1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

3    _____

4    QORVO, INC.,

5              Plaintiff,

6    vs.                                  NO. 1:21-cv-01417

7    AKOUSTIS TECHNOLOGIES, INC.,

8              Defendant.

9    _____

10

11

12              SCHEDULING CONFERENCE

13

14

15    BEFORE THE HONORABLE JON P. McCALLA, JUDGE

16

17              MONDAY

18         7TH OF FEBRUARY, 2022

19

20

21

22         LISA J. MAYO, RDR, CRR
           OFFICIAL REPORTER
23    FOURTH FLOOR FEDERAL BUILDING
      MEMPHIS, TENNESSEE 38103

24

25

**UNREDACTED TRANSCRIPT**

```
1              A P P E A R A N C E S

2

3

4

5         Appearing on behalf of the Plaintiff:

6              Robert M. Masters
               Jonathan R. DeFosse
7              Thomas J. Carr
               Trevor J. Quist
8              Sheppard Mullin
               2099 Pennsylvania Avenue, N.W.
9              Washington, DC 20006-6801
               Phone: (202) 747-1935
10

11
               Jeremy A. Tigan
12             Morris, Nichols, Arsht & Tunnell LLP
               1201 North Market Street, 16th Floor
13             Wilmington DE 19899-1347
               Phone: (302) 351-9106
14

15

16        Appearing on behalf of the Defendant:

17             David A. Jakopin
               Robert M. Fuhrer
18             Diane L. Sweeney
               Pillsbury Winthrop Shaw Pittman LLP
19             2550 Hanover Street
               Palo Alto, CA 94304-1115
20             Phone: (650) 233-4790

21
               Ronald P. Golden III
22             Bayard, P.A.
               600 N. King Street, Suite 400
23             Wilmington, DE 19899
               Phone: (302) 429-4238
24

25
```

**UNREDACTED  TRANSCRIPT**

1          MONDAY

2      February 7, 2022

3

4      ----------------------

5

6          **THE COURT:**  All right.  This is Judge McCalla,

7  and we need to make sure we know who is going to be the lead

8  spokesperson.  I also need to check the mic.  Ms. Mayo, can

9  you hear me okay?  I can move some mics around if we need to.

10  I think we're good.

11          So let's make sure who will be the lead attorney,

12  and we have determined that we do have general counsel for

13  the plaintiff on the line, and we now have your name, I

14  think.  Do you want to go -- there you go.

15          Do you want to tell us what your name is?

16          **MR. WARDER:**  Yeah, my name is Greg Warder and I'm

17  not the general counsel.  I'm the Chief IP counsel for Qorvo.

18          **THE COURT:**  Thank you.  We weren't sure.  Thanks

19  for clearing that up.

20          Who do we have as lead counsel for Qorvo?  If

21  nobody wants to be lead, I can pick somebody out, I suppose.

22          **MR. MASTERS:**  Sorry, Your Honor, Robert Masters

23  of Sheppard Mullin who will be here for the plaintiffs, and I

24  am joined by my partner Jonathan DeFosse.  We're both here in

25  our Washington DC offices.  I have two others with us which

**UNREDACTED TRANSCRIPT**

1    is Trevor Quist and Thomas Carr.

2              **THE COURT:**  Let me make a note there.  I know

3    Mr. Quist, let me find you on there.  I see you there.  Okay.

4              And who was our fourth one?

5              **MR. MASTERS:**  Thomas Carr.

6              **THE COURT:**  Okay.  I'm letting Mr. Carr become

7    visible if he wants to.  He's invisible right now.  There he

8    is.  He didn't have a tie on today.  That's why he was

9    invisible.  No problem.  Good to see you, Mr. Carr.

10             **MR. TIGAN:**  Your Honor, if I may, I'm Jeremy

11   Tigan.  I'm Delaware counsel for Qorvo.

12             **THE COURT:**  Yes.  Good to have you, too.

13   Absolutely, absolutely.

14             Now who do we have as lead counsel for the

15   defense?

16             **MR. JAKOPIN:**  Your Honor, that would be me, David

17   Jakopin with the Pillsbury firm, and I have with me my

18   colleagues Diane Sweeney and Bob Fuhrer.

19             **THE COURT:**  Okay.  Let me make sure we have

20   everybody.  We've got Ms. Sweeney, I see you there, yes,

21   exactly.  And our third person was -- let me see.  He can

22   unmute and identify themselves.

23             **MR. FUHRER:**  Good afternoon, Your Honor.  I'm

24   Robert Fuhrer with Pillsbury.

25             **THE COURT:**  Okay.  Got you.  Exactly.

                    **UNREDACTED TRANSCRIPT**

5

1          **MR. GOLDEN:**  And then also, Your Honor, Ron

2     Golden is our Delaware counsel who is joining us today as

3     well.

4          **THE COURT:**  All right.  Mr. Golden, how are you

5     today?

6          **MR. GOLDEN:**  Doing well, Your Honor.  Nice to

7     meet you.

8          **THE COURT:**  Good to see you.

9          All right.  This is a case involving two

10    patients, actually three in a way, that relate to BAW

11    acoustic wave resonators.  I take it these are small wafers,

12    I'm not sure.  Usually individuals, counsel, they send us

13    something just so we have a tangible item.  Now these aren't

14    very big tangible items, I'm confident, but let me check with

15    Mr. Masters.  And do you want to show me one of those things?

16         **MR. MASTERS:**  I don't have a physical filter to

17    show you, but they are extremely small because they sit on a

18    semi-conductor substrate.  And just by way of an example

19    within an iPhone, you have upwards of 30 to 50 of these

20    filters built in to the electronics.

21         **THE COURT:**  Absolutely, absolutely.  And I do

22    understand that.

23         Will you want to do -- normally plaintiff's

24    counsel and defense counsel also at our first conference have

25    an opportunity to give a succinct technical briefing if you

**UNREDACTED TRANSCRIPT**

1  like.  Now of course we've gone over the patents, but

2  sometimes that's helpful.  Sometimes it's not so helpful.

3  Sometimes it descends into a type of argument that's not very

4  useful but purely technical discussion.

5          Did you want to do that, Mr. Masters, or do you

6  want to call on Mr. DeFosse or someone else to do that for us

7  today?

8          **MR. MASTERS:**  Thank you, Your Honor.  I'm

9  prepared to do that, share a few slides with you to go

10  through the technology.  I just don't have a physical filter

11  sitting here with me.  That's all.

12          **THE COURT:**  I understand.  And I did understand

13  they were small.  I wasn't quite sure how small.

14          Do you want to describe that?

15          **MR. MASTERS:**  So when you think about some of the

16  filters for the 5G technology that's coming out in the

17  iPhones, the piezoelectric layer which is one layer we're

18  going to be talking about is on the order of 400 nanometers.

19  So that's extremely small and I would venture to say much

20  smaller than a strand of hair.

21          **THE COURT:**  Right.  Almost invisible in a sense.

22  Is that fair to say if we're looking at the width or depth of

23  it?  You couldn't really see it?

24          **MR. MASTERS:**  That's correct.

25          **THE COURT:**  Okay.  Well, let's go first to the

**UNREDACTED TRANSCRIPT**

1  defense and then see how we're going to proceed on discussion

2  of the technology just to make sure that we got that down.

3  And so is it Mr. Golden on the technology?  Do you want to --

4  were you also prepared to talk about that a little bit, maybe

5  show some slides, just go through that, make sure that

6  everybody, particularly the Court, is in the right place on

7  this technology?

8           **MR. JAKOPIN:**  Your Honor, this is David Jakopin.

9           **THE COURT:**  I'm sorry, Mr. Jakopin, exactly.

10          **MR. JAKOPIN:**  Yeah, we had in our schedule

11  suggested the technology tutorial at the time of the Markman

12  hearing.

13          **THE COURT:**  You did suggest that.  That's

14  correct.  That's not usually what we do.  That's not usually

15  what we do.

16          **MR. JAKOPIN:**  Was not aware of that and so sorry

17  about that.

18          **THE COURT:**  That's okay.  That's all right.

19          We will get -- you will have a chance today to

20  talk about it a little bit if you want to.  Obviously we've

21  looked at it and have some idea about it, but I think you can

22  always -- both sides can always add something that helps us

23  understand at the very beginning exactly what we're dealing

24  with, and we've got -- like I said, we've got a decent idea

25  about it having read through the materials, but one of you

**UNREDACTED TRANSCRIPT**

1    may want to just comment on what Mr. Masters says and then

2    you can have a more detailed presentation if you want to at a

3    later time, but Mr. Masters has a few slides and that will

4    help us get through it.

5                   This is not really an adversarial process.  This

6    is an educational process at the very beginning and we'll try

7    to do that in just a moment and we'll get to that.

8                   At this point, there are a couple of things.

9    There's some questions I will ask today.  I'm going to tell

10   you a little bit about what they are.  Also ask you about the

11   number of terms you think will need to be construed.  Usually

12   have some idea about that.  I know the lawyers have been

13   giving that thought.  You don't want to pin yourself down,

14   probably say 22 or something like that.  Hopefully it's more

15   like 10, 12 or 8, but we'll ask you to think about that, give

16   us a little idea there.

17                  And we also are aware that of course there's

18   briefing that's already occurred in connection with the

19   motions to dismiss.  We're aware of the motions to dismiss

20   and the fact that -- I've also got your proportionality

21   materials.

22                  In connection with the motions to dismiss, they

23   deal with unfair and deceptive trade practices.  They also

24   deal with false marking, false advertising, willfulness and

25   induce infringement; and just a quick look at those would

**UNREDACTED TRANSCRIPT**

1   suggest that there's probably -- clearly we're going to have

2   a case that's going to go forward and also there's certainly

3   no motion on patent infringement.  So we don't have any

4   question about the case going forward and we've taken a

5   beginning look at some of those materials.

6            We also understand that there's been a request

7   for briefing on the motions themselves and -- not briefing --

8   for argument, and we may want a little bit of argument on

9   that.  So we'll try to schedule an opportunity for that.  If

10  it turns out that we should go ahead and resolve the matters

11  without argument, we'll enter an order before the scheduled

12  hearing in that regard.

13           We also have the proposed timelines, and we've

14  also put that in the format that fits more or less our

15  standard scheduling order.  You can also put them in

16  connection with your filings, and we have, for example,

17  initial infringement contentions which would be February 18th

18  and so forth.  We have down there a claim construction

19  hearing on November the 10th, and that -- we'll make sure

20  that works with our schedule, and Mr. Sample will check that

21  out.  Looks like that would be -- not be a problem, I think,

22  at this point in time.  Of course we've got all the other

23  dates that have been proposed.

24           In connection with proportionality, I want to

25  make sure I understand a couple of things at the very

**UNREDACTED TRANSCRIPT**

1    beginning and then we're going to come back, talk about

2    technology a little bit, talk about the schedule and see what

3    we can do to make this as efficient and appropriate as

4    possible.

5              I do understand that Qorvo is a large entity, I

6    think in this area, I'm not sure because I don't know what

7    large is in terms of all of this technology, but about a four

8    billion I think in revenues.  That's not a secret, I'm sure.

9    I do want to check with counsel there.

10             This does not appear to be -- it's not a public

11   company; is that right?

12             **MR. MASTERS:**  Your Honor --

13             **THE COURT:**  Whoever wants to answer that.

14             **MR. MASTERS:**  Yes.  This is Mr. Masters, Robert

15   Masters.

16             **THE COURT:**  One of the things we are going to

17   ask -- the court reporter asks me to do this -- is at the

18   beginning at least state your name again so it's very simple

19   for Ms. Mayo to get that down.  She can see on the screen,

20   but it's a confidence level just until we know everybody.

21             So, Mr. Masters, you were saying?

22             **MR. MASTERS:**  Yes.  I was saying Qorvo is a

23   publicly-traded company.

24             **THE COURT:**  Okay.  And their total sales are in

25   the 4 to 4.2 billion range; is that right?

**UNREDACTED TRANSCRIPT**

1          **MR. MASTERS:**  That is the overall revenue for the
2     company.  It's a little bit over $4 billion.  That includes
3     more than simply the BAW filters that are the subject of this
4     case, but yes, that number is correct.
5          **THE COURT:**  Sure.  And their market cap is about
6     what?  I'm sure you know.
7          **MR. MASTERS:**  Market cap I don't know that.
8          **THE COURT:**  You have an expert on there that
9     knows that exactly probably, but do you want to turn to
10    somebody else and let them tell me?
11         **MR. MASTERS:**  I would turn to Greg if he knows.
12         **MR. WARDER:**  Your Honor, I believe our market cap
13    is around $15 billion.
14         **THE COURT:**  Did I write that down as 15 billion?
15         **MR. WARDER:**  Yes, Your Honor.  That's correct.
16         **THE COURT:**  Okay.  All right.  Okay.
17         And is the company -- is there a parent company
18    also?  I know it might be, probably not.
19         MR. WARDER:  There is a parent company called
20    Qorvo Inc. International that is the -- and the only
21    subsidiary that it has directly below it is the plaintiff
22    corporation.
23         **THE COURT:**  Sure.  I understand.
24         And how big a market is this particular -- these
25    particular products, the resonators, the BAW resonators,

**UNREDACTED TRANSCRIPT**

1 | however you want to call them.

2 |              MR. WARDER:  Yes, Your Honor.  For our

3 | corporation this is a large part of our business.  This would

4 | be in the hundreds of millions of dollars in annual revenue.

5 |              **THE COURT:**  Okay.  Very helpful for that amount.

6 |              And it would be -- as you said, it's a

7 | significant, important part of the company's total revenue?

8 |              MR. WARDER:  Yes.  That is correct.

9 |              **THE COURT:**  I'm going to ask a question that

10 | probably everybody all knows except me, and that is, are

11 | these manufactured in more than one location?

12 |              **MR. WARDER:**  So Your Honor, my understanding,

13 | majority of these are manufactured at our facility in Texas.

14 |              **THE COURT:**  Where in Texas?

15 |              **MR. WARDER:**  In our fabrication facility in

16 | Plano, Texas.

17 |              **THE COURT:**  Plano, right outside of Dallas,

18 | right?

19 |              **MR. WARDER:**  Yes, sir.

20 |              **THE COURT:**  Absolutely.  That just gives me some

21 | background.  I'm sure everybody else knows all this but it is

22 | helpful to know that.

23 |              Most of your employees then are in either North

24 | Carolina or Texas.  Is that right or wrong?

25 |              **MR. WARDER:**  I would say that most of our

**UNREDACTED TRANSCRIPT**

1   employees are within the United States.  The largest

2   locations that we have are in North Carolina where our

3   headquarters are, in Texas where we have a large part of our

4   manufacturing facility, and also in Oregon, and then we do

5   have large overseas facilities in other countries around the

6   world including China where we have a large number of

7   employees working on testing and verification of our

8   products.

9             **THE COURT:**  Where are they in China?

10            **MR. WARDER:**  Actually I can't say the -- the

11   exact name.  I can't remember the exact name right now, but

12   it's somewhere close to Chen Zhen, China, which is just

13   outside of Hong Kong.

14            **THE COURT:**  Sure.  Exactly.

15            Do we anticipate that there will be any witnesses

16   from China?

17            **MR. WARDER:**  No.

18            **THE COURT:**  Okay.  And do you anticipate that all

19   of your witnesses will in all likelihood be from either North

20   Carolina or Texas?

21            **MR. WARDER:**  That is my understanding, yes.

22            **THE COURT:**  Okay.  That's very helpful.

23            Let me see one more thing here.  Let me make sure

24   I understand, is the inventor on the '755 patent located in

25   North Carolina?

**UNREDACTED TRANSCRIPT**

14

```
 1          MR. WARDER:  One of those -- one of those
 2   inventors ^  Gairnot, I think he's the first named inventor
 3   on one of those patents is located in Florida actually, and
 4   then I believe there are -- on one patent, two of those
 5   inventors are not currently with the company.
 6          THE COURT:  Okay.  All right.
 7          But we don't have any problem in terms of access
 8   to the inventors in this case; is that right?
 9          MR. MASTERS:  Your Honor, if I may just on the
10   '755, Gernot Fattinger is in Florida and the other inventor,
11   Mr. Tajic is in Oregon.
12          THE COURT:  He is now in Oregon?
13          MR. MASTERS:  Oregon, yes.  And the '018 patent
14   has two inventors, both of which are in Europe.
15          THE COURT:  And they are where in Europe?  Which
16   country?
17          MR. MASTERS:  I believe one is in Great Britain
18   and another one is in Denmark, but I'd have to confirm that.
19          THE COURT:  Okay.  That is perfectly fine.  And I
20   take it that your position, Mr. Masters, on this has always
21   been that you will make them available for depositions in the
22   United States.  Is that how you approach that?  What's your
23   thought on it?
24          MR. MASTERS:  Well, certainly for the two here in
25   the US they'll make them available.  The other two are not
```

UNREDACTED TRANSCRIPT

1  employees of us.  They were third parties of the -- the two

2  inventors of the '018 patent.

3          THE COURT:  The two inventors of the '018 you'll

4  make available in the United States.  I'm sure you've talked

5  about that with counsel and that's certainly fine with the

6  Court.  That's a good idea.

7          MR. MASTERS:  We haven't discussed that with the

8  other side.  What I'm saying is they're not employees of

9  Qorvo.  They were third parties.

10          THE COURT:  Oh, they are, okay.  I'm sorry, go

11  ahead.

12          MR. MASTERS:  We would have to discuss this with

13  the witnesses themselves and see the extent to which they

14  would be willing to travel to the US for depositions.

15          THE COURT:  And we've been in every case

16  encouraging everybody to do as much as they can

17  electronically as opposed to spending money unnecessarily,

18  and so we would encourage everybody just to take initial --

19  if they need to take an initial deposition do that

20  electronically.  We can talk about that if we need to work

21  things out, but we want to encourage everybody to be very

22  efficient in a case like this.  That's because also I'm going

23  to go to the defense in just a moment and it looks to me like

24  that they are of course a lot smaller and so we're going to

25  talk about that.

**UNREDACTED TRANSCRIPT**

1          All right.  I am going to ask the defense at this

2    time do you make any of these particular products BAW

3    Akoustis wave resonators?  Do you make any of them using

4    single crystal only?

5          **MR. JAKOPIN:**  Certain products have been made

6    using single crystal only.  Right now those that are publicly

7    sold are using the piezo and not the single crystal.

8          **THE COURT:**  Okay.  So all those that are publicly

9    sold do not use the single crystal?

10          One reason we have this conversation is just to

11    eliminate things that are pretty easy to eliminate on the

12    front end.

13          **MR. JAKOPIN:**  Understood.

14          **THE COURT:**  Absolutely.  And I just to remind

15    everybody under Rule 16 and under Rule 26 one of the purposes

16    of everything is to try to cut down issues and to obtain

17    acknowledgments as to specific facts that are not dispute.

18    That's a fact that apparently we can find to not be in

19    dispute in the case.

20          Now let's go to -- let's go to defense a little

21    bit more, and that is I want to make sure on your

22    proportionality information that I understand it.  You now

23    have about 6. -- about 6.6 million in gross sales, that would

24    be total sales for the entire company, and is that -- am I

25    correct in that understanding?

**UNREDACTED TRANSCRIPT**

1          **MR. JAKOPIN:**  That is, but that also includes

2     certain work that relates to NRE that is obtained, and so

3     that's actually not only including the sale of products.  The

4     sale of products for last year would have been lower than

5     that number.

6          **THE COURT:**  Okay.  And do you think that the sale

7     of products would have been closer to five -- 4.5 million?

8          **MR. JAKOPIN:**  I believe it's somewhere in the

9     range of 3 to 5 million, Your Honor.

10          **THE COURT:**  Okay.  And the reason -- it just

11     helps us proportionality wise.  I'm not trying to say

12     anything negative.  You're a relatively small entity; is that

13     correct?

14          **MR. JAKOPIN:**  Yes, that's absolutely true.

15          **THE COURT:**  Okay.  Do you have an idea as to what

16     portion of the market you might have in this area?  I'm going

17     to come back to the plaintiff and ask the same thing.  Are

18     you maybe 2% of the market?

19          **MR. JAKOPIN:**  I would say that it's less than 1%,

20     Your Honor.

21          **THE COURT:**  Okay.  And I'm going to go to

22     Mr. Masters, do you have anything to indicate that it's more

23     than 1%?  I mean, we're not trying to -- we're just trying to

24     get an idea of what we're talking about here.

25          **MR. MASTERS:**  I do not, Your Honor.

**UNREDACTED TRANSCRIPT**

```
 1              THE COURT:  Okay.  It sounds like, though, I mean
 2     that helps us in the proportional way to understand what
 3     we're dealing with.
 4              Now, your employees are all -- are they -- where
 5     are they all -- Mr. Jakopin, where are they located?  Are
 6     they in North Carolina?
 7              MR. JAKOPIN:  They're in two different locations.
 8     There's a lab that the company owns in New York and then our
 9     headquarters are in North Carolina.  And so the employees I
10     believe are split primarily between those two locations, but
11     there could be a few others as well.
12              THE COURT:  Okay.  And where is the lab -- I
13     think you said lab in New York.
14              MR. JAKOPIN:  You know, I don't recall the name
15     of the city off the top of my head right now.
16              THE COURT:  It's certainly not in New York City?
17              MR. JAKOPIN:  No, it's not in New York City.
18              THE COURT:  Right.  Upstate New York somewhere?
19              MR. JAKOPIN:  I don't know.  Canondaigua.
20              THE COURT:  I'm sorry?
21              MR. JAKOPIN:  A city called Canondaigua.
22              THE COURT:  Canondaigua.  Is that up near -- is
23     it Finger Lakes up there?
24              MR. JAKOPIN:  Could be.
25              THE COURT:  Okay.  I'm going to see if
```

**UNREDACTED TRANSCRIPT**

1   Ms. Sweeney knows where they're located.  She's going to back

2   you up here.

3            **MR. JAKOPIN:**  She is.

4            **MS. SWEENEY:**  It is.  It's up by the Finger

5   Lakes.  Apparently there is Lake Canondaigua.  So it is in

6   the northern part of the state, Your Honor.

7            **THE COURT:**  One of the more famous lakes up

8   there, I'm sure.

9            Okay.  How many are in the New York facility?  Is

10  that -- you said about half or less?

11           **MR. JAKOPIN:**  I believe it's less than half, but

12  I can get back to you with a more specific number if that

13  would be helpful.

14           **THE COURT:**  The main thing is so we all

15  understand where people are located, what your issues are

16  going to be in that regard if any and make sure the parties

17  are in general agreement about how you're going to handle

18  depositions and where you'll be taking them and so forth.

19           Now -- okay.

20           **MR. JAKOPIN:**  Your Honor, one point you had

21  raised the question about single crystal before.

22           **THE COURT:**  Yes.

23           **MR. JAKOPIN:**  While there aren't any that are

24  currently being sold, they have been sold in the past in

25  terms of single crystal products and they are also I'll say

**UNREDACTED TRANSCRIPT**

1   in a state where they can be available to be sold as well in

2   the right circumstances.

3            And so to the extent that I gave you the

4   impression that, yes, right now, that only currently being

5   sold are the piezo products which is accurate, I did want to

6   clarify to give a little bit more color as to the single

7   crystal aspect of what the company has done.

8            **THE COURT:**  I'm going to ask you something that

9   seems to be important perhaps in the case, and that is, what

10  is the advantage of single crystal and --

11           **MR. JAKOPIN:**  Generally speaking, if there are

12  less impurities, there ends up being less heat that is

13  generated, and so as a result, you can end up operating it

14  more efficiently.

15           **THE COURT:**  Okay.  Makes sense to me.

16           Of course, these are pretty -- very small amounts

17  of heat; is that a fair --

18           **MR. JAKOPIN:**  That's fair.

19           **THE COURT:**  Okay.  And, Mr. Masters, does the

20  plaintiff manufacture any single crystal items?

21           **MR. MASTERS:**  Judge, when we're talking about BAW

22  filters and single crystal issue, here is the piezoelectric

23  layer.

24           **THE COURT:**  I understand.

25           **MR. MASTERS:**  And the answer to that is no.

**UNREDACTED TRANSCRIPT**

```
1    Qorvo does not manufacture single crystal piezoelectric BAW
2    filters layers.
3              THE COURT:  I'm going to ask so I'll understand.
4    I'm not quite sure how you -- first of all, do you agree
5    generally with the statement about single crystal that is --
6    that have less impurities and generate less heat?
7              MR. MASTERS:  Well, I'm not sure I'm going to
8    agree with everything because for this reason:  Akoustis has
9    touted this single crystal piezoelectric product since their
10   inception.
11             THE COURT:  I understand.  I understand that.
12             MR. MASTERS:  There is no benefit in using a
13   single crystal piezoelectric layer with BAW filters for two
14   reasons.  One is it is enormously expensive to try and make a
15   single crystal piezoelectric layer; and two is you do not get
16   the performance benefit once you do get that single crystal
17   piezoelectric layer in your product, and so it's not
18   something that Qorvo does -- in fact nobody does it -- and of
19   course we contend Akoustis does not even do it.
20             THE COURT:  I understand the tension here between
21   the parties on these issues.
22             Okay.  Now, how much -- and, Mr. Masters, I need
23   to understand how much each one of these -- and I know
24   they're made in bulk as I understand it.  They're also called
25   bulk acoustic wave resonator.  What's the range in price for
```

**UNREDACTED TRANSCRIPT**

1    these particular components?  Is this something that cost --

2    you know, I have no idea -- that cost $0.37 or it costs 1.12.

3    I have no idea.

4              MR. MASTERS:  It's in that range, Your Honor.

5    Without being precise, the fact is that there are so many

6    used that the estimate is that there's a hundred billion

7    filters per year being sold in the marketplace and, you know,

8    some estimates are 60 billion and with the advent, you know,

9    of 5G and Wi-Fi 6E, internet of things, you're just finding

10   these BAW filters that have a unique ability to really work

11   in this frequency range.  And so they -- their use and

12   necessity really has taken off.  And so when you're talking

13   about a hundred billion filters being sold, the money adds

14   up, and it's alarming.

15             THE COURT:  No doubt about it.  And if you --

16   does the price vary with particular filter sold?

17             MR. MASTERS:  With various what filter?

18             THE COURT:  Does it vary?  And I know we've got

19   somebody on the line who knows the exact answer to that, but

20   are some at $0.37 or some at $0.12 and are some at $0.92?  I

21   don't know.

22             MR. MASTERS:  So the answer would likely be yes

23   because as you get to the higher frequencies, it takes more

24   precision and the manufacturing of them.  You have to pay

25   more attention to the yield of the manufacturing.  When

**UNREDACTED TRANSCRIPT**

1    they're for the lower frequencies they're easier to

2    manufacture so the cost is going to vary as well.

3              **THE COURT:**  Okay.  Now let's go back to defense

4    counsel.  What's your concept on pricing?  I think it's just

5    helping me understand.  I know it can't cost a huge amount or

6    we couldn't afford the phone.

7              **MR. JAKOPIN:**  Well, Your Honor, as you correctly

8    observed, you know, Akoustis is a small essentially -- you

9    know, they have gone public, but they're a company that is

10   not yet, I'll say revenue positive in terms of, you know,

11   actually having made moneys to pay off.  And so they're at

12   the moment in the infancy of having product that is being

13   sold.  And so there's -- they've had their first few

14   customers and those products have been sold.

15             I am informed that they're competitive in terms

16   of price with those of other companies including Qorvo.  In

17   terms of what the specifics are, I agree with Robert that

18   they vary in cost, and so that's the level of information

19   that I have at my disposal today.

20             **THE COURT:**  Okay.  And I take it that -- does

21   anybody think that they cost more than that very -- I think

22   very high number which I gave you earlier which was over a

23   dollar?  Does everybody think typically they're going to cost

24   less?

25             **MR. JAKOPIN:**  I think that will depend.  So

**UNREDACTED TRANSCRIPT**

24

1   there's going to be potentially various different

2   applications for BAW filters, and so there could be many,

3   many, many of them that are inside of a cell phone.  There

4   could be others that are inside of a watch, but at the same

5   time there could be BAW filters that are inside of a base

6   station.  Those filters that are inside of a base station

7   have many significantly different requirements and so as a

8   result they would end up being more expensive.

9          **THE COURT:**  Okay.  That's all helpful.  Now let

10  me go back.

11         Who is the largest shareholder in the defendant

12  company?  Just to make sure I can -- I'm not going to guess.

13  I'm just going to ask you to tell me if you know.

14         **MR. JAKOPIN:**  I do not know, Your Honor.

15         **THE COURT:**  Is it one of the individuals who

16  founded the company?

17         **MR. JAKOPIN:**  If I had to guess, I would suspect

18  so, but I just don't know for sure.

19         **THE COURT:**  Okay.  All right.  I think we're -- I

20  think we're in pretty good shape.

21         Now we're going to go to that fairly brief

22  technology.  Mr. Masters is ready there and he's got his

23  slides ready and he's going to tell me about this.  I see a

24  couple people smiling there.  You may want to call on them.

25  They may want to do this instead.

**UNREDACTED TRANSCRIPT**

1          Mr. Masters, are you all set?

2          **MR. MASTERS:**  I am.  May I share the screen?

3          **THE COURT:**  You may.  And also I've got two big

4    screens here so that's great.

5          **MR. MASTERS:**  Very good.

6          So do you see my screen here, Your Honor?

7          **THE COURT:**  Yes.  Yes.  You're fine.  We've got

8    you very clearly.

9          **MR. MASTERS:**  Perfect.  So as we've been

10   discussing, the case relates to bulk acoustive wave, that's

11   the BAW, resonator filters.  Resonator is the key term here

12   and you'll see why shortly.

13         As we've also discussed, they're used in many,

14   many devices that we all have, mobile devices such as smart

15   phones, tablets, GPS systems, radars, wireless structures,

16   such as Wi-Fi, like a base station, repeaters, antenna

17   systems, tower mounted amplifiers.  They're used within your

18   office where you have a Wi-Fi network.  That's the

19   infrastructure division if you will where these RF filters

20   are used and the base station with infrastructure.

21         So they're really used throughout, and with the

22   advent of 5G and Wi-Fi 6 and internet of things, Baw filters

23   are especially suited for this technology because they are

24   able to handle the frequency ranges that apply to 5G and

25   Wi-Fi 6.  I earlier told you there could be 30-60 RF filters

**UNREDACTED TRANSCRIPT**

1    with an iPhone and sales are estimated 60 billion to a 100

2    billion about being sold this year.

3              So filters generally remove unwanted frequency

4    components of a signal and allow the desired components to

5    pass.  So if I can direct you down to the lower left, there's

6    four charts here.  My cursor is there.  I think you can see

7    that.  This is a low pass filter.  So in a low pass filter,

8    the lower frequencies within the signal are allowed to pass

9    through and to go on for further processing.  The higher

10   frequencies are rejected.

11             On the other hand, you have a high pass filter.

12   High pass filter allows the higher frequency of the signal to

13   pass through for further processing and it rejects the lower

14   frequencies of the signal.  Now what constitutes a lower

15   frequency or high frequency where you have that cutoff is

16   really dependent on the application and it goes into how you

17   fine tune these devices.

18             The bottom two graphs here is what -- one is

19   called a band pass filter.  So in a band pass filter, it is

20   rejecting the lower frequencies that fall on the low end and

21   it rejects the high frequency signal or frequencies of the

22   signal, but it allows a band of frequencies to pass through,

23   hence in the name band pass.  And then band reject means it's

24   rejecting a band of frequencies and allowing all other

25   frequencies to pass.

**UNREDACTED TRANSCRIPT**

1          So this highly simplified sketch here on the

2     right, bottom right of my slide would show the signal coming

3     in.  It's of a band pass filter.  So if 3.5 GHz which is the

4     frequency, which is our targeted frequency if you will, that

5     signal component will pass through the filter and will

6     continue on for further processing.  If you have any

7     frequencies of this signal that are greater than 4 gigahertz,

8     they're blocked, and if you have any signals with frequency

9     component less than two gigahertz, they would be blocked.  So

10    the band here is two gigahertz to just to four gigahertz.  So

11    any frequency between two and four gigahertz of a signal will

12    be allowed to pass and everything else is going to be

13    rejected.  So that's the band pass signal filter.

14          So now a little more to BAW filters.  So

15    typically these are arranged between an antenna and the

16    microprocessor or the processing device that is going to

17    process the signals and the BAW filter here again is to do

18    what I've just described.  It's either going to allow a band

19    of frequencies that you want to pass through and it will

20    reject all others and vice versa.  So it works both on the

21    receiving of signals and on the transmission of signals so

22    that you have the exact range of signals being passed

23    through.  Okay.  This is how you control it.

24          The structure -- and these patents really deal

25    with the structures of the BAW filter itself.  So it consists

1   of a piezoelectric layer which is shaded here blue,

2   sandwiched between electrodes and the green is a top

3   electrode and the red I guess is a bottom electrode and these

4   three, the electrodes in the piezoelectric layer, are formed

5   on the substrate.  This one has a cavity which I can explain

6   later.

7              So let's talk a little bit about the

8   piezoelectric layer.  When you squeeze this piezoelectric

9   material or stretch it, it produces an electric charge.

10  Conversely, if you apply an electric field to it, these

11  electrodes apply an electric field to the piezoelectric

12  layer, it makes it contract or expand or squeeze or stretch,

13  and it generates when it does that an acoustic wave or

14  mechanical energy.  So it's a conversion between the

15  electrical signal coming through the electrodes is converted

16  by piezoelectric layer to a mechanical energy or an acoustic

17  layer.

18             And the amount of that -- that is the manner in

19  which the filters work because the manner in which you design

20  this piezoelectric layer tells you how much of that band

21  you're going to allow to pass and which part of the frequency

22  of the signal to reject.  And there is a relationship between

23  the frequencies of the signal coming in and the thickness of

24  this piezoelectric layer, and that is where all the

25  engineering is done so you know how much or how to create the

1    band and what frequency this filter will work at.

2              So again, back to BAW filters.  You can see this
3    is a band pass filter and it's allowing just this frequency
4    range which is light green here to pass.  This is an Akoustis
5    product by the way for Wi-Fi 6 application, and it rejects
6    the frequencies greater than here is 5.9 gigahertz.  This
7    vertical line here going to the top of the pass band and then
8    again the vertical line going down, there's a lot of
9    engineering that goes in there and how you -- this is the
10   cutoff frequency and it's how do you design this pass band so
11   that the cutoff -- I mean, you want this to be as vertical as
12   possible both sides so you have precise control over your
13   signal, but you also have to worry about thermal issues and
14   we talked a little bit about heat being generated.

15             Yes, the heat is very small compared to what, you
16   know, we would think of as heat, but it's a matter of
17   relativity because when you look at these small devices and
18   they're all generating heat, that adds up and you know if you
19   leave your iPhone or smart phone in the sun, it sets off
20   sometimes because the heat is too much.  I mean, heat is a
21   real thing.

22             What heat does to these filters is it can move
23   the cutoff lines slightly left or right by a few percentages
24   and so this is part of the engineering of these BAW filters
25   that's all taken into account these tolerances.

1           A little bit more about the piezoelectric layer.

2    Again, it's selected to provide a balance of performance,

3    reliability and manufacturability.  You got to be able to

4    manufacture these in high quantities because if you're making

5    a hundred billion in the marketplace, a lot are being made.

6    A typical material is aluminum nitride, A-I-N, could be a

7    zinc oxide or quartz.  Some don't.  The aluminium nitride is

8    the scandium.  I think I'm pronouncing that correctly.

9           And typically this structure of the piezoelectric

10   layer is what we call polycrystalline, and polycrystalline

11   means it has many crystalline parts that are randomly

12   oriented with respect to each other.  On the other hand, the

13   single crystal means it has a composition that has a single

14   crystal made up of the atoms or other materials that are

15   arranged in such a way that the entire object is described as

16   a single grain or continuous crystal.

17          And to figure this out, you have to use

18   transmission electron microscopes as one way to get down to

19   blow this device up and magnify thousand times or more to

20   figure out the crystalline structure of the piezoelectric

21   layer, but as I told you, Qorvo uses polycrystalline.  There

22   are no -- they don't use single crystal BAW filters.

23          The substrate now, typically made of a ceramic,

24   sapphire, glass or silicon which is most common.  There are a

25   couple different kinds of BAW filters.  So this is an FBAR

UNREDACTED TRANSCRIPT

1    type.  FBAR stands for thin film bulk acoustic resonator, and

2    what that means is this has this cavity here.  This gray is a

3    substrate and they form a cavity in the substrate and the

4    purpose of the cavity is to make sure none of the mechanical

5    energy from the piezoelectric layer goes into this substrate.

6    It essentially dies and prevents that mechanical energy from

7    going into your substrate.  It keeps it up here into the

8    active region of the device.

9           There's also something called an SMR type BAW

10   filter, and instead of a cavity there is a -- what's called a

11   brag reflector and we don't show it because it's not that

12   important here to the issues, but just to round out the

13   discussion, the brag reflector sits between the bottom

14   electrode and the substrate and it has the same purpose of

15   preventing any of the mechanical energy of the piezoelectric

16   layer going to the substrate.

17          So briefly, the Qorvo's '018 patent filed in

18   December of 2003, this seeks to increase the filter band

19   width which is the frequencies that are allowed to pass, and

20   it does this by providing a particular structure of the

21   device where you have a top electrode that is thinner than

22   the bottom electrode.

23          And here, left side is claim one, sorry about

24   that.  And the right is figure one from the patent.  So very

25   briefly, this is talking about a resonator, a BAW acoustic

**UNREDACTED TRANSCRIPT**

1   wave resonator.  The blue again is the piezoelectric layer.

2   It has an electrode, top electrode, which is in green and

3   then red or dark red is the bottom electrode.  The claim

4   requires that the top electrode be thinner than the bottom

5   electrode, and the purpose of that is to get better

6   performance out of the filter and to improve its band width

7   capabilities.

8           Akoustis filters -- again, this is the claim.

9   This is a -- just a sketch of the device, and we found that

10  their bottom electrode is in fact thicker than their top

11  electrode.  Of course they have a piezoelectric layer in

12  between the two, and this is the Akoustis A10235 filter, and

13  this is a graph of its pass band characteristics here from

14  the data sheet that they provided on their web-site.

15          Qorvo's '755 patent, now that was filed more

16  recently.  This was from October 2015.  This patent relates

17  more to confining the mechanical energy within the active

18  region of the BAW filter.  And another way maybe of saying it

19  is to prevent energy that's generated by the piezoelectric

20  layer leaking into the outer structure of the filter.  And on

21  this chart claim, again is on the left-hand side, claim one,

22  and Figure 2B from the patent is on the right-hand side.

23  Very briefly the piezoelectric layer again is in blue,

24  situated between the top electrode in green and the bottom

25  electrode in red.  And on top of the top electrode in orange

1   is a passivation layer and that's something that's required

2   by the claim.

3          Now the extent of the passivation layer which is

4   represented by this vertical dotted line to this vertical

5   dotted line represents the active region of the BAW filter,

6   and that means that's where the processing or the filtering

7   of the signal is taking place within this active region, and

8   the goal here is to prevent any of this mechanical energy

9   that's being generated by the piezoelectric layer leak out

10  into the outer regions because if you have energy leaking

11  out, your filter is much less efficient and it's just not

12  going to work as well.

13         And so this patent, the structure calls for

14  additional materials to be added in both the outer regions as

15  shown here in this drawing on the left side and the right

16  side which is denoted in like a pinkish color, I guess, and

17  there is a relationship in the amount of the pink color you

18  need in order to have the intended effect of keeping the

19  energy within the active region.  And the relationship again

20  is defined by the claim that the thickness of pink layer is

21  greater than the thickness of the orange passivation layer,

22  and it's -- the claim talks about it in terms of I guess pro

23  rata.  And it has to be greater than one, means the pink

24  layer has to be greater than this orange passivation layer.

25         Again, when we looked at the Akoustis product, it

**UNREDACTED TRANSCRIPT**

1    has a piezoelectric layer with a top electrode and a bottom

2    electrode, passivation layer, and again we found the pink

3    additional layers in the outer regions outside of the active

4    region where N was 1.57N.  So it was much thicker than the

5    passivation layer, and the purpose for that is to maintain

6    and keep the energy within the active region.

7              Those are the two patents.  Then finally, the

8    Akoustis '786 patent, which you talked about briefly, goes to

9    the false patent marking claim, possibly the false

10   advertising claim as well was filed in 2017.  This patent

11   says it's directed to a BAW filter with a single crystal

12   piezoelectric layer.  Again, if I go back, that's this blue

13   layer they're saying is the single crystal, and they assert

14   it's improved manufacturability, performance is provided by

15   the single crystal, and the purpose of these two slides is

16   just to present what's in this patent which is that it's

17   entirely directed to a single crystal acoustic resonator BAW

18   device.  And, you know, here are just a sampling of the

19   patent disclosure that talks about the single crystal

20   piezoelectric layer, talks about the substrate with an

21   overlying single crystal piezoelectric layer, and the point

22   is that every reference to piezoelectric layer in this patent

23   is talking about a single crystal piezoelectric layer.  It

24   doesn't talk about a polycrystalline layer or anything of

25   that sort.

**UNREDACTED TRANSCRIPT**

1            I think that concludes my brief presentation.

2            **THE COURT:**  Of course we have a copy of the '786

3   patent that does have a lot of references to a single

4   crystal, but in the claims, of course, it's -- I think it's

5   only mentioned in two of the claims, I believe, claims two

6   and nine, I believe.  So I want to make sure everybody

7   understands that maybe there's some -- going to be a dispute

8   maybe about some of this.

9            Okay.  Well, let's go back to --

10           **MR. MASTERS:**  If I can follow up to your

11  observation there about the Claim 2.

12           **THE COURT:**  Sure.

13           **MR. MASTERS:**  The Claim 2 is talking about this

14  substrate down here, not the piezoelectric layer, and the

15  substrate may be in fact a single crystal.  That's not

16  uncommon in semiconductor devices, but it's the piezoelectric

17  layer and whether that is a single crystal or not.

18           **THE COURT:**  Right.  And I think the point --

19  maybe I wasn't very clear about that.  I'm not -- I just want

20  to make sure we're all thinking the same way if we can, and

21  that was that they really didn't talk about the single

22  crystal in the same -- the single crystal acoustic resonator

23  in the same way that you were talking about some of the

24  things in connection with the first two patents, I think; is

25  that right?  Single crystal is not --

**UNREDACTED TRANSCRIPT**

1              I'm going to go defense counsel.  I'm going to go

2  to Mr. Jakopin and what about this single crystal?  '786.

3              **MR. JAKOPIN:**  So, Your Honor, if I may I can put

4  up Claim 1 from the '786 patent on my screen if I can get the

5  ability to do that.

6              **THE COURT:**  Sure, sure.  Right.

7              And there may not be much disagreement on this

8  actual point so I want to make sure.

9              **MR. JAKOPIN:**  So Claim 1, which is shared on the

10  screen --

11              **THE COURT:**  Right.

12              **MR. JAKOPIN:** -- recites a piezoelectric layer

13  substrate having a substrate surface region, does not say

14  single crystal, and so the point that we had made in our

15  briefing when Akoustis intended to use single crystal in the

16  claims it did and I agree with Mr. Masters that in Claim 2,

17  that is a different arena where it nonetheless uses the

18  phrase single crystal which was intended.  We just do not

19  agree that there aren't teachings in the specification for a

20  piezoelectric substrate that can be something other than a

21  single crystal the way they are construing it, but on the

22  face of the claim itself, there's no requirement that single

23  crystal piezoelectric substrate.

24              **THE COURT:**  Right.  I think that may be something

25  that Mr. Masters doesn't disagree with you about.

**UNREDACTED TRANSCRIPT**

1          **MR. JAKOPIN:**  Perhaps.

2          **THE COURT:**  Well, I want to check with him.

3          **MR. JAKOPIN:**  Okay.

4          **MR. MASTERS:**  I'll admit the words single crystal

5    are not used in Claim 1 next to piezoelectric.  That's true,

6    but our contention, Your Honor, is that the piezoelectric

7    described, disclosed and claimed in this patent is only a

8    single crystal.  That is the teachings of the patent.

9          Claim 2 talks about the substrate which is a

10   different arena as counsel said and I agree, and there that

11   can be -- it's very common in semiconductor art to have a

12   single crystal substrate or another kind that is a

13   polycrystalline substrate that's made of something different,

14   and so that's why Claim 2 is specified, but piezoelectric

15   substrate it's our contention that means and can only mean

16   single crystal consistent with the disclosure of the '786

17   patent.

18         **THE COURT:**  Okay.  And I think that that's helped

19   focus things there.  I think it's useful.  I appreciate both

20   of you looking through that and I think we're not going to be

21   confused on that point so that's all useful.

22         Let's go back and ask a few questions and then

23   we're going to set the schedule here, and that is --

24         **MR. JAKOPIN:**  Your Honor, if I may say I don't

25   have any slides but if I can say a few things about --

**UNREDACTED TRANSCRIPT**

1          **THE COURT:**  Please do.

2          **MR. JAKOPIN:**  -- the technology in general.

3                I will say that the characterizations that

4    Mr. Masters put up on the general viewpoint of how these

5    devices can be made, they're accurate.  I'll say when

6    potentially looking through the lens of a Qorvo product, my

7    understanding is that there are differences in the manner in

8    which the Akoustis products are also made that end up making

9    a difference, and so, you know, when we get to claim

10   construction and the specific words, that ends up making a

11   significant difference in terms of whether it's only the

12   piezo layer or if it's other aspects that end up making the

13   Akoustis devices working as well as they do as well as

14   whether there end up being infringement of the claims.

15               So as a general overview that he has provided but

16   there are other considerations which that was the reason I

17   think we wanted the technical tutorial after we knew what

18   claims were being asserted.  I'll note that for instance the

19   complaint asserted Claim 12 of the -- I believe it was '755

20   patent but he put up Claim 1 on the claim chart here today.

21   So I'm not sure what claim limitations we're in fact looking

22   to have to construe, and so that was why we had made the

23   request to do this after we received what their infringement

24   contentions really were.

25               **THE COURT:**  I understand.  And that's fine, and I

**UNREDACTED TRANSCRIPT**

1  think as most of the general information there's not really a

2  dispute about and then of course toward the end we have

3  matters that are not in agreement, and I understand that.  My

4  recollection, maybe it's incorrect, was that -- and may not

5  matter in this case -- but there were some aspects in your

6  patent that talked about trenching or that sort of thing and

7  I don't know if those are important or not, but there was

8  some things that you might focus on.  Is that what you're

9  talking about?

10         **MR. JAKOPIN:**  In part, yes, correct.

11         **THE COURT:**  Sure, sure.  So I've got that and

12  we're not trying to resolve anything.  We're just trying to

13  make sure we got the technology down or at least down to a

14  degree.

15         Is there anything else, though, Mr. Jakopin, that

16  you wanted to talk about in terms of technology at all?  I

17  think that you commented on it.  Anything else that you --

18         **MR. JAKOPIN:**  I think the comments that I just

19  made are kind of the point that I wanted to raise.  I did

20  want to make that point.  Thank you.

21         **THE COURT:**  Absolutely.  No problem at all.

22         Now I had a couple of questions at the beginning

23  which was -- and I think you're right.  It's going to be hard

24  to tell how many terms but as the plaintiff, this one

25  question about do you think we're going to be construing

1   many, many terms.  Some places as you know, some limit the

2   number of claims that will be construed.  Sometimes as a cap

3   of ten.  I'm not saying I'm going to do that, but can you

4   give me some guidance on the number of claims you think would

5   probably be construed, Mr. Masters, and you've got a whole

6   raft of people there who can send you an e-mail about it or

7   text you if you want extra comments.  Ms. Sweeney is busy

8   there.  I'm watching.  Any idea there?

9        **MR. MASTERS:**  So, Your Honor, because we got the

10  motion to dismiss and no answer, I mean -- we don't have any

11  intel from there.  Our infringement contentions are due on

12  the 18th.

13       **THE COURT:**  Correct.

14       **MR. MASTERS:**  So it's hard to guess, but my

15  estimation for the two Qorvo patents is it couldn't be much

16  more than two or four terms at most.  I would be surprised at

17  that because we believe there is a very good literal reading

18  and not terms that are going to require the Court's

19  construction.  There is the piezoelectric layer for the

20  Akoustis patent as we just discussed so there's one I guess

21  for that patent.  So I would be surprised if there are two --

22  more than two or four terms.

23       **THE COURT:**  Okay.  And that makes some sense to

24  me.  I'm going to see if your counsel opposite has any idea.

25  Of course it's hard to know now, but you know the patent

**UNREDACTED TRANSCRIPT**

1   well, patents well.

2          **MR. JAKOPIN:**  So, Your Honor, I would guess that

3   with respect to the Qorvo patents there's probably somewhere

4   between 4 and 8 terms.  And then as to the Akoustis patent,

5   query whether that -- I mean, there has been no assertion of

6   infringement.  There are no issues that I'll take that in

7   the -- you know, where the typical rules leading up to a

8   Markman hearing would apply.

9          I think that, you know, the issue here is Qorvo

10  is asserting a claim construction that it believes is

11  accurate and then saying that, well, therefore, based on that

12  claim construction Akoustis has done something false, and

13  there's actually two different steps there that they have to

14  go through in order for their assertion to be found correct.

15  And so in our joint statement where we had said that we're

16  holding out whether any of the issues would be ripe with

17  respect to summary judgment, frankly on this false marking

18  one, this would be one that if the Court does not actually

19  dismiss that claim in the motion to dismiss stage, I would

20  think ends up being one that would be ripe for a very early

21  motion for summary judgment because we think that this

22  argument of Qorvo's is a lot of nonsense.

23         **THE COURT:**  Well, nobody ever said that lawyers

24  weren't advocates during these types of conferences.  I think

25  your point partly was that we might have to construe terms in

**UNREDACTED TRANSCRIPT**

42

1    that third path.

2              **MR. JAKOPIN:**  Well, to the extent that there's

3    that one claim limitation and that only one claim limitation

4    that ends up being an issue then that would be correct.  I

5    don't think that anything else needs to be done with respect

6    to that patent.

7              **THE COURT:**  Okay.  And I don't -- Mr. Masters, do

8    you want to say anything?  I mean that may well be the case.

9              **MR. MASTERS:**  I think that's the case on the

10   Akoustis patent.

11             **THE COURT:**  I think we're good on that.  I think

12   it's useful.

13             Let's go back quickly to one other thing which is

14   how many of the former Qorvo employees are now or have since

15   leaving Qorvo worked at Akoustis, and somebody knows that.

16   So I'm going to ask whoever knows that to tell me that.  It

17   may be defense counsel on that one.

18             **MR. JAKOPIN:**  Well, Your Honor, the complaint

19   gave a list of positions.  They didn't even give the names.

20   There's been some attempt to figure it out, but it's much

21   less than -- it's less than 20, but I don't know what the

22   exact number is.

23             **THE COURT:**  Okay.  And is there a problem in

24   identifying those -- I'm going to go to Mr. Masters.

25   Mr. Masters, do you know who those less than 20 employees

**UNREDACTED TRANSCRIPT**

1    are?

2              **MR. MASTERS:**  Well, in all, Your Honor, there's

3    probably 32, which is about 20% of their work force as of

4    today if I -- if their numbers of 146 full-time employees is

5    accurate which was in Akoustis' proportionality report and I

6    have no reason to doubt the 146 number.

7              The Qorvo employees who have now gone to Akoustis

8    is -- they know who they are.  I mean, they know every one of

9    them, and the complaint even provides more detail as to their

10   titles and responsibilities.

11             **THE COURT:**  Do we have their names?  I'm sure we

12   do.  I'm sure both of you do.  I don't want to have a big

13   dispute about this when it's something that's essentially a

14   fact, these are facts that can be readily ascertained.

15             **MR. MASTERS:**  Yes, Your Honor.

16             **THE COURT:**  Any problem with the two of you

17   saying this is the group and we checked it off and this is

18   it, it's 32, and here are their names?

19             **MR. JAKOPIN:**  There has been no group, and Your

20   Honor, I think an issue is, you know, the first quote exQorvo

21   employee was Jeff Sheely and that was in 2014.  That was

22   seven years ago, and we're now seven years later.  And so the

23   mere fact that over that seven-year period there has been 20

24   people that have been hired, that's just lawful hiring of

25   people and there's nothing to suggest that there's been

                    **UNREDACTED TRANSCRIPT**

44

1  anything wrong that has been done, and there's no

2  specifically identified, you know, act that the complaint

3  alleges that they have done other than to say, well,

4  Akoustis' product couldn't have gotten to be as good as it is

5  in as such short of a time without this having been done.

6         **THE COURT:**  Well, I think we don't know the

7  resolution of the issue at all, but the point is there's no

8  problem then, I take it, Mr. Jakopin, to just listing those

9  and giving their addresses, and the same thing for

10 Mr. Masters.  The answer may be this doesn't matter.  I don't

11 know the answer, but we don't want to have disputes on things

12 that are so easy to determine, and even counsel who is on

13 line doesn't want you to waste money on issues, right.  We

14 don't want to waste money.  We want to save money.

15        **MR. JAKOPIN:**  Agree we can identify who are

16 former Qorvo employees who are employees currently at

17 Akoustis.

18        **THE COURT:**  Absolutely.  Absolutely.

19        And I'm going to ask Mr. Masters, is there a key

20 employee that you think is particularly somebody you may be

21 concerned about in terms of some -- something that was done

22 that's in violation of any law?

23        **MR. MASTERS:**  We can identify some of the key

24 employees, Your Honor.  Yes, we could do that.  We can also

25 give the list of employees that we know as of today.

**UNREDACTED TRANSCRIPT**

 1              THE COURT:  Sure.

 2              MR. MASTERS:  I'm not quite sure we would have

 3    necessarily a total list despite our diligence in trying to

 4    find it without some additional discovery.

 5              THE COURT:  Sure.  Let me suggest one thing.  We

 6    have not put in --

 7              MR. JAKOPIN:  Well, Your Honor, our view is that

 8    just a list of employees is insufficient.  You actually asked

 9    the right question:  Why is it that they've done something

10    that ends up being objectionable by Qorvo?

11              THE COURT:  Well, I understand that, and the main

12    thing to do is keep in mind that conferences are for the

13    purpose of narrowing the issues, getting things out of the

14    way, and I certainly get a lot of ideas about how things

15    might ultimately be resolved, but getting factual disputes,

16    things that are really not factual disputes clearly

17    referenced so that everybody understands we're not going to

18    fight about this.  This is something we're just going to

19    disclose and we're going to move along.

20              Now, I'm going to go -- we've got to wrap things

21    up eventually here.  And I'm going to go to our draft which

22    incorporates your draft, and you've got, for example, initial

23    infringement contentions.  I'm trying to figure out because

24    of the way the case is working, going to work, and because of

25    the number of nonpatent-related issues, it seems to me that

**UNREDACTED TRANSCRIPT**

46

1   we probably need to have a 26(a)(1) initial disclosure also,

2   and that's a little independent of everything else that is

3   set up.

4           Of course we've got initial infringement.  We

5   know that's going to be on February 18th.  I always tell

6   everyone in every case if the dates don't work and you can't

7   do something by a particular date -- these are really

8   important.  It has to be done on the date that we -- that we

9   put in the order, but if there's an impediment to doing that.

10  Who knows, maybe there will be a snowstorm in North Carolina,

11  I don't care, or Delaware or somewhere Texas -- I doubt it

12  there -- that affects that, ask for a change or extension of

13  the date.  I don't expect dates to be extended by a month.

14  That's not really what we're doing here, but if you need

15  three more days, ask for it, rather than find yourself in

16  default on a particular deadline.  So keep that in mind.

17          The second thing is we would -- I may require a

18  26(a)(1) initial disclosure because of the materials that

19  are -- that might be relevant to unfairness, for example,

20  false marking, false advertising, willful infringement not so

21  much, but unfair and deceptive trade practices.  It may be

22  that we need to look at the 26(a)(1) requirements and follow

23  that pattern.  I'm not sure.  I'm not sure here.

24          **MR. MASTERS:**  May I address you?

25          **THE COURT:**  The reason to do that is that that

**UNREDACTED TRANSCRIPT**

47

1    does require a listing of individuals who may be -- may have

2    knowledge or may be witnesses on particular points, not who

3    will be, and that way we get these lists of individuals

4    disclosed and you don't have to fight over it or have a

5    discussion about it or spend money on it.  You simply

6    disclose their contact information, and then of course you

7    disclose a couple other things, too.

8              I'm not necessarily going to include that,

9    Mr. Masters, right now but I'm going to say we ought to think

10   about it.

11             **MR. MASTERS:**  Judge, I was just going to direct

12   you to exhibit A of our report, Item 3, we do have 26(a)

13   disclosures built in.

14             **THE COURT:**  You do.  You do.

15             **MR. MASTERS:**  And I think at Page 1, those were I

16   guess more of the disclosures related to the patent claims.

17             **THE COURT:**  No, you've got them there.  I just

18   want to -- do you think it's a good idea, right, Mr. Masters?

19             **MR. MASTERS:**  We do.  We do, Your Honor, and we

20   did add a couple to meet and confer with counsel to walk

21   through the schedule.

22             **THE COURT:**  I want to make sure that I -- I think

23   we discussed it and I think we do need to include the date

24   and you all are in agreement that we are going to proceed in

25   the standard 26(a)(1) way of proceeding.  Is that right?

**UNREDACTED TRANSCRIPT**

 1           **MR. JAKOPIN:**  We have, Your Honor.  You'll see

 2    line 3 of Exhibit A we have that due on 2-23.

 3           **THE COURT:**  You've got it March 23 and you've

 4    got --

 5           **MR. JAKOPIN:**  No, February 23rd.

 6           **THE COURT:**  I'm sorry, February 23rd.  Now, I've

 7    got it right here.

 8           Now I want to talk a little bit about that,

 9    because this comes up in nonpatent litigation very regularly,

10    and it is a very serious requirement and if it is not

11    complied with, there are really very substantial

12    consequences, and I've had this occur in cases that we've

13    tried both in New York and Nashville, and that is where a

14    party failed to either disclose the witnesses that they would

15    have with diligence known may have information, in which

16    case -- in the Nashville case the person was not allowed to

17    testify.  I picked up that trial.  I didn't have the

18    scheduling conference, and of course the plaintiff in that

19    case opposed when the defense sought to bring in a witness

20    that had not been previously disclosed who happened to be an

21    employee of the defendant, and it turned out they had to be

22    excluded.  This is how the rule works.  And in New York what

23    happened was there was some documents where that had happened

24    where they failed to disclose the documents in the disclosure

25    requirement.

**UNREDACTED TRANSCRIPT**

1            The reason I raise it is really so that no one

2    will be surprised if when you don't do one of these major

3    disclosure requirements that you have very serious

4    consequences.  Nice to have counsel for the company on the

5    phone also so you'll know what happened when they didn't do

6    it.

7            And so in both 26(a) -- in 26(a)(1), I believe,

8    you're required to identify individuals and that is a strict

9    requirement.  You have to give those names, and if you fail

10   to do so, and it's someone that with diligence you would have

11   known and you would have known may have information, then you

12   will not be able to use them, and you cannot solve that

13   problem by supplementing later on -- very much later on

14   usually -- with that name.  It's kind of complicated, but you

15   cannot do that because these are people you would know now.

16           So we've just had a little discussion about names

17   and so forth to make sure that everybody understands.  This

18   is going to be a pretty extensive list, probably not terribly

19   difficult to prepare but you must do that.

20           Now the next thing, though, is probably more --

21           **MR. GOLDEN:**  Your Honor, if I may, I have a

22   question --

23           **THE COURT:**  Sure.

24           **MR. JAKOPIN:**  -- on what you just said.

25           **THE COURT:**  Sure.

**UNREDACTED TRANSCRIPT**

1      **MR. JAKOPIN:**  You know, there are all sorts of

2   these nonpatent claims that had been set forth where we

3   really don't know what the claim is other than to say they

4   think we've done something wrong.  And so it's going to be --

5   I mean, we'll try our best with respect to putting names on,

6   but until we receive I'll say an order on the motion to

7   dismiss, until we receive some more specificity from Qorvo,

8   it's going to be nearly impossible to, if you will, put down

9   names of people who have information and we don't even know

10  what the claim is.

11     **THE COURT:**  Well, I hear what you're saying, and

12  of course the plaintiff is going to have the more difficult

13  time at this point in making sure that they've covered this

14  well, but the defense will have an obligation.

15          I'm going to read the rule to you.  I know you

16  know it.  It says provide the other party the name and if

17  known the address and phone number of each individual likely

18  to have discoverable information along with the subject of

19  that information that the disclosing party may use to support

20  its claims or defenses unless the use would be solely for

21  impeachment.  Now the last little phrase, don't get hung up

22  on.  There are not many things that would fall into that

23  category and so typically -- you have the advantage.  You

24  only have 156 employees.  I mean, my goodness, you got a good

25  thing going there.  You probably list everybody and you

**UNREDACTED TRANSCRIPT**

1    wouldn't have anything to worry about.  You probably don't

2    want to do that.

3            The answer is that everything is applied with a

4    rule of reason.  We look at what happened, but what happened

5    in Nashville was they didn't -- they thought that the chief

6    executive officer of the company could testify to some very

7    important things in an architectural copyright case and

8    turned out he couldn't.  Turned out he didn't know it.

9    Turned out it was easy to object to his testimony.  He

10   clearly didn't know these things, and the person they should

11   have identified was a long-standing employee who knew about

12   this maybe -- I'm not sure.  We never found out -- and the

13   objection was properly made and sustained, and obviously what

14   happened in the case ultimately was the jury returned a

15   verdict for the plaintiff.  The defense partly had difficulty

16   in presenting some of its proof.

17           So the point is, I would err on the side of

18   inclusiveness.  This isn't a guarantee.  This is a may.  So,

19   please, you have probably the easier side of this than the

20   plaintiff.  The plaintiff needs to be careful here to make

21   sure they included what they should.

22           Now let's go to the second thing which is

23   probably more useful and a time saver and money saver.  The

24   first one is pretty easy to do.  The second one is a copy or

25   a description by category and location of all documents,

1   electronically stored information and tangible things that

2   the disclosing party has in its possession, custody or

3   control and may use to support its claims or defenses unless

4   the use would be solely for impeachment.  Again don't get

5   hung up on the last phrase there.

6          Now what I do in most cases -- and I'm trying to

7   assess how this is going to work here -- is I say, well,

8   we're not going to allow you in this case because of the

9   inefficiencies involved to describe by category and location.

10  We're going to require you to produce the copies of the

11  documents, electronically stored information and tangible

12  things that the party has in its possession, custody or

13  control that it may use to support its claim, and the reason

14  I like to do that if I can is because it saves you all a lot

15  of money and the difficulty of going through request for

16  production after request for production and other things,

17  subpoenas and so forth where it's a third party and you

18  simply produce essentially the documents and things that

19  support your case at this stage.

20         Now this is a big production -- and particularly

21  I'm not sure how big it is in this case -- but it's a

22  significant production that requires cooperation from the

23  parties, but what it does is that really looks at what do I

24  have and then go ahead and disclose it.  If I can do that --

25  and this is on the edge of maybe not being the best case for

1    it -- but if I can do that, I can see -- I think you can both

2    see how that results in a lot of materials being turned

3    over -- by the way, may have to have a protective order on

4    some of this -- being turned over early and eliminating some

5    of the back and forth that becomes expensive for litigants.

6            Now in a case like this with one party -- and I'm

7    not picking on anybody -- but the plaintiff is a large

8    entity.  It's probably not so burdensome for the plaintiff to

9    go through that long and litigious and costly and sometimes

10   confusing process on production, but for the defense I'm a

11   little concerned that we need to be mindful of holding

12   expenses down.  Now it may be that I will be told now by

13   Mr. Jakopin that they have an unlimited budget and they don't

14   care and go ahead and do it the way lawyers always do it.  If

15   that's the case I suppose don't care either but I'm supposed

16   to care and I do care.

17           **MR. JAKOPIN:**  You don't have to worry, Your

18   Honor.  I will not be telling you that.

19           **THE COURT:**  Okay.  Well, you see my concern here,

20   and that is I have an -- I'm not -- we shouldn't make it

21   unfair to either side and we should make sure that the

22   purposes of disclosures are met for both sides, but I think

23   it may be the only right way to proceed which is to have this

24   fairly extensive 26(a)(1) initial disclosure of documentation

25   and materials that is done under this rule versus, I think

**UNREDACTED TRANSCRIPT**

54

1    you would acknowledge, the more expensive method that often

2    occurs.

3              What's the defense counsel think?

4              MR. JAKOPIN:  Well, Your Honor, for the patent

5    claims, I think that --

6              THE COURT:  We've got a lot of other claims here,

7    too.

8              MR. JAKOPIN:  I know we do, but as to the patent

9    claims where there is enough specificity that I can kind of

10   know what to go ahead and search, that ends up being at some

11   level a doable thing, though I may be hard pressed to

12   actually produce documents by the date that we have on the

13   schedule.  It's a lot easier to identify the location of

14   where those documents would be rather than actually produce

15   them by that date, but as to the nonpatent claims, without

16   specificity, I'm really in a difficult position as to know

17   what to be producing.

18             THE COURT:  Sure.  And I hear you on that.  Let's

19   go to Mr. Masters.  Mr. Masters, with that explanation what

20   we're trying to get done here, how would you add some

21   additional specificity to the claims that we've already

22   discussed to some degree?  That's a question for you.

23             What do you think?  What's the best way to get

24   this done and save people money and let you spend your money

25   on the things that need to be spent on as opposed to things

**UNREDACTED TRANSCRIPT**

 1   that are simply expensive to do?

 2           **MR. MASTERS:**  So, Your Honor, the idea is a good

 3   one if we can get the documents from defense.  The patent

 4   claims is fairly straightforward.  Core technical documents

 5   is what we need, along with damages information.  Nonpatent

 6   claims, Your Honor, I think the complaint is extremely

 7   detailed and counsel understands the nature of our claims and

 8   what would be required.

 9           I will admit, though, to have this all produced

10   by February 23rd would be a difficult task.  So I would

11   suggest, if Your Honor would go along with this, maybe a

12   two-stage approach:  By the 23rd we list the categories and

13   description of the documents and then by March 23rd, the

14   actual documents are produced.  We can also provide search

15   terms for the other side within the initial phase one of that

16   disclosure so they can use the search terms to do the

17   searching of their e-mails as in the same of course would

18   apply to us.

19           **THE COURT:**  Sure.  And we've done the stage --

20   sounds like you've looked at something we've done in the

21   past, you've done stage one, stage two, phase one, phase two

22   in the past.  Sounds like it's the way we usually proceed,

23   and then because of the amount of material to be produced,

24   even when you get to the March 23 date, we need some -- I

25   usually say, look, if you end up needing another week, just

**UNREDACTED TRANSCRIPT**

1   file the motion, tell us and we will give you another week.
2   I'm not going to give you a year or I'm not going to give you
3   three or four months.

4          **MR. JAKOPIN:**  Your Honor, I don't know that, you
5   know, suggesting that we give a -- for these nonpatent
6   claims -- and particularly this unfair competition claim --
7   or while he says it's been extremely detailed they have a
8   definition of confidential information that could be anything
9   under the sun and then there's no actual confidential
10  information of any particular employee that we know that
11  they're alleging has been taken.  And so while Mr. Masters
12  says that they've given a lot of detail, respectfully we
13  don't see it that way at all, and for us to then just be
14  agreeing to, well, e-mails with these search terms where
15  there isn't any relevance to what is being asked for because
16  we don't know what the claim is, that's the issue that we
17  have.

18         **THE COURT:**  And I did notice -- and I'm looking
19  for it right now -- in the complaint that the list of
20  information was pretty generic and I may find it in a second,
21  but you can probably give me the paragraph number right
22  there.

23         **MR. JAKOPIN:**  Paragraph 20 of the complaint.

24         **THE COURT:**  Paragraph 20, exactly.  Thank you so
25  much.  Examples of confidential proprietary information and

**UNREDACTED TRANSCRIPT**

1    it had a lot of -- it had a list of everything you could

2    think of.  What we usually want to have happen is we want the

3    parties to have some discussion about -- for example, I did

4    ask at the very beginning, what exactly have they done that

5    is a problem here with more specificity, and Mr. Masters, I

6    don't want to ask you, it's getting toward 3:00 so we're not

7    going to go forever on, but I mean what have they done?  Did

8    the chief engineer go over there and suddenly provide a whole

9    bunch of stuff they weren't supposed to?

10            **MR. MASTERS:**  Well, so Your Honor, this is a

11   startup company and as I referenced there's 20% of the work

12   force comes from Qorvo.  So as they grow, if you will, they

13   hire what they need from Qorvo, and they have had some

14   aggressive tactics to get certain people to join.  Paragraph

15   48 of the complaint talks about the job titles and

16   descriptions of the people that they have lured over.

17            **THE COURT:**  There's nothing -- you don't say

18   there's anything illegal about hiring away your folks unless

19   you've got some type of -- I don't think you have this in

20   North Carolina -- but some type of tortious interference with

21   some contractual relationship.  Did they hire a device

22   engineer?

23            **MR. MASTERS:**  They have, including senior --

24            **THE COURT:**  What was wrong with hiring the device

25   engineer?

**UNREDACTED TRANSCRIPT**

1          **MR. MASTERS:**  Well, when they're hiring the

2     senior device engineers, I mean they are going to be using

3     the confidential information they have from Qorvo in terms of

4     designing products that are directly competing.

5          **THE COURT:**  Okay.  Did any of those

6     individuals -- they may well have -- sign a document with

7     your company, with Qorvo, that required them to maintain

8     information as confidential information, not share it with a

9     competitor?

10          **MR. MASTERS:**  There are employee agreements and

11     NDAs between Qorvo and their ex-employees.  That's correct.

12          **THE COURT:**  Okay.  How many people have such an

13     agreement?  Everybody or just eight of them?

14          **MR. MASTERS:**  I'm fairly certain all of them.  I

15     mean, maybe there was one or two that slipped through the

16     cracks but I think all of them.  I would say, Paragraph 54,

17     we have at least one example where Akoustis was asking a

18     Qorvo employee during an interview to disclose proprietary

19     information in that recruitment process, and that employee

20     was so worked up about it, did not do it, but contacted her

21     superior and relayed that information.  I mean, this

22     pattern --

23          **MR. JAKOPIN:**  As to that point, Your Honor, that

24     was actually not Akoustis.  That was a recruiter.  That was

25     not Akoustis at all and we don't even know what the

**UNREDACTED TRANSCRIPT**

59

1    confidential information is that they're referring to there.

2    If Mr. Masters would like to tell me, I would love to hear

3    what it was.

4             **THE COURT:**  Well, what we did in most

5    confidential information cases -- and there's one in

6    Chattanooga where that became how we defined confidential

7    information was very important in actually a lithium battery

8    case, and that was something that he's not going to tell you

9    right now in public.  I'm not sure everybody knows it right

10   now.  But I'm going to need the two of you or your teams to

11   discuss the allegations and the disclosures that need to be

12   made, and I do think it would be beneficial to -- for

13   example, I'm going to go to Mr. Masters and say, Mr. Masters,

14   do you have some e-mails that support your contention here

15   where -- or do you have memos?  Do you have reports?  Do you

16   have that sort of thing?  We're not going to ask you right

17   now but we're going to wrap this up in a moment and come back

18   and figure out a way to solve this problem.

19            Mr. Masters, what about that?  Do you have

20   documents and/or e-mails, other things, text messages,

21   whatever, that would support your position as to

22   inappropriate appropriation of confidential information?

23            **MR. MASTERS:**  I don't believe I have an e-mail,

24   Your Honor, or text message.  I have the one example that I

25   just referred to you.  I have another example that's recently

**UNREDACTED TRANSCRIPT**

1    come to light, actually two more.

2              **THE COURT:**  Okay.  And what's going to happen is

3    I know you're going to end up disclosing that more specific

4    information in phase one and then defense counsel will be

5    disclosing responsive information in phase two, and that's

6    the way we're going to have to handle that.  It's going to be

7    if you don't disclose it, if you don't come forward with it

8    and say these are the people that's the subject we're talking

9    about, I think those issues will probably resolve as a

10   failure to meet the disclosure requirements under 26(a)(1)

11   and in light of the efficiency considerations that we have to

12   consider.

13             Okay.  Now I've got down February 23rd as stage

14   one.  Actually if you want a little more time on that, I'm

15   going to give you that on stage one disclosures in the order,

16   and then on your stage two or phase two, 26(a)(1)

17   disclosures, of course you got search terms and so forth that

18   will show up in your initial disclosures and then the balance

19   will be on March 23rd, and I don't have my regular big

20   calendar out here but that's probably going to work,

21   March 23.  I want to make sure it's not -- doesn't matter if

22   it's a Saturday or Sunday I suppose but we usually try to

23   make it a regular workday.

24             Okay.  Let's run through everything.  We've got a

25   set of dates and then I'm going to be around.  I don't

**UNREDACTED TRANSCRIPT**

1  disappear.  We have a number of cases in Delaware and I

2  always can use your suggestions as to how to make these

3  things work.  I'm very interested in my Delaware counsel on

4  the line both sides helping us in terms of trying to make

5  this as efficient as we can.  I know your judges have

6  different ways of doing things.  We look for a central

7  pattern and it was harder to find than sometimes it is.  So

8  if you have suggestions as to how we do this a little better

9  we'll be glad to.  I see that at least one of you came back

10  on line when I said that.

11          March 23 is a Wednesday.  We'll say March 25.

12  That will be our deadline for that.  You know what to do if

13  you need additional time, file a short motion, probably an

14  agreed-upon motion asking for an additional 4 days, 7 days,

15  10 days, something in that range and we'll grant that.  And

16  I'm going to -- which is my Delaware counsel that wanted to

17  tell me something about that?  I think it was -- make sure

18  I've got everybody here.  That was -- is it Mr. Tigan?

19          **MR. TIGAN:**  It's Tigan, you got it, Your Honor.

20          **THE COURT:**  What should we do differently?  Your

21  judges do it in different ways.  It's a -- I'm trying to

22  figure it out.

23          **MR. TIGAN:**  We do.  We also have some newer

24  judges who are trying some new things out.  Judge Conley and

25  Judge Noreika but, yeah, we have that default standard that

**UNREDACTED TRANSCRIPT**

 1  you've probably heard about but no local patent rules.  We do

 2  things a little less formally than other districts but it

 3  mostly works pretty well.

 4          **THE COURT:**  I think this will work if you think

 5  we -- something's going to be in conflict with what you

 6  usually do, I want you guys to tell me.  We want to help out

 7  a Delaware judge, not somebody else.

 8          Who do we have -- where is my local counsel again

 9  for the defense?  I think I've got --

10          **MR. GOLDEN:**  Your Honor, Ron Golden.  I'm here.

11          **THE COURT:**  Yeah, what shall we do, Mr. Golden?

12          **MR. GOLDEN:**  I'm not even being cautious but I

13  sincerely don't have much to add other than what Jeremy said,

14  but if I think of something along the way, I will comply with

15  your directive and speak up.

16          **THE COURT:**  Well, we definitely want to hear from

17  everybody.  I'm going to go through the draft dates then

18  again and we have the dates on 26(a)(1) disclosures.  We've

19  got those two dates in there.  You know what to do if you

20  have an issue or a problem.  We're going to get phase one

21  which is going to help set up phase two and you all of course

22  are required to work with each other and we're moving toward

23  that idea of initial eventually substantial documentation

24  disclosures so that you don't have to go through all the

25  steps that you otherwise might have to go through.

**UNREDACTED TRANSCRIPT**

63

1           We've got initial infringement contentions,

2   you've got those, these are what you gave me, February 18th.

3   I think if you -- if that's still achievable that's fine.

4   I'll leave it there.  Phased initial disclosure pursuant to

5   26(a)(1), we've got that down.  Again, you've got the phase

6   one, phase two, and we're going to write that in there

7   differently.  Then initial nondisclosure contentions

8   March 18.  I'm just going to read them so everybody's got

9   them on record, invalidity and unenforceability contentions

10  April 18th, validity and enforceability contentions May 19th.

11  Preliminary identification of claim terms to be construed May

12  27.  This sounds like it won't be terribly difficult in this

13  case.

14          Finally identification of claim terms to be

15  construed June 6th.  That sounds like you're going to be

16  pretty close right away.  I'm not exactly sure what we're

17  going to be doing on the third patent.  Are we putting in

18  those terms in now or not?  Is that what we're going to do,

19  Mr. Jakopin?

20          **MR. JAKOPIN:**  Well, Your Honor, this is David

21  Jakopin, the claim terms that is in issue -- and we've agreed

22  with Mr. Masters -- is the construction of the one phrase,

23  the one limitation in that patent, and so I would -- we also

24  have a motion to dismiss pending on that.  And so, if

25  possible, we could perhaps see your order and if it's then

**UNREDACTED TRANSCRIPT**

64

1   still in the case to the extent that it needs to get added

2   into the claim terms for the Markman hearing we could do that

3   then.

4           **THE COURT:**  That's how we'll handle that.

5           Okay.  Preliminary claim construction supporting

6   materials, you have those dates.  Initial experts, that will

7   be July 11th.  And then rebuttal, that's July 25th.  And I

8   think all the other dates I know you know them.  I'm going to

9   put them in order and then I've got opening claim

10  construction briefs August 30th.  I've got the claim

11  construction hearing on November 10th.  And checking with my

12  staff, make sure we think we can do that.  And so sometimes

13  Mr. Sample will contact both sides and say this has to be

14  adjusted just a little and sometimes we will do that.

15          Probably we're good on that date right now so I

16  should be here or there for that matter.  I usually am

17  personally present in Delaware for those if I can be.  That's

18  the idea on that.  So I will plan on physically being there.

19          **MR. JAKOPIN:**  Your Honor, for the Markman

20  hearing, we had also suggested a tutorial.  I know that there

21  was a presentation given today, but I think that there's kind

22  of an important layer in between of being able to understand

23  some of the technology involved to then actually get the leap

24  to the actual claim terms that we'll be talking about.  Was

25  wondering if you had any thoughts on that.

**UNREDACTED TRANSCRIPT**

1          **THE COURT:**  Well, I don't have any problem with a
2    more detailed tutorial at that time.  As you can see, it's
3    useful to have this much of a tutorial at this time as we go
4    through material.  So we will make that note and you would
5    like to do it at that time.  That's going to be fine with me.
6    You were planning on having an expert do that?
7                    **MR. JAKOPIN:**  Yes, Your Honor.
8               **THE COURT:**  You'll have an expert do that one?
9                    **MR. JAKOPIN:**  Correct.
10               **THE COURT:**  And, Mr. Masters, will you have
11   someone who perhaps is an expert on that?  Not that you both
12   are not, but you might want somebody who might ultimately
13   testify.
14                    **MR. MASTERS:**  We will, Your Honor.
15               **THE COURT:**  Okay.  However you want to handle
16   that, we will have -- we will note that there will be -- that
17   will be an opportunity for a detailed tutorial not too long
18   but a detailed.  This was filmed, and I'm going to make sure
19   that -- looking to Ms. Mayo -- we will have available for the
20   Court, the very brief tutorial we had.  We won't keep the
21   rest of the material and it will not be available to you in
22   this case typically.  So that's the way it works.
23               Motion to amend pleadings, motion to join parties
24   April 8, 2022.  Do we think anybody's going to need to be
25   joined?  I'm going to go to defense on this.  Is there

**UNREDACTED TRANSCRIPT**

```
 1    someone else that's going to be coming in in this case?

 2                 MR. JAKOPIN:  Not that I'm aware of.

 3                 THE COURT:  Plaintiffs, anybody else you need to

 4    be brought in?

 5                 MR. MASTERS:  We do not have anybody else.

 6                 THE COURT:  Okay.  I'm just making sure that the

 7    plaintiff does not intend to add -- and I don't think you

 8    have a basis to add parties -- does not intend to add the

 9    parent company, right?

10                 MR. MASTERS:  That's correct.

11                 THE COURT:  Okay.  So that's going to be

12    reflected that is not anticipated, that we have the correct

13    parties and it's not anticipated that anyone will be added.

14                 Okay.  And I believe that that's all that we need

15    to set right now.  So I believe that's it for right now.  I

16    do appreciate -- Mr. DeFosse, they didn't let you say much.

17    Unless you have something to enlighten us there, anything

18    that you want to add?

19                 MR. DeFOSSE:  Thank you, Your Honor, I was

20    worried this whole conference would go and I wouldn't get my

21    name on the record.  That will be it.

22                 THE COURT:  No problem.  Mr. Fuhrer, anything

23    else from you?  I don't want to leave anyone out.

24                 MR. FUHRER:  I have nothing else to add.

25                 THE COURT:  Mr. Quist, anything else to add?
```

**UNREDACTED TRANSCRIPT**

1           **MR. QUIST:**  Nothing else, Your Honor.

2           **THE COURT:**  Mr. Carr, you never have to wear a

3   white shirt with us.  You can come in however you wish to be

4   attired.

5           **MR. CARR:**  I appreciate it, Your Honor.  Nothing

6   from me.

7           **THE COURT:**  Okay.  And Counsel, anything that

8   you -- you don't really -- you're not really to speak on any,

9   but I would not want to leave you out.  We appreciate you

10  being here.  Anything else we need to give you a chance to

11  talk with your counsel about?

12          **MR. MASTERS:**  Nothing from Qorvo, Your Honor.

13  Thank you for your time.

14          **THE COURT:**  And Ms. Sweeney, I was waiting on you

15  to enlighten us.  You were sending him messages, weren't you?

16          **MS. SWEENEY:**  From time to time, Your Honor.  We

17  work as a team.

18          **THE COURT:**  No problem.  I'm glad to have all of

19  you.  I probably left out somebody, I didn't mean to do that.

20  We're going to look forward to moving this case along.  We

21  will stay with this schedule.  Thank y'all very much.

22          **MR. JAKOPIN:**  Thank you, Your Honor.

23          **MR. MASTERS:**  Thank you.

24          (Adjournment.)

25

**UNREDACTED TRANSCRIPT**

1                      **C E R T I F I C A T E**

2

3

4            I, LISA J. MAYO, do hereby certify that the

5    foregoing 68 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the SCHEDULING CONFERENCE on 7th day of

8    February, 2022, in the matter of:

9

10

11   QORVO, INC.

12   vs.

13   AKOUSTIS TECHNOLOGIES, INC.

14

15   Dated this 02.16.2022

16

17

18

19                          _____S/Lisa J. Mayo_____

20                          LISA J. MAYO, LCR, RDR, CRR
                            Official Court Reporter
21                          United States District Court
                            Western District of Tennessee
22

23

24

25

                       **UNREDACTED TRANSCRIPT**