# Exhibit A1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QORVO, INC. | ) |
| | ) |
| | ) |
| Plaintiff, | ) C.A. No. 21-1417-JPM |
| | ) |
| v. | ) |
| | ) |
| AKOUSTIS TECHNOLOGIES, INC. and | ) |
| AKOUSTIS, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## INITIAL CLAIM CONSTRUCTION DECLARATION OF JOHN C. BRAVMAN, PH.D.

## I.      INTRODUCTION

1.      My name is John C. Bravman, Ph.D.  I am the President of, and a Professor of Electrical Engineering at, Bucknell University.  As described in §VII, I am an expert in the area of, among other things, integrated circuit processing and structures, thin film materials processing and analysis, microelectronics packaging, and microstructural and mechanical properties of materials and structures.

2.      I have been retained by Qorvo, Inc. ("Qorvo") to serve as a technical expert witness in this matter.  For my time in connection with the preparation of this declaration I am being compensated at my standard rate for this type of consulting activity at $650/hour.  My compensation is in no way contingent on the results of this proceeding or the opinions that I express herein.

3.      In this report I give my opinions as to how a person of ordinary skill in the art, at the time of their respective inventions, ("POSITA"; *see* definition in §III) would have understood certain terms or phrases in the claims of U.S. Patent Nos. 9,735,755 (the "'755 Patent") and 10,256,786 (the "'786 Patent").  I provide technical bases for these opinions as appropriate.

4.      I am not an attorney.  In forming my opinions in this Declaration, I applied the relevant legal principles provided to me by counsel as discussed in §VI.

5.      I have considered information from various sources and relied upon my experience and background in forming my opinions.  I have reviewed and considered the '755 Patent and the '786 Patent, their respective file histories, the constructions proposed by the parties, the extrinsic evidence identified by the parties, and any other documents I reference in this Declaration.

6.      This Declaration contains statements of my opinions formed to date and the bases

and reasons for those opinions.  I may offer additional opinions based on further review of

materials in this matter and/or further positions advanced by Defendants Akoustis Technologies,

Inc. and Akoustis, Inc. ("Akoustis"), or any expert witness retained thereby.  I make this

Declaration based upon my own personal knowledge and, if called upon to testify, would testify

competently to the matters contained herein.

## II.      GENERAL TECHNOLOGY OVERVIEW

7.      Both the '755 Patent and the '786 Patent relate to structural features of Bulk

Acoustic Wave ("BAW") resonators.  BAW resonators are used for many different applications,

including in wireless communications to remove irrelevant signals.

8.      A BAW resonator is an electromechanical device in which a standing acoustic

wave is generated by an electrical signal in a piezoelectric material.  In a simple configuration, a

BAW resonator includes a piezoelectric material (*e.g.*, quartz, AlN, or ZnO) sandwiched

between two metallic electrodes, such as shown in the diagram below.



9.      In this example, the top and bottom electrodes excite acoustic waves in the

piezoelectric layer, which are reflected from the top and bottom surfaces to form a standing

acoustic wave. The frequency at which resonance occurs is determined by the physical parameters of the piezoelectric layer and electrodes.

10.     At the high frequencies in which BAW filters are effective, the piezoelectric layer must be only micrometers thick, requiring the resonator structure to be made using thin-film deposition and micro-machining on a carrier substrate.

11.     In addition to the electrodes and piezoelectric layer, BAW resonators also utilize supporting structure intended to prevent the generated waves from escaping.  The type of supporting structure divides BAW resonators into two categories, solidly mounted resonator BAW (or BAW-SMR) or a film bulk acoustic resonator (or FBAR).  Simplified examples of these two constructions are shown below.



12.     In FBAR devices, the air/crystal interface on both faces of the resonator ensures that the main acoustic wave of interest is appropriately trapped. In BAW-SMR, Bragg reflectors underneath the resonator effectively trap the wave of interest.

## III.     PERSON OF ORDINARY SKILL IN THE ART ("POSITA")

13.     In determining the characteristics of a hypothetical POSITA of the '755 Patent and the '786 Patent at the time of their respective inventions, I considered several things, including various prior art techniques relating to thin film devices, such as BAW resonators and other closely-related technologies, the types of problems that such techniques gave rise to, and

the rapidity with which innovations were made.  I also considered the sophistication of the technologies involved, and the educational background and experience of those actively working in the field at the time.  I also considered the level of education that would have been necessary to understand the '755 Patent and '786 Patent.  Finally, I placed myself back in the relevant period of time and considered the engineers that I have worked with and trained in thin film technologies.

14.     I came to the conclusion that a POSITA of the '755 Patent would have had at least a bachelor's degree, or the equivalent degree, in electrical engineering, materials science, physics, or a related field, and 3-5 years of experience in the research, design, or development of thin film devices, or equivalent experience.  A person with more education and less experience may also meet this standard.

15.     I came to the conclusion that a POSITA of the '786 Patent would also have had at least a bachelor's degree, or the equivalent degree, in electrical engineering, materials science, physics, or a related field, and 3-5 years of experience in the research, design, or development of thin film devices, or equivalent experience.  A person with more education and less experience may also meet this standard.

16.     I believe that I am at least a POSITA in the context of the '755 Patent and the '786 Patent and, furthermore, I have supervised or trained those who were also POSITAs.  Moreover, I qualified as a POSITA as of the time of the invention of the claims of the '755 Patent and the '786 Patent.  Accordingly, I believe that I am qualified to opine from the perspective of a POSITA as to both patents.

## IV.    THE '755 PATENT

### A.    The '755 Patent's Disclosure

17.    A POSITA would have understood the '755 Patent to be directed to structural configurations of BAW resonators that improve the confinement of mechanical energy therein. *See*, *e.g.*, '755 Patent, 1:14-17.

18.    As shown in the sections below, the Parties disagree on the meanings of several terms in the claims of the '755 Patent.  I have considered the proposed constructions in view of the '755 Patent, its related provisional application (U.S. Provisional Application No. 62/207,702), and the '755 Patent's file history, all of which I understand to be part of the intrinsic record.

19.    It is my opinion that the intrinsic record is sufficient for a POSITA to understand the disputed terms, and that the disputed terms are used according to their plain and ordinary meaning (*e.g.*, the intrinsic record does not use the disputed terms differently from their normal usage in the art).

20.    I have also considered the extrinsic evidence cited by the Parties as relevant to the identified terms.  Based on my current understanding, it is my opinion that it is unnecessary to resort to extrinsic evidence to understand the disputed terms.

21.    My conclusions as to the disputed terms of the '755 Patent follow.

### B.    "Active Region" / "Outer Region"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning.  If a construction is necessary, "active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality. | Active region: That region of the device where motional current density is generated through the piezoelectric layer. |

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning. "Outer region" is the region of the BAW resonator that is not electrically driven. | Outer region: defined as that region outside the active region. |

22.    As shown above, the parties dispute the meaning of "active region" and "outer region" in the claims of the '755 Patent.  It is my opinion that Qorvo's constructions are correct, for at least the following reasons.

23.    Looking first at the intrinsic record, "active region" and "outer region" are used throughout the claims of the '755 Patent.  For example, claim 1 of the '755 Patent recites the following (with instances of "active region and "outer region" bolded and italicized):

1. A Bulk Acoustic Wave (BAW) resonator, comprising:

a piezoelectric layer;

a first electrode on a first surface of the piezoelectric layer;

a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer;

a passivation layer on a surface of the second electrode opposite the piezoelectric layer within ***an active region*** of the BAW resonator, the passivation layer having a thickness ($T_{PA}$) within ***the active region*** of the BAW resonator; and

one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in ***an outer region*** of the BAW resonator, ***the outer region*** of the BAW resonator being a region outside of ***the active region*** of the BAW resonator and the one or more material layers having a thickness that is n times the thickness ($T_{PA}$) of the passivation layer within ***the active region***, wherein:

n is a value other than 1; and

n is within a range of values for which a density of mechanical energy in ***the outer region*** of the BAW resonator is reduced as compared to a density of mechanical energy in ***the outer region*** of the BAW resonator when n is equal to 1.

24.    While the language of claim 1 recites that the "active region" includes a "passivation layer having a thickness ($T_{PA}$)," it does not further describe what an "active region" is (independent claims 9, 10, and 11 include similar language).  Dependent claims 4, 5, and 7

further recite that a "border ring" may be arranged "around a periphery of the active region," but also do not further describe the "active region" (claims 13, 14, and 16 include similar language).

25.     The language of claim 1 does specify that the "outer region of the BAW resonator [is] a region outside of the active region of the BAW resonator," and that the "outer region" includes "one or more material layers" (independent claims 9, 10, and 11 include similar language).

26.     Turning to the specification of the '755 Patent, "active region" and "outer region" are used throughout.  *See*, *e.g.*, '755 Patent, Abstract; 1:51-2:3; 2:4-13; 2:14-26; 2:30-51; 2:52-56; 2:57-61; 2:62-65; 2:66-3:5; 3:6-24; 3:28-46; 5:5-23; 5:58-6:5; 6:6-25; 6:26-31; 6:42-63; 7:1-33; 7:34-53; 7:58-8:16; 8:17-30; 8:36-61; 9:4-20; FIGS. 1-5E.

27.     The first time "active region" and "outer region" are found in the '755 Patent's specification ('755 Patent, 1:51-2:3), the specification provides a specific description of those terms, as shown by the bolded and italicized language in the following reproduction of this portion of the specification:

> In operation, acoustic waves in the piezoelectric layer 12 within an active region 34 of the BAW resonator 10 are excited by an electrical signal applied to the bottom and top electrodes 14 and 16. ***The active region 34 is the region of the BAW resonator 10 that is electrically driven***. In other words, the active region 34 is the region of the BAW resonator 10 consisting of, in this example, the bottom electrode 14, the top electrode 16, the portion of the piezoelectric layer 12 between the bottom and top electrodes 14 and 16, and the portion of the reflector 18 below the bottom electrode 14. Conversely, ***an outer region 36 of the BAW resonator 10 is a region of the BAW resonator 10 that is not electrically driven (i.e., the area outside of the active region 34)***. The frequency at which resonance of the acoustic waves occurs is a function of the thickness of the piezoelectric layer 12 and the mass of the bottom and top electrodes 14 and 16. At high frequencies (e.g., greater than 1.5 GHz), the thickness of the piezoelectric layer 12 is only micrometers thick and, as such, the BAW resonator 10 is fabricated using thin-film techniques.

28.    "Active region" and "outer region" are used throughout the remainder of the specification and figures to describe portions of BAW resonators in this context.

29.    The prosecution history of the '755 Patent does not address these terms or utilize them differently from that discussed above.

30.    Based on the above, a POSITA would have understood "active region" and "outer region" as proposed by Qorvo.

31.    A POSITA would not have understood "active region" and "outer region" as proposed by Akoustis.  Regarding "active region," the '755 Patent does not describe this region in terms of "motional current density," and Akoustis has not explained why a POSITA would have imported such a requirement.  Regarding "outer region," Akoustis' proposed construction is redundant to the claim language and thus unnecessary.  I reserve my right to further address Akoustis' proposed construction on rebuttal.

32.    I have reviewed the extrinsic evidence identified by the parties.  My review indicates that "active region" and "outer region" are used in the '755 Patent in the same way they are used in the art and according to Qorvo's proposed constructions.  The extrinsic evidence does not dictate a construction different from that indicated by the intrinsic record.

### C.    "*A Density Of Mechanical Energy* In The Outer Region Of The BAW Resonator Is Reduced As Compared To *A Density Of Mechanical Energy* In The Outer Region Of The BAW Resonator When N Is Equal To 1"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning.  If a construction for "density of mechanical energy" is needed, it means the amount of mechanical energy from acoustic waves leaked from the active region. | The density of mechanical energy means a total density over the full volume of the outer region, or otherwise indefinite. |

33.     As shown above, the parties dispute the meaning of "density of mechanical energy" in the above claim elements of the '755 Patent.  Based on my review of the intrinsic record and identified extrinsic evidence, it is my opinion that Qorvo's construction is correct.

34.     Looking at the intrinsic record, "density of mechanical energy" is found in independent claims 1 and 11 of the '755 Patent.  For example, claim 1 of the '755 Patent recites the following (with instances of "density of mechanical energy" bolded and italicized):

> 1. A Bulk Acoustic Wave (BAW) resonator, comprising:
>
> a piezoelectric layer;
>
> a first electrode on a first surface of the piezoelectric layer;
>
> a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer;
>
> a passivation layer on a surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonator, the passivation layer having a thickness (TPA) within the active region of the BAW resonator; and
>
> one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator, the outer region of the BAW resonator being a region outside of the active region of the BAW resonator and the one or more material layers having a thickness that is n times the thickness (TPA) of the passivation layer within the active region, wherein:
>
> n is a value other than 1; and
>
> n is within a range of values for which a ***density of mechanical energy*** in the outer region of the BAW resonator is reduced as compared to a ***density of mechanical energy*** in the outer region of the BAW resonator when n is equal to 1.

35.     As understood in context, the claim specifies that an amount of mechanical energy created by the claimed construction and leaked to the outer region is reduced as compared to a prior art construction.  This concept is described throughout the '755 Patent's specification, such as at 2:4-26, reproduced below (with relevant language bolded and italicized):

> Ideally, in order to achieve a high Q value, the ***mechanical energy*** should be contained, or trapped, within the active region 34 of the BAW resonator 10. The reflector 18 operates to prevent acoustic waves from leaking longitudinally, or

vertically, from the BAW resonator 10 into the substrate (not shown, but below the reflector 18). Notably, in a Film Bulk Acoustic Resonator (FBAR) type BAW resonator, an air cavity is used instead of the reflector 18, where the air cavity likewise prevents acoustic waves from escaping into the substrate.

While the reflector 18 (or air cavity for a FBAR type BAW resonator) confines *mechanical energy* within the active region 34 of the BAW resonator 10 in the longitudinal, or vertical, direction, a substantial amount of *mechanical energy* still leaks laterally from the active region 34 of the BAW resonator 10 into the outer region 36 of the BAW resonator 10 and then down into the substrate, as illustrated FIG. 1B. This lateral leakage of *mechanical energy* at the boundaries of the BAW resonator 10 degrades the Q of the BAW resonator 10. As such, there is a need for systems and methods for mitigating the loss of *mechanical energy* through lateral dispersion into the outer region 36 of the BAW resonator 10.

36.     The '755 Patent at 2:30-51 provides the following additional description (with

relevant language bolded and italicized):

> Embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered in such a manner that lateral leakage of *mechanical energy* from an active region of the BAW resonator is reduced, and methods of fabrication thereof, are disclosed. In some embodiments, a BAW resonator includes a piezoelectric layer, a first electrode on a first surface of the piezoelectric layer, a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer, and a passivation layer on a surface of the second electrode opposite the piezoelectric layer, the passivation layer having a thickness ($T_{PA}$). The BAW resonator also includes a material on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator. The outer region of the BAW resonator is a region outside of an active region of the BAW resonator. The additional material has a thickness that is n times the thickness ($T_{PA}$) of the passivation layer, wherein n is a value other than 1. In this manner, lateral leakage of the *mechanical energy* from the active region of the BAW resonator into the outer region of the BAW resonator can be reduced.

> In some embodiments, n is within a range of values for which a *density of mechanical energy* in the outer region of the BAW resonator is reduced as compared to a *density of mechanical energy* in the outer region of the BAW resonator when n is equal to 1.

37.     The '755 Patent at 5:5-23 provides the following additional description (with

relevant language bolded and italicized):

> Embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered in such a manner that lateral leakage of *mechanical energy* from an active region of the BAW resonator is reduced,

and methods of fabrication thereof, are disclosed. In general, in some embodiments, a thickness of a material in the outer region of the BAW resonator is such that the outer region of the BAW resonator is acoustically matched to the active region of the BAW resonator in such a manner that wavelengths that cause the lateral leakage of ***mechanical energy*** are not excited in the active region. As a result, there is no leakage of wavelengths excited in the active region into oscillation modes in the outer region. In other words, the thickness of the material in the outer region of the BAW resonator is selected such that the extinction coefficient (i.e., the rate of exponential decay for evanescent waves) associated with the exponential decay in the outer region and the imaginary part of the lateral dispersion in the outer region are changed in such a manner that lateral leakage is reduced.

38.     Finally, the '755 Patent at 6:26-63[1] provides the following additional description

(with relevant language bolded and italicized):

As illustrated in FIG. 3A, during operation, the reference BAW resonator 38 of FIG. 2A exhibits a significant amount of lateral leakage of ***mechanical energy*** from the active region 62 into the outer region 64. This lateral leakage, or lack of lateral confinement, degrades the quality factor (Q) of the reference BAW resonator 38.

FIG. 2B illustrates a BAW resonator 66 with improved lateral confinement (i.e., reduced lateral leakage) of ***mechanical energy*** according to some embodiments of the present disclosure. In this example, the BAW resonator 66 includes a piezoelectric layer 68 (which is sometimes referred to as a piezoelectric plate), bottom and top electrodes 70 and 72, a reflector 74 including layers 76, 78, 80, 82, and 84, and a BO ring 86, which are exactly the same as the corresponding components of the reference BAW resonator 38 and, as such, their details are not repeated.

Lastly, the BAW resonator 66 includes a passivation layer 88 on the surface of the BAW resonator 66 over both an active region 90 and an outer region 92 of the BAW resonator 66. Within the active region 90, the passivation layer 88 is exactly the same as the passivation layer 60 of the reference BAW resonator 38. Within the active region 90, the passivation layer 88 has a thickness ($T_{PA}$), which is equal to that of the passivation layer 60 of the reference BAW resonator 38. However, in the outer region 92, the passivation layer 60 has a thickness of $n \times T_{PA}$, where $n \neq 1$ (i.e., the thicknesses of the passivation layers 60 and 88 in the outer regions 64 and 92 of the reference BAW resonator 38 and the BAW resonator 66, respectively, are not the same). The value of n is in a range that reduces the lateral leakage of ***mechanical energy*** from the active region 90 of the BAW resonator 66 into the outer region 92 as compared to that of the reference BAW resonator 38 of FIG. 2A. This reduction of lateral leakage is illustrated in

_____

[1] *See also* '755 Patent, Abstract; 1:14-18; 2:52-56; 2:57-61; 5:5-23; 6:26-31; 7:1-33; and 8:36-61.

FIG. 3B, where FIGS. 3A and 3B are graphical illustrations of the results of a simulation of the ***density of mechanical energy*** throughout the structures of the reference BAW resonator 38 and the BAW resonator 66, respectively.

39.     FIGS. 3A and 3B identified in the above passage show the following:



*FIG. 3A*                                    *FIG. 3B*

40.     The '755 Patent also describes these Figures as "illustrat[ing] the reduced lateral leakage of the BAW resonator of FIG. 2B as compared to the reference BAW resonator of FIG. 2A, for one example implementation."  '755 Patent, 4:1-4.

41.     Thus, the specification repeatedly indicates that the amount of mechanical energy created by the inventive structural configuration and leaked to the outer region is reduced as compared a prior art configuration.  While the claims and specification (sometimes) use the word "density" to describe the relative amounts, a POSITA reading the intrinsic record in its entirety would not have understood "density" in the '755 Patent to require a specific mathematical or dimensional relationship.  Rather, a POSITA reading the '755 Patent would have understood "density" to be used in a broader sense and recognizing general and/or localized mechanical energy reduction, such as is shown in the comparison images of FIGS. 3A and 3B.

42.     The prosecution history of the '755 Patent does not address this term or utilize it differently from that discussed above.

43.     Based on the above, a POSITA would have understood "density of mechanical energy" as proposed by Qorvo.

44.     A POSITA would not have understood "density of mechanical energy" as proposed by Akoustis.  Akoustis' proposed construction (as best understood) imports volumetric requirements that would not be considered necessary by a POSITA.  The intrinsic record does not dictate or support Akoustis' proposed construction.  I reserve my right to further address Akoustis' proposed construction on rebuttal.

45.     I have reviewed the extrinsic evidence identified by the parties.  My review indicates that "density of mechanical energy" is used in the '755 Patent in the same way it is used in the art and according to Qorvo's proposed constructions.  The extrinsic evidence does not dictate a construction different from that indicated by the intrinsic record.

**D.     "Acoustically Matched In Such A Manner That One Or More Wavelengths That Cause Energy Leakage Into The Outer Region *Are Not Excited* In The Active Region"**

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning.  If a construction for "are not excited" is needed, it means "are not substantively created" | "[A]re not excited" means that the wavelengths do not exist in the whole volume of the active region, or otherwise indefinite. |

46.     As shown above, the parties dispute the meaning of "are not excited" in the above element of the claims of the '755 Patent.  Based on my review of the intrinsic record and identified extrinsic evidence, it is my opinion that Qorvo's construction is correct.

47.     Looking first at the intrinsic record, "are not excited" is used in independent claims 9 and 10, and dependent claims 3 and 12, of the '755 Patent.  For example, independent claim 9 recites the following (with instances of "are not excited" bolded and italicized):

9. A BAW resonator comprising:

a piezoelectric layer;

PAGE 13

a first electrode on a first surface of the piezoelectric layer;

a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer;

a passivation layer on a surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonator, the passivation layer having a thickness (TPA) within the active region of the BAW resonator; and

one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator, the outer region of the BAW resonator being a region outside of the active region of the BAW resonator and the one or more material layers having a thickness that is n times the thickness (TPA) of the passivation layer within the active region, wherein:

n is a value other than 1; and

n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region *are not excited* in the active region.

48.     As understood in context, the claim specifies that particular wavelengths are not substantively excited (*e.g.*, not excited enough to cause energy leakage) in the active region as a result of the claimed construction.  The concept of excitation/non-excitation of waves is described in various portions of the '755 Patent, such as at 1:51-2:3, reproduced below (with relevant language bolded and italicized):

> In operation, acoustic waves in the piezoelectric layer 12 within an active region 34 of the BAW resonator 10 *are excited* by an electrical signal applied to the bottom and top electrodes 14 and 16. The active region 34 is the region of the BAW resonator 10 that is electrically driven. In other words, the active region 34 is the region of the BAW resonator 10 consisting of, in this example, the bottom electrode 14, the top electrode 16, the portion of the piezoelectric layer 12 between the bottom and top electrodes 14 and 16, and the portion of the reflector 18 below the bottom electrode 14. Conversely, an outer region 36 of the BAW resonator 10 is a region of the BAW resonator 10 that is not electrically driven (i.e., the area outside of the active region 34).

49.     The '755 Patent at 2:52-56 provides the following additional description (with relevant language bolded and italicized):

In some embodiments, n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region *are not excited* in the active region.

50.     Finally, the '755 Patent at 5:5-23[2] provides the following additional description

(with relevant language bolded and italicized):

> Embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered in such a manner that lateral leakage of mechanical energy from an active region of the BAW resonator is reduced, and methods of fabrication thereof, are disclosed. In general, in some embodiments, a thickness of a material in the outer region of the BAW resonator is such that the outer region of the BAW resonator is acoustically matched to the active region of the BAW resonator in such a manner that wavelengths that cause the lateral leakage of mechanical energy *are not excited* in the active region. As a result, there is no leakage of wavelengths *excited* in the active region into oscillation modes in the outer region. In other words, the thickness of the material in the outer region of the BAW resonator is selected such that the extinction coefficient (i.e., the rate of exponential decay for evanescent waves) associated with the exponential decay in the outer region and the imaginary part of the lateral dispersion in the outer region are changed in such a manner that lateral leakage is reduced.

51.     A reading of the intrinsic record in its entirety indicates that the recited non-

excitation relates to reducing the lateral leakage of mechanical energy into the outer region,

which is discussed with regard to the previous element.  To do so, the intrinsic record indicates

that "are not excited" means that the particular wavelengths that cause the lateral leakage are not

excited *enough* (*e.g.*, substantively excited) to result in energy leakage from the active region to

the outer region as a result of the claimed construction.  In other words, excitations of one or

more wavelengths that don't cause leakage (*e.g.*, minor or transient excitations) may occur

within the scope of the claim.

---

[2] *See also* '755 Patent, Abstract; 1:14-18; 2:4-13; 2:14-26; 2:30-51; 2:57-61; 6:26-31; 6:32-41; 6:42-63; 7:1-33; 8:36-61.

52.     The prosecution history of the '755 Patent does not address this term or utilize it differently from that discussed above.

53.     Based on the above, a POSITA would have understood "are not excited" as proposed by Qorvo.

54.     A POSITA would not have understood "are not excited" as proposed by Akoustis. Akoustis' proposed construction (as best understood) imports unnecessarily restrictive language that is not supported by the intrinsic record as understood by a POSITA.  I reserve my right to further address Akoustis' proposed construction on rebuttal.

55.     I have reviewed the extrinsic evidence identified by the parties.  My review indicates that "are not excited" is used in the '755 Patent in the same way it is used in the art and according to Qorvo's proposed constructions.  The extrinsic evidence does not dictate a construction different from that indicated by the intrinsic record.

## V.     THE '786 PATENT

### A.     The '786 Patent's Disclosure

56.     A POSITA would have understood the '786 Patent to be directed to BAW resonators using single crystal piezoelectric layers.  *See*, *e.g.*, '786 Patent, 1:40-52, 2:10-28.

57.     I have reviewed the '786 Patent, its related provisional application (U.S. Provisional Application No. 62/360,904; "the '904 Provisional"), and the '786 Patent's file history, all of which I understand to be part of the intrinsic record.

58.     It is my opinion that the intrinsic record is sufficient for a POSITA to understand the disputed term below.  I have also considered the extrinsic evidence cited by the Parties as relevant to the identified term.  Based on my current understanding, it is my opinion that it is unnecessary to resort to extrinsic evidence to understand the disputed term.

B.     "Piezoelectric Layer"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| A layer of piezoelectric material having single crystal structure. | A layer of piezoelectric material having single or multiple crystal structure. |

59.     As shown above, the parties dispute whether the "piezoelectric layer" of independent claims 1, 8, 12, 16 of the '786 Patent is a "single crystal structure" as Qorvo proposes, or a "single or multiple crystal structure," as Akoustis proposes.

60.     Based on my review of these documents, it is my opinion that Qorvo's construction is correct, *i.e.*, a POSITA would have understood that the "piezoelectric layer" of independent claims 1, 8, 12, 16 of the '786 Patent is a "a layer of piezoelectric material having single crystal structure."

61.     Looking first at the claims of the '786 Patent, "piezoelectric layer" is found only in independent claims 1, 8, 12, 16.  As a matter of example, I reproduce below independent claim 1 with the instances of "piezoelectric layer" bolded and italicized.

1. A communication filter device comprising:

a piezoelectric substrate having a substrate surface region, the piezoelectric substrate having a ***piezoelectric layer*** formed overlying a thinned seed substrate;

a topside metal electrode formed overlying a portion of the substrate surface region;

a topside micro-trench formed within a portion of the ***piezoelectric layer***;

one or more bond pads formed overlying one or more portions of the ***piezoelectric layer***;

a topside metal having a topside metal plug formed within the topside micro-trench and electrically coupled to at least one of the bond pads;

a first backside trench formed within the thinned seed substrate and underlying the topside metal electrode;

a second backside trench formed within the thinned seed substrate and underlying the topside micro-trench;

a backside metal electrode formed underlying one or more portions of the thinned seed substrate, within the first backside trench, and underlying the topside metal electrode; and

a backside metal plug formed underlying one or more portions of the thinned seed substrate, within the second backside trench, and underlying the topside micro-trench, the backside metal plug being electrically coupled to the topside metal plug and the backside metal electrode, wherein the topside micro-trench, the topside metal plug, the second backside trench, and the backside metal plug form a micro-via.

62.     Independent claims 1, 8, 12, and 16 do not otherwise describe the structure or composition of the "piezoelectric layer[s]." Nor does "piezoelectric layer" appear in any dependent claim. Thus, a POSITA would have reviewed the remaining intrinsic record to understand the meaning of "piezoelectric layer."

63.     The first description of the alleged invention of the '786 Patent in the intrinsic record is found in the '904 Provisional, which indicates the following:

> **COMMUNICATION FILTER FOR LTE BAND 41**
>
> **DESCRIPTION**
>
> The LTE Band 41 (B41) bandpass RF filter is a miniature filter designed for use in the 2496-2690MHz wireless frequency spectrum. The solution is designed to operate concurrently with adjacent 2.4GHz Bands including Wi-FI, WLAN, Bluetooth and ISM. The solution utilizes Akoustis BAW resonator technology built from the highest quality, single crystal piezoelectric materials, enabling high bandwidth-low loss filters in a miniature form factor. The B41 solution is compatible with high volume, lead free SMT solder processes and can be direct surface mounted to a PCB or integrated into a fronted module.

'904 Provisional, p. 13.

64.     Thus, from the very beginning, the focus of the alleged invention of the '786 Patent was on "single crystal piezoelectric" layers.

65.     This focus was maintained in the '786 Patent itself. First, as shown below, the '786 Patent is titled "Communication Filter Using **Single Crystal** Acoustic Resonator Devices." '786 Patent, cover page and col.1:1-3 (emphasis added).

66.     Second, the first sentence of the '786 Patent's Abstract indicates the patent is directed to "[a] communication system using a ***single crystal*** acoustic resonator device."  '786 Patent, Abstract (emphasis added).

67.     Third, the "Brief Summary of the Invention" section of the '786 Patent confirms it is directed to a single crystal piezoelectric layer.  For example, 1:40-52 indicates (emphasis added):

> The present invention relates generally to electronic devices. More particularly, the present invention provides techniques related to bulk acoustic wave resonator devices, ***single crystal*** bulk acoustic wave resonator devices, ***single crystal*** filter and resonator devices, and the like. Merely by way of example, the invention has been applied to a ***single crystal*** resonator device for a communication device, mobile device, computing device, among others.

> In an example, the present invention provides a communication system using a ***single crystal*** acoustic resonator device. The device includes a piezoelectric substrate with a piezoelectric layer formed overlying a thinned seed substrate. A topside metal electrode is formed overlying the substrate …
>
> ***
>
> One or more benefits are achieved over pre-existing techniques using the invention. In particular, the present device can be manufactured in a relatively simple and cost effective manner while using conventional materials and/or methods according to one of ordinary skill in the art. Using the present method, one can create a reliable ***single crystal*** based acoustic filter or resonator using multiple ways of three-dimensional stacking through a wafer level process. Such ***single crystal*** acoustic resonators enable high bandwidth-low loss filters in a miniature form factor, and such filters or resonators can be implemented in an RF filter device, an RF filter system, or the like. In an example, this communication filter can be a miniature filter configured for use in a 2496-2690 MHz wireless frequency spectrum. This filter can operate concurrently with adjacent 2.4 GHz bands including Wi-Fi, WLAN, Bluetooth, ISM, and the like. Depending upon the embodiment, one or more of these benefits may be achieved.

68.     While the above passage provides some broadening language, a POSITA would understand it, read as a whole, as indicating that the ***invention*** is to a single crystal piezoelectric layer.  In particular, the benefits of the invention are all characterized in relation to the single crystal nature of the piezoelectric layer.

69.     Turning next to the "Detailed Description of the Invention" section of the '786

Patent, this section again emphasizes the invention is directed to a single crystal piezoelectric

layer.  For example, 3:45-4:2 indicates the following:

 The present invention relates generally to electronic devices. More particularly,
the present invention provides techniques related to bulk acoustic wave resonator
devices, *single crystal* bulk acoustic wave resonator devices, *single crystal* filter
and resonator devices, and the like. Merely by way of example, the invention has
been applied to a *single crystal* resonator device for a communication device,
mobile device, computing device, among others.

FIG. 1A is a simplified diagram illustrating an acoustic resonator device 101
having topside interconnections according to an example of the present invention.
As shown, device 101 includes a thinned seed substrate 112 with an overlying
*single crystal* piezoelectric layer 120, which has a micro-via 129. The micro-via
129 can include a topside micro-trench 121, a topside metal plug 146, a backside
trench 114, and a backside metal plug 147. Although device 101 is depicted with
a single micro-via 129, device 101 may have multiple micro-vias. A topside metal
electrode 130 is formed overlying the piezoelectric layer 120. A top cap structure
is bonded to the piezoelectric layer 120. This top cap structure includes an
interposer substrate 119 with one or more through-vias 151 that are connected to
one or more top bond pads 143, one or more bond pads 144, and topside metal
145 with topside metal plug 146. Solder balls 170 are electrically coupled to the
one or more top bond pads 143.

70.     The '786 Patent reinforces that the piezoelectric layer 120 is single crystal

multiple times.  *See* 4:49-54, 5:4-10, 5:32-39, 6:46-50.  No embodiment using a polycrystalline

piezoelectric layer is described.  Thus, like the "Brief Summary of the Invention" section above,

a POSITA would have understood these portions, when read as a whole, to indicate that the

*invention* is to a single crystal piezoelectric layer.

71.     Still further, the '786 Patent indicates that

According to an example, the present invention includes a method for forming a
piezoelectric layer to fabricate an acoustic resonator device. More specifically, the
present method includes forming a *single crystal* material to be used to fabricate
the acoustic resonator device. By modifying the strain state of the III-Nitride (III-
N) crystal lattice, the present method can change the piezoelectric properties of
the *single crystal* material to adjust the acoustic properties of subsequent devices
fabricated from this material. In a specific example, the method for forming the

strained *single crystal* material can include modification of growth conditions of individual layers by employing one or a combination of the following parameters; gas phase reactant ratios, growth pressure, growth temperature, and introduction of impurities.

In an example, the *single crystal* material is grown epitaxially upon a substrate. Methods for growing the *single crystal* material can include metal-organic chemical vapor deposition (MOCVD), molecular beam epitaxy (MBE), hydride vapor phase epitaxy (HVPE), atomic layer deposition (ALD), or the like. Various process conditions can be selectively varied to change the piezoelectric properties of the *single crystal* material. These process conditions can include temperature, pressure, layer thickness, gas phase ratios, and the like. For example, the temperature conditions for films containing aluminum (Al) and gallium (Ga) and their alloys can range from about 800 to about 1500 degrees Celsius. The temperature conditions for films containing Al, Ga, and indium (In) and their alloys can range from about 600 to about 1000 degrees Celsius. In another example, the pressure conditions for films containing Al, Ga, and In and their alloys can range from about 1E-4 Torr to about 900 Torr.

72.     The above passages explain how to form the inventive piezoelectric layer only as a single crystal layer.  There is no indication in the '786 Patent as to how a polycrystalline piezoelectric layer would be formed according to the (alleged) invention of the '786 Patent.

73.     Still further, at 11:31-12:25, the '786 Patent provides an exemplary communication system using filters according to the (alleged) invention of the '786 Patent.  In this example, the '786 Patent emphasizes that "one or more single crystal acoustic resonators" are used.  '786 Patent, 12:6-8.

74.     Finally, at 13:50-67, the '786 Patent characterizes the benefits of the (alleged) invention solely in the context of single crystal piezoelectric layers.

One or more benefits are achieved over pre-existing techniques using the invention. In particular, the present device can be manufactured in a relatively simple and cost effective manner while using conventional materials and/or methods according to one of ordinary skill in the art. Using the present method, one can create a reliable *single crystal* based acoustic filter or resonator using multiple ways of three-dimensional stacking through a wafer level process. Such *single crystal* acoustic resonators enable high bandwidth-low loss filters in a miniature form factor, and such filters or resonators can be implemented in an RF filter device, an RF filter system, or the like. In an example, this communication

filter can be a miniature filter configured for use in a 2496-2690 MHz wireless frequency spectrum. This filter can operate concurrently with adjacent 2.4 GHz bands including Wi-Fi, WLAN, Bluetooth, ISM, and the like. Depending upon the embodiment, one or more of these benefits may be achieved.

75.     In view of the above, a POSITA would recognize that the '786 Patent clearly and repeatedly explains that its invention is a single crystal piezoelectric layer, repeatedly describes the benefits of its invention as being related to the single crystal piezoelectric layer, and only provides embodiments using a single crystal piezoelectric layer.  There is no indication in the '786 Patent that a polycrystalline piezoelectric layer could be used or could provide the alleged benefits of the (alleged) invention.

76.     It is my understanding that, when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication.  Here, the specification of the '786 Patent makes it clear that the '786 Patent is directed to single crystal "piezoelectric layers."

77.     The prosecution history of the '786 Patent does not address this term or utilize it differently from that discussed above.

78.     Based on the above, a POSITA would have understood "piezoelectric layer" as proposed by Qorvo.

79.     A POSITA would not have understood "piezoelectric layer" as proposed by Akoustis.  There is simply no support in the '786 Patent for a polycrystalline piezoelectric layer. I reserve my right to further address Akoustis' proposed construction on rebuttal.

80.     I have reviewed the extrinsic evidence identified by the parties.  The extrinsic evidence does not dictate a construction different from that indicated by the intrinsic record.

## VI.    LEGAL STANDARDS

81.    In forming my opinions in this Declaration, I applied the following legal principles.

82.    I understand that, to determine how a person of ordinary skill would have understood a claim term, one should look to sources available at the time of the alleged invention that show what a person of ordinary skill in the art would have understood the disputed claim language to mean.  It is my understanding that this may include what is called "intrinsic" evidence as well as "extrinsic" evidence.

83.    I understand that, in construing a claim term, one should primarily rely on intrinsic patent evidence, which includes the words of the claims themselves, the remainder of the patent specification, and the prosecution history.  I understand that extrinsic evidence, which is evidence external to the patent and the prosecution history, may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient.  I understand that extrinsic evidence may include principles, concepts, terms, and other resources available to those of ordinary skill in the art at the time of the invention.

84.    I understand that words or terms should be given their ordinary and accepted meaning unless it appears that the inventors were using them to mean something else or something more specific.  I understand that to determine whether a term has special meaning, the claims, the patent specification, and the prosecution history are particularly important, and may show that the inventor gave a term a particular definition or intentionally disclaimed, disavowed, or surrendered claim scope.

85.    I understand that the claims of a patent define the scope of the rights conferred by the patent.  I understand that, because the claims point out and distinctly claim the subject matter

which the inventors regard as their invention, claim construction analysis must begin with and is focused on the claim language itself.  I understand that the context of the term within the claim as well as other claims of the patent can inform the meaning of a claim term.  For example, because claim terms are normally used consistently throughout the patent, how a term is used in one claim can often inform the meaning of the same term in other claims.  Differences among claims or claim terms can also be a useful guide in understanding the meaning of particular claim terms.

86.     I understand that a claim term should be construed not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the entire specification.  I understand that because the specification is a primary basis for construing the claims, a correct construction must align with the specification.

87.     I understand that the prosecution history of the patent as well as art incorporated by reference or otherwise cited during the prosecution history are also highly relevant in construing claim terms.  For instance, art cited by or incorporated by reference may indicate how the inventor and others of skill in the art at the time of the invention understood certain terms and concepts.  Additionally, the prosecution history may show that the inventors disclaimed or disavowed claim scope, or further explained the meaning of a claim term.

88.     With regard to extrinsic evidence, I understand that all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises, can also be considered.  For example, technical dictionaries may indicate how one of skill in the art used or understood the claim terms.  However, I understand that extrinsic evidence is considered to be less reliable than intrinsic evidence, and for that reason is generally given less weight than intrinsic evidence.

## VII.   BACKGROUND AND QUALIFICATIONS

89.     This section contains a summary of my educational background, career history, publications, and other relevant qualifications.  My full *curriculum vitae* is attached as Appendix A to this declaration.

90.     I have a Ph.D. in Materials Science and Engineering from Stanford University.  I have taught a wide variety of courses at the undergraduate and graduate level in material science and engineering including coursework in the areas of materials analysis and crystallography.  I am a member of many professional societies, including the Materials Research Society, the Institute of Electrical and Electronic Engineers, the American Society of Metals, the Microscopy Society of America, and the American Physical Society. I was heavily involved with the Materials Research Society for more than 20 years, including service as its President in 1994.

91.     My work as a researcher and consultant has included thin film materials processing and analysis.  I have worked for more than 35 years in the areas of thin film materials processing and analysis.  Much of my work has involved analyzing properties and structures of electronic components.  I led investigations involving polycrystalline silicon, and a variety of oxide and nitride dielectrics.  I also led investigations in mechanical behaviors of many different electrical components focusing on the relationship between microstructures of each materials, processing and manufacturing of each electrical components, and its electrical and physical properties.

92.     I have previously testified as an expert witness. My full *curriculum vitae,* attached as Appendix A to this declaration, includes a list of those matters within the last four years.

93.     I have no financial interest in Qorvo or the '755 Patent or '786 Patent.

## VIII.   RESERVATION OF RIGHTS

94.     My opinions are based upon the information that I have considered to date.  I reserve the right to supplement my opinions in the future to respond to any arguments raised by Akoustis or its expert and to take into account new information that becomes available to me.

95.     I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed on July 11, 2022.

_____

John C. Bravman

# APPENDIX A

– John C. Bravman –
President, and Professor of Electrical Engineering, Bucknell University
Chairman of the Board, Geisinger Health System
Bing Centennial Professor Emeritus, Materials Science & Engineering, Stanford University
Freeman–Thornton Vice Provost, Emeritus, Stanford University
103 University Avenue, Lewisburg, Pennsylvania 17837

Research Interests & Expertise

- Integrated circuit process technology
- IC failure processes and phenomena
- Mechanical behavior of thin films
- High spatial resolution materials analysis
- Microelectronic packaging
- Superconductivity

Education

| 1975 – 1979 | B.S., Materials Science and Engineering, Stanford University |
| 1979 – 1984 | M.S., Ph.D., Materials Science and Engineering, Stanford University |

Professional Career

| 1979 – 1984 | Research Engineer, Fairchild Semiconductor Research Laboratory, Palo Alto, CA |
| 1985 – 1991 | Assistant Professor, Materials Science & Engineering, Stanford University |
| 1991 – 1995 | Associate Professor, Materials Science & Engineering, Stanford University |
| 1991 – 1995 | Associate Chairman, Materials Science & Engineering, Stanford University |
| 1992 – 1993 | Associate Dean, School of Engineering, Stanford University |
| 1993 – 2001 | Senior Associate Dean, School of Engineering, Stanford University |
| 1995 – 1997 | Professor, Dept. of Materials Science & Engineering, Stanford University |
| 1997 – 2010 | Bing Centennial Professor, Materials Science & Engineering, Stanford University |
| 1996 – 1999 | Chairman, Dept. of Materials Science & Engineering, Stanford University |
| 1998 – 1999 | Director, Center for Materials Research, Stanford University |
| 1999 – 2010 | Founder and Dean of the Freshman/Sophomore College, Stanford University |
| 1999 – 2010 | Freeman Thornton Vice Provost for Undergraduate Education, Stanford Univ. |
| 2001 | Interim Vice Provost for Student Affairs, Stanford University |
| 2001 – 2010 | Professor, by courtesy, Electrical Engineering, Stanford University |
| 2010 – present | Bing Centennial Professor of Materials Science and Freeman Thornton Vice Provost for Undergraduate Education, Emeritus, Stanford University |
| 2010 – present | President, and Professor of Electrical Engineering, Bucknell University |
| 2012 – present | Board of Directors, Geisinger Health System; Chairman, 2017 – present |

Honors and Awards

| 1987 | School of Engineering Distinguished Advisor Award, Stanford University |

Updated: 1 May 2022

| | |
|---|---|
| 1988 | Excellence in Teaching Award, Society of Black Scientists & Engineers |
| 1989 | Walter J. Gores Award for Excellence in Teaching, Stanford University's highest award for teaching |
| 1990 | Tau Beta Pi Engineering Honor Society Award for Excellence in Undergraduate Engineering Teaching, Stanford University |
| 1991 | Bradley Stoughton Award, ASM International, a national teaching award for scientists under the age of 35. |
| 1992 – 1995 | Bing Teaching Fellow, Stanford University |
| 1992 | Excellence in Teaching Award, Society of Women Engineers, Stanford Univ. |
| 1994 | President, Materials Research Society |
| 1995 – 1997 | University Fellow, Stanford University |
| 1997 | Bing Centennial Professor, Stanford University |
| 2001 | Stanford Associates Award for Service to the Alumni Association |
| 2004 | Woody White Award, Materials Research Society |
| 2010 | Kenneth M. Cuthbertson Award for Exceptional Service, Stanford University's highest award for contributions to the university. |
| 2022 | Modern Healthcare's Excellence in Healthcare Governance Class of 2022 |

External Service and Scholarly Activities

| | |
|---|---|
| 1986 – 1987 | Symposium Organizer, 1987 Fall Meeting of the Materials Research Society; "Workshop on Specimen Preparation for Transmission Electron Microscopy of Materials" |
| 1987 – 1988 | Symposium Organizer, 1988 Fall Meeting of the Materials Research Society; "Thin Films: Stresses and Mechanical Properties" |
| 1988 – 1989 | Organizing Committee, International Conference on Materials and Mechanisms of Superconductivity – High Temperature Superconductivity |
| 1988 – 1989 | Symposium Organizer, 1989 Meeting of the Electron Microscopy Society of America: "Structure and Reactivity of Metal – Semiconductor Interfaces" |
| 1989 – 1990 | Conference Chairman, 1990 Spring Meeting of the Materials Research Society |
| 1989 – 1990 | Symposium Organizer, 1990 Spring Meeting of the Materials Research Society: "Laser Ablation for Thin Film Synthesis" |
| 1989 – 1990 | Symposium Organizer, 1990 Spring Meeting of the Materials Research Society: "Frontiers of Materials Science" |
| 1990 – 1991 | Symposium Organizer, 1991 Fall Meeting of the Materials Research Society; "Thin Films: Stresses and Mechanical Properties III" |
| 1990 – 1991 | Symposium Organizer, 1991 Fall Meeting of the Materials Research Society; "Workshop on Specimen Preparation for Transmission Electron Microscopy of Materials III" |
| 1991 – 1993 | Council Member, Materials Research Society |
| 1991 – 1992 | Symposium Organizer, 1992 Spring Meeting of the Materials Research Society: "Structure and Defects in Electronic Oxides" |
| 1991 – 1996 | Technical Editorial Board, Materials Research Society Bulletin |

| | |
|---|---|
| 1992 | Second Vice President, Materials Research Society |
| 1992 – 1998 | Editorial Board, Annual Reviews of Materials Science |
| 1992 | Guest Editor, July 1992 Issue of the Materials Research Society Bulletin; "Mechanical Properties of Thin Film Materials" |
| 1993 | First Vice President, Materials Research Society |
| 1993 – 1995 | Selection Committee, Bradley Stoughton Award, ASM International |
| 1993, 2001 | Member, National Advisory Board, Materials Science & Technology Programs, Sandia National Laboratories |
| 1994 | President, Materials Research Society |
| 1994 – 1995 | Conference Organizer, 3rd International Workshop on Stress Induced Phenomena, Stanford, CA |
| 1995 – 1998 | Solid States Sciences Committee of the National Research Council |
| 1996 – 1999 | Awards Committee, ASM International |
| 1996 – 1999 | Chair, Program Development Subcommittee, Materials Research Society |
| 1996 – 1999 | Member, Electronics and Photonics Program National Advisory Board, Sandia National Laboratories |
| 1997 – 1998 | Symposium Organizer, 1998 Spring Meeting of the Materials Research Society, "Materials Reliability in Microelectronics VIII" |
| 1997 – 1998 | Conference Organizer, 15th Biennial Conference on National Materials Policy, Washington, D.C. |
| 1998 – 1999 | Program Committee, 5th International Workshop on Stress Induced Phenomena, Stuttgart, Germany |
| 1998 – 1999 | Chair, Long Range Planning Committee, Materials Research Society |
| 1998 – 2001 | Member, Editorial Board, Applied Physics Reviews |
| 1998 – 2006 | Associate Editor, Annual Reviews of Materials Science |
| 2000 – 2004 | Chair, Program Committee, Materials Research Society |
| 2001 | Member, Middle States Association Accreditation Review Panel, Cornell |
| 2001 | Member, Middle States Association Accreditation Review Panel, University of Pennsylvania |
| 2002 – 2008 | Visiting Committee, Massachusetts Institute of Technology |
| 2002 – 2006 | Member, Director's Review Board, Chemistry and Materials Science, Lawrence Livermore National Laboratory. |
| 2005 – 2009 | Board of Directors, LEAD Program for Underserved Youth |
| 2006 – 2010 | Member, Advisory Board, Journal of Engineering Education |
| 2010 – 2013 | Member, Board of Directors, Council of Higher Education Accreditation |
| 2010 – present | Member, Selection Committee for the Clare Booth Luce Awards, Henry Luce Foundation |
| 2011 – 2012 | Chair, Publications Review Committee, Materials Research Society |
| 2012 – 2013 | Chair, Middle States Association Accreditation Review Panel, Marist College |
| 2012 – present | Member, Board of Directors, Geisinger Health Systems Foundations |

| | |
|---|---|
| 2015 – 2016 | Chair, Middle States Association Accreditation Review Panel, United States Naval Academy |
| 2017 – 2018 | Chair, Middle States Association Accreditation Review Panel, Colgate University |

Stanford University Service

| | |
|---|---|
| 1986 – 2010 | Freshman Advisor |
| 1991 – 1992 | Deans' Advisory Group, Libraries & Information Resources |
| 1991 | Faculty Advisor, Freshman Alcohol Responsibility & Management Program |
| 1991 – 1995 | Committee on Residential Computing |
| 1991 – 1997 | Steering Committee, Continuing Education Program |
| 1992 | Faculty Expenditure Certification Process Task Force |
| 1992 – 1995 | Faculty Resident Fellow, Yost House Undergraduate Residence |
| 1992 | Search Committee, Director of Environmental Health and Safety |
| 1992 – 1996 | Chair, University Committee on Health and Safety |
| 1993 – 1999 | Chair, C-AAA Subcommittee on University and Departmental Honors |
| 1993 | Search Committee, Director of Residential Education |
| 1993 – 1997 | Faculty Senate of the Academic Council |
| 1993 – 1999 | Steering Committee, Center for Teaching and Learning |
| 1993 – 1994 | President's Commission on Undergraduate Education at Stanford; Chair of Subcommittee on Technology in Teaching and Learning |
| 1993 – 1995 | C-ASIS Subcom. on Distributed Information & Computing Environment |
| 1994 – 1995 | President's Commission on Technology in Teaching and Learning |
| 1994 – 1997 | Board of Directors, Faculty Club |
| 1994 – 2003 | C–AAA Subcommittee on Academic Standing |
| 1995 – 2004 | Faculty Member, Stanford Sophomore College |
| 1995 | Search Committee, Dean of Students |
| 1995 – 1996 | Faculty Senate Committee on Committees |
| 1995 – 1997 | Design Committee for Cultures, Ideas & Values Program |
| 1996 | Search Committee, Director of Career Planning and Placement Center |
| 1996 – 1998 | Stanford University Board of Trustees Committee on Development |
| 1996 – 1999 | Writing Advisory Board |
| 1996 – 2010 | University Undergraduate Advisory Council |
| 1996 – 1997 | Residences Task Force |
| 1996 – 1999 | Executive Committee, Center for Materials Research |
| 1997 | Search Committee, Dean of Admissions & Financial Aid |
| 1997 – 1999 | Residence Programs Implementation Group |
| 1998 – 2001 | Stanford University Board of Trustees Committee on Nominations |
| 1998 – 1999 | Director, Center for Materials Research |
| 1999 | Elected Chair, Faculty Senate of the Academic Council |
| 1999 – 2010 | Dean of the Freshman/Sophomore College |
| 1999 – 2010 | Freeman–Thornton Vice Provost for Undergraduate Education |
| 2000 | Co–Chair, Search Committee, Dean of Admissions & Financial Aid |
| 2000 – 2001 | Provost's Task Force, University Needs Assessment |

| | |
|---|---|
| 2000 – 2003 | Strategic Planning Board, Cantor Center for the Visual Arts |
| 2001 | Search Committee, Dean of Humanities and Sciences |
| 2001 | Chair, Search Committee, Vice Provost for Student Affairs |
| 2001 | Interim Vice Provost for Student Affairs |
| 2004 – 2005 | Co–Chair, Search Committee, Dean of Admissions & Financial Aid |
| 2004 – 2007 | Dean of Potter College |
| 2005 – 2006 | Search Committee, Director of Athletics |
| 2006 | Co–Chair, Stanford Task Force Evaluating Education in the Residences |
| 2006 – 2007 | Search Committee, University Registrar |
| 2006 – 2010 | Co–Chair, WASC Reaccreditation Steering Committee |

## Stanford School of Engineering Service

| | |
|---|---|
| 1986 – 1990 | EE–ICL Faculty Search Committees (Silicon Processing; Sensors) |
| 1986 – 1992 | Radiation Safety Committee |
| 1987 – 1992 | School of Engineering Committee on Computers |
| 1991 – 2001 | Member of Undergraduate Council |
| 1991 – 2006 | Faculty Advisor, Tau Beta Pi Engineering Honor Society |
| 1992 – 1993 | MSE–EE Faculty Search Committee (Magnetic Materials & Devices) |
| 1992 – 1994 | MSE–Chem. E. Faculty Search Committee (Comput. Materials Science) |
| 1992 – 1993 | Associate Dean for Undergraduate Affairs |
| 1992 – 2009 | Faculty Advisor, Stanford Solar Car Project |
| 1993 – 2001 | Senior Associate Dean for Student Affairs |

## Stanford Departmental Service

| | |
|---|---|
| 1986 – 1987 | Student Faculty Liaison Committee, Dept. of Materials Science |
| 1986 – 1987 | Industrial Affiliates Program Committee, Dept. of Materials Science |
| 1986 – 1990 | Advanced Degree Committee, Dept. of Materials Science |
| 1986 – 1990 | Curriculum Committee, Dept. of Materials Science |
| 1986 – 1991 | Project Director, X–ray Diffraction Lab., Dept. of Materials Science |
| 1986 – 1991 | Chair, Computer Committee, Dept. of Materials Science |
| 1987 – 1991 | Chair, Space and Building Committee, Dept. of Materials Science |
| 1990 – 1995 | Chair, Financial Aids Committee, Dept. of Materials Science |
| 1991 – 1995 | Associate Chairman, Dept. of Materials Science and Engineering |
| 1996 – 1999 | Chairman, Department of Materials Science & Engineering |

## Referee

| | |
|---|---|
| Journals | Journal of Applied Physics, Applied Physics Letters, Journal of Materials Science, Journal of the Electrochemical Society, Physical Review B, IEEE Electron Device Letters, Journal of Materials Research, Physical Review Letters, Journal of Engineering Education |

| Agencies | National Science Foundation, Electric Power Research Institute, Air Force Office of Scientific Research, Department of Energy, Army Research Labs, Science and Engineering Research Council (Singapore) |

## Professional Society Memberships

| American Physical Society | American Society of Metals |
| Materials Research Society | The Metallurgical Society of AIME |
| Microscopy Society of America | Institute of Electrical & Electronic Engineers |

## Patents

"Drug Delivery Systems using Mesoporous Oxide Films," Dimitrios Pantelidis and John C. Bravman, US Patent 7,981,441, issued July 19, 2011.

"Bioactive Material Delivery Systems Comprising Sol-Gel Compositions," Dimitrios Pantelidis, John C. Bravman, Jonathan Rothbard, and Richard Klein, US Patent 8,097,269, issued January 17, 2012.

## Consulting Activities – Technical Advisory

| 1985 – 1987 | Fairchild Semiconductor, Palo Alto, CA. (technical consulting) |
| 1986 – 1992 | National Semiconductor, Santa Clara, CA. (technical consulting) |
| 1987 – 1990 | Intel Corporation, Santa Clara, CA. (technical consulting) |
| 1992 – 2000 | Mayfield Fund, Menlo Park, CA. (technical consulting) |
| 1994 – 2002 | Chair, National Advisory Board, Materials Science & Technology Programs, Sandia National Laboratories |
| 1998 – 2003 | Mohr, Davidow, Menlo Park, CA. (technical consulting) |
| 2001 – 2005 | Reflectivity, Inc., Sunnyvale, CA. (technical consulting) |
| 2003 – 2007 | Applied Plasma Lab, Inc., Santa Clara, CA. (Board of Directors) |
| 2004 – 2010 | Medlogics, Santa Rosa, CA. (technical consulting) |
| 2005 – 2007 | Sharefare, Los Altos, CA. (Technical Advisory Board) |
| 2006 – 2008 | HSH Nordbank, New York, NY. (technical due diligence) |
| 2007 | Virgin Fuels, London, U.K. (technical due diligence) |

Consulting Activities – Intellectual Property, Trade Secret, Product Liability

1999 – 2000    Robins, Kaplan, Miller and Ciresi
- for Raychem; patent litigation, consultant, 1999 – 2000. [*completed*]

2001 – present    Perkins Coie
- for Semitool in Semitool vs. Applied Materials, Novellus, and Ebara; patent litigation, testifying witness, 2001 – 2004. [Case CV 01-1066-BR (Applied Materials), [Case CV 01-874-BR (Novellus), Case CV 01-873-BR (Ebara); US District Court, District of Oregon.] [*completed*]
- for Semitool in Semitool vs. DMS; patent litigation, testifying witness, 2004 – 2005. [Case 01–1391 WHA; US District Court, Northern District of California, San Francisco Division; filed April 9, 2001] [*completed*]
- for Micron in Ohmi vs. Intel, IBM, Samsung and Micron; patent litigation, testifying witness, 2006 – 2007. [Case 2–05–CV–209; US District Court, Eastern District of Texas, Marshall Division; filed June 2, 2005.] [*completed*]
- for On Semiconductor in On Semiconductor vs. Hynix Semiconductor, Elpida Memory, Nanya Technology, and Hittite Microwave; patent litigation, testifying witness, 2010. [Case 6–09-CV–390; United States District Court for the Eastern District Of Texas.] [*completed*]
- for Intel in Semcon Tech LLC *vs.* Intel Corporation; patent litigation, testifying witness, 2012 – 2013. [Case 12-531-RGA; United States District Court for Delaware.] [*completed*]
- for Intel, Global Foundries, and Micron in Intel Corporation, Global Foundries U.S., Inc., and Micron Technology, Inc., Petitioners, *vs.* Daniel L. Flamm; IPR Petitions on U.S Patent RE40,264; 2016-2018. [*completed*]
- for STMicroelectronics, in Ocean Semiconductor LLC vs. STMicroelectronics, Inc., patent litigation, testifying witness, 2021 – present. [Case 6:20-cv-01215-ADA, W.D. Texas.] *

2003 – 2020    Kirkland & Ellis
- for Honeywell Electronic Materials; patent litigation; consultant, 2003. [*completed*]
- for Samsung in Ohmi vs. Intel, IBM, Samsung and Micron; patent litigation; testifying witness, 2006 – 2007. [Case 2–05–CV–209; US District Court, Eastern District of Texas, Marshall Division; filed June 2, 2005.] [*completed*]
- for Samsung in Samsung vs. Matsushita; patent litigation; testifying witness, 2006 – 2007. [Case 6:06-CV-154 LED; US District Court, Eastern District of Texas, Tyler Division; filed September 15, 2005.] [*completed*]
- for Agere Systems in Agere vs. Atmel; patent litigation; testifying witness, 2006. [Case 02–CV–864; US District Court, Eastern District of Pennsylvania] [*completed*]
- for Samsung in On Semiconductor vs. Samsung; patent litigation; testifying witness, 2008 – 2009 [Case 07–449 (JJF); US District Court, District of Delaware]; and in Samsung vs. On Semiconductor; patent litigation; testifying witness, 2008 – 2009 [Case 06–720 (JJF); US District Court, District of Delaware]. [*completed*]

- for Samsung in Spansion vs. Samsung; patent litigation; testifying witness, 2009 [Investigation 337–TA–664; US International Trade Commission, Washington D.C.] [*completed*]
- for Samsung in Spansion vs. Samsung; patent litigation; testifying witness, 2010 – 2011 [Case 08–855 (SLR); US District Court, District of Delaware]. [*completed*]
- for Samsung in Spansion vs. Samsung; patent litigation; testifying witness, 2011 – 2012 [Case No. 3:10-CV-685 (WMC); US District Court, Western District of Wisconsin]. [*completed*]
- for Intel in IP Bridge vs. Intel, Petitioners; IPR Petitions on U.S Patents 6346736, 6424041, 6709950, 6967409, 7417289, 7893501; 2017–2019. [*completed*]
- for Intel, Acer, ASUSTeK, Lenovo, and Micro-Star International, in Tela Innovations, Inc. vs. Intel, Acer, ASUSTeK, Lenovo, and Micro-Star International; patent litigation; testifying witness, 2019–2020 [Case 337-TA-1148; US International Trade Commission, Washington D.C.] [*completed*]

2003          McDermott, Will & Emery
- for Motorola/Freescale in Motorola vs. Analog Devices; patent litigation, testifying witness, 2003. [Case 1:03-CV-0131; US District Court, Eastern District of Texas, Beaumont Division; filed March 4, 2003.] [*completed*]

2003 – 2004          Jones Day
- for Motorola/Freescale in Motorola vs. Analog Devices; patent litigation, testifying witness, 2003 – 2004. [Case 1:03-CV-0131; US District Court, Eastern District of Texas, Beaumont Division; filed March 4, 2003.] [*completed*]

2004 – 2005          Heller Erhman White & McAuliffe
- for Fujitsu in Fujitsu vs. Sumitomo, Amkor, and Cirrus Logic; product liability, testifying witness, 2004 – 2005. [Case 1-03-CV-009885; Superior Court of the State of California, County of Santa Clara; filed November 25, 2003.] [*completed*]
- for Western Digital in Reiber et al. *vs.* Western Digital et al., patent litigation, testifying witness, 2008. [Investigation No. 337-TA-616.] [*completed*]

2004 – 2005          Paul, Hastings, Janofsky & Walker
- for SMIC in TSMC vs. SMIC; trade secrets, consultant, 2004 – 2005. [Case C-03-5761 MMC; US District Court, Northern District of California.] [*completed*]

2005 – 2006          Townsend and Townsend and Crew
- for Hynix in Toshiba vs. Hynix; patent litigation, testifying witness, 2005 – 2006. [Case 3:04-CV-04708 VRW; US District Court, Northern District of California; filed September 1, 2006.] [*completed*]

2005 – 2007          Keker and Van Nest
- for Intel in Ohmi vs. Intel, Samsung and Micron; patent litigation, testifying witness, 2005 – 2007. [Case 2–05CV–209; US District Court, Eastern District of Texas, Marshall Division; filed June 2, 2005.] [*completed*]

- for Sputtered Films Inc. in SFI vs. Advanced Modular Sputtering; trade secret litigation, consultant, 2006. [Case 0113-2336; Superior Court of the State of California, Anacapa Division; filed December 23, 2003.] [*completed*]

| | |
|---|---|
| 2005 – present | **Fish and Richardson** |

- for Hynix in Toshiba vs. Hynix; patent litigation, testifying witness, 2005 – 2006. [Investigation 337–TA–552; US International Trade Commission, Washington D.C.] [*completed*]
- for Metconnex in JDS Uniphase vs. Metconnex; patent litigation, consultant, 2005 – 2006. [Case 05-5371-AG(SS); US District Court, Central District of California, Southern Division; filed July 25, 2005.] [*completed*]
- for Hynix in Toshiba vs. Hynix; patent litigation, testifying witness, 2007 – 2008. [Investigation 337–TA–592; US International Trade Commission, Washington D.C.] [*completed*]
- for Samsung in Renesas vs. Samsung; patent litigation, testifying witness, 2007 – 2008. [Investigation 337–TA–595; US International Trade Commission, Washington D.C.] [*completed*]
- for Applied Materials, in Applied Materials vs. SSC, patent litigation, testifying witness, 2007 – 2008 [*completed*]
- for Spansion in Spansion vs. Samsung; patent litigation, testifying witness, 2010 – 2011. [Investigation 337–TA–735; US International Trade Commission, Washington D.C.] [*completed*]
- for Invensense in STMicroelectronics vs. Invensense; patent litigation, testifying witness, 2013 – 2014. [Case CV 12-02475 (JSW), US District Court, Northern District of California, San Francisco Division.] [*completed*]
- for Macronix in Spansion vs. Macronix; patent litigation, testifying witness, 2014 – 2015. [Investigation 337–TA–916; US International Trade Commission, Washington D.C.] [*completed*]
- for Samsung in KIPB LLC vs. Samsung; patent litigation, testifying witness, 2020 – present. [Case No. 2:19-cv-00056-JRG-RSP; US District Court, Eastern District of Texas, Marshall Division.] [*completed*]
- for General Motors LLC, Volkswagen AG and Volkswagen Group of America, Inc., and Bayerische Motoren Werke AG and BMW of North America, LLC, in Arigna vs. General Motors LLC, Volkswagen AG and Volkswagen Group of America, Inc., and Bayerische Motoren Werke AG and BMW of North America, LLC; testifying witness, 2021 – present, [International Trade Commission, Investigation No. 337-TA-1267]. *

| | |
|---|---|
| 2006 – 2014 | **Irell & Manella** |

- for Tessera in Tessera, Inc. vs. Amkor; patent litigation, testifying witness, 2006 – 2008. [International Court of Arbitration of The International Chamber of Commerce] [*completed*]
- for Tessera in Tessera, Inc. vs. Advanced Micro Devices, Inc., Spansion Inc., Spansion Technology Inc., Spansion LLC, Advanced Semiconductor Engineering, Inc., ASE (US) Inc., ChipMOS Technologies Inc., ChipMOS USA Inc., Siliconware Precision Industries Co. Ltd, Siliconware USA Inc., STMicroelectronics N.V. STMicroelectronics, Inc., STATSChipPac Ltd., STATSChipPac, Inc., STATSChipPac (BVI) Limited; patent litigation, testifying witness, 2006 – 2008. [Case 4:05-CV-04063 CW); US District Court,

9

Updated: 1 May 2022

Northern District of California; filed January 31, 2006 (Second Amended Complaint).] [*completed*]
- for Chi Mei Optoelectronics in LG Display vs. Chi Mei Optoelectronics; patent litigation, testifying witness, 2009 – 2011. [Case 06-726, 07-357, 08-355 (D. Dell); US District Court, Delaware.] [*completed*]
- for Tessera in Tessera, Inc. vs. Amkor; patent litigation, testifying witness, 2010 – 2011. [International Court of Arbitration of The International Chamber of Commerce] [*completed*]
- for Tessera in Tessera, Inc. *vs.* Sony Corporation, 2012 – 2013. [Case 5:11-CV-04399-EJD, US District Court, Northern District of California.] [*completed*]
- for Tessera in Power Technology Inc. *vs.* Tessera, Inc. 2012 – 2014. [Case 4:10-CV-00945-CW, US District Court, Northern District of California.] [*completed*]
- for Tessera in Tessera *vs.* UTAC, 2015 – 16, patent litigation, testifying witness. [*completed*]

2006 – present    Sheppard, Mullin, Richter, & Hampton
- for Northrup Grumman; contract dispute, consultant, 2006 – 2010. [*completed*]
- for Qorvo, in Qorvo *vs.* Akoustis, Inc.; patent litigation, testifying witness, 2022 – present. [Case 21-cv-01417, District of Delaware.]  *

2006 – 2007    Foley & Lardner
- for Schlumberger Technology Corporation in Memory Corporation vs. Kentucky Oil Technology N.V., Peter Besselink, Memory Metals Holland, B.V., and Kentucky Oil Technology N.V. vs. Memry Corporation and Schlumberger Technology Corporation; trade secrets, consultant, 2006 – 2008. [Case 04–CV–03843 RMW (HRL); US District Court, Northern District of California.] [*completed*]

2007 – 2009    Baker Botts
- for Agere in Agere vs. Sony; patent litigation, testifying witness, 2007 – 2009. [Case 2:06–CV–00079 (TJW); US District Court, Eastern District of Texas, Marshall Division.] [*completed*]
- for Samsung in Samsung vs. Pioneer Corporation; patent litigation, testifying witness, 2007 – 2008. [Case 2:06–CV–384 (DF); US District Court, Eastern District of Texas, Marshall Division.] [*completed*]

2007 – 2008    Wolf, Greenfield & Sacks
- for Nanya Technology Corporation in Fujitsu vs. Nanya; patent litigation, testifying witness, 2007 – 2008. [Case 4:06-CV-06-06613 (CW); US District Court, Northern District of California, Oakland Division.] [*completed*]

2008 – 2009    Quinn Emanuel Urquhart Oliver & Hedges
- for Samsung in Samsung vs. SanDisk; patent litigation, testifying witness, 2008 – 2009. [*completed*]

2008 – 2021    Winston & Strawn
- for S.O.I.TEC Silicon on Insulator Technologies in S.O.I.TEC Silicon on Insulator Technologies vs. MEMC Electronic Materials; patent litigation,

testifying witness, 2008 – present. [Case 1:08-cv-292-SLR; US District Court, District of Delaware.] [*completed*]
- for Corning, testifying witness, 2019–2021. [*completed*]

2009 – 2011    Lerner, David, Littenberg, Krumholz & Mentlik
- for Tessera in Tessera vs. ST Microelectronics; patent re–examination, consulting expert, 2009 – 2011. [*completed*]

2009 – 2013    Morrison & Foerster
- for Advanced Microfabrication Equipment in Applied Materials vs. Advanced Microfabrication Equipment; patent litigation, testifying witness, 2009. [Case C07–05248 JW (PVT), US District Court, North. District of California, San Jose Division.] [*completed*]
- for Invensas in STMicroelectronics vs. Invensas; patent litigation, testifying witness, 2013 – 2014. [Case CV 12-02475 (JSW), US District Court, Northern District of California, San Francisco Division.] [*completed*]

2009    Sidley Austin
- for Samsung in Samsung vs. Pioneer Corporation; patent litigation, testifying witness, 2009. [Case 2:06–CV–384 (DF); US District Court, Eastern District of Texas, Marshall Division.] [*completed*]

2009    Thompson & Knight
- for LSI in Qimonda *vs.* LSI; patent litigation, testifying witness, 2009. [Investigation 337–TA–665; US International Trade Commission, Washington D.C.] [*completed*]

2009    O'Melveny & Myers
- for Samsung in Semiconductor Energy Laboratory *vs.* Samsung; patent litigation, testifying witness, 2009 – 2010. [Case 3:09–CV–0001; US District Court, Western District of Wisconsin.] [*completed*]

2010 – 2011    Farella, Braun & Martell
- for Volterra Semiconductor in Volterra *vs.* Infineon Technologies; patent litigation, testifying witness, 2010 – 2011. [Case No. CV-08-5129 (JCS); US District Court, Northern District of California, San Francisco Division.] [*completed*]

2011    Faegre & Benson
- for CoorsTek in CoorsTek *vs.* Reiber & Reiber; patent litigation, testifying witness, 2011. [Case 08-CV-1133-KMT-CBS; US District Court, District of Colorado.] [*completed*]

2012 – 2021    WilmerHale
- for Apple, Intel, and Hewlett-Packard, in X2Y Attenuators LLC v. Apple, Intel and Hewlett-Packard, patent litigation, testifying witness, 2012. [ITC Investigation No. 337-781.] [*completed*]

- for Intel, in Zond LLC v. Intel, patent litigation, testifying witness, 2013 – 2014. [Case No. CV-1:13-11570-JLT; US District Court.] [*completed*]
- for Gillette, in Gillette v. Zond, LLC, testifying witness, 2015. [Patent 8,125,155; Case Nos. IPR 2014–00477 and 00479.] [*completed*]
- for Gillette, in Gillette v. Zond, LLC, testifying witness, 2015. [Patent 6,896,775; Case Nos. IPR 2014-00578 and 00604.] [*completed*]
- for Gillette, in Gillette v. Zond, LLC, testifying witness, 2015. [Patent 6,896,773; Case Nos. IPR 2014-00580 and 00726.] [*completed*]
- for Gillette and TSMC, in Gillette, Fujitsu Semiconductor Limited, Advanced Micro Devices, Renesas Electronics Corporation, Renesas Electronics America, Global Foundries U.S., Global Foundries Dresden Module One LLC & Co. KG, Global Foundries Dresden Module Two LLC & Co. KG, Toshiba America Electronic Components, Toshiba America, Toshiba America Information Systems, and Toshiba Corporation v. Zond, LLC, testifying witness, 2015. [Patent 7,808,184 ; Case Nos. IPR 2014-00799 and 00803.] [*completed*]
- for Apple in Apple *vs.* Ericsson; patent litigation, 2015. [ITC Investigation No. 337-953.] [*completed*]
- for Intel in DSS *vs.* Intel Corporation; patent litigation, 2015. [Case No. CV-6:15-130; US District Court.] [*completed*]
- for Intel in DSS *vs.* Intel Corporation; patent litigation, 2015. [Patent 5,965,924: Case Nos. IPR 2015-TBD and Patent 6,784,552: Case Nos. IPR 2015-TBD.] [*completed*]
- For Intel in VLSI Technology *vs.* Intel, Petitioners; IPR Petitions on U.S Patents 7709303, 8268672; 2017 – 2019. [*completed*]

| | |
|---|---|
| 2015 | Latham & Watkins |

- for NVIDIA,  in Samsung v. NVIDIA, patent litigation, testifying witness, 2015. [Case No. CV-3:14-757; US District Court.] [*completed*]

| | |
|---|---|
| 2015 – 2016 | Troutman Sanders |

- for Soitec in Silicon Genesis *vs.* Soitec; patent litigation, testifying witness, 2015-16. [Investigation 337–TA–966; US International Trade Com., Washington D.C.] [*completed*]

| | |
|---|---|
| 2016 – 2020 | Covington |

- for Tessera, in Tessera vs. Broadcom; patent litigation, testifying witness, 2016-17 [Investigation 337–TA–1010; US International Trade Com., Washington D.C.] [*completed*]
- for Hanwha Q CELLS in Hanwha Q Cells vs. JinkoSolar Holding Co., Ltd., JinkoSolar (U.S.) Inc., Jinko Solar (U.S.) Industries Inc., Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jinko Solar Technology Sdn. Bhd., LONGi Green Energy Technology Co., Ltd., LONGi Solar Technology Co., Ltd., LONGi (H.K.) Trading Ltd., LONGi (Kuching) Sdn. Bhd., Taizhou LONGi Solar Technology Ltd., Zhejiang LONGi Solar Technology Ltd., Hefei LONGi Solar Technology Ltd., LONGi Solar Technology (U.S.) Inc., REC Solar Holdings AS, REC Solar Pte. Ltd. and REC Americas, LLC; patent litigation, testifying witness, 2019 [Investigation 337–TA–1151; US International Trade Com., Washington D.C.] [*completed*]

- for Invensas Corporation and Tessera Advanced Technologies, Inc., in Invensas Corporation and Tessera Advanced Technologies vs. NVIDIA Corporation; patent litigation, testifying witness, 2019-2020 [Case No. 1:19-cv-00861; US District Court] [*completed*]
- for Samsung Display Co., *Inter Partes Review* of Certain AUO Patents. *

2018 – 2021    Mintz Levin
- for Innovative Foundry Technologies, consulting expert. [ ITC investigation 337-TA-1149] [*completed*]

2019 – 2021    Orrick
- for Micron Technology, Inc., in North Star Innovations, Inc. vs. Micron Technology, Inc., patent litigation, testifying witness, 2019–present. [Case No. 17-cv-506-LPS-CJB; US District Court.] [*completed*]
- for Micron Technology, Inc., in Lone Star Innovations LLC, Inc. vs. Micron Technology, Inc., patent litigation, testifying witness, 2019–present. [Case No. 3:17-cv-05458-WHA; US District Court.] [*completed*]

2019 – 2021    Steptoe & Johnson
- for Chilisin Electronics Corp., in Cyntec Company, Ltd. v. Chilisin Electronics Corp, Inc., patent litigation, testifying witness, 2019–2021. [Case No.: 4:18-cv-00939-PJH; US District Court.] [*completed*]

2014 – present    Desmarais
- for Round Rock Research LLC, in Round Rock Research LLC v. SanDisk Corporation; consulting expert. 2014–15. [*completed*]
- for Apple, in nCAP Licensing, LLC, nCAP Telecommunications LLC, nCAP Medical, LLC v. Apple Inc, consulting expert. [No.: 2:17-cv-00905-HCN-CMR]. [*completed*]
- for Samsung Electronics Ltd. et al., in Samsung Electronics Ltd. et al. v. Trenchant Blade Technologies LLC, Inter Partes Review; testifying witness, 2020–2021. [*completed*]
- for Samsung in Demaray LLC v. Samsung Electronics Co., Ltd. et al., 6:20-cv-00636; testifying witness. 2020–present. *

2021 – present    Finnegan
- for General Motors LLC, Volkswagen AG and Volkswagen Group of America, Inc., and Bayerische Motoren Werke AG and BMW of North America, LLC, in Arigna v. General Motors LLC, Volkswagen AG and Volkswagen Group of America, Inc., and Bayerische Motoren Werke AG and BMW of North America, LLC; testifying witness, 2021 – present, [International Trade Commission, Investigation No. 337-TA-1267]. *

Note: The designation "[*completed*]" at the end of an entry indicates that Dr. Bravman's involvement in the matter has ended no later than the publication date of this document. Matters indicated with a * remain active as of that date.

Doctoral Students of Prof. John C. Bravman

| Name | Dissertation Title | Completion Date |
|------|-------------------|-----------------|
| 1.   David C. Paine | A Microstructural Study of LPCVD | September 1988 |
|      | Tungsten Thin Films for Use as a Contact Material to Silicon. | |
| 2.   Ming Bing Chang | Deep Level Related Studies in GaAs | October 1989 |
|      | with the Constant Capacitance Voltage Transient Technique. | |
| 3.   Soonil Hong | Free Standing Multilayer Thin Film | December 1990 |
|      | Microstructures for Electronic Systems. | |
| 4.   Bruce M. Lairson | Critical Currents and Flux Creep in $YBa_2Cu_3O_{7-\delta}$ Superconducting Thin Films. | August 1991 |
| 5.   Paul L. Meissner | Barrier Height Reduction and Interface Chemistry in Pd–Ge Based Contacts to GaAs. | August 1991 |
| 6.   Ramnath Venkatraman | Plasticity and Flow Stresses in Al Thin Films on Silicon. | May 1992 |
| 7.   Stephen K. Streiffer | Nucleation and Growth of $YBa_2Cu_3O_{7-\delta}$ | November 1992 |
|      | Films on Lattice–Matched and Mismatched Substrates. | |
| 8.   Paul R. Besser | X–ray Determination of Thermal Strains, Stresses, and Relaxation in Passivated Al Lines During Thermal Cycling | August 1993 |
| 9.   Thomas N. Marieb | In-Situ Observations of Void Nucleation and Growth in Passivated Metal Lines | January 1994 |
| 10.  Richard Vinci | Thermal Stresses and Strains in Copper Films and Interconnect Structures | August 1994 |
| 11.  Cynthia Lee | Diffusion of Implanted Dopants | December 1994 |
|      | in GaAs/AlGaAs. | |
| 12.  Eden Zielinski | The Influence of Strain Energy on Abnormal Grain Growth in Copper Thin Films | August 1995 |
| 13.  Yaser M. Haddara | Transient Diffusion of Dopants in Gallium Arsenide | March 1997 |
| 14.  Charlie Yu | High Temperature Mechanical Properties of Thin Films used in VLSI Fabrication | August 1997 |
| 15.  Samantha Lee | The Effects of Passivation on Electromigration Behavior in Aluminum Interconnects | August 1998 |
| 16.  Jonathan Doan | In–Situ Studies of Electromigration in Thin Films | December 1998 |

Updated: 1 May 2022

| | | |
|---|---|---|
| 17.  Guido Cornella | Monotonic and Cyclic Testing of Thin Film Materials | December 1998 |
| 18.  Seok Hee Lee | Electromigration in Cu Thin Films | December 2000 |
| 19.  Nicole Meier | Electromigration in Cu Thin Films | March 2002 |
| 20.  Dimitrios Pantelidis | Mechanisms of Adhesion of Organic/Inorganic Interfaces Reinforced by Silane Coupling Agents and Self-Assembling Mesoporous Oxide Thin Films | June 2003 |
| 21.  Ping Zhang | Thin Film Mechanical Behavior | May 2003 |
| 22.  Bryan Valek | Thin Film Mechanical Behavior | March 2003 |
| 23.  Maura Jenkins | Selection and Use of Silane Adhesion Promoters in Microelectronic Packaging | June 2003 |
| 24.  Gaurav Verma | Laser Silicidation for Deep Submicron MOSFETs | August 2003 |

Invited Presentations at Conferences, Workshops, etc.

| | | |
|---|---|---|
| 1. | March 1985 | "High Resolution Microstructural Studies of VLSI Interfaces," Electronic Materials Symposium, Northern California Section, AIME, Santa Clara, CA. |
| 2. | October 1985 | "Microstructural Characterization of LPCVD Tungsten Interfaces," Second Annual Workshop on Tungsten & Other Refractory Metals, Albuquerque, NM. |
| 3. | January 1986 | "High Resolution Microstructural Studies of Semiconductor Materials," 1986 Annual Meeting of the Society of Photo–Optical Instrumentation Engineers, Los Angeles, CA. |
| 4. | February 1987 | "High Resolution Microstructural Studies of Semiconductor Materials," Golden Gate Materials Technology Conference, San Francisco, CA. |
| 5. | June, 1987 | "Structural Characterization of Silicon – LPCVD Tungsten Interfaces," 13th Western Regional Meeting for Electron Microscopy and Microbeam Analysis, Concord, CA. |
| 6. | July 1987 | "TEM Studies of Semiconductor Materials," Annual Meeting of the International Metallographic Society, Monterey, CA. |

7.  September 1987    "Synthesis and Properties of Superconducting Parasites," Regional Meeting of the Materials Research Society, Univ. of Washington, Seattle, WA.

8.  January 1988    "TEM Studies of VLSI Materials," Northern California American Vacuum Society Thin Film Microanalysis Seminar, San Jose, CA.

9.  January 1988    "Synthesis and Properties of Superconducting Perovskites," 1988 Annual Meeting of The Metallurgical Society, Phoenix, AZ.

10.  April 1988    "Morphology and Microstructure of LPCVD Tungsten Films," 1988 Spring Meeting of the Materials Research Society, Reno, NV.

11.  September 1989    "High Resolution Electron Microscopy of Semiconductor Interfaces," 12th Brazilian Congress on Electron Microscopy, Rio de Janeiro, Brazil.

12.  April 1990    "Beam Deflection Techniques for Studying Thin Film Mechanical Behavior," 1990 Spring Meeting of the Materials Research Society, San Francisco, CA.

13.  June, 1991    "Mechanical Testing of Thin Films," 6th International Conference on Solid State Sensors and Actuators," San Francisco, CA.

14.  November 1991    "Mechanical Properties of Thin Film Aluminum," American Vacuum Society Annual Meeting, Seattle, WA.

15.  March 1992    "Mechanical Testing of Thin Film Media," The Metallurgical Society Annual Meeting, San Diego, CA.

16.  April 1992    "Mechanical Testing of Thin Film Materials," 1992 Spring Meeting of the Materials Research Society, San Francisco, CA.

17.  March 1993    "X-ray Determination of Strains, Stresses and Relaxation in Interconnection Metallizations," Second International Workshop on Stress Induced Phenomena in Metallizations, Austin, TX.

18.  June 1994    "Microstructure and Stresses in Sputtered Copper Films," Symposium on Micromechanisms in Stressed Conductor Lines and Thin Films, Ringberg, Germany.

19.  December 1994    "In-situ Electromigration Testing of Aluminum Metallizations," 1994 Fall Meeting of the Materials Research Society, Boston, MA.

20.  April 1995    "Development of High Voltage SEM for In-situ Electromigration Testing," 1995 Spring Meeting of the Materials Research Society, San Francisco, CA.

21.  May 1995    "Development of High Voltage SEM for In-situ Electromigration Testing," 1995 Meeting, European Materials Research Society, Strasbourg, France.

22.  September 1998    "In–Situ High Voltage Scanning Electron Microscopy for Electromigration Studies," 14th Quadrennial International Conference on Electron Microscopy, Cancun, Mexico.

23. June 2001     "Micromechanical Testing of Free-Standing Thin Films for MEMS Applications," 2001 Mechanics and Materials Conference, San Diego. (Keynote)

24. June 2001     "In–Situ Dynamic Studies of Electromigration in Copper Metallizations," 2001 Mechanics and Materials Conference, San Diego. (Keynote)

25. December 2001     "Micromechanical Testing of Free-Standing Thin Films for MEMS Applications," 2001 Fall Meeting of the Materials Research Society, Boston, MA.


## Invited Presentations at Universities, Corporations, etc.

26. December 1984     "Transmission Electron Microscopy of Semiconductor Materials," Department of Materials Science, Oregon Graduate Center.

27. January 1985     "Transmission Electron Microscopy of VLSI Interfaces," Rockwell International, Semiconductor Products Division, Los Angeles, CA.

28. January 1985     "Transmission Electron Microscopy: A Tool for VLSI Research," Hewlett Packard Research Laboratories, Palo Alto, CA.

29. March 1985     "Morphological Aspects of Silicon – Silicon Dioxide VLSI Interfaces," Texas Instruments Central Research Laboratories, Dallas, TX.

30. October 1987     "Transmission Electron Microscopy of Thin Films and Interfaces," Department of Materials Science and Mineral Engineering, Univ. of California at Berkeley.

31. May 1988     "Progress and Prospects in High Temperature Superconductors," Raychem Corporation, Redwood City, CA.

32. June 1988     "An Assessment of LPCVD Tungsten for VLSI Metallizations," Xerox Corp., Palo Alto Research Center, Palo Alto, CA.

33. April 1989     "Transmission Electron Microscopy: A Tool for VLSI Research," National Semiconductor Corporation, Santa Clara, CA.

34. September 1989     "Mechanical Properties of Thin Film Materials," 12th Brazilian Congress on Electron Microscopy, Rio de Janeiro, Brazil.

35. October 1989     "Mechanical Properties of Thin Film Materials," Motorola Corporation, Phoenix, AZ.

36. February 1991     "Microstructural Studies of Y–Ba–Cu–O High Tc Thin Films," 1991 Stanford Symposium on Applications of Contemporary Electron Microscopy, Stanford, CA.

37. May 1991     "Mechanical Testing Techniques for Thin Film Structures," Microelectronics Center of North Carolina, Research Triangle Park, NC.

38. September 1991     "Processing and Structure of Y–Ba–Cu–O High Tc Thin Films," Physical Sciences Colloquium, IBM Almaden Research Center, San Jose, CA.

39. November 1991     "Mechanical Properties of Thin Films," Department Colloquium, Materials Science and Engineering, U. C. Berkeley.

40. March 1992     "Mechanical Testing of Thin Film Media," Department Colloquium, Materials Science and Engineering, University of Southern California, Los Angeles, CA.

41. November 1992     "Mechanical Testing Techniques for Thin Film Structures," Opening Dedication Ceremony, Max Planck Institüt, Stuttgart, Germany.

42. November 1992     "Micron–Scale Mechanical Testing of Films and Layered Media," Opening Dedication Ceremony, Max Planck Institüt für Metallforschung; Stuttgart, Germany.

43. September 1993     "Modern Techniques for Surface and Interface Analysis," National Defense Academy, Japan.

44. October 1993     "X-ray Methods for Determining Strains and Stresses in Thin Films and Interconnection Lines," AFOSR Workshop on Stress and Reliability in Thin Film and Optical Materials, The Aerospace Corporation, Los Angeles, CA.

45. October 1995     "Development of High Voltage SEM for In-situ Electromigration Testing," University of California at Los Angeles.

46. November 1996     "Development of High Voltage SEM for In-situ Electromigration Testing," University of Michigan at Ann Arbor.

47. August, 1997     "How to be an Effective Engineering Educator," Linkoping University, Sweden

48. August 1997     "How to be an Effective Engineering Educator," Upsala University, Sweden

49. August 1997     High Voltage Scanning Electron Microscopy for In-situ Electromigration Testing," Royal Institute of Technology, Sweden

50. November 1997     High Voltage Scanning Electron Microscopy for In-situ Electromigration Testing," Georgia Institute of Technology.

51. February 1998     "The Future of Engineering Education at Major Research Universities: Course Correction or New Paradigm?" Symposium on Engineering Education for the 21st Century, Nagoya, Japan.

52. March 1998     "Quantitative Assessments of Electromigration Lifetime," Lehigh University

53. November 1998     "A New Method for Studying Electromigration in IC Interconnects," Lawrence Berkeley Laboratory, Advanced Light Source Colloquium Series.

Publications  (approximately 4500 citations; h-index ~ 40)

Archival Refereed Journals

1.   "TEM Studies of the Polycrystalline Silicon – Silicon Dioxide Interface," J.C. Bravman and R. Sinclair, Thin Solid Films, 104, 153–61 (1983).

2.   "Observation of Rapid Field Aided Diffusion of Silver in Metal Oxide Semiconductor Structures," J.D. McBrayer, R.M. Swanson, T.W. Sigmon and J.C. Bravman, Applied Physics Letters, 43, 653–54 (1983).

3.   "The Preparation of Cross–section Specimens for Transmission Electron Microscopy," J.C. Bravman and R. Sinclair, Journal of Electron Microscopy Technique, 1, 52–61 (1984).

4.   "Structure and Morphology of Polycrystalline Silicon – Single Crystal Silicon Interfaces," J.C. Bravman, G.L. Patton and J.D. Plummer, Journal of Applied Physics, 57, 2279–82 (1985).

5.   "Physics, Technology and Modeling of Polysilicon Emitter Contacts for VLSI Bipolar Transistors," G.L. Patton, J.C. Bravman and J.D. Plummer, IEEE Transactions on Electron Devices, ED–33, 1754–68 (1986).

6.   "Damage Calculation and Measurement for GaAs Amorphized by Si–Implantation," W.G. Opyd, J.F. Gibbons, J.C. Bravman and M.A. Parker, Applied Physics Letters, 49, 974–976 (1986).

7.   "Observations of Beta–tungsten deposited by Low Pressure Chemical Vapor Deposition," D. C. Paine, J.C. Bravman and C. Y. Yang, Applied Physics Letters, 50, 498–500 (1987).

8.   "The Mechanical Deflection of Cantilever Microbeams: A New Technique for Testing the Mechanical Properties of Thin Films," T. P. Weihs, S. Hong, J.C. Bravman and W.D. Nix, Journal of Materials Research, 3, 931–942 (1988)

9.   "Molecular Beam Epitaxy of Layered Dy–Ba–Cu–O Compounds," D. G. Schlom, J. N. Eckstein, E. S. Hellman, S.K. Streiffer, J. S. Harris, M. R. Beasley, J.C. Bravman, T. H. Geballe, C. Webb, K. von Dessonneck and F. Turner, Applied Physics Letters, 53, 1660–1662. (1988).

10.  "Microstructural Characterization of YBa2Cu3O7–d Thin Films on SrTiO3 Using Four Axis X–ray Diffraction," J. Sizemore, R. Barton, A. Marshall and J.C. Bravman, IEEE Transactions on Magnetics, 25 (2), 2245-2249 (1989).

11.  "Determination of High Field Enhanced Emission Rates with the Constant Capacitance–Voltage Transient Technique," M.B. Chang, H. Tomokage, J.J. Shiau, R. H. Bube, and J.C. Bravman, Journal of Applied Physics, 65, 2734–2738 (1989).

12.  "Phase Characterization of Dysprosium Barium Copper Oxide Thin Films Grown on Strontium Titanate by Molecular Beam Epitaxy," E. S. Hellman, D. G. Schlom, A. F. Marshall, S.K. Streiffer, J. S. Harris, M. R. Beasley, J.C. Bravman and T. H. Geballe, Journal of Materials Research, 4, 476–95 (1989).

13.  "Elimination of Current Dissipation in High Transition Temperature Superconductors," J.Z. Sun, B. Lairson, C.B. Eom, J.C. Bravman and T.H. Geballe, Science, 247, 307–309 (1990).

14.  "Microwave Properties of Highly Oriented YBa2Cu3O7–  Thin films," A. Inam, X.D. Wu, L. Nazar, M.S. Hegde. C.T. Rogers, T. Venkatesan, R.W. Simon, K. Daly, H. Padamsee, J.

Updated: 1 May 2022

Kirchgessner, D. Moffat, D. Rubin, Q.S. Shu, D, Kalolitis, A. Fathy, V. Pendrick, R. Brown, B. Brycki, E. Belohoubek, L. Drabeck, G. Gruner, R. Hammond, F. Gamble, B.M. Lairson and J.C. Bravman, Applied Physics Letters, 56, 1178–80 (1990).

15. "Reduction of Magnetization Decay Rate in High Tc Superconductors," B. Lairson, J.Z. Sun, J.C. Bravman and T.H. Geballe, Physical Review B, 42, 1008–1011 (1990).

16. "Measuring Stiffnesses and Residual Stresses of Silicon Nitride Thin Films," S. Hong, T.P. Weihs, J.C. Bravman and W.D. Nix, Journal of Electronic Materials, 19, 903–909 (1990).

17. "Molecular Beam Epitaxial Growth of Layered Bi–Sr–Ca–Cu–O Compounds," D. G. Schlom, A. F. Marshall, J.T. Sizemore, Z.J.Chen, J. N. Eckstein, I. Bozovic, K.E. von Dessonneck, J.S. Harris and J.C. Bravman, Journal of Crystal Growth, 102, 361–375 (1990).

18. "Mechanical Properties and Microstructural Characterization of Al–0.5% Cu Thin Films," R. Venkatraman, J.C. Bravman, P.W. Davies, P.A. Flinn, D.B. Fraser and W.D. Nix, Journal of Electronic Materials, 19, 1231–7 (1990).

19. "The Microstructure of Fe and Ag Thin Films Grown by Molecular Beam Epitaxy on GaAs (001)," C.J. Chien, R.F.C. Farrow and J.C. Bravman, Journal of Applied Physics, 68, 4343–5 (1990).

20. "Vortex Pinning by Twin Boundaries in YBa2Cu3O7–d Thin Films," B.M. Lairson, S.K. Streiffer and J.C. Bravman, Physical Review B, 42, 10067–74 (1990).

21. "Magnetic ordering in strain-controlled epitaxial rare-earth films," R. F. C. Farrow, S. S. P. Parkin, W. Bennett, A. Segmuller, J. Chien, and J. C. Bravman, Journal of Applied Physics, 67, 5733 (1990).

22. "Growth of YBa2Cu3O7–d Thin Films on Vicinal MgO Surfaces," S.K. Streiffer, B.M. Lairson and J.C. Bravman, Applied Physics Letters, 57, 2501–3 (1990).

23. "Synthesis and Properties of YBa2Cu3O7–d Thin Films Grown In–Situ by 90° Off–Axis Single Magnetron Sputtering," C.B. Eom, J.Z. Sun, S.K. Streiffer, A.F. Marshall, B.M. Lairson, K. Yamamoto, S.M. Anlage, J.C. Bravman, T. H. Geballe, S.S. Laderman and R. C. Taber, Physica C, 171, 354–82 (1990).

24. "Role of Atomic Oxygen produced by ECR Plasma in the Oxidation of YBa2Cu3O7–d Thin Films studied by In–situ Resistivity Measurements," K. Yamamoto, B.M. Lairson, C.B. Eom, R. H. Hammond, J.C. Bravman and T.H. Geballe, Applied Physics Letters, 57, 1936–8 (1990).

25. "Thermal Activation of Vortex Motion in YBa2Cu3O7–d Films at Low Temperatures," B.M. Lairson, J.Z. Sun, T.H. Geballe, M. R. Beasley and J.C. Bravman, Physical Review B, 43, 10405–12 (1991).

26. "Magnetic Relaxation, J–E Characteristics and Possible Dissipation Mechanisms for High Tc Superconducting Films of YBa2Cu3O7–d," J.Z. Sun, C.B. Eom, B.M. Lairson, J.C. Bravman and T. H. Geballe, Physical Review B, 43, 3002–8 (1991).

27. "Oxidation Kinetics of YBa2Cu3O7–d Thin Films in the Presence of Atomic Oxygen and Molecular Oxygen by In–situ Resistivity Measurements," K. Yamamoto, B.M. Lairson, J.C. Bravman and T.H. Geballe, Journal of Applied Physics, 69, 7189–7201 (1991).

28. "Microstructure of Ultrathin Films of YBa2Cu3O7–d on MgO," S.K. Streiffer, B.M. Lairson, C.B. Eom, J.C. Bravman and T. H. Geballe, Physical Review B, 43, 13007–13018 (1991).

29.   "Thickness Dependence of the Twin Density in YBa2Cu3O7–d Thin Films Sputtered onto MgO Substrates," S.K. Streiffer, E.M. Zielinski, B.M. Lairson, and J.C. Bravman, Applied Physics Letters, 58, 2171–3 (1991).

30.   "The Effect of Laser Reflowing on the Variation of Stress with Thermal Cycling in Aluminum Thin Films," R. Venkatraman, S. Chen and J.C. Bravman, Journal of Vacuum Science and Technology A, 9, 2536–42 (1991).

31.   "Separation of Film Thickness and Grain Boundary Strengthening Effects in Al Thin Films on Si," R. Venkatraman and J.C. Bravman, Journal of Materials Research, 7, 2040–2048 (1992).

32.   "Limits on the use of tunneling to describe the Pd--Ge ohmic contact to GaAs," A. Herrera-Gómez, P. L. Meissner, J. C. Bravman and W. E. Spicer, Journal of Vacuum Science and Technology A, 10, 1029 (1992).

33.   "Nucleation and Growth Mechanisms of a,b–Axis Oriented YBa2Cu3O7–d Films on LaAlO3," S.K. Streiffer, B.M. Lairson, E.M. Zielinski, and J.C. Bravman, Physical Review B, 47, 11431-38 (1993).

34.   "Finite–Element Modeling and X–ray Determination of Stress in Passivated Al Lines During Thermal Cycling," P.R. Besser, A. Sauter–Mack, D. Fraser, and J.C. Bravman, Journal of the Electrochemical Society, 140, 1769–73 (1993).

35.   "An X-ray Method for Direct Determination of the Stress State and Strain Relaxation in Micro–scale Passivated Metallization Lines During Thermal Cycling," P.R. Besser, S. Brennan, and J.C. Bravman, Journal of Materials Research, 9, 13–24 (1994).

36.   "Elastic Strain Gradients and X-ray Line Broadening Effects as a Function of Temperature in Aluminum Thin Films on Silicon," R. Venkatraman, P.R. Besser, S. Brennan and J.C. Bravman, Journal of Materials Research, 9, 328-35 (1994).

37.   "Understanding and Electrochemical Control of YBa2Cu3O7–x Thin Film Epitaxy on Yttrium Stabilized Zirconia," J.L. MacManus–Driscoll, T.H. Geballe, and J.C. Bravman, Journal of Applied Physics, 75, 412-422 (1994).

38.   "Effect of Ion Energy on the Diffusion of Si Implanted into GaAs," C.C. Lee, M.D. Deal, K.S. Jones, H.G. Robinson, and J.C. Bravman, Journal of the Electrochemical Society, 141, 2245-2249 (1994).

39.   "Eliminating Dopant Diffusion after Ion Implantation by Surface Etching," C.C. Lee, M. E. Deal and J.C. Bravman, Applied Physics Letters, 64, 3302-3304 (1994).

40.   "Observation of Voids Induced by Mechanical Stress and Electromigration in Passivated Al Lines Deposited at Different Purity Levels," T. Marieb, J.C. Bravman, P. Flinn, D. S. Gardner, and M. Madden, Applied Physics Letters, 64, 2424-6 (1994).

41.   "The Effects of Silver and Lead on the Phase Stability of the Bi–2212 and Bi–2223 Phases Above and Below the Solidus Temperature," J.L. MacManus–Driscoll, J.C. Bravman, R. J. Savoy, G. Gorman and R.B. Beyers, Journal of the American Ceramic Society, 77, 2305-13 (1994).

42.   "Effects of Barrier Layer and Annealing on Abnormal Grain Growth in Copper Thin Films," E.M. Zielinski, R.P. Vinci, and J.C. Bravman, Journal of Applied Physics, 76, 4516-23 (1994).

43. "Studies of Structural Disorder in ReBa2Cu3O7–x Thin Films as a Function of Rare Earth Ionic Radius and Film Deposition Conditions," J.L. MacManus–Driscoll, J.A. Alonso, P. Wang, T.H. Geballe and J.C. Bravman, Physica C, 232, 288-308 (1994).

44. "Phase Equilibria and Melt Processing of Bi2Sr2Ca1Cu2O8+x Tapes at Reduced Oxygen Partial Pressures, J.L. MacManus–Driscoll, P. Wang, J.C. Bravman and R.B. Beyers, Applied Physics Letters, 65, 2872–4 (1994).

45. "The Influence of Strain Energy on Abnormal Grain Growth in Copper Thin Films," E.M. Zielinski, R.P. Vinci, and J.C. Bravman, Applied Physics Letters, 67, 1078 - 1080 (1995).

46. "Transport Characterization of Calcium-Doped YBCO Thin Films," J.T. Kucera and J.C. Bravman, Physical Review B, 51, 8582-90 (1995).

47. "Thermal Strain and Stress in Copper Thin Films," R.P. Vinci, E.M. Zielinski, J.C. Bravman, Thin Solid Films, 262, 142-153 (1995).(Invited Review)

48. "Effects of Barrier Layer and Processing Conditions on Thin Film Cu Microstructure." E.M. Zielinski, R.P. Vinci, J.C. Bravman, Journal of Electronic Materials, 24, 1485-1492 (1995).

49. "Observations of Electromigration Induced Void Nucleation and Growth in Polycrystalline and Near-bamboo Passivated Al Lines," T. Marieb, P. Flinn, J.C. Bravman, D. Gardner, M. Madden, Journal of Applied Physics, 78, 1026–32 (1995).

50. "Diffusion of Implanted Be in AlxGa1-xAs as a Function of Al Concentration and Anneal Temperature," C.C. Lee, M. Deal and J.C. Bravman, Applied Physics Letters, 66, 355-7 (1995).

51. "Phase Equilibria in the Y-Ba-Cu-O System and Melt Processing of Ag Clad Y1Ba2Cu3O7-x Tapes at Reduced Oxygen Partial Pressures," J.L MacManus–Driscoll, J.C. Bravman and R.B. Beyers, Physica C, 241, 401-13 (1995).

52. "Pseudo-Quaternary Phase Relations Near Bi2Sr2Ca1Cu2O8+x in Reduced Oxygen Pressures," J.L MacManus–Driscoll, J.C. Bravman and R.B. Beyers, Physica C, 251, 71-88 (1995).

53. "Modeling Diffusion in Gallium Arsenide: Recent Work," Y.M. Haddara, C.C. Lee, J.C. Hu, M.D. Deal & J.C. Bravman, MRS Bulletin, 20, #4, 41-50 (1995).

54. "Measurement and Interpretation of Strain Relaxation in Passivated Al–0.5%Cu Lines," P.R. Besser, T.N. Marieb, P.A. Flinn, and J.C. Bravman, Journal of Materials Research, 11, 184–193 (1996).

55. "The Effect of Encapsulant Material on the Diffusion of Beryllium in Molecular Beam Epitaxially Grown Gallium Arsenide," Y.M. Haddara, M.D. Deal and J.C. Bravman, Applied Physics Letters, 68, 1939–41 (1996).

56. "An Analysis Technique for Extraction of Thin Film Stresses from X-ray Data," G. Cornella, S.H. Lee, W.D. Nix, and J.C. Bravman, Applied Physics Letters, 71, 2949-52 (1997).

57. "Transient Diffusion of Beryllium and Silicon in Gallium Arsenide," Y. Haddara and J.C. Bravman, Annual Reviews of Materials Science, 28, 185–214 (1998)

58. "Void nucleation on intentionally added defects in Al interconnects," J. C. Doan, S.-H. Lee, J. C. Bravman, P. A. Flinn and T. N. Marieb, Applied Physics Letters, 75, 633-35 (1999).

59.   "The Evolution of the Resistance of Aluminum Interconnects during Electromigration," J. C. Doan, J. C. Bravman, P. A. Flinn, and T. N. Marieb, Microelectronics Reliability, 40, 981-990 (2000).

60.   A High–Voltage Scanning Electron Microscopy System for In–Situ Electromigration Testing," J. C. Doan, S.-H. Lee, N. E. Meier, J. C. Bravman, P. A. Flinn, T. N. Marieb and M. C. Madden, Review of Scientific Instruments, 71, 2848-2854 (2000).

61.   "Stress Relaxation of Free Standing Aluminum Beams for Microelectromechanical Systems Applications," H.–J. Lee, G. Cornella and J. C. Bravman, Applied Physics Letters, 76, 3415-17 (2000).

62.   "Differential Thermal Budget in Laser Processing: Application to Formation of Titanium Silicide," J. C. Bravman, G. Verma, and S. Talwar, IEEE Electron Device Letters, 21, #10, 482-84, (2000).

63.   "Effects of Dielectric Materials on Electro-migration Failure," J. C. Doan, S. Lee, S.-H. Lee, P. A. Flinn, J. C. Bravman and T. N. Marieb, Journal of Applied Physics, 89, 7797-7808 (2001).

64.   "Use of angle resolved x-ray photoelectron spectroscopy for determination of depth and thickness of compound layer structures," S. Spruytte, C. Coldren, J. Harris, D. Pantelidis, H.-J. Lee, J. Bravman, and M. Kelly, Journal of Vacuum Science and Technology A, 19, 603-608 (2001).

65.   "Creating Process Margin in Laser Thermal Processing: Application to Formation of Titanium Silicide," G. Verma, S. Talwar and J. C. Bravman, Applied Physics Letters, 78, 925-27 (2001).

66.   "Submicron X-Ray Diffraction," A. A. MacDowell, R. S. Celestre, N. Tamura, R. Spolenak, B. Valek, W. L. Brown, J. C. Bravman, H. A. Padmore, B. W. Batterman and J. R. Patel, Nuclear Instruments & Methods In Physics Research Section A-Accelerators Spectrometers Detectors And Associated Equipment 467, 936-43 Part 2, (2001)

67.   "Miniature Nernstian Oxygen Sensors for Deposition and Growth Environments," E. van Setten, T. M. Gur, D. Blank, J. C. Bravman and M. R. Beasley, Review of Scientific Instruments, 73, 156–161 (2002).

68.   "Formation of Titanium Silicide on Narrow Gates Using Laser Processing," G. Verma, C. Gelatos, S. Talwar, and J. C. Bravman, IEEE Transactions on Electron Devices, 49, #1, 42–48 (2002).

69.   "Effect of interface conditions on yield behavior of passivated copper thin films," R. P. Vinci, S. A. Forrest, and J. C. Bravman, J. Mater. Res., 17, 1863 (2002).

70.   "Stress-induced and electromigration voiding in aluminum interconnects passivated with silicon nitride," S.-H. Lee, J. C. Bravman, J. C. Doan, S. Lee, P. A. Flinn, and T. N. Marieb, Journal of Applied Physics, 91, 3653-57 (2002).

71.   "Subcritical debonding of polymer/silica interfaces under monotonic and cyclic loading," J. M. Snodgrass, D. Pantelidis, M. L. Jenkins, J. C. Bravman, and R. H. Dauskardt, Acta Materialia, 50 (9), 2395-2411 (2002).

72.   "High spatial resolution grain orientation and strain mapping in thin films using polychromatic submicron x-ray diffraction," N. Tamura, A. A. MacDowell, R. S. Celestre, H. A. Padmore, B. Valek, J. C. Bravman, R. Spolenak, W. L. Brown, T. Marieb, H. Fujimoto, B. W. Batterman and J. R. Patel, Applied Physics Letters, 80, 3724-26 (2002).

73. "Electromigration-induced plastic deformation in passivated metal lines," B. C. Valek, J. C. Bravman, N. Tamura, A. A. MacDowell, R. S. Celestre, H. A. Padmore, R. Spolenak, W. L. Brown, B. W. Batterman, and J. R. Patel; Applied Physics Letters, 81, 4168-70 (2002).

74. "Tensile failure by grain thinning in micromachined aluminum thin films," H. J. Lee, P. Zhang, and J. C. Bravman, Journal of Applied Physics, 93, 1443-49 (2003).

75. "Scanning X-ray Microdiffraction with Submicrometer White Beam for Strain/Stress and Orientation Mapping in Thin Film," N. Tamura, A. A. MacDowell, R. Spolenak, B. C. Valek, J. C. Bravman, W. L. Brown, R. S. Celestre, H. A. Padmore, B. W. Batterman, and J. R. Patel, Journal of Synchrotron Radiation, 10, 137-43 (2003).

76. "Local plasticity of Al thin films as revealed by X-ray microdiffraction," R. Spolenak, W. Brown, N. Tamura, A. A. MacDowell, R. S. Celestre, H. A. Padmore, B. C. Valek, J.C. Bravman, T. Marieb, H. Fujimoto, B. W. Batterman, and J. R. Patel, Physical Review Letters, 90(9), (2003).

77. "Quantitative analysis of dislocation arrangements induced by electromigration in a passivated Al (0.5 wt % Cu) interconnect," R. I. Barabash, G. E. Ice, N. Tamura, B. C. Valek, J. C. Bravman, R. Spolenak and J. R. Patel, Journal of Applied Physics, 93 (9), 5701-06 (2003).

78. "Early Stage of Plastic Deformation in Thin Films Undergoing Electromigration," B. C. Valek, N. Tamura, R. Spolenak, W. A. Caldwell, A. A. MacDowell, R. S. Celestre, H. A. Padmore, J. C. Bravman, B. W. Batterman, W. D. Nix, and J. R. Patel, Journal of Applied Physics, 94, 3757-61 (2003).

79. "Study on the strength and elongation of free-standing Al beams for microelectromechanical systems applications," H. J. Lee, P. Zhang, J. C. Bravman, Applied Physics Letters, 84 (6), 915-17 (2004).

80. "Quantitative characterization of electromigration-induced plastic deformation in Aluminum (0.5wt%Cu) interconnect," R. I. Barabash, G. E. Ice, N. Tamura, B. C. Valek, J. C. Bravman, R. Spolenak and J. R. Patel, Microelectronic Engineering, 75 (1), 24-30 (2004)

81. "Important Factors for Silane Adhesion Promoter Efficacy: Surface Coverage, Functionality, and Chain Length," M. L. Jenkins, R. H. Dauskardt, and J. C. Bravman, Journal of Adhesion Science and Technology, 18, 1483-88 (2005).

82. "Stress Relaxation in Free–Standing Aluminum Beams," H. J. Lee, P. Zhang, and J. C. Bravman, Thin Solid Films, 476, 118–24 (2005).

83. "White beam analysis of coupling between precipitation and plastic deformation during electromigration in a passivated Al(0.5wt.% Cu) interconnect," R. I. Barabash, G. E. Ice, N. Tamura, B. C. Valek, J. C. Bravman, and J. R. Patel, Metallofizika I Noveishie Tekhnologii 27, 75-94 (2005) {in Russian}.

84. "Effect of Silane Functional Group on Adhesion of Selected Epoxies for Microelectronic Packaging," M. Jenkins-Borrego, R.H. Dauskardt, and J. C. Bravman, Journal of Microelectronics and Electronic Packaging, 4, 8–16 (2007).

Conference Proceedings

85. "High Resolution Transmission Electron Microscopy of Semiconductor Materials," R. Sinclair, F.A. Ponce, J.C. Bravman, T. Yamashita & P. Pirouz, 2nd Oxford Conference on Microscopy of Semiconducting Materials, Oxford, England; Inst. of Physics Conf. Series, 147–52 (1981).

86. "High Resolution Imaging of Semiconductor Interfaces," R. Sinclair, F.A. Ponce, T. Yamashita & J.C. Bravman, Proc. of the Electron Microscopy Society of America 39, p.124–27 (1981).

87. "Interface Morphologies in the Polycrystalline Silicon–Silicon Dioxide Materials System," J.C. Bravman, Proc. of the Electron Microscopy Society of America 41, p.108–09 (1983).

88. "The Morphology of the Polysilicon–Silicon Dioxide Interface," J.C. Bravman & R. Sinclair, Proc. of the Materials Research Society 25, p.311–16 (1984).

89. "Structural Aspects of Polysilicon Emitter Contacts," J.C. Bravman, G.L. Patton and J.D. Plummer, Electrochemical Society Extended Abstracts, 84–2, 718–19 (1984).

90. "Characterization of Bipolar Transistors with Polysilicon Emitter Contacts," G.L. Patton, J.D. Plummer and J.C. Bravman, 1984 IEEE Conference on VLSI Technology, 53–54, San Diego (1984).

91. "Morphological Studies of Polysilicon Emitter Contacts," J.C. Bravman, G.L. Patton, R. Sinclair & J.D. Plummer, Proc. of the Materials Research Society #37: Layered Structures, Epitaxy and Interfaces, J. Gibson & L. Dawson, eds., 461–66 (1985).

92. "Impact of Processing Parameters on Base Current in Polysilicon Contacted Bipolar Transistors," G.L. Patton, J.C. Bravman and J.D. Plummer, Proc. of the IEEE International Electron Devices Meeting, 30–33 (1985).

93. "Microstructural Characterization of LPCVD Tungsten Interfaces," J.C. Bravman, D.C. Paine and K.C. Saraswat, Proc. of the Materials Research Society: Tungsten and Other Refractory Metals for VLSI Applications (I), R. Blewer, ed, 117–24 (1986). (Invited Paper)

94. "High Resolution Microstructural Studies of Semiconductor Materials," J.C. Bravman, Proc. Society of Photo–Optical Instrumentation Engineers #623: Advanced Processing and Characterization of Semiconductors III, D. Sadana & M. Current, eds., 18–25 (1986). (Invited Paper)

95. "Preparation of Cross–sectioned Semiconductor Devices for Transmission Electron Microscopy," R. Anderson, J.C. Bravman, R. Flutie, E. Hall, B. Marcus & S. Newcomb, Video–taped Tutorial, recorded at 44th. Ann. Meeting Electron Microscopy Society of America (1986). (Invited Paper)

96. "High Performance Packaging for VLSI Systems," F. Pease, J.C. Bravman, O.K. Kwon, S. Hong, S.C. Douglas, B.W. Langley and A.F. Paul, Advanced Research in VLSI – Proc. of the 1987 Stanford Conference, P. Losleben, ed., 279–92, MIT Press (1987). (Invited Paper)

97. "Junction Leakage of Selectively Deposited LPCVD Tungsten for Contact Fill Applications," C. Yang, J. Multani, D. Paine and J.C. Bravman, Proc. of the 1987 IEEE VLSI Multilevel Interconnection Conference, 200–207 (1987).

98. "Conditions for the Deposition of Beta–Tungsten by Low Pressure Chemical Vapor Deposition," D.C. Paine, J.C. Bravman, M. Wong and C. Y. Yang, Electrochemical Society Extended Abstracts (1987).

99. "SUPREM 3.5, Process Modeling of Gallium Arsenide," M.E. Deal, S. E. Hansen, R. Anholt, S. Chou, J.D. Plummer, R.W. Dutton, D. A. Stevenson, C.R. Helms and J.C. Bravman, Proc. of the IEEE International Electron Devices Meeting, 256–259 (1987).

100. "Metastable Beta–tungsten in LPCVD Contacts to Silicon," D.C. Paine, J.C. Bravman and C. Y. Yang, Proc. of the Materials Research Society: Tungsten and Other Refractory Metals for VLSI Applications (III), V.A. Wells, ed., 95–101 (1988).

101. "Structural and Electrical Characterization of LPCVD Tungsten Contacts to Silicon," D. C. Paine and J.C. Bravman, 5th Oxford Conference on Microscopy of Semiconducting Materials, Oxford, England; Inst. of Physics Conf. Series #87, A.G. Cullis and P.D. Augustus, eds., 547–552, Inst. of Physics Press (1988).

102. "Microstructures of Polysilicon," R. Sinclair, A.H. Carim, J. Morgiel and J.C. Bravman, Proc. of the Materials Research Society #106: Polysilicon and its Interfaces, C. Y. Wong, C. V. Thompson and K. N. Tu, eds., 27–38 (1988). (Invited Paper)

103. "Materials and Structures for High Density I/O Interconnection Systems," S. Hong, J.C. Bravman, T. P. Weihs and O. K. Kwon, Proc. of the Materials Research Society #108: Electronic Packaging Materials Science III, R. Jaccodine, K. Jackson and R. Sundahl, eds, 309–317 (1988).

104. "Synthesis and Properties of High Tc Thin Film Superconductors," J.C. Bravman and R. W. Barton, Microstructural Science for Thin Film Metallization in Electronic Applications, J. Sanchez, D.A. Smith and N. Delanerolle, ed.s., 3–6, The Minerals, Metals & Materials Society (TMS), Warrendale, PA (1988). (Invited Paper)

105. "Vortex Motion and Time Dependent Magnetic Responses in High Tc Superconductors," J.Z. Sun, C.B. Eom, B. Lairson, J.C. Bravman, T.h. Geballe and A. Kapitulnik, Proc. of the International Conference on Materials and Mechanisms of Superconductivity – High Temperature Super–conductors II, R. Shelton, W.A. Harrison and N.E. Phillips, eds., 687–688 (1989).

106. "Cantilever Beam Micro–contacts in a Multichip Interconnection System," S. Hong, T.P. Weihs, O.K. Kwon and J.C. Bravman, Proc. of the 1989 IEEE/CHMT International Electronic Manufacturing Symposium, 239–245 (1989).

107. "Design and Fabrication of a Monolithic High–Density Probe Card for High Frequency On–Wafer Testing," S. Hong and J.C. Bravman, Proc. of the IEEE International Electron Devices Mtg., 289–292 (1989).

108. "The Determination of Mechanical Parameters and Residual Stresses for Thin Films using Micro-cantilever Beams," S. Hong, T. P Weihs, J.C. Bravman and W.D. Nix, Proc. of the Materials Research Society #130: Thin Films – Stresses and Mechanical Properties, 93–98 (1989).

109. "TEM Studies of Semiconductor Materials," J.C. Bravman, Characterization of Advanced Materials, W. Altergott and E. Henneke, eds., Plenum Press, 89 – 96 (1990). (Invited Paper)

110. "Morphology and Defect Structure of Sputtered High–Quality in–situ YBa2Cu3O7–d Films," S.K. Streiffer, B.M. Lairson, C.B. Eom, J.C. Bravman, A.F. Marshall and T.H. Geballe, Proc. of the Materials Research Society, #183, 363–68 (1991).

111. "Mechanical Testing of Thin Films," R.P. Vinci and J.C. Bravman, Proc. of the 6th International Conference on Solid State Sensors and Actuators," IEEE Press, 943–48 (1991). (Invited Paper)

112. "Synthesis and Properties of Ultra–Thin YBa2Cu3O7 and YBa2Cu3O7/La2–xSrxCu3O7 Multilayers," C.B. Eom, S.K. Streiffer, J.Z. Sun, K. Yamamoto, S.S. Laderman, J.C. Bravman, and T.H. Geballe, Proc. of the Materials Research Society #169, 557–60 (1991).

113. "Investigation of Thin Pd–Ge Layer Formation using Synchrotron Vacuum Ultraviolet Photo-emission Spectroscopy," P.L. Meissner, J.C. Bravman, T. Kendelewicz, K. Miyano, J.C. Woicik, C. Bouldin and W. E. Spicer, Proc. of the Materials Research Society #181: Advanced Metallizations in Microelectronics, A. Katz, S. P. Murarka, A. Appelbaum, eds., 265–270 (1990).

114. "Microstructural Investigation of Ultra–thin Films of YBa2Cu3O7 Grown on MgO," S.K. Streiffer, C.B. Eom, T. H. Geballe and J.C. Bravman, Proceedings of the XIIth International Congress for Electron Microscopy, 4, 6–7 (1990).

115. "Investigation of YBa2Cu3O7–   Films Grown on Vicinally–Polished MgO Substrates," S.K. Streiffer, B.M. Lairson, and J.C. Bravman, Proc. of the Materials Research Society #209, 777–82 (1991).

116. "On the Microstructure of Ultrathin Films of YBa2Cu3O7–  ," S.K. Streiffer, B.M. Lairson, C.B. Eom, T.H. Geballe, and J.C. Bravman, Program of the 1991 March Meeting of the American Physical Society, Bulletin of the American Physical Society #36, 425 (1991).

117. "Critical Currents and Magnetization Decay in Oxygen Deficient YBa2Cu3O7 Thin Films," B.M. Lairson, J. Vargas, S.K. Streiffer, D.C. Larbalestier and J.C. Bravman, Proc. of the International Conference on Materials and Mechanisms of Superconductivity – High Temperature Superconductors III, in Physica C, 2161–62 (1991).

118. "Initial Conditions in Magnetization Decay of High Tc Superconducting Films," B.M. Lairson, J.Z. Sun, T.H. Geballe and J.C. Bravman, Proc. of the International Conference on Materials and Mechanisms of Superconductivity – High Temperature Superconductors III, in Physica C, 2519–20 (1991).

119. "Barrier Height Reduction at the Pd–Ge/n–GaAs Interface," P.L. Meissner, J.C. Bravman, T. Kendelewicz, C.J. Spindt, A. Herrera–Gomez, W. A. Spicer and A.J. Arko, Proc. of the Materials Research Society, #240, 485–490 (1992).

120. "Calculation of Stress Gradients in Thin Al – 0.5% Cu/Ti Lines from Strain Gradients Measured as a Function of Temperature using Grazing Incidence X–ray Scattering," P.R. Besser, R. Venkatraman, S. Brennan and J.C. Bravman, Proc. of the Materials Research Society #239; 233–238 (1992).

121. "Determination of the Strain Distributions in Aluminum Thin Films as a Function of Temperature by the Use of Synchrotron Grazing Incidence X–ray Scattering," R. Venkatraman, P.R. Besser, S. Brennan and J.C. Bravman, Proc. of the Materials Research Society #239; 227–232 (1992).

122. "An Anodic Process for the Determination of Grain Boundary and Film Thickness Strengthening Effects in Aluminum Films on Oxidized Silicon," R. Venkatraman and J.C. Bravman, Proc. of the Materials Research Society #239; 127–132 (1992).

123. "Microstructural Issues found in c–Parallel YBa2Cu3O7–d Thin Films," S.K. Streiffer, B.M. Lairson, E. Zielinski, T. Umezawa, T. H. Geballe and J.C. Bravman, Proc. of the Electron Microscopy Society of America, 50th Annual Mtg, G. W. Bailey; 240–241 (1992).

124. "Transmission Electron Microscopy and X–ray Diffraction Studies of a,b–Axis Oriented YBa2Cu3O7–   Thin Films," S.K. Streiffer, B.M. Lairson, E. Zielinski, and J.C. Bravman, Proc. of the Materials Research Society #275; 771–776 (1993).

125. "X-ray Observation of Stress Gradients and Precipitation in Passivated Al–0.5%Cu Films," P.R. Besser, S. Brennan, and J.C. Bravman, Proceedings of the Materials Research Society #307: Application of Synchrotron Radiation Techniques to Materials Science, 161–167 (1993).

126. "Strain Relaxation and In–situ Observation of Voiding in Passivated Aluminum Lines," P.R. Besser, T.N. Marieb, and J.C. Bravman, Proc. of the Materials Research Society, #308, 249-254 (1993).

127. "Non-destructive Evaluation of Strains and Voiding in Passivated Copper Metallizations," R.P. Vinci, T.N. Marieb and J.C. Bravman, Proc. of the Materials Research Society, #308, 297-302 (1993).

128. "X–ray Determination and Finite–Element Modeling of Stress in Passivated Al Lines During Thermal Cycling," P.R. Besser, A. Sauter–Mack, D. Fraser, and J.C. Bravman, Proceedings of the Materials Research Society #309, 287-292 (1993).

129. "Stress Gradient and Relaxation Measurements in Al and Oxygen Inplanted Al Films," P.R. Besser, S. Bader, R. Venkatraman and J.C. Bravman, Proceedings of the Materials Research Society, #308, 323-328 (1993).

130. "Stress in Copper Thin Films with Barrier Layers," R.P. Vinci and J.C. Bravman, Proceedings of the Materials Research Society #308, 337- 341 (1993).

131. "X-ray Determination of Strains, Stresses and Relaxation in Interconnection Metallizations," Proc. of the Second International Workshop on Stress Induced Phenomena in Metallizations, AIP Conference Proc. Series, 305, 46-61 (1994).

132. "Direct Observation of the Growth and Movement of Electromigration Voids under Passivation," T.N. Marieb, E. Abratowski, J.C. Bravman, M. A. Madden and P.A. Flinn, Proc. of the Second International Workshop on Stress Induced Phenomena in Metallizations, AIP Conference Proc. Series, 305, 1-14 (1994).

133. "Measurement and Interpretation of Strain Relaxation in Passivated Al-0.5% Cu Lines," P.R. Besser, T.N. Marieb, J.C. Bravman and P.A. Flinn, Proceedings of the Materials Research Society, 338, 275-80 (1994).

134. "Microstructural Characterization of Copper Thin Films on Metallic Underlayers," E.M. Zielinski, R.P. Vinci, and J.C. Bravman, Proceedings of the Materials Research Society #338, 307-12 (1994).

135. "Thermal Stresses in Passivated Copper Interconnects Determined by X-ray Analysis and Finite Element Modeling," R.P. Vinci, E.M. Zielinski, and J.C. Bravman, Proceedings of the Materials Research Society #338, 289-94 (1994).

136. "In-Situ Observations of Voiding in Metal Lines Under Passivation," T.N. Marieb, J.C. Bravman, P. Flinn, and M. Madden, Proceedings of the Materials Research Society #338, p. 409-413 (1994).

137. "A New Model for the Anomalous Diffusion of Grown –In Magnesium in GaAs," Y. M. Haddara, M.D. Deal, H. G. Robinson, J.C. Bravman, Proceedings of SOTAPOCS XXI, 96-106, Electrochemistry Society p. 96-106 (1995).

138.  "Diffusion of implanted Be in AlxGa1-xAs as a function of Al concentration," C.C. Lee, M.D. Deal, J.C. Bravman, Proceedings of SOTAPOCS XXI, 96-106, Electrochemistry Society p. 85–95 (1995).

139.  "The Effects of Processing on the Microstructure of Copper Thin Films on Tantalum Barrier Layers," E.M. Zielinski, R.P. Vinci, and J.C. Bravman, Proceedings of the Materials Research Society #391, p. 303-8 (1995).

140.  "The Influence of Strain Energy Minimization on Abnormal Grain Growth in Copper Thin Films," E.M. Zielinski, R.P. Vinci, and J.C. Bravman, Proceedings of the Materials Research Society #391, p. 103-8 (1995).

141.  "A simple analysis of average mechanical behavior and strain energy density of misoriented grains in a textured film," R.P. Vinci, T.P. Weihs, E.M. Zielinski, T. W. Barbee, J.C. Bravman, Proceedings of the Materials Research Society #391, p. 97–102 (1995).

142.  "Finite Element Modeling of Grain Aspect Ratio and Strain Energy Density in a Textured Copper Thin Film," R.P. Vinci, and J.C. Bravman, Proceedings of the Materials Research Society #436, p. xx–xxx (1995).

143.  "Modeling the Transient Diffusion Behavior of Beryllium in Gallium Arsenide and the Effect of Encapsulant Material on Non-Equilibrium Point Defect Populations," Fourth International Symposium on Process Physics and Modeling, in press (1996).

144.  "Observations of Electromigration Voiding in Copper Lines," S.H. Lee, J.C. Bravman, P.A. Flinn, and L. Arnaud, Proceedings of the Materials Research Society #xxx, (1997).

145.  "Comparison of Stresses in Al Lines Under Various Passivations," S. Lee, J.C. Bravman, P.A. Flinn, and T.N. Marieb, Proceedings of the Materials Research Society, 473, p.415-21, (1997).

146.  "In–Situ Stress Measurements during Dry Oxidation of Silicon," C. Yu, P.A. Flinn, and J.C. Bravman, Proceedings of the Materials Research Society #xxx, (1997).

147.  "A High Voltage Scanning Electron Microscope for the In–Situ Observation and recording of Electromigration Voids in Metal Lines on Integrated Circuits," P.A. Flinn, S. Lee, J.C. Doan, J.C. Bravman, T. Marieb, and M.C. Madden, Proceedings: Microscopy and Microanalysis '97, #3 (Supplement 2), p. 615–16 (1997).

148.  "A Quantitative Study of Void Nucleation Times in Passivated Aluminum Interconnects," J. C. Doan, J. C. Bravman, P. A. Flinn and T. N. Marieb, Proceedings of the Materials Research Society, 516, 83-88 (1998).

149.  "Comparisons of constraint effects on Al lines under various passivations," S. Lee, J. C. Bravman, P. A. Flinn, and T. N. Marieb, AIP Conf. Proc. Series, 418, 277 (1998).

150.  "Void phenomena in passivated metal lines: Recent observations and interpretation," P. A. Flinn, S. Lee, J. Doan, T. N. Marieb, J. C. Bravman, and M. Madden, AIP Conf. Proc. Series, 418, 250 (1998).

151.  "Comparison of electromigration behavior in passivated aluminum interconnects," S. Lee, J.C. Doan, J. C. Bravman, P. A. Flinn, T. N. Marieb, and S. Ogawa, AIP Conf. Proc. Series, 418, 101 (1998).

152.  "Comparison of Electromigration Behavior in Passivated Aluminum Interconnects," S. Lee, J. Doan, J.C. Bravman, P.A. Flinn, T.N. Marieb, and S. Ogawa, Proceedings of the Fourth

International Workshop on Stress Induced Phenomena in Metallizations, AIP Conference Proc. Series #xxx, p. 101–106 (1998).

153. "Void Phenomena in Passivated Metal Lines: Recent Observations and Interpretation," P.A. Flinn, S. Lee, J. Doan, T.N. Marieb, J.C. Bravman, and M. Madden, Proceedings of the Fourth International Workshop on Stress Induced Phenomena in Metallizations, AIP Conference Proc. Series #xxx, p. xxx (1998).

154. "Determination of Temperature Dependent Unstressed Lattice Spacings in Crystalline Thin Films on Substrates," G. Cornella, S. Lee, O. Kraft, W.D. Nix, and J.C. Bravman, Proceedings of the Materials Research Society, 505 p. 527–32 (1998).

155. "An In–situ Stress Sensor for Vapor–phase Thin Film Deposition," P. Zhang, R. P. Vinci, J.C. Bravman, and T. Kenny, Proceedings of the Materials Research Society, 546, p.45-50 (1999).

156. "Observations of Low Cycle Fatigue of Al Thin Films for MEMS Applications," G. Cornella, R.P. Vinci, R. Suryanarayanan, R.H. Dauskardt, and J.C. Bravman, Proceedings of the Materials Research Society, 518 p.81-86 (1999).

157. "The Effects of Environment and Fatigue on the Adhesion and Subcritical Debonding of Dielectric Polymers," J.M. Snodgrass, D. Pantelidis, J.C. Bravman, and R.H. Dauskardt, Proceedings of the Materials Research Society, 565 p. 123-128 (1999).

158. "Electromigration Voiding in Argon-Implanted Interconnects," N.E. Meier, J.C. Doan, T.N. Marieb, P.A. Flinn, and J.C. Bravman, Proceedings of the Materials Research Society, xxx p. xxx–xx (1999).

159. "A Detailed Study of Void Motion in Passivated Aluminum Interconnects," J.C. Doan, J.C. Bravman, P. A. Flinn, and T.N. Marieb, Proceedings of the Materials Research Society, xxx p. xxx–xx (1999).

160. "The Relationship Between Resistance Changes and Void Volume Changes in Passivated Aluminum Interconnects," J.C. Doan, J.C. Bravman, P.A. Flinn and T.N. Marieb, Proceedings of the 37th Annual International Reliability Physics Symposium, IEEE Press, p. 206-212 (1999).

161. "Effect of Microstructure and Chemical Bonding on the Adhesion Strength of a Silicon/Polymer Interface for Microelectronic Packaging Applications," D. Pantelidis and J.C. Bravman, Proceedings of the Materials Research Society, xxx p. xxx–xx (1999).

162. "Direct Measurements of Nucleation Times and Growth Rates of Electromigration–Induced Voids, Proceedings of the Fifth International Workshop on Stress Induced Phenomena in Metallizations, AIP Conference Proc. Series #xxx, p. xxx (1999).

163. "Atomic Force Microscopy Studies of Fracture Surfaces From Oxide / Polymer Interfaces," M. Jenkins, J. Snodgrass, A. Chesterman, R. Dauskardt, and J. C. Bravman, Proceedings of the Materials Research Society, xxx p. xxx–xx (2001).

Edited Works

164. Specimen Preparation Techniques for Transmission Electron Microscopy of Materials, J.C. Bravman, R. M. Anderson and M. L. McDonald, editors; Volume 115, Symposium Proceedings, Materials Research Society (1988).

165. Thin Films: Stresses and Mechanical Properties, J.C. Bravman, W.D. Nix, D. M. Barnett and D. A. Smith, editors; Volume 130, Symposium Proceedings, Materials Research Society (1989).

166. Laser Ablation for Materials Synthesis, D. C. Paine and J. C. Bravman, editors; Volume 191, Symposium Proceedings, Materials Research Society, (1990).

167. Specimen Preparation Techniques for Transmission Electron Microscopy of Materials III, R. M. Anderson, B. Tracey and J. C. Bravman, editors; Volume 254, Symposium Proceedings, Materials Research Society (1992).

168. Thin Films: Stresses and Mechanical Properties III, W.D. Nix, J.C. Bravman, L. B. Freund and E. A. Arzt, editors; Symposium Proceedings, Materials Research Society (1992).

169. Guest Editor: July, 1992 Issue of the Materials Research Society Bulletin; "Mechanical Properties of Thin Film Materials."

170. Stress–Induced Phenomena in Metallization, P. S. Ho, J. C. Bravman, C. Y. Li, J. Sanchez, editors; Volume 373, AIP Conference Proceedings (1995).

171. Materials Reliability for Microelectronics VIII, J. C. Bravman, T. N. Marieb, J. R. Lloyd, M. A. Korhonen, editors; Volume 516, Symposium Proceedings, Materials Research Society (1998).

# Exhibit A2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QORVO, INC. | ) |
| | ) |
| | ) |
| Plaintiff, | ) C.A. No. 21-1417-JPM |
| | ) |
| v. | ) |
| | ) |
| AKOUSTIS TECHNOLOGIES, INC. and | ) |
| AKOUSTIS, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**REBUTTAL CLAIM CONSTRUCTION DECLARATION
OF JOHN C. BRAVMAN, PH.D.**

## I.   INTRODUCTION

1.      My name is John C. Bravman, Ph.D.  I am the President of, and a Professor of

Electrical Engineering at, Bucknell University, as described in my July 11, 2022 *Initial Claim*

*Construction Declaration* ("*Initial Declaration*").  I am an expert in the area of, among other

things, integrated circuit processing and structures, thin film materials processing and analysis,

microelectronics packaging, and microstructural and mechanical properties of materials and

structures.

2.      I have prepared this Declaration as an expert witness retained by Qorvo, Inc.

("Qorvo").  As mentioned above, I previously prepared the *Initial Declaration*, the opinions from

which I incorporate herein.  In this Declaration, I give additional opinions in response to the

opinions and arguments presented by the July 11, 2022 *Initial Claim Construction Expert Report*

*and Declaration by Dr. Clark Nguyen* ("*Nguyen Declaration*").  I provide technical bases for

these opinions below.

3.      This Declaration contains statements of my opinions formed to date and the bases

and reasons for those opinions.  I may offer additional opinions based on further review of

materials in this matter and/or further positions advanced by Defendants Akoustis Technologies,

Inc. and Akoustis, Inc. (collectively, "Akoustis"), Dr. Nguyen, or any other expert witness

retained by Akoustis.  I make this Declaration based upon my own personal knowledge and

information that I have reviewed as referenced herein or in my *Initial Declaration*, and, if called

upon to testify, would testify competently to the matters contained herein.

## II.   PERSON OF ORDINARY SKILL IN THE ART ("POSITA")

4.      In my *Initial Declaration*, I came to the conclusion that a POSITA of the '755

Patent and the '786 Patent would have had at least a bachelor's degree, or the equivalent degree,

in electrical engineering, materials science, physics, or a related field, and three to five years of experience in the research, design, or development of thin film devices, or equivalent experience. *Initial Declaration* at 4.  A person with more education and less experience may also meet this standard.

5.     In the *Nguyen Declaration*, Dr. Nguyen states that a POSITA for the '755 Patent and '786 Patent "would have had an undergraduate degree in electrical engineering with two to four years of experience in the technical field, or a master's degree in electrical engineering with one to two years of experience in the field; or an equivalent combination of education and experience."  *Nguyen Declaration* at 9.

6.     The substantive difference between Dr. Nguyen's definition and mine relates to a POSITA's possible undergraduate degrees.  It is my opinion that any of the undergraduate programs identified in my definition of a POSITA would have provided the requisite technical background for a POSITA.  In fact, it is my opinion that—when it comes to thin film device design—engineers/scientists with materials science, mechanical engineering (a "related field"), and/or physics backgrounds are generally better equipped to understand the implications of structural and material design choices in thin film devices than those with solely electrical engineering backgrounds.  The fundamental tenet of materials science, for instance, links material properties and performance—in isolation and within a system—to how each material has been processed and to how each material is structured at the atomic level and above.  These are the core concepts that need understanding to understand the '755 Patent.  Thus, I maintain my opinion as to the definition of a POSITA is correct.

## III.    THE '755 PATENT

### A.    "Active Region" / "Outer Region"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning.  If a construction is necessary, "active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality. | Active region: That region of the device where motional current density is generated through the piezoelectric layer. |
| Plain and Ordinary Meaning.  "Outer region" is the region of the BAW resonator that is not electrically driven. | Outer region: defined as that region outside the active region. |

7.      It is my understanding that, in construing claim terms, one should primarily rely on intrinsic patent evidence, which includes the words of the claims themselves, the patent specification, and the prosecution history.

8.      In my *Initial Declaration*, I reviewed the intrinsic record related to the '755 Patent and came to the conclusion that Qorvo's proposed constructions for "active region" and "outer region" are correct.

9.      In particular, I highlighted the following portion of the specification of the '755 Patent:

> In operation, acoustic waves in the piezoelectric layer 12 within an active region 34 of the BAW resonator 10 are excited by an electrical signal applied to the bottom and top electrodes 14 and 16. ***The active region 34 is the region of the BAW resonator 10 that is electrically driven***. In other words, the active region 34 is the region of the BAW resonator 10 consisting of, in this example, the bottom electrode 14, the top electrode 16, the portion of the piezoelectric layer 12 between the bottom and top electrodes 14 and 16, and the portion of the reflector 18 below the bottom electrode 14. Conversely, ***an outer region 36 of the BAW resonator 10 is a region of the BAW resonator 10 that is not electrically driven (i.e., the area outside of the active region 34)***. The frequency at which resonance of the acoustic waves occurs is a function of the thickness of the piezoelectric layer 12 and the mass of the bottom and top electrodes 14 and 16. At high frequencies (e.g., greater than 1.5 GHz), the thickness of the piezoelectric layer 12 is only micrometers thick and, as such, the BAW resonator 10 is fabricated using thin-film techniques.

PAGE 3

'755 Patent, 1:51-2:3.

10.     In addition to the portions of the specification I identified in my *Initial Declaration*, the '755 Patent's Figures also repeatedly label the "active region" and "outer region" of exemplary embodiments (see reference numerals 62 and 90 for "active region" and numerals 64 and 92 for "outer region"), as shown in FIGS. 2A and 2B, below.



FIG. 2A                                    FIG. 2B

11.     Based on the intrinsic record, including those portions identified in my *Initial Declaration* and above, a POSITA would have understood "active region" and "outer region" to be used in the '755 Patent to provide appropriate context for the location of particular layers (*e.g.*, passivation and material layers) and analysis of certain characteristics (*e.g.*, density of mechanical energy and wavelength excitation).

12.     Based on the descriptions of "active region" and "outer region" in the patent specification as reproduced above, along with their usage in the claims and throughout the remainder of the intrinsic record, such as in the above Figures, it remains my opinion that a POSITA would have understood these terms to be used in the patent as proposed by Qorvo.

PAGE 4

13.     My analysis above and in my *Initial Declaration* is primarily based on the intrinsic record.

14.     In contrast, the *Nguyen Declaration* does not cite a single portion of the intrinsic record to support Akoustis' construction of  "active region" and "outer region."  Instead, it relies **only** on extrinsic evidence, including unsupported opinions as to what a "skilled artisan" (apparently untethered to the timeframe of the invention) would be "interested in" (*Nguyen Declaration* at 11-12) and various extrinsic evidence (*Nguyen Declaration* at 12-15).

15.     It is my understanding that extrinsic evidence is considered less reliable than intrinsic evidence, and for that reason is generally given less weight than intrinsic evidence.

16.     More importantly, the intrinsic record does not mention "motional current" at all. Thus, a POSITA would not have understood "active region" and "outer region" in the '755 Patent to be defined based on "motional current."  Nor would a POSITA have considered it necessary to define "active region" and "outer region" based on "motional current" to understand other features of the '755 Patent, for example, the location of particular layers (*e.g.*, passivation and material layers) and analysis of certain characteristics (*e.g.*, density of mechanical energy and wavelength excitation).

17.     Turning to the extrinsic evidence, "active region" and "outer region" are used in the '755 Patent in the same manner they are commonly used in the art.  *See, e.g.*, Hashimoto at 42-43, 71-74, 80-87, 102, 145, 205, 208, 211, 214; *see also, e.g.*, U.S. Patent Nos. 7,795,781, at 3:22-38; 8,999,187, at 2:14-16, 4:23-30, 5:56-60; 9,197,185, at 7:40-43; 9,689,765, at 23:4-18; 10,778,186, at FIGS. 2a, 5b.  Each describes an active region/area as being defined by particular electrode and piezoelectric layer arrangements that allow the region to be electrically driven.  *Id.* This fully supports Qorvo's construction.

PAGE 5

18.     Additionally, I performed a Google Patents search for documents mentioning "BAW Filter"/ "BAW Resonator," "active region"/"active area"/"active portion," and "motional current" to confirm my understanding.[1]  I did not find a document that describes an "active region" in the context of "motional current density" as asserted by Akoustis and Dr. Nguyen. This further shows that Akoustis' construction was not commonly used in the art.

19.     I have also reviewed the extrinsic evidence identified by Dr. Nguyen on pages 13-15 of the *Nguyen Declaration*.  This extrinsic evidence is not drawn from treatises, textbooks, or other more general sources.  Rather, each is a research paper directed to narrow topics such as particular resonator constructions and circuit analyses.  While the references discuss the (uncontroversial) concept of motional current being present in an active region, including as part of a resonator's equivalent circuit, the descriptions of active regions and motional current in these papers is focused on the narrow scope of the underlying research topics.  None of the references provide particular evidence (other than the opinions of the authors) that "active region" and "outer region" are inextricably defined in the art in terms of motional current— particularly in comparison to my search described above.  None of the papers even mention the concept of "motional current density," which is the basis of Akoustis' construction.

20.     Moreover, while a POSITA would have recognized that motional current does have some relationship with active regions of devices, a POSITA seeking to understand the '755 Patent would not have considered it necessary to define "active region" and "outer region" by using the concept of motional current, as narrowly defining the regions in this context is not

---

[1]https://patents.google.com/?q=%22BAW+filter%22,%22BAW+resonator%22&q=%22active+region%22,%22active+area%22,%22active+portion%22&q=%22motional+current%22&before=priority:20150820&num=100 (last visited July 28, 2022).

necessary to understand the invention.  In other words, while in some applications or designs a "skilled artisan" may be "interested in" motional current in a resonator, a POSITA would have understood that such a level of granularity is unnecessary in the context of the '755 Patent. Moreover, even if a POSITA would have been motivated to review extrinsic sources, the POSITA would not have imported the concept of "motional current" into the definition, at least because it is not needed to understand the scope of the subject matter of the '755 Patent, and is therefore unnecessary to add.

21.      In view of the above, a POSITA would not have considered it necessary to look to extrinsic evidence to understand "active region" and "outer region" in the context of the '755 Patent as these terms are easily understood based on the intrinsic record.  Thus, the extrinsic evidence does not dictate a construction different from that indicated by the intrinsic record.

22.      Finally, turning to Dr. Nguyen's comments on pages 11-12 of the *Nguyen Declaration*, Dr. Nguyen first asserts that a:

> … skilled artisan designing a resonator is interested in what the effect of that resonator will be on an input signal, which is determined by the resonator's equivalent circuit, generally based on an LCR and associated elements to model things like multiple ports (where transformers are often used) or parasitic paths and losses (where extra branches with resistors and capacitors might be used). Thus, the key concern is that part of the device that generates motional current density through the piezoelectric layer.

*Nguyen Declaration* at 11.

23.      Whether or not a designer would have been "interested" in motional current density for certain performance aspects of a resonator is not the relevant question for the present claim construction analysis.  Rather, the relevant question is what would "active region" and "outer region" mean to a POSITA in the context of the '755 Patent.  Dr. Nguyen's comments above are therefore not on point.

24.    Dr. Nguyen next asserts:

I disagree with Qorvo's suggested plain and ordinary meaning of "active region"
as the region of the BAW resonator that is electrically driven to provide the
resonator functionality or active region. First, the phrase "to provide the resonator
functionality" is vague, as functionality could mean many things, such as
generating motional current or presenting a specific impedance or realizing a
specific equivalent circuit, or all of these combined.

*Nguyen Declaration* at 11-12.

25.    I disagree that the following highlighted portion of Qorvo's definition of "active

region" (i.e., "the region of the BAW resonator that is electrically driven ***to provide the***

***resonator functionality***") is vague.  A POSITA reviewing the intrinsic record would have

understood that the function of the resonator is to provide a desired filtering function.  '755

Patent, 1:20-34.  The '755 Patent indicates that this is done by exciting acoustic waves in a

piezoelectric layer in an active region by applying an electrical signal to top and bottom

electrodes, which is electrically driving the active region.  *Id.*, 1:51-61.  The filtering function is

the sole focus of the BAW resonator in the '755 Patent.  As such, a POSITA would not have

understood the minor component functions identified by Dr. Nguyen as "***the*** resonator

functionality."

26.    Dr. Nguyen next asserts:

Second, while the '755 specification uses the same language electrically driven
language to describe the active region (1:55), the term "electrically driven" is not
a well-defined term in the art as it could mean many things and could lead to an
erroneous understanding of the scope of the claim limitation. "Electrically driven"
does not describe to what degree any particular voltage is applied, nor to any
specific effect of such voltage. For example, electrically driven could mean the
piezoelectric is driven to vibration; or that a non-motional current is driven to
flow through the capacitance between two conductive plates; or that a suspended
piezoelectric layer (as in an FBAR) is driven into a flexural mode (which is not
the mode of interest). The main problem with a definition that just focuses on the
drive input is that it is not enough to identify the active device. One can drive
anything, including things that are not the device, so specifying the drive only
does not specify the active device. Rather, one must specify the result of driving

PAGE 8

(i.e., the output, in this case the motional current, which together with the input voltage in turn specifies the equivalent circuit) to isolate the actual device.

*Nguyen Declaration* at 12.

27.   I disagree that "electrically driven" is unclear or not known in the art.  *See, e.g.*, Hashimoto at 4, 6, 14, 38, 39, 56, 187, 201; *see also, e.g.*, Akoustis' Exs. B03 at [0005]; B05 at 2; B08 at 461; B09 at 1414; B10 at 851; B15 at 3; B16 at 218; B17 at 1415.  As shown in these references, electrically driving a circuit is a basic concept that would have been well-known to and understood by a POSITA.

28.   I also disagree that "'[e]lectrically driven' does not describe to what degree any particular voltage is applied, nor to any specific effect of such voltage."  First of all, this position ignores the actual language of Qorvo's proposed construction ("the region of the BAW resonator that is electrically driven ***to provide the resonator functionality***").  In other words, a POSITA would have understood, in the context of the '755 Patent, that the electrically driven region is what provides the resonator functionality (*e.g.*, as discussed above, the desired filtering function).  Further, a POSITA would not have understood the electrically driven language to be referring merely to the component effects identified by Dr. Nguyen.  Rather, a POSITA would have understood the "electrically driven" to be related to the ultimate purpose of the resonator— its filter functionality.

29.   For at least the foregoing reasons, I agree that Qorvo's proposed constructions for "active region" and "outer region" are correct.

**B.**     "*A Density Of Mechanical Energy* In The Outer Region Of The BAW Resonator Is Reduced As Compared To *A Density Of Mechanical Energy* In The Outer Region Of The BAW Resonator When N Is Equal To 1"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning.  If a construction for "density of mechanical energy" is needed, it means the amount of mechanical energy from acoustic waves leaked from the active region. | The density of mechanical energy means a total density over the full volume of the outer region, or otherwise indefinite. |

30.     As discussed above, it is my understanding that, in construing claim terms, one should primarily rely on the intrinsic record.

31.     In my *Initial Declaration*, I reviewed the intrinsic record related to the '755 Patent and came to the conclusion that Qorvo's proposed construction for "density of mechanical energy" is correct.

32.     In particular, I highlighted the various explanations in the '755 Patent's specification of *what* is being reduced (*e.g.*, what is the "density of mechanical energy") when N is not equal to 1.  What is clear from the specification (and claims) when read as a whole is that the invention is directed to reducing the amount of mechanical energy—created by the claimed structure—"leaked" from the active region.

33.     For example, as described in the '755 Patent at 6:26-63 (with relevant language bolded and italicized):

> As illustrated in FIG. 3A, during operation, the reference BAW resonator 38 of FIG. 2A exhibits a significant amount of lateral leakage of **mechanical energy** from the active region 62 into the outer region 64. This lateral leakage, or lack of lateral confinement, degrades the quality factor (Q) of the reference BAW resonator 38.

> FIG. 2B illustrates a BAW resonator 66 with improved lateral confinement (i.e., reduced lateral leakage) of **mechanical energy** according to some embodiments of the present disclosure. In this example, the BAW resonator 66 includes a piezoelectric layer 68 (which is sometimes referred to as a piezoelectric plate), bottom and top electrodes 70 and 72, a reflector 74 including layers 76, 78, 80,

PAGE 10

82, and 84, and a BO ring 86, which are exactly the same as the corresponding components of the reference BAW resonator 38 and, as such, their details are not repeated.

Lastly, the BAW resonator 66 includes a passivation layer 88 on the surface of the BAW resonator 66 over both an active region 90 and an outer region 92 of the BAW resonator 66. Within the active region 90, the passivation layer 88 is exactly the same as the passivation layer 60 of the reference BAW resonator 38. Within the active region 90, the passivation layer 88 has a thickness ($T_{PA}$), which is equal to that of the passivation layer 60 of the reference BAW resonator 38. However, in the outer region 92, the passivation layer 60 has a thickness of $n \times T_{PA}$, where $n \neq 1$ (i.e., the thicknesses of the passivation layers 60 and 88 in the outer regions 64 and 92 of the reference BAW resonator 38 and the BAW resonator 66, respectively, are not the same). The value of n is in a range that reduces the lateral leakage of **mechanical energy** from the active region 90 of the BAW resonator 66 into the outer region 92 as compared to that of the reference BAW resonator 38 of FIG. 2A. This reduction of lateral leakage is illustrated in FIG. 3B, where FIGS. 3A and 3B are graphical illustrations of the results of a simulation of the **density of mechanical energy** throughout the structures of the reference BAW resonator 38 and the BAW resonator 66, respectively.

34.     FIGS. 3A and 3B identified above are also described by the '755 Patent as

"illustrat[ing] the reduced lateral leakage of the BAW resonator of FIG. 2B as compared to the

reference BAW resonator of FIG. 2A, for one example implementation" ('755 Patent, 4:1-4).

FIGS. 3A and 3B are reproduced below:



FIG. 3A                          FIG. 3B

35.     As such, a POSITA reading the intrinsic record as a whole would have understood "density" in the '755 Patent to describe the relative amounts of mechanical energy at issue.  In particular, a POSITA reading the '755 Patent would have understood reduced "density" of mechanical energy to be used in a broad sense that refers to the overall and/or localized mechanical energy reduction in the outer region.  An example of such an understanding is shown in the intrinsic record—the comparison images of FIGS. 3A and 3B, which illustrates both overall and localized reduction in mechanical energy density in an outer region by using the inventive relationship.

36.     Thus, the meaning of "density of mechanical energy" that is in harmony with the intrinsic record is an "amount of mechanical energy from acoustic waves leaked from the active region," as Qorvo proposes.  To the extent a POSITA would have found it necessary to append a particular "density" explanation to the definition for added context (which is not necessary), a POSITA would have added "measured over a volume of the outer region," such that the definition would read "amount of mechanical energy from acoustic waves leaked from the active region, measured over a volume of the outer region."

37.     In other words, the intrinsic record does not support limiting "density of mechanical energy" to *only* the *particular* density calculation proposed by Akoustis involving determining an undefined "full volume of the outer region" and then an undefined "total density" over that volume.  These parameters are not found in the intrinsic record.  When combined, the phrase is itself very confusing and highly redundant.  For example, it is unclear what Akoustis or Dr. Nguyen means by "total" in the phrase "total density," particularly where Akoustis' construction includes the phrase "full volume of the outer region." As described above, what is

important to the claimed invention is simply that there be a reduced lateral leakage of mechanical energy, which is what is explicitly shown in, for example, FIG. 3B as compared to FIG. 3A.

38.     Moreover, Akoustis' proposed construction does not actually define "density." Rather, it adds language (*i.e.*, "a total density over the full volume of the outer region") to the element in question without actually explaining what is meant by "density," "total density," and "full volume" in the context of the '755 Patent.  I have been informed that defining a term using the term itself is a disfavored manner of construing claim terms.

39.     In sum, based on the descriptions of "mechanical energy" and "density of mechanical energy" in the portion of the specification reproduced above, along with its usage in the claims and throughout the remainder of the intrinsic record, such as in the above Figures, it is my opinion that a POSITA would have understood "density of mechanical energy" as proposed by Qorvo.

40.     My analysis above and in my *Initial Declaration* is primarily based on the intrinsic record.

41.     In contrast, the *Nguyen Declaration* does not cite a single portion of the intrinsic record to support Akoustis' construction of  "density of mechanical energy."  Instead, it relies **only** on extrinsic evidence, including unsupported opinions as to what a person of skill would be "concerned about" in resonator design (*Nguyen Declaration* at 16) and various extrinsic evidence (*Nguyen Declaration* at 17-18).

42.     It is my understanding that extrinsic evidence is considered less reliable than intrinsic evidence, and for that reason is generally given less weight than intrinsic evidence.

43.     As with the previous terms, Dr. Nguyen's extrinsic evidence is not drawn from treatises, textbooks, or other more general sources.  Again, Dr. Nguyen relies on research papers

directed to narrow topics.  Dr. Nguyen cites these references not to identify definitions for

"density of mechanical energy," but to support his argument (discussed below) that it is energy

loss that matters in resonator design.  While energy loss is important, the documents do not

address the relevant question here—what is the meaning of the phrase "a density of mechanical

energy in the outer region of the BAW resonator is reduced as compared to a density of

mechanical energy in the outer region of the BAW resonator when n is equal to 1"  in the context

of the '755 Patent.

44.     Turning to Dr. Nguyen's comments on pages 16-17 of the *Nguyen Declaration*,

Dr. Nguyen first asserts:

> What a person skilled in the art is mainly concerned about is how much total
> energy is lost to the surroundings of the device. For a miniature device like a
> BAW or micromechanical resonator, the surrounding is generally the substrate on
> which the device is fabricated. Energy lost to the substrate—which can be waves
> going into the substrate that experience dissipation in the substrate (or its mounts,
> adhesives, etc.)—that does not return to the resonator is energy lost, so lowers the
> quality factor Q, a very important filter or oscillator design parameter. What
> matters is the total energy lost to all of the surroundings, i.e., strain energy
> dissipation in a large area around the resonator, not just some small region(s).

*Nguyen Declaration* at 16.

45.     What a designer would have been "mainly concerned" about as to certain

performance aspects of a resonator is not the relevant question for the present claim construction

analysis.  Rather, the relevant question is what would "density of mechanical energy" mean as

used in the disputed claim term to a POSITA in the context of the '755 Patent.  Dr. Nguyen's

comments above are therefore not on point.

46.     Dr. Nguyen next asserts:

> The Akoustis construction is necessary because the patent claim language
> "density of mechanical energy in the outer region" opens too wide a possibility of
> regions where density can be determined. For example, in a typical scenario, there
> could be a small region outside the device active region where the energy density

is higher than when n=1 and at the same time another small region where the energy density is lower than when n=1. The fact that there is a region where the energy density is lower does not necessarily mean the total energy lost is lower. In other words, it is possible that even where total energy in the outer region has increased, there can be a particular point where there is a reduction in energy density.

*Nguyen Declaration* at 16-17.

47.     I disagree with Dr. Nguyen's above analysis.  First, it appears Dr. Nguyen's primary complaint about the claim language is its breadth.  But I have been informed that a claim does not need construction simply because it is broad.  Second, a POSITA would not have understood the claimed invention to cover *de minimus* differences in "densities of mechanical energy" (*e.g.*, Dr. Nguyen's "small regions" or "point") resulting from the claimed construction. Third, for at least the reasons discussed above, the intrinsic record supports an understanding of the claimed invention as including both localized and overall reduction in mechanical energy density in an outer region by using the inventive relationship (*e.g.*, *compare* FIGS. 3A *with* 3B).

48.     Dr. Nguyen next asserts:

Only the total energy over the full volume can provide useful information regarding the effectiveness of any structure intended to reduce energy losses from the active device. A more accurate measure of the total energy lost that removes some of the ambiguity of location and region and still captures the use of energy density in the claim is to get the energy density (or average energy density) over the entire outer region, which is the Akoustis construction. Because limiting the region to the outer region of the device still does not quite capture all the energy lost, a yet more accurate and useful measure would be the energy density in the entire region outside the active region (not just the outer region of the device).

*Nguyen Declaration* at 17.

49.     I disagree with Dr. Nguyen's above analysis.  Dr. Nguyen appears to be focused on limiting the definition to metrics that define the "effectiveness of the any structure intended to reduce energy losses from the active device."  But Dr. Nguyen does not explain how this concept is relevant to understanding "density of mechanical energy" in the context of the '755 Patent.  As

PAGE 15

described above, the purpose of "density of mechanical energy" in the claims is not necessarily to measure specific values of "energy losses," but is used as a comparative (*e.g.*, the "density of mechanical energy" in the outer region when using the claimed inventive structure versus when the inventive structure is not used) to describe the inventive structure. As such, a POSITA reading the '755 Patent would have understood "density of mechanical energy" as comparing the amount of mechanical energy in the two configurations—not limited to measuring specific values of "energy losses."

50.     Dr. Nguyen also asserts:

Qorvo's proposed construction as "the amount of mechanical energy from acoustic waves leaked from the active region" uses the term "leaked", which does not necessarily mean the same as "lost". A "leaked" amount of energy can be reflected and returned to the active region, in which case it is not "lost". What is important here is what energy is lost. Because it does not use the words "total amount", it also leaves open the flawed notion that the amount of energy can be measured at any finite point in space or in time, and not as it relates to the total energy over the full volume of the outer region. In this regard, an amount leaked could refer to an amount of energy at a particular point in space, or at a particular point in time.

*Nguyen Declaration* at 16-17.

51.     I disagree with Dr. Nguyen's above analysis. Dr. Nguyen is again focused on measurements of "lost" energy, stating "what is important here is what energy is lost." As stated above, energy loss is important, but again, this is not the focus of the claimed invention. The '755 Patent clearly and repeatedly indicates that its concern is lateral energy leakage (repeatedly using forms of "leak" to describe the issue), and uses "density of mechanical energy" in a comparative manner as discussed above.

52.     Lastly, Dr. Nguyen also asserts:

Qorvo's proposal leaves out entirely the concept of "energy density," instead referring to an amount of energy. An energy density is defined as an amount of energy per unit volume, just as an object's density is its mass per unit volume.

That is, energy density requires a defined volume over which the "amount" of energy is measured, and any amount without an associated volume cannot be an "energy density." I believe such a construction would be fundamentally flawed for the above reasons and incorrect (or not true to the original claim) in the sense that it does not capture the concept of density.

*Nguyen Declaration* at 16-17.

53.　　I disagree with Dr. Nguyen's above analysis.  First, as discussed above, Akoustis' construction fails to explain what is meant by "density" in context of the '755 Patent, as it uses "density" in its definition.  On the other hand, the term "amount of energy" in Qorvo's construction includes "energy density"; that is, "energy density" corresponds to an "amount of energy" when comparing the amount of energy leaked to a certain region when the extent of that region is not varied.  Second, Dr. Nguyen continues to ignore the intrinsic record in the entirety.  The *Nguyen Declaration* does not cite a single part of the intrinsic record to support Akoustis' construction of "density."  Rather, it is carefully drafted to limit "density of mechanical energy" to ***only*** the ***particular*** density calculation proposed by Akoustis.  Interestingly, none of Akoustis' proposed parameters used to define "density of mechanical energy" are found in the intrinsic record.  Again, the '755 Patent clearly and repeatedly indicates that its concern is amount of lateral energy leakage (repeatedly using forms of "leak" to describe the issue), and uses "density of mechanical energy" in a comparative manner as discussed above—not limited to specific values using specific metrics.

54.　　For at least the foregoing reasons, I agree that Qorvo's proposed construction for "density of mechanical energy" is correct.

PAGE 17

C.     **"Acoustically Matched In Such A Manner That One Or More Wavelengths That Cause Energy Leakage Into The Outer Region *Are Not Excited* In The Active Region"**

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning.  If a construction for "are not excited" is needed, it means "are not substantively created." | "[A]re not excited" means that the wavelengths do not exist in the whole volume of the active region, or otherwise indefinite. |

55.     As discussed above, it is my understanding that, in construing claim terms, one should primarily rely on intrinsic patent evidence.

56.     In my *Initial Declaration*, I reviewed the intrinsic record related to the '755 Patent and came to the conclusion that Qorvo's proposed construction of "are not excited" is correct.

57.     In particular, I highlighted the following portion of the specification of the '755 Patent:

> Embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered in such a manner that lateral leakage of mechanical energy from an active region of the BAW resonator is reduced, and methods of fabrication thereof, are disclosed. In general, in some embodiments, a thickness of a material in the outer region of the BAW resonator is such that the outer region of the BAW resonator is acoustically matched to the active region of the BAW resonator in such a manner that wavelengths that cause the lateral leakage of mechanical energy ***are not excited*** in the active region. As a result, there is no leakage of wavelengths ***excited*** in the active region into oscillation modes in the outer region. In other words, the thickness of the material in the outer region of the BAW resonator is selected such that the extinction coefficient (i.e., the rate of exponential decay for evanescent waves) associated with the exponential decay in the outer region and the imaginary part of the lateral dispersion in the outer region are changed in such a manner that lateral leakage is reduced.

'755 Patent at 5:5-23 (emphasis added).

58.     Based on the intrinsic record, including those portions identified in my *Initial Declaration* and above, a POSITA would have understood "are not excited" to mean that the particular wavelengths that cause the lateral leakage are not excited *enough* (*e.g.*, substantively

excited) to result in energy leakage from the active region to the outer region as a result of the claimed construction.  In other words, excitations of one or more wavelengths that don't cause leakage (*e.g.*, minor or transient excitations) may occur within the scope of the claim.

59.     The intrinsic record does not support limiting "are not excited" to the extent advanced by Akoustis' proposed construction—"the wavelengths do not exist in the whole volume of the active region."  Such a restriction is found nowhere in the intrinsic record.  As described above, including with respect to the previously discussed term ("density of mechanical energy"), what is important to the claimed invention is that there be a reduced lateral leakage of mechanical energy, which is what is shown in, for example, FIG. 3B as compared to FIG. 3A. To do so, the '755 Patent (and claimed invention) specifies that the resonator is constructed so as not to excite particular wavelengths ***such that energy leakage results***.  A POSITA would have understood that it is the leakage that matters, and therefore that non-substantive excitations of wavelengths in the active region that don't result in energy leakage are not prohibited.

60.     Indeed, as Dr. Nguyen recognizes in the *Nguyen Declaration*, the proposition underlying Akoustis' construction (that "are not excited" means that the wavelengths do not exist in the whole volume of the active region) is not scientifically realistic.  *Nguyen Declaration* at 20.  Absent specific descriptions in the '755 Patent that it was the inventors' intent to limit their invention in such a manner, a POSITA would not have understood "are not excited" in the manner proposed by Akoustis.

61.     My analysis above and in my *Initial Declaration* is primarily based on the intrinsic record.

62.     In contrast, the *Nguyen Declaration* does not cite a single part of the intrinsic record to support Akoustis' construction of  "are not excited."  Instead, it relies ***only*** on extrinsic

evidence, including various extrinsic documents (*Nguyen Declaration* at 18-19) and unsupported

opinions as to how a person of skill would understand this term (*Nguyen Declaration* at 19-20).

63.     It is my understanding, however, that extrinsic evidence is considered less reliable

than intrinsic evidence, and for that reason is generally given less weight than intrinsic evidence.

64.     As with the previous terms, Dr. Nguyen's extrinsic evidence is not drawn from

treatises, textbooks, or other more general sources.  Again, Dr. Nguyen relies on a research paper

directed to a narrow topic.  Moreover, he cites these references not to identify definitions for "are

not excited," but to discuss the meaning of a different term, "suppression." The document does

not address the relevant question here—what "are not excited" means.

65.     Finally, turning to Dr. Nguyen's comments on pages 18-20 of the *Nguyen*

*Declaration*, Dr. Nguyen first asserts:

> In relevant technical literature, when something is "not excited", it is non-existent,
> as opposed to something that is "reduced", which one skilled in the art interprets
> as "reduced but not eliminated completely." (See '755 Patent, 2:33, 51, 54; 3:65;
> 4:1, 5:8, 23, 25; 6:33; 7:8, 16, 50; 9:49, 11:36). When used in the literature,
> absolute terms and phrases like "not excited" are interpreted as such. One
> example is the Pauli exclusion principle, which Physics LibreTexts quotes as
> "The Pauli exclusion principle says that no two electrons can have the same set of
> quantum numbers; that is, no two electrons can be in the same state. This
> exclusion limits the number of electrons in atomic shells and subshells.

*Nguyen Declaration* at 19.

66.     Although Dr. Nguyen identifies "relevant technical literature," he cites only one

example related to the Pauli exclusion principle.  He does not explain how the Pauli exclusion

principle—a principle of atomic physics that speaks to the quantum numbers assigned to each

electron within an atom—would compel a POSITA to adopt Akoustis' proposed construction

here, rather than the construction supported by the intrinsic record proposed by Qorvo.

Moreover, while some literature may use "are not excited" in the manner suggested by Dr.

Nguyen, that is not a universally accepted meaning in the art, which is apparent by the lack of

evidence identified by Dr. Nguyen.  In any event, how some extrinsic sources may use "are not

excited" is not necessarily relevant to construing "are not excited" in the context of the '755

Patent.

      67.     Finally, Dr. Nguyen asserts:

> Here, "not excited" is interpreted as absolute. It does not mean "a little bit" or
> "tiny" or "a reduced amount", or "suppressed" but rather "none at all." This is why
> I cannot agree with Qorvo's proposed construction of "not excited" as meaning
> "are not substantively created." That definition is inconsistent with the plain
> meaning of "not excited" and would be viewed as ambiguously indefinite
> compared to the term "reduced" used throughout the '755 Patent specification. If
> the inventors intended to mean suppressed or greatly reduced, those are the
> appropriate terms to express as much in the context of this invention. Qorvo's
> notion that "not excited" means not "substantially" excited is adding an adjective
> not present and not clear or evident to a person of ordinary skill in the art absent
> some supporting intrinsic evidence that the inventors were acting as their own
> lexicographer. I do not see any such support in the specification (compare "755,
> Patent, 2:61, 5:15, 7:5) or the prosecution history. Nor can I glean from the
> specification what level of presence of such wavelengths would correspond to a
> substantial amount vs. an insubstantial amount, while it is straightforward to
> discern the difference between present and not present. I also consider Qorvo's
> proposed construction to be indefinite because, as described above, it fails to
> inform, with reasonable certainty, those skilled in the art about the scope of the
> invention.
>
> I also disagree with any notion that the inability to ever achieve a total absence of
> the wavelengths in the whole volume of the active region justifies Qorvo's
> proposed construction. The fact that the inventors used the term throughout the
> specification absent any suggestion of a more scientifically realistic meaning does
> not change the plain and ordinary meaning that "not existing" means not at all.

*Nguyen Declaration* at 16-17.

      68.     Dr. Nguyen's argument here is illogical.  First, for at least the reasons above,

there is no support in the intrinsic record or the cited extrinsic evidence for Akoustis'

construction that "not excited" means "none at all."  In fact, Dr. Nguyen admits that Akoustis'

construction is not "scientifically realistic" but asserts it must somehow apply because he sees no

indication in the '755 Patent that the inventors did not intend such a scientifically unrealistic

construction to apply.  But it is my understanding that patents are written for POSITAs.  Thus,
without some indication in the specification that the inventors were applying a scientifically
unrealistic definition for aspects of their invention, a POSITA would not interpret the patent in a
scientifically unreasonable manner.  In other words, Dr. Nguyen's analysis is backwards—a
POSITA would interpret a patent in a scientifically reasonable manner absent an express reason
not to.  Dr. Nguyen has not identified any reason to depart from a scientifically reasonable
understanding here.

69.     As for Dr. Nguyen's assertion that Qorvo's construction is somehow indefinite, I
disagree.  A POSITA would be aware of how to identify non-substantive waves in an active
region—such as those that do not result in energy leakage.

70.     For at least the foregoing reasons, I agree that Qorvo's proposed construction for
"are not excited" is correct.

## IV.     THE '786 PATENT

### A.     "Piezoelectric Layer"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| A layer of piezoelectric material having single crystal structure. | A layer of piezoelectric material having single or multiple crystal structure. |

71.     In my *Initial Declaration*, I reviewed the intrinsic record related to the '786 Patent
and came to the conclusion that Qorvo's proposed construction is correct.

72.     In particular, I highlighted the clear and repeated description of the "piezoelectric
layer" in the '786 Patent as having a single crystal structure and my understanding that, when a
patentee uses a claim term in a manner consistent with only a single meaning, the patentee has
defined the term as such.

73.     I have reviewed Dr. Nguyen's arguments in the *Nguyen Declaration* that the "piezoelectric layer" of the '786 Patent may have a "single or multiple crystal structure."  I disagree with each.

74.     First, Dr. Nguyen asserts:

[I]ndependent claim 1 does not include the term "single-crystal" at all to define or describe the piezoelectric layer material. Rather, the single-crystal limitation is found, as an optional feature, of dependent claim 2, unrelated to the piezoelectric layer ('786 Patent, 14:62-64): "The device of claim 1 wherein the seed substrate includes silicon, silicon carbide, aluminum oxide, or single crystal aluminum gallium nitride materials." This informs me that the inventors knew when to use the single-crystal modifier if intended to further limit a limitation (like the seed substrate) consistent with embodiments described in the specification. Moreover, the "single-crystal" term is not in any independent claims of the '786 Patent describing the piezoelectric layer.

*Nguyen Declaration* at 21-22.

75.     I disagree that the lack of a "single crystal" descriptor for "piezoelectric layer" in claim 1 is determinative here.  As I explained in my *Initial Declaration*, a POSITA would have understood "piezoelectric layer" based on the intrinsic record as a whole, and that the intrinsic record as a whole points to only one understanding—that the "piezoelectric layer" of claim 1 is a "single crystal piezoelectric layer."

76.     I also disagree that the use of "single crystal aluminum gallium nitride materials" in claim 2 for the "seed substrate" is at all instructive as to the meaning of "piezoelectric layer." The "seed substrate" and "piezoelectric layer" are different elements of the claims, and they are different components of a resonator.  Neither should be conflated with the other.  Indeed, "piezoelectric layer" must be interpreted according to the repeated, clear and consistent descriptions throughout the intrinsic record, namely, that it is of a single crystal construction. Tellingly, the '786 Patent claims priority to U.S. provisional application number 62/360,904, which only includes a disclosure of a resonator with a single crystal piezoelectric layer.  If the

PAGE 23

inventors had intended the claims to cover polycrystalline piezoelectric layers contrary to the descriptions throughout the intrinsic record, they would have specified in the claims that the piezoelectric layer was *either* single crystal or polycrystalline.  They did not, either in the claims or specification. Thus, a POSITA would have recognized that the piezoelectric layer is limited to the single crystal construction repeatedly discussed in the '786 Patent.

77.    Dr. Nguyen further asserts:

In my opinion, the specification makes clear to a person of ordinary skill in the art that any reference to a single-crystal embodiment should not be viewed as limiting the scope or meaning of any claim that does not also specifically identify the piezoelectric layer as single-crystal. In fact, the prosecution history supports the notion that the inventors and the Patent Office did not view the term as limited to single crystal because there is no mention that the claim is so limited. The disputed term can refer to either a polycrystalline material or a single-crystal material.

*Nguyen Declaration* at 22.

78.    I disagree.  In contrast to the detailed analysis of the intrinsic record provided in my *Initial Declaration*, Dr. Nguyen's opinion here is conclusory and fails to cite to any portion of the intrinsic record.

79.    I have also reviewed the extrinsic evidence cited by Dr. Nguyen.  But the papers cited by Dr. Nguyen do not shed any light on how "piezoelectric layer" is used in the '786 Patent.  Just because other resonator configurations use polycrystalline piezoelectric layers does not mean that was what the inventors intended in the '786 Patent.

80.    For at least the foregoing reasons, I agree that Qorvo's proposed construction for "piezoelectric layer" is correct.

## V.    RESERVATION OF RIGHTS

81.    My opinions are based upon the information that I have considered to date.  I reserve the right to supplement my opinions in the future to respond to any arguments raised by Akoustis or Dr. Nguyen and to take into account new information that becomes available to me.

82.    I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed on July 29, 2022

_____

    John C. Bravman

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2022, copies of the foregoing were caused to be served

upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                                         *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

David A. Jakopin, Esquire                                            *VIA ELECTRONIC MAIL*
Dianne L. Sweeney, Esquire
PILLSBURY WINTHROP SHAW PITTMAN LLP
2550 Hanover Street
Palo Alto, CA  94304-1115
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Robert M. Fuhrer, Esquire                                           *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Boulevard, 14th Floor
McLean, VA  22102-4856
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

David L. Stanton, Esquire                                           *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, 36th Floor
Los Angeles, CA  90017-5524
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Theresa A. Roozen, Esquire                                          *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC  20036-3006
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)

# Exhibit A3

Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 90 of 598 PageID #: 1017

# Ken-ya Hashimoto
### editor



# RF

## BULK ACOUSTIC
## WAVE FILTERS
## FOR COMMUNICATIONS





Hashimoto
editor

RF

BULK ACOUSTIC WAVE FILTERS
FOR COMMUNICATIONS

# RF Bulk Acoustic Wave Filters
# for Communications

For a listing of recent titles in the
*Artech House Microwave Library,*
turn to the back of this book.

# RF Bulk Acoustic Wave Filters for Communications

Ken-ya Hashimoto

*Editor*



**ARTECH**
**HOUSE**

BOSTON | LONDON
artechhouse.com

**Library of Congress Cataloging-in-Publication Data**
A catalog record for this book is available from the U.S. Library of Congress.


**British Library Cataloguing in Publication Data**
A catalogue record for this book is available from the British Library.


ISBN-13: 978-1-59693-321-7


**Cover design by Igor Valdman**


© 2009 ARTECH HOUSE
**685 Canton Street**
**Norwood, MA 02062**

All rights reserved. Printed and bound in the United States of America. No part of this book may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the publisher.
   All terms mentioned in this book that are known to be trademarks or service marks have been appropriately capitalized. Artech House cannot attest to the accuracy of this information. Use of a term in this book should not be regarded as affecting the validity of any trademark or service mark.

10 9 8 7 6 5 4 3 2 1

# Contents

Preface                                                                                  *ix*

## CHAPTER 1
### Background and History                                                               1

1.1   BAW Technology Background                                                           1
   1.1.1   Basic Definitions                                                1
   1.1.2   Role of Piezoelectric Materials                                  2
   1.1.3   Transducers and Resonators                                       3
   1.1.4   Comparisons with SAW and Plate Wave Resonators                   4
   1.1.5   Other Kind of Resonators                                         5
   1.1.6   Electrical Characteristics of Piezoelectric Resonators           7
   1.1.7   Technology Driving Forces                                        10
1.2   Thin Plate Resonators: Towards High Frequencies                                    11
   1.2.1   Conventional Quartz Crystal Thinning                             11
   1.2.2   Bonded Plate Resonators                                          11
1.3   Composite Resonators                                                               12
1.4   Development of Thin Films                                                           13
1.5   Multidimensional Effects                                                           14
1.6   Legacy Filter Topologies                                                           15
   1.6.1    Balanced Bridge Filter                                          15
   1.6.2   Ladder Filters                                                   16
   1.6.3   Lattice Filter                                                   17
   1.6.4   Monolithic Filters                                               18
1.7   Some Acoustic Device and Materials Processing Legacy                               18
   References                                                              19

## CHAPTER 2
### Resonator and Filter Topologies                                                      21

2.1   Plate Edge-Supported Resonators                                                     21
   2.1.1   Pothole Membrane                                                 21
   2.1.2   Pocket Membrane                                                  24
   2.1.3   Undercut Air Gap Membrane                                        25
2.2   Solidly Mounted Resonators                                                          27
2.3   Electrode Metallization                                                            29
2.4   Temperature Compensation                                                           31
2.5   Electrically Coupled Filters                                                        34
   2.5.1   Ladder Filters                                                   34

| | | |
|---|---|---:|
| | 2.5.2 Balanced Ladder | 37 |
| | 2.5.3 Conventional Lattice | 37 |
| 2.6 | Acoustically Coupled Filters | 37 |
| | 2.6.1 Stacked Crystal Filter | 38 |
| | 2.6.2 Coupled Resonator Filter | 42 |
| 2.7 | Wide-Bandwidth Tuned Coupled Resonator Filters | 45 |
| 2.8 | Hybrid Filters | 47 |
| 2.9 | Summary | 48 |
| | References | 48 |

### CHAPTER 3

BAW Device Basics     51

| | | |
|---|---|---:|
| 3.1 | Thin Film Bulk Acoustic Wave Resonator | 52 |
| | 3.1.1 The Prototype Resonator and Piezoelectric Constitutive Relations | 52 |
| | 3.1.2 The Basic Parameters and Equivalent Circuit | 57 |
| 3.2 | Basic Physics | 59 |
| | 3.2.1 Wave Propagation, Transmission, Reflection, and Attenuation of Acoustic Waves | 59 |
| | 3.2.2 Electroacoustic Conversion | 62 |
| | 3.2.3 Mason Model | 64 |
| | 3.2.4 Dispersion Relations and Wave Modes | 67 |
| | 3.2.5 Resonator Design Based on Dispersion Relations | 70 |
| 3.3 | Device Design | 74 |
| | 3.3.1 Effective Coupling Coefficient | 74 |
| | 3.3.2 Loss Mechanisms and $Q$-Values | 78 |
| | 3.3.3 Spurious Modes | 82 |
| | 3.3.4 The Other Important Parameters | 88 |
| 3.4 | Summary | 89 |
| | References | 89 |

### CHAPTER 4

Design and Fabrication of BAW Devices     91

| | | |
|---|---|---:|
| 4.1 | Design Considerations for BAW Devices | 91 |
| | 4.1.1 Electromechanical Coupling Coefficient | 91 |
| | 4.1.2 Quality Factor | 92 |
| | 4.1.3 Spurious Modes | 92 |
| | 4.1.4 Power Handling | 93 |
| | 4.1.5 Temperature Coefficient of Frequency | 93 |
| | 4.1.6 Area Efficiency | 94 |
| | 4.1.7 Interconnect Losses and Parasitics | 94 |
| | 4.1.8 Robustness | 95 |
| | 4.1.9 Nonlinearities | 96 |
| 4.2 | Fabrication of BAW Devices | 97 |
| | 4.2.1 Material Selection | 97 |
| | 4.2.2 Fabrication of SMR Resonators and Filters | 101 |
| | 4.2.3 Fabrication Tolerances and Trimming | 102 |

|  | 4.2.4 | Process Controls | 108 |
| 4.3 | Application Space for BAW-FBAR Technology | | 108 |
|  | 4.3.1 | RF Filters and Duplexers | 108 |
|  | 4.3.2 | Oscillators | 112 |
|  | 4.3.3 | Sensors | 113 |
|  | References | | 115 |

**CHAPTER 5**

**FBAR Resonators and Filters** — 117

| 5.1 | Introduction | | 117 |
|  | 5.1.1 | Short History of FBAR | 117 |
|  | 5.1.2 | The Duplexer | 119 |
|  | 5.1.3 | The Package | 122 |
|  | 5.1.4 | FBAR in Context with the Rest of the World | 123 |
| 5.2 | FBAR Technology | | 124 |
|  | 5.2.1 | Introduction | 124 |
|  | 5.2.2 | Modeling of FBARs | 126 |
|  | 5.2.3 | Method of Ascertaining $Q$ | 129 |
|  | 5.2.4 | The Rayleigh-Lamb Modes | 133 |
|  | 5.2.5 | Apodization | 137 |
|  | 5.2.6 | Frames | 140 |
|  | 5.2.7 | Temperature-Compensated Resonators | 145 |
|  | 5.2.8 | Coupled Resonator Filters | 149 |
| 5.3 | FBAR Filters | | 150 |
|  | 5.3.1 | Interstage Filters | 150 |
|  | 5.3.2 | The Duplexer and Multiplexers | 152 |
| 5.4 | Conclusions | | 156 |
|  | References | | 158 |

**CHAPTER 6**

**Comparison with SAW Devices** — 161

| 6.1 | Introduction | 161 |
| 6.2 | Structural Comparison and Features | 161 |
| 6.3 | Resonator Performance and Reliability | 162 |
|  | 6.3.1 | $Q$-Factor | 162 |
|  | 6.3.2 | Power Durability | 165 |
| 6.4 | Filter Design | 166 |
| 6.5 | Manufacturing Process | 168 |
| 6.6 | Temperature Compensation Technique | 168 |
| 6.7 | Application Map | 169 |
|  | References | 170 |

**CHAPTER 7**

**Thin Films Deposition for BAW Devices** — 173

| 7.1 | Most Commonly Used Piezoelectric Materials | 173 |
|  | 7.1.1 | Zinc Oxide | 173 |
|  | 7.1.2 | PZT | 173 |

      7.1.3   Aluminum Nitride   174
7.2   Methods of Deposition of Piezoelectric Films   175
      7.2.1   Sputtering   175
      7.2.2   Practical Aspects of the Sputter Deposition of the AlN Films   183
      7.2.3   Electron Cyclotron Resonance Deposition   187
      7.2.4   Ion Beam Deposition   188
      7.2.5   Metalorganic Chemical Vapor Deposition   188
      7.2.6   Jet Vapor Deposition   189
      7.2.7   Nonvacuum Deposition   189
7.3   Metal Deposition for BAW Applications   189
      7.3.1   Aluminum   191
      7.3.2   Molybdenum   192
      7.3.3   Tungsten   192
      7.3.4   Platinum   193
      7.3.5   Ruthenium   194
      7.3.6   Combinations of Metals   194
      References   194

**CHAPTER 8**
Characterization of BAW Devices   197

8.1   Introduction   197
8.2   Single-Layer Material Characterization   198
      8.2.1   Introduction   198
      8.2.2   Dielectric and Piezoelectric Layers   198
      8.2.3   Metallic Layers   200
8.3   Laser Interferometry   201
      8.3.1   Introduction   201
      8.3.2   Measurement Setup   201
      8.3.3   Evaluation of Dispersion   203
8.4   Loss Mechanisms   204
      8.4.1   Introduction   204
      8.4.2   Acoustic Leakage   205
      8.4.3   Acoustic Leakage Through the Bragg Reflector   207
      8.4.4   Laterally Leaking Waves   211
      8.4.5   Electrical Losses   212
      8.4.6   Viscoelastic Losses   212
      8.4.7   Scattering Losses   214
8.5   Electrical Characterization   214
      8.5.1   Introduction   214
      8.5.2   Resonator Measurements   214
      8.5.3   Filter Measurements   217
      References   219

**CHAPTER 9**
Monolithic Integration   221

9.1   Introduction   221
9.2   Compatibility Issues Between IC and BAW Technologies   223

| | | |
|---|---|---:|
| 9.3 | Practical Implementation | 224 |
| | 9.3.1   Technology Description | 225 |
| | 9.3.2   Filtering LNA | 227 |
| | 9.3.3   WCDMA RF Front-End | 228 |
| | 9.3.4   WLAN Oscillator | 232 |
| 9.4 | Conclusion | 232 |
| | Acknowledgements | 233 |
| | References | 233 |

**CHAPTER 10**

**System-in-Package Integration** | | 235 |

| | | |
|---|---|---:|
| 10.1 | Introduction | 235 |
| 10.2 | Trends in Front-End Integration for Wireless Applications | 235 |
| | 10.2.1   Multiband, Multimode Wireless Systems | 235 |
| | 10.2.2   SiP Versus SoC | 239 |
| 10.3 | SiP Technologies | 241 |
| | 10.3.1   Laminate Platform | 241 |
| | 10.3.2   LTCC Platform | 242 |
| | 10.3.3   Thin Film Platform | 243 |
| 10.4 | SiP Design | 245 |
| | 10.4.1   Electromagnetic Modeling | 246 |
| | 10.4.2   Design Methodology | 251 |
| 10.5 | Test and Industrialization, Known-Good Die Concept | 252 |
| 10.6 | RF-SiP Examples | 253 |
| | 10.6.1   General Wireless Examples | 253 |
| | 10.6.2   Examples Including BAW | 255 |
| | References | 257 |

| | |
|---|---:|
| Glossary | 259 |
| About the Author | 265 |
| List of Contributors | 266 |
| Index | 267 |

## CHAPTER 1
# Background and History

Ken Lakin

## 1.1 BAW Technology Background

The purpose of this chapter is to give a brief history of the development of BAW
technology which is covered in technical detail in later chapters of this book. First it
is necessary to define what the BAW technology is and then put the history in that
context. For the purposes of this book, BAW history is interesting not so much as
who did what when (that will be apparent from numerous references) but how other
technologies were drawn upon to make the development of the modern thin film
BAW technology possible. Microelectronics has played a key role over the years by
providing materials-processing techniques previously unavailable. Review papers
give an overview of thin film resonator technology [1–5].

### 1.1.1 Basic Definitions

The term bulk acoustic wave (BAW) refers to primary acoustic waves that propaga-
tion in the bulk of a material whose dimensions are infinite and wherein the wave
occupies all of that volume. There are three possible propagation modes called the
normal modes of the material. Those modes are well understood for a large number
of materials whose elastic properties are known. In more practical terms, a wave in
a finite three- dimensional region can only approximate the propagation character-
istics of an infinite region. The first approximation required to support a BAW is
that the lateral extent of the medium is much larger than the wavelength and
cross-section of the wave. The practical definition of BAW is imprecise and depends
on what artifacts crop up due to the finiteness of the beam. For example, a beam
starting out as being of comparable dimensions to the wavelength would appear as
a point source and spread widely, due to diffraction, but could be described as some
complex linear combination of the normal modes. The second approximation is
that the lateral extent of the wave, and therefore of the medium, is such that the
wave is primarily one-dimensional but with some residual effects due to lateral
finiteness. In the direction of propagation the material extent may be very finite,
such as a half-wavelength thick for a resonator. Yet in such a case, dimensions will
appear large in the direction of propagation because the wave bounces within the
resonator between parallel surfaces maintaining its characteristics as if propagating
over considerable distance. Typical average lateral dimensions might be

1

approximately 100 times the wavelength for resonators in filters designed for 50-ohm source and load impedances.

Whereas finiteness is a distortion imposed on BAW, other modes of propagation are uniquely tied to the finiteness of a structure. For example, waves can propagate along and be guided by a surface or at an interface. The most notable being the solid to air interface that supports surface acoustic waves (SAWs). A feature of waves is that they tend to be guided by regions of slower velocity and lower energy density. If there is a lateral deformation at or very near a surface, the material can expand perpendicular to the force (Poisson effect) out into the air region. That added degree of freedom makes the surface appear mechanically softer and as a result the SAW is confined to the surface. In the case of SAWs the material region must be just a half space with the relevant approximation that the material is sufficiently thick that the wave does not exist at any other surfaces.

If the material region is formed as a plate with two parallel surfaces, but large in lateral extent, then another set of waves, plate waves (PW), can propagate along the parallel boundaries of the plate. These waves are most pronounced when the thickness of the plate is comparable to the propagation wavelength. It turns out that such a geometrical constraint is met by a typical BAW resonator. Further, plate waves can be generated in BAW resonators and can plague high-performance BAW resonators with parasitic resonances.

Other modes of propagation are possible in the typical BAW structural approximation but PW are the most pronounced.

Since a resonator can be though of as a confinement structure for a wave bouncing between reflecting surfaces, it is only a manner of properly generating and confining a wave to make a useful resonator. Two issues then emerge. First, how to generate the wave, and second how to confine the wave so that most of the energy is stored with a minimum amount of energy loss except on a controlled basis.

## 1.1.2   Role of Piezoelectric Materials

The most straight forward method of generating an acoustic wave is to use a piezoelectric material. The piezoelectric direct and inverse effects are described in general by the equations,

$$T = cS - eE \tag{1.1}$$

$$D = eS + \varepsilon E \tag{1.2}$$

Here (1.1) is Hook's law of elasticity, $T$ is stress (force per unit area), $S$ is strain, $e$ is the piezoelectric coefficient, $c$ is mechanical stiffness, $\varepsilon$ is permittivity, and $E$ is the electric field. The second equation shows the contribution of mechanical strain to electric charge generation and displacement current. Accordingly, mechanical deformations and electric properties are piezoelectrically coupled.

As will be shown in subsequent chapters, the strength of the piezoelectric coupling determines the bandwidth of filters and the mechanical losses in the material will determine resonator $Q$ and accordingly filter insertion loss.

nators (OMR). A small change in frequency can cause the resonance to shift up or down one mode number and many resonances can exist over the bandwidth of the transducer. The frequency spacing is the reciprocal of the round-trip time of a propagating wave.

In Figure 1.1(d) the lateral field resonator is designed to keep electrodes out of the resonator by exciting the piezoelectric plate with fringing electrical fields that are mostly parallel to the plate surface. Resonance is established between two unelectroded surfaces.

Historically, resonators (called crystals then and today) of the type in Figure 1.1(c) were used until the early 1950s. With the need for smaller resonators and the availability of metal plating techniques, crystals of the form in Figure 1.1(a) were produced in ever decreasing sizes. The configuration in Figure 1.1(b) was limited to transducers for delay lines and other applications. Transducer bonding techniques were not advanced enough to support low-loss transduction although some metallurgical techniques showed some promise in special applications. It was the need for BAW delay-line transducers at high frequencies that led to the development of piezoelectric thin film deposition [6]. And, it was not until the introduction of thin film deposition did the composite configuration show some promise as a resonator. The air gap and lateral field resonators have a modern day application in quartz crystals for low-aging applications where metal electrodes would have detrimental effects, or for microwave resonators where acoustic losses in the electrodes are excessive.

### 1.1.4   Comparisons with SAW and Plate Wave Resonators

It is apparent from the discussion above that an acoustic resonator can be formed by a transduction means and mechanical boundaries that confine the energy. As introduced above, there are other waves that exist at boundaries such as SAWs and PWs.

Figure 1.2 shows the cross-section of a SAW transducer wherein the thickness of the substrate is much larger than the wavelength of the SAW. Here spatially periodic



(a)

(b)

**Figure 1.2**   *SAW transducer and resonator. (a) Side view showing driven electrodes and reflectors. (b) Top view of transducer and resonator. In practice there are many more pairs of transducer electrodes and more reflector stripes on both sides of the transducer.*



**Figure 1.3** Plate wave excitation and trapped energy. (a) Cross-section showing top and bottom electrode stripes used to excite the plate wave. The electrodes are normally comparable to the principal wavelength in the lateral propagation direction and longer in the depth direction of the figure by many times the plate thickness. (b) Calculation of wave amplitude in the vicinity of the electrode showing that energy is actually trapped.

These various forms of resonators may occur by deliberate design or as an artifact in some other more desired resonator. They have also appeared in one form or another in the field of MEM devices.

Figure 1.5 suggests a possible implementation in thin film form of a piezoelectric bimorph cantilever beam resonator designed to operate in a flexure mode. A voltage applied to the top piezoelectric plate can excite a length extension strain that causes the beam to bend. The bending of the lower beam is detected by the piezoelectric and generates an output voltage. Although useful in low-frequency resonators and filters, the driven flexure vibration can possibly occur in high-frequency BAW devices as a parasitic effect.

Figure 1.6 gives a pictorial summary of frequency ranges for different modes of vibration resonators over a range of plate thicknesses. BAW modes for longitudinal and shear waves are higher in frequency because the material structure is stiffer for those modes and frequency is simply inversely proportional to thickness.

tion. The problem of material $Q$ surfaced again, and in the extreme, when films were applied to thin film BAW resonators where most of the energy is in the film. Films good enough for SAW were not good enough for BAW resonators. AlN films grown by high-temperature organometallic chemical vapor deposition for SAW devices were of the required quality but lacked a viable means of putting an electrode under the resonator.

Significant advances have been made in sputter film deposition as will be detailed in a later chapter.

## 1.5   Multidimensional Effects

All structures actually fabricated are of course three dimensional, and it is only a matter of the degree of multidimensionality that affects device performance. The most important issue with BAW resonators is the generation of plate wave modes that can be seen as spurious responses in the normal resonator response.

Figure 1.12 illustrates the physics of the problem. In Figure 1.12(a) a simple resonator having electrodes and a lateral dimension comparable to the piezoelectric plate thickness is shown. Assuming a simple longitudinal mode-thickness excitation, vertical deformation causes a lateral deformation through the natural Poisson coupling. This coupling causes lateral vibrations in additional to thickness vibration in time harmonic excitation. In Figure 1.12(b), the plate is assumed to be much larger in lateral extent. Thus when volume element A is subjected to excitation its lateral deformation is canceled by the like lateral deformation of adjacent cells C and B. The result is a one-dimensional deformation locally.

End cell D is also driven to a thickness deformation but in this case there is no adjacent cell on the left-hand side to cancel the lateral deformation in that direction. Accordingly, volume element D generates vertical and horizontal deformations capable of exciting lateral wave propagation in the plate.

Once excited at the plate edges, plate waves will propagate throughout the plate reflecting off any material or electrical discontinuity. The energy contained in the lateral wave will be dependent on the strength of the excitation. Most important is the ratio of plate wave energy to that in the primary thickness mode. In the small resonator case of Figure 1.12(a), there is no real distinction between the two excitations because the deformations are so tightly coupled and occupy the same volume. In the extended resonator of Figure 1.12(b), the internal volume elements driven in the thickness mode will have an associated energy larger than the plate wave in approximate proportion to the width-to-thickness ratio of the resonator.

In Figure 1.12(c) the plate wave problem is cast in a format closer to the thin film BAW case. Here the piezoelectric plate is assumed to be of a lateral extent larger than the electroded region, or more pertinent, the overlap of the electroded region.



(a)                              (b)                                              (c)

**Figure 1.12**   Resonator geometry for describing plate wave excitation. (a) Resonator having comparable lateral and thickness dimensions, (b) large lateral-to-thickness dimensions, and (c) part of an extended plate.



**Figure 2.20**   Lattice filter. The upper-circuit diagram gives the general circuit of a two-section 4-pole ladder filter. The lower drawing is a topside view of the filter as laid out for a thin film resonator fabrication. The resonator and electrode designations can be used to correlate the circuit diagram with the layout.

### 2.6.1   Stacked Crystal Filter

One of the primary thickness-mode-coupled resonators is the stacked crystal filter (SCF) (Figure 2.21 [22–26]). The SCF is composed of multilayers of piezoelectric and metal layers, as shown in Figure 2.21(a) for a one-pole filter and in Figure 2.21(b) for a two-pole filter. Because one transducer is located directly on top of the other, there is little or no impediment for the sound generated by one resonator propagating between the two transducers. A voltage applied between electrode 2 and the ground drives the top transducer. The wave that is generated in the top



**Figure 2.21**   Cross-sectional views of a simple SCF. In (a) is shown two piezoelectric layers with intervening electrodes for a single section one-pole filter, and in (b) two sections are connected electrically in series to form a two-pole filter.

transducer propagates through the structure and reflects off the bottom of the bottom transducer. Thus, the acoustic region established between outer reflecting surfaces of the two transducers forms a resonator. In the SCF then, one transducer drives the resonant structure and the other extracts energy from the resonator. The limited frequency range of the externally loaded resonator is the basis of the filter response.

Figure 2.21 also shows the electrical shielding between input and output provided by the ground plane.

The lowest order resonance, as shown in Figure 2.22, is for a half-wavelength across the entire structure or an approximate quarter-wavelength across each piezoelectric region, and will be denoted as mode 1. Although transduction is not the most efficient when there is only a quarter-wavelength across the piezoelectric, the structure is nevertheless resonant and a filter response is obtained. The most efficient transduction, and hence the greatest effective electrical coupling to the external circuit occurs at the second overtone, mode 2, where there is a half-wavelength across each transducer. The next major response is at the third overtone, mode 3, and coupling is inefficient because each transducer is operating at three-fourths wavelength. Taken together, these resonances have the effect of placing adjacent spurs at the half- and three-halves frequency around the most efficient transduction frequency. The response of the mode 2 SCF can be improved by fabricating in the SMR format on a limited bandwidth reflector array to effectively attenuate the mode 1 and mode 3 frequency responses, as implied by Figure 2.10.

It is useful to compare filters designed for mode 1 and for mode 2 resonant structures. Figure 2.23(b) shows in dashed lines an SCF designed for the mode 2 optimal coupling case. Here the SMR format is used to limit the mode 1 and mode 3 responses that occur relatively near-in and would otherwise severely limit the out-of-band rejection. Also, on the plot is a mode 1 filter centered on the frequency of the mode 2 filter. The mode 2 filter is on a nine-layer reflector stack of AlN and $SiO_2$ whereas the mode 1 filter has the simpler air reflector structure. Clearly, the mode 1 filter has higher ultimate rejection over most of the range shown than does the mode 2 filter, Figure 2.23(b). The overtones for the mode 1 filter occur at higher frequencies far removed and there is no need for the SMR reflector's rejection characteristics.

Table 2.1 gives the data for the two cases. For the chosen example, the electrodes are Al, the piezoelectric is AlN, and two sections are connected in series to



**Figure 2.22**   Modeled response of an SCF showing the three principal resonance modes.

Figure 2.25 the lightly shaded areas are acoustically active as defined by the overlap of the I/O electrodes with the ground plane. The bottom floater electrode is denoted by $d$, $e$, $f$ and is rectangular with no cutouts. Over the floater electrode is a piezoelectric layer and on top of that is the ground plane. Consider the overlap of electrode $b$ with the ground plane the excitation region and note that the ground plane is cutout for out-feeds $a$ and $b$. The wave generated propagates to the bottom piezoelectric and a voltage is generated at electrode $d$ against ground. Thus, electrode $d$ and $b$ must line up very closely to avoid a parasitic resonator. For example, if I/O electrode $a$ was over ground (no cutout in the ground plane) a resonator would be formed between there and the bottom of the lower piezoelectric. Likewise, when electrode $e$ transfers current to the right-hand side resonator there must not be a parasitic resonator formed with the ground plane in the gap region between electrodes $b$ and $g$. Therefore, the ground plane must have a rectangular cutout corresponding to the gap between $b$ and $g$. Note that in Figure 2.25(a) the line to denote the cross-section is irregular shaped to better show the electrode overlaps.

The ground contact for the device is shown in Figure 2.25(a) as being on just one side of the device but in practice it should be on both sides. Better I/O isolation is obtained when capacitance between input and output is at a minimum, which is not hard to achieve at the die level.

### 2.6.2   Coupled Resonator Filter

The SCF discussed above is effectively a single resonator with an arrangement for sampling the energy within the resonator. The resonator either operates in mode 1



(a)

(b)

**Figure 2.25**   Stacked crystal filter layout. (a) Top view of the layout, and (b) the side view. The lightly shaded areas are acoustically active. (Note in part (a) the shift in the cross-section indicator line.)

without optimal electrical to acoustical coupling or in mode 2 which is an overtone. In both cases the effective $K^2$ is limited resulting in narrower bandwidth than that obtained with a ladder filter. The limited bandwidth of the SCF can be overcome by reducing the coupling between the vertically disposed transducers in such a way that they begin to act as independent resonators rather than as a single resonator. The resulting configuration is called a coupled resonator filter (CRF) (Figure 2.26) to distinguish it from the SCF [27, 28]. In this case it is appropriate to blur the distinction between transducer and resonator because the resonators (transducers) are sufficiently decoupled that they can be properly called resonators. However, keep in mind that the bottom of the top resonator is at a plane that is 180° of phase down from the top reflecting surface, and that plane may or may not represent an actual material boundary.

In Figure 2.26(a) the acoustically active region defined by electrode overlaps is indicated between the vertical dashed lines. The bottom electrode is patterned such that it is brought out from under the acoustically active region for eventual contacting. Above the bottom piezoelectric is another electrode that too must be brought out for contact. Next, formed in sequence, are an acoustic isolation region, on top of that another electrode, a top piezoelectric layer, and finally the top electrode. As in the SCF, layout must be such as to avoid unwanted parasitic resonators.

In Figure 2.26(b) two sections of CRF are connected in series to produce a 4-pole filter. This arrangement allows the lower two electrodes to float and there-



**Figure 2.26**   Cross-sectional view of a CRF. In (a) a single section CRF is shown, and in (b) two sections are connected in series electrically and in a form that allows the input and output to be independent.

## CHAPTER 3

# BAW Device Basics

Jyrki Kaitila

In this book we make the definition that the thin film bulk acoustic wave (BAW) resonator is a piezoelectric device. This means that the electromechanical conversion is based on the piezoelectric effect. In the literature some other classes of devices, such as CMUTs (capacitive micromachined ultrasonic transducers), are also sometimes called BAW devices, but here we will reserve the term exclusively for the use given above.

Piezoelectric effect is an ability of a material to convert electrical energy into mechanical energy and vice versa. Most materials exhibiting this property are crystalline. However all crystalline materials are not piezoelectric: the criterion is the lack of center of symmetry. This is essential as the mechanism of piezoelectricity is based on spatial separation of positive and negative electrical charges under applied stress. Thin film piezoelectric materials will be discussed in detail in Chapter 7.

Properties of crystalline materials are inherently complex and they are even more so when it comes to the piezoelectric phenomena. In this chapter we will make no attempt to explain the detailed workings of piezoelectricity. What will be attempted is to give an overview of the relevant topics associated with design and analysis of thin film BAWs.

Some of the models that we will use are very simple; someone understanding the real complexity of the covered issues would probably term them naive. We accept this possible criticism, but take the practical view: even if the models and analysis lack ultimate precision, they nevertheless can explain general behavior of real devices with reasonable accuracy, at least qualitatively. Ultimately designing and manufacturing devices is an engineering art. We are extremely pleased if we can bring any insights into how a practitioner can identify the phenomena described in the following pages and apply the solutions offered to the benefit of his devices.

This chapter is about resonators. Resonators form part of many different systems: The thin film BAW technology has started out with filters. However, other applications such as oscillators and various kinds of sensors are being envisioned. The basic three parameters that a designer is interested in are usually sufficient effective coupling coefficient, high $Q$-values, and operation free of spurious resonances (remember the discussion in Section 1.5). This does not mean that all these are the most important parameters for a given application; neither does it mean that there would not be any other considerations to be taken into account. It all depends on the specifications of the task at hand. The first two sections of this chapter will

material). For rather weak piezoelectrics, like AlN or ZnO, the two coupling constants are approximately equal, $K_t^2 \approx K^2$. The static capacitance $C_0$, given by the familiar expression

$$C_0 = \frac{\varepsilon^S A}{2d} \tag{3.21}$$

Note that the factor 2 appearing in the denominator is the consequence of defining the thickness as $2d$. In most other works the thickness of the plate is given as $d$, but in order to keep the definition of plate thickness constant throughout this chapter we have opted to use this one.

The resonant frequencies are obtained from (3.19). The antiresonances (or parallel resonances) are obtained when $Z \to \infty$ (or when the admittance $Y = 1/Z = 0$. This gives

$$kd = (2n+1) \cdot \frac{\pi}{2}, \quad n = 0, 1, 2, \dots \tag{3.22}$$

Using (3.13) this becomes

$$\omega_{a,n} = (2n+1) \cdot \frac{\pi}{2} \cdot \frac{v^D}{d}, \quad n = 0, 1, 2, \dots \tag{3.23}$$

The resonant frequencies $\omega_{r,n}$ are obtained from solution $Z = 0$ of (3.19). They are therefore obtained from

$$\frac{\tan\left(\frac{\pi}{2} \cdot \frac{\omega_r}{\omega_{a,0}}\right)}{\frac{\pi}{2} \cdot \frac{\omega_r}{\omega_{a,0}}} = \frac{1}{K_t^2} \tag{3.24}$$

where we utilized $v^D/d$ solved from (3.22) for the lowest antiresonance frequency $\omega_{a,0}$.

It is interesting to note the apparent similarity, but the subtle difference between (3.1) and (3.23). The first one was obtained by simple reasoning without very much hard physics involved. It describes resonances in a purely mechanical system, which means it is a plate-and-hammer model. That is: what waves would be observed if we simply hit the plate with a hammer (assuming that the hammer really is a wide-frequency band stimulus). On the other hand, (3.23) was derived based on the piezoelectric phenomenon. The difference between the obtained resonances is that the antisymmetric modes present in the purely mechanical treatment are missing from the piezoelectric driven case. This agrees with intuition: the antisymmetric modes are not excited because the constant external electric field cannot drive them. This symmetry argument will be used in the later sections when effective coupling coefficient and spurious modes are analyzed.

## 4.2   Fabrication of BAW Devices

It is remarkable that BAW or FBAR used to be a topic of intense R&D, mostly in companies *not* being main players in surface acoustic wave filters. The schematic cross-section of an FBAR or BAW-SMR device looks very similar to thin-film capacitors or micromachined pressure sensors; things the semiconductor industry has been doing for two decades. So it is no surprise that semiconductor companies have been the first to successfully demonstrate the mass-manufacturing of BAW devices [8, 9].

There are several aspects why BAW manufacturing in a semiconductor fab can make sense:

- The tools and processes available today for semiconductor device manufacturing have reached a very high level in both process quality (e.g., film thickness uniformity and stability) as well as process cost (e.g., throughput, mean time between failure).
- The couse of the same equipment for other products besides BAW typically enables lower manufacturing cost due to optimized utilization and shared depreciation.
- A third motivation could be the option for monolithic integration of microelectronics and bulk acoustic wave devices. This topic is discussed separately in Chapter 9.

### 4.2.1   Material Selection

The selection of the "right materials" is one of the key elements for fabrication of high-performance BAW devices. "Right" in this case means the optimum selection with regards to electrical properties (e.g., sheet resistance), acoustic properties (e.g., acoustic impedance, material quality factor, temperature behavior, roughness) and other properties (e.g., thermal conductivity, moisture stability). Beside these fundamental material properties, manufacturability (e.g., homogeneity and repeatability of film properties) also is an important selection criterion. We will discuss the materials most commonly used in BAW manufacturing in this section.

The acoustic impedance can be calculated from the product of acoustic velocity and mass density (Section 3.2). Figure 4.1 illustrates these two material properties for some typical semiconductor device materials and some other materials for comparison. It should be noted that not all of the shown materials have high acoustic quality factor, especially the "soft" materials with low acoustic velocity typically have also low $Q$.

*Metals*

For electrode layers the thickness is typically much less than the skin depth at the relevant frequency. As a consequence the electrode resistance is higher than desired. BAW people are facing the dilemma that good acoustic materials are usually lousy conductors while the best conductors have excessive material damping and would create acoustic losses.



**Figure 4.1**   Acoustic velocity, density, and acoustic impedance (size of the bullets) for various materials. Materials with thick lines are most common materials in integrated circuit fabrication.

- *Aluminum* (Al) is typically used in form of aluminum alloys as AlCu, AlSiCu with electrical and mechanical properties very close to pure Al. It has a favorable electrical conductivity (see Chapter 7). However, due to its low acoustic impedance and the subsequently lower achievable bandwidth compared to high acoustic impedance materials such as tungsten and molybdenum, Al is not commonly used as electrode material for BAW devices.

- *Tungsten* (W) in contrast to Al has a very high acoustic impedance and is therefore an excellent candidate as part of an acoustic mirror in a SMR-type BAW resonator [1, 10], and as an electrode material (see also Chapter 7). In semiconductor device manufacturing, tungsten is mainly used as via fill in between metal layers. The respective processes (typically CVD deposition) are therefore optimized for good step coverage whereas for a BAW device, optimization for thickness uniformity and residual stress is of higher importance.

- *Copper* (Cu) has approximately 1.5 times better conductivity compared to aluminum and is therefore increasingly used for interconnect layers. However, process complexity and process cost are significantly higher than for Al. It requires diffusion barrier layers and equipment dedication to prevent transistor device contamination by copper diffusion into the silicon. The acoustic impedance of Cu is very similar and acoustic $Q$-value is even worse than aluminum, which makes it also an unfavorable material for BAW electrodes.

- *Titanium* (Ti) and *Titanium nitride* (TiN) are common diffusion barriers and liners for CVD-W layers in IC manufacturing. As Ti has higher resistivity than Al but similar acoustic impedance, it is typically not used in a BAW device for other purposes than these two.

- *Tantalum* (Ta) is used pure or in form as nitride, silicide, or oxide in semiconductor device manufacturing. Typically, these layers are used as thin diffusion barrier layers (e.g,. for Cu interconnects). Tantalumpentoxide is a high-k dielectric and has been used as part of an acoustic mirror in a SMR-type BAW [11].

- *Molybdenum* (Mo) has an electrical conductivity similar to tungsten, but a slightly lower acoustic impedance. It is therefore also commonly used as electrode material for BAW resonators. It is a reasonable compromise for FBAR but for BAW-SMR it will increases resonator size and will lower the $k_{eff}^2$ as compared to a tungsten electrode, in particular when used as a bottom electrode.

- Potential alternatives for electrode materials have been proposed which include *iridium* [12] and *ruthenium* [13]. Those materials may be difficult to introduce but they could allow improving electrode resistance somewhat. Little data is available about research on metal alloys showing improved resistance and acoustical parameters but this is a field of great potential.

*Semiconductors and Dielectrics*

- *Silicon* (Si) as the most important material of integrated circuits is typically not an essential part of BAW devices. It can be used for micromachining thin membranes either by bulk or surface micromachining [14, 15]; otherwise, it serves just as a carrier substrate for SMR-type BAW devices. In the latter case, high-resistive (undoped) silicon should be used in order to minimize electrical losses. Compared to other substrates it has some proven advantages: Beside cost and availability aspects, silicon is mechanically very robust which eases handling during processing and assembly. Singulation of silicon wafers to individual dies also is a process available at every semiconductor device manufacturer.

- *Silicon oxide* (SiO$_2$) actually has multiple interesting properties for BAW devices: It has low acoustic impedance, which makes it a good candidate to be part of an acoustic mirror in SMR-type BAW devices. Also, its temperature behavior is inverted to most other layers [3]: With increasing temperature, SiO$_2$ exhibits an increase of Young's modulus together with a rather small thermal expansion, which leads to an overall decrease in acoustic delay. It can therefore be used to reduce (or even fully compensate) the temperature dependence of BAW devices.

- *Silicon nitride* (SiN) has a similar mass density but higher acoustic velocity than SiO$_2$. However, the difference in acoustic impedance is not large enough to build good acoustic reflectors from a SiN/SiO$_2$ multilayer stack. For membrane-type resonators, SiN layers are sometimes used as supporting membrane [16]. Additionally, like in semiconductor manufacturing, SiN can be used as a passivation layer.

- Another promising material under evaluation is *silicon-oxy-carbide* (SiOC, also called silicon carb-oxide). SiOC is a popular material in CMOS where it is used as "low-k" intermetal dielectric to reduce capacitive parasitics. SiOC

can be deposited by fairly conventional PE-CVD tools. The tricky thing about SiOC is that its material parameters can vary significantly and are more difficult to control than for $SiO_2$. Acoustic losses in SiOC seem to be significantly higher than in $SiO_2$. A concern is also that SiOC is mechanically less robust and it can introduce roughness which could harm the quality of subsequent layers.

- Another group of materials with very low acoustic impedance are *polymers*. Polymers with sufficient temperature stability exist and are under evaluation as acoustic layers. Typically, these polymers are spin coated, baked, and cured at elevated temperatures in order to cross-link all active chains. Polymers exhibit strong material damping and are not well suited to be placed into regions with high mechanical energy density but they can be a good solution for reflector layers deep down in the stack. Another consideration when using polymers is that the acoustic velocity is very low, and as a consequence the layers need to be very thin. Many of the other layers in BAW exhibit large stress which means that the polymer needs to have excellent adhesion to layers below and above or else delamination will be an issue.

*Piezoelectric Layers*

- From the material perspective, *aluminum nitride* is the preferred piezo material for integration in a semiconductor fab environment. As discussed in Chapter 7, it can be deposited with high quality on W, Mo, and Al electrodes. It has been so far the only piezoelectric film material that has proven manufacturability in terms of stable and reproducible film quality in high-volume production [5, 17]. There are no contamination concerns. As a positive side effect, AlN is an excellent heat conductor, which helps to improve device reliability at high power levels.

*Other Processes Besides Film Deposition*

- The *lithography* requirements for BAW devices are less demanding than for most semiconductor devices. The minimum feature size is typically much larger than $1\,\mu m$; however, overlay accuracy may be critical in some cases to minimize appearance of unwanted acoustic side-modes. Therefore, the use of a step and repeat system (which costs multiple million dollars each) is preferred over contact lithography systems.
- *Etching processes* for BAW need to be developed such that overetch into critical layers is minimized. Regardless if wet or dry etching is used it is important to choose etch processes which are either highly selective or allow use of end-point detection systems in modern dry-etch tools. Very often additional layers have to be introduced to achieve a robust etch stop. It is also important to be cautious with chemical cleaning processes which are very common after any kind of dry-etch to remove residues created at the sidewalls of the etch profiles and photoresist. In many cases the cleaning procedures will show more metal removal than can be tolerated.

- As discussed in Chapter 7, chemical mechanical polishing (CMP) to improve surface smoothness and planarity can have positive impact on BAW device performance. CMP processes for polishing tungsten and $SiO_2$ are extensively used in microelectronics fabrication to minimize surface topology. When using these CMP processes for BAW fabrication, particular attention should be given to the prevention of dishing effects in the active resonator stack, as any nonuniformity over the resonator area would degrade the quality of acoustic resonance.

### 4.2.2   Fabrication of SMR Resonators and Filters

In this section we will briefly describe a typical process flow for SMR-type resonators and filters. Starting with a high-resistive substrate, first the mirror is fabricated by deposition of alternating low and high acoustic impedance layers. In the case that metallic layers are used in the acoustic mirror, those have to be patterned in order to minimize parasitic coupling in between adjacent resonators. The construction of such a mirror can either be mesa type [as shown in Figure 4.2(a)] or—for example, by using CMP processes—fully planarized [see Figure 4.2(b)].

Following on the fabrication of the acoustic mirror, the two most critical layers in BAW manufacturing are deposited and patterned: the bottom electrode and the piezolayer. The challenges regarding the bottom electrode are manifold: First, the film microstructure (e.g., roughness) may have significant impact on the quality of the piezolayer deposited on it (see also Chapter 7). Second, the topology before the deposition of the piezolayer should be minimized as piezolayer growth can be disturbed in a way that a fold develops [as indicated in Figure 4.3(a)], which can negatively affect the device performance (e.g., ESD robustness, as discussed in Section 4.1.8). The challenges of depositing high-quality piezolayers are discussed in Chapter 7.

In the case that an electrical connection of bottom and top electrode is needed (which is the case for a single resonator, but not mandatory for all filter designs), the piezolayer has to be patterned as well. Subsequently, the top electrode can be deposited and patterned. Figure 4.4 shows the cross-section of a single resonator after completion of these process steps.

The figures do not include the "detuning layer," which is needed in a filter device to put the shunt resonators to a lower frequency than the series resonators. This layer is typically placed either below the bottom electrode or on top of the top electrode. Also not included is the patterning of border rings at the edge of the reso-



(a)                              (b)

**Figure 4.2**   Cross-section of an acoustic mirror having two metallic layers (e.g., W) with high acoustic impedance and three dielectric layers (e.g., $SiO_2$) having low acoustic impedance. (a) Mesa configuration, and (b) planarized configuration.

usually result in more compressive AlN films. Breaking films into multiple steps have been reported [23] to modify film stress.

PZT deposition by sputtering is a lot more complex than either AlN or ZnO depositions. RF diode deposition of PZT is an extremely slow process when deposited in the commercially available equipment, resulting in deposition rates of 50 to 100 Å/min. Conventional RF magnetron processes can achieve up to 500 Å/min deposition rates by employing an appropriate array of magnets, but it is very difficult to get correct stoicheometry from a given target over the entire target life because of the different yield level of the lead, zirconium, and titanium at different voltages [24]. It is also important to have the right mixture of argon and oxygen to maintain desired ratio of the materials in PZT. Because PZT is a dielectric, it does not lend itself to either DC or AC magnetron deposition techniques commonly used for either AlN or ZnO. An interesting deposition method designed to circumvent these issues is described in [25]. Using a hallow cathode effect with high-rate gas flow, deposition rates of up to 2,500 Å/min were demonstrated. Authors claim films as thick as 16 $\mu$m were deposited with excellent film characteristics in only ninety minutes. Typically, hollow cathode consists of a cylindrically shaped target arranged perpendicular to the substrate. Very high plasma density creates high erosion rate of the material from the target. Argon and oxygen flowing through the center of the target carry target material to the wafer. In PZT deposition, target is composed of the individual rings of lead zirconium, and titanium. In order to obtain the desired ratio in the PZT material, the size of the target rings is adjusted to obtain appropriate composition on the surface of the substrate. Temperatures of 550°C to 650°C as well as a small amount of the substrate bias are used to obtain dense, highly oriented PZT. This approach demonstrates a path forward for a PVD deposition of PZT at high deposition rates with good control over the stoichiometry of the PZT. Unfortunately, this system is in the experimental stages and no commercially proven equipment is available on the market.

Sputter deposition from ceramic AlN or ZnO targets can be accomplished only in the RF-deposition mode. This is due to a need to couple between backing plate and the insulating target. In order to accomplish this, higher frequency is required. Unfortunately deposition rate from the ceramic are an order of magnitude slower that either AC or pulsed-DC deposition. For this reason, as well as cost and difficulty of making a ceramic target, this technique did not find a wide commercial application.

### 7.2.3 Electron Cyclotron Resonance Deposition

Electron cyclotron resonance (ECR) has been used to deposit AlN [6] and ZnO films of high quality. Typically, argon/nitrogen mixture is used with aluminum target. A magnetic field of about 875G is driven at 2.45 GHz. The advantage of the technique is that it allows a nearly epitaxial film deposition at temperatures below 300°C. The disadvantage of ECR is that because deposition rate tends to be low there are no high-volume, low-cost, production machines available on the market. Most work reported in the literature is from universities and R&D laboratories.

A somewhat more robust method for determining metal layer thickness is X-ray fluorescence measurements. This method basically "counts" the number of atoms in the thin film by irradiating a predefined spot on the wafer with a relatively monochromatic X-ray beam tuned to a low-energy electronic level of the metal under investigation. The fluorescence signal from the recombination is directly proportional to the number of atoms in the irradiated spot (at least until the thickness of the layer is smaller than the attenuation length of the X-rays). A drawback of this method is—similar to the four-point probe—that it can basically just be applied to unpatterned layers. It is therefore only suited for process monitoring.

Again, an economic method that can as well be used for productive wafer monitoring is the above-mentioned weighing of the wafers.

## 8.3   Laser Interferometry

### 8.3.1   Introduction

Electrical measurements are an important source to gain hints and clues about the mechanism and the basic behavior of the acoustic waves in thin film layer stacks. Nevertheless, without a possibility to observe the mechanical behavior (at least at the surface), it would be almost impossible to find out why the behavior of a certain resonator deviates from theory.

A reason for such deviations is the imperfect layer deposition, with respect to layer quality, structure, and thickness. And even if the stack composition happens to be perfectly known, there are usually a few not so well-known numbers in the material parameters.

Now, the most important detail which can be obtained by such measurements might be the dispersion relation of a certain layer stack. To be able to predict the mechanical and electrical response of a resonator it is necessary to know about the dispersion of the three mainly involved regions on top and around the device. A method to calculate the dispersion relation of a certain stack from laser interferometric measurements has been first developed and demonstrated by one of the authors in [5–7], and since been used and adapted by many others [8, 9].

Besides the resolution of the dispersion type, a useful application of optical measurements is the investigation of side resonances (e.g., from the leads or the pad areas). The setup briefly described in the next section, which has been developed by one of the authors during his Master's thesis, allows us to take a closer look at the vibration of relatively small details. Due to its very high lateral resolution, the vibration of resonator parts like the border ring area (usually 1 to 10 micrometers) can be studied accurately. A more accurate description of the setup can be found in [5–7].

Other setups, allowing for comparable data acquisition capabilities can be found in [8, 9].

### 8.3.2   Measurement Setup

The setup is fundamentally based on a modified Mach-Zehnder interferometer; a sketch of this construction can be seen in Figure 8.1. While the device under test (DUT) is driven by a signal source, the whole area of interest is scanned by the laser.

**Microwave and RF Engineering**

For years, surface acoustic wave (SAW) filters have been widely used as radio frequency front-end filters and duplexers for mobile communication systems. Recently, bulk acoustic wave (BAW) filters are gaining more popularity for their performance benefits and are being utilized more often in the design of today's cutting-edge mobile devices and systems. This timely book presents a thorough overview of RF BAW filters, covering a vast range of technologies, optimal device design, filter topologies, packaging, fabrication processes, and high-quality piezoelectric thin films. Moreover, this book discusses the integration of BAW filters in RF systems.

## Contents Overview

- Background and History
- Resonator and Filter Topologies
- BAW Device Basics
- Design and Fabrication of BAW Devices
- FBAR Resonators and Filters
- Comparison with SAW Devices
- Thin Films Deposition for BAW Devices
- Characterization of BAW Devices
- Monolithic Integration
- System-in-Package (SiP) Integration

*Ken-ya Hashimoto* is a professor in the Graduate School of Engineering at Chiba University in Japan. He holds an M.Eng. and a D.Eng. in electrical engineering from Chiba University and the Tokyo Institute of Technology, respectively.

ISBN-13: 978-1-59693-321-7
ISBN-10: 1-59693-321-6

9 781596 933217



**ARTECH HOUSE**
BOSTON | LONDON
www.artechhouse.com

# Exhibit A4

DocuSign Envelope ID: 77D24F88-13AC-4BEE-90C4-C41AAC7D674C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417-JPM |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## INITIAL CLAIM CONSTRUCTION EXPERT REPORT AND DECLARATION BY DR. CLARK NGUYEN

### I.     INTRODUCTION

Pursuant to the Court's Scheduling Order and the Local Patent Rule 4.3 for the Western District of Tennessee ("LPRs" or "Local Patent Rules"), Defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively, "Defendants" or "Akoustis") hereby submit the Expert Report and Declaration of Dr. Clark Nguyen ("Dr. Nguyen") in support of Akoustis' Preliminary Claim Construction and Evidence under LPR 4.2 as to United States Patent Nos. 7,522,018 (the "'018 Patent") and 9,735,755 (the "'755 Patent") (collectively, the "Asserted Patents" or "Patents-in-Suit"). Qorvo asserts that Akoustis infringes claims 1-6, 10, and 12-14 of the '018 Patent and claims 1-7, 9-16, and 18 of the '755 Patent (collectively, the "Asserted Claims"). Qorvo also alleges that Akoustis falsely marks its accused RF filter products as practicing U.S. Patent No. 10,256,786 ('the '786 Patent').

This report is based on information currently available to Akoustis and Dr. Nguyen. The parties have not completed discovery and Akoustis has not yet received any Qorvo expert report relating to claim construction. Akoustis and Dr. Nguyen therefore reserves the right to revise,

1

supplement, amend, or subtract from this report supporting Akoustis' proposed construction

based on further discovery and Qorvo's own expert report to the extent one is provided.

Inclusion or omission in the report of terms, constructions, or supporting evidence is not an

admission that any particular claim term is definite or otherwise in compliance with 35 U.S.C. §

112.  Akoustis does not contend that any claim term is properly construed as means-plus-

function under 35 U.S.C. § 112(6) or 35 U.S.C. § 112(f) and the parties have agreed that the

asserted claims of the '018 Patent do not require construction to resolve any presently known

dispute over the terms' plain and ordinary meaning.

        The information set forth in this report is provided without waiving: (1) the right to object

to the use of any statement for any purpose, in this action or any other, on the grounds of

privilege, relevance, materiality, or any other appropriate grounds; (2) the right to object to any

request involving or relating to the subject matter of the statements herein; (3) the right to revise,

correct, supplement, or clarify any of the statements provided below at any time, including at

trial; or (4) any of Akoustis' claims or defenses in this litigation.

        I, Dr. Clark Nguyen, offer the following as my expert report and declaration relating to

the proposed preliminary claim construction of disputed claim terms in the above-entitled matter.

## II.     QUALIFICATIONS OF DR. NGUYEN

        I am currently the Conexant Distinguished Professor in Electrical Engineering and

Computer Sciences at the University of California at Berkeley ("U.C. Berkeley"), a co-Director

and former Executive Director of the Berkeley Sensor & Actuator Center, and the Chair of

Electrical Engineering in the Department of Electrical Engineering & Computer Sciences at UC

Berkeley.  I have over three decades of experience in Microelectromechanical systems

("MEMS") technology.  My areas of expertise include integrated micromechanical signal

4875-5086-7240.v1

processors and integrated sensors, merged circuit/micromechanical technologies, RF

communications, integrated circuit design and technology, and short- and long-term stability in

micromechanical devices.

My educational background includes a Ph.D. in Electrical Engineering and Computer

Sciences in 1994, a M.S. in Electrical Engineering and Computer Sciences in 1991, and a B.S. in

Electrical Engineering and Computer Sciences in 1988, all at U.C. Berkeley.

I have been a Full Professor of the Electrical Engineering and Computer Sciences

Department at U.C. Berkeley from July 2006 until the present.  Before that, I worked at the

Department of Electrical Engineering and Computer Science at the University of Michigan as an

Assistant Professor from 1995 to 2001, an Associate Professor from 2001 to 2006, and a Full

Professor up until mid-2006 when I took the professorship position at U.C. Berkeley.

I have regularly taught electrical engineering courses at the graduate level.  These courses

have included silicon MEMS resonators and related devices, which are reflected in my

curriculum vitae.  A current copy of my curriculum vitae is attached to this declaration as

**Exhibit A.**

My research focuses on MEMS, including integrated micromechanical signal processors

and sensors, merged transistor/MEMS circuit design, merged circuit/micromechanical

technologies, RF communication architectures, and integrated circuit design and technology.  My

research group at U.C. Berkeley is presently investigating extension of the frequency range of

micromechanical signal processors (filters and oscillators) into the X-Band range, developing

merged circuit/microstructure technologies, studying physical phenomena that influence the

frequency stability of micro- and nano-scale mechanical resonators, exploring novel

architectures for single-chip transceivers for military and commercial applications using MEMS

4875-5086-7240.v1

technologies, generating circuit models and developing automatic generation codes for mechanical signal processor design, and designing and implementing novel, completely monolithic integrated sensors.

I am perhaps best recognized as a pioneer of vibrating RF MEMS technology, whose research results include (i) the first VHF micromechanical filter and mixer-filter devices; (ii) the first medium-scale integrated (MSI) micromechanical signal processing circuits; (iii) the first micromechanical power amplifier and converter, (iv) the first ultra-low power MEMS-based wireless communication transceivers, (v) the first micromechanical free-free beam and contour-mode disk and ring resonators with Q's exceeding 42,000 at frequencies up to 3 GHz—still the highest on-chip Q's of any room temperature device at this frequency; and (vi) oscillator circuits referenced to wine-glass disk resonator arrays that achieve phase noise performance commensurate with smartphone reference oscillator specifications.

In 2001, I founded Discera, Inc., a company aimed at commercializing communication products based upon MEMS technology, with an initial focus on the very vibrating micromechanical resonators pioneered by my research in past years.  I served as Vice President and Chief Science & Technology Officer of Discera from 2001 to mid-2002.  Discera shipped more than 1 million MEMS-based oscillators per month up until late 2013, when it was acquired by Micrel, itself absorbed by Microchip, who continues to sell these MEMS oscillators to this day.

In mid-2002, I joined the Microsystems Technology Office (MTO) of the Defense Advanced Research Projects Agency (DARPA) in Arlington, Virginia, where I served as a Program Manager in MEMS technology.  At DARPA, from mid-2002 through 2005, I created and managed a diverse set of programs that included MEMS, Micro Power Generation (MPG),

DocuSign Envelope ID: 77D24E88-13AC-4BEE-90CA-C41AAC7D674C

Chip-Scale Atomic Clock (CSAC), MEMS Exchange (MX), Harsh Environment Robust Micromechanical Technology (HERMIT), Micro Gas Analyzers (MGA), Radio Isotope Micropower Sources (RIMS), RF MEMS Improvement (RFMIP), Navigation-Grade Integrated Micro Gyroscopes (NGIMG), and Micro Cryogenic Coolers (MCC).

I have received numerous awards and recognition for my contributions to MEMS (among other things), which are reflected in my curriculum vitae, including the 1938E Award for Research and Teaching Excellence from the University of Michigan in 1998, the University of Michigan EECS Departmental Achievement Award in 1999, the Ruth and Joel Spira Award for Outstanding Teaching in 2000, the University of Michigan's 2001 Henry Russel Award, the U.C. Berkeley EECS Department EE Outstanding Teaching Award in 2013, the 2006 Cady Award from the IEEE UFFC society, and the 2017 IEEE Robert Bosch Micro and Nano Electro Mechanical Systems Award.

In addition, I am the author of numerous publications, which are reflected in my curriculum vitae.  My publication accolades include the 2007 IEEE Transactions on Ultrasonics, Ferroelectrics, and Frequency Control Best Paper Award, the 2005 IEEE International Solid-State Circuits Conference Jack Raper Award for Outstanding Technology Directions, the Best Invited Paper Award at the 2004 IEEE Custom Integrated Circuits Conference, the 2004 DARPA Tech Best Technical Presentation Award, and together with my students, numerous Best Paper Awards at prestigious conferences that include the IEEE International Frequency Control Symposium, the IEEE International Microelectromechanical Systems Conference, the IEEE International Electron Devices Meeting, and the International Conference on Solid-State Sensors, Actuators, and Microsystems (Transducers).

I am a Fellow of the IEEE and served as President of the IEEE Ultrasonics,

4875-5086-7240.v1

Ferroelectrics, and Frequency Control (UFFC) Society from 2016-2017, its Junior Past-President from 2018-2019, and its Senior Past-President from 2020-2021. I presently serve as the President of the IEEE MEMS Technical Community, which intends to transition to an IEEE Council in the near future.

I have over 30 pending and granted U.S. patents in MEMS and related technology, which are also reflected in my curriculum vitae.

On behalf of Defendants ("Akoustis"), Pillsbury Winthrop Shaw Pittman LLP has retained me as an expert witness to analyze claim construction issues involving the '755 Patent, and '786 Patent asserted by Plaintiff ("Qorvo") in this lawsuit. I have reviewed the patent and its prosecution history with the goal of determining how one of ordinary skill in the art at the time of the claimed invention would have interpreted the terms and phrases that are in dispute in this lawsuit. I have also reviewed the parties' Preliminary Claim Construction and Supporting Materials pursuant to LPR 4.3 and the Scheduling Order.

My opinions expressed in this declaration are for the purpose explaining why Akoustis' proposed claim constructions are consistent with how a person of ordinary skill in the art would have understood those terms or phrases in the context of the claims, specification, and the prosecution file history of the '755 and '786 Patents. I have formulated and provided my opinions in reliance upon my technical experience, knowledge, and expertise in RF filter technology in general, and RF filter resonators in particular.

I am currently being compensated by Akoustis for my work done on this case at a rate of $700 per hour. My compensation does not in any way depend on the content of my analysis, testimony, report(s), or the outcome of this proceeding.

## III.    CLAIM CONSTRUCTION IN GENERAL

I am not an attorney and will not be addressing legal arguments.  I will, however, provide my analysis and opinions on whether the parties' proposed constructions are consistent with the understanding of one skilled in the art from a technical perspective in light of the intrinsic record and any extrinsic record detailed herein.  My understanding of the meaning of the disputed claim terms as understood by a person of ordinary skill in the art at the time the invention was made is further based on my understanding of the legal principles of claim construction detailed herein as explained by counsel.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally

DocuSign Envelope ID: 77D24F88-13AC-4BEE-90C4-C41AAC7D674C

used consistently throughout the patent." *Id.* (internal citation omitted). It is likewise true that "[d]ifferences among claims can also be a useful guide. . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). The specification may also "reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316.

In addition to the specification, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317. In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 841 (2015). Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

A claim is invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.* (Nautilus II), 572 U.S. 898, 134 S.Ct. 2120, 2124 (2014). Prior to the Supreme Court's decision in *Nautilus II*, a claim was indefinite when it was "insolubly ambiguous" or "not amenable to construction." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015). In *Nautilus II*, the

4875-5086-7240.v1

Supreme Court observed that §112, ¶2 (now §112(b)) requires "a delicate balance." 134 S.Ct. at 2128. The Court explained that a patent must be precise enough to afford clear notice of what is claimed, thereby "appris[ing] the public of what is still open to them. Otherwise, there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.* at 2129 (internal quotation marks and citations omitted); *Chef America, Inc. v. Lamb-Weston, Inc.,* 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity.").

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

The '755 and '786 Patents concern BAW resonators as used in certain RF filters.  Based on the complexity of the technology, one of ordinary skill in the art during the time period in question would have had an undergraduate degree in electrical engineering with two to four years of experience in the technical field, or a master's degree in electrical engineering with one to two years of experience in the field; or an equivalent combination of education and experience.  I base this on my experience working with those skilled in the art in the relevant technology, my years of experience teaching those subjects, and curriculum development and administration during my teaching career.

## V.   THE '755 PATENT

### A.   Background

The '755 Patent, entitled "BAW resonator having lateral energy confinement and methods of fabrication thereof," relates to embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered such that lateral leakage of mechanical energy from an active region of the BAW resonator is reduced or otherwise not excited. In some embodiments, a BAW resonator includes a piezoelectric layer, a first electrode

9

on a first surface of the piezoelectric layer, a second electrode on a second surface of the piezoelectric layer opposite the first electrode, and a passivation layer on a surface of the second electrode opposite the piezoelectric layer, the passivation layer having a thickness ($T_{PA}$). The BAW resonator also includes a material on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator. The additional material has a thickness that is n times the thickness ($T_{PA}$) of the passivation layer, where n is greater or less than 1.

Mechanical and acoustic resonators (FBARs and SMRs are BAW resonators) are used in circuit design to harness the equivalent electrical circuit they provide, which commonly manifests around an *LCR* circuit that derives from the motional current induced through the device by inputs across its electrodes (e.g., voltage inputs). An *LCR* circuit, sometimes interchangeably referred to as an *RLC* circuit, is a resonant circuit, which can be characterized in terms of its inductance (*L*), capacitance (*C*) and resistance (*R*).  Such circuits are commonly used in applications such as filters for use in radio frequency (RF) communications.

The motional current is the current generated by motion of the mechanical resonator that flows from one electrode to the other. A circuit designer who designs filters, oscillators, or other applications using such resonators recognizes that the motional inductance $L_{x,}$ motional capacitance $C_x$, and motional resistance $R_x$ govern important parameters impacting the design of the resonator, such as the center frequency ($f_0 = 1/(2\pi\sqrt{L_x C_x})$), the quality factor ($Q = f_0/(3\text{dB-down bandwidth})$), the 3dB-down bandwidth ($= f_0/Q$), and the electromechanical coupling ($k_t^2 \sim C_x/C_o$), where $C_o$ is the static electrode overlap capacitance. Because the motional current ultimately flows from one electrode to the other, the regions of the electrodes that generate motional current by inducing motion of the mechanical resonator define the active area of the

10

device.

## B.  "Active Region" and "Outer Region" [all asserted claims]

| Akoustis's preliminary construction | Qorvo's preliminary construction |
|---|---|
| Active region: That region of the device where motional current density is generated through the piezoelectric layer.<br><br>Outer region: defined as that region outside the active region. | Plain and ordinary meaning (POM). If a construction is necessary,<br>"active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality<br><br>"outer region" is the region of the BAW resonator that is not electrically driven. |

Akoustis offers the proposed construction of "active region" as "that region of the device where a motional current density is generated through the piezoelectric layer."  I agree with Akoustis' construction of "active region" as the plain and ordinary meaning as understood by one of ordinary skill in the art at the time of the invention in view of the intrinsic evidence for the reasons described above relating to motional current of an acoustic resonator.  In this regard, as noted above, the skilled artisan designing a resonator is interested in what the effect of that resonator will be on an input signal, which is determined by the resonator's equivalent circuit, generally based on an *LCR* and associated elements to model things like multiple ports (where transformers are often used) or parasitic paths and losses (where extra branches with resistors and capacitors might be used). Thus, the key concern is that part of the device that generates motional current density through the piezoelectric layer.  I disagree with Qorvo's suggested plain and ordinary meaning of "active region" as the region of the BAW resonator that is *electrically driven* to provide the resonator functionality or active region.  First, the phrase "to provide the resonator functionality" is vague, as functionality could mean many things, such as generating motional current or presenting a specific impedance or realizing a specific equivalent circuit, or

11

all of these combined. Second, while the '755 specification uses the same language *electrically driven* language to describe the active region (1:55), the term "electrically driven" is not a well-defined term in the art as it could mean many things and could lead to an erroneous understanding of the scope of the claim limitation. "Electrically driven" does not describe to what degree any particular voltage is applied, nor to any specific effect of such voltage. For example, electrically driven could mean the piezoelectric is driven to vibration; or that a non-motional current is driven to flow through the capacitance between two conductive plates; or that a suspended piezoelectric layer (as in an FBAR) is driven into a flexural mode (which is not the mode of interest). The main problem with a definition that just focuses on the drive input is that it is not enough to identify the active device. One can drive anything, including things that are not the device, so specifying the drive only does not specify the active device. Rather, one must specify the result of driving (i.e., the output, in this case the motional current, which together with the input voltage in turn specifies the equivalent circuit) to isolate the actual device.

The words "electrically driven" do not specify the result of the driving that identifies the ultimate function of the device. Instead, to be more precise, I believe the construction offered by Akoustis more accurately defines an "active region" as the "region …where a motional current density is generated" through the piezoelectric layer as described above and as further supported by extrinsic evidence.[1] I also consider Qorvo's proposed construction to be indefinite because, as described above, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### 1.    Extrinsic Evidence Supporting Akoustis' Construction

---

[1] For the same reasons, I agree with Akoustis' proposed construction of "outer region" over Qorvo's construction that also includes the "electrically driven" proposed construction.

12

The following extrinsic evidence further supports Akoustis' proposed plain and ordinary meaning of "active region" as used in the '755 claims:

R. A. Johnson, Mechanical Filters in Electronics. New York: John Wiley & Sons, 1983.

- pg. 29: Equation (2.10) provides an explicit relationship between $k_t^2$ (which the text calls $k_{em}^2$) and the motional inductance $L_1$ and static inductance $L_o$ for a magnetostrictively transduced resonator, showing how motional quantities (in this case motional voltage) universally determine the motional equivalent circuit of a mechanical or acoustic resonator, whether the transducer is piezoelectric, magnetostrictive, capacitive, etc. …

- pg. 30: Equation (2.12) provides an explicit relationship between $k_t^2$ (which the text calls $k_{em}^2$) and the motional capacitance $C_1$ and electrode overlap capacitance $C_o$ for a piezoelectrically transduced resonator. Here, Robert Johnson uses the mobility analogy, which is the dual of the current analogy (that others use, including myself), where the ratio of $C_1/C_o$ is inverted.

R. J. Besson, "A new electrodeless resonator design," Proceedings, 31st Annual Symp. on Freq. Control, Atlantic City, New Jersey, June 1-3, 1977, pp. 147-152.

- pp. 148: "The active part of the crystal is connected to the dormant part by little quartz "bridges" …" indicates the region that is considered active is different from the regions considered dormant, even though the electrode also goes over the dormant parts. The regions are different because the structure in the active region is able to vibrate at the desired resonance frequency, and thus generate motional current that supports the desired equivalent circuit; whereas that in the dormant region does not vibrate at this frequency, so does not provide the desired motional current nor the desired equivalent circuit. This even though voltages applied by the metal (i.e., electrode) in the dormant region can drive that region, just not with the desired output. This is an example where the output, i.e., motional current in a small specific frequency range, is imperative to identifying the active device (region).

- pp. 150-151: Fig. 2 and Fig. 3 depict a quartz resonator in which the transducer electrodes D1 and D2 do not touch the quartz, yet still define the region where the motional current of interest is generated and therefore the active "part" or "region". Note that regions where the metal touches the quartz (which is a piezoelectric material) on the outer skirts of the structure beyond the bridges are not considered the active region because they do not move at the frequency of the intended resonator, so do not produce motional current at the intended frequency, i.e., do not produce the intended equivalent circuit. Because the quartz is much thinner there, these regions would produce motional current at a very different (larger) frequency that would be out of the bandwidth of the intended resonator.

13

L.-W. Hung and C. T.-C. Nguyen, "Capacitive-piezoelectric transducers for high-$Q$ micromechanical AlN resonators," IEEE/ASME J. Microelectromech. Syst., vol. 24, no. 2, pp. 458-473, April 2015.

- Pg. 459, col. 1: Fig. 1 provides another micro-scale example of how it is motional current that defines the active region, not the just the electrical drive voltage and its placements. Here, the piezoelectric structure is ring-shaped with a left-side electrode and a right-side electrode. In the figure, the left-side electrode receives the excitation voltage, while the right side merely sources the output motional current. Motional current also flows between the electrodes on the left side. The main point here is that the right side is also considered part of the active device—in this case a two-port device—yet it receives no electrical drive voltage. Clearly, it is the motional current or the response of the device that most correctly defines the device. i.e., a drive voltage or force is not even needed to call an area an active region and whether the electrode even touches the piezoelectric or not is immaterial.  This figure further shows how proximity of the drive electrode does not matter much. Specifically, Fig. 1(a) shows how one can make a device where the electrode touches the piezoelectric layer, but one can also make a useful (and superior from a $Q$ perspective) device by lifting the electrodes so they do not touch the piezoelectric layer, as done in Fig. 1(b). Here, if the gaps between the electrodes and piezoelectric layer are small enough, the electric fields in the piezoelectric layer can still be strong enough to induce substantial motion and substantial motional current induced by the reverse-piezoelectric effect. The motional current across the electrodes defines the equivalent motional $LCR$ circuit in Fig. 2 on pg. 461 for the device, and thus, defines its performance and utility in an actual filter, oscillator, etc., circuit. (Note how when I write "$LCR$ circuit" I do not mean just the $L$, $C$, and $R$, but rather include all other elements in the Fig. 2 circuit.) In both devices, the overlapping top and bottom electrode regions close enough to, but not necessarily touching, the device generate enough motional current to define the $LCR$ circuit, and thus, to define the active device regions.

- pg. 463, col. 2: Fig. 6 shows the use of the "m" subscript to emphasize that the elements in the circuit (that govern resonator performance) are "motional", meaning they derive from electrical current that in turn derives from the motion of the resonator. This emphasizes how it is the motional current that defines the active region. Note that this motional current and the motional elements in the equivalent circuit all derive from motion of the resonant structure. In fact, electrical current and mechanical velocity are often interchangeable in these electromechanical equivalent circuits. However, from a practical perspective for a designer skilled in the art, it is the motional current that is the important and useful output. In many cases, it is the relationship between the motional current and the input (voltage) that is important, as this is ultimately what defines an equivalent circuit.

G. Piazza, P.J. Stephanou, and A. P. Pisano, "Piezoelectric aluminum nitride vibrating contour-mode MEMS resonators," IEEE/ASME J. Microelectromech. Syst., vol. 15, no. 6, pp. 1406-1418, Dec. 2006.

14

- pg. 1407, col. 2: Equation (7) and the associated text provides another example of the use of "m" for "motional" in the equivalent Butterworth Van Dyke circuit for a piezoelectric resonator, which in turn equates the active region of the device to that which generates the motional current, in this case for a lateral AlN resonator (which operates like an FBAR, but the piezoelectric moves laterally). This further attests to how universal is the concept of the motional current governing the equivalent circuit and therefore the active portion of the device.

M. Akgul, L. Wu, Z. Ren, and C. T.-C. Nguyen, "A negative-capacitance equivalent circuit model for parallel-plate capacitive-gap-transduced micromechanical resonators," IEEE Trans. Ultrason., Ferroelect., Freq. Contr., vo. 61, no. 5, pp.849-869, May 2014.

- pg. 850, col. 2: Fig. 2 and 3 together show yet again how the motional current defines the active regions of a mechanical resonator device by governing the equivalent *LCR* circuit and encouraging the use of "x" subscripts for the elements. Here, "x" is a commonly used variable for displacement (i.e., motion) and further emphasizes how the motional current governs the active region of the device, in this case for a capacitively transduced resonator. The fact that this concept is also used for capacitively transduced (or electrostatically transduced) resonators further attests the universality of this definition for the active region, as governed by the *LCR* equivalent circuit.

U. S. Patent US 2014/0159548

- Sheet 2, Fig. 1B: Here, the active region includes the regions where layer 145 (which can be a dielectric) sits between the piezoelectric and the top electrode, attesting to the fact that the electrode metal need not touch the piezoelectric to be included in the active region. Rather, as long as motional current flows through that region from the top to the bottom electrode, this is part of the active region.

C.    **"[A] density of mechanical energy in the outer region"   [claims 1, 11]**

| Akoustis's preliminary construction | Qorvo's preliminary construction |
| --- | --- |
| The "density of mechanical energy" means a total density over the full volume of the outer region, or otherwise indefinite. | POM. If a construction for "density of mechanical energy" is needed, it means the amount of mechanical energy from acoustic waves leaked from the active region. |

Akoustis' proposed construction of "a density of mechanical energy in the outer region" is "the density of mechanical energy means a total density over the full volume of the outer region, or otherwise indefinite."   I agree with that proposed construction as the plain and

15

DocuSign Envelope ID: 77D24F88-13AC-4BEE-90C4-C41AAC7D674C

ordinary meaning as understood by one of ordinary skill in the art for the reasons that follow. What a person skilled in the art is mainly concerned about is how much total energy is lost to the surroundings of the device. For a miniature device like a BAW or micromechanical resonator, the surrounding is generally the substrate on which the device is fabricated.  Energy lost to the substrate—which can be waves going into the substrate that experience dissipation in the substrate (or its mounts, adhesives, etc.)—that does not return to the resonator is energy lost, so lowers the quality factor $Q$, a very important filter or oscillator design parameter. What matters is the total energy lost to all of the surroundings, i.e., strain energy dissipation in a large area around the resonator, not just some small region(s).

The Akoustis construction is necessary because the patent claim language "density of mechanical energy in the outer region" opens too wide a possibility of regions where density can be determined. For example, in a typical scenario, there could be a small region outside the device active region where the energy density is higher than when n=1 and at the same time another small region where the energy density is lower than when n=1. The fact that there is a region where the energy density is lower does not necessarily mean the total energy lost is lower. In other words, it is possible that even where total energy in the outer region has increased, there can be a particular point where there is a reduction in energy density.  Only the total energy over the full volume can provide useful information regarding the effectiveness of any structure intended to reduce energy losses from the active device.  A more accurate measure of the total energy lost that removes some of the ambiguity of location and region and still captures the use of energy density in the claim is to get the energy density (or average energy density) over the entire outer region, which is the Akoustis construction. Because limiting the region to the outer region of the device still does not quite capture all the energy lost, a yet more accurate and useful

16

measure would be the energy density in the entire region outside the active region (not just the outer region of the device). Unfortunately, the patent claim limits the region to the "outer region of the BAW resonator", which is not entirely definite in my opinion, so flawed. One could argue that this claim should never have been allowed.

Qorvo's proposed construction as "the amount of mechanical energy from acoustic waves leaked from the active region" uses the term "leaked", which does not necessarily mean the same as "lost". A "leaked" amount of energy can be reflected and returned to the active region, in which case it is not "lost". What is important here is what energy is *lost*. Because it does not use the words "total amount", it also leaves open the flawed notion that the amount of energy can be measured at any finite point in space or in time, and not as it relates to the total energy over the full volume of the outer region.  In this regard, an amount leaked could refer to an amount of energy at a particular point in space, or at a particular point in time. Furthermore, Qorvo's proposal leaves out entirely the concept of "energy *density*," instead referring to an *amount* of energy.  An energy density is defined as an amount of energy per unit volume, just as an object's density is its mass per unit volume.  That is, energy density requires a defined volume over which the "amount" of energy is measured, and any amount without an associated volume cannot be an "energy density."   I believe such a construction would be fundamentally flawed for the above reasons and incorrect (or not true to the original claim) in the sense that it does not capture the concept of density.

### 1.      Extrinsic Evidence Supporting Akoustis' Construction

The following extrinsic evidence further supports Akoustis' proposed plain and ordinary meaning of "density of mechanical energy" as used in the '755 claims:

Bindel, D. S., Quevy, E., Koyama, Govindjee, S., Demmel, J. W., and R. T. Howe, "Anchor loss simulation in resonators," Tech. Digest, 18th IEEE Int. Conf. on Micro Electro Mechanical Systems, Jan. 30 – Feb. 3, 2005, pp. 133-136.

- pg. 134, col. 2: "The bending motion of the mode along with the Poisson effect induces a vertical motion in the stem which pumps displacement waves into the substrate, where they carry away the energy of the resonance." This passage (as well as the whole paper) clearly indicates that it is energy lost to the substrate that matters. Their use of a perfectly matched layer (PML) in simulation to capture all energy lost from the resonator into the substrate and surroundings indicates that it is all the energy lost to the infinite surroundings that matters to one skilled in the art.

K. Wang, A.-C. Wong, and C. T.-C. Nguyen, "VHF free-free beam high-$Q$ micromechanical resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 9, no. 3, pp. 347-360, Sept. 2000.

- pg. 1, abstract: "The microresonators feature torsional-mode support springs that effectively isolate the resonator beam from its anchors via quarter-wavelength impedance transformations, minimizing anchor dissipation and allowing these resonators to achieve high-$Q$ with high stiffness in the VHF frequency range." This paper describes quarter-wavelength resonator support design methods to suppress anchor loss, which is loss to the substrate. Again, what matters is loss to the infinite surroundings around the resonator, not just some small region.

M. U. Demirci and C. T.-C. Nguyen, "Higher-mode free-free beam micromechanical resonators," *Proceedings,* 2003 IEEE Int. Frequency Control Symposium, Tampa, Florida, May 5-8, 2003, pp. 810-818.

- pg. 816, col. 1: "The observance of slightly higher $Q$ in the second mode design than the fundamental seems to be tied to the use of fewer support beams in the former, which suggests that vibrational energy losses to the substrate can be minimized by using fewer supports, hence, providing fewer energy-loss paths." This provides additional evidence that it is loss to the substate or to the infinite surroundings that matters. All the strain energy losses are generally integrated over a much larger region surrounding a resonator to determine its $Q$.

**D.    "[A]re not excited" [claims 3, 9, 10, 12]**

| Akoustis's preliminary construction | Qorvo's preliminary construction |
|---|---|
| "[A]re not excited" means that the wavelengths do not exist in the whole volume of the active region, or otherwise indefinite. | POM. If a construction for "are not excited" is needed, it means "are not substantively created" |

Akoustis offers the proposed construction of "are not excited" as "the wavelengths *do not exist* in the whole volume of the active region."  I agree with that proposed construction as the

18

DocuSign Envelope ID: 77D24F88-13AC-4BEE-90CA-C41AAC7D674C

plain and ordinary meaning as understood by one of ordinary skill in the art for the reasons that

follow. In relevant technical literature, when something is "not excited", it is non-existent, as

opposed to something that is "reduced", which one skilled in the art interprets as "reduced but

not eliminated completely." (See '755 Patent, 2:33, 51, 54; 3:65; 4:1, 5:8, 23, 25; 6:33; 7:8, 16,

50; 9:49, 11:36). When used in the literature, absolute terms and phrases like "not excited" are

interpreted as such. One example is the Pauli exclusion principle, which Physics LibreTexts

quotes as "The Pauli exclusion principle says that no two electrons can have the same set of

quantum numbers; that is, no two electrons can be in the same state. This exclusion limits the

number of electrons in atomic shells and subshells."[2]

Here, "not excited" is interpreted as absolute. It does not mean "a little bit" or "tiny" or

"a reduced amount", or "suppressed" but rather "none at all." This is why I cannot agree with

Qorvo's proposed construction of "not excited" as meaning "are not substantively created." That

definition is inconsistent with the plain meaning of "not excited" and would be viewed as

ambiguously indefinite compared to the term "reduced" used throughout the '755 Patent

specification. If the inventors intended to mean suppressed or greatly reduced, those are the

appropriate terms to express as much in the context of this invention. Qorvo's notion that "not

excited" means not "substantially" excited is adding an adjective not present and not clear or

evident to a person of ordinary skill in the art absent some supporting intrinsic evidence that the

inventors were acting as their own lexicographer. I do not see any such support in the

specification (compare '755, Patent, 2:61, 5:15, 7:5) or the prosecution history. Nor can I glean

---

[2] Pauli Exclusion Principle - Chemistry LibreTexts -
ttps://chem.libretexts.org/Bookshelves/Physical_and_Theoretical_Chemistry_Textbook_Maps/S
upplemental_Modules_(Physical_and_Theoretical_Chemistry)/Electronic_Structure_of_Atoms_
and_Molecules/Electronic_Configurations/Pauli_Exclusion_Principle (reviewed July 11, 2022).

4875-5086-7240.v1

DocuSign Envelope ID: 77D24F88-13AC-4BEE-90C4-C41AAC7D674C

from the specification what level of presence of such wavelengths would correspond to a substantial amount vs. an insubstantial amount, while it is straightforward to discern the difference between present and not present.   I also consider Qorvo's proposed construction to be indefinite because, as described above, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

I also disagree with any notion that the inability to ever achieve a total absence of the wavelengths in the whole volume of the active region justifies Qorvo's proposed construction. The fact that the inventors used the term throughout the specification absent any suggestion of a more scientifically realistic meaning does not change the plain and ordinary meaning that "not existing" means not at all.

### 1.     Extrinsic Evidence Supporting Akoustis' Construction

The scientific literature is also filled with less absolute descriptions of things, where words like "reduced" or "suppress" might be used.  By way of example only, I offer the following:

M. Akgul, A. Ozgurluk, and C. T.-C. Nguyen, "RF channel-select micromechanical disk filters—part II: demonstration," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 66, no. 1, pp.218-235, Jan. 2019, DOI: 10.1109/TUFFC.2018.2883296.

- Pg. 232, col.1-2: "Suppression of spurious modes often requires creative solutions that are not easily designable and that often result in unique geometries, e.g., the polygons of FBAR filter design [22]. Interestingly, the micromechanical filter design herein suffers much less from these issues, as shown in Fig. 21, which presents the terminated spectrum for the filter in Fig. 14 over a 100-MHz wide span, showing no strong spurious modes." Note how this passage is careful to use the word "suppression" to indicate that the spurious modes are not necessarily eliminated, but rather are suppressed or reduced to very small magnitudes. In addition, the phrase at the end "showing no strong spurious modes" is careful to include the word "strong" so that it maintains a non-absolute meaning. If the word "strong" were left out, then the phrase "showing no spurious modes" would mean that there are no spurious modes, i.e., none at all or zero energy in spurious modes, which is not the statement this paper would want to make. Leaving out the word "strong" would have made the statement false. Keeping it in makes it true.

20

4875-5086-7240.v1

DocuSign Envelope ID: 77D24F88-13AC-4BEF-90CA-C41AAC7D674C

## VI.    THE '786 PATENT

### A.    Background

The '786 Patent, entitled "Communication filter using single crystal acoustic resonator devices," relates generally to electronic devices.  More particularly, the invention described in this patent provides techniques related to bulk acoustic wave resonator devices, single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, and the like. *Merely by way of example* the invention is described as applied to a single crystal resonator device for a communication device, mobile device, computing device, among others.  '786 Patent: 1:40-50; 3:45-52; 14:24-31, 62-64.  Nowhere in the specification or the prosecution history do the inventors disclaim a polycrystalline "piezoelectric layer" as used in claim 1. Likewise, nowhere in the specification do the inventors act as their own lexicographer by describing or defining the piezoelectric layer of the claimed invention as limited only to single-crystal materials.  For that reason, I believe the correct construction is the plain and ordinary meaning as understood by one of ordinary skill in the art at the time of the invention.

### B.    "piezoelectric layer" [claim 1]

| Akoustis's preliminary construction | Qorvo's preliminary construction |
|---|---|
| A layer of piezoelectric material having single or multiple crystal structure. | A layer of piezoelectric material having single crystal structure. |

I understand that Qorvo asserts that Akoustis falsely identifies its RF filter products as including single-crystal-technology by marking datasheets with the '786 Patent number.  But independent claim 1 does not include the term "single-crystal" at all to define or describe the piezoelectric layer material.  Rather, the single-crystal limitation is found, as an optional feature, of dependent claim 2, <u>unrelated to</u> the piezoelectric layer ('786 Patent, 14:62-64):  "The device

4875-5086-7240.v1

of claim 1 wherein the seed substrate includes silicon, silicon carbide, aluminum oxide, or single crystal aluminum gallium nitride materials." This informs me that the inventors knew when to use the single-crystal modifier if intended to further limit a limitation (like the seed substrate) consistent with embodiments described in the specification. Moreover, the "single-crystal" term is not in any independent claims of the '786 Patent describing the piezoelectric layer. In my opinion, the specification makes clear to a person of ordinary skill in the art that any reference to a single-crystal embodiment should not be viewed as limiting the scope or meaning of any claim that does not also specifically identify the piezoelectric layer as single-crystal. In fact, the prosecution history supports the notion that the inventors and the Patent Office did not view the term as limited to single crystal because there is no mention that the claim is so limited. The disputed term can refer to either a polycrystalline material or a single-crystal material.

Akoustis offers the proposed construction of "piezoelectric layer" as "a layer of piezoelectric material having single or multiple crystal structure." I agree with that proposed construction as the plain and ordinary meaning as understood by one of ordinary skill in the art for the above reasons. For the same reasons, I do not agree with Qorvo's proposed construction that improperly seeks to limit the term to only single crystal materials.

### 1. Extrinsic Evidence Supporting Akoustis' Construction

Both polycrystalline and single-crystal materials can be called "piezoelectric materials" or "piezoelectric layers" in technical literature. Thus, "piezoelectric layer" is not specific to one or the other and a person of ordinary skill in the art would not read the claim term as limited based on the specification or prosecution history. There are many examples in the literature that also support the Akoustis construction, so I will just point out one here.

G. Piazza, P.J. Stephanou, and A. P. Pisano, "Piezoelectric aluminum nitride vibrating contour-mode MEMS resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 15, no. 6, pp. 1406-1418, Dec. 2006.

22

- pg. 1406, Title: The title includes "Piezoelectric Aluminum Nitride", where the aluminum nitride in this paper is a polycrystalline material. This confirms that "piezoelectric" is used to refer to a polycrystalline material.

- pg. 1406, col. 2: "Piezoelectric materials such as aluminum nitride or quartz" is a good example of a single sentence where "piezoelectric materials" refers to both a polycrystalline material (the aluminum nitride of this paper) and a crystalline material (quartz).

## VII.   CONCLUSION

While the opinions set forth in this report are complete, I reserve the right to supplement this report and any of the opinions expressed herein, should I receive additional information or evidence that is relevant to those opinions between now and the time that I testify at deposition or trial.  Moreover, I reserve the right to serve one or more additional expert reports in this litigation if requested to do so, and I reserve the right to supplement the opinions set forth herein as part of such additional expert reports in order to account for additional information or evidence that is learned or developed before any such additional report is prepared.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and information.

Dated July 11, 2022                                    Respectfully submitted,

By: _____
                                                        Clark Nguyen, PhD.

23

Dated: July 11, 2022

PILLSBURY WINTHROP
SHAW PITTMAN LLP

David A. Jakopin
Dianne L. Sweeney
2550 Hanover Street
Palo Alto, CA 94304-1115
(650) 233-4500
david.jakopin@pillsburylaw.com
dianne@pillsburylaw.com

Robert M. Fuhrer
1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856
(703) 770-7900
robert.fuhrer@pillsburylaw.com

David L. Stanton
725 S. Figueroa St., 36th Floor
Los Angeles, CA 90017
(213) 488-7100
david.stanton@pillsburylaw.com

*Attorneys for Akoustis Technologies, Inc.
and Akoustis, Inc.*

BAYARD, P.A.

*/s/ Ronald P. Golden III*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Akoustis Technologies, Inc. and
Akoustis, Inc.*

24

# Exhibit A

## CURRICULUM VITAE
## INITIAL CLAIM CONSTRUCTION
## EXPERT REPORT AND DECLARATION
## BY DR. CLARK NGUYEN

**CURRICULUM VITAE (Extended)**

# Prof. Clark T.-C. Nguyen
**Professor of Electrical Engineering & Computer Sciences**

***Business Address:*** Dept. of Electrical Engineering and Computer Sciences, University of California at Berkeley, 574 Cory Hall, Berkeley, CA 94720-1770, Tel: (510)642-6251, FAX: (510)643-6637, email: ctnguyen@berkeley.edu

***Education:***

| | |
|---|---|
| 1994 | • <u>Ph.D.</u>: Electrical Engineering and Computer Sciences, University of California, Berkeley, CA 94720. <br> *Ph.D. Dissertation Title*: Micromechanical Signal Processors |
| 1991 | • <u>M.S.</u>: Electrical Engineering and Computer Sciences, University of California, Berkeley, CA 94720. <br> *M.S. Thesis Title*: Electromechanical Characterization of Microresonators for Circuit Applications |
| 1988 | • <u>B.S.</u>: Electrical Engineering and Computer Sciences, University of California, Berkeley, CA 94720. |

***Areas of Expertise:*** Micro electromechanical systems, including integrated micromechanical signal processors and integrated sensors, merged circuit/micromechanical technologies, RF communications, integrated circuit design and technology, short- and long-term stability in micromechanical devices

***Biography:***

Prof. Clark T.-C. Nguyen received the B.S., M.S., and Ph.D. degrees from the University of California at Berkeley in 1989, 1991, and 1994, respectively, all in Electrical Engineering and Computer Sciences. In 1995, he joined the faculty of the University of Michigan, Ann Arbor, where he was a Professor in the Department of Electrical Engineering and Computer Science up until mid-2006. In 2006, he joined the faculty of the University of California at Berkeley, where he is presently a Professor in the Department of Electrical Engineering and Computer Sciences. From 1995 to 1997, he was a member of the National Aeronautics and Space Administration (NASA)'s New Millennium Integrated Product Development Team on Communications, which roadmapped future communications technologies for NASA use into the turn of the century. His research interests focus upon micro electromechanical systems (MEMS), including integrated micromechanical signal processors and sensors, merged transistor/MEMS circuit design, merged circuit/micromechanical technologies, RF communication architectures, and integrated circuit design and technology. Prof. Nguyen is perhaps best recognized as a pioneer of vibrating RF MEMS technology, whose research results include the first micromechanical free-free beam and contour-mode disk and ring resonators with $Q$'s exceeding 42,000 at frequencies up to 3 GHz—still the highest on-chip $Q$'s of any room temperature device at this frequency; the first VHF micromechanical filter and mixer-filter devices; oscillator circuits referenced to wine-glass disk resonator arrays that achieve phase noise performance commensurate with GSM cellular telephone reference oscillator specifications; the first medium-scale integrated (MSI) micromechanical signal processing circuits; the first micromechanical power amplifier and converter, and the first ultra-low power MEMS-based wireless communication transceivers. Dr. Nguyen's research group at UC Berkeley is presently investigating extension of the frequency range of micromechanical signal processors (filters and oscillators) into the X-Band range, developing merged circuit/microstructure technologies, studying physical phenomena that influence the frequency stability of micro- and nano-scale mechanical resonators, exploring novel architectures for single-chip transceivers for military and commercial applications using MEMS technologies, developing automatic generation codes for mechanical signal processor design, and designing and implementing novel, completely monolithic integrated sensors.

In 2001, Prof. Nguyen founded Discera, Inc., a company aimed at commercializing communication products based upon MEMS technology, with an initial focus on the very vibrating micromechanical

### CURRICULUM VITAE (Extended)

resonators pioneered by his research in past years. He served as Vice President and Chief Technology Officer (CTO) of Discera from 2001 to mid-2002. Discera shipped more than 1 million MEMS-based oscillators per month up till late 2013, when it was acquired by Micrel, itself absorbed by Microchip, who continues to sell these oscillators.

In mid-2002, Prof. Nguyen went on leave from the University of Michigan to join the Microsystems Technology Office (MTO) of DARPA in Arlington, Virginia, where he served as a Program Manager in MEMS technology. At DARPA, from mid-2002 through 2005, Prof. Nguyen created and managed a diverse set of programs that included Microelectromechanical Systems (MEMS), Micro Power Generation (MPG), Chip-Scale Atomic Clock (CSAC), MEMS Exchange (MX), Harsh Environment Robust Micromechanical Technology (HERMIT), Micro Gas Analyzers (MGA), Radio Isotope Micropower Sources (RIMS), RF MEMS Improvement (RFMIP), Navigation-Grade Integrated Micro Gyroscopes (NGIMG), and Micro Cryogenic Coolers (MCC).

Prof. Nguyen received the 1938E Award for Research and Teaching Excellence from the University of Michigan in 1998, a Univ. of Michigan EECS Departmental Achievement Award in 1999, the Ruth and Joel Spira Award for Outstanding Teaching in 2000, the University of Michigan's 2001 Henry Russel Award, and a UC Berkeley EECS Department EE Outstanding Teaching Award in 2013. He received the 2006 Cady Award from the IEEE UFFC society and the 2017 IEEE Robert Bosch Micro and Nano Electro Mechanical Systems Award. Among his publication accolades are the 2007 IEEE Transactions on Ultrasonics, Ferroelectrics, and Frequency Control Best Paper Award, the 2005 IEEE International Solid-State Circuits Conference Jack Raper Award for Outstanding Technology Directions, the Best Invited Paper Award at the 2004 IEEE Custom Integrated Circuits Conference, the 2004 DARPA Tech Best Technical Presentation Award, and together with his students, numerous Best Student Paper Awards at major conferences that include the IEEE Int. Frequency Control Symposium, the IEEE Int. Microelectromechanical Systems Conference, the IEEE Int. Electron Devices Meeting, and the Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers). To date, he has organized and chaired a total of 37 IEEE and DARPA workshops, and was the Technical Program Chair and General Chair of the 2010 and 2011 IEEE Int. Frequency Control Symposiums; as well as a Co-General Chair of the 2017 IEEE Int. Micro Electro Mechanical Systems Conference. Prof. Nguyen is a Fellow of the IEEE and served as President of the IEEE Ultrasonics, Ferroelectrics, and Frequency Control (UFFC) Society from 2016-2017. In 2018, he founded and began as President of the IEEE MEMS Technical Community, a role that he continues with an intention to transition the IEEE Technical Community to an IEEE Council over the next few years.

### EMPLOYMENT HISTORY

| | |
|---|---|
| 7/06 - present | • <u>University of California at Berkeley</u>, Berkeley Sensor & Actuator Center (BSAC), Dept. of Electrical Engineering and Computer Sciences (EECS), 574 Cory Hall, Berkeley, California 94720 |
| 7/06 - present | *Position*: Full Professor<br>7/21 – present: Chair, Electrical Engineering Division in EECS<br>4/20 – present: Exec. Director, Berkeley Sensor & Actuator Center<br>7/18 – present: Conexant Distinguished Professor<br>*Research Interests*: micromechanical signal processors for wireless communications, frequency control and stability of micromechanical resonators, integrated sensors, merged micromechanical and circuit technologies |
| 5/28/02 – 12/31/05 | • <u>Defense Advanced Research Projects Agency (DARPA)</u>, 3701 North Fairfax Drive, Arlington, Virginia 22203<br>*Position*: Program Manager |

## CURRICULUM VITAE (Extended)

|  |  |
|---|---|
|  | *Programs Created/Managed*: Micro Electro Mechanical Systems (MEMS), Micro Power Generation (MPG), Chip-Scale Atomic Clock (CSAC), MEMS Exchange (MX), Harsh Environment Robust Micromechanical Technology (HERMIT), Micro Gas Analyzers (MGA), Radio Isotope Micropower Sources (RIMS), RF MEMS Improvement Program (RFMIP), Navigation-Grade Integrated Micro Gyroscope (NGIMG), Micro Cryogenic Coolers (MCC) |
|  | *Total Funding Amount Generated While At DARPA*: **$356,392,008** (to last through 2009) |
| 1/95 – 6/06 | • <u>University of Michigan</u>, Center for Wireless Integrated Microsystems (WIMS), Dept. of Electrical Engineering and Computer Science, 2402 EECS Building, 1301 Beal Ave., Ann Arbor, Michigan 48109-2122 |
| 6/1/06 – 6/30/06 | *Position*: Full Professor |
| 6/1/01 – 6/1/06 | *Position*: Associate Professor |
| 1/1/95 – 5/31/01 | *Position*: Assistant Professor |
|  | *Research Interests*: micromechanical signal processors for wireless communications, frequency control and stability of micromechanical resonators, integrated sensors, merged micromechanical and circuit technologies |
| 4/01 – 6/02 | • <u>Discera, Inc.</u>, 755 Phoenix Drive, Ann Arbor, Michigan 48108 |
|  | *Position*: Founder, Vice President and Chief Technology Officer (CTO) |
|  | *Duties*: direct technology and product development efforts for communication products based upon MEMS technology |
| 5/88 - 12/94 | • <u>University of California at Berkeley</u>, Berkeley Sensor and Actuator Center (BSAC), Dept. of Electrical Engineering and Computer Sciences, and the Electronics Research Laboratory, 497 Cory Hall, Berkeley, California 94720 |
|  | *Research Advisor*: Prof. Roger T. Howe |
| 6/89 - 12/94 | *Position*: Graduate Student Researcher, Step VI |
| 1/89 - 6/89 | *Position*: Graduate Student Instructor |
| 5/88 - 1/89 | *Position*: Engineering Aide (undergraduate) |
|  | *Duties*: Ph.D. research; manage the Berkeley Microfabrication Laboratory baseline CMOS process; lab equipment manager for BSAC; UNIX operating system manager (superuser) |
|  | *Research Projects*: (1) High-$Q$ microresonator-based oscillators; (2) Integration of CMOS with micromechanics; (3) Fundamental microresonator issues: frequency stability, temperature coefficient nulling, $Q$-control, frequency pulling methods |
| 9/83 - 5/89 | • <u>Pacific Northwest Laboratories (Battelle)</u>, P.O. Box 999, Richland, Washington 99352 |
| 6/87 - 5/89 | Fluid and Thermal Science Section (FTS), Energy Systems Department |
|  | *Supervisor*: Dr. Mel G. Piepho |
|  | *Position*: Computer Programmer |
|  | *Research Project*: PROBCON-HDW: A Probability and Consequence System of Codes for Long Term Analysis of Hanford Defense Waste |
| 9/83 - 6/87 | Metals and Ceramics Science Section, Materials Department |
|  | *Supervisor*: Dr. Gregory J. Exarhos |
|  | *Position*: Laser Technician |

# CURRICULUM VITAE (Extended)

*Research Projects*: laser damage in thin optical coatings, vibrational Raman studies of particle induced damage in oxide glasses, implementation of an optical pH detector for waste repository environments, phase identification and localized stress studies of thin optical coatings and bulk samples, manipulation of products in titanium dioxide coating production

## HONORS AND AWARDS

❑ 2020 IEEE Joint Conf. of the IEEE Int. Frequency Contr. Symp. & IEEE Int. Symp. on Applications of Ferroelectrics *Best Paper Award* for the paper titled "199-MHz polysilicon micromechanical disk array-composite oscillator" by Qianyi Xie, Sherwin Afshar, Alper Ozgurluk, and Clark T.-C. Nguyen.

❑ 2018-2023 UC Berkeley Conexant Distinguished Professor

❑ 2017 IEEE Robert Bosch Micro and Nano Electro Mechanical Systems Award.

❑ 2016 IEEE Frequency Control Symposium *Best Paper Award* for the paper titled "RF-Powered Micromechanical Clock Generator," by Ruonan Liu, Jalal Naghsh Nilchi, and Clark T.-C. Nguyen.

❑ 2013 IEEE Frequency Control Symposium *Best Paper Award* for the paper titled "A 78-microwatt GSM phase noise-compliant Pierce oscillator referenced to a 61-MHz wine-glass disk resonator" by Thura Lin Naing, Tristan O. Rocheleau, Elad Alon, and Clark T.-C. Nguyen.

❑ 2013 International Conference on Solid-State Sensors & Actuators (*Transducers'13*) *Best Oral Paper Award* for the paper titled "A micromechanical resonant charge pump" by Yang Lin, Ruonan Liu, Wei-Chang Li, Mehmet Akgul, and Clark T.-C. Nguyen.

❑ 2013 IEEE Microelectromechanical Systems Conference (*MEMS'13*) *Best Oral Paper Award* for the paper titled "Enhancement of mechanical $Q$ for low phase noise optomechanical oscillators" by Tristan O. Rocheleau, Alex J. Grine, Karen E. Grutter, Robert A. Schneider, Niels Quack, Ming C. Wu, and Clark T.-C. Nguyen.

❑ 2013 University of California at Berkeley Dept. of Electrical Engineering & Computer Sciences EE Division *Outstanding Teaching Award*.

❑ *2010 TSMC Outstanding Student Research Award (1ˢᵗ Place)* for "Silicide based release of high aspect-ratio gaps" to my student Ms. Li-Wen Hung.

❑ 2007 *IEEE Transactions on Ultrasonics, Ferroelectrics, and Frequency Control Best Paper Award* for the paper titled, "MEMS Technology for Timing and Frequency Control".

❑ Advanced to *IEEE Fellow* on Jan. 1, 2007 "for contributions to physics and technology of micromechanical systems".

❑ *Distinguished Lecturer* for the IEEE Solid-State Circuits Society from 2007-2009.

❑ 2006 IEEE *Cady Award* "for pioneering research, development, and commercialization of timing and frequency control devices based on vibrating RF MEMS technology".

❑ 2005 IEEE International Solid-State Circuits Conference *Jack Raper Award* for Outstanding Technology-Directions for the paper titled "Towards chip-scale atomic clocks" by Clark T.-C. Nguyen and John Kitching.

❑ 2005 IEEE International Solid-State Circuits Conference *Outstanding Panel Award* for participation on the panel entitled "RF MEMS: Fact or Stiction?"

❑ 2005 Joint IEEE International Frequency Control / Precise Time and Time Interval (PTTI) Systems and Applications Symposium Category 1 *Best Student Paper Award* for the paper titled "Vibrating micromechanical resonators with solid dielectric capacitive-transducer 'gaps'" by Yu-Wei Lin, Sheng-Shian Li, Zeying Ren, and Clark T.-C. Nguyen.

## CURRICULUM VITAE (Extended)

- ❑ 2004 IEEE Custom Integrated Circuits Conference *Best Invited Paper Award* for the paper titled "Vibrating RF MEMS for next generation wireless applications" by Clark T.-C. Nguyen.
- ❑ 2004 IEEE International Ultrasonics, Ferroelectrics, and Frequency Control Symposium *Best Paper Award in the Frequency Control Category* for the paper titled "Mechanically-coupled micromechanical resonator arrays for improved phase noise" by Seungbae Lee and Clark T-C. Nguyen.
- ❑ DARPA Tech 2004 *Award for Best Technical Presentation (Top Prize).*
- ❑ 2003 IEEE International Electron Devices Meeting (IEDM) *Roger A. Haken Best Student Paper Award* for the paper titled "UHF micromechanical extensional wine-glass mode ring resonators" by Yuan Xie, Sheng-Shian Li, Yu-Wei Lin, Zeying Ren, and Clark T.-C. Nguyen.
- ❑ 2001 *Henry Russel Award* (UofM university-wide award, highest honor given to one young faculty member each year).
- ❑ 2000 *Ruth and Joel Spira Award* for Outstanding Teaching.
- ❑ 1999 *IBM University Partnership Program Award* (Faculty Development Award).
- ❑ 1999 *EECS Department Achievement Award* for Outstanding Research, Teaching, and Service.
- ❑ 1998 International Electron Devices Meeting (IEDM) *Roger A. Haken Best Student Paper Award* for the paper titled "Micromechanical mixer+filters" by Ark-Chew Wong, Hao Ding, and Clark T.-C. Nguyen.
- ❑ *Judges Award for Top Ten Paper* at the 1998 IEEE MTT-S International Microwave Symposium for the paper entitled "Micromechanical electrostatic K-band switches," by S. Pacheco, C. T.-C. Nguyen, and L. P. B. Katehi.
- ❑ the 1998 *1938E Award* for Outstanding Research and Teaching for a Junior Faculty (UofM College of Engineering Award, given once per year).
- ❑ BSAC Industrial Advisory Board Meeting Student Awards: (awarded by BSAC industry members)
  - — *Spring 2022 Best Presentation Award* to Xintian Liu for "Temperature-Insensitive Resonant Strain Sensor"
  - — *Spring 2021 Best Presentation Award* to Qianyi Xie for "Performance Enhancement and Restoration of Micromechanical Resonators via UV-Ozone"
  - — *Fall 2018 Best Poster Award* to Kieran Peleaux for "Fully Integrated CMOS-Metal MEMS Systems"
  - — *Fall 2015 Best Poster Award* to Tristan Rocheleua for "MEMS-Based Tunable Channel-Selecting Super-Regenerative RF Transceivers"
  - — *Spring 2014 Best Poster Award* to Mehmet Akgul for "RF Channel-Selecting Micromechanical Filters"
  - — *Spring 2013 Best Research Group Award* to the Nguyen Research Group
  - — *Spring 2013 Best Presentation Award* to Yang Lin for "Micromechanical Charge Pump"
  - — *Fall 2012 Best Research Group Award* to the Nguyen Research Group
  - — *Fall 2012 Best Presentation Award* to Lingqi Wu for "Hollow Stems for Higher Micromechanical Disk Resonator Quality Factor"
  - — *Spring 2012 Best Presentation Award* to Thura Lin Naing for "3-GHz CVD Diamond Ring Resonator With $Q > 40,000$"
  - — *Fall 2011 Best Presentation Award* to Tristan Rocheleau for "A 515-MHz Diamond Disk with $Q > 109,000$"
  - — *Spring 2011 Best Presentation Award* to Mehmet Akgul for "Voltage-Controlled Phase Matching to Optimize Micromechanical Array-Composite Resonator Output Power"
  - — *Spring 2011 Best Poster Award* to Li-Wen Hung for "High-$Q$, Low Impedance μMechanical Resonators"
  - — *Spring 2011 Best Poster Award* to Lingqi Wu for "Temperature Stable Micromechanical Resonators and Filters"
  - — *Fall 2010 Best Poster Award* to Li-Wen Hung for "Capacitive-Piezoelectric Micromechanical Resonators"
  - — *Fall 2010 Best Poster Award* to Yang Lin for "A Micromechanical Power Converter"
  - — *Fall 2009 Best Presentation Award* to Li-Wen Hung for "Silicide-Induced Air Gaps for MEMS Structures"
  - — *Fall 2008 Best Presentation Award* to Mehmet Akgul for "RF Channel-Selecting Micromechanical Filters"
  - — *Spring 2008 Best Presentation Award* to Yang Lin for "Micromechanical Resonator Switches"

## CURRICULUM VITAE (Extended)

— *Fall 2007 Best Poster Award* to Li-Wen Hung for "Micromechanical Transmit Filters: $Q$-Boosting Array"
— *March 2007 Best Presentation Award* to Li-Wen Hung for "Intermodulation Distortion in VHF Micromechanical Resonators and Filters"

## UNIVERSITY (OF CALIFORNIA AT BERKELEY) RECORD

*University Service:*

| | |
|---|---|
| 7/21 – present | • Electrical Engineering Division Chair & EECS Associate Chair<br>— run and oversee the EE Division of the Dept. of EECS |
| 10/20 – 1/21 | • Chair of the Senate Working Group on Remote Exams<br>— run and oversee the Senate Working Group on Remote Exams<br>— found a way to bring disparate groups (one that wanted remote exam proctoring outlawed, another that wanted it to be standard practice) to a compromise that allowed the university to go forward with a Zoom-based approach<br>— wrote the report titled "Remote Exam Proctoring Policy Recommendation" which now resides on UC Berkeley's Center for Teaching & Learning Remote Proctoring FAQ website at <u>Remote Proctoring FAQ | Center for Teaching & Learning (berkeley.edu)</u> |
| 4/20 – present | • Executive Director, Berkeley Sensor & Actuator Center (BSAC)<br>— run and oversee the operations of BSAC, a university/industry center comprising two universities (UC Berkeley and UC Davis) and an average of 30-35 industry member companies over decades<br>— recruit and retain industry members, organize and run conferences |
| 1/20 – 8/21 | • Senate Committee on Course Instruction (COCI)<br>— serving on the Sciences Sub-Committee and experiencing a high workload as the committee deals with campus interruptions due to power shutdowns and the current pandemic |
| 1/19 – 8/21 | • College of Engineering Faculty Advising Council<br>— council to advise the Dean of the College of Engineering |
| 8/18 – 8/21 | • Chair of the EE Faculty Recruiting Committee<br>— recruit new faculty |
| 8/18 – present | • EECS Executive Committee<br>— advise the EECS Chairs on various matters |
| 2/07 – present | • MEMS Area Coordinator<br>— coordinate the MEMS Area in EE |
| 2/13 – present | • Mentor for the Regents and Chancellors Scholars<br>— mentoring an average of 8 students per year |
| 2/19 – 3/19 | • Interviewer for the RC Undergraduate Scholarships<br>— interviewed 8 students<br>— expect to mentor some students |
| 8/17 – 5/18 | • Member of the EE Faculty Recruiting Committee<br>— recruiting new faculty, especially in MEMS and PHY |
| 8/13 – 8/18 | • Member of the Committee on Undergraduate Scholarships, Honors, and Financial Aid (CUSHFA)<br>— contribute to discussions and decisions on undergraduate scholarships, honors, and financial aid policy |
| 2/18 – 3/18 | • Interviewer for the RC Undergraduate Scholarships |

## CURRICULUM VITAE (Extended)

|  |  |
|---|---|
|  | — interviewed 9 students |
|  | — expect to mentor some students |
| 5/17 – 12/17 | • Developing a training course for gov't funding agency program managers, first for DARPA, then for other funding sources, e.g., foundations |
|  | — working with Paul Alivisatos, David Trinkle, Tom Kalil, and Shankar Sastry, to generate and pitch this training program |
|  | — DARPA showed interest in funding this, but got bogged on questions on the most appropriate funding mechanism |
| 1/17 – 5/17 | • Member of the EE Faculty Recruiting Committee |
|  | — recruited new faculty, especially in MEMS and Power |
| 2/17 – 3/17 | • Interviewer for the RC Undergraduate Scholarships |
|  | — interviewed 12 students |
|  | — expect to mentor some students |
| 7/12 – 7/16 | • EE Scheduling Officer |
|  | — generate and maintain the EE class schedule for all semesters, including summer |
|  | — time consuming work, requiring adjustments year-round |
| 7/12 – 7/16 | • Member of the Undergraduate Study Committee |
|  | — contribute to discussions and decisions on undergraduate study and curriculum policy |
| 2/16 – 3/16 | • Interviewer & Mentor for the RC Undergraduate Scholarships |
|  | — interviewed 9 students |
|  | — expect to mentor some students |
| 10/15 – 12/15 | • Chair of the Ad Hoc Committee for Bernhard Boser's Step VI Promotion |
|  | — wrote the ad hoc report with Bob Meyer |
| 2/15 – 3/15 | • Interviewer & Mentor for the RC Undergraduate Scholarships |
|  | — interviewed 8 students |
|  | — expect to mentor some students |
| 2/14 – 3/14 | • Interviewer & Mentor for the RC Undergraduate Scholarships |
|  | — interviewed 19 students |
|  | — expect to mentor some students |
| 7/13 – 8/13 | • Member of the Ad Hoc Committee for Vladimir Stojanovic's Appointment Case |
|  | — helped write the ad hoc report |
| 2/13 – 3/13 | • Interviewer & Mentor for the RC Undergraduate Scholarships |
|  | — interviewed 20 students |
|  | — mentoring three students |
| 7/11 – 7/12 | • Chair of the Grad Study/Prelim Committee |
|  | — presiding over graduate program matters (e.g., prelim petitions, possibility of mezzanine courses) and organizing prelim exam assignments |
| 7/11 – 12/11 | • Chair of the Ad Hoc Committee for Michel Maharbiz's Promotion |
|  | — wrote the ad hoc report |
| 4/11 – 9/13 | • Nominated Richard Muller and Dick White for the IEEE Maxwell Award |
|  | — not an official member of the Awards Committee, but did all the work for this award |
|  | — wrote the nomination package and solicited/collected all letters |

## CURRICULUM VITAE (Extended)

| | |
|---|---|
| 12/10 – 5/11 | • Member of the Graduate Admissions Committee<br>— handled all MEMS applications (>100 of them) |
| 4/10 – 7/11 | • Member of the College of Engineering Common First Year Committee<br>— listened to discussions, but couldn't really do much, since EECS refuses to join the Common First Year (a mistake, in my opinion) |
| 4/10 – 12/10 | • Member of the 4th Floor Cory Task Force<br>— represented N/MEMS and BSAC |
| 8/09 – 7/11 | • Member of the Grad Study/Prelim Committee<br>— helped make decisions on graduate program matters |
| 8/09 – 12/09 | • Member of the Ad Hoc Committee for Michel Maharbiz's Promotion<br>— wrote the research portion of the ad hoc report and presented the case to the department (the ad hoc committee chair was absent) |
| 8/09 – 8/10 | • Member of the CNIL Committee<br>— participated in CNIL meetings; perhaps, created some controversy regarding adoption of a university-wide computer support model |
| 7/09 – 3/10 | • Member of the Masters in EECS (MEECS) Committee<br>— participated in construction of a potential MEECS program that eventually turned into EECS involvement with the MEng program |
| 8/08 – 8/10 | • Member of the EECS Executive Committee<br>— participated in meetings to advise the EECS department chairs |
| 8/07 – 8/09 | • Member of the Faculty Recruiting Committee<br>— recruited new faculty, especially in MEMS; Michel Maharbiz came |
| 8/07 - 8/08 | • Chair of the Grad Study/Prelim Committee<br>— presided over graduate program matters (e.g., prelim petitions, possibility of mezzanine courses) and organized prelim exam assignments |
| 8/07 - 8/08 | • Member of the Graduate Admissions Committee<br>— evaluated Integrated Circuit graduate applications and participated in committee meetings |
| 1/07 - 5/07 | • Member of the Faculty Recruiting Committee<br>— participated in committee meetings, interviewed and evaluated numerous candidates, suggested and pushed for the hiring of Michel Maharbiz |

***Teaching History:*** (* = major course creation performed; † = major course revision performed)
    *Average Overall Instructor Evaluation Score*: 6.4 (out of 7).
    In reverse chronological order:

| Course Title and Number | Term | Enrollment | Student Eval. of Instructor (Max.=7) | Student Eval. of Course (Max.=7) |
|---|---|---|---|---|
| EE C247B / ME C218: Intro. to MEMS Design | S'21 | 8 | 6.67 | 6.0 |
| EE 105: Microelectronic Devices & Circuits | F'20 | 33 | 6.13 | 5.94 |
| EE C247B / ME C218: Intro. to MEMS Design | S'20 | 17 | 6.3 | 6.0 |
| EE 105: Microelectronic Devices & Circuits | F'19 | 24 | 6.3 | 5.9 |
| EE C247B / ME C218: Intro. to MEMS Design | S'19 | 9 | 6.8 | 6.5 |
| EE W247B: MEMS for MASIC | F'18 | 5 | 7.0 | 6.7 |
| EE 105: Microelectronic Devices & Circuits | F'18† | 53 | 6.5 | 6.3 |

## CURRICULUM VITAE (Extended)

| Course | Term | Enroll | Instr | Course |
|---|---|---|---|---|
| EE C247B / ME C218: Intro. to MEMS Design | S'18 | 18 | 6.4 | 6.2 |
| EE W240A: Analog IC's for MASIC | S'17 | 2 | 7.0 | 6.5 |
| EE C247B / ME C218: Intro. to MEMS Design | S'17 | 21 | 6.4 | 5.8 |
| EE W247B: MEMS for MASIC | F'16* | 4 | n/a | n/a |
| EE W240A: Analog IC's for MASIC | S'16 | 6 | n/a | n/a |
| EE C247B / ME C218: Intro. to MEMS Design | S'16 | 26 | 6.2 | 6.2 |
| EE140: Analog Integrated Circuits | F'15 | 18 | 6.4 | 6.1 |
| EE240A: Analog Integrated Circuits | F'15 | 28 | 6.2 | 6.2 |
| EE W240A: Analog IC's for MASIC | S'15 | 8 | n/a | n/a |
| EE C247B / ME C218: Intro. to MEMS Design | S'15 | 17 | 6.7 | 6.6 |
| EE143: Microfabrication Technology | F'14 | 35 | 6.3 | 6.5 |
| EE C247B / ME C218: Intro. to MEMS Design | S'14 | 35 | 6.3 | 6.3 |
| EE W240A: Analog IC's for MAS-IC | F'13* | 4 | n/a | n/a |
| EE240A: Analog Integrated Circuits | F'13 | 18 | 6.4 | 6.6 |
| EE 140: Analog Integrated Circuits | F'13 | 29 | 6.2 | 6.5 |
| EE 240A: Analog Integrated Circuits | S'13 | 10 | 7.0 | 7.0 |
| EE 140: Analog Integrated Circuits | S'13 | 55 | 6.5 | 6.4 |
| EE C245 / ME C218: Introduction to MEMS | F'12 | 22 | 6.4 | 6.8 |
| EE 140: Analog Integrated Circuits | S'12 | 33 | 6.6 | 6.7 |
| EE C245 / ME C218: Introduction to MEMS | F'11 | 34 | 6.4 | 6.3 |
| EE 140: Analog Integrated Circuits | S'11 | 45 | 6.7 | 6.6 |
| EE C245 / ME C218: Introduction to MEMS | F'10 | 21 | 6.5 | 6.2 |
| EE 143: Microfabrication Technology | S'10† | 40 | 6.5 | 6.4 |
| EE C245 / MEC218: Introduction to MEMS | F'09† | 31 | 6.4 | 6.2 |
| EE 140: Analog Integrated Circuits | S'09† | 42 | 6.3 | 6.4 |
| EE 245: Introduction to MEMS | F'08 | 30 | 5.7 | 5.5 |
| EE 245: Introduction to MEMS | F'07† | 60 | 5.6 | 5.7 |
| EE 243: Adv. IC Processing & Layout | S'07† | 18 | 6.2 | 5.7 |
| | | *Averages*: | *6.4* | *6.3* |

Reference Information:
   00: lower division (freshman, sophomore); 100: upper division (junior, senior); 200: graduate

### *Course Creation:*

❑ *Overhauled EE105: Microelectronic Devices & Circuits* (undergraduate leader course into the Physical Electronics and Integrated Circuits areas) during Fall Semester 2018. This was partly to accommodate a (constantly) changing EE16A/B series and entailed not only a complete restructuring of the EE105 lectures, but also generating completely new labs for the course. The incentive to do this arose from my strong belief that students should learn in lecture the material needed to fully understand and execute a lab *before* doing that lab, not after, which was the case for some renditions of this course. I also insist that if students use bipolar transistors in the lab, then they must learn about them in lecture—again, something that was not happening in all renditions of the course, some of which skipped bipolar transistors and covered only MOS, yet still used bipolar transistors in the lab. The other incentive for re-introducing bipolar transistors is that it enables a course final lab project much more substantial that would otherwise be achievable with discrete MOS transistors, which perform horribly compared with discrete bipolar devices. The result of this rather complete overhaul of the course was the highest instructor and course ratings for EE105 in its history.

❑ *Created EE W247B: Introduction to MEMS Design for MAS-IC* (graduate course on MEMS for the online MAS-IC program). The lectures for the course were recorded during the Spring 2014 semester and the video editing, website construction, and homework materials finalized over the summer of

## CURRICULUM VITAE (Extended)

2016. The first offering occurred in Fall 2016. Like EE W240A, creation of this course required a considerable amount of work.

❑ *Exported EE W240A for Shanghai Tech* (graduate course on analog integrated circuits for the Shanghai Tech collaboration with UC Berkeley) during Fall 2013.

❑ *Created EE W240A: Analog Integrated Circuits for MAS-IC* (graduate course on analog integrated circuits for the online MAS-IC program) during the Spring, Summer, and Fall 2013 semesters. This new online course is based on the ground offering of EE240A and was recorded during Spring 2013, edited over Summer 2013, and offered as the pilot course for the MAS-IC program during Fall 2013. Creation of this course ended up being an enormous amount of work for me, since recording issues during Spring 2013 forced me to re-record 13 of the lectures over the following summer, which amounts to about 26 sub-modules. There was also a good amount of editing and creation of online study aides, e.g., Discussion Points, for which I am grateful for support from Priya Dasgupta. Running the course over the Fall 2013 semester was quite smooth, and I was happy with the results.

❑ *Revised EE 245: Introduction to MEMS* (graduate course on MEMS) during the Summer and Fall 2007 semesters. EE 245 had not been taught since 2003, so required substantial updating. I thus completely reorganized the course, rewriting its lecture notes and converting it from the somewhat survey course it once was to now a course that goes into a good amount of depth into specific important topics. EE 245 now has much more content on circuit modeling of micromechanical elements and noise analysis of systems that utilize MEMS devices. This material is taught in the context of inertial sensors (e.g., accelerometers and gyroscopes), but the fundamentals of modeling and noise that students learn will be useful in a much more general sense for countless other examples in MEMS. Much of my intent in re-vamping this course is to service an eventual prelim in MEMS, which the EECS department needs for its new MEMS focus area.

---

# UNIVERSITY (OF MICHIGAN) RECORD

*University Service:*

Note: My appointment to DARPA began on 6/02, and thus, the lack of formal University of Michigan service after this date. Once the DARPA appointment began, the nature of my service was directed more towards the MEMS community as a whole, rather than just the university.

| | |
|---|---|
| 9/01 - 6/02 | • Member of the Special Committee on Dissertation Filing<br>— helped to deliberate on whether or not dissertations should be filed electronically, with no requirement for paper copies |
| 9/96 - 6/02 | • Member of the EE Graduate Division Committee<br>— advising students majoring in Circuits and Microsystems and managing graduate curriculum issues |
| 1/00 - 6/02 | • Member of the SSEL Operations Committee<br>— participating in making decisions on issues concerning the operation of the Solid-State Electronics Laboratory |
| 8/97 - 9/00 | • Member of the Circuits Faculty Search Committee<br>— participating in the recruiting of a new circuits faculty member, setting up interviews, providing transportation and social functions |
| 9/99 - 5/00 | • Member of the Undergraduate Degree Programs Committee<br>— proposed a flexible EECS degree and participated in discussions to decide on the future degree programs offered by the EECS Dept. |

## CURRICULUM VITAE (Extended)

| | |
|---|---|
| 4/98 - 4/00 | • Member of the College of Engineering Honors and Awards Committee<br>— decide with other members the awardees of the College of Engineering Honors and Awards |
| 9/96 - 5/99 | • Member of the ESE Undergraduate Curriculum Committee<br>— participating in the definition and implementation of the new EECS undergraduate curriculum for Curriculum 2000 at the UofM |
| 3/97 - 1/99 | • Co-Chair of the Circuits and Microsystems Ph.D. Committee<br>— developed Ph.D. major program in *Circuits and Microsystems* with Prof. Khalil Najafi |
| 1/97 - 12/97 | • Chair of the EECS 311 (Electronic Circuits) Committee<br>— developing/teaching EECS 311—the junior level leader course in Electronic Circuits—Fall Semester 1997 (wrote lab manual, projects, and lecture/logistical notes, procured ~$429,550 in equipment) |
| 1/96 - 9/96 | • Member of the EECS 210/211 Committee<br>— participated in making key decisions in defining the order and coverage of EECS 210/211, the Introduction to Electrical Engineering sequence at the UofM |

**Teaching History:** (* = major course creation performed; † = major course revision performed)

<u>Note</u>: There is a large gap between Winter 2001 and Winter 2006, since this was the period during which I started my company, Discera, then did my DARPA appointment. I left the University of Michigan before receiving evaluation scores for Winter 2006.

<u>*Average Overall Instructor Evaluation Score*</u>: 4.78 (out of 5)—one of highest in the college.

In reverse chronological order:

| Course Title and Number | Term | Enrollment | Student Eval. of Instructor (Max.=5) | Student Eval. of Course (Max.=5) |
|---|---|---|---|---|
| EECS 522: Analog IC's for Communications | W'06 | ** | ** | ** |
| EECS 522: Analog IC's for Communications | W'01 | 30 | 4.83 | 4.63 |
| EECS 413: Monolithic Amplifier Circuits | F'00 | 55 | 4.85 | 4.83 |
| EECS 522: Analog IC's for Communications | W'00 | 34 | 4.79 | 4.67 |
| EECS 523: Digital Integrated Circuits | F'99 | 50 | 4.86 | 4.74 |
| EECS 522: Analog IC's for Communications | W'99 | 31 | 4.84 | 4.78 |
| EECS 523: Digital Integrated Circuits | F'98 | 42 | 4.81 | 4.44 |
| EECS 311: Electronic Circuits | W'98 | 91 | 4.77 | 4.31 |
| EECS 311: Electronic Circuits | F'97* | 63 | 4.80 | 4.38 |
| EECS 522: Analog IC's for Communications | W'97 | 28 | 4.75 | 4.79 |
| EECS 523: Digital Integrated Circuits | F'96† | 44 | 4.71 | 4.45 |
| EECS 522: Analog IC's for Communications | W'96* | 29(+~25visits) | 4.82 | 4.74 |
| EECS 318: Analog Electronics | F'95 | 55 | 4.71 | 4.29 |
| EECS 318: Analog Electronics | W'95 | 44 | 4.64 | 4.70 |
| | | *Averages*: | *4.78* | *4.59* |

Reference Information:
  100: freshman; 200: sophomore; 300: junior; 400: senior; 500: graduate
  *College Average* on Student Evaluation of Instructor for a 300-level Course in F'97: 4.11
  *College Average* on Student Evaluation of 300-level Course in F'97: 3.94

**Course Creation:**

## CURRICULUM VITAE (Extended)

❑ *Created EECS 311: Electronic Circuits* (undergraduate leader course in electronic circuits) during the Summer and Fall 1997 semesters, establishing one of the core courses in the new EECS program for the College of Engineering's Curriculum 2000 Initiative and ABET. This course is taken by *all* electrical engineering students. Its primary objectives are to teach fundamental transistor-level circuit design and prepare students for subsequent advanced analog (EECS 411, 413) and digital (EECS 427) circuit design courses. In preparing this course, I chaired the EECS 311 Formation Committee, wrote and verified the lab manual, wrote the lecture notes, and handled all paperwork required for establishing the course in the EECS curriculum, including ABET justifications. I had also participated in a proposal to the Hewlett-Packard Equipment Initiative for Curriculum 2000, and through this proposal, won $429,550 in equipment to create the EECS 311 laboratory.

❑ *Created EECS 522: Analog IC's for Communications* (graduate course on analog communication circuits) during the Fall and Winter 1996 semesters, covering topics relevant to present-day requirements and applications of wireless communication transceivers. New material includes noise in circuits, phase noise, supply independent biasing, temperature independent biasing, oscillator and synthesizer design, distortion in nonlinear circuits, and short-channel circuit design—all topics that were not previously covered that *must* be understood by present-day M.S.- or Ph.D.-level circuit designers.

❑ *Revised EECS 523: Digital Integrated Circuits* (graduate course on digital integrated circuits) during the Fall 1996 semester, completely revamping the course to include more discussion of present-day technology topics. New material includes more detailed discussion of short-channel effects in MOS transistors, submicron surface and buried channel devices, and the latest interconnect issues, which dominate research in high-density digital integrated circuit technology.

## PROFESSIONAL RECORD

*Professional Activities/Service:*

| | |
|---|---|
| 10/1/18 – present | • President of the IEEE MEMS Technical Community, which is currently working to become an IEEE Council |
| 1/1/20 – 12/31/21 | • Senior Past-President of the IEEE Ultrasonics, Ferroelectrics, and Frequency Control (UFFC) Society (2 yrs. as President-Elect, 2 yrs. as President, 2 yrs. as Jr. Past-President, and 2 yrs. As Senior-Past President) |
| 10/6/09 – present | • Editor for *IEEE/ASME Journal of Microelectromechanical Systems* |
| 7/1/18 – 9/21 | • Member of the IEEE Bosch MEMS Awards Committee |
| 1/26/14 – 1/30/20 | • Member of the International Steering Committee (ISC) of the IEEE MEMS Conference (was chair in 2017) |
| 1/1/18 – 12/31/19 | • Nominations Chair of the IEEE Ultrasonics, Ferroelectrics, and Frequency Control (UFFC) Society |
| 1/1/18 – 12/31/19 | • Junior Past-President of the IEEE Ultrasonics, Ferroelectrics, and Frequency Control (UFFC) Society (2 yrs. as President-Elect, 2 yrs. as President, 2 yrs. as Jr. Past-President, and 2 yrs. As Senior-Past President) |
| 1/30/18 – 1/30/19 | • Member of the 2019 IEEE MEMS Conference Executive & Technical Program Committee |
| 1/30/17 – 1/30/18 | • Co-Chair of the International Steering Committee (ISC) of the IEEE MEMS Conference |
| 1/30/17 – 1/30/18 | • Member of the 2018 IEEE MEMS Conference Executive & Technical Program Committee |
| 1/1/16 – 12/31/17 | • President of the IEEE Ultrasonics, Ferroelectrics, and Frequency Control (UFFC) Society (2 yrs. as President-Elect, 2 yrs. as President, 2 yrs. as Jr. Past President, and 2 yrs. As Senior Past President) |

## CURRICULUM VITAE (Extended)

| | |
|---|---|
| 1/30/16 – 1/30/17 | • Co-Chair of the IEEE MEMS Conference |
| 1/30/16 – 1/30/17 | • Member of the 2017 IEEE MEMS Conference Executive & Technical Program Committee |
| 1/1/14 – 12/31/15 | • President-Elect of the IEEE Ultrasonics, Ferroelectrics, and Frequency Control (UFFC) Society (2 yrs. as President-Elect, 2 yrs. as President, and 2 yrs. as Jr. Past President) |
| 1/30/15 – 1/30/16 | • Member of the 2016 IEEE MEMS Conference Executive & Technical Program Committee |
| 1/26/14 – 1/30/15 | • Member of the 2015 IEEE MEMS Conference Executive & Technical Program Committee |
| 6/6/11 – 6/21/17 | • Member of the International Steering Committee on Solid-State Sensors, Actuators, & Microsystems |
| 12/1/08 – 12/31/13 | • Vice President of Frequency Control (and Adcom member) for the *IEEE Ultrasonics Ferroelectrics and Frequency Control Society* |
| 7/30/13 – 5/30/14 | • Member of the 2014 IEEE Frequency Control Symposium (FCS) Technical Program Committee |
| 5/1/12 – 7/30/13 | • Member of the 2013 Joint IEEE UFFC Conference Technical Program Committee |
| 7/1/09 – 12/31/11 | • General Chair of the 2011 Joint Conference of the IEEE International Frequency Control Symposium and European Time and Frequency Forum |
| 10/28/08 – 8/1/10 | • Technical Program Chair of the 2010 IEEE International Frequency Control Symposium (IFCS'10) |
| 7/20/08 – 1/31/09 | • Organized and Chaired the DARPA Workshop on RF MEMS Opportunities |
| 4/1/08 – 6/30/09 | • Executive Committee Member of the 2009 15th International Conference on Solid-State Sensors and Actuators (Transducers 2009) |
| 1/1/07 – 5/31/10 | • Editor for *IEEE Transactions on Electron Devices* |
| 10/24/06 – 12/31/09 | • Distinguished Lecturer for the *IEEE Solid-State Circuits Society* |
| 8/28/08 – 6/30/09 | • Member of the 2009 IEEE Frequency Control Symposium (FCS) Technical Program Committee |
| 3/18/08 – 9/20/08 | • Organized and Chaired the Workshop of Applications of MEMS in Wireless Communications |
| 8/28/07 – 6/30/08 | • Member of the 2008 IEEE Frequency Control Symposium (FCS) Technical Program Committee |
| 1/15/07 – 1/31/08 | • Member of the 2008 IEEE Microelectromechanical Systems (MEMS) Conference Technical Program Committee |
| 5/9/00 – 7/31/08 | • Member of the MTT-S ADCOM Subcommittee on RF MEMS MTT-21 |
| 1/7/06 – 7/31/07 | • Technical Program Chair of the American Region for the 14th International Conference on Solid-State Sensors and Actuators (Transducers 2007) |
| 8/28/06 – 6/30/07 | • Member of the 2007 IEEE Frequency Control Symposium (FCS) Technical Program Committee |
| 1/15/06 – 1/31/07 | • Member of the 2007 IEEE Microelectromechanical Systems (MEMS) Conference Technical Program Committee |
| 8/28/05 – 6/30/06 | • Member of the 2006 IEEE Frequency Control Symposium (FCS) Technical Program Committee |

## CURRICULUM VITAE (Extended)

| | |
|---|---|
| 1/14/00 – 12/31/05 | • Member of the International Steering Committee for the International Symposium on Smart Structures and Microsystems (IS3M) |
| 5/28/02 – 12/31/05 | • Program Manager of the Micro Electro Mechanical Systems (MEMS), Micro Power Generation (MPG), Chip-Scale Atomic Clock (CSAC), MEMS Exchange (MX), Harsh Environment Robust Micromechanical Technology (HERMiT), Micro Gas Analyzers (MGA), Radio Isotope Micropower Sources (RIMS), RF MEMS Improvement Program (RFMIP), Navigation-Grade Integrated Micro Gyroscope (NGIMG), and Micro Cryogenic Coolers (MCC) programs in the Microsystem Technology Office (MTO) of DARPA |

Programs Managed While at DARPA: (* = created program, † = augmented existing program)

*Micro Cryogenic Coolers (MCC)

*Navigation-Grade Integrated Micro Gyroscope (NGIMG)

†RF MEMS Improvement Program (RFMIP)

*Radio Isotope Micropower Sources (RIMS)

*Micro Gas Analyzers (MGA)

*Harsh Environment Robust Micromechanical Technology (HERMiT)

*MEMS Exchange (MX)

*Chip-Scale Atomic Clock (CSAC)

†Micro Power Generation (MPG)

†Micro Electro Mechanical Systems (MEMS)

Major Workshops/Conferences Organized While at DARPA:

(Avg. No. Attendees: PI Mtg: ~250, Workshop and Meetings: ~50)

| | |
|---|---|
| 11/2/05 – 11/3/05 | • Micro Gas Analyzers (MGA) Phase 1-2 Workshop, Arlington, Virginia. |
| 10/20/05 - 10/21/05 | • Nav.-Grade Integrated Micro Gyroscope Kick-Off Mtg., Phoenix, AZ. |
| 8/27/05 - 8/28/05 | • Summer 2005 DARPA/MEMS PI Meeting, Las Vegas, Nevada. |
| 8/26/05 | • Summer 2005 DoD-Wide MEMS Mtg., Las Vegas, Nevada. |
| 6/9/05 - 6/10/05 | • U.S. MEMS Competitiveness Workshop, Seoul, Korea. |
| 5/18/-05 - 5/19-05 | • MEMS Basic Science Workshop, Santa Barbara, California. |
| 3/15/05 - 3/16/05 | • Chip-Scale Atomic Clock Applications Workshop, Alexandria, Virginia. |
| 1/26/04 - 1/28/04 | • Winter 2005 DARPA/MEMS PI Meeting, Las Vegas, Nevada. |
| 1/25/05 | • Winter 2005 DoD-Wide MEMS Mtg., Las Vegas, Nevada. |
| 10/14/04 - 10/15/04 | • Radio Isotope Micropower Sources Kick-Off Mtg., Arlington, Virginia. |
| 9/15/04 - 9/16/04 | • Micro Gas Analyzers Kick-Off Meeting, Vail, Colorado. |
| 9/13/04 - 9/14/04 | • Sustainable Micro-Scale Power Sources Workshop, Vail, Colorado. |
| 6/14/04 - 6/15/04 | • Summer 2004 DARPA/MEMS PI Meeting, Seattle, Washington. |
| 6/13/04 | • Summer 2004 DoD-Wide MEMS Mtg., Seattle, Washington. |
| 6/3/04 - 6/4/04 | • Navigation-Grade MEMS IMU Workshop, Hilton Head, South Carolina. |
| 1/15/04 - 1/16/04 | • Winter 2004 DARPA/MEMS PI Meeting, San Antonio, Texas. |
| 1/14/04 | • Winter 2004 DoD-Wide MEMS Mtg., San Antonio, Texas. |
| 10/29/03 - 10/30/03 | • Massively Reconfigurable Microfabrication Tech. Wkshp, Napa, CA. |
| 10/23/03 - 10/24/03 | • HERMIT Kick-Off Meeting, Arlington, Virginia. |
| 8/27/03 - 8/28/03 | • Fall 2003 DARPA/MEMS PI Meeting, Monterey, California. |
| 8/26/03 | • Fall 2003 DoD-Wide MEMS Mtg., Monterey, California. |

## CURRICULUM VITAE (Extended)

| | |
|---|---|
| 7/14/03 - 7/15/03 | • Micro Cryogenic Coolers Workshop, Mystic Seaport, Connecticut. |
| 4/23/03 - 4/25/03 | • Cognitive Arthropods Workshop, Arlington, Virginia. |
| 2/21/03 | • Winter 2003 DoD-Wide MEMS Mtg., Orlando, Florida. |
| 2/19/03 - 2/20/03 | • Winter 2003 DARPA/MEMS PI Meeting, Orlando, Florida. |
| 1/29/03 - 1/30/03 | • DSRC Triboelectric Phenomena Workshop, San Diego, California. |
| 1/13/03 - 1/14/03 | • Robust RF MEMS Switch Workshop, Dulles, Virginia. |
| 12/16/02 - 12/17/02 | • Micro Gas Analyzers Workshop, Monterey, California. |
| 8/7/02 - 8/8/02 | • Summer 2002 DARPA/MEMS PI Meeting, Detroit, Michigan. |
| 8/6/02 | • Summer 2002 DoD-Wide MEMS Mtg., Detroit, Michigan. |
| 7/15/02 - 7/16/02 | • Chip-Scale Atomic Clock (CSAC) Kick-Off Meeting, Boulder, Colorado. |
| 7/11/02 - 7/12/02 | • Future of MEMS Manufacturing Workshop, Berkeley, California. |
| 6/18/02 - 6/20/02 | • MEMS Test & Evaluation Workshop, Annapolis, Maryland. |
| 4/23/02 | • Micro Cryogenic Coolers Workshop, Arlington, Virginia. |
| 1/1/04 – 1/31/05 | • Member of the 2005 IEEE Microelectromechanical Systems (MEMS) Conference Technical Program Committee |
| 12/10/03 - 12/13/04 | • Emerging Technologies Chair on the Executive Committee of the 2004 Int. Electron Devices Meeting (IEDM) |
| 12/12/02 - 12/10/03 | • Chair of the 2003 Int. Electron Devices Meeting (IEDM) Sub-Committee on Displays, Sensors, and MEMS (DSM)—I successfully changed the name of this committee. |
| 12/6/01 - 12/12/02 | • Member of the 2002 Int. Electron Devices Meeting (IEDM) Sub-Committee on Detectors, Sensors, and Displays (DSD). |
| 8/4/01 - 6/6/02 | • Member of the 2002 Solid-State Sensor & Actuator Workshop (Hilton Head) Technical Program Committee |
| 3/9/01 - 12/6/01 | • Member of the 2001 Int. Electron Devices Meeting (IEDM) Sub-Committee on Detectors, Sensors, and Displays (DSD). |
| 2/21/01 - 2/7/02 | • Member of the 2002 Int. Solid-State Circuits Conference (ISSCC) Program Sub-Committee on Imaging, MEMS, and Displays. |
| 4/24/00 - 6/14/01 | • Member of the North American Technical Program Committee for the 11th International Conference on Solid-State Sensors and Actuators (Transducers'01), Munich, Germany, 2001. |
| 7/24/00 | • Served on the Review Panel for NSF's 2000 New Technologies for the Environment Initiative. |
| 11/1/99 - 12/2/99 | • Member of the Organizing Committee and Session Chair for the NSF/ARO/DARPA/NRL Workshop on RF Micromachining and MEMS Technology for Wireless Communications Systems, Arlington, Virginia. |
| 2/1/99 - 9/23/99 | • Member of the Organizing Committee and Poster Session Chair for the 6th Annual Strategic and Technical Symposium on Vehicular Applications of Displays and Microsensors, Ypsilanti, Michigan. |
| 9/1/98 - 6/18/99 | • General Co-Chair of the Workshop on Microelectromechanical Devices for RF Systems at the 1999 IEEE MTT-S International Microwave Symposium, Anaheim, California, June 18, 1999. |
| 8/1/98 - 3/6/99 | • Served on the Technical Program Committee for the 1999 IEEE Great Lakes Symposium on VLSI, Ann Arbor, Michigan. |

## CURRICULUM VITAE (Extended)

| | |
|---|---|
| 2/22/99 - 2/23/99 | • Served on a DARPA Workshop Panel on MEMS for Mechanical Computation and Information Processing, La Jolla, California. |
| 12/1/97 - 12/2/97 | • Served on NSF's 1997 CAREER Panel Review Committee. |
| 7/9/96 - 7/10/96 | • Served on the Review Panel for NSF's 1996 Combined Research-Curriculum Development (CRCD) Program. |
| 9/96 - 8/98 | • Consulting Member of NASA's New Millennium Integrated Product Development Team (IPDT) on Communications (more info. below) |
| 6/95 - 8/96 | • Member of NASA's New Millennium Program Integrated Product Development Team (IPDT) on Communications (one of 8 team members; function: advise and roadmap new technologies for NASA into the turn of the century). |
| 10/2/95 | • Served on the Panel Review Committee for NSF's 1995 Small Business Innovation Research (SBIR) Phase I Program, Panel Number 20-8. |
| 1/95 - present | • Session Chair for Various Conferences: MEMS'97, Transducers'97, 1999 GLSVLSI, 6th Annual Symposium on Vehicular Applications of Displays and Microsensors, Transducers'99, 1999 MTT-S, … |
| 1/95 - present | • Reviewer for the IEEE Journal of Microelectromechanical Systems, Sensors and Actuators, IEEE Trans. on Electron Devices, IEEE Journal of Solid-State Circuits, … |

**Invited Papers/Presentations:** (does not include industry visits or my own DARPA workshops, * = to be presented)

_Total Number of Accepted Invites_: 216

_Plenary or Keynote Presentations_: 21 (* = to be presented)

[1]  4/22/18 – 4/26/18 • <u>Invited Paper/Presentation</u> **(Keynote)**, "All-Mechanical Micro-Scale Radios," 13th IEEE Int. Conf. on Nano/Micro Engineered and Molecular Systems (IEEE NEMS 2018), Singapore.

[2]  7/18/13 – 7/19/13 • <u>Invited Presentation</u> **(Plenary)**, "Radio Isotope Micropower Sources (RIMS)," Workshop on Nuclear Microsystems, Columbia, Missouri.

[3]  10/15/09 – 10/16/09 • <u>Invited Presentation</u> **(Plenary)**, "Integrated Micromechanical RF Circuits for Software-Defined Cognitive Radio," the 26th Symposium on Sensors, Micromachines & Applied Systems, Tokyo, Japan.

[4]  9/26/08 • <u>Invited Presentation</u> **(Keynote)**, "Automated Design Needs for LSI Micromechanical Circuits," 2008 IEEE Behavioral Modeling and Simulation Conference (BMAS'08), San Jose, California.

[5]  4/21/08 – 4/23/08 • <u>Invited Paper/Presentation</u> **(Plenary)**, "Integrated Micromechanical Radio Front-Ends," 2008 IEEE Int. Symp. On VLSI Technology, Systems, and Applications (VLSI-TSA'08), Hsinchu, Taiwan.

[6]  9/18/06 – 9/22/06 • <u>Invited Paper/Presentation</u> **(Plenary)**, "Integrated Micromechanical Circuits for RF Front Ends," 2006 Combined 36th European Solid-State Device Research Conference & 32nd European Solid-State Circuits Conference (ESSDERC/ESSCIRC'06), Montreux, Switzerland.

[7]  9/17/06 – 9/20/06 • <u>Invited Presentation</u> **(Plenary)**, "Towards LSI Vibrating Micromechanical Signal Processors," 2006 Int. Conf. on Micro- and Nano-Engineering (MNE'06), Barcelona, Spain.

[8]  8/5/06 • <u>Invited Presentation</u> **(Keynote)**, "Advances in RF MEMS and MEMS-Based RF Front-Architectures," 1st Int. Workshop on Technology and Policy for Accessing Spectrum (TAPAS'06), Boston, Massachusetts.

## CURRICULUM VITAE (Extended)

[9] 4/25/06 – 4/26/06    • <u>Invited Paper/Presentation</u> (**Keynote**), "MEMS Technologies and Devices for Single-Chip RF Front-Ends," IMAPS/ACerS 2nd Int. Conference and Exhibition on Ceramic Interconnect and Ceramic Microsystems Technologies (CICMT), Denver, Colorado.

[10] 1/25/06 – 1/27/06    • <u>Invited Presentation</u> (**Keynote**), "From MEMS to NEMS: Smaller is Still Better," 2006 MIT/MTL Annual Research Conference, Waterville Valley, New Hampshire.

[11] 8/29/05 – 8/31/05    • <u>Invited Paper/Presentation</u> (**Plenary**), "MEMS for Frequency Control and Timing," 2005 IEEE Combined Frequency Control/Precision Time & Time Interval Symposium, Vancouver, Canada.

[12] 1/22/05 - 1/27/05    • <u>Invited Paper/Presentation</u> (**Plenary**), "Vibrating RF MEMS Overview: Applications to Wireless Communications," 2005 SPIE MOEMS-MEMS Micro & Nanofabrication Symposium, San Jose, California.

[13] 11/17/04 - 11/18/04    • <u>Invited Presentation</u> (**Keynote**), "MEMS Programs in DARPA/MTO," 2004 Nano and Microsystems Technology and Metrology Workshop, Huntsville, Alabama.

[14] 5/6/03    • <u>Invited Presentation</u> (**Keynote**), "MEMS: Generalizing the Benefits of Miniaturization," TEXMEMS2003, Austin, Texas.

[15] 2/24/03 - 2/27/03    • <u>Invited Paper/Presentation</u> (**Keynote**), "MEMS Technologies for Communications," Nanotech 2003 Conf., San Francisco, California.

[16] 6/24/02 - 6/26/02    • <u>Invited Paper/Presentation</u> (**Keynote**), "RF MEMS for Wireless Applications," 2002 Device Research Conf., Santa Barbara, California.

[17] 7/4/01 - 7/6/01    • <u>Invited Paper/Presentation</u> (**Keynote**), "Vibrating RF MEMS for Low Power Wireless Communications," 2001 International MEMS Workshop, Singapore.

[18] 9/11/00 - 9/13/00    • <u>Invited Paper/Presentation</u> (**Plenary**), "Micromechanical circuits for wireless communications," 2000 European Solid-State Device Research Conference, Cork, Ireland.

[19] 7/12/99 - 7/14/99    • <u>Invited Presentation</u> (**Keynote**), "Vibrating micromechanical resonators for miniaturized low-power communications," 11th International Conference on Wireless Communications (Wireless'99), Calgary, Canada.

[20] 9/20/98 - 9/22/98    • <u>Invited Paper/Presentation</u> (**Plenary**), "Micromachining technologies for miniaturized communication devices," 1998 SPIE MEMS Conference, Santa Clara, California.

[21] 1/25/98 - 1/29/98    • <u>Invited Paper/Presentation</u> (**Plenary**), "Micromechanical devices for wireless communications," 1998 IEEE International Workshop on Micro Electro Mechanical Systems, Heidelberg, Germany.

*IEEE Solid-State Circuits Society Distinguished Lectures*: 6 (* = to be presented)

[22] 5/8/08    • <u>Invited SSCS DL Presentation</u>, "Integrated Micromechanical Circuits for RF Front-Ends," National Semiconductor, San Jose, California.

[23] 4/23/08    • <u>Invited SSCS DL Presentation</u>, "Integrated Micromechanical Circuits for RF Front-Ends," NDK, Tokyo, Japan.

[24] 4/22/08    • <u>Invited SSCS DL Presentation</u>, "Integrated Micromechanical Circuits for RF Front-Ends," TSMC, Taipei, Taiwan.

[25] 11/30/07    • <u>Invited SSCS DL Presentation</u>, "Integrated Micromechanical Circuits for RF Front-Ends," Univ. of Colorado, Boulder, Colorado.

[26] 11/30/07    • <u>Invited SSCS DL Presentation</u>, "Integrated Micromechanical Circuits for RF Front-Ends," IEEE Local Chapter, Fort Collins, Colorado.

[27] 7/17/07    • <u>Invited SSCS DL Presentation</u>, "Integrated Micromechanical Circuits for RF Front-Ends," National Taiwan University, Taipei, Taiwan.

## CURRICULUM VITAE (Extended)

*Invited Short Courses at Conferences/Workshops*: 19 (* = to be presented)

| | | |
|---|---|---|
| [28] | 5/21/18 | • Invited Tutorial, "MEMS-Based Oscillators," IEEE Frequency Control Symp., Olympic Valley, California. |
| [29] | 2/22/16 | • Invited Tutorial, "Present and Future Opps in MEMS-Based Timing," Texas Instruments, Santa Clara, CA. |
| [30] | 4/12/15 | • Invited Tutorial, "MEMS-Based Oscillators," IEEE Frequency Control Symp., Denver, Colorado. |
| [31] | 3/11/15 | • Invited Tutorial, "MEMS-Based Oscillators," Spring 2015 BSAC IAB Tutorial, Berkeley, California. |
| [32] | 7/23/14 | • Invited Tutorial, "MEMS-Based Filter Technology for RF Front Ends," Skyworks, Newbury Park, California. |
| [33] | 5/19/14 – 5/22/14 | • Invited Tutorial, "MEMS-Based Oscillators," IEEE Frequency Control Symp., Taipei, Taiwan. |
| [34] | 7/21/13 | • Invited Tutorial, "Fabrication Methods for MEMS-Based Frequency Control Devices," IEEE Frequency Control Symp. Portion of the Joint UFFC Conference, Prague, Czech Republic. |
| [35] | 6/10/11 | • Invited Tutorial, "MEMS for Frequency Control," 36th Annual NIST Time & Frequency Seminar, Boulder, Colorado. |
| [36] | 6/11/10 | • Invited Tutorial, "MEMS for Frequency Control," 35th Annual NIST Time & Frequency Seminar, Boulder, Colorado. |
| [37] | 6/5/09 | • Invited Tutorial, "MEMS for Frequency Control," 34th Annual NIST Time & Frequency Seminar, Boulder, Colorado. |
| [38] | 4/20/09 | • Invited Tutorial, "MEMS for Frequency Control," 2009 IEEE International Frequency Control Symposium, Besancon, France. |
| [39] | 9/18/06 | • Invited Tutorial, "RF MEMS: Micromechanical Circuits for Wireless Transceiver Front-Ends," 2006 Combined 36th European Solid-State Device Research Conference & 32nd European Solid-State Circuits Conference, Montreux, Switzerland. |
| [40] | 6/12/06 | • Invited Tutorial, "Key System Opportunities for Vibrating MEMS Resonators," Introduction to MEMS Resonators and Filters Workshop at the 2006 IEEE International Microwave Symposium, San Francisco, California. |
| [41] | 8/28/05 | • Invited Tutorial, "MEMS for Frequency and Timing References," 2005 IEEE Combined Frequency Control/Precision Time & Time Interval Symposium, Vancouver, Canada. |
| [42] | 8/23/04 | • Invited Tutorial, "MEMS for Frequency and Timing References," 2004 IEEE Symposium on Ultrasonics, Ferroelectrics, and Frequency Control, Montreal, Canada. |
| [43] | 3/15/04 | • Invited Tutorial, "Accessing Microelectromechanical Systems (MEMS) Technology," Government Microcircuit Applications Conference (*GOMAC'04*), Monterey, California. |
| [44] | 5/12/02 | • Invited Tutorial, "Vibrating RF MEMS for Low Power Wireless Communications," 1st Int. Conf. and School on Nanoscale/Molecular Mechanics, Maui, Hawaii. |
| [45] | 7/3/01 | • Invited Short Course, "RF MEMS for Wireless Communications," given at the 2001 Int. MEMS Workshop, Singapore. |
| [46] | 6/10/01 | • Invited Short Course, "Micromechanical RF Devices for Communication Transceivers," given at the 11th Int. Conference on Solid-State Sensors and Actuators (Transducers'01), 9 a.m.-12:30 p.m., Munich, Germany. |

## CURRICULUM VITAE (Extended)

*Other Invited Presentations at Conferences/Workshops (not including above and not including my own DARPA Workshops):* (* = to be presented)

(Key: P/P = paper and presentation, PA = journal paper, PR = presentation only, PN = panel member)

| | | |
|---|---|---|
| [47] | 10/6/21 | • PR: FISITA: Sensing & Perception Future Technologies, virtual meeting. |
| [48] | 10/8/20 | • PR: National Research Council (NRC) Seminar, virtual meeting. |
| [49] | 2/13/20 | • PR: BEARS, Berkeley, CA. |
| [50] | 12/11/19 | • PR: Northeastern University Distinguished Seminar Series, Boston, MA |
| [51] | 9/12/18 | • PR: MIT-MTL Seminar, Cambridge, MA. |
| [52] | 8/13/18 | • PR: Brain-Efficient Nanomechanical AI Computer Scientific Workshop, Singapore. |
| [53] | 5/16/18 | • PR: DARPA Rapid Innovation with Production MEMS (RIPM) Workshop, Arlington, VA. |
| [54] | 4/24/18 | • PR: A*Star, Singapore. |
| [55] | 10/18/17 | • PR: Analog Devices Inc., Milpitas, CA. |
| [56] | 8/8/17 | • PR: NIST IEEE Milestone Colloquium, Gaithersburg, MD. |
| [57] | 4/12/17 | • PR: IPIRA-BEA Event, Berkeley, CA. |
| [58] | 3/21/17 | • PR: 2017 Government Microcircuit Applications & Critical Technology Conference, Reno, NV. |
| [59] | 8/12/16 | • PR: DARPA Workshop on EMT-VLF, Arlington, VA. |
| [60] | 9/23/15 | • PR: IEEE Bay Area MEMS Seminar, Santa Clara, CA. |
| [61] | 8/3/15 – 8/4/15 | • PR: Microsystem & Nanoengineering Summit, Beijing, China. |
| [62] | 7/7/15 | • PR: Interpack & ICNMM 2015, San Francisco, CA. |
| [63] | 3/6/15 | • PR: IoT Summit, San Francisco, CA. |
| [64] | 3/6/15 | • PN: IoT Summit Panel Discussion, Santa Clara, CA. |
| [65] | 3/6/14 | • PR: BSAC IAB Thrust Workshop, Berkeley, CA. |
| [66] | 1/28/14 | • PR: DARPA ORCHID PI Meeting, Long Beach, CA. |
| [67] | 9/19/13 | • PR: BSAC IAB Thrust Workshop, Berkeley, CA. |
| [68] | 8/26/13 – 8/30/13 | • PR: DARPA ORCHID PI Meeting, Santa Cruz, CA. |
| [69] | 6/17/13 – 6/20/13 | • P/P: Transducers'13, Barcelona, Spain. |
| [70] | 6/3/13 – 6/4/13 | • PR: IEEE RFIC Workshop, Seattle, WA. |
| [71] | 3/6/13 | • PR: BSAC IAB Thrust Workshop, Berkeley, CA. |
| [72] | 11/13/12 – 11/14/12 | • PR: BSAC Japan MEMS Symposium, Tokyo, Japan. |
| [73] | 8/27/12 – 8/31/12 | • PR: DARPA ORCHID PI Meeting, Santa Barbara, CA. |
| [74] | 8/14/12 – 8/15/12 | • PR: DARPA N/MEMS S&T PI Meeting, Irvine, CA. |
| [75] | 7/11/12 – 7/12/12 | • PR: DARPA ART PI Meeting, Dearborn, MI. |
| [76] | 6/17/12 – 6/22/12 | • P/P: IEEE Int. Microwave Symp. (IMS), Montreal, Canada. |
| [77] | 3/27/12 – 3/30/12 | • PR: ARL MAST Review, Joppa, MD. |
| [78] | 2/15/12 – 2/16/12 | • PR: DARPA NEMS PI Meeting, San Diego, CA. |
| [79] | 2/7/12 – 2/8/12 | • PR: DARPA ORCHID PI Meeting, Pasadena, CA. |
| [80] | 12/8/11 – 12/9/11 | • PR: DARPA N/MEMS S&T PI Meeting, Arlington, VA. |
| [81] | 11/7/11 – 11/8/11 | • PR: BSAC Japan MEMS Symposium, Tokyo, Japan. |
| [82] | 10/27/11 | • PR: DARPA ART PI Meeting, Arlington, VA. |
| [83] | 9/22/11 | • PR: BSAC 25th Anniv. Event, Berkeley, CA. |
| [84] | 9/21/11 | • PR: DARPA N/MEMS S&T Review Mtg., Berkeley, CA. |
| [85] | 5/25/11 – 5/26/11 | • PR: DARPA N/MEMS S&T PI Meeting, Newport Beach, CA. |
| [86] | 5/9/11 – 5/10/11 | • PR: DARPA ART PI Meeting, Washington, DC. |
| [87] | 5/1/11 – 5/5/11 | • PN: IEEE Frequency Control Symposium, San Francisco, CA. |
| [88] | 3/31/11 – 4/1/11 | • PR: ARL MAST Review, Joppa, MD. |
| [89] | 2/14/11 | • PR: DARPA RF-FPGA Workshop, Arlington, VA. |
| [90] | 1/19/11 – 1/20/11 | • PR: DARPA ORCHID PI Meeting, The Biosphere 2, AZ. |

## CURRICULUM VITAE (Extended)

[91]  12/15/10 – 12/16/10   • PR: DARPA N/MEMS S&T PI Meeting, Arlington, VA.
[92]  10/27/10   • PR: DSRC Workshop on Heterogeneous Integration, Arlington, VA.
[93]  7/23/10   • PR: DARPA MEMS PI Meeting (CSSA), San Francisco, CA.
[94]  7/23/10   • PR: DARPA MEMS PI Meeting (NEMS), San Francisco, CA.
[95]  7/22/10   • PR: DARPA MEMS PI Meeting (N/MEMS S&T), San Francisco, CA.
[96]  7/21/10   • PR: DARPA NEMS PI Meeting, San Francisco, CA.
[97]  6/25/10   • PR: DARPA N/MEMS S&T Ph. 2 KO Meeting, Newport Beach, CA.
[98]  6/15/10 – 6/16/10   • PR: DARPA ORCHID Kick-Off Meeting, Santa Barbara, CA.
[99]  6/1/10 – 6/4/10   • PN: IEEE Frequency Control Symposium, Newport Beach, CA.
[100]  5/20/10   • PR: MEPTEC 8th Annual MEMS Symposium, San Jose, CA.
[101]  3/10/10   • PR: BSAC Thrust Session, Berkeley, CA.
[102]  2/4/10 – 2/5/10   • PR: DARPA NEMS PI Meeting, San Diego, CA.
[103]  2/2/10 – 2/3/10   • PR: DARPA Deep Intg. of Timing and IMUs Wkshp, Park City, UT.
[104]  10/18/09 – 10/19/09   • PR: BSAC Japan MEMS Symposium, Tokyo, Japan.
[105]  10/27/09 – 10/28/09   • PR: DARPA MTO Brainstorming Meeting, Minneapolis, MN.
[106]  7/10/09   • PR: DARPA MEMS PI Meeting (NEMS), Sun River, Oregon.
[107]  7/9/09   • PR: DARPA MEMS PI Meeting (CSSA), Sun River, Oregon.
[108]  5/29/09   • PR: DARPA CSSA Kick-Off Meeting, San Francisco, CA.
[109]  1/13/09   • PR: DARPA RF MEMS Integration Workshop, Napa, CA.
[110]  12/4/08 – 12/5/08   • PR: DARPA NEMS PI Meeting, Point Clear, AL.
[111]  11/19/08   PR: RF MEMS for Defense Applications Workshop, San Diego, CA.
[112]  9/22/08   PN: 2008 IEEE Custom Integrated Circuits Conference, San Jose, CA.
[113]  9/1/08   • PR: BSAC Thrust Session, Berkeley, California.
[114]  7/23/08 – 7/25/08   • PR: DARPA MEMS PI Meeting, Vail, Colorado.
[115]  5/30/08   • PR: BSAC European Symposium, Munich, Germany.
[116]  4/12/08   • PR: Cal Day 2008, Berkeley, California.
[117]  3/12/08   • PR: BSAC Thrust Session, Berkeley, California.
[118]  2/28/08 – 2/29/08   • PR: MITRE MEMS for Defense & Security Apps., McLean, Virginia.
[119]  12/13/07 – 12/14/07   • PR: DARPA Wkshop on Nonlinear Dynamics in NEMS, San Fran., CA.
[120]  12/6/07 – 12/7/07   • PR: DARPA Wkshop on N/MEMS Design Automation, San Diego, CA.
[121]  12/4/07 – 12/5/07   • PR: BSAC Japan MEMS Symposium, Tokyo, Japan.
[122]  6/15/07   • PR: CNT NEMS Workshop, Lausanne, Switzerland.
[123]  5/3/07   • PR: Cadence Seminar, Berkeley, California.
[124]  3/28/07   • PR: CITRIS (TSMC), Taipei, Taiwan.
[125]  3/28/07   • PR: CITRIS (Mediatek), Taipei, Taiwan.
[126]  3/27/07   • PR: CITRIS (Nat. Taiwan Univ.), Taipei, Taiwan.
[127]  3/8/07   • PR: BSAC Industrial Advisory Board Meeting, Berkeley, California.
[128]  3/7/07   • PR: BSAC Thrust Session, Berkeley, California.
[129]  2/21/07 – 2/22/07   • PR: DARPA, Chip-Scale Avionics Workshop, Orlando, Florida.
[130]  2/15/07   • PR: BEARS'07, Berkeley, California.
[131]  1/8/07 – 1/9/07   • PR: BWRC Retreat, Monterey. California.
[132]  12/6/06   • PR: Sharp, Nara, Japan
[133]  12/1/06   • PR: GSRC Quarterly Workshop, Berkeley, California
[134]  11/9/06 – 11/10/06   • PR: Nortel Wireless Forum, Ottawa, Canada.
[135]  11/5/06   • PR: IEEE Int. Conf. on Computer-Aided Design, San Jose, California.
[136]  10/2/06 – 10/6/06   • P/P: IEEE Int. Ultrasonics Symposium, Vancouver, Canada.
[137]  5/9/06 – 5/12/06   • PR: Honeywell Technology Symposium, Scottsdale, Arizona.
[138]  1/30/06   • PR: Electrical Engineering Seminar, Univ. of California, Berkeley
[139]  10/21/05   • PR: Electrical Engineering Seminar, Univ. of California, Los Angeles
[140]  10/18/05   • PR: Solid-State Device Seminar, University of California, Berkeley
[141]  9/19/05   • PR: BSAC Seminar, University of California, Berkeley

## CURRICULUM VITAE (Extended)

[142] 6/1305 - 6/17/05 • <u>P/P</u>: 2005 Design Automation Conference
[143] 6/13/05 • <u>P/P</u>: 2005 Wkshp on Advanced Technologies for Next Generation RFIC's
[144] 6/6/05 - 6/9/05 • <u>P/P</u>: Int. Conf. on Solid-State Sensors and Actuators (Transducers'05)
[145] 5/16/05 - 5/19/05 • <u>P/P</u>: 2005 Int. Conf. on Diamond and Related Materials
[146] 2/28/05 - 3/1/05 • <u>PR</u>: Defense Science Board Power Meeting
[147] 2/10/05 • <u>PR</u>: 2005 NAVWAR Conference
[148] 2/8/05 • <u>PN</u>: Panel at the 2005 IEEE Int. Solid-State Circuits Conf.
[149] 2/7/05 - 2/10/05 • <u>P/P</u>: 2005 IEEE Int. Solid-State Circuits Conf.
[150] 1/30/05 • <u>PN</u>: 2004 MEMS Education Workshop
[151] 10/4/04 - 10/6/04 • <u>P/P</u>: 2004 IEEE Custom Integrated Circuits Conf.
[152] 9/29/04 - 9/30/04 • <u>PN</u>: 2004 MIG Metric Meeting
[153] 9/23/04 • <u>PR</u>: 2004 Motorola Energy Summit
[154] 9/22/04 • <u>PR</u>: RAF Cranwell Lecture
[155] 8/23/04 - 8/26/04 • <u>PN</u>: 2004 UFFC Panel on Future Materials for Frequency Control
[156] 6/07/04 • <u>PR</u>: 2004 MTT MEMS & Micromachined Filter Technology Workshop
[157] 4/20/04 • <u>PR</u>: GPS IRT Meeting
[158] 3/29/04 - 3/31/04 • <u>P/P</u>: 2004 Military Fuel Cell Conf.
[159] 3/8/04 - 3/12/04 • <u>P/P</u>: DARPA Tech 2004
[160] 10/1/03 • <u>PR</u>: Connectionless Networking Kick-Off Mtg.
[161] 10/27/03 - 10/29/03 • <u>PR</u>: Cognitive Arthropods Systems Workshop
[162] 10/20/03 - 10/21/03 • <u>P/P</u>: 2003 Military Fuel Cell Conf.
[163] 9/18/03 - 9/19/03 • <u>PN</u>: 2003 METRIC Conf.
[164] 2/10/03 - 2/13/03 • <u>PN</u>: 2003 IEEE ISSCC
[165] 1/21/03 • <u>PR</u>: Working Group A Meeting
[166] 12/2/02 - 12/6//02 • <u>P/P</u>: Materials Research Society Fall Meeting
[167] 9/19/02 - 9//20/02 • <u>PR</u>: METRIC Conf.
[168] 8/26/02 - 8//29/02 • <u>PR</u>: DARPA MEMS Improvement Program PI Meeting
[169] 7/30/02 - 8/2/02 • <u>P/P</u>: DARPA Tech 2002
[170] 5/20/02 - 5/21/02 • <u>PN</u>: NanoBusiness Spring Event
[171] 5/12/02 - 5/17/02 • <u>PR</u>: Nano/Molecular Mechanics School and Conference
[172] 4/22/02 • <u>PR</u>: DARPA MicroCryogenic Cooler Workshop
[173] 3/21/02 - 3/22/02 • <u>PR</u>: Sandia National Laboratories
[174] 3/6/02 • <u>PR</u>: Harvard University
[175] 3/5/02 • <u>PR</u>: Massachusetts Institute of Technology (MIT)
[176] 9/26/01 - 9/28/01 • <u>P/P</u>: 2001 Int. Conf. on Solid-State Devices and Materials (SSDM'01)
[177] 9/18/01 - 9/21/01 • <u>PN</u>: Small Tech 2001 Conference
[178] 9/12/01 - 9/14/01 • <u>P/P</u>: 2001 Topical Mtg. on Silicon Monolithic IC's in RF Systems
[179] 8/29/01 - 8/31/01 • <u>PR</u>: Summer 2001 DARPA/MEMS PI Meeting
[180] 5/3/01 - 5/4/01 • <u>PR</u>: 2001 Advisory Group on Electron Devices Meeting (AGED'01)
[181] 3/22/01 - 3/23/01 • <u>PR</u>: DARPA/MTO Workshop on Chip-Scale Atomic Clocks
[182] 2/16/01 • <u>PN</u>: 2001 Microsystems Symposium
[183] 9/25/00 - 9/26/00 • <u>P/P</u>: 2000 Bipolar/BiCMOS Circuits and Technology Meeting (BCTM)
[184] 8/23/00 - 8/25/00 • <u>PR</u>: Summer 2000 DARPA MEMS PI Meeting
[185] 7/17/00 - 7/18/00 • <u>P/P</u>: 2000 IEEE European MIDAS Workshop
[186] 6/16/00 • <u>P/P</u>: Workshop on Microwave and Photonic Applications of MEMS at the 2000 IEEE MTT-S International Microwave Symposium
[187] 6/5/00 • <u>PN</u>: 2000 37th Design Automation Conference (DAC)
[188] 4/25/00 - 4/28/00 • <u>P/P</u>: 2000 Int. Conference on High Density Interconnect and Systems Packaging
[189] 3/14/00 • <u>PR</u>: Solid-State Sciences Seminar Series, California Inst. of Technology
[190] 3/13/00 • <u>PR</u>: BSAC Seminar, University of California, Berkeley

## CURRICULUM VITAE (Extended)

| | | |
|---|---|---|
| [191] | 12/1/99 - 12/2/99 | • <u>PR</u>: NSF/ARO/DARPA/NRL Workshop on RF Micromachining and MEMS Technology for Wireless Communications Systems |
| [192] | 8/99 | • <u>PA</u>: IEEE Trans. on Microwave Theory Tech.(invited journal paper) |
| [193] | 6/18/99 | • <u>P/P</u>: Workshop on Microelectromechanical Devices for RF Systems at the 1999 IEEE MTT-S International Microwave Symposium |
| [194] | 3/1/99 - 3/5/99 | • <u>P/P</u>: 1999 SPIE Symposium on Smart Structures and Materials |
| [195] | 2/22/99 - 2/23/99 | • <u>PR</u>: DARPA Workshop on MEMS for Mechanical Computation and Information Processing |
| [196] | 2/16/99 | • <u>PN</u>: 1999 International Solid-State Circuits Conference (ISSCC) |
| [197] | 2/14/99 | • <u>P/P</u>: 1999 IEEE Solid-State Circuits Technology Workshop on RF Passive Components |
| [198] | 1/13/99 | • <u>PR</u>: DoD-Wide MEMS Meeting |
| [199] | 1/12/99 | • <u>PR</u>: Baltimore IEEE MTT Local Chapter Meeting |
| [200] | 11/3/98 | • <u>PR</u>: Air Force Research Laboratory (AFRL) |
| [201] | 9/29/98 | • <u>PR</u>: Southeast Michigan SPIE Local Chapter Meeting |
| [202] | 8/98 | • <u>PA</u>: *Proc. IEEE* (invited journal paper) |
| [203] | 5/19/98 - 5/21/98 | • <u>P/P</u>: 1998 Sensors Expo |
| [204] | 6/7/98 - 6/12/98 | • <u>PN</u>: 1998 IEEE MTT-S International Microwave Symposium (IMS) |
| [205] | 4/21/98 - 4/22/98 | • <u>PR</u>: Micro-Nanotechnology for Micro-Nanosatellites Workshop |
| [206] | 3/21/98 - 3/28/98 | • <u>P/P</u>: 1998 IEEE Aerospace Conference |
| [207] | 2/24/98 - 2/25/98 | • <u>PR</u>: MCC Heterogeneous Component Integration Executive Workshop |
| [208] | 1/15/98 - 1/16/98 | • <u>PR</u>: DARPA/MEMS PI Meeting |
| [209] | 1/14/98 | • <u>PR</u>: DoD-Wide MEMS Meeting |
| [210] | 10/28/97 | • <u>PR</u>: Cornell University |
| [211] | 5/27/97 - 5/29/97 | • <u>PR</u>: DARPA Composite CAD Semi-Annual PI Meeting |
| [212] | 6/9/97 - 6/12/97 | • <u>P/P</u>: 1997 IEEE International Symposium on Circuits and Systems |
| [213] | 4/24/97 | • <u>PR</u>: Case Western Reserve University |
| [214] | 12/5/95 | • <u>PR</u>: Meeting of the IEEE-Southeastern Michigan Section of the Aerospace and Electronics Systems and Communications Chapters |
| [215] | 11/9/95 | • <u>P/P</u>: 1995 IEEE Ultrasonics Symposium, Seattle, Washington. |
| [216] | 10/30/95 - 11/3/95 | • <u>PN</u>: 1995 Int. Conference on Integrated Micro-Nanotechnology for Space Applications |

---

## PUBLICATIONS

***Total Number of Publications:*** 205

***Publications Winning Best Paper Awards:*** 13 (student names underlined)

[1] <u>Q. Xie</u>, <u>S. Afshar</u>, <u>A. Ozgurluk</u>, and C. T.-C. Nguyen, "199-MHz polysilicon micromechanical disk array-composite oscillator," *Proceedings*, IEEE Joint Conf. of the IEEE Int. Frequency Control Symp. & IEEE Int. Symp. on Applications of Ferroelectrics, Virtual Conference, July 19-23, 2020. *(best paper award winner)*

[2] <u>R. Liu</u>, <u>J. N. Nilchi</u>, and C. T.-C. Nguyen, "RF-powered micromechanical clock generator," *Proceedings*, IEEE Int. Frequency Control Symp., New Orleans, Louisiana, May 9-12, 2016, pp. 73-78. *(best paper award winner)*

[3] <u>T. L. Naing</u>, T. O. Rocheleau, E. Alon, and C. T.-C. Nguyen, "A 78-μW GSM phase noise-compliant Pierce oscillator referenced to a 61-MHz wine-glass disk resonator," *Proceedings*, IEEE Int. Ultrason., Ferroelect., Freq. Contr. Joint Symp., Prague, Czech Republic, July 21-25, 2013, pp. 209-212. *(best paper award winner)*

[4] <u>Y. Lin</u>, <u>R. Liu</u>, <u>W.-C. Li</u>, <u>M. Akgul</u>, and C. T.-C. Nguyen, "A micromechanical resonant charge pump," *Proceedings* of the 17th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'13), Barcelona, Spain, June 16-20, 2013, pp. 1727-1730. *(best paper award winner)*

[5] T. O. Rocheleau, <u>A. J. Grine</u>, <u>K.E. Grutter</u>, <u>R. A. Schneider</u>, N. Quack, M. C. Wu, and C. T.-C. Nguyen, "Enhancement of mechanical $Q$ for low phase noise optomechanical oscillators," *Tech. Digest*, 2012 IEEE

# CURRICULUM VITAE (Extended)

Int. Micro Electro Mechanical Systems Conference, Taipei, Taiwan, Jan. 20-24, 2013, pp. 118-121. **(best paper award winner)**

[6] C. T.-C. Nguyen, "MEMS technology for timing and frequency control," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 54, no. 2, pp. 251-270, Feb. 2007 (20 pages). **(2007 IEEE Transactions on Ultrasonics, Ferroelectrics, and Frequency Control Best Paper Award Winner)**

[7] Y.-W. Lin, S.-S. Li, Z. Ren, and C. T.-C. Nguyen, "Vibrating micromechanical resonators with solid dielectric capacitive-transducer 'gaps'," *Proceedings*, Joint IEEE Int. Frequency Control/Precision Time & Time Interval Symposium, Vancouver, Canada, Aug. 29-31, 2005, digest to be released soon. **(best paper award winner)**

[8] C. T.-C. Nguyen and J. Kitching, "Towards chip-scale atomic clocks," *Digest of Technical Papers*, 2005 IEEE Int. Solid-State Circuits Conference, San Francisco, California, Feb. 6-9, 2005, pp. 84-85. **(best paper award winner)**

[9] C. T.-C. Nguyen, "Vibrating RF MEMS for next generation wireless applications," *Proceedings*, 2004 IEEE Custom Integrated Circuits Conf., Orlando, Florida, Oct. 3-6, 2004, pp. 257-264. **(best paper award winner)**

[10] S. Lee and C. T.-C. Nguyen, "Mechanically-coupled micromechanical arrays for improved phase noise," *Proceedings*, IEEE Int. Ultrasonics, Ferroelectrics, and Frequency Control 50th Anniv. Joint Conf., Montreal, Canada, Aug. 24-27, 2004, pp. 280-286. **(best paper award winner)**

[11] Y. Xie, S.-S. Li, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "UHF Micromechanical Extensional Wine-Glass Mode Ring Resonators" *Technical Digest*, 2003 IEEE International Electron Devices Meeting, Washington, DC, Dec. 8-10, 2003, pp. 953-956. **(best paper award winner)**

[12] J. Wang, Z. Ren, and C. T.-C. Nguyen, "1.14-GHz self-aligned vibrating micromechanical disk resonator," *Tech. Digest*, 2003 Radio Frequency Integrated Circuits Symposium, Philadelphia, Pennsylvania, June 8-10, 2003, pp. 335-338. **(best paper award winner)**

[13] A.-C. Wong, H. Ding, and C. T.-C. Nguyen, "Micromechanical mixer+filters," *Technical Digest*, IEEE International Electron Devices Meeting, San Francisco, California, Dec. 6-9, 1998, pp. 471-474. **(best paper award winner)**

***Publications:*** (most on-line at http://www.eecs.berkeley.edu/~ctnguyen; student names underlined)

[1] Q. Xie, S. Afshar, A. Ozgurluk, and C. T.-C. Nguyen, "Performance enhancement and restoration of micromechanical resonators via UV-ozone treatment," *Tech. Digest*, 2021 IEEE Int. Micro Electromechanical Systems Conference, Virtual Conference, Jan. 25-29, 2021, pp. 945-948, DOI: 10.1109/MEMS51782.2021.9375184.

[2] Q. Xie, S. Afshar, A. Ozgurluk, and C. T.-C. Nguyen, "199-MHz polysilicon micromechanical disk array-composite oscillator," *Proceedings*, IEEE Joint Conf. of the IEEE Int. Frequency Contr. Symp. & IEEE Int. Symp. on Applications of Ferroelectrics, Virtual Conference, July 19-23, 2020, DOI: 10.1109/IFCS-ISAF41089.2020.9234862. **(best paper award winner)**

[3] A. Ozgurluk and C. T.-C. Nguyen, "Precision residual strain sensor employing gap-dependent frequency shift," *Proceedings*, IEEE Joint Conf. of the IEEE Int. Frequency Contr. Symp. & IEEE Int. Symp. on Applications of Ferroelectrics, Virtual Conference, July 19-23, 2020, DOI: 10.1109/IFCS-ISAF41089.2020.9234911.

[4] T. L. Naing, T. O. Rocheleau, E. Alon, and C. T.-C. Nguyen, "Low-power MEMS-based Pierce oscillator using a 61-MHz capacitive-gap disk resonator," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 67, no. 7, pp. 1377-1391, July 2020, online in Jan. 2020, DOI: 10.1109/TUFFC.2020.2969530. (15 pages)

[5] A. Ozgurluk, K. A. Peleaux, C. T.-C. Nguyen, "Single-digit-nm capacitive-gap transduced micromechanical disk resonators," *Tech. Digest*, 2020 IEEE Int. Micro Electromechanical Systems Conference, Vancouver, Canada, Jan. 18-22, 2020, pp. 222-225.

[6] A. Ozgurluk and C. T.-C. Nguyen, "On-chip precision residual strain diagnostic based on gap-dependent electrical stiffness," *Proceedings* of the 20th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'19), Berlin Germany, June 23-27, 2019, pp. 2029-2032, DOI: 10.1109/TRANSDUCERS.2019.8808299.

[7] K. A. Peleaux, T.-P. K. Nguyen, A. Anton, and C. T.-C. Nguyen, "A parametric MEMS oscillator-based super-regenerative receiver front-end," *Proceedings*, IEEE Int. Frequency Control Symp., Orlando, Florida, April 14-18, 2019, DOI: 10.1109/FCS.2019.8856028.

# CURRICULUM VITAE (Extended)

[8]  A. Ozgurluk, K. A. Peleaux, and C. T.-C. Nguyen, "Widely tunable 20-nm-gap ruthenium metal square-plate resonator," *Tech. Digest*, 2019 IEEE Int. Micro Electromechanical Systems Conference, Seoul, Korea, Jan. 27-31, 2019, pp. 153-156, DOI: 10.1109/MEMSYS.2019.8870623.

[9]  M. Akgul, A. Ozgurluk, and C. T.-C. Nguyen, "RF channel-select micromechanical disk filters—part II: demonstration," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 66, no. 1, pp.218-235, Jan. 2019, DOI: 10.1109/TUFFC.2018.2883296. (18 pages)

[10]  A. Ozgurluk, M. Akgul, and C. T.-C. Nguyen, "RF channel-select micromechanical disk filters—part I: design," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 66, no. 1, pp.192-217, Jan. 2019, DOI: 10.1109/TUFFC.2018.2881727. (26 pages)

[11]  A. Ozgurluk, Y. Li, and C. T.-C. Nguyen, "High-$C_x/C_o$ hollow disk resonators," *Proceedings*, IEEE Int. Frequency Control Symp., Olympic Valley, California, May 21-24, 2018, pp. 1-3, DOI: 10.1109/FCS.2018.8597505.

[12]  C. T.-C. Nguyen, "All-mechanical micro-scale radios (invited keynote)," *Proceedings*, 13th IEEE Int. Conf. on Nano/Micro Engineered and Molecular Syst. (NEMS'18), Singapore, April 22-26, 2018.

[13]  A. Ozgurluk, R. Liu, and C. T.-C. Nguyen, "$Q$-boosting of metal MEMS resonators via localized anneal-induced tensile stress," *Proceedings*, IEEE Int. Frequency Control Symp., Besancon, France, July 10-13, 2017, pp. 10-15, DOI: 10.1109/FCS.2017.8088786.

[14]  C. T.-C. Nguyen, R. Liu, and J. N. Nilchi, "An ultra-low power mechanical trigger detector (invited)," *Proceedings*, 2017 Gov. Microcircuit Applications & Critical Technology Conf., Reno, Nevada, March 20-23, 2017, pp. 104-107.

[15]  J. N. Nilchi, R. Liu, and C. T.-C. Nguyen, "High $C_x/C_o$ 13nm-capacitive-gap transduced disk resonator," *Tech. Digest*, 2017 IEEE Int. Micro Electro Mechanical Systems Conference, Las Vegas, Nevada, Jan. 22-26, 2017, pp. 924-927, DOI: 10.1109/MEMSYS.2017.7863560.

[16]  R. Liu, J. N. Nilchi, and C. T.-C. Nguyen, "CW-powered squegging micromechanical clock generator," *Tech. Digest*, 2017 IEEE Int. Micro Electro Mechanical Systems Conference, Las Vegas, Nevada, Jan. 22-26, 2017, pp. 905-908, DOI: 10.1109/MEMSYS.2017.7863555.

[17]  R. Liu, J. N. Nilchi, and C. T.-C. Nguyen, "RF-powered micromechanical clock generator," *Proceedings*, IEEE Int. Frequency Control Symp., New Orleans, Louisiana, May 9-12, 2016, pp. 73-78. **(best paper award winner)**

[18]  T. L. Naing, T. O. Rocheleau, Z. Ren, S.-S. Li, and C. T.-C. Nguyen, "High-$Q$ spoke-supported ring resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 25, no. 1, pp. 11-29, Feb. 2016. (19 pages)

[19]  R. Liu, J. N. Nilchi, W.-C. Li, and C. T.-C. Nguyen, "Soft-impacting micromechanical resoswitch zero-quiescent power AM receiver," *Tech. Digest*, 2016 IEEE Int. Micro Electro Mechanical Systems Conference, Shanghai, China, Jan. 24-28, 2016, pp. 51-54.

[20]  W.-C. Li, Z. Ren, and C. T.-C. Nguyen, "A micromechanical high-$Q$ elliptic disk displacement amplifier," *Tech. Digest*, 2016 IEEE Int. Micro Electro Mechanical Systems Conference, Shanghai, China, Jan. 24-28, 2016, pp. 663-666.

[21]  R. Liu, J. N. Nilchi, Y. Lin, T. L. Naing, and C. T.-C. Nguyen, "Zero quiescent power VLF mechanical communication receiver," *Proceedings* of the 18th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'15), Anchorage, Alaska, June 21-25, 2015, pp. 129-132.

[22]  J. N. Nilchi, R. Liu, and C. T.-C. Nguyen, "7[th] order sharp-roll-off bridged micromechanical filter," *Proceedings* of the 18th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'15), Anchorage, Alaska, June 21-25, 2015, pp. 137-140.

[23]  R. A. Schneider, T. L. Naing, T. O. Rocheleau, and C. T.-C. Nguyen, "Gap reduction based frequency tuning for AlN capacitive-piezoelectric resonators," *Proceedings*, IEEE Int. Frequency Control Symp., Denver, Colorado, April 12-16, 2015, pp. 700-705, DOI: 10.1109/FCS.2015.7138938.

[24]  J. N. Nilchi, R. Liu, S. Li, M. Akgul, T. O. Rocheleau, and C. T.-C. Nguyen, "Third-order intermodulation distortion in capacitive-gap transduced micromechanical filters," *Proceedings*, IEEE Int. Frequency Control Symp., Denver, Colorado, April 12-16, 2015, pp. 5-10, DOI: 10.1109/FCS.2015.7138782.

[25]  T. Beyazoglu, T. O. Rocheleau, A. J. Grine, K. E. Grutter, M. C. Wu, and C. T.-C. Nguyen, "A su-

**CURRICULUM VITAE (Extended)**

per-regenerative optical receiver based on an optomechanical oscillator," *Tech. Digest*, 2015 IEEE Int. Micro Electro Mechanical Systems Conference, Estoril, Portugal, Jan. 18-22, 2015, pp. 976-979.

[26]  T. L. Naing, T. O. Rocheleau, and C. T.-C. Nguyen, "Simultaneous multi-frequency switchable oscillator and FSK modulator based on a capacitive-gap MEMS disk array," *Tech. Digest*, 2015 IEEE Int. Micro Electro Mechanical Systems Conference, Estoril, Portugal, Jan. 18-22, 2015, pp. 1024-1027.

[27]  L.-W. Hung and C. T.-C. Nguyen, "Capacitive-piezoelectric transducers for high-$Q$ micromechanical AlN resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 24, no. 2, pp. 458-473, April 2015. (16 pages).

[28]  T. O. Rocheleau, T. L. Naing, J. N. Nilchi, and C. T.-C. Nguyen, "A MEMS-based tunable RF channel-selecting super-regenerative transceiver for wireless sensor nodes," *Tech. Digest*, 2014 Hilton Head MEMS Conf., Hilton Head, SC, June 8-12, 2014, pp. 83-86.

[29]  M. Akgul, L. Wu, Z. Ren, and C. T.-C. Nguyen, "A negative-capacitance equivalent circuit model for parallel-plate capacitive-gap-transduced micromechanical resonators," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vo. 61, no. 5, pp.849-869, May 2014 (21 pages).

[30]  M Akgul and C. T.-C. Nguyen, "A passband-corrected high rejection channel-select micromechanical disk filter," *Proceedings*, IEEE Int. Frequency Control Symp., Taipei, Taiwan, May 19-22, 2014, pp. 601-606.

[31]  T. L. Naing, J. N. Nilchi, R. Liu, T. O. Rocheleau, and C. T.-C. Nguyen, "Active $Q$-control for improved insertion loss micromechanical filters," *Proceedings*, IEEE Int. Frequency Control Symp., Taipei, Taiwan, May 19-22, 2014, pp. 612-617.

[32]  H. G. Barrow and C. T.-C. Nguyen, "A protocol for automated passband tuning of high-order microelectromechanical filters," *Proceedings*, IEEE Int. Frequency Control Symp., Taipei, Taiwan, May 19-22, 2014, pp. 607-611.

[33]  T. O. Rocheleau, R. Liu, J. N. Nilchi, T. L. Naing, and C. T.-C. Nguyen, "A micromechanical parametric oscillator for frequency division and phase noise reduction," *Tech. Digest*, 2014 IEEE Int. Micro Electro Mechanical Systems Conference, San Francisco, California, Jan. 26-30, 2014, pp. 210-213.

[34]  T. Beyazoglu, T. O. Rocheleau, K. E. Grutter, A. J. Grine, M. C. Wu, and C. T.-C. Nguyen, "A multi-material $Q$-boosted low phase noise optomechanical oscillator," *Tech. Digest*, 2014 IEEE Int. Micro Electro Mechanical Systems Conference, San Francisco, California, Jan. 26-30, 2014, pp. 1193-1196.

[35]  Y. Lin, R. Liu, W.-C. Li, and C. T.-C. Nguyen, "Polycide contact interface to suppress squegging in micromechanical resoswitches," *Tech. Digest*, 2014 IEEE Int. Micro Electro Mechanical Systems Conference, San Francisco, California, Jan. 26-30, 2014, pp. 1273-1276.

[36]  R. A. Schneider and C. T.-C. Nguyen, "On/off switchable high-$Q$ capacitive-piezoelectric AlN resonators," *Tech. Digest*, 2014 IEEE Int. Micro Electro Mechanical Systems Conference, San Francisco, California, Jan. 26-30, 2014, pp. 1265-1268.

[37]  L. Wu, M. Akgul, Z. Ren, and C. T.-C. Nguyen, "Micromechanical disk array-composite for enhanced frequency stability against bias voltage fluctuations," *Proceedings*, IEEE Int. Ultrason., Ferroelect., Freq. Contr. Joint Symp., Prague, Czech Republic, July 21-25, 2013, pp. 547-550.

[38]  T. L. Naing, T. O. Rocheleau, E. Alon, and C. T.-C. Nguyen, "A 78-μW GSM phase noise-compliant Pierce oscillator referenced to a 61-MHz wine-glass disk resonator," *Proceedings*, IEEE Int. Ultrason., Ferroelect., Freq. Contr. Joint Symp., Prague, Czech Republic, July 21-25, 2013, pp. 562-565. ***(best paper award winner)***

[39]  T. O. Rocheleau, T. L. Naing, and C. T.-C. Nguyen, "Long-term stability of a MEMS disk oscillator," *Proceedings*, IEEE Int. Ultrason., Ferroelect., Freq. Contr. Joint Symp., Prague, Czech Republic, July 21-25, 2013, pp. 209-212.

[40]  Y. Lin, R. Liu, W.-C. Li, M. Akgul, and C. T.-C. Nguyen, "A micromechanical resonant charge pump," *Proceedings* of the 17th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'13), Barcelona, Spain, June 16-20, 2013, pp. 1727-1730. ***(best paper award winner)***

[41]  W.-C. Li, Y. Lin, and C. T.-C. Nguyen, "Metal Micromechanical filter-power amplifier utilizing a displacement-amplifying resonant switch," *Proceedings* of the 17th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'13), Barcelona, Spain, June 16-20, 2013, pp. 2469-2472.

[42]  C. T.-C. Nguyen, "RF MEMS for channelizing low-power radios," *Proceedings* of the 17th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'13), Barcelona, Spain, June 16-20, 2013, pp.

**CURRICULUM VITAE (Extended)**

2455-2460.

[43] A. Grine, K. E. Grutter, T. Rocheleau, N. Quack, T. Beyazoglu, Z. Zheng, I. Jutla, M. C. Wu, C. T.-C. Nguyen, "Phase noise spectrum and carrier power modeling of high performance optomechanical resonators," *Proceedings*, 2013 Conf. on Lasers and Electro Optics, (CLEO): QELS Fundamental Science, San Jose, California, June 9, 2013, pp. QTh4E.2.

[44] C. T.-C. Nguyen, "MEMS-based RF channel-selection for true software-defined cognitive radio and low power sensor communications," *IEEE Commun. Mag.,* pp. 110-119, April 2013.

[45] T. O. Rocheleau, A. J. Grine, K.E. Grutter, R. A. Schneider, N. Quack, M. C. Wu, and C. T.-C. Nguyen, "Enhancement of mechanical $Q$ for low phase noise optomechanical oscillators," *Tech. Digest*, 2012 IEEE Int. Micro Electro Mechanical Systems Conference, Taipei, Taiwan, Jan. 20-24, 2013, pp. 118-121. ***(best paper award winner)***

[46] T.-T. Yen, A. P. Pisano, and C. T.-C. Nguyen, "High-$Q$ capacitive-piezoelectric AlN lamb wave resonators," *Tech. Digest*, 2012 IEEE Int. Micro Electro Mechanical Systems Conference, Taipei, Taiwan, Jan. 20-24, 2013, pp. 114-117.

[47] A. J. Grine, N. Quack, K. Grutter, T. O. Rocheleau, J. Huang, C. T.-C. Nguyen, and M. C. Wu, "Wafer-scale silica optomechanical oscillators with low threshold power and low phase noise for monolithic optical frequency references," 2012 Int. Conf. on Optical MEMS and Nanophotonics (MOEMS'12), Aug. 6-9, 2012, pp. 51-52.

[48] T. L. Naing, T. O. Rocheleau, Z. Ren, E. Alon, and C. T.-C. Nguyen, "Vibration-Insensitive 61-MHz Micromechanical Disk Reference Oscillator," *Proceedings*, 2012 IEEE Int. Frequency Control Symp., Baltimore Maryland, May 21-24, 2012, pp. 276-281.

[49] H. G. Barrow, T. Naing, R. A. Schneider, T. O. Rocheleau, V. Yeh, Z. Ren, and C. T.-C. Nguyen, "A real-time 32.768-kHz clock oscillator using a 0.0154-mm$^2$ micromechanical resonator frequency-setting element," *Proceedings*, IEEE Int. Frequency Control Symp., Baltimore, Maryland, May 21-24, 2012, pp. 282-287.

[50] T. L. Naing, T. Beyazoglu, L. Wu, M. Akgul, Z. Ren, T. O. Rocheleau, and C. T.-C. Nguyen, "2.97-GHz CVD diamond ring resonator with $Q$ >40,000," *Proceedings*, 2012 IEEE Int. Frequency Control Symp., Baltimore Maryland, May 21-24, 2012, pp. 570-575.

[51] K. E. Grutter, A. Grine, M.-K. Kim, N. Quack, T. Rocheleau, C. T.-C. Nguyen, M. C. Wu, "A platform for on-chip silica optomechanical oscillators with integrated waveguides," *Proceedings*, 2012 Conf. on Lasers and Electro-Optics (CLEO 2012), May 6-11, 2012, San Jose, California, pp. CW1M.5.pdf.

[52] T. O. Rocheleau, T. L. Naing, Z. Ren, and C. T.-C. Nguyen, "Acoustic whispering gallery mode resonator with $Q$ >109,000 at 515 MHz," *Tech. Digest*, 2012 IEEE Int. Micro Electro Mechanical Systems Conference, Paris, France, Jan. 29 – Feb. 2, 2012, pp. 672-675.

[53] Y. Lin, T. Riekkinen, W.-C. Li, E. Alon, and C. T.-C. Nguyen, "Metal micromechanical resonant switch for On-Chip Power Applications," *Tech. Digest*, IEEE Int. Electron Devices Mtg., Washington, DC, Dec. 5-7, 2011, pp. 497-500.

[54] L. Wu, M. Akgul, Z. Ren, Y. Lin, W.-C. Li, T. Rocheleau, and C. T.-C. Nguyen, "Hollow stems for higher UHF micromechanical disk resonator quality factor," *Proceedings*, 2011 IEEE Int. Ultrasonics Symp., Orlando, FL, Oct. 18-21, 2011, pp. 1964-1967.

[55] M. Akgul, R.Schneider, Z. Ren, G. Chandler, V. Yeh, and C. T.-C. Nguyen, "Hot filament CVD conductive microcrystalline diamond for high $Q$, high acoustic velocity micromechanical resonators," *Proceedings*, 2011 IEEE Int. Frequency Control Symp., San Francisco, California, May 1-5, 2011, pp. 753-758.

[56] M. Akgul, Z. Ren, and C. T.-C. Nguyen, "Voltage-controlled tuning to optimize MEMS resonator array-composite output power," *Proceedings*, 2011 IEEE Int. Frequency Control Symp., San Francisco, California, May 1-5, 2011, pp. 753-758.

[57] L.-W. Hung and C. T.-C. Nguyen, "Capacitive-Piezoelectric AlN Resonators With $Q$>12,000," *Tech. Digest*, 24th IEEE Int. Conf. on Micro Electro Mechanical Systems (MEMS'11), Cancun, Mexico, Jan. 24-28, 2011, pp. 173-176.

[58] W.-C. Li, Y. Jiang, R. A. Schneider, H. G. Barrow, L. Lin, and C. T.-C. Nguyen, "Polysilicon-filled carbon

**CURRICULUM VITAE (Extended)**

nanotube grass structural material for micromechanical resonators," *Tech. Digest*, 24th IEEE Int. Conf. on Micro Electro Mechanical Systems (MEMS'11), Cancun, Mexico, Jan. 24-28, 2011, pp. 477-480.

[59] L.-W. Hung and C. T.-C. Nguyen, "$Q$-boosted AlN array-composite resonator with $Q > 10,000$," *Tech. Digest*, IEEE Int. Electron Devices Mtg., San Francisco, California, Dec. 6-8, 2010, pp. 162-165.

[60] M. Akgul, B. Kim, Z. Ren, and C. T.-C. Nguyen, "Capacitively transduced micromechanical resonators with simultaneous low motional resistance and $Q > 70,000$," *Tech. Digest*, 2008 Solid-State Sensor, Actuator, and Microsystems Workshop, Hilton Head, South Carolina, June 6-10, 2010, pp. 467-470.

[61] L.-W. Hung and C. T.-C. Nguyen, "Capacitive-piezo transducers for higher $Q$ contour-mode AlN resonators at 1.2 GHz," *Tech. Digest*, 2008 Solid-State Sensor, Actuator, and Microsystems Workshop, Hilton Head, South Carolina, June 6-10, 2010, pp. 463-466.

[62] B. Kim, M. Akgul, Y. Lin, W.-C. Li, Z. Ren, and C. T.-C. Nguyen, "Acceleration sensitivity of small-gap capacitive micromechanical resonator oscillators," *Proceedings*, 2010 IEEE Int. Frequency Control Symp., Newport Beach, California, June 1-4, 2010, pp. 273-278.

[63] L.-W. Hung and C. T.-C. Nguyen, "Silicide-Based Release of High Aspect Ratio Microstructures," *Tech. Digest*, 23rd IEEE Int. Conf. on Micro Electro Mechanical Systems (MEMS'10), Hong Kong, China, Jan. 24-28, 2010, pp. 120-123.

[64] C. T.-C. Nguyen, "Radios with micromachined resonators," *IEEE Spectrum*, Nov. 30, 2009, https://spectrum.ieee.org/telecom/wireless/radios-with-micromachined-resonators.

[65] C. T.-C. Nguyen, "Integrated micromechanical RF circuits for software-defined cognitive radio (invited plenary)," *Proceedings*, the 26th Symposium on Sensors, Micromachines & Applied Systems, Tokyo, Japan, Oct. 15-16, 2009, pp. 1-5.

[66] M. Akgul, B. Kim, L.-W. Hung, Y. Lin, W.-C. Li, W.-L. Huang, I. Gurin, A. Borna, and C. T.-C. Nguyen, "Oscillator far-from-carrier phase noise reduction via nano-scale gap tuning of micromechanical resonators," the 15th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'09), Denver, Colorado, June 21-25, 2009, pp. 798-801.

[67] Y. Lin, W.-C. Li, I. Gurin, S.-S. Li, Y.-W. Lin, Z. Ren, B. Kim, and C. T.-C. Nguyen, "Digitally-specified micromechanical displacement amplifiers," the 15th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'09), Denver, Colorado, June 21-25, 2009, pp. 781-784.

[68] W.-C. Li, Y. Lin, B. Kim, Z. Ren, and C. T.-C. Nguyen, "Quality factor enhancement in micromechanical resonators at cryogenic temperatures," the 15th Int. Conf. on Solid-State Sensors, Actuators, & Microsystems (Transducers'09), Denver, Colorado, June 21-25, 2009, pp. 1445-1448.

[69] B. Kim, Y. Lin, W.-L. Huang, M. Akgul, W.-C. Li, Z. Ren, and C. T.-C. Nguyen, "Micromechanical resonant displacement gain stages," *Tech. Digest*, 22nd IEEE Int. Conf. on Micro Electro Mechanical Systems (MEMS'09), Sorrento, Italy, Jan. 25-29, 2009, pp. 19-22.

[70] Y. Lin, W.-C. Li, B. Kim, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "Enhancement of micromechanical resonator manufacturing precision via mechanically-coupled arraying," *Proceedings*, 2009 IEEE Int. Frequency Control Symp., Besancon, France, April 20-24, 2009, pp. 58-63.

[71] Y. Lin, W.-C. Li, Z. Ren, and C. T.-C. Nguyen, "The micromechanical resonant switch ("resoswitch")," *Tech. Digest*, 2008 Solid-State Sensor, Actuator, and Microsystems Workshop, Hilton Head, South Carolina, June 1-5, 2008, pp. 40-43.

[72] L.-W. Hung, Z. A. Jacobson, Z. Ren, A. Javey, and C. T.-C. Nguyen, "Capacitive transducer strengthening via ALD-enabled partial-gap filling," *Tech. Digest*, 2008 Solid-State Sensor, Actuator, and Microsystems Workshop, Hilton Head, South Carolina, June 1-5, 2008, pp. 208-211.

[73] Y. Lin, W.-C. Li, Z. Ren, and C. T.-C. Nguyen, "A resonance dynamical approach to faster, more reliable micromechanical switches," *Proceedings*, 2008 IEEE Int. Frequency Control Symp., Honolulu, Hawaii, May 19-21, 2008, pp. 640-645.

[74] Y. Xie, S.-S. Li, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "1.52-GHz micromechanical extensional wine-glass mode ring resonators," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 55, no. 4, pp. 890-907, April 2008 (18 pages).

[75] C. T.-C. Nguyen, "Integrated micromechanical radio front-ends (invited plenary)," *Proceedings of Tech.*

# CURRICULUM VITAE (Extended)

*Program*, 2008 IEEE Int. Symp. On VLSI Technology, Systems, and Applications (VLSI-TSA'08), Hsinchu, Taiwan, April 21-23, 2008, pp. 3-4.

[76]  W.-L. Huang, Z. Ren, Y.-W. Lin, H.-Y. Chen, J. Lahann, and C. T.-C. Nguyen, "Fully monolithic CMOS nickel micromechanical resonator oscillator," *Tech. Digest*, 21st IEEE Int. Conf. on Micro Electro Mechanical Systems (MEMS'08), Tucson, Arizona, Jan. 13-17, 2008, pp. 10-13.

[77]  S.-S. Li, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "An MSI micromechanical differential disk-array filter," *Dig. of Tech. Papers*, the 14th Int. Conf. on Solid-State Sensors & Actuators (Transducers'07), Lyon, France, June 11-14, 2007, pp. 307-311.

[78]  W.-L. Huang, S.-S. Li, Z. Ren, and C. T.-C. Nguyen, "UHF nickel micromechanical spoke-supported ring resonators," *Dig. of Tech. Papers*, the 14th Int. Conf. on Solid-State Sensors & Actuators (Transducers'07), Lyon, France, June 11-14, 2007, pp. 323-326.

[79]  Y.-W. Lin, L.-W. Hung, S.-S. Li, Z. Ren, and C. T.-C. Nguyen, "Quality factor boosting via mechanical-ly-coupled arraying," *Dig. of Tech. Papers*, the 14th Int. Conf. on Solid-State Sensors & Actuators (Transducers'07), Lyon, France, June 11-14, 2007, pp. 2453-2456.

[80]  Y. Lin, J. Wang, S. Pietrangelo, Z. Ren, and C. T.-C. Nguyen, "Effect of electrode configuration on the frequency and quality factor repeatability of RF micromechanical disk resonators," *Dig. of Tech. Papers*, the 14th Int. Conf. on Solid-State Sensors & Actuators (Transducers'07), Lyon, France, June 11-14, 2007, pp. 2461-2464.

[81]  L.-W. Hung, Y. Xie, Y.-W. Lin, S.-S. Li, Z. Ren, and C. T.-C. Nguyen, "UHF micromechanical compound-(2,4) mode ring resonators with solid-gap transducers," *Proceedings*, 2006 IEEE Int. Frequency Control Symp., Geneva, Switzerland, May 29-June 1, 2007, pp. 1370-1375.

[82]  S.-S. Li, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "A micromechanical parallel-class disk-array filter," *Proceedings*, 2006 IEEE Int. Frequency Control Symp., Geneva, Switzerland, May 29-June 1, 2007, pp. 1356-1361.

[83]  C. T.-C. Nguyen, "MEMS technology for timing and frequency control," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 54, no. 2, pp. 251-270, Feb. 2007 (20 pages). **(2007 IEEE Transactions on Ultrasonics, Ferroelectrics, and Frequency Control Best Paper Award Winner)**

[84]  M. Demirci and C. T.-C. Nguyen, "Mechanically corner-coupled square microresonator array for reduced series motional resistance," *IEEE/ASME J. Microelectromech. Syst.*, vol. 15, no. 6, pp. 1419-1436, Dec. 2006. (18 pages)

[85]  C. T.-C. Nguyen, "Integrated micromechanical circuits fueled by vibrating RF MEMS technology," *Proceedings*, IEEE Int. Ultrasonics Symposium, Oct. 2-6, 2006, pp. 953-962.

[86]  C. T.-C. Nguyen, "Integrated micromechanical circuits for RF front ends (invited)," *Proceedings* of the 36th European Solid-State Device Research Conference, Montreux, Switzerland, Sept. 19-21, 2006, pp. 7-16.

[87]  C. T.-C. Nguyen, "Towards LSI vibrating micromechanical signal processors (invited)," *Proceedings* of the 32nd Int. Conference on Micro- and Nano-Engineering, Barcelona, Spain, Sept. 17-20, 2006, pp. 69-70.

[88]  W.-L. Huang, Z. Ren, and C. T.-C. Nguyen, "Nickel vibrating micromechanical disk resonator with solid dielectric capacitive-transducer gap," *Proceedings*, 2006 IEEE Int. Frequency Control Symp., Miami, Florida, June 5-7, 2006, pp. 839-847.

[89]  C. T.-C. Nguyen, "MEMS technologies and devices for single-chip RF front-ends (invited)," 2005 IMAPS/ACerS Int. Conf. on Ceramic Interconnect and Ceramic Microsystems Technologies (CICMT), *Tech. Dig.*, Denver, Colorado, April 25-26, 2006, CDROM.

[90]  S.-S. Li, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "Disk-array design for suppression of unwanted modes in micromechanical composite-array filters," *Tech. Digest*, 19th IEEE Int. Conf. on Micro Electro Mechanical Systems (MEMS'06), Istanbul, Turkey, Jan. 22-26, 2006, pp. 866-869.

[91]  J. R. Clark, W.-T. Hsu, M. A. Abdelmoneum, and C. T.-C. Nguyen, "High-*Q* UHF micromechanical radial-contour mode disk resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 14, no. 6, pp. 1298-1310, Dec. 2005. (13 pages)

[92]  J. Wang, Y. Xie, and C. T.-C. Nguyen, "Frequency tolerance of RF micromechanical disk resonators in nanocrystalline diamond and polysilicon structural materials," *Technical Digest*, IEEE Int. Electron Devices

## CURRICULUM VITAE (Extended)

Mtg., Washington, DC, Dec. 5-7, 2005, pp. 291-294.

[93] Y.-W. Lin, S.-S. Li, Z. Ren, and C. T.-C. Nguyen, "Low phase noise array-composite micromechanical wine-glass disk oscillator," *Tech. Digest*, IEEE Int. Electron Devices Mtg., Washington, DC, Dec. 5-7, 2005, pp. 287-290.

[94] Y.-W. Lin, S.-S. Li, Z. Ren, and C. T.-C. Nguyen, "Third-order intermodulation distortion in capacitively-driven VHF micromechanical resonators," *Proceedings*, IEEE Int. Ultrasonics Symposium, Sept. 18-21, 2005, pp. 1592-1595.

[95] S.-S. Li, Y.-W. Lin, Y. Xie, Z. Ren, and C. T.-C. Nguyen, "Small percent bandwidth design of a 431-MHz notch-coupled micromechanical hollow-disk ring mixer-filter," *Proceedings*, IEEE Int. Ultrasonics Symposium, Sept. 18-21, 2005, pp. 1295-1298.

[96] S.-S. Li, Y.-W. Lin, Y. Xie, Z. Ren, and C. T.-C. Nguyen, "Charge-biased vibrating micromechanical resonators," *Proceedings*, IEEE Int. Ultrasonics Symposium, Rotterdam, The Netherlands, Sept. 18-21, 2005, pp. 1596-1599.

[97] C. T.-C. Nguyen, "MEMS for frequency control and timing (invited)," *Proceedings*, Joint IEEE Int. Frequency Control/Precision Time & Time Interval Symposium, Vancouver, Canada, Aug. 29-31, 2005, pp. 1-11.

[98] Y.-W. Lin, S.-S. Li, Z. Ren, and C. T.-C. Nguyen, "Vibrating micromechanical resonators with solid dielectric capacitive-transducer 'gaps'," *Proceedings*, Joint IEEE Int. Frequency Control/Precision Time & Time Interval Symposium, Vancouver, Canada, Aug. 29-31, 2005, pp. 128-134. ***(best paper award winner)***

[99] S.-S. Li, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "Self-switching vibrating micromechanical filter bank," *Proceedings*, Joint IEEE Int. Frequency Control/Precision Time & Time Interval Symposium, Vancouver, Canada, Aug. 29-31, 2005, pp. 135-141.

[100] C. T.-C. Nguyen, "RF MEMS in wireless architectures (invited)," *Proceedings*, the 42nd Design Automation Conference, Anaheim, California, June 13-17, 2005, pp. 416-420.

[101] C. T.-C. Nguyen, "Vibrating RF MEMS technology: fuel for an integrated micromechanical circuit revolution? (invited)" *Dig. of Tech. Papers*, the 13th Int. Conf. on Solid-State Sensors & Actuators (Transducers'05), Seoul, Korea, June 5-9, 2005, pp. 243-246.

[102] M. U. Demirci and C. T.-C. Nguyen, "A low impedance VHF micromechanical filter using coupled-array composite resonators," *Dig. of Tech. Papers*, the 13th Int. Conf. on Solid-State Sensors & Actuators (Transducers'05), Seoul, Korea, June 5-9, 2005, pp. 2131-2134.

[103] C. T.-C. Nguyen and J. Kitching, "Towards chip-scale atomic clocks," *Digest of Technical Papers*, 2005 IEEE Int. Solid-State Circuits Conference, San Francisco, California, Feb. 6-9, 2005, pp. 84-85. ***(best paper award winner)***

[104] M. U. Demirci and C. T.-C. Nguyen, "Single-resonator fourth-order micromechanical disk filters," *Proceedings*, 18th IEEE Int. Micro Electro Mechanical Systems Conf., Miami, Florida, Jan. 30 - Feb. 3, 2005, pp. 207-210.

[105] Y. Xie, S.-S. Li, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "Spurious mode suppression in UHF micromechanical extensional wine-glass ring resonators," *Proceedings*, 18th IEEE Int. Micro Electro Mechanical Systems Conf., Miami, Florida, Jan. 30 - Feb. 3, 2005, pp. 219-222.

[106] C. T.-C. Nguyen, "Vibrating RF MEMS overview: applications to wireless communications (invited)," *Proceedings of SPIE: Micromachining and Microfabrication Process Technology*, vol. 5715, Photonics West: MOEMS-MEMS 2005, San Jose, California, Jan. 22-27, 2005, pp. 11-25.

[107] Y.-W. Lin, S. Lee, S.-S. Li, Y. Xie, Z. Ren, C. T.-C. Nguyen, "Series-resonant VHF micromechanical resonator reference oscillators," *IEEE J. Solid-State Circuits*, vol. 39, no. 12, pp. 2477-2491, Dec. 2004. (15 pages)

[108] J. Wang, Z. Ren, and C. T.-C. Nguyen, "1.156-GHz self-aligned vibrating micromechanical disk resonator," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 51, no. 12, pp. 1607-1628, Dec. 2004. (22 pages)

[109] M. A. Abdelmoneum, M. U. Demirci, S.-S. Li, and C. T.-C. Nguyen, "Post-fabrication laser trimming of micromechanical filters," *Technical Digest*, IEEE Int. Electron Devices Mtg., San Francisco, California, Dec. 13-15, 2004, pp. 39-42.

**CURRICULUM VITAE (Extended)**

[110] C. T.-C. Nguyen, "Vibrating RF MEMS for next generation wireless applications (invited)," *Proceedings*, 2004 IEEE Custom Integrated Circuits Conf., Orlando, Florida, Oct. 3-6, 2004, pp. 257-264. (**best paper award winner**)

[111] S. Lee and C. T.-C. Nguyen, "Mechanically-coupled micromechanical arrays for improved phase noise," *Proceedings*, IEEE Int. Ultrasonics, Ferroelectrics, and Frequency Control 50th Anniv. Joint Conf., Montreal, Canada, Aug. 24-27, 2004, pp. 280-286. (**best paper award winner**)

[112] M. A. Abdelmoneum, M. U. Demirci, Y.-W. Lin, and C. T.-C. Nguyen, "Location-dependent tuning of vibrating micromechanical resonators via laser trimming," *Proceedings*, IEEE Int. Ultrasonics, Ferroelectrics, and Frequency Control 50th Anniv. Joint Conf., Montreal, Canada, Aug. 24-27, 2004, pp. 272-279.

[113] S.-S. Li, M. U. Demirci, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "Bridged micromechanical filters," *Proceedings*, IEEE Int. Ultrasonics, Ferroelectrics, and Frequency Control 50th Anniv. Joint Conf., Montreal, Canada, Aug. 24-27, 2004, pp. 144-150.

[114] S. Lee and C. T.-C. Nguyen, "Phase noise amplitude dependence in self-limiting wine-glass disk oscillators," *Tech. Digest*, 2002 Solid-State Sensor, Actuator, and Microsystems Workshop, Hilton Head, South Carolina, June 6-10, 2004, pp. 33-36.

[115] A.-C. Wong and C. T.-C. Nguyen, "Micromechanical mixer-filters ("mixlers")," *IEEE/ASME J. Microelectromech. Syst.*, vol. 13, no. 1, pp. 100-112, Feb. 2004. (13 pages)

[116] Y.-W. Lin, S. Lee, S.-S. Li, Y. Xie, Z. Ren, and C. T.-C. Nguyen, "60-MHz wine glass micromechanical disk reference oscillator," *Digest of Technical Papers*, 2004 IEEE International Solid-State Circuits Conference, San Francisco, California, Feb. 15-19, 2004, pp. 322-323.

[117] J. Wang, J. E. Butler, T. Feygelson, and C. T.-C. Nguyen, "1.51-GHz polydiamond micromechanical disk resonator with impedance-mismatched isolating support," *Proceedings*, 17th IEEE Int. Micro Electro Mechanical Systems Conf., Maastricht, The Netherlands, Jan. 25-29, 2004, pp. 641-644.

[118] S.-S. Li, Y.-W. Lin, Y. Xie, Z. Ren, and Clark T.-C. Nguyen, "Micromechanical hollow-disk ring resonators," *Proceedings*, 17th IEEE Int. Micro Electro Mechanical Systems Conf., Maastricht, The Netherlands, Jan. 25-29, 2004, pp. 821-824.

[119] Y.-W. Lin, S. Lee, Z. Ren, and C. T.-C. Nguyen, "Series-resonant micromechanical resonator oscillator," *Technical Digest*, 2003 IEEE International Electron Devices Meeting, Washington, DC, Dec. 8-10, 2003, pp. 961-964.

[120] Y. Xie, S.-S. Li, Y.-W. Lin, Z. Ren, and C. T.-C. Nguyen, "UHF micromechanical extensional wine-glass mode ring resonators" *Technical Digest,* 2003 IEEE International Electron Devices Meeting, Washington, DC, Dec. 8-10, 2003, pp. 953-956. (*best paper award winner*)

[121] J. Wang, Z. Ren, and C. T.-C. Nguyen, "Self-aligned 1.14-GHz vibrating radial-mode disk resonators," *Dig. of Tech. Papers*, the 12th Int. Conf. on Solid-State Sensors & Actuators (Transducers'03), Boston, Massachusetts, June 8-12, 2003, pp. 947-950.

[122] M. U. Demirci, M. A. Abdelmoneum, and C. T.-C. Nguyen, "Mechanically corner-coupled square microresonator array for reduced series motional resistance," *Dig. of Tech. Papers*, the 12th Int. Conf. on Solid-State Sensors & Actuators (Transducers'03), Boston, Massachusetts, June 8-12, 2003, pp. 955-958.

[123] J. Wang, Z. Ren, and C. T.-C. Nguyen, "1.14-GHz self-aligned vibrating micromechanical disk resonator," *Tech. Digest*, 2003 Radio Frequency Integrated Circuits Symposium, Philadelphia, Pennsylvania, June 8-10, 2003, pp. 335-338.

[124] M. U. Demirci and C. T.-C. Nguyen, "Higher-mode free-free beam micromechanical resonators," *Proceedings,* 2003 IEEE Int. Frequency Control Symposium, Tampa, Florida, May 5-8, 2003, pp. 810-818.

[125] J. R. Clark, M. A. Abdelmoneum, C. T.-C. Nguyen, "UHF high-order radial-contour mode disk resonators," *Proceedings,* 2003 IEEE Int. Frequency Control Symposium, Tampa, Florida, May 5-8, 2003, pp. 802-809.

[126] S. Lee and C. T.-C. Nguyen, "Influence of automatic level control on micromechanical resonator oscillator phase noise," *Proceedings,* 2003 IEEE Int. Frequency Control Symposium, Tampa, Florida, May 5-8, 2003, pp. 341-349.

[127] J. E. Butler, T. Feygelson, L. Sekaric, H. Craighead, J. Wang, and C. T.-C. Nguyen, "Diamond materials for MEMS and NEMS structures and devices," *Tech. Proceedings*, 2003 Nanotechnology Conference and Trade

## CURRICULUM VITAE (Extended)

Show, San Francisco, California, February 23-27, 2003, pp. 474-477.

[128] C. T.-C. Nguyen, "MEMS technologies for communications (invited keynote)," *Tech. Proceedings*, 2003 Nanotechnology Conference and Trade Show, San Francisco, California, February 23-27, 2003, pp. 452-455.

[129] M. A. Abdelmoneum, M. U. Demirci, and C. T.-C. Nguyen, "Stemless wine-glass-mode disk microme-chanical resonators," *Proceedings*, 16th IEEE Int. Micro Electro Mechanical Systems Conf., Kyoto, Japan, Jan. 19.-23, 2003, pp. 698-701.

[130] C. T.-C. Nguyen, "Vibrating RF MEMS for low power communications (invited)," *Proceedings*, 2002 MRS Fall Meeting, Boston, Massachusetts, Dec. 2-6, 2002, pp. J12.1.1-J2.1.12.

[131] Y.-T. Cheng, W.-T. Hsu, K. Najafi, C.T.-C. Nguyen, and L. Lin, "Vacuum packaging technology using localized aluminum/silicon-to-glass bonding," *IEEE/ASME J. Microelectromech. Syst.*, vol. 11, no. 5, pp. 556-565, Oct. 2002. (10 pages)

[132] C. T.-C. Nguyen, "RF MEMS for wireless applications (invited keynote)," *Conf. Digest*, 2002 Device Research Conference, Santa Barbara, California, June 24-26, 2002, pp. 9-12.

[133] J. Wang, J. E. Butler, D. S. Y. Hsu, and C. T.-C. Nguyen, "High-$Q$ micromechanical resonators in CH$_4$-reactant-optimized high acoustic velocity CVD polydiamond," *Tech. Digest*, 2002 Solid-State Sensor, Actuator, and Microsystems Workshop, Hilton Head, South Carolina, June 2-6, 2002, pp. 61-62.

[134] Y. Xie and C. T.-C. Nguyen, "A low-voltage tiltable microplatform using bent-beam actuation" *Tech. Digest*, 2002 Solid-State Sensor, Actuator, and Microsystems Workshop, Hilton Head, South Carolina, June 2-6, 2002, pp. 350-353.

[135] W. -T. Hsu and C. T. -C. Nguyen, "Stiffness-compensated temperature-insensitive micromechanical reso-nators," *Tech. Digest*, 2002 IEEE Int. Micro Electro Mechanical Systems Conf., Las Vegas, Nevada, Jan. 20-24, 2002, pp. 731-734.

[136] J. Wang, J. E. Butler, D. S. Y. Hsu, and C. T.-C. Nguyen, "CVD polycrystalline diamond high-$Q$ micro-mechanical resonators" *Tech. Digest*, 2002 IEEE Int. Micro Electro Mechanical Systems Conf., Las Vegas, Jan. 20-24, 2002, pp. 657-660.

[137] C. T.-C. Nguyen, "Transceiver front-end architectures using vibrating micromechanical signal processors," chapter in *RF Technologies for Low Power Wireless Communications*, edited by G. I. Haddad, T. Itoh, and J. Harvey, pp. 411-461. New York: Wiley IEEE-Press, 2001. (50 pages)

[138] C. T.-C. Nguyen, "RF MEMS for Low-Power Communications," *Extended Abstracts*, 2001 Int. Conf. on Solid-State Devices and Materials (SSDM'01), Tokyo, Japan, Sept. 26-28, 2001, pp. 462-463.

[139] C. T.-C. Nguyen, "Transceiver front-end architectures using vibrating micromechanical signal processors (invited)," *Dig. of Papers*, Topical Meeting on Silicon Monolithic Integrated Circuits in RF Systems, Sept. 12-14, 2001, pp. 23-32.

[140] C. T.-C. Nguyen, "Vibrating RF MEMS for low power wireless communications (invited keynote)," *Proceedings*, 2001 Int. MEMS Workshop (iMEMS'01), Singapore, July 4-6, 2001, pp. 21-34.

[141] S. Lee, M. U. Demirci, and Clark T.-C. Nguyen, "A 10-MHz micromechanical resonator Pierce reference oscillator for communications," *Dig. of Tech. Papers*, the 11th Int. Conf. on Solid-State Sensors & Actuators (Transducers'01), Munich, Germany, June 10-14, 2001, pp. 1094-1097.

[142] W. -T. Hsu, J. R. Clark, and C. T. -C. Nguyen, "$Q$-optimized lateral free-free beam micromechanical reso-nators," *Digest of Technical Papers*, the 11th Int. Conf. on Solid-State Sensors & Actuators (Transducers'01), Munich, Germany, June 10-14, 2001, pp. 1110-1113.

[143] W. -T. Hsu, J. R. Clark, and C. T. -C. Nguyen, "A resonant temperature sensor based on electrical spring softening," *Digest of Technical Papers*, the 11th Int. Conf. on Solid-State Sensors & Actuators (Transducers'01), Munich, Germany, June 10-14, 2001, pp. 1484-1487.

[144] A.-C. Wong, Y. Xie, and C. T.-C. Nguyen, "A bonded-micro-platform technology for modular merging of RF MEMS and transistor circuits," *Digest of Technical Papers*, the 11th Int. Conf. on Solid-State Sensors & Actuators (Transducers'01), Munich, Germany, June 10-14, 2001, pp. 992-995.

[145] J. R. Clark, W.-T. Hsu, and C. T.-C. Nguyen, "Measurement techniques for capacitively-transduced VHF-to-UHF micromechanical resonators," *Dig. of Tech. Papers*, the 11th Int. Conf. on Solid-State Sensors & Actuators (Transducers'01), Munich, Germany, June 10-14, 2001, pp. 1118-1121.

**CURRICULUM VITAE (Extended)**

[146]  R. Navid, J. R. Clark, M. Demirci, and C. T.-C. Nguyen, "Third-order intermodulation distortion in capacitively-driven CC-beam micromechanical resonators," *Technical Digest*, 14th IEEE Int. Micro Electro Mechanical Systems Conference, Interlaken, Switzerland, Jan. 21-25, 2001, pp. 228-231.

[147]  W.-T. Hsu, J. R. Clark, and C. T.-C. Nguyen, "A sub-micron capacitive gap process for multiple-metal-electrode lateral micromechanical resonators," *Tech. Digest*, 14th IEEE Int. Micro Electro Mechanical Systems Conference, Interlaken, Switzerland, Jan. 21-25, 2001, pp. 349-352.

[148]  Y.-T. Cheng, W.-T. Hsu, L. Lin, C. T.-C. Nguyen, and K. Najafi, "Vacuum packaging using localized aluminum/silicon-to-glass bonding," *Technical Digest*, 14th IEEE Int. Micro Electro Mechanical Systems Conference, Interlaken, Switzerland, Jan. 21-25, 2001, pp. 18-21.

[149]  J. R. Clark, W.-T. Hsu, and C. T.-C. Nguyen, "High-$Q$ VHF micromechanical contour-mode disk resonators," *Technical Digest*, IEEE Int. Electron Devices Meeting, San Francisco, California, Dec. 11-13, 2000, pp. 493-496.

[150]  W.-T. Hsu, J. R. Clark, and C. T.-C. Nguyen, "Mechanically temperature compensated flexural-mode micromechanical resonators," *Tech. Digest*, IEEE Int. Electron Devices Meeting, San Francisco, California, Dec. 11-13, 2000, pp. 399-402.

[151]  J.-B. Yoon and C. T.-C. Nguyen, "A high-$Q$ tunable micromechanical capacitor with movable dielectric for RF applications," *Technical Digest*, IEEE Int. Electron Devices Meeting, San Francisco, California, Dec. 11-13, 2000, pp. 489-492.

[152]  K. Wang, A.-C. Wong, and C. T.-C. Nguyen, "VHF free-free beam high-$Q$ micromechanical resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 9, no. 3, pp. 347-360, Sept. 2000. (14 pages)

[153]  C. T.-C. Nguyen, "Micromechanical circuits for communication transceivers (invited)," *Proceedings*, 2000 Bipolar/BiCMOS Circuits and Technology Meeting (BCTM), Minneapolis, Minnesota, September 25-26, 2000, pp. 142-149.

[154]  C. T.-C. Nguyen, "Micromechanical circuits for wireless communications (invited plenary)," *Proceedings*, 2000 European Solid-State Device Research Conference, Cork, Ireland, September 11-13, 2000, pp. 2-12.

[155]  C. T.-C. Nguyen, "Transceiver front-end architectures using high-$Q$ micromechanical resonators (invited)," *Proceedings*, IEEE European MIDAS Workshop, University of Surrey, United Kingdom, July 17-18, 2000.

[156]  C. T.-C. Nguyen, "Communication architectures based on high-$Q$ MEMS devices (invited)," *Workshop Notes*, Workshop on Microwave and Photonic Applications of MEMS at the 2000 IEEE MTT-S International Microwave Symposium, Anaheim, California, June 16, 2000.

[157]  S. Pacheco, L. P. B. Katehi, and C. T.-C. Nguyen, "Design of low actuation voltage RF MEMS switches," *Proceedings*, IEEE MTT-S International Microwave Symposium, Boston, Massachusetts, June 11-16, 2000.

[158]  F. D. Bannon III, J. R. Clark, and C. T.-C. Nguyen, "High frequency micromechanical filters," *IEEE J. Solid-State Circuits*, vol. 35, no. 4, pp. 512-526, April 2000. (15 pages)

[159]  C. T.-C. Nguyen, "Micromechanical circuits for communications (invited)," *Proceedings*, 2000 Int. Conference on High Density Interconnect and Systems Packaging, Denver, Colorado, April 25-28, 2000, pp. 112-117.

[160]  K. Wang and C. T.-C. Nguyen, "High-order medium frequency micromechanical electronic filters," *IEEE/ASME J. Microelectromech. Syst.*, vol. 8, no. 4, pp. 534-557, Dec. 1999. (24 pages)

[161]  J. W. Weigold, A.-C. Wong, C. T.-C. Nguyen, and S. W. Pang, "A merged process for thick single crystal Si resonators and conventional BiCMOS Circuitry," *IEEE/ASME J. Microelectromech. Syst.*, vol. 8, no. 3, pp. 221-228, Sept. 1999. (8 pages)

[162]  C. T.-C. Nguyen, "Frequency-selective MEMS for miniaturized low-power communication devices (invited)," *IEEE Trans. Microwave Theory Tech.*, vol. 47, no. 8, pp. 1486-1503, Aug. 1999. (18 pages)

[163]  C. T.-C. Nguyen, "Micromechanical components for miniaturized low-power communications (invited)," *Proceedings*, 1999 IEEE MTT-S International Microwave Symposium RF MEMS Workshop (on Microelectromechanical Devices for RF Systems: Their Construction, Reliability, and Application), Anaheim, California, June 18, 1999, pp. 48-77.

[164]  A.-C. Wong, J. R. Clark, and C. T.-C. Nguyen, "Anneal-activated, tunable, 68MHz micromechanical filters" *Digest of Technical Papers*, 10th International Conference on Solid-State Sensors and Actuators, Sendai,

# CURRICULUM VITAE (Extended)

Japan, June 7-10, 1999, pp. 1390-1393.

[165] W.-T. Hsu, S. Lee, and C. T.-C. Nguyen, "*In situ* localized annealing for contamination resistance and enhanced stability in nickel micromechanical resonators," *Digest of Technical Papers*, 10th International Conference on Solid-State Sensors and Actuators, Sendai, Japan, June 7-10, 1999, pp. 932-935.

[166] J. Cao and C. T.-C. Nguyen, "Drive Amplitude Dependence of Micromechanical Resonator Series Motional Resistance," *Digest of Technical Papers*, 10th International Conference on Solid-State Sensors and Actuators, Sendai, Japan, June 7-10, 1999, pp. 1826-1829.

[167] V. L. Rabinovich, M. Deshpande, J. R. Gilbert, M.-A. Getillat, N. de Rooij, J. R. Clark, and C. T.-C. Nguyen, "Prediction of mode frequency shifts due to electrostatic bias," *Digest of Technical Papers*, 10th International Conference on Solid-State Sensors and Actuators, Sendai, Japan, June 7-10, 1999, pp. 442-445.

[168] T. C. Nolan, W. E. Stark, and C. T.-C. Nguyen, "Direct down conversion of passband signals using MEMS filters and sub-sampling," *Proceedings*, the Spring 1999 IEEE Vehicular Technology Conference, Houston, TX, May 16-19, 1999, pp. 1896-1899. (paper copy of *Proceedings* has an error; CD ROM copy is correct)

[169] C. T.-C. Nguyen and R. T. Howe, "An integrated CMOS micromechanical resonator high-$Q$ oscillator," *IEEE J. Solid-State Circuits*, vol. 34, no. 4, pp. 440-455, April 1999. (16 pages)

[170] C. T.-C. Nguyen, "Micromechanical filters for miniaturized low-power communications," *Proceedings of SPIE*: Smart Structures and Materials (Smart Electronics and MEMS), Newport Beach, California, March 1-5, 1999, pp. 55-66.

[171] C. T.-C. Nguyen, A.-C. Wong, and H. Ding, "Tunable, switchable, high-$Q$ VHF microelectromechanical bandpass filters," *Digest of Technical Papers*, 1999 IEEE International Solid-State Circuits Conference, San Francisco, California, Feb. 15-17, 1999, pp. 78-79, 448.

[172] K. Wang, Y. Yu, A.-C. Wong, and C. T.-C. Nguyen, "VHF free-free beam high-$Q$ micromechanical resonators," *Technical Digest,* 12th International IEEE Micro Electro Mechanical Systems Conference, Orlando, Florida, Jan. 17-21, 1999, pp. 453-458.

[173] A.-C. Wong, H. Ding, and C. T.-C. Nguyen, "Micromechanical mixer+filters," *Technical Digest,* IEEE Int. Electron Devices Meeting, San Francisco, California, Dec. 6-9, 1998, pp. 471-474. **(best paper award winner)**

[174] W.-T. Hsu and C. T.-C. Nguyen, "Geometric stress compensation for enhanced thermal stability in micromechanical resonators," *Proceedings*, 1998 IEEE International Ultrasonics Symposium, Sendai, Japan, Oct. 5-8, 1998, pp. 945-948.

[175] C. T.-C. Nguyen, "Micromachining technologies for miniaturized communication devices (invited plenary)," *Proceedings of SPIE*: Micromachining and Microfabrication, Santa Clara, California, Sept. 20-22, 1998, pp. 24-38.

[176] C. T.-C. Nguyen, L. P.B. Katehi, and G. M. Rebeiz, "Micromachined devices for wireless communications (invited)," *Proc. IEEE,* vol. 86, no. 8, pp. 1756-1768, Aug. 1998. (13 pages)

[177] C. T.-C. Nguyen, "Communications applications of microelectromechanical systems (invited)," *Proceedings*, Sensors Expo, San Jose, California, May 20, 1998, pp. 447-455.

[178] L. P.B. Katehi, G. M. Rebeiz, and C. T.-C. Nguyen, "MEMS and Si-micromachined components for low-power, high-frequency communications systems (invited)," *Proceedings,* IEEE MTT-S International Microwave Symposium, Baltimore, Maryland, June 7-12, 1998, pp. 331-333.

[179] S. Pacheco, C. T.-C. Nguyen, and L. P. B. Katehi, "Micromechanical electrostatic K-band switches," *Proceedings*, IEEE MTT-S International Microwave Symposium, Baltimore, Maryland, June 7-12, 1998, pp. 1569-1572. **(Judges award winner)**

[180] C. T.-C. Nguyen, "Frequency-selective MEMS for miniaturized communication devices (invited)," *Proceedings, 1*998 IEEE Aerospace Conference, Snowmass, Colorado, March 21-28, 1998, pp. 445-460.

[181] C. T.-C. Nguyen, "Micromechanical devices for wireless communications (invited plenary)," *Proceedings*, 1998 IEEE International Workshop on Micro Electro Mechanical Systems, Heidelberg, Germany, Jan. 25-29, 1998, pp. 1-7.

[182] K. Wang, F. D. Bannon III, J. R. Clark, and C. T.-C. Nguyen, "$Q$-enhancement of micromechanical filters via low-velocity spring coupling," *Proceedings*, 1997 IEEE International Ultrasonics Symposium, Toronto,

## CURRICULUM VITAE (Extended)

Ontario, Canada, Oct. 5-8, 1997, pp. 323-327.

[183] K. Wang, A.-C. Wong, W.-T. Hsu, and C. T.-C. Nguyen, "Frequency-trimming and $Q$-factor enhancement of micromechanical resonators via localized filament annealing," *Digest of Technical Papers*, 1997 International Conference on Solid-State Sensors and Actuators, Chicago, Illinois, June 16-19, 1997, pp. 109-112.

[184] J. R. Clark, A.-C. Wong, and C. T.-C. Nguyen, "Parallel-resonator HF Micromechanical Bandpass Filters," *Digest of Technical Papers*, 1997 International Conference on Solid-State Sensors and Actuators, Chicago, Illinois, June 16-19, 1997, pp. 1161-1164.

[185] C. T.-C. Nguyen, "High-$Q$ micromechanical oscillators and filters for communications (invited)," *Proceedings*, 1997 IEEE Int. Symposium on Circuits and Systems, Hong Kong, June 9-12, 1997, pp. 2825-2828.

[186] K. Wang and C. T.-C. Nguyen, "High-order micromechanical electronic filters," *Proceedings*, 1997 IEEE International Micro Electro Mechanical Systems Workshop, Nagoya, Japan, Jan. 26-30, 1997, pp. 25-30.

[187] F. D. Bannon III, J. R. Clark, and C. T.-C. Nguyen, "High frequency microelectromechanical IF filters," *Technical Digest*, 1996 IEEE Electron Devices Meeting, San Francisco, CA, Dec. 8-11, 1996, pp. 773-776.

[188] C. T.-C. Nguyen, "Micromechanical resonators for oscillators and filters (invited)," *Proceedings*, 1995 IEEE International Ultrasonics Symposium, Seattle, WA, Nov. 7-10, 1995, pp. 489-499.

[189] K. D. Wise, C. H. Mastrangelo, K. Najafi, and C. T.-C. Nguyen, "Research in integrated sensors and microsystems at the University of Michigan," *Digest*, Sensors Expo, Chicago, Il, Sept. 12-15, 1995, 4 pages.

[190] J. M. Bustillo, G. K. Fedder, C. T.-C. Nguyen, and R. T. Howe, "Process technology for the modular integration of CMOS and polysilicon microstructures," *Microsystem Technologies*, **1** (1994), pp. 30-41. (12 pages)

[191] C. T.-C. Nguyen, "Micromechanical Signal Processors," Ph.D. Dissertation, Dept. of Electrical Engineering and Computer Sciences, University of California at Berkeley, December 1994.

[192] R. T. Howe and C. T.-C. Nguyen, "Micromechanical resonators for frequency references and signal processing (invited)," *Technical Digest*, 1994 IEEE Electron Devices Meeting, San Francisco, CA, Dec. 12-14, 1994, pp. 343-347.

[193] C. T.-C. Nguyen and R. T. Howe, "Polysilicon microresonators for signal processing," *Digest of Papers*, Government Microcircuit and Applications Conference, San Diego, CA, Aug. 15, 1994, pp. 195-198.

[194] C. T.-C. Nguyen and R. T. Howe, "Design and performance of monolithic CMOS micromechanical resonator oscillators," *Proceedings,* 1994 IEEE International Frequency Control Symposium, Boston, MA, May 31-June 3, 1994, pp. 127-134.

[195] C. T.-C. Nguyen and R. T. Howe, "CMOS Micromechanical Resonator Oscillator," *Technical Digest*, IEEE International Electron Devices Meeting, Washington, D. C., pp. 199-202, December 5-8, 1993.

[196] C. T.-C. Nguyen and R. T. Howe, "Microresonator frequency control and stabilization using an integrated micro oven," *Digest of Technical Papers*, the 7th International Conference on Solid-State Sensors and Actuators (Transducers'93), Yokohama, Japan, pp. 1040-1043, June 7-10, 1993.

[197] C. T.-C. Nguyen and R. T. Howe, "Quality factor control for micromechanical resonators," *Technical Digest*, IEEE International Electron Devices Meeting, San Francisco, California, December 14-16, 1992, pp. 505-508.

[198] L. Lin, C. T.-C. Nguyen, R. T. Howe, and A. P. Pisano, "Micro electromechanical filters for signal processing," *Technical Digest*, IEEE Micro Electromechanical Systems Workshop, Travemunde, Germany, pp. 226-231, Feb. 4-7, 1992.

[199] C. T.-C. Nguyen and R. T. Howe, "Electromechanical characterization of microresonators for circuit applications," *Tech. Dig.*, MICRO Program, 1991.

[200] C. T.-C. Nguyen, "Electromechanical Characterization of Microresonators for Circuit Applications," M. S. Report, Dept. of Electrical Engineering and Computer Sciences, University of California at Berkeley, April 1991.

[201] W. C. Tang, T.-C. H. Nguyen, M. W. Judy, and R. T. Howe, "Electrostatic-comb drive of lateral polysilicon resonators," *Sensors and Actuators*, vol. A21-23, pp. 328-331, 1990. (4 pages)

[202] W. C. Tang, T.-C. H. Nguyen, and R. T. Howe, "Laterally driven polysilicon resonant microstructures,"

## CURRICULUM VITAE (Extended)

*Sensors and Actuators,* **20**, 25-32, 1989. (8 pages)

[203]  W. C. Tang, T.-C. H. Nguyen, and R. T. Howe, "Laterally driven polysilicon resonant microstructures," *Proceedings*, IEEE Micro Electromechanical Systems Workshop, Salt Lake City, Utah, Feb. 1989, pp. 53-59.

[204]  M. G. Piepho and C. H. Nguyen, PROBCON-HDW: A Probability and Consequence System of Codes for Long Term Analysis of Hanford Defense Waste (PNL 6656), Pacific Northwest Laboratories, Richland, Washington 99352.

[205]  K. F. Ferris, G. J. Exarhos, and C. H. Nguyen, "Influence of solution chemistry on the microstructure of sol-gel derived films," presented at the "Symposium on Optical Materials for High Power Lasers," Nov. 3-4, 1986, Boulder, Colorado, published in proceedings by National Bureau of Standards, U. S. Government Printing Office, Washington, D. C. 20402.

*Patents:* (student names underlined)

[1]  C. T.-C. Nguyen, T. O. Rocheleau, and T. L. Naing, "Active resonator system with tunable quality factor, frequency, and impedance," U. S. Patent No. 10,530,337 B2, issued Jan. 7, 2020.

[2]  C. T.-C. Nguyen, W.-C. Li, R. Liu, "Zero-quiescent power receiver," U. S. Patent No. 10,257,002 B2, issued April 9, 2019.

[3]  C. T.-C. Nguyen and T. O. Rocheleau, "Micromechanical frequency divider," U. S. Patent No. 10,224,875 B2, issued Mar. 5, 2019.

[4]  C. T.-C. Nguyen, T. O. Rocheleau, and T. L. Naing, "Active resonator system with tunable quality factor, frequency, and impedance," U. S. Patent No. 10,177,742 B2, issued Jan. 8, 2019.

[5]  C. T.-C. Nguyen and Lingqi Wu, "Hollow supports and anchors for mechanical resonators," U. S. Patent No. 9,866,172 B2, issued Jan. 9, 2018.

[6]  C. T.-C. Nguyen, T. O. Rocheleau, and T. L. Naing, "MEMS-based regenerative transceiver," U. S. Patent No. 9,853,679, issued Dec. 26, 2017.

[7]  C. T.-C. Nguyen and Y. Lin, "Micromechanical resonant switches and charge pumps," U. S. Patent No. 9,431,201 B2, issued Aug. 30, 2016.

[8]  C. T.-C. Nguyen, Y. Lin, W.-C. Li, B. Kim, "Microelectromechanical system (MEMS) resonant switches and application for power converters and amplifiers," U. S. Patent No. 9,077,060, issued July 7, 2015.

[9]  C. T.-C. Nguyen and L.-W. Hung, "Etchant-free methods of producing a gap between two layers, and devices produced thereby," U. S. Patent No. 8,704,316, issued April 22, 2014.

[10]  C. T.-C. Nguyen and Y.-W. Lin, "Resonator system such as a microresonator system and method of making the same," U. S. Patent No. 7,911,296 B2, issued March 22, 2011.

[11]  C. T.-C. Nguyen, Y.-W. Lin, S.-S. Li, and Y. Xie, "Micromechanical structures having a capacitive trans-ducer gap filled with a dielectric and method of making same," U. S. Patent No. 7,551,043, issued June 23, 2009.

[12]  S.-S. Li and C. T.-C. Nguyen, "High-$Q$ micromechanical devices and filters utilizing the same," U. S. Patent No. 7,295,088 B2, issued Nov. 13, 2007.

[13]  Y. Xie and C. T.-C. Nguyen, "Micromechanical resonator device having a desired mode shape," U. S. Patent No. 7,119,636, issued Oct. 10, 2006.

[14]  M. A. Abdelmoneum and C. T.-C. Nguyen, "Micromechanical resonator device and method of making a micromechanical device," U. S. Patent No. 6,985,051 B2, issued Jan. 10, 2006.

[15]  W.-T. Hsu and C. T.-C. Nguyen, "Mechanical resonator device having phenomena-dependent electrical stiffness," U. S. Patent No. 6,958,566, issued Oct. 25, 2005.

[16]  Y. Xie and C. T.-C. Nguyen, "Low-voltage electromechanical device including a tiltable microplatform, method of tilting same, array of such devices and method of setting dimple-to-substrate spacing," U. S. Patent No. 6,954,301, issued Oct. 11, 2005.

[17]  J. R. Clark and C. T.-C. Nguyen, "Micromechanical resonator device and micromechanical device utilizing same," U. S. Patent No. 6,856,217, issued Feb. 15, 2005.

## CURRICULUM VITAE (Extended)

[18]  C. T.-C. Nguyen, "Method and subsystem for processing signals utilizing a plurality of vibrating micromechanical devices," U. S. Patent No. 6,917,138, issued July 12, 2005.

[19]  W.-T. Hsu, J. R. Clark, and C. T.-C. Nguyen, "Method for making micromechanical structures having at least one lateral, small gap therebetween and micromechanical device produced thereby," U. S. Patent No. 6,846,691, issued January 25, 2005.

[20]  M. U. Demirci and C. T.-C. Nguyen, "Filter-based method and system for measuring angular speed of an object," U. S. Patent No. 6,742,389, issued June 1, 2004.

[21]  W.-T. Hsu and C. T.-C. Nguyen, "Micromechanical resonator device," U. S. Patent No. 6,739,190, issued May 25, 2004.

[22]  C. T.-C. Nguyen, "Method and apparatus for filtering signals utilizing a vibrating micromechanical resonator," U. S. Patent No. 6,713,938, issued March 30, 2004.

[23]  C. T.-C. Nguyen, "Method and apparatus for selecting at least one desired channel utilizing a bank of vibrating micromechanical apparatus," U. S. Patent No. 6,680,660 B2, issued Jan. 20, 2004.

[24]  A.-C. Wong and C. T.-C. Nguyen, "Module and method of making same," U. S. Patent No. 6,667,558 B2, issued Dec. 23, 2003.

[25]  J. R. Clark and C. T.-C. Nguyen, "Micromechanical resonator device and micromechanical device utilizing same," U. S. Patent No. 6,628,177, issued September 30, 2003.

[26]  C. T.-C. Nguyen, "Method and subsystem for processing signals utilizing a plurality of vibrating micromechanical devices," U. S. Patent No. 6,600,252, issued July 29, 2003.

[27]  C. T.-C. Nguyen, "Method and apparatus for filtering signals in a subsystem including a power amplifier utilizing a bank of vibrating micromechanical apparatus," U. S. Patent No. 6,593,831, issued July 15, 2003.

[28]  C. T.-C. Nguyen, "Method and apparatus for generating a signal having at least one desired output frequency utilizing a bank of vibrating micromechanical devices," U. S. Patent No. 6,577,040, issued June 10, 2003.

[29]  A.-C. Wong and C. T.-C. Nguyen, "Method for making a module including a microplatform," U. S. Patent No. 6,659,754, issued May 27, 2003.

[30]  Clark T.-C. Nguyen, "Method and apparatus for selecting at least one desired channel utilizing a bank of vibrating micromehanical apparatus," U. S. Patent No. 6,566,786, issued May 20, 2003.

[31]  J.-B. Yoon and C. T.-C. Nguyen, "High-$Q$ micromechanical device and method of tuning same," U. S. Patent No. 6,490,147, issued Dec. 3, 2002.

[32]  C. T.-C. Nguyen, "Method and apparatus for upconverting and filtering an information signal utilizing a vibrating micromechanical device," U. S. Patent No. 6,424,074, issued July 23, 2002.

[33]  C. T.-C. Nguyen, M. McCorquodale, K. Wang, "Device including a micromechanical resonator having an operating frequency and method of extending the same," U. S. Patent No. 6,249,073, issued June 19, 2001.

[34]  K. Wang and C. T.-C. Nguyen, "Method and system for locally annealing a microstructure formed on a substrate and device formed thereby," U. S. Patent No. 6,169,321, issued Jan. 2, 2001 (new claims).

[35]  K. Wang and C. T.-C. Nguyen, "Method and system for locally annealing a microstructure formed on a substrate and device formed thereby," U. S. Patent No. 5,976,994, issued Nov. 2, 1999.

[36]  C. T.-C. Nguyen and R. T. Howe, "$Q$-controlled microresonators and tunable electronic filters using such resonators," U. S. Patent No. 5,955,932, issued Sept. 21, 1999. (This is the second patent to come out under this title; i.e., a whole new set of claims.)

[37]  C. T.-C. Nguyen, V. Gutnik, and R. T. Howe, "Mixing, modulation, and demodulation via mechanical resonators," U. S. Patent No. 5,839,062, issued November 17, 1998.

[38]  C. T.-C. Nguyen, L. Lin, R. T. Howe, and A. P. Pisano, "Microelectromechanical signal processors," U. S. Patent No. 5,537,083, issued July 16, 1996. (This is the second patent to come out under this title; i.e., a whole new set of claims.)

[39]  C. T.-C. Nguyen and R. T. Howe, "$Q$-controlled microresonators and tunable electronic filters using such resonators," U. S. Patent No. 5,491,604, issued Feb. 13, 1996.

[40]  C. T.-C. Nguyen, L. Lin, R. T. Howe, and A. P. Pisano, "Microelectromechanical signal processors," U. S.

## CURRICULUM VITAE (Extended)

Patent No. 5,455,547, issued Oct. 3, 1995.

***Press Releases:*** (that I am aware of; stopped recording this in 2003, as there are too many of them all over the place, largely due to my startup company, Discera)

[1]   Nicolas Mokhoff, "MEMS to remain a niche technology?" *EE Times*, Feb. 12, 2003.

[2]   Candace Stuart, "U.S. military's research agency gets a new microsystems chief," *Small Times*, July 1, 2002.

[3]   Jack Mason, "Putting the micro in phone: RF MEMS and next generation mobile devices," *Small Times*, Feb. 7, 2002.

[4]   Ian Austen, "Shrinking the cellular phone, one component at a time," *The New York Times*, Jan. 31, 2002, pg. D7.

[5]   Neil Gross, "What's needed for teensy-weensy cell phones," *Business Week*, Nov. 5, 2001.

[6]   Jeff Goldman, "Teeny tiny wireless," *The Feature*, Aug. 30, 2001.

[7]   Duane Ramsey, "Ardesta launches third start-up—Discera," *Insider Business Journal*, Aug. 10-23, 2001, pg. 5.

[8]   Jeff Karoub, "Firm aims for 1-chip integration," *Small Times*, July 27, 2001.

[9]   Eric W. Pfeiffer, "The MEMS microcosm," *Forbes*, May 2, 2001.

[10]   Stephen Cass, "Large jobs for little devices," *IEEE Spectrum*, Jan. 2001, pp. 72-73.

[11]   R. Allan, "MEMS designs gear up for greater commercialization," *Electronic Design*, vol. 48, no. 12, June 12, 2000, pp. 85-96 (90).

[12]   I. Amato, "May the micro force be with you," *MIT's Magazine of Innovation: Technology Review*, vol. 102, no. 5, Sept.-Oct. 1999, pp. 74-81 (80).

[13]   J. Langone, *How Things Work: Everyday Technology Explained*. National Geographic Society, 1999.

[14]   L. Geppert, "Technology 1999 analysis and forecast: solid state," *IEEE Spectrum*, Technology 1999: Analysis & Forecast Issue, vol. 36, no. 1, pp. 52-56, Jan. 1999.

[15]   D. Pescovitz, "Small will be beautiful," *New Scientist*, no. 2140, pp. 40-42, June 27, 1998.

[16]   "Discover Awards 1998: Vibrating Gizmos," *Discover Magazine*, pg. 64, July 1998.

[17]   "On-chip MEMS seen replacing board-mounted components in future wireless transceivers," *Micromachine Devices*, vol. 3, no. 2, Feb. 1998, pp. 12-13.

[18]   "Microtechnology: a minor chord," *The Economist*, Nov. 15-21, 1997, pg. 89.

[19]   G. Stix, "Beam it up: micromechanical beams may enable a radio-on-a-chip," *Scientific American*, Sept. 1997, pp. 40-41.

[20]   S. Ohr, "DARPA sows seeds of a telecom revolution," *EE Times*, August 1997.

---

## RESEARCH HIGHLIGHTS

The next page presents a pictorial summary of Prof. Nguyen's research.

CURRICULUM VITAE (Extended)



# Exhibit A5

DocuSign Envelope ID: 973B858F-2A7G-4FBC-B0C6-642CD7A34DD5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QORVO, INC.,         ) | |
|         ) | |
| Plaintiff,         ) | |
|         ) | |
| v.         ) | C.A. No. 21-1417-JPM |
|         ) | |
| AKOUSTIS TECHNOLOGIES, INC. and   ) | |
| AKOUSTIS, INC.,         ) | |
|         ) | |
| Defendants.         ) | |

## REBUTTAL EXPERT CLAIM CONSTRUCTION REPORT AND DECLARATION BY DR. CLARK NGUYEN

### I.    INTRODUCTION

Pursuant to the Court's Scheduling Order and Local Patent Rule 4.3 for the Western District of Tennessee ("LPRs" or "Local Patent Rules"), Defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively, "Defendants" or "Akoustis") hereby submit the Rebuttal Expert Claim Construction Report and Declaration by Dr. Clark Nguyen ("Dr. Nguyen") of Dr. John C. Bravman's Initial Claim Construction Declaration ("Bravman Decl.") dated July 11, 2022, in support of Qorvo Inc.'s ("Qorvo") Preliminary Claim Construction and Evidence under LPR 4.2 as to United States Patent Nos. 9,735,755 (the "'755 Patent") and 10,256,786 ("the '786 Patent").

This rebuttal report is based on information currently available to Akoustis and Dr. Nguyen.  The parties have not completed discovery and Akoustis has not yet received Dr. Bravman's expert rebuttal report relating to claim construction.  Akoustis and Dr. Nguyen therefore reserve the right to revise, supplement, amend, or subtract from this rebuttal report supporting Akoustis' proposed construction based on further discovery and Qorvo's own expert

rebuttal report to the extent one is provided.  Inclusion or omission in the report of terms,

constructions, or supporting evidence is not an admission that any particular claim term is

definite or otherwise in compliance with 35 U.S.C. § 112.  Akoustis does not contend that any

claim term is properly construed as means-plus-function under 35 U.S.C. § 112(6) or 35 U.S.C. §

112(f) and the parties have agreed that the asserted claims of United States Patent No. 7,522,018

do not require construction to resolve any presently known dispute over the terms' plain and

ordinary meaning.

      The information set forth in this rebuttal report is provided without waiving: (1) the right

to object to the use of any statement for any purpose, in this action or any other, on the grounds

of privilege, relevance, materiality, or any other appropriate grounds; (2) the right to object to

any request involving or relating to the subject matter of the statements herein; (3) the right to

revise, correct, supplement, or clarify any of the statements provided below at any time,

including at trial; or (4) any of Akoustis' claims or defenses in this litigation.

      I, Dr. Clark Nguyen, offer the following as my Rebuttal Expert Claim Construction

Report and Declaration relating to the proposed preliminary claim construction of disputed claim

terms in the above-entitled matter.  I incorporate by reference my qualifications and those

identified as the level of ordinary skill in the art detailed in my Initial Claim Construction Expert

Report and Declaration dated July 11, 2022 ("Nguyen Decl.").

## II.    LEVEL OF ORDINARY SKILL IN THE ART

      Dr. Bravman identifies the level of ordinary skill in the art ("POSITA") as a person with

at least a bachelor's degree, or the equivalent degree, in electrical engineering, materials science,

physics, or a related field, and 3-5 years of experience in the research, design, or development of

thin film devices, or equivalent experience.  A person with more education and less experience

may also meet this standard.  (Bravman Decl. at ¶¶ 14-15.)  While this description of the

POSITA differs slightly from mine ("undergraduate degree in electrical engineering with two to

four years of experience in the technical field, or a master's degree in electrical engineering with

one to two years of experience in the field"), the differences are not significant enough to impact

any analysis and opinions relating to claim construction, including a POSITA's understanding of

the plain and ordinary meaning of the disputed claim terms.  However, for the different

disciplines needed for the application at hand, electrical engineering is perhaps the most

consequential, since a person of ordinary skill in the art dealing with the subject devices should

understand the purpose and use of the devices, e.g., RF filtering, meaning they should understand

not only device properties, but also its response to inputs and why certain response

characteristics are needed.

III.    THE '755 PATENT

    A.    The '755 Patent's Disclosure

    I incorporate by reference the '755 Patent Background section of the Nguyen Decl.

    Dr. Bravman contends that "A POSITA would have understood the '755 Patent to be

directed to structural configurations of BAW resonators that improve the confinement of

mechanical energy therein. *See, e.g.*, '755 Patent, 1:14-17."  (Bravman Decl. at ¶ 17.)  I do not

disagree with this statement, but I point out that it is not a complete statement, since confinement

is not the only issue of importance.  For example, if energy leaks out, then not all is necessarily

lost, since some can come back.  Things are not as simple as this, which is why it is important to

properly define terms.

    Dr. Bravman contends that "It is my opinion that the intrinsic record is sufficient for a

POSITA to understand the disputed terms, and that the disputed terms are used according to their

3

DocuSign Envelope ID: 973B858F-2A7C-4FBC-B0C6-642CD7A34DD5

plain and ordinary meaning (*e.g.*, the intrinsic record does not use the disputed terms differently from their normal usage in the art)." (Bravman Decl. at ¶ 19.) While a POSITA may be able to understand certain disputed claim terms without resorting to extrinsic evidence, as detailed in the Nguyen Decl., identified extrinsic evidence is available to provide clarification and support in view of the differences in the plain and ordinary constructions proposed by the parties. I also note that Qorvo provided extrinsic evidence in support of its own proposed claim constructions. I do not agree with Dr. Bravman's blanket statement that "it is unnecessary to resort to extrinsic evidence to understand the disputed terms." (Bravman Decl. at ¶ 20.)

**B.      "Active Region" and "Outer Region" [all asserted claims]**

| Akoustis' Preliminary Construction | Qorvo's Preliminary Construction |
|---|---|
| Active region: That region of the device where motional current density is generated through the piezoelectric layer.<br><br>Outer region: Defined as that region outside the active region. | Plain and ordinary meaning (POM). If a construction is necessary,<br><br>"active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality<br><br>"outer region" is the region of the BAW resonator that is not electrically driven. |

I disagree with Dr. Bravman's contention that Qorvo's constructions are correct. (Bravman Decl. at ¶ 22.) I note that Qorvo's primary contention is that no construction is necessary (undefined "POM") but then offers a proposed construction of the plain and ordinary meaning of "active region" and "outer region". Both propositions cannot be equally correct. As to no construction at all of the two disputed terms, the fact that the parties do not agree on what

DocuSign Envelope ID: 973B858F-2A7C-45BC-B0C6-642CD7A34DD5

the POM meaning is suggests that a construction is necessary.[1]

Turning to Dr. Bravman's explanations in support of Qorvo's proposed construction (Bravman Decl. at ¶¶ 23-31), I disagree that the intrinsic record supports Qorvo's proposed construction. The words "electrically driven" do not accurately specify the result of the driving that identifies the ultimate function of the device. I disagree with Qorvo's suggested plain and ordinary meaning of "active region" as the region of the BAW resonator that is *electrically driven* to provide the resonator functionality or active region. First, the phrase "to provide the resonator functionality" is vague, as functionality could mean many things, such as generating motional current or presenting a specific impedance or realizing a specific equivalent circuit, or all of these combined. Second, while the '755 Patent specification uses the same *electrically driven* language to describe the active region (1:55), the term "electrically driven" is not a well-defined term in the art as it could mean many things and could lead to an erroneous understanding of the scope of the claim limitation.

"Electrically driven" does not describe to what degree any particular voltage is applied, nor to any specific effect of such voltage. For example, electrically driven could mean the piezoelectric is driven to vibration; or that a non-motional current is driven to flow through the capacitance between two conductive plates; or that a suspended piezoelectric layer (as in an FBAR) is driven into a mode different from the mode of interest, *e.g.*, a flexural mode rather than a bulk mode. The main problem with a definition that just focuses on the drive input is that it is not enough to identify the active device. One can drive anything, including things that are

---

[1] I understand that a district court's failure to resolve a claim construction dispute is improper. *O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co.,* 521 F.3d 1351 (Fed. Cir. 2008).

not the device, so specifying the drive only does not specify the active device. Rather, one must specify the result of driving (*i.e.*, the output, in this case the motional current, which together with the input voltage in turn specifies the equivalent circuit) to isolate the actual device. I also consider Qorvo's proposed construction to be indefinite because, as described above, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

Instead, to be more precise, I believe the construction offered by Akoustis more accurately defines an "active region" as the "region … where a motional current density is generated" through the piezoelectric layer as described above and as further supported by extrinsic evidence.[2] I agree with Akoustis' construction of "active region" as the plain and ordinary meaning as understood by one of ordinary skill in the art at the time of the invention in view of the intrinsic evidence for the reasons described above relating to motional current of an acoustic resonator. In this regard, the skilled artisan designing a resonator is interested in what the effect of that resonator will be on an input signal, which is determined by the resonator's equivalent circuit, generally based on an *LCR* circuit (or several of them) that models the motional behavior of the device (which is generally the most important part), but also often containing associated elements to model things like multiple ports (where transformers are often used) or parasitic paths and losses (where extra branches with resistors and capacitors might be used). Again, the key concern is that part of the device that generates motional current density through the piezoelectric layer, since it is the relationship between the input, *i.e.*, input voltage, and resulting motional current, that determines the *LCR* circuit modeling, the most important

---

[2] For the same reasons, I agree with Akoustis' proposed construction of "outer region" over Qorvo's construction that also includes the "electrically driven" proposed construction.

6

DocuSign Envelope ID: 073B858F-2A7C-4FBC-B0C6-642CD7A34DDB

behavior of the device.

### 1.    Extrinsic Evidence Supporting Akoustis' Construction

Dr. Bravman contends that the extrinsic evidence does not dictate a construction different from that indicated by the intrinsic record.  (Bravman Decl. at ¶ 32.)  I do not agree with his contention to the extent he is suggesting that the intrinsic record defines "active region" as the region "electrically driven."  I note, however, that his declaration does not point to any specific examples of such alleged agreement between Qorvo's proposed construction and the use of the term in the art as shown by any extrinsic evidence.  This is in contrast to my numerous examples of extrinsic evidence supporting my understanding of the term set forth in my declaration.  Decl. of Nguyen, pp. 12-15.

While the specification describes the active region as being the region electrically driven, the specification does not reveal a special definition given to "active region" by the patentee that differs from the meaning it would otherwise possess.  For that reason, I believe it is a mistake not to apply the ordinary meaning to the ordinary artisan after reading the entire patent.  Contrary to Dr. Bravman, I believe this is a case where the district court will need to look beyond the patent's intrinsic and inadequate description of "electrically driven" and consult extrinsic evidence in order to understand the background science and the meaning of "active region" in the relevant art during the relevant time period to better identify the plain and ordinary meaning. To be clear, "electrically driven" is not a term of art used to describe the active region of a resonator.  At best it is short-hand used by the patentees.  But it does not provide the requisite details to properly discern what is and is not an active region.

As previously noted, the following extrinsic evidence further supports Akoustis' proposed plain and ordinary meaning of "active region" as used in the '755 Patent claims:

DocuSign Envelope ID: 973B858F-2A7C-4FBC-B0C6-642CD7A34DD5

R. A. Johnson, Mechanical Filters in Electronics. New York: John Wiley & Sons, 1983.

- pg. 29: Equation (2.10) provides an explicit relationship between $k_t^2$ (which the text calls $k_{em}^2$) and the motional inductance $L_1$ and static inductance $L_o$ for a magnetostrictively transduced resonator, showing how motional quantities (in this case motional voltage) universally determine the motional equivalent circuit of a mechanical or acoustic resonator, whether the transducer is piezoelectric, magnetostrictive, capacitive, etc. …

- pg. 30: Equation (2.12) provides an explicit relationship between $k_t^2$ (which the text calls $k_{em}^2$) and the motional capacitance $C_1$ and electrode overlap capacitance $C_o$ for a piezoelectrically transduced resonator. Here, Robert Johnson uses the mobility analogy, which is the dual of the current analogy (that others use, including myself), where the ratio of $C_1/C_o$ is inverted.

R. J. Besson, "A new electrodeless resonator design," Proceedings, 31st Annual Symp. on Freq. Control, Atlantic City, New Jersey, June 1-3, 1977, pp. 147-152.

- pp. 148: "The active part of the crystal is connected to the dormant part by little quartz "bridges" …" indicates the region that is considered active is different from the regions considered dormant, even though the electrode also goes over the dormant parts. The regions are different because the structure in the active region is able to vibrate at the desired resonance frequency, and thus generate motional current that supports the desired equivalent circuit; whereas that in the dormant region does not vibrate at this frequency, so does not provide the desired motional current nor the desired equivalent circuit. This even though voltages applied by the metal (i.e., electrode) in the dormant region can drive that region, just not with the desired output. This is an example where the output, i.e., motional current in a small specific frequency range, is imperative to identifying the active device (region).

- pp. 150-151: Fig. 2 and Fig. 3 depict a quartz resonator in which the transducer electrodes D1 and D2 do not touch the quartz, yet still define the region where the motional current of interest is generated and therefore the active "part" or "region". Note that regions where the metal touches the quartz (which is a piezoelectric material) on the outer skirts of the structure beyond the bridges are not considered the active region because they do not move at the frequency of the intended resonator, so do not produce motional current at the intended frequency, i.e., do not produce the intended equivalent circuit. Because the quartz is much thinner there, these regions would produce motional current at a very different (larger) frequency that would be out of the bandwidth of the intended resonator.

L.-W. Hung and C. T.-C. Nguyen, "Capacitive-piezoelectric transducers for high-$Q$ micromechanical AlN resonators," IEEE/ASME J. Microelectromech. Syst., vol. 24, no. 2, pp. 458-473, April 2015.

- Pg. 459, col. 1: Fig. 1 provides another micro-scale example of how it is motional current that defines the active region, not the just the electrical drive voltage and its placements. Here, the piezoelectric structure is ring-shaped with a left-side electrode and a right-side electrode. In the figure, the left-side electrode receives the excitation voltage, while the right side merely sources the output motional current. Motional current also flows between the electrodes on the left side. The main point here is that the right side is also considered part of the active device—in this case a two-port device—yet it receives no electrical drive voltage. Clearly, it is the motional current or the response of the device that most correctly defines the device. i.e., a drive voltage or force is not even needed to call an area an active region and whether the electrode even touches the piezoelectric or not is immaterial. This figure further shows how proximity of the drive electrode does not matter much. Specifically, Fig. 1(a) shows how one can make a device where the electrode touches the piezoelectric layer, but one can also make a useful (and superior from a $Q$ perspective) device by lifting the electrodes so they do not touch the piezoelectric layer, as done in Fig. 1(b). Here, if the gaps between the electrodes and piezoelectric layer are small enough, the electric fields in the piezoelectric layer can still be strong enough to induce substantial motion and substantial motional current induced by the reverse-piezoelectric effect. The motional current across the electrodes defines the equivalent motional $LCR$ circuit in Fig. 2 on pg. 461 for the device, and thus, defines its performance and utility in an actual filter, oscillator, etc., circuit. (Note how when I write "$LCR$ circuit" I do not mean just the $L$, $C$, and $R$, but rather include all other elements in the Fig. 2 circuit.) In both devices, the overlapping top and bottom electrode regions close enough to, but not necessarily touching, the device generate enough motional current to define the $LCR$ circuit, and thus, to define the active device regions.

- pg. 463, col. 2: Fig. 6 shows the use of the "m" subscript to emphasize that the elements in the circuit (that govern resonator performance) are "motional", meaning they derive from electrical current that in turn derives from the motion of the resonator. This emphasizes how it is the motional current that defines the active region. Note that this motional current and the motional elements in the equivalent circuit all derive from motion of the resonant structure. In fact, electrical current and mechanical velocity are often interchangeable in these electromechanical equivalent circuits. However, from a practical perspective for a designer skilled in the art, it is the motional current that is the important and useful output. In many cases, it is the relationship between the motional current and the input (voltage) that is important, as this is ultimately what defines an equivalent circuit.

G. Piazza, P.J. Stephanou, and A. P. Pisano, "Piezoelectric aluminum nitride vibrating contour-mode MEMS resonators," IEEE/ASME J. Microelectromech. Syst., vol. 15, no. 6, pp. 1406-1418, Dec. 2006.

- pg. 1407, col. 2: Equation (7) and the associated text provides another example of the use of "m" for "motional" in the equivalent Butterworth Van Dyke circuit for a

piezoelectric resonator, which in turn equates the active region of the device to that which generates the motional current, in this case for a lateral AlN resonator (which operates like an FBAR, but the piezoelectric moves laterally). This further attests to how universal is the concept of the motional current governing the equivalent circuit and therefore the active portion of the device.

M. Akgul, L. Wu, Z. Ren, and C. T.-C. Nguyen, "A negative-capacitance equivalent circuit model for parallel-plate capacitive-gap-transduced micromechanical resonators," IEEE Trans. Ultrason., Ferroelect., Freq. Contr., vo. 61, no. 5, pp.849-869, May 2014.

- pg. 850, col. 2: Fig. 2 and 3 together show yet again how the motional current defines the active regions of a mechanical resonator device by governing the equivalent *LCR* circuit and encouraging the use of "x" subscripts for the elements. Here, "x" is a commonly used variable for displacement (i.e., motion) and further emphasizes how the motional current governs the active region of the device, in this case for a capacitively transduced resonator. The fact that this concept is also used for capacitively transduced (or electrostatically transduced) resonators further attests the universality of this definition for the active region, as governed by the *LCR* equivalent circuit.

U. S. Patent US 2014/0159548

- Sheet 2, Fig. 1B: Here, the active region includes the regions where layer 145 (which can be a dielectric) sits between the piezoelectric and the top electrode, attesting to the fact that the electrode metal need not touch the piezoelectric to be included in the active region. Rather, as long as motional current flows through that region from the top to the bottom electrode, this is part of the active region.

**C.** **"[A] density of mechanical energy in the outer region"** [claims 1, 11]

| Akoustis' Preliminary Construction | Qorvo's Preliminary Construction |
|---|---|
| The "density of mechanical energy" means a total density over the full volume of the outer region, or otherwise indefinite. | POM. If a construction for "density of mechanical energy" is needed, it means the amount of mechanical energy from acoustic waves leaked from the active region. |

I disagree with Dr. Bravman's contention that Qorvo's constructions are correct. (Bravman Decl. at ¶ 33.) As with "active region," I note that Qorvo's primary contention is that no construction is necessary (undefined "POM") but then offers a proposed construction of the plain and ordinary meaning. Both propositions cannot be equally correct. As to no construction

of "density of mechanical energy," the fact that the parties do not agree on the POM meaning suggests that a construction is necessary.

Turning to Dr. Bravman's explanations in support of Qorvo's proposed construction (Bravman Decl. at ¶¶ 34-44), I disagree that the intrinsic record supports Qorvo's proposed construction. In particular, but without limitation, I disagree with Dr. Bravman's contention that "a POSITA reading the '755 Patent would have understood 'density' to be used in a broader sense and recognizing general and/or localized mechanical energy reduction, such as is shown in the comparison images of FIGS. 3A and 3B."[3] (Bravman Decl. at ¶ 41.) Qorvo's proposed construction as "the amount of mechanical energy from acoustic waves leaked from the active region" uses the term "leaked", which does not necessarily mean the same as "lost". A "leaked" amount of energy can be reflected and returned to the active region, in which case it is not "lost". "Leaked" energy is only "lost" when dissipated by various loss mechanisms that could include thermoelastic damping, hysteretic effects, and die mounting losses, just to cite a few. What is important here is what energy is *lost*. Because the words "amount … leaked" does not provide a quantifiable amount of loss, it does not provide a definitive comparison of energy loss before and after a structural design modification. Furthermore, because it does not use the words "total amount", it also leaves open the flawed notion that the amount of energy can be measured at any finite point in space or in time, and not as it relates to the total energy over the full volume of the outer region. In this regard, an amount leaked could refer to an amount of energy at a particular

---

[3] I further note that the use of a greyscale image in which both low and high energy regions are indicated as being darker in tone than mid-energy regions in FIGS. 3A and 3B of the '755 Patent makes it impossible to tell which regions of the figure show any reduction or increase of energy density such that it is impossible to make any comparison between the images as Dr. Bravman asserts he has done.

point in space, or at a particular point in time, neither of which captures the total integrated energy.

To be clear, I recognize that the intrinsic record uses the term "leak." It is okay for the intrinsic record to use "leak" because it can describe things in qualitative, i.e., less definite, terms. A claim on the other hand must be more precise and, in this case, should provide a more quantitative measure of energy loss to be sufficiently clear. Because it does not specify the amount of loss, but rather only represents potential loss, the word "leaked" does not provide this degree of clarity to a person of ordinary skill in the art. Given that "leak" is not itself sufficiently clear, it is not advisable to use the word "leak" to try to clarify the claim.

Qorvo's proposal further leaves out entirely the concept of "energy *density*," instead referring to an *amount* of energy. An energy density is defined as an amount of energy per unit volume, just as an object's density is its mass per unit volume. That is, energy density requires a defined volume over which the "amount" of energy is measured, and any amount without an associated volume cannot be an "energy density." I believe Qorvo's proposed construction to be fundamentally flawed for the above reasons and incorrect (or not true to the original claim) in the sense that it does not capture the concept of density.

In my opinion, Dr. Bravman improperly downplays that "the claims and specification (sometimes) use the word 'density' to describe the relative amounts," suggesting that "a POSITA reading the intrinsic record in its entirety would not have understood 'density' in the '755 Patent to require a specific mathematical or dimensional relationship." (Bravman Decl. at ¶ 41.) A person of ordinary skill in the art knows the definition of density and there is no reason why that person would want to ignore the definition or morph it into an entirely different concept the way Qorvo proposes they should. Even if one accepted that the specification uses "density" in this

12

DocuSign Envelope ID: 073B858F-2A7C-4FBC-B0C6-642CD7A34DD5

fashion "sometimes," it has not been shown that the patentee clearly and unambiguously intended to impart a definition of "density" that lacks the concept of volume, contrary to its plain and ordinary meaning as understood by the skilled artisan.

I further note that the simulations in Fig. 3A and 3B used to illustrate the invention in the intrinsic record are indeed density plots, meaning that density, as mathematically defined, is used to explain the invention. Specifically, the units shown in the figures are Joules per cubic micron $(J/\mu m^3)$, where Joules are a unit of energy, and a cubic micron is a unit of volume. This further indicates that the word "density" is purposefully used and not just a casual term to be interpreted as something different than its mathematical definition.

### 1.      Extrinsic Evidence Supporting Akoustis' Construction

Dr. Bravman contends that "[m]y review [of extrinsic evidence] indicates that 'density of mechanical energy' is used in the '755 Patent in the same way it is used in the art and according to Qorvo's proposed constructions." (Bravman Decl. at ¶ 45.) While I agree that the term is used according to its plain and ordinary meaning, it is not consistent with Qorvo's proposed construction. Akoustis' proposed construction of "a density of mechanical energy in the outer region" is "the density of mechanical energy means a total density over the full volume of the outer region, or otherwise indefinite." I agree with that proposed construction as the plain and ordinary meaning as understood by one of ordinary skill in the art. What a person skilled in the art is mainly concerned about, as reflected in the '755 Patent (2:4-26), is how much total energy is lost to the surroundings of the device. For a miniature device like a BAW or micromechanical resonator, the surrounding is generally the substrate on which the device is fabricated. Energy lost to the substrate—which can be waves going into the substrate that experience dissipation in the substrate (or its mounts, adhesives, etc.)—that does not return to the resonator lowers the

13

DocuSign Envelope ID: 973B858F-2A7C-4FBC-B0C6-642CD7A34DD5

quality factor Q, a very important filter or oscillator design parameter.  What matters to the designer is the total energy lost to all of the surroundings, *i.e.*, strain energy dissipation in a large area around the resonator, not just some small region(s).

Unfortunately, the patent claim as written does not capture this.  Rather, it focuses on densities of "mechanical energy in the outer region", which has some connection to energy lost, but is not exactly the same and does not capture the total energy lost, because it limits the region of energy density to the "outer region" (which itself is not well specified).  Its use of energy density further introduces additional ambiguity.  First, there is no single value for "energy density" throughout the "outer region."  As can be seen from Figures 3A and 3B of the '755 Patent, energy density varies considerably throughout the volume illustrated, as represented by the light and dark portions of the figures.  Second, a value for energy density at any given point cannot give a total amount of energy, but merely characterizes an amount of energy present <u>at that point</u>.  The only way to determine total energy lost is to integrate (add up) the density over the full volume into which energy can escape.

In this respect, I believe the patent claim appears to be indefinite.  As I understand, it is not appropriate to attempt to "fix" an indefinite claim through claim construction as the plaintiff seems to want to do.  Rather, a construction is proper only if the claim informs, with reasonable certainty, those skilled in the art about the scope of the invention.  I do not believe Qorvo's proposed construction of "density of mechanical energy in the outer region" reflects a reasonably identifiable scope of the invention to those skilled in the art.

To the extent the scope of the meaning can be reasonably identified by a skilled artisan, Akoustis' construction provides clarity to the deficient claim language ("density of mechanical energy in the outer region") that otherwise opens too wide a possibility of various regions where

14

density could be measured if it is not clearly linked to a defined total volume as reflected in Akoustis' construction. For example, in a typical scenario, there could be a small region outside the device active region where the energy density is higher than when n=1 and at the same time another small region where the energy density is lower than when n=1. The fact that one can find one region where the energy density is lower does not necessarily mean the total energy lost is lower. In other words, it is possible that even where total integrated energy in the outer region has increased there can be a particular point where there is a reduction in energy density. If one focuses only on that point, then one would incorrectly think the energy outside the resonator has decreased. Only the total energy over the full volume can provide useful information regarding the efficacy of any structure intended to reduce energy losses from the active device. A more accurate measure of the total energy lost that removes some of the ambiguity of location and region and still captures the use of energy density in the claim is to get the energy density (or average energy density) over the entire outer region ("the full volume of the outer region"), which is the Akoustis construction. Because limiting the region to the outer region of the device still does not quite capture all the energy lost, a yet more accurate and useful measure would be the energy density in the entire region outside the active region (not just the outer region of the device). Unfortunately, the patent claim limits the region to the "outer region of the BAW resonator", which is not entirely definite in my opinion, and so is flawed. One could argue that this claim should never have been allowed as written.

The following extrinsic evidence further supports Akoustis' proposed plain and ordinary meaning of "density of mechanical energy" as used in the '755 Patent claims:

Bindel, D. S., Quevy, E., Koyama, T., Govindjee, S., Demmel, J. W., and R. T. Howe, "Anchor loss simulation in resonators," Tech. Digest, 18th IEEE Int. Conf. on Micro Electro Mechanical Systems, Jan. 30 – Feb. 3, 2005, pp. 133-136.

pg. 134, col. 2: "The bending motion of the mode along with the Poisson effect induces a vertical motion in the stem which pumps displacement waves into the substrate, where they carry away the energy of the resonance." This passage (as well as the whole paper) clearly indicates that it is energy lost to the substrate that matters. Their use of a perfectly matched layer (PML) in simulation to capture all energy lost from the resonator into the substrate and surroundings indicates that it is all the energy lost to the infinite surroundings that matters to one skilled in the art.

K. Wang, A.-C. Wong, and C. T.-C. Nguyen, "VHF free-free beam high-$Q$ micromechanical resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 9, no. 3, pp. 347-360, Sept. 2000.

- pg. 1, abstract: "The microresonators feature torsional-mode support springs that effectively isolate the resonator beam from its anchors via quarter-wavelength impedance transformations, minimizing anchor dissipation and allowing these resonators to achieve high-$Q$ with high stiffness in the VHF frequency range." This paper describes quarter-wavelength resonator support design methods to suppress anchor loss, which is loss to the substrate. Again, what matters is loss to the infinite surroundings around the resonator, not just some small region.

M. U. Demirci and C. T.-C. Nguyen, "Higher-mode free-free beam micromechanical resonators," *Proceedings,* 2003 IEEE Int. Frequency Control Symposium, Tampa, Florida, May 5-8, 2003, pp. 810-818.

- pg. 816, col. 1: "The observance of slightly higher $Q$ in the second mode design than the fundamental seems to be tied to the use of fewer support beams in the former, which suggests that vibrational energy losses to the substrate can be minimized by using fewer supports, hence, providing fewer energy-loss paths." This provides additional evidence that it is loss to the substate or to the infinite surroundings that matters. All the strain energy losses are generally integrated over a much larger region surrounding a resonator to determine its $Q$.

### D.    "[A]re not excited" [claims 3, 9, 10, 12]

| Akoustis' Preliminary Construction | Qorvo's Preliminary Construction |
|---|---|
| "[A]re not excited" means that the wavelengths do not exist in the whole volume of the active region, or otherwise indefinite. | POM.  If a construction for "are not excited" is needed, it means "are not substantively created" |

I disagree with Dr. Bravman's contention that Qorvo's constructions are correct.

16

DocuSign Envelope ID: 073B858F-2A7C-4FBC-B0C6-642CD7A34DD5

(Bravman Decl. at ¶ 46.)  As with the previous disputed terms, I note that Qorvo's primary contention is that no construction is necessary (undefined "POM") but then offers a proposed construction of the plain and ordinary meaning.  Both propositions cannot be equally correct.  As to no construction of "[A]re not excited" the fact that the parties do not agree on what the POM meaning is suggests that a construction is necessary.

Turning to Dr. Bravman's explanations in support of Qorvo's proposed construction (Bravman Decl. at ¶¶ 47-54), I disagree that the intrinsic record supports Qorvo's proposed construction.  In particular, but without limitation, I disagree with Dr. Bravman's contention that "A reading of the intrinsic record in its entirety indicates that the recited non-excitation relates to reducing the lateral leakage of mechanical energy into the outer region, which is discussed with regard to the previous element."  (Bravman Decl. at ¶ 51.)  That definition is inconsistent with the plain meaning of "not excited" and would be viewed as ambiguously indefinite compared to the term "reduced" used throughout the '755 Patent specification.  If the inventors intended to mean suppressed or greatly reduced, those are the appropriate terms to express as much in the context of this invention.

Qorvo's notion that "not excited" means not "substantially" excited is adding an adjective not present and not clear or evident to a person of ordinary skill in the art absent some supporting intrinsic evidence that the inventors were acting as their own lexicographer.  I do not see any such support in the specification (*compare* '755 Patent, 2:61, 5:15, 7:5) or the prosecution history.  To that end, I do not agree with Dr. Bravman's reliance on the "In other words …"[4]

---

[4] '755 Patent, 5:17-23 ("In other words, the thickness of the material in the outer region of the BAW resonator is selected such that the extinction coefficient (i.e., the rate of exponential decay

explanation in the specification (Bravman Decl. at ¶ 50) justifying a construction inconsistent with the "not excited" terms plain and ordinary meaning.  Nor can I glean from the specification what level of presence of such wavelengths would correspond to a substantial amount vs. an insubstantial amount, while it is straightforward to discern the difference between present and not present.  I also consider Qorvo's proposed construction to be indefinite because, as described above, it fails to inform, with reasonable certainty, to those skilled in the art about the scope of the invention.  Here, "not excited" is properly interpreted as absolute to one of ordinary skill in the art.  It does not mean "a little bit" or "tiny" or "a reduced amount", or "suppressed" but rather "none at all."  This is why I cannot agree with Qorvo's proposed construction of "not excited" as meaning "are not substantively created."

Although Dr. Bravman does not suggest as much, I also disagree with any notion that the inability to ever achieve a total absence of the wavelengths in the whole volume of the active region justifies Qorvo's proposed construction.  The fact that the inventors used the term throughout the specification absent any suggestion of a more scientifically realistic meaning does not change the plain and ordinary meaning that "not existing" means not at all.

Akoustis offers the proposed construction of "are not excited" as "the wavelengths *do not exist* in the whole volume of the active region."  I agree with that proposed construction as the plain and ordinary meaning as understood by one of ordinary skill in the art for the reasons that follow.  In relevant technical literature, when something is "not excited", it is non-existent, as opposed to something that is "reduced", which one skilled in the art interprets as "reduced but

---

for evanescent waves) associated with the exponential decay in the outer region and the imaginary part of the lateral dispersion in the outer region are changed in such a manner that lateral leakage is reduced.").

not eliminated completely." (*See* '755 Patent, 2:33, 51, 54; 3:65; 4:1, 5:8, 23, 25; 6:33; 7:8, 16, 50; 9:49, 11:36.)

### 1.    Extrinsic Evidence Supporting Akoustis' Construction

I strongly disagree with Dr. Bravman's contention that "[t]he extrinsic evidence does not dictate a construction different from that indicated by the intrinsic record." (Bravman Decl. at ¶ 55.)  I find it particularly notable that he fails to identify any examples of extrinsic evidence to support the notion that excitations of one or more wavelengths that don't cause leakage (*e.g.*, minor or transient excitations) is described as "not excited" as used in the claims.  When used in the literature, absolute terms, and phrases like "not excited" are interpreted as such.  One example is the Pauli exclusion principle, which Physics LibreTexts quotes as "The Pauli exclusion principle says that no two electrons can have the same set of quantum numbers; that is, no two electrons can be in the same state. This exclusion limits the number of electrons in atomic shells and subshells."[5]

The scientific literature is also filled with less absolute descriptions of things, where words like "reduced" or "suppress" might be used.  By way of example only, I offer the following:

M. Akgul, A. Ozgurluk, and C. T.-C. Nguyen, "RF channel-select micromechanical disk filters—part II: demonstration," *IEEE Trans. Ultrason., Ferroelect., Freq. Contr.*, vol. 66, no. 1, pp.218-235, Jan. 2019, DOI: 10.1109/TUFFC.2018.2883296.

- Pg. 232, col.1-2: "Suppression of spurious modes often requires creative solutions that are not easily designable and that often result in unique geometries, e.g., the polygons of FBAR filter design [22]. Interestingly, the micromechanical filter design

---

[5] Pauli Exclusion Principle - Chemistry LibreTexts - ttps://chem.libretexts.org/Bookshelves/Physical_and_Theoretical_Chemistry_Textbook_Maps/S upplemental_Modules_(Physical_and_Theoretical_Chemistry)/Electronic_Structure_of_Atoms_ and_Molecules/Electronic_Configurations/Pauli_Exclusion_Principle (reviewed July 11, 2022).

DocuSign Envelope ID: 073B858F-2A7C-4FBC-B0C6-642CD7A34DD5

herein suffers much less from these issues, as shown in Fig. 21, which presents the terminated spectrum for the filter in Fig. 14 over a 100-MHz wide span, showing no strong spurious modes." Note how this passage is careful to use the word "suppression" to indicate that the spurious modes are not necessarily eliminated, but rather are suppressed or reduced to very small magnitudes. In addition, the phrase at the end "showing no strong spurious modes" is careful to include the word "strong" so that it maintains a non-absolute meaning. If the word "strong" were left out, then the phrase "showing no spurious modes" would mean that there are no spurious modes, i.e., none at all or zero energy in spurious modes, which is not the statement this paper would want to make. Leaving out the word "strong" would have made the statement false. Keeping it in makes it true.

## IV.   THE '786 PATENT

### A.    The '786 Patent Disclosure

I incorporate by reference the '786 Patent Background section of the Nguyen Decl.

I disagree with Dr. Bravman's contention that the skilled artisan would understand "the '786 Patent to be directed to BAW resonators using single crystal piezoelectric layers. *See, e.g.*, '786 Patent, 1:40-52, 2:10-28." (Bravman Decl. at ¶ 56), to the extent he suggests that the invention is limited to only single crystal piezoelectric layer BAW resonators. The '786 Patent, entitled "Communication filter using single crystal acoustic resonator devices," relates generally to electronic devices. ('786 Patent, 1:14-15.) More particularly, the invention described in this patent provides techniques related to bulk acoustic wave resonator devices (where this first item explicitly allows for materials other than single-crystal), single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, and the like. *Merely by way of example* the invention is described as applied to a single crystal resonator device for a communication device, mobile device, computing device, among others. ('786 Patent, 1:40-50; 3:45-52; 14:24-31, 62-64.) Nowhere in the specification or the prosecution history do the inventors disclaim a polycrystalline "piezoelectric layer" as used in claim 1. Dr. Bravman's reliance on specification passages that describe how to form the single-crystal layer

DocuSign Envelope ID: 973B858F-2A7C-4FBC-B0C6-642CD7A34DD5

embodiments (Bravman Decl. at ¶ 72) is misguided as is his general mischaracterization of the invention is being based on a single-crystal piezoelectric layer (Bravman Decl. at ¶ 75) simply because the specification references the benefits of single-crystal.

**B.      "piezoelectric layer" [claim 1]**

| Akoustis' Preliminary Construction | Qorvo's Preliminary Construction |
| --- | --- |
| A layer of piezoelectric material having single or multiple crystal structure. | A layer of piezoelectric material having single crystal structure. |

Turning to Dr. Bravman's explanations in support of Qorvo's proposed construction (Bravman Decl. at ¶¶ 59-79), I disagree that the intrinsic record supports Qorvo's proposed construction.  Dr. Bravman misunderstands the significance of references to single-crystal "piezoelectric layer" in the specification.  (Bravman Decl. at ¶ 62 ("Thus, a POSITA would have reviewed the remaining intrinsic record to understand the meaning of 'piezoelectric layer.'").) While the intrinsic record is always relevant in claim construction, nowhere in the specification do the inventors act as their own lexicographer by describing or defining the piezoelectric layer of the claimed invention as limited only to single-crystal materials.  For that reason, I believe the correct construction is the plain and ordinary meaning as understood by one of ordinary skill in the art at the time of the invention.

Dr. Bravman incorrectly contends that "[w]hile the above passage provides some broadening language, a POSITA would understand it, read as a whole, as indicating that the *invention* is to a single crystal piezoelectric layer."  (Bravman Decl. at ¶ 68.)  The passage is clearly instructive as to whether the invention relates strictly to single crystal – "Merely by way of example, the invention has been applied to a single crystal resonator device for a

DocuSign Envelope ID: 973B858F-2A7C-4FBC-B0C6-642CD7A34DD5

communication device, mobile device, computing device, among others." A POSITA would read that and understand that the invention is not so limited. As such, other references to single crystal embodiments lose the limiting significance that Dr. Bravman suggests, including the referenced DESCRIPTION found in the '904 Provisional. (Bravman Decl. at ¶ 63.)

The fact that the inventors described the type of piezoelectric layer "utilized" in the provisional application does not describe the "solution" that is at the heart of the invention. In other words, the invention or solution is not that the resonator utilized a single-crystal piezoelectric layer. Again, as is evident from the totality of the intrinsic evidence, that is merely *an example* of the type of piezoelectric layer that can be utilized to practice the invention. The Background of the Invention describes the "present invention … [m]ore particularly, the present invention provides *techniques* related to bulk acoustic wave resonator devices, including single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, and the like." ('786 Patent, 1:41-44) (italics added).) The specification goes on to describe the benefits of the *inventive techniques* over pre-existing techniques: "One or more benefits are achieved over pre-existing techniques using the invention. In particular, the present device can be manufactured in a relatively simple and cost-effective manner while using conventional materials and/or methods according to one of ordinary skill in the art." ('786 Patent, 2:10-14.) So, the specification describes the materials as conventional – which would include the piezoelectric material, and in my opinion, the skilled artisan at the time of filing of the '786 Patent would have considered both single-crystal and polycrystalline piezoelectric materials to be conventional.

As I understand, the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Independent claim 1 does not include the term "single-crystal" at all to define or describe the piezoelectric layer material. Rather, the single-crystal limitation is found, as an optional feature, of dependent claim 2, underlined to the piezoelectric layer ('786 Patent, 14:62-64) "The device of claim 1 wherein the seed substrate includes silicon, silicon carbide, aluminum oxide, or single crystal aluminum gallium nitride materials." This informs me that the inventors knew when to use the single-crystal modifier if intended to further limit a limitation (like the seed substrate) consistent with embodiments described in the specification.

I believe Dr. Bravman misapplies proper claim construction protocol when he suggests that "It is my understanding that, when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication." (Bravman Decl. at ¶ 76.) This is not a case where "[f]or example, an applicant's repeated and consistent remarks during prosecution can define a claim term by demonstrating how the inventor understood the invention." *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020). Likewise, the inventors did not overcome the plain and ordinary meaning presumption by acting as their own lexicographer to assign a special definition. I understand that to overcome the plain and ordinary meaning presumption a specialized definition must be "clearly set forth" and "explicit." *Prima Tek II, L.L.C v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003). There is no such explicit disclosure of a specialized meaning for "piezoelectric layer." All evidence to the contrary. When the inventors wanted to disclose a single crystal "piezoelectric layer", they used the single crystal modifier. Moreover, the "single-crystal" term is not in any independent claims of the '786 Patent describing the piezoelectric layer.

The inventive technique of claim 1 includes multiple steps, unrelated to the material

23

DocuSign Envelope ID: 973B858F-2A7C-45BC-B0C6-642CD7A34DD5

characteristics of the piezoelectric layer:

1.    A communication filter device comprising:

a piezoelectric substrate having a substrate surface region, the piezoelectric substrate having a piezoelectric layer formed overlying a thinned seed substrate;

a topside metal electrode formed overlying a portion of the substrate surface region;

a topside micro-trench formed within a portion of the piezoelectric layer;

one or more bond pads formed overlying one or more portions of the piezoelectric layer;

a topside metal having a topside metal plug formed within the topside micro-trench and electrically coupled to at least one of the bond pads;

a first backside trench formed within the thinned seed substrate and underlying the topside metal electrode;

a second backside trench formed within the thinned seed substrate and underlying the topside micro-trench;

a backside metal electrode formed underlying one or more portions of the thinned seed substrate, within the first backside trench, and underlying the topside metal electrode; and

a backside metal plug formed underlying one or more portions of the thinned seed substrate, within the second backside trench, and underlying the topside micro-trench, the backside metal plug being electrically coupled to the topside metal plug and the backside metal electrode, wherein the topside micro-trench, the topside metal plug, the second backside trench, and the backside metal plug form a micro-via.  ('786 Patent, 14:33-61.)

In my opinion, the specification makes clear to a person of ordinary skill in the art that any reference to a single-crystal embodiment should not be viewed as limiting the scope or meaning of any claim that does not also specifically identify the piezoelectric layer as single-crystal.  In fact, the prosecution history supports the notion that the inventors and the Patent Office did not view the term as limited to single crystal because there is no mention that the claim is so limited.  The disputed term can refer to either a polycrystalline material or a single-crystal material.

Akoustis offers the proposed construction of "piezoelectric layer" as "a layer of

24

piezoelectric material having single or multiple crystal structure."  I agree with that proposed

construction as the plain and ordinary meaning as understood by one of ordinary skill in the art

for the above reasons.  For the same reasons, I do not agree with Qorvo's proposed construction

that improperly seeks to limit the term to only single crystal materials.

### 2.  Extrinsic Evidence Supporting Akoustis' Construction

Dr. Bravman contends that "[b]ased on my current understanding, it is my opinion that it

is unnecessary to resort to extrinsic evidence to understand the disputed term." (Bravman Decl.

at ¶ 58.)  While I agree with Dr. Bravman that it is unnecessary to resort to extrinsic evidence to

construe the plain and ordinary meaning of "piezoelectric layers," extrinsic evidence is

inconsistent with Qorvo's proposed construction.  Both polycrystalline and single-crystal

materials can be called "piezoelectric materials" or "piezoelectric layers" in technical literature.

Thus, "piezoelectric layer" is not specific to one or the other and a person of ordinary skill in the

art would not read the claim term as limited based on the specification or prosecution history.

There are many examples in the literature that also support the Akoustis construction, so I will

again just point to one.

G. Piazza, P.J. Stephanou, and A. P. Pisano, "Piezoelectric aluminum nitride vibrating
contour-mode MEMS resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 15, no. 6, pp.
1406-1418, Dec. 2006.

- pg. 1406, Title: The title includes "Piezoelectric Aluminum Nitride", where the
  aluminum nitride in this paper is a polycrystalline material. This confirms that
  "piezoelectric" is used to refer to a polycrystalline material.

- pg. 1406, col. 2: "Piezoelectric materials such as aluminum nitride or quartz" is a
  good example of a single sentence where "piezoelectric materials" refers to both a
  polycrystalline material (the aluminum nitride of this paper) and a crystalline material
  (quartz).

## V.      CONCLUSION

While the opinions set forth in this rebuttal report are complete, I reserve the right to supplement this report and any of the opinions expressed herein, should I receive additional information or evidence that is relevant to those opinions between now and the time that I testify at deposition or trial.  Moreover, I reserve the right to serve one or more additional rebuttal expert reports in this litigation if requested to do so, and I reserve the right to supplement the opinions set forth herein as part of such additional rebuttal expert reports in order to account for additional information or evidence that is learned or developed before any such additional report is prepared.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and information.

Dated July 29, 2022                      Respectfully submitted,

By _____
        Clark Nguyen, PhD.

# Exhibit A6

1             IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3     - - - - - - - - - - - - - - - - X

4     QORVO, INC.,                     :

5         Plaintiff,                   :

6             v.                       :   C.A. No.

7     AKOUSTIS TECHNOLOGIES, INC.      :   21-1417-JPM

8     and AKOUSTIS, INC.,              :

9         Defendants.                  :

10    - - - - - - - - - - - - - - - - X

11                         Remote Deposition

12                         Friday, August 12, 2022

13            Deposition via Zoom of JOHN C. BRAVMAN,

14    Ph.D., a witness herein, called for examination by

15    counsel for Defendants in the above-entitled matter,

16    pursuant to notice, the witness being duly sworn by

17    MARY GRACE CASTLEBERRY, a Notary Public in and for

18    the State of Maryland, taken at 9:02 a.m. EDT,

19    Friday, August 12, 2022, and the proceedings being

20    taken down by Stenotype by MARY GRACE CASTLEBERRY,

21    RPR, and transcribed under her direction.

22

```
 1    APPEARANCES:

 2

 3        On behalf of the Plaintiff:

 4            TREVOR J. QUIST, ESQ.

 5            ROY JUNG, ESQ.

 6            Sheppard Mullin

 7            1540 El Camino Real, Suite 120

 8            Menlo Park, California  94025

 9            (650) 815-2654

10            tquist@sheppardmullin.com

11

12        On behalf of the Defendants:

13            ROBERT M. FUHRER, ESQ.

14            Pillsbury Winthrop Shaw Pittman

15            1650 Tysons Boulevard, 14th Floor

16            McLean, Virginia  22102-4856

17            (703) 770-7900

18            robert.fuhrer@pillsburylaw.com

19

20        ALSO PRESENT:

21            CHRISTIAN OWEN, Exhibit Tech

22
```

1                    C O N T E N T S

2    WITNESS                        EXAMINATION BY COUNSEL FOR

3    JOHN C. BRAVMAN, Ph.D.          PLAINTIFF    DEFENDANTS

4         BY MR. FUHRER                              5

5         BY MR. QUIST              174

6

7

8                    E X H I B I T S

9    EXHIBIT NO.                                    PAGE

10   5 - Initial Claim Construction Declaration

11   of John C. Bravman, Ph.D.                       4

12   6 - Rebuttal Claim Construction Declaration

13   of John C. Bravman, Ph.D.                       4

14   7 - United States Patent 9,735,755          106

15   8 - United States Patent 10,256,786         157

16                        - - -

17

18

19

20

21

22

 1                    P R O C E E D I N G S

 2                      (Exhibit Nos. 5 and 6 were marked for

 3                       identification.)

 4     Whereupon,

 5                      JOHN C. BRAVMAN, Ph.D.,

 6     was called as a witness by counsel for Defendants,

 7     and having been duly sworn by the Notary Public, was

 8     examined and testified as follows:

 9                      MR. FUHRER:  Do we need a stipulation

10     because we're doing this by Zoom?  I just feel like

11     that's something that's regular.

12                      MR. QUIST:  Just in terms of jurisdiction,

13     you're referring to, Bob?

14                      MR. FUHRER:  Correct.

15                      MR. QUIST:  Yeah, that's fine.  We can

16     make that on the record if the court reporter wants

17     to request it.

18                      MR. FUHRER:  If she's not prepared, we can

19     move on.  Just deal with it.

20                      MR. QUIST:  Yeah, we'll stipulate to that.

21                      THE REPORTER:  Okay.  Thank you.

22                      MR. FUHRER:  You're welcome.

```
 1              EXAMINATION BY COUNSEL FOR DEFENDANTS

 2     BY MR. FUHRER:

 3          Q.    Good morning, Dr. Bravman.

 4          A.    Good morning.

 5          Q.    Obviously, thank you for being here this

 6     morning.  And just to start things off with, I wanted

 7     to go through what are typically called the ground

 8     rules of deposition.  I assume you're familiar with

 9     them because I assume you've been deposed before,

10     correct?

11          A.    Yes.

12          Q.    Approximately how many times have you been

13     deposed?

14          A.    I think it's about 60.

15          Q.    Okay.  Over what span of time, roughly?

16          A.    Twenty years maybe.

17          Q.    And were those 60 all related to you being

18     an expert witness?

19          A.    A few cases involving by academic career,

20     but mainly as an expert witness, yes.

21          Q.    So you'll be familiar with these, but just

22     to sort of go through them quickly as a refresher,
```



1    obviously you're sworn in, so you're testifying under

2    oath as if you were at trial.

3              You understand that, correct?

4        A.    I do.

5        Q.    And as you can tell, this is being

6    recorded, so all responses have to be verbal.  And

7    please try as best you can to wait until I complete

8    my question before you start talking.  It's

9    particularly important during these Zoom depositions

10   as you may be familiar because there tends to be a

11   slight lag and the court reporter has to get down

12   everything we say, okay?

13       A.    Yes.

14       Q.    If there's a question that I ask that is

15   unclear to you, please ask me to clarify or else I'll

16   presume that you understand the question that's

17   pending, okay?

18       A.    Yes.

19       Q.    I know there's an agreement that this

20   deposition will be limited to four hours of tape

21   time, as I'm sure you're familiar, and that you do

22   have a pressing deadline of I think around 1:30 to



1    complete this.  So we'll make all efforts to meet

2    that objective, okay?

3         A.    Yes.  Thank you.

4         Q.    Is there any reason why you can't answer

5    truthfully and fully today during your deposition?

6         A.    No.

7         Q.    And I understand that you have your

8    initial and rebuttal declarations handy; is that

9    correct?

10        A.    Yes, I have clean, unmarked copies of

11   those and the two patents that I've opined upon.

12        Q.    Thank you.  And I appreciate that.  In the

13   reports -- to clarify, I tend to call them reports,

14   but obviously they're identified as declarations.  If

15   I say reports, will you understand that I mean your

16   declarations?

17        A.    I will.

18        Q.    Thank you.  In those reports, there are

19   places in there where you reference that you

20   understand one thing or another, generally related to

21   a legal proposition.  Are you familiar with what I'm

22   referring to?



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 220 of 598 PageID #: 1147

1      A.    Yes.

2      Q.    And when you make those references to your

3  understanding, is that based on advice from counsel,

4  if you will?

5      A.    A combination of --

6            MR. QUIST:  Objection.  Lacks foundation.

7            THE WITNESS:  -- advice from counsel and

8  prior experience in this domain.

9  BY MR. FUHRER:

10     Q.    Have you previously offered expert

11 opinions as it relates to claim construction?

12     A.    Yes.

13     Q.    And if you know -- and again, if it's

14 approximation, just let me know -- how many times

15 have you done that in the past prior to this case?

16     A.    I would estimate maybe 10 to 15 times.

17     Q.    And each of those times you worked with

18 counsel who gave you some guidance on what the law is

19 on claim construction?

20     A.    Yes.

21     Q.    Did you type your reports yourself,

22 Doctor?



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 221 of 598 PageID #: 11448

1          MR. QUIST:  Objection.  That's privileged.

2   I'll instruct the witness not to answer that.

3          MR. FUHRER:  Trevor, are you sure?  I'm

4   pretty familiar with some cases that say that it's

5   not.

6          MR. QUIST:  I'm pretty sure it is.

7          MR. FUHRER:  I'm not asking for drafts.

8   I'm just asking for this final report and whether or

9   not he typed the words in the report.

10          MR. QUIST:  Okay.  That's okay.

11          THE WITNESS:  Some I physically typed and

12   some I corrected from drafts that I was presented

13   with.

14   BY MR. FUHRER:

15      Q.    Other than the law aspects that we were

16   just discussing, were there other aspects that

17   someone else drafted and you either adopted or

18   rejected?

19      A.    No.

20          MR. QUIST:  Sorry.  Can you restate that

21   question?  I'm sorry, Bob.  I missed part of that.

22          MR. FUHRER:  That's fine.  I can rephrase



1    it, I think.

2    BY MR. FUHRER:

3        Q.    We talked earlier about parts of your

4    report where it references "I understand," and that

5    relates at least in part to the law on claim

6    construction.  And I'm wondering, did you type those

7    sections?

8        A.    I don't --

9            MR. QUIST:  Objection.  Form.

10            THE WITNESS:  I don't believe so.

11   BY MR. FUHRER:

12       Q.    Counsel provided you those sections?

13       A.    Provided me an understanding of --

14            MR. QUIST:  Objection.  Privileged.

15            MR. FUHRER:  If he's taking assumptions

16   from counsel, that's an exception to the privilege.

17            MR. QUIST:  If you're asking that, then go

18   ahead and ask that.  It sounds like you're asking

19   more about drafting and drafts are privileged.

20   BY MR. FUHRER:

21       Q.    Okay.  Dr. Bravman, in your final report,

22   are there sections there that counsel provided you as



1    assumptions on the law as it relates to claim

2    construction?

3        A.    Yes.   What's in my final report reflects

4    my understanding of aspects of the law as counsel

5    explained it to me.

6        Q.    And those aspects are reflected in your

7    report where you reference that you understand

8    certain aspects of claim construction law, correct?

9            MR. QUIST:  Objection.  Form.

10            THE WITNESS:  As I hear your question,

11   yes.

12   BY MR. FUHRER:

13       Q.    And who drafted those parts of your

14   reports?

15       A.    I think Mr. Quist did after our

16   discussions about them.

17       Q.    Okay.   In preparing for today's

18   deposition, what did you do?

19       A.    I reread the documents that have been

20   produced, the various reports or declarations that

21   have been issued and generally reviews like that.

22       Q.    Did you review Dr. Nguyen's rebuttal



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 224 of 598 PageID #: 1151

1    report?

2         A.    Yes.

3         Q.    Did you review a rough transcript of his

4    deposition from two days ago?

5         A.    No.

6         Q.    Did you take any notes during your prep --

7    I'm sorry, excuse me.  My mouth just shut down on me.

8              Did you take any notes during your

9    preparation that would aid you in your testimony

10   today?

11        A.    No.

12        Q.    Other than with counsel, did you speak to

13   anyone else about this deposition?

14        A.    No.

15        Q.    You mentioned earlier that you've been a

16   testifying expert for a number of years.  How many of

17   those -- how many of the cases that you referenced

18   were patent cases or involved patents?

19        A.    Most involved patents.  Some involved

20   other intellectual property matters, but most

21   involved patents.  Probably 90-plus percent.

22        Q.    I guess just to make it clear, you don't

1   hold yourself out as an expert in patent law or claim

2   construction law, do you?

3        A.    No.   I'm a scientist, not an attorney.

4        Q.    You currently are working on other matters

5   as an expert; is that correct?

6        A.    Yes.

7        Q.    How many matters are you working on that

8   you would consider active as of today?

9        A.    Active, probably one or two.

10       Q.    Is being a testifying expert something

11  that you do on a regular basis?

12       A.    It's episodic.   It ebbs and flows over the

13  last many, many years.

14       Q.    And just looking at your CV, it looks like

15  you're sought out by a number of firms and companies.

16             Is that a fair statement?

17       A.    I think so.

18       Q.    Have you ever turned down an engagement

19  because you didn't agree with the potential client's

20  position?

21       A.    Yes.

22       Q.    Are you able to share with me any



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 226 of 598 PageID #: 1153

1   specifics as to the number of times or who they were

2   or why?

3            MR. QUIST:  Objection.  Scope.

4            THE WITNESS:  I would be almost guessing,

5   Counselor.  I -- when I'm first retained, I always

6   tell people you need to understand I'm going to tell

7   the truth as best I understand it, that my -- you are

8   retaining me for my best efforts, not for a specific

9   opinion that you want me to render.

10           And so I've always operated under that

11  presumption and always explained that.  And in some

12  matters it's a case of not of being engaged or not

13  but, within the course of a continuing engagement,

14  indicating what I believe and then moving forward and

15  saying, well, I think that's wrong, I'm not going to

16  defend that opinion.

17  BY MR. FUHRER:

18      Q.   But off the top of your head, you can't

19  say the number of times you've had to -- I'm going to

20  use the word "disengage."  Probably not the best

21  word -- disengage from working with a potential

22  client because you disagreed with him?



1          MR. QUIST:  Objection.  Scope.  Relevance.

2          THE WITNESS:  No, I'm sorry.  I would be

3  guessing at that.

4  BY MR. FUHRER:

5     Q.    In your initial report -- and you can look

6  at it.  It's at paragraph 90.  But it's just a quick

7  sentence and I can read the sentence if it'll

8  expedite things.

9          You say, "My work as a researcher and

10  consultant has included thin film material processing

11  and analysis."  Does that sound familiar?

12     A.    Yes.

13     Q.    Can you explain what you mean by that as

14  far as your experience?

15     A.    So most of my work, but not all of it, has

16  been within the microelectronic domain.  I also

17  worked in superconducting materials.  I -- again,

18  most of my work involves materials in thin film form

19  as workers in this area would understand thin films.

20  There is no rigid limit on thicknesses there, but

21  that's micron scale structures.

22          And then in terms of the analyses, these



1    were electron optical, x-ray-based and

2    micromechanical-based techniques for the most part.

3         Q.    And have you ever been disqualified as an

4    expert over the years of being identified as a

5    testifying expert related to patent matters?

6         A.    Once, because my attorney turned in a

7    prior copy of my CV and the date was wrong and the

8    judge sided with -- I don't know what the right

9    phrase -- the other side.  Other than that, no.

10        Q.    And how long ago was that, if you

11   remember?

12        A.    At least 15 years ago.

13        Q.    Sort of turning to what I'll call the

14   substance here of the reports, the first thing I

15   wanted to talk about was the experts' identification

16   of what they consider the person of ordinary skill in

17   the art.

18        A.    Okay.

19        Q.    Some people call that a POSITA or a

20   POSITA.  I don't know if it's -- you know, what do

21   you go with, Doctor?

22        A.    I heard it always as POSITA.



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 229 of 598 PageID #: 1156

1        Q.    Did you?  I did, too.  Okay.

2        A.    Yeah.

3        Q.    There's a recent POSITA movement going on

4   in case you haven't heard.

5        A.    Okay.  Very de re guerre.

6        Q.    Yes, exactly.  I'm sorry, I didn't mean to

7   make light of things.

8              But my question is, you've read

9   Dr. Nguyen's report.  Obviously, you're familiar with

10  yours.  There seems to be close proximity as to what

11  a POSITA is, but some discussion in the rebuttal

12  reports as to what would be the most beneficial

13  undergraduate degree.

14             Does that sound familiar?

15       A.    Yes.

16       Q.    Okay.  And without getting into who is

17  right and wrong, do you feel like the difference

18  between the two of your views on that would impact

19  the understanding of any of the disputed terms by a

20  POSITA?

21             MR. QUIST:  Objection.  Form.

22             THE WITNESS:  No.  I think my assertion

Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 230 of 598 PageID #: 1157

1    there subsumes Dr. Nguyen's and involving electrical

2    engineering.  And just like there's often a statement

3    such as I made about years of experience plus or

4    minus may influence other things, I think the

5    differences between our definitions would not affect

6    the outcome.

7    BY MR. FUHRER:

8         Q.    Okay.  And in your report -- I guess I'm

9    referencing your initial report.  I'm looking at

10   paragraph 83 if you wish to refer to it.

11        A.    I have that.

12        Q.    And there's a term I'm familiar with.

13   It's called the Canons of Claim Construction.  Are

14   you familiar with that phrase?

15        A.    The Canons of Claim Construction?

16        Q.    Correct.

17        A.    As in canonical?  I don't believe I've

18   heard that phrase.

19        Q.    Maybe it dates me too much.  But I will

20   just get into -- paragraph 83 starts as, "I

21   understand that extrinsic evidence, which is evidence

22   external to the patent and the prosecution history,

1    may also be useful in interpreting patent claims when

2    the intrinsic evidence itself is insufficient."

3          Do you see that?

4    A.    Yes.

5    Q.    And again, is this one of those sections

6    where the attorneys drafted it?

7          MR. QUIST:  Objection.  Privilege.  You're

8    asking about drafts.

9    BY MR. FUHRER:

10   Q.    Okay.  I'll rephrase the question.

11         In your final report, were these words

12   typed by the attorney?

13   A.    Yes, I believe so.

14   Q.    And do you have an understanding of what

15   it means for the intrinsic evidence itself to be

16   insufficient?

17   A.    My understanding is that the intrinsic

18   record, starting with the claims and then including

19   to the specification and then patent application

20   itself, if there is, to a worker of skill, ambiguity

21   or lack of sufficient clarity, that recourse to

22   extrinsic materials is allowable as a matter of law,



1   but is weighted less than the intrinsic record.

2       Q.    You mentioned ambiguity.  Can you help me

3   understand what you mean by that?  What kind of

4   ambiguity are you talking about?  And if you want to

5   use a specific example of one of the disputed terms,

6   that's fine, but I'm just trying to understand what

7   you mean by ambiguity.

8       A.    Patents are an artifact of written

9   language, and written language rarely is as

10  unambiguous, let us say, as a mathematical equation

11  and so it requires interpretation and understanding.

12  And of course what may be ambiguous to one person may

13  not be ambiguous to another person in their

14  respective honest opinions.

15          So I don't think that what is ambiguous

16  can be precisely defined, but if a worker of skill

17  and good faith does or does not understand a concept,

18  he or she would say that it is or is not ambiguous.

19          For me, it's do I understand this in the

20  context of the claims, the specification and the file

21  history.  And in matters where I have found what I

22  would call ambiguity or less than certainty in my



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 233 of 598 PageID #: 1160

1   opinion, then I would like to and have looked in the

2   past to extrinsic evidence.

3        Q.    When you sort of start the process of or

4   the exercise of claim construction, do you understand

5   that you start with the presumption that a term in a

6   claim is entitled to its plain and ordinary meaning?

7        A.    Yes, that's the phrase that I learned long

8   ago.

9        Q.    So if you start with the presumption that

10  it is entitled to its plain and ordinary meaning,

11  when you go to the intrinsic record, are you looking

12  for insufficiency in the record or are you looking

13  for whether the record is inconsistent with the plain

14  and ordinary meaning?

15       A.    I'm looking for aspects of the

16  specification, the claims, the file history, the

17  intrinsic record that support the claim or claim term

18  with regard to its plain and ordinary meaning.

19            I know, for instance, that a patentee can

20  act as his or her own lexicographer, so I'm looking

21  for that.  I'm not going in with a notion of this is

22  right or wrong, but I'm looking for, in terms of the



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 234 of 598 PageID #: 1161

1    appropriate time frame and a POSITA's understanding,

2    that a term to be construed is in fact consistent

3    with what that POSITA in that time frame would find

4    supported in the intrinsic record.

5         Q.    You mentioned that you were looking at the

6    intrinsic record to see whether or not the patentees

7    were acting as their own lexicographer, correct?

8         A.    Yes.

9         Q.    Did you find that in this case as it

10   relates to any of the disputed claim terms in the

11   '755 patent?

12        A.    I made no such assertion, no.

13        Q.    In other words, you examined the intrinsic

14   record and determined that the patentees were not

15   offering a definition for those disputed terms,

16   correct?

17        A.    Correct.

18        Q.    So if you start with a plain and ordinary

19   meaning and the record doesn't give you a different

20   meaning, aren't you still left with the original

21   plain and ordinary meaning?

22             MR. QUIST:  Objection.  Form.



1           THE WITNESS:  Well, I think there's an

2    area, a spectrum of meaning within any language,

3    certainly the English language between those two

4    extremes where a person may have chose -- which is

5    not the case here -- to define the term in a certain

6    word -- certain way, but is using it in a context

7    accessible by the POSITA in the time frame, and

8    because they are the claims, understanding the claims

9    comes in the context of what the intrinsic record

10   describes or supports.

11   BY MR. FUHRER:

12       Q.    So for the '75 -- I'll make sure you were

13   clear on the record.  I think you understand me.  But

14   when you say '755, that's the claim that's being

15   asserted in the case and that you referenced in your

16   report, correct?

17       A.    Yes, the 9,735,755 patent.

18       Q.    Thank you.  And there are three disputed

19   terms that you addressed in your reports, correct, as

20   it relates to the '755 patent?

21       A.    That's correct.

22       Q.    And if you are doing your analysis, as I



1   understand it from your testimony today, you looked

2   at the claim and you saw the disputed term in the

3   claim.  Let's use active region as an example.  And

4   did you at that point have a plain and ordinary

5   meaning in mind?  Did you have an understanding of

6   what that term means to one of skill in the art?

7        A.    Yes.  Active region is a term that's often

8   used in the entirety of the microelectronic domain,

9   in contradistinction to, for example, passive region,

10  outer region, other regions.  And that's why I

11  support the proposal that begins with plain and

12  ordinary meaning.

13       Q.    Is there one definition?  Like is there a

14  technical book that you can go to that would give you

15  the -- or arguably a definition of active region?

16       A.    I don't recall reading text in a textbook

17  or other such tome that purported to give a singular

18  definition as you posit.  To the extent a phrase such

19  as active region is used -- a term I read for 30, 40

20  years -- it's either clear as having a plain and

21  ordinary meaning within a certain context or it might

22  specify something particular.



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 237 of 598 PageID #: 1164

1            But active and action, there's some kind

2    of action, be it electrical, be it mechanical, be it

3    optical that a worker of skill would understand to be

4    referencing to a physical place within a device where

5    the operational characteristics are most directly

6    manifest, understanding that the totality of the

7    device has a purpose most likely at least.

8         Q.    And in this case, just using claim 1 of

9    the '755 patent as an example, it's referring to a

10   BAW resonator, correct?

11        A.    Yes.

12        Q.    So does that give you a more exacting

13   plain and ordinary meaning as opposed to maybe active

14   region in a broader technical sense?

15        A.    So a worker of skill understands a BAW --

16   for the court reporter, that's B-A-W -- BAW

17   resonator, as the claim clearly goes on to explicate,

18   is a device centering around the conversion to and

19   fro of electronic and mechanical energy through a

20   piezoelectric layer most typically.

21            And so I know now I'm -- having read BAW,

22   I know I'm not talking about a MOSFET.  I'm talking



1   about some other type of active region.  And so the

2   worker of skill's mind is immediately drawn to that

3   type of device and its typical utility as a, say,

4   filter, et cetera.  So the active region is different

5   than it might be in many other types of devices where

6   the same words, "active region," are used.

7        Q.    And again, I'm not trying to put you on

8   the spot or ask you to be Webster's Dictionary, but

9   is there a working definition for a person of skill

10  in the art as to what active region means as it

11  relates to BAW resonators?

12            MR. QUIST:  Objection.  Lacks foundation.

13            THE WITNESS:  I've not used it that way.

14  What I did was, with that general understanding of

15  the conversion of electrical signals to mechanical

16  energy as being key and as claim 1, for instance, in

17  the entire patent immediately draws one's attention

18  to the use of a piezoelectric material for that

19  conversion, then of course I want to understand what

20  the patent says about this active region and how it's

21  speaking to that.

22            And of course my opinion, as laid out, is



1  that it's speaking to certain aspects of what the

2  active region does, how it is operated and, most

3  particularly, to a type of energy loss or leakage to

4  laterally situated structures, material structures.

5  BY MR. FUHRER:

6      Q.    In paragraph 84 of your initial report,

7  you say that you understand that words or terms

8  should be given their ordinary and accepted meaning

9  unless it appears that the inventors were using them

10 to mean something else or something more specific.

11         Do you see that?

12     A.    Yes.

13     Q.    Is it your testimony -- or was it your

14 analysis that you saw that the inventors were using

15 something more specific than the plain and ordinary

16 meaning?

17     A.    No.  They were using the plain and

18 ordinary meaning in the context of a set of claims in

19 the patent, focusing on the relationship of this

20 active region and its loss or leakage of energy to

21 structures lateral to it.

22         And so that in particular means the worker

1   of skill, in my opinion, is focused on how the active

2   region interacts with those lateral regions and how

3   the patent claims to address that with the desirable

4   endpoint of minimizing that leakage or loss.

5        Q.    With regard -- we're talking about the

6   active region one.  With regard to that, do you feel

7   like if the inventors used a term in the

8   specification in describing the active region, that

9   you should use those words from the specification?

10            MR. QUIST:  Objection.  Vague.

11            THE WITNESS:  I'm sorry, Counselor, I'm

12   not quite sure I follow your question.

13   BY MR. FUHRER:

14        Q.    That's okay.  In your report, you say that

15   the term "electrically driven" is in the

16   specification, correct?

17        A.    Yes.

18        Q.    And you find that that was important to

19   you when deciding which construction was the most

20   appropriate, correct?

21            MR. QUIST:  Objection.  Vague.

22            THE WITNESS:  Well, again, I'm supporting,



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 241 of 598 PageID #: 1168

1   first, the plain and ordinary meaning, but then, as

2   it goes on to say, if explication is necessary -- and

3   this is in paragraph 21 -- that it's the part of the

4   resonator that is electrically driven to provide the

5   resonator functionality.

6           And so it's the piezoelectric layer

7   between the electrodes most particularly that couples

8   the electronic and the mechanical domains and it's

9   from that region that leakage or loss of mechanical

10  energy is addressed in the patent.

11  BY MR. FUHRER:

12      Q.   And having looked to that section of the

13  specification, did that tell you that -- did that

14  suggest to you that it was inappropriate to look to

15  extrinsic evidence to determine the plain and

16  ordinary meaning?

17          MR. QUIST:  Objection.  Calls for a legal

18  conclusion.

19          THE WITNESS:  It's my opinion that a

20  worker of skill as we've defined it, through the

21  section on a POSITA, would not have to go to

22  extrinsic evidence to understand active region in the



1    context of the '755 patent.

2    BY MR. FUHRER:

3        Q.    That's an area I want to focus on just for

4    a minute.  If I understand what you just testified

5    to, you're saying that you don't think a POSITA would

6    need to go to extrinsic evidence to understand the

7    plain and ordinary meaning; is that correct?

8        A.    Yes.

9        Q.    And I think we talked about earlier, when

10   you start the analysis, you're looking at a term and

11   you're starting with the plain and ordinary meaning,

12   correct?

13       A.    Yes.

14       Q.    So right from the beginning, you've

15   already got a plain and ordinary meaning when you're

16   starting your claim construction analysis, correct?

17       A.    No.  The worker of skill sees a term and I

18   see a term in a context which provides that plain and

19   ordinary meaning certainly as a starting point and

20   then goes from there, as I described earlier.

21       Q.    Okay.  So -- but the starting point is

22   what a person of skill in the art would have



John C. Bravman, Ph.D.                                        8/12/2022

Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 243 of 598 PageID #: 1170.

Page 31

1    understood even before examining the intrinsic

2    record, correct?

3       A.    If you mean does the POSITA in this

4    exemplar have a conception of active region before

5    even reading that term in the claim, yes, I think he

6    or she would.  But then, in reading the claim itself,

7    would, as a POSITA, come to understand most likely a

8    narrower definition.

9           Again harkening back, I read that, I know

10   instantly I'm not talking about the active region in

11   a MOSFET.  So I have a very broad meaning in a

12   certain context.  I read the context of the claim and

13   then I read the entire patent to ensure that

14   construction is or is not required.  And again, it's

15   my opinion that it's not, hence, plain and ordinary

16   meaning appears first in the opinion I support.

17          But then if it's necessary, I go on to

18   describe how it would be understood to a POSITA.

19      Q.    You're saying plain and ordinary meaning

20   without extrinsic evidence is your initial position?

21          MR. QUIST:  Objection.  Form.

22   BY MR. FUHRER:



1      Q.    I'll rephrase it.  I'm sorry.  In your

2  initial report, you show that Qorvo's proposed

3  construction is just plain and ordinary meaning,

4  period, correct?

5      A.    Yes.

6      Q.    And you understand that to mean that they

7  don't even think that the term needs to be construed

8  by the Court, correct?

9      A.    Correct.

10     Q.    And you agree with that?

11     A.    In that context of the time frame and a

12  POSITA level understanding, yes.

13     Q.    You don't believe that the term "active

14  region" should be construed so that the jury could

15  have an understanding as to what active region means?

16          MR. QUIST:  Objection.  Relevance and

17  vague.

18          THE WITNESS:  A jury would be unlikely to

19  be -- would unlikely comprise POSITAs.  So I would

20  expect, if ever asked, to explain what many of these

21  terms mean to a jury, but a worker of skill reading

22  the patent, I think, would not have to have this



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 245 of 598 PageID #: 1172

1    construed and would just be comfortable understanding

2    the claim in the context of the entire patent and the

3    intrinsic evidence for what an active region

4    comprises.

5    BY MR. FUHRER:

6        Q.    Well, you're saying that you would think

7    it important for someone like yourself or some expert

8    to explain to a jury what the term means, correct?

9             MR. QUIST:  Objection.  Mischaracterizes

10   the witness' testimony.

11            THE WITNESS:  I've not thought in this

12   document or my work in here about a jury at all, but

13   my understanding is that I'm providing an

14   understanding at the level of a POSITA and that

15   that's what I tried to do here in a certain time

16   frame as well with that.  A technical matter of

17   almost any type requires explication to people who

18   are not POSITAs.

19   BY MR. FUHRER:

20       Q.    And isn't it Qorvo's position, based upon

21   their proposed construction, that no construction is

22   necessary for these disputed terms?



1          A.      For a POSITA, yes.

2          Q.      If the judge is to construe the terms,

3     would you agree that he should look to extrinsic

4     evidence in order to decide the proper construction?

5                  MR. QUIST:  Objection.  Vague.

6                  THE WITNESS:  I'm not aware of what the

7     judge's obligations are in such a matter.

8     BY MR. FUHRER:

9          Q.      Well, I'll rephrase it.  If you think that

10    I'm asking if it's an obligation of the judge, I'm

11    certainly not suggesting that.

12                 I'm saying that if the judge is to

13    construe these claims, do you not think it would be

14    helpful for the judge to receive extrinsic evidence

15    in order to better understand technical terms like

16    are present in this case?

17                 MR. QUIST:  Objection.  Vague and

18    relevance.

19                 THE WITNESS:  Again, I have no -- I'll use

20    the phrase "legal opinion" about that or opinion

21    based in the law.  I don't know how judges go about

22    this.



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 247 of 598 PageID #: 1174

1              I'm an educator and I believe in

2    education.  And I don't mean just formal teaching or

3    classroom education.  So to render an opinion

4    speaking in the abstract, information is good.  But

5    how a judge goes about this, I have no understanding.

6    BY MR. FUHRER:

7         Q.    And I just want to be clear.  Earlier you

8    said that you agree with Qorvo's position that these

9    terms do not need to be construed, correct?

10        A.    That to a POSITA, they have their plain

11   and ordinary meaning, yes.

12        Q.    Isn't the -- since you've done this -- I

13   guess this claim construction exercise a number of

14   times, isn't the point that the plain and ordinary

15   meaning is that based on the understanding of a

16   POSITA, correct?

17        A.    Yes.

18        Q.    But when you say that a POSITA would not

19   have to use extrinsic evidence, doesn't that confuse

20   the issue to the extent that, whether or not

21   extrinsic evidence should be considered, it's whether

22   it will help the judge come to the right claim



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 248 of 598 PageID #: 1175

1    construction?

2              MR. QUIST:  Objection.  Vague.  Confusing.

3              THE WITNESS:  I don't -- as I hear your

4    question, I think the answer is no.  The judge or any

5    other party will do as he or she best sees fit.  But

6    speaking as a POSITA in a certain time frame and

7    understanding that that means there's a certain set

8    of experiences and body of knowledge that a POSITA

9    has, in that context, my opinion here does support

10   plain and ordinary meaning for these disputed terms.

11   BY MR. FUHRER:

12        Q.    Could you look at paragraph 88 of your

13   initial report?

14        A.    I have that.

15        Q.    You say that with regard to extrinsic

16   evidence, "I understand that all evidence external to

17   the patent and prosecution history, including expert

18   testimony and inventor testimony as well,

19   dictionaries and learned treatises, can also be

20   considered," correct?

21        A.    Yes.

22        Q.    But throughout your report, you then go on



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 249 of 598 PageID #: 1176

1   to say that you don't think extrinsic evidence should

2   be considered, correct?

3           MR. QUIST:  Objection.  Mischaracterizes

4   the witness' testimony.

5           THE WITNESS:  What I say again is that for

6   a POSITA, recourse to using extrinsic evidence in my

7   opinion is not required to understand the disputed

8   terms.

9   BY MR. FUHRER:

10      Q.    So you're not saying that the judge

11  shouldn't consider extrinsic evidence.  You're saying

12  that a POSITA wouldn't need extrinsic evidence,

13  correct?

14          MR. QUIST:  Objection.  Mischaracterizes

15  the witness' testimony.

16          THE WITNESS:  I've answered only with

17  regard to a POSITA and not to a judge or anybody

18  else.

19  BY MR. FUHRER:

20      Q.    And you understand that your report or

21  your testimony would be considered extrinsic

22  evidence, correct?



1          A.      Yes.   It's right there in paragraph 88.

2          Q.      And I think we touched upon this earlier,

3     but for the disputed terms of the '755 patent, you

4     didn't come across any technical or other dictionary

5     definitions that you found represented the plain and

6     ordinary meaning?

7          A.      For an active region, it's -- both the

8     word "active" and the "word" region are so broad in

9     their extent, it would always have to be

10    contextualized.

11         Q.      But I'm saying is there a technical

12    dictionary that defines active region as it relates

13    to MIMs products?

14         A.      I certainly am not aware of a dictionary

15    of MIM structures that has that phrase to find in it,

16    but that's not to say that it doesn't exist.

17         Q.      Did you find any extrinsic evidence where

18    the phrase "electrically driven" was used to describe

19    an active region of a BAW resonator?

20         A.      Electrically driven, as you described, is

21    also a broad assertion in its meaning.  In context,

22    though, in a MIMs device, especially one with a



1  piezoelectric layer that's going to be used as, say,

2  a filter, the worker of skill, you know, does

3  understand that in that context.

4         I did not find that particular phrase that

5  you posited in a technical dictionary either.  That

6  doesn't mean it doesn't exist somewhere.

7     Q.   Did you look to see if you could find

8  electrically driven in any treatise or dictionary or

9  other technical document?

10    A.   So if you type in electrically driven into

11 a Google search or a patent search, you get a very,

12 very broad set of answers.  So the only way to

13 approach that is then to filter it down to whatever

14 domain, whether it's MOSFETs or MIMs tools, devices

15 or something else.  But in terms of a dictionary or a

16 treatise, no.

17    Q.   Did you try to get it more specific than

18 the Google search to BAW resonators and see if

19 electrically driven was ever a phrase used?

20    A.   In my report -- I'm searching for the

21 page -- I give the details of not a broad search, but

22 a more tailored search in Google for that purpose.



1   But I spent time -- more than a little time reading

2   documents of various types and "active region" and

3   terms like that, I never found something that was in

4   the domain that was not consistent with my

5   understanding or, more importantly, my assertion of

6   what a POSITA would understand in this time frame.

7        Q.    But you understand my question is did you

8   find that phrase, those two words used together,

9   "electrically driven," in describing the active

10  region of a BAW resonator?  Because I'm guessing if

11  you found it, it would have been in your report and I

12  would say that it's not there.

13           MR. QUIST:  Objection to form.

14           THE WITNESS:  It's in the intrinsic

15  evidence.  And so whether or not I've looked for that

16  specifically or found it, I certainly don't recall.

17  If I did, I didn't think it was helpful and, as you

18  said, then I didn't put it in my report.  But it's in

19  the intrinsic evidence.

20  BY MR. FUHRER:

21       Q.    So your position is since it's in the

22  intrinsic evidence, then that's the right word to



1   use; is that your position?

2               MR. QUIST:  Objection.  Mischaracterizes

3   the witness' testimony.

4               THE WITNESS:  In particular because it's

5   consistent with what I understand a POSITA would

6   appropriate by reading it, I saw no particular reason

7   to go to the extrinsic evidence.  I'm quite certain

8   the phrase "electrically driven" is found throughout

9   the BAW literature.  Whether it's directly linked to

10  active region or not, I've not offered an opinion

11  about that.

12              It's so plainly in the intrinsic evidence

13  that -- and it's so consistent, in my opinion, with

14  what a worker of skill would understand, that I feel

15  confident about the assertions I supported.

16  BY MR. FUHRER:

17      Q.    I just want to go back to one point I

18  think you just made just to make sure I understand

19  it.  I asked you earlier if the words "electrically

20  driven" used together, did you ever find them in any

21  document that was describing the active region of a

22  BAW resonator?  And I thought your answer was you had



1    not found it, correct?

2         A.    As I sit here now, I can't recall finding

3    it, that's correct.

4         Q.    And if you had to -- to the best of your

5    recollection, did you look for it to see if you could

6    find it?

7         A.    I, to the best of my recollection, do not

8    recall searching for that in particular.  I've read

9    many, many papers in the course of this action and I

10   don't recall looking for that phrase in particular

11   and I don't recall finding it.

12        Q.    And going to your -- I don't want to make

13   you jump around here, but I might because it's the

14   order of my notes.  I apologize.  If you go to your

15   rebuttal report.

16        A.    Okay.  I have it.

17        Q.    Paragraph 7 says that it is my

18   understanding that, in construing claim terms, one

19   should primarily rely on intrinsic patent evidence,

20   which includes the words, the spec, and the

21   prosecution history.

22             Do you see that, right?



1      A.    Yes.

2      Q.    Did you type that or did counsel type

3  that?

4            MR. QUIST:  Objection.  Privileged.

5            MR. FUHRER:  We sort of covered this

6  already, Trevor.

7            MR. QUIST:  Yeah.  I don't think he has to

8  answer any of these questions related to who draft --

9  who wrote what in his declaration.  If you want to

10  ask him if it's, you know, his opinion, you're

11  welcome to do that.

12           MR. FUHRER:  No, I'm going to ask him the

13  same question I asked before, which he answered, by

14  the way.

15           MR. QUIST:  I understand that he answered

16  it and, going forward, I'm going to object on

17  privilege and instruct him not to answer.

18           MR. FUHRER:  Okay.

19  BY MR. FUHRER:

20      Q.    Are you going to follow his instructions

21  and not answer the question, Doctor?

22      A.    I've been advised by counsel not to



1    respond, so I will not.

2        Q.    Okay.  What did you understand "should

3    primarily rely on" intrinsic record to mean?

4        A.    As I write elsewhere in my declaration,

5    that one considers the intrinsic patent evidence and,

6    if one finds those somehow deficient to a POSITA's

7    understanding in a time frame, that one then would

8    look to the extrinsic record for further explication.

9        Q.    And that's what you mean by primarily?

10       A.    Yes.  I mean, a POSITA -- implicit in a

11   POSITA is a professional lifetime of knowledge,

12   acquisition and synthesis.  I've never thought about

13   that as extrinsic evidence, but I bring my

14   understanding, a POSITA brings his or her

15   understanding and that's why the word "primarily" I'm

16   completely comfortable with and understand.

17       Q.    In your opinion, a POSITA would never have

18   to look to extrinsic evidence to understand the

19   meaning of a term, correct?

20       A.    No, not correct.  I've used extrinsic

21   evidence many times in these types of proceedings and

22   there are times when I've argued for it and there's



1    times when I've argued against it.  And times when I

2    find ambiguity or inconsistency with what a POSITA

3    would understand, for instance, I've gone to

4    extrinsic evidence.

5        Q.    And going back to your initial report,

6    paragraph 19.

7        A.    Okay.  I have it.

8        Q.    It starts with, "It is my opinion that the

9    intrinsic record is sufficient for a POSITA to

10   understand the disputed terms," according to their

11   plain and ordinary meaning, correct?

12       A.    Yes.

13       Q.    And that's essentially what you were just

14   describing, that you find that the intrinsic record

15   is sufficient for a POSITA to understand the disputed

16   terms?

17       A.    Correct.

18       Q.    In paragraph 20 of the initial report, you

19   say, "I have considered the extrinsic evidence cited

20   by the parties," but based on your current

21   understanding" -- I'll read it verbatim -- "based on

22   my current understanding, it is my opinion that it is



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 258 of 598 PageID #: 1185

1   unnecessary to resort to extrinsic evidence to

2   understand the disputed terms," correct?

3        A.    Yes.

4        Q.    And when you say to understand, you mean

5   for a POSITA to understand?

6        A.    Yes.

7        Q.    You don't mean the judge?

8        A.    I mean a POSITA.  So unless the judge is a

9   POSITA, no.

10       Q.    Fair enough.  Would you prefer to take a

11  break now or maybe in 10 or 15 minutes?  Whatever you

12  prefer.

13       A.    Ten or 15 minutes would be fine.

14       Q.    Okay.  We'll press on.

15       A.    Thank you.

16       Q.    Sure.  So I know that we were talking

17  about active region in the conversations about claim

18  construction, but I want to focus on active region

19  some more.

20       A.    Okay.

21       Q.    In your rebuttal report, paragraph 16 --

22       A.    I have it.



1          Q.     -- you say, "More importantly, the

2    intrinsic record does not mention motional current at

3    all."

4               Do you see that?

5          A.     Yes.

6          Q.     And it says, "Thus, a POSITA would not

7    have understood active region or outer region of the

8    '755 patent to be defined based on motional current,"

9    correct?

10         A.     Yes.

11         Q.     So can you explain that to me what you

12   mean by the fact that since motional current wasn't

13   in the intrinsic record, a POSITA would not

14   understand the plain and ordinary meaning to include

15   that term?

16         A.     Of course I offered that opinion based on

17   Dr. Nguyen's opinion, so it's in response to that.

18   There are other terms I could have put in quotations

19   there.  It's my opinion that, although, as I say

20   somewhere else, the notion of motional current is

21   indisputed as useful in the art or understood in the

22   art, here the POSITA would not have to make recourse



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 260 of 598 PageID #: 1187

1    to that to understand the claimed invention of the

2    '755 patent.

3            I see nothing that supports that in the

4    intrinsic record and, as I've opined, the intrinsic

5    record provides POSITA with the understanding in

6    context to understand the claims of the patent.  So

7    there's nothing that's, in my opinion, suggesting or

8    motivating or compelling POSITA to go to motional

9    current or other terms that one might find in the

10   extrinsic evidence, but not in the intrinsic

11   evidence.

12       Q.    I mean, what is your understanding of what

13   motional current is as it relates to BAW resonators?

14       A.     Current related to motion.  And so, as

15   I've said a couple of times today, these are devices

16   in which electrical and mechanical energy are coupled

17   and so motional current carries with it both phrases,

18   both concepts.

19       Q.    And I apologize.  Motional current --

20   could you repeat that answer?  I apologize.

21       A.     No problem.  Motional current, a current

22   somehow linked to motion of current -- electrical



1    currents are always involving the motion of charge.

2    That's not what this is referring to.  It's referring

3    to physical movement of a region.

4              And so depending on context, because

5    motional current is a term of art used outside of BAW

6    resonators, it's current associated with physical

7    movement.  And since piezoelectric devices, as I've

8    said a couple times, relate to the interplay of

9    electrical and mechanical energy, it makes perfect

10   sense to a worker of skill.

11        Q.    What makes perfect sense?  I'm sorry.

12        A.    Motional current in the context of a BAW

13   resonator.

14        Q.    Is that a -- are you saying that of course

15   there's motional current in the active region of a

16   BAW resonator?

17        A.    I've not opined on that here because I'm

18   just saying that motional current is not required.

19   But one understands that in an active region of a BAW

20   resonator, when energized, there is physical motion

21   and there are currents and so one does understand

22   that, yes.



1      Q.    I mean, I don't know if you were being

2  careful not to put motional current together in

3  there, but is motional current the term that you're

4  familiar with?

5      A.    Yes.

6      Q.    And you say in paragraph 8 of your initial

7  report, "A BAW resonator is an electromechanical

8  device in which a standing acoustic wave is generated

9  by an electrical signal in a piezoelectric material."

10            Does that sound familiar?

11     A.    Yes.

12     Q.    And what is a standing acoustic wave?

13     A.    A standing wave is one in which -- in

14  general physics, a standing wave is one in which a

15  wave form is established and maintained.  Unlike an

16  ocean wave where the wave is moving, a standing wave

17  does not have that characteristic.

18     Q.    And in terms of motional current, is

19  motional current describing a standing acoustic wave?

20     A.    I've not opined that those are synonymous

21  or not, but they are related to one another.

22     Q.    And what you are saying here is that an



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 263 of 598 PageID #: 1190

1    electrical signal is what generates the standing

2    acoustic wave, correct?

3         A.    Yes.  And a worker of skill understands

4    the opposite is true as well.

5         Q.    And the electrically driven term in

6    Qorvo's construction, is that consistent with the

7    idea of an electrical signal?

8         A.    Yes.  A worker of skill would understand

9    that.

10        Q.    So the -- I'm going to use the phrase the

11   active electrically driving a BAW resonator results

12   in motional current?

13             MR. QUIST:  Objection.  Vague.

14             THE WITNESS:  I'd want to think about

15   that.  I've not offered that opinion.  I don't have

16   an opinion about that as I sit here today.  I've not

17   opined on that.

18   BY MR. FUHRER:

19        Q.    I guess I want to go back to the point,

20   which we can look at your rebuttal report, paragraph

21   16.

22        A.    Okay.



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 264 of 598 PageID #: 1191

1       Q.    Do you have that there?

2       A.    Yes, I do.

3       Q.    Okay.  You say, "More importantly, the

4    intrinsic record does not mention motional current at

5    all," which it sounds like it's the same as in the

6    initial report.  But I just want to drive home the

7    fact that you seem to be saying that since motional

8    current isn't in the intrinsic record, it would be

9    inappropriate to use it in construing active region.

10          Is that what you're saying?

11      A.    What I'm saying is in the -- to this

12   particular point in the third sentence of paragraph

13   16 of my rebuttal report, quote, "nor would a POSITA

14   have considered it necessary to define active region

15   and outer region based on motional current to

16   understand other features of the '755 patent.  And

17   that's the opinion about that, that it's not

18   required.

19          And since it's not found in the intrinsic

20   record, I see no reason, and hence my statement that

21   it's not necessary, to define active region and outer

22   region, et cetera, using that term.



1        Q.     When you say it's not required, what do

2   you mean?

3        A.     It's one does not have to define it that

4   way.  One does not have to have an unambiguous

5   understanding of that term to understand the '755

6   patent and its claims.

7        Q.     Isn't the -- I mean, it seems like both

8   experts -- strike that.  I'll rephrase it.

9             It seems as though both parties are

10  contending that a plain and ordinary meaning is the

11  proper construction, correct?

12            MR. QUIST:  Objection.

13            THE WITNESS:  I'm going to go back --

14            MR. QUIST:  Form.

15            THE WITNESS:  In paragraph 21 of my

16  opening declaration, I recite the two parties'

17  proposed constructions and Qorvo starts with plain

18  and ordinary, but then goes on to explain if a

19  construction is necessary, whereas Akoustis' proposed

20  construction just states not region of the device

21  where motional current density is generated through

22  the piezoelectric layer.  It does not start with a



1   presumption of plain and ordinary, so I don't

2   understand your question.

3   BY MR. FUHRER:

4       Q.    Okay.   I guess -- I don't want to make

5   this a memory test, but do you recall whether

6   Dr. Nguyen identified Akoustis' proposed construction

7   as the plain and ordinary meaning?

8       A.    I don't.   If you point me to it or

9   represent that he did, then of course he did.   But I

10  don't recall.

11      Q.    Well, for purposes of expediting things,

12  if I tell you that he identified it as a plain and

13  ordinary meaning, did you analyze each of the

14  proposed constructions to determine whether or not

15  they were in fact the plain and ordinary meaning of

16  the term -- of the disputed term as understood by a

17  POSITA?

18              MR. QUIST:  Objection.  Vague.

19              THE WITNESS:  Not outside the context of

20  the patent.  So in the context of the patent's claim

21  and -- claims and specification, that's how I did

22  those analyses.  And then opined on what was



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 267 of 598 PageID #: 1194

1    necessary or not.

2              MR. FUHRER:  Why don't we take a 10-minute

3    break.

4              THE WITNESS:  Okay.  10:17 East Coast

5    time.

6              MR. FUHRER:  That would be great.

7              THE WITNESS:  Thank you.

8              (Recess.)

9    BY MR. FUHRER:

10       Q.   Dr. Bravman, before the break, we were

11   talking about active region and if I could have you

12   go back to your initial report, paragraph 11.  And

13   just for the record, this isn't you discussing active

14   region, but I just want to get your opinion or

15   explanation on this.

16             Do you see in that section you're talking

17   about a BAW resonator and it says, "In addition to

18   the electrodes and piezoelectric layer, BAW

19   resonators also utilize supporting structures."

20             Do you see that section?

21       A.   Yes.

22       Q.   And then you identify two types of



1    supporting structures, either the solidly mounted or

2    the FBAR, correct?

3        A.    Yes.

4        Q.    And do you consider what you call here the

5    supporting structures part of the BAW resonator?

6        A.    I don't think I've opined about exactly

7    what the endpoints are of the resonator.  But a

8    worker of skill understands that if someone says here

9    is a BAW resonator, it's going to be inclusive of

10   structures which are there for mechanical support,

11   electrical activation, et cetera.  So in abstract,

12   yes.

13       Q.    In the abstract, yes, it's part of the BAW

14   resonator?

15       A.    A BAW resonator is divided into two

16   categories, as I show here, generally.  And that

17   device is the BAW resonator as opposed to say, its

18   electrically active region or the substrate or the

19   packaging.  Those all could also be explicated if

20   necessary.

21       Q.    And I apologize, maybe it's just for me,

22   but I'm still not clear.  Is it your opinion that the



1    supporting structures are included as part of the BAW

2    resonators?

3             MR. QUIST:  Objection.  Scope.  Relevance.

4             THE WITNESS:  I've not opined in a way

5    that takes a firm position what limits the material

6    extent of a BAW resonator.  It's not, in my opinion,

7    relevant to understanding the '755 patent.

8             What I just said was that, depending on

9    context, if someone handed you a BAW resonator, one

10   would understand it was in some kind of a package, it

11   included a substrate and other structures, but in a

12   different context, one might be including a subset of

13   those structures.  And here it doesn't really -- it's

14   not pertinent to understanding the '755 patent.

15   BY MR. FUHRER:

16        Q.    And why do you say that?

17        A.    Because the claims of the '755 patent

18   speak to aspects of BAW resonators as described in

19   the intrinsic record and so doesn't require the

20   worker of skill to opine about what constitutes the

21   moniker bulk acoustic wave resonator to understand

22   it, that is, "it" being the patent.



1        Q.    So if we look at figure 4 of the '755

2   patent.

3        A.    Okay.

4        Q.    And hopefully just to put what you just

5   testified to in context, do you agree that the Bragg

6   reflectors -- oh, I'll let you say it since you're

7   the expert.

8             Do you see what could be identified as

9   Bragg reflectors in figure 4?

10       A.    Yes.  That's the layers 76, 78, 80, 82 and

11  84 comprise a reflector which is designated structure

12  74.

13       Q.    And do you know whether the inventors

14  identify that portion 74 as part of the active

15  region?

16       A.    So graphically right there, we see that

17  there's a set of dotted lines, as I have often seen

18  on these kind of drawings, which in this vertical

19  cross-section, I'll call it, of a device, it

20  illustrates the lateral extent of active and outer

21  regions relative to the width of the electrodes and

22  the piezoelectric layer subsumed within.



1    Q.    So does this figure 4, in your

2  understanding of the intrinsic record, include all of

3  the reflectors as part of the active region?

4    A.    There's no doubt here on the clawing, it's

5  plain to see that there are fractions of the Bragg

6  reflector within the boundaries of those dotted

7  lines.  Elsewhere in the text it refers to the active

8  region with -- in a variety of ways that are not

9  inconsistent with this drawing.

10       So this is one reason why, if we're going

11  to explicate on a meaning for active region relevant

12  to understanding the claims of the invention, why the

13  electrical activation concept is one that I, you

14  know, support.

15    Q.    The teachings of the intrinsic record, do

16  they tell a person of ordinary skill in the art that

17  all layers of the reflector 74 should be considered

18  part of the active region at least within the dotted

19  lines of active region 90?

20    A.    In this particular graphical depiction of

21  figure 4, it's not perfectly unambiguous whether or

22  not that's the case.  I've seen plenty of drawings



1    where dotted lines are extended to the periphery of

2    the main drawing so they can be labeled as they are

3    here.

4              But clearly, almost anyone could look at

5    this and see that there are at least portions of the

6    Bragg reflector that are physically located in this

7    cross-section between the dotted lines.  And I think

8    in my text of my opening report and in my rebuttal

9    report, I speak further to other descriptions found

10   in the patent.

11       Q.    If you can go to your rebuttal report,

12   paragraph 17.

13       A.    Okay.

14       Q.    It says in paragraph 17, "Each describes

15   an active region."  Do you see that part?

16       A.    Yes.

17       Q.    I'll go on.  "Each describes an active

18   region/area as being defined by particular electrode

19   and piezoelectric layer arrangements that allow the

20   region to be electrically driven."

21              Do you see that?

22       A.    Yes.



1       Q.      And what are you describing there?

2       A.      In the extrinsic evidence, I'm describing

3    the use of the terms "active region" and "outer

4    region" in a certain way, as you just read, and

5    asserting how they are -- how those uses are

6    supportive of Qorvo's construction.

7       Q.      So is it correct that the piezoelectric

8    layer is electrically driven by the voltage input; is

9    that correct?

10      A.      Yes.  That is certainly an aspect of this

11   device's operation.

12      Q.      And if you look at '755 patent column 6.

13      A.      I have it.

14      Q.      Starting at line 14.

15      A.      Yes.

16      Q.      I'm sorry.  Make sure I'm on the right

17   one.  Oh, yeah.  It starts with, "Notably."

18              Do you see that?

19      A.      Yes.

20      Q.      And it says, Notably, as used herein, the

21   active region 62 is the region of the reference BAW

22   resonator 38 that is electrically driven which, in



1    the example of figure 2A, is the region consisting of

2    the bottom electrode, the top electrode and the

3    portion of the piezoelectric layer 40 between the top

4    and the bottom, correct?

5         A.    Yes.

6         Q.    And then it goes on to say, "And the

7    portion of the reflector beneath the bottom

8    electrode," correct?

9         A.    Yes.

10        Q.    In your opinion, would the portion of the

11   reflector beneath the bottom electrode be

12   electrically driven?

13        A.    No.  The electrical driving is between the

14   plates of the two electrodes with the piezoelectric

15   layer in between.

16        Q.    Would you describe the portion of the

17   reflector beneath the bottom electrode as being

18   acoustically driven?

19        A.    It cannot be -- as a principle of physics,

20   it cannot be fully decoupled from the motion in the

21   device above.  And that is the piezoelectric layer

22   and the electrodes.



1           But the purpose of the device is to

2   convert via the electrodes and electrical signal to

3   an acoustic or mechanical signal in the piezoelectric

4   layer.  And, in particular, the patent speaks to how

5   to best contain that within that region and how most

6   particularly to minimize its loss or leakage

7   laterally.

8       Q.    Doctor, I just asked --

9       A.    The patent describes -- sorry.

10      Q.    Go ahead.

11      A.    The patent describes loss of energy down

12  through the reflector layers, but then focuses again,

13  as I said, on the lateral loss.

14      Q.    My question was would you describe the

15  portion of the reflector beneath the bottom electrode

16  to be acoustically driven, yes or no?

17      A.    I have to be honest.  That's not a

18  question I would ask appropriately from a scientific

19  point of view.  But I'll answer first, as you ask it,

20  I think the answer is no.  It's not being -- but I'll

21  go on to say that it's not the point of a BAW

22  structure to acoustically or electrically drive the



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 276 of 598 PageID #: 1303

1  reflector region as part of the overall structure

2  with a certain function and that is to contain the

3  acoustically -- the acoustic wave within the

4  piezoelectric electrode layers.  But it's impossible

5  to fully decouple it acoustically, that is

6  mechanically, which in a different context Dr. Nguyen

7  affirms in his own report.

8      Q.    But you did say that the portion of the

9  reflector 46 beneath the bottom electrode 42 would

10  not be electrically driven, correct?

11      A.    Certainly in the normal context of what

12  electrically driven means, in the context of the '755

13  patent, no.  The electrically driven portion is the

14  fraction of the piezoelectric layer between the

15  electrodes.  So that an electric field can be

16  established across those electrodes through the

17  piezoelectric layer at a known frequency giving rise

18  to acoustic action within the piezoelectric layer.

19      Q.    I know you may not be fond of short

20  answers, but to the extent you can agree or disagree

21  with this, the portion of the reflector 46 beneath

22  the bottom electrode 42 would not be electrically



1   driven.  Do you agree with that, yes or no?

2            MR. QUIST:  Objection.  Vague.

3            THE WITNESS:  In the context of this

4   patent, a POSITA would not call that region

5   electrically driven.

6   BY MR. FUHRER:

7        Q.    Thank you.  So would Qorvo's construction

8   that includes electrically driven exclude the portion

9   of the reflector 46 beneath the bottom electrode 42?

10       A.    For purposes of understanding the claimed

11  invention, yes.

12       Q.    But you agree that the inventors were

13  describing the active region as including the portion

14  of the reflector beneath the bottom electrode?

15       A.    In certain parts of the texts and

16  graphically, yes.  In other parts, he defines it

17  differently.

18       Q.    But in the section we just looked at, at

19  column 6, lines 14 through 21, they're using the term

20  "electrically driven" in describing what portions are

21  included in the active region, correct?

22       A.    Yes, and then goes on to explicate further



1    as we read.

2         Q.    Can you explain why you agree with Qorvo's

3    construction that uses electrically driven that would

4    not include the portions of the reflector beneath the

5    bottom electrode?

6         A.    Because read in the context of the entire

7    intrinsic record of the '755 patent, my opinion is

8    that it's directed to minimization of energy loss in

9    the lateral directions; that is, energy loss

10   emanating out the sides, as it were, of the

11   electrically driven piezoelectric layer as well as

12   from the electrodes.  That's the whole focus of the

13   invention.

14        The patent, as I mentioned a few moments

15   ago, describes energy loss in the longitudinal

16   direction, but then goes on to focus on the lateral

17   loss or leakage and addresses that.  And it's that

18   active region, that part of the active region that's

19   electrically activated.

20        I don't -- it's my opinion that a worker

21   of skill would understand the electrical activation

22   is between the electrodes very clearly and, because



1    of that and because of the purpose of the invention

2    being, again, in my opinion, unambiguously directed

3    to minimization of lateral leakage or loss, those

4    terms are consistently used and do not require

5    discussing aspects of electrically driving the Bragg

6    reflector region.

7         Q.    So when the inventors said it included the

8    portion of the Bragg reflector, you just think that

9    was a misstatement inconsistent with the invention?

10            MR. QUIST:  Objection.  Mischaracterizes

11   the witness' testimony.

12            THE WITNESS:  No, I've not offered that.

13   But there are, in both words and graphical depictions

14   in all technical literature, including patent

15   literature, often a variety of explanatory comments

16   or visualizations.

17            Here what I'm doing, without saying he

18   made a mistake or he's wrong at all, I'm saying the

19   worker of skill would understand that the

20   electrically activated very particularly refers to a

21   voltage being established, a certain frequency across

22   the two electrodes, that this constitutes



1   electrically driven region.  It gives rise to

2   deleterious losses laterally and that's what we're

3   going to address.

4              So I'm not saying he's right or wrong.

5   Those words are consistent with one interpretation at

6   least of the drawing that you directed me to.

7   They're not -- I have no issue with that.  But

8   because of what the patent teaches, in my opinion, I

9   can agree with the term as construed.

10  BY MR. FUHRER:

11      Q.    For Akoustis' proposed construction where

12  it uses the term "motional current density" --

13      A.    Yes.

14      Q.    -- would that be a construction that would

15  include the portion of the reflector beneath the

16  bottom electrode?

17      A.    I haven't offered an opinion about that.

18  You've got highly insulative materials and conductive

19  materials interlayered in that reflector region, so

20  currents through those highly insulating materials,

21  that would at least give one pause.  I don't think of

22  the term as being appropriate for those structures,



1  but I've not opined upon that in my report.  But the

2  notion of currents in part through a dielectric or

3  insulating layer, I don't quite understand that.

4      Q.    In the '755 patent, at the bottom of

5  column 4 and the top of column 5.

6      A.    Okay.  I have it.

7      Q.    You understand that the inventors

8  specifically said to apply the plain and ordinary

9  meaning to one of ordinary skill in the art to terms?

10     A.    Yes.

11     Q.    It goes on as a caveat, I guess, that the

12  terms used herein should be interpreted as having --

13  up to the top of column 5 -- meanings that are

14  consistent with their meaning in the context of this

15  specification, correct?

16     A.    Yes.

17     Q.    And my question is, if the inventors were

18  including the portion of the reflector beneath the

19  bottom electrode as the active region, how is Qorvo's

20  construction being consistent with the specification?

21     A.    Because the specification very clearly in

22  my opinion refers to and speaks to the electrical



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 282 of 598 PageID #: 1309

1   activation between the electrodes and leakage

2   laterally out of that region and ways to minimize

3   that leakage.  And so that's what it's focused on.

4   It distinguishes that in fact from leakage or loss

5   through the reflector region or reflector structures.

6           Independent of whether or not one has

7   labeled that as part of the active region, it

8   acknowledges that -- the existence of loss there, but

9   talks about the loss laterally and focuses upon that.

10      Q.    I want to turn your attention, if I might,

11  to your rebuttal report and paragraph 25.

12      A.    I have that.

13      Q.    In there you say, "A POSITA reviewing the

14  intrinsic record would have understood that the

15  function of the resonator is to provide a desired

16  filtering function," correct?

17      A.    Yes.

18      Q.    And if I remember correctly, I think you

19  were addressing Dr. Nguyen's criticism of the term

20  "functionality" within Qorvo's construction.

21           Does that sound correct?

22      A.    Yes.



1              MR. QUIST:  Objection.  Vague.

2              THE WITNESS:  It's in a full reading of

3    paragraph 25 of my rebuttal report.

4    BY MR. FUHRER:

5         Q.    Thank you.  So is the filtering function

6    that you reference in paragraph 25, is the filtering

7    function of the BAW resonator impacted by the outer

8    region of the BAW resonator according to the claimed

9    invention?

10             MR. QUIST:  Objection.  Vague.

11             THE WITNESS:  Is the functionality

12   impacted, did you ask me?

13   BY MR. FUHRER:

14        Q.    Well, I want to use your words.  You say

15   that the resonator -- the function of the resonator

16   is to provide the filtering function, the desired

17   filtering function, correct?

18        A.    Yes.

19        Q.    So you're talking about the resonator as a

20   whole?

21        A.    Yes.  I mean, that's the purpose -- that's

22   the device I would -- that's the name I would give to



1    the device.

2         Q.    Right.  But under the claimed invention,

3    that device is broken down into two regions, right,

4    the active region and the outer region?

5         A.    Yes.  A worker of skill understands there

6    are others as well, but yes.

7         Q.    But for purposes of claim construction,

8    you agree that whatever construction is determined,

9    it's important that the construction identify where

10   the active region ends and the outer region begins,

11   correct?

12            MR. QUIST:  Objection.  Mischaracterizes

13   the witness' testimony.

14            THE WITNESS:  I think a worker of skill

15   would come to grapple with that concept, but that's

16   not what I've written as being required.  What I've

17   done is affirmed, should a construction be required

18   or desired, is that it's the electrically driven

19   portion of the overall resonator device or structure

20   that is being described when one talks about active

21   region, because it's that region, again, in the

22   context of the patent, from which energy is being



1  lost laterally and to which loss the patent is

2  directed.

3  BY MR. FUHRER:

4      Q.    Well, isn't the invention about comparing

5  different BAW resonators, one where the outer region

6  has N not equal to 1 and one where the outer

7  region -- I'm sorry.  I'm sure I misspoke there.

8          But the point is that, in comparing BAW

9  resonators, the relevant difference between the

10 resonators is that in one, N does not equal 1 and in

11 the other, N equals 1, correct?

12         MR. QUIST:  Objection.  Vague.

13         THE WITNESS:  In the language, as you say,

14 of the patent in various places, this concept of an

15 N -- letter N for the court reporter -- N factor does

16 come into play and shows or asserts that, under

17 conditions where that is the case, that is, N is

18 different than 1, the functionality is improved by

19 reducing the loss or leakage laterally from the

20 electrically driven region.  It does not exclude

21 other loss mechanisms, but it speaks to that loss

22 mechanism most particularly.  And most particularly,



1   when it defines N, it talks about materials in the

2   outer region that may or may not be there to varying

3   thicknesses.

4            And then lastly, I'll say a worker of

5   skill understands an improvement that is claimed with

6   language such as that means, all other things being

7   equal, if you want to show an improvement and assert

8   that it has to do with a ratio of thicknesses of

9   certain structures and is otherwise silent about a

10  before and after state, then one assumes that before

11  and after is unchanged except for, in this case,

12  doing that which changes the value of N away from 1.

13  BY MR. FUHRER:

14       Q.    I mean, I guess my question is, if the

15  claim is directed -- if the invention is directed to

16  having one or more layers in the outer region

17  relative to the active region, don't we have to know

18  where the active region ends and the outer region

19  begins so we know what we're comparing?

20       A.    Yes.  And the patent, relative to my

21  understanding of its claimed inventiveness, speaks

22  directly to that, that is, outside of the boundaries



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 287 of 598 PageID #: 1314

1   of this electrically driven region between the

2   electrodes.

3        Q.    But your position is that the analysis of

4   the active region ends with the piezoelectric layer,

5   that essentially defines the active region because

6   that's the region that's electrically driven?

7        A.    My analysis clearly understands that, for

8   instance, the figure 2, I believe it was, says what

9   it says, but for understanding the claimed invention

10  and the losses trying to be mitigated, that would be

11  an alternative to plain and ordinary meaning of

12  active region because it's directed to, again, the

13  lateral loss or leakage of mechanical energy from the

14  electrically driven region that it seeks to mitigate,

15  that is, the patent seeks to mitigate.

16       Q.    So for the function at aspect -- I guess

17  I'll first ask, we were talking about the N equals 1

18  versus N not equaling 1.  You make reference in your

19  report of prior art BAW resonators and I'm just

20  wondering, is it your intention that all prior art

21  BAW resonators could be described as N equal to 1?

22            MR. QUIST:  Objection.  Scope.  Relevance.



1          THE WITNESS:  I've not asserted that in my

2     reports.

3     BY MR. FUHRER:

4          Q.    And you've not done that analysis?  I

5     mean, you've referenced prior art conventional

6     resonators, correct?

7          A.    BAW resonators --

8               MR. QUIST:  Objection.  Vague.

9               THE WITNESS:  BAW resonators are known in

10    the art before the '755 patent.  The N ratio in '755

11    may or may not be particular to the '755, but I've

12    certainly not said that analysis of all prior art,

13    all resonators has that feature, that is, N equals to

14    1.  The patent clearly is asserting its claimed

15    invention in that context, that if we make this

16    change in structure adjacent to the electrically

17    driven region, we will see an improvement if N is

18    different than 1.

19    BY MR. FUHRER:

20         Q.    But you agree that before the '755 patent,

21    there were BAW resonators where N did not equal 1,

22    correct?



1            MR. QUIST:  Objection.  Relevance.  Scope.

2            THE WITNESS:  I've not done any kind of

3    analysis of that type.

4    BY MR. FUHRER:

5        Q.    For this case.  But you claim to be quite

6    well versed and experienced with BAW resonators,

7    correct?

8        A.    But again, I've not done that analysis.

9    And as I sit here, I certainly don't know the answer

10   to your understandable question.

11       Q.    You don't know whether or not prior art

12   devices had what the patent describes as N not equal

13   to 1?

14            MR. QUIST:  Objection.  Scope.  Relevance.

15            THE WITNESS:  This sounds like a validity

16   analysis and I have not done a validity analysis on

17   '755.

18   BY MR. FUHRER:

19       Q.    Do you know how hard it is or whether it's

20   difficult at all to make N equal to 1 in a BAW

21   resonator?

22            MR. QUIST:  Objection.  Relevance.  Scope.



1    Vague.

2              THE WITNESS:   Speaking in the abstract

3    only, I know that over the decades, great advances

4    have been consistently achieved in control of layered

5    geometries in all three dimensions and that, as a

6    matter of technical ability versus justifiable cost,

7    a very large range of structures today can be in fact

8    produced.   Whether or not they're economically

9    viable, different question.

10   BY MR. FUHRER:

11        Q.    So back to paragraph 25 where we were

12   talking about the filtering function.

13        A.    Yes.

14        Q.    You were equating to the functionality

15   used in Qorvo's claim construction, correct?

16        A.    Yes.

17        Q.    And not to put too blunt a point on it,

18   but you're saying essentially I don't know why

19   Dr. Nguyen's confused about the term "functionality,"

20   it means the filtering function, isn't it the point?

21        A.    Yes.

22        Q.    But this is in the context of the active

1    region.  And is it your contention that it's the

2    active region only that's responsible for the desired

3    filtering function?

4              MR. QUIST:  Objection.  Vague.

5              THE WITNESS:  I would make an analogy of

6    what is it in a car that makes it go forward.  And

7    one would understand there's many parts to that, but

8    if there was an analogy to this patent about cars, it

9    would be talking about the engine, even though other

10   parts may play a role.  But it's the piezoelectric

11   material and how it behaves that around which

12   everything else is designed and built to provide a

13   deliverable or an actual filtering function.  But at

14   the core of it is certainly the electrically driven

15   piezoelectric region that gives you that

16   functionality.

17             I'd be -- I would use, when teaching a

18   class, such phrases as the other structures are there

19   in support of that function, but they can't be

20   eliminated because that function otherwise would not

21   be realized.

22   BY MR. FUHRER:



1     Q.    And in paragraph 28 --

2     A.    Okay.

3     Q.    -- I'm looking at the sentence that starts

4   with the word "Rather."

5     A.    I have it.

6     Q.    It says, "Rather, a POSITA would have

7   understood the 'electrically driven' to be related to

8   the ultimate purpose of the resonator - its filter

9   functionality," correct?

10    A.    Yes.

11    Q.    Wouldn't you agree that current -- you

12  could say the same thing about current, that current

13  is related to the ultimate purpose of the resonator,

14  its filter functionality?

15    A.    Yes.  I mean, if there's no electrical

16  currents involved, then there's no filter -- there's

17  nothing to filter.

18    Q.    Right.  So whether or not it's related to

19  the filter functionality, either -- sorry.  Strike

20  that.  I'll try it again.

21          A POSITA would understand that both terms

22  would be equally applicable to the filter



1    functionality, both electrically driven and current

2    or motional current, correct?

3              MR. QUIST:  Objection.  Vague.

4              THE WITNESS:  No, I would not agree with

5    that.  I mean, I think this is why the concept in

6    particular of a POSITA must come to the fore, because

7    there's probably 50 other things I could read

8    there -- read into that that would be related to the

9    ultimate purpose.

10             The use of a conductor for the electrodes

11   rather than the use of an insulating material, the

12   POSITA understands that.  It doesn't have to be

13   explicated for the POSITA to understand that.  And so

14   that's what I meant by, in the context of a POSITA,

15   the ultimate purpose of the resonator is as I say.

16   It doesn't -- it's not a full explication of all the

17   things that could be considered directly related to

18   its function.

19   BY MR. FUHRER:

20        Q.    I guess I'm just trying to make sure I

21   understand why this sentence was written the way it

22   was, and you agree that motional current is related



1    to the ultimate purpose, correct?

2         A.     In the abstract, yes.  What I've opined on

3    is that, in the '755 patent, especially with that

4    phrase not being found within the patent, a POSITA

5    would not think to make recourse to that term in

6    understanding the claimed invention of the '755

7    patent.

8         Q.     We can shift gears, if we will, back to

9    your initial report and discuss density of mechanical

10   energy.  And if you could go to paragraph 41.

11        A.     Okay.  Okay.  I have that.

12        Q.     I think we've covered that already.  I'll

13   let you skip that.  I'll go on to the next one.  I

14   apologize.  You have in there, in paragraph 41, a

15   sentence that begins with, "Rather, a POSITA reading

16   the '755," do you see that?

17        A.     Yes.

18        Q.     And it says that the '755 patent -- I'm

19   sorry, a POSITA would have understood the, quote,

20   unquote, "density to be used in a broader sense and

21   recognizing general and/or localized mechanical

22   energy reduction, such as shown in figures 3A and



1    3B."

2            Do you see that?

3       A.    Yes.

4       Q.    So in this sentence, you are at least

5    agreeing that there is a need for some volume in

6    order to determine density, correct?

7            MR. QUIST:  Objection.  Misstates the

8    witness' testimony.

9            THE WITNESS:  I've not said that density

10   can exclude a volumetric component, but here, as it

11   says, it's used in a broader sense, again, for a

12   worker of skill, in the context of the patent, to

13   understand what is actually in the claims.

14            And as I say above that, while sometimes

15   the word "density" is used to describe relative

16   amounts, the POSITA would not understand density to

17   require a particular specific mathematical or

18   dimensional relationship.  That's my opinion about

19   how a worker of skill would read the claim elements

20   involving the word "density" in light of the entire

21   patent.

22   BY MR. FUHRER:



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 296 of 598 PageID #: 1223

1       Q.     Well, what do you mean by localized

2   mechanical energy?

3       A.     It could be looking at some region.

4   Again, my before and after explanation a few moments

5   ago about you make a change and you try to hold all

6   other things being equal so you could define any

7   region you wanted to and said before and after the

8   introduction of the invention, one would look at that

9   same region for mechanical energy density.

10      Q.     You referenced figures 3A and 3B.  Can you

11  take a look at those, please?

12      A.     Yes.  They're on page 12 of my -- that

13  report.  I've got them.

14      Q.     And so just for a sense of reference, for

15  figures 3A and 3B, the right side represents the

16  outer region, correct?

17      A.     Yes.

18      Q.     And there are numbers associated with

19  measurements from the outer region, correct?

20      A.     Yes.

21      Q.     Could you describe for me what you

22  understand those to represent?



1          A.     So what he's depicting here are, in 3A as

2     opposed to 3B, the change of material structures as

3     indicated in the patent and by a clear change in the

4     darkest regions, which varies with position, but a

5     clear change, a demonstration that the energy loss is

6     diminished.  When you go to the structure which is

7     depicted in figure 3B, that is when the claimed

8     invention is instantiated.

9          Q.     And you see, I guess, for both figures,

10    but at the top of the numbers, there seems to be a

11    formula, correct?

12         A.     Yep.

13         Q.     And do you understand what that formula

14    is?

15         A.     It looks like current density per micron

16    cubed.

17         Q.     And so the micron cubed represents a

18    volume, does it?

19         A.     Yes.  Because the way this technique

20    works, they're giving that kind of -- it's providing

21    that kind of information and then depicting it

22    graphically.



1        Q.      And what are the Joules that you

2   reference?

3        A.      Level of energy.

4        Q.      So the Joules over the -- I'm sorry, did

5   you say micron --

6        A.      Cubed.

7        Q.      Yes.  Is that determining density?

8        A.      It's a volumetric component, so it's

9   immediately understood as density, yes.

10       Q.      And you mentioned that if you compare the

11  outer region of 3A to 3B, there's a clear change, but

12  it varies by position, correct?

13       A.      Yes.

14       Q.      So under your -- under Qorvo's

15  construction, which you've said is the correct one,

16  you could be measuring the Joules over microns cubed

17  in any region of the outer region, correct?

18       A.      One could.  And that's why this particular

19  depiction, which only shows a two-dimensional slice,

20  is understandable.  One could choose one or more or

21  many regions.  And, again, it's the before and after,

22  as I've called it, that's important to show the



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 299 of 598 PageID #: 1226

1    change.

2           And this shows the spatial arrangements of

3    those changes, and one could then go on to ask

4    whether one wants to specify regions, let us say

5    closer to or further away from the edge of the

6    piezoelectric region in a lateral direction.  One

7    could look at the vertical direction as well.  And so

8    the worker of skill understands that a complete

9    understanding or picture of energy loss would

10   comprise such analysis.

11        Q.    So I know this is a two-dimensional

12   representation, but as best as we can, is it your

13   position that if you just -- I'm going to use my pen.

14   We don't have it here.  And I've just made a pen

15   point somewhere in the outer region.  Are you

16   following me so far?

17        A.    Yes.  I understand.

18        Q.    Would that be an acceptable localized

19   region where you could determine whether or not there

20   was a change in density of mechanical energy?

21             MR. QUIST:  Objection.  Vague.

22             THE WITNESS:  Any region in the outer



1   region could be analyzed as you posit.  A worker of

2   skill would understand that with a capability of

3   making two and three-dimensional assessments, that

4   most typically many such assessments would

5   necessarily be made to understand the energy loss.

6   BY MR. FUHRER:

7        Q.    So in my example, if I make a very small

8   area, very small, the localized region and it shows a

9   reduction in density of mechanical energy, you

10  believe that that is an appropriate measure of the

11  claimed invention as it relates to reducing the

12  density?

13            MR. QUIST:  Objection.  Form.

14            THE WITNESS:  My supposition is you're

15  asking with regard to Dr. Nguyen's assertion that

16  it's over the whole volume as opposed to some

17  localization of that which my construction would

18  allow.  I understand your posit.  But I think no

19  worker of skill would pick a dot and say let's look

20  at that before and after and come to a conclusion.

21            But reading the patent as I believe a

22  worker of skill would with the focus clearly being on



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 301 of 598 PageID #: 1228

1    before and after, I don't think specification of the

2    entire volume is required, nor -- in the same way a

3    dot that you would draw in a certain area would also

4    be, I would deem, inadequate for understanding.

5            And that's why in particular I think these

6    graphical depictions are nice because they show you,

7    as a function of position -- in this case in two

8    dimensions -- what the energy loss is.  And with

9    simulations, of course, possible and very much so in

10   three dimensions and if one validates those

11   simulations with these type of data and gains

12   confidence in the model, then you can look in three

13   dimensions in a very complicated way.

14   BY MR. FUHRER:

15       Q.    So in staying with figures 3A and 3B for a

16   minute, would you agree or disagree that these

17   figures show the average density leaked over the full

18   volume of the outer region?

19            MR. QUIST:  Objection.  Form.

20            THE WITNESS:  I don't -- well, it's only a

21   two-dimensional slice and so it can't be over the

22   full active or outer region.  And I don't know,



1   because there was no further scale markings or

2   anything like that.

3           What it clearly is showing and, you know,

4   it's claiming -- the reader has to decide whether one

5   believes it or not -- that the transition from figure

6   3A to 3B is indicative of the success of the claimed

7   invention and that one sees much lower densities of

8   mechanical energy in the outer region in 3B than in

9   3A and that, therefore, this is emblematic of the

10  success of the invention.  That's what I think 3A and

11  3B are showing.

12  BY MR. FUHRER:

13      Q.    Does the result of the reduction have to

14  ultimately lower the Q to practice the claimed

15  invention?

16          MR. QUIST:  Objection.  Scope.  Relevance.

17          THE WITNESS:  I'm sorry, I heard you say

18  lower the cube?

19  BY MR. FUHRER:

20      Q.    I said Q as in Q factor.

21      A.    I mean, I've not opined on a Q -- Q factor

22  is used in the patent as one measure of the end goal



1    of the patent's invention.  It doesn't claim to be

2    the only way to improve Q.

3         Q.    I guess my question is, and you, I

4    believe, stated earlier, that the idea is everything

5    stays the same, but we change the N.  And my question

6    is, if that's the case, everything is the same but N

7    is changed, in order to practice the invention, does

8    the Q have to improve with the N not equal to 1 in

9    order to practice the invention?

10              MR. QUIST:  Objection.  Scope.  Relevance.

11              THE WITNESS:  Yeah, I've certainly not

12   opined on that.  But since I'm positing a

13   hypothetical, if in fact nothing else changed, if you

14   improve one aspect of the factors that go into Q,

15   it's likely that Q itself would improve.  But that's

16   just in the abstract.

17   BY MR. FUHRER:

18        Q.    And to try to speak plainly, I think, more

19   for my sake, but the difference, it seems, between

20   the constructions -- at least one difference is that

21   there's no volume identified in Qorvo's construction.

22   You would agree with that, correct?



1              MR. QUIST:  Objection.  Form.

2              THE WITNESS:  No.

3    BY MR. FUHRER:

4         Q.    I'm sorry?

5              MR. QUIST:  Dr. Bravman, I don't think the

6    answer was heard clearly.  If you can restate your

7    answer to that question.

8              THE WITNESS:  Oh, I'm sorry, I thought I

9    heard counsel say sorry as if he was going to change

10   the question.  Qorvo's proposed construction does not

11   specifically require any particular volume.

12   BY MR. FUHRER:

13        Q.    It doesn't identify any volume at all,

14   correct?

15        A.    No.  As it says, it talks about the energy

16   lost from the active region.  And one would assess,

17   to practice the invention, that.

18        Q.    And you did recommend -- I take that back.

19   I'll strike that.

20              In your rebuttal report, you did offer

21   what I'll call an addendum to the construction of

22   Qorvo's by giving it some language related to volume,



1    correct?

2              MR. QUIST:  Objection.  Vague.

3              THE WITNESS:  Where would that be?

4    BY MR. FUHRER:

5         Q.    Let's go to paragraph 36 of your rebuttal.

6         A.    Okay.

7         Q.    And the part I'm referring to is where it

8    says, "To the extent."

9         A.    Yes, that's correct.

10        Q.    You say, "To the extent a POSITA would

11   have found it necessary to append a particular

12   'density' explanation to the definition" -- I'm going

13   to jump ahead -- "a POSITA would have added 'measured

14   over a volume of the outer region,'" correct?

15        A.    Yes.

16        Q.    And so that would be -- you're suggesting,

17   although not required, you could -- one could append

18   that to Qorvo's construction?

19        A.    Well, since a volume would include any

20   scale of that volume, then 100 percent of the volume

21   falls within that scope.

22        Q.    I guess my question was, you're suggesting



1    that this could be added to Qorvo's, to the extent a

2    POSITA would find it necessary to include some

3    description of volume, correct?

4         A.    Yes.

5         Q.    And I guess you got -- maybe your last

6    answer was going to be my next question -- but you

7    chose the word a volume of the outer region.

8         A.    Yes.

9         Q.    And what does a volume mean?  Does it

10   essentially mean any volume?

11        A.    Well, a volume rationally described in

12   terms of the patent context.

13        Q.    What would you -- sorry.  Go ahead.

14        A.    No.  I mean, it's not the volume.  It

15   would be a volume of the outer region.  That makes

16   sense in the context of the patent.

17        Q.    What would that volume be in your opinion?

18        A.    It wouldn't be the volume of the

19   electrode.  It wouldn't be the volume of the

20   substrate.  It would be the volume that you would

21   pick of -- within the outer region that speaks to the

22   loss of mechanical energy laterally from the active



1  region.

2      Q.    It speaks to all loss?

3      A.    That's not a -- I've never said that's an

4  illegitimate concept.  I'm saying that's not what

5  necessarily has to be taken away from the patent from

6  the way it's written, because even the patent says a

7  density of mechanical energy in the outer region.  It

8  doesn't say the density.

9      Q.    Why would you exclude the pen point

10  example that I described earlier from your proposed

11  construction of a region?  Wouldn't that be a region?

12      A.    It would be.  But no worker of skill would

13  confine the application of that rationally to a pen

14  point scaled region.

15      Q.    But isn't the purpose of claim

16  construction to spell out what a person of skill

17  would understand it to mean?

18      A.    Yes, in the context of a POSITA.  And a

19  POSITA would never do that.

20      Q.    You don't think it's necessary to give any

21  more description to what the region is other than to

22  say a volume.  You think that that is satisfactory,



1   correct?

2      A.   First and foremost because of -- it's

3   looking at this change in structure, all other things

4   being equal, I would answer your question no, that

5   one could and should describe many such regions.  But

6   knowing, for instance, a POSITA would understand the

7   concept of damping and distance, therefore, from a

8   source of energy becomes an important factor.

9         So maybe the worker of skill wants to

10  define a multiplicity of vertical slices in equally

11  sized arrayed periodically moving away from the

12  active region.  I could easily see that being of

13  importance.  The problem with the whole volume is now

14  you're saying it must be that, and I don't think -- I

15  think that's overly restrictive for what a POSITA

16  would understand.

17     Q.   Is there another way that you would

18  describe what would be a sufficiently large enough

19  volume that it would be meaningful to the claimed

20  results?

21     A.   A worker of skill would not want to make a

22  conclusion in this case of the patent being



1   practiced.  And that would mean the reduction and the

2   loss of energy from the electrically driven region,

3   active region, to the adjacent outer region

4   without -- as a scientist without sufficient

5   confidence that the volumes selected did not support

6   that conclusion.

7              Now, one can argue about, well, therefore

8   this should or should not include a specific volume,

9   but the only volume that can be unambiguously

10  specified is what was chosen, that is, the whole

11  volume.  And I just said that restricts the analyses

12  in ways that I don't think are required or

13  appropriate.

14             MR. QUIST:  And I'll object to the form of

15  that last question.  Apologies.

16  BY MR. FUHRER:

17     Q.    So as I understand the testimony, you

18  think that the full volume is too much, Doctor,

19  correct?

20             MR. QUIST:  Objection.  Mischaracterizes

21  the witness' testimony.

22             THE WITNESS:  It's too much to be the only



1   volume to be considered.

2   BY MR. FUHRER:

3        Q.     Right.  And you agree that the pen point

4   is too small to be a region that could be considered?

5        A.     To be the only region that was considered.

6        Q.     But it seems like you're saying that only

7   a POSITA will know where the happy medium is.

8              MR. QUIST:  Objection.  Mischaracterizes

9   the witness' testimony.

10             THE WITNESS:  No, I didn't frame it that

11  way, I don't think, and I wouldn't.  I would say a

12  POSITA would always want as much information as

13  possible.  But limiting it to, in this case, the

14  whole volume rather than allowing for other types of

15  analyses to me is not required, especially in the

16  context of how the phrase density is used -- density

17  of mechanical energy used throughout the patent.

18  BY MR. FUHRER:

19       Q.     Could you give at least a floor, bottom

20  number?  For instance, if Dr. Nguyen is suggesting

21  100 percent volume, would you say, well, it's got to

22  at least be 50 percent?



1      A.      No, because that's --

2              MR. QUIST:  Objection.  Vague.  Relevance.

3  Scope.

4              THE WITNESS:  As I've indicated, it's the

5  spatial -- or it's the spatial arrangement of such

6  matters that's often of interest to a worker of skill

7  for understanding how the invention is being

8  affected.  And I just think restricting that analysis

9  to only the whole region is just not consistent with

10 how the patent's being written.

11 BY MR. FUHRER:

12     Q.      My question was to half the region, half

13 the full region.

14     A.      But I've not -- no, there's no -- it's

15 completely context dependent.  Because if you go for

16 half, I could say, well, it was 99.999.  That's not

17 whole, but I'd say, sure, that's functionally

18 equivalent to whole.  But those kind of hair

19 splittings are not what I would do and it's my

20 opinion that's not what a POSITA would do in trying

21 to understand the patent.  And it's why the patentee,

22 for instance, showed a two-dimensional slice.  A



1    visualization of a three-dimensional analysis didn't

2    present total density and didn't claim total density.

3    And as I think I say in my report, you know, total

4    density over the full volume, there's some -- that

5    language strikes me as odd.

6        Q.    Well, I was going to get to that next, but

7    just to finish up on this thought before we do and

8    that is, if I gave you the hypothetical that if a

9    region of the outer region, the density of mechanical

10   energy was reduced, but that region was a smaller

11   region than other regions of the -- this is tougher

12   than I thought.  Let me strike that and start over

13   again.

14           So you can imagine where there would be a

15   region in the outer region where there was reduced

16   mechanical energy -- density of mechanical energy,

17   but there could be increases in mechanical energy in

18   other regions, correct?

19           MR. QUIST:  Objection.  Scope.  Relevance.

20           THE WITNESS:  Figure 3 shows that.

21   BY MR. FUHRER:

22       Q.    Well, what I want to talk about is not



1    comparing the two, but if we just -- okay.  Maybe

2    that's what you're saying.

3              Are you saying there are portions of

4    figure 3B that show an increase in lateral energy

5    loss compared to 3A?

6         A.    No, I've not done that analysis.

7         Q.    Okay.

8         A.    I just meant they're not -- there are

9    different regions which show -- there's not a uniform

10   gray there, I'll say.  And so clearly there are -- in

11   that measurement technique, at least -- there are

12   spatial variations in what's interpreted as

13   mechanical energy loss.

14        Q.    In fact, if you look at 3A and you look at

15   the -- I'm going to use the technical term, the

16   elongated dark blob that's in the middle right by the

17   EM formula.  Do you see what I'm referring to?

18        A.    I think so.  Go ahead.

19              MR. QUIST:  I'll object to that as vague.

20              MR. FUHRER:  Okay.

21              MR. QUIST:  I'm actually not sure what

22   you're referring to.  Could you give me a little bit



1    more guidance there, Bob?

2             MR. FUHRER:  Yeah, that's fine.  Am I

3    doing it right?

4             MR. QUIST:  Yeah.  I can see the image and

5    I see something you have circled on there.  Is that

6    the one you're referring to?

7             MR. FUHRER:  Yes.

8             MR. QUIST:  Okay.  Understood.

9    BY MR. FUHRER:

10       Q.    All right.  So if we use that as our data

11   point, right, and then we compare it with the 3B

12   image, does the 3B show a reduction in density of

13   mechanical energy in that region?

14       A.    Not in the equivalent region because it's

15   a different device, right?

16       Q.    Right, right, right.

17       A.    It's spatially equivalent.  This data

18   shows a reduction.

19       Q.    So if we take that, as you suggest, that

20   that's a reduction, but let's assume that 3B, the

21   rest of the outer region shows an increase.

22       A.    You're saying hypothetically?



1      Q.    Yes.  Would that be practicing the claimed

2   invention because we found a region where there was

3   reduction?

4            MR. QUIST:  Objection.  Vague and calls

5   for a legal conclusion.

6            THE WITNESS:  No.  Again, I didn't --

7   that's a big -- that's a felt tip pen blob, right?

8   BY MR. FUHRER:

9      Q.    Right.

10     A.    All I'm trying to preserve is the ability

11  to do analysis with a spatial component because I

12  believe that's what the patent suggests.  Would a

13  worker of skill look at one point, even an elongated

14  blob, and compare it to another one and -- where

15  everything else changed and say you're practicing?

16           I don't have an opinion about that because

17  I think it is a legal matter.  But I'm just -- I

18  want -- I support this because it supports what I

19  believe is the correct interpretation of the patent

20  of maintaining, as these figures do, a spatial

21  component to the mechanical energy assessment.

22     Q.    So under your appended construction where



1    you say a region, correct?

2        A.    Yes.

3        Q.    That would be an example of a region, the

4    blob that I've been referring to, correct?

5              MR. QUIST:  Objection.  Vague.  Scope.

6              THE WITNESS:  It again comes under the

7    rubric of a region.  But as I indicated a few minutes

8    ago, that's not the point of my support for this

9    interpretation.  It is just to maintain the spatial

10   relationships that I believe the patent cites to

11   directly as in figure 3 and wants to maintain.

12             MR. FUHRER:  Our technical guy, is that

13   Christian?

14             EXHIBIT TECHNICIAN:  Yes.

15             MR. FUHRER:  Can we get the '755 up and

16   maybe we can mark this and then take a break so I can

17   make a record of the blob so I don't get yelled at

18   later?

19             EXHIBIT TECHNICIAN:  The '755?  All right.

20   Which document is that underneath?

21             MR. FUHRER:  The '755 patent has been

22   identified in the exhibits that I sent.



1                    THE REPORTER:  It's Exhibit 7, Christian.

2                    EXHIBIT TECHNICIAN:  Okay.  Thank you.  Is

3     this the correct document?

4                    MR. FUHRER:  Yes.  And we can go to

5     figures 3A and 3B, please.  And can we turn that on

6     its side?  And is there a way for me to mark on

7     there?

8                    EXHIBIT TECHNICIAN:  I have to give you

9     control.  One moment.  And then I believe you can

10    annotate.  There you go.  Is this something you're

11    planning to save, though?

12                   MR. FUHRER:  Yes.

13                   EXHIBIT TECHNICIAN:  I'm not sure that you

14    can save it through the Zoom.  Let me --

15                   MR. FUHRER:  Can you mark it and save it?

16    Because I can show you where.

17                   EXHIBIT TECHNICIAN:  Sure.  One moment.

18                   MR. FUHRER:  If I mark it and then you can

19    mark it; is that right?

20                   EXHIBIT TECHNICIAN:  Yeah.  Let me bring

21    this back up.

22                   MR. FUHRER:  If we want to take a break



1    while we fix this and then we can get on the record

2    and make sure you guys are happy with it; is that

3    okay?

4              MR. QUIST:  Yeah, that's fine with me.

5              THE WITNESS:  Works for me.

6              MR. QUIST:  Let's go off the record.

7              MR. FUHRER:  Ten minutes?

8              MR. QUIST:  Ten minutes.

9              MR. FUHRER:  11:40?

10             MR. QUIST:  Yes.

11             (Recess.)

12                  (Exhibit No. 7 was marked for

13                   identification.)

14   BY MR. FUHRER:

15        Q.    Dr. Bravman, before the break, we were

16   talking about figures 3A and 3B from the '755 patent.

17             Do you recall that?

18        A.    Yes.

19        Q.    And in particular, I was using the term

20   "blob" to describe a section, the relative section of

21   the outer region, correct?

22        A.    Yes.

1       Q.      And do you see on the screen now what has

2   been marked as Exhibit 7, which is the '755 patent

3   where I've identified with the highlighted yellow in

4   3A the blob section that I was referring to?

5       A.      Yes.

6       Q.      So what we discussed before the break

7   about that particular blob being a region of the

8   outer region where it shows reduced density of

9   mechanical energy in 3B relative to 3A; is that

10  correct?

11      A.      Yes.  By the shading change, the

12  equivalent region, albeit in a different device,

13  shows that as you say.

14      Q.      And you don't believe -- am I correct in

15  summarizing that you don't believe that that would be

16  a sufficiently large enough region to determine

17  whether or not there was a reduction in density of

18  mechanical energy to practice the claimed invention?

19      A.      I don't think a worker of skill would come

20  to that conclusion knowing that this is one

21  two-dimensional slice of an entire structure, that's

22  correct.



1          MR. QUIST:  Also, I'm sorry, I tried to

2   object.  I was on mute.  So just objection to that

3   last question to form, vague and calling for a legal

4   conclusion.

5          MR. FUHRER:  Okay.

6          MR. QUIST:  Apologies for the interruption

7   there, Bob.

8          MR. FUHRER:  No problem.

9   BY MR. FUHRER:

10     Q.    And at the risk of using layman's terms, a

11  POSITA would not consider that a proper region of

12  outer region because it's just too small?

13         MR. QUIST:  Objection.  Mischaracterizes

14  the witness' testimony.

15         THE WITNESS:  Again, would not consider

16  any one such region as indicative of that.  The

17  patentee himself uses the comparison between 3A and

18  3B visually over a limited region and draws the

19  conclusion based on his visualization that the patent

20  is being practiced.  So that similarly does not

21  define what percentage, as you asked me about

22  earlier, one would conclude, but it illustrates that



1    the spatial distribution of the stress or energy is

2    important to him.

3    BY MR. FUHRER:

4        Q.    You used the term "limited region," that

5    the figures show only a limited region of the outer

6    region; is that correct?

7        A.    Well, I did.  It's a two-dimensional

8    slice.  It doesn't include the other side, the left

9    side, I'll call it, of the device, for instance.  And

10   these things, if they're rectangular or ring-shaped,

11   they have an entire periphery.  So these kinds of

12   issues are common in engineering and science and

13   dealing with them appropriately is the job of a

14   POSITA.

15       Q.    So you mentioned it only shows one of the

16   two sides -- and I thought maybe I had control.

17           MR. FUHRER:  Christian, can you roll up to

18   2A and 2B?  And flip it.

19   BY MR. FUHRER:

20       Q.    Are these the two sides that you were

21   referring to?

22       A.    Yes.  I'll use --



1            MR. QUIST:  Objection.  Vague.

2            THE WITNESS:  -- the term left and right

3    side of the piezoelectric electrode stack.  Two outer

4    regions are marked, but, again, they're also just two

5    two-dimensional slices.

6    BY MR. FUHRER:

7       Q.    So you don't believe that the -- if we go

8    back down to 3A and 3B, you don't think that 3A and

9    3B is representing -- that those numbers are

10   representative of the full volume of the outer

11   region, it's just that slice that's being

12   represented?

13      A.    It's not what's explained, but since those

14   numbers are reduced to colors --

15            (Interruption.)

16            THE WITNESS:  Sorry.  Apologize.  They're

17   being reduced to spatially dependent color

18   variations.  They can't be throughout the whole

19   volume.  They're measured at the location within the

20   spatial resolution of the technique and then mapped

21   into this visualization.  The same thing would be

22   done with a numerical simulation.



1          So they're showing spatial variations of

2  energy densities.  If you say, well, that's over the

3  whole volume, that's not consistent with the

4  depiction.

5  BY MR. FUHRER:

6      Q.    I'm trying to see if I'm able to put a --

7  I'm going to do it the best way I can and I apologize

8  for this.

9      A.    That's okay.

10     Q.    But I'm going to put a little -- well, do

11  you see my little purple spots?

12     A.    I do.

13          EXHIBIT TECHNICIAN:  Would you like for me

14  to fill in between?

15          MR. FUHRER:  Well, I just want you to put

16  a triangle around this area here.  Or rectangle.  I

17  said triangle.  Good golly.  And similarly over here,

18  right?

19  BY MR. FUHRER:

20     Q.    Anyways, Dr. Bravman, I assume you know

21  where I'm going with this, that those marks that I've

22  put on the page, that represents the outer region,



1    correct?

2             MR. QUIST:  Objection.  Vague.

3             THE WITNESS:  That is a two-dimensional

4    slice through part of the outer region of the entire

5    device.

6    BY MR. FUHRER:

7        Q.    And so there may be reduction in that

8    slice, but that doesn't mean that, from a 360-degree

9    perspective, that that region is reduced in energy?

10            MR. QUIST:  Objection.  Vague.  Form.

11            THE WITNESS:  I'm sorry, Counsel, could

12   you ask the question again?

13   BY MR. FUHRER:

14       Q.    Sure.  Maybe I'll lean on you here.  If

15   that's a slice of the outer region, how would you

16   describe the full volume of the outer region?

17            MR. QUIST:  Objection.  Scope.  Relevance.

18            THE WITNESS:  It's not depicted here.

19   BY MR. FUHRER:

20       Q.    I understand it.  But how would you

21   describe it as -- you know, it's that slice, but all

22   the way around?  How would you describe the full



1    volume of the outer region?

2             MR. QUIST:  Objection.  Vague.  Scope.

3    Relevance.

4             THE WITNESS:  In the context of the

5    patent, the outer region is the portion of the

6    overall structure which is subject to the analyses of

7    a reduction in mechanical energy lost from the

8    electrically activated region.  So at a minimum, as

9    we just looked at with figure 2A and 2B, there's a

10   left and right side.  I'll call this the right side.

11   It appears to be the right side in this drawing.  But

12   those are relative terms, of course.

13            But then as your 360-degree posit

14   suggests, I mean, there's some three dimensionality

15   to this whole structure and just as if -- just as

16   there's two-dimensional spatial variations here which

17   are complex, to say the least, one would expect there

18   would be similarly variations around the periphery.

19   The patent does not describe the experimental

20   conditions under which these images were obtained, so

21   I don't know what thicknesses were interrogated, et

22   cetera.



1   BY MR. FUHRER:

2        Q.    So if you're describing this as a slice of

3   the outer region -- is that correct?

4        A.    Yes.  And although, as a depiction, it's,

5   I'll say, a two-dimensional slice, if it was truly

6   two dimensional as a physical object, that makes no

7   sense.  It has to have some thickness in and out of

8   the page, as it were, that was made into a sample and

9   measured.

10       Q.    But can you tell what portion of the full

11  volume of the outer region is represented here?

12            MR. QUIST:  Objection.  Vague.

13            THE WITNESS:  The patent does not go into

14  that level of detail.  It's using this as an

15  illustration of the benefit of the invention.

16  BY MR. FUHRER:

17       Q.    Right.  Maybe that's -- let's go to your

18  rebuttal report, paragraph 37.

19            MR. FUHRER:  Can you keep the document up,

20  please?

21            THE WITNESS:  I have it.  Thirty-seven.

22  BY MR. FUHRER:



1        Q.    The paragraph should begin with the words

2   "In other words"; is that correct?

3        A.    I see it, yes.

4        Q.    And you could obviously read the full

5   paragraph.  I wanted to ask you about the sentence

6   that begins, "As described above."  I'll read it and

7   then you tell me if you want to go back and reference

8   the earlier stuff.

9             "As described above, what is important to

10  the claimed invention is simply that there be a

11  reduced lateral leakage of mechanical energy, which

12  is what is explicitly shown in, for example, figure

13  3B as compared to 3A," correct?

14       A.    Yes.

15       Q.    So when you say what is important to the

16  claimed invention, it is simply that there be reduced

17  lateral leakage, and we look at my example of the

18  yellow blob -- are you with me?

19       A.    Yes.

20       Q.    Is that an example of reduced lateral

21  leakage, which is what is explicitly shown in figure

22  3B?



1          A.     In that particular region, it is, by

2     reduction in the density of what appears to be dark

3     gray or black.   In other regions, it shows a spatial

4     variation.

5          Q.     And in my hypothetical, if the other

6     regions all showed an increase in lateral leakage,

7     would that still be an example of reduced lateral

8     leakage because of what's shown in my yellow blob?

9          A.     It would --

10              MR. QUIST:   Objection.   Vague.

11              THE WITNESS:   In that hypothetical, it

12     would show that -- in that yellow and circled region

13     a reduction.   You're positing hypothetically if

14     everywhere else it showed an increase, depending on

15     the amount of increase, that would determine whether

16     or not the entire change was positive or negative.

17              But what I'm saying is the patentee

18     presents this as evidence that is visually striking

19     without recourse to a particular region, but also

20     without recourse necessarily to the entire region of

21     indicative of success of his patent -- success of his

22     invention, a reduction.   And in this case, it's



1   showing it in a region.

2          And that's why I think, given what the

3   patentee is saying and using to illustrate why, as I

4   say in my report in paragraph 37 of my rebuttal, the

5   only particular density, I just think that's too

6   limiting.  Again, a worker of skill would not go to a

7   dot and say, look, there's a reduction, therefore, it

8   practices the patent.  I haven't said that.

9   BY MR. FUHRER:

10         Q.    Or the yellow blob, correct?

11         A.    Or the yellow blob.

12         Q.    But to use the words from the sentence

13  that I directed your attention to where you say what

14  is important to the claimed invention, what is

15  important to the claimed invention is the improvement

16  in Q, correct?

17         MR. QUIST:  Objection.  Misstates the

18  witness' testimony.

19         THE WITNESS:  As I indicated earlier, Q,

20  sort of near the top of the patent, if you will, is

21  an understood known desire to achieve.  The patent

22  then goes on to describe one aspect of that that can



1   be addressed through its claims.  And again, that's

2   the loss, the minimization of the loss and laterally

3   from the electrically activated region,

4   electrically -- yeah, from the active region to --

5   laterally to the outer regions.

6   BY MR. FUHRER:

7       Q.    I don't think we said this directly, but

8   in the figures 3A and 3B we've been discussing, 3B

9   represents the improvements as claimed, correct?

10      A.    Yes.  If you look at the text of the

11  patent, it makes that clear.

12      Q.    And therefore, we can see visually that N

13  does not equal 1 when you're comparing the one or

14  more layers of 3B to 3A, correct?

15      A.    The patent makes reference of 3A and 3B to

16  figures 2A and 2B.  2A and 2B shows the change in N

17  that you just posited.  And so the very clear

18  implication that this is a depiction of an actual

19  device and energy lost spatially represented that's

20  schematically shown from structures in figures 2A and

21  2B.

22      Q.    So can you say that figure 3 has improved

1   Q or an improved Q factor relative to figure 3A?

2               MR. QUIST:  Objection.  Relevance.  Scope.

3               THE WITNESS:  I think you meant figure 3B

4   relative to 3A?

5   BY MR. FUHRER:

6      Q.    Yes.  If I misspoke, I'll try it again and

7   you tell me.  Go ahead.

8      A.    No.  I've not drawn any conclusions about

9   Q.  I'm just saying that the patentee asserts figures

10  3A and B as showing the inventive improvement of

11  energy loss from the electrically driven active

12  region.

13     Q.    So you don't think that, in order to

14  practice the claimed invention, the device that has

15  the N not equal to 1 needs to improve the Q factor

16  over the device where N equals 1?

17              MR. QUIST:  Objection.  Scope.  Relevance.

18              THE WITNESS:  I've not opined on that.  At

19  most, I've merely noted that the Q factor is cited in

20  a patent as one overarching goal of device

21  improvements, but this is speaking to a very much

22  more limited feature.



1    BY MR. FUHRER:

2        Q.    To put a fine point on it, you don't think

3    a -- strike that.

4            To give you a hypothetical, if a device

5    has an N value not equal to 1 and shows a small

6    regional reduction in energy in the outer region, but

7    overall has a lower Q, that it is still reducing the

8    density of mechanical energy in an outer region?

9        A.    That's a very complex hypothetical.  You

10   said a reduction in Q so the quality factor goes

11   down?

12       Q.    Correct.

13       A.    I'm not drawing any conclusions to Q or

14   the quality factor.  Again, I'm just talking about

15   what the patentee is asserting and how he's

16   validating his assertions and nothing more at this

17   point.

18       Q.    Does the size of the region -- you spoke

19   that, you know, there are regions that would be too

20   small, correct?

21       A.    Too small to rely upon as a singular

22   region?  Sure.



1        Q.     And you thought that the full volume was

2   too much, correct?

3        A.     No.

4             MR. QUIST:  Objection.  Form.

5             THE WITNESS:  I didn't say it was

6   incorrect or improper to use it, but I just said we

7   should not limit it to that.

8   BY MR. FUHRER:

9        Q.     I apologize.  Yes.  So can you tie the

10  amount or the size of the region relative to whether

11  it's increasing Q?

12            MR. QUIST:  Objection.  Vague.

13            THE WITNESS:  I've not offered any --

14            MR. QUIST:  Relevance.

15            THE WITNESS:  I've not offered any such

16  opinion here.  Again, I note and I understand that

17  the improvement in Q isn't typically an overall

18  industrial goal.  This patent is speaking to one

19  aspect of device performance and an improvement in a

20  certain way.

21  BY MR. FUHRER:

22       Q.     So you think the claims are untethered to

1   whether Q is improved or not?

2           MR. QUIST:  Objection.  Calls for a legal

3   conclusion.  Relevance.  Scope.

4           THE WITNESS:  I've not made any conclusion

5   about that one way or the other.  It's not what I was

6   asked to do.

7   BY MR. FUHRER:

8       Q.    You, in your report -- I think it's in

9   paragraph 37 which we just looked at, in your

10  rebuttal report, you referred to the total density as

11  being undefined.  Do you see that?

12      A.    Yes.

13      Q.    And why do you feel like that has to be

14  further defined?

15      A.    Well, if, as appears to be the case,

16  Akoustis' definition as supported by Dr. Nguyen

17  require the full volume of the outer region, then

18  total density to me is redundant.  I mean, once you

19  define a volume, you can talk about a density.  It's

20  understood, especially in light of spatial variations

21  we have here, that whatever that volume is, full or

22  not, you're still going to do an averaging function



1    over that to give you the density.  It's some unit

2    divided by the volume of that region.

3              And so I don't recall ever seeing the

4    phrase "total density."  And that's where -- as soon

5    as I read this, I thought, wow, that's an unusual

6    phrase.  I don't know what that means unambiguously.

7         Q.    So if you dropped "total" and it just read

8    density of full volume in the outer region, would

9    that lose its redundancy in your opinion?

10        A.    Yeah.  Total density is a redundant

11   phrase.  Full volume of the outer region, you say the

12   volume of the outer region, I -- you know, full also

13   seems to be redundant.

14        Q.    So would full volume exclude less than all

15   of the volume?

16             MR. QUIST:  Objection.  Vague.

17   BY MR. FUHRER:

18        Q.    I might have misspoke there.  Give me one

19   second.  Is there a difference in your mind, when

20   we're talking about the outer region as claimed in

21   the '755 patent, between full volume and volume?

22        A.    Depends on the context, right?  If it says



1   a volume, the volume, those are different.  I would

2   think in normal English parlance, it -- so that again

3   just contributes to why I think this is confusing.

4            There's better ways to say what I believe

5   is meant and we're trying to be as unambiguous as

6   possible.  But again, it's the sentence above, the

7   first sentence of 37, that is why I entered into this

8   whole line of reasoning about don't want to limit it

9   to only any particular density.  And if I take full

10  volume and total density as I can guess Dr. Nguyen

11  means, that's limiting it to one particular density.

12  And I don't believe the claim in context requires

13  that.

14       Q.    But it does require more than just a small

15  region, it seems like, correct?

16            MR. QUIST:  Objection.  Vague.

17            THE WITNESS:  Again, to our point or blob

18  analyses, my opinion would be that a POSITA would not

19  look only to that.  It's this use of as much

20  information as possible as figures 3A and B

21  demonstrate is obtainable that I think is of most

22  relevance to a POSITA.



1   BY MR. FUHRER:

2        Q.    So do you disagree that what the claimed

3   invention is about is the reduction of mechanical

4   energy over the full volume of the outer region?

5              MR. QUIST:  Objection.  Vague.  Scope.

6              THE WITNESS:  No.  My opinion is, as

7   written, that's not what the claims require.

8   BY MR. FUHRER:

9        Q.    I understand.  But we were just talking

10  about what you referenced as what was important --

11       A.    Yes.

12       Q.    -- in the claimed invention, correct?

13       A.    Yes.

14       Q.    And I'm saying so you don't think what was

15  important was the reduction of mechanical energy over

16  the full volume of the outer region, correct?

17             MR. QUIST:  Objection.  Misstates the

18  witness' testimony.

19             THE WITNESS:  I think that would be an

20  example of one thing that, under a proper read of the

21  claim, would be important, but there could also be

22  others and that's why I don't want to limit it to



1    one.

2    BY MR. FUHRER:

3        Q.      There could be reductions of mechanical

4    energy in less than the full volume and you would

5    still say that that would be practicing the claimed

6    invention?

7        A.      As written, I don't believe the patent

8    requires that.

9        Q.      But you don't have an opinion as to how

10   much less than the full volume is appropriate before

11   you get too small, correct?

12       A.      And that's what I said before.  We

13   understand, in the patent technical art, but also in

14   many other pieces of technical art, those

15   distinctions often are not drawn often because they

16   can't be perfectly drawn, but a worker of skill has

17   to interpret and work within those contexts.

18               Again, I don't find that the patentee is

19   by any means wrong here.  I'm just interpreting the

20   issued claims as I believe they should be interpreted

21   in light of what he wrote, that is, the patentee or

22   patentees.



1        Q.     And for paragraph -- I'm sorry, paragraph

2   32 of your rebuttal report.

3        A.     Okay.  I have it.

4        Q.     And I think it starts with "In

5   particular," but I want to focus on the sentence that

6   says, "What is clear from."

7        A.     I have it.

8        Q.     It says, "What is clear from the

9   specification (and claims) when read as a whole is

10  that the invention is directed to reducing the amount

11  of mechanical energy - created by the claimed

12  structure -- leaked from the active region," right?

13       A.     That's right.

14       Q.     So when you say leaked from the active

15  region, you mean leaked into the outer region?

16       A.     Correct.

17       Q.     So in order -- and I think it's consistent

18  with what we've been saying, but in order to

19  determine what was leaked from the active region, you

20  have to know a difference in density of mechanical

21  energy in the outer region, correct?

22                 MR. QUIST:  Objection.  Vague.



1    BY MR. FUHRER:

2         Q.    I'll restate it.  In figures 3A and 3B,

3    the figures show a change in the leaked energy by

4    measuring the energy differences in the outer region

5    of the two different resonators, correct?

6              MR. QUIST:  Objection.  Form.

7              THE WITNESS:  In portions of the outer

8    region, yes.

9    BY MR. FUHRER:

10        Q.    And you believe that those figures show a

11   large enough region of the outer region where

12   reduction occurs to practice the claimed invention?

13        A.    That is what the patentee is clearly

14   asserting.  And I think he demonstrates -- he uses

15   this to demonstrate what he means verbally.  He

16   demonstrates it visually.

17        Q.    You're saying that's what the inventor's

18   asserting.  Can you see as an expert in the field

19   that there's a reduction of mechanical energy from

20   figures 3A and 3B?

21        A.    Because of what the color scale or the

22   gray scale here means, yes, one can see that.



1        Q.     As far as the -- from my purple dots --

2   the four corners of the outer region, if you

3   understand what I'm saying --

4        A.     Yes.

5        Q.     -- are you able to determine whether what

6   I'll call the full volume of the outer region, the

7   mechanical energy is reduced in 3B as relative to 3A?

8               MR. QUIST:  Objection.  Vague.  Scope.

9               THE WITNESS:  I've not made that

10  assertion.  And one of course would have to be making

11  certain assumptions or suppositions to make -- to

12  reach that conclusion.  Again, with these kind of

13  visualizations or modeling efforts, both, unless one

14  models the entire structure, you can't draw a

15  conclusion about the entire structure.

16              When a worker of skill looks at this --

17  looks at an issued patent, believes that this is

18  representative of what's happening, a worker of skill

19  would know if he came back an hour later and did the

20  same analysis on the structure in either 3A or 3B --

21  as you say, these are different structures, different

22  samples -- they probably would not look exactly the



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 342 of 598 PageID #: 1269

1   same.  There would be different blobs and splotches

2   because a worker of skill understands kind of

3   experimental variations here, in the same way if one

4   went to a different slice or to the left side as

5   opposed to this right side, one might see different

6   spatial variations.

7           But even without a presentation of the

8   density averaged over your rectangle bounded by four

9   purple dots, it's pretty clear that there's a

10  significant reduction in the darkest regions within

11  the equivalent rectangles, demonstrating that there

12  is a reduction in energy coming out of the

13  electrically driven active region.

14  BY MR. FUHRER:

15      Q.    In paragraph 42 of your rebuttal report --

16  I'll give you a moment.

17      A.    Okay.

18      Q.    I think you say this a few times in the

19  report, but just to focus on it once, you say, "It is

20  my understanding that extrinsic evidence is

21  considered less reliable than intrinsic evidence, and

22  for that reason is generally given less weight than



1    intrinsic evidence," correct?

2         A.    Yes.

3         Q.    So in this instance, as it relates to the

4    density of mechanical energy and what its plain and

5    ordinary meaning is, do you believe there is value in

6    looking to extrinsic evidence to determine the plain

7    and ordinary meaning?

8              MR. QUIST:  Objection.  Vague.  Calls for

9    a legal conclusion and relevance.

10             THE WITNESS:  Here, again, with the full

11   machinery of a POSITA in a time frame within the

12   intrinsic evidence, no.

13   BY MR. FUHRER:

14        Q.    There's no need for -- there's no value to

15   looking to extrinsic evidence?

16             MR. QUIST:  Objection.  Same objections.

17             THE WITNESS:  Yeah.  I guess I wouldn't

18   use the same -- I would not use the expression "no

19   value."  Information is generally good.  But there's

20   no need, as a POSITA, to do what's required in this

21   particular case.

22   BY MR. FUHRER:



1      Q.      And why is that?

2      A.      It's my opinion that it's -- the patent

3  read provides sufficient and consistent information

4  to understand what is being claimed.

5      Q.      I'm focusing specifically on density of

6  mechanical energy.  Does the specification give a

7  definition for density of mechanical energy?

8      A.      In my report, I go through all the places

9  where it uses that phrase and --

10     Q.      Sure.

11     A.      -- and, you know, it doesn't -- as I

12 recall, it doesn't give a specific textbook-like

13 definition, because the outer region as opposed to

14 the active region is unambiguous in my opinion.

15         The phrase "density of mechanical energy"

16 in places is used, in my opinion, to connote energy

17 lost to a region and not necessarily, as I say in my

18 report, to a particular region or even a particular

19 density in that region.

20     Q.      But just to be clear, you're not

21 suggesting that the inventors were their own

22 lexicographer as it relates to density of mechanical



1    energy, correct?

2         A.    No.   Correct.

3         Q.    So there would be no reason to give a

4    construction different than the plain and ordinary

5    meaning so long as that construction was consistent

6    with the intrinsic record, correct?

7         A.    Yes, consistent with the intrinsic record.

8         Q.    But there's no requirement that you have

9    to use the words that are in the intrinsic record to

10   construe the terms, correct?

11            MR. QUIST:  Objection.  Calls for a legal

12   conclusion.

13            THE WITNESS:  Sorry, Counselor, could you

14   ask that question once again?

15   BY MR. FUHRER:

16        Q.    Sure.  If you are determining, like doing

17   what you're doing in this case, determining what the

18   plain and ordinary meaning is to a person of ordinary

19   skill in the art, you aren't bound by the words used

20   by the inventors, correct?

21            MR. QUIST:  Objection.  Vague.  Calls for

22   a legal conclusion.



1            THE WITNESS:  I've never considered it in

2      terms of being bound by the words.  Again, I think in

3      this case, my job here is to opine on what a POSITA

4      would understand certain phrases to mean.  Whether or

5      not one is bound to that, I just haven't thought

6      about it in those terms.  It's my opinion about what

7      a POSITA would understand.

8      BY MR. FUHRER:

9         Q.    To say it differently, for density of

10     mechanical energy, there's no particular language in

11     the specification you're leaning on as the words that

12     are appropriate for the construction, correct?

13            MR. QUIST:  Same objections.

14            THE WITNESS:  Well, in my report in

15     various places, I think I speak to that very

16     question, but I don't talk about someone being bound

17     to that.

18     BY MR. FUHRER:

19        Q.    I guess just to -- we can move on, but I

20     want to make clear, for active region, you endorse

21     Qorvo's construction that uses the words

22     "electrically driven," correct?



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 347 of 598 PageID #: 1274

1       A.      Yes.

2       Q.      And part of your explanation for why you

3  think that's the appropriate construction is because

4  the patentees use the term "electrically driven,"

5  correct?

6       A.      And because that, in my opinion, causes

7  no -- I've used the phrase many times.  The POSITA

8  does not trip on that phrase used in this context.

9  It's understood.  It's expected or it's not

10 unexpected at least.

11      Q.      Okay.  But just in comparison, for density

12 of mechanical energy, there isn't a particular line

13 or term that the inventors use that is embraced in

14 Qorvo's construction, correct?

15      A.      Yeah.  I think the construction does not

16 extract verbatim from the patent.  It gives a

17 construction consistent with a POSITA, what he or she

18 would understand from that phrase in the patent.

19      Q.      So the inventors didn't even offer a

20 particular term as describing what density of

21 mechanical energy is; is that correct?

22              MR. QUIST:  Objection.  Vague.



1          THE WITNESS:  I'm just looking through the

2     patent.

3     BY MR. FUHRER:

4          Q.    I don't -- I'll just -- it's not in your

5     report; is that fair to say?

6          A.    I don't recall extracting a verbatim, as I

7     said, set of words from the patent, that's correct.

8          Q.    Okay.

9          THE WITNESS:  I'm sorry to interrupt.

10    Could we take like a three-minute break?  I think you

11    know what that means.

12          MR. FUHRER:  I do.  No problem.

13          THE WITNESS:  Thank you very much.

14          (Recess.)

15    BY MR. FUHRER:

16          Q.    Dr. Bravman, before the break -- a while

17    before the break, we had talked about the outer

18    region or at least the slice the outer region

19    represented in 3A and 3B and I had put some purple

20    dots to represent the corners.  And now we've, during

21    the break, tried to hand draw in the purple to show

22    the outer region.



1           Do you see that?

2      A.    Yes.

3      Q.    And although it's not perfect, you

4  understand -- is that consistent with our discussion

5  about the outer region of 3A and 3B?

6      A.    Yes.

7      Q.    Thank you.  If we go to paragraph 45 of

8  your rebuttal report.

9      A.    I have it.

10      Q.    And I don't know if it begins at the

11  paragraph, but it says, "What a designer would have

12  been 'mainly concerned' about as to certain

13  performance aspects of a resonator is not the

14  relevant question for the present claim construction

15  analysis."

16           Do you see that?

17      A.    Yes.

18      Q.    And that's you responding to Dr. Nguyen

19  talking about what designers were mainly concerned

20  about, correct?

21      A.    Yes.

22      Q.    And then you go on to say, "Rather, the

1    relevant question is what would 'density of

2    mechanical energy' mean as used in the disputed claim

3    term to a POSITA in the context of the '755 patent,"

4    correct?

5         A.    Yes.

6         Q.    And when Dr. Nguyen says designer, I

7    assume you interpret it as a person of skill in the

8    art; is that fair?

9         A.    Yes.

10        Q.    So would you agree with this statement

11   that the inventors had the same concern as a person

12   of skill in the art when they were describing their

13   '755 invention and that is to avoid degrading Q

14   factor?

15             MR. QUIST:  Objection.  Form.  Vague.

16   Relevance.

17             THE WITNESS:  I, of course, can't say what

18   was in the designers' minds when they wrote the

19   patent, but I have acknowledged several times now

20   that the concept of an improved Q factor is found

21   within the patent.  But then the patentee goes on to

22   then talk about one particular aspect of device



1  performance degradation and how to minimize that

2  particular factor.

3          Again, I don't deny that the quality

4  factor is stated as an overarching goal by the

5  patentee, but the patent is not speaking to that as a

6  whole.

7  BY MR. FUHRER:

8     Q.    You can improve Q factor in a number of

9  ways; is that correct?

10    A.    Yes.

11    Q.    Is one of those ways to decrease the

12  leakage of energy into the outer region as claimed in

13  the '755 patent?

14          MR. QUIST:  Objection.  Form.  Scope.

15          THE WITNESS:  All things being equal, I

16  would answer yes.  All other things being equal, yes.

17  BY MR. FUHRER:

18    Q.    If we turn your attention to the other

19  disputed term from the '755 patent, which is -- it's

20  a long term, but the dispute seems to be over what

21  "not excited" means in the context of the claim.

22          Does that ring familiar to you?



1       A.      Yes.

2       Q.      In your initial report, paragraph 48 --

3       A.      Okay.

4       Q.      -- part of the way down, you say, "In

5   operation, acoustic waves in the piezoelectric

6   layer."

7               Do you see that part?  Or are my notes not

8   accurate?  I apologize.

9       A.      Forty-eight of my opening report?  I guess

10  that's what I'm looking at.  It's on page 14, "As

11  understood in context, the claim specifies that

12  particular wavelengths are not substantively

13  excited."

14      Q.      Right.  I guess the part that I'm

15  referring to is you cite to the patent, correct?

16      A.      Yes, the waves --

17      Q.      And in the patent it --

18      A.      -- in operation.

19      Q.      I'm sorry, yes.  My first question is,

20  when the patent uses acoustic waves, is that the same

21  as the standing waves that you discussed in your

22  report?



1        A.     Yes.   A standing wave is one type of

2   acoustic wave.   Acoustic wave would be a broader

3   term.

4        Q.     Okay.   And here it talks about that the

5   acoustic waves are excited by the electrical signal,

6   correct?

7        A.     Yes.

8        Q.     So is the electrical signal producing

9   unwanted waves as well as wanted waves, if that's a

10  fair way of phrasing?

11              MR. QUIST:   Objection.   Form.

12              THE WITNESS:   I understand, I think, what

13  you're getting at.   But as a filter, for instance, an

14  electronic component is used to remove portions of

15  the complex signal that is being transmitted

16  electrically and so you could call the filter

17  functioning reducing the amplitude of the unwanted

18  waves that you mentioned.

19  BY MR. FUHRER:

20       Q.     And do all BAW resonators reduce the

21  amplitude of the unwanted waves?

22       A.     I think in general, I wouldn't want to go



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 354 of 598 PageID #: 1281

1  so far, but certainly their use as a filter and even

2  perhaps more generally than that, if they're

3  unwanted, you want to reduce them.  So yes.  But

4  just -- I'm not ready to just affirm a very broad

5  statement like that.

6      Q.    Okay.  Maybe I was just trying to poorly

7  paraphrase.  RF filters, RF BAW filters, they're

8  designed to reduce the unwanted waves, correct?  The

9  amplitude of the unwanted waves?

10          MR. QUIST:  Objection.  Vague.  Scope.

11  Relevance.

12          THE WITNESS:  A worker of skill

13  understands a filter to be a device which affects

14  signals of varying frequencies differentially and

15  that capability can be manifest in a variety of ways

16  and it can reduce unwanted frequencies, as you posit.

17  BY MR. FUHRER:

18      Q.    You say in 48, the concept of excitation

19  and nonexcitation is described in that first section

20  where it talks about acoustic waves --

21      A.    Yes.

22      Q.    -- are excited.  How is it describing the



1  concept other than the words that are there?  I mean,

2  is there more we should appreciate?  That's why you

3  included it in your report?

4            MR. QUIST:  Objection.  Vague.

5            THE WITNESS:  Well, I included it in my

6  report because I'm responding to the assertions of

7  the two parties with regard to a certain claim which

8  includes the phrase "are not excited."

9            And my assertion in 48 and elsewhere is

10 that a worker of skill understands that the

11 electrical activation of the device via the

12 electrodes results in the creation of acoustic waves

13 in the piezoelectric layer and that is referred to as

14 excitation.

15            And again, the plain construction that I'm

16 affirming starts with plain and ordinary meaning, but

17 goes on to say, "If a construction is needed," then

18 goes on.  So that's why I'm saying anything here.

19 BY MR. FUHRER:

20      Q.    Do you consider Qorvo's proposed

21 construction to be the plain and ordinary meaning of

22 the disputed term?



1      A.    In the context of the patent, yes.

2   Because except in the abstract of the world of

3   textbook perfection, when you say excited or not

4   excited, the only way to not excite a wave is to

5   not -- in this case, to not energize the electrodes,

6   don't put any voltage across them.

7           But when you put a real RF signal across

8   it, no matter what you do, you're not going to have

9   perfect performance in the active region or in the

10  outer region.  And so that's why I included the word

11  "substantively" to help understand what is meant.

12     Q.    And certainly my question is always going

13  to be tied to a person of skill in the art.

14     A.    Yes.

15     Q.    The plain meaning to a layperson of not

16  excited probably means not excited.  You would agree

17  with that?

18           MR. QUIST:  Objection.  Objection.  Vague.

19           THE WITNESS:  I --

20  BY MR. FUHRER:

21     Q.    I can rephrase it.  I'll strike it, but

22  I'll use Akoustis' construction.



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 357 of 598 PageID #: 1284

1          In the general population, if somebody

2    says not excited, they mean not excited at all.

3    Would you agree with that?

4               MR. QUIST:  Objection.  Scope.  Relevance.

5    Vague.

6               THE WITNESS:  Honestly, I would say no,

7    because, again, there'd be a context to a situation

8    and I'm having an interesting and thoughtful

9    discussion with one of my colleagues and I start

10   explicating something and he says, don't get excited,

11   that could mean something very different as when I'm

12   talking to my 10-year-old.

13          So I don't think it's absolutely digital.

14   I fully understand your question and I'm not trying

15   to be difficult, but I just don't think it's digital

16   in that realm either.

17   BY MR. FUHRER:

18   Q.   I'm just trying to compare, just so it's

19   clear for the record and for the judge, when you say

20   the plain and ordinary meaning of not excited is not

21   substantively -- or not substantively created, I

22   assume that's in the context of BAW resonators and



1    the claimed invention, that you wouldn't use that as

2    the plain and ordinary meaning in general talk.

3         A.    Probably not.  But as you say, we're

4    talking about the context of POSITA in the patent.

5         Q.    Right.

6         A.    And the POSITA understands that there are

7    spurious and other signals that are created, but

8    that's not really what we're talking about here.  So

9    that's the distinction I'm drawing.

10        Q.    Fair enough.  So if a POSITA understands

11   the plain and ordinary meaning of not excited to be

12   not substantively created, how much is required to --

13   well, it's that double negative thing.  How much

14   excitement is allowed where it's still not

15   substantively created?

16              MR. QUIST:  Objection.  Vague.

17              THE WITNESS:  And so, again, we have,

18   commonly at least in the patent art, but also in more

19   technical literature these questions of extent, you

20   know, are always going to be problematic and

21   absolutes are rarely found in nature or physics or

22   electronic devices, so they have to be interpreted.



1          And what -- and of course over time,

2   what's not excited may change to excited.  Things

3   have gotten smaller, faster, cheaper, all those

4   things.  So I fully, believe me, understand.  Not

5   being able to give a cutoff number is not satisfying

6   to especially a layperson.  But what's substantively

7   created is going to have to be understood by a POSITA

8   at a function in a period of time.

9          And this is why I cite what I do in my

10  report about Dr. Nguyen recognizes that you don't

11  have a real world version of do not exist in the

12  whole volume.  He knows that.  And every worker of

13  skill knows that.  And so that means you have to have

14  some version of substantively created because you're

15  not talking about immaterial aspects here, but you're

16  also not writing them out of existence.

17  BY MR. FUHRER:

18      Q.    Of course this term comes from claim 3.

19  If I could direct your attention to claim 3 of the

20  '755 patent.

21      A.    Okay.  I have it.

22      Q.    I guess my question is, it's talking



1    about -- claim 3 is talking about wavelengths.  So we

2    discussed earlier that you have your standing wave,

3    which is the -- is that the good wave, the useful

4    wave?

5         A.    Yeah.

6         Q.    What would you call it?

7         A.    Right.

8         Q.    And acoustic wave, which is, I guess,

9    broader in scope and would include disfavored waves.

10   And so this claim 3 is talking -- it seems to be

11   about the bad waves.  Would you agree with that?

12        A.    Yeah --

13             MR. QUIST:  Objection.  Vague.

14             THE WITNESS:  It -- when a worker of skill

15   reads "is acoustically matched in such a manner that

16   one or more wavelengths that cause energy leakage

17   into the outer region," that means, in my opinion, if

18   something beyond plain and ordinary needs to be

19   stated, not substantively created because a worker of

20   skill knows that there's always going to be some

21   measure of spurious signal which is there, these are

22   imperfect devices, et cetera.  And that's why I



1    offered the construction or the support for the

2    construction that I do.

3    BY MR. FUHRER:

4        Q.    I guess my question is, the standing waves

5    we talked about, correct?

6        A.    Yep.

7        Q.    Those are the good waves?

8        A.    Yes.

9             MR. QUIST:  Objection to form.

10   BY MR. FUHRER:

11       Q.    Would they also fall under the one or more

12   waves that cause energy leakage?

13            MR. QUIST:  Objection.  Form.  Scope.

14            THE WITNESS:  Yes, because any energy in

15   one region, the acoustic matching itself that this

16   refers to is not going to be perfect.  And so this is

17   the whole issue with transmission lines and other

18   aspects of technology in which these devices are

19   used.

20            Just like the worker of skill understands

21   a filter function is not a steep cliff where you go

22   from 100 percent transmission to zero percent



1   transmission.  There's, you know, a six-decibel

2   roll-off per decade of frequency change.  Those kind

3   of claims.  It's all that background that a POSITA

4   has and understands in context, as context when

5   reading these kinds of, you know, what could appear

6   to be absolute terms, understands a worker of skill

7   doesn't speak in that way and interprets accordingly.

8   And that's where the concept of substantively comes

9   from.  It's of substance to the claimed invention.

10  BY MR. FUHRER:

11      Q.    If the wavelength is not substantively

12  created, can it still cause energy leakage in the

13  outer region?

14          MR. QUIST:  Objection.  Form.  Scope.

15          THE WITNESS:  Mathematically, yes.  And

16  again, we get to substantively, does that amount of

17  leakage matter?  But then that's even before we get

18  to the important point.  We're talking before and

19  after the invention is instantiated and what

20  differences do I have?  Are the differences

21  themselves substantive?  If they are, then that's the

22  invention.



1          Whether or not that perfectly obtains for

2   all wavelengths, the worker of still understands you

3   can't in effect answer that question.  That's why I

4   think a worker of skill just thinks substantively

5   without even it coming consciously to mind.

6   BY MR. FUHRER:

7       Q.    While you still have the patent in front

8   of you and looking at claim 3 --

9       A.    Yes.

10      Q.    -- can you also look at claim 1 and the

11  last limitation of claim 1?

12      A.    Okay.

13      Q.    And it starts with, "N is within range"?

14      A.    Yes.

15      Q.    And to me, it suggests that if N is not

16  within a range of values, it will not practice the

17  invention.  Is that your understanding?

18          MR. QUIST:  Objection.  Form.  Vague.

19          THE WITNESS:  Well, a practicing or

20  infringement type analysis I've not done, but the

21  words are plainly there.  And element -- the last

22  element says N was within a range of values.  And



1    then it doesn't give those values.  What it gives is

2    the outcome of those values and that is in terms of,

3    as it says, a density of mechanical energy in the

4    outer region.

5    BY MR. FUHRER:

6        Q.    And the specification doesn't give those

7    values either, correct?

8        A.    No, quite properly, because that's going

9    to be dependent on a whole host of things.

10        Q.    So a person of skill in the art to

11    practice this would have to basically do their own

12    simulations and trial and error; is that correct?

13            MR. QUIST:  Objection.  Scope.  Relevance.

14            THE WITNESS:  A simulation or reduction to

15    practice and comparison as that claim element clearly

16    calls for would be required to see if this effect was

17    obtained.

18    BY MR. FUHRER:

19        Q.    So in comparing that last limitation of

20    claim 1, which you're familiar with, correct?

21        A.    Yes.

22        Q.    Comparing it to claim 3, do you have an



1    understanding as to what, if any, difference is being

2    described in claim 3 as to claim -- that limitation

3    of claim 1?

4                MR. QUIST:  Objection.  Relevance.  Scope.

5    Vague.

6                THE WITNESS:  Claim 3 is dependent on

7    claim 1, so it incorporates all of claim 1.

8    BY MR. FUHRER:

9        Q.    Sure.

10       A.    And it goes on to describe additional

11   constraints on N.  That's the "wherein N is such

12   that."  And it includes now the acoustically matched

13   concept itself then having a derivative effect.  So

14   acoustically matched in such a manner that one or

15   more wavelengths that cause energy leakage into the

16   outer region are not excited in the active region.

17   And that's -- it's adding explication that's not

18   found in 1.

19       Q.    So earlier I believe you testified that

20   the waves generated would include the standing waves,

21   which are the good waves, and you don't want to

22   reduce those so that they're not substantively



1    created, correct?

2              MR. QUIST:  Objection.  Vague.

3              THE WITNESS:  You don't want to be

4    diminishing the benefit of the device, which is the

5    creation of a certain set of waves which give rise to

6    the device's functionality.  So without limiting it

7    to a particular standing wave, I'll answer yes to

8    your question.

9    BY MR. FUHRER:

10       Q.    Well, my question is to standing waves.

11   The standing waves -- well, I'll add on to the

12   question.  My question now is are standing waves

13   waves that cause energy leakage into the outer

14   region?

15             MR. QUIST:  Objection.  Vague.

16             THE WITNESS:  I haven't opined on that,

17   but I already answered that question, I believe,

18   saying that no wave is going to be perfectly

19   constrained within the active region.  There is --

20   I'm not aware of a theoretical, let alone practical

21   device that has a Q of infinity.

22   BY MR. FUHRER:



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 367 of 598 PageID #: 1294

1      Q.     So the one or more wavelengths that you

2  understand from this limitation are the -- if you

3  want to get rid of the bad waves, these are the waves

4  that you -- this is a way to do it.  Is that your

5  understanding of this limitation?

6            MR. QUIST:  Objection.  Relevance.  Scope.

7  Mischaracterizes the witness' testimony.

8            THE WITNESS:  It presupposes a structure

9  and a construction thereof, but it speaks to, as I

10  said, acoustic matching of wavelengths that cause

11  energy leakage into the outer region are not excited.

12            But as we've discussed, the worker of

13  skill understands there's not going to be absolutes

14  there.  The acoustic coupling is not going to be

15  perfect such that even a standing wave energy is

16  perfectly contained within the active region.  It's

17  just not how physics works.  You just want to make it

18  better.

19  BY MR. FUHRER:

20      Q.     Okay.  So in case it's not clear, for the

21  record, do you agree with this statement that the one

22  or more wavelengths that is referenced in claim 3



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 368 of 598 PageID #: 1295

1    includes standing waves?

2              MR. QUIST:  Objection.  Relevance.  Scope.

3              THE WITNESS:  Well, I certainly haven't

4    opined on that.  It does say are not excited in the

5    active region.  I think it would be unusual to say

6    the standing wave, the one that's creating the

7    desired function, is not excited.  I don't know what

8    that would mean, so I don't think the worker of skill

9    would draw that conclusion.

10   BY MR. FUHRER:

11       Q.    Are standing waves waves that cause energy

12   leakage into the outer region?

13       A.    Again, I've answered that.  No wave could

14   be perfectly constrained within a fixed region unless

15   it's sitting out in a vacuum of space.

16       Q.    So the answer is yes to my question?

17             MR. QUIST:  Objection.  Mischaracterizes

18   the witness' testimony.

19   BY MR. FUHRER:

20       Q.    Just so I'm clear -- and if you say you

21   answered this, it's fine, but I'm not sure I heard it

22   in these terms.



1           There's no way to acoustically match such

2     that the waves -- one or more waves will not be

3     excited at all.  Is that your testimony?

4           MR. QUIST:  Objection.  Mischaracterizes

5     the witness' testimony.

6           THE WITNESS:  No.  The excitation comes

7     about from the creation of a very -- a voltage on the

8     electrodes.  We're talking about energy leakage, I

9     believe, and that has to do with the acoustic

10    coupling.

11              (Exhibit No. 8 was marked for

12               identification.)

13    BY MR. FUHRER:

14        Q.    Okay.  If we turn to the '786 patent for a

15    moment.

16        A.    '786, okay.

17        Q.    In your initial report, you say at

18    paragraph 58 --

19        A.    I have it.

20        Q.    And paragraph 58 says, "It is my opinion

21    that the intrinsic record is sufficient for a POSITA

22    to understand the disputed term," correct?



1        A.    Yes.

2        Q.    And what do you mean by the fact that the

3    intrinsic record is sufficient for a POSITA to

4    understand?

5        A.    That read in the context of the intrinsic

6    record, a POSITA would not need to make recourse to

7    extrinsic evidence to understand what the disputed

8    term means.

9        Q.    And the disputed term is piezoelectric

10    layer, correct?

11        A.    Well, it's about the nature of that

12    piezoelectric layer, yes.

13        Q.    The construction may be about the nature,

14    but the disputed term is piezoelectric layer,

15    correct?

16        A.    Correct.

17        Q.    And would you agree that the plain and

18    ordinary meaning of piezoelectric layer to a person

19    of skill in the art would not be limited to single

20    crystal piezoelectric layer?

21        A.    In the abstract, yes.

22        Q.    Okay.



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 371 of 598 PageID #: 1298

1        A.      In the context of the '786, no.

2        Q.      Okay.  Well, just -- I'm going to be clear

3   on sort of the language here.  The plain and ordinary

4   meaning isn't going to change because of the

5   intrinsic record, correct?

6               MR. QUIST:  Objection.  Calls for a legal

7   conclusion.

8               THE WITNESS:  Yeah, I don't think I would

9   phrase it that way.  The plain and ordinary meaning

10  which here is not even part of the proposed

11  construction, that's the starting point, as we agreed

12  to earlier today.  But then it's read in context of

13  the intrinsic record.

14  BY MR. FUHRER:

15       Q.      But I want to be clear on my question

16  here.  The intrinsic record isn't going to change the

17  plain and ordinary meaning, is it?

18              MR. QUIST:  Same objection.

19              THE WITNESS:  In the realm of patent law,

20  that seems to me could easily be, although I'm not

21  aware of -- one way or the other of that being a

22  legal conclusion.



1                I do agree, as I just said, that a worker

2     of skill brings a plain and ordinary meaning, at

3     least properly so, to the beginning of an analysis of

4     a patent.  But then to construct a term, you look at

5     it in terms of -- in the context of the patent and

6     the intrinsic record.

7     BY MR. FUHRER:

8        Q.   So in terms of the '786 patent, do you

9     agree that the inventors did not act as their own

10    lexicographer by providing a clear and explicit

11    definition for piezoelectric layer?

12               MR. QUIST:  Objection.  Calls for a legal

13    conclusion.

14               THE WITNESS:  Technically, as I recall,

15    they did not say we hereby throughout this patent

16    define piezoelectric layer or material to be X, Y or

17    Z.  They were not that explicit, which to me is

18    required to be that explicit if you're going to be

19    your own lexicographer.

20    BY MR. FUHRER:

21       Q.   So in other words, no, they did not act as

22    their own lexicographer as it relates to the term



1    "piezoelectric layer," correct?

2         A.    No, I've not asserted that they did.

3         Q.    But you are asserting that the proper

4    construction is something other than its plain and

5    ordinary meaning, correct?

6         A.    As the asserted interpretation is given,

7    yes.

8         Q.    And you believe that because you believe

9    that the inventive aspect of the '786 patent is the

10   fact that it utilizes a single crystal piezoelectric

11   layer, correct?

12             MR. QUIST:  Objection.  Mischaracterizes

13   the witness' testimony.

14             THE WITNESS:  No, that it's however

15   inherent in whatever the invention is that it is to

16   be understood as part of the invention as a single

17   crystal layer.

18   BY MR. FUHRER:

19        Q.    Do you have an understanding as to what

20   the inventive aspect is as claimed in the '786

21   patent?

22        A.    I've not opined on that right here.  Can

1    we take down, please, the figure on the screen?

2         Q.    Oh, yes, yes, yes.

3         A.    No problem at all.  Thank you.

4         Q.    So I'm going to direct your attention to

5    paragraph 68 of what I hope is your rebuttal report.

6         A.    Of my rebuttal report?  Okay.

7         Q.    I believe so.  I can double-check.  Do you

8    have that?

9         A.    I do.

10        Q.    Does it by chance start with the words,

11   "While the above passage?

12        A.    Yes.

13        Q.    "While the above passage provides some

14   broadening language, a POSITA would understand it,

15   read as a whole, as indicating that the invention is

16   to a single crystal piezoelectric layer."

17             Do you see that?

18        A.    Yes.

19        Q.    And are you saying there that what makes

20   the claims inventive or novel is the use of single

21   crystal piezoelectric layer?

22        A.    I'm not saying that they solely do, but

1    that that is part of the invention, yes.

2          Q.    And you believe that because the spec only

3    references a single crystal piezoelectric embodiment,

4    correct?

5          A.    Now, I state in my report that the

6    embodiments do not extend to non-single crystal

7    devices as one piece of evidence, I'll say, to why a

8    worker of skill reading this patent in the intrinsic

9    record as a whole would reach that conclusion.

10         Q.    I think you testified at the beginning of

11   the day that you've been doing expert work in patent

12   cases for over 20 years; is that correct?

13         A.    I think that's about right, yeah.

14         Q.    And you have at least a couple of patents

15   that you're a named inventor on, correct?

16         A.    Yes.

17         Q.    So are you familiar with the notion of

18   what a preferred embodiment is?

19         A.    Yes.

20         Q.    What is your understanding of what a

21   preferred embodiment is as in a specification --

22   patent specification?



1              MR. QUIST:  Objection.  Relevance.  Scope.

2              THE WITNESS:  I don't have a legal

3  definition of that to offer.  I know embodiments are

4  described with or without the descriptor preferred.

5  I'm not aware that it means anything different from

6  the normal parlance of preferred.

7  BY MR. FUHRER:

8      Q.    Again, I'm not asking you for the legal

9  correct answer.  You testified that you had an

10  understanding of what the term "preferred embodiment"

11  means, correct?

12      A.    Sort of best in the judgment of the

13  inventor.

14      Q.    And oftentimes inventors will put their

15  preferred embodiment in the specification, correct?

16      A.    Yes.

17      Q.    And do you have an understanding that, as

18  an inventor, you don't have to identify every

19  embodiment in your specification?

20      A.    Yes.  That would be impossible.

21      Q.    And so do you have an understanding as to

22  whether or not a claim should be limited to its

1    preferred embodiment?

2              MR. QUIST:  Objection.  Vague.  Calls for

3    a legal conclusion.

4              THE WITNESS:  My understanding as I sit

5    here is that claim is not limited to its embodiments,

6    preferred or not.

7    BY MR. FUHRER:

8        Q.    Would you agree that each time the single

9    crystal piezoelectric layer is described in the '786

10   patent is describing it as an embodiment?

11       A.    I believe that's the case, yes.  All of

12   the embodiments, as I say in my report, make

13   reference to single crystal.

14       Q.    But the various embodiments describe

15   different features, right?  That's the only common --

16   I don't want to say it that broadly.  I apologize.

17   That there are differences between the embodiments

18   except for the fact that they're each described as

19   using a single crystal piezoelectric layer; is that

20   correct?

21       A.    There may be other common elements, but

22   they're -- as different embodiments, something would



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 378 of 598 PageID #: 1305

1  be different, yes.

2       Q.    And your point is the one thing that isn't

3  different in the embodiments is the fact that they're

4  using a single crystal piezoelectric layer?

5       A.    That's correct.

6       Q.    And you find that compelling in a way that

7  directs you to not apply the plain and ordinary

8  meaning of piezoelectric layer, correct?

9       A.    As I indicated a few minutes ago, I said

10  that was part of the reasons -- a set of reasons why

11  I think the worker of skill would understand the

12  claim element -- claims to mean single crystal.

13       Q.    Well, in paragraph 64 of your rebuttal,

14  you make reference to the focus.  Do you see that?

15  "Thus, from the very beginning" --

16       A.    Yes.

17       Q.    -- "the focus of the alleged invention was

18  on single crystal piezoelectric layers."

19       A.    Yes.

20       Q.    What do you mean by "the focus of the

21  alleged invention"?

22       A.    Well, as it says there, and it's in the

1    boxed region of text on page 18 of my report, it's

2    going back to the provisional patent application that

3    eventuated ultimately in the '786 patent.  And in the

4    third sentence of the description of the alleged

5    invention in its provisional application, that's what

6    it's talking about very explicitly, single crystal

7    materials.

8         Q.    If you can go to the '786 patent.  Do you

9    have it handy?

10        A.    I do.

11        Q.    And go to column 1, line 41.

12        A.    I've got it.

13        Q.    I believe on that line, the sentence

14   starts by saying, "More particularly, the present

15   invention provides techniques related to bulk

16   acoustic wave resonator devices."

17            Do you see that?

18        A.    Yes.

19        Q.    Is it your understanding that the focus of

20   the invention is on techniques related to bulk

21   acoustic wave devices?

22        A.    I didn't use the focus to describe that,

1    but it's the second sentence of the inventor's own

2    summary.  So I'm not sure -- I haven't opined upon

3    what technique means in this context.  A technique is

4    a method, but I see what he's saying there.

5        Q.    If you go to column 2, line 10.

6        A.    Yes.

7        Q.    And it says, "One or more benefits are

8    achieved over preexisting techniques."

9              Do you see that?

10       A.    Yes.

11       Q.    Do you have an understanding of what the

12   inventors were talking about, improvements over

13   preexisting techniques?

14       A.    Well --

15             MR. QUIST:  Objection to scope.

16             THE WITNESS:  In reading it here, just --

17   he's talking about -- he's referring to design and/or

18   manufacturing.

19   BY MR. FUHRER:

20       Q.    He's not talking about single crystal

21   there, is he?

22       A.    Not right there, no.



1           MR. QUIST:  I'll object to that last

2  question as mischaracterizing the witness' testimony.

3  BY MR. FUHRER:

4     Q.    Okay.  And the sentence that starts with,

5  "In particular, the present device can be

6  manufactured in a relatively simple and

7  cost-effective manner," do you see that?

8     A.    Yes.

9     Q.    And it's this method of manufacturing that

10  is tied to the inventive technique we referred to

11  earlier, correct?

12          MR. QUIST:  Objection.  Form.  Vague.

13  Relevance.

14          THE WITNESS:  Well, since it has an

15  "and/or" before the methods -- because it has an

16  and/or clause before the methods, that would --

17  techniques would possibly encompass that, but not

18  necessarily.

19  BY MR. FUHRER:

20     Q.    Okay.  But the sentence goes on to say,

21  "While using conventional materials."

22          Do you see that?



1          A.      Yes.

2          Q.      Would a single crystal piezoelectric layer

3    be considered a conventional material in BAW

4    resonators in 2017?

5              MR. QUIST:  Objection to form.  Scope.

6              THE WITNESS:  I haven't opined on that,

7    but I think a worker of skill in general, when

8    thinking about piezoelectric crystals, harkening back

9    all the way to the days of quartz radios, would think

10   about single crystals.

11   BY MR. FUHRER:

12         Q.      So nowhere in this specification did you

13   identify where the inventors described the invention

14   as limited to the use of single crystal piezoelectric

15   layers, correct?

16             MR. QUIST:  Objection.  Mischaracterizes

17   the witness' declaration and testimony.

18             THE WITNESS:  I said earlier that the

19   patentee did not act as his own lexicographer or in a

20   similar way at least given absolute, all-encompassing

21   definition for his invention.  But as I do explain in

22   my declaration -- and this is what I was asked to

1    opine upon -- that the worker of skill would

2    understand that based on the intrinsic record.

3    BY MR. FUHRER:

4         Q.    And part of the intrinsic record you

5    referred to is the provisional application?

6         A.    Yes.  That's my understanding.

7         Q.    And your point with the provisional

8    application is that it only references a single

9    crystal piezoelectric layer, correct?

10        A.    Well, in a highlighted section on

11    paragraph 63 of my report, it gives, I think, an

12    unambiguous statement concerning that.  It says the

13    solution utilizes, built from, single crystal.  It

14    doesn't say may utilize or can utilize.  It just says

15    it utilizes.

16        Q.    So you think the compelling word there is

17    the use of the word "utilize"?

18        A.    Well, no.  The compelling phrase there is

19    it says the solution utilizes this technology built

20    from single crystals.  So the sentence as a whole.

21    But it doesn't -- yes, "utilize" is a very important

22    word there.



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 384 of 598 PageID #: 1311

1        Q.     Okay.  But if the solution is utilizing a

2   single crystal piezoelectric layer, doesn't that mean

3   that the single crystal piezoelectric layer is not

4   the solution?

5        A.     No, the solution -- of course a single

6   crystal in the abstract is not going to be a

7   solution.  It's part of an actual operative device.

8   But the fact that the patentee called out single

9   crystal piezoelectric material of high quality, I

10   think the worker of skill says that is absolutely

11   inherent in this solution.  The solution infers other

12   things, too.

13           But by calling that out -- in a way, that

14   doesn't -- I don't think jars the sensibility of a

15   worker of skill.  There's no reason to question the

16   claim there.  Again, it doesn't jar the worker of

17   skill at all.  It kind of confirms that, well, if I

18   don't have to worry about grain boundaries and other

19   types of polycrystalline defects, that's probably

20   going to be a good thing for these applications.

21   That's why it doesn't jar his thought pattern when he

22   reads this phrase.



1        Q.     So you don't see the reference to the

2   single crystal in the provisional application as

3   being a preferred embodiment?

4               MR. QUIST:  Objection.  Form and

5   mischaracterizes the witness' testimony.

6               THE WITNESS:  I've not said that, no.

7   BY MR. FUHRER:

8        Q.     You do consider it to be a preferred

9   embodiment?

10       A.     I have offered no such opinion and all I'm

11  saying here is, by highlighting this, it seems to be

12  a requirement of the solution right from the get-go.

13  The solution utilizes single crystal piezoelectric

14  material.  Even for patent language, that seems quite

15  descriptive to me of a particularity that obtains, in

16  this case around the crystal structure of the

17  piezoelectric material.

18              MR. FUHRER:  I have no further questions.

19  Thank you, Doctor.

20              THE WITNESS:  Thank you, sir.

21              MR. QUIST:  Can we take five minutes and

22  then I'd like to -- I have a few questions, after a



1    break.

2                MR. FUHRER:  1:15?

3                MR. QUIST:  Yeah.  That's perfect.

4                MR. FUHRER:  Thank you.

5                MR. QUIST:  Thanks.

6                (Recess.)

7           EXAMINATION BY COUNSEL FOR PLAINTIFF

8    BY MR. QUIST:

9         Q.    Dr. Bravman, could you take a look at the

10   '755 patent?  I'd like to look at claim 1 with you.

11   So if you'd turn to column 9 and then go down, the

12   piece of -- the first part I want you to look at in

13   claim 1 is at approximately line 40 --

14        A.    Okay.

15        Q.    -- in column 9, okay?

16        A.    I have it.

17        Q.    Do you see where it introduces an outer

18   region?

19        A.    Yes.

20        Q.    Okay.  Do you understand that's the first

21   time outer region is introduced in this claim?

22                MR. FUHRER:  Objection.  Leading.  Sorry,

1    didn't mean to interrupt you, Trevor.

2              MR. QUIST:  That's okay.

3              THE WITNESS:  Yes, reading up to that

4    point, the phrase "outer region" does not appear.

5    BY MR. QUIST:

6        Q.    Okay.  And let me ask that differently.

7    Before the instance of an outer region that appears

8    in line 40, do you see anywhere earlier in the claim

9    where the phrase "outer region" appears?

10       A.    No.

11       Q.    Okay.  In the balance of the claim,

12   meaning the rest of the claim, when the claim refers

13   to the outer region, do you understand it to be

14   referring back to an outer region that was introduced

15   in line 40?

16             MR. FUHRER:  Objection.  Leading.

17             THE WITNESS:  Understanding how

18   antecedents are typically used in English, yes, that

19   would be my understanding.

20   BY MR. FUHRER:

21       Q.    Okay.  And when the claim introduces an

22   outer region, is there anything in the claim that



Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 388 of 598 PageID #: 1315

1    would suggest to you that it means the entire outer

2    region?

3              THE WITNESS:  It just says an outer

4    region.  So it's not -- again, the clause there does

5    not require that.

6    BY MR. QUIST:

7        Q.    Okay.  In your opinion, do you think a

8    POSITA would need to understand whether or not --

9    well, let me strike that.

10             Earlier in your conversation, earlier in

11   your deposition, there was some discussion

12   surrounding Bragg reflectors.  Do you remember that?

13       A.    Yes.

14       Q.    Okay.  The conversation took place in the

15   context of the disputed terms "active region" and

16   "outer region."

17             Do you recall that?

18       A.    Yes.

19       Q.    Do you think a person of ordinary skill in

20   the art at the time of the invention would need to

21   understand whether or not the Bragg reflector is part

22   of the active region in order to understand how to



1   apply the claims of the '755 patent?

2       A.    No.   And what I think I said whether or

3   not that was included in active region was immaterial

4   to understanding the patent's inventiveness and

5   that's why I support the claim construction as it is

6   written.

7       Q.    Okay.   Looking at claim 1, does the

8   claim -- so if you can just turn back to claim 1.

9   And if you need to take a look through the entire

10  claim, you know, you're welcome to do that if you

11  need to.

12          Does the claim specify an amount of the

13  outer region that a person of ordinary skill in the

14  art must observe in connection with evaluating the

15  decrease in density of mechanical energy?

16      A.    No, it does not specify it.

17      Q.    Is it fair to say it would not be required

18  by the claim under your understanding of how claim

19  interpretation works?

20          MR. FUHRER:   Objection.   Leading.

21          THE WITNESS:   I think I offered that

22  opinion several times today, that it would not be



 1    required.

 2    BY MR. QUIST:

 3        Q.    Okay.  Did you thoroughly review each and

 4    every paragraph and opinion that appears in your

 5    initial declaration?

 6        A.    Yes.

 7        Q.    And then does the final version of your

 8    initial declaration, the one that you signed, does

 9    that reflect an accurate representation of your own

10    expert opinions?

11        A.    Yes.

12        Q.    Okay.  Did you thoroughly review each and

13    every paragraph and opinion that appears in your

14    rebuttal declaration?

15        A.    Yes.

16        Q.    Okay.  And then similar question.  Does

17    the final version of your rebuttal declaration, the

18    one that you signed, reflect an accurate

19    representation of your own expert opinions?

20        A.    Yes.

21            MR. QUIST:  Okay.  Give me just one second

22    here.  Okay.  No further questions.

1                    MR. FUHRER:  I have no more questions.

2                    (Whereupon, at 1:25 p.m., the taking of

3       the instant deposition ceased.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA ) ss.:

STATE OF MARYLAND      )

I, **MARY GRACE CASTLEBERRY, RPR,** the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties for the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

*Notary Public in and for*

*the State of Maryland*

Notice Date: 08/16/2022

Deposition Date: 8/12/2022

Deponent: John C. Bravman, Ph.D.

Case Name: Qorvo, Inc. v. Akoustis Technologies, Inc.

Page:Line                Now Reads                Should Read

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this \_\_\_\_\_ day of _____,

20\_\_, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

**< 1 >**
**1** 25:*8* 26:*16* 73:6, *10,
11, 18* 74:*12* 75:*17, 18,
21* 76:*14, 18, 21* 77:*13,
20* 91:*8* 118:*13* 119:*15,
16* 120:*5* 151:*10, 11*
152:*20* 153:*3, 7, 18*
167:*11* 174:*10, 13* 177:*7,
8*
**1:15** 174:*2*
**1:25** 179:*2*
**1:30** 6:*22*
**10** 8:*16* 46:*11* 168:*5*
**10,256,786** 3:*15*
**10:17** 55:*4*
**100** 93:*20* 98:*21* 149:*22*
**106** 3:*14*
**10-minute** 55:*2*
**10-year-old** 145:*12*
**11** 55:*12*
**11:40** 106:*9*
**12** 1:*12, 19* 84:*12*
**120** 2:*7*
**14** 61:*14* 65:*19* 140:*10*
**14th** 2:*15*
**15** 8:*16* 16:*12* 46:*11, 13*
**1540** 2:*7*
**157** 3:*15*
**16** 46:*21* 51:*21* 52:*13*
**1650** 2:*15*
**17** 60:*12, 14*
**174** 3:*5*
**18** 167:*1*
**19** 45:*6*

**< 2 >**
**2** 75:*8* 168:*5*
**20** 45:*18* 163:*12*
**2017** 170:*4*
**2022** 1:*12, 19*
**21** 29:*3* 53:*15* 65:*19*
**21-1417-JPM** 1:*7*
**22102-4856** 2:*16*
**25** 70:*11* 71:*3, 6* 78:*11*
**28** 80:*1*
**2A** 62:*1* 109:*18* 113:*9*
118:*16, 20*
**2B** 109:*18* 113:*9*
118:*16, 21*

**< 3 >**
**3** 100:*20* 104:*11* 118:*22*
147:*18, 19* 148:*1, 10*
151:*8* 152:*22* 153:*2, 6*
155:*22*
**30** 24:*19*
**32** 127:*2*
**36** 93:*5*
**360-degree** 112:*8* 113:*13*

**37** 114:*18* 117:*4* 122:*9*
124:*7*
**38** 61:*22*
**3A** 82:*22* 84:*10, 15*
85:*1* 86:*11* 89:*15* 90:6,
9, 10* 101:*5, 14* 105:*5*
106:*16* 107:4, 9* 108:*17*
110:*8* 115:*13* 118:*8, 14,
15* 119:*1, 4, 10* 124:*20*
128:2, 20* 129:*7, 20*
136:*19* 137:*5*
**3B** 83:*1* 84:*10, 15* 85:*2,
7* 86:*11* 89:*15* 90:6, 8,
11* 101:*4* 102:*11, 12, 20*
105:*5* 106:*16* 107:*9*
108:*18* 110:*8, 9* 115:*13,
22* 118:*8, 14, 15* 119:*3*
128:*2, 20* 129:*7, 20*
136:*19* 137:*5*

**< 4 >**
**4** 3:*11, 13* 58:*1, 9* 59:*1,
21* 69:*5*
**40** 24:*19* 62:*3* 174:*13*
175:*8, 15*
**41** 82:*10, 14* 167:*11*
**42** 64:*9, 22* 65:*9* 130:*15*
**45** 137:*7*
**46** 64:*9, 21* 65:*9*
**48** 140:*2* 142:*18* 143:*9*

**< 5 >**
**5** 3:*4, 10* 4:*2* 69:*5, 13*
**50** 81:*7* 98:*22*
**58** 157:*18, 20*

**< 6 >**
**6** 3:*12* 4:*2* 61:*12* 65:*19*
**60** 5:*14, 17*
**62** 61:*21*
**63** 171:*11*
**64** 166:*13*
**650** 2:*9*
**68** 162:*5*

**< 7 >**
**7** 3:*14* 42:*17* 105:*1*
106:*12* 107:*2*
**7/18/2023** 180:*21*
**703** 2:*7*
**74** 58:*12, 14* 59:*17*
**75** 23:*12*
**755** 22:*11* 23:*14, 20*
25:*9* 30:*1* 38:*3* 47:*8*
48:*2* 52:*16* 53:*5* 57:*7,
14, 17* 58:*1* 61:*12* 64:*12*
66:*7* 69:*4* 76:*10, 11, 20*
77:*17* 82:*3, 6, 16, 18*
104:*15, 19, 21* 106:*16*
107:*2* 123:*21* 138:*3, 13*

**139**:*13, 19* 147:*20*
174:*10* 177:*1*
**76** 58:*10*
**770-7900** 2:*17*
**78** 58:*10*
**786** 157:*14, 16* 159:*1*
160:*8* 161:*9, 20* 165:*9*
167:*3, 8*

**< 8 >**
**8** 3:*15* 50:*6* 157:*11*
**80** 58:*10*
**815-2654** 2:*9*
**82** 58:*10*
**83** 18:*10, 20*
**84** 27:*6* 58:*11*
**88** 36:*12* 38:*1*

**< 9 >**
**9** 174:*11, 15*
**9,735,755** 3:*14* 23:*17*
**9:02** 1:*18*
**90** 15:*6* 59:*19*
**90-plus** 12:*21*
**94025** 2:*8*
**99.999** 99:*16*

**< A >**
**a.m** 1:*18*
**ability** 78:*6* 103:*10*
180:*9*
**able** 13:*22* 111:*6* 129:*5*
147:*5*
**above-entitled** 1:*15*
**absolute** 150:*6* 170:*20*
**absolutely** 145:*13* 172:*10*
**absolutes** 146:*21* 155:*13*
**abstract** 35:*4* 56:*11, 13*
78:*2* 82:*2* 91:*16* 144:*2*
158:*21* 172:*6*
**academic** 5:*19*
**acceptable** 87:*18*
**accepted** 27:*8*
**accessible** 23:*7*
**accurate** 140:*8* 178:*9, 18*
**achieve** 117:*21*
**achieved** 78:*4* 168:*8*
**acknowledged** 138:*19*
**acknowledges** 70:*8*
**acoustic** 50:*8, 12, 19*
51:*2* 57:*21* 63:*3* 64:*3,
18* 140:*5, 20* 141:*2, 5*
142:*20* 143:*12* 148:*8*
149:*15* 155:*10, 14* 157:*9*
167:*16, 21*
**acoustically** 62:*18* 63:*16,
22* 64:*3, 5* 148:*15*
153:*12, 14* 157:*1*
**acquisition** 44:*12*
**act** 21:*20* 160:*9, 21*

**170**:*19*
**acting** 22:*7*
**action** 25:*1, 2* 42:*9*
64:*18*
**activated** 66:*19* 67:*20*
113:*8* 118:*3*
**activation** 56:*11* 59:*13*
66:*21* 70:*1* 143:*11*
**active** 13:*8, 9* 24:*3, 7, 15,
19* 25:*1, 13* 26:*1, 4, 6, 10,
20* 27:*2, 20* 28:*1, 6, 8*
29:*22* 31:*4, 10* 32:*13, 15*
33:*3* 38:*7, 8, 12, 19* 40:*2,
9* 41:*10, 21* 44:*16, 17, 18*
47:*7* 49:*15, 19* 51:*11*
52:*9, 14, 21* 55:*11, 13*
56:*18* 58:*14, 20* 59:*3, 7,
11, 18, 19* 60:*15, 17* 61:*3,
21* 65:*13, 21* 66:*18*
69:*19* 70:*7* 72:*4, 10, 20*
74:*17, 18* 75:*4, 5, 12*
78:*22* 79:*2* 89:*22* 92:*16*
94:*22* 96:*12* 97:*3* 118:*4*
119:*11* 127:*12, 14, 19*
130:*13* 132:*14* 134:*20*
144:*9* 153:*16* 154:*19*
155:*16* 156:*5* 176:*15, 22*
177:*3*
**actual** 79:*13* 118:*18*
172:*7*
**add** 154:*11*
**added** 93:*13* 94:*1*
**addendum** 92:*21*
**adding** 153:*17*
**addition** 55:*17*
**additional** 153:*10*
**address** 28:*3* 68:*3*
**addressed** 23:*19* 29:*10*
118:*1*
**addresses** 66:*17*
**addressing** 70:*19*
**adjacent** 76:*16* 97:*3*
**adopted** 9:*17*
**advances** 78:*3*
**advice** 8:*3, 7*
**advised** 43:*22*
**affect** 18:*5*
**affirm** 142:*4*
**affirmed** 72:*17*
**affirming** 143:*16*
**affirms** 64:*7*
**ago** 12:*4* 16:*10, 12* 21:*8*
66:*15* 84:*5* 104:*8* 166:*9*
**agree** 13:*19* 32:*10* 34:*3*
35:*8* 58:*5* 64:*20* 65:*1,
12* 66:*2* 68:*9* 72:*8*
76:*20* 80:*11* 81:*4, 22*
89:*16* 91:*22* 98:*3*
138:*10* 144:*16* 145:*3*
148:*11* 155:*21* 158:*17*

**160:**1, 9  **165:**8

**agreed**  159:11

**agreeing**  83:5

**agreement**  6:19

**ahead**  10:18  63:10
93:13  94:13  101:18
119:7

**aid**  12:9

**AKOUSTIS**  1:7, 8
53:19  54:6  68:11
122:16  144:22

**albeit**  107:12

**alleged**  166:17, 21  167:4

**all-encompassing**  170:20

**allow**  60:19  88:18

**allowable**  19:22

**allowed**  146:14

**allowing**  98:14

**alternative**  75:11

**ambiguity**  19:20  20:2, 4,
7, 22  45:2

**ambiguous**  20:12, 13, 15,
18

**AMERICA**  180:2

**amount**  116:15  121:10
127:10  150:16  177:12

**amounts**  83:16

**amplitude**  141:17, 21
142:9

**analogy**  79:5, 8

**analyses**  15:22  54:22
97:11  98:15  113:6
124:18

**analysis**  15:11  23:22
27:14  30:10, 16  75:3, 7
76:4, 12  77:3, 8, 16
87:10  99:8  100:1  101:6
103:11  129:20  137:15
151:20  160:3

**analyze**  54:13

**analyzed**  88:1

**and/or**  82:21  168:17
169:15, 16

**annotate**  105:10

**answer**  7:4  9:2  36:4
41:22  43:8, 17, 21  48:20
63:19, 20  77:9  92:6, 7
94:6  96:4  139:16  151:3
154:7  156:16  164:9

**answered**  37:16  43:13,
15  154:17  156:13, 21

**answers**  39:12  64:20

**antecedents**  175:18

**anybody**  37:17

**Anyways**  111:20

**Apologies**  97:15  108:6

**apologize**  42:14  48:19,
20  56:21  82:14  110:16
111:7  121:9  140:8
165:16

**appear**  150:5  175:4

**APPEARANCES**  2:1

**appears**  27:9  31:16
113:11  116:2  122:15
175:7, 9  178:4, 13

**append**  93:11, 17

**appended**  103:22

**applicable**  80:22

**application**  19:19  95:13
167:2, 5  171:5, 8  173:2

**applications**  172:20

**apply**  69:8  166:7  177:1

**appreciate**  7:12  143:2

**approach**  39:13

**appropriate**  22:1  28:20
41:6  68:22  88:10  97:13
126:10  134:12  135:3

**appropriately**  63:18
109:13

**Approximately**  5:12
174:13

**approximation**  8:14

**area**  15:19  23:2  30:3
88:8  89:3  111:16

**arguably**  24:15

**argue**  97:7

**argued**  44:22  45:1

**arrangement**  99:5

**arrangements**  60:19
87:2

**arrayed**  96:11

**art**  16:17  24:6  26:10
30:22  47:21, 22  49:5
59:16  69:9  75:19, 20
76:5, 10, 12  77:11
126:13, 14  133:19  138:8,
12  144:13  146:18
152:10  158:19  176:20
177:14

**artifact**  20:8

**asked**  32:20  41:19
43:13  63:8  108:21
122:6  170:22

**asking**  9:7, 8  10:17, 18
19:8  34:10  88:15  164:8

**aspect**  61:10  75:16
91:14  117:22  121:19
138:22  161:9, 20

**aspects**  9:15, 16  11:4, 6,
8  21:15  27:1  57:18
67:5  137:13  147:15
149:18

**assert**  74:7

**asserted**  23:15  76:1
161:2, 6

**asserting**  61:5  76:14
120:15  128:14, 18  161:3

**assertion**  17:22  22:12
38:21  40:5  88:15
129:10  143:9

**assertions**  41:15  120:16
143:6

**asserts**  73:16  119:9

**assess**  92:16

**assessment**  103:21

**assessments**  88:3, 4

**associated**  49:6  84:18

**assume**  5:8, 9  102:20
111:20  138:7  145:22

**assumes**  74:10

**assumptions**  10:15  11:1
129:11

**attention**  26:17  70:10
117:13  139:18  147:19
162:4

**attorney**  13:3  16:6
19:12

**attorneys**  19:6

**August**  1:12, 19

**average**  89:12

**averaged**  130:8

**averaging**  122:22

**avoid**  138:13

**aware**  34:6  38:14
154:20  159:21  164:5

**< B >**

**back**  31:9  41:17  45:5
51:19  53:13  55:12
78:11  82:8  92:18
105:21  110:8  115:7
129:19  167:2  170:8
175:14  177:8

**background**  150:3

**bad**  148:11  155:3

**balance**  175:11

**based**  8:3  33:20  34:21
35:15  45:20, 21  47:8, 16
52:15  108:19  171:2

**basically**  152:11

**basis**  13:11

**BAW**  25:10, 15, 16, 21
26:11  38:19  39:18
40:10  41:9, 22  48:13
49:5, 12, 16, 19  50:7
51:11  55:17, 18  56:5, 9,
13, 15, 17  57:1, 6, 9, 18
61:21  63:21  71:7, 8
73:5, 8  75:19, 21  76:7, 9,
21  77:6, 20  141:20
142:7  145:22  170:3

**B-A-W**  25:16

**beginning**  30:14  160:3
163:10  166:15

**begins**  24:11  72:10
74:19  82:15  115:6
137:10

**behalf**  2:3, 12

**behaves**  79:11

**believe**  10:10  14:14
18:17  19:13  32:13  35:1

**75:**8  **88:**10, 21  **91:**4
103:12, 19  104:10  105:9
107:14, 15  110:7  124:4,
12  126:7, 20  128:10
131:5  147:4  153:19
154:17  157:9  161:8
162:7  163:2  165:11
167:13

**believes**  90:5  129:17

**beneath**  62:7, 11, 17
63:15  64:9, 21  65:9, 14
66:4  68:15  69:18

**beneficial**  17:12

**benefit**  114:15  154:4

**benefits**  168:7

**best**  6:7  14:7, 8, 20
36:5  42:4, 7  63:5  87:12
111:7  164:12  180:9

**better**  34:15  124:4
155:18

**beyond**  148:18

**big**  103:7

**bit**  101:22

**black**  116:3

**blob**  101:16  103:7, 14
104:4, 17  106:20  107:4,
7  115:18  116:8  117:10,
11  124:17

**blobs**  130:1

**blunt**  78:17

**Bob**  4:13  9:21  102:1
108:7

**body**  36:8

**book**  24:14

**bottom**  62:2, 4, 7, 11, 17
63:15  64:6, 9, 22  65:9, 14
66:5  68:16  69:4, 19
98:19

**Boulevard**  2:15

**bound**  133:19  134:2, 5,
16

**boundaries**  59:6  74:22
172:18

**bounded**  130:8

**boxed**  167:1

**Bragg**  58:5, 9  59:5  60:6
67:5, 8  176:12, 21

**BRAVMAN**  1:13  3:3,
11, 13  4:5  5:3  10:21
55:10  92:5  106:15
111:20  136:16  174:9

**break**  46:11  55:3, 10
104:16  105:22  106:15
107:6  136:10, 16, 17, 21
174:1

**bring**  44:13  105:20

**brings**  44:14  160:2

**broad**  31:11  38:8, 21
39:12, 21  142:4

**broadening**  162:14

**broader** 25:*14* 82:*20* 83:*11* 141:*2* 148:*9*
**broadly** 165:*16*
**broken** 72:*3*
**built** 79:*12* 171:*13, 19*
**bulk** 57:*21* 167:*15, 20*

**< C >**
**C.A** 1:*6*
**California** 2:*8*
**call** 7:*13* 16:*13, 19* 20:*22* 56:*4* 58:*19* 65:*4* 92:*21* 109:*9* 113:*10* 129:*6* 141:*16* 148:*6*
**called** 1:*14* 4:*6* 5:*7* 18:*13* 86:*22* 172:*8*
**calling** 108:*3* 172:*13*
**Calls** 29:*17* 103:*4* 122:*2* 131:*8* 133:*11, 21* 152:*16* 159:*6* 160:*12* 165:*2*
**Camino** 2:*7*
**canonical** 18:*17*
**Canons** 18:*13, 15*
**capability** 88:*2* 142:*15*
**car** 79:*6*
**career** 5:*19*
**careful** 50:*2*
**carries** 48:*17*
**cars** 79:*8*
**case** 8:*15* 14:*12* 17:*4* 22:*9* 23:*5, 15* 25:*8* 34:*16* 59:*22* 73:*17* 74:*11* 77:*5* 89:*7* 91:*6* 96:*22* 98:*13* 116:*22* 122:*15* 131:*21* 133:*17* 134:*3* 144:*5* 155:*20* 165:*11* 173:*16* 180:*12*
**cases** 5:*19* 9:*4* 12:*17, 18* 163:*12*
**CASTLEBERRY** 1:*17, 20* 180:*4*
**categories** 56:*16*
**cause** 148:*16* 149:*12* 150:*12* 153:*15* 154:*13* 155:*10* 156:*11*
**causes** 135:*6*
**caveat** 69:*11*
**ceased** 179:*3*
**centering** 25:*18*
**certain** 11:*8* 23:*5, 6* 24:*21* 27:*1* 31:*12* 33:*15* 36:*6, 7* 41:*7* 61:*4* 64:*2* 65:*15* 67:*21* 74:*9* 89:*3* 121:*20* 129:*11* 134:*4* 137:*12* 143:*7* 154:*5*
**certainly** 23:*3* 30:*19* 34:*11* 38:*14* 40:*16* 61:*10* 64:*11* 76:*12* 77:*9* 79:*14* 91:*11* 142:*1*

**certainty** 20:*22*
**CERTIFICATE** 180:*1*
**certify** 180:*6*
**cetera** 26:*4* 52:*22* 56:*11* 113:*22* 148:*22*
**chance** 162:*10*
**change** 76:*16* 84:*5* 85:*2, 3, 5* 86:*11* 87:*1, 20* 91:*5* 92:*9* 96:*3* 107:*11* 116:*16* 118:*16* 128:*3* 147:*2* 150:*2* 159:*4, 16*
**changed** 91:*7, 13* 103:*15*
**changes** 74:*12* 87:*3*
**characteristic** 50:*17*
**characteristics** 25:*5*
**charge** 49:*1*
**cheaper** 147:*3*
**choose** 86:*20*
**chose** 23:*4* 94:*7*
**chosen** 97:*10*
**CHRISTIAN** 2:*21* 104:*13* 105:*1* 109:*17*
**circled** 102:*5* 116:*12*
**cite** 140:*15* 147:*9*
**cited** 45:*19* 119:*19*
**cites** 104:*10*
**Claim** 3:*10, 12* 8:*11, 19* 10:*5* 11:*1, 8* 13:*1* 18:*13, 15* 21:*4, 6, 17* 22:*10* 23:*14* 24:*2, 3* 25:*8, 17* 26:*16* 30:*16* 31:*5, 6, 12* 33:*2* 35:*13, 22* 42:*18* 46:*17* 54:*20* 72:*7* 74:*15* 77:*5* 78:*15* 83:*19* 91:*1* 95:*15* 100:*2* 124:*12* 125:*21* 137:*14* 138:*2* 139:*21* 140:*11* 143:*7* 147:*18, 19* 148:*1, 10* 151:*8, 10, 11* 152:*15, 20, 22* 153:*2, 3, 6, 7* 155:*22* 164:*22* 165:*5* 166:*12* 172:*16* 174:*10, 13, 21* 175:*8, 11, 12, 21, 22* 177:*5, 7, 8, 10, 12, 18*
**claimed** 48:*1* 65:*10* 71:*8* 72:*2* 74:*5, 21* 75:*9* 76:*14* 82:*6* 85:*7* 88:*11* 90:*6, 14* 96:*19* 103:*1* 107:*18* 115:*10, 16* 117:*14, 15* 118:*9* 119:*14* 123:*20* 125:*2, 12* 126:*5* 127:*11* 128:*12* 132:*4* 139:*12* 146:*1* 150:*9* 161:*20*
**claiming** 90:*4*
**claims** 19:*1, 18* 20:*20* 21:*16* 23:*8* 27:*18* 28:*3* 34:*13* 48:*6* 53:*6* 54:*21* 57:*17* 59:*12* 83:*13* 118:*1* 121:*22* 125:*7*

**126:*20** 127:*9* 150:*3* 162:*20* 166:*12* 177:*1*
**clarify** 6:*15* 7:*13*
**clarity** 19:*21*
**class** 79:*18*
**classroom** 35:*3*
**clause** 169:*16* 176:*4*
**clawing** 59:*4*
**clean** 7:*10*
**clear** 12:*22* 23:*13* 24:*20* 35:*7* 56:*22* 85:*3, 5* 86:*11* 118:*11, 17* 127:*6, 8* 130:*9* 132:*20* 134:*20* 145:*19* 155:*20* 156:*20* 159:*2, 15* 160:*10*
**clearly** 25:*17* 60:*4* 66:*22* 69:*21* 75:*7* 76:*14* 88:*22* 90:*3* 92:*6* 101:*10* 128:*13* 152:*15*
**client** 14:*22*
**client's** 13:*19*
**cliff** 149:*21*
**close** 17:*10*
**closer** 87:*5*
**Coast** 55:*4*
**colleagues** 145:*9*
**color** 110:*17* 128:*21*
**colors** 110:*14*
**column** 61:*12* 65:*19* 69:*5, 13* 167:*11* 168:*5* 174:*11, 15*
**combination** 8:*5*
**come** 31:*7* 35:*22* 38:*4* 72:*15* 73:*16* 81:*6* 88:*20* 107:*19*
**comes** 23:*9* 104:*6* 147:*18* 150:*8* 157:*6*
**comfortable** 33:*1* 44:*16*
**coming** 130:*12* 151:*5*
**comments** 67:*15*
**commission** 180:*21*
**common** 109:*12* 165:*15, 21*
**commonly** 146:*18*
**companies** 13:*15*
**compare** 86:*10* 102:*11* 103:*14* 145:*18*
**compared** 101:*5* 115:*13*
**comparing** 73:*4, 8* 74:*19* 101:*1* 118:*13* 152:*19, 22*
**comparison** 108:*17* 135:*11* 152:*15*
**compelling** 48:*8* 166:*6* 171:*16, 18*
**complete** 6:*7* 7:*1* 87:*8*
**completely** 44:*16* 99:*15*
**complex** 113:*17* 120:*9* 141:*15*
**complicated** 89:*13*
**component** 83:*10* 86:*8* 103:*11, 21* 141:*14*

**comprise** 32:*19* 58:*11* 87:*10*
**comprises** 33:*4*
**concept** 20:*17* 59:*13* 72:*15* 73:*14* 81:*5* 95:*4* 96:*7* 138:*20* 142:*18* 143:*1* 150:*8* 153:*13*
**conception** 31:*4*
**concepts** 48:*18*
**concern** 138:*11*
**concerned** 137:*12, 19*
**concerning** 171:*12*
**conclude** 108:*22*
**conclusion** 29:*18* 88:*20* 96:*22* 97:*6* 103:*5* 107:*20* 108:*4, 19* 122:*3, 4* 129:*12, 15* 131:*9* 133:*12, 22* 156:*9* 159:*7, 22* 160:*13* 163:*9* 165:*3*
**conclusions** 119:*8* 120:*13*
**conditions** 73:*17* 113:*20*
**conductive** 68:*18*
**conductor** 81:*10*
**confidence** 89:*12* 97:*5*
**confident** 41:*15*
**confine** 95:*13*
**confirms** 172:*17*
**confuse** 35:*19*
**confused** 78:*19*
**Confusing** 36:*2* 124:*3*
**connection** 177:*14*
**connote** 132:*16*
**consciously** 151:*5*
**consider** 13:*8* 16:*16* 37:*11* 56:*4* 108:*11, 15* 143:*20* 173:*8*
**considered** 35:*21* 36:*20* 37:*2, 21* 45:*19* 52:*14* 59:*17* 81:*17* 98:*1, 4, 5* 130:*21* 134:*1* 170:*3*
**considers** 44:*5*
**consistent** 22:*2* 40:*4* 41:*5, 13* 51:*6* 68:*5* 69:*14, 20* 99:*9* 111:*3* 127:*17* 132:*3* 133:*5, 7* 135:*17* 137:*4*
**consistently** 67:*4* 78:*4*
**consisting** 62:*1*
**constitutes** 57:*20* 67:*22*
**constrained** 154:*19* 156:*14*
**constraints** 153:*11*
**construct** 160:*4*
**Construction** 3:*10, 12* 8:*11, 19* 10:*6* 11:*2, 8* 13:*2* 18:*13, 15* 21:*4* 28:*19* 30:*16* 31:*14* 32:*3* 33:*21* 34:*4* 35:*13* 36:*1* 46:*18* 51:*6* 53:*11, 19, 20* 54:*6* 61:*6* 65:*7* 66:*3* 68:*11, 14* 69:*20* 70:*20*

72:7, *8, 9, 17*  78:15
86:*15*  88:*17*  91:*21*
92:*10, 21*  93:*18*  95:*11,
16*  103:*22*  133:*4, 5*
134:*12, 21*  135:*3, 14, 15,
17*  137:*14*  143:*15, 17, 21*
144:*22*  149:*1, 2*  155:*9*
158:*13*  159:*11*  161:*4*
177:*5*
**constructions**  53:*17*
54:*14*  91:*20*
**construe**  34:2, *13*  133:*10*
**construed**  22:2  32:7, *14*
33:*1*  35:*9*  68:*9*
**construing**  42:*18*  52:*9*
**consultant**  15:*10*
**contain**  63:*5*  64:*2*
**contained**  155:*16*
**contending**  53:*10*
**contention**  79:*1*
**context**  20:*20*  23:6, *9*
24:*21*  27:*18*  30:*1, 18*
31:*12*  32:*11*  33:2  36:*9*
38:*21*  39:*3*  48:6  49:*4,
12*  54:*19, 20*  57:*9, 12*
58:*5*  64:6, *11, 12*  65:*3*
66:6  69:*14*  72:*22*  76:*15*
78:*22*  81:*14*  83:*12*
94:*12, 16*  95:*18*  98:*16*
99:*15*  113:*4*  123:*22*
124:*12*  135:*8*  138:*3*
139:*21*  140:*11*  144:*1*
145:7, *22*  146:*4*  150:*4*
158:*5*  159:*1, 12*  160:*5*
168:*3*  176:*15*
**contexts**  126:*17*
**contextualized**  38:*10*
**continuing**  14:*13*
**contradistinction**  24:*9*
**contributes**  124:*3*
**control**  78:*4*  105:*9*
109:*16*
**conventional**  76:*5*
169:*21*  170:*3*
**conversation**  176:*10, 14*
**conversations**  46:*17*
**conversion**  25:*18*  26:*15,
19*
**convert**  63:*2*
**copies**  7:*10*
**copy**  16:*7*
**core**  79:*14*
**corners**  129:*2*  136:*20*
**Correct**  4:*14*  5:*10*  6:*3*
7:*9*  11:*8*  13:*5*  18:*16*
22:7, *16, 17*  23:*16, 19, 21*
25:*10*  28:*16, 20*  30:7, *12,
16*  31:*2*  32:*4, 8, 9*  33:*8*
35:*9, 16*  36:*20*  37:2, *13,
22*  42:*1, 3*  44:*19, 20*
45:*11, 17*  46:*2*  47:*9*

51:*2*  53:*11*  56:*2*  61:*7, 9*
62:*4, 8*  64:*10*  65:*21*
69:*15*  70:*16, 21*  71:*17*
72:*11*  73:*11*  76:*6, 22*
77:*7*  78:*15*  80:*9*  81:*2*
82:*1*  83:*6*  84:*16, 19*
85:*11*  86:*12, 15, 17*
91:*22*  92:*14*  93:*1, 9, 14*
94:*3*  96:*1*  97:*19*  100:*18*
103:*19*  104:*1, 4*  105:*3*
106:*21*  107:*10, 14, 22*
109:*6*  112:*1*  114:*3*
115:*2, 13*  117:*10, 16*
118:*9, 14*  120:*12, 20*
121:*2*  124:*15*  125:*12, 16*
126:*11*  127:*16, 21*  128:*5*
131:*1*  133:*1, 2, 6, 10, 20*
134:*12, 22*  135:*5, 14, 21*
136:*7*  137:*20*  138:*4*
139:*9*  140:*15*  141:*6*
142:*8*  149:*5*  152:*7, 12,
20*  154:*1*  157:*22*  158:*10,
15, 16*  159:*5*  161:*1, 5, 11*
163:*4, 12, 15*  164:*9, 11,
15*  165:*20*  166:*5, 8*
169:*11*  170:*15*  171:*9*
180:*7*
**corrected**  9:*12*
**correctly**  70:*18*
**cost**  78:*6*
**cost-effective**  169:*7*
**counsel**  1:*15*  3:2  4:6
5:*1*  8:*3, 7, 18*  10:*12, 16,
22*  11:*4*  12:*12*  43:*2, 22*
92:*9*  112:*11*  174:*7*
180:*11*
**Counselor**  14:*5*  28:*11*
133:*13*
**couple**  48:*15*  49:*8*
163:*14*
**coupled**  48:*16*
**couples**  29:*7*
**coupling**  155:*14*  157:*10*
**course**  14:*13*  20:*12*
26:*19, 22*  42:*9*  47:*16*
49:*14*  54:*9*  89:*9*  113:*12*
129:*10*  138:*17*  147:*1, 18*
172:*5*
**COURT**  1:*1*  4:*16*  6:*11*
25:*16*  32:*8*  73:*15*
**covered**  43:*5*  82:*12*
**created**  127:*11*  145:*21*
146:*7, 12, 15*  147:*7, 14*
148:*19*  150:*12*  154:*1*
**creating**  156:*6*
**creation**  143:*12*  154:*5*
157:*7*
**criticism**  70:*19*
**cross-section**  58:*19*  60:*7*
**crystal**  158:*20*  161:*10,
17*  162:*16, 21*  163:*3, 6*

165:*9, 13, 19*  166:*4, 12,
18*  167:*6*  168:*20*  170:*2,
14*  171:*9, 13*  172:*2, 3, 6,
9*  173:*2, 13, 16*
**crystals**  170:*8, 10*  171:*20*
**cube**  90:*18*
**cubed**  85:*16, 17*  86:*6, 16*
**current**  45:*20, 22*  47:*2,
8, 12, 20*  48:*9, 13, 14, 17,
19, 21, 22*  49:*5, 6, 12, 15,
18*  50:*2, 3, 18, 19*  51:*12*
52:*4, 8, 15*  53:*21*  68:*12*
80:*11, 12*  81:*1, 2, 22*
85:*15*
**currently**  13:*4*
**currents**  49:*1, 21*  68:*20*
69:*2*  80:*16*
**cutoff**  147:*5*
**CV**  13:*14*  16:*7*

**< D >**
**damping**  96:*7*
**dark**  101:*16*  116:*2*
**darkest**  85:*4*  130:*10*
**data**  89:*11*  102:*10, 17*
**date**  16:*7*
**dates**  18:*19*
**day**  163:*11*
**days**  12:*4*  170:*9*
**de**  17:*5*
**deadline**  6:*22*
**deal**  4:*19*
**dealing**  109:*13*
**decade**  150:*2*
**decades**  78:*3*
**decide**  34:*4*  90:*4*
**deciding**  28:*19*
**Declaration**  3:*10, 12*
43:*9*  44:*4*  53:*16*  170:*17,
22*  178:*5, 8, 14, 17*
**declarations**  7:*8, 14, 16*
11:*20*
**decouple**  64:*5*
**decoupled**  62:*20*
**decrease**  139:*11*  177:*15*
**deem**  89:*4*
**defects**  172:*19*
**defend**  14:*16*
**Defendants**  1:*9, 15*  2:*12*
3:*3*  4:*6*  5:*1*
**deficient**  44:*6*
**define**  23:*5*  52:*14, 21*
53:*3*  84:*6*  96:*10*  108:*21*
122:*19*  160:*16*
**defined**  20:*16*  29:*20*
47:*8*  60:*18*  122:*14*
**defines**  38:*12*  65:*16*
74:*1*  75:*5*
**definition**  22:*15*  24:*13,
15, 18*  26:*9*  31:*8*  93:*12*

122:*16*  132:*7, 13*  160:*11*
164:*3*  170:*21*
**definitions**  18:*5*  38:*5*
**degradation**  139:*1*
**degrading**  138:*13*
**degree**  17:*13*
**DELAWARE**  1:2
**deleterious**  68:*2*
**deliverable**  79:*13*
**demonstrate**  124:*21*
128:*15*
**demonstrates**  128:*14, 16*
**demonstrating**  130:*11*
**demonstration**  85:*5*
**densities**  90:*7*  111:*2*
**density**  53:*21*  68:*12*
82:*9, 20*  83:*6, 9, 15, 16,
20*  84:*9*  85:*15*  86:*7, 9*
87:*20*  88:*9, 12*  89:*17*
93:*12*  95:*7, 8*  98:*16*
100:*2, 4, 9, 16*  102:*12*
107:*8, 17*  116:*2*  117:*5*
120:*8*  122:*10, 18, 19*
123:*1, 4, 8, 10*  124:*9, 10,
11*  127:*20*  130:*8*  131:*4*
132:*5, 7, 15, 19, 22*  134:*9*
135:*11, 20*  138:*1*  152:*3*
177:*15*
**deny**  139:*3*
**dependent**  99:*15*  110:*17*
152:*9*  153:*6*
**depending**  49:*4*  57:*8*
116:*14*
**Depends**  123:*22*
**depicted**  85:*7*  112:*18*
**depicting**  85:*1, 21*
**depiction**  59:*20*  86:*19*
111:*4*  114:*4*  118:*18*
**depictions**  67:*13*  89:*6*
**deposed**  5:*9, 13*
**Deposition**  1:*11, 13*  5:*8*
6:*20*  7:*5*  11:*18*  12:*4, 13*
176:*11*  179:*3*
**depositions**  6:*9*
**derivative**  153:*13*
**describe**  31:*18*  38:*18*
62:*16*  63:*14*  83:*15*
84:*21*  96:*5, 18*  106:*20*
112:*16, 21, 22*  113:*19*
117:*22*  153:*10*  165:*14*
167:*22*
**described**  30:*20*  38:*20*
57:*18*  72:*20*  75:*21*
94:*11*  95:*10*  115:*6, 9*
142:*19*  153:*2*  164:*4*
165:*9, 18*  170:*13*
**describes**  23:*10*  60:*14,
17*  63:*9, 11*  66:*15*  77:*12*
**describing**  28:*8*  40:*9*
41:*21*  45:*14*  50:*19*  61:*1,
2*  65:*13, 20*  114:*2*

135:*20* 138:*12* 142:*22* 165:*10*

**description** 94:*3* 95:*21* 167:*4*

**descriptions** 60:*9*

**descriptive** 173:*15*

**descriptor** 164:*4*

**design** 168:*17*

**designated** 58:*11*

**designed** 79:*12* 142:*8*

**designer** 137:*11* 138:*6*

**designers** 137:*19* 138:*18*

**desirable** 28:*3*

**desire** 117:*21*

**desired** 70:*15* 71:*16* 72:*18* 79:*2* 156:*7*

**detail** 114:*14*

**details** 39:*21*

**determine** 29:*15* 54:*14* 83:*6* 87:*19* 107:*16* 116:*15* 127:*19* 129:*5* 131:*6*

**determined** 22:*14* 72:*8*

**determining** 86:*7* 133:*16, 17*

**device** 25:*4, 7, 18* 26:*3* 38:*22* 50:*8* 53:*20* 56:*17* 58:*19* 62:*21* 63:*1* 71:*22* 72:*1, 3, 19* 102:*15* 107:*12* 109:*9* 112:*5* 118:*19* 119:*14, 16, 20* 120:*4* 121:*19* 138:*22* 142:*13* 143:*11* 154:*4, 21* 169:*5* 172:*7*

**devices** 26:*5* 39:*14* 48:*15* 49:*7* 77:*12* 146:*22* 148:*22* 149:*18* 163:*7* 167:*16, 21*

**device's** 61:*11* 154:*6*

**dictionaries** 36:*19*

**Dictionary** 26:*8* 38:*4, 12, 14* 39:*5, 8, 15*

**dielectric** 69:*2*

**difference** 17:*17* 73:*9* 91:*19, 20* 123:*19* 127:*20* 153:*1*

**differences** 18:*5* 128:*4* 150:*20* 165:*17*

**different** 22:*19* 26:*4* 57:*12* 64:*6* 73:*5, 18* 76:*18* 78:*9* 101:*9* 102:*15* 107:*12* 124:*1* 128:*5* 129:*21* 130:*1, 4, 5* 133:*4* 145:*11* 164:*5* 165:*15, 22* 166:*1, 3*

**differentially** 142:*14*

**differently** 65:*17* 134:*9* 175:*6*

**difficult** 77:*20* 145:*15*

**digital** 145:*13, 15*

**dimensional** 83:*18* 114:*6*

**dimensionality** 113:*14*

**dimensions** 78:*5* 89:*8, 10, 13*

**diminished** 85:*6*

**diminishing** 154:*4*

**direct** 147:*19* 162:*4*

**directed** 66:*8* 67:*2* 68:*6* 73:*2* 74:*15* 75:*12* 117:*13* 127:*10*

**direction** 1:*21* 66:*16* 87:*6, 7*

**directions** 66:*9*

**directly** 25:*5* 41:*9* 74:*22* 81:*17* 104:*11* 118:*7*

**directs** 166:*7*

**disagree** 64:*20* 89:*16* 125:*2*

**disagreed** 14:*22*

**discuss** 82:*9*

**discussed** 107:*6* 140:*21* 148:*2* 155:*12*

**discussing** 9:*16* 55:*13* 67:*5* 118:*8*

**discussion** 17:*11* 137:*4* 145:*9* 176:*11*

**discussions** 11:*16*

**disengage** 14:*20, 21*

**disfavored** 148:*9*

**dispute** 139:*20*

**disputed** 17:*19* 20:*5* 22:*10, 15* 23:*18* 24:*2* 33:*22* 36:*10* 37:*7* 38:*3* 45:*10, 15* 46:*2* 54:*16* 138:*2* 139:*19* 143:*22* 157:*22* 158:*7, 9, 14* 176:*15*

**disqualified** 16:*3*

**distance** 96:*7*

**distinction** 146:*9*

**distinctions** 126:*15*

**distinguishes** 70:*4*

**distribution** 109:*1*

**DISTRICT** 1:*1, 2*

**divided** 56:*15* 123:*2*

**Doctor** 8:*22* 16:*21* 43:*21* 63:*8* 97:*18* 173:*19*

**document** 33:*12* 39:*9* 41:*21* 104:*20* 105:*3* 114:*19*

**documents** 11:*19* 40:*2*

**doing** 4:*10* 23:*22* 67:*17* 74:*12* 102:*3* 133:*16, 17* 163:*11*

**domain** 8:*8* 15:*16* 24:*8* 39:*14* 40:*4*

**domains** 29:*8*

**dot** 88:*19* 89:*3* 117:*7*

**dots** 129:*1* 130:*9* 136:*20*

**dotted** 58:*17* 59:*6, 18* 60:*1, 7*

**double** 146:*13*

**double-check** 162:*7*

**doubt** 59:*4*

**Dr** 5:*3* 10:*21* 11:*22* 17:*9* 18:*1* 47:*17* 54:*6* 55:*10* 64:*6* 70:*19* 78:*19* 88:*15* 92:*5* 98:*20* 106:*15* 111:*20* 122:*16* 124:*10* 136:*16* 137:*18* 138:*6* 147:*10* 174:*9*

**draft** 43:*8*

**drafted** 9:*17* 11:*13* 19:*6*

**drafting** 10:*19*

**drafts** 9:*7, 12* 10:*19* 19:*8*

**draw** 89:*3* 129:*14* 136:*21* 156:*9*

**drawing** 59:*9* 60:*2* 68:*6* 113:*11* 120:*13* 146:*9*

**drawings** 58:*18* 59:*22*

**drawn** 26:*2* 119:*8* 126:*15, 16*

**draws** 26:*17* 108:*18*

**drive** 52:*6* 63:*22*

**driven** 28:*15* 29:*4* 38:*18, 20* 39:*8, 10, 19* 40:*9* 41:*8, 20* 51:*5* 60:*20* 61:*8, 22* 62:*12, 18* 63:*16* 64:*10, 12, 13* 65:*1, 5, 8, 20* 66:*3, 11* 68:*1* 72:*18* 73:*20* 75:*1, 6, 14* 76:*17* 79:*14* 80:*7* 81:*1* 97:*2* 119:*11* 130:*13* 134:*22* 135:*4*

**driving** 51:*11* 62:*13* 67:*5*

**dropped** 123:*7*

**duly** 1:*16* 4:*7*


**< E >**

**earlier** 10:*3* 12:*15* 30:*9, 20* 35:*7* 38:*2* 41:*19* 91:*4* 95:*10* 108:*22* 115:*8* 117:*19* 148:*2* 153:*19* 159:*12* 169:*11* 170:*18* 175:*8* 176:*10*

**easily** 96:*12* 159:*20*

**East** 55:*4*

**ebbs** 13:*12*

**economically** 78:*8*

**edge** 87:*5*

**EDT** 1:*18*

**education** 35:*2, 3*

**educator** 35:*1*

**effect** 151:*3* 152:*16* 153:*13*

**efforts** 7:*1* 14:*8* 129:*13*

**either** 9:*17* 24:*20* 39:*5* 56:*1* 80:*19* 129:*20* 145:*16* 152:*7*

**El** 2:*7*

**electric** 64:*15*

**electrical** 18:*1* 25:*2* 26:*15* 48:*16, 22* 49:*9* 50:*9* 51:*1, 7* 56:*11* 59:*13* 62:*13* 63:*2* 66:*21* 69:*22* 80:*15* 141:*5, 8* 143:*11*

**electrically** 28:*15* 29:*4* 38:*18, 20* 39:*8, 10, 19* 40:*9* 41:*8, 19* 51:*5, 11* 56:*18* 60:*20* 61:*8, 22* 62:*12* 63:*22* 64:*10, 12, 13, 22* 65:*5, 8, 20* 66:*3, 11, 19* 67:*5, 20* 68:*1* 72:*18* 73:*20* 75:*1, 6, 14* 76:*16* 79:*14* 80:*7* 81:*1* 97:*2* 113:*8* 118:*3, 4* 119:*11* 130:*13* 134:*22* 135:*4* 141:*16*

**electrode** 60:*18* 62:*2, 8, 11, 17* 63:*15* 64:*4, 9, 22* 65:*9, 14* 66:*5* 68:*16* 69:*19* 94:*19* 110:*3*

**electrodes** 29:*7* 55:*18* 58:*21* 62:*14, 22* 63:*2* 64:*15, 16* 66:*12, 22* 67:*22* 70:*1* 75:*2* 81:*10* 143:*12* 144:*5* 157:*8*

**electromechanical** 50:*7*

**electron** 16:*1*

**electronic** 25:*19* 29:*8* 141:*14* 146:*22*

**element** 151:*21, 22* 152:*15* 166:*12*

**elements** 83:*19* 165:*21*

**eliminated** 79:*20*

**elongated** 101:*16* 103:*13*

**EM** 101:*17*

**emanating** 66:*10*

**emblematic** 90:*9*

**embodiment** 163:*3, 18, 21* 164:*10, 15, 19* 165:*1, 10* 173:*3, 9*

**embodiments** 163:*6* 164:*3* 165:*5, 12, 14, 17, 22* 166:*3*

**embraced** 135:*13*

**employed** 180:*11*

**encompass** 169:*17*

**endorse** 134:*20*

**endpoint** 28:*4*

**endpoints** 56:*7*

**ends** 72:*10* 74:*18* 75:*4*

**energize** 144:*5*

**energized** 49:*20*

**energy** 25:*19* 26:*16* 27:*3, 20* 29:*10* 48:*16*



49:9  63:11  66:8, 9, 15
72:22  75:13  82:10, 22
84:2, 9  85:5  86:3  87:9,
20  88:5, 9  89:8  90:8
92:15  94:22  95:7  96:8
97:2  98:17  100:10, 16,
17  101:4, 13  102:13
103:21  107:9, 18  109:1
111:2  112:9  113:7
115:11  118:19  119:11
120:6, 8  125:4, 15  126:4
127:11, 21  128:3, 4, 19
129:7  130:12  131:4
132:6, 7, 15, 16  133:1
134:10  135:12, 21  138:2
139:12  148:16  149:12,
14  150:12  152:3  153:15
154:13  155:11, 15
156:11  157:8  177:15
**engaged** 14:12
**engagement** 13:18  14:13
**engine** 79:9
**engineering** 18:2  109:12
**English** 23:3  124:2
175:18
**ensure** 31:13
**entered** 124:7
**entire** 26:17  31:13  33:2
66:6  83:20  89:2  107:21
109:11  112:4  116:16, 20
129:14, 15  176:1  177:9
**entirety** 24:8
**entitled** 21:6, 10
**episodic** 13:12
**equal** 73:6, 10  74:7
75:21  76:21  77:12, 20
84:6  91:8  96:4  118:13
119:15  120:5  139:15, 16
**equaling** 75:18
**equally** 80:22  96:10
**equals** 73:11  75:17
76:13  119:16
**equating** 78:14
**equation** 20:10
**equivalent** 99:18  102:14,
17  107:12  130:11
**error** 152:12
**especially** 38:22  82:3
98:15  122:20  147:6
**ESQ** 2:4, 5, 13
**essentially** 45:13  75:5
78:18  94:10
**established** 50:15  64:16
67:21
**estimate** 8:16
**et** 26:4  52:22  56:11
113:21  148:22
**evaluating** 177:14
**eventuated** 167:3
**evidence** 18:21  19:2, 15
21:2  29:15, 22  30:6

31:20  33:3  34:4, 14
35:19, 21  36:16  37:1, 6,
11, 12, 22  38:17  40:15,
19, 22  41:7, 12  42:19
44:5, 13, 18, 21  45:4, 19
46:1  48:10, 11  61:2
116:18  130:20, 21  131:1,
6, 12, 15  158:7  163:7
**exacting** 25:12
**exactly** 17:6  56:6
129:22
**examination** 1:14  3:2
5:1  174:7
**examined** 4:8  22:13
**examining** 31:1
**example** 20:5  24:3, 9
25:9  62:1  88:7  95:10
104:3  115:12, 17, 20
116:7  125:20
**exception** 10:16
**excitation** 142:18
143:14  157:6
**excite** 144:4
**excited** 139:21  140:13
141:5  142:22  143:8
144:3, 4, 16  145:2, 10, 20
146:11  147:2  153:16
155:11  156:4, 7  157:3
**excitement** 146:14
**exclude** 65:8  73:20
83:10  95:9  123:14
**excuse** 12:7
**exemplar** 31:4
**exercise** 21:4  35:13
**Exhibit** 2:21  3:9  4:2
104:14, 19  105:1, 2, 8, 13,
17, 20  106:12  107:2
111:13  157:11
**exhibits** 104:22
**exist** 38:16  39:6  147:11
**existence** 70:8  147:16
**expect** 32:20  113:17
**expected** 135:9
**expedite** 15:8
**expediting** 54:11
**experience** 8:8  15:14
18:3
**experienced** 77:6
**experiences** 36:8
**experimental** 113:19
130:3
**expert** 5:18, 20  8:10
12:16  13:1, 5, 10  16:4, 5
33:7  36:17  58:7  128:18
163:11  178:10, 19
**experts** 16:15  53:8
**expires** 180:21
**explain** 15:13  32:20
33:8  47:11  53:18  66:2
170:21

**explained** 11:5  14:11
110:13
**explanation** 55:15  84:4
93:12  135:2
**explanatory** 67:15
**explicate** 25:17  59:11
65:22
**explicated** 56:19  81:13
**explicating** 145:10
**explication** 29:2  33:17
44:8  81:16  153:17
**explicit** 160:10, 17, 18
**explicitly** 115:12, 21
167:6
**expression** 131:18
**extend** 163:6
**extended** 60:1
**extent** 24:18  35:20  38:9
57:6  58:20  64:20  93:8,
10  94:1  146:19
**external** 18:22  36:16
**extract** 135:16
**extracting** 136:6
**extremes** 23:4
**extrinsic** 18:21  19:22
21:2  29:15, 22  30:6
31:20  34:3, 14  35:19, 21
36:15  37:1, 6, 11, 12, 21
38:17  41:7  44:8, 13, 18,
20  45:4, 19  46:1  48:10
61:2  130:20  131:6, 15
158:7

**< F >**
**fact** 22:2  47:12  52:7
54:15  70:4  78:7  91:13
101:14  158:2  161:10
165:18  166:3  172:8
**factor** 73:15  90:20, 21
96:8  119:1, 15, 19
120:10, 14  138:14, 20
139:2, 4, 8
**factors** 91:14
**fair** 13:16  46:10  136:5
138:8  141:10  146:10
177:17
**faith** 20:17
**fall** 149:11
**falls** 93:21
**familiar** 5:8, 21  6:10, 21
7:21  9:4  15:11  17:9, 14
18:12, 14  50:4, 10
139:22  152:20  163:17
**far** 15:14  87:16  129:1
142:1
**faster** 147:3
**FBAR** 56:2
**feature** 76:13  119:22
**features** 52:16  165:15
**feel** 4:10  17:17  28:6

41:14  122:13
**felt** 103:7
**field** 64:15  128:18
**figure** 58:1, 9  59:1, 21
62:1  75:8  85:7  90:5
100:20  101:4  104:11
113:9  115:12, 21  118:22
119:1, 3  162:1
**figures** 82:22  84:10, 15
85:9  89:15, 17  103:20
105:5  106:16  109:5
118:8, 16, 20  119:9
124:20  128:2, 3, 10, 20
**file** 20:20  21:16
**fill** 111:14
**film** 15:10, 18
**films** 15:19
**filter** 26:4  39:2, 13  80:8,
14, 16, 17, 19, 22  141:13,
16  142:1, 13  149:21
**filtering** 70:16  71:5, 6,
16, 17  78:12, 20  79:3, 13
**filters** 142:7
**final** 9:8  10:21  11:3
19:11  178:7, 17
**financial** 180:12
**find** 22:3, 9  28:18
38:15, 17  39:4, 7  40:8
41:20  42:6  45:2, 14
48:9  94:2  126:18  166:6
**finding** 42:2, 11
**finds** 44:6
**fine** 4:15  9:22  20:6
46:13  102:2  106:4
120:2  156:21
**finish** 100:7
**firm** 57:5
**firms** 13:15
**first** 14:5  16:14  29:1
31:16  63:19  75:17  96:2
124:7  140:19  142:19
174:12, 20
**fit** 36:5
**five** 173:21
**fix** 106:1
**fixed** 156:14
**flip** 109:18
**Floor** 2:15  98:19
**flows** 13:12
**focus** 30:3  46:18  66:12,
16  88:22  127:5  130:19
166:14, 17, 20  167:19, 22
**focused** 28:1  70:3
**focuses** 63:12  70:9
**focusing** 27:19  132:5
**follow** 28:12  43:20
**following** 87:16
**follows** 4:8
**fond** 64:19
**fore** 81:6

**foregoing** 180:*5, 6*
**foremost** 96:2
**Form** 10:*9* 11:*9* 15:*18*
17:*21* 22:22 31:*21*
40:*13* 50:*15* 53:*14*
88:*13* 89:*19* 92:*1* 97:*14*
108:*3* 112:*10* 121:4
128:*6* 138:*15* 139:*14*
141:*11* 149:*9, 13* 150:*14*
151:*18* 169:*12* 170:*5*
173:*4*
**formal** 35:2
**formula** 85:*11, 13*
101:*17*
**Forty-eight** 140:*9*
**forward** 14:*14* 43:*16*
79:6
**found** 20:*21* 38:5 40:*3,
11, 16* 41:8 42:*1* 52:*19*
60:9 82:*4* 93:*11* 103:2
138:20 146:*21* 153:*18*
**foundation** 8:*4* 26:*12*
**four** 6:*20* 129:2 130:8
**fraction** 64:*14*
**fractions** 59:*5*
**frame** 22:*1, 3* 23:7
32:*11* 33:*16* 36:6 40:6
44:7 98:*10* 131:*11*
**frequencies** 142:*14, 16*
**frequency** 64:*17* 67:*21*
150:2
**Friday** 1:*12, 19*
**fro** 25:*19*
**front** 151:7
**FUHRER** 2:*13* 3:*4* 4:*9,
14, 18, 22* 5:2 8:*9* 9:*3, 7,
14, 22* 10:2, *11, 15, 20*
11:*12* 14:*17* 15:*4* 18:*7*
19:*9* 23:*11* 27:5 28:*13*
29:*11* 30:2 31:22 33:*5,
19* 34:*8* 35:6 36:*11*
37:9, *19* 40:20 41:*16*
43:5, *12, 18, 19* 51:*18*
54:*3* 55:*2, 6, 9* 57:*15*
65:6 68:*10* 71:*4, 13*
73:3 74:*13* 76:3, *19*
77:4, *18* 78:*10* 79:22
81:*19* 83:22 88:6 89:*14*
90:*12, 19* 91:*17* 92:*3, 12*
93:*4* 97:*16* 98:2, *18*
99:*11* 100:*21* 101:*20*
102:*2, 7, 9* 103:8 104:*12,
15, 21* 105:*4, 12, 15, 18,
22* 106:*7, 9, 14* 108:*5, 8,
9* 109:*3, 17, 19* 110:6
111:*5, 15, 19* 112:*6, 13,
19* 114:*1, 16, 19, 22*
117:*9* 118:6 119:*5*
120:*1* 121:*8, 21* 122:*7*
123:*17* 125:*1, 8* 126:2
128:*1, 9* 130:*14* 131:*13,*

*22* 133:*15* 134:*8, 18*
136:*3, 12, 15* 139:*7, 17*
141:*19* 142:*17* 143:*19*
144:*20* 145:*17* 147:*17*
149:*3, 10* 150:*10* 151:6
152:*5, 18* 153:8 154:*9,
22* 155:*19* 156:*10, 19*
157:*13* 159:*14* 160:*7, 20*
161:*18* 164:7 165:7
168:*19* 169:*3, 19* 170:*11*
171:*3* 173:7, *18* 174:*2, 4,
22* 175:*16, 20* 177:20
179:*1*
**full** 71:2 81:*16* 89:*17,
22* 97:*18* 99:*13* 100:*4*
110:*10* 112:*16, 22*
114:*10* 115:*4* 121:*1*
122:*17, 21* 123:*8, 11, 12,
14, 21* 124:9 125:*4, 16*
126:*4, 10* 129:6 131:*10*
**fully** 7:*5* 62:20 64:*5*
145:*14* 147:*4*
**function** 64:2 70:*15, 16*
71:*5, 7, 15, 16, 17* 75:*16*
78:*12, 20* 79:*3, 13, 19, 20*
81:*18* 89:7 122:22
147:8 149:*21* 156:7
**functionality** 29:*5* 70:20
71:*11* 73:*18* 78:*14, 19*
79:*16* 80:*9, 14, 19* 81:*1*
154:*6*
**functionally** 99:*17*
**functioning** 141:*17*
**further** 44:8 60:*9* 65:22
87:*5* 90:*1* 122:*14*
173:*18* 178:22

**< G >**
**gains** 89:*11*
**gears** 82:*8*
**general** 26:*14* 50:*14*
82:*21* 141:22 145:*1*
146:2 170:7
**generally** 7:20 11:*21*
56:*16* 130:22 131:*19*
142:2
**generated** 50:8 53:*21*
153:*20*
**generates** 51:*1*
**geometries** 78:*5*
**get-go** 173:*12*
**getting** 17:*16* 141:*13*
**give** 22:*19* 24:*14, 17*
25:*12* 39:*21* 68:*21*
71:22 95:20 98:*19*
101:22 105:8 120:*4*
123:*1, 18* 130:*16* 132:6,
12* 133:*3* 147:5 152:*1, 6*
154:*5* 178:*21*
**given** 27:*8* 117:2
130:22 161:*16* 170:20

**gives** 68:*1* 79:*15* 135:*16*
152:*1* 171:*11*
**giving** 64:*17* 85:20
92:22
**go** 5:7, 22 10:*17* 16:*21*
21:*11* 24:*14* 29:*21* 30:6
31:*17* 34:*21* 36:22 41:7,
17* 42:*14* 48:*8* 51:*19*
53:*13* 55:*12* 60:*11, 17*
63:*10, 21* 79:6 82:*10, 13*
85:6 87:*3* 91:*14* 93:5
94:*13* 99:*15* 101:*18*
105:*4, 10* 106:6 110:7
114:*13, 17* 115:7 117:6
119:7 132:8 137:*7, 22*
141:22 149:*21* 167:*8, 11*
168:*5* 174:*11*
**goal** 90:22 119:20
121:*18* 139:*4*
**goes** 25:*17* 29:2 30:20
35:5 53:*18* 62:6 65:22
66:*16* 69:*11* 117:22
120:*10* 138:*21* 143:*17,
18* 153:*10* 169:20
**going** 14:6, *15, 19* 17:*3*
21:*21* 39:*1* 42:*12* 43:*12,
16, 20* 45:5* 51:*10* 53:*13*
56:*9* 59:*10* 68:*3* 87:*13*
92:*9* 93:*12* 94:6 100:6
101:*15* 111:*7, 10, 21*
122:22 144:*8, 12* 146:20
147:7 148:20 149:*16*
152:8 154:*18* 155:*13, 14*
159:*2, 4, 16* 160:*18*
162:*4* 167:2 172:6, *20*
**golly** 111:*17*
**Good** 5:*3, 4* 20:*17* 35:4
111:*17* 131:*19* 148:*3*
149:7 153:*21* 172:20
**Google** 39:*11, 18, 22*
**gotten** 147:*3*
**GRACE** 1:*17, 20* 180:*4*
**grain** 172:*18*
**graphical** 59:20 67:*13*
89:6
**graphically** 58:*16* 65:*16*
85:22
**grapple** 72:*15*
**gray** 101:*10* 116:*3*
128:22
**great** 55:6 78:*3*
**ground** 5:7
**guerre** 17:*5*
**guess** 12:22 18:8 35:*13*
51:*19* 54:*4* 69:*11* 74:*14*
75:*16* 81:20 85:9 91:*3*
93:22 94:5 124:*10*
131:*17* 134:*19* 140:*9, 14*
147:22 148:*8* 149:*4*
**guessing** 14:*4* 15:*3*

40:*10*
**guidance** 8:*18* 102:*1*
**guy** 104:*12*
**guys** 106:2

**< H >**
**hair** 99:*18*
**half** 99:*12, 16*
**hand** 136:*21*
**handed** 57:9
**handy** 7:8 167:*9*
**happening** 129:*18*
**happy** 98:7 106:2
**hard** 77:*19*
**harkening** 31:9 170:8
**head** 14:*18*
**hear** 11:*10* 36:*3*
**heard** 16:22 17:*4* 18:*18*
90:*17* 92:6, *9* 156:*21*
**help** 20:2 35:22 144:*11*
**helpful** 34:*14* 40:*17*
**high** 172:*9*
**highlighted** 107:*3* 171:*10*
**highlighting** 173:*11*
**highly** 68:*18, 20*
**history** 18:22 20:*21*
21:*16* 36:*17* 42:*21*
**hold** 13:*1* 84:*5*
**home** 52:6
**honest** 20:*14* 63:*17*
**Honestly** 145:6
**hope** 162:*5*
**hopefully** 58:*4*
**host** 152:*9*
**hour** 129:*19*
**hours** 6:20
**hypothetical** 91:*13*
100:8 116:*5, 11* 120:4, *9*
**hypothetically** 102:22
116:*13*

**< I >**
**idea** 51:7 91:*4*
**identification** 4:*3* 16:*15*
106:*13* 157:*12*
**identified** 7:*14* 16:*4*
54:6, *12* 58:8 91:*21*
104:22 107:*3*
**identify** 55:22 58:*14*
72:9 92:*13* 164:*18*
170:*13*
**illegitimate** 95:*4*
**illustrate** 117:*3*
**illustrates** 58:20 108:22
**illustration** 114:*15*
**image** 102:*4, 12*
**images** 113:20
**imagine** 100:*14*
**immaterial** 147:*15* 177:*3*
**immediately** 26:2, *17*



86:9

**impact** 17:*18*
**impacted** 71:7, *12*
**imperfect** 148:22
**implication** 118:*18*
**implicit** 44:*10*
**importance** 96:*13*
**important** 6:9 28:*18*
  33:7 72:9 86:22 96:8
  109:2 115:9, *15* 117:*14*,
  *15* 125:*10*, *15*, *21* 150:*18*
  171:*21*
**importantly** 40:5 47:*1*
  52:*3*
**impossible** 64:*4* 164:2*0*
**improper** 121:6
**improve** 91:2, *8*, *14*, *15*
  119:*15* 139:8
**improved** 73:*18* 118:22
  119:*1* 122:*1* 138:2*0*
**improvement** 74:5, *7*
  76:*17* 117:*15* 119:*10*
  121:*17*, *19*
**improvements** 118:*9*
  119:*21* 168:*12*
**inadequate** 89:*4*
**inappropriate** 29:*14*
  52:*9*
**include** 47:*14* 59:2 66:*4*
  68:*15* 93:*19* 94:2 97:*8*
  109:*8* 148:9 153:2*0*
**included** 15:*10* 57:*1*, *11*
  65:2*1* 67:7 143:*3*, *5*
  144:*10* 177:*3*
**includes** 42:2*0* 65:8
  143:*8* 153:*12* 156:*1*
**including** 19:*18* 36:*17*
  57:*12* 65:*13* 67:*14*
  69:*18*
**inclusive** 56:*9*
**inconsistency** 45:2
**inconsistent** 21:*13* 59:*9*
  67:*9*
**incorporates** 153:*7*
**incorrect** 121:6
**increase** 101:*4* 102:2*1*
  116:6, *14*, *15*
**increases** 100:*17*
**increasing** 121:*11*
**Independent** 70:6
**indicated** 85:*3* 99:*4*
  104:7 117:*19* 166:*9*
**indicating** 14:*14* 162:*15*
**indicative** 90:6 108:*16*
  116:2*1*
**indisputed** 47:2*1*
**industrial** 121:*18*
**infers** 172:*11*
**infinity** 154:2*1*
**influence** 18:*4*

**information** 35:*4* 85:2*1*
  98:*12* 124:2*0* 131:*19*
  132:*3*
**infringement** 151:2*0*
**inherent** 161:*15* 172:*11*
**Initial** 3:*10* 7:8 15:5
  18:9 27:6 31:2*0* 32:2
  36:*13* 45:5, *18* 50:6
  52:6 55:*12* 82:9 140:2
  157:*17* 178:5, *8*
**input** 61:*8*
**instance** 21:*19* 26:*16*
  45:*3* 75:*8* 96:6 98:2*0*
  99:22 109:9 131:*3*
  141:*13* 175:7
**instant** 179:*3*
**instantiated** 85:*8* 150:*19*
**instantly** 31:*10*
**instruct** 9:2 43:*17*
**instructions** 43:2*0*
**insufficiency** 21:*12*
**insufficient** 19:2, *16*
**insulating** 68:2*0* 69:*3*
  81:*11*
**insulative** 68:*18*
**intellectual** 12:2*0*
**intention** 75:2*0*
**interacts** 28:2
**interest** 99:6 180:*12*
**interesting** 145:*8*
**interlayered** 68:*19*
**interplay** 49:*8*
**interpret** 126:*17* 138:7
**interpretation** 20:*11*
  68:*5* 103:*19* 104:9
  161:6 177:*19*
**interpreted** 69:*12*
  101:*12* 126:2*0* 146:22
**interpreting** 19:*1* 126:*19*
**interprets** 150:*7*
**interrogated** 113:2*1*
**interrupt** 136:9 175:*1*
**interruption** 108:*6*
  110:*15*
**intrinsic** 19:2, *15*, *17*
  20:*1* 21:*11*, *17* 22:4, *6*,
  *13* 23:9 31:*1* 33:*3*
  40:*14*, *19*, *22* 41:*12*
  42:*19* 44:*3*, *5* 45:9, *14*
  47:2, *13* 48:*4*, *10* 52:*4*, *8*,
  *19* 57:*19* 59:2, *15* 66:7
  70:*14* 130:2*1* 131:*1*, *12*
  133:6, *7*, *9* 157:2*1* 158:*3*,
  *5* 159:*5*, *13*, *16* 160:6
  163:*8* 171:2, *4*
**introduced** 174:2*1*
  175:*14*
**introduces** 174:*17*
  175:2*1*
**introduction** 84:*8*

**invention** 48:*1* 59:*12*
  65:*11* 66:*13* 67:*1*, *9*
  71:9 72:2 73:*4* 74:*15*
  75:9 76:*15* 82:6 84:*8*
  85:*8* 88:*11* 90:7, *10*, *15*
  91:*1*, 7, 9 92:*17* 99:7
  103:2 107:*18* 114:*15*
  115:*10*, *16* 116:22
  117:*14*, *15* 119:*14* 125:*3*,
  *12* 126:6 127:*10* 128:*12*
  138:*13* 146:*1* 150:9, *19*,
  22 151:*17* 161:*15*, *16*
  162:*15* 163:*1* 166:*17*, 2*1*
  167:5, *15*, 2*0* 170:*13*, 2*1*
  176:2*0*
**inventive** 119:*10* 161:9,
  2*0* 162:2*0* 169:*10*
**inventiveness** 74:2*1*
  177:*4*
**inventor** 36:*18* 163:*15*
  164:*13*, *18*
**inventors** 27:9, *14* 28:7
  58:*13* 65:*12* 66:7 69:7,
  *17* 132:2*1* 133:2*0*
  135:*13*, *19* 138:*11* 160:9
  164:*14* 168:*12* 170:*13*
**inventor's** 128:*17* 168:*1*
**involved** 12:*18*, *19*, *21*
  80:*16*
**involves** 15:*18*
**involving** 5:*19* 18:*1*
  49:*1* 83:2*0*
**issue** 35:2*0* 88:7 149:*17*
**issued** 11:2*1* 126:2*0*
  129:*17*
**issues** 109:*12*
**it'll** 15:7
**its** 21:6, *10*, *18* 26:*3*
  27:2*0* 38:2*1* 53:6 56:*17*
  63:6 74:2*1* 76:*14* 80:*8*,
  *14* 81:*18* 105:6 118:*1*
  123:9 131:*4* 161:*4*
  164:22 165:5 167:5
  180:*13*

**< J >**

**jar** 172:*16*, 2*1*
**jars** 172:*14*
**job** 109:*13* 134:*3*
**JOHN** 1:*13* 3:*3*, *11*, *13*
  4:5
**Joules** 86:*1*, *4*, *16*
**judge** 16:8 34:2, *10*, *12*,
  *14* 35:5, 22 36:*4* 37:*10*,
  *17* 46:7, *8* 145:*19*
**judges** 34:2*1*
**judge's** 34:7
**judgment** 164:*12*
**jump** 42:*13* 93:*13*
**JUNG** 2:5
**jurisdiction** 4:*12*

**jury** 32:*14*, *18*, 2*1* 33:*8*,
  *12*
**justifiable** 78:6

**< K >**

**keep** 114:*19*
**key** 26:*16*
**kind** 20:*3* 25:*1* 57:*10*
  58:*18* 77:2 85:2*0*, 2*1*
  99:*18* 129:*12* 130:2
  150:2 172:*17*
**kinds** 109:*11* 150:5
**know** 6:*19* 8:*13*, *14*
  16:8, 2*0* 21:*19* 25:2*1*, 22
  31:9 34:2*1* 39:2 43:*10*
  46:*16* 50:*1* 58:*13* 59:*14*
  64:*19* 74:*17*, *19* 77:9, *11*,
  *19* 78:*3*, *18* 87:*11* 89:22
  90:*3* 98:7 100:*3* 111:2*0*
  112:2*1* 113:2*1* 120:*19*
  123:6, *12* 127:2*0* 129:*19*
  132:*11* 136:*11* 137:*10*
  146:2*0* 150:*1*, 5 156:7
  164:*3* 177:*10*
**knowing** 96:6 107:2*0*
**knowledge** 36:8 44:*11*
**known** 64:*17* 76:9
  117:2*1*
**knows** 147:*12*, *13* 148:2*0*

**< L >**

**labeled** 60:2 70:7
**lack** 19:2*1*
**Lacks** 8:6 26:*12*
**lag** 6:*11*
**laid** 26:22
**language** 20:9 23:2, *3*
  73:*13* 74:6 92:22 100:5
  134:*10* 159:*3* 162:*14*
  173:*14*
**large** 78:7 96:*18*
  107:*16* 128:*11*
**lastly** 74:*4*
**lateral** 27:2*1* 28:2
  58:2*0* 63:*13* 66:9, *16*
  67:3 75:*13* 87:6 101:*4*
  115:*11*, *17*, 2*0* 116:6, 7
**laterally** 27:*4* 63:7 68:2
  70:2, 9 73:*1*, *19* 94:22
  118:2, 5
**law** 8:*18* 9:*15* 10:5
  11:*1*, *4*, *8* 13:*1*, 2 19:22
  34:2*1* 159:*19*
**layer** 25:2*0* 29:6 39:*1*
  53:22 55:*18* 58:22
  60:*19* 61:8 62:*3*, *15*, 2*1*
  63:*4* 64:*14*, *17*, *18* 66:*11*
  69:*3* 75:*4* 140:6 143:*13*
  158:*10*, *12*, *14*, *18*, 2*0*
  160:*11*, *16* 161:*1*, *11*, *17*
  162:*16*, 2*1* 165:9, *19*



166:*4, 8*   170:*2*   171:*9*
172:*2, 3*
**layered**   78:*4*
**layers**   58:*10*   59:*17*
63:*12*   64:*4*   74:*16*
118:*14*   166:*18*   170:*15*
**layman's**   108:*10*
**layperson**   144:*15*   147:*6*
**Leading**   174:*22*   175:*16*
177:*20*
**leakage**   27:*3, 20*   28:*4*
29:*9*   63:*6*   66:*17*   67:*3*
70:*1, 3, 4*   73:*19*   75:*13*
115:*11, 17, 21*   116:*6, 8*
139:*12*   148:*16*   149:*12*
150:*12, 17*   153:*15*
154:*13*   155:*11*   156:*12*
157:*8*
**leaked**   89:*17*   127:*12, 14,*
*15, 19*   128:*3*
**lean**   112:*14*
**leaning**   134:*11*
**learned**   21:*7*   36:*19*
**left**   22:*20*   109:*8*   110:*2*
113:*10*   130:*4*
**legal**   7:*21*   29:*17*   34:*20*
103:*5, 17*   108:*3*   122:*2*
131:*9*   133:*11, 22*   159:*6,*
*22*   160:*12*   164:*2, 8*
165:*3*
**letter**   73:*15*
**level**   32:*12*   33:*14*   86:*3*
114:*14*
**lexicographer**   21:*20*
22:*7*   132:*22*   160:*10, 19,*
*22*   170:*19*
**lifetime**   44:*11*
**light**   17:*7*   83:*20*   122:*20*
126:*21*
**limit**   15:*20*   121:*7*   124:*8*
125:*22*
**limitation**   151:*11*
152:*19*   153:*2*   155:*2, 5*
**limited**   6:*20*   108:*18*
109:*4, 5*   119:*22*   158:*19*
164:*22*   165:*5*   170:*14*
**limiting**   98:*13*   117:*6*
124:*11*   154:*6*
**limits**   57:*5*
**line**   61:*14*   124:*8*   135:*12*
167:*11, 13*   168:*5*   174:*13*
175:*8, 15*
**lines**   58:*17*   59:*7, 19*
60:*1, 7*   65:*19*   149:*17*
**linked**   41:*9*   48:*22*
**literature**   41:*9*   67:*14, 15*
146:*19*
**little**   40:*1*   101:*22*
111:*10, 11*
**localization**   88:*17*

**localized**   82:*21*   84:*1*
87:*18*   88:*8*
**located**   60:*6*
**location**   110:*19*
**long**   16:*10*   21:*7*   133:*5*
139:*20*
**longitudinal**   66:*15*
**look**   15:*5*   29:*14*   34:*3*
36:*12*   39:*7*   42:*5*   44:*8,*
*18*   51:*20*   58:*1*   60:*4*
61:*12*   84:*8, 11*   87:*7*
88:*19*   89:*12*   101:*14*
103:*13*   115:*17*   117:*7*
118:*10*   124:*19*   129:*22*
151:*10*   160:*4*   174:*9, 10,*
*12*   177:*9*
**looked**   21:*1*   24:*1*   29:*12*
40:*15*   65:*18*   113:*9*
122:*9*
**looking**   13:*14*   18:*9*
21:*11, 12, 15, 20, 22*   22:*5*
30:*10*   42:*10*   80:*3*   84:*3*
96:*3*   131:*6, 15*   136:*1*
140:*10*   151:*8*   177:*7*
**looks**   13:*14*   85:*15*
129:*16, 17*
**lose**   123:*9*
**loss**   27:*3, 20*   28:*4*   29:*9*
63:*6, 11, 13*   66:*8, 9, 15,*
*17*   67:*3*   70:*4, 8, 9*   73:*1,*
*19, 21*   75:*13*   85:*5*   87:*9*
88:*5*   89:*8*   94:*22*   95:*2*
97:*2*   101:*5, 13*   118:*2*
119:*11*
**losses**   68:*2*   75:*10*
**lost**   73:*1*   92:*16*   113:*7*
118:*19*   132:*17*
**lower**   90:*7, 14, 18*   120:*7*

**< M >**
**machinery**   131:*11*
**main**   60:*2*
**maintain**   104:*9, 11*
**maintained**   50:*15*
**maintaining**   103:*20*
**making**   88:*3*   129:*10*
**manifest**   25:*6*   142:*15*
**manner**   148:*15*   153:*14*
169:*7*
**manufactured**   169:*6*
**manufacturing**   168:*18*
169:*9*
**mapped**   110:*20*
**mark**   104:*16*   105:*6, 15,*
*18, 19*
**marked**   4:*2*   106:*12*
107:*2*   110:*4*   157:*11*
**markings**   90:*1*
**marks**   111:*21*
**MARY**   1:*17, 20*   180:*4*

**Maryland**   1:*18*   180:*3, 18*
**match**   157:*1*
**matched**   148:*15*   153:*12,*
*14*
**matching**   149:*15*   155:*10*
**material**   15:*10*   26:*18*
27:*4*   50:*9*   57:*5*   79:*11*
81:*11*   85:*2*   160:*16*
170:*3*   172:*9*   173:*14, 17*
**materials**   15:*17, 18*
19:*22*   68:*18, 19, 20*   74:*1*
167:*7*   169:*21*
**mathematical**   20:*10*
83:*17*
**Mathematically**   150:*15*
**matter**   1:*15*   19:*22*
33:*16*   34:*7*   78:*6*   103:*17*
144:*8*   150:*17*
**matters**   12:*20*   13:*4, 7*
14:*12*   16:*5*   20:*21*   99:*6*
**McLean**   2:*16*
**mean**   7:*15*   15:*13*   17:*6*
20:*3, 7*   27:*10*   31:*3*   32:*6,*
*21*   35:*2*   39:*6*   44:*3, 9, 10*
46:*4, 7, 8*   47:*12*   48:*12*
50:*1*   53:*2, 7*   71:*21*
74:*14*   76:*5*   80:*15*   81:*5*
84:*1*   90:*21*   94:*9, 10, 14*
95:*17*   97:*1*   112:*8*
113:*14*   122:*18*   127:*15*
134:*4*   138:*2*   143:*1*
145:*2, 11*   156:*8*   158:*2*
166:*12, 20*   172:*2*   175:*1*
**meaning**   21:*6, 10, 14, 18*
22:*19, 20, 21*   23:*2*   24:*5,*
*12, 21*   25:*13*   27:*8, 16, 18*
29:*1, 16*   30:*7, 11, 15, 19*
31:*11, 16, 19*   32:*3*   35:*11,*
*15*   36:*10*   38:*6, 21*   44:*19*
45:*11*   47:*14*   53:*10*   54:*7,*
*13, 15*   59:*11*   69:*9, 14*
75:*11*   131:*5, 7*   133:*5, 18*
143:*16, 21*   144:*15*
145:*20*   146:*2, 11*   158:*18*
159:*4, 9, 17*   160:*2*   161:*5*
166:*8*   175:*12*
**meaningful**   96:*19*
**meanings**   69:*13*
**means**   19:*15*   24:*6*
26:*10*   27:*22*   32:*15*   33:*8*
36:*7*   64:*12*   74:*6*   78:*20*
123:*6*   124:*11*   126:*19*
128:*15, 22*   136:*11*
139:*21*   144:*16*   147:*13*
148:*17*   158:*8*   164:*5, 11*
168:*3*   176:*1*
**meant**   81:*14*   101:*8*
119:*3*   124:*5*   144:*11*
**measure**   88:*10*   90:*22*
148:*21*

**measured**   93:*13*   110:*19*
114:*9*
**measurement**   101:*11*
**measurements**   84:*19*
**measuring**   86:*16*   128:*4*
**mechanical**   25:*2, 19*
26:*15*   29:*8, 9*   48:*16*
49:*9*   56:*10*   63:*3*   75:*13*
82:*9, 21*   84:*2, 9*   87:*20*
88:*9*   90:*8*   94:*22*   95:*7*
98:*17*   100:*9, 16, 17*
101:*13*   102:*13*   103:*21*
107:*9, 18*   113:*7*   115:*11*
120:*8*   125:*3, 15*   126:*3*
127:*11, 20*   128:*19*   129:*7*
131:*4*   132:*6, 7, 15, 22*
134:*10*   135:*12, 21*   138:*2*
152:*3*   177:*15*
**mechanically**   64:*6*
**mechanism**   73:*22*
**mechanisms**   73:*21*
**medium**   98:*7*
**meet**   7:*1*
**memory**   54:*5*
**Menlo**   2:*8*
**mention**   47:*2*   52:*4*
**mentioned**   12:*15*   20:*2*
22:*5*   66:*14*   86:*10*
109:*15*   141:*18*
**merely**   119:*19*
**method**   168:*4*   169:*9*
**methods**   169:*15, 16*
**microelectronic**   15:*16*
24:*8*
**micromechanical-based**
16:*2*
**micron**   15:*21*   85:*15, 17*
86:*5*
**microns**   86:*16*
**middle**   101:*16*
**MIM**   38:*15*
**MIMs**   38:*13, 22*   39:*14*
**mind**   24:*5*   26:*2*   123:*19*
151:*5*
**minds**   138:*18*
**minimization**   66:*8*   67:*3*
118:*2*
**minimize**   63:*6*   70:*2*
139:*1*
**minimizing**   28:*4*
**minimum**   113:*8*
**minus**   18:*4*
**minute**   30:*4*   89:*16*
**minutes**   46:*11, 13*   104:*7*
106:*7, 8*   166:*9*   173:*21*
**Mischaracterizes**   33:*9*
37:*3, 14*   41:*2*   67:*10*
72:*12*   97:*20*   98:*8*
108:*13*   155:*7*   156:*17*
157:*4*   161:*12*   170:*16*

173:5
**mischaracterizing** 169:2
**missed** 9:21
**misspoke** 73:7 119:6
123:18
**misstatement** 67:9
**Misstates** 83:7 117:17
125:17
**mistake** 67:18
**mitigate** 75:14, 15
**mitigated** 75:10
**model** 89:12
**modeling** 129:13
**models** 129:14
**moment** 105:9, 17
130:16 157:15
**moments** 66:14 84:4
**moniker** 57:21
**morning** 5:3, 4, 6
**MOSFET** 25:22 31:11
**MOSFETs** 39:14
**motion** 48:14, 22 49:1,
20 62:20
**motional** 47:2, 8, 12, 20
48:8, 13, 17, 19, 21 49:5,
12, 15, 18 50:2, 3, 18, 19
51:12 52:4, 7, 15 53:21
68:12 81:2, 22
**motivating** 48:8
**mounted** 56:1
**mouth** 12:7
**move** 4:19 134:19
**movement** 17:3 49:3, 7
**moving** 14:14 50:16
96:11
**Mullin** 2:6
**multiplicity** 96:10
**mute** 108:2

**< N >**
**name** 71:22
**named** 163:15
**narrower** 31:8
**nature** 146:21 158:11, 13
**near** 117:20
**necessarily** 88:5 95:5
116:20 132:17 169:18
**necessary** 29:2 31:17
33:22 52:14, 21 53:19
55:1 56:20 93:11 94:2
95:20
**need** 4:9 14:6 30:6
35:9 37:12 83:5 131:14,
20 158:6 176:8, 20
177:9, 11
**needed** 143:17
**needs** 32:7 119:15
148:18
**negative** 116:16 146:13
**neither** 180:11

**never** 40:3 44:12, 17
95:3, 19 134:1
**Nguyen** 54:6 64:6
98:20 122:16 124:10
137:18 138:6 147:10
**Nguyen's** 11:22 17:9
18:1 47:17 70:19 78:19
88:15
**nice** 89:6
**nonexcitation** 142:19
**non-single** 163:6
**normal** 64:11 124:2
164:6
**Nos** 4:2
**Notably** 61:17, 20
**Notary** 1:17 4:7 180:17
**note** 121:16
**noted** 119:19
**notes** 12:6, 8 42:14
140:7
**notice** 1:16
**notion** 21:21 47:20
69:2 163:17
**novel** 162:20
**number** 12:16 13:15
14:1, 19 35:13 98:20
139:8 147:5
**numbers** 84:18 85:10
110:9, 14
**numerical** 110:22

**< O >**
**oath** 6:2
**object** 43:16 97:14
101:19 108:2 114:6
169:1
**Objection** 8:6 9:1 10:9,
14 11:9 14:3 15:1
17:21 19:7 22:22 26:12
28:10, 21 29:17 31:21
32:16 33:9 34:5, 17
36:2 37:3, 14 40:13
41:2 43:4 51:13 53:12
54:18 57:3 65:2 67:10
71:1, 10 72:12 73:12
75:22 76:8 77:1, 14, 22
79:4 81:3 83:7 87:21
88:13 89:19 90:16
91:10 92:1 93:2 97:20
98:8 99:2 100:19 103:4
104:5 108:2, 13 110:1
112:2, 10, 17 113:2
114:12 116:10 117:17
119:2, 17 121:4, 12
122:2 123:16 124:16
125:5, 17 127:22 128:6
129:8 131:8, 16 133:11,
21 135:22 138:15
139:14 141:11 142:10
143:4 144:18 145:4
146:16 148:13 149:9, 13

150:14 151:18 152:13
153:4 154:2, 15 155:6
156:2, 17 157:4 159:6,
18 160:12 161:12 164:1
165:2 168:15 169:12
170:5, 16 173:4 174:22
175:16 177:20
**objections** 131:16 134:13
**objective** 7:2
**obligation** 34:10
**obligations** 34:7
**observe** 177:14
**obtainable** 124:21
**obtained** 113:20 152:17
**obtains** 151:1 173:15
**Obviously** 5:5 6:1 7:14
17:9 115:4
**occurs** 128:12
**ocean** 50:16
**odd** 100:5
**offer** 92:20 135:19
164:3
**offered** 8:10 41:10
47:16 51:15 67:12
68:17 121:13, 15 149:1
173:10 177:21
**offering** 124:1
**officer** 180:4
**oftentimes** 164:14
**oh** 58:6 61:17 92:8
162:2
**Okay** 4:21 5:15 6:12,
17 7:2 9:10 10:21
11:17 16:18 17:1, 5, 16
18:8 19:10 28:14 30:21
42:16 43:18 44:2 45:7
46:14, 20 51:22 52:3
54:4 55:4 58:3 60:13
69:6 80:2 82:11 93:6
101:1, 7, 20 102:8 105:2
106:3 108:5 111:9
127:3 130:17 135:11
136:8 140:3 141:4
142:6 147:21 151:12
155:20 157:14, 16
158:22 159:2 162:6
169:4, 20 172:1 174:14,
15, 20 175:2, 6, 11, 21
176:7, 14 177:7 178:3,
12, 16, 21, 22
**Once** 16:6 122:18
130:19 133:14
**one's** 26:17
**opening** 53:16 60:8
140:9
**operated** 14:10 27:2
**operation** 61:11 140:5,
18
**operational** 25:5
**operative** 172:7
**opine** 57:20 134:3 171:1

**opined** 7:11 48:4 49:17
50:20 51:17 54:22 56:6
57:4 69:1 82:2 90:21
91:12 119:18 154:16
156:4 161:22 168:2
170:6
**opinion** 14:9, 16 21:1
26:22 28:1 29:19 31:15,
16 34:20 35:3 36:9
37:7 41:10, 13 43:10
44:17 45:8, 22 47:16, 17,
19 48:7 51:15, 16 52:17
55:14 56:22 57:6 62:10
66:7, 20 67:2 68:8, 17
69:22 83:18 94:17
99:20 103:16 121:16
123:9 124:18 125:6
126:9 132:2, 14, 16
134:6 135:6 148:17
157:20 173:10 176:7
177:22 178:4, 13
**opinions** 8:11 20:14
178:10, 19
**opposed** 25:13 56:17
85:2 88:16 130:5
132:13
**opposite** 51:4
**optical** 16:1 25:3
**order** 34:4, 15 42:14
83:6 91:7, 9 119:13
127:17, 18 176:22
**ordinary** 16:16 21:6, 10,
14, 18 22:18, 21 24:4, 12,
21 25:13 27:8, 15, 18
29:1, 16 30:7, 11, 15, 19
31:15, 19 32:3 35:11, 14
36:10 38:6 45:11 47:14
53:10, 18 54:1, 7, 13, 15
59:16 69:8, 9 75:11
131:5, 7 133:4, 18
143:16, 21 145:20 146:2,
11 148:18 158:18 159:3,
9, 17 160:2 161:5 166:7
176:19 177:13
**original** 22:20
**outcome** 18:6 152:2
180:13
**outer** 24:10 47:7 52:15,
21 58:20 61:3 71:7
72:4, 10 73:5, 6 74:2, 16,
18 84:16, 19 86:11, 17
87:15, 22 89:18, 22 90:8
93:14 94:7, 15, 21 95:7
97:3 100:9, 15 102:21
106:21 107:8 108:12
109:5 110:3, 10 111:22
112:4, 15, 16 113:1, 5
114:3, 11 115:8 120:6, 8
122:17 123:8, 11, 12, 20
125:4, 16 127:15, 21
128:4, 7, 11 129:2, 6

132:*13*  136:*17, 18, 22*
137:*5*  139:*12*  144:*10*
148:*17*  150:*13*  152:*4*
153:*16*  154:*13*  155:*11*
156:*12*  174:*17, 21*  175:*4,
7, 9, 13, 14, 22*  176:*1, 3,
16*  177:*13*
**outside** 49:*5*  54:*19*
74:*22*
**overall** 64:*1*  72:*19*
113:*6*  120:*7*  121:*17*
**overarching** 119:*20*
139:*4*
**overly** 96:*15*
**OWEN** 2:*21*

**< P >**
**p.m** 179:*2*
**package** 57:*10*
**packaging** 56:*19*
**PAGE** 3:*9*  39:*21*  84:*12*
111:*22*  114:*8*  140:*10*
167:*1*
**papers** 42:*9*
**paragraph** 15:*6*  18:*10,
20*  27:*6*  29:*3*  36:*12*
38:*1*  42:*17*  45:*6, 18*
46:*21*  50:*6*  51:*20*  52:*12*
53:*15*  55:*12*  60:*12, 14*
70:*11*  71:*3, 6*  78:*11*
80:*1*  82:*10, 14*  93:*5*
114:*18*  115:*1, 5*  117:*4*
122:*9*  127:*1*  130:*15*
137:*7, 11*  140:*2*  157:*18,
20*  162:*5*  166:*13*  171:*11*
178:*4, 13*
**paraphrase** 142:*7*
**Park** 2:*8*
**parlance** 124:*2*  164:*6*
**part** 9:*21*  10:*5*  16:*2*
29:*3*  56:*5, 13*  57:*1*
58:*14*  59:*3, 18*  60:*15*
64:*1*  66:*18*  69:*2*  70:*7*
93:*7*  112:*4*  135:*2*  140:*4,
7, 14*  159:*10*  161:*16*
163:*1*  166:*10*  171:*4*
172:*7*  174:*12*  176:*21*
**particular** 24:*22*  27:*22*
39:*4*  41:*4, 6*  42:*8, 10*
52:*12*  59:*20*  60:*18*  63:*4*
76:*11*  81:*6*  83:*17*  86:*18*
89:*5*  92:*11*  93:*11*
106:*19*  107:*7*  116:*1, 19*
117:*5*  124:*9, 11*  127:*5*
131:*21*  132:*18*  134:*10*
135:*12, 20*  138:*22*  139:*2*
140:*12*  154:*7*  169:*5*
**particularity** 173:*15*
**particularly** 6:*9*  27:*3*
29:*7*  63:*6*  67:*20*  73:*22*
167:*14*

**parties** 45:*20*  53:*9, 16*
143:*7*  180:*12*
**parts** 10:*3*  11:*13*  65:*15,
16*  79:*7, 10*
**party** 36:*5*
**passage** 162:*11, 13*
**passive** 24:*9*
**Patent** 3:*14, 15*  12:*18*
13:*1*  16:*5*  18:*22*  19:*1,
19*  22:*11*  23:*17, 20*  25:*9*
26:*17, 20*  27:*19*  28:*3*
29:*10*  30:*1*  31:*13*  32:*22*
33:*2*  36:*17*  38:*3*  39:*11*
42:*19*  44:*5*  47:*8*  48:*2, 6*
52:*16*  53:*6*  54:*20*  57:*7,
14, 17, 22*  58:*2*  60:*10*
61:*12*  63:*4, 9, 11*  64:*13*
65:*4*  66:*7, 14*  67:*14*
68:*8*  69:*4*  72:*22*  73:*1,
14*  74:*20*  75:*15*  76:*10,
14, 20*  77:*12*  79:*8*  82:*3,
4, 7, 18*  83:*12, 21*  85:*3*
88:*21*  90:*22*  94:*12, 16*
95:*5, 6*  96:*22*  98:*17*
99:*21*  103:*12, 19*  104:*10,
21*  106:*16*  107:*2*  108:*19*
113:*5, 19*  114:*13*  116:*21*
117:*8, 20, 21*  118:*11, 15*
119:*20*  121:*18*  123:*21*
126:*7, 13*  129:*17*  132:*2*
135:*16, 18*  136:*2, 7*
138:*3, 19, 21*  139:*5, 13,
19*  140:*15, 17, 20*  144:*1*
146:*4, 18*  147:*20*  151:*7*
157:*14*  159:*19*  160:*4, 5,
8, 15*  161:*9, 21*  163:*8, 11,
22*  165:*10*  167:*2, 3, 8*
173:*14*  174:*10*  177:*1*
**patentee** 21:*19*  99:*21*
108:*17*  116:*17*  117:*3*
119:*9*  120:*15*  126:*18, 21*
128:*13*  138:*21*  139:*5*
170:*19*  172:*8*
**patentees** 122:*6, 14*
126:*22*  135:*4*
**patents** 7:*11*  12:*18, 19,
21*  20:*8*  163:*14*
**patent's** 54:*20*  91:*1*
99:*10*  177:*4*
**pattern** 172:*21*
**pause** 68:*21*
**pen** 87:*13, 14*  95:*9, 13*
98:*3*  103:*7*
**pending** 6:*17*
**people** 14:*6*  16:*19*  33:*17*
**percent** 12:*21*  93:*20*
98:*21, 22*  149:*22*
**percentage** 108:*21*
**perfect** 49:*9, 11*  137:*3*
144:*9*  149:*16*  155:*15*

**perfection** 144:*3*
**perfectly** 59:*21*  126:*16*
151:*1*  154:*18*  155:*16*
156:*14*
**performance** 121:*19*
137:*13*  139:*1*  144:*9*
**period** 32:*4*  147:*8*
**periodically** 96:*11*
**periphery** 60:*1*  109:*11*
113:*18*
**person** 16:*16*  20:*12, 13*
23:*4*  26:*9*  30:*22*  59:*16*
95:*16*  133:*18*  138:*7, 11*
144:*13*  152:*10*  158:*18*
176:*19*  177:*13*
**perspective** 112:*9*
**pertinent** 57:*14*
**Ph.D** 1:*14*  3:*3, 11, 13*
4:*5*
**phrase** 16:*9*  18:*14, 18*
21:*7*  24:*18*  34:*20*  38:*15,
18*  39:*4, 19*  40:*8*  41:*8*
42:*10*  51:*10*  82:*4*  98:*16*
123:*4, 6, 11*  132:*9, 15*
135:*7, 8, 18*  143:*8*  159:*9*
171:*18*  172:*22*  175:*4, 9*
**phrases** 48:*17*  79:*18*
134:*4*
**phrasing** 141:*10*
**physical** 25:*4*  49:*3, 6, 20*
114:*6*
**physically** 9:*11*  60:*6*
**physics** 50:*14*  62:*19*
146:*21*  155:*17*
**pick** 88:*19*  94:*21*
**picture** 87:*9*
**piece** 163:*7*  174:*12*
**pieces** 126:*14*
**piezoelectric** 25:*20*
26:*18*  29:*6*  39:*1*  49:*7*
50:*9*  53:*21*  55:*18*  58:*22*
60:*19*  61:*7*  62:*3, 14, 21*
63:*3*  64:*4, 14, 17, 18*
66:*11*  75:*4*  79:*10, 15*
87:*6*  110:*3*  140:*5*
143:*13*  158:*9, 12, 14, 18,
20*  160:*11, 16*  161:*1, 10*
162:*16, 21*  163:*3*  165:*9,
19*  166:*4, 8, 18*  170:*2, 8,
14*  171:*9*  172:*2, 3, 9*
173:*13, 17*
**Pillsbury** 2:*14*
**Pittman** 2:*14*
**place** 25:*4*  176:*14*
**places** 7:*19*  73:*14*  132:*8,
16*  134:*15*
**plain** 21:*6, 10, 13, 18*
22:*18, 21*  24:*4, 11, 20*
25:*13*  27:*15, 17*  29:*1, 15*
30:*7, 11, 15, 18*  31:*15, 19*

174:*3*
**perfection** 144:*3*

32:*3*  35:*10, 14*  36:*10*
38:*5*  45:*11*  47:*14*  53:*10,
17*  54:*1, 7, 12, 15*  59:*5*
69:*8*  75:*11*  131:*4, 6*
133:*4, 18*  143:*15, 16, 21*
144:*15*  145:*20*  146:*2, 11*
148:*18*  158:*17*  159:*3, 9,
17*  160:*2*  161:*4*  166:*7*
**plainly** 41:*12*  91:*18*
151:*21*
**Plaintiff** 1:*5*  2:*3*  3:*3*
174:*7*
**planning** 105:*11*
**plates** 62:*14*
**play** 73:*16*  79:*10*
**please** 6:*7, 15*  84:*11*
105:*5*  114:*20*  162:*1*
**plenty** 59:*22*
**plus** 18:*3*
**point** 24:*4*  30:*19, 21*
35:*14*  41:*17*  51:*19*
52:*12*  54:*8*  63:*19, 21*
73:*8*  78:*17, 20*  87:*15*
95:*9, 14*  98:*3*  102:*11*
103:*13*  104:*8*  120:*2, 17*
124:*17*  150:*18*  159:*11*
166:*2*  171:*7*  175:*4*
**polycrystalline** 172:*19*
**poorly** 142:*6*
**population** 145:*1*
**portion** 58:*14*  62:*3, 7,
10, 16*  63:*15*  64:*8, 13, 21*
65:*8, 13*  67:*8*  68:*15*
69:*18*  72:*19*  113:*5*
114:*10*
**portions** 60:*5*  65:*20*
66:*4*  101:*3*  128:*7*
141:*14*
**posit** 24:*18*  88:*1, 18*
113:*13*  142:*16*
**POSITA** 16:*19, 20, 22*
17:*3, 11, 20*  22:*3*  23:*7*
29:*21*  30:*5*  31:*3, 7, 18*
32:*12*  33:*14*  34:*1*  35:*10,
16, 18*  36:*6, 8*  37:*6, 12,
17*  40:*6*  41:*5*  44:*10, 11,
14, 17*  45:*2, 9, 15*  46:*5, 8,
9*  47:*6, 13, 22*  48:*5, 8*
52:*13*  54:*17*  65:*4*  70:*13*
80:*6, 21*  81:*6, 12, 13, 14*
82:*4, 15, 19*  83:*16*  93:*10,
13*  94:*2*  95:*18, 19*  96:*6,
15*  98:*7, 12*  99:*20*
108:*11*  109:*14*  124:*18,
22*  131:*11, 20*  134:*3, 7*
135:*7, 17*  138:*3*  146:*4, 6,
10*  147:*7*  150:*3*  157:*21*
158:*3, 6*  162:*14*  176:*3*
**POSITAs** 32:*19*  33:*18*
**POSITA's** 22:*1*  44:*6*

**posited** 39:5 118:*17*
**positing** 91:*12* 116:*13*
**position** 13:*20* 31:*20*
33:*20* 35:8 40:*21* 41:*1*
57:5 75:3 85:4 86:*12*
87:*13* 89:7
**positive** 116:*16*
**possible** 89:9 98:*13*
124:6, *20*
**possibly** 169:*17*
**potential** 13:*19* 14:*21*
**practical** 154:*20*
**practice** 90:*14* 91:7, 9
92:*17* 107:*18* 119:*14*
128:*12* 151:*16* 152:*11*,
*15*
**practiced** 97:*1* 108:*20*
**practices** 117:8
**practicing** 103:*1*, *15*
126:5 151:*19*
**precisely** 20:*16*
**preexisting** 168:8, *13*
**prefer** 46:*10*, *12*
**preferred** 163:*18*, *21*
164:4, 6, *10*, *15* 165:*1*, 6
173:3, 8
**prep** 12:6
**preparation** 12:9
**prepared** 4:*18*
**preparing** 11:*17*
**PRESENT** 2:*20* 34:*16*
100:2 137:*14* 167:*14*
169:5
**presentation** 130:7
**presented** 9:*12*
**presents** 116:*18*
**preserve** 103:*10*
**press** 46:*14*
**pressing** 6:*22*
**presume** 6:*16*
**presumption** 14:*11* 21:5,
9 54:*1*
**presupposes** 155:8
**pretty** 9:4, 6 130:9
**previously** 8:*10*
**primarily** 42:*19* 44:3, 9,
*15*
**principle** 62:*19*
**prior** 8:8, *15* 16:7
75:*19*, *20* 76:5, *12* 77:*11*
**privilege** 10:*16* 19:7
43:*17*
**privileged** 9:*1* 10:*14*, *19*
43:*4*
**Probably** 12:*21* 13:9
14:*20* 81:7 129:*22*
144:*16* 146:*3* 172:*19*
**problem** 48:*21* 96:*13*
108:8 136:*12* 162:3
**problematic** 146:*20*

**proceedings** 1:*19* 44:*21*
180:5, 7, 8
**process** 21:*3*
**processing** 15:*10*
**produced** 11:*20* 78:8
**producing** 141:8
**products** 38:*13*
**professional** 44:*11*
**proper** 34:*4* 53:*11*
108:*11* 125:*20* 161:*3*
**properly** 152:8 160:*3*
**property** 12:*20*
**proposal** 24:*11*
**proposed** 32:2 33:*21*
53:*17*, *19* 54:6, *14* 68:*11*
92:*10* 95:*10* 143:*20*
159:*10*
**proposition** 7:*21*
**prosecution** 18:*22* 36:*17*
42:*21*
**provide** 29:*4* 70:*15*
71:*16* 79:*12*
**provided** 10:*12*, *13*, *22*
**provides** 30:*18* 48:5
132:*3* 162:*13* 167:*15*
**providing** 33:*13* 85:*20*
160:*10*
**provisional** 167:2, 5
171:5, 7 173:2
**proximity** 17:*10*
**Public** 1:*17* 4:7 180:*17*
**purple** 111:*11* 129:*1*
130:9 136:*19*, *21*
**purported** 24:*17*
**purpose** 25:7 39:*22*
63:*1* 67:*1* 71:*21* 80:8,
*13* 81:9, *15* 82:*1* 95:*15*
**purposes** 54:*11* 65:*10*
72:7
**pursuant** 1:*16*
**put** 26:7 40:*18* 47:*18*
50:2 58:4 78:*17* 111:6,
*10*, *15*, *22* 120:2 136:*19*
144:6, 7 164:*14*

**< Q >**
**QORVO** 1:*4* 53:*17*
**Qorvo's** 32:2 33:*20*
35:8 51:6 61:6 65:7
66:2 69:*19* 70:*20* 78:*15*
86:*14* 91:*21* 92:*10*, *22*
93:*18* 94:*1* 134:*21*
135:*14* 143:*20*
**quality** 120:*10*, *14* 139:*3*
172:9
**quartz** 170:9
**question** 6:8, *14*, *16* 9:*21*
11:*10* 17:8 19:*10* 28:*12*
36:*4* 40:7 43:*13*, *21*
54:2 63:*14*, *18* 69:*17*
74:*14* 77:*10* 78:9 91:*3*,

5 92:7, *10* 93:*22* 94:6
96:*4* 97:*15* 99:*12* 108:*3*
112:*12* 133:*14* 134:*16*
137:*14* 138:*1* 140:*19*
144:*12* 145:*14* 147:*22*
149:*4* 151:*3* 154:8, *10*,
*12*, *17* 156:*16* 159:*15*
169:2 172:*15* 178:*16*
**questions** 43:8 146:*19*
173:*18*, *22* 178:*22* 179:*1*
**quick** 15:6
**quickly** 5:*22*
**QUIST** 2:*4* 3:5 4:*12*, *15*,
*20* 8:6 9:*1*, 6, *10*, *20*
10:9, *14*, *17* 11:9, *15*
14:*3* 15:*1* 17:*21* 19:7
22:*22* 26:*12* 28:*10*, *21*
29:*17* 31:*21* 32:*16* 33:9
34:5, *17* 36:2 37:*3*, *14*
40:*13* 41:2 43:*4*, 7, *15*
51:*13* 53:*12*, *14* 54:*18*
57:*3* 65:2 67:*10* 71:*1*,
*10* 72:*12* 73:*12* 75:*22*
76:8 77:*1*, *14*, *22* 79:*4*
81:*3* 83:7 87:*21* 88:*13*
89:*19* 90:*16* 91:*10* 92:*1*,
5 93:2 97:*14*, *20* 98:8
99:2 100:*19* 101:*19*, *21*
102:*4*, 8 103:*4* 104:5
106:*4*, 6, 8, *10* 108:*1*, 6,
*13* 110:*1* 112:2, *10*, *17*
113:2 114:*12* 116:*10*
117:*17* 119:2, *17* 121:*4*,
*12*, *14* 122:2 123:*16*
124:*16* 125:5, *17* 127:*22*
128:6 129:8 131:8, *16*
133:*11*, *21* 134:*13*
135:*22* 138:*15* 139:*14*
141:*11* 142:*10* 143:*4*
144:*18* 145:*4* 146:*16*
148:*13* 149:9, *13* 150:*14*
151:*18* 152:*13* 153:*4*
154:2, *15* 155:6 156:2,
*17* 157:*4* 159:6, *18*
160:*12* 161:*12* 164:*1*
165:2 168:*15* 169:*1*, *12*
170:5, *16* 173:*4*, *21*
174:*3*, 5, 8 175:2, 5
176:6 178:2, *21*
**quite** 28:*12* 41:7 69:*3*
77:5 152:8 173:*14*
**quotations** 47:*18*
**quote** 52:*13* 82:*19*

**< R >**
**radios** 170:9
**range** 78:7 151:*13*, *16*,
22
**rarely** 20:9 146:*21*
**ratio** 74:8 76:*10*

**rationally** 94:*11* 95:*13*
**reach** 129:*12* 163:9
**read** 15:7 17:8 24:*19*
25:*21* 31:9, *12*, *13* 42:8
45:*21* 61:*4* 66:*1*, 6 81:7,
8 83:*19* 115:*4*, 6 123:5,
7 125:*20* 127:9 132:*3*
158:5 159:*12* 162:*15*
**reader** 90:*4*
**reading** 24:*16* 31:5, 6
32:*21* 40:*1* 41:6 71:2
82:*15* 88:*21* 150:5
163:8 168:*16* 175:*3*
**reads** 148:*15* 172:*22*
**ready** 142:*4*
**Real** 2:7 144:7 147:*11*
**realized** 79:*21*
**really** 57:*13* 146:8
**realm** 145:*16* 159:*19*
**reason** 7:*4* 41:6 52:*20*
59:*10* 130:*22* 133:*3*
172:*15*
**reasoning** 124:8
**reasons** 166:*10*
**Rebuttal** 3:*12* 7:8
11:*22* 17:*11* 42:*15*
46:*21* 51:*20* 52:*13* 60:8,
*11* 70:*11* 71:*3* 92:*20*
93:5 114:*18* 117:*4*
122:*10* 127:2 130:*15*
137:8 162:5, 6 166:*13*
178:*14*, *17*
**recall** 24:*16* 40:*16* 42:2,
8, *10*, *11* 54:5, *10* 106:*17*
123:*3* 132:*12* 136:6
160:*14* 176:*17*
**receive** 34:*14*
**Recess** 55:8 106:*11*
136:*14* 174:6
**recite** 53:*16*
**recognizes** 147:*10*
**recognizing** 82:*21*
**recollection** 42:5, 7
**recommend** 92:*18*
**record** 4:*16* 19:*18* 20:*1*
21:*11*, *12*, *13*, *17* 22:*4*, 6,
*14*, *19* 23:9, *13* 31:2
44:*3*, 8 45:9, *14* 47:2, *13*
48:*4*, 5 52:*4*, 8, *20* 55:*13*
57:*19* 59:2, *15* 66:7
70:*14* 104:*17* 106:*1*, 6
133:6, 7, 9 145:*19*
155:*21* 157:*21* 158:*3*, 6
159:5, *13*, *16* 160:6
163:9 171:2, *4* 180:7
**recorded** 6:6
**recourse** 19:*21* 37:6
47:*22* 82:5 116:*19*, *20*
158:6
**rectangle** 111:*16* 130:8

**rectangles** 130:*11*
**rectangular** 109:*10*
**reduce** 141:*20* 142:*3, 8, 16* 153:*22*
**reduced** 100:*10, 15* 107:*8* 110:*14, 17* 112:*9* 115:*11, 16, 20* 116:*7* 129:*7* 180:*9*
**reducing** 73:*19* 88:*11* 120:*7* 127:*10* 141:*17*
**reduction** 82:*22* 88:*9* 90:*13* 97:*1* 102:*12, 18, 20* 103:*3* 107:*17* 112:*7* 113:*7* 116:*2, 13, 22* 117:*7* 120:*6, 10* 125:*3, 15* 128:*12, 19* 130:*10, 12* 152:*14*
**reductions** 126:*3*
**redundancy** 123:*9*
**redundant** 122:*18* 123:*10, 13*
**refer** 18:*10*
**reference** 7:*19* 11:*7* 61:*21* 71:*6* 75:*18* 84:*14* 86:*2* 115:*7* 118:*15* 165:*13* 166:*14* 173:*1*
**referenced** 12:*17* 23:*15* 76:*5* 84:*10* 125:*10* 155:*22*
**references** 8:*2* 10:*4* 163:*3* 171:*8*
**referencing** 18:*9* 25:*4*
**referred** 122:*10* 143:*13* 169:*10* 171:*5*
**referring** 4:*13* 7:*22* 25:*9* 49:*2* 93:*7* 101:*17, 22* 102:*6* 104:*4* 107:*4* 109:*21* 140:*15* 168:*17* 175:*14*
**refers** 59:*7* 67:*20* 69:*22* 149:*16* 175:*12*
**reflect** 178:*9, 18*
**reflected** 11:*6*
**reflector** 58:*11* 59:*6, 17* 60:*6* 62:*7, 11, 17* 63:*12, 15* 64:*1, 9, 21* 65:*9, 14* 66:*4* 67:*6, 8* 68:*15, 19* 69:*18* 70:*5* 176:*21*
**reflectors** 58:*6, 9* 59:*3* 176:*12*
**reflects** 11:*3*
**refresher** 5:*22*
**regard** 21:*18* 28:*5, 6* 36:*15* 37:*17* 88:*15* 143:*7*
**region** 24:*3, 7, 9, 10, 15, 19* 25:*14* 26:*1, 4, 6, 10, 20* 27:*2, 20* 28:*2, 6, 8* 29:*9, 22* 31:*4, 10* 32:*14, 15* 33:*3* 38:*7, 8, 12, 19* 40:*2, 10* 41:*10, 21* 46:*17,*
*18* 47:*7* 49:*3, 15, 19* 52:*9, 14, 15, 21, 22* 53:*20* 55:*11, 14* 56:*18* 58:*15* 59:*3, 8, 11, 18, 19* 60:*15, 20* 61:*3, 4, 21* 62:*1* 63:*5* 64:*1* 65:*4, 13, 21* 66:*18* 67:*6* 68:*1, 19* 69:*19* 70:*2, 5, 7* 71:*8* 72:*4, 10, 21* 73:*5, 7, 20* 74:*2, 16, 17, 18* 75:*1, 4, 5, 6, 12, 14* 76:*17* 79:*1, 2, 15* 84:*3, 7, 9, 16, 19* 86:*11, 17* 87:*6, 15, 19, 22* 88:*1, 8* 89:*18, 20* 92:*16* 93:*14* 94:*7, 15, 21* 95:*1, 7, 11, 14, 21* 96:*12* 97:*2, 3* 98:*4, 5* 99:*9, 12, 13* 100:*9, 10, 11, 15* 102:*13, 14, 21* 103:*2* 104:*1, 3, 7* 106:*21* 107:*7, 8, 12, 16* 108:*11, 12, 16, 18* 109:*4, 5, 6* 110:*11* 111:*22* 112:*4, 9, 15, 16* 113:*1, 5, 8* 114:*3, 11* 116:*1, 12, 19, 20* 117:*1* 118:*3, 4* 119:*12* 120:*6, 8, 18, 22* 121:*10* 122:*17* 123:*2, 8, 11, 12, 20* 124:*15* 125:*4, 16* 127:*12, 15, 19, 21* 128:*4, 8, 11* 129:*2, 6* 130:*13* 132:*13, 14, 17, 18, 19* 134:*20* 136:*18, 22* 137:*5* 139:*12* 144:*9, 10* 148:*17* 149:*15* 150:*13* 152:*4* 153:*16* 154:*14, 19* 155:*11, 16* 156:*5, 12, 14* 167:*1* 174:*18, 21* 175:*4, 7, 9, 13, 14, 22* 176:*2, 4, 15, 16, 22* 177:*3, 13*
**region/area** 60:*18*
**regional** 120:*6*
**regions** 24:*10* 28:*2* 58:*21* 72:*3* 85:*4* 86:*21* 87:*4* 96:*5* 100:*11, 18* 101:*9* 110:*4* 116:*3, 6* 118:*5* 120:*19* 130:*10*
**regular** 4:*11* 13:*11*
**rejected** 9:*18*
**relate** 49:*8*
**related** 5:*17* 7:*20* 16:*5* 43:*8* 48:*14* 50:*21* 80:*7, 13, 18* 81:*8, 17, 22* 92:*22* 167:*15, 20* 180:*11*
**relates** 8:*11* 10:*5* 11:*1* 22:*10* 23:*20* 26:*11* 38:*12* 48:*13* 88:*11* 131:*3* 132:*22* 160:*22*
**relationship** 27:*19* 83:*18*
**relationships** 104:*10*
**relative** 58:*21* 74:*17, 20* 83:*15* 106:*20* 107:*9*
113:*12* 119:*1, 4* 121:*10* 129:*7*
**relatively** 169:*6*
**Relevance** 15:*1* 32:*16* 34:*18* 57:*3* 75:*22* 77:*1, 14, 22* 90:*16* 91:*10* 99:*2* 100:*19* 112:*17* 113:*3* 119:*2, 17* 121:*14* 122:*3* 124:*22* 131:*9* 138:*16* 142:*11* 145:*4* 152:*13* 153:*4* 155:*6* 156:*2* 164:*1* 169:*13*
**relevant** 57:*9* 59:*11* 73:*9* 137:*14* 138:*1*
**reliable** 130:*21*
**rely** 42:*19* 44:*3* 120:*21*
**remember** 16:*11* 70:*18* 176:*12*
**Remote** 1:*11*
**remove** 141:*14*
**render** 14:*9* 35:*3*
**repeat** 48:*20*
**rephrase** 9:*22* 19:*10* 32:*1* 34:*9* 53:*8* 144:*21*
**report** 9:*8, 9* 10:*4, 21* 11:*3, 7* 12:*1* 15:*5* 17:*9* 18:*8, 9* 19:*11* 23:*16* 27:*6* 28:*14* 32:*2* 36:*13, 22* 37:*20* 39:*20* 40:*11, 18* 42:*15* 45:*5, 18* 46:*21* 50:*7* 51:*20* 52:*6, 13* 55:*12* 60:*8, 9, 11* 64:*7* 69:*1* 70:*11* 71:*3* 75:*19* 82:*9* 84:*13* 92:*20* 100:*3* 114:*18* 117:*4* 122:*8, 10* 127:*2* 130:*15, 19* 132:*8, 18* 134:*14* 136:*5* 137:*8* 140:*2, 9, 22* 143:*3, 6* 147:*10* 157:*17* 162:*5, 6* 163:*5* 165:*12* 167:*1* 171:*11*
**reporter** 4:*16, 21* 6:*11* 25:*16* 73:*15* 105:*1* 180:*1*
**reports** 7:*13, 15, 18* 8:*21* 11:*14, 20* 16:*14* 17:*12* 23:*19* 76:*2*
**represent** 54:*9* 84:*22* 136:*20*
**representation** 87:*12* 178:*9, 19*
**representative** 110:*10* 129:*18*
**represented** 38:*5* 110:*12* 114:*11* 118:*19* 136:*19*
**representing** 110:*9*
**represents** 84:*15* 85:*17* 111:*22* 118:*9*
**request** 4:*17*
**require** 57:*19* 67:*4* 83:*17* 92:*11* 122:*17* 124:*14* 125:*7* 176:*5*
**required** 31:*14* 37:*7* 49:*18* 52:*18* 53:*1* 72:*16, 17* 89:*2* 93:*17* 97:*12* 98:*15* 131:*20* 146:*12* 152:*16* 160:*18* 177:*17* 178:*1*
**requirement** 133:*8* 173:*12*
**requires** 20:*11* 33:*17* 124:*12* 126:*8*
**reread** 11:*19*
**researcher** 15:*9*
**resolution** 110:*20*
**resonator** 25:*10, 17* 29:*4, 5* 38:*19* 40:*10* 41:*22* 49:*13, 16, 20* 50:*7* 51:*11* 55:*17* 56:*5, 7, 9, 14, 15, 17* 57:*6, 9, 21* 61:*22* 70:*15* 71:*7, 8, 15, 19* 72:*19* 77:*21* 80:*8, 13* 81:*15* 137:*13* 167:*16*
**resonators** 26:*11* 39:*18* 48:*13* 49:*6* 55:*19* 57:*2, 18* 73:*5, 9, 10* 75:*19, 21* 76:*6, 7, 9, 13, 21* 77:*6* 128:*5* 141:*20* 145:*22* 170:*4*
**resort** 46:*1*
**respective** 20:*14*
**respond** 44:*1*
**responding** 137:*18* 143:*6*
**response** 47:*17*
**responses** 6:*6*
**responsible** 79:*2*
**rest** 102:*21* 175:*12*
**restate** 9:*20* 92:*6* 128:*2*
**restricting** 99:*8*
**restrictive** 96:*15*
**restricts** 97:*11*
**result** 90:*13*
**results** 51:*11* 96:*20* 143:*12*
**retained** 14:*5*
**retaining** 14:*8*
**review** 11:*22* 12:*3* 178:*3, 12*
**reviewing** 70:*13*
**reviews** 11:*21*
**RF** 142:*7* 144:*7*
**rid** 155:*3*
**right** 16:*8* 17:*17* 21:*22* 30:*14* 35:*22* 38:*1* 40:*22* 42:*22* 58:*16* 61:*16* 68:*4* 72:*2, 3* 80:*18* 84:*15* 98:*3* 101:*16* 102:*3, 10, 11, 15, 16* 103:*7, 9* 104:*19* 105:*19* 110:*2* 111:*18* 113:*10, 11*

114:*17* 123:22 127:*12, 13* 130:5 140:*14* 146:5 148:7 161:22 163:*13* 165:*15* 168:22 173:*12*
rigid 15:*20*
ring 139:22
ring-shaped 109:*10*
rise 64:*17* 68:*1* 154:5
risk 108:*10*
ROBERT 2:*13*
robert.fuhrer@pillsburyla w.com 2:*18*
role 79:*10*
roll 109:*17*
roll-off 150:2
rough 12:*3*
roughly 5:*15*
ROY 2:5
RPR 1:*21* 180:*4*
rubric 104:7
rules 5:8

< S >
sake 91:*19*
sample 114:*8*
samples 129:22
satisfactory 95:22
satisfying 147:5
save 105:*11, 14, 15*
saw 24:*2* 27:*14* 41:6
saying 14:*15* 30:5 31:*19* 33:6 34:*12* 37:*10, 11* 38:*11* 49:*14, 18* 50:22 52:7, *10, 11* 67:*17, 18* 68:*4* 78:*18* 95:*4* 96:*14* 98:6 101:*2, 3* 102:22 116:*17* 117:*3* 119:*9* 125:*14* 127:*18* 128:*17* 129:*3* 143:*18* 154:*18* 162:*19, 22* 167:*14* 168:*4* 173:*11*
says 26:20 42:*17* 47:6 55:*17* 56:8 60:*14* 61:20 75:8, *9* 80:6 82:*18* 83:*11* 92:*15* 93:*8* 95:6 123:22 127:6, *8* 137:*11* 138:6 145:*2, 10* 151:22 152:*3* 157:20 166:22 168:7 171:*12, 14, 19* 172:*10* 176:*3*
scale 15:*21* 90:*1* 93:20 128:*21, 22*
scaled 95:*14*
schematically 118:*20*
science 109:*12*
scientific 63:*18*
scientist 13:*3* 97:*4*
Scope 14:*3* 15:*1* 57:*3* 75:22 77:*1, 14, 22* 90:*16* 91:*10* 93:21 99:*3* 100:*19* 104:5 112:*17*

113:*2* 119:2, *17* 122:*3* 125:5 129:*8* 139:*14* 142:*10* 145:*4* 148:9 149:*13* 150:*14* 152:*13* 153:*4* 155:6 156:*2* 164:*1* 168:*15* 170:5
screen 107:*1* 162:*1*
search 39:*11, 18, 21, 22*
searching 39:20 42:8
second 123:*19* 168:*1* 178:*21*
section 29:*12, 21* 55:*16, 20* 65:*18* 106:20 107:*4* 142:*19* 171:*10*
sections 10:7, *12, 22* 19:5
see 19:*3* 22:6 27:*11* 30:*18* 39:7, *18* 42:5, 22 47:*4* 48:*3* 52:20 55:*16, 20* 58:*8, 16* 59:5 60:5, *15, 21* 61:*18* 76:*17* 82:*16* 83:2 85:*9* 96:*12* 101:*17* 102:*4, 5* 107:*1* 111:6, *11* 115:*3* 118:*12* 122:*11* 128:*18, 22* 130:5 137:*1, 16* 140:7 152:*16* 162:*17* 166:*14* 167:*17* 168:*4, 9* 169:*7, 22* 173:*1* 174:*17* 175:*8*
seeing 123:*3*
seeks 75:*14, 15*
seen 58:*17* 59:22
sees 30:*17* 36:5 90:7
selected 97:5
sense 25:*14* 49:*10, 11* 82:20 83:*11* 84:*14* 94:*16* 114:7
sensibility 172:*14*
sent 104:22
sentence 15:7 52:*12* 80:*3* 81:*21* 82:*15* 83:*4* 115:5 117:*12* 124:6, 7 127:5 167:*4, 13* 168:*1* 169:*4, 20* 171:20
set 27:*18* 36:7 39:*12* 58:*17* 136:7 154:5 166:*10*
shading 107:*11*
share 13:22
Shaw 2:*14*
Sheppard 2:6
shift 82:8
short 64:*19*
show 32:2 56:*16* 74:7 86:22 89:6, *17* 101:*4, 9* 102:*12* 105:*16* 109:5 116:*12* 128:*3, 10* 136:*21*
showed 99:22 116:6, *14*
showing 90:*3, 11* 111:*1* 117:*1* 119:*10*
shown 82:22 115:*12, 21* 116:*8* 118:20

shows 73:*16* 86:*19* 87:2 88:*8* 100:20 102:*18, 21* 107:*8, 13* 109:*15* 116:*3* 118:*16* 120:5
shut 12:7
side 16:*9* 84:*15* 105:6 109:*8, 9* 110:*3* 113:*10, 11* 130:*4, 5*
sided 16:8
sides 66:*10* 109:*16, 20*
signal 50:*9, 17* 63:2, *3* 141:5, *8, 15* 144:7 148:*21*
signals 26:*15* 142:*14* 146:7
signed 178:*8, 18*
significant 130:*10*
silent 74:*9*
similar 170:20 178:*16*
similarly 108:20 111:*17* 113:*18*
simple 169:6
simply 115:*10, 16*
simulation 110:22 152:*14*
simulations 89:*9, 11* 152:*12*
single 158:*19* 161:*10, 16* 162:*16, 20* 163:*3* 165:*8, 13, 19* 166:*4, 12, 18* 167:6 168:20 170:2, *10, 14* 171:*8, 13, 20* 172:2, *3, 5, 8* 173:2, *13*
singular 24:*17* 120:*21*
sir 173:20
sit 42:2 51:*16* 77:9 165:*4*
sitting 156:*15*
situated 27:*4*
situation 145:7
six-decibel 150:*1*
size 120:*18* 121:*10*
sized 96:*11*
skill 16:*16* 19:20 20:*16* 24:6 25:*3, 15* 26:9 28:*1* 29:20 30:*17, 22* 32:21 39:*2* 41:*14* 49:*10* 51:*3, 8* 56:8 57:20 59:*16* 66:*21* 67:*19* 69:9 72:5, *14* 74:5 83:*12, 19* 87:8 88:2, *19, 22* 95:*12, 16* 96:*9, 21* 99:6 103:*13* 107:*19* 117:6 126:*16* 129:*16, 18* 130:2 133:*19* 138:7, *12* 142:*12* 143:*10* 144:*13* 147:*13* 148:*14, 20* 149:20 150:6 151:*4* 152:*10* 155:*13* 156:8 158:*19* 160:2 163:*8* 166:*11* 170:7 171:*1*

172:*10, 15, 17* 176:*19* 177:*13*
skill's 26:2
skip 82:*13*
slice 86:*19* 89:*21* 99:22 107:*21* 109:*8* 110:*11* 112:*4, 8, 15, 21* 114:2, 5 130:*4* 136:*18*
slices 96:*10* 110:5
slight 6:*11*
small 88:7, *8* 98:*4* 108:*12* 120:5, *20, 21* 124:*14* 126:*11*
smaller 100:*10* 147:*3*
solely 162:22
solidly 56:*1*
solution 171:*13, 19* 172:*1, 4, 5, 7, 11* 173:*12, 13*
somebody 145:*1*
soon 123:*4*
Sorry 9:20, *21* 12:7 15:*2* 17:6 28:*11* 32:*1* 49:*11* 61:*16* 63:*9* 73:7 80:*19* 82:*19* 86:*4* 90:*17* 92:*4, 8, 9* 94:*13* 108:*1* 110:*16* 112:*11* 127:*1* 133:*13* 136:*9* 140:*19* 174:22
sort 5:22 16:*13* 21:*3* 43:*5* 117:20 159:*3* 164:*12*
sought 13:*15*
sound 15:*11* 17:*14* 50:*10* 70:*21*
sounds 10:*18* 52:5 77:*15*
source 96:*8*
space 156:*15*
span 5:*15*
spatial 87:2 99:5 101:*12* 103:*11, 20* 104:9 109:*1* 110:20 111:*1* 113:*16* 116:*3* 122:20 130:6
spatially 102:*17* 110:*17* 118:*19*
speak 12:*12* 57:*18* 60:9 91:*18* 134:*15* 150:7
speaking 26:21 27:*1* 35:*4* 36:6 78:2 119:21 121:*18* 139:5
speaks 63:*4* 69:22 73:*21* 74:*21* 94:21 95:2 155:9
spec 42:20 163:2
specific 14:*8* 20:5 27:*10, 15* 39:*17* 83:*17* 97:8 132:*12*
specifically 40:*16* 69:8 92:*11* 132:5

**specification** 19:*19*
20:*20* 21:*16* 28:*8, 9, 16*
29:*13* 54:*21* 69:*15, 20,*
*21* 89:*1* 127:9 132:6
134:*11* 152:6 163:2*1, 22*
164:*15, 19* 170:*12*
**specifics** 14:*1*
**specified** 97:*10*
**specifies** 140:*11*
**specify** 24:22 87:*4*
177:*12, 16*
**spectrum** 23:2
**spell** 95:*16*
**spent** 40:*1*
**splittings** 99:*19*
**splotches** 130:*1*
**spoke** 120:*18*
**spot** 26:*8*
**spots** 111:*11*
**spurious** 146:7 148:2*1*
**ss** 180:2
**stack** 110:*3*
**standing** 50:*8, 12, 13, 14,*
*16, 19* 51:*1* 140:2*1*
141:*1* 148:2 149:*4*
153:20 154:7, *10, 11, 12*
155:*15* 156:*1, 6, 11*
**start** 5:*6* 6:*8* 21:*3, 5, 9*
22:*18* 30:*10* 53:22
100:*12* 145:*9* 162:*10*
**starting** 19:*18* 30:*11, 16,*
*19, 21* 61:*14* 159:*11*
**starts** 18:*20* 45:*8* 53:*17*
61:*17* 80:*3* 127:*4*
143:*16* 151:*13* 167:*14*
169:*4*
**State** 1:*18* 74:*10* 163:*5*
180:*3, 18*
**stated** 91:*4* 139:*4*
148:*19*
**statement** 13:*16* 18:2
52:*20* 138:*10* 142:*5*
155:2*1* 171:*12*
**STATES** 1:*1* 3:*14, 15*
53:*20* 180:2
**staying** 89:*15*
**stays** 91:*5*
**steep** 149:2*1*
**stenographically** 180:*8*
**Stenotype** 1:*20*
**stipulate** 4:*20*
**stipulation** 4:*9*
**stress** 109:*1*
**strike** 53:*8* 80:*19* 92:*19*
100:*12* 120:*3* 144:2*1*
176:*9*
**strikes** 100:*5*
**striking** 116:*18*
**structure** 58:*11* 63:22
64:*1* 72:*19* 76:*16* 85:6
96:*3* 107:2*1* 113:6, *15*

127:*12* 129:*14, 15, 20*
155:*8* 173:*16*
**structures** 15:2*1* 27:*4,*
*21* 38:*15* 55:*19* 56:*1, 5,*
*10* 57:*1, 11, 13* 68:22
70:*5* 74:*9* 78:7 79:*18*
85:*2* 118:2*0* 129:2*1*
**stuff** 115:*8*
**subject** 113:*6*
**subset** 57:*12*
**substance** 16:*14* 150:*9*
**substantive** 150:2*1*
**substantively** 140:*12*
144:*11* 145:2*1* 146:*12,*
*15* 147:6, *14* 148:*19*
150:*8, 11, 16* 151:*4*
153:22
**substrate** 56:*18* 57:*11*
94:*20*
**subsumed** 58:22
**subsumes** 18:*1*
**success** 90:6, *10* 116:2*1*
**sufficient** 19:2*1* 45:9, *15*
97:*4* 132:*3* 157:2*1*
158:*3*
**sufficiently** 96:*18* 107:*16*
**suggest** 29:*14* 102:*19*
176:*1*
**suggesting** 34:*11* 48:7
93:*16, 22* 98:20 132:2*1*
**suggests** 103:*12* 113:*14*
151:*15*
**Suite** 2:7
**summarizing** 107:*15*
**summary** 168:2
**superconducting** 15:*17*
**supervision** 180:*10*
**support** 21:*17* 24:*11*
31:*16* 36:9 56:*10* 59:*14*
79:*19* 97:*5* 103:*18*
104:*8* 149:*1* 177:*5*
**supported** 22:*4* 41:*15*
122:*16*
**supporting** 28:22 55:*19*
56:*1, 5* 57:*1*
**supportive** 61:*6*
**supports** 23:*10* 48:*3*
103:*18*
**supposition** 88:*14*
**suppositions** 129:*11*
**sure** 6:2*1* 9:*3, 6* 23:*12*
28:*12* 41:*18* 46:*16*
61:*16* 73:7 81:*20* 99:*17*
101:2*1* 105:*13, 17* 106:2
112:*14* 120:22 132:*10*
133:*16* 153:9 156:2*1*
168:2
**surrounding** 176:*12*
**sworn** 1:*16* 4:7 6:*1*
**synonymous** 50:2*0*

**synthesis** 44:*12*

**< T >**
**tailored** 39:22
**take** 12:6, *8* 46:*10* 55:2
84:*11* 92:*18* 102:*19*
104:*16* 105:22 124:9
136:*10* 162:*1* 173:2*1*
174:9 177:9
**taken** 1:*18, 20* 95:*5*
180:*5, 8*
**takes** 57:*5*
**talk** 16:*15* 100:22
122:*19* 134:*16* 138:22
146:2
**talked** 10:*3* 30:9
136:*17* 149:*5*
**talking** 6:8 20:*4* 25:22
28:*5* 31:*10* 46:*16* 55:*11,*
*16* 71:*19* 75:*17* 78:*12*
79:9 106:*16* 120:*14*
123:20 125:9 137:*19*
145:*12* 146:*4, 8* 147:*15,*
*22* 148:*1, 10* 150:*18*
157:*8* 167:6 168:*12, 17,*
*20*
**talks** 70:9 72:20 74:*1*
92:*15* 141:*4* 142:2*0*
**tape** 6:*20*
**teaches** 68:*8*
**teaching** 35:2 79:*17*
**teachings** 59:*15*
**Tech** 2:2*1*
**technical** 24:*14* 25:*14*
33:*16* 34:*15* 38:*4, 11*
39:*5, 9* 67:*14* 78:6
101:*15* 104:*12* 126:*13,*
*14* 146:*19*
**Technically** 160:*14*
**TECHNICIAN** 104:*14,*
*19* 105:2, *8, 13, 17, 20*
111:*13*
**technique** 85:*19* 101:*11*
110:20 168:*3* 169:*10*
**techniques** 16:2 167:*15,*
*20* 168:*8, 13* 169:*17*
**TECHNOLOGIES** 1:7
**technology** 149:*18*
171:*19*
**tell** 6:*5* 14:6 29:*13*
54:*12* 59:*16* 114:*10*
115:7 119:7
**Ten** 46:*13* 106:7, *8*
**tend** 7:*13*
**tends** 6:*10*
**term** 18:*12* 21:*5, 17*
22:2 23:*5* 24:2, *6, 7, 19*
28:7, *15* 30:*10, 17, 18*
31:*5* 32:7, *13* 33:8
44:*19* 47:*15* 49:*5* 50:*3*
51:*5* 52:22 53:*5* 54:*16*

65:*19* 68:9, *12, 22* 70:*19*
78:*19* 82:*5* 101:*15*
106:*19* 109:*4* 110:2
135:*4, 13, 20* 138:*3*
139:*19, 20* 141:*3* 143:22
147:*18* 157:22 158:*8, 9,*
*14* 160:*4, 22* 164:*10*
**terms** 4:*12* 15:22 17:*19*
20:*5* 21:22 22:*10, 15*
23:*19* 27:7 32:2*1* 33:22
34:2, *15* 35:9 36:*10*
37:*8* 38:*3* 39:*15* 40:*3*
42:*18* 45:*10, 16* 46:2
47:*18* 48:9 50:*18* 61:*3*
67:*4* 69:9, *12* 80:2*1*
94:*12* 108:*10* 113:*12*
133:*10* 134:2, 6 150:6
152:2 156:22 160:*5, 8*
176:*15*
**test** 54:*5*
**testified** 4:*8* 30:*4* 58:*5*
153:*19* 163:*10* 164:9
**testifying** 6:*1* 12:*16*
13:*10* 16:*5*
**testimony** 12:9 24:*1*
27:*13* 33:*10* 36:*18* 37:*4,*
*15, 21* 41:*3* 67:*11* 72:*13*
83:*8* 97:*17, 21* 98:9
108:*14* 117:*18* 125:*18*
155:7 156:*18* 157:*3, 5*
161:*13* 169:2 170:*17*
173:*5*
**text** 24:*16* 59:7 60:*8*
118:*10* 167:*1*
**textbook** 24:*16* 144:*3*
**textbook-like** 132:*12*
**texts** 65:*15*
**Thank** 4:2*1* 5:*5* 7:*3, 12,*
*18* 23:*18* 46:*15* 55:7
65:*7* 71:*5* 105:2 136:*13*
137:7 162:*3* 173:*19, 20*
174:*4*
**Thanks** 174:*5*
**theoretical** 154:2*0*
**thereof** 155:*9*
**thickness** 114:7
**thicknesses** 15:2*0* 74:*3,*
*8* 113:2*1*
**thin** 15:*10, 18, 19*
**thing** 7:20 16:*14* 80:*12*
110:2*1* 125:20 146:*13*
166:2 172:20
**things** 5:6 15:*8* 17:7
18:*4* 54:*11* 74:6 81:7,
*17* 84:6 96:*3* 109:*10*
139:*15, 16* 147:2, *4*
152:9 172:*12*
**think** 5:*14* 6:22 10:*1*
11:*15* 13:*17* 14:*15*
17:22 18:*4* 20:*15* 23:*1,*
*13* 30:*5, 9* 31:*5* 32:7, 22*

33:6  34:9, *13*  36:4  37:*1*
38:2  40:*17*  41:*18*  43:7
51:*14*  56:6  60:7  63:*20*
67:8  68:*21*  70:*18*  72:*14*
81:*5*  82:5, *12*  88:*18*
89:*1, 5*  90:*10*  91:*18*
92:5  95:*20, 22*  96:*14, 15*
97:*12, 18*  98:*11*  99:8
100:*3*  101:*18*  103:*17*
107:*19*  110:8  117:2, *5*
118:7  119:*3, 13*  120:2
121:22  122:8  124:2, *3, 21*  125:*14, 19*  127:*4, 17*
128:*14*  130:*18*  134:2, *15*
135:*3, 15*  136:*10*  141:*12, 22*  145:*13, 15*  151:*4*
156:*5, 8*  159:*8*  163:*10, 13*  166:*11*  170:7, *9*
171:*11, 16*  172:*10, 14*
176:7, *19*  177:2, *21*
**thinking** 170:8
**thinks** 151:*4*
**third** 52:*12*  167:4
**Thirty-seven** 114:*21*
**thoroughly** 178:*3, 12*
**thought** 33:*11*  41:22
44:*12*  92:8  100:7, *12*
109:*16*  121:*1*  123:*5*
134:5  172:*21*
**thoughtful** 145:8
**three** 23:*18*  78:5  89:*10, 12*  113:*14*
**three-dimensional** 88:*3*
100:*1*
**three-minute** 136:*10*
**tie** 121:*9*
**tied** 144:*13*  169:*10*
**time** 5:*15*  6:*21*  22:*1, 3*
23:7  32:*11*  33:*15*  36:6
40:*1, 6*  44:7  55:5
131:*11*  147:*1, 8*  165:*8*
174:*21*  176:*20*
**times** 5:*12*  8:*14, 16, 17*
14:*1, 19*  35:*14*  44:*21, 22*
45:*1*  48:*15*  49:*8*  130:*18*
135:7  138:*19*  177:22
**tip** 103:7
**today** 7:5  12:*10*  13:8
24:*1*  48:*15*  51:*16*  78:7
159:*12*  177:22
**today's** 11:*17*
**tome** 24:*17*
**tools** 39:*14*
**top** 14:*18*  62:2, *3*  69:*5, 13*  85:*10*  117:20
**total** 100:2, *3*  122:*10, 18*
123:*4, 7, 10*  124:*10*
**totality** 25:6
**touched** 38:2
**tougher** 100:*11*

tquist@sheppardmullin.com  2:*10*
**transcribed** 1:*21*
**transcript** 12:*3*  180:6
**transition** 90:5
**transmission** 149:*17, 22*  150:*1*
**transmitted** 141:*15*
**treatise** 39:*8, 16*
**treatises** 36:*19*
**TREVOR** 2:*4*  9:*3*  43:6  175:*1*
**trial** 6:2  152:*12*
**triangle** 111:*16, 17*
**tried** 33:*15*  108:*1*  136:*21*
**trip** 135:*8*
**true** 51:*4*  180:7
**truly** 114:*5*
**truth** 14:7
**truthfully** 7:5
**try** 6:7  39:*17*  80:*20*
84:*5*  91:*18*  119:6
**trying** 20:6  26:7  75:*10*
81:*20*  99:*20*  103:*10*
111:*6*  124:5  142:*6*
145:*14, 18*
**turn** 70:*10*  105:*5*
139:*18*  157:*14*  174:*11*
177:*8*
**turned** 13:*18*  16:6
**turning** 16:*13*
**Twenty** 5:*16*
**two** 7:*11*  12:*4*  13:9
17:*18*  23:*3*  40:8  53:*16*
55:22  56:*15*  62:*14*
67:22  72:*3*  88:*3*  89:7
101:*1*  109:*16, 20*  110:*3, 4*  114:6  128:*5*  143:7
**two-dimensional** 86:*19*
87:*11*  89:*21*  99:22
107:*21*  109:7  110:*5*
112:*3*  113:*16*  114:*5*
**type** 8:*21*  10:6  26:*1, 3*
27:*3*  33:*17*  39:*10*  43:2
77:*3*  89:*11*  141:*1*
151:*20*
**typed** 9:*9, 11*  19:*12*
**types** 26:5  40:2  44:*21*
55:22  98:*14*  172:*19*
**typewriting** 180:*10*
**typical** 26:*3*
**typically** 5:7  25:*20*
88:*4*  121:*17*  175:*18*
**Tysons** 2:*15*

< U >
**ultimate** 80:*8, 13*  81:*9, 15*  82:*1*
**ultimately** 90:*14*  167:*3*

**unambiguous** 20:*10*
53:*4*  59:*21*  124:5
132:*14*  171:*12*
**unambiguously** 67:2
97:*9*  123:6
**unchanged** 74:*11*
**unclear** 6:*15*
**undefined** 122:*11*
**undergraduate** 17:*13*
**underneath** 104:*20*
**understand** 6:*3, 16*  7:7, *15, 20*  10:4  11:7  14:6, 7
15:*19*  18:*21*  20:3, 6, *17, 19*  21:4  23:*13*  24:*1*
25:*3*  26:*19*  27:7  29:22
30:4, 6  31:7  32:6  34:*15*
36:*16*  37:7, 20  39:3
40:6, 7  41:5, *14, 18*
43:*15*  44:2, *16, 18*  45:*3, 10, 15*  46:2, 4, 5  47:*14*
48:*1, 6*  49:*21*  51:8
52:*16*  53:5  54:2  57:*10, 21*  66:*21*  67:*19*  69:*3, 7*
79:7  80:*21*  81:*13, 21*
83:*13, 16*  84:22  85:*13*
87:*17*  88:2, *5, 18*  95:*17*
96:6, *16*  97:*17*  99:*21*
112:*20*  121:*16*  125:9
126:*13*  129:*3*  132:4
134:*4, 7*  135:*18*  137:4
141:*12*  144:*11*  145:*14*
147:*4*  155:2  157:*22*
158:*4, 7*  162:*14*  166:*11*
171:2  174:*20*  175:*13*
176:*8, 21, 22*
**understandable** 77:*10*  86:*20*
**understanding** 8:*3*
10:*13*  11:4  17:*19*  19:*14, 17*  20:*11*  22:*1*  23:8
24:5  25:6  26:*14*  32:*12, 15*  33:*1, 13, 14*  35:5, *15*
36:7  40:*5*  42:*18*  44:7, *14, 15*  45:*21, 22*  48:5, *12*
53:*5*  57:*7, 14*  59:2, *12*
65:*10*  74:*21*  75:9  82:6
87:9  89:*4*  99:7  130:*20*
151:*17*  153:*1*  155:*5*
161:*19*  163:*20*  164:*10, 17, 21*  165:*4*  167:*19*
168:*11*  171:6  175:*17, 19*
177:*4, 18*
**understands** 25:*15*
49:*19*  51:*3*  56:8  72:5
74:*5*  75:7  81:*12*  87:8
130:2  142:*13*  143:*10*
146:6, *10*  149:*20*  150:*4, 6*  151:2  155:*13*
**understood** 31:*1, 18*
47:7, *21*  54:*16*  70:*14*
80:7  82:*19*  86:9  102:8

117:*21*  122:*20*  135:9
140:*11*  147:7  161:*16*
**unexpected** 135:*10*
**uniform** 101:*9*
**unit** 123:*1*
**UNITED** 1:*1*  3:*14, 15*
180:2
**unmarked** 7:*10*
**unnecessary** 46:*1*
**unquote** 82:*20*
**untethered** 121:*22*
**unusual** 123:*5*  156:*5*
**unwanted** 141:*9, 17, 21*
142:*3, 8, 9, 16*
**use** 14:*20*  20:*5*  24:*3*
26:*18*  28:9  34:*19*  35:*19*
41:*1*  51:*10*  52:9  61:*3*
71:*14*  79:*17*  81:*10, 11*
87:*13*  101:*15*  102:*10*
109:22  117:*12*  121:6
124:*19*  131:*18*  133:9
135:*4, 13*  142:*1*  144:22
146:*1*  162:*20*  167:22
170:*14*  171:*17*
**useful** 19:*1*  47:*21*  148:*3*
**uses** 61:*5*  66:*3*  68:*12*
108:*17*  128:*14*  132:9
134:*21*  140:*20*
**utility** 26:*3*
**utilize** 55:*19*  171:*14, 17, 21*
**utilizes** 161:*10*  171:*13, 15, 19*  173:*13*
**utilizing** 172:*1*

< V >
**vacuum** 156:*15*
**Vague** 28:*10, 21*  32:*17*
34:*5, 17*  36:2  51:*13*
54:*18*  65:2  71:*1, 10*
73:*12*  76:8  78:*1*  79:*4*
81:*3*  87:*21*  93:2  99:2
101:*19*  103:*4*  104:*5*
108:*3*  110:*1*  112:2, *10*
113:2  114:*12*  116:*10*
121:*12*  123:*16*  124:*16*
125:*5*  127:22  129:8
131:*8*  133:*21*  135:22
138:*15*  142:*10*  143:*4*
144:*18*  145:5  146:*16*
148:*13*  151:*18*  153:*5*
154:*2, 15*  165:2  169:*12*
**validates** 89:*10*
**validating** 120:*16*
**validity** 77:*15, 16*
**value** 74:*12*  120:*5*
131:*5, 14, 19*
**values** 151:*16, 22*  152:*1, 2, 7*
**variation** 116:*4*



**variations** 101:*12*
110:*18* 111:*1* 113:*16, 18*
122:*20* 130:*3, 6*
**varies** 85:*4* 86:*12*
**variety** 59:*8* 67:*15*
142:*15*
**various** 11:*20* 40:2
73:*14* 134:*15* 165:*14*
**varying** 74:2 142:*14*
**verbal** 6:*6*
**verbally** 128:*15*
**verbatim** 45:*21* 135:*16*
136:*6*
**versed** 77:*6*
**version** 147:*11, 14* 178:*7,
17*
**versus** 75:*18* 78:*6*
**vertical** 58:*18* 87:*7*
96:*10*
**viable** 78:*9*
**view** 63:*19*
**views** 17:*18*
**Virginia** 2:*16*
**visualization** 100:*1*
108:*19* 110:*21*
**visualizations** 67:*16*
129:*13*
**visually** 108:*18* 116:*18*
118:*12* 128:*16*
**voltage** 61:*8* 67:*21*
144:*6* 157:*7*
**volume** 83:*5* 85:*18*
88:*16* 89:*2, 18* 91:*21*
92:*11, 13, 22* 93:*14, 19,
20* 94:*3, 7, 9, 10, 11, 14,
15, 17, 18, 19, 20* 95:*22*
96:*13, 19* 97:*8, 9, 11, 18*
98:*1, 14, 21* 100:*4*
110:*10, 19* 111:*3* 112:*16*
113:*1* 114:*11* 121:*1*
122:*17, 19, 21* 123:*2, 8,
11, 12, 14, 15, 21* 124:*1,
10* 125:*4, 16* 126:*4, 10*
129:*6* 147:*12*
**volumes** 97:*5*
**volumetric** 83:*10* 86:*8*

< W >
**wait** 6:*7*
**want** 14:*9* 20:*4* 26:*19*
30:*3* 35:*7* 41:*17* 42:*12*
43:*9* 46:*18* 51:*14, 19*
52:*6* 54:*4* 55:*14* 70:*10*
71:*14* 74:*7* 96:*21* 98:*12*
100:*22* 103:*18* 105:*22*
111:*15* 115:*7* 124:*8*
125:*22* 127:*5* 134:*20*
141:*22* 142:*3* 153:*21*
154:*3* 155:*3, 17* 159:*15*
165:*16* 174:*12*

**wanted** 5:*6* 16:*15* 84:*7*
115:*5* 141:*9*
**wants** 4:*16* 87:*4* 96:*9*
104:*11*
**wave** 50:*8, 12, 13, 14, 15,
16, 19* 51:2 57:*21* 64:*3*
141:*1, 2* 144:*4* 148:2, *3,
4, 8* 154:*7, 18* 155:*15*
156:*6, 13* 167:*16, 21*
**wavelength** 150:*11*
**wavelengths** 140:*12*
148:*1, 16* 151:2 153:*15*
155:*1, 10, 22*
**waves** 140:*5, 16, 20, 21*
141:*5, 9, 18, 21* 142:*8, 9,
20* 143:*12* 148:*9, 11*
149:*4, 7, 12* 153:*20, 21*
154:*5, 10, 11, 12, 13*
155:*3* 156:*1, 11* 157:2
**way** 23:*6* 26:*13* 39:*12*
43:*14* 53:*4* 57:*4* 61:*4*
81:*21* 85:*19* 89:*2, 13*
91:2 95:*6* 96:*17* 98:*11*
105:*6* 111:*7* 112:*22*
121:*20* 122:*5* 130:*3*
140:*4* 141:*10* 144:*4*
150:*7* 155:*4* 157:*1*
159:*9, 21* 166:*6* 170:*9,
20* 172:*13*
**ways** 59:*8* 70:2 97:*12*
124:*4* 139:*9, 11* 142:*15*
**Webster's** 26:*8*
**weight** 130:22
**weighted** 20:*1*
**welcome** 4:22 43:*11*
177:*10*
**well** 14:*15* 23:*1* 28:22
33:*6, 16* 34:*9* 36:*18*
51:*4* 54:*11* 66:*11* 71:*14*
72:*6* 73:*4* 77:*6* 84:*1*
87:*7* 89:*20* 93:*19* 94:*11*
97:*7* 98:*21* 99:*16* 100:*6,
22* 109:*7* 111:*2, 10, 15*
122:*15* 134:*14* 141:*9*
143:*5* 146:*13* 151:*19*
154:*10, 11* 156:*3* 158:*11*
159:2 166:*13, 22* 168:*14*
169:*14* 171:*10, 18*
172:*17* 176:*9*
**went** 130:*4*
**we're** 4:*10* 28:*5* 59:*10*
68:2 74:*19* 123:*20*
124:*5* 146:*3, 8* 150:*18*
157:*8*
**we've** 29:*20* 82:*12*
118:*8* 127:*18* 136:*20*
155:*12*
**width** 58:*21*
**Winthrop** 2:*14*
**wish** 18:*10*

**witness** 1:*14, 16* 3:2 4:*6*
5:*18, 20* 8:*7* 9:2, *11*
10:*10* 11:*10* 14:*4* 15:2
17:22 23:*1* 26:*13* 28:*11,
22* 29:*19* 32:*18* 33:*10,
11* 34:*6, 19* 36:*3* 37:*4, 5,
15, 16* 40:*14* 41:*3, 4*
51:*14* 53:*13, 15* 54:*19*
55:*4, 7* 57:*4* 65:*3* 67:*11,
12* 71:*2, 11* 72:*13, 14*
73:*13* 76:*1, 9* 77:*2, 15*
78:2 79:*5* 81:*4* 83:*8, 9*
87:22 88:*14* 89:*20*
90:*17* 91:*11* 92:*2, 8*
93:*3* 97:*21, 22* 98:*9, 10*
99:*4* 100:*20* 103:*6*
104:*6* 106:*5* 108:*14, 15*
110:*2, 16* 112:*3, 11, 18*
113:*4* 114:*13, 21* 116:*11*
117:*18, 19* 119:*3, 18*
121:*5, 13, 15* 122:*4*
124:*17* 125:*6, 18, 19*
128:*7* 129:*9* 131:*10, 17*
133:*13* 134:*1, 14* 136:*1,
9, 13* 138:*17* 139:*15*
141:*12* 142:*12* 143:*5*
144:*19* 145:*6* 146:*17*
148:*14* 149:*14* 150:*15*
151:*19* 152:*14* 153:*6*
154:*3, 16* 155:*7, 8* 156:*3,
18* 157:*5, 6* 159:*8, 19*
160:*14* 161:*13, 14* 164:2
165:*4* 168:*16* 169:2, *14*
170:*6, 17, 18* 173:*5, 6, 20*
175:*3, 17* 176:*3* 177:*21*
**wondering** 10:*6* 75:*20*
**word** 14:*20, 21* 23:*6*
38:*8* 40:22 44:*15* 80:*4*
83:*15, 20* 94:*7* 144:*10*
171:*16, 17, 22*
**words** 9:*9* 19:*11* 22:*13*
26:*6* 27:*7* 28:*9* 40:*8*
41:*19* 42:*20* 67:*13* 68:*5*
71:*14* 115:*1, 2* 117:*12*
133:*9, 19* 134:*2, 11, 21*
136:*7* 143:*1* 151:*21*
160:*21* 162:*10*
**work** 15:*9, 15, 18* 33:*12*
126:*17* 163:*11*
**worked** 8:*17* 15:*17*
**worker** 19:*20* 20:*16*
25:*3, 15* 26:2 27:22
29:*20* 30:*17* 32:*21* 39:2
41:*14* 49:*10* 51:*3, 8*
56:*8* 57:*20* 66:*20* 67:*19*
72:*5, 14* 74:*4* 83:*12, 19*
87:*8* 88:*1, 19, 22* 95:*12*
96:*9, 21* 99:*6* 103:*13*
107:*19* 117:*6* 126:*16*
129:*16, 18* 130:2 142:*12*
143:*10* 147:*12* 148:*14,*

*19* 149:*20* 150:*6* 151:*2,
4* 155:*12* 156:*8* 160:*1*
163:*8* 166:*11* 170:*7*
171:*1* 172:*10, 15, 16*
**workers** 15:*19*
**working** 13:*4, 7* 14:*21*
26:*9*
**works** 85:*20* 106:*5*
155:*17* 177:*19*
**world** 144:2 147:*11*
**worry** 172:*18*
**wow** 123:*5*
**write** 44:*4*
**writing** 147:*16*
**written** 20:*8, 9* 72:*16*
81:*21* 95:*6* 99:*10* 125:*7*
126:*7* 177:*6*
**wrong** 14:*15* 16:*7*
17:*17* 21:22 67:*18* 68:*4*
126:*19*
**wrote** 43:*9* 126:*21*
138:*18*

< X >
**x-ray-based** 16:*1*

< Y >
**Yeah** 4:*15, 20* 17:2
43:*7* 61:*17* 91:*11* 102:*2,
4* 105:*20* 106:*4* 118:*4*
123:*10* 131:*17* 135:*15*
148:*5, 12* 159:*8* 163:*13*
174:*3*
**years** 5:*16* 12:*16* 13:*13*
16:*4, 12* 18:*3* 24:*20*
163:*12*
**yelled** 104:*17*
**yellow** 107:*3* 115:*18*
116:*8, 12* 117:*10, 11*
**Yep** 85:*12* 149:*6*

< Z >
**zero** 149:22
**Zoom** 1:*13* 4:*10* 6:*9*
105:*14*



# Exhibit A7

1            IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3

4   QORVO, INC.,

5           Plaintiff,

6           vs.   C.A. No. 21-1417(JPM)

7   AKOUSTIS TECHNOLOGIES, INC. and
    AKOUSTIS, INC.,
8
            Defendants.
9   _____

10

11            VIDEOCONFERENCE DEPOSITION OF

12                 DR. CLARK NGUYEN

13                     Volume I

14

15                 August 10, 2022

16               9:56 a.m. - 1:23 p.m.

17

18            REMOTE DEPOSITION VIA ZOOM

19

20            DAVID OCANAS, CSR NO. 12567

21

22

23

24

25



```
 1                     APPEARANCES OF COUNSEL

 2

 3    On Behalf of the PLAINTIFF:

 4            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
              TIMOTHY P. CREMEN, ESQ.
 5            TREVOR J. QUIST, ESQ.
              2099 Pennsylvania Avenue, NW, Suite 100
 6            Washington, DC 20006-6801
              (202) 747-1900
 7            tcremen@sheppardmullin.com
              tquist@sheppardmullin.com
 8

 9    On Behalf of the DEFENDANTS, AKOUSTIS TECHNOLOGIES,
      INC. AND AKOUSTIS, INC.:
10
              PILLSBURY WINTHROP SHAW PITTMAN LLP
11            ROBERT M. FUHRER, ESQ.
              1650 Tysons Boulevard, 14th Floor
12            McLean, VA 22102-4856
              (703) 770-7543
13            Robert.fuhrer@pillsburylaw.com

14    Also Present:

15            TOM ROWLES

16

17

18

19

20

21

22

23

24

25
```



```
 1                  INDEX OF EXAMINATION

 2

 3   WITNESS:  DR. CLARK NGUYEN

 4   EXAMINATION                              PAGE

 5   BY MR. CREMEN                            6, 98

 6   BY MR. FUHRER                          90, 105

 7

 8                  INDEX OF EXHIBITS

 9   DEPOSITION          DESCRIPTION           PAGE

10   Exhibit 1     Initial Claim Construction of

11                 Expert Report and Declaration  8

12   Exhibit 2     Rebuttal Expert Construction

13                  Report and Declaration        8

14   Exhibit 3     '755 Patent                    28

15   Exhibit 4     '786 Patent                    86

16

17

18

19

20

21

22

23

24

25
```



```
 1              INFORMATION REQUESTED

 2                    PAGE   LINE

 3                       (NONE)

 4

 5

 6   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

 7                    PAGE   LINE

 8                       (NONE)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1              DEPOSITION OF DR. CLARK NGUYEN

2                    August 10, 2022

3

4         THE COURT REPORTER:  Hello, my name is

5    David Ocanas.  I am a Certified Shorthand Reporter

6    and notary public for the State of California.  The

7    deposition of the witness, DR. CLARK NGUYEN, is

8    being held via videoconferencing equipment.  The

9    witness and reporter are not in the same room.

10         Pursuant to agreement, all parties

11   stipulate that the witness will be sworn in

12   remotely and that the testimony being given today

13   will be the same as if the witness was sworn in in

14   person.

15         So stipulated?

16         MR. CREMEN:  So stipulated.

17         MR. FUHRER:  So stipulated.

18         MR. QUIST:  So stipulated.

19

20

21

22

23

24

25
```



1             DR. CLARK NGUYEN,

2  called as a witness by and on behalf of the

3  Plaintiff, having been first duly sworn, was

4  examined and testified as follows:

5

6                  EXAMINATION

7  BY MR. CREMEN:

8      Q.   Good morning, Dr. Nguyen.

9      A.   Good morning.

10     Q.   Have you been deposed before?                      09:56

11     A.   No.

12     Q.   I will give you a little bit of an

13  explanation of how it will go.

14         Because we are doing this over video, we

15  have to be careful not to speak over each other.  I      09:56

16  will ask questions and you can answer, your counsel

17  may object from time to time to some of my

18  questions, but unless he tells you not to answer

19  them, you have to answer.

20         Do you understand that?                            09:56

21     A.   Yes.

22     Q.   If at any time one of my questions is

23  unclear -- I'm sure there will be unclear questions

24  today -- I'll try to rephrase it or you can answer

25  it with any qualifiers you need.  I usually try to       09:57



1  go for about an hour and then take a short break.

2  I think today we're going to try to stay -- we have

3  agreed to stay within four hours.

4        I don't know what your -- when your normal

5  lunchtime is.  I think it's 10:00 a.m. for you          09:57

6  right now.  But if you want to take a longer lunch

7  break in the noon to 1:00 range, we can do that as

8  well.

9      A.  Okay, I'll let you know.

10     Q.  Is there anything that would prevent you        09:57

11 from answering truthfully today?

12     A.  No.

13     Q.  Do you understand why you are here today?

14     A.  Yes.

15     Q.  What is your understanding?                      09:58

16     A.  I'm here to give my expert opinion on this

17 case.

18     Q.  Do you recall submitting an Initial Claim

19 Construction of Expert Report and Declaration dated

20 July 11th, 2022?                                          09:58

21     A.  Yes.

22     Q.  Do you have a copy of that with you today?

23     A.  Yes.

24     Q.  Do you recall preparing a Rebuttal Expert

25 Construction Report and Declaration dated July           09:58



1   29th, 2022?

2        A.   Yes.

3        Q.   Do you have a copy of that with you today?

4        A.   Yes.

5             (Deposition Exhibit 1,

6             Initial Claim Construction of Expert

7             Report and Declaration, was marked

8             for identification by the Certified

9             Shorthand Reporter, a copy of which

10            is attached hereto.)

11            (Deposition Exhibit 2,

12            Rebuttal Expert Construction Report

13            and Declaration, was marked for

14            identification by the Certified

15            Shorthand Reporter, a copy of which

16            is attached hereto.)

17   BY MR. CREMEN:

18        Q.   Now, if I call those the initial

19   declaration and the rebuttal declaration, will you

20   know what I mean?                                          09:58

21        A.   Yes.

22        Q.   Just so we don't have to say the long

23   titles 25 times today or more.

24             Can you give me an overview of how those

25   documents were prepared?                                  09:59



1       MR. FUHRER:  Objection, vague.  Calls for

2   a narrative.

3   BY MR. CREMEN:

4       Q.  You can answer.

5       A.  Okay, there was an objection, I can still      09:59

6   answer?

7       Q.  Yes, unless your counsel instructs you not

8   to answer, you can answer.

9       A.  So the question again was?

10      Q.  I was interested in your -- just give me        09:59

11  -- let me start over.  I would like a brief

12  overview of how the documents were prepared?

13      Did you write them, did your counsel write

14  them, was it a joint effort, that kind of thing?

15      A.  Yes, I submitted an initial draft.  I          09:59

16  guess there were a few drafts of this thing.  In

17  the end, it's my writing, except for perhaps some

18  legal stuff that I'm not an expert on which I

19  looked at and approved.  Everything was approved by

20  me by the end of this whole thing.                     10:00

21      Q.  Do you recall how many drafts went back

22  and forth for the initial report?

23      A.  I don't know, maybe three or so, something

24  -- there was a lot -- when you say type, I typed

25  and I dictate sometimes when I write.                  10:00



1      Q.   Same question for the rebuttal

2   declaration, how many drafts went back and forth?

3      A.   I would estimate two or three.

4      Q.   If you had to estimate how many hours you

5   spent on each of the declarations, what would that          10:00

6   estimate be?

7      A.   These are just estimates, but I spent days

8   on these things.  It was several hours per day.

9   We're talking ten hours or something for each, or

10  more, actually.                                             10:01

11     Q.   Do you recall reviewing documents to

12  prepare your declarations?

13     A.   Yes.

14     Q.   Do you have copies of each of those

15  documents with you today?                                   10:01

16     A.   Yes, I believe so.

17     Q.   Could you tell me your basic understanding

18  of the claim construction process for patents?

19          MR. FUHRER:  Objection, calls for a legal

20  conclusion.  Speculative, calls for a narrative.            10:01

21          THE WITNESS:  So the question again is --

22  can you say it again?

23  BY MR. CREMEN:

24     Q.   I would like to understand your

25  understanding as to -- as an expert witness of the          10:02



 1  claim construction process?

 2        MR. FUHRER:  Same objection.

 3        THE WITNESS:  My understanding is I'm an

 4  expert that looks at the specification, looks at

 5  the claims and interprets it all.                        10:02

 6  BY MR. CREMEN:

 7     Q.  Do you know what intrinsic evidence is?

 8     A.  Yes, my understanding, that's the

 9  specification.

10     Q.  Anything else?                                    10:03

11     A.  The claims made -- the claims, the

12  terminology, I don't have the terminology, the

13  claims, the specification, what came with the

14  patent, is my understanding.

15     Q.  Do you know what the prosecution history    10:03

16  is?

17     A.  Yes.

18     Q.  Are the patent documents cited or

19  discussed in the prosecution history part of the

20  entries of record?                                       10:03

21        MR. FUHRER:  Objection, vague.

22        THE WITNESS:  I should answer that?

23        MR. FUHRER:  Doctor, I'll object and you

24  can still answer, as he instructed you at the

25  beginning.                                               10:04



 1        If I object and instruct you not to

 2   answer, then that will be a different thing.  I've

 3   not yet instructed you not to answer.

 4        Please answer the question unless I

 5   instruct you not to.                                    10:04

 6        THE WITNESS:  Okay, you're asking if the

 7   patent documents were cited in the prosecution

 8   history?

 9   BY MR. CREMEN:

10   Q.  Do you understand that during the                  10:04

11   prosecution history, the patent examiner may make

12   reference to a piece of prior art that he thinks is

13   relevant to the patent application?

14        MR. FUHRER:  Objection, lacks foundation.

15   Calls for speculation.                                 10:04

16        THE WITNESS:  If you're asking if I do

17   understand that these histories will reference

18   documents, yes.

19   BY MR. CREMEN:

20   Q.  Do you know -- are those reference                 10:04

21   documents part of the entries of record?

22        MR. FUHRER:  Same objection, lacks

23   foundation.

24        THE WITNESS:  I think so.

25   BY MR. CREMEN:                                          10:05



1      Q.  What is extrinsic evidence?

2          MR. FUHRER:  Calls for a legal conclusion.

3          THE WITNESS:  My understanding is

4  extrinsic evidence is the evidence that is not

5  intrinsic evidence, everything on the outside.          10:05

6  BY MR. CREMEN:

7      Q.  Do you know in your role as an expert

8  witness whether intrinsic evidence or extrinsic

9  evidence is considered more reliable for claim

10 construction purposes?                                   10:05

11         MR. FUHRER:  Objection, calls for a legal

12 conclusion.

13         THE WITNESS:  I learned of the process

14 that intrinsic evidence is very important.  I've

15 always known that.  In this process, reading the        10:05

16 documents, it's really hammered in.  It depends on

17 the argument trying to be made.

18         Sometimes extrinsic evidence is very

19 necessary.

20 BY MR. CREMEN:                                           10:06

21     Q.  When you are asked to construe a claim as

22 an expert witness, should you start with the

23 intrinsic evidence or with the extrinsic evidence?

24     A.  Intrinsic evidence.

25     Q.  When would you look to extrinsic evidence?       10:06



1          MR. FUHRER:  Objection, lacks foundation.
2    Speculation.
3          THE WITNESS:  I would look to the
4    extrinsic evidence when the intrinsic evidence
5    could be helped, say if you wanted to define          10:06
6    something with information extrinsically.
7    BY MR. CREMEN:
8       Q.  What do you mean by can be helped?
9       A.  So, for example, if the intrinsic evidence
10   makes it very clear that it means the plain and       10:07
11   ordinary meaning, you can bring in extrinsic
12   evidence to make it even clearer.
13      Q.  If the meaning of in particular single
14   crystal record, would you ever look to the
15   extrinsic record?                                     10:07
16         MR. FUHRER:  Objection, vague.  Calls for
17   a legal conclusion.  Speculation.
18         THE WITNESS:  This depends on the
19   situation.  I don't think I can answer yes or no.
20   I can say you might.                                  10:07
21   BY MR. CREMEN:
22      Q.  If in your mind reviewing the claim term
23   the meaning was clear for intrinsic record, why
24   would you look to the extrinsic record?
25         MR. FUHRER:  Objection, lacks foundation.       10:08



 1 | Calls for speculation.

 2 |        THE WITNESS:  I would do it to make sure

 3 | it's clear for everyone involved.

 4 | BY MR. CREMEN:

 5 |     Q.  What do you mean by everyone involved?          10:08

 6 |     A.  Everyone here, everyone looking at the

 7 | patent.  I'm a professor at heart, I like to

 8 | explain things.

 9 |     Q.  If the meaning of the term was clear in

10 | the intrinsic record, why would you need to make it     10:08

11 | clearer?

12 |        MR. FUHRER:  Objection, vague.

13 |        THE WITNESS:  It could be clear, but like

14 | I said, I'm a professor, I like it to be -- I look

15 | to put all the information down.                        10:09

16 |        It can be clear without everything said

17 | about it.  But I tend to like to say more.

18 | BY MR. CREMEN:

19 |     Q.  If you were reviewing a patent document

20 | and intrinsic record defines a term but the             10:10

21 | extrinsic record suggests a different definition

22 | for that term, which should control, the extrinsic

23 | or the intrinsic?

24 |        MR. FUHRER:  Objection, calls for a legal

25 | conclusion.  Vague.  Lacks foundation.                  10:10



1          THE WITNESS:  My assumption, it should be

2    the intrinsic or my understanding it should be

3    intrinsic.

4    BY MR. CREMEN:

5          Q.  Let's look at page 4 of your rebuttal          10:10

6    declaration.

7          A.  I'm on page 4 of my rebuttal.

8          Q.  Let's look at the sentence starting on the

9    second line of page 4.

10          In that sentence you mention that -- that        10:11

11   identified extrinsic evidence available to provide

12   clarification and support in view of the

13   differences in the plain and ordinary constructions

14   proposed by the parties.

15          Do you see that?                                 10:11

16          A.  Yes.

17          Q.  Is it your opinion that a person of skill

18   would look to extrinsic evidence because there is a

19   difference between the parties' construction?

20          A.  In the case, it was appropriate.            10:12

21          Q.  Why was it appropriate?

22          A.  Because looking at the two constructions,

23   Akoustis's is not consistent with the

24   specification.

25          Q.  Why not?                                    10:12



1      A.  Akoustis -- sorry, I meant Qorvo, not
2  Akoustis.  Let me say that again.
3          Qorvo is not consistent with the
4  specification.
5          So I assume -- you asked why not.  I will        10:12
6  continue with that.
7      Q.  Sure.
8      A.  It's saying that the active region is the
9  better resonator that is electrically driven.
10         The electrically driven part highlights          10:13
11 the BAW resonator that does not include the whole
12 BAW resonator in many different types of BAW
13 resonators.
14     Q.  We'll come back to that in a minute.
15         Let's go to the beginning of that sentence        10:13
16 we were just looking at, where you say that:
17         "While a POSITA may be able to understand
18 certain disputed claim terms without resorting to
19 extrinsic evidence..."
20         Do you see that?                                   10:13
21     A.  Yes.
22     Q.  What certain disputed claim terms would a
23 POSITA not have to resort to extrinsic evidence in
24 this case?
25     A.  I don't think any of this case.                    10:14



```
 1       Q.  So each of the disputed claim terms that
 2  you opine on in your declarations, a person of the
 3  ordinary skill in the art would have to rely on
 4  extrinsic evidence to understand them?
 5            MR. FUHRER:  Objection, mischaracterizes     10:14
 6  testimony.  Misleading.
 7            THE WITNESS:  I'm thinking of the four
 8  different terms right now to make sure I understand
 9  this correctly.  In this case, I think, yes.
10  BY MR. CREMEN:                                         10:14
11       Q.  Do you know to what audience a patent
12  specification is written to?
13            MR. FUHRER:  Objection, lacks foundation.
14  Calls for a legal conclusion.
15            THE WITNESS:  I think I do and the           10:16
16  audience can be large.
17  BY MR. CREMEN:
18       Q.  Who would be the audience?
19       A.  It could be people working in the area.
20            It could be people not working in the area   10:16
21  directly.
22            The area, to understand what I'm saying,
23  the area, it's not a very specific thing.
24            It could be people working in resonators
25  and that type of thing.  It would be people who are    10:17
```



1   physicists.  It could be students.  It could be all

2   types of people.

3        Q.  Let me ask you more discretely.

4            Do you know if a patent specification is

5   written for the level of a person of ordinary skill        10:17

6   in the art?

7        A.  Yes.

8        Q.  Does a patent specification have to

9   explain concepts that a person of ordinary skill in

10  the art would be aware of?                                  10:17

11           MR. FUHRER:  Objection, vague.  Confusing.

12           THE WITNESS:  My understanding, it could

13  be good if it did.

14           There are certain things that a person of

15  ordinary skill in the art understands.                     10:18

16  BY MR. CREMEN:

17       Q.  Do you know to what level of detail a

18  patent specification is supposed to be written for

19  to be proper?

20           MR. FUHRER:  Objection, calls for a legal         10:18

21  conclusion.  Vague.  Lacks foundation.

22           THE WITNESS:  Can you repeat that

23  question?

24           You are asking about specifics?

25  BY MR. CREMEN:                                              10:18



1    Q.  Is it your understanding that a patent

2  application has to be written with enough detail

3  for one of skill to make use of the invention?

4    A.  Yes.

5    Q.  Reviewing your declarations, I see there      10:19

6  is a bit of case law in them.

7        For example, on page 7 of your initial

8  declaration; do you see that?

9    A.  Let me bring up my initial declaration.

10       Yes.                                          10:20

11   Q.  How many expert declarations for patent

12 cases have you prepared prior to this one?

13   A.  Just one.

14   Q.  You're not an attorney; correct?

15   A.  No.                                           10:20

16   Q.  There are a couple of cases cited on page

17 7 of your initial declaration, Phillips versus AWH

18 Corp., and Vitronics versus Conceptronic.

19       Did you review those cases to prepare this

20 paragraph of your declaration?                      10:20

21   A.  No.

22   Q.  Were you relying on your attorney's

23 interpretation of those cases for this section?

24       MR. FUHRER:  Objection.  Misleading.

25       THE WITNESS:  I read this section.  I         10:21



1  agree with these things.  So it was me that agreed

2  to it.

3  BY MR. CREMEN:

4      Q.  I'm just curious about the source of this.

5  You said you didn't review the case law.                    10:21

6          Was this paragraph provided to you by

7  counsel and you agreed to it, is my understanding

8  correct?

9      A.  Yes.  The draft came in with this.  I read

10  through it and made sense and I have seen texts          10:21

11  like this before.  So it made sense to me and I

12  approved it.

13     Q.  Let's go to page 9 of your initial

14  declaration.  There is a section titled Level of

15  Ordinary Skill in the Art; do you see that?             10:22

16     A.  Yes.

17     Q.  In the second line of this section, you

18  mention that this definition is for the time period

19  in question; correct?

20     A.  Yes.                                              10:22

21     Q.  What time frame is that?

22     A.  That is a time frame up to the patent

23  submission date, I think it was 2015.

24          I have to look -- for the '755 Patent.

25     Q.  Would your definition of a person of             10:23



 1  ordinary skill in the art have changed if the time

 2  frame in question was 1990?

 3           MR. FUHRER:  Objection, calls for

 4  speculation.  Lacks foundation.

 5           THE WITNESS:  I don't know that I can            10:23

 6  answer that question, actually.  Electrical

 7  engineers learn lots of things, not just circuits.

 8  For example, I'm an electrical engineer and I came

 9  out of that -- those times.

10  BY MR. CREMEN:                                           10:23

11     Q.  Can you think of any earlier time frame

12  where your definition of person of ordinary skill

13  in the art on page 9 of your initial declaration

14  would be different?

15           MR. FUHRER:  Objection, vague.  Lacks           10:24

16  foundation.

17           THE WITNESS:  So the history of this

18  field, immense field, is that it came out of

19  electrical engineering and other as specifics of

20  engineering that fed into it for the benefit of the    10:24

21  whole thing.

22           But electrical engineering still remains

23  and was even in those initial periods, the backbone

24  of this technology.

25  BY MR. CREMEN:                                           10:25



1    Q.  By this technology, you mean MEMS

2  technology in general?

3    A.  Yes, which includes what we're talking

4  about today.

5    Q.  Are all resonators MEMS?                      10:25

6    A.  It fits the definition of MEMS.

7    Q.  Are MEMS courses typically part of an

8  electrical engineer's education?

9    A.  I would say yes, because in courses, for

10  example, that are teaching fabrication technology,   10:26

11  these courses do not just teach transistor

12  fabrication.  They pretty much always teach MEMS as

13  well because it's an important part of the

14  technology that students need to learn.  At least

15  every time I taught the course, there have been      10:26

16  MEMS in it and all the other courses I have looked

17  at have had MEMS processes, too, in them.

18    Q.  Is a MEMS course required to graduate with

19  an electrical engineering degree from Berkeley

20  currently, to your knowledge?                        10:26

21    A.  At UC Berkeley, what we have is a first

22  course that all students take.

23      There is a course that goes through lots

24  of different aspects of electrical engineering.

25      Did you say something?                           10:27



1          It's a course that goes through many

2   different aspects of electrical engineering.

3          This is throughout the history of UC

4   Berkeley, I guess way back in the '80s and '90s, it

5   was a single course that covered many topics          10:27

6   including MEMS.

7          Now it's two courses, I believe still

8   covering some MEMS topics in them.

9          I guess it may depend on the year, who is

10  teaching the course, how much they put into it.       10:27

11         But MEMS is something that -- if this is a

12  course that all students take, I would say not even

13  electrical engineers, at Berkeley, this is even

14  taught to computer science students.

15         If you have looked lately at how many           10:27

16  students are taking which courses at any

17  university, computer science is probably the most

18  populous major now, which means that an awful lot

19  of students are learning about MEMS and it's part

20  of a required course that they have to take.          10:28

21         I would say in most semesters, depends on

22  who is teaching the course, depends on how much

23  they put into it.  This is a course that covers a

24  lot of material.

25         It covers a slew of different ideas.           10:28



1        If the question is, do they learn MEMS,
2  yes.
3        Q.  In your definition of a person of ordinary
4  skill in the art, you indicate that someone with an
5  undergraduate degree in electrical engineering with          10:28
6  two to four years of experience in the technical
7  field would qualify or someone with a master's and
8  additional information; is that right?
9        A.  Yes.
10       Q.  In your opinion, is the electrical              10:28
11  engineering degree or the work experience more
12  important for a person of ordinary skill in the art
13  to understand this technical field?
14        MR. FUHRER:  Objection, vague.
15  Speculative, lacks foundation.                           10:29
16        THE WITNESS:  They are both important.  In
17  order to learn things, once you go out to work, you
18  have to have the foundation.
19        I'm not sure how I can put one in front of
20  the other.                                               10:29
21  BY MR. CREMEN:
22       Q.  Okay, let's look at page 2 of your
23  rebuttal report.
24        Paragraph bridging pages 2 and 3, you
25  discuss Dr. Bravman's definition of a person of          10:30



1  ordinary skill in the art; is that right?

2      A.  Yes.

3      Q.  In the fourth line down, you take the

4  position that the differences between you and

5  Dr. Bravman's definition of a person of skill would        10:30

6  not impact claim construction; is that right?

7      A.  Yes, mainly because the discipline -- it's

8  difficult to delineate between the disciplines.

9          They have all sort of gone into one

10 another.                                                    10:31

11         So people learn a lot of the same things

12 in the different disciplines.

13     Q.  When you say discipline, do you mean for

14 an undergraduate degree?

15     A.  Yes.                                                10:31

16     Q.  Do you think that Dr. Bravman's definition

17 of a person of skill is unreasonable?

18         MR. FUHRER:  Objection, vague.

19         THE WITNESS:  I think it misses some

20 things.                                                     10:31

21 BY MR. CREMEN:

22     Q.  What do you think it misses?

23     A.  The last sentence in that paragraph.

24     Q.  So --

25     A.  Actually, I'm reading this again -- I'm            10:32



1   sorry, it does include electrical engineering.

2          He includes electrical engineering.  I

3   think that's fine with me.

4      Q.  Is there a course for electrical engineers

5   at Berkeley that covers the effects of different          10:33

6   crystal structures of piezoelectric layers?

7      A.  Different crystal structures -- what do

8   you mean by that?

9      Q.  In one of the patents we will discuss

10  today, we will talk about single crystal or               10:33

11  polycrystalline and piezoelectric layers; is that

12  right?

13     A.  Yes.

14     Q.  Is there a required course for an

15  electrical engineering degree at Berkeley that            10:33

16  would cover the differences in a single crystal

17  piezoelectric layer versus a polycrystalline

18  piezoelectric layer?

19          MR. FUHRER:  Objection, misleading.

20          THE WITNESS:  There are courses that cover        10:34

21  piezoelectrics.

22          There are courses that cover between

23  single crystal and polycrystalline.  Those are

24  usually in the context of silicon.

25          The courses that cover piezoelectric -- I         10:34



1  guess I can't really tell you, because I don't

2  teach that class.

3          That would be the first MEMS class where

4  that is covered.

5          We have two MEMS classes.                    10:34

6          MR. CREMEN:  We'll move on.

7          Let's look at the '755 Patent, if you

8  will.

9          (Deposition Exhibit 3,

10          '755 Patent, was marked for

11          identification by the Certified

12          Shorthand Reporter, a copy of which

13          is attached hereto.)

14  BY MR. CREMEN:

15      Q.  You reviewed this patent before you      10:35

16  prepared your initial declaration; correct?

17      A.  Yes.

18      Q.  What is the purpose of a BAW resonator?

19      A.  The BAW resonator goes into a system,

20  receiver/transceiver system, for a wireless      10:36

21  circuit, in most cases.

22          It's also used -- resonators as sensors.

23          They are also used as sensors.  There are

24  a variety of applications for BAW resonators.  The

25  purpose of it as a sensor is to sense the parameter   10:36



1  that you want to sense.

2         I guess I can include another application.

3  There is an oscillator application.

4         That purpose is to put out a very stable

5  output frequency and then there is the filtering        10:36

6  application in communications where the oscillator

7  is also in communication as well, where its purpose

8  is multifold.

9         Its purpose is to pass certain frequencies

10 and reject others, but also to appropriate             10:37

11 impedances to the preceding and following stages,

12 also to lend a temperature stability to the whole

13 system, also to be linear enough that it doesn't

14 generate unwanted spurious signals.

15        So there are multiple purposes that you         10:37

16 can think of for BAW resonators.

17    Q.  Does the '755 patent discuss one of those

18 functions for its BAW resonator?

19    A.  Yes.

20    Q.  Which one?                                       10:38

21    A.  The receiver/transceiver system function

22 which are two of them, I suppose, right, although

23 unfiltered.

24    Q.  That was my next question.

25        Is it discussed in the filter application       10:38



1  you mentioned in your two previous answers?

2      A.  Say that again?

3          Is the discussion of the filters in my

4  previous two answers?

5      Q.  I'll start over.  Sorry.                        10:38

6          Does the '755 patent focus on the use of a

7  BAW resonator as a filter?

8          MR. FUHRER:  Objection.

9          Misleading, calls for a legal conclusion.

10         THE WITNESS:  You said does it?               10:39

11         The answer is yes.

12 BY MR. CREMEN:

13     Q.  What in your expert opinion is the

14 invention of the '755 patent?

15     A.  They are inventing a method to raise the      10:40

16 quality factor of a BAW resonator.

17     Q.  How are they doing that?

18     A.  They are doing that by adding material in

19 an outside region to the side of the BAW resonator.

20     Q.  What effect does that have?                    10:40

21     A.  So that actually changes the acoustic

22 matching between the resonator and the side

23 portion, allowing them to extinguish certain

24 wavelengths.

25     Q.  What do you mean by extinguishing?            10:41



1      A.   Scientifically, they would not exist.

2      Q.   Let's look at page 3 of your rebuttal

3   declaration.

4           Towards the bottom there is a paragraph

5   that starts out "Dr. Bravman contends"; do you see      10:41

6   that paragraph?

7      A.   Yes.

8      Q.   Do you see in the middle of that paragraph

9   where you say:

10          "I do not disagree with this statement."       10:42

11     A.   Yes.

12     Q.   But then you go on to say:

13          "It's not a complete statement."

14          Is that right?

15     A.   Yes.                                            10:42

16     Q.   What would you add to Dr. Bravman's

17   statement to make it complete, in your view?

18     A.   I would add the possibility that energy

19   could come back.

20     Q.   What do you mean by energy could come           10:42

21   back?

22     A.   If energy leaves the -- let me read

23   exactly what he says.

24          If energy leaves the confinement area, it

25   can reflect somewhere else and come back.              10:43

1      Q.  So what language would be added on to the

2  end of Dr. Bravman's statement to make it complete?

3      A.  I'm trying to look if I wrote something on

4  that already.

5      Q.  Take your time.                                   10:44

6      A.  I would say to improve the confinement of

7  electrical engineering therein and reduce loss.

8      Q.  Is that it?

9      A.  I think so, without getting too

10  complicated.                                              10:45

11          This is a short phrase that doesn't really

12  capture everything.  Keeping in line with that, I

13  will just add "and reduce loss."

14      Q.  Going back for a moment to the

15  applications of BAW filters, are BAW filters used     10:45

16  in mobile phones?

17      A.  Yes.

18          Let me add to the previous one.  There are

19  several ways -- what I said was absolutely correct.

20          You can also say and to increase Q.           10:46

21          There are several different ways to attach

22  to that statement.

23          So your second question, yes.

24      Q.  What function does it provide to mobile

25  phones?                                                10:46



1      A.   They remove unwanted frequencies and past
2   wanted frequencies and they also do this in a way
3   where they minimize the loss in the passband, which
4   is another way of saying they match to the
5   preceding and succeeding stages.  That's enough.          10:46
6      Q.   Let's go to page 4 of your rebuttal
7   declaration.
8      A.   I'm there.
9      Q.   You have reproduced the parties' proposed
10   construction for active region and outer region          10:47
11   here; right?
12      A.   Yes.
13      Q.   Do you have an opinion as to whether one
14   of the parties' construction for active region is
15   broader than the other?                                  10:47
16      A.   Is broader than the other?  I think
17   Akoustis's is broader.
18      Q.   Why do you think that?
19      A.   Because when you are looking at -- did
20   someone say something?                                   10:47
21      Q.   No.
22      A.   I'm sorry, I'm hearing things coming in,
23   it sounds like someone is interrupting me.
24           That's why I'm asking if someone said
25   something.                                               10:48



1      Q.   Continue, I'm sorry.

2      A.   Sometimes you are very quiet, in the

3   beginning, so I can't tell.  It's not a huge issue

4   here.

5           So the reason why I think that Qorvo's in      10:48

6   saying it is the region that is electrically

7   driven, electrically driven is a small region of

8   the entire BAW resonator and certain embodiments of

9   them.

10          What electrically driven is what is           10:48

11  between the electrons within the electric fields

12  and that doesn't capture all of the BAW resonator.

13          So if you have a BAW resonator with --

14  I'll just stop there.

15     Q.   How is Akoustis's proposed construction       10:48

16  different from that?

17     A.   So motional current, where the motion is

18  important, most people will just say current.  I

19  will add "motional" to it.

20          To emphasize the motion of the device is      10:49

21  important.  The motion that gives the purpose of

22  the device is important.

23          So the drive does create that motion and

24  the driver between the electrodes.

25          But there are devices that have electrodes     10:49



1  in other places where you are not applying a

2  voltage to those electrodes, yet they are still

3  moving.

4        They are still providing the purpose of

5  the device and that they are actually delivering      10:49

6  the output current which ends up being the motional

7  current.

8        So the Qorvo construction misses that

9  part.

10        The Akoustis construction includes it by      10:50

11  focusing on the current, the motional current.

12    Q.   Could you turn to the '755 patent for a

13  moment?

14    A.   Yes.

15    Q.   Let's look at Figure 2B.                       10:50

16    A.   Okay, I'm there.

17    Q.   Would applying either parties'

18  construction to the BAW resonator in Figure 2B

19  result in a different identification of an active

20  region?                                               10:51

21    A.   Yes.

22    Q.   How so?

23    A.   So the specification clearly says that the

24  active region includes not only the piezoelectric

25  layer, between those dotted lines, the Bragg          10:51



1  reflector at the bottom.

2          In the Qorvo construction, the electric

3  field is between the top electrode and the bottom

4  electrode.

5          So it's the only electrically driven        10:51

6  portion of the piezoelectric layer.

7          So it would include only the piezoelectric

8  layer as the active region and would miss the Bragg

9  reflector below, because the Bragg reflector is not

10 driven electrically.                                 10:52

11         There are not electric fields through it

12 that are creating the piezoelectric drive for that

13 layer.

14         In fact, the Bragg reflector, in fact, is

15 being driven acoustically, not electrically.         10:52

16         So that's the reason why the Qorvo

17 construction is not consistent with the

18 specification.

19     Q.  Okay.  Let's look at page 12 of your

20 initial declaration.                                 10:53

21     A.  Okay.  I'm there.

22     Q.  Actually, I'm sorry, start on page 11, I'm

23 going to ask you some questions about the paragraph

24 that bridges pages 11 and 12, in particular the

25 sentence starting five lines up from the bottom of   10:54



1   11, starting with, "I disagree with Qorvo's

2   suggested plain and ordinary meaning..."

3           You want to take a quick read through that

4   to the end of the paragraph and then I'll ask you

5   some questions.                                          10:54

6       A.  To the end of the paragraph, even on page

7   12.  I read it.

8       Q.  Let's start on the second line of page 12,

9   you say the term electrically driven is not a

10  well-defined term of the art; do you see that?          10:55

11      A.  Yes.

12      Q.  What do you mean by that?

13      A.  So there is a large number of resonators

14  in the art, there are resonators that are

15  electrostatically driven, which means there's no        10:55

16  piezoelectric between the electrode and the actual

17  resonator.

18          In that type of device, it's just the

19  force of the electric fields that actually actuates

20  the resonator.                                           10:56

21          The piezoelectric device, of course, we

22  know the force that actuates the resonator is the

23  stress that is generated within the piezoelectric

24  as a response to the electric field.

25          So there could be confusion between those       10:56



1  two there.

2       A lot of times when people say

3  electrically driven mean the ones that are

4  electrostatically driven.

5       When a person is referring to driving a          10:56

6  piezoelectric device, they are saying

7  piezoelectrically driven.

8       There is a little bit of confusion there

9  in using that term.

10     Q.  To your knowledge, how many U.S. patents       10:57

11  are you listed as an inventor on?

12     A.  So I kind of lost count in my count -- my

13  count may not be accurate.

14      There are some patents that issued, I was

15  not aware of, I suppose.  I think 30 or                10:57

16  thereabouts.

17      But if I go online and how many patents I

18  have, some places say 60.  There is a good number.

19     Q.  Do you recall reading the term

20  "electrically driven" in your patents?                 10:57

21     A.  I often use capacitively driven or

22  capacitive transducer or capacitively transduced;

23  it's possible I would have said electrically

24  driven, which would be more appropriate for what I

25  do because I have electrostatic devices.               10:58



```
1          I also do piezoelectric as well.  But a

2     lot of my stuff is electrostatic.

3          Q.  Is it your opinion that a person of

4     ordinary skill in the art would not know what

5     electrically driven means in the context of the    10:58

6     '755 patent?

7          A.  No.  I think they would understand that

8     it's where the fields are.

9          Q.  What do you mean by where the fields are?

10         A.  Between the electrodes that the voltages   10:59

11    are applied across.

12         Q.  Now, the same paragraph I had you read,

13    the fifth line down at the very end, it begins,

14    "For example..."

15         Do you see that?                               10:59

16         A.  I'm not seeing that, are you on page 12?

17         Q.  Yes.  Page 12, fifth line down,

18    "Electrically driven could mean..."

19         A.  I see that.

20         Q.  Why did you include this list of examples? 11:00

21         MR. FUHRER:  Objection, vague.  Confusing.

22    Calls for speculation.

23         THE WITNESS:  I included it to explain why

24    someone could be confused by electrically driven.

25    BY MR. CREMEN:                                       11:00
```



```
 1       Q.   At the end of the list of examples, you
 2  mention flexural mode.
 3            Then in parens, you say:
 4            "(Which is not the mode of interest."
 5            Do you see that?                            11:00
 6       A.   Yes.
 7       Q.   What is the mode of interest?
 8       A.   Depends on the device, depends on the
 9  purpose.
10       Q.   What is the mode of interest in the        11:01
11  context of the '755 patent?
12       A.   It's the longitudinal mode, the
13  extensional mode.
14       Q.   What is the end function of that mode?
15       A.   What is the end function of that mode?     11:01
16            It is to pass a frequency.
17            I heard a sound, but I don't think someone
18  was saying something.
19       Q.   I wasn't.  There may be some background
20  noise.                                               11:02
21            When you say pass a frequency, is that to
22  function as a filter?
23       A.   Yes.
24            That's the filtering function.  There are
25  other functions like you mentioned before.  But      11:02
```



 1  that would also influence the impedance.

 2      Q.  Are there other words that are used to --

 3  hold on one second.

 4          I was trying to scroll up to see the

 5  phrase you used for the mode of interest.          11:03

 6          What was the phrase you used?

 7      A.  You mean the thing that says:

 8          "...or that a suspended piezoelectric

 9  layer (as in an FBAR) is driven into a flexural

10  mode..."?                                          11:03

11      Q.  Yes.

12          When we were discussing what mode was not

13  of interest, I asked you what mode was of interest

14  and you said something longitudinal.

15          What was the phrase you used?              11:03

16      A.  You mean the word that I used?  It's

17  called either longitudinal or extensional mode.

18      Q.  Is the longitudinal or extensional mode

19  called other things in the art?

20      A.  Thickness mode.                            11:04

21      Q.  Anything else?

22      A.  Nothing comes to mind.

23      Q.  Does anyone called it the bulk mode of

24  vibration?

25      A.  People will call it that, but there are    11:04



 1  many bulk modes.

 2        That would not be -- that probably would

 3  not be specific enough.

 4     Q.  Why would not be specific enough in the

 5  context of the '755 patent?                              11:04

 6     A.  In the context of the '755 patent, a bulk

 7  mode means that the mode is throughout the

 8  thickness of the resonator.

 9        When you ask that question, I come to

10  think what other modes could be used for the --          11:05

11  some people do use other modes.

12        But I would say that -- if I know -- it's

13  a company doing -- I would say people do use other

14  modes.

15     Q.  Okay, let's look at the very last sentence      11:05

16  of that paragraph I just had you read, starting:

17        "Rather, one must specify the result of

18  the driving..."

19        Do you see that?

20     A.  Yes.                                              11:06

21     Q.  What is a result of the driving in your

22  opinion?

23     A.  So the result of the driving is the

24  purpose of the resonator, meaning to deliver a

25  current or a voltage, and to present the right          11:06



1  impedances to the first and second stages, and to

2  elicit the right amount of linearity, to elicit the

3  right amount of temperature and sensitivity.

4      All of those are associated with device

5  energy, resonator energy, which is captured by the    11:07

6  motional current and the motional elements.

7      Q.  In the context of the '755 patent, is not

8  the ultimate result of the driving provided a

9  filtering function?

10     A.  It's one of the results.                       11:07

11     Q.  And the parameters you described in your

12 previous answer, aren't those ways to arrive at the

13 ultimate filtering function of the BAW resonator?

14     MR. FUHRER:  Objection, misleading,

15 mischaracterizing.                                      11:08

16     THE WITNESS:  The filtering function is to

17 pass certain frequencies from other frequencies.

18     You can do that with an impedance matched

19 or not.

20     You would rather do impedance matched to     11:08

21 the preceding and succeeding stages.

22 BY MR. CREMEN:

23     Q.  If I were to select a BAW resonator for a

24 particular application in a mobile phone, I would

25 select it for its filtering capability; correct?      11:09



 1      A.   Not necessarily.

 2           You may select it for its power handling.

 3           You may select it -- assuming that it's

 4  for a filtering capability, there are many other

 5  things you have to worry about.                      11:09

 6      Q.   Let's look -- we'll go a few more minutes

 7  and take a quick break.

 8           Let's look at page 7 of your rebuttal

 9  declaration.

10      A.   Okay, I'm there.                             11:10

11      Q.   The last -- I'm looking at the second full

12  paragraph that starts:

13           "While the specification describes..."

14           Do you see that?

15      A.   Yes.                                         11:10

16      Q.   And the last three lines of that

17  paragraph, I'd like you to take a quick read of

18  that and then I'll ask you a question.

19      A.   I'm going to read the whole paragraph.

20      Q.   Sure.                                        11:11

21      A.   I have read it.

22      Q.   In the second to last line, you say:

23           "At best it is in short-hand used by the

24  patentees."

25           I want to know what you mean by             11:12



 1  short-hand?

 2      A.   The specification makes clear that the

 3  active region includes not only the piezoelectric

 4  layer but also the Bragg reflector.

 5          Electrically driven does not include all          11:12

 6  of that, as I explained before, because the

 7  electric fields are only around the piezoelectric.

 8          So it's basically a term they are using to

 9  capture that the active region is both, the

10  piezoelectric and the Bragg reflector.                     11:12

11          But clearly, it's not -- that word itself

12  doesn't capture them both.  It's kind of a

13  short-hand.

14      Q.   Why does it not capture them both?

15      A.   Because electrically driven, the fields         11:13

16  are only around the piezoelectric.  That's what is

17  electrically driven.

18          The fields are not around the Bragg

19  reflector.

20      Q.   Let's look at page 13 of your initial           11:13

21  declaration.

22      A.   Okay, I'm there.

23      Q.   On page 13, 14 and 15, there are a series

24  of bullet points and blocks of texts, do you see

25  those?                                                     11:13



1        A.   Yes.

2        Q.   Are these intended to be block quotes from

3   the references you identified or your explanation

4   or some mix of that?

5        A.   Not all of them are quotes.                      11:14

6            But some of them are -- some of them are

7   and some of them are figures and some of them are

8   other things.

9            They help with the explanation.  They help

10  with the understanding of the description, the        11:14

11  construction.

12       Q.   Let's look at the reference -- the

13  reference and the bullets identified on page 13,

14  about halfway down to R.J. Besson.

15           Do you see that?                               11:14

16       A.   Yes.

17       Q.   In the first bullet point, are you

18  comparing the dormant region or dormant parts, I

19  guess it says here, to the outer region in the '755

20  patent?                                                11:15

21       A.   Yes, there is a comparison there.

22           I'm not sure I was trying to do that.

23  What I'm trying to do is show the active region can

24  be someplace that -- where the electrodes -- I'm

25  just trying to show the active region.                 11:15



1          I'm saying this is an example of the
2     active region.
3          Q.  Is the dormant region -- dormant part of
4     Besson equivalent to the outer region in the '755
5     patent?                                              11:15
6          MR. FUHRER:  Objection, leading, calls for
7     a legal conclusion.
8          THE WITNESS:  It's obviously not the same.
9     It's different materials.
10          In terms of not being in the active        11:16
11     region, that's what it is.  It's not in the active
12     region.
13     BY MR. CREMEN:
14          Q.  Is it your opinion that no motional
15     current density as you phrased it in your          11:16
16     definition of active region would be present in the
17     outer region?
18          A.  If there is any present in the outer
19     region, that should be considered as part of the
20     active region.                                      11:17
21          Q.  So if there is any motional current
22     density in the region of a BAW resonator, it would
23     be the active region; is that right?
24          A.  Yes, inasmuch motional current captures
25     the purposeful motion of the device -- of the      11:17



1    resonator.

2        Q.   What do you mean by purposeful motion?

3        A.   The motion that contributes to the current

4    motion of the device.

5             That then determines the ability to pass          11:17

6    or reject frequencies pursuant to certain

7    impedances, maximize the Q, et cetera.

8        Q.   Could there be some nonpurposeful motion

9    in the outer region under your definition?

10       A.   I don't know -- could there be a                   11:18

11   nonpurposeful, my answer is I don't think so.

12            I think any time you have motional

13   current, it's purposeful.

14            It determines the impedances.  It

15   determines what frequencies are passed or rejected.      11:19

16   It determines how much energy is lost.

17            It determines a lot of the things trying

18   to deter energy from being lost.

19            It determines Q.

20            It's a very good characterization of all         11:19

21   the purposes of the resonator.  I'm trying to think

22   of -- to your question, whether there are any that

23   are not and I'm not coming up with any right now.

24       Q.   Is there a difference between electrical

25   (phonetic) current and motional current density?        11:19



 1      A.  I would not say so, no.

 2          I think they are pretty much the same

 3  things.  Multiply the density by the appropriate

 4  volume of area component to get the motional

 5  current.                                              11:20

 6          MR. CREMEN:  Let's take a five-minute

 7  break and we can pick up again at 2:30 Eastern.

 8          (Whereupon, the proceedings

 9          recessed at the hour of

10          11:20 A.M. until 11:30 A.M.)               11:22

11  BY MR. CREMEN:

12      Q.  Let's look at claim 1 of the 755 patent,

13  if you will turn to that?

14      A.  I'm there.

15      Q.  I'm going to ask you some questions about   11:31

16  the density of mechanical energy term.

17          If we look at the final clause of claim 1,

18  that's at column 1, lines 47 through 51, within a

19  range of values --

20      A.  Yes.                                          11:31

21      Q.  This is the clause that includes the

22  density of mechanical energy term; right?

23      A.  Yes.

24      Q.  Does the language of the claim itself that

25  we're looking at require the density of mechanical   11:31



 1  energy be measured over the full volume of the

 2  outer region?

 3       A.  The language of the claim in my

 4  interpretation is yes.

 5            I can see others may not think so.          11:32

 6       Q.  So the language of the claim states that

 7  density is measured over the full volume of the

 8  outer region?

 9            MR. FUHRER:  Objection, mischaracterizes.

10            THE WITNESS:  When I read density of the    11:32

11  mechanical energy in the outer region, I think of

12  the density in the outer region.

13  BY MR. CREMEN:

14       Q.  You don't see the words "outer region" in

15  this portion of the claim; right?                      11:32

16            MR. FUHRER:  Objection --

17  BY MR. CREMEN:

18       Q.  Let me rephrase.

19            You don't see the words "full volume" in

20  this portion of the claim; correct?                    11:32

21       A.  No, I don't.

22       Q.  How would you measure a density of

23  mechanical energy in the outer region?

24       A.  I would determine the energy in the outer

25  region and divide it by the volume.                    11:33



1      Q.  How would you measure the density of

2   mechanical energy?

3      A.  How would I measure the density of

4   mechanical energy -- how can I measure that?

5          The specifications simulates it.  That's          11:33

6   one way to get at it.

7      Q.  Are there other ways?

8      A.  Probably are, yes.

9      Q.  Can you think of any?

10     A.  Maybe an optical technique or something,          11:34

11  using light that can penetrate into the layers of

12  the materials to pull off the energy in different

13  places that you would then sum, then divide by the

14  volume to get density.

15     Q.  Can you think of any other ways?                   11:34

16     A.  Maybe, given time.

17     Q.  I'll be asking questions, if any more pop

18  into your mind, let me know.

19         You mentioned that in this '755 patent,

20  the density of mechanical energy is modeled; is          11:35

21  that right?

22     A.  Is modeled?

23         What do you mean by is modeled?

24     Q.  I was trying to use the word you used.

25  Maybe I misstated it.                                     11:35



1          Sorry, simulates.

2      A.   Simulated.

3      Q.   So earlier you mentioned that the '755

4  patent simulates the density of mechanical energy;

5  is that right?                                           11:35

6      A.   Yes, it's one of the figures.

7      Q.   In your experience, what inputs are needed

8  for that simulation?

9      A.   So one way to simulate that would be

10 through solid model simulation (phonetic).              11:36

11         You would need to create a solid model for

12 the device, which is basically drawing up the

13 device and dividing it up into elements.

14         These elements would then be

15 mathematically connected by boundary conditions and    11:36

16 the trend (phonetic) relationships that govern how

17 this thing behaves.

18         And you can then do a stress or strain

19 plot for this to determine energy or energy will be

20 a function of either the stress or the strain.          11:36

21         Each of these elements would be the volume

22 over which you would be determining that energy.

23 You would divide that energy by the volume to get

24 the density.

25     Q.   Let's go back to the last item on Claim 1      11:37



 1  of the '755 patent that we were looking at a moment

 2  ago.

 3      A.  Okay.

 4      Q.  Would you agree with me that this claim

 5  element is comparing two resulting densities of          11:37

 6  mechanical energy based on a value of N?

 7      A.  Yes.

 8      Q.  Where does the mechanical energy referred

 9  to in this portion of the claim come from?

10          MR. FUHRER:  Objection, vague.                   11:38

11          THE WITNESS:  Where does it come from?

12          It comes from the initial excitation in

13  some way.

14  BY MR. CREMEN:

15      Q.  Initial excitation of what?                      11:38

16      A.  Of the system, resonator and all the

17  sources.

18      Q.  Where does the excitation occur?

19      A.  The initial excitation is coming from the

20  voltage coming in, which is the electrodes.             11:38

21      Q.  What does the voltage across the

22  electrodes cause?

23      A.  It causes the piezoelectric to move.

24      Q.  In what region as defined by claim 1 does

25  that occur?                                              11:39



 1          MR. FUHRER:  Objection, misleading.

 2          THE WITNESS:  In what region as defined by

 3   claim 1 does that occur.  It occurs in the active

 4   region.

 5          However some of that energy is not coming          11:39

 6   just from the electrical.

 7          So the energy going into the Bragg

 8   reflector underneath is acoustically driven.  But

 9   it is a total energy.

10   BY MR. CREMEN:                                            11:39

11      Q.  Let's look at 16 of your initial

12   declaration.

13      A.  Okay, I'm there.

14      Q.  Feel free to read from the beginning of

15   this paragraph on the previous page.                      11:40

16          My question is -- the second line, you

17   say:

18          "What a person skilled in the art is

19   mainly concerned about..."

20          What do you mean, concerned about?                 11:40

21      A.  That's a mis-phrase, actually.  I don't

22   think -- I guess the professor in me is just trying

23   to explain things.  This is sort of -- that's the

24   issue with me.

25          I like to explain things.  So I'm                  11:40



1  over-explaining things here.

2        The main statement here is that the

3  specification revolves around the total energy

4  lost.

5        It doesn't matter whether people agree          11:41

6  with it.  It's good that people agree with it.

7        It's a specification that the total energy

8  lost is important -- not important, but is the

9  purpose of this invention, to reduce total energy

10 lost.                                                  11:41

11    Q.  Where does the specification say that?

12    A.  Near the beginning, when it talks about Q

13 and energy going into the substrate.

14    Q.  In your experience, what are ways to

15 measure energy lost?                                   11:42

16        MR. FUHRER:  Objection, vague.

17        THE WITNESS:  Q is a good parameter to

18 determine the ratio between the energy and the

19 purposeful -- the useful energy in the resonator

20 over the energy lost.                                  11:42

21 BY MR. CREMEN:

22    Q.  What do you mean by useful energy?

23    A.  I mean the energy in the active region,

24 what I should say.

25        We discussed this in length.  It creates       11:42



1  motional current -- motional current responsible

2  for the passing or rejection of filters,

3  responsible for impedances, and responsible for all

4  sorts of other things that we talked about.

5      Q.  How do you calculate the ratio between the      11:43

6  useful energy and the energy lost?

7      A.  You take all of the energy in the active

8  region and you divide that by all the energy lost

9  outside of that active region.

10     Q.  How do you measure those two energies?        11:43

11     A.  So there are ways to do that in some of

12  the references that I provided, the extrinsic

13  evidence, for example, the one on PML, the use of

14  PML layers capture the energy lost and determine

15  the energy in the resonator.                         11:44

16         That's one way to do it.

17     Q.  Any other ways?

18     A.  Any other ways to do what, to measure the

19  different energies to measure the Q -- to determine

20  the Q?                                               11:44

21     Q.  Either one, start with the energy

22  measurement?

23     A.  Energy measurement is an interesting thing

24  -- you could do something like I described before,

25  use some type of optical technique.                  11:44



1          There are waves that can penetrate optical
2   waves or ortonic (phonetic) waves that can
3   penetrate into the device and you can visualize and
4   determine stresses and strains this way.
5          You can do simulation techniques like I          11:44
6   just described which is paper which I talked about
7   even with these figures that are in the
8   specification and you can measure Q.
9          Q can be measured in a variety of
10  different ways.                                           11:45
11         You can ring the device and monitor the
12  ring down or their relationship with -- detach the
13  ring down towards the Q.
14         You can measure the frequency response of
15  the device, take the frequency divided by the 3B        11:45
16  (phonetic) frequency.
17         You can use "S" parameter plots to try to
18  do this.
19         There are a variety of ways to get the
20  quality factor.                                          11:45
21         In each case, the quality factor you are
22  getting is of the entire device and the entire
23  region.
24     Q.  Let's look back at claim 1 of the '755
25  patent, please.                                          11:46



 1       A.  Yes, I'm back there.

 2       Q.  Does claim 1 of the '755 patent recite any

 3   parameters of energy lost?

 4       A.  It compares a density of energy before and

 5   after.                                                    11:46

 6           But yes, we're talking about energy lost.

 7       Q.  Why do you think that is talking about

 8   energy lost?

 9       A.  There is a difference in the levels of

10   energy that you have there.                               11:47

11       Q.  Is there any requirement in claim 1 of a

12   particular energy lost value?

13           MR. FUHRER:  Objection.  Vague.

14           THE WITNESS:  It doesn't specify the

15   specific value.  It's comparative.                        11:47

16   BY MR. CREMEN:

17       Q.  Does claim 1 require a particular Q value?

18       A.  No.  But it compares them.

19           It compares Q values -- or it effectively

20   does.  It compares energy.                                11:48

21       Q.  Does the amount of energy in a particular

22   region of the resonator without knowing more

23   indicate a particular Q value?

24       A.  The amount of energy in a particular

25   region without knowing more?                              11:49



1          I'm not sure what you mean by this.

2      Q.   Earlier you said that the Q value is the

3  ratio between useful energy and energy lost;

4  correct?

5      A.   Yes.                                          11:49

6      Q.   If I did not know the useful energy value,

7  I only knew energy lost in terms of density of

8  mechanical energy in the outer region, would I be

9  able to determine a Q value?

10      A.   To determine Q value, you need to have the   11:50

11  energy in the active region, too.

12          To determine Q value, you need the total

13  energy in the active region and the total energy in

14  the outer region, assuming that the loss is

15  occurring in the outer region.                        11:50

16      Q.   Let's look at --

17      A.   I should note that the patent is not

18  looking for the Q value.  The specification is

19  looking for the change in Q.

20      Q.   Would you agree that the specification is    11:50

21  looking to the change in the density of mechanical

22  energy in the outer regions; right?

23      A.   As it relates to Q.

24      Q.   I thought we agreed that measuring only

25  the density of mechanical energy in the outer        11:51



1  region would get you Q?

2      A.  It can get you the difference in Q.

3      Q.  Even without knowing the energy in the

4  active region?

5      A.  It can give you the factor that Q                11:51

6  increases, yes, it can, because if you are putting

7  the same energy in, the energy in the active region

8  would be the same for both.

9          So it divides out when you take the ratio.

10     Q.  Okay, let's look -- I think we were on         11:52

11 page 16 of your initial declaration.  But if we

12 weren't, let's go back to that page.

13     A.  I'm there.

14     Q.  Halfway down the page, there is a

15 beginning of a paragraph that starts with:            11:52

16         "The Akoustis construction is

17 necessary..."

18         Do you see that?

19     A.  Yes.

20     Q.  In this sentence, you say that the phrase     11:52

21 density of mechanical energy in the outer region

22 opens too wide a possibility of regions where

23 density can be determined; right?

24     A.  Yes.

25     Q.  What do you mean by too wide?                  11:52



1      A.   I explain it in the sentences that follow.
2   There is a for example.

3           The typical scenario, it could be a small
4   region outside the device of the active region
5   where the energy density is higher than N equals 1.          11:53

6           At the same time, another small region
7   where the energy density is lower than when N
8   equals 1.

9           The fact that there is a region where the
10  energy density is lower doesn't mean the total                11:53
11  energy lost is lower.

12          The specification says the purpose of this
13  invention is to raise the Q.

14          You will fool yourself if you think just a
15  small portion or you have to -- to raise the Q --            11:53
16  scratch that, you will fool yourself.

17          Let's say the definition of a Q is the
18  total energy in the active region divided by the
19  total energy in the outer region.

20          If you are picking just some small                    11:53
21  portion, you are not getting the total energy.

22          Beyond that, when you make a change to a
23  resonator like this -- I can say in general, it can
24  change to anything.

25          There is always something that gets                   11:54



1  better.  There is always something that doesn't get

2  better and they happen in different spacial

3  locations.

4       So you really need to get the information

5  of volume, enough of a volume, in order to get the        11:54

6  answer.

7       Q.  Would a person of ordinary skill in the

8  art understand --

9       A.  I think so --

10      Q.  -- would understand that concept?                11:54

11      A.  Yes, I think so.  I think it's illustrated

12  in the figures that are in the specification.

13      Q.  In your answer, you mentioned that you

14  would need to get the information of volume or

15  enough of a volume in order to get the answer.           11:55

16      What do you mean by enough of a volume?

17      A.  So we know there is going to be peaks and

18  valleys of energy in this.

19      There is going to be a spot where the

20  energy went up, a spot where the energy went down.        11:55

21      If you look at the first spot, you go, oh,

22  the energy went up, so I'm losing more energy.

23      When you look at the second spot, oh, the

24  energy went down, so I'm actually helping myself

25  with this invention.                                      11:55



 1          But it's really the sum of those two that
 2   you have to look at in order to know whether this
 3   invention is doing its purpose.
 4          So you need enough of -- you need to
 5   capture the peaks and valleys.                                11:55
 6      Q.  A person of ordinary skill would
 7   understand that?
 8      A.  Yes.
 9          I guess I could say a person of not skill
10   would understand a thing like this.                          11:56
11          If you have a river flowing and you put a
12   rock in it, the velocity of the water will change
13   on that rock.
14          It will slow down where that rock is.
15          If you picked that rock up, say a boulder            11:57
16   and move it to another location, there's a
17   different location where the velocity has changed,
18   but the total flow hasn't changed.
19          I think people do understand that things
20   go up and things go down and whether you'd really            11:57
21   gotten the purpose of this specification or other
22   things on the outside, you have to take into
23   account all of the things that are happening.
24      Q.  Let's go to page 17 of your initial
25   declaration.                                                  11:57



1          Five lines down, that paragraph starting:

2          "Qorvo's proposed construction..."

3          Do you see that?

4     A.   Yes.

5     Q.   Okay, feel free to read as much of the          11:58

6   paragraph you would like.

7          My question is going to revolve around the

8   second sentence starting:

9          "The leaked amount of energy can be

10  reflected and returned to the active regions, in       11:58

11  which case it is not lost."

12         Tell me when you are ready.

13    A.   Okay.

14    Q.   Is it fair to say that you consider leaked

15  and lost to not be synonymous?                          11:58

16    A.   From a very exacting point, they are not

17  synonymous, for the reasons I gave.

18    Q.   What is the difference between leaked and

19  lost?

20    A.   Leaked means the energy has gotten out.          11:59

21         Lost means it's successfully made it

22  through the substrate, through the package and it's

23  gone.

24         Leak is possible because energy going

25  laterally is what you are talking about right now,      11:59



1  you can have some other reflecting interface there

2  that could reflect this energy back, in which case

3  it's gotten back into the active region and was not

4  lost.

5       Q.  What is an example of a reflecting          11:59

6  interface?

7       A.  I suppose just another device, right, Type

8  1, Type 2, dispersion-type design.

9            If you have these devices on a chip and if

10 you designed them carefully, there is a certain way   12:00

11 you can reflect off of another device.

12      Q.  In the previous answer, you mentioned

13 leaked means the energy has gotten out?

14      A.  Yes.

15      Q.  What do you mean by gotten out?            12:00

16      A.  It's made it through the boundary of the

17 captured energy.

18      Q.  What is the boundary of captured energy?

19      A.  So in a BAW device, the electrode, because

20 of the mass loading, you can confine the energy       12:00

21 within that BAW device, and different types of

22 designs can help to confine that energy such that

23 there are forbidden frequencies in the other part

24 (phonetic) of the device.

25      Q.  Is there an interface between the active     12:01



1  and outer regions?

2      A.  Meaning is there another material

3  separating them?

4          What do you mean?

5      Q.  Let's focus a little more.                        12:02

6          In the embodiments of the '755 patent, is

7  there any boundary between the active region and

8  outer region?

9          MR. FUHRER:  Objection, vague.

10         THE WITNESS:  The word "boundary" elicits    12:02

11  the idea there is some different material there.

12         In that case, there is not.

13         But there is a difference in the two,

14  because one of them is mass loaded differently than

15  the other.                                              12:02

16  BY MR. CREMEN:

17     Q.  Is there a reflecting interface between

18  the active and outer regions in the embodiments of

19  the '755 patent?

20     A.  Yes.                                             12:03

21     Q.  What is that?

22     A.  The reflective interface is where the mass

23  loading is different, so where the electrode is and

24  bordering different things that you put there to

25  load that portion differently than in the outer       12:03



1  region.

2       Q.  Does that reflecting interface reflect

3  energy in the active region?

4       A.  Yes, for certain frequencies, depending on

5  your design.  It all depends on design.                    12:03

6       Q.  Is it true to say that leaked energy and

7  lost energy are both types of energy that pass from

8  the active region to the outer region?

9       A.  Yes.

10      Q.  In your opinion, is it what happens to       12:04

11 that energy once it gets to the outer region is the

12 difference between those two types of energy?

13      A.  Yes.

14      Q.  What happens to the lost energy once it

15 enters the outer region?                                   12:04

16      A.  Loss occurs when you have the energy

17 suffering lost mechanisms, they dislocate.  They

18 make their way to a substrate or a boundary that is

19 not reflective.

20          Lost energy comes from leaked energy, but    12:05

21 they are not the same.

22      Q.  What happens to the leaked energy once it

23 enters the outer region?

24      A.  It can be lost or it can return.

25      Q.  If you are measuring the density of          12:05



1  mechanical energy in the outer region, is there any

2  way to tell whether that energy you are measuring

3  is leaked or lost energy?

4      A.  I'm not sure that's the real question you

5  -- I should answer your question.                        12:05

6         Is there any way to tell whether it's

7  leaked or lost energy?

8         You can tell if the energy has been lost

9  by the differences in the densities, in the two

10 cases.                                                    12:06

11        If you are saying if you can identify

12 whether this portion and that portion is just

13 leaking or whether it's lost energy, too, but

14 that's a more difficult question to answer.

15        That's why in order to get the Q or the       12:07

16 change in Q, you have to look at the whole volume.

17     Q.  The latter question was what I was more

18 interested in, your opinion on.

19        If you are simply measuring energy in --

20 strike that.                                              12:07

21        If you are simply measuring the density of

22 mechanical energy in the outer region and you don't

23 know the other energy values for the device, is

24 there a way to determine whether that measured

25 energy density is lost energy versus leaked energy?      12:07



1      A.  I guess my answer is, really it doesn't

2   matter.  The reason I'm having trouble with your

3   first question, because you are talking about lost

4   energy and leaked energy.

5           Lost energy is no longer there.  It's        12:08

6   lost.

7           So what you are measuring is basically the

8   leaked energy that remains after the losses.

9           So when you ask, can you tell whether the

10  energy is leaked energy or lost energy, no, you      12:08

11  can't.

12          Because the lost energy is not there any

13  more.

14          You are only seeing the leaked energy and

15  you can infer where there has been an energy loss     12:08

16  whether you have less or more energy.

17          Your first question I was trying to answer

18  it, this is the reason it took so much time doing

19  it.

20          It's not formulated in a way that it can      12:08

21  be answered by me at this time.

22      Q.  Okay, I understand your point.  Thank you.

23          So the energy -- so the density of

24  mechanical energy that you can measure in an outer

25  region is, by definition, leaked energy?             12:09



1      A.  Yes.

2      Q.  Let's look at page 11 of your rebuttal

3   declaration.

4      A.  Okay, I'm there.

5      Q.  Actually, let's skip down to page 12,          12:10

6   looking at the wrong note.

7          On page 12, the first full paragraph

8   beginning:

9          "To be clear..."

10          Do you see that?                              12:10

11      A.  Yes.

12      Q.  The third sentence in that paragraph

13   starts:

14          "A claim on the other hand must be more

15   precise and in this case should provide a more      12:10

16   quantitative measure of energy lost to be

17   sufficiently clear."

18          Do you see that sentence?

19      A.  Yes.

20      Q.  What do you mean by a claim must be more      12:11

21   precise?

22      A.  That's just me putting my professor hat on

23   again and just -- saying something that -- I like

24   to teach people things, but maybe should not be

25   doing it.                                            12:11



1          In this case, the claim is the claim.  We

2    need to interpret the claim.

3        Q.  Does a claim have to be more precise than

4    the specification?

5              MR. FUHRER:  Objection, calls for a legal        12:11

6    conclusion.  Vague.  Misleading.

7              THE WITNESS:  I would say it needs to be

8    precise enough to be used.  I don't know if I can

9    make a comparison between claim and specification.

10   BY MR. CREMEN:                                             12:12

11       Q.  What do you mean by to be used?

12       A.  Not to be used -- I should say to be

13   precise enough to be consistent with the

14   specification where here the specification is

15   looking to raise Q.                                        12:12

16       Q.  To your understanding of claims, does

17   every claim element need a quantitative measurement

18   to be clear?

19       A.  No.

20       Q.  If we look back to Claim No. 1 of the '755        12:13

21   patent, the last clause we've been looking at, let

22   me know when you have it up.

23       A.  I have it up.

24       Q.  I think earlier we agreed that this

25   language requires a comparison of density of             12:14



1  mechanical energy values when -- for different

2  values of that; right?

3      A.  Yes.

4      Q.  Why is that not a quantitative

5  measurement?                                            12:14

6      A.  That is a quantitative measurement.

7      Q.  Okay, let's go to page 10 of your rebuttal

8  declaration.

9      A.  I'm there.

10      Q.  Akoustis's preliminary construction which   12:14

11  you reproduced here says that a density of

12  mechanical energy means a total density over the

13  full volume of the outer region; right?

14      A.  Yes.

15      Q.  What does total density mean?               12:15

16      A.  I think -- that's an average density, is

17  what it is.  It means taking the full volume.

18      Q.  So do you mean -- total density means the

19  average density, in your view.

20      A.  It's the energy you have over that volume   12:15

21  divided by a volume.

22      Q.  What effect does the adjective "total"

23  have on that density?

24      A.  It's opposed as to just chooses small

25  pieces of -- for example, if you look at Qorvo's    12:16



1  construction, it says waves leaked.

2          It doesn't say all the waves leaked.

3          You can take waves in a certain point,

4  location, certain time.

5          It doesn't capture the fact that you have          12:16

6  those peaks and valleys that I talked about.

7          You need to capture that to be able to

8  determine whether the specification purpose has

9  been met.

10      Q.  I think I understand what you mean by          12:16

11  density over the full volume.

12          It's the density over a particular volume;

13  right?

14      A.  Yes.

15      Q.  How does "total" change that phrase?          12:17

16      A.  It may not change it that much; right?

17          It helps to understand that it's all of

18  the density.

19          But maybe it's being said twice when it

20  says the full volume.                                      12:17

21      Q.  Is total redundant to the phrase "density

22  over the full volume"?

23      A.  I'm trying to think and be careful with

24  the wordsmithing here.

25          I'd rather keep it there to make sure all          12:18



1  of the peaks and valleys are accounted for.

2      Q.  Okay, so if you want to keep it there, I

3  guess that makes me ask the question again.

4          What is the difference between the "phrase

5  density over the full volume" and the phrase "total      12:18

6  density over the full volume"?

7      A.  I'm just trying to make sure that we

8  account for all the peaks and valleys, both account

9  for all the peaks and valleys.

10         I'm satisfied with either.                        12:18

11     Q.  I'm trying to make sure I understand your

12  position as to this particular construction and if

13  there is an additional word that we don't need, I

14  would prefer to ignore it.

15         I'm just trying to understand what           12:19

16  particular difference is there between the phrase

17  density over the full volume and total density over

18  the full volume?

19         MR. FUHRER:  Asked and answered.

20         THE WITNESS:  I answered that.                 12:19

21         There's no difference if both the peaks

22  and valleys are accounted for -- if all the peaks

23  and valleys are accounted for.

24  BY MR. CREMEN:

25     Q.  How would density over the full volume not    12:19



1  account for all the peaks and valleys?

2      A.   Total helps to include everything.  Total

3  means you are including everything.

4          Someone may think density over the full

5  volume might not.                                         12:19

6      Q.  Can you give me a particular example of

7  something that would be covered by total density

8  that would not be covered by density?

9          MR. FUHRER:  Objection, vague.  Confusing.

10          THE WITNESS:  Just in looking at, for         12:20

11  example, the Qorvo construction, that construction

12  seems to say there could be some localized region

13  or it could be the full volume.

14          Even with that, someone can interpret as

15  being localized.                                         12:20

16          If the word "total" helps someone making

17  that construction to understand that it can't just

18  be localized, it has to include all the peaks and

19  values, then I want the word "total" there.

20  BY MR. CREMEN:                                           12:21

21      Q.  But doesn't the definition already require

22  that the density be taken over the full volume?

23          MR. FUHRER:  Asked and answered.

24          THE WITNESS:  So the claim itself already

25  says the outer region, which to me shouldn't be         12:21



1  interpreted as the full volume, but obviously

2  people are not interpreting that way.

3        So add "full volume" and add "total" to

4  make sure it's interpreted that way, the way that

5  the specification wants it, the way that the          12:21

6  specification needs for its purpose.

7  BY MR. CREMEN:

8     Q.  In your understanding, density is measured

9  by an amount over a volume; right?

10    A.  Yes.                                            12:22

11    Q.  If we were to assume that the volume of

12 the outer region stays the same, if the amount of

13 energy in that volume increases, would you agree

14 that the density of energy in that volume would

15 increase as well?                                      12:22

16    A.  You are going to want me to use the word

17 "total," if the total energy increases then -- if

18 you mean -- I like using the word "total."

19        Yes, if the energy increases in there.

20        It means all of it, all the peaks and        12:23

21 valleys are the volume, then, yes, density of

22 energy has increased over that volume.

23    Q.  Again, assuming that the volume of the

24 outer region stays the same, is there any possible

25 situation where the amount of energy within a         12:23



1  particular -- in that particular volume could

2  increase without the density of energy and that

3  same volume also increases?

4      A.  No.

5      Q.  And the same for decreasing, right, is          12:24

6  there any situation where the amount of energy

7  within that volume could decrease without the

8  density of energy in that volume decreasing?

9      A.  Let's make sure we're talking about the

10  same thing for these two questions.                     12:24

11      You are adding peaks and valleys to

12  determine that energy and that volume and getting

13  the total energy and you are dividing by that

14  volume.

15      So in that question, yes, the energy          12:24

16  density would decrease.

17      Q.  Let's talk a little about the

18  construction, the section where it say "not

19  excited."

20      Let's go to page 19 of your initial          12:25

21  declaration.

22      A.  I'm there.

23      Q.  The paragraph that starts halfway down

24  page 19, I'd like you to look at -- seven lines

25  down, there is a sentence that starts:              12:25



1          "Qorvo's notion that 'not excited'..."

2          Do you see that sentence?

3     A.  Yes.

4     Q.  It says, "Qorvo's notion that 'not

5  excited' means not 'substantially' excited is          12:26

6  adding an adjective not present...," right?

7     A.  Yes.

8     Q.  So is it your opinion that the phrase

9  "substantially excited" is not supported by the

10  intrinsic record?                                       12:26

11     A.  Yes.

12     Q.  Let's look at page 17 of your rebuttal

13  declaration.

14     A.  I'm there.

15     Q.  Towards the bottom, there is a paragraph      12:26

16  that starts:

17          "Qorvo's notion that 'not excited' means

18  not 'substantially' excited is adding an adjective

19  not present..."

20          Do you see that phrase?                        12:26

21     A.  Yes.

22     Q.  Is this repeating your earlier opinion

23  that the concept of substantially committed is not

24  supported by the intrinsic record?

25     A.  Yes.                                             12:27



1      Q.  I want you to go one page earlier to page

2   16 of your rebuttal declaration.

3      A.  Okay, I'm there.

4      Q.  Is foremost construction substantially

5   created?                                               12:27

6      A.  It's substantively.  You can substitute

7   those two terms and they would be the same.

8      Q.  Let's look at page 19 of your initial

9   declaration.

10      A.  Okay, I'm there.                               12:27

11      Q.  We were just talking about the paragraph,

12   halfway down on page 19.

13      A.  Uh-hmm.

14      Q.  And that paragraph starts out:

15          "Here 'not excited' is interpreted as         12:28

16   absolute."

17          And then you have a listing of things that

18   it does not mean; right?

19      A.  Yes.

20      Q.  Could you let me know all the evidence you    12:28

21   relied on to make these statements?

22      A.  You mean read this paragraph, first?

23      Q.  Yes.

24      A.  Your question was all the evidence I used

25   to come to this?                                      12:29



1      Q.  Yes, what evidence did you rely on?

2      A.  I submitted some extrinsic evidence.

3      Q.  Does the intrinsic record indicate that

4  not excited is absolute?

5      A.  It doesn't indicate the opposite.          12:30

6      Q.  What do you mean by the opposite?

7      A.  It doesn't indicate that it's not

8  absolute, that it's not -- it is not absolute.

9      Q.  Does it indicate one way or the other that

10 it's absolute or not absolute?                     12:30

11     A.  Not to my recollection.

12     Q.  Let's look at Claim No. 9 of the '755

13 patent, let me know when you get to it.

14     A.  I'm there.

15     Q.  Okay, the last clause at column 10, lines   12:30

16 47 or so through 52, there is a clause that starts,

17 "And as such"...; do you see that?

18     A.  Yes.

19     Q.  Is that where "are not excited" appears?

20     A.  Yes.  It appears in another place, too,    12:31

21 Claim No. 3.

22     Q.  Would you agree that this element

23 specifies that the wavelengths that are not excited

24 are those that cause energy leakage into the outer

25 region?                                            12:31



1      A.   That's what it says, yes.

2      Q.   In the context of this claim element, will

3  any wavelength excitation, no matter how small,

4  will result in energy leakage?

5      A.   The way that -- let's see.                       12:32

6           They have acoustically matched.  That

7  wavelength will leak.

8      Q.   In your view, there is not a minimum

9  amount of energy that a wavelength has to have to

10 cause it to leak?                                          12:33

11     A.   If you have a matched interface, it will

12 go through that interface.

13     Q.   No matter how small the energy?

14     A.   To be clear, this is different than the

15 dispersion analysis.  The dispersion analysis, you       12:33

16 make a reflective surface.

17          Here they are saying they are making a

18 matched surface, acoustically matched, which to me

19 is not reflective.

20          So that wavelength should get through.           12:34

21     Q.   No matter how small that energy as part of

22 that wavelength is, it will pass through; is that

23 your opinion?

24     A.   I'm thinking about that.

25          It depends on the degree of matching,            12:34

1  right, and, second, order of facts and different

2  things.

3         But theoretically, it should get through.

4         Your question is vague, because are you

5  talking about how small an energy, I'm not sure          12:34

6  what the smallest of the energy is.

7     Q.  That's what I'm kind of curious about.

8         What about in a practical application, not

9  -- let's leave the theoretical realm, but in a

10 practical application, would there ever be a             12:34

11 perfect acoustic match?

12    A.  Like you said, mathematically,

13 scientifically, yes.

14        Engineering-wise, it would be very

15 difficult to do.                                         12:35

16    Q.  In the real world practical environment,

17 there has to be some minimum amount of energy as

18 part of that wavelength to get it to pass through

19 the active and outer region; right?

20    A.  I think no matter what the energy is, even        12:35

21 if this was not perfectly transmissive, there is

22 some reflection.

23        Even if it's a little bit of transmissive,

24 the energy will get out.

25        Some of that wavelength will reflect and          12:35



 1  some of it will get out.

 2          If it's a little bit transmissive, the

 3  wave will get out.

 4          When you talk about small energy, I'm

 5  trying to think of physical things, physics faculty    12:36

 6  like to think about, and that's where the answer is

 7  taking time for me.

 8          If you have energy heading that direction,

 9  even if you don't have it perfectly acoustically

10  matched, some of it is going to get out.               12:36

11          It has to be perfectly reflective for it

12  not to get out.

13      Q.  Some of it, but not all of it?

14      A.  Well, understand we're talking about an

15  acoustically matched, so the majority will get out     12:36

16  and very small would be reflective.

17      Q.  Let's look at page 18 of your initial

18  declaration.

19          Looking again at Akoustis's preliminary

20  construction, there is a phrase:                       12:37

21          "The whole volume of the active region..."

22          Do you see that?

23      A.  Yes.

24      Q.  What do you mean by "the whole volume of

25  the active region"?                                    12:38



1          A.   I mean the active region as we define it.

2               I guess it hasn't been defined yet, but as

3     we're trying to define it.

4          Q.   Let's look at the '755 patent.  Let's go

5     back to Figure 2B that we were looking at before.        12:38

6               Let me know when you are there.

7          A.   Okay, I'm there.

8          Q.   Can you tell me what the whole volume of

9     the active region would be in Figure 2B?

10         A.   It will be what the specification says it       12:39

11    is, which is going from the passivation layer to

12    the top electrode -- to the Bragg reflector -- it's

13    what is within those dotted lines.

14         Q.   So your opinion is the whole volume of the

15    active region in Figure 2B would be the rectangle       12:39

16    formed by the two dashed lines, the SiO2 layer at

17    the bottom and the passivation layer at the top?

18         A.   This is not my opinion.  This is what is

19    specified in the specification.

20         Q.   Would a person of ordinary skill in the        12:40

21    art normally consider the reflector to be part of

22    the outer region?

23         A.   I'm not sure that matters.  The

24    specification does.

25         Q.   I'm just asking your opinion in general.        12:41



 1  Would a person of ordinary skill in the art

 2  normally include a Bragg reflector in his

 3  definition of active region?

 4       A.  I think some would, yes.

 5       Q.  Are you assuming some would not?                    12:41

 6       A.  You're asking me to speak for someone

 7  else.  Did someone say something?

 8       Q.  No.

 9       A.  You're asking me to speak for someone

10  else.  I can't do that.                                     12:41

11          I'm a person skilled in the art and I

12  would include it, because it would be part of the

13  equivalent circuit of the resonator.

14       Q.  Let's go back to the Claim No. 9 of the

15  '755 patent.                                                12:42

16       A.  I'm getting there.  I'm there.

17       Q.  You would agree with me that the words of

18  the claim do not include the phrase "whole volume

19  of the active region"; right?

20       A.  Yes, it does not include that.                     12:42

21          MR. CREMEN:  Let's take ten minutes, if

22  that's okay.

23          Then we'll get back to it and hopefully

24  wrap this thing up.

25          (Whereupon, the proceedings



```
 1              recessed at the hour of

 2              12:42 P.M. until 12:53 P.M.)

 3              (Deposition Exhibit 4,

 4              '786 Patent, was marked for

 5              identification by the Certified

 6              Shorthand Reporter, a copy of which

 7              is attached hereto.)

 8   BY MR. CREMEN:

 9       Q.  I want to switch gears and talk about the

10   '786 Patent, if you can grab that.                    12:53

11       A.  One second.

12       Q.  You reviewed this patent in the course of

13   preparing your two declarations; correct?

14       A.  Yes.

15       Q.  Could you give me an overview of what this   12:54

16   patent is directed to?

17       A.  This patent is on packaging devices.

18       Q.  How so?

19       A.  Packaging device in a way that it's easy

20   to attach it to a board or bigger system, resurface  12:54

21   mounting or other similar packaging mounting

22   methods that -- and the usual things for packaging,

23   protect the device, et cetera.

24       Q.  Let's look at the first page of the '786

25   Patent.                                               12:55
```



1      A.   I'm there.

2      Q.   The title reads "Communication Filter

3  Using Single Crystal Acoustic Resonator Devices";

4  do you agree?

5      A.   Yes.                                              12:55

6      Q.   You can look at the abstract.

7           The abstract begins "A communication

8  system using a single crystal resonator device"; is

9  that correct?

10     A.   Yes.                                              12:55

11     Q.   Do you know if there is any relationship

12 between a patent's title and abstract and the scope

13 of its claim?

14          MR. FUHRER:   Objection, calls for a legal

15 conclusion.   Vague.                                       12:55

16          THE WITNESS:   I don't know.

17          To me, it'll always be the claim that are

18 the most important part of the patent, at least in

19 my experience.

20 BY MR. CREMEN:                                             12:56

21     Q.   Do you have an opinion as to why the

22 inventors described their filtering system that is

23 using the single crystal?

24          MR. FUHRER:   Objection, calls for

25 speculation.                                               12:56



DR. CLARK NGUYEN Vol. I                    August 10, 2022
QORVO V. AKOUSTIS TECHNOLOGIES                      88

1          THE WITNESS:  You're asking me to put

2   myself in someone else's mind and I can't do that.

3   I don't know.

4   BY MR. CREMEN:

5          Q.  In the embodiments of the '786 Patent,        12:57

6   such as described in Figures 1A through 3, would

7   you agree that the patent describes its

8   piezoelectric layer 120 as being single crystal?

9          MR. FUHRER:  Objection, compound question.

10         THE WITNESS:  I'll have to look at this to       12:57

11  answer that question.  This may take some time.

12  BY MR. CREMEN:

13         Q.  Sure.  I can direct you and maybe we can

14  speed up the process.

15         So in column 3, line 57, the patent            12:58

16  describes its piezoelectric layer 120 as being

17  single crystal; correct?

18         A.  It does say single crystal.

19         Like many patents earlier on, it says this

20  is an embodiment.  There can be other embodiments.      12:58

21         Q.  Then in column 4, line 53, it again

22  describes the piezoelectric layer 120 as being

23  single crystal; right?

24         A.  Yes.

25         Q.  Again on column 5, line 9, again, it again    12:58



1   describes the piezoelectric layer 120 as being a

2   single crystal; right?

3        MR. FUHRER:  Objection, document speaks

4   for itself.  You don't need an expert to tell you

5   whether or not the words are there on the page.          12:59

6        THE WITNESS:  Yes, it does.  There are a

7   lot of them, I know.

8   BY MR. CREMEN:

9        Q.  So my question is, does the '786 Patent

10  ever describe the piezoelectric layer 120 as being      12:59

11  polycrystalline?

12       A.  I actually couldn't tell you without

13  having to read through it again.

14       Q.  Let me ask you a different question.  Do

15  you recall the '786 Patent ever describing its          12:59

16  piezoelectric layer as being polycrystalline?

17       A.  I don't recall, but I'll admit while I'm

18  reading this patent, I'm not thinking about what

19  type of piezoelectric layer it is.

20       This is about packaging.                           12:59

21       Q.  You understand that the parties dispute on

22  this patent as to whether the piezoelectric layer

23  can be a single crystal or both -- either a single

24  crystal or multiple crystal structure; right?

25       A.  I understand that's the dispute.  I don't       13:00



 1  quite understand the dispute, because this is

 2  packaging.  It's device agnostic.

 3          MR. CREMEN:  I think we're just about

 4  done.  Bob, do you have any redirect?

 5          MR. FUHRER:  I do, just very quickly.        13:00

 6

 7                      EXAMINATION

 8  BY MR. FUHRER:

 9      Q.  Doctor, obviously you've been talking for

10  the past four hours about your report.             13:01

11          In your preparing your report, you were

12  presented with four disputed terms; correct?

13      A.  Yes.

14      Q.  Then you were presented with competing

15  constructions for each of those four terms;        13:01

16  correct?

17      A.  Yes.

18      Q.  When you were doing your analysis that led

19  to your final declarations, did you begin each of

20  those term analysis -- disputed term analysis with  13:01

21  the presumption that the term deserved its plain

22  and ordinary meaning?

23          MR. CREMEN:  Objection, scope.

24          THE WITNESS:  Yes, I did.

25  BY MR. FUHRER:                                      13:01



1    Q.  Did you then for each of the disputed

2  terms turn to the intrinsic record to determine

3  whether or not there was evidence in the record to

4  tell you to not use the plain and ordinary meaning?

5           MR. CREMEN:  Objection, outside the scope.     13:02

6           THE WITNESS:  Yes, I did.  I looked to see

7  if the specification was trying to define it as

8  different than the plain and ordinary meaning.

9  BY MR. FUHRER:

10    Q.  Then for each of those terms, did you find    13:02

11  -- for each of those terms, did you find anything

12  in the specification to suggest that the

13  construction should be something other than its

14  plain and ordinary meaning?

15    A.  No.                                              13:02

16           MR. CREMEN:  Objection, outside the scope.

17  BY MR. FUHRER:

18    Q.  Then after making that determination, did

19  you look to see which of the two competing proposed

20  constructions were most consistent with the          13:02

21  specification?

22           MR. CREMEN:  Objection, outside the scope.

23           THE WITNESS:  Yes.

24  BY MR. FUHRER:

25    Q.  For active region, did you find Qorvo's        13:03



1  construction more inconsistent with the

2  specification than Akoustis's?

3          MR. CREMEN:  Objection, outside the scope.

4          THE WITNESS:  Yes, I did.

5  BY MR. FUHRER:                                      13:03

6     Q.  For the active region, can you give me one

7  reason why it is more inconsistent with the patent

8  specification?

9          MR. CREMEN:  Objection, outside the scope.

10         THE WITNESS:  The patent specification        13:03

11 includes the stack of the piezoelectric layer, the

12 electrodes and the Bragg reflector in the active

13 region.  It explicitly includes that, the

14 specification does.  And the Qorvo construction

15 does not.                                            13:03

16 BY MR. FUHRER:

17    Q.  For the term "density of mechanical

18 energy," did you find a reason why the Qorvo

19 construction was more inconsistent with the

20 specification than Akoustis's construction?          13:04

21         MR. CREMEN:  Objection, outside the scope.

22         THE WITNESS:  Yes, I did.

23 BY MR. FUHRER:

24    Q.  What was that?

25    A.  The reason?                                    13:04



 1          The reason is because the specification

 2   made it very clear that the purpose of the

 3   invention is to raise the Q of the device.

 4          And Qorvo's construction does not allow

 5   you to determine whether that's been done.          13:04

 6      Q.  For the longer disputed term, the dispute

 7   being over the "are not excited" terms, did you

 8   find that Qorvo's proposed construction was more

 9   inconsistent with the specification than Akoustis's

10   proposed construction?                              13:04

11          MR. CREMEN:  Objection to scope.

12          I move to strike.  We did not discuss

13   Qorvo's construction in the main part of the

14   deposition.

15          MR. FUHRER:  You can answer.                 13:05

16          THE WITNESS:  Can you repeat the question?

17   BY MR. FUHRER:

18      Q.  Similar to the other two, did you find

19   anything in Qorvo's construction that was more

20   inconsistent than Akoustis's proposed construction  13:05

21   for the "are not excited" disputed term?

22          MR. CREMEN:  Objection, outside the scope.

23          THE WITNESS:  Yes, I did.  The word

24   "substantively."

25   BY MR. FUHRER:                                      13:05



1      Q.   What is that again?

2      A.   The word "substantively" -- are not

3   substantively created.

4      Q.   Why is that inconsistent with the

5   specification?                                              13:05

6          MR. CREMEN:  Objection, outside the scope.

7          THE WITNESS:  The specifications does not

8   use those terms at all.

9   BY MR. FUHRER:

10     Q.   What is the plain and ordinary meaning in      13:05

11  your mind of "are not excited"?

12         MR. CREMEN:  Objection, outside the scope.

13         THE WITNESS:  The plain and ordinary

14  meaning of "are not excited" at all.

15  BY MR. FUHRER:                                              13:06

16     Q.   Was there anything in the specification

17  that instructed you to make sure to apply the plain

18  and ordinary meaning to terms in the claims?

19         MR. CREMEN:  Objection, outside the scope.

20         THE WITNESS:  Can you repeat that            13:06

21  question?

22  BY MR. FUHRER:

23     Q.   Was there anything explicit within the

24  '755 patent specification that made it clear that

25  you should apply the plain and ordinary meaning to     13:06



 1  terms unless otherwise specified?

 2          MR. CREMEN:  Objection, outside the scope.

 3          THE WITNESS:  Was there anything in that

 4  that made it clear we should apply the plain and

 5  ordinary meaning --                                     13:06

 6          MR. FUHRER:  Strike that one.

 7  BY MR. FUHRER:

 8      Q.  I'll bring you up to the '755 patent,

 9  again, please, can you find it?

10          Do you have it in front of you?            13:06

11      A.  Yes.  I have it.

12      Q.  Column 4, line 62, the paragraph begins,

13  "Unless otherwise..."

14          Do you see that?

15      A.  "Unless otherwise defined...," yes.        13:07

16      Q.  Can you review that and tell me whether or

17  not you're familiar with that language for the

18  specification.

19      A.  Okay.

20      Q.  What do you understand that to mean?       13:07

21          MR. CREMEN:  Objection, outside the scope.

22          THE WITNESS:  I understand it to mean that

23  we're to take the plain and ordinary meaning of

24  terms unless the specification tries to redefine

25  them.                                              13:08



 1          In my layman's terms, that's how I

 2     describe it.

 3     BY MR. FUHRER:

 4        Q.  From the three disputed terms from the

 5     '755 patent, did you find anything in the              13:08

 6     specification that you should apply some other

 7     definition or meaning besides the plain and

 8     ordinary meaning?

 9        A.  No.

10          MR. CREMEN:  Objection, outside the scope.        13:08

11          THE WITNESS:  That was a no.

12     BY MR. FUHRER:

13        Q.  With regard to the '786 Patent you were

14     just asked about, could you look at that again,

15     look to Claim No. 1.                                   13:08

16        A.  I'm there.

17        Q.  Do you see the disputed term there in

18     Claim No. 1, the piezoelectric layer?

19        A.  Yes, I see piezoelectric layer.

20        Q.  Do you see the modifier single crystal in       13:09

21     front of it?

22        A.  No.

23        Q.  Is that -- were you applying the plain and

24     ordinary meaning to that term similar to the way

25     you did for the '755 patent terms?                     13:09



```
 1           MR. CREMEN:  Objection, outside the scope.
 2           THE WITNESS:  Yes.
 3  BY MR. FUHRER:
 4      Q.  In your expert opinion, what is the plain
 5  and ordinary meaning of piezoelectric layer?          13:09
 6           Is it more in line with Akoustis's
 7  construction or Qorvo's construction in view of the
 8  specification?
 9           MR. CREMEN:  Objection, outside the scope.
10           THE WITNESS:  It's more in line with        13:10
11  Akoustis's.
12  BY MR. FUHRER:
13      Q.  Why is that?
14           MR. CREMEN:  Same objection.
15           THE WITNESS:  Because a person of ordinary   13:10
16  skill would understand that.  That's what is taught
17  in classes.  That's what is seen in classes and
18  papers, all sorts of literature.
19  BY MR. FUHRER:
20      Q.  Did you see anything in the specification    13:10
21  of the '786 Patent that informed you to give it
22  something other than its plain and ordinary
23  meaning?
24           MR. CREMEN:  Objection, outside the scope.
25           THE WITNESS:  No.  I did not.               13:10
```



 1  BY MR. FUHRER:

 2      Q.   In reading the specification, did you

 3  determine that the inventive feature of the '786

 4  Patent was the fact that it was a single crystal

 5  piezoelectric layer?                                     13:10

 6          MR. CREMEN:  Objection, outside the scope.

 7          THE WITNESS:  No.

 8          MR. FUHRER:  No further questions.

 9

10                   FURTHER EXAMINATION                     13:10

11  BY MR. CREMEN:

12      Q.   How do you determine the plain and

13  ordinary meaning of a term?

14      A.   Say that again.

15      Q.   When you are doing a claim construction,        13:11

16  how do you determine the plain and ordinary meaning

17  of the term?

18      A.   It is the meaning of the term that one

19  skilled in the art would understand.

20      Q.   Based on what?                                  13:11

21      A.   Based on the definition of one skilled in

22  the art.

23      Q.   What do you first look to determine plain

24  and ordinary meaning of a term in the patent?

25          MR. FUHRER:  Objection, vague.                   13:11



1       THE WITNESS:  You first look at the

2   intrinsic record to make sure that they use -- that

3   the record uses the plain and ordinary meaning, the

4   specification uses the plain and ordinary meaning.

5   BY MR. CREMEN:                                      13:12

6       Q.  When you are considering the plain and

7   ordinary meaning of a term, do you apply the

8   broadest meaning you can ascribe to that term or

9   the meaning that is supported by the intrinsic

10  record?                                             13:12

11          MR. FUHRER:  Objection, vague.

12          THE WITNESS:  I don't know if there is a

13  difference between the two.  At least in these

14  cases, I don't think there was.

15  BY MR. CREMEN:                                      13:12

16      Q.  The plain and ordinary meaning could be

17  the broadest possible meaning you can ascribe to a

18  term?

19      A.  It's not broad or narrow.  It's the plain

20  and ordinary meaning.                               13:13

21      Q.  Do you understand there to be a difference

22  between a broadest possible interpretation you can

23  apply to a term on one hand and on the other hand

24  the meaning of a term as instructed by the

25  intrinsic record?                                   13:13



```
 1          MR. FUHRER:  Objection, confusing.  Calls
 2   for a legal conclusion.  Mischaracterizing.
 3          THE WITNESS:  I don't understand your
 4   question, actually.
 5   BY MR. CREMEN:                                    13:13
 6      Q.  If there is a term in a patent that you
 7   are going to construe, do you construe the scope of
 8   that term based on the teachings of the intrinsic
 9   record or do you ascribe meaning to that term in
10   the broadest possible way you can understand the   13:14
11   term?
12          MR. FUHRER:  Objection, confusing.
13          THE WITNESS:  I think I said before, you
14   look at the intrinsic record, you see if it's
15   trying to define the term and anything different   13:14
16   from the plain and ordinary meaning.  If it's not
17   used in the plain and ordinary meaning, which is
18   the meaning you find in countless treatments in the
19   field, including classes, papers, conferences.
20   BY MR. CREMEN:                                    13:14
21      Q.  I think we're getting to the point of the
22   question.  Is the plain and ordinary meaning in
23   your mind -- strike that.
24          In your opinion, is the plain and ordinary
25   meaning defined by how the term is used in the     13:15
```



1  intrinsic record or is it necessary to also look to

2  the extrinsic record to understand how that term is

3  used in the art?

4          MR. FUHRER:  Objection, asked and

5  answered.  Cumulative.  Compound.                        13:15

6          THE WITNESS:  I don't know how differently

7  to answer this.  I look at the intrinsic record.

8          I see whether it's using the plain and

9  ordinary meaning and if it's trying to redefine it.

10  If it's not, I use the plain and ordinary meaning.      13:15

11  BY MR. CREMEN:

12      Q.  In your analysis, how do you know that the

13  intrinsic record is using the term according to its

14  plain and ordinary meaning?

15      A.  I will look for statements where it says       13:16

16  it's redefining something or explicitly redefines.

17      Q.  Can the plain and ordinary meaning of a

18  term in a patent claim be defined solely by the

19  intrinsic record?

20          MR. FUHRER:  Objection, calls for a legal       13:16

21  conclusion.

22          THE WITNESS:  Can the plain and ordinary

23  meaning be defined by the intrinsic record?

24          It won't define the plain and ordinary

25  meaning.  It will just -- I think no.                   13:16



1  BY MR. CREMEN:

2      Q.  In your opinion, in order to understand

3  the plain and ordinary meaning of the term, you

4  would always have to look to the intrinsic; is that

5  right?                                                    13:17

6          MR. FUHRER:  Objection, misleading,

7  mischaracterizing, vague.

8          THE WITNESS:  No.

9  BY MR. CREMEN:

10     Q.  Maybe I'm missing something, but the plain   13:17

11 and ordinary meaning has to come from somewhere.

12         Does it come from the intrinsic record or

13 the extrinsic record?

14         MR. FUHRER:  Objection.  Argumentative.

15 Mischaracterizing the law.                                13:17

16         THE WITNESS:  It depends on the record.

17 The cases, what is in the intrinsic record.

18         I can't answer that question in

19 generalities.

20 BY MR. CREMEN:                                            13:17

21     Q.  So can it ever be the case that the plain

22 and ordinary meaning of a term is provided by the

23 intrinsic only?

24         MR. FUHRER:  Objection, calls for

25 speculation.  Vague.                                      13:18



1           THE WITNESS:  I really need to have a

2     specific case to answer this question.

3     BY MR. CREMEN:

4           Q.  In the '755 patent, is it your opinion

5     that the intrinsic record alone does not provide          13:18

6     the plain and ordinary meaning of the term?

7           A.  No.  Intrinsic record did provide the

8     plain and ordinary meaning.

9           Q.  Which term?

10          A.  So all of them have been consistent with        13:18

11    the plain and ordinary meaning, so the active

12    region, for example.

13          I think the terms -- they are all the

14    plain and ordinary meaning.

15          Q.  But for each term, you have also relied on       13:19

16    extrinsic evidence; right?

17          A.  Yes.

18          Q.  In each of those cases, is it your opinion

19    that the intrinsic record was insufficient to

20    provide the plain and ordinary meaning?                   13:19

21          A.  No.

22          Q.  Why did you rely on extrinsic evidence?

23          A.  In order to make it clear, because I'm a

24    professor.

25          I think it was already clear from the               13:19



 1  record.

 2          But for example, if you look at active

 3  region, what am I doing with the extrinsic

 4  evidence; right?

 5          I'm showing devices for which the          13:20

 6  electrically driven area for which the active

 7  region is more than the electrically driven area

 8  which is consistent with the specification.

 9          I'm enforcing that.

10      Q.  In that example, you introduced the        13:20

11  concept of motional current density?

12      A.  Yes.

13      Q.  Motional current density is not mentioned

14  at all in the '755 patent; right?

15      A.  Do they mention current anywhere?          13:20

16          It's something I want to look at.  If

17  current is mentioned, it is.

18      Q.  Is the term "motional current density"

19  ever used in the '755 patent?

20      A.  I don't think so.                           13:21

21      Q.  Where did motional current density, that

22  phrase, come from?

23      A.  Motional current is a description of --

24  the word "motion" is the important thing here.

25  That's where the energy is.                         13:21



1           That came from the wider understanding

2    across the field that includes all resonators, not

3    even just BAW resonators, but electrostatic

4    resonators -- all resonators.

5           It's universal, understanding that the          13:21

6    current models the motion of the device and,

7    therefore, sets the equivalent circuit which then

8    sets the purpose of the device, which we talked

9    about before was passing frequencies, protecting

10   frequencies, setting up impedances.                    13:21

11          MR. CREMEN:  Okay.  I think that's all I

12   have.

13

14                FURTHER EXAMINATION

15   BY MR. FUHRER:                                          13:22

16      Q.  One more question.

17          I think at least for my vantage point, to

18   clear the record, is it your testimony, Doctor,

19   that the intrinsic record of the '755 patent is

20   providing plain and ordinary definitions for the       13:22

21   disputed terms or that it's using those terms

22   consistent with your understanding of the plain and

23   ordinary meaning?

24      A.  It's using those terms consistent with my

25   understanding of the plain and ordinary meaning.       13:22



1              MR. FUHRER:   No other questions.

2              MR. CREMEN:   None from me either.

3

4

5

6          (Whereupon, the deposition concluded at

7   1:22 P.M.)

8

9          (DECLARATION UNDER PENALTY OF PERJURY ON

10   THE PAGE FOLLOWING THE CERTIFICATION PAGE.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                           CERTIFICATION

2                                OF

3                  CERTIFIED SHORTHAND REPORTER

4

5           I, the undersigned, a Certified Shorthand

6    Reporter of the State of California, do hereby

7    certify:

8           That the foregoing proceedings were taken

9    before me at the time and place herein set forth;

10   that any witness in the foregoing proceedings,

11   prior to testifying, were placed under oath; that a

12   verbatim record of the proceedings was made by me

13   using machine shorthand which was thereafter

14   transcribed under my direction; further, that the

15   foregoing is an accurate transcription thereof.

16          I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney of any of the parties.  Signed on

19   the 11th day of August, 2022.

20

21

22                   

23   _____

24   DAVID OCANAS, CSR NO. 12567

25

```
 1                    DEPOSITION ERRATA SHEET

 2

 3   Assignment No. 8529586

 4   Case Caption:  QORVO v. AKOUSTIS

 5

 6           DECLARATION UNDER PENALTY OF PERJURY

 7

 8           I declare under penalty of perjury that I

 9   read the entire transcript of my deposition taken

10   in the above-captioned matter or the same has been

11   read to me and the same is true and accurate, save

12   and except for changes and/or corrections, if any,

13   as indicated by me on the DEPOSITION ERRATA SHEET

14   hereof, with the understanding that I offer these

15   changes as if still under oath.  Signed on this day

16   _____of _____, 2022.

17

18

19   _____

20   DR. CLARK NGUYEN

21

22

23

24

25
```



```
 1                    DEPOSITION ERRATA SHEET

 2   Page No.____Line No.____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No.____Line No.____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No.____Line No.____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No.____Line No.____Change to:_____

12   _____

13   Reason for change:_____

14   Page No.____Line No.____Change to:_____

15   _____

16   Reason for change:_____

17   Page No.____Line No.____Change to:_____

18   _____

19   Reason for change:_____

20   Page No.____Line No.____Change to:_____

21   _____

22   Reason for change:_____

23   Page No.____Line No.____Change to:_____

24   _____

25   Reason for change:_____
```



```
1                    DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23

24    SIGNATURE:_____DATE_____

25              DR. CLARK NGUYEN
```



**Exhibits**

8529586 DR.
.
CLARK NGUYE
N.EXHIBIT1
  3:10 8:5

8529586 DR.
.
CLARK NGUYE
N.EXHIBIT2
  3:12 8:11

8529586 DR.
.
CLARK NGUYE
N.EXHIBIT3
  3:14 28:9

8529586 DR.
.
CLARK NGUYE
N.EXHIBIT4
  3:15 86:3

─────────
**1**

1
  8:5
  49:12,17,
  18 52:25
  53:24
  54:3
  57:24
  58:2,11,
  17 61:5,8
  65:8
  71:20
  96:15,18

10
  72:7
  80:15

10:00
  7:5

11
  36:22,24
  37:1 70:2

11:20
  49:10

11:30
  49:10

11th
  7:20

12
  36:19,24
  37:7,8
  39:16,17
  70:5,7

120
  88:8,16,
  22 89:1,
  10

12:42
  86:2

12:53
  86:2

13
  45:20,23
  46:13

14
  45:23

15
  45:23

16
  54:11
  60:11
  79:2

17
  63:24
  78:12

18
  83:17

19
  77:20,24

79:8,12

1990
  22:2

1:00
  7:7

1A
  88:6

─────────
**2**

2
  8:11
  25:22,24
  65:8

2015
  21:23

2022
  7:20 8:1

25
  8:23

29th
  8:1

2:30
  49:7

2B
  35:15,18
  84:5,9,15

─────────
**3**

3
  25:24
  28:9 31:2
  80:21
  88:6,15

30
  38:15

3B
  57:15

─────────
**4**

4
  16:5,7,9
  33:6 86:3
  88:21
  95:12

47
  49:18
  80:16

─────────
**5**

5
  88:25

51
  49:18

52
  80:16

53
  88:21

57
  88:15

─────────
**6**

60
  38:18

62
  95:12

─────────
**7**

7
  20:7,17
  44:8

755
  21:24
  28:7,10

29:17
30:6,14
35:12
39:6
40:11
42:5,6
43:7
46:19
47:4
49:12
51:19
52:3 53:1
57:24
58:2
66:6,19
71:20
80:12
84:4
85:15
94:24
95:8
96:5,25
103:4
104:14,19
105:19

786
  86:4,10,
  24 88:5
  89:9,15
  96:13
  97:21
  98:3

─────────
**8**

80s
  24:4

─────────
**9**

9
  21:13
  22:13
  80:12



85:14
88:25

**90s**
24:4

_____

**A**

_____

**a.m.**
7:5 49:10

**ability**
48:5

**absolute**
79:16
80:4,8,10

**absolutely**
32:19

**abstract**
87:6,7,12

**account**
63:23
74:8 75:1

**accounted**
74:1,22,
23

**accurate**
38:13

**acoustic**
30:21
82:11
87:3

**acoustically**
36:15
54:8
81:6,18
83:9,15

**active**
17:8
33:10,14
35:19,24
36:8

45:3,9
46:23,25
47:2,10,
11,16,20,
23 54:3
55:23
56:7,9
59:11,13
60:4,7
61:4,18
64:10
65:3,25
66:7,18
67:3,8
82:19
83:21,25
84:1,9,15
85:3,19
91:25
92:6,12
103:11
104:2,6

**actual**
37:16

**actuates**
37:19,22

**add**
31:16,18
32:13,18
34:19
76:3

**added**
32:1

**adding**
30:18
77:11
78:6,18

**additional**
25:8
74:13

**adjective**
72:22
78:6,18

**admit**
89:17

**agnostic**
90:2

**agree**
21:1 53:4
55:5,6
59:20
76:13
80:22
85:17
87:4 88:7

**agreed**
7:3 21:1,
7 59:24
71:24

**Akoustis**
17:1,2
35:10
60:16

**Akoustis's**
16:23
33:17
34:15
72:10
83:19
92:2,20
93:9,20
97:6,11

**allowing**
30:23

**amount**
43:2,3
58:21,24
64:9
76:9,12,
25 77:6
81:9
82:17

**analysis**
81:15
90:18,20
101:12

**answering**
7:11

**answers**
30:1,4

**appears**
80:19,20

**application**
12:13
20:2
29:2,3,6,
25 43:24
82:8,10

**applications**
28:24
32:15

**applied**
39:11

**apply**
94:17,25
95:4 96:6
99:7,23

**applying**
35:1,17
96:23

**approved**
9:19
21:12

**area**
18:19,20,
22,23
31:24
49:4
104:6,7

**argument**
13:17

**Argumentative**
102:14

**arrive**
43:12

**art**
12:12
18:3
19:6,10,
15 21:15
22:1,13
25:4,12
26:1
37:10,14
39:4
41:19
54:18
62:8
84:21
85:1,11
98:19,22
101:3

**ascribe**
99:8,17
100:9

**aspects**
23:24
24:2

**assume**
17:5
76:11

**assuming**
44:3
59:14
76:23
85:5

**assumption**
16:1

**attach**
32:21
86:20

**attached**
8:10,16
28:13
86:7

**attorney**
20:14



attorney's
  20:22

audience
  18:11,16,
  18

average
  72:16,19

aware
  19:10
  38:15

awful
  24:18

AWH
  20:17

        B

back
  9:21 10:2
  17:14
  24:4
  31:19,21,
  25 32:14
  52:25
  57:24
  58:1
  60:12
  65:2,3
  71:20
  84:5
  85:14,23

backbone
  22:23

background
  40:19

based
  53:6
  98:20,21
  100:8

basic
  10:17

basically
  45:8
  52:12
  69:7

BAW
  17:11,12
  28:18,19,
  24 29:16,
  18 30:7,
  16,19
  32:15
  34:8,12,
  13 35:18
  43:13,23
  47:22
  65:19,21
  105:3

begin
  90:19

beginning
  11:25
  17:15
  34:3
  54:14
  55:12
  60:15
  70:8

begins
  39:13
  87:7
  95:12

behaves
  52:17

benefit
  22:20

Berkeley
  23:19,21
  24:4,13
  27:5,15

Besson
  46:14
  47:4

bigger
  86:20

bit
  6:12 20:6
  38:8
  82:23
  83:2

block
  46:2

blocks
  45:24

board
  86:20

Bob
  90:4

bordering
  66:24

bottom
  31:4
  36:1,3,25
  78:15
  84:17

boulder
  63:15

boundary
  52:15
  65:16,18
  66:7,10
  67:18

Bragg
  35:25
  36:8,9,14
  45:4,10,
  18 54:7
  84:12
  85:2
  92:12

Bravman
  31:5

Bravman's
  25:25

26:5,16
31:16
32:2

break
  7:1,7
  44:7 49:7

bridges
  36:24

bridging
  25:24

bring
  14:11
  20:9 95:8

broad
  99:19

broader
  33:15,16,
  17

broadest
  99:8,17,
  22 100:10

bulk
  41:23
  42:1,6

bullet
  45:24
  46:17

bullets
  46:13

        C

calculate
  56:5

call
  8:18
  41:25

called
  41:17,19,
  23

calls
  9:1
  10:19,20
  12:15
  13:2,11
  14:16
  15:1,24
  18:14
  19:20
  22:3 30:9
  39:22
  47:6 71:5
  87:14,24
  100:1
  101:20
  102:24

capability
  43:25
  44:4

capacitive
  38:22

capacitively
  38:21,22

capture
  32:12
  34:12
  45:9,12,
  14 56:14
  63:5
  73:5,7

captured
  43:5
  65:17,18

captures
  47:24

careful
  6:15
  73:23

carefully
  65:10

case
  7:17



16:20
17:24,25
18:9 20:6
21:5
57:21
64:11
65:2
66:12
70:15
71:1
102:21
103:2

**cases**
20:12,16,
19,23
28:21
68:10
99:14
102:17
103:18

**Certified**
8:8,14
28:11
86:5

**cetera**
48:7
86:23

**change**
59:19,21
61:22,24
63:12
68:16
73:15,16

**changed**
22:1
63:17,18

**characteriz**
**ation**
48:20

**chip**
65:9

**chooses**
72:24

**circuit**
28:21
85:13
105:7

**circuits**
22:7

**cited**
11:18
12:7
20:16

**claim**
7:18 8:6
10:18
11:1
13:9,21
14:22
17:18,22
18:1 26:6
49:12,17,
24 50:3,
6,15,20
52:25
53:4,9,24
54:3
57:24
58:2,11,
17 70:14,
20 71:1,
2,3,9,17,
20 75:24
80:12,21
81:2
85:14,18
87:13,17
96:15,18
98:15
101:18

**claims**
11:5,11,
13 71:16
94:18

**clarificati**
**on**
16:12

**class**
28:2,3

**classes**
28:5
97:17
100:19

**clause**
49:17,21
71:21
80:15,16

**clear**
14:10,23
15:3,9,
13,16
45:2
70:9,17
71:18
81:14
93:2
94:24
95:4
103:23,25
105:18

**clearer**
14:12
15:11

**column**
49:18
80:15
88:15,21,
25 95:12

**committed**
78:23

**communicati**
**on**
29:7
87:2,7

**communicati**
**ons**
29:6

**company**
42:13

**comparative**
58:15

**compares**
58:4,18,
19,20

**comparing**
46:18
53:5

**comparison**
46:21
71:9,25

**competing**
90:14
91:19

**complete**
31:13,17
32:2

**complicated**
32:10

**component**
49:4

**compound**
88:9
101:5

**computer**
24:14,17

**concept**
62:10
78:23
104:11

**Conceptroni**
**c**
20:18

**concepts**
19:9

**concerned**
54:19,20

**conclusion**
10:20
13:2,12

14:17
15:25
18:14
19:21
30:9 47:7
71:6
87:15
100:2
101:21

**conditions**
52:15

**conferences**
100:19

**confine**
65:20,22

**confinement**
31:24
32:6

**confused**
39:24

**confusing**
19:11
39:21
75:9
100:1,12

**confusion**
37:25
38:8

**connected**
52:15

**considered**
13:9
47:19

**consistent**
16:23
17:3
36:17
71:13
91:20
103:10
104:8
105:22,24



construction
    7:19,25
    8:6,12
    10:18
    11:1
    13:10
    16:19
    26:6
    33:10,14
    34:15
    35:8,10,
    18 36:2,
    17 46:11
    60:16
    64:2
    72:10
    73:1
    74:12
    75:11,17
    77:18
    79:4
    83:20
    91:13
    92:1,14,
    19,20
    93:4,8,
    10,13,19,
    20 97:7
    98:15

constructions
    16:13,22
    90:15
    91:20

construe
    13:21
    100:7

contends
    31:5

context
    27:24
    39:5
    40:11
    42:5,6

    43:7 81:2

continue
    17:6 34:1

contributes
    48:3

control
    15:22

copies
    10:14

copy
    7:22 8:3,
    9,15
    28:12
    86:6

Corp
    20:18

correct
    20:14
    21:8,19
    28:16
    32:19
    43:25
    50:20
    59:4
    86:13
    87:9
    88:17
    90:12,16

correctly
    18:9

counsel
    6:16 9:7,
    13 21:7

count
    38:12,13

countless
    100:18

couple
    20:16

courses
    23:7,9,

    11,16
    24:7,16
    27:20,22,
    25

cover
    27:16,20,
    22,25

covered
    24:5 28:4
    75:7,8

covering
    24:8

covers
    24:23,25
    27:5

create
    34:23
    52:11

created
    79:5 94:3

creates
    55:25

creating
    36:12

CREMEN
    8:17 9:3
    10:23
    11:6
    12:9,19,
    25 13:6,
    20 14:7,
    21 15:4,
    18 16:4
    18:10,17
    19:16,25
    21:3
    22:10,25
    25:21
    26:21
    28:6,14
    30:12
    39:25
    43:22

    47:13
    49:6,11
    50:13,17
    53:14
    54:10
    55:21
    58:16
    66:16
    71:10
    74:24
    75:20
    76:7
    85:21
    86:8
    87:20
    88:4,12
    89:8
    90:3,23
    91:5,16,
    22 92:3,
    9,21
    93:11,22
    94:6,12,
    19 95:2,
    21 96:10
    97:1,9,
    14,24
    98:6,11
    99:5,15
    100:5,20
    101:11
    102:1,9,
    20 103:3
    105:11
    106:2

crystal
    14:14
    27:6,7,
    10,16,23
    87:3,8,23
    88:8,17,
    18,23
    89:2,23,
    24 96:20
    98:4

Cumulative
    101:5

curious
    21:4 82:7

current
    34:17,18
    35:6,7,11
    42:25
    43:6
    47:15,21,
    24 48:3,
    13,25
    49:5 56:1
    104:11,
    13,15,17,
    18,21,23
    105:6

D

dashed
    84:16

date
    21:23

dated
    7:19,25

day
    10:8

days
    10:7

declaration
    7:19,25
    8:7,13,19
    10:2 16:6
    20:8,9,
    17,20
    21:14
    22:13
    28:16
    31:3 33:7
    36:20
    44:9
    45:21



54:12
60:11
63:25
70:3 72:8
77:21
78:13
79:2,9
83:18

**declarations**
10:5,12
18:2
20:5,11
86:13
90:19

**decrease**
77:7,16

**decreasing**
77:5,8

**define**
14:5
84:1,3
91:7
100:15
101:24

**defined**
53:24
54:2 84:2
95:15
100:25
101:18,23

**defines**
15:20

**definition**
15:21
21:18,25
22:12
23:6
25:3,25
26:5,16
47:16
48:9
61:17
69:25

75:21
85:3 96:7
98:21

**definitions**
105:20

**degree**
23:19
25:5,11
26:14
27:15
81:25

**delineate**
26:8

**deliver**
42:24

**delivering**
35:5

**densities**
53:5 68:9

**density**
47:15,22
48:25
49:3,16,
22,25
50:7,10,
12,22
51:1,3,
14,20
52:4,24
58:4
59:7,21,
25 60:21,
23 61:5,
7,10
67:25
68:21,25
69:23
71:25
72:11,12,
15,16,18,
19,23
73:11,12,
18,21
74:5,6,

17,25
75:4,7,8,
22 76:8,
14,21
77:2,8,16
92:17
104:11,
13,18,21

**depend**
24:9

**depending**
67:4

**depends**
13:16
14:18
24:21,22
40:8 67:5
81:25
102:16

**deposed**
6:10

**deposition**
8:5,11
28:9 86:3
93:14

**describe**
89:10
96:2

**describes**
44:13
88:7,16,
22 89:1

**describing**
89:15

**description**
46:10
104:23

**deserved**
90:21

**design**
65:8 67:5

**designed**
65:10

**designs**
65:22

**detach**
57:12

**detail**
19:17
20:2

**deter**
48:18

**determination**
91:18

**determine**
50:24
52:19
55:18
56:14,19
57:4
59:9,10,
12 68:24
73:8
77:12
91:2 93:5
98:3,12,
16,23

**determined**
60:23

**determines**
48:5,14,
15,16,17,
19

**determining**
52:22

**device**
34:20,22
35:5
37:18,21
38:6 40:8
43:4
47:25

48:4
52:12,13
57:3,11,
15,22
61:4
65:7,11,
19,21,24
68:23
86:19,23
87:8 90:2
93:3
105:6,8

**devices**
34:25
38:25
65:9
86:17
87:3
104:5

**dictate**
9:25

**difference**
16:19
48:24
58:9 60:2
64:18
66:13
67:12
74:4,16,
21 99:13,
21

**differences**
16:13
26:4
27:16
68:9

**differently**
66:14,25
101:6

**difficult**
26:8
68:14
82:15



direct
  88:13

directed
  86:16

direction
  83:8

directly
  18:21

disagree
  31:10
  37:1

discipline
  26:7,13

disciplines
  26:8,12

discretely
  19:3

discuss
  25:25
  27:9
  29:17
  93:12

discussed
  11:19
  29:25
  55:25

discussing
  41:12

discussion
  30:3

dislocate
  67:17

dispersion
  81:15

dispersion-
type
  65:8

dispute
  89:21,25
  90:1 93:6

disputed
  17:18,22
  18:1
  90:12,20
  91:1
  93:6,21
  96:4,17
  105:21

divide
  50:25
  51:13
  52:23
  56:8

divided
  57:15
  61:18
  72:21

divides
  60:9

dividing
  52:13
  77:13

Doctor
  11:23
  90:9
  105:18

document
  15:19
  89:3

documents
  8:25 9:12
  10:11,15
  11:18
  12:7,18,
  21 13:16

dormant
  46:18
  47:3

dotted
  35:25
  84:13

draft

  9:15 21:9

drafts
  9:16,21
  10:2

drawing
  52:12

drive
  34:23
  36:12

driven
  17:9,10
  34:7,10
  36:5,10,
  15 37:9,
  15 38:3,
  4,7,20,
  21,24
  39:5,18,
  24 41:9
  45:5,15,
  17 54:8
  104:6,7

driver
  34:24

driving
  38:5
  42:18,21,
  23 43:8

―――――――――

          E
―――――――――

earlier
  22:11
  52:3 59:2
  71:24
  78:22
  79:1
  88:19

Eastern
  49:7

easy
  86:19

education
  23:8

effect
  30:20
  72:22

effectively
  58:19

effects
  27:5

effort
  9:14

electric
  34:11
  36:2,11
  37:19,24
  45:7

electrical
  22:6,8,
  19,22
  23:8,19,
  24 24:2,
  13 25:5,
  10 27:1,
  2,4,15
  32:7
  48:24
  54:6

electrically
  17:9,10
  34:6,7,10
  36:5,10,
  15 37:9
  38:3,20,
  23 39:5,
  18,24
  45:5,15,
  17 104:6,
  7

electrode
  36:3,4
  37:16
  65:19

66:23
  84:12

electrodes
  34:24,25
  35:2
  39:10
  46:24
  53:20,22
  92:12

electrons
  34:11

electrostat
ic
  38:25
  39:2
  105:3

electrostat
ically
  37:15
  38:4

element
  53:5
  71:17
  80:22
  81:2

elements
  43:6
  52:13,14,
  21

elicit
  43:2

elicits
  66:10

else's
  88:2

embodiment
  88:20

embodiments
  34:8
  66:6,18
  88:5,20



emphasize
  34:20

end
  9:17,20
  32:2
  37:4,6
  39:13
  40:1,14,
  15

ends
  35:6

energies
  56:10,19

energy
  31:18,20,
  22,24
  43:5
  48:16,18
  49:16,22
  50:1,11,
  23,24
  51:2,4,
  12,20
  52:4,19,
  22,23
  53:6,8
  54:5,7,9
  55:3,7,9,
  13,15,18,
  19,20,22,
  23 56:6,
  7,8,14,
  15,21,23
  58:3,4,6,
  8,10,12,
  20,21,24
  59:3,6,7,
  8,11,13,
  22,25
  60:3,7,21
  61:5,7,
  10,11,18,
  19,21
  62:18,20,
  22,24

64:9,20,
24 65:2,
13,17,18,
20,22
67:3,6,7,
11,12,14,
16,20,22
68:1,2,3,
7,8,13,
19,22,23,
25 69:4,
5,8,10,
12,14,15,
16,23,24,
25 70:16
72:1,12,
20 76:13,
14,17,19,
22,25
77:2,6,8,
12,13,15
80:24
81:4,9,
13,21
82:5,6,
17,20,24
83:4,8
92:18
104:25

enforcing
  104:9

engineer
  22:8

engineer's
  23:8

engineering
  22:19,20,
  22 23:19,
  24 24:2
  25:5,11
  27:1,2,15
  32:7

Engineering
-wise

82:14

engineers
  22:7
  24:13
  27:4

enters
  67:15,23

entire
  34:8
  57:22

entries
  11:20
  12:21

environment
  82:16

equals
  61:5,8

equivalent
  47:4
  85:13
  105:7

estimate
  10:3,4,6

estimates
  10:7

evidence
  11:7
  13:1,4,5,
  8,9,14,
  18,23,24,
  25 14:4,
  9,12
  16:11,18
  17:19,23
  18:4
  56:13
  79:20,24
  80:1,2
  91:3
  103:16,22
  104:4

exacting
  64:16

EXAMINATION
  90:7
  98:10
  105:14

examiner
  12:11

examples
  39:20
  40:1

excitation
  53:12,15,
  18,19
  81:3

excited
  77:19
  78:5,9,
  17,18
  79:15
  80:4,19,
  23 93:7,
  21 94:11,
  14

excited'
  78:1,5

Exhibit
  8:5,11
  28:9 86:3

exist
  31:1

experience
  25:6,11
  52:7
  55:14
  87:19

expert
  7:16,19,
  24 8:6,12
  9:18
  10:25
  11:4

13:7,22
20:11
30:13
89:4 97:4

explain
  15:8 19:9
  39:23
  54:23,25
  61:1

explained
  45:6

explanation
  6:13
  46:3,9

explicit
  94:23

explicitly
  92:13
  101:16

extensional
  40:13
  41:17,18

extinguish
  30:23

extinguishi
ng
  30:25

extrinsic
  13:1,4,8,
  18,23,25
  14:4,11,
  15,24
  15:21,22
  16:11,18
  17:19,23
  18:4
  56:12
  80:2
  101:2
  102:13
  103:16,22
  104:3



extrinsical
ly
  14:6

—————————

      F

—————————

fabrication
  23:10,12

fact
  36:14
  61:9 73:5
  98:4

factor
  30:16
  57:20,21
  60:5

facts
  82:1

faculty
  83:5

fair
  64:14

familiar
  95:17

FBAR
  41:9

feature
  98:3

fed
  22:20

feel
  54:14
  64:5

field
  22:18
  25:7,13
  36:3
  37:24
  100:19
  105:2

fields
  34:11
  36:11
  37:19
  39:8,9
  45:7,15,
  18

Figure
  35:15,18
  84:5,9,15

figures
  46:7 52:6
  57:7
  62:12
  88:6

filter
  29:25
  30:7
  40:22
  87:2

filtering
  29:5
  40:24
  43:9,13,
  16,25
  44:4
  87:22

filters
  30:3
  32:15
  56:2

final
  49:17
  90:19

find
  91:10,11,
  25 92:18
  93:8,18
  95:9 96:5
  100:18

fine
  27:3

fits
  23:6

five-minute
  49:6

flexural
  40:2 41:9

flow
  63:18

flowing
  63:11

focus
  30:6 66:5

focusing
  35:11

follow
  61:1

fool
  61:14,16

forbidden
  65:23

force
  37:19,22

foremost
  79:4

formed
  84:16

formulated
  69:20

foundation
  12:14,23
  14:1,25
  15:25
  18:13
  19:21
  22:4,16
  25:15,18

fourth
  26:3

frame
  21:21,22

  22:2,11

free
  54:14
  64:5

frequencies
  29:9
  33:1,2
  43:17
  48:6,15
  65:23
  67:4
  105:9,10

frequency
  29:5
  40:16,21
  57:14,15,
  16

front
  25:19
  95:10
  96:21

FUHRER
  9:1 10:19
  11:2,21,
  23 12:14,
  22 13:2,
  11 14:1,
  16,25
  15:12,24
  18:5,13
  19:11,20
  20:24
  22:3,15
  25:14
  26:18
  27:19
  30:8
  39:21
  43:14
  47:6
  50:9,16
  53:10
  54:1
  55:16

  58:13
  66:9 71:5
  74:19
  75:9,23
  87:14,24
  88:9 89:3
  90:5,8,25
  91:9,17,
  24 92:5,
  16,23
  93:15,17,
  25 94:9,
  15,22
  95:6,7
  96:3,12
  97:3,12,
  19 98:1,
  8,25
  99:11
  100:1,12
  101:4,20
  102:6,14,
  24 105:15
  106:1

full
  44:11
  50:1,7,19
  70:7
  72:13,17
  73:11,20,
  22 74:5,
  6,17,18,
  25 75:4,
  13,22
  76:1,3

function
  29:21
  32:24
  40:14,15,
  22,24
  43:9,13,
  16 52:20

functions
  29:18
  40:25



—————

**G**

—————

**gave**
   64:17

**gears**
   86:9

**general**
   23:2
   61:23
   84:25

**generalities**
   102:19

**generate**
   29:14

**generated**
   37:23

**give**
   6:12 7:16
   8:24 9:10
   60:5 75:6
   86:15
   92:6
   97:21

**good**
   6:8,9
   19:13
   38:18
   48:20
   55:6,17

**govern**
   52:16

**grab**
   86:10

**graduate**
   23:18

**guess**
   9:16
   24:4,9
   28:1 29:2

   46:19
   54:22
   63:9 69:1
   74:3 84:2

—————

**H**

—————

**halfway**
   46:14
   60:14
   77:23
   79:12

**hammered**
   13:16

**hand**
   70:14
   99:23

**handling**
   44:2

**happen**
   62:2

**happening**
   63:23

**hat**
   70:22

**heading**
   83:8

**heard**
   40:17

**hearing**
   33:22

**heart**
   15:7

**helped**
   14:5,8

**helping**
   62:24

**helps**
   73:17
   75:2,16

**hereto**
   8:10,16
   28:13
   86:7

**higher**
   61:5

**highlights**
   17:10

**histories**
   12:17

**history**
   11:15,19
   12:8,11
   22:17
   24:3

**hold**
   41:3

**hour**
   7:1 49:9
   86:1

**hours**
   7:3 10:4,
   8,9 90:10

**huge**
   34:3

—————

**I**

—————

**idea**
   66:11

**ideas**
   24:25

**identification**
   8:8,14
   28:11
   35:19
   86:5

**identified**
   16:11
   46:3,13

**identify**
   68:11

**ignore**
   74:14

**illustrated**
   62:11

**immense**
   22:18

**impact**
   26:6

**impedance**
   41:1
   43:18,20

**impedances**
   29:11
   43:1
   48:7,14
   56:3
   105:10

**important**
   13:14
   23:13
   25:12,16
   34:18,21,
   22 55:8
   87:18
   104:24

**improve**
   32:6

**include**
   17:11
   27:1 29:2
   36:7
   39:20
   45:5
   75:2,18
   85:2,12,
   18,20

**included**
   39:23

**includes**
   23:3 27:2

   35:10,24
   45:3
   49:21
   92:11,13
   105:2

**including**
   24:6 75:3
   100:19

**inconsistent**
   92:1,7,19
   93:9,20
   94:4

**increase**
   32:20
   76:15
   77:2

**increased**
   76:22

**increases**
   60:6
   76:13,17,
   19 77:3

**infer**
   69:15

**influence**
   41:1

**information**
   14:6
   15:15
   25:8
   62:4,14

**informed**
   97:21

**initial**
   7:18 8:6,
   18 9:15,
   22 20:7,
   9,17
   21:13
   22:13,23
   28:16



36:20
45:20
53:12,15,
19 54:11
60:11
63:24
77:20
79:8
83:17

inputs
52:7

instruct
12:1,5

instructed
11:24
12:3
94:17
99:24

instructs
9:7

insufficien
t
103:19

intended
46:2

interest
40:4,7,10
41:5,13

interested
9:10
68:18

interesting
56:23

interface
65:1,6,25
66:17,22
67:2
81:11,12

interpret
71:2
75:14

interpretat
ion
20:23
50:4
99:22

interpreted
76:1,4
79:15

interpretin
g
76:2

interprets
11:5

interruptin
g
33:23

intrinsic
11:7
13:5,8,
14,23,24
14:4,9,23
15:10,20,
23 16:2,3
78:10,24
80:3 91:2
99:2,9,25
100:8,14
101:1,7,
13,19,23
102:4,12,
17,23
103:5,7,
19 105:19

introduced
104:10

inventing
30:15

invention
20:3
30:14
55:9
61:13
62:25

63:3 93:3

inventive
98:3

inventor
38:11

inventors
87:22

involved
15:3,5

issue
34:3
54:24

issued
38:14

item
52:25

J

joint
9:14

July
7:20,25

K

Keeping
32:12

kind
9:14
38:12
45:12
82:7

knew
59:7

knowing
58:22,25
60:3

knowledge
23:20

38:10

L

lacks
12:14,22
14:1,25
15:25
18:13
19:21
22:4,15
25:15

language
32:1
49:24
50:3,6
71:25
95:17

large
18:16
37:13

laterally
64:25

law
20:6 21:5
102:15

layer
27:17,18
35:25
36:6,8,13
41:9 45:4
84:11,16,
17 88:8,
16,22
89:1,10,
16,19,22
92:11
96:18,19
97:5 98:5

layers
27:6,11
51:11
56:14

layman's
96:1

leading
47:6

leak
64:24
81:7,10

leakage
80:24
81:4

leaked
64:9,14,
18,20
65:13
67:6,20,
22 68:3,
7,25
69:4,8,
10,14,25
73:1,2

leaking
68:13

learn
22:7
23:14
25:1,17
26:11

learned
13:13

learning
24:19

leave
82:9

leaves
31:22,24

led
90:18

legal
9:18
10:19
13:2,11



14:17
15:24
18:14
19:20
30:9 47:7
71:5
87:14
100:2
101:20

**lend**
29:12

**length**
55:25

**level**
19:5,17
21:14

**levels**
58:9

**light**
51:11

**linear**
29:13

**linearity**
43:2

**lines**
35:25
36:25
44:16
49:18
64:1
77:24
80:15
84:13,16

**list**
39:20
40:1

**listed**
38:11

**listing**
79:17

**literature**

97:18

**load**
66:25

**loaded**
66:14

**loading**
65:20
66:23

**localized**
75:12,15,
18

**location**
63:16,17
73:4

**locations**
62:3

**long**
8:22

**longer**
7:6 69:5
93:6

**longitudina
l**
40:12
41:14,17,
18

**looked**
9:19
23:16
24:15
91:6

**losing**
62:22

**loss**
32:7,13
33:3
59:14
67:16
69:15

**losses**
69:8

**lost**
38:12
48:16,18
55:4,8,
10,15,20
56:6,8,14
58:3,6,8,
12 59:3,7
61:11
64:11,15,
19,21
65:4
67:7,14,
17,20,24
68:3,7,8,
13,25
69:3,5,6,
10,12
70:16

**lot**
9:24
24:18,24
26:11
38:2 39:2
48:17
89:7

**lots**
22:7
23:23

**lower**
61:7,10,
11

**lunch**
7:6

**lunchtime**
7:5

──────────
M
──────────

**made**
11:11
13:17
21:10,11
64:21

65:16
93:2
94:24
95:4

**main**
55:2
93:13

**major**
24:18

**majority**
83:15

**make**
12:11
14:12
15:2,10
18:8 20:3
31:17
32:2
61:22
67:18
71:9
73:25
74:7,11
76:4 77:9
79:21
81:16
94:17
99:2
103:23

**makes**
14:10
45:2 74:3

**making**
75:16
81:17
91:18

**marked**
8:7,13
28:10
86:4

**mass**
65:20
66:14,22

**master's**
25:7

**match**
33:4
82:11

**matched**
43:18,20
81:6,11,
18 83:10,
15

**matching**
30:22
81:25

**material**
24:24
30:18
66:2,11

**materials**
47:9
51:12

**mathematica
lly**
52:15
82:12

**matter**
55:5 69:2
81:3,13,
21 82:20

**matters**
84:23

**maximize**
48:7

**meaning**
14:11,13,
23 15:9
37:2
42:24
66:2
90:22
91:4,8,14
94:10,14,
18,25



95:5,23
96:7,8,24
97:5,23
98:13,16,
18,24
99:3,4,7,
8,9,16,
17,20,24
100:9,16,
17,18,22,
25 101:9,
10,14,17,
23,25
102:3,11,
22 103:6,
8,11,14,
20
105:23,25

**means**
14:10
24:18
37:15
39:5 42:7
64:20,21
65:13
72:12,17,
18 75:3
76:20
78:5,17

**meant**
17:1

**measure**
50:22
51:1,3,4
55:15
56:10,18,
19 57:8,
14 69:24
70:16

**measured**
50:1,7
57:9
68:24
76:8

**measurement**
56:22,23
71:17
72:5,6

**measuring**
59:24
67:25
68:2,19,
21 69:7

**mechanical**
49:16,22,
25 50:11,
23 51:2,
4,20 52:4
53:6,8
59:8,21,
25 60:21
68:1,22
69:24
72:1,12
92:17

**mechanisms**
67:17

**MEMS**
23:1,5,6,
7,12,16,
17,18
24:6,8,
11,19
25:1
28:3,5

**mention**
16:10
21:18
40:2
104:15

**mentioned**
30:1
40:25
51:19
52:3
62:13
65:12
104:13,17

**met**
73:9

**method**
30:15

**methods**
86:22

**middle**
31:8

**mind**
14:22
41:22
51:18
88:2
94:11
100:23

**minimize**
33:3

**minimum**
81:8
82:17

**minute**
17:14

**minutes**
44:6
85:21

**mis-phrase**
54:21

**mischaracte
rizes**
18:5 50:9

**mischaracte
rizing**
43:15
100:2
102:7,15

**misleading**
18:6
20:24
27:19
30:9
43:14

54:1 71:6
102:6

**misses**
26:19,22
35:8

**missing**
102:10

**misstated**
51:25

**mix**
46:4

**mobile**
32:16,24
43:24

**mode**
40:2,4,7,
10,12,13,
14,15
41:5,10,
12,13,17,
18,20,23
42:7

**model**
52:10,11

**modeled**
51:20,22,
23

**models**
105:6

**modes**
42:1,10,
11,14

**modifier**
96:20

**moment**
32:14
35:13
53:1

**monitor**
57:11

**morning**
6:8,9

**motion**
34:17,20,
21,23
47:25
48:2,3,4,
8 104:24
105:6

**motional**
34:17,19
35:6,11
43:6
47:14,21,
24 48:12,
25 49:4
56:1
104:11,
13,18,21,
23

**mounting**
86:21

**move**
28:6
53:23
63:16
93:12

**moving**
35:3

**multifold**
29:8

**multiple**
29:15
89:24

**Multiply**
49:3

_____

**N**

_____

**narrative**
9:2 10:20



narrow
  99:19

necessarily
  44:1

needed
  52:7

Nguyen
  6:8

noise
  40:20

nonpurposef
ul
  48:8,11

noon
  7:7

normal
  7:4

note
  59:17
  70:6

notion
  78:1,4,17

number
  37:13
  38:18

—————————

        O

object
  6:17
  11:23
  12:1

objection
  9:1,5
  10:19
  11:2,21
  12:14,22
  13:11
  14:1,16,
  25  15:12,
  24  18:5,

13 19:11,
20 20:24
22:3,15
25:14
26:18
27:19
30:8
39:21
43:14
47:6
50:9,16
53:10
54:1
55:16
58:13
66:9 71:5
75:9
87:14,24
88:9 89:3
90:23
91:5,16,
22 92:3,
9,21
93:11,22
94:6,12,
19 95:2,
21 96:10
97:1,9,
14,24
98:6,25
99:11
100:1,12
101:4,20
102:6,14,
24

occur
  53:18,25
  54:3

occurring
  59:15

occurs
  54:3
  67:16

online
  38:17

opens
  60:22

opine
  18:2

opinion
  7:16
  16:17
  25:10
  30:13
  33:13
  39:3
  42:22
  47:14
  67:10
  68:18
  78:8,22
  81:23
  84:14,18,
  25  87:21
  97:4
  100:24
  102:2
  103:4,18

opposed
  72:24

opposite
  80:5,6

optical
  51:10
  56:25
  57:1

order
  25:17
  62:5,15
  63:2
  68:15
  82:1
  102:2
  103:23

ordinary
  14:11
  16:13
  18:3
  19:5,9,15

21:15
22:1,12
25:3,12
26:1 37:2
39:4 62:7
63:6
84:20
85:1
90:22
91:4,8,14
94:10,13,
18,25
95:5,23
96:8,24
97:5,15,
22 98:13,
16,24
99:3,4,7,
16,20
100:16,
17,22,24
101:9,10,
14,17,22,
24 102:3,
11,22
103:6,8,
11,14,20
105:20,
23,25

ortonic
  57:2

oscillator
  29:3,6

outer
  33:10
  46:19
  47:4,17,
  18 48:9
  50:2,8,
  11,12,14,
  23,24
  59:8,14,
  15,22,25
  60:21
  61:19

66:1,8,
18,25
67:8,11,
15,23
68:1,22
69:24
72:13
75:25
76:12,24
80:24
82:19
84:22

output
  29:5 35:6

over-
explaining
  55:1

overview
  8:24 9:12
  86:15

—————————

        P

P.M.
  86:2

package
  64:22

packaging
  86:17,19,
  21,22
  89:20
  90:2

pages
  25:24
  36:24

paper
  57:6

papers
  97:18
  100:19

paragraph
  20:20



21:6
25:24
26:23
31:4,6,8
36:23
37:4,6
39:12
42:16
44:12,17,
19 54:15
60:15
64:1,6
70:7,12
77:23
78:15
79:11,14,
22 95:12

parameter
28:25
55:17
57:17

parameters
43:11
58:3

parens
40:3

part
11:19
12:21
17:10
23:7,13
24:19
35:9
47:3,19
65:23
81:21
82:18
84:21
85:12
87:18
93:13

parties
16:14
89:21

parties'
16:19
33:9,14
35:17

parts
46:18

pass
29:9
40:16,21
43:17
48:5 67:7
81:22
82:18

passband
33:3

passed
48:15

passing
56:2
105:9

passivation
84:11,17

past
33:1
90:10

patent
11:14,18
12:7,11,
13 15:7,
19 18:11
19:4,8,18
20:1,11
21:22,24
28:7,10,
15 29:17
30:6,14
35:12
39:6
40:11
42:5,6
43:7
46:20
47:5

49:12
51:19
52:4 53:1
57:25
58:2
59:17
66:6,19
71:21
80:13
84:4
85:15
86:4,10,
12,16,17,
25 87:18
88:5,7,15
89:9,15,
18,22
92:7,10
94:24
95:8
96:5,13,
25 97:21
98:4,24
100:6
101:18
103:4
104:14,19
105:19

patent's
87:12

patentees
44:24

patents
10:18
27:9
38:10,14,
17,20
88:19

peaks
62:17
63:5 73:6
74:1,8,9,
21,22
75:1,18
76:20

77:11

penetrate
51:11
57:1,3

people
18:19,20,
24,25
19:2
26:11
34:18
38:2
41:25
42:11,13
55:5,6
63:19
70:24
76:2

perfect
82:11

perfectly
82:21
83:9,11

period
21:18

periods
22:23

person
16:17
18:2
19:5,9,14
21:25
22:12
25:3,12,
25 26:5,
17 38:5
39:3
54:18
62:7
63:6,9
84:20
85:1,11
97:15

Phillips

20:17

phone
43:24

phones
32:16,25

phonetic
48:25
52:10,16
57:2,16
65:24

phrase
32:11
41:5,6,15
60:20
73:15,21
74:4,5,16
78:8,20
83:20
85:18
104:22

phrased
47:15

physical
83:5

physicists
19:1

physics
83:5

pick
49:7

picked
63:15

picking
61:20

piece
12:12

pieces
72:25

piezoelectr
ic



27:6,11,
17,18,25
35:24
36:6,7,12
37:16,21,
23 38:6
39:1 41:8
45:3,7,
10,16
53:23
88:8,16,
22 89:1,
10,16,19,
22 92:11
96:18,19
97:5 98:5

piezoelectr
ically
38:7

piezoelectr
ics
27:21

place
80:20

places
35:1
38:18
51:13

plain
14:10
16:13
37:2
90:21
91:4,8,14
94:10,13,
17,25
95:4,23
96:7,23
97:4,22
98:12,16,
23 99:3,
4,6,16,19
100:16,
17,22,24

101:8,10,
14,17,22,
24 102:3,
10,21
103:6,8,
11,14,20
105:20,
22,25

plot
52:19

plots
57:17

PML
56:13,14

point
46:17
64:16
69:22
73:3
100:21
105:17

points
45:24

polycrystal
line
27:11,17,
23 89:11,
16

pop
51:17

populous
24:18

portion
30:23
36:6
50:15,20
53:9
61:15,21
66:25
68:12

POSITA
17:17,23

position
26:4
74:12

possibility
31:18
60:22

power
44:2

practical
82:8,10,
16

preceding
29:11
33:5
43:21

precise
70:15,21
71:3,8,13

prefer
74:14

preliminary
72:10
83:19

prepare
10:12
20:19

prepared
8:25 9:12
20:12
28:16

preparing
7:24
86:13
90:11

present
42:25
47:16,18
78:6,19

presented
90:12,14

presumption

90:21

pretty
23:12
49:2

prevent
7:10

previous
30:1,4
32:18
43:12
54:15
65:12

prior
12:12
20:12

proceedings
49:8
85:25

process
10:18
11:1
13:13,15
88:14

processes
23:17

professor
15:7,14
54:22
70:22
103:24

proper
19:19

proposed
16:14
33:9
34:15
64:2
91:19
93:8,10,
20

prosecution
11:15,19

12:7,11

protect
86:23

protecting
105:9

provide
16:11
32:24
70:15
103:5,7,
20

provided
21:6 43:8
56:12
102:22

providing
35:4
105:20

pull
51:12

purpose
28:18,25
29:4,7,9
34:21
35:4 40:9
42:24
55:9
61:12
63:3,21
73:8 76:6
93:2
105:8

purposeful
47:25
48:2,13
55:19

purposes
13:10
29:15
48:21

pursuant
48:6



put
    15:15
    24:10,23
    25:19
    29:4
    63:11
    66:24
    88:1

putting
    60:6
    70:22

―――――――
        Q
―――――――

Qorvo
    17:1,3
    35:8
    36:2,16
    75:11
    92:14,18

Qorvo's
    34:5 37:1
    64:2
    72:25
    78:1
    91:25
    93:4,8,
    13,19
    97:7

Qorvo's
    78:4,17

qualifiers
    6:25

qualify
    25:7

quality
    30:16
    57:20,21

quantitativ
e
    70:16
    71:17
    72:4,6

question
    9:9 10:1,
    21 12:4
    19:23
    21:19
    22:2,6
    25:1
    29:24
    32:23
    42:9
    44:18
    48:22
    54:16
    64:7
    68:4,5,
    14,17
    69:3,17
    74:3
    77:15
    79:24
    82:4
    88:9,11
    89:9,14
    93:16
    94:21
    100:4,22
    102:18
    103:2
    105:16

questions
    6:16,18,
    22,23
    36:23
    37:5
    49:15
    51:17
    77:10
    98:8
    106:1

quick
    37:3
    44:7,17

quickly
    90:5

quiet
    34:2

quotes
    46:2,5

―――――――
        R
―――――――

R.J.
    46:14

raise
    30:15
    61:13,15
    71:15
    93:3

range
    7:7 49:19

ratio
    55:18
    56:5 59:3
    60:9

read
    20:25
    21:9
    31:22
    37:3,7
    39:12
    42:16
    44:17,19,
    21 50:10
    54:14
    64:5
    79:22
    89:13

reading
    13:15
    26:25
    38:19
    89:18
    98:2

reads
    87:2

ready

64:12

real
    68:4
    82:16

realm
    82:9

reason
    34:5
    36:16
    69:2,18
    92:7,18,
    25 93:1

reasons
    64:17

rebuttal
    7:24
    8:12,19
    10:1
    16:5,7
    25:23
    31:2 33:6
    44:8 70:2
    72:7
    78:12
    79:2

recall
    7:18,24
    9:21
    10:11
    38:19
    89:15,17

receiver/
transceiver
    28:20
    29:21

recessed
    49:9 86:1

recite
    58:2

recollectio
n
    80:11

record
    11:20
    12:21
    14:14,15,
    23,24
    15:10,20,
    21 78:10,
    24 80:3
    91:2,3
    99:2,3,
    10,25
    100:9,14
    101:1,2,
    7,13,19,
    23
    102:12,
    13,16,17
    103:5,7,
    19 104:1
    105:18,19

rectangle
    84:15

redefine
    95:24
    101:9

redefines
    101:16

redefining
    101:16

redirect
    90:4

reduce
    32:7,13
    55:9

redundant
    73:21

reference
    12:12,17,
    20 46:12,
    13

references
    46:3
    56:12



**referred**
53:8

**referring**
38:5

**reflect**
31:25
65:2,11
67:2
82:25

**reflected**
64:10

**reflecting**
65:1,5
66:17
67:2

**reflection**
82:22

**reflective**
66:22
67:19
81:16,19
83:11,16

**reflector**
36:1,9,14
45:4,10,
19 54:8
84:12,21
85:2
92:12

**regard**
96:13

**region**
17:8
30:19
33:10,14
34:6,7
35:20,24
36:8
45:3,9
46:18,19,
23,25
47:2,3,4,
11,12,16,

17,19,20,
22,23
48:9
50:2,8,
11,12,14,
23,25
53:24
54:2,4
55:23
56:8,9
57:23
58:22,25
59:8,11,
13,14,15
60:1,4,7,
21 61:4,
6,9,18,19
65:3
66:7,8
67:1,3,8,
11,15,23
68:1,22
69:25
72:13
75:12,25
76:12,24
80:25
82:19
83:21,25
84:1,9,
15,22
85:3,19
91:25
92:6,13
103:12
104:3,7

**regions**
59:22
60:22
64:10
66:1,18

**reject**
29:10
48:6

**rejected**

48:15

**rejection**
56:2

**relates**
59:23

**relationship**
57:12
87:11

**relationships**
52:16

**relevant**
12:13

**reliable**
13:9

**relied**
79:21
103:15

**rely**
18:3 80:1
103:22

**relying**
20:22

**remains**
22:22
69:8

**remove**
33:1

**repeat**
19:22
93:16
94:20

**repeating**
78:22

**rephrase**
6:24
50:18

**report**
7:19,25

8:7,12
9:22
25:23
90:10,11

**Reporter**
8:9,15
28:12
86:6

**reproduced**
33:9
72:11

**require**
49:25
58:17
75:21

**required**
23:18
24:20
27:14

**requirement**
58:11

**requires**
71:25

**resonator**
17:9,11,
12 28:18,
19 29:18
30:7,16,
19,22
34:8,12,
13 35:18
37:17,20,
22 42:8,
24 43:5,
13,23
47:22
48:1,21
53:16
55:19
56:15
58:22
61:23
85:13
87:3,8

**resonators**
17:13
18:24
23:5
28:22,24
29:16
37:13,14
105:2,3,4

**resort**
17:23

**resorting**
17:18

**response**
37:24
57:14

**responsible**
56:1,3

**result**
35:19
42:17,21,
23 43:8
81:4

**resulting**
53:5

**results**
43:10

**resurface**
86:20

**return**
67:24

**returned**
64:10

**review**
20:19
21:5
95:16

**reviewed**
28:15
86:12

**reviewing**
10:11



14:22
15:19
20:5

revolve
64:7

revolves
55:3

ring
57:11,12,
13

river
63:11

rock
63:12,13,
14,15

role
13:7

——————

S

satisfied
74:10

scenario
61:3

science
24:14,17

scientifica
lly
31:1
82:13

scope
87:12
90:23
91:5,16,
22 92:3,
9,21
93:11,22
94:6,12,
19 95:2,
21 96:10
97:1,9,24

98:6
100:7

scratch
61:16

scroll
41:4

section
20:23,25
21:14,17
77:18

select
43:23,25
44:2,3

semesters
24:21

sense
21:10,11
28:25
29:1

sensitivity
43:3

sensor
28:25

sensors
28:22,23

sentence
16:8,10
17:15
26:23
36:25
42:15
60:20
64:8
70:12,18
77:25
78:2

sentences
61:1

separating
66:3

series

45:23

sets
105:7,8

setting
105:10

short
7:1 32:11

short-hand
44:23
45:1,13

Shorthand
8:9,15
28:12
86:6

show
46:23,25

showing
104:5

side
30:19,22

signals
29:14

silicon
27:24

similar
86:21
93:18
96:24

simply
68:19,21

simulate
52:9

Simulated
52:2

simulates
51:5
52:1,4

simulation
52:8,10
57:5

single
14:13
24:5
27:10,16,
23 87:3,
8,23
88:8,17,
18,23
89:2,23
96:20
98:4

Sio2
84:16

situation
14:19
76:25
77:6

skill
16:17
18:3
19:5,9,15
20:3
21:15
22:1,12
25:4,12
26:1,5,17
39:4 62:7
63:6,9
84:20
85:1
97:16

skilled
54:18
85:11
98:19,21

skip
70:5

slew
24:25

slow
63:14

small
34:7

61:3,6,
15,20
72:24
81:3,13,
21 82:5
83:4,16

smallest
82:6

solely
101:18

solid
52:10,11

someplace
46:24

sort
26:9
54:23

sorts
56:4
97:18

sound
40:17

sounds
33:23

source
21:4

sources
53:17

spacial
62:2

speak
6:15
85:6,9

speaks
89:3

specific
18:23
42:3,4
58:15
103:2



specificati
on
    11:4,9,13
    16:24
    17:4
    18:12
    19:4,8,18
    35:23
    36:18
    44:13
    45:2
    55:3,7,11
    57:8
    59:18,20
    61:12
    62:12
    63:21
    71:4,9,14
    73:8
    76:5,6
    84:10,19,
    24 91:7,
    12,21
    92:2,8,
    10,14,20
    93:1,9
    94:5,16,
    24 95:18,
    24 96:6
    97:8,20
    98:2 99:4
    104:8

specificati
ons
    51:5 94:7

specifics
    19:24
    22:19

specifies
    80:23

speculation
    12:15
    14:2,17
    15:1 22:4
    39:22

    87:25
    102:25

Speculative
    10:20
    25:15

speed
    88:14

spent
    10:5,7

spot
    62:19,20,
    21,23

spurious
    29:14

stability
    29:12

stable
    29:4

stack
    92:11

stages
    29:11
    33:5
    43:1,21

start
    9:11
    13:22
    30:5
    36:22
    37:8
    56:21

starting
    16:8
    36:25
    37:1
    42:16
    64:1,8

starts
    31:5
    44:12
    60:15

    70:13
    77:23,25
    78:16
    79:14
    80:16

statement
    31:10,13,
    17 32:2,
    22 55:2

statements
    79:21
    101:15

states
    50:6

stay
    7:2,3

stays
    76:12,24

stop
    34:14

strain
    52:18,20

strains
    57:4

stress
    37:23
    52:18,20

stresses
    57:4

strike
    68:20
    93:12
    95:6
    100:23

structure
    89:24

structures
    27:6,7

students
    19:1

    23:14,22
    24:12,14,
    16,19

stuff
    9:18 39:2

submission
    21:23

submitted
    9:15 80:2

submitting
    7:18

substantial
ly
    78:5,9,
    18,23
    79:4

substantive
ly
    79:6
    93:24
    94:2,3

substitute
    79:6

substrate
    55:13
    64:22
    67:18

succeeding
    33:5
    43:21

successfull
y
    64:21

suffering
    67:17

sufficientl
y
    70:17

suggest
    91:12

suggested
    37:2

suggests
    15:21

sum
    51:13
    63:1

support
    16:12

supported
    78:9,24
    99:9

suppose
    29:22
    38:15
    65:7

supposed
    19:18

surface
    81:16,18

suspended
    41:8

switch
    86:9

synonymous
    64:15,17

system
    28:19,20
    29:13,21
    53:16
    86:20
    87:8,22

                T

taking
    24:16
    72:17
    83:7

talk



27:10
77:17
83:4 86:9

**talked**
56:4 57:6
73:6
105:8

**talking**
10:9 23:3
58:6,7
64:25
69:3 77:9
79:11
82:5
83:14
90:9

**talks**
55:12

**taught**
23:15
24:14
97:16

**teach**
23:11,12
28:2
70:24

**teaching**
23:10
24:10,22

**teachings**
100:8

**technical**
25:6,13

**technique**
51:10
56:25

**techniques**
57:5

**technology**
22:24
23:1,2,
10,14

**tells**
6:18

**temperature**
29:12
43:3

**ten**
10:9
85:21

**tend**
15:17

**term**
14:22
15:9,20,
22 37:9,
10 38:9,
19 45:8
49:16,22
90:20,21
92:17
93:6,21
96:17,24
98:13,17,
18,24
99:7,8,
18,23,24
100:6,8,
9,11,15,
25 101:2,
13,18
102:3,22
103:6,9,
15 104:18

**terminology**
11:12

**terms**
17:18,22
18:1,8
47:10
59:7 79:7
90:12,15
91:2,10,
11 93:7
94:8,18
95:1,24

96:1,4,25
103:13
105:21,24

**testimony**
18:6
105:18

**texts**
21:10
45:24

**theoretical**
82:9

**theoretically**
82:3

**thereabouts**
38:16

**thickness**
41:20
42:8

**thing**
9:14,16,
20 12:2
18:23,25
22:21
41:7
52:17
56:23
63:10
77:10
85:24
104:24

**things**
10:8 15:8
19:14
21:1 22:7
25:17
26:11,20
33:22
41:19
44:5 46:8
48:17
49:3
54:23,25

55:1 56:4
63:19,20,
22,23
66:24
70:24
79:17
82:2 83:5
86:22

**thinking**
18:7
81:24
89:18

**thinks**
12:12

**thought**
59:24

**time**
6:17,22
21:18,21,
22 22:1,
11 23:15
32:5
48:12
51:16
61:6
69:18,21
73:4 83:7
88:11

**times**
8:23 22:9
38:2

**title**
87:2,12

**titled**
21:14

**titles**
8:23

**today**
6:24 7:2,
11,13,22
8:3,23
10:15
23:4

27:10

**top**
36:3
84:12,17

**topics**
24:5,8

**total**
54:9
55:3,7,9
59:12,13
61:10,18,
19,21
63:18
72:12,15,
18,22
73:15,21
74:5,17
75:2,7,
16,19
76:3,17,
18 77:13

**transduced**
38:22

**transducer**
38:22

**transistor**
23:11

**transmissive**
82:21,23
83:2

**treatments**
100:18

**trend**
52:16

**trouble**
69:2

**true**
67:6

**truthfully**
7:11



turn
    35:12
    49:13
    91:2

type
    9:24
    18:25
    37:18
    56:25
    65:7,8
    89:19

typed
    9:24

types
    17:12
    19:2
    65:21
    67:7,12

typical
    61:3

typically
    23:7

——————————

        U

U.S.
    38:10

UC
    23:21
    24:3

Uh-hmm
    79:13

ultimate
    43:8,13

unclear
    6:23

undergraduate
    25:5
    26:14

underneath
    54:8

understand
    6:20 7:13
    10:24
    12:10,17
    17:17
    18:4,8,22
    25:13
    39:7
    62:8,10
    63:7,10,
    19 69:22
    73:10,17
    74:11,15
    75:17
    83:14
    89:21,25
    90:1
    95:20,22
    97:16
    98:19
    99:21
    100:3,10
    101:2
    102:2

understanding
    7:15
    10:17,25
    11:3,8,14
    13:3 16:2
    19:12
    20:1 21:7
    46:10
    71:16
    76:8
    105:1,5,
    22,25

understands
    19:15

unfiltered
    29:23

universal
    105:5

university
    24:17

unreasonable
    26:17

unwanted
    29:14
    33:1

usual
    86:22

——————————

        V

vague
    9:1 11:21
    14:16
    15:12,25
    19:11,21
    22:15
    25:14
    26:18
    39:21
    53:10
    55:16
    58:13
    66:9 71:6
    75:9 82:4
    87:15
    98:25
    99:11
    102:7,25

valleys
    62:18
    63:5 73:6
    74:1,8,9,
    22,23
    75:1
    76:21
    77:11

values
    49:19
    58:19

68:23
    72:1,2
    75:19

vantage
    105:17

variety
    28:24
    57:9,19

velocity
    63:12,17

versus
    20:17,18
    27:17
    68:25

vibration
    41:24

video
    6:14

view
    16:12
    31:17
    72:19
    81:8 97:7

visualize
    57:3

Vitronics
    20:18

voltage
    35:2
    42:25
    53:20,21

voltages
    39:10

volume
    49:4
    50:1,7,
    19,25
    51:14
    52:21,23
    62:5,14,
    15,16

68:16
    72:13,17,
    20,21
    73:11,12,
    20,22
    74:5,6,
    17,18,25
    75:5,13,
    22 76:1,
    3,9,11,
    13,14,21,
    22,23
    77:1,3,7,
    8,12,14
    83:21,24
    84:8,14
    85:18

——————————

        W

wanted
    14:5 33:2

water
    63:12

wave
    83:3

wavelength
    81:3,7,9,
    20,22
    82:18,25

wavelengths
    30:24
    80:23

waves
    57:1,2
    73:1,2,3

ways
    32:19,21
    43:12
    51:7,15
    55:14
    56:11,17,
    18 57:10,



19

well-
defined
  37:10
wide
  60:22,25
wider
  105:1
wireless
  28:20
word
  41:16
  45:11
  51:24
  66:10
  74:13
  75:16,19
  76:16,18
  93:23
  94:2
  104:24
words
  41:2
  50:14,19
  85:17
  89:5
wordsmithin
g
  73:24
work
  25:11,17
working
  18:19,20,
  24
world
  82:16
worry
  44:5
wrap
  85:24
write

9:13,25

writing
  9:17
written
  18:12
  19:5,18
  20:2
wrong
  70:6
wrote
  32:3

────────────

        Y
────────────

year
  24:9
years
  25:6



# Exhibit A8

US007795781B2

(12) **United States Patent**
Barber et al.

(10) **Patent No.:** **US 7,795,781 B2**
(45) **Date of Patent:** **Sep. 14, 2010**

(54) **BULK ACOUSTIC WAVE RESONATOR WITH REDUCED ENERGY LOSS**

(75) Inventors: **Bradley P. Barber**, Acton, MA (US);
**Frank Bi**, Shrewsbury, MA (US); **Craig
E. Carpenter**, Shirley, MA (US)

(73) Assignee: **Avago Technologies Wireless IP
(Singapore) Pte. Ltd.**, Singapore (SG)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 86 days.

(21) Appl. No.: **12/150,244**

(22) Filed: **Apr. 24, 2008**

(65) **Prior Publication Data**
US 2009/0267457 A1      Oct. 29, 2009

(51) **Int. Cl.**
*H01L 41/08*      (2006.01)
(52) **U.S. Cl.** ..................................................... **310/320**
(58) **Field of Classification Search** .................. 310/320
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,363,119 A | 1/1968 | Koneval et al. | |
| 3,365,591 A | 1/1968 | Curran et al. | |
| 3,401,276 A | 9/1968 | Curran et al. | |
| 4,634,914 A * | 1/1987 | Ballato | 310/313 D |
| 6,091,406 A * | 7/2000 | Kambara et al. | 345/177 |
| 6,420,202 B1 * | 7/2002 | Barber et al. | 438/52 |
| 6,424,237 B1 * | 7/2002 | Ruby et al. | 333/187 |
| 6,657,363 B1 | 12/2003 | Aigner | |
| 6,812,619 B1 * | 11/2004 | Kaitila et al. | 310/320 |
| 6,933,809 B2 | 8/2005 | Kyoung et al. | |
| 7,148,769 B2 * | 12/2006 | Takano | 333/193 |
| 7,323,953 B2 | 1/2008 | Yokoyama et al. | |

| | | | |
|---|---|---|---|
| 7,369,013 B2 * | 5/2008 | Fazzio et al. | 333/187 |
| 7,482,737 B2 | 1/2009 | Yamada et al. | |
| 7,535,154 B2 * | 5/2009 | Umeda et al. | 310/320 |
| 7,594,307 B2 | 9/2009 | Morimura | |
| 2002/0121840 A1 | 9/2002 | Larson et al. | |
| 2005/0140247 A1 | 6/2005 | Lee | |
| 2006/0103492 A1 | 5/2006 | Feng et al. | |
| 2006/0132262 A1 * | 6/2006 | Fazzio et al. | 333/187 |
| 2006/0226932 A1 | 10/2006 | Fazzio et al. | |
| 2008/0157629 A1 | 7/2008 | Noguchi et al. | |
| 2009/0045703 A1 | 2/2009 | Barber et al. | |
| 2009/0045704 A1 | 2/2009 | Barber et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2007/006542 | 1/2007 |
| WO | 2005008889 | 1/2005 |

OTHER PUBLICATIONS

International Searching Authority, "Notification of Transmittal of the
International Search Report and the Written Opinion of the Interna-
tional Searching Authority, or the Declaration", *International Appli-
cation No. PCT/US2009/041265* Nov. 30, 2009.

* cited by examiner

*Primary Examiner*—J. SanMartin

(57) **ABSTRACT**

According to an exemplary embodiment, a bulk acoustic
wave (BAW) resonator includes a piezoelectric layer having a
disrupted texture region, where the disrupted texture region is
situated in a controlled thickness region of the BAW resona-
tor. The BAW resonator further includes lower and upper
electrodes situated on opposite surfaces of the piezoelectric
layer. The controlled thickness region has controlled electro-
mechanical coupling and includes a segment of material situ-
ated over the upper electrode. The segment of material can be
a metal or a dielectric material. The disrupted texture region
can be situated at an edge of the BAW resonator and can
extend along a perimeter of the BAW resonator.

**13 Claims, 4 Drawing Sheets**





**Fig. 1A**



**Fig. 1B**

# Fig. 2

200



Form lower electrode of BAW resonator over underlying substrate.          202

Form piezoelectric layer over lower electrode, where piezoelectric layer includes disrupted texture region.          204

Form upper electrode of BAW resonator over piezoelectric layer.          206

Form material segment over upper electrode in controlled thickness region of BAW resonator.          208

**Fig. 3**





US 7,795,781 B2

**1**

## BULK ACOUSTIC WAVE RESONATOR WITH REDUCED ENERGY LOSS

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention generally relates to the field of electronics. More particularly, the invention relates to bulk acoustic wave (BAW) resonators.

2. Background Art

Because of their small footprint, low profile, and high performance, bulk acoustic wave (BAW) filters are increasingly utilized to provide radio frequency (RF) filtering in mobile electronic devices, such as cellular phones, as well as other types of electronic devices. BAW filters can include a number of BAW resonators, where each BAW resonator typically includes a layer of piezoelectric material, such as aluminum nitride, sandwiched between upper and lower electrodes. When an electric field is applied across the upper and lower electrodes of the BAW resonator, the electric field can cause the layer of piezoelectric material to vibrate. As a result, the piezoelectric material can generate a number of allowed modes of acoustic wave propagation, which include a desired longitudinal mode. However, unwanted excitation of energy in modes of wave propagation that have high energy loss, such as lateral modes, can cause a significant loss of energy in a BAW resonator and, thereby, undesirably lower the BAW resonator's quality factor (Q).

Conventional approaches to reducing energy loss in a BAW resonator include shaping the profile of the resonator such that the energy is best contained and controlled in a desired longitudinal mode. In one conventional profile shaping approach, a shaped region can be provided close to the edge of the BAW resonator, which is a region of high energy loss, to reduce the amount of energy that is excited in lossy modes of wave propagation in the BAW resonator. However, the shaped region provided in this conventional approach can also introduce additional unwanted modes, such as lateral modes contained within the shaped region, which can cause energy loss in the BAW resonator.

### SUMMARY OF THE INVENTION

A bulk acoustic wave resonator with reduced energy loss, substantially as shown in and/or described in connection with at least one of the figures, as set forth more completely in the claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A illustrates a cross-sectional view of an exemplary bulk acoustic wave (BAW) resonator, in accordance with one embodiment of the present invention.

FIG. 1B illustrates a top view of the exemplary BAW resonator of FIG. 1A.

FIG. 2 shows a flowchart illustrating an exemplary method for fabricating a BAW resonator in accordance with one embodiment of the present invention.

FIG. 3 is a diagram of an exemplary electronic system including an exemplary chip or die utilizing a BAW resonator in accordance with one embodiment of the present invention.

### DETAILED DESCRIPTION OF THE INVENTION

The present invention is directed to a bulk acoustic wave resonator with reduced energy loss. The following description contains specific information pertaining to the imple-

**2**

mentation of the present invention. One skilled in the art will recognize that the present invention may be implemented in a manner different from that specifically discussed in the present application. Moreover, some of the specific details of the invention are not discussed in order not to obscure the invention. The specific details not described in the present application are within the knowledge of a person of ordinary skill in the art.

The drawings in the present application and their accompanying detailed description are directed to merely exemplary embodiments of the invention. To maintain brevity, other embodiments of the invention which use the principles of the present invention are not specifically described in the present application and are not specifically illustrated by the present drawings.

FIG. 1A shows a cross-sectional view of BAW resonator **100**, in accordance with one embodiment of the present invention. Certain details and features have been left out of FIG. 1A, which are apparent to a person of ordinary skill in the art. BAW resonator **100** includes lower electrode **102**, piezoelectric layer **104**, upper electrode **106**, and material segment **108**. BAW resonator **100** can further include an acoustic mirror, which provides acoustic isolation from an underlying substrate. The acoustic mirror and the substrate over which BAW resonator **100** is fabricated are not shown in FIG. 1A so as not to obscure the invention. In one embodiment, BAW resonator **100** can be a film bulk acoustic wave resonator (FBAR) and can be acoustically isolated from an underlying substrate by an air cavity. BAW resonator **100** can be utilized in a BAW filter to provide RF filtering in a cell phone or other type of semiconductor device and can be fabricated in a semiconductor die.

As shown in FIG. 1A, lower electrode **102** can be situated over, for example, an acoustic mirror, which is not shown in FIG. 1A, and can comprise tungsten, molybdenum, or other suitable metal having a high density (i.e. a high density metal). Lower electrode **102** has thickness **110**, which can be, for example, between 500.0 Angstroms and 5000.0 Angstroms. Lower electrode **102** can be formed by depositing a layer of high density metal, such as tungsten or molybdenum, over a layer of material (not shown in FIG. 1A) by utilizing a physical vapor deposition (PVD) or sputtering process or other suitable deposition process and appropriately patterning the layer of high density metal.

Also shown in FIG. 1A, piezoelectric layer **104** is situated over lower electrode **102**, includes disrupted texture region **109** and non-disrupted texture region **111**, and has top surface **126**. A seed layer (not shown in FIG. 1A) can be situated between piezoelectric layer **104** and lower electrode **102**. Piezoelectric layer **104** can comprise aluminum nitride (AlN) or other suitable piezoelectric material and has thickness **112**, which can be, for example, between 0.5 microns and 3.0 microns. Disrupted texture region **109** is situated in controlled thickness region **114** at the edge of BAW resonator **100** and extends along the entire perimeter of the BAW resonator. Disrupted texture region **109** has width **116**, which can be, for example, between 1.0 micron and 5.0 microns. In disrupted texture region **109**, the crystallinity of the piezoelectric material is disrupted so as to cause significantly reduced electromechanical coupling therein. Non-disrupted texture region **111** is situated adjacent to and surrounded by disrupted texture region **109** and comprises piezoelectric material having normal crystallinity, i.e., crystallinity that has not been intentionally disrupted. Piezoelectric layer **104** can be formed by, for example, depositing a layer of aluminum nitride over lower electrode **102** by utilizing a PVD or sputtering process, a CVD process, or other suitable deposition process.

US 7,795,781 B2

**3**

Prior to formation of piezoelectric layer **104**, the surface area that will underlie disrupted texture region **109** can be sufficiently disturbed so as to insure that the texture of the piezoelectric material will be disrupted when piezoelectric layer **104** is formed. For example, a thin layer of material known to disrupt texture, such as silicon oxide, can be deposited over a thin seed layer (not shown in FIG. **1**A) in the surface region of lower electrode **102** over which disrupted texture region **109** will be formed. As another example, an etch process or other suitable process can be utilized to roughen the surface region of lower electrode **102** over which disrupted texture region **109** will be formed. In one embodiment, the surface region of a layer (not shown in FIG. **1**A) underlying the region of lower electrode over which disrupted texture region **108** will be formed can be roughened prior to forming the lower electrode. The resulting disruption in the texture of the lower electrode caused by the roughening of the surface region of the underlying layer can, in turn, cause the texture of the piezoelectric material to be disrupted in disrupted texture region **108** when piezoelectric layer **104** is formed.

Further shown in FIG. **1**A, upper electrode **106** is situated over piezoelectric layer **104** and can comprise tungsten, molybdenum, or other suitable dense metal. Upper electrode **106** has thickness **120**, which can be, for example, between 500.0 Angstroms and 5000.0 Angstroms. Upper electrode **106** has width **122**, which can be less than the width of lower electrode **102** and which defines the width of the active portion of BAW resonator **100**. In one embodiment, upper electrode **106** and lower electrode **102** can be approximately equal in width. Upper electrode **106** can be formed by depositing a layer of dense metal, such as tungsten or molybdenum, over piezoelectric layer **104** by utilizing a PVD or sputtering process or other suitable deposition process. The layer of dense metal can be appropriately patterned by utilizing a suitable etch process. In the present embodiment, the edge of upper electrode **106** can be self-aligned with the outer edge of material segment **108** as discussed below.

Also shown in FIG. **1**A, material segment **108** is situated over upper electrode **106** at the edge of BAW resonator **100**. Material segment **108** is also situated in controlled thickness region **114** and extends along the entire perimeter of BAW resonator **100**. Material segment **108** can comprise a metal, such as a low or high density metal, a dielectric material, or a semiconductor material and has thickness **124** and width **130**. For example, thickness **124** of material segment **108** can be between 100.0 Angstroms and 3000.0 Angstroms. Width **130** of material segment **108** can be, for example, between 1.0 micron and 5.0 microns. In the embodiment in FIG. **1**A, material segment **108** has a uniform cross-sectional thickness. In other embodiments, material segment **108** can have a non-uniform cross-sectional thickness and can have a wedge shape, a teardrop shape, or other suitable shape.

Material segment **108** can be formed by depositing a layer of material over upper electrode **106** by utilizing a PVD or sputtering process, a CVD process, or other suitable deposition process. The layer of material can then be appropriately patterned by utilizing a suitable etch process to form the inner edge of material segment **108**. In the embodiment in FIG. **1**A, the outer edge of material segment **108** can be formed concurrently with the edge of upper electrode **106** in the same etch process so as to precisely define the edge of BAW resonator **100**. In one embodiment, the layer of material can be appropriately patterned by utilizing a suitable etch process to form the inner and outer edges of material segment **108**. In that embodiment, material segment **108** can overlap the edge of upper electrode **106** or fall entirely within its boundary.

**4**

Further shown in FIG. **1**A, controlled thickness region **114** is situated at the edge of BAW resonator **100** and includes material segment **108**, disrupted texture region **109** of piezoelectric layer **104**, and the portion of upper electrode **106** situated between material segment **108** and disrupted texture region **109**. In another embodiment, controlled thickness region **114** can be formed at a location other than at the edge of the BAW resonator. Also shown in FIG. **1**A, high density metal region **128** is situated adjacent to and surrounded by controlled thickness region **114** and includes the region of BAW resonator **100** in which upper electrode **106** is situated over non-disrupted texture region **111** of piezoelectric layer **104**.

FIG. **1**B shows a top view of structure **100**, where the cross-sectional view of BAW resonator **100** in FIG. **1**A is across line 1A-1A in FIG. **1**B. In particular, piezoelectric layer **104**, upper electrode **106**, material segment **108**, disrupted texture region **109**, controlled thickness region **114**, widths **116**, **122**, and **130**, and high density metal region **128** correspond to the same elements in FIG. **1**A and FIG. **1**B. As shown in FIG. **1**B, upper electrode **106** has depth **132**, which defines the approximate depth of the active region of BAW resonator **100**. In the embodiment in FIGS. **1**A and **1**B, BAW resonator **100** has a rectangular shape. In one embodiment, BAW resonator **100** can have a square shape, wherein width **122** can be approximately equal to depth **132**. There can also be advantages to rounding the BAW resonator's corners and/or forming the resonator such that opposite sides of the resonator are not parallel.

As shown in FIG. **1**B, controlled thickness region **114** is situated at the edge of BAW resonator **100**, extends along the resonator's perimeter, and has a width that is defined by width **116** of disrupted texture region **109**. Also shown in FIG. **1**B, material segment **108** is situated over upper electrode **106** and disrupted texture region **109** and is also situated at the edge of BAW resonator **100**. Material segment **108** is further situated in controlled thickness region **114** and extends along the perimeter of BAW resonator **100**.

The operation of BAW resonator **100** will now be discussed. When an electric field is applied across piezoelectric layer **104** via upper electrode **106** and lower electrode **102**, electrical energy is converted into acoustic energy in piezoelectric layer **104** through electromechanical coupling, thereby causing piezoelectric layer **104** to vibrate. As a result, piezoelectric layer **104** can generate acoustic waves that can propagate in a longitudinal mode, i.e., in a direction perpendicular to top surface **126** of piezoelectric layer **104**, which is a desired mode. However, as a result of the crystalline structure of piezoelectric layer **104**, the edge region of BAW resonator **100**, and other factors, a multitude of other, unwanted modes of wave propagation can also be generated in piezoelectric layer **104**. For example, unwanted modes such as lateral modes, i.e., modes of acoustic wave propagation that occur in a direction parallel to top surface **126** of piezoelectric layer **104**, can be generated in piezoelectric layer **104**. As discussed above, a significant loss of energy in BAW resonators can occur as a result of coupling energy into unwanted modes, such as lateral modes. In particular, the edge of a BAW resonator, such as BAW resonator **100**, is a lossy region of the resonator wherein coupling into unwanted, lossy modes, such as lateral modes, can undesirably increase energy loss in the BAW resonator.

In BAW resonator **100**, controlled thickness region **114** includes material segment **108**, which is situated over upper electrode **106** to provide thickness shaping at the edge of the resonator, and disrupted texture region **109**, which comprises piezoelectric material having disrupted crystallinity. As a

US 7,795,781 B2

5

result, the electromechanical coupling can be controlled and, thereby, significantly reduced in controlled thickness region **114**. Thus, electromechanical coupling into unwanted modes, such as lateral modes, as well as coupling into the desired longitudinal mode, can be significantly reduced in controlled thickness region **114**. However, the overall loss of coupling into the longitudinal mode in BAW resonator **100** as a result of the loss of coupling in controlled thickness region **114** is significantly less than the overall reduction in energy loss achieved in BAW resonator **100** by reducing electromechanical coupling into unwanted modes in controlled thickness region **114**. Also, width **130**, thickness **124**, the composition of material segment **108**, and width **116** of disrupted texture region **109** of piezoelectric layer **104** can be appropriately selected to optimize reduction of coupling into unwanted modes, such as lateral modes.

Thus, by utilizing disrupted texture region **109** of piezoelectric layer **104** to reduce electromechanical coupling in controlled thickness region **114**, an embodiment of the invention's BAW resonator **100** achieves a significant reduction of electromechanical coupling into unwanted modes, thereby significantly reducing overall energy loss in BAW resonator **100**. By reducing overall energy loss, the invention advantageously achieves a BAW resonator having an increased Q.

From the above description of the embodiment of invention in FIGS. **1**A and **1**B, it is manifest to one of ordinary skill in the art that a material segment, such as material segment **108**, can alternatively be formed under disrupted texture region **109** of piezoelectric layer **104** and even under lower electrode **102** in BAW resonator **100** to achieve similar advantages as discussed above.

FIG. **2** shows a flowchart illustrating an exemplary method according to one embodiment of the present invention. Certain details and features have been left out of flowchart **200** that are apparent to a person of ordinary skill in the art. For example, a step may consist of one or more substeps or may involve specialized equipment or materials, as known in the art. It is noted that the processing steps shown in flowchart **200** are performed on a portion of a processed wafer, which, prior to step **202** of flowchart **200**, includes, among other things, an acoustic mirror or an air cavity overlying a substrate, which are not shown in any of the figures.

At step **202** of flowchart **200**, lower electrode **102** of BAW resonator **100** in FIG. **1**A is formed over a substrate (not shown in any of the figures). In one embodiment, lower electrode **102** can be formed over an acoustic mirror (not shown in any of the figures), which can be formed over the substrate. In another embodiment, lower electrode **102** can be formed over an air cavity (not shown in any of the figures), which can be formed over the substrate. Lower electrode **102** can comprise a high density metal, such as tungsten or molybdenum, and can be formed by depositing a layer of high density metal by utilizing a PVD or sputtering process or other suitable deposition process and appropriately patterning the layer of high density metal. At step **204**, piezoelectric layer **104** is formed over lower electrode **202**, where piezoelectric layer **104** includes disrupted texture region **109**. In disrupted texture region **109**, the crystallinity of the piezoelectric material is disrupted to significantly reduce electromechanical coupling in controlled thickness region **114**.

Prior to formation of piezoelectric layer **104**, the surface area that will underlie disrupted texture region **109** can be sufficiently disturbed so as to insure that the texture of the piezoelectric material will be disrupted when piezoelectric layer **104** is formed. For example, an etch process or other suitable process can be utilized to roughen the surface region of lower electrode **102** over which disrupted texture region

6

**109** will be formed. This disruption can alternatively be done before the lower electrode is deposited since in some cases disruption of the lower electrode's texture will subsequently disrupt the piezoelectric material's texture. In one implementation, piezoelectric layer **104** can comprise aluminum nitride and can be formed by depositing a layer of aluminum nitride over lower electrode **102** by utilizing a PVD process or other suitable deposition process and appropriately patterning the layer of aluminum nitride. At step **206**, upper electrode **106** of BAW resonator **100** is formed over piezoelectric layer **104**. For example, upper electrode **106** can comprise a high density metal, such as tungsten or molybdenum, and can be formed by depositing a layer of high density metal over piezoelectric layer **104** by utilizing a PVD or sputtering process and appropriately patterning the layer of high density metal.

At step **208**, material segment **108** is formed over upper electrode **106** in controlled thickness region **114** of BAW resonator **100**. For example, material segment **108** can comprise a metal, a dielectric material, or a semiconductor material and can be formed by depositing a layer of the material over upper electrode **106** in controlled thickness region **114** by utilizing a CVD or other suitable deposition process. After deposition, the layer of material can be appropriately patterned by utilizing a suitable etch process. For example, the layer of material can be concurrently etched with an underlying layer of unpatterned high density metal such that the outer edge of material segment **108** is self-aligned with the edge of upper electrode **106**.

FIG. **3** illustrates a diagram of an exemplary electronic system including an exemplary chip or die utilizing one or more BAW resonators in accordance with one embodiment of the present invention. Electronic system **300** includes exemplary modules **302**, **304**, and **306**, IC chip or semiconductor die **308**, discrete components **310** and **312**, residing in and interconnected through circuit board **314**. In one embodiment, electronic system **300** may include more than one PCB. IC chip **308** includes circuit **316**, which can comprise a BAW filter, including one or more of the invention's BAW resonators designated by numeral **318**.

As shown in FIG. **3**, modules **302**, **304**, and **306** are mounted on circuit board **314** and can each be, for example, a central processing unit (CPU), a graphics controller, a digital signal processor (DSP), an application specific integrated circuit (ASIC), a video processing module, an audio processing module, an RF receiver, an RF transmitter, an image sensor module, a power control module, an electromechanical motor control module, or a field programmable gate array (FPGA), or any other kind of module utilized in modern electronic circuit boards. Circuit board **314** can include a number of interconnect traces (not shown in FIG. **3**) for interconnecting modules **302**, **304**, and **306**, discrete components **310** and **312**, and IC chip **308**.

Also shown in FIG. **3**, IC chip **308** is mounted on circuit board **314** and can be, for example, any chip utilizing one or more of an embodiment of the invention's BAW resonator, such as BAW resonator **100** in FIGS. **1**A and **1**B. In one embodiment, IC chip **308** may not be mounted on circuit board **314**, and may be interconnected with other modules on different circuit boards. As stated above, circuit **316** is situated in IC chip **308** and can comprise a BAW filter including one or more of the invention's BAW resonators designed by numeral **318**. Further shown in FIG. **3**, discrete components **310** and **312** are mounted on circuit board **314** and can each be, for example, a discrete filter, such as one including a SAW filter or the like, a power amplifier or an operational amplifier, a semiconductor device, such as a transistor or a diode or the like, an antenna element, an inductor, a capacitor, or a resistor.

US 7,795,781 B2

7

Electronic system **300** can be utilized in, for example, a wired or wireless communications device, a cell phone, a switching device, a router, a repeater, a codec, a wired or wireless LAN, a WLAN, a Bluetooth enabled device, a Global Positioning System (GPS) device, a computer, a monitor, a television set, a satellite set top box, a cable modem, a printer, a copier, an RF transceiver, a personal digital assistant (PDA), or in any other kind of system, device, component or module utilized in modern electronics applications.

Thus, as discussed above, in the embodiment in FIGS. **1**A and **1**B, the invention provides a BAW resonator having a controlled thickness region that includes a material segment to provide thickness shaping and a disrupted texture region of a piezoelectric layer to provide controlled electromechanical coupling. By utilizing a controlled thickness region to reduce electromechanical coupling at the edge of the BAW resonator, the invention's BAW resonator advantageously achieves a significant reduction in energy loss by significantly decreasing electromechanical coupling into unwanted, lossy modes compared to a conventional BAW resonator utilizing only profile shaping to reduce energy loss. As a result, the invention's BAW resonator advantageously achieves a higher Q compared to the conventional BAW resonator.

From the above description of the invention it is manifest that various techniques can be used for implementing the concepts of the present invention without departing from its scope. Moreover, while the invention has been described with specific reference to certain embodiments, a person of ordinary skill in the art would appreciate that changes can be made in form and detail without departing from the spirit and the scope of the invention. Thus, the described embodiments are to be considered in all respects as illustrative and not restrictive. It should also be understood that the invention is not limited to the particular embodiments described herein but is capable of many rearrangements, modifications, and substitutions without departing from the scope of the invention.

Thus, a bulk acoustic wave resonator with reduced energy loss has been described.

The invention claimed is:

**1**. A bulk acoustic wave (BAW) resonator comprising:

a piezoelectric layer having a disrupted texture region, said disrupted texture region being situated in a controlled thickness region of said BAW resonator and having a disrupted crystallinity; and

lower and upper electrodes situated on opposite surfaces of said piezoelectric layer; wherein said controlled thickness region has a controlled electromechanical coupling.

**2**. The BAW resonator of claim **1**, wherein said controlled thickness region provides reduced electromechanical coupling into lateral modes.

8

**3**. The BAW resonator of claim **1**, wherein said controlled thickness region is situated at an edge of said BAW resonator and extends along a perimeter of said BAW resonator.

**4**. The BAW resonator of claim **1**, wherein said controlled thickness region includes a segment of material situated over said upper electrode.

**5**. The BAW resonator of claim **4**, wherein said segment of material is selected from the group consisting of a metal and a dielectric material.

**6**. The BAW resonator of claim **4**, wherein an outer edge of said segment of material is self-aligned with an edge of said upper electrode.

**7**. The BAW resonator of claim **1** further comprising a thin layer of silicon oxide underlying said disrupted texture region and situated between said lower electrode and said piezoelectric layer.

**8**. The BAW resonator of claim **1**, wherein said disrupted texture region is situated at an edge of said BAW resonator and extends along a perimeter of said BAW resonator.

**9**. A semiconductor die comprising at least one BAW resonator, said at least one BAW resonator comprising:

a piezoelectric layer having a disrupted texture region, said disrupted texture region situated in a controlled thickness region of said BAW resonator and having a disrupted crystallinity;

lower and upper electrodes situated on opposite surfaces of said piezoelectric layer; wherein said controlled thickness region has a controlled electromechanical coupling.

**10**. The semiconductor die of claim **9**, wherein said controlled thickness region provides reduced electromechanical coupling into lateral modes.

**11**. The semiconductor die of claim **9**, wherein said controlled thickness region is situated at an edge of said BAW resonator and extends along a perimeter of said BAW resonator.

**12**. The semiconductor die of claim **9**, wherein said controlled thickness region includes a segment of material situated over said upper electrode.

**13**. The semiconductor die of claim **9**, wherein said semiconductor die is utilized in a circuit board as a part of an electronic system, said electronic system being selected from the group consisting of a wired or wireless communications device, a cell phone, a switching device, a router, a repeater, a codec, a wired or wireless LAN, a WLAN, a Bluetooth enabled device, a Global Positioning System (GPS) device, a computer, a monitor, a television set, a satellite set top box, a cable modem, a printer, a copier, an RF transceiver, and a personal digital assistant (PDA).

* * * * *

# Exhibit A9

US008999187B2

(12) **United States Patent**
Obernhuber et al.

(10) Patent No.: **US 8,999,187 B2**
(45) Date of Patent: ***Apr. 7, 2015**

(54) **METHOD FOR MANUFACTURING A DEVICE ON A SUBSTRATE**

(71) Applicant: **Infineon Technologies AG**, Neubiberg (DE)

(72) Inventors: **Sandra Obernhuber**, Lappersdorf (DE); **Christof Jalics**, Aalen (DE); **Joerg Adler**, Regensburg (DE); **Uwe Hoeckele**, Regensburg (DE); **Walter Preis**, Regensburg (DE); **Reinhard Goellner**, Regensburg (DE); **Tanja Ippisch**, Steinberg am See (DE); **Patricia Nickut**, Burghausen (DE)

(73) Assignee: **Infineon Technologies AG**, Neubiberg (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/092,624**

(22) Filed: **Nov. 27, 2013**

(65) **Prior Publication Data**

US 2014/0083973 A1     Mar. 27, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 12/417,100, filed on Apr. 2, 2009, now Pat. No. 8,597,531.

(51) **Int. Cl.**
*C03C 15/00*     (2006.01)
*H01L 41/297*     (2013.01)
*H03H 3/04*     (2006.01)

(52) **U.S. Cl.**
CPC .............. *H01L 41/297* (2013.01); *H03H 3/04* (2013.01)

(58) **Field of Classification Search**
USPC .......................................... 216/88
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,190,613 A | | 3/1993 | Yamagata |
| 8,597,531 B2* | | 12/2013 | Obernhuber et al. ........... 216/88 |
| 2002/0048959 A1 | | 4/2002 | Clevenger et al. |
| 2002/0102863 A1 | | 8/2002 | Beaman |
| 2003/0139051 A1 | | 7/2003 | Andideh et al. |
| 2005/0230677 A1 | | 10/2005 | Wetzel et al. |
| 2006/0131275 A1 | | 6/2006 | Bian |
| 2007/0090730 A1 | | 4/2007 | Fukui et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 10200741 A1 | 7/2003 | |
| DE | 102005058271 A1 | 7/2006 | |

(Continued)

*Primary Examiner* — Shamim Ahmed
*Assistant Examiner* — Bradford Gates
(74) *Attorney, Agent, or Firm* — Slater & Matsil, L.L.P.

(57)     **ABSTRACT**

A method for manufacturing a device on a substrate includes forming a layer structure on the substrate, forming an auxiliary layer on the layer structure, forming a planarization layer on the auxiliary layer and on the substrate, exposing the auxiliary layer by a chemical mechanical polishing process and removing at least partly the auxiliary layer to form a planar surface of the remaining auxiliary layer or of the layer structure and the planarization layer. The chemical mechanical polishing process has a first removal rate with respect to the planarization layer and a second removal rate with respect to the auxiliary layer and the first removal rate is greater than the second removal rate.

**14 Claims, 9 Drawing Sheets**



**US 8,999,187 B2**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| 2007/0115078 | A1 | 5/2007 | Sano et al. |
| 2007/0209174 | A1 | 9/2007 | Aigner et al. |
| 2007/0222003 | A1 | 9/2007 | Matsushita et al. |
| 2007/0236104 | A1 | 10/2007 | Fujii |
| 2007/0254397 | A1 | 11/2007 | Fattinger et al. |

| 2007/0254466 | A1 | 11/2007 | Nam |
| 2008/0036092 | A1 | 2/2008 | Gambino et al. |

FOREIGN PATENT DOCUMENTS

| DE | 102006019505 | A1 | 10/2007 |
| WO | 0229878 | A2 | 4/2002 |

* cited by examiner



FIG 1



FIG 2A

FIG 2B



FIG 2C



FIG 2D



FIG 2E



FIG 3A



FIG 3B



FIG 3C



FIG 3D



FIG 3E



FIG 3F



FIG 4A



FIG 4B



FIG 4C



FIG 4D



FIG 4E



FIG 4F

Case 1:21-cv-01417-JPM   Document 101-1   Filed 08/30/22   Page 565 of 598 PageID #: 1492



FIG 5A



FIG 5B



FIG 5C



FIG 5D



FIG 5E



FIG 5F



FIG 5G



FIG 5H



FIG 6

US 8,999,187 B2

**1**

## METHOD FOR MANUFACTURING A DEVICE ON A SUBSTRATE

This is a continuation application of U.S. application Ser. No. 12/417,100, entitled "Method for Manufacturing a Device on a Substrate" which was filed on Apr. 2, 2009 and issued as U.S. Pat. No. 8,597,531 on Dec. 3, 2013 and is incorporated herein by reference.

### BACKGROUND

Embodiments of the present invention relate to a method for manufacturing a device on a substrate.

Embodiments of the present invention relate also to the manufacturing of a device with a highly planar surface. In addition, embodiments relate to a method of manufacturing a patterned highly planar bottom electrode exhibiting an excellent uniformity in layer deposition and a planar surface of the entire bottom electrode.

### SUMMARY OF THE INVENTION

Embodiments of the present invention relate to a method for manufacturing a device on a substrate. The method comprises the steps of forming a layer structure on the substrate, forming an auxiliary layer on the layer structure, forming a planarization layer on the auxiliary layer and on the substrate, exposing the auxiliary layer by a chemical mechanical polishing process and removing at least partly the auxiliary layer to form a planar surface of the remaining auxiliary layer or of the layer structure and the planarization layer. The chemical mechanical polishing process comprises a first removal rate with respect to the planarization layer and a second removal rate with respect to the auxiliary layer and the first removal rate is greater than the second removal rate.

### BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention will be explained in the following with reference to the accompanying drawings, in which:

FIG. **1** shows a cross-sectional view of a device during manufacturing according to an embodiment of the present invention;

FIGS. **2**a to **2**e show conventional processing steps in manufacturing;

FIGS. **3**a to **3**f show processing steps for a method according to a first embodiment of the present invention;

FIGS. **4**a to **4**f show process steps for a method according to a second embodiment;

FIGS. **5**a to **5**h show processing steps for manufacturing a piezoelectric device; and

FIG. **6** shows an embodiment comprising a layer structure with a seed layer according to a further embodiment.

Before embodiments of the present invention are explained on the basis of the drawings in greater detail in the following, it is pointed out that like elements in the figures are provided with the same or similar reference numerals, and that a repeated description of these elements is omitted.

### DETAILED DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

For many technologies, a defined planarization comprises a critical influence on the quality of the component. It is thus important, for example, to achieve a defined end substrate thickness and/or the most planar surface possible.

**2**

Radio-frequency (RF) filters based on BAW resonators are of great interest for many RF applications. There are two concepts for BAW resonators, on the one hand the so-called thin-film BAW resonator (FBAR), and the so-called solidly mounted resonator (SMRs). Thin-film BAW resonators include a membrane on which a layer sequence comprising a lower electrode, a piezoelectric layer, and an upper electrode is arranged. In the alternative concept of solidly mounted resonators, an SMR comprises a substrate, such as, for example, a silicon substrate, on which the layer sequence comprising the lower electrode, the piezoelectric layer, and the upper electrode is arranged. In order to keep the acoustic waves in the active region in this design, a so-called acoustic minor is needed. It is located between the active layers, i.e., the two electrodes and the piezoelectric layer, and the substrate.

In both concepts for BAW resonators, the deposition of a piezoelectric layer on a patterned bottom electrode is needed, the bottom electrode being exemplarily made of a metal. A uniformed deposition is thus of crucial importance for the quality of the resonator. To allow a uniformed deposition, it is desired to have a highly planar wafer surface and, in particular, a bottom electrode comprising a highly planar surface before depositing the piezoelectric layer. Thus, growth edges in the piezoelectric layer are avoided and a high quality of the piezo material is made possible. This results in a high electromechanical coupling and a high acoustic quality. In addition, subsequent process steps are made easier by a planar surface. This particularly applies to patterning the upper electrode.

The conventional methods are problematic in that an oxide CMP (Chemical Mechanical Polishing) step affects the surface of the bottom electrode. This results in a so-called "dishing" effect, a local variation of the electrode thickness. This also results in local variations of the piezo layer thickness deposited on the bottom electrode. Since the resonant frequency of the BAW resonator, except for the material of the piezo layer, is basically given by the layer thickness of the piezo layer, the local variation of the electrode thickness results in a widening of the series resonance of the BAW resonator, resulting in a considerable decrease in the series quality of the BAW resonator.

Therefore, there is a need to provide an improved method for manufacturing, for example, a patterned bottom electrode in a piezoelectric device.

Hence, in the case of a BAW filter, this applies to the planarization of the lower electrode. The resonance frequencies are determined by the substrate stack, and a topology in the active area should thus be as planar as possible. It is of great significance that the planarization of the lower electrode be as defined as possible, since it is important for the performance of the component that this layer is as planar as possible. In addition, no additional layers may exist between electrodes and piezo material. A slight variation of the substrate thickness results in a shift in the resonance frequency leading to a reduced resonator quality, and to the excitation of spurious modes.

There are various technical approaches to leveling, for example, simple CMP, BPSG melt (BPSG=borophosphosilicate-glass), etc. These frequently fail to achieve the desired quality. In the case of simple CMP, for example, said dishing occurs, and structures are attacked.

Embodiments of the present invention suggest protecting important layers by an extra layer or a substrate stack. The structure to be created is hence protected with an auxiliary layer, which exhibits a high selectivity vis-à-vis the CMP process employed. A layer or a substrate stack is also possible here. Two fundamental principles are conceivable here:

US 8,999,187 B2

3

(a) the auxiliary layers are again removed after planarization, or

(b) the auxiliary layers remain at least partly on the structure.

Embodiments of the present invention therefore rely on a selectivity of the auxiliary layer, vis-à-vis, with respect to the CMP process.

FIG. **1** shows a cross-section of a device manufactured according to an embodiment. A layer structure **133** is arranged on a substrate **100** over a region R. In addition, a planarization layer **150** is arranged on the substrate **100** essentially flush with the layer structure **133**. On top of the layer structure **133**, an auxiliary layer **140** is arranged to protect the layer structure **133**. According to embodiments of the present invention, the auxiliary layer **140** comprises a lower removal rate than the removal rate of planarization layer **150** under a mechanical process to remove material. As a consequence, in the process of mechanically removing, more material is removed from the planarization layer **150** than is removed from the auxiliary layer **140**. Thus, the auxiliary layer **140** protects the layer structure **133** under the mechanical removing process, which may, for example, comprise a CMP process. The removal rate can be defined as the amount of removed material per time unit (e.g., the decreased layer thickness per second). The layer structure **133** may also be a layer sequence comprising different layers.

FIGS. **2**a to **2**e show a conventional process for planarization of a layer structure **133**.

FIG. **2**a shows a first step in which a layer structure **133** is formed on the substrate **100**.

FIG. **2**b shows as next step, a structuring of the layer structure **133**, so that the layer structure **133** covers a region R on the substrate **100**.

FIG. **2**c shows the following step, in which a planarization layer **150** is arranged on the substrate **100** and on the layer structure **133**. The planarization layer **150** comprises a layer thickness, which corresponds approximately with the layer thickness of the layer structure **133**.

In a next step (FIG. **2**d) the planarization layer **150** is removed over a further region **170**, which is smaller, or inside the region R, so that the layer structure **133** is exposed over the region **170**. Since the further region **170** is smaller than the region R, the planarization layer **150** leaves a first stud **150**a and a second stud **150**b on top of the layer structure **133**. Both studs **150**a and **150**b may of course be connected along the direction perpendicular to the drawing plane (not shown in the figure).

In a last step (FIG. **2**e) the studs **150**a and **150**b are removed, which is performed by a mechanical polishing, such as, for example, a CMP process. As a result of the CMP process, the studs **150**a and **150**b are removed leaving, on the one hand a first and a second rounding-off **151**a, **151**b, at the edges of the layer structure **133**, and on the other hand yield a dishing **153** in the middle of the layer structure **133**. The dishing **153** may comprise, for example, a continuous recess such that the thickness of the layer structure **133** is smaller in the middle than towards its edges. As a consequence, the layer structure **133** does not exhibit a planar surface resulting in the aforementioned disadvantages.

In the context of the exemplarily BAW filter, this conventional planarization of the lower electrode can be rephrased as follows. The layer structure **133** comprises electrode layers, which are deposited, structured, and the oxide (planarization layer **150**) is deposited (FIGS. **2**a to **2**c). This is opened in the area R of the electrodes (e.g., by an etching process) and the remaining oxide studs **150**a, **150**b at the edges of the electrodes are then polished away (FIGS. **2**d and **2**e).

4

This conventional procedure comprises a number of disadvantages, which result in an inhomogeneous layer. Opening of the planarization oxide causes the surface of the electrode to be attacked during the etching process and oxidized upon subsequent removal of the resist. Depending on the etching process, this leads to a smaller step in the area of the oxide studs, and an oxidized electrode surface exhibits higher erosion during the subsequent CMP. Furthermore, the surface is not evenly polished during the polishing process. This is generally known as dishing **153**. In the case of the BAW resonators, especially the center of the electrode surface is more intensively polished here, and longer polishing does not result in rounding-off of the edges. This leads to inhomogeneous layers and thus to a deterioration in the quality of the component. In addition, the process window here is relatively small.

FIGS. **3**a to **3**f show a first embodiment for processing a planarized surface for a device.

FIG. **3**a shows the layer structure **133** being arranged on the substrate **100**. In this first embodiment the auxiliary layer **140** is arranged on the layer structure **133** prior to the structuring of the layer structure **133**.

FIG. **3**b shows as the next step the structuring of the layer structure **133** together with the auxiliary layer **140**. As result, the layer structure **133** and the auxiliary layer **140** extend over the region R and are removed outside the region R exposing the substrate **100**. The layer structure **133** together with the auxiliary layer **140**, comprise a layer thickness **144**. The region R may comprise, for example, later on the active area of the resonator or the active region is inside the region R.

FIG. **3**c shows the following step in which the planarization layer **150** is formed on the substrate **100** and the auxiliary layer **140**. The planarization layer **150** is arranged with an approximate thickness **144** and extends on both sides of the region R along the substrate **100**.

FIG. **3**d shows the next step in which the auxiliary layer **140** is exposed along a region **170**. The region **170** may, for example, again be smaller than the region R, so that a first and a second stud **150**a, **150**b remains on top of the auxiliary layer **140**. This removal can, for example, be performed by an etching step, in which the auxiliary layer **140** acts as an etch stop layer. As a result, a surface **180** of the auxiliary layer **140** is exposed.

FIG. **3**e shows the next step in which the studs **150**a, **150**b are removed and, in addition, also part of the planarization layer **150** is removed on both sides of the region R. As a consequence, the planarization layer **150** comprises a layer thickness, which is by an amount **146** smaller than thickness **144** of the layer structure **133** together with the auxiliary layer **140**. The amount **146** is adjusted such that the thickness of the auxiliary layer **140**. As a result, a surface **185** of the planarization layer **150** is exposed. The removal of the planarization layer **150** may comprise a mechanical process such as, for example, a CMP step and it is needed that the auxiliary layer **140** comprises a lower removal rate than the removal rate of the planarization layer **150** under the mechanical process.

FIG. **3**f shows as final step the removal of the auxiliary layer **140**. The result is a planar surface **190**, along which the layer structure **133** is flush with the planarization layer **150** on both sides providing a highly planar surface **190**. The removal of the auxiliary layer **140** may differ from the mechanical process used in removing the planarization layer **150** so that the material of the auxiliary layer **140** is selectively removed.

FIGS. **4**a to **4**f show another embodiment of the present invention.

FIG. **4**a shows again the starting point, wherein the layer structure **133** is arranged on the substrate **100**.

**5**

As a next step, FIG. **4***b* shows a structuring of the layer structure **133**, so that the layer structure **133** extends over a region R over the substrate **100**.

FIG. **4***c* shows the deposition of the auxiliary layer **140** on the layer structure **133** and the substrate **100**. As a result, the auxiliary layer **140** comprises a first part **140***a* extending over the layer structure **133**, and a second part **140***b* extending over the substrate **100**. As a consequence, in this embodiment the layer structure **133** is between the substrate **100** and the first part of the auxiliary layer **140***a*, and the second part of the auxiliary layer **140***b* extends laterally on both sides of the layer structure **133**.

FIG. **4***d* shows the next step in which the planarization layer **150** is arranged on the first part **140***a* of the auxiliary layer **140** and on the second part **140***b* of the auxiliary layer **140**. Again, the thickness of the planarization layer **150** may be arranged such that the thickness of the layer structure **133** corresponds approximately to the thickness of the planarization layer **150**.

FIG. **4***e* shows as the next step the removal of the planarization layer **150** on top of the first part of the auxiliary layer **140***a* and partly above the second part of auxiliary layer **140***b* so that a remaining part of the planarization layer **150***c* remains partly on the second part of the auxiliary layer **140***b*. As a result, a surface **180** of the first part of the auxiliary layer **140***a* and a surface **185** of the planarization layer **150** is exposed. The removal of the planarization layer **150** may again comprise a mechanical removing as, for example, a CMP process and may be arranged in a manner that the remaining part of the planarization layer, together with the second part of the auxiliary part **140***b*, comprises a thickness **157** which corresponds approximately with the thickness of the layer structure **133**.

FIG. **4***f* shows as a final step the selective removal of the first part of the auxiliary layer **140***a*, so that the remaining parts **150***c* of the planarization layer **150** is flush with the layer structure **133** providing a highly planar surface **190**. The second part of the auxiliary layer **140***b* remains between the substrate **100** and the remaining part of the planarization layer **150***c*.

The first embodiment as shown in FIG. **3** and the second embodiment as shown in FIG. **4** may be applied to any layer structure **133**, which should be planarized or flush to a planarization layer **150**. As a specific example, the layer structure **133** may comprise a lower electrode of a piezoelectric device and, in addition, may comprise a plurality of layers.

FIGS. **5***a* to **5***h* show the example of a lower electrode or the planarization of a lower electrode in more detail.

FIG. **5***a* shows a starting layer arrangement. The substrate **100** is arranged between a ground layer **102** and the layer structure **133**, wherein the layer structure **133** comprises two layers, a first conductive layer **120**, and a second conductive layer **130**.

FIG. **5***b* shows the next step in which the auxiliary layer **140** is arranged on top of the layer structure **133**.

FIG. **5***c* once again shows the step in which the layer structure **133** together with the auxiliary layer **140**, is structured so that a region R, which again may comprise the active region of the resonator, is defined. This step may comprise a lithographic process by using a mask layer.

As the next step (FIG. **5***d*) the planarization layer **150** is arranged on the substrate **100** and on the auxiliary layer **140** together with the layer structure **133**. The substrate **100** and the planarization layer **150** may comprise a same or similar material, in which case the layer structure **133** together with the auxiliary layer **140** are embedded in the resulting combined structure **150**, **100**.

**6**

FIG. **5***e* shows as next step the opening of the planarization layer **150** along the region **170** so that the surface **180** of the auxiliary layer **140** is exposed. In case the opening region **170** is smaller than the region R, again a first stud **150***a* and a second stud **150***b* remain on top of the auxiliary layer **140**.

FIG. **5***f* shows the step in which the studs **150***a*, **150***b* are removed. This process of removing may, for example, comprise a mechanical polishing, such that the surface **180** is flush with a surface **185** of the planarization layer **150**.

FIG. **5***g* shows the next step, in which the auxiliary layer **140** and part of the planarization layer **150** are removed such that the second conductive layer **130** is exposed and forms together with the remaining planarization layer **150***c* a highly planar surface **190**.

FIG. **5***h* shows as final step the deposition of a piezoelectric layer **200** on the highly planar surface **190**. The layer structure **133** can be electrically connected to a controlling device (not shown) so that it becomes a lower electrode for a piezoelectric device. On top of the piezoelectric layer **200**, a top electrode may be arranged along the region R in order to define a BAW device (not shown in FIG. **5***h*).

FIG. **6** shows a further embodiment, in which a remaining part **140***c* of the auxiliary layer **140** is still present on the layer structure **133** arranged on the substrate **100**. In this embodiment, the auxiliary layer **140** may not be removed completely from the layer structure **133**, but the remaining part **140***c* is left, which may act as a seed layer for the subsequent layer (e.g., the piezoelectric layer) to be deposited on it. Alternatively, the seed layer **140***c* can also be an additional layer of different material formed between the auxiliary layer **140** and the layer structure **133**.

According to this embodiment, on both sides of the seed layer **140***c*, as well as the layer structure **133**, remaining parts of the planarization layer **150***c* are flush with the seed layer **140***c*. The seed layer **140***c* may, for example, comprise a material on which the remaining layers can be grown upon. For example, on amorphous Silicon a piezoelectric layer can be grown and hence may provide a possible choice for the seed layer **140***c*. In order to obtain the layer structure **133** as shown in FIG. **6**, the process steps as shown in FIGS. **3***a* to **3***d* may be repeated with the difference that the planarization layer **150** remains present laterally on both sides of the seed layer **140***c*. Alternatively, the process steps as shown in FIGS. **4***a* to **4***d* may also be repeated to obtain the structure as shown in FIG. **6**, in which case, between the remaining parts **150***c* of the planarization layer **150** and the substrate **100**, the second part **140***b* of the auxiliary layer would be present.

The embodiments with (shown in FIG. **6**) or without seed layer **140***c* (shown in FIG. **4***f*, or **3***f*) rely on the removal process of the protective layer **140**. In case it can be optimized with respect to the electrode surface (the layer structure **133**) so that no attack occurs, the variant without the seed layer **140***c* may be preferred, especially as the seed layer **140***c* may have drawbacks with respect to the characteristics of the resulting device. It cannot be completely ruled out that as a result of this process sequence the seed layer will change in its structure and the growth of the piezoelectric layer may not be optimal.

If part of the auxiliary layer **140** remains at the seed layer **140***c* on the layer structure **133**, the layer thickness should be adjusted in a manner that the filter property, when, for example, being used within a BAW filter, is not significantly altered.

To summarize, the planarization described in the different embodiments make use of the auxiliary layer **140**.

In the first embodiment, as shown in FIG. **3**, the protective layer **140** was applied to the electrode **133**, which is still in an

US 8,999,187 B2

7

unstructured form and structured in conjunction with the electrode **133**. The planarization layer **150** (may comprise an oxide) is then deposited, opened over the electrode surface **180**, and planarized with the aid of, for example, the CMP process. The protective layer **140** is once again removed as shown in FIG. **3**, or a layer of protective layer is left on the electrode **133**.

In the second embodiment (see FIG. **4**) the protective layer **140** is deposited after structuring of the electrodes. Here, the planarization oxide **150** is subsequently deposited at a suitable thickness and planarized without opening the oxide **150** over the region R. This variant provides the advantage of saving one photo technology step.

In order to achieve the desired result (highly planar surface **190**), it is important to choose the material for the auxiliary layer **140** appropriately. In conventional methods, the material of the auxiliary layer **140** comprises silicon-nitrate, which however does not comprise the desired selectivity with respect to the CMP process.

A better material for the auxiliary layer **140** is, for example, carbon. The use of carbon comprises the advantage that this material is very hard, and is scarcely attacked during the planarization, i.e., it may serve as a CMP stop layer. In addition, carbon is also very easy to remove. The amount of carbon may, for example, be such that 10% to 60% or about 20% or about 50% or at least 90% of the auxiliary layer **140** is carbon. A possible means for removing the carbon should not involve an oxygen environment, as the surface of the electrode is oxidized when exposed to oxygen. This is important especially for the embodiments, in which the protective layer **140** is fully removed.

In general, the materials are selected taking into account the selectivity with respect to a CMP process. The ratio between the removal rates of the planarization layer **150** (first removal rate) compared to the removal rate of the auxiliary layer **140** (second removal rate) may comprise a value greater than 100:1, or greater than 50:1, or greater than 20:1. This means that the first removal rate is, for example, greater than 100 times than the second removal rate, or the first removal rate is greater than 50 times than the second removal rate, or the first removal rate is greater than 20 times the second removal rate. Such selectivity may be reached if the planarization layer **150** comprises, for example, silicon-oxide, and the auxiliary layer **140** comprises said carbon.

In addition, as said above, the auxiliary layer **140** should be selectively removable from the layer structure **133**, meaning that the structure **133** to be protected will not be damaged by the removal of the auxiliary layer **140**. For example, in order to remove the auxiliary layer **140**, a non-oxidizable material may be used, and may for instance be performed within a hydrogen surrounding. If, for instance, the upper layer of electrode material (second conductive layer **130**) comprises tungsten, nitrogen-hydrogen ($N_2H_2$) may be used and if the upper layer of the electrode comprises, for example, aluminum, also oxygen or hydrogen can be used.

On the other hand, if the seed layer **140**$c$ is used (shown in FIG. **6**) the seed layer **140**$c$ provides already a protection for the layer structure **133**. For the seed layer **140**$c$, an amorphous silicon layer may be used and may be deposited under a carbon CMP stop layer (as auxiliary layer **140**), and the process carried out is as described above. After the removal of the carbon layer **140**, the amorphous silicon layer **140**$c$ remains behind. In a standard process this layer is likewise deposited on the electrode **133**, and serves as a seed layer for the piezoelectric layer. This variant would have the advantage that the tungsten layer is already protected directly after the deposition.

8

If the layer sequence **133** becomes the bottom electrode the following materials may be arranged as layers. A first layer comprises, for example, aluminum, an intermediate layer comprising for example of titanium nitride, and a last layer comprising, for example, of tungsten, which are arranged such that the tungsten layer and the aluminum layer are arranged on both sides of the titanium nitride layer. The tungsten layer is then the upper layer on which the auxiliary layer **140** is arranged.

What is claimed is:

**1**. A method for manufacturing a device on a substrate, the method comprising:

forming a layer structure on the substrate;

forming an auxiliary layer on the layer structure;

forming a planarization layer on the auxiliary layer and on the substrate;

exposing the auxiliary layer and the planarization layer to a chemical mechanical polishing process, wherein a top surface of the planarization layer around the auxiliary layer is coplanar with a top surface of the layer structure after the chemical mechanical polishing process, wherein the chemical mechanical polishing process comprises a first removal rate with respect to the planarization layer and a second removal rate with respect to the auxiliary layer, and wherein the first removal rate is greater than the second removal rate; and

selectively removing the auxiliary layer to form a substantially planar surface of remaining auxiliary layer or of the layer structure and the planarization layer.

**2**. The method of claim **1**, wherein the first removal rate is greater than 20 times the second removal rate.

**3**. The method of claim **2**, wherein the first removal rate is greater than 50 times the second removal rate.

**4**. The method of claim **3**, wherein the first removal rate is greater than 100 times the second removal rate.

**5**. The method of claim **1**, wherein the auxiliary layer comprises carbon.

**6**. The method of claim **1**, wherein exposing the auxiliary layer comprises exposing the auxiliary layer within a non-oxidizing environment.

**7**. The method of claim **6**, wherein the non-oxidizing environment comprises hydrogen or nitrogen-hydrogen.

**8**. The method of claim **1**, wherein exposing the auxiliary layer comprises performing an etching step to expose a region, the chemical mechanical polishing process being performed after the etching step.

**9**. The method of claim **8**, wherein at least partly removing the planarization layer leaves studs on the auxiliary layer and wherein the chemical mechanical polishing process is performed such that the studs are removed.

**10**. A method for manufacturing a lower electrode of a piezoelectric device on a substrate, the method comprising:

forming a layer structure on the substrate, wherein the layer structure comprises a conductive material;

forming an auxiliary layer on the layer structure;

forming a planarization layer on the auxiliary layer and on the substrate;

exposing a portion of the auxiliary layer;

applying a chemical-mechanical-polishing such that the planarization layer comprises a smaller thickness than a layer thickness of both the auxiliary layer and the layer structure,

wherein, after the chemical-mechanical-polishing, the thickness of the planarization layer is the same as a thickness of the layer structure; and

US 8,999,187 B2

**9**

selectively removing the auxiliary layer to form a substantially planar surface of the auxiliary layer and the planarization layer.

**11**. The method of claim **10**, wherein the auxiliary layer comprises a material comprising a lower removal rate than a removal rate of the planarization layer with respect to the chemical-mechanical-polishing.

**12**. A method for manufacturing a device on a substrate, the method comprising:

forming a layer sequence on the substrate;

structuring the layer sequence by exposing part of the substrate to define a region;

forming a first part of an auxiliary layer on the structured layer sequence and a second part of the auxiliary layer on the part of the substrate;

forming a planarization layer on the first and second part of the auxiliary layer;

**10**

exposing the first part of the auxiliary layer by performing chemical-mechanical-polishing, wherein the chemical-mechanical-polishing comprises a first removal rate with respect to the planarization layer and a second removal rate with respect to the auxiliary layer and wherein the first removal rate is greater than the second removal rate, wherein a thickness of the layer sequence is about equal to a combined thickness of the remaining planarization layer and the second part of the auxiliary layer; and

removing the first part of the auxiliary layer from the layer sequence to form a substantially planar surface of the layer structure with the planarization layer.

**13**. The method of claim **12**, wherein the first part of the auxiliary layer comprises carbon.

**14**. The method of claim **12**, further comprising depositing a layer on the substantially planar surface.

*   *   *   *   *

# Exhibit A10

US009197185B2

(12) **United States Patent**
Zou et al.

(10) **Patent No.:** **US 9,197,185 B2**
(45) **Date of Patent:** **Nov. 24, 2015**

(54) **RESONATOR DEVICE INCLUDING ELECTRODES WITH BURIED TEMPERATURE COMPENSATING LAYERS**

(75) Inventors: **Qiang Zou**, Fort Collins, CO (US); **Zhiqiang Bi**, Fort Collins, CO (US); **Kristina Lamers**, Fort Collins, CO (US); **Richard C. Ruby**, Menlo Park, CA (US)

(73) Assignee: **Avago Technologies General IP (Singapore) Pte. Ltd.**, Singapore (SG)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 434 days.

(21) Appl. No.: **13/601,384**

(22) Filed: **Aug. 31, 2012**

(65) **Prior Publication Data**

US 2013/0049545 A1     Feb. 28, 2013

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 12/769,791, filed on Apr. 29, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *H03H 9/17* | (2006.01) |
| *H03H 3/04* | (2006.01) |
| *H03H 9/02* | (2006.01) |
| *H03H 9/13* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *H03H 3/04* (2013.01); *H03H 9/02102* (2013.01); *H03H 9/131* (2013.01); *H03H 9/173* (2013.01); *H03H 9/175* (2013.01)

(58) **Field of Classification Search**
CPC ........ H03H 3/04; H03H 9/131; H01L 41/053; H01L 41/047; H01L 41/0926; H01L 41/083; H01L 41/39

USPC .......................... 310/346, 363, 364, 365, 366
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,456,850 A | 6/1984 | Inoue et al. | |
| 5,587,620 A | 12/1996 | Ruby et al. | |
| 5,872,493 A | * 2/1999 | Ella | ............................. 333/191 |
| 5,873,153 A | 2/1999 | Ruby et al. | |
| 5,956,292 A | 9/1999 | Bernstein | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 58137317 | 8/1983 |
| JP | 58156220 | 9/1983 |

(Continued)

OTHER PUBLICATIONS

Co-pending U.S. Appl. No. 13/168,101, filed Jun. 24, 2011.

(Continued)

*Primary Examiner* — Shawki S Ismail
*Assistant Examiner* — Bryan Gordon

(57) **ABSTRACT**

An acoustic resonator includes a substrate and a first composite electrode disposed over the substrate. The first composite electrode includes first and second electrically conductive layers and a first temperature compensating layer disposed between the first and second electrically conductive layers. The second electrically conductive layer forms a first electrical contact with the first electrically conductive layer on at least one side of the first temperature compensating layer, and the first electrical contact electrically shorts a first capacitive component of the first temperature compensating layer.

**49 Claims, 11 Drawing Sheets**



100
108
148
150
109  142  144  146  143
155
141
130
122  124  126  115
110
128
140
124a
120
129
105

**US 9,197,185 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,107,721 | A | 8/2000 | Lakin |
| 6,384,697 | B1 | 5/2002 | Ruby |
| 6,420,820 | B1 | 7/2002 | Larson, III |
| 6,441,539 | B1 | 8/2002 | Kitamura et al. |
| 6,507,983 | B1 | 1/2003 | Ruby et al. |
| 6,732,415 | B2 | 5/2004 | Nakatani et al. |
| 6,849,475 | B2 | 2/2005 | Kim |
| 6,906,451 | B2 | 6/2005 | Yamada et al. |
| 6,936,954 | B2 | 8/2005 | Peczalski |
| 7,212,082 | B2 | 5/2007 | Nagao et a |
| 7,259,498 | B2 | 8/2007 | Nakatsuka et al. |
| 7,280,007 | B2 | 10/2007 | Feng et al. |
| 7,345,410 | B2 * | 3/2008 | Grannen et al. .............. 310/364 |
| 7,358,831 | B2 * | 4/2008 | Larson et al. ................ 333/187 |
| 7,388,454 | B2 | 6/2008 | Ruby et al. |
| 7,391,285 | B2 * | 6/2008 | Larson et al. ................ 333/189 |
| 7,408,428 | B2 | 8/2008 | Larson, III |
| 7,508,286 | B2 | 3/2009 | Ruby et al. |
| 7,561,009 | B2 * | 7/2009 | Larson et al. ................ 333/187 |
| 7,561,010 | B2 | 7/2009 | Hikita et al. |
| 7,629,865 | B2 | 12/2009 | Ruby |
| 8,248,185 | B2 | 8/2012 | Choy et al. |
| 2006/0035471 | A1 | 2/2006 | Hill et al. |
| 2007/0120625 | A1 * | 5/2007 | Larson et al. ................ 333/189 |
| 2007/0205850 | A1 | 9/2007 | Jamneala et al. |
| 2007/0267942 | A1 | 11/2007 | Matsumoto et al. |
| 2010/0295631 | A1 | 11/2010 | Coudrain et al. |
| 2010/0327701 | A1 | 12/2010 | Grannen et al. |
| 2010/0327994 | A1 | 12/2010 | Choy et al. |
| 2011/0121916 | A1 | 5/2011 | Barber et al. |
| 2011/0227671 | A1 | 9/2011 | Zhang |
| 2011/0266925 | A1 * | 11/2011 | Ruby et al. .................... 310/346 |
| 2012/0050236 | A1 | 3/2012 | Lo et al. |
| 2012/0161902 | A1 | 6/2012 | Feng et al. |
| 2012/0218055 | A1 | 8/2012 | Burak et al. |
| 2012/0218056 | A1 | 8/2012 | Burak |
| 2012/0218058 | A1 | 8/2012 | Burak et al. |
| 2012/0218059 | A1 | 8/2012 | Burak et al. |
| 2012/0218060 | A1 | 8/2012 | Burak et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 60016010 | 1/1985 |
| JP | 1158730 | 6/1989 |
| RU | 2066856 | 9/1996 |
| WO | WO 2010122024 | 10/2010 |

OTHER PUBLICATIONS

Zou, et al. "High Coupling Coefficient Temperature Compensated FBAR Resonator for Oscillator Application with Wide Pulling Range", 2010 IEEE International Frequency Control Symposium (FCS).

* cited by examiner



Fig. 1



*Fig. 2*



*Fig. 3A*

*Fig. 3B*



*Fig. 3C*





*Fig. 3E*



*Fig. 3G*



Fig. 4



Fig. 5A

Fig. 5B



Fig. 5C

Fig. 5D



*Fig. 5E*

US 9,197,185 B2

1

## RESONATOR DEVICE INCLUDING ELECTRODES WITH BURIED TEMPERATURE COMPENSATING LAYERS

### CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation-in-part application under 37 C.F.R. §1.53(b) of commonly owned U.S. patent application Ser. No. 12/769,791 to Richard C. Ruby, et al., entitled "RESONATOR DEVICE INCLUDING ELECTRODE WITH BURIED TEMPERATURE COMPENSATING LAYER," filed on Apr. 29, 2010. Applicants claim priority under 35 U.S.C. §120 from U.S. patent application Ser. No. 12/769,791, and the entire disclosure of U.S. patent application Ser. No. 12/769,791 is hereby incorporated by reference.

### BACKGROUND

Electrical resonators are widely incorporated in modern electronic devices. For example, in wireless communications devices, radio frequency (RF) and microwave frequency resonators are used as filters, such as ladder filters having electrically connected series and shunt resonators formed in a ladder structure. The filters may be included in a duplexer, for example, connected between a single antenna and a receiver and a transmitter for respectively filtering received and transmitted signals.

Various types of filters use mechanical resonators, such as bulk acoustic wave (BAW) resonators and surface acoustic wave (SAW) resonators. The resonators generally convert electrical signals to mechanical signals or vibrations, and/or mechanical signals or vibrations to electrical signals. A BAW resonator, for example, is an acoustic stack that generally includes a layer of piezoelectric material between two electrodes. Acoustic waves achieve resonance across the acoustic stack, with the resonant frequency of the waves being determined by the materials in the acoustic stack and the thickness of each layer (e.g., piezoelectric layer and electrode layers). One type of BAW resonator includes a piezoelectric film as the piezoelectric material, which may be referred to as a film bulk acoustic resonator (FBAR). FBARs resonate at GHz frequencies, and are thus relatively compact, having thicknesses on the order of microns, and length and width dimensions of hundreds of microns.

Resonators may be used as band-pass filters with associated passbands providing ranges of frequencies permitted to pass through the filters. The passbands of the resonator filters tend to shift in response to environmental and operational factors, such as changes in temperature and/or incident power. For example, the passband of a resonator filter moves lower in frequency in response to rising temperature and higher incident power.

Cellular phones, in particular, are negatively affected by shifts in passband due to fluctuations in temperature and power. For example, a cellular phone includes power amplifiers (PAs) that must be able to deal with larger than expected insertion losses at the edges of the filter (duplexer). As the filter passband shifts down in frequency, e.g., due to rising temperature, the point of maximum absorption of power in the filter, which is designed to be above the passband, moves down into the frequency range of the FCC or government designated passband. At this point, the filter begins to absorb more power from the PA and heats up, causing the temperature to increase further. Thus, the filter passband shifts down in frequency more, bringing the maximum filter absorbing

2

point even closer. This sets up a potential runaway situation, which is avoided only by the fact that the reflected power becomes large and the filter eventually settles at some high temperature.

PAs are designed specifically to handle the worst case power handling of the filter at the corner of the pass band. Currents of a typical PA can run from a few mA at the center of the filter passband to about 380 mA-450 mA at the edges. This is a huge power draw on the PA, as well as the battery that drives the cellular phone. This is one reason that a cellular phone operating more in the transmit mode (i.e., talk time) than in the receive mode (i.e., listening time) drains battery power more quickly.

In order to prevent or reduce rising temperatures, a known filter may include a layer of oxide material within the piezoelectric layer of the acoustic stack. The oxide material has a positive temperature coefficient, which at least partially offsets the negative temperature coefficients of the metal electrodes and the piezoelectric material, respectively. For example, the oxide material may be placed in the center of the piezoelectric layer or at either end of the piezoelectric layer between the electrodes. However, that the acoustic coupling coefficient ($kt^2$) of the resonator is greatly compromised by the addition of oxide material to the piezoelectric layer. This is because the oxide material appears as a "dead" capacitor in series with the active piezoelectric material dielectric. Further, the oxide material may contaminate the piezoelectric material. For example, when the piezoelectric material is aluminum nitride (AlN), the oxide material causes the AlN to become a chemical compound that includes oxygen (e.g., $AlN_{(x)}O_{(y)}$), which is a non-piezoelectric material, thus further degrading the acoustic coupling coefficient.

What is needed, therefore, is a mechanical resonator that overcomes at least the deficiencies of known mechanical resonators described above.

### SUMMARY

In a representative embodiment, an acoustic resonator includes a substrate and a first composite electrode disposed over the substrate. The first composite electrode includes first and second electrically conductive layers and a first temperature compensating layer disposed between the first and second electrically conductive layers. The second electrically conductive layer forms a first electrical contact with the first electrically conductive layer on at least one side of the first temperature compensating layer, and the first electrical contact electrically shorts a first capacitive component of the first temperature compensating layer. The acoustic resonator also includes a piezoelectric layer disposed over the first composite electrode, and a second composite electrode disposed over the piezoelectric layer. The second composite electrode includes third and fourth electrically conductive layers and a second temperature compensating layer disposed between the third and fourth electrically conductive layers. The fourth electrically conductive layer forms a second electrical contact with the third electrically conductive layer on at least one side of the second temperature compensating layer, and the second electrical contact electrically shorts a second capacitive component of the second temperature compensating layer. The acoustic resonator also includes an acoustic reflector disposed beneath the first composite electrode.

In another representative embodiment, an acoustic resonator device includes an acoustic resonator including a substrate, and a first composite electrode disposed over the substrate. The first composite electrode includes first and second electrically conductive layers and a first temperature compen-

US 9,197,185 B2

3

sating layer disposed between the first and second electrically conductive layers. The acoustic resonator also includes a piezoelectric layer disposed over the first composite electrode, the piezoelectric layer having a thickness, and a second composite electrode disposed over the piezoelectric layer. The second composite electrode includes third and fourth electrically conductive layers and a second temperature compensating layer disposed between the third and fourth electrically conductive layers. The acoustic resonator also includes an acoustic reflector disposed beneath the first composite electrode. The first and second composite electrodes are symmetrically disposed about an axis of symmetry passing substantially along a center of the thickness of the piezoelectric layer.

BRIEF DESCRIPTION OF THE DRAWINGS

The example embodiments are best understood from the following detailed description when read with the accompanying drawing figures. It is emphasized that the various features are not necessarily drawn to scale. In fact, the dimensions may be arbitrarily increased or decreased for clarity of discussion. Wherever applicable and practical, like reference numerals refer to like elements.

FIG. 1 is a cross-sectional diagram illustrating an acoustic resonator device according to a representative embodiment.

FIG. 2 shows a graph comparing frequency response of a known acoustic resonator and an acoustic resonator in accordance with a representative embodiment.

FIGS. 3A-3G are cross-sectional diagrams depicting an illustrative fabrication sequence of an acoustic resonator device according to a representative embodiment.

FIG. 4 is a cross-sectional diagram illustrating an acoustic resonator device according to another representative embodiment.

FIGS. 5A-5E are cross-sectional diagrams depicting an illustrative fabrication sequence of an acoustic resonator device according to a representative embodiment.

DETAILED DESCRIPTION

In the following detailed description, for purposes of explanation and not limitation, representative embodiments disclosing specific details are set forth in order to provide a thorough understanding of the present teachings. However, it will be apparent to one having ordinary skill in the art having had the benefit of the present disclosure that other embodiments according to the present teachings that depart from the specific details disclosed herein remain within the scope of the appended claims. Moreover, descriptions of well-known apparatuses and methods may be omitted so as to not obscure the description of the representative embodiments. Such methods and apparatuses are clearly within the scope of the present teachings.

Generally, it is understood that the drawings and the various elements depicted therein are not drawn to scale. Further, relative terms, such as "above," "below," "top," "bottom," "upper," "lower," "left," "right," "vertical" and "horizontal," are used to describe the various elements' relationships to one another, as illustrated in the accompanying drawings. It is understood that these relative terms are intended to encompass different orientations of the device and/or elements in addition to the orientation depicted in the drawings. For example, if the device were inverted with respect to the view in the drawings, an element described as "above" another element, for example, would now be "below" that element. Likewise, if the device were rotated 90 degrees with respect to

4

the view in the drawings, an element described as "vertical," for example, would now be "horizontal."

Aspects of the present teachings are relevant to components of BAW and FBAR devices and filters, their materials and their methods of fabrication. Various details of such devices and corresponding methods of fabrication may be found, for example, in one or more of the following U.S. patent publications: U.S. Pat. No. 6,107,721, to Lakin; U.S. Pat. Nos. 5,587,620, 5,873,153, 6,507,983, 7,388,454 and 7,629,865 to Ruby et al.; U.S. Pat. No. 7,280,007 to Hongjun Feng et al.; U.S. Pat. No. 8,248,185 to Choy, et al.; U.S. Patent Application Pub. No. 20070205850 to Jamneala et al.; and U.S. Patent Application Pub. No. 20100327994 to Choy, et al. The disclosures of these patents and published patent applications are hereby incorporated by reference. It is emphasized that the components, materials and method of fabrication described in these patents and patent applications are representative and other methods of fabrication and materials within the purview of one of ordinary skill in the art are contemplated.

According to various embodiments, a resonator device has an acoustic stack with a piezoelectric layer between top and bottom composite electrodes, both of which have a temperature compensating layer deposited between electrically conductive layers, which may be referred to as a base electrode layer and a conductive interposer layer. Each of the temperature compensating layers may be formed of polycrystalline silicon or an oxide material, such as boron silicate glass (BSG), for example, having a positive temperature coefficient which offsets at least a portion of the negative temperature coefficients of the piezoelectric layer and the conductive material in the top and bottom composite electrodes. The conductive interposer layer thus makes a DC electrical connection with the electrode layer in each of the top and bottom composite electrodes, effectively shorting out capacitive components of the respective temperature compensating layers and increasing coupling coefficient $kt^2$ of the resonator device. Also, the conductive interposers, which are positioned between the temperature compensating layers and the piezoelectric layer, present barriers preventing oxygen, for example, from diffusing into the piezoelectric material of the piezoelectric layer.

FIG. 1 is a cross-sectional view of a BAW resonator device, and more particularly, an FBAR in the depicted illustrative configuration, which includes composite electrodes having buried temperature compensating layers, according to a representative embodiment.

Referring to FIG. 1, acoustic resonator device 100 includes acoustic stack 105 formed on substrate 110. The substrate 110 may be formed of various types of semiconductor materials compatible with semiconductor processes, such as silicon (Si), gallium arsenide (GaAs), indium phosphide (InP), or the like, which is useful for integrating connections and electronics, thus reducing size and cost. In the depicted embodiment, the substrate 110 includes an acoustic reflector, indicated by representative cavity 115 in the depicted embodiment, formed beneath the acoustic stack 105 to provide acoustic isolation. The acoustic stack 105 is suspended over an air space formed by the cavity 115 to enable mechanical movement. In alternative embodiments, the substrate 110 may be formed with no cavity 115, for example, using surface mounted resonator (SMR) technology. For example, the acoustic stack 105 may be formed over an acoustic mirror or a Bragg Reflector (not shown) formed on or in the substrate 110. The acoustic mirror or Bragg Reflector may have alternating layers of high and low acoustic impedance materials. An acoustic mirror may be fabricated according to various

US 9,197,185 B2

5

techniques, an example of which is described in U.S. Pat. No. 7,358,831 to Larson, III, et al., which is hereby incorporated by reference.

The acoustic stack **105** includes piezoelectric layer **130** formed between first composite electrode **120** and second composite electrode **140**. The first composite electrode **120** includes a first base electrode layer or first electrically conductive layer **122**, a buried first temperature compensating layer **124**, and a second conductive interposer layer or second electrically conductive layer **126**, stacked sequentially on the substrate **110** over the cavity **115**. The first and second electrically conductive layers **122** and **126** are formed of electrically conductive materials, such as various metals compatible with semiconductor processes, including tungsten (W), molybdenum (Mo), aluminum (Al), platinum (Pt), ruthenium (Ru), niobium (Nb), or hafnium (Hf), for example.

In various embodiments, the first electrically conductive layer **122** and the second electrically conductive layer **126** are formed of different conductive materials, where the first electrically conductive layer **122** is formed of a material having relatively lower conductivity and relatively higher acoustic impedance, and the second electrically conductive layer **126** is formed of a material having relatively higher conductivity and relatively lower acoustic impedance. For example, the first electrically conductive layer **122** may be formed of W and the second electrically conductive layer **126** may be formed of Mo, although other materials and/or combinations of materials may be used without departing from the scope of the present teachings. Further, in various embodiments, the first electrically conductive layer **122** and the second electrically conductive layer **126** may be formed of the same conductive material, without departing from the scope of the present teachings.

The buried first temperature compensating layer **124** is formed between the first electrically conductive layer **122** and the second electrically conductive layer **126**. The buried first temperature compensating layer **124** is therefore separated or isolated from the piezoelectric layer **130** by the second electrically conductive layer **126**, and is otherwise sealed in by the connection between the second electrically conductive layer **126** and the first electrically conductive layer **122**. Accordingly, the buried first temperature compensating layer **124** is effectively buried within the first composite electrode **120**. The buried first temperature compensating layer **124** may be formed of various materials compatible with semiconductor processes, including polycrystalline silicon, boron silicate glass (BSG), silicon dioxide (SiO$_2$), chromium (Cr) or tellurium oxide (TeO$_{(x)}$), for example, which have positive temperature coefficients. The positive temperature coefficient of the buried first temperature compensating layer **124** offsets negative temperature coefficients of other materials in the acoustic stack **105**, including the piezoelectric layer **130**, the second composite electrode **140**, the first electrically conductive layer **122** and the second electrically conductive layer **126** of the first composite electrode **120**.

As shown in the embodiment of FIG. **1**, the buried first temperature compensating layer **124** does not extend the full width of the acoustic stack **105**. Thus, the second electrically conductive layer **126**, which is formed on the top and side surfaces of the buried first temperature compensating layer **124**, contacts the top surface of the first electrically conductive layer **122**, as indicated for example by reference numerals **128** and **129**. Therefore, DC electrical connections are formed between the second electrically conductive layer **126** and the first electrically conductive layer **122**. By DC electrically connecting with the first electrically conductive layer **122**, the second electrically conductive layer **126** effectively

6

"shorts" out a capacitive component of the buried first temperature compensating layer **124**, thus increasing a coupling coefficient (kt$^2$) of the acoustic resonator device **100**. In addition, the second electrically conductive layer **126** provides a barrier between the buried first temperature compensating layer **124** and the piezoelectric layer **130**, e.g., preventing oxygen from diffusing into the piezoelectric layer **130** when the buried first temperature compensating layer **124** contains oxygen.

Also, in the depicted embodiment, the buried first temperature compensating layer **124** has tapered edges **124***a*, which enhance the DC electrical connection between the second electrically conductive layer **126** and the first electrically conductive layer **122**. In addition, the tapered edges **124***a* enhance the mechanical connection between the second electrically conductive layer **126** and the first electrically conductive layer **122**, which improves the sealing quality, e.g., for preventing oxygen in the buried first temperature compensating layer **124** from diffusing into the piezoelectric layer **130**. In alternative embodiments, the edges of the buried first temperature compensating layer **124** are not tapered, but may be substantially perpendicular to the top and bottom surfaces of the buried first temperature compensating layer **124**, for example, without departing from the scope of the present teachings.

The piezoelectric layer **130** is formed on the top surface of the second electrically conductive layer **126**. The piezoelectric layer **130** may be formed of a thin film piezoelectric compatible with semiconductor processes, such as aluminum nitride (AlN), zinc oxide (ZnO), lead zirconium titanate (PZT), or the like. The thickness of the piezoelectric layer **130** may range from about 1000 Å to about 100,000 Å, for example, although the thickness may vary to provide unique benefits for any particular situation or to meet application specific design requirements of various implementations, as would be apparent to one of ordinary skill in the art. In an embodiment, the piezoelectric layer **130** may be formed on a seed layer (not shown) disposed over an upper surface the first composite electrode **120**. For example, the seed layer may be formed of Al to foster growth of an AlN piezoelectric layer **130**. The seed layer may have a thickness in the range of about 50 Å to about 5000 Å, for example.

The second composite electrode **140** is formed on the top surface of the piezoelectric layer **130**. The second composite electrode **140** includes a second conductive interposer layer or third electrically conductive layer **142**, a buried second temperature compensating layer **144**, and a second base electrode layer or fourth electrically conductive layer **146**, stacked sequentially on the piezoelectric layer **130**. The third and fourth electrically conductive layers **142** and **146** are formed of electrically conductive materials, such as various metals compatible with semiconductor processes, including W, Mo, Al, Pt, Ru, Nb, or Hf, for example. In various embodiments, the third electrically conductive layer **142** and the fourth electrically conductive layer **146** are formed of different conductive materials, where the fourth electrically conductive layer **146** is formed of a material having relatively lower conductivity and relatively higher acoustic impedance, and the third electrically conductive layer **142** is formed of a material having relatively higher conductivity relatively lower acoustic impedance. For example, the fourth electrically conductive layer **146** may be formed of W and the third electrically conductive layer **142** may be formed of Mo, although other materials and/or combinations of materials may be used without departing from the scope of the present teachings. Further, in various embodiments, the third electrically conductive layer **142** and the fourth electrically conduc-

7

tive layer **146** may be formed of the same conductive material, without departing from the scope of the present teachings. The third and fourth electrically conductive layers **142** and **146** may be formed of the same or different materials than the first and second electrically conductive layers **122** and **126** of the first composite electrode **120**, without departing from the scope of the present teachings.

The buried second temperature compensating layer **144** is formed between the third electrically conductive layer **142** and the fourth electrically conductive layer **146**. The buried second temperature compensating layer **144** is therefore separated or isolated from the piezoelectric layer **130** by the third electrically conductive layer **142**. Accordingly, the buried second temperature compensating layer **144** is effectively buried within the second composite electrode **140**, with the exception of an exposed outer edge, discussed below. The buried second temperature compensating layer **144** may be formed of various materials compatible with semiconductor processes, including polycrystalline silicon, BSG, $SiO_2$, Cr or $TeO_{(x)}$, for example, which have positive temperature coefficients. The positive temperature coefficient of the buried second temperature compensating layer **144** further offsets negative temperature coefficients of other materials in the acoustic stack **105**, including the piezoelectric layer **130**, the first composite electrode **120**, and the third and fourth electrically conductive layers **142** and **146** of the second composite electrode **140**.

As shown in the embodiment of FIG. **1**, the second composite electrode **140** has a connection edge **141** and a non-connection edge **143**. The connection edge **141** is on a side of the second composite electrode **140** configured to electrically connect to circuitry (not shown) to provide electrical signals to and/or from the acoustic resonator device **100**. Also, a portion of the second composite electrode **140** extending toward the connection edge **141** includes bridge **150** over air gap **155**. The bridge **150** is formed between the top surface of the piezoelectric layer **130** and the bottom surface of the second composite electrode **140** (more particularly, the bottom surface of the third electrically conductive layer **142**). The acoustic stack **105** includes an active area **108**, indicated by dashed lines. The active area **108** is terminated at the beginning of the bridge **150** and at the non-connection edge **143** of the second composite electrode **140**. The bridge **150** effectively separates a dead resonator area of the acoustic resonator device **100** from the active area **108**. It is noted that although the bridge **150** provides improved performance to the acoustic resonator device **100** (see for example the above-referenced patent and patent application to Choy, et al.), the bridge **150** is not essential to the acoustic resonator device **100**, and the present teachings contemplate acoustic resonators that do not include the bridge **150**.

The acoustic stack **105** within the active area **108** is substantially symmetrical about horizontal axis **109**, which passes substantially about the center of a thickness of the piezoelectric layer **130**. Notably, various factors such as manufacturing processes and application of seeding, mass loading and/or passivation layers (discussed below) may cause slight differences in structure on either side of the horizontal axis **109**, such that the acoustic stack **105** may not be precisely symmetrical about the horizontal axis **109**. Generally, though, the acoustic stack **105** within the active area **108** is more symmetrical than in a resonator device having only one composite electrode. As a result of the improved symmetry, negative effects of the second overtone are reduced or minimized in acoustic resonators according to the present teachings (e.g., acoustic resonator device **100**) compared to a known acoustic resonator.

8

For example, FIG. **2** shows a graph comparing frequency response of a known acoustic resonator and an acoustic resonator in accordance with a representative embodiment. Referring to FIG. **2**, the horizontal axis depicts frequency in MHz and the vertical axis depicts impedance in Ohms.

Trace **210** shows the frequency response of an acoustic resonator having one composite electrode. Trace **210** includes a first mode **211** at about 1500 MHz (corresponding to resonate frequency) and a second overtone spurious mode **212** at about 3500 MHz. In comparison, trace **220** shows the frequency response of an acoustic resonator having two composite electrodes, such as acoustic resonator device **100**, according to a representative embodiment. Like trace **210**, trace **220** includes a first mode at about 1500 MHz (corresponding to resonate frequency) and a second overtone spurious mode **222** at about 3500 MHz. However, the second overtone spurious mode **222** has been significantly suppressed (minimized). The trace **220** also includes higher order spurious mode **223** that occurs at about 5600 MHz, not seen in the trace **210**. However, this frequency is well outside the frequency band of interest, and therefore does not negatively impact operation of the acoustic resonator device **100**.

Generally, the more precisely symmetrical the acoustic stack **105** is about the horizontal axis **109**, the better the suppression of the second overtone spurious mode **222**, and ultimately, the better the performance of the acoustic resonator device **100** of the representative embodiment.

Referring again to FIG. **1**, the fourth electrically conductive layer **146**, which is formed on the top surface of the buried second temperature compensating layer **144**, contacts the top surface of the third electrically conductive layer **142**, as indicated for example by reference numeral **148**. Therefore, a DC electrical connection is formed between the third electrically conductive layer **142** and the fourth electrically conductive layer **146**. By DC electrically connecting with the third electrically conductive layer **142**, the fourth electrically conductive layer **146** effectively "shorts" out a capacitive component of the buried second temperature compensating layer **144**, thus further increasing the coupling coefficient ($kt^2$) of the acoustic resonator device **100**. In addition, the third electrically conductive layer **142** provides a barrier between the buried second temperature compensating layer **144** and the piezoelectric layer **130**, e.g., preventing oxygen from diffusing into the piezoelectric layer **130** when the buried second temperature compensating layer **144** contains oxygen. In the depicted embodiment, the fourth electrically conductive layer **146** does not connect with the third electrically conductive layer **142** at the non-connection edge **143** of the second composite electrode **140**. Accordingly, an edge portion of the buried second temperature compensating layer **144** is exposed.

Also, in the depicted embodiment, the buried second temperature compensating layer **144** has tapered edge **144***a*, which enhances the DC electrical connection between the third and fourth electrically conductive layers **142** and **146**. In addition, the tapered edge **144***a* enhances the mechanical connection between the fourth electrically conductive layer **146** and the third electrically conductive layer **142**. In alternative embodiments, the edges of the buried second temperature compensating layer **144** are not tapered, but may be substantially perpendicular to the top and bottom surfaces of the buried second temperature compensating layer **144**, for example, without departing from the scope of the present teachings.

The second composite electrode **140** may further include a passivation layer (not shown) on a top surface, which may be formed of various types of materials, including AlN, silicon

US 9,197,185 B2

**9**

carbide (SiC), BSG, $Si_{O2}$, SiN, polysilicon, and the like. The thickness of the passivation layer must be sufficient to insulate all layers of the acoustic stack **105** from the environment, including protection from moisture, corrosives, contaminants, debris and the like. The first and second composite electrodes **120** and **140** may be electrically connected to external circuitry via contact pads (not shown), which may be formed of a conductive material, such as gold, gold-tin alloy or the like.

In an embodiment, an overall first thickness of the first composite electrode **120** is substantially the same as an overall second thickness of the second composite electrode **140**, as shown in FIG. **1**. For example, the thickness of each of the first and second composite electrodes **120** and **140** may range from about 600 Å to about 30000 Å, although the thicknesses may vary to provide unique benefits for any particular situation or to meet application specific design requirements of various implementations, as would be apparent to one of ordinary skill in the art.

The multiple layers of each of the first and second composite electrodes **120** and **140** also have corresponding thicknesses. For example, the thickness of the first and fourth electrically conductive layers **122** and **146** may range from about 400 Å to about 29,900 Å, the thickness of the buried first and second temperature compensating layers **124** and **144** may range from about 100 Å to about 5000 Å, and the thickness of second and third electrically conductive layers **126** and **142** may range from about 100 Å to about 10000 Å. Each of the layers of the first and second composite electrodes **120** and **140** may be varied to produce different characteristics with respect to temperature coefficients and coupling coefficients, while the overall thicknesses of the first and second composite electrodes **120** and **140** remain substantially the same. For example, the thicknesses of the buried first and second temperature compensating layers **124** and **144** may be varied to affect the overall temperature coefficient of the acoustic stack **105**, and the relative thicknesses of the first through fourth electrically conductive layers **122**, **126**, **142** and **146** may be varied to affect the overall coupling coefficient of the acoustic resonator device **100**.

For example, thicknesses of the first through fourth electrically conductive layers **122**, **126**, **142** and **146** may be varied in order to "sink" the respective buried first and second temperature compensating layers **124** and **144** deeper into the corresponding first and second composite electrodes **120** and **140** (i.e., moved further away from the piezoelectric layer **130**). That is, while the overall thicknesses of the first and second composite electrodes **120** and **140** remain substantially the same, the thicknesses of the second and third electrically conductive layers **126** and **142** (the conductive interposer layers) may be increased and the first and fourth electrically conductive layers **122** and **146** (the base electrode interposer layers) may be decreased, such that the buried first and second temperature compensating layers **124** and **144** become buried more deeply within the first and second composite electrodes **120** and **140**, respectively. Also, the thicknesses of the buried first and second temperature compensating layers **124** and **144** can be targeted to be thicker (as they are buried more deeply) to help maintain, or minimize, the linear temperature coefficient. For example, burying the buried first and second temperature compensating layers **124** and **144** more deeply causes the coupling coefficient of the acoustic resonator device **100** to be relatively greater (at the expense of worsening temperature coefficient), while thickening the buried first and second temperature compensating layers **124** and **144** improves the temperature coefficient.

**10**

Generally, the thickness and location of each of the buried first and second temperature compensating layers **124** and **144** inside the first and second composite electrodes **120** and **140** should be optimized, in order to maximize the coupling coefficient for an allowable linear temperature coefficient. This optimization may be accomplished, for example, by modeling an equivalent circuit of the acoustic stack **105** using a Mason model and adjusting the buried first and second temperature compensating layers **124** and **144**, and adding more material to the second and third electrically conductive layers **126** and **142** and removing material from the first and fourth electrically conductive layers **122** and **146**, so the overall thicknesses of the first and second composite electrodes **120** and **140** remain constant, as would be apparent to one of ordinary skill in the art. An algorithm may be developed to optimize the depth of the buried first and second temperature compensating layers **124** and **144** in light of the trade-off between the temperature coefficient and the coupling coefficient, for example, using a multivariate optimization technique, such as a Simplex method, as would be apparent to one of ordinary skill in the art. In addition, the depth of the buried first and second temperature compensating layers **124** and **144** may be limited by various constraints, such as minimum necessary coupling coefficient and maximum allowable temperature coefficient. Likewise, the thicknesses of the buried first and second temperature compensating layers **124** and **144** may adjusted to provide the optimal coupling coefficient and a minimum overall temperature coefficient of the acoustic resonator device **100**.

According to various embodiments, the resonator device may be fabricated using various techniques compatible with semiconductor processes. A non-limiting example of a fabrication process directed to representative acoustic resonator device **100** is discussed below with reference to FIGS. **3**A-**3**G, which are cross-sectional views of a BAW resonator device in various stages of the fabrication process, according to a representative embodiment.

FIG. **3**A shows substrate **110** defining cavity **115**, and first electrically conductive layer **122** is applied to a top surface of the substrate **110**. In the depicted embodiment, the cavity **115** is formed in the substrate **110** and is initially filled with a sacrificial material **117**, such as phosphosilicate glass (PSG) or polysilicon, which is released using a suitable etchant later in the fabrication process, e.g., after application of the layers of the acoustic stack **105**, as would be apparent to one of ordinary skill in the art. In alternative configurations, the cavity **115** may pass through the substrate **110** to form a backside opening, which may be formed by back side etching a bottom surface of the substrate **110**. The back side etching may include a dry etch process, such as a Bosch process, for example, although various alternative techniques may be incorporated. The cavities may be formed by a number of known methods, examples of which are described in U.S. Pat. No. 6,384,697 to Ruby et al., which is hereby incorporated by reference.

Alternatively, an acoustic isolator, such as an acoustic mirror or Bragg Reflector, may be included in or formed on a top surface of the substrate **110**, rather than the cavity **115**. Such acoustic isolator may be formed using any technique compatible with semiconductor processes before forming the acoustic stack **105**, as would be apparent to one of ordinary skill in the art. Examples of fabricating acoustic mirrors for a resonator device are described in U.S. Patent App. Pub. No. 2011/0121916 to Barber et al., which is hereby incorporated by reference.

In an embodiment, the substrate **110** is formed of Si and the first electrically conductive layer **122** is formed of W, for

US 9,197,185 B2

**11**

example, although different materials may be used, as discussed above, without departing from the scope of the present teachings. The first electrically conductive layer **122** may be applied using spin-on, sputtering, evaporation, physical vapor deposition (PVD) or chemical vapor disposition (CVD) techniques, for example, although other application methods may be incorporated.

Referring to FIG. **3**B, buried first temperature compensating layer **124** is formed on a top surface of the first electrically conductive layer **122**. In an embodiment, the buried first temperature compensating layer **124** is formed of polycrystalline silicon, for example, although different materials may be used, as discussed above, without departing from the scope of the present teachings. The buried first temperature compensating layer **124** may be applied using spin-on, sputtering, evaporation, PVD or CVD techniques, for example, although other application methods may be incorporated. Various illustrative techniques for forming temperature compensating layers are described, for example, in U.S. Pat. No. 7,561,009 to Larson, III, et al., which is hereby incorporated by reference.

A mask pattern (not shown) is then applied to the buried first temperature compensating layer **124**, which is then etched to the desired size as depicted in FIG. **3**B. This includes formation of the tapered edges **124**a, discussed above. For example, a photoresist layer (not shown) may be applied to the top surface of the buried first temperature compensating layer **124** and patterned to form a mask or photoresist pattern, using any photoresist patterning technique compatible with semiconductor processes, as would be apparent to one of ordinary skill in the art. The photoresist pattern may be formed by machining or chemically etching the photoresist layer using photolithography, although various alternative techniques may be incorporated. Following etching of the buried first temperature compensating layer **124**, the photoresist pattern is removed, for example, by chemically releasing or etching using a wet etch process including HF etch solution, although the photoresist pattern may be removed by various other techniques, without departing from the scope of the present teachings.

In various embodiments, to obtain the tapered edges **124**a, oxygen is leaked into the etcher used to etch the buried first temperature compensating layer **124**. The oxide (and/or temperature chuck) causes the photoresist to erode more quickly at the edges of the patterned photo resist and to pull back slightly. This "thinning" of the resist forms a wedge shaped profile that is then imprinted into the oxide underneath as the photoresist goes away. Generally, the wedge is created by adjusting the etch rate of resist relative to the etched material, as would be apparent to one of ordinary skill in the art. Meanwhile, further from the edges of the buried first temperature compensating layer **124**, there is sufficient photoresist coverage throughout the etch that the underlying oxide material is not touched. Of course, other methods of obtaining tapered edges may be incorporated without departing form the scope of the present teachings.

The second electrically conductive layer **126** is applied to a top surface of the buried first temperature compensating layer **124**, as shown in FIG. **3**C. The second electrically conductive layer **126** is formed of Mo, for example, although different materials may be used, as discussed above, without departing from the scope of the present teachings. The second electrically conductive layer **126** may be applied using spin-on, sputtering, evaporation, PVD or CVD techniques, for example, although other application methods may be incorporated. A mask pattern (not shown) is then applied to the structure, which is then etched to remove portions of the first and second electrically conductive layers **122** and **126** on the

**12**

left side to form the desired shape and size as depicted in FIG. **3**C. The mask is then removed. As discussed above, any masking and etching technique compatible with semiconductor processes may be incorporated, as would be apparent to one of ordinary skill in the art.

In an alternative embodiment, an interim seed layer (not shown) is formed on the top surface of the buried first temperature compensating layer **124** before the buried first temperature compensating layer **124** is etched. The interim seed layer may be formed of the same piezoelectric material as the piezoelectric layer **130**, such as AlN, for example. The interim seed layer may be formed to a thickness of about 300 Å, for example, and reduces or minimizes oxide diffusion from the buried first temperature compensating layer **124** into the piezoelectric layer **130**. Outer portions of the interim seed layer are removed by etching, along with the etched portions of the buried first temperature compensating layer **124**, to expose portions of the top surface of the first electrically conductive layer **122**, so that the first electrically conductive layer **122** is able to make an electrical connection between with the second electrically conductive layer **126**. In other words, after etching, the interim seed layer covers only the top surface of the buried first temperature compensating layer **124**, so that it is positioned between the buried first temperature compensating layer **124** and the second electrically conductive layer **126**.

Referring to FIG. **3**D, the piezoelectric layer **130** is formed on a top surface of the second electrically conductive layer **126**, which is also the top surface of the first composite electrode **120**. The piezoelectric layer **130** is formed of AlN, for example, although different materials may be used, as discussed above, without departing from the scope of the present teachings. The piezoelectric layer **130** may be applied using a sputtering technique, for example, although other application methods may be incorporated. For example, the piezoelectric layer **130** may be grown from a seed layer, as discussed above, according to various techniques compatible with semiconductor processes.

The second composite electrode **140** is formed on a top surface of the piezoelectric layer **130**, as described below. However, as mentioned above, a portion of the second composite electrode forms bridge **150**, which terminates an edge of the active area **108**. In order to form the bridge **150**, a bridge layer **152** of sacrificial material **157** is formed on a top surface of the piezoelectric layer **130**, as shown in FIG. **3**E. The sacrificial material **157** may be PSG, polysilicon or sputtered amorphous silicon, for example, which is released using a suitable etchant later in the fabrication process, as would be apparent to one of ordinary skill in the art. A mask pattern (not shown) is then applied to the bridge layer **152**, which is then etched to the desired size. For example, a photoresist layer (not shown) may be applied to the top surface of the piezoelectric layer **130** and patterned to form a mask or photoresist pattern, using any photoresist patterning technique compatible with semiconductor processes, as would be apparent to one of ordinary skill in the art. Following etching of the bridge layer **152**, the photoresist pattern is removed, for example, by chemically releasing or etching using a wet etch process, although the photoresist pattern may be removed by various other techniques without departing from the scope of the present teachings.

Referring to FIG. **3**F, the second composite electrode **140** is formed by first forming third electrically conductive layer **142** on a top surface of the piezoelectric layer **130** and the bridge layer **152**. The third electrically conductive layer **142** is formed of Mo, for example, although different materials may be used, as discussed above, without departing from the

US 9,197,185 B2

**13**

scope of the present teachings. The third electrically conductive layer **142** may be applied using spin-on, sputtering, evaporation, PVD or CVD techniques, for example, although other application methods may be incorporated. A mask pattern (not shown) is then applied to the third electrically conductive layer **142**, which is then etched to form the desired shape as depicted in FIG. **3**G. The mask is then removed. As discussed above, any masking and etching technique compatible with semiconductor processes may be incorporated, as would be apparent to one of ordinary skill in the art.

Referring again to FIG. **3**G, the buried second temperature compensating layer **144** and the fourth electrically conductive layer **146** are formed in substantially the same manner as discussed above with regard to the buried first temperature compensating layer **124** and the second electrically conductive layer **126**. The fourth electrically conductive layer **146** is formed of W and the buried second temperature compensating layer **144** is formed of polycrystalline silicon, for example, although different materials may be used, as discussed above, without departing from the scope of the present teachings. Also, the buried second temperature compensating layer **144** may be etched to include tapered edge **144***a*, as discussed above with regard to the tapered edge **124***a* of the buried first temperature compensating layer **124**. Notably, because the buried second temperature compensating layer **144** is on top of the piezoelectric layer **130** (as opposed to being buried in the first composite electrode **120**), in line ion milling may be performed in order to fine tune the second composite electrode **140** and the frequency of the acoustic stack **105**, simultaneously.

After application of the third and fourth electrically conductive layers **142** and **146** and the buried second temperature compensating layer **144**, a vertical etch is performed to form the edge (e.g., the non-connection edge **143**) of the second composite electrode **140**, which also terminates an edge of the active area **108** (opposite the edge of the active area **108** terminated by the bridge **150**). For example, a photoresist layer (not shown) may be applied to the top surface of the fourth electrically conductive layer **146** and patterned to form a mask or photoresist pattern, using any phostoresist patterning technique compatible with semiconductor processes, as would be apparent to one of ordinary skill in the art. The photoresist pattern may be formed by machining or by chemically etching the photoresist layer using photolithography, although various alternative techniques may be incorporated. Following etching of the third and fourth electrically conductive layers **142** and **146** and the buried second temperature compensating layer **144**, the photoresist pattern is removed, for example, by chemically releasing or etching using a wet etch process, although the photoresist pattern may be removed by various other techniques without departing from the scope of the present teachings. In various embodiments, the second composite electrode **140** may further include a passivation layer (not shown) formed of BSG, SiO₂, SiN, polysilicon, or the like.

Also as shown in FIG. **3**G, the sacrificial material **117** in the cavity **115** and the sacrificial material **157** of the bridge layer **152** are released to form the cavity **115** and the bridge **150** (over air gap **155**), respectively. For example, when the sacrificial material **117** is polysilicon and the sacrificial material **157** is polysilicon or sputtered amorphous silicon, they each may be released using xenon difluoride (XeF₂) in a dry release process. Various illustrative techniques for forming bridges are described, for example, in the referenced U.S. patent and Published patent application to Choy, et al., referenced above, as well as: U.S. Patent Application Publication No. 20120218056 to Dariusz Burak; U.S. Patent Application

**14**

Publication No. 20120218055 to Dariusz Burak, et al.; U.S. Patent Application Publication No. 20120161902 to Chris Feng, et al.; U.S. Patent Application Publication No. 20120218059 to Dariusz Burak, et al.; U.S. Patent Application Publication No. 20120218058 to Dariusz Burak, et al.; U.S. Patent Application Publication No. 20120218060 to Dariusz Burak, et al.; and U.S. patent application Ser. No. 13/168,101 to Alexandre Shirakawa, et al. The entire disclosures of the U.S. patent applications and U.S. patent application Publication listed above are specifically incorporated by reference.

In various embodiments, the acoustic resonator device **100** may be fabricated as part of a wafer. Thus, after completion, the acoustic resonator device **100** may be cut or separated from the wafer, to the extent necessary, in order to form a singulated die, e.g., as shown in FIGS. **1** and **3**G. The acoustic resonator device **100** may be separated using various techniques compatible with semiconductor fabrication processes, such as scribe and break, for example.

FIG. **4** is a cross-sectional view of a BAW resonator device, and more particularly, an FBAR in the depicted illustrative configuration, which includes composite electrodes having buried temperature compensating layers, according to another representative embodiment.

Referring to FIG. **4**, illustrative acoustic resonator device **400** includes acoustic stack **405** formed on substrate **110**. The acoustic stack **405** includes piezoelectric layer **130** formed between a first composite electrode **120** and a second composite electrode **440**. Generally, the structure of the second composite electrode **440** is different from the structure of the second composite electrode **140** in FIG. **1**. Like reference numerals in FIGS. **1** and **4** refer to like elements, and therefore corresponding descriptions of like elements will not be repeated.

In the depicted embodiment, the acoustic stack **405** includes piezoelectric layer **130** formed between a first composite electrode **120** and a second composite electrode **440**. In the depicted embodiment, the substrate **110** includes an acoustic reflector, indicated by representative cavity **115** in the depicted embodiment, formed beneath the acoustic stack **405** to provide acoustic isolation. The acoustic stack **405** is suspended over an air space formed by the cavity **115** to enable mechanical movement. In alternative embodiments, the substrate **110** may be formed with no cavity **115**, for example, using SMR technology. For example, the acoustic stack **405** may be formed over an acoustic mirror or a Bragg Reflector (not shown) formed on or in the substrate **110**, as discussed above.

The first composite electrode **120** includes first base electrode layer or first electrically conductive layer **122**, buried first temperature compensating layer **124**, and second conductive interposer layer or second electrically conductive layer **126**, stacked sequentially on the substrate **110**. The first and second electrically conductive layers **122** and **126** are formed of electrically conductive materials, such as various metals compatible with semiconductor processes, including W, Mo, Al, Pt, Ru, Nb, or Hf, for example. The buried first temperature compensating layer **124** may be formed of various materials compatible with semiconductor processes, including polycrystalline silicon, BSG, SiO₂, Cr or TeO₍ₓ₎, for example, which have positive temperature coefficients. The piezoelectric layer **130** is formed on the top surface of the second electrically conductive layer **126**, and may be formed of a thin film piezoelectric compatible with semiconductor processes, such as AlN, ZnO, PZT, or the like. As discussed above, the second electrically conductive layer **126** contacts the top surface of the first electrically conductive layer **122**, as indicated for example by reference numerals **128** and **129**,

15

forming a DC electrical connection and thereby shorting out a capacitive component of the buried first temperature compensating layer **124** and increasing a coupling coefficient (kt²) of the acoustic resonator device **400**.

The second composite electrode **440** is formed on the top surface of the piezoelectric layer **130**. The second composite electrode **440** includes a second conductive interposer layer or third electrically conductive layer **442**, a buried second temperature compensating layer **444**, and a second base electrode layer or fourth electrically conductive layer **446**, stacked sequentially on the piezoelectric layer **130**. The third electrically conductive layer **442** and the fourth electrically conductive layer **446** are formed of electrically conductive materials, such as various metals compatible with semiconductor processes, including W, Mo, Al, Pt, Ru, Nb, or Hf, for example. In various embodiments, the third electrically conductive layer **442** and the fourth electrically conductive layer **446** are formed of different conductive materials, where the fourth electrically conductive layer **446** is formed of a material having relatively lower conductivity and relatively higher acoustic impedance, and the third electrically conductive layer **442** is formed of a material having relatively higher conductivity and relatively lower acoustic impedance. For example, the fourth electrically conductive layer **446** may be formed of W and the third electrically conductive layer **442** may be formed of Mo, although other materials and/or combinations of materials may be used without departing from the scope of the present teachings. Further, in various embodiments, the third electrically conductive layer **442** and the fourth electrically conductive layer **446** may be formed of the same conductive material, without departing from the scope of the present teachings. The third and fourth electrically conductive layers **442** and **446** may be formed of the same or different materials than the first and second electrically conductive layers **122** and **126** of the first composite electrode, without departing from the scope of the present teachings.

The buried second temperature compensating layer **444** is formed between the third electrically conductive layer **442** and the fourth electrically conductive layer **446**. The buried second temperature compensating layer **444** is therefore separated or isolated from the piezoelectric layer **130** by the third electrically conductive layer **442**. Accordingly, the buried second temperature compensating layer **444** is effectively buried within the second composite electrode **440**, including both edges, as discussed below. The buried second temperature compensating layer **444** may be formed of various materials compatible with semiconductor processes, including polycrystalline silicon, BSG, SiO2, Cr or TeO(x), for example, which have positive temperature coefficients. The positive temperature coefficient of the buried second temperature compensating layer **444** further offsets negative temperature coefficients of other materials in the acoustic stack **405**, including the piezoelectric layer **130**, the first composite electrode **120**, and the third and fourth electrically conductive layers **442** and **446** of the second composite electrode **440**.

As shown in the embodiment of FIG. **4**, the second composite electrode **440** has a connection edge **441** and a non-connection edge **443**. The connection edge **441** is on a side of the second composite electrode **440** configured to electrically connect to circuitry (not shown) to provide electrical signals to and/or from the acoustic resonator device **400**. Also, a portion of the second composite electrode **440** extending toward the connection edge **441** includes bridge **450** over air gap **455**. The bridge **450** is formed between the top surface of the piezoelectric layer **130** and the bottom surface of the second composite electrode **440** (more particularly, the bottom surface of the third electrically conductive layer **442**).

16

Similarly, another portion of the second composite electrode **440** extending toward the non-connection edge **443** includes cantilever **460** over air gap **465**. The cantilever **460** is also formed between the top surface of the piezoelectric layer **130** and the bottom surface of the second composite electrode **440** (more particularly, the bottom surface of the third electrically conductive layer **442**). Notably, unlike the air gap **455** formed by the bridge **450**, the air gap **465** is open ended, such that the portion of the second composite electrode **440** extending toward the non-connection edge **443** is not connected (i.e., is cantilevered) to the end portion of the piezoelectric layer **130**.

It is noted that although the bridge **450** and the cantilever **460** each provide improved performance to the acoustic resonator device **400** (see for example the above-referenced patent and patent application to Choy, et al.), the bridge **450** and the cantilever **460** are not essential to the acoustic resonator device **400**, and the present teachings contemplate acoustic resonators that do not include the bridge **150**, or the cantilever **460**, or both.

The acoustic stack **405** includes an active area **408**, indicated by dashed lines. The active area **408** is terminated at the beginning of the bridge **450** and at the beginning of the cantilever **460** of the second composite electrode **440**. The bridge **450** and the cantilever **460** effectively separate dead resonator areas of the acoustic resonator device **400** from the active area **408**. The acoustic stack **405** within the active area **408** is substantially symmetrical about horizontal axis **409**, as discussed above with respect to active area **108** in FIG. **1**. The horizontal axis **409** passes substantially along the center of a thickness of the piezoelectric layer **130**. Notably, various factors such as manufacturing processes and application of seeding, mass loading and/or passivation layers may cause slight differences in structure on either side of the horizontal axis **409**, such that the acoustic stack **405** may not be precisely symmetrical about the horizontal axis **409**. Generally, though, the acoustic stack **405** within the active area **408** is more symmetrical than in a resonator device having only one composite electrode. As a result of the improved symmetry, negative effects of second overtone and higher order spurious modes are minimized.

The fourth electrically conductive layer **446**, which is formed on the top surface of the buried second temperature compensating layer **444**, contacts the top surface of the third electrically conductive layer **442**, as indicated for example by reference numerals **448** and **449**. Therefore, DC electrical connections are formed between the third and fourth electrically conductive layers **442** and **446**, which effectively "shorts" out a capacitive component of the buried second temperature compensating layer **444**, thus further increasing a coupling coefficient (kt²) of the acoustic resonator device **400**. In addition, the third electrically conductive layer **442** provides a barrier between the buried second temperature compensating layer **444** and the piezoelectric layer **130**.

In the depicted embodiment, the buried second temperature compensating layer **444** has tapered edges **444a**, which enhance the DC electrical and mechanical connections between the third and fourth electrically conductive layers **442** and **446**. In alternative embodiments, the edges of the buried second temperature compensating layer **444** are not tapered, but may be substantially perpendicular to the top and bottom surfaces of the buried second temperature compensating layer **444**, for example, without departing from the scope of the present teachings.

The second composite electrode **440** may further include a passivation layer (not shown) on a top surface, which may be formed of various types of materials, including AlN, SiC, BSG, SiO2, SiN, polysilicon, and the like. The thickness of

US 9,197,185 B2

17

18

the passivation layer must be sufficient to insulate all layers of the acoustic stack **405** from the environment, including protection from moisture, corrosives, contaminants, debris and the like. The first and second composite electrodes **120** and **440** may be electrically connected to external circuitry via contact pads (not shown), which may be formed of a conductive material, such as gold, gold-tin alloy or the like.

In an embodiment, an overall first thickness of the first composite electrode **120** is substantially the same as an overall second thickness of the second composite electrode **440**, as shown in FIG. **4**. Also, the thicknesses of the first through fourth electrically conductive layers **122**, **126**, **442** and **446**, as well as the thicknesses of the buried first and second temperature compensating layers **124** and **444**, may vary in relation to one another, in order to optimize the coupling coefficient and overall temperature coefficient of the acoustic resonator device **400**, as discussed above with reference to the acoustic resonator device **100**. Likewise, the illustrative thicknesses discussed above may also apply to the acoustic resonator device **400** to provide unique benefits for any particular situation or to meet application specific design requirements of various implementations, as would be apparent to one of ordinary skill in the art.

According to various embodiments, the resonator device may be fabricated using various techniques compatible with semiconductor processes. A non-limiting example of a fabrication process directed to representative acoustic resonator device **400** is discussed below with reference to FIGS. **5**A-**5**E, which are cross-sectional views of a BAW resonator device in various stages of the fabrication process, according to a representative embodiment.

FIG. **5**A is substantially the same as FIG. **3**D, discussed above. Thus, it is understood that the fabrication process steps leading to the structure shown in FIG. **5**A are substantially the same as discussed above with reference to FIGS. **3**A-**3**D, and therefore this description will not be repeated. Referring to FIG. **5**A, substrate **110** includes cavity **115**, which has been initially filled with sacrificial material **117**, such as PSG or polysilicon, which is released using a suitable etchant later in the fabrication process, e.g., after application of the layers of the acoustic stack **405**, as would be apparent to one of ordinary skill in the art. The first composite electrode **120** has been formed, including the first electrically conductive layer **122**, the buried first temperature compensating layer **124**, and the second electrically conductive layer **126**, stacked sequentially on the substrate **110** over the cavity **115**. The piezoelectric layer **130** has been formed on the top surface of the first composite electrode **120** (and a portion of the substrate **110**).

Referring to FIG. **5**B, a portion of the second composite electrode **440** forms bridge **450** and cantilever **460**, which terminates edges of the active area **408**, as mentioned above. In order to form the bridge **450** and the cantilever **460**, a sacrificial layer (not shown) of sacrificial material **457** is formed on a top surface of the piezoelectric layer **130**. The sacrificial material **457** may be PSG, polysilicon or sputtered amorphous silicon, for example, which is released using a suitable etchant later in the fabrication process, as would be apparent to one of ordinary skill in the art. A mask pattern (not shown) is then applied to the sacrificial material **457**, which is then etched to the desired size, forming bridge layer **452** and cantilever layer **462**. For example, a photoresist layer (not shown) may be applied to the top surface of the piezoelectric layer **130** and patterned to form a mask or photoresist pattern, using any photoresist patterning technique compatible with semiconductor processes, as would be apparent to one of ordinary skill in the art. Following etching of the sacrificial material **457**, the photoresist pattern is removed, for example,

by chemically releasing or etching using a wet etch process including HF etch solution, although the photoresist pattern may be removed by various other techniques, without departing from the scope of the present teachings.

Referring to FIG. **5**C, the second composite electrode **440** is formed by first forming third electrically conductive layer **442** on a top surface of the piezoelectric layer **130** and the bridge layer **452** and the cantilever layer **462**. The third electrically conductive layer **442** is formed of Mo, for example, although different materials may be used, as discussed above, without departing from the scope of the present teachings. The third electrically conductive layer **442** may be applied using spin-on, sputtering, evaporation, PVD or CVD techniques, for example, although other application methods may be incorporated.

Referring again to FIG. **5**D, the buried second temperature compensating layer **444** is formed in substantially the same manner as discussed above with regard to the buried first temperature compensating layer **124**. The buried second temperature compensating layer **444** is formed of polycrystalline silicon, for example, although different materials may be used without departing from the scope of the present teachings. Also, the buried second temperature compensating layer **444** may be etched to include tapered edges **444**a, as discussed above with regard to the tapered edge **124**a of the buried first temperature compensating layer **124**. A mask pattern (not shown) is applied to the buried second temperature compensating layer **444**, which is then etched to form the desired shape as depicted in FIG. **5**D. The mask is then removed. As discussed above, any masking and etching technique compatible with semiconductor processes may be incorporated, as would be apparent to one of ordinary skill in the art.

Referring to FIG. **5**E, fourth electrically conductive layer **446** is formed on a top surface of the buried second temperature compensation layer **444**. The fourth electrically conductive layer **446** is formed of W, for example, although different materials may be used, as discussed above, without departing from the scope of the present teachings. The fourth electrically conductive layer **446** may be applied using spin-on, sputtering, evaporation, PVD or CVD techniques, for example, although other application methods may be incorporated. After application of the third and fourth electrically conductive layers **442** and **446** and the buried second temperature compensating layer **444**, a vertical etch is performed to form the edge (e.g., the non-connection edge **143**) of the second composite electrode **440**. Unlike the embodiment depicted in FIG. **3**G, for example, the vertical etch in FIG. **5**E does not terminate an edge of the active area **408**. Rather, the beginning of the cantilever **460** terminates the edge of the active area **408**, opposite the edge of the active area **408** terminated by the bridge **450**. For example, a photoresist layer (not shown) may be applied to the top surface of the fourth electrically conductive layer **446** and patterned to form a mask or photoresist pattern, using any photoresist patterning technique compatible with semiconductor processes, as would be apparent to one of ordinary skill in the art. The photoresist pattern may be formed by machining or by chemically etching the photoresist layer using photolithography, although various alternative techniques may be incorporated. Following etching of the third and fourth electrically conductive layers **442** and **446** and the buried second temperature compensating layer **444**, the photoresist pattern is removed, for example, by chemically releasing or etching using a known wet etch process, although the photoresist pattern may be removed by various other techniques without departing from the scope of the present teachings. In various embodi-

US 9,197,185 B2

19

ments, the second composite electrode **440** may further include a passivation layer (not shown) formed of BSG, SiO2, SiN, polysilicon, or the like.

Also as shown in FIG. **5**E, the sacrificial material **117** in the cavity **115** is released to form the cavity **115**, and the sacrificial material **457** of the bridge layer **452** and the cantilever layer **462** are released to form the bridge **450** (over air gap **455**) and the cantilever **460** (over air gap **465**), respectively. For example, when the sacrificial material **117** is polysilicon or amorphous silicon and the sacrificial material **457** is sputtered amorphous silicon, they each may be released using XeF₂ in a dry release process. Alternatively, the sacrificial material **457** and **117** may be PSG, in which case it may be released using HF in a wet release process.

In various embodiments, the acoustic resonator device **400** may be fabricated as part of a wafer. Thus, after completion, the acoustic resonator device **400** may be cut or separated from the wafer, to the extent necessary, in order to form a singulated die, e.g., as shown in FIGS. **4** and **5**E. The acoustic resonator device **400** may be separated using various techniques compatible with semiconductor fabrication processes, such as scribe and break, for example.

According to various embodiments, an acoustic stack of a resonator device has at least one composite electrode that includes a buried temperature compensating layer separated from a piezoelectric layer by a conductive interposer layer. The temperature compensating layer has a temperature coefficient that has an opposite sign from a temperature coefficient of at least one other element in the acoustic stack, thus offsetting the effects of that temperature coefficient. Further, the conductive interposer layer effectively shorts out a capacitive component of the temperature compensating layer, which effectively increases a coupling coefficient of the resonator device. Accordingly, this enables more stable operation of the resonator, for example, by preventing shifts in passband due to increases in temperature, while preventing contamination of the piezoelectric material by the material in the temperature compensating layer.

The various components, materials, structures and parameters are included by way of illustration and example only and not in any limiting sense. In view of this disclosure, those skilled in the art can implement the present teachings in determining their own applications and needed components, materials, structures and equipment to implement these applications, while remaining within the scope of the appended claims.

The invention claimed is:

**1**. An acoustic resonator device, comprising:

a substrate:

a first composite electrode disposed over the substrate, the first composite electrode comprising first and second electrically conductive layers and a first temperature compensating layer disposed between the first and second electrically conductive layer forms a first electrical contact with the first electrically conductive layer on at least one side of the first temperature compensating layer, the first electrical contact electrically shorting a first capacitive component of the first temperature compensating layer;

a piezoelectric layer disposed over the first composite electrode;

a second composite electrode disposed over the piezoelectric layer, the second composite electrode comprising third and fourth electrically conductive layers and a second temperature compensating layer disposed between the third and fourth electrically conductive layers,

20

wherein the fourth electrically conductive layer forms a second electrical contact with the third electrically conductive layer on at least one side of the second temperature compensating layer, the second electrical contact electrically shorting a second capacitive component of the second temperature compensating layer; and

an acoustic reflector disposed beneath the first composite electrode.

**2**. The acoustic resonator device as claimed in claim **1**, wherein the acoustic reflector comprises a cavity disposed in the substrate.

**3**. The acoustic resonator device as claimed in claim **1**, wherein the acoustic reflector comprises an acoustic minor disposed in or over the substrate.

**4**. The acoustic resonator device as claimed in claim **1**. wherein the first electrically conductive layer comprises a first metal layer formed on the substrate, and the second electrically conductive layer comprises a second metal layer disposed on the first temperature compensating layer.

**5**. The acoustic resonator as claimed in claim wherein the third electrically conductive layer comprises a third metal layer disposed on the piezoelectric layer, and the fourth electrically conductive layer comprises a fourth metal layer disposed on the second temperature compensating layer.

**6**. The acoustic resonator as claimed in claim **1**, wherein the first and second temperature compensating layers each comprise polycrystalline silicon.

**7**. The acoustic resonator as claimed in claim **4**, wherein the first metal layer comprises tungsten and the second metal layer comprises molybdenum.

**8**. The acoustic resonator as claimed in claim **5**, wherein the third metal layer comprises molybdenum and the fourth metal layer comprises tungsten.

**9**. The acoustic resonator as claimed in claim **1**. wherein the second composite electrode comprises a side configured to form an electrical connection, and at least one other side that forms a cantilever.

**10**. The acoustic. resonator as claimed in claim **9**, wherein the side that forms the electrical connection comprises a bridge.

**11**. The acoustic resonator as claimed in claim **10**, wherein an active area of the acoustic resonator is terminated at the bridge and at the cantilever.

**12**. An acoustic resonator device, comprising:

a substrate;

a first composite electrode disposed over the substrate, the first composite electrode comprising first and second electrically conductive layers and a first temperature compensating layer disposed between the first and second electrically conductive layers;

a piezoelectric layer disposed over the first composite electrode, the piezoelectric layer having a thickness;

a second composite electrode disposed over the piezoelectric layer, the second composite electrode comprising third and fourth electrically conductive layers and a second temperature compensating layer disposed between the third and fourth electrically conductive layers, the second composite electrode comprising a side configured to form an electrical connection, and at least one other side that forms a cantilever; and

an acoustic reflector disposed beneath the first composite electrode, wherein the first and second composite electrodes are symmetrically disposed about an axis of symmetry passing substantially along a center of the thickness of the piezoelectric layer.

**13**. The acoustic resonator device, as claimed in claim **12**. wherein the first electrically conductive layer comprises a

US 9,197,185 B2

21

first metal layer formed on the substrate, and the second electrically conductive layer comprises a second metal layer disposed on the first temperature compensating layer.

**14**. The acoustic resonator as claimed in claim **12**, wherein the third electrically conductive layer comprises a third metal layer disposed on the piezoelectric layer, and the fourth electrically conductive layer comprises a fourth metal layer disposed on the second temperature compensating layer.

**15**. The acoustic resonator as claimed in claim **12**, wherein the side that forms the electrical connection comprises a bridge.

**16**. The acoustic resonator as claimed in claim **15**, wherein an active area of the acoustic resonator is terminated at the bridge and at the cantilever.

**17**. The acoustic resonator as claimed in claim **12**, wherein the first temperature compensating layer, or the second temperature compensating layer, or both has tapered edges.

**18**. An acoustic resonator device, comprising:

a substrate;

a first composite electrode disposed over the substrate, the first composite electrode comprising, first and second electrically conductive layers and a first temperature compensating layer disposed between the first and second electrically conductive layers;

a piezoelectric layer disposed over the first composite electrode, the piezoelectric layer having a thickness;

a second composite electrode disposed over the piezoelectric layer, the second composite electrode comprising third and fourth electrically conductive layers and a second temperature compensating layer disposed between the third and fourth electrically conductive layers; and

an acoustic reflector disposed beneath the first composite electrode, the first and second composite electrodes being symmetrically disposed about an axis of symmetry passing substantially along a center of the thickness of the piezoelectric layer, wherein no acoustic decoupler layer is disposed between the first and second composite electrodes.

**19**. The acoustic resonator device as claimed in claim **18**, wherein the acoustic reflector comprises a cavity disposed in the substrate.

**20**. The acoustic resonator device as claimed in claim **18**, wherein the acoustic reflector comprises an acoustic mirror disposed in or over the substrate.

**21**. The acoustic resonator device as claimed in claim **18**, wherein the first electrically conductive layer comprises a first metal layer formed on the substrate, and the second electrically conductive layer comprises a second metal layer disposed on the first temperature compensating, layer.

**22**. The acoustic resonator as claimed in claim **18**, wherein the third electrically conductive layer comprises a third metal layer disposed on the piezoelectric layer, and the fourth electrically conductive layer comprises a fourth metal layer disposed on the second temperature compensating layer.

**23**. The acoustic resonator as claimed in claim **18**, wherein the first and second temperature compensating layers each comprise polycrystalline silicon.

**24**. The acoustic resonator as claimed in claim **21**, wherein the first metal layer comprises tungsten and the second metal layer comprises molybdenum.

**25**. The acoustic resonator as claimed in claim **22**, wherein the third metal layer comprises molybdenum and the fourth metal layer comprises tungsten.

**26**. The acoustic resonator as claimed in claim **18**, wherein the second composite electrode comprises a side configured to form an electrical connection, and at least one other side that forms a cantilever.

22

**27**. The acoustic resonator as claimed in claim **26**, wherein the side that forms the electrical connection comprises a bridge.

**28**. The acoustic resonator as claimed in claim **27**, wherein an active area of the acoustic resonator is terminated at the bridge and at the cantilever.

**29**. An acoustic resonator device, comprising:

a substrate;

a first composite electrode disposed over the substrate, the first composite electrode comprising first and second electrically conductive layers and a first temperature compensating layer disposed between the first and second electrically conductive layers;

a piezoelectric layer disposed over the first composite electrode, the piezoelectric layer having a thickness;

a second composite electrode disposed over the piezoelectric layer, the second composite electrode comprising third and fourth electrically conductive layers and a second temperature compensating layer disposed between the third and fourth electrically conductive layers, wherein no acoustic decoupler layer is disposed between the first and second composite electrodes; and

an acoustic reflector disposed beneath the first composite electrode, the first and second composite electrodes being symmetrically disposed about an axis of symmetry passing substantially along a center of the thickness of the piezoelectric layer, wherein the first temperature compensating layer, or the second temperature compensating layer, or both, has tapered edges.

**30**. The acoustic resonator device as claimed in claim **29**, wherein the acoustic reflector comprises a cavity disposed in the substrate.

**31**. The acoustic resonator device as claimed in claim **29**, wherein the acoustic reflector comprises an acoustic mirror disposed in or over the substrate.

**32**. The acoustic resonator device as claimed in claim **29**, wherein the first electrically conductive layer comprises a first metal layer formed on the substrate, and the second electrically conductive layer comprises a second metal layer disposed on the first temperature compensating layer.

**33**. The acoustic resonator as claimed in claim **29**, wherein the third electrically conductive layer comprises a third metal layer disposed on the piezoelectric layer, and the fourth electrically conductive layer comprises a fourth metal layer disposed on the second temperature compensating layer.

**34**. The acoustic resonator as claimed in claim **29**, wherein the first and second temperature compensating layers each comprise polycrystalline silicon.

**35**. The acoustic. resonator as claimed in claim **32**, wherein the first metal layer comprises tungsten and the second metal, layer comprises molybdenum.

**36**. The acoustic resonator as claimed in claim **35**, wherein the third metal layer comprises molybdenum and the fourth metal layer comprises tungsten.

**37**. The acoustic resonator as claimed in claim **29**, wherein the second composite electrode comprises a side configured to form an electrical connection, and at least one other side that forms a cantilever.

**38**. The acoustic resonator as claimed in claim **37**, wherein the side that forms the electrical connection comprises a bridge.

**39**. The acoustic resonator as claimed in claim **38**, wherein an active area of the acoustic resonator is terminated at the bridge and at the cantilever.

**40**. An acoustic resonator device, comprising:

a substrate;

US 9,197,185 B2

23

a first composite electrode disposed over the substrate, the first composite electrode comprising first and second electrically conductive layers and a first temperature compensating layer disposed between the first and second electrically conductive layers;

a piezoelectric layer disposed over the first composite electrode, the piezoelectric layer having a thickness;

a second composite electrode disposed over the piezoelectric layer, the second composite electrode comprising third and fourth electrically conductive layers and a second temperature compensating layer disposed between the third and fourth electrically conductive layers, wherein the second composite electrode comprises a side configured to form an electrical connection, and at least one other side that forms a cantilever; and

an acoustic reflector disposed beneath the first composite electrode, the first and second composite electrodes being symmetrically disposed about an axis of symmetry passing substantially along a center of the thickness of the piezoelectric layer, wherein the first temperature compensating layer, or the second temperature compensating layer, or both, has tapered edges.

**41**. The acoustic resonator device as claimed in claim **40**, wherein the acoustic reflector comprises a cavity disposed in the substrate.

**42**. The acoustic resonator device as claimed in claim **40**, wherein the acoustic reflector comprises an acoustic mirror disposed in or over the substrate.

24

**43**. The acoustic resonator device as claimed in claim **40**, wherein the first electrically conductive layer comprises a first metal layer formed on the substrate, and the second electrically conductive layer comprises a. second metal layer disposed on the first temperature compensating layer.

**44**. The acoustic resonator as claimed in claim **40**, wherein the third electrically conductive layer comprises a third metal layer disposed on the piezoelectric layer, and the fourth electrically conductive layer comprises a fourth metal layer disposed on the second temperature compensating layer.

**45**. The acoustic resonator as claimed in claim **40**, wherein the first and second temperature compensating layers each comprise polycrystalline silicon.

**46**. The acoustic resonator as claimed in claim **45**, wherein the first metal layer comprises tungsten and the second metal layer comprises molybdenum.

**47**. The acoustic resonator as claimed in claim **46**, wherein the third metal layer comprises molybdenum and the fourth metal layer comprises tungsten.

**48**. The acoustic resonator as claimed in claim **29**, wherein the side that forms the electrical connection comprises a bridge.

**49**. The acoustic resonator as claimed in claim **48**, wherein an active area of the acoustic resonator is terminated at the bridge and at the cantilever.

* * * * *