**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417-JPM |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

BAYARD, P.A

Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Akoustis Technologies, Inc. and*
*Akoustis, Inc.*

OF COUNSEL:

PILLSBURY WINTHROP
SHAW PITTMAN LLP

David A. Jakopin
Dianne L. Sweeney
2550 Hanover Street
Palo Alto, CA 94304-1115
(650) 233-4500
david.jakopin@pillsburylaw.com
dianne@pillsburylaw.com

Robert M. Fuhrer
1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856

(703) 770-7900
robert.fuhrer@pillsburylaw.com

David L. Stanton
725 S. Figueroa St., 36th Floor
Los Angeles, CA 90017
(213) 488-7100
david.stanton@pillsburylaw.com

Theresa A. Roozen
1200 Seventeenth St. NW
Washington, DC 20036
(202) 663-8025
theresa.roozen@pillsburylaw.com

*Attorneys for Akoustis Technologies, Inc. and
Akoustis, Inc.*

August 30, 2022

# TABLE OF CONTENTS

Page

I. PREAMBLE ........................................................................................................... 1

II. INTRODUCTION .................................................................................................. 1

III. LEVEL OF ORDINARY SKILL IN THE ART .................................................. 2

IV. TECHNOLOGY OVERVIEW OF THE '755 and '786 PATENTS .............................. 2

    A. The '755 Patent .................................................................................... 2

    B. The '786 Patent .................................................................................... 8

V. LEGAL STANDARD ........................................................................................ 10

VI. AKOUSTIS' PROPOSED CLAIM CONSTRUCTIONS ........................................... 11

    A. The '755 Patent .................................................................................. 11

        1. "Active Region" and "Outer Region" [all asserted claims] .................. 12
        2. "[A] density of mechanical energy in the outer region" [claims 1, 11] 17
        3. "[A]re not excited" [claims 3, 9, 10, 12]............................................ 19

    B. The '786 Patent .................................................................................. 21

        1. False Patent Marking versus Patent Infringement ................................. 21
        2. "piezoelectric layer" [claim 1] ........................................................... 22

            a. Most importantly, independent claim 1 does not include the term "single-crystal" to describe the piezoelectric layer material...... 22
            b. The specification and prosecution history lacks any disclaimer of polycrystalline materials ............................................................ 23
            c. The specification does not define "piezoelectric materials" as single crystal. .......................................................................... 23
            d. The preferred use of single-crystal was not a part of the "inventive aspect" of the '786 Patent......................................... 23

VII. CONCLUSION ................................................................................................... 25

Cases

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
　783 F.3d 1374 (Fed. Cir. 2015) ........................................................................ 11

*GL Trade Americas, Inc. v. Trading Techs. Int'l, Inc.*,
　No. 11 C 1538, 2012 WL 205909 (N.D. Ill. Feb. 13, 2012) ............................. 21

*Moore U.S.A., Inc. v. Standard Reg. Co.*,
　229 F.3d 1091 (Fed. Cir. 2000) .......................................................................... 8

*Nautilus, Inc. v. Biosig Instruments, Inc. (Nautilus II)*,
　572 U.S. 898, 134 S. Ct. 2120 (2014) ................................................... 11, 18, 20

*Nike Inc. v. Wolverine World Wide, Inc.*,
　43 F.3d 644 (Fed. Cir. 1994) ............................................................................. 20

*O2 Micro Int'l v. Beyond Innovation Tech. Co.*,
　521 F.3d 1351 (Fed. Cir. 2008) ........................................................................... 1

*Phillips v. AWH Corp.*,
　415 F.3d 1303 (Fed. Cir. 2005) .................................................................. *passim*

*Pitney Bowes, Inc. v. Hewlett–Packard Co.*,
　182 F.3d 1298 (Fed. Cir. 1999) ........................................................................... 8

*Renishaw PLC v. Marposs Societa' per Azioni*,
　158 F.3d 1243 (Fed. Cir. 1998) ........................................................................ 11

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
　824 F.3d 999 (Fed. Cir. 2016) ............................................................................. 8

*Symantec Corp. v. Comput. Assocs. Int'l, Inc.*,
　522 F.3d 1279 (Fed. Cir. 2008) ................................................................... 23, 25

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
　135 S. Ct. 831 (2015) ......................................................................................... 11

*UltimatePointer, L.L.C. v. Nintendo Co.*,
　816 F.3d 816 (Fed. Cir. 2016) ............................................................................. 8

*Vitronics Corp. v. Conceptronic, Inc.*,
　90 F.3d 1576 (Fed. Cir. 1996) ..................................................................... 10, 14

## Statutes and Codes

United States Code
   Title 35 Section 112(b) ..................................................................................... 18

## Rules and Regulations

Western District of Tennesse Local Patent Rules
   Rule 4.4(a)........................................................................................................... 1

## Other Authorities

D. S. Bindel et al., *Anchor loss simulation in resonators*, Tech. Digest, 18th IEEE Int'l Conf. on Micromechanical Sys., Jan. 30 – Feb. 3, 2005, 133-136 ................................ 19

L.-W. Hung and C. T.-C. Nguyen, *Capacitive-piezoelectric transducers for high-Q micromechanical AlN resonators*, IEEE/ASME J. Microelectromech. Sys., vol. 24, no. 2, 458-473, Apr. 2015 ................................................................... 16

M. Akgul et al., *RF channel-select micromechanical disk filters—part II: demonstration*, IEEE Transactions Ultrasonics, Ferroelect., and Frequency Control, vol. 66, no. 1, 218-235, Jan. 2019 ...................................................................................... 21

R. A. Johnson, *Mechanical Filters in Electronics*, New York: John Wiley & Sons, 1983 ....... 15

R. J. Besson, *A new electrodeless resonator design*, Proceedings, 31st Annual Symp. on Frequency Control, Atlantic City, New Jersey, June 1-3, 1977, 147-152 .......................... 16

# I.    **PREAMBLE**

Pursuant to the Court's Scheduling Order (Doc. 23) and the Local Patent Rule 4.4(a) for

the Western District of Tennessee ("LPR"), Defendants Akoustis Technologies, Inc. and

Akoustis, Inc. (collectively, "Defendants" or "Akoustis") hereby submit Akoustis' Opening

Claim Construction Brief as to United States Patent Nos. 9,735,755 (the "'755 Patent") and

10,256,786 (the "'786 Patent") (collectively, the "Asserted Patents" or "Patents-in-Suit").[1]

Plaintiff Qorvo, Inc. ("Plaintiff" or "Qorvo") asserts that Akoustis infringes claims 1-7, 9-16, and

18 of the '755 Patent and falsely marks and/or otherwise advertises that one or more of the

accused bulk acoustic wave ("BAW") filter products use single crystal piezoelectric layer

resonators as allegedly claimed in Akoustis' own '786 Patent.

# II.    **INTRODUCTION**

The four competing constructions show a clear distinction between the parties'

approaches to claim construction.  For the three '755 Patent disputed terms, Qorvo seeks the

broadest possible construction, even going so far as to suggest that no construction is necessary

despite the obvious dispute over the terms' plain and ordinary meaning.[2]  On the other hand, for

the '786 Patent, Qorvo contends that the claim term should not be construed according to its

undisputed plain and ordinary meaning, despite the lack of any clear intrinsic disavowal or

explicit narrowing definition.  As detailed below, the proper construction for each term is the

plain and ordinary meaning, as proposed by Akoustis, because it is the one that is both consistent

with the intrinsic record and supported by extrinsic evidence.

---

[1] There are no identified disputed terms for asserted United States Patent No. 7,522,018 (the "'018 Patent").

[2] *O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("In this case, the 'ordinary' meaning of a term does not resolve the parties' dispute, and claim construction requires the court to determine what claim scope is appropriate… .").

1

## III. LEVEL OF ORDINARY SKILL IN THE ART

Both Asserted Patents concern BAW resonators used as components of certain radio frequency "RF" filters, which RF filters operate to eliminate undesired frequencies, and allow desired frequencies to pass. Based on the complexity of the technology, one of ordinary skill in the art ("POSITA") during the time period in question would have had an undergraduate degree in electrical engineering with two to four years of experience in the technical field, or a master's degree in electrical engineering with one to two years of experience in the field; or an equivalent combination of education and experience. Any difference between the parties' proposed level of skill in the art would not impact a POSITA's understanding of the plain and ordinary meaning of the disputed claim terms. **Exhibit D1**: Dr. Nguyen Initial Declaration ("Decl.") at 9; **Exhibit D2**: Dr. Nguyen Rebuttal Decl. at pp. 2-3; **Exhibit D3**: Dr. Bravman deposition transcript ("Tr.") at 17:16-18:6.

## IV. TECHNOLOGY OVERVIEW OF THE '755 and '786 PATENTS

### A. The '755 Patent

A BAW resonator used in an RF filter uses electrodes to convert electrical energy to mechanical acoustic waves that travel through the surface of the piezoelectric material and are stored in it. The acoustic waves propagate vertically as shown in the figure below.[3] The resonant frequency is determined by the thickness of the piezoelectric material and the mass of the electrodes. To keep the waves from escaping into the substrate, there are two main configurations of BAW filters:



**Figure 3.15** The geometry of a resonator with electrodes. Example corresponds to the case of $Z_p > Z_e$. The stress field is drawn with a solid line and the displacement with a dashed line.

---

[3] **Exhibit D4**: Hashimoto, QORVO_00024743 (annotated).

(1) BAW-SMR device and (2) FBAR device.  A "Solidly-Mounted Resonator BAW" or BAW-SMR device is created by stacking thin multiple layers of alternating materials with varying refractive index that prevent the waves from escaping into the substrate.  An alternative approach, called a "Film Bulk Acoustic Resonator" or FBAR, etches a cavity underneath the active area, creating suspended membranes, such that the cavity prevents the waves from escaping into the substrate.

The '755 Patent specification explains that "[t]he present disclosure relates to Bulk Acoustic Wave (BAW) resonators and, in particular, to improvement of confinement of mechanical energy within a BAW resonator."  **Exhibit C1**: the '755 Patent, 1:14-16.[4]  The '755 Patent specification further describes the **active region** and the outer region in Figure 1A: "The active region 34 is the region of the BAW resonator 10 that is <u>electrically driven</u>.  In other words, <u>the active region 34 is the region of the BAW resonator 10 consisting of, in this example</u>, the bottom electrode 14, the top electrode 16, the portion of the <span style="color:orange">piezoelectric layer</span> 12 between the bottom and top electrodes 14 and 16, **and** the <span style="color:#3399cc">**portion of the reflector 18**</span> below the bottom electrode 14. Conversely, an <span style="color:red">**outer region 36**</span> of the BAW resonator 10 is a region



FIG. 1A
(PRIOR ART)

FIG. 1B
(PRIOR ART)

---

[4] Exh. D4 at QORVO_00024878 (discussing lateral leakage of SMR and FBAR resonators). The '755 Patent specification only shows examples of SMR-type BAW resonators with Bragg reflectors.

of the BAW resonator 10 that <u>is not electrically driven</u> (i.e., the area outside of the active region 34)." '755 Patent, 1:54-64 (emphasis added). It should be noted that the portion of the reflector 18 below the bottom electrode 14 is not actually electrically driven, as further explained in the term construction of "active region" below. "While the reflector 18 (or air cavity for a FBAR type BAW resonator) confines mechanical energy within the active region 34 of the BAW resonator 10 in the longitudinal, or vertical, direction, **a substantial amount of mechanical energy still leaks laterally** from the **active region** 34 of the BAW resonator 10 into the outer region 36 of the BAW resonator 10 <u>and then down into the substrate</u>, as illustrated FIG. 1B." '755 Patent, 2:14-21 (emphasis added). The specification goes on to explain that "[i]n some embodiments, n is within a range of values for which a <u>density of mechanical energy</u> in the outer region of <u>the</u> BAW resonator <u>is reduced</u> as compared to a density of mechanical energy in the outer region of <u>the</u> BAW resonator *when n is equal to 1*." '755 Patent, 2:52-56 (emphasis added).

While the '755 Patent mentions FBAR resonators, the embodiments illustrated in its drawings and discussed in detail are SMR resonators. And so, with respect to an SMR-type resonator, the '755 Patent explains that "[i]deally, in order to achieve a high Q value, the mechanical energy should be contained, or trapped, within the active region 34 of the BAW resonator 10. The reflector 18 [a component that is only within an SMR-type resonator, and not an FBAR resonator] operates to prevent acoustic waves from leaking longitudinally, or vertically, from the BAW resonator 10 into the substrate (not shown, but below the reflector 18)." '755 Patent, 2:4-9.[5]

---

[5] **Exhibit D6**: Akoustis' Exh. B9 at 1414-17 (describing the quality factor Q of a resonator as a direct measure of the energy lost per cycle. The higher the Q, the lower the energy lost.);

The '755 Patent describes layers of a BAW resonator, and with reference to Figure 2B (shown below) describes a piezoelectric layer 68 that has first bottom electrode 70 and a second top electrode 72 on opposite surfaces thereof, and what is known as a passivation layer 88 (simply an insulator, shown in blue) over the top electrode 72, within the active region. In the "outer region," the thickness of one or more materials is different than the thickness of the passivation layer (shown thicker outer region in green). Thus, the phrase "n has a value other than 1" in the claims refers to the green layer thickness in the outer region being different than the blue layer thickness in the active region. The '755 Patent teaches that "[T]he additional material [of the outer region] has a thickness that is n times the thickness ($T_{PA}$) of the [active region] passivation layer, wherein n is a value other than 1. In this manner, lateral leakage of the mechanical energy from the active region of the BAW resonator into the outer region of the BAW resonator can be reduced." '755 Patent, 2:46-51.



The performance of piezoelectric devices, such as BAW resonators, depends on proper matching of both electric and acoustic impedances. *See, generally*, Exh. D4 at Qorvo_00024674-77, Qorvo_00024726-59; **Exhibit D5**: Dr. Nguyen Tr. at 32:24-33:5 (describing the function of a BAW resonator in a mobile phone).[6] Electric impedance matching

---

**Exhibit D7**: Akoustis' Exh. B13 at 133-36 (describing how the substrate plays a crucial role in determining both energy losses from a resonator and the interactions with nearby resonators).

[6] "They remove unwanted frequencies and pas[s] wanted frequencies and they also do this in a way where they minimize the loss in the passband, which is another way of saying they match to the preceding and succeeding stages."

enables an efficient transfer of electric power whereas acoustic impedance matching enables the proper transfer of acoustic energy. At an interface, for example, between devices, or between portions of a single device, a mismatch in impedance will result in a reflection of some portion of the energy. The amount of energy reflected depends on the difference in impedances across the interface. This is true for both electric impedance and acoustic impedance. Acoustic impedance matching, in particular, involves the selection of materials and geometric design of the matching layer, backing layer, and the piezoelectric element.

The '755 Patent addresses only the acoustic impedance issue, and describes a way to improve acoustic matching by altering the acoustic impedance in the **outer region** relative to the acoustic impedance in the **active region**. In light of the Patent Office determining that the broad concept of altering acoustic impedance in the outer region relative to the acoustic impedance in the active region was known, the claimed novelty of the '755 Patent relates to a change in n, **relative to the same device**, as detailed below. **Exhibit C3**: '755 Patent Prosecution History, QORVO_00000354-57. The specification adds that "[i]n some embodiments, n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region." '755 Patent, 2:57-61 (emphasis added).[7]

Qorvo's expert, Dr. Bravman, incorrectly summarizes the '755 Patent specification as follows: "[t]hus, the specification repeatedly indicates that the amount of mechanical energy created by the inventive structural configuration and leaked to the outer region *is reduced* *as*

---

[7] Exh. D1 at 16 ("Energy lost to the substrate—which can be waves going into the substrate that experience dissipation in the substrate (or its mounts, adhesives, etc.)—that do not return to the resonator is energy lost, thereby lowering the quality factor Q, a very important filter or oscillator design parameter.").

compared to a prior art configuration." **Exhibit D8**: Dr. Bravman Initial Decl. ¶ 41 (emphasis added).  However, the comparison *as claimed* is not to a prior art (n=1) configuration as suggested, but rather between two different configurations of the same device, *e.g.*, when n is not equal to 1 and when n is equal to 1.  '755 Patent, 2:52-56 ("In some embodiments, n is within a range of values for which a density of mechanical energy in the outer region of *the BAW resonator* is reduced as compared to a density of mechanical energy in the outer region of *the BAW resonator* when n is equal to 1.") (emphasis added); *compare* Exhibit A, Claim 1 *with* Exh. D8 ¶ 49.  Indeed, this limitation (comparing the same device in two different configurations) was added to the independent claim to overcome an invalidity rejection for claims that already included "the one or more material layers having a thickness that is n times the thickness ($T_{PA}$) of the passivation layer within the active region, wherein: n is a value other than 1."  Exh. C3 at QORVO_00000381.  Thus, the <u>inventive</u> structure of the '755 Patent is *the change* to "n" *in the same device* (and not a "prior art configuration") where the result is an improved Q factor by reducing lateral energy leakage.

The '755 Patent specification goes on to say that "[s]uitable values for n [not equal to 1] may be determined, e.g., by simulation or, in some cases, empirically.  However, for most practical implementations, empirical calculations are complex and, as such, simulation will provide better results."  '755 Patent, 6:64-67.  The specification further explains that "[i]n general, the value of n is such that the outer region 92 and the active region 90 of the BAW resonator 66 are <u>acoustically matched</u> such that <u>one or more acoustic wavelengths that cause lateral leakage</u> of mechanical energy from the active region 90 into the outer region 92 are <u>not excited</u> in the active region 90."  '755 Patent, 7:1-6 (emphasis added).  As referenced above, acoustic impedance matching of a BAW resonator involves the matching of piezoelectric

element properties with the corresponding properties of the adjacent structures and media into which the acoustic energy may be leaked.

## B.    The '786 Patent

The '786 Patent, entitled "Communication filter using single crystal acoustic resonator devices," relates generally to electronic devices.[8] **Exhibit C2**: '786 Patent, 1:14-15. Importantly, independent claim 1 does not include the term "single-crystal" to define or describe the piezoelectric layer material. *See also*, **Exhibit B** (claim 1). Rather, the single-crystal limitation is found, as an *optional* feature, of dependent claim 2, unrelated to the piezoelectric layer. '786 Patent, 14:62-64 ("The device of claim 1 wherein the seed substrate includes silicon, silicon carbide, aluminum oxide, *or single crystal* aluminum gallium nitride materials.") (emphasis added). Nowhere in the specification or the prosecution history do the inventors disclaim a polycrystalline "piezoelectric layer" or otherwise act as their own lexicographer by defining "piezoelectric layer" as only single-crystal. To the contrary, the patent provides "[M]erely by way of example, the invention has been applied to a single crystal resonator device for a communication device, mobile device, computing device, among others." '786 Patent, 1:18-21, 44-47; 3:45-52. The specification further adds that "the above description and

---

[8] Patent titles are accorded no more weight in claim construction than other portions of the specification. *See Moore U.S.A., Inc. v. Standard Reg. Co.*, 229 F.3d 1091, 1111 (Fed. Cir. 2000) ("the bar on importing limitations from the written description into the claims applies no less forcefully to a title"); *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1312 (Fed. Cir. 1999) (patent title is "near irrelevancy" in claim construction; *compare Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 n.2 (Fed. Cir. 2016) ("We have used the title of a patent to aid in claim construction."); *see also, e.g.*, *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 823 (Fed. Cir. 2016) (partly relying on the patent's title when limiting a claim's scope). Thus, the use of the "single crystal" embodiment in the title of the invention, in a vacuum, has little to no impact on the proper claim construction analysis.

illustrations should not be taken as limiting the scope of the present invention which is defined by the appended claims." '786 Patent, 14:29-31.

"More particularly, the invention described in this patent provides *techniques* related to *bulk acoustic wave resonator devices*, single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, *and the like*." (emphasis added) '786 Patent, 1:15-18.  Both the explicit reference to "*bulk acoustic wave resonator devices*" as well as the phrase "*and the like*" clearly envision usage of materials other than single-crystal.  According to expert Dr. Nguyen, the invention is not based on the use of a single crystal piezoelectric layer, but rather relates to a new way of "packaging" BAW resonators, using conventional materials, including, but not exclusively, single-crystal piezoelectric layers.  Exh. D5 at 89:21-90:2 ("… because this is packaging.  It's device agnostic.").[9]  The specification goes on to describe the benefits of the inventive packaging techniques over pre-existing techniques: "One or more benefits are achieved over pre-existing techniques using the invention.  In particular, the present device can be manufactured in a relatively simple and cost-effective manner while using conventional materials and/or methods according to one of ordinary skill in the art." '786 Patent, 2:10-14.  So, the specification describes the materials used as "conventional" – which would necessarily include the choice of type of piezoelectric material; and a skilled artisan at the time of filing of the '786 Patent would have considered single-crystal piezoelectric materials to be conventional for use in BAW resonators.  Exh. D3 at 170:2-10 (acknowledging that use of single-crystal piezoelectric material was well-known).  **Exhibit B**, claim 1 provides underlined examples of the

_____

[9] Wafer-level packaging (WLP) is the technology of manufacturing packaging components on the die while it is still on the wafer—for example, protective layers and electrical connections are added to the substrate before dicing.

limitations related to the inventive "packaging" technique disclosed in the '786 Patent specification.

## V.   <u>LEGAL STANDARD</u>

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted). It is likewise true that "[d]ifferences among claims can also be a useful guide. . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). The specification may also "reveal a special definition given to a claim term

by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316.

In addition to the specification, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317. In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

A claim is invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc. (Nautilus II)*, 572 U.S. 898, 901, 134 S. Ct. 2120, 2124 (2014). Prior to the Supreme Court's decision in *Nautilus II*, a claim was indefinite when it was "insolubly ambiguous" or "not amenable to construction." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015). The Court explained that a patent must be precise enough to afford clear notice of what is claimed, thereby "appris[ing] the public of what is still open to them." *Nautilus II*, 134 S. Ct. at 2129 (internal quotation marks and citations omitted).

## VI.    AKOUSTIS' PROPOSED CLAIM CONSTRUCTIONS

### A.    The '755 Patent

The following claim terms detailed in sub-sections 1-3 below are in dispute. To provide context for each term the whole of dependent claim 3 (including claims 1 and 3) is provided as **Exhibit A** with the disputed terms in **bold** and the key features of the claimed invention underlined.

### 1. "Active Region" and "Outer Region" [all asserted claims]

| Akoustis' Proposed Construction | Qorvo's Proposed Construction |
|---|---|
| Active region: That region of the device where motional current density is generated through the piezoelectric layer.<br><br>Outer region: defined as that region outside the active region. | Plain and ordinary meaning (POM). If a construction is necessary,<br><br>"active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality<br><br>"outer region" is the region of the BAW resonator that is not electrically driven. |

The fundamental difference between these disputed constructions revolves around the question of *whether the main embodiment disclosed* in the '755 Patent, namely an SMR-type embodiment where the reflectors are said to be part of the active region, *should be excluded as practicing the patent*. Qorvo's construction would do just that because the reflectors are not electrically driven. Akoustis' construction of "active region," however, would *include* the reflectors because they are part of the region where *motional current density* is generated through the piezoelectric layer.

In operation, acoustic waves in the piezoelectric layer **12** within an active region **34** of the BAW resonator **10** are excited by an electrical signal applied to the bottom and top electrodes **14** and **16**. The active region **34** is the region of the BAW resonator **10** that is electrically driven. In other words, the active region **34** is the region of the BAW resonator **10** consisting of, in this example, the bottom electrode **14**, the top electrode **16**, the portion of the piezo-electric layer **12** between the bottom and top electrodes **14** and **16**, and the portion of the reflector **18** below the bottom electrode **14**. Conversely, an outer region **36** of the BAW resonator **10** is a region of the BAW resonator **10** that is not electrically driven (i.e., the area outside of the active region **34**). The frequency at which resonance of the acoustic waves

Unlike Akoustis' construction which is consistent with the main embodiment, Qorvo's suggested plain and ordinary meaning of "active region" would leave the jury without a

construction and guessing as to what this term means. The fact that the '755 Patent specification is also unclear, as explained below, simply reinforces that a construction of the phrase is necessary.

As to Qorvo's proposed construction, that must also be rejected. First, the added phrase "to provide the resonator functionality" is vague and unhelpful in describing the metes and bounds of the active region. Qorvo seems to be suggesting, through its use of the word "functionality," that the overall resonator filtering function is provided exclusively by the active region; and that adding it to the construction somehow assists in defining the active region. Yet, it is clear from the '755 Patent, as a whole, that any reduced lateral energy loss caused by adding the "one or more layers" to the outer is the by-product of change in the <u>outer region</u>. Exh. D5 at 30:13-24; 43:7-21. Clearly, the end-game filtering functionality of a BAW resonator implicates more than the active region, especially as detailed in the '755 Patent. There is no sound reason to inject resonator "functionality" as part of the construction of active region.

The fundamental problem with Qorvo's construction that focuses on the drive input ("electrically driven") is that it has the effect of improperly excluding portions of disclosed embodiments that describe the active region. The active region is described as the region of the SMR BAW resonator that <u>*includes* the reflector 18 below the bottom electrode 14</u>. '755 Patent, 1:51-61 (emphasis added). This



*FIG. 5E*

13

reflector portion (74) below the bottom electrode is indisputably not electrically driven. Exh. D5 at 44:22-45:19; 53:21-54:9; Exh. D3 at 64:19-65:17. Why the inventors used the term electrically driven can be questioned, but for claim construction purposes, the term *electrically driven*, which is not in the claim language, cannot trump the embodiment, especially when the inventors were not using the term to act as their own lexicographer.

Since reflectors in the SMR-BAW resonator cannot be electrically driven, Qorvo's proposed construction would improperly exclude the very reflectors that are described as part of the active region in the main embodiment, thus relegating the reflectors to be part of the outer region. That goes against a fundamental principle of claim construction. *Vitronics*, 90 F.3d at 1583 (claim interpretation excluding the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support). For the same reason, Qorvo's construction of "outer region" is equally flawed based on the imprecise "electrically driven" term that would necessarily relegate the entire reflector region to the outer region in disregard of numerous examples in the patent that confirm it is part of the active region.

Akoustis' proposed construction embraces a definition of "active region" that, consistent with the patent, permits the reflectors to be part of the active region by replacing "electrically driven" with "motional current density"; as the "region … where a motional current density is generated." Motional current is a more appropriate term to describe the plain and ordinary meaning of an active region of a BAW resonator and remains



*FIG. 1B*
*(PRIOR ART)*

14

consistent with the '755 Patent and with what one of ordinary skill in the art would understand as occurring. As referenced earlier, motional current is the current generated by motion of the mechanical resonator that flows from one electrode to the other. Exh. D1 at 10. Because the motional current ultimately flows from one electrode to the other, the regions of the electrodes that generate motional current by inducing motion of the mechanical resonator define the active area of the device, including reflectors in an SMR-type BAW resonator. All of this is consistent with the intrinsic record that shows lateral leakage from the active region – ***including the reflector portion of the active region.***



FIG. 1A
(PRIOR ART)

FIG. 1B
(PRIOR ART)

Using motional current density as the proper term for the active region of the claimed BAW resonator is further supported by additional extrinsic evidence:

**Exhibit D9:** R. A. Johnson, *Mechanical Filters in Electronics*, New York: John Wiley & Sons, 1983. Dr. Nguyen explains that page 29: Equation (2.10) provides an explicit relationship

between $k_t^2$ (which the text calls $k_{em}^2$) and the motional inductance $L_1$ and static inductance $L_o$ for a magnetostrictively transduced resonator, showing how motional quantities (in this case motional voltage) universally determine the motional equivalent circuit of a mechanical or acoustic resonator, whether the transducer is piezoelectric, magnetostrictive, capacitive, etc. Exh. D1 at 8.

**Exhibit D10**: R. J. Besson, *A new electrodeless resonator design,* Proceedings, 31st Annual Symp. on Frequency Control, Atlantic City, New Jersey, June 1-3, 1977, 147-152. Dr. Nguyen explains that pages 150-151: Fig. 2 and Fig. 3 depict a quartz resonator in which the transducer electrodes D1 and D2 do not touch the quartz, yet still define the region where the motional current of interest is generated and therefore the active "part" or "region." Exh. D1 at 8.

**Exhibit D11**: L.-W. Hung and C. T.-C. Nguyen, *Capacitive-piezoelectric transducers for high-Q micromechanical AlN resonators,* IEEE/ASME J. Microelectromech. Sys., vol. 24, no. 2, 458-473, Apr. 2015. Dr. Nguyen explains that page 459, col. 1: Fig. 1 provides another micro-scale example of how motional current defines the active region; not the electrical drive voltage and its placements. Exh. D1 at 8-9.

**Exhibit D12**: U.S. Patent Appln. Publ'n 2014/0159548. Dr. Nguyen explains that at Sheet 2, Fig. 1B, the active region includes the regions where layer 145 (which can be a dielectric) sits between the piezoelectric and the top electrode, attesting to the fact that the electrode metal need not touch the piezoelectric to be included in the active region. Rather, as long as motional current flows through that region from the top to the bottom electrode, this is part of the active region. Exh. D1 at 10.

For all of these reasons, the Court should adopt Akoustis' proposed construction of "active region", as well as Akoustis' proposed construction of "outer region."

### 2. "[A] density of mechanical energy in the outer region" [claims 1, 11]

| Akoustis' Proposed Construction | Qorvo's Proposed Construction |
|---|---|
| The "density of mechanical energy" means a total density over the full volume of the outer region, or otherwise indefinite. | POM. If a construction for "density of mechanical energy" is needed, it means the amount of mechanical energy from acoustic waves leaked from the active region, measured over a volume of the outer region. |

Energy density is defined as an amount of energy per unit volume, just as an object's density is its mass per unit volume. Exh. D1 at 12. That is, energy density requires a defined volume over which the "amount" of energy is measured, and any amount without an associated volume cannot be "energy density." As detailed above, for a miniature device like a BAW or micromechanical resonator, the surroundings into which energy may be lost is generally the substrate on which the device is fabricated. Energy passing into the substrate—which can be waves going into the substrate that experience dissipation in the substrate (or its mounts, adhesives, etc.)—that does not return to the resonator, is energy lost. Energy lost lowers the quality factor $Q$; a very important filter or oscillator design parameter. What matters generally to a designer, is the total energy lost to the surroundings, not just energy lost in one or more undefined smaller region(s), without knowing what happens in other undefined smaller region(s). This is especially important in this case where the invention relates to improving Q by mitigating lateral energy loss. *See, also* '755 Patent, 2:21-26 (annotated).

The only way to determine whether a change to n mitigates lateral loss is to measure density change over the entirety of the outer region. Exh. D1 at 17. For example, it is possible that even where total



resonator **10** and then down into the substrate, as illustrated
FIG. **1**B. This lateral leakage of mechanical energy at the
boundaries of the BAW resonator **10** degrades the Q of the
BAW resonator **10**. As such, there is a need for systems and
methods for mitigating the loss of mechanical energy
through lateral dispersion into the outer region **36** of the
BAW resonator **10**.

energy in the outer region has increased, there can be a particular region where there is a reduction in energy density – and this would not improve Q.  Only the total energy over the full volume can provide quantitative information regarding the effectiveness of any structure intended to reduce energy losses from the active region.

The alternative, as Qorvo proposes, is that lateral energy leakage can be measured over some undefined lesser volume(s) of the outer region.  However, without any further detail, Qorvo's "a volume" construction is indefinite.  Indefiniteness is a standard that assesses compliance with 35 U.S.C. § 112(b), which requires no special form of claiming, but mandates the following: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."  35 U.S.C. § 112(b).  An entire patent or certain claims can be invalid for indefiniteness if the claims, read in light of the specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.  *Nautilus II*, 134 S. Ct. at 2124.  In other words, if the reduction in energy density leaked (lost) to the outer region is for a volume less than the entire outer region, there is simply no way to know how much is enough to achieve the claimed results.  Exh. D3 at 94:5-99:10 ("… but the ***only volume*** that can be ***unambiguously*** specified is what was chosen, that is, ***the whole volume***. And I just said that restricts the analyses in ways that I don't think are required or appropriate.") (emphasis added).  Qorvo's expert, Dr. Bravman acknowledges, as he must, that the Qorvo unspecified volume is ambiguous and that only the full volume can be unambiguously specified.  *Id*.  "If, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity."  *Phillips*, 415 F.3d at 1327.  Thus, the only construction that avoids indefiniteness is Akoustis' proposed construction.

The following extrinsic evidence further supports Akoustis' proposed plain and ordinary meaning of "density of mechanical energy" as used in the '755 Patent claims: **Exhibit D7**: D. S. Bindel et al., *Anchor loss simulation in resonators*, Tech. Digest, 18th IEEE Int'l Conf. on Micromechanical Sys., Jan. 30 – Feb. 3, 2005, 133-136. Dr. Nguyen explains the passage "[T]he bending motion of the mode along with the Poisson effect induces a vertical motion in the stem which pumps displacement waves into the substrate, where they carry away the energy of the resonance" (and the paper as a whole) clearly indicates that it is energy lost to the substrate that matters. Their use of a perfectly matched layer (PML) in simulation to capture all energy lost from the resonator into the substrate and surroundings indicates that it is all the energy lost to the infinite surroundings that matters to one skilled in the art. Exh. D1 at 17-18.

### 3. "[A]re not excited" [claims 3, 9, 10, 12]

| Akoustis' Proposed Construction | Qorvo's Proposed Construction |
| --- | --- |
| "[A]re not excited" means that the wavelengths do not exist in the whole volume of the active region, or otherwise indefinite. | POM. If a construction for "are not excited" is needed, it means "are not substantively created" |

Qorvo's proposed construction seeks to undo the plain meaning as drafted and rewrite the claim by replacing the "are not excited" with the term "are not substantively created." Qorvo's construction is seemingly based on a flawed premise that a POSITA would have understood that it is the leakage that matters, and therefore any "non-substantive" excitations of wavelengths in the active region "that <u>don't result in energy leakage are not prohibited</u>." **Exhibit D13**: Dr. Bravman Rebuttal Decl. ¶ 59. But all wavelengths in the active region, even those that are "not substantively created" will still leak into the outer region. Exh. D3 at 150:11-151:5 ("Mathematically, yes. And again, we get to substantively, does that amount of leakage matter?"). In essence, Qorvo's proposed construction is based on whether the one or more

wavelengths are reduced *enough* such that the amount of leakage into the outer region is not

substantive – i.e. an acceptable loss – "Are the differences themselves substantive. If they are,

then that's the invention." Exh. D3 at 150:20-22. The central issue with Qorvo's position is that

it is a complete rewrite of the claim language and puts the POSITA in the quandary of deciding

how much is enough. *See Nike Inc. v. Wolverine World Wide, Inc*., 43 F.3d 644, 647 (Fed. Cir.

1994) (rejecting the patentee's proposed claim construction that would, "in effect, rewrite its

patent claims to suit its needs in this litigation."). In fact, where the patentee intended to write

"reduced" rather than "not excited," they did so. *Cf.* claim 1 ("a density of mechanical

energy…is reduced…."). **Exhibit A**. That is not what claims 3, 9, 10, and 12 say or even

reasonably suggest:

> **3**. The BAW resonator of claim **1** wherein n is such that
> the outer region of the BAW resonator and the active region
> of the BAW resonator are acoustically matched in such a
> manner that one or more wavelengths that cause energy
> leakage into the outer region are not excited in the active 60
> region.

Under Qorvo's proposed construction claims 3, 9, 10, and 12 are invalid for

indefiniteness because the proposed construction fails to inform, with reasonable certainty what

satisfies the "not substantively created" language. *See, e.g.*, *Nautilus II*, 134 S. Ct. at 2122.

Furthermore, Qorvo's definition is inconsistent with the plain meaning of "not excited" and

would be viewed as ambiguously indefinite relative to the term "reduced" used throughout the

'755 Patent specification. (*See, e.g.*, '755 Patent, 2:33, 51, 54; 3:65; 4:1; 5:8, 23, 25; 6:33; 7:8,

16, 50; 9:49; 11:36.)

Scientific literature is also filled with less absolute descriptions of things, where words

like "reduced" or "suppress" might be used. One example, written by the Akoustis expert, is

**Exhibit D14**: M. Akgul et al., *RF channel-select micromechanical disk filters—part II: demonstration,* IEEE Transactions Ultrasononics, Ferroelect., and Frequency Control, vol. 66, no. 1, 218-235, Jan. 2019.  Dr. Nguyen explains that at page 232, col.1-2: "Suppression of spurious modes often requires creative solutions that are not easily designable and that often result in unique geometries, e.g., the polygons of FBAR filter design [22]."  In addition, the phrase at the end "showing no strong spurious modes" is careful to include the word "strong" so that it maintains a non-absolute meaning.  Exh. D1 at 20.

### B.    The '786 Patent

The "piezoelectric material" claim term detailed below is in dispute.  To provide context for the term the whole of claim 1 and claim 2 is provided as **Exhibit B** with the disputed term in **bold** and the key features of the claimed invention underlined.

### 1.    False Patent Marking versus Patent Infringement

"It is worth noting the false marking statute 'has not been interpreted to require the same type of exact claim construction that would be required in an infringement action.'" *GL Trade Americas, Inc. v. Trading Techs. Int'l, Inc.,* No. 11 C 1538, 2012 WL 205909, at *6 (N.D. Ill. Feb. 13, 2012) (citation omitted).  In *GL Trade Americas*, the district court explained that "[i]n the context of false marking claims, courts have held that where a patentee's *legal position* as to its patents is *sufficiently plausible*, the claim cannot survive as a matter of law." *Id.* (emphasis added) (citation omitted).  Similarly, the court in *GL Trade Americas* reasoned that the false marking "issue boils down to whether TT's interpretation that is allowed (or perhaps even required) to mark its products even when they are being used in a non-infringing mode is *legally plausible* so as to negate any possibility of a finding of bad faith." *Id.* (emphasis added).

While Akoustis is confident that "piezoelectric material" was not intended to be limited to single-crystal, and the patent expressly contemplates the same, Akoustis is permitted to be

wrong so long as its own proposed construction was, at least, legally plausible; a less exacting standard than typical claim construction for patent infringement determination.

### 2. "piezoelectric layer" [claim 1]

| Akoustis' Proposed Construction | Qorvo's Proposed Construction |
|---|---|
| A layer of piezoelectric material having single or multiple crystal structure. | A layer of piezoelectric material having single crystal structure. |

Qorvo's proposed contention has three strikes against it: (1) Claim 1 simply does not modify piezoelectric with a single-crystal modifier; (2) nowhere in the '786 Patent intrinsic record do the inventors disclaim a polycrystalline "piezoelectric layer" as used in claim 1; and (3) the inventors did not act as their own lexicographer.

a. Most importantly, independent claim 1 does not include the term "single-crystal" to describe the piezoelectric layer material.

Akoustis' proposed construction is the plain and ordinary meaning as understood by one of ordinary skill in the art. Exh. D3 at 158:17-21. "[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13. Here, the words of the claim are unambiguous and offer no reason to adopt Qorvo's construction. The single-crystal limitation is found, as an *optional* feature of dependent claim 2, unrelated to the piezoelectric layer. '786 Patent, 14:62-64 ("The device of claim 1 wherein the seed substrate includes silicon, silicon carbide, aluminum oxide, or single crystal aluminum gallium nitride materials.") Moreover, *the "single-crystal" term is not in any independent claims* of the '786 Patent describing the piezoelectric layer. This informs a POSITA that the inventors knew when to use the single-crystal modifier if/when they intended to further limit a limitation (like the seed

substrate) consistent with embodiments described in the specification. *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent.")    Additionally, the claim limitations themselves further support a clear understanding that the inventive techniques are not the presence of a single crystal piezoelectric layer.  In all events, nothing the claims themselves provide a basis to limit the construction to single-crystal.

> b.    The specification and prosecution history lacks any disclaimer of polycrystalline materials

The prosecution history also supports the notion that the inventors and the Patent Office did not view the "piezoelectric material" of claim 1 as limited to single crystal because there is no mention that the claims were so limited.  *See, e.g.*, *Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1290 (Fed. Cir. 2008) ("[t]he terms are not expressly defined in the specification, and there is nothing in the specification that suggests that it adopted a special definition of those terms.").  The lack of disclaimer in the specification refutes Qorvo's proposed limiting construction.

> c.    The specification does not define "piezoelectric materials" as single crystal.

There is no basis to contend that the inventors acted as their own lexicographer.  Exh. D3 at 160:8-19 (acknowledging that the '786 Patent inventors did not offer a definition of piezoelectric layer as meaning only single crystal).

> d.    The preferred use of single-crystal was not a part of the "inventive aspect" of the '786 Patent

In addition to the three strikes noted above, patent titles are accorded no more weight in claim construction than other portions of the specification.  The title, thus, should only reinforce

a limited construction if further supported by written description. So, the issue is whether the written description provides a basis for finding that the invention is inextricably tied to the use of single-crystal materials. The written description does nothing on the sort. Indeed, the opposite is true here. Throughout the specification the inventors make clear that *merely by way of example* the invention is described as using a single crystal resonator device. *See, e.g.*, '786 Patent, 1:40-50; 3:45-52; 14:24-31, 62-64. Qorvo's reliance on the preferred embodiment references to single-crystal resonators is nothing more than a red-herring. The '786 Patent is expressly not dependent on the use of any particular piezoelectric material to be novel, but rather "[m]ore particularly, the present invention provides *techniques* related to bulk acoustic wave resonator devices [where this first item explicitly allows for materials other than single-crystal], single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, and the like." '786 Patent, 1:14-18 (emphasis added). According to Dr. Nguyen, the invention is not predicated on using a single-crystal piezoelectric material, but instead describes a new way of "packaging" a BAW filter, while using conventional materials, such as single-crystal piezoelectric layers. Exh. D5 at 89:21-90:2 ("… because this is packaging. It's device agnostic.").

The '786 Patent specification goes on to describe the benefits of the inventive techniques over pre-existing techniques: "One or more benefits are achieved **over pre-existing techniques** using the invention. In particular, the present device can be manufactured in a relatively simple and cost-effective manner **while using conventional materials** and/or methods according to one of ordinary skill in the art." '786 Patent, 2:10-14 (emphasis added). So, the specification describes the materials as conventional – which would include, but is expressly not limited to,

any one type of piezoelectric material.[10]  *See Symantec Corp.*, 522 F.3d at 1290 ("The specification does not limit the invention to the preferred embodiment, and the ordinary meaning of the term 'computer system,' according to *Symantec*, includes both a single computer and a system of multiple, interconnected computers.").  The same is as true here as it was in *Symantec*; the specification does not limit the invention to the preferred single-crystal embodiments and the ordinary meaning of piezoelectric materials is not limited to single crystal.  Qorvo's proposed construction improperly seeks to limit the term to a preferred embodiment and should be rejected.  Akoustis' proposed construction is not only legally plausible as it relates to alleged false marking, but also the correct construction under an infringement construction standard.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should adopt Akoustis' constructions for each of the disputed terms or alternatively for "density of mechanical energy" and "are not excited" find that the impacted claims are indefinite.

---

[10] Even without the specification saying so, a skilled artisan, at the time of filing of the '786 Patent, would have considered the use of single-crystal piezoelectric materials as conventional. Exh. D3 at 170:2-10.

Dated: August 30, 2022

PILLSBURY WINTHROP
SHAW PITTMAN LLP

David A. Jakopin
Dianne L. Sweeney
2550 Hanover Street
Palo Alto, CA 94304-1115
(650) 233-4500
david.jakopin@pillsburylaw.com
dianne@pillsburylaw.com

Robert M. Fuhrer
1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856
(703) 770-7900
robert.fuhrer@pillsburylaw.com

David L. Stanton
725 S. Figueroa St., 36th Floor
Los Angeles, CA 90017
(213) 488-7100
david.stanton@pillsburylaw.com

Theresa A. Roozen
1200 Seventeenth St. NW
Washington, DC 20036
(202) 663-8025
theresa.roozen@pillsburylaw.com

*Attorneys for Akoustis Technologies, Inc. and Akoustis, Inc.*

BAYARD, P.A.

*/s/ Ronald P. Golden III*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Akoustis Technologies, Inc. and Akoustis, Inc.*