## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417-JPM |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

BAYARD, P.A.

Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Akoustis Technologies, Inc. and
Akoustis, Inc.*

OF COUNSEL:

PILLSBURY WINTHROP
SHAW PITTMAN LLP

David A. Jakopin
Dianne L. Sweeney
2550 Hanover Street
Palo Alto, CA 94304-1115
(650) 233-4500
david.jakopin@pillsburylaw.com
dianne@pillsburylaw.com

Robert M. Fuhrer
1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856

(703) 770-7900
robert.fuhrer@pillsburylaw.com

David L. Stanton
725 S. Figueroa St., 36th Floor
Los Angeles, CA 90017
(213) 488-7100
david.stanton@pillsburylaw.com

Theresa A. Roozen
1200 Seventeenth St. NW
Washington, DC 20036
(202) 663-8025
theresa.roozen@pillsburylaw.com

*Attorneys for Akoustis Technologies, Inc. and
Akoustis, Inc.*

September 28, 2022

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PREAMBLE .................................................................................................. 1

II.   INTRODUCTION ........................................................................................ 1

III.  OVERVIEW OF THE TECHNOLOGY ..................................................... 2

IV.  DISPUTED CLAIM TERMS ...................................................................... 5

     A.    The '755 Patent ................................................................................ 5

           1.    "Active Region" and "Outer Region" [all asserted claims].................... 6
           2.    "[A] density of mechanical energy in the outer region" [claims 1, 11]. 12
           3.    "[A]re not excited" [claims 3, 9, 10, 12]................................................ 17

     B.    The '786 Patent .............................................................................. 21

           1.    "piezoelectric layer" [claim 1] .............................................................. 21
           2.    False Patent Marking versus Patent Infringement Revisited ................. 25

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
   868 F.2d 1251, 1257 (Fed. Cir. 1989) .................................................................................... 7

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314 (Fed. Cir. 2016)
   Qorvo Br. at 10 ....................................................................................................................... 10

*GL Trade Americas, Inc. v. Trading Techs. Int'l, Inc.*,
   No. 11 C 1558, 2012 WL 205909 (N.D. Ill. Jan. 23, 2012) ................................................. 25

*Kaplan v. Helenhart Novelty Corp.*,
   182 F.2d 311 (2d Cir. 1950) .................................................................................................. 25

*Leader Techs. Inc. v. Facebook, Inc.*,
   692 F. Supp. 2d 425 (D. Del. 2010) ........................................................................................ 2

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) ............................................................................................................... 25

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*,
   165 F.3d 891 (Fed. Cir. 1998) ............................................................................................... 25

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898, 134 S. Ct. 2120 (2014) ................................................................................... 18

*Nike Inc. v. Wolverine World Wide, Inc.*,
   43 F.3d 644 (Fed. Cir. 1994) ................................................................................................. 18

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
   138 F.3d 1437 (Fed. Cir. 1998) ............................................................................................. 25

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................................................................... 1, 2

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
   318 F.3d 1143 (Fed. Cir. 2003) ............................................................................................. 23

*SoftView LLC v. Apple Inc.*,
   C.A. Nos. 10-389, 2013 WL 4758195 (D. Del. Sept. 4, 2013) .............................................. 1

*Symantec Corp. v. Comput. Assocs. Int'l, Inc.*,
   522 F.3d 1279 (Fed. Cir. 2008) ............................................................................................. 22

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..............................................................................8

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)........................................................................8, 10

### Rules and Regulations

Local Patent Rule 4.4(b) ..........................................................................................1

### Other Authorities

M. Akgul et al., *RF Channel-Select Micromechanical Disk Filters-Part II: Demonstration,*
    IEEE Transactions Ultrasonics, Ferroelects., and Frequency Control, vol. 66, no. 1, pgs.
    218-235, Jan. 2019)...............................................................................................18

## I.    PREAMBLE

Pursuant to the Court's Amended Scheduling Order (Dkt. 106) and the Local Patent Rule 4.4(b) for the Western District of Tennessee ("LPR"), Defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively, "Defendants" or "Akoustis") hereby submit Akoustis' Responsive Claim Construction Brief as to United States Patent Nos. 9,735,755 (the "'755 Patent") and 10,256,786 (the "'786 Patent") (collectively, the "Asserted Patents" or "Patents-in-Suit").

## II.    INTRODUCTION

Qorvo begins by asserting that "[t]he disputed terms utilize straightforward language and would have been easily understood by a person of ordinary skill in the art at the time of the respective inventions ("POSITA") without detailed explanation or resort to publications."  Qorvo Opening Br. (Dkt. 100) at 1.  In other words, Qorvo, right off the bat, wrongly contends that it is unnecessary and therefore improper *for the Court* to consider extrinsic evidence in resolving the parties claim construction disputes relating to terms and technology associated with BAW filters. Qorvo Br. at 9 ("In view of the above, the meaning of 'active region' and 'outer region' is clear from the intrinsic record.  In such a situation there is no reason to resort to extrinsic evidence."). But Qorvo misstates the law as it relates to the use of extrinsic evidence in conducting claim construction analysis.  "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'"  *SoftView LLC v. Apple Inc*., C.A. Nos. 10-389 (Consolidated), 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips v. AWH Corp*., 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc) (alteration in original)).  Extrinsic evidence may *assist the Court* in understanding the underlying technology, the meaning of terms *to one skilled in the art*, and how the invention works.  *Phillips*, 415 F.3d at 1317-19; **Exhibit**

**D2-a**, Nguyen Rebuttal Declaration at pgs. 3-4.  Indeed, the Court has scheduled a technology tutorial as part of the claim construction process.  Qorvo's suggested notion that extrinsic evidence is unwarranted to aid *the POSITA* in understanding the meaning of the disputed terms misses the point of extrinsic evidence.  It is available, when appropriate, to aid the Court in understanding what the terms mean to a person or ordinary skill.  *Leader Techs. Inc. v. Facebook, Inc*., 692 F. Supp. 2d 425, 428 (D. Del. 2010) (quoting *Phillips*, 415 F.3d at 1318-19. As detailed below and in Akoustis' Opening Brief (Dkt. 102), the proper construction for each term is the plain and ordinary meaning, as proposed by Akoustis, because it is the one that is both consistent with the intrinsic record and further supported by extrinsic evidence.

## III.  <u>OVERVIEW OF THE TECHNOLOGY</u>

Akoustis offers a minor clarification to its Opening Brief Technology Overview at page 2 (Section IV), that begins by stating that "A BAW resonator used in an RF filter uses electrodes to convert electrical energy to mechanical acoustic waves that travel through the **surface** of the piezoelectric material and are stored in it." (emphasis added).  A bulk acoustic wave (BAW) differs from surface acoustic wave (SAW) devices in that the mechanical acoustic waves travel through the **bulk** of the



Figure 3.15  The geometry of a resonator with electrodes. Example corresponds to the case of $Z_e$ > $Z_c$. The stress field is drawn with a solid line and the displacement with a dashed line.

piezoelectric material, as shown in the corresponding figure previously provided, and further, but to a lesser extent, into the Bragg reflectors (not shown) – for SMR-type resonators.  The mechanical acoustic waves generated by the vibrating piezoelectric layer are vertical (longitudinal) in nature (as shown in red).  **Exhibit D5-a,** Nguyen Tr. at 37:21-24; 41:12-43:6; 48:2:49:5 (explaining that the electric field is between the top and bottom electrodes).  Qorvo describes this transition from an electrical input to motional current as the BAW resonator being "[c]apable of converting electrical energy (e.g., a voltage across the two electrodes) into

2

mechanical energy (e.g., vibrations)." Qorvo Br. at 1. The resonant mechanical acoustic wave is amplified (reinforced) by reflecting back and forth within the active region. This is described by Qorvo as "causing [the piezoelectric layer] to mechanically vibrate and excite particular acoustic waves which are internally reflected from the top and bottom surfaces to form a standing acoustic wave." *Id.* at 2. Thus, the presence of excited vertical acoustic waves (the "standing wave") determines the active region of the BAW device set by what is called the equivalent circuit. Exh. D5-a, Nguyen Tr. at 85:1-13, 104:21-105:10 (noting that the Bragg reflector would be included in active region "because it would be part of the equivalent circuit of the resonator");

**Exhibit D4-a**, Hashimoto, Qorvo_00024718-00024725 (describing equivalent circuits and explaining a well-known fact that stress in one direction, for example, z, produces strains also in the perpendicular directions, x and y). Hashimoto also makes clear that the electrical drive port where the voltage is applied (in Fig. 3.4) (Akoustis Br., D4 at Qorvo_00024733) is just one stage of a circuit consisting of a stack of mechanical layers (in Fig. 3.5), where the mechanical layers mechanically force one another to move (acoustically driven), not electrically. So only one stage is "electrically driven"; the others are acoustically or mechanically driven by mechanical forces.

**Exhibit D1-a**, Nguyen Initial Declaration at pgs. 9-10. Thus, for all BAW resonators, the active region is the by-product of an equivalent circuit, and would include the Bragg reflectors of an SMR-type resonator. *Id*. at 11-12.

Qorvo concedes that "[t]he stack of electrodes and piezoelectric layer themselves cannot contain all of the acoustic waves generated therein." Qorvo Br. at 2. But those acoustic waves would include the standing wave, although not specifically called out by Qorvo. Qorvo further identifies both lateral and vertical leakage, but wrongly suggests that the Bragg reflectors "prevent ***vertical*** escape of waves." *Id.* (emphasis in original). Vertical acoustic energy leakage

through the Bragg reflector of an SMR-type resonator is inevitable, making the Q value of

FBAR-type ("air cavity") resonators higher than SMR-type ("reflectors") resonators.  Exh. D4-a

at Qorvo_00024872-00024878.

Qorvo also conflates the "focus" of the '755 Patent's reduction of lateral leakage with

how "active region" should be defined.  The active region of any BAW resonator is determined

by the presence of motional energy (or velocity) in the purposeful (vertical) mode, modeled by

the motional current in the equivalent circuit.  In turn, the absence of circuit-modeled vertical

motion is what sets apart the outer region of a BAW resonator.  Qorvo's technology overview

simply ignores the fact that there is motional current (and therefore, circuit current) in the Bragg

reflectors; this is inconsistent with the inventors' description of the invention, where the Bragg

reflectors are described and illustrated as part of the active region.  Exh. D5-a, Nguyen Tr. at

36:7-18; 53:21-54:9 (explaining that the Bragg reflector is acoustically driven by motional

current, not electrically driven like the piezoelectric layer); '755 Patent, 1:51-61, FIG. 1B.  In

understanding BAW filters, it is more appropriate to focus on motion in the vertical direction, as

this is what the equivalent circuit models, meaning it will model the motion of the desired mode,

which in the case of an FBAR or SMR is in the vertical (or longitudinal or extensional) direction.

The equivalent circuit model will not normally model the horizontal direction, which is the

direction of waves leaked and lost, so the equivalent circuit model does not include the outer

region.  Thus, the equivalent circuit, as governed by a combination of input voltage and resultant

(motional) current, i.e., both input and output, identifies the active region and excludes the outer

region.

Qorvo also conflates the notion of "acoustic matching" with preventing lateral leakage of

any particular wavelength.  Qorvo Br. at 6 (citing '755 Patent, 7:1-16).  When the active region

and outer regions are acoustically matched, there is no reflective interface to trap mechanical energy in the active region.  Exh. D5-a, Nguyen Tr. at 65:5-67:5; 81:2-83:16; Akoustis Br., D3, Bravman Tr. at 150:11-22.  As such, any particular wavelength that is excited (at all) will leak from the active region to the outer region.  Thus, the only way to reduce lateral energy loss through acoustic matching is to not excite a particular wavelength at all.

Certainly, a value of "n" can be selected to create a reflective interface between regions to reduce laterally leaked energy.  But that is the opposite of acoustically matching the regions to eliminate the reflective interface altogether.  *See* Akoustis Br., D4 at Qorvo_00024740-1; 00024750-1 ("In a laterally infinite resonator there are no edges and therefore no possibility of setting up laterally trapped waves and consequently no spurious modes are excited.").  By eliminating the reflective interface between the active and outer regions, the result of acoustic matching will be a near total lack of excitation of any sinusoidal wavelength – based on the near total permissibility between the regions.  In other words, any lateral sinusoidal wavelength produced by the electrical field through the piezoelectric layer cannot be further excited without a reflective surface; similar to the discussions above for the vertical standing wave ("The mechanical acoustic waves are excited (generated) by reflecting back and forth within the active region.").  Qorvo's reference to the '755 Patent (8:36-61) does not suggest a different resulting outcome based on acoustic matching, refuting Qorvo's flawed suggestion that any *not excited* "enough" wavelength will not leak into the outer region.

## IV.   DISPUTED CLAIM TERMS

### A.   The '755 Patent

Qorvo mischaracterizes the true nature of '755 Patented invention, by suggesting that "[i]n other words, the '755 Patent *discovered* that adjusting the thickness of the passivation layer 88 in the outer region versus the active region *reduces lateral energy leakage* from the active

region." Qorvo Br. at 5 (emphasis added). Adjusting the thickness of the passivation layer to reduce lateral leakage was well known in the art, as detailed in Akoustis' Opening Brief at pg. 7; *see, also,* D4-a at Qorvo_00024878 ("Also, it has been shown experimentally [4] that energy leaking laterally can indeed be confined by appropriate measures."). Qorvo relies on the fact that FIG. 3A is the same as FIG. 1B, identified as prior art, explaining that "[b]y comparing them, one sees that the density of mechanical energy in the *outer region* of FIG. 3B is less than that in *the outer region* of FIG. 3A." Qorvo Br. at 5 (emphasis added). But, as detailed in Akoustis' Opening Brief (at pg. 7), the <u>inventive</u> structure of the '755 Patent is *the change* to "n" *in the same device* (and not a "prior art configuration") where the result is an improved Q factor by reducing lateral energy leakage. Qorvo is further mistaken in suggesting that "[t]his is true whether comparing the entirety of the depicted outer regions of FIGS. 3A and 3B, or smaller constituent regions thereof." *Id.* As further detailed below, relating to the disputed term "density of mechanical energy," the only way to determine whether a change to "n" mitigates lateral energy loss, thereby improving Q, is to measure change over the entirety of the outer region, to assure that the overall energy in the outer region has been reduced. Exh. D5-a, Nguyen Tr. at 55:2-13.

### 1.    "Active Region" and "Outer Region" [all asserted claims]

| Akoustis' Proposed Construction | Qorvo's Proposed Construction |
|---|---|
| Active region: That region of the device where motional current density is generated through the piezoelectric layer.<br><br>Outer region: defined as that region outside the active region. | Plain and ordinary meaning (POM). If a construction is necessary,<br><br>"active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality<br><br>"outer region" is the region of the BAW resonator that is not electrically driven. |

Qorvo starts by suggesting that "Claim 1 uses 'active region' and 'outer region' to define *laterally **where*** particular thickness measurements are taken for comparison purposes …." Qorvo Br. At 7 (emphasis added).  To be clear, Claim 1 compares the <u>outer region</u> of the BAW resonator under two different conditions; where n=1 (relative to the active region), and n≠1 (relative to the active region).  Thus, the proper construction of the disputed terms needs to provide the metes and bounds[1] of the "active region" and by default the "outer region" – defined as any region of the BAW resonator outside the active region.  But Qorvo improperly suggests that the only relevant aspect of the active region that needs defined is its lateral (side-to-side) end points determined by the width of the overlapping electrodes.  *See* Exh. D5-a, Nguyen Tr. at 40:1-13 (explaining that the mode of interest in the '755 Patent is the "longitudinal mode").  As Dr. Nguyen explains, the plain and ordinary meaning of "active region" is not one dimensional, as shown and supported by the intrinsic record, describing the reflectors as part of the active region.  Furthermore, "active region" is an understood term very familiar to those of skill in the art.  Exh. D3-a, Bravman Tr. at 23:22-24:12; Akoustis Br., D5, Nguyen Tr. at 105:17-25.  Qorvo likewise contends that the plain meaning should apply here.

In operation, acoustic waves in the piezoelectric layer **12** within an active region **34** of the BAW resonator **10** are excited by an electrical signal applied to the bottom and top electrodes **14** and **16**. The active region **34** is the region of the BAW resonator **10** that is electrically driven. In other words, the active region **34** is the region of the BAW resonator **10** consisting of, in this example, the bottom electrode **14**, the top electrode **16**, the portion of the piezoelectric layer **12** between the bottom and top electrodes **14** and **16**, and the portion of the reflector **18** below the bottom electrode **14**. Conversely, an outer region **36** of the BAW resonator **10** is a region of the BAW resonator **10** that is not electrically driven (i.e., the area outside of the active region **34**). The frequency at which resonance of the acoustic waves

Qorvo cannot have it both ways.  Either the disputed terms are used according to their plain and ordinary meaning, or the inventors acted as their own lexicographer, by providing a

---

[1] It is well-understood that "[a] claim in a patent provides the **metes and bounds** of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention."  *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) (emphasis added).

definition – other than the plain and ordinary meaning. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996) ) (The Federal Circuit recognizes "only two exceptions to this general rule [that claim terms are generally given their ordinary and customary meaning]: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the **patentee disavows the full scope of a claim term** either in the specification or during prosecution.") (emphasis added). For the '775 Patent, the inventors did neither 1) or 2) for the disputed terms, as acknowledged by Dr. Bravman.

Remarkably, however, Qorvo goes on to suggest that "when the *intrinsic evidence provides a clear and unambiguous definition for the terms*, there is no reason to resort to extrinsic evidence. Qorvo Br. at 9 (emphasis added). Qorvo's patentee definitional contention is most peculiar considering Qorvo's own expert, Dr. Bravman, acknowledged that, for the '755 Patent disputed terms, the inventors did not act as their own lexicographer. Exh. D3-a, Bravman Tr. at 22:5-17; 27:13-21 (specifically relating to the "active region" term). Dr. Bravman does suggest that the patent's focus is on "the relationship of this active region and its loss or leakage of energy to structures **lateral to it.**" *Id.* at 27:19-21 (emphasis added). But that is a far cry from contending that the inventors actually defined the meaning of "active region" in the intrinsic record as Qorvo now contends. *See* Qorvo Br. at 7 ("The '755 Patent's specification provides a specific description and *express definition* of 'active region' and 'outer region,'…") (emphasis added). Moreover, Qorvo's suggested intrinsic definition, that limits the active region of the BAW resonator to only the "electrically driven" region, simply ignores the inventors' own descriptions of the active region as it relates to its vertical (or longitudinal) parameters, that include the reflectors 18 below the bottom electrode.

8

Qorvo offers no explanation or justification for including "to provide the resonator functionality" as part of its proposed construction.  To the extent "filter functionality" further describes the active region (and distinguishes the outer region) – it is the longitudinal mode that is in play for the active region functionality, relating to the standing wave (a.k.a. extensional (thickness) mode) and not the so-called lateral leakage focus that Qorvo accentuates.  Exh. D5-a, Nguyen Tr. at 40:1-41:20.  Thus, adding filter functionality to the construction of active region would support Akoustis' construction that includes the Bragg reflector – based on the presence of vertical motional current in the Bragg reflector.  But including "functionality" in the construction is not needed since Akoustis' construction already includes motional current.

As previously raised in Akoustis' Opening Brief (pgs. 13-15), and consistent with Qorvo's contentions now, the fundamental problem with Qorvo's construction that focuses on the drive input ("electrically driven") and only the lateral aspect of the "active region" is that the active region is consistently described in the '755 Patent as the region of the SMR BAW resonator that *includes* "the **reflector 18** below the bottom electrode 14".  '755 Patent, 1:51-61 (emphasis added).  This reflector portion (**74**) below the bottom electrode is indisputably not electrically driven.  *See* Akoustis Br., Exh. D5, Nguyen Tr. at 44:22-45:19; 53:21-54:9; Exh. D3 at 64:19-65:17.  Since the reflectors in the SMR-



FIG. 5E

BAW resonator cannot be electrically driven, Qorvo's proposed construction would improperly exclude the very reflectors that are described as part of the active region in the main embodiment; thus, relegating the reflectors as part of the outer region.  As previously argued by

Akoustis, that goes against a fundamental principle of claim construction. *Vitronics*, 90 F.3d at 1583 (claim interpretation excluding the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support).[2]  Qorvo fails to provide any such highly persuasive evidentiary support to exclude the preferred embodiment identified by the inventors or the full scope of the meaning of the "active region."  Indeed, Qorvo makes little attempt to address the issue other than to contend that the reflectors reflect the acoustic waves vertically but not laterally.  Qorvo Br. at 12.  But Qorvo does not explain what causes shear waves to reflect laterally and ignores the fact that both longitudinal and shear waves are present in the active region. *See, e.g.,* Exh. D4-a at Qorvo_00024718-00024725 (describing equivalent circuits and explaining a well-known fact that stress in one direction, for example, z, produces strains also in the perpendicular directions, x and y).

Akoustis' proposed construction embraces a definition of "active region" that, consistent with the '755 Patent, includes the reflectors as part of the "active region" by rejecting "electrically driven" in favor of "motional current density" as the "region … where a motional current density is generated."  Extrinsic evidence further supports the use of motional current density in describing the "active region" as claimed, consistent with the specification by showing that motional current density does not exclude the reflectors as part of the active region. *See* Akoustis Br., Exh. D9 (Dr. Nguyen explains that motional quantities (in this case motional voltage) universally determine the motional equivalent circuit of a mechanical or acoustic resonator, including a piezoelectric transducer or BAW resonator); *see also* Akoustis Br., Exh.

---

[2] It is noteworthy that Qorvo highlights the fact that "[a]n inventor is free to specify the parameters of his invention the way he sees fit. *Eon Corp.* [*IP Holdings LLC v. Silver Spring Networks, Inc.*], 815 F.3d [1314] 1320 [(Fed. Cir. 2016)]."  Qorvo Br. at 10.  To the extent the inventors did just that, they included the reflectors as part of the claimed active region.

D1 at 8.  The motional current is the current generated by motion of the mechanical resonator that flows from one electrode to the other.  Because the motional current ultimately flows from one electrode to the other, the regions of the electrodes that generate motional current by inducing motion of the mechanical resonator properly define the active area of the device, including **reflectors 18** in an SMR-type BAW resonator.  Exh. D5-a, Nguyen Tr. at 84:20-85:13; *see, also*, Akoustis Br., D5, Nguyen Tr. at 35:17-36:18, 45:2-19, 53:8-54:9, 90:18-92:15; Exh. D3-a, Bravman Tr. at 47:6-50:5 (generally); Exh. D3-a, Bravman Tr. at 47:20-22 ("the notion of motional current is [u]ndisputed as useful in the art or understood in the art …").  When asked whether there is motional current in the active region, Dr. Bravman explained that "I've not opined on that here … But one understands that in an active region of a BAW resonator, when energized, there is physical motion and there are currents and so one does understand that, yes." Exh. D3-a, Bravman Tr. at 49:14-22.

Qorvo proposed construction would, by default, exclude the reflectors as part of the active region; or worse yet, leave open the question of whether the reflectors are in the active region or outer region.  Qorvo Br. at fn. 4 ("[O]ther portions of the BAW resonator *may be* considered part of the active/outer regions by nature of being located underline below the electrically driven region (e.g., beneath the stack of electrodes and piezoelectric layer), but the lateral dimensions of those elements do not define the active/outer regions.") (emphasis added; emphasis in original omitted).  Here, Qorvo suggests that the reflectors *may be* part of the active region, to the extent they are within the lateral constraints of the overlapping electrodes.  But Qorvo cannot, so it does not try to, resolve the underlying issue that the reflectors are not electrically driven – as required by its own construction.  So, the reflectors would necessarily be excluded from the active region under Qorvo's construction.  That is a problem of Qorvo's own

making, by incorporating the limiting "electrically driven" language in its proposed construction – despite also contending that the plain and ordinary meaning is proper.  As previously stated, the proper construction needs to provide the metes and bounds of the "active region" and by default the "outer region."  However, there is no sound reason to adopt a construction that **excludes** the preferred embodiments.  Placing the Bragg reflector "portions" of the BAW resonator in limbo (at best) makes Qorvo's proposed construction facially flawed.  Again, the inventors were not vague or unclear; expressly including the reflectors <u>within the lateral constraints</u> of the overlapping electrodes as being <u>within the active region</u>.

For all of these reasons, the Court should adopt Akoustis' proposed construction of "active region," as well as Akoustis' proposed construction of "outer region."

      **2.**    **"[A] density of mechanical energy in the outer region"   [claims 1, 11]**

| Akoustis' Proposed Construction | Qorvo's Proposed Construction |
|---|---|
| The "density of mechanical energy" means a total density over the full volume of the outer region, or otherwise indefinite. | POM.  If a construction for "density of mechanical energy" is needed, it means the amount of mechanical energy from acoustic waves leaked from the active region, measured over a volume of the outer region. |

Here, again, the objective of claim construction is to define the metes and bounds of the requisite "volume" of the outer region that satisfies the claimed reduction of "density of mechanical energy" leaked to the outer region.  It is fundamental that "density of mechanical energy" as claimed is understood in the art as an amount of energy <u>per unit volume</u>, just as an object's density is its mass per unit volume.  Exh. D1-a, Nguyen Initial Decl. at pgs. 15-17 ("That is, energy density requires a **defined volume** over which the 'amount' of energy is measured, and any amount without an associated volume cannot be an 'energy density.'").  Qorvo proposes a construction where the lateral energy leakage is measured over some

**undefined** lesser volume(s) of the outer region.  Absent any further detail as to the scope of the volume, Qorvo's "a volume" construction is indefinite.

There should be no confusion that the volume cannot be any, unspecified volume, no matter the size or amount, because too small a volume clearly will not indicate whether there is actual energy reduction in the outer region adequate to improve the overall Q of the device.  In fact, Qorvo begins its defense of "over [any] volume" construction by explaining that "[t]he amount that leaks should be reduced *to provide a higher quality resonator*, as described throughout the '755 Patent. …."  Qorvo Br. at 12 (emphasis added) (citing '755 Patent at 2:4-26 ("Ideally, in order to achieve a high Q value, the ***mechanical energy*** should be contained, or trapped, within the active region 34 of the BAW resonator 10.  …")) (emphasis in brief); Exh. D5-a, Nguyen Tr. at 67:22-68:16;  Exh. D5-a, Nguyen Tr. at 68:15-16 ("That's why in order to get the Q or the change in Q, you have to look at the whole volume."); *see* Exh. D3-a, Bravman Tr. at 91:3-16, 119:13-120:22 (conceding that he did not opine on whether an improved Q is required in order to practice the claims of '755 Patent; while acknowledging that improved Q is "one overarching goal" he suggests that the patent is speaking to a "more limited feature").

Qorvo's flawed proposed construction is exposed in Qorvo's own contention that "[i]mportantly, however, the '755 Patent does not require the density of mechanical energy to be measured *over a particular extent of the volume* of the outer region."  Qorvo Br. at 14 (emphasis added).  As Dr. Nguyen explains, this argument "leaves open the flawed notion that the amount of energy can be measured at any finite point in space or in time."  Exh. D2-a, Nguyen Rebuttal Decl. at pgs. 11-12.  In other words, Qorvo is unwilling to define the requisite volume(s) of the outer region at all.  But an undefined volume is no volume at all.  Qorvo's explanation only further exacerbates the objective of making clear the requisite volume in play: "On this basis, a

POSITA would have understood the extent of the outer region subject to comparison in the context of claim 1 as a volume sufficient to show the desired inventive effect."  Qorvo Br. at 14. Qorvo's explanation needs its own explanation.  It is particularly interesting that Qorvo cites to Dr. Bravman's declaration in support of this proposition, because Dr. Bravman, himself, could not offer a concrete volume needed to show the "desired inventive effect" of improving Q other than the full volume.  Akoustis Br., Exh. D3, Bravman Tr. at 94:9-97:13 ("... but the ***only volume*** that can be ***unambiguously*** specified is what was chosen [by Akoustis], that is, ***the whole volume***.") (emphasis added).  Dr. Bravman could not provide any further specifics as to another, lesser volume that would be adequate to show the desired inventive effect.  Akoustis Br., Exh. D3, Bravman Tr. at 98:6-99:10; 101:3-13; **Exhibit D3-a**, Bravman Tr. at 112:20-113:22 (referring instead to "two-dimensional variations" in FIGs. 3A-B as example of a volume).

Indeed, Qorvo does not offer an explanation as to what the "desired inventive effect" means other than citing to Dr. Bravman's Rebuttal Declaration at ¶¶ 35-36.  Qorvo Br. at 14.  Dr. Bravman, in ¶ 35, offers an opinion that a POSITA would have understood *reduced density* "in a broad sense that refers to the overall and/or localized mechanical energy reduction in the outer region."  Beyond that, Dr. Bravman does not explain what "localized" means.  But he did agree that a localized area can be too small to be considered an adequate volume by a POSITA as shown here in yellow.



**Exh. C1-a, '755 Patent, annotated FIGs. 3A-B**

Akoustis Br., D3, Bravman Tr. at 94:5-99:10; **Exhibit D3-a**, Bravman Tr. at 103:22-104:11; 107:1-111:4; **Exhibit C1-a** ('755 Patent, FIGs. 3A-B (annotated)).[3]

Dr. Bravman ultimately agreed with a Qorvo proposed construction that did not even include a volume aspect at all – not even a vague "over a volume" version that Qorvo now adopts from Dr. Bravman's rebuttal declaration, as shown below:

> Thus, the meaning of "density of mechanical energy" that is in harmony with the intrinsic record is an "amount of mechanical energy from acoustic waves leaked from the active region," as Qorvo proposes. **To the extent a POSITA would have found it necessary** to append a particular "density" explanation to the definition for added context (**which is not necessary**), a POSITA would have added "measured over a volume of the outer region," such that the definition would read "amount of mechanical energy from acoustic waves leaked from the active region, measured **over a volume** of the outer region." (Bravman Rebuttal Decl. at ¶ 36 (emphasis added)).

So Qorvo went from a proposed construction with no reference to volume to one that includes an undefined, ambiguous reference to "a" volume, proposed by Dr. Bravman. But Dr. Bravman also wrongly suggests that it is "not necessary" to append any volume in defining "*density* of mechanical energy in the outer region." But that is clearly wrong since a volume is needed in order to determine any change in energy density in the outer region.

As suggested above, Qorvo's reliance on FIGS. 3A and 3B is likewise unavailing; suggesting that the images are illustrations of varying volumes or "particular constituents regions" that show a reduction in energy density in the outer region, e.g., upper half, lower half, middle 25%. Qorvo Br. at 14. Here again, Qorvo offers attorney argument in direct opposition to its own expert's testimony, Dr. Bravman, who when asked if there was at least a floor or minimum volume that would be required, he could not give an answer except to say that "it's the

---

[3] Dr. Bravman does mischaracterize the inventive structure (at 107:11-13) by suggesting that Figure 3B shows a *different device* than Figure 3A, instead of a change in "n" for the same device. *See,* '755 Patent, Claim 1.

spatial arrangement of such matters that's often **of interest to a worker of skill** for

understanding how the invention is being affected."[4]  Akoustis Br., D3, Bravman Tr. at 98:19-

99:10 (emphasis added).  While Dr. Bravman's answer is not helpful in clarifying the metes and

bounds of the claim term, it does tend to illustrate the general pitfall of Qorvo's unspecified

volumes claim construction.  Moreover, FIGs. 3A-B do not actually show reduced energy

density since the images are in black and white ("grayscale images").  Exh. D2-a, Nguyen

Rebuttal Decl. at fn. 3 (making it "impossible to tell which regions of the figure show any

reduction or increase of energy density such that it is impossible to make any comparison

between the images as Dr. Bravman asserts he has done.").  As such, a POSITA must rely on the

inventors' description of the figures. '755 Patent, 4:1-4 ("FIGS. 3A and 3B illustrate the reduced

lateral leakage of the BAW resonator of FIG. 2B as compared to the reference BAW resonator of

FIG. 2A, for one example implementation[.]").[5]  But even taking the inventors at their word,

there can be no doubt that a POSITA would assign a fixed, defined volume to the outer region in

order to determine if there is any change in density that improves the Q factor.  Exh. D5-a,

Nguyen Tr. at 68:15-16 ("That's why in order to get the Q or the change in Q, you have to look

at the whole volume.").  There should also be no doubt that the construction needed here must

define the proper volume with particularly – or else be considered indefinite.  Qorvo simply

wants to leave undefined a sufficient volume, based on some vague suggested understanding of

---

[4] It is also noteworthy that Qorvo takes issue with Dr. Nguyen expressing his expert analysis in terms of what is of interest to a POSITA – in spite of a similar reference of "interest" offered by Dr. Bravman.  Qorvo Br. at 10 ("But whether or not an engineer would have been 'interested' in motional current density in a hypothetical design process is not the relevant question for claim construction.").

[5] Even under the inventors' description, Figures 3A-B actually show the remaining leaked energy after the lost energy dissipates into the substrate.  Exh. D5-a, Nguyen Tr. at 67:14-70:1 ("So what you are measuring is basically the leaked energy that remains after the losses.").

how much is enough to a POSITA.  But that is not claim construction.  Claim construction is supposed to provide, in words, the understanding of a POSITA.  It is not enough to say that a POSITA will know it when it sees it.

Qorvo's contentions that the Akoustis' proposed construction is only one possible method of defining the volume of the outer region to determine energy reduction begs the question as to any other acceptable and unambiguous options.  Qorvo's wrongly suggests that Akoustis fails to provide appropriate reasons to limit the construction to the full outer region.  As previously detailed, and repeated above, the only unambiguous volume available is the full volume; and the only one that aligns with improving the Q factor is Akoustis' total volume construction.  Akoustis' complaint with Qorvo's construction is not that it makes the claim too broad, as Qorvo suggests.  It's that the claim must be construed consistent with the so-called "inventive effect" – to improve Q.  *See* Qorvo Br. at 12 ("The amount that leaks should be reduced to provide a higher quality resonator, …").  Qorvo's construction embraces a fallacy, that any "spatial variations" practice the patented invention.  Finally, Qorvo's contentions that the Akoustis construction is superfluous misses the point completely.  The singular issue in dispute relates to the acceptable volume needed to determine if the energy in the outer region is, in fact, reduced.  Akoustis' proposed construction removes any ambiguity – using the "total density over the full volume."  Qorvo wants to leave it as an open question for a POSITA to determine.  But a POSITA will not be assessing Qorvo's infringement claims based on the Court's adopted construction.  For all these reasons, the Court should adopt Akoustis' proposed construction.

### 3.    "[A]re not excited" [claims 3, 9, 10, 12]

| Akoustis' Proposed Construction | Qorvo's Proposed Construction |
| --- | --- |

17

| "[A]re not excited" means that the wavelengths do not exist in the whole volume of the active region, or otherwise indefinite. | POM.  If a construction for "are not excited" is needed, it means "are not substantively created" |
|---|---|

Qorvo's brief confirms the problem with its own proposed construction, that Qorvo seeks to undo the plain meaning as drafted in the claim and rewrite the claim by replacing the phrase "are not excited" with "are not substantively created."  *See Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647 (Fed. Cir. 1994) (rejecting the patentee's proposed claim construction that would, "in effect, rewrite its patent claims to suit its needs in this litigation.").  As evidence of the fundamental problem with its proposed construction Qorvo suggests that "not substantively created" means not excited *enough*.  Qorvo Br. at 18.  This is just another example of Qorvo's penchant for ambiguous claim construction for its own patent terms.  Exh. D2-a, Nguyen Rebuttal Decl. at pgs. 17-18.  Under Qorvo's proposed construction of "not substantively created" (not excited enough), claims 3, 9, 10, and 12 are invalid for indefiniteness because the proposed construction fails to inform, with reasonable certainty what satisfies the "not substantively created" language.  *See, e.g., Nautilus, Inc. v. Biosig Instruments, Inc. (Nautilus II)*, 572 U.S. 898, 901, 134 S. Ct. 2120, 2122 (2014).  Furthermore, Qorvo's definition is inconsistent with the plain meaning of "not excited" and would be further viewed as ambiguously indefinite relative to the term "reduced" used throughout the '755 Patent specification.  (*See, e.g*., '755 Patent, 2:33, 51, 54; 3:65; 4:1; 5:8, 23, 25; 6:33; 7:8, 16, 50; 9:49; 11:36).  Scientific literature is also filled with the use of less absolute descriptions, such as "not substantively created," when intending to mean reduced or lessened or not excited enough to be meaningful.  Akoustis Br., Exh. D14 (M. Akgul et al., *RF Channel-Select Micromechanical Disk Filters—Part II: Demonstration,* IEEE Transactions Ultrasonics, Ferroelects., and Frequency Control, vol. 66, no. 1, pgs. 218-235, Jan. 2019).

As previously explained, Qorvo's construction is based on a flawed premise that a POSITA would have an understanding that "excitations of one or more wavelengths <u>that do not cause leakage</u> (e.g., minor or transient excitations) may occur within the scope of the claim." Qorvo Br. at 18 (emphasis added) (citing Dr. Bravman Initial Decl. at ¶ 51).  That proposition is simply wrong because any excited wavelength will leak into the outer region, especially when the device is acoustically matched to eliminate any reflective interface.  Akoustis Br., Exh. D3, Bravman Tr. at 150:11-151:5 ("Mathematically, yes.  And again, we get to substantively, does that amount of leakage matter?").  Thus, Qorvo improperly suggests that the plain and ordinary meaning of "not excited" calls for the impossible – that minor or transient excited wavelengths will not leak to the outer region.  *Compare* Qorvo Br. at 19 ("Moreover, the scientifically impossible construction cannot be proper where there is a reasonable alternative consistent with the intrinsic record (i.e., Qorvo's).").

Qorvo offers only passing reference to the fact that the "not excited" language is tied to acoustic matching.  Qorvo Br. at 17 ("2:52-56 ('n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region'") (emphasis in original omitted).  But Qorvo does not account for the impact of acoustic matching on the meaning of a wavelength not being excited – as claimed.  As explained in the above technology overview, when the active region and outer regions are acoustically matched, there is **no reflective interface** to trap mechanical energy in the active region.  Exh. D5-a, Nguyen Tr. at 65:5-67:5; 81:2-83:16.  As such, any particular wavelength that is excited (at all) will leak from the active region to the outer region based on the BAW

resonator being acoustically matched.  Thus, acoustic matching reduces lateral energy loss, not by trapping the energy in the active region, but by not exciting a particular wavelength at all.

Instead of addressing how acoustic matching impacts the meaning of "not excited," Qorvo offers only conclusory contentions in support of its construction.  Qorvo Br. at 17 ("A review of the intrinsic record in its entirety indicates that the recited non-excitation relates to reducing the lateral leakage of mechanical energy into the outer region, which is discussed with regard to the previous element.").  In other words, Qorvo ignores the difference between creating a reflective interface (conventional mass loading) (Akoustis Br., D4 at Qorvo_00024741, 00024747) in order to reduce energy leakage by trapping and an alternative method of using acoustic matching that eliminates any reflective interface, which in turn means no possibility of setting up laterally trapped waves and consequently no spurious modes are excited.  *Id.* at Qorvo_00024750 (describing a single excited mode excited (no spurious mode excitation) by "a constant displacement amplitude in the outside region").

Hashimoto further explains that acoustic matching creates a "clear violation" of the typical energy-trapping (mass loading) structure that typically includes an "*exponentially decaying amplitude in the outside*."  *Id.*  The '755 Patent specification offers a similar description for conventional mass loading.  *See, e.g.,* '755 Patent, 8:14-16 ("This leads to an *exponentially decaying main thickness wave mode in the outer region* and, thus, trapping of the main thickness wave mode in the active region.") (emphasis added).  The top of column 7 of the '755 Patent further explains that acoustically matching prevents generation of certain acoustic wavelengths by using a dispersion design to convert the outer region propagation constant to imaginary in order to suppress those waves.  *Id.* at 7:1-33.  The bottom of column 8 reiterates the concept of a dispersion design that is different than energy-trapping because it effectively

20

converts the situation from a Type II problem to something more like Type I by altering the

dispersion curve *of the outer region. Id.* at 8:36-61; *id.* at 60-61 ("which is contrary to the

conventional mass loading for Type II dispersion.").[6] So the inventors describe a combination of

acoustic matching and energy trapping solutions to reduce energy loss in the outer region.  In

fact, where the patentees intended to write "reduced" rather than "not excited," they did so.  *Cf.*

*id.* at claim 1 ("a density of mechanical energy…is reduced….").  Therefore, Qorvo's contention

(at pg. 18) that "a POSITA would understand 'are not excited' as proposed by Qorvo,

consistently with its clear usage in the intrinsic record" is incomplete at best and thus unhelpful.

For these reasons, the Court should adopt Akoustis' plain and ordinary meaning of "not excited"

that is also consistent with the '755 Patent specification's description of acoustic matching, as

well as supporting extrinsic evidence.

   **B.    The '786 Patent**

   **1.    "piezoelectric layer" [claim 1]**

| Akoustis' Proposed Construction | Qorvo's Proposed Construction |
|---|---|
| A layer of piezoelectric material having single or multiple crystal structure. | A layer of piezoelectric material having single crystal structure. |

Qorvo goes to great lengths to mischaracterize the teachings of the '786 Patent's intrinsic

record; from wrongly suggesting that the patent "repeatedly and consistently characterizes a

claim term in a particular way" to wrongly contending that the patent implicitly teaches away

from multiple crystal piezoelectric layers.  Qorvo Br. at 22-23 ("By emphasizing the 'single

crystal' structure of the 'piezoelectric layer' throughout the entire specification, the '786 Patent

---

[6] Hashimoto also describes the acoustic matching approach to eliminate spurious modes as
   unconventional.  Akoustis Br., D4 at Qorvo_00024750 ("The condition ß0 = 0 seems
   ridiculous at first glance.").

implicitly stresses that 'multiple crystal' piezoelectric layers ***are not*** included.") (emphasis in original) (citing Bravman Initial Decl. at ¶¶ 63-74).  Qorvo's common theme of "consistent characterization" of single crystal is nothing more than a mischaracterization of a very common practice in patent law – disclosing a preferred embodiment.  *See Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1290 (Fed. Cir. 2008) ("The specification does not limit the invention to the preferred embodiment, and the ordinary meaning of the term 'computer system,' according to Symantec, includes both a single computer and a system of multiple, interconnected computers.").  Objective, explicit evidence in the intrinsic record clearly demonstrates that the single crystal embodiment is simply an embodiment of a "preferred" piezoelectric material to use when practicing the claimed invention ("the present invention provides *techniques* related to bulk acoustic wave resonator devices").  By way of example, the following is repeated **three times** in specification: "*Merely by way of example* the invention has been applied to a single crystal resonator device."  *See,* '786 Patent, 1:14-21, 40-47; 3:45-52 (emphasis added).  Qorvo openly ignores these disclosures by not referencing them or addressing them at all in its Opening Brief.[7] Extrinsic evidence similarly supports the understanding that piezoelectric layer is not limited to single crystal and the '786 Patent disclosures align with the plain and ordinary meaning.  Exh. D1-a, Nguyen Initial Decl. at pgs. 21-23; Exh. D2-a, Nguyen Rebuttal Decl. at pgs. 20-25.

Qorvo goes so far as to suggest that the inventors used the claim term "piezoelectric layer" in the '786 Patent specification as shorthand to define the term as only single crystal.

---

[7] Interestingly, Qorvo does use the term "merely" in addressing the '786 Patent: "These consistent characterizations are not *merely* a coincidence, but instead should drive the construction."  Qorvo Br. at 22 (emphasis added).  But the preferred embodiment should not drive claim construction, especially when the patent consistently explains that the preferred single crystal embodiment is but a known example of conventional material to use as a part of the claimed *techniques* related to bulk acoustic wave resonator devices.

Qorvo Br. at 22.  Here again, Qorvo offers an argument unsupported by its own expert, Dr.

Bravman.  Akoustis Br., D3, Bravman Tr. at 160:8-161:2 (agreeing that he does not assert that

the inventors acted as their own lexicographer); *see, also, Prima Tek II, L.L.C. v. Polypap,*

*S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003) (explaining that to overcome the plain and

ordinary meaning presumption a specialized definition must be "clearly set forth" and

"explicit.").  Qorvo's facially suspect explanation is that because the specification describes the

preferred embodiment initially as including a "single-crystal piezoelectric layer" and then

shortens the reference to just "piezoelectric layer" in the follow-on discussion is implicit

evidence of a patentee defined construction.  Qorvo even goes so far as to suggest that "[b]y

emphasizing the 'single crystal' structure of the 'piezoelectric layer' throughout the entire

specification, the '786 Patent *implicitly* stresses that 'multiple crystal' piezoelectric layers are not

included."  Qorvo Br. at 23 (emphasis added).  Qorvo's "implicit" definition/disavowal argument

(of polycrystalline materials) is beyond the realm of reason and flies in the face of key principles

of claim construction and its own expert's testimony.

The same could be said for Qorvo's emphasis on the '904 Provisional application being

"explicitly focused on single crystal piezoelectric materials."  Qorvo Br. at 22 (emphasis in

original omitted).  The fact that the inventors described the type of piezoelectric layer "utilized"

in the provisional application does not describe the inventive "solution" that is at the heart of the

patent.[8]  In other words, the inventive solution is not that the resonator utilized a single-crystal

piezoelectric layer.  Exh. D2-a, Nguyen Rebuttal Decl. at pg. 21.  To that end, Qorvo also

---

[8] The prosecution history of the '786 Patent is particularly uninformative with respect to the
construction of the disputed claim language.  That is to say, there was no challenge to
patentability by the Examiner based on the fact that claim 1 used "piezoelectric layer" without
Qorvo's suggested single crystal qualifier.

misstates that the '786 Patent's "entire invention" is "tailored to the 'single-crystal' piezoelectric layers[.]"  Qorvo Br. at 20; *see* Akoustis Br., D3, Bravman Tr. at 161:19-22 (conceding that he has not opined on what the inventive aspect is as claimed in the '786 Patent).  According to Dr. Nguyen, the invention is not predicated on using a single-crystal piezoelectric material, but instead describes a new way of "packaging" a BAW filter, while using conventional materials, such as single-crystal piezoelectric layers.  Akoustis Br., Exh. D5, Nguyen Tr. at 89:21-90:2 ("… because this is packaging.  It's device agnostic."); Exh. D2-a, Nguyen Rebuttal Decl. at pgs. 23-24.  The '786 Patent specification goes on to describe the benefits of the inventive techniques over pre-existing techniques: "One or more benefits are achieved **over pre-existing techniques** using the invention.  In particular, the present device can be manufactured in a relatively simple and cost effective manner **while using conventional materials** and/or methods according to one of ordinary skill in the art."  '786 Patent at 2:10-14 (emphasis added).  Even without the specification saying so, a skilled artisan, at the time of filing of the '786 Patent, would have considered the use of single-crystal piezoelectric materials as conventional – making Qorvo's "entire invention" contention facially flawed.  Akoustis Br., D3, Bravman Tr. at 170:2-10.

The '786 Patent specification expressly refutes any notion of limiting the invention to only single crystal materials, by stating "[m]ore particularly, the present invention provides underline techniques *related to bulk acoustic wave resonator devices* [where this general reference to BAW resonators is not limited to single-crystal], single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, and the like."  '786 Patent, 1:14-18 (emphasis added).  Qorvo conveniently does not reference this passage, suggesting instead that "***both alternatives are single crystal***."  Qorvo Br. at 24 (emphasis in original) (citing '786 Patent, 5:37-39).  But even that passage is not as Qorvo contends.  The passage says that the piezoelectric

layer 120 "can" include a piezoelectric single crystal layer or a thin film piezoelectric single crystal layer.  It does not suggest, explicitly or implicitly, that it "must" include a single crystal version of piezoelectric material.  For all of these reasons, the Court should adopt the presumptive plain and ordinary meaning proposed by Akoustis.

### 2.    False Patent Marking versus Patent Infringement Revisited

As noted in Akoustis' Opening Brief, Akoustis is permitted to be wrong regarding its proposed construction so long as it is, at least, *legally plausible*.  Indeed, a patentee, acting in good faith *on its belief* as to the nature and scope of its rights, is fully permitted to press those rights "even though he may misconceive what those rights are."  *Mikohn Gaming Corp. v. Acres Gaming, Inc*., 165 F.3d 891, 897 (Fed. Cir. 1998) (quoting *Kaplan v. Helenhart Novelty Corp*., 182 F.2d 311, 314 (2d Cir. 1950)).  The marking statute serves three purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give notice that a product is patented; and (3) aiding the public in identifying whether a product is patented.  *GL Trade Americas, Inc. v. Trading Techs. Int'l, Inc.,* No. 11 C 1558, 2012 WL 205909, at *12 (N.D. Ill. Jan. 23, 2012) ("All of these purposes are met in this case by TT displaying its patent numbers, **which competitors or the public can use to determine the scope of the patent**." (emphasis added) (quoting *Nike, Inc. v. Wal-Mart Stores, Inc*., 138 F.3d 1437, 1443 (Fed. Cir. 1998))).  Finally, the Supreme Court, in *Markman v. Westview Instruments, Inc*., held that claim construction is a matter exclusively within the province of the court.  *Markman v. Westview Instruments, Inc*., 517 U.S. 370, 372 (1996).  To that end, the jury is not permitted to ultimately decide if Akoustis' construction, correct or not, is *legally plausible*, because that determination falls squarely within the province of the Court.

Dated: September 28, 2022

PILLSBURY WINTHROP
SHAW PITTMAN LLP

David A. Jakopin
Dianne L. Sweeney
2550 Hanover Street
Palo Alto, CA 94304-1115
(650) 233-4500
david.jakopin@pillsburylaw.com
dianne@pillsburylaw.com

Robert M. Fuhrer
1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856
(703) 770-7900
robert.fuhrer@pillsburylaw.com

David L. Stanton
725 S. Figueroa St., 36th Floor
Los Angeles, CA 90017
(213) 488-7100
david.stanton@pillsburylaw.com

Theresa A. Roozen
1200 Seventeenth St. NW
Washington, DC 20036
(202) 663-8025
theresa.roozen@pillsburylaw.com

*Attorneys for Akoustis Technologies, Inc.
and Akoustis, Inc.*

BAYARD, P.A.

*/s/ Ronald P. Golden III*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Akoustis Technologies, Inc. and
Akoustis, Inc.*

26