# Exhibit D1-a

**Extrinsic Evidence:**

**Excerpts from Dr. Clark Nguyen's Initial Claim Construction Expert Report and Declaration, dated July 11, 2022**

Defendants' Responsive Claim Construction Brief

*Qorvo v. Akoustis*, C.A. No. 21-1417 (JPM)

DocuSign Envelope ID: 77D24E98-13AC-4BEE-90C4-C41AAC7D674C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417-JPM |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## INITIAL CLAIM CONSTRUCTION EXPERT REPORT AND DECLARATION BY DR. CLARK NGUYEN

### I.      INTRODUCTION

Pursuant to the Court's Scheduling Order and the Local Patent Rule 4.3 for the Western District of Tennessee ("LPRs" or "Local Patent Rules"), Defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively, "Defendants" or "Akoustis") hereby submit the Expert Report and Declaration of Dr. Clark Nguyen ("Dr. Nguyen") in support of Akoustis' Preliminary Claim Construction and Evidence under LPR 4.2 as to United States Patent Nos. 7,522,018 (the "'018 Patent") and 9,735,755 (the "'755 Patent") (collectively, the "Asserted Patents" or "Patents-in-Suit"). Qorvo asserts that Akoustis infringes claims 1-6, 10, and 12-14 of the '018 Patent and claims 1-7, 9-16, and 18 of the '755 Patent (collectively, the "Asserted Claims"). Qorvo also alleges that Akoustis falsely marks its accused RF filter products as practicing U.S. Patent No. 10,256,786 ('the '786 Patent').

This report is based on information currently available to Akoustis and Dr. Nguyen. The parties have not completed discovery and Akoustis has not yet received any Qorvo expert report relating to claim construction. Akoustis and Dr. Nguyen therefore reserves the right to revise,

4875-5086-7240.v1

DocuSign Envelope ID: 77D24E98-13AC-4BEE-90C4-C41AAC7D674C

Supreme Court observed that §112, ¶2 (now §112(b)) requires "a delicate balance." 134 S.Ct. at 2128. The Court explained that a patent must be precise enough to afford clear notice of what is claimed, thereby "appris[ing] the public of what is still open to them. Otherwise, there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.* at 2129 (internal quotation marks and citations omitted); *Chef America, Inc. v. Lamb-Weston, Inc.,* 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity.").

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

The '755 and '786 Patents concern BAW resonators as used in certain RF filters. Based on the complexity of the technology, one of ordinary skill in the art during the time period in question would have had an undergraduate degree in electrical engineering with two to four years of experience in the technical field, or a master's degree in electrical engineering with one to two years of experience in the field; or an equivalent combination of education and experience. I base this on my experience working with those skilled in the art in the relevant technology, my years of experience teaching those subjects, and curriculum development and administration during my teaching career.

## V.    THE '755 PATENT

### A.    Background

The '755 Patent, entitled "BAW resonator having lateral energy confinement and methods of fabrication thereof," relates to embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered such that lateral leakage of mechanical energy from an active region of the BAW resonator is reduced or otherwise not excited. In some embodiments, a BAW resonator includes a piezoelectric layer, a first electrode

4875-5086-7240.v1

on a first surface of the piezoelectric layer, a second electrode on a second surface of the

piezoelectric layer opposite the first electrode, and a passivation layer on a surface of the second

electrode opposite the piezoelectric layer, the passivation layer having a thickness ($T_{PA}$). The

BAW resonator also includes a material on the second surface of the piezoelectric layer adjacent

to the second electrode in an outer region of the BAW resonator. The additional material has a

thickness that is n times the thickness ($T_{PA}$) of the passivation layer, where n is greater or less

than 1.

Mechanical and acoustic resonators (FBARs and SMRs are BAW resonators) are used in

circuit design to harness the equivalent electrical circuit they provide, which commonly

manifests around an *LCR* circuit that derives from the motional current induced through the

device by inputs across its electrodes (e.g., voltage inputs). An *LCR* circuit, sometimes

interchangeably referred to as an *RLC* circuit, is a resonant circuit, which can be characterized in

terms of its inductance (*L*), capacitance (*C*) and resistance (*R*).  Such circuits are commonly used

in applications such as filters for use in radio frequency (RF) communications.

The motional current is the current generated by motion of the mechanical resonator that

flows from one electrode to the other. A circuit designer who designs filters, oscillators, or other

applications using such resonators recognizes that the motional inductance $L_x$, motional

capacitance $C_x$, and motional resistance $R_x$ govern important parameters impacting the design of

the resonator, such as the center frequency ($f_0 = 1/(2\pi\sqrt{L_x C_x})$), the quality factor ($Q = f_0/(3\text{dB-}$

down bandwidth)), the 3dB-down bandwidth (= $f_0/Q$), and the electromechanical coupling ($k_t^2 \sim$

$C_x/C_o$), where $C_o$ is the static electrode overlap capacitance. Because the motional current

ultimately flows from one electrode to the other, the regions of the electrodes that generate

motional current by inducing motion of the mechanical resonator define the active area of the

device.

**B.     "Active Region" and "Outer Region" [all asserted claims]**

| Akoustis's preliminary construction | Qorvo's preliminary construction |
|---|---|
| Active region: That region of the device where motional current density is generated through the piezoelectric layer.<br><br>Outer region: defined as that region outside the active region. | Plain and ordinary meaning (POM). If a construction is necessary, "active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality<br><br>"outer region" is the region of the BAW resonator that is not electrically driven. |

Akoustis offers the proposed construction of "active region" as "that region of the device where a motional current density is generated through the piezoelectric layer."  I agree with Akoustis' construction of "active region" as the plain and ordinary meaning as understood by one of ordinary skill in the art at the time of the invention in view of the intrinsic evidence for the reasons described above relating to motional current of an acoustic resonator.  In this regard, as noted above, the skilled artisan designing a resonator is interested in what the effect of that resonator will be on an input signal, which is determined by the resonator's equivalent circuit, generally based on an *LCR* and associated elements to model things like multiple ports (where transformers are often used) or parasitic paths and losses (where extra branches with resistors and capacitors might be used). Thus, the key concern is that part of the device that generates motional current density through the piezoelectric layer.  I disagree with Qorvo's suggested plain and ordinary meaning of "active region" as the region of the BAW resonator that is *electrically driven* to provide the resonator functionality or active region.  First, the phrase "to provide the resonator functionality" is vague, as functionality could mean many things, such as generating motional current or presenting a specific impedance or realizing a specific equivalent circuit, or

DocuSign Envelope ID: 77D24E98-13AC-4BEE-90C4-C41AAC7D674C

all of these combined. Second, while the '755 specification uses the same language *electrically driven* language to describe the active region (1:55), the term "electrically driven" is not a well-defined term in the art as it could mean many things and could lead to an erroneous understanding of the scope of the claim limitation.  "Electrically driven" does not describe to what degree any particular voltage is applied, nor to any specific effect of such voltage. For example, electrically driven could mean the piezoelectric is driven to vibration; or that a non-motional current is driven to flow through the capacitance between two conductive plates; or that a suspended piezoelectric layer (as in an FBAR) is driven into a flexural mode (which is not the mode of interest).  The main problem with a definition that just focuses on the drive input is that it is not enough to identify the active device. One can drive anything, including things that are not the device, so specifying the drive only does not specify the active device. Rather, one must specify the result of driving (i.e., the output, in this case the motional current, which together with the input voltage in turn specifies the equivalent circuit) to isolate the actual device.

The words "electrically driven" do not specify the result of the driving that identifies the ultimate function of the device. Instead, to be more precise, I believe the construction offered by Akoustis more accurately defines an "active region" as the "region …where a motional current density is generated" through the piezoelectric layer as described above and as further supported by extrinsic evidence.[1]  I also consider Qorvo's proposed construction to be indefinite because, as described above, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### 1.    Extrinsic Evidence Supporting Akoustis' Construction

---

[1] For the same reasons, I agree with Akoustis' proposed construction of "outer region" over Qorvo's construction that also includes the "electrically driven" proposed construction.

4875-5086-7240.v1

DocuSign Envelope ID: 77D24E98-13AC-4BEE-90C4-C41AAC7D674C

- pg. 1407, col. 2: Equation (7) and the associated text provides another example of the use of "m" for "motional" in the equivalent Butterworth Van Dyke circuit for a piezoelectric resonator, which in turn equates the active region of the device to that which generates the motional current, in this case for a lateral AlN resonator (which operates like an FBAR, but the piezoelectric moves laterally). This further attests to how universal is the concept of the motional current governing the equivalent circuit and therefore the active portion of the device.

M. Akgul, L. Wu, Z. Ren, and C. T.-C. Nguyen, "A negative-capacitance equivalent circuit model for parallel-plate capacitive-gap-transduced micromechanical resonators," IEEE Trans. Ultrason., Ferroelect., Freq. Contr., vo. 61, no. 5, pp.849-869, May 2014.

- pg. 850, col. 2: Fig. 2 and 3 together show yet again how the motional current defines the active regions of a mechanical resonator device by governing the equivalent *LCR* circuit and encouraging the use of "x" subscripts for the elements. Here, "x" is a commonly used variable for displacement (i.e., motion) and further emphasizes how the motional current governs the active region of the device, in this case for a capacitively transduced resonator. The fact that this concept is also used for capacitively transduced (or electrostatically transduced) resonators further attests the universality of this definition for the active region, as governed by the *LCR* equivalent circuit.

U. S. Patent US 2014/0159548

- Sheet 2, Fig. 1B: Here, the active region includes the regions where layer 145 (which can be a dielectric) sits between the piezoelectric and the top electrode, attesting to the fact that the electrode metal need not touch the piezoelectric to be included in the active region. Rather, as long as motional current flows through that region from the top to the bottom electrode, this is part of the active region.

**C.     "[A] density of mechanical energy in the outer region"   [claims 1, 11]**

| Akoustis's preliminary construction | Qorvo's preliminary construction |
|---|---|
| The "density of mechanical energy" means a total density over the full volume of the outer region, or otherwise indefinite. | POM. If a construction for "density of mechanical energy" is needed, it means the amount of mechanical energy from acoustic waves leaked from the active region. |

Akoustis' proposed construction of "a density of mechanical energy in the outer region"

is "the density of mechanical energy means a total density over the full volume of the outer

region, or otherwise indefinite."   I agree with that proposed construction as the plain and

15

DocuSign Envelope ID: 77D24E98-13AC-4BEE-90C4-C41AAC7D674C

ordinary meaning as understood by one of ordinary skill in the art for the reasons that follow. What a person skilled in the art is mainly concerned about is how much total energy is lost to the surroundings of the device. For a miniature device like a BAW or micromechanical resonator, the surrounding is generally the substrate on which the device is fabricated.  Energy lost to the substrate—which can be waves going into the substrate that experience dissipation in the substrate (or its mounts, adhesives, etc.)—that does not return to the resonator is energy lost, so lowers the quality factor $Q$, a very important filter or oscillator design parameter. What matters is the total energy lost to all of the surroundings, i.e., strain energy dissipation in a large area around the resonator, not just some small region(s).

The Akoustis construction is necessary because the patent claim language "density of mechanical energy in the outer region" opens too wide a possibility of regions where density can be determined. For example, in a typical scenario, there could be a small region outside the device active region where the energy density is higher than when n=1 and at the same time another small region where the energy density is lower than when n=1. The fact that there is a region where the energy density is lower does not necessarily mean the total energy lost is lower. In other words, it is possible that even where total energy in the outer region has increased, there can be a particular point where there is a reduction in energy density.  Only the total energy over the full volume can provide useful information regarding the effectiveness of any structure intended to reduce energy losses from the active device.  A more accurate measure of the total energy lost that removes some of the ambiguity of location and region and still captures the use of energy density in the claim is to get the energy density (or average energy density) over the entire outer region, which is the Akoustis construction. Because limiting the region to the outer region of the device still does not quite capture all the energy lost, a yet more accurate and useful

16

measure would be the energy density in the entire region outside the active region (not just the outer region of the device). Unfortunately, the patent claim limits the region to the "outer region of the BAW resonator", which is not entirely definite in my opinion, so flawed. One could argue that this claim should never have been allowed.

Qorvo's proposed construction as "the amount of mechanical energy from acoustic waves leaked from the active region" uses the term "leaked", which does not necessarily mean the same as "lost". A "leaked" amount of energy can be reflected and returned to the active region, in which case it is not "lost". What is important here is what energy is *lost*. Because it does not use the words "total amount", it also leaves open the flawed notion that the amount of energy can be measured at any finite point in space or in time, and not as it relates to the total energy over the full volume of the outer region.  In this regard, an amount leaked could refer to an amount of energy at a particular point in space, or at a particular point in time. Furthermore, Qorvo's proposal leaves out entirely the concept of "energy *density*," instead referring to an *amount* of energy.  An energy density is defined as an amount of energy per unit volume, just as an object's density is its mass per unit volume.  That is, energy density requires a defined volume over which the "amount" of energy is measured, and any amount without an associated volume cannot be an "energy density."   I believe such a construction would be fundamentally flawed for the above reasons and incorrect (or not true to the original claim) in the sense that it does not capture the concept of density.

### 1.        Extrinsic Evidence Supporting Akoustis' Construction

The following extrinsic evidence further supports Akoustis' proposed plain and ordinary meaning of "density of mechanical energy" as used in the '755 claims:

Bindel, D. S., Quevy, E., Koyama, Govindjee, S., Demmel, J. W., and R. T. Howe, "Anchor loss simulation in resonators," Tech. Digest, 18th IEEE Int. Conf. on Micro Electro Mechanical Systems, Jan. 30 – Feb. 3, 2005, pp. 133-136.

17

DocuSign Envelope ID: 7D24E98-13AC-4BEE-90C4-C41AAC7D674C

## VI.    THE '786 PATENT

### A.    Background

The '786 Patent, entitled "Communication filter using single crystal acoustic resonator devices," relates generally to electronic devices.  More particularly, the invention described in this patent provides techniques related to bulk acoustic wave resonator devices, single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, and the like. *Merely by way of example* the invention is described as applied to a single crystal resonator device for a communication device, mobile device, computing device, among others.  '786 Patent: 1:40-50; 3:45-52; 14:24-31, 62-64.  Nowhere in the specification or the prosecution history do the inventors disclaim a polycrystalline "piezoelectric layer" as used in claim 1. Likewise, nowhere in the specification do the inventors act as their own lexicographer by describing or defining the piezoelectric layer of the claimed invention as limited only to single-crystal materials.  For that reason, I believe the correct construction is the plain and ordinary meaning as understood by one of ordinary skill in the art at the time of the invention.

### B.    "piezoelectric layer" [claim 1]

| Akoustis's preliminary construction | Qorvo's preliminary construction |
|---|---|
| A layer of piezoelectric material having single or multiple crystal structure. | A layer of piezoelectric material having single crystal structure. |

I understand that Qorvo asserts that Akoustis falsely identifies its RF filter products as including single-crystal-technology by marking datasheets with the '786 Patent number.  But independent claim 1 does not include the term "single-crystal" at all to define or describe the piezoelectric layer material.  Rather, the single-crystal limitation is found, as an optional feature, of dependent claim 2, <u>unrelated to</u> the piezoelectric layer ('786 Patent, 14:62-64):  "The device

21

DocuSign Envelope ID: 77D24F98-13AC-4BEE-90C4-C41AAC7D674C

of claim 1 wherein the seed substrate includes silicon, silicon carbide, aluminum oxide, or single crystal aluminum gallium nitride materials." This informs me that the inventors knew when to use the single-crystal modifier if intended to further limit a limitation (like the seed substrate) consistent with embodiments described in the specification. Moreover, the "single-crystal" term is not in any independent claims of the '786 Patent describing the piezoelectric layer. In my opinion, the specification makes clear to a person of ordinary skill in the art that any reference to a single-crystal embodiment should not be viewed as limiting the scope or meaning of any claim that does not also specifically identify the piezoelectric layer as single-crystal. In fact, the prosecution history supports the notion that the inventors and the Patent Office did not view the term as limited to single crystal because there is no mention that the claim is so limited. The disputed term can refer to either a polycrystalline material or a single-crystal material.

Akoustis offers the proposed construction of "piezoelectric layer" as "a layer of piezoelectric material having single or multiple crystal structure." I agree with that proposed construction as the plain and ordinary meaning as understood by one of ordinary skill in the art for the above reasons. For the same reasons, I do not agree with Qorvo's proposed construction that improperly seeks to limit the term to only single crystal materials.

### 1.     Extrinsic Evidence Supporting Akoustis' Construction

Both polycrystalline and single-crystal materials can be called "piezoelectric materials" or "piezoelectric layers" in technical literature. Thus, "piezoelectric layer" is not specific to one or the other and a person of ordinary skill in the art would not read the claim term as limited based on the specification or prosecution history. There are many examples in the literature that also support the Akoustis construction, so I will just point out one here.

G. Piazza, P.J. Stephanou, and A. P. Pisano, "Piezoelectric aluminum nitride vibrating contour-mode MEMS resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 15, no. 6, pp. 1406-1418, Dec. 2006.

22

- pg. 1406, Title: The title includes "Piezoelectric Aluminum Nitride", where the aluminum nitride in this paper is a polycrystalline material. This confirms that "piezoelectric" is used to refer to a polycrystalline material.

- pg. 1406, col. 2: "Piezoelectric materials such as aluminum nitride or quartz" is a good example of a single sentence where "piezoelectric materials" refers to both a polycrystalline material (the aluminum nitride of this paper) and a crystalline material (quartz).

## VII.   CONCLUSION

While the opinions set forth in this report are complete, I reserve the right to supplement this report and any of the opinions expressed herein, should I receive additional information or evidence that is relevant to those opinions between now and the time that I testify at deposition or trial.  Moreover, I reserve the right to serve one or more additional expert reports in this litigation if requested to do so, and I reserve the right to supplement the opinions set forth herein as part of such additional expert reports in order to account for additional information or evidence that is learned or developed before any such additional report is prepared.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and information.

Dated July 11, 2022                           Respectfully submitted,

By: _____
       Clark Nguyen, PhD.

4875-5086-7240.v1

# Exhibit D2-a

**Extrinsic Evidence:**

**Excerpts from Dr. Clark Nguyen's Rebuttal Claim
Construction Expert Report and Declaration,
dated July 29, 2022**

Defendants' Responsive Claim Construction Brief

*Qorvo v. Akoustis*, C.A. No. 21-1417 (JPM)

DocuSign Envelope ID: 973B855F-2A7C-4FBC-B9C6-642CD7A34DD5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417-JPM |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## REBUTTAL EXPERT CLAIM CONSTRUCTION REPORT AND DECLARATION BY DR. CLARK NGUYEN

### I.  INTRODUCTION

Pursuant to the Court's Scheduling Order and Local Patent Rule 4.3 for the Western District of Tennessee ("LPRs" or "Local Patent Rules"), Defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively, "Defendants" or "Akoustis") hereby submit the Rebuttal Expert Claim Construction Report and Declaration by Dr. Clark Nguyen ("Dr. Nguyen") of Dr. John C. Bravman's Initial Claim Construction Declaration ("Bravman Decl.") dated July 11, 2022, in support of Qorvo Inc.'s ("Qorvo") Preliminary Claim Construction and Evidence under LPR 4.2 as to United States Patent Nos. 9,735,755 (the "'755 Patent") and 10,256,786 ("the '786 Patent").

This rebuttal report is based on information currently available to Akoustis and Dr. Nguyen.  The parties have not completed discovery and Akoustis has not yet received Dr. Bravman's expert rebuttal report relating to claim construction.  Akoustis and Dr. Nguyen therefore reserve the right to revise, supplement, amend, or subtract from this rebuttal report supporting Akoustis' proposed construction based on further discovery and Qorvo's own expert

may also meet this standard.  (Bravman Decl. at ¶¶ 14-15.)  While this description of the
POSITA differs slightly from mine ("undergraduate degree in electrical engineering with two to
four years of experience in the technical field, or a master's degree in electrical engineering with
one to two years of experience in the field"), the differences are not significant enough to impact
any analysis and opinions relating to claim construction, including a POSITA's understanding of
the plain and ordinary meaning of the disputed claim terms.  However, for the different
disciplines needed for the application at hand, electrical engineering is perhaps the most
consequential, since a person of ordinary skill in the art dealing with the subject devices should
understand the purpose and use of the devices, e.g., RF filtering, meaning they should understand
not only device properties, but also its response to inputs and why certain response
characteristics are needed.

## III.     THE '755 PATENT

### A.     The '755 Patent's Disclosure

I incorporate by reference the '755 Patent Background section of the Nguyen Decl.

Dr. Bravman contends that "A POSITA would have understood the '755 Patent to be
directed to structural configurations of BAW resonators that improve the confinement of
mechanical energy therein.  *See, e.g.*, '755 Patent, 1:14-17."  (Bravman Decl. at ¶ 17.)  I do not
disagree with this statement, but I point out that it is not a complete statement, since confinement
is not the only issue of importance.  For example, if energy leaks out, then not all is necessarily
lost, since some can come back.  Things are not as simple as this, which is why it is important to
properly define terms.

Dr. Bravman contends that "It is my opinion that the intrinsic record is sufficient for a
POSITA to understand the disputed terms, and that the disputed terms are used according to their

plain and ordinary meaning (*e.g.*, the intrinsic record does not use the disputed terms differently from their normal usage in the art)."  (Bravman Decl. at ¶ 19.)  While a POSITA may be able to understand certain disputed claim terms without resorting to extrinsic evidence, as detailed in the Nguyen Decl., identified extrinsic evidence is available to provide clarification and support in view of the differences in the plain and ordinary constructions proposed by the parties.  I also note that Qorvo provided extrinsic evidence in support of its own proposed claim constructions. I do not agree with Dr. Bravman's blanket statement that "it is unnecessary to resort to extrinsic evidence to understand the disputed terms."  (Bravman Decl. at ¶ 20.)

**B.**      **"Active Region" and "Outer Region" [all asserted claims]**

| Akoustis' Preliminary Construction | Qorvo's Preliminary Construction |
|---|---|
| Active region: That region of the device where motional current density is generated through the piezoelectric layer.<br><br>Outer region: Defined as that region outside the active region. | Plain and ordinary meaning (POM).  If a construction is necessary,<br><br>"active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality<br><br>"outer region" is the region of the BAW resonator that is not electrically driven. |

I disagree with Dr. Bravman's contention that Qorvo's constructions are correct. (Bravman Decl. at ¶ 22.)  I note that Qorvo's primary contention is that no construction is necessary (undefined "POM") but then offers a proposed construction of the plain and ordinary meaning of "active region" and "outer region".  Both propositions cannot be equally correct.  As to no construction at all of the two disputed terms, the fact that the parties do not agree on what

of "density of mechanical energy," the fact that the parties do not agree on the POM meaning suggests that a construction is necessary.

Turning to Dr. Bravman's explanations in support of Qorvo's proposed construction (Bravman Decl. at ¶¶ 34-44), I disagree that the intrinsic record supports Qorvo's proposed construction. In particular, but without limitation, I disagree with Dr. Bravman's contention that "a POSITA reading the '755 Patent would have understood 'density' to be used in a broader sense and recognizing general and/or localized mechanical energy reduction, such as is shown in the comparison images of FIGS. 3A and 3B."[3] (Bravman Decl. at ¶ 41.) Qorvo's proposed construction as "the amount of mechanical energy from acoustic waves leaked from the active region" uses the term "leaked", which does not necessarily mean the same as "lost". A "leaked" amount of energy can be reflected and returned to the active region, in which case it is not "lost". "Leaked" energy is only "lost" when dissipated by various loss mechanisms that could include thermoelastic damping, hysteretic effects, and die mounting losses, just to cite a few. What is important here is what energy is *lost*. Because the words "amount … leaked" does not provide a quantifiable amount of loss, it does not provide a definitive comparison of energy loss before and after a structural design modification. Furthermore, because it does not use the words "total amount", it also leaves open the flawed notion that the amount of energy can be measured at any finite point in space or in time, and not as it relates to the total energy over the full volume of the outer region. In this regard, an amount leaked could refer to an amount of energy at a particular

---

[3] I further note that the use of a greyscale image in which both low and high energy regions are indicated as being darker in tone than mid-energy regions in FIGS. 3A and 3B of the '755 Patent makes it impossible to tell which regions of the figure show any reduction or increase of energy density such that it is impossible to make any comparison between the images as Dr. Bravman asserts he has done.

DocuSign Envelope ID: 973B855F-2A7C-4FBC-B9C6-642CD7A34DD5

(Bravman Decl. at ¶ 46.)  As with the previous disputed terms, I note that Qorvo's primary contention is that no construction is necessary (undefined "POM") but then offers a proposed construction of the plain and ordinary meaning.  Both propositions cannot be equally correct.  As to no construction of "[A]re not excited" the fact that the parties do not agree on what the POM meaning is suggests that a construction is necessary.

Turning to Dr. Bravman's explanations in support of Qorvo's proposed construction (Bravman Decl. at ¶¶ 47-54), I disagree that the intrinsic record supports Qorvo's proposed construction.  In particular, but without limitation, I disagree with Dr. Bravman's contention that "A reading of the intrinsic record in its entirety indicates that the recited non-excitation relates to reducing the lateral leakage of mechanical energy into the outer region, which is discussed with regard to the previous element."  (Bravman Decl. at ¶ 51.)  That definition is inconsistent with the plain meaning of "not excited" and would be viewed as ambiguously indefinite compared to the term "reduced" used throughout the '755 Patent specification.  If the inventors intended to mean suppressed or greatly reduced, those are the appropriate terms to express as much in the context of this invention.

Qorvo's notion that "not excited" means not "substantially" excited is adding an adjective not present and not clear or evident to a person of ordinary skill in the art absent some supporting intrinsic evidence that the inventors were acting as their own lexicographer.  I do not see any such support in the specification (*compare* '755 Patent, 2:61, 5:15, 7:5) or the prosecution history.  To that end, I do not agree with Dr. Bravman's reliance on the "In other words …"[4]

---

[4] '755 Patent, 5:17-23 ("In other words, the thickness of the material in the outer region of the BAW resonator is selected such that the extinction coefficient (i.e., the rate of exponential decay

DocuSign Envelope ID: 973B855F-2A7C-4FBC-B9C6-642CD7A34DD5

explanation in the specification (Bravman Decl. at ¶ 50) justifying a construction inconsistent

with the "not excited" terms plain and ordinary meaning.  Nor can I glean from the specification

what level of presence of such wavelengths would correspond to a substantial amount vs. an

insubstantial amount, while it is straightforward to discern the difference between present and

not present.  I also consider Qorvo's proposed construction to be indefinite because, as described

above, it fails to inform, with reasonable certainty, to those skilled in the art about the scope of

the invention.  Here, "not excited" is properly interpreted as absolute to one of ordinary skill in

the art.  It does not mean "a little bit" or "tiny" or "a reduced amount", or "suppressed" but rather

"none at all."  This is why I cannot agree with Qorvo's proposed construction of "not excited" as

meaning "are not substantively created."

    Although Dr. Bravman does not suggest as much, I also disagree with any notion that the

inability to ever achieve a total absence of the wavelengths in the whole volume of the active

region justifies Qorvo's proposed construction.  The fact that the inventors used the term

throughout the specification absent any suggestion of a more scientifically realistic meaning does

not change the plain and ordinary meaning that "not existing" means not at all.

    Akoustis offers the proposed construction of "are not excited" as "the wavelengths *do not

exist* in the whole volume of the active region."  I agree with that proposed construction as the

plain and ordinary meaning as understood by one of ordinary skill in the art for the reasons that

follow.  In relevant technical literature, when something is "not excited", it is non-existent, as

opposed to something that is "reduced", which one skilled in the art interprets as "reduced but

---

for evanescent waves) associated with the exponential decay in the outer region and the
imaginary part of the lateral dispersion in the outer region are changed in such a manner that
lateral leakage is reduced.").

DocuSign Envelope ID: 973B855F-2A7C-4FBC-B9C6-642CD7A34DD5

herein suffers much less from these issues, as shown in Fig. 21, which presents the terminated spectrum for the filter in Fig. 14 over a 100-MHz wide span, showing no strong spurious modes." Note how this passage is careful to use the word "suppression" to indicate that the spurious modes are not necessarily eliminated, but rather are suppressed or reduced to very small magnitudes. In addition, the phrase at the end "showing no strong spurious modes" is careful to include the word "strong" so that it maintains a non-absolute meaning. If the word "strong" were left out, then the phrase "showing no spurious modes" would mean that there are no spurious modes, i.e., none at all or zero energy in spurious modes, which is not the statement this paper would want to make. Leaving out the word "strong" would have made the statement false. Keeping it in makes it true.

## IV.    THE '786 PATENT

### A.    The '786 Patent Disclosure

I incorporate by reference the '786 Patent Background section of the Nguyen Decl.

I disagree with Dr. Bravman's contention that the skilled artisan would understand "the '786 Patent to be directed to BAW resonators using single crystal piezoelectric layers. *See, e.g.*, '786 Patent, 1:40-52, 2:10-28." (Bravman Decl. at ¶ 56), to the extent he suggests that the invention is limited to only single crystal piezoelectric layer BAW resonators. The '786 Patent, entitled "Communication filter using single crystal acoustic resonator devices," relates generally to electronic devices. ('786 Patent, 1:14-15.) More particularly, the invention described in this patent provides techniques related to bulk acoustic wave resonator devices (where this first item explicitly allows for materials other than single-crystal), single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, and the like. *Merely by way of example* the invention is described as applied to a single crystal resonator device for a communication device, mobile device, computing device, among others. ('786 Patent, 1:40-50; 3:45-52; 14:24-31, 62-64.) Nowhere in the specification or the prosecution history do the inventors disclaim a polycrystalline "piezoelectric layer" as used in claim 1. Dr. Bravman's reliance on specification passages that describe how to form the single-crystal layer

embodiments (Bravman Decl. at ¶ 72) is misguided as is his general mischaracterization of the invention is being based on a single-crystal piezoelectric layer (Bravman Decl. at ¶ 75) simply because the specification references the benefits of single-crystal.

**B.      "piezoelectric layer" [claim 1]**

| Akoustis' Preliminary Construction | Qorvo's Preliminary Construction |
|---|---|
| A layer of piezoelectric material having single or multiple crystal structure. | A layer of piezoelectric material having single crystal structure. |

Turning to Dr. Bravman's explanations in support of Qorvo's proposed construction (Bravman Decl. at ¶¶ 59-79), I disagree that the intrinsic record supports Qorvo's proposed construction.  Dr. Bravman misunderstands the significance of references to single-crystal "piezoelectric layer" in the specification.  (Bravman Decl. at ¶ 62 ("Thus, a POSITA would have reviewed the remaining intrinsic record to understand the meaning of 'piezoelectric layer.'").)  While the intrinsic record is always relevant in claim construction, nowhere in the specification do the inventors act as their own lexicographer by describing or defining the piezoelectric layer of the claimed invention as limited only to single-crystal materials.  For that reason, I believe the correct construction is the plain and ordinary meaning as understood by one of ordinary skill in the art at the time of the invention.

Dr. Bravman incorrectly contends that "[w]hile the above passage provides some broadening language, a POSITA would understand it, read as a whole, as indicating that the *invention* is to a single crystal piezoelectric layer."  (Bravman Decl. at ¶ 68.)  The passage is clearly instructive as to whether the invention relates strictly to single crystal – "Merely by way of example, the invention has been applied to a single crystal resonator device for a

communication device, mobile device, computing device, among others." A POSITA would read that and understand that the invention is not so limited. As such, other references to single crystal embodiments lose the limiting significance that Dr. Bravman suggests, including the referenced DESCRIPTION found in the '904 Provisional. (Bravman Decl. at ¶ 63.)

The fact that the inventors described the type of piezoelectric layer "utilized" in the provisional application does not describe the "solution" that is at the heart of the invention. In other words, the invention or solution is not that the resonator utilized a single-crystal piezoelectric layer. Again, as is evident from the totality of the intrinsic evidence, that is merely *an example* of the type of piezoelectric layer that can be utilized to practice the invention. The Background of the Invention describes the "present invention … [m]ore particularly, the present invention provides *techniques* related to bulk acoustic wave resonator devices, including single crystal bulk acoustic wave resonator devices, single crystal filter and resonator devices, and the like." ('786 Patent, 1:41-44) (italics added).) The specification goes on to describe the benefits of the *inventive techniques* over pre-existing techniques: "One or more benefits are achieved over pre-existing techniques using the invention. In particular, the present device can be manufactured in a relatively simple and cost-effective manner while using conventional materials and/or methods according to one of ordinary skill in the art." ('786 Patent, 2:10-14.) So, the specification describes the materials as conventional – which would include the piezoelectric material, and in my opinion, the skilled artisan at the time of filing of the '786 Patent would have considered both single-crystal and polycrystalline piezoelectric materials to be conventional.

As I understand, the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Independent claim 1 does not include the term "single-crystal" at all to define or describe the piezoelectric layer material. Rather, the single-crystal limitation is found, as an optional feature, of dependent claim 2, underlined to the piezoelectric layer ('786 Patent, 14:62-64) "The device of claim 1 wherein the seed substrate includes silicon, silicon carbide, aluminum oxide, or single crystal aluminum gallium nitride materials." This informs me that the inventors knew when to use the single-crystal modifier if intended to further limit a limitation (like the seed substrate) consistent with embodiments described in the specification.

I believe Dr. Bravman misapplies proper claim construction protocol when he suggests that "It is my understanding that, when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication." (Bravman Decl. at ¶ 76.) This is not a case where "[f]or example, an applicant's repeated and consistent remarks during prosecution can define a claim term by demonstrating how the inventor understood the invention." *Personalized Media Commc'ns, LLC v. Apple Inc*., 952 F.3d 1336, 1340 (Fed. Cir. 2020). Likewise, the inventors did not overcome the plain and ordinary meaning presumption by acting as their own lexicographer to assign a special definition. I understand that to overcome the plain and ordinary meaning presumption a specialized definition must be "clearly set forth" and "explicit." *Prima Tek II, L.L.C v. Polypap, S.A.R.L*., 318 F.3d 1143, 1148 (Fed. Cir. 2003). There is no such explicit disclosure of a specialized meaning for "piezoelectric layer." All evidence to the contrary. When the inventors wanted to disclose a single crystal "piezoelectric layer", they used the single crystal modifier. Moreover, the "single-crystal" term is not in any independent claims of the '786 Patent describing the piezoelectric layer.

The inventive technique of claim 1 includes multiple steps, unrelated to the material

characteristics of the piezoelectric layer:

1.      A communication filter device comprising:

a piezoelectric substrate having a substrate surface region, the piezoelectric substrate having a piezoelectric layer formed overlying a thinned seed substrate;

a topside metal electrode formed overlying a portion of the substrate surface region;

a topside micro-trench formed within a portion of the piezoelectric layer;

one or more bond pads formed overlying one or more portions of the piezoelectric layer;

a topside metal having a topside metal plug formed within the topside micro-trench and electrically coupled to at least one of the bond pads;

a first backside trench formed within the thinned seed substrate and underlying the topside metal electrode;

a second backside trench formed within the thinned seed substrate and underlying the topside micro-trench;

a backside metal electrode formed underlying one or more portions of the thinned seed substrate, within the first backside trench, and underlying the topside metal electrode; and

a backside metal plug formed underlying one or more portions of the thinned seed substrate, within the second backside trench, and underlying the topside micro-trench, the backside metal plug being electrically coupled to the topside metal plug and the backside metal electrode, wherein the topside micro-trench, the topside metal plug, the second backside trench, and the backside metal plug form a micro-via.  ('786 Patent, 14:33-61.)

In my opinion, the specification makes clear to a person of ordinary skill in the art that any reference to a single-crystal embodiment should not be viewed as limiting the scope or meaning of any claim that does not also specifically identify the piezoelectric layer as single-crystal.  In fact, the prosecution history supports the notion that the inventors and the Patent Office did not view the term as limited to single crystal because there is no mention that the claim is so limited.  The disputed term can refer to either a polycrystalline material or a single-crystal material.

Akoustis offers the proposed construction of "piezoelectric layer" as "a layer of

24

piezoelectric material having single or multiple crystal structure." I agree with that proposed construction as the plain and ordinary meaning as understood by one of ordinary skill in the art for the above reasons. For the same reasons, I do not agree with Qorvo's proposed construction that improperly seeks to limit the term to only single crystal materials.

### 2. Extrinsic Evidence Supporting Akoustis' Construction

Dr. Bravman contends that "[b]ased on my current understanding, it is my opinion that it is unnecessary to resort to extrinsic evidence to understand the disputed term." (Bravman Decl. at ¶ 58.) While I agree with Dr. Bravman that it is unnecessary to resort to extrinsic evidence to construe the plain and ordinary meaning of "piezoelectric layers," extrinsic evidence is inconsistent with Qorvo's proposed construction. Both polycrystalline and single-crystal materials can be called "piezoelectric materials" or "piezoelectric layers" in technical literature. Thus, "piezoelectric layer" is not specific to one or the other and a person of ordinary skill in the art would not read the claim term as limited based on the specification or prosecution history. There are many examples in the literature that also support the Akoustis construction, so I will again just point to one.

G. Piazza, P.J. Stephanou, and A. P. Pisano, "Piezoelectric aluminum nitride vibrating contour-mode MEMS resonators," *IEEE/ASME J. Microelectromech. Syst.*, vol. 15, no. 6, pp. 1406-1418, Dec. 2006.

- pg. 1406, Title: The title includes "Piezoelectric Aluminum Nitride", where the aluminum nitride in this paper is a polycrystalline material. This confirms that "piezoelectric" is used to refer to a polycrystalline material.

- pg. 1406, col. 2: "Piezoelectric materials such as aluminum nitride or quartz" is a good example of a single sentence where "piezoelectric materials" refers to both a polycrystalline material (the aluminum nitride of this paper) and a crystalline material (quartz).

DocuSign Envelope ID: 973B855F-2A7C-4FBC-B9C6-642CD7A34DD5

## V.      CONCLUSION

While the opinions set forth in this rebuttal report are complete, I reserve the right to supplement this report and any of the opinions expressed herein, should I receive additional information or evidence that is relevant to those opinions between now and the time that I testify at deposition or trial.  Moreover, I reserve the right to serve one or more additional rebuttal expert reports in this litigation if requested to do so, and I reserve the right to supplement the opinions set forth herein as part of such additional rebuttal expert reports in order to account for additional information or evidence that is learned or developed before any such additional report is prepared.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and information.

Dated July 29, 2022                                   Respectfully submitted,

                                                      DocuSigned by:

                                                      *Clark Nguyen*

                                       By
                                                      5524E63669CF442

                                                      Clark Nguyen, PhD.

# Exhibit D3-a

### Extrinsic Evidence:

### Excerpts from the deposition transcript for the August 12, 2022 deposition of Dr. John Bravman

Defendants' Responsive Claim Construction Brief

*Qorvo v. Akoustis*, C.A. No. 21-1417 (JPM)

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3      - - - - - - - - - - - - - - - - X

4    QORVO, INC.,                     :

5        Plaintiff,                   :

6            v.                       :   C.A. No.

7    AKOUSTIS TECHNOLOGIES, INC.      :   21-1417-JPM

8    and AKOUSTIS, INC.,              :

9        Defendants.                  :

10     - - - - - - - - - - - - - - - X

11                       Remote Deposition

12                       Friday, August 12, 2022

13           Deposition via Zoom of JOHN C. BRAVMAN,

14   Ph.D., a witness herein, called for examination by

15   counsel for Defendants in the above-entitled matter,

16   pursuant to notice, the witness being duly sworn by

17   MARY GRACE CASTLEBERRY, a Notary Public in and for

18   the State of Maryland, taken at 9:02 a.m. EDT,

19   Friday, August 12, 2022, and the proceedings being

20   taken down by Stenotype by MARY GRACE CASTLEBERRY,

21   RPR, and transcribed under her direction.

22

Page 22

1  appropriate time frame and a POSITA's understanding,
2  that a term to be construed is in fact consistent
3  with what that POSITA in that time frame would find
4  supported in the intrinsic record.
5      Q.   You mentioned that you were looking at the
6  intrinsic record to see whether or not the patentees
7  were acting as their own lexicographer, correct?
8      A.   Yes.
9      Q.   Did you find that in this case as it
10 relates to any of the disputed claim terms in the
11 '755 patent?
12     A.   I made no such assertion, no.
13     Q.   In other words, you examined the intrinsic
14 record and determined that the patentees were not
15 offering a definition for those disputed terms,
16 correct?
17     A.   Correct.
18     Q.   So if you start with a plain and ordinary
19 meaning and the record doesn't give you a different
20 meaning, aren't you still left with the original
21 plain and ordinary meaning?
22         MR. QUIST:  Objection.  Form.

Page 23

1          THE WITNESS:  Well, I think there's an
2  area, a spectrum of meaning within any language,
3  certainly the English language between those two
4  extremes where a person may have chose -- which is
5  not the case here -- to define the term in a certain
6  word -- certain way, but is using it in a context
7  accessible by the POSITA in the time frame, and
8  because they are the claims, understanding the claims
9  comes in the context of what the intrinsic record
10 describes or supports.
11 BY MR. FUHRER:
12     Q.   So for the '75 -- I'll make sure you were
13 clear on the record.  I think you understand me.  But
14 when you say '755, that's the claim that's being
15 asserted in the case and that you referenced in your
16 report, correct?
17     A.   Yes, the 9,735,755 patent.
18     Q.   Thank you.  And there are three disputed
19 terms that you addressed in your reports, correct, as
20 it relates to the '755 patent?
21     A.   That's correct.
22     Q.   And if you are doing your analysis, as I

Page 24

1  understand it from your testimony today, you looked
2  at the claim and you saw the disputed term in the
3  claim.  Let's use active region as an example.  And
4  did you at that point have a plain and ordinary
5  meaning in mind?  Did you have an understanding of
6  what that term means to one of skill in the art?
7      A.   Yes.  Active region is a term that's often
8  used in the entirety of the microelectronic domain,
9  in contradistinction to, for example, passive region,
10 outer region, other regions.  And that's why I
11 support the proposal that begins with plain and
12 ordinary meaning.
13     Q.   Is there one definition?  Like is there a
14 technical book that you can go to that would give you
15 the -- or arguably a definition of active region?
16     A.   I don't recall reading text in a textbook
17 or other such tome that purported to give a singular
18 definition as you posit.  To the extent a phrase such
19 as active region is used -- a term I read for 30, 40
20 years -- it's either clear as having a plain and
21 ordinary meaning within a certain context or it might
22 specify something particular.

Page 25

1          But active and action, there's some kind
2  of action, be it electrical, be it mechanical, be it
3  optical that a worker of skill would understand to be
4  referencing to a physical place within a device where
5  the operational characteristics are most directly
6  manifest, understanding that the totality of the
7  device has a purpose most likely at least.
8      Q.   And in this case, just using claim 1 of
9  the '755 patent as an example, it's referring to a
10 BAW resonator, correct?
11     A.   Yes.
12     Q.   So does that give you a more exacting
13 plain and ordinary meaning as opposed to maybe active
14 region in a broader technical sense?
15     A.   So a worker of skill understands a BAW --
16 for the court reporter, that's B-A-W -- BAW
17 resonator, as the claim clearly goes on to explicate,
18 is a device centering around the conversion to and
19 fro of electronic and mechanical energy through a
20 piezoelectric layer most typically.
21         And so I know now I'm -- having read BAW,
22 I know I'm not talking about a MOSFET.  I'm talking



Page 26

1 about some other type of active region. And so the
2 worker of skill's mind is immediately drawn to that
3 type of device and its typical utility as a, say,
4 filter, et cetera. So the active region is different
5 than it might be in many other types of devices where
6 the same words, "active region," are used.
7      Q.    And again, I'm not trying to put you on
8 the spot or ask you to be Webster's Dictionary, but
9 is there a working definition for a person of skill
10 in the art as to what active region means as it
11 relates to BAW resonators?
12      MR. QUIST: Objection. Lacks foundation.
13      THE WITNESS: I've not used it that way.
14 What I did was, with that general understanding of
15 the conversion of electrical signals to mechanical
16 energy as being key and as claim 1, for instance, in
17 the entire patent immediately draws one's attention
18 to the use of a piezoelectric material for that
19 conversion, then of course I want to understand what
20 the patent says about this active region and how it's
21 speaking to that.
22      And of course my opinion, as laid out, is

Page 27

1 that it's speaking to certain aspects of what the
2 active region does, how it is operated and, most
3 particularly, to a type of energy loss or leakage to
4 laterally situated structures, material structures.
5 BY MR. FUHRER:
6      Q.    In paragraph 84 of your initial report,
7 you say that you understand that words or terms
8 should be given their ordinary and accepted meaning
9 unless it appears that the inventors were using them
10 to mean something else or something more specific.
11      Do you see that?
12      A.    Yes.
13      Q.    Is it your testimony -- or was it your
14 analysis that you saw that the inventors were using
15 something more specific than the plain and ordinary
16 meaning?
17      A.    No. They were using the plain and
18 ordinary meaning in the context of a set of claims in
19 the patent, focusing on the relationship of this
20 active region and its loss or leakage of energy to
21 structures lateral to it.
22      And so that in particular means the worker

Page 28

1 of skill, in my opinion, is focused on how the active
2 region interacts with those lateral regions and how
3 the patent claims to address that with the desirable
4 endpoint of minimizing that leakage or loss.
5      Q.    With regard -- we're talking about the
6 active region one. With regard to that, do you feel
7 like if the inventors used a term in the
8 specification in describing the active region, that
9 you should use those words from the specification?
10      MR. QUIST: Objection. Vague.
11      THE WITNESS: I'm sorry, Counselor, I'm
12 not quite sure I follow your question.
13 BY MR. FUHRER:
14      Q.    That's okay. In your report, you say that
15 the term "electrically driven" is in the
16 specification, correct?
17      A.    Yes.
18      Q.    And you find that that was important to
19 you when deciding which construction was the most
20 appropriate, correct?
21      MR. QUIST: Objection. Vague.
22      THE WITNESS: Well, again, I'm supporting,

Page 29

1 first, the plain and ordinary meaning, but then, as
2 it goes on to say, if explication is necessary -- and
3 this is in paragraph 21 -- that it's the part of the
4 resonator that is electrically driven to provide the
5 resonator functionality.
6      And so it's the piezoelectric layer
7 between the electrodes most particularly that couples
8 the electronic and the mechanical domains and it's
9 from that region that leakage or loss of mechanical
10 energy is addressed in the patent.
11 BY MR. FUHRER:
12      Q.    And having looked to that section of the
13 specification, did that tell you that -- did that
14 suggest to you that it was inappropriate to look to
15 extrinsic evidence to determine the plain and
16 ordinary meaning?
17      MR. QUIST: Objection. Calls for a legal
18 conclusion.
19      THE WITNESS: It's my opinion that a
20 worker of skill as we've defined it, through the
21 section on a POSITA, would not have to go to
22 extrinsic evidence to understand active region in the



Page 46

1  unnecessary to resort to extrinsic evidence to
2  understand the disputed terms," correct?
3      A.   Yes.
4      Q.   And when you say to understand, you mean
5  for a POSITA to understand?
6      A.   Yes.
7      Q.   You don't mean the judge?
8      A.   I mean a POSITA.  So unless the judge is a
9  POSITA, no.
10     Q.   Fair enough.  Would you prefer to take a
11 break now or maybe in 10 or 15 minutes?  Whatever you
12 prefer.
13     A.   Ten or 15 minutes would be fine.
14     Q.   Okay.  We'll press on.
15     A.   Thank you.
16     Q.   Sure.  So I know that we were talking
17 about active region in the conversations about claim
18 construction, but I want to focus on active region
19 some more.
20     A.   Okay.
21     Q.   In your rebuttal report, paragraph 16 --
22     A.   I have it.

Page 47

1      Q.   -- you say, "More importantly, the
2  intrinsic record does not mention motional current at
3  all."
4           Do you see that?
5      A.   Yes.
6      Q.   And it says, "Thus, a POSITA would not
7  have understood active region or outer region of the
8  '755 patent to be defined based on motional current,"
9  correct?
10     A.   Yes.
11     Q.   So can you explain that to me what you
12 mean by the fact that since motional current wasn't
13 in the intrinsic record, a POSITA would not
14 understand the plain and ordinary meaning to include
15 that term?
16     A.   Of course I offered that opinion based on
17 Dr. Nguyen's opinion, so it's in response to that.
18 There are other terms I could have put in quotations
19 there.  It's my opinion that, although, as I say
20 somewhere else, the notion of motional current is
21 indisputed as useful in the art or understood in the
22 art, here the POSITA would not have to make recourse

Page 48

1  to that to understand the claimed invention of the
2  '755 patent.
3           I see nothing that supports that in the
4  intrinsic record and, as I've opined, the intrinsic
5  record provides POSITA with the understanding in
6  context to understand the claims of the patent.  So
7  there's nothing that's, in my opinion, suggesting or
8  motivating or compelling POSITA to go to motional
9  current or other terms that one might find in the
10 extrinsic evidence, but not in the intrinsic
11 evidence.
12     Q.   I mean, what is your understanding of what
13 motional current is as it relates to BAW resonators?
14     A.   Current related to motion.  And so, as
15 I've said a couple of times today, these are devices
16 in which electrical and mechanical energy are coupled
17 and so motional current carries with it both phrases,
18 both concepts.
19     Q.   And I apologize.  Motional current --
20 could you repeat that answer?  I apologize.
21     A.   No problem.  Motional current, a current
22 somehow linked to motion of current -- electrical

Page 49

1  currents are always involving the motion of charge.
2  That's not what this is referring to.  It's referring
3  to physical movement of a region.
4           And so depending on context, because
5  motional current is a term of art used outside of BAW
6  resonators, it's current associated with physical
7  movement.  And since piezoelectric devices, as I've
8  said a couple times, relate to the interplay of
9  electrical and mechanical energy, it makes perfect
10 sense to a worker of skill.
11     Q.   What makes perfect sense?  I'm sorry.
12     A.   Motional current in the context of a BAW
13 resonator.
14     Q.   Is that a -- are you saying that of course
15 there's motional current in the active region of a
16 BAW resonator?
17     A.   I've not opined on that here because I'm
18 just saying that motional current is not required.
19 But one understands that in an active region of a BAW
20 resonator, when energized, there is physical motion
21 and there are currents and so one does understand
22 that, yes.

Page 50

1    Q.   I mean, I don't know if you were being
2    careful not to put motional current together in
3    there, but is motional current the term that you're
4    familiar with?
5    A.   Yes.
6    Q.   And you say in paragraph 8 of your initial
7    report, "A BAW resonator is an electromechanical
8    device in which a standing acoustic wave is generated
9    by an electrical signal in a piezoelectric material."
10        Does that sound familiar?
11   A.   Yes.
12   Q.   And what is a standing acoustic wave?
13   A.   A standing wave is one in which -- in
14   general physics, a standing wave is one in which a
15   wave form is established and maintained.  Unlike an
16   ocean wave where the wave is moving, a standing wave
17   does not have that characteristic.
18   Q.   And in terms of motional current, is
19   motional current describing a standing acoustic wave?
20   A.   I've not opined that those are synonymous
21   or not, but they are related to one another.
22   Q.   And what you are saying here is that an

Page 51

1    electrical signal is what generates the standing
2    acoustic wave, correct?
3    A.   Yes.  And a worker of skill understands
4    the opposite is true as well.
5    Q.   And the electrically driven term in
6    Qorvo's construction, is that consistent with the
7    idea of an electrical signal?
8    A.   Yes.  A worker of skill would understand
9    that.
10   Q.   So the -- I'm going to use the phrase the
11   active electrically driving a BAW resonator results
12   in motional current?
13        MR. QUIST:  Objection.  Vague.
14        THE WITNESS:  I'd want to think about
15   that.  I've not offered that opinion.  I don't have
16   an opinion about that as I sit here today.  I've not
17   opined on that.
18   BY MR. FUHRER:
19   Q.   I guess I want to go back to the point,
20   which we can look at your rebuttal report, paragraph
21   16.
22   A.   Okay.

Page 52

1    Q.   Do you have that there?
2    A.   Yes, I do.
3    Q.   Okay.  You say, "More importantly, the
4    intrinsic record does not mention motional current at
5    all," which it sounds like it's the same as in the
6    initial report.  But I just want to drive home the
7    fact that you seem to be saying that since motional
8    current isn't in the intrinsic record, it would be
9    inappropriate to use it in construing active region.
10        Is that what you're saying?
11   A.   What I'm saying is in the -- to this
12   particular point in the third sentence of paragraph
13   16 of my rebuttal report, quote, "nor would a POSITA
14   have considered it necessary to define active region
15   and outer region based on motional current to
16   understand other features of the '755 patent.  And
17   that's the opinion about that, that it's not
18   required.
19        And since it's not found in the intrinsic
20   record, I see no reason, and hence my statement that
21   it's not necessary, to define active region and outer
22   region, et cetera, using that term.

Page 53

1    Q.   When you say it's not required, what do
2    you mean?
3    A.   It's one does not have to define it that
4    way.  One does not have to have an unambiguous
5    understanding of that term to understand the '755
6    patent and its claims.
7    Q.   Isn't the -- I mean, it seems like both
8    experts -- strike that.  I'll rephrase it.
9        It seems as though both parties are
10   contending that a plain and ordinary meaning is the
11   proper construction, correct?
12        MR. QUIST:  Objection.
13        THE WITNESS:  I'm going to go back --
14        MR. QUIST:  Form.
15        THE WITNESS:  In paragraph 21 of my
16   opening declaration, I recite the two parties'
17   proposed constructions and Qorvo starts with plain
18   and ordinary, but then goes on to explain if a
19   construction is necessary, whereas Akoustis' proposed
20   construction just states not region of the device
21   where motional current density is generated through
22   the piezoelectric layer.  It does not start with a



Page 90

1  because there was no further scale markings or
2  anything like that.
3        What it clearly is showing and, you know,
4  it's claiming -- the reader has to decide whether one
5  believes it or not -- that the transition from figure
6  3A to 3B is indicative of the success of the claimed
7  invention and that one sees much lower densities of
8  mechanical energy in the outer region in 3B than in
9  3A and that, therefore, this is emblematic of the
10 success of the invention.  That's what I think 3A and
11 3B are showing.
12 BY MR. FUHRER:
13    Q.  Does the result of the reduction have to
14 ultimately lower the Q to practice the claimed
15 invention?
16       MR. QUIST:  Objection.  Scope.  Relevance.
17       THE WITNESS:  I'm sorry, I heard you say
18 lower the cube?
19 BY MR. FUHRER:
20    Q.  I said Q as in Q factor.
21    A.  I mean, I've not opined on a Q -- Q factor
22 is used in the patent as one measure of the end goal

Page 91

1  of the patent's invention.  It doesn't claim to be
2  the only way to improve Q.
3     Q.  I guess my question is, and you, I
4  believe, stated earlier, that the idea is everything
5  stays the same, but we change the N.  And my question
6  is, if that's the case, everything is the same but N
7  is changed, in order to practice the invention, does
8  the Q have to improve with the N not equal to 1 in
9  order to practice the invention?
10       MR. QUIST:  Objection.  Scope.  Relevance.
11       THE WITNESS:  Yeah, I've certainly not
12 opined on that.  But since I'm positing a
13 hypothetical, if in fact nothing else changed, if you
14 improve one aspect of the factors that go into Q,
15 it's likely that Q itself would improve.  But that's
16 just in the abstract.
17 BY MR. FUHRER:
18    Q.  And to try to speak plainly, I think, more
19 for my sake, but the difference, it seems, between
20 the constructions -- at least one difference is that
21 there's no volume identified in Qorvo's construction.
22 You would agree with that, correct?

Page 92

1        MR. QUIST:  Objection.  Form.
2        THE WITNESS:  No.
3  BY MR. FUHRER:
4     Q.  I'm sorry?
5        MR. QUIST:  Dr. Bravman, I don't think the
6  answer was heard clearly.  If you can restate your
7  answer to that question.
8        THE WITNESS:  Oh, I'm sorry, I thought I
9  heard counsel say sorry as if he was going to change
10 the question.  Qorvo's proposed construction does not
11 specifically require any particular volume.
12 BY MR. FUHRER:
13    Q.  It doesn't identify any volume at all,
14 correct?
15    A.  No.  As it says, it talks about the energy
16 lost from the active region.  And one would assess,
17 to practice the invention, that.
18    Q.  And you did recommend -- I take that back.
19 I'll strike that.
20       In your rebuttal report, you did offer
21 what I'll call an addendum to the construction of
22 Qorvo's by giving it some language related to volume,

Page 93

1  correct?
2        MR. QUIST:  Objection.  Vague.
3        THE WITNESS:  Where would that be?
4  BY MR. FUHRER:
5     Q.  Let's go to paragraph 36 of your rebuttal.
6     A.  Okay.
7     Q.  And the part I'm referring to is where it
8  says, "To the extent."
9     A.  Yes, that's correct.
10    Q.  You say, "To the extent a POSITA would
11 have found it necessary to append a particular
12 'density' explanation to the definition" -- I'm going
13 to jump ahead -- "a POSITA would have added 'measured
14 over a volume of the outer region,'" correct?
15    A.  Yes.
16    Q.  And so that would be -- you're suggesting,
17 although not required, you could -- one could append
18 that to Qorvo's construction?
19    A.  Well, since a volume would include any
20 scale of that volume, then 100 percent of the volume
21 falls within that scope.
22    Q.  I guess my question was, you're suggesting



Page 102

¹ more guidance there, Bob?

²      MR. FUHRER: Yeah, that's fine. Am I

³ doing it right?

⁴      MR. QUIST: Yeah. I can see the image and

⁵ I see something you have circled on there. Is that

⁶ the one you're referring to?

⁷      MR. FUHRER: Yes.

⁸      MR. QUIST: Okay. Understood.

⁹ BY MR. FUHRER:

¹⁰    Q. All right. So if we use that as our data

¹¹ point, right, and then we compare it with the 3B

¹² image, does the 3B show a reduction in density of

¹³ mechanical energy in that region?

¹⁴    A. Not in the equivalent region because it's

¹⁵ a different device, right?

¹⁶    Q. Right, right, right.

¹⁷    A. It's spatially equivalent. This data

¹⁸ shows a reduction.

¹⁹    Q. So if we take that, as you suggest, that

²⁰ that's a reduction, but let's assume that 3B, the

²¹ rest of the outer region shows an increase.

²²    A. You're saying hypothetically?

Page 103

¹    Q. Yes. Would that be practicing the claimed

² invention because we found a region where there was

³ reduction?

⁴      MR. QUIST: Objection. Vague and calls

⁵ for a legal conclusion.

⁶      THE WITNESS: No. Again, I didn't --

⁷ that's a big -- that's a felt tip pen blob, right?

⁸ BY MR. FUHRER:

⁹    Q. Right.

¹⁰    A. All I'm trying to preserve is the ability

¹¹ to do analysis with a spatial component because I

¹² believe that's what the patent suggests. Would a

¹³ worker of skill look at one point, even an elongated

¹⁴ blob, and compare it to another one and -- where

¹⁵ everything else changed and say you're practicing?

¹⁶      I don't have an opinion about that because

¹⁷ I think it is a legal matter. But I'm just -- I

¹⁸ want -- I support this because it supports what I

¹⁹ believe is the correct interpretation of the patent

²⁰ of maintaining, as these figures do, a spatial

²¹ component to the mechanical energy assessment.

²²    Q. So under your appended construction where

Page 104

¹ you say a region, correct?

²    A. Yes.

³    Q. That would be an example of a region, the

⁴ blob that I've been referring to, correct?

⁵      MR. QUIST: Objection. Vague. Scope.

⁶      THE WITNESS: It again comes under the

⁷ rubric of a region. But as I indicated a few minutes

⁸ ago, that's not the point of my support for this

⁹ interpretation. It is just to maintain the spatial

¹⁰ relationships that I believe the patent cites to

¹¹ directly as in figure 3 and wants to maintain.

¹²      MR. FUHRER: Our technical guy, is that

¹³ Christian?

¹⁴      EXHIBIT TECHNICIAN: Yes.

¹⁵      MR. FUHRER: Can we get the '755 up and

¹⁶ maybe we can mark this and then take a break so I can

¹⁷ make a record of the blob so I don't get yelled at

¹⁸ later?

¹⁹      EXHIBIT TECHNICIAN: The '755? All right.

²⁰ Which document is that underneath?

²¹      MR. FUHRER: The '755 patent has been

²² identified in the exhibits that I sent.

Page 105

¹      THE REPORTER: It's Exhibit 7, Christian.

²      EXHIBIT TECHNICIAN: Okay. Thank you. Is

³ this the correct document?

⁴      MR. FUHRER: Yes. And we can go to

⁵ figures 3A and 3B, please. And can we turn that on

⁶ its side? And is there a way for me to mark on

⁷ there?

⁸      EXHIBIT TECHNICIAN: I have to give you

⁹ control. One moment. And then I believe you can

¹⁰ annotate. There you go. Is this something you're

¹¹ planning to save, though?

¹²      MR. FUHRER: Yes.

¹³      EXHIBIT TECHNICIAN: I'm not sure that you

¹⁴ can save it through the Zoom. Let me --

¹⁵      MR. FUHRER: Can you mark it and save it?

¹⁶ Because I can show you where.

¹⁷      EXHIBIT TECHNICIAN: Sure. One moment.

¹⁸      MR. FUHRER: If I mark it and then you can

¹⁹ mark it; is that right?

²⁰      EXHIBIT TECHNICIAN: Yeah. Let me bring

²¹ this back up.

²²      MR. FUHRER: If we want to take a break

Page 106

1  while we fix this and then we can get on the record
2  and make sure you guys are happy with it; is that
3  okay?
4        MR. QUIST:  Yeah, that's fine with me.
5        THE WITNESS:  Works for me.
6        MR. QUIST:  Let's go off the record.
7        MR. FUHRER:  Ten minutes?
8        MR. QUIST:  Ten minutes.
9        MR. FUHRER:  11:40?
10       MR. QUIST:  Yes.
11       (Recess.)
12          (Exhibit No. 7 was marked for
13          identification.)
14  BY MR. FUHRER:
15       Q.   Dr. Bravman, before the break, we were
16  talking about figures 3A and 3B from the '755 patent.
17       Do you recall that?
18       A.   Yes.
19       Q.   And in particular, I was using the term
20  "blob" to describe a section, the relative section of
21  the outer region, correct?
22       A.   Yes.

Page 107

1        Q.   And do you see on the screen now what has
2  been marked as Exhibit 7, which is the '755 patent
3  where I've identified with the highlighted yellow in
4  3A the blob section that I was referring to?
5        A.   Yes.
6        Q.   So what we discussed before the break
7  about that particular blob being a region of the
8  outer region where it shows reduced density of
9  mechanical energy in 3B relative to 3A; is that
10  correct?
11       A.   Yes.  By the shading change, the
12  equivalent region, albeit in a different device,
13  shows that as you say.
14       Q.   And you don't believe -- am I correct in
15  summarizing that you don't believe that that would be
16  a sufficiently large enough region to determine
17  whether or not there was a reduction in density of
18  mechanical energy to practice the claimed invention?
19       A.   I don't think a worker of skill would come
20  to that conclusion knowing that this is one
21  two-dimensional slice of an entire structure, that's
22  correct.

Page 108

1        MR. QUIST:  Also, I'm sorry, I tried to
2  object.  I was on mute.  So just objection to that
3  last question to form, vague and calling for a legal
4  conclusion.
5        MR. FUHRER:  Okay.
6        MR. QUIST:  Apologies for the interruption
7  there, Bob.
8        MR. FUHRER:  No problem.
9  BY MR. FUHRER:
10       Q.   And at the risk of using layman's terms, a
11  POSITA would not consider that a proper region of
12  outer region because it's just too small?
13       MR. QUIST:  Objection.  Mischaracterizes
14  the witness' testimony.
15       THE WITNESS:  Again, would not consider
16  any one such region as indicative of that.  The
17  patentee himself uses the comparison between 3A and
18  3B visually over a limited region and draws the
19  conclusion based on his visualization that the patent
20  is being practiced.  So that similarly does not
21  define what percentage, as you asked me about
22  earlier, one would conclude, but it illustrates that

Page 109

1  the spatial distribution of the stress or energy is
2  important to him.
3  BY MR. FUHRER:
4        Q.   You used the term "limited region," that
5  the figures show only a limited region of the outer
6  region; is that correct?
7        A.   Well, I did.  It's a two-dimensional
8  slice.  It doesn't include the other side, the left
9  side, I'll call it, of the device, for instance.  And
10  these things, if they're rectangular or ring-shaped,
11  they have an entire periphery.  So these kinds of
12  issues are common in engineering and science and
13  dealing with them appropriately is the job of a
14  POSITA.
15       Q.   So you mentioned it only shows one of the
16  two sides -- and I thought maybe I had control.
17       MR. FUHRER:  Christian, can you roll up to
18  2A and 2B?  And flip it.
19  BY MR. FUHRER:
20       Q.   Are these the two sides that you were
21  referring to?
22       A.   Yes.  I'll use --

Page 110

1    MR. QUIST:  Objection.  Vague.
2    THE WITNESS:  -- the term left and right
3  side of the piezoelectric electrode stack.  Two outer
4  regions are marked, but, again, they're also just two
5  two-dimensional slices.
6  BY MR. FUHRER:
7    Q.   So you don't believe that the -- if we go
8  back down to 3A and 3B, you don't think that 3A and
9  3B is representing -- that those numbers are
10  representative of the full volume of the outer
11  region, it's just that slice that's being
12  represented?
13    A.   It's not what's explained, but since those
14  numbers are reduced to colors --
15    (Interruption.)
16    THE WITNESS:  Sorry.  Apologize.  They're
17  being reduced to spatially dependent color
18  variations.  They can't be throughout the whole
19  volume.  They're measured at the location within the
20  spatial resolution of the technique and then mapped
21  into this visualization.  The same thing would be
22  done with a numerical simulation.

Page 111

1    So they're showing spatial variations of
2  energy densities.  If you say, well, that's over the
3  whole volume, that's not consistent with the
4  depiction.
5  BY MR. FUHRER:
6    Q.   I'm trying to see if I'm able to put a --
7  I'm going to do it the best way I can and I apologize
8  for this.
9    A.   That's okay.
10    Q.   But I'm going to put a little -- well, do
11  you see my little purple spots?
12    A.   I do.
13    EXHIBIT TECHNICIAN:  Would you like for me
14  to fill in between?
15    MR. FUHRER:  Well, I just want you to put
16  a triangle around this area here.  Or rectangle.  I
17  said triangle.  Good golly.  And similarly over here,
18  right?
19  BY MR. FUHRER:
20    Q.   Anyways, Dr. Bravman, I assume you know
21  where I'm going with this, that those marks that I've
22  put on the page, that represents the outer region,

Page 112

1  correct?
2    MR. QUIST:  Objection.  Vague.
3    THE WITNESS:  That is a two-dimensional
4  slice through part of the outer region of the entire
5  device.
6  BY MR. FUHRER:
7    Q.   And so there may be reduction in that
8  slice, but that doesn't mean that, from a 360-degree
9  perspective, that that region is reduced in energy?
10    MR. QUIST:  Objection.  Vague.  Form.
11    THE WITNESS:  I'm sorry, Counsel, could
12  you ask the question again?
13  BY MR. FUHRER:
14    Q.   Sure.  Maybe I'll lean on you here.  If
15  that's a slice of the outer region, how would you
16  describe the full volume of the outer region?
17    MR. QUIST:  Objection.  Scope.  Relevance.
18    THE WITNESS:  It's not depicted here.
19  BY MR. FUHRER:
20    Q.   I understand it.  But how would you
21  describe it as -- you know, it's that slice, but all
22  the way around?  How would you describe the full

Page 113

1  volume of the outer region?
2    MR. QUIST:  Objection.  Vague.  Scope.
3  Relevance.
4    THE WITNESS:  In the context of the
5  patent, the outer region is the portion of the
6  overall structure which is subject to the analyses of
7  a reduction in mechanical energy lost from the
8  electrically activated region.  So at a minimum, as
9  we just looked at with figure 2A and 2B, there's a
10  left and right side.  I'll call this the right side.
11  It appears to be the right side in this drawing.  But
12  those are relative terms, of course.
13    But then as your 360-degree posit
14  suggests, I mean, there's some three dimensionality
15  to this whole structure and just as if -- just as
16  there's two-dimensional spatial variations here which
17  are complex, to say the least, one would expect there
18  would be similarly variations around the periphery.
19  The patent does not describe the experimental
20  conditions under which these images were obtained, so
21  I don't know what thicknesses were interrogated, et
22  cetera.

Page 118

1  be addressed through its claims. And again, that's
2  the loss, the minimization of the loss and laterally
3  from the electrically activated region,
4  electrically -- yeah, from the active region to --
5  laterally to the outer regions.
6  BY MR. FUHRER:
7      Q. I don't think we said this directly, but
8  in the figures 3A and 3B we've been discussing, 3B
9  represents the improvements as claimed, correct?
10     A. Yes. If you look at the text of the
11  patent, it makes that clear.
12     Q. And therefore, we can see visually that N
13  does not equal 1 when you're comparing the one or
14  more layers of 3B to 3A, correct?
15     A. The patent makes reference of 3A and 3B to
16  figures 2A and 2B. 2A and 2B shows the change in N
17  that you just posited. And so the very clear
18  implication that this is a depiction of an actual
19  device and energy lost spatially represented that's
20  schematically shown from structures in figures 2A and
21  2B.
22     Q. So can you say that figure 3 has improved

Page 119

1  Q or an improved Q factor relative to figure 3A?
2         MR. QUIST: Objection. Relevance. Scope.
3         THE WITNESS: I think you meant figure 3B
4  relative to 3A?
5  BY MR. FUHRER:
6      Q. Yes. If I misspoke, I'll try it again and
7  you tell me. Go ahead.
8      A. No. I've not drawn any conclusions about
9      Q. I'm just saying that the patentee asserts figures
10  3A and B as showing the inventive improvement of
11  energy loss from the electrically driven active
12  region.
13     Q. So you don't think that, in order to
14  practice the claimed invention, the device that has
15  the N not equal to 1 needs to improve the Q factor
16  over the device where N equals 1?
17         MR. QUIST: Objection. Scope. Relevance.
18         THE WITNESS: I've not opined on that. At
19  most, I've merely noted that the Q factor is cited in
20  a patent as one overarching goal of device
21  improvements, but this is speaking to a very much
22  more limited feature.

Page 120

1  BY MR. FUHRER:
2      Q. To put a fine point on it, you don't think
3  a -- strike that.
4         To give you a hypothetical, if a device
5  has an N value not equal to 1 and shows a small
6  regional reduction in energy in the outer region, but
7  overall has a lower Q, that it is still reducing the
8  density of mechanical energy in an outer region?
9      A. That's a very complex hypothetical. You
10  said a reduction in Q so the quality factor goes
11  down?
12     Q. Correct.
13     A. I'm not drawing any conclusions to Q or
14  the quality factor. Again, I'm just talking about
15  what the patentee is asserting and how he's
16  validating his assertions and nothing more at this
17  point.
18     Q. Does the size of the region -- you spoke
19  that, you know, there are regions that would be too
20  small, correct?
21     A. Too small to rely upon as a singular
22  region? Sure.

Page 121

1      Q. And you thought that the full volume was
2  too much, correct?
3      A. No.
4         MR. QUIST: Objection. Form.
5         THE WITNESS: I didn't say it was
6  incorrect or improper to use it, but I just said we
7  should not limit it to that.
8  BY MR. FUHRER:
9      Q. I apologize. Yes. So can you tie the
10  amount or the size of the region relative to whether
11  it's increasing Q?
12         MR. QUIST: Objection. Vague.
13         THE WITNESS: I've not offered any --
14         MR. QUIST: Relevance.
15         THE WITNESS: I've not offered any such
16  opinion here. Again, I note and I understand that
17  the improvement in Q isn't typically an overall
18  industrial goal. This patent is speaking to one
19  aspect of device performance and an improvement in a
20  certain way.
21  BY MR. FUHRER:
22     Q. So you think the claims are untethered to



# Exhibit D4-a

**Extrinsic Evidence:**

**Excerpts from Plaintiff's Preliminary Claim Construction Supporting Materials, Hashimoto, Ken-ya, RF Bulk Acoustic Wave Filters for Communications (2009)**

Defendants' Responsive Claim Construction Brief

*Qorvo v. Akoustis*, C.A. No. 21-1417 (JPM)

# Plaintiff's Preliminary Claim Constructions Supporting Materials

# Ken-ya Hashimoto
## editor



# RF BULK ACOUSTIC WAVE FILTERS FOR COMMUNICATIONS



QORVO_00024654

# RF Bulk Acoustic Wave Filters
# for Communications

Ken-ya Hashimoto

*Editor*



**ARTECH**
**HOUSE**

BOSTON | LONDON
artechhouse.com

QORVO_00024658

**Library of Congress Cataloging-in-Publication Data**
A catalog record for this book is available from the U.S. Library of Congress.

**British Library Cataloguing in Publication Data**
A catalogue record for this book is available from the British Library.

ISBN-13: 978-1-59693-321-7

Cover design by Igor Valdman

© 2009 ARTECH HOUSE
685 Canton Street
Norwood, MA 02062

All rights reserved. Printed and bound in the United States of America. No part of this book may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the publisher.

All terms mentioned in this book that are known to be trademarks or service marks have been appropriately capitalized. Artech House cannot attest to the accuracy of this information. Use of a term in this book should not be regarded as affecting the validity of any trademark or service mark.

10 9 8 7 6 5 4 3 2 1

## CHAPTER 3
# BAW Device Basics

Jyrki Kaitila

In this book we make the definition that the thin film bulk acoustic wave (BAW) resonator is a piezoelectric device. This means that the electromechanical conversion is based on the piezoelectric effect. In the literature some other classes of devices, such as CMUTs (capacitive micromachined ultrasonic transducers), are also sometimes called BAW devices, but here we will reserve the term exclusively for the use given above.

Piezoelectric effect is an ability of a material to convert electrical energy into mechanical energy and vice versa. Most materials exhibiting this property are crystalline. However all crystalline materials are not piezoelectric: the criterion is the lack of center of symmetry. This is essential as the mechanism of piezoelectricity is based on spatial separation of positive and negative electrical charges under applied stress. Thin film piezoelectric materials will be discussed in detail in Chapter 7.

Properties of crystalline materials are inherently complex and they are even more so when it comes to the piezoelectric phenomena. In this chapter we will make no attempt to explain the detailed workings of piezoelectricity. What will be attempted is to give an overview of the relevant topics associated with design and analysis of thin film BAWs.

Some of the models that we will use are very simple; someone understanding the real complexity of the covered issues would probably term them naive. We accept this possible criticism, but take the practical view: even if the models and analysis lack ultimate precision, they nevertheless can explain general behavior of real devices with reasonable accuracy, at least qualitatively. Ultimately designing and manufacturing devices is a engineering art. We are extremely pleased if we can bring any insights into how a practitioner can identify the phenomena described in the following pages and apply the solutions offered to the benefit of his devices.

This chapter is about resonators. Resonators form part of many different systems: The thin film BAW technology has started out with filters. However, other applications such as oscillators and various kinds of sensors are being envisioned. The basic three parameters that a designer is interested in are usually sufficient effective coupling coefficient, high $Q$-values, and operation free of spurious resonances (remember the discussion in Section 1.5). This does not mean that all these are the most important parameters for a given application; neither does it mean that there would not be any other considerations to be taken into account. It all depends on the specifications of the task at hand. The first two sections of this chapter will

QORVO_00024718

build up a rudimentary base for the analysis done in Section 3.3, concerned with thin film bulk acoustic wave resonator design.

## 3.1  Thin Film Bulk Acoustic Wave Resonator

### 3.1.1  The Prototype Resonator and Piezoelectric Constitutive Relations

BAW devices utilize piezoelectric effect to generate a mechanical resonance from an electrical input. Conversely, the mechanical resonance is turned into electrical domain for output. Figure 3.1 shows a prototype resonator consisting of a piezoelectric plate of thickness $2d$ sandwiched by infinitely thin electrodes. Intuition tells us that, if we consider the material having an acoustic velocity of $v$ then the purely mechanical resonance condition of this system is simply

$$\omega_n = (n+1) \cdot \frac{\pi}{2} \cdot \frac{v}{d}, \quad n = 0, 1, 2, \dots \tag{3.1}$$

which is obtained by setting up a multiple of half-wave lengths in the thickness of the plate. The associated stress fields are plotted in Figure 3.1. We are generally interested in the fundamental mode $n = 1$. Putting in some representative numbers for a traditional crystals, $v = 6000$ m/s and $2d = 100\,\mu m$, we arrive at resonance frequency $f = 30$ MHz. On the other hand if we are tasked in building an AlN resonator operating at a fundamental frequency $f = 2$ GHz we arrive at plate thickness of roughly $3\,\mu m$. This is a regime where thin films technology quite obviously enters the picture.

Before we enter the world of the thin film devices it is necessary to quickly review the basic equations and theories governing piezoelectric resonators. We will not go into too many details here, neither will we offer any lengthy derivations of equations. There are excellent works already available on these topics, see for example books by Auld [1], Ristic [2], or Rosenbaum [3]. However, for the later discussions in this book it is necessary to include the most important aspects for quick and easy reference.

The piezoelectric constitutive relations relate the mechanical and electrical variables. These relations are written as

$$T = c^E S - eE \tag{3.2}$$

$$D = eS + \varepsilon^S E \tag{3.3}$$

where $T$ is stress, $S$ is strain, $E$ is electric field, and $D$ is electric displacement. These are the field variables. The terms $c^E$, $e$, and $\varepsilon^S$ are the material parameters: $c^E$ is the



**Figure 3.1**  Mechanical resonances in a plate of thickness $2d$. The stress fields associated with the resonances are plotted.

QORVO_00024719

stiffness constant, and it is the parameter $c$ that appears in the original Hooke's law for nonpiezoelectric material, relating stress $T$ and strain $S$ through $T = cS$. In the case of piezoelectric medium, Hooke's law needs to be modified to (3.2) in order to account for the emergence of stress associated with external electric field (i.e., the direct piezoelectric effect). This is achieved through the piezoelectric (stress) constant $e$. Similarly (3.3) now has a component describing how internal stress contributes to the electric displacement (i.e., the inverse piezoelectric effect) again through the same material parameter $e$. The material parameter relating $D$ and $E$ in (3.3) is permittivity of the material and is denoted by $\varepsilon^S$.

We have here written the constants $c^E$ and $\varepsilon^S$ with a superscripts to emphasize that the constants need to be evaluated under specific conditions. Therefore what $c^E$ denotes is stiffness under constant (usually zero) electric field. Likewise $\varepsilon^S$ gives permittivity under constant strain. Generally, all material parameters have to be defined this way. It reflects the fact that these constants are true constants only when specific experimental conditions are applied when the parameters are measured.

Equations (3.2) and (3.3) give one of the four possible ways of expressing the piezoelectric constitutive relations. Instead of writing stress $T$ and electric displacement $D$ as functions of strain $S$ and electric field $E$ [i.e., $T(S, E)$ and $D(S, E)$], we could have just as well chosen any one of the remaining three permutations between the four variables. This would in each case invoke a new set of material parameters. Obviously these different sets of material parameters are related through some (fairly simple) transformations.

The second important equation is the Newton's second law, familiar from high school physics, relating force with mass and acceleration, $F = ma$. In the one-dimensional case we can identify the left-hand side with $\partial T/\partial z \cdot \Delta V$ and the right-hand side with $(\rho \cdot \Delta V) \cdot \partial^2 u/\partial t^2$, resulting in

$$\frac{\partial T}{\partial z} = \rho \cdot \frac{\partial^2 u}{\partial t^2} \tag{3.4}$$

Here $\rho$ is the mass density of the material and $u$ is the (particle) displacement. In a nonpiezoelectric medium using the Hooke's law and the definition of strain

$$S = \frac{\partial u}{\partial z} \tag{3.5}$$

we end up with the wave equation

$$\frac{\partial^2 u}{\partial t^2} = \frac{c}{\rho} \cdot \frac{\partial^2 u}{\partial z^2} \tag{3.6}$$

We assume a time dependence of all the fields as $\exp(j\omega t)$. Therefore the wave equation describes a wave propagating with a phase velocity

$$v = \sqrt{\frac{c}{\rho}} \tag{3.7}$$

QORVO_00024720

It should be emphasized that this velocity is not the particle velocity associated with the particle displacement $u$, given by $\partial u/\partial t$. We will refer to $v$ in (3.7) as velocity of the acoustic wave, that is in the pure mode cases either the velocity of the longitudinal or the shear wave, denoted later by $v_L$ and $v_s$, respectively.

In a piezoelectric medium we get from the constitutive relations (3.2) and (3.3)

$$T = c^E\left(1 + \frac{e^2}{c^E \varepsilon^S}\right)S - \frac{e}{\varepsilon^S}D = c^D S - \frac{e}{\varepsilon^S}D \qquad (3.8)$$

Inserting this into the wave equation, (3.4) and utilizing the fact that $D$ is a constant in the dielectric piezoelectric medium one arrives at an acoustic velocity

$$v^D = \sqrt{\frac{c^D}{\rho}} = \sqrt{\frac{c^E}{\rho}} \cdot \sqrt{1 + K^2} = v \cdot \sqrt{1 + K^2} \qquad (3.9)$$

This highlights the first effect of piezoelectricity in our system: the acoustic velocity is higher than would be deduced simply from the material parameter $c^E$. In essence the piezoelectric effect stiffens the material ($c^D > c^E$). Therefore $c^D$ is sometimes called the piezoelectrically stiffened elastic constant. We have also in the last forms defined the electromechanical coupling factor $K^2$, given by

$$K^2 = \frac{e^2}{c^E \varepsilon^S} \qquad (3.10)$$

It depends only on the material parameters and is a measure of conversion efficiency between electric and acoustical domains in the piezoelectric material.

Finally, we can now examine a simple prototype resonator to study some real-life consequences of the previous analysis. We will assume a simple piezoelectric plate of thickness $2d$ with infinitely thin massless electrodes covering the opposing faces. We will assume that the lateral dimensions of the resonator are much larger than the thickness and this will reduce our system to purely one-dimensional case. Looking at the wave equation, (3.6), we can assume a general Ansatz for the displacement as

$$u(z,t) = \left[a \cdot \sin(kz) + b \cdot \cos(kz)\right] \cdot e^{i\omega t} \qquad (3.11)$$

where $k$ is called a (vertical) wave number or propagation constant. The constants $a$ and $b$ are determined by the boundary conditions. Inserting (3.11) into (3.6) we have

$$\omega^2 \cdot u(z,t) = \frac{k^2 c^D}{\rho} \cdot u(z,t) \qquad (3.12)$$

and the wave number is therefore

$$k = \frac{\omega}{v^D} = \frac{2\pi}{\lambda} \qquad (3.13)$$

In the last form we have identified the wavelength $\lambda$.

The stress is now given by (3.8), and is

$$T(z) = c^D k \cdot \left[ a \cdot \cos(kz) - b \cdot \sin(kz) \right] - \frac{e}{\varepsilon^S} D \qquad (3.14)$$

We have here dropped off the time dependence of our field variables. Throughout this text the term $\exp(j\omega t)$ will mostly be suppressed to keep the presentation more readable. Assuming the boundary condition of vanishing stress at the upper and lower surfaces, $T(\pm d) = 0$, gives

$$T(z) = \frac{eD}{\varepsilon^S} \cdot \left[ \frac{\cos(kz)}{\cos(kd)} - 1 \right] \qquad (3.15)$$

The associated displacement is (see (3.8))

$$u(z) = \frac{eD}{c^D \varepsilon^S k} \cdot \frac{\sin(kz)}{\cos(kd)} \qquad (3.16)$$

In order to find the response of the system to the outside electrical stimulus we eliminate stress $S$ from (3.8) and (3.3) and solve for $E$. The result is

$$E = -\frac{e}{c^D \varepsilon^S} T - \left( \frac{1}{\varepsilon} - \frac{e^2}{c^D \varepsilon^{S2}} \right) D \qquad (3.17)$$

The voltage over the piezolayer is given by the integral of electric field over the thickness of the body. After some lengthy manipulation this becomes

$$V = \int_{-d}^{+d} E(z) dz = \frac{2dD}{\varepsilon^S} \cdot \left[ 1 - \frac{e^2}{c^D \varepsilon^S} \cdot \frac{\tan(kd)}{kd} \right] \qquad (3.18)$$

If the piezolayer is dielectric the current is purely a displacement current, $J = \partial D / \partial t$. Therefore the current at the terminals is given by $I = j\omega A \cdot D$, where $A$ is the area of the device. Now the impedance is given by

$$Z = \frac{V}{I} = \frac{1}{j\omega C_0} \cdot \left[ 1 - K_t^2 \cdot \frac{\tan(kd)}{kd} \right] \qquad (3.19)$$

where we have introduced yet another electromechanical coupling coefficient

$$K_t^2 = \frac{e^2}{c^D \varepsilon^S} = \frac{K^2}{K^2 + 1} \qquad (3.20)$$

This is called the electromechanical coupling factor for the thickness-longitudinal vibration (also called the piezoelectric-coupling constant for transversely clamped

QORVO_00024722

material). For rather weak piezoelectrics, like AlN or ZnO, the two coupling constants are approximately equal, $K_t^2 \approx K^2$. The static capacitance $C_0$, given by the familiar expression

$$C_0 = \frac{\varepsilon^S A}{2d} \qquad (3.21)$$

Note that the factor 2 appearing in the denominator is the consequence of defining the thickness as $2d$. In most other works the thickness of the plate is given as $d$, but in order to keep the definition of plate thickness constant throughout this chapter we have opted to use this one.

The resonant frequencies are obtained from (3.19). The antiresonances (or parallel resonances) are obtained when $Z \to \infty$ (or when the admittance $Y = 1/Z = 0$. This gives

$$kd = (2n+1)\cdot\frac{\pi}{2}, \quad n = 0, 1, 2, \dots \qquad (3.22)$$

Using (3.13) this becomes

$$\omega_{a,n} = (2n+1)\cdot\frac{\pi}{2}\cdot\frac{v^D}{d}, \quad n = 0, 1, 2, \dots \qquad (3.23)$$

The resonant frequencies $\omega_{r,n}$ are obtained from solution $Z = 0$ of (3.19). They are therefore obtained from

$$\frac{\tan\left(\frac{\pi}{2}\cdot\frac{\omega_r}{\omega_{a,0}}\right)}{\frac{\pi}{2}\cdot\frac{\omega_r}{\omega_{a,0}}} = \frac{1}{K_t^2} \qquad (3.24)$$

where we utilized $v^D/d$ solved from (3.22) for the lowest antiresonance frequency $\omega_{a,0}$.

It is interesting to note the apparent similarity, but the subtle difference between (3.1) and (3.23). The first one was obtained by simple reasoning without very much hard physics involved. It describes resonances in a purely mechanical system, which means it is a plate-and-hammer model. That is: what waves would be observed if we simply hit the plate with a hammer (assuming that the hammer really is a wide-frequency band stimulus). On the other hand, (3.23) was derived based on the piezoelectric phenomenon. The difference between the obtained resonances is that the antisymmetric modes present in the purely mechanical treatment are missing from the piezoelectric driven case. This agrees with intuition: the antisymmetric modes are not excited because the constant external electric field cannot drive them. This symmetry argument will be used in the later sections when effective coupling coefficient and spurious modes are analyzed.

### 3.1.2   The Basic Parameters and Equivalent Circuit

In order to develop an equivalent circuit it is convenient to write the impedance expression in a slightly modified form. It can be shown [2, 3] that (3.19) can be expressed as

$$Z(\omega) = \frac{1}{j\omega C_0} \cdot \left[ 1 - K_t^2 - \sum_n \frac{\omega^2 k_n^2}{\omega_{a,n}^2 - \omega^2} \right] \tag{3.25}$$

where we have introduced the coupling of the $n$th mode

$$k_n^2 = \frac{8K_t^2}{\left[ (2n+1)\pi \right]^2} \tag{3.26}$$

The choice of the equivalent circuit is not unique; many different topologies that bring about electrical behavior as expressed by (3.25) can be envisioned. However, from (3.25) it is clear that the resonator can be described by a capacitance $C_0$ in parallel with an acoustic arm. Parallel to this we can have further motional arms corresponding to the terms in the sum in (3.25). This circuit is the Butterworth–Van Dyke (BVD) circuit and is shown in Figure 3.2(a). Generally, the higher order harmonics are neglected in the basic analysis concentrating on the main resonance and the circuit takes the form shown in Figure 3.2(b).

For the simplified circuit the input impedance takes the form

$$Z(\omega) = \frac{j(\omega L_1 - 1/\omega C_1)}{1 - \omega^2 C_0 L_1 + C_0 / C_1} \tag{3.27}$$

Again we find the series and parallel resonances by requiring zero and infinite impedances, respectively, and these are

$$\omega_r = \frac{1}{\sqrt{L_1 C_1}} \tag{3.28}$$

and

$$\omega_a = \sqrt{\frac{C_1 + C_0}{L_1 C_1 C_0}} = \omega_r \cdot \sqrt{1 + \frac{C_1}{C_0}} \tag{3.29}$$



**Figure 3.2**   (a) Multiresonant BVD circuit. Each motional leg corresponds to a resonance. (b) Single resonance BVD circuit, and (c) the modified BVD (mBVD) circuit taking into account losses.

The basic BVD circuit does not have any resistive elements and therefore it cannot take into account any losses in the system. This means that the quality factors of our series and parallel resonances are infinite. A more realistic representation is obtained with the circuit given in Figure 3.2(c) [4]. The resistance $R_x$ in series can be associated with the simple, ever-present resistance of the metal electrodes connecting the device. The inductance $L_x$ can arise because of the measurement configuration (device layout on the wafer). The motional resistance $R_1$ is associated with acoustic losses, of whatever origin, in the system. Now the input impedance takes a rather complicated form as

$$Z(\omega) = j\omega L_x + R_x + \left[ \frac{1}{R_0 + 1/j\omega C_0} + \frac{1}{R_1 + j(\omega L_1 - 1/\omega C_1)} \right]^{-1} \tag{3.30}$$

We define the quality factors at series and parallel resonances as

$$Q_s = -\frac{1}{2}\omega_s \frac{\partial \varphi}{\partial \omega}\bigg|_{\omega=\omega_s} \tag{3.31}$$

and

$$Q_p = +\frac{1}{2}\omega_p \frac{\partial \varphi}{\partial \omega}\bigg|_{\omega=\omega_p} \tag{3.32}$$

where $\varphi$ is the phase angle of the impedance. Therefore we have from (3.30) approximately

$$Q_s \approx \frac{\omega_s L_1}{R_x + R_1} \tag{3.33}$$

and

$$Q_p \approx \frac{\omega_p L_1}{R_0 + R_1} \tag{3.34}$$

This shows that at the series resonance $\omega_s$ the main contributors to the $Q$-value are $R_x$ and $R_1$. The appearance of $R_x$ is expected because of the high currents associated with the series resonance.

The benefit of having the three resistors in our modified BVD circuit is that it allows us to better model the situation where the series and parallel resonance $Q$-values are different. However, in a simple analysis we can calculate only two $Q$-values from a measured resonator, the series resonance $Q_s$ and the parallel resonance $Q_p$, and in the equivalent circuit we have introduced three resistors. Therefore, the choice of distributing the losses among these three elements is not unique. We will explore this theme in the later chapters of this book. Besides resonator analysis the BVD circuit can readily be used in design of filters.



**Figure 8.3** (a) Active area deflection of a rectangular-shaped resonator, and (b) Fourier transformation of deflection data.

## 8.4.2  Acoustic Leakage

In general, various loss mechanisms are possible, one of the most obvious and frequently discussed ones being the loss of energy due to acoustic leakage. The SMR BAW resonator is especially prone to this kind of losses compared to the FBAR since the latter lacks an important acoustic loss path: via the Bragg reflector into the substrate.

QORVO_00024872



**Figure 8.4**  Amplitude versus propagation constant *k* of the surface deflection of a resonator at a certain frequency.



**Figure 8.5**  Measured dispersion of a 1,050-MHz resonator layer stack [10].

QORVO_00024873



**Figure 8.6**   Measured wideband dispersion diagram of a 1,050-MHz resonator layer stack.

As discussed in Section 8.1, given a sufficient piezoelectric coupling factor, the resonator quality factor is the main performance parameter deciding about whether a certain application can be addressed with the BAW technology at hand, or not.

In the case of the ladder filter topology, which makes up the major part of today's BAW applications, the available resonator $Q$ has its primary impact on the steepness of the passband roll-off as well as on the minimum insertion loss of a filter.

### 8.4.3   Acoustic Leakage Through the Bragg Reflector

As discussed in Chapter 3, SMR-BAW devices use an acoustic reflector (sometimes referred to as a Bragg reflector), to isolate the resonating device acoustically from

QORVO_00024874

the device substrate. If the reflectivity of the Bragg reflector is not a perfect 100%, energy will be leaking in the form of acoustic waves from the active region of the SMR throughout the reflector layers into the substrate. There it will be transported away from the resonator, scattered or damped on the substrate backside or in the substrate itself due to imperfections, or reflected back into the resonator out-of-phase. In any case, since energy that leaked into the substrate cannot be recovered, this loss mechanism significantly reduces the quality factor of the resonance. [See the earlier definitions (Chapter 5) of resonator $Q$.]

Experiments [14, 15] have shown that even a perfectly matched quarter-wavelength reflector, which should in the (simplest) theory reflect close to 100% of the inbound waves, does show a significantly lower quality factor than expected by theory.

In order to get information about the energy which is possibly leaking into the substrate, a resonator with a straight-forward quarter-wavelength reflector which has been measured interferometrically beforehand, was mounted upside-down into the interferometric measurement setup. This enabled the measurement of the surface deflection on the backside of the substrate, caused by the acoustic waves leaking through the Bragg reflector. A few snapshots of the measured surface deflection are shown in Figure 8.7.

Although the amplitudes on the substrate backside are approximately a factor of 10 times smaller than those at the front surface, they're still constituting a significant contribution to the losses and results in a decrease in the resonator $Q$, effectively limiting the $Q$ to the regime of <700.

Now, since obviously a significant part of the wave energy is leaking despite the fact that in theory the quarter-wavelength Bragg reflector should reflect 100% of the inbound longitudinal waves, one is inevitably led to the conclusion that a nonnegligible part of the mechanical energy is stored and traveling in the form of shear waves.

At the first glance, given the (naive) image of the strictly vertically moving resonator surface, this seems to be unlikely. However, on closer investigation it turns out that there are a variety of mechanisms promoting the conversion of longitudinal wave energy into shear waves. Tilting of the wave vector due to lateral mode dispersion (see Chapter 3), scattering at layer imperfections and layer roughness, and



**Figure 8.7**   Resonator top-surface deflection at different frequencies (a) and corresponding substrate backside deflection patterns (b).

interface effects adhering to the simple requirements of acoustic boundary conditions on layer interfaces are among the most important ones.

The idea of shear waves leaking energy throughout the acoustic Bragg reflector has been put to the test first by Infineon's BAW group [14, 16], and in the meanwhile by several others as well. Countermeasures have been presented as well in the form of cooptimized Bragg reflectors providing good reflectivity for both, shear and longitudinal waves.

Using Mason's model to simulate the longitudinal and shear wave transitivity of a given Bragg reflector configuration, the resulting limitations to the resonator quality factor can be calculated. Figure 8.8 shows the resulting $Q$ limits for a quarter-wavelength mirror. In contrast to that, Figure 8.9 shows the same parameters, this time calculated for a reflector which has been cooptimized for longitudinal and shear wave reflectivity.

Samples with the different reflector types have been prepared, and the resonator $Q$ has been measured for each variant respectively. Representative Smith charts of the measurements are shown in Figure 8.10.

Both resonators have been fitted with a modified BVD model (see Chapter 3). The shown $Q$-value represents the maximum achievable $Q$ at any point of the resonance curve in the absence of spurious modes. Note that the $Q$-value at the serious resonance frequency is lower than at the parallel resonance frequency, since there's a strong influence of electrical (ohmic) losses at this point, which will be discussed briefly further down. In general, the parallel resonance $Q$ is, given a spurious-free response, the best parameter to look at while optimizing a BAW device for acoustic losses.

The $Q$-value of the optimized reflector resonator is twice that of the standard quarter-wavelength version. Since the transitivity of the longitudinal waves is calculated to be almost the same in both cases, and only the shear wave reflectivity changes, the result suggests that a major part of the losses in the quarter-wavelength variant has been indeed due to shear waves.

Recent reports from various groups among the BAW (SMR) community [4, 16, 17] confirm that careful cooptimization of the reflector for longitudinal and shear



**Figure 8.8**  Calculated $Q$ limitation due to Bragg reflector, assuming a quarter-wavelength reflector.

QORVO_00024876

Characterization of BAW Devices



**Figure 8.9**   Calculated Q limitation due to Bragg reflector for a longitudinal and shear wave cooptimized reflector.



**Figure 8.10**   Resonator Q measurements for different reflector types. Left Smith chart shows response of a quarter-wavelength reflector resonator. Right chart shows a resonator incorporation a longitudinal and shear wave cooptimized reflector. Note that the difference is most obvious in at the parallel resonance. The quality factor of the series resonance is limited by electrical conductivity rather than acoustic losses.

waves significantly boosts the usable resonator $Q$. Without consideration of the shear wave reflectivity, all groups seem to hit a wall at a quality factor of about ~700. In this case the losses seem to be dominated indeed by the acoustic reflector leakage due to shear waves. Careful reflector design on the other hand can easily boost the resonator $Q$ up to >1,500, some groups reporting quality factors up to >2,500 [16].

It should be mentioned that this cooptimization of the Bragg reflector for shear waves goes hand-in-hand with sacrificing some piezoelectric coupling, since usually layers in the reflector close to the resonator have to be made thicker. This in turn causes a larger part of the stress field to reside outside the piezoelectric material, thus reducing the coupling.

QORVO_00024877

Also, at this point it seems important to reiterate that the quality factor of a resonator is always dictated by the (at this point) dominant loss mechanism (see Chapter 3). However, most SMR manufacturers seem to be suffering mainly from shear wave losses while they roam in the region of $Q < 1,000$.

### 8.4.4  Laterally Leaking Waves

Another acoustic loss path is the energy loss by laterally leaking waves. This mechanism received quite a bit of attention since it is important for SMR as well as FBAR manufacturers. The existence of this type of losses can be verified much easier than the previously discussed losses, since it shows up immediately in interferometer measurements of SMR and FBAR resonators. However, the amplitudes of these waves are considerably smaller than the amplitudes in the active area of the resonator. The difference is more than two orders of magnitude (see Figure 8.11).

It has to be pointed out that accurate laser-interferometric measurement of the wave amplitudes outside the metallized active resonator region is not straight-forward since the measurement is in most cases done looking through a dielectric (e.g., the piezo layer) onto the bottom electrode. Thus, the comparison of the mechanical deflection amplitudes is to be devoured with great care in addition to the bottom electrode deflection (e.g., a change of refractive index in the dielectric layers due to stress/strain might contribute to the measured signal as well).

Experiments [14, 16] have shown that lateral wave leakage is not a dominant loss mechanism in SMRs operating in the $Q$-regime up to 2,500. It might very well become significant above that threshold, though. Also, it has been shown experimentally [4] that energy leaking laterally can indeed be confined by appropriate measures. However, a confinement of these waves produced additional unwanted spurious resonances due to standing waves, of course.

Some FBAR groups have shown simulations suggesting scattering of wave energy at the suspension points into the substrate [18]. Methods to prevent this scattering have been suggested; however, from the authors' point of view, FBAR resonators have up to now not been limited by lateral acoustic losses, as long as some fundamental design principles (like keeping the acoustically active region confined to the suspended area) have been followed.



**Figure 8.11**  Interferometric measurement of an SMR resonator device, leaking acoustic waver laterally.

QORVO_00024878

# Exhibit D5-a

**Extrinsic Evidence:**

**Excerpts from the deposition transcript for the August 10, 2022 deposition of Dr. Clark Nguyen**

Defendants' Responsive Claim Construction Brief

*Qorvo v. Akoustis*, C.A. No. 21-1417 (JPM)

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF DELAWARE
3
4    QORVO, INC.,
5            Plaintiff,
6            vs.   C.A. No. 21-1417(JPM)
7    AKOUSTIS TECHNOLOGIES, INC. and
     AKOUSTIS, INC.,
8
             Defendants.
9    _____
10
11         VIDEOCONFERENCE DEPOSITION OF
12              DR. CLARK NGUYEN
13                  Volume I
14
15             August 10, 2022
16           9:56 a.m. - 1:23 p.m.
17
18         REMOTE DEPOSITION VIA ZOOM
19
20         DAVID OCANAS, CSR NO. 12567
21
22
23
24
25
```

**Page 2**

```
1              APPEARANCES OF COUNSEL
2
3    On Behalf of the PLAINTIFF:
4        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
         TIMOTHY P. CREMEN, ESQ.
5        TREVOR J. QUIST, ESQ.
         2099 Pennsylvania Avenue, NW, Suite 100
6        Washington, DC 20006-6801
         (202) 747-1900
7        tcremen@sheppardmullin.com
         tquist@sheppardmullin.com
8
9    On Behalf of the DEFENDANTS, AKOUSTIS TECHNOLOGIES,
     INC. AND AKOUSTIS, INC.:
10
         PILLSBURY WINTHROP SHAW PITTMAN LLP
11       ROBERT M. FUHRER, ESQ.
         1650 Tysons Boulevard, 14th Floor
12       McLean, VA 22102-4856
         (703) 770-7543
13       Robert.fuhrer@pillsburylaw.com
14   Also Present:
15       TOM ROWLES
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                  INDEX OF EXAMINATION
2
3    WITNESS:  DR. CLARK NGUYEN
4    EXAMINATION                             PAGE
5    BY MR. CREMEN                           6, 98
6    BY MR. FUHRER                          90, 105
7
8                  INDEX OF EXHIBITS
9    DEPOSITION        DESCRIPTION          PAGE
10   Exhibit 1    Initial Claim Construction of
11                Expert Report and Declaration  8
12   Exhibit 2    Rebuttal Expert Construction
13                  Report and Declaration      8
14   Exhibit 3    '755 Patent                   28
15   Exhibit 4    '786 Patent                   86
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              INFORMATION REQUESTED
2              PAGE  LINE
3                (NONE)
4
5
6    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
7              PAGE  LINE
8                (NONE)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



DR. CLARK NGUYEN Vol. I                                          August 10, 2022
QORVO V. AKOUSTIS TECHNOLOGIES                                   33—36

Page 33

1     A.  They remove unwanted frequencies and past
2  wanted frequencies and they also do this in a way
3  where they minimize the loss in the passband, which
4  is another way of saying they match to the
5  preceding and succeeding stages.  That's enough.
6     Q.  Let's go to page 4 of your rebuttal
7  declaration.
8     A.  I'm there.
9     Q.  You have reproduced the parties' proposed
10  construction for active region and outer region
11  here; right?
12     A.  Yes.
13     Q.  Do you have an opinion as to whether one
14  of the parties' construction for active region is
15  broader than the other?
16     A.  Is broader than the other?  I think
17  Akoustis's is broader.
18     Q.  Why do you think that?
19     A.  Because when you are looking at -- did
20  someone say something?
21     Q.  No.
22     A.  I'm sorry, I'm hearing things coming in,
23  it sounds like someone is interrupting me.
24        That's why I'm asking if someone said
25  something.

Page 34

1     Q.  Continue, I'm sorry.
2     A.  Sometimes you are very quiet, in the
3  beginning, so I can't tell.  It's not a huge issue
4  here.
5        So the reason why I think that Qorvo's in
6  saying it is the region that is electrically
7  driven, electrically driven is a small region of
8  the entire BAW resonator and certain embodiments of
9  them.
10       What electrically driven is what is
11  between the electrons within the electric fields
12  and that doesn't capture all of the BAW resonator.
13       So if you have a BAW resonator with --
14  I'll just stop there.
15     Q.  How is Akoustis's proposed construction
16  different from that?
17     A.  So motional current, where the motion is
18  important, most people will just say current.  I
19  will add "motional" to it.
20       To emphasize the motion of the device is
21  important.  The motion that gives the purpose of
22  the device is important.
23       So the drive does create that motion and
24  the driver between the electrodes.
25       But there are devices that have electrodes

Page 35

1  in other places where you are not applying a
2  voltage to those electrodes, yet they are still
3  moving.
4        They are still providing the purpose of
5  the device and that they are actually delivering
6  the output current which ends up being the motional
7  current.
8        So the Qorvo construction misses that
9  part.
10        The Akoustis construction includes it by
11  focusing on the current, the motional current.
12     Q.  Could you turn to the '755 patent for a
13  moment?
14     A.  Yes.
15     Q.  Let's look at Figure 2B.
16     A.  Okay, I'm there.
17     Q.  Would applying either parties'
18  construction to the BAW resonator in Figure 2B
19  result in a different identification of an active
20  region?
21     A.  Yes.
22     Q.  How so?
23     A.  So the specification clearly says that the
24  active region includes not only the piezoelectric
25  layer, between those dotted lines, the Bragg

Page 36

1  reflector at the bottom.
2        In the Qorvo construction, the electric
3  field is between the top electrode and the bottom
4  electrode.
5        So it's the only electrically driven
6  portion of the piezoelectric layer.
7        So it would include only the piezoelectric
8  layer as the active region and would miss the Bragg
9  reflector below, because the Bragg reflector is not
10  driven electrically.
11        There are not electric fields through it
12  that are creating the piezoelectric drive for that
13  layer.
14        In fact, the Bragg reflector, in fact, is
15  being driven acoustically, not electrically.
16        So that's the reason why the Qorvo
17  construction is not consistent with the
18  specification.
19     Q.  Okay.  Let's look at page 12 of your
20  initial declaration.
21     A.  Okay.  I'm there.
22     Q.  Actually, I'm sorry, start on page 11, I'm
23  going to ask you some questions about the paragraph
24  that bridges pages 11 and 12, in particular the
25  sentence starting five lines up from the bottom of



Page 37

1 11, starting with, "I disagree with Qorvo's
2 suggested plain and ordinary meaning..."
3       You want to take a quick read through that
4 to the end of the paragraph and then I'll ask you
5 some questions.
6    A. To the end of the paragraph, even on page
7 12. I read it.
8    Q. Let's start on the second line of page 12,
9 you say the term electrically driven is not a
10 well-defined term of the art; do you see that?
11   A. Yes.
12   Q. What do you mean by that?
13   A. So there is a large number of resonators
14 in the art, there are resonators that are
15 electrostatically driven, which means there's no
16 piezoelectric between the electrode and the actual
17 resonator.
18      In that type of device, it's just the
19 force of the electric fields that actually actuates
20 the resonator.
21      The piezoelectric device, of course, we
22 know the force that actuates the resonator is the
23 stress that is generated within the piezoelectric
24 as a response to the electric field.
25      So there could be confusion between those

Page 38

1 two there.
2       A lot of times when people say
3 electrically driven mean the ones that are
4 electrostatically driven.
5       When a person is referring to driving a
6 piezoelectric device, they are saying
7 piezoelectrically driven.
8       There is a little bit of confusion there
9 in using that term.
10   Q. To your knowledge, how many U.S. patents
11 are you listed as an inventor on?
12   A. So I kind of lost count in my count -- my
13 count may not be accurate.
14      There are some patents that issued, I was
15 not aware of, I suppose. I think 30 or
16 thereabouts.
17      But if I go online and how many patents I
18 have, some places say 60. There is a good number.
19   Q. Do you recall reading the term
20 "electrically driven" in your patents?
21   A. I often use capacitively driven or
22 capacitive transducer or capacitively transduced;
23 it's possible I would have said electrically
24 driven, which would be more appropriate for what I
25 do because I have electrostatic devices.

Page 39

1    I also do piezoelectric as well. But a
2 lot of my stuff is electrostatic.
3    Q. Is it your opinion that a person of
4 ordinary skill in the art would not know what
5 electrically driven means in the context of the
6 '755 patent?
7    A. No. I think they would understand that
8 it's where the fields are.
9    Q. What do you mean by where the fields are?
10   A. Between the electrodes that the voltages
11 are applied across.
12   Q. Now, the same paragraph I had you read,
13 the fifth line down at the very end, it begins,
14 "For example..."
15      Do you see that?
16   A. I'm not seeing that, are you on page 12?
17   Q. Yes. Page 12, fifth line down,
18 "Electrically driven could mean..."
19   A. I see that.
20   Q. Why did you include this list of examples?
21   MR. FUHRER: Objection, vague. Confusing.
22 Calls for speculation.
23      THE WITNESS: I included it to explain why
24 someone could be confused by electrically driven.
25 BY MR. CREMEN:

Page 40

1    Q. At the end of the list of examples, you
2 mention flexural mode.
3       Then in parens, you say:
4       "(Which is not the mode of interest."
5       Do you see that?
6    A. Yes.
7    Q. What is the mode of interest?
8    A. Depends on the device, depends on the
9 purpose.
10   Q. What is the mode of interest in the
11 context of the '755 patent?
12   A. It's the longitudinal mode, the
13 extensional mode.
14   Q. What is the end function of that mode?
15   A. What is the end function of that mode?
16      It is to pass a frequency.
17      I heard a sound, but I don't think someone
18 was saying something.
19   Q. I wasn't. There may be some background
20 noise.
21      When you say pass a frequency, is that to
22 function as a filter?
23   A. Yes.
24      That's the filtering function. There are
25 other functions like you mentioned before. But



DR. CLARK NGUYEN Vol. I
QORVO V. AKOUSTIS TECHNOLOGIES

August 10, 2022
41–44

Page 41

1 that would also influence the impedance.
2     Q.  Are there other words that are used to --
3 hold on one second.
4         I was trying to scroll up to see the
5 phrase you used for the mode of interest.
6         What was the phrase you used?
7     A.  You mean the thing that says:
8         "...or that a suspended piezoelectric
9 layer (as in an FBAR) is driven into a flexural
10 mode..."?
11     Q.  Yes.
12         When we were discussing what mode was not
13 of interest, I asked you what mode was of interest
14 and you said something longitudinal.
15         What was the phrase you used?
16     A.  You mean the word that I used?  It's
17 called either longitudinal or extensional mode.
18     Q.  Is the longitudinal or extensional mode
19 called other things in the art?
20     A.  Thickness mode.
21     Q.  Anything else?
22     A.  Nothing comes to mind.
23     Q.  Does anyone called it the bulk mode of
24 vibration?
25     A.  People will call it that, but there are

Page 42

1 many bulk modes.
2         That would not be -- that probably would
3 not be specific enough.
4     Q.  Why would not be specific enough in the
5 context of the '755 patent?
6     A.  In the context of the '755 patent, a bulk
7 mode means that the mode is throughout the
8 thickness of the resonator.
9         When you ask that question, I come to
10 think what other modes could be used for the --
11 some people do use other modes.
12         But I would say that -- if I know -- it's
13 a company doing -- I would say people do use other
14 modes.
15     Q.  Okay, let's look at the very last sentence
16 of that paragraph I just had you read, starting:
17         "Rather, one must specify the result of
18 the driving..."
19         Do you see that?
20     A.  Yes.
21     Q.  What is a result of the driving in your
22 opinion?
23     A.  So the result of the driving is the
24 purpose of the resonator, meaning to deliver a
25 current or a voltage, and to present the right

Page 43

1 impedances to the first and second stages, and to
2 elicit the right amount of linearity, to elicit the
3 right amount of temperature and sensitivity.
4         All of those are associated with device
5 energy, resonator energy, which is captured by the
6 motional current and the motional elements.
7     Q.  In the context of the '755 patent, is not
8 the ultimate result of the driving provided a
9 filtering function?
10     A.  It's one of the results.
11     Q.  And the parameters you described in your
12 previous answer, aren't those ways to arrive at the
13 ultimate filtering function of the BAW resonator?
14         MR. FUHRER:  Objection, misleading,
15 mischaracterizing.
16         THE WITNESS:  The filtering function is to
17 pass certain frequencies from other frequencies.
18         You can do that with an impedance matched
19 or not.
20         You would rather do impedance matched to
21 the preceding and succeeding stages.
22 BY MR. CREMEN:
23     Q.  If I were to select a BAW resonator for a
24 particular application in a mobile phone, I would
25 select it for its filtering capability; correct?

Page 44

1     A.  Not necessarily.
2         You may select it for its power handling.
3         You may select it -- assuming that it's
4 for a filtering capability, there are many other
5 things you have to worry about.
6     Q.  Let's look -- we'll go a few more minutes
7 and take a quick break.
8         Let's look at page 7 of your rebuttal
9 declaration.
10     A.  Okay, I'm there.
11     Q.  The last -- I'm looking at the second full
12 paragraph that starts:
13         "While the specification describes..."
14         Do you see that?
15     A.  Yes.
16     Q.  And the last three lines of that
17 paragraph, I'd like you to take a quick read of
18 that and then I'll ask you a question.
19     Q.  I'm going to read the whole paragraph.
20     Q.  Sure.
21     A.  I have read it.
22     Q.  In the second to last line, you say:
23         "At best it is in short-hand used by the
24 patentees."
25         I want to know what you mean by



Page 45

1 short-hand?
2      A.  The specification makes clear that the
3 active region includes not only the piezoelectric
4 layer but also the Bragg reflector.
5      Electrically driven does not include all
6 of that, as I explained before, because the
7 electric fields are only around the piezoelectric.
8      So it's basically a term they are using to
9 capture that the active region is both, the
10 piezoelectric and the Bragg reflector.
11      But clearly, it's not -- that word itself
12 doesn't capture them both.  It's kind of a
13 short-hand.
14      Q.  Why does it not capture them both?
15      A.  Because electrically driven, the fields
16 are only around the piezoelectric.  That's what is
17 electrically driven.
18      The fields are not around the Bragg
19 reflector.
20      Q.  Let's look at page 13 of your initial
21 declaration.
22      A.  Okay, I'm there.
23      Q.  On page 13, 14 and 15, there are a series
24 of bullet points and blocks of texts, do you see
25 those?

Page 46

1      A.  Yes.
2      Q.  Are these intended to be block quotes from
3 the references you identified or your explanation
4 or some mix of that?
5      A.  Not all of them are quotes.
6      But some of them are -- some of them are
7 and some of them are figures and some of them are
8 other things.
9      They help with the explanation.  They help
10 with the understanding of the description, the
11 construction.
12      Q.  Let's look at the reference -- the
13 reference and the bullets identified on page 13,
14 about halfway down to R.J. Besson.
15      Do you see that?
16      A.  Yes.
17      Q.  In the first bullet point, are you
18 comparing the dormant region or dormant parts, I
19 guess it says here, to the outer region in the '755
20 patent?
21      A.  Yes, there is a comparison there.
22      I'm not sure I was trying to do that.
23 What I'm trying to do is show the active region can
24 be someplace that -- where the electrodes -- I'm
25 just trying to show the active region.

Page 47

1      I'm saying this is an example of the
2 active region.
3      Q.  Is the dormant region -- dormant part of
4 Besson equivalent to the outer region in the '755
5 patent?
6      MR. FUHRER:  Objection, leading, calls for
7 a legal conclusion.
8      THE WITNESS:  It's obviously not the same.
9 It's different materials.
10      In terms of not being in the active
11 region, that's what it is.  It's not in the active
12 region.
13 BY MR. CREMEN:
14      Q.  Is it your opinion that no motional
15 current density as you phrased it in your
16 definition of active region would be present in the
17 outer region?
18      A.  If there is any present in the outer
19 region, that should be considered as part of the
20 active region.
21      Q.  So if there is any motional current
22 density in the region of a BAW resonator, it would
23 be the active region; is that right?
24      A.  Yes, inasmuch motional current captures
25 the purposeful motion of the device -- of the

Page 48

1 resonator.
2      Q.  What do you mean by purposeful motion?
3      A.  The motion that contributes to the current
4 motion of the device.
5      That then determines the ability to pass
6 or reject frequencies pursuant to certain
7 impedances, maximize the Q, et cetera.
8      Q.  Could there be some nonpurposeful motion
9 in the outer region under your definition?
10      A.  I don't know -- could there be a
11 nonpurposeful, my answer is I don't think so.
12      I think any time you have motional
13 current, it's purposeful.
14      It determines the impedances.  It
15 determines what frequencies are passed or rejected.
16 It determines how much energy is lost.
17      It determines a lot of the things trying
18 to deter energy from being lost.
19      It determines Q.
20      It's a very good characterization of all
21 the purposes of the resonator.  I'm trying to think
22 of -- to your question, whether there are any that
23 are not and I'm not coming up with any right now.
24      Q.  Is there a difference between electrical
25 (phonetic) current and motional current density?



Page 49

1      A.  I would not say so, no.
2      I think they are pretty much the same
3   things.  Multiply the density by the appropriate
4   volume of area component to get the motional
5   current.
6      MR. CREMEN:  Let's take a five-minute
7   break and we can pick up again at 2:30 Eastern.
8      (Whereupon, the proceedings
9      recessed at the hour of
10     11:20 A.M. until 11:30 A.M.)
11  BY MR. CREMEN:
12     Q.  Let's look at claim 1 of the 755 patent,
13  if you will turn to that?
14     A.  I'm there.
15     Q.  I'm going to ask you some questions about
16  the density of mechanical energy term.
17     If we look at the final clause of claim 1,
18  that's at column 1, lines 47 through 51, within a
19  range of values --
20     A.  Yes.
21     Q.  This is the clause that includes the
22  density of mechanical energy term; right?
23     A.  Yes.
24     Q.  Does the language of the claim itself that
25  we're looking at require the density of mechanical

Page 50

1   energy be measured over the full volume of the
2   outer region?
3      A.  The language of the claim in my
4   interpretation is yes.
5      I can see others may not think so.
6      Q.  So the language of the claim states that
7   density is measured over the full volume of the
8   outer region?
9      MR. FUHRER:  Objection, mischaracterizes.
10     THE WITNESS:  When I read density of the
11  mechanical energy in the outer region, I think of
12  the density in the outer region.
13  BY MR. CREMEN:
14     Q.  You don't see the words "outer region" in
15  this portion of the claim; right?
16     MR. FUHRER:  Objection --
17  BY MR. CREMEN:
18     Q.  Let me rephrase.
19     You don't see the words "full volume" in
20  this portion of the claim; correct?
21     A.  No, I don't.
22     Q.  How would you measure a density of
23  mechanical energy in the outer region?
24     A.  I would determine the energy in the outer
25  region and divide it by the volume.

Page 51

1      Q.  How would you measure the density of
2   mechanical energy?
3      A.  How would I measure the density of
4   mechanical energy -- how can I measure that?
5      The specifications simulates it.  That's
6   one way to get at it.
7      Q.  Are there other ways?
8      A.  Probably are, yes.
9      Q.  Can you think of any?
10     A.  Maybe an optical technique or something,
11  using light that can penetrate into the layers of
12  the materials to pull off the energy in different
13  places that you would then sum, then divide by the
14  volume to get density.
15     Q.  Can you think of any other ways?
16     A.  Maybe, given time.
17     Q.  I'll be asking questions, if any more pop
18  into your mind, let me know.
19     You mentioned that in this '755 patent,
20  the density of mechanical energy is modeled; is
21  that right?
22     A.  Is modeled?
23     What do you mean by is modeled?
24     Q.  I was trying to use the word you used.
25  Maybe I misstated it.

Page 52

1      Sorry, simulates.
2      A.  Simulated.
3      Q.  So earlier you mentioned that the '755
4   patent simulates the density of mechanical energy;
5   is that right?
6      A.  Yes, it's one of the figures.
7      Q.  In your experience, what inputs are needed
8   for that simulation?
9      A.  So one way to simulate that would be
10  through solid model simulation (phonetic).
11     You would need to create a solid model for
12  the device, which is basically drawing up the
13  device and dividing it up into elements.
14     These elements would then be
15  mathematically connected by boundary conditions and
16  the trend (phonetic) relationships that govern how
17  this thing behaves.
18     And you can then do a stress or strain
19  plot for this to determine energy or energy will be
20  a function of either the stress or the strain.
21     Each of these elements would be the volume
22  over which you would be determining that energy.
23  You would divide that energy by the volume to get
24  the density.
25     Q.  Let's go back to the last item on Claim 1



Page 53

1 of the '755 patent that we were looking at a moment
2 ago.
3    A. Okay.
4    Q. Would you agree with me that this claim
5 element is comparing two resulting densities of
6 mechanical energy based on a value of N?
7    A. Yes.
8    Q. Where does the mechanical energy referred
9 to in this portion of the claim come from?
10      MR. FUHRER: Objection, vague.
11      THE WITNESS: Where does it come from?
12      It comes from the initial excitation in
13 some way.
14 BY MR. CREMEN:
15   Q. Initial excitation of what?
16   A. Of the system, resonator and all the
17 sources.
18   Q. Where does the excitation occur?
19   A. The initial excitation is coming from the
20 voltage coming in, which is the electrodes.
21   Q. What does the voltage across the
22 electrodes cause?
23   A. It causes the piezoelectric to move.
24   Q. In what region as defined by claim 1 does
25 that occur?

Page 54

1      MR. FUHRER: Objection, misleading.
2      THE WITNESS: In what region as defined by
3 claim 1 does that occur. It occurs in the active
4 region.
5      However some of that energy is not coming
6 just from the electrical.
7      So the energy going into the Bragg
8 reflector underneath is acoustically driven. But
9 it is a total energy.
10 BY MR. CREMEN:
11   Q. Let's look at 16 of your initial
12 declaration.
13   A. Okay, I'm there.
14   Q. Feel free to read from the beginning of
15 this paragraph on the previous page.
16      My question is -- the second line, you
17 say:
18      "What a person skilled in the art is
19 mainly concerned about..."
20      What do you mean, concerned about?
21   A. That's a mis-phrase, actually. I don't
22 think -- I guess the professor in me is just trying
23 to explain things. This is sort of -- that's the
24 issue with me.
25      I like to explain things. So I'm

Page 55

1 over-explaining things here.
2      The main statement here is that the
3 specification revolves around the total energy
4 lost.
5      It doesn't matter whether people agree
6 with it. It's good that people agree with it.
7      It's a specification that the total energy
8 lost is important -- not important, but is the
9 purpose of this invention, to reduce total energy
10 lost.
11   Q. Where does the specification say that?
12   A. Near the beginning, when it talks about Q
13 and energy going into the substrate.
14   Q. In your experience, what are ways to
15 measure energy lost?
16      MR. FUHRER: Objection, vague.
17      THE WITNESS: Q is a good parameter to
18 determine the ratio between the energy and the
19 purposeful -- the useful energy in the resonator
20 over the energy lost.
21 BY MR. CREMEN:
22   Q. What do you mean by useful energy?
23   A. I mean the energy in the active region,
24 what I should say.
25      We discussed this in length. It creates

Page 56

1 motional current -- motional current responsible
2 for the passing or rejection of filters,
3 responsible for impedances, and responsible for all
4 sorts of other things that we talked about.
5    Q. How do you calculate the ratio between the
6 useful energy and the energy lost?
7    A. You take all of the energy in the active
8 region and you divide that by all the energy lost
9 outside of that active region.
10   Q. How do you measure those two energies?
11   A. So there are ways to do that in some of
12 the references that I provided, the extrinsic
13 evidence, for example, the one on PML, the use of
14 PML layers capture the energy lost and determine
15 the energy in the resonator.
16      That's one way to do it.
17   Q. Any other ways?
18   A. Any other ways to do what, to measure the
19 different energies to measure the Q -- to determine
20 the Q?
21   Q. Either one, start with the energy
22 measurement?
23   A. Energy measurement is an interesting thing
24 -- you could do something like I described before,
25 use some type of optical technique.



DR. CLARK NGUYEN Vol. I
QORVO V. AKOUSTIS TECHNOLOGIES

August 10, 2022
65–68

Page 65

1  you can have some other reflecting interface there
2  that could reflect this energy back, in which case
3  it's gotten back into the active region and was not
4  lost.
5      Q.  What is an example of a reflecting
6  interface?
7      A.  I suppose just another device, right, Type
8  1, Type 2, dispersion-type design.
9         If you have these devices on a chip and if
10  you designed them carefully, there is a certain way
11  you can reflect off of another device.
12      Q.  In the previous answer, you mentioned
13  leaked means the energy has gotten out?
14      A.  Yes.
15      Q.  What do you mean by gotten out?
16      A.  It's made it through the boundary of the
17  captured energy.
18      Q.  What is the boundary of captured energy?
19      A.  So in a BAW device, the electrode, because
20  of the mass loading, you can confine the energy
21  within that BAW device, and different types of
22  designs can help to confine that energy such that
23  there are forbidden frequencies in the other part
24  (phonetic) of the device.
25      Q.  Is there an interface between the active

Page 66

1  and outer regions?
2      A.  Meaning is there another material
3  separating them?
4         What do you mean?
5      Q.  Let's focus a little more.
6         In the embodiments of the '755 patent, is
7  there any boundary between the active region and
8  outer region?
9      MR. FUHRER:  Objection, vague.
10      THE WITNESS:  The word "boundary" elicits
11  the idea there is some different material there.
12         In that case, there is not.
13         But there is a difference in the two,
14  because one of them is mass loaded differently than
15  the other.
16  BY MR. CREMEN:
17      Q.  Is there a reflecting interface between
18  the active and outer regions in the embodiments of
19  the '755 patent?
20      A.  Yes.
21      Q.  What is that?
22      A.  The reflective interface is where the mass
23  loading is different, so where the electrode is and
24  bordering different things that you put there to
25  load that portion differently than in the outer

Page 67

1  region.
2      Q.  Does that reflecting interface reflect
3  energy in the active region?
4      A.  Yes, for certain frequencies, depending on
5  your design.  It all depends on design.
6      Q.  Is it true to say that leaked energy and
7  lost energy are both types of energy that pass from
8  the active region to the outer region?
9      A.  Yes.
10      Q.  In your opinion, is it what happens to
11  that energy once it gets to the outer region is the
12  difference between those two types of energy?
13      A.  Yes.
14      Q.  What happens to the lost energy once it
15  enters the outer region?
16      A.  Loss occurs when you have the energy
17  suffering lost mechanisms, they dislocate.  They
18  make their way to a substrate or a boundary that is
19  not reflective.
20         Lost energy comes from leaked energy, but
21  they are not the same.
22      Q.  What happens to the leaked energy once it
23  enters the outer region?
24      A.  It can be lost or it can return.
25      Q.  If you are measuring the density of

Page 68

1  mechanical energy in the outer region, is there any
2  way to tell whether that energy you are measuring
3  is leaked or lost energy?
4      A.  I'm not sure that's the real question you
5  -- I should answer your question.
6         Is there any way to tell whether it's
7  leaked or lost energy?
8         You can tell if the energy has been lost
9  by the differences in the densities, in the two
10  cases.
11         If you are saying if you can identify
12  whether this portion and that portion is just
13  leaking or whether it's lost energy, too, but
14  that's a more difficult question to answer.
15         That's why in order to get the Q or the
16  change in Q, you have to look at the whole volume.
17      Q.  The latter question was what I was more
18  interested in, your opinion on.
19         If you are simply measuring energy in --
20  strike that.
21         If you are simply measuring the density of
22  mechanical energy in the outer region and you don't
23  know the other energy values for the device, is
24  there a way to determine whether that measured
25  energy density is lost energy versus leaked energy?



DR. CLARK NGUYEN Vol. I                                      August 10, 2022
QORVO V. AKOUSTIS TECHNOLOGIES                                    69—72

Page 69

1    A.  I guess my answer is, really it doesn't
2  matter.  The reason I'm having trouble with your
3  first question, because you are talking about lost
4  energy and leaked energy.
5        Lost energy is no longer there.  It's
6  lost.
7        So what you are measuring is basically the
8  leaked energy that remains after the losses.
9        So when you ask, can you tell whether the
10  energy is leaked energy or lost energy, no, you
11  can't.
12        Because the lost energy is not there any
13  more.
14        You are only seeing the leaked energy and
15  you can infer where there has been an energy loss
16  whether you have less or more energy.
17        Your first question I was trying to answer
18  it, this is the reason it took so much time doing
19  it.
20        It's not formulated in a way that it can
21  be answered by me at this time.
22    Q.  Okay, I understand your point.  Thank you.
23        So the energy -- so the density of
24  mechanical energy that you can measure in an outer
25  region is, by definition, leaked energy?

Page 70

1    A.  Yes.
2    Q.  Let's look at page 11 of your rebuttal
3  declaration.
4    A.  Okay, I'm there.
5    Q.  Actually, let's skip down to page 12,
6  looking at the wrong note.
7        On page 12, the first full paragraph
8  beginning:
9        "To be clear..."
10        Do you see that?
11    A.  Yes.
12    Q.  The third sentence in that paragraph
13  starts:
14        "A claim on the other hand must be more
15  precise and in this case should provide a more
16  quantitative measure of energy lost to be
17  sufficiently clear."
18        Do you see that sentence?
19    A.  Yes.
20    Q.  What do you mean by a claim must be more
21  precise?
22    A.  That's just me putting my professor hat on
23  again and just -- saying something that -- I like
24  to teach people things, but maybe should not be
25  doing it.

Page 71

1        In this case, the claim is the claim.  We
2  need to interpret the claim.
3    Q.  Does a claim have to be more precise than
4  the specification?
5        MR. FUHRER:  Objection, calls for a legal
6  conclusion.  Vague.  Misleading.
7        THE WITNESS:  I would say it needs to be
8  precise enough to be used.  I don't know if I can
9  make a comparison between claim and specification.
10  BY MR. CREMEN:
11    Q.  What do you mean by to be used?
12    A.  Not to be used -- I should say to be
13  precise enough to be consistent with the
14  specification where here the specification is
15  looking to raise Q.
16    Q.  To your understanding of claims, does
17  every claim element need a quantitative measurement
18  to be clear?
19    A.  No.
20    Q.  If we look back to Claim No. 1 of the '755
21  patent, the last clause we've been looking at, let
22  me know when you have it up.
23    A.  I have it up.
24    Q.  I think earlier we agreed that this
25  language requires a comparison of density of

Page 72

1  mechanical energy values when -- for different
2  values of that; right?
3    A.  Yes.
4    Q.  Why is that not a quantitative
5  measurement?
6    A.  That is a quantitative measurement.
7    Q.  Okay, let's go to page 10 of your rebuttal
8  declaration.
9    A.  I'm there.
10    Q.  Akoustis's preliminary construction which
11  you reproduced here says that a density of
12  mechanical energy means a total density over the
13  full volume of the outer region; right?
14    A.  Yes.
15    Q.  What does total density mean?
16    A.  I think -- that's an average density, is
17  what it is.  It means taking the full volume.
18    Q.  So do you mean -- total density means the
19  average density, in your view.
20    A.  It's the energy you have over that volume
21  divided by a volume.
22    Q.  What effect does the adjective "total"
23  have on that density?
24    A.  It's opposed as to just chooses small
25  pieces of -- for example, if you look at Qorvo's



DR. CLARK NGUYEN Vol. I
QORVO V. AKOUSTIS TECHNOLOGIES

August 10, 2022
81–84

Page 81

1    A. That's what it says, yes.
2    Q. In the context of this claim element, will
3 any wavelength excitation, no matter how small,
4 will result in energy leakage?
5    A. The way that -- let's see.
6       They have acoustically matched.  That
7 wavelength will leak.
8    Q. In your view, there is not a minimum
9 amount of energy that a wavelength has to have to
10 cause it to leak?
11    A. If you have a matched interface, it will
12 go through that interface.
13    Q. No matter how small the energy?
14    A. To be clear, this is different than the
15 dispersion analysis.  The dispersion analysis, you
16 make a reflective surface.
17       Here they are saying they are making a
18 matched surface, acoustically matched, which to me
19 is not reflective.
20       So that wavelength should get through.
21    Q. No matter how small that energy as part of
22 that wavelength is, it will pass through; is that
23 your opinion?
24    A. I'm thinking about that.
25       It depends on the degree of matching,

Page 82

1 right, and, second, order of facts and different
2 things.
3       But theoretically, it should get through.
4       Your question is vague, because are you
5 talking about how small an energy, I'm not sure
6 what the smallest of the energy is.
7    Q. That's what I'm kind of curious about.
8       What about in a practical application, not
9 -- let's leave the theoretical realm, but in a
10 practical application, would there ever be a
11 perfect acoustic match?
12    A. Like you said, mathematically,
13 scientifically, yes.
14       Engineering-wise, it would be very
15 difficult to do.
16    Q. In the real world practical environment,
17 there has to be some minimum amount of energy as
18 part of that wavelength to get it to pass through
19 the active and outer region; right?
20    A. I think no matter what the energy is, even
21 if this was not perfectly transmissive, there is
22 some reflection.
23       Even if it's a little bit of transmissive,
24 the energy will get out.
25       Some of that wavelength will reflect and

Page 83

1 some of it will get out.
2    If it's a little bit transmissive, the
3 wave will get out.
4       When you talk about small energy, I'm
5 trying to think of physical things, physics faculty
6 like to think about, and that's where the answer is
7 taking time for me.
8       If you have energy heading that direction,
9 even if you don't have it perfectly acoustically
10 matched, some of it is going to get out.
11       It has to be perfectly reflective for it
12 not to get out.
13    Q. Some of it, but not all of it?
14    A. Well, understand we're talking about an
15 acoustically matched, so the majority will get out
16 and very small would be reflective.
17    Q. Let's look at page 18 of your initial
18 declaration.
19       Looking again at Akoustis's preliminary
20 construction, there is a phrase:
21       "The whole volume of the active region..."
22       Do you see that?
23    A. Yes.
24    Q. What do you mean by "the whole volume of
25 the active region"?

Page 84

1    A. I mean the active region as we define it.
2    I guess it hasn't been defined yet, but as
3 we're trying to define it.
4    Q. Let's look at the '755 patent.  Let's go
5 back to Figure 2B that we were looking at before.
6       Let me know when you are there.
7    A. Okay, I'm there.
8    Q. Can you tell me what the whole volume of
9 the active region would be in Figure 2B?
10    A. It will be what the specification says it
11 is, which is going from the passivation layer to
12 the top electrode -- to the Bragg reflector -- it's
13 what is within those dotted lines.
14    Q. So your opinion is the whole volume of the
15 active region in Figure 2B would be the rectangle
16 formed by the two dashed lines, the SiO2 layer at
17 the bottom and the passivation layer at the top?
18    A. This is not my opinion.  This is what is
19 specified in the specification.
20    Q. Would a person of ordinary skill in the
21 art normally consider the reflector to be part of
22 the outer region?
23    A. I'm not sure that matters.  The
24 specification does.
25    Q. I'm just asking your opinion in general.

Page 85

1  Would a person of ordinary skill in the art
2  normally include a Bragg reflector in his
3  definition of active region?
4      A.  I think some would, yes.
5      Q.  Are you assuming some would not?
6      A.  You're asking me to speak for someone
7  else.  Did someone say something?
8      Q.  No.
9      A.  You're asking me to speak for someone
10  else.  I can't do that.
11        I'm a person skilled in the art and I
12  would include it, because it would be part of the
13  equivalent circuit of the resonator.
14      Q.  Let's go back to the Claim No. 9 of the
15  '755 patent.
16      A.  I'm getting there.  I'm there.
17      Q.  You would agree with me that the words of
18  the claim do not include the phrase "whole volume
19  of the active region"; right?
20      A.  Yes, it does not include that.
21        MR. CREMEN:  Let's take ten minutes, if
22  that's okay.
23        Then we'll get back to it and hopefully
24  wrap this thing up.
25        (Whereupon, the proceedings

Page 86

1        recessed at the hour of
2        12:42 P.M. until 12:53 P.M.)
3        (Deposition Exhibit 4,
4        '786 Patent, was marked for
5        identification by the Certified
6        Shorthand Reporter, a copy of which
7        is attached hereto.)
8  BY MR. CREMEN:
9      Q.  I want to switch gears and talk about the
10  '786 Patent, if you can grab that.
11      A.  One second.
12      Q.  You reviewed this patent in the course of
13  preparing your two declarations; correct?
14      A.  Yes.
15      Q.  Could you give me an overview of what this
16  patent is directed to?
17      A.  This patent is on packaging devices.
18      Q.  How so?
19      A.  Packaging device in a way that it's easy
20  to attach it to a board or bigger system, resurface
21  mounting or other similar packaging mounting
22  methods that -- and the usual things for packaging,
23  protect the device, et cetera.
24      Q.  Let's look at the first page of the '786
25  Patent.

Page 87

1      A.  I'm there.
2      Q.  The title reads "Communication Filter
3  Using Single Crystal Acoustic Resonator Devices";
4  do you agree?
5      A.  Yes.
6      Q.  You can look at the abstract.
7        The abstract begins "A communication
8  system using a single crystal resonator device"; is
9  that correct?
10      A.  Yes.
11      Q.  Do you know if there is any relationship
12  between a patent's title and abstract and the scope
13  of its claim?
14        MR. FUHRER:  Objection, calls for a legal
15  conclusion.  Vague.
16        THE WITNESS:  I don't know.
17        To me, it'll always be the claim that are
18  the most important part of the patent, at least in
19  my experience.
20  BY MR. CREMEN:
21      Q.  Do you have an opinion as to why the
22  inventors described their filtering system that is
23  using the single crystal?
24        MR. FUHRER:  Objection, calls for
25  speculation.

Page 88

1        THE WITNESS:  You're asking me to put
2  myself in someone else's mind and I can't do that.
3  I don't know.
4  BY MR. CREMEN:
5      Q.  In the embodiments of the '786 Patent,
6  such as described in Figures 1A through 3, would
7  you agree that the patent describes its
8  piezoelectric layer 120 as being single crystal?
9        MR. FUHRER:  Objection, compound question.
10        THE WITNESS:  I'll have to look at this to
11  answer that question.  This may take some time.
12  BY MR. CREMEN:
13      Q.  Sure.  I can direct you and maybe we can
14  speed up the process.
15        So in column 3, line 57, the patent
16  describes its piezoelectric layer 120 as being
17  single crystal; correct?
18      A.  It does say single crystal.
19        Like many patents earlier on, it says this
20  is an embodiment.  There can be other embodiments.
21      Q.  Then in column 4, line 53, it again
22  describes the piezoelectric layer 120 as being
23  single crystal; right?
24      A.  Yes.
25      Q.  Again on column 5, line 9, again, it again



DR. CLARK NGUYEN Vol. I
QORVO V. AKOUSTIS TECHNOLOGIES

August 10, 2022
101–104

Page 101

1  intrinsic record or is it necessary to also look to
2  the extrinsic record to understand how that term is
3  used in the art?
4       MR. FUHRER:  Objection, asked and
5  answered.  Cumulative.  Compound.
6       THE WITNESS:  I don't know how differently
7  to answer this.  I look at the intrinsic record.
8       I see whether it's using the plain and
9  ordinary meaning and if it's trying to redefine it.
10 If it's not, I use the plain and ordinary meaning.
11 BY MR. CREMEN:
12     Q.  In your analysis, how do you know that the
13 intrinsic record is using the term according to its
14 plain and ordinary meaning?
15     A.  I will look for statements where it says
16 it's redefining something or explicitly redefines.
17     Q.  Can the plain and ordinary meaning of a
18 term in a patent claim be defined solely by the
19 intrinsic record?
20     MR. FUHRER:  Objection, calls for a legal
21 conclusion.
22     THE WITNESS:  Can the plain and ordinary
23 meaning be defined by the intrinsic record?
24     It won't define the plain and ordinary
25 meaning.  It will just -- I think no.

Page 102

1  BY MR. CREMEN:
2       Q.  In your opinion, in order to understand
3  the plain and ordinary meaning of the term, you
4  would always have to look to the intrinsic; is that
5  right?
6       MR. FUHRER:  Objection, misleading,
7  mischaracterizing, vague.
8       THE WITNESS:  No.
9  BY MR. CREMEN:
10     Q.  Maybe I'm missing something, but the plain
11 and ordinary meaning has to come from somewhere.
12     Does it come from the intrinsic record or
13 the extrinsic record?
14     MR. FUHRER:  Objection.  Argumentative.
15 Mischaracterizing the law.
16     THE WITNESS:  It depends on the record.
17 The cases, what is in the intrinsic record.
18     I can't answer that question in
19 generalities.
20 BY MR. CREMEN:
21     Q.  So can it ever be the case that the plain
22 and ordinary meaning of a term is provided by the
23 intrinsic only?
24     MR. FUHRER:  Objection, calls for
25 speculation.  Vague.

Page 103

1       THE WITNESS:  I really need to have a
2  specific case to answer this question.
3  BY MR. CREMEN:
4       Q.  In the '755 patent, is it your opinion
5  that the intrinsic record alone does not provide
6  the plain and ordinary meaning of the term?
7       A.  No.  Intrinsic record did provide the
8  plain and ordinary meaning.
9       Q.  Which term?
10     A.  So all of them have been consistent with
11 the plain and ordinary meaning, so the active
12 region, for example.
13     I think the terms -- they are all the
14 plain and ordinary meaning.
15     Q.  But for each term, you have also relied on
16 extrinsic evidence; right?
17     A.  Yes.
18     Q.  In each of those cases, is it your opinion
19 that the intrinsic record was insufficient to
20 provide the plain and ordinary meaning?
21     A.  No.
22     Q.  Why did you rely on extrinsic evidence?
23     A.  In order to make it clear, because I'm a
24 professor.
25     I think it was already clear from the

Page 104

1  record.
2       But for example, if you look at active
3  region, what am I doing with the extrinsic
4  evidence; right?
5       I'm showing devices for which the
6  electrically driven area for which the active
7  region is more than the electrically driven area
8  which is consistent with the specification.
9       I'm enforcing that.
10     Q.  In that example, you introduced the
11 concept of motional current density?
12     A.  Yes.
13     Q.  Motional current density is not mentioned
14 at all in the '755 patent; right?
15     A.  Do they mention current anywhere?
16     It's something I want to look at.  If
17 current is mentioned, it is.
18     Q.  Is the term "motional current density"
19 ever used in the '755 patent?
20     A.  I don't think so.
21     Q.  Where did motional current density, that
22 phrase, come from?
23     A.  Motional current is a description of --
24 the word "motion" is the important thing here.
25 That's where the energy is.



DR. CLARK NGUYEN Vol. I
QORVO V. AKOUSTIS TECHNOLOGIES

August 10, 2022
105—108

Page 105

1    That came from the wider understanding
2  across the field that includes all resonators, not
3  even just BAW resonators, but electrostatic
4  resonators -- all resonators.
5    It's universal, understanding that the
6  current models the motion of the device and,
7  therefore, sets the equivalent circuit which then
8  sets the purpose of the device, which we talked
9  about before was passing frequencies, protecting
10  frequencies, setting up impedances.
11    MR. CREMEN:  Okay.  I think that's all I
12  have.
13
14        FURTHER EXAMINATION
15  BY MR. FUHRER:
16    Q.  One more question.
17    I think at least for my vantage point, to
18  clear the record, is it your testimony, Doctor,
19  that the intrinsic record of the '755 patent is
20  providing plain and ordinary definitions for the
21  disputed terms or that it's using those terms
22  consistent with your understanding of the plain and
23  ordinary meaning?
24    A.  It's using those terms consistent with my
25  understanding of the plain and ordinary meaning.

Page 106

1    MR. FUHRER:  No other questions.
2    MR. CREMEN:  None from me either.
3
4
5
6    (Whereupon, the deposition concluded at
7  1:22 P.M.)
8
9    (DECLARATION UNDER PENALTY OF PERJURY ON
10  THE PAGE FOLLOWING THE CERTIFICATION PAGE.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 107

1          CERTIFICATION
2              OF
3      CERTIFIED SHORTHAND REPORTER
4
5      I, the undersigned, a Certified Shorthand
6  Reporter of the State of California, do hereby
7  certify:
8      That the foregoing proceedings were taken
9  before me at the time and place herein set forth;
10  that any witness in the foregoing proceedings,
11  prior to testifying, were placed under oath; that a
12  verbatim record of the proceedings was made by me
13  using machine shorthand which was thereafter
14  transcribed under my direction; further, that the
15  foregoing is an accurate transcription thereof.
16      I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney of any of the parties.  Signed on
19  the 11th day of August, 2022.
20
21
22
23  _____
24
25
    DAVID OCANAS, CSR NO. 12567

Page 108

1        DEPOSITION ERRATA SHEET
2
3  Assignment No. 8529586
4  Case Caption:  QORVO v. AKOUSTIS
5
6      DECLARATION UNDER PENALTY OF PERJURY
7
8      I declare under penalty of perjury that I
9  read the entire transcript of my deposition taken
10  in the above-captioned matter or the same has been
11  read to me and the same is true and accurate, save
12  and except for changes and/or corrections, if any,
13  as indicated by me on the DEPOSITION ERRATA SHEET
14  hereof, with the understanding that I offer these
15  changes as if still under oath.  Signed on this day
16  _____of _____, 2022.
17
18
19  _____
20  DR. CLARK NGUYEN
21
22
23
24
25

