IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417 (JPM) |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | DEMAND FOR JURY TRIAL |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Trevor J. Quist
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
1540 El Camino Real
Menlo Park, CA 94025
(650) 815-2600

September 28, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiff Qorvo, Inc.*

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................... 1

II.     DISPUTED CLAIM TERMS ............................................................................ 1

        A.      The '755 Patent .................................................................................... 1

                1.      "Active Region" / "Outer Region" ......................................... 1

                2.      "A Density Of Mechanical Energy In The Outer Region Of The BAW
                        Resonator Is Reduced As Compared To A Density Of Mechanical Energy
                        In The Outer Region Of The BAW Resonator When N Is Equal To 1" .... 8

                3.      "Acoustically Matched In Such A Manner That One Or More
                        Wavelengths That Cause Energy Leakage Into The Outer Region Are Not
                        Excited In The Active Region" ............................................................. 14

        B.      The '786 Patent ................................................................................... 16

                1.      "Piezoelectric Layer" .............................................................. 17

III.    CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

Page(s)

Cases

*Allergan Sales, LLC v. Sandoz, Inc.*
    935 F.3d 1370 (Fed. Cir. 2019)...........................................................................15

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*
    725 F.2d 1350 (Fed. Cir. 1984)...........................................................................13

*Amgen Inc. v. Sanofi*
    872 F.3d 1367 (Fed. Cir. 2017)...........................................................................21

*Apple Inc. v. MPH Techs. Oy*
    28 F.4th 254 (Fed. Cir. 2022) ............................................................................11

*Barry Fiala, Inc. v. Card USA, Inc.*
    292 F. Supp. 2d 1009 (W.D. Tenn. 2003)...........................................................19

*Biosig Instruments, Inc. v. Nautilus, Inc.*
    783 F.3d 1374 (Fed. Cir. 2015)...........................................................................13

*Dow Chem. Co. v. NOVA Chems. Corp.*
    809 F.3d 1223 (Fed. Cir. 2015)...........................................................................13

*Eon Corp. v. Silver Spring Networks, Inc.*
    815 F.3d 1314 (Fed. Cir. 2016)...........................................................................11

*GL Trade Americas, Inc. v. Trading Techs. Int'l, Inc.*
    No. 11 C 1538, 2012 WL 205909 (N.D. Ill. Feb. 13, 2012).................................17

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*
    493 F.3d 1358 (Fed. Cir. 2007).............................................................................3

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*
    302 F.3d 1352 (Fed. Cir. 2002).............................................................................2

*Level Sleep LLC v. Sleep No. Corp.*
    2021 WL 2934816 (Fed. Cir. July 13, 2021)........................................................2

*Mass. Inst. of Tech. v. Abacus Software, Inc.*
    2004 WL 5268123 (E.D. Tex. Aug. 4, 2004) ......................................................17

*Nautilus, Inc. v. Biosig Instruments, Inc.*
    572 U.S. 898 (2014).............................................................................................12

*Netword, LLC v. Centraal Corp.*
    242 F.3d 1347 (Fed. Cir. 2001)...........................................................................22

*Neville v. Foundation Constructors, Inc.*
    972 F.3d 1350 (Fed. Cir. 2020)....................................................................15

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*
    298 F.3d 1290 (Fed. Cir. 2002)....................................................................21

*Pause Tech. LLC v. Tivo Inc.*
    419 F.3d 1326 (Fed. Cir. 2005)....................................................................18

*Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...........................................2, 20

*Profectus Tech. LLC v. Huawei Techs. Co.*
    823 F.3d 1375 (Fed. Cir. 2016).......................................................................3

*Renishaw PLC v. Marposs Societa' Per Azioni*
    158 F.3d 1243 (Fed. Cir. 1998).......................................................................2

*Sonix Tech. Co. v. Pub. Int'l, Ltd.*
    844 F.3d 1370 (Fed. Cir. 2017)....................................................................13

*Sumitomo Dainippon Pharma Co. v. Emcure Pharms. Ltd.*
    887 F.3d 1153 (Fed. Cir. 2018).......................................................................7

*Symantec Corp. v. Comput. Assoc. Int'l, Inc.*
    522 F.3d. 1279 (Fed. Cir. 2008)..............................................................24, 25

*Vitronics Corp. v. Conceptronic, Inc.*
    90 F.3d 1576 (Fed. Cir. 1996).........................................................................2

<u>Statutes</u>

35 U.S.C. § 282(a) .........................................................................................13

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| A1 | *Initial Claim Construction Declaration of John C. Bravman, Ph.D.* ("Bravman Initial Decl.") |
| A2 | *Rebuttal Claim Construction Declaration of John C. Bravman, Ph.D.* ("Bravman Rebuttal Decl.") |
| A3 | *RF Bulk Acoustic Wave Filters for Communications* (Ken-ya Hashimoto ed., 2009 ("Hashimoto") |
| A4 | *Initial Claim Construction Expert Report and Declaration by Dr. Clark Nguyen* ("Nguyen Initial Decl.") |
| A5 | *Rebuttal Claim Construction Expert Report and Declaration by Dr. Clark Nguyen* ("Nguyen Rebuttal Decl.") |
| A6 | Transcript for Deposition of Dr. John C. Bravman, August 12, 2022 ("Bravman Tr.") |
| A7 | Transcript for Deposition of Dr. Clark Nguyen, August 10, 2022 ("Nguyen Tr.") |
| A8 | U.S. Patent No. 7,795,781 |
| A9 | U.S. Patent No. 8,999,187 |
| A10 | U.S. Patent No. 9,197,185 |
| A11 | U.S. Patent No. 9,679,765 |
| A12 | Akoustis Ex. B03 (U.S. Patent Publication No. 2014/0159548) |
| A13 | Akoustis Ex. B05 (F. Shen et al., *Energy Trapping in Mesa-shaped Quartz Crystal Microbalance*, 2002 IEEE: Sensors (Nov. 2002)) |

| Exhibit No. | Description |
|---|---|
| A14 | Akoustis Ex. B08 (Li-Wen Hung & Clark T-C. Nguyen, *Capacitive-piezoelectric Transducers for High-Q Micromechanical AlN Resonators*, 24 J. of Microelectromechanical Sys. No. 2, (Apr. 2015)) |
| A15 | Akoustis Ex. B10 (Clark T-C. Nguyen et al., *A Negative-Capacitance Equivalent Circuit Model for Parallel-plate Capacitive-gap-transduced Micromechanical Resonators*, 61 IEEE Transactions On Ultrasonics, Ferroelectrics, and Frequency Control No. 5, (May 2014)) |
| A16 | Akoustis Ex. B15 (Mustafa U. Demirci & Clark T-C. Nguyen, *Higher-mode Free-free Beam Micromechanical Resonators*, Symposium, 2003 IEEE Int'l Frequency Control (May 5-8, 2003)) |
| A17 | Akoustis Ex. B16 (Clark T-C. Nguyen et al., *RF Channel-select Micromechanical Disk Filters—Part II: Demonstration*, 66 IEEE Transactions On Ultrasonics, Ferroelectrics, and Frequency Control No. 1 (Jan. 2019)) |
| A18 | U.S. Patent No. 9,735,755 (the "'755 Patent") |
| A19 | U.S. Patent No. 10,256,786 (the "'786 Patent") |
| A20 | U.S. Provisional Patent Application No. 62/360,904 (the "'904 Provisional") |

## I.      INTRODUCTION

The parties agree that the three claim terms in Qorvo's '755 Patent should be interpreted according to their "plain and ordinary meaning." But the parties' approaches for construing the disputed terms are drastically different. As demonstrated in its *Opening Claim Construction Brief*, Qorvo's proposed constructions are grounded in the ***intrinsic record***—the proper approach under applicable Federal Circuit precedent. Akoustis, in contrast, ignores the intrinsic record and formulates constructions based completely on ***extrinsic*** sources, such as cherry-picked publications unrelated to the patents. As to the one claim term in Akoustis' '786 Patent, Akoustis again ignores the intrinsic record to propose a construction. In all, Akoustis' approach violates the rules of claim construction and must be disregarded.

## II.     DISPUTED CLAIM TERMS

### A.      The '755 Patent

#### 1.      "Active Region" / "Outer Region"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning. If a construction is necessary, "active region" is the region of the BAW resonator that is electrically driven to provide the resonator functionality. | Active region: That region of the device where motional current density is generated through the piezoelectric layer. |
| Plain and Ordinary Meaning. If a construction is necessary, "outer region" is the region of the BAW resonator that is not electrically driven. | Outer region: defined as that region outside the active region. |

As discussed in Qorvo's *Opening Brief* and below, the '755 Patent describes and expressly defines the "active region" as "the region of the BAW resonator [] that is electrically driven" to provide the resonator functionality and the "outer region" as the "region of the BAW resonator [] that is not electrically driven." Qorvo's *Opening Brief*, 7-9; '755 Patent, 1:51-2:3, 6:15-25, FIGS, 2A, 2B.  This relationship between the "active" and "outer" regions is also

depicted in FIGS. 2A and 2B. *Id.* As dictated by Federal Circuit precedent, Qorvo bases its construction on those express definitions. *See, e.g.*, *Level Sleep LLC v. Sleep No. Corp.*, 2021 WL 2934816, at *4 (Fed. Cir. July 13, 2021) ("[W]here 'a patent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term[,]' the 'definition selected by the applicant controls.'" Quoting *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998)); *see also Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1360-61 (Fed. Cir. 2002) ("Where, as here, the patentee has clearly defined a claim term, that definition 'usually . . . is dispositive; it is the single best guide to the meaning of a disputed term.'" Quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). There is no reason, and Akoustis provides none, why the applicant's definition should not control here.

In contrast to Qorvo's intrinsic record-based constructions, Akoustis ignores the '755 Patent's express definitions and instead imports a construction for "active region" using the concept of "motional current density" derived from extrinsic sources unrelated to the '755 Patent. As explained in Qorvo's *Opening Brief* (10-11), there are several reasons Akoustis' construction cannot be correct.

*First*, Akoustis' approach of ignoring the intrinsic record's express definitions in favor of cherry-picked extrinsic language violates the most basic tenets of claim construction. While extrinsic evidence "can shed useful light, . . . it is less significant than the intrinsic [evidence]" to determine the "meaning of claim language." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*). And, in no case can extrinsic evidence be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324. Indeed, when a term is clearly defined by the intrinsic record, there is no need to look to extrinsic evidence. *Profectus*

*Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1381 (Fed. Cir. 2016).  Indeed, even if Akoustis had shown that its "motional current density" language was an art-accepted description of "active region" (it has not for at least the reasons immediately below), it has long been held that "when a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007).

<u>Second</u>, while Akoustis relies on a handful of cherry-picked extrinsic references, it fails to show that its "motional current density" definition for "active region" was commonly used in the art such that a POSITA would have even theoretically considered it to understand "active region" in the context of the '755 Patent. *See* Qorvo's *Opening Brief*, 11.

In fact, as explained in Qorvo's *Opening Brief*, "active region" is used in the '755 Patent in the same manner it is commonly used in other contemporaneous references. Qorvo's *Opening Brief*, 9 n. 5. For example, U.S. Patent No. 9,197,185 (Ex. A10) shows active area 108. Ex. A10, 5:4-6, 7:40-43, FIG. 1 (reproduced below). Similarly, U.S. Patent No. 9,679,765 (Ex. A11) identifies active region 809. Ex. A11, 23:4-18, FIG. 8 (reproduced below). Further, U.S. Patent No. 7,795,781 (Ex. A8) specifies the width of its upper electrode "defines the width of the active portion of BAW resonator 100." Ex. A8, 3:22-38, FIG 1A (reproduced below).



Ex. A10             Ex. A11             Ex. A8

Like the '755 Patent, these contemporaneous references define an active region by their electrically driven elements (*e.g.*, their stacks of electrodes and piezoelectric layers), and set forth the width of these regions in their drawings with vertical dashed lines or brackets. This demonstrates that the '755 Patent's express definitions of "active region" and "outer region" are commonly found in the related art. Akoustis has made no such similar showing. Indeed, Dr. Bravman was unable to find a ***single*** patent document describing a BAW resonator active region in the context of motional current. Bravman Rebuttal Decl., ¶18.

*Third*, Akoustis has not identified any ***reason*** a POSITA would have deviated from the express definitions in the intrinsic record and looked to Akoustis' cherry-picked extrinsic sources. While Akoustis' *Opening Brief* criticizes Qorvo's construction, it offers no affirmative support for its own position. In other words, Akoustis does not answer the basic question "why would a POSITA ignore the express definitions offered by the '755 Patent in favor of language from unrelated documents?"

Akoustis' arguments against Qorvo's construction are also wrong. Akoustis' primary argument is that Qorvo's construction would somehow exclude the '755 Patent's "main embodiment." Akoustis' *Opening Brief*, 12-14. This is nonsensical—Qorvo's constructions are based on the '755 Patent's express definitions that are ***specifically describing the features of the exemplary embodiment of the '755 Patent's invention described in FIG. 2B***.

More specifically, as best understood, Akoustis argues that Qorvo's construction of "active region" as "the region of the BAW resonator [] that is electrically driven" requires both a width (*e.g.*, the dashed vertical lines of FIGS. 2A and 2B), ***and a height***, as shown by the blue arrows and dashed lines in the annotated version of FIG. 2B here. Thus, Akoustis reasons, there is a disconnect in Qorvo's definition of "active region" and the '755 Patent's indication that the "portion of the reflector [74] beneath the bottom electrode [70]" is part of the "active region" ('755 Patent, 6:16-21) because the "portion of the reflector [74] beneath the bottom electrode [70]" is not "electrically driven." Akoustis' *Opening Brief*, 13-14.



*FIG. 2B*

But this argument ignores the fact that Qorvo's construction comes directly from the description of FIGS. 2A, 2B:

> Notably, as used herein, the active region 62 is the region of the reference BAW resonator 38 that is electrically driven which, in the example of FIG. 2A, is the region consisting of the bottom electrode 42, the top electrode 44, the portion of the piezoelectric layer 40 between the bottom and top electrodes 42 and 44, and the portion of the reflector 46 beneath the bottom electrode 42. The outer region 64 is the region of the reference BAW resonator 38 that is not electrically driven or, in other words, the region of the reference BAW resonator 38 that is outside of the active region 62.[1]

'755 Patent, 6:15-25. This passage, and the similar one at 1:51-2:3, specifies ***both*** that the "active region:" (i) is the region "that is electrically driven;" ***and*** (ii) includes, for example, the "portion of the reflector [74] beneath the bottom electrode [70]." *Id.*, 6:15-25.

---

[1] While this passage refers to element numbers in (reference) FIG. 2A, the '755 Patent indicates that the relevant elements are "exactly the same" in FIGS. 2A and 2B. '755 Patent, 6:35-41.

A POSITA (or any reader for that matter) would have understood that the "electrically driven" description of the active region is used to set the **width**, or lateral borders, of the "active region." Specifically, both experts agree the "electrically driven" portion of a BAW resonator is the directly overlapping, or stacked, portions of the electrodes and piezoelectric layer, shaded yellow in annotated FIG. 2B here. Bravman Tr., 64:13-18; *accord.* Nguyen Tr., 45:15-17. Consistent with this understanding, the width, or lateral borders, of the active region is specifically illustrated by vertical dashed lines that coincide with the lateral extent of this stack, as shown in FIG. 2B. This makes perfect sense in the context of the '755 Patent, which is focused on preventing lateral leakage of mechanical energy from an active region to an outer region. Bravman Tr., 66:2-73:22. It is self-evident that, to measure such lateral leakage, lateral borders between the active and outer regions must be defined.



FIG. 2B

A POSITA would have also understood that the above passage does not set the height, or vertical borders, of the "active region" based on the "electrically driven" description. Rather, the '755 Patent expressly indicates that other portions of the BAW resonator are considered **part** of the active/outer regions by nature of being located above or below the "electrically driven" region (*e.g.*, above or beneath the yellow-shaded components in annotated FIG. 2B here). For example, the portions of the passivation layer 88 and reflector 74 that fall within the lateral bounds of the active region defined by the electrode and piezoelectric stack (denoted by the dashed vertical lines) are in the active region 90, while the portions of the piezoelectric layer 68, reflector 74, and passivation layer 88 that are outside the lateral bounds of the electrode and piezoelectric stack are in the outer region 92. The lateral positioning of features is what defines

-6-

them as being inside or outside of the "active region," not their vertical positioning vis-à-vis the "electrically driven" elements. This is also fully consistent with how this terminology was used in the contemporaneous art discussed above, a fact Akoustis wholly ignores.

Accordingly, Akoustis' argument that the '755 Patent's own express definition of "active region" would somehow import a height limitation to "active region"—such that its exemplary embodiments would be excluded—is baseless.

Akoustis also argues in passing that applying Qorvo's construction "would leave the jury without a construction and guessing as to what it means." Akoustis' *Opening Brief*, 12-13. Qorvo disagrees. It is hard to envision a clearer definition for a jury to apply than that of "active region" here, particularly in conjunction with the guidance offered by the pictorial representations of exemplary "active regions" in the figures of the '755 Patent. Moreover, claim elements are construed as a POSITA (not a jury member) would have understood them. *See Sumitomo Dainippon Pharma Co. v. Emcure Pharms. Ltd.*, 887 F.3d 1153, 1157 (Fed. Cir. 2018).

Finally, Akoustis argues that "to provide the resonator functionality" in Qorvo's construction is ambiguous. Akoustis' *Opening Brief*, 12-13. But this language merely reflects the end effect of "electrically driving" discussed in the express definition of "active region" (*e.g.*, what the electrically driving ***does***). Here, it is quite clear from the intrinsic record that the active region of a BAW resonator is electrically driven to provide the filtering functionality to which the BAW resonator is directed. *See, e.g.*, '755 Patent, 1:51-54 ("[i]n operation, acoustic waves in the piezoelectric layer 12 within an active region 34 of the BAW resonator 10 are excited by an electrical signal applied to the bottom and top electrodes 14 and 16.")

In view of the above, to the extent a construction is necessary, a POSITA would have understood "active region" and "outer region" according to their express definitions in the intrinsic record, as reflected in Qorvo's constructions.

2.     **"A Density Of Mechanical Energy In The Outer Region Of The BAW Resonator Is Reduced As Compared To A Density Of Mechanical Energy In The Outer Region Of The BAW Resonator When N Is Equal To 1"**

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning. If a construction for "density of mechanical energy" is needed, it means the amount of mechanical energy from acoustic waves leaked from the active region, measured over a volume of the outer region. | The density of mechanical energy means a total density over the full volume of the outer region, or otherwise indefinite. |

The primary dispute between the Parties as to "density of mechanical energy" used in this element is whether the density must be measured over the entire volume of the outer region, or may be measured over lesser constituent volumes. As discussed in Qorvo's *Opening Brief* and below, the '755 Patent does not limit its density measurement to a "full volume" as Akoustis argues. Qorvo's *Opening Brief*, 11-16. Rather, a POSITA would have recognized—based on the intrinsic record— that volumes of the outer region *less than its entire volume* can be compared for different "n" values to analyze whether the density of mechanical energy has changed in the context of the '755 Patent. For several reasons, Akoustis' attempt to limit the plain meaning of this term by inserting "total density" and "full volume" requirements cannot be correct.

<u>First</u>, Akoustis' attempt to insert such limitations is not supported by the intrinsic record, which never states (or even implies) that the density of mechanical energy *must* be measured over a "full volume of the outer region." While Akoustis' construction encompasses *one possible method* of comparing energy leakage from the active region to the outer region in the n≠1 versus n=1 configurations, it is not the *only way* to do so. *See* Qorvo's *Opening Brief*, 15.

Specifically, as discussed in Qorvo's *Opening Brief* (5-6, 12-14), to reduce lateral leakage of mechanical energy from acoustic waves leaked from the active region, the '755 Patent indicates that the thickness of the material layer(s) in the outer region can be made n times the thickness ($T_{PA}$) of the passivation layer in the active region. '755 Patent, 2:30-51. To show the exemplary effects of this inventive configuration, the '755 Patent provides a



comparison between simulations of the density of mechanical energy in embodiments where n=1 (FIG. 3A) and n>1 (FIG. 3B), both reproduced here. '755 Patent at 6:26-63; *see also id.*, Abstract; 1:14-18, 2:52-56, 2:57-61, 5:5-23, 6:26-31, 7:1-33, 8:36-61.

As can be seen in the FIG. 3A, 3B comparison above and the annotated versions of this comparison below, the density in the outer region of FIG. 3B is less than the density in the outer region of FIG. 3A ***over many different volume comparisons*** represented by FIGS. 3A, 3B. To give just a few examples, this would include over the entirety of the outer regions depicted in FIGS. 3A and 3B, or over smaller regions thereof, such as the upper half (*see* green-shaded areas below), middle 33% (*see* blue-shaded areas), a grid (*see* yellow-shaded areas), or vertical slices (*see* purple-shaded areas). *See, e.g.*, Bravman Tr., 94:9-95:1 (the relevant volume can be a volume "that makes sense in the context of the patent" and "that speaks to the loss of mechanical energy laterally from the active region"), 96:2 ("one could and should describe many such regions" including a "multiplicity of vertical slices").



Moreover, as explained by Dr. Bravman during his deposition, it is important to note that

FIGS. 3A and 3B are themselves two-dimensional cross-sections of a BAW resonator. *See, e.g.*,

Bravman Tr., 99:12-100:5, 109:4-114:16. They do not illustrate densities of mechanical energy

throughout the entire three-dimensional volume of a BAW resonator's "outer region." *Id.* Thus,

in the context of the '755 Patent, a POSITA would have recognized that the inventors themselves

considered the "densities of mechanical energy" shown by these two-dimensional slices to be

sufficient representations of the densities in the outer region of the BAW resonator to compare

the effects of changing the value of "n." A POSITA reviewing the intrinsic record would come to

the same conclusion—a "density of mechanical energy" in the asserted claims can be measured

over volumes less than the entire volume of the outer region.[2]

---

[2] Of course, the volume necessary to measure may vary on a design-by-design basis (*e.g.*, the upper 50% may be enough for one implementation but not a second). In any event, however, it would have been well within a POSITA's capabilities to determine both where and how much of the outer region is necessary to analyze to perform the claimed measurements.

*Second*, Akoustis' construction does not actually define the term in question—"density of mechanical energy." It ignores "of mechanical energy" completely and uses "density" to define "density," which is disfavored by courts. *See* Qorvo's *Opening Brief*, 15-16.

*Third*, Akoustis has not identified any ***reason*** a POSITA would have deviated from the intrinsic record-based construction and inserted the "total density" and "full volume" requirements. Instead, Akoustis argues that "[w]hat matters generally to a designer, is the total energy lost to the surroundings, not just energy lost in one or more undefined smaller region(s), without knowing what happens in other undefined smaller region(s)" and that the only way to measure this "total energy lost" is to "measure density change over the entirety of the outer region." Akoustis' *Opening Brief*, 17-18. In other words, Akoustis seeks to reframe the scope of the claims to be directed to "total energy lost" and correspondingly argues that this concept requires its "total density" and "full volume" requirements to be inserted into the disputed term.

This reframing fails for several reasons. As an initial matter, it is based entirely on Akoustis' posit that "what matters generally to a designer is the total energy lost to the surroundings[.]" But Akoustis' untethered musings on what a designer might find useful in some undefined design cannot be imported into the claims of the '755 Patent. Claim terms are construed according to how a POSITA would have understood them ***in the context of the intrinsic record***. *Apple Inc. v. MPH Techs. Oy*, 28 F.4th 254, 259 (Fed. Cir. 2022); *Eon Corp. v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1321 (Fed. Cir. 2016) (emphasis added). "Energy lost" is not the focus of the invention of the '755 Patent. Bravman Rebuttal Decl., ¶51.

Moreover, the claim language in question is not reciting a measurement of "the total energy lost to the surroundings" as Akoustis argues. Rather, the claim element including the disputed term(s) is:

> n is within a range of values for which a ***density of mechanical energy*** in the outer region of the BAW resonator is reduced as compared to a ***density of mechanical energy*** in the outer region of the BAW resonator when n is equal to 1.

'755 Patent, 9:47-51. "Density of mechanical energy" in this element is quite clearly used as a ***comparative*** measure of densities between two configurations (n=1 vs. n>1). Bravman Rebuttal Decl., ¶49. Akoustis' expert agrees. Nguyen Tr., 53:4-7. The ***comparison*** between the two density values in the outer region is what matters, not how "total energy lost to the surroundings" is measured. *Id*. As long as the methodology of measuring "density of mechanical energy" is consistent between the two configurations (n=1 vs. n>1), that is all that matters in the context of the relevant claim language.

<u>Fourth</u>, Akoustis' indefiniteness argument—that the claim is indefinite unless a lower limit for the volume of the outer region over which the density of mechanical energy is to be measured and compared is defined—is wrong. Akoustis' *Opening Brief*, 18.

As an initial matter, claims can only be found "indefinite" if they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). That is not the case here. For at least the reasons above, a POSITA would have a reasonable understanding that many different volumes could be used for the claimed comparison. This reasonableness analysis reflects the "inherent limitations" of language and permits "some modicum of uncertainty," recognizing that patents are written for those skilled in the art, not lawyers or the public. *Id*. at 909-910. A claim does not have to provide numerical limits to each element or define every variable to be definite. *Sonix Tech. Co. v. Pub. Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) ("[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement"). Rather, a claim language "employing terms of degree has long been found

definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Biosig Instruments, Inc. v. Nautilus*, *Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015).

Moreover, Akoustis' argument that "density of mechanical energy" is "indefinite" is really an argument that the claims are invalid. Patents are presumed valid. 35 U.S.C. § 282(a). Thus, Akoustis' argument that this term is somehow indefinite without a grafted on "full volume" limitation must be proven by clear and convincing evidence. *Dow Chem. Co. v. NOVA Chems. Corp.*, 809 F.3d 1223, 1227 (Fed. Cir. 2015) ("Th[e] presumption of validity 'imposes the burden of proving invalidity on the attacker. That burden is constant and never changes and is to convince the court of invalidity by clear evidence.'" (quoting *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984)). Akoustis' halfhearted musings on the subject in its *Opening Brief* do not even approach meeting its burden in this regard. Akoustis nowhere explains ***why*** a POSITA would not have understood that volumes less than the entire volume may be utilized for the "density of mechanical energy" comparison recited in the claims. Nor has its expert, Dr. Nguyen, offered such an opinion throughout the claim construction process.

Indeed, the only factual basis offered by Akoustis is its argument that Qorvo's expert, Dr. Bravman, agreed that "the only volume that can be unambiguously specified is . . . the whole volume." Akoustis' *Opening Brief*, 18. But ***Dr. Bravman actually said the very opposite***. Akoustis strategically omitted the portion of Dr. Bravman's testimony making it clear that he believed Akoustis' "whole volume" position inappropriately restricts the claims:

> Now, one can argue about, well, therefore this should or should not include a specific volume, but the only volume that can be unambiguously specified is what was chosen, that is, the whole volume. And I just said that restricts the analyses in ways that I don't think are required or appropriate.

Bravman Tr., 97:7-13. As can be seen in the full quote above, Dr. Bravman was characterizing Akoustis' and Dr. Nguyen's argument that only the "whole volume" can be "unambiguously specified" as inappropriate, not agreeing that it was the only unambiguously-identifiable volume.

Accordingly, a POSITA would have understood "density of mechanical energy" as proposed by Qorvo, consistently with its clear usage in the intrinsic record.

### 3. "Acoustically Matched In Such A Manner That One Or More Wavelengths That Cause Energy Leakage Into The Outer Region Are Not Excited In The Active Region"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning. If a construction for "are not excited" is needed, it means "are not substantively created." | "[A]re not excited" means that the wavelengths do not exist in the whole volume of the active region, or otherwise indefinite. |

The primary dispute between the parties is whether the term "are not excited" should be saddled with Akoustis' proposed definition—**which Akoustis admits a POSITA would find scientifically unrealistic**—or whether this term means "are not substantively created" as proposed by Qorvo. Qorvo's construction comports with the intrinsic record and a normal reading of the specification, and is scientifically realistic unlike Akoustis'. Akoustis' attempt to limit the plain meaning of this term cannot be correct for several reasons.

_First_, the intrinsic record does not support or even reference the underline absolute restriction sought by Akoustis. _See_ Qorvo's _Opening Brief_, 18.

_Second_, as Dr. Nguyen recognizes, the proposition underlying Akoustis' construction is not scientifically realistic. A definition that would result in a scientifically unrealistic construction cannot be applied without specific intrinsic support. _Neville v. Foundation Constructors, Inc._, 972 F.3d 1350, 1357 (Fed. Cir. 2020); Qorvo's _Opening Brief_, 18-19.

_Third_, Akoustis has not identified any **reason** a POSITA would have deviated from the intrinsic record-based construction to limit "are not excited" as it proposes. Indeed, Qorvo offers

-14-

no affirmative arguments supporting its construction—it only attacks Qorvo's construction. *See* Qorvo's *Opening Brief*, 19-20.

For example, Akoustis argues: "[t]he central issue with Qorvo's position is that it is a complete rewrite of the claim language and puts the POSITA in the quandary of deciding how much is enough." Akoustis' *Opening Brief*, 20. Both criticisms are baseless.

Qorvo's construction does not "rewrite the claim language." Rather, it is based on the intrinsic record. As discussed in Qorvo's *Opening Brief* (16-18), the claim element in which "are not excited" appears ("acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region") provides guidance as to its meaning. *See Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("claim construction must begin with the words of the claims themselves"). This element is not reciting non-excitation in the abstract, it is reciting that the wavelengths that cause energy leakage into the outer region are not excited.  This understanding is repeatedly confirmed by the '755 Patent's specification. '755 Patent, Abstract, 1:14-18, 1:51-2:61, 5:5-23, 6:26-63, 7:1-33, 8:36-61. Accordingly, the relevant excitation[3] is that which results in wavelengths causing energy leakage, and the phrase "are not excited" means that the particular wavelengths that cause the lateral leakage are not excited *enough* (*e.g.*, substantively excited) to result in energy leakage from the active region to the outer region as a result of the claimed construction. Bravman Initial Decl., ¶51. In other words, excitations of one or more wavelengths that do not

---

[3] As a linguistic matter, "excited" exists on a continuum from, *e.g.*, "a bit excited" to "really excited." "Excited" is not a proxy for a binary on/off or yes/no requirement as Akoustis argues.

cause leakage (*e.g.*, minor or transient excitations) may occur. *Id.*[4] Moreover, **it is Akoustis**, not Qorvo, that is doing the litigation-inspired "rewrite" of the claim language by seeking to graft on the scientifically unrealistic concept that "wavelengths do not exist in the whole volume of the active region."

As for Akoustis' argument that Qorvo's construction is indefinite and would put a POSITA "in the quandary of deciding how much is enough," that is also not true.[5] Replacing the disputed term with Qorvo's proposed construction would result in the following language: "acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region ~~are not excited~~ <u>are not substantively created</u> in the active region." This is a straight-forward, accepted determination—if the wavelengths are not excited enough that they ultimately leak they are not substantively created. This is not a difficult concept or analysis.

For at least the reasons above, Qorvo's construction reflects how a POSITA would have understood "are not excited."

**B.    The '786 Patent**

The '786 Patent is not alleged to be infringed. Rather, it is the subject of a false patent marking claim. In view of this distinction, Akoustis suggests the Court may ignore the level of "exactness" that normally characterizes the claim construction process. *See* Akoustis' *Opening Brief*, 21. Akoustis pretends that as long as the patentee's (Akoustis') construction is "sufficiently plausible," it can be adopted for false patent marking purposes. *Id.* (citing *GL Trade*

---

[4] Indeed, Dr. Nguyen conceded that, "engineering-wise," not every "excited" wavelength would leak due to the reflective border between the active and outer regions, even where they are "acoustically matched." Nguyen Tr., 80:22-83:16.

[5] Akoustis' indefiniteness argument is legally and factually deficient for the same reasons discussed above regarding "density of mechanical energy." Akoustis and its expert offer no affirmative argument **why** a POSITA would not have reasonably understood "are not excited."

*Americas, Inc. v. Trading Techs. Int'l, Inc.,* No. 11 C 1538, 2012 WL 205909, at *6 (N.D. Ill. Feb. 13, 2012)). Akoustis is wrong, and a looser claim construction standard is not what the single unpublished opinion it cites stands for.

Instead, *GL Trade Americas* stands for the proposition that the ***comparison*** of a construed claim to a product for patent marking purposes can be evaluated with less exactness than a corollary infringement analysis. 2012 WL 205909, at *6. Nothing in *GL Trade Americas* suggests any different underlying claim construction analysis, or lowering the level of "exactness" required in claim construction.

Akoustis' preliminary argument, therefore, is a red-herring. Claim construction should be carried out for the '786 Patent just as it is for the '755 Patent. Thereafter, when it comes time to determine whether Akoustis acted in "bad faith," it may argue its marking decisions were "sufficiently plausible" to "negate any possibility of a finding of bad faith." *See Mass. Inst. of Tech. v. Abacus Software, Inc.*, No. 01cv344, 2004 WL 5268123, at *20 (E.D. Tex. Aug. 4, 2004). But again, this is not the focus at this juncture.

### 1.    "Piezoelectric Layer"

| Qorvo's Proposed Construction | Akoustis' Proposed Construction |
|---|---|
| A layer of piezoelectric material having single crystal structure. | A layer of piezoelectric material having single or multiple crystal structure. |

As detailed in Qorvo's *Opening Brief* (21-25), the well-established rules of claim construction make Qorvo's proposed construction the only correct interpretation.  The arguments in Akoustis' Opening Brief (addressed below) do not show the contrary.

<u>First</u>, Akoustis' self-proclaimed "[m]ost important" argument in attacking Qorvo's construction is that "claim 1 does not include the term 'single-crystal' to describe the piezoelectric layer material." Akoustis' *Opening Brief*, 22. This "most important argument"

misses the mark for several reasons. The *point* of claim construction is to define disputed terms to clarify meaning, which absolutely may include the use of language not already in the claims. Courts regularly perform the claim construction exercise, and in doing so regularly use language not already found verbatim in the claims. *See, e.g., Pause Tech. LLC v. Tivo Inc.*, 419 F.3d 1326, 1333 (Fed. Cir. 2005). Tellingly, Akoustis' novel claim construction rule would preclude its own construction (which includes the terms "single crystal" and "multiple crystal," neither of which appear in the issued claims).

*Second*, Akoustis argues that the lack of a "single crystal" modifier for "piezoelectric layer" in claim 1 was intentional, citing the recitation in dependent claim 2 that a different element—"the seed layer"—may be made of "***single crystal*** aluminum gallium nitride materials." '786 Patent, 14:62-64 (emphasis added); Akoustis' *Opening Brief*, 22. Armed with nothing more, Akoustis concludes that "the inventors knew when to use the single crystal modifier if/when they intended to further limit a limitation (like the seed substrate) consistent with the embodiments described in the specification." Akoustis' *Opening Brief*, 22.

Akoustis is wrong. The use (or lack of use) of "single crystal" to describe a ***different*** claimed layer does not shed light on the dispute here—whether the "piezoelectric layer" as used in the '786 Patent would have been understood by a POSITA to be "single crystal." Moreover, the intrinsic record does not support the conclusion that the patentees were especially careful or calculating in their usage of the "single crystal" qualifier. For example, in describing Figure 1A, the inventors refer to the exact same "single crystal piezoelectric layer" both by its full name ("single crystal piezoelectric layer") and in a shorthand style ("piezoelectric layer") that is clear in the context of '786 Patent. *See* '786 Patent, 3:53-64 (reproduced below with emphasis added).

FIG. 1A is a simplified diagram illustrating an acoustic resonator device 101 having topside interconnections according to an example of the present invention. As

shown, device 101 includes a thinned seed substrate 112 with an overlying **single crystal piezoelectric layer 120**, which has a micro-via 129. The micro-via 129 can include a topside micro-trench 121, a topside metal plug 146, a backside trench 114, and a backside metal plug 147. Although device 101 is depicted with a single micro-via 129, device 101 may have multiple micro-vias. A topside metal electrode 130 is formed overlying the **piezoelectric layer 120**. A top cap structure is bonded to the **piezoelectric layer 120** . . . .

There is no question the inventors knew how to use the full phrase "single crystal piezoelectric layer" as Akoustis suggests—Qorvo does not dispute that. But there is also no question that when the inventors refer to "piezoelectric layer" alone, without the qualifier, they know that a POSITA will understand it is just the '786 Patent's shorthand for the "single crystal piezoelectric layer" that is the sole focus of the '786 Patent. *See* '786 Patent, 3:53-64 (reproduced above).[6] This is where the logic of Akoustis' argument runs out. Further confounding Akoustis' rationale, patentees also use the phrase "piezoelectric single crystal layer" (different word order) from time-to-time in the specification. '786 Patent, 5:37-39, 6:50. But again, just like when they use the phrase "piezoelectric layer" on its own, the patentees very apparently expect that a POSITA reading the '786 Patent will understand that they are referring to the same thing. *See* Bravman Initial Decl., ¶60. Akoustis' suggestion to the contrary requires viewing the claim **despite** the specification instead of **in light** of the specification.

Akoustis' plea for the court to view this claim with blinders on should be wholly rejected. As explained in the Qorvo's *Opening Brief*, from the Title to the Abstract and throughout the entire specification, the '786 Patent describes and refers only to a single crystal piezoelectric

---

[6] Making this even clearer, every single one of the thirty-nine (39) drawings of acoustic resonator devices in the '786 Patent include the same "single crystal piezoelectric layer 120," sometimes referring to it in full, and sometimes referring to it in shorthand, but always referring to the same thing. *See* FIGS. 1A-15E; *see also Barry Fiala, Inc. v. Card USA, Inc.*, 292 F. Supp. 2d 1009, 1016 (W.D. Tenn. 2003) (adopting narrowing construction, noting that "[t]he fact that every embodiment incorporates [the narrowing feature] cannot be dismissed as a mere coincidence").

layer. It is well established that the specification "is the single best guide to the meaning of a disputed term" and "[u]sually, it is dispositive." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). A POSITA would never read the specification and be of belief that the subject matter includes the use of multiple crystal piezoelectric layers. Qorvo's *Opening Brief*, 23 (citing Bravman Initial Decl., ¶¶63-74). Indeed, the '786 Patent never, not once, describes or refers to the piezoelectric layer as being "multiple crystal" or "polycrystalline" or any synonym of those terms. Thus, to adopt Akoustis' construction would be to ignore the teachings of the Title, Abstract and Specification. Qorvo's construction remains the only correct construction and should be adopted.

*Third*, Akoustis asserts that the '786 Patent's prosecution history lacks any express disclaimer of polycrystalline materials, suggesting that "polycrystalline" piezoelectric layers must therefore be within scope of the claims. *See* Akoustis' *Opening Brief*, 23. While technically true that the patentee did not respond to an Office Action with an express statement that polycrystalline materials were to be excluded, this is only because the '786 Patent was not rejected during prosecution. Thus, the inference Akoustis attempts to draw from the lack of Office Action history is meaningless. Much more meaningful is the priority claim in the specification (detailed further below), which does make it clear that polycrystalline materials were to be excluded.

*Fourth*, Akoustis asserts that the specification does not disclaim polycrystalline materials. *See* Akoustis' *Opening Brief*, 23. Not so. Akoustis turns a blind eye to the leading statement in the '786 Patent, made on the date the underlying application was filed, declaring that "[t]he present application claims priority to U.S. Patent Application No. 62/360,904 [(the "'904 Provisional")]." '786 Patent, 1:8-10. In view of: (i) the well-known condition that in order to

-20-

claim priority, a parent application needs to support and enable the full scope of the claim-at-issue; and (ii) the fact that the '904 Provisional undisputedly discloses only single crystal piezoelectric materials, the patentees' declaration makes it abundantly clear that the single crystal embodiment from the '904 Provisional is what the patentees intended to be the full scope of claims. *See New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1296 (Fed. Cir. 2002) (recognizing that "what is claimed by the patent application must be the same as what is disclosed . . ."); *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1375 (Fed. Cir. 2017) (recognizing that to obtain priority, the priority document "must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation"); *see also, e.g.*, '904 Provisional at 10 ("[t]he solution utiliz[ing] Akoustis BAW resonator technology built from the highest quality, single crystal piezoelectric materials, enabling high bandwidth-low loss filters in a miniature form factor."). Significantly, the "piezoelectric layer" limitation in the as-filed claims of the '786 Patent is verbatim identical to that of the issued claims of the '786 Patent, so the patentees' declaration of priority at filing can be understood to carry through to the issued claims.

Fifth, Akoustis asserts there is no basis for a contention that the inventors acted as their own lexicographer. Qorvo has not argued that the inventors acted as their own lexicographer. Qorvo's construction remains the only correct construction.

Sixth, Akoustis asserts that "the preferred use of single-crystal was not a part of the 'inventive aspect' of the '786 Patent," suggesting that it should not drive the construction. *See*

Akoustis' *Opening Brief*, 23-24. For support, Akoustis points to three identical sentences[7] used in the '786 Patent and argues that "[t]hroughout the specification the inventors make clear that *merely by way of example* the invention is described as using a single crystal resonator device." *Id* (emphasis in original). But simply using the word "example" does not magically endow a patent disclosure with virtually limitless potential coverage, particularly where all the "examples" are characterized by the inventive concept that Akoustis now wishes to avoid. *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("[N]either do the claims enlarge what is patented beyond what the inventor has described as the invention.").

And while Akoustis would like the Court to believe that "merely by way of example" was the inventors' way of saying that the claims could cover "polycrystalline" embodiments too, the specification suggests otherwise. Specifically, the sentences cited by Akoustis attach "example" to the types of devices that the filters could be applied to (*e.g.*, "communication device, mobile device, computing device, among others"). They do not indicate that the type of piezoelectric layer described is exemplary. And even if they did imply different piezoelectric layers could be used, other sections of the specification make it clear that all such "examples" have a common requirement—they are "single crystal." For instance, in explaining alternative examples of what the piezoelectric layer can include, the patentees expressly state that "[t]he piezoelectric layer 120 can include [1] a piezoelectric *single crystal* layer or [2] a thin film piezoelectric *single crystal* layer." '786 Patent, 5:37-39 (emphasized). These two options are both "single crystal;" neither suggests even remotely that "polycrystalline" embodiments could

---

[7] "Merely by way of example, the invention has been applied to a single crystal resonator device for a communication device, mobile device, computing device, among others." '786 Patent, 1:40-50, 3:45-52, 14:24-31, 14:62-64.

-22-

or should be used. Indeed, the words "multiple crystal" and "polycrystalline" do not even appear in the '786 Patent. If, as Akoustis contends, the piezoelectric could have any kind of crystalline structure (single crystal or multiple crystal), one would find in the '786 Patent at least one reference to multi-crystal piezoelectric layers, and not focus entirely and exclusively on "single crystal" piezoelectric layers.

Akoustis tries to skirt around the above by pointing to the '786 Patent's reference to "using conventional materials," which Akoustis argues could include polycrystalline materials. *See* Akoustis' *Opening Brief*, 24 (citing '786 Patent, 2:10-14). But this language does not change the analysis. First of all, the phrase "conventional materials" in that sentence is not made with reference to any particular element, piezoelectric layer or otherwise, so the inference Akoustis makes is erroneous. Secondarily, single crystal materials *are* "conventional materials." Qorvo does not suggest that Akoustis invented single crystal materials in general. Rather, Qorvo submits that the '786 Patent leverages those conventional, single-crystal materials in a specific manner to achieve the alleged invention recited in the claims. There is nothing broadening about the '786 Patent referring to a conventional material (single crystal material) as a conventional material. As such, Akoustis' suggestion is incorrect.

Also worried that the title of the '786 Patent—which comes right out and says the invention is about "single crystal" devices—undermines its theory, Akoustis briefly notes that "the title . . . should only reinforce a limited construction if further supported by written description." Akoustis' *Opening Brief*, 23-24. But this proposition only further favors Qorvo's construction. The '786 Patent's title does reinforce the "single crystal" nature of the "piezoelectric layer" because it finds abundant support in the written description (being part of every single embodiment disclosed, and referenced over 20 times in the specification). The

-23-

contrary position advanced by Akoustis (that the "piezoelectric layer" can be "polycrystalline"/ "multiple crystal") finds no support (never appearing even once in any part of the specification or the underlying provisional).

Akoustis also lobs in the argument that it (and its expert, Dr. Nguyen) believes that the real invention of the '786 Patent is in the "techniques" (*i.e.*, methods) related to bulk acoustic wave resonator devices, not in the "single crystal" piezoelectric layers within the recited structure. *See* Akoustis' *Opening Brief*, 23-24. But none of the claims in the '786 Patent are "method" or "process" claims, they are all apparatus claims. *See* '786 Patent, Claims 1 ("[a] communication filter device comprising…"), 8 (same), 12 (same), 16 (same). And indeed, Akoustis' very own marking of actual products (method claims not subject to the marking statute) confirms that the '786 Patent is not about the "techniques" it now clings to. No, the claims of the '786 Patent are not about methods, they are about single crystal resonator devices. Akoustis' inconsistency highlights why this argument fails. Moreover, Akoustis' citation to *Symantec Corp. v. Comput. Assoc. Int'l, Inc.* for the general proposition that claim terms should get their ordinary meaning where the specification does not give them special meaning is inapposite. Akoustis' *Opening Brief*, 24-25 (citing *Symantec*, 522 F.3d. 1279, 1290 (Fed. Cir. 2008)). Unlike the patent specification at issue in *Symantec Corp.*—for all of the reasons stated above (as well as in Qorvo's *Opening Brief*)—the specification here does make it clear that "piezoelectric layer" is shorthand for, and corresponds exclusively to, "single crystal piezoelectric layers."

For all of these reasons, Akoustis' theories should be rejected and Qorvo's proposed construction should be adopted as it remains the only correct construction.

III.    **CONCLUSION**

In view of above, Qorvo requests that, to the extent any constructions for the identified terms are necessary, the Court adopt each of Qorvo's proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Trevor J. Quist
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1540 El Camino Real
Menlo Park, CA 94025
(650) 815-2600

September 28, 2022

*Attorneys for Plaintiff Qorvo, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 28, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on September 28, 2022, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                    *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

David A. Jakopin, Esquire                    *VIA ELECTRONIC MAIL*
Dianne L. Sweeney, Esquire
PILLSBURY WINTHROP SHAW PITTMAN LLP
2550 Hanover Street
Palo Alto, CA  94304-1115
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Robert M. Fuhrer, Esquire                    *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Boulevard, 14th Floor
McLean, VA  22102-4856
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

David L. Stanton, Esquire                    *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, 36th Floor
Los Angeles, CA  90017-5524
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Theresa A. Roozen, Esquire                                    *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC  20036-3006
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

*/s/ Jeremy A. Tigan*

_____

Jeremy A. Tigan (#5239)