commencing before January 1, 2018, the statute exempted qualifying performance-based compensation from the deduction limit if certain requirements were met. While the Committee has historically attempted to maximize the tax deductibility of executive compensation, the Committee has always maintained the flexibility to award compensation that may not be tax-deductible.

Section 162(m) was amended in December 2017 by the Tax Act to eliminate the exemption for performance-based compensation and to expand the group of current and former executive officers who may be covered by the deduction limit, subject to a transition rule for compensation payable pursuant to a written binding contract that was in effect on November 2, 2017, that is not materially modified after that date, and which compensation otherwise would have been deductible under Section 162(m) prior to the amendments made by the Tax Act. The changes made by the Tax Act apply to tax years commencing after December 31, 2017.

As a result of the changes made by the Tax Act, short-term and long-term equity-based incentive awards granted or other compensation provided under arrangements entered into on or after April 1, 2018 (Qorvo's first tax year commencing after December 31, 2017) will not be tax deductible to the extent they result in compensation to certain executive officers that exceeds $1 million in any one year for any such officer. When designing the compensation structure for our executives, the Committee believes that it needs to consider all relevant factors that attract, retain and reward talent. Therefore, the Committee will continue to maintain the flexibility to award compensation that may not be tax deductible.

*Employment Agreement and Offer Letter Agreement*

In connection with the Business Combination, Qorvo assumed the employment agreement previously entered into between RFMD and our CEO, Mr. Bruggeworth, as required by the terms of that agreement. The Committee believes the employment agreement helps ensure that Mr. Bruggeworth will devote a significant portion of his time on long-term strategic initiatives that are in our best interests, including those that may not be in his personal best interests. Mr. Klein is also a party to an employment offer letter agreement with TriQuint pursuant to which he will receive benefits in the event of the termination of his employment by the Company without cause or by Mr. Klein for good reason other than in connection with a change in control of the Company. Qorvo assumed this offer letter agreement in connection with the Business Combination. The terms of Mr. Bruggeworth's agreement and Mr. Klein's offer letter agreement are described in more detail below in the section entitled "Potential Payments upon Termination or Change-in-Control."

## Change in Control Agreements

We have entered into change-in-control agreements with each of our Named Executive Officers and certain other members of our executive management team. We entered into these arrangements to acknowledge the respective employee's importance to us and our stockholders and to attempt to avoid the distraction and loss of key management personnel that may occur in connection with rumored or actual fundamental corporate organizational changes. The terms of these change-in-control arrangements are described in more detail below in the section entitled "Potential Payments Upon Termination or Change in Control."

## Conclusion

We believe our executive compensation program provides a balanced and stable foundation for rewarding our Named Executive Officers for achieving Qorvo's corporate objectives. Based on our financial performance in fiscal 2019, the Named Executive Officers received short-term incentive awards at 147.7% of their fiscal 2019 target percentage of base salary paid in the first six months of fiscal 2019 and 16.4% of their fiscal 2019 target percentage of base salary paid in the second six months of fiscal 2019. These awards reflect operating performance by the Company above the threshold performance level required for an award, with the first six-month period of fiscal 2019 demonstrating strong performance that exceeded the target levels reflected in our Board-approved annual operating plan, and the second six-month period reflecting performance below the target levels reflected in our Board-approved updated annual operating plan. The Committee believes the award levels match the Company's performance against its plan in fiscal 2019. In addition, as a result of the achievement of seven of the ten objectives in full and partial achievement of two of the three remaining objectives, our executive officers, including the Named Executive Officers, earned their objectives-based RSUs at 115% of target. The Committee believes that accomplishment of these objectives will position the Company for improved operating performance in fiscal 2020 and beyond. Finally, based on the performance of our stock price in fiscal 2019 in comparison to a benchmark index, no 2017 TSR Performance RSUs were earned in the third and final year of our TSR program.

Our executive compensation philosophy emphasizes team effort, which we believe fosters rapid adjustment and adaptation to fast-changing market conditions. We believe that our combination of short-term incentive awards and long-term service-based and performance-based RSUs helps us achieve our long-term goals and will continue to align the interests of our executive officers, including the Named Executive Officers, with those of Qorvo and our stockholders during fiscal 2020 and beyond.

QORVO   *2019 Proxy Statement*   33

Table of Contents

Executive Compensation

## Compensation Committee Report

The Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis that accompanies this report with our management. Based on such review and discussions, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in our Annual Report on Form 10-K for the year ended March 30, 2019 by incorporation by reference to this proxy statement.

Except for the Annual Report on Form 10-K described above, this Compensation Committee Report is not incorporated by reference into any of our previous or future filings with the SEC, unless any such filing explicitly incorporates this Report.

The Compensation Committee

Walden C. Rhines (Chair)
David H. Y. Ho
Susan L. Spradley
Walter H. Wilkinson, Jr.

## Summary Compensation Table

The following table summarizes the compensation of the Named Executive Officers for the fiscal years ended March 30, 2019, March 31, 2018 and April 1, 2017. We use a 52- or 53-week fiscal year ending on the Saturday closest to March 31 of each year.

| Name & Principal Position | Year | Salary ($) | Stock Awards ($) (1) | Non-Equity Incentive Plan Compensation ($) (2) | All Other Compensation ($) (3) | Total Compensation ($) |
|---|---|---|---|---|---|---|
| Robert A. Bruggeworth, | 2019 | 826,412 | 6,015,423 | 1,133,084 | 9,820 | 7,984,739 |
| President and Chief | 2018 | 802,936 | 5,399,959 | 729,663 | 9,219 | 6,941,777 |
| Executive Officer | 2017 | 794,398 | 4,854,843 | 940,604 | 9,340 | 6,599,185 |
| Mark J. Murphy, | 2019 | 503,364 | 1,654,237 | 414,075 | 9,465 | 2,581,141 |
| Chief Financial Officer (4) | 2018 | 488,002 | 1,599,950 | 263,751 | 9,201 | 2,360,904 |
| | 2017 | 367,784 | 4,324,853 | 194,903 | 18,884 | 4,906,424 |
| Steven E. Creviston, | 2019 | 493,364 | 2,005,197 | 405,912 | 9,741 | 2,914,214 |
| Corporate Vice President | 2018 | 479,169 | 2,000,022 | 259,923 | 9,526 | 2,748,640 |
| and President of Mobile Products | 2017 | 469,601 | 1,985,711 | 333,618 | 9,386 | 2,798,316 |
| James L. Klein, | 2019 | 447,305 | 1,503,875 | 366,459 | 8,417 | 2,326,056 |
| Corporate Vice President and President of | 2018 | 426,387 | 1,400,050 | 230,703 | 8,029 | 2,065,169 |
| Infrastructure & Defense Products | 2017 | 415,912 | 1,544,793 | 295,475 | 8,026 | 2,264,206 |
| Paul J. Fego | 2019 | 282,404 | 2,328,286 | 66,358 | 8,387 | 2,685,435 |
| Corporate Vice President, Global Operations (5) | | | | | | |

(1)  Represents the aggregate grant date fair value of performance-based and service-based restricted stock units granted during the fiscal years shown calculated in accordance with Financial Accounting Standards Board, or FASB, Accounting Standards Codification Topic 718, Compensation-Stock Compensation, or ASC Topic 718, rather than an amount paid to or realized by the Named Executive Officer, disregarding the estimate of forfeitures related to performance-based and service-based, as applicable, vesting conditions. The aggregate grant date fair value is the amount we expect to expense in our financial statements over the award's vesting schedule. See "*Stock-Based Compensation*" in Note 14 of the Notes to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the year ended March 30, 2019 (the "10-K") for the assumptions used to calculate grant date fair value. The actual amounts, if any, ultimately realized may differ from the ASC Topic 718 grant date fair value amounts. See the "2019 Grants of Plan-Based Awards Table" on page 36 for information on grants awarded in fiscal year 2019.

(2)  Represents amounts paid under our Short-Term Incentive Plan. For the second half of fiscal year 2019, the short-term incentive awards were settled in the form of RSUs with a value on the grant date equal to the dollar value of the short-term incentive earned. The RSUs vest six months from the grant date, subject to the Named Executive Officer's continued employment. The grant date was the date that the second half of fiscal year 2019 incentive awards were approved by the Compensation Committee. See "Compensation Discussion and Analysis – Elements of Compensation – Short-Term Incentive Opportunities" for information on the Short-Term Incentive Plan.

(3)  Represents company matching contributions to the accounts of the Named Executive Officers under our 401(k) plan, and for Mr. Murphy, a payment of $6,735 for relocation expenses in fiscal year 2017.

(4)  Mr. Murphy was appointed as Chief Financial Officer effective June 6, 2016.

(5)  Mr. Fego was appointed as Corporate Vice President, Global Operations effective July 30, 2018.



Executive Compensation

## 2019 Grants of Plan-Based Awards Table

The following table provides information on restricted stock unit awards and plan-based short-term incentive awards granted to or earned by each of our Named Executive Officers with respect to fiscal year 2019. The actual amounts, if any, ultimately realized may differ from the amounts set forth in the "Grant Date Fair Value of Stock and Option Awards" column.

| Name | Grant Date (1) | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards (2) | | | Estimated Possible Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | Grant Date Fair Value of Stock and Option Awards ($) (5) |
|---|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | |
| Robert A. Bruggeworth | N/A | 0 | 1,241,011 | 2,482,022 | | | | | |
| | 5/10/2018 (3) | | | | 1,122 | 44,882 | 67,323 | | 3,615,424 |
| | 8/7/2018 (4) | | | | | | | 28,169 | 2,399,999 |
| Mark J. Murphy | N/A | 0 | 453,529 | 907,059 | | | | | |
| | 5/10/2018 (3) | | | | 309 | 12,343 | 18,515 | | 994,278 |
| | 8/7/2018 (4) | | | | | | | 7,746 | 659,959 |
| Steven E. Creviston | N/A | 0 | 444,525 | 889,050 | | | | | |
| | 5/10/2018 (3) | | | | 374 | 14,961 | 22,442 | | 1,205,169 |
| | 8/7/2018 (4) | | | | | | | 9,390 | 800,028 |
| James L. Klein | N/A | 0 | 403,322 | 806,645 | | | | | |
| | 5/10/2018 (3) | | | | 281 | 11,221 | 16,832 | | 903,897 |
| | 8/7/2018 (4) | | | | | | | 7,042 | 599,978 |
| Paul J. Fego | N/A | 0 | 333,746 | 667,493 | | | | | |
| | 8/5/2018 (3) | | | | 187 | 7,480 | 11,220 | | 628,280 |
| | 8/5/2018 (6) | | | | | | | 15,443 | 1,299,992 |
| | 8/7/2018 (4) | | | | | | | 4,695 | 400,014 |

(1)  Equity awards granted to the Named Executive Officers were made pursuant to our 2012 Plan. See "Equity Compensation Plans – 2012 Stock Incentive Plan – Qorvo, Inc.," below for more information. The grant date above is determined in accordance with ASC Topic 718.

(2)  Each Named Executive Officer participates in our Short-Term Incentive Plan. The short-term incentive award earned by each Named Executive Officer is shown in the Summary Compensation Table under the column captioned "Non-Equity Incentive Plan Compensation," Short-term incentive awards are earned based on attainment of Company operating performance goals based on two six-month performance periods. The short-term incentive opportunities available under the Short-Term Incentive Plan are described in greater detail under "Compensation Discussion and Analysis – Elements of Compensation – Short-term Incentive Opportunities."

(3)  Information in this row reflects the Objectives-based RSU awards granted under our 2012 Plan. Objectives-based RSUs are earned, if at all, at the end of a specified performance period based on achievement of pre-established performance goals, with 50% vesting at the end of the performance period and the remaining 50% vesting in equal installments over the following two years. In the event of termination of employment other than for cause, these performance-based RSU awards granted to a Named Executive Officer will continue to be capable of being earned and vest over the original vesting term as if the Named Executive Officer had remained an employee of Qorvo subject to the Named Executive Officer's compliance with certain restrictive covenants and other conditions. For a detailed discussion of the performance-based RSU awards, see "Compensation Discussion and Analysis – Elements of Compensation – Performance-Based Restricted Stock Unit Awards," above.

(4)  These service-based RSU awards were granted under our 2012 Plan and vest in increments of 25% per year over a period of four years. In the event of termination of employment other than for cause, the service-based RSU awards granted to a Named Executive Officer generally will continue to vest over the original vesting term as if the Named Executive Officer had remained an employee of Qorvo subject to the Named Executive Officer's compliance with certain restrictive covenants and other conditions. For a detailed discussion of the service-based RSU awards, see "Compensation Discussion and Analysis – Elements of Compensation – Service-Based Restricted Stock Unit Awards," above.

(5)  These amounts do not reflect compensation actually received by the Named Executive Officer. Amounts presented represent the aggregate grant date fair value calculated in accordance with ASC Topic 718 of our common stock awards granted during the fiscal year. See "Stock-Based Compensation" in Note 14 of the Notes to the Consolidated Financial Statements set forth in the 10-K for the assumptions used to calculate the grant date fair value of the awards. The actual amount of the stock award ultimately realized upon vesting may differ from the aggregate grant date fair value.

(6)   These service-based RSU awards were granted under our 2012 Plan and vest in increments of 25% per year over a period of four years, and represent a "sign-on" award granted to Mr. Fego. For a detailed discussion of the sign-on award, see "Compensation Discussion and Analysis — Elements of Compensation — One-Time Sign-On Award," above.

## Equity Compensation Plans

The discussion that follows describes the material terms of our principal equity compensation plans in which the Named Executive Officers participate. The material terms of the employment agreement entered into by RFMD and Mr. Bruggeworth and assumed by Qorvo in connection with the Business Combination and the offer letter agreement entered into by TriQuint and Mr. Klein and assumed by Qorvo in connection with the Business Combination, and the change in control arrangements applicable to our Named Executive Officers are described under "Potential Payments Upon Termination or Change-in-Control" below.

### 2012 Stock Incentive Plan – Qorvo, Inc.

The Company currently grants equity awards to eligible employees, directors and independent contractors under the 2012 Stock Incentive Plan (the "2012 Plan"), which was approved by RFMD's shareholders on August 16, 2012 and assumed by the Company in connection with the Business Combination. Under the 2012 Plan, the Company is permitted to grant stock options and other types of equity incentive awards, such as stock appreciation rights, restricted stock awards, performance shares and performance units. The maximum number of shares issuable under the 2012 Plan may not exceed the sum of (a) 4.3 million shares, plus (b) any shares of common stock (i) remaining available for issuance as of the effective date of the 2012 Plan under the Company's prior plans and (ii) subject to an award granted under a prior plan, which awards are forfeited, canceled, terminated, expire or lapse for any reason. As of March 30, 2019, approximately 3.3 million shares were available for issuance under the 2012 Plan.

### 2009 and 2012 Incentive Plans – TriQuint Semiconductor, Inc.

Effective upon the closing of the Business Combination, the Company assumed the TriQuint Semiconductor, Inc. 2009 Incentive Plan and the TriQuint Semiconductor, Inc. 2012 Incentive Plan (together, the "TriQuint Incentive Plans"), originally adopted by TriQuint. The TriQuint Incentive Plans provided for the grant of stock options, restricted stock units, stock appreciation rights and other stock or cash awards to employees, officers, directors, consultants, agents, advisors and independent contractors of TriQuint and its subsidiaries and affiliates. The options granted thereunder were required to have an exercise price per share no less than 100% of the fair market value per share on the date of grant. The terms of each grant under the TriQuint Incentive Plans could not exceed ten years. No further awards can be granted under these plans.

### 2013 Incentive Plan – Qorvo, Inc.

Effective upon the closing of the Business Combination, the Company assumed the TriQuint Semiconductor, Inc. 2013 Incentive Plan (the "2013 Incentive Plan"), originally adopted by TriQuint, allowing Qorvo to issue awards under this plan. The 2013 Incentive Plan replaces the TriQuint 2012 Incentive Plan and provides for the grant of stock options, restricted stock units, stock appreciation rights and other stock or cash awards to employees, officers, directors, consultants, agents, advisors and independent contractors of TriQuint and its subsidiaries and affiliates who were such prior to the Business Combination or who become employed by the Company or its affiliates after the closing of the Business Combination. Former employees, officers and directors of RFMD are not eligible for awards under the 2013 Incentive Plan. The options granted thereunder must have an exercise price per share no less than 100% of the fair market value per share on the date of grant. The terms of each grant under the 2013 Incentive Plan may not exceed ten years. As of March 30, 2019, approximately 2.1 million shares were available for issuance under the 2013 Incentive Plan.

### Employee Stock Purchase Plan – Qorvo, Inc.

Effective upon closing of the Business Combination, the Company assumed the TriQuint Employee Stock Purchase Plan ("ESPP"), which is intended to qualify as an "employee stock purchase plan" under Section 423 of the Code. All regular full-time employees of the Company (including officers) and all other employees who meet the eligibility requirements of the plan may participate in the ESPP. The ESPP provides eligible employees an opportunity to acquire the Company's common stock at 85% of the lower of the closing price per share of the Company's common stock on the first or last day of each six-month purchase period. As of March 30, 2019, approximately 4.1 million shares were available for future issuance under this plan. The Company makes no cash contributions to the ESPP, but bears the expenses of its administration.

For a discussion of the May 2019 grants of performance-based RSU awards, which are capable of being earned based on objective performance goals, see "Compensation Discussion and Analysis — Elements of Compensation — Performance-Based Restricted Stock Unit Awards." For a discussion of the methodology with respect to the grants of service-based RSU awards, see "Compensation Discussion and Analysis — Elements of Compensation — Service-Based Restricted Stock Unit Awards." For a discussion of our Named Executive Officers' equity award compensation in proportion to their total compensation, see "Compensation Discussion and Analysis — Executive Compensation Program — Fiscal 2019 Executive Compensation Program Design."

Executive Compensation

## Outstanding Equity Awards at Fiscal 2019 Year-End Table

The following table shows the number of shares of our common stock covered by exercisable and unexercisable options and unvested restricted stock unit awards held by our Named Executive Officers on March 30, 2019.

| | | Option Awards | | | | Stock Awards | |
| Name | Grant Date (1) | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) (2) | Option Expiration Date (3) | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) (4) |
|---|---|---|---|---|---|---|---|
| Robert A. Bruggeworth | 8/7/2018 (5) | | | | | 28,169 | 2,020,562 |
| | 5/10/2018 (5) | | | | | 44,882 | 3,219,386 |
| | 8/8/2017 (5) | | | | | 23,547 | 1,689,026 |
| | 5/11/2017 (5) | | | | | 26,562 | 1,905,292 |
| | 8/5/2016 (5) | | | | | 16,475 | 1,181,752 |
| | 5/13/2016 (5) | | | | | 17,949 | 1,287,482 |
| | 8/10/2015 (5) | | | | | 8,143 | 584,097 |
| Mark J. Murphy | 8/7/2018 (5) | | | | | 7,746 | 555,621 |
| | 5/10/2018 (5) | | | | | 12,343 | 885,363 |
| | 8/8/2017 (5) | | | | | 6,977 | 500,460 |
| | 5/11/2017 (5) | | | | | 7,870 | 564,515 |
| | 8/5/2016 (5) | | | | | 5,615 | 402,764 |
| | 7/5/2016 (5) | | | | | 26,424 | 1,895,394 |
| | 6/6/2016 (5) | | | | | 6,119 | 438,916 |
| Steven E. Creviston | 8/7/2018 (5) | | | | | 9,390 | 673,545 |
| | 5/10/2018 (5) | | | | | 14,961 | 1,073,153 |
| | 8/8/2017 (5) | | | | | 8,721 | 625,557 |
| | 5/11/2017 (5) | | | | | 9,838 | 705,680 |
| | 8/5/2016 (5) | | | | | 6,740 | 483,460 |
| | 5/13/2016 (5) | | | | | 7,342 | 526,642 |
| | 8/10/2015 (5) | | | | | 3,065 | 219,852 |
| James L. Klein | 8/7/2018 (5) | | | | | 7,042 | 505,123 |
| | 5/10/2018 (5) | | | | | 11,221 | 804,882 |
| | 8/8/2017 (5) | | | | | 6,105 | 437,912 |
| | 5/11/2017 (5) | | | | | 6,888 | 494,076 |
| | 8/5/2016 (5) | | | | | 5,240 | 375,865 |
| | 5/13/2016 (5) | | | | | 5,714 | 409,865 |
| | 8/10/2015 (5) | | | | | 2,585 | 185,422 |
| | 4/7/2014 (6) | 1 | 0 | 31,08 | 4/7/2021 | | |
| Paul J. Fego | 8/7/2018 (5) | | | | | 4,695 | 336,772 |
| | 8/5/2018 (5) | | | | | 7,480 | 536,540 |
| | 8/5/2018 (5) | | | | | 15,443 | 1,107,726 |

(1) The grant date is determined in accordance with ASC Topic 718.

(2) The option price is equal to the closing price of our common stock as reported by Nasdaq on the grant date for Mr. Klein.

(3) Options expire seven years after grant.

(4) Based upon $71.73 per share, which was the closing price of Qorvo's common stock as reported by Nasdaq on March 29, 2019, the last trading day of our last fiscal year, multiplied by the number of shares subject to restricted stock unit awards that had not yet vested.

(5) Performance-based restricted stock unit awards, if earned, generally vest over a period of three years. Service-based restricted stock unit awards generally vest over a period of four years, except for Mr. Murphy's award granted on July 5, 2016, which vests over five years.

(6) Option vests in four quarterly installments commencing the ninth quarter after grant.

Executive Compensation

## 2019 Option Exercises and Stock Vested Table

The table below shows the number of shares of our common stock acquired by the Named Executive Officers during fiscal year 2019 upon the exercise of stock options and the vesting of restricted stock unit awards.

| Name | Option Awards | | Stock Awards | |
| --- | --- | --- | --- | --- |
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) (1) | Number of Shares Acquired on Vesting (#) (2) | Value Realized on Vesting ($) (3) |
| Robert A. Bruggeworth | – | – | 79,089 | 6,495,172 |
| Mark J. Murphy | – | – | 28,059 | 2,297,477 |
| Steven E. Creviston | – | – | 31,090 | 2,554,568 |
| James L. Klein | 18,839 | 805,254 | 21,347 | 1,752,020 |
| Paul J. Fego | – | – | – | – |

(1) Values are calculated by subtracting the aggregate exercise price of the options exercised, which is calculated by multiplying the number of shares being purchased by the exercise price of the options, from the aggregate market value of the shares of common stock acquired on the date of exercise, which is calculated by multiplying the number of shares being purchased by the actual market value of our common stock on the date of exercise.

(2) Share amounts are represented on a pre-tax basis. Our stock plans permit withholding of shares upon vesting to satisfy applicable withholding taxes.

(3) Values represent the market value of our common stock on the vesting date multiplied by the number of shares vested, rounded to the nearest dollar.

## Potential Payments upon Termination or Change-In-Control

As described above under "Executive Compensation – Compensation Discussion and Analysis – Elements of Compensation – Employment Agreement and Offer Letter Agreement," Mr. Bruggeworth has an employment agreement with Qorvo and Mr. Klein has an employment offer letter agreement that he entered into when he first joined TriQuint (and which has been subsequently assumed by Qorvo). The employment agreement, the offer letter agreement and the change in control agreements between the Named Executive Officers and Qorvo are discussed below under the heading "Individual Agreements."

The information below describes and quantifies certain compensation that would become payable under existing plans and arrangements if our Named Executive Officers' employment had terminated on March 30, 2019 and the price per share of our common stock on the date of termination was $71.73, which was the closing price of our common stock on March 29, 2019 (the last business day of our fiscal year). These benefits are in addition to benefits available generally to employees, such as distributions under our 401(k) plan and deferred compensation plan, disability benefits and accrued vacation pay.

Due to the number of factors that affect the nature and amount of any benefits provided upon the events discussed below, any actual amounts paid or distributed may be different. Factors that could affect these amounts include the timing during the year of any such event and our stock price.

## Equity Awards

Under our equity incentive plans, the option holder generally has three months to exercise vested options after the date employment ends (other than for death or disability). The option holder or his or her estate in the case of death may exercise the option upon the holder's respective disability or death (excluding unvested amounts) for a period of one year.

Under our equity incentive plans, unvested restricted stock unit awards are generally forfeited upon termination. However, restricted stock unit awards granted to the Named Executive Officers under the 2012 Plan generally will continue to vest pursuant to the same vesting schedule in the event of termination of employment, other than death or for cause, as if such individual had remained an employee of Qorvo, subject to certain restrictive covenants, clawback provisions and other conditions.

QORVO   *2019 Proxy Statement*   39

Table of Contents

Executive Compensation

### 401(k) Savings Plan; Deferred Compensation Plan

Effective upon the closing of the Business Combination, the Company assumed the RFMD and TriQuint qualified defined contribution 401(k) plans and the TriQuint deferred compensation plan. The 401(k) plans were merged on January 4, 2016. The 401(k) plan and the deferred compensation plan are the only retirement plans available to U.S. employees, including each of our Named Executive Officers. We match 100% of the first 1%, and 50% of the next 5%, of each employee's eligible earnings contributed to the 401(k) plan, and employees immediately vest in our contributions. Under the deferred compensation plan, employees who are eligible to participate are provided with the opportunity to defer a specified percentage of their base salary and short-term incentive awards paid in cash, which the Company will be obligated to deliver on a future date. None of our Named Executive Officers has elected to defer compensation under the deferred compensation plan.

### Employee Stock Purchase Plan

Upon termination of employment, all amounts in a participant's ESPP account are paid to the participant.

### Medical Benefits

All medical insurance benefits terminate effective at midnight on the last day of the month in which employment is terminated. Health care continuation coverage rules, commonly referred to as COBRA, require us to provide employees enrolled in our health, dental and vision plans with an opportunity to purchase continued health care coverage at their own expense upon the occurrence of a qualifying event, such as termination of employment for reasons other than gross misconduct, reduction in hours worked, divorce, death or loss of dependency status.

### Individual Agreements

*Employment Agreement with Mr. Bruggeworth.* In connection with the Business Combination, Qorvo assumed the November 12, 2008 employment agreement previously entered into between RFMD and Mr. Bruggeworth, our President and Chief Executive Officer. Pursuant to this assumed employment agreement, the term of the employment agreement continues until the earliest of (a) November 11, 2010 (as extended as described in the following sentence); (b) Mr. Bruggeworth's death; (c) termination by Qorvo for "Cause," as defined in the employment agreement or otherwise upon 30 days' notice; (d) termination by Mr. Bruggeworth for "Good Reason," as defined in the employment agreement or otherwise on 30 days' notice; or (e) the end of any 180-day Disability Period, as defined in the employment agreement. The employment agreement is subject to automatic daily extension of the two-year term until notice of non-extension is given in accordance with the terms of the employment agreement.

Under the employment agreement, Mr. Bruggeworth is entitled to a specified annual base salary, which amount is reviewed annually by the Compensation Committee and may be increased or reduced by the Compensation Committee if part of a salary reduction plan for similarly situated officers. Mr. Bruggeworth also is eligible to receive the following compensatory benefits:

- A bonus opportunity under the Short-Term Incentive Plan for each performance period during the term of the employment agreement. The target annual bonus opportunity in each performance period cannot be less than 100% of Mr. Bruggeworth's base salary.

- The opportunity to receive periodic grants of equity compensation under the Company's equity plans, in the Compensation Committee's discretion, so long as he is treated similarly to other senior executive officers.

- The right to participate in other bonus or incentive plans, paid time off and other retirement plans and welfare benefits in which other senior executive officers may participate in accordance with our policies as in effect from time to time.

If the employment agreement is terminated, Mr. Bruggeworth would be entitled to be compensated in the following manner:

- Termination for any reason: Mr. Bruggeworth would be entitled to receive (a) base salary through the date of termination; (b) any previously earned but unpaid bonus under the Short-Term Incentive Plan for a completed performance period; (c) rights under equity plans, retirement plans and welfare benefit plans, which would be determined based on respective plan terms; and (d) unpaid paid time off per our policy.

- Termination due to death or total disability: Mr. Bruggeworth, or, in the case of his death, his beneficiary, would be entitled to receive the benefits described above under "Termination for any reason" plus the greater of Mr. Bruggeworth's accrued annual bonus or accrued target bonus for the performance period in which the termination date occurs, in each case pro-rated based on the termination date.

- Termination by Qorvo without cause or by Mr. Bruggeworth with good reason: Mr. Bruggeworth would be entitled to receive the benefits described above under "Termination for any reason" plus (a) salary continuation equal to two times base salary; (b) his accrued annual bonus (payable after end of performance period), pro-rated based on the termination date; (c) a special

bonus equal to two times his target annual bonus; (d) continuation coverage of health care benefits (or substantially identical individual coverage, plus special health care benefit) for two years; (e) equity awards (other than performance-based equity awards), which will be governed by terms of the respective equity plan and individual equity award agreement (including the right of the Compensation Committee to determine if post-termination vesting and/or exercise rights apply); (f) performance-based equity awards and any previously earned equity-based awards, which will be deemed earned, if at all, on a pro rata basis only if performance goals are met during the performance period, with such earned awards being deemed fully vested at grant or as of the date of termination in the case of previously earned awards; and (g) eligibility to participate in other welfare benefit plans on the same terms and conditions as available to active employees.

- Termination by Qorvo for cause or by Mr. Bruggeworth without good reason: Mr. Bruggeworth would be entitled to receive the benefits described above under "Termination for any reason."

- Change of Control: Benefits (if any) paid under Mr. Bruggeworth's existing change in control agreement would offset benefits (if any) paid under the employment agreement following Mr. Bruggeworth's termination.

The employment agreement also establishes certain employment and post-termination obligations for Mr. Bruggeworth. He is required to assist in any Qorvo litigation and also is required to comply with certain confidentiality, nondisparagement, noncompetition and nonsolicitation covenants contained in the employment agreement.

Further, the employment agreement provides that if independent accountants determine that part or all of the payments and benefits to be paid to Mr. Bruggeworth under the employment agreement and all other plans or arrangements of Qorvo (a) constitute "parachute payments" under Code Section 280G, and (b) will more likely than not cause Mr. Bruggeworth to incur an excise tax under Code Section 4999 as a result of such payments or other benefits, Qorvo will pay a gross-up payment so that the net amount Mr. Bruggeworth will receive after payment of any excise tax equals the amount that he would have received if the excise tax had not been imposed. If the excise tax would not apply if the total payments to Mr. Bruggeworth were reduced by an amount less than 5%, then the amounts payable will be so reduced and gross-up payments would not be made to Mr. Bruggeworth.

The employment agreement also contains certain forfeiture and recoupment rights. Generally, during the term of the employment agreement and the 24-month period following the expiration thereof, if Mr. Bruggeworth engages in a "Prohibited Activity," then (a) any equity awards granted or subject to vesting during the Prohibited Activity Term would be forfeited; (b) any and all shares issued to Mr. Bruggeworth under an equity award granted during the Prohibited Activity Term would be forfeited (without payment of consideration); (c) any gain realized by Mr. Bruggeworth with respect to any shares issued pursuant to an equity award granted during the Prohibited Activity Term would be required to be immediately paid to Qorvo; (d) any cash/incentive payments made during the Prohibited Activity Term would be required to be returned to Qorvo; and (e) any rights to future cash/incentive payments granted during the Prohibited Activity Term would be forfeited. Qorvo also has an offset right to recover such amounts against amounts otherwise due to Mr. Bruggeworth. For purposes of the employment agreement, "Prohibited Activity" includes (a) violation of certain restrictive covenants; (b) Mr. Bruggeworth's engaging in willful conduct that results in an obligation to reimburse Qorvo under Section 304 of the Sarbanes-Oxley Act of 2002; or (c) Mr. Bruggeworth's engaging in fraud, theft, misappropriation, embezzlement or dishonesty to the material detriment of Qorvo. "Prohibited Activity Term" means the period starting when Mr. Bruggeworth first engaged in Prohibited Activity conduct and without time limitation.

*Offer Letter Agreement with Mr. Klein.* In connection with his initial employment by TriQuint, Mr. Klein entered into an employment offer letter agreement in 2011 that specified his initial salary, target bonus and equity awards. This offer letter agreement was subsequently assumed by Qorvo in connection with the Business Combination. Under this offer letter agreement, in the event of a termination of employment without cause or a resignation by Mr. Klein for good reason, Mr. Klein is entitled to a lump sum severance payment equal to one year of base salary and continuation of health and life insurance benefits for 12 months.

Pursuant to the offer letter agreement, the term "termination for cause" means a termination of employment by the Company for any of the following reasons: (a) intentional failure to perform assigned duties; (b) personal dishonesty; (c) incompetence, as measured against standards generally prevailing in the industry; (d) willful misconduct; (e) any breach of fiduciary duty involving personal profit; (f) willful violation of any domestic or international law, rule, regulation or final cease and desist order; or (g) any sexual or other harassment of others.

Pursuant to the offer letter agreement, a "resignation for good reason" is deemed to occur if Mr. Klein resigns employment within sixty (60) days of the occurrence of any of the following that occur without the officer's written consent: (a) a loss of the title; (b) a material reduction in duties or responsibilities; (c) any reduction in base salary or any target bonus (other than a reduction comparable in percentage to a reduction affecting other officers generally); (d) any material reduction in benefits (other than a reduction affecting the Company's personnel generally); or (e) a company-mandated relocation of Mr. Klein's principal place of employment or current principal residence by more than 50 miles from its respective location immediately prior to the resignation.

Table of Contents

Executive Compensation

*Change in Control Agreements.*

We have entered into change in control agreements with each of our Named Executive Officers. The change in control agreements will end on the earliest of: (a) the first anniversary of the effective date, subject to automatic renewal for additional one-year periods unless we give notice to the officer that we do not wish to extend it; (b) the termination of the officer's employment with us for any reason during the period from the effective date until the date that is ninety (90) days prior to a change in control; (c) the termination of the officer's employment with us by the officer without good reason or by us with cause; or (d) the end of a two-year period following a change in control and the fulfillment by us and the officer of all obligations under the agreement.

Under these agreements, if a change in control occurs while the officer is our employee, and a qualifying termination of his employment with us occurs within the two-year period following the change in control (which will include the ninety (90) days prior to the date of the change in control in the case of a termination by us without cause), then he or she (or his or her legal representative) is entitled to certain compensation payments and benefits provided he or she has executed a general release of claims. A "qualifying termination" means: (a) our termination of the officer's employment for a reason other than death, disability or cause; (b) the officer's termination of his or her employment for good reason; or (c) the termination of the officer's employment due to death following delivery of a notice of good reason by the officer, which condition constituting good reason remains uncured by us.

A "change in control" is deemed to have occurred under the change in control agreements on the earliest of the following dates: (a) the acquisition by a person or entity of voting control over more than forty percent (40%) of the total voting power of our then outstanding voting stock; (b) a merger, consolidation or reorganization of us, in which holders of our common stock immediately prior to the transaction have voting control over less than sixty percent (60%) of the voting securities of the surviving corporation immediately after the transaction; (c) the sale or disposition of all or substantially all of our assets; or (d) a change in a majority of the Board within a 12-month period unless the nomination for election by our stockholders of each new director was approved by the vote of two-thirds of the members of the Board then still in office who were in office at the beginning of the 12-month period.

The agreements provide that, upon a qualifying termination after a change in control, we will pay a severance benefit to the officer. The severance benefit is equal to the sum of: (a) one times the highest annual rate of the officer's base salary during the 12-month period before termination (two times in the case of Messrs. Bruggeworth and Murphy) plus (b) one times the officer's target annual bonus opportunity based on the officer's target bonus opportunity for the period in which the termination occurs (two times in the case of Messrs. Bruggeworth and Murphy).

In addition, the agreements provide that upon a qualifying termination after a change in control, all of our stock options, stock appreciation rights or similar stock-based awards held by the officer will be accelerated and exercisable in full, and all restrictions on any restricted stock, performance stock or similar stock-based awards granted by us will be removed and such awards will be fully vested. If the officer receives any payments or benefits under the agreement or under any other arrangement with us that may separately or in the aggregate constitute "parachute payments" within the meaning of Section 280G of the Code and it is determined that any of such payments will be subject to any excise tax pursuant to applicable provisions of the Code, we will pay to the officer either: (i) the full amount of such payments; or (ii) an amount equal to such payments reduced by the minimum amount necessary to prevent any portion of such payments from being an "excess parachute payment" (within the meaning of the Code), whichever amount results in the officer's receipt, on an after-tax basis, of the greatest amount of payments notwithstanding that all or some portion of the payments may be subject to the excise tax (that is, there is no gross up provision). The agreements also provide that if the officer elects continuation coverage through our health plan, we will reimburse the officer for the difference between the monthly COBRA premium paid by the officer and the monthly premium amount required to be paid by our active employees for the same level of coverage under our health plan for a one-year period following termination. We will also provide an annual payment equal to the amount necessary to pay any taxes imposed on the officer as a result of the officer's receipt of health care reimbursements from us.

The agreements also provide that the officer is subject to certain confidentiality, nonsolicitation and noncompetition provisions. In the event the officer fails to comply with any of these provisions, he or she will not be entitled to receive any payment or benefits under the agreement. These payments also are subject to "clawback" restrictions in the event of certain prohibited conduct. The following table sets forth information about potential payments to the Named Executive Officers, assuming that their employment was terminated following a change in control of Qorvo as of March 29, 2019 (the last business day of the fiscal year) and that the price per share of our common stock on that date was $71.73. The table also assumes prior payment of any remaining accrued annual bonus in accordance with the terms of our Short-Term Incentive Plan and any portion of base salary that would have been accrued but not yet paid as of March 30, 2019.

42   QORVO   *2019 Proxy Statement*

#### Potential Payments Upon a Qualifying Termination after a Change in Control

| Name | | Robert A. Bruggeworth | Mark J. Murphy | Steven E. Creviston | James L. Klein | Paul J. Fego |
|------|---|---|---|---|---|---|
| Base Salary | (1) | $ 1,654,682 | $1,007,843 | $ 493,917 | $ 448,136 | $ 444,995 |
| Bonus | (2) | 2,482,022 | 907,059 | 444,525 | 403,322 | 333,746 |
| Stock Awards | (3) | 11,887,598 | 5,243,033 | 4,307,889 | 3,213,145 | 1,981,039 |
| Benefits Continuation | (4) | 73,000 | 64,840 | 27,344 | 27,942 | 14,280 |
| Accrued Vacation | (5) | 79,552 | 28,661 | 37,139 | 6,528 | (8,821) |
| Total | | $16,176,854 | $7,251,436 | $5,310,814 | $4,099,073 | $2,765,239 |

(1) For Messrs. Bruggeworth and Murphy, the amount represents two times the highest annual rate of base salary during the twelve-month period before termination. For the other Named Executive Officers, the amount represents one times the highest annual rate of base salary during the twelve-month period before termination. A portion of these amounts would be payable in a lump sum within 30 days following the date of termination, with the remainder to be paid in periodic installments, in accordance with our normal payroll practices, over a two-year period for Messrs. Bruggeworth and Murphy, and over a one-year period for the other Named Executive Officers.

(2) For Messrs. Bruggeworth and Murphy, the amount represents two times the target annual bonus opportunity as defined in our Short-Term Incentive Plan for the year of termination. For the other Named Executive Officers, the amount represents one times the target annual bonus opportunity as defined in our Short-Term Incentive Plan for the year of termination. A portion of these amounts would be payable in a lump sum within 30 days following the date of termination, with the remainder to be paid in periodic installments, in accordance with our normal payroll practices, over a two-year period for Messrs. Bruggeworth and Murphy, and over a one-year period for the other Named Executive Officers.

(3) Represents the intrinsic value of unvested performance- and service-based restricted stock units as of March 30, 2019.

(4) Represents the value of continuing health and welfare based on the monthly premiums paid by Qorvo at March 30, 2019 (for two years with respect to Messrs. Bruggeworth and Murphy, and one year with respect to the other Named Executive Officers).

(5) Represents accrued vacation earned but not utilized, which would be payable in a lump sum within 30 days following the date of termination, other than for Mr. Fego, who would be obligated to repay an amount of utilized but unearned vacation.

#### Other Potential Payments Upon Resignation, Termination for Cause, Termination without Cause, Retirement or Constructive Termination

Other than potential receipt of a cash payment worth up to 26 weeks of base salary under our general severance program following an involuntary termination, Messrs. Murphy, Creviston and Fego are not entitled to any cash payments from Qorvo in the event of their resignation, termination with or without cause, retirement or constructive termination without a change in control. However, their unvested restricted stock units listed below may be subject to acceleration or may continue to vest if and as provided in individual agreements.

| Name | | Mark J. Murphy | Steven E. Creviston | Paul J. Fego |
|------|---|---|---|---|
| Stock Awards | (1) | $5,243,033 | $4,307,889 | $1,981,039 |

(1) Represents the intrinsic value of service-based restricted stock units for these Named Executive Officers at March 30, 2019.

In accordance with the terms of his employment agreement, Mr. Bruggeworth would have been entitled to the following payments from Qorvo upon the occurrence of any of the termination events described in the table below as of March 30, 2019. The table below assumes prior payment of any portion of base salary that would have been accrued but not yet paid as of March 30, 2019.

Table of Contents

## Executive Compensation

Although Mr. Bruggeworth is also entitled to change of control benefits under his employment agreement, pursuant to the terms of his employment agreement, any benefits payable under his change in control agreement with Qorvo offset any benefits paid under his employment agreement following his termination. As of March 30, 2019, the benefits payable under his change in control agreement, as set forth in the above table, would have been equal to the change in control benefits payable under his employment agreement.

| Robert A. Bruggeworth | | Termination for Any Reason | Termination Due to Death or Total Disability | Termination without Cause or for Good Reason | Termination for Cause | Termination without Good Reason |
|---|---|---|---|---|---|---|
| Base Salary | (1) | $ – | $ – | $ 1,654,682 | $ – | $ – |
| Accrued Annual Bonus | (2) | – | – | – | – | – |
| Special Bonus | (3) | – | – | 2,482,022 | – | – |
| Stock Awards | (4) | 11,887,598 | 11,887,598 | 11,887,598 | – | 11,887,598 |
| Benefits Continuation | (5) | – | – | 73,000 | – | – |
| Accrued Vacation | (6) | 79,552 | 79,552 | 79,552 | 79,552 | 79,552 |
| Total | | $ 11,967,150 | $11,967,150 | $16,176,854 | $ 79,552 | $11,967,150 |

(1)  With respect to the "Termination without Cause or for Good Reason" column, the amount shown represents two times base salary and would be payable in equal periodic installments, in accordance with the payroll schedule for our salaried personnel, over a two-year period.

(2)  Represents previously earned but unpaid bonus under our Short-Term Incentive Plan for a completed performance period, which would be payable in a lump sum within 30 days of the termination date. With respect to the "Termination Due to Death or Total Disability" column, the amount payable is the greater of the accrued annual bonus or the accrued target bonus, in each case for the performance period in which the termination date occurs, which would be payable in a lump sum within 45 days following the end of the performance period in which the termination date occurs. With respect to the "Termination without Cause or for Good Reason" column, the amount shown represents the accrued annual bonus, which would be payable within 45 days following the end of the performance period in which the termination date occurs. Under these severance scenarios, all or a portion of the accrued annual bonus may have already been paid or would nevertheless be payable without regard to the nature of Mr. Bruggeworth's termination.

(3)  With respect to the "Termination without Cause or for Good Reason" column, the Special Bonus amount shown represents two times the target annual bonus opportunity as defined in our Short-Term Incentive Plan for the year in which the termination occurs, which would be payable in equal periodic installments, in accordance with the payroll schedule for our salaried personnel, over a two-year period. Mr. Bruggeworth is not entitled to a Special Bonus under the other severance scenarios set forth in the above table.

(4)  Represents the intrinsic value of unvested performance- and service-based restricted stock units as of March 30, 2019. With respect to the "Termination for Any Reason," "Termination Due to Death or Total Disability," "Termination Without Cause or For Good Reason" and "Termination Without Good Reason" columns, the amount shown: (a) reflects the value of unvested service-based restricted stock units which shall continue to vest if and as provided in an individual award agreement and (b) reflects that if and to the extent performance goals are deemed met, Mr. Bruggeworth shall be deemed to have earned a pro-rata number of performance-based restricted stock units for the relevant performance period. With respect to the "Termination for Cause" column, the amount shown: (a) reflects that Mr. Bruggeworth's unvested service-based restricted stock units will be forfeited unless the Compensation Committee determines otherwise and (b) reflects that Mr. Bruggeworth's unvested performance-based restricted stock units will be forfeited unless the Compensation Committee determines otherwise.

(5)  Represents the value of continuing health, welfare and other benefits through March 30, 2019, based on the monthly premiums paid by Qorvo at March 30, 2019.

(6)  Represents accrued vacation earned but not utilized, which would be payable in a lump sum within 30 days following the date of termination.

As described above, in accordance with the terms of his offer letter agreement, Mr. Klein is entitled to a lump sum severance payment equal to one year of base salary and continuation of health and life insurance benefits for 12 months in the event of a termination of his employment without cause or a resignation by him for good reason. The table below shows the termination benefits that Mr. Klein would have been entitled to receive from Qorvo upon the occurrence of the termination events described as of March 30, 2019. The table below assumes prior payment of any portion of base salary that would have been accrued but not yet paid as of March 30, 2019.

| | | | James L. Klein | | |
| | | | Termination for Any Reason | Termination without Cause or for Good Reason | Termination for Cause |
|---|---|---|---|---|---|
| Base Salary | (1) | $ | – | $   448,136 | $   – |
| Stock Awards | (2) | | 3,213,145 | 3,213,145 | – |
| Benefits Continuation | (3) | | – | 27,942 | – |
| Accrued Vacation | (4) | | 6,528 | 6,528 | 6,528 |
| **Total** | | $ | 3,219,673 | $3,695,751 | $   6,528 |

(1)   Represents one year of base salary payable in a lump sum pursuant to the terms of Mr. Klein's employment offer letter agreement.

(2)   Represents the intrinsic value of unvested service-based restricted stock units as of March 30, 2019 that may be subject to acceleration or may continue to vest if and as provided in individual agreements.

(3)   Represents the value of continuing health and life insurance benefits for 12 months, based on the monthly premiums paid by Qorvo at March 30, 2019.

(4)   Represents accrued vacation earned but not utilized, which would be payable in a lump sum within 30 days following the date of termination.

## CEO Pay Ratio Disclosure

As required by Section 953(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and Item 402(u) of Regulation S-K, we are providing the ratio of the annual total compensation of our CEO to the annual total compensation of our median employee. This ratio is a reasonable estimate calculated in a manner consistent with SEC rules. Because SEC rules for identifying the median employee allow companies to adopt a variety of methodologies, apply certain exclusions, and make reasonable estimates and assumptions that reflect their compensation practices, the pay ratio reported by other companies may not be comparable to the pay ratio reported below, as other companies have different employment and compensation practices, and may use different methodologies, exclusions, estimates and assumptions in calculating their own pay ratios.

During fiscal 2019, our last completed fiscal year, there was no change to our employee population or compensation arrangements that we reasonably believe would significantly affect our pay ratio disclosure. Further, there was no change in the circumstances of the employee identified as the median employee in fiscal 2018. Accordingly, we have used the same median employee, initially identified for fiscal 2018, in our pay ratio calculation for fiscal 2019. The methodology used to identify our median employee for fiscal 2018 is described in our fiscal 2018 proxy statement.

This individual's annual total compensation for fiscal 2019 was $44,708, determined in accordance with the same requirements for calculation of the total compensation of our Named Executive Officers for the Summary Compensation Table. With respect to the annual total compensation of our CEO, we used the amount reported for our CEO in the "Total" column for fiscal 2019 in the Summary Compensation Table, which was $7,984,739.

Based on this information, for fiscal 2019, our CEO's annual total compensation was 179 times that of the annual total compensation of our median employee.

Our compensation philosophy is to pay our workforce competitively and equitably. We offer competitive pay packages across all geographies based on industry-specific compensation information in the local market, job responsibilities, and individual performance. In general, our compensation programs are applied consistently across the workforce, with a higher percentage of

Table of Contents

Executive Compensation

at-risk pay provided to our executives. We believe both our CEO and our employee compensation packages are appropriately structured to attract and retain the talent needed to deliver on our business plan and to drive long-term stockholder value.

## Director Compensation

### Director Compensation Philosophy

Directors who are full-time employees of Qorvo, such as Mr. Bruggeworth, receive no additional compensation for services as a director. Our philosophy is to provide competitive compensation necessary to attract and retain high-quality non-employee directors. The Board believes that a substantial portion of our non-employee directors' compensation should consist of equity-based compensation to assist in aligning directors' interests with the interests of our stockholders. The Compensation Committee periodically reviews our director compensation program and makes recommendations to the Board for changes to our program.

As previously disclosed in our fiscal 2018 proxy statement, in May 2018, based on a report from Compensia, the Compensation Committee's compensation consultant, the Compensation Committee recommended, and the Board unanimously approved, increasing the dollar value of the annual restricted stock unit award for each non-employee director from $190,000 to $200,000, the annual retainer for the Audit Committee Chair from $20,000 to $30,000, and the annual retainer for the Governance and Nominating Committee Chair from $10,000 to $15,000, in each case effective as of August 7, 2018, the date of our fiscal 2018 annual meeting of stockholders. No other changes were made to our director compensation program for fiscal 2019. The following table summarizes the annual compensation paid to our non-employee directors for the year ended March 30, 2019.

### Director Compensation for Fiscal Year Ended March 30, 2019

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) (1) | Total ($) |
|---|---|---|---|
| Daniel A. DiLeo | 90,000 | 199,964 | 289,964 |
| Jeffery R. Gardner | 106,484 | 199,964 | 306,448 |
| Charles S. Gibson | 80,000 | 199,964 | 279,964 |
| John R. Harding | 80,000 | 199,964 | 279,964 |
| David H. Y. Ho | 80,000 | 199,964 | 279,964 |
| Roderick D. Nelson | 80,000 | 199,964 | 279,964 |
| Ralph G. Quinsey | 148,000 | 199,964 | 347,964 |
| Walden C. Rhines | 100,000 | 199,964 | 299,964 |
| Susan L. Spradley | 80,000 | 199,964 | 279,964 |
| Walter H. Wilkinson, Jr. | 100,275 | 199,964 | 300,239 |

(1)  These amounts represent the aggregate grant date fair value for restricted stock unit awards granted to the indicated director in fiscal 2019 computed in accordance with ASC Topic 718, excluding the effect of any estimated forfeitures. A summary of the assumptions we apply in calculating these amounts is set forth in Note 14 of the Notes to the Consolidated Financial Statements included in the 10-K. The aggregate number of shares that were outstanding and granted during the fiscal year ended March 30, 2019 for each of the directors were as follows:

| Name | Aggregate Number of Restricted Stock Unit Awards Outstanding at March 30, 2019 (#) | Number of Restricted Stock Unit Awards Granted in FY19 (#) | Aggregate Number of Option Awards Outstanding at March 30, 2019 (#) |
|---|---|---|---|
| Daniel A. DiLeo | 2,347 | 2,347 | 35,800 |
| Jeffery R. Gardner | 2,347 | 2,347 | – |
| Charles S. Gibson | 2,347 | 2,347 | – |
| John R. Harding | 2,347 | 2,347 | 7,850 |
| David H. Y. Ho | 2,347 | 2,347 | 10,660 |
| Roderick D. Nelson | 2,347 | 2,347 | 17,796 |
| Ralph G. Quinsey | 2,347 | 2,347 | 274,703 |
| Walden C. Rhines | 2,347 | 2,347 | 48,585 |
| Susan L. Spradley | 2,347 | 2,347 | – |
| Walter H. Wilkinson, Jr. | 2,347 | 2,347 | – |

The outstanding restricted stock unit awards vest on the earlier of (a) one year following the grant date or (b) the day before the Company's first annual meeting of stockholders occurring after the grant date, in each case subject to continued service as of such date.

Directors who were not employees of Qorvo were compensated for their service as a director as shown in the table below:

### Schedule of Director Fees for Fiscal Year Ended March 30, 2019

| Compensation Item | Amount |
|---|---|
| Annual Retainers | |
| Chairman of the Board | $148,000 |
| Board Service | 80,000 |
| Lead Director (Additional Fee) (1) | 20,000 |
| Audit Committee Chair (Additional Fee) (2) | 30,000 |
| Compensation Committee Chair (Additional Fee) | 20,000 |
| Governance and Nominating Committee Chair (Additional Fee) (2) | 15,000 |
| Corporate Development Committee Chair (Additional Fee) | 10,000 |

(1)  Mr. Quinsey declined to receive the additional $20,000 to which he was entitled as the Lead Director for fiscal 2019.

QORVO  *2019 Proxy Statement*   47

(2)  Amounts paid in fiscal 2019 to the Audit Committee Chair and the Governance and Nominating Committee Chair were prorated to reflect the increase to the annual retainer for the Audit Committee Chair from $20,000 to $30,000, and the increase to the annual retainer for the Governance and Nominating Committee Chair from $10,000 to $15,000, in each case effective August 7, 2018.

## Equity Compensation

In fiscal 2019, each participating non-employee director who was re-elected received an annual restricted stock unit award, which we refer to as the annual RSU, pursuant to the 2012 Plan, with a value of $199,964. These annual RSUs vest on the earlier of (a) the first anniversary of the grant date or (b) the day before the Company's first annual meeting of stockholders occurring after the grant date, in each case subject to continued service as of such date. See "Equity Compensation Plans – 2012 Stock Incentive Plan – Qorvo, Inc.," above for more information.

Non-employee directors are also eligible to receive discretionary stock-based awards, which may be granted under the 2012 Plan, See "Equity Compensation Plans – 2012 Stock Incentive Plan – Qorvo, Inc.," above. No discretionary equity awards to non-employee directors were granted in fiscal 2019.

Our securities trading policy prohibits any pledging or hedging of our securities by our directors. This includes engaging in any type of short sale or purchasing any financial instrument (including prepaid variable forward contracts, equity swaps, collars and exchange traded funds) or engaging in any transaction that, in either case, hedges or offsets, or is designed to hedge or offset any risk of decrease in the market value of our common stock.

## Other Compensation

We reimburse all non-employee directors for expenses incurred in their capacity as non-employee directors. Directors may defer all or a portion of their cash retainers by participating in our Nonqualified Deferred Compensation Plan. Commencing with stock awards first made after July 1, 2017, directors may also elect to defer receipt of shares of our common stock upon vesting. In addition, we offer participation in our group medical insurance program to any non-employee director who agrees to pay the full amount of the premium.

## Director Compensation for Fiscal Year Ending March 28, 2020

In May 2019, the Compensation Committee reviewed a report from Compensia on the philosophy, structure and amounts of compensation payable under our director compensation program in comparison to the Company's peer group (discussed on page 24). Based on this report, the Compensation Committee recommended, and the Board unanimously approved, keeping the director compensation program for fiscal 2020 unchanged from fiscal 2019.

# EQUITY COMPENSATION PLAN INFORMATION

The following table summarizes information as of March 30, 2019 relating to our equity compensation plans, under which grants of stock options, restricted stock and other rights to acquire shares of our common stock may be made from time to time.

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights (1) | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 4,036,012 | $20.36 | 9,469,164(2) |
| Equity compensation plans not approved by security holders (3) | 3,030 | $18.35 | 254,189 |
| Total | 4,039,042(4) | | 9,723,353 |

(1)  The weighted-average exercise price does not take into account restricted stock unit awards because such awards do not have an exercise price.

(2)   The total shares available for future issuance in column (c) may be the subject of awards other than options, warrants or rights granted under our 2012 Plan and 2013 Incentive Plan. For a more detailed discussion of these and other equity plans that have been approved by our stockholders, see "Equity Compensation Plans," above. The number of securities remaining available for future issuance also includes securities that may be issued pursuant to the ESPP.

(3)   For a more detailed description of these plans, see "Non-Stockholder Approved Plans," below.

(4)   Includes shares subject to issuance pursuant to outstanding stock options and restricted stock unit awards if certain performance-based and service-based conditions are met. For more detailed information, see "Performance-Based Restricted Stock Unit Awards" and "Service-Based Restricted Stock Unit Awards" under "Compensation Discussion and Analysis – Elements of Compensation," above.

## Non-Stockholder Approved Plans

The inducement plans described below are intended to comply with Nasdaq Listing Rule 5635(c)(4), which provides an exception to the stockholder approval requirements for the grant of equity awards as a material inducement to an individual entering into employment with the Company.

### *2008 Inducement Award Program*

Effective upon the closing of the Business Combination, the Company assumed the 2008 Inducement Award Program from TriQuint (the "2008 Program"). The 2008 Program provided for the issuance of a maximum number of 921,140 shares. No new awards can be granted under the 2008 Program.

The purposes of the 2008 Program were to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to employees and consultants and to promote the success of our business. The 2008 Program authorized the grant of nonstatutory stock options, restricted stock, restricted stock units, stock appreciation rights and other stock or cash awards at the discretion of the compensation committee to new employees.

### *2015 Inducement Stock Plan*

Effective January 1, 2015, the Company adopted the 2015 Inducement Stock Plan (the "2015 Plan"). The 2015 Plan provides for the issuance of a maximum number of the sum of 250,000 shares and any shares subject to an award granted under the 2008 Program outstanding as of January 1, 2015, which award is later forfeited, cancelled, terminated or lapses for any reason.

The purposes of the 2015 Plan are to provide a material inducement for the best available persons to become employees of the Company or its affiliates, to attract and retain such employees, and to align the interests of such persons with the interests of the Company and its stockholders. The 2015 Plan authorizes the grant of nonstatutory stock options, restricted stock, restricted stock units, stock appreciation rights, performance awards, phantom stock awards and other stock or cash awards at the discretion of the compensation committee to new employees. No awards were made under the 2015 Plan during fiscal 2019.

 *2019 Proxy Statement*   49

## PROPOSAL 2 – APPROVAL OF THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS

As required by Section 14A of the Exchange Act, we are asking our stockholders to approve, on a non-binding, advisory basis, the compensation of our Named Executive Officers as disclosed in accordance with the SEC's rules in the "Executive Compensation" section of this proxy statement. This proposal, commonly known as a "say-on-pay" proposal, gives our stockholders the opportunity to express their views on our Named Executive Officers' compensation as a whole. At our 2015 annual meeting, our stockholders voted, on an advisory basis, to include an annual "say-on-pay" proposal in our proxy materials. In accordance with this advisory vote, we determined that we will include a "say-on-pay" proposal in our proxy materials for each annual meeting of stockholders until the next advisory vote on the frequency of future "say-on-pay" votes, which will occur no later than our 2021 annual meeting of stockholders.

This vote is not intended to address any specific item of compensation or any specific Named Executive Officer, but rather the overall compensation of all of our Named Executive Officers and the philosophy, policies and practices described in this proxy statement. The say-on-pay vote is advisory, and therefore not binding on the Company, the Compensation Committee or the Board. The say-on-pay vote will, however, provide information to us regarding stockholder sentiment about our executive compensation philosophy, policies and practices, which the Compensation Committee will consider when setting executive compensation for the remainder of the current fiscal year and beyond. Our Board of Directors and our Compensation Committee value the opinion of our stockholders, and to the extent there is any significant vote against the Named Executive Officer compensation as disclosed in this proxy statement, the Compensation Committee will evaluate whether any actions are necessary to address those concerns.

We believe that the information provided within the "Executive Compensation" section of this proxy statement demonstrates that our executive compensation program was designed appropriately and is working to ensure management's interests are aligned with our stockholders' interests to support long-term value creation. Highlights of our executive compensation program include the following:

- A significant portion of each Named Executive Officer's potential total annual compensation, consisting of base salary and short-term incentive award opportunities, is intended to be at-risk and is linked to our operating performance.

- Long-term equity-based compensation, consisting of performance-based and service-based restricted stock unit awards, makes up a significant portion of the overall compensation of our Named Executive Officers. Performance-based equity awards granted in fiscal 2019 were linked to achievement during the year of key Company projects or initiatives that the Compensation Committee believes have the potential to impact long-term stockholder value creation. No minimum equity award is guaranteed.

- The Compensation Committee generally has referred to peer group data to help establish base salaries and target total direct compensation for each Named Executive Officer. In addition to considering the peer group data, the Compensation Committee also considers each Named Executive Officer's performance, level of responsibility in comparison to the other Named Executive Officers and other internal equitable considerations when establishing base salaries and short-term and long-term incentive award opportunities and then make adjustments it deems appropriate.

- We prohibit the backdating or spring-loading of equity awards.

- We prohibit the repricing of stock options or stock appreciation rights without stockholder approval.

- We do not provide perquisites to our Named Executive Officers.

- Our securities trading policy and Corporate Governance Guidelines prohibit any hedging of our securities by our employees, including our executive officers. This includes engaging in any type of short sale or purchasing any financial instrument (including prepaid variable forward contracts, equity swaps, collars and exchange traded funds) or engaging in any transaction that, in either case, hedges or offsets, or is designed to hedge or offset any risk of decrease in the market value of our common stock.

- Our securities trading policy and Corporate Governance Guidelines prohibit any pledging of our securities by our employees, including our executive officers. Accordingly, none of our executive officers has pledged our common stock.

- We have established stock ownership guidelines for our Named Executive Officers and impose compensation recovery ("clawback") restrictions in our senior officer equity awards in the event of certain prohibited conduct.

- We set aggregate equity awards at a level at or below the median of our peer group run rate. Our aggregate burn rate is below the 25th percentile of our peer group, and our total stock plan overhang, including outstanding equity awards and shares available for grant, is below the median of our peer group.

Table of Contents

Proposal 2 – Approval of the Compensation of our Named Executive Officers

Accordingly, we are asking our stockholders to vote "FOR" the following resolution at the Annual Meeting:

"RESOLVED, that the compensation paid to the Company's Named Executive Officers, as disclosed in the proxy statement for the Company's 2019 Annual Meeting of Stockholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the compensation tables and related narrative discussion, is hereby APPROVED."

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" APPROVAL OF THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS AS DISCLOSED IN THIS PROXY STATEMENT.**

QORVO   *2019 Proxy Statement*   51

Proposal 3 – Ratification of Appointment of Independent Registered Public Accounting Firm

## PROPOSAL 3 – RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Audit Committee has appointed Ernst & Young LLP ("EY") to audit the consolidated financial statements of Qorvo for fiscal 2020. EY, an independent registered public accounting firm, has served as Qorvo's independent auditor since fiscal 2019 when it replaced KPMG LLP ("KPMG"). A representative from EY is expected to be present at the annual meeting and will have the opportunity to make a statement if he or she desires to do so and is expected to be available to respond to appropriate questions.

Although stockholder ratification of the appointment is not required by law, we desire to solicit such ratification as a matter of good governance. If the appointment of EY is not approved by a majority of the shares present in person or represented by proxy at the annual meeting and entitled to vote, the Audit Committee will consider the appointment of another independent registered public accounting firm for fiscal 2020.

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" RATIFICATION OF THE APPOINTMENT OF ERNST & YOUNG LLP AS OUR INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING MARCH 28, 2020.**

### Recent Change in Auditor

On May 18, 2018, the Audit Committee approved the dismissal of KPMG as our independent registered public accounting firm, effective upon filing of our Annual Report on Form 10-K for the year ended March 31, 2018. Also on May 18, 2018, the Audit Committee approved the appointment of EY as our independent registered public accounting firm for the fiscal year ending March 30, 2019, effective as of the same time as the dismissal of KPMG.

The audit reports of KPMG on our consolidated financial statements as of and for the fiscal years ended March 31, 2018 and April 1, 2017 did not contain any adverse opinion or disclaimer of opinion, nor were they qualified or modified as to uncertainty, audit scope, or accounting principles.

During our fiscal years ended March 31, 2018 and April 1, 2017, and through the date of KPMG's dismissal, (i) there were no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements, if not resolved to the satisfaction of KPMG, would have caused KPMG to make reference to the subject matter of the disagreement in its report on our consolidated financial statements for such periods, and (ii) there were no reportable events of the type described in Item 304(a)(1)(v) of Regulation S-K.

We provided KPMG with a copy of our Current Report on Form 8-K reporting the change in auditor, before filing the Form 8-K with the SEC on May 23, 2018, and requested that KPMG furnish us with a letter addressed to the SEC stating whether or not KPMG agreed with the above statements and stating the respects, if any, in which KPMG did not agree with such statements. The letter from KPMG was filed as Exhibit 16.1 to the Form 8-K.

During our fiscal years ended March 31, 2018 and April 1, 2017, and through the date of EY's appointment, neither Qorvo nor anyone acting on its behalf consulted with EY regarding either: (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on our financial statements, and neither a written report nor oral advice was provided to Qorvo that EY concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions thereto) or a reportable event (as described in Item 304(a)(1)(v) of Regulation S-K).

### Independent Registered Public Accounting Firm Fee Information

The following table shows the aggregate fees that were paid or accrued for the audit and other services provided by EY for fiscal year 2019 and by KPMG for fiscal year 2018.

|  | 2019 | 2018 |
|---|---|---|
| Audit Fees | $2,200,159 | $2,253,800 |
| Audit-Related Fees | 128,000 | 1,780 |
| Tax Fees | 88,588 | 108,594 |
| All Other Fees | – | – |
| **Total** | $2,416,747 | $2,364,174 |

*Audit Fees.* This category includes fees for: (a) the audit of our annual financial statements and review of financial statements included in our quarterly reports on Form 10-Q; (b) the audit of our internal control over financial reporting; and (c) services that are normally provided by our independent registered public accounting firm in connection with statutory and regulatory filings or engagements for the relevant fiscal years.

*Audit-Related Fees.* For fiscal year 2019, this category includes fees for due diligence services provided by EY in connection with our acquisition of Active-Semi International, Inc. For fiscal year 2018, this category includes the aggregate fees for assurance and related services provided by KPMG that are reasonably related to the performance of the audits or reviews of the financial statements and which are not reported above under "Audit Fees."

*Tax Fees.* This category consists of professional services rendered by our independent registered public accounting firm for tax compliance, tax planning, tax advice and value added tax process review. The services for the fees disclosed under this category include tax return preparation, research and technical tax advice.

*All Other Fees.* This category includes the aggregate fees for products and services provided by our independent registered public accounting firm that are not reported above under "Audit Fees," "Audit-Related Fees" or "Tax Fees."

The Audit Committee has considered the compatibility of the non-audit services performed by and fees paid to EY and KPMG in fiscal years 2019 and 2018, respectively, and the proposed non-audit related services and proposed fees for fiscal year 2020 and has determined that such services and fees are compatible with the independence of EY and KPMG. All audit and non-audit related services were approved by the Audit Committee prior to such services being rendered, except for approximately $15,000 in fees paid to EY in fiscal year 2019 for tax compliance services rendered to a global affiliate of the Company. Such tax compliance services were not initially identified as an ongoing service at the time of EY's appointment as auditor for the Company in May 2018. When identified, such in-process services were suspended by EY until the services were brought to the attention of the Audit Committee and approved by the Audit Committee.

 *2019 Proxy Statement* 53

Table of Contents

Report of the Audit Committee

## REPORT OF THE AUDIT COMMITTEE

Each member of the Audit Committee is an independent director under existing Nasdaq listing standards and SEC requirements. In addition, the Board of Directors has determined that each of Mr. Gardner, Mr. Gibson and Mr. Harding is an "audit committee financial expert," as defined by SEC rules.

In the performance of its oversight function, the Audit Committee has reviewed and discussed the audited consolidated financial statements with management and the independent registered public accounting firm. The Audit Committee also has reviewed and discussed with management and the independent registered public accounting firm management's assessment of the effectiveness of our internal control over financial reporting and the independent registered public accounting firm's evaluation of our internal control over financial reporting.

The Audit Committee reviewed with the independent registered public accounting firm its judgments as to the quality, not just the acceptability, of our accounting principles and such other matters as are required to be discussed with the Audit Committee under the applicable Public Company Accounting Oversight Board standards and SEC Rule 2-07 of Regulation S-X.

The Audit Committee has received the written disclosures and the letter from the independent registered public accounting firm required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence, and has discussed with the independent registered public accounting firm that firm's independence.

Based upon the discussions and review described above, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in our Annual Report on Form 10-K for the year ended March 30, 2019 for filing with the SEC. This report has been prepared by members of the Audit Committee. Current members of this committee are:

Jeffery R. Gardner (Chair)
Daniel A. DiLeo
Charles Scott Gibson
John R. Harding
Roderick D. Nelson

54    QORVO    *2019 Proxy Statement*

## DELINQUENT SECTION 16(a) REPORTS

Under federal securities laws, Qorvo's directors, officers and beneficial owners of more than ten percent of Qorvo's common stock are required to report their beneficial ownership of common stock and any changes in that ownership to the SEC. Specific dates for such reporting have been established, and we are required to report any failure to file by the established dates. To our knowledge, all of these filing and reporting requirements were satisfied by our directors, officers and principal stockholders during the year ended March 30, 2019. During fiscal 2019, Qorvo discovered that two gifts of Qorvo common stock made by Mr. Quinsey in prior fiscal years (on November 30, 2015 and November 7, 2017) were inadvertently not timely reported. These gifts were subsequently reported in a Form 4 filed on February 26, 2019. Following fiscal 2019, Qorvo discovered that three gifts of Qorvo common stock made by Mr. Creviston in prior fiscal years (on May 21, 2015, August 25, 2016, and September 19, 2017) were inadvertently not timely reported. Also following fiscal 2019, a sale of Qorvo common stock by Mr. Creviston pursuant to his Rule 10b5-1 plan was not timely reported in May 2019. This sale and Mr. Creviston's gifts were subsequently reported in a Form 4 filed on June 18, 2019.

## RELATED PERSON TRANSACTIONS

### Related Person Transactions Policy

The Board maintains a written policy regarding transactions that involve Qorvo and any of its executive officers, directors, director nominees or five percent or greater stockholders or their affiliates, which are referred to generally as "related persons." The Governance and Nominating Committee will analyze and consider any such transaction in accordance with this written policy in order to determine whether the terms and conditions of the transaction are substantially the same as, or more favorable to Qorvo than, transactions that would be available from unaffiliated parties.

The policy governs the procedures for review and consideration of all "related person transactions," as that term is defined in the policy, to help ensure that any such transactions are timely identified and given appropriate consideration. Generally, any current or proposed financial transaction, arrangement or relationship in which a "related person" had or will have a direct or indirect material interest, in an amount exceeding $120,000 and in which Qorvo was or will be a participant, requires the approval of the Governance and Nominating Committee or a majority of the disinterested members of the Board. Before granting such approval, the Governance and Nominating Committee will consider all of the relevant facts and circumstances to ensure that the proposed transaction is in the best interest of Qorvo and its stockholders. The term "related person" is defined by the policy and by Item 404 of Regulation S-K.

In conducting its review of any proposed related person transaction, the Governance and Nominating Committee will consider all of the relevant facts and circumstances available to the Governance and Nominating Committee, including but not limited to (a) the benefits to Qorvo; (b) the impact on a director's independence in the event the related person is a director, an immediate family member of a director or an entity in which a director is a partner, stockholder or executive officer; (c) the availability of other sources for comparable products or services; (d) the terms of the proposed related person transaction; and (e) the terms available to unrelated third parties or to employees generally in an arms-length negotiation. No member of the Governance and Nominating Committee will participate in any review, consideration or approval of any related person transaction with respect to which such member or any of his or her immediate family members is the related person.

The Governance and Nominating Committee may, from time to time as it determines in its discretion to be appropriate, review periodically any previously approved or ratified related person transaction to determine if it is in the best interests of us and our stockholders to continue, modify or terminate such related person transaction.

We did not engage in any related person transactions during the year ended March 30, 2019.

Proposals for 2020 Annual Meeting

## PROPOSALS FOR 2020 ANNUAL MEETING

Pursuant to SEC Rule 14a-8, under certain conditions, stockholders may request that we include a proposal in our proxy materials for a forthcoming meeting of Qorvo stockholders. Any stockholder desiring to include a proposal in our proxy materials pursuant to Rule 14a-8 must ensure that we receive the proposal at our principal executive office in Greensboro, North Carolina by February 26, 2020 in order for the proposal to be eligible for inclusion in our proxy statement and proxy card relating to our 2020 annual meeting of stockholders.

If a stockholder desires to propose any business from the floor during the meeting (other than pursuant to Rule 14a-8 or our proxy access bylaw provisions), our bylaws provide that the stockholder must deliver or mail timely advance written notice of such business to our principal executive office. Under our bylaws, to be timely, such stockholder's notice generally must be delivered to our Secretary not later than the close of business on the 90th day before the first anniversary of the date of the preceding year's annual meeting and not earlier than the close of business on the 120th day prior to such anniversary. In the event that the date of the annual meeting is more than 30 days before or more than 60 days after the first anniversary date of the preceding year's annual meeting, then notice by the stockholder must be delivered not earlier than the close of business on the 120th day prior to the annual meeting and not later than the close of business on the 90th day prior to the annual meeting, or by the 10th day following the notice date for such meeting if the first public announcement of the date of the annual meeting is less than 100 days prior to the date of such annual meeting.

If a stockholder desires to propose a director candidate for nomination to the Board of Directors pursuant to our proxy access bylaw provisions, our bylaws provide that the stockholder must deliver or mail timely advance written notice of such nomination to our principal executive office. Under our bylaws, to be timely, such stockholder's notice generally must be delivered to our Secretary not later than the close of business on the 120th day before the first anniversary of the date the definitive proxy statement was first sent to stockholders in connection with the preceding year's annual meeting and not earlier than the close of business on the 150th day before such anniversary. In the event that the date of the annual meeting is more than 30 days before or more than 60 days after the anniversary of the preceding year's annual meeting, or if no annual meeting was held in the preceding year, then notice by the stockholder must be delivered not earlier than the close of business on the 150th day prior to such annual meeting and not later than the close of business on the later of the 120th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made.

Each item of business proposed by a stockholder, including director nominations, must be made in accordance with our bylaws, our Corporate Governance Guidelines and any other applicable law, rule or regulation. In addition, any notice of a proposed director candidate must also comply with our bylaws, including the criteria set forth under "Procedures for Director Nominations" on page 11 of this proxy statement. If written notice is not given in accordance with these requirements, the proposal or nomination will be considered deficient or untimely, as applicable, and Qorvo may exclude such business from consideration at the meeting.

If the proposal or proposed director candidate is permitted to be considered at the meeting, the proxies appointed pursuant to the proxy card will have discretionary authority to vote for or against the matter even if the proposal or proposed director candidate was not discussed in the proxy statement. Assuming that the date of our annual meeting of stockholders is not advanced or delayed in the manner described above:

- Appropriate notice of a proposal or proposed director candidate (other than pursuant to Rule 14a-8 or our proxy access bylaw provisions) for the 2020 Annual Meeting would need to be delivered to our principal executive office no earlier than April 8, 2020 and no later than May 8, 2020 to be considered timely.

- Appropriate notice of a proposed director candidate pursuant to the proxy access provisions of our bylaws for the 2020 Annual Meeting would need to be delivered to our principal executive office no earlier than January 27, 2020 and no later than February 26, 2020.

## HOUSEHOLDING OF ANNUAL MEETING MATERIALS

Some banks, brokers or other nominee record holders may be participating in the practice of "householding" annual reports, proxy statements and Notices of Internet Availability of Proxy Materials. This means that only one copy of our annual report, proxy statement or Notice of Internet Availability of Proxy Materials, as applicable, may have been sent to multiple stockholders in the same household. We will promptly deliver a separate copy of our annual report, proxy statement or Notice of Internet Availability of Proxy Materials, as applicable, to any stockholder upon request submitted in writing to Qorvo at the following address: Qorvo, Inc., 7628 Thorndike Road, Greensboro, North Carolina 27409-9421, Attention: Investor Relations Department, or by calling (336) 664-1233. Any stockholder who wants to receive separate copies of our annual report, proxy statement or Notice of Internet Availability of Proxy Materials in the future, or who is currently receiving multiple copies and would like to receive only one copy for his or her household, should contact his or her bank, broker or other nominee record holder, or contact Qorvo at the above address and telephone number.

## FINANCIAL INFORMATION

**Our annual report for the fiscal year ended March 30, 2019 is enclosed. Upon written request, we will provide without charge to any stockholder of record or beneficial owner of common stock a separate copy of our Annual Report on Form 10-K for the fiscal year ended March 30, 2019, including financial statements, filed with the SEC. Any such request should be directed to Doug Delieto, our Vice President of Investor Relations, at 7628 Thorndike Road, Greensboro, North Carolina 27409-9421. We will furnish any exhibit to our Annual Report on Form 10-K upon receipt of payment for our reasonable expenses in furnishing such exhibit.**

## OTHER BUSINESS

As of the date of this proxy statement, the Board knows of no other matter to come before the 2019 annual meeting. However, if any other matter requiring a vote of the stockholders arises, the persons named in the accompanying proxy will vote properly executed proxies in accordance with their best judgment.

By Order of the Board of Directors,

Jeffrey C. Howland
Secretary

Dated: June 25, 2019

Table of Contents



**QORVO, INC.**
**C/O BROADRIDGE**
**PO BOX 1342**
**BRENTWOOD, NY 11717**

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 p.m. Eastern Daylight Time the day before the meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by Qorvo, Inc. in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 p.m. Eastern Daylight Time the day before the meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Qorvo, Inc., c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

E81913-P26918-Z75315                    KEEP THIS PORTION FOR YOUR RECORDS

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

| **QORVO, INC.** | For All | Withhold All | For All Except | To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below. |
|---|---|---|---|---|
| **THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE DIRECTOR NOMINEES LISTED IN ITEM 1 AND "FOR" ITEMS 2 AND 3.** | ☐ | ☐ | ☐ | |

1.  ELECTION OF DIRECTORS

    **Nominees:**

    | | | | |
    |---|---|---|---|
    | 01) | Ralph G. Quinsey | 06) | Roderick D. Nelson |
    | 02) | Robert A. Bruggeworth | 07) | Dr. Walden C. Rhines |
    | 03) | Jeffery R. Gardner | 08) | Susan L. Spradley |
    | 04) | John R. Harding | 09) | Walter H. Wilkinson, Jr. |
    | 05) | David H. Y. Ho | | |

|  | | For | Against | Abstain |
|---|---|---|---|---|
| 2. | To approve, on an advisory basis, the compensation of our Named Executive Officers (as defined in the proxy statement). | ☐ | ☐ | ☐ |
| 3. | To ratify the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending March 28, 2020. | ☐ | ☐ | ☐ |

The shares represented by this proxy when properly executed will be voted in the manner directed herein by the undersigned stockholder(s). **If no direction is made, this proxy will be voted "FOR" the director nominees listed in Item 1 and "FOR" Items 2 and 3.** If any other matters properly come before the meeting, the persons named in this proxy will vote in their discretion.

For address changes and/or comments, please check this box and write them on the back where indicated.    ☐

Please indicate if you plan to attend this meeting.    Yes ☐    No ☐

Please sign your name exactly as it appears hereon. When signing as attorney, executor, administrator, trustee or guardian, please add your title as such. When signing as joint tenants, all parties in the joint tenancy must sign. If a signer is a corporation, please sign in full corporate name by a duly authorized officer.

| | | | |
|---|---|---|---|
| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |

Table of Contents

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:**
The Notice and Proxy Statement and Annual Report are available at www.proxyvote.com.

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

E81914-P26918-Z75315

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS OF QORVO, INC.**
**ANNUAL MEETING OF STOCKHOLDERS AUGUST 6, 2019**

The stockholder(s) hereby appoint(s) Robert A. Bruggeworth and Jeffrey C. Howland, or either of them, as proxies, each with the power to appoint his substitute, and hereby authorize(s) them to represent and to vote, as designated on the reverse side of this ballot, all of the shares of Common Stock of Qorvo, Inc. that the stockholder(s) is/are entitled to vote at the Annual Meeting of Stockholders to be held at 8:00 a.m. Pacific Daylight Time on August 6, 2019, at The Allison Inn, 2525 Allison Lane, Newberg, Oregon, and any adjournment or postponement thereof.

**THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED BY THE STOCKHOLDER(S). IF NO SUCH DIRECTIONS ARE MADE, THIS PROXY WILL BE VOTED "FOR" THE ELECTION OF THE DIRECTOR NOMINEES LISTED ON THE REVERSE SIDE AND "FOR" ITEMS 2 AND 3.**

**PLEASE MARK, SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY USING THE ENCLOSED REPLY ENVELOPE.**

**Address Changes/Comments:** _____

_____

(If you noted any Address Changes/Comments above, please mark corresponding box on the reverse side.)

**CONTINUED AND TO BE SIGNED ON REVERSE SIDE**