**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Qorvo, Inc.:

We have audited Qorvo, Inc.'s internal control over financial reporting as of April 2, 2016, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Qorvo, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Assessment of Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to insufficient complement of knowledgeable tax and accounting personnel; an ineffective risk assessment process to assess the changes in the regulatory environment, the organization and personnel impacting the Company's financial reporting of income taxes; and ineffective process level controls and monitoring activities over the completeness, existence, accuracy, valuation and presentation of the income tax provision, including deferred tax assets, valuation allowances, and tax uncertainties has been identified and included in management's assessment. We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Qorvo, Inc. and subsidiaries as of April 2, 2016 and March 28, 2015, and the related consolidated statements of operations, comprehensive income (loss), stockholders' equity, and cash flows for each of the years in the two-year period ended April 2, 2016. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2016 consolidated financial statements, and this report does not affect our report dated May 31, 2016, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, Qorvo, Inc. has not maintained effective internal control over financial reporting as of April 2, 2016, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We do not express an opinion or any other form of assurance on management's statements referring to corrective actions taken after April 2, 2016, relative to the aforementioned material weakness in internal control over financial reporting.

/s/ KPMG LLP

Greensboro, North Carolina
May 31, 2016

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

Not applicable.

**ITEM 9A. CONTROLS AND PROCEDURES.**

(a) Evaluation of disclosure controls and procedures

Disclosure controls and procedures refer to controls and other procedures designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding our required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

As of the end of the period covered by this annual report, the Company's management, including our Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures in accordance with Rule 13a-15 under the Exchange Act. Based on this evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that due to a material weakness in our internal control over financial reporting described below, the Company's disclosure controls and procedures were not effective as of April 2, 2016.

However, giving full consideration to the material weakness, management has concluded that the Consolidated Financial Statements included in this Annual Report on Form 10-K present fairly, in all material respects, the Company's financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. generally accepted accounting principles.

(b) Management's assessment of Internal control over financial reporting

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting and for the assessment of the effectiveness of internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed by and under the supervision of our Chief Executive Officer and Chief Financial Officer and effected by our management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the company, (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements for external purposes in accordance with U.S. generally accepted accounting principles and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company, and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the consolidated financial statements.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

Management assessed the effectiveness of the Company's internal control over financial reporting as of April 2, 2016, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013) ("COSO 2013 Framework"). Based on this assessment, management concluded that our internal control over financial reporting as of April 2, 2016 was not effective because the Company did not have a sufficient complement of trained resources with knowledge of the Company's financial reporting processes and internal control related to accounting for income taxes and therefore did not conduct an effective risk assessment process that evaluated changes in the regulatory environment, the organization and personnel that impacted financial

reporting processes and internal controls related to income taxes. As a consequence, the Company did not maintain effective process-level controls and monitoring activities over the completeness, existence, accuracy, valuation and presentation of the income tax provision, including deferred tax assets, valuation allowances, and tax uncertainties.

The control deficiencies described above resulted in immaterial misstatements in the preliminary consolidated financial statements as of and for the fiscal year ended April 2, 2016 related to income taxes that were corrected. However, these control deficiencies create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis, and therefore we concluded that the deficiencies represent a material weakness in internal control over financial reporting and our internal control over financial reporting is not effective as of April 2, 2016.

KPMG LLP, an independent registered public accounting firm, has audited the Consolidated Financial Statements included in this Annual Report on Form 10-K and, as part of its audit, has issued an adverse opinion on the effectiveness of the Company's internal control over financial reporting, which is included in this Annual Report on Form 10-K on page 98.

(c) <u>Changes in internal control over financial reporting</u>

Except for the material weakness described above, no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended April 2, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Remediation Plan**

We are actively remediating the identified material weakness, and have identified the following preliminary steps:

- Aggressively recruit to fill open positions existing within the tax department and continue to evaluate the structure of the tax organization and add resources as needed;
- Move to a single income tax provision model in conjunction with Qorvo moving from its two separate ERP systems to a single integrated ERP system; and
- Engage a qualified outside party to conduct a review and assessment of the tax provision process to determine what, if any, additional actions should be undertaken to address the control deficiencies.

**ITEM 9B. OTHER INFORMATION.**

Not applicable.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

Information required by this Item may be found in our definitive proxy statement for our 2016 Annual Meeting of Stockholders under the captions "Corporate Governance," "Executive Officers," "Proposal 1 - Election of Directors" and "Section 16(a) Beneficial Ownership Reporting Compliance," and the information therein is incorporated herein by reference.

The Company has adopted its "Code of Business Conduct and Ethics," and a copy is posted on the Company's website at www.qorvo.com, on the "Corporate Governance" tab under the "Investor Relations" page. In the event that we amend any of the provisions of the Code of Business Conduct and Ethics that requires disclosure under applicable law, SEC rules or NASDAQ listing standards, we intend to disclose such amendment on our website. Any waiver of the Code of Business Conduct and Ethics for any executive officer or director must be approved by the Board and will be promptly disclosed, along with the reasons for the waiver, as required by applicable law or NASDAQ rules.

**ITEM 11. EXECUTIVE COMPENSATION.**

Information required by this Item may be found in our definitive proxy statement for our 2016 Annual Meeting of Stockholders under the captions "Executive Compensation" and "Compensation Committee Interlocks and Insider Participation," and the information therein is incorporated herein by reference.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.**

Information required by this Item may be found in our definitive proxy statement for our 2016 Annual Meeting of Stockholders under the captions "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information," and the information therein is incorporated herein by reference.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

Information required by this Item may be found in our definitive proxy statement for our 2016 Annual Meeting of Stockholders under the captions "Related Person Transactions" and "Corporate Governance," and the information therein is incorporated herein by reference.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

Information required by this Item may be found in our definitive proxy statement for our 2016 Annual Meeting of Stockholders under the captions "Proposal 4 - Ratification of Appointment of Independent Registered Public Accounting Firm" and "Corporate Governance," and the information therein is incorporated herein by reference.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

(a)   The following documents are filed as part of this report:

    (1)   Financial Statements

        i.   Consolidated Balance Sheets as of April 2, 2016 and March 28, 2015.

        ii.   Consolidated Statements of Operations for fiscal years 2016, 2015 and 2014.

        iii. Consolidated Statements of Comprehensive (Loss) Income for fiscal years 2016, 2015 and 2014.

        iv.   Consolidated Statements of Stockholders' Equity for fiscal years 2016, 2015 and 2014.

        v.   Consolidated Statements of Cash Flows for fiscal years 2016, 2015 and 2014.

        vi.   Notes to Consolidated Financial Statements.

               Reports of Independent Registered Public Accounting Firms.

    (2)   The financial statement schedules are not included in this item as they are either included within the consolidated financial statements or the notes thereto in this Annual Report on Form 10-K or are inapplicable and, therefore, have been omitted.

    (3) The exhibits listed in the accompanying Exhibit Index are filed as a part of this Annual Report on Form 10-K.

(b) Exhibits.
    See the Exhibit Index.

(c) Separate Financial Statements and Schedules.
    None.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Qorvo, Inc.

Date:    May 31, 2016                                                   /s/ Robert A. Bruggeworth

                                                                                    By: Robert A. Bruggeworth
                                                                                    President and Chief Executive Officer

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Robert A. Bruggeworth and Steven J. Buhaly and each of them, as true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all which said attorneys-in-fact and agents or any of them, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

104

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on May 31, 2016.

| /s/ Robert A. Bruggeworth | Name: | Robert A. Bruggeworth |
|---|---|---|
| | Title: | President, Chief Executive Officer and Director |
| | | (principal executive officer) |
| /s/ Steven J. Buhaly | Name: | Steven J. Buhaly |
| | Title: | Chief Financial Officer and Secretary |
| | | (principal financial officer) |
| /s/ Gina B. Harrison | Name: | Gina B. Harrison |
| | Title: | Vice President and Corporate Controller |
| | | (principal accounting officer) |
| /s/ Ralph G. Quinsey | Name: | Ralph G. Quinsey |
| | Title: | Chairman of the Board of Directors |
| /s/ Daniel A. DiLeo | Name: | Daniel A. DiLeo |
| | Title: | Director |
| /s/ Jeffery R. Gardner | Name: | Jeffery R. Gardner |
| | Title: | Director |
| /s/ Charles Scott Gibson | Name: | Charles Scott Gibson |
| | Title: | Director |
| /s/ John R. Harding | Name: | John R. Harding |
| | Title: | Director |
| /s/ David H.Y. Ho | Name: | David H.Y. Ho |
| | Title: | Director |
| /s/ Roderick D. Nelson | Name: | Roderick D. Nelson |
| | Title: | Director |
| /s/ Dr. Walden C. Rhines | Name: | Dr. Walden C. Rhines |
| | Title: | Director |
| /s/ Walter H. Wilkinson, Jr. | Name: | Walter H. Wilkinson, Jr. |
| | Title: | Director |

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger and Reorganization dated February 22, 2014, by and among TriQuint Semiconductor, Inc., RF Micro Devices, Inc. and Rocky Holding, Inc. (incorporated by reference to Exhibit 2.1 to Amendment No. 3 to the Company's Registration Statement on Form S-4 filed with the SEC on July 21, 2014 (File No. 333-195236)) |
| 2.2 | First Amendment to Agreement and Plan of Merger and Reorganization, dated July 15, 2014, by and among RF Micro Devices, Inc., TriQuint Semiconductor, Inc. and Rocky Holding, Inc. (incorporated by reference to Exhibit 2.2 to Amendment No. 3 to the Company's Registration Statement on Form S-4 filed with the SEC on July 21, 2014 (File No. 333-195236)) |
| 2.3 | Contingent Acquisition Implementation Deed by and among TriQuint Semiconductor, Inc., Cavendish Kinetics Limited and Certain Cavendish Shareholders, dated as of August 4, 2015 (incorporated by reference to Exhibit 2.1 to the Company's Quarterly Report on Form 10-Q/A filed with the SEC on April 26, 2016)+ |
| 3.1 | Amended and Restated Certificate of Incorporation of Qorvo, Inc., as amended (incorporated by reference to Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q filed with the SEC on November 12, 2015) |
| 3.2 | Amended and Restated Bylaws of Qorvo, Inc., effective as of May 13, 2016 (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed with the SEC on May 19, 2016) |
| 4.1 | Specimen Certificate of Common Stock of Qorvo, Inc. (incorporated by reference to Exhibit 4.1 to the Company's Annual Report on Form 10-K filed with the SEC on May 27, 2015) |
| 4.2 | Indenture, dated as of November 19, 2015, among Qorvo, Inc., the Guarantors party thereto and MUFG Union Bank, N.A., as Trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 4.3 | Registration Rights Agreement, dated as of November 19, 2015, by and among Qorvo, Inc., the Guarantors named therein and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representative of the several Initial Purchasers named therein (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.1 | Qorvo, Inc. 2007 Employee Stock Purchase Plan (As Assumed and Amended by Qorvo, Inc.) (incorporated by reference to Exhibit 10.1 to the Company's Annual Report on Form 10-K filed with the SEC on May 27, 2015)* |
| 10.2 | Qorvo, Inc. 2013 Incentive Plan (As Assumed and Amended by Qorvo, Inc.) (incorporated by reference to Exhibit 99.2 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201357))* |
| 10.3 | Qorvo, Inc. 2012 Incentive Plan (As Assumed by Qorvo, Inc.) (incorporated by reference to Exhibit 99.3 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201357))* |
| 10.4 | Qorvo, Inc. 2009 Incentive Plan (As Assumed by Qorvo, Inc.) (incorporated by reference to Exhibit 99.4 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201357))* |
| 10.5 | Qorvo, Inc. 2008 Inducement Program (As Assumed by Qorvo, Inc.) (incorporated by reference to Exhibit 99.5 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201357))* |
| 10.6 | Qorvo, Inc. 1996 Stock Incentive Program (As Assumed by Qorvo, Inc.) (incorporated by reference to Exhibit 99.6 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201357))* |
| 10.7 | Qorvo, Inc. 2012 Stock Incentive Plan (As Assumed by Qorvo, Inc. and Amended and Restated Effective January 1, 2015) (incorporated by reference to Exhibit 99.1 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201358))* |
| 10.8 | 2003 Stock Incentive Plan of Qorvo, Inc. (As Assumed and Amended by Qorvo, Inc. Effective January 1, 2015) (incorporated by reference to Exhibit 99.2 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201358))* |
| 10.9 | Qorvo, Inc. 2006 Directors Stock Option Plan (As Assumed by Qorvo, Inc. and Amended Effective January 1, 2015) (incorporated by reference to Exhibit 99.3 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201358))* |

| 10.10 | Nonemployee Directors' Stock Option Plan of Qorvo, Inc. (As Assumed by Qorvo, Inc. and Amended Effective January 1, 2015) (incorporated by reference to Exhibit 99.4 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201358))* |
|---|---|
| 10.11 | Qorvo, Inc. 2015 Inducement Stock Plan (incorporated by reference to Exhibit 99.5 to the Company's Registration Statement on Form S-8 filed with the SEC on January 5, 2015 (File No. 333-201358))* |
| 10.12 | Qorvo, Inc. Form of Indemnification Agreement (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on January 5, 2015)* |
| 10.13 | Qorvo, Inc. Form of Change in Control Agreement (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on February 10, 2015)* |
| 10.14 | Qorvo, Inc. Director Compensation Program (incorporated by reference to Exhibit 10.14 to the Company's Annual Report on Form 10-K filed with the SEC on May 27, 2015)* |
| 10.15 | Qorvo, Inc. Nonqualified Deferred Compensation Plan (As Assumed and Amended and Restated Effective January 1, 2015) (incorporated by reference to Exhibit 10.15 to the Company's Annual Report on Form 10-K filed with the SEC on May 27, 2015)* |
| 10.16 | Qorvo, Inc. Cash Bonus Plan (As Assumed and Amended and Restated Effective January 1, 2015) (incorporated by reference to Exhibit 10.16 to the Company's Annual Report on Form 10-K filed with the SEC on May 27, 2015)* |
| 10.17 | Employment Agreement, dated as of November 12, 2008, between RF Micro Devices, Inc. and Robert A. Bruggeworth (As Assumed by Qorvo, Inc.) (incorporated by reference to Exhibit 10.1 to RFMD's Current Report on Form 8-K filed with the SEC on November 14, 2008 (File No. 000-22511))* |
| 10.18 | Wafer Supply Agreement, dated June 9, 2012, between RF Micro Devices, Inc. and IQE, Inc. (incorporated by reference to Exhibit 10.1 to RFMD's Quarterly Report on Form 10-Q/A filed with the SEC on January 3, 2013 (File No. 000-22511)) |
| 10.19 | Credit Agreement, dated as of April 7, 2015, by and between Qorvo, Inc., certain of its material domestic subsidiaries, Bank of America, N.A., as administrative agent, swing line lender and L/C issuer, and a syndicate of lenders (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on April 9, 2015) |
| 10.20 | First Amendment to Credit Agreement, dated as of June 5, 2015, by and between Qorvo, Inc., certain of its material domestic subsidiaries, Bank of America, N.A., as administrative agent, swing line lender and L/C issuer, and a syndicate of lenders (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on June 5, 2015) |
| 10.21 | Form of Stock Option Agreement (Senior Officers) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 5, 2015)* |
| 10.22 | Form of Restricted Stock Unit Agreement (Service-Based Award for Senior Officers) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan (incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 5, 2015)* |
| 10.23 | Form of Restricted Stock Unit Agreement (Performance-Based and Service Based Award for Senior Officers) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan (incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 5, 2015)* |
| 10.24 | Form of Restricted Stock Unit Agreement (Performance-Based Award for Senior Officers (TSR)) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan (incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 5, 2015)* |
| 10.25 | Qorvo, Inc. Severance Benefits Plan and Summary Plan Description (incorporated by reference to Exhibit 10.8 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 5, 2015)* |
| 10.26 | Second Amendment to Credit Agreement, dated as of November 12, 2015, by and between Qorvo, Inc., certain of its material domestic subsidiaries, Bank of America, N.A. as administrative agent, swing line lender and L/C issuer, and a syndicate of lenders (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on November 13, 2015). |
| 10.27 | Accelerated Share Repurchase Agreement (uncollared), dated February 16, 2016, between Qorvo, Inc. and Bank of America, N.A.# |
| 10.28 | Accelerated Share Repurchase Agreement (collared), dated February 16, 2016, between Qorvo, Inc. and Bank of America, N.A.# |

| 10.29 | Qorvo, Inc. Director Compensation Program, effective August 10, 2015* |
|---|---|
| 10.30 | Form of Stock Option Agreement (Senior Officers) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan* |
| 10.31 | Form of Restricted Stock Unit Agreement (Service-Based Award for Senior Officers) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan* |
| 10.32 | Form of Restricted Stock Unit Agreement (Performance-Based and Service Based Award for Senior Officers) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan* |
| 10.33 | Form of Restricted Stock Unit Agreement (Performance-Based Award for Senior Officers (TSR)) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan* |
| 10.34 | Form of Restricted Stock Unit Award Agreement (Director Annual/Supplemental RSU) pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan* |
| 21 | Subsidiaries of Qorvo, Inc. |
| 23.1 | Consent of Independent Registered Public Accounting Firm (KPMG LLP) |
| 23.2 | Consent of Independent Registered Public Accounting Firm (Ernst & Young LLP) |
| 31.1 | Certification of Periodic Report by Robert A. Bruggeworth, as Chief Executive Officer, pursuant to Rule 13a-14(a) or 15d-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Periodic Report by Steven J. Buhaly, as Chief Financial Officer, pursuant to Rule 13a-14(a) or 15d-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of Periodic Report by Robert A. Bruggeworth, as Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Periodic Report by Steven J. Buhaly, as Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101 | The following materials from our Annual Report on Form 10-K for the fiscal year ended April 2, 2016, formatted in XBRL (eXtensible Business Reporting Language): (i) the Consolidated Balance Sheets as of April 2, 2016 and March 28, 2015, (ii) the Consolidated Statements of Operations for the fiscal years ended April 2, 2016, March 28, 2015, and March 29, 2014, (iii) the Consolidated Statements of Stockholders' Equity for the fiscal years ended April 2, 2016, March 28, 2015 and March 29, 2014, (iv) the Consolidated Statements of Cash Flows for the fiscal years ended April 2, 2016, March 28, 2015, and March 29, 2014, and (v) the Notes to the Consolidated Financial Statements. |

# Portions of this Exhibit have been omitted and filed separately with the Securities and Exchange Commission as part of an application for confidential treatment pursuant to the Securities Exchange Act of 1934, as amended.

+ Confidential treatment has been granted with respect to certain portions of this Exhibit, which portions have been omitted and filed separately with the SEC as part of an application for confidential treatment.

* Executive compensation plan or agreement

Our SEC file number for documents filed with the SEC pursuant to the Securities Exchange Act of 1934, as amended, is 001-36801. The SEC file number for RFMD is 000-22511 and the SEC file number for TriQuint is 000-22660.

**CERTAIN CONFIDENTIAL MATERIAL APPEARING IN THIS DOCUMENT,
MARKED BY [****], HAS BEEN OMITTED AND FILED SEPARATELY WITH
THE SECURITIES AND EXCHANGE COMMISSION PURSUANT TO RULE 24B-2
PROMULGATED UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.**

February 16, 2016

To:        Qorvo, Inc.
             7628 Thorndike Road
             Greensboro, NC 27409
             Attn:     Robert G. Clancy
             Telephone:  336-678-8106
             Facsimile:  336-678-0427

From       Bank of America, N.A.
             c/o Merrill Lynch, Pierce, Fenner & Smith Incorporated
             Bank of America Tower at One Bryant Park
             New York, NY 10036
             Attn: Peter Tucker
             Telephone: 646-855-5821
             Facsimile: 646-822-5633

**Re:**        **Issuer Forward Repurchase Transaction
             (BofAML Reference Number: 168545134)**

Ladies and Gentlemen:

      The purpose of this communication (this "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between Bank of America, N.A. ("**BofA**") and Qorvo, Inc. ("**Counterparty**") on the Trade Date specified below (the "**Transaction**"). The terms of the Transaction shall be set forth in this Confirmation. This Confirmation shall constitute a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1.   This Confirmation is subject to, and incorporates, the definitions and provisions of the 2006 ISDA Definitions (including the Annex thereto) (the "**2006 Definitions**") and the definitions and provisions of the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**", and together with the 2006 Definitions, the "**Definitions**"), in each case as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**"). In the event of any inconsistency between the 2006 Definitions and the Equity Definitions, the Equity Definitions will govern.

      This Confirmation evidences a complete and binding agreement between BofA and Counterparty as to the terms of the Transaction to which this Confirmation relates. This Confirmation shall be subject to an agreement (the "**Agreement**") in the form of the 2002 ISDA Master Agreement (the "**ISDA Form**") as if BofA and Counterparty had executed an agreement in such form (without any Schedule but with the elections set forth in this Confirmation). The Transaction shall be the only Transaction under the Agreement.

      All provisions contained in, or incorporated by reference to, the Agreement will govern this Confirmation except as expressly modified herein. In the event of any inconsistency between this Confirmation and either the Definitions or the Agreement, this Confirmation shall govern. The Transaction is a Share Forward Transaction within the meaning set forth in the Equity Definitions.

2.   The terms of the particular Transaction to which this Confirmation relates are as follows:

General Terms:

          Trade Date:          February 16, 2016

          Seller:               BofA

          Buyer:               Counterparty

          Shares:              The common stock of Counterparty, par value USD 0.0001 per share (Ticker Symbol: "QRVO")

| | |
|---|---|
| Prepayment: | Applicable |
| Prepayment Amount: | As provided in Annex B to this Confirmation. |
| Prepayment Date: | The first Exchange Business Day following the Trade Date |
| Exchange: | Nasdaq Global Select |
| Related Exchange(s): | All Exchanges |
| Calculation Agent: | Bank of America, N.A. All calculations and determinations by the Calculation Agent shall be made in good faith and in a commercially reasonable manner. Following any determination, adjustment or calculation by the Calculation Agent, the Calculation Agent will upon request by Counterparty promptly following (and, in any event, within five Exchange Business Days of) such request, provide to Counterparty a report (in a commonly used file format for the storage and manipulation of financial data without disclosing any confidential or proprietary models or other information that is confidential or proprietary) displaying in reasonable detail the basis for such determination, adjustment or calculation, as the case may be. |

Valuation Terms:

| | |
|---|---|
| Averaging Dates: | Each of the consecutive Exchange Business Days commencing on, and including, the Exchange Business Day immediately following the Trade Date and ending on and including the Final Averaging Date. |
| Final Averaging Date: | The Scheduled Final Averaging Date; *provided* that BofA shall have the right, in its absolute discretion, at any time to accelerate the Final Averaging Date, in whole or in part, to any date that is on or after the Scheduled Earliest Acceleration Date by written notice to Counterparty no later than 8:00 P.M., New York City time, on the Scheduled Trading Day immediately preceding the Settlement Date. |
| | In the case of any acceleration of the Final Averaging Date in part (a "**Partial Acceleration**"), BofA shall specify in its written notice to Counterparty accelerating the Final Averaging Date the corresponding percentage of the Prepayment Amount that is subject to valuation on the related Valuation Date, and Calculation Agent shall adjust the terms of the Transaction as it deems appropriate, in a commercially reasonable manner, in order to take into account the occurrence of such Partial Acceleration (including cumulative adjustments to take into account all Partial Accelerations that occur during the term of the Transaction). For the avoidance of doubt, such adjustments shall be administrative or mechanical in nature and shall (i) not be based on an observable market, other than the market for the Shares, or an observable index, other than an index calculated or measured solely by reference to the Counterparty's own operations, (ii) be commercially reasonable in nature as permitted by the Transaction (such as to consider changes in volatility, expected dividends, stock price, strike price, stock loan rate or liquidity relevant to the Shares and Dealer's ability to maintain a commercially reasonable hedge position in the underlying shares) and (iii) retain the Counterparty's right for any settlement to be in Shares. |

| | |
|---|---|
| Scheduled Final Averaging Date: | As provided in Annex B to this Confirmation. |
| Scheduled Earliest Acceleration Date: | As provided in Annex B to this Confirmation. |
| Valuation Date: | The Final Averaging Date. |
| Averaging Date Disruption: | Modified Postponement, *provided* that notwithstanding anything to the contrary in the Equity Definitions, if a Market Disruption Event occurs on any Averaging Date, the Calculation Agent may, if appropriate in light of market conditions, regulatory considerations or otherwise, take any or all of the following actions: (i) postpone the Scheduled Final Averaging Date in accordance with Modified Postponement (as modified herein) and/or (ii) determine that such Averaging Date is a Disrupted Day only in part, in which case the Calculation Agent shall (x) determine the VWAP Price for such Disrupted Day based on Rule 10b-18 eligible transactions in the Shares on such Disrupted Day taking into account the nature and duration of such Market Disruption Event and (y) determine the Settlement Price based on an appropriately weighted average instead of the arithmetic average described under "Settlement Price" below. Any Exchange Business Day on which, as of the date hereof, the Exchange is scheduled to close prior to its normal close of trading shall be deemed not to be an Exchange Business Day; if a closure of the Exchange prior to its normal close of trading on any Exchange Business Day is scheduled following the date hereof, then such Exchange Business Day shall be deemed to be a Disrupted Day in full. Section 6.6(a) of the Equity Definitions is hereby amended by replacing the word "shall" in the fifth line thereof with the word "may," and by deleting clause (i) thereof, and Section 6.7(c)(iii)(A) of the Equity Definitions is hereby amended by replacing the word "shall" in the sixth and eighth line thereof with the word "may." |
| Market Disruption Events: | Section 6.3(a) of the Equity Definitions is hereby amended (A) by deleting the words "during the one hour period that ends at the relevant Valuation Time, Latest Exercise Time, Knock-in Valuation Time or Knock-out Valuation Time, as the case may be" in clause (ii) thereof, and (B) by replacing the words "or (iii) an Early Closure." therein with "(iii) an Early Closure, or (iv) a Regulatory Disruption." |
| | Section 6.3(d) of the Equity Definitions is hereby amended by deleting the remainder of the provision following the term "Scheduled Closing Time" in the fourth line thereof. |
| Regulatory Disruption: | Any event that BofA, in its good faith discretion and based on the advice of counsel, determines makes it appropriate with regard to any legal, regulatory or self-regulatory requirements or related policies and procedures (provided that such requirements, policies and procedures relate to regulatory issues and are generally applicable in similar situations and are applied in a consistent manner in similar transactions) for BofA to refrain from or decrease any market activity in connection with the Transaction. BofA shall notify Counterparty as soon as reasonably practicable that a Regulatory Disruption has occurred and the Averaging Dates affected by it; provided that Calculation Agent, in making any adjustment to the terms of the Transaction as a result of a Regulatory Disruption, shall make any such adjustment by reference of such event on Dealer |

3

assuming Dealer maintains a commercially reasonable Hedge Position.

**Settlement Terms:**

| | |
|---|---|
| Initial Share Delivery: | On the Initial Share Delivery Date, BofA shall deliver to Counterparty the Initial Shares. |
| Initial Share Delivery Date: | The second Exchange Business Day following the Trade Date. |
| Initial Shares: | As provided in Annex B to this Confirmation. |
| Settlement Date: | The date that falls one Settlement Cycle following the Valuation Date. |
| Settlement: | On the Settlement Date BofA shall deliver to Counterparty the Number of Shares to be Delivered if a positive number, or, if the Number of Shares to be Delivered is a negative number, the Counterparty Settlement Provisions in Annex A shall apply. |
| Number of Shares to be Delivered: | A number of Shares equal to (i)(a) the Prepayment Amount *divided by* (b) the Averaging Period Price *minus* (ii) the Initial Shares. |
| Settlement Price: | The Averaging Period Price. |
| Averaging Period Price: | (a) The arithmetic average of the VWAP Prices for all Averaging Dates *minus* (b) the Discount. |
| VWAP Price: | For any Averaging Date, the Rule 10b-18 dollar volume weighted average price per Share for such day based on transactions executed during such day, as reported on Bloomberg Page "QRVO <Equity> AQR SEC" (or any successor thereto) or, in the event such price is not so reported on such day for any reason or is manifestly incorrect, as reasonably determined in good faith and in a commercially reasonable manner by the Calculation Agent using a volume weighted method. |
| Price Adjustment Amount: | As provided in Annex B to this Confirmation. |
| Excess Dividend Amount: | For the avoidance of doubt, all references to the Excess Dividend Amount in Section 9.2(a)(iii) of the Equity Definitions shall be deleted. |
| Other Applicable Provisions: | To the extent either party is obligated to deliver Shares hereunder, the provisions of the last sentence of Section 9.2 and Sections 9.8, 9.9, 9.10, 9.11 (except that the Representation and Agreement contained in Section 9.11 of the Equity Definitions shall be modified by excluding any representations therein relating to restrictions, obligations, limitations or requirements under applicable securities laws arising as a result of the fact that Counterparty is the Issuer of the Shares) and 9.12 of the Equity Definitions will be applicable as if "Physical Settlement" applied to the Transaction. |

**Dividends:**

| | |
|---|---|
| Dividend: | Any dividend or distribution on the Shares other than any dividend or distribution of the type described in Sections 11.2(e)(i), 11.2(e)(ii)(A) or 11.2(e)(ii)(B) of the Equity Definitions. |

**Share Adjustments:**

| | |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment; *provided* that the declaration or payment of Dividends shall not be a Potential Adjustment Event. |

It shall constitute an additional Potential Adjustment Event if the Scheduled Final Averaging Date is postponed pursuant to "Averaging Date Disruption" above, in which case the Calculation Agent may, in its commercially reasonable discretion, adjust any relevant terms of the Transaction as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such postponement.

Extraordinary Events:

    Consequences of Merger Events:

|  |  |
|---|---|
| (a) Share-for-Share: | Modified Calculation Agent Adjustment |
| (b) Share-for-Other: | Cancellation and Payment |
| (c) Share-for-Combined: | Cancellation and Payment |

    Tender Offer:                                           Applicable

    Consequences of Tender Offers:

|  |  |
|---|---|
| (a) Share-for-Share: | Modified Calculation Agent Adjustment |
| (b) Share-for-Other: | Modified Calculation Agent Adjustment |
| (c) Share-for-Combined: | Modified Calculation Agent Adjustment |

    Composition of Combined Consideration:       Not Applicable

    Consequences of Announcement Events:       Modified Calculation Agent Adjustment as set forth in Section 12.3(d) of the Equity Definitions; *provided* that references to "Tender Offer" shall be replaced by references to "Announcement Event" and references to "Tender Offer Date" shall be replaced by references to "Announcement Date." An Announcement Event shall be an "Extraordinary Event" for purposes of the Equity Definitions, to which Article 12 of the Equity Definitions is applicable.

    Announcement Event:       The occurrence of an Announcement Date in respect of a potential Acquisition Transaction (as defined in Section 9 below).

    Announcement Date:       The date of the first public announcement in relation to an Acquisition Transaction, or any publicly announced change or amendment to the announcement giving rise to an Announcement Date.

    Provisions applicable to Merger Events and Tender Offers:       The consequences set forth opposite "Consequences of Merger Events" and "Consequences of Tender Offers" above shall apply regardless of whether a particular Merger Event or Tender Offer relates to an Announcement Date for which an adjustment has been made pursuant to Consequences of Announcement Events, without duplication of any such adjustment.

    New Shares:       In the definition of New Shares in Section 12.1(i) of the Equity Definitions, the text in clause (i) thereof shall be deleted in its entirety (including the word "and" following such clause (i)) and replaced with "publicly quoted, traded or listed on any of the New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or their respective successors)".

| | |
|---|---|
| Nationalization, Insolvency or Delisting: | Cancellation and Payment (Calculation Agent Determination); *provided* that in addition to the provisions of Section 12.6(a)(iii) of the Equity Definitions, it shall also constitute a Delisting if the Exchange is located in the United States and the Shares are not immediately re-listed, re-traded or re-quoted on any of the New York Stock Exchange, The NASDAQ Global Market or The NASDAQ Global Select Market (or their respective successors); if the Shares are immediately re-listed, re-traded or re-quoted on any such exchange or quotation system, such exchange or quotation system shall thereafter be deemed to be the Exchange. |

Additional Disruption Events:

| | |
|---|---|
| Change in Law: | Applicable |
| Failure to Deliver: | Applicable |
| Insolvency Filing: | Applicable |
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Loss of Stock Borrow: | Applicable |
| Maximum Stock Loan Rate: | As provided in Annex B to this Confirmation. |
| Increased Cost of Stock Borrow: | Applicable |
| Initial Stock Loan Rate: | As provided in Annex B to this Confirmation. |
| Hedging Party: | For all applicable Potential Adjustment Events and Extraordinary Events, BofA |
| Determining Party: | For all Extraordinary Events, BofA |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

3. <u>Account Details</u>:

(a) Account for payments to Counterparty:  To be provided separately upon request

(b) Account for payments to BofA:

      Bank of America
      New York, NY
      SWIFT: BOFAUS3N
      Bank Routing: 026-009-593
      Account Name: Bank of America
      Account No.: 0012334-61892

4. <u>Offices</u>:

(a) The Office of Counterparty for the Transaction is: Counterparty is not a Multibranch Party

(b) The Office of BofA for the Transaction is:

      Bank of America, N.A.
      c/o Merrill Lynch, Pierce, Fenner & Smith Incorporated
      Bank of America Tower at One Bryant Park

New York, NY 10036

5.  <u>Notices</u>: For purposes of this Confirmation:

    (a) Address for notices or communications to Counterparty:

        Qorvo, Inc.
        7628 Thorndike Road
        Greensboro, NC 27409
        Attn:     Robert G. Clancy
        Telephone:  336-678-8106
        Facsimile:   336-678-0427

    (b) Address for notices or communications to BofA:

        Bank of America, N.A.
        c/o Merrill Lynch, Pierce, Fenner & Smith Incorporated
        Bank of America Tower at One Bryant Park
        New York, NY 10036
        Attn: Peter Tucker
        Telephone: 646-855-5821
        Facsimile: 646-822-5633

6.  <u>Additional Provisions Relating to Transactions in the Shares</u>.

    (a)   Counterparty acknowledges and agrees that the Initial Shares delivered on the Initial Share Delivery Date may be sold short to Counterparty. Counterparty further acknowledges and agrees that BofA may, during (i) the period from the date hereof to the Valuation Date or, if later, the Scheduled Earliest Acceleration Date without regard to any adjustment thereof pursuant to "Special Provisions regarding Transaction Announcements" below, and (ii) the period from and including the first Settlement Valuation Date to and including the last Settlement Valuation Date, if any (together, the "**Relevant Period**"), purchase Shares in connection with the Transaction, which Shares may be used to cover all or a portion of such short sale or may be delivered to Counterparty. Such purchases will be conducted independently of Counterparty. The timing of such purchases by BofA, the number of Shares purchased by BofA on any day, the price paid per Share pursuant to such purchases and the manner in which such purchases are made, including without limitation whether such purchases are made on any securities exchange or privately, shall be within the absolute discretion of BofA. It is the intent of the parties that the Transaction comply with the requirements of Rule 10b5-1(c)(1)(i)(B) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), and the parties agree that this Confirmation shall be interpreted to comply with the requirements of Rule 10b5-1(c), and Counterparty shall not take any action that results in the Transaction not so complying with such requirements. Without limiting the generality of the preceding sentence, Counterparty acknowledges and agrees that (A) Counterparty does not have, and shall not attempt to exercise, any influence over how, when or whether BofA effects any purchases of Shares in connection with the Transaction, (B) during the period beginning on (but excluding) the date of this Confirmation and ending on (and including) the last day of the Relevant Period, neither Counterparty nor its officers or employees shall, directly or indirectly, communicate any information regarding Counterparty or the Shares to any employee of BofA or its Affiliates responsible for trading the Shares in connection with the transactions contemplated hereby, (C) Counterparty is entering into the Transaction in good faith and not as part of a plan or scheme to evade compliance with federal securities laws including, without limitation, Rule 10b-5 promulgated under the Exchange Act and (D) Counterparty will not alter or deviate from this Confirmation or enter into or alter a corresponding hedging transaction with respect to the Shares. Counterparty also acknowledges and agrees that any amendment, modification, waiver or termination of this Confirmation must be effected in accordance with the requirements for the amendment or termination of a "plan" as defined in Rule 10b5-1(c) under the Exchange Act. Without limiting the generality of the foregoing, any such amendment, modification, waiver or termination shall be made in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b-5 under the Exchange Act, and no such amendment, modification or waiver shall be made at any time at which Counterparty or any officer or director of Counterparty is aware of any material nonpublic information regarding Counterparty or the Shares.

(b)     Counterparty agrees that neither Counterparty nor any of its Affiliates or agents shall take any action that would cause Regulation M to be applicable to any purchases of Shares, or any security for which the Shares are a reference security (as defined in Regulation M), by Counterparty or any of its affiliated purchasers (as defined in Regulation M) during the Relevant Period.

(c)     Counterparty shall, at least one day prior to the first day of the Relevant Period, notify BofA of the total number of Shares purchased in Rule 10b-18 purchases of blocks pursuant to the once-a-week block exception contained in Rule 10b-18(b)(4) by or for Counterparty or any of its affiliated purchasers during each of the four calendar weeks preceding the first day of the Relevant Period and during the calendar week in which the first day of the Relevant Period occurs ("Rule 10b-18 purchase", "blocks" and "affiliated purchaser" each being used as defined in Rule 10b-18).

(d)     During the Relevant Period, Counterparty shall (i) notify BofA prior to the opening of trading in the Shares on any day on which Counterparty makes, or expects to be made, any public announcement (as defined in Rule 165(f) under the Securities Act of 1933, as amended (the "**Securities Act**") of any merger, acquisition, or similar transaction involving a recapitalization relating to Counterparty (other than any such transaction in which the consideration consists solely of cash and there is no valuation period), (ii) promptly notify BofA following any such announcement that such announcement has been made, and (iii) promptly deliver to BofA following the making of any such announcement a certificate indicating (A) Counterparty's average daily Rule 10b-18 purchases (as defined in Rule 10b-18) during the three full calendar months preceding the date of the announcement of such transaction and (B) Counterparty's block purchases (as defined in Rule 10b-18) effected pursuant to paragraph (b)(4) of Rule 10b-18 during the three full calendar months preceding the date of the announcement of such transaction. In addition, Counterparty shall promptly notify BofA of the earlier to occur of the completion of such transaction and the completion of the vote by target shareholders. Counterparty acknowledges that any such public announcement may result in a Regulatory Disruption and may cause the Relevant Period to be suspended. Accordingly, Counterparty acknowledges that its actions in relation to any such announcement or transaction must comply with the standards set forth in Section 6(a) above.

(e)     Without the prior written consent of BofA, Counterparty shall not, and shall cause its Affiliates and affiliated purchasers (each as defined in Rule 10b-18) not to, directly or indirectly (including, without limitation, by means of a cash-settled or other derivative instrument) purchase, offer to purchase, place any bid or limit order that would effect a purchase of, or commence any tender offer relating to, any Shares (or an equivalent interest, including a unit of beneficial interest in a trust or limited partnership or a depository share) or any security convertible into or exchangeable for Shares during the Relevant Period.

7.     Representations, Warranties and Agreements.

(a)     In addition to the representations, warranties and agreements in the Agreement and those contained elsewhere herein, Counterparty represents and warrants to and for the benefit of, and agrees with, BofA as follows:

(i)     As of the Trade Date, and as of the date of any election by Counterparty of the Share Termination Alternative under (and as defined in) Section 10(a) below, (A) none of Counterparty and its officers and directors is aware of any material nonpublic information regarding Counterparty or the Shares and (B) all reports and other documents filed by Counterparty with the Securities and Exchange Commission pursuant to the Exchange Act when considered as a whole (with the more recent such reports and documents deemed to amend inconsistent statements contained in any earlier such reports and documents), do not contain any untrue statement of a material fact or any omission of a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading.

(ii)     Without limiting the generality of Section 13.1 of the Equity Definitions, Counterparty acknowledges that BofA is not making any representations or warranties or taking any position or expressing any view with respect to the treatment of the Transaction under any accounting standards including ASC Topic 260, *Earnings Per Share*, ASC Topic 815, *Derivatives and Hedging*, or ASC Topic 480, *Distinguishing Liabilities from Equity* and ASC 815-40, *Derivatives and Hedging – Contracts in Entity's Own Equity* (or any successor issue statements) or under FASB's Liabilities & Equity Project.

8

(iii)   Without limiting the generality of Section 3(a)(iii) of the Agreement, the Transaction will not violate Rule 13e-1 or Rule 13e-4 under the Exchange Act.

(iv)   Prior to the Trade Date, Counterparty shall deliver to BofA a resolution of Counterparty's board of directors authorizing the Transaction and such other certificate or certificates as BofA shall reasonably request. Counterparty has publicly disclosed its intention to institute a program for the acquisition of Shares.

(v)   Counterparty is not entering into this Confirmation to create actual or apparent trading activity in the Shares (or any security convertible into or exchangeable for Shares) or to raise or depress or otherwise manipulate the price of the Shares (or any security convertible into or exchangeable for Shares) or otherwise in violation of the Exchange Act, and will not engage in any other securities or derivative transaction to such ends.

(vi)   Counterparty is not, and after giving effect to the transactions contemplated hereby will not be, required to register as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

(vii)   On the Trade Date, the Prepayment Date, the Initial Share Delivery Date and the Settlement Date, Counterparty is not, or will not be, "insolvent" (as such term is defined under Section 101(32) of the U.S. Bankruptcy Code (Title 11 of the United States Code) (the "**Bankruptcy Code**")) and Counterparty would be able to purchase the Shares hereunder in compliance with the corporate laws of the jurisdiction of its incorporation.

(viii)   No state or local (including non-U.S. jurisdictions) law, rule, regulation or regulatory order applicable to the Shares would give rise to any reporting, consent, registration or other requirement (including without limitation a requirement to obtain prior approval from any person or entity) as a result of BofA or its affiliates owning or holding (however defined) Shares.

(ix)   Counterparty shall not declare or pay any Dividend (as defined above) to holders of record as of any date occurring prior to the Settlement Date or, if the provisions of Annex A apply, the Cash Settlement Payment Date.

(x)   Counterparty understands no obligations of BofA to it hereunder will be entitled to the benefit of deposit insurance and that such obligations will not be guaranteed by any affiliate of BofA or any governmental agency.

(xi)   Counterparty is (i) a corporation for U.S. federal income tax purposes and is organized under the laws of Delaware and (ii) a "U.S. person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for U.S. federal income tax purposes.

(b)   Each of BofA and Counterparty agrees and represents that it is an "eligible contract participant" as defined in Section 1a(18) of the U.S. Commodity Exchange Act, as amended.

(c)   Counterparty acknowledges that the offer and sale of the Transaction to it is intended to be exempt from registration under the Securities Act, by virtue of Section 4(2) thereof. Accordingly, Counterparty represents and warrants to BofA that (i) it has the financial ability to bear the economic risk of its investment in the Transaction and is able to bear a total loss of its investment, (ii) it is an "accredited investor" as that term is defined in Regulation D as promulgated under the Securities Act, (iii) it is entering into the Transaction for its own account and without a view to the distribution or resale thereof, and (iv) the assignment, transfer or other disposition of the Transaction has not been and will not be registered under the Securities Act and is restricted under this Confirmation, the Securities Act and state securities laws.

(d)   Counterparty agrees and acknowledges that BofA is a "financial institution," "swap participant" and "financial participant" within the meaning of Sections 101(22), 101(53C) and 101(22A) of the Bankruptcy Code. The parties hereto further agree and acknowledge that it is the intent of the parties that (A) this Confirmation is (i) a "securities contract," as such term is defined in Section 741(7) of the Bankruptcy Code, with respect to which each payment and delivery hereunder or in connection herewith is a "termination value," "payment amount" or "other transfer

obligation" within the meaning of Section 362 of the Bankruptcy Code and a "settlement payment," within the meaning of Section 546 of the Bankruptcy Code and (ii) a "swap agreement," as such term is defined in Section 101(53B) of the Bankruptcy Code, with respect to which each payment and delivery hereunder or in connection herewith is a "termination value," "payment amount" or "other transfer obligation" within the meaning of Section 362 of the Bankruptcy Code and a "transfer," as such term is defined in Section 101(54) of the Bankruptcy Code and a "payment or other transfer of property" within the meaning of Sections 362 and 546 of the Bankruptcy Code, and (B) BofA is entitled to the protections afforded by, among other sections, Sections 362(b)(6), 362(b)(17), 362(o), 546(e), 546(g), 548(d)(2), 555, 560 and 561 of the Bankruptcy Code.

8.   Agreements and Acknowledgements Regarding Hedging.

Counterparty acknowledges and agrees that:

(a)   During the Relevant Period, BofA and its Affiliates may buy or sell Shares or other securities or buy or sell options or futures contracts or enter into swaps or other derivative securities in order to adjust its hedge position with respect to the Transaction;

(b)   BofA and its Affiliates also may be active in the market for Shares other than in connection with hedging activities in relation to the Transaction;

(c)   BofA shall make its own determination as to whether, when or in what manner any hedging or market activities in Counterparty's securities shall be conducted and shall do so in a manner that it deems appropriate to hedge its price and market risk with respect to the Settlement Price and/or the VWAP Price; and

(d)   Any market activities of BofA and its Affiliates with respect to Shares may affect the market price and volatility of Shares, as well as the Settlement Price and/or the VWAP Price, each in a manner that may be adverse to Counterparty.

9.   Special Provisions regarding Transaction Announcements.

(a)   If a Transaction Announcement occurs on or prior to the Settlement Date, the Calculation Agent shall make such adjustment to the exercise, settlement, payment or any of the other terms of the Transaction (including without limitation, the Settlement Price and the Price Adjustment Amount) as the Calculation Agent determines in good faith appropriate to account for the economic effect of the Transaction Announcement (and, for the avoidance of doubt, in such event the Number of Shares to be Delivered may be reduced below zero pursuant to the proviso to such definition). If a Transaction Announcement occurs after the Trade Date but prior to the Scheduled Earliest Acceleration Date, the Scheduled Earliest Acceleration Date shall be adjusted to be the date of such Transaction Announcement.

(b)   "**Transaction Announcement**" means (i) the announcement of an Acquisition Transaction, (ii) an announcement that Counterparty or any of its subsidiaries has entered into an agreement, a letter of intent or an understanding to enter into an Acquisition Transaction, (iii) the announcement of an intention to solicit or enter into, or to explore strategic alternatives or other similar undertaking that may include, an Acquisition Transaction, or (iv) any other announcement that in the good faith and commercially reasonable judgment of the Calculation Agent may result in an Acquisition Transaction. For the avoidance of doubt, announcements as used in this definition of Transaction Announcement refer to any public announcement whether made by the Issuer or a third party.

"**Acquisition Transaction**" means (i) any Merger Event (and for purposes of this definition the definition of Merger Event shall be read with the references therein to "100%" being replaced by "15%" and to "50%" by "85%" and as if the clause beginning immediately following the definition of Reverse Merger therein to the end of such definition were deleted) or Tender Offer, or any other transaction involving the merger of Counterparty with or into any third party, (ii) the sale or transfer of all or substantially all of the assets of Counterparty, (iii) a recapitalization, reclassification, binding share exchange or other similar transaction, (iv) any acquisition, lease, exchange, transfer, disposition (including by way of spin-off or distribution) of assets (including any capital stock or other ownership interests in subsidiaries) or other similar event by Counterparty or any of its subsidiaries where the aggregate consideration transferable or receivable by or to Counterparty or its subsidiaries exceeds 15% of the market capitalization of Counterparty and (v) any transaction

10

in which Counterparty or its board of directors has a legal obligation to make a recommendation to its shareholders in respect of such transaction (whether pursuant to Rule 14e-2 under the Exchange Act or otherwise).

10.   <u>Other Provisions</u>.

(a)   *Alternative Calculations and Payment on Early Termination and on Certain Extraordinary Events*. If either party would owe the other party any amount pursuant to Sections 12.2, 12.3, 12.6, 12.7 or 12.9 of the Equity Definitions or pursuant to Section 6(d)(ii) of the Agreement (a "**Payment Obligation**"), Counterparty shall have the right, in its sole discretion, to satisfy or to require BofA to satisfy, as the case may be, any such Payment Obligation, in whole or in part, by the Share Termination Alternative (as defined below) by giving irrevocable telephonic notice to BofA, confirmed in writing within one Scheduled Trading Day, no later than 9:30 A.M. New York City time on the Merger Date, Tender Offer Date, Announcement Date, Early Termination Date or date of cancellation or termination in respect of an Extraordinary Event, as applicable ("**Notice of Share Termination**"); *provided* that if BofA would owe Counterparty the Payment Obligation and Counterparty does not elect to require BofA to satisfy such Payment Obligation by the Share Termination Alternative in whole, BofA shall have the right, in its sole discretion, to elect to satisfy any portion of such Payment Obligation that Counterparty has not so elected by the Share Termination Alternative, notwithstanding Counterparty's failure to elect or election to the contrary; and *provided further* that Counterparty shall not have the right to so elect (but, for the avoidance of doubt, BofA shall have the right to so elect) in the event of (i) an Insolvency, a Nationalization, a Merger Event or a Tender Offer, in each case, in which the consideration or proceeds to be paid to holders of Shares consists solely of cash or (ii) an Event of Default in which Counterparty is the Defaulting Party or a Termination Event in which Counterparty is the Affected Party, which Event of Default or Termination Event resulted from an event or events within Counterparty's control. Upon such Notice of Share Termination, the following provisions shall apply on the Scheduled Trading Day immediately following the Merger Date, Tender Offer Date, Announcement Date, Early Termination Date or date of cancellation or termination in respect of an Extraordinary Event, as applicable, with respect to the Payment Obligation or such portion of the Payment Obligation for which the Share Termination Alternative has been elected (the "**Applicable Portion**"):

| | |
|---|---|
| Share Termination Alternative: | Applicable and means, if delivery pursuant to the Share Termination Alternative is owed by BofA, that BofA shall deliver to Counterparty the Share Termination Delivery Property on the date on which the Payment Obligation would otherwise be due pursuant to Section 12.7 or 12.9 of the Equity Definitions or Section 6(d)(ii) of the Agreement, as applicable, or such later date as the Calculation Agent may reasonably determine (the "**Share Termination Payment Date**"), in satisfaction of the Payment Obligation or the Applicable Portion, as the case may be. If delivery pursuant to the Share Termination Alternative is owed by Counterparty, paragraphs 2 through 5 of Annex A shall apply as if such delivery were a settlement of the Transaction to which Net Share Settlement (as defined in Annex A) applied, the Cash Settlement Payment Date were the Early Termination Date, the Forward Cash Settlement Amount were zero (0) *minus* the Payment Obligation (or the Applicable Portion, as the case may be) owed by Counterparty, and "Shares" as used in Annex A were replaced by "Share Termination Delivery Units." |
| Share Termination Delivery Property: | A number of Share Termination Delivery Units, as calculated by the Calculation Agent, equal to the Payment Obligation (or the Applicable Portion, as the case may be) divided by the Share Termination Unit Price. The Calculation Agent shall adjust the Share Termination Delivery Property by replacing any fractional portion of a security therein with an amount of cash equal to the value of such fractional security based on the values used to calculate the Share Termination Unit Price. |
| Share Termination Unit Price: | The value of property contained in one Share Termination Delivery Unit on the date such Share Termination Delivery Units are to be delivered as Share Termination Delivery Property, as determined by the Calculation Agent in its discretion by commercially reasonable means and notified by the Calculation Agent to the parties at the time of notification of the Payment Obligation. |

11

| | |
|---|---|
| Share Termination Delivery Unit: | In the case of a Termination Event, Event of Default, Delisting or Additional Disruption Event, one Share or, in the case of an Insolvency, Nationalization, Merger Event or Tender Offer, one Share or a unit consisting of the number or amount of each type of property received by a holder of one Share (without consideration of any requirement to pay cash or other consideration in lieu of fractional amounts of any securities) in such Insolvency, Nationalization, Merger Event or Tender Offer. If such Insolvency, Nationalization, Merger Event or Tender Offer involves a choice of consideration to be received by holders, such holder shall be deemed to have elected to receive the maximum possible amount of cash. |
| Failure to Deliver: | Applicable |
| Other applicable provisions: | If Share Termination Alternative is applicable, the provisions of Sections 9.8, 9.9, 9.10, 9.11 (except that the Representation and Agreement contained in Section 9.11 of the Equity Definitions shall be modified by excluding any representations therein relating to restrictions, obligations, limitations or requirements under applicable securities laws arising as a result of the fact that Counterparty is the issuer of the Shares or any portion of the Share Termination Delivery Units) and 9.12 of the Equity Definitions will be applicable as if "Physical Settlement" applied to the Transaction, except that all references to "Shares" shall be read as references to "Share Termination Delivery Units". |

(b)     *Equity Rights*. BofA acknowledges and agrees that this Confirmation is not intended to convey to it rights with respect to the Transaction that are senior to the claims of common stockholders in the event of Counterparty's bankruptcy. For the avoidance of doubt, the parties agree that the preceding sentence shall not apply at any time other than during Counterparty's bankruptcy to any claim arising as a result of a breach by Counterparty of any of its obligations under this Confirmation or the Agreement. For the avoidance of doubt, the parties acknowledge that this Confirmation is not secured by any collateral that would otherwise secure the obligations of Counterparty herein under or pursuant to any other agreement.

(c)     *Indemnification*. In the event that BofA or the Calculation Agent or any of their Affiliates becomes involved in any capacity in any action, proceeding or investigation brought by or against any person in connection with any matter referred to in this Confirmation, Counterparty shall reimburse BofA or the Calculation Agent or such Affiliate for its reasonable legal and other out-of-pocket expenses (including the cost of any investigation and preparation) incurred in connection therewith within 30 days of receipt of notice of such expenses, and shall indemnify and hold BofA or the Calculation Agent or such Affiliate harmless on an after-tax basis against any losses, claims, damages or liabilities to which BofA or the Calculation Agent or such Affiliate may become subject in connection with any such action, proceeding or investigation, except to the extent it is finally judicially determined that such losses, claims, damages, or liabilities result from gross negligence or bad faith of BofA or the Calculation Agent or a breach by BofA or the Calculation Agent of any of its covenants or obligations hereunder. If for any reason the foregoing indemnification is unavailable to BofA or the Calculation Agent or such Affiliate or insufficient to hold it harmless, then Counterparty shall contribute to the amount paid or payable by BofA or the Calculation Agent or such Affiliate as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by Counterparty on the one hand and BofA or the Calculation Agent or such Affiliate on the other hand in the matters contemplated by this Confirmation or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits received by Counterparty on the one hand and BofA or the Calculation Agent or such Affiliate on the other hand in the matters contemplated by this Confirmation but also the relative fault of Counterparty and BofA or the Calculation Agent or such Affiliate with respect to such losses, claims, damages or liabilities and any other relevant equitable considerations. The relative benefits received by Counterparty, on the one hand, and BofA or the Calculation Agent or such Affiliate, on the other hand, shall be in the same proportion as the Prepayment Amount bears to the customary brokerage commission for share repurchases multiplied by the Number of Shares to be Delivered, which number may be estimated for purposes of this sentence if the relative benefits are calculated prior to the final determination of the Number of Shares to be Delivered. The reimbursement, indemnity and contribution obligations of Counterparty under this Section 10(c) shall be in addition to any liability that Counterparty may otherwise have, shall extend upon the same terms and conditions to the partners,

directors, officers, agents, employees and controlling persons (if any), as the case may be, of BofA or the Calculation Agent and their Affiliates and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of Counterparty, BofA or the Calculation Agent, any such Affiliate and any such person. Counterparty also agrees that neither BofA, the Calculation Agent nor any of such Affiliates, partners, directors, officers, agents, employees or controlling persons shall have any liability to Counterparty for or in connection with any matter referred to in this Confirmation except to the extent that any losses, claims, damages, liabilities or expenses incurred by Counterparty result from the gross negligence or bad faith of BofA or the Calculation Agent or a breach by BofA or the Calculation Agent of any of its covenants or obligations hereunder. The foregoing provisions shall survive any termination or completion of the Transaction.

      (d)   *Staggered Settlement*. If BofA would owe Counterparty any Shares pursuant to the "Settlement Terms" above, BofA may, by notice to Counterparty on or prior to the Settlement Date (a "**Nominal Settlement Date**"), elect to deliver the Shares deliverable on such Nominal Settlement Date on two or more dates (each, a "**Staggered Settlement Date**") or at two or more times on the Nominal Settlement Date as follows: (i) in such notice, BofA will specify to Counterparty the related Staggered Settlement Dates (each of which will be on or prior to such Nominal Settlement Date) or delivery times and how it will allocate the Shares it is required to deliver under "Settlement Terms" above among the Staggered Settlement Dates or delivery times; and (ii) the aggregate number of Shares that BofA will deliver to Counterparty hereunder on all such Staggered Settlement Dates and delivery times will equal the number of Shares that BofA would otherwise be required to deliver on such Nominal Settlement Date.

      (e)   *Adjustments*. For the avoidance of doubt, whenever the Calculation Agent is called upon to make an adjustment pursuant to the terms of this Confirmation or the Definitions to take into account the effect of an event, the Calculation Agent shall make such adjustment by reference to the effect of such event on the Hedging Party, assuming that the Hedging Party maintains a commercially reasonable hedge position.

      (f)   *Transfer and Assignment*. BofA may transfer or assign without any consent of the Counterparty its rights and obligations hereunder and under the Agreement, in whole or in part, to (i) any of its affiliates, (ii) any entities sponsored or organized by, or on behalf of or for the benefit of, BofA or (iii) any person of credit quality equivalent to BofA. At any time at which any Excess Ownership Position or a Hedging Disruption exists, if BofA, in its discretion, is unable to effect a transfer or assignment to a third party in accordance with the requirements set forth above after using its commercially reasonable efforts on pricing terms and within a time period reasonably acceptable to BofA such that an Excess Ownership Position or a Hedging Disruption, as the case may be, no longer exists, BofA may designate any Scheduled Trading Day as an Early Termination Date with respect to a portion (the "**Terminated Portion**") of the Transaction, such that such Excess Ownership Position or Hedging Disruption, as the case may be, no longer exists. In the event that BofA so designates an Early Termination Date with respect to a portion of the Transaction, a payment or delivery shall be made pursuant to Section 6 of the Agreement and Section 10(a) of this Confirmation as if (i) an Early Termination Date had been designated in respect of a Transaction having terms identical to the Terminated Portion of the Transaction, (ii) Counterparty shall be the sole Affected Party with respect to such partial termination and (iii) such portion of the Transaction shall be the only Terminated Transaction. "**Excess Ownership Position**" means any of the following: (i) the Equity Percentage exceeds 9.0%, (ii) BofA or any "affiliate" or "associate" of BofA would own in excess of 13% of the outstanding Shares for purposes of Section 203 of the Delaware General Corporation Law or (iii) BofA, BofA Group (as defined below) or any person whose ownership position would be aggregated with that of BofA or BofA Group (BofA, BofA Group or any such person, a "**BofA Person**") under any federal, state or local laws, regulations or regulatory orders applicable to ownership of Shares ("**Applicable Laws**"), owns, beneficially owns, constructively owns, controls, holds the power to vote or otherwise meets a relevant definition of ownership in excess of a number of Shares equal to (x) the number of Shares that would give rise to reporting or registration obligations or other requirements (including obtaining prior approval by a state or federal regulator) of a BofA Person under Applicable Laws and with respect to which such requirements have not been met or the relevant approval has not been received or that would give rise to any consequences under the constitutive documents of Counterparty or any contract or agreement to which Counterparty is a party, in each case *minus* (y) 1% of the number of Shares outstanding on the date of determination. The "**Equity Percentage**" as of any day is the fraction, expressed as a percentage, (A) the numerator of which is the number of Shares that BofA and any of its affiliates or any other person subject to aggregation with BofA, for purposes of the "beneficial ownership" test under Section 13 of the Exchange Act, or any "group" (within the meaning of Section 13 of the Exchange Act) of which BofA is or may be deemed to be a part (BofA and any such affiliates, persons and groups, collectively, "**BofA Group**") beneficially owns (within the meaning of Section 13 of the Exchange Act), without

duplication, on such day (or, to the extent that, as a result of a change in law, regulation or interpretation after the date hereof, the equivalent calculation under Section 16 of the Exchange Act and the rules and regulations thereunder results in a higher number, such number) and (B) the denominator of which is the number of Shares outstanding on such day.

(g)     *Disposition of Hedge Shares*. Counterparty hereby agrees that if, in the good faith reasonable judgment of BofA, any Shares (the "**Hedge Shares**") acquired by BofA for the purpose of hedging its obligations pursuant to the Transaction cannot be sold in the public market by BofA without registration under the Securities Act, Counterparty shall, at its election: (i) in order to allow BofA to sell the Hedge Shares in a registered offering, make available to BofA an effective registration statement under the Securities Act to cover the resale of such Hedge Shares and (A) enter into an agreement, in form and substance satisfactory to BofA, substantially in the form of an underwriting agreement for a registered offering, (B) provide accountant's "comfort" letters in customary form for registered offerings of equity securities, (C) provide disclosure opinions of nationally recognized outside counsel to Counterparty reasonably acceptable to BofA, (D) provide other customary opinions, certificates and closing documents customary in form for registered offerings of equity securities and (E) afford BofA a reasonable opportunity to conduct a "due diligence" investigation with respect to Counterparty customary in scope for underwritten offerings of equity securities; *provided* that if BofA, in its sole reasonable discretion, is not satisfied with access to due diligence materials, the results of its due diligence investigation, or the procedures and documentation for the registered offering referred to above, then clause (ii) or clause (iii) of this Section 10(g) shall apply at the election of Counterparty; (ii) in order to allow BofA to sell the Hedge Shares in a private placement, enter into a private placement agreement substantially similar to private placement purchase agreements customary for private placements of equity securities, in form and substance satisfactory to BofA, including customary representations, covenants, blue sky and other governmental filings and/or registrations, indemnities to BofA, due diligence rights (for BofA or any designated buyer of the Hedge Shares from BofA), opinions and certificates and such other documentation as is customary for private placements agreements, all reasonably acceptable to BofA (in which case, the Calculation Agent shall make any adjustments to the terms of the Transaction that are necessary, in its reasonable judgment, to compensate BofA for any discount from the public market price of the Shares incurred on the sale of Hedge Shares in a private placement); or (iii) purchase the Hedge Shares from BofA at the Volume Weighted Average Price on such Exchange Business Days, and in the amounts, requested by BofA. "**Volume Weighted Average Price**" means, on any Exchange Business Day, the per Share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page QRVO <equity> VAP (or any successor thereto) in respect of the period from 9:30 a.m. to 4:00 p.m. (New York City time) on such Exchange Business Day (or if such volume-weighted average price is unavailable or is manifestly incorrect, the market value of one Share on such Exchange Business Day, as determined by the Calculation Agent using a volume-weighted method).

(h)     *Additional Termination Event*. It shall constitute an Additional Termination Event with respect to which the Transaction is the sole Affected Transaction and Counterparty is the sole Affected Party and BofA shall be the party entitled to designate an Early Termination Date pursuant to Section 6(b) of the Agreement if at any time during the Relevant Period, the price per Share on the Exchange, as determined by the Calculation Agent, is at or below the Threshold Price (as provided in Annex B to this Confirmation).

(i)     *Amendments to Equity Definitions*. The following amendments shall be made to the Equity Definitions:

(i)     Section 11.2(a) of the Equity Definitions is hereby amended by deleting the words "a diluting or concentrative effect on the theoretical value of the relevant Shares" and replacing them with the words "an economic effect on the relevant Transaction";

(ii)     The first sentence of Section 11.2(c) of the Equity Definitions, prior to clause (A) thereof, is hereby amended to read as follows: "(c) If 'Calculation Agent Adjustment' is specified as the Method of Adjustment in the related Confirmation of a Share Option Transaction or Share Forward Transaction, then following the announcement or occurrence of any Potential Adjustment Event, the Calculation Agent will determine whether such Potential Adjustment Event has an economic effect on the Transaction and, if so, will (i) make appropriate adjustment(s), if any, to any one or more of:" *and* the portion of such sentence immediately preceding clause (ii) thereof is hereby amended by deleting the words "diluting or concentrative" and the words "(*provided* that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Shares)" and replacing such latter phrase with the words "(and, for

14

the avoidance of doubt, adjustments may be made to account solely for changes in volatility, stock loan rate or liquidity relative to the relevant Shares)";

(iii)    Section 11.2(e)(vii) of the Equity Definitions is hereby amended by deleting the words "diluting or concentrative effect on the theoretical value of the relevant Shares" and replacing them with the words "economic effect on the relevant Transaction";

(iv)    Section 12.6(a)(ii) of the Equity Definitions is hereby amended by (1) deleting from the fourth line thereof the word "or" after the word "official" and inserting a comma therefor, and (2) deleting the semi-colon at the end of subsection (B) thereof and inserting the following words therefor "or (C) at BofA's option, the occurrence of any of the events specified in Section 5(a)(vii) (1) through (9) of the ISDA Master Agreement with respect to that issuer";

(v)    Section 12.9(b)(iv) of the Equity Definitions is hereby amended by (A) deleting (1) subsection (A) in its entirety, (2) the phrase "or (B)" following subsection (A) and (3) the phrase "in each case" in subsection (B); and (B) deleting the phrase "neither the Non-Hedging Party nor the Lending Party lends Shares in the amount of the Hedging Shares or" in the penultimate sentence; and

(vi)    Section 12.9(b)(v) of the Equity Definitions is hereby amended by (A) adding the word "or" immediately before subsection "(B)" and deleting the comma at the end of subsection (A); and (B)(1) deleting subsection (C) in its entirety, (2) deleting the word "or" immediately preceding subsection (C) and (3) replacing in the penultimate sentence the words "either party" with "the Hedging Party" and (4) deleting clause (X) in the final sentence.

(j)    *No Netting and Set-off*. Each party waives any and all rights it may have to set off obligations arising under the Agreement and the Transaction against other obligations between the parties, whether arising under any other agreement, applicable law or otherwise.

(k)    *Disclosure*. Effective from the date of commencement of discussions concerning the Transaction, Counterparty and each of its employees, representatives, or other agents may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transaction and all materials of any kind (including opinions or other tax analyses) that are provided to Counterparty relating to such tax treatment and tax structure.

(l)    *Designation by BofA*. Notwithstanding any other provision in this Confirmation to the contrary requiring or allowing BofA to purchase, sell, receive or deliver any Shares or other securities to or from Counterparty, BofA (the "**Designator**") may designate any of its Affiliates (the "**Designee**") to deliver or take delivery, as the case may be, and otherwise perform its obligations to deliver, if any, or take delivery of, as the case may be, any such Shares or other securities in respect of the Transaction, and the Designee may assume such obligations, if any. Such designation shall not relieve the Designator of any of its obligations, if any, hereunder. Notwithstanding the previous sentence, if the Designee shall have performed the obligations, if any, of the Designator hereunder, then the Designator shall be discharged of its obligations, if any, to Counterparty to the extent of such performance.

(m)    *Wall Street Transparency and Accountability Act of 2010*.  The parties hereby agree that none of (i) Section 739 of the Wall Street Transparency and Accountability Act of 2010 (the "WSTAA"), (ii) any similar legal certainty provision included in any legislation enacted, or rule or regulation promulgated, on or after the Trade Date, (iii) the enactment of the WSTAA or any regulation under the WSTAA, (iv) any requirement under the WSTAA or (v) any amendment made by the WSTAA shall limit or otherwise impair either party's right to terminate, renegotiate, modify, amend or supplement this Confirmation or the Agreement, as applicable, arising from a termination event, force majeure, illegality, increased cost, regulatory change or similar event under this Confirmation, the Equity Definitions or the Agreement (including, but not limited to, any right arising from any Change in Law, Hedging Disruption, Increased Cost of Hedging or Illegality).

(n)    *Tax Matters*

15