**Qorvo, Inc.**
**2012 Stock Incentive Plan**
**Restricted Stock Unit Agreement**
**(Performance-Based and Service-Based Award for Senior Officers)**

**Schedule A/Grant Letter**

*[Modify schedule as appropriate.]*

1.      Award Opportunity.

(a)     Pursuant to the terms and conditions of the Company's 2012 Stock Incentive Plan, as it may be amended (the "Plan"), and the Restricted Stock Unit Agreement (Performance-Based and Service-Based Award for Senior Officers) attached hereto, including any special terms and conditions for your country in the Appendix attached thereto (together, the "Agreement"), you (the "Participant") are eligible to be granted an award of Restricted Stock Units (the "Award") for the number of shares of Common Stock (the "Shares") as may be determined pursuant to this Section 1. Unless otherwise defined herein, capitalized terms in this Schedule A shall have the same definitions as set forth in the Agreement and the Plan.

(b)     No Award will be granted unless at least one of the Performance Objectives is met during the applicable Performance Period. Each of the Performance Objectives is expressed as a fixed or variable percentage of the Target number of Shares shown in Section 1(c) below (the "Target"). If a Performance Objective is met, the Participant shall be granted an Award for a number of Shares equal to the Target multiplied by the percentage assigned to such Performance Objective. One or more of the Performance Objectives may contain a variable percentage of the Target based on performance criteria applicable to such Performance Objective, and the Administrator has the sole discretion to determine if, and to what extent on a percentage basis, any such Performance Objectives are met. If all of the Performance Objectives are fully met, the Participant shall be granted an Award for the Maximum number of Shares (150% of Target) shown in Section 1(c) below. The Award shall not be granted for a particular Performance Objective until following the end of the Performance Period for that Performance Objective and then only if the terms and conditions described in the Agreement have been met. The actual number of Shares which may be subject to the Award shall be as provided in Section 1(c) below.

(c)     Number of Shares Potentially Subject to Award:

Target Number of Shares (100% of Target): _____.
Maximum Number of Shares (150% of Target)

(d)     The Performance Objectives must be met, if at all, during the applicable Performance Period, as described in Schedule B. The Administrator has sole discretion to determine if, and to what extent, any or all Performance Objectives are met and to interpret the other terms and conditions of the Agreement.

2.      Performance Objectives. The Performance Objectives for the applicable Performance Period pursuant to the Agreement, and the applicable weighting of each Performance Objective expressed as a percentage of the Target, shall be as stated in Schedule B, attached hereto, the terms of which shall be incorporated in and constitute a part of the Agreement.

A-1

Updated February 2016

3.        <u>Vesting of Award</u>. If the Award is granted in accordance with this Agreement, the Award shall vest as follows:

(a)    *General*:

(i)    The Award shall be deemed earned and vested with respect to fifty percent (50%) of the Target on the Award Date, subject to the continued employment of the Participant with the Company or an Affiliate through such vesting date;

(ii)    The Award shall be deemed earned and vested with respect to an additional twenty-five percent (25%) (for a total of seventy-five percent (75%)) of the Target on the first anniversary of the earliest Award Date applicable to any Performance Objective covered by this Agreement, subject to the continued employment of the Participant with the Company or an Affiliate through such vesting date; and

(iii)    The Award shall be deemed earned and vested with respect to an additional twenty-five percent (25%) (for a total of one hundred percent (100%)) of the Target on the second anniversary of the earliest Award Date applicable to any Performance Objective covered by this Agreement, subject to the continued employment of the Participant with the Company or an Affiliate through such vesting date.

(b)    *Special Post-Termination Earning and Vesting Terms*: Notwithstanding the provisions of Section 3(a), the following terms shall apply with respect to the Award , provided that the Participant resides in and is employed by the Company or an Affiliate based in the United States:

(i)    In the event of the Participant's termination of employment or service for Cause, the Award (and any remaining right to underlying Shares) shall be forfeited immediately.

(ii)    In the event of the Participant's death (X) before the end of the Performance Period, the Award shall be deemed automatically earned and vested at the Target effective as of the date of the Participant's death, or (Y) on or following the end of the Performance Period, to the extent the Award has previously been earned and is not fully vested as of the date of the Participant's death, the Award shall automatically fully vest effective as of the date of the Participant's death.

(iii)    In the event of the Participant's termination of employment or service for any reason (including termination due to Disability) other than death or for Cause, the following terms shall apply with respect to the Award:

A.    If the Participant (1) has executed, within the Statutory Notice Period, a Release and, if so determined by the Company, a Severance Agreement, (2) does not revoke the Release prior to the end of the seven-day statutory revocation period, and (3) satisfies the Post-Employment Condition, then (X) if the Participant's Termination Date is on or after the end of the Performance Period, to the extent the Award has previously been earned, the Award shall continue to vest, and (Y) if the Participant's Termination Date precedes the end of the Performance Period, the Award shall continue to be eligible to be earned (based on the Administrator's determination of the extent, if any, to which the Performance Objectives have been met following the end of the Performance Period) and shall vest, in each case, according to the vesting schedule stated in Section 3(a) above as if the Participant had remained an Employee of, or service provider to, the Company or an Affiliate during the Post-Termination Period.

A-2

Updated February 2016

B.      If the Participant fails to execute such Release and, if applicable, Severance Agreement, within the Statutory Notice Period, or revokes the Release prior to the end of the seven-day statutory revocation period, or violates the Post-Employment Condition, the Award (and any remaining right to underlying Shares) shall be deemed forfeited in its entirety as of the Participant's Termination Date.

C.      If the Administrator determines in the exercise of its discretion that the Participant has committed a breach or violation of the Release, the Severance Agreement, the ICN Agreement or the Post-Employment Condition at any time on or prior to the end of the Post-Termination Period (without regard to when the Administrator first discovers or has notice of any such breach or violation), then, in addition to any other remedies available to the Company at law or in equity as a result of such breach or violation, (1) the Award (and any remaining right to underlying Shares) shall immediately be forfeited in its entirety; (2) any Shares and any other benefit subject to the Award that vested following the Participant's Termination Date shall immediately be forfeited and returned to the Company (without the payment of any consideration for such Shares, including repayment of any amount paid by the Participant with respect to taxes related to the grant or vesting of the Award), and the Participant shall cease to have any interest in or right to such Shares and shall cease to be recognized as the legal owner of such Shares; and (3) any Gain realized by the Participant with respect to any Shares issued following the Participant's Termination Date shall immediately be paid by the Participant to the Company. The Administrator shall have discretion to determine the basis for termination, whether any breach of the Release, the Severance Agreement, the ICN Agreement or the Post-Employment Condition has occurred and to otherwise interpret this Section 3.

D.      If, during the Post-Termination Period, the Participant dies (1) before the end of the Performance Period, the Award shall be deemed automatically fully earned and vested at the Target effective as of the date of the Participant's death, or (2) on or after the end of the Performance Period, to the extent the Award has previously been earned and is not fully vested as of the date of the Participant's death, such Award shall automatically fully vest effective as of the date of the Participant's death.

(iv)    Except as otherwise provided in Section 3(b)(v) below, any Shares and any other benefit subject to the Award distributable to the Participant following the Termination Date pursuant to Section 3(b) herein shall be issued in accordance with the vesting schedule stated in Section 3(a) above and shall be distributed on such vesting dates or a later date(s) within the same taxable year of the Participant's Termination Date, or, if later, by the 15th day of the third calendar month following the date(s) specified in Section 3(a) and the Participant shall not be permitted, directly or indirectly, to designate the taxable year of distribution, or shall otherwise be made in accordance with Code Section 409A and related regulations.

(v)    Any Shares issuable to such person or persons as shall have acquired the right to the Award by will or by the laws of descent and distribution following the Participant's death pursuant to Section 3(b)(ii) or Section 3(b)(iii)(D) above shall be issued to such person or persons on the date that is the 90th day following the date of the Participant's death and shall be distributed on such date or a later date within the same taxable year of the Participant's death, or, if later, by the 15th day of the third calendar month following the taxable year of the Participant's death and the Participant (or such person or persons as shall have acquired the right to the Award by will or by the laws of descent and distribution) shall not be permitted, directly or indirectly, to designate the taxable year of

A-3

Updated February 2016

distribution, or shall otherwise be issued and distributed in accordance with Code Section 409A and related regulations.

(c)   *Defined Terms*: In addition to other terms defined herein or in the Agreement, the following terms shall have the meanings given below:

(i)   "Gain" means the Fair Market Value of the Company's Common Stock on the date of sale or other disposition, multiplied by the number of Shares sold or disposed of.

(ii)   "ICN Agreement" means any Inventions, Confidentiality and Nonsolicitation Agreement (without regard to the formal title of such agreement) previously entered into between the Company and the Participant.

(iii)   "Post-Employment Condition" means the Participant may not provide services (whether as an employee, consultant or advisor) to any for-profit entity other than the Company or its Affiliates during the Post-Termination Period without the approval of the Administrator, which may be exercised in its sole discretion.

(iv)   "Post-Termination Period" means the period commencing on the Participant's Termination Date and ending on the date that the last installment of Shares covered by the Award vests under this Agreement.

(v)   "Release" means an irrevocable (except to the extent required by law to be revocable) general release of claims, in form acceptable to the Company and containing such terms as may be specified by the Company in the exercise of its discretion (which discretion may include, but shall not be limited to, requiring a broad release of claims in favor of the Company).

(vi)   "Severance Agreement" means a severance or other similar agreement, in form acceptable to the Company and containing such terms as may be specified by the Company in the exercise of its discretion (which discretion may include, but shall not be limited to, requiring restrictive covenants in favor of the Company).

(vii)   "Statutory Notice Period" means twenty-one (21) days (or such other applicable statutory notice and/or consideration period) from the date a Release has been presented to the Participant by the Company.

4.   Change of Control. Notwithstanding the provisions of Section 14 of the Plan and Sections 1 and 3(a) of Schedule A, in the event of a Change of Control, the Performance Objectives shall be deemed met for an Award with the number of underlying Shares equal to 100% of the Target and the Award shall be deemed earned and vested as follows:

(a)   The Award shall be deemed earned and vested with respect to fifty percent (50%) of the Target on the date of the Change of Control, subject to the continued employment of the Participant with the Company or an Affiliate through such vesting date;

(b)   The Award shall be deemed earned and vested with respect to an additional twenty-five percent (25%) (for a total of seventy-five percent (75%)) of the Target on the second anniversary of the Effective Date, subject to the continued employment of the Participant with the Company or an Affiliate through such vesting date; and

A-4

Updated February 2016

(c)    The Award shall be deemed earned and vested with respect to an additional twenty-five percent (25%) (for a total of one hundred percent (100%)) of the Target on the third anniversary of the Effective Date, subject to the continued employment of the Participant with the Company or an Affiliate through such vesting date.

5.    <u>Dividends</u>. If the Company pays a dividend at any time after the Effective Date, such dividends shall be paid to the Participant at the end of each applicable Performance Period in accordance with Section 8 of the Agreement and Sections 3(b)(iv) and 3(b)(v) of this Schedule A if and to the extent the underlying Shares are earned in that Performance Period.

*[Signature Page to Follow]*

A-5

Updated February 2016

By my signature below, I, the Participant, hereby acknowledge receipt of this Grant Letter and the Agreement, including any special terms and conditions for my country in the Appendix attached thereto. I understand that the provisions of Schedule A and Schedule B are incorporated by reference into the Agreement and constitute a part of the Agreement. By my signature below, I further agree to be bound by the terms of the Plan and the Agreement, including but not limited to the terms of Schedule A and Schedule B herein. The Company reserves the right to treat the Award and the Agreement as cancelled, void and of no effect if the Participant fails to return a signed copy of the Grant Letter within thirty (30) days of receipt.

Signature: _____          Date: _____

*Note: If there are any discrepancies in the name shown above, please make the appropriate corrections on this form and return to Treasury Department, Qorvo, Inc., 7628 Thorndike Road, Greensboro, NC 27409-9421. Please retain a copy of the Agreement, including this Grant Letter, for your files.*

A-6

Updated February 2016

**Qorvo, Inc.**
**2012 Stock Incentive Plan**
**Restricted Stock Unit Agreement**
**(Performance-Based and Service-Based Award for Senior Officers)**

**Schedule B**
**Performance Period and Performance Objectives**

*[Modify schedule as appropriate.]*

1.  <u>Performance Period</u>.

The Performance Period is the period beginning _____, and ending on _____.

2.  <u>Performance Objectives</u>.


The Performance Objectives for the Performance Period(s) applicable to the Participant pursuant to the Agreement are as follows:

B-1

Updated February 2016

**QORVO, INC.**
**2012 STOCK INCENTIVE PLAN**
**Restricted Stock Unit Agreement**
**(Performance-Based Award for Senior Officers (TSR))**

THIS AGREEMENT, including any special terms and conditions for the Participant's country set forth in the appendix attached hereto (the "Appendix") (together with Schedule A and Schedule B, attached hereto, the "Agreement"), is made effective as of _____ (the "Effective Date") between QORVO, INC., a Delaware corporation (the "Company"), and _____, an Employee of, or individual in service to, the Company or an Affiliate (the "Participant").

<u>**RECITALS:**</u>

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "Administrator") has approved the grant to the Participant of a contingent right to receive an award of Restricted Stock Units (the "Award") for shares of Common Stock issuable under the Qorvo, Inc. 2012 Stock Incentive Plan (As Assumed by Qorvo, Inc. and Amended and Restated Effective January 1, 2015) (Formerly, the RF Micro Devices, Inc. 2012 Stock Incentive Plan), as it may be amended (the "Plan"), the grant and vesting of which Award is subject to the attainment of certain performance objectives, as further described in this Agreement;

NOW, THEREFORE, in furtherance of the purposes of the Plan, the Company and the Participant hereby agree as follows:

1.      <u>Incorporation of Plan</u>. The rights and duties of the Company and the Participant under this Agreement shall in all respects be subject to and governed by the provisions of the Plan, the terms of which are incorporated herein by reference. In the event of any conflict between the provisions in this Agreement and those of the Plan, the provisions of the Plan shall govern, unless the Administrator determines otherwise. Unless otherwise defined herein, capitalized terms in this Agreement shall have the same definitions as set forth in the Plan.

2.      <u>Certain Defined Terms</u>. The following terms used in this Agreement shall have the meanings set forth in this Section 2:

(a)     The "Award Date" is the date on which the Award or any portion of the Award is or may be granted to the Participant following the Administrator's determination regarding whether all or a portion of the Performance Objectives have been attained and completion of such other action as may be necessary to complete the grant of the Award or a portion of the Award. Performance Objectives may have separate Award Dates.

(b)     The "Effective Date" is the effective date of the Agreement, as stated above.

(c)     The "Participant" is _____. Participant ID#_____.

(d)     "Performance Objectives" are the specific performance objectives identified in Schedule B attached hereto.

(e)     The "Performance Period" or "Performance Periods" shall be the Performance Period or Performance Periods as described in Schedule B.

Updated February 2016

(f) "The Shares" shall be that number, if any, of shares of Common Stock subject to the Award which are or may be granted under this Agreement, as such number may be determined in accordance with Section 1 of Schedule A.

3.    Award Opportunity; Incorporation of the Terms of Schedule A and Schedule B of the Agreement.

(a)    The Company hereby grants to the Participant an opportunity to be granted the Award for a certain number of shares of Common Stock (as defined above, the "Shares") based upon the level of attainment of the Performance Objectives, all as described in Schedule A and Schedule B, during the Performance Period. The number, if any, of Shares subject to the Award shall be determined by the Administrator based on the achievement of the Performance Objectives described in Schedule B. No Award is being granted at this time, and no Award shall be granted unless and until the Administrator, in its sole discretion and in accordance with the terms of the Plan and this Agreement, determines whether and to what extent the Award has been earned (including but not limited to determining whether and to what extent the Performance Objectives have been met), determines the number of Shares that shall be subject to the Award and takes any other action it deems necessary or advisable in order to complete the grant.

(b)    The Participant expressly acknowledges that the terms of Schedule A and Schedule B are incorporated herein by reference and constitute part of this Agreement. The Company and the Participant further acknowledge that the Company's signature on the signature page hereof, and the Participant's signature on the Grant Letter contained in Schedule A, constitute their acceptance of all of the terms of this Agreement.

4.    Grant of Award of Restricted Stock Units. Subject to the terms of this Agreement and the Plan, the Company shall grant the Participant an Award of Restricted Stock Units (as defined above, the "Award") for that number of Shares as is determined in accordance with Schedule A and Schedule B if and only if and to the extent that the Performance Objectives are met during the applicable Performance Period, as further described in Schedule A and Schedule B. The number of Shares, if any, subject to the Award shall be determined by the Administrator in its sole discretion in accordance with the Plan and this Agreement (including Schedule A and Schedule B) following completion of the applicable Performance Period. The Award Date shall be as soon as practicable after the end of the applicable Performance Period and the Administrator's determination of the extent, if any, to which the Performance Objectives have been met and the Award has been earned (but, in any event, shall be in the calendar year that the applicable Performance Period ends). The Award shall not be deemed earned, and the Award Date shall not occur, unless and until the Administrator determines the extent, if any to which the Award has been earned following completion of the applicable Performance Period (unless the Administrator determines otherwise). The Company shall give notice to the Participant after each Performance Period regarding whether the Award applicable to that Performance Period has been granted and the number of Shares subject to the Award.

5.    Stockholder Rights. The Participant or his or her legal representatives, legatees or distributees shall not be deemed to be the holder of any Shares subject to the Award and shall not have any dividend rights (except as otherwise provided in Section 5 of Schedule A), voting rights or other rights as a stockholder unless and until (and then only to the extent that) the Award has been earned and vested and certificates for such Shares have been issued and delivered to him, her or them (or, in the case of uncertificated shares, other written evidence of ownership in accordance with Applicable Law shall have been provided).

2

Updated February 2016

6. Vesting and Earning of Award. Subject to the terms of the Plan and this Agreement, the Shares subject to the Award shall be deemed earned and vested, and such Shares shall be distributable as provided in Section 8 herein, upon such date or dates, and subject to such conditions, as are described in this Agreement, including Section 3 of Schedule A. Without limiting the effect of the foregoing, the Shares subject to the Award may vest and be earned in installments over a period of time, if so provided in Schedule A. The Participant expressly acknowledges that the Award shall vest and be earned only upon such terms and conditions as are provided in this Agreement (including Schedule A and Schedule B) and otherwise in accordance with the terms of the Plan. Notwithstanding the foregoing, the Participant shall be entitled to the greater of the benefits provided in this Agreement and any Change in Control Agreement, Employment Agreement or any other similar agreement between the Participant and the Company with respect to the terms governing the earning and vesting of the Award. Without limiting the effect of the foregoing, the Participant understands and agrees that the Administrator may delay the vesting of the Award (or portion thereof) and the issuance of the underlying Shares in order to comply with Applicable Law or applicable policies of the Company implemented to ensure compliance with such laws (including but not limited to insider trading provisions and the Company's insider trading policy); provided, however, that any such delay in vesting of the Award or issuance of Shares shall not apply to any Shares subject to an effective Rule 10b5-1 trading plan. The Administrator has sole authority to determine whether and to what degree the Award has been earned and vested and to interpret the terms and conditions of this Agreement and the Plan.

7. Effect of Termination of Employment; Forfeiture of Award. Except as may be otherwise provided in the Plan or this Agreement (including but not limited to Schedule A), in the event that the employment or service of the Participant is terminated for any reason (whether by the Company or an Affiliate or by the Participant, whether voluntary or involuntary, and regardless of the reason for such termination and whether or not found to be invalid or in breach of employment laws in the jurisdiction where the Participant is rendering services or the terms of his or her employment or service agreement, if any) and all or part of the Award has not been earned and vested as of the Participant's Termination Date pursuant to the terms of this Agreement, then the Award, to the extent not earned and vested as of the Participant's Termination Date, shall be forfeited immediately upon such termination, and the Participant shall have no further rights with respect to the Award or the Shares underlying that portion of the Award that has not yet been earned and vested. The Participant expressly acknowledges and agrees that the termination of his or her employment or service shall (except as may otherwise be provided in this Agreement or the Plan) result in forfeiture of the Award and the Shares to the extent the Award has not been earned and vested as of his or her Termination Date.

For purposes of the Award (and except as otherwise required under Code Section 409A), the Termination Date occurs on the date the Participant is no longer actively providing services to the Company or any Affiliate and will not be extended by any notice period (e.g., the Participant's period of service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where the Participant is employed or providing services, or the terms of his or her employment or service agreement, if any); and the Administrator shall have the exclusive discretion to determine when the Participant is no longer actively providing services for purposes of the Award (including whether the Participant may still be considered to be providing services while on a leave of absence).

8. Settlement of Award. The Award, if earned and vested in accordance with the terms of this Agreement, shall be payable in whole Shares. The total number of Shares that may be acquired upon vesting of the Award (or portion thereof) shall be rounded down to the nearest whole share. A certificate or certificates representing the Shares subject to the Award (or portion thereof) shall be issued in the name of the Participant or his or her beneficiary (or, in the case of uncertificated shares, other written evidence of ownership in

Updated February 2016

accordance with Applicable Law shall be provided) as soon as practicable after, and only to the extent that, the Award (or portion thereof) has vested and Shares are distributable. Shares or any other benefit subject to the Award shall, upon vesting of the Award (and except as otherwise provided in Sections 3(b)(iv) and 3(b)(v) of Schedule A), be issued and distributed to the Participant (or his or her beneficiary) no later than the later of (a) the fifteenth (15th) day of the third month following the Participant's first taxable year in which the amount is no longer subject to a substantial risk of forfeiture, or (b) the fifteenth (15th) day of the third month following the end of the Company's first taxable year in which the amount is no longer subject to a substantial risk of forfeiture, or otherwise in accordance with Code Section 409A.

9.   <u>No Right of Continued Employment or Service</u>. Nothing contained in this Agreement or the Plan shall confer upon the Participant any right to continue in the employment or service of the Company or an Affiliate or to interfere in any way with the right of the Company or an Affiliate to terminate the Participant's employment or service at any time. Except as otherwise expressly provided in the Plan and this Agreement (including but not limited to Schedule A), all rights of the Participant under the Plan with respect to the unearned or unvested portion of his or her Award shall terminate upon the Termination Date. The grant of any Award, if earned, does not create any obligation to grant further awards.

10.   <u>Nontransferability of Award and Shares</u>. The Award shall not be transferable (including by sale, assignment, pledge or hypothecation) other than by will or the laws of descent and distribution. The designation of a beneficiary in accordance with the Plan (to the extent permitted by the Administrator) does not constitute a transfer. The Participant shall not sell, transfer, assign, pledge or otherwise encumber the Shares subject to the Award until such Shares have been issued and delivered to the Participant.

11.   <u>Withholding; Tax Consequences</u>.

(a)   The Participant acknowledges that, regardless of any action taken by the Company or, if different, his or her employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items") is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer.  Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(b)   Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items.  In this regard, the Participant authorizes the Company or its respective agents to satisfy their withholding obligations with regard to all Tax-Related Items by withholding Shares to be issued upon settlement of the Award. The Company may withhold or account for Tax-Related Items by considering minimum statutory withholding rates or other applicable withholding rates. For tax purposes, the Participant is deemed to have been issued the full number of Shares subject to the vested portion of the Award, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items. In the event that the Company determines that withholding Shares is problematic under applicable local laws or has materially adverse accounting consequences, by his or her acceptance of the Award, the Participant authorizes the Company and any brokerage firm determined acceptable to the Company to sell, on his or her behalf, a whole number of Shares from those Shares issuable to the Participant as the Company determines to be appropriate to generate cash proceeds sufficient to satisfy the obligation for Tax-Related Items.  If

withholding is performed from proceeds from the sale of Shares, the Company may withhold for Tax-Related Items by considering maximum applicable rates, in which case the Participant may receive a refund of any over-withheld amount in cash and will have no entitlement to the Shares equivalent.   Alternatively, the Company or the Employer may (subject to any Code Section 409A considerations) satisfy their withholding obligations for Tax-Related Items by withholding from the Participant's wages or other cash compensation. The Company may refuse to issue or deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with his or her obligations in connection with the Tax-Related Items.

(c)    The Participant acknowledges that the Company and/or the Employer have made no warranties or representations to the Participant with respect to the Tax-Related Items (including but not limited to income tax consequences) with respect to the transactions contemplated by this Agreement, and the Participant is in no manner relying on the Company or its representatives for an assessment of such tax consequences. The Participant further acknowledges that there may be adverse tax consequences upon the grant or vesting of the Award and/or the acquisition or disposition of the Shares subject to the Award and the receipt of any dividends, and that he or she has been advised that he or she should consult with his or her own attorney, accountant and/or tax advisor regarding the decision to enter into this Agreement and the consequences thereof. The Participant also acknowledges that the Company has no responsibility to take or refrain from taking any actions in order to achieve a certain tax result for the Participant.

12.    <u>Nature of Grant</u>. In accepting the contingent right to receive the Award, the Participant acknowledges, understands and agrees that:

(a)    the Plan is established voluntarily by the Company, is discretionary in nature, and may be amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)    all decisions with respect to future equity-based awards to the Participant, if any, will be at the sole discretion of the Company;

(c)    the Participant's participation in the Plan is voluntary;

(d)    the Award and any Shares acquired under the Plan, and the value of and income attributable to the same, are not intended to replace any pension rights or compensation;

(e)    unless otherwise agreed with the Company, the Award and any Shares acquired under the Plan, and the value of and income attributable to the same, will not be granted as consideration for, or in connection with, any service the Participant may provide as a director of any Affiliate;

(f)    the Award and any Shares acquired under the Plan, and the value of and income attributable to the same, are not part of normal or expected compensation or salary for purposes of calculating any severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments;

(g)    the future value of the Shares underlying the Award is unknown and cannot be predicted;

Updated February 2016

(h)   unless otherwise provided in the Plan, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the Common Stock;

(i)   no claim or entitlement to compensation or damages shall arise from forfeiture of the Award resulting from the Participant's termination of employment or service (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of his or her employment or service agreement, if any); and

(j)   if the Participant is employed or providing services outside of the U.S.:

(i)   the Award and any Shares acquired under the Plan, and the value of and income attributable to the same, are not part of normal or expected compensation or salary for any purpose, and in no event should be considered as compensation for, or relating in any way to, past services to the Employer, the Company or any other Affiliate; and

(ii)   neither the Company, the Employer nor any other Affiliate shall be liable for any foreign exchange rate fluctuation between the Participant's local currency and the U.S. dollar that may affect the value of the Award or of any amounts due to the Participant pursuant to the vesting of the Award or the subsequent sale of any Shares acquired upon vesting.

**13.   _Data Privacy._   The Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of his or her personal data as described in this Agreement and any other Award grant materials by and among, as applicable, the Employer, the Company and any other Affiliate for the exclusive purpose of implementing, administering and managing his or her participation in the Plan.**

**The Participant understands that the Company and the Employer may hold certain personal information about him or her, including, but not limited to, his or her name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of Common Stock or directorships held in the Company or any Affiliate, details of all Restricted Stock Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in his or her favor ("Data"), for the exclusive purpose of implementing, administering and managing the Plan.**

**The Participant understands that Data will be transferred to Fidelity Stock Plan Services, LLC ("Fidelity") or to any other third party assisting in the implementation, administration and management of the Plan.  The Participant understands that the recipients of Data may be located in the Participant's country or elsewhere, and that the recipient's country may have different data privacy laws and protections than his or her country.  The Participant understands that, if he or she resides outside the U.S., the Participant may request a list with the names and addresses of any potential recipients of Data by contacting his or her local Human Resources representative.  The Participant authorizes the Company, Fidelity and any other recipients of Data which may assist the Company (presently or in the future) with implementing, administering and managing his or her participation in the Plan, including any requisite transfer of Data as may be required to a broker or other third party with whom the Participant may elect to deposit any Shares purchased upon vesting of the Award. The Participant**

6

Updated February 2016

*understands that Data will be held only as long as is necessary to implement, administer and manage his or her participation in the Plan. The Participant understands that, if he or she resides outside the U.S., the Participant may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local Human Resources representative. Further, the Participant understands that he or she is providing the consents herein on a purely voluntary basis. If the Participant does not consent, or if the Participant later seeks to revoke the consent, his or her employment status or service and career with the Employer will not be affected solely by such actions of the Participant; the only consequence of refusing or withdrawing the consent is that the Company would not be able to grant Restricted Stock Units or other equity awards to the Participant or administer or maintain such awards. Therefore, the Participant understands that refusing or withdrawing the consent may affect his or her ability to participate in the Plan. For more information on the consequences of his or her refusal to consent or withdrawal of consent, the Participant understands that he or she may contact the local Human Resources representative.*

14.     <u>Administration</u>. The authority to construe and interpret this Agreement and the Plan, and to administer all aspects of the Plan, shall be vested in the Administrator, and the Administrator shall have all powers with respect to this Agreement as are provided in the Plan, including but not limited to the sole authority to determine whether and to what degree the Award has been earned and vested. Any interpretation of this Agreement by the Administrator and any decision made by it with respect to this Agreement is final and binding.

15.     <u>Superseding Agreement; Successors and Assigns</u>. This Agreement supersedes any statements, representations or agreements of the Company with respect to the grant of the Award or any related rights, and the Participant hereby waives any rights or claims related to any such statements, representations or agreements. Except as may be otherwise provided in the Plan or expressly provided in this Agreement, this Agreement does not supersede or amend any existing Change in Control Agreement, Inventions, Confidentiality and Nonsolicitation Agreement, Noncompetition Agreement, Severance Agreement, Employment Agreement or any other similar agreement between the Participant and the Company or an Affiliate, including, but not limited to, any restrictive covenants contained in such agreements. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, administrators, next-of-kin, successors and assigns.

16.     <u>Governing Law and Venue</u>. Except as otherwise provided in the Plan or herein, this Agreement shall be construed and enforced according to the laws of the State of Delaware, without regard to the conflict of laws provisions of any state, and in accordance with applicable federal laws of the United States. For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by the Award or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of the State of North Carolina and agree that such litigation shall be conducted only in the courts of Guilford County, North Carolina, or the federal courts of the United States for the Middle District of North Carolina, and no other courts, such jurisdiction being where the Award is made and/or to be performed.

17.     <u>Electronic Delivery and Participation</u>. The Company may, in its sole discretion, decide to deliver to and obtain Participant's acceptance of any documents related to the Award or future awards of Restricted Stock Units that may be granted under the Plan by electronic means or request the Participant's consent to participate in the Plan by electronic means. The Participant hereby consents to receive and accept such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

7

18.   Language. If the Participant has received this Agreement, or any other document related to the Award and/or the Plan translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control.

19.   Appendix. The Award shall be subject to any special terms and conditions for the Participant's country set forth in the Appendix, if any. If the Participant relocates to one of the countries included in the Appendix during any Performance Period or the term of the Award, the special terms and conditions for such country shall apply to him or her to the extent the Company determines that the application of such provisions is necessary or advisable for legal or administrative reasons. The Appendix constitutes part of this Agreement.

20.   Imposition of Other Requirements. The Company reserves the right to impose other requirements on the Award and the Shares acquired upon vesting of the Award, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

21.   Amendment; Waiver. Subject to the terms of the Plan and this Agreement, this Agreement may be modified or amended only by the written agreement of the parties hereto. Notwithstanding the foregoing, the Administrator shall have unilateral authority to amend this Agreement (without Participant consent) to the extent necessary to comply with Applicable Law or changes to Applicable Law (including but not limited to U.S. federal securities laws and Code Section 409A). The waiver by the Company of a breach of any provision of this Agreement by the Participant shall not operate or be construed as a waiver of any subsequent breach by the Participant.

22.   Notices. Except as may be otherwise provided by the Plan, any written notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three (3) business days after mailed but in no event later than the date of actual receipt. Notice may also be provided by electronic submission, if and to the extent permitted by the Administrator. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, at the Company's principal office located in Greensboro, NC, attention Corporate Treasurer, Qorvo, Inc.

23.   Severability. The provisions of this Agreement are severable and if any one or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

24.   Restrictions on Award and Shares. The Company may impose such restrictions on the Award and any Shares or other benefits underlying the Award as it may deem advisable, including without limitation restrictions under the U.S. federal securities laws, the requirements of any stock exchange or similar organization and any blue sky, state or foreign securities laws applicable to such Award or Shares. Notwithstanding any other provision in the Plan or this Agreement to the contrary, the Company shall not be obligated to issue, deliver or transfer Shares, to make any other distribution of benefits, or to take any other action, unless such delivery, distribution or action is in compliance with Applicable Law (including but not limited to the requirements of the Securities Act). The Company may cause a restrictive legend to be placed on any certificate for Shares issued pursuant to the Award in such form as may be prescribed from time to time by Applicable Law or as may be advised by legal counsel. The Administrator may delay the right to receive or dispose of Shares (or other benefits) upon settlement of the Award at any time if the Administrator determines that allowing issuance of Shares (or distribution of other benefits) would violate

8

Updated February 2016

any federal, state or foreign securities laws or applicable policies of the Company, and the Administrator may provide in its discretion that any time periods to receive Shares (or other benefits) subject to the Award are tolled or extended during a period of suspension or delay (subject to any Code Section 409A considerations); provided, however, that any such delay, suspension, tolling or extension shall not apply to any Shares subject to an effective Rule 10b5-1 trading plan.

25.     <u>Counterparts; Further Instruments</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties hereto agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this Agreement.

26.     <u>Compliance with Recoupment, Ownership and Other Policies or Agreements</u>. As a condition to receiving the Award, the Participant agrees that he or she shall abide by all provisions of any equity retention policy, compensation recovery policy, stock ownership guidelines and/or other similar policies maintained by the Company, each as in effect from time to time and to the extent applicable to the Participant from time to time. In addition, the Participant shall be subject to such compensation recovery, recoupment, forfeiture, or other similar provisions as may apply at any time to the Participant under Applicable Law.

27.     <u>Foreign Asset/Account Reporting Requirements</u>. The Participant acknowledges that there may be certain foreign asset and/or account reporting requirements which may affect his or her ability to acquire or hold the Shares acquired under the Plan or cash received from participating in the Plan (including from any dividends paid on the Shares acquired under the Plan) in a brokerage or bank account outside his or her country. The Participant may be required to report such accounts, assets or transactions to the tax or other authorities in his or her country. The Participant also may be required to repatriate sale proceeds or other funds received as a result of participating in the Plan to his or her country through a designated bank or broker within a certain time after receipt. The Participant acknowledges that it is his or her responsibility to be compliant with such regulations, and the Participant should speak to his or her personal advisor on this matter.

*[Signature Page to Follow]*

9

Updated February 2016

     IN WITNESS WHEREOF, this Agreement has been executed on behalf of the Company and by the Participant effective as of the Effective Date stated herein.

**QORVO, INC.**


By:    _____

              Robert A. Bruggeworth
              President and Chief Executive Officer

Attest:

_____
Jeffrey C. Howland
Secretary


*[Signature Page of Participant to Follow on Schedule A/Grant Letter]*


10

Updated February 2016

**Qorvo, Inc.**
**2012 Stock Incentive Plan**
**Restricted Stock Unit Agreement**
**(Performance-Based Award for Senior Officers (TSR))**

**Schedule A/Grant Letter**

*[Modify schedule as appropriate.]*

1.      <u>Award Opportunity</u>.

(a)   Pursuant to the terms and conditions of the Company's 2012 Stock Incentive Plan, as it may be amended (the "Plan"), and the Restricted Stock Unit Agreement (Performance-Based Award for Senior Officers (TSR)) attached hereto, including any special terms and conditions for your country in the Appendix attached thereto (together, the "Agreement"), you (the "Participant") are eligible to be granted an award of Restricted Stock Units (the "Award") for the number of shares of Common Stock (the "Shares") as may be determined pursuant to this Section 1. Unless otherwise defined herein, capitalized terms in this Schedule A shall have the same definitions as set forth in the Agreement and the Plan.

(b)    No Award will be granted unless the Company achieves certain thresholds of Relative TSR, as outlined in the Performance Objectives set forth on Schedule B. The Award shall be divided into a series of three Performance Periods, and the Target number of Shares shown in Section 1(c) below shall be equally divided among such Performance Periods (the "Target"). If the number of Shares earned in a given Performance Period is below the Target for that Performance Period, the difference between the number of Shares earned and the Target for that Performance Period (the "Unearned Shares") will be added to the Target that may be earned in the next succeeding Performance Period, if any; however, in no event will Unearned Shares be transferred forward for more than one Performance Period. The Relative TSR Performance Objective will remain the same for each Performance Period and is expressed as a variable percentage of the Target shown in Section 1(c) below. If the Relative TSR that is achieved is equal to zero (0) as set forth on Schedule B, the Participant shall be granted an Award for a number of Shares equal to the Target for that Performance Period. If the Relative TSR that is achieved is greater or less than zero (0), to the extent it exceeds the minimum Relative TSR threshold of set forth in Schedule B, the Target for the Performance Period will be multiplied by the percentage assigned to the threshold level of Relative TSR achieved as set forth in Schedule B. If the Company achieves the highest threshold of Relative TSR, forty percent (40%) or greater, as set forth on Schedule B, the Participant shall be granted an Award for the maximum number of Shares (200% of Target) shown in Section 1(c) below. The Award for each Performance Period shall not be granted until following the end of such Performance Period and then only if the terms and conditions described in the Agreement have been met. The aggregate number of Shares which may be subject to the Award shall be as provided in Section 1(c) below.

(c)   Target Number of Shares: _____
Maximum Number of Shares (200% of Target)

(d)    The Relative TSR thresholds must be met, as described in the Performance Objectives set forth in Schedule B, if at all, during the applicable Performance Period. The Administrator has sole discretion to determine if, and to what extent, any or all Performance Objectives are met and to interpret the other terms and conditions of the Agreement.

A-1

Updated February 2016

2.      _Performance Objectives_. The Relative TSR thresholds for each Performance Period pursuant to the Agreement, and the award multiplier associated with each Relative TSR level, expressed as a percentage of the Target for a given Performance Period, shall be as stated in Schedule B, attached hereto, the terms of which shall be incorporated in and constitute a part of the Agreement.

3.      _Earning of Award_. If the Award is granted in accordance with this Agreement, the Award shall vest and be earned as follows:

(a)     _General_:

(i)      Up to one-third (1/3) of the Shares subject to the Award shall vest and be earned as of the date the Administrator determines the Relative TSR for the fiscal year following the date hereof (the "1 Year Relative TSR Performance Period") if and to the extent that the Relative TSR for that Performance Period exceeds the minimum Relative TSR thresholds set forth in Schedule B;

(ii)     Up to an additional one-third (1/3) of the Shares subject to the Award, plus any Unearned Shares from the 1 Year Relative TSR Performance Period, shall vest and be earned as of the date the Administrator determines the Relative TSR for the fiscal year period ended two years from the date hereof (the "2 Year Relative TSR Performance Period") if and to the extent that the Relative TSR for that Performance Period exceeds the minimum Relative TSR thresholds set forth in Schedule B; and

(iii)    Up to an additional one-third (1/3) of the Shares subject to the Award, plus any Unearned Shares from the 2 Year Relative TSR Performance Period (but excluding any Unearned Shares carried over from the 1 Year Relative TSR Performance Period) shall vest and be earned as of the date the Administrator determines the Relative TSR for the fiscal year period ended three years from the date hereof (the "3 Year Relative TSR Performance Period") if and to the extent that the Relative TSR for that Performance Period exceeds the minimum Relative TSR thresholds set forth in Schedule B.

(b)     _Special Post-Termination Earning and Vesting Terms_: Notwithstanding the provisions of Section 3(a), the following terms shall apply with respect to the Award, provided that the Participant resides in and is employed by the Company or an Affiliate based in the United States:

(i)     In the event of the Participant's termination of employment or service for Cause, the Award (and any remaining right to underlying Shares) shall be forfeited immediately.

(ii)     In the event of the Participant's death (X) before the end of any Performance Period, the Award shall automatically be deemed earned and fully vested at 100% of the Target for such Performance Period (but excluding any Unearned Shares that may be available for carryover from any prior Performance Period) effective as of the date of the Participant's death, or (Y) on or following the end of any Performance Period, to the extent the Award has not previously been earned and fully vested as of the date of the Participant's death, the Award shall be eligible to be earned and fully vested effective as of the date of the Participant's death (based on the Administrator's determination of the extent, if any, to which the Performance Objectives have been met following the end of such Performance Period).

(iii)    In the event of the Participant's termination of employment or service for any reason (including termination due to Disability) other than death or for Cause, the following terms shall apply with respect to the Award:

A-2

Updated February 2016

A.    If the Participant (1) has executed, within the Statutory Notice Period, a Release and, if so determined by the Company, a Severance Agreement, (2) does not revoke the Release prior to the end of the seven-day statutory revocation period, and (3) satisfies the Post-Employment Condition, then the Award shall continue to be eligible to be earned (based on the Administrator's determination of the extent, if any, to which the Performance Objectives have been met following the end of the applicable Performance Period) and vested according to the earning and vesting schedule stated in Section 3(a) above as if the Participant had remained an employee of, or service provider to, the Company or an Affiliate during the Post-Termination Period.

B.    If the Participant fails to execute such Release and, if applicable, Severance Agreement, within the Statutory Notice Period, or revokes the Release prior to the end of the seven-day statutory revocation period, or violates the Post-Employment Condition, the Award (and any remaining right to underlying Shares) shall be deemed forfeited in its entirety as of the date of the Participant's Termination Date.

C.    If the Administrator determines in the exercise of its discretion that the Participant has committed a breach or violation of the Release, the Severance Agreement, the ICN Agreement or the Post-Employment Condition at any time on or prior to end of the Post-Termination Period (without regard to when the Administrator first discovers or has notice of any such breach or violation), then, in addition to any other remedies available to the Company at law or in equity as a result of such breach or violation, (1) the Award (and any remaining right to underlying Shares) shall immediately be forfeited in its entirety; (2) any Shares and any other benefit subject to the Award that vested following the Participant's Termination Date shall immediately be forfeited and returned to the Company (without the payment of any consideration for such Shares, including repayment of any amount paid by the Participant with respect to taxes related to the grant or vesting of the Award), and the Participant shall cease to have any interest in or right to such Shares and shall cease to be recognized as the legal owner of such Shares; and (3) any Gain realized by the Participant with respect to any Shares issued following the Participant's Termination Date shall immediately be paid by the Participant to the Company. The Administrator shall have discretion to determine the basis for termination, whether any breach of the Release, the Severance Agreement, the ICN Agreement or the Post-Employment Condition has occurred and to otherwise interpret this Section 3.

D.    If, during the Post-Termination Period, the Participant dies (1) before the end of any Performance Period, the Award shall automatically be deemed earned and fully vested at 100% of the Target for such Performance Period (but excluding any Unearned Shares that may be available for carryover from any prior Performance Period) effective as of the date of the Participant's death, or (2) on or following the end of any Performance Period, to the extent the Award has not previously been earned and fully vested as of the date of the Participant's death, the Award shall be eligible to be earned and fully vested effective as of the date of the Participant's death (based on the Administrator's determination of the extent, if any, to which the Performance Objectives have been met following the end of such Performance Period).

(iv)    Except as otherwise provided in Section 3(b)(v) below, any Shares and any other benefit subject to the Award distributable to the Participant following the Termination Date pursuant to Section 3(b) herein shall be issued in accordance with the earning and vesting schedule stated in Section 3(a) above and shall be distributed on such earning and vesting dates or a later date(s) within the same taxable year of the Participant, or, if later, by the 15th day of the third calendar month following the date(s) specified in Section 3(a) and the Participant shall not be permitted, directly or

A-3

Updated February 2016

indirectly, to designate the taxable year of distribution, or shall otherwise be made in accordance with Code Section 409A and related regulations.

(v)    Any Shares issuable to such person or persons as shall have acquired the right to the Award by will or by the laws of intestate succession following the Participant's death pursuant to Section 3(b)(ii) or Section 3(b)(iii)(D) above shall be issued to such person or persons on the date that is the 90th day following the date of the Participant's death and shall be distributed on such date or a later date within the same taxable year of the Participant's death, or, if later, by the 15th day of the third calendar month following the taxable year of the Participant's death and the Participant (or such person or persons as shall have acquired the right to the Award by will or by the laws of intestate succession) shall not be permitted, directly or indirectly, to designate the taxable year of distribution, or shall otherwise be made in accordance with Code Section 409A and related regulations.

(c)    *Defined Terms*: In addition to other terms defined herein or in the Agreement, the following terms shall have the meanings given below:

(i)    "Gain" means the Fair Market Value of the Company's Common Stock on the date of sale or other disposition, multiplied by the number of Shares sold or disposed of.

(ii)    "ICN Agreement" means any Inventions, Confidentiality and Nonsolicitation Agreement (without regard to the formal title of such agreement) previously entered into between the Company and the Participant.

(iii)    "Post-Employment Condition" means the Participant may not provide services (whether as an employee, consultant or advisor) to any for-profit entity other than the Company or its Affiliates during the Post-Termination Period without the approval of the Administrator, which may be exercised in its sole discretion.

(iv)    "Post-Termination Period" means the period commencing on the Participant's Termination Date and ending on the date that the last installment of Shares covered by the Award is earned and vests under this Agreement.

(v)    "Release" means an irrevocable (except to the extent required by law to be revocable) general release of claims, in form acceptable to the Company and containing such terms as may be specified by the Company in the exercise of its discretion (which discretion may include, but shall not be limited to, requiring a broad release of claims in favor of the Company).

(vi)    "Severance Agreement" means a severance or other similar agreement, in form acceptable to the Company and containing such terms as may be specified by the Company in the exercise of its discretion (which discretion may include, but shall not be limited to, requiring restrictive covenants in favor of the Company).

(vii)    "Statutory Notice Period" means twenty-one (21) days (or such other applicable statutory notice and/or consideration period) from the date a Release has been presented to the Participant by the Company.

4.    <u>Change of Control</u>.

(a)    In the event of a Change of Control, the remaining Performance Period(s) will be truncated. In such a case, the TSR of the Company will be measured as of the date of the Change

A-4

Updated February 2016

of Control, using the transaction price. For the avoidance of doubt, no averaging period as described in the definition of "TSR" will be applied to the ending price for the Company. The TSR of the Benchmark will be measured using the 90-day period ending on the date of the Change of Control.

      (b)    The number of Award Shares will be based upon the Relative TSR thresholds outlined in the Performance Objectives set forth in Schedule B.

      (c)    The number of Award Shares that may be earned during any remaining Performance Period(s) shall be pro-rated based on a fraction, the numerator of which is the number of days between the first day of such remaining Performance Period and the date of the Change of Control and the denominator of which is the number of days between the first day of such remaining Performance Period and the last day of the third and last Performance Period. Such pro-rated Award Shares shall become fully vested upon the date of the Change of Control. Any Award Shares, to the extent not previously vested or forfeited prior to the Change of Control, in excess of the pro-rated number of Award Shares described in the preceding sentence will convert into a time-based award that will vest at the end of each remaining Performance Period, subject to the Participant's continued service throughout each such Performance Period. Further, in the event that the employment of the Participant is terminated within one (1) year (or such other period after a Change of Control as may be stated in the Participant's Change in Control agreement, employment agreement or similar agreement, if applicable) after the date of the Change of Control and such termination of employment (A) is by the Company not for Cause (as defined in the Plan) or (B) is by the Participant for Good Reason (as defined in the Plan), the aforementioned time-based award will accelerate and fully vest on the Participant's Termination Date.

      5.   <u>Dividends</u>. If the Company pays a dividend at any time after the Effective Date, such dividends shall be paid to the Participant at the end of each applicable Performance Period in accordance with Section 8 of the Agreement and Sections 3(b)(iv) and 3(b)(v) of this Schedule A if and to the extent the underlying Shares are earned in that Performance Period.

      6.   <u>Definitions</u>. For purposes of this Agreement, the following terms have the following meanings:

      (a)    "Benchmark" is the S&P SPDR Semiconductor ETF index (NYSE: XSD) or any successor index that may be selected by the Administrator.

      (b)    "Relative TSR" equals the Company's TSR minus the Benchmark's TSR during an applicable Performance Period.

      (c)    "TSR" means total stockholder return, measured by taking the average share price during the final 90 days of the Performance Period divided by the average share price during the 90 days ending on the day prior to the start of the Performance Period. In calculating TSR, share prices will be adjusted to reflect the reinvestment of dividends, if any, to reflect the Company's and Benchmark's TSR.

*[Signature Page to Follow]*

A-5

Updated February 2016

By my signature below, I, the Participant, hereby acknowledge receipt of this Grant Letter and the Agreement, including any special terms and conditions for my country in the Appendix attached thereto. I understand that the provisions of Schedule A and Schedule B are incorporated by reference into the Agreement and constitute a part of the Agreement. By my signature below, I further agree to be bound by the terms of the Plan and the Agreement, including but not limited to the terms of Schedule A and Schedule B herein. The Company reserves the right to treat the Award and the Agreement as cancelled, void and of no effect if the Participant fails to return a signed copy of the Grant Letter within thirty (30) days of receipt.

Signature: _____   Date: _____

*Note: If there are any discrepancies in the name shown above, please make the appropriate corrections on this form and return to Treasury Department, Qorvo, Inc., 7628 Thorndike Road, Greensboro, NC 27409-9421. Please retain a copy of the Agreement, including this Grant Letter, for your files.*

A-6

Updated February 2016

**Qorvo, Inc.**
**2012 Stock Incentive Plan**
**Restricted Stock Unit Agreement**
**(Performance-Based Award for Senior Officers)**
<u>Schedule B</u>
<u>Performance Period and Performance Objectives</u>

*[Modify schedule as appropriate.]*

1. <u>Performance Period</u>.

    1 Year Relative TSR Performance Period:

    2 Year Relative TSR Performance Period:

    3 Year Relative TSR Performance Period:


2. <u>Performance Objectives</u>.

    Awards are earned based on the Relative TSR in each of the 1 Year TSR Performance Period, 2 Year Relative TSR Performance Period and 3 Year Relative TSR Performance Period. The Award shall be earned based upon a sliding scale that ranges from zero percent (0%) to two hundred percent (200%) of the Target. One hundred percent (100%) of the Award shall be earned if the Relative TSR equals zero (0). The number of Shares earned will increase or decrease, as applicable, by 2.5% for each percentage point that the Relative TSR is greater or less than zero (0), as illustrated in the table below. Notwithstanding the foregoing, no Award shall be earned and no Shares shall be vested in the event that the Relative TSR is less than negative thirty percent (-30%).

| Relative TSR Performance | Award Multiplier |
|---|---|
| +40% or greater | 200% |
| +20% | 150% |
| 0% | 100% |
| -20% | 50% |
| -30% | 25% |
| Less than -30% | 0% |

B-1

Updated February 2016

QORVO, INC.

**2012 STOCK INCENTIVE PLAN**
**Restricted Stock Unit Agreement**
**(Director Annual/Supplemental RSU)**

THIS AGREEMENT (together with Schedule A, attached hereto, the "Agreement") is made effective as of the Grant Date (as defined in Section 2 below) between QORVO, INC., a Delaware corporation (the "Company"), and _____, a Director of the Company or an Affiliate (the "Participant").

<u>**RECITALS:**</u>

In furtherance of the purposes of the Qorvo, Inc. 2012 Stock Incentive Plan (As Assumed by Qorvo, Inc. and Amended and Restated Effective January 1, 2015) (Formerly, the RF Micro Devices, Inc. 2012 Stock Incentive Plan), as it may be amended (the "Plan"), and in consideration of the services of the Participant and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Participant hereby agree as follows:

1.      <u>Incorporation of Plan</u>. The rights and duties of the Company and the Participant under this Agreement shall in all respects be subject to and governed by the provisions of the Plan, the terms of which are incorporated herein by reference. In the event of any conflict between the provisions in the Agreement and those of the Plan, the provisions of the Plan shall govern, unless the Administrator determines otherwise. Unless otherwise defined herein, capitalized terms in this Agreement shall have the same definitions as set forth in the Plan.

2.      <u>Terms of Award</u>. The following terms used in this Agreement shall have the meanings set forth in this Section 2:

a.      The "Participant" is _____.

b.      The "Grant Date" is _____.

c.      The "Restriction Period" is the period beginning on the Grant Date and ending on such date or dates and occurrence of such conditions as described in Schedule A, which is attached hereto and expressly made a part of this Agreement.

d.      The number of shares of Common Stock subject to the award of Restricted Stock Units granted under this Agreement shall be _____ shares (the "Shares").

3.      <u>Grant of Award of Restricted Stock Units</u>. Subject to the terms of this Agreement and the Plan, the Company hereby grants the Participant an award of Restricted Stock Units (the "Award") for that number of Shares as is set forth in Section 2. <u>The Participant expressly acknowledges that the terms of Schedule A shall be incorporated herein by reference and shall constitute part of this Agreement. The Company and the Participant further acknowledge that the Company's signature on the signature page hereof, and the Participant's signature on the Grant Letter contained in Schedule A, shall constitute their acceptance of all of the terms of this Agreement.</u>

4.      <u>Stockholder Rights</u>. The Participant or his or her legal representatives, legatees or distributees shall not be deemed to be the holder of any Shares subject to the Award and shall not have any dividend rights (except as otherwise provided in Section 3 of Schedule A), voting rights or other rights

Updated August 2015

1

as a stockholder unless and until (and then only to the extent that) the Award has vested and certificates for such Shares have been issued and delivered to him, her or them (or, in the case of uncertificated shares, other written evidence of ownership in accordance with Applicable Law shall have been provided).

5.   <u>Vesting and Earning of Award</u>. Subject to the terms of the Plan and this Agreement, the Award shall be deemed vested and earned, and the Shares subject to the Award shall be distributable as provided in Section 7 herein, upon such date or dates, and subject to such conditions, as are described in this Agreement, including Section 2 of Schedule A. Without limiting the effect of the foregoing, the Shares subject to the Award may vest in installments over a period of time, if so provided in Schedule A. <u>The Participant expressly acknowledges that the Award shall vest only upon such terms and conditions as are provided in this Agreement (including but not limited to Schedule A) and otherwise in accordance with the terms of the Plan</u>. Without limiting the effect of the foregoing, the Participant understands and agrees that the Administrator may delay the vesting of the Award (or portion thereof) and the issuance of the underlying Shares in order to comply with Applicable Law or applicable policies of the Company implemented to ensure compliance with such laws (including but not limited to insider trading provisions and the Company's insider trading policy); provided, however, that any such delay in vesting of the Award or issuance of Shares shall not apply to any Shares subject to an effective Rule 10b5-1 trading plan. The Administrator has sole authority to determine whether and to what degree the Award has vested and been earned and is payable and to interpret the terms and conditions of this Agreement and the Plan.

6.   <u>Effect of Termination of Service; Forfeiture of Award</u>. Except as may be otherwise provided in the Plan or this Agreement (including but not limited to Schedule A), in the event of the termination of service of the Participant for any reason (whether by the Company or the Participant, and whether voluntary or involuntary) and all or part of the Award has not been earned or vested as of the Participant's Termination Date pursuant to the terms of this Agreement, then the Award, to the extent not vested as of the Participant's Termination Date, shall be forfeited immediately upon such termination, and the Participant shall have no further rights with respect to the Award or the Shares underlying that portion of the Award that has not yet been earned and vested. The Participant expressly acknowledges and agrees that the termination of his or her service shall (except as may otherwise be provided in this Agreement or the Plan) result in forfeiture of the Award and the Shares to the extent the Award has not been earned and vested as of his or her Termination Date.

7.   <u>Settlement of Award</u>. The Award, if earned in accordance with the terms of this Agreement, shall be payable in whole shares of Common Stock. The total number of Shares that may be acquired upon vesting of the Award (or portion thereof) shall be rounded down to the nearest whole share. A certificate or certificates for the Shares subject to the Award or portion thereof shall be issued in the name of the Participant or his or her beneficiary (or, in the case of uncertificated shares, other written evidence of ownership in accordance with Applicable Law shall be provided) as soon as practicable after, and only to the extent that, the Award or portion thereof has vested and is distributable. Shares of Common Stock or any other benefit subject to the Award shall, upon vesting of the Award, be issued and distributed to the Participant (or his or her beneficiary) no later than the later of (a) the fifteenth (15th) day of the third month following the Participant's first taxable year in which the amount is no longer subject to a substantial risk of forfeiture, or (b) the fifteenth (15th) day of the third month following the end of the Company's first taxable year in which the amount is no longer subject to a substantial risk of forfeiture, or otherwise in accordance with Code Section 409A.

8.   <u>No Right of Continued Service</u>. Nothing contained in this Agreement or the Plan shall confer upon the Participant any right to continue in the service of the Company or an Affiliate or to interfere in any way with the right of the Company or its stockholders to terminate the Participant's service at any

Updated August 2015

2

time. Except as otherwise expressly provided in the Plan and this Agreement (including but not limited to Schedule A), all rights of the Participant under the Plan with respect to the unvested portion of his or her Award shall terminate upon the termination of service of the Participant with the Company or an Affiliate. The grant of the Award does not create any obligation to grant further awards.

9.        Nontransferability of Award and Shares.  The Award shall not be transferable (including by sale, assignment, pledge or hypothecation) other than by will or the laws of intestate succession. The designation of a beneficiary in accordance with the Plan does not constitute a transfer. The Participant shall not sell, transfer, assign, pledge or otherwise encumber the Shares subject to the Award until such Shares have been issued and delivered to the Participant.

10.      Withholding; Tax Consequences.

(a)        The Participant acknowledges that the Company shall require the Participant to pay the Company the amount, if any, of any federal, state, local, foreign or other tax or other amount required by any governmental authority to be withheld and paid over by the Company to such authority for the account of the Participant, and the Participant agrees, as a condition to the grant of the Award and delivery of any Shares, to satisfy such obligations. Notwithstanding the foregoing, the Administrator may in its discretion establish procedures to permit the Participant to satisfy such obligation in whole or in part, and any local, state, federal, foreign or other income tax obligations relating to the Award, by electing (the "election") to have the Company withhold shares of Common Stock from the Shares to which the recipient is otherwise entitled. The number of Shares to be withheld shall have a Fair Market Value as of the date that the amount of tax to be withheld is determined as nearly equal as possible to (but not exceeding) the amount of such obligations being satisfied. Each election must be made in writing to the Administrator in accordance with election procedures established by the Administrator.

(b)        The Participant acknowledges that the Company has made no warranties or representations to the Participant with respect to the tax consequences (including but not limited to income tax consequences) with respect to the transactions contemplated by this Agreement, and the Participant is in no manner relying on the Company or its representatives for an assessment of such tax consequences. The Participant acknowledges that there may be adverse tax consequences upon the grant or vesting of the Award and/or the acquisition or disposition of the Shares subject to the Award and that he or she has been advised that he or she should consult with his or her own attorney, accountant and/or tax advisor regarding the decision to enter into this Agreement and the consequences thereof. The Participant also acknowledges that the Company has no responsibility to take or refrain from taking any actions in order to achieve a certain tax result for the Participant.

11.      Administration.  The authority to construe and interpret this Agreement and the Plan, and to administer all aspects of the Plan, shall be vested in the Administrator, and the Administrator shall have all powers with respect to this Agreement as are provided in the Plan, including but not limited to the sole authority to determine whether and to what degree the Award has been earned and vested. Any interpretation of this Agreement by the Administrator and any decision made by it with respect to this Agreement is final and binding.

12.      Superseding Agreement; Successors and Assigns.  This Agreement supersedes any statements, representations or agreements of the Company with respect to the grant of the Award, any other equity-based awards or any related rights, and the Participant hereby waives any rights or claims related to any such statements, representations or agreements. Except as may be otherwise provided in the Plan, this

Updated August 2015

3

Agreement does not supersede or amend any existing Change in Control Agreement, Inventions, Confidentiality and Nonsolicitation Agreement, Noncompetition Agreement, Severance Agreement, Employment Agreement or any other similar agreement between the Participant and the Company, including, but not limited to, any restrictive covenants contained in such agreements. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, administrators, next-of-kin, successors and assigns.

13.　　Governing Law. Except as otherwise provided in the Plan or herein, this Agreement shall be construed and enforced according to the laws of the State of Delaware, without regard to the conflict of laws provisions of any state, and in accordance with applicable federal laws of the United States.

14.　　Amendment; Waiver. Subject to the terms of the Plan and this Agreement, this Agreement may be modified or amended only by the written agreement of the parties hereto. Notwithstanding the foregoing, the Administrator shall have unilateral authority to amend this Agreement (without Participant consent) to the extent necessary to comply with Applicable Law or changes to Applicable Law (including but not limited to federal securities laws and Code Section 409A). The waiver by the Company of a breach of any provision of this Agreement by the Participant shall not operate or be construed as a waiver of any subsequent breach by the Participant.

15.　　Notices. Except as may be otherwise provided by the Plan, any written notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailed but in no event later than the date of actual receipt. Notice may also be provided by electronic submission, if and to the extent permitted by the Administrator. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, at the Company's principal office located in Greensboro, NC, attention Corporate Treasurer, Qorvo, Inc.

16.　　Severability. The provisions of this Agreement are severable and if any one or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

17.　　Restrictions on Award and Shares. The Company may impose such restrictions on the Award and any Shares or other benefits underlying the Award as it may deem advisable, including without limitation restrictions under the federal securities laws, the requirements of any stock exchange or similar organization and any blue sky, state or foreign securities laws applicable to such Award or Shares. Notwithstanding any other provision in the Plan or this Agreement to the contrary, the Company shall not be obligated to issue, deliver or transfer shares of Common Stock, to make any other distribution of benefits, or to take any other action, unless such delivery, distribution or action is in compliance with all Applicable Law (including but not limited to the requirements of the Securities Act). The Company may cause a restrictive legend to be placed on any certificate for Shares issued pursuant to the Award in such form as may be prescribed from time to time by Applicable Law or as may be advised by legal counsel. The Administrator may delay the right to receive or dispose of shares of Common Stock (or other benefits) upon settlement of the Award at any time if the Administrator determines that allowing issuance of shares of Common Stock (or distribution of other benefits) would violate any federal, state or foreign securities laws or applicable policies of the Company, and the Administrator may provide in its discretion that any time periods to receive shares of Common Stock (or other benefits) subject to the Award are tolled or extended during a period of suspension or delay (subject to any Code Section 409A considerations); provided, however, that any such delay,

Updated August 2015

4

suspension, tolling or extension shall not apply to any Shares subject to an effective Rule 10b5-1 trading plan.

18.     <u>Counterparts; Further Instruments</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties hereto agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this Agreement.

19.     <u>Compliance with Recoupment, Ownership and Other Policies or Agreements</u>. As a condition to receiving this Award, the Participant agrees that he or she shall abide by all provisions of any equity retention policy, compensation recovery policy, stock ownership guidelines and/or other similar policies maintained by the Company, each as in effect from time to time and to the extent applicable to the Participant from time to time. In addition, the Participant shall be subject to such compensation recovery, recoupment, forfeiture, or other similar provisions as may apply at any time to the Participant under Applicable Law.

*[Signature Page to Follow]*

Updated August 2015

5

IN WITNESS WHEREOF, this Agreement has been executed on behalf of the Company and by the Participant effective as of the Grant Date stated herein.

**QORVO, INC.**

By: _____
    Robert A. Bruggeworth
    President and Chief Executive Officer

Attest:

_____
Jeffrey C. Howland
Secretary

*[Signature Page of Participant to Follow on Schedule A/Grant Letter]*

Updated August 2015

6

**Qorvo, Inc.**
**2012 Stock Incentive Plan**
**Restricted Stock Unit Agreement**
**(Director Annual/Supplemental RSU)**

**<u>Schedule A/Grant Letter</u>**

1.      <u>Grant Terms</u>. Pursuant to the terms and conditions of the Company's 2012 Stock Incentive Plan, as it may be amended (the "Plan"), and the Restricted Stock Unit Agreement (Director Annual/Supplemental RSU) attached hereto (the "Agreement"), you (the "Participant") have been granted an award of Restricted Stock Units (the "Award") for _____ shares of Common Stock (the "Shares"). Unless otherwise defined herein, capitalized terms in this Schedule A shall have the same definitions as set forth in the Agreement and the Plan.

Granted To:      _____
Grant Date:      _____
Number of Shares Subject to Award:      _____

2.      <u>Vesting of Award</u>.

(a)      The Award shall be deemed vested with respect to one hundred percent (100%)) of the Shares subject to the Award on the earlier of (i) the first anniversary of the Grant Date or (ii) the day before the Company's first annual meeting of stockholders occurring after the Grant Date, in each case subject to the continued service of the Participant as a Director of the Company through such vesting date.

(b)      Notwithstanding the provisions of Section 2(a) above, in the event of the Participant's death or Disability (as defined in the Plan), the Award shall automatically fully vest, effective as of the date of the Participant's death or the date of Disability as determined by the Administrator, as applicable.

3.      <u>Dividends</u>.      If the Company pays a dividend at any time after the Grant Date, such dividends shall be paid to the Participant in accordance with Section 7 of the Agreement upon and to the extent of the vesting of the underlying shares of Common Stock.

*[Signature Page to Follow]*

A-1

Updated August 2015

By my signature below, I, the Participant, hereby acknowledge receipt of this Grant Letter and the Agreement. I understand that the Grant Letter and other provisions of Schedule A herein are incorporated by reference into the Agreement and constitute a part of the Agreement. <u>By my signature below, I further agree to be bound by the terms of the Plan and the Agreement, including but not limited to the terms of this Grant Letter and the other provisions of Schedule A contained herein. The Company reserves the right to treat the Award and the Agreement as cancelled, void and of no effect if the Participant fails to return a signed copy of the Grant Letter within 30 days of receipt</u>.

Signature: _____      Date: _____

*Note: If there are any discrepancies in the name shown above, please make the appropriate corrections on this form and return to Treasury Department, Qorvo, Inc., 7628 Thorndike Road, Greensboro, NC 27409-9421. Please retain a copy of the Agreement, including this Grant Letter, for your files.*

A-2

Updated August 2015

**EXHIBIT 21**

| <u>Name</u> | <u>State or Other Jurisdiction of Incorporation</u> |
|---|---|
| RF Micro Devices, Inc. | North Carolina |
| RFMD, LLC | North Carolina |
| RFMD Infrastructure Product Group, Inc. | North Carolina |
| RF Micro Devices International, Inc. | North Carolina |
| RF Micro Devices UK Ltd. | United Kingdom |
| RFMD (UK) Limited | United Kingdom |
| RF Micro Devices (Holland) B.V. | The Netherlands |
| RF Micro Devices (Taiwan) B.V. | The Netherlands |
| RF Micro Devices, Svenska AB | Sweden |
| RF Micro Devices (Denmark) ApS | Denmark |
| RF Micro Devices (Finland) Oy | Finland |
| RF Micro Devices (Korea) YH | Korea |
| RF Micro Devices (Beijing) Co. Ltd. | People's Republic of China |
| RF Micro Devices (Hong Kong) Pvt. Limited | Hong Kong |
| Xemod Incorporated | California |
| Micro Linear International Corporation | Delaware |
| Premier Devices – A Sirenza Company | California |
| Premier Devices German Holding GmbH | Germany |
| RFMD Germany GmbH | Germany |
| Radio Frequency Micro Devices (India) Private Limited | India |
| Amalfi Semiconductor, Inc. | Delaware |
| Amalfi Semiconductor, Ltd. | Cayman Islands |
| Amalfi Semiconductor Pte. Ltd. | Singapore |
| RF Micro Devices (Cayman Islands), Ltd. | Cayman Islands |
| RF Micro Devices (Singapore) Pte. Ltd. | Singapore |
| RF Micro Devices (Dezhou) Co. Ltd. | People's Republic of China |
| TriQuint Semiconductor, Inc. | Delaware |
| TriQuint, Inc. | Florida |
| TriQuint TFR, Inc. | Oregon |
| TriQuint Semiconductor GmbH | Germany |
| TriQuint S.R.L | Costa Rica |
| TriQuint Asia LLC | Delaware |
| TriQuint International Pte. Ltd. | Singapore |
| TriQuint Semiconductor Malaysia SDN BHD | Malaysia |
| TriQuint Japan YK | Japan |
| TriQuint Semiconductor (Shanghai) Ltd | China |
| TriQuint Semiconductor Texas, LLC | Texas |
| TriQuint Sales and Design, Inc. | Delaware |
| TriQuint Europe Holding Company | Delaware |
| TriQuint WJ, Inc. | Delaware |
| WJ Newco LLC | Delaware |
| TriQuint CW, Inc. | California |

All of the above listed entities are 100% directly or indirectly owned by Qorvo, Inc.

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
Qorvo, Inc.:

We consent to the incorporation by reference in the registration statements (No. 333-195236) on Form S-4 and (No. 333-201357 and No. 333-201358) on Form S-8 of Qorvo, Inc. of our reports dated May 31, 2016, with respect to the consolidated balance sheets of Qorvo, Inc. as of April 2, 2016 and March 28, 2015, and the related consolidated statements of operations, comprehensive income (loss), stockholders' equity, and cash flows for each of the years in the two-year period ended April 2, 2016, and the effectiveness of internal control over financial reporting as of April 2, 2016, which reports appear in the April 2, 2016 annual report on Form 10-K of Qorvo, Inc.

Our report dated May 31, 2016 on the effectiveness of internal control over financial reporting as of April 2, 2016, expresses our opinion that Qorvo, Inc. did not maintain effective internal control over financial reporting as of April 2, 2016 because of the effect of a material weakness on the achievement of the objectives of the control criteria and contains an explanatory paragraph that states:

A material weakness related to insufficient complement of knowledgeable tax and accounting personnel; an ineffective risk assessment process to assess the changes in the regulatory environment, the organization and personnel impacting the Company's financial reporting of income taxes; and ineffective process level controls and monitoring activities over the completeness, existence, accuracy, valuation and presentation of the income tax provision, including deferred tax assets, valuation allowances, and tax uncertainties has been identified and included in management's assessment.

/s/ KPMG LLP

Greensboro, North Carolina
May 31, 2016

**Exhibit 23.2**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in the following Registration Statements:

(1)     Registration Statement (Form S-4 No. 333-195236) of Qorvo, Inc. (formerly known as Rocky Holding, Inc.),

(2)     Registration Statement (Form S-8 No. 333-201357) pertaining to the Qorvo, Inc. 2007 Employee Stock Purchase Plan, the Qorvo, Inc. 2013 Incentive Plan, the Qorvo, Inc. 2012 Incentive Plan, the Qorvo, Inc. 2009 Incentive Plan, the Qorvo, Inc. 2008 Inducement Program, and the Qorvo, Inc. 1996 Stock Incentive Program, and

(3)     Registration Statement (Form S-8 No. 333-201358) pertaining to the Qorvo, Inc. 2012 Stock Incentive Plan, the 2003 Stock Incentive Plan of Qorvo, Inc., the Qorvo, Inc. 2006 Directors Stock Option Plan, the Nonemployee Directors' Stock Option Plan of Qorvo, Inc., and the Qorvo, Inc. 2015 Inducement Stock Plan;

of our report dated May 21, 2014 (except for the effect of the reverse stock split described in Note 12 and the segment presentation in Note 15, as to which the date is May 27, 2015), with respect to the consolidated financial statements of RF Micro Devices, Inc. and Subsidiaries for the year ended March 29, 2014 included in this Annual Report (Form 10-K) of Qorvo, Inc. and Subsidiaries for the year ended April 2, 2016.

/s/ Ernst & Young LLP

Charlotte, North Carolina

May 31, 2016

EXHIBIT 31.1

**CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE EXCHANGE ACT, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert A. Bruggeworth, certify that:

1.       I have reviewed this annual report on Form 10-K of Qorvo, Inc.;

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.       The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)       Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)       Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)       Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)       Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.       The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)       All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)       Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 31, 2016

/s/ ROBERT A. BRUGGEWORTH
Robert A. Bruggeworth
President and Chief Executive Officer

EXHIBIT 31.2

**CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE EXCHANGE ACT, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Steven J. Buhaly, certify that:

1.   I have reviewed this annual report on Form 10-K of Qorvo, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

   Date: May 31, 2016

/s/ STEVEN J. BUHALY
Steven J. Buhaly
Chief Financial Officer

**EXHIBIT 32.1**


**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert A. Bruggeworth, President and Chief Executive Officer of Qorvo, Inc. (the "Company"), certify pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that, to my knowledge:

(1)     the Annual Report on Form 10-K of the Company for the fiscal year ended April 2, 2016 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


        /s/ ROBERT A. BRUGGEWORTH
        Robert A. Bruggeworth
        President and Chief Executive Officer

        May 31, 2016

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Steven J. Buhaly, Chief Financial Officer of Qorvo, Inc. (the "Company"), certify pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that, to my knowledge:

(1)    the Annual Report on Form 10-K of the Company for the fiscal year ended April 2, 2016 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ STEVEN J. BUHALY
Steven J. Buhaly
Chief Financial Officer

May 31, 2016