# EXHIBIT 13

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☑    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

      **For the quarterly period ended October 1, 2016**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

      **For the transition period from _____ to _____**

**Commission File Number 001-36801**

# QORVO

# Qorvo, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **46-5288992** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**7628 Thorndike Road, Greensboro, North Carolina 27409-9421**

(Address of principal executive offices)

(Zip Code)

**(336) 664-1233**

(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

As of October 31, 2016, there were 127,727,701 shares of the registrant's common stock outstanding.

**QORVO, INC. AND SUBSIDIARIES**

**INDEX**

| | Page |
|---|---|
| **PART I — FINANCIAL INFORMATION** | |
| | |
| **Item 1. Financial Statements (Unaudited).** | |
| Condensed Consolidated Balance Sheets as of October 1, 2016 and April 2, 2016 | 3 |
| Condensed Consolidated Statements of Income for the three and six months ended October 1, 2016 and October 3, 2015 | 4 |
| Condensed Consolidated Statements of Comprehensive Income for the three and six months ended October 1, 2016 and October 3, 2015 | 5 |
| Condensed Consolidated Statements of Cash Flows for the six months ended October 1, 2016 and October 3, 2015 | 6 |
| Notes to Condensed Consolidated Financial Statements | 7 |
| | |
| **Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.** | 28 |
| **Item 3. Quantitative and Qualitative Disclosures About Market Risk.** | 37 |
| **Item 4. Controls and Procedures.** | 37 |
| | |
| **PART II — OTHER INFORMATION** | 38 |
| | |
| **Item 1A. Risk Factors.** | 38 |
| **Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.** | 38 |
| **Item 6. Exhibits.** | 39 |
| | |
| **SIGNATURES** | 40 |
| **EXHIBIT INDEX** | 41 |

**PART I — FINANCIAL INFORMATION**

**ITEM 1.**

**QORVO, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(In thousands)
(Unaudited)

| | October 1, 2016 | April 2, 2016 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents *(Note 7)* | $ 469,219 | $ 425,881 |
| Short-term investments *(Note 7)* | — | 186,808 |
| Accounts receivable, less allowance of $100 and $143 as of October 1, 2016 and April 2, 2016, respectively | 491,489 | 316,356 |
| Inventories *(Note 3)* | 437,135 | 427,551 |
| Prepaid expenses | 58,579 | 63,850 |
| Other receivables | 78,022 | 47,380 |
| Other current assets | 48,092 | 41,384 |
| Total current assets | 1,582,536 | 1,509,210 |
| Property and equipment, net of accumulated depreciation of $820,306 at October 1, 2016 and $751,898 at April 2, 2016 | 1,240,050 | 1,046,888 |
| Goodwill *(Note 4)* | 2,174,918 | 2,135,697 |
| Intangible assets, net *(Note 4)* | 1,656,158 | 1,812,515 |
| Long-term investments *(Note 7)* | 34,902 | 26,050 |
| Other non-current assets | 63,058 | 66,459 |
| Total assets | $ 6,751,622 | $ 6,596,819 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 323,696 | $ 205,364 |
| Accrued liabilities | 212,220 | 137,889 |
| Other current liabilities | 21,529 | 30,548 |
| Total current liabilities | 557,445 | 373,801 |
| Long-term debt *(Note 5)* | 988,625 | 988,130 |
| Deferred tax liabilities *(Note 6)* | 146,927 | 152,160 |
| Other long-term liabilities | 82,249 | 83,056 |
| Total liabilities | 1,775,246 | 1,597,147 |
| Stockholders' equity: | | |
| Preferred stock, $.0001 par value; 5,000 shares authorized; no shares issued and outstanding | — | — |
| Common stock and additional paid-in capital, $.0001 par value; 405,000 shares authorized; 126,995 and 127,386 shares issued and outstanding at October 1, 2016 and April 2, 2016, respectively | 5,413,742 | 5,442,613 |
| Accumulated other comprehensive loss, net of tax | (3,730) | (3,133) |
| Accumulated deficit | (433,636) | (439,808) |
| Total stockholders' equity | 4,976,376 | 4,999,672 |
| Total liabilities and stockholders' equity | $ 6,751,622 | $ 6,596,819 |

See accompanying Notes to Condensed Consolidated Financial Statements.

3

**QORVO, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**
(In thousands, except per share data)
(Unaudited)

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | October 1, 2016 | October 3, 2015 | October 1, 2016 | October 3, 2015 |
| Revenue | $ 864,698 | $ 708,335 | $ 1,563,235 | $ 1,381,976 |
| Cost of goods sold | 547,899 | 423,487 | 969,961 | 817,611 |
| Gross profit | 316,799 | 284,848 | 593,274 | 564,365 |
| Operating expenses: | | | | |
| Research and development | 126,078 | 118,293 | 243,215 | 235,503 |
| Marketing and selling | 108,128 | 105,925 | 217,164 | 215,570 |
| General and administrative | 30,455 | 29,069 | 65,014 | 65,152 |
| Other operating expense | 6,745 | 13,522 | 16,747 | 31,436 |
| Total operating expenses | 271,406 | 266,809 | 542,140 | 547,661 |
| Income from operations | 45,393 | 18,039 | 51,134 | 16,704 |
| Interest expense *(Note 5)* | (15,554) | (660) | (30,741) | (1,208) |
| Interest income | 192 | 472 | 470 | 864 |
| Other (expense) income | (311) | 381 | (811) | 4,500 |
| Income before income taxes | 29,720 | 18,232 | 20,052 | 20,860 |
| Income tax expense *(Note 6)* | (17,873) | (13,784) | (13,880) | (14,376) |
| Net income | $ 11,847 | $ 4,448 | $ 6,172 | $ 6,484 |
| | | | | |
| Net income per share *(Note 2):* | | | | |
| Basic | $ 0.09 | $ 0.03 | $ 0.05 | $ 0.04 |
| Diluted | $ 0.09 | $ 0.03 | $ 0.05 | $ 0.04 |
| | | | | |
| Weighted average shares of common stock outstanding *(Note 2):* | | | | |
| Basic | 127,546 | 146,053 | 127,543 | 147,627 |
| Diluted | 132,329 | 150,783 | 132,461 | 152,562 |

See accompanying Notes to Condensed Consolidated Financial Statements.

4

**QORVO, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
(In thousands)
(Unaudited)

| | Three Months Ended | | | | Six Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | October 1, 2016 | | October 3, 2015 | | October 1, 2016 | | October 3, 2015 | |
| Net income | $ | 11,847 | $ | 4,448 | $ | 6,172 | $ | 6,484 |
| Other comprehensive income (loss): | | | | | | | | |
| Unrealized gain (loss) on marketable securities, net of tax | | 1 | | (105) | | 73 | | 707 |
| Foreign currency translation adjustment, including intra-entity foreign currency transactions that are of a long-term-investment nature | | 353 | | (97) | | (758) | | 25 |
| Reclassification adjustments, net of tax: | | | | | | | | |
| Realized gain on marketable securities | | — | | (30) | | — | | (1,958) |
| Amortization of pension actuarial loss | | 57 | | 34 | | 88 | | 69 |
| Other comprehensive income (loss) | | 411 | | (198) | | (597) | | (1,157) |
| Total comprehensive income | $ | 12,258 | $ | 4,250 | $ | 5,575 | $ | 5,327 |

See accompanying Notes to Condensed Consolidated Financial Statements.

5

**QORVO, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)
(Unaudited)

| | Six Months Ended | |
| --- | --- | --- |
| | October 1, 2016 | October 3, 2015 |
| **Cash flows from operating activities:** | | |
| Net income | $ 6,172 | $ 6,484 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation | 97,177 | 88,807 |
| Amortization and other non-cash items | 243,397 | 250,940 |
| Excess tax benefit from exercises of stock options | (56) | — |
| Deferred income taxes | (13,310) | 2,388 |
| Foreign currency adjustments | 1,128 | 427 |
| Gain on investments and other assets, net | (165) | (3,132) |
| Stock-based compensation expense | 56,636 | 83,900 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (170,920) | (84,496) |
| Inventories | (11,689) | (51,803) |
| Prepaid expenses and other current and non-current assets | (23,617) | (5,469) |
| Accounts payable and accrued liabilities | 136,832 | 31,599 |
| Income tax (recoverable) / payable | (13,205) | (585) |
| Other liabilities | 1,007 | (8,833) |
| Net cash provided by operating activities | 309,387 | 310,227 |
| **Investing activities:** | | |
| Purchase of property and equipment | (250,419) | (169,686) |
| Purchase of a business, net of cash acquired *(Note 4)* | (118,173) | — |
| Purchase of available-for-sale securities | (469) | (150,104) |
| Proceeds from maturities and sales of available-for-sale securities | 186,793 | 370,067 |
| Other investing activities | (4,710) | (24,745) |
| Net cash (used in) provided by investing activities | (186,978) | 25,532 |
| **Financing activities:** | | |
| Proceeds from debt issuances | — | 125,000 |
| Payment of debt | — | (50,000) |
| Debt issuance costs | — | (1,339) |
| Excess tax benefit from exercises of stock options | 56 | — |
| Proceeds from the issuance of common stock | 27,077 | 29,708 |
| Repurchase of common stock, including transaction costs | (91,400) | (549,940) |
| Tax withholding paid on behalf of employees for restricted stock units | (14,763) | (19,430) |
| Other financing activities | (3) | 83 |
| Net cash used in financing activities | (79,033) | (465,918) |
| Effect of exchange rate changes on cash | (38) | (58) |
| Net increase (decrease) in cash and cash equivalents | 43,338 | (130,217) |
| Cash and cash equivalents at the beginning of the period | 425,881 | 299,814 |
| Cash and cash equivalents at the end of the period | $ 469,219 | $ 169,597 |
| **Non-cash investing information:** | | |
| Capital expenditure adjustments included in liabilities | $ 43,602 | $ 5,217 |

See accompanying Notes to Condensed Consolidated Financial Statements.

6

QORVO, INC. AND SUBSIDIARIES
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS*
(Unaudited)

## 1. BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES

The accompanying Condensed Consolidated Financial Statements of Qorvo, Inc. and Subsidiaries (together, the "Company" or "Qorvo") have been prepared in conformity with accounting principles generally accepted in the United States. The preparation of these financial statements requires management to make estimates and assumptions, which could differ materially from actual results. In addition, certain information or footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States have been condensed, or omitted, pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). In the opinion of management, the financial statements include all adjustments (which are of a normal and recurring nature) necessary for the fair presentation of the results of the interim periods presented. These Condensed Consolidated Financial Statements should be read in conjunction with the Company's audited consolidated financial statements and notes thereto included in Qorvo's Annual Report on Form 10-K for the fiscal year ended April 2, 2016.

On February 22, 2014, RF Micro Devices, Inc. ("RFMD") entered into an Agreement and Plan of Merger and Reorganization as subsequently amended on July 15, 2014 (the "Merger Agreement"), with TriQuint Semiconductor, Inc. ("TriQuint") providing for the combination of RFMD and TriQuint in a merger of equals (the "Business Combination") under a new holding company named Qorvo, Inc. The transactions contemplated by the Merger Agreement were consummated on January 1, 2015.

The Condensed Consolidated Financial Statements include the accounts of the Company and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation.

The Company uses a 52- or 53-week fiscal year ending on the Saturday closest to March 31 of each year. The first fiscal quarter of each year ends on the Saturday closest to June 30, the second fiscal quarter of each year ends on the Saturday closest to September 30 and the third fiscal quarter of each year ends on the Saturday closest to December 31. Fiscal 2017 is a 52-week year and the three and six months ended October 1, 2016 included 13 and 26 weeks, respectively. Comparatively, fiscal 2016 was a 53-week year and the three and six months ended October 3, 2015 included 14 and 27 weeks, respectively.

## 2. NET INCOME PER SHARE

The following table sets forth the computation of basic and diluted net income per share (in thousands, except per share data):

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 1, 2016 | October 3, 2015 | October 1, 2016 | October 3, 2015 |
| Numerator: | | | | |
| Numerator for basic and diluted net income per share — net income available to common stockholders | $ 11,847 | $ 4,448 | $ 6,172 | $ 6,484 |
| Denominator: | | | | |
| Denominator for basic net income per share — weighted average shares | 127,546 | 146,053 | 127,543 | 147,627 |
| Effect of dilutive securities: | | | | |
| Stock-based awards | 4,783 | 4,730 | 4,918 | 4,935 |
| Denominator for diluted net income per share — adjusted weighted average shares and assumed conversions | 132,329 | 150,783 | 132,461 | 152,562 |
| Basic net income per share | $ 0.09 | $ 0.03 | $ 0.05 | $ 0.04 |
| Diluted net income per share | $ 0.09 | $ 0.03 | $ 0.05 | $ 0.04 |

In the computation of diluted net income per share for the three and six months ended October 1, 2016, outstanding options to purchase less than 0.1 million shares were excluded because the exercise price of the options was greater than the average market price of the underlying common stock and the effect of their inclusion would have been anti-dilutive. In the computation of diluted net income per share for the three and six months ended October 3, 2015, outstanding options to

QORVO, INC. AND SUBSIDIARIES
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

purchase approximately 0.2 million shares and 0.1 million shares, respectively, were excluded because the exercise price of the options was greater than the average market price of the underlying common stock and the effect of their inclusion would have been anti-dilutive.

## 3. INVENTORIES

Inventories are stated at the lower of cost or market based on standard costs which approximates actual average costs. The components of inventories, net of reserves, are as follows (in thousands):

|  | October 1, 2016 | April 2, 2016 |
|---|---|---|
| Raw materials | $ 106,874 | $ 89,928 |
| Work in process | 222,695 | 228,626 |
| Finished goods | 107,566 | 108,997 |
| Total inventories | $ 437,135 | $ 427,551 |

## 4. GOODWILL AND INTANGIBLE ASSETS

The change in the carrying amount of goodwill for the six months ended October 1, 2016 are as follows (in thousands):

|  | Mobile Products | Infrastructure and Defense Products | Total |
|---|---|---|---|
| Balance as of April 2, 2016 | $ 1,751,503 | $ 384,194 | $ 2,135,697 |
| Acquisition | — | 39,221 | 39,221 |
| Balance at October 1, 2016 | $ 1,751,503 | $ 423,415 | $ 2,174,918 |

On April 29, 2016, the Company completed the acquisition of GreenPeak Technologies, B.V. ("GreenPeak"), a leader in ultra-low power, short range radio frequency ("RF") communication technology for a purchase price of $118.7 million. The acquisition expanded the Company's offerings to include integrated RF solutions and systems-on-a-chip ("SoCs") for the connected home and the Internet of Things ("IoT"). The acquisition resulted in initial goodwill of $39.2 million and an increase in intangible assets of $82.1 million. The more significant intangible assets acquired were developed technology of $74.2 million (being amortized over 7 years) and customer relationships of $5.6 million (being amortized over 3 years).

The following summarizes information regarding the gross carrying amounts and accumulated amortization of intangible assets (in thousands):

|  | October 1, 2016 | | April 2, 2016 | |
|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Intangible Assets: |  |  |  |  |
| In-process research and development | $ 267,000 | N/A | $ 267,000 | N/A |
| Technology licenses | 13,346 | 11,357 | 12,446 | 11,021 |
| Customer relationships | 1,272,725 | 516,943 | 1,267,103 | 377,357 |
| Developed technology | 989,335 | 371,125 | 915,163 | 277,736 |
| Wafer supply agreement | 20,443 | 20,443 | 20,443 | 20,443 |
| Trade names | 29,353 | 16,989 | 29,000 | 12,083 |
| Backlog | 65,000 | 65,000 | 65,000 | 65,000 |
| Non-compete agreement | 1,026 | 213 | — | — |
| Total | $ 2,658,228 | $ 1,002,070 | $ 2,576,155 | $ 763,640 |

QORVO, INC. AND SUBSIDIARIES
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

Total intangible assets amortization expense was $119.8 million and $239.2 million for the three and six months ended October 1, 2016, respectively, and $128.0 million and $251.2 million for the three and six months ended October 3, 2015, respectively.

Based on identified intangible assets as of October 1, 2016, we expect amortization expense for each period to be as follows (in thousands):

| Fiscal Year | Estimated Amortization Expense | |
|---|---|---|
| 2017 | $ | 505,502 |
| 2018 | | 542,634 |
| 2019 | | 455,402 |
| 2020 | | 206,986 |
| 2021 | | 144,066 |

## 5. DEBT

Debt as of October 1, 2016 and April 2, 2016 is as follows (in thousands):

| | October 1, 2016 | | April 2, 2016 | |
|---|---|---|---|---|
| 6.75% Senior Notes due 2023 | $ | 450,000 | $ | 450,000 |
| 7.00% Senior Notes due 2025 | | 550,000 | | 550,000 |
| Less unamortized issuance costs | | (11,375) | | (11,870) |
| Total long-term debt | $ | 988,625 | $ | 988,130 |

*Senior Notes*
On November 19, 2015, the Company completed an offering of $450.0 million aggregate principal amount of its 6.75% senior notes due December 1, 2023 (the "2023 Notes") and $550.0 million aggregate principal amount of its 7.00% senior notes due December 1, 2025 (the "2025 Notes" and, together with the 2023 Notes, the "Notes"). The Notes were sold in the United States to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), and outside the United States pursuant to Regulation S under the Securities Act. The carrying value of issuance costs related to the Notes is $11.4 million as of October 1, 2016 and $11.9 million as of April 2, 2016, and is presented on the Condensed Consolidated Balance Sheets as a direct deduction of Long-term debt.

The Notes were issued pursuant to an indenture, dated as of November 19, 2015 (the "Indenture"), by and among the Company, the Company's domestic subsidiaries that guarantee the Company's obligations under its revolving credit facility, as guarantors (the "Guarantors"), and MUFG Union Bank, N.A., as trustee. The Company used the net proceeds of the offering of the Notes for general corporate purposes, including share repurchases and merger and acquisition activity.

Interest is payable on the 2023 Notes at a rate of 6.75% per annum and on the 2025 Notes at a rate of 7.00% per annum. For the three and six months ended October 1, 2016, the Company recognized $17.3 million and $34.8 million, respectively, of interest expense related to the Notes which was offset by $2.4 million and $5.4 million, respectively, of interest capitalized to property and equipment. Interest on both series of Notes is payable semi-annually on June 1 and December 1 of each year, and commenced on June 1, 2016. Interest paid on the Notes during the six months ended October 1, 2016 was $36.7 million.

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

At any time prior to December 1, 2018, the Company may redeem all or part of the 2023 Notes, at a redemption price equal to their principal amount, plus a "make whole" premium as of the redemption date, and accrued and unpaid interest. In addition, at any time prior to December 1, 2018, the Company may redeem up to 35% of the original aggregate principal amount of the 2023 Notes with the proceeds of one or more equity offerings, at a redemption price equal to 106.75%, plus accrued and unpaid interest. Furthermore, at any time on or after December 1, 2018, the Company may redeem the 2023 Notes, in whole or in part, at once or over time, at the specified redemption prices set forth in the Indenture plus accrued and unpaid interest thereon to the redemption date (subject to the rights of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

At any time prior to December 1, 2020, the Company may redeem all or part of the 2025 Notes, at a redemption price equal to their principal amount, plus a "make whole" premium as of the redemption date, and accrued and unpaid interest. In addition, at any time prior to December 1, 2018, the Company may redeem up to 35% of the original aggregate principal amount of the 2025 Notes with the proceeds of one or more equity offerings, at a redemption price equal to 107.00%, plus accrued and unpaid interest. Furthermore, at any time on or after December 1, 2020, the Company may redeem the 2025 Notes, in whole or in part, at once or over time, at the specified redemption prices set forth in the Indenture plus accrued and unpaid interest thereon to the redemption date (subject to the rights of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

The Indenture contains customary events of default, including, among other things, payment default, failure to provide certain notices thereunder and certain provisions related to bankruptcy events. The Indenture also contains customary negative covenants.

In connection with the offering of the Notes, the Company agreed to provide the holders of the Notes with an opportunity to exchange the Notes for registered notes having terms substantially identical to the Notes. On September 19, 2016, the Company completed the exchange offer, in which all of the 2023 Notes and substantially all of the 2025 Notes were exchanged for new notes that have been registered under the Securities Act.

The 2023 Notes and the 2025 Notes are traded over the counter and their fair values as of October 1, 2016, of $487.1 million and $598.1 million, respectively (compared to carrying values of $450.0 million and $550.0 million, respectively) were estimated based upon the values of their last trade at the end of the period. The fair values of the 2023 Notes and the 2025 Notes were $465.8 million and $581.6 million, respectively as of April 2, 2016.

10

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS* **(continued)**
(Unaudited)

*Credit Agreement*

On April 7, 2015, the Company and the Guarantors entered into a five-year unsecured senior credit facility with Bank of America, N.A., as administrative agent (in such capacity, the "Administrative Agent"), swing line lender, and L/C issuer, and a syndicate of lenders (the "Credit Agreement"). The Credit Agreement includes a $300.0 million revolving credit facility, which includes a $25.0 million sublimit for the issuance of standby letters of credit and a $10.0 million sublimit for swing line loans. The Company may request, at any time and from time to time, that the revolving credit facility be increased by an amount not to exceed $150.0 million. The revolving credit facility is available to finance working capital, capital expenditures and other corporate purposes. The Company's obligations under the Credit Agreement are jointly and severally guaranteed by the Guarantors. During the six months ended October 1, 2016, there were no borrowings under the revolving credit facility. The Company had no outstanding amounts under the Credit Agreement as of October 1, 2016 and April 2, 2016.

At the Company's option, loans under the Credit Agreement will bear interest at (i) the Applicable Rate (as defined in the Credit Agreement) plus the Eurodollar Rate (as defined in the Credit Agreement) or (ii) the Applicable Rate plus a rate equal to the highest of (a) the federal funds rate plus 0.50%, (b) the prime rate of the Administrative Agent, or (c) the Eurodollar Base Rate plus 1.0% (the "Base Rate"). All swing line loans will bear interest at a rate equal to the Applicable Rate plus the Base Rate. The Eurodollar Base Rate is the rate per annum equal to the London Interbank Offered Rate, as published by Bloomberg, for dollar deposits for interest periods of one, two, three or six months, as selected by the Company. The Applicable Rate for Eurodollar Rate loans ranges from 1.50% per annum to 2.00% per annum. The Applicable Rate for Base Rate loans ranges from 0.50% per annum to 1.00% per annum. Interest for Eurodollar Rate loans will be payable at the end of each applicable interest period or at three-month intervals, if such interest period exceeds three months. Interest for Base Rate loans will be payable quarterly in arrears. The Company will pay a letter of credit fee equal to the Applicable Rate multiplied by the daily amount available to be drawn under any letter of credit, a fronting fee, and any customary documentary and processing charges for any letter of credit issued under the Credit Agreement.

The Credit Agreement contains various conditions, covenants and representations with which the Company must be in compliance in order to borrow funds and to avoid an event of default, including financial covenants that the Company must maintain. On November 12, 2015, the Credit Agreement was amended to increase the size of certain of the negative covenant baskets and the threshold for certain negative covenant incurrence-based permissions and to raise the consolidated leverage ratio test from 2.50 to 1.00 to 3.00 to 1.00 as of the end of any fiscal quarter. The Company must also maintain a consolidated interest coverage ratio of not less than 3.00 to 1.00 as of the end of any fiscal quarter.

The Credit Agreement also contains customary events of default, and the occurrence of an event of default will increase the applicable rate of interest by 2.00% and could result in the termination of commitments under the revolving credit facility, the declaration that all outstanding loans are due and payable in whole or in part and the requirement of cash collateral deposits in respect of outstanding letters of credit. Outstanding amounts are due in full on the maturity date of April 7, 2020 (with amounts borrowed under the swing line option due in full no later than ten business days after such loan is made).

**6. INCOME TAXES**

*Income Tax Expense*

The Company's provision for income taxes for the three and six months ended October 1, 2016 and October 3, 2015 has been calculated by applying an estimate of the annual effective tax rate for the full fiscal year to "ordinary" income or loss (pre-tax income or loss excluding unusual or infrequently occurring discrete items) for the three and six months ended October 1, 2016 and October 3, 2015.

The Company's income tax expense was $17.9 million and $13.9 million for the three and six months ended October 1, 2016, respectively, and the Company's income tax expense was $13.8 million and $14.4 million for the three and six months ended October 3, 2015, respectively. The Company's effective tax rate was 60.1% and 69.2% for the three and six months ended October 1, 2016, respectively, and 75.7% and 69.0% for the three and six months ended October 3, 2015, respectively. The Company's effective tax rate for both the second quarter of fiscal 2017 and the second quarter of fiscal 2016 differed from the statutory rate primarily due to tax rate differences in foreign jurisdictions, state income taxes, domestic tax credits generated, and changes in unrecognized tax benefits.

11

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

*Deferred Taxes*
A valuation allowance remained against certain domestic and foreign net deferred tax assets as it is more likely than not that the related deferred tax assets will not be realized.

The Company has domestic federal and state tax net operating loss ("NOLs") carry-forwards that expire in fiscal years 2017 to 2036 if unused. The use of the NOLs that were acquired in prior year acquisitions is subject to certain annual limitations under Internal Revenue Code Section 382 and similar state income tax provisions.

*Uncertain Tax Positions*
The Company's gross unrecognized tax benefits increased from $69.1 million as of the end of fiscal 2016 to $79.4 million as of the end of the second quarter of fiscal 2017, due to a $10.3 million increase related to tax positions taken with respect to the current fiscal year.

**7. INVESTMENTS AND FAIR VALUE MEASUREMENTS**

*Investments*
The following is a summary of cash equivalents and available-for-sale securities as of October 1, 2016 and April 2, 2016 (in thousands):

| | Cost | | Gross Unrealized Gains | | Gross Unrealized Losses | | Estimated Fair Value |
|---|---|---|---|---|---|---|---|
| **October 1, 2016** | | | | | | | |
| Auction rate securities | $ | 2,150 | $ | — | $ | (398) | $ | 1,752 |
| Money market funds | | 91,878 | | — | | — | | 91,878 |
| | $ | 94,028 | $ | — | $ | (398) | $ | 93,630 |
| **April 2, 2016** | | | | | | | |
| U.S. government/agency securities | $ | 149,874 | $ | 19 | $ | (1) | $ | 149,892 |
| Auction rate securities | | 2,150 | | — | | (350) | | 1,800 |
| Corporate debt | | 45,510 | | — | | — | | 45,510 |
| Money market funds | | 146,779 | | — | | — | | 146,779 |
| | $ | 344,313 | $ | 19 | $ | (351) | $ | 343,981 |

The estimated fair value of available-for-sale securities was based on the prevailing market values on October 1, 2016 and April 2, 2016. The Company determines the cost of an investment sold based on the specific identification method.

There were no gross realized gains and insignificant gross realized losses recognized on available-for-sale securities for the three and six months ended October 1, 2016. The gross realized gains and losses realized on available-for-sale securities for the three months ended October 3, 2015 were insignificant. There were $4.0 million of gross realized gains and insignificant gross realized losses recognized on available-for-sale securities for the six months ended October 3, 2015.

There were no unrealized losses on available-for-sale securities in a continuous loss position for fewer than 12 months as of October 1, 2016, and as of April 2, 2016, such unrealized losses were insignificant. Unrealized losses on available-for-sale securities in a continuous loss position for 12 months or greater were $0.4 million as of October 1, 2016 and April 2, 2016.

The aggregate amount of available-for-sale securities in an unrealized loss position at October 1, 2016 was $1.8 million, with $0.4 million in unrealized losses. The aggregate amount of available-for-sale securities in an unrealized loss position at April 2, 2016 was $55.6 million, with $0.4 million in unrealized losses.

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

The expected maturity distribution of cash equivalents and available-for-sale debt securities is as follows (in thousands):

| | October 1, 2016 | | April 2, 2016 | |
| --- | --- | --- | --- | --- |
| | Cost | Estimated Fair Value | Cost | Estimated Fair Value |
| Due in less than one year | $ 91,878 | $ 91,878 | $ 342,163 | $ 342,181 |
| Due after ten years | 2,150 | 1,752 | 2,150 | 1,800 |
| Total investments in debt securities | $ 94,028 | $ 93,630 | $ 344,313 | $ 343,981 |

During the first quarter of fiscal 2017, our investments in commercial paper and U.S. government treasury bills matured and a portion of the proceeds was used for the GreenPeak acquisition.

*Other Investments*
On August 4, 2015, the Company invested $25.0 million to acquire shares of Series F Preferred Stock of Cavendish Kinetics Limited, a private limited company incorporated in England and Wales. This investment is accounted for as a cost method investment and classified in "Long-term investments" on the Company's Condensed Consolidated Balance Sheet. No impairment was recognized on the Company's cost-method investment during the six months ended October 1, 2016.

*Fair Value of Financial Instruments*
On a quarterly basis, the Company measures the fair value of its marketable securities, which are comprised of U.S. government/agency securities, corporate debt, auction rate securities (ARS), and money market funds. Marketable securities are reported at fair value in "Cash and cash equivalents," "Short-term investments" and "Long-term investments" on the Company's Condensed Consolidated Balance Sheet. The related unrealized gains and losses are included in "Accumulated other comprehensive loss," a component of stockholders' equity, net of tax.

13

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

*Recurring Fair Value Measurements*

The fair value of the financial assets measured at fair value on a recurring basis was determined using the following levels of inputs as of October 1, 2016 and April 2, 2016 (in thousands):

| | Total | Quoted Prices In Active Markets For Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) |
|---|---|---|---|
| **October 1, 2016** | | | |
| **Assets:** | | | |
| Available-for-sale securities | | | |
| Auction rate securities (1) | $ 1,752 | $ — | $ 1,752 |
| Money market funds | 91,878 | 91,878 | — |
| Total available-for-sale securities | 93,630 | 91,878 | 1,752 |
| Invested funds in deferred compensation plan (3) | 7,858 | 7,858 | — |
| **Total assets measured at fair value** | $ 101,488 | $ 99,736 | $ 1,752 |
| **Liabilities:** | | | |
| Deferred compensation plan obligation (3) | 7,858 | 7,858 | — |
| **Total liabilities measured at fair value** | $ 7,858 | $ 7,858 | $ — |
| | | | |
| **April 2, 2016** | | | |
| **Assets:** | | | |
| Available-for-sale securities | | | |
| U.S. government/agency securities | $ 149,892 | $ 149,892 | $ — |
| Auction rate securities (1) | 1,800 | — | 1,800 |
| Corporate debt (2) | 45,510 | — | 45,510 |
| Money market funds | 146,779 | 146,779 | — |
| Total available-for-sale securities | 343,981 | 296,671 | 47,310 |
| Invested funds in deferred compensation plan (3) | 6,468 | 6,468 | — |
| **Total assets measured at fair value** | $ 350,449 | $ 303,139 | $ 47,310 |
| **Liabilities:** | | | |
| Deferred compensation plan obligation (3) | 6,468 | 6,468 | — |
| **Total liabilities measured at fair value** | $ 6,468 | $ 6,468 | $ — |

(1) ARS are debt instruments with interest rates that reset through periodic short-term auctions. The Company's Level 2 ARS are valued based on quoted prices for identical or similar instruments in markets that are not active.
(2) Corporate debt includes corporate bonds and commercial paper that are valued using observable market prices for identical securities that are traded in less active markets.
(3) The Company's non-qualified deferred compensation plan provides eligible employees and members of the Board of Directors with the opportunity to defer a specified percentage of their cash compensation. The Company includes the assets deferred by the participants in the "Other current assets" and "Other non-current assets" line items of its Condensed Consolidated Balance Sheets and the Company's obligation to deliver the deferred compensation in the "Other current liabilities" and "Other long-term liabilities" line items of its Condensed Consolidated Balance Sheets.

*Other Fair Value Disclosures*

The carrying values of cash and cash equivalents, accounts receivable, accounts payable and other accrued liabilities approximate fair values because of the relatively short-term maturities of these instruments. See Note 5 for the fair value of the Company's long-term debt.

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

## 8. STOCK REPURCHASES

During the first half of fiscal 2016, the Company completed share repurchases under two programs approved by its Board of Directors under which it repurchased on the open market approximately 2.4 million shares for $150.0 million and approximately 7.3 million shares for $400.0 million.

On November 5, 2015, the Company announced a new share repurchase program to repurchase up to $1.0 billion of the Company's outstanding stock through November 4, 2016. During the third quarter of fiscal 2016, the Company repurchased approximately 4.6 million shares of its common stock for approximately $250 million and during the fourth quarter of fiscal 2016, the Company repurchased approximately 10.0 million shares of its common stock for approximately $500.0 million. The amounts for the fourth quarter of fiscal 2016 reflect shares repurchased pursuant to variable maturity accelerated shares repurchase ("ASR") agreements that the Company entered into with Bank of America, N.A. on February 16, 2016 as part of the $1.0 billion share repurchase program described above. Final settlements of the ASR agreements were completed during the first quarter of fiscal 2017 with an additional 0.4 million shares received.

During the second quarter of fiscal 2017, the Company repurchased approximately 1.6 million shares of its common stock for approximately $91.4 million.

## 9. RECENT ACCOUNTING PRONOUNCEMENTS

### *Accounting Pronouncements Not Yet Effective*

In October 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2016-16, *"Income Taxes (Topic 740), Intra-Entity Transfers of Assets Other Than Inventory"*, which requires the recognition of the income tax consequences of an intra-entity transfer of an asset, other than inventory, when the transfer occurs. The new standard will become effective for the Company in the first quarter of fiscal year 2019. The Company is currently evaluating the effects this new guidance will have on its consolidated financial statements.

In August 2016, the FASB issued ASU 2016-15, *"Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments, a consensus of the FASB's Emerging Issues Task Force."* The new guidance addresses eight specific cash flow issues with the objective of reducing the existing diversity in practice. The new standard will become effective for the Company beginning in the first quarter of fiscal year 2019. The Company is currently evaluating the effects the new guidance will have on its consolidated financial statements.

In June 2016, the FASB issued ASU 2016-13, *"Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments."* The new guidance introduces an approach based on current expected losses over the life of the exposure to estimate credit losses on certain types of financial instruments. It also modifies the impairment model for available-for-sale debt securities and provides for a simplified accounting model for purchased financial assets with credit deterioration since their origination. The new standard will become effective for the Company beginning in the first quarter of fiscal year 2021. The Company does not believe it will have a significant impact on its consolidated financial statements.

In March 2016, the FASB issued ASU 2016-09, *"Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting."* The new guidance will simplify certain aspects of accounting for share-based payment transactions, including income tax consequences, forfeitures, classification of awards on the balance sheet and presentation on the statement of cash flows. The new standard will become effective for the Company beginning in the first quarter of fiscal 2018. The Company is currently evaluating the effects this new guidance will have on its consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, *"Leases (Topic 842)."* The new standard will revise the current guidance for lessees, lessors and sale-leaseback transactions. Under the new guidance, substantially all lessees will now recognize a right-of-use asset and a lease liability for all of their leases with terms greater than 12 months even if the lease is an operating lease. Consistent with current GAAP, the recognition, measurement, and presentation of expenses and cash flow arising from a lease by a lessee primarily will depend on its classification as a finance or operating lease. The new guidance becomes effective for the Company in the first quarter of fiscal 2020. The Company is currently evaluating the effects this new guidance will have on its consolidated financial statements.

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

In January 2016, the FASB issued ASU 2016-01, *"Financial Instruments - Overall (Subtopic 825-10): Recognition and Measurements of Financial Assets and Financial Liabilities."* This new standard will affect the accounting for equity investments, financial liabilities measured under the fair value option and presentation and disclosure requirements for financial instruments. In addition, the FASB clarified guidance related to the assessment of valuation allowances when recognizing deferred tax assets related to unrealized losses on available-for-sale debt securities. The new standard is effective for the Company beginning in the first quarter of fiscal 2019. The Company does not believe it will have a significant impact on its consolidated financial statements.

In July 2015, the FASB issued ASU 2015-11, *"Inventory (Topic 330): Simplifying the Measurement of Inventory."* Entities that measure their inventory other than pursuant to the last-in, last-out and retail inventory methods will measure their inventory at the lower of cost or net realized value. Net realized value is the estimated selling price in the ordinary course of business less reasonably predictable costs to completion, transportation, or disposal. Currently, inventory is required to be measured at the lower of cost or market where market could be the replacement cost, net realizable value, or net realizable value less an approximated normal profit margin. The Company will adopt the provisions of this standard in the first quarter of fiscal 2018, and is currently evaluating the impact on its consolidated financial statements.

In May 2014, the FASB issued ASU 2014-09, *"Revenue from Contracts with Customers (Topic 606)"* that amends existing guidance on revenue recognition. The new guidance is based on principles that an entity will recognize revenue to depict the transfer of goods and services to customers at an amount the entity expects to be entitled to in exchange for those goods and services. The guidance requires additional disclosures regarding the nature, amount, timing, and uncertainty of cash flows and both qualitative and quantitative information about contracts with customers and applied significant judgments. The FASB has issued several amendments to the new guidance. In August 2015, they delayed the effective date for adoption by one year. In March 2016, additional guidance was issued that clarifies the principal versus agent considerations within the new revenue standard. In April, 2016, additional guidance was issued that clarifies the identification of distinct performance obligations in a contract as well as clarifies the accounting for licenses of intellectual property. In May 2016, additional guidance was issued related to transition, collectibility, non-cash consideration and the presentation of sales and other similar taxes. The new amended guidance will become effective for the Company in the first quarter of fiscal 2019, using one of two retrospective methods of adoption. The Company has not determined which method it will adopt and is evaluating the effects the new guidance will have on its consolidated financial statements.

*Accounting Pronouncements Recently Adopted*

In April 2015, the FASB issued ASU 2015-05, *"Intangibles - Goodwill and Other - Internal-Use Software (Subtopic 350-40): Customer's Accounting for Fees Paid in a Cloud Computing Arrangement"* which provided additional guidance to customers about whether a cloud computing arrangement includes a software license. Under this guidance, if a cloud computing arrangement contains a software license, customers should account for the license element of the arrangement in a manner consistent with the acquisition of other software licenses. If the arrangement does not contain a software license, customers should account for the arrangement as a service contract. The Company adopted the provisions of this standard in the first quarter of fiscal 2017, and there was no impact on its condensed consolidated financial statements.

In September 2015, the FASB issued ASU No. 2015-16, *"Business Combinations (Topic 805): Simplifying the Accounting for Measurement-Period Adjustments."* This standard requires an acquirer in a business combination to recognize adjustments to provisional amounts that are identified during the measurement period in the reporting period in which the adjustment amounts are determined. The effect on earnings of changes in depreciation, amortization or other income effects, as a result of the change in provisional amounts, are to be included in the same period's financial statements, calculated as if the accounting had been completed at the acquisition date. The amendments in this update became effective for the Company beginning in the first quarter of fiscal 2017 and will be applied prospectively to adjustments to provisional amounts that occur in the future.

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

## 10. OPERATING SEGMENT INFORMATION

The Company's operating segments as of October 1, 2016 are Mobile Products (MP) and Infrastructure and Defense Products (IDP) based on the organizational structure and information reviewed by the Company's Chief Executive Officer, who is the Company's chief operating decision maker (or CODM), and these segments are managed separately based on the end markets and applications they support. The CODM allocates resources and assesses the performance of each operating segment primarily based on non-GAAP operating income (loss) and non-GAAP operating income (loss) as a percentage of revenue.

MP is a leading global supplier of RF solutions that perform various functions in the increasingly complex cellular radio front end section of smartphones and other cellular devices. These RF solutions are required in fourth generation ("4G") data-centric devices operating under Long-Term Evolution ("LTE") 4G networks, as well as third generation ("3G") and second generation mobile devices. These solutions include complete RF front end modules that combine high-performance filters, power amplifiers ("PAs"), low noise amplifiers ("LNAs") and switches, PA modules, transmit modules, antenna control solutions, antenna switch modules, diversity receive modules and envelope tracking power management devices. MP supplies its broad portfolio of RF solutions into a variety of mobile devices, including smartphones, notebook computers, wearables, tablets and cellular-based applications for the IoT, including the connected car.

IDP is a leading global supplier of RF solutions that support diverse global applications, including ubiquitous high-speed network connectivity to the cloud, data center communications, rapid internet connectivity throughout the home and workplace, and upgraded military capabilities across the globe. These RF solutions enhance performance and reduce complexity in cellular base stations, optical long haul, data center and metro networks, WiFi networks, cable networks, and emerging fifth generation ("5G") wireless networks. Products include high power gallium arsenide ("GaAs") and gallium nitride ("GaN") PAs, LNAs, switches, RF filter solutions, CMOS system-on-a-chip ("SoC") solutions and various multichip and hybrid assemblies. IDP market-leading RF solutions for defense and aerospace upgrade communications and radar systems for air, land and sea. IDP RF solutions for the IoT enable the connected car and an array of industrial applications, and serve the home automation market with SoC solutions based on ZigBee and Bluetooth Smart technologies. During the first quarter of fiscal 2017, the Company acquired GreenPeak, a leader in ultra-low power, short range RF communication technology. The acquisition expanded the Company's offerings to include integrated RF solutions and SoCs for the connected home and the IoT.

The "All other" category includes operating expenses such as stock-based compensation, amortization of intangible assets, acquisition and integration related costs, acquired inventory step-up and revaluation, intellectual property rights (IPR) litigation settlement (costs), restructuring and disposal costs, start-up costs, gain (loss) on assets and other miscellaneous corporate overhead expenses that the Company does not allocate to its reportable segments because these expenses are not included in the segment operating performance measures evaluated by the Company's CODM. The CODM does not evaluate operating segments using discrete asset information. The Company's operating segments do not record intercompany revenue. The Company does not allocate gains and losses from equity investments, interest and other income, or taxes to operating segments. Except as discussed above regarding the "All other" category, the Company's accounting policies for segment reporting are the same as for the Company as a whole.

17

QORVO, INC. AND SUBSIDIARIES
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

The following tables present details of the Company's reportable segments and a reconciliation of the "All other" category (in thousands):

| | Three Months Ended | | | | Six Months Ended | | | |
| | October 1, 2016 | | October 3, 2015 | | October 1, 2016 | | October 3, 2015 | |
|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | |
| MP | $ | 706,138 | $ | 578,160 | $ | 1,253,215 | $ | 1,129,047 |
| IDP | | 157,590 | | 129,205 | | 308,080 | | 250,989 |
| All other (1) | | 970 | | 970 | | 1,940 | | 1,940 |
| **Total revenue** | $ | 864,698 | $ | 708,335 | $ | 1,563,235 | $ | 1,381,976 |
| **Income (loss) from operations:** | | | | | | | | |
| MP | $ | 164,397 | $ | 171,974 | $ | 297,374 | $ | 345,717 |
| IDP | | 32,416 | | 22,850 | | 67,067 | | 36,922 |
| All other | | (151,420) | | (176,785) | | (313,307) | | (365,935) |
| **Income from operations** | | 45,393 | | 18,039 | | 51,134 | | 16,704 |
| Interest expense | | (15,554) | | (660) | | (30,741) | | (1,208) |
| Interest income | | 192 | | 472 | | 470 | | 864 |
| Other (expense) income | | (311) | | 381 | | (811) | | 4,500 |
| **Income before income taxes** | $ | 29,720 | $ | 18,232 | $ | 20,052 | $ | 20,860 |

(1) "All other" revenue relates to royalty income that is not allocated to MP or IDP.

| | Three Months Ended | | | | Six Months Ended | | | |
| | October 1, 2016 | | October 3, 2015 | | October 1, 2016 | | October 3, 2015 | |
|---|---|---|---|---|---|---|---|---|
| **Reconciliation of "All other" category:** | | | | | | | | |
| Stock-based compensation expense | $ | (26,042) | $ | (35,729) | $ | (56,636) | $ | (83,900) |
| Amortization of intangible assets | | (119,646) | | (128,028) | | (238,991) | | (251,230) |
| Acquisition and integration related costs | | (8,962) | | (5,589) | | (15,722) | | (16,003) |
| Acquired inventory step-up and revaluation | | (318) | | — | | (1,517) | | — |
| Restructuring and disposal costs | | (468) | | (2,403) | | (882) | | (3,830) |
| IPR litigation settlement (costs) | | 5,100 | | (192) | | 4,944 | | (340) |
| Start-up costs | | (2,012) | | (3,496) | | (4,088) | | (7,206) |
| Other expenses (including gain (loss) on assets and other miscellaneous corporate overhead) | | 928 | | (1,348) | | (415) | | (3,426) |
| **Loss from operations for "All other"** | $ | (151,420) | $ | (176,785) | $ | (313,307) | $ | (365,935) |

18

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

## 11. CONDENSED CONSOLIDATING FINANCIAL INFORMATION

As discussed in Note 5, the Notes were issued pursuant to the Indenture by and among the Company, the Company's domestic subsidiaries that guarantee the Company's obligations under its revolving credit facility, as guarantors, and MUFG Union Bank, N.A., as trustee. The Notes are fully and unconditionally guaranteed on a joint and several basis by each guarantor subsidiary, each of which is a direct or indirect wholly owned subsidiary of the Company. A guarantor subsidiary's guarantee can be released in certain customary circumstances.

In accordance with Rule 3-10 of Regulation S-X, the following presents the condensed consolidating financial information separately for:

(i)   the Company, the issuer of the Notes;
(ii)  the guarantor subsidiaries, on a combined basis, as specified in the Indenture;
(iii) the non-guarantor subsidiaries, on a combined basis;
(iv)  consolidating entries and eliminations representing adjustments to (a) eliminate intercompany transactions between or among the Company, the guarantor subsidiaries and the non-guarantor subsidiaries, (b) eliminate intercompany profit in inventory, (c) eliminate the investments in the Company's subsidiaries and (d) record consolidating entries; and
(v)   the Company, on a consolidated basis.

Each entity in the condensed consolidating financial information follows the same accounting policies as described in the consolidated financial statements, except for the use by the Company and guarantor subsidiaries of the equity method of accounting to reflect ownership interests in subsidiaries that are eliminated upon consolidation. The financial information may not necessarily be indicative of the financial position, results of operations, comprehensive income (loss), and cash flows, had the Company, guarantor or non-guarantor subsidiaries operated as independent entities.

19

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

**Condensed Consolidating Balance Sheet**

**October 1, 2016**

| (in thousands) | Parent Company | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ — | $ 195,307 | $ 273,912 | $ — | $ 469,219 |
| Accounts receivable, less allowance | — | 52,707 | 439,934 | (1,152) | 491,489 |
| Intercompany accounts and notes receivable | — | 636,122 | 71,542 | (707,664) | — |
| Inventories | — | 97,206 | 416,982 | (77,053) | 437,135 |
| Prepaid expenses | — | 50,024 | 8,555 | — | 58,579 |
| Other receivables | — | 5,830 | 72,192 | — | 78,022 |
| Other current assets | — | 47,752 | 340 | — | 48,092 |
| Total current assets | — | 1,084,948 | 1,283,457 | (785,869) | 1,582,536 |
| Property and equipment, net | — | 924,409 | 315,641 | — | 1,240,050 |
| Goodwill | — | 1,953,102 | 221,816 | — | 2,174,918 |
| Intangible assets, net | — | 696,062 | 960,096 | — | 1,656,158 |
| Long-term investments | — | 26,002 | 8,900 | — | 34,902 |
| Long-term intercompany accounts and notes receivable | — | 398,243 | 129,734 | (527,977) | — |
| Investment in subsidiaries | 6,144,541 | 1,664,717 | — | (7,809,258) | — |
| Other non-current assets | 955 | 37,666 | 24,437 | — | 63,058 |
| Total assets | $ 6,145,496 | $ 6,785,149 | $ 2,944,081 | $ (9,123,104) | $ 6,751,622 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ — | $ 116,802 | $ 206,894 | $ — | $ 323,696 |
| Intercompany accounts and notes payable | — | 71,542 | 636,122 | (707,664) | — |
| Accrued liabilities | 23,152 | 144,233 | 44,835 | — | 212,220 |
| Other current liabilities | — | 715 | 20,814 | — | 21,529 |
| Total current liabilities | 23,152 | 333,292 | 908,665 | (707,664) | 557,445 |
| Long-term debt | 988,625 | — | — | — | 988,625 |
| Deferred tax liabilities | (113,216) | 211,501 | 48,642 | — | 146,927 |
| Long-term intercompany accounts and notes payable | 270,559 | 129,734 | 127,684 | (527,977) | — |
| Other long-term liabilities | — | 33,369 | 48,880 | — | 82,249 |
| Total liabilities | 1,169,120 | 707,896 | 1,133,871 | (1,235,641) | 1,775,246 |
| Total stockholders' equity | 4,976,376 | 6,077,253 | 1,810,210 | (7,887,463) | 4,976,376 |
| Total liabilities and stockholders' equity | $ 6,145,496 | $ 6,785,149 | $ 2,944,081 | $ (9,123,104) | $ 6,751,622 |

20

Table of Contents

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

**Condensed Consolidating Balance Sheet**

**April 2, 2016**

| (in thousands) | Parent Company | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $    — | $    220,633 | $    205,248 | $    — | $    425,881 |
| Short-term investments | — | 186,808 | — | — | 186,808 |
| Accounts receivable, less allowance | — | 203,488 | 112,868 | — | 316,356 |
| Intercompany accounts and notes receivable | — | 532,508 | 404,330 | (936,838) | — |
| Inventories | — | 186,627 | 325,346 | (84,422) | 427,551 |
| Prepaid expenses | — | 56,151 | 7,699 | — | 63,850 |
| Other receivables | — | 37,033 | 10,347 | — | 47,380 |
| Other current assets | — | 40,866 | 518 | — | 41,384 |
| Total current assets | — | 1,464,114 | 1,066,356 | (1,021,260) | 1,509,210 |
| Property and equipment, net | — | 807,586 | 239,495 | (193) | 1,046,888 |
| Goodwill | — | 1,868,816 | 266,881 | — | 2,135,697 |
| Intangible assets, net | — | 786,314 | 1,026,201 | — | 1,812,515 |
| Long-term investments | — | 26,050 | — | — | 26,050 |
| Long-term intercompany accounts and notes receivable | — | 564,397 | 267,823 | (832,220) | — |
| Investment in subsidiaries | 6,151,119 | 1,645,846 | — | (7,796,965) | — |
| Other non-current assets | 1,091 | 39,478 | 25,890 | — | 66,459 |
| Total assets | $    6,152,210 | $    7,202,601 | $    2,892,646 | $    (9,650,638) | $    6,596,819 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $    — | $    141,792 | $    66,508 | $    (2,936) | $    205,364 |
| Intercompany accounts and notes payable | — | 404,330 | 532,508 | (936,838) | — |
| Accrued liabilities | 25,445 | 93,609 | 18,835 | — | 137,889 |
| Other current liabilities | — | 20,122 | 10,426 | — | 30,548 |
| Total current liabilities | 25,445 | 659,853 | 628,277 | (939,774) | 373,801 |
| Long-term debt | 988,130 | — | — | — | 988,130 |
| Deferred tax liabilities | (93,340) | 195,462 | 50,038 | — | 152,160 |
| Long-term intercompany accounts and notes payable | 232,303 | 267,823 | 332,094 | (832,220) | — |
| Other long-term liabilities | — | 39,288 | 43,768 | — | 83,056 |
| Total liabilities | 1,152,538 | 1,162,426 | 1,054,177 | (1,771,994) | 1,597,147 |
| Total stockholders' equity | 4,999,672 | 6,040,175 | 1,838,469 | (7,878,644) | 4,999,672 |
| Total liabilities and stockholders' equity | $    6,152,210 | $    7,202,601 | $    2,892,646 | $    (9,650,638) | $    6,596,819 |

Table of Contents

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

**Condensed Consolidating Statement of Operations and Comprehensive Income (Loss)**

**Three Months Ended October 1, 2016**

| (in thousands) | Parent Company | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenue | $ — | $ 272,065 | $ 842,144 | $ (249,511) | $ 864,698 |
| Cost of goods sold | — | 240,837 | 529,298 | (222,236) | 547,899 |
| Gross profit | — | 31,228 | 312,846 | (27,275) | 316,799 |
| Operating expenses: | | | | | |
| Research and development | 6,248 | 12,427 | 115,044 | (7,641) | 126,078 |
| Marketing and selling | 1,796 | 33,251 | 84,910 | (11,829) | 108,128 |
| General and administrative | 17,998 | 13,929 | 7,790 | (9,262) | 30,455 |
| Other operating expense | — | 94 | 1,012 | 5,639 | 6,745 |
| Total operating expenses | 26,042 | 59,701 | 208,756 | (23,093) | 271,406 |
| Income (loss) from operations | (26,042) | (28,473) | 104,090 | (4,182) | 45,393 |
| Interest expense | (15,167) | (589) | (1,741) | 1,943 | (15,554) |
| Interest income | — | 1,510 | 624 | (1,942) | 192 |
| Other (expense) income | — | 189 | 1,780 | (2,280) | (311) |
| Income (loss) before income taxes | (41,209) | (27,363) | 104,753 | (6,461) | 29,720 |
| Income tax (expense) benefit | 9,581 | (23,457) | (3,997) | — | (17,873) |
| Income in subsidiaries | 43,475 | — | — | (43,475) | — |
| Net income (loss) | $ 11,847 | $ (50,820) | $ 100,756 | $ (49,936) | $ 11,847 |
| | | | | | |
| Comprehensive income (loss) | $ 12,258 | $ (50,819) | $ 101,166 | $ (50,347) | $ 12,258 |

22

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

|  | Condensed Consolidating Statement of Operations and Comprehensive Income (Loss) | | | | |
|  | Three Months Ended October 3, 2015 | | | | |
| *(in thousands)* | Parent Company | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenue | $ — | $ 640,261 | $ 697,459 | $ (629,385) | $ 708,335 |
| Cost of goods sold | — | 491,627 | 538,663 | (606,803) | 423,487 |
| Gross profit | — | 148,634 | 158,796 | (22,582) | 284,848 |
| Operating expenses: | | | | | |
| Research and development | 16,802 | 48,962 | 59,942 | (7,413) | 118,293 |
| Marketing and selling | 14,949 | 28,155 | 66,751 | (3,930) | 105,925 |
| General and administrative | 3,979 | 17,039 | 27,722 | (19,671) | 29,069 |
| Other operating expense | — | 13,121 | 399 | 2 | 13,522 |
| Total operating expenses | 35,730 | 107,277 | 154,814 | (31,012) | 266,809 |
| Income (loss) from operations | (35,730) | 41,357 | 3,982 | 8,430 | 18,039 |
| Interest expense | (579) | (504) | (596) | 1,019 | (660) |
| Interest income | — | 625 | 705 | (858) | 472 |
| Other income (expense) | — | (1,515) | (165) | 2,061 | 381 |
| Income (loss) before income taxes | (36,309) | 39,963 | 3,926 | 10,652 | 18,232 |
| Income tax (expense) benefit | 9,566 | (4,736) | (18,614) | — | (13,784) |
| Income in subsidiaries | 31,191 | — | — | (31,191) | — |
| Net income (loss) | $ 4,448 | $ 35,227 | $ (14,688) | $ (20,539) | $ 4,448 |
| | | | | | |
| Comprehensive income (loss) | $ 4,250 | $ 35,093 | $ (14,751) | $ (20,342) | $ 4,250 |

23

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

**Condensed Consolidating Statement of Operations and Comprehensive Income (Loss)**

**Six Months Ended October 1, 2016**

| (in thousands) | Parent Company | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenue | $ — | $ 677,043 | $ 1,574,638 | $ (688,446) | $ 1,563,235 |
| Cost of goods sold | — | 585,404 | 1,008,340 | (623,783) | 969,961 |
| Gross profit | — | 91,639 | 566,298 | (64,663) | 593,274 |
| Operating expenses: | | | | | |
| Research and development | 17,917 | 22,267 | 213,531 | (10,500) | 243,215 |
| Marketing and selling | 7,854 | 58,785 | 171,522 | (20,997) | 217,164 |
| General and administrative | 30,865 | 16,028 | 27,716 | (9,595) | 65,014 |
| Other operating expense | — | 4,187 | 6,953 | 5,607 | 16,747 |
| Total operating expenses | 56,636 | 101,267 | 419,722 | (35,485) | 542,140 |
| Income (loss) from operations | (56,636) | (9,628) | 146,576 | (29,178) | 51,134 |
| Interest expense | (29,935) | (1,407) | (3,319) | 3,920 | (30,741) |
| Interest income | — | 2,992 | 1,191 | (3,713) | 470 |
| Other (expense) income | — | (132) | 835 | (1,514) | (811) |
| Income (loss) before income taxes | (86,571) | (8,175) | 145,283 | (30,485) | 20,052 |
| Income tax (expense) benefit | 19,876 | (50,544) | 16,788 | — | (13,880) |
| Income in subsidiaries | 72,867 | — | — | (72,867) | — |
| Net income (loss) | $ 6,172 | $ (58,719) | $ 162,071 | $ (103,352) | $ 6,172 |
| | | | | | |
| Comprehensive income (loss) | $ 5,575 | $ (58,646) | $ 161,401 | $ (102,755) | $ 5,575 |

24

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

**Condensed Consolidating Statement of Operations and Comprehensive Income (Loss)**

**Six Months Ended October 3, 2015**

| (in thousands) | Parent Company | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenue | $ — | $ 1,366,023 | $ 1,264,287 | $ (1,248,334) | $ 1,381,976 |
| Cost of goods sold | — | 1,039,150 | 1,002,603 | (1,224,142) | 817,611 |
| Gross profit | — | 326,873 | 261,684 | (24,192) | 564,365 |
| Operating expenses: | | | | | |
| Research and development | 38,275 | 92,632 | 119,953 | (15,357) | 235,503 |
| Marketing and selling | 35,036 | 61,663 | 129,610 | (10,739) | 215,570 |
| General and administrative | 10,589 | 39,595 | 36,901 | (21,933) | 65,152 |
| Other operating expense | — | 28,549 | 2,885 | 2 | 31,436 |
| Total operating expenses | 83,900 | 222,439 | 289,349 | (48,027) | 547,661 |
| Income (loss) from operations | (83,900) | 104,434 | (27,665) | 23,835 | 16,704 |
| Interest expense | (579) | (1,390) | (1,155) | 1,916 | (1,208) |
| Interest income | — | 1,147 | 1,312 | (1,595) | 864 |
| Other income (expense) | — | 3,002 | (404) | 1,902 | 4,500 |
| Income (loss) before income taxes | (84,479) | 107,193 | (27,912) | 26,058 | 20,860 |
| Income tax (expense) benefit | 25,649 | (16,624) | (23,401) | — | (14,376) |
| Income in subsidiaries | 65,314 | — | — | (65,314) | — |
| Net income (loss) | $ 6,484 | $ 90,569 | $ (51,313) | $ (39,256) | $ 6,484 |
| | | | | | |
| Comprehensive income (loss) | $ 5,327 | $ 89,318 | $ (51,219) | $ (38,099) | $ 5,327 |

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

**Condensed Consolidating Statement of Cash Flows**

**Six Months Ended October 1, 2016**

| (in thousands) | Parent Company | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 79,030 | $ (27,693) | $ 258,050 | $ — | $ 309,387 |
| **Investing activities:** | | | | | |
| Purchase of property and equipment | — | (189,037) | (61,382) | — | (250,419) |
| Purchase of a business | — | — | (118,173) | — | (118,173) |
| Purchase of available-for-sale securities | — | (469) | — | — | (469) |
| Proceeds from maturities and sales of available-for-sale securities | — | 186,793 | — | — | 186,793 |
| Other investing activities | — | 4,190 | (8,900) | — | (4,710) |
| Net cash (used in) provided by investing activities | — | 1,477 | (188,455) | — | (186,978) |
| **Financing activities:** | | | | | |
| Excess tax benefit from exercises of stock options | 56 | — | — | — | 56 |
| Proceeds from the issuance of common stock | 27,077 | — | — | — | 27,077 |
| Repurchase of common stock, including transaction costs | (91,400) | — | — | — | (91,400) |
| Tax withholding paid on behalf of employees for restricted stock units | (14,763) | — | — | — | (14,763) |
| Other financing | — | (3) | — | — | (3) |
| Net transactions with related parties | — | 893 | (893) | — | — |
| Net cash provided by (used in) financing activities | (79,030) | 890 | (893) | — | (79,033) |
| Effect of exchange rate changes on cash | — | — | (38) | — | (38) |
| Net increase (decrease) in cash and cash equivalents | — | (25,326) | 68,664 | — | 43,338 |
| Cash and cash equivalents at the beginning of the period | — | 220,633 | 205,248 | — | 425,881 |
| Cash and cash equivalents at the end of the period | $ — | $ 195,307 | $ 273,912 | $ — | $ 469,219 |

26

Table of Contents

**QORVO, INC. AND SUBSIDIARIES**
*NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)*
(Unaudited)

**Condensed Consolidating Statement of Cash Flows**

**Six Months Ended October 3, 2015**

| (in thousands) | Parent Company | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by operating activities | $ 466,001 | $ (110,207) | $ (45,567) | $ — | $ 310,227 |
| **Investing activities:** | | | | | |
| Purchase of property and equipment | — | (156,030) | (13,656) | — | (169,686) |
| Purchase of available-for-sale securities | — | (150,104) | — | — | (150,104) |
| Proceeds from maturities and sales of available-for-sale securities | — | 370,067 | — | — | 370,067 |
| Other investing activities | — | (24,745) | — | — | (24,745) |
| Net cash used in investing activities | — | 39,188 | (13,656) | — | 25,532 |
| **Financing activities:** | | | | | |
| Proceeds from debt | 125,000 | — | — | — | 125,000 |
| Payment of debt | (50,000) | — | — | — | (50,000) |
| Debt issuance costs | (1,339) | — | — | — | (1,339) |
| Proceeds from the issuance of common stock | 29,708 | — | — | — | 29,708 |
| Repurchase of common stock, including transaction costs | (549,940) | — | — | — | (549,940) |
| Tax withholding paid on behalf of employees for restricted stock units | (19,430) | — | — | — | (19,430) |
| Other financing | — | 83 | — | — | 83 |
| Net transactions with related parties | — | (709) | 709 | — | — |
| Net cash (used in) provided by financing activities | (466,001) | (626) | 709 | — | (465,918) |
| Effect of exchange rate changes on cash | — | — | (58) | — | (58) |
| Net increase (decrease) in cash and cash equivalents | — | (71,645) | (58,572) | — | (130,217) |
| Cash and cash equivalents at the beginning of the period | — | 154,332 | 145,482 | — | 299,814 |
| Cash and cash equivalents at the end of the period | $ — | $ 82,687 | $ 86,910 | $ — | $ 169,597 |

27

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

**SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, as amended, that relate to our plans, objectives, estimates and goals. Statements expressing expectations regarding our future and projections relating to products, sales, revenues and earnings are typical of such statements and are made under the Private Securities Litigation Reform Act of 1995. Words such as "expect," "anticipate," "intend," "plan," "believe," and "estimate," and variations of such words and similar expressions, identify such forward-looking statements. Our business is subject to numerous risks and uncertainties, including, but not limited to the factors listed below:

- changes in business and economic conditions, including downturns in the semiconductor industry and the overall economy;

- our ability to accurately predict market requirements and evolving industry standards in a timely manner;

- our ability to accurately predict customer demand and thereby avoid the possibility of obsolete inventory, which would reduce our profit margins;

- our customers' and distributors' ability to manage the inventory they hold and forecast their demand;

- our ability to successfully integrate acquired businesses, operations, product technologies and personnel as well as achieve expected synergies;

- our ability to achieve cost savings and improve yields and margins on our new and existing products;

- our ability to respond to possible downward pressure on the average selling prices of our products caused by our customers or our competitors;

- our ability to utilize our capacity efficiently, or to acquire or source additional capacity, in response to customer demand;

- the inability of one or more of our customers to access their traditional sources of credit, which could lead them to reduce their level of purchases or seek credit or other accommodations from us;

- our ability to continue to improve our product designs, develop new products in response to new technologies, and achieve design wins;

- our dependence on a limited number of customers for a substantial portion of our revenue;

- our reliance on the U.S. government and on U.S government sponsored programs (principally for defense and aerospace applications) for a portion of our revenue;

- our ability to bring new products to market in response to market shifts and to use technological innovation to shorten time-to-market for our products;

- our ability to efficiently and successfully operate our wafer fabrication facilities, assembly facilities and test and tape and reel facilities;

- variability in manufacturing yields;

- variability in raw material costs and availability of raw materials;

- our dependence on third parties, including wafer foundries, wafer starting material suppliers, passive component manufacturers, assembly and packaging suppliers and test and tape and reel suppliers;

- our ability to manage platform provider and customer relationships;

- our ability to procure, commercialize and enforce intellectual property rights (IPR) and to operate our business without infringing on the unlicensed IPR of others;

- the risks associated with security breaches and other similar disruptions, which could compromise our information and expose us to liability and could cause our business and reputation to suffer;

- currency fluctuations, tariffs, trade barriers, tax and export license requirements and health and security issues associated with our foreign operations;

- the impact of stringent environmental regulations;

- the adverse impact of any future decision to repatriate non-U.S. earnings;

- our ability to attract and retain skilled personnel and develop leaders for key business units and functions; and

- failure to realize the anticipated benefits of the Business Combination, including difficulty in integrating the businesses of RFMD and TriQuint or not realizing the expected amount and timing of cost savings and operating synergies.

These and other risks and uncertainties, which are described in more detail in our most recent Annual Report on Form 10-K and in other reports and statements that we file with the SEC, could cause the actual results and developments to be materially different from those expressed or implied by any of these forward-looking statements. Forward-looking statements speak only as of the date they were made, and we undertake no obligation to update or revise such statements, except as required by the federal securities laws.

**OVERVIEW**

*Company*

The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is intended to help the reader understand the consolidated results of operations and financial condition of Qorvo. MD&A is provided as a supplement to, and should be read in conjunction with, our Condensed Consolidated Financial Statements and accompanying Notes.

We are a leading provider of technologies and solutions that address the growing demand for always-on, high reliability, broadband data connectivity. We combine one of the industry's broadest portfolios of radio frequency ("RF") solutions and semiconductor technologies with deep systems-level expertise and scale manufacturing capabilities to enable a diverse set of cutting-edge customer products, including smartphones, tablets, wearables, broadband customer premise equipment, home automation, in-vehicle infotainment, data center and military radar and communications. Our products are helping to drive the ongoing, rapid transformation of how people around the world interact with their communities, access and use data, and transact commerce.

We have more than 8,000 global employees dedicated to delivering solutions for everything that connects the world. We have world-class ISO-certified manufacturing facilities, and our Richardson, Texas facility is a U.S. Department of Defense- accredited 'Trusted Source' (Category 1A) for gallium arsenide ("GaAs"), gallium nitride ("GaN") and bulk acoustic wave ("BAW") technologies, products and services. Our design and manufacturing expertise encompasses many semiconductor process technologies, which we source both internally and through external suppliers. We operate worldwide with design, sales and manufacturing facilities located throughout Asia, Europe and North America. Our primary manufacturing facilities are located in North Carolina, Oregon, Texas and Florida, and our primary assembly and test facilities are located in China, Costa Rica and Texas.

We design, develop, manufacture and market our products to leading U.S. and international original equipment manufacturers ("OEMs") and original design manufacturers ("ODMs") in the following operating segments:

- *Mobile Products (MP)* - MP is a leading global supplier of RF solutions that perform various functions in the increasingly complex cellular radio front end section of smartphones and other cellular devices. These RF solutions are required in fourth generation ("4G") data-centric devices operating under Long-Term Evolution 4G networks, as well as third generation and second generation mobile devices. Our solutions include complete RF front end modules that combine

high-performance filters, power amplifiers ("PAs"), low noise amplifiers ("LNAs") and switches, PA modules, transmit modules, antenna control solutions, antenna switch modules, diversity receive modules and envelope tracking power management devices. MP supplies its broad portfolio of RF solutions into a variety of mobile devices, including smartphones, notebook computers, wearables, tablets, and cellular-based applications for the Internet of Things ("IoT"), including the connected car.

- *Infrastructure and Defense Products (IDP)* - IDP is a leading global supplier of RF solutions that support diverse global applications, including ubiquitous high-speed network connectivity to the cloud, data center communications, rapid internet connectivity throughout the home and workplace, and upgraded military capabilities across the globe. Qorvo's RF solutions enhance performance and reduce complexity in cellular base stations, optical long haul, data center and metro networks, WiFi networks, cable networks, and emerging fifth generation ("5G") wireless networks. Our IDP products include high power GaAs and GaN PAs, LNAs, switches, RF filter solutions, CMOS system-on-a-chip ("SoC") solutions and various multichip and hybrid assemblies. Our market-leading RF solutions for defense and aerospace upgrade communications and radar systems for air, land and sea. Our RF solutions for the IoT enable the connected car and an array of industrial applications, and we serve the home automation market with SoC solutions based on ZigBee and Bluetooth Smart technologies. During the first quarter of fiscal 2017, we acquired GreenPeak Technologies, B.V. ("GreenPeak"), a leader in ultra-low power, short range RF communication technology. The acquisition expanded our offerings to include integrated RF solutions and SoCs for the connected home and the IoT.

As of October 1, 2016, our reportable segments are MP and IDP. These business segments are based on the organizational structure and information reviewed by our Chief Executive Officer, who is our chief operating decision maker (or CODM), and these segments are managed separately based on the end markets and applications they support. The CODM allocates resources and assesses the performance of each operating segment primarily based on non-GAAP operating income (loss) and non-GAAP operating income (loss) as a percentage of revenue (see Note 10 of the Notes to Condensed Consolidated Financial Statements in Part I, Item 1 of this report for additional information regarding our operating segments).

**SECOND QUARTER FISCAL 2017 FINANCIAL HIGHLIGHTS:**

- Quarterly revenue increased 22.1% as compared to the second quarter of fiscal 2016, due to higher demand for our cellular RF solutions for smartphones, wireless infrastructure and WiFi products, as well as the addition of GreenPeak revenue.

- Gross margin for the second quarter of fiscal 2017 was 36.6% as compared to 40.2% for the second quarter of fiscal 2016. Although year-over-year revenue increased substantially, gross margin was adversely impacted by several factors, including an unfavorable change in product mix towards lower margin products, average selling price erosion and unfavorable inventory adjustments primarily due to quality issues and lower than expected manufacturing and assembly yields on a high volume part.

- Operating income was $45.4 million for the second quarter of fiscal 2017 as compared to operating income of $18.0 million for the second quarter of fiscal 2016. This improvement was primarily due to increased gross profit, lower stock-based compensation expense and lower intangible asset amortization expense. These increases in operating income were partially offset by higher personnel expense primarily driven by increased manufacturing and research and development headcount.

- Diluted earnings per share for the second quarter of fiscal 2017 was $0.09 as compared $0.03 for the second quarter of fiscal 2016.

- Cash flow from operations was $250.0 million for the second quarter of fiscal 2017 as compared to $168.8 million for the second quarter of fiscal 2016. This year-over-year increase was primarily attributable to changes in working capital and higher profitability.

- Capital expenditures were $120.0 million for the second quarter of fiscal 2017 as compared to $80.3 million for the second quarter of fiscal 2016. This year-over-year increase was primarily related to projects for increasing premium filter capacity and projects for manufacturing cost savings initiatives.

- During the second quarter of fiscal 2017, we recorded interest expense of $17.3 million (which was offset by $2.4 million of capitalized interest) on the $1.0 billion of senior notes that were issued in the third quarter of fiscal 2016.

- During the second quarter of fiscal 2017, we repurchased approximately 1.6 million shares of our common stock for approximately $91.4 million.

**RESULTS OF OPERATIONS**

*Consolidated*

The following table presents a summary of our results of operations for the three and six months ended October 1, 2016 and October 3, 2015 (in thousands, except percentages):

| | Three Months Ended | | | | | |
| | October 1, 2016 | % of Revenue | October 3, 2015 | % of Revenue | Increase (Decrease) | Percentage Change |
|---|---|---|---|---|---|---|
| Revenue | $ 864,698 | 100.0% | $ 708,335 | 100.0% | $ 156,363 | 22.1 % |
| Cost of goods sold | 547,899 | 63.4 | 423,487 | 59.8 | 124,412 | 29.4 |
| Gross profit | 316,799 | 36.6 | 284,848 | 40.2 | 31,951 | 11.2 |
| Research and development | 126,078 | 14.6 | 118,293 | 16.7 | 7,785 | 6.6 |
| Marketing and selling | 108,128 | 12.5 | 105,925 | 15.0 | 2,203 | 2.1 |
| General and administrative | 30,455 | 3.5 | 29,069 | 4.1 | 1,386 | 4.8 |
| Other operating expense | 6,745 | 0.8 | 13,522 | 1.9 | (6,777) | (50.1) |
| Operating income | $ 45,393 | 5.2% | $ 18,039 | 2.5% | 27,354 | 151.6 |

| | Six Months Ended | | | | | |
| | October 1, 2016 | % of Revenue | October 3, 2015 | % of Revenue | Increase (Decrease) | Percentage Change |
|---|---|---|---|---|---|---|
| Revenue | $ 1,563,235 | 100.0% | $ 1,381,976 | 100.0% | $ 181,259 | 13.1 % |
| Cost of goods sold | 969,961 | 62.0 | 817,611 | 59.2 | 152,350 | 18.6 |
| Gross profit | 593,274 | 38.0 | 564,365 | 40.8 | 28,909 | 5.1 |
| Research and development | 243,215 | 15.6 | 235,503 | 17.0 | 7,712 | 3.3 |
| Marketing and selling | 217,164 | 13.9 | 215,570 | 15.6 | 1,594 | 0.7 |
| General and administrative | 65,014 | 4.1 | 65,152 | 4.7 | (138) | (0.2) |
| Other operating expense | 16,747 | 1.1 | 31,436 | 2.3 | (14,689) | (46.7) |
| Operating income | $ 51,134 | 3.3% | $ 16,704 | 1.2% | 34,430 | 206.1 |

Revenue increased for the three and six months ended October 1, 2016, as compared to the three and six months ended October 3, 2015, due to higher demand for our cellular RF solutions for smartphones, wireless infrastructure and WiFi products, as well as the addition of GreenPeak revenue.

Gross margin for the three and six months ended October 1, 2016 was 36.6% and 38.0%, respectively, as compared to 40.2% and 40.8%, respectively, for the three and six months ended October 3, 2015. Although year-over-year revenue increased substantially, gross margin was adversely impacted by several factors, including an unfavorable change in product mix towards lower margin products, average selling price erosion and unfavorable inventory adjustments primarily due to quality issues and lower than expected manufacturing and assembly yields on a high volume part.

Operating income increased for the three and six months ended October 1, 2016, primarily due to increased gross profit, lower stock-based compensation expense and lower intangible asset amortization expense. These increases in operating income were partially offset by higher personnel expense primarily driven by increased manufacturing and research and development headcount.

Stock-based compensation expense included in operating expense for the three and six months ended October 1, 2016 included post-combination service award expense related to the Business Combination. As the requisite service periods roll-off, the stock-based compensation expense associated with the Business Combination will continue to decline.

*Operating Expenses*

Research and development expense increased for the three and six months ended October 1, 2016 as compared to the three and six months ended October 3, 2015, primarily due to increased headcount and related personnel expense associated with the

32

design and development of high-performance filter based products as well as the addition of GreenPeak expenses, partially offset by lower stock-based compensation expense.

Marketing and selling expense increased slightly for the three and six months ended October 1, 2016 as compared to the three and six months ended October 3, 2015.

General and administrative expense increased slightly for the three months ended October 1, 2016 as compared to the three months ended October 3, 2015. General and administrative expense decreased slightly for the six months ended October 1, 2016 as compared to the six months ended October 3, 2015.

Other operating expense decreased for the three and six months ended October 1, 2016 as compared to the three and six months ended October 3, 2015, primarily due to lower restructuring and integration costs associated with the Business Combination, as well as lower start-up costs.

### *Segment Product Revenue, Operating Income and Operating Income as a Percentage of Revenue*

**Mobile Products**

| | Three Months Ended | | | |
|---|---|---|---|---|
| (In thousands, except percentages) | October 1, 2016 | October 3, 2015 | Increase (Decrease) | Percentage Change |
| Revenue | $ 706,138 | $ 578,160 | $ 127,978 | 22.1 % |
| Operating income | 164,397 | 171,974 | (7,577) | (4.4) |
| Operating income as a % of revenue | 23.3% | 29.7% | | |

| | Six Months Ended | | | |
|---|---|---|---|---|
| (In thousands, except percentages) | October 1, 2016 | October 3, 2015 | Increase (Decrease) | Percentage Change |
| Revenue | $ 1,253,215 | $ 1,129,047 | $ 124,168 | 11.0 % |
| Operating income | 297,374 | 345,717 | (48,343) | (14.0) |
| Operating income as a % of revenue | 23.7% | 30.6% | | |

MP revenue increased for the three and six months ended October 1, 2016 as compared to the three and six months ended October 3, 2015, primarily due to higher demand for our cellular RF solutions for smartphones.

The decrease in MP operating income as a percentage of revenue for the three and six months ended October 1, 2016 as compared to the three and six months ended October 3, 2015 was primarily due to lower gross margin resulting from an unfavorable change in product mix towards lower margin products, average selling price erosion, unfavorable inventory adjustments primarily due to quality issues and lower than expected manufacturing and assembly yields on a high volume part and increased personnel expense primarily related to the design and development of high-performance filter based products.

**Infrastructure and Defense Products**

| (In thousands, except percentages) | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | October 1, 2016 | October 3, 2015 | Increase | Percentage Change |
| Revenue | $ 157,590 | $ 129,205 | $ 28,385 | 22.0% |
| Operating income | 32,416 | 22,850 | 9,566 | 41.9 |
| Operating income as a % of revenue | 20.6% | 17.7% | | |

| (In thousands, except percentages) | Six Months Ended | | | |
| --- | --- | --- | --- | --- |
| | October 1, 2016 | October 3, 2015 | Increase | Percentage Change |
| Revenue | $ 308,080 | $ 250,989 | $ 57,091 | 22.7% |
| Operating income | 67,067 | 36,922 | 30,145 | 81.6 |
| Operating income as a % of revenue | 21.8% | 14.7% | | |

Revenue increased for the three and six months ended October 1, 2016 as compared to the three and six months ended October 3, 2015, primarily due to improved global demand for our wireless infrastructure and WiFi products, as well as the inclusion of GreenPeak revenue in the three and six months ended October 1, 2016.

The increase in IDP operating income as a percentage of revenue for the three months ended October 1, 2016 as compared to the three months ended October 3, 2015 was primarily due to increased revenue and lower unfavorable inventory adjustments.

The increase in IDP operating income as a percentage of revenue for the six months ended October 1, 2016 as compared to the six months ended October 3, 2015 was primarily due to increased revenue, favorable factory utilization, lower unfavorable inventory adjustments and favorable product mix.

See Note 10 to the Condensed Consolidated Financial Statements for a reconciliation of segment operating income to the consolidated operating income (loss) for the three and six months ended October 1, 2016 and October 3, 2015.

**OTHER (EXPENSE) INCOME AND INCOME TAXES**

| (In thousands) | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 1, 2016 | October 3, 2015 | October 1, 2016 | October 3, 2015 |
| Interest expense | $ (15,554) | $ (660) | $ (30,741) | $ (1,208) |
| Interest income | 192 | 472 | 470 | 864 |
| Other (expense) income | (311) | 381 | (811) | 4,500 |
| Income tax expense | (17,873) | (13,784) | (13,880) | (14,376) |

*Interest Expense*
During the three and six months ended October 1, 2016, we recorded interest expense of $17.3 million and $34.8 million, respectively, related to the $1.0 billion of senior notes that were issued in the third quarter of fiscal 2016. Interest expense in the preceding table for the three and six months ended October 1, 2016 is net of capitalized interest of $2.4 million and $5.4 million, respectively.

*Other (Expense) Income*
During the first quarter of fiscal 2016, we sold equity securities and recognized a gain of approximately $4.0 million.

*Income Taxes*
Our provision for income taxes for the three and six months ended October 1, 2016 and October 3, 2015 has been calculated by applying an estimate of the annual effective tax rate for the full fiscal year to "ordinary" income or loss (pre-tax income or loss excluding unusual or infrequently occurring discrete items) for the three and six months ended October 1, 2016 and October 3, 2015.

For the three and six months ended October 1, 2016, we had an income tax expense of $17.9 million and $13.9 million, respectively, which was comprised primarily of tax expense related to domestic and international operations generating pre-tax

book income offset by a tax benefit related to international operations generating pre-tax book losses. For the three and six months ended October 3, 2015, income tax expense was $13.8 million and $14.4 million, respectively, which was comprised primarily of tax expense related to domestic and international operations generating pre-tax book income offset by a tax benefit related to international operations generating pre-tax book losses.

A valuation allowance remained against certain domestic and foreign net deferred tax assets as it is more likely than not that the related deferred tax assets will not be realized.

## LIQUIDITY AND CAPITAL RESOURCES

We have funded our operations to date through revenue from product sales, sales of equity and debt securities, bank borrowings and capital equipment leases. As of October 1, 2016, we had working capital of approximately $1,025.1 million, including $469.2 million in cash and cash equivalents, compared to working capital of approximately $1,135.4 million at April 2, 2016, including $425.9 million in cash and cash equivalents.

Our total cash, cash equivalents and short-term investments were $469.2 million as of October 1, 2016. This balance includes approximately $273.9 million held by our foreign subsidiaries. If the undistributed earnings of our foreign subsidiaries are needed in the U.S., we may be required to accrue and pay U.S. taxes to repatriate.  Our current plans are to permanently reinvest the undistributed earnings of our foreign subsidiaries.

*Stock Repurchases*

On November 5, 2015, we announced a new share repurchase program to repurchase up to $1.0 billion of our outstanding stock through November 4, 2016. During the third quarter of fiscal 2016, we repurchased approximately 4.6 million shares of our common stock for approximately $250.0 million and during the fourth quarter of fiscal 2016, we repurchased approximately 10.0 million shares of our common stock for approximately $500.0 million. The amounts for the fourth quarter of fiscal 2016 reflect shares repurchased pursuant to variable maturity accelerated shares repurchase ("ASR") agreements that we entered into with Bank of America, N.A. on February 16, 2016 as part of the $1.0 billion share repurchase program described above. Final settlements of the ASR agreements were completed during the first quarter of fiscal 2017 with an additional 0.4 million shares received.

During the second quarter of fiscal 2017, we repurchased approximately 1.6 million shares of our common stock pursuant to this authorization for approximately $91.4 million.

On November 3, 2016, we announced that our Board of Directors authorized a new share repurchase program to repurchase up to $500.0 million of our outstanding stock. The new repurchase program includes approximately $158.6 million authorized on a prior program that was set to expire on November 4, 2016. Under the share repurchase program, share repurchases will be made in accordance with applicable securities laws on the open market or in privately negotiated transactions. The extent to which we repurchase our shares, the number of shares and the timing of any repurchases will depend on general market conditions, regulatory requirements, alternative investment opportunities and other considerations. The program does not require us to repurchase a minimum number of shares and does not have a fixed term, and may be modified, suspended or terminated at any time without prior notice.

*Cash Flows from Operating Activities*

Operating activities for the six months ended October 1, 2016 generated cash of $309.4 million, compared to $310.2 million for the six months ended October 3, 2015.

*Cash Flows from Investing Activities*

Net cash used in investing activities for the six months ended October 1, 2016 was $187.0 million as compared to net cash provided by investing activities of $25.5 million for the six months ended October 3, 2015. This year over year increase in cash used in investing activities was primarily driven by the acquisition of GreenPeak and increased capital expenditures (primarily related to projects for increasing premium filter capacity and projects for manufacturing cost savings initiatives).

*Cash Flows from Financing Activities*

Net cash used in financing activities was $79.0 million for the six months ended October 1, 2016, compared to $465.9 million for the six months ended October 3, 2015. This year over year decrease in cash used in financing activities was primarily driven by lower share repurchase activity, which was partially offset by lower net proceeds from borrowings.

**COMMITTMENTS AND CONTINGENCIES**

_Credit Agreement_ On April 7, 2015, we and certain of our material domestic subsidiaries (the "Guarantors") entered into a five-year unsecured senior credit facility with Bank of America, N.A., as administrative agent, swing line lender, and L/C issuer, and a syndicate of lenders (the "Credit Agreement"). The Credit Agreement includes a $300.0 million revolving credit facility, which includes a $25.0 million sublimit for the issuance of standby letters of credit and a $10.0 million sublimit for swing line loans. We may request, at any time and from time to time, that the revolving credit facility be increased by an amount not to exceed $150.0 million. The revolving credit facility is available to finance working capital, capital expenditures and other corporate purposes. Our obligations under the Credit Agreement are jointly and severally guaranteed by the Guarantors. We had no outstanding amounts under the Credit Agreement as of October 1, 2016.

The Credit Agreement contains various conditions, covenants and representations with which we must be in compliance in order to borrow funds and to avoid an event of default, including financial covenants that we must maintain. On November 12, 2015, the Credit Agreement was amended to increase the size of certain of the negative covenant baskets and the threshold for certain negative covenant incurrence-based permissions and to raise the consolidated leverage ratio test from 2.50 to 1.00 to 3.00 to 1.00 as of the end of any fiscal quarter. We must also maintain a consolidated interest coverage ratio of not less than 3.00 to 1.00 as of the end of any fiscal quarter. At October 1, 2016, we were in full compliance with these covenants.

_Notes Offering_ On November 19, 2015, we completed an offering of $450.0 million aggregate principal amount of 6.75% senior notes due December 1, 2023 and $550.0 million aggregate principal amount of 7.00% senior notes due December 1, 2025 (collectively the "Notes"). The Notes are senior unsecured obligations and are guaranteed, jointly and severally, by our domestic subsidiaries that guarantee our obligations under our revolving credit facility. Interest on both series of the Notes is payable semi-annually on June 1 and December 1 of each year and commenced on June 1, 2016.

The indenture governing the Notes contains customary events of default, including among other things, payment default, exchange default, failure to provide certain notices thereunder and certain provisions related to bankruptcy events. The indenture also contains customary negative covenants.

We completed an exchange offer on September 19, 2016 under which substantially all of the Notes were exchanged for senior notes registered under the Securities Act (see Note 5 of the Notes to Condensed Consolidated Financial Statements).

_Capital Commitments_ At October 1, 2016, we had capital commitments of approximately $124.3 million primarily related to projects increasing premium filter capacity, projects for manufacturing cost savings initiatives, constructing a new office and design center, equipment replacements and general corporate purposes.

_Future Sources of Funding_ Our future capital requirements may differ materially from those currently anticipated and will depend on many factors, including, but not limited to, market acceptance of and demand for our products, acquisition opportunities, technological advances and our relationships with suppliers and customers. Based on current and projected levels of cash flow from operations, coupled with our existing cash and cash equivalents and our revolving credit facility, we believe that we have sufficient liquidity to meet both our short-term and long-term cash requirements. However, if there is a significant decrease in demand for our products, or in the event that growth is faster than we had anticipated, operating cash flows may be insufficient to meet our needs. If existing resources and cash from operations are not sufficient to meet our future requirements or if we perceive conditions to be favorable, we may seek additional debt or equity financing. We cannot be sure that any additional equity or debt financing will not be dilutive to holders of our common stock. Further, we cannot be sure that additional equity or debt financing, if required, will be available on favorable terms, if at all.

_Legal_ We are involved in various legal proceedings and claims that have arisen in the ordinary course of business that have not been fully adjudicated. These actions, when finally concluded and determined, will not, in the opinion of management, have a material adverse effect on our consolidated financial position or results of operations.

_Taxes_ We are subject to income and other taxes in the United States and in numerous foreign jurisdictions. Our domestic and foreign tax liabilities are subject to the allocation of revenues and expenses in different jurisdictions. Additionally, the amount of taxes paid is subject to our interpretation of applicable tax laws in the jurisdictions in which we operate. We are subject to audits by tax authorities. While we endeavor to comply with all applicable tax laws, there can be no assurance that a governing tax authority will not have a different interpretation of the law than we do or that we will comply in all respects with applicable tax laws, which could result in additional taxes. There can be no assurance that the outcomes from tax audits will not have an adverse effect on our results of operations in the period during which the review is conducted.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

There have been no material changes to our market risk exposures during the second quarter of fiscal 2017. For a discussion of our exposure to market risk, refer to Item 7A, "Quantitative and Qualitative Disclosures About Market Risk," contained in Qorvo's Annual Report on Form 10-K for the fiscal year ended April 2, 2016.

**ITEM 4. CONTROLS AND PROCEDURES.**

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

In connection with the preparation of this Quarterly Report on Form 10-Q, we carried out an evaluation under the supervision of and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, as of October 1, 2016, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were not effective as of October 1, 2016, as we cannot conclude that the material weakness in internal control over financial reporting related to accounting for income taxes described in Part II, Item 9A of the Annual Report on Form 10-K for the fiscal year ended April 2, 2016 has been fully remediated as of the date of this Quarterly Report on Form 10-Q.

*Update on Remediation Plan*

During the quarter ended October 1, 2016, we made substantial progress toward remediating the material weakness that existed in accounting for income taxes as of April 2, 2016. Our remediation plan is subject to ongoing senior management review, as well as Audit Committee oversight. As part of such plan, as of the date of this Quarterly Report on Form 10-Q:

- We have implemented a single income tax provision model in conjunction with completing our move to a single integrated ERP system.
- We have filled three open positions within the tax department. We will continue to evaluate the structure of our tax organization and add resources as needed.
- With the assistance of a qualified outside party, we have undergone a review and assessment of our internal controls over accounting for income taxes and the tax provision process. Based on that review and assessment, we are in process of redesigning and enhancing our procedures to improve the effectiveness of the internal controls related to accounting for income taxes.

The Company believes that the remediation steps completed to date have significantly improved our internal control over the accounting for income taxes. However, the Company expects to continue to further strengthen internal controls over accounting for income taxes and make additional improvements in the tax provision process during the remainder of fiscal 2017. Until these remediation steps are fully implemented and tested, the material weakness described above will continue to exist.

*Changes in Internal Controls over Financial Reporting*

Other than the remediation steps described above, no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended October 1, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

37

**PART II — OTHER INFORMATION**

**ITEM 1A. RISK FACTORS.**

In addition to the other information set forth in this report and in our other reports and statements that we file with the SEC, including our quarterly reports on Form 10-Q, careful consideration should be given to the factors discussed in Part I, Item 1A., "Risk Factors" in Qorvo's Annual Report on Form 10-K for the fiscal year ended April 2, 2016, which could materially affect our business, financial condition or future results. The risks described in Qorvo's Annual Report on Form 10-K are not the only risks that we face. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition and/or operating results.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.**

**(c) Issuer Purchases of Equity Securities**

**Purchases of Equity Securities**

| Period | Total number of shares purchased (in thousands) | Average price paid per share | Total number of shares purchased as part of publicly announced plans or programs (in thousands) | Approximate dollar value of shares that may yet be purchased under the plans or programs |
|---|---|---|---|---|
| July 3, 2016 through July 30, 2016 | — | | — | $ 250.0 million |
| July 31, 2016 through August 27, 2016 | 1,077 | $          55.13 | 1,077 | $ 190.6 million |
| August 28, 2016 through October 1, 2016 | 560 | 57.19 | 560 | $ 158.6 million |
| Total | 1,637 | $          55.82 | 1,637 | $ 158.6 million |

On November 5, 2015, the Company announced a new share repurchase program to repurchase up to $1.0 billion of the Company's outstanding stock through November 4, 2016. During the third quarter of fiscal 2016, the Company repurchased approximately 4.6 million shares of its common stock for approximately $250.0 million and during the fourth quarter of fiscal 2016, the Company repurchased approximately 10.0 million shares of its common stock for approximately $500.0 million. The amounts for the fourth quarter of fiscal 2016 reflect shares repurchased pursuant to variable maturity accelerated shares repurchase ("ASR") agreements that the Company entered into with Bank of America, N.A. on February 16, 2016 as part of the $1.0 billion share repurchase program described above. Final settlements of the ASR agreements were completed during the first quarter of fiscal 2017 with an additional 0.4 million shares received.

During the second quarter of fiscal 2017, the Company repurchased approximately 1.6 million shares of its common stock for approximately $91.4 million.

On November 3, 2016, the Company announced that its Board of Directors authorized a new share repurchase program to repurchase up to $500.0 million of the Company's outstanding stock. The new repurchase program includes approximately $158.6 million authorized on a prior program that was set to expire on November 4, 2016. Under the share repurchase program, share repurchases will be made in accordance with applicable securities laws on the open market or in privately negotiated transactions. The extent to which the Company repurchases its shares, the number of shares and the timing of any repurchases will depend on general market conditions, regulatory requirements, alternative investment opportunities and other considerations. The program does not require the Company to repurchase a minimum number of shares and does not have a fixed term, and may be modified, suspended or terminated at any time without prior notice.

**ITEM 6. EXHIBITS.**

10.1   Qorvo, Inc. Cash Bonus Plan (As Amended and Restated Through June 9, 2016) *

10.2   Severance Agreement and Release of All Claims between Steven J. Buhaly and Qorvo US, Inc. *

10.3   Consulting Agreement by and between Qorvo US, Inc. and Steven J. Buhaly *

10.4   Qorvo, Inc. Director Compensation Program, effective August 3, 2016 *

31.1   Certification of Periodic Report by Robert A. Bruggeworth, as Chief Executive Officer, pursuant to Rule 13a-14(a) or 15d-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2   Certification of Periodic Report by Mark J. Murphy, as Chief Financial Officer, pursuant to Rule 13a-14(a) or 15d-14 (a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1   Certification of Periodic Report by Robert A. Bruggeworth, as Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

32.2   Certification of Periodic Report by Mark J. Murphy, as Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

101   The following materials from our Quarterly Report on Form 10-Q for the quarter ended October 1, 2016, formatted in XBRL (eXtensible Business Reporting Language): (i) the Condensed Consolidated Balance Sheets as of October 1, 2016 and April 2, 2016; (ii) the Condensed Consolidated Statements of Income for the three and six months ended October 1, 2016 and October 3, 2015; (iii) the Condensed Consolidated Statements of Comprehensive Income for the three and six months ended October 1, 2016 and October 3, 2015; (iv) the Condensed Consolidated Statements of Cash Flows for the six months ended October 1, 2016 and October 3, 2015; and (v) the Notes to Condensed Consolidated Financial Statements

* Executive compensation plan or agreement

39

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Qorvo, Inc.

Date:   November 7, 2016

/s/ Mark J. Murphy
Mark J. Murphy
Chief Financial Officer

40

**EXHIBIT INDEX**

10.1  Qorvo, Inc. Cash Bonus Plan (As Amended and Restated Through June 9, 2016) *

10.2  Severance Agreement and Release of All Claims between Steven J. Buhaly and Qorvo US, Inc. *

10.3  Consulting Agreement by and between Qorvo US, Inc. and Steven J. Buhaly *

10.4  Qorvo, Inc. Director Compensation Program, effective August 3, 2016 *

31.1  Certification of Periodic Report by Robert A. Bruggeworth, as Chief Executive Officer, pursuant to Rule 13a-14(a) or 15d-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2  Certification of Periodic Report by Mark J. Murphy, as Chief Financial Officer, pursuant to Rule 13a-14(a) or 15d-14 (a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1  Certification of Periodic Report by Robert A. Bruggeworth, as Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

32.2  Certification of Periodic Report by Mark J. Murphy, as Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

101  The following materials from our Quarterly Report on Form 10-Q for the quarter ended October 1, 2016, formatted in XBRL (eXtensible Business Reporting Language): (i) the Condensed Consolidated Balance Sheets as of October 1, 2016 and April 2, 2016; (ii) the Condensed Consolidated Statements of Income for the three and six months ended October 1, 2016 and October 3, 2015; (iii) the Condensed Consolidated Statements of Comprehensive Income for the three and six months ended October 1, 2016 and October 3, 2015; (iv) the Condensed Consolidated Statements of Cash Flows for the six months ended October 1, 2016 and October 3, 2015; and (v) the Notes to Condensed Consolidated Financial Statements

* Executive compensation plan or agreement

Our SEC file number for documents filed with the SEC pursuant to the Securities Exchange Act of 1934, as amended, is 001-36801.

41

**QORVO, INC.**
**CASH BONUS PLAN**
**(As Amended and Restated Through June 9, 2016)**

**1.      Purpose; Plan Background**

The purpose of the Qorvo, Inc. Cash Bonus Plan, as previously amended and as it may be further amended (the "Plan"), is to provide selected employees of Qorvo, Inc. and its affiliated companies (collectively, the "Company") with the opportunity to earn awards in the form of cash bonuses based upon attainment of preestablished, objective performance goals, thereby promoting a closer identification of the participating employees' interests with the interests of the Company and its stockholders, and further stimulating such employees' efforts to enhance the efficiency, profitability, growth and value of the Company.

**2.      Plan Administration**

(a)      *Administration*: The Plan shall be administered by the Compensation Committee (the "Committee") of the Board of Directors (the "Board") of the Company or a subcommittee of the Committee. To the extent required by Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), the Committee shall be comprised of at least two members and each member of the Committee (or subcommittee of the Committee) shall be an "outside director" as defined in Code Section 162(m) and related regulations. In addition, the members of the Compensation Committee shall be deemed independent if and to the extent required under Section 10C of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and applicable rules of The NASDAQ Stock Market LLC or other applicable stock exchange or national securities association. In addition to action by meeting in accordance with applicable laws, any action of the Committee with respect to the Plan may be taken by a written instrument signed (including any electronic signature complying with the U.S. federal ESIGN Act of 2000) by all of the members of the Committee, and any such action so taken by written consent shall be as fully effective as if it had been taken by a majority of the members at a meeting duly held and called.

(b)      *Administrator Authority*: Subject to the terms of the Plan, the Committee shall have full authority in its discretion to take any action with respect to the Plan, including, but not limited to, the authority to (i) determine all matters relating to awards, including selection of individuals to be granted awards and all terms, conditions, restrictions and limitations of an award; and (ii) construe and interpret the Plan and any instruments evidencing awards granted under the Plan, to establish and interpret rules and regulations for administering the Plan and to make all other determinations deemed necessary or advisable for administering the Plan. The Committee's authority to grant awards and authorize payments under the Plan shall not in any way restrict the authority of the Committee to grant compensation to employees under any other compensation plan or program of the Company. The Committee also shall have the authority and discretion to establish terms and conditions of awards (including but not limited to the establishment of subplans) as the Committee determines to be necessary or appropriate to conform to the applicable requirements or practices of jurisdictions outside of the United States. Any decision made, or action taken, by the Committee in connection with the administration of the Plan shall be final, binding and conclusive.

(c)   *Delegation of Authority*: Notwithstanding the foregoing, the Committee may delegate the administration of the Plan to one or more of its designees (subject to any conditions imposed by the Committee), but only with respect to matters which would not affect the deductibility under Code Section 162(m) of compensation paid under the Plan to "covered employees" (as such term is defined in Code Section 162(m) and related regulations) to the extent such compensation is intended to qualify as "performance-based compensation" under Code Section 162(m), or as may otherwise be permitted under applicable laws, rules or regulations. In the case of any such delegation, references to the "Committee" herein shall include such designee or designees, unless the context otherwise requires. No member of the Board or the Committee shall be liable for any action, determination or decision made in good faith with respect to the Plan or any award paid under it. The members of the Board and the Committee shall be entitled to indemnification and reimbursement in the manner and to the fullest extent provided in the Company's certificate of incorporation and bylaws.

## 3.    Eligibility

The participants in the Plan (individually, a "participant," and collectively, the "participants") shall be those employees of the Company who are designated from time to time by the Committee or its designees as being eligible to participate under the Plan based on criteria established from time to time by or at the direction of the Committee. Participation in the Plan for any one performance period does not guarantee that an employee will be entitled to participate in any other performance period. For the purposes of the Plan, "performance period" shall mean a period established by the Committee during which performance shall be measured to determine if any payment will be made under the Plan. A performance period may be coincident with one or more fiscal years or fiscal quarters of the Company, or any portion thereof, and performance periods may be overlapping.

## 4.    Nature of Awards

Awards granted under the Plan shall be in the form of cash bonuses.

## 5.    Awards

(a)    *Grant of Awards:* At the time performance objectives are established for a performance period as provided in Section 5(b) herein, the Committee also shall assign to each participant a target cash bonus award applicable for the particular performance period (each, a "target bonus"). A participant's award, if any, shall be earned based on the attainment of written performance objectives approved by the Committee for a specified performance period, as provided in Section 5(b) herein. In the case of awards granted to covered employees that are intended to comply with Code Section 162(m), designation of such covered employees and such performance objectives shall be established by the Committee (i) while the outcome for the performance period is substantially uncertain, and (ii) (A) no more than 90 days after the commencement of the performance period to which the performance objective relates and (B) before 25% of the relevant performance period has elapsed (or otherwise at such time and upon such terms as to ensure that the award will, to the extent practicable, qualify as "performance-based compensation" for purposes of Code Section 162(m)). During any fiscal year of the Company, no participant may be granted more than the maximum award limitation stated in Section 5(d) herein. The Committee may adjust awards as appropriate for partial achievement of goals, exemplary effort on the part of a participant and/or other external, extraordinary or mitigating circumstances and may also interpret and make necessary and appropriate adjustments to performance

2

goals and the manner in which such performance goals are evaluated; provided, however, that, except as may be otherwise provided in Section 6 or Section 7, no such adjustment shall be made with respect to an award intended to qualify as performance-based compensation under Code Section 162(m) and granted under the Plan to a participant who is a "covered employee" if such adjustment would cause the award to fail to qualify as "performance-based compensation" for purposes of Code Section 162(m).

(b)     *Performance Objectives*: For each performance period, the Committee shall establish one or more specific performance measures and specific goals for each participant, for each group of participants or for all participants. The performance objectives established by the Committee shall be based on one or more performance measures that apply to the individual participant ("individual performance"), to a business unit or function at the Company ("business unit/function performance"), to the Company as a whole ("corporate performance"), or to any combination of individual performance, business unit/function performance or corporate performance. Without limiting the foregoing, performance goals for business unit/function performance may be set for an identifiable business group, division, segment, unit, affiliate, facility, product line, product or function (such as sales, manufacturing or research and development). If a participant's performance goals are based on a combination of individual performance, business unit/function performance and/or corporate performance, the Committee may weight the importance of each type of performance that applies to such participant by assigning a percentage to it. In the case of awards granted to participants that are intended to qualify for the performance-based compensation exception under Code Section 162(m), the performance objectives shall be objective and shall be based upon one or more of the following criteria, as determined by the Committee: (i) revenues or sales; (ii) gross margins, operating margins or profit margins; (iii) earnings (including net income or loss, operating profit; earnings before interest, taxes, depreciation and amortization; earnings before interest, taxes and depreciation; earnings before interest and taxes; earnings before or after taxes;; and earnings before special or extraordinary items) or earnings, income or loss per share; (iv) net bookings; (v) product production or shipments; (vi) income, net income, operating income, net operating income, net operating profit, controllable profits, pre-tax profit or operating margin; (vii) book value per share; (viii) return on stockholders' equity, return on investment, return on assets or net assets, return on capital, return on invested capital, return on sales or return on revenues; (ix) improvements in capital structure; (x) expense management; (xi) debt reduction or debt levels; (xii) maintenance or improvement of gross margins, operating margins or profit margins; (xiii) stock price or total stockholder return; (xiv) market share; (xv) profitability; (xvi) costs; (xvii) cash flow, free cash flow, cash flow return on investment (discounted or otherwise), net cash provided by operations, or cash flow in excess of cost of capital; (xviii) working capital; (xix) economic wealth created; (xx) operational performance, including orders, backlog, deferred revenues, revenue per employee, overhead, days sales outstanding, inventory turns, or other expense levels; (xxi) minimum cash balances, (xxii) asset turns; (xxiii) product or technological developments; and/or (xxiv) strategic business criteria, based on meeting specified goals or objectives related to market penetration, new products, design wins, geographic business expansion, cost targets, reductions and savings, improvement in or attainment of working capital levels, productivity and efficiencies, customer satisfaction, employee satisfaction, management of employment practices and employee benefits, workforce diversity, management of litigation, management of information technology, goals relating to acquisitions or divestitures of products, product lines, subsidiaries, affiliates or joint ventures, quality matrices, customer service matrices, negotiation of transactions, formation of joint ventures, research or development collaborations, completion of corporate transactions and/or execution of pre-approved corporate strategy. In addition, with respect to awards granted to participants that are not intended to qualify for

3

the performance-based compensation exception under Code Section 162(m), the Committee may approve performance objectives based on other criteria, which may or may not be objective. The foregoing criteria may relate to the Company, one or more of its affiliates or one or more of its divisions, units, partnerships, joint venturers or minority investments, facilities, product lines or products or any combination of the foregoing. The targeted level or levels of performance with respect to such business criteria may be established at such levels and on such terms as the Committee may determine, in its discretion, including but not limited to on an absolute basis, in relation to performance in a prior performance period, and/or relative to one or more peer group companies or indices, or any combination thereof. In addition, the performance measures may be subject to adjustment as provided in Section 11(i) herein.

(c)   *Earning of Awards:* As soon as practicable after the end of the performance period, the Committee shall determine whether the performance goals for the performance period were achieved and, if so, at what level of achievement under specific formulae established for the performance period. If the performance goals were met for the performance period, the Committee shall determine the amount, if any, of the award earned by each participant and such award shall be paid in accordance with Section 5(e) herein (subject, however, to the limitation on awards stated in Section 5(d) herein).

(d)   *Maximum Award Payable to Any One Participant*: Other provisions of the Plan notwithstanding, the maximum amount of cash bonus awards that may be granted under the Plan to any one participant in any one fiscal year shall not exceed $5,000,000.

(e)   *Payment of Awards:* An award earned by a participant with respect to a performance period shall be paid to him following the determination of the amount, if any, of the award and, with respect to participants who are covered employees, the Committee's written certification (which may be by approval of the minutes from the meeting in which the certification was made or by a written certification signed by a duly authorized officer of the Company who attended the Committee meeting of the certifications made by the Committee in its meeting, or other approval made in accordance with Code Section 162(m)) that the participant achieved his performance goals. Without limiting the foregoing, awards payable under the Plan shall be paid no later than the later of (i) the 15th day of the third month following the end of the participant's first taxable year in which the right to payment is no longer subject to a substantial risk of forfeiture, or (ii) the 15th day of the third month following the end of the Company's first taxable year in which the right to payment is no longer subject to a substantial risk of forfeiture, or shall otherwise be structured in a manner to be exempt from, or in compliance with, Code Section 409A. Notwithstanding the foregoing, when the Company reasonably anticipates that any deduction for its payment would be limited or eliminated by Code Section 162(m), such payment may be delayed until the earlier of the following: (i) the date which is as soon as reasonably practicable following the first date on which the Company reasonably anticipates that the deduction will not be limited or eliminated by Code Section 162(m), or (ii) the date which is as soon as reasonably practicable following the end of the calendar year in which the participant separates from service, or such payment shall be otherwise structured so as to comply with Code Section 409A, related regulations and other guidance. The Committee shall not have any discretion to increase the amount of an award earned and payable pursuant to the terms of the Plan, to the extent such compensation is intended to qualify as performance-based compensation under Code Section 162(m) (except to the extent otherwise provided pursuant to Section 7 herein in the event of a change of control). The Committee shall have the unilateral discretion to reduce or eliminate the amount of an award granted to any participant, including an award otherwise earned and payable pursuant to the terms of the Plan.

4

**6.**       **Termination of Employment and Other Events; Covenants**

The Committee shall specify the circumstances in which awards shall be paid or forfeited in the event of termination of employment by the participant or other event prior to the end of a performance period or prior to payment of such awards. Unless otherwise determined by the Committee, if a participant dies, retires, is granted a leave of absence, or if the participant's employment is otherwise terminated (except for cause by the Company): (a) during a performance period, then a pro rata share of the participant's award based on the period of actual participation may, at the Committee's discretion, be paid to the participant after the end of the performance period if and to the extent that it would have become earned and payable had the participant's employment status not changed, and (b) after the completion of a performance period in which an award has been earned, but prior to the date of payment of such award, then such award shall be paid to the former employee participant. The Committee may require a participant, as a condition to the grant or payment of an award, to enter or have entered into agreements or covenants with the Company obligating the participant to not compete, to not interfere with the relationships of the Company with customers, suppliers or employees in any way, to refrain from disclosing or misusing confidential or proprietary information of the Company, and to take or refrain from taking such other actions adverse to the Company as the Committee may specify. The form of such agreements or covenants shall be specified by the Committee, which may vary such form from time to time and require renewal of the agreements or covenants, as then specified by the Committee, in connection with the allocation or payout of any award. For the purposes herein, termination for "cause" shall mean termination for cause under the terms of any employment, consulting, change in control or similar agreement, plan or program, if any, between the Company and the participant, or, if the participant has not entered into any such agreement, plan or program (or if any such agreement, plan or program does not define "cause"), "cause" shall have the meaning ascribed to such term under Qorvo, Inc.'s 2012 Stock Incentive Plan (as it may be further amended, or any successor to such stock incentive plan, the "Stock Plan").

**7.**       **Change of Control**

(a)    Notwithstanding any other provision in the Plan to the contrary, and except as may be otherwise provided in Section 7(b) herein, in the event of a "change of control" (as defined in Section 7(c)), all outstanding awards under the Plan shall be deemed to be earned at target bonus based on the assumption that any applicable performance goals were met in full; provided, however, that the amount of any such target bonus shall be reduced on a pro rata basis, so that the participant shall only receive a pro rata portion of the target bonus for each completed month of the applicable performance period which had elapsed when the change of control occurred. By way of example (and not limitation), if (i) a participant would have been entitled to a $100,000 target bonus based on attainment of applicable performance goals during a 12-month performance period, and (ii) a change of control occurs during the seventh month of the performance period, the participant shall be entitled to a $50,000 bonus (one-half of the $100,000 target bonus that would otherwise have been payable if the full performance period had elapsed), treating any applicable performance goals as being fully met. In the event of a change of control, any bonuses payable under Section 7 shall be immediately due and payable, without regard to whether such bonuses are deductible under Code Section 162(m) and without regard to whether the participant continues in service in the same position following the change of control, has a change in position or responsibility, or is terminated from employment with the Company (or successor or surviving corporation). In addition, without in any way limiting the preceding, in the event that a participant has entered into an employment agreement, change in control agreement or similar agreement, plan or

5

program with or of the Company, the participant shall be entitled to the greater of the benefits payable upon a change of control of the Company pursuant to Section 7 herein or the respective employment agreement, change in control agreement or similar agreement, plan or program, and such employment agreement, change in control agreement or similar agreement, plan or program shall not be construed to reduce in any way the benefits otherwise payable to a participant upon the occurrence of a change of control as defined in the Plan.

(b)   Notwithstanding the provisions of Section 7(a), in the event that a change of control occurs, the Committee may, in its sole and absolute discretion, determine that any or all awards granted pursuant to the Plan shall be deemed to be earned in an amount greater than the amount of pro rata bonus payments that would otherwise be payable under Section 7(a) herein, up to the maximum bonus opportunity. In the event of a change of control, the Company or the surviving or acquiring corporation shall not take any action to reduce the awards granted pursuant to the Plan below the amount of pro rata payments that would otherwise be payable under Section 7(a) herein.

(c)   For the purposes herein, for each participant, a "change of control" shall have the definition given the term "change in control" in the participant's change in control agreement with the Company, or, if the participant has not entered into a change in control agreement with the Company, then a "change of control" shall have the meaning ascribed to such term under the Stock Plan.

## 8.   No Right to Employment

Nothing contained in this Plan or any action taken pursuant to the Plan shall be construed as conferring upon any participant the right or imposing upon him the obligation to continue in the employment of or service to the Company, nor shall it be construed as imposing upon the Company the obligation to continue the employment or service of a participant. Except as may be otherwise provided in the Plan or determined by the Committee, all rights of a participant with respect to an award and distribution of any cash payment subject to an award shall terminate and be forfeited upon a participant's termination of employment or service with the Company.

## 9.   Amendment and Termination

The Board of Directors of the Company may amend, discontinue or terminate the Plan in whole or in part at any time, provided that (a) approval of an amendment to the Plan by the stockholders of the Company shall be required to the extent, if any, that stockholder approval of such amendment is required by applicable laws, rules or regulations; and (b) except as otherwise provided in Section 5(e), no such amendment, discontinuance or termination of the Plan shall adversely affect any award earned and payable under the Plan as of the date of such amendment or termination without the participant's consent. However, notwithstanding the foregoing, the Committee shall have unilateral authority to amend the Plan and any award (without participant consent) to the extent necessary to comply with applicable laws, rules or regulations or changes to applicable laws, rules or regulations (including but in no way limited to Code Section 162(m) and Code Section 409A, related regulations and other guidance), and to reduce or eliminate the amount of an award, as provided in Section 5(e).

## 10.   Effective Date

The Plan became effective on June 1, 2006, following approval by the Board and the stockholders of the Company as required by Code Section 162(m) and related regulations. The Plan was amended

and restated effective June 20, 2011, January 1, 2015 and June 9, 2016, subject to stockholder approval as required by Code Section 162(m). To the extent required under Code Section 162(m), awards under the Plan granted prior to any required stockholder approval shall be conditioned upon and shall be payable only upon approval of such performance criteria by the stockholders of the Company in accordance with the requirements of Code Section 162(m).

**11.     Miscellaneous**

(a)     *Taxes; Offset*: Any tax required to be withheld by any government authority shall be deducted from each award. The Company has no responsibility to take or refrain from taking any actions in order to achieve a certain tax result for the participant or any other person. Participants are solely responsible and liable for the satisfaction of all taxes and penalties that may arise in connection with awards (including any taxes arising under Code Section 409A), and the Company shall not have any obligation to indemnify or otherwise hold any participant harmless from any or all of such taxes. The Committee, in its sole discretion (but subject to applicable law), may apply any amounts payable to any participant hereunder as a setoff to satisfy any liabilities owed to the Company by the participant.

(b)     *Nonassignability*: Unless the Committee determines otherwise, awards and any other rights under the Plan shall not be subject to anticipation, alienation, pledge, transfer or assignment by any person entitled thereto, except by designation of a beneficiary or by will or the laws of intestate succession.

(c)     *No Trust; Unfunded Plan*: The obligation of the Company to make payments hereunder shall constitute a liability of the Company to the participants. Such payments shall be made from the general funds of the Company, and the Company shall not be required to establish or maintain any special or separate fund, or otherwise to segregate assets to assure that such payments shall be made, and neither the participants nor their beneficiaries shall have any interest in any particular assets of the Company by reason of its obligations hereunder. Nothing contained in this Plan shall create or be construed as creating a trust of any kind or any other fiduciary relationship between the Company and the participants or any other person or constitute a guarantee that the assets of the Company shall be sufficient to pay any benefits to any person. To the extent that any person acquires a right to receive payments from the Company hereunder, such right shall be no greater than the right of an unsecured creditor of the Company.

(d)     *Impact of Plan Award on other Plans:* Awards granted pursuant to the Plan shall not be treated as compensation for purposes of any other compensation or benefit plan, program or arrangement of the Company, unless either (i) such other plan, program or arrangement provides that compensation in the form of awards payable under the Plan are to be considered as compensation thereunder, or (ii) the Committee so determines. The adoption of the Plan shall not affect any other incentive or other compensation plans or programs in effect for the Company, nor shall the Plan preclude the Company from establishing any other forms of incentive or other compensation for employees of the Company.

(e)     *Facility of Payments*: If a participant or any other person entitled to receive an award under this Plan (the "recipient") shall, at the time payment of any such amount is due, be incapacitated so that such recipient cannot legally receive or acknowledge receipt of the payment, then the Committee, in its sole and absolute discretion, may direct that the payment be made to the legal guardian, attorney-

in-fact or person with whom such recipient is residing, and such payment shall be in full satisfaction of the Company's obligation under the Plan with respect to such amount.

(f)    *Beneficiary Designation*: The Committee may permit a participant to designate in writing a person or persons as beneficiary, which beneficiary shall be entitled to receive settlement of awards, if any, to which the participant is otherwise entitled in the event of death. In the absence of such designation by a participant, and in the event of the participant's death, the estate of the participant shall be treated as beneficiary for purposes of the Plan, unless the Committee determines otherwise. The Committee shall have sole discretion to approve and interpret the form or forms of such beneficiary designation.

(g)    *Governing Law*: The Plan shall be construed and its provisions enforced and administered in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of laws, and in accordance with applicable federal laws.

(h)    *Compliance with Code Section 162(m)*: The Company intends that compensation under the Plan payable to covered employees will, to the extent practicable, constitute qualified "performance-based compensation" within the meaning of Code Section 162(m) and related regulations, unless otherwise determined by the Committee. Accordingly, the provisions of the Plan shall be administered and interpreted in a manner consistent with Code Section 162(m) and related regulations if and to the extent required. If any provision of the Plan or any award that is granted to a covered employee (in each case, other than payments to be made pursuant to Section 6 and/or Section 7 herein) does not comply or is inconsistent with the requirements of Code Section 162(m) or related regulations, such provision shall, to the extent practicable, be construed or deemed amended to the extent necessary to conform to such requirements.

(i)    *Adjustments*: The Committee is authorized at any time before, during or after the completion of a performance period, in its sole discretion, to adjust or modify the terms of awards or performance objectives, or specify new awards, due to extraordinary items, transactions, events or developments, or in recognition of any other unusual, nonrecurring or infrequent events affecting the Company or the financial statements of the Company, or in response to changes in applicable laws, rules and regulations, accounting principles, tax rates (and interpretations thereof), business conditions or the Committee's assessment of the business strategy of the Company, in each case as determined by the Committee (provided that any adjustment or modification involving covered employees for compensation that is intended to qualify as "performance-based compensation" under Code Section 162(m) shall be made in an objectively determinable manner and shall be subject to any applicable Code Section 162(m) restrictions). To the extent that an award is not intended to qualify as "performance-based compensation" under Code Section 162(m), the Committee may make any other adjustments or modifications to the terms of awards or performance objectives selected by the Committee. By way of example but not limitation, the Committee may provide with respect to any award that any evaluation of performance shall exclude or otherwise adjust for any specified circumstance or event that occurs during a performance period, including but not limited to circumstances or events such as the following: currency fluctuations; discontinued operations; non-cash items, such as amortization, depreciation or reserves; asset impairment; significant litigation or claim judgments or settlements; any recapitalization, restructuring, reorganization, merger, acquisition, divestiture, consolidation, spin-off, split-up, combination, liquidation, dissolution, sale of assets, or other similar corporate transaction or event; the

8

effects of stock-based compensation (including any modification charges) or other compensation; and/or any other specific unusual or infrequent events or objectively determinable category thereof.

(j)     *Compliance with Code Section 409A:* Notwithstanding any other provision in the Plan or an award to the contrary, if and to the extent that Code Section 409A is deemed to apply to the Plan or any award granted under the Plan, it is the general intention of the Company that the Plan and any such award shall, to the extent practicable, be construed in accordance therewith. Deferrals pursuant to an award otherwise exempt from Code Section 409A in a manner that would cause Code Section 409A to apply shall not be permitted unless such deferrals are permitted by the Committee and structured to be in compliance with or exempt from Code Section 409A. Without in any way limiting the effect of the foregoing, (i) in the event that Code Section 409A requires that any special terms, provision or conditions be included in the Plan or any award, then such terms, provisions and conditions shall, to the extent practicable, be deemed to be made a part of the Plan and/or award, as applicable, and (ii) terms used in the Plan or an award shall be construed in accordance with Code Section 409A if and to the extent required. Further, in the event that the Plan or any award shall be deemed not to comply with Code Section 409A, then neither the Company, the Board, the Committee nor its or their designees or agents shall be liable to any participant or other persons for actions, decisions or determinations made in good faith.

(k)     *Restrictions on Awards:* Notwithstanding any other Plan provision to the contrary, the Company shall not be obligated to make any distribution of benefits under the Plan or take any other action, unless such distribution or action is in compliance with applicable laws, rules and regulations (including but not limited to applicable requirements of the Code).

(l)     *Gender and Number:* Where the context admits, words in any gender shall include any other gender, words in the singular shall include the plural and words in the plural shall include the singular.

(m)     *Severability:* If any provision of the Plan shall be held illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining parts of the Plan, and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

(n)     *Binding Effect:* The Plan shall be binding upon the Company, its successors and assigns, and participants, their legal representatives, executors, administrators and beneficiaries.

*[Signature Page to Follow]*

This Qorvo, Inc. Cash Bonus Plan, as amended and restated by Qorvo, Inc., has been executed on behalf of the Company effective as of June 9, 2016.

**QORVO, INC.**

By: /s/ Robert A. Bruggeworth
    Robert A. Bruggeworth
    Chief Executive Officer

Attest:


/s/ Jeffrey C. Howland
Jeffrey C. Howland
Secretary

9



## SEVERANCE AGREEMENT
## AND RELEASE OF ALL CLAIMS

This Severance Agreement and Release of All Claims (this "Agreement") is made by and between Steven J. Buhaly ("Employee") and Qorvo US, Inc., a Delaware corporation formerly known as TriQuint Semiconductor, Inc. ("Qorvo").

Reference is made to the Change of Control Policy, as amended and restated as of May 13, 2014 (the "Policy"), executed by the Parties and attached as Exhibit A to this Agreement. The terms of the Policy, as modified by this Agreement, are incorporated into this Agreement by reference. Employee has provided notice of his resignation as an officer and retirement from Employer and by executing this Agreement, the Employee confirms that he has resigned as an officer, director or any other position or capacity with Employer as of the Termination Date.

This Agreement constitutes the "Release" described in Section 5 of the Policy and must be fully executed and not revoked by the Employee no later than September 29, 2016 for the provisions of this Agreement and the Policy to be enforceable by either Party.

In consideration of the mutual promises herein, the Parties agree as follows:

1. **Parties.**

   (a)  As used in this Agreement, "Employee" shall mean Steven J. Buhaly and any spouse, heirs, executors, representatives, administrators, agents, attorneys and assigns, and any other person or entity acting with or on behalf of Steven J. Buhaly, and any other person claiming by, through or under Steven J. Buhaly.

   (b)  As used in this Agreement, "Employer" shall mean Qorvo, its parent corporation Qorvo, Inc., and any of their respective subsidiaries, affiliated entities, successors and assigns.

   (c)  As used in this Agreement, "Parties" shall mean Employee and Employer.

2. **Termination of Employment and Policy Payments.**

   (a)  Employee's final termination date with Employer is July 30, 2016 (the "Termination Date").

   (b)  Employee will be paid a lump sum cash amount, payable no later than the next scheduled payroll period following the Termination Date, equal to the sum of (i) any accrued but unpaid base salary through the Termination Date, plus (ii) any accrued but unpaid paid time off (PTO) and vacation pay (collectively, the "Cash Payment"). This lump sum Cash Payment, which we calculate to be a gross total of $46,092.62, will be subject to reduction to the extent you take PTO prior to your Termination Date and to applicable tax withholdings.

   (c)  As consideration for this Agreement and for the Policy, the severance payments, the COBRA payments, and the acceleration of options and restricted stock awards set out in Section 4 of the Policy shall occur in accordance with the terms of the Policy and in accordance with the following additional terms:

      1.  The Change of Control Effective Date under both this Agreement and the Policy shall be January 1, 2015.

2.  The base salary to be paid to Employee pursuant to Section 4(a)(i) of the Policy in twenty-six (26) equal payments shall be $16,355.78 per two week pay period, with the first payment to be made on the first payroll date after the "Release Effective Date" (as defined in the Policy), and the total amount of the twenty-six (26) payments over twelve (12) months will be $425,250.18.

3.  The additional cash severance payment to be paid to Employee pursuant to Section 4(a)(ii) of the Policy shall be a total payment of $340,200.14 to be paid in twenty-six (26) equal installments of $13,084.62, with the first payment to be made on the first payroll date after the Release Effective Date.

4.  Employee's medical and dental coverage under Employer's group health plans (United Healthcare, Delta Dental/Moda Health, Tufts, Assurant, Kaiser NW, and Kaiser CA, as applicable) will continue until July 31, 2016. Under a federal law known as COBRA, effective as of August 1, 2016, Employee and his covered dependents will be entitled to elect to continue medical and dental coverage for up to eighteen months (the "COBRA Period"). COBRA is administered through Discovery Benefits, which will mail enrollment forms and instructions to Employee's home address following the Termination Date. To elect COBRA coverage, Employee must complete, sign and mail the application form to Discovery Benefits within 60 days of the Termination Date. Employee's medical and dental insurance providers will be notified and Employee's coverage will be reinstated retroactively to the group health plan termination date upon their receipt of your enrollment election and first payment. Enclosed is a COBRA rate sheet for medical and dental benefits. To the extent the Employee timely elects COBRA continuation coverage under the Employer's group health plans, as set forth in Section 4(b) of the Policy the Employer will reimburse the Employee for the premiums paid by the Employee to continue Employee's current coverage (which is Employee plus spouse) for the period specified in Section 4(b) of the Policy. The current rate of reimbursement is $549.39 per each bi-weekly pay period. Such reimbursement will commence following the commencement of Employee's COBRA coverage and will be made as specified in Section 4(b) of the Policy.

5.  All stock options granted by TriQuint Semiconductor, Inc. prior to the Change of Control Effective Date shall accelerate and vest and become exercisable in full as of Release Effective Date. Employee may exercise any such vested options until the original expiration date applicable to the options. Outstanding vested options must be exercised through Employee's Fidelity account. Employee may elect to do a same day sale, sell to cover, or exercise and hold. If Employee wants to exercise and hold the shares, Employee must deposit funds ahead of time into Employee's Fidelity account to cover the cost of the exercise. If the option is a non-qualified stock option, Employee will also need to pay tax at the time of exercise.

6.  All unvested restricted stock unit awards granted to Employee by TriQuint Semiconductor, Inc. prior to the Change of Control Effective Date will accelerate and vest in full as of the Release Effective Date. These shares will be net settled for payment of applicable taxes.

Employee agrees and acknowledges that the payments to be made to Employee in consideration for this Agreement and the Policy are in in lieu of any other severance payment under any other severance plan of Employer. Employee acknowledges that Employee received full payment for all wages and salary due to Employee for Employee's services to the Employer up to and including the Termination Date and that Employee is not otherwise owed any additional wages, salary or other amounts except as specified in this Agreement, the Policy and the Consulting Agreement referenced below. Employee also acknowledges and agrees that Employee has been properly provided all leaves of absence required by law and by the Employer's policies.

3.  **Qorvo Equity Awards.** All restricted stock unit awards granted to Employee by Qorvo, Inc. after the Change in Control Effective Date contain post-termination vesting provisions under which the awards would continue to vest following the Termination Date, subject to satisfaction by Employee of certain conditions both initially and on an ongoing basis. To be eligible for such post-termination vesting, Employee must execute and deliver this Agreement and Employee must satisfy the other conditions specified in the applicable award agreements, including the "Post-Employment Condition" (as defined in the applicable award agreements). Please note that restricted stock unit awards that vest following the Termination Date pursuant to these post-termination vesting provisions are subject to so-called "clawback" provisions under which you may become obligated to forfeit unvested awards, return vested shares without compensation and repay any "Gain" realized on vested shares under certain circumstances. Employee should refer to his individual Fidelity account, the stock incentive plan under which his restricted stock awards were granted and his individual award agreements.

4.  **Nonqualified Deferred Compensation Payments.** As of July 1, 2016, Employee had a vested balance of approximately $1,126,447.11 under Employer's Nonqualified Deferred Compensation Plan, as amended (the "NQDC Plan"). Commencing on March 30, 2015 and in accordance with the NQDC Plan, a portion of Employee's vested balance under the NQDC Plan became subject to distributions to Employee in 60 quarterly installments; at July 1, 2016, approximately $592,232.49 of Employee's vested balance remained to be distributed over the 54 remaining quarterly installments. As a result of Employee's termination of employment, the remaining portion of Employee's vested balance under the NQDC Plan (approximately $534,214.16 at July, 1, 2016) will be distributed in 60 quarterly installments commencing six months after the Termination Date.

5.  **Other Benefit Matters.** As a result of Employee's termination of employment, please note the following:

•   Flexible Spending Account (FSA). Employee can submit claims for FSA-eligible expenses incurred through the Termination Date. Claims must be submitted within 90 days from the Termination Date. Healthcare FSAs may be continued through COBRA on a post-tax basis. Dependent Care Accounts are not eligible for continuation upon termination of employment. If Employee is enrolled in a Healthcare FSA, the COBRA notification will be mailed directly to Employee from Discovery Benefits. If Employee wants to accept coverage, Employee must complete, sign and mail the application form to Discovery Benefits within 60 days of the Termination Date.

•   401(k) Plan. Assuming it exceeds $5,000, Employee's account balance in Qorvo's 401(k) Plan may remain in such Plan or be transferred to another qualified plan or IRA at Employee's election. To transfer your account balance to another qualified plan or IRA or to obtain a distribution from the account, you should visit Fidelity's website at www.401k.com or call the Fidelity Retirement Benefits Line at 1-800-890-4015. Outstanding loans against Employee's 401(k) Plan balance must be repaid within 30 days of the Termination Date.

•   Group Life Insurance and Accidental Death & Dismemberment (AD&D). Employee's Life and Accidental Death and Dismemberment coverage ends on the Termination Date. However, Employee has the option to purchase a portable Term Life policy. Employee is eligible to port the coverage in force at the time employment terminates, including Basic Life, AD&D, Additional Life, and Dependent Life. Employee must apply for portability within 31 days of the Termination Date. If Employee is interested in porting Employee's Life Insurance coverage, please call The Standard's Continued Benefits department at 800-378-4668 or email: cbt@standard.com.

•   Voluntary Accident, Critical Illness and Hospital Indemnity Insurance. If Employee is enrolled in Voluntary Accident, Critical Illness and/or Hospital Indemnity Insurance, Employee's coverage ends on the Termination Date. Unum will send Employee instructions regarding the process for continuation of

coverage. The continuation application and payment needs to be received by Unum within 31 days of the Termination Date.

- <u>Disability Insurance</u>. Employer-paid short-term and long-term disability insurance coverage ceases effective midnight on the Termination Date. This benefit cannot be converted to an individual plan.

- <u>Employee Stock Purchase Plan</u>. Eligibility for participation in Qorvo's Employee Stock Purchase Plan ceases effective as of the Termination Date. Qorvo will reimburse payroll deductions credited to your account during the current purchase period no later than the next scheduled payroll period following the Termination Date.

- <u>Consulting Agreement</u>. Qorvo and Employee agree that they will enter into the Consulting Agreement in substantially the form of Exhibit B hereto as of the Termination Date (the "Consulting Agreement").

Please note that the above is a summary of the benefits available to you as a result of your retirement, and is qualified in all respects by reference to the terms of the Policy, stock award agreements and the applicable stock incentive plans and other benefit plans referenced in this Agreement. The contents of this Agreement should not be construed as legal, tax or other advice. Employee should consult with Employee's own attorney and advisors as to the legal and tax related matters concerning these matters.

     **6.**   **<u>Release of All Claims</u>.** In consideration of receiving the severance benefits described above, the Employee, for Employee's self, heirs, spouse, executors, administrators, successors, and assigns, hereby knowingly and voluntarily releases Employer, its subsidiaries, affiliates, parents, predecessors and successors, and all officers, directors, agents and employees, and all persons, corporations, or other entities who might be claimed to be jointly or severally liable with it from any and all charges, complaints, grievances, causes of action, claims, and liabilities of any kind or nature whatsoever, whether actual or potential, known or unknown, suspected or unsuspected ("claims"), which Employee or anyone claiming by, through or under Employee may have or claim to have, and specifically but not exclusively, all claims regarding offenses that have occurred as of the date of this Agreement, including, without limitation, any and all claims relating to Employee's employment or termination from employment with Employer. Employee expressly agrees that among the various rights and claims being waived in this Agreement are those arising under the United States and state constitutions, the common law of any applicable jurisdiction, the Age Discrimination in Employment Act of 1967, the Employee Retirement Income Security Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Americans with Disabilities Act, the Family and Medical Leave Act, and any and all corresponding state laws that might apply, including, but not limited to any and all federal and state executive orders and other statutes and regulations, and any claim for attorneys' fees, costs, disbursements and/or the like. This is a full and final waiver and release of any such claims, and the parties intend that it have the broadest effect possible under law. Employee expressly represents that Employee has no claim against the Employer which is not released under this Agreement.

     **7.**   **<u>Covenant Not to Sue</u>.** A "covenant not to sue" is a legal term that means a person promises not to file a lawsuit or other legal proceeding. It is additional to the release of claims contained above. Besides waiving and releasing the claims above, Employee promises never to file or prosecute any legal claim of any kind against Employer in court for any reason based on any act, omission, event, occurrence, or non-occurrence, from the beginning of time to the effective date of this Agreement, including but not limited to claims, laws or theories covered by the Release of All Claims contained in Paragraph 6 above. Excluded from this covenant not to sue is the right to file charges with, or assist/participate in an investigation conducted by any agency that expressly prohibits waiver of such rights, such as the U.S. Equal Employment Opportunity Commission and the National Labor Relations Board. Employee understands and agrees that Employee is waiving, however, any right to monetary recovery, including but not limited to compensatory or punitive damages, attorneys' fees or costs, or other damages or recovery should such an agency, or any other person, entity or group, pursue any claim on Employee's behalf. Employee represents that, as of the effective date of this Agreement, Employee has not filed or caused to be filed any claims against Employer.

**8.    Compliance with the Older Workers Benefit Protection Act.** This Agreement is subject to the terms of the Older Workers Benefit Protection Act of 1990 ("OWBPA"). The OWBPA provides that an individual cannot waive a right or claim under the Age Discrimination in Employment Act ("ADEA") unless the waiver is knowing and voluntary. Pursuant to the terms of the OWBPA, Employee acknowledges and agrees that Employee has executed this Agreement voluntarily, and with full knowledge of its consequences. In addition, Employee hereby acknowledges and agrees as follows:

(a)    This Agreement has been written in a manner that is calculated to be understood, and is understood, by Employee.

(b)    The release provisions of this Agreement apply to any rights Employee may have under the ADEA.

(c)    The release provisions of this Agreement do not apply to any rights or claims Employee may have under the ADEA that arise after the date that this Agreement is executed.

(d)    The Employer hereby advises Employee to consult with an attorney prior to executing this Agreement.

(e)    The Employer is giving Employee a period of forty-five (45) days to consider this Agreement. Employee may accept and sign this Agreement before the expiration of the forty-five (45) day time-period, but is not required to do so by the Employer.

(f)    For a period of seven (7) days following the signing of this Agreement, Employee may revoke the waiver of ADEA claims made in this Agreement by sending written notice of any such revocation to the Employer. This Agreement shall become effective on the eighth day after Employee signs it, if it has not been revoked during the revocation period.

**9.    Return of Company Property.** No later than the effective date of this Agreement, Employee will return all Employer property in Employee's possession or under Employee's control, including but not limited to keys, credit cards, files, documents, pagers and laptop computers. Employee may keep his cellular phone once all Employer confidential information has been removed.

**10.    Non-Solicitation of Employees and Non-Competition.** Employee agrees that for a period of one (1) year following Employee's Termination Date, Employee will comply with the non-solicitation and non-competition covenants contained in the Policy, and that such compliance is a condition to receiving the payments provided for under this Agreement.

**11.    References.** In response to inquiries regarding Employee's employment with Employer, Employee will direct all such inquiries solely to Employer's Human Resources Department and such department will confirm dates of employment, and Employee's job title and salary information as of the date of termination.

**12.    Entire Agreement.** Employee agrees that this Agreement, the Policy and the Consulting Agreement constitute the entire agreement concerning employment with Employer and termination of employment with Employer and all other subjects addressed herein. Except for the Employee Confidentiality and Invention Assignment Agreement dated September 14, 2007, which Employee signed and which remains in effect pursuant to its terms, this Agreement supersedes and replaces all prior negotiations and all agreements proposed or otherwise, whether written or oral, concerning the subject matters therein; and it is expressly understood that no amendment, deletion, addition, modification, or waiver of any provision of this Agreement shall be binding or enforceable unless in writing and signed by all parties.

**13    No Admission of Liability.** Employee acknowledges that the payments described herein are not to be construed as an admission of liability by the Employer that it has violated any law, state or federal or otherwise.

**14.    Confidentiality.** In further consideration of the payment of the foregoing sum, Employee agrees that the terms and provisions of this Agreement and the Consulting Agreement shall be kept in strict confidence although

Employee may disclose the fact that this Agreement and the Consulting Agreement exist. Specifically, the amounts payable to Employee under this Agreement or the Consulting Agreement shall not be published, displayed, discussed, disclosed or revealed in any way by Employee or anyone on behalf of Employee without written permission of Employer or as required by court order, except that Employee may discuss this Agreement and the Consulting Agreement and their respective terms with Employee's spouse, attorney, financial advisor, tax preparer and accountant. Prior to disclosing these terms to any of the above-referenced persons, Employee shall inform them of their obligations not to disclose the terms further. Disclosure of the terms of this Agreement or the Consulting Agreement by anyone to whom Employee discloses them shall be treated as an unauthorized disclosure by Employee. The above restrictions do not apply to Employee if and to the extent that Employer discloses the terms and provisions of this Agreement or the Consulting Agreement in any filing with the SEC or other governmental authority.

      **15.**    **Severability.** The provisions of the Agreement are severable, and if any part of it is found to be unlawful or unenforceable, the other provisions of the Agreement shall remain fully valid and enforceable to the maximum extent consistent with applicable law.

      **16.**    **Knowing Release.** Employee declares that Employee fully understands the terms and provisions of this Agreement and voluntarily accepts the above terms and provisions regarding the termination of Employee's employment. Employee declares that prior to the execution of this Agreement, Employee apprised had a sufficient opportunity to consult with an attorney in order that Employee might intelligently exercise Employee's own judgment in deciding whether to execute this Agreement.

**THE UNDERSIGNED STATE THAT THEY HAVE CAREFULLY READ THIS AGREEMENT IN ITS ENTIRETY, THAT NO PROMISE, INDUCEMENT OR AGREEMENT NOT HEREIN EXPRESSED HAS BEEN MADE TO EMPLOYEE, AND THAT EMPLOYEE VOLUNTARILY AND KNOWINGLY ACCEPTS ITS TERMS AND PROVISIONS.**

Steven J. Buhaly                                  QORVO US, INC.

| /s/ Steven J. Buhaly | | By: | /s/ Jeffrey C. Howland |
| --- | --- | --- | --- |
| Signature | | Its: | Vice President |
| Dated: | July 29, 2016 | Dated: | July 29, 2016 |

**WAIVER OF 45-DAY REVIEW**

I, Steven J. Buhaly, understand that I may take up to 45 days from receipt of the **SEVERANCE AGREEMENT AND RELEASE OF ALL CLAIMS** to review the document and determine whether to accept it. If I elect to sign this Agreement before that period has expired, I hereby knowingly and voluntarily waive the 45-day review provision of the Agreement.

Prior to executing this Waiver and the Severance Agreement and Release of All Claims, I acknowledge that I have been advised to consult with an attorney, that I have had an opportunity to consult with an attorney and I fully understand the terms of this Waiver and the Agreement. I have not been compelled to sign it by anyone, and have entered into the Agreement and Waiver voluntarily and of my own free will.

DATE:

July 29, 2016
_____

/s/ Steven J. Buhaly
_____
Steven J. Buhaly

## CONSULTING AGREEMENT

This Consulting Agreement (this **"Agreement"**) is made and entered into as of July 30, 2016 (the **"Effective Date"**), by and between **Qorvo US, Inc**., a Delaware corporation having an office at 2300 NE Brookwood Parkway, Hillsboro, Oregon 97124 (the **"Company"**), and Steven J. Buhaly, an individual residing at 8208 NW Reed Drive, Portland, Oregon 97229 (**"Consultant"**).

## RECITALS

A.      Consultant is the former Chief Financial Officer of the Company's parent corporation and has retired from such position and as an employee of the Company effective as of the Effective Date;

B.      The Company desires to have access to the knowledge, experience and expertise of Consultant in order to assist the Company in the orderly transition of Consultant's duties to his successor and proposes to engage Consultant as an independent contractor for such purpose; and

C.      Consultant is willing to make himself available to provide such services for the Company under the terms and conditions set forth in this Agreement.

In consideration of the mutual promises and agreements contained herein, the parties, intending to be legally bound, agree as follows:

## 1.  SERVICES AND COMPENSATION

(a)      <u>Services.</u> Company hereby engages Consultant as an independent contractor, and Consultant hereby accepts such engagement, to provide business, financial and other advice and to be available for consultation to the Company from time to time on an as-needed basis, in each case at times, covering a scope of specific work and deliverables (if any) and otherwise in a manner as are mutually acceptable to the Company and Consultant (the **"Services"**). Consultant shall have no formal schedule of duties or any obligation or expectation to provide the Services for any minimum number of hours during any week or month during the term of this Agreement. Consultant shall, however, cooperate with the Company and be responsive to the Company's reasonable requests for Services, make himself available at reasonable times as may be requested by the Company and devote such time to the Services as may be reasonably necessary to assist the Company as it may require. Consultant will perform the Services in a professional manner and in compliance with the terms of this Agreement and any and all applicable laws and regulations.

(b)      <u>Compensation.</u> The Company agrees to compensate Consultant for the Services rendered and reimburse Consultant for expenses incurred according to the terms set forth in <u>Exhibit A.</u>

## 2.  INTELLECTUAL PROPERTY

The parties entered into an Employee Confidentiality and Invention Assignment Agreement dated September 14, 2007 (the **"CIA Agreement"**), the terms of which are incorporated by reference into this Agreement. The parties agree that (i) all advice, ideas, recommendations, suggestions, comments, feedback, input, work product, deliverables or other information that Consultant furnishes or discloses to the Company in the performance of the Services will be treated in the same manner as inventions or works of authorship under Sections 3 and 4 of the CIA Agreement; and (ii) all confidential information of the Company or other parties disclosed to Consultant by

the Company under this Agreement will be treated in the same manner as confidential information is treated under Sections 1 and 2 of the CIA Agreement.

**3.** **CONFLICTING OBLIGATIONS**

Consultant certifies that Consultant has no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement or that would preclude Consultant from complying with the provisions hereof, and further certifies that Consultant will not enter into any such conflicting agreement during the term of this Agreement.

**4.** **TERM AND TERMINATION**

(a)      Term. This Agreement will commence on the Effective Date and will continue until the earlier of (i) December 31, 2016, (ii) the date it is terminated as provided in subsection (b) below, or (iii) the death of Consultant.

(b)      Termination. Either party may terminate this Agreement (for any reason and with or without cause) by giving at least thirty (30) days' prior written notice thereof to the other party. Any such notice shall be addressed to the relevant party at the address shown on the first page of this Agreement, or at such other address as either party may hereafter designate by written notice to the other.

(c)      Survival. Upon termination of this Agreement, all rights and duties of the parties shall cease, except that (i) the Company shall continue to be obligated to pay to Consultant all amounts owed to him for Services performed and expenses incurred prior to the termination in accordance with Exhibit A, and (ii) Sections 2 (Intellectual Property), 6 (Independent Contractor Relationship), 7 (Indemnification) and 8 (Arbitration and equitable Relief) shall survive termination of this Agreement.

**5.** **DEALINGS WITH THIRD PARTIES**

Consultant shall have no authority to commit or bind the Company to any contractual or other obligation of any kind with any third party. Consultant shall not represent to any third party that he is an employee, agent or other authorized representative of the Company.

**6.** **INDEPENDENT CONTRACTOR RELATIONSHIP**

(a)      The parties acknowledge and agree that Consultant is acting as an independent contractor under this Agreement *and not as an employee, agent or authorized representative of the Company*, and in providing the Services under this Agreement, Consultant will be treated for all purposes as an independent contractor.

(b)      Consultant acknowledges and agrees that because Consultant is an independent contractor, the Company will not (i) withhold from any compensation paid to Consultant any amounts for federal or state income taxes, social security (FICA) taxes, Medicare payments, worker's compensation premiums or other amounts, (ii) pay any social security or unemployment tax with respect to Consultant, or (iii) provide Consultant with any employee benefit of any kind whatsoever, including paid time off and benefits or coverage under any pension, 401(k) or other retirement plan or program, or coverage under any Company, individual or group life, disability, medical, dental or other insurance policy or program.

(c)      Consultant acknowledges and accepts full responsibility for (i) filing all tax returns and paying all taxes arising out of or resulting from his performance of the Services, including income, social security, worker's compensation and unemployment insurance taxes, and (ii) obtaining and paying for Consultant's own

insurance coverage and other benefits, including liability insurance, medical insurance, disability insurance and retirement plans.

7.  **INDEMNIFICATION**

Consultant shall, at Consultant's sole cost and expense, defend, indemnify and hold the Company and its directors, officers, agents and employees harmless from and against any and all claims, suits, actions, causes of actions, taxes, losses, damages, liabilities, costs and expenses, including reasonable attorneys' fees and other legal expenses, arising out of or resulting from (i) any acts, omissions, or violations of law by Consultant in the performance of the Services; (ii) any breach by the Consultant of any of his obligations in this Agreement; or (iii) any violation or claimed violation of a third party's rights resulting from the Company's use of the work product of Consultant under this Agreement.

8.  **ARBITRATION AND EQUITABLE RELIEF**

(a)     <u>Disputes</u>. Except as provided in Section 8(b) below, the parties agree that any dispute arising under this Agreement (including any claims arising out of, relating to, or in connection with the interpretation, validity, construction, performance, breach or termination of this Agreement) shall be resolved by final and binding arbitration to be held in Portland, Oregon, under the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association, as then in effect. Either party may require that an official record of the proceedings be prepared by a professional reporter.

(b)     <u>Equitable Relief</u>. The parties may apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction or other interim or conservatory relief, as necessary, without breach of their agreement to submit disputes to final and binding arbitration pursuant to this arbitration clause, and without abridgment of the powers of the arbitrator.

(c)     <u>Acknowledgment</u>. CONSULTANT HAS READ AND UNDERSTANDS THIS SECTION 8, WHICH DISCUSSES ARBITRATION. CONSULTANT UNDERSTANDS THAT BY SIGNING THIS AGREEMENT, CONSULTANT AGREES TO SUBMIT ANY DISPUTE UNDER THIS AGREEMENT (INCLUDING ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION OF THIS AGREEMENT), TO BINDING ARBITRATION, EXCEPT AS PROVIDED IN SECTION 8(b) ABOVE, AND THAT THIS SECTION 8 CONSTITUTES A WAIVER OF CONSULTANT'S RIGHT, IF ANY, TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE RELATIONSHIP BETWEEN THE PARTIES.

9.  **ASSIGNMENT**

Neither this Agreement or any interest herein or any rights hereunder shall be assigned or transferred by Consultant, nor shall any of the duties of Consultant hereunder be delegated to any person, firm or corporation, without prior notice to and consent of the Company. The Company may assign or transfer all or any part of its rights or obligations under this Agreement to any other person or entity without notice to Consultant. Subject to the foregoing, this Agreement is binding upon and shall inure to the benefit of the personal representatives, successors, and permitted assigns of the parties.

10. **NOTICES**

Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed given on the third business day after the date of mailing when mailed by certified mail, postage prepaid, return receipt requested, from within the United States, or on the date of actual delivery, whichever is the earliest, and shall be sent to the parties at the addresses shown on the first page of this Agreement, or at such other address as either party may hereafter designate by written notice to the other.

## 11. GOVERNING LAW

This Agreement will be governed by the substantive laws, but not the choice of law rules, of the state of Oregon.

## 12. ENTIRE AGREEMENT

This Agreement is the entire, final and complete agreement and understanding of the parties with respect to the subject matter hereof, and except as specifically set forth in this Agreement, supersedes and replaces all prior agreements and understandings between them, whether written or oral, with respect thereto.

## 13. WAIVER

No waiver by a party of a breach by the other party of any provision of this Agreement will be binding unless in writing, and such waiver will not operate or be construed as a waiver of any subsequent breach of such provision or any other provision.

## 14. SEVERABILITY

The invalidity or unenforceability of any provision of this Agreement, or any terms thereof, shall not affect the validity of this Agreement as a whole, which shall at all times remain in full force and effect.

## 15. AMENDMENT

No supplement, modification or amendment of this Agreement shall be valid, unless the same is in writing and signed by both parties.

## 16. CAPTIONS

The caption headings of the sections and subsections of this Agreement are for convenience of reference only and arc not intended to be, and should not be construed as, a part of this Agreement.

## 17. NO THIRD-PARTY BENEFICIARIES

Nothing in this Agreement, express or implied, is intended to confer on any person, other than the parties to this Agreement or their permitted assignees, any right or remedy of any nature whatsoever.

## 18. COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument and all of which together shall constitute a single agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**CONSULTANT**                                  **QORVO US, INC**

 /s/ Steven J. Buhaly                           By: /s/ Jeffrey C. Howland
Steven J. Buhaly
                                                Name: Vice President
                                                Title: July 29, 2016

**EXHIBIT A**

**COMPENSATION**

The parties agree to the following terms of compensation:

    1. The Company shall pay Consultant at the rate of $300.00 per hour for performance of the Services, but not to exceed a total amount of $2,400.00 in any given calendar day. Consultant shall furnish invoices on a monthly basis for Services performed, and such invoices shall be approved by a contact person designated by the Company. Invoices shall be payable no later than thirty (30) days after receipt. Invoices may be submitted by email attachment, as well as by regular mail.

    2. The Company shall reimburse Consultant for all reasonable travel and other out-of-pocket expenses incurred by Consultant in performing Services pursuant to this Agreement in accordance with the Company's standard policies for reimbursement of travel and business expenses; provided that Consultant shall obtain the consent from the Consultant's principal contact prior to incurring such expenses in amounts in excess of $1,000.

    3. Consultant agrees to furnish at his own expense all tools and materials necessary to perform the Services.

**QORVO, INC.**
**DIRECTOR COMPENSATION PROGRAM**

The following is a summary of compensation paid to the directors of Qorvo, Inc. (the "Company") effective August 4, 2016.

**Compensation of Non-Employee Directors**

The Company maintains a non-employee director compensation program pursuant to which our non-employee directors are paid as follows:

- Annual cash retainer of $80,000 payable quarterly in arrears;
- Additional annual retainer of $68,000 for the Non-Employee Chairman;
- Additional annual retainer of $20,000 for the Lead Director;
- Additional annual retainer for Committee Chairs:
    - $20,000 for the Audit Committee Chair;
    - $20,000 for the Compensation Committee Chair;
    - $10,000 for the Governance and Nominating Committee Chair; and
    - $10,000 for the Corporate Development Committee Chair.
- Annual restricted stock unit award, representing shares of Company common stock valued at $190,000.

The annual restricted stock unit awards are granted on the date of the annual stockholders meeting at which directors are elected, or as soon as practicable thereafter. Newly elected non-employee directors appointed to the Board other than at an annual stockholders meeting would receive a pro rata annual restricted stock unit award based on the number of full months remaining until the first annual stockholders meeting following the director's initial appointment to the Board. Each award vests and becomes non-forfeitable as to 100% of the shares subject to the award on the first anniversary of the date of grant, subject to the director's continued service from the date of grant until the vesting date. Directors may defer their annual restricted stock unit awards pursuant to the Qorvo, Inc. 2012 Stock Incentive Plan.

Directors may defer all or a portion of their cash retainers by participating in our Nonqualified Deferred Compensation Plan.

Directors are eligible to participate in our group medical and dental plans.

Directors are reimbursed for customary expenses for attending Board and committee meetings.

**Compensation of Directors who are Employees of the Company**

Directors who are employees of the Company are not paid for their service as a director.

EXHIBIT 31.1

**CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE EXCHANGE ACT, AS ADOPTED**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert A. Bruggeworth, certify that:

1.        I have reviewed this quarterly report on Form 10-Q of Qorvo, Inc.;

2.        Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.        Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.        The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)        Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)        Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)        Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)        Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.        The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)        All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)        Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 7, 2016

/s/ ROBERT A. BRUGGEWORTH
Robert A. Bruggeworth
President and Chief Executive Officer

EXHIBIT 31.2

**CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE EXCHANGE ACT, AS ADOPTED**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mark J. Murphy, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Qorvo, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 7, 2016

/s/ MARK J. MURPHY
Mark J. Murphy
Chief Financial Officer

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert A. Bruggeworth, President and Chief Executive Officer of Qorvo, Inc. (the "Company"), certify pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that, to my knowledge:

(1)      the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended October 1, 2016 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

        /s/ ROBERT A. BRUGGEWORTH
        Robert A. Bruggeworth
        President and Chief Executive Officer

        November 7, 2016

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mark J. Murphy, Chief Financial Officer of Qorvo, Inc. (the "Company"), certify pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that, to my knowledge:

(1)     the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended October 1, 2016 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/MARK J. MURPHY

Mark J. Murphy
Chief Financial Officer

November 7, 2016