1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
2

3    _____
                                      |
     QORVO, INC.,                     |
4                                     |
              Plaintiff,              |
5                                     |
     vs.                              |  NO. 21-CV-01417
6                                     |
     AKOUSTIS TECHNOLOGIES,           |
7    INC., AND AKOUSTIS, INC.,        |
                                      |
8             Defendants.             |
                                      |
9    _____

10

11

12          TRANSCRIPT OF THE SCHEDULING CONFERENCE

13                      BEFORE THE

14             HONORABLE JON P. MCCALLA

15

16

17                       MONDAY

18                   APRIL 3, 2023

19

20

21

22
                 TINA DuBOSE GIBSON, RPR
23                  OFFICIAL REPORTER
              FOURTH FLOOR FEDERAL BUILDING
24             MEMPHIS, TENNESSEE 38103

25

**UNREDACTED TRANSCRIPT**

<pre>
 1                  A P P E A R A N C E S

 2

 3         Appearing on behalf of the Plaintiff:

 4              ROBERT M. MASTERS
                ROY JUNG
 5              Sheppard, Mullin, Richter & Hampton, LLP
                2099 Pennsylvania Avenue, NW, Suite 100
 6              Washington, DC  20006-6801
                (202) 747-1900

 7              JONATHAN DEFOSSE
                Sheppard, Mullin, Richter & Hampton, LLP
 8              1540 El Camino Real
                Menlo Park, California  94025
 9              (650) 815-2600

10              JEREMY A. TIGAN
                JACK BLUMENFELD
11              Morris, Nichols, Arsht & Tunnell LLP
                1201 North Market Street, 16th Floor
12              Wilmington, Delaware 19899-1347
                (302) 351-9106

13


14

         Appearing on behalf of the Defendants:
15
                DAVID A. JAKOPIN
16              DIANNE L. SWEENEY
                ROBERT M. FUHRER
17              THERESA A. ROOZEN
                DAVID L. STANTON
18              Pillsbury, Winthrop, Shaw, Pittman, LLP
                2550 Hanover Street
19              Palo Alto, California 94304-1115
                (650) 233-4500
20
                STEPHEN B. BRAUERMAN
21              Bayard, PA
                600 North King Street, Suite 400
22              Wilmington, Delaware 19801
                (302) 655-5000
23


24


25
</pre>

**UNREDACTED TRANSCRIPT**

```
 1                              MONDAY

 2                           APRIL 3, 2023

 3                    ----------------------

 4

 5            THE COURT:  All right.  We need to go over the

 6   request for additional time, particularly by the defendant in

 7   the case.  Sorry.  Who is speaking?

 8            MS. SWEENEY:  Good morning, Your Honor.  This is

 9   Dianne Sweeney for Akoustis.

10            THE COURT:  Okay.  That's fine.  Yes, absolutely.

11   I understand that for Qorvo, Mr. Masters is going to be the

12   primary spokesperson; is that right?

13            MR. MASTERS:  Good morning, Your Honor.  Yes,

14   that's correct.

15            THE COURT:  Okay.  And, Ms. Sweeney, you will be

16   for the defense.  It's a little confusing there.  We have two

17   listed, so, Ms. Sweeney, are you going to be the primary

18   spokesperson?

19            MS. SWEENEY:  Yes, I will, with our local

20   counsel, Steve Brauerman, joining me as well.

21            THE COURT:  Sure.  Absolutely.  Not a problem.

22   Well, I've got the letter, and I've been looking at the

23   situation.  And I think you both wanted to make comments on

24   this.  I'm going to start with the party who is seeking the

25   more extensive revision of the schedule.  So, Ms. Sweeney, I
```

**UNREDACTED TRANSCRIPT**

1    suppose that's you?

2          MS. SWEENEY:  Yes, Your Honor, thank you.  And I

3    very much appreciate the Court's time this morning in setting

4    the conference so quickly.  This is a very important issue

5    for our client.  So why we're here, as the Court probably

6    notes that, immediately after the claim construction ruling

7    issued about two weeks ago, we concurrently received a trial

8    schedule further to the patent local rules.

9          THE COURT:  Right.

10          MS. SWEENEY:  And just to the outset, let me say

11    that if this is simply the issue of the two patent claims

12    going forward to trial, we would not be here.  We would be

13    fine with that schedule for the patent claims under the

14    patent local rules.  But here, as you know, we have a mix of

15    patent and nonpatent claims, and I'll -- as I'll explain in a

16    few minutes, it has recently become very clear that the

17    patent claims are not the driver of this case.  They're

18    relatively small in terms of the factual discovery that

19    remains and the alleged damages in this case.

20          The real drivers are the nonpatent claims.  And

21    the vast majority of those claims were just alleged in the

22    second amended complaint in the last 60 days.  We answered

23    that complaint just a few weeks ago.  The claims in the

24    second amended complaint are extensive.  They're extremely

25    complicated, and discovery has just begun on those nonpatent

**UNREDACTED TRANSCRIPT**

1    claims.

2          I'd like to step back for a moment because some

3    time has passed.  I know Your Honor has had a few other cases

4    since our last case management conference, but at that

5    initial conference, we talked about Qorvo's allegation that

6    Akoustis had recruited Qorvo personnel in order to gain

7    access to what it called Qorvo BAW proprietary information.

8    That was a defined term under the complaint.

9          During the hearing, we looked at that definition.

10   It was Paragraph 20 of the underlying complaint, and it had

11   kind of a laundry list of items that were generic like you

12   would see in a nondisclosure agreement.  So after some back

13   and forth on that call, the Court proceeded to issue an order

14   allowing Qorvo to amend its complaint to add some specificity

15   around its unfair competition claim.  Qorvo did that.

16         It issued a first amended complaint.  It added

17   two specific examples that it said was part of this broader

18   alleged scheme for Akoustis to hire Qorvo personnel and get

19   access to this Qorvo BAW proprietary information.  But as of

20   that point, beyond those two examples, neither party knew

21   what Qorvo BAW proprietary information would be at issue in

22   this case.

23         So we were then looking at discovery and we met

24   and conferred, and the parties agreed that sort of the only

25   way this made sense was for Akoustis to go gather all of its

**UNREDACTED TRANSCRIPT**

1    documents and produce what it had so that Qorvo could then

2    identify what's the other Qorvo BAW proprietary information

3    at issue.  So we did just that.  We had to know what was

4    relevant first.  We had to -- Qorvo had to know that for

5    purposes of setting forth its claim.  We had to know that for

6    purposes of determining what defensive steps we would take.

7            So we proceeded to do a massive review and

8    production of documents.  We produced 64,000 documents --

9    that's hundreds and hundreds of thousands of pages -- to see

10   what, if anything, Qorvo would add to those two examples for

11   Qorvo BAW proprietary information.

12           We finished that undertaking.  We did it on a

13   rolling basis.  We finished that undertaking in January, so

14   the next step, no surprise.

15           Qorvo came in, in February and identified

16   additional claims, filed nearly entirely on Akoustis'

17   document production.  So as the Court looks at the second

18   amended complaint, you can see it's not new legal theories

19   related to those two original factual issues.  Rather, there

20   are new legal claims.  We now have both federal and state

21   trade secret claims.  There's a RICO claim.  There's a civil

22   conspiracy claim.

23           I think more important for purposes of discovery,

24   there's entirely new facts.  Now the complaint adds more than

25   86 separate alleged trade secret and unfair competition

**UNREDACTED TRANSCRIPT**

1   events.  I should also note that there's a claim in the

2   second amended complaint called additional trade secrets.

3   It's unclear to us how many other factual issues are

4   unearthed in that sort of catch-all bucket.  It is also

5   unclear to us if this complaint will be amended.  There's

6   been some discussion of that.  There's suggestions of that in

7   the complaint itself saying that this is just a sample of

8   their claims.

9           So, you know, I've looked at what Qorvo offered

10  in terms of the letter that was issued to the Court on

11  Friday; and the suggestion that somehow we've known or should

12  have predivined what their allegations would be, that's not a

13  correct statement.  It's not well taken.  And, frankly, it's

14  belied by the documents themselves.

15          Both the complaint and the first amended

16  complaint with exhibits were 60 or 65 pages.  The second

17  amended complaint is 1,400 pages; and the discovery itself,

18  Qorvo objected saying it could not produce its documents

19  until we produced ours.  Everyone has known that this is what

20  the flow would be; and from our perspective, we've done our

21  job.  We've brought all of these issues forward.  We did not

22  require any motions to compel.  We've been very cooperative

23  through this entire process to get to the point where we

24  could start to do the real work.

25          Now that all these factual issues have been

**UNREDACTED TRANSCRIPT**

1    identified, every single one requires discovery and requires

2    separate legal analysis.  But the documents, for example,

3    assumed to be confidential, that has to be tested, and we

4    appreciate that Qorvo has identified documents in our

5    production that show a legend that says Qorvo confidential

6    information.  That's just the starting point, though.  It's

7    like seeing a document that says privileged.  You have to

8    actually do the factual work and the legal work to go from

9    there, and that's where we are.

10            When you look at Qorvo's production, it's not a

11   surprise.  We're at 64,000 pages.  They're at 3,000 pages.

12   They are just starting that process.  And, frankly, much of

13   those 3,000 documents they've produced are related to their

14   initial disclosures or their patent.  So we've got a very

15   long way to go, and we don't come to the Court lightly asking

16   for a significant schedule change.  But I think the patent

17   local rules were never intended to let any party avoid its

18   discovery obligations, and it certainly wasn't intended to

19   deprive Akoustis of basic discovery and due process rights.

20   We've worked very hard to get here to get the table set, but

21   now it's really the work that needs to be done.

22            And, frankly, Your Honor, just in addition to the

23   schedule itself, now that we know the breadth of these

24   claims, we need to go back and look at what's the scope of

25   discovery going to be?  How many depositions are going to be

**UNREDACTED TRANSCRIPT**

1   allowed?  Those are things the party, frankly, hadn't come to

2   a conclusion on in the initial case management conference

3   because all parties agreed we should talk about things after

4   the claims construction.

5          But Qorvo has sent us a 30(b)(6) notice with over

6   50 topics.  They've sent a host of other deposition notices.

7   We still don't have their documents.  So there's going to be

8   a lot of work to both get the documents, then give us an

9   opportunity to actually read those documents, to understand

10  them, to consult with our experts, and do the work that needs

11  to be done for each of these at least 86 different events.

12  So I will pause there.

13         THE COURT:  Sure.  Sure.  I understand.

14  Mr. Masters, we need to hear from you on these matters.

15         MR. MASTERS:  Thank you, Your Honor.  First and

16  foremost, Qorvo believes that the trial date of April of 2024

17  should be maintained by the Court.  There is sufficient

18  leeway between now and then, and I think the Court even

19  anticipated maybe having to adjust some of those dates, but

20  we can still meet the April 24 -- April 2024 date.

21         But by and large, this case kind of reared its

22  head when we filed our original complaint.  When we filed

23  that original complaint in October of 2021, Akoustis filed a

24  motion to dismiss.  We amended the complaint at the

25  suggestion of the Court.  They moved again to dismiss.   And

**UNREDACTED TRANSCRIPT**

1  those motions to dismiss were based largely on us not

2  identifying the trade secret or the confidential information

3  that had been misused by these employees.

4          Now, the employees are, one, Akoustis has known

5  from October of 2021 because they were identified in their

6  complaint, they were identified as ex-Qorvo employees, and

7  they know exactly who those employees are and were at that

8  time.

9          It is clear -- it would be very surprising that

10 Akoustis did not, at that time, talk to each of those

11 Qorvo -- ex-Qorvo employees and talked to them about what

12 confidential information they may or may not have taken.

13         So since October 2021, I'll give them a couple of

14 months to have done their interviews of those employees.

15 They've known about this information.  Discovery proceeded

16 and has been going on.  Document discovery of, largely,

17 claims of unfair competition, the misuse of confidential

18 information, and the patent claims since 12-plus months.

19         It is in December of 2022 and January where

20 Akoustis doubled the production in terms of what they gave

21 us, and that is when they finally disclosed all of the Qorvo

22 trade secret information that they have in their files in the

23 e-mails that implicated their use and misuse of Qorvo's trade

24 secret information.

25         So on the one hand, it is Qorvo, us, who are

**UNREDACTED TRANSCRIPT**

1  starting to process this information.  But also the document

2  discovery is nearly complete and will be substantially

3  complete by the end of April.

4          And then we want to move to depositions.  We've

5  served our deposition notices.  We're ready to go now.  And

6  we believe those depositions could be done by July of what we

7  propose, 2023, July 10.  And that's where we are right now.

8  I mean, the document discovery is beyond us.

9          Now, you know, there's talk about the size of

10  this second amended complaint being 1,400 pages or so.  Look,

11  we could have done a notice pleading and said there's a

12  misuse of trade secrets.  Then they would have served an

13  interrogatory, we would have identified these trade secrets.

14  But we put them in the second amended complaint as a way to

15  kind of move the case forward, and so they knew from the

16  beginning what documents we're talking about.  And, again,

17  they know.  They've known about these documents.

18          So we think the request for a two-month extension

19  is sufficient for us to get the depositions done.  There are

20  a number of issues; but, again, they're evolving within the

21  general framework of the original complaint, which was patent

22  claims on the one hand, nonpatent claims, essentially the

23  unfair competition claims.

24          We now have the evidence to support the unfair

25  competition claim.  We have the evidence now for the trade

**UNREDACTED TRANSCRIPT**

1  secret misappropriation claims that we have added really to

2  conform the pleadings to the discovery that we have found.

3  There are not -- it's not -- the nature of this case has not

4  changed.  The scope has changed slightly.

5       The last point, Your Honor, is an eight-month

6  delay.  I mean, that would give us ten more months of fact

7  discovery, and they want to put trial date in December

8  of 2024.  We're talking about Qorvo's sensitive confidential

9  information.  Qorvo is anxious to get this case to trial and

10  get it resolved and to stop this misuse of this confidential

11  information sooner and not later.  And just allowing Akoustis

12  to delay this, the continued use and not to have to face this

13  issue, it's just not -- it's fundamentally unfair to Qorvo.

14       If the Court has any specific questions you would

15  like me to address, I would be happy to do so.  But that's

16  essentially our position, Your Honor.  The document discovery

17  is essentially done.  It will be substantially done by the

18  end of April and move in earnest to depositions for May,

19  June, and July, and then to expert discovery.

20       THE COURT:  Let me ask how long the plaintiff

21  contemplates the trial would take knowing that typically

22  these are timed trials, but I need some general idea.

23       MR. MASTERS:  Your Honor, I would believe it

24  would take about eight full court days.

25       THE COURT:  Okay.  And, Ms. Sweeney, what do you

**UNREDACTED TRANSCRIPT**

1    think in that regard?

2              MS. SWEENEY:  I think, Your Honor, it would take

3    a minimum of two weeks because of the scope of these issues.

4    You know, each -- I understand that Qorvo's position is we

5    found a document that appears to be Qorvo confidential.  But

6    as I said, initially, that's -- that's the beginning point of

7    any of these discussions.  A document with a legend is not a

8    trade secret.  It's also not a confidential document.  There

9    are a series of multiple steps and analysis per item.

10             As I said, I think it's really, frankly, more

11   than the 86.  So it's hard for me to imagine that it's going

12   to be less than a two-week undertaking.

13             THE COURT:  How many depositions do you

14   anticipate will be needed, the plaintiff, how many

15   depositions?

16             MR. MASTERS:  Well, Your Honor, I want to answer

17   your question.  I want to kind of work to -- because I think

18   this point is very important.  We have found dozens of Qorvo

19   trade secrets in that production, and we're processing it.

20   We have no expectations to put all of them in front of a jury

21   when we go to trial.  We will have to pare that list down to

22   something that is manageable for our trial and for the jury

23   to understand the nature of this case.

24             The trade secrets encompass the business from

25   beginning to end.  I mean, it's financial information.  It's

**UNREDACTED TRANSCRIPT**

tax and accounting procedures.  It's design development of

competing products, manufacturing of products, packaging of

products, product road maps.  And it goes up to the executive

management of Akoustis who have accessed trade secret

misappropriation of -- Qorvo's trade secret misappropriation.

So for trial, we will have to pare our list to

what's manageable for the jury.  We have work to get there.

And so in terms of what we call the number of people that we

found, it's up to 30 people, but I don't have any

expectations of taking 30 depositions.  I would estimate 15

to 20 depositions.  And, of course, if we can reduce that, as

I said, we're trying to get to a point, get the case prepared

for trial, and if we can pare that list down, we will.  But

I --

THE COURT:  How many of those will be current

employees of Akoustis?

MR. MASTERS:  I think nearly all except for maybe

three or four.

THE COURT:  Okay.

MR. MASTERS:  I'm talking fact witnesses, not

expert witnesses.

THE COURT:  And you prioritize the importance of

the witnesses at some point.  You have maybe not done that,

but you would do that?

MR. MASTERS:  Internally, we are doing that now,

1    yes, absolutely.  We have no interest in taking the

2    deposition of, you know, somebody that we may, you know,

3    never need or --

4               THE COURT:  Right.

5               MR. MASTERS:  -- their testimony or --

6               THE COURT:  Right.  And, of course, you'll --

7    there's some people that you may not depose that you will be

8    prepared, if you need to, to cross-examine with the documents

9    you've got.

10              MR. MASTERS:  Absolutely, yes.

11              THE COURT:  And then the defendant, Ms. Sweeney,

12   how many depositions?  Are we in this range of maximum of,

13   hopefully, something in the range of 15?

14              MS. SWEENEY:  Your Honor, candidly, it's very

15   difficult for me to put a number on that because we literally

16   don't have, you know, any of those documents, except for the

17   3,000 I mentioned.

18              THE COURT:  Sure.

19              MS. SWEENEY:  I think as Mr. Masters described,

20   there's tremendous complexity.  While he may ultimately pare

21   this down before trial, at this point, I have to deal with

22   the complaint that they filed.  And that seems to me, we're

23   at 20 to 25 depositions.  You know, as I said, their 30(b)(6)

24   has 50 topics.  I would think that we're going to have, you

25   know, a similar, very large 30(b)(6) as well.  How we count

**UNREDACTED TRANSCRIPT**

1   those is always a bit of a trick to that.

2          But let me just add one other point, and I

3   mentioned it as one of the foundational problems that we have

4   at this point in the letter.  The second amended complaint

5   has been designated as AEO.  So at this point, our team has

6   not been able to sit down and have a conversation with

7   management or the board about these allegations.

8          We've met and conferred with Qorvo on this.

9   We've resolved the issue of what the public version should

10  be.  We've not resolved how we get this, you know, basic

11  charging document, which we dispute has trade secrets in it.

12         But, in any case, you know, how we get this in

13  front of our client so we can inform them of these

14  allegations, so we can prepare for discovery, they have

15  30(b)(6) topics that we can't even talk with the witness

16  about.  So we plan to file a motion on that point next week,

17  but we see a lot of discovery work to be done long before

18  we're at depositions.  Unfortunately, I think we're going to

19  need the Court's guidance on some of those things.

20         THE COURT:  Let me ask Mr. Masters.  I need to

21  understand.  You obviously have a lot more -- many more

22  documents to produce, right?

23         MR. MASTERS:  We have documents to produce, yes,

24  Your Honor.  I mean, we are responding to -- we're producing

25  documents this week; and, like I said, by the end of April we

**UNREDACTED TRANSCRIPT**

1    will be done.  This is responding to Akoustis', I think, last

2    few sets of requests for productions.  So, yes, we do have

3    those documents to produce.

4              THE COURT:  What -- how many are we talking

5    about?

6              MR. MASTERS:  Well, I anticipate about a thousand

7    to be produced, trying to get out this week.  But beyond

8    that, I'm not -- I mean, there will be more documents.  Your

9    Honor, I really can't put a number on it right now.  Again,

10   Akoustis is in possession of a large number of our trade

11   secret information.  They have those documents.  And, yes, we

12   get them from our files, we're going to produce back the same

13   document that we find in our files, if we haven't done that

14   already, but I can't give you a top number on it.  I mean,

15   there will be more.

16             MS. SWEENEY:  I can speak to that issue a little

17   bit.  So we were -- we thought, as of last week, we would be

18   filing a motion to compel on our first and second set of

19   RFPs.  Production has not even happened as to those RFPs,

20   which were issued last spring.  We had, I think, a productive

21   discussion.  As part of that discussion, the hope was that

22   Qorvo would have those documents produced by May.

23             But this isn't an issue of Akoustis finds a

24   document, and then Qorvo produces the same document back.

25   That's not the right analysis.  Once a document is produced

**UNREDACTED TRANSCRIPT**

1   that suggests that it might be Qorvo confidential

2   information, we then have to understand, is this a Qorvo

3   document in the first place?  How was it used by Qorvo?  Was

4   it sent to a third party with an NDA, without an NDA?  If you

5   look at Qorvo's website -- and we note this in our answer --

6   there are documents on their website that have a confidential

7   Qorvo legend on them.

8           So just the fact the legend is there is just the

9   beginning.  There would not be just one document that Qorvo

10  would be returning.  It should be 10 to 15 or even more

11  documents.  If it's a trade secret, then we have to

12  understand how was that used within the company?  How was it

13  protected?  How many people had access to it?  You know, what

14  was the guardrails around that document?

15          Our production should just be a miniature version

16  of what should be coming from Qorvo.  So the idea that we're

17  at 64,000 documents, they're at 3,000, and maybe there's

18  another thousand would suggest we have a very serious

19  discovery problem that we're going to have to address once we

20  see what they produce.

21          So, you know, also I should note, we haven't

22  agreed on search terms.  That's something the parties have

23  been talking about at length, but it's the next thing for us

24  to do in our discussion with -- predominantly with

25  Mr. Defosse.  Last week, we had a good conversation around

**UNREDACTED TRANSCRIPT**

1    that and that, you know, a set of terms would be coming, but

2    we don't have those yet.  This is truly at a nascent stage

3    for the second amended complaint.

4            MR. MASTERS:  Your Honor, may I respond?

5            THE COURT:  Sure.

6            MR. MASTERS:  Qorvo has produced documents to

7    those first and second sets, and we used search terms that we

8    gave to Akoustis about a year ago.  And then it was only four

9    months later, Akoustis came back to us and said, we don't

10    like those search terms, you got to change them.  And they

11    have been writing letters to us, and we've been responding

12    since October.  And yes, last week, on a Wednesday afternoon,

13    we had a meet and confer, and we talked through some of these

14    issues.

15            So I find it difficult to believe that they have

16    a real concern with our production -- and I'm not talking

17    about the most recent request, the first and second -- when

18    this issue has been lingering apparently since October, and

19    they've never moved to compel.  So when we had the meet and

20    confer, we've offered to do some more searching for them to

21    try to compromise and get this case moving, and we will

22    produce some more documents that are responsive to that first

23    and second set, but also the primary is the third and fourth

24    set that deal with the more recent trade secret claims.

25            But the idea that Qorvo as the plaintiff is going

**UNREDACTED TRANSCRIPT**

1    to be produced, fifty, sixty, 70,000 documents is just not

2    accurate.  That is not the case here.

3              THE COURT:  Well, let's go through something

4    that we have -- I don't know that we have talked about, maybe

5    we did some time ago, which is -- well, the patent rules work

6    in a certain way.  The nonpatent issues in the case should

7    really be subject to a 26(a)(1) disclosure process, and you

8    may have been thinking that way; and that's good, if you

9    have.  If you haven't been thinking that way, then we do need

10   to talk about that.

11             So have you been thinking about that,

12   Mr. Masters?  I'm going to actually have to impose a clear

13   26(a)(1) disclosure requirement as to all of the

14   nonpatent-related materials.  That's pretty obvious.  Have we

15   got a deadline on that? because the 26(a)(1) -- I can't quite

16   tell where we're going on that.

17             That will mean that if you do not produce

18   materials, you will not be allowed to use them at trial if

19   it's a non-26 -- if it's a nonpatent issue.  Now, let's go

20   back and let you bring me up to date because I need to know

21   what you've done, and you may have addressed that.

22             MR. MASTERS:  Well, we have served supplemental

23   disclosures about two to three weeks ago, Your Honor.

24             THE COURT:  Sure.

25             MR. MASTERS:  And, again, we're still processing

**UNREDACTED TRANSCRIPT**

1   the information that we have, and I believe that those have

2   been up to date.  We would update them again if there was a

3   need to do so.  But I don't have the exact date in front of

4   me, but I do believe it was --

5              THE COURT:  Have you been exchanging,

6   Ms. Sweeney, 26(a)(1) disclosures, which are really -- I need

7   to know.

8              MS. SWEENEY:  Sure.  Obviously, we have our

9   initial disclosures, but, no, we have been -- you know, as I

10  said, we phased this discovery so we could provide Qorvo the

11  documents that we had so they could then tell us what is at

12  issue.

13             THE COURT:  Okay.  The answer, I think, is you

14  have not proceeded in that -- along that path.  Is that

15  right?

16             MS. SWEENEY:  No.  It's that we have been

17  expecting Qorvo to do that because --

18             THE COURT:  I'm not asking that.

19             MS. SWEENEY:  Yes.

20             THE COURT:  You have not been proceeding along

21  the 26(a)(1) -- maybe you have -- the 26(a)(1) path, which

22  means neither of you, if we do this, will not be able to use

23  materials in your case that you might use at trial.  So that

24  shifts the responsibility on all of the patent issues -- on

25  the nonpatent issues to the party that is either defending or

**UNREDACTED TRANSCRIPT**

1    pursuing the nonpatent issues.  And if you don't do it, there

2    are just very severe consequences.  There should be.  There

3    should be.  Because, otherwise, it's just prohibitively

4    expensive to go through this discovery process.

5            And it sounds like that I'm -- I'm not hearing

6    that Qorvo has done what they would be required to do under

7    26(a)(1) for all of their nonpatent matters.  It just isn't

8    possible.

9            Are you talking about 3,000 pages or 3,000

10   documents that are another -- which one, Mr. Masters?

11           MR. MASTERS:  Documents.

12           THE COURT:  Well, that's not helpful.  Tell me

13   how many pages.

14           MR. MASTERS:  Let me see if I have that

15   information.

16           THE COURT:  Well, I'm going to go back to

17   Ms. Sweeney.  Are you talking about documents or pages when

18   you're talking?

19           MS. SWEENEY:  Sixty-four thousand documents, it's

20   about half a million pages.

21           THE COURT:  No, that's helpful.  That's helpful.

22   That's helpful to know.

23           MS. SWEENEY:  And I think, Your Honor, to your

24   26(a)(1) point of view, I absolutely agree.  I mean, anything

25   that Qorvo intends to rely on needs to be produced.  There

**UNREDACTED TRANSCRIPT**

1  are things, you know, that we have been waiting to see and

2  expect to see.  They certainly have the burden on a trade

3  secrets to identify those with specificity.

4            THE COURT:  Right.  Right.  And there's some -- I

5  know that's always a sticky issue, so I'm not -- I'm familiar

6  with that.  There is -- there is a burden on them to do that,

7  and it is complicated a lot of times.

8            MS. SWEENEY:  If the Court could give us guidance

9  on that point.  I mean, here in California, we have specific

10  affirmative discovery obligations on --

11            THE COURT:  Sure.

12            MS. SWEENEY:  -- the party offering trade

13  secrets.

14            THE COURT:  Right.

15            MS. SWEENEY:  A lot of courts have adopted -- if

16  the Court has a preference in this regard, or has -- you

17  know, if we could agree on affirmative disclosure to identify

18  those trade secrets, that would be helpful because then we

19  won't be looking at the complaint saying, well, there's at

20  least 86 and maybe there's more and maybe they're amending.

21  It could really help us focus this.

22            THE COURT:  Right.

23            MS. SWEENEY:  Which would be very useful.  And,

24  you know, we can go through that in the discovery process.

25  We've seen other cases in the Third Circuit that have done it

**UNREDACTED TRANSCRIPT**

1  that way, but if the Court has some guidance for the parties

2  on that point, we would certainly embrace it.  Anything to

3  tailor this because even under our schedule, it's going to be

4  a significant amount of work.

5         You know, I should say that I worked with

6  Mr. Brauerman to come up with a schedule, and what we had in

7  mind is in Delaware, you generally have a minimum of 12

8  months when you have new claims to deal with, so we took the

9  date of the second amended complaint in February and we

10  rolled out the fact -- let me step back, 12 months, at least,

11  for fact discovery so we --

12         THE COURT:  I wouldn't be counting on 12 months.

13  You need to --

14         MS. SWEENEY:  Understood.  I just wanted to tell

15  you there was a theory in how we approached this.

16         THE COURT:  Oh, no, that's fine.  That's good.

17  And you were saying -- and I'm not sure I've looked at -- is

18  it Northern District of California you're talking about?

19         MS. SWEENEY:  Yes.

20         THE COURT:  On an affirmative obligation to

21  produce materials, I like that.  We've had some issues in

22  other places.  And that's not a bad idea.  We'll take a quick

23  look at that.

24         MS. SWEENEY:  Yes.  And I'm happy to provide you

25  with the cite.  Both the state and federal follow the rules

**UNREDACTED TRANSCRIPT**

1   that comes under the California Code of Civil Procedure under

2   Section 2019.  I think it's -- 2019.210, I believe.  But I

3   could -- I can check that.

4            THE COURT:  Obviously, I'm not impressed with

5   Qorvo's performance so far in terms of recognizing their

6   obligation to come forward with the material that's going to

7   support their case.  Or may support their case.  And so we're

8   going to have to be very clear.

9            If Qorvo wants to go forward, which they say they

10  do, then they're going to have to get a lot more assertive.

11  Not assertive, but they're going to have to be a lot more

12  forthcoming with the materials on which they may rely, and

13  you have to look at 26(a)(1) and realize that it is not a

14  will rely.  It is things that you might rely on.  And if we

15  don't get that done -- and I can't tell for sure.  It doesn't

16  sound like that's been done.  Then that needs -- that

17  approach needs to change.

18            I do understand that, for certain reasons, they

19  would want to go ahead and get as much material as they could

20  from Akoustis.  I understand that to sort of isolate that at

21  the appropriate time.  We're going to --

22            MR. MASTERS:  Your Honor --

23            THE COURT:  Excuse me, Mr. Masters.

24            MS. MASTERS:  I'm sorry.

25            THE COURT:  We're going to have to set a time;

**UNREDACTED TRANSCRIPT**

1  otherwise, we're not going to get through the case in a

2  reasonable time frame, and that's what I'm worried about.

3          So, okay, now Mr. Masters, see what I'm saying?

4  We're going to have to set a time where you've got to come

5  forward with a lot of material, and the idea that we're going

6  to engage in expensive discovery in a case where that is very

7  out of balance as to the size of entities is disturbing.

8  That is not the way that it should be approached.

9          Now, I may be -- Ms. Sweeney, I may be incorrect,

10  but my impression is that your client is still probably not

11  making a profit and is rather small.

12          MS. SWEENEY:  Yes.

13          THE COURT:  And so we don't get to -- I'm sorry,

14  I should let you say something.

15          MS. SWEENEY:  That's absolutely right, Your

16  Honor.  You're correct.

17          THE COURT:  I'm not saying that, you know, that

18  the big guy has to always come forward with everything.

19  That's not true.  But what we have to do is we have to look

20  at some proportionality.  But we also have to look at a

21  schedule because if things go on forever, that can be just as

22  disastrous for both sides.  It can be disastrous for the

23  defendant from the point of view is that they've got limited

24  resources, I think.  Maybe they don't.  Maybe they have

25  unlimited resources.

**UNREDACTED TRANSCRIPT**

1          And it can be disastrous for the plaintiff

2    because they have real issues in terms of if their trade

3    secrets have been taken and if their patents have been

4    infringed, then they don't want it to go on forever, and they

5    need it to stop reasonably soon.  So both sides have an

6    interest in being forthcoming.  And I think I'm hearing from

7    Ms. Sweeney that at least you've attempted to be forthcoming.

8          MS. SWEENEY:  We really have.  You know, we took

9    the Court's order that a claim had been stated whether we had

10   concerns, you know, and knew we had to go forward with the

11   discovery.  And, frankly, in all the work I've done in this

12   space, you know, seeing a party who has come through, it was

13   Herculean for the company to pull this amount of documents

14   and to produce all of these things.  It's been

15   extraordinarily expensive; but, you know, as I said, it was

16   putting the pieces on the table.

17         And once we do see from Qorvo, you know, their

18   production at 26(a)(1) disclosure, we then need all the

19   rebuttal evidence I spoke of, you know, to show how they used

20   these things, to test whether or not they're trade secrets,

21   to understand the damages.  So I agree with the Court that

22   there's substantial work to be done.

23         THE COURT:  Okay.  So, Mr. Masters, I'd like to

24   have a plan that's going to get a lot of material.  I

25   understand that this is a who is on which side here, and

**UNREDACTED TRANSCRIPT**

1    where the relevant material may reside, but I need a plan

2    that is going to get a lot -- is going to get everything,

3    basically, that Qorvo might use at trial to support any of

4    its claims.  That needs to be produced.  I take it that

5    hasn't happened yet, right?

6            MR. MASTERS:  Well, in large part, it has been

7    produced, Your Honor.  The last set of requests for

8    production from Akoustis came after we filed the second

9    amended complaint, and we're responding to those now.

10           THE COURT:  I'm not really interested in what

11   they have produced.

12           MR. MASTERS:  I guess what I'm saying is --

13           THE COURT:  I'm interested in what you have

14   produced, and I'm interested in have you produced it with an

15   eye toward if I don't produce this, I will never be able,

16   under any circumstance, essentially, not quite any, to use

17   this at trial.  Has that happened?

18           MR. MASTERS:  As I said, by the end of April, we

19   will have a substantial completion.  Everything that --

20           THE COURT:  I think the answer is no -- excuse

21   me.  I think you're saying, no, you have not done that.

22   Please say either yes or no.  I just need to know.

23           MR. MASTERS:  We have not, Your Honor.

24           THE COURT:  Okay.  No, that's okay.  That's okay.

25   Because you didn't understand that was your requirement.  So

**UNREDACTED TRANSCRIPT**

1   that's all right.

2          The question is:  How do we get there now?  How

3   do we get there in terms of producing this?

4          We're changing course a little bit, maybe

5   significantly, so that your objective of moving the case

6   along more rapidly can occur and that's what I -- you may

7   want to confer with some colleagues and think about it.  But

8   this is -- I think the case needs to move along.  It's been

9   going on for a while.  You want it to move along.  Let's

10  figure out how to get that done.

11         That means, you know, a little different approach

12  in terms of what you need to voluntarily disclose.  Not

13  voluntarily, but under order, you need to disclose.

14         MS. SWEENEY:  Your Honor, I have a possible

15  recommendation on that point.  The Court has already

16  indicated having a further status conference on this on

17  May 10.

18         THE COURT:  Sure.

19         MS. SWEENEY:  Perhaps what we could do is set

20  aside the current patent local rule schedule, come back in

21  May, and to see where these things are.  We both have the

22  26(a) issue.  A host of document requests out to Qorvo that

23  haven't been responded to, search terms, all the other things

24  that I mentioned, we've got to work out the issue about our

25  client seeing these allegations.  So we could come back in --

**UNREDACTED TRANSCRIPT**

1   at that May 10th time or shortly thereafter, and hopefully be

2   in a much better position to have a thoughtful discussion

3   about when the trial should be, when we can get through fact

4   discovery, and so forth.

5           THE COURT:  Well, that's -- that's not a bad idea

6   at all.  The -- what I'm concerned about is I need to start

7   the clock running on the plaintiff's disclosures as they

8   would appear under 26(a)(1), which I just don't think has

9   happened.  Maybe -- I mean, I think you've both been candid

10  with me and, normally, that would be a fairly short period of

11  time from now.  And so we're on -- at the 3rd of April.

12          There's an enormous amount of -- I don't know

13  about enormous.  There are a lot of decisions that have to be

14  made by a party in terms of am I sure I'm producing

15  everything that I may need to use to support any aspect of my

16  case, my damages case, my everything else portion of the

17  case, my number of witnesses, the identification of the

18  documents.

19          What we typically have done to reduce the cost

20  for the parties -- and this is a pretty sophisticated case.

21  What we've usually done is we've said, you have to go ahead

22  and have a little more time to do that, but you have to

23  produce the documents and not just identify them by category,

24  so that the burden is now on -- in this case, it will be the

25  plaintiff, to identify those documents.

**UNREDACTED TRANSCRIPT**

1          In other words, they've got to put their whole

2    case together.  I think they did a pretty good job, frankly.

3    I'm not -- I can't comment on it much because I'm not sure.

4    But they've put together a detailed -- a second amended

5    complaint, which serves partly -- Mr. Masters, that serves

6    partly as that function; is that right?

7          MR. MASTERS:  Absolutely, Your Honor, and we have

8    responded to interrogatory responses too that are further to

9    the disclosures.  But, you know, we just identified these

10   trade secrets, and there are dozens of them.  We amended the

11   complaint very detailed, Your Honor.

12         Like I said, we could have done a notice pleading

13   and then waited for the interrogatory and then slowly leaked

14   out the trade secrets.  We did them.  We are -- and that was

15   February, I believe.  So we are now collecting -- I hear you

16   loud and clear, Your Honor.  We have to produce or we can't

17   use it, and we are collecting all of that information as we

18   process these trade secrets to prepare the case for trial.

19         As I said, we're not going to go to trial on all

20   86, or whatever we identified; but it's complicated

21   technology involved in some cases, and it requires us, you

22   know, to work with our experts and to understand that

23   technology and to move the case forward.  So I -- we -- I

24   hear you loud and clear.  We have every intention of

25   complying with all of our disclosure requirements by

**UNREDACTED TRANSCRIPT**

1   documents, responding to their discovery, to Rule 26, and so

2   on.  And we appreciate the Court putting a date to motivate

3   both sides to get there.

4            THE COURT:  Right.  That's what we're both -- I

5   think all of us are trying to get -- we have different

6   reasons to want to move reasonably promptly.  Plaintiff has

7   lots of reasons.  Defense maybe not so many reasons, but they

8   still have serious reasons.  Because of cost, they need to

9   move forward.

10            I think what we might want to do -- I will tell

11   you what I started to say earlier.  In less complicated

12   cases, we would set a 14-day date from perhaps today to

13   complete your 26(a)(1) disclosure.  That's not going to work

14   here.

15            But in this case, we would typically say, well,

16   let's set a 28-day or 21-day -- 28-day time period for what

17   we call an initially -- this is a little bit -- I want to

18   make sure we're not off track here -- for a 26(a)(1)

19   disclosure date to disclose anything you can by that date

20   that will support or might be necessary to support your case,

21   recognizing that if you don't get it done, there can be some

22   really serious consequences in terms of not being able to use

23   it.

24            But, usually, we have a Phase 1, which is --

25   let's do a Phase 1.  Let's get everything out there that we

**UNREDACTED TRANSCRIPT**

1  possibly can, and then we'll have a clean-up phase, which

2  would be usually pretty short after that.  Usually -- I mean,

3  I'm adding time to what we typically use right now.  So it

4  might be a couple of weeks later.  In discussion, it might be

5  somewhat longer because you have a much better grasp on this,

6  all of you do, than I do.  I hope.  I'm sure you do.

7           So that would give me more confidence,

8  Ms. Sweeney, that we were going to make progress -- that's

9  what I'm worried about -- and save money for both sides.  I

10  really think it does save money.

11           I think, Ms. Sweeney, you did the other for

12  reasons you needed to, multiple reasons, but, one, was let's

13  get it out there so that perhaps we can cut down on both time

14  and cost, probably.  I'm not sure.

15           MS. SWEENEY:  No, that's exactly right, Your

16  Honor.  We really couldn't see another logical path forward

17  for identification of these claims.  And by the way, Your

18  Honor, I did check it.  It is, in terms of the California

19  rules, it is to California Civil Code and it's 2019.210, the

20  same section I provided before.  And I think as part of --

21  you know, that's an affirmative disclosure obligation

22  followed here.

23           Various courts in the country have used that

24  standard requiring a party to identify their trade secret

25  with reasonable particularity.  I've seen similar language

**UNREDACTED TRANSCRIPT**

34

```
 1    used within the Third Circuit, both North Carolina, Delaware.
 2              THE COURT:  True.
 3              MS. SWEENEY:  I checked around.  That's what
 4    everyone is using.  So if we can do that in an affirmative
 5    way, as the Court looks at the second amended complaint,
 6    there's a lot of documents that are referenced.  You see long
 7    lists of Bates labels.
 8              THE COURT:  Yes.
 9              MS. SWEENEY:  I think that the law is also clear
10    that you can't just point to a document and say that's a
11    trade secret.  It may have a trade secret in it or part of a
12    trade secret in it.  So in identification, you're looking at
13    that specific formula at issue, that secret sauce, not the
14    fact that that's part of a broader document, so we're trying
15    to really get that point clear so we know exactly what we're
16    talking about.
17              THE COURT:  Absolutely.  And so what we'll do
18    is -- because we will be getting back together obviously
19    soon.  But by the 1st of May -- and I would think that both
20    parties will want to look at this.  I'm looking -- we'll say
21    I'm looking, in many ways, almost primarily at the plaintiff
22    because that's where I detect that there's work -- much work
23    to be done.  I know there's work to be done on both sides.
24    It's just that the defendant is so much smaller that I assume
25    your accumulation is many documents, and you don't have a lot
```

**UNREDACTED TRANSCRIPT**

1  left.  I may be unfair there maybe.  Ms. Sweeney?

2          MS. SWEENEY:  Well, you know, it makes it a

3  challenge.  There was more than we thought, but no, we are

4  substantially complete with our production as of the end of

5  January.  So no.

6          THE COURT:  And would you be substantially

7  complete if we were doing it -- looking at it strictly as a

8  26(a)(1) issue that if I don't produce it, I'm going to be

9  barred from using it.

10         MS. SWEENEY:  Based on what we know at this

11  point, we would be looking for that trade secret

12  identification.  That would no doubt spur additional

13  documents that we would have, although I think, largely,

14  those rebuttal documents would be with Qorvo.  But I think we

15  would have some more once we have some refinement on the

16  trade secrets at issue.

17         THE COURT:  Okay.  What we'll do is we'll -- and

18  I'm really looking to all of you.  I really feel comfortable

19  with this group.  And I'm to set that May 1 date as a really,

20  really important disclosure date where both sides say, I

21  really need to make sure I've produced this to the other side

22  so that I can use it at trial.  But we will have a

23  supplemental date, which will follow that after our next

24  conference.

25         And, Ms. Sweeney, you're suggesting that we

**UNREDACTED TRANSCRIPT**

1    look -- we go ahead, and I will do this shortly, and look at

2    the affirmative disclosure obligations under the California

3    Code and adopt those for this case.  Is that your suggestion?

4              MS. SWEENEY:  Yes, Your Honor.

5              THE COURT:  Okay.  I think that's all very good.

6         I am worried about the timing.  What we were

7    thinking about is that we need to stay fairly close to the

8    trial date that we have, but we need to -- and we did put

9    some extra time.  As Mr. Masters pointed out, we did put some

10   extra time in there earlier.  But we understand that we may

11   need to move that by maybe two months or so.  But we need to

12   stay pretty tight on that.

13        Now, Mr. Masters, I didn't really mean to cut you

14   off.  I just was trying to get to the heart of what we were

15   doing and try to get things moved along.  What are your other

16   thoughts in terms of -- I think you do have quite a bit to do

17   here.  Would you say this is a fairly big task for you even

18   in a 28-day period?

19             MR. MASTERS:  I believe -- you were suggesting

20   May 1; I think that's doable.  As I said, we anticipate to

21   have a substantial completion of our document discovery done

22   by then, and that would include our Rule 26 obligations.

23             THE COURT:  Sure.

24             MR. MASTERS:  So, yes, it's a task, but we're --

25   we're ready to address it, and we anticipated having to deal

**UNREDACTED TRANSCRIPT**

```
 1    with it --

 2                THE COURT:  Okay.

 3                MR. MASTERS:  -- in today's conference.

 4                THE COURT:  Okay.  Let me look at one or two more

 5    things.  I did look at your schedule pretty carefully.

 6    It's -- and that was the -- basically, you were in agreement

 7    for initial things, which are not a problem through June

 8    the 15th.  That's probably going to be something that we will

 9    be doing.  That was your point that we needed to get some

10    relief on that right now so that we have some way to deal

11    with that.

12                The real question was the disclosure of facts

13    discovery, which was initially June the 10th of 2023, and the

14    defense was asking for February the 29th.  What we've done is

15    we've substituted in this time frame to try to help us move

16    along this 26(a)(1) requirement, which will be that May 1

17    date, so I'm going to make sure that's in there.  That's for

18    both parties.  I don't want anybody to be under the illusion

19    that you will be able then to fix it if you don't get it done

20    and if, with due diligence, you could have done it by May 1.

21    And that's always a question that requires a little fact

22    inquiry, so it's a very, very important date to try to cut

23    down on our cost.  I've said it many times, so we're going to

24    skip doing that again.

25                We'll have our conference and our conference is
```

**UNREDACTED TRANSCRIPT**

 1   coming up on -- is it the 10th?  May the 10th.  Is that --

 2   Ms. Sweeney, I'm looking back to you just to be sure.  That

 3   will give us a good check-in date in terms of how we're

 4   doing, and then we will be doing some adjustment.  I am

 5   concerned about the expert questions that you've got here in

 6   terms of how much time -- additional time they will need.

 7   And I just need to check on that.

 8            The trial date that the plaintiffs proposed was

 9   to stay with May the 22nd.  The defense, I'm going to tell

10   you right now, is December 9th is too far away, but you

11   need -- but if you propose mechanisms that will make it both

12   more efficient and less expensive and work better for all of

13   us, then I'll be happy to listen to those -- more than happy

14   to listen to those from the defense.

15            I think that's maybe what we should accomplish

16   today.  Mr. Masters, do you think that -- that's a big chunk.

17   That seems to me, Ms. Sweeney, you know, you'll have some

18   obligations here.  If neither -- I mean, you understand this

19   isn't just for the plaintiff, this is for both sides.

20            MS. SWEENEY:  Yes.

21            THE COURT:  And I'm looking to both of you.  I'm

22   looking to their teams.  I'm looking over there, and they're

23   saying, oh, my gosh, Mr. Jung, is this going to work?  You

24   know, I can see everybody.  Is it Mr. Brauerman?  Is that --

25   are you going to be doing all this work?  I can't tell who is

**UNREDACTED TRANSCRIPT**

1    doing it.  My point is that I know it's a team issue.  I know

2    you have a lot to do.  And I know -- is this a little bit of

3    a seat change, Mr. Masters, in how things are proceeding?  Is

4    that -- I hope it's not too big a seat change.  Is it a

5    little bit?

6            MR. MASTERS:  Well, Your Honor, I think that

7    having the Rule 26 May 1 date is a very good idea.  Keeping

8    the May 10th status conference that you had set is good so we

9    can check in.  And I don't understand -- are you going to

10   maintain the rest of the schedule for now and hold until

11   May 10?

12           THE COURT:  Don't you remember, there were a few

13   items that you had?  Don't you remember we changed the final

14   infringement contentions?  I did say that was going to

15   change.

16           MR. MASTERS:  Okay.

17           THE COURT:  Right.  To June the 15th, and I did

18   say that the final noninfringement contentions were also

19   changing, so I adopted that portion of your proposed schedule

20   because, otherwise, you'll have too many things going on, I'm

21   afraid.  Is that kind of how both of you see that?

22           And then when we get together on the 10th, we

23   will look at the remainder of the schedule.  I will need the

24   defense to take a little look at some of the -- how much we

25   can reel this in with other mechanisms, so knowing that we

**UNREDACTED TRANSCRIPT**

1  need to be shooting for a trial date that is somewhat

2  significantly quicker than you have on your December date.

3  That's not the date that we're going to be able to work with.

4  So we'll do that.  Okay.

5           MS. SWEENEY:  Your Honor, if I could just

6  clarify.  So the -- in terms of where we are now, we're going

7  to come back on May 10th; we will, at that point, address the

8  close of fact discovery, sort of the rest of the dates,

9  starting with an understanding that we may move the trial

10  date, you know, out several months, but we're certainly not

11  going to go as far as December.  And we can discuss that

12  further schedule at this point.

13           But we will, however -- the part of the schedule

14  that will stay in place are the patent local rules related to

15  infringement contentions and so forth is the June 15 date.

16  Obviously, the May 1 date for the 26(a) and then the next

17  conference on May 10, and we'll discuss the balance of this

18  schedule at that point in time.

19           THE COURT:  That is exactly as the Court

20  perceives it, but I'm going to go to Mr. Masters.  I don't

21  want to leave him out.  Does that sound like what you

22  understand?

23           MR. MASTERS:  I think that's consistent with what

24  we've been discussing.  So sounds good.

25           THE COURT:  Well, I appreciate all of you.

**UNREDACTED TRANSCRIPT**

1  Obviously, we have a lot to do.  I do think this is a really

2  good case, and we want to get it moved along.  We know it's

3  important to both sides.  So thank you all very much.  And,

4  Mr. Sample, we have another matter that we're going to have

5  to start work on right away.  Anything else?  Mr. Sample, you

6  can put us in adjournment.

7            CASE MANAGER:  No, Your Honor.  This Court stands

8  in recess.

9            THE COURT:  We are in recess.  Thank you all very

10 much.

11            MS. SWEENEY:  Thank you, Your Honor.

12            MR. MASTERS:  Thank you, Your Honor.

13            (Adjournment.)

14

15

16

17

18

19

20

21

22

23

24

25

42

1          **C E R T I F I C A T E**

2

3

4          I, TINA DuBOSE GIBSON, do hereby certify that the

5   foregoing 41 pages are, to the best of my knowledge, skill

6   and abilities, a true and accurate transcript from my

7   stenotype notes of the scheduling conference hearing held on

8   the 3rd day of April, 2023, in the matter of:

9

10  QORVO, INC.

11  vs.

12  AKOUSTIS TECHNOLOGIES, INC. AND AKOUSTIS, INC.

13

14

15  Dated this 6th day of April, 2023.

16

17

18

19                    S/Tina DuBose Gibson

20                    _____
                      TINA DuBOSE GIBSON, RPR
                      Official Court Reporter
21                    United States District Court
                      Western District of Tennessee
22

23

24

25

**UNREDACTED TRANSCRIPT**