AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | | |
|---|---|---|
| QORVO, INC. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:21-cv-01417-JPM |
| AKOUSTIS TECHNOLOGIES, INC. and AKOUSTIS, INC. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                     Alan Nicol

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Appendix A

| Place: Sheppard, Mullin, Richter & Hampton LLP<br>12275 El Camino Real, Suite 100<br>San Diego, CA  92130-4092 | Date and Time:<br><br>08/23/2023 9:00 am |
|---|---|

The deposition will be recorded by this method:    Audio, video and stenographic

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Appendix B

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        08/08/2023

                    *CLERK OF COURT*

                                                                OR

_____                    /s/Robert M. Masters
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Plaintiff, Qorvo, Inc.                                                          , who issues or requests this subpoena, are:

Robert M. Masters, Sheppard Mullin Richter & Hampton, LLP; 2099 Pennsylvania Ave., NW, Suite 100, Washington, DC 20006-6801; rmasters@sheppardmullin.com; (202) 747-1900

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:21-cv-01417-JPM

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Print     Save As...     Add Attachment     Reset

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A) *Appearance Not Required.*** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B) *Objections.*** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***

   **(A) *When Required.*** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B) *When Permitted.*** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C) *Specifying Conditions as an Alternative.*** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A) *Documents.*** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B) *Form for Producing Electronically Stored Information Not Specified.*** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C) *Electronically Stored Information Produced in Only One Form.*** The person responding need not produce the same electronically stored information in more than one form.
   **(D) *Inaccessible Electronically Stored Information.*** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
   **(A) *Information Withheld.*** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B) *Information Produced.*** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff Qorvo, Inc. ("Qorvo") requests that Alan Nicol produce the documents, information, and things set forth below.  The requested documents, information, and things are to be produced on or before August 22, 2023 to Eric K. Gill, Sheppard, Mullin, Richter & Hampton LLP, 12275 El Camino Real, Suite 100, San Diego, CA  92130-4092 at 9:00 AM or at such other place and time as may be agreed by counsel. A copy of the Protective Order entered in this action for the protection of any requested proprietary, confidential, or commercially sensitive information is attached hereto as Exhibit C.

### DEFINITIONS

1.      As used herein, "Alan Nicol," "Nicol," "You," or "Your" means Alan Nicol and any investigator, attorney, accountant, representative, or other Person acting or purporting to act on Alan Nicol's behalf.

2.      As used herein, "Qorvo" means Qorvo, Inc., and all of its predecessors (merged, acquired, or otherwise), successors, subsidiaries, parents, sisters, divisions, departments, partnerships, and affiliates thereof, and all officers, directors, principals, agents, employees, attorneys, and other persons action on its behalf.

3.      As used herein, "Akoustis" means, individually and collectively, Akoustis Technologies, Inc., Akoustis, Inc., and all of their predecessors (merged, acquired, or otherwise), successors, subsidiaries, parents, sisters, divisions, departments, partnerships, and affiliates thereof, and all officers, directors, principals, agents, employees, attorneys, and other persons action on their behalf.

4.      As used herein, "Confidential Information" means commercial information relating to Qorvo's business that is not or was not intended to become publicly available.

1

5.      "The Present Action," as used herein, means *Qorvo, Inc. v. Akoustis Technologies, Inc. et al.*, No. 1:21-cv-1417-JPM pending in the United States District Court for the District of Delaware.

6.      "The Second Amended Complaint," as used herein, means Qorvo's second amended complaint filed in the Present Action on February 8, 2023 (D.I. 125).

7.      The words "and" and "or," as used herein, shall be construed either conjunctively or disjunctively, as required by the context, to bring within the scope any information which might be deemed outside the scope by any other construction.

8.      As used herein, "any" and "all" shall be construed to mean "each and every," so as to acquire the broadest possible meaning.

9.      As used herein, "each" and "every" mean "each and every."

10.      As used herein, "include" and "including" shall be construed to mean "without limitation," so as to acquire the broadest possible meaning.

11.      As used herein, "identify" as applied to an event means to provide a description of the event, the date of the event, the location of the event, and the individuals and entities participating in the event.

12.      As used herein, "Document(s)" has the same broad meaning as in Rule 34 of the Federal Rules of Civil Procedure, including, without limitation, all written, graphic or otherwise recorded material, including without limitation, microfilms or other film records or impressions, electronically stored information regardless of the form of storage medium, tape recordings or computer cards, floppy disks or printouts, any and all papers, photographs, films, recordings, memoranda, books, records, accounts, communications, letters, telegrams, correspondence, notes of meetings, notes of conversations, notes of telephone calls, inter-office memoranda or written

communications of any nature, recordings of conversations either in writings or upon any mechanical or electrical recording devices, including email, notes, papers, reports, analyses, invoices, canceled checks or check stubs, receipts, minutes of meetings, time sheets, diaries, desk calendars, ledgers, schedules, licenses, financial statements, telephone bills, logs, and any differing versions of any of the foregoing, whether so denominated, formal, informal or otherwise, as well as copies of the foregoing which differ in any way, including by the addition of handwritten notations or other written or printed matter of any nature, from the original. The foregoing specifically includes information stored in a computer database and capable of being generated in documentary form, such as electronic mail.

13.     As used herein, "Communication(s)" means, without limitation, any transmission, conveyance or exchange of a word, statement, fact, thing, idea, document, instruction, information, demand or question by any medium, whether by written, oral or other means, including but not limited to, electronic communications, electronic mail (including but not limited to electronic mail from or to any of your personal electronic mail accounts), text messages, and chat messages.

14.     As used herein, "reflect," "reflecting," "relate to," "refer to," "relating to," and "referring to" mean relating to, referring to, concerning, mentioning, reflecting, pertaining to, evidencing, involving, demonstrating, describing, discussing, commenting on, comprising, embodying, responding to, supporting, contradicting, containing, and/or constituting (in whole or in part), as the context makes appropriate.

15.     "Person" or "Persons," as used herein, means any natural person, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

16.     Except as specifically provided herein, words imparting the singular shall include the plural and vice versa.

## INSTRUCTIONS

1.      Pursuant to any requests herein, You are to produce any and all relevant Documents within Your possession, custody, or control, including Documents located in the files of any and all of Persons who acted at any time or who are currently acting on Your behalf.

2.      Produce each Document in its entirety without deletions, redactions, or exclusions, regardless of whether you deem part of a Document outside of the scope of the Requests.

3.      Produce Documents that identify the file or other source in which each Document responsive to these Requests is found or keep a record of such information.

4.      Documents from any single file should be produced in the same order as they were found in such file, including any labels, files, folders, and/or containers in in which such Documents are located or with which such Documents are associated.  If copies of Documents are produced in lieu of the originals, such copies should be legible and bound or stapled in the same manner as the originals.

5.      All Documents that constitute electronically stored information, with that term having the meaning ascribed to it by the Federal Rules of Civil Procedure, shall be produced in an intelligible format.

6.      If a Document once existed, but has been lost, destroyed, erased, or otherwise is no longer in your possession, identify the Document and state the details concerning the loss or destruction of such Document, including the name and address of the present custodian of any such Document known to You.

7.      If, after conducting a reasonable investigation, a full answer cannot be provided for any request for the production of Documents, state that such is the case and answer to the fullest extent possible, stating what responsive Documents or information are available, what

Documents or information cannot be provided, and what efforts were made to obtain the unavailable Documents or information.

8.      If any of the Documents requested herein are no longer in Your possession, custody, or control, identify for each such Document the date, the type of the Document, any senders and recipients, and any persons receiving any copies of each such Document, and provide a summary of each such Document's pertinent contents.

9.      If any Document responsive to these Requests has been destroyed, describe the contents of the Document, identify the location of any copies of the Document, and the date of destruction of the Document.

10.      If any Document is withheld on a claim of attorney/client privilege or work product immunity, provide a detailed privilege log that describes the nature and basis for your claim and the subject matter of the Document withheld, in a manner sufficient to disclose facts upon which You rely in asserting your claim and to identify the grounds and reasons for withholding the Document.  Such description should, at a minimum, include the date of the withheld Document, an identification of each and every author of the Document, an identification of each and every person who received the Document, an identification of each and every person from whom the Document was received, a description of the subject of the Document, and further information relating to the Document sufficient to explain the claim of privilege or immunity and to permit the adjudication of the propriety of that claim.

11.      The Document requests herein shall be deemed continuing, and it is requested that You provide supplemental responses and production as additional information or documents become available, in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

12.     If a Document is in a language other than English and an English translation exists, provide both Documents.

## DOCUMENTS TO BE PRODUCED

1.      All Documents and Communications relating to Akoustis hiring, engaging or contracting You, or attempting to hire, engage or contract You, to perform any services for or on behalf of Akoustis, including but not limited to all offers and agreements for You to work and/or perform services for or on behalf of Akoustis.

2.      All Documents and Communications concerning Your role, job description, terms of employment or engagement, or responsibility at Akoustis, including but not limited to any services You performed for or on behalf of Akoustis.

3.      All Documents and Communications constituting, referring or relating to any agreement You and Akoustis entered into.

4.      All Documents and Communications involving the email address of glenview_7@yahoo.com concerning Qorvo or Akoustis, including but not limited to all Documents attached to emails to or from glenview_7@yahoo.com.

5.      All Documents and Communications referring to the technical knowledge of current or former Qorvo employees in connection with You or Akoustis hiring, attempting to hire, potentially hiring, or considering hiring such employees.

6.      All Documents and Communications listing or identifying current or former Qorvo employees who You or anyone at Akoustis were considering recruiting for employment by Akoustis, regardless of whether such employees were offered a position with Akoustis, and all Documents and Communications relating or referring to the foregoing Documents and Communications.

7.      All Documents and Communications including, containing, and/or referring expressly or impliedly to, Confidential Information.

8.      All Documents bearing the word "Qorvo," including but not limited to Documents bearing the words "confidential" and/or "proprietary" and/or any other designation indicating that Qorvo intended the Documents to be non-public, confidential, and/or proprietary, and all Communications relating or referring to such Documents.

9.      All Documents and Communications relating or referring to efforts by any person to obtain or use Confidential Information while You were employed by, or working for, Akoustis or when you were considering working for Akoustis.

10.     All Communications between You when employed by, or working for, Akoustis and Persons who were employed by Qorvo at the time of the Communications.

11.     All Documents and Communications relating to steps taken by You to store any Qorvo Documents on a person device or share drive while you were employed by Qorvo.

12.     All Documents and Communications relating to steps taken by You, after your employment with Qorvo ended, to keep any hard copies of Qorvo Documents obtained while you were employed by Qorvo.

13.     All Documents and Communications relating to You deciding to use or considering using information You accessed or otherwise obtained using Qorvo's computer systems, where such deciding or considering occurred while you were employed by, or working for, Akoustis or when you were considering working for Akoustis.

14.     All Documents obtained directly or indirectly from Qorvo and all Communications relating to such Documents.

15.     All Documents referring to Qorvo explicitly or implicitly and all Communications relating to such Documents.

16.     All Documents and Communications relating to the allegations that Qorvo has asserted against Akoustis in the Second Amended Complaint, attached hereto as Exhibit B.

**<u>EXHIBIT B</u>**
(Second Amended Complaint)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417(JPM) |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | **DEMAND FOR JURY TRIAL** |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a)(2) and this Court's Order granting Plaintiff, Qorvo, Inc. ("Plaintiff" or "Qorvo")'s unopposed motion for leave, Qorvo, by and through its attorneys, submits this Second Amended Complaint and brings this action for damages, injunctive relief and declaratory relief against Akoustis Technologies, Inc. and Akoustis, Inc. (collectively, "Defendants" or "Akoustis") and alleges as follows:

## I. NATURE OF THE ACTION

1.     This is an action for patent infringement, false advertising, false patent marking, unfair competition, trade secret misappropriation, racketeering, and civil conspiracy, respectively arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, the Lanham Act, 15 U.S.C. § 1125, the Defense of Trade Secrets Act ("DTSA") (18 U.S.C. § 1832, *et seq.*), the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, *et seq.*), the North Carolina Trade Secrets Protection Act (N.C. Gen. Stat § 66-152, *et seq.*), and civil conspiracy laws of the state of North Carolina.

## II.   PARTIES

2.      Plaintiff is a Delaware corporation with its principal place of business at 7628 Thorndike Road, Greensboro, North Carolina 27409.

3.      Defendant Akoustis Technologies, Inc. is a Delaware corporation with its principal place of business at 9805 Northcross Center Court, Suite A, Huntersville, North Carolina, 28078. The Delaware registered agent for Akoustis Technologies, Inc. is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

4.      Defendant Akoustis, Inc. is a Delaware corporation with its principal place of business located at 9805 Northcross Center Court, Suite A, Huntersville, North Carolina, 28078. The Delaware registered agent for Akoustis, Inc. is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

## III.  JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Qorvo's patent infringement and false marking claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), because they arise under the laws of the United States, specifically those relating to the infringement of U.S. patents, 35 U.S.C. § 1, *et seq*.

6.      This Court has subject matter jurisdiction over Qorvo's Lanham Act claims pursuant to 28 U.S.C. § 1331, because they arise under the laws of the United States, specifically those related to the Lanham Act, 15 U.S.C. §§ 1051, *et seq*.

7.      This Court has subject matter jurisdiction over Qorvo's DTSA claims pursuant to 28 U.S.C. § 1331, because they arise under the laws of the United States, specifically those related to the DTSA, 18 U.S.C. § 1832, *et seq*.

8.     This Court has subject matter jurisdiction over Qorvo's RICO claims pursuant to 28 U.S.C. § 1964 and 28 U.S.C. § 1331, because they arise under the laws of the United States, specifically those related to the RICO, 18 U.S.C. § 1961 *et seq.*

9.     This Court also has supplemental jurisdiction over Qorvo's state law claims pursuant to 28 U.S.C. § 1367, because the supplemental state law claims arise out of the same case or controversy as the federal claims over which this Court has original jurisdiction.

10.     Akoustis is subject to this Court's personal jurisdiction, at least because Akoustis is incorporated, organized, and existing under the laws of the State of Delaware and has a registered agent in Wilmington, Delaware.

11.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b) at least because Akoustis resides in this district.

## IV.    **FACTUAL BACKGROUND**

### A.    **Qorvo**

12.     Qorvo is a leader in the development and commercialization of technologies and products for wireless and wired connectivity. Qorvo combines a broad portfolio of innovative radio frequency ("RF") solutions, highly differentiated semiconductor technologies, systems-level expertise and global manufacturing to supply to a diverse set of customers a broad range of products that enable a more connected world.

13.     Qorvo was formed on January 1, 2015 as a result of the merger between TriQuint Semiconductor ("TriQuint") and RF Micro Devices ("RFMD"), which were formed in 1985 and 1991, respectively. Qorvo is headquartered in Greensboro, North Carolina.

14.     Qorvo operates in a highly competitive industry characterized by rapid advances in technology and new product introductions. Qorvo's continued success therefore depends in substantial part on its constant attention to research and development and the creation of new

-3-

PUBLIC VERSION

technologies. Each year, Qorvo invests significant resources on research and development activities to develop the most innovative and highest quality products in the markets in which it operates, and to establish the most efficient, repeatable, and highest quality manufacturing processes to support those products.

15. Qorvo's success depends in part on its ability to improve its products and processes faster than its competitors, anticipate changing customer requirements, and successfully develop and launch new products while reducing costs.

16. As part of its research and development, Qorvo has produced, among other cutting-edge technologies, a wide range of novel technologies and processes directed to thin-film bulk acoustic wave (BAW) resonator filters.

17. BAW resonator filters, or BAW filters, are a vital component in advanced radio frequency filtering solutions for wireless devices, as well as the world's most advanced radar and communications systems. This is because wireless devices communicate in particularized frequency bands in the electromagnetic spectrum that are assigned by government entities to prevent interference between different devices and service providers. Thus, because devices using nearby frequencies could create interference, it is important to filter out signals, through BAW filters, from those frequencies that are irrelevant to a particular device (i.e., communications in frequency bands above or below that assigned to the device) to improve communications efficacy.

18. The rapid growth of wireless devices has created an increasing demand for bandwidth, resulting in different devices using immediately adjacent bands. Thus, filter effectiveness has become a critical requirement. Moreover, prior filter designs were relatively less effective for removing unwanted frequencies. Thus, demand for more effective filters has greatly increased.

-4-

19.     Qorvo's current BAW filter offerings are the result of many years of intensive, dedicated, and expensive research, design, development, testing, and refinement.

20.     Qorvo's BAW filters are industry leading.  Qorvo's BAW filters have been instrumental in awards received by Qorvo, including the 2015 Corporate Innovation Award (for its development of RF solutions, including BAW technology), the 2020 World Electronic Achievement Award (for Qorvo's QM28014 antennaplexer, which utilizes Qorvo BAW filters), and the 2020 GTI Innovative Breakthrough Award (for Qorvo's RF Fusion™ 5G chipset, which utilizes Qorvo BAW filters).  Qorvo's substantial research and development investment was (and remains) key to gaining its current position in the market and BAW filters enjoy competitive performance advantages because of such investment.

21.     Qorvo protects its investments in its technology and products, including its BAW filter products, by, among other things, maintaining information regarding its products as confidential and proprietary information and filing patent applications.

22.     Examples of Qorvo's confidential and proprietary information include, but are not limited to, technical expertise and know-how, such as BAW filter designs, specifications, development methods and techniques, material specifications, design tolerances, packaging, quality assurance and testing, manufacturing specifications, methods, and techniques; and business information, such as future product development and refinement plans, pricing information, cost information, marketing and sales strategies, internal organization structures, employee information, and capabilities, as well as supplier lists, customer lists, contracts, demands, desires, and requirements related to the BAW filters (together referred to herein as the "Qorvo BAW Proprietary Information").

23.     Qorvo takes a number of commercially reasonable steps to maintain the confidentiality of documents containing Qorvo BAW Proprietary Information. Exemplary steps include, but are not limited to: restricting access to confidential documents within its document storage and management systems, marking its confidential documents as confidential, causing its employees and other recipients of its confidential information to enter into agreements having non-disclosure obligations, and reminding employees of their obligation to return Qorvo's confidential materials and to otherwise keep secret confidential information of Qorvo's that may be retained in their unaided memory.

24.     Qorvo has also implemented device-based password protection, workspace-based password protections, role-based password protections, folder-based password protections, file-based password protections, and/or using IT systems to detect misuse and/or theft of confidential information.     Where appropriate, Qorvo takes steps to limit electronic access to certain confidential/proprietary documents and information to only authorized need-to-know Qorvo employees.

25.     Additionally, Qorvo's regular practice is to mark as "confidential" and/or "proprietary" any written materials containing Qorvo BAW Proprietary Information and/or other confidential information. The typical legend Qorvo uses to mark its documents recites "Qorvo™ Confidential & Proprietary Information." Qorvo's efforts to use this legend (or similar markings) are intended to serve as both a reminder to employees (or other recipients) that the materials are highly sensitive and subject to disclosure restrictions, and also to put unintended recipients and other third parties on notice that the content within the written materials are owned by Qorvo and should not be disseminated without authorization.

26. Additionally, Qorvo also provides its employees with a handbook detailing Qorvo's policy mandating that employees maintain the confidentiality of Qorvo BAW Proprietary Information and other confidential information. Further, among other steps, Qorvo enters into non-disclosure and other agreements with its employees obligating such employees not to disclose or use Qorvo BAW Proprietary Information or other confidential information without authorization and/or without making such disclosure subject to a non-disclosure or other similar agreement. Qorvo also enters into agreements with its employees that obligate them not to disclose or use Qorvo's confidential information after such time as the employees' employment with Qorvo is terminated. Upon an employee's termination, Qorvo also requests that the employee execute a document acknowledging the employee's agreement not to disclose Qorvo confidential information. Qorvo also enters into non-disclosure agreements or similar agreements with third parties (e.g., customers, suppliers, etc.) to impose non-disclosure obligations on the third parties as to Qorvo BAW Proprietary Information and other confidential information.

27. Qorvo has invested significant time, money and human capital in developing, maintaining, and protecting the Qorvo BAW Proprietary Information and other confidential information. The Qorvo BAW Proprietary Information and other confidential information described herein is strategic, proprietary information that is not generally known to the public and would not be ascertainable without the expenditure of substantial time, effort, and resources.

28. The Qorvo BAW Proprietary Information and other confidential information described herein has significant independent economic value, potential and actual, as a result of not being generally known or readily ascertainable, including by those in the industry. Qorvo's confidential information, including but not limited to the Qorvo BAW Proprietary Information and other confidential information described herein, gives Qorvo an advantage in attracting, recruiting,

-7-

and retaining talented employees that contribute to various aspects of Qorvo's business, including but not limited to the design, testing, production, and quality of its BAW filters and other products; and it gives Qorvo an advantage over competitors in more quickly, efficiently, and effectively designing, developing, modeling, simulating, testing, qualifying, manufacturing, marketing, selling, and supporting high quality BAW filters and other products. Qorvo protects its technology and products, including its BAW filter and other products, by, among other things, maintaining information regarding its products as confidential and proprietary.

29.     Qorvo's success depends in part on its ability to develop and improve its products and processes faster than its competitors, anticipate changing customer requirements, and successfully develop and launch new products while reducing cost. Akoustis' acquisition of, access to, disclosure and use of Qorvo's confidential information undermines, among other things, Qorvo's ability to do keep its competitive edge by being first to market (relative to its competitors, including Akoustis) with the highest quality filters and other products meeting customers' needs.

30.     Because sales in the BAW filter market are driven, in part, by how quickly the supplier can develop the filter meeting customers' ever increasing requirements, Qorvo BAW Proprietary Information, would be highly valuable to a startup company trying to enter the market, such as Akoustis. Indeed, acquiring Qorvo BAW Proprietary Information would enable a startup company to skip over many of the laborious, time-exhaustive and highly expensive trial and error processes required to design BAW filters to satisfy such requirements—processes that every other company has to endure to fairly compete. And while Qorvo BAW Proprietary Information would be highly valuable to any BAW filter market entrant, it is of particularly high value to a new market entrant that intends to offer products that directly compete with and provide a substitute for the precise BAW filters that Qorvo sells, and that were developed on the basis of the Qorvo BAW

-8-

Proprietary Information. Effectively, a startup could use Qorvo BAW Proprietary Information to unfairly advance its ability to compete earlier and more aggressively with market participants— and, as described below, Akoustis has done exactly that.

31.     To protect its valuable intellectual property, Qorvo also often seeks patent protection. Qorvo has applied for and has been awarded over 3,000 patents in the United States and abroad through its history (including through TriQuint and RFMD), and including hundreds of patents related to its BAW filter technology.

32.     Two of these patents, U.S. Patent Nos. 7,522,018 (the "'018 Patent") and 9,735,755 (the "'755 Patent") describe important structural features of BAW filters that enable the performance required by today's wireless devices. A copy of each patent (collectively, the "Patents-in-Suit") is attached hereto as Exhibits A (the '018 Patent) and Exhibit B (the '755 Patent).

33.     The '018 Patent (Exhibit A), entitled "Electro-Acoustic Resonator With A Top Electrode Layer Thinner Than A Bottom Electrode Layer," was duly and legally issued on April 21, 2009 from an application filed on December 4, 2003, naming Robert Milsom and Hans-Peter Löbl as the inventors.

34.     The '018 Patent claims priority to European Application No. 02258613, filed December 13, 2002.

35.     Qorvo owns, by assignment, all substantial right, title, and interest in and to the '018 Patent.

36.     Pursuant to 35 U.S.C. § 282, the '018 Patent is presumed valid.

37.     Claim 1 of the '018 Patent reads as follows:

  1. Electro-acoustic resonator (1, 8, 17) comprising a membrane structure
  FBAR (1) with a layer structure comprising a piezoelectric layer (5, 14, 24)

-9-

████████████████████████████████████████████

and a top (6, 15, 25) and a bottom (4, 13, 23) electrode layer, with the thickness (T1, T2, . . . T6) of the two electrode layers being unequal, characterised in that the top electrode layer (Tl, T3, TS) is thinner than the bottom (T2, T 4, T6) electrode layer to increase a filter bandwidth of the electro-acoustic resonator.

38.     The '755 Patent (Exhibit B), entitled "BAW Resonator Having Lateral Energy Confinement And Methods of Fabrication Thereof," was duly and legally issued on August 15, 2017 from an application filed on October 6, 2015, naming Gernot Fattinger and Alireza Tajic as the inventors.

39.     The '755 Patent claims priority to provisional application No. 62/207,702, filed August 20, 2015.

40.     Qorvo owns, by assignment, all substantial right, title, and interest in and to the '755 Patent.

41.     Pursuant to 35 U.S.C. § 282, the '755 Patent is presumed valid.

42.     Claim 9 of the '755 Patent reads as follows:

9. A BAW resonator comprising:

a piezoelectric layer;

a first electrode on a first surface of the piezoelectric layer;

a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer;

a passivation layer on a surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonator, the passivation layer having a thickness ($T_{PA}$) within the active region of the BAW resonator; and

one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator, the outer region of the BAW resonator being a region outside of the active

region of the BAW resonator and the one or more material layers having a
thickness that is n times the thickness ($T_{PA}$) of the passivation layer within
the active region, wherein:

n is a value other than 1; and

n is such that the outer region of the BAW resonator and the active region
of the BAW resonator are acoustically matched in such a manner that one
or more wavelengths that cause energy leakage into the outer region are not
excited in the active region.

43. Qorvo's considerable investment in the development, manufacturing, and
marketing of its BAW filters, as well as its efforts to maintain the confidentiality of the Qorvo
BAW Proprietary Information and patent other innovations related to its BAW filters—such as
through the Patents-in-Suit—has resulted in substantial sales for Qorvo in the BAW filter market.

44. Qorvo's business is also dependent on its ability to attract and keep key technical
personnel and management. Qorvo has invested substantial time, effort, and expense in
developing and training its employees' knowledge and experience in the areas crucial to Qorvo's
BAW filter technologies, including in RF engineering, integrated circuit and filter design, and
technical marketing and support.

**B. Akoustis**

45. Defendant Akoustis was founded in 2014 by Jeffrey B. Shealy, Steven P. Denbaars,
and Richard T. Ogawa.

46. Mr. Shealy was, from October 2001 through February 2014, a vice-president of
RFMD which, together with TriQuint, merged to become Qorvo in 2015. By virtue of his
leadership role at RFMD, Mr. Shealy had extensive knowledge of RFMD's and Qorvo's
operations, business strategies, patents, and personnel as of the date of his departure from Qorvo
to form Akoustis.

47.     Mr. Shealy also sits on Akoustis' Board of Directors, a majority of which are Ex-Qorvo employees.  Beyond Mr. Shealy, Co-Chairman Jerry D. Neal founded RFMD in 1991 and served in various leadership roles, including as Executive Vice President of Marketing and Strategic Development at the time of his departure.  Board member Arthur E. Geiss was Vice President of Wafer Fab Operations at RFMD until his departure.  Board member Suzanne Rudy was Vice President of Tax and Corporate Treasurer, Compliance Officer, and Assistant Secretary at Qorvo at the time of her departure.  Mr. Neal, Mr. Geiss, and Ms. Rudy had extensive knowledge of Qorvo's (including RFMD's) operations, business strategies, patents, and personnel as of their dates of departure.

48.     Akoustis was formed specifically to compete with Qorvo (and its predecessor companies) in the BAW filter market.  While Akoustis describes itself as being focused on "developing, designing, and manufacturing … RF filter products for the wireless industry," its current product offerings are narrowly limited to what it calls its "3-7 GHz BAW RF filter portfolio."

49.     Akoustis' "3-7 GHz BAW RF filter portfolio" currently includes twelve BAW filters.      *See*      ALL      PRODUCTS      -      AKOUSTIS      TECHNOLOGIES, https://akoustis.com/products/filters/applications/all-products/ (last visited Sept. 14, 2021).

50.     Akoustis' BAW filters compete with Qorvo's BAW filters.

51.     While Qorvo's design and development of BAW filters has taken many years and great expense, Akoustis was able to design and qualify its 3-7 GHz BAW RF filter portfolio from scratch in just a few years and with just a fraction of the number of Qorvo's employees and a fraction of the amount of Qorvo's research and development investment.  To do so, Akoustis

-12-

improperly leveraged Qorvo's intellectual property, including the Patents-in-Suit and the Qorvo BAW Proprietary Information, as obtained by its systematic poaching of Qorvo's employees.

52.     Akoustis built its 3-7 GHz BAW RF filter portfolio using Qorvo's patented technology. Each of Akoustis' BAW filters identified above infringes the Patents-in-Suit. Each of Akoustis' BAW filters uses the structural configurations disclosed and claimed by the Patents-in-Suit to provide the performance necessary to compete in the BAW filter market. On information and belief, Akoustis has been aware of Qorvo's patent portfolio throughout its existence, including specifically the Patents-in-Suit.

53.     On information and belief, Akoustis has also used the Qorvo BAW Proprietary Information to design, manufacture, market, and sell its BAW filters and other offerings, and to otherwise develop its technological know-how.

C.     **Akoustis' Poaching of Qorvo Employees**

54.     Since its inception, Akoustis has engaged in conscious, methodical, and systematic recruitment and solicitation of Qorvo's employees in all major areas. Indeed, and beyond a majority of its board being Ex-Qorvo employees, Akoustis has poached over twenty key employees, including crucial personnel from engineering, operations, sales, quality control and testing, packaging, and management.

55.     On information and belief, Akoustis recruited Ex-Qorvo employees for positions with largely overlapping responsibilities to their positions at Qorvo, focusing on employees with the specialized knowledge of Qorvo's confidential and proprietary information, including the Qorvo BAW Proprietary Information, that Akoustis needed at the particular stage of its development. For example, Qorvo focused on those Qorvo employees with business development and BAW filter design experience when it was initially defining and designing its products, and

-13-

then focused on those Qorvo employees with quality, manufacturing, and management expertise

as it moved from product design to manufacture and sales.

56. As examples, since its formation, Akoustis has poached Qorvo employees (the "Ex-

Qorvo BAW Employees") with the following job titles/descriptions.

| | Job Title | Job Description |
|---|---|---|
| 1 | Director, Business Development | developed, coordinated, and implemented plans designed to increase existing business and capture new opportunities |
| 2 | Device Engineer | evaluated and characterized high power and mm-wave GaN RF technologies; supported foundry customers in evaluation and selection of RFMD GaAs and GaN semiconductor processes; planned, implemented, and managed GaN device performance and reliability projects; generated production test plans for customer discrete FET and MMIC designs; developed and supported customer qualification tests |
| 3 | Plasma Process Engineer | analyzed BAW resonator electrical data and metrology data; developed new processes on plasma platforms; improved process reliability; demonstrated proficiency in design of experiment, statistical process control, and model based problem solving |
| 4 | Customer Quality Manager | managed customer concerns and ensured their satisfaction; traveled extensively to train local teams and to work with customers; lead team responsible for chemical compliance monitoring and reporting |
| 5 | Senior Tax Manager | managed all federal, foreign, and state & local income tax filings; managed audit activities; responsible for corporate cash planning, investment, and funds management; managed all sales and use and property tax functions for the US; and responsible for expatriate tax compliance |
| 6 | Senior Business Analyst, SAP IBP | managed implementation of SAP integrated business planning; supported planning team regarding demand and supply; assisted with revenue planning and margin analysis |
| 7 | Director of Infrastructure and Defense Packaging | evaluated current and future enterprise infrastructure needs |
| 8 | Senior BAW Design Engineer | responsible for the research and design of new BAW products and systems |
| 9 | Senior Planner | responsible for the execution of in-house and external prototype assembly |

-14-

| | Job Title | Job Description |
|---|---|---|
| 10 | Senior RF Test Engineer | responsible for hardware and software development for 2G/3G/4G power amplifiers; developed production test solutions; performed production line debug and efficiency optimization; performed product data analysis; and performed production |
| 11 | Senior Customer Quality Engineer | acted as the representative to premier customers; provided strategic direction and leadership; and knowledgeable in quality, design, supply chain, product engineering, sales, and marketing |
| 12 | Manager, BAW R&D, Technology | managed technology divisions and BAW research and development |

57. Each of the Ex-Qorvo BAW Employees identified above had routine and repeated access to one or more categories of the Qorvo BAW Proprietary Information.

58. On information and belief, numerous Ex-Qorvo BAW Employees who are now employed by Akoustis were aware of the Patents-in-Suit during their work at Qorvo. For example, the Ex-Qorvo BAW Employees include employees who formerly worked in the same department at Qorvo as the inventors of the Patents-in-Suit and those Ex-Qorvo BAW Employees now work in a similar department at Akoustis that is involved in developing the technology embodied in the Accused Products. As part of their former employment with Qorvo, these Ex-Qorvo BAW Employees would have been aware of the Patents-in-Suit. This knowledge then transferred to Akoustis when they became Akoustis employees.

59. Additionally, on information and belief, Akoustis has had knowledge of the Patents-in-Suit because a number of senior executives of Akoustis were executives at Qorvo (or one of its predecessor companies, such as RFMD) at the time when the Patents-in-Suit were issued or acquired. On information and belief, these former Qorvo executives had knowledge of the Patents-in-Suit in connection with their positions at Qorvo and brought that knowledge to Akoustis.

60.     The Ex-Qorvo BAW Employees entered into non-disclosure agreements as a condition of their employment. The non-disclosure agreements require the Ex-Qorvo BAW Employees not to use, take, or disclose Qorvo's confidential information, including the Qorvo BAW Proprietary Information, without authorization.

**D.     Akoustis Engages in Widespread Misappropriation of Qorvo's Trade Secrets**

61.     Akoustis has built its company based on the misappropriation of Qorvo BAW Proprietary Information and other confidential information, using that information to shortcut the hard work of building an innovative company and to shorten the typical time to market for new products in the relevant market.

62.     Discovery has confirmed the blatant and widespread nature of Akoustis' efforts to steal Qorvo's trade secrets and its actual use of the same throughout the company's operation. Indeed, this disregard for the propriety of Qorvo's trade secrets has been found in nearly every area of Akoustis' operations, with direct evidence of Qorvo's trade secrets being misappropriated at the highest of levels within the company, including but not limited the CEO of Akoustis, Jeffrey Shealy and other members of the executive team. Akoustis' files are littered with documents that are expressly marked as Qorvo's "Confidential" and "Proprietary" information. Akoustis employees unabashedly acknowledge in internal communications that certain documents are Qorvo's confidential files. Akoustis employees nonetheless used the confidential information. Akoustis employees even re-purposed a highly confidential Qorvo document by stripping-off the Qorvo confidentiality legend and inserting Akoustis' own logo on the Qorvo document. As set forth below, Qorvo has identified at least 86 trade secrets that Akoustis has misappropriated, and Qorvo believes that recent and ongoing discovery will show Akoustis' misappropriation of additional trade secrets.

-16-

63.     One of the primary means Akoustis used to misappropriate Qorvo BAW Proprietary Information and other confidential information was to strategically hire key Qorvo employees.  For example, Akoustis has poached the Ex-Qorvo BAW Employees for employment in positions with substantial responsibility overlap to those employees' previous roles at Qorvo. On information and belief, the Ex-Qorvo BAW Employees were hired for the specific purpose of using their knowledge of the Qorvo BAW Proprietary Information to permit Akoustis to compete directly against Qorvo for customers and market share.

64.     Akoustis has aggressively recruited Qorvo employees to obtain confidential information.  On several occasions, Akoustis proactively contacted employees with access to Qorvo BAW Proprietary Information—sometimes repeatedly—as part of this recruitment scheme. For example, in late 2020, an Akoustis engineering manager contacted a Qorvo Product Engineer through LinkedIn.  During a subsequent call, the Akoustis engineering manager expressly asked the Qorvo Product Engineer to disclose Qorvo BAW Proprietary Information. More specifically, the Akoustis engineering manager asked this Qorvo employee to access the corporate yield page on Qorvo's computer system and provide screen shots of information found on that page.  The corporate yield page is a repository for confidential information.  It reflects, for example, analytical tools Qorvo is using to assess its products, the parts that Qorvo is using, the tests that Qorvo is running on those parts, and the performance and failure rates of those parts.  There is no legitimate reason that Akoustis would ask a Qorvo employee to provide this type of confidential information as part of the recruitment process.  The Qorvo Product Engineer felt that Akoustis' request for the confidential information was unethical and reported the incident to a supervisor.

65.     The sheer number of highly-knowledgeable and qualified Qorvo employees poached by Akoustis over its history has resulted in Akoustis inevitably using their knowledge and

experience, including the Qorvo BAW Proprietary Information. It is highly probable—and on information and belief, inevitable—that Akoustis has used, relied upon, and exploited the Ex-Qorvo BAW Employees' knowledge of the Qorvo BAW Proprietary Information. In addition to their knowledge of and experience with Qorvo BAW Proprietary Information, these employees had been entrusted with access to documents containing Qorvo BAW Proprietary Information and other confidential information. Upon information and belief, during the time period prior to their departure from Qorvo and their joining Akoustis, these employees had a specific opportunity to improperly access and take Qorvo documents containing Qorvo BAW Proprietary Information and other confidential information, and the trade secrets within them, including for disclosure or use at Akoustis without the express or implied consent or authority of Qorvo. Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.

66. For example, in October 2019, Akoustis recruited Robert Dry. Mr. Dry was the Director of Qorvo's Infrastructure and Defense Packaging business. In that position, Mr. Dry had access and was aware of Qorvo BAW Proprietary Information, including but not limited to micro BAW processes used to shrink the size of filters. Mr. Dry also had access to confidential Qorvo documents reflecting Qorvo's trade secrets, including but not limited to Qorvo BAW Proprietary Information and other confidential information described herein. As Akoustis attempted to manufacture competing products, Akoustis was in need of the specific kind of confidential information known to Mr. Dry. This technology is not publicly available and is highly valuable. Mr. Dry was also a member of the patent committee at Qorvo and one of the persons who

-18-

determined whether inventions should be maintained as trade secrets or disclosed in patent applications. As such, Mr. Dry was in a position to have widespread knowledge of Qorvo BAW Proprietary information. On information and belief, Akoustis actively recruited Mr. Dry specifically because of his knowledge of Qorvo's proprietary information and placed him in the position of Vice President of Operations with the expectation that Mr. Dry would use Qorvo BAW Proprietary information to the benefit of Akoustis, including micro BAW technology.

67. After Akoustis targeted and hired him, Mr. Dry, in breach of his obligations to Qorvo, distributed confidential Qorvo documents within Akoustis, including but not limited to documents relating to the manufacture of Qorvo's BAW filters, such as documents concerning assembly, packaging, and inspection of BAW filters and documents relating to customer requirements for such BAW filters. Upon information and belief, Mr. Dry took the Qorvo documents without authorization while he was employed by Qorvo. The confidential Qorvo documents Mr. Dry stole and shared with Akoustis were expressly marked confidential, and contained trade secret information. For at least this reason, Mr. Dry knew or should have known that the information in such documents included one or more Qorvo trade secrets and that he was not authorized to distribute the documents to Akoustis personnel. Nevertheless, Mr. Dry distributed confidential Qorvo documents in response to requests from other Akoustis employees. Upon information and belief, Akoustis then used the confidential Qorvo documents in connection with developing BAW filters that compete with Qorvo's products. As the Vice President Operations and Test at Akoustis, Mr. Dry is one of just ten members of Akoustis' "management team."

68. By way of further example, in November 2020, Akoustis recruited David Breton. Mr. Breton was a Manager of BAW Research and Development at Qorvo. In that position, Mr.

Breton had access to and was aware of Qorvo BAW Proprietary Information, including but not limited to how Qorvo filters achieve superior performance in high frequency bands (5-7 GHz). Mr. Breton was also knowledgeable about the customized, proprietary, and highly confidential tools used by the Developmental Physics Team at Qorvo to perform simulations as part of the technology development process. As Akoustis is engaged in designing, developing and manufacturing competing products in the 5-7 GHz frequency band, Akoustis was in need of the specific kind of confidential information known to Mr. Breton. The Qorvo BAW Proprietary Information known to Mr. Breton is not publicly available and is highly valuable. On information and belief, Akoustis actively and specifically recruited Mr. Breton and placed him in the position of Manager with the expectation that Mr. Breton would use Qorvo BAW Proprietary Information, including confidential information concerning how Qorvo simulates and achieves improved performance in its BAW filters, to the benefit of Akoustis.

69. By way of further example, in November 2019 Akoustis recruited Guillermo Moreno. Mr. Moreno was a Senior BAW Design Engineer at Qorvo. In that position, Mr. Moreno had access to and was aware of Qorvo BAW Proprietary Information, including but not limited to how Qorvo BAW filters achieve superior performance. The Qorvo BAW Proprietary Information known to Mr. Moreno is not publicly available and is highly valuable. As Akoustis engaged in designing, developing and manufacturing competing BAW products, Akoustis was in need of the specific kind of confidential information known to Mr. Moreno. On information and belief, Akoustis actively recruited Mr. Moreno and placed him in the position of Design Engineering Manager with the expectation that Mr. Moreno would use Qorvo BAW Proprietary information to the benefit of Akoustis.

70.     By way of further example, in May 2020 Akoustis recruited William Schmid. Mr. Schmid was a Senior RF Test Engineer at Qorvo. In that position, Mr. Schmid had access to and was aware of Qorvo BAW Proprietary Information, including but not limited to the proprietary procedures and software libraries that Qorvo uses to test products. The Qorvo BAW Proprietary Information known to Mr. Schmid is not publicly available and is highly valuable. In its business cycle, Akoustis was in need for someone specifically having knowledge of Qorvo's confidential and proprietary information relating to testing of BAW filters. Accordingly, on information and belief, Akoustis actively recruited Mr. Schmid and placed him in the position of Operations Test Senior Manager with the expectation that Mr. Schmid would use Qorvo BAW Proprietary information, including Qorvo's testing procedures and information concerning Qorvo's software libraries.

71.     By way of further example, in July 2020, Akoustis recruited Kindra Lane. Ms. Lane was a Senior NPI Planner at Qorvo. In that position, Ms. Lane worked on new product development and was responsible for worldwide logistics. Ms. Lane had access to and was aware of Qorvo BAW Proprietary Information, including but not limited to Qorvo's EFC modeling tool, which is a secret and confidential estimation process Qorvo has built to estimate costs for products. Ms. Lane was also aware of Qorvo's confidential internal financial targets and mid- and long-term plans, proprietary cost issues relating to the manufacture of BAW filters, and the identities of Qorvo's critical vendors. The Qorvo BAW Proprietary Information known to Ms. Lane is not publicly available and is highly valuable. Akoustis was in specific need of the Qorvo BAW Proprietary Information known to Ms. Lane, including Qorvo's proprietary modeling processes and information related to sourcing components and materials from world-wide suppliers critical to the manufacture of BAW filters. Accordingly, on information and belief, Akoustis actively and

-21-

specifically recruited Ms. Lane and placed her in the position of Operations Planning Manager with the expectation that Ms. Lane would use Qorvo BAW Proprietary information, including information concerning Qorvo's EFC modeling tool, financial targets, vendors, and mid- and long-term plans to the benefit of Akoustis.

72.     By way of further example, in April 2019 Akoustis recruited Wendy Wright. Ms. Wright was a Senior Business Analyst at Qorvo. In that position, Ms. Wright was responsible for implementing and customizing Qorvo's integrated business planning ("IBP") system. Ms. Wright had access to and was aware of Qorvo BAW Proprietary Information, including but not limited to Qorvo's customized IBP system and Qorvo's proprietary process for generating "what if" scenarios to analyze demand and supply. The Qorvo BAW Proprietary Information known to Ms. Wright is not publicly available and is highly valuable. On information and belief, Akoustis actively recruited Ms. Wright and placed her in the position of Global Planning Manager with the expectation that Ms. Wright would use Qorvo BAW Proprietary information, including information concerning Qorvo's IBP system and "what if" analysis to the benefit of Akoustis.

73.     By way of further example, in August 2020 Akoustis recruited Paul Makowenskyj. Mr. Makowenskyj was a Senior Customer Quality Engineer at Qorvo. In that position, Mr. Makowenskyj  had access to and was aware of Qorvo BAW Proprietary Information, including but not limited to Qorvo's product pipeline, the performance and requirements for those products, and Qorvo's interactions with customers relating to quality issues of BAW filters. The BAW Proprietary Information known to Mr. Makowenskyj is not publicly available and is highly valuable. On information and belief, Akoustis was in specific need of the Qorvo BAW Proprietary Information known to Mr. Makowenskyj, and therefore actively recruited Mr. Makowenskyj  and placed him in the position of Staff Quality Engineer with the expectation that Mr. Makowenskyj

would use Qorvo BAW Proprietary Information, including information concerning Qorvo's product pipeline, the performance and requirements for those products, and Qorvo's customers, for the benefit of Akoustis.

74.     The former Qorvo employees identified in the preceding paragraphs are only recent examples of Akoustis' efforts to raid Qorvo employees to obtain confidential information that would allow Akoustis to short-cut its entry into the BAW filter market.  In addition to the former Qorvo employees listed above, Akoustis has also hired at least the following employees away from Qorvo: Tony Espinoza, Ali-Imran Bawangaonwala, Todd Bender, Shawn Gibb, David Hodge, Rohan Houlden, Joonbum Kwon, John Myrick, and Ya Shen.  On information and belief, each of these former Qorvo employees had access to Qorvo BAW Proprietary Information that would benefit Akoustis.

75.     After Rohan Houlden left Qorvo to join Akoustis, and in breach of his obligations to Qorvo, he distributed Qorvo confidential information and documents within Akoustis, including but not limited to documents relating to the assembly, packaging, inspection, branding, marketing and sales of Qorvo's BAW filters, documents containing intelligence reports prepared by Qorvo that include information regarding Qorvo's competitive position with its customers, feedback from Qorvo's customers, and market intelligence and strategy, and as well as documents containing Qorvo financial information, including salary information for substantially all of Qorvo's engineering roles.  By way of non-limiting example, Mr. Houlden stole and distributed within Akoustis some of Qorvo's confidential-marked test plan and product requirements documents for designing, developing, testing, and characterizing Qorvo's products, including but not limited to its BAW Filters.  In addition, Mr. Houlden stole and distributed within Akoustis and to Akoustis' third-party recruiters a confidential-marked Qorvo document containing comprehensive

compensation and job structure information for all of Qorvo's engineering and sales jobs in various important markets, including the United States. Upon information and belief, Mr. Houlden obtained such information and documents, among others, while employed by Qorvo and/or via unauthorized channels after leaving Qorvo to join Akoustis. Upon information and belief, on multiple occasions, Mr. Houlden solicited Qorvo confidential information and documents from individuals with access to such information in violation of confidentiality obligations and then distributed such information and documents within Akoustis. At least in part, Mr. Houlden also had access to the foregoing Qorvo confidential information via his prior employment with Qorvo. Upon information and belief, Akoustis then used the confidential Qorvo documents in connection with developing BAW filters that compete with Qorvo's products. As the Chief Product Officer at Akoustis, Mr. Houlden was one of approximately ten members of Akoustis' "management team."

76. Akoustis' Executive Vice President of Business Development and Corporate Officer, Dave Aichele, also distributed Qorvo confidential-marked documents on multiple occasions to others at Akoustis, including to Akoustis' CEO Jeffrey Shealy. Such confidential-marked documents relate to, for example, Qorvo's product roadmaps, BAW filter design and simulations, and confidential intelligence reports prepared by Qorvo that include sensitive information regarding Qorvo's competitive position with its customers, feedback from Qorvo's customers, and market intelligence and strategy. Mr. Aichele disseminated this information within Akoustis without Qorvo's permission or authorization. As former Qorvo employees, all of these Akoustis executives and officers were privy to the sensitivity and value of the trade secret information in these confidential Qorvo documents, and knew or should have known that Akoustis was not authorized to acquire, access, disclose, disseminate, or otherwise use the same and that doing so would harm Qorvo's competitive position.

-24-

Case 1:21-cv-04447-JPM Document 269-1 Filed 08/09/23 Page 39 of 190 PageID #: 8548

77.    Akoustis has also made public statements that indicate it has obtained Qorvo BAW Proprietary Information, including confidential information about Qorvo's product pipeline and development activities. For example, in a December 2021 issue of Wireless Watch, Akoustis' Vice President of Corporate Development stated that Akoustis WiFi 6E products will outperform future Qorvo WiFi 6E products: "Sepenzis claimed that Qorvo's BAW filter can only operate with a low temperature co-fired ceramic (LTCC) filter placed on top. He described the LTTC component was 'low performance,' noting that while it can cover the 5GHz and 6GHz bands, it cannot separate them so that they can be used simultaneously, which renders the addition of an extra band somewhat useless." Mr. Sepenzis did not provide any basis for his statement and Qorvo does not have a WiFi 6E 6GHz product on the market. As such, Mr. Sepenzis's statement about potential future Qorvo products is, on information and belief, based on Qorvo BAW Proprietary Information concerning Qorvo's development pipeline and prototyping process.

78.    In addition to the foregoing, in many cases Akoustis has misappropriated highly valuable trade secrets contained within sensitive Qorvo documents that are very clearly marked as Qorvo confidential and proprietary information. Upon information and belief, it obtained these documents through Ex-Qorvo employees it recruited. A sample of such Qorvo trade secrets, the documents they are reflected in, and the blatant misappropriations of the same at Akoustis are detailed below.

**Trade Secrets 1-18 (Exhibits C-1, C-2, C-3)**

79.    Through years of research and development, and at great expense, Qorvo developed trade secrets related to the manufacture and production of semiconductor devices, including the inspection of products such as wafers used for BAW filters, and procedures for inspection and rejection analysis of the same to reduce production delays and minimize waste. These trade secrets

-25-

existed ███████████████████████████ including as reflected in a confidential-marked Qorvo document attached hereto as Exhibit C-1 and bearing the bates label QORVO_00035002-069.

80.  Qorvo trade secrets contained in Exhibit C-1 include, but are not limited to: (a) ███

███████████████████████████████████████████

████████████████████ ("Trade Secret 1"), *see, e.g.,* Exhibit C-1, QORVO_00035007-013 at Sections 7.1.4-7.1.6; (b) ████████████████

████████████████████████████ ████████

████████████████ ("Trade Secret 2"), *see, e.g., id.;* ████████████

████████████████████ ("Trade Secret 3"), *see, e.g.,* Exhibit C -1, QORVO_00035007 at Section 7.1.2(1); (d) ██████████

███████████████████ ("Trade Secret 4"), *see, e.g.,* Exhibit C-1, QORVO_00035007 at Section 7.1.3; (e) ███████████████

████████████ ("Trade Secret 5"), *see, e.g.,* Exhibit C-1, QORVO_00035007-011 at Section 7.1.4; (f) █████████████████████████

("Trade Secret 6"), *see, e.g., id.;* (g) ██████████████████

████████████ ("Trade Secret 7"), *see, e.g.,* Exhibit C-1, QORVO_00035007-012 at Section 7.1.4-7.1.5; (h) ███████████████████████████

███████████████████████████ ("Trade Secret 8"); *see, e.g., id.;* (i) ████████████████████████ ("Trade Secret 9"), *see, e.g.,* Exhibit C-1, QORVO_00035012-013 at Section 7.1.6; (h) ████████████

████████ ("Trade Secret 10"), *see, e.g.,* Exhibit C-1, QORVO_00035007-014 at Section 7.1; (i)

██████████████████████████████████████



("Trade Secret 11"), *see, e.g.*, Exhibit C-1, QORVO_00035014-019 at Sections 7.2.1-7.2.2; (j) ("Trade Secret 12"), *see, e.g.*, Exhibit C-1, QORVO_00035019-020 at Section 7.2.3; (k) ("Trade Secret 13"), *see, e.g.*, Exhibit C-1, QORVO_00035020-21 at Section 7.2.4; (l) ("Trade Secret 14"), *see, e.g.*, Exhibit C-1, QORVO_00035021-23 at Section 7.2.5; (m) ("Trade Secret 15"), *see, e.g.*, Exhibit C-1, QORVO_00035023 at Sections 7.2.6; (n) ("Trade Secret 16"), *see, e.g.*, Exhibit C-1, QORVO_00035023 at Sections 7.2.7, (o) ("Trade Secret 17"), *see, e.g.*, Exhibit C-1, QORVO_00035030-059; and (p) ("Trade Secret 18") *see, e.g.*, Exhibit C-1, QORVO_00035024-027.

81. Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 1-18. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

82. As a result none of Trade Secrets 1-18 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 1-18 be determined through reverse engineering. Trade Secrets 1-18 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 1-18 create competitive value for Qorvo by enabling its manufacturing team to efficiently

-27-

and accurately inspect its products and determine whether such products have been manufactured to an acceptable standard. This information, in turn, informs Qorvo's engineers in making modifications and improvements to the manufacturing process to avoid the issues leading to unacceptable products. This enables Qorvo to, among other things, create more reliable and more robust products that can perform with greater resilience when deployed in real world environments, and gives Qorvo a competitive edge in the industry. In short, Trade Secrets 1-18 enable Qorvo to create products, including BAW filters, of a high level of quality that drives its business. Moreover, Trade Secrets 1-18 also create competitive value for Qorvo

thereby avoiding waste and saving resources to use elsewhere in the business. Trade Secrets 1-18 took Qorvo several years to develop, and cost Qorvo millions of dollars to create. By misappropriating Trade Secrets 1-18, Akoustis obtained an unfair advantage, including but not limited to obtaining a head start in its ability to produce and offer semiconductor products that realize the same efficiencies and cost savings, and to avoid failures resulting from missed quality considerations. Moreover, Akoustis avoided the great costs and expenses of developing its own inspection procedures and criteria through trial and error.

83. Akoustis misappropriated Trade Secrets 1-18 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that Trade Secrets 1-18 were acquired by improper means, including through at least one Ex-Qorvo employee who improperly disclosed Trade Secrets 1-18 with Akoustis personnel. At least because these Ex-Qorvo employees had access to Qorvo documents and trade secrets during their employment with Qorvo, such Ex-Qorvo employees had a specific opportunity to acquire the same for disclosure or

-28-

use without the express or implied consent or authority of Qorvo. Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.

84. ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████     ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████     ████████

████████████████████████████████

85. ████████████████████████████████████

████████████████████████████████████████

86.     Upon information and belief, in addition to acquiring, accessing, and disclosing Qorvo's trade secret information, Akoustis knowingly used and continues to use Qorvo's trade secret information to advance its business.

**Trade Secrets 19-24 (Exhibits D-1, D-2, D-3)**

87.     Through years of research and development, and at great expense, Qorvo developed trade secrets related to BAW filter testing. These trade secrets existed ███████████████ ████████████████████ including as reflected in a confidential-marked Qorvo document attached hereto as Exhibit D-1 and bearing the bates label QORVO_00035070-105.

88.     Qorvo trade secrets contained in Exhibit D-1 include, but are not limited to: (a) ████████████████████████████████████████████████████████████ ██████████████████ ( "Trade Secret 19"), *see* Exhibit D-1 at QORVO_00035084; (b) ████████████████████████████████████████████ ("Trade Secret

-30-



20"), *see* Exhibit D-1 at QORVO_00035084, 086;  (c)

( "Trade Secret 21"), *see*

Exhibit D-1 at QORVO_00035084-085, 079, 093; (d)

("Trade Secret 22"), *see* Exhibit D-1 at

QORVO_00035081, 087-088, 094; (e)               ("Trade Secret 23"), *see* Exhibit

D-1 at QORVO_00035084; and (f)

("Trade Secret 24"), *see* Exhibit D-1 at QORVO_00035098-105.

89.     Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 19-24. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

90.     As a result, none of Trade Secrets 19-24 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 19-24 be determined through reverse engineering.  Trade Secrets 19-24 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information.  Trade Secrets 19-24 create competitive value for Qorvo by

This

information, in turn, informs Qorvo's design engineers in improve their processes, identify new rejection/acceptance criteria, and to track and take preventative steps to avoid the issues resulting in a particular defect. This enables Qorvo to create more reliable and more robust BAW filters that can perform with greater resilience when deployed in real world environments, and giving Qorvo

-31-

a competitive edge in the industry. In short, Trade Secrets 19-24 enable Qorvo to create BAW filters of a high level of quality that drives its business. Trade Secrets 19-24 took Qorvo several years, and cost Qorvo millions of dollars to create. By misappropriating Trade Secrets 19-24, Akoustis obtained an unfair advantage, including but not limited to obtaining a head start in producing and offering competing BAW filters accounting for the same quality considerations. Moreover, Akoustis avoided the great costs and expenses of developing its own testing methods and criteria through trial and error.

91. Akoustis misappropriated Trade Secrets 19-24 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that Trade Secrets 19-24 were acquired by improper means, including through former Qorvo employees who improperly disclosed Trade Secrets 19-24 withing Akoustis and to its other employees (including officers and other executives at Akoustis).

-32-

92.     Upon information and belief, in addition to acquiring, accessing, and disclosing Qorvo's trade secret information, Akoustis knowingly used and continues to use the information to advance its business. █████████████████████████████████████████████

**Trade Secrets 25-29 (Exhibits E-1, E-2)**

93.     Through years of research and development, and at great expense, Qorvo developed trade secrets related to the manufacture and production of semiconductor devices, including but not limited to the inspection of products such as BAW filters. These trade secrets existed █████ ██████████████████████████ including as reflected in a confidential-marked Qorvo document attached hereto as Exhibit E-1 and bearing the bates label QORVO_00034983-5001.

94.     Qorvo trade secrets contained in Exhibit E-1 include, but are not limited to: (a) ████████████████████████████████████████████ ███████████████ ("Trade Secret 25"), *see* Exhibit E-1 at QORVO_00034984-985; (b) █ ███████████████████████████████ ("Trade Secret 26"), *see* Exhibit E-1 at QORVO_00034985-87; (c) ████████████████████ ("Trade Secret 27"), *see* Exhibit E-1 at QORVO_00034985-87; (d) ██████████ █████████████████████ ("Trade Secret 28"), *see* Exhibit E-1 at QORVO_00034986-88;

and (e) █████████████████████████████████████████████████████████

("Trade Secret 29"), *see* Exhibit E-1 at QORVO_00034988-5000.

95.     Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 25-29. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

96.     As a result, none of Trade Secrets 25-29 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 25-29 be determined through reverse engineering. Trade Secrets 25-29 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 25-29 create competitive value for Qorvo by enabling its manufacturing team to efficiently and accurately inspect its products and determine whether such products have been manufactured to an acceptable standard. This information, in turn, informs Qorvo's engineers in making modifications and improvements to the manufacturing process to avoid the issues leading to unacceptable products. This enables Qorvo to, among other things, create more reliable and more robust filters that can perform with greater resilience when deployed in real-world environments, and gives Qorvo a competitive edge in the industry. In short, Trade Secrets 25-29 enable Qorvo to create products, including BAW filters, of a high level of quality that drives its business and sets it apart from its competitors. Trade Secrets 25-29 took Qorvo several years, and cost Qorvo millions of dollars, to create. By misappropriating Trade Secrets 25-29, Akoustis obtained an advantage, including but not limited to obtaining a head start in producing and offering competing BAW filters and other products accounting for the same quality considerations. Moreover,

███████████████████████████████████████

Akoustis avoided the great costs and expenses of developing its own inspection procedures and criteria through trial and error.

97.     Akoustis misappropriated Trade Secrets 25-29 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing.  Akoustis and its employees knew or had reason to know that Trade Secrets 25-29 were acquired by improper means, including through at least one former Qorvo employee who improperly disclosed Trade Secrets 25-29 to Akoustis personnel. ████████████

98.     Upon information and belief, in addition to acquiring, accessing, and disclosing Qorvo's trade secret information, Akoustis knowingly used and continues to use the information to advance its business.

### Trade Secrets 30-32 (Exhibits F-1, F-2)

99.     Through years of research and development, and at great expense, Qorvo developed trade secrets related to implementation requirements for ███████████████   ███████████

create BAW filters of a high level of quality that drives its business. Trade Secrets 30-32 took Qorvo several years, and cost Qorvo millions of dollars, to create. By misappropriating Trade Secrets 30-32, Akoustis obtained an unfair advantage, including but not limited to obtaining a head start in producing and offering competing BAW filters accounting for the same quality considerations. Moreover, Akoustis avoided the great costs and expenses of developing its own reflow preconditioning procedure through trial and error.

102. Akoustis misappropriated Trade Secrets 30-32 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that Trade Secrets 30-32 were acquired by improper means, including through former Qorvo employees who improperly disclosed Trade Secrets 30-32 within Akoustis and to its employees.

███████████████████████████████████████████

103.     Upon information and belief, Mr. Dry doctored Qorvo's confidential document in
attempt to conceal his misappropriation and use of Qorvo confidential information. As stated
above, Mr. Dry is a former Qorvo employee who knew or had reason to know that Exhibits F-1
and F-2 contained Qorvo's trade secrets. Moreover, because Exhibit F-1 was marked as Qorvo's
"Confidential & Proprietary Information" and was, or at least a version of it was, shared by former
Qorvo employees having obligations of confidentiality to Qorvo, Akoustis and its employees knew
or should have known that Exhibits F-1 and/or F-2 were derived from or through a person who
owed a duty of non-disclosure to Qorvo.

104.     Upon information and belief, in addition to acquiring, accessing, and disclosing
Qorvo's trade secret information, upon information and belief, Akoustis knowingly used and
continues to use the information to advance its business. ████████████████████████

███████████████████████████████████████████████

### Trade Secrets 33-36 (Exhibits G-1, G-2, G-3)

105.     Through years of research and development, and at great expense, Qorvo developed
trade secrets related to implementation requirements for ████████████   ████████
████████████████████   These trade secrets existed ████████████████████
████████████   including as reflected in a confidential-marked Qorvo document attached hereto
as Exhibit G-1, ████████████████████████████████████████████
████████████████████████████████████.   Qorvo trade secrets contained
in Exhibit G-1 include, but are not limited to: (a) ████████████████████████

████████████████████████████████████████████

████████████████████████████████   ("Trade Secret 33"); *see* Exhibit G-1
at QORVO_00034926-30; (b) ████████████████████████████████████



("Trade Secret 34"), *see* Exhibit G-1 at QORVO_00034929; (c)

("Trade Secret 35"), *see* Exhibit G-1 QORVO_00034927-28; and (d)

("Trade Secret 36"), *see* Exhibit G-1 at QORVO_00034929-30.

106.    Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 33-36. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

107.    As a result, none of Trade Secrets 33-36 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 33-36 be determined through reverse engineering. Trade Secrets 33-36 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 33-36 create competitive value for Qorvo by enabling assembly, manufacturing, and engineering teams to produce BAW filters and other products that are more reliable and more robust and can perform with greater resilience when deployed in real-world environments, and giving Qorvo a competitive edge in the industry. In short, Trade Secrets 33-36 enable Qorvo to create BAW filters of a high level of quality that drives its business. Trade Secrets 33-36 took Qorvo several years, and cost Qorvo millions of dollars, to create. By misappropriating Trade Secrets 33-36, Akoustis obtained an unfair advantage, including but not limited to obtaining a head start in its ability to produce and offer competing BAW filters accounting for the same quality

-39-

considerations.  Moreover, Akoustis avoided the great costs and expenses of developing its own reflow preconditioning procedure through trial and error.

108.    Akoustis misappropriated Trade Secrets 33-36 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing.  Akoustis and its employees knew or had reason to know that Trade Secrets 33-36 were acquired by improper means, including through former Qorvo employees who improperly disclosed Trade Secrets 33-36 within Akoustis and to its employees.

109.    Upon information and belief, Mr. Dry doctored Qorvo's confidential document in attempt to conceal his misappropriation and use of Qorvo confidential information.  As stated above, Mr. Dry is a former Qorvo employee who knew or had reason to know that Exhibits G-1 and G-3 contained Qorvo's trade secrets.  Moreover, because Exhibit G-1 was marked as Qorvo's

"Confidential & Proprietary Information" and was, or at least a version of it was, shared by former Qorvo employees having obligations of confidentiality to Qorvo, Akoustis and its employees knew or should have known that Exhibits G-1 and/or G-3 were derived from or through a person who owed a duty of non-disclosure to Qorvo. In addition to acquiring, accessing, and disclosing Qorvo's trade secret information, upon information and belief, Akoustis knowingly used and continues to use the information to advance its business.

### Trade Secrets 37-46 (Exhibits H-1, H-2, H-3)

110. Through years of research and development, and at great expense, Qorvo developed trade secrets related to its QPF4551 product. . These trade secrets existed including as reflected in a confidential-marked Qorvo document attached hereto as Exhibit H-1 and bearing the bates label QORVO_00059418 ("Exhibit H-1"). Qorvo trade secrets contained in Exhibit H-1 include, but are not limited to: (a) ("Trade Secret 37"), *see* Exhibit H-1 at Overview sheet; (b) ("Trade Secret 38"), *see* Exhibit H-1; and (c) ("Trade Secret 39"), *see* Exhibit H-1.

111. Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 37-39. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

112. As a result, none of Trade Secrets 37-39 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 37-39 be determined through reverse engineering. Trade Secrets 37-39 derive independent economic

-41-

value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 37-39 create competitive value for Qorvo by enabling it design, manufacture, test, price, and sell its product according to acceptable standards. In short, Trade Secrets 37-39 enable Qorvo to create products of a high level of quality that drives its business. Trade Secrets 37-39 took Qorvo several years, and cost Qorvo millions of dollars, to create. By misappropriating Trade Secrets 37-39, Akoustis obtained an advantage, including but not limited to obtaining a head start in producing and offering products accounting for the same quality considerations. Moreover, Akoustis avoided the great costs and expenses of developing its own products.

113.    Akoustis misappropriated Trade Secrets 37-39 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that Trade Secrets 37-39 were acquired by improper means, including through at least one former Qorvo employee who improperly disclosed Trade Secrets 37-39 to Akoustis personnel.

-42-

██████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

114.    Mr. Houlden's email attached another confidential-marked Qorvo document

attached hereto as Exhibit H-3 and bearing the bates label AKTS_00145342 ("Exhibit H-3").

Qorvo invested great resources to create trade secrets reflected in ██████████████████

███████████████████████████████ Exhibit H-3, ███████████

██████████████████████████████ Such trade

secrets include, but are not limited to: (a) ██████████████████████

████████████████████ ("Trade Secret 40"); (b) ████████████████

██████████████████████████████████

████ ("Trade Secret 41"); (c) █████████████████████████

("Trade Secret 42"); (d) █████████████████████ ("Trade Secret 43");

(e) ██████████████████████████████████

("Trade Secret 44"); (f) ███████████████████████████

████ ("Trade Secret 45"); and (g) ███████████████████████

██████████████████████████████████

████ ("Trade Secret 46").

115.    Qorvo has taken and continues to take commercially reasonable steps to protect

Trade Secrets 40-46. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at

least in part by maintaining the confidentiality of documents containing such information.

116.    As a result, none of Trade Secrets 40-46 were or are generally known or readily

ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 40-46

be determined through reverse engineering. Trade Secrets 40-46 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 40-46 create competitive value for Qorvo by enabling it design, manufacture, test, price, and sell its product according to acceptable standards. In short, Trade Secrets 40-46 enable Qorvo to create products of a high level of quality that drives its business. Trade Secrets 40-46 took Qorvo several years, and cost Qorvo millions of dollars, to create. By misappropriating Trade Secrets 40-46, Akoustis obtained an unfair advantage, including but not limited to obtaining a head start in producing and offering products accounting for the same quality considerations. Moreover, Akoustis avoided the great costs and expenses of developing its own products.

117. Akoustis misappropriated Trade Secrets 40-46 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that Trade Secrets 40-46 were acquired by improper means, including through former at least one former Qorvo employee who improperly disclosed Trade Secrets 40-46 with Akoustis personnel. At least because these Ex-Qorvo employees had access to Qorvo documents and trade secrets during their employment with Qorvo, such Ex-Qorvo employees had a specific opportunity to acquire the same for disclosure or use without the express or implied consent or authority of Qorvo. Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.



118.

119.     Upon information and belief, in addition to acquiring, accessing, and disclosing Qorvo's trade secret information, Akoustis knowingly used and continues to use the information to advance its business.

**Trade Secrets 47-51 (Exhibits I-1, I-2, I-3, I-4, I-5)**

120.     Through years of research and development, and at great expense, Qorvo developed trade secrets relating to its QPD2593 product. These trade secrets existed ███████ ████████████████ including as reflected in a confidential-marked Qorvo document attached hereto as Exhibit I-1 and bearing the bates label QORVO_00035126-132. Qorvo trade secrets contained in Exhibit I-1 include, but are not limited to: (a) ███████ ████████ ("Trade Secret 47"), *see* Exhibit I-1 at QORVO_00035126-132; (b) ██ ███████████ ("Trade Secret 48"), *see* Exhibit I-1 at QORVO_00035127; (c) ███████████████ ("Trade Secret 49"), *see* Exhibit I-1 at QORVO_00035128; (d) ████████████ ("Trade Secret 50"), *see* Exhibit I-1 at QORVO_00035129-30; and (d) ████

("Trade Secret 51"), *see* Exhibit I-1 at

QORVO_00035131.

121.    Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 47-53. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

122.    As a result, none of Trade Secrets 47-51 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 47-51 be determined through reverse engineering. Trade Secrets 47-51 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 47-51 create competitive value for Qorvo by enabling it to assemble its product according to acceptable standards. In short, Trade Secrets 47-51 enable Qorvo to create a product of a high level of quality that drives its business. Trade Secrets 47-51 took Qorvo several years, and cost Qorvo millions of dollars, to create. By misappropriating Trade Secrets 47-51, Akoustis obtained an unfair advantage, including but not limited to obtaining a head start in producing and offering products accounting for the same quality considerations. Moreover, Akoustis avoided the great costs and expenses of developing its own products.

123.    Akoustis misappropriated Trade Secrets 47-51 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that Trade Secrets 47-51 were acquired by improper means, including through at least one former Qorvo employee who improperly disclosed Trade Secrets 47-51 with Akoustis personnel. At least because these Ex-Qorvo employees had access to Qorvo documents and trade secrets during their

-46-

employment with Qorvo, such Ex-Qorvo employees had a specific opportunity to acquire the same for disclosure or use without the express or implied consent or authority of Qorvo. Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.

124.

**Trade Secrets 52-63 (Exhibits J-1, J-2, J-3)**



125. Through years of research and development, and at great expense, Qorvo developed trade secrets relating to detailed ███████████████████████████████ ███████████████ ██████████████████████████. This intelligence included detailed promotion criteria for each job title through years of training employees and human resources analyses. These trade secrets existed ██████████████████████████, including as reflected in a confidential-marked Qorvo document attached hereto as Exhibit J-1 and bearing the bates label QORVO_00039655. Qorvo trade secrets contained in Exhibit J-1 include, but are not limited to: (a) ████████████████████████████ ("Trade Secret 52"); *see* Exhibit J-1, ██████████████; (b) ██████████████████████████ ██████████████ ("Trade Secret 53"), *see* Exhibit J-1, ██████████████; (c) ██████████████████████████████ ("Trade Secret 54"), *see* Exhibit J-1, ████████████████████; (d) ██████████████████████ ██████████ ("Trade Secret 55"), *see* Exhibit J-1, ██████████████████ ██████; (e) ██████████████████████ ("Trade Secret 56"), *see* Exhibit J-1 at "████████████████████ (f) ██████████████████████ ("Trade Secret 57"), *see* Exhibit J-1 at ██████████████████ ██████████ (g) ██████████████████████████ ("Trade Secret 58"), *see* Exhibit J-1 at ██████████████████; (h) ██████████████████ ██████████ ("Trade Secret 59"), *see* Exhibit J-1 at ██████████████ ██████████; (i) ██████████████████████ ("Trade Secret 60"), *see* Exhibit J-1 at ██████████████████ (j) ████████████ ██████████ ("Trade Secret 61"), *see* Exhibit J-1 at ██████████████



███████████ (k) ███████████████████████████ ("Trade Secret 62"),

*see* Exhibit J-1 at ████████ ; and (l) █████████████████████

█████████████ ("Trade Secret 63"), *see* Exhibit J-1 ██████████

126.    Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 52-63. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

127.    As a result none of Trade Secrets 52-63 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 52-63 be determined through reverse engineering. Trade Secrets 52-63 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 52-63 create competitive value for Qorvo by enabling Qorvo to strike a delicate balance between ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ In short, Trade Secrets 52-63 enable Qorvo to hire and retain highly competent employees who are critical to its business. Trade Secrets 52-63 took Qorvo several years, and cost Qorvo millions of dollars, to create. By misappropriating Trade Secrets 52-63, Akoustis obtained an unfair advantage, including but not limited to obtaining a head start in its ability to create an effective hiring process, internal performance evaluation manuals, and most importantly, effectively poach key Qorvo employees. Moreover, Akoustis avoided the great costs and expenses of losing employees, hiring employees without the necessary skillsets, and promoting ill-prepared employees, all avoidable only through many years of trial and error.

███████████████████████████████████████████

128.    Akoustis misappropriated Trade Secrets 52-63 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing.  Akoustis and its employees knew or had reason to know that 52-63 were acquired by improper means, including through former Qorvo employees who improperly disclosed Trade Secrets 52-63 within Akoustis and to its other employees. ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████    ████████████████████

█████████████████

### Trade Secrets 64-67 (Exhibits K-1, K-2, K-3)

129.    Through years of research and development, and at great expense, Qorvo developed trade secrets relating to its branding requirements and guidelines for marking its products ████ ██████████████████████████████████████. These trade secrets existed ████ ████████████████████████████ including as reflected in a confidential-marked Qorvo document attached hereto as Exhibit K-1 and bearing the bates label QORVO_00035135-



148 ("Exhibit K-1"). Qorvo trade secrets contained in Exhibit K-1 include, but are not limited to ▮ including with respect to (a) ▮ ▮ ("Trade Secret 64"), *see* Exhibit K-1 at QORVO_00035135-148; (b) ▮ ▮ ("Trade Secret 65"), *see* Exhibit K-1 at QORVO_00035135-148; (c) ▮ ▮ ("Trade Secret 66"), *see* Exhibit K-1 at QORVO_00035135-148; and (d) ▮ ▮ ("Trade Secret 67"), *see* Exhibit K-1 at QORVO_00035135-148.

130.    Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 64-67. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

131.    As a result, none of Trade Secrets 64-67 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 64-67 be determined through reverse engineering. Trade Secrets 64-67 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 64-67 create competitive value for Qorvo ▮ ▮ ▮ ▮. In short, Trade Secrets 64-67 enable Qorvo to create a product of a high level of quality and usability in the assembly process, that drives Qorvo's business. Trade Secrets 64-67

took Qorvo several years and cost Qorvo tens of thousands of dollars to create. By misappropriating Trade Secrets 64-67, Akoustis obtained an advantage, including but not limited to obtaining a head start in producing and offering products accounting for the same quality and usability considerations.

132.    Akoustis misappropriated Trade Secrets 64-67 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing.  Akoustis and its employees knew or had reason to know that Trade Secrets 64-67 were acquired by improper means, including through at least one former Qorvo employee who improperly disclosed Trade Secrets 64-67 with Akoustis personnel. At least because these Ex-Qorvo employees had access to Qorvo documents and trade secrets during their employment with Qorvo, such Ex-Qorvo employees had a specific opportunity to acquire the same for disclosure or use without the express or implied consent or authority of Qorvo.  Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.

133.

Upon information and
belief, in addition to acquiring, accessing, and disclosing Qorvo's trade secret information,
Akoustis knowingly used and continues to use the information to advance its business.

## Trade Secrets 68-85 (Exhibits L-1, L-2, L-3, L-4)

134.    Through years of research and development, and at great expense, Qorvo developed
trade secrets relating to BAW filters in development, including high-performance, high power
Bulk Acoustic Wave (BAW) band-pass filters with extremely steep skirts.

. Qorvo invested significant resources into developing



this BAW filter to enables, among other ███████████████████████████████

███████████████████████████████. The products under

development include filters with highly unique power handling capabilities that allow for

implementation into high-power applications. The trade secrets concerning these filters, their

applications, technical architecture and layout plans, and product roadmaps ██████████████

████████████████████, including as reflected in a confidential-marked Qorvo document

attached hereto as Exhibit L-1 and bearing the bates label QORVO_00034746-821. See also the

confidential-marked Qorvo document attached hereto as Exhibit L-2 and bearing the bates label

QORVO_00034822-896, and containing some overlapping content. Qorvo trade secrets contained

in Exhibit L-1 include, but are not limited to Qorvo's: (a) █████████████████████

████████████████████ ("Trade Secret 68"), see Exhibit L-1

at QORVO_00034758; (b) ████████████████████████ ("Trade

Secret 69"), see Exhibit L-1 at QORVO_00034759; (c) ████████████████████

████████ ("Trade Secret 70"), see Exhibit L-1 at QORVO_00034760; (d) ████

████████████████████████ ("Trade Secret 71"),

see Exhibit L-1 at QORVO_00034761; (e) ███████████████████████████

("Trade Secret 72"), see Exhibit L-1 at QORVO_00034762; (f) ████████████

███████████████████ ("Trade Secret 73"), see Exhibit

L-1 at QORVO_00034764; (g) ████ ███████████████████████ ████

█████ █████ █████ ████████ ("Trade Secret 74"), see Exhibit L-1 at

QORVO_00034766; (h) ███████████████████████████████████

████████████ ("Trade Secret 75"), see Exhibit L-1 at QORVO_00034770-73; (i)

████████████████████████████████████████████████



("Trade Secret 76"), *see* Exhibit L-1 at QORVO_00034775-76; (j)

("Trade Secret 77"), *see* Exhibit L-1 at QORVO_00034777, 790; (k)

("Trade Secret 78"), *see* Exhibit L-1 at QORVO_00034780-83; (l)

("Trade Secret 79"), *see* Exhibit L-1 at QORVO_00034784; (m)

("Trade Secret 80"), *see* Exhibit L-1 at QORVO_00034789; (n)

("Trade Secret 81"), *see* Exhibit L-1 at QORVO_00034790-91; (o)

("Trade Secret 82"), *see* Exhibit L-1 at QORVO_00034792-97; (p)

("Trade Secret 83"), *see* Exhibit L-1 at QORVO_00034799; (r)

("Trade Secret 84"), *see* Exhibit L-1 at QORVO_00034800-808; (r)

("Trade Secret 85"), *see* Exhibit L-1 at QORVO_00034816-820.

135.    Qorvo has taken and continues to take commercially reasonable steps to protect Trade Secrets 68-85. As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

136.    As a result, none of Trade Secrets 68-85 were or are generally known or readily ascertainable, nor can they be obtained through the public domain. Nor could Trade Secrets 68-85 be determined through reverse engineering. Trade Secrets 68-85 derive independent economic value from not being generally known to, and not being readily ascertainable through proper means



by, entities who can obtain economic value from the disclosure or use of the information. Trade Secrets 68-85 create competitive value for Qorvo by enabling it to mark and brand its

. In short, Trade Secrets 68-85 enable

. Trade Secrets 68-85

took Qorvo several years and cost Qorvo millions of dollars to create. By misappropriating one or more of Trade Secrets 68-85, Akoustis obtained an advantage, including but not limited to obtaining a head start in producing and offering products

137.    Akoustis misappropriated Trade Secrets 68-85 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that Trade Secrets 68-85 were acquired by improper means, including through at least one former Qorvo employee who improperly disclosed one or more of Trade Secrets 68-85 with Akoustis personnel. At least because these Ex-Qorvo employees had access to Qorvo documents and trade secrets during their employment with Qorvo, such Ex-Qorvo employees had a specific opportunity to acquire the same for disclosure or use without the express or implied consent or authority of Qorvo. Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.

-56-

138.

Upon information and belief, in addition to acquiring, accessing, and disclosing Qorvo's trade secret information, Akoustis knowingly used and continues to use the information to advance its business.

**Trade Secret 86 (Exhibits M-1, M-2)**

139.     Through years of research and development, and at great expense, Qorvo developed trade secrets relating to BAW filter simulation and performance data that informed its research, development, and competitive analysis in the BAW filter space. Qorvo invested significant resources into generating such data, identifying parameters/variables to modify to best understand underlying products associated with this data, and interpreting this data to inform the way it refines its products.  This data is highly sensitive. The trade secrets reflected in this data existed in the

form of, e.g., ███████████████████████ ███████████████

███████████████ ████████████

████████████████████████████ The trade

secrets arising out of Qorvo generated ██████ are collectively referred to herein as "Trade Secret

86." ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

140.    Qorvo has taken and continues to take commercially reasonable steps to protect
Trade Secret 86.  As set forth in paragraphs 1 through 29, Qorvo protects its trade secrets at least
in part by maintaining the confidentiality of documents containing such information.

141.    As a result, Trade Secret 86 was not or is not generally known or readily
ascertainable, nor can it be obtained through the public domain. Trade Secret 86 derives
independent economic value from not being generally known to, and not being readily
ascertainable through proper means by, entities who can obtain economic value from the disclosure
or use of the information.  Trade Secret 86 creates competitive value for Qorvo by enabling it to
evaluate its products at various points throughout the development process, and under different
conditions of unique interest, and refine their BAW filter designs to produce the most reliable and
highest performance filters relative to their competition.  In short, Trade Secret 86 enables Qorvo
to create a product of a high level of quality and usability that drives Qorvo's business.  Trade
Secret 86 took Qorvo considerable time and financial resource to create. By misappropriating

Trade Secret 86, Akoustis obtained an advantage, including but not limited to obtaining a head start in their competitive analysis and production of BAW filter products, among others, that account for the same performance and usability considerations that Qorvo learned through trial and error over an extensive period of time.

142. Akoustis misappropriated Trade Secret 86 by improperly acquiring, accessing, disclosing and using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that Trade Secret 86 were acquired by improper means, including through at least one former Qorvo employee who improperly disclosed Trade Secret 86 with Akoustis personnel. At least because these Ex-Qorvo employees had access to Qorvo documents and trade secrets during their employment with Qorvo, such Ex-Qorvo employees had a specific opportunity to acquire the same for disclosure or use without the express or implied consent or authority of Qorvo. Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.

143.

███████████████████████████████████████████████████

██████████████████████████████████████ Upon information and belief, in addition to acquiring,

accessing, and disclosing Qorvo's trade secret information, Akoustis knowingly used and

continues to use the information to advance its business.

### Additional Trade Secrets (Exhibits N-1)

144.    In addition to enumerated Trade Secrets 1–86, Qorvo has developed many other

highly valuable trade secrets ("Additional Trade Secrets"). Upon information and belief, Akoustis

has improperly acquired, accessed, disclosed and/or used such Additional Trade Secrets in

advancing its own business interests. Examples of this are attached hereto as Exhibit N-1, which

includes documents bearing the bates labels: AKTS_00156270, AKTS_00117498,

AKTS_00138229, AKTS_00138271, AKTS_00141631, AKTS_00151319, AKTS_00143669,

AKTS_00145340, AKTS_00146974, AKTS_00146974, AKTS_00167236; AKTS_00198676;

AKTS_00198680; AKTS_00198699; AKTS_00198718; AKTS_00198736; AKTS_00198755;

AKTS_00198821; AKTS_00198836; AKTS_00198854; AKTS_00198873; AKTS_00198944;

AKTS_00199018; AKTS_00199032; AKTS_00199035; AKTS_00199038; AKTS_00199040;

AKTS_00199042; AKTS_00199107; AKTS_00199110; AKTS_00199113 (collectively, "Exhibit

N-1").

145.    Qorvo has taken and continues to take commercially reasonable steps to protect the

Additional Trade Secrets, including as set forth in paragraphs 1 through 29.

146.    As a result the Additional Trade Secrets are not generally known or readily

ascertainable, nor can they be obtained through the public domain. Nor could the Additional Trade

Secrets be determined through reverse engineering. The Additional Trade Secrets derive

independent economic value from not being generally known to, and not being readily

ascertainable through proper means by, entities who can obtain economic value from the disclosure or use of the information. The Additional Trade Secrets create competitive value for Qorvo by, *inter alia*, enabling Qorvo to meet or exceed performance objective and requirements, to accelerate the research and development cycle, to avoid errors in future product builds, to reduce the amount of time between design and manufacture, to reduce waste and other expenditure of resources to achieve profitability targets, to attract and retain talent, to maintain the product quality that customers have come to associate with the "Qorvo" brand, and to isolate the reason why certain defects arise or certain failures are experienced with BAW filters. If misappropriated, a competitor could (and Akoustis did) avoid the great costs and expenses resulting from running a BAW filter business without these Additional Trade Secrets.

147.    Upon information and belief, Akoustis misappropriated the Additional Trade Secrets by improperly acquiring, accessing, disclosing and/or using such trade secrets for its own benefit. Upon information and belief, Akoustis' misappropriation is continuing. Akoustis and its employees knew or had reason to know that the Additional Trade Secrets were Qorvo's confidential information, at least on account of the "Confidential" and/or "Proprietary" marking on the documents containing these Additional Trade Secrets, and/or the nature of the content included within these documents. Moreover, Akoustis and its employees knew or had reason to know that the Additional Trade Secrets were acquired by improper means, including through former Qorvo employees who improperly shared such Additional Trade Secrets within Akoustis, knowing that the information was not authorized for such use.

148.    Accordingly, Akoustis has improperly built its 3-7 GHz BAW RF filter portfolio, and created related business opportunities, based on the Qorvo BAW Proprietary Information and confidential information, including trade secrets.

-61-

149.     The Akoustis employees who misappropriated Qorvo's trade secrets knew or had reason to know that the trade secrets, including confidential-marked documents, were acquired by improper means. For example, the Akoustis employees knew that they were not authorized to take confidential Qorvo documents and keep those documents after their employment with Qorvo terminated and knew that doing so violated and/or breached one or more agreements with Qorvo, among other things. In addition, Akoustis employees, including but not limited to Rohan Houlden, in soliciting Qorvo employees to divulge Qorvo confidential documents and information, knew or should have known that they were inducing Qorvo employees to breach their confidentiality agreements with Qorvo. Further, the Akoustis employees acquired confidential-marked Qorvo documents by theft, including by emailing the documents to a personal email account or downloading the documents from Qorvo's computer systems without authorization to use them in the intended manner or the manner in which they were used. Moreover, the Akoustis employees disclosed and/or used Qorvo's trade secrets without Qorvo's consent and in violation and/or breach of one or more agreements with Qorvo.

150.     Akoustis and Qorvo are direct competitors in the BAW filter market. Qorvo's trade secrets, including confidential-marked documents, were directly transferable for use by Akoustis. By way of non-limiting example, Akoustis took certain confidential-marked Qorvo documents as described above and re-purposed them to be used by Akoustis for essentially the same purpose for which they were used within Qorvo, including for the development and related activities of competing BAW filters.

151.     Akoustis' wrongful conduct alleged herein by their misappropriation of Qorvo's trade secrets has and will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Qorvo's business, and it could cause Akoustis to have improper

advantages, positions, and rights in the marketplace to Qorvo's detriment. Absent injunctive relief, Akoustis' further disclosure and use of Qorvo's trade secrets could irreparably harm Qorvo.

152. By using the Qorvo BAW Proprietary Information and other confidential information obtained according to the preceding paragraphs, Akoustis has gained an unfair advantage, enabling Akoustis to misappropriate trade secrets and to enter the BAW filter market more quickly than it could have without the Qorvo BAW Proprietary Information and/or other proprietary or confidential information of Qorvo.

153. On information and belief, Akoustis has used, continues to use, has inevitably used, or will inevitably use, the Qorvo BAW Proprietary Information obtained through Ex-Qorvo BAW Employees and confidential Qorvo documents (including the trade secrets reflected therein) in connection with Akoustis' design, development, manufacture, and qualification of its BAW filters.

**E.** **Akoustis Engages in False Advertising and False Patent Marking By Falsely Describing its BAW Filters as "Single-Crystal"**

154. Akoustis' unfair competition has also extended to making false and misleading statements about the characteristics of its BAW filters in an attempt to derive an unfair competitive advantage over competing products including Qorvo products.

155. Akoustis repeatedly promotes and asserts in advertisements, marketing and related materials including investor brochures that its BAW filters use "single-crystal" piezoelectric layers, which it refers to as "XBAW™ technology."

156. For example, this alleged differentiation is prominent on Akoustis' website blog, as shown below (*see* AKOUSTIS GOES LIVE – AKOUSTIS TECHNOLOGIES, https://akoustis.com/akoustis-goes-live/ (last visited Sept. 14, 2021)).

**Pioneering Next-Generation Materials**

At the core of our success lies the conceptualization, development, and manufacturing capabilities of patented XBAWTM technology and our high-purity piezoelectric materials.

Our next-gen materials allow for single-crystal bulk acoustic wave (BAW) high-band RF filters which utilize our advanced resonator-filter process technology to drive higher electro- mechanical coupling wider bandwidth RF filter solutions.

157.    Akoustis makes similar claims in its press releases, such as the Press Release related to the AKF-1938 Filter (*see* AKOUSTIS EXPANDS COMMERCIAL PRODUCT PORTFOLIO WITH NEW 3.8 GHZ BAW RF FILTER :: AKOUSTIS TECHNOLOGIES, INC. (AKTS), https://ir.akoustis.com/news-events/press-releases/detail/90/akoustis-expands-commercial-product-portfolio-with-new-3-8 (last visited Sept. 14, 2021)), as shown below.

The AKF-1938 is a high performance, ultra-small passband 3.8 GHz BAW RF filter designed for use in radar and RF transceiver applications. The filter wafers will be manufactured using Akoustis' new_proprietary_XB1_single-crystal_BAW_manufacturing_process which delivers high-performance RF filter solutions for frequencies up to 7 GHz. The AKF-1938 provides

158.    Further, in product datasheets for each of the twelve BAW filters identified above that are currently offered for sale on its website (*see* ALL PRODUCTS – AKOUSTIS TECHNOLOGIES, https://akoustis.com/products/filters/applications/all-products/ (last visited Sept. 14, 2021)), Akoustis states that the filters utilize "Akoustis' patented, XBAW technology which provides leading RF filter performance" and that U.S. Patent No. 10,256,786 (the "'786 Patent") covers that BAW filter.

159.    U.S. Patent No. 10,256,786 is titled "Communication Filter Using Single Crystal Acoustic Resonator Devices." The independent claims of U.S. Patent No. 10,256,786 define

piezoelectric layers, and the disclosure of U.S. Patent No. 10,256,786 and Akoustis' statements make clear that these recited piezoelectric layers are single-crystal.

160.     Akoustis relies on its descriptions of its filters as "single-crystal" and the related marking of those filters with U.S. Patent No. 10,256,786 to attract customers and prospective customers in conjunction with its claims that single-crystal piezoelectric materials drive superior performance as compared to polycrystalline technology, such as is used in competitor's BAW filters, including by Qorvo. However, Akoustis' BAW filter products are not "single crystal." They are polycrystalline.

### F.     Akoustis Engages In Unfair Competition By Promoting Its Infringing, Misappropriated, and Falsely Advertised Products to Qorvo Customers

161.     On information and belief, Akoustis has competed with Qorvo and has attempted to persuade Qorvo's customers to replace Qorvo BAW filters with Akoustis' BAW filters that: (i) infringe the Patents-in-Suit; (ii) were developed and manufactured with the Qorvo BAW Proprietary Information and Qorvo's trade secrets; and (iii) are falsely advertised as "single-crystal" and marked with U.S. Patent No. 10,256,786.

## V.     CLAIMS FOR RELIEF

### A.     Count I - Infringement of U.S. Patent No. 7,522,018 (the '018 Patent)

162.     Qorvo incorporates by reference the allegations of paragraphs 1 through 161 set forth above.

163.     Akoustis infringes the '018 Patent under 35 U.S.C. § 271(a), by making, using, selling, or offering for sale the 3-7 GHz BAW RF filter portfolio including, but not limited to its 5.2 GHz RF BAW filters (*i.e.,* AKF-1252), 5.6 GHz RF BAW filters (*i.e.,* AKF-1256), 3.6 GHz CBRS bandpass BAW filters (*i.e.,* AKF-1336), and 3.5 GHz 5G coexistence BAW filters (*i.e.,* AKF-10235) and related products (collectively the "Accused Products"), each of which utilizes

the inventions disclosed and claimed in the '018 Patent. On information and belief, each of the
Accused Products is of similar design and construction as it pertains to the '018 Patent.

164. Qorvo recently acquired a sample Accused Product, conducted testing and analysis
on it, and determined that it meets all of the limitations of one or more claims of the '018 Patent.
As an example, Akoustis directly infringes at least independent claim 1 of the '018 Patent. The
Accused Products are film bulk acoustic resonators ("FBAR") that have a membrane structure
FBAR with a layer structure including a piezoelectric layer and a top and a bottom electrode layer.

165. Like claim 1, the Accused Products are configured with thicknesses of the two
electrode layers being unequal, characterized in that the top electrode layer is thinner than the
bottom electrode layer. By way of example, the Akoustis AKF-10235 BAW Filter has a top
electrode layer that is averages about110 nm thick and a bottom electrode layer that averages about
129 nm thick. On information and belief, the other Accused Products similarly have piezoelectric
layers and top electrode layers that are thinner than their bottom electrode layers.

166. To the extent required by claim 1, the Accused Products have increased filter
bandwidth performance. By way of example, increased filter bandwidth performance of the
Akoustis AKF-10235 BAW Filter is shown in the below graph taken from the AKF-10235 Data
Sheet. On information and belief, the other Accused Products similarly have increased filter
bandwidth performance.



167.    Thus, Akoustis has infringed, and continues to infringe, at least claim 1 of the '018

Patent in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making,

using, selling, and/or offering for sale in the United States, and/or importing into the United States,

the Accused Products that are covered by one or more claims of the '018 Patent.

168.    On information and belief, Akoustis has been and is inducing infringement of

the'018 Patent in violation of 35 U.S.C. § 271(b) at least by actively and knowingly inducing its

customers to, literally or under the doctrine of equivalents, make, use, sell, and/or offer for sale in

the United States, and/or import into the United States, products incorporating the Accused

Products which utilize the inventions disclosed and claimed in the '018 Patent. Specifically,

Akoustis induces infringement of the '018 Patent by publishing instructions on its website

instructing third parties on how to use the Accused Products.   These instructions include

recommendations for customers of the Accused Products on how to solder and package the

Accused Products as part of customer systems.  Akoustis' intent is further demonstrated by PCB

diagrams published on its website that instruct customers on PCB metal, solder mask, and stencil pattern layouts for implementing the Accused Products in infringing systems.

169.     As of the introduction of the Accused Products, Akoustis has had knowledge of the '018 Patent and Akoustis' infringement thereof, because the Ex-Qorvo BAW Employees, including former executives of Qorvo who are now executives of Akoustis, knew of the '018 patent and brought that knowledge to Akoustis. Akoustis also has known and knows that its customers' use, sale, and offering for sale of the Accused Products constitutes infringement of at least claim 1 of the '018 Patent for the same reasons set forth above.

170.     Akoustis' infringement of the '018 patent is willful, deliberate, and intentional, and Akoustis is acting in reckless disregard of Qorvo's patent rights.

171.     Because of Akoustis' infringement of the '018 patent, Qorvo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

172.     Unless enjoined, Akoustis, and/or others acting on behalf of Akoustis, will continue their infringing acts, thereby causing additional irreparable injury to Qorvo for which there is no adequate remedy at law.

173.     Akoustis' actions render this an exceptional case and entitle Qorvo to attorneys' fees and costs under 35 U.S.C. § 285.

**B.     Count II - Infringement of U.S. Patent No. 9,735,755 (the '755 Patent)**

174.     Qorvo incorporates by reference the allegations of paragraphs 1 through 173 set forth above.

175.     Akoustis infringes the '755 Patent under 35 U.S.C. § 271(a) by making, using, selling, or offering for sale the 3-7 GHz BAW RF filter portfolio including, but not limited to, its 5.2 GHz RF BAW filters (i.e., AKF-1252), 5.6 GHz RF BAW filters (i.e., AKF-1256), 3.6 GHz

CBRS bandpass BAW filters (i.e., AKF-1336), and 3.5 GHz 5G coexistence BAW filters (i.e., AKF-10235), along with related products (collectively, and as defined above, the "Accused Products"), which utilize the inventions disclosed and claimed in the '755 Patent. On information and belief, the Accused Products are of similar design and construction as it pertains to the '755 Patent.

176.    Qorvo recently acquired a sample Accused Product, conducted testing and analysis on it, and determined that it meets all of the limitations of one or more claims of the '755 Patent. As an example, Akoustis directly infringes at least independent claim 9 of the '755 Patent. The Accused Products are BAW resonators comprising a piezoelectric layer, a first electrode on a first surface of the piezoelectric layer, a second electrode on a second surface of the piezoelectric layer opposite the first electrode.

177.    To render a surface of the second electrode inert, the Accused Products include a passivation layer. The passivation layer is on the surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonators. The passivation layer has a thickness ($T_{PA}$) within the active region of the BAW resonators.

178.    The Accused Products further include one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonators. The outer region of the BAW resonators is a region outside of the active region of the BAW resonators. The one or more material layers have a thickness that is n times the thickness ($T_{PA}$) of the passivation layer within the active region, wherein: n is a value other than 1. For example, the Akoustis AKF-10235 BAW Filter has one or more material layers outside an active region with a thickness of about 1.5 to 1.6 times a thickness of the passivation layer within the active region.

179.    In the Accused Products, "n" is such that the outer region of the BAW resonators and the active region of the BAW resonators are acoustically matched in such a manner that the energy of the one or more acoustic wavelengths leaked into the outer region is not excited in the active region.

180.    Thus, Akoustis has infringed, and continues to infringe, at least claim 9 of the '755 Patent in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, the Accused Products that are covered by one or more claims of the '755 Patent.

181.    On information and belief, Akoustis has been and is inducing infringement of the '755 Patent in violation of 35 U.S.C. § 271(b) at least by actively and knowingly inducing its customers to, literally or under the doctrine of equivalents, make, use, sell, and/or offer for sale in the United States, and/or import into the United States, products incorporating the Accused Products which utilize the inventions disclosed and claimed in the '755 Patent. Specifically, Akoustis induces infringement of the '755 Patent by publishing instructions on its website instructing third parties on how to use the Accused Products.    These instructions include recommendations for customers of the Accused Products on how to solder and package the Accused Products as part of customer systems.  Akoustis' intent is further demonstrated by PCB diagrams published on its website that instruct customers on PCB metal, solder mask, and stencil pattern layouts for implementing the Accused Products in infringing systems.

182.    As of the introduction of the Accused Products, Akoustis has had knowledge of the '755 Patent and Akoustis' infringement thereof, because the Ex-Qorvo BAW Employees, including former executives of Qorvo who are now executives of Akoustis, knew of the '755 patent and brought that knowledge to Akoustis.  Akoustis also has known and knows that its customers'

use, sale, and offering for sale of the Accused Products constitutes infringement of at least claim 9 of the '755 Patent for the same reasons set forth above.

183.    Akoustis' infringement of the '755 patent is willful, deliberate, and intentional, and Akoustis is acting in reckless disregard of Qorvo's patent rights.

184.    Because of Akoustis' infringement of the '755 patent, Qorvo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

185.    Unless enjoined, Akoustis, and/or others acting on behalf of Akoustis, will continue their infringing acts, thereby causing additional irreparable injury to Qorvo for which there is no adequate remedy at law.

186.    Akoustis' actions render this an exceptional case and entitle Qorvo to attorneys' fees and costs under 35 U.S.C. § 285.

C.    **Count III - Lanham Act False Advertising Under 15 U.S.C. § 1125(a)**

187.    Qorvo incorporates by reference the allegations of paragraphs 1 through 186 set forth above.

188.    Akoustis describes its BAW filters as being "single crystal" construction, which misrepresents the nature, characteristics, and/or qualities of Akoustis' BAW filters and constitutes false advertising in violation of 15 U.S.C. § 1125(a).

189.    Akoustis' description of its BAW filters as being "single crystal" is made in commercial advertising or promotion, including via Akoustis' website, presentations, and press releases.  Akoustis also describes its BAW filters as being "single crystal" in its SEC filings.

190.    Akoustis falsely or misleadingly represents to the consuming public, customers, potential customers (collectively, the "target customers") and investors that Akoustis' BAW filters

-71-

are of a "single crystal" construction to support a claim of superior performance over the competition. However, Akoustis' BAW filters are, in fact, polycrystalline.

191. Akoustis' false or misleading representations that its BAW filters are "single crystal" actually deceives a substantial portion of the target customers, or has the tendency to deceive the target customers.

192. On information and belief, Akoustis used its false or misleading representations of its BAW filters as "single-crystal" to promote and advertise that it has better technology than Qorvo, or that its BAW filters have better performance than Qorvo's filters. Akoustis' false or misleading representations that its BAW filters are "single crystal" are material because they are likely to influence the purchasing decisions of the target customers.

193. Akoustis' false or misleading representations that its BAW filters are "single crystal" involves BAW filters that are advertised, promoted, sold, and distributed in interstate commerce, including via Akoustis' website.

194. Akoustis' false or misleading representations that its BAW filters are "single crystal" have competitively injured, and are likely to further competitively injure, Qorvo by diverting sales from target customers and through loss of their goodwill.

195. Akoustis knows that its representations of its BAW filters as being of a "single crystal" construction are false or misleading.

196. Akoustis' false or misleading representations of fact are done with bad faith and malice or reckless indifference to Qorvo's and consumers' interests.

197. Based upon the above wrongful acts of Akoustis, Qorvo has incurred monetary damages through the diversion of sales and loss of goodwill in an amount to be fully demonstrated at trial.

198.     Akoustis' intentional and bad faith or misleading representations of fact will continue until enjoined by this Court.

199.     Qorvo is entitled to preliminary and permanent injunctive to prevent Defendant's continued false advertising.

### D.     Count IV – False Patent Marking Under 35 U.S.C. § 292

200.     Qorvo incorporates by reference the allegations of paragraphs 1 through 199 set forth above.

201.     Akoustis has marked each of the Accused Products with U.S. Patent No. 10,256,786 on datasheets available on its website (*see* ALL PRODUCTS – AKOUSTIS TECHNOLOGIES, https://akoustis.com/products/filters/applications/all-products/ (last visited Sept. 14, 2021)).

202.     The independent claims of U.S. Patent No. 10,256,786 recite piezoelectric layers. Based on the disclosure of U.S. Patent No. 10,256,786 and Akoustis' statements, the recited piezoelectric layers are single-crystal.

203.     However, Akoustis' BAW filter products are not "single-crystal."  They are polycrystalline.  On information and belief, Akoustis regularly tests and analyzes its BAW filter products and knew or should have known that Akoustis' BAW filter products are polycrystalline. Moreover, Akoustis knew or should have known that U.S. Patent No. 10,256,786 covered only single-crystal piezoelectric layers.

204.     Akoustis falsely marked the Accused Products with purpose or intent to deceive the public that the Accused Products were covered by U.S. Patent No. 10,256,786 in violation of 35 U.S.C. § 292.  Akoustis engaged in the false marketing of its products to support a claim that the products are innovative and result in superior performance.  Akoustis' false marking is material because it is likely to influence the purchasing decisions of the target customers.  Akoustis' false

marking has competitively injured, and is likely to further competitively injure, Qorvo by diverting sales from target customers and through loss of their goodwill.

205.    Qorvo is entitled to compensatory damages in an amount to be determined at trial.

**E.    Count V - Unfair and Deceptive Trade Practices Prohibited by NC. Gen. Stat. § 75-1**

206.    Qorvo incorporates by reference the allegations of paragraphs 1 through 205 set forth above.

207.    By virtue of the aforesaid acts, Akoustis has engaged in unfair or deceptive acts or practices and in unfair methods of competition affecting commerce in the state of North Carolina. Such acts violate the North Carolina Unfair and Deceptive Trade Practices Act, NC. Gen. Stat. § 75-1.1.

208.    Qorvo owns and possesses the Qorvo BAW Proprietary Information and employed the Ex-Qorvo BAW Employees.

209.    Qorvo's business is dependent on its ability to attract and keep key technical personnel and management.  Qorvo has invested substantial time, effort, and expense in developing its employees' knowledge and experience in the areas crucial to Qorvo's BAW filter technologies, including in RF engineering, integrated circuit and filter design, and technical marketing and support.

210.    Akoustis has engaged in conscious, methodical, and systematic recruitment and solicitation of Qorvo's employees in all major areas.  On information and belief, a large number of Akoustis' current employees are Ex-Qorvo employees.  As detailed above, these include many employees with significant technical and business experience crucial to BAW filter technology, such as the Ex-Qorvo BAW Employees.

211.    Akoustis is seeking to damage Qorvo's business through the recruiting and hiring away from Qorvo the Ex-Qorvo BAW Employees.  This poaching is intended to damage Qorvo by attrition, rather than by fair competition in the marketplace.

212.    Moreover, as described above, the Ex-Qorvo BAW Employees have significant knowledge of the Qorvo BAW Proprietary Information, and were placed by Akoustis in positions with substantial responsibility that overlapped with those employees' previous roles at Qorvo such that disclosure of the Qorvo BAW Proprietary Information was inevitable.  On information and belief, Akoustis targeted the Ex-Qorvo BAW Employees, including Robert Dry, David Breton, Guillermo Moreno, William Schmid, Kindra Lane, Wendy Wright, Paul Makowenskyj, Tony Espinoza, Ali-Imran Bawangaonwala, Todd Bender, Shawn Gibb, David Hodge, Rohan Houlden, Joonbum Kwon, John Myrick, and Ya Shen to obtain Qorvo BAW Proprietary Information from those employees.  On information and belief, the goal of the systematic raiding of Qorvo employees was to use this Qorvo BAW Proprietary information as a short-cut for Akoustis to enter the market for BAW filters.

213.    The Qorvo BAW Proprietary Information derives independent economic value, actual or potential, from not being known generally to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

214.    Qorvo expended substantial effort, time, and capital in developing, maintaining, and possessing the Qorvo BAW Proprietary Information that it incorporated into its highly successful BAW filter products.

215.    During their employment by Qorvo, the Ex-Qorvo BAW Employees hired by Akoustis had access to the Qorvo BAW Proprietary Information.

216. Following the termination of their employment, the Ex-Qorvo BAW Employees were not authorized to disclose, share, use, or possess the Qorvo BAW Proprietary Information.

217. Akoustis was aware that the Ex-Qorvo BAW Employees it recruited and hired had entered into binding agreements with Qorvo that prohibited the employees from taking, disclosing, using, sharing, or possessing the Qorvo BAW Proprietary Information.

218. On information and belief, Akoustis requested the Ex-Qorvo BAW Employees to disclose, use, or share the Qorvo BAW Proprietary Information as part of Akoustis' recruitment process, or otherwise expected the Ex-Qorvo BAW Employees to disclose, use, or share, the Qorvo BAW Proprietary Information as part of their employment at Akoustis, or implemented a hiring scheme that resulted in the Ex-Qorvo BAW Employees inevitably disclosing, using, or sharing, the Qorvo BAW Proprietary Information as part of their employment at Akoustis.

219. As set forth above, one example of Akoustis' efforts to obtain Qorvo BAW Proprietary Information as part of the recruitment process occurred in late 2020 when an Akoustis engineering manager asked a Qorvo RF Product Engineer to access Qorvo's computer systems during a job interview and provide screen shots of Qorvo BAW Proprietary information to Akoustis.

220. On information and belief, Ex-Qorvo BAW Employees have disclosed, shared, or used the Qorvo BAW Proprietary Information, at least inevitably, as part of their job responsibilities at Akoustis.

221. On information and belief, the Ex-Qorvo BAW Employees will continue to disclose, share, or use the Qorvo BAW Proprietary Information as part of their job responsibilities at Akoustis unless and until they are enjoined by this Court from doing so.

222.     On information and belief, the poaching of the Ex-Qorvo BAW Employees and the misappropriation of the Qorvo BAW Proprietary Information has resulted in Akoustis being able to bring its "3-7 GHz BAW RF filter portfolio," including the Accused Products, to market in a timeframe that is highly unlikely, if not impossible, without these unfair practices. Akoustis' "3-7 GHz BAW RF filter portfolio," has been placed in commerce in North Carolina, and interstate and foreign commerce, within the past four years.

223.     As a result of Akoustis' wrongful conduct, Qorvo has been substantially and irreparably harmed in an amount not readily capable of determination and for which there is no adequate remedy at law.  Unless restrained by this Court, Akoustis will cause further irreparable injury to Plaintiff.

224.     Qorvo is entitled to preliminary and permanent injunctive relief enjoining Akoustis, its agents and employees, and all persons acting in concert or participation with Akoustis, from engaging in any further poaching of Qorvo employees and/or use of the Qorvo BAW Proprietary Information.

225.     Moreover, Akoustis has engaged in unfair or deceptive acts or practices and unfair methods of competition affecting commerce in the state of North Carolina through Akoustis' false or misleading representations to the target customers and investors that Akoustis' BAW filters are of a "single crystal" construction.  Akoustis' false or misleading representations that its BAW filters are "single crystal" actually deceives, or has the tendency to deceive, the target customers, and its representations are material because they are likely to influence the purchasing decisions of the target customers.  Akoustis' false or misleading representations have competitively injured, and are likely to further competitively injure, Qorvo by diverting sales from target customers and through loss of their goodwill.

-77-

226.    On information and belief, Akoustis has made and will continue to make substantial profits and/or gains to which it is not in law or equity entitled.

227.    On information and belief, Akoustis' violations of NC. Gen. Stat. § 75-1.1 have directly and proximately caused and continue to cause Qorvo substantial actual damages in North Carolina and throughout the United States, and Qorvo is entitled to recover actual damages in an amount to be proven at trial.

228.    Pursuant to NC. Gen. Stat. § 75-16 and NC. Gen. Stat. § 75-16.1 Qorvo is entitled to treble damages and attorney fees for Akoustis' unfair and deceptive trade practices and unfair methods of competition.

### F.    Count VI – Misappropriation of Trade Secrets Under the Defense of Trade Secrets Act (18 U.S.C. § 1832 *et seq.*)

229.    Qorvo incorporates by reference the allegations of paragraphs 1 through 228 set forth above.

230.    By virtue of the aforesaid acts, which upon information and belief, are continuing, Akoustis has and continues to engage in trade secret misappropriation under federal law.  Such acts violate the Defense of Trade Secrets Act (18 U.S.C. § 1832 *et seq.*).

231.    As set forth in paragraphs 61 through 153, Qorvo has developed an extensive trade secret portfolio. Qorvo's trade secrets relate to, among other things, documentation and know-how for designing, developing, modeling, simulating, testing, qualifying, manufacturing, marketing, selling, and supporting its BAW filters and other products, as well as Qorvo's compensation and job structure for its engineers and other employees, including those who work on Qorvo's BAW filters and other products. Use of Qorvo's trade secrets allowed Akoustis to implement technology that would otherwise take months if not years to develop independently and to avoid dead-ends.

In the end, Akoustis was able to get to market much faster compared to a company that did not have the benefit of Qorvo's trade secrets.

232. As set forth in paragraphs 1 through 29, as well as in paragraphs 61 through 153, Qorvo has taken and continues to take commercially reasonable steps to protect its trade secret information. Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

233. As set forth in paragraphs 1 through 29, as well as in paragraphs 61 through 153, Qorvo's trade secrets derive independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain value from the trade secrets' disclosure. Maintaining the confidentiality of Qorvo's trade secrets gives Qorvo a highly valuable advantage over competitors in the BAW filter market.

234. Qorvo's trade secrets and their use by Akoustis implicate interstate or foreign commerce. For example, both Qorvo and Akoustis sell BAW filters in interstate and foreign commerce and the trade secrets were used by both parties to develop such filters.

235. As set forth in paragraphs 1 through 29, as well as in paragraphs 61 through 153, Akoustis improperly acquired, disclosed, used, appropriated, took, carried away, concealed, copied, duplicated, downloaded, replicated, transmitted, sent, uploaded, communicated, or conveyed the Qorvo trade secrets for the benefit of Akoustis.

236. As set forth in paragraphs 1 through 29, as well as in paragraphs 61 through 153, Akoustis' improper misappropriations were facilitated through former Qorvo employees who Akoustis recruited for the purpose of obtaining such trade secrets and confidential information, and who—during the time period prior to their departure from Qorvo and their joining Akoustis—

had a specific opportunity to improperly access and take documents containing Qorvo BAW Proprietary Information and other Qorvo confidential information, including for disclosure or use at Akoustis without the express or implied consent or authority Qorvo. Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.

237.    The use of Qorvo's trade secrets by Akoustis was without Qorvo's authorization. Qorvo did not consent to their acquisition, disclosure, or use of Qorvo's trade secrets.

238.    Akoustis intended to, and continues to, convert Qorvo's trade secrets to the economic benefit of one other than their owner, Qorvo.

239.    Akoustis knew and intended that Qorvo, as the owner of Qorvo's trade secrets, would be injured by their actions.

240.    As a result of Akoustis' misappropriation of Qorvo's trade secrets, Qorvo has suffered actual damages in an amount to be proven at trial.

241.    As a result of Akoustis' misappropriation, Akoustis has been unjustly enriched.

242.    Qorvo further pleads entitlement to a reasonable royalty to compensate Qorvo for Akoustis' misappropriation of trade secrets.

243.    Qorvo is informed and believes, and thereon alleges, that Akoustis' misappropriation of Qorvo's trade secrets was willful and malicious based on the facts alleged herein. Akoustis acted with a purpose and willingness to commit the acts alleged, and Akoustis' conduct was not reasonable under the circumstances. Qorvo is therefore entitled to exemplary damages and attorney fees and costs. Qorvo further seeks exemplary damages against Akoustis in

an amount up to two times the amount of Qorvo's actual damages according to proof under 18 U.S.C. § 1836.

244.    The misappropriation of Qorvo's trade secrets has caused and will continue to cause Qorvo irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

245.    If Akoustis were permitted to continue to use and disseminate Qorvo's trade secrets, Qorvo will be irreparably harmed and the economic damages to Qorvo will be difficult to quantify. An injunction prohibiting Akoustis from further acquisition, disclosure, use, and possession of Qorvo's trade secrets is necessary to provide Qorvo with complete relief.

246.    On information and belief, Akoustis has made and will continue to make substantial profits and/or gains on account of its misappropriations, to which it is not in law or equity entitled.

247.    On information and belief, Akoustis' violations of 18 U.S.C. § 1832 *et seq.* have directly and proximately caused and continue to cause Qorvo substantial actual damages, and Qorvo is entitled to recover actual damages in an amount to be proven at trial.

### G.    Count VII – Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.*)

248.    Qorvo incorporates by reference the allegations of paragraphs 1 through 247 set forth above.

249.    Akoustis is an enterprise because it is a Delaware corporation.

250.    As set forth in paragraphs 61 through 153, Akoustis conspired with Rohan Houlden, Robert Dry, and other former Qorvo employees, before Akoustis formally hired such employees at a later date, to steal, copy, possess and use Qorvo's trade secrets without authorization, violating the Defense of Trade Secrets Act.  Akoustis' prior and continuing conspiracy to misappropriate

Qorvo's trade secrets through improper means constitutes unlawful activity pursuant to 18 U.S.C. § 1962(d).

251.    As set forth in paragraphs 61 through 153, Akoustis has misappropriated Qorvo's trade secrets in violation of the Defense of Trade Secrets Act. On multiple occasions, persons employed by Akoustis—e.g., Rohan Houlden, Robert Dry—have stolen Qorvo's trade secrets, have shared Qorvo's trade secrets, and have re-purposed Qorvo's trade secrets for Akoustis' use to gain an unfair competitive advantage in the market for BAW filters. Akoustis' multiple and continuing violations of the Defense of Trade Secrets Act and misappropriation through improper means of Qorvo's trade secrets constitutes pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c).

252.    Akoustis' racketeering activities is ongoing because, on belief, Akoustis continues to use Qorvo's trade secrets in its business including, but not limited to, documentation and know-how for designing, developing, modeling, simulating, testing, qualifying, manufacturing, marketing, selling, and supporting its BAW filters and other products, as well as Qorvo's compensation and job structure for its engineers and other employees, including those who work on Qorvo's BAW filters and other products.

253.    Akoustis' racketeering activities are related to Akoustis and the former Qorvo employees using misappropriated Qorvo trade secrets in interstate and foreign commerce by, among other things, using know-how and documentation for designing, developing, modeling, simulating, testing, qualifying, manufacturing, marketing, selling, and supporting Akoustis BAW filters and other products, as well as Qorvo's compensation and job structure for its engineers and other employees.

-82-

254.   On information and belief, Akoustis' violations of 18 U.S.C. § 1961 *et seq.* have directly and proximately caused and continue to cause Qorvo substantial actual damages, and Qorvo is entitled to recover actual damages in an amount to be proven at trial.

255.   Pursuant to 18 U.S.C. § 1964(c), Qorvo is entitled to treble damages, costs, and attorney fees for Akoustis' racketeering.

**H.     Count VIII – Misappropriation of Trade Secrets Under the North Carolina Trade Secrets Protection Act (N.C. Gen. Stat § 66-152 et seq.)**

256.   Qorvo incorporates by reference the allegations of paragraphs 1 through 255 set forth above.

257.   By virtue of Akoustis' acts of misappropriation, including as set forth in paragraphs 61 through 153, which upon information and belief are continuing, Akoustis has and continues to engage in trade secret misappropriation under North Carolina state law. Such acts violate the North Carolina Trade Secrets Protection Act (N.C. Gen. Stat § 66-152 et seq.).

258.   As set forth in paragraphs 61 through 153, Qorvo has developed an extensive trade secret portfolio. Qorvo's trade secrets relate to, among other things, documentation and know-how for designing, developing, modeling, simulating, testing, qualifying, manufacturing, marketing, selling, and supporting its BAW filters and other products, as well as Qorvo's compensation and job structure for its engineers and other employees, including those who work on Qorvo's BAW filters and other products. Use of Qorvo's trade secrets allowed Akoustis to implement technology that would otherwise take months if not years to develop independently and to avoid dead-ends. In the end, Akoustis was able to get to market much faster compared to a company that did not have the benefit of Qorvo's trade secrets.

259.   As set forth in paragraphs 1 through 29, as well as in paragraphs 61 through 153, Qorvo has taken and continues to take commercially reasonable steps to protect its trade secret

-83-

information.  Qorvo protects its trade secrets at least in part by maintaining the confidentiality of documents containing such information.

260.    As set forth in paragraphs 1 through 29, as well as in paragraphs 61 through 153, Qorvo's trade secrets derive independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain value from the trade secrets' disclosure.  Maintaining the confidentiality of Qorvo's trade secrets gives Qorvo a highly valuable advantage over competitors in the BAW filter market.

261.    Qorvo's trade secrets and their use by Akoustis implicate interstate or foreign commerce.  For example, both Qorvo and Akoustis sell BAW filters in interstate and foreign commerce and the trade secrets were used by both parties to develop such filters.

262.    As set forth in paragraphs 1 through 29, as well as in paragraphs 61 through 153, Akoustis improperly acquired, disclosed, used, appropriated, took, carried away, concealed, copied, duplicated, downloaded, replicated, transmitted, sent, uploaded, communicated, or conveyed the Qorvo trade secrets for the benefit of Akoustis.

263.    As set forth in paragraphs 1 through 29, as well as in paragraphs 61 through 153, Akoustis' improper misappropriations were facilitated through former Qorvo employees who Akoustis recruited for the purpose of obtaining such trade secrets and confidential information, and who—during the time period prior to their departure from Qorvo and their joining Akoustis— had a specific opportunity to improperly access and take documents containing Qorvo BAW Proprietary Information and other Qorvo confidential information, including for disclosure or use at Akoustis without the express or implied consent or authority Qorvo. Furthermore, at least because Akoustis recruited and hired these employees (those who had accessed and taken such

Qorvo documents), Akoustis, as their new employer, had a specific opportunity to improperly obtain and use the documents, and the trade secrets within them, without the express or implied consent or authority of Qorvo.

264.    The use of Qorvo's trade secrets by Akoustis was without Qorvo's authorization. Qorvo did not consent to their acquisition, disclosure, or use of Qorvo's trade secrets.

265.    Akoustis intended to, and continues to, convert Qorvo's trade secrets to the economic benefit of one other than their owner, Qorvo.

266.    Akoustis knew and intended that Qorvo, as the owner of Qorvo's trade secrets, would be injured by their actions.

267.    As a result of Akoustis' misappropriation of Qorvo's trade secrets, Qorvo has suffered actual damages in an amount to be proven at trial.

268.    As a result of Akoustis' misappropriation, Akoustis has been unjustly enriched.

269.    Qorvo further pleads entitlement to a reasonable royalty to compensate Qorvo for Akoustis' misappropriation of Qorvo's trade secrets.

270.    Qorvo is informed and believes, and thereon alleges, that Akoustis' misappropriation of Qorvo's trade secrets was willful and malicious based on the facts alleged herein. Akoustis acted with a purpose and willingness to commit the acts alleged, and Akoustis' conduct was not reasonable under the circumstances. Qorvo is therefore entitled to exemplary damages and attorney fees and costs.

271.    The misappropriation of Qorvo's trade secrets has caused and will continue to cause Qorvo irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

PUBLIC VERSION

272.    If Akoustis were permitted to continue to use and disseminate Qorvo's trade secrets, Qorvo will be irreparably harmed and the economic damages to Qorvo will be difficult to quantify. An injunction prohibiting Akoustis from further acquisition, disclosure, use, and possession of Qorvo's trade secrets is necessary to provide Qorvo with complete relief.

## I.    Count IX – Civil Conspiracy Under North Carolina

273.    Qorvo incorporates by reference the allegations of paragraphs 1 through 272 set forth above.

274.    By virtue of Akoustis' acts of misappropriation, including as set forth in paragraphs 6161 through 153, Akoustis and its employees engaged in trade secret misappropriation in violation of the North Carolina Trade Secrets Protection Act (N.C. Gen. Stat § 66-152 *et seq.*).

275.    Upon information and belief, Akoustis conspired with one or more Qorvo employees, including former Qorvo employees who later joined Akoustis (but prior to their employment by Akoustis), to violate their legal obligations to Qorvo and misappropriate Qorvo's trade secrets for Akoustis' benefit.  Upon information and belief, it was agreed that if these employees would join Akoustis and aid Akoustis in this manner, Akoustis' resultant success in the marketplace would yield substantial financial increase for these employees including through the increased value of securities in Akoustis that would be granted to such employees pursuant to their anticipated employment with Akoustis. Upon information and belief, Akoustis and the one or more employees committed acts in furtherance of the aforesaid conspiracy.

276.    Akoustis' prior  and continuing conspiracy with such employees to misappropriate Qorvo's trade secrets and confidential information is causing, and threatens to continue causing, Qorvo to suffer irreparable harm, including but not limited to loss of business advantage, loss of exclusivity rights, and loss of its investment in its trade secrets.

277.    As a result of Akoustis' acts of conspiracy in connection with trade secret misappropriation, Qorvo has suffered actual damages in an amount to be proven at trial, and Akoustis has been unjustly enriched.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Qorvo respectfully prays for relief as follows:

1)    Enter a judgment that Akoustis has directly and indirectly infringed the Patents-in-Suit;

2)    Award Qorvo damages in an amount sufficient to compensate it for Akoustis' infringement of the Patents-in-Suit, together with pre-judgment and post-judgment interest and costs, and all other damages permitted under 35 U. S. C. § 284;

3)    Find that Akoustis' infringement of the Patents-in-Suit has been willful and deliberate;

4)    Enter a judgment awarding Qorvo treble damages as a result of Akoustis' willful and deliberate infringement of the Patents-in-Suit, pursuant to 35 U.S.C. § 284;

5)    Find that Akoustis' actions render this an exceptional case under 35 U.S.C. § 285 and award Qorvo its attorneys' fees, costs and expenses;

6)    Preliminarily and permanently enjoin, pursuant to 35 U.S.C. § 283, Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further infringing the Patents-in-Suit;

7)    Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further falsely advertising the properties of its BAW filters;

8)      Award Qorvo damages in an amount sufficient to compensate it for Akoustis' false advertising;

9)      Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further falsely marking its BAW filters;

10)     Award Qorvo damages in an amount sufficient to compensate it for Akoustis' false patent marking;

11)     Award Qorvo damages in an amount sufficient to compensate it for Akoustis' trade secret misappropriation under the North Carolina Trade Secrets Protection Act (N.C. Gen. Stat § 66-152 *et seq.*) and/or under the Defense of Trade Secrets Act (18 U.S.C. § 1832 *et seq.*);

12)     Award Qorvo damages, including exemplary damages, punitive damages, attorneys' fees, and costs and expenses in view of Akoustis' violations under the North Carolina Trade Secrets Protection Act (N.C. Gen. Stat § 66-152 *et seq.*) and/or under the Defense of Trade Secrets Act (18 U.S.C. § 1832 *et seq.*);

13)     Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further misappropriating and using Qorvo's trade secrets under the North Carolina Trade Secrets Protection Act (N.C. Gen. Stat § 66-152 *et seq.*);

14)     Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further misappropriating and using Qorvo's trade secrets under the Defense of Trade Secrets Act (18 U.S.C. § 1832 *et seq.*);

15) Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further selling any products that resulted, in whole or in part, from misappropriating Qorvo's trade secrets under the North Carolina Trade Secrets Protection Act (N.C. Gen. Stat § 66-152 *et seq.*);

16) Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further misappropriating and using Qorvo's trade secrets under the Defense of Trade Secrets Act (18 U.S.C. § 1832 *et seq.*);

17) Award Qorvo damages, including exemplary damages, punitive damages, attorneys' fees, and costs and expenses in view of Akoustis' wrongful acts committed pursuant to a conspiracy in violation of North Carolina law;

18) Award Qorvo damages in an amount sufficient to compensate it for Akoustis' violation under 18 U.S.C. § 1961 *et seq.*;

19) Award Qorvo damages, including treble damages, punitive damages, attorneys' fees, and costs and expenses in view of Akoustis' violations under 18 U.S.C. § 1961 *et seq.*;

20) Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further selling any products that resulted, in whole or in part, from pattern of racketeering activity under 18 U.S.C. § 1961 *et seq.*;

21) Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or

in active concert or participation with any of them, from further misappropriating and using Qorvo's trade secrets under 18 U.S.C. § 1961 *et seq.*;

22) Award Qorvo damages in an amount sufficient to compensate it for Akoustis' unfair and deceptive trade practices;

23) Award Qorvo damages, including treble damages, punitive damages, and attorneys' fees, in view of Akoustis' violation of N.C. Gen. Stat. § 75-1.1;

24) Preliminarily and permanently enjoin Akoustis, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1;

25) Order a full and complete accounting to Qorvo for Akoustis' profits, gains, advantages or the value of business opportunities received from the foregoing acts of infringement;

26) Award Qorvo all actual, compensatory, consequential, liquidated, treble, and special damages to which it is entitled in an amount to be determined at trial;

27) Assess punitive damages against Akoustis;

28) Award Qorvo all attorneys' fees and costs to which it is entitled associated with bringing and prosecuting this action;

29) Award pre-judgment and post-judgment interest against Akoustis; and

30) Award Qorvo such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and D. Del. LR 38.1, Qorvo demands a trial by jury on all issues raised by the Complaint.

Dated: Feburary 8, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*
Jack B. Blumenfeld (#1014)|
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006
(202) 747-1900

Trevor J. Quist
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
1540 El Camino Real
Menlo Park, CA 94025

PUBLIC VERSION

EXHIBIT A

US007522018B2

(12) **United States Patent**     (10) **Patent No.:**    **US 7,522,018 B2**

Milsom et al.         (45) **Date of Patent:**     **Apr. 21, 2009**

(54) **ELECTRO-ACOUSTIC RESONATOR WITH A TOP ELECTRODE LAYER THINNER THAN A BOTTOM ELECTRODE LAYER**

(75) Inventors: **Robert Frederick Milsom**, Redhill (GB); **Hans-Peter Löbl**, Monschau-Imgenbroich (DE)

(73) Assignee: **NXP B.V.**, Eindhoven (NL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 330 days.

(21) Appl. No.: **10/538,110**

(22) PCT Filed: **Dec. 4, 2003**

(86) PCT No.: **PCT/IB03/05675**

§ 371 (c)(1),
(2), (4) Date: **Dec. 14, 2005**

(87) PCT Pub. No.: **WO2004/053798**

PCT Pub. Date: **Jun. 24, 2004**

(65) **Prior Publication Data**

US 2006/0131990 A1    Jun. 22, 2006

(30) **Foreign Application Priority Data**

Dec. 13, 2002   (EP)   .................................. 02258613

(51) **Int. Cl.**
*H03H 9/13*    (2006.01)
*H03H 9/15*    (2006.01)
*H03H 9/54*    (2006.01)

(52) **U.S. Cl.** ....................... **333/187**; 333/189; 310/312; 310/364

(58) **Field of Classification Search** ................. 333/187, 333/188; 310/312, 364
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,864,261 A * | 1/1999 | Weber ........................ 333/187 |
| 5,873,154 A | 2/1999 | Ylilammi et al. |
| 6,051,907 A | 4/2000 | Ylilammi |
| 6,249,074 B1 | 6/2001 | Zimnicki et al. |
| 6,291,931 B1 * | 9/2001 | Lakin ........................ 310/364 |
| 6,710,508 B2 * | 3/2004 | Ruby et al. ................. 310/312 |
| 6,874,211 B2 * | 4/2005 | Bradley et al. ............. 29/25.35 |
| 2006/0220763 A1 * | 10/2006 | Iwasaki et al. .............. 333/133 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1152475 A1 | 11/2001 |
| WO | WO0223720 A1 | 3/2002 |

* cited by examiner

*Primary Examiner*—Barbara Summons
(74) *Attorney, Agent, or Firm*—Aaron Waxler

(57) **ABSTRACT**

An electro-acoustic resonator (**1**, **8**, **17**) of the membrane or FBAR type (**1**) or the solidly-mounted or SBAR type (**8**), with electrodes comprising a single conducting layer or multiple conducting layers, i.e. sandwich construction (**17**) with an optimum coupling factor kr and thus an improved filter bandwidth. The optimum coupling factor kr is achieved by the arrangement that the top electrode (**6**, **15**, **25**) is thinner than the bottom electrode (**4**, **13**, **23**). The coupling factor is independent of the resonator's layout defined by the mask.

**14 Claims, 5 Drawing Sheets**



Case 3:21-cv-01417-JD Document 88-2 Filed 08/04/23 Page 108 of 330 PageID #:864627
PUBLIC VERSION



FIG.1

Case 3:21-cv-01417-JMK Document 69-2 Filed 08/04/23 Page 4 of 38 PageID #:844728
PUBLIC VERSION



FIG.2

Case 21-12047-JMP Doc 200-2 Filed 08/04/23 Page 15 of 28 PageID #:854829
PUBLIC VERSION



FIG.3

CaSeSe3:212b401417JMPUSMCDoDneumanB0982-2FilFdee08/0927/23Pagge16 of 28PageelD#864930
PUBLIC VERSION

| T3 / T4 | 50 nm | 100 nm | 150 nm | 200 nm | 250 nm | 300 nm |
|---|---|---|---|---|---|---|
| 100 nm | 0,216 | 0,219 | 0,218 | 0,218 | 0,212 | 0,208 |
| 150 nm | 0,216 | 0,219 | 0,223 | 0,218 | 0,219 | 0,216 |
| 200 nm | 0,220 | 0,224 | 0,222 | 0,224 | 0,224 | 0,220 |
| 250 nm | 0,216 | 0,219 | 0,224 | 0,226 | 0,219 | 0,216 |
| 300 nm | 0,223 | 0,226 | 0,224 | 0,226 | 0,218 | 0,223 |
| 350 nm | 0,214 | 0,218 | 0,224 | 0,226 | 0,218 | 0,214 |
| 400 nm |  |  | 0,223 | 0,217 | 0,217 | 0,213 |

FIG.4

| T3 / T4 | 50 nm | 100 nm | 150 nm | 200 nm | 250 nm | 300 nm |
|---|---|---|---|---|---|---|
| 100 nm | 0,214 | 0,216 | 0,216 | 0,214 | 0,212 | 0,209 |
| 150 nm | 0,218 | 0,219 | 0,219 | 0,218 | 0,216 | 0,213 |
| 200 nm | 0,219 | 0,222 | 0,222 | 0,221 | 0,218 | 0,214 |
| 250 nm | 0,221 | 0,223 | 0,223 | 0,222 | 0,219 | 0,217 |
| 300 nm | 0,221 | 0,223 | 0,223 | 0,222 | 0,219 | 0,217 |
| 350 nm | 0,219 | 0,223 | 0,223 | 0,222 | 0,219 | 0,217 |
| 400 nm |  |  | 0,222 | 0,221 | 0,218 | 0,216 |

FIG.5

PUBLIC VERSION

| T6 \ T6 | 0 nm | 50 nm | 100 nm | 150 nm | 200 nm | 250 nm |
|---|---|---|---|---|---|---|
| 0 nm | 0,204 | 0,202 | 0,198 | 0,191 | 0,191 | 0,181 |
| 50 nm | 0,207 | 0,212 | 0,208 | 0,203 | 0,194 | 0,192 |
| 100 nm | 0,209 | 0,216 | 0,211 | 0,204 | 0,204 | 0,194 |
| 150 nm | 0,209 | 0,216 | 0,211 | 0,213 | 0,203 | 0,192 |
| 200 nm | 0,213 | 0,211 | 0,216 | 0,208 | 0,196 | 0,183 |
| 250 nm | 0,207 | 0,214 | 0,208 | 0,199 | 0,185 | 0,171 |

FIG.6

| T5 \ T6 | 0 nm | 50 nm | 100 nm | 150 nm | 200 nm | 250 nm |
|---|---|---|---|---|---|---|
| 0 nm | 0,204 | 0,204 | 0,198 | 0,191 | 0,184 | 0,177 |
| 50 nm | 0,212 | 0,212 | 0,208 | 0,201 | 0,194 | 0,186 |
| 100 nm | 0,214 | 0,216 | 0,213 | 0,207 | 0,198 | 0,190 |
| 150 nm | 0,216 | 0,218 | 0,214 | 0,216 | 0,198 | 0,180 |
| 200 nm | 0,213 | 0,216 | 0,212 | 0,204 | 0,194 | 0,183 |
| 250 nm | 0,208 | 0,212 | 0,206 | 0,198 | 0,187 | 0,175 |

FIG.7

PUBLIC VERSION

**1**

## ELECTRO-ACOUSTIC RESONATOR WITH A TOP ELECTRODE LAYER THINNER THAN A BOTTOM ELECTRODE LAYER

The invention relates to an electro-acoustic wave resonator. Resonators are the basic building blocks of filters.

Thin-film bulk acoustic wave (BAW) resonator filters are of growing interest particularly for radio frequency (RF) front-end selectivity in wireless applications, e.g. 2G and 3G handsets. This technology offers the best possibility for integration and miniaturisation. One of the important parameters of an electro-acoustic resonator is its coupling factor $k_r$ defined by $k_r{}^2=[1-(f_r/f_a)^2]$. In this equation $f_r$ and $f_a$ are the resonator's resonance and antiresonance, i.e. the frequencies of minimum and maximum impedance. Maximum achievable filter bandwidth is proportional to $k_r{}^2$.

A BAW resonator consists essentially of a layer sequence comprising two electrode layers adjacent to a piezoelectric layer. For RF applications the piezoelectric layer typically consists of a deposited layer of a material such as aluminium nitride (AlN). For reducing deposition time, resonators with a feasibly thin piezoelectric layer are desired. The disadvantage of thin-film piezoelectric materials is their rather low coupling coefficient $k_r$. As resonator coupling factor $k_r$ is proportional to the coupling coefficient $k_t$ the design of the electro-acoustic resonator has to be optimised to compensate the rather low coupling coefficient $k_t$ of thin-film piezoelectric materials. For example, a high coupling factor $k_r$ is required for the 3G UMTS receive (RX) and transmit (TX) bands.

WO 02/23720 A1 discloses a resonator that comprises a first electrode, a second electrode and a piezoelectric layer arranged between the above. A first acoustic compression layer is arranged between the piezoelectric layer and the first electrode with a higher acoustic impedance than the first electrode. For a warranty of a sufficiently low resistance of the electrodes that document reveals that the electrodes are at least 200 nm thick. There, the electrode preferably consists of Aluminium (Al) with a thickness of 300-600 nm. Such an electrode results in a low electrical resistance and effects only a small deterioration of the coupling coefficient achieved by the arrangement of an acoustic compression layer.

U.S. Pat. No. 6,051,907 discloses a method for tuning a thin-film bulk acoustic wave resonator (FBAR) located on a wafer. The method is used for fine tuning if the centre frequency is different from a target value and is done by etching the top electrode. According to U.S. Pat. No. 6,051,907 the structure of thin-film bulk acoustic wave resonators formed on wafers is altered before the wafer is diced. That method effects that the FBAR exhibits a series or parallel resonant frequency that is within an acceptable error margin of a design series or parallel resonant frequency, respectively. In one example of U.S. Pat. No. 6,051,907 the top and the bottom electrode both comprise molybdenum (Mo) having a thickness of 300 nm. As the method for fine tuning in that document is based on thinning of the top electrodes of the FBARs, which results in increasing series resistance of the FBARs, there it is proposed to design top electrodes (of Mo) with a thickness of 400 nm and with a correspondingly thinner layer of piezoelectric material, in this case zinc-oxide (ZnO).

The objective of the invention is to provide an electro-acoustic resonator which will give increased filter bandwidth.

This objective is achieved by an electro-acoustic resonator with a layer structure comprising a piezoelectric layer and a top and a bottom electrode layer, with the thickness of the two electrode layers being unequal and with the top electrode layer being thinner than the bottom electrode layer. In this

**2**

configuration maximum resonator coupling factor is achieved. The enhancement occurs due to an improved match, inside the piezoelectric layer, between the spatial distributions of the applied electric field (which is approximately constant in the direction normal to the layer) and the electric field directly coupled to the acoustic wave (which is approximately cosinusoidal about a plane midway between thin electrodes, but closer to constant for optimal electrode thickness).

The electro-acoustic resonator may be a solidly-mounted thin-film resonator (SBAR) or may have a membrane structure, also referred to as a film bulk acoustic wave resonator (FBAR). The layer sequence of an FBAR is typically etch-stop layer/bottom electrode layer/piezoelectric layer/top electrode layer. The energy is confined by having a perfect reflector at the free-space interface above and below the resonator. The layer sequence of an SBAR is typically substrate/Bragg reflector/bottom electrode layer/piezoelectric layer/top electrode layer. The Bragg reflector comprises alternate high and low mechanical impedance layers and provides the required reflection below the resonator. A mass-loading layer above the top electrode is included in a subset of the resonators in a typical filter design. The mass-loaded resonators have slightly lower $f_r$ and $f_a$ than the non-mass-loaded resonators. In all cases the resonant frequency is approximately inversely proportional to the thickness of the piezoelectric layer. For typical RF applications all layer thicknesses are of the order of 100 nm to 2000 nm. The substrate thickness is typically of the order of 0.1 mm to 2 mm.

At least one of the electrode layers of the electro-acoustic resonator can be formed by a stack of two (or more) conductive materials. Such a configuration is referred to here as a "sandwich" structure. The conductive materials have to be carefully chosen as they influence the electrical loss and the bandwidth.

In one embodiment of the electro-acoustic resonator a conductive thin diffusion barrier is formed between the electrode layers.

In a further embodiment the conductive material in the stack that is in contact with the piezoelectric layer has a higher acoustic impedance than the conductive material that is not in contact with the piezoelectric layer.

In another embodiment the conductive material in the stack that is in contact with the piezoelectric layer has a lower acoustic impedance than the outer conductive material that is not in contact with the piezoelectric layer. Preferably, the outer conductive material is a noble metal such as gold (Au) or platinum (Pt) which protects the resonator's surface.

The conductive material with the lower acoustic impedance preferably comprises aluminium (Al).

The conductive material with the higher acoustic impedance comprises for example platinum (Pt), tungsten (W), molybdenum (Mo), titan-tungsten ($Ti_xW_{1-x}$, $0<x<1$) or gold (Au).

The diffusion barrier between the electrode layers and/or between the electrodes may consist of titanium nitride (TiN) or titanium (Ti) or may consist of combinations of titanium nitride (TiN) and titanium (Ti).

For example, the inventive electro-acoustic resonator can be used in a filter with a centre frequency of 1.95 GHz. This is the centre frequency corresponding to the transmission (TX) band of the UMTS 3G standard. For this application the bandwidth required is very close to the maximum achievable using aluminium nitride for the piezoelectric layer.

One preferred embodiment, for use in filters with centre frequency in the region of 2 GHz, is an electro-acoustic resonator whose electrode layers comprise molybdenum with, for a resonant frequency in the region of 2 GHz, the top layer's

US 7,522,018 B2

3

thickness being in the region of 200 nm and the bottom layer's thickness being the region of 300 nm, these thicknesses scaling approximately inversely with resonant frequency.

Another preferred embodiment is an electro-acoustic resonator whose electrode layers comprise platinum with, for a resonant frequency in the region of 2 GHz, the top layer's thickness being in the region of 50 nm and the bottom layer's thickness being in the region of 150 nm, these thicknesses scaling approximately inversely with resonant frequency.

The inventive electro-acoustic resonator may be used as a component of a radio frequency (RF) filter, or as a component used in a sensor, or used in an ultrasonic transducer, or used in an array of ultrasonic transducers.

These and other aspects of the invention will become apparent from and will be elucidated with reference to the embodiments described hereinafter, where

FIG. **1** illustrates a layer sequence in an FBAR,

FIG. **2** illustrates a layer sequence in an SBAR,

FIG. **3** illustrates a layer sequence in a sandwich SBAR,

FIG. **4** illustrates a table with the coupling factor versus the thicknesses of top and bottom electrode for a non-mass-loaded SBAR,

FIG. **5** illustrates a table with the coupling factor versus the thicknesses of top and bottom electrode for a mass-loaded SBAR,

FIG. **6** illustrates a table with the coupling factor versus the thicknesses of top and bottom electrode for a non-mass-loaded sandwich SBAR,

FIG. **7** illustrates a table with the coupling factor versus the thicknesses of top and bottom electrode for a mass-loaded sandwich SBAR.

FIG. **1** illustrates a layer sequence in an FBAR **1** consisting of, from bottom to top, a substrate **2**, an etch-stop layer **3**, a bottom electrode layer **4**, a piezoelectric layer **5**, a top electrode layer **6** and a mass-loading layer **7**. The FBAR **1** shows the electrode layers **4**, **6** with unequal thicknesses with the top electrode **6** having a thickness of T1 and the bottom electrode **4** having a thickness of T2. According to the invention T1 is smaller than T2. This asymmetrical arrangement enables the resonator to achieve maximum coupling-factor, thus giving maximum filter bandwidth.

FIG. **2** illustrates a layer sequence in an SBAR **8** consisting of, from bottom to top, a substrate **9**, an acoustic mirror **10** like a Bragg reflector comprising alternate high **11** and low **12** mechanical impedance layers, a bottom electrode layer **13**, a piezoelectric layer **14**, a top electrode layer **15** and a mass-loading layer **16**. The SBAR **8** shows electrode layers **13**, **15** with unequal thicknesses with the top electrode **15** having a thickness of T3 and the bottom electrode **13** having a thickness of T4. According to the invention thickness T3 is smaller than thickness T4.

FIG. **3** illustrates a layer sequence in a sandwich SBAR **17** consisting of, from bottom to top, a substrate **18**, an acoustic mirror **19** like a Bragg reflector comprising alternate high **20** and low **21** mechanical impedance layers, a bottom outer electrode layer **22**, a bottom inner electrode layer **23**, a piezoelectric layer **24**, a top inner electrode layer **25**, a top outer electrode layer **26** and a mass-loading layer **27**. The sandwich SBAR **17** shows outer electrode layers **22** and **26** of equal thickness, and inner electrode layers **23** and **25** of unequal thickness with the inner top electrode **25** having a thickness of T5 and the inner bottom electrode **23** having a thickness of T6. Between the electrodes **22** and **23** and/or between the electrodes **25** and **26** there may be a diffusion barrier consisting of a layer of e.g. TiN or a combination of layers of Ti and TiN. This diffusion barrier is to avoid inter-diffusion of the two electrode materials **22** and **23** or **25** and **26** respectively.

4

The thickness of the thin diffusion barrier is between 10 and 30 nm and does not change the performance of the resonator substantially.

The mass-loading layer (**7** in FIG. **1**, **16** in FIG. **2**, **27** in FIG. **3**) is included in a subset of the resonators in a typical filter. The remaining resonators are non-mass-loaded.

The invention is illustrated by the example of a 1.95 GHz filter for the TX band of the UMTS 3G standard. For this application the bandwidth required is very close to the maximum achievable using aluminium nitride (AlN). In principle, a different optimum combination of layers is required for the mass-loaded and non-mass-loaded resonators. The optimum combinations are applicable to both ladder and lattice implementations of the filter.

FIG. **4** illustrates a table with the coupling factor $k_r$ versus the thickness T3 of the top electrode **15** and versus the thickness T4 of the bottom electrode **13** of the filter's non-mass-loaded SBARs **8** as shown in FIG. **2**. The electrode metal is molybdenum (Mo) which has about twice the acoustic impedance of aluminium nitride, and very high quality aluminium nitride layers can be grown on it. Tantalum pentoxide ($Ta_2O_5$) and silicon dioxide ($SiO_2$) are employed as the high and the low impedance layers of the Bragg reflector. According to the table the optimum thicknesses of Molybdenum are seen to be in the region of T3=200 nm for the top electrode **15** and of T4=300 nm for the bottom electrode **13**. For this combination the corresponding thickness of the aluminium nitride is 1410 nm, and the corresponding maximum value of $k_r$ is 0.226.

FIG. **5** illustrates a table with the coupling factor $k_r$ versus the thickness T3 of the top electrode **15** and versus the thickness T4 of the bottom electrode **13** for the filter's mass-loaded resonators SBAR **8**. The optimum thicknesses of the molybdenum also are seen to be in the region of T3=200 nm for the top electrode **15** and of T4=300 nm for the bottom electrode **13** resulting in a maximum value of kr of 0.222. The mass-loading layer thickness is 150 nm. Other layer thicknesses are the same as for the non-mass-loaded SBARs described in FIG. **4**.

The enhancement of the coupling factor kr using the described optimum unequal thicknesses T3 and T4 should be even higher when tungsten (W) is used instead of molybdenum as tungsten has a mechanical impedance some 70% higher than that of molybdenum.

Filter implementation for the same centre frequency using sandwich SBARs is now considered.

FIG. **6** illustrates a table with the coupling factor $k_r$ versus the thickness T5 of the top electrode **25** and versus the thickness T6 of the bottom electrode **23** for the filter's non-mass-loaded sandwich SBARs **17**. The outer electrode layers **22**, **26** are of aluminium and the inner electrode layers **23**, **25** adjacent to the piezoelectric (AlN) layer **24** are of platinum (Pt). To achieve an adequately low electrical resistance it is proposed that the aluminium layers **22**, **26** have the same thickness, here set to 200 nm. The top **25** and the bottom **23** electrode layers are the variables. Optimum coupling factor $k_r$ is obtained with values of about T5=50 nm for the top electrode **25** and of about T6=150 nm for the bottom electrode **23** respectively. Between the electrodes **22** and **23** and/or between the electrodes **25** and **26** there may be a diffusion barrier consisting of a layer of e.g. TiN or a combination of layers of Ti and TiN. This diffusion barrier is to avoid inter-diffusion of the two electrode materials **22** and **23** or **25** and **26** respectively. The thickness of the thin diffusion barrier is between 10 and 30 nm and does not change the performance of the resonator substantially.

Case 2:21-cv-40441-JPM-MDD Document 283-2 Filed 10/04/23 Page 10 of 150 PageID #: 26243
PUBLIC VERSION

US 7,522,018 B2

5

FIG. **7** illustrates a table with the coupling factor $k_r$ versus the thickness T**5** of the top electrode **25** and versus the thickness T**6** of the bottom electrode **23** for the filter's mass-loaded SBARs **17**. Optimum coupling factor $k_r$ is again obtained with values of about T**5**=50 nm for the top electrode **25** and of about T**6**=150 nm for the bottom electrode **23** respectively. Other layer thicknesses are the same as for the non-mass-loaded sandwich SBARs described in FIG. **6**.

In both mass-loaded and non-mass-loaded sandwich SBARs optimum thicknesses of the inner Pt electrodes are almost independent of the thicknesses of the Al outer electrodes **22**, **26**. For optimum Pt layer thicknesses and Al layer thicknesses of 100 nm, 200 nm and 300 nm the coupling factor $k_r$=0.220, 0.216 and 0.202 respectively.

The invention may be summarised by a thin-film bulk acoustic wave resonator (**1**, **8**, **17**) of the membrane or FBAR type (**1**) or the solidly-mounted or SBAR type (**8**), either with single layer electrodes (**1**, **8**) or of the multiple-layer electrode sandwich construction (**17**), with an optimum coupling factor $k_r$, and thus increased bandwidth in filters incorporating such resonators. The optimum coupling factor $k_r$ is achieved by the arrangement that the top electrode (**6**, **15**, **25**) is thinner than the bottom electrode (**4**, **13**, **23**). The coupling factor is independent of the resonator's layout.

The invention claimed is:

**1**. Electro-acoustic resonator (**1**, **8**, **17**) comprising a membrane structure FBAR (**1**) with a layer structure comprising a piezoelectric layer (**5**, **14**, **24**) and a top (**6**, **15**, **25**) and a bottom (**4**, **13**, **23**) electrode layer, with the thickness (T**1**, T**2**, . . . T**6**) of the two electrode layers being unequal, characterised in that the top electrode layer (T**1**, T**3**, T**5**) is thinner than the bottom (T**2**, T**4**, T**6**) electrode layer to increase a filter bandwidth of the electro-acoustic resonator.

**2**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **1**, characterised in that a relative thickness of the two electrode layers maximizes the filter bandwidth.

**3**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **1**, characterised in that at least one of the electrode layers is formed by a stack of conductive materials (**25**, **26** or **22**, **23**).

**4**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **3**, characterised in that between the stacked conductive materials of the electrode layers (**22** and **23** and/or **25** and **26**) a conductive thin diffusion baffler is formed.

**5**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **4**, characterised in that the diffusion baffler between the stacked conductive materials of the electrode layers (**22** and **23** and/or **25** and **26**) consists of titanium nitride (TiN), or titanium (Ti), or consists of combinations of titanium nitride (TiN) and titanium (Ti).

6

**6**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **3**, characterised in that in the stack, the conductive material (**23**, **25**) in contact with the piezoelectric layer (**24**) has a lower acoustic impedance than the conductive material (**22**, **26**) that is not in contact with the piezoelectric layer (**24**).

**7**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **3**, characterised in that the conductive material (**23**, **25**) that is in contact with the piezoelectric layer (**24**) has a higher acoustic impedance than the conductive material (**22**, **26**) that is not in contact with the piezoelectric layer (**24**).

**8**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **7**, characterised in that the conductive material with the higher acoustic impedance comprises platinum (Pt), tungsten (W), molybdenum (Mo), titan-tungsten (Ti$_x$W$_{1-x}$, 0<x<1), Gold (Au).

**9**. Electro-acoustic (**1**, **8**, **17**) resonator as claimed in claim **7**, characterised in that the conductive material with the lower acoustic impedance comprises Aluminium (Al).

**10**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **1**, characterised in that the electrode layers (**4**, **6**, **13**, **15**, **23**, **25**) comprise Molybdenum (Mo) and that, for a resonant frequency in the region of 2 GHz, the thickness (T**1**, T**3**, T**5**) of the top Molybdenum layer (**6**, **15**, **25**) is in the region of 200 nm and the thickness (T**2**, T**4**, T**6**) of the bottom Molybdenum layer (**4**, **13**, **23**) is in the region of 300 nm, these thicknesses scaling approximately inversely with resonant frequency.

**11**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **1**, characterised in that the electrode layers (**4**, **6**, **13**, **15**, **23**, **25**) comprise platinum (Pt) and that, for a resonant frequency in the region of 2 GHz, the thickness (T**1**, T**3**, T**5**) of the top platinum layer (**6**, **15**,**25**) is in the region of 50 nm and the thickness (T**2**, T**4**, T**6**) of the bottom platinum layer (**4**, **13**, **23**) is in the region of 150 nm, these thicknesses scaling approximately inversely with resonant frequency.

**12**. Use of an electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **1**, as a component of a radio frequency (RF) filter, or as a component used in a sensor, or used in an ultrasonic transducer, or used in an array of ultrasonic transducers.

**13**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **1**, characterised in that a relative thickness of the two electrode layers maximizes a coupling factor of the electro-acoustic resonator (**1**, **8**, **17**).

**14**. Electro-acoustic resonator (**1**, **8**, **17**) as claimed in claim **1**, characterised in that a coupling factor of the electro-acoustic resonator (**1**, **8**, **17**) is greater than 0.215.

\* \* \* \* \*

PUBLIC VERSION

# EXHIBIT B

Case 1:21-cv-04447-JPM Document 63-2 Filed 06/30/22 Page 117 of 150 PageID #: 42536
PUBLIC VERSION

US009735755B2

(12) **United States Patent** (10) **Patent No.:** **US 9,735,755 B2**
Fattinger et al. (45) **Date of Patent:** **Aug. 15, 2017**

(54) **BAW RESONATOR HAVING LATERAL ENERGY CONFINEMENT AND METHODS OF FABRICATION THEREOF**

(71) Applicant: **RF Micro Devices, Inc.**, Greensboro, NC (US)

(72) Inventors: **Gernot Fattinger**, Sorrento, FL (US); **Alireza Tajic**, Winter Springs, FL (US)

(73) Assignee: **Qorvo US, Inc.**, Greensboro, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 29 days.

(21) Appl. No.: **14/876,426**

(22) Filed: **Oct. 6, 2015**

(65) **Prior Publication Data**

US 2017/0054429 A1 Feb. 23, 2017

**Related U.S. Application Data**

(60) Provisional application No. 62/207,702, filed on Aug. 20, 2015.

(51) **Int. Cl.**
$H03H\ 9/02$ (2006.01)
$H03H\ 9/13$ (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... **$H03H\ 9/02157$** (2013.01); **$H03H\ 3/02$** (2013.01); **$H03H\ 9/02086$** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........... H03H 9/02118; H03H 9/02102; H03H 9/132; H03H 9/02157; H03H 9/171; H03H 9/02086; H03H 3/02
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,612,488 B1 * 11/2009 Bouche ................. H03H 9/131
310/320
2002/0014808 A1 * 2/2002 Misu ................. H03H 9/02133
310/312
(Continued)

OTHER PUBLICATIONS

Pensala, Tuomas, "Thin Film Bulk Acoustic Wave Devices—Performance Optimization and Modeling," Dissertation, VTT Publications 756, 2011, pp. 50-53.

*Primary Examiner* — Robert Pascal
*Assistant Examiner* — Jorge Salazar, Jr.
(74) *Attorney, Agent, or Firm* — Withrow & Terranova, P.L.L.C.

(57) **ABSTRACT**

Embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered in such a manner that lateral leakage of mechanical energy from an active region of the BAW resonator is reduced, and methods of fabrication thereof, are disclosed. In some embodiments, a BAW resonator includes a piezoelectric layer, a first electrode on a first surface of the piezoelectric layer, a second electrode on a second surface of the piezoelectric layer opposite the first electrode, and a passivation layer on a surface of the second electrode opposite the piezoelectric layer, the passivation layer having a thickness $(T_{PA})$. The BAW resonator also includes a material on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator. The additional material has a thickness that is n times the thickness $(T_{PA})$ of the passivation layer.

**18 Claims, 9 Drawing Sheets**



Case 1:21-cv-00442-JPM Document 263-2 Filed 01/04/23 Page 118 of 150 PageID #: 36237
PUBLIC VERSION

(51) **Int. Cl.**
  *H03H 3/02*          (2006.01)
  *H03H 9/17*          (2006.01)
(52) **U.S. Cl.**
  CPC ........ *H03H 9/02118* (2013.01); *H03H 9/132*
                  (2013.01); *H03H 9/171* (2013.01)
(58) **Field of Classification Search**
  USPC ........................................ 333/133, 187, 188
  See application file for complete search history.

(56)                    **References Cited**

              U.S. PATENT DOCUMENTS

2013/0127300  A1 *    5/2013   Umeda ................... H01L 41/18
                                                               310/365
2015/0094000  A1 *    4/2015   Aigner .................... H03H 3/02
                                                               455/73

* cited by examiner

Case 2:20-cv-04717-JMV-MDC Document 2632-2 Filed 03/09/23 Page 194 of 350 PageID #: 94238
PUBLIC VERSION



*FIG. 1B*
*(PRIOR ART)*



*FIG. 1A*
*(PRIOR ART)*



66
BO RING 86
n*T_PA
T_PA
PASSIVATION LAYER 88
86
TOP ELECTRODE 72
PIEZOELECTRIC LAYER 68
BOTTOM ELECTRODE 70
SiO2 84
TUNGSTEN 82
SiO2 80
TUNGSTEN 78
SiO2 76
REFLECTOR 74
OUTER REGION 92
ACTIVE REGION 90
OUTER REGION 92
38
BO RING 58
T_PA
T_PA
PASSIVATION LAYER 60
58
TOP ELECTRODE 44
PIEZOELECTRIC LAYER 40
BOTTOM ELECTRODE 42
SiO2 56
TUNGSTEN 54
SiO2 52
TUNGSTEN 50
SiO2 48
REFLECTOR 46
OUTER REGION 64
ACTIVE REGION 62
OUTER REGION 64

*FIG. 2B*

*FIG. 2A*

PUBLIC VERSION



FIG. 3B



FIG. 3A



FIG. 4

Case 1:21-cv-40011-JPM Document 83-2 Filed 03/04/23 Page 123 of 150 PageID #: 3842
PUBLIC VERSION



FIG. 5A

Case 1:21-cv-01417-JPM Document 662-2 Filed 10/04/23 Page 124 of 150 PageID #: 36943
PUBLIC VERSION



*FIG. 5B*

Case 1:21-cv-04421-JPM Document 82-2 Filed 03/04/23 Page 125 of 150 PageID #: 8334
PUBLIC VERSION



FIG. 5C

Case 2:21-cv-00474-JRG Document 263-2 Filed 08/04/23 Page 21 of 150 PageID #: 8445
PUBLIC VERSION



*FIG. 5D*

66
BO RING 86
MATERIAL LAYER(S) 94
n*T_PA
T_PA
PASSIVATION LAYER 88
86
TOP ELECTRODE 72
PIEZOELECTRIC LAYER 68
BOTTOM ELECTRODE 70
SiO2 84
TUNGSTEN 82
SiO2 80
TUNGSTEN 78
SiO2 76
OUTER REGION 92
ACTIVE REGION 90
OUTER REGION 92
MATERIAL LAYER(S) 94
REFLECTOR 74

FIG. 5E

US 9,735,755 B2

1

**BAW RESONATOR HAVING LATERAL ENERGY CONFINEMENT AND METHODS OF FABRICATION THEREOF**

RELATED APPLICATIONS

This application claims the benefit of provisional patent application Ser. No. 62/207,702, filed Aug. 20, 2015, the disclosure of which is hereby incorporated herein by reference in its entirety.

FIELD OF THE DISCLOSURE

The present disclosure relates to Bulk Acoustic Wave (BAW) resonators and, in particular, to improvement of confinement of mechanical energy within a BAW resonator.

BACKGROUND

Due to, among other things, their small size, high Q values, and very low insertion losses at microwave frequencies, particularly those above 1.5 Gigahertz (GHz), Bulk Acoustic Wave (BAW) filters have become the filter of choice for many modern wireless applications. In particular, BAW filters are the filter of choice for many 3rd Generation (3G) and 4th Generation (4G) wireless devices. For instance, virtually all Long Term Evolution (LTE) compatible mobile devices operating in LTE frequency bands above 1.9 GHz utilize BAW filters. For mobile devices, the low insertion loss of the BAW filter provides many advantages such as, e.g., improved battery life, compensation for higher losses associated with the need to support many frequency bands in a single mobile device, etc.

One example of a conventional BAW resonator 10 is illustrated in FIG. 1A. In this example, the BAW resonator 10 is, in particular, a Solidly Mounted Resonator (SMR) type BAW resonator 10. As illustrated, the BAW resonator 10 includes a piezoelectric layer 12 (which is sometimes referred to as a piezoelectric plate) between a bottom electrode 14 and a top electrode 16. Since the BAW resonator 10 is a SMR type BAW resonator 10, the BAW resonator 10 also includes a reflector 18 (which is more specifically referred to as a Bragg reflector) that includes multiple layers 20-28 of alternating materials with varying refractive index. In this example, the BAW resonator 10 also includes a Border (BO) ring 30 on the top surface of the top electrode 16 around the periphery of the top electrode 16. Finally, the BAW resonator 10 includes a passivation layer 32.

In operation, acoustic waves in the piezoelectric layer 12 within an active region 34 of the BAW resonator 10 are excited by an electrical signal applied to the bottom and top electrodes 14 and 16. The active region 34 is the region of the BAW resonator 10 that is electrically driven. In other words, the active region 34 is the region of the BAW resonator 10 consisting of, in this example, the bottom electrode 14, the top electrode 16, the portion of the piezoelectric layer 12 between the bottom and top electrodes 14 and 16, and the portion of the reflector 18 below the bottom electrode 14. Conversely, an outer region 36 of the BAW resonator 10 is a region of the BAW resonator 10 that is not electrically driven (i.e., the area outside of the active region 34). The frequency at which resonance of the acoustic waves occurs is a function of the thickness of the piezoelectric layer 12 and the mass of the bottom and top electrodes 14 and 16. At high frequencies (e.g., greater than 1.5 GHz), the thick-

2

ness of the piezoelectric layer 12 is only micrometers thick and, as such, the BAW resonator 10 is fabricated using thin-film techniques.

Ideally, in order to achieve a high Q value, the mechanical energy should be contained, or trapped, within the active region 34 of the BAW resonator 10. The reflector 18 operates to prevent acoustic waves from leaking longitudinally, or vertically, from the BAW resonator 10 into the substrate (not shown, but below the reflector 18). Notably, in a Film Bulk Acoustic Resonator (FBAR) type BAW resonator, an air cavity is used instead of the reflector 18, where the air cavity likewise prevents acoustic waves from escaping into the substrate.

While the reflector 18 (or air cavity for a FBAR type BAW resonator) confines mechanical energy within the active region 34 of the BAW resonator 10 in the longitudinal, or vertical, direction, a substantial amount of mechanical energy still leaks laterally from the active region 34 of the BAW resonator 10 into the outer region 36 of the BAW resonator 10 and then down into the substrate, as illustrated FIG. 1B. This lateral leakage of mechanical energy at the boundaries of the BAW resonator 10 degrades the Q of the BAW resonator 10. As such, there is a need for systems and methods for mitigating the loss of mechanical energy through lateral dispersion into the outer region 36 of the BAW resonator 10.

SUMMARY

Embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered in such a manner that lateral leakage of mechanical energy from an active region of the BAW resonator is reduced, and methods of fabrication thereof, are disclosed. In some embodiments, a BAW resonator includes a piezoelectric layer, a first electrode on a first surface of the piezoelectric layer, a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer, and a passivation layer on a surface of the second electrode opposite the piezoelectric layer, the passivation layer having a thickness ($T_{PA}$). The BAW resonator also includes a material on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator. The outer region of the BAW resonator is a region outside of an active region of the BAW resonator. The additional material has a thickness that is n times the thickness ($T_{PA}$) of the passivation layer, wherein n is a value other than 1. In this manner, lateral leakage of the mechanical energy from the active region of the BAW resonator into the outer region of the BAW resonator can be reduced.

In some embodiments, n is within a range of values for which a density of mechanical energy in the outer region of the BAW resonator is reduced as compared to a density of mechanical energy in the outer region of the BAW resonator when n is equal to 1.

In some embodiments, n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region.

In some embodiments, the BAW resonator further includes a Border (BO) ring around a periphery of the active region of the BAW resonator within or on the second electrode, the BO ring providing a mass loading.

In some embodiments, the BAW resonator further includes a BO ring around a periphery of the active region

Case 1:21-cv-00411-JPM Document 263-2 Filed 03/04/23 Page 234 of 350 PageID #: 8438
PUBLIC VERSION

3

4

of the BAW resonator, and n is such that a thickness of the one or more material layers in the outer region of the BAW resonator is less than or equal to a combined thickness of the second electrode, the BO ring, and the passivation layer within the active region.

In some embodiments, the passivation layer is also on the surface of the piezoelectric layer adjacent to the second electrode in the outer region of the BAW resonator, and the one or more material layers in the outer region consist of the portion of the passivation layer in the outer region of the BAW resonator such that the thickness of the passivation layer in the outer region is n times the thickness $(T_{P4})$ of the passivation layer in the active region. Further, in some embodiments, the BAW resonator further includes a BO ring around a periphery of the active region of the BAW resonator, and n is such that a thickness of the passivation layer in the outer region of the BAW resonator is less than or equal to a combined thickness of the second electrode, the BO ring, and the passivation layer within the active region. Further, in some embodiments, the piezoelectric layer is Aluminum Nitride (AlN), the first and second electrodes each comprise a Tungsten layer and an Aluminum Copper layer, and the passivation layer is Silicon Nitride (SiN).

In some embodiments, the one or more material layers comprise one or more layers of a material other than a passivation material comprised in the passivation layer.

Embodiments of a method of fabricating a BAW resonator are also disclosed. In some embodiments, the method of fabrication of a BAW resonator includes providing an initial structure comprising a piezoelectric layer and a first electrode on a first surface of the piezoelectric layer, providing a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer, providing a passivation layer on a surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonator, the passivation layer having a thickness $(T_{P4})$ within the active region of the BAW resonator, and providing one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator, the outer region of the BAW resonator being a region outside of the active region of the BAW resonator and the one or more material layers having a thickness that is n times the thickness $(T_{P4})$ of the passivation layer, wherein n is a value other than 1.

Those skilled in the art will appreciate the scope of the present disclosure and realize additional aspects thereof after reading the following detailed description of the preferred embodiments in association with the accompanying drawing figures.

BRIEF DESCRIPTION OF THE DRAWING FIGURES

The accompanying drawing figures incorporated in and forming a part of this specification illustrate several aspects of the disclosure, and together with the description serve to explain the principles of the disclosure.

FIGS. 1A and 1B illustrate one example of a conventional Bulk Acoustic Wave (BAW) resonator and lateral leakage of mechanical energy from an active region of the BAW resonator into an outer region of the BAW resonator;

FIGS. 2A and 2B illustrate a BAW resonator having reduced lateral leakage, as compared to a reference BAW resonator, according to some embodiments of the present disclosure;

FIGS. 3A and 3B illustrate the reduced lateral leakage of the BAW resonator of FIG. 2B as compared to the reference BAW resonator of FIG. 2A, for one example implementation;

FIG. 4 illustrates a BAW resonator having reduced lateral leakage according to some other embodiments of the present disclosure; and

FIGS. 5A through 5E graphically illustrate a process for fabricating the BAW resonator of either FIG. 2B or FIG. 4 according to some embodiments of the present disclosure.

DETAILED DESCRIPTION

The embodiments set forth below represent the necessary information to enable those skilled in the art to practice the embodiments and illustrate the best mode of practicing the embodiments. Upon reading the following description in light of the accompanying drawing figures, those skilled in the art will understand the concepts of the disclosure and will recognize applications of these concepts not particularly addressed herein. It should be understood that these concepts and applications fall within the scope of the disclosure and the accompanying claims.

It should be understood that, although the terms first, second, etc. may be used herein to describe various elements, these elements should not be limited by these terms. These terms are only used to distinguish one element from another. For example, a first element could be termed a second element, and, similarly, a second element could be termed a first element, without departing from the scope of the present disclosure. As used herein, the term "and/or" includes any and all combinations of one or more of the associated listed items.

It should also be understood that when an element is referred to as being "connected" or "coupled" to another element, it can be directly connected or coupled to the other element or intervening elements may be present. In contrast, when an element is referred to as being "directly connected" or "directly coupled" to another element, there are no intervening elements present.

It should be understood that, although the terms "upper," "lower," "bottom," "intermediate," "middle," "top," and the like may be used herein to describe various elements, these elements should not be limited by these terms.

These terms are only used to distinguish one element from another. For example, a first element could be termed an "upper" element and, similarly, a second element could be termed an "upper" element depending on the relative orientations of these elements, without departing from the scope of the present disclosure.

The terminology used herein is for the purpose of describing particular embodiments only and is not intended to be limiting of the disclosure. As used herein, the singular forms "a," "an," and "the" are intended to include the plural forms as well, unless the context clearly indicates otherwise. It will be further understood that the terms "comprises," "comprising," "includes," and/or "including" when used herein specify the presence of stated features, integers, steps, operations, elements, and/or components, but do not preclude the presence or addition of one or more other features, integers, steps, operations, elements, components, and/or groups thereof.

Unless otherwise defined, all terms (including technical and scientific terms) used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this disclosure belongs. It will be further understood that terms used herein should be interpreted as having

US 9,735,755 B2

5

meanings that are consistent with their meanings in the context of this specification and the relevant art and will not be interpreted in an idealized or overly formal sense unless expressly so defined herein.

Embodiments of a Bulk Acoustic Wave (BAW) resonator in which an outer region of the BAW resonator is engineered in such a manner that lateral leakage of mechanical energy from an active region of the BAW resonator is reduced, and methods of fabrication thereof, are disclosed. In general, in some embodiments, a thickness of a material in the outer region of the BAW resonator is such that the outer region of the BAW resonator is acoustically matched to the active region of the BAW resonator in such a manner that wavelengths that cause the lateral leakage of mechanical energy are not excited in the active region. As a result, there is no leakage of wavelengths in the active region into oscillation modes in the outer region. In other words, the thickness of the material in the outer region of the BAW resonator is selected such that the extinction coefficient (i.e., the rate of exponential decay for evanescent waves) associated with the exponential decay in the outer region and the imaginary part of the lateral dispersion in the outer region are changed in such a manner that lateral leakage is reduced.

In this regard, FIGS. 2A and 2B illustrate a BAW resonator having reduced lateral leakage, as compared to a reference BAW resonator, according to some embodiments of the present disclosure. More specifically, FIG. 2A illustrates a reference BAW resonator 38. In this example, the reference BAW resonator 38 includes a piezoelectric layer 40 (which is sometimes referred to as a piezoelectric plate). The piezoelectric layer 40 may be any suitable type of piezoelectric material such as, for example, Aluminum Nitride (AlN) or Zinc Oxide (ZnO). Further, the piezoelectric layer 40 may be a single layer of piezoelectric material or may include multiple sublayers of the same or different piezoelectric materials.

The reference BAW resonator 38 further includes a bottom electrode 42 on a bottom surface of the piezoelectric layer 40 and a top electrode 44 on a top surface of the piezoelectric layer 40 opposite the bottom electrode 42. Each of the bottom and top electrodes 42 and 44 may be a single layer of one material or may include two or more layers of the same or different materials. For example, in some embodiments, each of the bottom and top electrodes 42 and 44 includes a layer of Tungsten immediately adjacent to the piezoelectric layer 40 and a layer of Aluminum Copper on the Tungsten layer opposite the piezoelectric layer 40.

In this example, the reference BAW resonator 38 is a Solidly Mounted Resonator (SMR) type BAW resonator and, as such, the reference BAW resonator 38 also includes a reflector 46 (which is more specifically referred to as a Bragg reflector) that includes multiple alternating layers 48, 50, 52, 54, and 56 of alternating materials with varying refractive index. In this example, the layers 48, 50, 52, 54, and 56 are alternating layers of Silicon Dioxide (SiO₂) and Tungsten.

In this example, the reference BAW resonator 38 also includes a Border (BO) ring 58. In this example, the BO ring 58 is a "ring" or "frame" of material that is on the top surface of the top electrode 44 around the periphery of the top electrode 44. However, the BO ring 58 may alternative be within the top electrode 44 (i.e., beneath a first metal layer of multiple metal layers forming the top electrode 44 or between two adjacent metal layers in a stack of metal layers forming the top electrode). As will be appreciated by one of ordinary skill in the art, the BO ring 58 provides mass

6

loading or thickened edge loading, where this mass loading avoids acoustic mismatch between an active region and an outer region, providing a smooth transition of propagating waves in the active region to evanescent waves in the outer region.

Lastly, the reference BAW resonator 38 includes a passivation layer 60 on the surface of the reference BAW resonator 38 over both an active region 62 and an outer region 64 of the reference BAW resonator 38. While the passivation layer 60 can be of any suitable material, in one example, the passivation layer 60 is Silicon Nitride (SiN). For the reference BAW resonator 38, a thickness ($T_{P4}$) of the passivation layer 60 is the same both in the active region 62 and in the outer region 64. Notably, as used herein, the active region 62 is the region of the reference BAW resonator 38 that is electrically driven which, in the example of FIG. 2A, is the region consisting of the bottom electrode 42, the top electrode 44, the portion of the piezoelectric layer 40 between the bottom and top electrodes 42 and 44, and the portion of the reflector 46 beneath the bottom electrode 42. The outer region 64 is the region of the reference BAW resonator 38 that is not electrically driven or, in other words, the region of the reference BAW resonator 38 that is outside of the active region 62.

As illustrated in FIG. 3A, during operation, the reference BAW resonator 38 of FIG. 2A exhibits a significant amount of lateral leakage of mechanical energy from the active region 62 into the outer region 64. This lateral leakage, or lack of lateral confinement, degrades the quality factor (Q) of the reference BAW resonator 38.

FIG. 2B illustrates a BAW resonator 66 with improved lateral confinement (i.e., reduced lateral leakage) of mechanical energy according to some embodiments of the present disclosure. In this example, the BAW resonator 66 includes a piezoelectric layer 68 (which is sometimes referred to as a piezoelectric plate), bottom and top electrodes 70 and 72, a reflector 74 including layers 76, 78, 80, 82, and 84, and a BO ring 86, which are exactly the same as the corresponding components of the reference BAW resonator 38 and, as such, their details are not repeated.

Lastly, the BAW resonator 66 includes a passivation layer 88 on the surface of the BAW resonator 66 over both an active region 90 and an outer region 92 of the BAW resonator 66. Within the active region 90, the passivation layer 88 is exactly the same as the passivation layer 60 of the reference BAW resonator 38. Within the active region 90, the passivation layer 88 has a thickness ($T_{P4}$), which is equal to that of the passivation layer 60 of the reference BAW resonator 38. However, in the outer region 92, the passivation layer 60 has a thickness of $n \times T_{P4}$, where $n \ne 1$ (i.e., the thicknesses of the passivation layers 60 and 88 in the outer regions 64 and 92 of the reference BAW resonator 38 and the BAW resonator 66, respectively, are not the same). The value of n is in a range that reduces the lateral leakage of mechanical energy from the active region 90 of the BAW resonator 66 into the outer region 92 as compared to that of the reference BAW resonator 38 of FIG. 2A. This reduction of lateral leakage is illustrated in FIG. 3B, where FIGS. 3A and 3B are graphical illustrations of the results of a simulation of the density of mechanical energy throughout the structures of the reference BAW resonator 38 and the BAW resonator 66, respectively.

Suitable values for n may be determined, e.g., by simulation or, in some cases, empirically. However, for most practical implementations, empirical calculations are complex and, as such, simulation will provide better results.

Case 1:21-cv-01417-JPM Document 632-2 Filed 01/04/23 Page 26 of 150 PageID #: 86950
PUBLIC VERSION

7

8

In general, the value of n is such that the outer region **92** and the active region **90** of the BAW resonator **66** are acoustically matched such that one or more acoustic wavelengths that cause lateral leakage of mechanical energy from the active region **90** into the outer region **92** are not excited in the active region **90**. As a result, the acoustic coupling between the active and outer regions **90** and **92** is mitigated and, as such, lateral leakage is reduced. In other words, n is selected such that the total thickness of the material on the surface of the piezoelectric layer **68** in the outer region **92** of the BAW resonator **66** changes the extinction coefficient associated with the exponential decay in the outer region **92** (as compared to that in the reference BAW resonator **38**) and modifies the imaginary part of the lateral dispersion in the outer region **92** in such a manner that lateral leakage is reduced. In some embodiments, the value of n is selected such that the total thickness of the layers on the surface of the piezoelectric layer **68** in the outer region **92** is less than or equal to the total thickness of the top electrode **72**, the BO ring **86**, and the passivation layer **88** within the active region **90**. This can be expressed as:

$$T_{PA\_OUT} = n*T_{PA} \leq T_{ELEC} + T_{BO} + T_{PA},$$

where $T_{PA\_OUT}$ is the thickness of the passivation layer **88** in the outer region **92**, $T_{ELEC}$ is the thickness of the top electrode **72**, $T_{BO}$ is the thickness of the BO ring **86**, and $T_{PA}$ is the thickness of the passivation layer **88** in the active region **90**. In some embodiments, within the range of $0 < n*T_{PA} \leq T_{ELEC} + T_{BO} + T_{PA}$, the value of n that provides the best performance (e.g., highest Q) can be determined, e.g., via simulation. Thus, the value of n can be said to be a function of the thicknesses of the material stack in the active region **90**.

In the embodiment of FIG. **2**B, the material layers (i.e., the stack of material layers) in the outer region **92** is modified via the thickness of the passivation layer **88** in the outer region **92**. However, the present disclosure is not limited thereto. Additional or alternative materials may be used in the outer region **92** to provide the desired reduction in lateral leakage. In this regard, FIG. **4** illustrates the BAW resonator **66** according to another embodiment of the present disclosure. In this example, the material layer(s) on the surface of the piezoelectric layer **68** in the outer region **92** are generalized as material layer(s) **94**. The material layer(s) **94** may be the same material as the passivation layer **88** (i.e., the embodiment of FIG. **2**B), some other material(s), or any combination thereof. The material layer(s) **94** has a thickness that is $n \times T_{PA}$, as described above. As also described above, the value of n is selected such that lateral leakage is reduced as compared to a corresponding reference BAW resonator (i.e., a BAW resonator that, other than the material layer(s) **94**, is otherwise exactly the same as the BAW resonator **66**).

In the examples of FIGS. **2**B and **4**, the BAW resonator **66** is a SMR type BAW resonator. However, the concepts disclosed herein are equally applicable to Film Bulk Acoustic Resonator (FBAR) type BAW resonators.

Notably, the use of the material (i.e., the passivation layer **88** having thickness $n \times T_{PA}$ in the embodiment of FIG. **2**B or the material layer(s) **94** in the embodiment of FIG. **4**) in the outer region **92** of the BAW resonator **66** as described herein is to be distinguished from conventional treatment of type II dispersion stacks. With respect to conventional treatment of type II resonators, mass loading of a BAW resonator is used to move the cutoff frequency of the outer region of the BAW resonator to be in the correct position, relative to the cutoff frequency of the active region, in order to trap the waves

associated with the main thickness extensional wave mode. More specifically, there are two types of lateral dispersion that a thickness extensional BAW resonator can exhibit, namely, Type I and Type II. Type I, which is normally exhibited by ZnO based BAW resonators, is where the dispersion curve of the main thickness extensional wave mode is monotonically increasing from the cut-off frequency, which is defined by the frequency at which the dispersion curve crosses from real to imaginary. For Type I dispersion, mass loading of the BAW resonator in the outer region is not needed. More specifically, the top electrode not being present in the outer region is sufficient to have the outside cutoff frequency above the active cutoff frequency. This leads to an exponentially decaying main thickness wave mode in the outer region and, thus, trapping of the main thickness wave mode in the active region.

Type II lateral dispersion, which is normally exhibited by AlN based BAW resonators, is where the dispersion curve of the main thickness extensional wave mode has a negative slope. For conventional mass loading with respect to BAW resonators exhibiting Type II dispersion, the idea is to trap the small kx wave modes on the negative part of the main thickness branch. For that, the cutoff frequency of the outer region of the BAW resonator must be below the cutoff frequency of the active region to ensure that there is no propagating wave mode associated with the main thickness wave mode in the outer region. Therefore, conventional mass loading is used to move the cutoff frequency of the outer region of the BAW resonator below the cutoff frequency of the active region.

The problem with such conventional treatment of type II resonator is that it does not take into account the presence of any other higher kx branches. In practice, other higher kx branches must be taken into account to minimize lateral leakage.

In the present disclosure, depending on the particular implementation, the BAW resonator **66** may exhibit either Type I or Type II dispersion. Regardless of the dispersion type exhibited by the BAW resonator **66**, unlike conventional treatment of type II resonators which moves the cutoff frequency of the outer region to a desired point relative to the cutoff frequency of the active region (i.e., higher than the cutoff frequency of the active region for Type I dispersion or lower than the cutoff frequency of the active region for Type II dispersion), the material stack in the outer region **92** of the BAW resonator **66** is engineered, as described above, in such a manner that the extinction coefficient associated with the exponential decay in the outer region **92** is changed and the imaginary part of the lateral dispersion in the outer region **92** is modified. By doing so, the way in which waves decay in the outer region **92** can be controlled to reduce lateral leakage. For example, for an embodiment of the BAW resonator **66** exhibiting Type II dispersion, the material stack in the outer region **92** is modified to improve energy trapping by modifying the imaginary part of the dispersion curve in the outer region **92**. While engineering the material stack in the outer region **92** in this manner will alter the cutoff frequency of the outer region **92**, the altered cutoff frequency of the outer region **92** will not necessarily be lower than the cutoff frequency of the active region **90**, which is contrary to the conventional mass loading for Type II dispersion.

FIGS. **5**A through **5**E graphically illustrate a process for fabricating the BAW resonator of either FIG. **2**B or FIG. **4** according to some embodiments of the present disclosure. As illustrated, the process begins with an initial structure that includes the piezoelectric layer **68**, the bottom electrode **70**, and, in this example, the reflector **74**. Note, however, that

US 9,735,755 B2

9

the initial structure may vary depending on the particular implementation. The initial structure may be fabricated using any appropriate process.

Next, as illustrated in FIG. 5B, the top electrode 72 is provided on (e.g., formed or deposited on) the surface of the piezoelectric layer 68 opposite the bottom electrode 70. Then, in this example, the BO ring 86 is provided on the surface of the top electrode 72 opposite the piezoelectric layer 68 around the periphery of the active region 90, as illustrated in FIG. 5C. Lastly, in the embodiment of FIG. 2B, the passivation layer 88 is provided (e.g., formed or deposited) on the surface of the BAW resonator 66 in both the active region 90 and the outer region 92 such that the thickness of the passivation layer 88 in the outer region 92 is n times the thickness ($T_{PA}$) of the passivation layer 88 within the active region 90, as illustrated in FIG. 5D. More generally, the passivation layer 88 is provided in the active region 90 and the one or more material layers 94 are provided in the outer region 92 according to the embodiment of FIG. 4, as illustrated in FIG. 5E.

Those skilled in the art will recognize improvements and modifications to the preferred embodiments of the present disclosure. All such improvements and modifications are considered within the scope of the concepts disclosed herein and the claims that follow.

What is claimed is:

1. A Bulk Acoustic Wave (BAW) resonator, comprising:
   a piezoelectric layer;
   a first electrode on a first surface of the piezoelectric layer;
   a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer;
   a passivation layer on a surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonator, the passivation layer having a thickness ($T_{PA}$) within the active region of the BAW resonator; and
   one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator, the outer region of the BAW resonator being a region outside of the active region of the BAW resonator and the one or more material layers having a thickness that is n times the thickness ($T_{PA}$) of the passivation layer within the active region, wherein:
      n is a value other than 1; and
      n is within a range of values for which a density of mechanical energy in the outer region of the BAW resonator is reduced as compared to a density of mechanical energy in the outer region of the BAW resonator when n is equal to 1.

2. The BAW resonator of claim 1 wherein the one or more material layers comprise one or more layers of a material other than a passivation material comprised in the passivation layer.

3. The BAW resonator of claim 1 wherein n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region.

4. The BAW resonator of claim 1 further comprising a border ring around a periphery of the active region of the BAW resonator within or on the second electrode, the border ring providing a mass loading.

5. The BAW resonator of claim 1 further comprising a border ring around a periphery of the active region of the

10

BAW resonator, and n is such that a thickness of the one or more material layers in the outer region of the BAW resonator is less than or equal to a combined thickness of the second electrode, the border ring, and the passivation layer within the active region.

6. The BAW resonator of claim 1 wherein the passivation layer is also on the second surface of the piezoelectric layer adjacent to the second electrode in the outer region of the BAW resonator, and the one or more material layers in the outer region is formed by a portion of the passivation layer in the outer region of the BAW resonator such that a thickness of the passivation layer in the outer region is the n times the thickness ($T_{PA}$) of the passivation layer in the active region.

7. The BAW resonator of claim 6 further comprising a border ring around a periphery of the active region of the BAW resonator, and n is such that a thickness of the passivation layer in the outer region of the BAW resonator is less than or equal to a combined thickness of the second electrode, the border ring, and the passivation layer within the active region.

8. The BAW resonator of claim 7 wherein the piezoelectric layer is Aluminum Nitride (AlN), the first and second electrodes each comprise a Tungsten layer and an Aluminum Copper layer, and the passivation layer is Silicon Nitride (SiN).

9. A BAW resonator comprising:
   a piezoelectric layer;
   a first electrode on a first surface of the piezoelectric layer;
   a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer;
   a passivation layer on a surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonator, the passivation layer having a thickness ($T_{PA}$) within the active region of the BAW resonator; and
   one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator, the outer region of the BAW resonator being a region outside of the active region of the BAW resonator and the one or more material layers having a thickness that is n times the thickness ($T_{PA}$) of the passivation layer within the active region, wherein:
      n is a value other than 1; and
      n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region.

10. A method of fabricating a BAW resonator, comprising:
   providing an initial structure comprising a piezoelectric layer and a first electrode on a first surface of the piezoelectric layer;
   providing a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer;
   providing a passivation layer on a surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonator, the passivation layer having a thickness ($T_{PA}$) within the active region of the BAW resonator; and
   providing one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator, the

Case 1:21-cv-01417-JPM Document 632-2 Filed 08/04/23 Page 133 of 150 PageID #: 84452
PUBLIC VERSION

11

outer region of the BAW resonator being a region outside of the active region of the BAW resonator and the one or more material layers having a thickness that is n times the thickness ($T_{P4}$) of the passivation layer within the active region, wherein:

n is a value other than 1; and

n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region.

**11**. A method of fabricating a Bulk Acoustic Wave (BAW) resonator, comprising:

providing an initial structure comprising a piezoelectric layer and a first electrode on a first surface of the piezoelectric layer;

providing a second electrode on a second surface of the piezoelectric layer opposite the first electrode on the first surface of the piezoelectric layer;

providing a passivation layer on a surface of the second electrode opposite the piezoelectric layer within an active region of the BAW resonator, the passivation layer having a thickness ($T_{P4}$) within the active region of the BAW resonator; and

providing one or more material layers on the second surface of the piezoelectric layer adjacent to the second electrode in an outer region of the BAW resonator, the outer region of the BAW resonator being a region outside of the active region of the BAW resonator and the one or more material layers having a thickness that is n times the thickness ($T_{P4}$) of the passivation layer within the active region, wherein:

n is a value other than 1; and

n is within a range of values for which a density of mechanical energy in the outer region of the BAW resonator is reduced as compared to a density of mechanical energy in the outer region of the BAW resonator when n is equal to 1.

**12**. The method of claim **11** wherein n is such that the outer region of the BAW resonator and the active region of the BAW resonator are acoustically matched in such a

12

manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region.

**13**. The method of claim **11** further comprising providing a border ring around a periphery of the active region of the BAW resonator within or on the second electrode, the border ring providing a mass loading.

**14**. The method of claim **11** further comprising providing a border ring around a periphery of the active region of the BAW resonator, and n is such that a thickness of the one or more material layers in the outer region of the BAW resonator is less than or equal to a combined thickness of the second electrode, the border ring, and the passivation layer within the active region.

**15**. The method of claim **11** wherein providing the passivation layer comprises providing the passivation layer such that the passivation layer is also on the second surface of the piezoelectric layer adjacent to the second electrode in the outer region of the BAW resonator, and the one or more material layers in the outer region is formed by a portion of the passivation layer in the outer region of the BAW resonator such that the thickness of the passivation layer in the outer region is the n times the thickness ($T_{P4}$) of the passivation layer in the active region.

**16**. The method of claim **15** further comprising providing a border ring around a periphery of the active region of the BAW resonator, and n is such that a thickness of the passivation layer in the outer region of the BAW resonator is less than or equal to a combined thickness of the second electrode, the border ring, and the passivation layer within the active region.

**17**. The method of claim **16** wherein the piezoelectric layer is Aluminum Nitride (AlN), the first and second electrodes each comprise a Tungsten layer and an Aluminum Copper layer, and the passivation layer is Silicon Nitride (SiN).

**18**. The method of claim **11** wherein the one or more material layers comprise one or more layers of a material other than a passivation material comprised in the passivation layer.

* * * * *

**<u>Exhibit C</u>**
(Protective Order)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417 (JPM) |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | **JURY TRIAL DEMANDED** |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## STIPULATED PROTECTIVE ORDER

IT IS HEREBY STIPULATED, by and between Plaintiff, Qorvo Inc. ("Qorvo") and Defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively "Akoustis"), by and through their respective attorneys of record, as follows ("Party" refers, individually, to (a) Qorvo or (b) Akoustis; "Parties" refers, collectively, to each Party):

1.     **Purpose.** Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting, defending, or attempting to settle this litigation may be warranted. Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order. The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

2.     **Scope.** All disclosures, affidavits, and declarations and exhibits thereto, deposition testimony and exhibits, discovery responses, documents, electronically stored information, tangible objects, information, and other things produced, provided, or disclosed in the course of this action, or any portion thereof, which may be subject to restrictions on disclosure under this Order, and information derived directly therefrom (hereinafter referred to collectively as "Documents"), shall be subject to this Order as set forth below. As there is a presumption in favor

of open and public judicial proceedings in the federal courts, this Order shall be strictly construed in favor of public disclosure and open proceedings wherever possible. The Order is also subject to the Local Rules of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation of time periods.

3.     **Form and Timing of Designation.** A Party may designate Documents as confidential and restricted from disclosure under this Order, pursuant to the procedures set forth herein ("Protected Material"). A Party designates Documents as Protected Material by placing or affixing the words "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" (hereinafter referred to as "CONFIDENTIAL") or "ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER" (hereinafter referred to as "ATTORNEYS EYES ONLY") on the Document in a manner that will not interfere with the legibility of the Document and that will permit complete removal of the designation. Documents shall be designated prior to or at the time of the production or disclosure of the Documents. When a tangible object is produced for inspection, subject to protection under this Order, a photograph thereof shall be produced at the time of inspection labeled with the designation CONFIDENTIAL or ATTORNEYS EYES ONLY. Thereafter, any information learned or obtained as a result of the inspection shall be subject to protection under this Order in accordance with the applicable designation, including any information copied or extracted from protected Documents; (2) all copies, excerpts, summaries, or compilations of protected Documents; and (3) any testimony, conversations, or presentations by Parties or their counsel that might reveal the contents of protected Documents. When electronically stored information is produced on physical media or via online transfer, and where the electronically stored information cannot itself be marked with the designation CONFIDENTIAL or ATTORNEYS EYES ONLY, the physical media and/or the electronic container (e.g., zip folder) in which such electronically stored information is produced shall be marked with the applicable designation. The Party receiving such electronically stored information shall then be responsible for labeling any copies that it creates thereof, whether electronic or paper, with the applicable designation. By written stipulation, the Parties may agree temporarily to designate original Documents that are produced for inspection CONFIDENTIAL or ATTORNEYS EYES ONLY even though the original Documents being produced have not themselves been so labeled. All information learned in the course of such an inspection shall be protected in accordance with the stipulated designation. The

copies of Documents that are selected for copying during such an inspection shall be marked CONFIDENTIAL or ATTORNEYS EYES ONLY as required under this Order and, thereafter, the copies shall be subject to protection under this Order in accordance with their designation. The designation of Documents for protection under this Order does not mean that the Document has any status or protection by statute or otherwise, except to the extent and for the purposes of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Each Party that designates Protected Material under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. To the extent it is practical to do so, the designating Party must designate for protection only those parts of materials, documents, items, or oral or written communications that qualify – so that other portions of the materials, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order. For purposes of producing documents in response to requests for production, the Parties may designate an entire single document at the highest level of confidentiality to which any portion of the document is entitled and the Parties shall not be required to separately designate individual pages of a contiguous document at a lower level of confidentiality, even if those pages viewed in isolation do not warrant the same confidentiality level. To the extent there is good cause for a specific document to be redacted so as to create a lower confidentiality version of the document, the Parties agree to meet and confer in good faith to attempt to resolve any disagreement over such redactions.

4. **Documents Which May be Designated CONFIDENTIAL.** Any Party may designate Documents as CONFIDENTIAL upon making a good faith determination that the Documents contain information protected from disclosure by statute or that should be protected from disclosure as confidential business or personal information, medical or psychiatric information, trade secrets, personnel records, or such other sensitive commercial information that is not publicly available. However, the protections conferred by this Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a receiving Party or becomes part of the public domain after its disclosure to a receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or

otherwise; and (b) any information known to the receiving Party prior to the disclosure or obtained by the receiving Party after the disclosure, in each case through a source who obtained the information lawfully and under no obligation of confidentiality to the designating Party.

5.      **Documents Which May be Designated ATTORNEYS EYES ONLY**. Any Party may designate Documents as ATTORNEYS EYES ONLY upon making a good faith determination that the Documents contain information protected from disclosure by statute or that should be protected from disclosure as trade secrets or other highly sensitive business or personal information, the disclosure of which is likely to cause significant harm to an individual or to the business or competitive position of the designating Party.

6.      **Depositions.** Deposition testimony shall be deemed CONFIDENTIAL or ATTORNEYS EYES ONLY only if designated as such on the record, before the close of the deposition, hearing, or other proceeding, or in writing within two business days after the conclusion of the deposition, hearing, or other proceeding. The entire testimony transcript shall be protected under the terms of this Order for thirty (30) days following receipt of the final testimony transcript, during which time the designating Party shall identify the specific portions of the testimony that are CONFIDENTIAL or ATTORNEYS EYES ONLY. Only those specific portions of the testimony that are designated for protection within the 30 days after receipt of the final transcript shall be covered by the provisions of this Stipulated Protective Order.  Alternatively, if it is impractical to identify specific portions of testimony that are CONFIDENTIAL or ATTORNEYS EYES ONLY, a designating Party may specify that the entire testimony transcript shall be treated as CONFIDENTIAL or ATTORNEYS EYES ONLY. The use of a Document as an exhibit at a deposition shall not in any way affect its designation as CONFIDENTIAL or ATTORNEYS EYES ONLY.  Transcripts containing testimony designated as CONFIDENTIAL or ATTORNEYS EYES ONLY shall have an obvious legend on the title page that the transcript contains Protected Material.

7.      **Inadvertent Failures to Designate**.  If timely corrected by the Designating Party following discovery, an inadvertent failure to designate qualified information or items does not, standing alone, waive the designating Party's right to secure protection under this Order for such

4

material.  Upon notice of a correction of a designation, the receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order, and the producing Party must promptly reproduce the information or items with the proper designation.  If the receiving Party contends the correction is not timely then the parties shall meet and confer and if there is no informal resolution, the receiving Party may seek an order to de-designate the material at issue.

**8.** **Protection of Protected Material**. Each receiving Party shall treat the other parties' documents with the same standard of care with which the receiving Party treats and protects its own confidential and proprietary documents or pursuant the standard set forth in this Agreement, whichever is greater.

      **(a)** **Storage and Handling.** All Protected Material must be stored and maintained by a receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.  Electronic documents shall be stored in a manner where proper authentication credentials are required for access.  In addition to those provisions provided for elsewhere in this Order, the following security measures shall also apply to those types of Protected Material that the following persons are authorized to receive:  (1) for Outside Counsel, paralegals, and support staff working under the direction of Outside Counsel, the user's network credentials for their employer's network shall be deemed proper authentication credentials; (2) for In-House Counsel and their support staff, any received Protected Material shall be maintained in a manner where access is limited to only In-House Counsel and their support staff and where employees outside the legal department are not permitted access to the Protected Material; (3) for receiving Party reviewers and their support staff, any received Protected Material shall be maintained in a manner where access is limited to only the receiving Party reviewers and their support staff and where other employees (except In-House Counsel and their support staff) are not permitted access to the Protected Material; and (4) for Consultants and Experts, and their support staff, any received Protected Material shall be stored by the Consultants and Exports only on password-protected media or accounts.  No Protected Materials will be accessed or reviewed over open, unsecure or public wireless networks without the use of secure socket layer ("SSL") tunneling, a virtual private network conduit ("VPN") or similarly secure networking technology

in place. To the extent Protected Material of another Party is disclosed to any Party herein, as set forth in Section 8(b)(2), below, the following handling rules apply: Any electronic transmissions of such Protected Material to or from the receiving Party shall be encrypted with at least 128-bit file encryption prior to any upload or transfer, and the transmission shall be made in a secure manner. Further, at no time shall Protected Material of another Party be stored by the receiving Party or transmitted electronically to or from the receiving Party in a manner in which the materials are present in unencrypted form on any server in their "at rest" state.

      **(b)**       **Protected Materials Designated CONFIDENTIAL.** Protected Materials designated CONFIDENTIAL under this Order shall not be used for any purpose whatsoever other than the prosecution or defense of this action and of any appeal thereof. The Parties and counsel for the Parties shall not disclose or permit the disclosure of any Protected Materials designated CONFIDENTIAL to any person or entity, except as set forth in subparagraphs (1)-(9). Subject to these requirements, the following categories of persons may be allowed to review Protected Materials that have been designated CONFIDENTIAL:

      (1)     <u>Outside Counsel of Record</u>. Outside counsel of record for the Parties and employees and agents of outside counsel of record to whom it is reasonably necessary to disclose the information for the preparation and trial of the action and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

      (2)     <u>Parties</u>. The officers, directors, and employees (including in-house counsel) of the Parties to whom it is reasonably necessary to disclose the information for the preparation and trial of the action and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

      (3)     <u>The Court</u>. The Court and its personnel.

      (4)     <u>Court Reporters and Recorders</u>. Court reporters and recorders engaged for depositions.

(5)   Persons Creating or Receiving Documents. Any person who authored or recorded the designated Document and any person who has previously seen the designated Document.

(6)   Employees of the Producing Party.  Any employee of the Party that has designated the Document as CONFIDENTIAL.

(7)   Consultants and Experts. A person with specialized knowledge or experience in a matter pertinent to the litigation who is not a current employee of a Party, who has not been an employee of a Party for at least 24 months and who is not anticipated to become an employee of a Party ("Qualified Person"), provided that each such Qualified Person has also been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, pursuant to the requirements of Section 9, but only after such person has completed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

(8)   Professional Document Processing Vendors:  persons or entities that provide litigation support services (e.g., photocopying, videotaping, clerical preparation of exhibits or demonstratives, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors, including graphics professionals who create graphic materials or demonstratives and who are providing more than clerical or copying services. In the case of a Professional Document Processing Vendor, a single Exhibit A, "Acknowledgment and Agreement to Be Bound," must be executed by a corporate representative of the Professional Document Processing Vendor prior to disclosure of the Protected Materials.

(9)   Others by Consent. Other persons only by written consent of the producing Party or upon order of the Court and on such conditions as may be agreed or ordered. All such persons shall complete the "Acknowledgment and Agreement to

Be Bound" that is attached hereto as Exhibit A  and provide the same to the producing Party before access is given.

**(c)** **Protected Material Designated ATTORNEYS EYES ONLY.** Protected Material ATTORNEYS EYES ONLY under this Order shall not be used for any purpose whatsoever other than the prosecution or defense of this action, and of any appeal thereof. The Parties and counsel for the Parties shall not disclose or permit the disclosure of any Protected Material designated ATTORNEYS EYES ONLY to any person or entity, except as set forth in subparagraphs 8(b)(1) and (3)-(9) set forth above.

**(d)** **Control of Documents.** Counsel for the Parties shall take reasonable and appropriate measures to prevent unauthorized access to or disclosure of Documents designated for protection under this Order. Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of one (1) year after dismissal of the action, the entry of final judgment and/or the conclusion of any appeals arising therefrom.

**(e)** **Copies.** All copies of Documents designated for protection under this Order, or any individual portion of such a Document, shall be marked with the designation CONFIDENTIAL or ATTORNEYS EYES ONLY if the words do not already appear on the copy. All such copies shall be entitled to the protection of this Order. The term "copies" shall not include indices, electronic databases, or lists of Documents, provided these indices, electronic databases, or lists do not contain substantial portions or images of the text of designated Documents or otherwise disclose the substance of the designated Documents.

**9.** **Disclosure to Experts and Consultants.** Trial counsel desiring to disclose Protected Materials to experts or consultants specified in Paragraph 8(b)(7) above shall first obtain a signed undertaking, in the form of Exhibit A attached hereto, from each such expert or consultant, and such counsel shall retain in his/her files the original of each such signed undertaking. A copy of the proposed undertaking shall be forwarded to opposing counsel with the current curriculum vitae for such expert or consultant. Such curriculum vitae, or other disclosure materials provided therewith, shall identify all current and former employers and/or consulting engagements within the ten (10) years prior to the date of such disclosure, as

well as a list of the cases in which the person has testified at deposition or trial within the last five (5) years[1]. No Protected Materials shall be disclosed to such expert or consultant attorney until after the expiration of a five (5) business day period commencing with the service of a copy of the proposed undertaking and curriculum vitae, provided, however, that if during that five (5) business day period opposing counsel makes an objection to such disclosure, there shall be no disclosure of Protected Materials to such expert or consultant except by mutual agreement of the parties or further order of the Court. All objections must be made in writing and for good cause and must state the reasons for such objections. If opposing counsel objects to disclosure to the person within such five (5) business day period, the parties shall meet and confer via telephone or in person within three (3) business days following the objection and attempt in good faith to resolve the dispute on an informal basis. If the dispute is not resolved, the party objecting to the disclosure will have five (5) business days from the date of the meet and confer to seek relief from the Court pursuant to Paragraph 8(h) of the Scheduling Order. If relief is not sought from the Court within that time, the objection shall be deemed withdrawn. If relief is sought, Protected Materials shall not be disclosed to the person in question until the Court resolves the objection.

10.     **<u>Filing of Protected Material Under Seal.</u>** Any party may file or lodge with the Court documents or tangible items designated as CONFIDENTIAL or ATTORNEYS EYES ONLY. Any briefs, transcripts, exhibits, depositions, or documents that are filed with the Court and that comprise, embody, summarize, or quote from documents or tangible things designated as CONFIDENTIAL or ATTORNEYS EYES ONLY material shall be sealed, unless the Parties otherwise agree in writing or the Court otherwise orders. Where reasonably practicable, only the portions of documents consisting of such items or information shall be lodged under seal. To the extent physical copies of documents containing Protected Material are filed or lodged, those physical copies must be placed in sealed envelopes or other appropriate sealed containers. Each sealed envelope or container shall be endorsed with the title and case number of this action, and a legend in substantially the following form:

> CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER. THE MATERIALS CONTAINED HEREIN HAVE BEEN DESIGNATED AS CONFIDENTIAL OR CONFIDENTIAL – OUTSIDE COUNSEL ONLY PURSUANT TO PROTECTIVE ORDER AND MAY NOT BE EXAMINED OR COPIED EXCEPT BY THE COURT OR PURSUANT TO COURT ORDER.

---

[1] If the expert or consultant believes any of this information is subject to a confidentiality obligation to a third-party, then the expert or consultant should provide whatever information the expert or consultant believes can be disclosed without violating any confidentiality agreements, and the party seeking to disclose to the expert or consultant shall be available to meet and confer with opposing counsel regarding any such engagement.

**11.**     **Challenges by a Party to a Designation for Protection Under this Order.**

**(a)**     Any CONFIDENTIAL or ATTORNEYS EYES ONLY designation is subject to challenge by any Party or non-Party with standing to object (hereafter "challenging Party"). Before filing any motions or objections to a designation for protection under this Order with the Court, the objecting Party shall have an obligation to meet and confer with the designating Party to make a reasonable effort to resolve the objection by agreement, in accordance with Local Rule 7.1.1. If agreement is reached confirming or waiving the CONFIDENTIAL or ATTORNEYS EYES ONLY designation as to any Documents subject to the objection, the designating Party shall serve on all Parties a notice specifying the Documents and the nature of the agreement.

**(b)**     If the Parties cannot resolve a challenge without court intervention, the designating Party shall file and serve a motion to retain confidentiality within 21 calendar days of the Parties agreeing that the meet and confer process will not resolve their dispute, unless the Parties agree in writing upon a longer time period to file and serve such motion.  Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the designating Party to make such a motion including the required declaration within 21 calendar days (or within the agreed upon time period) shall automatically waive the confidentiality designation for each challenged designation. In addition, the challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

**(c)**     The burden of persuasion in any such challenge proceeding shall be on the designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other Parties) may expose the challenging Party to sanctions. Unless the designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all Parties shall continue to afford the

material in question the level of protection to which it is entitled under the producing Party's designation until the court rules on the challenge.

12.     **Action by the Court**. Applications to the Court for an order relating to any Documents designated for protection under this Order shall be by motion under the Local Rules of this District, and any other procedures set forth in the presiding judge's standing orders or other relevant orders. Nothing in this Order or any action or agreement of a Party under this Order limits the Court's power to make any orders that may be appropriate with respect to the use and disclosure of any Documents produced or used in discovery or at trial.

13.     **Use of Confidential Documents or Information at Trial**. Absent order of the Court, all trials are open to the public, and there will be no restrictions on the use at trial of any Document designated for protection under this Order. If a Party intends to present at trial Documents designated for protection under this Order, or information derived therefrom, such Party shall provide advance notice to the Party designating the Documents for protection under this Order at least seven (7) business days before the commencement of trial by identifying the Documents or information at issue as specifically as possible (e.g., by Bates number, page range, deposition transcript lines, etc.). Upon motion of the Party designating the Document for protection under this Order, the Court may thereafter make such orders as are necessary to govern the use of such Documents or information at trial.

14.     **Obligations on Conclusion of Litigation**.

       (a)     **Order Remains in Effect.** Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

       (b)     **Return of Documents Designated for Protection Under this Order.** Within sixty (60) days after dismissal or entry of final judgment not subject to further appeal, and upon written request of the producing Parties, all Protected Material under this Order, including copies shall be returned to the producing Party unless: (1) the Protected Material has been offered into evidence or filed without restriction as to disclosure; (2) the Parties agree to destruction in lieu of return; or (3) as to Protected Material bearing the notations, summations, or other mental

impressions of the receiving Party, that Party elects to destroy the source Documents and certifies to the producing Party that it has done so. Notwithstanding the above requirements to return or destroy Protected Material, counsel may retain copies of all pleadings, motions, orders, written discovery, and other papers filed with the Court or exchanged by the Parties even though they may contain Protected Material under this Order. Further, counsel may retain attorney work product, attorney working files, and emails that include, reference, excerpt, or attach Protected Material designated for protection under this Order.  This work product shall continue to be subject to the protections of this Order in accordance with the applicable designation. An attorney may use his or her work product in a subsequent litigation provided that its use does not disclose or use Protected Materials under this Order.

(c)     **Return of Documents Filed under Seal.** After dismissal or entry of final judgment not subject to further appeal, the Clerk may elect to return to counsel for the Parties or, after notice, destroy Documents filed or offered at trial under seal or otherwise restricted by the Court as to disclosure.

15.     **Protected Material Subpoenaed or Ordered Produced in Other Litigation**.  If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any Protected Material, that Party must:

(a)     promptly notify in writing the designating Party.  Such notification shall include a copy of the subpoena or court order;

(b)     promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order.  Such notification shall include a copy of this Order; and

(c)     cooperate with respect to all reasonable procedures sought to be pursued by the designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as CONFIDENTIAL or ATTORNEYS EYES ONLY before a determination by the court from which the subpoena or order issued, unless the Party has obtained the designating Party's written permission.  The designating Party shall bear the burden and expense of seeking protection in that court of its

confidential material – and nothing in these provisions should be construed as authorizing or encouraging a receiving Party in this action to disobey a lawful directive from another court.

16. **A Non-Party's Protected Material Sought To Be Produced in This Litigation.** The terms of this Order are applicable to information produced by a non-Party in this action and designated as "CONFIDENTIAL" or "ATTORNEYS EYES ONLY". Such information produced by non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a non-Party from seeking additional protections.

17. **Unauthorized Disclosure of Protected Material.** If a receiving Party learns that, by inadvertence or otherwise, it has disclosed or provided access to Protected Material to any person or in any circumstance not authorized under this Order, the receiving Party must immediately (a) notify in writing the designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute Exhibit A.

18. **Inadvertent Production of Privileged or Work-Product Protected Material.** The production of privileged or work-product protected Documents, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding. This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d). Nothing contained herein is intended to or shall serve to limit a Party's right to conduct a review of documents, ESI or information (including metadata) for relevance, responsiveness and/or segregation of privileged and/or protected information before production. Should any Party inadvertently produce privileged or work-product protected Documents, that Party shall upon discovery promptly notify all receiving Parties of the inadvertent production ("Clawback Notification"), and provide a privilege log for the subject materials. Upon receipt of a Clawback Notification, the receiving Parties must promptly delete or return all copies of the subject materials—including all natives and images, including from their copies of the affected production deliverable, from any document review databases or other repositories in

which they have been copied or stored, must destroy any hard copies that have been printed, and must take reasonable efforts to retrieve and destroy any copies that have been circulated. No Party or Counsel may examine or make any further use of Documents subject to a Clawback Notification.

19.    **Order Subject to Modification.** This Order shall be subject to modification by the Court on its own motion or on motion of a Party or any other person with standing concerning the subject matter. Motions to modify this Order shall be served and filed under Local Rule 7.1 and the presiding judge's standing orders or other relevant orders.

20.    **No Prior Judicial Determination.** This Order is entered based on the representations and agreements of the Parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any Documents designated for protection under this Order are entitled to protection under Rule 26(c) of the Federal Rules of Civil Procedure, or otherwise, until such time as the Court may rule on a specific Document or issue.

21.    **Persons Bound.** This Order shall take effect when entered and shall be binding upon all counsel and their law firms, the Parties, and persons made subject to this Order by its terms.

    **IT IS SO ORDERED,** this 14th day of April, 2022.

                                        /s/ Jon P. McCalla
                                    _____
                                    HONORABLE JON P. MCCALLA
                                    UNITED STATES DISTRICT JUDGE

**WE SO MOVE/STIPULATE**
**and agree to abide by**
**terms of this Order.**

Dated: April 12, 2022

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:                             */s/ Jeremy A. Tigan*

Robert M. Masters                       _____
Jonathan R. DeFosse                     Jack B. Blumenfeld (#1014)|
Timothy P. Cremen                       Jeremy A. Tigan (#5239)
SHEPPARD, MULLIN, RICHTER               1201 North Market Street
  & HAMPTON LLP                         P.O. Box 1347
2099 Pennsylvania Avenue, NW, Suite 100 Wilmington, DE 19899
Washington, DC 20006                    (302) 658-9200
(202) 747-1900                          jblumenfeld@morrisnichols.com
                                        jtigan@morrisnichols.com

Trevor J. Quist                         *Attorneys for Plaintiff Qorvo, Inc.*
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
1540 El Camino Real
Menlo Park, CA 94025
(650) 815-2600

Dated: April 12, 2022

                                        BAYARD, P.A.

OF COUNSEL:                             */s/ Ronald P. Golden III*

David A. Jakopin                        _____
Dianne L. Sweeney                       Stephen B. Brauerman (#4952)
PILLSBURY WINTHROP SHAW                 Ronald P. Golden III (#6254)
  PITTMAN LLP                           600 N. King Street, Suite 400
2550 Hanover Street                     Wilmington, Delaware 19801
Palo Alto, CA 94304-1115                (302) 655-5000
(650) 233-4500                          sbrauerman@bayardlaw.com
                                        rgolden@bayardlaw.com

Robert M. Fuhrer
PILLSBURY WINTHROP SHAW                 *Attorneys for Defendants Akoustis*
  PITTMAN LLP                           *Technologies, Inc. and Akoustis, Inc.*
1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856
(703) 770-7900

David L. Stanton
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
725 S. Figueroa St.
36th Floor
Los Angeles, CA 90266
(213) 488-7100