1

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DELAWARE

3   _____

4   QORVO, INC.,

5                  Plaintiff,

6   vs.                                NO. 1:21-cv-01417

7   AKOUSTIS TECHNOLOGIES, INC.,

8                  Defendant.

9   _____

10

11

12                   DISCOVERY CONFERENCE

13

14

15      BEFORE THE HONORABLE JON P. McCALLA, JUDGE

16

17                        FRIDAY

18                 18TH OF AUGUST, 2023

19

20

21

22              LISA J. MAYO, RDR, CRR
                   OFFICIAL REPORTER
23           FOURTH FLOOR FEDERAL BUILDING
              MEMPHIS, TENNESSEE 38103

24

25

**UNREDACTED TRANSCRIPT**

2

1          A P P E A R A N C E S

2

3

4

5     Appearing on behalf of the Plaintiff:

6          Robert M. Masters
           Jonathan R. DeFosse
7          2099 Pennsylvania Avenue, N.W.
           Washington, DC 20006-6801
8          Phone: (202) 747-1935

9

10

      Appearing on behalf of the Defendant:
11
           Diane L. Sweeney
12         David Stanton
           Ryan Selness
13         Pillsbury Winthrop Shaw Pittman LLP
           2550 Hanover Street
14         Palo Alto, CA 94304-1115
           Phone: (650) 233-4790
15

16         Stephen Brauerman
           Bayard, P.A.
17         600 N. King Street, Suite 400
           Wilmington, DE 19899
18         Phone: (302) 429-4238

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1                                FRIDAY

2                        August 18, 2023

3

4                  ----------------------

5

6

7          **THE COURT:**  We're here in connection with a

8  number of matters, which have been brought to the Court's

9  attention, and as to which some guidance might be helpful to

10  the parties.  For example, in connection with motions for

11  leave to amend of which we don't actually have to -- to

12  assert counter claims, we don't have them.

13          And so as a general proposition, we need to look

14  carefully at the existing scheduling orders which, of course,

15  we have, and remember that we do have the case set for trial

16  on May 6th of 2024, and it is scheduled for a six- to

17  seven-day trial.  That's the kind of basic fact we have to

18  keep in mind as we go through the process.

19          We do understand that parties do want to tell me

20  about a number of things, and I do have correspondence in

21  which there's been discussion in connection with certain

22  production of documents and assertions that the requests are

23  too broad and so forth.  So we do need to get a good update

24  as to exactly where the parties are, keeping in mind that in

25  order to change the schedule, the party seeking to change the

**UNREDACTED TRANSCRIPT**

4

1  schedule does have a burden of showing that there is good

2  cause to make a schedule change.

3          I'm not saying we wouldn't do it.  I'm simply

4  saying that we certainly are going to be reluctant to do

5  that, partly in consideration of the fact that there have

6  been a number of modifications to the schedule, and we made

7  very specific plans in connection with the trial of the case

8  at this point in time.  So we need to keep those things in

9  mind.

10          Now, as to Qorvo, we need to make sure who will

11  be the primary spokesperson for Qorvo today, and I'm not sure

12  if that's going to be -- I'm not sure who it's going to be.

13          It may be Mr. -- it may be -- let's see,

14  Mr. Masters it may be you?  I'm looking to you on the

15  right-hand side of my screen.  Is that -- are you going to

16  hand that off to Mr. DeFosse?  I mean, what's the plan here?

17      **MR. MASTERS:**  Well, good morning, Your Honor.

18  The plan is that Mr. DeFosse will address the Court on

19  request for Production Number 173, which has been submitted

20  to you in letter briefed by the parties.

21          **THE COURT:**  Right.

22      **MR. MASTERS:**  And also Qorvo's request for

23  inspection, which Qorvo submitted its letter on the

24  inspection.  And there's been a recent motion for protective

25  order by Akoustis and to the extent, there are other issues

**UNREDACTED TRANSCRIPT**

1  that the Court raises, such as a motion that has already been

2  filed, Number 2 on it, on the letter that was submitted

3  August 15th, motion to re-designate, that would be

4  Mr. DeFosse.

5          Motion for leave to file amended answer to

6  counter claim, which was Number 3 on the August 15th letter,

7  Mr. DeFosse.  And I think I will address the other issues to

8  the extent the Court wishes to have a discussion about those,

9  which would be --

10          **THE COURT:**  Okay.  That's fine.  And then, let's

11  make sure that we know who will be handling matters for

12  Akoustis.  So let's see.

13          **MR. BRAUERMAN:**  Your Honor -- good morning, Your

14  Honor.  This is Steve Brauerman for Bayard.  It depends on

15  what issues the Court wants to hear, but Mr. Selness, who has

16  been taking the lead on the meet and confers, will be

17  presenting his first federal court argument today on the RFP

18  issue.  Ms. Sweeney will address the scheduling issues.  And

19  to the extent we get to it or the Court entertains it, the

20  inspection protective order issue, Mr. Stanton will address.

21  I believe Ms. Sweeney will also address, if Your Honor's

22  willing to hear us, the motion for leave to amend.  And if

23  other issues come up, one of the three of them will be

24  addressing the Court today.

25          **THE COURT:**  Okay.  We may need to review, since

**UNREDACTED TRANSCRIPT**

1  everybody's got a kind of complicated presentation scheduled,

2  you may have to say who is going to address this, but that's

3  fine.

4          And let's see where he is.  Oh, yeah,

5  Mr. Selness, what did he say about you?  What's he saying

6  about what's going on here?

7          **MR. SELNESS:**  Thank you, Your Honor.  He said it

8  was my first federal court argument, and I've been handling

9  the meet and confers on this issue.

10          **THE COURT:**  Oh, that's what I understood and --

11  well, the nice thing is that it's remote, and you can have

12  all sorts of things in front of you that I can't see, so

13  that's a plus.  We're glad to have you doing that.

14          Let me make sure I know who for the defense was

15  going to handle because I didn't necessarily get them all

16  down, motion for leave to amend.  Of course, it's not really

17  a motion yet, but I think I wrote down -- not Ms. -- I didn't

18  write down Ms. Sweeney.

19          Ms. Sweeney, you're handling scheduling

20  questions, so let's make sure who we've got for that.

21          **MS. SWEENEY:**  Sure, Your Honor, and you're right,

22  the motion for leave is not on calendar today.  We just

23  wanted to highlight that it was -- it now has been fully

24  briefed and it is before the Court, but I'm happy to answer

25  any questions the Court has on that, as well as address the

1    scheduling.

2            **THE COURT:**  Okay.  All right.  I think we're

3    fine.

4            Well, let's start with a couple of -- let's see

5    how we can perhaps get through this.  We're not going to take

6    an indefinite amount of time because I have other matters

7    scheduled today.  This is really to help us get focused.

8    We've been focusing on it, frankly, and talking about it and

9    going through it in chambers.  But I think that there's --

10   one thing that might be helpful is to talk about the request

11   for Production Number 173.  That may be useful.

12           And, Mr. DeFosse, I think that that's part of

13   what you're going to talk about.

14           **MR. DeFOSSE:**  That's right, Your Honor.  So this

15   is not our issue that's been brought to the Court.  This is

16   actually Akoustis's issue seeking to compel production in

17   response to the RFP.  I'm happy to address it first if Your

18   Honor would like me to.

19           **THE COURT:**  I wanted to hear your point first

20   because I think I understand your position, but I wanted to

21   hear that.  It's important that there be appropriate complete

22   production, and you may want to talk about that.

23           **MR. DeFOSSE:**  Thank you, Your Honor.

24           So for us, the issue here is really one of burden

25   or proportionality.  This request for inspection has asked us

                    **UNREDACTED TRANSCRIPT**

1   to go on a trade secret by trade secret, employee by employee

2   investigation to find out each -- the names of each

3   individual employee who has ever had access to the 350-plus

4   trade secrets that are at issue in this case.  And our

5   position on that is that would be an extremely burdensome

6   task both because of the number of trade secrets at issue,

7   also the time frames that are at issue here.

8         You know, a number of these trade secrets were

9   developed over the course of more than a decade, so to find

10   out the names of every individual employee who ever had

11   access to these things, we would have to engage in a type of

12   inquest that would require a ton of resources, both from the

13   outside counsel and from inside folks at Qorvo.

14         The -- we understand that the other side is

15   seeking this information because one of the factors of many

16   that's relevant to whether or not you've taken reasonable

17   measures to protect your trade secrets is the extent of

18   employee access.  We, obviously, don't dispute that the

19   extent of employee access is one factor to consider, but what

20   we've done here and what we've seen in other cases is that

21   we've addressed that generally.  So, for example, we've

22   produced documents showing who -- which employees currently

23   have access to servers where the documents are stored.

24         We've produced corporate-level policies about

25   appropriate access to documents.  We've produced information

**UNREDACTED TRANSCRIPT**

1  about the data loss prevention software that the client is

2  using to track employee access and to see whether

3  unauthorized folks are getting into materials.  And we've

4  also produced, you know, documents sufficient to show

5  contractual restrictions on employees where they basically

6  are required only to access information on a need to know

7  basis.

8          Those are just some examples.  This has been an

9  extensive -- an issue of extensive focus between the parties.

10  There's more than 20 RFPs that have been served on this.  For

11  the vast majority of those, we've agreed to produce

12  information.  And the problem with this one really just is if

13  we have to go and give them a list of the name of every

14  employee who has ever accessed 350 trade secrets over the

15  course of more than a decade, that's an incredible

16  undertaking.

17          **THE COURT:**  May I ask a question about the trade

18  secret status because I'm trying to think practically about

19  how this is going to work in a six- to seven-day trial.  You

20  could hardly list 150 trade secrets in that time period and

21  have any discussion at all about them.  We've got to have a

22  better plan here.  What's going -- what's the way that the

23  plaintiff would actually be able to go forward?

24          **MR. DeFOSSE:**  Yeah.  So, Your Honor, we have

25  addressed this previously, and we agree that the number of

**UNREDACTED TRANSCRIPT**

1  trade secrets needs to be reduced for the purposes of trial

2  and for jury comprehension at the very least.

3            **THE COURT:**  Right.

4            **MR. DeFOSSE:**  We're actively working that -- on

5  that on our side, and what we need to do is get through

6  discovery and work with the experts.

7            For example, another issue that we hope to

8  address today is this forensic inspection issue, which has

9  been pending for three-and-a-half months.  We can't reduce

10  the number of trade secrets until we have the forensic

11  inspection of the computer systems, as one example.

12            Another example is we haven't taken a single

13  party deposition yet.  We have to get those party

14  depositions.  Now, what we expect to do is once we have

15  discovery in the door, once we've had the inspection, we're

16  going to be rapidly reducing the focus of the

17  misappropriation claims to a more limited number.  But we're

18  not in a position to do that now, I think is the bottom line.

19            **THE COURT:**  Right.  Well, what would be your goal

20  in terms of the number of trade secrets that are presented at

21  trial because trial attorneys have to think about that?  I

22  know you have a goal.  It may not be -- you may not exactly

23  know how they fit in that plan, but having more than -- and

24  I'm not going to pick out a number right now, but you and I

25  both have a pretty good idea about what's probably practical.

**UNREDACTED TRANSCRIPT**

1   What's our goal?  What do you think your goal will likely be?

2   That's a better way to put it.  You're not bound by that, but

3   I want some guidance here.

4            **MR. DeFOSSE:**  Thank you, Your Honor.  I

5   appreciate that because Mr. Masters may also look at me and

6   askew on this.  I believe we've -- our goal is no more than

7   20, and we would be hopeful that it would be less than that

8   as well.  You know, part of that goes into obviously how are

9   you identifying -- defining the individual trade secret.  A

10  lot of these trade secrets are related to each other, so

11  we're trying to group those.  That's what we've done in our

12  trade secret disclosures.  So we're trying to make it

13  practical, but I think our goal has been no more than 20.

14           **THE COURT:**  Right.

15           Mr. Masters, did you want to comment on that?  I

16  don't want to leave you out on that.

17           **MR. MASTERS:**  I have nothing further to add to

18  what Mr. DeFosse said.  He is correct.

19           **THE COURT:**  Okay.  Now, let's go to the forensic

20  examination question.

21           **MS. SWEENEY:**  Your Honor, I could comment on that

22  point.

23           **THE COURT:**  Sure, absolutely.

24           **MS. SWEENEY:**  Thank you.  I think it would be

25  helpful, and perhaps the parties can meet and confer on this

**UNREDACTED TRANSCRIPT**

1    point, but we need to have a firm date where we sort of know

2    what we're looking at.  So when experts are preparing their

3    reports, obviously, Qorvo is going to know what it's looking

4    at, what its expert is going to be preparing for.  If we

5    could have a date before those reports so that our experts

6    can be informed of what trade secrets are really going to be

7    at issue since I think we're now over 350.

8            Qorvo just added another set of trade secrets

9    just a few weeks ago that we'll talk about when we come to

10   the scheduling point, but I think it would be very helpful

11   before the experts are working and so we have time to prepare

12   our own reports.

13           **THE COURT:**  I think -- and are you asking about

14   the date for the forensic examination, which the Court does

15   find is pretty typical?  We have to figure out a right way to

16   do it and so forth.  It's often conducted by a third party.

17           As I think, Ms. Sweeney, you would agree it's

18   usually not conducted by someone who is affiliated with the

19   party or an employee of the party.  Is that -- that's exactly

20   what you're thinking about, right?

21           **MS. SWEENEY:**  That is exactly what I'm thinking

22   of in terms of the inspection.  In terms of the trade secret

23   issue, I was asking and thinking about something separate,

24   which is to set a deadline before the expert report so that

25   both parties have knowledge of which claims are going

1    forward.  So if it's the 20 that Mr. DeFosse mentioned -- and

2    I'm not holding him to that -- that we know what it is and

3    can inform our experts these are the trade secrets that will

4    be proceeding forward and that the experts should be looking

5    at.

6            **THE COURT:**  Right.  Now, my perception is that

7    the final trade secret identification would take place after

8    the forensic examination.

9            And, Mr. DeFosse, is that what you're thinking?

10           **MR. DeFOSSE:**  I would envision, Your Honor, that

11   the most appropriate place to have the reduction would be in

12   the opening expert reports, which will, you know, we'll serve

13   opening expert reports.  They'll address the trade secrets

14   issues and then in the normal course, Akoustis can respond to

15   those issues in their reports.  I think that would be typical

16   here.

17           Given the compressed schedule that we have, I'm

18   not sure that there is really -- discovery is supposed to

19   close October 16th.  We're already up against it and given

20   the delays in the forensic inspection, to set some deadline

21   between that time and November 17th when expert reports are

22   due, I believe, is -- you know, I don't think it makes a big

23   impact on the case and would conversely make our lives a lot

24   more difficult.

25           **THE COURT:**  Okay.  So when do you think,

**UNREDACTED TRANSCRIPT**

1   Mr. DeFosse, the expert examination of the computers would

2   take place?

3            **MR. DeFOSSE:**  So we would like that to go forward

4   with haste, as soon as possible.  We've proposed the protocol

5   to Your Honor with our letter of last week, which is a fairly

6   typical protocol to issue in a case like this.

7            One thing I would like to address is the comment

8   Your Honor made about the typicality of having a third party

9   do this.  I think it depends on what you have in mind by that

10  because we have engaged a third party to do this.  He's our

11  expert, and the expectation is he's doing this in an

12  examination as part of preparing an expert report, and then

13  ultimately testifying at trial about the way in which our

14  trade secrets were used on their computer systems.  So he's a

15  third party but engaged by us to do this.  That's what we

16  believe is typical in this case.

17           I think there's a little bit of kind of confusion

18  when we discuss this because I think what Akoustis is

19  referring to as a third party is like a neutral that would

20  sit between our expert and their expert and issue some kind

21  of report.  And on that issue, we have a strong disagreement

22  that that would be appropriate here because our expert

23  obviously needs to do the analysis because he's going to be

24  testifying at trial.

25           **THE COURT:**  Right.  But your point is that there

**UNREDACTED TRANSCRIPT**

1   would be appropriate protections because your third-party

2   examiner -- your expert examiner would be restricted in

3   disclosing information to anybody within the company and so

4   forth?

5           **MR. DeFOSSE:**  Yes.

6           **THE COURT:**  There would be an allowance.  They

7   could, for example, disclose it to you, but they're not going

8   to be able to disclose it to an executive in Qorvo?

9           **MR. DeFOSSE:**  Yes, and I would even go a step

10  further.  There is a -- the protocol currently requires the

11  expert to perform his analysis without even discussing the

12  substance of the materials with us until Akoustis has had a

13  chance to review which materials he would like to be produced

14  in this case, which is the way that courts have dealt with

15  this concern about privilege and privacy and things like

16  that.

17          The expert will do his expert analysis.  He

18  identifies to Akoustis these are the materials that I think

19  are going to be relevant that I would like you to produce.

20  Akoustis then has a chance to look through those materials.

21  If they think there's something that's privileged there, they

22  can log it.  If they think that we're, you know, trying to

23  get pictures of people's children which, obviously, we're not

24  trying to do, but they'll have a chance to flag those issues.

25  So it's not just that we won't ever share the information

**UNREDACTED TRANSCRIPT**

1    with Qorvo, but even the attorneys don't get the information

2    until Akoustis has had a chance to look at what our expert's

3    done.

4              **THE COURT:**  Right, exactly.  And that's

5    usually -- when I said third party, I meant somebody who is

6    not -- I think I was clear about that -- not an employee.

7    Let's go back to Ms. Sweeney.

8              Ms. Sweeney, that's an acceptable protocol,

9    typically.  We certainly want to protect Akoustis.  We also

10   want to get it done.  What's wrong with that?

11             **MS. SWEENEY:**  Your Honor, I'd like to circle back

12   both to the expert witness deadline issue, but let me pass

13   this issue to Mr. Stanton, who prepared the protective order

14   that we filed earlier this week, because I do think there's

15   considerable case law about this issue and some further

16   complexity that Mr. Stanton can address.

17             **MR. STANTON:**  Good morning, Your Honor.

18             **THE COURT:**  Good morning.

19             **MR. STANTON:**  The approach that Mr. DeFosse

20   outlines is not typical according to the cases.  The minority

21   of cases allow for an expert engaged by the plaintiff to

22   perform a unilateral inspection.  It's usually assigned to a

23   third-party neutral, who is authorized under Rule 706.  Or in

24   several cases we've cited, the courts have found there's no

25   reason for the plaintiff to -- you know, to believe or to

**UNREDACTED TRANSCRIPT**

17

1  conclude that the defendant's expert is not capable of

2  performing the inspection.

3          Their inspection protocol is also highly unusual,

4  in that, it doesn't provide any specific parameters about

5  what the expert is authorized to do or is intended to do.  It

6  doesn't define the steps that he's going to take.  It doesn't

7  define the documents he's looking for.  It doesn't define --

8  you know, it doesn't prevent him from just exercising, you

9  know, a search term and review of documents and then

10 producing documents to Akoustis, who presumably is going to

11 have one week to review those whether they're, you know, a

12 thousand documents or ten thousand documents.

13         You know, in the cases we've cited, it says, the

14 discovery -- you know, the discovery rules here and this kind

15 of inspection are not a ticket to an unlimited exploration of

16 every conceivable matter that captures an attorney's

17 interest.

18         **THE COURT:**  I think that it's -- let's go back to

19 counsel opposite on that.

20         I think you expect some limitations -- in fact,

21 you're not hiring somebody just to go look at everything,

22 right?

23         **MR. DeFOSSE:**  That's right, Your Honor.  And I

24 think the answer to Mr. Stanton point is in paragraph 5 of

25 our protocol where it sets out that he's really -- he's doing

**UNREDACTED TRANSCRIPT**

1    an analysis to look at how the extent of the use of the trade

2    secrets.  So, you know, that's what he's doing.

3            The backstop on that is Akoustis gets to look at

4    the materials that he's identified.  So if, in fact, he does

5    try to go on some off -- you know, some fishing expedition,

6    there's a check on that as well.  We can further, if Your

7    Honor has concerns about what we're doing there, we can add

8    that to the declaration.  We've proposed the expert filing in

9    this case that he's only looking at these systems in order to

10   determine the use of the trade secrets.

11           But, you know, it's -- and just to Mr. Stanton's

12   point that this is not typical, we've cited in our letter to

13   the Court two cases.  I think IsaNova is the most relevant.

14   The protocol is laid right out in that case.  It's very

15   similar to what we've proposed here.  And where we're getting

16   some kind of disagreement over what the cases show, the

17   problem in a nutshell, Your Honor, is that they're citing

18   cases that don't really deal with expert examination of the

19   use of trade secrets.

20           Most of the cases they're citing are really more

21   about discovery disputes, like, have you really produced

22   everything to us?  You know, no.  You know, there's some

23   evidence that things have been altered or things like that.

24   This is really can't -- this inspection can't be done by

25   neutral because our expert has to testify at trial.  I mean,

**UNREDACTED TRANSCRIPT**

1   I think that's --

2            **THE COURT:**  I think that -- I think we both

3   understand that the Court's inclination is to move the case

4   forward.  And a way to move the case forward, that is, a

5   legitimate way to move the case forward, is to follow

6   something close to what the plaintiff's proposed, maybe with

7   some modifications.

8            And I think that, Mr. Stanton, you're not wrong

9   to suggest that there might be a little modification there.

10  But we do need to move forward, and I think that we certainly

11  want to -- I'm inclined to allow something close to what

12  Mr. DeFosse has indicated.

13           Now --

14           **MR. STANTON:**  Your Honor, can I make --

15           **THE COURT:**  Yes, sir, absolutely.  I was inviting

16  you to respond.

17           **MR. STANTON:**  I mean, you know, we -- we have

18  briefed this.  The cases that we've cited are all trade

19  secret cases.  The standard is for the appointment of a

20  third-party neutral to do this work.

21           **THE COURT:**  I've pretty well addressed that.  We

22  understand that there's no concrete way to proceed and that

23  we do need to proceed in an orderly fashion.  We need to

24  proceed with appropriate protections for the defendant, but

25  also in a way that will allow the case to proceed.  I do

**UNREDACTED TRANSCRIPT**

1    think that it's probably not useful to say that because who

2    has -- I'm sorry.  Who is the proposed third-party neutral

3    that you want to proceed with?

4           **MR. STANTON:**  Parties could negotiate upon a

5    third-party neutral, and if they're unable to reach an

6    agreement with the -- the majority of the cases have found is

7    that they submit some names to the Court, and the Court

8    selects among the CVs.

9           **THE COURT:**  Okay.  I think that efficiency

10   because that creates lots of things that we have to deal with

11   that may not very efficient.  If there's an appropriate

12   protection for Akoustis in terms the restrictions on the

13   expert that Mr. DeFosse would be using, then we may well find

14   that a more efficient way to proceed in this case and, of

15   course, I understand we could do it either way.  I do

16   understand that.

17          **MR. STANTON:**  I would posit that, you know, it's

18   inefficient because Akoustis has a mutual interest in doing

19   this same work as we pointed out that our board has

20   authorized this kind of an exercise.  We're not going to be

21   able to rely upon, you know, the work that Qorvo does to

22   perform our own analysis and certify that any documents that

23   pertain to, you know, Qorvo's information have been deleted

24   from our systems.  We're going to have to do our own work.

25          It makes sense for there to be a third-party

**UNREDACTED TRANSCRIPT**

1    neutral upon which both parties can rely so you don't have

2    duplication of effort.

3              And a final point on the perspections, Your

4    Honor, that's really important, is that, you know, they're

5    proposing to do these inspections on the computers all

6    personal and all, you know, other devices and network

7    repositories accessed by 31 people.  That includes massive

8    production servers that are in place and in active use at

9    Akoustis.  Imaging them is impractical.  It's extraordinarily

10   intrusive to our business operations, and the number of

11   systems that they're proposing to inspect is extreme.  It's

12   not proportional to the needs of the case.

13             Just as the Court is looking to reduce the number

14   of trade secrets at issue, we would ask if you're --- you

15   know, if you're inclined to pursue this, that, you know, the

16   parties be instructed to meet and confer about a more limited

17   number of custodians whose devices will be inspected, not 31,

18   which is just a massive undertaking.

19             And especially that if there's going to be a

20   review of documents by Akoustis following the inspection that

21   it be proportional in time to the number of documents

22   identified by the inspector.  Right now, it proposes,

23   regardless of the number of documents that are identified, we

24   only get a week, which is --

25             **THE COURT:**  I understand.

**UNREDACTED TRANSCRIPT**

1          How much time, Mr. DeFosse, do you anticipate

2     that this inspection would involve?  That's important.

3          **MR. DeFOSSE:**  Yeah, and so I think to get the

4     entire thing done, right now we're already up against the

5     October 16th deadline --

6          **THE COURT:**  Right.

7          **MR. DeFOSSE:**  -- if we get started right away.  I

8     just -- we're not seeking 31 custodians.  You know, I

9     understand why Mr. Stanton has said that because in the

10    original, you know, request for inspection, I think we listed

11    all the folks that were in the complaint.  But as the

12    protocol we submitted to Your Honor and we've shared with

13    them previously says, the first step is identifying

14    custodians.  Our current expectation is we need 15.

15         Then what happens there is we're not asking to,

16    as a blanket matter, inspect every device.  What the protocol

17    says is once we identify the custodians, they need to tell us

18    what devices they have, and then we'll make a decision as to

19    what should be imaged.  And we can meet and confer again on

20    that as part of the protocol to make it reasonable.

21         You know, we're not looking -- I mean, it's not

22    in our interest to drag this out either.  We're really trying

23    to do a very focused and forensic review so our expert can

24    testify at trial about how they were using the trade secret.

25    So it's not about, you know, hundreds of devices and all

**UNREDACTED TRANSCRIPT**

1   their stuff.

2         **THE COURT:**  I'm looking for also -- and I agree

3   that it needs to be limited.  I think you've pointed out that

4   it would be no more than 15, I think, is what we're really

5   saying, and that's quite a few, and then they're going to

6   identify particular devices.

7         Now, I was looking for also that.  But I was also

8   looking for a time limit on this because this -- Mr. Stanton

9   is not wrong.  This is not an opportunity to go just spend an

10  extraordinary amount of time and then burden them with a huge

11  number of materials and giving them seven days to review

12  that.  That's not going to work.

13        **MR. DeFOSSE:**  I agree, Your Honor, and that's not

14  our intention.  We had to put some time frame in because of

15  the amount of time that we've lost trying to negotiate this.

16  We are going to be reasonable.  I think a week, we think, is

17  reasonable based on the quantity of information we're

18  expecting to be generated from this but, of course, if it's

19  not, if that's not as a reasonable amount of time to review

20  the materials that the expert has to produce, we will work

21  with them.  And we will commit to get this done so that the

22  materials can be produced before October 16th and the close

23  of discovery.

24        Now, beyond that, like, I know Your Honor is

25  looking for, like, specific guarantees.  It's hard for me to

**UNREDACTED TRANSCRIPT**

1    do that without asking the expert and without seeing, you

2    know, the number of devices we're going to need and things

3    like that, but we are very committed to getting this case

4    discovery closed on the 16th, and we're going to do

5    everything we can to make that happen, including facilitating

6    their review.

7            **THE COURT:**  All right.  I'm not quite sure that's

8    exactly what I was looking for because your point is that

9    it's hard to say, but my -- there are limits as to what would

10   be reasonable.  And the Court would simply say that if you

11   engage in the conduct that appears to be unreasonable, we

12   will simply say, I'm sorry it's over.  I hope everybody

13   understands that.

14           I'm not trying to be arbitrary.  I think that's a

15   really bad thing, but what we're trying to say is it has to

16   be -- it has to be restricted.  You're saying it will be as I

17   understand it.

18           Mr. Stanton, it's probably not the assurance

19   you'd like to get.  You'd like to say, oh, this is the box

20   it's going to fit in.

21           I understand that, and that's not unreasonable.

22   Sometimes we have to go forward, and then if something is

23   unreasonable, call us up.  I don't particularly invite that,

24   and I'm not.

25           Mr. Stanton, it's going to have to be a lot of

**UNREDACTED TRANSCRIPT**

1    discussion.  There will be some meet and confers, but I think

2    we can make this process work, and I'm inclined to allow it

3    to go forward.

4              Yes, sir?

5         **MR. STANTON:**  Two things.  I think that, you

6    know, we would ask that the inspections be limited to laptop

7    devices, mobile phones, you know, there's limited use of

8    mobile phones that are relevant here.  It is extraordinarily

9    invasive of people's privacy interest to search their mobile

10   devices.  Akoustis has a few of those in its possession

11   custody and control for senior executives of the company.  We

12   just think that they're beyond scope.

13             And, you know, also beyond scope are, like, the

14   production servers that Akoustis is using inside of it to run

15   its business that contain -- you know, one can take 24

16   terabytes of information.  The other one, 158 terabytes of

17   information.  It's just those -- you know, those can be

18   approached in ordinary discovery with search terms.  They're

19   not amenable to the kinds of forensic inspection.  So limited

20   to, you know, we think 15 is a lot.  We would propose

21   something like, you know, eight to ten laptops be inspected.

22   That can be done in a reasonable amount of time.  It'd be

23   limited to those laptops.

24             And that there will be some prohibition upon

25   interactions between the forensic examiner and counsel for

**UNREDACTED TRANSCRIPT**

1    Qorvo during the inspection.

2            THE COURT:  Right.

3            MR. STANTON:  So this is not a -- you know, sort

4    of fishing expedition, and they're not receiving guidance and

5    they're not sort of, you know, getting coached on looking,

6    you know, for things that might be interpreted as possibly

7    trade secrets.

8            And that's one of our big concerns about the way

9    that their protocol is worded right now.  It asks for their

10   inspector, who is not an expert in BAW filter technology, to

11   make determinations about what documents are derivative of

12   what, you know, are Qorvo documents or Qorvo's proprietary

13   information or confidential information without really even

14   defining that.

15           We think this protocol needs to be limited to

16   looking at their trade secret documents that they've

17   identified and tracing the -- you know, what happened with

18   those documents.  Were they deleted, were they shared,

19   were -- you know, what happened with those particular

20   documents?  Those are the kinds of specifics that we've been

21   trying to negotiate over the months and, you know, Qorvo has

22   refused to do anything but offer its open-ended protocol that

23   really does look like a fishing expedition.

24           **THE COURT:**  Well, it does have to be focused,

25   Mr. DeFosse.  I've said that all along.  I think everybody

1    understands that.  And, obviously, tracing identified trade

2    secret materials is a central part of what you would be

3    doing, I assume, or the expert would be doing.

4              Is that right?

5              **MR. DeFOSSE:**  That's right, Your Honor, and yet

6    that's a hundred percent right.  And on the particular issues

7    that Mr. Stanton raises, phones, I would expect phones to be

8    limited here.  I agree that it's not generally what we're

9    looking at, but there have been text messages here where

10   confidential information is being discussed in the messages,

11   so I can see the expert saying he would like to see whether

12   there are conversations that have been deleted from the

13   phones that show further use.

14             So I wouldn't, as a blanket matter, say phones

15   are out but, you know, I would agree, generally, that we're

16   not really -- that's not the focus of what we're doing here.

17   It could be one aspect.

18             Servers, we're not looking for, you know, they

19   said at some point, they had more than a hundred terabytes of

20   data on, like, raw material data.  That's not what we're

21   looking for.  But the servers do have relevant information

22   where our files, we believe, have been stored and used on

23   those servers.

24             So, again, I wouldn't categorically rule it out,

25   but it's not -- we're not looking for hundreds of terabytes

**UNREDACTED TRANSCRIPT**

1  of data.  We're looking, as Your Honor said, for the use of

2  the trade secrets.  So, you know, I think that -- and, you

3  know, that's part of the protocol was supposed to be they

4  will tell us what's out there, and then we can talk about how

5  to do this.  And we never got to that stage because every

6  time we attempted to work this out, there was some new things

7  coming up.  So that -- you know, that's -- I expect that

8  these will be dealt with in the ordinary course.

9          Last thing, conversations with the expert, I

10  don't find it objectionable.  I mean, Mr. Stanton called it

11  coaching.  The expert is -- our testifying expert, who is

12  going to be presenting information at trial and, of course,

13  will need some guidance from us.  What we agree is improper

14  is for him to potentially share with us privileged

15  information that he has access to because of this protocol,

16  so we've built in protections there.  But the concept that we

17  wouldn't be able to work with our expert to help guide his

18  analysis or focus his analysis, I think is -- is not -- it

19  falls flat.  It's not supportable.

20          **THE COURT:**  I understand that.  I understand

21  that, and there will be some communication.  And, of course,

22  the difficulty that you run into, Mr. DeFosse, is you run

23  into the fact that at trial, there can be problems created

24  for your own case and your own expert if you go too far,

25  right?  And I think everybody has seen that backfire on

**UNREDACTED TRANSCRIPT**

```
 1   someone.  So you're aware of that, and there's some naturally
 2   imposed restrictions in that regard.
 3             What the Court wants -- thinks is probably
 4   necessary to do is to set a time limit.  I was going to set
 5   an hour limit, but it's so hard to do that in terms of -- for
 6   sure, on this examination.  It's still my perception that
 7   this needs to get done promptly.  I mean, promptly in the
 8   sense of this is the 18th of August and, you know, obviously,
 9   the preference of the Court, but I'm not sure this works,
10   would be that within 28 days, that's probably not -- that may
11   not work.
12             So, Mr. DeFosse, what's going to work here?  I
13   know you're saying the time.
14        MR. DeFOSSE:  Yeah, so I would just point out,
15   Your Honor, that the -- we don't have control of the initial
16   steps here, and it would help us.  We want to press this
17   forward quickly, so what we need from them because we're
18   allowing them to do the imaging themselves, right?  Our
19   expert is not taking the images.  So they control the timing
20   on that.  So what we need to help them at the end, we need
21   their help at the beginning to get things quickly.
22             So I think we propose having the production of
23   the images by the beginning of September.  We haven't heard
24   whether they believe that's possible or not.  But if we can
25   get that on a rolling basis, then I think we can commit to
```

**UNREDACTED TRANSCRIPT**

1   have our review done by the end of the September.  I think

2   Your Honor said September 28th, which will then give them a

3   little more than two weeks to review the materials, log them,

4   and produce them before the close of discovery.  So I think

5   that's the best I can come up with here on timing now with

6   the understanding that we don't control -- it's -- we don't

7   want to delay.  We want to get started right away.

8           **THE COURT:**  Right.  And that, I realize, it's a

9   lot to do.  So I'm not -- I'm not --

10          Mr. Stanton, I'm not minimizing that there's a

11  lot.  It just has to get done.  That's our issue here.

12          **MR. STANTON:**  I hear you, Your Honor.  And I

13  think -- you know, I think that it's appropriate for the

14  Court to set a time period for this inspection.  You know,

15  set proportional limits on the number of devices.  Limit it

16  to the laptops.  You know, require the parties to meet and

17  confer about the specific steps that are going to be

18  included, so that it's not, like, a search for the word Qorvo

19  and the expert assigns a bunch of document reviewers, you

20  know, to look at every document that Akoustis has, you know,

21  which have already been produced.

22          I mean, we've produced everything in this case.

23  There is no contention that we've, you know, not been turning

24  over information that are purported trade secrets and, you

25  know, this shouldn't sort of be an effort for them to go look

1    for more documents, you know, that they think are responsive

2    to discovery requests.

3              It should be a forensic inspection that's tracing

4    the -- you know, the progeny of specific documents.  And set

5    a particular time period.  Once we deliver images to them,

6    the inspection should be given a specific -- you know, a

7    defined time period to continue and be completed.

8              **THE COURT:**  Well --

9              **MR. STANTON:**  And Mr. DeFosse's point that he's

10   not in control of how long it takes us to turn over the

11   images, but once his expert has the images, it's appropriate

12   for the Court to set a time period for that inspection to

13   take place.

14             **THE COURT:**  Right.  And they're saying to

15   complete that by September 28th, right, Mr. Stanton?

16             **MR. DeFOSSE:**  Yes, 28 days, I think, would be

17   appropriate, Your Honor.  Once we receive the images, we have

18   28 days.

19             **THE COURT:**  I may have said something a little

20   different than what you were saying.  September 1 would be

21   imaging, et cetera, turned over, then you were saying

22   September -- I said the 28th, which would be a Thursday,

23   would be the -- a date -- the date for completion of the

24   expert analysis; is that right?

25             **MR. DeFOSSE:**  Yes, the -- September 28th would be

**UNREDACTED TRANSCRIPT**

1  the date by which the expert would be required to tell

2  Akoustis which materials we want to have produced.

3         **THE COURT:**  Right.

4         **MR. DeFOSSE:**  And we can also do that on a

5  rolling basis up until the 28th to facilitate their review as

6  well.

7         **THE COURT:**  Okay.  Okay.

8         On the laptop issue, it sounds like that that is

9  the focus, Mr. DeFosse, that's appropriate.  I do understand

10  that it could be that that leads to the examination of two,

11  three, or four mobile devices.  Is that what your -- but it

12  may not.  Is that what you're thinking?

13         **MR. DeFOSSE:**  It may not.  Yeah, it may not.  And

14  I would say between the mobile devices and the servers, the

15  servers are much more critical.

16         **THE COURT:**  I would think the mobile devices -- I

17  think that's correct.  Now, the servers, I think that's a lot

18  of material, but that's pretty --

19         Yes, sir, what else about that?

20         **MR. STANTON:**  I would say that imaging the

21  servers is impractical for what we're talking about.  The

22  server -- you know, you normally trace activity -- they don't

23  contain the kinds of logs that a -- that a device does, that

24  a laptop does.  You know, forensic examination is normally

25  looking for interactions with a server.  If they find

**UNREDACTED TRANSCRIPT**

1  interactions with a server that involve particular documents,

2  we could negotiate further search terms for Akoustis to run

3  on the server and produce documents from the server.

4  Producing a forensic image of a 24-terabyte server is

5  impractical.

6          **THE COURT:**  I understand that.  Let's go to the

7  issue on laptops.

8          I'm just going to ask Mr. Stanton a question so

9  I'll understand:  What if the expert in the process

10 determines that there was material deleted?  How are we going

11 to handle that?

12         **MR. STANTON:**  Well, the expert would have -- you

13 know, the expert will determine that there's material deleted

14 by, you know, identifying what file fragments or other

15 information --

16         THE COURT:  Right, right.

17         MR. STANTON:  -- in the device.  Those file

18 fragments and whatnot can be identified for production.  I'm

19 not quite sure what Your Honor has in mind about identifying.

20         **THE COURT:**  You know, we've had all sorts of

21 strange things happen.  Somebody actually took a laptop out

22 and decided the best way to get rid of the material was to

23 run over it multiple times in a vehicle, which was pretty

24 effective, but not completely.

25         MR. STANTON:  There's no evidence of anything

**UNREDACTED TRANSCRIPT**

1   like that here.  We've thought -- you know, there have been

2   lots of, you know, admittedly documents that are Qorvo

3   related that we have produced, you know, without any motions

4   to compel, without any issues.  We've found them.  You know,

5   there hasn't been any indication of an effort to

6   surreptitiously -- and it sort of goes to the lack of

7   materiality and significance of the kind of documents they're

8   claiming to be trade secrets.

9           **THE COURT:**  And your point there, I think, is

10  that let's take this very significant step.  If the expert

11  then finds a significant problem -- you might not even know

12  about it, Mr. Stanton -- then you will find out about it.

13  He'll tell you that.

14          **MR. STANTON:**  Sure.

15          **THE COURT:**  He or she.

16          **MR. STANTON:**  I think a two-stage approach to

17  anything that goes beyond a limited number of laptops makes

18  sense, and we can have that discussion, meet and confer about

19  it, and if we can't reach agreement --

20          **THE COURT:**  And it can -- it can be a big deal.

21  In some cases, it has been.  I know you know that.  I know

22  that, and so that's probably a way to approach that.  Does

23  that sound reasonable to you, Mr. Stanton?

24          **MR. STANTON:**  Sounds reasonable to me that if

25  there's evidence to, you know, submit that there's something

**UNREDACTED TRANSCRIPT**

1  to be found on a server that a forensic analysis is necessary

2  to determine, then it might make sense to take more steps in

3  that regard.

4         But I think there -- you know, servers are a very

5  limited sort of forensic data in the way that a laptop does.

6  You know, if there's going to be something on the server, we

7  can run searches on the server.  We can identify where those

8  documents are.  You normally -- like we're saying, you know,

9  you start with the laptop device, you see the interaction

10  with the server.  You know, that sort of leads you to look

11  for a document on the server, and we can look for that

12  document and find that if it's appropriate.

13         I think that it would be an unusual circumstance

14  to say then the server itself needs to be, you know, searched

15  unless there's some indication that something's amiss with

16  the server.  This is a production server.  There's no auto

17  delete on it.  Data is kept there indefinitely, you know, and

18  it's a massive production environment, again, that would

19  really disruptive to take off line in order to image.

20         **THE COURT:**  Right.  And that's my inclination is

21  to start this step and just --

22         And then, Mr. DeFosse, if there is a huge issue,

23  you're going to find out about it.  I mean, Mr. Stanton is

24  going to find out about it, and it's going to be ultimately

25  disclosed.

**UNREDACTED TRANSCRIPT**

1           **MR. DeFOSSE:**  I think that's fair, Your Honor.

2           I mean, I would just say on the servers, like, a

3   very common example here.  We would investigate the laptop.

4   The laptop shows that files are being opened off the server,

5   so we need to be able to get access to the files on the

6   server.

7           So that would be -- so it's not so simple as to

8   just say, well, this is going to be completely irrelevant.

9   But I'm totally on board with we can table that discussion

10  and have it as a result of what the analysis is showing as

11  long as we have a commitment that the parties are really

12  working together here to get this done because my biggest

13  concern, based on history until now, is we start the

14  inspection, we get the laptops, we say, wait a minute,

15  there's stuff on the server that's really important to this

16  analysis.

17          And then we have two weeks of trying to schedule

18  meet and confers and having an evolving set of objections to

19  why we can't do it.  And then we're in front of the Court at

20  the end of September without time.  And that's the -- so

21  that's my -- if we can have a commitment that we're going to

22  work together to do this, then absolutely, two stages, we'll

23  look at the laptops and figure out what to do with the

24  servers.

25          **THE COURT:**  Mr. Stanton, that sounds like a good

**UNREDACTED TRANSCRIPT**

1    way to approach it.  What do you think?

2            **MR. STANTON:**  Again, the only distinction I made

3    is just the circumstance that Mr. DeFosse stated that there

4    could be evidence that documents were being accessed from the

5    server.  We wouldn't object to the production of those

6    documents.  What would be problematic is then going and

7    creating a forensic image of an entire server in order for

8    that to be inspected.

9            **THE COURT:**  I don't think anybody is really

10   headed that way right now or that that's going to be a way in

11   which the Court's going to approve the analysis.  So I think

12   your point is well taken.  That's not what the Court thinks

13   is appropriate at this stage based on the information we

14   have.  And Mr. DeFosse understands that.  We understand that

15   you can't anticipate everything.  And so that's where we are.

16           **MR. STANTON:**  Thank you.

17           **THE COURT:**  All right.  Now, let me make sure

18   we've got our dates correct.

19           Mr. DeFosse, do you want to repeat those, make

20   sure that we were accurate on this?  I think we've got them

21   down.

22           **MR. DeFOSSE:**  So my understanding, Your Honor, is

23   that we will have the images of the laptops by no later than

24   September 1st, and we will complete our identification of

25   the -- the expert will complete his identification of the

**UNREDACTED TRANSCRIPT**

1   information produced by September 28th, provide that to

2   Akoustis so that Akoustis will have time to review and

3   produce by October 16th.

4           **THE COURT:**  That's what I understand also.

5           Mr. Stanton, is that your understanding?

6           **MR. STANTON:**  That is my understanding, you know,

7   and we will identify the laptops that have been imaged so far

8   by us.  You know, if we can do that on Monday, then, you

9   know, that will give them some time to consider those and get

10  back to us with which ones they want produced.

11          **THE COURT:**  I think we're -- I think that is, as

12  far as the Court's concerned, that is now resolved.

13          **MR. STANTON:**  How many laptops, Your Honor?  We

14  would ask it be reduced.  Fifteen is still a lot.

15          **THE COURT:**  It depends on which ones they are and

16  a few facts that I don't know.

17          Mr. DeFosse, obviously, we don't have to look at

18  everything.  To me, it depends on the size of the case.

19          **MR. DeFOSSE:**  We've looked at this very closely,

20  Your Honor.  We've really looked at this.  As Mr. Stanton

21  said, originally, we were talking about 30.  We got down to

22  15.  The 15 people are people who are using -- there's

23  evidence in the record that they're using trade secrets.

24  Some of these people, hundreds; some of these people, dozens.

25  So I think we've been pretty selective.  When we get back the

**UNREDACTED TRANSCRIPT**

 1   identification of where they're storing their information for

 2   the imaging, then I think we can have a further discussion.

 3   But I think going less than 15 is going to be -- we've done

 4   our homework on that one.

 5          **THE COURT:**  Well, it seems to me, and I'm

 6   certainly not an expert in this at all, but it seems to me

 7   that this doesn't sound unreasonable.  I think 30 did sound

 8   unreasonable.  And also the process of imaging that I have

 9   some limited knowledge about, it sounds like this would not

10   be unduly burdensome.

11          Mr. Stanton, I'm willing to listen a little more,

12   but I don't think that the imaging process here with 15

13   identified laptops should be something that would be really

14   terribly burdensome.

15          **MR. STANTON:**  No, we're asking the Court to limit

16   it as duplicative.  You know, if they're looking for

17   custodians who are likely to have duplicative information and

18   additional information, every one of these images, you know,

19   results in additional work by their expert, and then ensuing

20   review and analysis of the documents that are produced by

21   Akoustis.

22          You know, the more that the Court is -- the more

23   laptops that the Court is permitting them to inspect, the

24   more work Akoustis is going to have to do later on in the

25   case in order to vet those materials for privilege and --

**UNREDACTED TRANSCRIPT**

1        **THE COURT:**  My impression, Mr. DeFosse, is that

2    what's going to happen is you're going to get 15 images,

3    essentially, and I -- which will -- but you'll -- but that

4    won't be -- it won't end up being the focus in all

5    likelihood.  You just don't know which ones will be; is that

6    right?

7        **MR. DeFOSSE:**  Basically right, Your Honor.  The

8    only caveat I'd have is we'll identify 15 custodians, we

9    don't know how many devices they have.  So if they have a

10   laptop and a desktop, we may have two images from them.

11        **THE COURT:**  Yes, yes, that's true.

12        **MR. DeFOSSE:**  But, yes, we expect to get the

13   devices for 15 people, and we'll look at them, and -- yes,

14   Mr. -- if -- to Your Honor's point, if we look at them and

15   there's not a lot of material, then there won't be a lot for

16   Akoustis to review.  So we can't say until we've looked at

17   them, but at this point, we think those 15 are needed.

18        **THE COURT:**  All right.  Let me check on one

19   thing.

20        **MR. STANTON:**  If there are 15 custodians, if they

21   have multiple devices, they've just expanded this to, you

22   know, upward -- an unlimited number of laptops.

23        **THE COURT:**  I understand the issue.  Let me check

24   on one thing.  I'm going to go off, stop video, and go mute

25   for just a second.

**UNREDACTED TRANSCRIPT**

1          I don't want to inject something that is

2    something that you -- I don't know exactly what a person is

3    going to do in imaging these materials.  Occasionally, we

4    have to do that in what we do, and I don't see this as a big

5    problem.  I haven't had an expert come in and explain that to

6    me again.  I was going to have my IT staff just confirm that

7    I'm not completely wrong on this.

8          Mr. DeFosse, can you give me some assurance about

9    the time on imaging?

10          **MR. DeFOSSE:**  I cannot because it's their expert.

11    We've agreed to allow their expert to do the imaging.

12          **THE COURT:**  Sure, that's fine.  Typical time

13    periods?

14          **MR. DeFOSSE:**  Yeah, so my understanding, and I'll

15    look to other colleagues here, but my understanding is it

16    would be far less than a day to image a laptop.

17          **THE COURT:**  And I'm going to -- what I'm going do

18    is I'm going to look around the room and say, okay, who on

19    the plaintiff's side wants to provide more specific

20    information in this regard? because the Court's impression is

21    this does not take -- it is -- it takes some time, I

22    understand that, but it is not something that takes an

23    extremely long period of time.  It's something that can be

24    accomplished on a pretty routine basis.  I'm looking to all

25    of you.  I don't see anybody raising their hand.

**UNREDACTED TRANSCRIPT**

1      **MR. STANTON:**  Mr. DeFosse is right.  You know, it

2 takes about a day to sort of deal with a laptop image, you

3 know, and we're talking about 12 days that remain.  But, you

4 know, I think that -- yeah.  I mean, look, I think that a

5 limited number of laptops or if, you know, it shouldn't be 15

6 custodians if they have multiple laptops -- multiple devices.

7      You know -- and look, the rule against, you know,

8 the sort of proportionality rule is to regard against

9 redundant or disproportionate discovery, right?

10      THE COURT:  Yes.

11      MR. STANTON:  To reduce discovery even in the

12 matters that are proper subjects of inquiry.  We're not

13 saying that, you know, they might have a nexus to more

14 employees.  And the 15 employees, we think, you know, for all

15 the reasons the Court has stated, we need to narrow things,

16 we need to focus things.  They should pick the ones that are

17 most interested, and we should go forward with, you know, ten

18 laptops or eight custodians and move this case forward.

19      **THE COURT:**  And I understand that.  What I'm

20 saying is I usually think of this process as occurring in one

21 of which imaging can occur as to multiple devices at the same

22 time, which doesn't seem to me to be unusual and that,

23 therefore, the time period is not -- is adequate.  And the

24 amount that involves the actual active participation of an

25 individual and the imaging process is fairly limited.

**UNREDACTED TRANSCRIPT**

1          Mr. Stanton, isn't that about right?  I'm not

2    minimizing what has to be done.  I'm just saying that --

3          **MR. STANTON:**  As far as -- our point -- you know,

4    the point, I think, in addition is reducing this because it's

5    disproportionate and duplicative.  That they should be

6    focused upon the custodians that are of greatest interest to

7    them and of narrowing focus, our expert can do that.  You

8    know, do the analysis on their devices.  But 15 custodians,

9    it can end up being 30 -- 30 devices - you know, 30 devices

10   just seems disproportionate.

11         **THE COURT:**  I'm not sure.

12         Mr. DeFosse, obviously, you've reduced it from 30

13   to 15.  That's a proper step.  They're saying, and I

14   understand, let's make it eight, ten, 12, something like

15   that.  I don't see the burden as being that great in terms of

16   physically what's going to happen here.  There will be a lot

17   of material.  That's going to generate a lot of material.

18         And, frankly, Mr. DeFosse, you may be asking for

19   more than you want.

20         **MR. DeFOSSE:**  I don't think so, Your Honor.  I

21   appreciate the concern and the sentiment, but we've -- like I

22   said, we sharpened our pencils here, and we really got down

23   to the ones we need.

24         And, I mean, I don't want to devolve into a

25   merits discussion here but, obviously, I think what the Court

**UNREDACTED TRANSCRIPT**

44

1    may have a sense of here is that the breadth of the

2    misappropriation in this case is massive.  So to say 15 is --

3    I mean, it's already such a small subset of what we're

4    talking about, and there really -- it's not we've picked

5    people from different areas.  Our whole point is to try to

6    get what we -- the minimum.

7            **THE COURT:**  We have a fair amount of background

8    in terms of previous conversations and the materials

9    submitted, and this does not appear to be disproportionate.

10   I'm not saying it's easy, but I think it's appropriate.  And

11   I understand that what's going to happen is in the process,

12   some materials are going fall away as not helpful or relevant

13   in the case.

14           Okay.  So we're going to stay with the 15, but we

15   understand the way in which it's going to operate.  We've got

16   a timeline in that regard.

17           And so, Mr. Stanton, what else do we need to do

18   in that regard?  I know that the protocol, there's some

19   argument about that.  We can --

20           **MR. STANTON:**  The specificity about this being a

21   forensic examination, looking at the progeny of the specific

22   documents that are identified in their trade secret

23   disclosure and where those documents went and, you know, what

24   happened to them.  The idea that they're going to further

25   make these legal relevance assessments of what other Qorvo

**UNREDACTED TRANSCRIPT**

 1   documents may be derivative or related, you know, if they're

 2   not directly connected.

 3           You know, I'm not saying that if there is, you

 4   know, simultaneous review of two documents and Qorvo is

 5   creating -- you know, Akoustis has created a document that

 6   appears to be -- you know, Akoustis has created a document

 7   that appears to be, you know, a copy of a Qorvo document or

 8   that the metadata shows that they were created

 9   simultaneously, those kinds of forensic links make sense to

10   me.  But sort of a broad search term analysis to try to find

11   more documents responsive to their discovery requests seems

12   very inappropriate.

13           And for their -- you know, their forensic expert,

14   who is not an expert in BAW technology to be making

15   assessments about what's derivative, if it doesn't have a

16   direct forensic connection seems to us to be way beyond the

17   pale.  And that's the kind of thing that we don't think

18   should be, you know, interaction between the forensic expert

19   and Qorvo.  Like, talking about the specific contents of

20   documents and asking, do you want me to include this one?

21   because maybe you think you can make an argument that it's

22   derivative.

23           **THE COURT:**  I think that they're going to --

24   candidly, they have -- they've got to understand the initial

25   comments of the Court, which I think Mr. DeFosse has got,

**UNREDACTED TRANSCRIPT**

1    which is we have a limited time frame to try the case.  They

2    have to get a lot more focused.  They're not, from the

3    Court's point of view, not sufficiently focused now.

4           What they're going to do is they are going to get

5    a substantial amount of material.  But they're also going to

6    have to limit what they're doing or they are going to be in a

7    big mess down the road eventually, and they understand that.

8    Because they're not going to be able to come into court.

9    They're not going to be able to get before a jury with too

10   many claims because it won't make any sense to anybody.  It

11   will be just a jumble.

12          So, Mr. DeFosse, you understand, I'm driving the

13   case toward plaintiffs have got to focus their case.

14          **MR. DeFOSSE:**  Understood, Your Honor.

15          **MR. STANTON:**  I appreciate Mr. DeFosse's

16   assurances but, Your Honor, would it make -- would it be, you

17   know, permissible or would the Court be inclined to let

18   Akoustis's expert oversee the analysis, just watch it in a

19   screen share while it's ongoing?

20          **THE COURT:**  That's not the way in which that will

21   normally be conducted, but they will be -- but the expert

22   will be able to ultimately see what occurred, but they won't

23   be looking over in a real-time sense.

24          **MR. STANTON:**  It would ensure that we keep this

25   within a sort of an appropriate scope and that it would

**UNREDACTED TRANSCRIPT**

 1    actually be a forensic examination and not a broad search

 2    term inquiry.

 3              THE COURT:  I think that they understand that.

 4    If they then come back at a later point and you're able to

 5    show that they've engaged in overbroad inquiry, then

 6    Mr. DeFosse gets the benefit of -- and his client get the

 7    benefit of dealing with the problems that that will engender,

 8    including expense-related items and so forth.  And they

 9    understand that if they go overboard and engage in activity

10    that's inappropriate -- I don't want to go to the sanctions

11    issue.  That's just never appropriate at this point in time,

12    but they do know what the rules are.

13              MR. STANTON:  We just have no way to police that,

14    right?  We have no way to know if they've gone beyond the

15    scope of what is appropriate here if we don't have somebody

16    who is observing.

17              THE COURT:  I don't think that --

18              MR. STANTON:  And the evidence -- you know, at a

19    minimum, could we have some -- you know, require the parties

20    to define the parameters of this inspection to prohibit that

21    kind of broad inquiry?  And, again, I appreciate

22    Mr. DeFosse's assurances, but my client would like something

23    that's more in the order of an agreed upon stipulation about

24    what the scope and sort of techniques are that are going to

25    be applied here.

**UNREDACTED TRANSCRIPT**

1    **THE COURT:**  Well, final comment, Mr. DeFosse, and

2  recognizing that I will have other matters that are going to

3  come up, and we spent a lot of time on this, but this seems

4  like an important initial issue.

5    **MR. DeFOSSE:**  Yeah, and we appreciate Your

6  Honor -- your time, Your Honor.

7    I don't think it's appropriate to limit what the

8  techniques that an expert is using here.  I'm not sure

9  exactly what Mr. Stanton is concerned about.  I mean,

10  certainly, our expert will use some kind of search terms to

11  try to identify the material that's relevant to the trade

12  secrets.  If he identified something that hasn't been

13  produced, I don't find that to be a problem.  In fact, I

14  think that's, you know, one thing that he would do there,

15  right?  So, you know, I don't see the concern there.

16    He has to write a report describing what it is he

17  did, and if it's not forensically sound, they'll have a

18  chance to challenge that at the expert phase.  But to have --

19  I've not seen any case where their expert stands over our

20  shoulder, shares a screen, does any of that kind of stuff.

21    **THE COURT:**  I mean, I think there have been a few

22  occasions where we've had some software issues where there

23  were oversight.  But the answer is that I think we have a

24  workable format.  We're going to follow this format.  We're

25  going to use the protocol that's been proposed generally.

**UNREDACTED TRANSCRIPT**

1          And, Mr. DeFosse, do you want to submit the final

2   revised protocol very, very, very promptly so we can get

3   this -- adhere to these dates because I need to kind of move

4   to the other subjects -- couple other subjects.

5          **MR. DeFOSSE:**  We will, Your Honor.  And just one

6   last procedural thing, I think, if the Court agrees it would

7   be appropriate then to deny the motion for protective order

8   that was filed yesterday or the day before since we've

9   resolved this issue now so that we don't have to respond to

10  that motion.

11         **THE COURT:**  Well, my note is that that appears to

12  be what we should do.  I'm going to discuss that a little bit

13  that.  That will be reflected in a very, very short order.  I

14  think that takes care of that.

15         **MR. DeFOSSE:**  Thank you, Your Honor.

16         **THE COURT:**  No problem.

17         Now, I do have a whole list of things that we

18  have not gotten to, and I know all of you do out there.  I

19  understand that we don't want to preclude Mr. Selness from

20  get to talk a lot in this case, so I'm kind of worried about

21  that.

22         So what did you want to tell me about?

23         **MR. SELNESS:**  Thank you, Your Honor.  And I

24  appreciate Qorvo's recognition that the request does seek

25  something that's relevant here.  One main point I wanted to

**UNREDACTED TRANSCRIPT**

1    make is, you know, we're not -- as far as the burden, we're

2    not looking for every document on this topic.  You know, it's

3    a document sufficient to show requests, and we intentionally

4    framed those requests as a document sufficient to show

5    requests because we don't know how Qorvo maintains the

6    information.

7            I hear their argument that what this really seeks

8    is a list of every single name of every employee who has ever

9    had access to any single alleged trade secret, but that's not

10   what the request says.  The request seeks documents and

11   communications sufficient to show who had access to each

12   Qorvo trade secret.

13           Now, if they have a list of names that are

14   readily accessible and reasonable to produce, then they

15   should produce that.  But if what they have is lists of the

16   groups or departments or job titles that have access to

17   different alleged trade secrets, then they should produce

18   that, and that's been the approach we've taken throughout

19   this meet and confer process.

20           You know, we asked them back in May, you know,

21   what information do you have that you can produce in response

22   to this request?  Go back and talk to your IT department.

23   Figure out what's there and get back to us.  But then the

24   next time we heard from them, presumably after they did talk

25   to their IT department, they said they were going to refuse

51

1    to produce any documents at all in response to this request.

2              And, you know, Qorvo really should have this

3    information available because they've alleged in their

4    complaint, in paragraph 24 of their Second Amended Complaint,

5    that, quote, where appropriate, Qorvo takes steps to limit

6    electronic access to certain confidential/proprietary

7    documents and information to only authorized need to know

8    Qorvo employees, end quote.

9              And then in -- they expanded that claim in their

10   response to Akoustis' Interrogatory Number 11 to cover all of

11   their alleged trade secrets.  They stated that, quote, Qorvo

12   takes steps to limit electronic access to documents

13   containing Qorvo trade secret to only authorized need to know

14   Qorvo employees, end quote.

15             So they should have that information gathered

16   already if they're making those claims, and they're

17   continuing to press those claims in this case.  We need to

18   have a way to be able to test those claims and dispute those

19   claims.  Because if, for example, the manufacturing documents

20   are accessible, not just to the manufacturing employees, but

21   to the marketing employees and the HR department and people

22   with no need, no reason to see those documents, that cuts

23   against trade secret protection.

24             And in that case, we should have those documents

25   to be able to dispute those claims and show that what they

**UNREDACTED TRANSCRIPT**

1    have alleged and are seeking to prove is not true.  You know,

2    this is also relevant to, you know, differential treatment of

3    different trade -- alleged trade secrets.

4              For example, in the *Diamond Power* case that we've

5    cited in our letter, the Court considered evidence that the

6    company had two different servers and that there was a P

7    drive, which was widely accessible to all employees that had

8    computer access.  And there was an Oracle network, which was

9    only accessible to select employees who had been issued

10   additional passwords.  And the Court there explained that in

11   light of Diamond Power's demonstrated ability to be more

12   restrictive over the information which it wished to keep

13   secret, referring there to the information in the Oracle

14   server, no reasonable trier of fact could determine that

15   Diamond Power exercised reasonable efforts to maintain the

16   secrecy of the documents on the widely accessible P drive.

17             So -- and then a final point, Your Honor, that I

18   believe you've already addressed is that, you know, forcing

19   Qorvo to do this work and assemble this information could

20   very well help narrow the scope of the alleged trade secret

21   claims in this case.  If, you know, some or a large portion

22   of Qorvo's alleged trade secrets are broadly accessible

23   across the company to employees with no need to see them,

24   that would suggest that they aren't entitled to trade secret

25   protection and shouldn't remain in this case.

**UNREDACTED TRANSCRIPT**

1          **THE COURT:**  Isn't one of the most common ways of

2     dealing with the issue of essentially failing to protect the

3     trade secrets is through inquiry in the deposition process,

4     just to make sure I understand?  I mean, that's certainly --

5     usually that's where you find out, well, they really didn't

6     protect the secrecy of this particular material.

7          **MR. SELNESS:**  That's certainly one way, Your

8     Honor, and that I'm sure will be a subject of inquiry during

9     the depositions in this case.  But depositions are in every

10    case informed my documents, and witnesses tend to give much

11    different answers when faced with documents relevant to the

12    issues that provide the information relevant to that topic

13    than they do when allowed to give answers divorced from any

14    documents on that topic from the company.

15         **THE COURT:**  Let's hear from counsel opposite on

16    this.

17         **MR. DeFOSSE:**  That's still me, Your Honor.  Thank

18    you.

19         So I think Your Honor hit on one of our points,

20    which is this is more easily obtained through a deposition.

21    If you want to ask witnesses what are the protections that

22    are applicable to this document, you can ask the witnesses

23    that.

24         As I said, and I don't want to repeat myself, but

25    it has been a while in the conference, we've produced a lot

**UNREDACTED TRANSCRIPT**

1   information on this topic, reasonable measures to protect

2   these things.  And our understanding, until this hearing, was

3   that the -- what distinguishes this RFP is they're looking

4   for a trade secret by trade secret, employee by employee list

5   of who can access these materials.

6        **THE COURT:**  Obviously, that's not something we're

7   going to sanction.

8        **MR. DeFOSSE:**  Thank you.  So then, if the

9   question is more like Mr. Selness referenced this *Diamond*

10  *Power* case, we produced the list of who has access to

11  servers.  We've, you know, listed who has read access, who

12  has write access, so that's been produced in this case, along

13  with a wealth of other information about how we protect our

14  information:  Contractual limitations, technical limitations,

15  software limitations.  I mean, there's a lot of information

16  out there.

17        Our only problem was going trade secret by trade

18  secret, employee by employee, and, like, asking HR to print

19  out a list of -- like, tell HR put this name on a piece of

20  paper and print it out.

21        **THE COURT:**  Right.  What we normally would look

22  at in this circumstance is the plaintiff has to recognize

23  that they're going to have to establish that they did protect

24  their trade secrets.  You recognize that under the

25  instructions that the jury would be given, if you didn't meet

**UNREDACTED TRANSCRIPT**

1    each of those elements, they're just going to find that you

2    didn't have a trade secret on that particular point, right?

3            **MR. DeFOSSE:**  Absolutely.

4            **THE COURT:**  And so you're going to have --

5    everybody agrees you're going to have the burden there.

6            Right, Mr. Selness, plaintiff is going to have

7    the burden?

8            **MR. SELNESS:**  That's correct, Your Honor, the

9    plaintiff will have the burden, but the defendant needs an

10   opportunity to rebut the evidence that the plaintiff is

11   seeking to put in.

12           **THE COURT:**  Absolutely, absolutely.  And sounds

13   to me -- it looks to me like that what we need to do is --

14   what sometimes happens in this category, and I'm just going

15   to ask Mr. Selness on this:  Is that you can find things that

16   have been publicly disseminated that were out there on the

17   net and so forth; is there something like that that existed

18   on this?

19           **MR. SELNESS:**  I'm sorry, Your Honor, publicly

20   disseminated in terms of the alleged trade secrets or --

21           **THE COURT:**  Anything -- a trade secret

22   information -- sometimes a plaintiff will come in and try to

23   say, this is a trade secret, but then the defendant will be

24   able to go search everything on the web and say, well, you

25   may say it's a trade secret, but over here, you essentially

**UNREDACTED TRANSCRIPT**

1   provided this information to individuals outside the company.

2          I'm just going to ask just directly right now:

3   Is there material like that that's already out there.

4          MR. SELNESS:  Yes, some of the alleged trade

5   secrets, yes, we have found publicly available, and that will

6   be a component of our defense.  But that doesn't take away

7   the need to address this specific issue, which is a separate

8   point.

9          THE COURT:  Sure.

10          MR. SELNESS:  Which is that the reasonableness of

11   their efforts to maintain the secrecy of their information,

12   the extent of access within the company, those involved in

13   the business to this information, that's a factor that must

14   be considered in determining whether information is entitled

15   to trade secret protection, regardless of whether it's been

16   made publicly available.

17          THE COURT:  Right, right.

18          Obviously, Mr. DeFosse, you're aware that they're

19   going to come back and say some of this material was publicly

20   available.

21          MR. DeFOSSE:  Yeah, that's the kind of analysis

22   we'd expect to see.

23          THE COURT:  That's pretty routine.  It happens

24   all the time, and plaintiffs can find that to be a major

25   problem in a case.  So that's already out there in terms of

**UNREDACTED TRANSCRIPT**

1   Qorvo's already agreed to produce documents related to

2   employee access generally.  You've already done that, right?

3                **MR. DeFOSSE:**  Yes.  Yes, Your Honor.

4                **THE COURT:**  And you produced all the policy,

5   contracts, and so forth?

6                **MR. DeFOSSE:**  Yes, Your Honor.

7                **THE COURT:**  Okay.  I think that it appears

8   that -- and that's all I can be certain about at this point

9   in time, that the request for Production Number 173 is overly

10  broad and that, therefore, we're going to require, of course,

11  the plaintiff to produce the materials that they produced or

12  said they would produce in this regard already.

13               We're not going to change that.  But that we're

14  not going to require further information to be disclosed at

15  this point in time in this particular -- in connection with

16  this particular issue.  Now, there may be something else I

17  need to look at.

18               Mr. Selness, the Court doesn't see everything.

19  We see a lot of things.  We only see what you tell me, most

20  of the time, and we can't use anything that you don't tell me

21  anyway.  We're kind of stuck with that.

22               Something else I should note here, it sounds to

23  me like you're going to have -- you're going to have

24  opportunity to take depositions and ask critical people about

25  the steps that they took in order to protect and, certainly,

**UNREDACTED TRANSCRIPT**

1    anything else that we need to discuss in connection with this

2    particular matter.

3              I'm looking at my watch a little bit because I

4    have something pretty soon, right?

5              **THE CASE MANAGER:**  Yes, sir.

6              **THE COURT:**  I know.  They're telling me, Judge,

7    you got something at 11 o'clock.  You got to somehow get

8    through the rest of this.

9              Well, Mr. Selness, it's good to have you here.

10   That doesn't mean that you lost.  You know, the idea of

11   advocacy is that you made the appropriate argument.

12             **MR. SELNESS:**  Thank you.

13             **THE COURT:**  Now, let's go quickly through a

14   couple of things here.  The re-designation of the Second

15   Amended Complaint marked Attorneys' Eyes Only, that seems

16   awfully, awfully broad.

17             So who wants to tell me why there shouldn't be

18   some type of re-designation here that just seems like it's --

19   there are a lot of things in that Second Amended Complaint

20   that don't look to me like they're Attorneys' Eyes Only.

21             **MR. DeFOSSE:**  Your Honor, this is my issue again.

22   So this has been fully briefed, and it's been a while.  So

23   the issue here was we had agreed to kind of fairly broad

24   access for Akoustis to look at AEO information, including

25   three members of management, three members of the board --

**UNREDACTED TRANSCRIPT**

1          THE COURT:  Yes --

2          MR. DEFOSSE:  -- seen that stuff.  And the issue

3   that's still before the Court is whether they should be able

4   to show the AEO information to other Akoustis competitive

5   decision-makers.  So people who are making decisions as far

6   as competing with Qorvo on a day-to-day basis.  That's where

7   we drew the line on that information, and so I think that's

8   the kind of limited issue that's there.

9          As far as the information we're seeking to

10  protect, we submitted declarations explaining from our expert

11  why each of those documents is properly AEO, you know, what

12  confidential information it shows, what's not publicly

13  available, why it's valuable to a competitor.  So I think

14  we've addressed that issue.  It's -- you know, it's just

15  basically those attachments to the documents to the complaint

16  and limited number of redactions that only competitive

17  decision-makers can't see currently under the protective

18  order.

19          **THE COURT:**  Right.  I understand that.

20          We all understand, Mr. DeFosse, that as a general

21  proposition, there is a strong preference in federal courts

22  and under the Constitution to have documents that are filed

23  in court generally available.  And I'm not saying that

24  there's not a reason to restrict some access, but there is

25  that preference.

**UNREDACTED TRANSCRIPT**

1          Anything that you want to say about that?  I

2    mean, we don't like to have any perception that the courts

3    are operating in some secret or behind closed doors manner.

4          **MR. DeFOSSE:**  Yeah.  I mean, obviously, we don't

5    challenge that presumption, and we believe we've abided by

6    it.

7          The documents we're talking about here are trade

8    secret materials that were misappropriated that we attached

9    to the complaint so that everyone would have full visibility

10   as to that stage of the case what we were talking about.

11         So, obviously, it would be a great problem for my

12   client that by virtue of attaching AEO materials to give

13   Akoustis notice of what we're talking about, they now say

14   anyone at Akoustis can get access to those documents.  That's

15   our real problem, and I think we've gone much further than

16   you would see in a normal case with these type of materials

17   to say they actually can have board members look at them,

18   they can actually have members of management look at them,

19   general counsel.  The line we drew was someone who is making

20   competitive decisions shouldn't be able to see our trade

21   secrets.

22         **THE COURT:**  Okay.

23         I'm sorry, Ms. Sweeney.  I was trying to get to

24   you.  I know you've got a little bit of a time squeeze here.

25         **MS. SWEENEY:**  We do have a time squeeze.  And let

**UNREDACTED TRANSCRIPT**

1   me say, Your Honor, we have some incredibly important issues

2   to update you on.  This is one of them, and I'm happy to

3   respond.  But could we perhaps schedule a short conference

4   for early next week to address the motion to compel -- or,

5   I'm sorry, the motion to amend our answer to add the counter

6   claim?  We can address this issue because this particular

7   issue was specifically briefed before the Court.  We have a

8   reply brief that expressly goes to these issues, and then we

9   can also talk about the schedule at that time.

10          We've had a number of very material updates that

11  I think more than meet Your Honor's request for good cause on

12  the scheduling point, but I do need a few minutes to update

13  you on it because I'm afraid it's a bit of a laundry list.

14          And on this just AEO point, as you'll see in our

15  reply brief, we are in no way asking for Akoustis, in

16  general, to have access to this AEO information.  The last

17  discussion we had with the Court as we hadn't -- the motion

18  itself was never set for hearing.  But we had sort of a

19  preliminary discussion, and the Court indicated that we

20  should be allowed to have some of our board members have

21  access to these AEO materials, which is now about a thousand

22  documents that we're looking at, and these are documents that

23  came out of Akoustis's files.

24          So we have two board members that have access to

25  this and, obviously, they have no knowledge of the company on

**UNREDACTED TRANSCRIPT**

1   a day-to-day basis.  That's not what they do, they sit on a

2   board.  We asked for one manager in our reply brief, asking

3   for Mr. David Aichele to be able to review these materials so

4   that we could both have someone who could look at the

5   materials that Akoustis is charged with misappropriating,

6   assess those, and make the critical determination of usage.

7            So, you know, employees may come into a company

8   with what I call the stickiness factor and may have brought

9   documents with them that they shouldn't have.  Sometimes

10  those documents are used, sometimes they're not, but we need

11  a manager who understands this space to do that.

12           And during that hearing, I explained that the

13  people that we had been looking at to do this analysis were

14  our regular contacts at the company, which were the CEO, Jeff

15  Shealy, and Mr. Aichele, which is the senior VP, and that we

16  don't -- we don't have other people.  We don't have layers of

17  management, and the Court indicated it seemed to the Court

18  that, you know, we should have, you know, at least one or two

19  of those folks, I believe is what the Court said at that

20  point in time.

21           And so our request is just for one, it's just for

22  Mr. Aichele to be able to see this material and to be able to

23  help counsel and, frankly, help the board understand this

24  case.  But usage is something that an expert can't comment

25  on.  That's a factual issue for the company to figure out and

**UNREDACTED TRANSCRIPT**

1    this far into the case, we don't have -- we don't have any

2    way to assess that with any assistance from the company.

3              **THE COURT:**  I understand, and we need to

4    probably -- I know they're looking around and saying,

5    Judge --

6              **MS. SWEENEY:**  Yeah, well, I -- yeah, maybe if we

7    could just put a pin in this and return because as I said, we

8    really have some --

9              THE COURT:  Sure.

10             MS. SWEENEY:  -- some really critical issues that

11   we want to address, and we want to do it efficiently.  We

12   don't want to delay, so perhaps we could convene at the

13   Court's convenience.

14             **THE COURT:**  We actually had a development -- or

15   we are having a development now that should occur in about an

16   hour -- less than an hour, which will help me clear up part

17   of the schedule for next week.

18             What's the suggestion, Mr. Sample, understanding

19   that if things don't go forward the way we expect them to go

20   forward today in another matter, that that could change, but

21   let's assume that we're going to have more time next week?

22             **THE CASE MANAGER:**  Tuesday morning at ten.

23             **THE COURT:**  Tuesday morning at ten central.

24   That's 11.  Tuesday at ten?  Well, let me check.

25             Because, Ms. Sweeney, you did -- I think you're

**UNREDACTED TRANSCRIPT**

1   right.  We can't get through everything today in the way in

2   which we'd like to.  Is that okay with you?

3            **MS. SWEENEY:**  Absolutely, Your Honor.

4            **THE COURT:**  Okay.  And I'm not sure who I need to

5   look to, but I've been looking to at least Mr. DeFosse some

6   or a lot, but whether he wanted me to or not.

7            **MR. DeFOSSE:**  I love the attention, Your Honor.

8   That works for us.  There is -- if you have a couple more

9   minutes, there is maybe one issue that would be better to do

10  before then.

11           **THE COURT:**  I have about six-and-a-half minutes.

12           **MR. DeFOSSE:**  Okay.  It's the deposition issue,

13  Your Honor.  So one thing, we're trying to move the case

14  forward.  We had a discussion in May about how many

15  depositions were going to happen in this case.

16           **THE COURT:**  Let me say one thing about that

17  quickly.  And you suggested that you want to take, I think,

18  20 -- over 20 depositions; is that right?

19           **MR. DeFOSSE:**  So there's a way of counting that

20  gets you over 20 based on what's happened in the past and

21  what we're going forward with.  What we've asked for is for

22  15 depositions, additional depositions, recognizing we

23  haven't deposed a single party witness yet.  We haven't.  And

24  the four depositions we've taken to date have been less than

25  half a day.  So they're third-party depositions.

**UNREDACTED TRANSCRIPT**

 1          So -- and I'm actually overstepping my bounds
 2   because Mr. Masters was going to address this issue, but it
 3   is something that's preventing us to go forward because right
 4   now, we're trying to get depositions scheduled and,
 5   obviously, the other side is pointing out that we need the
 6   Court's permission to move forward.
 7          **THE COURT:**  All right.
 8          **MS. SWEENEY:**  Your Honor --
 9          **THE COURT:**  Let Mr. Masters speak because he --
10   that was his charged area.
11          **MR. MASTERS:**  Well, thank you, Your Honor.  I
12   don't know that I had much to add to what Mr. DeFosse has
13   already said, but the last time we were before you, I think,
14   was May 10th.  We did ask for 15 to 20, so we remain
15   consistent with that number.
16          Our disclosures, initial disclosures, have 61
17   people.  So coming down to the 15 to 20 is a substantial cut
18   plus the breadth of the trade secrets and going through a
19   number of Akoustis employees has also -- is why our list is
20   what it is, plus the claims.  We have patent infringement,
21   false advertising, unfair competition, and trade secrets.
22          **THE COURT:**  Let me hear briefly from Ms. Sweeney.
23   I know if we can't resolve it, but I do think there may need
24   to be some adjustment but not a lot.  And the reason that we
25   have a restriction on the number of depositions is

**UNREDACTED TRANSCRIPT**

1  recognition of parties need to focus, but also recognition

2  that there is great expense in connection with depositions,

3  at least there used to be, not so much now, since we can do

4  them remotely and, therefore, we want to limit the number.

5  Now, there are a lot of issues in this case.

6          So, Ms. Sweeney, what are you -- what's your

7  bottom line here?

8          **MS. SWEENEY:**  My bottom line is last time we

9  discussed this with the Court, Qorvo asked, as Mr. Masters

10 said, for 15 to 20 depositions.  The Court said that was

11 excessive.  You might consider 10, but you were inclined to

12 hold at -- you might consider 12, but you were inclined to

13 hold at the ten.  So our view, we prefer the ten.  We're

14 willing to agree to the 12.  We've communicated that to

15 Qorvo.

16         And, you know, it doesn't depend how you count on

17 depositions.  If you take a deposition, whether it's six

18 hours, three hours, you know, that counts.  So we're at, you

19 know, Qorvo is at 19 or 20 depositions.  We think 12 is

20 sufficient.  We're willing to agree with that, or we're

21 willing to live with ten.

22         **THE COURT:**  Well, it does make some difference as

23 to how long the depositions are because one of the concerns

24 always is efficiency, and if a party then took three

25 depositions all of which took 30 minutes each, we would not

**UNREDACTED TRANSCRIPT**

1    count them in the same way.

2         MS. SWEENEY:  I'm bad at this, Your Honor.  They

3    were half-day depositions or a bit longer, depending on --

4         THE COURT:  Right.  I'm just saying that, you

5    know, it does make some difference as to how many hours are

6    to be used.  What we needed to do -- I'm sorry, go ahead.

7         MR. MASTERS:  I was going to say we took two

8    depositions last year on third-party recruiters.  One was

9    three hours.  One was three hours and 3 minutes of record

10   time.  And then, in February, we amended the claim to add the

11   trade secrets.  Since then, we took two third parties, both

12   of which had disclosed or testified with trade secret

13   information to support our case.  One of those depositions

14   was four hours and 17 minutes, and one was two hours and

15   49 minutes.

16        So we don't think it's fair to count each witness

17   as one.  We would suggest if you want to go with 12, 12 times

18   seven hours is 84 hours.  Let's do it by hours rather than

19   number of witnesses because I don't want to sit with a

20   witness for seven hours just to extend and use my full day

21   if --

22        THE COURT:  Also, I want to make it clear that

23   sometimes we count hours based on the party who is deposing

24   them as opposed to counsel opposition, who is

25   cross-examination -- who is cross-examining because we're not

**UNREDACTED TRANSCRIPT**

1    going to penalize the party who needs to take the deposition

2    by allowing someone to extend the time period unnecessarily.

3           So the typical way for us to try to approach this

4    is to recognize that the efficiency is essentially 84 hours,

5    maybe 90, and that's about it.  That's the way we need to

6    approach these.  That encourages efficiency, and it

7    encourages also --

8           Now, I'm going to ask this other question of

9    Mr. Masters:  I have no problem with deposition cost being

10   reduced by remote depositions.  That doesn't work very well

11   in a lot of cases, may not well work here.  Have you been

12   able to take anything remotely?  I'm looking at my two-minute

13   marker here.

14          **MR. MASTERS:**  I'm sorry.  I think the first two

15   last year were remote, but since then, the two recent ones

16   were in person.  We can certainly discuss with counsel

17   whether we can do some of these remotely to reduce the

18   burden.

19          **THE COURT:**  Right.  Currently, you've taken a

20   total of four depositions.  We're certainly going to --

21   because they were relatively short, I'm going to restrict you

22   to, at this point in time, a projected 90 hours per side.

23          But let me also say, I think you can go ahead and

24   schedule and I'm doing a quick little calculation here, you

25   can, therefore, proceed, to schedule ten more -- is that what

**UNREDACTED TRANSCRIPT**

1  you're talking about, ten more depositions?  Is that right,

2  Mr. Masters?  I know you're seeking more than that.

3          **MR. MASTERS:**  We did have more, but the 90 hours,

4  we can certainly work within Your Honor's 90 hours per side.

5  We would also like to have an agreement where once a

6  deposition is noticed, the other side gets back to counsel

7  with dates that work or don't work within a --

8          **THE COURT:**  Well, let me put it like this:  If

9  you notice a deposition and they don't respond to you within

10  24 hours with a change as to the time and place, they're

11  stuck.  You show up, and you take the deposition.  They

12  forfeited their opportunity or they'll have somebody there.

13  This is not -- this is not a process where you negotiate

14  unnecessarily on these points.

15          I'm not trying to be unfair, but noticing is for

16  the purpose of this is when we're going to take the

17  deposition and, of course, you're going to give them

18  reasonable notice.  It's going to be, what are you doing, at

19  least five days' reasonable notice, six days, seven days,

20  whatever.  You're going to give them notice.  Both sides will

21  do that.  And then that's when the deposition is going to

22  take place generally.

23          Now, it is better to the talk about this and work

24  through it.  There's no question about it.  Just noticing and

25  being hard on these points is not the way to conduct

**UNREDACTED TRANSCRIPT**

1   yourself, and you all know that because you've got to live

2   with each other.  You're going to have other cases where

3   you'll be dealing with each other.  You need to be

4   reasonable.  But it is not an opportunity to negotiate for

5   two weeks about when you're going to take the deposition.

6   They need to get taken.

7          So with that guidance, I think that will work.  I

8   didn't do the math real quickly.  I'm going to go to my next

9   matter.

10          **MS. SWEENEY:**  Your Honor, for clarification.

11          **THE COURT:**  Yes, ma'am.

12          **MS. SWEENEY:**  So my understanding is Qorvo then

13   can take -- they've taken four depositions.  They can take

14   ten more for the maximum of 90 hours.  I want to make sure

15   I'm not going to say 25 deposition notices with two-hour

16   depositions.  We're talking ten more witnesses maximum and

17   with 90 hours maximum.

18          **THE COURT:**  We have to be -- this is sort of --

19   you needed some guidance as to how to plan, and I'm giving

20   you guidance as to how to plan.  And we're going to have

21   another conference, which is going to be next week, and if

22   these things didn't work out quite right, we'll do that.  But

23   let's go ahead and get these set up for both sides, and I

24   think we'll make progress.  I think they're looking for me

25   one more place.  I've got about 30 seconds.  I know they'll

**UNREDACTED TRANSCRIPT**

1    wait on me, but we have to be --

2             **MS. SWEENEY:**  You are the guest of honor, so to

3    speak.

4             **THE COURT:**  We are respective of everybody's

5    time.  Good to see everyone, always.  We're going to move the

6    case along.  Very interesting case.  Thank you all very much.

7             **MS. SWEENEY:**  Thank you, Your Honor.

8             (Adjournment.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1                **C E R T I F I C A T E**

2

3

4          I, LISA J. MAYO, do hereby certify that the

5    foregoing 83 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the DISCOVERY CONFERENCE on 18th day of

8    August, 2023, in the matter of:

9

10

11   QORVO, INC.

12   vs.

13   AKOUSTIS TECHNOLOGIES, INC.

14

15   Dated this AUGUST 21, 2023

16

17

18

19                    _____S/Lisa J. Mayo_____

20                    LISA J. MAYO, RDR, CRR
                     Official Court Reporter
21                   United States District Court
                     Western District of Tennessee
22

23

24

25

                   **UNREDACTED TRANSCRIPT**

**1**

**1** [1] - 31:20
**10** [1] - 66:11
**10th** [1] - 65:14
**11** [3] - 51:10, 58:7, 63:24
**12** [7] - 42:3, 43:14, 66:12, 66:14, 66:19, 67:17
**15** [22] - 22:14, 23:4, 25:20, 38:22, 39:3, 39:12, 40:2, 40:8, 40:13, 40:17, 40:20, 42:5, 42:14, 43:8, 43:13, 44:2, 44:14, 64:22, 65:14, 65:17, 66:10
**150** [1] - 9:20
**158** [1] - 25:16
**15th** [2] - 5:3, 5:6
**16th** [5] - 13:19, 22:5, 23:22, 24:4, 38:3
**17** [1] - 67:14
**173** [3] - 4:19, 7:11, 57:9
**17th** [1] - 13:21
**18** [1] - 3:2
**18TH** [1] - 1:18
**18th** [2] - 29:8, 72:7
**19** [1] - 66:19
**19899** [1] - 2:17
**1:21-cv-01417** [1] - 1:6
**1st** [1] - 37:24

**2**

**2** [1] - 5:2
**20** [11] - 9:10, 11:7, 11:13, 13:1, 64:18, 64:20, 65:14, 65:17, 66:10, 66:19
**20006-6801** [1] - 2:7
**202** [1] - 2:8
**2023** [4] - 1:18, 3:2, 72:8, 72:15
**2024** [1] - 3:16
**2099** [1] - 2:7
**21** [1] - 72:15
**233-4790** [1] - 2:14
**24** [3] - 25:15, 51:4, 69:10
**24-terabyte** [1] - 33:4
**25** [1] - 70:15
**2550** [1] - 2:13
**28** [3] - 29:10, 31:16, 31:18
**28th** [6] - 30:2, 31:15, 31:22, 31:25, 32:5, 38:1

**3**

**3** [2] - 5:6, 67:9
**30** [8] - 38:21, 39:7, 43:9, 43:12, 66:25, 70:25
**302** [1] - 2:18
**31** [3] - 21:7, 21:17, 22:8
**350** [2] - 9:14, 12:7
**350-plus** [1] - 8:3
**38103** [1] - 1:23

**4**

**400** [1] - 2:17
**429-4238** [1] - 2:18
**49** [1] - 67:15

**5**

**5** [1] - 17:24

**6**

**600** [1] - 2:17
**61** [1] - 65:16
**650** [1] - 2:14
**6th** [1] - 3:16

**7**

**706** [1] - 16:23
**72** [1] - 72:5
**747-1935** [1] - 2:8

**8**

**84** [2] - 67:18, 68:4

**9**

**90** [6] - 68:5, 68:22, 69:3, 69:4, 70:14, 70:17
**94304-1115** [1] - 2:14

**A**

**abided** [1] - 60:5
**abilities** [1] - 72:6
**ability** [1] - 52:11
**able** [18] - 9:23, 15:8, 20:21, 28:17, 36:5, 46:8, 46:9, 46:22, 47:4, 51:18, 51:25, 55:24, 59:3, 60:20, 62:3, 62:22, 68:12
**absolutely** [7] - 11:23, 19:15, 36:22, 55:3,

55:12, 64:3
**acceptable** [1] - 16:8
**access** [28] - 8:3, 8:11, 8:18, 8:19, 8:23, 8:25, 9:2, 9:6, 28:15, 36:5, 50:9, 50:11, 50:16, 51:6, 51:12, 52:8, 54:5, 54:10, 54:11, 54:12, 56:12, 57:2, 58:24, 59:24, 60:14, 61:16, 61:21, 61:24
**accessed** [3] - 9:14, 21:7, 37:4
**accessible** [6] - 50:14, 51:20, 52:7, 52:9, 52:16, 52:22
**accomplished** [1] - 41:24
**according** [1] - 16:20
**accurate** [2] - 37:20, 72:6
**active** [2] - 21:8, 42:24
**actively** [1] - 10:4
**activity** [2] - 32:22, 47:9
**actual** [1] - 42:24
**add** [5] - 11:17, 18:7, 61:5, 65:12, 67:10
**added** [1] - 12:8
**addition** [1] - 43:4
**additional** [4] - 39:18, 39:19, 52:10, 64:22
**address** [17] - 4:18, 5:7, 5:18, 5:20, 5:21, 6:2, 6:25, 7:17, 10:8, 13:13, 14:7, 16:16, 56:7, 61:4, 61:6, 63:11, 65:2
**addressed** [5] - 8:21, 9:25, 19:21, 52:18, 59:14
**addressing** [1] - 5:24
**adequate** [1] - 42:23
**adhere** [1] - 49:3
**Adjournment** [1] - 71:8
**adjustment** [1] - 65:24
**admittedly** [1] - 34:2
**advertising** [1] - 65:21
**advocacy** [1] - 58:11
**AEO** [7] - 58:24, 59:4, 59:11, 60:12, 61:14, 61:16, 61:21
**affiliated** [1] - 12:18
**afraid** [1] - 61:13
**ago** [1] - 12:9
**agree** [9] - 9:25, 12:17, 23:2, 23:13, 27:8, 27:15, 28:13,

66:14, 66:20
**agreed** [5] - 9:11, 41:11, 47:23, 57:1, 58:23
**agreement** [3] - 20:6, 34:19, 69:5
**agrees** [2] - 49:6, 55:5
**ahead** [4] - 67:6, 68:23, 70:23
**Aichele** [3] - 62:3, 62:15, 62:22
**Akoustis** [34] - 4:25, 5:12, 13:14, 14:18, 15:12, 15:18, 15:20, 16:2, 16:9, 17:10, 18:3, 20:12, 20:18, 21:9, 21:20, 25:10, 25:14, 30:20, 32:2, 33:2, 38:2, 39:21, 39:24, 40:16, 45:5, 45:6, 58:24, 59:4, 60:13, 60:14, 61:15, 62:5, 65:19
**AKOUSTIS** [2] - 1:7, 72:13
**Akoustis'** [1] - 51:10
**Akoustis's** [3] - 7:16, 46:18, 61:23
**alleged** [10] - 50:9, 50:17, 51:3, 51:11, 52:1, 52:3, 52:20, 52:22, 55:20, 56:4
**allow** [5] - 16:21, 19:11, 19:25, 25:2, 41:11
**allowance** [1] - 15:6
**allowed** [2] - 53:13, 61:20
**allowing** [1] - 29:18, 68:2
**altered** [1] - 18:23
**Alto** [1] - 2:14
**amenable** [1] - 25:19
**amend** [4] - 3:11, 5:22, 6:16, 61:5
**Amended** [3] - 51:4, 58:15, 58:19
**amended** [2] - 5:5, 67:10
**amiss** [1] - 35:15
**amount** [8] - 7:6, 23:10, 23:15, 23:19, 25:22, 42:24, 44:7, 46:5
**analysis** [18] - 14:23, 15:11, 15:17, 18:1, 20:22, 28:18, 31:24, 35:1, 36:10, 36:16, 37:11, 39:20, 43:8, 45:10, 46:18, 56:21,

62:13
**answer** [5] - 5:5, 6:24, 17:24, 48:23, 61:5
**answers** [2] - 53:11, 53:13
**anticipate** [2] - 22:1, 37:15
**anyway** [1] - 57:21
**appear** [1] - 44:9
**Appearing** [2] - 2:5, 2:10
**applicable** [1] - 53:22
**applied** [1] - 47:25
**appointment** [1] - 19:19
**appreciate** [6] - 11:5, 43:21, 46:15, 47:21, 48:5, 49:24
**approach** [7] - 16:19, 34:16, 34:22, 37:1, 50:18, 68:3, 68:6
**approached** [1] - 25:18
**appropriate** [21] - 7:21, 8:25, 13:11, 14:22, 15:1, 19:24, 20:11, 30:13, 31:11, 31:17, 32:9, 35:12, 37:13, 44:10, 46:25, 47:11, 47:15, 48:7, 49:7, 51:5, 58:11
**approve** [1] - 37:11
**arbitrary** [1] - 24:14
**area** [1] - 65:10
**areas** [1] - 44:5
**argument** [6] - 5:17, 6:8, 44:19, 45:21, 50:7, 58:11
**askew** [1] - 11:6
**aspect** [1] - 27:17
**assemble** [1] - 52:19
**assert** [1] - 3:12
**assertions** [1] - 3:22
**assess** [2] - 62:6, 63:2
**assessments** [2] - 44:25, 45:15
**assigned** [1] - 16:22
**assigns** [1] - 30:19
**assistance** [1] - 63:2
**assume** [2] - 27:3, 63:21
**assurance** [2] - 24:18, 41:8
**assurances** [2] - 46:16, 47:22
**attached** [1] - 60:8
**attaching** [1] - 60:12
**attachments** [1] - 59:15
**attempted** [1] - 28:6

**attention** [2] - 3:9, 64:7
**attorney's** [1] - 17:16
**attorneys** [2] - 10:21, 16:1
**Attorneys'** [2] - 58:15, 58:20
**AUGUST** [2] - 1:18, 72:15
**August** [5] - 3:2, 5:3, 5:6, 29:8, 72:8
**authorized** [5] - 16:23, 17:5, 20:20, 51:7, 51:13
**auto** [1] - 35:16
**available** [6] - 51:3, 56:5, 56:16, 56:20, 59:13, 59:23
**Avenue** [1] - 2:7
**aware** [2] - 29:1, 56:18
**awfully** [1] - 58:16

**B**

**backfire** [1] - 28:25
**background** [1] - 44:7
**backstop** [1] - 18:3
**bad** [2] - 24:15, 67:2
**based** [5] - 23:17, 36:13, 37:13, 64:20, 67:23
**basic** [1] - 3:17
**basis** [6] - 9:7, 29:25, 32:5, 41:24, 59:6, 62:1
**BAW** [2] - 26:10, 45:14
**Bayard** [2] - 2:16, 5:14
**BEFORE** [1] - 1:15
**beginning** [2] - 29:21, 29:23
**behalf** [2] - 2:5, 2:10
**behind** [1] - 60:3
**benefit** [2] - 47:6, 47:7
**best** [3] - 30:5, 33:22, 72:5
**better** [4] - 9:22, 11:2, 64:9, 69:23
**between** [6] - 9:9, 13:21, 14:20, 25:25, 32:14, 45:18
**beyond** [6] - 23:24, 25:12, 25:13, 34:17, 45:16, 47:14
**big** [5] - 13:22, 26:8, 34:20, 41:4, 46:7
**biggest** [1] - 36:12
**bit** [6] - 14:17, 49:12, 58:3, 60:24, 61:13, 67:3
**blanket** [2] - 22:16,

27:14
**board** [8] - 20:19, 36:9, 58:25, 60:17, 61:20, 61:24, 62:2, 62:23
**bottom** [3] - 10:18, 66:7, 66:8
**bound** [1] - 11:2
**bounds** [1] - 65:1
**box** [1] - 24:19
**BRAUERMAN** [1] - 5:13
**Brauerman** [2] - 2:16, 5:14
**breadth** [2] - 44:1, 65:18
**brief** [3] - 61:8, 61:15, 62:2
**briefed** [5] - 4:20, 6:24, 19:18, 58:22, 61:7
**briefly** [1] - 65:22
**broad** [7] - 3:23, 45:10, 47:1, 47:21, 57:10, 58:16, 58:23
**broadly** [1] - 52:22
**brought** [3] - 3:8, 7:15, 62:8
**BUILDING** [1] - 1:22
**built** [1] - 28:16
**bunch** [1] - 30:19
**burden** [9] - 4:1, 7:24, 23:10, 43:15, 50:1, 55:5, 55:7, 55:9, 68:18
**burdensome** [3] - 8:5, 39:10, 39:14
**business** [3] - 21:10, 25:15, 56:13

**C**

**CA** [1] - 2:14
**calculation** [1] - 68:24
**calendar** [1] - 6:22
**candidly** [1] - 45:24
**cannot** [1] - 41:10
**capable** [1] - 17:1
**captures** [1] - 17:16
**care** [1] - 49:14
**carefully** [1] - 3:14
**CASE** [2] - 58:5, 63:22
**case** [49] - 3:15, 4:7, 8:4, 13:23, 14:6, 14:16, 15:14, 16:15, 18:9, 18:14, 19:3, 19:4, 19:5, 19:25, 20:14, 21:12, 24:3, 28:24, 30:22, 38:18, 39:25, 42:18, 44:2,

44:13, 46:1, 46:13, 48:19, 49:20, 51:17, 51:24, 52:4, 52:21, 52:25, 53:9, 53:10, 54:10, 54:12, 56:25, 60:10, 60:16, 62:24, 63:1, 64:13, 64:15, 66:5, 67:13, 71:6
**cases** [15] - 8:20, 16:20, 16:21, 16:24, 17:13, 18:13, 18:16, 18:18, 18:20, 19:18, 19:19, 20:6, 34:21, 68:11, 70:2
**categorically** [1] - 27:24
**category** [1] - 55:14
**caveat** [1] - 40:8
**central** [2] - 27:2, 63:23
**CEO** [1] - 62:14
**certain** [3] - 3:21, 51:6, 57:8
**certainly** [11] - 4:4, 16:9, 19:10, 39:6, 48:10, 53:4, 53:7, 57:25, 68:16, 68:20, 69:4
**certify** [2] - 20:22, 72:4
**cetera** [1] - 31:21
**challenge** [2] - 48:18, 60:5
**chambers** [1] - 7:9
**chance** [5] - 15:13, 15:20, 15:24, 16:2, 48:18
**change** [6] - 3:25, 4:2, 57:13, 63:20, 69:10
**charged** [2] - 62:5, 65:10
**check** [4] - 18:6, 40:18, 40:23, 63:24
**children** [1] - 15:23
**circle** [1] - 16:11
**circumstance** [3] - 35:13, 37:3, 54:22
**cited** [5] - 16:24, 17:13, 18:12, 19:18, 52:5
**citing** [2] - 18:17, 18:20
**claim** [4] - 5:6, 51:9, 61:6, 67:10
**claiming** [1] - 34:8
**claims** [11] - 3:12, 10:17, 12:25, 46:10, 51:16, 51:17, 51:18, 51:19, 51:25, 52:21, 65:20

**clarification** [1] - 70:10
**clear** [3] - 16:6, 63:16, 67:22
**client** [4] - 9:1, 47:6, 47:22, 60:12
**close** [5] - 13:19, 19:6, 19:11, 23:22, 30:4
**closed** [2] - 24:4, 60:3
**closely** [1] - 38:19
**coached** [1] - 26:5
**coaching** [1] - 28:11
**colleagues** [1] - 41:15
**coming** [2] - 28:7, 65:17
**comment** [5] - 11:15, 11:21, 14:7, 48:1, 62:24
**comments** [1] - 45:25
**commit** [2] - 23:21, 29:25
**commitment** [2] - 36:11, 36:21
**committed** [1] - 24:3
**common** [2] - 36:3, 53:1
**communicated** [1] - 66:14
**communication** [1] - 28:21
**communications** [1] - 50:11
**company** [12] - 15:3, 25:11, 52:6, 52:23, 53:14, 56:1, 56:12, 61:25, 62:7, 62:14, 62:25, 63:2
**compel** [2] - 7:16, 34:4, 61:4
**competing** [1] - 59:6
**competition** [1] - 65:21
**competitive** [3] - 59:4, 59:16, 60:20
**competitor** [1] - 59:13
**complaint** [4] - 22:11, 51:4, 59:15, 60:9
**Complaint** [3] - 51:4, 58:15, 58:19
**complete** [4] - 7:21, 31:15, 37:24, 37:25
**completed** [1] - 31:7
**completely** [3] - 33:24, 36:8, 41:7
**completion** [1] - 31:23
**complexity** [1] - 16:16
**complicated** [1] - 6:1
**component** [1] - 56:6
**comprehension** [1] - 10:2

**compressed** [1] - 13:17
**computer** [2] - 10:11, 14:14, 52:8
**computers** [2] - 14:1, 21:5
**conceivable** [1] - 17:16
**concept** [1] - 28:16
**concern** [4] - 15:15, 36:13, 43:21, 48:15
**concerned** [2] - 38:12, 48:9
**concerns** [3] - 18:7, 26:8, 66:23
**conclude** [1] - 17:1
**concrete** [1] - 19:22
**conduct** [2] - 24:11, 69:25
**conducted** [3] - 12:16, 12:18, 46:21
**confer** [6] - 11:25, 21:16, 22:19, 30:17, 34:18, 50:19
**conference** [3] - 53:25, 61:3, 70:21
**CONFERENCE** [2] - 1:12, 72:7
**confers** [4] - 5:16, 6:9, 25:1, 36:18
**confidential** [3] - 26:13, 27:10, 59:12
**confidential/ proprietary** [1] - 51:6
**confirm** [1] - 41:6
**confusion** [1] - 14:17
**connected** [1] - 45:2
**connection** [8] - 3:7, 3:10, 3:21, 4:7, 45:16, 57:15, 58:1, 66:2
**consider** [4] - 8:19, 38:9, 66:11, 66:12
**considerable** [1] - 16:15
**consideration** [1] - 4:5
**considered** [2] - 52:5, 56:14
**consistent** [1] - 65:15
**Constitution** [1] - 59:22
**contacts** [1] - 62:14
**contain** [2] - 25:15, 32:23
**containing** [1] - 51:13
**contention** [1] - 30:23
**contents** [1] - 45:19
**continue** [1] - 31:7
**continuing** [1] - 51:17

contracts [1] - 57:5
contractual [2] - 9:5, 54:14
control [5] - 25:11, 29:15, 29:19, 30:6, 31:10
convene [1] - 63:12
convenience [1] - 63:13
conversations [3] - 27:12, 28:9, 44:8
conversely [1] - 13:23
copy [1] - 45:7
corporate [1] - 8:24
corporate-level [1] - 8:24
correct [4] - 11:18, 32:17, 37:18, 55:8
correspondence [1] - 3:20
cost [1] - 68:9
counsel [9] - 8:13, 17:19, 25:25, 53:15, 60:19, 62:23, 67:24, 68:16, 69:6
count [4] - 66:16, 67:1, 67:16, 67:23
counter [3] - 3:12, 5:6, 61:5
counting [1] - 64:19
counts [1] - 66:18
couple [4] - 7:4, 49:4, 58:14, 64:8
course [12] - 3:14, 6:16, 8:9, 9:15, 13:14, 20:15, 23:18, 28:8, 28:12, 28:21, 57:10, 69:17
Court [43] - 4:18, 5:1, 5:8, 5:15, 5:19, 5:24, 6:24, 6:25, 7:15, 12:14, 18:13, 20:7, 21:13, 24:10, 29:3, 29:9, 30:14, 31:12, 36:19, 37:12, 39:15, 39:22, 39:23, 42:15, 43:25, 45:25, 46:17, 49:6, 52:5, 52:10, 57:18, 59:3, 61:7, 61:17, 61:19, 62:17, 62:19, 66:9, 66:10, 72:20, 72:21
court [4] - 5:17, 6:8, 46:8, 59:23
COURT [107] - 1:1, 3:7, 4:21, 5:10, 5:25, 6:10, 7:2, 7:19, 9:17, 10:3, 10:19, 11:14, 11:19, 11:23, 12:13, 13:6, 13:25, 14:25,

15:6, 16:4, 16:18, 17:18, 19:2, 19:15, 19:21, 20:9, 21:25, 22:6, 23:2, 24:7, 26:2, 26:24, 28:20, 30:8, 31:8, 31:14, 31:19, 32:3, 32:7, 32:16, 33:6, 33:16, 33:20, 34:9, 34:15, 34:20, 35:20, 36:25, 37:9, 37:17, 38:4, 38:11, 38:15, 39:5, 40:1, 40:11, 40:18, 40:23, 41:12, 41:17, 42:10, 42:19, 43:11, 44:7, 45:23, 46:20, 47:3, 47:17, 48:1, 48:21, 49:11, 49:16, 53:1, 53:15, 54:6, 54:21, 55:4, 55:12, 55:21, 56:9, 56:17, 56:23, 57:4, 57:7, 58:6, 58:13, 59:1, 59:19, 60:22, 63:3, 63:9, 63:14, 63:23, 64:4, 64:11, 64:16, 65:7, 65:9, 65:22, 66:22, 67:4, 67:22, 68:19, 69:8, 70:11, 70:18, 71:4
Court's [8] - 3:8, 19:3, 37:11, 38:12, 41:20, 46:3, 63:13, 65:6
courts [4] - 15:14, 16:24, 59:21, 60:2
cover [1] - 51:10
created [4] - 28:23, 45:5, 45:6, 45:8
creates [1] - 20:10
creating [2] - 37:7, 45:5
critical [4] - 32:15, 57:24, 62:6, 63:10
cross [2] - 67:25
cross-examination [1] - 67:25
cross-examining [1] - 67:25
CRR [2] - 1:21, 72:20
current [1] - 22:14
custodians [11] - 21:17, 22:8, 22:14, 22:17, 39:17, 40:8, 40:20, 42:6, 42:18, 43:6, 43:8
custody [1] - 25:11
cut [1] - 65:17
cuts [1] - 51:22
CVs [1] - 20:8

## D

data [6] - 9:1, 27:20, 28:1, 35:5, 35:17
date [7] - 12:1, 12:5, 12:14, 31:23, 32:1, 64:24
Dated [1] - 72:15
dates [3] - 37:18, 49:3, 69:7
David [2] - 2:12, 62:3
day-to-day [2] - 59:6, 62:1
days [7] - 23:11, 29:10, 31:16, 31:18, 42:3, 69:19
days' [1] - 69:19
DC [1] - 2:7
DE [1] - 2:17
deadline [4] - 12:24, 13:20, 16:12, 22:5
deal [4] - 18:18, 20:10, 34:20, 42:2
dealing [3] - 47:7, 53:2, 70:3
dealt [2] - 15:14, 28:8
decade [2] - 8:9, 9:15
decided [1] - 33:22
decision [3] - 22:18, 59:5, 59:17
decision-makers [2] - 59:5, 59:17
decisions [2] - 59:5, 60:20
declaration [1] - 18:8
declarations [1] - 59:10
Defendant [2] - 1:8, 2:10
defendant [3] - 19:24, 55:9, 55:23
defendant's [1] - 17:1
defense [2] - 6:14, 56:6
define [4] - 17:6, 17:7, 47:20
defined [1] - 31:7
defining [2] - 11:9, 26:14
DeFosse [79] - 2:6, 4:16, 4:18, 5:4, 5:7, 7:12, 7:14, 7:23, 9:24, 10:4, 11:4, 11:18, 13:1, 13:9, 13:10, 14:1, 14:3, 15:5, 15:9, 16:19, 17:23, 19:12, 20:13, 22:1, 22:3, 22:7, 23:13, 26:25, 27:5, 28:22, 29:12, 29:14,

31:16, 31:25, 32:4, 32:9, 32:13, 35:22, 36:1, 37:3, 37:14, 37:19, 37:22, 38:17, 38:19, 40:1, 40:7, 40:12, 41:8, 41:10, 41:14, 42:1, 43:12, 43:18, 43:20, 45:25, 46:12, 46:14, 47:6, 48:1, 48:5, 49:1, 49:5, 49:15, 53:17, 54:8, 55:3, 56:18, 56:21, 57:3, 57:6, 58:21, 59:20, 60:4, 64:5, 64:7, 64:12, 64:19, 65:12
DEFOSSE [1] - 59:2
DeFosse's [3] - 31:9, 46:15, 47:22
DELAWARE [1] - 1:2
delay [2] - 30:7, 63:12
delays [1] - 13:20
delete [1] - 35:17
deleted [5] - 20:23, 26:18, 27:12, 33:10, 33:13
deliver [1] - 31:5
demonstrated [1] - 52:11
deny [1] - 49:7
department [3] - 50:22, 50:25, 51:21
departments [1] - 50:16
deposed [1] - 64:23
deposing [1] - 67:23
deposition [14] - 10:13, 53:3, 53:20, 64:12, 66:17, 68:1, 68:9, 69:6, 69:9, 69:11, 69:17, 69:21, 70:5, 70:15
depositions [26] - 10:14, 53:9, 57:24, 64:15, 64:18, 64:22, 64:24, 64:25, 65:4, 65:25, 66:2, 66:10, 66:17, 66:19, 66:23, 66:25, 67:3, 67:8, 67:13, 68:10, 68:20, 69:1, 70:13, 70:16
derivative [4] - 26:11, 45:1, 45:15, 45:22
describing [1] - 48:16
designate [1] - 5:3
designation [2] - 58:14, 58:18
desktop [1] - 40:10
determination [1] - 62:6

determinations [1] - 26:11
determine [4] - 18:10, 33:13, 35:2, 52:14
determines [1] - 33:10
determining [1] - 56:14
developed [1] - 8:9
development [2] - 63:14, 63:15
device [4] - 22:16, 32:23, 33:17, 35:9
devices [20] - 21:6, 21:17, 22:18, 22:25, 23:6, 24:2, 25:7, 25:10, 30:15, 32:11, 32:14, 32:16, 40:9, 40:13, 40:21, 42:6, 42:21, 43:8, 43:9
devolve [1] - 43:24
Diamond [4] - 52:4, 52:11, 52:15, 54:9
Diane [1] - 2:11
difference [2] - 66:22, 67:5
different [6] - 31:20, 44:5, 50:17, 52:3, 52:6, 53:11
differential [1] - 52:2
difficult [1] - 13:24
difficulty [1] - 28:22
direct [1] - 45:16
directly [2] - 45:2, 56:2
disagreement [2] - 14:21, 18:16
disclose [2] - 15:7, 15:8
disclosed [3] - 35:25, 57:14, 67:12
disclosing [1] - 15:3
disclosure [1] - 44:23
disclosures [3] - 11:12, 65:16
DISCOVERY [2] - 1:12, 72:7
discovery [14] - 10:6, 10:15, 13:18, 17:14, 18:21, 23:23, 24:4, 25:18, 30:4, 31:2, 42:9, 42:11, 45:11
discuss [4] - 14:18, 49:12, 58:1, 68:16
discussed [2] - 27:10, 66:9
discussing [1] - 15:11
discussion [11] - 3:21, 5:8, 9:21, 25:1, 34:18, 36:9, 39:2, 43:25, 61:17, 61:19,

64:14
**disproportionate** [4] -
42:9, 43:5, 43:10,
44:9
**dispute** [3] - 8:18,
51:18, 51:25
**disputes** [1] - 18:21
**disruptive** [1] - 35:19
**disseminated** [2] -
55:16, 55:20
**distinction** [1] - 37:2
**distinguishes** [1] -
54:3
**District** [2] - 72:21,
72:21
**DISTRICT** [2] - 1:1, 1:2
**divorced** [1] - 53:13
**document** [11] -
30:19, 30:20, 35:11,
35:12, 45:5, 45:6,
45:7, 50:2, 50:3,
50:4, 53:22
**documents** [56] -
3:22, 8:22, 8:23,
8:25, 9:4, 17:7, 17:9,
17:10, 17:12, 20:22,
21:20, 21:21, 21:23,
26:11, 26:12, 26:16,
26:18, 26:20, 31:1,
31:4, 33:1, 33:3,
34:2, 34:7, 35:8,
37:4, 37:6, 39:20,
44:22, 44:23, 45:1,
45:4, 45:11, 45:20,
50:10, 51:1, 51:7,
51:12, 51:19, 51:22,
51:24, 52:16, 53:10,
53:11, 53:14, 57:1,
59:11, 59:15, 59:22,
60:7, 60:14, 61:22,
62:9, 62:10
**done** [15] - 8:20,
11:11, 16:3, 16:10,
18:24, 22:4, 23:21,
25:22, 29:7, 30:1,
30:11, 36:12, 39:3,
43:2, 57:2
**door** [1] - 10:15
**doors** [1] - 60:3
**down** [8] - 6:16, 6:17,
6:18, 37:21, 38:21,
43:22, 46:7, 65:17
**dozens** [1] - 38:24
**drag** [1] - 22:22
**drew** [2] - 59:7, 60:19
**drive** [2] - 52:7, 52:16
**driving** [1] - 46:12
**due** [1] - 13:22
**duplication** [1] - 21:2
**duplicative** [3] -

39:16, 39:17, 43:5
**during** [3] - 26:1, 53:8,
62:12

### E

**early** [1] - 61:4
**easily** [1] - 53:20
**easy** [1] - 44:10
**effective** [1] - 33:24
**efficiency** [4] - 20:9,
66:24, 68:4, 68:6
**efficient** [2] - 20:11,
20:14
**efficiently** [1] - 63:11
**effort** [3] - 21:2, 30:25,
34:5
**efforts** [2] - 52:15,
56:11
**eight** [3] - 25:21,
42:18, 43:14
**either** [2] - 20:15,
22:22
**electronic** [2] - 51:6,
51:12
**elements** [1] - 55:1
**employee** [16] - 8:1,
8:3, 8:10, 8:18, 8:19,
9:2, 9:14, 12:19,
16:6, 50:8, 54:4,
54:18, 57:2
**employees** [13] - 8:22,
9:5, 42:14, 51:8,
51:14, 51:20, 51:21,
52:7, 52:9, 52:23,
62:7, 65:19
**encourages** [2] - 68:6,
68:7
**end** [7] - 29:20, 30:1,
36:20, 40:4, 43:9,
51:8, 51:14
**ended** [1] - 26:22
**engage** [3] - 8:11,
24:11, 47:9
**engaged** [4] - 14:10,
14:15, 16:21, 47:5
**engender** [1] - 47:7
**ensuing** [1] - 39:19
**ensure** [1] - 46:24
**entertains** [1] - 5:19
**entire** [2] - 22:4, 37:7
**entitled** [2] - 52:24,
56:14
**environment** [1] -
35:18
**envision** [1] - 13:10
**especially** [1] - 21:19
**essentially** [4] - 40:3,
53:2, 55:25, 68:4
**establish** [1] - 54:23

**et** [1] - 31:21
**eventually** [1] - 46:7
**evidence** [8] - 18:23,
33:25, 34:25, 37:4,
38:23, 47:18, 52:5,
55:10
**evolving** [1] - 36:18
**exactly** [8] - 3:24,
10:22, 12:19, 12:21,
16:4, 24:8, 41:2,
48:9
**examination** [12] -
11:20, 12:14, 13:8,
14:1, 14:12, 18:18,
29:6, 32:10, 32:24,
44:21, 47:1, 67:25
**examiner** [1] - 15:2,
25:25
**examining** [1] - 67:25
**example** [9] - 3:10,
8:21, 10:7, 10:11,
10:12, 15:7, 36:3,
51:19, 52:4
**examples** [1] - 9:8
**excessive** [1] - 66:11
**executive** [1] - 15:8
**executives** [1] - 25:11
**exercise** [1] - 20:20
**exercised** [1] - 52:15
**exercising** [1] - 17:8
**existed** [1] - 55:17
**existing** [1] - 3:14
**expanded** [2] - 40:21,
51:9
**expect** [7] - 10:14,
17:20, 27:7, 28:7,
40:12, 56:22, 63:19
**expectation** [2] -
14:11, 22:14
**expecting** [1] - 23:18
**expedition** [3] - 18:5,
26:4, 26:23
**expense** [2] - 47:8,
66:2
**expense-related** [1] -
47:8
**expert** [61] - 12:4,
12:24, 13:12, 13:13,
13:21, 14:1, 14:11,
14:12, 14:20, 14:22,
15:2, 15:11, 15:17,
16:12, 16:21, 17:1,
17:5, 18:8, 18:18,
18:25, 20:13, 22:23,
23:20, 24:1, 26:10,
27:3, 27:11, 28:9,
28:11, 28:17, 28:24,
29:19, 30:19, 31:11,
31:24, 32:1, 33:9,
33:12, 33:13, 34:10,

37:25, 39:6, 39:19,
41:5, 41:10, 41:11,
43:7, 45:13, 45:14,
45:18, 46:18, 46:21,
48:8, 48:10, 48:18,
48:19, 59:10, 62:24
**expert's** [1] - 16:2
**experts** [6] - 10:6,
12:2, 12:5, 12:11,
13:3, 13:4
**explain** [1] - 41:5
**explained** [2] - 52:10,
62:12
**explaining** [1] - 59:10
**exploration** [1] - 17:15
**expressly** [1] - 61:8
**extend** [2] - 67:20,
68:2
**extensive** [2] - 9:9
**extent** [7] - 4:25, 5:8,
5:19, 8:17, 8:19,
18:1, 56:12
**extraordinarily** [2] -
21:9, 25:8
**extraordinary** [1] -
23:10
**extreme** [1] - 21:11
**extremely** [2] - 8:5,
41:23
**Eyes** [2] - 58:15, 58:20

### F

**faced** [1] - 53:11
**facilitate** [1] - 32:5
**facilitating** [1] - 24:5
**fact** [7] - 3:17, 4:5,
17:20, 18:4, 28:23,
48:13, 52:14
**factor** [3] - 8:19,
56:13, 62:8
**factors** [1] - 8:15
**facts** [1] - 38:16
**factual** [1] - 62:25
**failing** [1] - 53:2
**fair** [3] - 36:1, 44:7,
67:16
**fairly** [3] - 14:5, 42:25,
58:23
**fall** [1] - 44:12
**falls** [1] - 28:19
**false** [1] - 65:21
**far** [9] - 28:24, 38:7,
38:12, 41:16, 43:3,
50:1, 59:5, 59:9,
63:1
**fashion** [1] - 19:23
**February** [1] - 67:10
**FEDERAL** [1] - 1:22
**federal** [3] - 5:17, 6:8,

59:21
**few** [6] - 12:9, 23:5,
25:10, 38:16, 48:21,
61:12
**Fifteen** [1] - 38:14
**figure** [4] - 12:15,
36:23, 50:23, 62:25
**file** [3] - 5:5, 33:14,
33:17
**filed** [4] - 5:2, 16:14,
49:8, 59:22
**files** [4] - 27:22, 36:4,
36:5, 61:23
**filing** [1] - 18:8
**filter** [1] - 26:10
**final** [5] - 13:7, 21:3,
48:1, 49:1, 52:17
**fine** [4] - 5:10, 6:3, 7:3,
41:12
**firm** [1] - 12:1
**first** [6] - 5:17, 6:8,
7:17, 7:19, 22:13,
68:14
**fishing** [3] - 18:5,
26:4, 26:23
**fit** [2] - 10:23, 24:20
**five** [1] - 69:19
**flag** [1] - 15:24
**flat** [1] - 28:19
**FLOOR** [1] - 1:22
**focus** [10] - 9:9, 10:16,
27:16, 28:18, 32:9,
40:4, 42:16, 43:7,
46:13, 66:1
**focused** [6] - 7:7,
22:23, 26:24, 43:6,
46:2, 46:3
**focusing** [1] - 7:8
**folks** [4] - 8:13, 9:3,
22:11, 62:19
**follow** [2] - 19:5, 48:24
**following** [1] - 21:20
**FOR** [1] - 1:2
**forcing** [1] - 52:18
**foregoing** [1] - 72:5
**forensic** [21] - 10:8,
10:10, 11:19, 12:14,
13:8, 13:20, 22:23,
25:19, 25:25, 31:3,
32:24, 33:4, 35:1,
35:5, 37:7, 44:21,
45:9, 45:13, 45:16,
45:18, 47:1
**forensically** [1] -
48:17
**forfeited** [1] - 69:12
**format** [2] - 48:24
**forth** [6] - 3:23, 12:16,
15:4, 47:8, 55:17,
57:5

**forward** [19] - 9:23, 13:1, 13:4, 14:3, 19:4, 19:5, 19:10, 24:22, 25:3, 29:17, 42:17, 42:18, 63:19, 63:20, 64:14, 64:21, 65:3, 65:6
**four** [5] - 32:11, 64:24, 67:14, 68:20, 70:13
**FOURTH** [1] - 1:22
**fragments** [2] - 33:14, 33:18
**frame** [2] - 23:14, 46:1
**framed** [1] - 50:4
**frames** [1] - 8:7
**frankly** [3] - 7:8, 43:18, 62:23
**FRIDAY** [2] - 1:17, 3:1
**front** [2] - 6:12, 36:19
**full** [2] - 60:9, 67:20
**fully** [2] - 6:23, 58:22

**G**

**gathered** [1] - 51:15
**general** [4] - 3:13, 59:20, 60:19, 61:16
**generally** [7] - 8:21, 27:8, 27:15, 48:25, 57:2, 59:23, 69:22
**generate** [1] - 43:17
**generated** [1] - 23:18
**given** [4] - 13:17, 13:19, 31:6, 54:25
**glad** [1] - 6:13
**goal** [6] - 10:19, 10:22, 11:1, 11:6, 11:13
**great** [3] - 43:15, 60:11, 66:2
**greatest** [1] - 43:6
**group** [1] - 11:11
**groups** [1] - 50:16
**guarantees** [1] - 23:25
**guest** [1] - 71:2
**guidance** [7] - 3:9, 11:3, 26:4, 28:13, 70:7, 70:19, 70:20
**guide** [1] - 28:17

**H**

**half** [4] - 10:9, 64:11, 64:25, 67:3
**half-day** [1] - 67:3
**hand** [3] - 4:15, 4:16, 41:25
**handle** [2] - 6:15, 33:11
**handling** [3] - 5:11, 6:8, 6:19

**Hanover** [1] - 2:13
**happy** [3] - 6:24, 7:17, 61:2
**hard** [4] - 23:25, 24:9, 29:5, 69:25
**hardly** [1] - 9:20
**haste** [1] - 14:4
**headed** [1] - 37:10
**hear** [8] - 5:15, 5:22, 7:19, 7:21, 30:12, 50:7, 53:15, 65:22
**heard** [2] - 29:23, 50:24
**hearing** [3] - 54:2, 61:18, 62:12
**help** [9] - 7:7, 28:17, 29:16, 29:20, 29:21, 52:20, 62:23, 63:16
**helpful** [5] - 3:9, 7:10, 11:25, 12:10, 44:12
**hereby** [1] - 72:4
**highlight** [1] - 6:23
**highly** [1] - 17:3
**hiring** [1] - 17:21
**history** [1] - 36:13
**hit** [1] - 53:19
**hold** [2] - 66:12, 66:13
**holding** [1] - 13:2
**homework** [1] - 39:4
**Honor** [62] - 4:17, 5:13, 5:14, 6:7, 6:21, 7:14, 7:18, 7:23, 9:24, 11:4, 11:21, 13:10, 14:5, 14:8, 16:11, 16:17, 17:23, 18:7, 18:17, 19:14, 21:4, 22:12, 23:13, 23:24, 27:5, 28:1, 29:15, 30:2, 30:12, 31:17, 33:19, 36:1, 37:22, 38:13, 38:20, 40:7, 43:20, 46:14, 46:16, 48:6, 49:5, 49:15, 49:23, 52:17, 53:8, 53:17, 53:19, 55:8, 55:19, 57:3, 57:6, 58:21, 61:1, 64:3, 64:7, 64:13, 65:8, 65:11, 67:2, 70:10, 71:7
**honor** [1] - 71:2
**Honor's** [4] - 5:21, 40:14, 61:11, 69:4
**HONORABLE** [1] - 1:15
**hope** [2] - 10:7, 24:12
**hopeful** [1] - 11:7
**hour** [4] - 29:5, 63:16, 70:15
**hours** [19] - 66:18,

67:5, 67:9, 67:14, 67:18, 67:20, 67:23, 68:4, 68:22, 69:3, 69:4, 69:10, 70:14, 70:17
**HR** [3] - 51:21, 54:18, 54:19
**huge** [2] - 23:10, 35:22
**hundred** [2] - 27:6, 27:19
**hundreds** [3] - 22:25, 27:25, 38:24

**I**

**idea** [3] - 10:25, 44:24, 58:10
**identification** [4] - 13:7, 37:24, 37:25, 39:1
**identified** [9] - 18:4, 21:22, 21:23, 26:17, 27:1, 33:18, 39:13, 44:22, 48:12
**identifies** [1] - 15:18
**identify** [6] - 22:17, 23:6, 35:7, 38:7, 40:8, 48:11
**identifying** [4] - 11:9, 22:13, 33:14, 33:19
**image** [5] - 33:4, 35:19, 37:7, 41:16, 42:2
**imaged** [2] - 22:19, 38:7
**images** [10] - 29:19, 29:23, 31:5, 31:11, 31:17, 37:23, 39:18, 40:2, 40:10
**imaging** [12] - 21:9, 29:18, 31:21, 32:20, 39:2, 39:8, 39:12, 41:3, 41:9, 41:11, 42:21, 42:25
**impact** [1] - 13:23
**important** [6] - 7:21, 21:4, 22:2, 36:15, 48:4, 61:1
**imposed** [1] - 29:2
**impractical** [2] - 21:9, 32:21, 33:5
**impression** [2] - 40:1, 41:20
**improper** [1] - 28:13
**IN** [1] - 1:1
**inappropriate** [2] - 45:12, 47:10
**INC** [4] - 1:4, 1:7, 72:11, 72:13

**inclination** [2] - 19:3, 35:20
**inclined** [6] - 19:11, 21:15, 25:2, 46:17, 66:11, 66:12
**include** [1] - 45:20
**included** [1] - 30:18
**includes** [1] - 21:7
**including** [3] - 24:5, 47:8, 58:24
**incredible** [1] - 9:15
**incredibly** [1] - 61:1
**indefinite** [1] - 7:6
**indefinitely** [1] - 35:17
**indicated** [3] - 19:12, 61:19, 62:17
**indication** [2] - 34:5, 35:15
**individual** [4] - 8:3, 8:10, 11:9, 42:25
**individuals** [1] - 11:9
**inefficient** [1] - 20:18
**inform** [1] - 13:3
**information** [51] - 8:15, 8:25, 9:6, 9:12, 15:3, 15:25, 16:1, 20:23, 23:17, 25:16, 25:17, 26:13, 27:10, 27:21, 28:12, 28:15, 30:24, 33:15, 37:13, 38:1, 39:1, 39:17, 39:18, 41:20, 50:6, 50:21, 51:3, 51:7, 51:15, 52:12, 52:13, 52:19, 53:12, 54:1, 54:13, 54:14, 54:15, 55:22, 56:1, 56:11, 56:13, 56:14, 57:14, 58:24, 59:4, 59:7, 59:9, 59:12, 61:16, 67:13
**informed** [2] - 12:6, 53:10
**infringement** [1] - 65:20
**initial** [4] - 29:15, 45:24, 48:4, 65:16
**inject** [1] - 41:1
**inquest** [1] - 8:12
**inquiry** [6] - 42:12, 47:2, 47:5, 47:21, 53:3, 53:8
**inside** [2] - 8:13, 25:14
**inspect** [3] - 21:11, 22:16, 39:23
**inspected** [3] - 21:17, 25:21, 37:8
**inspection** [25] - 4:23, 4:24, 5:20, 7:25, 10:8, 10:11, 10:15,

12:22, 13:20, 16:22, 17:2, 17:3, 17:15, 18:24, 21:20, 22:2, 22:10, 25:19, 26:1, 30:14, 31:3, 31:6, 31:12, 36:14, 47:20
**inspections** [2] - 21:5, 25:6
**inspector** [2] - 21:22, 26:10
**instructed** [1] - 21:16
**instructions** [1] - 54:25
**intended** [1] - 17:5
**intention** [1] - 23:14
**intentionally** [1] - 50:3
**interaction** [2] - 35:9, 45:18
**interactions** [3] - 25:25, 32:25, 33:1
**interest** [5] - 17:17, 20:18, 22:22, 25:9, 43:6
**interested** [1] - 42:17
**interesting** [1] - 71:6
**interpreted** [1] - 26:6
**Interrogatory** [1] - 51:10
**intrusive** [1] - 21:10
**invasive** [1] - 25:9
**investigate** [1] - 36:3
**investigation** [1] - 8:2
**invite** [1] - 24:23
**inviting** [1] - 19:15
**involve** [2] - 22:2, 33:1
**involved** [1] - 56:12
**involves** [1] - 42:24
**irrelevant** [1] - 36:8
**IsaNova** [1] - 18:13
**issue** [43] - 5:18, 5:20, 6:9, 7:15, 7:16, 7:24, 8:4, 8:6, 8:7, 9:9, 10:7, 10:8, 12:7, 12:23, 14:6, 14:20, 14:21, 16:12, 16:13, 16:15, 21:14, 30:11, 32:8, 33:7, 35:22, 40:23, 47:11, 48:4, 49:9, 53:2, 56:7, 57:16, 58:21, 58:23, 59:2, 59:8, 59:14, 61:6, 61:7, 62:25, 64:9, 64:12, 65:2
**issued** [1] - 52:9
**issues** [16] - 4:25, 5:7, 5:15, 5:18, 5:23, 13:14, 13:15, 15:24, 27:6, 34:4, 48:22, 53:12, 61:1, 61:8, 63:10, 66:5

**IT** [3] - 41:6, 50:22, 50:25
**it'd** [1] - 25:22
**items** [1] - 47:8
**itself** [2] - 35:14, 61:18

## J

**Jeff** [1] - 62:14
**job** [1] - 50:16
**JON** [1] - 1:15
**Jonathan** [1] - 2:6
**Judge** [2] - 58:6, 63:5
**JUDGE** [1] - 1:15
**jumble** [1] - 46:11
**jury** [3] - 10:2, 46:9, 54:25

## K

**keep** [4] - 3:18, 4:8, 46:24, 52:12
**keeping** [1] - 3:24
**kept** [1] - 35:17
**kind** [18] - 3:17, 6:1, 14:17, 14:20, 17:14, 18:16, 20:20, 34:7, 45:17, 47:21, 48:10, 48:20, 49:3, 49:20, 56:21, 57:21, 58:23, 59:8
**kinds** [4] - 25:19, 26:20, 32:23, 45:9
**King** [1] - 2:17
**knowledge** [4] - 12:25, 39:9, 61:25, 72:5

## L

**lack** [1] - 34:6
**laid** [1] - 18:14
**laptop** [11] - 25:6, 32:8, 32:24, 33:21, 35:5, 35:9, 36:3, 36:4, 40:10, 41:16, 42:2
**laptops** [16] - 25:21, 25:23, 30:16, 33:7, 34:17, 36:14, 36:23, 37:23, 38:7, 38:13, 39:13, 39:23, 40:22, 42:5, 42:6, 42:18
**large** [1] - 52:21
**last** [8] - 14:5, 28:9, 49:6, 61:16, 65:13, 66:8, 67:8, 68:15
**laundry** [1] - 61:15
**law** [1] - 16:15
**layers** [1] - 62:16

**lead** [1] - 5:16
**leads** [2] - 32:10, 35:10
**least** [5] - 10:2, 62:18, 64:5, 66:3, 69:19
**leave** [6] - 3:11, 5:5, 5:22, 6:16, 6:22, 11:16
**legal** [1] - 44:25
**legitimate** [1] - 19:5
**less** [5] - 11:7, 39:3, 41:16, 63:16, 64:24
**letter** [7] - 4:20, 4:23, 5:2, 5:6, 14:5, 18:12, 52:5
**level** [1] - 8:24
**light** [1] - 52:11
**likelihood** [1] - 40:5
**likely** [2] - 11:1, 39:17
**limit** [10] - 23:8, 29:4, 29:5, 30:15, 39:15, 46:6, 48:7, 51:5, 51:12, 66:4
**limitations** [4] - 17:20, 54:14, 54:15
**limited** [17] - 10:17, 21:16, 23:3, 25:6, 25:7, 25:19, 25:23, 26:15, 27:8, 34:17, 35:5, 39:9, 42:5, 42:25, 46:1, 59:8, 59:16
**limits** [2] - 24:9, 30:15
**line** [6] - 10:18, 35:19, 59:7, 60:19, 66:7, 66:8
**links** [1] - 45:9
**LISA** [3] - 1:21, 72:4, 72:20
**list** [10] - 9:13, 9:20, 49:17, 50:8, 50:13, 54:4, 54:10, 54:19, 61:13, 65:19
**listed** [2] - 22:10, 54:11
**listen** [1] - 39:11
**lists** [1] - 50:15
**live** [2] - 66:21, 70:1
**lives** [1] - 13:23
**LLP** [1] - 2:13
**log** [2] - 15:22, 30:3
**logs** [1] - 32:23
**look** [28] - 3:13, 11:5, 15:20, 16:2, 17:21, 18:1, 18:3, 26:23, 30:20, 30:25, 35:10, 35:11, 36:23, 38:17, 40:13, 40:14, 41:15, 41:18, 42:4, 42:7, 54:21, 57:17, 58:20,

58:24, 60:17, 60:18, 62:4, 64:5
**looked** [3] - 38:19, 38:20, 40:16
**looking** [34] - 4:14, 12:2, 12:3, 13:4, 17:7, 18:9, 21:13, 22:21, 23:2, 23:7, 23:8, 23:25, 24:8, 26:5, 26:16, 27:9, 27:18, 27:21, 27:25, 28:1, 32:25, 39:16, 41:24, 44:21, 46:23, 50:2, 54:3, 58:3, 61:22, 62:13, 63:4, 64:5, 68:12, 70:24
**looks** [1] - 55:13
**loss** [1] - 9:1
**lost** [2] - 23:15, 58:10
**love** [1] - 64:7

## M

**ma'am** [1] - 70:11
**main** [1] - 49:25
**maintain** [2] - 52:15, 56:11
**maintains** [1] - 50:5
**major** [1] - 56:24
**majority** [2] - 9:11, 20:6
**makers** [2] - 59:5, 59:17
**management** [3] - 58:25, 60:18, 62:17
**manager** [2] - 62:2, 62:11
**MANAGER** [2] - 58:5, 63:22
**manner** [1] - 60:3
**manufacturing** [2] - 51:19, 51:20
**marked** [1] - 58:15
**marker** [1] - 68:13
**marketing** [1] - 51:21
**massive** [4] - 21:7, 21:18, 35:18, 44:2
**masters** [6] - 4:14, 11:5, 11:15, 65:2, 65:9, 68:9
**Masters** [3] - 2:6, 66:9, 69:2
**MASTERS** [7] - 4:17, 4:22, 11:17, 65:11, 67:7, 68:14, 69:3
**material** [15] - 27:20, 32:18, 33:10, 33:13, 33:22, 40:15, 43:17, 46:5, 48:11, 53:6, 56:3, 56:19, 61:10,

62:22
**materiality** [1] - 34:7
**materials** [24] - 9:3, 15:12, 15:13, 15:18, 15:20, 18:4, 23:11, 23:20, 23:22, 27:2, 30:3, 32:2, 39:25, 41:3, 44:8, 44:12, 54:5, 57:11, 60:8, 60:12, 60:16, 61:21, 62:3, 62:5
**math** [1] - 70:8
**matter** [7] - 17:16, 22:16, 27:14, 58:2, 63:20, 70:9, 72:8
**matters** [5] - 3:8, 5:11, 7:6, 42:12, 48:2
**maximum** [2] - 70:14, 70:16, 70:17
**MAYO** [3] - 1:21, 72:4, 72:20
**Mayo** [1] - 72:19
**McCALLA** [1] - 1:15
**mean** [19] - 4:16, 18:25, 19:17, 22:21, 28:10, 29:7, 30:22, 35:23, 36:2, 42:4, 43:24, 44:3, 48:9, 48:21, 53:4, 54:15, 58:10, 60:2, 60:4
**meant** [1] - 16:5
**measures** [2] - 8:17, 54:1
**meet** [12] - 5:16, 6:9, 11:25, 21:16, 22:19, 25:1, 30:16, 34:18, 36:18, 50:19, 54:25, 61:11
**members** [6] - 58:25, 60:17, 60:18, 61:20, 61:24
**MEMPHIS** [1] - 1:23
**mentioned** [1] - 13:1
**merits** [1] - 43:25
**mess** [1] - 46:7
**messages** [2] - 27:9, 27:10
**metadata** [1] - 45:8
**might** [9] - 3:9, 7:10, 19:9, 26:6, 34:11, 35:2, 42:13, 66:11, 66:12
**mind** [5] - 3:18, 3:24, 4:9, 14:9, 33:19
**minimizing** [2] - 30:10, 43:2
**minimum** [2] - 44:6, 47:19
**minority** [1] - 16:20
**minute** [2] - 36:14,

68:12
**minutes** [7] - 61:12, 64:9, 64:11, 66:25, 67:9, 67:14, 67:15
**misappropriated** [1] - 60:8
**misappropriating** [1] - 62:5
**misappropriation** [2] - 10:17, 44:2
**mobile** [6] - 25:7, 25:8, 25:9, 32:11, 32:14, 32:16
**modification** [1] - 19:9
**modifications** [2] - 4:6, 19:7
**Monday** [1] - 38:8
**months** [2] - 10:9, 26:21
**morning** [6] - 4:17, 5:13, 16:17, 16:18, 63:22, 63:23
**most** [6] - 13:11, 18:13, 18:20, 42:17, 53:1, 57:19
**motion** [13] - 4:24, 5:1, 5:3, 5:5, 5:22, 6:16, 6:17, 6:22, 49:7, 49:10, 61:4, 61:5, 61:17
**motions** [2] - 3:10, 34:3
**move** [9] - 19:3, 19:4, 19:5, 19:10, 42:18, 49:3, 64:13, 65:6, 71:5
**MR** [90] - 4:17, 4:22, 5:13, 6:7, 7:14, 7:23, 9:24, 10:4, 11:4, 11:17, 13:10, 14:3, 15:5, 15:9, 16:17, 16:19, 17:23, 19:14, 19:17, 20:4, 20:17, 22:3, 22:7, 23:13, 25:5, 26:3, 27:5, 29:14, 30:12, 31:9, 31:16, 31:25, 32:4, 32:13, 32:20, 33:12, 33:17, 33:25, 34:14, 34:16, 34:24, 36:1, 37:2, 37:16, 37:22, 38:6, 38:13, 38:19, 39:15, 40:7, 40:12, 40:20, 41:10, 41:14, 42:1, 42:11, 43:3, 43:20, 44:20, 46:14, 46:15, 46:24, 47:13, 47:18, 48:5, 49:5, 49:15, 49:23, 53:7, 53:17, 54:8, 55:3,

55:8, 55:19, 56:4, 56:10, 56:21, 57:3, 57:6, 58:12, 58:21, 59:2, 60:4, 64:7, 64:12, 64:19, 65:11, 67:7, 68:14, 69:3
**MS** [16] - 6:21, 11:21, 11:24, 12:21, 16:11, 60:25, 63:6, 63:10, 64:3, 65:8, 66:8, 67:2, 70:10, 70:12, 71:2, 71:7
**multiple** [5] - 33:23, 40:21, 42:6, 42:21
**must** [1] - 56:13
**mute** [1] - 40:24
**mutual** [1] - 20:18

## N

**N.W** [1] - 2:7
**name** [3] - 9:13, 50:8, 54:19
**names** [4] - 8:2, 8:10, 20:7, 50:13
**narrow** [2] - 42:15, 52:20
**narrowing** [1] - 43:7
**naturally** [1] - 29:1
**necessarily** [1] - 6:15
**necessary** [2] - 29:4, 35:1
**need** [43] - 3:13, 3:23, 4:8, 4:10, 5:25, 9:6, 10:5, 12:1, 19:10, 19:23, 22:14, 22:17, 24:2, 28:13, 29:17, 29:20, 36:5, 42:15, 42:16, 43:23, 44:17, 49:3, 51:7, 51:13, 51:17, 51:22, 52:23, 55:13, 56:7, 57:17, 58:1, 61:12, 62:10, 63:3, 64:4, 65:5, 65:23, 66:1, 68:5, 70:3, 70:6
**needed** [3] - 40:17, 67:6, 70:19
**needs** [9] - 10:1, 14:23, 21:12, 23:3, 26:15, 29:7, 35:14, 55:9, 68:1
**negotiate** [6] - 20:4, 23:15, 26:21, 33:2, 69:13, 70:4
**net** [1] - 55:17
**network** [2] - 21:6, 52:8
**neutral** [7] - 14:19, 16:23, 18:25, 19:20,

20:2, 20:5, 21:1
**never** [3] - 28:5, 47:11, 61:18
**new** [1] - 28:6
**next** [6] - 50:24, 61:4, 63:17, 63:21, 70:8, 70:21
**nexus** [1] - 42:13
**nice** [1] - 6:11
**NO** [1] - 1:6
**normal** [2] - 13:14, 60:16
**normally** [5] - 32:22, 32:24, 35:8, 46:21, 54:21
**note** [2] - 49:11, 57:22
**notes** [1] - 72:7
**nothing** [1] - 11:17
**notice** [5] - 60:13, 69:9, 69:18, 69:19, 69:20
**noticed** [1] - 69:6
**notices** [1] - 70:15
**noticing** [2] - 69:15, 69:24
**November** [1] - 13:21
**number** [28] - 3:8, 3:20, 4:6, 8:6, 8:8, 9:25, 10:10, 10:17, 10:20, 10:24, 21:10, 21:13, 21:17, 21:21, 21:23, 23:11, 24:2, 30:15, 34:17, 40:22, 42:5, 59:16, 61:10, 65:15, 65:19, 65:25, 66:4, 67:19
**Number** [4] - 4:19, 5:2, 5:6, 7:11, 51:10, 57:9
**nutshell** [1] - 18:17

## O

**o'clock** [1] - 58:7
**object** [1] - 37:5
**objectionable** [1] - 28:10
**objections** [1] - 36:18
**observing** [1] - 47:16
**obtained** [1] - 53:20
**obviously** [16] - 8:18, 11:8, 12:3, 14:23, 15:23, 27:1, 29:8, 38:17, 43:12, 43:25, 54:6, 56:18, 60:4, 60:11, 61:25, 65:5
**occasionally** [1] - 41:3
**occasions** [1] - 48:22
**occur** [2] - 42:21, 63:15

**occurred** [1] - 46:22
**occurring** [1] - 42:20
**October** [4] - 13:19, 22:5, 23:22, 38:3
**OF** [2] - 1:2, 1:18
**offer** [1] - 26:22
**OFFICIAL** [1] - 1:22
**Official** [1] - 72:20
**often** [1] - 12:16
**once** [7] - 10:14, 10:15, 22:17, 31:5, 31:11, 31:17, 69:5
**one** [39] - 5:23, 7:10, 7:24, 8:15, 8:19, 9:12, 10:11, 14:7, 17:11, 25:15, 25:16, 26:8, 27:17, 39:4, 39:18, 40:18, 40:24, 42:20, 45:20, 48:14, 49:5, 49:25, 53:1, 53:7, 53:19, 61:2, 62:2, 62:18, 62:21, 64:9, 64:13, 64:16, 66:23, 67:8, 67:9, 67:13, 67:14, 67:17, 70:25
**ones** [6] - 38:10, 38:15, 40:5, 42:16, 43:23, 68:15
**ongoing** [1] - 46:19
**open** [1] - 26:22
**open-ended** [1] - 26:22
**opened** [1] - 36:4
**opening** [2] - 13:12, 13:13
**operate** [1] - 44:15
**operating** [1] - 60:3
**operations** [1] - 21:10
**opportunity** [5] - 23:9, 55:10, 57:24, 69:12, 70:4
**opposed** [1] - 67:24
**opposite** [2] - 17:19, 53:15
**opposition** [1] - 67:24
**Oracle** [2] - 52:8, 52:13
**order** [13] - 3:25, 4:25, 5:20, 16:13, 18:9, 35:19, 37:7, 39:25, 47:23, 49:7, 49:13, 57:25, 59:18
**orderly** [1] - 19:23
**orders** [1] - 3:14
**ordinary** [2] - 25:18, 28:8
**original** [1] - 22:10
**originally** [1] - 38:21
**outlines** [1] - 16:20

**outside** [2] - 8:13, 56:1
**overboard** [1] - 47:9
**overbroad** [1] - 47:5
**overly** [1] - 57:9
**oversee** [1] - 46:18
**oversight** [1] - 48:23
**overstepping** [1] - 65:1
**own** [5] - 12:12, 20:22, 20:24, 28:24

## P

**P.A** [1] - 2:16
**pages** [1] - 72:5
**pale** [1] - 45:17
**Palo** [1] - 2:14
**paper** [1] - 54:20
**paragraph** [2] - 17:24, 51:4
**parameters** [2] - 17:4, 47:20
**part** [7] - 7:12, 11:8, 14:12, 22:20, 27:2, 28:3, 63:16
**participation** [1] - 42:24
**particular** [11] - 23:6, 26:19, 27:6, 31:5, 33:1, 53:6, 55:2, 57:15, 57:16, 58:2, 61:6
**particularly** [1] - 24:23
**parties** [15] - 3:10, 3:19, 3:24, 4:20, 9:9, 11:25, 12:25, 20:4, 21:1, 21:16, 30:16, 36:11, 47:19, 66:1, 67:11
**partly** [1] - 4:5
**party** [23] - 3:25, 10:13, 12:16, 12:19, 14:8, 14:10, 14:15, 14:19, 15:1, 16:5, 16:23, 19:20, 20:2, 20:5, 20:25, 64:23, 64:25, 66:24, 67:8, 67:23, 68:1
**pass** [1] - 16:12
**passwords** [1] - 52:10
**past** [1] - 64:20
**patent** [1] - 65:20
**penalize** [1] - 68:1
**pencils** [1] - 43:22
**pending** [1] - 10:9
**Pennsylvania** [1] - 2:7
**people** [13] - 21:7, 38:22, 38:24, 40:13, 44:5, 51:21, 57:24,

59:5, 62:13, 62:16, 65:17
**people's** [2] - 15:23, 25:9
**per** [2] - 68:22, 69:4
**percent** [1] - 27:6
**perception** [3] - 13:6, 29:6, 60:2
**perform** [3] - 15:11, 16:22, 20:22
**performing** [1] - 17:2
**perhaps** [4] - 7:5, 11:25, 61:3, 63:12
**period** [8] - 9:20, 30:14, 31:5, 31:7, 31:12, 41:23, 42:23, 68:2
**periods** [1] - 41:13
**permissible** [1] - 46:17
**permission** [1] - 65:6
**permitting** [1] - 39:23
**person** [2] - 41:2, 68:16
**personal** [1] - 21:6
**perspections** [1] - 21:3
**pertain** [1] - 20:23
**phase** [1] - 48:18
**Phone** [3] - 2:8, 2:14, 2:18
**phones** [6] - 25:7, 25:8, 27:7, 27:13, 27:14
**physically** [1] - 43:16
**pick** [2] - 10:24, 42:16
**picked** [1] - 44:4
**pictures** [1] - 15:23
**piece** [1] - 54:19
**Pillsbury** [1] - 2:13
**pin** [1] - 63:7
**Pittman** [1] - 2:13
**place** [8] - 13:7, 13:11, 14:2, 21:8, 31:13, 69:10, 69:22, 70:25
**plaintiff** [9] - 9:23, 16:21, 16:25, 54:22, 55:6, 55:9, 55:10, 55:22, 57:11
**Plaintiff** [2] - 1:5, 2:5
**plaintiff's** [2] - 19:6, 41:19
**plaintiffs** [2] - 46:13, 56:24
**plan** [6] - 4:16, 4:18, 9:22, 10:23, 70:19, 70:20
**plans** [1] - 4:7
**plus** [3] - 6:13, 65:18, 65:20

**point** [33] - 4:8, 7:19, 11:22, 12:1, 12:10, 14:25, 17:24, 18:12, 21:3, 24:8, 27:19, 29:14, 31:9, 34:9, 37:12, 40:14, 40:17, 43:3, 43:4, 44:5, 46:3, 47:4, 47:11, 49:25, 52:17, 55:2, 56:8, 57:8, 57:15, 61:12, 61:14, 62:20, 68:22
**pointed** [2] - 20:19, 23:3
**pointing** [1] - 65:5
**points** [3] - 53:19, 69:14, 69:25
**police** [1] - 47:13
**policies** [1] - 8:24
**policy** [1] - 57:4
**portion** [1] - 52:21
**posit** [1] - 20:17
**position** [3] - 7:20, 8:5, 10:18
**possession** [1] - 25:10
**possible** [2] - 14:4, 29:24
**possibly** [1] - 26:6
**potentially** [1] - 28:14
**Power** [3] - 52:4, 52:15, 54:10
**Power's** [1] - 52:11
**practical** [2] - 10:25, 11:13
**practically** [1] - 9:18
**preclude** [1] - 49:19
**prefer** [1] - 66:13
**preference** [3] - 29:9, 59:21, 59:25
**preliminary** [1] - 61:19
**prepare** [1] - 12:11
**prepared** [1] - 16:13
**preparing** [3] - 12:2, 12:4, 14:12
**presentation** [1] - 6:1
**presented** [1] - 10:20
**presenting** [2] - 5:17, 28:12
**press** [2] - 29:16, 51:17
**presumably** [2] - 17:10, 50:24
**presumption** [1] - 60:5
**pretty** [9] - 10:25, 12:15, 19:21, 32:18, 33:23, 38:25, 41:24, 56:23, 58:4
**prevent** [1] - 17:8

**preventing** [1] - 65:3
**prevention** [1] - 9:1
**previous** [1] - 44:8
**previously** [2] - 9:25, 22:13
**primary** [1] - 4:11
**print** [2] - 54:18, 54:20
**privacy** [2] - 15:15, 25:9
**privilege** [2] - 15:15, 39:25
**privileged** [2] - 15:21, 28:14
**problem** [11] - 9:12, 18:17, 34:11, 41:5, 48:13, 49:16, 54:17, 56:25, 60:11, 60:15, 68:9
**problematic** [1] - 37:6
**problems** [2] - 28:23, 47:7
**procedural** [1] - 49:6
**proceed** [7] - 19:22, 19:23, 19:24, 19:25, 20:3, 20:14, 68:25
**proceeding** [1] - 13:4
**process** [11] - 3:18, 25:2, 33:9, 39:8, 39:12, 42:20, 42:25, 44:11, 50:19, 53:3, 69:13
**produce** [14] - 9:11, 15:19, 23:20, 30:4, 33:3, 38:3, 50:14, 50:15, 50:17, 50:21, 51:1, 57:1, 57:11, 57:12
**produced** [20] - 8:22, 8:24, 8:25, 9:4, 15:13, 18:21, 23:22, 30:21, 30:22, 32:2, 34:3, 38:1, 38:10, 39:20, 48:13, 53:25, 54:10, 54:12, 57:4, 57:11
**producing** [2] - 17:10, 33:4
**production** [10] - 3:22, 7:16, 7:22, 21:8, 25:14, 29:22, 33:18, 35:16, 35:18, 37:5
**Production** [3] - 4:19, 7:11, 57:9
**progeny** [2] - 31:4, 44:21
**progress** [1] - 70:24
**prohibit** [1] - 47:20
**prohibition** [1] - 25:24
**projected** [1] - 68:22
**promptly** [3] - 29:7,

49:2
**proper** [2] - 42:12, 43:13
**properly** [1] - 59:11
**proportional** [3] - 21:12, 21:21, 30:15
**proportionality** [2] - 7:25, 42:8
**propose** [2] - 25:20, 29:22
**proposed** [6] - 14:4, 18:8, 18:15, 19:6, 20:2, 48:25
**proposes** [1] - 21:22
**proposing** [2] - 21:5, 21:11
**proposition** [2] - 3:13, 59:21
**proprietary** [1] - 26:12
**protect** [9] - 8:17, 16:9, 53:2, 53:6, 54:1, 54:13, 54:23, 57:25, 59:10
**protection** [4] - 20:12, 51:23, 52:25, 56:15
**protections** [4] - 15:1, 19:24, 28:16, 53:21
**protective** [5] - 4:24, 5:20, 16:13, 49:7, 59:17
**protocol** [18] - 14:4, 14:6, 15:10, 16:8, 17:3, 17:25, 18:14, 22:12, 22:16, 22:20, 26:9, 26:15, 26:22, 28:3, 28:15, 44:18, 48:25, 49:2
**prove** [1] - 52:1
**provide** [4] - 17:4, 38:1, 41:19, 53:12
**provided** [1] - 56:1
**publicly** [6] - 55:16, 55:19, 56:5, 56:16, 56:19, 59:12
**purported** [1] - 30:24
**purpose** [1] - 69:16
**purposes** [1] - 10:1
**pursue** [1] - 21:15
**put** [6] - 11:2, 23:14, 54:19, 55:11, 63:7, 69:8

**Q**

**QORVO** [2] - 1:4, 72:11
**Qorvo** [32] - 4:10, 4:11, 4:23, 8:13, 12:3, 12:8, 15:8, 16:1, 20:21, 26:1,

26:12, 26:21, 30:18, 34:2, 44:25, 45:4, 45:7, 45:19, 50:5, 50:12, 51:2, 51:5, 51:8, 51:11, 51:13, 51:14, 52:19, 59:6, 66:9, 66:15, 66:19, 70:12
**Qorvo's** [6] - 4:22, 20:23, 26:12, 49:24, 52:22, 57:1
**quantity** [1] - 23:17
**questions** [2] - 6:20, 6:25
**quick** [1] - 68:24
**quickly** [5] - 29:17, 29:21, 58:13, 64:17, 70:8
**quite** [4] - 23:5, 24:7, 33:19, 70:22
**quote** [4] - 51:5, 51:8, 51:11, 51:14

**R**

**raises** [2] - 5:1, 27:7
**raising** [1] - 41:25
**rapidly** [1] - 10:16
**rather** [1] - 67:18
**raw** [1] - 27:20
**RDR** [2] - 1:21, 72:20
**re** [3] - 5:3, 58:14, 58:18
**re-designate** [1] - 5:3
**re-designation** [2] - 58:14, 58:18
**reach** [2] - 20:5, 34:19
**read** [1] - 54:11
**readily** [1] - 50:14
**real** [3] - 46:23, 60:15, 70:8
**real-time** [1] - 46:23
**realize** [1] - 30:8
**really** [31] - 6:16, 7:7, 7:24, 9:12, 12:6, 13:18, 17:25, 18:18, 18:20, 18:21, 18:24, 21:4, 22:22, 23:4, 24:15, 26:13, 26:23, 27:16, 35:19, 36:11, 36:15, 37:9, 38:20, 39:13, 43:22, 44:4, 50:7, 51:2, 53:5, 63:8, 63:10
**reason** [4] - 16:25, 51:22, 59:24, 65:24
**reasonable** [16] - 8:16, 22:20, 23:16, 23:17, 23:19, 24:10, 25:22, 34:23, 34:24, 50:14,

52:14, 52:15, 54:1, 69:18, 69:19, 70:4
**reasonableness** [1] - 56:10
**reasons** [1] - 42:15
**rebut** [1] - 55:10
**receive** [1] - 31:17
**receiving** [1] - 26:4
**recent** [2] - 4:24, 68:15
**recognition** [3] - 49:24, 66:1
**recognize** [3] - 54:22, 54:24, 68:4
**recognizing** [2] - 48:2, 64:22
**record** [2] - 38:23, 67:9
**recruiters** [1] - 67:8
**redactions** [1] - 59:16
**reduce** [4] - 10:9, 21:13, 42:11, 68:17
**reduced** [4] - 10:1, 38:14, 43:12, 68:10
**reducing** [2] - 10:16, 43:4
**reduction** [1] - 13:11
**redundant** [1] - 42:9
**referenced** [1] - 54:9
**referring** [2] - 14:19, 52:13
**reflected** [1] - 49:13
**refuse** [1] - 50:25
**refused** [1] - 26:22
**regard** [7] - 29:2, 35:3, 41:20, 42:8, 44:16, 44:18, 57:12
**regardless** [2] - 21:23, 56:15
**regular** [1] - 62:14
**related** [5] - 11:10, 34:3, 45:1, 47:8, 57:1
**relatively** [1] - 68:21
**relevance** [1] - 44:25
**relevant** [11] - 8:16, 15:19, 18:13, 25:8, 27:21, 44:12, 48:11, 49:25, 52:2, 53:11, 53:12
**reluctant** [1] - 4:4
**rely** [2] - 20:21, 21:1
**remain** [3] - 42:3, 52:25, 65:14
**remember** [1] - 3:15
**remote** [3] - 6:11, 68:10, 68:15
**remotely** [3] - 66:4, 68:12, 68:17
**repeat** [2] - 37:19,

53:24
**reply** [3] - 61:8, 61:15, 62:2
**report** [4] - 12:24, 14:12, 14:21, 48:16
**Reporter** [1] - 72:20
**REPORTER** [1] - 1:22
**reports** [7] - 12:3, 12:5, 12:12, 13:12, 13:13, 13:15, 13:21
**repositories** [1] - 21:7
**request** [13] - 4:19, 4:22, 7:10, 7:25, 22:10, 49:24, 50:10, 50:22, 51:1, 57:9, 61:11, 62:21
**requests** [6] - 3:22, 31:2, 45:11, 50:3, 50:4, 50:5
**require** [5] - 8:12, 30:16, 47:19, 57:10, 57:14
**required** [2] - 9:6, 32:1
**requires** [1] - 15:10
**resolve** [1] - 65:23
**resolved** [2] - 38:12, 49:9
**resources** [1] - 8:12
**respective** [1] - 71:4
**respond** [5] - 13:14, 19:16, 49:9, 61:3, 69:9
**response** [4] - 7:17, 50:21, 51:1, 51:10
**responsive** [2] - 31:1, 45:11
**rest** [1] - 58:8
**restrict** [2] - 59:24, 68:21
**restricted** [2] - 15:2, 24:16
**restriction** [1] - 65:25
**restrictions** [3] - 9:5, 20:12, 29:2
**restrictive** [1] - 52:12
**result** [1] - 36:10
**results** [1] - 39:19
**return** [1] - 63:7
**review** [17] - 5:25, 15:13, 17:9, 17:11, 21:20, 22:23, 23:11, 23:19, 24:6, 30:1, 30:3, 32:5, 38:2, 39:20, 40:16, 45:4, 62:3
**reviewers** [1] - 30:19
**revised** [1] - 49:2
**RFP** [3] - 5:17, 7:17, 54:3
**RFPs** [1] - 9:10

**rid** [1] - 33:22
**right-hand** [1] - 4:15
**road** [1] - 46:7
**Robert** [1] - 2:6
**rolling** [2] - 29:25, 32:5
**room** [1] - 41:18
**routine** [2] - 41:24, 56:23
**Rule** [1] - 16:23
**rule** [3] - 27:24, 42:7, 42:8
**rules** [2] - 17:14, 47:12
**run** [6] - 25:14, 28:22, 33:2, 33:23, 35:7
**Ryan** [1] - 2:12

# S

**S/Lisa** [1] - 72:19
**sample** [1] - 63:18
**sanction** [1] - 54:7
**sanctions** [1] - 47:10
**schedule** [11] - 3:25, 4:1, 4:2, 4:6, 13:17, 36:17, 61:3, 61:9, 63:17, 68:24, 68:25
**scheduled** [4] - 3:16, 6:1, 7:7, 65:4
**scheduling** [6] - 3:14, 5:18, 6:19, 7:1, 12:10, 61:12
**scope** [6] - 25:12, 25:13, 46:25, 47:15, 47:24, 52:20
**screen** [4] - 4:15, 46:19, 48:20
**search** [9] - 17:9, 25:9, 25:18, 30:18, 33:2, 45:10, 47:1, 48:10, 55:24
**searched** [1] - 35:14
**searches** [1] - 35:7
**Second** [3] - 51:4, 58:14, 58:19
**second** [1] - 40:25
**seconds** [1] - 70:25
**secrecy** [3] - 52:16, 53:6, 56:11
**secret** [31] - 8:1, 9:18, 11:9, 11:12, 12:22, 13:7, 19:19, 22:24, 26:16, 27:2, 44:22, 50:9, 50:12, 51:13, 51:23, 52:13, 52:20, 52:24, 54:4, 54:17, 54:18, 55:2, 55:21, 55:23, 55:25, 56:15, 60:3, 60:8, 67:12

**secrets** [37] - 8:4, 8:6, 8:8, 8:17, 9:14, 9:20, 10:1, 10:10, 10:20, 11:10, 12:6, 12:8, 13:3, 13:13, 14:14, 18:2, 18:10, 18:19, 21:14, 26:7, 28:2, 30:24, 34:8, 38:23, 48:12, 50:17, 51:11, 52:3, 52:22, 53:3, 54:24, 55:20, 56:5, 60:21, 65:18, 65:21, 67:11
**see** [26] - 4:13, 5:12, 6:4, 6:12, 7:4, 9:2, 27:11, 35:9, 41:4, 41:25, 43:15, 46:22, 48:15, 51:22, 52:23, 56:22, 57:18, 57:19, 59:17, 60:16, 60:20, 61:14, 62:22, 71:5
**seeing** [1] - 24:1
**seek** [1] - 49:24
**seeking** [8] - 3:25, 7:16, 8:15, 22:8, 52:1, 55:11, 59:9, 69:2
**seeks** [2] - 50:7, 50:10
**seem** [1] - 42:22
**select** [1] - 52:9
**selective** [1] - 38:25
**selects** [1] - 20:8
**Selness** [9] - 2:12, 5:15, 6:5, 49:19, 54:9, 55:6, 55:15, 57:18, 58:9
**SELNESS** [8] - 6:7, 49:23, 53:7, 55:8, 55:19, 56:4, 56:10, 58:12
**senior** [2] - 25:11, 62:15
**sense** [8] - 20:25, 29:8, 34:18, 35:2, 44:1, 45:9, 46:10, 46:23
**sentiment** [1] - 43:21
**separate** [2] - 12:23, 56:7
**September** [10] - 29:23, 30:1, 30:2, 31:15, 31:20, 31:22, 31:25, 36:20, 37:24, 38:1
**serve** [1] - 13:12
**served** [1] - 9:10
**server** [20] - 32:22, 32:25, 33:1, 33:3, 33:4, 35:1, 35:6, 35:7, 35:10, 35:11,

35:14, 35:16, 36:4, 36:6, 36:15, 37:5, 37:7, 52:14
**servers** [15] - 8:23, 21:8, 25:14, 27:18, 27:21, 27:23, 32:14, 32:15, 32:17, 32:21, 35:4, 36:2, 36:24, 52:6, 54:11
**set** [13] - 3:15, 12:8, 12:24, 13:20, 29:4, 30:14, 30:15, 31:4, 31:12, 36:18, 61:18, 70:23
**sets** [1] - 17:25
**seven** [6] - 3:17, 9:19, 23:11, 67:18, 67:20, 69:19
**seven-day** [2] - 3:17, 9:19
**several** [1] - 16:24
**share** [3] - 15:25, 28:14, 46:19
**shared** [2] - 22:12, 26:18
**shares** [1] - 48:20
**sharpened** [1] - 43:22
**Shaw** [1] - 2:13
**Shealy** [1] - 62:15
**short** [3] - 49:13, 61:3, 68:21
**shoulder** [1] - 48:20
**show** [10] - 9:4, 18:16, 27:13, 47:5, 50:3, 50:4, 50:11, 51:25, 59:4, 69:11
**showing** [3] - 4:1, 8:22, 36:10
**shows** [3] - 36:4, 45:8, 59:12
**side** [8] - 4:15, 8:14, 10:5, 41:19, 65:5, 68:22, 69:4, 69:6
**sides** [2] - 69:20, 70:23
**significance** [1] - 34:7
**significant** [2] - 34:10, 34:11
**similar** [1] - 18:15
**simple** [1] - 36:7
**simply** [3] - 4:3, 24:10, 24:12
**simultaneous** [1] - 45:4
**simultaneously** [1] - 45:9
**single** [4] - 10:12, 50:8, 50:9, 64:23
**sit** [3] - 14:20, 62:1, 67:19

**six** [5] - 3:16, 9:19, 64:11, 66:17, 69:19
**six-and-a-half** [1] - 64:11
**size** [1] - 38:18
**skill** [1] - 72:5
**small** [1] - 44:3
**software** [3] - 9:1, 48:22, 54:15
**someone** [5] - 12:18, 29:1, 60:19, 62:4, 68:2
**something's** [1] - 35:15
**sometimes** [6] - 24:22, 55:14, 55:22, 62:9, 62:10, 67:23
**soon** [2] - 14:4, 58:4
**sorry** [7] - 20:2, 24:12, 55:19, 60:23, 61:5, 67:6, 68:14
**sort** [14] - 12:1, 26:3, 26:5, 30:25, 34:6, 35:5, 35:10, 42:2, 42:8, 45:10, 46:25, 47:24, 61:18, 70:18
**sorts** [2] - 6:12, 33:20
**sound** [4] - 34:23, 39:7, 48:17
**sounds** [6] - 32:8, 34:24, 36:25, 39:9, 55:12, 57:22
**space** [1] - 62:11
**specific** [10] - 4:7, 17:4, 23:25, 30:17, 31:4, 31:6, 41:19, 44:21, 45:19, 56:7
**specifically** [1] - 61:7
**specificity** [1] - 44:20
**specifics** [1] - 26:20
**spend** [1] - 23:9
**spent** [1] - 48:3
**spokesperson** [1] - 4:11
**squeeze** [2] - 60:24, 60:25
**staff** [1] - 41:6
**stage** [4] - 28:5, 34:16, 37:13, 60:10
**stages** [1] - 36:22
**standard** [1] - 19:19
**stands** [1] - 48:19
**STANTON** [31] - 16:17, 16:19, 19:14, 19:17, 20:4, 20:17, 25:5, 26:3, 30:12, 31:9, 32:20, 33:12, 33:17, 33:25, 34:14, 34:16, 34:24, 37:2, 37:16, 38:6, 38:13,

39:15, 40:20, 42:1, 42:11, 43:3, 44:20, 46:15, 46:24, 47:13, 47:18

**Stanton** [25] - 2:12, 5:20, 16:13, 16:16, 17:24, 19:8, 22:9, 23:8, 24:18, 24:25, 27:7, 28:10, 30:10, 31:15, 33:8, 34:12, 34:23, 35:23, 36:25, 38:5, 38:20, 39:11, 43:1, 44:17, 48:9

**Stanton's** [1] - 18:11

**start** [4] - 7:4, 35:9, 35:21, 36:13

**started** [2] - 22:7, 30:7

**States** [1] - 72:21

**STATES** [1] - 1:1

**status** [1] - 9:18

**stay** [1] - 44:14

**stenotype** [1] - 72:7

**step** [5] - 15:9, 22:13, 34:10, 35:21, 43:13

**Stephen** [1] - 2:16

**steps** [7] - 17:6, 29:16, 30:17, 35:2, 51:5, 51:12, 57:25

**Steve** [1] - 5:14

**stickiness** [1] - 62:8

**still** [4] - 29:6, 38:14, 53:17, 59:3

**stipulation** [1] - 47:23

**stop** [1] - 40:24

**stored** [2] - 8:23, 27:22

**storing** [1] - 39:1

**strange** [1] - 33:21

**Street** [2] - 2:13, 2:17

**strong** [2] - 14:21, 59:21

**stuck** [2] - 57:21, 69:11

**stuff** [4] - 23:1, 36:15, 48:20, 59:2

**subject** [1] - 53:8

**subjects** [3] - 42:12, 49:4

**submit** [3] - 20:7, 34:25, 49:1

**submitted** [6] - 4:19, 4:23, 5:2, 22:12, 44:9, 59:10

**subset** [1] - 44:3

**substance** [1] - 15:12

**substantial** [2] - 46:5, 65:17

**sufficient** [5] - 9:4, 50:3, 50:4, 50:11, 66:20

**sufficiently** [1] - 46:3

**suggest** [3] - 19:9, 52:24, 67:17

**suggested** [1] - 64:17

**suggestion** [1] - 63:18

**Suite** [1] - 2:17

**support** [1] - 67:13

**supportable** [1] - 28:19

**supposed** [2] - 13:18, 28:3

**surreptitiously** [1] - 34:6

**SWEENEY** [16] - 6:21, 11:21, 11:24, 12:21, 16:11, 60:25, 63:6, 63:10, 64:3, 65:8, 66:8, 67:2, 70:10, 70:12, 71:2, 71:7

**Sweeney** [12] - 2:11, 5:18, 5:21, 6:18, 6:19, 12:17, 16:7, 16:8, 60:23, 63:25, 65:22, 66:6

**systems** [5] - 10:11, 14:14, 18:9, 20:24, 21:11

### T

**table** [1] - 36:9

**task** [1] - 8:6

**technical** [1] - 54:14

**techniques** [2] - 47:24, 48:8

**TECHNOLOGIES** [2] - 1:7, 72:13

**technology** [2] - 26:10, 45:14

**ten** [14] - 17:12, 25:21, 42:17, 43:14, 63:22, 63:23, 63:24, 66:13, 66:21, 68:25, 69:1, 70:14, 70:16

**tend** [1] - 53:10

**Tennessee** [1] - 72:21

**TENNESSEE** [1] - 1:23

**terabytes** [4] - 25:16, 27:19, 27:25

**term** [3] - 17:9, 45:10, 47:2

**terms** [12] - 10:20, 12:22, 20:12, 25:18, 29:5, 33:2, 43:15, 44:8, 48:10, 55:20, 56:25

**terribly** [1] - 39:14

**test** [1] - 51:18

**testified** [1] - 67:12

**testify** [2] - 18:25, 22:24

**testifying** [3] - 14:13, 14:24, 28:11

**text** [1] - 27:9

**THE** [111] - 1:1, 1:2, 1:15, 3:7, 4:21, 5:10, 5:25, 6:10, 7:2, 7:19, 9:17, 10:3, 10:19, 11:14, 11:19, 11:23, 12:13, 13:6, 13:25, 14:25, 15:6, 16:4, 16:18, 17:18, 19:2, 19:15, 19:21, 20:9, 21:25, 22:6, 23:2, 24:7, 26:2, 26:24, 28:20, 30:8, 31:8, 31:14, 31:19, 32:3, 32:7, 32:16, 33:6, 33:16, 33:20, 34:9, 34:15, 34:20, 35:20, 36:25, 37:9, 37:17, 38:4, 38:11, 38:15, 39:5, 40:1, 40:11, 40:18, 40:23, 41:12, 41:17, 42:10, 42:19, 43:11, 44:7, 45:23, 46:20, 47:3, 47:17, 48:1, 48:21, 49:11, 49:16, 53:1, 53:15, 54:6, 54:21, 55:4, 55:12, 55:21, 56:9, 56:17, 56:23, 57:4, 57:7, 58:5, 58:6, 58:13, 59:1, 59:19, 60:22, 63:3, 63:9, 63:14, 63:22, 63:23, 64:4, 64:11, 64:16, 65:7, 65:9, 65:22, 66:22, 67:4, 67:22, 68:19, 69:8, 70:11, 70:18, 71:4

**themselves** [1] - 29:18

**therefore** [4] - 42:23, 57:10, 66:4, 68:25

**they've** [7] - 26:16, 40:21, 45:24, 47:5, 47:14, 51:3, 70:13

**thinking** [5] - 12:20, 12:21, 12:23, 13:9, 32:12

**thinks** [2] - 29:3, 37:12

**third** [15] - 12:16, 14:8, 14:10, 14:15, 14:19, 15:1, 16:5, 16:23, 19:20, 20:2, 20:5, 20:25, 64:25, 67:8, 67:11

**third-party** [8] - 15:1,

16:23, 19:20, 20:2, 20:5, 20:25, 64:25, 67:8

**thousand** [3] - 17:12, 61:21

**three** [9] - 5:23, 10:9, 32:11, 58:25, 66:18, 66:24, 67:9

**three-and-a-half** [1] - 10:9

**throughout** [1] - 50:18

**Thursday** [1] - 31:22

**ticket** [1] - 17:15

**timeline** [1] - 44:16

**timing** [2] - 29:19, 30:5

**titles** [1] - 50:16

**today** [8] - 4:11, 5:17, 5:24, 6:22, 7:7, 10:8, 63:20, 64:1

**together** [2] - 36:12, 36:22

**ton** [1] - 8:12

**took** [6] - 33:21, 57:25, 66:24, 66:25, 67:7, 67:11

**topic** [4] - 50:2, 53:12, 53:14, 54:1

**total** [1] - 68:20

**totally** [1] - 36:9

**toward** [1] - 46:13

**trace** [1] - 32:22

**tracing** [3] - 26:17, 27:1, 31:3

**track** [1] - 9:2

**trade** [67] - 8:1, 8:4, 8:6, 8:8, 8:17, 9:14, 9:17, 9:20, 10:1, 10:10, 10:20, 11:9, 11:10, 11:12, 12:6, 12:8, 12:22, 13:3, 13:7, 13:13, 14:14, 18:1, 18:10, 18:19, 19:18, 21:14, 22:24, 26:7, 26:16, 27:1, 28:2, 30:24, 34:8, 38:23, 44:22, 48:11, 50:9, 50:12, 50:17, 51:11, 51:13, 51:23, 52:3, 52:20, 52:22, 52:24, 53:3, 54:4, 54:17, 54:24, 55:2, 55:20, 55:21, 55:23, 55:25, 56:4, 56:15, 60:7, 60:20, 65:18, 65:21, 67:11, 67:12

**transcript** [1] - 72:6

**treatment** [1] - 52:2

**trial** [13] - 3:15, 3:17, 4:7, 9:19, 10:1,

10:21, 14:13, 14:24, 18:25, 22:24, 28:12, 28:23

**trier** [1] - 52:14

**true** [3] - 40:11, 52:1, 72:6

**try** [7] - 18:5, 44:5, 45:10, 46:1, 48:11, 55:22, 68:3

**trying** [15] - 9:18, 11:11, 11:12, 15:22, 15:24, 22:22, 23:15, 24:14, 24:15, 26:21, 36:17, 60:23, 64:13, 65:4, 69:15

**Tuesday** [3] - 63:22, 63:23, 63:24

**turn** [1] - 31:10

**turned** [1] - 31:21

**turning** [1] - 30:23

**two** [20] - 18:13, 25:5, 30:3, 32:10, 34:16, 36:17, 36:22, 40:10, 45:4, 52:6, 61:24, 62:18, 67:7, 67:11, 67:14, 68:12, 68:14, 68:15, 70:5, 70:15

**two-hour** [1] - 70:15

**two-minute** [1] - 68:12

**two-stage** [1] - 34:16

**type** [3] - 8:11, 58:18, 60:16

**typical** [8] - 12:15, 13:15, 14:6, 14:16, 16:20, 18:12, 41:12, 68:3

**typicality** [1] - 14:8

**typically** [1] - 16:9

### U

**ultimately** [3] - 14:13, 35:24, 46:22

**unable** [1] - 20:5

**unauthorized** [1] - 9:3

**under** [4] - 16:23, 54:24, 59:17, 59:22

**understood** [2] - 6:10, 46:14

**undertaking** [2] - 9:16, 21:18

**unduly** [1] - 39:10

**unfair** [2] - 65:21, 69:15

**unilateral** [1] - 16:22

**UNITED** [1] - 1:1

**United** [1] - 72:21

**unless** [1] - 35:15

**unlimited** [2] - 17:15, 40:22

**unnecessarily** [2] - 68:2, 69:14
**unreasonable** [5] - 24:11, 24:21, 24:23, 39:7, 39:8
**unusual** [3] - 17:3, 35:13, 42:22
**up** [13] - 5:23, 13:19, 22:4, 24:23, 28:7, 30:5, 32:5, 40:4, 43:9, 48:3, 63:16, 69:11, 70:23
**update** [3] - 3:23, 61:2, 61:12
**updates** [1] - 61:10
**upward** [1] - 40:22
**usage** [2] - 62:6, 62:24
**useful** [2] - 7:11, 20:1

## V

**valuable** [1] - 59:13
**vast** [1] - 9:11
**vehicle** [1] - 33:23
**vet** [1] - 39:25
**video** [1] - 40:24
**view** [2] - 46:3, 66:13
**virtue** [1] - 60:12
**visibility** [1] - 60:9
**VP** [1] - 62:15
**vs** [2] - 1:6, 72:12

## W

**wait** [2] - 36:14, 71:1
**wants** [4] - 5:15, 29:3, 41:19, 58:17
**Washington** [1] - 2:7
**watch** [2] - 46:18, 58:3
**ways** [1] - 53:1
**wealth** [1] - 54:13
**web** [1] - 55:24
**week** [9] - 14:5, 16:14, 17:11, 21:24, 23:16, 61:4, 63:17, 63:21, 70:21
**weeks** [4] - 12:9, 30:3, 36:17, 70:5
**Western** [1] - 72:21
**whatnot** [1] - 33:18
**whole** [2] - 44:5, 49:17
**widely** [2] - 52:7, 52:16
**willing** [5] - 5:22, 39:11, 66:14, 66:20, 66:21
**Wilmington** [1] - 2:17
**Winthrop** [1] - 2:13
**wished** [1] - 52:12
**wishes** [1] - 5:8

**witness** [4] - 16:12, 64:23, 67:16, 67:20
**witnesses** [5] - 53:10, 53:21, 53:22, 67:19, 70:16
**word** [1] - 30:18
**worded** [1] - 26:9
**workable** [1] - 48:24
**works** [2] - 29:9, 64:8
**worried** [1] - 49:20
**write** [3] - 6:18, 48:16, 54:12
**wrote** [1] - 6:17

## Y

**year** [2] - 67:8, 68:15
**yesterday** [1] - 49:8
**yourself** [1] - 70:1