Public Version

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QORVO, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 1:21-cv-01417-RGA ) |
| AKOUSTIS TECHNOLOGIES, INC. and AKOUSTIS, INC. | ) ) ) |
| Defendants. | ) ) ) |

**DECLARATION OF JERRY BUI IN SUPPORT OF DEFENDANTS AKOUSTIS TECHNOLOGIES, INC. AND AKOUSTIS, INC.'S MOTION FOR PROTECTIVE ORDER ON QORVO INC'S REQUEST FOR INSPECTION**

I, Jerry Bui, declare:

**I.   PERSONAL AND COMPANY BACKGROUND AND EXPERIENCE**

    **A.   Qualifications**

1. My name is Jerry Bui. I am a Managing Director at FTI Consulting, Inc. ("FTI"), located at 2001 Ross Ave, Suite 650, Dallas, Texas 75201. I currently serve as one of the Technology Segment's leaders of FTI's Digital Forensics practice, where I provide services that include evidence collection, forensic analysis, expert testimony, and data analytics.

2. FTI is a well-respected, independent, global business advisory firm dedicated to helping organizations manage change, mitigate risk, and resolve disputes: financial, legal, operational, political & regulatory, reputational, and transactional. The organization has more than 4,700 consultants and professionals in 27 countries, and every year, FTI helps more than 6,100 organizations globally transform the way they anticipate and respond to events. The scope of FTI's clients includes, but is not limited to, 56 of Fortune's Global 100 corporations, 43 of the Financial Times-Stock Exchange 100, 97 of the world's top 100 law firms, and each of the top 10 bank

**Public Version**

holding companies. I am supported by hundreds of dedicated digital forensics, cybersecurity, incident response, and data and analytics consultants, with cross-functional teams led by those with decades of experience at the highest levels of law enforcement, intelligence, and global private sector institutions.

3. Prior to this position, I was Executive Director of Digital Forensics at Lighthouse Document Technologies, Inc. ("Lighthouse"), where I served as the global leader of digital forensic services and evidence collection for investigation and litigation matters and was responsible for the development of proactive risk management consulting services.

4. Before joining Lighthouse, I served as the U.S. Director of Forensics at Inventus, LLC, where I acted as the national leader of digital forensic services performing similar duties as at Lighthouse.

5. Before joining Inventus, LLC, I served as an independent contractor supporting an OFAC investigation for a large online retailer in response to a regulatory inquiry.

6. Prior to that, I was the Advisory Director of Forensic Technology Services and Investigative Analytics at PricewaterhouseCoopers, where I focused on global supply chain fraud and compliance solutions in pharmaceutical life sciences and food trust. I was responsible for advising clients on regulatory affairs and enforcement trends involving the Food and Drug Administration and Department of Justice as it related to false claims, anti-bribery and anti-corruption, and food safety. I also have held leadership positions at Ernst and Young, KPMG, and Navigant Consulting.

7. I have more than 20 years of experience in forensic analysis, including in connection with complex investigations, regulatory inquiries, and litigation matters. I have performed hundreds of forensic acquisitions of electronic evidence, forensic examinations of

Public Version

digital media, forensic inspections as a third-party neutral, and conversions of electronic evidence for litigation review.

8. I hold the following professional certifications: I am a Certified Fraud Examiner (License 662639); a Microsoft Certified Professional; and a Six Sigma Green Belt. These certifications demonstrate my expertise in fraud detection and prevention, forensic accounting, Microsoft technologies, and business process improvement.

9. I also am a member of the Forensic Expert Witness Association, Academy of Court-Appointed Neutrals, Association of Certified Fraud Examiners, the Institute of Internal Auditors, and Project Management Institute.

10. I regularly provide thought leadership on topics of e-Discovery, emerging technology, fraud, and misconduct, speaking at industry events sponsored by FTI Consulting and third-party Forensic software companies. On April 3, 2023, for example, I spoke to 300 judges and attorneys at the Jacksonville Federal Bar Association at the Nimmons Seminar about AI deep fakes and falsified evidence.

11. My curriculum vitae is enclosed as **Exhibit A** hereto and contains testimony given at trial or deposition in the past four years and lists articles that I have published in the past 10 years.

**B.     Assignment**

12. FTI was engaged by Pillsbury Winthrop Shaw Pittman, LLP ("Pillsbury") as an e-Discovery consultant to perform the preservation of devices and other data sources for key custodians of Defendant Akoustis, Inc. ("Akoustis"). [REDACTED]

[REDACTED]

Given my experience, I was asked during this pause to review a document entitled "Plaintiff Qorvo, Inc.'s Request For Inspection To Defendants Akoustis Technologies, Inc. And Akoustis, Inc. ("Inspection Demand").

13. My testimony in this Declaration is based on an objective analysis of the evidence and circumstances made available to me.

## II. QORVO'S INSPECTION DEMAND IS ATYPICAL

### A. What is a forensic inspection?

14. A forensic inspection, often referred to as digital forensics or computer forensics, is the process of collecting, analyzing, and preserving electronic evidence in a manner that is legally admissible. It is commonly used in both criminal and civil investigations to uncover evidence from electronic devices such as computers, smartphones, tablets, and storage devices. The goal is to extract and interpret electronic data without altering the original information.

### B. Typical steps involved in a forensic inspection:

15. The process of a forensic inspection begins with thorough preparation. This involves understanding the scope of the investigation, gathering the necessary tools and equipment, and ensuring that the investigator has the requisite legal permissions to access and analyze the data. Once prepared, the next step is identification. The investigator must recognize sources of potential electronic evidence pertinent to the case, which could range from computers and mobile devices to external storage devices and cloud storage. Reasonable preservation within the scope of the investigation is of utmost importance. The preservation step often, but not always, involves creating a bit-for-bit copy, or "image", of the device's storage to guarantee that the contents remain unaltered. It depends a great deal, however, on how voluminous the data is and whether the preservation process is likely to yield any value. Certain online systems and databases

are not amenable to forensic imaging. For example, large production servers do not lend themselves to be taken offline for imaging, so a more targeted approach may be taken, including capturing only specific folders or search term results. Particularly in the case of specialized servers storing data in excess of 10 terabytes, the extent of available relevant data may be unknown, and a cost/benefit analysis must be performed. One way this scoping exercise can be accomplished is by generating a directory tree report to understand the nature of the file types stored on the machine and how all the files are organized. Another mechanism would be to implement technology that allows search terms to be run on the system.

16. With the data safeguarded, the collection phase commences. Investigators extract targeted data from the electronic devices, employing specialized forensic tools to maintain data integrity.

17. The examination phase follows, where the collected data undergoes rigorous analysis using forensic tools and techniques. Investigators search for specific files, keywords, metadata, and even deleted data or logs. The digital forensics inspector focuses on the characteristics of documents and not on interpreting the substance of the documents themselves. The aim is to identify patterns or evidence that either support or refute a claim or suspicion. In the case of document misappropriation and propagation, the focus is narrow and not like ordinary discovery; there is greater emphasis on the particular documents at issue (e.g., an exemplar set of documents described by file name or MD5 hash value), and the application of techniques that will leverage identification, and the likely travel vectors across a computer network given the system access levels and activity for key custodians.

4885-2529-1384

18.     Post-examination, the analysis phase takes center stage. Here, the results of the examination are summarized, findings are related to the context of the investigation, and the significance of each piece of evidence is determined.

19.     Note that the forensic inspection does not usually involve document review or interpretation, but instead identifies materials—based on objective criteria—to be reviewed for responsiveness and privilege by counsel for the producing party and then produced. To this end, parties typically negotiate a detailed protocol that defines exactly what steps the forensic inspector will take. I have personally conducted large-scale forensic inspections as a third-party neutral and I have always been subject to a rigorously detailed inspection protocol negotiated and specified in advance of starting my work.

### C.     Qorvo's Inspection Demand is Highly Unusual

#### 1.     Qorvo's Inspection Demand Lacks a Detailed Protocol

20.     The scope outlined in paragraph 1 of Exhibit A of the Inspection Demand is particularly expansive. It asks for virtually unrestricted access to all personal and business electronic devices and media in Akoustis' possession that is associated with anyone allegedly involved in the alleged misappropriation. This extensive access can be seen as quite intrusive, especially in the context of a smaller company such as Akoustis, and because this impacts the primary databases and servers used by the company to conduct its day-to-day business. It is broader than what is commonly demanded in the forensic inspection protocols I've seen.

21.     The challenge in crafting a good forensic inspection protocol lies in balancing the need to discover crucial evidence and protect rights with the imperative of avoiding procedures that are overly burdensome or invasive. I find Exhibit A of the Inspection Demand to be overreaching or misaligned with standard practices and lacking the necessary technical detail for

forensic inspection protocols based on my experience and reasons that I've listed above in this section.

> **2. Qorvo's Demand Proposes Highly Technical Relevance Assessments and Interpretations That Are Beyond the Scope of a Forensic Inspection**
>
> **a.     Exh. A, Para 6.a –**

22.     Paragraph 6.a's specifications for what data to search for are very broad, encompassing a unlimited array of data types, and outside the scope of a forensic examination. Forensic inspectors are specialists trained to locate, preserve, and analyze electronic data, ensuring its integrity for potential legal proceedings. Their primary role revolves around the technical aspect of data retrieval and ensuring the authenticity and non-alteration of electronic evidence. Typically, they are not qualified to interpret the substantive content of documents or to make legal determinations about the nature of the information, such as whether something constitutes confidential information, intellectual property, or a trade secret. Such evaluations generally require legal expertise and are usually the domain of attorneys or subject matter experts. Thus, while a forensic examiner can identify where specific types of data are located and ensure they are properly retrieved and preserved, determining the legal significance or classification of that data is outside their typical job description.

> **b.     Exh. A, Para 6.b**

23.     Paragraph 6.b's phrasing, which seeks items "derivative of proprietary, trade secret, intellectual property or other property" of Qorvo, appears especially broad and lacks precise boundaries for what constitutes "derivative" items. Without a clear definition or limiting criteria, this could ostensibly permit a sweeping search across Akoustis' entire computer network. Such an expansive scope can be concerning as it may be viewed as a "fishing expedition," where one party

seeks to rummage through vast amounts of data in hopes of finding something beneficial, rather than conducting a targeted search with clear parameters based on specific, well-founded suspicions. The vagueness of paragraph 6.b raises concerns about the balance between legitimate investigative needs and the potential for unwarranted intrusion into Akoustis' electronic data.

        **c.**        **Exh. A, Para 6.c**

24.     Regarding paragraph 6.c, the absence of a clear definition for "Confidential Information" presents a significant challenge. Without a specific and clear delineation of what constitutes "Confidential Information," the forensic examiner is not equipped to make an accurate or conclusive determination. Such tasks require interpretive judgments that go beyond mere technical evaluation and venture into the realm of content understanding and legal analysis.

        **a.**        **Exh. A, Para 6.d**

25.     Regarding paragraph 6.d, the phrase "as may be deemed relevant to the matter" is particularly concerning. This vague qualifier requires continuous legal interpretation at each step of the examination. Without clear, objective criteria to determine relevance, there's a significant risk of subjective judgments being made about which documents or data fall into the "relevant" category. Such a broad directive can lead to inconsistencies in assessment and could unintentionally introduce biases into the evaluation process. Proper forensic evaluation thrives on objective criteria; this ambiguity undermines the very essence of a straightforward and unbiased forensic assessment.

        **3.**        **Proposed "imaging" of network repositories and databases is unduly burdensome and unusual.**

26.     In any proposed inspection protocol, it is essential to consider the size and function of the systems involved. Traditional forensic assessments and reviews begin with identified documents or known data points. From there, examiners extend their search to other locations that

are reasonably expected to contain those documents or their various versions. The process does not typically commence with the imaging of vast quantities of data, especially not when discussing systems that amount to hundreds of terabytes (TB). The act of imaging servers of such magnitude is not just time-consuming but also technically challenging.

27. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

28. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████

//

//

4885-2529-1384

### III. WHO TYPICALLY CONDUCTS THE FORENSIC INSPECTION

    **1.** **FTI's qualification to conduct an inspection on behalf of Akoustis.**

29. ███████████████████████████████████████████ Given our current engagement and familiarity with the systems and data in question, FTI is well-positioned to promptly embark on this task. Furthermore, our team can effectively report the steps taken, our findings and progress directly to both parties involved, as well as to the Court, ensuring transparency and timeliness in addressing the matter at hand.

    **2.** **Routine use of third-party neutral or discovery referee to conduct or oversee inspections in trade secret cases.**

30. In my extensive experience with forensic inspections, I have never encountered an inspection of this magnitude being conducted unilaterally by the requesting party. Typically, such forensic examinations are executed either by the producing party or, to ensure impartiality and thoroughness, under the guidance and oversight of a third-party neutral or a discovery referee. This traditional approach is favored to ensure that the inspection process is both comprehensive and free from potential biases, while also ensuring that the rights and interests of all parties involved are safeguarded.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of August, 2023.

                                                                                           _____
                                                                                                  Jerry Bui