IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

QORVO, INC.,                    |

            Plaintiff,          |

vs.                             |   NO. 21-CV-01417

AKOUSTIS TECHNOLOGIES,          |
INC., AND AKOUSTIS, INC.,       |
                                |
            Defendants.         |

_____


TRANSCRIPT OF THE MOTION HEARING

BEFORE THE

HONORABLE JON P. MCCALLA


MONDAY

NOVEMBER 20, 2023


TINA DuBOSE GIBSON, RPR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103


UNREDACTED TRANSCRIPT

1                   A P P E A R A N C E S

2

3          Appearing on behalf of the Plaintiff:

4              ROBERT M. MASTERS
               Sheppard, Mullin, Richter & Hampton, LLP
5              2099 Pennsylvania Avenue, NW, Suite 100
               Washington, DC  20006-6801
6              (202) 747-1900

7              JONATHAN DEFOSSE
               Sheppard, Mullin, Richter & Hampton, LLP
8              1540 El Camino Real
               Menlo Park, California  94025
9              (650) 815-2600

10             JEREMY A. TIGAN
               Morris, Nichols, Arsht & Tunnell LLP
11             1201 North Market Street, 16th Floor
               Wilmington, Delaware 19899-1347
12             (302) 351-9106

13

14         Appearing on behalf of the Defendants:

15             DAVID L. STANTON
               Pillsbury, Winthrop, Shaw, Pittman, LLP
16             2550 Hanover Street
               Palo Alto, California 94304-1115
17             (650) 233-4500

18             STEPHEN BRAUERMAN
               Bayard, PA
19             600 North King Street, Suite 400
               Wilmington, Delaware 19801
20             (302) 655-5000

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

```
 1                          MONDAY

 2                     NOVEMBER 20, 2023

 3               -----------------------

 4

 5          THE COURT:  All right.  We're here in connection

 6  with a motion for sanctions, which is a very important motion

 7  in this case.  I would like -- we definitely are not going to

 8  go forever on this subject, but I do need to have some

 9  information from different individuals.

10          I understand that, Mr. DeFosse, you are in charge

11  of the position of the plaintiff in the case.

12          And, Mr. Stanton, you are responding?

13          MR. STANTON:  Yes, sir.

14          THE COURT:  Both of you.  And there are a number

15  of people online, and sometimes we go through a roll call,

16  but I don't know that it's necessary in this case.  Now, the

17  first question always is what standard applies, and there is

18  a disagreement in that regard.

19          Sometimes certain types of -- depends on how

20  they're worded -- instructions on spoliation can be regarded

21  as the equivalent of a death penalty in a case.  We

22  understand that's a very serious matter.  I'm not saying

23  that's what's going to happen here, but we understand how

24  serious it is.  We also understand that the timing on this

25  does not look good for the defense.
```

UNREDACTED TRANSCRIPT

4

1              So I'm going to start -- I have a couple of basic

2    questions, but I want to make sure I understand and recall

3    how many people currently work at the location where these

4    computers were wiped.  I mean, is this 35? 25? 42?  I don't

5    know, but I'm sure that someone there does.

6              So, Mr. Stanton, how many people work there?

7              MR. STANTON:  I think overall it's 400 employees.

8    But, you know, less than half of those are in the

9    Huntersville location and the rest in the New York facility.

10             THE COURT:  Okay.  And so it's 400-plus.  And

11   then help me understand.  I know that -- they were not

12   supposed to destroy this, right, Mr. Stanton?

13             MR. STANTON:  Correct, yes.  These laptops were

14   under hold.

15             THE COURT:  They were under hold.  So who did it,

16   just to make sure I understand?  It had to be somebody?

17             MR. STANTON:  Sure.  So, you know, we're talking

18   about two laptops here for Joonbum Kwon and Joel Morgan.  Of

19   course, we understand that for those individuals, hundreds of

20   thousands of e-mails and documents were preserved and were

21   produced.

22             THE COURT:  I didn't ask that.  I didn't ask

23   that.

24             MR. STANTON:  And they had two lap- --

25             THE COURT:  I want to know who destroyed the --

UNREDACTED TRANSCRIPT

1    who wiped these computers?  Just tell me.

2              MR. STANTON:  There were two individuals in the

3    IT department.  One in the Huntersville location by the name

4    of Mr. Spickler, and another in the New York facility.

5              THE COURT:  Sure.  I understand.  And this was

6    done by Spickler; is that right?  Spickler wiped it?

7              MR. STANTON:  He wiped one of them in the

8    Huntersville facility.  And then it -- it's a former

9    employee.  I'll have his name for you in just a minute, Your

10   Honor.  It was a former employee in the New York facility.

11             THE COURT:  I'm sorry.  Who was that?

12             MR. STANTON:  I'll give it to you in just a

13   second.

14             THE COURT:  Take your time.  Not a problem.

15             MR. STANTON:  Anthony Ricketts.

16             THE COURT:  Okay.  Let's make sure we've got the

17   last name spelled correctly on that person.

18             MR. STANTON:  Ricketts, R-i-c-k-e-t-t-s, Your

19   Honor.

20             THE COURT:  Okay.  All right.  Okay.  All right.

21             What happened to them as a result of their

22   failure to comply with the order, Mr. Stanton?  Did anything

23   happen to them?

24             MR. STANTON:  Well, they had not been informed of

25   the order.  So the order had been issued to the vice

UNREDACTED TRANSCRIPT

1   president of information technology.  It's a small IT group.

2   He had personally undertaken to implement the legal hold.  He

3   had gone through and ensured that things that were being

4   backed up and synchronized were appropriately being backed

5   up.  He also implemented a process to ensure the preservation

6   of laptops, and that was to monitor the tickets that were

7   automatically issued for any departing employees and to

8   interrupt the process of, you know, any deletion or rewriting

9   of their laptops, you know, if they were to be returned to

10  the IT department.

11          And then, you know, Mr. Nixon had a medical

12  emergency.  He was out for a bit, and this happened in the

13  interim while he was absent.

14          THE COURT:  Okay.  All right.  I understand.

15          Now, let's go back to the plaintiff.  You say

16  that the standard for the motion is not clear and convincing?

17  Or maybe I misunderstood that.

18          MR. DEFOSSE:  Yes, Your Honor.  So I think we

19  cited cases in the Third Circuit, the standard is unclear

20  whether it's clear and convincing or something else.

21          THE COURT:  Right.

22          MR. DEFOSSE:  I mean, our bottom line position

23  would be it shouldn't really matter in this case.  We think

24  we have clear and convincing evidence.  What I would say is

25  the cases where you see clear and convincing evidence applied

```
 1    are two types generally.  One is where you're proceeding
 2    under civil contempt, not under Rule 37.  So to the extent
 3    our motion implicates civil contempt, clear and convincing
 4    would apply there, but it's important what elements does that
 5    apply to because those elements are things I think we've
 6    clearly shown with clear and convincing evidence.
 7                THE OTHER instance where clear and convincing is
 8    applied is where you're seeking terminating sanctions, and
 9    that's obviously not what we're seeking here.  So we think
10    the proper standard, if it's going to matter to the Court's
11    decision, would be preponderance of the evidence.
12                THE COURT:  Okay.  And I know you've cited some
13    cases there.  What do you think is your best case that has
14    been applied by a court in Delaware?
15                MR. DEFOSSE:  Yes, Your Honor, if you give me
16    just one second.  I apologize.
17                THE COURT:  No.  That's fine.
18                MR. DEFOSSE:  So there's the *IOENGINE* case, which
19    is a recent Delaware case from 2022 --
20                THE COURT:  Sure.
21                MR. DEFOSSE:  -- which is favorable.  And then we
22    also cited the *Bistrian* case from the Eastern District of
23    Pennsylvania also in the Third Circuit, 2020.
24                THE COURT:  Sure.  And I've got that noted.
25                All right.  What is the sanction that would be
```

1    most appropriate if the Court determined that an instruction

2    such as the more severe instruction that you did suggest

3    should not be given?

4              MR. DEFOSSE:  Yes, Your Honor.  So our fallback

5    position would be that we should be granted leave to discuss

6    the destruction of the laptops with the jury and then may

7    also include an appropriate instruction for the jury along

8    the lines that we've seen in some other cases concerning how

9    they can weigh that evidence, you know, that it may -- they

10   may consider it important, not important.  It's up to them.

11   That would be our sanction -- requested sanction under Rule

12   37(e)(1) if the Court were not to grant the adverse

13   inference.

14             THE COURT:  Right.  And that is the situation

15   where the jury could regard this as simply not particularly

16   important or they could give it whatever weight they thought?

17             MR. DEFOSSE:  Exactly, Your Honor, yes.

18             THE COURT:  Okay.  And how many cases have you

19   had in which that instruction or that process has been

20   followed?  I'm not picking on you.  I just wonder what's your

21   experience.

22             MR. DEFOSSE:  Personally, I've never had a case

23   where this has been raised before.

24             THE COURT:  And there is a significant concern by

25   any Court imposing a sanction under Rule 37 that might cause

UNREDACTED TRANSCRIPT

1    the jury to be -- I don't want a mini trial on this issue.

2    How do we avoid that?

3            MR. DEFOSSE:  Well, Your Honor, I think this is

4    one part of the case that we're going to be presenting.  It

5    happens to be -- these witnesses happen to be important to

6    two of the groups of trade secrets that we're presenting, so

7    I don't think it would predominate the trial.  But I do think

8    it's important for us to point out that, for example,

9    Mr. Kwon was integrally involved in the trimming issues that

10   we believe have been misappropriated.

11           And we weren't able to have the same evidence

12   that we have for other witnesses or other employees

13   concerning their kind of routine use of the information

14   because we don't have the artifacts from his computer showing

15   the access to the files.  So I think it's -- it would be

16   something we would like to say.  I don't believe it would

17   predominate the trial.

18           THE COURT:  Okay.  Kwon has been less than

19   cooperative on these matters?  Or what's our situation?

20           MR. DEFOSSE:  Yes.  So we submitted trans- --

21   excerpts of his transcripts, which I think are quite

22   remarkable if Your Honor has a chance to look at those.

23           You know, we asked him very straightforward

24   questions:  Did you use Qorvo information to create these

25   procedures?  Did you -- are these procedures in this box

                        UNREDACTED TRANSCRIPT

```
 1   Oorvo information.
 2             We went through, and if you read it, it's one
 3   time after another, I don't remember, I don't remember, I
 4   don't recall.  And that's exactly why we needed this
 5   information from him that's been destroyed.
 6             THE COURT:  Will you remind me again of where
 7   Kwon is now.
 8             MR. DEFOSSE:  I believe Mr. Kwon is currently
 9   working at Northrop Grumman, is my recollection, Your Honor.
10             THE COURT:  Sure.  And that's fine.
11             Let's go back to this question on burden and
12   going back to Mr. Stanton.
13             MR. STANTON:  I agree, Your Honor, that the
14   authorities are mixed.  I think it probably is right that
15   when evaluating a harsher sanction, including an adverse
16   inference instruction, that the clear and convincing standard
17   ought to apply consistent with the 37(e)(2) kind of
18   heightened burden of proof.  But where the Court is
19   evaluating the lesser sanction, it seems that the weight of
20   the case is, you know, preponderance of the evidence for
21   those.
22             THE COURT:  Sure.  Exactly.  Exactly.
23             Now, I really need to let both of you make
24   statements you'd like to make.  I just want to go over a
25   couple of things to begin with.
```

UNREDACTED TRANSCRIPT

1          But I am going to go back to plaintiff's counsel

2    again to Mr. DeFosse.  To the degree that you had in the

3    examination of Kwon, you were able to use, to some degree,

4    information to inquire as to what he did; is that right?

5          MR. DEFOSSE:  That is right, Your Honor.  So we

6    have -- we have information that was produced from him.  The

7    primary documents we have from him are PowerPoint

8    presentations that he created within a month of joining

9    Akoustis where he lays out what he calls Qorvo's trimming

10   process, and that was the heading on the slides and there are

11   some very detailed calculations and procedural steps and

12   things like that there.

13         We believe that those have come from Qorvo, and

14   we believe that if we had obtained his laptop, we would have

15   had the source Qorvo documents from the laptop that he would

16   have stored locally on that laptop because of the close match

17   between the materials that he reproduced into his Akoustis

18   PowerPoint presentation and what is in place at Qorvo.

19         THE COURT:  To what degree has the plaintiff been

20   prejudiced by this situation?  I mean, there's a lot of

21   information out there.  And I'm not sure.  I mean, they

22   seemed to be doing pretty well, so what about that?

23         MR. DEFOSSE:  Yes, Your Honor.  So, obviously, we

24   do have some information about the misappropriation, and

25   we're not saying that we don't.  What we're missing are a few

UNREDACTED TRANSCRIPT

12

1    things.

2          One are locally saved files from his computer,

3    which aren't backed up anywhere and may include a substantial

4    amount of information that we don't see that we don't know

5    about that was implemented as part of their trimming

6    procedures.  It appears that the process has been wholesale

7    copied from Qorvo, but we don't have the underlying documents

8    to show the breadth of the material that Mr. Kwon took and

9    used.

10          Secondly, what we're missing are what our

11   forensic expert would call artifacts.  Those are

12   computer-stored information discussing when files were

13   created, when they were accessed, when they were used, and

14   whether other files were opened at the same time.

15          If our forensic expert had the laptop as he

16   should have had, he would have been able to look at

17   Mr. Kwon's computer and say, he has these Qorvo documents

18   that were on his computer, they were opened at these times,

19   they were copied at these times.  They were derived from a --

20   for example, a USB drive or external drive that was plugged

21   in at this time.

22          So it's really a large amount of detail that we

23   would normally be presenting to the jury to show the use of

24   these materials and how important they were to the building

25   of Akoustis's trimming procedures.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  Well, let me go to a couple of

2     other things, and then we do -- I really do want you to both

3     make your best statements.  It looks -- it looks very

4     problematic that personnel who wiped the files were not

5     provided early on information regarding the necessity of

6     preserving the information.

7          What do you say about that, Mr. Stanton?  It just

8     doesn't -- it's a problem.  I mean, the fact that the vice

9     president had some information is sort of -- it sounds

10    strange, but the first thing you do is tell the IT

11    department.

12          MR. STANTON:  He is the IT department, Your

13    Honor.  It's a very small group.  He's intimately involved

14    with all aspects of its operation.

15          THE COURT:  Wait a minute.

16          MR. STANTON:  We're not talking about --

17          THE COURT:  Wait a minute.  Excuse me.  Excuse

18    me.  He didn't tell the people who did the wiping.  What's

19    the reason?

20          MR. STANTON:  Because he took it upon himself to

21    monitor and to interrupt those -- you know, those

22    protocols --

23          THE COURT:  What's his excuse for not doing the

24    obvious, which is to say, here, these things, we can't

25    disturb, we can't do anything about, we have to preserve

1    them?

2           I mean, you know, he's acting, it seems, pretty

3    irresponsibly.  What's going on here?

4           MR. STANTON:  I think he was being sensitive to

5    the confidential nature of the litigation is the best

6    explanation.

7           THE COURT:  What do you mean by that?  This was a

8    publicly filed case.

9           MR. STANTON:  Well, the individuals who were

10   involved in it are not publicly known nor known within

11   Akoustis itself.

12          THE COURT:  Everybody at Akoustis knew there was

13   litigation, right?

14          MR. STANTON:  Sure, yes.

15          THE COURT:  So he just didn't do his job, and he

16   didn't tell the people he should have told, and then he let

17   this happen?

18          MR. STANTON:  I think he undertook the

19   responsibility himself and --

20          THE COURT:  Would he have wiped the -- would he

21   have preserved the computers himself?  I mean, what is --

22          MR. STANTON:  Yes.  That was the process that he

23   gets a ticket.  Anytime somebody leaves the company, he's

24   checking that against the legal hold list, and he's

25   interrupting the standard operating procedure for any kind of

UNREDACTED TRANSCRIPT

1    deletion or recycling of those devices for those individuals.

2             THE COURT:  So they would not have deleted

3    anything without his permission; is that correct?

4             MR. STANTON:  They would -- well, in this

5    instance, it was more --

6             THE COURT:  He chose to -- excuse me.  He chose

7    to control whatever was deleted.  He kept it all to himself.

8    He didn't authorize them just to delete something that came

9    in, right?

10            MR. STANTON:  The standard process was, you know,

11   that things did get deleted and recycled.  You know tickets

12   were issued to the IT department.  The protocol that the vice

13   president of IT put in place was to review those tickets when

14   they came in and confirm whether people that were on hold to,

15   you know, interrupt the standard practice if there were

16   individuals who were on hold.

17            Could he have issued the hold to more people

18   earlier?  Could he have notified folks of that?  He could

19   have.  But, you know, he undertook that responsibility

20   himself.  I don't think from Akoustis's perspective,

21   entrusting that responsibility to his director of IT or vice

22   president of IT was irresponsible.  It was a process --

23            THE COURT:  But he left in place a wipe policy

24   when individuals left the company.  He left that in place.

25   He didn't do anything about that.  How many people are in his

UNREDACTED TRANSCRIPT

1   department again?

2                    MR. STANTON:  Ten.

3                    THE COURT:  Ten people.

4                    Okay.  Did he tell no one else in the department

5   about the order to preserve material?

6                    MR. STANTON:  Not to my knowledge.

7                    THE COURT:  But did you ask him?

8                    MR. STANTON:  Yes.  I -- yes.

9                    THE COURT:  Okay.

10                   MR. STANTON:  You know, the ones at issue are the

11  ones that have been focused on, but I didn't ask about other

12  folks in the department, Your Honor, but --

13                   THE COURT:  Who was second in command?

14                   MR. STANTON:  Jimmy -- James Spickler, the fellow

15  who is responsible for the Morgan laptop.  And --

16                   THE COURT:  So his second in command -- he didn't

17  tell his second in command that there was an order to

18  preserve evidence, and he then was gone; is that right?

19                   MR. STANTON:  Yes.  He had a medical issue, and

20  he was out.

21                   THE COURT:  What was his medical issue?

22                   MR. STANTON:  He had -- was recovering from eye

23  surgery.  He had eye surgery and then had complications,

24  medical issues that kept him out of work for about a month.

25                   THE COURT:  And so during that month, no one in

UNREDACTED TRANSCRIPT

```
 1   the IT department knew anything about the order to preserve
 2   evidence, right?
 3              MR. STANTON:  Correct.
 4              THE COURT:  And would Spickler say that's true?
 5              MR. STANTON:  Yes, that's what Spickler's
 6   declaration makes clear.  He did not know.
 7              THE COURT:  Well, I know he declared, but would
 8   he say that that's true?
 9              MR. STANTON:  I believe so.
10              THE COURT:  Has he been -- he hadn't been
11   examined yet, right?
12              MR. STANTON:  No, there's been no request to do
13   it.
14              THE COURT:  So Spickler is running the
15   department, everybody in the company knows that the VP for IT
16   is out for a month, and Spickler doesn't -- isn't clued in by
17   anybody, including the lawyers; is that right?
18              MR. STANTON:  Correct.
19              THE COURT:  Okay.  Well, it doesn't look very
20   good.
21              Okay.  Let's go through a -- I don't want to --
22   it's very unfortunate.  This is not a good situation.
23              So let me make sure:  Who was the communication
24   hold or the hold then communicated to in the company?
25              Then let's go back to Mr. Stanton.
```

UNREDACTED TRANSCRIPT

1          MR. STANTON:  Within the company, it was

2     communicated to the individuals who are named in the

3     complaint, all the individuals who were on hold, the

4     executives of the organization, the board, and the director

5     of IT.

6          THE COURT:  How many everyday employees in the IT

7     department performed a function of erasing computers?

8          MR. STANTON:  I don't know that information.

9          THE COURT:  Okay.  Spickler, though, is second in

10    command.  He is in charge of the department.  Was anyone else

11    in his location allowed to erase, that is, wipe computers?

12         MR. STANTON:  I don't know that information.

13         THE COURT:  Okay.  So if others were allowed to

14    do that, then they could have wiped it, right?

15         MR. STANTON:  Hypothetically?

16         THE COURT:  Right.  But the second in command of

17    the department made the decision to erase this information;

18    is that correct?

19         MR. STANTON:  I believe that's correct.  I mean,

20    when you say second in command, I don't exactly have in mind,

21    but my understanding of their working relationship is that

22    Mr. Spickler would be considered second in command.

23         THE COURT:  Right.  What's his title?

24         MR. STANTON:  Hold on one second.

25         THE COURT:  I think you've got it there.  I can

UNREDACTED TRANSCRIPT

1   look it up.

2                MR. STANTON:  Okay.

3                THE COURT:  But go ahead.

4                MR. STANTON:  It's the senior systems engineer in

5   the information technology department.

6                THE COURT:  And how long has he been with the

7   company?  I think it's all there.

8                MR. STANTON:  Since 2021.

9                Mr. Nixon has also been with the company since

10  June of 2021.

11               THE COURT:  Sure.  And what's Rickett's position?

12               MR. STANTON:  An IT support technician.

13               THE COURT:  Okay.  And at whose direction did he

14  erase the material that he erased?

15               MR. STANTON:  Well, I don't know that it was at

16  direction.  I think that the laptop was just treated

17  according to standard procedure.  It was held on to for a

18  while, and then there was -- it was reimaged so it could be

19  issued to somebody else.

20               THE COURT:  And to whom was it reissued?

21               MR. STANTON:  I don't have that name, Your Honor,

22  but it was imaged.  I mean, there was no recoverable data on

23  that drive once the reimaging took place.

24               THE COURT:  Based on what you're telling me,

25  right?

1          MR. STANTON:  Based on the reimaging processes

2    and the factory reset of a laptop, that's what that means.

3          THE COURT:  I understand that's what it means,

4    but I'm relying on what you're telling me.  Somebody could

5    get that computer and just examine it, just to be sure,

6    right?

7          MR. STANTON:  Sure.  But we could check.

8          THE COURT:  Have you retrieved the computer just

9    to check?

10         MR. STANTON:  I don't -- I think that it might

11   have been checked, Your Honor, but I don't have -- I'm not

12   clear in my recollection on that point.

13         THE COURT:  Do you even know to whom it was

14   reissued?

15         MR. STANTON:  I don't know sitting here.

16         THE COURT:  Now, I understand the whole reimaging

17   process.  That's not a mystery.  And I understand that might

18   be a futile effort.  Of course, we won't know the answer

19   until somebody checks.  I don't think it's probably going to

20   be beneficial, but maybe somebody will get lucky and it might

21   work.

22         Okay.  So you've not exhausted every possibility

23   of rechecking that piece of equipment?

24         MR. STANTON:  Your Honor, we've been working with

25   the forensic examiner.  My understanding is that data was no

UNREDACTED TRANSCRIPT

1 longer available but whether they did that final step of

2 recovering that machine and double-checking it, I'm just not

3 positive.  But I don't think that that happened.

4             THE COURT:  And I understand.  I mean, you and I

5 understand there's probably not anything there.  It just goes

6 to the thoroughness of the inquiry.

7             Okay.  All right.  Well, Qorvo, I know you're

8 missing some things, particularly locally saved files; is

9 that correct?

10            MR. DEFOSSE:  That's right, Your Honor.

11            THE COURT:  Now, is there any way to -- I

12 understand locally saved files.  I think -- tell me about

13 them again because they're not on -- they're not in the

14 Cloud.  They're not somewhere else.  They're basically local.

15            MR. DEFOSSE:  Yes.  So our understanding is on

16 the Akoustis computers, there are folders that are

17 synchronized to a central repository.  So if a person saves

18 something in that folder, a copy is made, and that's what's

19 been provided to us.

20            If an employee saves things locally only to their

21 computer outside of those synchronized folders, those files

22 only exist on those computers.  And the reason that those are

23 critical in our case, and I think in most trade secret cases,

24 are that someone who has misappropriated trade secret

25 information that belongs to another company is -- are

UNREDACTED TRANSCRIPT

1   typically hesitant to save those things to a centralized file

2   server where everyone can access them.

3           So, for example, in this case, one thing we

4   discovered when we had our forensic inspection was that there

5   were -- there was an employee at Akoustis who saved multiple

6   copies of his Qorvo laptop locally, not on the shared files.

7   We would have never found that if we didn't get the locally

8   saved files for that person, and those files have not been

9   produced in this case prior to us finding them as part of the

10  forensic inspection.

11          THE COURT:  Remind me who that was because --

12  yes, yes, I understand that.

13          MR. DEFOSSE:  That gentleman's name was Rama

14  Vetury, V-E-T-U-R-Y.

15          THE COURT:  Yes.  And to what degree can you

16  associate what he had with what these two other individuals

17  had?

18          MR. DEFOSSE:  Substantively, it would not be the

19  same.  Mr. Vetury is an engineer.  He had a lot of highly

20  technical documents.  He was involved in trimming, but

21  Mr. Kwon was the primary trim engineer who they hired to do

22  the process, so Mr. Vetury's files would not have duplicated

23  what Mr. Kwon had.

24          Mr. Morgan was respon- -- he was the director of

25  quality, so he was responsible for a lot of testing and

UNREDACTED TRANSCRIPT

1   things like that, so also not really what Mr. Vetury did.

2          The way I would associate it, Your Honor, and

3   this is -- if I had my pitch for a higher level of sanctions

4   in this case, which -- yes, if I have the opportunity to

5   pitch for that, the problem in this case for us is not just

6   the destruction of these particular laptops, but there's a

7   real pattern in this case of this company taking steps to try

8   to --

9          THE COURT:  I had a note actually to ask you

10  about that comment in your material.

11         MR. DEFOSSE:  Yes.  So we have now the Vetury

12  materials that I mentioned were not produced in this case.

13  It appears that Mr. Vetury withheld those from counsel and

14  didn't let them know that he had copied his corporate laptop.

15         Mr. Vetury also made archives of his entire Qorvo

16  e-mail, and brought those with him, not produced in this case

17  until the forensic inspection.

18         Another employee at Akoustis named Todd Bender,

19  did the same thing, made copies of his entire e-mail archived

20  at Qorvo, brought them with him to Akoustis, and did not

21  provide those for discovery in this matter.

22         We just discovered last week that there -- that

23  one of the primary people involved in the misappropriation,

24  who was the chief product officer at Akoustis, his name was

25  Rohan Houlden, created an external drive within days of

24

1   leaving Qorvo.  They had a folder on it called Qorvo laptop,

2   and he used that drive to transfer files to himself at

3   Akoustis.  Again, that drive has not been produced to us in

4   this case.

5           On top of these things, what we see just

6   throughout the evidence in record here is that these

7   employees at Akoustis were very aware of taking steps to try

8   to avoid detection, so they routinely shifted to using

9   personal e-mail accounts to obtain information and get it

10  sent -- you know, they would request information using a

11  personal account and had it sent to their personal account.

12  So these are people who have been taking steps until now to

13  avoid creating records and avoid producing documents to us in

14  this case.

15          So as Your Honor might imagine, when we found out

16  that there were two laptops destroyed 14 months after the

17  litigation started for two of the key people in this case,

18  that raises a major red flag for us and we think crosses the

19  line into the type of behavior that would warrant the higher

20  level sanctions.

21          THE COURT:  In this case, though, there is --

22  seems to be an abundance of evidence to support your prop- --

23  I'm not saying how it's going to come out, but to support

24  your proposition that Akoustis was acting deliberately and

25  with the intent to avoid detection through employees as to

UNREDACTED TRANSCRIPT

1   how they were acting.

2           Why does this -- isn't the information that Kwon

3   had and Morgan had cumulative to some degree?

4           MR. DEFOSSE:  So for -- I'll answer that

5   separately.  For Kwon, I do not believe it's cumulative

6   really in most degrees.  He was the primary trim engineer

7   responsible for creating their process, and I think that the

8   materials on his laptop are unique to him.

9           Mr. Morgan, there may be some more overlap with

10  respect to Mr. Morgan because a lot of the materials that we

11  see that he took are testing policies, testing parameters,

12  procedures, and we do have e-mail records of those.

13          But what we don't have, for example, is

14  Mr. Morgan was the primary person responsible for their

15  reliability testing.  And we have e-mails from him saying,

16  here's a Qorvo document, I've been primarily relying on this

17  document to do the testing.

18          So we have that in an e-mail.  But what we don't

19  have is the forensic record to go along with that to say when

20  he says, I'm primarily relying on this, he's accessing it on

21  all these dates, and he's using it at the same time as these

22  other files on a computer.  So I do think it is important --

23  you know, it is prejudice to my client when we're at trial

24  and we say Mr. Morgan was using this for testing.  And then

25  Akoustis's counsel would like to stand up and say, no, he

1   wasn't, we had other processes, he wasn't really using it.

2   And we don't have the record, the forensic record, to show

3   actually here's all the accesses when he had this file.

4            So that's -- you know, I guess from a high level,

5   there's some cumulativeness there because we do have the

6   e-mail that shows that he used it.  But from I think the more

7   practical presentation to a jury level, it's a severe

8   prejudice to us not to be able to have that.

9            THE COURT:  Kwon is anticipated to give testimony

10   at trial, perhaps not in person; is that right, Mr. DeFosse?

11            MR. DEFOSSE:  We would expect to play his

12   videotape.

13            THE COURT:  Right.  And you will be able to show

14   that he said that he didn't remember a lot of things, and you

15   will be able to show his position and so forth.  Once again,

16   aren't you going to be able to make your case without the

17   instruction given under Rule 37, which we have to be very

18   cautious about?

19            MR. DEFOSSE:  I understand, Your Honor.  And what

20   I would say is we'll say that, and the jury will have him,

21   and I think his testimony is not particularly credible, and I

22   would like to believe the jury will reach that conclusion.

23            But we will also have, I expect, live witnesses

24   that will be presented by Akoustis, who are going to sit on

25   the stand and tell the jury, no, we didn't really use Qorvo's

UNREDACTED TRANSCRIPT

27

1    trimming process.  You know, what we developed here was

2    industry standard.  What Mr. Kwon did was -- you know, he

3    couldn't remember, but I'll tell you what he did because he

4    reported to me.

5              And that's what, you know, obviously we're

6    worried about.  And we think we shouldn't have to face that

7    deficit where we could just pull out his -- the artifacts

8    from his computer and the Qorvo files that he would have had

9    saved locally and say -- use those to impeach that witness.

10             THE COURT:  Well, you know, sometimes it's the

11   absence of information, even if it's not an instruction, can

12   be really powerful.  Don't you think that's going -- that

13   might be the case here?

14             MR. DEFOSSE:  We would hope so, but in

15   representing our client, I think we are reluctant to take

16   that chance.  And we would kick ourselves later if we present

17   this at trial and they have live witnesses who say they

18   didn't use the trimming information, and we're not there

19   to -- you know, we're in the position of not being able to

20   rebut that.

21             THE COURT:  Will they be able to run -- will they

22   run into a hearsay objection if they try to say this is what

23   Kwon said or did?

24             MR. DEFOSSE:  Possibly.  I wouldn't want to waive

25   any rights to object to something they do later, but I feel

1    like there would be -- there's a risk to us, yes.

2              THE COURT:  Okay.  Now, is there a way to --

3    short of the two alternatives that you would prefer, what is

4    sanc- -- the next sanction that you would think is most

5    appropriate?

6              MR. DEFOSSE:  In all honesty, Your Honor, I can't

7    think of another sanction that would really remedy what's

8    happened here for us.  We've obviously asked for the fees

9    that are involved with this motion, but that's not going to

10   remedy the evidentiary problem we have.  And I've been

11   racking my brain for something else and can't really come up

12   with something.  I mean, we've already deposed Mr. Kwon, and

13   Your Honor saw the result of that.  So there's not another

14   way to find this information.

15             I appreciate Your Honor's checking with

16   Mr. Stanton on whether there's something recoverable from the

17   laptops, but our forensic expert agreed with what they said

18   that this information is most likely gone forever.

19             THE COURT:  No, I understand that, and I would

20   just -- you know, anything that might solve the problem would

21   be probably better.

22             You know, I've asked this of you already, but

23   you've suggested that you can't recover -- you can't obtain

24   sufficient information from other sources, but there's a lot

25   of other information.  How much does this affect the

UNREDACTED TRANSCRIPT

1    presentation of your case in the sense that it sounds like it

2    would have sort of a minor effect?

3            MR. DEFOSSE:  Well, I certainly wouldn't suggest

4    to Your Honor we can't move forward on these trade secrets

5    because of the information that's been lost.  We plan to do

6    that.  We've included these in the trade secrets that we

7    expect to pursue at trial, so I think we can present a case.

8            I would say it's the difference between

9    presenting a case that I would say is very strong and

10   presenting a case that is really irrefutable.  To have our

11   forensic expert on the stand to be able to say, here are the

12   dates of accesses for these Qorvo files, and here are the

13   other files I found on this person's computer, is what I

14   believe we would be entitled to do.

15           And in the absence of being able to do that, I'm

16   reluctant to say that -- we wouldn't have the same case.  We

17   wouldn't have the same -- we'll have a strong case, but we

18   wouldn't have the same case.  And I think that's prejudice to

19   my client, if I may.

20           THE COURT:  All right.  Well, let's go back and

21   give each of you a chance.  We're not going to -- we've

22   covered a lot of -- some of what you've submitted already.

23           Let's go back to the defense.  It seems to me

24   that we might be able to tailor something that was not an

25   instruction that they should regard the information that's

UNREDACTED TRANSCRIPT

30

1    lost as unfavorable to your client, but that the jury would

2    receive the fact that these were wiped.  That's a better

3    alternative for you than other alternatives, isn't it?

4              MR. STANTON:  Than some other alternatives, Your

5    Honor.  You know, there's -- you know, the details are

6    important here.  As Mr. DeFosse pointed out, the Kwon

7    circumstance is different than the Morgan circumstance in two

8    important respects.

9              One is, for Morgan, Spickler testified that he

10   did check to ensure that user created files were being

11   synchronized with the OneDrive account, and so there really

12   isn't evidence of any unique files being lost from his system

13   or kind of the time stamp metadata that goes with them.

14   There is additional forensic information available on a

15   laptop that you can connect the dots with, but there's that

16   distinction.

17             For Kwon, though, we're not talking about a

18   particular document from Qorvo that has been identified that

19   Kwon is suspected of having.  That's their speculation.

20             Our speculation is that that document would not

21   have been there.  The evidence with respect to the Kwon drive

22   is entirely mixed as to whether it would be helpful to

23   Akoustis or helpful to Qorvo.  We don't know.

24             I wish we had the drive because I think it would

25   show that he didn't have any Qorvo documents that he was

UNREDACTED TRANSCRIPT

1    using, that, you know, the multitude of e-mails that we

2    produced, you know, are the documents of relevance here and,

3    you know, demonstrate the facts that are relevant to the

4    claim, not, you know, some imagined document that might have

5    been on Mr. Kwon's computer.

6            So I think that's -- you know, it's hard to have

7    an adverse instruction or an instruction at all on that

8    record where, you know, they're saying that Kwon created a

9    PowerPoint.  I think his testimony was he created it from

10   memory, you know.  And there isn't another document that's

11   been associated with it.  Maybe it would have been there, but

12   maybe not.

13           THE COURT:  Well, he's not disputing that he

14   created -- that the PowerPoint utilized information that he

15   acquired at the plaintiff, right?

16           MR. STANTON:  Right.  I think it's called, you

17   know, Qorvo trim process, so that information is available.

18   But that information, I mean, one of the important things is

19   here on page 5 and 6 of the opening brief, Qorvo identifies a

20   whole lot of information about Morgan's activities and Kwon's

21   activities.  These are available from the extensive

22   productions that Akoustis has made here.  And I think it's

23   just important that, you know, this prejudice needs to be

24   viewed on a continuum.  It's not a zero sum game.

25           We're talking about a company, a small company,

UNREDACTED TRANSCRIPT

1    as the Court has noted in prior hearings, a startup who has

2    been entirely cooperative with this discovery process, has

3    turned over, you know, over a million pages of records,

4    half -- you know, 50,000 native files.  Then we did the

5    forensic inspection.  You know, there's a massive amount of

6    information that's been available.

7            And as we pointed out in the opposition brief,

8    there are a lot of ways to demonstrate access and use, and

9    one of those is by sharing materials, which happened through

10   e-mail and otherwise.  Another is by looking at what was used

11   and how the processes relate to each other at Akoustis and

12   Qorvo.

13           So, you know, I think the prejudice here with

14   respect to these is de minimus and that implementing some

15   kind of, you know, jury instruction on it draws unfair

16   attention and is far more prejudicial than any harm and far

17   surpasses the idea of a curative remedy under Rule 37(e)(1).

18           THE COURT:  Right.  You -- I mean, again, I think

19   it's clear, though, you don't dispute that they would be able

20   to show that two of the computers involved, Kwon's included,

21   were wiped at Akoustis.  That's not something --

22           MR. STANTON:  No.

23           THE COURT:  They would be able to show that,

24   right?

25           MR. STANTON:  I mean, I don't know that they

UNREDACTED TRANSCRIPT

1    should be.  To me, It seems like that's prejud- -- that's

2    more prejudicial than probative in this case, that the jury

3    can draw, you know, sort of negative inferences if that's an

4    instruction that comes along.  It does require a mini trial

5    of the parties arguing about what might have been on that

6    drive and what might not have been on that drive.  I think

7    it's a very big distraction in the scheme of the amount of

8    information that's been made available, and it bears

9    repeating.

10            We're talking about voluntary productions that

11   Akoustis made over many months that have now, you know, led

12   to a trade secret disclosures that has 85 different

13   categories and a couple hundred different documents that have

14   been specifically cited.  This isn't a case where Akoustis

15   has been operating with any sort of an intent to deprive

16   Qorvo of information needed to, you know, advance its

17   litigation claim here.

18            THE COURT:  I'm going to let counsel opposite

19   respond to that.  And I assume that Kwon's is going to be a

20   video deposition anyway that will be played, is that right,

21   plaintiff's counsel?

22            MR. DEFOSSE:  Yes, that's right, Your Honor.

23            THE COURT:  Right.  I'm going to let you respond

24   too, though.

25            MR. DEFOSSE:  Yes, so just a few points.

34

1    Mr. Stanton said that for Morgan, Mr. Spickler considered

2    whether they were locally saved files, and I would

3    respectfully submit that claim has no credibility.  They've

4    produced 12 computers to us.  A hundred percent of those have

5    locally saved files.  Mr. Spickler didn't say where he

6    searched.  You know, for example, did he search the user

7    folder for files?

8              So we have no idea is it -- and to have us

9    believe that Morgan was the only person that was not saving

10   locally -- saving files locally, I think is a stretch.  I

11   think Mr. Stanton's comments about Mr. Kwon's computer and

12   what it would or would not have shown highlight exactly the

13   prejudice to us.  I think he just evidenced that they want to

14   show up and say, well, Mr. Kwon wasn't actually copying Qorvo

15   materials when he --

16             THE COURT:  Well, they might be -- they may not

17   be able to do that, though.  I think we could simply rule

18   that you can't make that inquiry because they destroyed the

19   computer.

20             MR. DEFOSSE:  That is one of the requests that we

21   made --

22             THE COURT:  Right.

23             MR. DEFOSSE:  -- in conjunction with the adverse

24   inference sanctions, but I guess we could break that part out

25   and just have a prohibition on submitting evidence contrary

UNREDACTED TRANSCRIPT

1    to what we submit is an option as well.

2              THE COURT:  And I think that might -- that's

3    certainly a more narrow source of relief and avoids some of

4    the problems that we run into with the stronger -- any

5    stronger instruction.

6              MR. DEFOSSE:  With an adverse inference, yes.

7    Yes, Your Honor, that would be another form of relief.

8              THE COURT:  You and I both know that the adverse

9    inferences can only be -- it' just -- you know, you know the

10   problem there.

11             MR. DEFOSSE:  It's a high bar.

12             THE COURT:  It's a high bar.  Now, did you want

13   to say anything further in response to Mr. Stanton, though,

14   last remarks?

15             MR. DEFOSSE:  Just two short things, Your Honor.

16   One, Mr. Stanton has referenced the size of Akoustis.  I

17   mean, as we mentioned before, this is a -- they have 400

18   employees.  They're a publicly traded company.  They know how

19   to implement litigation hold.

20             THE COURT:  What is their current -- just so I'll

21   know, what's their current market valuation?

22             MR. DEFOSSE:  Mr. Stanton may be in a better

23   position to address that.

24             MR. STANTON:  Your Honor, their stock price as of

25   today is down to 67 cents and the market cap is $48 million.

1              THE COURT:  Okay.  I just -- it just kind of

2    helps keep things in perspective.

3              MR. STANTON:  Sure.

4              MR. DEFOSSE:  Then the last thing, Your Honor, is

5    Mr. Stanton referenced the large amount of materials they

6    produced and how they've been -- Akoustis has been completely

7    cooperative in discovery is what I wrote down.  I think that

8    I would disagree with that quite strongly.

9              And the one thing I would highlight for Your

10   Honor is we've deposed now a number of Akoustis's witnesses,

11   and I think almost without exception, the depositions start

12   by us asking for them to tell about the Qorvo confidential

13   information that they've had possession of and used.  And

14   witness after witness has denied having Qorvo information.

15             And then we spend the next multiple hours walking

16   through the files that have been found, the Qorvo documents

17   that have been found in their files.  And to me that's

18   important here because it just shows, again, without the

19   ability to access the computers for these witnesses and have

20   those files that they were storing locally, we're

21   disadvantaged because I think these witnesses, like the other

22   Akoustis employees, are very quick to have, I think what we

23   call selective amnesia in their depositions.  They don't

24   recall.  They never took any Qorvo information, and as soon

25   as you start showing it to them, oh, I can't remember this, I

37

1    don't recall this, I don't know how I got this.

2            And with Kwon and Morgan, we don't even have the

3    ability to do that.  So thank you, Your Honor.

4            THE COURT:  Sure, no problem.

5            And last chance to say anything, Mr. Stanton, on

6    this matter.

7            MR. STANTON:  Well, Your Honor, if the Court is

8    inclined to find that they've been prejudiced by this and

9    issue sanctions, I think that, you know, at most, we're

10    dealing with a negligence or maybe even a grossly negligent

11    situation for Akoustis.  This is not a case of an intent to

12    deprive.  So it still remains a curative remedy under Rule

13    37(e)(1).

14            And there, you know, it seems at most that any

15    instruction might be that, you know, there was information

16    that was just lost, you know, but whether that finding is

17    important to the jury or not should be left to the jury.  You

18    know, we should be careful not to attempt to influence a jury

19    in the nature of an adverse inference instruction with

20    whatever ruling that the Court makes here.

21            THE COURT:  Well, I don't know if it was lost.  I

22    mean, it was deliberately destroyed supposedly pursuant to a

23    policy of the company.  And Spickler was the person in charge

24    of the department in the absence of the vice president of IT,

25    and Spickler was never told of a hold.

UNREDACTED TRANSCRIPT

38

1      So those pieces of information -- you would agree

2  that those pieces of information would be true; is that

3  right, Mr. Stanton?

4      MR. STANTON:  It is an imperfectly implemented

5  hold in those respects, Your Honor, yes.

6      THE COURT:  Well, yes, but you agree with the

7  facts that I just stated, right?  Those are facts?

8      MR. STANTON:  To my understanding, yes.

9      THE COURT:  Okay.  And, of course, under Rule 16,

10  statements made and facts admitted during a hearing can

11  become and do become facts that are established in the case.

12  So we need to see where we need to go from here.

13      All right.  I think that's been very helpful to

14  hear from both of you, but I think we probably need to

15  consider wrapping up at this time.

16      I will go back and say, last word, if you want

17  one.  I think we've got all the papers.  We have all the

18  material.

19      So, Mr. DeFosse, I suppose you always get the

20  last word on your side.  I think you've already said it.

21      MR. DEFOSSE:  Just thank you, Your Honor.

22      THE COURT:  No problem at all.

23      Mr. Stanton, always good to see you.  This is a

24  very interesting matter.

25      MR. STANTON:  Yes.  Interesting.  Thank you, Your

UNREDACTED TRANSCRIPT

1   Honor.

2          You know, I think that the proposition that I

3   leave the Court with is that it's on Qorvo to establish that

4   the information that has been lost would have been favorable

5   to it.  That doesn't need to be the onerous standard, but

6   here, you know, the prejudice, as the Court has suggested in

7   a couple of your questions, is minimal.  There's a massive

8   amount of information that's been produced.  There's a strong

9   record.  These are -- in the overall scheme of things and

10  kind of in a proportional way, this prejudice is de minimus.

11         THE COURT:  All right.  Well, I think we can go

12  ahead and be in adjournment on this matter, and we're going

13  to work on the order.  Thank you.

14         MR. DEFOSSE:  Thank you.

15         MR. STANTON:  Thank you.

16         (Adjournment.)

17

18

19

20

21

22

23

24

25

1                      **C E R T I F I C A T E**

2

3

4          I, TINA DuBOSE GIBSON, do hereby certify that the

5    foregoing 39 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the motion hearing held on the 20th day of

8    November, 2023, in the matter of:

9

10   QORVO, INC.

11   vs.

12   AKOUSTIS TECHNOLOGIES, INC.,
     AND AKOUSTIS, INC.

13

14

15   Dated this 25th day of November, 2023.

16

17                      s/Tina DuBose Gibson

18                      _____
                        TINA DuBOSE GIBSON, RPR, RCR
                        Official Court Reporter
19                      United States District Court
                        Western District of Tennessee
20

21

22

23

24

25

                        UNREDACTED TRANSCRIPT

— 1 —

## $

**$48** [1] - 35:25

## 1

**12** [1] - 34:4
**14** [1] - 24:16
**16** [1] - 38:9

## 2

**20** [1] - 3:2
**2020** [1] - 7:23
**2021** [2] - 19:8, 19:10
**2022** [1] - 7:19
**2023** [1] - 3:2
**25** [1] - 4:4

## 3

**35** [1] - 4:4
**37** [3] - 7:2, 8:25, 26:17
**37(e)(1)** [1] - 8:12
**37(e)(1)** [2] - 32:17, 37:13
**37(e)(2** [1] - 10:17

## 4

**400** [2] - 4:7, 35:17
**400-plus** [1] - 4:10
**42** [1] - 4:4

## 5

**5** [1] - 31:19
**50,000** [1] - 32:4

## 6

**6** [1] - 31:19
**67** [1] - 35:25

## 8

**85** [1] - 33:12

## A

**ability** [2] - 36:19, 37:3
**able** [15] - 9:11, 11:3, 12:16, 26:8, 26:13, 26:15, 26:16, 27:19, 27:21, 29:11, 29:15, 29:24, 32:19, 32:23, 34:17

**absence** [3] - 27:11, 29:15, 37:24
**absent** [1] - 6:13
**abundance** [1] - 24:22
**access** [4] - 9:15, 22:2, 32:8, 36:19
**accessed** [1] - 12:13
**accesses** [2] - 26:3, 29:12
**accessing** [1] - 25:20
**according** [1] - 19:17
**account** [3] - 24:11, 30:11
**accounts** [1] - 24:9
**acquired** [1] - 31:15
**acting** [3] - 14:2, 24:24, 25:1
**activities** [2] - 31:20, 31:21
**additional** [1] - 30:14
**address** [1] - 35:23
**adjournment** [1] - 39:12
**Adjournment** [1] - 39:16
**admitted** [1] - 38:10
**advance** [1] - 33:16
**adverse** [7] - 8:12, 10:15, 31:7, 34:23, 35:6, 35:8, 37:19
**affect** [1] - 28:25
**agree** [3] - 10:13, 38:1, 38:6
**agreed** [1] - 28:17
**ahead** [2] - 19:3, 39:12
**Akoustis** [23] - 11:9, 11:17, 14:11, 14:12, 21:16, 22:5, 23:18, 23:20, 23:24, 24:3, 24:7, 24:24, 26:24, 30:23, 31:22, 32:11, 32:21, 33:11, 33:14, 35:16, 36:6, 36:22, 37:11
**Akoustis's** [4] - 12:25, 15:20, 25:25, 36:10
**allowed** [2] - 18:11, 18:13
**almost** [1] - 36:11
**alternative** [1] - 30:3
**alternatives** [3] - 28:3, 30:3, 30:4
**amnesia** [1] - 36:23
**amount** [6] - 12:4, 12:22, 32:5, 33:7, 36:5, 39:8
**answer** [2] - 20:18, 25:4
**Anthony** [1] - 5:15
**anticipated** [1] - 26:9
**anytime** [1] - 14:23
**anyway** [1] - 33:20
**apologize** [1] - 7:16
**applied** [3] - 6:25, 7:8, 7:14
**applies** [1] - 3:17
**apply** [3] - 7:4, 7:5, 10:17
**appreciate** [1] - 28:15
**appropriate** [3] - 8:1, 8:7, 28:5

**appropriately** [1] - 6:4
**archived** [1] - 23:19
**archives** [1] - 23:15
**arguing** [1] - 33:5
**artifacts** [3] - 9:14, 12:11, 27:7
**aspects** [1] - 13:14
**associate** [2] - 22:16, 23:2
**associated** [1] - 31:11
**assume** [1] - 33:19
**attempt** [1] - 37:18
**attention** [1] - 32:16
**authorities** [1] - 10:14
**authorize** [1] - 15:8
**automatically** [1] - 6:7
**available** [6] - 21:1, 30:14, 31:17, 31:21, 32:6, 33:8
**avoid** [5] - 9:2, 24:8, 24:13, 24:25
**avoids** [1] - 35:3
**aware** [1] - 24:7

## B

**backed** [3] - 6:4, 12:3
**bar** [2] - 35:11, 35:12
**based** [2] - 19:24, 20:1
**basic** [1] - 4:1
**bears** [1] - 33:8
**become** [2] - 38:11
**begin** [1] - 10:25
**behavior** [1] - 24:19
**belongs** [1] - 21:25
**Bender** [1] - 23:18
**beneficial** [1] - 20:20
**best** [3] - 7:13, 13:3, 14:5
**better** [3] - 28:21, 30:2, 35:22
**between** [2] - 11:17, 29:8
**big** [1] - 33:7
**Bistrian** [1] - 7:22
**bit** [1] - 6:12
**board** [1] - 18:4
**bottom** [1] - 6:22
**box** [1] - 9:25
**brain** [1] - 28:11
**breadth** [1] - 12:8
**break** [1] - 34:24
**brief** [2] - 31:19, 32:7
**brought** [2] - 23:16, 23:20
**building** [1] - 12:24
**burden** [2] - 10:11, 10:18

## C

**calculations** [1] - 11:11
**cap** [1] - 35:25

**careful** [1] - 37:18
**case** [38] - 3:7, 3:11, 3:16, 3:21, 6:23, 7:13, 7:18, 7:19, 7:22, 8:22, 9:4, 10:20, 14:8, 21:23, 22:3, 22:9, 23:4, 23:5, 23:7, 23:12, 23:16, 24:4, 24:14, 24:17, 24:21, 26:16, 27:13, 29:1, 29:7, 29:9, 29:10, 29:16, 29:17, 29:18, 33:2, 33:14, 37:11, 38:11
**cases** [6] - 6:19, 6:25, 7:13, 8:8, 8:18, 21:23
**categories** [1] - 33:13
**cautious** [1] - 26:18
**central** [1] - 21:17
**centralized** [1] - 22:1
**cents** [1] - 35:25
**certain** [1] - 3:19
**certainly** [2] - 29:3, 35:3
**chance** [4] - 9:22, 27:16, 29:21, 37:5
**charge** [3] - 3:10, 18:10, 37:23
**check** [3] - 20:7, 20:9, 30:10
**checked** [1] - 20:11
**checking** [3] - 14:24, 21:2, 28:15
**checks** [1] - 20:19
**chief** [1] - 23:24
**chose** [2] - 15:6
**Circuit** [2] - 6:19, 7:23
**circumstance** [2] - 30:7
**cited** [4] - 6:19, 7:12, 7:22, 33:14
**civil** [2] - 7:2, 7:3
**claim** [3] - 31:4, 33:17, 34:3
**clear** [11] - 6:16, 6:20, 6:24, 6:25, 7:3, 7:6, 7:7, 10:16, 17:6, 20:12, 32:19
**clearly** [1] - 7:6
**client** [4] - 25:23, 27:15, 29:19, 30:1
**close** [1] - 11:16
**Cloud** [1] - 21:14
**clued** [1] - 17:16
**command** [7] - 16:13, 16:16, 16:17, 18:10, 18:16, 18:20, 18:22
**comment** [1] - 23:10
**comments** [1] - 34:11
**communicated** [2] - 17:24, 18:2
**communication** [1] - 17:23
**company** [13] - 14:23, 15:24, 17:15, 17:24, 18:1, 19:7, 19:9, 21:25, 23:7, 31:25, 35:18, 37:23

**complaint** [1] - 18:3
**completely** [1] - 36:6
**complications** [1] - 16:23
**comply** [1] - 5:22
**computer** [14] - 9:14, 12:2, 12:12, 12:17, 12:18, 20:5, 20:8, 21:21, 25:22, 27:8, 29:13, 31:5, 34:11, 34:19
**computer-stored** [1] - 12:12
**computers** [10] - 4:4, 5:1, 14:21, 18:7, 18:11, 21:16, 21:22, 32:20, 34:4, 36:19
**concern** [1] - 8:24
**concerning** [2] - 8:8, 9:13
**conclusion** [1] - 26:22
**confidential** [2] - 14:5, 36:12
**confirm** [1] - 15:14
**conjunction** [1] - 34:23
**connect** [1] - 30:15
**connection** [1] - 3:5
**consider** [2] - 8:10, 38:15
**considered** [2] - 18:22, 34:1
**consistent** [1] - 10:17
**contempt** [2] - 7:2, 7:3
**continuum** [1] - 31:24
**contrary** [1] - 34:25
**control** [1] - 15:7
**convincing** [8] - 6:16, 6:20, 6:24, 6:25, 7:3, 7:6, 7:7, 10:16
**cooperative** [3] - 9:19, 32:2, 36:7
**copied** [3] - 12:7, 12:19, 23:14
**copies** [2] - 22:6, 23:19
**copy** [1] - 21:18
**copying** [1] - 34:14
**corporate** [1] - 23:14
**correct** [7] - 4:13, 15:3, 17:3, 17:18, 18:18, 18:19, 21:9
**correctly** [1] - 5:17
**counsel** [5] - 11:1, 23:13, 25:25, 33:18, 33:21
**couple** [5] - 4:1, 10:25, 13:1, 33:13, 39:7
**course** [3] - 4:19, 20:18, 38:9
**Court** [9] - 8:1, 8:12, 8:25, 10:18, 32:1, 37:7, 37:20, 39:3, 39:6
**court** [1] - 7:14
**COURT** [95] - 3:5, 3:14, 4:10, 4:15, 4:22, 4:25, 5:5, 5:11, 5:14, 5:16, 5:20, 6:14,

6:21, 7:12, 7:17, 7:20, 7:24, 8:14, 8:18, 8:24, 9:18, 10:6, 10:10, 10:22, 11:19, 13:1, 13:15, 13:17, 13:23, 14:7, 14:12, 14:15, 14:20, 15:2, 15:6, 15:23, 16:3, 16:7, 16:9, 16:13, 16:16, 16:21, 16:25, 17:4, 17:7, 17:10, 17:14, 17:19, 18:6, 18:9, 18:13, 18:16, 18:23, 18:25, 19:3, 19:6, 19:11, 19:13, 19:20, 19:24, 20:3, 20:8, 20:13, 20:16, 21:4, 21:11, 22:11, 22:15, 23:9, 24:21, 26:9, 26:13, 27:10, 27:21, 28:2, 28:19, 29:20, 31:13, 32:18, 32:23, 33:18, 33:23, 34:16, 34:22, 35:2, 35:8, 35:12, 35:20, 36:1, 37:4, 37:21, 38:6, 38:9, 38:22, 39:11
**Court's** [1] - 7:10
**covered** [1] - 29:22
**create** [1] - 9:24
**created** [7] - 11:8, 12:13, 23:25, 30:10, 31:8, 31:9, 31:14
**creating** [2] - 24:13, 25:7
**credibility** [1] - 34:3
**credible** [1] - 26:21
**critical** [1] - 21:23
**crosses** [1] - 24:18
**cumulative** [2] - 25:3, 25:5
**cumulativeness** [1] - 26:5
**curative** [2] - 32:17, 37:12
**current** [2] - 35:20, 35:21

## D

**data** [2] - 19:22, 20:25
**dates** [2] - 25:21, 29:12
**days** [1] - 23:25
**de** [2] - 32:14, 39:10
**dealing** [1] - 37:10
**death** [1] - 3:21
**decision** [2] - 7:11, 18:17
**declaration** [1] - 17:6
**declared** [1] - 17:7
**defense** [2] - 3:25, 29:23
**deficit** [1] - 27:7
**definitely** [1] - 3:7
**DEFOSSE** [36] - 6:18, 6:22, 7:15, 7:18, 7:21, 8:4, 8:17, 8:22, 9:3, 9:20, 10:8, 11:5, 11:23, 21:10, 21:15, 22:13, 22:18, 23:11, 25:4, 26:11, 26:19, 27:14, 27:24, 28:6, 29:3, 33:22, 33:25, 34:20, 34:23, 35:6, 35:11, 35:15,

35:22, 36:4, 38:21, 39:14
**DeFosse** [5] - 3:10, 11:2, 26:10, 30:6, 38:19
**degree** [5] - 11:2, 11:3, 11:19, 22:15, 25:3
**degrees** [1] - 25:6
**Delaware** [2] - 7:14, 7:19
**delete** [1] - 15:8
**deleted** [3] - 15:2, 15:7, 15:11
**deletion** [2] - 6:8, 15:1
**deliberately** [2] - 24:24, 37:22
**demonstrate** [2] - 31:3, 32:8
**denied** [1] - 36:14
**departing** [1] - 6:7
**department** [15] - 5:3, 6:10, 13:11, 13:12, 15:12, 16:1, 16:4, 16:12, 17:1, 17:15, 18:7, 18:10, 18:17, 19:5, 37:24
**deposed** [2] - 28:12, 36:10
**deposition** [1] - 33:20
**depositions** [2] - 36:11, 36:23
**deprive** [2] - 33:15, 37:12
**derived** [1] - 12:19
**destroy** [1] - 4:12
**destroyed** [4] - 4:25, 10:5, 24:16, 34:18, 37:22
**destruction** [2] - 8:6, 23:6
**detail** [1] - 12:22
**detailed** [1] - 11:11
**details** [1] - 30:5
**detection** [2] - 24:8, 24:25
**determined** [1] - 8:1
**developed** [1] - 27:1
**devices** [1] - 15:1
**difference** [1] - 29:8
**different** [4] - 3:9, 30:7, 33:12, 33:13
**direction** [2] - 19:13, 19:16
**director** [3] - 15:21, 18:4, 22:24
**disadvantaged** [1] - 36:21
**disagree** [1] - 36:8
**disagreement** [1] - 3:18
**disclosures** [1] - 33:12
**discovered** [2] - 22:4, 23:22
**discovery** [3] - 23:21, 32:2, 36:7
**discuss** [1] - 8:5
**discussing** [1] - 12:12
**dispute** [1] - 32:19
**disputing** [1] - 31:13
**distinction** [1] - 30:16

**distraction** [1] - 33:7
**District** [1] - 7:22
**disturb** [1] - 13:25
**document** [6] - 25:16, 25:17, 30:18, 30:20, 31:4, 31:10
**documents** [11] - 4:20, 11:7, 11:15, 12:7, 12:17, 22:20, 24:13, 30:25, 31:2, 33:13, 36:16
**done** [1] - 5:6
**dots** [1] - 30:15
**double** [1] - 21:2
**double-checking** [1] - 21:2
**down** [2] - 35:25, 36:7
**draw** [1] - 33:3
**draws** [1] - 32:15
**drive** [10] - 12:20, 19:23, 23:25, 24:2, 24:3, 30:21, 30:24, 33:6
**duplicated** [1] - 22:22
**during** [2] - 16:25, 38:10

## E

**e-mail** [7] - 23:16, 23:19, 24:9, 25:12, 25:18, 26:6, 32:10
**e-mails** [3] - 4:20, 25:15, 31:1
**early** [1] - 13:5
**Eastern** [1] - 7:22
**effect** [1] - 29:2
**effort** [1] - 20:18
**elements** [2] - 7:4, 7:5
**emergency** [1] - 6:12
**employee** [5] - 5:9, 5:10, 21:20, 22:5, 23:18
**employees** [8] - 4:7, 6:7, 9:12, 18:6, 24:7, 24:25, 35:18, 36:22
**engineer** [4] - 19:4, 22:19, 22:21, 25:6
**ensure** [2] - 6:5, 30:10
**ensured** [1] - 6:3
**entire** [2] - 23:15, 23:19
**entirely** [2] - 30:22, 32:2
**entitled** [1] - 29:14
**entrusting** [1] - 15:21
**equipment** [1] - 20:23
**equivalent** [1] - 3:21
**erase** [3] - 18:11, 18:17, 19:14
**erased** [1] - 19:14
**erasing** [1] - 18:7
**establish** [1] - 39:3
**established** [1] - 38:11
**evaluating** [2] - 10:15,

10:19
**everyday** [1] - 18:6
**evidence** [14] - 6:24, 6:25, 7:6, 7:11, 8:9, 9:11, 10:20, 16:18, 17:2, 24:6, 24:22, 30:12, 30:21, 34:25
**evidenced** [1] - 34:13
**evidentiary** [1] - 28:10
**exactly** [6] - 8:17, 10:4, 10:22, 18:20, 34:12
**examination** [1] - 11:3
**examine** [1] - 20:5
**examined** [1] - 17:11
**examiner** [1] - 20:25
**example** [5] - 9:8, 12:20, 22:3, 25:13, 34:6
**exception** [1] - 36:11
**excerpts** [1] - 9:21
**excuse** [3] - 13:17, 13:23, 15:6
**Excuse** [1] - 13:17
**executives** [1] - 18:4
**exhausted** [1] - 20:22
**exist** [1] - 21:22
**expect** [3] - 26:11, 26:23, 29:7
**experience** [1] - 8:21
**expert** [4] - 12:11, 12:15, 28:17, 29:11
**explanation** [1] - 14:6
**extensive** [1] - 31:21
**extent** [1] - 7:2
**external** [2] - 12:20, 23:25
**eye** [2] - 16:22, 16:23

## F

**face** [1] - 27:6
**facility** [4] - 4:9, 5:4, 5:8, 5:10
**fact** [2] - 13:8, 30:2
**factory** [1] - 20:2
**facts** [5] - 31:3, 38:7, 38:10, 38:11
**failure** [1] - 5:22
**fallback** [1] - 8:4
**far** [2] - 32:16
**favorable** [2] - 7:21, 39:4
**fees** [1] - 28:8
**fellow** [1] - 16:14
**few** [2] - 11:25, 33:25
**file** [2] - 22:1, 26:3
**filed** [1] - 14:8
**files** [27] - 9:15, 12:2, 12:12, 12:14, 13:4, 21:8, 21:12, 21:21, 22:6, 22:8, 22:22, 24:2, 25:22, 27:8, 29:12, 29:13, 30:10, 30:12, 32:4,

34:2, 34:5, 34:7, 34:10, 36:16, 36:17, 36:20
**final** [1] - 21:1
**fine** [2] - 7:17, 10:10
**first** [2] - 3:17, 13:10
**flag** [1] - 24:18
**focused** [1] - 16:11
**folder** [3] - 21:18, 24:1, 34:7
**folders** [2] - 21:16, 21:21
**folks** [2] - 15:18, 16:12
**followed** [1] - 8:20
**forensic** [12] - 12:11, 12:15, 20:25, 22:4, 22:10, 23:17, 25:19, 26:2, 28:17, 29:11, 30:14, 32:5
**forever** [2] - 3:8, 28:18
**form** [1] - 35:7
**former** [2] - 5:8, 5:10
**forth** [1] - 26:15
**forward** [1] - 29:4
**function** [1] - 18:7
**futile** [1] - 20:18

## G

**game** [1] - 31:24
**generally** [1] - 7:1
**gentleman's** [1] - 22:13
**given** [2] - 8:3, 26:17
**grant** [1] - 8:12
**granted** [1] - 8:5
**grossly** [1] - 37:10
**group** [2] - 6:1, 13:13
**groups** [1] - 9:6
**Grumman** [1] - 10:9
**guess** [2] - 26:4, 34:24

## H

**half** [2] - 4:8, 32:4
**hard** [1] - 31:6
**harm** [1] - 32:16
**harsher** [1] - 10:15
**heading** [1] - 11:10
**hear** [1] - 38:14
**hearing** [1] - 38:10
**hearings** [1] - 32:1
**hearsay** [1] - 27:22
**heightened** [1] - 10:18
**held** [1] - 19:17
**help** [1] - 4:11
**helpful** [3] - 30:22, 30:23, 38:13
**helps** [1] - 36:2
**hesitant** [1] - 22:1
**high** [3] - 26:4, 35:11, 35:12

**higher** [2] - 23:3, 24:19
**highlight** [2] - 34:12, 36:9
**highly** [1] - 22:19
**himself** [6] - 13:20, 14:19, 14:21, 15:7, 15:20, 24:2
**hired** [1] - 22:21
**hold** [14] - 4:14, 4:15, 6:2, 14:24, 15:14, 15:16, 15:17, 17:24, 18:3, 18:24, 35:19, 37:25, 38:5
**honesty** [1] - 28:6
**Honor** [36] - 5:10, 5:19, 6:18, 7:15, 8:4, 8:17, 9:3, 9:22, 10:9, 10:13, 11:5, 11:23, 13:13, 16:12, 19:21, 20:11, 20:24, 21:10, 23:2, 24:15, 26:19, 28:6, 28:13, 29:4, 30:5, 33:22, 35:7, 35:15, 35:24, 36:4, 36:10, 37:3, 37:7, 38:5, 38:21, 39:1
**Honor's** [1] - 28:15
**hope** [1] - 27:14
**Houlden** [1] - 23:25
**hours** [1] - 36:15
**hundred** [2] - 33:13, 34:4
**hundreds** [1] - 4:19
**Huntersville** [3] - 4:9, 5:3, 5:8
**hypothetically** [1] - 18:15

## I

**idea** [2] - 32:17, 34:8
**identified** [1] - 30:18
**identifies** [1] - 31:19
**imaged** [1] - 19:22
**imagine** [1] - 24:15
**imagined** [1] - 31:4
**impeach** [1] - 27:9
**imperfectly** [1] - 38:4
**implement** [2] - 6:2, 35:19
**implemented** [3] - 6:5, 12:5, 38:4
**implementing** [1] - 32:14
**implicates** [1] - 7:3
**important** [15] - 3:6, 7:4, 8:10, 8:16, 9:5, 9:8, 12:24, 25:22, 30:6, 30:8, 31:18, 31:23, 36:18, 37:17
**imposing** [1] - 8:25
**inclined** [1] - 37:8
**include** [2] - 8:7, 12:3
**included** [2] - 29:6, 32:20
**including** [2] - 10:15, 17:17
**individuals** [10] - 3:9, 4:19, 5:2, 14:9, 15:1, 15:16, 15:24, 18:2, 18:3, 22:16
**industry** [1] - 27:2

**inference** [5] - 8:13, 10:16, 34:24, 35:6, 37:19
**inferences** [2] - 33:3, 35:9
**influence** [1] - 37:18
**information** [47] - 3:9, 6:1, 9:13, 9:24, 10:1, 10:5, 11:4, 11:6, 11:21, 11:24, 12:4, 12:12, 13:5, 13:6, 13:9, 18:8, 18:12, 18:17, 19:5, 21:25, 24:9, 24:10, 25:2, 27:11, 27:18, 28:14, 28:18, 28:24, 28:25, 29:5, 29:25, 30:14, 31:14, 31:17, 31:18, 31:20, 32:6, 33:8, 33:16, 36:13, 36:14, 36:24, 37:15, 38:1, 38:2, 39:4, 39:8
**informed** [1] - 5:24
**inquire** [1] - 11:4
**inquiry** [2] - 21:6, 34:18
**inspection** [4] - 22:4, 22:10, 23:17, 32:5
**instance** [2] - 7:7, 15:5
**instruction** [15] - 8:1, 8:2, 8:7, 8:19, 10:16, 26:17, 27:11, 29:25, 31:7, 32:15, 33:4, 35:5, 37:15, 37:19
**instructions** [1] - 3:20
**integrally** [1] - 9:9
**intent** [3] - 24:25, 33:15, 37:11
**interesting** [2] - 38:24, 38:25
**interim** [1] - 6:13
**interrupt** [3] - 6:8, 13:21, 15:15
**interrupting** [1] - 14:25
**intimately** [1] - 13:13
**involved** [7] - 9:9, 13:13, 14:10, 22:20, 23:23, 28:9, 32:20
**IOENGINE** [1] - 7:18
**irrefutable** [1] - 29:10
**irresponsible** [1] - 15:22
**irresponsibly** [1] - 14:3
**issue** [5] - 9:1, 16:10, 16:19, 16:21, 37:9
**issued** [5] - 5:25, 6:7, 15:12, 15:17, 19:19
**issues** [2] - 9:9, 16:24
**IT** [15] - 5:3, 6:1, 6:10, 13:10, 13:12, 15:12, 15:13, 15:21, 15:22, 17:1, 17:15, 18:5, 18:6, 19:12, 37:24
**it'** [1] - 35:9
**itself** [1] - 14:11

4

## J

**James** [1] - 16:14
**Jimmy** [1] - 16:14
**job** [1] - 14:15
**Joel** [1] - 4:18
**joining** [1] - 11:8
**Joonbum** [1] - 4:18
**June** [1] - 19:10
**jury** [15] - 8:6, 8:7, 8:15, 9:1, 12:23, 26:7, 26:20, 26:22, 26:25, 30:1, 32:15, 33:2, 37:17, 37:18

## K

**keep** [1] - 36:2
**kept** [2] - 15:7, 16:24
**key** [1] - 24:17
**kick** [1] - 27:16
**kind** [7] - 9:13, 10:17, 14:25, 30:13, 32:15, 36:1, 39:10
**knowledge** [1] - 16:6
**known** [1] - 14:10
**knows** [1] - 17:15
**Kwon** [22] - 4:18, 9:9, 9:18, 10:7, 10:8, 11:3, 12:8, 22:21, 22:23, 25:2, 25:5, 26:9, 27:2, 27:23, 28:12, 30:6, 30:17, 30:19, 30:21, 31:8, 34:14, 37:2
**Kwon's** [6] - 12:17, 31:5, 31:20, 32:20, 33:19, 34:11

## L

**lap** [1] - 4:24
**laptop** [12] - 11:14, 11:15, 11:16, 12:15, 16:15, 19:16, 20:2, 22:6, 23:14, 24:1, 25:8, 30:15
**laptops** [8] - 4:13, 4:18, 6:6, 6:9, 8:6, 23:6, 24:16, 28:17
**large** [2] - 12:22, 36:5
**last** [7] - 5:17, 23:22, 35:14, 36:4, 37:5, 38:16, 38:20
**lawyers** [1] - 17:17
**lays** [1] - 11:9
**leave** [2] - 8:5, 39:3
**leaves** [1] - 14:23
**leaving** [1] - 24:1
**led** [1] - 33:11
**left** [4] - 15:23, 15:24, 37:17
**legal** [2] - 6:2, 14:24
**less** [2] - 4:8, 9:18

**lesser** [1] - 10:19
**level** [4] - 23:3, 24:20, 26:4, 26:7
**likely** [1] - 28:18
**line** [2] - 6:22, 24:19
**lines** [1] - 8:8
**list** [1] - 14:24
**litigation** [5] - 14:5, 14:13, 24:17, 33:17, 35:19
**live** [2] - 26:23, 27:17
**local** [1] - 21:14
**locally** [13] - 11:16, 12:2, 21:8, 21:12, 21:20, 22:6, 22:7, 27:9, 34:2, 34:5, 34:10, 36:20
**location** [4] - 4:3, 4:9, 5:3, 18:11
**look** [5] - 3:25, 9:22, 12:16, 17:19, 19:1
**looking** [1] - 32:10
**looks** [2] - 13:3
**lost** [6] - 29:5, 30:1, 30:12, 37:16, 37:21, 39:4
**lucky** [1] - 20:20

## M

**machine** [1] - 21:2
**mail** [7] - 23:16, 23:19, 24:9, 25:12, 25:18, 26:6, 32:10
**mails** [3] - 4:20, 25:15, 31:1
**major** [1] - 24:18
**market** [2] - 35:21, 35:25
**massive** [2] - 32:5, 39:7
**match** [1] - 11:16
**material** [5] - 12:8, 16:5, 19:14, 23:10, 38:18
**materials** [8] - 11:17, 12:24, 23:12, 25:8, 25:10, 32:9, 34:15, 36:5
**matter** [7] - 3:22, 6:23, 7:10, 23:21, 37:6, 38:24, 39:12
**matters** [1] - 9:19
**mean** [17] - 4:4, 6:22, 11:20, 11:21, 13:8, 14:2, 14:7, 14:21, 18:19, 19:22, 21:4, 28:12, 31:18, 32:18, 32:25, 35:17, 37:22
**means** [2] - 20:2, 20:3
**medical** [4] - 6:11, 16:19, 16:21, 16:24
**memory** [1] - 31:10
**mentioned** [2] - 23:12, 35:17
**metadata** [1] - 30:13
**might** [14] - 8:25, 20:10,

20:17, 20:20, 24:15, 27:13, 28:20, 29:24, 31:4, 33:5, 33:6, 34:16, 35:2, 37:15
**million** [2] - 32:3, 35:25
**mind** [1] - 18:20
**mini** [2] - 9:1, 33:4
**minimal** [1] - 39:7
**minimus** [2] - 32:14, 39:10
**minor** [1] - 29:2
**minute** [3] - 5:9, 13:15, 13:17
**misappropriated** [2] - 9:10, 21:24
**misappropriation** [2] - 11:24, 23:23
**missing** [3] - 11:25, 12:10, 21:8
**misunderstood** [1] - 6:17
**mixed** [2] - 10:14, 30:22
**MONDAY** [1] - 3:1
**monitor** [2] - 6:6, 13:21
**month** [4] - 11:8, 16:24, 16:25, 17:16
**months** [2] - 24:16, 33:11
**Morgan** [13] - 4:18, 16:15, 22:24, 25:3, 25:9, 25:10, 25:14, 25:24, 30:7, 30:9, 34:1, 34:9, 37:2
**Morgan's** [1] - 31:20
**most** [7] - 8:1, 21:23, 25:6, 28:4, 28:18, 37:9, 37:14
**motion** [5] - 3:6, 6:16, 7:3, 28:9
**move** [1] - 29:4
**MR** [98] - 3:13, 4:7, 4:13, 4:17, 4:24, 5:2, 5:7, 5:12, 5:15, 5:18, 5:24, 6:18, 6:22, 7:15, 7:18, 7:21, 8:4, 8:17, 8:22, 9:3, 9:20, 10:8, 10:13, 11:5, 11:23, 13:12, 13:16, 13:20, 14:4, 14:9, 14:14, 14:18, 14:22, 15:4, 15:10, 16:2, 16:6, 16:8, 16:10, 16:14, 16:19, 16:22, 17:3, 17:5, 17:9, 17:12, 17:18, 18:1, 18:8, 18:12, 18:15, 18:19, 18:24, 19:2, 19:4, 19:8, 19:12, 19:15, 19:21, 20:1, 20:7, 20:10, 20:15, 20:24, 21:10, 21:15, 22:13, 22:18, 23:11, 25:4, 26:11, 26:19, 27:14, 27:24, 28:6, 29:3, 30:4, 31:16, 32:22, 32:25, 33:22, 33:25, 34:20, 34:23, 35:6, 35:11, 35:15, 35:22, 35:24, 36:3, 36:4, 37:7, 38:4, 38:8, 38:21, 38:25, 39:14, 39:15
**multiple** [2] - 22:5, 36:15

**multitude** [1] - 31:1
**mystery** [1] - 20:17

## N

**name** [6] - 5:3, 5:9, 5:17, 19:21, 22:13, 23:24
**named** [2] - 18:2, 23:18
**narrow** [1] - 35:3
**native** [1] - 32:4
**nature** [2] - 14:5, 37:19
**necessary** [1] - 3:16
**necessity** [1] - 13:5
**need** [6] - 3:8, 10:23, 38:12, 38:14, 39:5
**needed** [2] - 10:4, 33:16
**needs** [1] - 31:23
**negative** [1] - 33:3
**negligence** [1] - 37:10
**negligent** [1] - 37:10
**never** [4] - 8:22, 22:7, 36:24, 37:25
**New** [3] - 4:9, 5:4, 5:10
**next** [2] - 28:4, 36:15
**Nixon** [2] - 6:11, 19:9
**normally** [1] - 12:23
**Northrop** [1] - 10:9
**note** [1] - 23:9
**noted** [2] - 7:24, 32:1
**notified** [1] - 15:18
**NOVEMBER** [1] - 3:2
**number** [2] - 3:14, 36:10

## O

**object** [1] - 27:25
**objection** [1] - 27:22
**obtain** [2] - 24:9, 28:23
**obtained** [1] - 11:14
**obvious** [1] - 13:24
**obviously** [4] - 7:9, 11:23, 27:5, 28:8
**officer** [1] - 23:24
**once** [2] - 19:23, 26:15
**One** [1] - 35:16
**one** [18] - 5:3, 5:7, 7:1, 7:16, 9:4, 10:2, 12:2, 16:4, 16:25, 18:24, 22:3, 23:23, 30:9, 31:18, 32:9, 34:20, 36:9, 38:17
**OneDrive** [1] - 30:11
**onerous** [1] - 39:5
**ones** [2] - 16:10, 16:11
**online** [1] - 3:15
**Oorvo** [1] - 10:1
**opened** [2] - 12:14, 12:18
**opening** [1] - 31:19

5

**operating** [2] - 14:25, 33:15
**operation** [1] - 13:14
**opportunity** [1] - 23:4
**opposite** [1] - 33:18
**opposition** [1] - 32:7
**option** [1] - 35:1
**order** [7] - 5:22, 5:25, 16:5, 16:17, 17:1, 39:13
**organization** [1] - 18:4
**otherwise** [1] - 32:10
**ought** [1] - 10:17
**ourselves** [1] - 27:16
**outside** [1] - 21:21
**overall** [2] - 4:7, 39:9
**overlap** [1] - 25:9

**P**

**page** [1] - 31:19
**pages** [1] - 32:3
**papers** [1] - 38:17
**parameters** [1] - 25:11
**part** [4] - 9:4, 12:5, 22:9, 34:24
**particular** [2] - 23:6, 30:18
**particularly** [3] - 8:15, 21:8, 26:21
**parties** [1] - 33:5
**pattern** [1] - 23:7
**penalty** [1] - 3:21
**Pennsylvania** [1] - 7:23
**people** [12] - 3:15, 4:3, 4:6, 13:18, 14:16, 15:14, 15:17, 15:25, 16:3, 23:23, 24:12, 24:17
**percent** [1] - 34:4
**performed** [1] - 18:7
**perhaps** [1] - 26:10
**permission** [1] - 15:3
**person** [7] - 5:17, 21:17, 22:8, 25:14, 26:10, 34:9, 37:23
**person's** [1] - 29:13
**personal** [3] - 24:9, 24:11
**personally** [2] - 6:2, 8:22
**personnel** [1] - 13:4
**perspective** [1] - 15:20, 36:2
**picking** [1] - 8:20
**piece** [1] - 20:23
**pieces** [2] - 38:1, 38:2
**pitch** [2] - 23:3, 23:5
**place** [5] - 11:18, 15:13, 15:23, 15:24, 19:23
**plaintiff** [4] - 3:11, 6:15, 11:19, 31:15
**plaintiff's** [2] - 11:1, 33:21
**plan** [1] - 29:5

**play** [1] - 26:11
**played** [1] - 33:20
**plugged** [1] - 12:20
**point** [2] - 9:8, 20:12
**pointed** [2] - 30:6, 32:7
**points** [1] - 33:25
**policies** [1] - 25:11
**policy** [2] - 15:23, 37:23
**position** [7] - 3:11, 6:22, 8:5, 19:11, 26:15, 27:19, 35:23
**positive** [1] - 21:3
**possession** [1] - 36:13
**possibility** [1] - 20:22
**possibly** [1] - 27:24
**powerful** [1] - 27:12
**PowerPoint** [4] - 11:7, 11:18, 31:9, 31:14
**practical** [1] - 26:7
**practice** [1] - 15:15
**predominate** [2] - 9:7, 9:17
**prefer** [1] - 28:3
**prejud** [1] - 33:1
**prejudice** [8] - 25:23, 26:8, 29:18, 31:23, 32:13, 34:13, 39:6, 39:10
**prejudiced** [2] - 11:20, 37:8
**prejudicial** [2] - 32:16, 33:2
**preponderance** [2] - 7:11, 10:20
**present** [2] - 27:16, 29:7
**presentation** [3] - 11:18, 26:7, 29:1
**presentations** [1] - 11:8
**presented** [1] - 26:24
**presenting** [5] - 9:4, 9:6, 12:23, 29:9, 29:10
**preservation** [1] - 6:5
**preserve** [4] - 13:25, 16:5, 16:18, 17:1
**preserved** [2] - 4:20, 14:21
**preserving** [1] - 13:6
**president** [5] - 6:1, 13:9, 15:13, 15:22, 37:24
**pretty** [2] - 11:22, 14:2
**price** [1] - 35:24
**primarily** [2] - 25:16, 25:20
**primary** [5] - 11:7, 22:21, 23:23, 25:6, 25:14
**probative** [1] - 33:2
**problem** [8] - 5:14, 13:8, 23:5, 28:10, 28:20, 35:10, 37:4, 38:22
**problematic** [1] - 13:4
**problems** [1] - 35:4
**procedural** [1] - 11:11
**procedure** [2] - 14:25, 19:17

**procedures** [5] - 9:25, 12:6, 12:25, 25:12
**proceeding** [1] - 7:1
**process** [14] - 6:5, 6:8, 8:19, 11:10, 12:6, 14:22, 15:10, 15:22, 20:17, 22:22, 25:7, 27:1, 31:17, 32:2
**processes** [3] - 20:1, 26:1, 32:11
**produced** [10] - 4:21, 11:6, 22:9, 23:12, 23:16, 24:3, 31:2, 34:4, 36:6, 39:8
**producing** [1] - 24:13
**product** [1] - 23:24
**productions** [2] - 31:22, 33:10
**prohibition** [1] - 34:25
**proof** [1] - 10:18
**prop** [1] - 24:22
**proper** [1] - 7:10
**proportional** [1] - 39:10
**proposition** [2] - 24:24, 39:2
**protocol** [1] - 15:12
**protocols** [1] - 13:22
**provide** [1] - 23:21
**provided** [2] - 13:5, 21:19
**publicly** [3] - 14:8, 14:10, 35:18
**pull** [1] - 27:7
**pursuant** [1] - 37:22
**pursue** [1] - 29:7
**put** [1] - 15:13

**Q**

**Qorvo** [28] - 9:24, 11:13, 11:15, 11:18, 12:7, 12:17, 21:7, 22:6, 23:15, 23:20, 24:1, 25:16, 27:8, 29:12, 30:18, 30:23, 30:25, 31:17, 31:19, 32:12, 33:16, 34:4, 36:12, 36:14, 36:16, 36:24, 39:3
**Qorvo's** [2] - 11:9, 26:25
**quality** [1] - 22:25
**questions** [3] - 4:2, 9:24, 39:7
**quick** [1] - 36:22
**quite** [2] - 9:21, 36:8

**R**

**racking** [1] - 28:11
**raised** [1] - 8:23
**raises** [1] - 24:18
**Rama** [1] - 22:13

**reach** [1] - 26:22
**read** [1] - 10:2
**real** [1] - 23:7
**really** [13] - 6:23, 10:23, 12:22, 13:2, 23:1, 25:6, 26:1, 26:25, 27:12, 28:7, 28:11, 29:10, 30:11
**reason** [2] - 13:19, 21:22
**rebut** [1] - 27:20
**receive** [1] - 30:2
**recent** [1] - 7:19
**rechecking** [1] - 20:23
**recollection** [2] - 10:9, 20:12
**record** [6] - 24:6, 25:19, 26:2, 31:8, 39:9
**records** [3] - 24:13, 25:12, 32:3
**recover** [1] - 28:23
**recoverable** [2] - 19:22, 28:16
**recovering** [2] - 16:22, 21:2
**recycled** [1] - 15:11
**recycling** [1] - 15:1
**red** [1] - 24:18
**referenced** [2] - 35:16, 36:5
**regard** [2] - 3:18, 8:15, 29:25
**regarded** [1] - 3:20
**regarding** [1] - 13:5
**reimaged** [1] - 19:18
**reimaging** [3] - 19:23, 20:1, 20:16
**reissued** [2] - 19:20, 20:14
**relate** [1] - 32:11
**relationship** [1] - 18:21
**relevance** [1] - 31:2
**relevant** [1] - 31:3
**reliability** [1] - 25:15
**relief** [2] - 35:3, 35:7
**reluctant** [2] - 27:15, 29:16
**relying** [3] - 20:4, 25:16, 25:20
**remains** [1] - 37:12
**remarkable** [1] - 9:22
**remarks** [1] - 35:14
**remedy** [4] - 28:7, 28:10, 32:17, 37:12
**remember** [5] - 10:3, 26:14, 27:3, 36:25
**remind** [1] - 10:6, 22:11
**repeating** [1] - 33:9
**reported** [1] - 27:4
**repository** [1] - 21:17
**representing** [1] - 27:15
**reproduced** [1] - 11:17
**request** [2] - 17:12, 24:10
**requested** [1] - 8:11

**requests** [1] - 34:20
**require** [1] - 33:4
**reset** [1] - 20:2
**respect** [3] - 25:10, 30:21, 32:14
**respectfully** [1] - 34:3
**respects** [2] - 30:8, 38:5
**respon** [1] - 22:24
**respond** [2] - 33:19, 33:23
**responding** [1] - 3:12
**response** [1] - 35:13
**responsibility** [3] - 14:19, 15:19, 15:21
**responsible** [4] - 16:15, 22:25, 25:7, 25:14
**rest** [1] - 4:9
**result** [2] - 5:21, 28:13
**retrieved** [1] - 20:8
**returned** [1] - 6:9
**review** [1] - 15:13
**rewriting** [1] - 6:8
**Rickett's** [1] - 19:11
**Ricketts** [2] - 5:15, 5:18
**RICKETTS** [1] - 5:18
**rights** [1] - 27:25
**risk** [1] - 28:1
**Rohan** [1] - 23:25
**roll** [1] - 3:15
**routine** [1] - 9:13
**routinely** [1] - 24:8
**rule** [1] - 34:17
**Rule** [7] - 7:2, 8:11, 8:25, 26:17, 32:17, 37:12, 38:9
**ruling** [1] - 37:20
**run** [3] - 27:21, 27:22, 35:4
**running** [1] - 17:14

## S

**sanc** [1] - 28:4
**sanction** [8] - 7:25, 8:11, 8:25, 10:15, 10:19, 28:4, 28:7
**sanctions** [6] - 3:6, 7:8, 23:3, 24:20, 34:24, 37:9
**save** [1] - 22:1
**saved** [8] - 12:2, 21:8, 21:12, 22:5, 22:8, 27:9, 34:2, 34:5
**saves** [2] - 21:17, 21:20
**saving** [2] - 34:9, 34:10
**saw** [1] - 28:13
**scheme** [2] - 33:7, 39:9
**search** [1] - 34:6
**searched** [1] - 34:6
**second** [10] - 5:13, 7:16, 16:13, 16:16, 16:17, 18:9, 18:16, 18:20, 18:22, 18:24

**secondly** [1] - 12:10
**secret** [3] - 21:23, 21:24, 33:12
**secrets** [3] - 9:6, 29:4, 29:6
**see** [6] - 6:25, 12:4, 24:5, 25:11, 38:12, 38:23
**seeking** [2] - 7:8, 7:9
**selective** [1] - 36:23
**senior** [1] - 19:4
**sense** [1] - 29:1
**sensitive** [1] - 14:4
**sent** [2] - 24:10, 24:11
**separately** [1] - 25:5
**serious** [2] - 3:22, 3:24
**server** [1] - 22:2
**severe** [2] - 8:2, 26:7
**shared** [1] - 22:6
**sharing** [1] - 32:9
**shifted** [1] - 24:8
**short** [2] - 28:3, 35:15
**show** [9] - 12:8, 12:23, 26:2, 26:13, 26:15, 30:25, 32:20, 32:23, 34:14
**showing** [2] - 9:14, 36:25
**shown** [2] - 7:6, 34:12
**shows** [2] - 26:6, 36:18
**side** [1] - 38:20
**significant** [1] - 8:24
**simply** [2] - 8:15, 34:17
**sit** [1] - 26:24
**sitting** [1] - 20:15
**situation** [5] - 8:14, 9:19, 11:20, 17:22, 37:11
**size** [1] - 35:16
**slides** [1] - 11:10
**small** [3] - 6:1, 13:13, 31:25
**solve** [1] - 28:20
**someone** [2] - 4:5, 21:24
**sometimes** [3] - 3:15, 3:19, 27:10
**somewhere** [1] - 21:14
**soon** [1] - 36:24
**sorry** [1] - 5:11
**sort** [4] - 13:9, 29:2, 33:3, 33:15
**sounds** [2] - 13:9, 29:1
**source** [2] - 11:15, 35:3
**sources** [1] - 28:24
**specifically** [1] - 33:14
**speculation** [2] - 30:19, 30:20
**spelled** [1] - 5:17
**spend** [1] - 36:15
**Spickler** [14] - 5:4, 5:6, 16:14, 17:4, 17:14, 17:16, 18:9, 18:22, 30:9, 34:1, 34:5, 37:23, 37:25
**Spickler's** [1] - 17:5

**spoliation** [1] - 3:20
**stamp** [1] - 30:13
**stand** [3] - 25:25, 26:25, 29:11
**standard** [11] - 3:17, 6:16, 6:19, 7:10, 10:16, 14:25, 15:10, 15:15, 19:17, 27:2, 39:5
**Stanton** [16] - 3:12, 4:6, 4:12, 5:22, 10:12, 13:7, 17:25, 28:16, 34:1, 35:13, 35:16, 35:22, 36:5, 37:5, 38:3, 38:23
**STANTON** [62] - 3:13, 4:7, 4:13, 4:17, 4:24, 5:2, 5:7, 5:12, 5:15, 5:18, 5:24, 10:13, 13:12, 13:16, 13:20, 14:4, 14:9, 14:14, 14:18, 14:22, 15:4, 15:10, 16:2, 16:6, 16:8, 16:10, 16:14, 16:19, 16:22, 17:3, 17:5, 17:9, 17:12, 17:18, 18:1, 18:8, 18:12, 18:15, 18:19, 18:24, 19:2, 19:4, 19:8, 19:12, 19:15, 19:21, 20:1, 20:7, 20:10, 20:15, 20:24, 30:4, 31:16, 32:22, 32:25, 35:24, 36:3, 37:7, 38:4, 38:8, 38:25, 39:15
**Stanton's** [1] - 34:11
**start** [3] - 4:1, 36:11, 36:25
**started** [1] - 24:17
**startup** [1] - 32:1
**statements** [3] - 10:24, 13:3, 38:10
**step** [1] - 21:1
**steps** [4] - 11:11, 23:7, 24:7, 24:12
**still** [1] - 37:12
**stock** [1] - 35:24
**stored** [2] - 11:16, 12:12
**storing** [1] - 36:20
**straightforward** [1] - 9:23
**strange** [1] - 13:10
**stretch** [1] - 34:10
**strong** [3] - 29:9, 29:17, 39:8
**stronger** [2] - 35:4, 35:5
**strongly** [1] - 36:8
**subject** [1] - 3:8
**submit** [2] - 34:3, 35:1
**submitted** [2] - 9:20, 29:22
**submitting** [1] - 34:25
**substantial** [1] - 12:3
**substantively** [1] - 22:18
**sufficient** [1] - 28:24
**suggest** [2] - 8:2, 29:3
**suggested** [2] - 28:23, 39:6

**sum** [1] - 31:24
**support** [3] - 19:12, 24:22, 24:23
**suppose** [1] - 38:19
**supposed** [1] - 4:12
**supposedly** [1] - 37:22
**surgery** [1] - 16:23
**surpasses** [1] - 32:17
**suspected** [1] - 30:19
**synchronized** [4] - 6:4, 21:17, 21:21, 30:11
**system** [1] - 30:12
**systems** [1] - 19:4

## T

**tailor** [1] - 29:24
**technical** [1] - 22:20
**technician** [1] - 19:12
**technology** [2] - 6:1, 19:5
**ten** [1] - 16:2
**Ten** [1] - 16:3
**terminating** [1] - 7:8
**testified** [1] - 30:9
**testimony** [3] - 26:9, 26:21, 31:9
**testing** [6] - 22:25, 25:11, 25:15, 25:17, 25:24
**THE** [95] - 3:5, 3:14, 4:10, 4:15, 4:22, 4:25, 5:5, 5:11, 5:14, 5:16, 5:20, 6:14, 6:21, 7:12, 7:17, 7:20, 7:24, 8:14, 8:18, 8:24, 9:18, 10:6, 10:10, 10:22, 11:19, 13:1, 13:15, 13:17, 13:23, 14:7, 14:12, 14:15, 14:20, 15:2, 15:6, 15:23, 16:3, 16:7, 16:9, 16:13, 16:16, 16:21, 16:25, 17:4, 17:7, 17:10, 17:14, 17:19, 18:6, 18:9, 18:13, 18:16, 18:23, 18:25, 19:3, 19:6, 19:11, 19:13, 19:20, 19:24, 20:3, 20:8, 20:13, 20:16, 21:4, 21:11, 22:11, 22:15, 23:9, 24:21, 26:9, 26:13, 27:10, 27:21, 28:2, 28:19, 29:20, 31:13, 32:18, 32:23, 33:18, 33:23, 34:16, 34:22, 35:2, 35:8, 35:12, 35:20, 36:1, 37:4, 37:21, 38:6, 38:9, 38:22, 39:11
**they've** [4] - 34:3, 36:6, 36:13, 37:8
**Third** [2] - 6:19, 7:23
**thoroughness** [1] - 21:6
**thousands** [1] - 4:20
**throughout** [1] - 24:6
**ticket** [1] - 14:23

**tickets** [3] - 6:6, 15:11, 15:13
**timing** [1] - 3:24
**title** [1] - 18:23
**today** [1] - 35:25
**Todd** [1] - 23:18
**took** [5] - 12:8, 13:20, 19:23, 25:11, 36:24
**top** [1] - 24:5
**trade** [6] - 9:6, 21:23, 21:24, 29:4, 29:6, 33:12
**traded** [1] - 35:18
**trans** [1] - 9:20
**transcripts** [1] - 9:21
**transfer** [1] - 24:2
**treated** [1] - 19:16
**trial** [8] - 9:1, 9:7, 9:17, 25:23, 26:10, 27:17, 29:7, 33:4
**trim** [3] - 22:21, 25:6, 31:17
**trimming** [7] - 9:9, 11:9, 12:5, 12:25, 22:20, 27:1, 27:18
**true** [3] - 17:4, 17:8, 38:2
**try** [3] - 23:7, 24:7, 27:22
**turned** [1] - 32:3
**two** [12] - 4:18, 4:24, 5:2, 7:1, 9:6, 22:16, 24:16, 24:17, 28:3, 30:7, 32:20, 35:15
**type** [1] - 24:19
**types** [2] - 3:19, 7:1
**typically** [1] - 22:1

## U

**unclear** [1] - 6:19
**under** [10] - 4:14, 4:15, 7:2, 8:11, 8:25, 26:17, 32:17, 37:12, 38:9
**underlying** [1] - 12:7
**undertaken** [1] - 6:2
**undertook** [2] - 14:18, 15:19
**unfair** [1] - 32:15
**unfavorable** [1] - 30:1
**unfortunate** [1] - 17:22
**unique** [2] - 25:8, 30:12
**up** [9] - 6:4, 6:5, 8:10, 12:3, 19:1, 25:25, 28:11, 34:14, 38:15
**USB** [1] - 12:20
**user** [2] - 30:10, 34:6
**utilized** [1] - 31:14

## V

**V-E-T-U-R-Y** [1] - 22:14

**valuation** [1] - 35:21
**Vetury** [6] - 22:14, 22:19, 23:1, 23:11, 23:13, 23:15
**Vetury's** [1] - 22:22
**vice** [5] - 5:25, 13:8, 15:12, 15:21, 37:24
**video** [1] - 33:20
**videotape** [1] - 26:12
**viewed** [1] - 31:24
**voluntary** [1] - 33:10
**VP** [1] - 17:15

## W

**wait** [1] - 13:15
**Wait** [1] - 13:17
**waive** [1] - 27:24
**walking** [1] - 36:15
**warrant** [1] - 24:19
**ways** [1] - 32:8
**week** [1] - 23:22
**weigh** [1] - 8:9
**weight** [2] - 8:16, 10:19
**whole** [2] - 20:16, 31:20
**wholesale** [1] - 12:6
**wipe** [2] - 15:23, 18:11
**wiped** [9] - 4:4, 5:1, 5:6, 5:7, 13:4, 14:20, 18:14, 30:2, 32:21
**wiping** [1] - 13:18
**wish** [1] - 30:24
**withheld** [1] - 23:13
**witness** [3] - 27:9, 36:14
**witnesses** [7] - 9:5, 9:12, 26:23, 27:17, 36:10, 36:19, 36:21
**wonder** [1] - 8:20
**word** [2] - 38:16, 38:20
**worded** [1] - 3:20
**worried** [1] - 27:6
**wrapping** [1] - 38:15
**wrote** [1] - 36:7

## Y

**York** [3] - 4:9, 5:4, 5:10

## Z

**zero** [1] - 31:24

UNREDACTED TRANSCRIPT