# EXHIBIT 10

# REDACTED PUBLIC VERSION

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

     _____

 4   AKOUSTIS TECHNOLOGIES,   :

 5   INC. AND AKOUSTIS, INC., :

 6           Plaintiffs,      :

 7      v.                    : Civil Action No.

 8   QORVO, INC.,             :  2:23-cv-180

 9           Defendant.       :

     _____:

10

11

12

13        Remote Zoom Videotaped Deposition of HELGE

14   HERMANN HEINRICH, PH.D., taken with the witness

15   participating from his office at the University

16   of Virginia, Thornton Hall, 351 McCormick Road,

17   Charlottesville, Virginia, beginning at 9:01 a.m.,

18   Friday, January 26, 2024, before Ryan K. Black,

19   Registered Professional Reporter, Certified

20   Livenote Reporter and Notary Public in and for

21   the Commonwealth of Pennsylvania.

22

23

24   JOB No. 6391955

25   PAGES 1 - 122
```

                                                    Page 1

1 A P P E A R A N C E S :
2
3 SQUIRE PATTON BOGGS LLP
4 BY: MATTHEW STANFORD, ESQ. - Via Zoom
5 2550 M Street NW
6 Washington 20037
7 202.457.6000
8 matthew.stanford@squirepb.com
9 Representing - Akoustis Technologies
10
11 SHEPPARD MULLIN LLP
12 BY: TIMOTHY P. CREMEN, ESQ. - Via Zoom
13 2099 Pennsylvania Avenue, N.W.
14 Suite 100
15 Washington, DC 20006
16 202.747.1900
17 tcremen@sheppardmullin.com
18 Representing - Qorvo, Inc.
19
20 ALSO PRESENT:
21 Solomon Francis - Legal Videographer
22
23
24
25

Page 2

1           I N D E X
2 TESTIMONY OF:  HELGE HERMANN HEINRICH, PH.D. PAGE
3 By Mr. Stanford................................5
4 By Mr. Cremen................................120
5
6
7           E X H I B I T S
8 EXHIBIT      DESCRIPTION           PAGE
9
10 Exhibit 1    a document titled Expert Report
11       of Helge Heinrich, Ph.D............10
12
13 Exhibit 2    Appendix G to Dr. Heinrich's
14       report...........................92
15
16 Exhibit 3    Appendix W to Dr. Heinrich's
17       report..........................108
18
19
20
21
22
23
24
25

Page 3

1       THE VIDEOGRAPHER:  Good morning.
2 We're going on the record at 9:01 a.m. Eastern
3 on January 26th, 2024.  Please note that this
4 deposition is being conducted virtually.  Quality
5 of recording depends on quality of camera and
6 internet connection of participants.  What is
7 seen from the witness and heard on screen is what
8 will be recorded.  Audio and video recording will
9 continue to take place unless all parties agree
10 to go off the record.
11       And so here begins Media Unit 1 of the
12 remote video-recorded deposition of Dr. Helge
13 Heinrich taken in the matter of Qorvo, Inc.,
14 Plaintiff, versus Akoustis Technologies, Inc.,
15 and Akoustis, Inc., filed in the United States
16 District Court for the District of Delaware.
17 Civil Action Number 21-1417(JPM).
18       My name is Solomon Francis,
19 representing Veritext Legal Solutions, and
20 I'm the videographer.  Our court reporter is
21 Ryan Black, with Veritext Legal Solutions.
22       At this time will counsel please state
23 their appearances and affiliations for the
24 record?
25       MR. STANFORD:  My name is Matthew

Page 4

1 Stanford.  I'm an attorney at Squire Patton
2 Boggs, representing Akoustis Technologies.
3       MR. CREMEN:  And I'm Timothy Cremen,
4 from Sheppard Mullin, on behalf of Qorvo, Inc.,
5 and the witness, Dr. Heinrich.
6       DR. HEINRICH:  And I'm Helge Heinrich.
7       THE VIDEOGRAPHER:  At this time will the
8 court reporter please swear in the witness and we
9 can proceed.
10       *   *   *
11 Whereupon --
12       HELGE HERMANN HEINRICH, PH.D.,
13 called to testify via remote Zoom
14 videoconference, having been first duly sworn or
15 affirmed, was examined and testified as follows:
16       THE REPORTER:  Counsel, you may proceed.
17       MR. STANFORD:  Thank you.
18           EXAMINATION
19 BY MR. STANFORD:
20    Q.  Good morning, Dr. Heinrich.  Will you
21 please state your full name for the record?
22    A.  Yes.  My name is Helge Heinrich.  And my
23 full name is Helge Hermann Helge Heinrich.  My
24 middle name is Hermann, with two Ns.
25    Q.  Thank you.

Page 5

1  perfectly uniform anyway, because the FIB process
2  is a little tricky and, yeah, you have the air
3  gap below that makes life a little more difficult
4  to get it uniform.
5     Q.  Understood.
6        Would that affect the results of your
7  measurement?
8     A.  Only if the thickness of the sample
9  -- the TEM sample thickness, not the layer
10 thickness, is significantly over, like, 150
11 nanometers, I would say.  But any sample analysis
12 that I did was definitely done on samples that
13 are hundred nanometers or below in thickness.
14    Q.  Why would having your thick
15 -- basically, at an angle, why having that
16 angle not affect the distance here?  Isn't that
17 just geometry that it would result in a longer --
18    MR. CREMEN:  Objection; vague.
19    THE WITNESS:  Can you repeat the
20 question?
21 BY MR. STANFORD:
22    Q.  Sure.  Because the cross-section could
23 have an angle, and let's say that it does for
24 this example, like the one we saw in that
25 appendix, wouldn't the result of the angle be

1     Q.  And when you take an image then,
2  or when you measure that micrograph to get
3  the measurements results that we saw in the
4  appendices, are you taking it from the angle
5  that we're seeing in the image?
6        MR. CREMEN:  Objection; vague.  This is
7  the image when all the layers are parallel to the
8  beam.  So it doesn't matter how thick the sample
9  is, unless I'm getting so thick that I'm getting
10 blurry with my contrast because my converge --
11 beam convergence is a limited value, I will
12 not get any different measurements because, in
13 projection, all the thicknesses should not be
14 affected by the sample, the thicker or thinner,
15 within a range of hundred nanometers or below.
16 BY MR. STANFORD:
17    Q.  Does the fact that the sample has
18 this -- this differing in thickness, in and out
19 of the page we're talking about, has some angle
20 to it, doesn't that affect the perspective at
21 which it's being viewed?
22    A.  No.  Because I'm still viewing it
23 with the electron beam parallel to all of the
24 interfaces that are involved in that area.
25    Q.  So the fact that there is a difference

1  that the measurement that you're looking -- when
2  you're looking directly onto it, would be a
3  different distance than if you were looking at a
4  perfectly flat cross-section?
5        MR. CREMEN:  Objection; vague.
6        THE WITNESS:  That's why I don't take
7  images when my sample is not parallel to the
8  -- when my sample is not tilted so that my sample
9  is parallel to the electron beam with the
10 interfaces.
11       So I'm only taking micrographs when
12 I'm perfectly as good as it can, obviously, but
13 perfectly parallel to my interfaces with my
14 electron beam each time I'm tilting my sample.
15 BY MR. STANFORD:
16    Q.  And forgive me if this is -- this is a
17 stupid question, but the cross-sections we are
18 looking at, they had a layer or two layers of the
19 same material and one was a lighter contrast and
20 one was a darker contrast relative to each other.
21 And I believe, as you explained, that that means
22 that there is some difference in thickness sort
23 of into out of the page, as I keep calling it,
24 direction.
25    A.  Correct.

1  in thickness would have no effect on the
2  measurement results?
3     A.  Correct.  Because it's a projection.
4  And if I'm perfectly parallel to the interfaces,
5  then the projection will not change.  It's the
6  transmission of the beam, and the projection does
7  not change.  If I'm tilted, however, you are
8  right, that would affect it more in the thicker
9  sample and less in a thinner sample.
10    Q.  Okay.  And so just a couple final
11 questions.  Were -- are you aware that some
12 alternative designs of the products were provided
13 by Akoustis to Qorvo?
14    A.  No.
15    Q.  Okay.  So you did not perform any tests
16 on any products outside of those listed in that
17 chart in your report?
18    A.  Correct.
19    Q.  Okay.  Has the concept of patent
20 infringement been explained to you in the course
21 of this case?
22    A.  I know that it's about that, but that's
23 all I know.
24    Q.  Okay.  Were you asked to provide an
25 opinion on patent infringement in this case?

1    A.   Because I don't know what the questions
2  are in the patent infringement, no, I don't know.
3  I am -- I was just asked to measure -- do
4  cross-sections and measure thicknesses in
5  certain --
6    Q.   Were you given copies of the patents
7  that are -- are at issue in this case?
8    A.   Nope.
9    Q.   Are you aware that other experts in this
10 case used your results -- or relied upon your
11 results, I should say?
12   A.   I assumed so.
13   Q.   Did you ever have any direct
14 communication with other experts in this case?
15   A.   We had -- before we looked at these
16 samples, we had a communication with the
17 President of Bucknell University, Jeff [sic]
18 Bravman.
19   Q.   And that was before you performed the
20 testing, --
21   A.   Correct.
22   Q.   -- or, excuse me, the analysis here?
23   A.   Correct.
24   Q.   Did he ask you to perform any specific
25 analysis?

Page 118

1  other way with any of the other experts?
2    A.   Nope.  I only communicated with law
3  firm, Sheppard Mullin, and Mr. Cremen and
4  Mr. Young and others.
5    Q.   Did Sheppard -- plaintiff's counsel,
6  Sheppard Mullin, did they relay any information
7  to you, or provide any information to you, from
8  the other experts?
9    A.   No.
10       MR. STANFORD:  Okay.  That is all the
11 questions I have.
12       THE WITNESS:  Okay.
13       MR. CREMEN:  Okay.  I have -- I have one
14 question.
15           EXAMINATION
16 BY MR. CREMEN:
17   Q.   Dr. Heinrich, is it -- does it remain
18 your opinion that the cross-sections and
19 measurements shown in your report accurately
20 depict the structure of each accused product you
21 tested within the margins of error you talked
22 about today?
23   A.   They represent the thickness within the
24 margins of one to two percent, correct?
25       MR. CREMEN:  That's all I have.

Page 120

1    A.   No, he didn't -- not ask me anything
2  about any specifics.
3    Q.   Well, what did you discuss?
4    A.   We discussed that they wanted to get
5  thickness measurements.
6    Q.   Did he explain what the purpose of those
7  thickness measurements would be?
8    A.   If I remember correctly, it was about
9  doing simulations.
10   Q.   All right.  So he -- he's -- you -- your
11 recollection is that he was going to use your
12 analysis as part of some simulations?
13   A.   I'm not a hundred percent sure if
14 that was the case.  I think we may have looked
15 -- Mr. Bravman may have asked for other experts
16 to do the simulations.  I'm not sure about that.
17   Q.   Okay.  But it was your understanding
18 from the call that your results would be used by
19 someone for simulations?
20   A.   Correct.
21   Q.   Understood.
22       Did you talk to any other experts
23 besides Dr. Bravman?
24   A.   Nope.
25   Q.   Okay.  Did -- did you communicate in any

Page 119

1        THE VIDEOGRAPHER:  All right.  If we're
2  done, I'll take us off the record.
3        The time is 11:58 a.m.  This concludes
4  today's testimony given by Dr. Helge Heinrich.
5  We're now off the record.
6        (Deposition concluded -- 11:58 a.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 121

31 (Pages 118 - 121)

```
 1          C E R T I F I C A T E
 2
 3       I do hereby certify that I am a Notary
 4  Public in good standing, that the aforesaid
 5  testimony was taken before me, pursuant to
 6  notice, at the time and place indicated; that
 7  said deponent was by me duly sworn to tell the
 8  truth, the whole truth, and nothing but the
 9  truth; that the testimony of said deponent was
10  correctly recorded in machine shorthand by me and
11  thereafter transcribed under my supervision with
12  computer-aided transcription; that the deposition
13  is a true and correct record of the testimony
14  given by the witness; and that I am neither of
15  counsel nor kin to any party in said action, nor
16  interested in the outcome thereof.
17
18       WITNESS my hand and official seal this
19  2nd
20
21
22
23       Ryan K. Black, RPR, CLR
24       Notary Public
25
                                          Page 122
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127