# Exhibit A
# (Redacted in Its Entirety)

# Exhibit B
# (Redacted in Its Entirety)

# Exhibit C
# (Redacted in Its Entirety)

# Exhibit D



## Transcript of Dr. Michael Lebby

**Date:** January 31, 2024
**Case:** Qorvo, Inc. -v- Akoustis Technologies, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF DELAWARE
3
4   QORVO, INC.,              )
5          Plaintiff,         )
6      VS.                    )   NO. 21-1417 JPM
7   AKOUSTIS TECHNOLOGIES, INC., )
    AKOUSTIS, INC.,
8          Defendants.        )
9   ---------------------------)
10
11
12
13
14
15
16            IN-PERSON DEPOSITION OF
17              DR. MICHAEL LEBBY
             WEDNESDAY, JANUARY 31, 2024
18
19
20
21
22
23
    STENOGRAPHIC REPORTER:  CHRISTA YAN, CSR NO. 14316, RPR
24                          ------
25
```

**Page 2**

```
1   IN-PERSON APPEARANCES:
2   FOR PLAINTIFF:
3       SHEPPARD MULLIN RICHTER & HAMPTON LLP
        BY:  JONATHAN DEFOSSE, ATTORNEY-AT-LAW
4       2099 Pennsylvania Avenue, NW, Suite 100
        Washington, D.C. 20006
5       (202) 747-1932
        tcremen@sheppardmullin.com
6
    FOR DEFENDANT:
7       SQUIRE PATTON BOGGS, LLP
        BY:  VICTORIA SMITH, ATTORNEY-AT-LAW
8       1841 Page Mill Road, Suite 150
        Palo Alto, California 94304
9       (650) 843-3237
        ronald.lemieux@squirepb.com
10      victoria.smith@squirepb.com
11
12
13
14
15  This in-person deposition was not videotaped.
16
17
18
19
20              --oOo--
21
22
23
24
25
```

**Page 3**

```
1              INDEX OF EXAMINATIONS
2                                      PAGE
3   MR. DEFOSSE                        5
4   MS. SMITH                          240
5
6
7
8
9
10                 --oOo--
11
12
13
14
15  Witness's Changes or Corrections    245
16  Reporter's Certificate              247
17
18
19
20
21                 --oOo--
22
23
24
25
```

**Page 4**

```
1                  E X H I B I T S
2   EXHIBIT       FOR IDENTIFICATION         PAGE
3   Exhibit 965 - Rebuttal Report of Dr. Michael   12
4              Lebby Regarding Trade Secrets
5              December 20, 2023, Binder
6   Exhibit 966 - Reverse Costing Analysis         123
7              Qorvo TQF6405 High Band FEM
8              SMR-BAW Filter iPhone 6s Plus
9              AKTS_01210570
10  Exhibit 967 - System Plus Consulting Reverse   126
11             Costing, Structural, Process
12             and Cost Report AKTS_01039458
13  Exhibit 968 - Expert Report of R. Cuyler        215
14             Robinson November 21, 2023
15
16
17
18
19
20                 --oOo--
21
22
23
24
25
```

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024

5

1    BE IT REMEMBERED that on WEDNESDAY, the 31ST DAY OF
2  JANUARY, 2024, at the hour of 9:02 a.m., Pacific Standard
3    Time, of said day, at Four Embarcadero Center, 17th Floor,
4    San Francisco, California 94111, before me personally,
5    CHRISTA YAN, a Certified Shorthand Reporter, State of
6  California, personally appeared DR. MICHAEL LEBBY, who was
7  examined as a witness in said cause; that said transcript
8  format was prepared in accordance with California Code of
9          Regulations Section 2473.
10             --oOo--
11        DR. MICHAEL LEBBY,
12  the Witness, called on behalf of the Defendant, being duly
13  sworn to state the truth, the whole truth, and nothing but
14        the truth, testified on oath as follows:
15             EXAMINATION
16  BY MR. DEFOSSE:
17    Q   Good morning, Dr. Lebby.  Thank you for being
18  here with us today.  How many times have you testified in
19  any type of litigation previously?
20    **A   When you mean testified are you looking for**
21  **testified at trial or just depositions or both?**
22    Q   Let's start with depositions.  How many times
23  have you been deposed?
24    **A   At least 60 times.**
25    Q   Okay.  And how many times have you testified at

6

1  trial?
2    **A   Probably 20 times or more.  I -- you have to**
3  **check to see.**
4    Q   Okay.  And when you say 20 times or more.  Are
5  you including all types of litigation, trials including
6  arbitrations?
7    **A   I don't believe there's any arbitrations, but**
8  **certainly I'm including PTAB, district court and ITC.**
9    Q   Okay.  So you understand you're testifying today
10  under oath?
11    **A   I do.**
12    Q   And it's the same oath that you'd take in a court
13  of law?
14    **A   I believe it is.**
15    Q   I'm sure you're familiar with deposition ground
16  rules, but I'm going to run through them just to have them
17  on the record here.  If I ask you a question today you
18  don't understand, I'd ask you to please let me that you
19  don't understand it and I can try to rephrase it, okay?
20    **A   I can do that.**
21    Q   Is there anything that would prevent you from
22  hearing or understanding my questions today?
23    **A   Not today.**
24    Q   Anything that would prevent you from providing
25  full and accurate testimony?

7

1    **A   Not today.**
2    Q   If you need a break, I'd like you to please let
3  me know and we'll take a break as long as there's not a
4  question pending.
5    **A   I can do that.**
6    Q   Your counsel throughout the day may be
7  interposing objections.  You should go ahead and answer
8  the question unless she instructs you not to answer, okay?
9    **A   I understand.**
10    Q   What did you do to prepare for your deposition
11  today?
12    **A   I went through at least my expert report and my**
13  **colleagues' expert reports and a number of the documents**
14  **over the last two or three days.**
15    Q   And when you say your colleagues' expert reports,
16  who do you mean?
17    **A   Robert Darveaux and Clark Nguyen, I think that's**
18  **how you pronounce his name.  I also reviewed Shanfield's**
19  **expert report and some of the citations in those reports.**
20    Q   And you said some of the citations.  How did you
21  choose which citations to review?
22    **A   Randomly.  I reviewed all the information earlier**
23  **in this case.  But I didn't have enough time to review all**
24  **citations or references in the last couple of days.  So I**
25  just chose randomly things that (indecipherable utterance)

8

1  I thought were pertinent.
2    THE STENOGRAPHIC REPORTER:  Like the what?
3    THE WITNESS:  Randomly things that I thought were
4  pertinent.
5    THE STENOGRAPHIC REPORTER:  Thank you.
6  BY MR. DEFOSSE:
7    Q   Other than reviewing materials, did you do
8  anything else to prepare for your deposition today?
9    **A   I talked with counsel twice.**
10    Q   Okay.  And were those in-person meetings?
11    **A   Yes, they were.**
12    Q   Okay.  And what days did you meet?
13    **A   What day is today?  Today is Wednesday.  So it**
14  **was Sunday and Monday.**
15    Q   And for how long did you speak with counsel on
16  Sunday?
17    **A   Three to four hours.**
18    Q   And how long was the meeting on Monday?
19    **A   Similar time frame.**
20    Q   Have you ever had any portion of your opinions
21  excluded in any case in which you've offered them?
22    **A   I don't believe so.  I've had two Daubert**
23  **challenges over 140 cases.  One was definitely turned**
24  **down.  The second one was partly accepted, but by the time**
25  **we came to trial, it was essentially diluted down to**

25

1  in the design of acoustic filters?
2     A   Yes, I do.
3     Q   Okay.  Okay.  Back to the people that you spoke
4  with in connection with this case, other than Mr. Kim and
5  Ms. Winters, you've not spoken to anyone else at Akoustis;
6  is that right?
7     A   I am not aware of speaking to anybody else.  To
8  the best of my knowledge, those were the only two people I
9  believe are current employees of Akoustis that I spoke
10 to in relation to this litigation.
11    Q   Did you rely on the information provided by
12 Mr. Kim in forming the opinions that are reflected in your
13 written report?
14    A   The opinions that I have in my report, I believe,
15 don't really relate to the discussion I was exposed to.
16 The discussion I was exposed to was definitely technically
17 oriented, and what I've opined on in my report is bringing
18 a filter to market and opining on rebutting
19 Dr. Shanfield's position on alleged trade secrets.
20        So I don't believe there was anything from those
21 calls that I've used substantially to support my opinions
22 in this case.
23    Q   When you say those calls, you're referring to the
24 calls with both Mr. Kim and Ms. Winters?
25    A   The two calls that I've already indicated on

26

1  record.  The first call had both those candidates, and I
2  believe the second call only had one to the best of my
3  knowledge.
4     Q   Now, you mentioned you also spoke to Dr. Darveaux
5  in preparation of your opinions or in forming your
6  opinions in this case?
7     A   That is correct.
8     Q   Okay.  On how many occasions did you speak to
9  Dr. Darveaux?
10    A   It may have been twice.  It may have been three
11 times.  I don't recall.
12    Q   And are you including in the two to three times
13 the calls you mentioned already with Ms. Winters and
14 Mr. Kim?
15    A   I do not believe so.
16    Q   Okay.  So in addition to the calls with
17 Ms. Winters and Mr. Kim, you've spoken, to the best of
18 your recollection, two or three times with Dr. Darveaux?
19    A   That is correct.
20    Q   And when were those conversations?
21    A   I believe they're in a similar time frame, summer
22 of last year.
23    Q   Did you speak with Dr. Darveaux in December of
24 2023?
25    A   I don't recall.

27

1     Q   Did you speak with Dr. Darveaux after receiving
2  the expert report of Dr. Shanfield?
3     A   I do not believe so, but I don't recall
4  explicitly.  I don't believe I've spoken to Robert
5  Darveaux for some time.
6     Q   Okay.  And Dr. Nguyen, when did you speak with
7  Dr. Nguyen?
8     A   He was on the same calls with Robert Darveaux
9  which was summer of 2023.  I don't believe I've spoken to
10 both those folks recently.
11    Q   So you also don't recall speaking with Dr. Nguyen
12 after receiving Dr. Shanfield's expert report?
13    A   I believe that is correct.
14    Q   Okay.  And you mentioned that you had a call with
15 Ms. Erwin.  Was it just one call?
16    A   Yes, that is true.
17    Q   Okay.  And when did you speak with Ms. Erwin?
18    A   I believe that was a week ago, or maybe two weeks
19 ago.
20    Q   So you did not speak with Ms. Erwin prior to
21 preparing your expert report in this case?
22    A   That is correct.
23    Q   Your report indicates that your hourly rate is
24 $450 an hour; is that right?
25    A   That is correct.

28

1     Q   And does that remain true today?
2     A   That is correct.
3     Q   Do you anticipate changing the rate between now
4  and trial in May of 2024?
5     A   No, I do not.
6     Q   Okay.  If you could please look at Appendix B of
7  your expert report.  Okay.  In Appendix B, I believe you
8  identified the materials that you considered in this case?
9     A   That is correct.
10    Q   And at the beginning of the report, you indicate
11 that you reviewed expert reports from other experts in
12 this matter; is that right?
13    A   That is correct.
14    Q   Including the reports of Dr. Darveaux and
15 Dr. Nguyen?
16    A   Their initial reports, that is correct.
17    Q   Okay.  When did you receive Dr. Darveaux's
18 initial report?
19    A   I really don't know when I actually received it.
20 Probably soon after it was serviced to opposing counsel.
21    Q   Did you review Dr. Darveaux's initial report
22 prior to forming the opinions that are expressed in your
23 report?
24    A   I do not believe I was exposed to his report
25 beforehand.

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024

29

1  Q   Because I believe the -- your report and his
2  report were served on the same day, is that your
3  understanding?
4  **A   I don't know that information.**
5  Q   Did you receive a draft of Dr. Darveaux's report?
6  **A   I do not believe I saw a draft of his report**
7  **before it was served.**
8  Q   And to the best of your recollection, you
9  received a final of his report after it was served?
10 **A   That is correct.  I read it for the first time**
11 **after it was served.  I believe it was a PDF.**
12 Q   And was that before or after that you prepared
13 the opinions in your written report?
14 **A   If they, as you say, were served on the same**
15 **date, it would have been after I prepared my opinions in**
16 **my report.**
17 Q   Okay.  You also indicate that you reviewed
18 Dr. Nguyen's report in this matter?
19 **A   That is correct.**
20 Q   When did you receive Dr. Nguyen's report?
21 **A   The same day I received Robert Darveaux's report,**
22 **both reports were sent to me at the same time.  Probably**
23 **soon after my report was serviced to opposing counsel.**
24 Q   Okay.  So it's fair to say you did not review
25 Dr. Nguyen's report prior to finalizing your report?

31

1  **A   Yes, it is.**
2  Q   Okay.  And this CV is an accurate description of
3  your education, work experience, and other experience that
4  you've had in working in the semiconductor industry; is
5  that right?
6  **A   It's certainly my CV, and it certainly gives**
7  **reasonable summary of my experience working in the**
8  electronics semiconductor (indecipherable utterance)
9  optoelectronics and related industries as detailed within
10 the CV.
11 THE STENOGRAPHIC REPORTER: I'm sorry, what did you
12 say after semiconductor?  Ultra electronics?
13 THE WITNESS:  Opto.
14 THE STENOGRAPHIC REPORTER:  Optoelectronics, thank
15 you.
16 BY MR. DEFOSSE:
17 Q   Okay.  Dr. Lebby, you mentioned previously in
18 response to one of my questions that you consider yourself
19 to be an expert in the design of acoustic filters; is that
20 right, do I recall that right?
21 **A   Yes, you recall that correctly.**
22 Q   Okay.  Can you identify for me -- well, strike
23 that.
24    At what -- which of your work experiences relates
25 to the design of acoustic filters?

30

1  **A   That is correct.**
2  Q   Now, if you could turn to paragraph 31 of your
3  written report.  You state here that you've reviewed and
4  considered the items listed in Appendix 2, including the
5  documents that Dr. Shanfield and Robinson characterized in
6  their report as trade secrets and other associated
7  documents.  Do you see that?
8  **A   I do see that.**
9  Q   Did you review all of the materials that
10 Dr. Shanfield addressed in his trade secret analysis?
11 **A   To the best of my knowledge, I tried to review**
12 **everything that was cited that I could actually see that**
13 **was on the counsel's website.  I may not have read every**
14 **word and every document, but I certainly opened every**
15 **document that was available to me.**
16 Q   Okay.  Did you review the documents that
17 Dr. Shanfield cited in the sections of his report that you
18 were not asked to rebut?
19 MS. SMITH:  Objection; vague.
20 THE WITNESS:  I don't know the answer to that
21 question.
22 BY MR. DEFOSSE:
23 Q   Okay.  Now, if I could ask you to turn to
24 Appendix A of your report.  Which I believe is the -- your
25 CV; is that right?

32

1  **A   So I worked with acoustic technology from --**
2  **during the period 1989 to 1999 while I was at Motorola,**
3  **and I also worked with acoustic technology in the time**
4  **frame 2010 to 2013 while at Translucent, and those were**
5  **two main areas where I worked on acoustic-based**
6  **technology.  Plus there is a bunch of patents that**
7  **directly relate to RF filter technology that have been**
8  **issued.  And I'm sure there's some still under**
9  **prosecution, but we can go into those details if you wish.**
10 Q   Thank you.
11    Other than your experience at Motorola from 1989
12 to 1999 and Translucent from 2010 to 2013, did you work at
13 any other companies on acoustic technology?
14 MS. SMITH:  Objection; vague.
15 THE WITNESS:  So certainly, acoustic technology came
16 up in 2005 to 2010 while I was working at OIDA, which is
17 the Optoelectronic Industry Development Association, and
18 they suddenly have come up and keep coming up during my
19 role as an expert for the European Commission in Brussels,
20 Belgium from 2013 to present day.
21 BY MR. DEFOSSE:
22 Q   Okay.  Did you work on acoustic technology in any
23 of your other roles?
24 **A   I certainly was aware of acoustic technology from**
25 **1977 to 1984 when I worked for the UK Ministry of Defense**

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024

69

1 opinions that I give in my corrected expert report, that I
2 haven't seen a trade secret yet.
3 BY MR. DEFOSSE:
4    Q    Okay.  So if we look at page 76 of
5 Dr. Shanfield's report, he begins to, on page 76, assess
6 the alleged trade secrets related to Qorvo BAW filter and
7 resonator designs.  Do you see that?
8    A    I do see that.
9    Q    And in your opinion Dr. Shanfield has not
10 identified any trade secrets related to Qorvo BAW filter
11 and resonator designs; is that right?
12    A    So in Section C, paragraph 126 of Dr. Shanfield's
13 expert report, which is on page 76, it is one of the eight
14 subsections that is entitled, Qorvo BAW filter resonator
15 design.  This is where Dr. Shanfield alleges that in
16 Section C, there are alleged trade Qorvo secrets.  I
17 certainly haven't seen any alleged trade secrets.  But I
18 do not detail this in my expert report.
19    I incorporate the opinions of Dr. Nguyen by
20 reference in Sections 4 and 6 of Dr. Nguyen's expert
21 report.  That's in paragraph 113 of my corrected expert
22 report.  And I certainly agree with the opinions of
23 Dr. Nguyen.  Now, I don't recall if Dr. Nguyen or
24 Dr. Darveaux did, that section is entitled, Qorvo BAW
25 filter and resonator designs, off the top of my head.

70

1    And so for completeness in answering the
2 question, I've also incorporated in paragraph 114,
3 Sections 1, 4 and 9 of Dr. Darveaux's expert report and
4 agree with those opinions and one of those sections
5 applies to the Qorvo BAW filter and resonator design
6 opinions that Dr. Shanfield has opined on.
7    And I agree with the opinions of the two experts
8 that have incorporated, that Dr. Shanfield is indeed
9 incorrect.  And these alleged trade secrets are not trade
10 secrets at all.
11    Q    Can you point me to where in your written report
12 you've analyzed whether the trade secrets Dr. Shanfield
13 identified with respect to Qorvo BAW filter and resonator
14 designs are in fact not trade secrets?
15 MS. SMITH:  Objection; foundation, asked and answered.
16 THE WITNESS:  So the area where I can point to where I
17 base my opinions on Dr. Shanfield's Section C on
18 paragraph, begins paragraph 126 on page 76 of his expert
19 report that's entitled, Qorvo BAW filter and resonator
20 designs, end quote.  I incorporate a technical and
21 detailed rebuttal by two experts that I've been analyzing.
22    One of those sections in their expert reports as
23 I sit here today, I can't remember whether Dr. Nguyen or
24 Dr. Darveaux opined on the section entitled, Qorvo BAW
25 filter and resonator designs.  I know between the two

71

1 their opinions, I agree with their opinions.  And that
2 section is included.  And this is in paragraphs 113 and
3 114 of my expert report where I incorporate their opinions
4 and sections by reference.
5    But I can't get to a level of granularity because
6 I can't recall the contents pages of Dr. Nguyen's and
7 Dr. Darveaux's reports at this time.
8 BY MR. DEFOSSE:
9    Q    Other than paragraphs 113 and 114 of your written
10 report, can you identify any other paragraphs in which you
11 address Dr. Shanfield's opinions concerning the Qorvo BAW
12 filter and resonator designs?
13 MS. SMITH:  Objection; asked and answered.
14 THE WITNESS:  So the question pertains to Section C of
15 Dr. Shanfield's expert report on page 76 which begins
16 paragraph 126 and is entitled, quote, Qorvo BAW filter and
17 resonator designs, end quote.  And of which, Dr. Shanfield
18 opines on Qorvo's alleged trade secrets in this area.
19 Which is one of eight categories that Dr. Shanfield calls
20 out in paragraph 78 of his report.
21    I've actually rebutted two of those categories.
22 Quote, Qorvo business plans for Wi-Fi products, end quote.
23 And Qorvo -- quote, Qorvo product roadmaps and product
24 prototypes, that's end quote.  I also give my overall
25 opinions that what Dr. Shanfield believes are alleged

72

1 trade secrets is completely incorrect.  I don't believe
2 I've seen any trade secrets or any of the alleged trade
3 secrets that are trade secrets.
4    And I've also incorporated in paragraphs 113 and
5 114, which seems to be the only place in my correct expert
6 report where I incorporate by reference Dr. Nguyen's and
7 Dr. Darveaux's opinions.  And I incorporate them by
8 reference in Sections 4 and 6 of Nguyen's expert report
9 and Sections 1, 4 and 9 of Darveaux's report, and I've
10 indicated I agree with the opinions by both Dr. Nguyen and
11 Dr. Darveaux that the alleged trade secrets that are
12 opined upon by Dr. Shanfield are indeed, not trade secrets
13 at all.
14    But to expressly answer your question, I don't
15 believe anywhere else in my expert report, I do actually
16 discuss Qorvo BAW filter and resonator designs expressly,
17 but I have incorporated them through paragraphs 113 and
18 114.
19 BY MR. DEFOSSE:
20    Q    Okay.  Let's go off the record.
21    (Recess taken.)
22 BY MR. DEFOSSE:
23    Q    Dr. Lebby, could I ask you a turn to page 127 of
24 Dr. Shanfield's report?  And look at paragraph 177 which
25 appears just under the heading Qorvo's trimming method and

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024

19 (73 to 76)

73

1 procedures.  Do you see that?
2    **A  I do see that.**
3    Q  And paragraph 177 Dr. Shanfield says, In my
4 opinion, Akoustis acquired, considered, and used Qorvo's
5 confidential information concerning its method and
6 procedures for trimming BAW filters.  Do you see that?
7    **A  I do see that.**
8    Q  Are you rebutting Dr. Shanfield's opinion that
9 Akoustis used Qorvo's confidential information concerning
10 its method and procedures for trimming BAW filters?
11    **A  Yeah, I am.  I am rebutting Dr. Shanfield's**
12 **opinion that he's given in paragraph 177, Section D of his**
13 **expert report.  And I'm rebutting that through my**
14 **paragraphs 113 and 114 where I incorporate Dr. Nguyen's**
15 **and Dr. Darveaux's opinions through their expert reports.**
16 **And I certainly agree with the opinions of both of those**
17 **folks.**
18 **But I can't recall which one of those goes —**
19 **which one of those experts did the detailed section on**
20 **trimming BAW filters.  That level of detail, I don't**
21 **recall because I don't have their reports in front of me.**
22    Q  Other than paragraphs 113 and 114 of your written
23 report, are you rebutting Dr. Shanfield's opinions
24 concerning Qorvo's trimming method and procedures anywhere
25 else?

74

1    **A  In general, I've rebutted Dr. Shanfield's**
2 **opinions of the alleged trade secrets by Qorvo in Section**
3 **Roman numeral IV of my expert report from paragraph 71 to**
4 **75.  Where I generally talk about Dr. Shanfield's opinions**
5 **of his — what he alleges is trade secrets are not trade**
6 **secrets at all.**
7 **But I do not detail this section, Section D in**
8 **paragraph 177 of Dr. Shanfield's report on, quote, Qorvo's**
9 **trimming methods and procedures in detail.  I do that**
10 **through incorporation of using Dr. Nguyen's and**
11 **Dr. Darveaux's expert reports in paragraphs 113 and 114 in**
12 **my report.**
13    Q  Okay.  Could I ask you to turn to page 168 of
14 Dr. Shanfield's report.  And could you please look at
15 Section E, Qorvo's evaluation board design rules and
16 schematics in paragraph 225.
17 And Dr. Shanfield says -- well, hold on.  Do you
18 understand that Dr. Shanfield has identified what he
19 believes to be trade secrets related to Qorvo's evaluation
20 board design rules and schematics?
21    **A  I do understand what Dr. Shanfield has written in**
22 **Section E of his expert report.**
23    Q  Okay.  And did you analyze Dr. Shanfield's
24 opinions with respect to Qorvo's evaluation board design
25 rules and schematics?

75

1    MS. SMITH:  Objection; vague.
2    THE WITNESS:  So in Dr. Shanfield's expert report in
3 Section E, which is entitled, Qorvo's evaluation board
4 design rules and schematics, end quote, I reviewed all the
5 documents that was available to me which included
6 documents in the section.
7 But I have not opined on this section of
8 Dr. Shanfield's alleged trade secrets by Qorvo in detail.
9 I've actually opined on the fact that Dr. Shanfield's
10 opinions of these alleged trade secrets are actually not
11 trade secrets through Section 4 of my expert report from
12 paragraphs 71 to 75 and by incorporation by reference in
13 paragraphs 113 and 114 by Dr. Nguyen and Dr. Darveaux.
14 I agree with the opinions of both those folks.
15 Although, I cannot recall what sections of their report
16 actually pertain to Section E of Dr. Shanfield's report on
17 Qorvo evaluation board design rules and schematics.
18 BY MR. DEFOSSE:
19    Q  Okay.  Could I ask you to turn to page 198 of
20 Dr. Shanfield's report.  And you see at the top of
21 page 19, there's this a section entitled, Qorvo's product
22 development process and testing procedures, do you see
23 that?
24    A  I do see that.
25    Q  Okay.  And you understand that Dr. Shanfield has

76

1 alleged that Qorvo's product development process and
2 testing procedures incorporate a number of trade secrets.
3 Do you understand that?
4    **A  I do understand Dr. Shanfield's position.**
5    Q  And have you analyzed Dr. Shanfield's position
6 with respect to Qorvo's product development process and
7 testing procedures?
8    MS. SMITH:  Objection; vague.
9    THE WITNESS:  So I see in Dr. Shanfield's report on
10 Section F, page 198 entitled, Qorvo's product development
11 process and testing procedures, end quote.  I certainly
12 reviewed all the documentation that I've been exposed to
13 by counsel on this area.  And I have not in detail
14 rebutted this section in my corrected expert report.
15 Although, I do give an overview starting on
16 page 41 in chapter Roman numeral IV, paragraph 71 to 75,
17 and I incorporate by reference the work of Dr. Nguyen and
18 Dr. Darveaux in paragraphs 113 and 114.  And I incorporate
19 sections of their report and I agreed with their opinions
20 that Dr. Shanfield's alleged trade secrets are not trade
21 secrets at all that pertain to Section F of his report.
22 BY MR. DEFOSSE:
23    Q  Okay.  Could I ask you to turn page 243 of
24 Dr. Shanfield's report.  And at the very bottom of
25 page 243, there's a heading that says, Qorvo's systems,

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024

**77**

1  processes, and procedures for testing reliability and mean
2  time to failure of parts.  Do you see that?
3     A   I do see that.
4     Q   And you understand that Dr. Shanfield has opined
5  that in his view Qorvo has trade secrets related to its
6  systems, processes, and procedures for testing reliability
7  and mean time to failure of parts?
8     A   I do see Dr. Shanfield's opinions in Section G on
9  page 243 of his expert report.
10    Q   Did you analyze Dr. Shanfield's opinions related
11 to Qorvo's systems, processes, and procedures for testing
12 reliability and mean time to failure of parts?
13    MS. SMITH:  Objection; vague.
14    THE WITNESS:  So in Dr. Shanfield's expert report, in
15 Section G that starts on page 243, I reviewed all the
16 documents that were exposed to me by counsel, and I
17 believe those documents do pertain to quote, Qorvo's
18 systems, processes, and procedures for testing reliability
19 and mean time to failure of parts, end quote.
20       And although I gave an overview of my opinions
21 that these alleged trade secrets are not trade secrets in
22 section -- or chapter Roman numeral IV, paragraph 71 to 75
23 of my expert report, I do not detail them in my corrected
24 report, but I do incorporate by reference Dr. Nguyen's and
25 Dr. Darveaux's opinions and in paragraphs 113 and 114.

**78**

1  And I agree with those opinions that the alleged trade
2  secrets that Dr. Shanfield opines on in Section G of his
3  report are not trade secrets at all.
4  BY MR. DEFOSSE:
5     Q   Okay.  Could I ask you to turn to page 300 of
6  Dr. Shanfield's report.  At the top of page 300, do you
7  see there's a heading entitled, Qorvo manufacturing,
8  assembly, and change procedures?
9     A   I see that.
10    Q   And you understand that Dr. Shanfield has opined
11 that Qorvo has trade secrets related to its manufacturing,
12 assembly and change procedures?
13    A   I do see Dr. Shanfield's opinions in
14 paragraph 369 of his expert report of the alleged trade
15 secrets of Qorvo.
16    Q   Did you analyze Dr. Shanfield's opinions related
17 to Qorvo manufacturing, assembly and change procedures?
18    MS. SMITH:  Objection; vague.
19    THE WITNESS:  So in Dr. Shanfield's expert report, in
20 Section H and at least on page 300 and paragraph 369, I
21 certainly reviewed documents that were exposed to me by
22 counsel in the section of, quote, Qorvo manufacturing,
23 assembly, and change procedures, end quote.
24       Although, I did not in detail my opinions on
25 these alleged trade secrets, I do give an overview in

**79**

1  chapter Roman numeral IV of my corrected expert report,
2  paragraphs 71 to 75.  And I do incorporate experts
3  Dr. Nguyen and Dr. Darveaux by reference of their expert
4  reports in paragraphs 113 and 114 of my expert report, and
5  I agree with those opinions of both Dr. Nguyen and
6  Dr. Darveaux that the alleged trade secrets that
7  Dr. Shanfield opines upon in Section H of his expert
8  report are not trade secrets at all.
9  BY MR. DEFOSSE:
10    Q   And, Dr. Lebby, could I ask you to return to
11 paragraph 3 of your report?  Okay, in paragraph 3 you say,
12 It is my opinion that the categories of information that
13 Dr. Shanfield claims are trade secrets are not trade
14 secrets.  What categories of information are you referring
15 to in paragraph 3?
16    MS. SMITH:  Objection; asked and answered.
17    THE WITNESS:  The question pertains to the categories
18 of information that I write in paragraph 3 of my corrected
19 expert report.  And what I've written is quote, The
20 categories of information discussed by Dr. Shanfield were
21 generally known, readily ascertainable in the industry,
22 end quote.
23       The categories of information I'm referring to
24 are given by Dr. Shanfield in paragraph 78 of his expert
25 report.  And I believe the eight different categories that

**80**

1  Dr. Shanfield splits up the information on this litigation
2  are the categories of information that I'm actually
3  rebutting and these are the categories, these eight
4  categories, Dr. Shanfield opines upon as alleged trade
5  secrets.
6        And I have not seen any alleged trade secrets in
7  any of these categories either through detailed analysis
8  by myself, as well as detailed analysis by Dr. Nguyen and
9  Dr. Darveaux which I incorporate by reference in
10 paragraphs 113 and 114 of my expert report.  And I give an
11 overview on pages 41 and 42 of my expert report.
12 BY MR. DEFOSSE:
13    Q   In paragraph 3 of the next sentence you state,
14 Competitors would not have obtained value from acquiring
15 this information.  Do you see that?
16    A   I do see that.
17    Q   What do you mean by this information?
18    MS. SMITH:  Objection; asked and answered.
19    THE WITNESS:  So paragraph 3 of my corrected expert
20 report is on the subject of the Qorvo's alleged trade
21 secrets, so this is what this paragraph is about.  And in
22 this paragraph, I indicate through my experience in
23 industry for nearly 40 years as well as reviewing the
24 information that's been presented to me in this litigation
25 as well as Dr. Shanfield's expert report that alleges the

**85**

1  information.
2  BY MR. DEFOSSE:
3    Q   Is your opinion with respect to the value
4  Akoustis obtained or didn't obtain based on the
5  understanding that Akoustis and Qorvo were not
6  competitors?
7    MS. SMITH:  Objection; vague.
8    THE WITNESS:  So my opinions are based on reviewing
9  the information I've seen in this litigation.  And
10  certainly, part of the reviewing of the information is
11  looking at in the market, where these companies are in
12  terms of their positions on the value chain.  So that's
13  certainly part of the answer.
14      But the other part of the answer is I've reviewed
15  all the documents that have been given to me and I
16  reviewed the expert reports of Dr. Darveaux and
17  Dr. Nguyen.  I've incorporated their opinions along with
18  my opinions.  And I've clearly rebutted Dr. Shanfield's
19  opinions that these Qorvo alleged trade secrets are
20  definitely not trade secrets, and they wouldn't benefit
21  folks who saw the information.
22      And I indicate that in paragraph 3 of my
23  corrected expert report.
24  BY MR. DEFOSSE:
25    Q   Do you have an understanding as to whether Qorvo

**86**

1  competes in the market for BAW filters?
2    MS. SMITH:  Objection; vague.
3    THE WITNESS:  So I haven't done analysis of Qorvo's
4  product portfolios and looked at what products it sells,
5  but I understand Qorvo does actually produce BAW filters
6  as well as RF modules.
7  BY MR. DEFOSSE:
8    Q   What analysis did you do to assure yourself that
9  you agreed with the opinions of Dr. Darveaux?
10    MS. SMITH:  Objection; vague.
11    THE WITNESS:  I believe when you asked me a question
12  earlier in this deposition of a date when I spoke to
13  Dr. Darveaux and Dr. Nguyen, it may well have been after
14  the -- their receiving of Dr. Shanfield's expert report.
15  So I believe there may have been one or two calls that
16  were in that time frame, and I believe on record, I may
17  have said the summer of 2023.  That may have not been
18  totally correct.
19      It may have been later in the year after the
20  report, which I don't know when Dr. Shanfield's was, when
21  it was, I believe it was November.
22      And so I believe if I remember correctly, there
23  may have been an overview of some of their opinions then.
24  BY MR. DEFOSSE:
25    Q   Okay.  So as I understand it, you're correcting

**87**

1  your testimony from earlier today because you now recall
2  that you spoke to Dr. Darveaux following the service of
3  Dr. Shanfield's expert report?
4    **A   Well, I don't really recall the conversations and**
5  **when.  But I must have had a conversation because**
6  **otherwise, how would I have the opinions if I hadn't had a**
7  **conversation so I realize then the conversation must have**
8  **taken place after Dr. Shanfield's report.  Otherwise, I**
9  **couldn't in good faith incorporate their opinions into my**
10  **expert report.**
11    Q   So when did you speak to Dr. Darveaux after the
12  service of Dr. Shanfield's report?
13    **A   Sometime after the service of Dr. Shanfield's**
14  **report.  I don't exactly remember when.  I don't even know**
15  **where I was, but -- and certainly believe I gave you an**
16  **incorrect answer earlier in this deposition.**
17    Q   On how many occasions did you speak to
18  Dr. Darveaux after the service of Dr. Shanfield's report
19  and before finalizing your report?
20    **A   It may have happened twice.  Definitely once but**
21  **it may have happened twice, I'm not sure.**
22    Q   For how long did you speak to Dr. Darveaux?
23    **A   I don't remember the length of the calls, but**
24  **typically the lengths of these types of calls that are set**
25  **up by counsel are one hour or less.**

**88**

1    Q   Okay.  And based on the one hour or less that you
2  spent with Dr. Darveaux -- well, strike that.
3      Based on your phone calls with Dr. Darveaux, you
4  concluded that you agreed with his opinions concerning
5  Dr. Shanfield's report?
6    MS. SMITH:  Objection; vague.
7    THE WITNESS:  I don't recall the details of the
8  conversation, but I would presume the details of the
9  conversation were the high level opinions of Dr
10  Darveaux --
11    THE STENOGRAPHIC REPORTER:  I'm sorry, you said were
12  or weren't the high level opinions?
13    MR. DEFOSSE:  Were.
14    THE WITNESS:  Were.
15    THE STENOGRAPHIC REPORTER:  Thank you.  Sorry, it's
16  just hard to hear you sometimes.
17  BY MR. DEFOSSE:
18    Q   Do you want to try that one all over again?
19    **A   Yeah, we can.**
20    Q   Why don't we just start based on your phone calls
21  with Dr. Darveaux, you concluded that you agreed with his
22  opinions concerning Dr. Shanfield's report?
23    **A   I believe the content of those calls also**
24  **included Dr. Nguyen, and there were high level reviews of**
25  **opinions of the -- their opinions after their**

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024

23 (89 to 92)

89

1 analysis of Dr. Shanfield's alleged trade secrets so I
2 could ascertain their opinions from their analysis of the
3 six sections that they reviewed and that are listed in
4 Dr. Shanfield's paragraph 78 of his expert report.
5        And so that I would either be comfortable or
6 uncomfortable incorporating those opinions into my expert
7 report, and as you can see, I was comfortable to include
8 their opinions by referencing paragraphs 113 and 114 of my
9 expert report.
10   Q    And the opinion you expect to offer at trial with
11 respect to Dr. Darveaux is that his opinions are correct?
12   A    Yes, I agree with his opinions, and I've
13 incorporated them by reference. And I will align to his
14 opinions in trial.
15   Q    And the opinion you expect to offer at trial with
16 respect to Dr. Nguyen is that his opinions are correct?
17   A    That is correct. I have incorporated
18 Dr. Nguyen's opinions by reference in my expert report in
19 the paragraphs 113 and 114, and I align with those
20 opinions and will give those in trial.
21   Q    Dr. Lebby, have you ever brought a BAW filter
22 product to market?
23   MS. SMITH:  Objection; vague.
24   THE WITNESS:  So I've brought many electronic and
25 optoelectronic technologies to market. The project I was

90

1 working on at Translucent may have been brought to market.
2 But I don't know in the last year and a half what the
3 status was because that was the subject of the patents
4 that opposing counsel objected to in the protective order.
5        So I haven't followed up and I don't know the
6 status of BAW filters that were patented when I was at
7 Translucent, which has now been signed to IQE, so maybe
8 they've been brought to market, maybe not. But certainly
9 I brought technologies to market with a similar process,
10 similar business plans, and similar type of devices, but
11 that may or may not have been BAW filters.
12 BY MR. DEFOSSE:
13   Q    Sorry, I didn't understand that answer. I'm
14 going to try my question again.
15        Dr. Lebby, have you ever brought a BAW filter to
16 market?
17   MS. SMITH:  Objection; asked and answered.
18   THE WITNESS:  So I brought technologies to market, the
19 electronic semiconductor and optoelectronic based, using a
20 similar process of bringing a BAW filter to market. I've
21 certainly brought optical filters to market, but BAW
22 filters are RF filters. Having said that, the protective
23 order I signed back in January 2023, meant I couldn't
24 really find out or watch or even talk to Translucent or
25 its acquirer, IQE, for the status of the FBAR and the BAW

91

1 filters that were the subject of the patents that I gave
2 to you earlier in this deposition.
3        And I don't know if the status of those
4 technologies, if they have been brought to market or not.
5 But nevertheless, I brought technologies to market that
6 have a similar process and a similar method of taking
7 technology from the lab to marketable products.
8 BY MR. DEFOSSE:
9   Q    Can I ask you to turn to paragraph 43 of your
10 report. And particularly, I want to ask you about some
11 statements on page 21. If you look at the middle of
12 page 21 there's a sentence that says, While FBAR filters
13 are still part of the family of BAW devices. Do you see
14 that?
15   A    Not yet.
16        I do see it now.
17   Q    Okay. So you say in that sentence, While FBAR
18 filters are still part of the family of BAW devices, they
19 are used in wireless RF bandwidth applications where size,
20 weight, and high frequency are key parameters for
21 subcomponents that go into an RF module.
22   MS. SMITH:  Counsel, for the record you're referring
23 to paragraph 44; is that right?
24   MR. DEFOSSE:  Paragraph 43 on page 21.
25   MS. SMITH:  Oh.

92

1   THE WITNESS:  Oh, let me look at the correct...
2   MS. SMITH:  Okay.
3   THE WITNESS:  Okay. I found it in the corrected
4 report.
5 BY MR. DEFOSSE:
6   Q    Okay. So in the sentence that starts, While FBAR
7 filters are still part of the family of BAW devices, are
8 you distinguishing FBAR-type filters from SMR-type
9 filters?
10   A    In the subsequent sentence I do distinguish SMR
11 filters and BAW filters as I indicate from paragraph 43,
12 quote -- sentence, quote, Both SMR filters and FBAR
13 filters are components that make up the bill of materials
14 of a RF module, end quote. So I am distinguishing between
15 a SMR filter and a BAW filter in that sentence that you
16 asked me, expressly asked me the question on.
17   Q    In your opinion is there a difference between the
18 size of filters with FBAR resonators and filters with SMR
19 resonators?
20   MS. SMITH:  Objection; vague.
21   THE WITNESS:  So I indicate in paragraph 43 that FBAR
22 filters are part of the family of BAW devices. I also
23 indicate depending on the design of those filters, size,
24 weight, and high frequency are certainly three of the key
25 parameters that get designed when you are looking at these

133

1  own RF modules and certainly was looking at different
2  types of suppliers to fill that gap.  And certainly a lot
3  of the documents I reviewed had gap analysis that
4  indicated they didn't have a 5 gigahertz filter product
5  for their modules and were clearly concerned about that.
6       I guess we can dig into this a little more, but
7  Akoustis at that time was already developing 5 gigahertz
8  FBAR filters for (indecipherable utterance) wireless RF
9  bandwidth markets.
10      THE STENOGRAPHIC REPORTER:  For what?
11      THE WITNESS:  Wireless RF bandwidth markets.
12      THE STENOGRAPHIC REPORTER:  Modules?
13      THE WITNESS:  Markets.
14      THE STENOGRAPHIC REPORTER:  Markets, thank you.
15      THE WITNESS:  And so this is why I gave my opinions in
16 paragraphs 76 through 80.
17 BY MR. DEFOSSE:
18      Q   Okay.  In your last answer, you said that
19 Akoustis was ahead of Qorvo at that time.  -- well, let
20 me -- sorry, strike that.
21      I'll just read what it says, I'm guessing we can
22 dig into this more, but Akoustis at that time was already
23 developing 5 gigahertz FBAR filters.
24      What did you do mean by at that time?
25      A   So in the section chapter Roman numeral IV,

134

1  Subsection B, there's a number of emails.  I've only cited
2  to a few them in my expert report because there are lots
3  of emails.  It's very clear from paragraph 79 to -- well,
4  in paragraph 79 there are a number of citations that
5  indicate that Qorvo realized it was slow to develop 5
6  gigahertz filters.
7       And, you know, some of the dates of the citations
8  include 2017 all the way to 2020.  This seemed to be a
9  major focus of Qorvo to try and play catch-up for
10 acoustic-based filters at the 5 gigahertz range, and we
11 can see through these emails, these internal emails of
12 Qorvo,
13
14
15
16 And in parallel, you know, Akoustis is a small and nimble
17 company that already was focusing on FBAR filters and
18 focusing on 5 gigahertz earlier than what Qorvo was.
19      Q   When do you understand that Akoustis began to
20 focus on 5 gigahertz filters?
21      MS. SMITH:  Objection; vague.
22      THE WITNESS:  So I believe the answer to that
23 question, as I've indicated in paragraph 77 of my
24 corrected expert report, was in Dr. Darveaux's analysis.
25 I indicate in paragraph 77 at Section 8, where he opines

135

1  on quote, Dr. Shanfield's opinion regarding Akoustis's
2  alleged 55-month head start, end quote.  I have
3  incorporated his opinions in his expert report and I agree
4  with him.
5       And I believe in his report he does detail
6  Akoustis's product development timeline, which I don't
7  recall from memory sitting here today, but we can
8  certainly look into his report and look at the details.
9  BY MR. DEFOSSE:
10      Q   Aside from what Dr. Darveaux did, did you make
11 any effort to independently determine when Akoustis began
12 to develop 5 gigahertz BAW filters?
13      A   Certainly when I reviewed all the documents in
14 this litigation, I certainly reviewed documents that
15 indicated the development timeline of Akoustis.  I have
16 not in detail opined on that myself in my corrected expert
17 report.  But what I have done is incorporate in by
18 reference Dr. Darveaux's analysis in my expert report in
19 paragraph 77.  And from what I saw, when I reviewed the
20 documents in this litigation and what Dr. Darveaux came up
21 with, I agree entirely with his opinions.
22      Q   Sitting here today do you have any understanding
23 as to when Akoustis began developing its 5 gigahertz
24 filters?
25      MS. SMITH:  Objection; asked and answered.

136

1  THE WITNESS:  Sitting here today I don't actually
2  recall the timeline from memory.  And so answering that
3  question would be difficult because I don't remember all
4  the exact dates that are on the timeline that Dr. Darveaux
5  analyzed.  But certainly, I did review the documents in
6  this litigation and agreed with the opinions that
7  Dr. Darveaux came up with.
8       And so no, I can't give you an exact date right
9  now.  But certainly, I agree with the incorporation of
10 Dr. Darveaux's analysis and his opinions.
11 BY MR. DEFOSSE:
12      Q   But you're certain sitting here today that
13 whenever it was that Akoustis started working on 5
14 gigahertz filters, that was before Qorvo started working
15 on 5 gigahertz filters?
16      MS. SMITH:  Objection; vague, misstates prior
17 testimony.
18      THE WITNESS:  All I can see from my corrected expert
19 report in chapter Roman numeral IV, Subsection B,
20 paragraphs 76 to 80, that I do have a rough timeline where
21 Akoustis was incorporated in 2014 and also ships its first
22 prototypes in 2017.
23      So clearly, previous to 2017 Akoustis was working
24 on FBAR filters.  I don't believe I have the detailed
25 dates written in my expert report, but I do incorporate

137

1  Dr. Darveaux's analysis and his expert report that went
2  into greater detail.
3  BY MR. DEFOSSE:
4      Q   Okay. I'm going to hand you what's previously
5  been marked as Exhibit 881. This is a copy of
6  Dr. Darveaux's corrected expert report. And I'd like you
7  to turn to page 20 where the heading, Dr. Shanfield's
8  opinion regarding Akoustis's alleged 55-month head start
9  is near the bottom of the page, do you see that? I guess
10 actually near the top of the page with very lengthy
11 footnotes.
12     A   I do see that.
13     Q   Okay. And Section 8 of Dr. Darveaux's expert
14 report is what you were referring to in paragraph 77 of
15 your report?
16     A   This is indeed correct.
17     Q   Okay. As a kind of housekeeping question, how is
18 it that you were able to refer to Section 8 of
19 Dr. Darveaux's report if you didn't receive his report
20 until after it was finalized?
21     A   I stated on record I didn't see his report until
22 it was after being finalized, but I did have a couple of
23 calls with him. So I presume, you know, this type of
24 information was conveyed in the call.
25     Q   During the call, did Dr. Darveaux tell you that

138

1  he was going to address, quote, Dr. Shanfield's opinion
2  regarding Akoustis's alleged 55-month head start in
3  Section 8 of his report?
4      A   I don't recall all the details. But I certainly
5  recall an overview from Dr. Darveaux about his opinions.
6  But certainly, I don't recall the details.
7      Q   Okay. Looking at Section 8 of Dr. Darveaux's
8  report, do you see where he addresses the start time for
9  Akoustis's development of its 5 gigahertz filters?
10     MS. SMITH: Objection; vague.
11     THE WITNESS: So I do see in paragraph 58 of
12 Dr. Darveaux's report, where he indicates from project
13 conception, he estimates that -- Dr. Darveaux estimates
14 that it took Akoustis about three years to ship their
15 first prototype units. Dr. Darveaux also indicates that
16 the shipping of the first prototype units occurred in
17 August 2017.
18 BY MR. DEFOSSE:
19     Q   Okay. And from that, did you understand that
20 Akoustis began the development of its BAW filters in 2014?
21     A   So as I look at Dr. Darveaux's report in
22 paragraph 58, and see that the first prototype was shipped
23 out to customers in August 2017 and the company was
24 started May 2014, I would expect the project for the FBAR
25 filters to begin sometime in 2014 after the inception of

139

1  the company.
2      And that is using Dr. Darveaux's calculation
3  about three years to ship a first prototype.
4      Q   Okay. So the basis for your opinion that
5  Akoustis was ahead of Qorvo in the development of 5
6  gigahertz range filters was based on your understanding
7  that Akoustis had begun its work on 5 gigahertz BAW
8  filters in 2014?
9      MS. SMITH: Objection; vague.
10     THE WITNESS: So the start of Akoustis developing 5
11 gigahertz BAW filters is certainly indicated by
12 Dr. Darveaux in his expert report, chapter Roman numeral
13 VIII, to be three years before the shipping of the first
14 prototype in August 2017.
15     That indicates to me that Akoustis was certainly
16 very active in developing FBAR filters at 5 gigahertz
17 previous to 2017. What I have in my expert report, my
18 corrected expert report, in paragraphs Subsection B,
19 paragraph 76 to 80 is a number of emails that -- Qorvo
20 emails, indicating that ████████████████████████
21 ████████████████████████████████████████████████
22 ████████████████████████████████████████████████
23 ████████████
24     And so all the while Akoustis was actually
25 developing its 5 gigahertz FBAR filters and actually had

140

1  prototypes out in 2017, which if we look at the emails
2  that I've actually cited in my document, Qorvo really
3  didn't even get there until 2020, which is three years
4  after Akoustis got 5 gigahertz filters out on the
5  marketplace.
6  BY MR. DEFOSSE:
7      Q   Okay. So it's clear that Akoustis introduced 5
8  gigahertz filters to the market before Qorvo did, right,
9  there's no dispute over that, do you agree?
10     A   Well, from the documents I've seen in this case,
11 it certainly looks like the first prototypes for Akoustis
12 with 5 gigahertz FBAR filters occurred in August 2017 as
13 per Dr. Darveaux's expert report.
14     The emails I've seen that are being -- that I've
15 reviewed, indicated in 2017, '18 and '19 time frame, Qorvo
16 was still trying to get its 5 gigahertz filter program off
17 the ground ███████████████████████████
18 ████████████████ So I would agree with you, it
19 certainly looks like Akoustis had 5 gigahertz FBAR filters
20 available from '17 onwards.
21     Q   And sitting here today your understanding is that
22 Akoustis began working on those filters in 2014?
23     MS. SMITH: Objection; vague, asked and answered.
24     THE WITNESS: So as I reviewed Dr. Darveaux's expert
25 report, chapter Roman numeral VIII, what Dr. Darveaux does

161

1    A   Yes, I do.
2    Q   And do you understand that this is the IDP market
3 segment analysis that Dr. Shanfield addressed in
4 paragraphs 82 to 86 of his report?
5    A   I'll warrant that you are correct. I know I have
6 his report in front of me, but I accept that.
7    Q   Okay. If we look at paragraph 84 of your report,
8 you state that in your opinion, the type of information in
9 this presentation is commonly found in publicly available
10 reports. Do you see that?
11   A   I do see that.
12   Q   Okay. Did you look for any publicly available
13 reports that include the information found in Exhibit 127?
14   MS. SMITH:  Objection; vague.
15   THE WITNESS:  So if I understand the question
16 correctly, that pertains to paragraph 84 and Exhibit 127,
17 I did not look for market research reports that relate to
18 this litigation, outside of the documents that I was
19 exposed to by counsel. So no, I did not look at other
20 market research reports to find -- to see if any of the
21 information here was available publicly because I don't
22 think that's appropriate.
23 BY MR. DEFOSSE:
24   Q   Okay. If I could ask you to turn to Slide 6 of
25 Exhibit 127. On this slide there are red, yellow, and

162

1 green boxes correlated with numbers that are ranking
2 market attractiveness and business strength for various
3 market segments, do you agree with that?
4    A   So on 6 of Exhibit 127, there isn't a key.
5 Usually when you have a color code, it comes with a key.
6 But I would agree with you, there seems to be some
7 analysis on business strength and market attractiveness
8 with different numbers in the boxes for different market
9 segments.
10   Q   Okay. And if you look on Slides 4 and 5 of
11 Exhibit 127, do you see the key?
12   A   Well, I agree that is in Exhibit 127 on Slide 4,
13 a key that pertains to the numbers between one and ten on
14 market attractiveness and a key on Slide 5 for numbers one
15 to ten for business strength.
16       But there doesn't seem to be a key for colors.
17 So one could only make the assumption that red may not be
18 as good as green and yellow might be in between. But
19 there doesn't seem to be a key for colors, only the
20 numbers in the boxes. And some of the boxes don't have
21 numbers between one and ten. They have different numbers.
22       So not everything is completely clear.
23   Q   In reviewing Exhibit 127 -- well, strike that.
24       Did you review Exhibit 127 in forming your
25 opinions in this case?

163

1    A   Certainly, Exhibit 127 was a document I reviewed
2 that constituted my opinions as well as me, myself
3 incorporated opinions from Dr. Nguyen and (indecipherable
4 utterance) Dr. Clark in my corrected expert report.
5    THE STENOGRAPHIC REPORTER:  I'm sorry, you said
6 Dr. Nguyen and who?
7    MR. DEFOSSE:  You said Dr. Clark. I think you meant
8 Darveaux.
9    THE WITNESS:  Sorry, Dr. Darveaux. My mistake, sorry
10 about that.
11 BY MR. DEFOSSE:
12   Q   Dr. Lebby, did you understand in reviewing
13 Exhibit 127, that the market attractiveness and business
14 strength rankings on Slide 6 reflected Qorvo's assessment
15 of those topics?
16   MS. SMITH:  Objection; speculation.
17   THE WITNESS:  Just because it's a document,
18 Exhibit 127, has a Qorvo label on it, that says
19 confidential and proprietary information, there's no
20 citation in this document of where this data has come
21 from. Actually, I don't even know if this is, this market
22 segmentation is actually Qorvo information or they've
23 cited it from some market research report. I don't even
24 know if the segment breakdown of the business strength is
25 actually Qorvo information or it's information from a

164

1 market research report.
2       So I actually don't know the source of the
3 information, other than the fact that the document I'm
4 looking at has a Qorvo label on it.
5 BY MR. DEFOSSE:
6    Q   Did you review Slide 3 of the presentation as
7 part of your analysis?
8    A   Yes, I did consider Slide 3 of Exhibit 127 as
9 part of my analysis in forming my opinions.
10   Q   And in the first bullet of Slide 3 of Exhibit
11 127, it states that, Each BUGM and key marketing members
12 contributed an assessment of market attractiveness and
13 business strength for their application market segments.
14 Do you see that?
15   A   I do see that.
16   MS. SMITH:  Objection; misquotes the document.
17   MR. DEFOSSE:  I don't know where I misquoted, but I'm
18 going to try that again to make sure we have it right.
19 BY MR. DEFOSSE:
20   Q   So, Dr. Lebby, do you see in the first bullet on
21 Exhibit 127, Slide 3, it says, Each BUGM and key marketing
22 members contributed in an assessment of market
23 attractiveness and business strength for their application
24 market segments?
25   A   I do see that.

189

1  Certainly, if there is information that Akoustis is
2  wanting to go into the RF module market, please let me
3  know.
4  BY MR. DEFOSSE:
5    Q  Is a diplexer an RF module?
6    A  So in paragraph 93 of my corrected report, it
7  looks like I've made a mistake.  So the question on the
8  table was is a diplexer an RF module.  It is not an RF
9  module, and it looks like I'm incorrect in the first part
10 of this paragraph.  A diplexer is a filter product, and it
11 is a product that I believe Akoustis may sell or sells or
12 plans to sell.
13       And so I will say on record that the first part
14 of paragraph 93 is incorrect.
15   Q  Okay.  If I could ask you to turn to
16 paragraph 100 of your report.  You note that Dr. Shanfield
17 has expressed opinion concerning how Akoustis came into
18 possession of documents that Dr. Shanfield claims are
19 confidential, do you see that?
20   A  I do see what's written in paragraph 100 of my
21 corrected expert report.
22   Q  Okay.  You say, Dr. Shanfield spends many
23 paragraphs focusing on competitive intelligence gathering
24 techniques that are common in the industry.  Do you see
25 that?

190

1    A  I do see that.
2    Q  Do you know what competitive intelligence
3  gathering techniques you were referring to in
4  paragraph 100?
5    A  I think we've touched on what competitive
6  intelligence gathering techniques are already in this
7  deposition, but as I indicate in paragraph 100 of my
8  corrected report, and that would include working with
9  market research companies, companies that do teardowns and
10 evaluation of products that they have gained possession of
11 and certainly, writing reports on teardowns and different
12 types of technologies and market research.
13       And so as we see in paragraph 100,
14 Dr. Shanfield's opinions generally from paragraphs 425 to
15 505, certainly look at a lot of technical information as
16 well as a lot of email traffic that he analyzes.
17   Q  Is it common in the industry to solicit
18 confidential information from China and Korea?
19   A  Well, it's not common for me because I don't do
20 that.  But what I do know is when you're dealing with
21 (indecipherable utterance) Asia in general, the minute --
22 THE STENOGRAPHIC REPORTER:  Dealing with what?
23 THE WITNESS:  Asia.
24 THE STENOGRAPHIC REPORTER:  Thank you.
25 MR. DEFOSSE:  Dealing with Asia in general.

191

1  THE WITNESS:  The minute a document leaves the dock or
2  the four walls of your facility, there is a high
3  probability that information will leak.  And so when I do
4  business with Asia in general, any document or any
5  technology whether it's an evaluation board or a
6  prereleased product or a product or any information, I
7  always have to assume that information may find its way to
8  become public or may find its way into competitive hands.
9       And so the general rule of thumb when working
10 with Asia is always assume that the information, once it
11 leaves the company, could very well be leaked.
12 BY MR. DEFOSSE:
13   Q  Dr. Lebby, I've handed you what's been marked
14 previously as Exhibit 530.  For the record this is a
15 three-page email with the production number AKTS_00264715.
16       First page, Dr. Lebby, is this one of the
17 exhibits that you reviewed in connection with offering
18 your opinions in this report?
19   A  Yes, it is.  But I don't recall it in detail.
20   Q  Okay.  The part I'm interested in, well
21 actually -- strike that.
22       Can you look at the first page, at the top, you
23 see that this is an email from SJ Kim to Dave Aichele from
24 August of 2019; is that right?
25   A  You certainly have entered that correctly.  SJ

192

1  Kim is an Akoustis employee, I presume?
2    Q  Yeah, so SJ Kim is, if you look at the page 3 of
3  3 of Exhibit 530, it states that he's the country manager
4  sales director for Akoustis.
5    A  I do see that.
6    Q  Okay.  What I'm interested in is on page 203,
7  there's a postscript.  It says, PS, do me a favor, that
8  you can accept my expense claim of entertainment with
9  ▓▓▓▓▓/Qorvo/▓▓▓▓▓ without the name of the persons.
10 Just put the name of the company.  The reason is that the
11 guys share those key confidential information with me
12 based on personal relationship, but they are so sensitive
13 with knowing their name with anyone in Akoustis.
14   Do you see that?
15   A  I do see that.
16   Q  And you reviewed this as part of your -- as part
17 of forming your opinions in this case?
18   A  I did use this document, which is Exhibit 530, to
19 form part of my opinions in this case.  That is correct.
20   Q  Is it your opinion that Mr. Kim's use of expenses
21 to obtain key confidential information was a common
22 competitive intelligence gathering technique in the
23 industry?
24 MS. SMITH:  Objection; vague.
25 THE WITNESS:  So as I've just indicated on record, and

193

1  I've indicated in at least my expert report on paragraphs
2  97 to 112, that when I work with Asia in general, with any
3  information that goes outside of our four walls to Asia, I
4  have to prepare myself to know that information could leak
5  and could become public.  So the level of information I
6  utilize when I work with Asia is a lot more critically
7  reviewed than it is when I work with companies, for
8  example, in Europe and America in general.
9       Having said that, I do expect employees to adhere
10 to ethical procedures when doing expense claims.  And so
11 this indicates to me that this person is not filling out
12 the expense form as one would expect a normal employee to
13 do.  So for -- certainly, from my personal standpoint,
14 that would make me uncomfortable because this person is
15 not filling out forms correctly, on one hand.
16      On the other hand, I don't know if in the
17 discussion of the entertainment with the people that SJ
18 Kim went out with, actual confidential information was
19 conveyed or not.  So I actually don't know if this is a
20 common competitive intelligence gathering procedure.
21 Certainly, I would not put up with it in my company, and
22 certainly, when I look for information on competitors, in
23 this case, you know, Qualcomm, Samsung, and different
24 types of players with acoustic filters, I would go up to
25 normal market research companies and purchase those

194

1  reports.
2       But this is clearly somebody who doesn't want to
3  fill an expense form correctly, and in my company, that
4  person wouldn't last.
5  BY MR. DEFOSSE:
6    Q   So is your problem with SJ Kim's statement that
7  he's not filling out expense forms correctly?  Or that
8  he's saying that he's using his expense report to obtain
9  key confidential information about competitors?
10   MS. SMITH:  Objection; vague, misquotes the document.
11   THE WITNESS:  As I've just indicated in the last
12 answer, so, you know, if this answer gets used in trial, I
13 would ask you to review my previous answer as part of the
14 complete answer.  But certainly, expense forms are not
15 being filled out correctly.  And I don't know whether
16 information that was confidential was conveyed or not.
17      That doesn't seem to me that there was any
18 details of any confidential information that was conveyed
19 in this entertainment.  So I actually don't know.  All I
20 know is that when I look for competitive information, I'll
21 go purchase the market research reports on one hand.
22      On the other hand, when I work with Asia, the
23 natural assumption is that any information leaving the
24 four walls of our facility could be subject to being given
25 to competitors, could be subject to public information.

195

1  And so we have to scrutinize that information with a
2  higher level of scrutiny than we do when we're working
3  with European and North American companies.
4  BY MR. DEFOSSE:
5    Q   I want to make sure we're looking at the same
6  portion of Exhibit 530.  You see the sentence where SJ Kim
7  says, The reason is that the guys share those key
8  confidential information with me based on personal
9  relationship.  But they are so sensitive with knowing
10 their name with anyone in Akoustis.
11      Did you interpret that sentence of Exhibit 530 as
12 meaning something other than that Mr. Kim's contacts were
13 sharing key confidential information with him?
14   MS. SMITH:  Objection; calls for speculation.
15   THE WITNESS:  I have no idea what this key
16 confidential information could be.  What I do know is when
17 you go out to dinners in Asia, you know, and there's a
18 bunch of men talking about stuff, they share information
19 that is confidential that has nothing whatever to do with
20 the business they're in.
21      It could be which prostitute they had sex with
22 the night before.  That's key confidential information.
23 You don't want that information going through other
24 employees in companies.  So I don't know.  It doesn't say
25 what the confidential information is in Exhibit 530.  And

196

1  so how can I make a categorical answer to your question
2  when I have no idea what it is in the first place, number
3  one.
4       Number two, I have no idea what the discussion
5  was taking place between these people from the companies
6  he had entertainment with, has no idea what the
7  entertainment is.  I don't know if that's a meal or that's
8  taking them to a normal prostitute place which happens
9  quite regularly in Asia.  And thirdly, whenever you do
10 business with Asia, always assume information will leak
11 out.
12      And so I always take precautions that if I'm
13 working with Asia in general, I scrutinize the information
14 that leaves the company.  And lastly, it looks like the
15 expense reports have not been filled out correctly.  And
16 that's probably -- doesn't align with the procedures I
17 have, and I don't know what the procedures are in
18 Akoustis.
19      But that doesn't feel good in my eyes.
20 BY MR. DEFOSSE:
21   Q   Okay.  I'm handing you what's been marked
22 previously as Exhibit 531.  This is a one-page document
23 that's got the production number AKTS_00496841 on the
24 first page.
25      Dr. Lebby, do you recall reviewing as part of

197

1  your analysis in this case a series of emails from SJ Kim
2  to Dave Aichele and Colin Hunt attaching zip files of
3  confidential Qorvo information?
4      A  I certainly reviewed all the documents that were
5  pretended to me in this litigation. I don't recall all
6  the details because there's thousands of documents. But I
7  did look at all the documents. And I'm reasonably
8  confident that Exhibit 531 is one document that I did
9  review. But I don't recall any details.
10     Q  Okay. Exhibit 531 is an email from Mr. Kim to
11 Mr. Aichele and Mr. Hunt dated August 7th, 2020; is that
12 right?
13     A  That is my understanding. That is correct.
14     Q  And you see it attached as a zip file?
15     A  I see in Exhibit 531 a zip file is attached to
16 this email.
17     Q  Okay. And then Mr. Kim writes in the body of his
18 email, Please don't ask me where did I get from. Because
19 of size of attachment, I will send total three emails.
20 Frankly, I always use my expense for right purpose. Do
21 you see that?
22     A  I do see that.
23     Q  Would you say that Mr. Kim's forwarding of a zip
24 file that he got by using his expense for the right
25 purpose is a common competitive intelligence gathering

198

1  technique in the industry?
2      MS. SMITH: Objection; vague.
3      THE WITNESS: I have no idea of what the zip file
4  contains here. I have no idea what the right purpose as
5  far as expenses were. I mean, he could be doing elicit
6  activities in terms of, you know, going to prostitution
7  houses for all I know. There's no detail in this email.
8  BY MR. DEFOSSE:
9      Q  I guess I'm confused by that answer. Are you
10 suggesting that Mr. Kim found Qorvo's confidential
11 information at a prostitution house?
12     A  I'm not suggesting anything of the kind.
13     Q  Are you suggesting that he was using his expense
14 report to buy prostitutes for Qorvo employees in order to
15 get their confidential information?
16     MS. SMITH: Objection; misstates prior testimony.
17     THE WITNESS: That completely misstates what I was
18 trying to say.
19 BY MR. DEFOSSE:
20     Q  Well, I'm asking you what you're trying to say
21 because you keep mentioning prostitutes and prostitution.
22 And I don't know how that fits with Exhibit 531 when
23 Mr. Kim says, I always use my expense for the right
24 purpose, while he's forwarding a zip file full of Qorvo
25 confidential information.

199

1      A  I don't know what's in that zip file.
2      Q  You didn't review that zip file as part of your
3  analysis in this case?
4      A  Well, let's take a look at the zip file.
5      Q  You don't recall sitting here today, whether you
6  reviewed the three zip files full of Qorvo information
7  that Mr. Kim sent to Mr. Aichele when you opined that
8  Qorvo had not identified any trade secrets in this case?
9      MS. SMITH: Objection; misstates prior testimony.
10     THE WITNESS: You're completely misstating my previous
11 answers. I don't know where you're coming from here.
12 I've given my answers very clear that all the information
13 that I've given -- that I've been given to see in this
14 litigation, I've reviewed.
15     I don't recall exactly what's in the zip file. I
16 don't know what Mr. Kim is using these expenses for. It
17 doesn't really say here. And you're asking me to opine on
18 something where there's not a lot of detail. And so I'm
19 giving you an answer where, you know, he could be using
20 his expenses for different purposes.
21     He doesn't even say what the purpose is. He just
22 says, Use my expense for right purpose. Well, I have no
23 idea what that is. That could be plane tickets. That
24 could be going to the opera. That could be doing elicit
25 activities which I don't want to hear about.

200

1      It's already we've proved on the record from your
2  previous exhibit, which is Exhibit 530, he already lies on
3  his expense forms. And that's something already I said on
4  record that I wouldn't accept in my company. So I don't
5  know what this guy is talking about and I certainly don't
6  have no idea what he means by, quote, Use my expense for
7  right purpose, end quote.
8      MR. DEFOSSE: Okay. Let's go off the record.
9      (Recess taken.)
10 BY MR. DEFOSSE:
11     Q  So, Dr. Lebby, I'd like you to turn to page 64 of
12 your report and look at the section that's titled, The
13 Qorvo documents in Akoustis's possession contained no
14 trade secrets and Akoustis received no head start,
15 Section E. Are you there?
16     A  I am there.
17     Q  Okay. In paragraph 115 I understand that you've
18 opined or you've restated your opinion that you disagree
19 with Dr. Shanfield's opinion that any of the documents
20 contain actual trade secrets in this case, right?
21     A  I do make that statement in paragraph 115 of my
22 corrected expert report.
23     Q  Okay. And then in paragraph 116, you state that
24 the information or the vast majority of the information
25 could have been obtained by Akoustis independently; is

217

1 the company.
2 BY MR. DEFOSSE:
3    Q   Have you ever served as the chief information
4 security officer at any company?
5    A   I don't believe I've had that role in any company
6 that I've been employed in so far.
7    Q   Have you ever been employed in the information
8 security department at any company that you've worked at?
9    A   So while I gave the answer in your last question,
10 I have not had a chief information security role in any
11 company I've worked at. But certainly, in a number of
12 small companies that I've worked at, for example, even in
13 this company, we don't have an information policy
14 department. But I do have responsibility of making sure
15 that policies are in place to protect confidential
16 information.
17       So it is probably not as formal as you would get
18 in a multibillion dollar company like Qorvo, but certainly
19 I have responsibility to protect confidential information,
20 and we do have information policies in place.
21    Q   Okay. Back to my question, have you ever been
22 employed in the information security department at any
23 company that you've worked at?
24    MS. SMITH: Objection; asked and answered.
25    THE WITNESS: So in my present role, I have

218

1 responsibilities with information security. And it's a
2 small company, and there's no separate information policy
3 department because the company's too small. So the
4 responsibility for information policy resides with me.
5       Certainly in previous jobs, like for example, the
6 Ignis Optics where I was the CEO, the information policy
7 resided with me. In OneChip Photonics, as the CEO, the
8 information policy resides with me. In, for example,
9 Oculi, which is my consulting company, there's no separate
10 information policy department, but I am responsible for
11 what is -- to decide what is confidential and what isn't.
12 And so the quote/unquote information policy resides with
13 me.
14 BY MR. DEFOSSE:
15    Q   Do you have any certifications in the field of
16 information security?
17    A   As far as I know, I do not have any
18 certifications in the field of information policy
19 or information certification -- I forget what you asked.
20    Q   Information security.
21    A   I do not have any qualifications as far as I'm
22 aware in information security. I've certainly taken
23 courses, internal courses in companies like, for example,
24 Intel and AT&T. I don't recall all the details, but
25 certainly as an employee, you do get subject to internal

219

1 courses in large corporations.
2    Q   Prior to this case have you ever offered expert
3 opinion regarding information security?
4    A   I cannot recall if I've actually offered opinions
5 on information security before. I certainly haven't
6 thought through all the litigations I've been on, but it
7 is mostly unlikely.
8    Q   You don't hold yourself out as a forensic expert,
9 do you?
10    MS. SMITH: Objection; vague.
11    THE WITNESS: Please define what you mean by a
12 forensic expert.
13 BY MR. DEFOSSE:
14    Q   Did you review the report of Mr. FAULKNER in this
15 case?
16    A   I did not review Mr. Faulkner's report in this
17 litigation.
18    Q   Okay. Did you speak with the forensic expert
19 that Akoustis hired in this case from FTI?
20    A   I don't recall any conversations with any
21 forensic experts that I'm aware of.
22    Q   Okay. Do you have any understanding of the term
23 forensic expert?
24    A   I do have an understanding. It just depends on
25 exactly what the project is and what needs to get

220

1 (indecipherable utterance) done.
2    THE STENOGRAPHIC REPORTER: What needs to be what?
3    THE WITNESS: The project.
4    MS. SMITH: What needs to get done.
5    THE STENOGRAPHIC REPORTER: Thank you.
6 BY MR. DEFOSSE:
7    Q   What is your understanding of a forensic expert?
8    A   Somebody that a forensic expert, at least from a
9 generic definition, is somebody who looks at minute
10 details of something. It could be all broad portfolio of
11 subjects. But certainly somebody who may look at, for
12 example, software, may look at details of different types
13 of emails, may look at minute quantities of something or
14 minute materials within something.
15       It's actually -- it's a very broad definition.
16 And certainly, I haven't been exposed to any forensic
17 activities in this litigation, so my answer to your
18 question won't be that clear.
19    Q   Are you familiar with the Common Sense Guide to
20 Mitigating Insider Threats that was cited in
21 Mr. Robinson's report?
22    A   I don't recall if I looked at that document or
23 not. Certainly, I remember the citation in Robinson's
24 expert report. I don't recall if I've actually looked at
25 that document. If that document was on the file server,

221

1  then I certainly would have reviewed it because I opened
2  every document.
3      But I certainly don't recall.
4      Q   Prior to receiving Mr. Robinson's report, had you
5  ever heard of the Common Sense Guide to Mitigating Insider
6  Threats?
7      A   Not that I recall.
8      Q   You didn't rely on any frameworks or industry
9  authorities in providing your rebuttal to Mr. Robinson,
10 did you?
11     MS. SMITH:  Objection; vague.
12     THE WITNESS:  I don't believe I cited any industry
13 associations or any industry groups in my rebuttal.  I
14 created my rebuttal after reading Robinson's expert
15 report, and provided my own opinions about the treatment
16 of sensitive, confidential information as well as trade
17 secrets using my 40 years of experience of being in
18 industry.
19 BY MR. DEFOSSE:
20     Q   Did you employ any methodology in connection with
21 assessing Qorvo's information security policies?
22     A   I don't recall implementing any methodology in
23 assessing Qorvo's information security policies.  I
24 certainly looked at what Robinson's expert report was
25 indicating in terms of his opinions.  I certainly rebutted

222

1  those opinions using my experience within industry of both
2  working in both small, high tech companies as well as
3  large multinational companies.
4      And working in the role of actually having
5  default responsibility of information security in my role
6  as CEO of a number of different small, high tech companies
7  where I was responsible for the protection of trade
8  secrets, the protection of confidential information, and
9  protection of information that I didn't want to leak
10 outside of the corporation.
11     Q   Have you published any articles related to
12 information security?
13     A   I don't believe I published any articles that
14 expressly relate to information security.  Information
15 security may have been mentioned in passing but wasn't, I
16 believe, the main thrust of any articles I wrote.
17     Q   Have you conducted any speaking engagements
18 related to information security?
19     A   I don't believe I've expressly given speaking
20 engagements that relate to information security.
21 Although, as I've indicated before, I may have mentioned
22 information security in passing as the CEO of a number of
23 different corporations and having responsibility of
24 information security.  But I don't believe any of my
25 speaking engagements have information security as the main

223

1  thrust.
2      Q   If you look at paragraph 126 of your report, you
3  state, I consider Qorvo's business its historical
4  operations, do you see that?
5      A   I do see that.
6      Q   What exactly did you consider?
7      A   When I looked at a number of the documents in
8  this case, in this litigation some of the documents were
9  Qorvo documents and some of the documents were RFMD and
10 some of the documents were TriQuint.  TriQuint and RFMD
11 were historical organizations that originally composed,
12 were merged together to some degree to create Qorvo.
13     And certainly, some of the documents I saw had
14 RFMD and TriQuint labeled on their documents.  And so
15 certainly, I looked at some of the historical documents
16 that came with the operations of this company to form my
17 opinions as I indicate in paragraph 126 of my corrected
18 expert report.
19     Q   Okay.  Can you identify for me the specific
20 documents that you considered in forming your opinions?
21     A   So if you look at chapter Roman numeral V of my
22 corrected expert report, that begins on paragraph 125 and
23 continues to paragraph 151, I do not cite any documents
24 that I reviewed in this litigation.  And so I don't think
25 I can answer your question because there are no documents

224

1  cited.
2      Q   And you understood that under the rules governing
3  expert disclosures, if you had relied on any documents in
4  forming your opinion, you would have needed to have
5  provided or identified that analysis as part of your
6  written report, right?
7      A   So I rebutted the Robinson report at certain
8  paragraphs, and I've cited where I've rebutted the
9  Robinson report in the footnotes of sections -- chapter
10 Roman numeral V in paragraph 125 to 151.  I certainly --
11 as I've just indicated on record, I haven't cited any
12 documents that I used to create my opinion.  So I created
13 my opinion after reviewing the Robinson report and cited
14 to the paragraphs in the footnotes in chapter Roman
15 numeral V of my corrected expert report.
16     Q   If we look at paragraph 127 of your report, and
17 in the portion that's at the top of page 69.  You say at
18 the end of the last sentence, My review of relevant
19 documents revealed no legitimately confidential
20 information belonging to Qorvo, do you see that?
21     A   I do see that.
22     Q   Okay.  And this opinion that you've recited here
23 overlaps with your opinions concerning Dr. Shanfield's
24 report; is that fair?
25     A   Well, I don't know what you mean by overlaps, but

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024

59 (233 to 236)

233

1  at as an employee, I had difficulty in trying to determine
2  what was confidential and what wasn't while working in
3  those companies.
4      I haven't come in here in the deposition to say
5  these companies over designate the word confidential
6  because I haven't done that analysis.  But as an employee
7  of those companies, I often had to seek help to find out
8  when given public information, what was confidential and
9  what wasn't to make sure that my public talks were void of
10  confidential information or if information was
11  confidential, I got approval to talk about it publicly.
12      And so I'm not actually saying these companies
13  are guilty.  I'm indicating as an employee, it's really
14  difficult in large companies to determine what the company
15  feels is confidential and what the company feels is public
16  information.  And I think that probably addresses my
17  answer of noting those companies in paragraph 128 of my
18  corrected expert report.
19  Q   In paragraph 130 of your report, you say, A
20  critical defect in Qorvo's information -- sorry, start
21  over.
22      In paragraph 130 you say, A critical defect in
23  Qorvo's security planning is what appears to be a habitual
24  and indiscriminate labelling of public information as
25  confidential.

234

1      What public information have you seen in this
2  case, that Qorvo labeled as confidential?
3  A   Well, in paragraph 30 of my corrected expert
4  report, I don't cite to any particular document, but
5  certainly I've seen a lot of information here that could
6  be found on the public, certainly in my review of the
7  documents in this litigation.  And I've indicated that in
8  my opinions a number of times today in answering your
9  questions.
10      And so I've actually opined that the over
11  labelling of documents of confidential has certainly been
12  a problem in terms of trying to figure out what is
13  confidential and what is public information, when
14  everything is labeled confidential and clearly, not
15  everything is confidential.  So I would assume if it isn't
16  confidential, then it's probably public information.
17  Q   Did you have any discussions with Akoustis
18  employees to determine whether they had difficulty in
19  determining which of Qorvo's information was confidential?
20  MS. SMITH:  Objection; outside the scope.
21  THE WITNESS:  No, I did not talk to any Akoustis
22  employees about security policies as far as I can recall.
23  BY MR. DEFOSSE:
24  Q   Did you review the testimony from Rohan Houlden
25  concerning his understanding of the confidentiality of

235

1  Qorvo's documents?
2  A   I believe I may have reviewed that document.  I
3  don't recall any details.
4  Q   Do you recall whether Mr. Houlden had difficulty
5  in determining which documents were confidential?
6  A   I don't recall that level of detail.  However,
7  I've come across many, many employees that really have
8  difficulty determining what is confidential and what is
9  not.  And a lot of employees, for example, in public
10  companies are not even aware that there's public documents
11  such as the 10-K that detailed a lot of detailed
12  information about company strategy, company products,
13  company technology that a lot of the employees are not
14  even privy to.
15      And so I don't know Mr. Holden's position, and I
16  don't recall in detail what that document had said, but
17  certainly it's common practice for employees to really not
18  properly understand what's confidential and what is not.
19  Q   So even if an employee such as Mr. Houlden had an
20  understanding of what was confidential which matched the
21  designation on the documents, your opinion would be that
22  you can't trust his understanding because he might not
23  know what's confidential?
24  MS. SMITH:  Objection; incomplete hypothetical.
25  THE WITNESS:  All I've indicated in my answer to your

236

1  previous question is as an industry technology leader, I
2  often have to sit down with the employees and teach them
3  what is confidential and what isn't.  For example, I
4  currently lead a public company, and as of such, the
5  policy in place is only two people in the company, one is
6  myself included, can actually talk to outside folks
7  because of the concern of engineers not knowing the
8  difference between confidential information and
9  nonconfidential information.
10      And so it is a concern, and it's something that
11  is tightly controlled, at least in my company, because
12  it's a clear problem.  And I also remember from my days at
13  Motorola, for example, I had trouble really understanding
14  what is confidential and what isn't even if something was
15  labeled confidential.  And I often seeked advice from
16  higher management to sort that out.
17  BY MR. DEFOSSE:
18  Q   Do you have any evidence in this case that you
19  can point to that indicates that Qorvo employees had
20  trouble distinguishing between confidential and
21  nonconfidential information?
22  A   I don't have any evidence I can point to.  I can
23  certainly point to the documents I've seen in this case
24  that have a huge level of over designation of the
25  information to be confidential when clearly in my opinion,

237

1  it is not. And so if I'm having difficulty seeing what's
2  confidential and what isn't, I'm sure the employees are
3  too.
4       But certainly I haven't seen any evidence from
5  employees and I certainly haven't interviewed any
6  employees from Qorvo about the certain situation.
7     Q   If the jury disagrees with you and determines
8  that the documents Dr. Shanfield addresses in his report
9  did in fact contain confidential information, would you
10 then agree that Qorvo's security measures were reasonable?
11    MS. SMITH: Objection; incomplete hypothetical.
12    THE WITNESS: I've already indicated on record a
13 company can have security policies in place. But if the
14 employees have no idea what's confidential and what isn't,
15 I mean, how can you protect confidential information?
16 BY MR. DEFOSSE:
17    Q   Yes, but see -- and sorry, I want to cut to the
18 end here because it's time for you to go.
19        I understand the basis of your opinion to be that
20 Qorvo's security measures are not reasonable because
21 employees didn't know it was confidential. And the basis
22 for you saying employees didn't know what was confidential
23 is that the documents you reviewed from Mr. Shanfield
24 are not confidential in your opinion.
25        And so we kind of have this circle going here.

238

1  And so what I'm asking is if the jury disagrees with you
2  and finds that those documents that you believe not to be
3  confidential are in fact confidential, whether you have
4  any other basis for saying that Qorvo's information
5  security measures are unreasonable?
6     MS. SMITH: Same objections.
7     THE WITNESS: I certainly feel that Qorvo's security
8  measures are unreasonable in the fact that they don't
9  teach employees the difference between confidential and
10 nonconfidential. Now, maybe they have that in their
11 policies, but certainly I haven't seen any evidence here
12 that the Qorvo security policies that have been presented
13 in this case actually teach employees the difference
14 between confidential and nonconfidential information
15 irrespective of the over labelling of all the documents.
16 BY MR. DEFOSSE:
17    Q   Did you review the Qorvo materials that define
18 confidential information for employees?
19    MS. SMITH: Objection; vague.
20    THE WITNESS: I don't recall the details of the
21 documents I've reviewed. Certainly, we can go review a
22 document if you wish.
23 BY MR. DEFOSSE:
24    Q   In paragraph 133, you address Mr. Robinson's
25 opinions concerning Qorvo's awareness, education, and

239

1  training for employees. Do you see that?
2     A   I do see that.
3     Q   Did you review the materials that Mr. Robinson
4  addressed concerning the awareness, education, and
5  training for employees?
6     A   So as I've already indicated on record, I don't
7  remember that level of detail other than the fact that all
8  the documents that were presented to me, I reviewed. And
9  certainly in terms of Qorvo's awareness, education, and
10 training, that training doesn't teach employees the
11 difference between what is confidential and what isn't.
12 Then I ask whether the awareness, education and training
13 policies in place are actually effective.
14        Because if employees can't tell, then it's
15 clearly not effective. And I didn't see any evidence that
16 I can recall that the training actually taught the
17 employees the difference.
18    Q   Other than failing to train employees on the
19 difference between confidential and nonconfidential
20 information, were there any other aspects of Qorvo's
21 information security policies that you found to be
22 unreasonable?
23    A   Well, in chapter Roman numeral V of my corrected
24 expert report, I certainly discuss a number of opinions
25 from paragraph 125 to 151. And I don't know if you want

240

1  me to go through each particular one here to address that
2  question. But I certainly found that the Qorvo
3  information security policies certainly, did not prevent
4  the over designation of things like marking things
5  confidential, and certainly, acted as a confusing
6  perspective for employees to try and decide whether
7  something was confidential or not.
8     Q   All right. Dr. Lebby, I think we're out of time.
9  I'm going to mark this transcript as attorneys' eyes only.
10        And as I said I'm going to hold this deposition
11 open while I have a chance to go back and review the
12 answers on the basis that the witness consistently
13 throughout the day filibustered my questions and delayed
14 the timing of this deposition.
15    MS. SMITH: Okay. May I have some time to redirect?
16    MR. DEFOSSE: Sure.
17    MS. SMITH: Okay.
18             EXAMINATION
19 BY MS. SMITH:
20    Q   Dr. Lebby, I have some questions for you.
21        Earlier today, you stated that you did not have a
22 copy of the CISSP guide, do you remember that? And when I
23 say CISSP guide, I'm referring to the Certified
24 Information Systems Security Professional Official Study
25 Guide that was cited in Mr. Robinson's report. Do you

245

```
1    Please be advised I have read the
     foregoing deposition, pages 1 through
2    247, inclusive.
3    I hereby state there are:
4
5
6
     (Check one)          no corrections
7
                          corrections per attached
8
9
10
     DR. MICHAEL LEBBY
11
12
13
14
15
16
17
18
19
            --oOo--
20
21
22
23
24
25
```

247

```
1               REPORTER'S CERTIFICATE
2
3    I, Christa Yan, CSR No. 14316, do hereby declare:
4    That, prior to being examined, the witness named in
     the foregoing proceeding was by me duly sworn pursuant to
5    Section 30(f)(1) of the Federal Rules of Civil Procedure,
     and the proceeding is a true record of the testimony given
6    by the witness as accurately as possible. That said
     proceeding was taken down by me stenographically at the
7    time therein named and thereafter reduced to text under my
     direction.
8
9    ____ That said witness was requested to review the
     transcript and make any changes to the transcript as a
10   result of that review pursuant to Section 30(e) of the
     Federal Rules of Civil Procedure.
11   ____ No changes have been provided by the witness
     during the period allowed.
12   ____ The changes made by the witness are appended to
     the transcript.
13   ____ No request was made that the transcript be
     reviewed pursuant to Section 30(e) of the Federal Rules of
     Civil Procedure.
14
15   I further declare that I have no interest in the event
     of the action. I declare under penalty of perjury under
16   the laws of the United States of America that the
     foregoing is true and correct.
17   WITNESS my hand this 5th day of February 2024
18
19
20
21
22   Christa Yan, CSR NO. 14316
23
24
25
```

246

```
1         WITNESS'S CHANGES OR CORRECTIONS
2
3    NOTE:   If you are adding to your testimony, print
     the exact words you want to add. If you are
4    deleting from your testimony, print the exact
     words you want to delete. Specify with "Add"
5    or "Delete" and sign this form.
6
     Deposition of:    DR. MICHAEL LEBBY
7    Case Title:       QORVO V. AKOUSTIS
     Date of Deposition:  JANUARY 31, 2024
8
9    I, _____ have
10   the following corrections to make to my deposition:
11   PageLine Change/Add/Delete
12
13   ___ ___ _____
14   ___ ___ _____
15   ___ ___ _____
16   ___ ___ _____
17   ___ ___ _____
18   ___ ___ _____
19   ___ ___ _____
20   ___ ___ _____
21   ___ ___ _____
22   ___ ___ _____
23   ___ ___ _____
24   ___ ___ _____
25   ___ ___ _____
```

# Exhibit E
# (Redacted in Its Entirety)

Exhibit F





# Transcript of Carlyn Irwin

**Date:** January 26, 2024
**Case:** Qorvo, Inc. -v- Akoustis Technologies, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**



**Page 1**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QORVO, INC.                          )
            PLAINTIFF,               )
    VS.                              )    CASE NO.
                                     )    1:21-cv-01417-JPM
AKOUSTIS TECHNOLOGIES, INC., AND     )
AKOUSTIS, INC.,                      )
            DEFENDANTS.              )
--------------------------------

IN PERSON DEPOSITION

CARLYN IRWIN

FRIDAY, JANUARY 26, 2024

LOS ANGELES, CALIFORNIA

PAGES 1 - 131
REPORTED BY MICHAEL CAGLIATA
CSR #14491, RPR

**Page 2**

Deposition of

CARLYN IRWIN, held in person:

Witness Location:

SHEPPARD MULLIN RICHTER & HAMPTON LLP
333 SOUTH HOPE STREET, 43RD FLOOR
LOS ANGELES, CALIFORNIA 90071

        Pursuant to Notice, before Michael Cagliata,

Registered Professional Reporter, and Certified

Shorthand Reporter No. 14491 in and for the State of

California.

**Page 3**

A P P E A R A N C E S

For the Plaintiff:

        SHEPPARD MULLIN RICHTER AND HAMPTON, LLP
        BY: JENNIFER KLEIN AYERS, ESQ.
        2200 ROSS AVENUE, 20TH FLOOR
        DALLAS, TEXAS 75201
        469-391-7400

For the Defendants:

        SQUIRE PATTON BOGGS
        BY: DAVID ELKINS, ESQ.
        1841 PAGE MILL ROAD, SUITE 150
        PALO ALTO, CALIFORNIA 94304
        650-856-6500

**Page 4**

INDEX

WITNESS NAME                                        PAGE

MS. CARLYN IRWIN, SWORN

        EXAMINATION BY MS. AYERS                       6

33

1   Q.  And they are the defendant; correct?
2   **A.  Correct.**
3   Q.  And what is the next one?
4   **A.  Middle of page 3, Newmark Group Inc. versus**
5 Avison Young (Canada) Inc.
6   Q.  And you represented the defendant, Avison
7 Young (Canada) Inc.; correct?
8   **A.  Correct. The one right after that Le Tote**
9 **Inc. versus Urban Outfitters, Inc.**
10   Q.  And you represented Urban Outfitters in that
11 matter; correct?
12   **A.  I did.**
13   Q.  And Urban Outfitters was the defendant in that
14 matter; correct?
15   **A.  Correct. The next one, Workplace Technologies**
16 **Research Inc. versus Project Management Inc. I worked**
17 **on behalf of Project Management Inc. And the trade**
18 **secret claim was a counterclaim. So that was on the**
19 **plaintiff's side of that testimony. The one below that,**
20 **Comet Technologies versus XP Power.**
21   Q.  And you represented XP Power in that case;
22 correct?
23   **A.  I did.**
24   Q.  Who was the defendant; correct?
25   **A.  Correct. Top of page 4, The Best Label**

34

1   **Company versus Custom Label and Decal.**
2   Q.  And you represented Custom Label and Decal; is
3 that correct?
4   **A.  Correct.**
5   Q.  Who was the defendant in that case; correct?
6   **A.  Yes. Towards the bottom of page 4, Left Coast**
7 **Ventures versus Bill's Nursery. Left Coast Ventures was**
8 **my client and they were the plaintiff in that matter.**
9 Page 5, Newmark Group Inc. versus Avison Young (Canada).
10 This is not a duplicate one. There was a series of
11 matters that were filed in various jurisdictions. I
12 think I've given a total of three depositions in those
13 series.
14   Q.  Okay. And you represented the defendant
15 Avison Young in that matter; correct?
16   **A.  Correct. Middle of page 6, BCG Partners Inc.**
17 versus Avison Young (Canada). Again, that's the third
18 one I mentioned.
19   Q.  And Avison Young (Canada) was the defendant in
20 that matter; correct?
21   **A.  Yes, all three matters. And that is it.**
22   Q.  Okay. So I think you've identified nine,
23 although the record my correct me. You mentioned in
24 your testimony just a few moments ago that in the
25 Workplace Technologies Research Inc. versus Project

35

1 Management Institute case, that Project Management
2 Institute was the defendant, but they had a counterclaim
3 of misappropriation of trade secrets; correct?
4   **A.  Yes.**
5   Q.  Did Workplace Technologies Research Inc., the
6 plaintiff in that case, also have a misappropriation of
7 trade secrets claim?
8   **A.  No.**
9   Q.  Okay. Do you have a law degree?
10   **A.  I do not.**
11   Q.  Lucky you. Are you licensed to practice law
12 anywhere in the United States?
13   **A.  No.**
14   Q.  Do you have a degree in electrical
15 engineering?
16   **A.  No.**
17   Q.  Have you ever designed, tested, manufactured,
18 marketed, or sold bulk acoustic wave filters?
19   **A.  No.**
20   Q.  Do you independently have any knowledge
21 regarding how long it might take to develop bulk
22 acoustic wave filters?
23   **A.  I do not.**
24   Q.  For purposes of your opinions in this matter,
25 you relied on other people to provide you with

36

1 information relating to how long it might take to
2 develop bulk acoustic wave filter technology; is that
3 correct?
4   **A.  Correct.**
5   Q.  You also don't know whether any information
6 relating to bulk acoustic wave filters is publicly
7 disclosed in a document that is available on the
8 Internet; correct?
9   **A.  Personally? No.**
10   Q.  You are relying upon others to assist you with
11 the aspects of your opinion to determine whether or not
12 information relating to bulk acoustic wave technology is
13 publicly disclosed on the Internet; correct?
14   **A.  Correct.**
15   Q.  Appendix B to Exhibit 2, which is your expert
16 report, identifies documents that you relied upon in
17 forming the opinions set forth in your report; correct?
18   **A.  That is the purpose of Appendix B.**
19   Q.  Okay. Did you review or consider any
20 documents not listed in Appendix B?
21   **A.  I don't believe so. If anything comes to my**
22 **mind, I will certainly let you know.**
23   Q.  Thank you. I appreciate that. And is it your
24 intent that if you cited a document in the footnotes or
25 body of your expert report, that it would also be listed

Transcript of Carlyn Irwin
Conducted on January 26, 2024

---

41

1 talked about information that would be helpful for us to
2 understand, for me to understand with respect to
3 damages.
4       Some of the information we obtained from Mr.
5 Aichele I'm sure at some point was discussed with Ms.
6 O'Neal or Ms. Gray, but I don't recall having a
7 conversation with them before they spoke with Mr.
8 Aichele asking them for -- giving them specific
9 questions to ask.
10     Q.  What did Mr. Aichele tell Ms. Gray and Ms.
11 O'Neal during their conversations prior to the issuance
12 of your report?
13     A.  What they -- what he told Ms. Gray and Ms.
14 O'Neal would be reflected in the body of my report and
15 footnoted accordingly.  There are a number of references
16 to that.
17     Q.  I'll help you out, Ms. Irwin, just so that we
18 can establish the foundation for how you recorded
19 information that was conveyed by Mr. Aichele to Ms.
20 O'Neal and Ms. Gray.  In paragraph 102 of your report
21 there's a reference to a discussion with Mr. Aichele.
22     A.  Yes.  That is one of the things I cite that
23 Mr. Aichele provided.
24     Q.  Okay.  And so you reference Mr. Aichele
25 specifically in the body of paragraph 102, and then you

---

42

1 reference the discussion with him in footnote 196;
2 correct?
3     A.  Correct.
4     Q.  Okay.  And so at least with respect to Mr.
5 Aichele and references to him in your report, where it
6 says, "I also understand based on my discussion with Mr.
7 Aichele that the '018 patent expires in June 2024," you
8 did not have that specific discussion with Mr. Aichele,
9 Ms. O'Neal and Ms. Gray did; correct?
10     A.  Correct.  Then I confirmed it with Mr. Aichele
11 in preparation for my deposition.
12     Q.  And that is true of all the references to Mr.
13 Aichele in the body or footnotes of your report because
14 you did not speak to Mr. Aichele personally before
15 issuing your report; is that correct?
16     A.  That's correct.
17     Q.  Who is Robert Darveaux?
18     A.  Dr. Darveaux is an expert that was retained by
19 Akoustis in this matter.
20     Q.  And your Appendix B references discussions
21 with Dr. Darveaux; correct?
22     A.  Yes.
23     Q.  Did you personally speak with Dr. Darveaux
24 prior to issuing your report in this matter?
25     A.  I did not.

---

43

1     Q.  Who on your team spoke with Dr. Darveaux prior
2 to issuing the report on this matter?
3     A.  Ms. O'Neal and Ms. Gray.
4     Q.  And do you know approximately how many times
5 Ms. O'Neal and Ms. Gray met with Dr. Darveaux?
6     A.  At least once, but I don't know.  It could
7 have been more.
8     Q.  Do you know how long Ms. O'Neal and Ms. Gray's
9 conversations with Dr. Darveaux lasted?
10     A.  I don't.
11     Q.  Do you know if anybody else participated in
12 that conversation with Dr. Darveaux?
13     A.  Counsel for Akoustis was likely on the phone
14 call, but I don't know whom.
15     Q.  Did Ms. O'Neal or Ms. Gray take any notes
16 relating to their conversations with Dr. Darveaux prior
17 to the issuance of your report?
18     A.  I don't know one way or the other.
19     Q.  And similar to Mr. Aichele whom we just
20 discussed, to the extent that you relied upon
21 information that Dr. Darveaux conveyed during those
22 conversations, it would be reflected in the body or
23 footnotes of your report; is that correct?
24     A.  Yes.
25     Q.  Okay.  And so references to conversations or

---

44

1 discussions that you had with Dr. Darveaux within the
2 body of your report are actually a reference to Ms. Gray
3 and Ms. O'Neal's conversations with Dr. Darveaux; is
4 that correct?
5     A.  They summarize the conversations that I relied
6 upon, correct.
7     Q.  And who is Michael Lebby?
8     A.  Dr. Lebby is another expert retained by
9 Akoustis in this matter.
10     Q.  Okay.  And did you personally speak with Dr.
11 Lebby prior to issuing your expert report in this
12 matter?
13     A.  No, I did not.
14     Q.  Who on your team personally spoke with Dr.
15 Lebby prior to the issuance of your report in this
16 matter?
17     A.  Ms. O'Neal and Ms. Gray.
18     Q.  Okay.  And do you know approximately how many
19 times Ms. O'Neal and Ms. Gray met with Dr. Lebby prior
20 to you issuing your report?
21     A.  At least once.
22     Q.  Do you know how long the conversation Ms.
23 O'Neal and Ms. Gray had with Dr. Lebby lasted?
24     A.  I do not.
25     Q.  Do you know if Ms. O'Neal and Ms. Gray took

Transcript of Carlyn Irwin
Conducted on January 26, 2024

---

45

1  any notes relating to their conversations with Dr.
2  Lebby?
3      **A.  I do not.**
4      Q.  And similar to Mr. Aichele and Dr. Darveaux,
5  to the extent that you relied upon information conveyed
6  by Dr. Lebby to Ms. O'Neal and Ms. Gray in those
7  conversations, you annotated that in your report;
8  correct?
9      **A.  Correct.**
10     Q.  Either within the body of the text itself or
11 in the footnote; correct?
12     **A.  Correct.**
13     Q.  Okay.  And if there are references to
14 discussions that you personally had with Dr. Lebby in
15 the body of your report, that is actually a reference to
16 the conversations that Ms. O'Neal and Ms. Gray had on
17 your behalf; is that correct?
18     **A.  Correct.**
19     Q.  Did you speak with anyone else that provided
20 you with factual information that you relied upon for
21 purposes of formulating the opinions expressed in your
22 report besides Mr. Aichele, Dr. Darveaux, and Dr. Lebby?
23     **A.  Well, obviously counsel gave me certain facts**
24 **and made me aware of certain aspects of the process of**
25 **litigation, but everything else is disclosed in my**

---

46

1  **report.**
2      Q.  Have you ever reviewed Dr. John Bravman's
3  expert report on patent infringement in this matter?
4      **A.  I believe I opened it and reviewed it quickly,**
5  **but I did not read it cover to cover.**
6      Q.  Okay.  Have you ever reviewed Dr. John
7  Bravman's expert report on invalidity in this matter?
8      **A.  No.**
9      Q.  Have you ever reviewed Dr. Heinrich's expert
10 report on patent infringement in this matter?
11     **A.  No.**
12     Q.  Have you ever reviewed Mr. Robinson's expert
13 report on trade secrets in this matter?
14     **A.  No.**
15     Q.  Have you ever reviewed Mr. Falkner's expert
16 report relating to his forensic inspection of
17 information Akoustis produced in this matter?
18     **A.  No.**
19     Q.  Have you ever reviewed Dr. -- I'm never going
20 to pronounce this right.  I'm going rely on opposing
21 counsel for this.  Doctor Clark --
22         MS. AYERS:  Nguyen.
23     Q.  Nguyen's expert report on non-infringement
24 trade secrets and invalidity in this matter?
25     **A.  No.**

---

47

1      Q.  You mentioned discussions that either you or
2  members of your team had with Dr. Darveaux.  Have you
3  ever reviewed Dr. Darveaux's expert report on trade
4  secrets in this matter?
5      **A.  I have.**
6      Q.  When did you review Dr. Darveaux's expert
7  report on trade secrets in this matter?
8      **A.  It would have been after my report was issued,**
9  **so that would have been another thing I did to prepare**
10 **for my deposition.  I also reviewed Dr. Shanfield's --**
11 **well, portions of Dr. Shanfield's report and portions of**
12 **Dr. Lebby's report.**
13     Q.  Okay.  So you didn't review Dr. Lebby's report
14 in total after it was issued; correct?
15     **A.  I certainly skimmed it.  There were certain**
16 **portions that I was more interested in.**
17     Q.  But you read the entirety of Dr. Darveaux's
18 report; correct?
19     **A.  Yes.  Again, there was probably some sections**
20 **I skipped over because they were technical in nature and**
21 **not relevant to the issue of damages, but I did skim or**
22 **at least view every page of that report.**
23     Q.  Okay.  And you mention that you skimmed Dr.
24 Shanfield's expert report, or reviewed portions of Dr.
25 Shanfield's expert report in this matter; correct?

---

48

1      **A.  Correct.**
2      Q.  When did you review portions of Dr.
3  Shanfield's report?
4      **A.  It would have been after the report was**
5  **issued, obviously.  I would have reviewed it in the**
6  **weeks leading up to the issuance of my report, and then**
7  **I reviewed it again in preparation for my deposition.**
8      Q.  Okay.  So you reviewed portions of Dr.
9  Shanfield's report prior to issuing your report;
10 correct?
11     **A.  Correct.**
12     Q.  Okay.  We're going to go ahead and mark as
13 Exhibit 3 Dr. Shanfield's report.
14         (Exhibit 3 marked for identification.)
15     Q.  I put it in a binder because it is very large.
16 Ms. Irwin, is Exhibit 3 a true and correct copy of the
17 expert report of Dr. Stanley Shanfield relating to
18 misappropriation of trade secrets that you reviewed
19 prior to the issuance of your expert report in this
20 matter?
21     **A.  It is.**
22     Q.  Okay.  And can you identify for me generally
23 which sections of Dr. Shanfield's report you
24 substantively reviewed prior to issuing your expert
25 report in this matter?

---

Transcript of Carlyn Irwin
Conducted on January 26, 2024

13 (49 to 52)

**Page 49**

1    A. Yes. I will tell you when I get there.
2    Q. Perfect.
3    A. So paragraph 508 is one -- that section is one
4    section that I looked at to understand employees and
5    their access to the alleged trade secrets and
6    confidential information. It references report in
7    general with respect to the respective groupings of
8    trade secrets. I'm looking at paragraph 77 of my
9    report, which references the general descriptions and
10   categories of alleged trade secrets and confidential
11   information.
12        Looking backwards, pages 344 through 349
13   discussing the -- Akoustis's acquisition and use of
14   Qorvo's manufacturing, assembly, and change procedures.
15   Pages 126 to 127 --
16   Q. I want to make sure that we're -- are you
17   talking about paragraph number or page number?
18   A. This is page number.
19   Q. Okay. Thank you.
20   A. I always want to make sure we're clear. I
21   would say, without going through his report page by page
22   by reference, everything that supports his opinion that
23   Ms. Bennis relied upon leading up to the 55-month delay.
24   Q. I just want to make sure your answer just now
25   was clear for purposes of the record, Ms. Irwin. I will

**Page 50**

1    try and assist you. So on page 481, Dr. Shanfield
2    begins his discussion of Akoustis's use of Qorvo's
3    confidential information to accelerate its entry into
4    the market, and does that entire section which spans
5    pages 41 to 499 encompass your referral to the 55-month
6    head start that Ms. Bennis relied upon?
7    A. Yes. There may be other things in the report
8    that support his rationale in this section, which I'm
9    relying upon by reference, as well as the very last page
10   of his entire report which is what I'll refer to as a
11   "GANT chart". I also reviewed that.
12   Q. It's fair to say that you didn't read word for
13   word every single page of Dr. Shanfield's 500 page
14   report; correct?
15   A. I did not.
16   MS. AYERS: Why don't we go ahead and go off
17   the record and take a break, if that works for you guys.
18   MR. ELKINS: Works.
19   (Recess taken.)
20   Q. Ms. Irwin, you made a number of assumptions in
21   connection with your analysis and the opinions that you
22   offered in this matter; correct?
23   A. Yes.
24   Q. And those assumptions are set forth in detail
25   in paragraph 28 of your report; correct?

**Page 51**

1    A. Yes.
2    Q. Okay. And for purposes of your opinions in
3    this matter, one of the assumptions that you made is
4    that the alleged trade secrets that Qorvo has identified
5    qualify as trade secrets under both the Federal Defend
6    Trade Secrets Act and/or the North Carolina Trade
7    Secrets Protection Act; correct?
8    A. Yes.
9    Q. Can you explain what your understanding is of
10   a trade secret?
11   A. I probably won't hit the perfect legal
12   definition, but my understanding of a trade secret is
13   that, first of all, it has independent economic value to
14   the owner or the creator of the trade secret. That it's
15   truly a secret and not something that can be necessarily
16   reverse engineered, because it's not public. The
17   purpose is that it's not public, dissimilar to a patent,
18   and that the owner is required to take sufficient steps
19   to keep it confidential and keep it a secret.
20        I'm probably missing one or more legal
21   qualifications, but the most important in my view for my
22   work is the independent economic value.
23   Q. As a general matter, do you agree that unjust
24   enrichment damages in the context of trade secret
25   misappropriation are measured by the amount of the

**Page 52**

1    benefit conferred on the defendant due to the alleged
2    misappropriation?
3    A. Generally speaking, yes.
4    Q. And do you believe that unjust enrichment
5    damages can include a defendant's profits, avoided
6    development costs, and/or the commercial advantage or
7    head start that a defendant received?
8    A. Correct.
9    Q. Do you agree that head start damages are
10   generally measured as the benefit a defendant received
11   because it was able to develop a competing business or
12   product faster than otherwise would be possible absent
13   the misappropriation?
14   A. Yes, that is the definition of -- the
15   situation in which you would calculate head start
16   damages.
17   Q. I want to talk about your opinions that
18   damages associated with Akoustis's alleged
19   misappropriation of trade secrets should be calculated
20   using an avoided cost methodology and limited to
21   ████████████. Okay?
22   A. Okay.
23   Q. Do you agree with me that avoided costs is
24   just one type of unjust enrichment remedies that are
25   recoverable under the Defend Trade Secrets Act?

**53**

1    A.  Yes, that is one form.
2    Q.  Do you agree that avoided costs are
3  essentially supposed to reflect the development cost the
4  defendant avoided because it misappropriated the
5  plaintiff's trade secrets?
6    A.  Generally, yes.
7    Q.  So if we can wrap our brains around this a
8  little bit for the benefit of the jury.  If it costs
9  $100 to develop a widget, but a defendant who was found
10  liable for misappropriating a plaintiff's trade secret
11  was able to develop the widget for $10 using the trade
12  secret information, the costs the defendant avoided
13  incurring was $90; is that correct?
14    A.  Correct.  If all that information is accurate
15  and supported, that would be the form of damages.
16    Q.  Okay.  And if we were talking about it in
17  terms of hours, if we wanted to think about avoided
18  costs in terms of hours, if it takes 100 hours to
19  develop a widget but a defendant who was found liable
20  for misappropriating a plaintiff's trade secret was able
21  to develop a widget in 10 hours, the cost the defendant
22  avoided incurring was the monetary amount associated
23  with those 90 hours; is that correct?
24    A.  In general, correct.  Again, assuming that the
25  100 and the time are substantiated.

**54**

1    Q.  Okay.  And in pages 30 through 33 of your
2  report, you opine that damages associated with
3  Akoustis's alleged misappropriation of Qorvo's trade
4  secrets should be limited to ████████ using an avoided
5  cost methodology; correct?
6    A.  Yes, although I will amend.  I will mention
7  that I understand that Dr. Darveaux had -- issued an
8  errata.  So instead of ██████, I now understand his
9  opinion is ██████████, which affects my calculation
10  from ████████████ and call it ██  It adds a
11  little over
12    Q.  Okay.  But the methodology that is set forth
13  in your report is unaffected by Dr. Darveaux's errata
14  and the increase of ████████████████; correct?
15    A.  Correct.
16    Q.  The methodology that you explained in your
17  report and that you used to form the basis of your
18  opinions is the same regardless of whether or not the
19  hours goes up or down; is that correct?
20    A.  Correct.
21    Q.  Your calculation for the ████████ of avoided
22  costs is set forth in Figure 4 of your report; correct
23  drop?
24    A.  Correct.
25    Q.  And if we wanted to correct your report to

**55**

1  reflect Dr. Darveaux's errata, we would essentially
2  identify where the additional ██████ should be placed
3  within Figure 4, and then perform the same mathematical
4  calculations that are already set forth in the table; is
5  that correct?
6    A.  Correct.  In other words, if we opened the
7  Excel spreadsheet that has the model that's in Figure 4,
8  you would simply change -- you would add ██████ to
9  the line item and then everything else would roll
10  forward.
11    Q.  Okay.  And Column A of Figure 4 contains the
12  hours estimates that Dr. Darveaux and Dr. Lebby provided
13  to Ms. Gray and Ms. O'Neal; is that correct?
14    A.  Correct.  And that were also in their reports,
15  and I confirmed after speaking with them.  When speaking
16  with them.
17    Q.  Okay.  You calculated the information
18  contained in Column B; correct?
19    A.  Yes.
20    Q.  Okay.  And you calculated the engineering cost
21  per hour using 2023 wage information for the highest
22  paid engineer that Qorvo alleged Akoustis poached;
23  correct?
24    A.  Correct.
25    Q.  And the methodology that you used to drive the

**56**

1  ██████ is set forth in paragraph 80 of your report; is
2  that correct?
3    A.  Yes, but it's probably better reflected in
4  footnote 3 to Figure 4 which expands upon it by saying
5  that we also included employer contributions to social
6  security and Medicare.
7    Q.  Okay.  So you calculated the ██████ per hour
8  by dividing the individual's gross wages plus employer
9  tax contributions by ████████; correct?
10    A.  Correct.
11    Q.  And the employer tax contributions that you
12  reference in paragraph 80 is more specifically
13  identified in the note 3 to Figure 4; is that correct?
14    A.  Yes.
15    Q.  Okay.  So the only employer tax contributions
16  that you included in your calculation to reach the
17  ██████ is social security, Medicare, and tax
18  withholdings for 2023; is that correct?
19    A.  Correct.
20    Q.  And then in Column C you essentially
21  multiplied the hour estimates you received from Dr.
22  Darveaux and Dr. Lebby by this ██████ per hour
23  engineering costs; is that correct?
24    A.  Yes.
25    Q.  Dr. Darveaux and Lebby also provided you with

---

57

1  the information that is reflected in Column D of
2  Figure 4; is that correct?
3      A. Yes.
4      Q. Can you explain to the jury what mathematical
5  formula you used to calculate Column E?
6      **A. E? E is the present value of Column C,**
7  **bringing the value of engineering hours saved through**
8  **the date of trial at a weighted average cost of capital**
9  **or discount rate of** ███████, **and bringing that**
10 **through June 30th, 2024.**
11     Q. Okay. And can you explain to the jury what
12 mathematical formula you used to calculate Column E?
13     **A. You just asked me that question.**
14     Q. F. Sorry. Thank you very much.
15     **A. F is similar. It's the cost to obtain the**
16 **public information, assuming that it was all acquired, I**
17 **think, December 31st, 2015, and brought forward through**
18 **June 30th, 2024, using a discount rate of** ███████.
19     Q. Okay. And ultimately you identify Akoustis's
20 alleged total avoided costs by adding Columns E and F
21 together; correct?
22     **A. Correct.**
23     Q. And it is ultimately your opinion in this
24 matter that a more appropriate form of damages is to
25 estimate the development costs that Akoustis avoided

---

58

1  through the alleged misappropriation of Qorvo's trade
2  secrets; correct?
3      **A. Correct.**
4      Q. You mentioned in your testimony a few moments
5  ago that Ms. O'Neal spoke to Dr. Darveaux and Lebby in
6  order to get the estimated number of engineering hours
7  for each source of trade secret groupings, but that you
8  confirmed the information included in your report by
9  reviewing both Dr. Darveaux and Dr. Lebby's reports;
10 correct?
11     **A. Yes.**
12     Q. Okay. And I want to make sure that I fully
13 understand what information Dr. Darveaux and Dr. Lebby
14 gave you and that you're relying upon for your opinions.
15 If we look at paragraph 76 of your report, both Dr.
16 Darveaux and Lebby conclude that none of the documents
17 Qorvo's experts identified contain trade secrets because
18 all of the information that might be useful to Akoustis
19 was publicly available; correct?
20     **A. Correct.**
21     Q. You go on to say in paragraph 77 that both
22 doctors Darveaux and Lebby provided you with hours
23 estimates that reflect, quote, the time it would take a
24 typical Akoustis engineer to find the information
25 publicly and the cost to purchase such information, if

---

59

1  any; correct?
2      **A. Correct.**
3      Q. And then as we discussed, if we turn back to
4  Figure 4 of your report, Columns A and D contain the
5  hours statements and cost information that doctors
6  Darveaux and Lebby provided to you; correct?
7      **A. Correct.**
8      Q. If the jury disagrees with doctors Darveaux
9  and Lebby and concludes that the information contained
10 in Qorvo's documents are trade secrets and are not
11 publicly available, then your analysis of Akoustis's
12 avoided costs does not apply; correct?
13     **A. If the jury finds that they are not -- that**
14 **they could not be replicated in a manner in which**
15 **doctors Darveaux and Lebby described, both identified**
16 **and implemented, then correct, they would disagree with**
17 **the premise of my -- the inputs, basically, of my**
18 **analysis. One thing I should clarify, though. The end**
19 **of paragraph 76, both doctors Darveaux and Lebby have**
20 **the opinions that they're not trade secrets, but I'm**
21 **assuming they're trade secrets. I'm not operating under**
22 **an assumption that these are not trade secrets.**
23     **I'm setting their opinions aside and then**
24 **relying on their expert work identifying the information**
25 **contained in the documents that were asserted as trade**

---

60

1  **secrets, finding that information and the estimates for**
2  **implementing the methodology that was contained in that**
3  **information. So I'm setting aside their ultimate**
4  **opinion of trade secrets as a legal issue and then**
5  **proceeding with the estimate of avoided costs.**
6      Q. But the hours that Dr. Darveaux and Lebby
7  provided to you are predicated on the assumption that an
8  Akoustis engineer could identify all of the information
9  contained in the documents Qorvo identifies as trade
10 secret on the Internet; correct?
11     **A. Either on the Internet or another -- through**
12 **other research. I'm not sure if it's all technically on**
13 **the Internet, so don't quote me on that, but that the**
14 **information was obtainable and could have been created**
15 **or designed around with this amount of effort and at**
16 **this cost.**
17     Q. Okay. But the level of effort that Dr.
18 Darveaux and Lebby identified and which you relied upon
19 is predicated upon their opinions that the information
20 Dr. Shanfield identified as trade secrets was publicly
21 available information; correct?
22     **A. It's based on their expert reports and the**
23 **research that they did, but yes, I rely on them for that**
24 **information.**
25     Q. So if the jury disagrees with doctors Darveaux

61

1  and Lebby, and determines that the information contained
2  in Qorvo's documents are in fact secret and not publicly
3  available and capable of being recreated in the hours
4  estimates that he opined to, then you have not performed
5  a calculation as to the harm that Qorvo suffered due to
6  the use of Qorvo's trade secrets; is that correct?
7      MR. ELKINS:  Object to form.
8      THE WITNESS:  So you're saying -- your
9  question, the end of it, talks about Qorvo's harm.  This
10 is a form of unjust enrichment, so that would not be
11 Qorvo's harm.
12     Q.  That's a fair response to the question.  Ms.
13 Irwin, let me reform late it for you.  So if the jury
14 degrees with Dr. Darveaux's and Lebby's and determine
15 that the Qorvo documents Akoustis took are in fact
16 secret and not publicly available, then you have not
17 performed a calculation as to the unjust enrichment that
18 Akoustis benefitted from the fact that it took Qorvo's
19 trade secrets; correct?
20     MR. ELKINS:  Object to form.
21     THE WITNESS:  If they disagreed with doctors
22 Darveaux and Lebby regarding the ability to
23 independently identify and obtain the information, then
24 yes.  That's correct.
25     Q.  Let's talk about your opinion relating to

62

1  Qorvo's, what I will refer to as, "poaching claim".
2      A.  Okay.
3      Q.  I believe your opinions begin to be reflected
4  with respect to Qorvo's poaching claim in paragraph 96
5  of your report; is that correct?
6      A.  Correct.
7      Q.  Your primary opinion with respect to Qorvo's
8  poaching claim is that the damages should be zero; is
9  that correct?
10     MR. ELKINS:  Can I hear the question again?
11     (Read back.)
12     Q.  Based on the fact that Ms. Bennis hasn't tied
13 her analysis to the stipulated -- the stipulation, that
14 the employees were poached only for the purposes of
15 unfair and deceptive trade practices, or that they were
16 -- sorry.  That it was based on that the employees were
17 poached because they had confidential information.
18 Probably I'm saying that in not such an eloquent way.
19 But she did not limit her analysis or tie her
20 calculation of individuals and their alleged value to
21 any information that these individuals had which may
22 have been the purpose of the poaching, alleged poaching.
23     So because she hasn't done that lost
24 causation, in my opinion, her calculation is not tied
25 and should be zero.  I'm not saying that replacing

63

1  employees is a cost free activity, but what I'm saying
2  here is that she has not tied it back to the ultimate
3  claim that Qorvo is asserting.
4      Q.  Okay.  So I just want to break that down so
5  that I can make sure that I understand the various
6  aspects of your poaching opinions.  So in paragraph 97
7  and in Figure 5, you attempt to identify those former
8  Qorvo employees who went to work at Akoustis, who were
9  allegedly identified in the Shanfield report as having
10 access to Qorvo trade secret information; is that
11 correct?
12     A.  Correct.
13     Q.  Okay.  And your opinion is that if Ms. Bennis
14 had limited her poaching damages calculation to only
15 those individuals identified in the Shanfield report as
16 having access to Qorvo's trade secrets, the amount of
17 her calculation would have been ▮▮▮▮▮; is that
18 correct?
19     A.  Had she performed the loss causation analysis
20 properly, yes.
21     Q.  Okay.  But that's separate from your opinion
22 in paragraph 96 that the damages should be zero;
23 correct?
24     A.  Yes, because -- so the whole statement is,
25 based on this stipulation which Ms. Bennis does not

64

1  consider, Qorvo couldn't have been harmed as a result of
2  such claims.  So she's asserting ▮▮▮▮▮▮▮▮▮▮▮
3  dollars of damages but hasn't looked at the lost
4  causation.  So to me, her entire analysis is
5  unsupported.
6      I've then done the analysis and said, "okay.
7  If you take her methodology, which I still believe is
8  overstated, and limit it based on the lost causation
9  analysis, it's ▮▮▮▮▮."
10     Q.  Okay.  So you're not offering an opinion in
11 this matter that Qorvo disclaimed its poaching
12 allegations in filings and statements it made before the
13 Court; correct?
14     A.  I don't think I followed your question.
15     Q.  Yeah.  I want to make sure that -- your
16 paragraph 96 talks about a stipulation and a disclaimer,
17 and I'm trying to determine whether or not you're
18 offering an expert opinion that Qorvo disclaimed its
19 poaching allegations in filings and statements it made
20 before the Court.
21     A.  It's that last part I'm not following or
22 tracking.  You're asking whether or not I believe or if
23 my expert opinion is based on the fact that Qorvo
24 disclaimed its allegation?
25     Q.  Correct.  Because if you look at paragraph 96,

129

1   close it out.
2           MS. AYERS:  I need a daily rough.
3           MR. ELKINS:  I need a daily rough.
4           (Proceedings concluded at 3:03 P.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

130

1       DECLARATION UNDER PENALTY OF PERJURY
2
3       I, CARLYN IRWIN, do hereby certify under
4   penalty of perjury that I have read the foregoing
5   transcript of my deposition taken January 26, 2024; that
6   I have made such corrections as appear noted on the
7   Deposition Errata Page attached hereto and signed by me;
8   that my testimony as contained herein, as corrected, is
9   true and correct.
10
11      Dated this _____ day of _____,
12      2023, at _____,
13   California.
14
15      _____
                CARLYN IRWIN
16
17
18
19
20
21
22
23
24
25

131

1   STATE OF CALIFORNIA     )
                            )
2   COUNTY OF LOS ANGELES   )
3
4       I, Michael Cagliata, Certified
5   Shorthand Reporter No. 14491, do hereby
6   Certify:
7       That prior to being examined, the witness
8   named in the foregoing deposition was by me duly
9   sworn to testify the truth, the whole truth, and
10  nothing but the truth;
11      That said deposition was taken down by me
12  in shorthand and thereafter reduced to print by
13  means of computer-aided transcription; and the same
14  is a true, correct, and complete transcript of said
15  proceedings.
16      I further certify that I am not
17  interested In the outcome of the action.
18      Witness my hand this 26th day of January, 2024.
19
20      _M. Cagliata_
21      _____
        Michael Cagliata, CSR #14491, RPR
22  Certified Shorthand Reporter
        In and for the State of California
23
24
25

# Exhibit G
# (Redacted in Its Entirety)

# Exhibit H



# Transcript of Robert Darveaux, Ph.D.

**Date:** January 18, 2024
**Case:** Qorvo, Inc. -v- Akoustis Technologies, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Robert Darveaux, Ph.D.

Conducted on January 18, 2024

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4    - - - - - - - - - - - - x
 5   QORVO, INC.,          :
 6        Plaintiff,       :
 7     v.                  :
 8                         :  C.A. NO. 21-1417 JPM
 9   AKOUSTIS TECHNOLGIES, :
10   INC., et al.,         :
11        Defendants.      :
12    - - - - - - - - - - - - x
13   ██████████████████████████████
14
15        Deposition of ROBERT DARVEAUX, PhD
16             Conducted Virtually
17          Thursday, January 18, 2024
18              11:04 a.m. EST
19
20
21   Job No.:  521333
22   Pages: 1 - 259
23   Reported By: Karen Klerekoper, CSR-4250, RPR
24
25
```

**Page 2**

```
 1      Deposition of ROBERT DARVEAUX, PhD, conducted
 2   virtually:
 3
 4
 5
 6
 7
 8
 9      Pursuant to Notice, before Karen Klerekoper,
10   Notary Public in and for the State of Michigan.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       JONATHAN R. DeFOSSE, ESQUIRE
 5       ROY JUNG, ESQUIRE
 6       SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
 7       2099 Pennsylvania Avenue, NW, Suite 100
 8       Washington, D.C.  20006
 9       202.747.1900
10
11   ON BEHALF OF THE DEFENDANTS:
12       VICTORIA Q. SMITH, ESQUIRE
13       XIAOMEI CAI, ESQUIRE
14       SQUIRE PATTON BOGGS
15       1841 Page Mill Road, Suite 150
16       Palo Alto, California  94304
17       650.856.6500
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    INDEX
 2
 3   WITNESS:                                    PAGE:
 4
 5   ROBERT DARVEAUX, PhD
 6           EXAMINATION BY MR. DeFOSSE:            6
 7
 8                   *****
 9   EXHIBIT:                                    PAGE:
10
11   (Exhibits attached to transcript.)
12   Exhibit 879, Darveaux Deposition Notice      16
13   Exhibit 880, 23-12-20 Darveaux rebuttal expert  16
14   report
15   Exhibit 881, 24-01-16 corrected Darveaux rebuttal  22
16   Exhibit 882, expert report of Dr. Stanley Shanfield  28
17   Exhibit 78, AKTS_00204965-4970, 2016 presentation  45
18   Exhibit 883, AKTS_01204609-4612, paper by Link  55
19   Exhibit 884, AKTS_01204591-4596, Gernot Fattinger  56
20   paper
21   Exhibit 149, AKTS_00204845-4876, Qorvo presentations  84
22
23   (Index continued on following page.)
24
25
```

209

1  Exhibit 881. And I would like to go to paragraph
2  58 of that report.
3     A Okay.
4     Q In paragraph 58, you start the section
5  where you address Dr. Shanfield's opinion
6  regarding the head start benefit he says that
7  Akoustis obtained from getting the Qorvo
8  documents; is that right?
9     A Correct.
10    Q Okay. In paragraph 58, you say that
11 you've reproduced some of the key milestones for
12 the Akoustis BAW filter development in the table
13 directly below 58; is that right?
14    A That's correct.
15    Q Is it your understanding that Akoustis
16 began developing BAW filters in May of 2014?
17    A So, I don't know the exact details of what
18 happened in May of 2014. All I know is the
19 company was incorporated. I don't have detailed
20 information in my report, or nor did I
21 investigate, you know, what their staffing levels
22 were over time.
23    I just state that's when they were
24 incorporated.
25    Q Okay. Do you know when Akoustis started

210

1  their project for developing 5 gigahertz BAW
2  filters?
3     A I don't know.
4     Q Okay. Do you know when their first 5
5  gigahertz BAW filter was shipped?
6     A I don't believe I have that in my report.
7  What I have is when they started getting -- you
8  know, what I include in my report is when they
9  start to get revenue from shipping filters. I
10 didn't break it down by frequency.
11    Q Okay. In your opinion, what would be a
12 reasonable time frame for Akoustis to have gone
13 from starting its 5 gigahertz BAW filter project
14 to shipping a prototype of that project of that
15 type of filter? Sorry.
16    A Okay. So, again, what I describe in this
17 section of the report is the experience I've had
18 in -- in development in this industry for many
19 different types of technologies. And then
20 included amongst those are development of SAW
21 filters and BAW filters. I didn't break it down
22 to a 5 gigahertz example, but I definitely have
23 examples of how long companies take to develop SAW
24 filters and BAW filters.
25    And -- and generally, that's in the one-

211

1  to three-year time frame, depending on the
2  magnitude of the change from their previous -- you
3  know, their previous product or experience.
4     Q Does the one- to three-year time frame
5  also account for the size of the company?
6     A So, one to three years were for the
7  companies that I mentioned. I didn't compare if
8  there was some variation in size that affected the
9  results. Basically all the -- for example,
10 Skyworks, when we first started, our suppliers
11 were Panasonic, Taiyo Yuden and TDK-EPCOS. I'm
12 quite certain those are all different sized
13 companies. I -- I don't have the data on how big
14 each one was. But everybody was held to the same
15 timeline in terms of development programs.
16    Q Okay.
17    A So, they all had to meet the same
18 timeline. So, it wasn't like you got a pass if
19 you were a smaller company, for example.
20    Q Okay. Well, that's kind of my question.
21    So, in your opinion, a small company that
22 only had a single BAW design engineer would take
23 the same amount of time to develop a new line of
24 BAW filters as, say, a company like Qorvo that has
25 183 BAW engineers?

212

1     MS. SMITH: Objection, misstates prior
2  testimony.
3     A That's not what I said, but...
4     Q Okay.
5     A So -- so, one of the issues with
6  comparing, say, a Qorvo timeline to Akoustis
7  timeline is, was focused on a very narrow range of
8  activity.
9     Qorvo's a huge company, yes. But they're
10 not all focused on making BAW filters for
11 infrastructure or automotive, for example.
12    In fact, that was one of the issues that
13 you'll find in the -- in the email exchanges that
14 were produced by Qorvo,
15                            -- these specific
16 5 gigahertz Wi-Fi-type filters, and that's what
17 caused their development time to be so long.
18    So, it's -- I don't think you can equate
19 size of company to development time.
20    I think there's other factors. Certainly,
21 focus is a big one. And then all the other
22 factors that I address in my report here is, you
23 know, your partners that you're utilizing and the
24 technology decisions you make along the way.
25    Q Okay. And just to tie this one off, then,

257

1  They're in our electronics industry. They're --
2  they're wafer foundries. They don't -- they don't
3  design products, per se. They -- you know,
4  they -- their primary function is to fabricate the
5  wafers, you know, giving provided design rules by
6  them, but they are designed by a third -- you
7  know, other companies like NVIDIA.
8      There is huge outsource assembly and test
9  companies like ASE or Amkor. They do the assembly
10 and test portion, so they're in the electronics
11 industry. Okay?
12     Then there's -- there's people that are
13 called electronic manufacturing service. EMS
14 companies, like Foxconn, and many others like
15 them. They're in the electronics industry.
16     So, they -- they do the, you know, part of
17 the manufacturer flow primarily from surface
18 mounting components on circuit boards all the way
19 thorough final product assembly and test.
20     So, I just gave a few names here and a few
21 different categories, but I consider all those
22 part of the industry. And I didn't even include,
23 you know, the manufacturers of the final product,
24 like Apple or Samsung or Hewlett-Packard or, you
25 know, whatever computer you have sitting on your

258

1  desk, right? Those are people that are in the
2  electronics industry, as well.
3    Q  Okay. What about Qualcomm?
4    A  Qualcomm is in the electronics industry.
5    Q  Intel?
6    A  Intel is in the electronics industry.
7      MR. DeFOSSE: Okay. I think that's --
8  let's go off the record for a moment.
9      (Off the record.)
10     MR. DeFOSSE: Dr. Darveaux, thank you for
11 your testimony today. I do not have any further
12 questions.
13     THE WITNESS: Okay.
14     MS. SMITH: I also don't have any
15 questions on redirect.
16     MR. DeFOSSE: Okay. I think we can go
17 off.
18     (Deposition concluded at 8:03 p.m. EST
19     Signature of the witness was not
20     requested.)
21
22
23
24
25

259

1  CERTIFICATE OF SHORTHAND REPORTER NOTARY PUBLIC
2      I, Karen Klerekoper, the officer before
3  whom the foregoing proceedings were taken, do
4  hereby certify that the foregoing transcript is a
5  true and correct record of the proceedings; that
6  said proceedings were taken by me stenographically
7  and thereafter reduced to typewriting under my
8  supervision; that review was NOT requested; and
9  that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13    IN WITNESS WHEREOF, I have hereunto set my hand
14 and affixed my notarial seal this 22nd day of
15 January 2024.
16
17
18 MY COMMISSION EXPIRES:
19 OCTOBER 7, 2024
20 _____
21 _____
22 NOTARY PUBLIC IN AND FOR THE STATE OF MICHIGAN
23
24
25

# Exhibit I
# (Redacted in Its Entirety)

# Exhibit J
# (Redacted in Its Entirety)