# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT COURT OF DELAWARE

| | |
|---|---|
| QORVO, INC.<br><br>Plaintiff,<br><br>v.<br><br>AKOUSTIS TECHNOLOGIES, INC. and AKOUSTIS, INC.<br><br>Defendants. | C.A. No. 21-1417 (JPM)<br><br>**JURY TRIAL DEMANDED**<br><br>**[FILED UNDER SEAL]**<br>[PUBLIC VERSION] |

### OPENING BRIEF IN SUPPORT OF THE AKOUSTIS DEFENDANTS' MOTION TO EXCLUDE CERTAIN DAMAGES OPINIONS OF MELISSA A. BENNIS

Dated: February 9, 2024

OF COUNSEL:

Ronald S. Lemieux
David S. Elkins
Victoria Q. Smith
Squire Patton Boggs (US) LLP
1841 Page Mill Road
Suite 150
Palo Alto, California 94304
(650) 856-6500
ronald.lemieux@squirepb.com
david.elkins@squirepb.com
victoria.smith@squirepb.com

Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Defendants Akoustis Technologies, Inc. and Akoustis, Inc.*

## I. INTRODUCTION AND SUMMARY OF ARGUMENTS

"The Third Circuit has explained" that "'Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit.'" *Mosaid Techs. Inc. v. LSI Corp.*, No. 10-192-RGA, 2014 WL 807877, at *2 (D. Del. Feb. 28, 2014) (quoting *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir.2003). Defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively "Akoustis") move to exclude certain opinions of plaintiff Qorvo, Inc.'s damages expert Melissa A. Bennis because they are unreliable and do not fit the facts of this case.

Ms. Bennis opines that Qorvo is entitled to recover the following alleged damages:

- o Unjust enrichment for trade secret misappropriation under a "head-start" theory in the amount of $66.1 million;

- o Unjust enrichment and damages for unfair competition under North Carolina law in the amount of $▇▇▇▇▇▇▇ for trade secret misappropriation, false advertising damages of $▇▇▇▇▇ for corrective advertising; and $▇▇▇▇ in damages for employee poaching; and

- o Patent damages in the form of a reasonable royalty through June 30, 2024 in the amount of $▇▇▇▇

(Elkins Decl. Ex. A (Bennis Report) at 90.) Her new, untested variation of a "head-start" analysis is Qorvo's sole support for all trade secret misappropriation damages and for the trade secret portion of unfair competition damages. Ms. Bennis' theory, however, is fatally flawed and unreliable for at least two reasons.

First, it is based on a comparison of the "time value" of bare revenue that Akoustis actually received versus the revenue it allegedly would have received if that revenue had been delayed by 55 months. Revenue, however, is not a cognizable basis for calculating unjust enrichment except as part of the calculation of a defendant's "ill-gotten" profits – something that Ms. Bennis does *not* purport to calculate, as Akoustis has never earned a profit. Second, even if revenue were a proper basis for unjust enrichment damages (it is not), Ms. Bennis errs by including in her revenue

calculation all of Akoustis' historical revenue, including revenue unrelated to any alleged use of Qorvo's purported trade secrets.

Ms. Bennis' opinion regarding "$▓▓▓▓ in damages for employee poaching" – part of Qorvo's claimed unfair competition damages – is also unreliable. This amount is claimed to be for the actual damages that Qorvo purportedly suffered in replacing employees it lost to Akoustis' alleged "poaching." But Ms. Bennis does not derive this amount by asking Qorvo for financial data reflecting what it spent to replace these employees. Instead, she fabricates an opinion based on an analysis completed by a third party (KPMG) regarding the "replacement" value of employees at a different company, RFM Integrated Device, Inc. ("RFMi"). RFMi is a fabless supplier of surface acoustic wave ("SAW") resonators and filters that Akoustis acquired in 2022. Ms. Bennis conducted no analysis regarding the comparability of employee replacement costs between Qorvo and RFMi. Nor did she even bother to ask Qorvo whether it actually replaced any of the allegedly poached employees about whom she opines on replacement costs.

Ms. Bennis' methodologies in calculating these two forms of damages are untested, unreliable, and do not fit the facts of this case. Akoustis therefore respectfully requests the Court to exercise its gatekeeping function and exclude Ms. Bennis' opinions regarding "head start" and "employee poaching" damages.

## II. THE CHALLENGED OPINIONS

### A. MS. BENNIS' "HEAD START" UNJUSTMENT ENRICHMENT DAMAGES OPINION

The Defend Trade Secrets Act ("DTSA") provides three forms of damages for trade secret misappropriation: (i)(a) damages for actual loss caused by the misappropriation of the trade secret; and (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; *or* (ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation as measured by the imposition of a

reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret. 18 U.S.C. § 1836(b)(3)(B). The North Carolina trade secret law is virtually identical. *See* N.C. Gen. Stat. § 66-154(b). Ms. Bennis did not analyze and has no opinions regarding Qorvo's actual damages, if any, or damages in the form of a reasonable royalty. (Elkins Decl. Ex. B (Bennis Depo.) at 14:10-21.) Ms. Bennis' only trade secret misappropriation damages opinion is for unjust enrichment based on a fabricated head start theory. (*Id.* Ex. A at 41 and 90.)

Ms. Bennis premises her head start opinions on the opinion of one of Qorvo's technical experts, Dr. Sidney Shanfield: "As a result of Akoustis' trade secret misappropriation, I understand that it is the opinion of Dr. Shanfield that Akoustis was ultimately able to enter the market at least ■ months earlier than it would have been able to had it not had the benefit of Qorvo's trade secrets." (Elkins Decl. Ex. A at 38 (citing discussion with Dr. Shanfield).)

> In order to measure the amount of Akoustis' unjust enrichment received by virtue of this head start advantage I measured the difference in the time value of money between what revenue Akoustis actually achieved by virtue of its trade secret misappropriation as compared to an alternative scenario which assumes that Akoustis would have received the same amount of revenue, but with a ■-month delay.

(*Id.*) Consequently, Ms. Bennis "first began by considering the amount of revenue that Akoustis has historically earned," (*id.*), what damages experts often call the "actual world." Ms. Bennis used Akoustis' total historical revenue, including revenue unrelated to Qorvo's purported trade secrets: "I understand that the trade secrets Akoustis is alleged to have misappropriated related to virtually every aspect of its business and ability to get to market in the timeframe that it did. This includes its ability to earn grant money, fabricate products, provide engineering services, and manufacture products. As such, it is appropriate to consider Akoustis' total company revenue in this analysis." (*Id.* at 39 (citing undated discussion with Dr. Shanfield).) Ms. Bennis' report includes a chart showing Akoustis' historical revenue as follows (*id.*):

[redacted image]

[redacted image]

Assuming that Akoustis received a 55-month head start, Ms. Bennis contends that the entirety of the revenue charted above would simply have shifted into the future (*id.* at 39-40):

[redacted image]

> The last step of my analysis involved measuring the difference in the time value of money between these two scenarios to determine Akoustis' unjust enrichment. Although Akoustis has historically operated at a Net Loss and has yet to become profitable, by receiving revenues prematurely Akoustis has benefited by being able to reduce the total amount of losses incurred to date. In turn, this would allow Akoustis to reduce the total amount of capital that it would need to borrow from investors or creditors. As such, by receiving revenues early due to the head start benefit received from the misappropriated trade secrets, Akoustis has benefitted by reducing its total borrowed capital. Thus, Akoustis' weighted average cost of capital ("WACC") may be applied to measure this benefit. (*Id.* at 40.)

Applying a 14.8% WACC rate to the two five-year periods through June 30, 2024, Ms. Bennis calculates purported head start damages as follows (*id.* at 40-41):



In her only reference to Akoustis' expenses, Ms. Bennis concludes (*id.* at 41):

> I note that while Akoustis has incurred significant expenses to date, had it not misappropriated Qorvo's trade secrets this development process would have not only taken a longer period of time, but Akoustis also would have incurred significantly more expenses. For instance, this figure does not account for the considerable actual expenses that would have been incurred in research and development in order to bring a product such as this one to market.

Ms. Bennis expert report, however, contains no analysis of Akoustis expenses in support of her above conclusion. (*Id.*)

For the misappropriation of trade secrets portion of Qorvo's unfair competition claim under North Carolina General Statute 75-1, Ms. Bennis concludes that her $[redacted] head start opinion above applies. (*Id.* at 42.)

### B. Ms. Bennis' "Employee Poaching" Damages Opinion

Ms. Bennis assumes Akoustis' liability for poaching Qorvo employees. (*Id.* at 46-47.) In opining on alleged damages arising from that element of the unfair competition claim under North Carolina General Statute 75-1, she focuses on the cost to Qorvo of replacing the allegedly poached employees: "Qorvo lost employees as a result of Akoustis' employee poaching. In order to replace poached employees, Qorvo must find suitable replacements, as well as get the replacements fully trained." (*Id.* at 47.) Continuing, Ms. Bennis states that:

> to calculate costs to Qorvo as a result of Akoustis' employee poaching, I first considered the quantifiable costs of replacing the Ex-Qorvo Employees. As discussed above, these costs include the cost to recruit and train new employees as well as other items such as lost knowledge and productivity. I am aware of one Akoustis document that quantifies these expenses based on the relative skill-level of each employee. According to Akoustis' fiscal year 2022 Form 10-K, "[i]n October 2021, [Akoustis] acquired a majority ownership position in RFM Integrated Device, Inc. ('RFMi') and, on April 29, 2022, exercised the right to acquire the remaining 49%." As part of this acquisition, Akoustis engaged KPMG to assist [redacted] of [RFMi] as of October 15, 2021 (the Valuation Date)." As part of that valuation, KPMG performed a valuation on RFMi's [redacted]

(*Id.* at 48.) She relies on the KPMG valuation for "[redacted]" (*Id.* at 48-49.)

Ms. Bennis recites that after "further consideration of the evidence in this matter" and speaking with a Qorvo human resources employee, she "ultimately identified a total of 19

employees that Akoustis directly poached from Qorvo." (*Id.* at 49-50.) Using the KPMG

"███████████████" by title, she assigns a "total cost of poached employees" (*id.* at 50):



Although she spoke with a Qorvo human resources employee, Ms. Bennis did not ask whether Qorvo had actually replaced each or any of the allegedly poached ex-employees:

> Q. Did you discuss with Ms. Stoddard or ask her whether or not the 19 employees that are the foundation of your damages analysis were actually replaced?
>
> A. I don't remember having that conversation, no.
>
> Q. So you don't know whether or not all of the 19 were, in fact, replaced by Qorvo, correct?
>
> A. That's correct.

(*Id.* Ex. B at 96:23-97:5.) Ms. Bennis did not seek information from Qorvo regarding its own costs incurred in replacing employees in the positions relevant to her report – even though she conceded Qorvo "perhaps" has it. (*Id.* at 97:11-24; 100:15-22.) She did not conduct any analysis of the differences between RFMi and Qorvo to test whether using the KPMG valuation of RFMi's ███████ for Qorvo's actual damages from alleged employee poaching. (*See id.* at 97:25-101:5.)

## III. THE COURT'S GATEKEEPING RESPONSIBILITY REGARDING EXPERT OPINION EVIDENCE

Federal Rule of Evidence ("Rule") 702 provides that

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The above reflects two amendments to Rule 702 that the Supreme Court adopted effective December 1, 2023. *See* https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf.

> First, the rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule. See Rule 104(a). This is the preponderance of the evidence standard that applies to most of the admissibility requirements set forth in the evidence rules. See *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration."); *Huddleston v. United States*, 485 U.S. 681, 687 n.5 (1988) ("preliminary factual findings under Rule 104(a) are subject to the preponderance-of-the evidence standard"). But many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).
>
> * * *
>
> Rule 702(d) has also been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology. Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

Fed. R. Evid. 702 Committee Notes on Rules – 2023 Amendment.

This District has held that "[t]he role of the district court is to serve as a 'gatekeeper' – to protect the jury from evidence that is unreliable, confusing, or unduly prejudicial." *Parallel Networks Licensing, LLC v. Int'l Bus. Machines Corp.*, No. 12-2072-KAJ,[1] 2017 WL 1405155, at

---
[1] Third Circuit Judge Kent Jordan, sitting by designation.

*2 (D. Del. Apr. 17, 2017) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145, 147–48 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–92 (1993)). "There must, in that regard, be both reliable methodology in the analysis and an adequate 'fit' between the offered expert opinion and the facts at issue in the case." *Id.* (citing *Daubert*, 509 U.S. at 591 (in turn quoting *U.S. v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985))).

### IV. BENNIS'S OPINION ABOUT HEAD START UNJUST ENRICHMENT DAMAGES IS UNRELIABLE, DOES NOT FIT, AND SHOULD BE EXCLUDED

The summary of Ms. Bennis' damages opinions (*supra* at 1) shows that Qorvo seeks damages for employee poaching ($■■■), false advertising ($■■■) and patent infringement ($■■■) – together less than $■■■. Ms. Bennis expresses no opinion regarding Qorvo's actual damages, if any, for trade secret misappropriation – something she logically would have included if they were more than de minimis. Given that the claimed reasonable royalty damages for patent infringement are under $■■■, using a reasonable royalty methodology for trade secret misappropriation apparently would not sufficiently "move the needle" on Qorvo's potential damages recovery for this case to be a worthwhile endeavor. In an evident attempt to move that needle for Qorvo, Ms. Bennis conjured a new methodology for unjust enrichment damages based on a purported head start. That "methodology," however, has never been accepted by any court. It has no support in the relevant literature. And it makes no economic sense. Put simply, Ms. Bennis' methodology is untested, unreliable and does not fit the case.

#### A. MS. BENNIS' HEAD START UNJUST ENRICHMENT DAMAGES OPINION IS BASED ON A NEW, UNAPPROVED METHODOLOGY THAT CONFLICTS WITH THE ACCEPTED DAMAGES AUTHORITIES IN THIS AREA

As chronicled above, Ms. Bennis calculated her head start unjust enrichment damages based on Akoustis' revenue: "Although Akoustis has historically operated at a Net Loss and has yet to become profitable, by receiving revenues prematurely Akoustis has benefited by being able

to reduce the total amount of losses incurred to date." (Elkins Decl. Ex. A at 40.) She thus (i) sums all of Akoustis' "actual revenue" through June 30, 2024, (ii) sums all of Akoustis' "but for" revenue by assuming its first year of revenue was five years later, (iii) applies Akoustis' WACC to value the actual and but-for world five-year revenue periods as of June 30, 2024, and (iv) subtracts the difference to arrive at her $▮ damages number. (*Id.* at 40-41.)

Ms. Bennis could not recall ever calculating head start damages in a trade secret case before this one. (*Id.* Ex. B at 62:6-9.) Had she done so, maybe she would have realized that basing unjust enrichment damages on Akoustis' *revenue* is an improper methodology. The relevant literature and case law teach that unjust enrichment damages based on a head start theory are based either on the defendant's *profits* or its incremental increases in *business value* realized from alleged wrongdoing. No source subject to peer review, nor any court decision, recognizes or even suggests that a defendant's revenue, without considering concomitant costs, is a reliable indicator of benefit.

### 1. THE TIMING OF A DEFENDANT'S REVENUE IS NOT AN ACCEPTABLE, RELIABLE MEASURE OF UNJUST ENRICHMENT DAMAGES UNDER A HEAD START THEORY

The Sedona Conference is a well-respected, nonpartisan, nonprofit research and educational institute "dedicated to the advanced study of law and policy in the areas of antitrust law, complex litigation, intellectual property rights, and data security and privacy law." https://thesedonaconference.org/; *see also IntelliCAD Tech. Consortium v. Suzhou Gstarsoft Co. Ltd.*, 508 F. Supp. 2d 790, 800 (D. Or. 2020) (referring to the "well-respected Sedona Conference" in citing to The Sedona Conference, Commentary on the Proper Identification of Asserted Trade Secrets in Misappropriation Cases, 22 SEDONA CONF. J. 223, 261 (2021)).

The Sedona Conference publishes an eponymous journal that includes significant articles, commentaries and other publications. According to the Sedona Conference Commentary on

Monetary Remedies in Trade Secrets Litigation, 24 Sedona Conf. J. (2023),[2] the three common categories of unjust enrichment damages are defendant's profits, avoided development costs, and/or head-start benefit. Sedona Commentary at 384-85.

Because Akoustis has not realized a profit, Qorvo could have sought to recover unjust enrichment damages based on Akoustis' avoided costs (if any) from the alleged misappropriation. As shown, however, Qorvo and Ms. Bennis opted not to pursue damages on that basis, instead relying exclusively on a head start theory.

The rationale for unjust enrichment damages under a head start theory is that the alleged misappropriation has given the defendant an unfair temporal advantage over its competitors. *Id.* at 386-87. The Sedona Commentary provides four specific examples of the bases on which courts have awarded damages under the theory. Three awarded damages for the defendant's profits that would not have been realized but for the misappropriation; the fourth required the defendant to "disgorge damages based on the increased value of defendant's company due to being two years further along than it otherwise would have been in developing and commercializing its products." *Id.* at 387 (citing *Sensormatic Elecs. Corp. v. Tag Co. US*, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008), *Alifax Holding Spa v. Alcor Sci. Inc.*, 404 F. Supp. 3d 552, 556 (D.R.I. 2019) and *TKC Aerospace. Inc. v. Phoenix Heliparts, Inc.*, No. CV-2011-018889, 2015 Ariz. Super. LEXIS 981, at *1 (Ariz. Super. Ct. Jan. 30, 2015) for the defendant's profit cases, and *Sabre GLBL, Inc. v. Shan*, 779 Fed. App'x 843, 851 (3d Cir. 2019) for the enhanced business valuation case).

The Restatement (Third) of Unfair Competition aligns with the Sedona Commentary. In addressing monetary relief for the misappropriation of trade secrets, the Restatement states that "[t]he traditional form of restitutionary relief in an action for the [mis]appropriation of a trade

---

[2] Attached to the Elkins Declaration as Exhibit C.

secret is an accounting of the defendant's profits on sales attributable to the use of the trade secret. The general rules governing accountings of profits are applicable in trade secret actions. The plaintiff is entitled to recover the defendant's net profits." Restatement (Third) of Unfair Competition § 45 Monetary Relief: Appropriation of Trade Secrets), comment f. (Relief measured by defendant's gain).[3]

Beyond the three cases cited in the Sedona Commentary above, many courts have approved unjust enrichment damages based on a defendant's profits from misappropriation. No court, however, has sanctioned the use of a defendant's *revenue* without also considering its concomitant costs.

Common sense supplies the reason why. As stated above, "the important considerations are that a judge or jury calculates *the benefit to the defendant*—not the loss to the plaintiff—and that this calculation is done with reasonable certainty." Sedona Commentary at 385, quoting *Epic Sys. Corp.*, 980 F.3d at 1130 (emphasis added). Revenue without consideration of the attendant costs does not reflect the benefit to the defendant. For example, if a defendant's costs to create the revenue in the actual and but-for worlds are the same, the defendant has received no benefit or unjust enrichment from its use of the alleged secret. Adjusting the revenue streams using WACC or any other present value methodology does not change the requirement to examine and consider costs – because any adjustment of revenue logically must be applied to the attendant costs, too.

In its response, Qorvo may be tempted to cite Ms. Bennis' expert report where she writes that "I note that while Akoustis has incurred significant expenses to date, had it not misappropriated Qorvo's trade secrets this development process would have not only taken a longer period of time, but Akoustis also would have incurred significantly more expenses."

---

[3] Attached to the Elkins Declaration as Exhibit D.

(Elkins Decl. Ex. A at 41.) This is a bare, unsupported conclusion, not an admissible expert opinion: Ms. Bennis' expert report includes no analysis of Akoustis costs in the actual world, let alone of what such costs would be in her but-for world.

The recent amendments to Rule 702 detailed above clarify that "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered [opinion] testimony meets the … preponderance of the evidence standard." Fed. R. Evid. 702 Committee Notes on Rules – 2023 Amendment. In assessing the reliability of Ms. Bennis' challenged opinions, this Court

> may consider a list of factors including: "whether a theory or technique ... can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," "the existence and maintenance of standards," and "general acceptance" of a theory in the "relevant scientific community." *Daubert*, 509 U.S. at 593–94.

*Bayer HealthCare LLC v. Baxalta Inc.*, No 16-cv-1122-RGA, 2019 WL 330149 (D. Del. Jan. 25, 2019). No evidence reflects that the timing of the receipt of revenue without consideration of the attendant costs is a reliable measure of Akoustis benefit (if any) from its alleged misappropriation of Qorvo's trade secrets. Indeed, when deposed Ms. Bennis was unable to identify a single publication or case "where a court allowed [a] damages opinion for head start unjust enrichment based solely on the timing of receipt of revenue." (Elkins Decl. Ex. B at 73:22-74:20.)

Ms. Bennis' opinion regarding head start unjust enrichment damages rests on a methodology that she has invented just for this case – apparently motivated by Qorvo's desire for lottery ticket damages where traditional, accepted methodologies will not provide a desired recovery. Her methodology, however, lacks support from any peer reviewed or authoritative publications. It lacks support from any court decisions. And it lacks common sense. Akoustis respectfully urges that the Court exercise its gatekeeping responsibility and exclude this unreliable, confusing and prejudicial opinion from the case.

### B. MS. BENNIS' HEAD START UNJUST ENRICHMENT DAMAGES OPINION DOES NOT FIT BECAUSE IT INCLUDES SOURCES OF REVENUE UNRELATED TO ANY ALLEGED WRONGDOING

"There must … be both reliable methodology in the analysis and an adequate 'fit' between the offered expert opinion and the facts at issue in the case." *Parallel Networks Licensing, LLC*, No. 12-2072 (KAJ), 2017 WL 1405155, at *2 (citing *Daubert*, 509 U.S. at 591). Reliability and fit are missing from Ms. Bennis' head start unjust enrichment damages opinion for a second, independent reason: her methodology includes revenue from RFMi and other sources that have no connection to Qorvo's alleged trade secrets.

As recited above, Ms. Bennis relies on Dr. Shanfield in assuming that

> the trade secrets Akoustis is alleged to have misappropriated related to virtually every aspect of its business and ability to get to market in the timeframe that it did. This includes its ability to earn grant money, fabricate products, provide engineering services, and manufacture products. As such, it is appropriate to consider Akoustis' total company revenue in this analysis.

(*Id.* at 39.) While she cites an undated discussion with Dr. Shanfield for this proposition, she does not cite to his November 21, 2023 report (which Ms. Bennis never saw until her January 23, 2024 deposition). Nor could she, for Dr. Shanfield's report nowhere recites such an opinion. But even if it had, it would be conclusory: in their reports, neither Dr. Shanfield nor Ms. Bennis makes any attempt to tie any Qorvo trade secrets to these unrelated sources of substantial Akoustis revenue:

- o federal government money grants;
- o a New York facility with a semiconductor wafer manufacturing and MEMS (micro-electromechanical system) business (the "New York fab");
- o RFMi, which continues to make and sell SAW filters it made and sold before Akoustis' 2022 acquisition; and
- o Akoustis' early 2023 acquisition of Grinding and Dicing Services, Inc. ("GDSI").

As her deposition, Ms. Bennis admitted that she did not know the basis on which Akoustis was awarded grant money, nor did she know the grants' terms and conditions. (Elkins Decl. Ex. B

at 35:14-36:11.) Ms. Bennis was aware of Akoustis' acquisition of the New York fab in fiscal year 2018 (*id.* at 46-17-23), but did not know whether Qorvo alleged that any of the New York fab's non-Akoustis products or services embody Qorvo trade secrets. (*Id.* at 47:13-22.) Ms. Bennis does *not* believe that Qorvo makes any allegations that RFMi products embody any Qorvo trade secrets. (*Id.* at 39:2-10.) And she does not know whether Qorvo alleges that any products or services of GDSI, a US-based provider of back-end semiconductor supply chain services, embody any Qorvo trade secrets (it does not). (*Id.* at 46:17-47:22.)

Ms. Bennis relies on Dr. Shanfield for the assumption that "the trade secrets Akoustis is alleged to have misappropriated related to virtually every aspect of its business." But neither Qorvo expert ties these four sources of Akoustis revenue – government grants, New York fab, RFMi, and GDSI – to Qorvo trade secrets. In other words, neither expert provides any basis for loss causation. By including these irrelevant sources of revenue in her damages methodology, Ms. Bennis' head start unjust enrichment opinion is neither reliable nor fitting with the facts of the case. The Court should exclude her opinion for this second, independent reason.

## V. BENNIS'S OPINION ABOUT DAMAGES FOR EMPLOYEE "POACHING" IS UNRELIABLE AND SHOULD BE EXCLUDED

Ms. Bennis spoke to a Qorvo human resources employee in connection with the employee poaching claim. In so doing, Ms. Bennis eschewed the opportunity to ask whether Qorvo even replaced the 19 allegedly poached employees – for whom Qorvo seeks damages through the cost of replacing them. For that reason alone her poaching opinion is unreliable and should be excluded.

The poaching opinion should be excluded for an independent, but more obvious reason: Ms. Bennis undertook no analysis or comparison regarding the employee replacement costs of Qorvo and RFMi to determine whether the KPMG valuation of RFMi is, indeed, a reliable proxy

for Qorvo's own employee replacement costs. Qorvo is a Greensboro, North Carolina headquartered company with over $3 *billion* in revenue ([https://ir.qorvo.com/static-files/e3b78d81-6624-46fb-9d5c-7a79daaf003f](https://ir.qorvo.com/static-files/e3b78d81-6624-46fb-9d5c-7a79daaf003f) at 27-28) and "over 8,500 full and part-time employees in 23 countries." *Id.* at 8. Akoustis acquired Carrollton, Texas based RFMi ([https://www.rfmi.co/](https://www.rfmi.co/)) for a total of $13.7 *million* in combined cash and stock. The allegedly poached Qorvo employees were engaged in its high-power BAW filter business. RFMi was and is engaged in designing and making low-power SAW devices, among other things. Ms. Bennis simply assumes without analysis that the two companies' respective costs to replace employees are the same. On the basis of her expert report and deposition testimony, Ms. Bennis has no way of sustaining her burden of proving by a preponderance of the evidence that her employee poaching damages opinion is a reliable estimate, or that the KPMG valuation fits the facts of the case. Akoustis respectfully requests that the Court exclude this part of Ms. Bennis' opinion.

## VI. CONCLUSION

Ms. Bennis and Qorvo could have chosen a recognized, reliable damages methodology for trade secret misappropriation – unjust enrichment based on avoided costs, or a reasonable royalty if no unjust enrichment theory fit. Rather than do so, Ms. Bennis and Qorvo base their trade secret damages on a methodology that is unreliable and does not fit the case – in the apparent hope they can use Ms. Bennis' expert status to persuade the jury to award lottery-type damages. The Court should exercise its gatekeeping responsibility to preclude that from happening.

The Court should also exclude Ms. Bennis' employee poaching damages opinion because it is likewise unreliable and does not fit. Rather than use Qorvo's actual costs to replace employees whom it really replaced – information that she easily could have obtained – Ms. Bennis uses a proxy analysis for another company without conducting any analysis regarding comparability.

███████████████████████

For the foregoing reasons, Akoustis respectfully requests that the Court enter an order excluding Ms. Bennis' opinions regarding head start unjust enrichment damages (regarding the trade secret and unfair competition claims) and employee poaching damages (regarding the unfair competition claim).

Dated:  February 9, 2024

OF COUNSEL:

Ronald S. Lemieux
David S. Elkins
Victoria Q. Smith
Squire Patton Boggs (US) LLP
1841 Page Mill Road
Suite 150
Palo Alto, California 94304
(650) 856-6500
ronald.lemieux@squirepb.com
david.elkins@squirepb.com
victoria.smith@squirepb.com

Respectfully submitted,

*/s/ Stephen B. Brauerman*
  Stephen B. Brauerman (#4952)
  Ronald P. Golden III (#6254)
  BAYARD, P.A.
  600 N. King Street, Suite 400
  Wilmington, Delaware
  (302) 655-5000
  sbrauerman@bayardlaw.com
  rgolden@bayardlaw.com

*Attorneys for Defendants Akoustis Technologies, Inc. and Akoustis, Inc.*

## CERTIFICATE OF SERVICE

      I, Stephen B. Brauerman, hereby certify that on February 9, 2024, a true and correct copy of the foregoing was served on all counsel of record.


Date: February 9, 2024

                                                */s/ Stephen B. Brauerman*
                                                Stephen B. Brauerman (#4952)

# Briefs, Responses and Replies
1:21-cv-01417-JPM Qorvo, Inc. v. Akoustis Technologies, Inc. et al

PATENT

U.S. District Court

District of Delaware

## Notice of Electronic Filing

The following transaction was entered by Brauerman, Stephen on 2/9/2024 at 5:05 PM EST and filed on 2/9/2024
**Case Name:** Qorvo, Inc. v. Akoustis Technologies, Inc. et al
**Case Number:** 1:21-cv-01417-JPM
**Filer:** Akoustis Technologies, Inc.
Akoustis, Inc.
**Document Number:** 457

**Docket Text:**
**[SEALED] OPENING BRIEF in Support re [456] MOTION to Exclude Certain Damages Opinions of Melissa A. Bennis filed by Akoustis Technologies, Inc., Akoustis, Inc..Answering Brief/Response due date per Local Rules is 2/23/2024. (Attachments: # (1) Certificate of Service)(Brauerman, Stephen)**

**1:21-cv-01417-JPM Notice has been electronically mailed to:**

David S. Elkins     david.elkins@squirepb.com, danni.fontana@squirepb.com

Eric K. Gill     egill@sheppardmullin.com, ksok@sheppardmullin.com

Jack B. Blumenfeld     Jbbefiling@mnat.com, jblumenfeld@mnat.com, mnat_IP_eFiling@morrisnichols.com

Jennifer Klein Ayers     jayers@sheppardmullin.com, 3515833420@filings.docketbird.com

Jeremy A. Tigan     JTigan@morrisnichols.com, jatefiling@mnat.com, mnat_IP_eFiling@morrisnichols.com

Jonathan R. DeFosse     jdefosse@sheppardmullin.com

Robert M. Masters     rmasters@sheppardmullin.com, mrpatrick@sheppardmullin.com

Ronald P. Golden , III     rgolden@bayardlaw.com, lfracek@bayardlaw.com, ntalarowski@bayardlaw.com

Roy D. Jung     rjung@sheppardmullin.com

Stephen B. Brauerman     sbrauerman@bayardlaw.com, lfracek@bayardlaw.com, ntalarowski@bayardlaw.com, tdevine@bayardlaw.com

Timothy P. Cremen     tcremen@sheppardmullin.com

Victoria Q. Smith     victoria.smith@squirepb.com

Zachary Alper    zalper@sheppardmullin.com

**1:21-cv-01417-JPM Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/9/2024] [FileNumber=5461710-0]
[792169dc4d68767f16ed5b498f7abacb4e6422578c36033a1e20283305f5df55e75c
16768c3699ddb7f4b3f012b016104692e7f9535802397d897c5a2280936b]]
**Document description:**Certificate of Service
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/9/2024] [FileNumber=5461710-1]
[0d7eac5b5fe7a272eb9ad4947768786cd27d49fa7f3fc8191affc201c361b9ae6e73
82a5e2a374baa958ddf6ed88365ba416de1ff3568e93e764efe8c2e39160]]