IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 21-1417 (JPM) |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | |
| AKOUSTIS, INC., | ) | **REDACTED - PUBLIC VERSION** |
| | ) | **Original Filing Date: February 26, 2024** |
| Defendants. | ) | **Redacted Filing Date: March 4, 2024** |

**PLAINTIFF QORVO, INC.'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE CERTAIN DAMAGES
OPINIONS OF MELISSA A. BENNIS**

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Eric K. Gill
Zachary Alper
Theodore Mayer
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

James C. Wald
Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

February 26, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

*Attorneys for Plaintiff Qorvo, Inc*

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION. ...................................................................................................... 1

II.     FACTUAL BACKGROUND. ..................................................................................... 3

    A.     Akoustis stole Qorvo's trade secrets and used them to launch its company. ..........3

    B.     Akoustis begins operating as a commercial entity and selling products 55 months
        early using Qorvo's stolen information. ...................................................................4

    C.     Akoustis's theft of Qorvo's trade secrets gave it a 55-month head start. ...............6

    D.     Ms. Bennis measured the benefit Akoustis received by entering the market 55
        months early.............................................................................................................7

    E.     Ms. Bennis relied upon industry data to support her opinion of Qorvo's poaching
        damages....................................................................................................................9

III.    LEGAL STANDARD................................................................................................ 11

IV.     ARGUMENT............................................................................................................. 12

    A.     Ms. Bennis's head start damages opinions are admissible. ...................................12

        1.     Ms. Bennis's calculation of the time value of money is reliable. ............. 12

        2.     Ms. Bennis's head start opinions appropriately applied the time value of
            money to all of Akoustis's revenue. ........................................................ 16

    B.     Ms. Bennis's Opinions Regarding Qorvo's Damages for Employee Poaching Are
        Based Upon Third-Party Industry Data .................................................................18

V.      CONCLUSION......................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Allscripts Healthcare, LLC v. Andor Health, LLC*
  No. 21-704, 2022 WL 3021560 (D. Del. July 29, 2022) ........................................19

*CardioVention, Inc. v. Medtronic, Inc.*
  483 F. Supp. 2d 830 (D. Minn. 2007)....................................................................13

*Daubert v. Merrell Dow Pharms., Inc.*
  509 U.S. 579 (1993)..........................................................................7, 11, 12, 14

*DSC Commc'ns Corp. v. Next Level Commc'ns*
  107 F.3d. 322 (5th Cir. 1997) ...............................................................................13

*Epic Sys. Corp. v. Tata Consultancy Servs.*
  980 F. 3d 1117 (7th Cir. 2020) .............................................................................13

*Financialapps, LLC v. Envestnet, Inc.*
  No. 19-1337, 2023 WL 6037242 (D. Del. Sept. 13, 2023).............................17, 18

*Integra Lifesciences Corp. v. HyberBranch Med. Tech., Inc.*
  No. 15-819, 2018 WL 2551053 (D. Del. May 8, 2018) ..................................16, 18

*Intellectual Ventures I LLC v. Check Point Software Tecs. Ltd.*
  215 F. Supp. 3d 314 (D. Del. 2014).......................................................................16

*Nat. Bank of Chicago v. Jefferson Mortg. Co.*
  576 F.2d 479 (3d Cir. 1978)..................................................................................19

*Rathborne Land Co. v. Ascent Energy, Inc.*
  610 F.3d 249 (5th Cir. 2010) ................................................................................14

*Sabre GLBL, Inc. v. Shan*
  779 F. App'x 843 (3d Cir. 2019) ......................................................13, 14, 15, 16

*Schneider ex rel. Estate of Schneider v. Fried*
  320 F. 3d 396 (3d Cir. 2003)............................................................................11, 12

*In re SemCrude, L.P.*
  648 Fed. Appx. 205 (3d Cir. 2016) .......................................................................18

*U.S. v. Allegheny Ludlum Corp.*
  366 F.3d 164 (3d Cir. 2004)..................................................................................14

*U.S. v. Torlai*
  728 F.3d 932 (9th Cir. 2013) ................................................................................14

*United States v. Gipson*
    383 F.3d 689 (8th Cir. 2004) ...............................................................15

*United States v. Shea*
    211 F.3d 658 (1st Cir. 2000) ...............................................................15

*Univ. Computing Co. v. Lykes-Youngstown Corp.*
    504 F.2d 518 (5th Cir. 1974) ...............................................................13

*Wellogix, Inc. v. Accenture, L.L.P.*
    716 F.3d 867 (5th Cir. 2013) ...............................................................13

Statutes

18 U.S.C. § 1836(b)(3)(B) ...............................................................13

Other Authorities

Federal Rule of Evidence 702 ...............................................................11, 12, 19

## I.      INTRODUCTION.

Evidence in this case proves that Akoustis engaged in a wide-ranging scheme to misappropriate Qorvo's trade secrets to shortcut the time needed to enter and compete in the market. Qorvo's technical expert—Dr. Stanley Shanfield—performed a detailed analysis of the misappropriation and determined that Akoustis obtained a cumulative 55-month head start as a result of the misappropriation. Akoustis did not move to exclude Dr. Shanfield's opinions. Qorvo's damages expert—Melissa A. Bennis—was tasked with analyzing the economic benefit that Akoustis obtained from entering the market 55 months early. Ms. Bennis adopted one of the most straightforward methodologies available: she calculated the economic benefit based on the time value of money. Akoustis argues that Ms. Bennis's damages opinion is improper because it disgorges Akoustis's revenue without accounting for expenses. According to Akoustis, unjust enrichment can only be calculated based on "ill-gotten **profits**" and, because "Akoustis has never earned a profit," it cannot be liable for unjust enrichment damages. This is both factually and legally wrong.

As a threshold matter, Ms. Bennis's opinion is based on the time value of money, not on the disgorgement of profits (nor revenues). Ms. Bennis determined that, based on the facts of this case, the time value of money calculation most accurately reflects the economic benefit Akoustis received from entering the market 55 months early. Contrary to Akoustis's arguments, Ms. Bennis did expressly consider whether Akoustis incurred any expenses that would have reduced the time value of money benefit. Ms. Bennis determined, based on the opinions of Dr. Shanfield, that no such offsets were warranted here. To the contrary, in addition to obtaining revenues 55 months earlier in time, Akoustis also lowered its expenses as a result of obtaining Qorvo's trade secrets. Akoustis and its economic expert are free to disagree with the assessments of Dr. Shanfield and Ms. Bennis. But it is for the jury to decide whether those opinions are correct.

████████████████████████████

Akoustis also argues that, as a matter of law, that unjust enrichment cannot be based on the time value of money. Remarkably, Akoustis fails to cite **a single case** in support of its argument. Instead, it claims that a secondary source requires the exclusion of Ms. Bennis's theory. But even the secondary authority that Akoustis cites recognizes that head start damages are available in trade secret cases and intended to address the "temporal advantage" received as a result of the misappropriation. Moreover,  courts have repeatedly recognized across many different areas of the law that the time value of money is a cognizable economic benefit that may be properly considered in assessing damages. Again, a jury should ultimately determine whether Akoustis received such an economic benefit as a result of its wrongdoing.

Akoustis also asserts that Ms. Bennis should not have included certain revenues in her time value of money calculation. But Dr. Shanfield has opined that Akoustis obtained those revenues as a result of its misappropriation of trade secrets. For example, Dr. Shanfield has opined that Akoustis's misappropriation was so widespread that it impacted the manufacturing of products at its fabrication facility. Akoustis can explore its criticisms of Dr. Shanfield's opinions (and Ms. Bennis's reliance on those opinions) on cross-examination. But it is axiomatic that disagreements regarding facts that support an expert's opinion go to weight, not admissibility. In short, none of Akoustis's complaints regarding Ms. Bennis's head start opinions warrants the exclusion of her opinions.

Finally, with respect to Ms. Bennis's opinions regarding Qorvo's poaching damages—Ms. Bennis relied upon a valuation performed by ████ as to the cost to replace employees with expertise relating to Radio Frequency ("RF") filters. To the extent Akoustis argues a third-party valuation overstates Qorvo's damages, it may cross-examine her. Courts routinely uphold an

expert's reliance upon third-party valuations and whether ███ replacement cost valuation is an appropriate proxy for the cost to Qorvo is a determination best made by the jury.

## II.     FACTUAL BACKGROUND.

### A.     Akoustis stole Qorvo's trade secrets and used them to launch its company.

The evidence in this case overwhelmingly proves that Akoustis stole Qorvo's trade secrets and used them to enter the market 55 months early. Akoustis incorporated in 2014 and went public in 2015 through a reverse merger. Ex. A, at QORVO_00021726.[1] At the time it went public, Akoustis told investors that it was "an early stage company" that "**expect[ed] to design and sell single crystal BAW RF filter products**." *Id.*, at QORVO_00021713 (emphasis added). Akoustis's efforts, however, were unsuccessful.[2] Desperate to enter the market quickly to generate revenues, Akoustis used confidential and trade secret information it stole from Qorvo to accelerate the company's entry into the market.

As is set forth in great detail in the report of Qorvo's expert—Dr. Stanley Shanfield—this misappropriation scheme touched nearly every aspect of Akoustis's business. D.I. 469, Declaration of Dr. Stanley Shanfield ("Shanfield Decl."), Ex. A. Akoustis identified its initial products based on Qorvo's business plans (*id.*, ¶¶ 512-514); Akoustis designed its resonators and BAW filters based on Qorvo's research (*id.*, ¶¶ 518-520); Akoustis built the devices to test its products (evaluation boards) using Qorvo's design rules and schematics (*id.*, ¶¶ 523-525); Akoustis devised its product development and testing process using documents stolen from Qorvo (*id.*, ¶¶ 515-517); Akoustis built its reliability testing protocols based on Qorvo's proprietary process (*id.*, ¶¶ 526-527); Akoustis stole Qorvo's procedures for manufacturing, assembling, and trimming its products

---

[1] All exhibit citations refer to the Declaration of Jennifer Klein Ayers unless otherwise indicated.
[2] For brevity and efficiency, Qorvo incorporates the facts and evidence set forth in its Opposition to Akoustis's Motion for Partial Summary Judgment (D.I. 465) as if fully set forth herein.

(*id.*, ¶¶ 521-522, 528-530); and Akoustis engaged in a concerted effort to steal information about Qorvo's product roadmaps and prototypes, focused particularly on soliciting confidential information in China and Korea (*id.*, ¶¶ 531-533).

The evidence also overwhelmingly proves that many of Akoustis's highest-level executives were directly involved and participated in this misappropriation scheme. For example, Rama Vetury, a former Qorvo employee who became Akoustis's Chief Device Scientist, transferred 279 GB of data from his Qorvo computer to Akoustis. D.I. 466, Declaration of Kevin T. Faulkner ("Faulkner Decl."), ¶ 17. Rohan Houlden, Akoustis's Chief Product Officer, downloaded confidential documents to an external hard drive before he quit his job at Qorvo, and then distributed those documents to employees at Akoustis. *Id.*, Ex. A, ¶¶ 67-68; D.I. 469, Ex. A, ¶ 157.

The effort to steal Qorvo's confidential and trade secret information even included using Akoustis's expense accounts to bribe Qorvo's employees. D.I. 468, Exs. Q-T. Akoustis's Executive Vice President of Business Development, David Aichele, was not only aware of these bribes, but encouraged them. *Id.* Qorvo's technical expert, Dr. Shanfield, analyzed this evidence and other information and opined on the egregious and widespread nature of Akoustis's misappropriation. D.I., 469, Ex. A, Parts V, VI. Ultimately, Dr. Shanfield testified that "**the volume and extent of the material taken from Qorvo was staggering**[.]" Ex. B, 137:21-138:8 (emphasis added). Based on the information Akoustis misappropriated, Dr. Shanfield opined that Akoustis obtained a **55-month head start** to competing in the market. D.I., 469, Ex. A, ¶ 510.

**B.     Akoustis begins operating as a commercial entity and selling products 55 months early using Qorvo's stolen information.**

In 2017, having stolen large quantities of Qorvo's documents and using those materials to identify and design products, Akoustis purchased a microelectromechanical systems ("MEMS")

facility with associated tools and equipment necessary to manufacture BAW filters. Ex. C, at QORVO_00022068. Shortly thereafter, Akoustis began using this facility to provide foundry and fabrication services for BAW filters. Ex. D, at QORVO_00017463.[3] Akoustis told investors it was using "new" and "proprietary" MEMS based BAW technology at this facility. Ex. E, at QORVO_00016878-16879 ("We plan to commercialize our technology by designing and manufacturing . . . BAW RF filter solutions in our New York wafer fabrication facility."). Akoustis also told investors it was using "unique manufacturing flows" to produce BAW products at this MEMS facility. *Id.* In reality, the evidence demonstrates that Akoustis used the information it stole from Qorvo to fabricate and test BAW filters. *See* Part II.A., *supra*.

In 2018, Akoustis launched and began selling its first Akoustis-branded BAW filter products. Ex. E, at QORVO_00016880, QORVO_00016884. As of March 15, 2023, Akoustis's "product offerings" remained limited to its "3-7 GHz BAW filter portfolio" (D.I. 158, ¶ 48), which incorporate Qorvo's trade secret information. *See* Part II.A., *supra*. The sales of these products, combined with the sale of BAW filters at its MEMS facility, allowed Akoustis to earn revenue much sooner than it otherwise would have been able had it not stolen Qorvo's trade secrets.

About a year ago, Akoustis acquired a company called Grinding and Dicing Services, Inc. ("GDSI"). Ex. F, at pp. 1, 41. GDSI provides "back-end semiconductor supply chain services" (*e.g.*, wafer preparation to make a BAW filter). *Id.* at 1. At the time of the acquisition, Akoustis claimed it would "support a strategy to reshore its packaging of XBAW filters to the United States." Ex. G, at p. 1. Akoustis even claimed the acquisition of GDSI would permit "[t]he

---

[3] Specifically, Akoustis told investors that the MEMS acquisition "allows the Company to internalize manufacturing, increase capacity . . . for its XBAW based RF filters. In January 2018, we successfully transferred our **R&D resonator filter process flow** into the facility, and we plan to utilize the facility to optimize our XBAW technology . . . targeting the multi-billion dollar mobile and other wireless markets." Ex. D, at QORVO_00017463 (emphasis added).

expansion of XBAW® RF filter margins[.]" *Id.*, p. 2.

Akoustis also closed on an acquisition of a company called RFM Integrated Device, Inc. ("RFMi") in April 2023. Ex. F, at 1. RFMi is fabless business that "offers selected (Bulk Acoustic Wave) BAW Filters," "SAW resonators, [and] RF filters . . . addressing . . . markets, such as automotive and industrial applications." Ex. H, at AKTS_00842038; Ex. F, at 1. When it announced the acquisition of RFMi, Akoustis boasted that it would create "new, synergistic sales channels and numerous market-leading customers" for its BAW filter technology. Ex. I, at AKTS_00164189. Akoustis also claimed that it would "leverage its leadership in high-frequency BAW with RFMi's growing portfolio of RF filter products to expand its reach[.]" *Id.*, at AKTS_00164190.

Notably, Akoustis's financial statements do not categorize revenue received from RFMi or GDSI separately from revenue it receives from the sale of BAW filters. *E.g.*, Ex. J, p. 17 (revenue segmented into fabrication services and RF filters, without a company designation); Ex. F, at p. F-29 (same); Ex. K, at AKTS_01095349 (same).

### C. Akoustis's theft of Qorvo's trade secrets gave it a 55-month head start.

To assess the head start advantage that Akoustis received, Dr. Shanfield: (i) correlated the asserted trade secrets he identified to specific business tasks; (ii) assessed the head start Akoustis obtained in performing these business tasks by virtue of acquiring Qorvo's confidential and trade secret information; (iii) determined the amount of operational time that Akoustis saved in performing the particular business tasks given the level of resources that Akoustis had to devote to such tasks; and (iv) plotted the head start advantages that Akoustis received for each individual task using a Gantt chart (Appendix 5 to his Report) to identify the cumulative head start advantage. *E.g.*, D.I., 469, Ex. A, ¶ 511 and App'x. 5.

Dr. Shanfield's 55-month head start analysis was not "merely a product of adding the individual head start advantages" that Akoustis received for each business task. D.I., 469, Ex. A, ¶ 511 and App'x. 5. Instead, Dr. Shanfield opined that in the "but for" world, "Akoustis would have engaged in many of the tasks in parallel[,]" and calculated a cumulative head start. *Id.*[4] **Importantly, Akoustis has not challenged, either on summary judgment or through a *Daubert* Motion, Dr. Shanfield's opinions regarding Akoustis's 55-month head start.** Throughout its Motion, Akoustis repeatedly criticizes Ms. Bennis's reliance upon Dr. Shanfield's opinions (*e.g.*, Akoustis argues that "Ms. Bennis'[s] only trade secret misappropriation damages opinion is for unjust enrichment based on a fabricated head start theory."). D.I. 457, p. 3. This is a red herring. Akoustis did not move to exclude Dr. Shanfield's opinion that Akoustis's theft of Qorvo's confidential and trade secret information gave it a 55-month head start. Accordingly, Akoustis cannot attack Ms. Bennis's reliance upon it for purposes of *Daubert*.

### D.    Ms. Bennis measured the benefit Akoustis received by entering the market 55 months early.

Akoustis claims that Ms. Bennis's head start calculation impermissibly seeks to disgorge Akoustis's revenue. *E.g.*, D.I., 457, pp. 8-9. This criticism both misapprehends and misconstrues Ms. Bennis's analysis. Ms. Bennis was tasked with determining what economic benefit Akoustis received as a result of the 55-month head start. Because Akoustis was a start-up company and did not earn a profit, Ms. Bennis concluded that disgorging profits (or revenues) did not fit the facts of this case. Declaration of Melissa A. Bennis ("Bennis Decl."), ¶ 3 ; *id.*, Ex. A, p. 39. Instead, Ms. Bennis determined the economic benefit to Akoustis from the 55-month head start was gaining

---

[4] By way of illustration, for each of the individual business tasks across all eight of the trade secret groups, Dr. Shanfield opined that Akoustis received a 217.5-month head start. D.I., 469, Ex. A, ¶¶ 512-533. This number is calculated by separately adding the head starts that Dr. Shanfield identified for each of the individual business tasks that Akoustis avoided having to perform. *Id.*

access to money sooner than Akoustis would have in the but-for world. Bennis Decl., ¶ 14; *id.*, Ex. A, pp. 39; Ex. R, 59:10-14, 60:5-18, 62:10-22, 73:16-21. To value that economic benefit, Ms. Bennis adopted a well-known and widely accepted economic methodology—calculating **the time value of money** to Akoustis. Bennis Decl., ¶¶ 17-19 ("The time value of money is premised on the macroeconomic principle that a dollar you receive today is worth more than a dollar you may receive a year from today. This principle is commonly taught to students in accounting and business administration across the country."); *id.*, Ex. A, pp. 37-41; *id.*, Ex. A, at Ex. 3, Schedules ("Sched.") 2-3, *id.*, Ex. C, pp. 129-130.[5]

Although, Ms. Bennis calculates the time value of money that Akoustis received when it stole Qorvo's trade secrets and entered the market 55-months early using Akoustis's revenue, she holds that revenue constant. Bennis Decl., ¶ 16; *id.*, Ex. A., pp. 37-41. In other words, Ms. Bennis "measured the difference in the time value of money between what revenue Akoustis actually achieved by virtue of its trade secret misappropriation as compared to an alternative scenario which [conservatively] assumes that Akoustis **would have received the same amount of revenue, but with a 55-month delay**." *Id.*, ¶ 16; *id.*, Ex. A, p. 38 (emphasis added). As with Dr. Shanfield's 55-month head start, Akoustis does not challenge the methodology that Ms. Bennis used to calculate the time value of money. In other words, Akoustis is not challenging Ms. Bennis's mathematical formula. Instead, Akoustis (incorrectly) argues that Ms. Bennis impermissibly disgorges Akoustis's revenues. Akoustis also argues, without citing a single case, that the "time value of money" cannot be used to calculate an economic benefit for the purposes of unjust enrichment. As set forth below, Akoustis is wrong on the facts and wrong on the law.

---

[5] Citations to numerical exhibits in this Opposition refer to the numerical exhibits attached to Ms. Bennis's expert report.

Akoustis also accuses Ms. Bennis of disregarding expenses. D.I. 457, p. 5. Not so. Ms. Bennis specifically opined, "while Akoustis has incurred significant expenses to date, had it not misappropriated Qorvo's trade secrets this development process would have not only taken a longer period of time, but Akoustis also would have incurred significantly more expenses. For instance, this figure does not account for the considerable actual expenses that would have been incurred in research and development in order to bring a product such as this one to market." Bennis Decl., ¶ 20; *id.*, Ex. A., p. 41. In other words, Ms. Bennis's time value of money analysis is the conservative estimate of Qorvo's unjust enrichment damages. *Id.*, ¶ 20; *id.*, Ex. A, p. 41.

### E.   Ms. Bennis relied upon industry data to support her opinion of Qorvo's poaching damages.

Akoustis claims that Ms. Bennis's analysis of Qorvo's damages under the North Carolina General Statute 75-1 is unreliable because she used third-party industry data relating to employee replacement costs that Akoustis itself commissioned. Akoustis's cursory complaint disregards the depths of Ms. Bennis's analysis. To determine Qorvo's damages under the North Carolina unfair competition statute, Ms. Bennis first analyzed evidence that Akoustis intentionally targeted Qorvo's employees in order to steal Qorvo's confidential and trade secret information. *See* Bennis Decl., ¶¶ 22-23; *id.*, Ex. A, pp. 47-50. Michael Ortiz, Founder of Exec-Tek, testified that he worked with Akoustis for purposes of recruiting and hiring employees and that approximately half of the people he placed were former Qorvo employees. Ex. P, 33:19-34:15, 116:18-117:3. Additionally, according to Mr. Ortiz, for more than one position, Akoustis specifically directed him to look for employees or candidates that have worked for Qorvo. *Id.*, 41:1-5, 90:9-92:4, 121:10-22:16. Mr. Ortiz specifically stated that "one position that [he] was physically pointed to Qorvo to fill . . . was a project management position. **And it was because Qorvo and Akoustis use a very similar project management process**, and it would be . . . an easy transition for somebody coming from

[Qorvo] into the process that they use from an environment standpoint." *Id.*, 41:16-42:1 (emphasis added).

In order to identify which Qorvo employees were impermissibly poached by Qorvo, Ms. Bennis also reviewed historical employee directory information produced by Akoustis. *See* Bennis Decl., ¶¶ 22-23; *id.*, Ex. A, pp. 47-50. According to that information, Akoustis hired at least 43 employees that formerly worked at Qorvo or one of its predecessor companies. *Id.*, ¶ 22; *id.*, Ex. A, p. 48; Ex. Q, AKTS_01200287-303. Ms. Bennis then identified which of these 43 employees should be excluded because of the facts relating to their departure from Qorvo and/or hiring by Akoustis. Bennis Decl., ¶ 23; *id.*, Ex. A, pp. 47-50. Ultimately, Ms. Bennis identified 19 employees that Akoustis poached out of the 43 initially identified. Bennis Decl., ¶ 23; *id.*, Ex. A, pp. 47-50.

Ms. Bennis then relied upon a valuation that Akoustis commissioned from ▅▅▅ when it acquired RFMi. *See* Bennis Decl., ¶ 24; *id.*, Ex. A., pp. 41, 48-50; Ex. L, at AKTS_00179477-79; *id.*, at AKTS_00179524. In that valuation, ▅▅▅ identified the cost to replace five types of employees in the RF industry: general managers, project managers, sales managers, senior product engineers, and coordinators. *See* Bennis Decl., ¶ 24; *id.*, Ex. A., pp. 41, 48-50; Ex. L, at AKTS_00179477-79; *id.*, at AKTS_00179524. Ms. Bennis then categorized the 19 employees that Akoustis poached based upon the position titles, and applied the cost ▅▅▅ identified in its valuation to determine Qorvo's damages:

███████████████████████████████████

*See* Bennis Decl., ¶ 24; *id.*, Ex. A., p. 50.

As set forth below, Ms. Bennis's analysis meets the threshold for reliability and admissibility under *Daubert*.

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F. 3d 396, 404 (3d Cir. 2003). "Qualification refers to the requirement that the witness possess specialized expertise." *Id.*

Ms. Bennis is a Managing Director at Stout Risius Ross, LLC, a multi-disciplinary firm that specializes in corporate finance, valuation, financial disputes, and investigations. *See* Bennis Decl., ¶¶ 1, 11; *id.*, Ex. B, p. 2.[6] She has a B.S. in Finance from the University of Illinois at Urbana-Champaign, and a Master of Business Administration with majors in Accounting, Marketing, and Management and Strategy from the Kellogg Graduate School of Management at Northwestern University. Bennis Decl., ¶ 7; *id.*, Ex. B, p. 2. Throughout her 25-year career, she has provided

---

[6] Prior to joining Stout, Ms. Bennis was a Principal at Davis & Hosfield Consulting, LLC, a manager in the Forensic Accounting practice at KPMG LLP, and a consultant within the Value Solutions practice of Andersen. Bennis Decl., ¶¶ 8-10; *id.*, Ex. B, p. 2. She is also a Certified Public Accountant. *Id.*, ¶ 7; *id.*, Ex. B, p. 2.

financial consulting services on numerous matters involving intellectual property, including misappropriation of trade secrets, and has performed numerous complex studies and analyses involving economic loss and valuation. Bennis Decl., ¶ 12; *id.*, Ex. B, pp. 2-14. Ms. Bennis's experience includes opining and/or testifying regarding damages in at least ten matters involving misappropriation of trade secrets. *Id.* Notably, Akoustis does not challenge Ms. Bennis's qualifications or experience.

The second prong of the standard—reliability—requires an expert's opinion to "to be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Schneider*, 320 F. 3d at 404 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)). Finally, "Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.* Akoustis argues that Ms. Bennis's head start damages opinions fail the second (reliability) and third (fit) prong of Rule 702's standard. Akoustis also argues that Ms. Bennis's opinions regarding Qorvo's damages for employee poaching are unreliable. All three of these arguments lack merit.

## IV.   ARGUMENT

### A.   Ms. Bennis's head start damages opinions are admissible.

#### 1.   Ms. Bennis's calculation of the time value of money is reliable.

Akoustis first attacks Ms. Bennis's head start analysis by claiming that it disgorges Akoustis's revenue. This is a strawman. Ms. Bennis calculates the economic benefit to Akoustis from its 55-month head start based upon the **time value of money**; she does not advance a theory based on disgorging revenues.

Under the Defend Trade Secrets Act ("DTSA"), Qorvo is entitled to recover damages for any unjust enrichment caused by the misappropriation of trade secret. 18 U.S.C. § 1836(b)(3)(B).[7] Unjust enrichment damages "can take several forms." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013). Ultimately, "[a]n action for recovery seeking unjust enrichment damages is 'grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust.'" *Epic Sys. Corp. v. Tata Consultancy Servs.*, 980 F. 3d 1117, 1130 (7th Cir. 2020). "Simply put, there is no single way to measure the benefit conferred on a defendant; the measurement is context dependent. The important considerations are that a . . . jury calculates the benefit to the defendant—not the loss to the plaintiff—and that this calculation is done with reasonable certainty." *Id.*

Unjust enrichment damages are not limited to determining a defendant's profits or avoided development costs. Rather, unjust enrichment damages may also encompass the commercial advantage the defendant has received, including the benefit of any head start.[8] *E.g.*, *Sabre GLBL, Inc. v. Shan*, 779 F. App'x 843, 851 (3d Cir. 2019) (identifying the differences between avoided development costs and head start damages). "This variety of approaches demonstrates the 'flexible' approach used to calculate damages for claims of misappropriation of trade secrets." *Wellogix, Inc.*, 716 F.3d at 879; *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974) ("The case law is thus plentiful, but the standard for measuring damages which emerges is very flexible."). Ultimately, the Third Circuit has recognized that head start damages

---

[7] Akoustis agrees that unjust enrichment damages are also available under North Carolina's trade secret law. D.I. 457, p. 3 (citing N.C. Gen. Stat. § 66-154(b)).

[8] In addition to disgorgement of defendant's profits, avoided development costs, and head start damages, courts have also held that unjust enrichment damages can include the entire value of a company. *E.g.*, *Wellogix, Inc.*, 716 F.3d at 879-880; *DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d. 322, 327-28 (5th Cir. 1997); *CardioVention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 846 (D. Minn. 2007).

are intended to measure the impact to a misappropriating defendant's development and operations. *See e.g.*, *Sabre GLBL, Inc.* 779 F. App'x. 843, 851 n.5 (3d Cir. 2019).

Importantly, courts have recognized the time value of money is an economic benefit that can be recovered as damages. *E.g. U.S. v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 (3d Cir. 2004) (identifying "return on capital" *e.g.*, the "time value of money" as "an appropriate calculation of economic benefit" that must be disgorged to prevent a defendant from being unjustly enriched by its environmental violations and acknowledging that weighted average cost of capital can be used to calculate this benefit); *U.S. v. Torlai*, 728 F.3d 932, 945, n.11 (9th Cir. 2013) (discussing the time value of money as an economic benefit that a fraudster received, such that the calculation applied by the district court "understates the true economic benefit" the defendant received as a result of its fraud); *Rathborne Land Co. v. Ascent Energy, Inc.*, 610 F.3d 249, 257 (5th Cir. 2010) (time value of money was a damage plaintiff recovered in a leasing dispute).

Apparently recognizing that no case supports excluding Ms. Bennis because she identified the time value of money as an economic benefit that Akoustis received, Akoustis primarily relies on a secondary source—The Sedona Conference's Commentary on Monetary Remedies in Trade Secret Litigation ("The Sedona Commentary")—to argue that time value of money is not a cognizable form of unjust enrichment damages. D.I. 457, pp. 9-10. But nothing in The Sedona Commentary supports this conclusion. Instead, The Sedona Commentary expressly states that "[t]he rationale for [head start damages] is that the misappropriation has given the defendant an unfair temporal advantage over its competitors." D.I. 458, Ex. C, pp. 386-87.

Whether Akoustis received an unfair temporal advantage over its competitors when it received money 55 months earlier than it otherwise would have is a question for the jury, not an issue under *Daubert*. This is particularly true when, as here, Akoustis has not challenged the

methodological calculation that Ms. Bennis performed, but instead claims the form of damages she identifies are not recoverable. *See, e.g.*, *United States v. Gipson*, 383 F.3d 689, 696-97 (8th Cir. 2004) ("[W]hen the application of a scientific methodology is challenged as unreliable under Daubert and the methodology itself is otherwise sufficiently reliable, outright exclusion of the evidence in question is warranted only if the methodology was so altered [by a deficient application] as to skew the methodology itself.'"); *United States v. Shea*, 211 F.3d 658, 668 (1st Cir. 2000) ("any flaws in Dr. Deadman's application of an otherwise reliable methodology went to weight and credibility and not to admissibility.").

Moreover, the case law Akoustis does cite confirms the discretion a damages expert has in calculating the head start benefit that a defendant receives. In *Sabre GLBL, Inc. v. Shan*, for example, the Third Circuit reviewed an arbitrator's award of head start damages based upon the hypothetical value of the misappropriating company. In that case, the plaintiff's expert "estimate[d] the value of the [misappropriating] company . . . with and without the head start[,]" and assessed the difference between the two. 779 F. App'x at 849-850. Because the misappropriator necessarily received the head start in the actual world, the plaintiff's expert necessarily speculated regarding the company's value in a "but for" world where the misappropriation did not occur. *Id.* The expert then disgorged the total value of the misappropriating company for the two-year period applicable to the head start. *Id.*

Here, Ms. Bennis adopted a damages theory that is specifically focused on the real-world economic benefit Akoustis received from the head start—the time value associated with obtaining actual funds 55 months early. Ms. Bennis's methodology fits this case. *Sabre GLBL.*, 779 F. App'x at 851 n.4 (3d Cir. 2019) ("[P]laintiffs are entitled to adapt their damage theory to fit within the particular facts [of the defendant's misappropriation]."). Moreover, Ms. Bennis's methodology is

far less speculative than methodologies that Akoustis recognizes are permissible—e.g., calculating the value of a company before and after the misappropriation, determining the value of avoided development costs. *See Sabre GLBL*, 779 F. App'x at 851.

Akoustis fails to cite a single case where any court has ever excluded an expert damages opinion based upon the principle of time value of money. The Court should decline to be the first.

> **2.    Ms. Bennis's head start opinions appropriately applied the time value of money to all of Akoustis's revenue.**

Akoustis alternatively argues that Ms. Bennis's head start opinions are unreliable because her methodology fails to exclude revenue from: (a) federal grants; (b) Akoustis's MEMS facility; (c) RFMi, which makes and sells SAW filters in addition to BAW filters; and (d) Akoustis's acquisition of GDSI. These complaints are classic examples of "fodder for cross." *E.g.*, *Integra Lifesciences Corp. v. HyberBranch Med. Tech., Inc.*, No. 15-819, 2018 WL 2551053, *3 (D. Del. May 8, 2018) (exclusion of certain customers from price erosion calculation "fodder for cross"); *Intellectual Ventures I LLC v. Check Point Software Tecs. Ltd.*, 215 F. Supp. 3d 314, 323-324 (D. Del. 2014) (stating "any objections to the type or data considered or the thoroughness of the analysis go the weight of the evidence[,]" which are suited for cross examination).

Ms. Bennis based her opinions on the fact that "the trade secrets Akoustis is alleged to have misappropriated related to virtually every aspect of its business and ability to get to market [and generate revenue] in the time frame that it did." Bennis Decl., ¶ 13; *id.*, Ex. A, pp. 39-40. Based on the widespread nature of the misappropriation and Dr. Shanfield's opinion that Akoustis entered the market 55 months early, Ms. Bennis concluded that Akoustis received all of its revenues 55 months sooner than it would have in the absence of the misappropriation. Bennis Decl., ¶¶ 13-15; *id.*, Ex. A, pp. 37-41. As set forth above, there is ample evidence to support this. For example, Akoustis's press releases indicate that it received federal grant money in connection with BAW

filter technology. Ex. M, at QORVO_00023831; Ex. N, at QORVO_00023867; *see also* Ex. B, at 224:18-225:7 (Qorvo's trade secrets put Akoustis in the position to receive grant money).

Similarly, there is also evidence that Akoustis's MEMS facility used Qorvo's trade secret information to fabricate BAW filters. *See e.g.*, Ex. E, at QORVO_00016878-16879 ("We plan to commercialize our technology by designing and manufacturing . . . BAW RF filter solutions in our New York wafer fabrication facility."); Ex. B, at 226:1-229:12 (explaining that trade secrets Akoustis stole relate to the operation of the MEMS facility); D.I. 469, Ex. A, pp. 127-168 (discussing Akoustis's misappropriation of Qorvo's trimming methods and procedures), pp. 168-198 (discussing Akoustis's misappropriation of Qorvo's evaluation board design rules and schematics), pp. 198-242 (discussing Akoustis's misappropriation of Qorvo's development process and testing procedures), pp. 243-299 (discussing Akoustis's misappropriation of Qorvo's systems, processes, and procedures for testing reliability and mean-time-to-failure of parts), pp. 300-343 (discussing Akoustis's misappropriation of Qorvo's manufacturing, assembly, and change procedures).

The evidence also shows that RFMi sells both BAW filters and SAW filters. Ex. H, AKTS_00842038. And in any event, Akoustis does not publicly report RFMi and GDSI revenue separately from revenue relating to BAW filters. *E.g.*, Ex. J, at p. 17 (revenue segmented into fabrication services and RF filters, without a company designation); Ex. F, at p. F-29 (same); Ex. K, AKTS_01095349 (same). None of Akoustis's complaints go to the admissibility of Ms. Bennis's opinions. They all go to the weight the jury should give her opinions and Akoustis may cross-examine her regarding them. *Financialapps, LLC v. Envestnet, Inc.*, No. 19-1337, 2023 WL 6037242, *9 (D. Del. Sept. 13, 2023) (denying motion to exclude damages expert because his unjust enrichment damages opinion included non-proprietary technology and unaccused products

and holding that "the disagreements Defendants have with these choices go to weight rather than admissibility."). Accordingly, the Court should deny Akoustis's Motion on this ground.

**B.     Ms. Bennis's Opinions Regarding Qorvo's Damages for Employee Poaching Are Based Upon Third-Party Industry Data**

Akoustis does not cite a single case in support of its argument that Ms. Bennis's opinions regarding Qorvo's poaching damages are so unreliable as to require exclusion. That is because they are not unreliable. Once again, Akoustis's complaints regarding Ms. Bennis's analysis go to weight and not admissibility. *Integra Lifesciences Corp.*, 2018 WL 2551053, at *3; *Financialapps, LLC*, 2023 WL 6037242, at *9.

First Akoustis complains that Ms. Bennis "[failed] to ask whether Qorvo even replaced the 19 allegedly poached employees." D.I. 457, p. 14. "Disagreements that Defendants have with [Ms. Bennis's choices,]" however, are not a basis for exclusion. *Financialapps, LLC*, 2023 WL 6037242, *9. Ms. Bennis conducted significant analyses regarding which Qorvo employees should be included in her damages calculation, and in fact eliminated more employees than she included. Bennis Decl., ¶¶ 22-23; *id.*, Ex. A, pp. 49-50 (identifying 43 former Qorvo employees Akoustis hired and eliminating 24 from her damages calculation). Akoustis may explore this issue with Ms. Bennis on cross-examination. It is not a basis for precluding her from testifying.

Next Akoustis complains that Ms. Bennis impermissibly relied upon a valuation that Akoustis commissioned from ▬▬▬. D.I. 457, pp. 14-15. Damages experts, however, routinely rely upon third party valuations in their analyses of damages, and courts routinely refuse to exclude them for doing so. *E.g.*, *In re SemCrude, L.P.*, 648 Fed. Appx. 205, 213-214 (3d Cir. 2016) (expert testimony that relied upon a draft valuation from Goldman Sachs was properly considered by the lower court). Ms. Irwin, Akoustis's expert, testified that ▬▬▬ analysis was based upon "general industry efforts … to advertise for a position, interview for a position, train them, loss of

productivity." Ex. O, 74:9-13. Whether based upon Akoustis's potential costs to replace employees,[9] or industry costs as Ms. Irwin testified, however, the jury is best suited to determine whether this is an appropriate proxy for Qorvo's damages. A damages experts opinions need not be precise, only reliable. *Nat. Bank of Chicago v. Jefferson Mortg. Co.*, 576 F.2d 479, 494-495 (3d Cir. 1978) ("While the fact of damage must be established with reasonable certainty, the precise amount need not be shown with mathematical precision so long as the court can arrive at an intelligent estimate without speculation or conjecture."); *Allscripts Healthcare, LLC v. Andor Health, LLC*, No. 21-704, 2022 WL 3021560, at *17 (D. Del. July 29, 2022) ("Whether the expert "relied on the best data in forming his opinions is a question for the jury."). Here, Ms. Bennis's are reliable and thus admissible. The Court should decline to exclude them.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Akoustis's Motion and permit Ms. Bennis to testify regarding all of her damages opinions at trial.

---

[9] Akoustis also complains that the cost to replace RFMi employees is not an appropriate proxy because RFMI manufactures SAW products. As set forth above, the record demonstrates that RFMi manufactures both SAW and BAW products. Ex. H, at AKTS_00842038. Accordingly, this complaint has no bearing on whether Ms. Bennis's opinion is admissible under Rule 702.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Eric K. Gill
Zachary Alper
Theodore Mayer
SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

James C. Wald
Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

February 26, 2024

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Qorvo, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 26, 2024, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                      *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Ronald S. Lemieux, Esquire                         *VIA ELECTRONIC MAIL*
David S. Elkins, Esquire
Victoria Q. Smith, Esquire
SQUIRE PATTON BOGGS (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA  94304-1216
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)