# Exhibit A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549
**FORM 10-K**

(Mark One)

☐ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

  For the fiscal year ended: _____

or

☒ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

  For the transition period from April 1, 2016 to June 30, 2016

Commission file number: **333-193467**

**AKOUSTIS TECHNOLOGIES, INC.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **33-1229046** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| | |
|---|---|
| **9805 Northcross Center Court, Suite H** **Huntersville, NC** | **28078** |
| (Address of principal executive offices) | (Postal Code) |

Registrant's telephone number, including area code:  **1-704-997-5735**

Securities registered under Section 12(b) of the Act:  **None**      Securities registered under Section 12(g) of the Act:  **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes  ☐  No  ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.  Yes  ☐  No  ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  ☒  No  ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes  ☒  No  ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a smaller reporting company. See the definitions of the "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large Accelerated Filer ☐ | Accelerated Filer ☐ |
| Non-Accelerated Filer ☐ | Smaller reporting company ☒ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes  ☐  No  ☒

The aggregate market value of the registrant's Common Stock, par value $0.001 per share (its only class of common equity), held by non-affiliates, on December 31, 2015, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $10,989,277, computed by reference to the price at which the Common Stock was last sold as of that date. For purposes of this computation, all officers, directors, and beneficial owners of ten percent or more of the registrant's Common Stock are deemed to be affiliates. Such determination should not be deemed an admission that such directors, officers, or 10 percent beneficial owners are, in fact, affiliates of the registrant.

As of October 25, 2016, there were 15,836,981 shares of the registrant's Common Stock issued and outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

None.

PART I

**ITEM 1.**     **BUSINESS**

**Overview**

Akoustis is an early stage company focused on developing, designing and manufacturing innovative radio frequency (RF) filter products for the mobile wireless device industry. We use a fundamentally new piezoelectric resonator technology that we call BulkONE$^{TM}$ in the manufacturing of bulk acoustic wave (BAW) resonators, the building blocks of high selectivity "RF" filters required to route signals in a smartphone or other mobile or wearable device. Filters are a critical component of the RF front-end (RFFE), and their use has multiplied with the launch and licensing of 4G/LTE frequency bands. They are used to define the range of frequencies of radio signals that are transmitted (the "passband") and simultaneously reject unwanted signals. The increasing demand for wireless data and user applications is driving an increase in the number of wireless channels or frequency bands in a single device. Each new band introduced creates an increase in a demand for filters. A high-end smartphone, for example, must filter the transmit and receive paths for 2G, 3G and 4G wireless access methods in up to 15 bands, as well as Wi-Fi, Bluetooth and in some cases GPS. Signals in the receive paths must be isolated from one another. The filters also must reject other extraneous signals from numerous sources. The current approach to RF filter manufacturing utilizes thin-film polycrystalline materials (thin-film bulk acoustic resonators, or "FBARs") with relatively high resistance that dissipate a significant amount of the energy in the signal (referred to as "lossy"), resulting in front-end heat generation and reduced battery life. In order to compensate for such losses, the power amplifier specifications are increased, by as much as a factor of two, which reduces further the battery life and puts more demands on the thermal management of the mobile device.

As the filter count per mobile device increases, these inefficiencies will become more limiting. We plan to use single crystal piezoelectric materials to develop a new class of RF filters with a fundamental advantage to reduce losses over existing thin film technologies. Our technology has not yet obtained market validation from Tier 1 mobile wireless customers or been verified in commercial manufacturing and our RF filters have yet to generate any sales. We have incurred accumulated losses from our inception through June 30, 2016 of $6,674,813. We have fabricated research and development ("R&D") resonators demonstrating the feasibility of our BulkONE technology, and have transitioned the technology into a production-capable wafer fabrication facility.

Once our technology is qualified for manufacturing, we expect to design and sell single crystal BAW RF filter products using our BulkONE technology. We believe our technology is disruptive to the RF front-end (RFFE) market through the following expected advantages:

·     Wider Bandwidth Coverage,

·     Lower Insertion Loss,

·     Improved power compression and linearity,

QORVO_00021713

The semiconductor and electronics industries also have been subject to increasing environmental regulations. A number of domestic and foreign jurisdictions seek to restrict the use of various substances, a number of which have been used in our products in development or processes. While we have implemented a compliance program to ensure our product offering meets these regulations, there may be instances where alternative substances will not be available or commercially feasible, or may only be available from a single source, or may be significantly more expensive than their restricted counterparts. Additionally, if we were found to be non-compliant with any such rule or regulation, we could be subject to fines, penalties and/or restrictions imposed by government agencies that could adversely affect our operating results. Our cost to maintain compliance with existing environmental regulations is expected to be nominal based on our structure in which we outsource a majority of our operations to suppliers that are responsible for meeting environmental regulations. We will continue to monitor our quality program and expand as required to maintain compliance and ability to audit our supply chain.

Noncompliance with applicable regulations or requirements could subject us to investigations, sanctions, mandatory product recalls, enforcement actions, disgorgement of profits, fines, damages, civil and criminal penalties, or injunctions. An adverse outcome in any such litigation could require us to pay contractual damages, compensatory damages, punitive damages, attorneys' fees and costs. These enforcement actions could harm our business, financial condition and results of operations. If any governmental sanctions are imposed, or if we do not prevail in any possible civil or criminal litigation, our business, financial condition and results of operations could be materially adversely affected. In addition, responding to any action will likely result in a significant diversion of management's attention and resources and an increase in professional fees.

**Organizational History**

We were incorporated as Danlax, Corp., in Nevada on April 10, 2013. Prior to the Merger and Split-Off (each as defined below), our business was the development and sales of mobile games.

On April 15, 2015, (i) we changed our name to Akoustis Technologies, Inc., and (ii) we increased our authorized capital stock from 75,000,000 shares of Common Stock, par value $0.001 per share, to 300,000,000 shares of Common Stock, par value $0.001 per share (the "Common Stock"), and 10,000,000 shares of "blank check" preferred stock, par value $0.001 per share.

On April 23, 2015, we completed a 1.094891-for-1 forward split of our Common Stock in the form of a dividend, with the result that the 11,740,000 shares of Common Stock outstanding immediately prior to the stock split became 12,854,020 shares of Common Stock outstanding immediately thereafter. All share and per share numbers in this Report relating to our Common Stock have been adjusted to give effect to this stock split, unless otherwise stated.

15

On May 22, 2015, our wholly owned subsidiary, Akoustis Acquisition Corp., a corporation formed in the State of Delaware on May 15, 2015 ("Acquisition Sub"), merged (the "Merger") with and into Akoustis, Inc., a corporation incorporated in the State of Delaware on May 12, 2014. Akoustis, Inc., was the surviving corporation in the Merger and became our wholly-owned subsidiary. All of the outstanding stock of Akoustis, Inc. was exchanged for shares of our Common Stock.

In connection with the Merger and pursuant to a Split-Off Agreement, we transferred our pre-Merger assets and liabilities to our pre-Merger majority stockholder, in exchange for the surrender by him and cancellation of 9,854,019 shares of our Common Stock (the "Split-Off").

As a result of the Merger and Split-Off, we discontinued our pre-Merger business and acquired the business of Akoustis, Inc., and we have continued the existing business operations of Akoustis, Inc., as a publicly-traded company under the name Akoustis Technologies, Inc.

In accordance with "reverse merger" accounting treatment, our historical financial statements as of period ends, and for periods ended, prior to the Merger have been replaced with the historical financial statements of Akoustis, Inc. in our SEC filings made subsequent to the Merger.

On May 22, 2015, we also changed our fiscal year from a fiscal year ending on July 31 of each year to one ending on March 31 of each year, and on August 11, 2016, we changed our fiscal year to one ending on June 30 of each year, effective immediately.

Prior to the Merger, we were a "shell company" (as such term is defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "Exchange Act")). As a result of the Merger, we have ceased to be a shell company. The information contained in our Current Report dated May 22, 2015, as filed with the SEC, contained the "Form 10 information" necessary to satisfy the related condition contained in Rule 144(i)(2) under the Securities Act of 1933, as amended (the "Securities Act").

**Akoustis, Inc.**

Akoustis, Inc. was founded in 2014 by experienced industry leaders and scientists from University of California at Santa Barbara (UCSB) and Cornell University. Our initial funding was through a $0.5 million series seed funding in 2014, and we received $655,000 in additional investments in convertible notes and stock by the founders and original angel investors in March 2015. We received a National Science Foundation ("NSF") Small Business Innovation Research ("SBIR") grant that started in January 2015 followed by a second grant award in April 2015. In addition, we received matching funds from North Carolina Science, Technology & Innovation Department of Commerce. More recently, we received a third NSF SBIR award in February 2016. The funds from these sources supported the operations of Akoustis, Inc. and the completion of multiple key Company milestones, including the application for more than ten patents, hiring of key personnel, the engagement with a foundry prototype facility, initiation of SBIR activities and the engagement of strategic partners who would consume our RF filters for wireless communications.

QORVO_00021726

**The 2015 Offering**

Concurrently with the closing of the Merger, we held a closing of a private placement offering (the "2015 Offering") in which we sold 3,531,104 shares of our Common Stock (including shares issued on conversion of convertible notes of Akoustis, Inc., as described below) to accredited investors, at a purchase price of $1.50 per share (the "2015 Offering Price"). On June 10, 2015, we completed a second and final closing of the 2015 Offering in which we sold an additional 261,000 shares of Common Stock. In total, we sold an aggregate of 3,792,104 shares of Common Stock in the 2015 Offering for gross proceeds of $5.7 million (before deducting expenses of the offering).

The closing of the 2015 Offering and the closing of the Merger were conditioned upon each other.

In connection with the 2015 Offering, we paid Northland Securities, Inc., and Katalyst Securities LLC, each a U.S. registered broker-dealer (the "Placement Agents"), a cash commission of 10% of the gross proceeds (or 2% in the case of certain existing Akoustis, Inc., investors) raised from investors in the 2015 Offering. In addition, the Placement Agents received warrants to purchase a number of shares of Common Stock equal to 10% (or 2% in the case of certain existing Akoustis, Inc., investors) of the number of shares of Common Stock sold in the 2015 Offering, with a term of five (5) years and an exercise price of $1.50 per share (the "2015 Placement Agent Warrants"). Any sub-agent of the Placement Agents that introduced investors to the 2015 Offering was entitled to share in the cash fees and warrants attributable to those investors as described above.

As a result of the foregoing, the Placement Agents and their sub-agents were paid aggregate commissions of $486,976 and were issued 2015 Placement Agent Warrants to purchase an aggregate of 324,650 shares of our Common Stock. We were also required to reimburse the Placement Agents approximately $77,150 of legal expenses incurred in connection with the 2015 Offering.

A form of the 2015 Placement Agent Warrant issued to the Placement Agents and their sub-agents is filed as an exhibit to this Report. All descriptions of the 2015 Placement Agent Warrants herein are qualified in their entirety by reference to the text of such warrant filed as an exhibit hereto and incorporated herein by reference.

**The 2016 Offering**

On March 10, 2016, we held a closing of a private placement offering (the "March 2016 Offering") in which we sold 494,125 shares of our Common Stock to accredited investors at a fixed purchase price of $1.60 per share (the "2016 Offering Price"), for aggregate gross proceeds of $790,600 (before deducting expenses of the March 2016 Offering).

On April 14, 2016, we held a closing of a private placement offering (the "April 2016 Offering," and together with the March 2016 Offering, the "2016 Offering") in which we sold 1,741,185 shares of our Common Stock at a fixed purchase price of $1.60 per share (the "2016 Offering Price"), for aggregate gross proceeds of $2.8 million (before deducting expenses of the April 2016 Offering).

17

In connection with the 2016 Offering, we agreed to pay the Placement Agents a cash commission of 8% of the gross proceeds raised from investors first contacted by the Placement Agents in the 2016 Offering. In addition, the Placement Agents received warrants to purchase a number of shares of Common Stock equal to 10% of the number of shares of Common Stock sold in the 2016 Offering, with a term of five (5) years and an exercise price of $1.60 per share (the "2016 Placement Agent Warrants"). Any sub-agent of the Placement Agents that introduced investors to the 2016 Offering was entitled to share in the cash fees and warrants attributable to those investors as described above.

As a result of the foregoing, the Placement Agents and their sub-agents were paid an aggregate commission of $196,752 and were issued 2016 Placement Agent Warrants to purchase an aggregate of 153,713 shares of Common Stock. We were also required to reimburse the Placement Agents approximately $17,500 of legal expenses incurred in connection with the 2016 Offering, of which $7,500 was paid by the issuance of 4,690 shares of Common Stock (valued at the 2016 Offering Price).

A form of the 2016 Placement Agent Warrant issued to the Placement Agents and their sub-agents is filed as an exhibit to this Report. All descriptions of the 2016 Placement Agent Warrants herein are qualified in their entirety by reference to the text of such warrant filed as an exhibit hereto and incorporated herein by reference.

## ITEM 1A.    RISK FACTORS

*An investment in shares of our common stock is highly speculative and involves a high degree of risk. We face a variety of risks that may affect our operations or financial results, and many of those risks are driven by factors that we cannot control or predict. Before investing in our Common Stock, you should carefully consider the following risks, together with the financial and other information contained in this Report. If any of the following risks actually occurs, our business, prospects, financial condition and results of operations could be materially adversely affected. In that case, the trading price of our Common Stock would likely decline and you may lose all or a part of your investment. Only those investors who can bear the risk of loss of their entire investment should invest in our Common Stock.*

*This Report contains certain statements relating to future events or the future financial performance of our company. Prospective investors are cautioned that such statements are only predictions and involve risks and uncertainties, and that actual events or results may differ materially. In evaluating such statements, prospective investors should specifically consider the various factors identified in this Report, including the matters set forth below, which could cause actual results to differ materially from those indicated by such forward-looking statements.*

If any of the following or other risks materialize, our business, financial condition, and results of operations could be materially adversely affected which, in turn, could adversely impact the value of our Common Stock. In such a case, investors in our Common Stock could lose all or part of their investment.

18

QORVO_00021728

# Exhibit B

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DELAWARE

3

4    - - - - - - - - - - - - - -+

5    QORVO, INC.,                |

6            Plaintiff,          | Case Number:

7      vs.                       | 1:21-cv-01417-JPM

8    AKOUSTIS TECHNOLOGIES,      |

9    INC., and AKOUSTIS, INC.,   |

10           Defendants.         |

11   - - - - - - - - - - - - - -+

12

13   ███████████████████████████

14

15            Videotaped Deposition of

16            STANLEY SHANFIELD, Ph.D.

17            Friday, January 26, 2024

18                 9:15 a.m.

19

20

21   Reported by:

22   Laurie Donovan, RPR, CRR, CLR

23   Veritext Job No. 6391961

24

25   PAGES 1 - 256

                                      Page 1

| | |
|---|---|
| 1         January 26, 2024 | 1         EXAMINATION INDEX |
| 2         9:15 a.m. | 2             PAGE |
| 3 | 3 EXAMINATION BY MR. LEMIEUX . . . . . . . . .  8 |
| 4     Confidential - Attorneys' Eyes Only - | 4 EXAMINATION BY MR. DEFOSSE . . . . . . . . . 250 |
| 5  video deposition of STANLEY SHANFIELD, Ph.D., | 5 FURTHER EXAM BY MR. LEMIEUX . . . . . . . . . 252 |
| 6  held fully in person, with the witness and | 6 |
| 7  all parties participating in person, pursuant | 7 |
| 8  to the Rules of the United States District | 8 |
| 9  Court for the District of Delaware, subject | 9      E X H I B I T S |
| 10 to such stipulations as may be recited herein | 10 EXHIBIT   DESCRIPTION      PAGE |
| 11 or attached hereto, before Laurie Donovan, a | 11 |
| 12 Registered Professional Reporter and notary | 12 Exhibit 1  Plaintiff's document entitled |
| 13 public of the District of Columbia, who | 13      "Identification of Trade Secrets |
| 14 officiated in administering the oath to the | 14      it Currently Expects to Present |
| 15 witness. | 15      at Trial" . . . . . . . . . . . . 135 |
| 16 | 16 |
| 17 | 17 Exhibit 2  Email from James Nelson to Shawn |
| 18 | 18      Gibb and others, June 12, 2020, |
| 19 | 19      Bates QORVO-00062161 . . . . . . 209 |
| 20 | 20 |
| 21 | 21 Exhibit 3  Expert Report and Disclosure of |
| 22 | 22      Melissa A. Bennis, November 21, |
| 23 | 23      2023. . . . . . . . . . . . . . 222 |
| 24 | 24 |
| 25 | 25 Exhibit 4  U.S. Patent Number 7,522,018 . . 40 |
|              Page 2 |              Page 4 |
| 1      A P P E A R A N C E S | 1      EXHIBITS CONTINUED |
| 2 | 2 EXHIBIT   DESCRIPTION      PAGE |
| 3 ON BEHALF OF THE PLAINTIFF: | 3 |
| 4    Sheppard Mullin Richter & Hampton LLP | 4 Exhibit 5  U.S. Patent Number 9,735,755 . . 118 |
| 5    2099 Pennsylvania Avenue, NW | 5 |
| 6    Suite 100 | 6 Exhibit 6  Expert Report of Stanley |
| 7    Washington, D.C. 20006 | 7      Shanfield, Ph.D. regarding |
| 8    (202)747-1900 | 8      infringement, November 21, 2023 . 115 |
| 9    By:  Jonathan R. DeFosse, Esq. | 9 |
| 10    jdefosse@sheppardmullin.com | 10 Exhibit 7  Supplemental Expert Report of |
| 11     Roy Jung, Esq. | 11      Stanley Shanfield, Ph.D., |
| 12 | 12      January 22, 2024 . . . . . . . . 215 |
| 13 ON BEHALF OF THE DEFENDANTS: | 13 |
| 14    Squire Patton Boggs (US)LLP | 14 Exhibit 8  Expert Report of Stanley |
| 15    2550 M Street, NW | 15      Shanfield, Ph.D. - Misappropriation |
| 16    Washington, D.C. 20037 | 16      of Trade Secrets, November 21, |
| 17    (202)457-7520 | 17      2023 . . . . . . . . . . . . . . 158 |
| 18    By:  Ronald Lemieux, Esq. | 18 |
| 19     ronald.lemieux@squirepb.com | 19 |
| 20     Matthew A. Stanford, Esq. | 20 |
| 21     matthew.stanford@squirepb.com | 21 |
| 22 | 22 |
| 23 ALSO PRESENT: | 23 |
| 24    Gordon Thomas, videographer | 24 |
| 25    Xiaomei Cai (remote) | 25 |
|              Page 3 |              Page 5 |

2 (Pages 2 - 5)

1  ---------------------------------------------------
2             P R O C E E D I N G S
3                  9:15 a.m.
4  ---------------------------------------------------
5           THE VIDEOGRAPHER:  Good morning.
6  We're going on the record at 9:15 a.m. on
7  January 26, 2024.
8           Please note that the microphones
9  are sensitive and may pick up whispering and
10 private conversations.  Please mute your
11 phones at this time.  Audio and video
12 recording will continue to take place unless
13 all parties agree to go off the record.
14          This is media unit one of the
15 video-recorded deposition of Mr. Stanley
16 Shanfield in the matter of Qorvo, Inc. versus
17 Akoustis Technologies, Inc., and Akoustis,
18 Inc., filed in the United States District
19 Court for the District of Delaware, case
20 number 1:21-cv-01417-JPM.
21          The location of the deposition is
22 2550 M Street, NW, Washington, D.C., 20037.
23          My name is Gordon Thomas,
24 representing Veritext Legal Solutions, and
25 I'm the videographer.  The court reporter is
                                        Page 6

1  Laurie Donovan from the firm Veritext.
2           Counsel and all present will now
3  state their appearances for the record,
4  beginning with the noticing attorney.
5           MR. LEMIEUX:  My name is Ron
6  Lemieux with Squire Patton Boggs on behalf of
7  the defendant, and accompanying me via Zoom
8  is Xiaomei Cai, one of my colleagues on this
9  case.
10          MR. DEFOSSE:  Jonathan DeFosse from
11 Sheppard Mullin on behalf of Qorvo.  Here
12 with me today is Roy Jung.
13          THE VIDEOGRAPHER:  Will the court
14 reporter please swear in the witness, and
15 counsel may proceed.
16          (Witness duly sworn.)
17          (Technical difficulties.)
18          THE REPORTER:  We need to go off
19 the record.
20          THE VIDEOGRAPHER:  The time is 9:17
21 a.m.  We are going off the record.
22          (Whereupon, a short recess was
23          held.)
24          THE VIDEOGRAPHER:  The time is
25 approximately 9:44 a.m.  We are going back on
                                        Page 7

1  the record.  Please proceed, Counsel.
2                  * * * * *
3  Whereupon,
4           STANLEY SHANFIELD, Ph.D.,
5       having been first duly sworn, testified
6       upon his oath as follows:
7       EXAMINATION BY COUNSEL FOR DEFENDANT
8  BY MR. LEMIEUX:
9    Q   Good morning, Dr. Shanfield.
10   A   Good morning.
11   Q   Would you please state your full name
12 for the record, please?
13   A   It's Stanley Shanfield.
14   Q   And if I refer to you during the course
15 of the day as "Dr. Shanfield," is that all right?
16   A   Sure.
17   Q   I want to make sure I give you
18 appropriate respect for someone who has slogged
19 their way through a Ph.D. program.
20       Dr. Shanfield, have you been deposed
21 before?
22   A   Yes.
23   Q   How many times?
24   A   Probably about 15 or 20 times.
25   Q   Okay, so you're familiar with the usual
                                        Page 8

1  instructions in a deposition.
2        You understand that you're testifying
3  here under oath today?
4    A   Yes.
5    Q   And that you are required to respond to
6  my questions unless counsel instructs you not to
7  answer --
8    A   Yes.
9    Q   -- a particular question?
10       We will take breaks from time to time,
11 but if at any point you would like to take a
12 break, just simply ask me, and we'll accommodate
13 that.  Try to do that not while there's a question
14 pending.
15       It's important that we try not to talk
16 over each other for the benefit of the court
17 reporter, and it's going to be even more important
18 that I slow down my speaking cadence for purposes
19 of the court reporter, because I tend to talk
20 quickly.
21       Are you taking any medications,
22 Dr. Shanfield, or is there any reason that might
23 interfere with your ability to give your best
24 testimony today?
25   A   No.
                                        Page 9

                                        3 (Pages 6 - 9)

1    A   Yes.
2    Q   In what circumstances have you looked at
3  such business intelligence reports?
4    A   Usually it was in the context of
5  communication systems that I was reading about,
6  and there's, there's typically some mention in the
7  system design end of it, what was happening in the
8  BAW filter design business.
9        I also had a colleague who I knew from
10 Raytheon, actually, who moved to RFMD, so I talked
11 with him about what he was doing, too.
12   Q   If I could have -- I don't think it's
13 been marked.  For right now, I'll allow you just
14 to simply look at the one that's in your binder,
15 but we'll take care of making it an official
16 exhibit.
17       Look at the very first document that's
18 in the new binder I just gave you titled
19 "Plaintiff Qorvo, Inc.'s identification of Trade
20 Secrets it currently expects to present at trial."
21   A   Yes.
22   Q   And I guess have you seen this document
23 before?
24   A   Yes.
25   Q   And when did you -- when had you seen

1  this document?
2    A   I think it was before November, but I
3  don't remember exactly.
4    Q   Okay, so you saw this document before
5  the preparation of your expert report on trade
6  secrets?
7    A   Yes.
8    Q   Do you know who determined what
9  information was to be included in this exhibit?
10 We'll call it Shanfield Exhibit 1.
11       (Exhibit 1 was marked for
12       identification.)
13       THE WITNESS:  Well, the signers,
14   including Mr. DeFosse here and Mr. Jung.
15 BY MR. LEMIEUX:
16   Q   Were you involved at all in determining
17 what information was to be included in Exhibit 1?
18   A   I reviewed this document and had
19 comments and input.
20   Q   What type of comment and input did you
21 have with regard to the creation of the list of
22 information that's contained in Exhibit 1?
23       MR. DEFOSSE:  I'm going to object
24   on the grounds of privilege, and I instruct
25   the witness not to answer that question.

1        MR. LEMIEUX:  As to what his
2    involvement was in the creation of this
3    document?
4        MR. DEFOSSE:  Yes.  I think that
5    would fall in the category of work product
6    communications between counsel and expert.
7  BY MR. LEMIEUX:
8    Q   Did you in the -- did you see drafts of
9  this document prior to the time that you submitted
10 your expert report?
11   A   Yes.
12   Q   And at any point in time, did you
13 challenge whether a particular item should be
14 included in Plaintiff's Exhibit 1?
15       MR. DEFOSSE:  I'm going to also
16   object to that question and instruct the
17   witness not to answer on work product
18   grounds.
19       MR. LEMIEUX:  You're asking him to
20   not answer whether or not he ever challenged
21   the inclusion of anything here?
22       MR. DEFOSSE:  Yes.  I think that
23   gets into attorney work product.
24       MR. LEMIEUX:  Just so we're clear,
25   so any questions I ask him as to whether or

1    not he objected or did not believe a
2    particular item should be included within the
3    draft list that you looked at, you would
4    instruct him not to answer that question?
5        MR. DEFOSSE:  Yes, if you're
6    talking about the presentation of what's been
7    marked as Shanfield Exhibit 1.
8  BY MR. LEMIEUX:
9    Q   Have there -- in the course of your work
10 on this case, have there been items suggested to
11 you to be considered trade secrets belonging to
12 Qorvo that you believed were not appropriately
13 characterized as trade secrets?
14   A   No.
15   Q   And so everything that has been
16 presented to you as a potential Qorvo trade
17 secret, you've agreed that, in fact, it was a
18 protectable trade secret; is that right?
19       MR. DEFOSSE:  Objection to the
20   form.
21       THE WITNESS:  My analysis of the
22   asserted trade secrets was affected by the
23   vast volume of material that was involved,
24   and therefore, I picked out what I regarded
25   as trade secrets, of which I then divided

1    into or was able to create the groups that
2    I've indicated in paragraph 78 in my report,
3    and of which I only could take a subset of
4    the documents I identified.
5         So the volume and extent of the
6    material taken from Qorvo was staggering, and
7    I was partly looking how to represent it
8    properly.
9    BY MR. LEMIEUX:
10   Q    Move to strike as nonresponsive.
11        Dr. Shanfield, was your list -- or were
12   the trade secrets, the alleged trade secrets that
13   you intended to cover in your report, were they
14   intended to include all of the items that are
15   listed in Exhibit 1, which is the identification
16   of trade secrets that the plaintiff currently
17   expects to present at trial?
18   A    I'm sorry.  Could you repeat the first
19   part of that question?
20        MR. LEMIEUX:  Would you read it
21   back?
22        THE REPORTER:  Sure.
23        (Whereupon, reporter reads
24        requested material.)
25        THE WITNESS:  No.
                                        Page 138

1    A    Oh, now I understand.  Thanks, and your
2    question is?  Do you mind repeating?
3         (Whereupon, reporter reads
4         requested material.)
5         THE WITNESS:  So I did address all
6    of the items listed in -- or at least most of
7    the items.  There's some exceptions at the
8    end, I believe.  I didn't address Qorvo's tax
9    and corporate compliance structure and
10   know-how, for example.
11   BY MR. LEMIEUX:
12   Q    Anything else you didn't address?
13   A    Trade secrets relating to job structures
14   and employee compensation.
15   Q    Is it your understanding that Exhibit 1,
16   again which is this list, that this constitutes
17   all of the trade secrets that plaintiff currently
18   intends to pursue at trial?
19        MR. DEFOSSE:  Objection; form.
20        THE WITNESS:  That's how this
21        document is labeled.
22   BY MR. LEMIEUX:
23   Q    And you have not been told anything to
24   the contrary; is that correct?
25   A    I haven't been given any information
                                        Page 140

1    BY MR. LEMIEUX:
2    Q    And is the, is the -- are the trade
3    secrets that -- the alleged trade secrets that you
4    address in your report, are they a subset of
5    Exhibit 1?
6    A    They are, yes.
7    Q    And so you did not attempt to address
8    all of the trade secrets that are specified in
9    Exhibit 1 in your report; is that right?
10   A    No.  I did, at great effort, review
11   those items in Appendix 1.  Let me check to be
12   sure we're referring to the same thing.
13        So are you talking about Appendix 2?
14   Q    No.  I'm simply talking about the items
15   that are listed in Exhibit 1 versus the material
16   that's contained in your report, which you said
17   was listed in paragraph 78.
18        MR. DEFOSSE:  It may help if you
19        tell the witness what you mean by "Exhibit
20        1."  I think he's confused.
21   BY MR. LEMIEUX:
22   Q    Exhibit 1 again is the document that we
23   were looking at when we started, picked up in this
24   session, the identification of trade secrets that
25   plaintiff currently expects to present at trial?
                                        Page 139

1    about what ultimately going to be presented.
2    Q    Well, you're the designated expert of
3    the plaintiff testifying on the matter of trade
4    secrets, and so you have not been told what trade
5    secrets are being pursued at trial?
6         MR. DEFOSSE:  I'm going to object
7         again.  We're not going to get into
8         discussions between counsel and attorneys as
9         to trial strategy, if that's what you're
10        asking.
11        MR. LEMIEUX:  No.  I just -- we
12   have been served with a document that you are
13   represented to be the trade secrets that the
14   plaintiff currently intends to present at
15   atrial, and you and I had a meet-and-confer
16   on this as to whether or not this was your
17   final document in this regard, and you've
18   stated that it was, you believed, sufficient
19   identification.
20        I'm asking the witness, who is one
21   of your experts, to speak to trade secret
22   issues, if that is also his understanding, is
23   that this represents the list of trade
24   secrets that the plaintiff intends to pursue
25   at trial.
                                        Page 141

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1 Ms. Bennis?
2    A   No.
3        MR. LEMIEUX:  Do we have Bennis'
4 report in any of this?  Yeah.  Can we just
5 take a quick break, let him get a copy of
6 Bennis' report?
7        MR. DEFOSSE:  Fair.
8        THE VIDEOGRAPHER:  The time is
9 5:46 p.m.  We are going off the record.
10       (Whereupon, a short recess was
11       taken.)
12       THE VIDEOGRAPHER:  The time is
13 6:03 p.m.  We are going back on the record.
14 Please proceed, Counsel.
15       MR. DEFOSSE:  I'd like to take this
16 opportunity to ask that this entire
17 transcript be designated as attorneys' eyes
18 only.
19       (Exhibit 3 was marked for
20       identification.)
21 BY MR. LEMIEUX:
22   Q   Dr. Shanfield, if I could -- I believe
23 what we've given you on the laptop there is page
24 39 of Melissa Bennis' report.
25       Is that right?

Page 222

1    A   I can go to page 39.
2    Q   Okay.
3    A   Okay.
4    Q   And I apologize, because I'm not sure
5 where on page 39 this might appear, but it will
6 say -- it will start out with, quote, "I
7 understand that the trade secrets Akoustis is
8 alleged to have misappropriated."
9        Do you see that paragraph or that
10 sentence?
11   A   Yes.
12   Q   It goes on to state -- well, I'll state
13 it in full again.
14       "I understand that the trade secrets
15 Akoustis is alleged to have misappropriated
16 related to virtually every aspect of its business
17 and ability to get to market in the time frame
18 that it did.  This includes its ability to earn
19 grant money, fabricate products, provide
20 engineering services, and manufacture products.
21 As such, it is appropriate to consider Akoustis'
22 total company value in this analysis," period,
23 close quote.
24       Did you make that statement anywhere in
25 your report that the trade secrets Akoustis is

Page 223

1 alleged to have misappropriated are related to
2 virtually every aspect of its business and ability
3 to get to market in the time frame that it did?
4        You're free to look.  I'll represent to
5 you that I don't believe you've made that
6 statement anywhere in your report, but feel free
7 to look to see if you can find it somewhere.
8    A   I don't think -- I did not make that
9 exact statement, but I made statements.  For
10 example, paragraph 509, "As reflected above," and
11 I'm reflecting on the materials of Qorvo's
12 confidential information, I said, "the breadth of
13 the acquisition and use of Qorvo's confidential
14 information at Akoustis is quite staggering."
15   Q   Have you discussed this issue with
16 Ms. Bennis?
17   A   No.
18   Q   How does the alleged misappropriation of
19 Qorvo's trade secrets impact Akoustis' ability to
20 earn grant money?
21   A   Very much so.
22   Q   Would you please explain why you believe
23 that to be the case.
24   A   Getting grant money is typically based
25 on a proposal that outlines why it is that your

Page 224

1 company is in a position to perform the work that
2 is being proposed, and in order for Akoustis to
3 make that statement, they had reached a place in
4 their development that was well ahead of where
5 they would have been without Qorvo's trade
6 secrets, and therefore, it allowed them to be
7 put -- be in a position to get grant money.
8    Q   Would that be true for grant money that
9 they are receiving in 2014?
10   A   I think what she's saying, if that's
11 what you're referring to, is that it did affect
12 Akoustis' ability to earn grant money, and she
13 didn't say what time, but it certainly, as time
14 went on, had a big impact on that.
15   Q   Well, in the early years of Akoustis'
16 development, prior to the time of Mr. Rohan
17 Houlden or other former Qorvo employees coming
18 over to Akoustis, would -- is it your testimony
19 that the misappropriation of Qorvo's trade secrets
20 impacted the obtaining of grant money even before
21 those folks moved from Qorvo to Akoustis?
22   A   No, of course not, but it had an effect
23 on the ability of grant money since the point --
24 at the point and since the point of getting that
25 head start.

Page 225

57 (Pages 222 - 225)

1    Q   What about fabrication revenue
2 recognized by the New York fab facility; is there
3 anything about the alleged Qorvo trade secret
4 information that had any impact on unrelated
5 revenue obtained by the -- or earned by the
6 fabrication facility in New York?
7         MR. DEFOSSE:  Objection to form.
8         THE WITNESS:  Are you talking about
9    after it was acquired?
10 BY MR. LEMIEUX:
11    Q   Yes.
12    A   So --
13    Q   It wouldn't matter to Akoustis with
14 regards to before they acquired it.
15    A   I have -- in Section H, H as in Henry, I
16 have the description of trade secrets that
17 Qorvo -- or that Akoustis had taken from Qorvo on
18 "manufacturing, assembly, and change procedures."
19 All of those aspects of operating the fab would be
20 of benefit to the MEMS facility in New York.
21 MEMS, M-E-M-S.
22    Q   And what impact do you believe that the
23 alleged acquisition and misappropriation of Qorvo
24 trade secrets would have had on revenue generated
25 from the manufacturer of non-BAW filters?

1 impact on the non-Akoustis business of that
2 fabrication facility?
3    A   Yes.
4    Q   And you believe that started when?
5    A   Clearly when -- in that long time period
6 where the Qorvo trade secret information related
7 to things like manufacturing, assembly and change
8 procedures, and other aspects of process and
9 fabrication was taken by people like Houlden and
10 was brought into Akoustis, that had the benefit
11 immediately, and has continued to realize
12 benefit -- Akoustis has continued to realize
13 benefit from it now.
14    Q   Do you believe that products that were
15 manufactured by the New York facility prior to its
16 acquisition by Akoustis and that were continued to
17 be manufactured after the acquisition by Akoustis
18 are somehow impacted by the acquisition of Qorvo
19 trade secrets?
20    A   Well, they are, yes.  As I said, the
21 fab, the New York fab benefited from Qorvo trade
22 secrets and continues to benefit from Qorvo trade
23 secrets that had to do with areas that matter to a
24 manufacturing facility like that.
25    Q   So do you believe then on the day of the

1    A   I think the example I just gave would
2 apply to both BAW filters and non-BAW filters,
3 because in order to supply parts of components
4 from the MEMS facility, often customers want to
5 see how you've -- what kind of library you keep,
6 how you control processes to make them stable and
7 repeatable.  So that they will get the same
8 product over and over again.
9         And so it's very relevant that they have
10 these manufacturing, assembly and change
11 procedures, and that's exactly the kinds of
12 information or trade secret information that, that
13 Akoustis obtained from Qorvo.
14    Q   Do you understand, Dr. Shanfield, that
15 the fabrication facility that Akoustis acquired in
16 New York existed prior to in any affiliation with
17 Akoustis?
18    A   Yes.
19    Q   And do you understand that that
20 fabrication facility made devices, products that
21 were completely unrelated to Akoustis' historic
22 business?
23    A   Yes.
24    Q   And is it your position that alleged
25 misappropriation of Qorvo trade secrets had an

1 acquisition by Akoustis, suddenly everything that
2 the fab facility had been doing prior to its, its
3 acquisition by Akoustis was converted into
4 something covered by Qorvo trade secrets?
5    A   No.  That's, that's simplifying it, but
6 the acquisition by Akoustis and a knowledge of
7 Qorvo's trade secrets in manufacturing and change
8 procedures and documentation, those found their
9 way into the operation of their fab, and it was a
10 gradual process, but that was taken into account
11 when I did my estimates on each operational task
12 in coming up with the total.
13    Q   Well, let's turn to the last page of
14 your report.
15         MR. DEFOSSE:  Can we take that
16    computer back?
17         MR. LEMIEUX:  Oh, yes, please.
18         THE WITNESS:  By "last page" you
19    don't mean appendix?  You mean of the report
20    itself?
21 BY MR. LEMIEUX:
22    Q   No, the appendix where it shows -- has
23 your chart.
24    A   Ah, okay.  I have a magnified version of
25 that, because it's hard to see.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      ACKNOWLEDGMENT OF WITNESS
2
3          I, Stanley Shanfield, Ph.D., do
4    hereby acknowledge that I have read and
5    examined the foregoing testimony, and the
6    same is a true, correct and complete
7    transcription of the testimony given by me,
8    and any corrections appear on the attached
9    Errata sheet signed by me.
10
11
12   _____  _____
13   (DATE)         STANLEY SHANFIELD, Ph.D.
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 254

1   CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
2
3          I, Laurie Donovan, Registered
4    Professional Reporter, Certified Realtime
5    Reporter, and notary public for the District
6    of Columbia, the officer before whom the
7    foregoing deposition was taken, do hereby
8    certify that the foregoing transcript is a
9    true and correct record of the testimony
10   given; that said testimony was taken by me
11   stenographically and thereafter reduced to
12   typewriting under my supervision; and that I
13   am neither counsel for, related to, nor
14   employed by any of the parties to this case
15   and have no interest, financial or otherwise,
16   in its outcome.
17         IN WITNESS WHEREOF, I have hereunto
18   set my hand and affixed my notarial seal this
19   2nd day of February 2024.
20
21
22        LAURIE DONOVAN, RPR, CRR
23        NOTARY PUBLIC IN AND FOR THE
24        DISTRICT OF COLUMBIA
25        My commission expires:  July 14, 2027
                                    Page 256

1      E R R A T A   S H E E T
2   IN RE:  QORVO, INC. vs. AKOUSTIS TECHNOLOGIES
3   RETURN BY:
4   PAGE   LINE       CORRECTION AND REASON
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24
25  STANLEY SHANFIELD, Ph.D.        DATE
                                    Page 255

65 (Pages 254 - 256)

# Exhibit C

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549
**FORM 10-K**

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended June 30, 2017

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

Commission file number: **001-38029**

**AKOUSTIS**
SMART SELECTIVITY SOLUTIONS

**AKOUSTIS TECHNOLOGIES, INC.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **33-1229046** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| | |
|---|---|
| **9805 Northcross Center Court, Suite H** | |
| **Huntersville, NC** | **28078** |
| (Address of principal executive offices) | (Postal Code) |

Registrant's telephone number, including area code: **1-704-997-5735**

Securities registered under Section 12(b) of the Act:

| Title of Each Class: | Name of each exchange on which registered: |
|---|---|
| **Common Stock, $0.001 par value** | **The NASDAQ Stock Market LLC (NASDAQ Capital Market)** |

Securities registered under Section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large Accelerated Filer ☐ | Accelerated Filer ☐ |
| Non-Accelerated Filer ☐ | Smaller reporting company ☒ |
| (Do not check if a smaller reporting company) | Emerging growth company ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock, par value $0.001 per share ("Common Stock"), held by non-affiliates on December 31, 2016 was approximately $52,512,000. For purposes of this computation, shares of Common Stock held by all officers,

On March 23, 2017, we entered into an Asset Purchase Agreement and a Real Property Purchase Agreement (collectively, the "STC-MEMS Agreements") with The Research Foundation for the State University of New York ("RF-SUNY") and Fuller Road Management Corporation ("FRMC"), an affiliate of RF-SUNY (collectively, "Sellers"), respectively, to acquire certain specified assets, including STC-MEMS, a semiconductor wafer-manufacturing and microelectromechanical systems (MEMS) operation with associated wafer-manufacturing tools, and the associated real estate and improvements located in Canandaigua, New York used in the operation of STC-MEMS (the assets and real estate and improvements referred to together herein as the "STC-MEMS Business"). Pursuant to the STC-MEMS Agreements, the Company also agreed to assume post acquisition date substantially all of the ongoing obligations of the STC-MEMS Business incurred in the ordinary course of business.

We completed the acquisition of the STC-MEMS Business through our wholly-owned subsidiary, Akoustis Manufacturing New York, Inc., a Delaware corporation formed in connection with the acquisition, on June 26, 2017 for an aggregate purchase price of $2.8 million in cash. The Company recorded net assets acquired of $6.3 million for purchase consideration of $4.6 million (includes $2.85 million of cash paid at closing plus $1.7m real estate contingent liability), which resulted in the recording of a bargain purchase gain of $1.7 million. The Company reviewed what factors might contribute to a bargain purchase to determine if it was reasonable for a bargain purchase to occur. We determined the factors that contributed to the bargain purchase price were:

- The transaction was completed with a motivated seller who the Company believed was very hesitant to liquidate assets and lay-off employees in the current political environment.

- The cash burn of the facility (approximately $3.0 million annually) was an economic burden to the sellers.

- The Company, the County and State were motivated to approve the transaction without significant price negotiation, as they believed it would insure the employment of the headcount and provide the opportunity for increased headcount and increased investment in the facility that would add to the tax base.

Based upon these factors, the Company concluded that the occurrence of a bargain purchase was reasonable.

The STC-MEMs acquisition allows the Company to internalize manufacturing, increase capacity and control its wafer supply chain for single crystal BAW RF filters. We have now successfully transferred our R&D resonator filter process flow into the facility, and we plan to utilize the facility to optimize our BulkONE® technology and to consolidate all aspects of wafer manufacturing for our disruptive and patented high band BAW RF filters targeting the multi-billion dollar mobile and other wireless markets. This planned consolidation of the Company's supply chain into the STC-MEMS Business started on June 26, 2017 and is expected to shorten time-to-market for our RF products, greatly enhancing our ability to service customers upon completion of development and design specifications. Furthermore, we believe that shorter time-to-market cycles provide us with the opportunity to increase the number of our potential customers.

In August 2017, we announced our first shipment of premium high-band BAW RF filter prototypes manufactured using our patented single-crystal BulkONE® technology to the aforementioned Chinese tier one customer. The shipment included high performance, LTE-TDD Band 41, 2.6 GHz BAW RF filters that we believe will satisfy the challenging filter requirements in the high growth 4G LTE mobile market in China. Shortly thereafter, we announced our first 3.5GHz RF filter shipments to our second customer for a key Radar application.

*Organizational Developments*

On August 11, 2016, we changed our fiscal year from a fiscal year ending on March 31 of each year to one ending on June 30 of each year, effective for the fiscal year ended June 30, 2017. On October 31, 2016, we filed a transition report on Form 10-K for the transition period from April 1, 2016 to June 30, 2016.

Following stockholder approval at our 2016 annual stockholders' meeting, we changed our state of incorporation from the State of Nevada to the State of Delaware on December 15, 2016.

**Glossary**

The following is a glossary of technical terms used herein:

- **Acoustic wave** — a mechanical wave that vibrates in the same direction as its direction of travel.

- **AlGaN** — Aluminum Gallium Nitride.

- **AlN** — Aluminum Nitride.

- **Acoustic wave filter** — an electromechanical device that provides radio frequency control and selection, in which an electrical signal is converted into a mechanical wave in a device constructed of a piezoelectric material and then back to an electrical signal.

3

# Exhibit D

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549
**FORM 10-K**

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended June 30, 2018

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

Commission file number: **001-38029**

**AKOUSTIS**
SMART SPECTRUM SOLUTIONS

**AKOUSTIS TECHNOLOGIES, INC.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **33-1229046** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| | |
|---|---|
| **9805 Northcross Center Court, Suite A Huntersville, NC** | **28078** |
| (Address of principal executive offices) | (Postal Code) |

Registrant's telephone number, including area code: **1-704-997-5735**

Securities registered under Section 12(b) of the Act:

| Title of Each Class: | Name of each exchange on which registered: |
|---|---|
| **Common Stock, $0.001 par value** | **The NASDAQ Stock Market LLC (NASDAQ Capital Market)** |

Securities registered under Section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to 1tem 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large Accelerated Filer ☐ | Accelerated Filer ☒ |
| Non-Accelerated Filer ☐ | Smaller reporting company ☒ |
| (Do not check if a smaller reporting company) | Emerging growth company ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The aggregate market value of the registrant's common stock, par value $0.001 per share ("Common Stock"), held by non-affiliates on December 29, 2017 was approximately $106.9 million. For purposes of this computation, shares of Common Stock held by all officers,

**Recent Developments**

*New York Manufacturing Facility*

On March 23, 2017, we entered into an Asset Purchase Agreement and a Real Property Purchase Agreement (collectively, the "STC-MEMS Agreements") with The Research Foundation for the State University of New York ("RF-SUNY") and Fuller Road Management Corporation ("FRMC"), an affiliate of RF-SUNY (collectively, "Sellers"), respectively, to acquire certain specified assets, including STC-MEMS, a semiconductor wafer-manufacturing and microelectromechanical systems ("MEMS") operation with associated wafer-manufacturing tools, and the associated real estate and improvements located in Canandaigua, New York used in the operation of STC-MEMS (the assets and real estate and improvements referred to together herein as the "STC-MEMS Business"). Pursuant to the STC-MEMS Agreements, the Company also agreed to assume post acquisition date substantially all of the ongoing obligations of the STC-MEMS Business incurred in the ordinary course of business.

We completed the acquisition of the STC-MEMS Business on June 26, 2017 for an aggregate purchase price of $2.8 million in cash. The Company recorded net assets acquired of $6.3 million for purchase consideration of $4.6 million (includes $2.85 million of cash paid at closing plus $1.7 million real estate contingent liability), which resulted in the recording of a bargain purchase gain of $1.7 million.

The STC-MEMs acquisition allows the Company to internalize manufacturing, increase capacity and control its wafer supply chain for its XBAW based RF filters. In January 2018, we successfully transferred our R&D resonator filter process flow into the facility, and we plan to utilize the facility to optimize our XBAW technology and consolidated all aspects of wafer manufacturing for our disruptive and patented high band BAW RF filters targeting the multi-billion dollar mobile and other wireless markets. Our consolidation of the Company's supply chain into the STC-MEMS Business started on June 26, 2017 and is expected to shorten time-to-market for our RF products, greatly enhancing our ability to service customers upon completion of development and design specifications. Furthermore, we believe that shorter time-to-market cycles provide us with the opportunity to increase the number of our potential customers.

On February 27, 2018, we entered into a Lease and Project Agreement and a Company Lease Agreement with the Ontario County Industrial Development Agency (the "OCIDA"), pursuant to which we will lease for $1.00 annually to the OCIDA a portion of the real property, including the improvements thereon, acquired in connection with the purchase of the STS MEMS Business and the OCIDA will lease such real property and improvements back to us for annual rent payments specified in such agreements. See Note 12.

*Business Developments*

In August 2017, we announced our first shipment of premium high-band BAW RF filter prototypes manufactured using our patented single-crystal BulkONE® technology to a Chinese tier one customer. The shipment included high performance, LTE-TDD Band 41, 2.6 GHz BAW RF filters that we believe address the challenging filter requirements in the high growth 4G LTE mobile market in China. Shortly thereafter, we announced our first 3.8GHz RF filter shipments to our second customer for a key Radar application.

In March and April of 2018, we announced our first two commercial products, the AKF-1252 and the AKF-1938, which we are currently sampling with customers involved in the WiFi market and military radar market, respectively. In May we announced an NRE contract and purchase order for a 4G/LTE infrastructure customer that we expect will ship in early calendar 2019. Additionally, in June 2018 we announced a 5.2 GHz BAW WiFi filter for the handset market, the AKF-1652. We expect to begin commercial production for one or multiple markets in the second half of calendar 2018. As we receive customer evaluations, we will do further iterations on the designs and provide next generation samples for evaluation and characterization.

In June 2018 we completed the qualification of our XBAW RF filter wafer manufacturing process to support an initial product family of 4G/LTE, 5G mobile, military and WiFi filter solutions. Now that we have stabilized our process technology in a manufacturing environment, we intend to complete a production release of our high-band filter products in the frequency range from 2 GHz to 6 GHz.

*Organizational Developments*

On August 11, 2016, we changed our fiscal year from a fiscal year ending on March 31 of each year to one ending on June 30 of each year, effective for the fiscal year ended June 30, 2017. On October 31, 2016, we filed a transition report on Form 10-K for the transition period from April 1, 2016 to June 30, 2016.

Following stockholder approval at our 2016 annual stockholders' meeting, we changed our state of incorporation from the State of Nevada to the State of Delaware on December 15, 2016.

On February 22, 2018, Akoustis Manufacturing New York, Inc. was merged into Akoustis, Inc., with Akoustis, Inc. as the surviving entity.

*Financing Developments*

On May 14, 2018 the Company completed the offering of $15.0 million principal amount of the Company's 6.5% Convertible Senior Secured Notes due 2023. The net proceeds of the offering after payment of offering costs were approximately $13.1 million. The notes will mature on May 31, 2023, unless earlier converted, redeemed or repurchased. Interest on the notes accrues at the rate of 6.5% per year and is payable at the Company's option quarterly in cash and/or freely tradable shares of the Company's common stock, subject to certain limitations. The notes may be converted into common stock at the option of the holder at any time prior to maturity at an initial conversion price of $6.55 per share, subject to adjustment under certain circumstances. If the holder elects to convert the notes at any time on or after the date that is one year after the last date of original issuance of the notes and prior to May 31, 2021, the holder will also receive a make-whole payment equal to the remaining scheduled interest payments that would have been made on the notes converted had such notes remained outstanding through May 31, 2021 (the "put date"). At the Company's option, make-whole payments may be paid in cash and/or

# Exhibit E

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

(Mark One)

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 30, 2019

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: **001-38029**

**AKOUSTIS TECHNOLOGIES, INC.**
(Exact name of registrant as specified in its charter)

| Delaware | 33-1229046 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| 9805 Northcross Center Court, Suite A Huntersville, NC | 28078 |
|---|---|
| (Address of principal executive offices) | (Postal Code) |

Registrant's telephone number, including area code: **1-704-997-5735**

Securities registered under Section 12(b) of the Act:

| Title of Each Class: | Trading Symbol | Name of each exchange on which registered: |
|---|---|---|
| Common Stock, $0.001 par value | AKTS | The NASDAQ Stock Market LLC (NASDAQ Capital Market) |

Securities registered under Section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.  Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large Accelerated Filer ☐                                        Accelerated Filer ☒
Non-Accelerated Filer ☐                                          Smaller reporting company ☒
                                                                                  Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock, par value $0.001 per share ("Common Stock"), held by non-affiliates on December 31, 2018 was approximately $123.6 million. For purposes of this computation, shares of Common Stock held by all officers, directors, and beneficial owners of 10% or more of the outstanding Common Stock were excluded because such persons may be deemed to be affiliates of the registrant. Such determination should not be deemed an admission that such persons are, in fact, affiliates of the registrant.

As of September 06, 2019, there were 30,329,525 shares of Common Stock issued and outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

The registrant intends to file a definitive proxy statement pursuant to Regulation 14A within 120 days after the end of the fiscal year ended June 30, 2019. Portions of such proxy statement are incorporated by reference into Part III of this Form 10-K.

PART I

**ITEM 1. BUSINESS**

**Overview**

Akoustis® is an emerging commercial company focused on developing, designing and manufacturing innovative RF filter products for the wireless industry, including for products such as smartphones and tablets, network infrastructure equipment, WiFi Customer Premise Equipment ("CPE") and defense applications. Located between the device's antenna and its digital backend, the RF front-end ("RFFE") is the circuitry that performs the analog signal processing and contains components such as amplifiers, filters and switches. We have developed a new and proprietary microelectromechanical systems ("MEMS") based bulk acoustic wave ("BAW") technology and unique manufacturing flow, which we have trademarked as XBAW. Our XBAW $^{TM}$ process incorporates optimized high purity piezoelectric materials designed to achieve high power, high frequency and/or wide bandwidth filter performance. Filters are critical in selecting and rejecting signals, and their performance enables differentiation in the hardware modules defining the RFFE.

We believe owning the core resonator device technology, manufacturing facility and intellectual property ("IP") to produce our designs is the most direct and efficient means of delivering our solutions to the market. Furthermore, our technology is based upon bulk-mode acoustic resonance, which we believe is superior to surface-mode acoustic resonance for high-band applications that include 4G/LTE, 5G, WiFi, and defense applications. Although some of our target customers utilize or make the RFFE module, they may lack access to critical ultra-high band (UHB) filter technology needed to compete in high-frequency applications. We intend to design, manufacture, and market our RF filter products to mobile phone original equipment manufacturers ("OEMs"), defense OEMs, network infrastructure OEMs, and WiFi CPE OEM's to enable broader competition among the front-end module manufacturers. We operate as a "pure-play" RF filter supplier and align with the front-end module manufacturers who seek to acquire high performance filters to expand their module business.

We currently build high performance RF filter circuits, using our first generation XBAW$^{TM}$ wafer process, in our 120,000 square-foot wafer-manufacturing facility located in Canandaigua, New York, which we acquired in June 2017. As of September 11, 2019, our (IP) portfolio included 24 patents, including one blocking patent that we have licensed from Cornell University. Additionally, we have 52 active and pending patent applications. These patents cover our XBAW $^{TM}$ RF filter technology from the substrate level through the system application layer. Where possible, we leverage both federal and state level R&D grants to support development and commercialization of our technology.

We are developing RF filters for 4G/LTE, 5G, WiFi and defense bands using our proprietary resonator device models and product design kits (PDK's). As we qualify our first RF filter products, we are engaging with target customers to evaluate our filter solutions. Our initial designs target UHB, sub-7 GHz 4G/LTE, 5G, WiFi and defense bands. Since Akoustis owns its core technology and controls access to its intellectual property, we expect to offer several ways to engage with potential customers. First, we intend to engage with multiple wireless markets, providing standardized filters that we design and offer as standard catalog components. Second, we expect to deliver unique filters to customer-supplied specifications, which we will design and fabricate on a customized basis. Finally, we may offer our models and design kits for our customers to design their own filters utilizing our proprietary technology.

We have earned minimal revenue from operations since inception, and we have funded our operations primarily with development contracts, RF filter prototype and initial production orders, government grants, MEMS foundry and engineering services, sales of our equity securities, and issuance of debt. We have incurred losses totaling approximately $67.5 million from inception through June 30, 2019. These losses are primarily the result of material and processing costs associated with developing and commercializing our technology, as well as personnel costs, professional fees (primarily accounting and legal), and other general and administrative ("G&A") expenses. We expect to continue to incur substantial costs for commercialization of our technology on a continuous basis because our business model involves materials and solid-state device technology development and engineering of catalog and custom filter design solutions.

1

**Plan of Operation**

We plan to commercialize our technology by designing and manufacturing single-band and multi-band BAW RF filter solutions in our New York wafer fabrication facility. We expect our filter solutions will address problems (such as power loss, bandwidth, power handling, and isolation) created by the growing number and convergence of frequency bands in the RFFE of mobile devices, infrastructure and premise equipment to support 4G/LTE, 5G, and WiFi. We have prototyped our first single-band BAW filter designs for 4G/LTE frequency bands, which are dominated by competitive BAW solutions and historically cannot be addressed with low-band, lower power handling surface acoustic wave ("SAW") technology.

To succeed, we must convince mobile phone OEMs, RFFE module manufacturers, network infrastructure OEMs, WiFi CPE OEMs and defense customers to use our XBAW$^{TM}$ filter technology in their systems and modules. However, since there are two dominant BAW filter suppliers in the industry that have high-band technology, and both utilize such technology as a competitive advantage at the module level, we expect customers that lack access to high-band filter technology will be open to engage with our pure-play filter company.

We plan to pursue RF filter design and R&D development agreements and potentially joint ventures with target customers and other strategic partners. These types of arrangements may subsidize technology development costs and qualification, filter design costs, and offer complementary technology and market intelligence and other avenues to revenue. However, we intend to retain ownership of our core technology, intellectual property, designs, and related improvements. We expect to pursue development of catalog designs for multiple customers and to offer such catalog products in one or more sales channels.

QORVO_00016879

**Recent Developments**

*Business Developments*

In July 2018, we completed the qualification of our high purity piezoelectric materials process and our XBAW$^{TM}$ manufacturing process to support an initial product family of 4G/LTE, 5G mobile, WiFi and defense filter solutions. Now that we have stabilized our resonator process technology in a manufacturing environment, we intend to complete a production release of our RF filter products in the frequency range from 1 to 7 GHz. The target frequency bands will be prioritized based upon customer priority. We expect this will require recruiting and hiring additional personnel and capital investments.

We added our first 5G network infrastructure customer for the Citizen's Broadband Radio Service in August 2018 and announced first samples to our 5G customer in March 2019. We announced a second 5G network infrastructure customer in October 2018, and we provided initial samples of our 3.5 GHz CBRS filter product in March 2019. In September 2018, we recorded our first XBAW$^{TM}$ filter revenue from our defense customer for pre-production units and received multiple follow-on orders in addition to the original purchase order for production units.

In December 2018, we introduced the AKF-1256, a 5.6 GHz BAW filter for the WiFi market and shipped samples to select partners for evaluation and testing. We are currently shipping production units of the AKF-1938 to our defense customer and have shipped pre-production units of our AKF-1252 product to multiple WiFi customers, including a new customer that signed a supply agreement with an initial order of more than 80,000 AK-1252 filters, which were delivered in the quarter ended March 31, 2019.

In May 2019, we announced receipt of sub-6GHz 5G filter development order from tier one wireless telecommunication customer and successfully delivered our first 5G prototype filter for mobile devices in June 2019. As we receive customer evaluations for our growing portfolio, we will do further iterations on the designs and provide next generation samples for evaluation and characterization.

*Financing Developments*

On October 23, 2018, the Company completed the offering of $10.0 million principal amount of the Company's 6.5% Convertible Senior Notes due 2023. The notes are unsecured and rank pari passu with the Company's outstanding unsubordinated liabilities. As unsecured obligations, the notes effectively rank junior in right of payment to our secured indebtedness, including our $15.0 million outstanding principal amount of convertible senior secured notes issued in May 2018. The net proceeds of the offering after payment of offering costs were approximately $8.9 million. The notes will mature on November 30, 2023, unless earlier converted, redeemed or repurchased. Interest on the notes accrues at the rate of 6.5% per year and is payable in cash on each February 28, May 31, August 31 and November 30, beginning February 28, 2019. The notes are convertible into common stock at the option of the holder at any time prior to maturity at an initial conversion price of $5.10 per share, subject to adjustment under certain circumstances.

Additionally, on October 23, 2018, the Company sold a total of 7,250,000 shares of its common stock at a price to the public of $4.25 per share for aggregate gross proceeds of $30.8 million, before deducting the underwriting discount and offering expenses payable by the Company of approximately $2.1 million.

3

QORVO_00016880

**Commercialization**

Our immediate focus is on the commercialization of wide bandwidth RF filters to address the WiFi, Infrastructure and defense bands with innovative single-band designs using our XBAW sub 6 GHz RF filter technology. We are currently developing commercial single-band filters through our wafer fabrication facility. We are focused on developing fixed-band filters because we believe these designs present the greatest near-term potential for commercialization of our technology, and that once demonstrated, the facility can be more efficiently readied for production compared to alternative technologies.

Our technology development process consists of the following five phases:

1. Pre-Alpha – Demonstrate basic feasibility/capabilities

2. Alpha – Develop stable recipe (Process freeze) with limited production development

3. Beta – Complete technology qualification (Process qualification) in factory to enable product design

4. Pre-Production – Demonstrate lead product production capabilities, release final design tools

5. Production – Continual improvement of process and parametric performance

In March 2018, we announced the completion of the alpha-phase for our first generation XBAW process technology called XB1. In July 2018 we announced the completion of the beta-phase for both the XB1 and our materials process. This shortens the development cycle time for new catalog and custom components as each new product will start in the pre-production phase and will not require end-to-end qualification.

**Research and Development**

Since inception, the Company's focus has been on developing an innovative mobile-wireless filter technology with a compelling value proposition to our potential customers and a significant and noticeable impact to the end user. Whereas today's polycrystalline material (used to manufacture RF resonators and filters) is sputtered on a metal-coated carrier, our patented XBAW technology employs high purity piezoelectric films in our resonators, which are used as the enabler to create high performance BAW RF filters. Our high purity piezoelectric materials are a key differentiator when compared to the incumbent amorphous thin-film technologies because it increases the acoustic velocity, the electromechanical coupling coefficient in the resonator and/or high-power performance. These technology features allow Akoustis to engineer RF filter solutions for a broad spectrum for multiple radio frequencies and thus multiple end markets. Research and development expense totaled $19.3 million for the year ended June 30, 2019 and $13.3 million for the year ended June 30, 2018. These R&D activities focused on high purity piezoelectric materials development and resonator demonstration. Current R&D investments include materials advancement, resonator development, RF filter design and high yield wafer manufacturing.

As a result of our efforts, we have developed and introduced several new filters which are currently sampling with multiple customers across multiple markets. Our focus remains on improving the electromechanical coupling and quality factor of our resonator technology and the performance of our fabricated filters through design improvements and process optimization experiments.

We announced our first filter in March 2018, the AKF-1252, a 5.2 GHz filter for the WiFi premise equipment market. The AKF-1252 is a wideband filter for the U-NII-1&2A bands with typical insertion loss of less than 1dB, high rejection and a high-power rating in an ultra- small footprint module. Offering our customers 23-times size reduction over current dielectric resonator technology, our product is the first BAW RF filter targeting the 5.2 GHz WiFi band and achieved pre-production status in November 2018. In addition, we have announced the sister part to the AKF-1252, called the AKF-1256, which allows the Company to bundle the 5.2 GHz and 5.6 GHz filter solutions to the CPE market. The Company received its first pre-production order in May 2019. The tandem 5.2 GHz and 5.6 GHz filter solutions allow coexistence of WiFi signals in the 5GHz spectrum as shown below.



7

# Exhibit F

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

(Mark One)
☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 30, 2023

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: **001-38029**

**AKOUSTIS TECHNOLOGIES, INC.**
(Exact name of registrant as specified in its charter)

| Delaware | 33-1229046 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| 9805 Northcross Center Court, Suite A Huntersville, NC | 28078 |
|---|---|
| (Address of principal executive offices) | (Postal Code) |

Registrant's telephone number, including area code: **1-704-997-5735**

Securities registered under Section 12(b) of the Act:

| Title of Each Class: | Trading Symbol | Name of each exchange on which registered: |
|---|---|---|
| **Common Stock, $0.001 par value** | **AKTS** | **The Nasdaq Stock Market LLC (Nasdaq Capital Market)** |

Securities registered under Section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large Accelerated Filer | ☐ | Accelerated Filer | ☐ |
|---|---|---|---|
| Non-Accelerated Filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

PART I

**ITEM 1. BUSINESS**

**Overview**

Akoustis Technologies, Inc., a Delaware corporation, was incorporated in 2013. The Company is an emerging commercial product company focused on developing, designing, and manufacturing innovative RF filter solutions for the wireless industry, including for products such as smartphones and tablets, network infrastructure equipment, Wi-Fi Customer Premise Equipment ("CPE"), and defense applications. Filters are critical in selecting and rejecting signals, and their performance enables differentiation in the modules defining the RF front-end ("RFFE"). Located between the device's antenna and its digital backend, the RFFE is the circuitry that performs the analog signal processing and contains components such as amplifiers, filters and switches. We have developed a proprietary microelectromechanical system ("MEMS") based bulk acoustic wave ("BAW") technology and a unique manufacturing process flow, called "XBAW $^{®}$", for our filters produced for use in RFFE modules. Our XBAW$^®$ filters incorporate optimized high purity piezoelectric materials for high power, high frequency and wide bandwidth operation. We are developing RF filters for 5G, Wi-Fi and defense bands using our proprietary resonator device models and product design kits ("PDKs"). As we qualify our RF filter products, we are engaging with target customers to evaluate our filter solutions. Our initial designs target UHB, sub-7 GHz 5G, Wi-Fi and defense bands. We expect our RF filter solutions will address problems (such as loss, bandwidth, power handling, and isolation) created by the growing number of frequency bands in the RFFE of mobile devices, infrastructure and premise equipment to support 5G, and Wi-Fi. We have prototyped, sampled and begun commercial shipment of our single-band low loss BAW filter designs for 5G frequency bands and 5 GHz and 6 GHz Wi-Fi bands which are suited to competitive BAW solutions and historically cannot be addressed with low-band, lower power handling surface acoustic wave ("SAW") technology. Additionally, through our wholly owned subsidiary, RFMi, of which we acquired majority ownership in October 2021 and full ownership in April 2023, we operate a fabless business whereby we make sales of complementary SAW resonators, RF filters, crystal ("Xtal") resonators and oscillators, and ceramic products—addressing opportunities in multiple end markets, such as automotive and industrial applications. We also offer back-end semiconductor supply chain services through our wholly owned subsidiary, GDSI, which we acquired in January 2023.

We own and/or have filed applications for patents on the core resonator device technology, manufacturing facility and intellectual property ("IP") necessary to produce our RF filter chips and operate as a "pure-play" RF filter supplier, providing discrete filter solutions direct to Original Equipment Manufacturers ("OEMs") and aligning with the front-end module manufacturers that seek to acquire high performance filters to expand their module businesses. We believe this business model is the most direct and efficient means of delivering our solutions to the market.

*Technology*. Our device technology is based upon bulk-mode acoustic resonance, which we believe is superior to surface-mode resonance for high-band and ultra-high-band ("UHB") applications that include 4G/LTE, 5G, Wi-Fi, and defense applications. Although some of our target customers utilize or manufacture the RFFE module, they may lack access to critical UHB filter technology that we produce, which is necessary to compete in high frequency applications.

*Manufacturing*. We currently manufacture Akoustis' high-performance RF filter circuits, using our first generation XBAW$^®$ wafer process, in our 125,000-square foot wafer-manufacturing facility located in Canandaigua, New York (the "New York Facility"), which we acquired in June 2017. Our SAW-based RF filter products are manufactured by a third party and sold either directly or through a sales distributor.

*Intellectual Property*. As of August 25, 2023, our IP portfolio included 104 patents, including a blocking patent that we have licensed from Cornell University. Additionally, as of August 25, 2023, we have 108 pending patent applications. These patents cover our XBAW$^®$ RF filter technology from raw materials through the system architectures. Given the significance of the Company's intellectual property to its business, the Company enforces its intellectual property rights and protects its patent portfolio, which may include filing lawsuits against companies that the Company believes are infringing upon its patents. The Company considers protecting its intellectual property rights to be central to its business model and competitive position in the RF filter industry.

By designing, manufacturing, and marketing our RF filter products to mobile phone OEMs, defense OEMs, network infrastructure OEMs, and Wi-Fi CPE OEMs, we seek to enable broader competition among the front-end module manufacturers.

Since we own and/or have filed applications for patents on the core technology and control access to our intellectual property, we expect to offer several ways to engage with potential customers. First, we intend to engage with multiple wireless markets, providing standardized filters that we design and offer as standard catalog components. Second, we expect to deliver unique filters to customer-supplied specifications, which we will design and fabricate on a customized basis. Finally, we may offer our models and design kits for our customers to design their own filters utilizing our proprietary technology.

**Recent Sales of Unregistered Securities**

We did not sell any equity securities during the fiscal year ended June 30, 2023 that were not registered under the Securities Act, other than as previously reported in our Quarterly Reports on Form 10-Q and our Current Reports on Form 8-K filed with the SEC.

**ITEM 6. [RESERVED]**

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following management's discussion and analysis should be read in conjunction with the historical financial statements and the related notes thereto contained in this Annual Report on Form 10-K. See also the "Cautionary Note Regarding Forward-Looking Information" on page ii of this Report.*

The following discussion highlights the results of operations and the principal factors that have affected our financial condition, as well as our liquidity and capital resources for the periods described, and provides information that management believes is relevant for an assessment and understanding of the statements of financial condition and results of operations presented herein. The following discussion and analysis are based on the audited financial statements contained in this Report, which we have prepared in accordance with United States generally accepted accounting principles. You should read the discussion and analysis together with such financial statements and the related notes thereto.

**Overview**

Akoustis Technologies, Inc., a Delaware corporation, was incorporated in 2013. The Company is an emerging commercial product company focused on developing, designing, and manufacturing innovative RF filter solutions for the wireless industry, including for products such as smartphones and tablets, network infrastructure equipment, Wi-Fi Customer Premise Equipment ("CPE") and defense applications. Filters are critical in selecting and rejecting signals, and their performance enables differentiation in the modules defining the RF front-end ("RFFE"). Located between the device's antenna and its digital backend, the "RFFE" is the circuitry that performs the analog signal processing and contains components such as amplifiers, filters and switches. We have developed a proprietary microelectromechanical system ("MEMS") based bulk acoustic wave ("BAW") technology and a unique manufacturing process flow, called "XBAW," for our filters produced for use in RFFE modules. Our XBAW$^{TM}$ filters incorporate optimized high purity piezoelectric materials for high power, high frequency and wide bandwidth operation. We are developing RF Filters for 5G, Wi-Fi and defense bands using our proprietary resonator device models and product design kits (PDKs). As we qualify our RF filter products, we are engaging with target customers to evaluate our filter solutions.

Our initial designs target UHB, sub-7 GHz 5G, Wi-Fi and defense bands. We expect our filter solutions will address problems (such as loss, bandwidth, power handling, and isolation) created by the growing number of frequency bands in the RFFE of mobile devices, infrastructure and premise equipment to support 5G and Wi-Fi. We have prototyped, sampled and begun commercial shipment of our single-band low loss BAW filter designs for 5G frequency bands and 5 GHz and 6 GHz Wi-Fi bands, which are suited to competitive BAW solutions and historically cannot be addressed with low-band, lower power handling surface acoustic wave ("SAW") technology. Additionally, through our wholly owned subsidiary, RFMi, of which we acquired majority ownership in October 2021 and full ownership in April 2023, we operate a fabless business whereby we make sales of complementary SAW resonators, RF filters, crystal ("Xtal") resonators and oscillators, and ceramic products—addressing opportunities in multiple end markets, such as automotive and industrial applications. We also offer back-end semiconductor supply chain services through our wholly owned subsidiary, GDSI, which we acquired in January 2023.

We expect to continue to incur substantial costs for commercialization of our technology on a continuous basis because our business model involves materials and solid-state device technology development and engineering of catalog and custom filter design solutions. To succeed across our combined portfolio of Akoustis, XBAW, and RFMi products, we must convince customers in a wide range of industries including mobile phone OEMs, RFFE module manufacturers, network infrastructure OEMs, Wi-Fi CPE OEMs, medical device makers, and defense customers to use our products in their systems and modules. For example, since there are two dominant BAW filter suppliers in the industry that have high-band technology, and both utilize such technology as a competitive advantage at the module level, we expect customers that lack access to high-band filter technology will be open to engage with our company for XBAW filters.

To help drive our XBAW filter business, we plan to continue to pursue RF filter design and R&D development agreements and potentially joint ventures with target customers and other strategic partners, although we cannot guarantee we will be successful in these efforts. These types of arrangements may subsidize technology development costs and qualification, filter design costs, and offer complementary technology and market intelligence and other avenues to revenue. However, we intend to retain ownership of our core XBAW technology, intellectual property, designs, and related improvements. Across our combined portfolio of Akoustis, XBAW, and RFMi products, we expect to continue development of catalog designs for multiple customers and to offer such catalog products in multiple sales channels.

Please see Item 1. Business for more information.

The company has not performed a detailed analysis to determine whether an ownership change under IRC Section 382 has occurred during the year ended June 30, 2023 or during any earlier year. If upon a complete analysis the company were to determine that an ownership change under Section 382 had occurred the effect of the ownership change would be the imposition of annual limitations on the use of NOL carryforwards. Any limitation may result in the expiration of a portion or all of the NOLs before utilization.

Based on a history of cumulative losses at the Company and the results of operations for the years ended June 30, 2023 and 2022, the Company determined that it is more likely than not it will not realize benefits from the deferred tax assets. The Company will not record income tax benefits in the financial statements until it is determined that it is more likely than not that the Company will generate sufficient taxable income to realize the deferred income tax assets. As a result of the analysis, the Company determined that a full valuation allowance against the deferred tax assets is required. The net change in the valuation allowance during the year ended June 30, 2023 was an increase of approximately $12.6 million.

The Company's gross unrecognized tax benefits totaled $0.5 million as of June 30, 2023 and $0.4 million as of June 30, 2021. Of these amounts, $0.5 million and $0.4 million as of June 30, 2023 and June 30, 2022, respectively, represent the amounts of unrecognized tax benefit that, if recognized, would impact the effective tax rate in each of the fiscal years.

A reconciliation of the beginning and ending amount of gross unrecognized tax benefits for the years ended June 30, 2023 and June 30, 2022 is as follows (in thousands):

| | June 30, 2023 | | June 30, 2022 |
|---|---|---|---|
| Beginning Balance | $ 427 | $ | 326 |
| Additions based on positions related to the current year | 70 | | 80 |
| Additions for tax positions in prior years | 44 | | 21 |
| Reductions for tax positions in prior years | — | | — |
| Expiration of statute of limitations | — | | — |
| Ending Balance | $ 541 | $ | 427 |

The unrecognized tax benefit of $541 thousand at the end of June 30, 2023 is recorded on the Consolidated Balance Sheet as a reduction to the carrying value of the gross deferred tax assets.

The Company's fiscal 2018 federal and state returns and all subsequent years remain open for examination, as well as all attributes brought forward into those years. The Company is not currently under examination by any taxing authorities.

### Note 17. Segment Information

Operating segments are defined as components of an enterprise about which separate financial information is available and evaluated regularly by the chief operating decision maker, or decision–making group, in deciding how to allocate resources and in assessing performance. The Company's chief operating decision maker is its Chief Executive Officer. The Company operates in two segments, Fabrication Services, which consists of engineering review services and backend packaging services, and RF Filters which consists of amplifier and filter product sales.

The Company evaluates performance of its operating segments based on revenue and operating profit (loss). Segment information for the years ended June 30, 2023 and 2022 are as follows (in thousands):

| | Fabrication Services | | RF Filters | | Total | |
|---|---|---|---|---|---|---|
| **Year ended June 30, 2023** | | | | | | |
| Revenue | $ | 8,984 | $ | 18,137 | $ | 27,121 |
| Cost of revenue | | 5,512 | | 24,725 | | 30,237 |
| Gross margin | | 3,472 | | (6,588) | | (3,116) |
| Research and development | | — | | 33,243 | | 33,243 |
| General and administrative | | 3,341 | | 26,368 | | 29,710 |
| Income/(Loss) from Operations | $ | 131 | $ | (66,199) | $ | (66,069) |
| | | | | | | |
| **Year ended June 30, 2022** | | | | | | |
| Revenue | $ | 1,870 | $ | 13,480 | $ | 15,350 |
| Cost of Revenue | | 2,452 | | 17,035 | | 19,487 |
| Gross Margin | | (582) | | (3,555) | | (4,137) |
| Research and development | | — | | 35,708 | | 35,708 |
| General and administrative | | — | | 20,710 | | 20,710 |
| Loss from Operations | $ | (582) | $ | (59,973) | $ | (60,555) |
| | | | | | | |
| **As of June 30, 2023** | | | | | | |
| Accounts receivable | $ | 1,124 | $ | 3,629 | $ | 4,753 |
| Property and equipment, net | | 2,394 | | 55,432 | | 57,826 |
| | | | | | | |
| **As of June 30, 2022** | | | | | | |
| Accounts receivable | $ | 572 | $ | 3,221 | $ | 3,793 |
| Property and equipment, net | | — | | 51,157 | | 51,157 |

# Exhibit G

January 4, 2023



# Akoustis Acquires GDSI, a US-Based, Trusted Supplier of Premium Semiconductor Back-End Supply Chain Services

- **Acquisition is Immediately Accretive and Adds High-Margin Premium Services Business Supporting over 250 Customers**
- **On-Shore Core Competencies include Wafer Grinding and Stealth Dicing to Support Package Reshoring Strategy for Upcoming CHIPS Act Application**
- **GDSI Delivers In-House Back-End Processing Supply Chain to Support Rapid Prototyping of Akoustis XBAW RF Filter Chips**
- **Active "Trusted Supplier" Accreditation with the US Department of Defense Supports Akoustis' DARPA Contract R&D Business and National Security**
- **Management to Host Conference Call with Q&A Today at 8:00 am ET**

**Huntersville, N.C., Jan. 04, 2023 (GLOBE NEWSWIRE) --** Akoustis Technologies, Inc. (NASDAQ: AKTS) ("Akoustis" or the "Company"), an integrated device manufacturer (IDM) of patented bulk acoustic wave (BAW) high-band RF filters for mobile and other wireless applications, announced today that it has acquired Grinding and Dicing Services, Inc. ("GDSI"), a US-based provider of premium back-end semiconductor supply chain services. Akoustis' acquisition of GDSI is expected to support a strategy to reshore its packaging of XBAW filters to the United States and to support its anticipated application for funding under the CHIPS and Science Act.

U.S. Senator Charles Schumer said, "Today's announcement that Akoustis is bringing new job-creating semiconductor technology back to America, and specifically to Upstate New York, is another example of the economic benefits made possible by my CHIPS and Science Act. Akoustis' new capabilities will both enhance and expand the Finger Lakes region's semiconductor industry, which is already home to unique assets in the semiconductor packaging space."

Akoustis will host an investor call to discuss the acquisition of GDSI and provide a business update and outlook, followed by a Q & A session this morning at 8:00 a.m. ET. The call-in numbers are 877-407-3982 (domestic) or +01 201-493-6780 (international). The conference call will be webcast live on the Company's website and will be available for playback at the following URL: https://ir.akoustis.com/ir-calendar.

The rationale for the acquisition and expected benefits include:

- The addition of a diverse, high-margin premium services business that is immediately accretive to our operating model. The gross margins of this new business unit are projected to be approximately 60%

- Achievement of $1M in cost savings/avoidance related to RF filter prototype activity within the next 18 months
- Strategic alignment with Akoustis' strategy to leverage the CHIPS Act of 2022 to create new jobs as we reshore core packaging capabilities from Asia to an advanced packaging center located on our Canandaigua campus in upstate New York. Specifically, this acquisition allows the opportunity to scale-up our backend core competencies including wafer grinding and Stealth Dicing$^{®}$ process capabilities supporting our CSP and WLP onshore package manufacturing
- Driving improved rapid prototype and development cycle time for Akoustis XBAW$^{®}$ filters through back-end process integration and supply chain efficiencies
- Integration of onshore front-end and back-end supply chains supporting national security
- New, synergistic sales channels in the defense market, including an active "Trusted Supplier" accreditation with the Department of Defense
- The addition of the GDSI management team along with significant technical talent in wafer grinding and dicing to complement Akoustis' front-end XBAW technology
- The expansion of XBAW$^{®}$ RF filter margins through the internalization of the grinding and dicing process supply chains

Jeff Shealy, founder and CEO of Akoustis, stated, "I am pleased to welcome Joe Collins along with the entire GDSI team to the Akoustis family. We look forward to expanding our internal supply chain capabilities and supporting the growth of GDSI's business with external customers." Mr. Shealy continued, "The acquisition of GDSI will enable Akoustis to speed the development of our leading XBAW$^{®}$ filters to take on the rapidly expanding demand for BAW filters that operate at frequencies above 3 GHz."

**Financial Terms**

Akoustis is paying $14 million in cash and $2 million in stock for GDSI, with an additional $4 million in the form of a secured promissory note payable over 3 years based on key employee retention and agreed upon performance, for a total of $20 million. In connection with the transaction, and as an inducement for employment, the company granted to Mr. Collins 242,235 shares of common stock, with an additional 242,235 shares issuable on the second anniversary of the transaction and 121,118 shares issuable on the third anniversary of the transaction, subject to certain employment conditions.

Akoustis continues to experience strong demand and a growing sales funnel for its Wi-Fi, 5G mobile, and 5G infrastructure products, including CBRS XBAW$^{®}$ filters, as well as its new XBAW$^{®}$ and RFMi resonator and oscillator products. During the last quarter, the Company shipped multiple samples of its new 5G XBAW$^{®}$ wafers complete with its new, advanced wafer-level packaging (WLP) technology. Akoustis continues to add new Wi-Fi design wins, many of which are expected to ramp into production in calendar 2023.

Akoustis is actively delivering volume production of its Wi-Fi 6 tandem filter solutions, shipping multiple 5G small cell XBAW$^{®}$ filter solutions, and delivering initial designs of its new 5G mobile filter solutions to multiple customers and is now entering the market with its

new Wi-Fi 6E coexistence XBAW® filter solutions. To date, Akoustis has received more than 20 customer design wins for its patented XBAW® filter solutions.

Given the rapidly growing sales funnel activity, as well as ongoing interaction with customers regarding expected ramps in 5G mobile, Wi-Fi 6, and Wi-Fi 6E in calendar 2023, the Company is completing the annual production capacity increase at its New York fab to approximately 0.5 billion filters per year.

**About Akoustis Technologies, Inc.**

Akoustis® (http://www.akoustis.com/) is a high-tech BAW RF filter solutions company that is pioneering next-generation materials science and MEMS wafer manufacturing to address the market requirements for improved RF filters - targeting higher bandwidth, higher operating frequencies and higher output power compared to legacy polycrystalline BAW technology. The Company utilizes its proprietary and patented XBAW® manufacturing process to produce bulk acoustic wave RF filters for mobile and other wireless markets, which facilitate signal acquisition and accelerate band performance between the antenna and digital back end. Superior performance is driven by the significant advances of poly-crystal, single-crystal and other high purity piezoelectric materials and the resonator-filter process technology which enables optimal trade-offs between critical power, frequency and bandwidth performance specifications.

Akoustis plans to service the fast growing multi-billion-dollar RF filter market using its integrated device manufacturer (IDM) business model. The Company owns and operates a 120,000 sq. ft. ISO-9001:2015 registered commercial wafer-manufacturing facility located in Canandaigua, NY, which includes a class 100 / class 1000 cleanroom facility - tooled for 150-mm diameter wafers - for the design, development, fabrication and packaging of RF filters, MEMS and other semiconductor devices. Akoustis Technologies, Inc. is headquartered in the Piedmont technology corridor near Charlotte, North Carolina.

**Forward-Looking Statements**

This document includes "forward-looking statements" within the meaning of Section 27A of the Securities Act, and Section 21E of the Securities Exchange Act of 1934, each as amended, that are intended to be covered by the "safe harbor" created by those sections. These forward-looking statements include, but are not limited to, statements about our estimates, expectations, beliefs, intentions, plans or strategies for the future (including our possible future results of operations, business strategies, competitive position, potential growth opportunities, potential market opportunities and the effects of competition), the anticipated benefits of the acquisition of Grinding and Dicing Services, Inc., including expected synergies and other financial impacts, such as revenue per quarter, and the assumptions underlying such statements. Forward-looking statements include all statements that are not historical facts and typically are identified by use of terms such as "may," "might," "would," "will," "should," "could," "project," "expect," "plan," "strategy," "anticipate," "attempt," "develop," "help," "believe," "think," "estimate," "predict," "intend," "forecast," "seek," "potential," "possible," "continue," "future," and similar words (including the negative of any of the foregoing), although some forward-looking statements are expressed differently. Forward-looking statements are neither historical facts nor assurances of future results, performance, events or circumstances. Instead, these forward-looking

statements are based on management's current beliefs, expectations and assumptions and are subject to risks and uncertainties. Factors that could cause actual results to differ materially from those currently anticipated include, without limitation, risks relating to our inability to obtain adequate financing and sustain our status as a going concern; our limited operating history; our inability to generate revenues or achieve profitability;  the results of our research and development activities; our inability to achieve acceptance of our products in the market; the possibility that the anticipated benefits from business acquisitions (including the acquisition of Grinding and Dicing Services, Inc.) will not be realized in full or at all or may take longer to realize than expected; the possibility that costs or difficulties related to the integration of acquired businesses' operations will be greater than expected and the possibility of disruptions to our business during integration efforts and strain on management time and resources; the impact of a pandemic or epidemic or a natural disaster, including the COVID-19 pandemic, the Russian-Ukrainian conflict and other sources of volatility on our operations, financial condition and the worldwide economy, including its impact on our ability to access the capital markets; increases in prices for raw materials, labor, and fuel caused by rising inflation; general economic conditions, including upturns and downturns in the industry; shortages in supplies needed to manufacture our products, or needed by our customers to manufacture devices incorporating our products; our limited number of patents; failure to obtain, maintain, and enforce our intellectual property rights; claims of infringement, misappropriation or misuse of third party intellectual property, including the lawsuit filed by Qorvo, Inc. in October 2021, that, regardless of merit, could result in significant expense and negatively impact our business results; our inability to attract and retain qualified personnel; our reliance on third parties to complete certain processes in connection with the manufacture of our products; product quality and defects; existing or increased competition; our ability to successfully manufacture, market and sell products based on our technologies; our ability to meet the required specifications of customers and achieve qualification of our products for commercial manufacturing in a timely manner; our inability to successfully scale our New York wafer fabrication facility and related operations while maintaining quality control and assurance and avoiding delays in output; the rate and degree of market acceptance of any of our products; our ability to achieve design wins from current and future customers; contracting with customers and other parties with greater bargaining power and agreeing to terms and conditions that may adversely affect our business; risks related to doing business in foreign countries, including China; any security breaches, cyber-attacks or other disruptions compromising our proprietary information and exposing us to liability; our failure to innovate or adapt to new or emerging technologies, including in relation to our competitors; our failure to comply with regulatory requirements; results of any arbitration or litigation that may arise; stock volatility and illiquidity; dilution caused by any future issuance of common stock or securities that are convertible into or exercisable for common stock; our failure to implement our business plans or strategies; and our ability to maintain effective internal control over financial reporting. These and other risks and uncertainties are described in more detail in the Risk Factors and Management's Discussion and Analysis of Financial Condition and Results of Operations sections of the Company's most recent Annual Report on Form 10-K and in subsequently filed Quarterly Reports on Form 10-Q. Considering these risks, uncertainties and assumptions, the forward-looking statements regarding future events and circumstances discussed in this document may not occur, and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements included in this document speak only as of the date

hereof and, except as required by law, we undertake no obligation to update publicly or privately any forward-looking statements, whether written or oral, for any reason after the date of this document to conform these statements to new information, actual results or to changes in our expectations.

```
COMPANY:
Tom Sepenzis
Akoustis Technologies
VP of Corporate Development & IR
(980) 689-4961
tsepenzis@akoustis.com

The Del Mar Consulting Group, Inc.
Robert B. Prag, President
(858) 794-9500
bprag@delmarconsulting.com
```



Source: Akoustis, Inc.

# Exhibit H



**RFM Integrated Device, Inc.**

**Industrial IoT**



**Automotive**



# Wireless is RFMi

**Healthcare/Medical/Implant**



**Telecom Infrastructure**



RFM Integrated Device, Inc. | www.rfmi.co

AKTS_00842035

# Table of Contents

**Overview of Products**

SAW/BAW Products ................................................................................................................ 3

Crystal Based Products ......................................................................................................... 4

Ceramic DR Filter Products ................................................................................................... 5

Front End Module ................................................................................................................... 6

RF Transceiver, TRC103 (863-960 MHz) ............................................................................. 7

SAW Filter for Industry/Energy/Smart Home ......................................................................... 8

SAW Filter & Automotive ....................................................................................................... 9

SAW Filter for Telecom ....................................................................................................... 10

SAW Filter & Resonator Structure ...................................................................................... 11

**Product Offerings**

Sub 500 MHz ISM Band SAW Filters ............................................................................. 12-13

ISM Band SAW Diplexers ..................................................................................................... 13

800 MHz Range ISM Band SAW Filters ............................................................................... 14

900 MHz Range ISM Band SAW Filter, 915 MHz DR Filters (High Power Handling) ....... 14A

470-519 MHz (China LoRa Band) SAW Filters ................................................................... 14A

433.92 MHz Range BCM/RKE SAW Filters ........................................................................ 14B

315 MHz Range BCM/RKE SAW Filters .............................................................................. 15

SAW Filter for WiFi Bands .................................................................................................... 16

BAW Filters for WiFi Bands .................................................................................................. 16

LTCC Filters & Diplexers for WiFi & Other Bands ............................................................... 16

DR Filters for WiFi & Other Bands ....................................................................................... 17

SAW Filters & Diplexers for GNSS Bands ...................................................................... 18-19

DR Filters for GNSS Bands .................................................................................................. 19

LTE Band SAW Duplexers 1.8 x 1.4 mm ............................................................................. 20

LTE Band SAW Filters 1.1 x 0.9 mm .............................................................................. 21-22

LTE Band BAW Filters 1.1 x 0.9 mm ................................................................................... 22

Dual LTE Band SAW Filters 1.5 x 1.1 mm .......................................................................... 22

SMD LTE Band SAW Filters ( 3 x 3 mm) ........................................................................ 23-24

DR & LTCC LTE Band Filters ............................................................................................... 24

IF and other SAW Filters ................................................................................................. 25-28

SAW Notch Filters ................................................................................................................ 28

SAW Low Pass Filters .......................................................................................................... 28

SAW By-Pass Filters ............................................................................................................ 28

SAW Resonators .............................................................................................................. 29-32

Example Applications for XTAL Products ......................................................................... 32-35

General Specification for Crystal Products (multiple frequencies by package) ............... 35-36

XTAL (Crystal Resonators) .............................................................................................. 36-38

TXCO (Temperature Compensated Crystal Oscillator) ................................................... 39-41

VCTCXO (Voltage Controlled Temperature Compensated Crystal Oscillator) .................... 42

TSX (Temperature Sensing Crystal Resonators) ................................................................. 43

XFL (Crystal Filters) ............................................................................................................. 43

XO (Crystal Oscillators) ................................................................................................... 43-44

VCXO (Voltage Controlled Crystal Oscillators) .................................................................... 44

OCXO (Oven Controlled Crystal Oscillators) ....................................................................... 45

Filter Package Size Examples .............................................................................................. 46

Crystal Package Size Examples ........................................................................................... 47

AKTS_00842036



Building on four decades of experience in the design and manufacture of low-power radio frequency (RF) products, today RFMi is enabling OEM design Engineers to connect and network more devices, equipment, and processes than ever before.

RFMi designs, develops, markets a broad range of radio frequency (RF) component and module products for low power and wireless communications. RFMi carry 4 major timing and frequency products lines for the emerging wireless applications.

## RFMi Products Offering



## RFMi Products for Focused Markets





RFM Integrated Device, Inc. | www.rfmi.co

AKTS_00842037



**RoHS** compliant

# SAW / BAW Products



With a long heritage from RFM, the pioneer in SAW and Low Power RF technologies, RFMi supplies (Surface Acoustic Wave) SAW Filters (including Band Pass Filters and Band Reject Filters or Notch Filters, for both RF Filtering and IF Filtering applications), SAW Duplexers, SAW Diplexers and SAW Resonators, giving RF engineers a broad range of SAW components from the leading global manufacturer of Electronic Frequency Components.

RFMi SAW technology is industry-leading for small size, high performance, high reliability, low cost and quick time-to-market. Most of our SAWs use (Surface Mount) SMT packages. They are hermetically sealed, RoHS compliant, AEC-Q200 qualified, made in IATF16949 certified factories, and support PPAP for automotive applications. We have one of the broadest SAW portfolios with frequencies from around 30MHz to around 3.7GHz, for LTE bands, ISM bands, GPS and GNSS bands and other frequency bands. Our state-of-the-art production facilities produce SAW components for high-volume and high-reliability markets, such as Automotive, Telecom Infrastructures, Access Points and Terminals, Industrial and Consumer IoT, Health Care and Medical applications, etc.

In addition, RFMi offers selected (Bulk Acoustic Wave) BAW Filters with higher Q, steeper roll-off, and higher frequency, for co-existence of adjacent bands and higher frequency bands.

| Standard Products | 30MHz ~ 3.7GHz |
|---|---|
| Customization | High Performance |

**Applications**

- Wireless security and control
- Data link, LoRa
- Medical monitoring and implant
- GPS, Glonass, BeiDou, Galileo
- RKE/PEPS/BCM/TPM
- Satellite digital audio radio (SDAR)

- Wi-Fi 5, Wi-Fi 6, Wi-Fi 7
- CATV Infrastructure
- ADAS
- Automated meter reading
- Barcode readers
- Cellular Base Stations, Small Cells

AKTS_00842038



RFM Integrated Device, Inc.
4100 Midway Road, Suite 1155
Carrollton, Texas 75007
Phone: +1-972-256-8478
www.rfmi.co

**Online Distributors**

 

**RFMi Contacts:**

America's: Patrick Evans (Email: pevans@rfmi.co) Phone: 972-373-4655 / 972-256-8478

Europe and Middle East: Kirk Doyle (Email: kdoyle@rfmi.co) Phone: Cell: 469-556-0158 / Direct: 972-373-4242

Asia Pacific: Sarah Tseng (Email: sarah@rfmi.co) Phone: +886-928-102667 / Fax: +866-3-4697532

TRADEMARKS: RFM Integrated Device, Inc., and the stylized RFMi logo are all registered trademarks of RFMi.

INFORMATION AND PRICING SUBJECT TO CHANGE: The specifications and availability of the components described
in this publication are subject to change without notice. Every effort has been made to ensure the accuracy of this publication.
However, RFMi does not assume responsibility for inaccuracies or changes.

SPECIFICATIONS: "Typical" specifications are based on measurements made on representative samples. These values may
vary from lot to lot and are not guaranteed. They are provided only as a reference for the circuit designer.

REGULATORY APPROVALS: Many products utilizing the products described in this publication require approval by the
government of the

destination country prior to sale. Buyers of these components assume all responsibility for compliance, testing and authorization
by the appropriate government agencies.

WARRANTIES: RFMi makes no warranty, representation, or guarantee regarding the suitability of these products for any
particular purpose. None of these devices are intended for surgical implants or any other application that may provide life
support or other critical function necessary for the support or protection of life, property, or business interests. The user assumes
responsibility for use of any of these products in any such application. RFMi shall not be liable for losses due to failure of any of
these devices beyond the RFMi commercial warranty, limited to the original purchase price.

PATENTS: Many of the devices described in this publication are patented. RFMi does not convey any license under its patent
rights or the rights of others.

©2021 RFM Integrated Device, Inc. (RFMi), All Rights Reserved

Published May 2021

AKTS_00842085

# Exhibit I



# Akoustis Acquires Majority Ownership Position of RFM Integrated Device, Inc., a Fabless Supplier of Acoustic Wave RF Resonators and Filters

Your publication date and time will appear here. | Source: Akoustis, Inc.






- **Opportunistically Acquiring an Acoustic Wave RF Resonator Filter Catalog Business, Complementing Akoustis' Leading XBAW Products in 5G Mobile, 5G Network Infrastructure and Wi-Fi**
- **RFMi Delivers New Strategic Sales Channels and Customers in Automotive, Medical, Networking and Industrial/IOT Markets**
- **Combination Allows for the Integration and Development of Multi-Chip-Modules Spanning Multiple Markets Including 5G Mobile**
- **Management to Host Conference Call with Q&A this Morning at 8:30 am ET**

Charlotte, N.C., Oct. 18, 2021 (GLOBE NEWSWIRE) -- Akoustis Technologies, Inc. (NASDAQ: AKTS) ("Akoustis" or the "Company"), an integrated device manufacturer (IDM) of patented bulk acoustic wave (BAW) high-band RF filters for mobile and other wireless applications, announced today that it is acquiring a 51% majority ownership position of RFM Integrated Device, Inc. ("RFMi"), with the right to purchase the remaining 49% in 2022.

Akoustis will host an investor call to provide a business update and outlook, followed by a Q & A session this morning at 8:30 a.m. ET. The call-in numbers are 877-407-3982 (domestic) or +01 201-493-6780 (international). The conference call will be webcast live on the Company's website and will be available for playback at the following URL: https://ir.akoustis.com/ir-calendar.

In terms of rationale for this opportunistic acquisition, RFMi offers Akoustis:

a. a comprehensive SAW resonator & RF filter, crystal (Xtal) resonator & oscillator and ceramic catalog product portfolio which complements Akoustis XBAW™ RF products

b. new, synergistic sales channels and numerous market-leading customers providing significant cross-selling opportunities for Akoustis XBAW™

AKTS_00164189

c. access to new strategic markets including Automotive/ADAS, medical monitoring and implant, energy and smart home, satellite communications and industrial/IoT

d. access to new wafer-level-package (WLP) products that are currently manufactured in factories certified to stringent automotive IATF16949 standards

e. the ability to develop multi-chip-modules incorporating multiple technologies for each of the end markets including 4G/5G mobile

f. access to complementary SAW resonator, Xtal resonator & oscillator products to enhance Akoustis' XBAW™ RF timing product portfolio announced last week

g. a low-capex, fabless product business with synergistic supply chain operations along with a proven technical, marketing and engineering team, and

h. a bolt-on RF filter business which is immediately accretive to Akoustis financials from a cash flow perspective.

Jeff Shealy, founder and CEO of Akoustis, stated, "I am pleased to welcome the RFMi team to the Akoustis family, and look forward to adding several new end markets to our sales channel and broadening our XBAW™ funnel with significant cross-selling opportunities." Mr. Shealy continued, "RFMi's products complement our patented XBAW™ platform and make it possible to accelerate the development of multi-chip-modules that span 4G, 5G, Wi-Fi and satellite technologies for multiple markets."

Akoustis intends to leverage its leadership in high-frequency BAW with RFMi's growing portfolio of RF filter products to expand its reach into multiple markets and grow its portfolio of multi-chip-modules. Akoustis also intends to leverage RFMi's wafer-level-package (WLP) products which are currently made in factories certified to the IATF16949 automotive quality standard.

Additionally, RFMi's timing control product portfolio will greatly expand Akoustis' new timing and frequency reference capabilities, introduced last week, with a growing portfolio of crystal resonator and oscillator products and RF SAW resonators designed to operate at lower frequencies than Akoustis' XBAW™ resonators.

RFMi also offers ceramic dielectric resonator filters and low temperature co-fired ceramic (LTCC) filters and diplexers for products that have significant power handling requirements, such as 5G network infrastructure, that exceed the capabilities of micro acoustic filter technology.

**Financial Terms**

Akoustis is paying $6.0 million in cash and approximately $2.5 million in stock to Tai-Saw Technologies Co., Ltd. ("TST") for the acquisition of 51% of RFMi's outstanding stock and has the option to acquire the remaining 49%

from TST on or before June 30, 2022, for an additional $3.5 million in cash and approximately $4.0 million in stock. Additionally, earn-out payments aggregating up to $3.0 million of cash and/or stock may be payable to TST based on the future operating results of RFMi. The business is accretive, with positive cash flow, and is expected to contribute between $500k and $1 million in revenue in the December quarter.

Akoustis is actively delivering volume production of its Wi-Fi 6 tandem filter solutions to multiple customers, shipping multiple 5G small cell XBAW™ filter solutions, delivering initial designs of its new 5G mobile filter solutions to multiple tier-1 customers and is now entering the market with its new Wi-Fi 6E coexistence XBAW™ filter solutions.

Given the growing sales funnel activity as well as ongoing interaction with customers regarding expected ramps in both 5G mobile, Wi-Fi 6 and Wi-Fi 6E in calendar 2022, the Company is increasing the annual production capacity at its New York fab, expected to reach a capacity of approximately 500 million filters per year by the end of calendar 2021.

Akoustis currently has 15 commercial XBAW™ filters in its product catalog, and recently introduced 5.6 GHz and 6.6 GHz Wi-Fi 6E coexistence filter modules, which when qualified, will bring the number of catalog products to 17. Current product catalog filters include a 5.6 GHz Wi-Fi filter, a 5.2 GHz Wi-Fi filter, a 5.5 GHz Wi-Fi-6E filter, a 6.5 GHz Wi-Fi 6E filter, three small cell 5G network infrastructure filters including two Band n77 filters and one Band n79 filter, a 3.8 GHz filter and five S-Band filters for defense phased-array radar applications, a 3.6 GHz filter for the CBRS 5G infrastructure market and a C-Band filter for the unmanned aircraft systems (UAS) market. The Company is also developing several new filters for the sub-7 GHz bands targeting 5G mobile device, network infrastructure, Wi-Fi CPE and defense markets.

**About Akoustis Technologies, Inc.**

Akoustis® (http://www.akoustis.com/) is a high-tech BAW RF filter solutions company that is pioneering next-generation materials science and MEMS wafer manufacturing to address the market requirements for improved RF filters - targeting higher bandwidth, higher operating frequencies and higher output power compared to incumbent polycrystalline BAW technology deployed today. The Company utilizes its proprietary XBAW™ manufacturing process to produce bulk acoustic wave RF filters for mobile and other wireless markets, which facilitate signal acquisition and accelerate band performance between the antenna and digital back end. Superior performance is driven by the significant advances of poly-crystal,

high-purity and single-crystal piezoelectric materials and the resonator-filter process technology which enables optimal trade-offs between critical power, frequency and bandwidth performance specifications.

Akoustis plans to service the fast growing multi-billion-dollar RF filter market using its integrated device manufacturer (IDM) business model. The Company owns and operates a 120,000 sq. ft. ISO-9001:2015 registered commercial wafer-manufacturing facility located in Canandaigua, NY, which includes a class 100 / class 1000 cleanroom facility - tooled for 150-mm diameter wafers - for the design, development, fabrication and packaging of RF filters, MEMS and other semiconductor devices. Akoustis Technologies, Inc. is headquartered in the Piedmont technology corridor near Charlotte, North Carolina.

**Forward-Looking Statements**

This document includes "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, each as amended, that are intended to be covered by the "safe harbor" created by those sections. These forward-looking statements include, but are not limited to, statements about our estimates, expectations, beliefs, intentions, plans or strategies for the future (including our possible future results of operations, business strategies, competitive position, potential growth opportunities, potential market opportunities and the effects of competition), the anticipated benefits of the acquisition of RFMi and supply agreement with Tai-Saw, including estimated synergies and other financial impacts, and the assumptions underlying such statements. Forward-looking statements include all statements that are not historical facts and typically are identified by use of terms such as "may," "might," "would," "will," "should," "could," "project," "expect," "plan," "strategy," "anticipate," "attempt," "develop," "help," "believe," "think," "estimate," "predict," "intend," "forecast," "seek," "potential," "possible," "continue," "future," and similar words (including the negative of any of the foregoing), although some forward-looking statements are expressed differently. Forward-looking statements are neither historical facts nor assurances of future results, performance, events or circumstances. Instead, these forward-looking statements are based on management's current beliefs, expectations and assumptions and are subject to risks and uncertainties. Factors that could cause actual results to differ materially from those currently anticipated include, without limitation, risks relating to our ability to obtain adequate financing and sustain our status as a going concern; our limited operating history; our inability to generate revenues or achieve profitability; the results of our research and development activities;

our inability to achieve acceptance of our products in the market; the possibility that the anticipated benefits from business acquisitions (including the acquisition of RFMi) cannot be realized in full or at all or may take longer to realize than expected; the possibility that costs or difficulties related to the integration of acquired businesses' (including RFMi's) operations will be greater than expected and the possibility of disruptions to our business during integration efforts and strain on management time and resources; the impact of a pandemic or epidemic or a natural disaster, including the COVID-19 pandemic, on our operations, financial condition and the worldwide economy, including its impact on our ability to access the capital markets; general economic conditions, including upturns and downturns in the industry; shortages in supplies needed to manufacture our products, or needed by our customers to manufacture devices incorporating our products; our limited number of patents; failure to obtain, maintain, and enforce our intellectual property rights; claims of infringement, misappropriation or misuse of third party intellectual property that, regardless of merit, could result in significant expense and loss of our intellectual property rights; our inability to attract and retain qualified personnel; our reliance on third parties to complete certain processes in connection with the manufacture of our products; product quality and defects; existing or increased competition; our ability to successfully manufacture, market and sell products based on our technologies; our ability to meet the required specifications of customers and achieve qualification of our products for commercial manufacturing in a timely manner; our ability to successfully scale our New York wafer fabrication facility and related operations while maintaining quality control and assurance and avoiding delays in output; the rate and degree of market acceptance of any of our products; our ability to achieve design wins from current and future customers; contracting with customers and other parties with greater bargaining power and agreeing to terms and conditions that may adversely affect our business; risks related to doing business in foreign countries, including China; any security breaches, cyber-attacks or other disruptions compromising our proprietary information and exposing us to liability; our failure to innovate or adapt to new or emerging technologies; our failure to comply with regulatory requirements; results of any arbitration or litigation that may arise; stock volatility and illiquidity; dilution caused by any future issuance of common stock or securities that are convertible into or exercisable for common stock; our failure to implement our business plans or strategies; and our ability to maintain effective internal control over financial reporting. These and other risks and uncertainties are described in more detail in the Risk Factors and Management's Discussion and Analysis

AKTS_00164193

of Financial Condition and Results of Operations sections of the Company's most recent Annual Report on Form 10-K and in subsequently filed Quarterly Reports on Form 10-Q. Considering these risks, uncertainties and assumptions, the forward-looking statements regarding future events and circumstances discussed in this document may not occur, and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements included in this document speak only as of the date hereof and, except as required by law, we undertake no obligation to update publicly or privately any forward-looking statements, whether written or oral, for any reason after the date of this document to conform these statements to new information, actual results or to changes in our expectations.

**Tags**

AKTS

**Related Links**

- https://akoustis.com/

**Contact Data**

```
Contact:

COMPANY:
Tom Sepenzis
Akoustis Technologies
VP of Corporate Development & IR
(980) 689-4961
tsepenzis@akoustis.com

The Del Mar Consulting Group, Inc.
Robert B. Prag, President
(858) 794-9500
bprag@delmarconsulting.com
```

Contact

AKTS_00164194

# Exhibit J

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

(Mark One)
☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended December 31, 2023

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: **001-38029**



**AKOUSTIS TECHNOLOGIES, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **33-1229046** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| **9805 Northcross Center Court, Suite A** **Huntersville, NC** | **28078** |
|---|---|
| (Address of principal executive offices) | (Postal Code) |

Registrant's telephone number, including area code: **1-704-997-5735**

Securities registered under Section 12(b) of the Act:

| Title of Each Class: | Trading Symbol | Name of each exchange on which registered: |
|---|---|---|
| **Common Stock, $0.001 par value** | **AKTS** | **The Nasdaq Stock Market LLC (Nasdaq Capital Market)** |

Securities registered under Section 12(g) of the Act:
**None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes ☐  No ☒

As of February 9, 2024, there were 98,602,957 shares of the registrant's common stock, $0.001 par value per share, issued and outstanding.

**Note 15. Segment Information**

Operating segments are defined as components of an enterprise about which separate financial information is available and evaluated regularly by the chief operating decision maker, or decision–making group, in deciding how to allocate resources and in assessing performance. The Company's chief operating decision maker is its Chief Executive Officer. The Company operates in two segments, Fabrication Services, which consists of engineering review services and backend packaging services, and RF Filters, which consists of filter product sales.

The Company evaluates performance of its operating segments based on revenue and operating profit (loss). Segment information for the three and six months ended December 30, 2023 and 2022 are as follows (in thousands):

| | Fabrication Services | RF Filters | Total |
|---|---:|---:|---:|
| **Three months ended December 31, 2023** | | | |
| Revenue | $ 3,298 | $ 3,719 | $ 7,017 |
| Cost of revenue | 2,253 | 4,083 | 6,336 |
| Gross margin | 1,045 | (364) | 681 |
| Research and development | — | 6,411 | 6,411 |
| General and administrative | 903 | 8,391 | 9,294 |
| Income (Loss) from Operations | $ 142 | $ (15,167) | $ (15,024) |
| | | | |
| **Three months ended December 31, 2022** | | | |
| Revenue | $ 1,891 | $ 3,974 | $ 5,865 |
| Cost of revenue | 1,126 | 4,148 | 5,274 |
| Gross margin | 765 | (174) | 591 |
| Research and development | — | 7,645 | 7,645 |
| General and administrative | — | 5,838 | 5,838 |
| Income (Loss) from Operations | $ 765 | $ (13,657) | $ (12,892) |
| | | | |
| **Six months ended December 31, 2023** | | | |
| Revenue | $ 5,960 | $ 8,059 | $ 14,019 |
| Cost of revenue | 3,800 | 10,622 | 14,422 |
| Gross margin | 2,160 | (2,563) | (403) |
| Research and development | — | 16,758 | 16,758 |
| General and administrative | 2,201 | 17,317 | 19,518 |
| Income (Loss) from Operations | $ (41) | $ (36,638) | $ (36,679) |
| | | | |
| **Six months ended December 31, 2022** | | | |
| Revenue | $ 2,823 | $ 8,609 | $ 11,432 |
| Cost of revenue | 2,018 | 9,709 | 11,727 |
| Gross margin | 805 | (1,100) | (295) |
| Research and development | — | 17,730 | 17,730 |
| General and administrative | — | 12,833 | 12,833 |
| Income (Loss) from Operations | $ 805 | $ (31,663) | $ (30,858) |
| | | | |
| **As of December 31, 2023** | | | |
| Accounts receivable | $ 1,529 | $ 3,279 | $ 4,808 |
| Property and equipment, net | 2,206 | 53,992 | 56,198 |
| | | | |
| **As of June 30, 2023** | | | |
| Accounts receivable | $ 1,124 | $ 3,629 | $ 4,753 |
| Property and equipment, net | 2,394 | 55,432 | 57,826 |

# Exhibit K

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

**FORM 10-K**

(Mark One)
☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 30, 2022

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: **001-38029**

**AKOUSTIS**
TECHNOLOGIES

**AKOUSTIS TECHNOLOGIES, INC.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **33-1229046** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **9805 Northcross Center Court, Suite A Huntersville, NC** | **28078** |
| (Address of principal executive offices) | (Postal Code) |

Registrant's telephone number, including area code: **1-704-997-5735**

Securities registered under Section 12(b) of the Act:

| Title of Each Class: | Trading Symbol | Name of each exchange on which registered: |
|---|---|---|
| Common Stock, $0.001 par value | AKTS | The Nasdaq Stock Market LLC (Nasdaq Capital Market) |

Securities registered under Section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☐ | Accelerated Filer | ☐ |
| Non-Accelerated Filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The aggregate market value of the registrant's common stock, par value $0.001 per share ("Common Stock"), held by non-affiliates on December 31, 2021 was approximately $331.1 million. For purposes of this computation, shares of Common Stock held by all officers, directors, and any beneficial owners of 10% or more of the outstanding Common Stock were excluded because such persons may be deemed to be affiliates of the registrant. Such determination should not be deemed an admission that such persons are, in fact, affiliates of the registrant.

As of September 6, 2022, there were 57,204,697 shares of Common Stock issued and outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

The registrant intends to file a definitive proxy statement pursuant to Regulation 14A within 120 days after the end of the fiscal year ended June 30, 2022. Portions of such proxy statement are incorporated by reference into Part III of this Form 10-K.

The unrecognized tax benefit of $427 thousand at the end of June 30, 2022 is recorded on the Consolidated Balance Sheet as a reduction to the carrying value of the gross deferred tax assets.

The Company's fiscal 2018 federal and state returns and all subsequent years remain open for examination, as well as all attributes brought forward into those years. The Company is not currently under examination by any taxing authorities.

**Note 17. Segment Information**

Operating segments are defined as components of an enterprise about which separate financial information is available and evaluated regularly by the chief operating decision maker, or decision–making group, in deciding how to allocate resources and in assessing performance. The Company's chief operating decision maker is its Chief Executive Officer. The Company operates in two segments, Foundry Fabrication Services, which consists of engineering review services and STC-MEMS foundry services, and RF Filters which consists of amplifier and filter product sales, and grant revenue. The Company records all general and administrative costs in the RF Filters segment.

The Company evaluates performance of its operating segments based on revenue and operating profit (loss). Segment information for the years ended June 30, 2022 and 2021 are as follows (in thousands):

| | Foundry Fabrication Services | | RF Filters | | Total | |
|---|---:|---|---:|---|---:|---|
| **Year ended June 30, 2022** | | | | | | |
| Revenue | $ | 1,870 | $ | 13,480 | $ | 15,350 |
| Cost of revenue | | 2,452 | | 17,035 | | 19,487 |
| Gross margin | | (582) | | (3,555) | | (4,137) |
| Research and development | | — | | 35,708 | | 35,708 |
| General and administrative | | — | | 20,710 | | 20,710 |
| **Income/(Loss) from Operations** | $ | (582) | $ | (59,973) | $ | (60,555) |
| | | | | | | |
| **Year ended June 30, 2021** | | | | | | |
| Revenue | $ | 2,848 | $ | 3,770 | $ | 6,618 |
| Cost of Revenue | | 1,507 | | 9,144 | | 10,651 |
| Gross Margin | | 1,341 | | (5,374) | | (4,033) |
| Research and development | | — | | 24,076 | | 24,076 |
| General and administrative | | — | | 13,285 | | 13,285 |
| **Loss from Operations** | $ | 1,341 | $ | (42,735) | $ | (41,394) |
| | | | | | | |
| **As of June 30, 2022** | | | | | | |
| Accounts receivable | $ | 572 | $ | 3,221 | $ | 3,793 |
| Property and equipment, net | | — | | 51,157 | | 51,157 |
| | | | | | | |
| **As of June 30, 2021** | | | | | | |
| Accounts receivable | $ | 242 | $ | 928 | $ | 1,170 |
| Property and equipment, net | | — | | 30,730 | | 30,730 |

**Note 18. Loss Per Share**

Basic net loss per common share is computed by dividing net loss attributable to common stockholders by the weighted-average number of common shares outstanding during the period. Diluted net loss per common share is determined using the weighted-average number of common shares outstanding during the period, adjusted for the dilutive effect of common stock equivalents. In periods when losses are reported, which is the case for the years ended June 30, 2022 and 2021 presented in these consolidated financial statements, the weighted-average number of common shares outstanding excludes common stock equivalents because their inclusion would be anti-dilutive.

AKTS_01095349

# Exhibit L
# (Redacted in Its Entirety)

# Exhibit M

February 3, 2016



# Akoustis™ Awarded $740K R&D Grant from National Science Foundation (NSF)

*Third Innovative Research Grant Extends Funding to Develop Cutting Edge Single Crystal RF Filters for Mobile Wireless Market*

CHARLOTTE, N.C.--(BUSINESS WIRE)-- Akoustis Technologies, Inc. (OTCQB: AKTS) ("Akoustis" or the "Company"), a manufacturer of innovative Bulk ONE™ single crystal piezoelectric RF bulk acoustic wave (BAW) filters for mobile wireless, announced today that it received a $740K Small Business Innovation Research (SBIR) Phase II award from the National Science Foundation (NSF). The grant was based on the results achieved by the Company's previously awarded Phase I grant as well as scientific and technical merit and commercial potential of the project proposed in Phase II.

"Akoustis is pleased to continue its partnership with NSF to develop and commercialize our single crystal resonator technology," said Jeff Shealy, CEO of Akoustis Technologies, Inc. "The goal of the Phase II award is to advance our Phase I research, accelerate commercialization, and create a sustainable business model," added Mr. Shealy.

The Phase II award is a 24-month extension of the Company's recently completed NSF SBIR Phase I grant and increases the total program funding to $920K. Further, the Phase II award allows Akoustis to apply for up to $500K in additional non-dilutive matching funds from NSF as part of a Phase IIb application, which the Company anticipates to submit later this year.

The Phase II funding will be used to continue development of the Company's new, cutting edge class of RF BAW Filters based upon patented, highly differentiated high purity single crystal piezoelectric materials. Its Bulk ONE™ technology will service the fast growing multi-billion dollar market of device OEMs, network providers, and consumers to diminish front end phone heat, battery drain and signal loss -- all considered to be directly related to current RF filter technologies' limitations.

Overall, the Phase II program with NSF allows Akoustis to accelerate the commercialization of its innovative filter products to address the critical mobile-wireless need by using single crystal piezoelectric materials to create a new class of acoustic wave filters. Such filters are expected to improve performance, lower system cost and drive miniaturization. Akoustis' Bulk ONE™ filters originate from materials which exhibit superior acoustic performance when compared to the incumbent thin-film technologies deployed today.

Akoustis has seven (7) U.S. Patents filed, plus three (3) international applications protecting its use of single crystal piezoelectric materials for the manufacturing, packaging and circuit integration of BAW resonators and filters. Akoustis holds exclusive rights to two (2) US Patents and associated foreign filings from the University of California at Santa Barbara and (1) US Patent from Cornell University.

**About Akoustis**

Akoustis™ (http://www.akoustis.com) is a high-tech RF filter solutions company that manufactures its unique, patent-pending Bulk ONE™ technology to produce single-crystal bulk acoustic wave (BAW) filters for the mobile-wireless industry, which facilitate signal acquisition and accelerate band performance between the antenna and the back end of mobile devices. Akoustis' "fabless" business model is capital efficient, leveraging existing manufacturing infrastructure in the semiconductor industry. Akoustis™ is located in the Piedmont technology corridor between Charlotte and Raleigh, North Carolina.

**About NSF SBIR/STTR Program**

The NSF SBIR/STTR program (http://www.nsf.gov/eng/iip/sbir/home.jsp) seeks to transform scientific discovery into societal and economic benefit by catalyzing private sector commercialization of technological innovations. The program increases the incentive and opportunity for startups and small businesses to undertake cutting-edge, high-quality scientific research and development. NSF SBIR/STTR provide grants in phases: a short proof-of-concept / feasibility grant ($150-225k) can potentially be followed by a longer development grant ($750k). SBIR/STTR grants complement angel funding and such federally funded grants are non-dilutive.

**Forward-Looking Statements**

Statements in this press release that are not descriptions of historical facts are forward-looking statements that are based on management's current expectations and assumptions and are subject to risks and uncertainties. In some cases, you can identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should," "will," "would" or the negative of these terms or other comparable terminology. Factors that could cause actual results to differ materially from those currently anticipated include, without limitation, risks relating to the results of our research and development activities, including uncertainties relating to semiconductor process manufacturing: the early stage of our Bulk ONE™ technology presently under development; our need for substantial additional funds in order to continue our operations and the uncertainty of whether we will be able to obtain the funding we need; our ability to retain or hire key scientific, engineering or management personnel; our ability to protect our intellectual property rights that are valuable to our business, including patent and other intellectual property rights; our dependence on third-party manufacturers, suppliers, research organizations, testing laboratories and other potential collaborators; our ability to successfully market and sell our technologies; the size and growth of the potential markets for any of our technologies, and the rate and degree of market acceptance of any of our technologies; competition in our industry; and regulatory developments in the U.S. and foreign countries.

In light of these risks, uncertainties and assumptions, the forward-looking statements regarding future events and circumstances discussed in this press release may not occur, and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements included in this presentation speak only as of the date hereof, and, except as required by law, we undertake no obligation to update publicly or privately any forward-looking statements for any reason after the date

QORVO_00023832

of this presentation to conform these statements to actual results or to changes in our expectations.

THESE MATERIALS DO NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF ANY OFFER TO BUY, ANY SECURITIES OF AKOUSTIS, INC., OR OF ANY OTHER ENTITY WHATSOEVER. ANY REPRESENTATION TO THE CONTRARY BY ANY PARTY SHOULD BE IGNORED.

View source version on businesswire.com:
http://www.businesswire.com/news/home/20160203005163/en/

The Del Mar Consulting Group, Inc.
Robert B. Prag, President
858-794-9500
bprag@delmarconsulting.com
or
Alex Partners, LLC
Scott Wilfong, President
425-242-0891
scott@alexpartnersllc.com

Source: Akoustis Technologies, Inc.

# Exhibit N

July 9, 2015



# National Science Foundation (NSF) Awards AkoustisTM Innovation Research Grant

Extends Funding to Develop Single Crystal RF Filters for Mobile Wireless Market

CHARLOTTE, N.C.--(BUSINESS WIRE)-- Akoustis Technologies, Inc. (OTCQB: AKTS) ("Akoustis" or the "Company"), a manufacturer of innovative single crystal Bulk ONE™ RF filters for mobile wireless, announced today that it received a Small Business Innovation Research (SBIR) Phase 1B award from the National Science Foundation (NSF). The Phase 1B funding will be used to continue development of single crystal group III-Nitride bulk acoustic resonators and bulk acoustic wave filter components for mobile communications.

"Akoustis is pleased to partner with NSF to develop and commercialize our single crystal resonator technology," said Jeff Shealy, CEO of Akoustis, Inc. "The goal of the Phase 1B award is to advance our Phase 1 research, accelerate commercialization and foster strategic relationships," added Mr. Shealy.

The Phase 1B award is a 6-month extension of the Company's existing NSF SBIR Phase 1 grant and increases the total program funding to $0.18M. This funding complements the $5.7M public offering funding previously announced in May 2015. Further, the program allows Akoustis to accelerate the commercialization of its innovative filter products to address the critical mobile-wireless need by using single crystal piezoelectric materials to create a new class of acoustic wave filters. Such filters are expected to improve performance, lower system cost and drive miniaturization within next generation 4G/LTE smartphones. Akoustis' Bulk ONE™ filters originate from materials which exhibit superior acoustic performance when compared to the incumbent thin-film technologies deployed today.

## About Akoustis

Akoustis™ (www.akoustis.com) is a high-tech RF filter solutions company that manufactures its unique, patent-pending Bulk ONE™ technology to produce single-crystal bulk acoustic wave (BAW) filters for the mobile-wireless industry. Akoustis' "fabless" business model is capital efficient, leveraging existing manufacturing infrastructure in the semiconductor industry. Founded in 2014, Akoustis™ is located in the Piedmont technology corridor between Charlotte and Raleigh, North Carolina.

## About NSF SBIR/STTR Program

The NSF SBIR/STTR program (http://www.nsf.gov/eng/iip/sbir/home.jsp) seeks to transform scientific discovery into societal and economic benefit by catalyzing private sector commercialization of technological innovations. The program increases the incentive and opportunity for startups and small businesses to undertake cutting-edge, high-quality

scientific research and development. NSF SBIR/STTR provide grants in phases: a short proof-of-concept / feasibility grant ($150-225k) can potentially be followed by a longer development grant ($750k). SBIR/STTR grants complement angel funding and such federally-funded grants are non-dilutive.

**Forward-Looking Statements**

Statements in this press release that are not descriptions of historical facts are forward-looking statements that are based on management's current expectations and assumptions and are subject to risks and uncertainties. In some cases, you can identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should," "will," "would" or the negative of these terms or other comparable terminology. Factors that could cause actual results to differ materially from those currently anticipated include, without limitation,

- risks relating to the results of our research and development activities, including uncertainties relating to semiconductor process manufacturing;
- the early stage of our Bulk ONE™ technology presently under development;
- our need for substantial additional funds in order to continue our operations and the uncertainty of whether we will be able to obtain the funding we need;
- our ability to retain or hire key scientific, engineering or management personnel; our ability to protect our intellectual property rights that are valuable to our business, including patent and other intellectual property rights;
- our dependence on third-party manufacturers, suppliers, research organizations, testing laboratories and other potential collaborators;
- our ability to successfully market and sell our technologies;
- the size and growth of the potential markets for any of our technologies, and the rate and degree of market acceptance of any of our technologies;
- competition in our industry; and
- regulatory developments in the U.S. and foreign countries.

In light of these risks, uncertainties and assumptions, the forward-looking statements regarding future events and circumstances discussed in this press release may not occur, and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements included in this presentation speak only as of the date hereof, and, except as required by law, we undertake no obligation to update publicly or privately any forward-looking statements for any reason after the date of this presentation to conform these statements to actual results or to changes in our expectations.

**THESE MATERIALS DO NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF ANY OFFER TO BUY, ANY SECURITIES OF AKOUSTIS, INC., OR OF ANY OTHER ENTITY WHATSOEVER. ANY REPRESENTATION TO THE CONTRARY BY ANY PARTY SHOULD BE IGNORED.**

View source version on businesswire.com:
http://www.businesswire.com/news/home/20150709005179/en/

Akoustis, Inc.
Dave Aichele, 1-704-997-5735, ext. 106
VP of Business Development
daichele@akoustis.com

Source: Akoustis, Inc.

# Exhibit O



# Transcript of Carlyn Irwin

**Date:** January 26, 2024
**Case:** Qorvo, Inc. -v- Akoustis Technologies, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**



**Page 1**

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3

 4   QORVO, INC.                    )

 5              PLAINTIFF,          )

 6   VS.                           )  CASE NO.
                                    )  1:21-cv-01417-JPM
 7   AKOUSTIS TECHNOLOGIES, INC., AND )

 8   AKOUSTIS, INC.,               )

 9              DEFENDANTS.         )
     ---------------------------------

10

11              ███████████████████

12         ███████████████████████

13

14

15              IN PERSON DEPOSITION

16              CARLYN IRWIN

17         FRIDAY, JANUARY 26, 2024

18         LOS ANGELES, CALIFORNIA

19

20

21

22

23   PAGES 1 - 131
     REPORTED BY MICHAEL CAGLIATA
24   CSR #14491, RPR

25
```

**Page 2**

```
 1              Deposition of

 2

 3    CARLYN IRWIN, held in person:

 4

 5         Witness Location:

 6   SHEPPARD MULLIN RICHTER & HAMPTON LLP
       333 SOUTH HOPE STREET, 43RD FLOOR
 7       LOS ANGELES, CALIFORNIA 90071

 8

 9

10

11

12        Pursuant to Notice, before Michael Cagliata,

13   Registered Professional Reporter, and Certified

14   Shorthand Reporter No. 14491 in and for the State of

15   California.

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
 1              A P P E A R A N C E S

 2

 3    For the Plaintiff:

 4         SHEPPARD MULLIN RICHTER AND HAMPTON, LLP
             BY: JENNIFER KLEIN AYERS, ESQ.
 5           2200 ROSS AVENUE, 20TH FLOOR
             DALLAS, TEXAS 75201
 6           469-391-7400

 7

 8    For the Defendants:

 9         SQUIRE PATTON BOGGS
             BY: DAVID ELKINS, ESQ.
10           1841 PAGE MILL ROAD, SUITE 150
             PALO ALTO, CALIFORNIA 94304
11           650-856-6500

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
 1                  INDEX

 2    WITNESS NAME                          PAGE

 3    MS. CARLYN IRWIN, SWORN

 4         EXAMINATION BY MS. AYERS          6

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Carlyn Irwin
Conducted on January 26, 2024

2 (5 to 8)

---

**Page 5**

                    EXHIBIT INDEX

EXHIBIT NUMBER                              PAGE

1      NOTICE OF DEPOSITION                 6
2      REBUTTAL EXPERT REPORT               19
3      DR. SHANFIELD'S REPORT               48
4      MS. BENNIS'S REPORT                  106
5      2021 10-K FORM                       115
6      SPREADSHEET                          120

---

**Page 6**

P R O C E E D I N G S
* * * *
(Oath given.)
EXAMINATION BY MS. AYERS
Q.  Okay.  Good morning, Ms. Irwin.
A.  Good morning.
Q.  I am going to go ahead and mark as Exhibit 1 of your deposition the notice of deposition in this case.
(Exhibit 1 marked for identification.)
Q.  You understand that you are here today to provide testimony in the case currently pending in the United States District Court for the District of Delaware titled Qorvo Inc. versus Akoustis Technologies Inc. and Akoustis Inc.; correct?
A.  Yes.
Q.  You are here in your capacity as an expert witness for the defendants Akoustis Technologies, Inc. and Akoustis, Inc.; correct?
A.  Correct.
Q.  How many times have you testified as an expert in any type of proceeding?
A.  Over 65 times.
Q.  And does that include trial testimony, deposition testimony?  Both?

---

**Page 7**

A.  That's just deposition testimony.  Trials would be another 20 or so including -- when I say trials, trials and arbitrations.
Q.  Okay.  So you're including basically any proceeding, hearing, arbitration, testimony before jury, et cetera, in your 20 times estimation; correct?
A.  Correct.
Q.  Okay.  Given your testifying experience, you understand that the oath that was administered to you a few moments ago is the same oath you would take before you testify at any hearing or trial in this matter; correct?
A.  Correct.
Q.  Are you aware of any circumstances that would prevent you from providing me with your full attention during this deposition?
A.  No.
Q.  Are you taking any medication that would inhibit your ability to listen to my questions, to comprehend them, and to provide an answer to the truthfully?
A.  No.
Q.  Do you have any medical condition that would inhibit your ability to listen to my questions, to comprehend them, and to answer them truthfully?

---

**Page 8**

A.  No.
Q.  What did you do to prepare for your deposition today?
A.  Lots of things.  I reviewed my report and exhibits.  I reviewed documents that are listed on my "documents relied upon" list.  I reviewed Ms. Bennis's report.  I reviewed a rough draft of her deposition testimony that was taken earlier this week.  I met with members of my team at Cornerstone Research.  I met with counsel.  I think that basically covers it.  If there's anything else, I'll let you know.
Q.  Great.  Thank you.  How many times did you meet with counsel to prepare for your deposition today?
A.  Just once.
Q.  How long did your meeting with counsel last?
A.  A little over an hour.
Q.  And you mentioned in your answer just now that you met with your team at Cornerstone.  Who specifically at Cornerstone did you meet with?
A.  I will list them.  Chanel O'Neal.  Spelled just like it sounds.  Katherine Gray.  Wenjie Xiu. W-E-N-J-I-E and then last name is X-I-U.  And then two of my analysts, Dalton Mann and Shay Lebowitz.  S-H-A-Y.
Q.  Okay.  And you mention that Dalton Mann and Shay Lebowitz are analysts.  What does an analyst do at

73

1  same is not -- she doesn't have a reasonable basis to do
2  so.
3      Q.  What kind of products does RFMI manufacture?
4      A.  RFMI -- after the acquisition, I believe RFMI
5  was in the product of surface acoustic wave filters.
6  Meaning SAW filters.
7      Q.  And a surface acoustic wave filter is a form
8  of a radio frequency filter; correct?
9      A.  That's my understanding.
10     Q.       valuation of RFMI analyzed employee
11  search costs to Akoustis if Akoustis had to replace RFMI
12  employees; correct?
13     A.  Yes, that is a portion of what         included
14  in their valuation of an assembled workforce.
15     Q.  And are you relying upon any information for
16  your conclusion that Qorvo's employee search costs would
17  be materially different for Akoustis's employee search
18  costs to replace a project manager with experience
19  working on radio frequency products, or are you simply
20  alleging that Ms. Bennis did not identify information
21  sufficient to support her conclusion that it did?
22     A.  I would say the latter.  I don't have enough
23  information from Qorvo, and I certainly didn't have
24  access to Qorvo to learn how they hire, what their
25  process is.  Do they outsource their hiring processes?

74

1  Do they track how many applications they receive per
2  position?  Do they track how many interviews are done
3  per position?  Assessments that are done?
4      I have no knowledge of any of that, yet Ms.
5  Bennis could have.  There is literature that, you know,
6  lays out a proper way of valuing what Qorvo's cost is
7  versus just pointing to a valuation for another company
8  that is based on general information.  I believe    --
9  I believe, I have to double check.  I believe the
10  valuation is general industry, or what they believe is
11  general industry efforts it takes to advertise for a
12  position, interview for a position, train them, loss of
13  productivity.  That type of thing.
14     Q.  In paragraph 99 of your report, you criticize
15  Ms. Bennis for failing to deduct from her estimate the
16  salaries that Qorvo would have paid its former employees
17  had they not left the company; correct?
18     A.  Correct.
19     Q.  But you did not attempt to quantify what
20  salary savings Qorvo might have had during any vacancy
21  period; correct?
22     A.  I didn't have enough information.  It would
23  have come from Qorvo.  I have no idea which positions
24  they replaced.  Did they backfill the positions?  How
25  long where the positions vacant?  And what those

75

1  individual's salaries are.  Ms. Bennis would have had
2  access to all of that information.
3      Q.  Did you ask Akoustis if Qorvo produced any of
4  that information as a part of that litigation?
5      A.  I believe we did.
6      Q.  Do you agree that any time an employee leaves
7  a company and a position is vacant, that loss of
8  productivity can occur?
9      A.  The loss of productivity is two-fold.  There's
10  the loss of productivity while the position is vacant,
11  and then there's the loss of productivity after the
12  person is replaced because there is training that goes
13  on and the person is not fully creating the value the
14  prior employee would have.
15     Q.  Do you know if       calculation of assembly
16  cost per employee accounted for loss of productivity due
17  to a position being vacant?
18     A.  I would need to look at it.  I know they
19  included loss of productivity, but what       was valuing
20  was the investment.  When you're valuing an assembled
21  workforce, you're evaluating the investment that has
22  been previously made to establish a workforce, not
23  necessarily the cost it would take to replicate or
24  rehire all of those people.  Right?  To replace an
25  employee that left.

76

1      When you replace an employee that left, you've
2  got the loss of productivity while the position is
3  vacant, you have -- countered by the fact you're not
4  paying.  You don't have incremental compensation while
5  that position is vacant.  And the -- so those things
6  have to be accounted for in addition to, I believe, what
7  is included in       analysis.  Again, I'm familiar
8  with this methodology because I've testified about it in
9  federal court, and all that analysis would have been
10  available through Qorvo.
11     Q.  Let's talk about your opinions regarding Ms.
12  Bennis's calculation of patent infringement damages in
13  this case.
14     A.  Okay.
15     Q.  You agree with Ms. Bennis that the
16  participants of a hypothetical negotiation in this case
17  would have agreed, at least for a certain timeframe, to
18  a one percent royalty; correct?
19     A.  Correct.
20     Q.  And you essentially opine that Ms. Bennis
21  overstates patent damages because the participants of
22  the hypothetical negotiation would have agreed that
23  royalty payments should cease in June of 2024 when the
24  '018 patent expires; is that correct?
25     A.  I don't think I say that it was "overstated".

129

1 close it out.
2      MS. AYERS: I need a daily rough.
3      MR. ELKINS: I need a daily rough.
4      (Proceedings concluded at 3:03 P.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

130

1     DECLARATION UNDER PENALTY OF PERJURY
2
3     I, CARLYN IRWIN, do hereby certify under
4 penalty of perjury that I have read the foregoing
5 transcript of my deposition taken January 26, 2024; that
6 I have made such corrections as appear noted on the
7 Deposition Errata Page attached hereto and signed by me;
8 that my testimony as contained herein, as corrected, is
9 true and correct.
10
11     Dated this _____ day of _____,
12     2023, at _____,
13 California.
14
15     _____
16        CARLYN IRWIN
16
17
18
19
20
21
22
23
24
25

131

1 STATE OF CALIFORNIA    )
                    )
2 COUNTY OF LOS ANGELES   )
3
4     I, Michael Cagliata, Certified
5 Shorthand Reporter No. 14491, do hereby
6 Certify:
7     That prior to being examined, the witness
8 named in the foregoing deposition was by me duly
9 sworn to testify the truth, the whole truth, and
10 nothing but the truth;
11     That said deposition was taken down by me
12 in shorthand and thereafter reduced to print by
13 means of computer-aided transcription; and the same
14 is a true, correct, and complete transcript of said
15 proceedings.
16     I further certify that I am not
17 interested In the outcome of the action.
18     Witness my hand this 26th day of January, 2024.
19
20   *M. Cagliata*
21 _____
    Michael Cagliata, CSR #14491, RPR
22 Certified Shorthand Reporter
    In and for the State of California
23
24
25

# Exhibit P

```
                                                          Page 1
1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
2
3
4    QORVO, INC.,                  )
                                   )
5           Plaintiff,             )
                                   )
6      v.                          ) C.A. NO.  21-1417-JPM
                                   )
7    AKOUSTIS TECHNOLOGIES, INC. )
     and AKOUSTIS, INC.            )
8                                  )
            Defendants.            )
9    _____)
10
11   ██████████████████████████████████
12
13       VIDEOCONFERENCE 30(b)6 DEPOSITION OF
14               MICHAEL ORTIZ
15               ON BEHALF OF
16           EXEC-TEK SOLUTIONS, INC.
17               October 13, 2022
18               11:06 a.m.
19
                 Doral, Florida
20
21
22
23          Jade Miserendino-Espinoza
24              Digital Reporter
25          Notary Commission No. HH 30966
```

```
                                                          Page 2
1            APPEARANCES OF COUNSEL
2  On behalf of the Plaintiff, Qorvo, Inc.:
3      TREVOR J. QUIST, ESQ.
       SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
4      1540 El Camino Real
       Suite 120
5      Menlo Park, California 94025
       650.815.2600
6      650.815.2601 FAX
       tquist@sheppardmullin.com
7
8  On behalf of the Defendants, Akoustis Technologies,
   Inc., and Akoustis, Inc.:
9
       THERESA A. ROOZEN, ESQ.
10     PILLSBURY WINTHROP SHAW PITTMAN LLP
       600 Brickell Avenue
11     Suite 3100
       Miami, Florida 33131
12     786.913.4900
       786.913.4901 FAX
13     theresa.roozen@pillsburylaw.com
14     DIANNE L. SWEENEY, ESQ.
       PILLSBURY WINTHROP SHAW PITTMAN LLP
15     2550 Hanover Street
       Palo Alto, California 94304-1115
16     650.233.4500
       650.233.4545 FAX
17     dianne@pillsburylaw.com
18
19
20
21
22
23
24
25
```

```
                                                          Page 3
1               INDEX OF EXAMINATION
2  EXAMINATION:                                    PAGE
3  Direct Examination by Mr. Quist                  6
4  Cross-Examination by Ms. Roozen                 130
5  Redirect Examination by Mr. Quist               135
6  Certificate of Digital Reporter                 141
7  Certificate of Transcriptionist                 142
8  Errata Pages                                    143
9
                INDEX TO EXHIBITS
10
11  PLAINTIFF'S        DESCRIPTION                  PAGE
12
    Exhibit 1      Notice of Taking Deposition       13
13
    Exhibit 2      Email Communication (3/20/18)      52
14
    Exhibit 3      Email Communication (3/6/18)       62
15
    Exhibit 4      Email Communication (1/24/19)      70
16
    Exhibit 5      Presentation RF test position      73
17
    Exhibit 6      Email Communication (11/21/19)     88
18
    Exhibit 7      Exec-Tek Position Ad               92
19
    Exhibit 8      Email Communication (8/30/18)      98
20
    Exhibit 9      Messenger Communication            78
21
    Exhibit 10     Email Communication (6/21)        103
22
    Exhibit 11     Email Re RF Test Engineer         105
23
    Exhibit 12     Email Communication (6/25/21)     112
24  (Original exhibits retained by counsel for the
    Plaintiff.)
25
```

```
                                                          Page 4
1         DEPOSITION OF MICHAEL ORTIZ
2              OCTOBER 13, 2022
3
4       THE REPORTER:  The time is 11:06 a.m.
5   eastern daylight time and we're on the record.  Good
6   morning.  My name is Jade Espinoza and I'm the
7   Florida notary and reporter assigned by Esquire
8   Deposition Solutions.  I request that all parties
9   stipulate and agree that by videoconference
10  technology, this will be the remote deposition of
11  Michael Ortiz taken in the case of Qorvo, Inc., v.
12  Akoustis Technologies, Inc., and Akoustis, Inc.
13       Today's date is Thursday, October the
14  13th, 2022.  And before going on the record, the
15  witness positively identified himself to me as
16  Michael Ortiz via a valid Florida driver's license.
17  And the witness is presently located in Dural,
18  Florida.
19       Counsel, will you please state your
20  appearance for the record, your firm, who you
21  represent, and that you agree to the following
22  stipulations?  One, the parties stipulate that the
23  remote deposition will be deemed to have been taken
24  before an appropriate officer, despite the court
25  reporter not being seated in the same physical
```



1 location as the witness.  And two, the parties
2 stipulate that the witness may be sworn in remotely
3 with the same effect as an oath administered in
4 person.
5     MR. QUIST:  Yes, this is Trevor Quist of
6 the law firm Sheppard, Mullin, Richter, and Hampton.
7 I'm appearing on behalf of plaintiff, Qorvo,
8 Incorporated.  And yes, so stipulated on both.
9     MS. ROOZEN:  This is Theresa Roozen and
10 my colleague, Diane Sweeney, is also here with me.
11 We're both from the firm Pillsbury, Winthrop, Shaw,
12 Pittman, and we are here on behalf of the deponent,
13 Exec-Tek, and we also represent both of the
14 defendants in this case.  I agree to both of the
15 stipulations.
16     THE REPORTER:  All right.  Thank you.
17 And may we have Ms. Sweeney stipulate and agree as
18 well?  Ms. Sweeney, were you able to hear me?
19     MS. SWEENEY:  Let me try this.  Can you
20 hear me now?
21     THE REPORTER:  Yes, we can hear you.
22     MS. SWEENEY:  Yes, so stipulated.
23     THE REPORTER:  Okay.  Great.  Thank you
24 so much.  Perfect.  All right.
25     I will now swear in the witness.  Mr.

1 Michael Ortiz, please hold your right hand to the
2 camera with me.  Thank you.
3     (Witness sworn.)
4 WHEREUPON:
5     MICHAEL ORTIZ,
6 called as a witness herein, having been first duly
7 sworn, was examined and testified as follows:
8     THE REPORTER:  Thank you.  You may hold
9 your hand down.  And Counsel, you may now begin.
10    MR. QUIST:  Thank you.  All right.
11        DIRECT EXAMINATION
12 BY MR. QUIST:
13    Q.  Good morning, Mr. Ortiz.  Thanks for
14 showing up here today.
15    A.  You're welcome.
16    Q.  Can I ask, again, where you're seated
17 today?
18    A.  Where I'm seated?  On -- in what city?
19    Q.  What city and state?
20    A.  Oh, I am in Florida.
21    Q.  Miami, Florida.  Okay.  And who's in the
22 room with you there?
23    A.  Theresa Roozen.
24    Q.  Okay.  Anybody else?
25    A.  No.

1     Q.  Okay.  Let me ask you, have you ever been
2 deposed before?
3     A.  I have not.
4     Q.  This is your first time then?  Okay.
5 Sounds good.  So let me kind of go over some ground
6 rules with you.  Your counsel may have -- Theresa may
7 have already gone over some of this with you, so it
8 may be repeat, but we'll just kind of go over it.  If
9 you have any questions, let me know.
10     So, first and foremost is I want to just
11 make it clear that you're testifying under oath
12 today, right?  You just were sworn in.  And even
13 though it's kind of a casual setting here, we're
14 appearing over Zoom.  You've probably had tons of
15 Zoom videoconference calls before this one, even
16 though it's got the same feeling of just being a
17 phone call or a remote conference, you're under the
18 same oath that you'd be under if you were sitting in
19 court, right?  If we were all in a courtroom right
20 now with a judge right next to us.  Do you understand
21 that?
22     A.  Yeah.
23     Q.  Okay.  Great.  And as the court reporter
24 mentioned, we try, especially in these depositions
25 where they're remote, to have just one of us talking

1 at a time so that the court reporter can get
2 everything down.  It usually starts out okay, where
3 you're finishing your sentences, and I'm waiting for
4 you, and you're waiting for me to finish my
5 questions.  But, oftentimes, a deposition can become
6 real conversational, and we might be speaking back
7 and forth really quickly.  Let's just both try and
8 remember that there's somebody trying to write all
9 this down, and we'll try and allow each other to
10 complete our thoughts, complete our sentences, before
11 we jump in with a response or with another question.
12 Does that sound fair?
13     A.  (No verbal response.)
14     Q.  Can you actually verbalize that for the
15 record?
16     A.  Yes.  I'm sorry.  I just didn't say it
17 loud enough.
18     Q.  No, you're totally fine.  And actually,
19 that brings up another kind of ground rule.  So even
20 though I can see you nodding or shaking your head
21 during the deposition and the court reporter can as
22 well, that doesn't translate into a yes or no on the
23 record.  So there always has to be a verbal response
24 that can be written down by the court reporter.  Do
25 you understand that?



Page 33

1     A.  12 or 13 years.
2     Q.  Okay.  Other than Advanced Technology
3  Search and Exec-Tek, do you have any other employers?
4  Do you have any other jobs?
5     A.  Yes.
6     Q.  And what are those?
7     A.  You want me to list all my jobs that I've
8  worked at?
9     Q.  Currently?  Let's just talk about
10  currently.  Do you have any other jobs beyond what
11  you're doing with Exec-Tek right now?
12     A.  No.
13     Q.  Okay.  And does Exec-Tek have any other
14  employees?
15     A.  No.
16     Q.  Okay.  You don't have an assistant or
17  anything?
18     A.  No, just me.
19     Q.  Okay.  When did Exec-Tek begin to engage
20  with Akoustis for the purposes of recruiting for
21  Akoustis?
22     A.  The date?  I don't remember.
23     Q.  Do you remember the year?
24     A.  Maybe 2016.  I, I -- but I can't say
25  that's accurate.  That's the date -- the year that

Page 34

1  would come to mind, but again, I don't want to be
2  held to that date.
3     Q.  Yeah.  And if you're unsure about it --
4     A.  No.  Yeah.  Yeah.
5     Q.  -- you can say, to the best of my
6  recollection or something.
7     A.  Best of my recollection, somewhere around
8  then.
9     Q.  Okay.  So about 2016, as you're sitting
10  here today, that's about the day or about the year
11  that Exec-Tek, began doing recruiting work for
12  Akoustis.  Is that fair?
13        MS. ROOZEN:  Objection.  You can answer.
14        THE WITNESS:  Correct.  To my -- to my
15  knowledge, yes.  I mean, to my best recollection.
16  BY MS. ROOZEN:
17     Q.  Okay.  Great.  And at that time, were
18  there any other people, any other employees at Exec-
19  Tek, or has it been you as the sole employee the
20  entire time?
21     A.  Direction?  Yes.
22     Q.  Okay.  Let me ask that -- that was kind
23  of two questions in one.  Has Exec-Tek ever had any
24  other employees other than you?
25     A.  Yes.

Page 35

1     Q.  Okay.  And who might that be?
2     A.  ███████████████████████
3  ██████████████████████
4     Q.  Okay.  And what was her role in the
5  company at the very beginning?
6     A.  Admin.  Helping with those types of
7  things.
8     Q.  Okay.  Is it fair to say that she was no
9  longer with the company at the time that you began
10  doing work for Akoustis?
11     A.  Absolutely.  Correct.
12     Q.  All right.  So from the outset of your
13  engagement with Akoustis, what are the names of the
14  Akoustis personnel that you have been in contact
15  with?
16     A.  All of them?
17     Q.  The ones for recruiting purposes.  So
18  let's exclude, for now, like, the people that you
19  recruited and that joined Akoustis.  We'll set aside
20  those, but who are the sort of points of contact that
21  you have with Akoustis that you work with on the
22  recruiting side?
23     A.  Primarily, Laura Shealy.  That was years
24  ago, though.  Rohan Houlden, Dave Aichele, Holly
25  Johnson, Megan, I think, Schwartz.  I don't really --

Page 36

1  I'm not 100 percent sure if that's her last name.
2     Q.  Okay.
3     A.  Mary Winters.  And there's another HR
4  person in the Rochester fab.  I don't remember her
5  name.  But those are, from my recollection right now,
6  those are the primary that I interacted with.
7     Q.  Okay.  And how was it that you first got
8  in contact with Akoustis?  Did they reach out to you?
9  Did you reach out to them?
10     A.  (No audible response.)
11     Q.  Okay.  Can you tell me a little bit about
12  what that involved?  Who reached out to you
13  initially?
14     A.  Dave Aichele.
15     Q.  Okay.  And do you know how he found you?
16     A.  Through previous work together.
17     Q.  And what was that previous work?
18     A.  We've interacted in the industry over the
19  years.
20     Q.  In what capacity?
21     A.  As a candidate.
22     Q.  You were a candidate for a job Dave was
23  hiring for or vice versa?
24        MS. ROOZEN:  Objection.  You can answer.
25        THE WITNESS:  I -- so how our



1        Is it accurate to say that for one or
2 more positions that they've engaged you to recruit
3 for, they have directed you to look for employees or
4 candidates that have worked for Qorvo?
5      A.   Yes.
6      Q.   Okay.  And who is it that has instructed
7 you to look for candidates from -- that were formerly
8 employed or, then, currently employed with Qorvo?
9      A.   Both Rohan and Laura, to my knowledge, or
10 recollection.
11      Q.   Okay.  And did Laura or Rohan, to the
12 best of your recollection, describe why they wanted
13 you to look at Qorvo employees first?
14      A.   I was never told to look at Qorvo
15 employees first.
16      Q.   What were you told about seeking
17 candidates from Qorvo?
18      A.   There is, to my recollection, one
19 position that I was physically pointed to Qorvo to
20 fill, and it was a project management position.  And
21 it was because Qorvo and Akoustis use a very similar
22 project management process, and it would be easy for
23 -- it would be an easy transition for somebody coming
24 from there into the process that they use from an
25 environment standpoint.  And that's the only one that

1 I was geared or pointed for, for a specific reason.
2      Q.   Okay.  We can come back to that.  So
3 currently, who is your primary point of contact at
4 Akoustis today?
5      A.   I don't -- haven't worked with them since
6 early this year, so I'm, I'm not in contact with
7 anyone there.
8      Q.   Okay.  If they were to reach out to you,
9 you would expect it to be from Rohan or Laura or
10 Dave, most likely?
11      A.   Either --
12      MS. ROOZEN:  Objection.  You can answer.
13      THE WITNESS:  Either Rohan or Holly
14 probably at this point.
15 BY MR. QUIST:
16      Q.   Or Holly?  Okay.
17      A.   One of them.
18      Q.   Okay.  So let's just talk more generally
19 about the recruitment industry and what you do.
20 Okay?  So isn't it true that when you are recruiting
21 for a company, part of your role is to sell the
22 company to the candidate in a way?  Like advertise
23 how great the company is or highlight some advantages
24 or benefits that the candidate would have in the new
25 role if they were to join the company?

1      MS. ROOZEN:  Objection.
2      THE WITNESS:  Yes.  Absolutely.
3 BY MR. QUIST:
4      Q.   Okay.  And where do you get that kind of
5 information that you're going to highlight for the
6 candidate?
7      A.   Various sources.
8      Q.   Like what?
9      A.   Press releases.
10      Q.   Give me the exhaustive list of what you
11 look at when you're trying to figure out what to
12 highlight for a candidate.
13      A.   Their website, press releases,
14 conversations with, with managers within a company
15 are probably some of the, the biggest places I would
16 get that information from.
17      Q.   Okay.  And by the way, what is the lingo
18 that you use?  What do you call those?  Like,
19 highlights, or attractors, or what do you refer to
20 those as?  Just benefits or what's the lingo in your
21 space?
22      A.   I mean, there's really no -- I don't know
23 if there's a lingo.  I put together a presentation
24 for any company that I'm working with which
25 highlights all that.  I do it once, and this way I

1 don't have to keep doing it, and that's what I use.
2      Q.   Okay.  So --
3      A.   Just an internal presentation that I
4 present to candidates.
5      Q.   Okay.  And do you run that presentation
6 by the company before you start sending it out?
7      A.   I do not.
8      Q.   Okay.  So with Akoustis, now, more
9 specifically, have they told you or instructed you to
10 highlight particular elements of their business that
11 might be attractive to potential candidates?
12      A.   Not that come to mind.
13      Q.   Okay.  We'll look at some exhibits later
14 on that -- from your perspective, based on what you
15 see in the, like you said, press releases or website,
16 what are some of the things that you mention to
17 candidates or convey to candidates about Akoustis and
18 what makes it an attractive option for a career move?
19      MS. ROOZEN:  Objection.
20      THE WITNESS:  So the, the top selling
21 point, from the beginning, has been their technology.
22 They have developed a new way or a new approach to
23 BAW filter technology, which is what they, they do,
24 and a small pool of companies in the industry do.
25 And their technology is the differentiator.  It is



---

---

Page 89

1    Q.   Okay.  Do you recall this email?
2    A.   I absolutely do not.
3    Q.   Okay.  Do you see here where it says, "Hi
4  Mike, please see if you can find Qorvo F-L ███
5  team."  Do you see that?
6    A.   I do.
7    Q.   Okay.  Any particular reason you don't
8  have any recollection of this?
9    A.   Again, I have absolutely no recollection.
10  It's like seeing this email for the first time.
11  Honestly, I, I don't have a recollection of it.
12    Q.   Okay.  If we look at to field versus
13  Michael Ortiz and in brackets it says "Mike",
14  M-I-K-E at Exec-Tek, E-X-E-C-T-E-K.com.  Is that your
15  email?
16    A.   Yes, it is.
17    Q.   Okay.  Were you having any email issues
18  in 2019 that you recall at around this time?
19    A.   None.  Not that I know of, no.
20    Q.   Okay.  What is meant by FL ███ team?
21  Do you mean, do you think?
22    A.   Florida.
23    Q.   Okay.  And when you receive emails at
24  this email address, does anybody else receive these
25  emails or is it only you?

Page 90

1    MS. ROOZEN:  Objection.  Form.
2    THE WITNESS:  Only me.  And to clarify,
3  I'm not stating I didn't receive this email.  I'm not
4  stating that I don't -- that, that this email didn't
5  come to me.  I'm just saying I have no recollection
6  of it.  I mean, I've received a lot of emails between
7  2019 and now.  I just don't remember this one.
8  BY MR. QUIST:
9    Q.   Okay.  So earlier you had stated that
10  only on one occasion had Akoustis pointed you in the
11  direction of Qorvo to fill a particular role,
12  correct?
13    A.   Yes, as I could recall.
14    Q.   Understood.  Yeah.  I understand you're
15  doing this to the best of your recollection.  Having
16  seen this email, and assuming it's an authentic email
17  and you produced it to us, isn't it fair to say that
18  on more than one occasion, Akoustis has directed you
19  to identify candidates for a particular job from
20  Qorvo?
21    MS. ROOZEN:  Objection.  Calls for
22  speculation.  Go ahead.
23    THE WITNESS:  Yeah.  I mean, this email
24  obviously shows that in this occasion, they, they
25  did.  But again, I don't -- I don't recall the email.

Page 91

1  And, and as I said, to, to the best of my
2  recollection, that was the one that stood out that
3  they pointed me towards.
4  BY MR. QUIST:
5    Q.   Yeah, I understand.  I'm not trying to
6  pin you down in particular.  And I just want to say,
7  sort of at this juncture, you know, you're not in
8  this case.  You're not a party in this case.
9  Nobody's suing you.  Okay?  You're fine.  We're
10  trying to learn as much information as we can about
11  the approach here.  If it feels like I'm really
12  trying to pin you down on something, I'm not.  We're
13  trying to just find the information, and you're
14  giving me information to the best of your
15  recollection.  You've prepared to come here today to
16  testify, and you're telling me, to the best of your
17  knowledge, the things that you know.  I understand
18  that.  Okay?
19    So what I'm asking you is, having seen
20  this email, and this is just a yes or no question, of
21  course you can answer it how you will, but having
22  seen this email, would it be fair to say that on more
23  than one occasion, Akoustis has directed you to
24  identify potential candidates for a job at Akoustis
25  from Qorvo?

Page 92

1    MS. ROOZEN:  Objection.  Asked and
2  answered.
3    THE WITNESS:  Yes.  Based on this email,
4  it would -- it would state that.
5    MR. QUIST:  Okay.  Let's go ahead and
6  turn to Exhibit 7.  We can go ahead and close this
7  one.  Open up Exhibit 7.
8    And would the court reporter, please mark
9  the next exhibit as Exhibit 7 for the record.
10    And Mr. Ortiz, you could just let me know
11  when that document is pulled up in front of you
12  there.
13    (Plaintiff's Exhibit 7 was marked for
14  identification.)
15    THE WITNESS:  I have it.
16  BY MR. QUIST:
17    Q.   Okay.  Just to make sure we're talking
18  about the same document, in the bottom right-hand
19  corner of the second page of the PDF, there's a label
20  number there.  It says Exec-Tek_00002578.  Are we
21  looking at the same page there?
22    A.   Right.
23    Q.   Okay.  Great.  This looks to be another
24  one of the documents that you send out in connection
25  with -- send out to candidates in connection with a



1    THE WITNESS:  Got it.
2  BY MR. QUIST:
3    Q.   Okay, so the last page of this exhibit
4  has the Bates label Exec-Tek_00017290.  Do you see
5  that?
6    A.   I do.
7    Q.   Okay.  Looking at the first email
8  communication that begins on the page just one up,
9  you write to ███████ at Qorvo regarding an RF test
10  opportunity on Friday, June 25th, 2021.  Correct?
11   A.   Correct.
12   Q.   Okay.  You send a brief email that
13  mentions the opportunity at a high level, and then
14  you request a call.  Is that a fair characterization
15  of your email?
16   A.   Correct.
17   Q.   Okay.  In ██████ response to your email,
18  actually, I'm sorry, strike that.
19       Let's go back and look at your email.
20  Your initial email, it does not mention Qorvo
21  anywhere in the email, correct?
22   A.   Qorvo?  No.
23   Q.   Correct.  It does not mention Akoustis
24  anywhere in the email, correct?
25   A.   No, it does not.

1    Q.   And it doesn't mention any company or
2  give any other indication as to what company this
3  position might be with, correct?
4    A.   Not that I can see.
5    Q.   Okay.  Now, moving up to ██████ response
6  to you, he says, "Michael, good morning, thanks for
7  the professional approach, but I'm assuming that this
8  is an RF test engineer position with Akoustis in
9  Huntersville, North Carolina."  Do you see that?
10   A.   I do.
11   Q.   Okay.  It appears that he is assuming
12  that you're referring to a position with Akoustis,
13  correct?
14   A.   Yes.
15   Q.   Do you have any reason or knowledge as to
16  why a random person at Qorvo might suspect that
17  you're recruiting for Akoustis from an email that
18  makes no reference to them?
19   A.   Just looking at what I sent him.
20       MS. ROOZEN:  Objection to the extent it
21  calls for speculation.
22       THE WITNESS:  Yeah, I, I do not.  The
23  assumption I could make is that he is likely in North
24  Carolina also.  I'm talking about an RF test
25  opportunity that I'm working on.  Possibly he was

1  approached about it in the past by another agency.
2  Maybe he heard about it through a friend and is
3  saying, I'm, I'm assuming this is it.  If it is, I've
4  already -- I know the manager and I'm not interested
5  in relocating.  So that is -- that would be my
6  assumption, and that's how I took it, I think, when I
7  received the email.  Which, this isn't an -- this
8  isn't an uncommon thing, where someone will say, "Oh,
9  are you reaching about a position with X Company,"
10  when I reach out about a position.  Because most
11  times companies aren't just bringing on one
12  recruiting firm to work on a position.  So there
13  is -- there is -- there are plenty of instances where
14  people have already heard about a position, or
15  already talked about the position, or various other
16  things.  So they'll send back an email like that to
17  wash it out and say, if it's that, no point in moving
18  forward.
19  BY MR. QUIST:
20   Q.   Okay.  So you said earlier that perhaps
21  you're making an assumption that he was located in
22  North Carolina and that this position, he assumed
23  that the position was for a North Carolina position,
24  but in his email he says, "I'm not interested in
25  relocating anytime soon."  Do you see that?

1    A.   Well, yes, I do.  Greensboro and
2  Charlotte are not typically close enough.  They're
3  about an hour and a half away, so most people would,
4  would likely have to relocate even if it's within the
5  state.  Again, I don't -- I don't recall where ████
6  lives.  I'm assuming maybe that's how he knows the
7  connection between the two because he's in
8  Greensboro.
9    Q.   So would you have any reason to believe
10  he's in Greensboro, or you're just using that as an
11  example?
12       MS. ROOZEN:  Objection.  Form.
13       THE WITNESS:  Again, I'm, I'm making an
14  assumption.  I don't -- I don't remember the
15  candidate, specifically, but I'm making an
16  assumption, which is how I stated it initially.
17  BY MR. QUIST:
18   Q.   Okay.  Stepping away from this exhibit
19  for a moment and just talking more generally about
20  your recruiting efforts on Akoustis's behalf.  How
21  many people would you say you have placed it at
22  Akoustis to the best of your recollection?
23   A.   Somewhere near 10, 12, if I had to throw
24  a number off the top of my head.
25   Q.   Okay.  And to the best of your knowledge,



Page 117

1  how many of those have been formerly employed at
2  Qorvo?
3      A.  Maybe half.
4      Q.  Okay.
5      A.  Again, that's throwing a number off the
6  top of my head.  If I had to --
7      Q.  Okay.  Are you aware of instances where
8  Akoustis or somebody at Akoustis directly reached out
9  to a Qorvo employee, or someone that had been
10 formally employed by Qorvo, for recruiting purposes?
11     MS. ROOZEN:  Objection.  Form.
12     THE WITNESS:  I wouldn't know that.  If
13 they reached out directly, I wouldn't be involved, so
14 I would have no way of knowing that.  You know, what
15 I can say is the BAW filter space is a very small
16 niche market.  There aren't many players in it.  You
17 have Qorvo, which is one of the largest.  You have
18 Greensboro and, and Orlando, Florida.  You have Avago
19 Broadcom, which is in the Bay area.  Most people
20 there are tied up with million-dollar stock packages,
21 so it's impossible to get somebody out of there.  You
22 have Skyworks, which does very little work in the BAW
23 space.  They're doing more now.  And then, you have
24 TDK Up Coast, which became Qualcomm.
25     So you have a very small pool, efficient,

Page 118

1  as a recruiter, if you're looking for BAW people.
2  Qorvo is, without a doubt, the largest company with
3  the largest employee staff doing BAW.  They have a
4  very easily accessible directory for me to get into.
5  Again, as a recruiter, I'm always looking for low
6  lying fruit.  Qorvo, in a lot of instances, was the
7  easy target for me to find people.  But it was -- I
8  was always looking at all companies.  I'm just
9  stating a fact.
10 BY MR. QUIST:
11     Q.  Okay.  And did Akoustis express any
12 preference to you about employees that could work in
13 North Carolina?  So, like, recruiting employees that
14 would be willing to work in North Carolina?
15     A.  One hundred percent.  You know, that is
16 where their design facility is.  Design engineering
17 is something that needs to be done hands on in an
18 engineering lab with the team.  So that was a 100
19 percent requirement that for those types of
20 positions, the position needed to be based in
21 Charlotte, which is why Greensboro, in a lot of
22 senses, made sense because it was an easy move for
23 people that could.  There's actually a lot of people
24 that still live in Greensboro and, you know, do
25 the -- do the drive or have a place there, and

Page 119

1  they'll come home on the weekends.
2      You know, Orlando, Florida, culturally,
3  cost of living-wise, is a very easy leap from there
4  to Charlotte.  Again, it, it made a lot of sense.  So
5  yes, they did want people there in Charlotte, and,
6  and those were easier locations for me as a recruiter
7  to get people to go to Charlotte.
8      Q.  Okay.
9      A.  You know, simply.
10     Q.  Yeah, that makes sense.  So let me ask
11 you this.  In terms of your fee arrangement with
12 Akoustis, do you get paid the same amount of money if
13 you find a potential candidate that gets placed there
14 all on your own as compared to a candidate that
15 someone at Akoustis told you to reach out to?
16     A.  I think that the arrangement was that if
17 they gave me somebody to reach out to, it was a lower
18 fee percentage.  So it was -- it would always be a
19 full fee if I find the person on my own.  But I think
20 there was either a verbal or loose arrangement made
21 that if a name was given to me from any company and I
22 were to place that person, it would be either a half
23 a fee or something like that.  So it would be like --
24     Q.  So a percentage of the -- okay.
25     A.  It would be, like, you know, maybe 10

Page 120

1  percent instead of 20 percent or something like that,
2  which is reasonable.  At the end of the day, if a
3  company gives you a name, it's a heck of a lot less
4  work I have to do.
5      Q.  Yeah.  That makes sense.  So for any of
6  the candidates that you placed at Akoustis, did you
7  receive less than your full fee?
8      A.  I think one, that I can recall.
9      Q.  Okay.  Yeah.  And then, I know we've
10 talked about this, but just for clarity on the
11 record, so given the documents that we've looked at
12 today, including at least Exhibit 6 and Exhibit 9,
13 which you've seen, isn't it true that Akoustis has,
14 on more than one occasion, suggested that you recruit
15 Qorvo employees having a particular job function or
16 experience level at Qorvo?
17     MS. ROOZEN:  Objection.  Misstates the
18 testimony, and to the extent needed, the witness
19 should be permitted to review both exhibits.
20     THE WITNESS:  Yeah.  I would actually
21 like to.  You said 6 and 9?
22     MR. QUIST:  Yeah.  Take your time to
23 review those if you want.
24     THE WITNESS:  All right.  I know which
25 one 6 is.  Nine?  So it looks like there were two



1  examples that that happened.
2  BY MR. QUIST:
3      Q.  Okay.  So the question was framed as a
4  yes or no question.  Would you like me to restate it?
5      A.  I don't know if I can give a yes or no
6  answer to the way you -- to the way you asked the
7  question.
8      Q.  Do you want me to restate it?
9      A.  Yeah, please.
10     Q.  Okay.  Given the documents we've looked
11  at today, including at least Exhibit 6 and Exhibit 9,
12  isn't it true that Akoustis has, on more than one
13  occasion, suggested that you recruit Qorvo employees
14  that have a particular job function or experience
15  level at Qorvo?
16         MS. ROOZEN:  Objection.  Misstates the
17  testimony.  Asked and answered.
18         THE WITNESS:  It appears that it was two,
19  is, is the best I can say.  Yes.  Yes.  It looks like
20  two times.
21  BY MR. QUIST:
22     Q.  Okay.  And it's possible that there were
23  more than two times, right?
24         MS. ROOZEN:  Objection.  Calls for
25  speculation.

1          THE WITNESS:  Anything is possible.  I, I
2  --
3  BY MR. QUIST:
4      Q.  Well, I mean, earlier in the deposition,
5  you were under the -- to the best of your
6  recollection, there was one time.  And I showed you
7  two examples proving that there were two times, at
8  least two times.  And all I'm saying is, is it
9  possible that there are more times that it was
10  suggested to you to look for a Qorvo employee to fill
11  a role?
12         MS. ROOZEN:  Objection.  Calls for
13  speculation.  Asked and answered.
14         THE WITNESS:  And, and I'm saying that,
15  yes, it is possible.
16         MR. QUIST:  Okay.  That's all.
17  BY MR. QUIST:
18     Q.  Okay.  Have you ever deleted any
19  communications between you and Akoustis since the
20  outset of your engagement by them in 2016?
21     A.  Have I ever deleted communications?  Not
22  that I'm specifically aware of, but I'm sure I have.
23  I, I adopt a minimalist mindset in, in all my -- in
24  all my affairs, and, and they're, they're -- I'm sure
25  that there have been communications over the years

1  that are old.  And I usually clean out my, my email
2  every -- I only keep probably about four years' worth
3  of emails, usually.  Just because --
4      Q.  Okay.
5      A.  -- after that, like, what is the point?
6  It's, it's my business.  I'm the only one that, that
7  needs, this is obviously the first time anything like
8  this has ever happened, so if it's not useful to me
9  or I don't need it, or if it's over four years old,
10  that's, that' ancient history in my business.
11     Q.  Okay.
12     A.  I'm, I'm sure that I have.
13     Q.  Okay.
14     A.  What they were?  I don't know.  Did I do
15  it purposely?  No.  It just -- it just is what it is.
16     Q.  Okay.  So it sounds like anything beyond
17  four years ago likely, yes.  Anything within the last
18  four years likely, no.  Would it be fair to say that
19  you haven't intentionally deleted any communications
20  with Akoustis in the last three years?
21         MS. ROOZEN:  Objection to the extent it
22  misstates testimony.  Objection to form.
23         THE WITNESS:  I can say that I haven't
24  purposely deleted any communication between myself
25  and Akoustis for a reason.  Have I deleted an email?

1  I, I can't say yes or no.  I don't know.  I can't
2  remember every email I've deleted over the last four
3  years.  Did I do it for reason?  Did I do it for a
4  purpose that there was anything suspicious in it?
5  Absolutely not.  There was -- there would be no
6  reason to.  So I, I -- if that answers your question.
7  BY MR. QUIST:
8      Q.  Yeah.  That answers my question.  Yeah.
9  Thank you.  Were you asked not to bring your work
10  cell phone to the deposition today?
11     A.  Absolutely not.  It never leaves my
12  house, so I never thought to bring it.
13     Q.  Is your office at your house?
14     A.  Yes.
15     Q.  Okay.  Okay.  I know we've gone over
16  quite a few different things today.  But just for the
17  sake of trying to make sure I haven't missed
18  anything, other than the directions to find
19  candidates that can be seated in North Carolina, and
20  providing you the job descriptions, and from time to
21  time suggesting the source where you might find a
22  potential candidate, are there any other directions
23  or instructions that Akoustis has given you in
24  connection with your recruitment efforts that involve
25  Qorvo in any way?



Page 141

```
1              CERTIFICATE OF DIGITAL REPORTER
2
3         I, JADE MISERENDINO-ESPINOZA, a Digital
4    Reporter and Notary Public within and for the State
5    of Florida, do hereby certify:
6
7         That MICHAEL ORTIZ, the witness whose
8    examination is hereinbefore set forth, was first duly
9    sworn by me and that said testimony was accurately
10   captured with annotations by me during the
11   proceeding.
12
13        I further certify that I am not related to any
14   of the parties to this action by blood or marriage
15   and that I am in no way interested in the outcome of
16   this matter.
17
18        IN WITNESS THEREOF, I have hereunto set my hand
19   this 13th day of October, 2022.
20
21                    Jade Miserendino-Espinoza
22   _____
     Jade Miserendino-Espinoza
23   Notary Commission Florida HH-30966
     Commission Expires August 10, 2024
24
25
```

Page 142

```
1            CERTIFICATE OF TRANSCRIPTIONIST
2
3         I, POLLYANNA HYRE, Legal Transcriptionist, do
4    hereby certify:
5         That the foregoing is a complete and true
6    transcription of the original digital audio recording
7    of the testimony and proceedings captured in the
8    above-entitled matter.  As the transcriptionist, I
9    have reviewed and transcribed the entirety of the
10   original digital audio recording of the proceeding to
11   ensure a verbatim record to the best of my ability.
12        I further certify that I am neither attorney
13   for nor a relative or employee of any of the parties
14   to the action; further, that I am not a relative or
15   employee of any attorney employed by the parties
16   hereto, nor financially or otherwise interested in
17   the outcome of this matter.
18
19        IN WITNESS THEREOF, I have hereunto set my hand
20   this 17th day of October, 2022.
21                    Pollyanna Hyre
22   _____
     Pollyanna Hyre
23
24
25
```

Page 143

```
1                 DEPOSITION ERRATA SHEET
2
3    Our Assignment No. J8672995
4    Case Caption: QORVO, INC. v. AKOUSTIS TECHNOLOGIES,
5    INC., and AKOUSTIS, INC.
6
7
8           DECLARATION UNDER PENALTY OF PERJURY
9
10        I declare under penalty of perjury that I have
11   read the entire transcript of my deposition taken in
12   the above-captioned matter or the same has been read
13   to me, and the same is true and accurate, save and
14   except for changes and/or corrections, if any, as
15   indicated by me on the DEPOSITION ERRATA SHEET
16   hereof, with the understanding that I offer these
17   changes as if still under oath.
18
19           Signed on the ____ day of _____, 20__.
20
21   _____
     MICHAEL ORTIZ
22
23
24
25
```

Page 144

```
1                 DEPOSITION ERRATA SHEET
2    Page No. _____ Line No. _____ Change to: _____
3    _____
4    Reason for change: _____
5    Page No. _____ Line No. _____ Change to: _____
6    _____
7    Reason for change: _____
8    Page No. _____ Line No. _____ Change to: _____
9    _____
10   Reason for change: _____
11   Page No. _____ Line No. _____ Change to: _____
12   _____
13   Reason for change: _____
14   Page No. _____ Line No. _____ Change to: _____
15   _____
16   Reason for change: _____
17   Page No. _____ Line No. _____ Change to: _____
18   _____
19   Reason for change: _____
20   Page No. _____ Line No. _____ Change to: _____
21   _____
22   Reason for change: _____
23
24   SIGNATURE: _____DATE: _____
25           MICHAEL ORTIZ
```



# Exhibit Q
# (Redacted in Its Entirety)

# Exhibit R

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4      QORVO, INC.                      )
                                         )
 5                   Plaintiff,          )
                                         )
 6      vs.                              ) No. 21-1417 (JPM)
                                         )
 7      AKOUSTIS TECHNOLOGIES, INC.      )
        And AKOUSTIC, INC.,              )
 8                                       )
                     Defendants.         )
 9
10              REMOTE VIDEOTAPED DEPOSITION
11                     Via ZOOM of
12                   MELISSA BENNIS
13                 January 23, 2024
14                    9:00 A.M.
15
16            ███████████████
              ██████████████████
              ████████████████████████
19
20
21
22
23      STENOGRAPHICALLY REPORTED BY:
        JO ANN LOSOYA, CSR, RPR, CRR
24      LICENSE #:  084-002437
25
```

Page 1

1   APPEARANCES
    (All participants appearing remotely)
2
3   SHEPPARD MULLIN LLP
    ROBERT MASTERS
4   2099 Pennsylvania Ave NW
    Suite 100
5   Washington DC 20006
    (202) 747-2312
6   rmasters@sheppardmullen.com
        Appeared on behalf of Plaintiffs.
7
8   SQUIRE PATTON BOGGS
    DAVID S. ELKINS
9   CHANEL O'NEILL
    1841 Page Mill Road
10  Suite 150
    Palo Alto, California 94304
11  (650) 843-3378
    david.elkins@squirepb.com
12
        Appeared on behalf of Defendants.
13
14
15
16
    VIDEOGRAPHER: Kevin Duncan
17
    CONCIERGE TECH: Mitch Reisbord
18
19
20
21
22
23
24
25

1           EXAMINATION
2   Witness                    Page   Line
3   MELISSA BENNIS
4   By Mr. Elkins              5    10
5
6           ***************
7        INDEX OF EXHIBITS
8   EXHIBIT        DESCRIPTION        PAGE
9   Exhibit 1    Expert Report of Melissa A.    8
10          Bennis
11  Exhibit 2    Expert Rebuttal Report of    11
12          Carlyn Irwin
13  Exhibit 3    Expert Report of Dr.    30
14          Stanley Shanfield
15  Exhibit 4    Sedona Commentary on    65
16          Monetary Remedies in Trade
17          Secret Litigation
18  Exhibit 5    Sedona Disputed Issues in    65
19          Awarding Unjust Enrichment
20          Damages in Trade Secret
21          Cases
22
23
24
25

1           THE VIDEOGRAPHER:  Good morning.  We are
2   going on the video record at 9:02 a.m. on
3   January 23, 2024.
4           Here begins the virtual
5   video-recorded deposition of Ms. Melissa Bennis
6   taken on behalf of defendant in the case matter of
7   Qorvo, Inc. versus Akoustis Technologies, Inc., et
8   al., filed in the U.S. District Court for the
9   District of Delaware, bearing Case
10  No. 21-1417 (JPM).
11          My name is Kevin Duncan, and I am a
12  legal videographer representing Veritext Legal
13  Solutions.  The court reporter today is Ms. JoAnn
14  Losoya.
15          Counsel, will you please identify
16  yourselves and affiliations, starting with the
17  noticing party.
18          MR. ELKINS:  David Elkins of Squire
19  Patton Boggs, and I represent the Akoustis
20  defendants.
21          MR. MASTERS:  Robert Masters of Sheppard
22  Mullin, on behalf of the plaintiff, Qorvo, Inc., and
23  the witness.
24          THE VIDEOGRAPHER:  Thank you, Counsel.
25          Will the court reporter please

1   administer the oath.
2           (Witness sworn at 9:03 a.m.)
3           THE VIDEOGRAPHER:  Thank you.
4           You may proceed.
5   WHEREUPON:
6           MELISSA BENNIS,
7   called as a witness herein, having been first duly
8   sworn, was examined and testified as follows:
9           E X A M I N A T I O N
10  BY MR. ELKINS:
11      Q.   Good morning, Ms. Bennis, again.
12      A.   Good morning.
13      Q.   So I'm -- you've had your deposition
14  taken before, correct?
15      A.   Correct.
16      Q.   Do you feel comfortable dispensing with
17  the list of all the things that we're supposed to do
18  during the deposition?
19      A.   I do if you do.
20      Q.   Okay.  I do too.
21          The only two things I will say is, as
22  you probably already know, if you need to take a
23  break before I suggest one, feel free to raise your
24  hand; we'll do it.
25          And the other is just wanted to

1  the associated damages.
2      Q.   So I want to delve into a little more
3  detail regarding your head start calculation.
4          And I think this is -- you explain
5  that calculation I think on Pages 39, 40, and the
6  top half of 41 of your report, but first you summed
7  Akoustis' total revenue from all sources from fiscal
8  year 2016 through the fiscal year ending June 30,
9  2024, nine fiscal years.  So that's Part 1, right?
10     A.   Yes.
11     Q.   Then second, you then mapped that same
12 total revenue for those fiscal years but with a
13 start date that was 55 months later?
14     A.   Correct.
15     Q.   And -- but you stopped as of June 30,
16 2024?
17     A.   That's correct.
18     Q.   And that's your but-for world?
19     A.   The but-for world is the actual revenue
20 shifted forward 55 months, yes.
21     Q.   And stopping on June 30, 2024?
22     A.   For the actual and estimated revenue that
23 would have occurred through that date, that shifted
24 forward, yes.
25     Q.   And then you then applied a -- Akoustis'

1  weighted average cost of capital as of November
2  2023, 14.8 percent, to each of those totals?
3      A.   That's correct.
4      Q.   And then you subtracted the product of
5  WACC, or weighted average cost of capital,
6  multiplied by the -- multiplied by the nine months,
7  so this is Step 1, and that totaled $141 million?
8      A.   I'm not sure I agree with quite how you
9  characterized that.
10     Q.   Okay.  How would you characterize it?
11     A.   I think very generally speaking, it is
12 the analysis itself measures the difference in the
13 time value of money between the two scenarios to
14 determine Akoustis' unjust enrichment.
15     Q.   I understand that.  I'm just trying to
16 make sure I understand the mechanics of it.
17         So why don't we take -- we'll call it
18 Step 1, that's calculating the historical period, if
19 that's okay with you.
20     A.   Okay.
21     Q.   So that -- that amount is -- I think it's
22 represented in Exhibit 3, Schedule 3 of your report?
23     A.   That's correct.
24     Q.   Okay.  And so you took that amount of
25 $113,703,903 and using a weighted average cost of

1  capital of 14.8 percent for that nine-year period,
2  resulted in a calculation of the total value of
3  Akoustis revenue as June 30, 2024, of ▆▆▆▆▆▆▆?
4      A.   Yes.
5      Q.   And then for Step 2, you map the same
6  amount of revenue but -- as the historical period,
7  but adjusted the calculation to take into account
8  that you would be measuring as of the end of January
9  2024; is that right?
10     A.   No.
11     Q.   Correct me.
12     A.   The analysis in Exhibit 3, Schedule 2
13 isn't meant to represent the total value of the
14 Akoustis revenue had it been shifted forward
15 55 months.  It's intended to represent had that
16 revenue been realized in those time periods instead,
17 what would the time value of that revenue be as of
18 June 30, 2024.
19     Q.   Oh, okay.  Right.  My bad.
20         And so -- and again, it's using the
21 same weighted average cost of capital of
22 14.8 percent across the entire period of time,
23 right?
24     A.   Correct.
25     Q.   And essentially it's -- it's -- it

1  results in a total value of Akoustis revenue as of
2  June 30, 2024 of just under ▆▆▆▆▆▆?
3      A.   That's correct.
4      Q.   Okay.  And the delta between those two
5  totals is ▆▆▆▆▆?
6      A.   That's correct.
7      Q.   And that's your damages estimate for
8  misappropriation of trade secrets head start unjust
9  enrichment damages?
10     A.   Yes.
11     Q.   Do you have an understanding of what
12 Akoustis' market value is as of today?
13     A.   I don't.
14     Q.   I'll represent that it's about
15 $54 million.  Sound approximately correct to you?
16     A.   I don't know.
17     Q.   Okay.  If -- if $54 million is correct,
18 then the amount of damages that you calculated is
19 about 120 percent of Akoustis' market value?
20     A.   At present but recall that the head start
21 advantage is something that will benefit Akoustis
22 for some time.
23     Q.   Have you ever testified that in a trade
24 secret misappropriation case that unjust enrichment
25 damages were greater than a defendant's entire

1  market value?
2      A.  Again, I hear you asking about the market
3  value as of a specific amount of time, so I probably
4  wouldn't make that direct correlation myself.  But
5  to answer your root question, I don't know.
6      Q.  Have you ever calculated head start
7  damages in a trade secret before this -- trade
8  secret case before this one?
9      A.  I can't recall sitting here.
10     Q.  You didn't take costs into consideration
11  in your head start damages calculation, correct?
12         MR. MASTERS:  Object to form.
13         You may answer.
14  BY THE WITNESS:
15     A.  No, I wouldn't say that exactly.  I think
16  again, the analysis as presented is really intended
17  to isolate the time value of the revenue.  So again,
18  the revenue is worth more given that Akoustis has
19  had the ability to earn it sooner than had it
20  actually not misappropriated and been forced to
21  develop all of the technology and all the trade
22  secrets and confidential information itself.
23     Q.  But you did not -- you're focusing on
24  revenue.  You are not focusing on profit, correct?
25     A.  Well, I have noted in the report that
                                              Page 62

1  there are other elements of expenses, for instance,
2  like research and development costs.  There can be
3  advantages that are related to early market entry,
4  that pertain to revenues and expenses and profits
5  that have been considered but not tabulated.
6          Again, the idea here was really just
7  to measure what is the benefit to Akoustis of having
8  that revenue at an earlier date.
9      Q.  Okay.  So -- so for your purposes, the
10  time value of money renders expenses such as cost of
11  goods sold irrelevant for purposes of the unjust
12  enrichment damages analysis?
13     A.  No, I don't think I said that.
14     Q.  Okay.  Did you take that into account in
15  your calculation?
16         MR. MASTERS:  Object to form.
17         You may answer.
18  BY THE WITNESS:
19     A.  And again, I think -- I hope the analysis
20  is clear and that the attempt here is to show the
21  benefit to Akoustis in isolation of the time value
22  of that revenue having been received at an earlier
23  date.  To the extent it has that revenue with which
24  to pay down expenses, every dollar of revenue earned
25  reduces $1 of expense as an example.  So all those
                                              Page 63

1  considerations have been made and the analysis
2  speaks for itself.
3          MR. ELKINS:  We've been going for about
4  an hour.  I could use a break, even if you can't.
5  Why don't we take one.  Go off the record, if that's
6  okay, Rob?
7          MR. MASTERS:  That's fine.
8          THE VIDEOGRAPHER:  We are going off
9  record at 11:16 a.m.
10             (Whereupon, a break in the
11             proceedings was taken.)
12         THE VIDEOGRAPHER:  We are back on record
13  at 11:27 a.m.
14         You may proceed.
15         MR. MASTERS:  Counsel, I'm going to mark
16  the transcript as confidential, attorneys' eyes only
17  subject to the protective order in the case.
18         MR. ELKINS:  That's fine.  I would have
19  done so had you not.
20  BY MR. ELKINS:
21     Q.  Okay.  Ms. Bennis, are you familiar with
22  The Sedona Conference?
23     A.  I am.
24     Q.  What is it?
25     A.  I have the general understanding that it
                                              Page 64

1  is a group of individuals that come together to
2  discuss issues having to do with disputes in the
3  intellectual property arena.
4      Q.  Have you ever attended a Sedona
5  Conference conference?
6      A.  I have not.
7      Q.  Have you ever reviewed any of its
8  publications?
9      A.  Yes.
10     Q.  Which ones have you reviewed?
11     A.  Most recently I have reviewed the two
12  cited by Ms. Irwin in her report.  Those come to
13  mind.
14     Q.  Okay.  Let's take a look at those now.
15         Mitch, would you please promote both
16  Exhibit 4 and 5.
17             (Deposition Exhibit 4 was marked
18             for identification.)
19             (Deposition Exhibit 5 was marked
20             for identification.)
21  BY THE WITNESS:
22     A.  Okay.  I see them on my end.
23     Q.  Let's take a look at Exhibit 4 first.
24  And for the record, I'll note that Exhibit 4 is a
25  copy of a Sedona Conference publication entitled
                                              Page 65

17 (Pages 62 - 65)

1    A.   That's correct.
2    Q.   And the third one is Defendant gained a
3  three-year head start on developing a competitive
4  bid and business model for aircraft product,
5  entitling plaintiff to recover damages measured by
6  defendant's profits during that period.
7         And again, that methodology is not
8  the one you're using in this case, correct?
9    A.   Yes, I would only caveat by saying the
10 measure that I have endeavored to develop is the
11 time value of the revenue.  And again, it's the
12 benefit that is received by getting the sales and
13 the revenue in the door sooner given every dollar of
14 revenue affects the bottom-line profit in that it is
15 available to cover expenses and other business
16 activities of the company.
17   Q.   Let's look at Exhibit 5.  For the record,
18 Exhibit 5 is Sedona Conference Journal, Volume 19,
19 No. 2 from 2018 and it's entitled Disputed Issues in
20 Awarding Unjust Enrichment Damages in Trade Secret
21 Cases.  And there are various authors.
22         Do you know any of those authors by
23 the way?  Walter Bratic's been around for --
24   A.   Yes, I believe I met Mr. Bratic and
25 Mr. Cox.

1    Q.   Did you read Exhibit 5 after seeing it
2  cited in Ms. Irwin's expert rebuttal report?
3    A.   Yes.
4    Q.   Let me take you to page numbered 689.  I
5  think it's Page 25 of the PDF.
6    A.   I'm there.
7    Q.   And I'm going to draw your attention to
8  the first sentence of the first -- of the paragraph
9  beginning on that page stating "A plaintiff seeking
10 unjust enrichment damages will have the burden of
11 proving the defendant's net profits gained from
12 actions like those attributable to accelerated time
13 to market and avoided costs that are proximately
14 caused by the misappropriation of the plaintiff's
15 trade secrets."
16         Did I read that correctly?
17   A.   I believe you read that correctly.
18   Q.   So the focus there is on net profits, not
19 on revenue, correct?
20   A.   As I read both before and after the
21 paragraph, I agree with you that this particular
22 portion is focused on what's required when
23 evaluating net -- net profit I believe you said.  I
24 don't see any indication that the article is
25 suggesting that that is the only means by which to

1  measure unjust enrichment.
2    Q.   Are you aware of any case in which a
3  court approved an unjust enrichment methodology
4  based on measuring the weighted average cost of
5  capital of revenue historically and comparing it to
6  the weighted average cost of capital of revenue in
7  the but-for world?
8    A.   I'm not sure I'm following exactly what
9  you're asking.  I think what you may be getting to
10 is have the -- am I aware if -- well, let me back
11 up.
12         I don't know that I can sit here and
13 say what the universe of courts has or hasn't ever
14 opined or issued.  I am aware that there are --
15 there's literature such as that which we're looking
16 at to suggest that unjust enrichment can be measured
17 in a variety of ways based on the facts and
18 circumstances available and present at any given
19 situation.  I'm also aware that the time value of
20 money is a real economic concept, and can provide a
21 measurement in this particular case and others in
22 terms of defining a benefit achieved by a head start
23 related to misappropriation of trade secrets.  And
24 so that's what I have endeavored to do here.
25   Q.   Are you aware of any case where the time

1  value of money, as you have said, has fueled the
2  calculation of unjust enrichment damages in a head
3  start case like this one?
4    A.   I believe in one of these two periodicals
5  that we reviewed, the time value benefit is
6  specifically cited.
7    Q.   In connection with a head start theory --
8    A.   Yes.
9    Q.   -- of damages?
10   A.   Hm-hmm.
11   Q.   Where did you see that?
12   A.   Sitting here I'm not sure.  It was in one
13 of them.
14         I mean -- and maybe just to simplify
15 it.  It's -- well, I suppose I already mentioned.
16 Time value of money is a real economic concept.  A
17 dollar today is known to be worth more than a dollar
18 tomorrow.  So to the extent that a company has
19 recognized revenue in advance of when it otherwise
20 would have, that provides a benefit in terms of the
21 time value of that revenue.
22   Q.   Are you aware of any other case, whether
23 you were involved in it or not, where a court
24 allowed the damages opinion for head start unjust
25 enrichment damages based solely on the timing of

19 (Pages 70 - 73)

1        REPORTER CERTIFICATE

2

3       I, JO ANN LOSOYA, a Certified Shorthand

4  Reporter within and for the State of Illinois, do

5  hereby certify:

6        That previous to the commencement

7  of the examination of the witness, the witness was

8  duly sworn to testify the whole truth concerning the

9  matters herein; That the foregoing deposition

10  transcript was reported stenographically by me, and

11  the foregoing constitutes a true record of the

12  testimony given and the proceedings had; That the

13  said deposition was taken before me at the time and

14  place specified; That I am not a relative or

15  employee or attorney or counsel, nor a relative or

16  employee of such attorney or counsel for any of the

17  parties hereto, nor interested directly or

18  indirectly in the outcome of this action.

19       IN WITNESS WHEREOF, I do hereunto set my

20  hand this day, January 28, 2024.

21

22                        JO ANN LOSOYA, CSR, RPR, CRR

23      C.S.R. 84-002437

24

25

Page 110

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127