IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417 (JPM) |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. | ) | **DEMAND FOR JURY TRIAL** |
| and AKOUSTIS, INC., | ) | **REDACTED - PUBLIC VERSION** |
| | ) | **Original Filing Date: February 20, 2024** |
| Defendants. | ) | **Redacted Filing Date: March 8, 2024** |

### PLAINTIFF QORVO INC.'S OPPOSITION TO
### <u>AKOUSTIS DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Eric K. Gill
Zachary Alper
Theodore Mayer
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

James C. Wald
Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

*Attorneys for Plaintiff Qorvo, Inc.*

February 20, 2024

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

II.   RELEVANT FACTS ................................................................................................. 2

    A.    Parties .......................................................................................................... 2

    B.    Events Leading Qorvo to File this Lawsuit ................................................. 3

    C.    Discovery Uncovers Widespread Theft of Qorvo's Trade Secrets ............ 3

    D.    Qorvo Identifies Trade Secrets with Reasonable Particularity ................... 6

    E.    Qorvo Narrows Trade Secrets It Expects to Present at Trial ...................... 7

    F.    Qorvo Serves Expert Report Analyzing Trade Secrets ............................... 8

        1.    Qorvo business plans for Wi-Fi products (Group 1) ................................. 8

        2.    Qorvo's BAW filter and resonator designs (Group 2) .............................. 9

        3.    Qorvo's Trimming Method and Procedures (Group 3) .......................... 11

        1.    Qorvo's EVB Design Rules and Schematics (Group 4) ......................... 12

        2.    Qorvo Product Development Process & Testing Procedures (Group 5) .. 13

        3.    Qorvo Systems, Processes, and Procedures for Testing Reliability and
              Mean-Time-to-Failure (Group 6) ............................................................ 14

        4.    Qorvo Manufacturing, Assembly, and Change Procedures (Group 7) ..... 15

        5.    Qorvo Product Roadmaps and Prototypes (Group 8) .............................. 15

    G.    Akoustis Serves Three Expert Reports Addressing Trade Secrets ...........16

    H.    Akoustis Engages New Counsel and Argues for First Time that Qorvo Failed to
        Identify Trade Secrets Seven Months After Disclosures .......................... 17

    I.    Infringement Analysis of Akoustis BAW Filters ..................................... 18

    J.    Akoustis's Falsely Advertises "Single Crystal" Products ....................... 19

III.  ARGUMENT .......................................................................................................... 21

    A.    Akoustis Misappropriated Qorvo's Trade Secrets ................................... 21

        1.    Qorvo identified its trade secrets with reasonable particularity ............... 21

        2.    Qorvo narrowed the trade secrets it will present at trial ......................... 25

    B.    Akoustis Falsely Advertised Products as "Single Crystal" ..................... 26

        1.    Akoustis's advertisements were false ...................................................... 26

        2.    Akoustis's advertisements caused confusion in the market ..................... 27

        3.    Akoustis's false statements were material ............................................... 28

    C.    Akoustis Engaged in Unfair Trade Practices ...........................................29

D.     Akoustis Is Not Entitled to a Declaration that its "Alternative" Designs Are Non-Infringing ...........................................................................................................30

E.     Qorvo Will Not Pursue its RICO or Patent Marking Claims at Trial ...................30

IV.    CONCLUSION.............................................................................................................. 30

## **TABLE OF AUTHORITIES**

Page(s)

<u>Cases</u>

*Arconic Inc. v. Novelis Inc.*
    No. 17-cv-1434, 2020 WL 7247112 (M.D. Pa. Dec. 9, 2020) ...............................................25

*Bridgetree, Inc. v. Red F Mktg. LLC*
    No.10-cv-00228, 2013 WL 443698 (W.D.N.C. Feb. 5, 2013) ..............................................29

*Dow Chemical Canada, Inc. v. HRD Corp.*
    909 F. Supp. 2d 340 (D. Del. 2012)......................................................................................21

*IDX Systems Corp. v. Epic Systems Corp.*
    285 F.3d 581 (7th Cir. 2002) ................................................................................................25

*MicroVention, Inc. v. Balt USA, LLC*
    No. 20-cv-02400, 2023 WL 4316880 (C.D. Cal. May 3, 2023).......................................22, 23

*Neural Magic, Inc. v. Meta Platforms, Inc.*
    659 F. Supp. 3d 138 (D. Mass. 2023) ...................................................................................23

*NEXT Payment Solutions, Inc. v. Clearesult Consulting, Inc.*
    No. 17-cv-8829, 2020 WL 2836778 (N.D. Ill. May 31, 2020)..............................................25

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer*
    *Pharmaceuticals Co.*
    290 F.3d 578 (3d Cir. 2002).................................................................................................28

*Oakwood Labs. LLC v. Thanoo*
    999 F.3d 892 (3d Cir. 2021).............................................................................................21, 22

*SMH Enterprises, L.L.C. v. Krispy Krunchy Foods, L.L.C.*
    2021 WL 4460522 (E.D. La. Sept. 29, 2021) ........................................................................22

## I.    INTRODUCTION

Discovery in this case has revealed that Akoustis engaged in a long-term, widespread and concerted scheme to misappropriate Qorvo's trade secrets. The evidence is compelling and overwhelming, proving that Akoustis: (1) systematically hired dozens of Qorvo's employees so that it could obtain access to Qorvo's confidential information; (2) used those employees to steal nearly **500,000 documents** from Qorvo; and (3) used the stolen materials to accelerate its entry into the market and directly compete against Qorvo. The evidence further proves that many of Akoustis's high-level executives, including its CEO, were directly involved in this misappropriation scheme.

Now faced with the consequences of its bad acts, Akoustis asks this Court to award summary judgment because Qorvo purportedly failed to identify the asserted trade secrets with "reasonable particularity." Qorvo, however, long ago served detailed disclosures identifying the specific information that Qorvo asserts as trade secrets and provided citations to supporting evidence. Akoustis's prior counsel, who were replaced in late 2023, never objected to the sufficiency of those disclosures, and even conceded to this Court "we got a disclosure of 300 trade secrets. . . . **the trade secret identification is what really volleys the ball back to us to then identify what we're going to present in rebuttal**." Akoustis's new counsel, however, argues that Qorvo's disclosures only identified vague "categories" of information that did not give Akoustis adequate notice of the asserted trade secrets. This newfound argument is belied by Qorvo's disclosures, the evidence cited in those disclosures, and the detailed report of Qorvo's expert witness, all of which Akoustis disregards in seeking summary judgment. Akoustis also argues that summary judgment is appropriate because Qorvo is asserting too many trade secrets. Akoustis does not cite any authority supporting this novel basis for summary judgment—that it stole too much information to be held liable. Moreover, contrary to Akoustis's argument, Qorvo has

substantially narrowed its trade secret claims for trial, dropping hundreds of trade secrets and placing the remaining trade secrets into ten organized groups to assist juror comprehension. The Court should deny Akoustis' motion for summary judgment—Qorvo is entitled to a jury trial on its claims for misappropriation of trade secrets, conspiracy, and unfair competition.

Akoustis also moves for summary judgment on Qorvo's false advertising claim. The record evidence, however, demonstrates that (i) Akoustis falsely advertised its products as "single crystal" when those products were polycrystalline; (ii) those advertisements created confusion in the market; and (iii) the single crystal advertisements were material to consumers, allowing them to differentiate Akoustis's products from its more established competitors.

Finally, Akoustis asks this court for "summary judgment" declaring that certain new/redesigned "sample" products do not infringe one of the two asserted patents (U.S. Patent No. 9,735,755). But there is no basis to provide such declaratory relief. The new/redesigned samples were not identified as accused products in this action because they were not on-sale when the suit was filed (or even when the final infringement contentions were served). Indeed, even today, there is no evidence that the samples are anything more than one-off, litigation-inspired samples. Thus, neither parties' experts tested the "samples." There is no basis to grant Akoustis "summary judgment" declaring that products outside of this case do not infringe.

## II.    RELEVANT FACTS

### A.    Parties

Plaintiff Qorvo, Inc. was formed on January 1, 2015 from the merger of TriQuint Semiconductor (formed in 1985) and RF Micro Devices (formed in 1991). *See* Ex. A at 54.[1] Qorvo manufactures semiconductor devices, including bulk acoustic wave (BAW) filters. *See id.* at 4-7.

---

[1] All exhibit citations refer to the Declaration of Jonathan DeFosse unless otherwise indicated.

Qorvo's predecessor companies began developing BAW filter technology in the 1990s. Ex. B at 388-389. By 2017, Qorvo had shipped more than 10 billion BAW filters. *See* Ex. C at 1. Defendant Akoustis, Inc. is a publicly-traded company that was formed in 2014 by Jeffrey Shealy, a former employee of RF Micro Devices. *See* Ex. D at 9-11. Akoustis manufactures and sells BAW filters. *See* Ex. E at 3. At the time of its formation, Akoustis claimed it developed "a new class" of BAW filters using "proprietary, single crystal materials." Ex. D at 11.

### B.      Events Leading Qorvo to File this Lawsuit

Prior to the filing of this case, Qorvo became increasingly concerned that Akoustis was engaging in unlawful activities. Akoustis hired an unusually large number of former Qorvo employees.  *See* Ex. F (listing employees). Akoustis also entered the market for BAW filters much faster than should have been possible. *See* Declaration of Stanley Shanfield ("Shanfield Decl."), Ex. B, ¶¶12-15. In 2021, Qorvo's concerns reached a new level when it received a report that Akoustis asked a Qorvo employee to share confidential information during a job interview. Declaration of Scott Miller, ¶4. Qorvo then discovered two additional disturbing facts—(i) despite its representations to the market about superior "single crystal" technology, Akoustis's products were actually polycrystalline; and (ii) Akoustis was infringing two Qorvo patents. *See* D.I. 1, ¶¶67-104. On October 4, 2021, Qorvo filed this lawsuit against Akoustis asserting claims for patent infringement, false advertising, and unfair trade practices under North Carolina law. *See id.*, ¶¶67-104, 111-132.

### C.      Discovery Uncovers Widespread Theft of Qorvo's Trade Secrets

Discovery in this case revealed that Akoustis's activities were far worse than imagined. Between November 2022 and January 2023, Akoustis produced documents in this case proving that Akoustis obtained a large volume of Qorvo's confidential information. DeFosse Decl., ¶2. On February 8, 2023, Qorvo filed the Second Amended Complaint alleging that Akoustis

misappropriated Qorvo's trade secrets in violation of federal and North Carolina law. D.I. 125. Qorvo also engaged an expert—Dr. Stanley Shanfield—to review the Qorvo documents found at Akoustis. Dr. Shanfield determined that Akoustis had produced more than 1,500 Qorvo documents containing confidential information not generally known in the industry. Shanfield Decl., ¶6; *see also id.*, Ex. A at ¶77 and Appx. 4 (listing confidential documents).

Based on the large volume of confidential documents found at Akoustis, Qorvo requested a forensic inspection of Akoustis's computer systems. *See* D.I. 193. The inspection examined the electronic devices of 12 Akoustis employees. Declaration of Kevin T. Faulkner ("Faulkner Decl."), ¶11. As a result of the inspection, Qorvo's forensic expert, Kevin Faulkner, made several disturbing discoveries. First, the 12 Akoustis employees had more than 9,000 incidents of the confidential Qorvo documents. *Id.*, ¶14. Second, Rama Vetury, a former Qorvo employee who became Akoustis's Chief Device Scientist, transferred **279 GB** of data from his Qorvo computer to Akoustis. *Id.*, ¶17. Third, Dr. Vetury also transferred more than 175,000 Qorvo emails to Akoustis. *Id.*, ¶18. Fourth, Todd Bender, a former Qorvo employee who became Akoustis's Director of Tax and Treasury, transferred more than 320,000 Qorvo emails to Akoustis. *Id.* The inspection also revealed that Akoustis destroyed the computers of two Akoustis employees— JB Kwon and Joel Morgan—who were centrally involved in the misappropriation of Qorvo's trade secrets. S*ee id.*, ¶8; *see also* D.I. 349, ¶23.[2]

With the assistance of the forensic inspection, Qorvo has now identified **nearly 500,000** Qorvo files**, plus 279 GB of additional data** that Akoustis illegally obtained from Qorvo. Faulkner Decl., ¶19. Confidential Qorvo materials were in the possession of at least **40 different**

---

[2] Details about the significance of Mr. Kwon and Mr. Morgan and the egregiousness of Akoustis's destruction of evidence are provided in Qorvo's Motion for Sanctions. *See* D.I. 348; *see also* D.I. 349; 350.

Akoustis employees. *See* Shanfield Decl., Ex. A, ¶480. Discovery also revealed that high-level Akoustis executives were intimately involved in the scheme to misappropriate and use Qorvo's trade secrets. For example:

- Dr. Jeff Shealy (Akoustis's CEO) acquired a confidential document describing Qorvo's process for developing new technology. Ex. I. Dr. Shealy saved the Qorvo document to Akoustis's system under the name "AKTS_Tech_development." Faulkner Decl., Ex. A, ¶140. He then inserted Akoustis's logo into the document and falsely identified himself as the author in the document. Ex. J.

- Rohan Houlden (Akoustis's Chief Product Officer) downloaded confidential documents to an external hard drive two days before quitting his job at Qorvo. Faulkner Decl., Ex. A, ¶¶ 67-68. Mr. Houlden then distributed those documents to employees at Akoustis. *Id.*; *see also* Shanfield Decl., Ex. A, ¶157. To cover his tracks, Mr. Houlden asked Dr. Shealy to wait before announcing his hiring, stating: "[t]hough I think I am clean, **I want to delay as long as I can, any reason for Qorvo IT to look at my computer**." Ex. K. Dr. Shealy responded: "Got it." *Id.* Mr. Houlden also routinely used his personal email account to solicit confidential Qorvo information and transfer that information to Akoustis. *See, e.g.*, Exs. L, M, N, O. When confronted with his activities during his deposition, Mr. Houlden claimed that it may have been ▮▮▮▮▮▮▮▮▮▮ that were using the personal email account to send confidential Qorvo documents to Akoustis. Ex. P, 141:2-18.

- SJ Kim (Akoustis's Country Manager in Korea) told David Aichele (Akoustis's Executive Vice President of Business Development) that Mr. Kim was using his Akoustis expense account to bribe people to obtain "key confidential information" about Qorvo ▮▮▮▮▮▮▮▮▮▮ Ex. Q. Mr. Kim subsequently sent Mr. Aichele three zip files of confidential Qorvo information, boasting: "I always use my expense for right purpose!" *See* Ex. R. Rather than correcting or disciplining Mr. Kim, Mr. Aichele encouraged these tactics, routinely asking Mr. Kim to obtain Qorvo's confidential information. *See, e.g.*, Ex. S; Ex. T.

- Steven Li (Akoustis's Country Manager in China) informed Colin Hunt (Akoustis's Vice President of Global Sales) that Li had a "private channel" for obtaining confidential information about Qorvo. Ex. V. At Mr. Hunt's request, Mr. Li used his private channel to borrow confidential prototypes of Qorvo's 5GHz filters. Ex. U. Akoustis shipped those confidential prototypes to the United States for testing and evaluation. *See* Ex. W.

- Robert Dry (Akoustis's Vice President of Operations) circulated numerous confidential Qorvo documents concerning manufacturing and inspection procedures. Shanfield Decl., Ex. A, ¶¶398-409. Before circulating the documents, Mr. Dry deleted the Qorvo logos, stating "for good reasons edited out former references." Exs. X, Y. Mr. Dry explained during his deposition: "I've edited out references to Qorvo because I didn't want to be showing a document around that

we would be discussing as an example that had Qorvo written on it." Ex. VVV, 153:9-14. Mr. Dry also gleefully circulated other confidential Qorvo materials to engineers at Akoustis, apparently pulling them from a repository of confidential information he had taken from Qorvo. *See* Ex. Z ("Look what I have?"); Ex. AA ("found it"); Ex. BB ("Here you go . . .").

Beyond the above examples, the egregious and widespread nature of Akoustis's misappropriation scheme is reflected throughout the discovery record in this case. Dr. Shanfield has analyzed that evidence in his expert report. *See generally* Shanfield Decl., Ex. A, Parts V, VI.

### D.    Qorvo Identifies Trade Secrets with Reasonable Particularity

Given that Akoustis stole **hundreds of thousands** of Qorvo documents (**plus 279 GB of additional information**), identifying the trade secrets that Akoustis obtained has been a significant undertaking and focus in this case. On May 1, 2023, Qorvo served its initial trade secret disclosure. *See* D.I. 447, Ex. 2. The 52-page disclosure identified 71 trade secret groups. *See id.* For each group, Qorvo identified specific information that it was claiming as a trade secret, with pin cites to documents found at Akoustis reflecting the trade secrets. *See id.*

On May 10, 2023, the Court held a discovery hearing. *See* D.I. 199. At the hearing, the Court asked: "To what degree has there been a relatively detailed disclosure of the trade secrets in the case?" *Id*. at 3. Qorvo responded that it had made a "voluminous" and detailed disclosure. *Id*. at 4. **Akoustis did not then (or ever) dispute the sufficiency of the disclosure**. To the contrary, Akoustis argued that it needed to share the disclosure with Akoustis employees so they could review and address the specific trade secrets Qorvo identified:

> And [Qorvo] is correct, in terms of the trade secret identification, it's voluminous.  It's over 2,000 pages once you have all the referenced exhibits with it, and we are dealing with something in the realm of 300 trade secrets.  He mentioned 71 groups, and when you break up the subgroups, I stopped counting around 300.  So we have a massive undertaking that will require our client to say, did we see this document, did we use this document, what usage did we have? Those are things that only fact witnesses can know.

*Id.* at 17; *see also id.* at 5 ("Last week, we got a disclosure of 300 trade secrets. . . . the trade secret identification is what really volleys the ball back to us to then identify what we're going to present in rebuttal.").

On July 25, 2023, Qorvo served a supplemental trade secret disclosure. D.I. 447, Ex. 3. The supplemental disclosure identified 83 groups of trade secrets. *See id.* Like the initial disclosure, the supplemental disclosure identified specific information for each group that Qorvo contends is a trade secret and included citations to Qorvo documents reflecting those trade secrets. On August 15, 2023, Akoustis asked the Court to strike the supplemental disclosure as untimely, but never argued that the disclosures lacked particularity. *See* D.I. 275; D.I. 288 at 9-13; D.I. 301 at 23-26.

On October 12, 2023, Qorvo served a second supplemental trade secret disclosure. D.I. 447, Ex. 4. In the second supplement, Qorvo identified 85 groups of trade secrets. *See id.* For each group, Qorvo continued to identify the specific information that Qorvo contends qualifies for trade secret protection. *Id.* Qorvo also continued to provide citations to Qorvo documents reflecting those trade secrets. *Id.* Akoustis never objected to the second supplemental disclosure.

E.     **Qorvo Narrows Trade Secrets It Expects to Present at Trial**

On September 1, 2023, the Court stated that it expected Qorvo to significantly narrow its trade secret case for trial. D.I. 313 at 2-3. On November 17, 2023, Qorvo identified the trade secrets that it expects to pursue at trial. D.I. 447, Ex. 5. Qorvo identified ten groups of trade secrets (down from 85): (1) Qorvo business plans for WiFi products; (2) Qorvo BAW filter and resonator designs; (3) Qorvo's trimming methods and procedures; (4) Qorvo's evaluation board design rules and schematics; (5) Qorvo's product development process and testing procedures; (6) Qorvo's systems, processes, and procedures for testing reliability and mean-time-to-failure of parts; (7) Qorvo manufacturing, assembly, and change procedures; (8) Qorvo product roadmaps and product

prototypes; (9) trade secrets relating to job structures and employee compensation; and (10) Qorvo's tax and corporate compliance structure and know-how. *See id*. For each group of trade secrets, Qorvo identified the specific information it is claiming as a trade secret, with citations to Qorvo documents where that information is found. *See id.*

### F.    Qorvo Serves Expert Report Analyzing Trade Secrets

On November 21, 2023, Qorvo served an expert report from Dr. Shanfield. *See* Shanfield Decl., Ex. A. Dr. Shanfield addressed eight of the ten trade secret groups that Qorvo expects to pursue at trial.[3]   *See id.*, ¶¶7-8; *see also id.*, Ex. A at 27-479. For each group, Dr. Shanfield (i) analyzed confidential Qorvo documents found at Akoustis; (ii) identified the specific information in those documents that was not generally known or readily ascertainable; (iii) assessed the value of that information; and (iv) analyzed Akoustis's use of the information. Shanfield Decl., ¶5. Based on the information Akoustis misappropriated, Dr. Shanfield opined that Akoustis obtained a 55-month head start to competing in the market. *Id*., ¶10.

### 1.    Qorvo business plans for Wi-Fi products (Group 1)

Dr. Shanfield first analyzed five confidential Qorvo business plans for the Wi-Fi market that Akoustis obtained in September 2016. Shanfield Decl., Ex. A, ¶¶81-93. At that time, Akoustis was attempting to transition from a research company to a company that develops and manufactures revenue-producing products. *See* Ex. DD at 3. Akoustis was thus searching for the best way to focus its resources to enter the market. Ex. H, 234:23-235:19. Shortly after receiving Qorvo's confidential business plans, Akoustis made the decision to focus on developing 5GHz BAW filters for WiFi applications. *See* Ex. EE. Akoustis's business plan—the "AKTS 5GHz

---

[3] Dr. Shanfield did not address trade secrets relating to job structures and employee compensation (group 9) or Qorvo's tax and corporate compliance structure and know-how (group 10).

Market Summary"—directly copied portions of the confidential Qorvo documents. Shanfield Decl., Ex. A, ¶¶119-22. Additionally, Akoustis focused its development efforts on an anticipated future "gap" in Qorvo's product line that was identified in the confidential documents stolen from Qorvo. *Id*., ¶100.

For each of the confidential business plans, Dr. Shanfield identified specific information that was not generally known or readily ascertainable. *Id*., ¶¶81-93. For example, Dr. Shanfield analyzed a June 2015 presentation entitled "IDP Market Segment Analysis." *Id*., ¶82; Ex. FF. Dr. Shanfield identified the information on slides 4-6 (Qorvo's internal assessment of the attractiveness of the WiFi market) and slides 8-10 (Qorvo's priorities for investing in research and development) as information that was not generally known or readily ascertainable. Shanfield Decl., Ex. A, at ¶¶83-85. Dr. Shanfield explained that this information provided a "playbook" for companies like Akoustis to compete with Qorvo. *Id*., ¶86 Dr. Shanfield opined that the information was particularly valuable to Akoustis because it allowed Akoustis to avoid generating its own market intelligence in deciding how to best compete in the market. *Id.* Dr. Shanfield provided a similar analysis for the other four business plans. *See id.,* ¶¶87-125.

### 2.    Qorvo's BAW filter and resonator designs (Group 2)

Dr. Shanfield next analyzed three confidential Qorvo documents found at Akoustis concerning Qorvo's BAW filter and resonator designs. Shanfield Decl., Ex. A, ¶¶126-176. When Akoustis decided to develop 5GHz BAW filters in 2016, Akoustis could not even produce an acceptable acoustic resonator, which is a fundamental building block for BAW filters. Ex. P, 20:20-21:10; GG, 26:6-17. In September 2016, Akoustis hired Mr. Houlden, a General Manager at Qorvo, to lead Akoustis's product development efforts. Ex. P, 17:25-18:6, 19:7-20. Mr. Houlden was aware of Akoustis's technical struggles. *See* Shanfield Decl., Ex. A, ¶172. Shortly before quitting his job at Qorvo, Mr. Houlden downloaded two confidential Qorvo presentations reporting

research Qorvo had conducted on 5GHz resonators and filters. *Id.*, ¶¶157, 171; Ex. HH; Ex. II. Upon arriving at Akoustis, Mr. Houlden printed copies of those presentations and provided them to Dave Hodge, the Akoustis engineer tasked with developing resonators and 5GHz BAW filters. *See* Ex. GG, 60:25-62:14, 79:25-82:23. In 2020, Akoustis obtained a third confidential Qorvo design presentation disclosing advanced research into the next generation of BAW filter designs.[4] Shanfield Decl., Ex. A, ¶¶174-175. Akoustis used the research in these three Qorvo design presentations to accelerate the design and development of Akoustis products. *Id.*, ¶518.

Dr. Shanfield again analyzed each of the Qorvo design presentations and identified specific information in those presentations that was not generally known or readily ascertainable. Shanfield Decl., Ex. A, ¶¶127-154. For example, Dr. Shanfield addressed Qorvo's confidential ███████████████████████ presentation. *Id.*, ¶¶127-28. Dr. Shanfield opined that the information on slides 2-6 of the presentation—Qorvo's research results concerning ████████ ████████████████████████████████████ for 5GHz BAW filters (spurious modes, Qp)—was not generally available or readily ascertainable. *Id.* Dr. Shanfield explained that this information was valuable to competitors because it would allow them to make more competitive resonators. *Id.*, at ¶128. Dr. Shanfield explained that the research was especially valuable to Akoustis given Akoustis's difficulty in developing an acceptable resonator. *See id.*, ¶172. Dr. Shanfield provided a similar analysis of the other Qorvo design presentations, identifying

---

[4] Akoustis also obtained this third presentation under troubling circumstances. In February 2020, two Akoustis employees drove to a Panera restaurant to meet with William Schmid, an engineer working at Qorvo. *See* Ex. JJ. Around the time of the meeting, Akoustis had been seeking confidential information in China and Korea about Qorvo's design for its prototype 5GHz filters. *See* Ex. S; Ex. KK. Shortly after meeting with Akoustis, Mr. Schmid obtained a copy of the confidential design presentation. *See* Ex. 720. In May 2020, Mr. Schmid began working for Akoustis **before quitting his job at Qorvo**, transferring the confidential design presentation to Akoustis in the process. *See* Ex. MM.

the specific information in those presentations that was not public and valuable to Akoustis. *See id.*, ¶¶129-176.

### 3.    Qorvo's Trimming Method and Procedures (Group 3)

Dr. Shanfield next analyzed three Akoustis presentations from 2017 that reproduced confidential diagrams showing Qorvo's trimming process.[5] Shanfield Decl., Ex. A, ¶¶398-409. ¶¶177-224; Exs. NN, OO, PP. At that time, Akoustis did not have a commercially viable trimming process, nor any experienced trim engineers. Ex. QQ, 61:24-62:6. Akoustis thus recruited Joonbum ("JB") Kwon, a trim engineer working at Qorvo, to develop a trim process for Akoustis. Ex. RR, 34:21-25. Within weeks of joining Akoustis, Dr. Kwon had circulated slides with the diagrams of Qorvo's trimming process that Dr. Kwon thought would be "helpful" in creating Akoustis's trimming plan. Ex. SS ("The enclosed is what I understand about █████████████████ ██████████████████████████████."). The diagrams Dr. Kwon circulated were almost identical to diagrams found in confidential Qorvo trimming presentations.[6] *Compare* Ex. PP at AKTS_00118856 (Akoustis slide with Qorvo diagram) *with* Ex. TT at QORVO_00890533 (Qorvo slide with diagram). One Akoustis employee—Dr. Annia Shen— cautioned that Dr. Kwon was sharing Qorvo's "secret sauce" and suggested deleting the information. Ex. TTT, 19:14-21:7. Rather than deleting the diagrams, Akoustis changed the titles of Dr. Kwon's slides to remove references to Qorvo and obscure the origin of the information. *Compare, e.g.,* Ex. PP at AKTS_00037341 ("QORVO Trim Process Flow") *with* Ex. UU at

---

[5] "Trimming" is a complex in-house manufacturing process that optimizes the frequency response of BAW filters. Shanfield Decl., Ex. A, ¶48. This process is "essential to obtaining an economically viable level of device yield—i.e., without such a process too many fabricated devices would not meet the ultimate specifications required for the devices." *Id.*, ¶49.

[6] Akoustis destroyed Dr. Kwon's computer in December 2022. *See* D.I. 349, ¶25. As such, Dr. Shanfield was unable to identify the exact confidential Qorvo documents from which Dr. Kwon extracted the diagrams.

████████████████████████████

AKTS_00476749 ("Standard Industrial Trim Process Flow").

Dr. Shanfield analyzed the diagrams of Qorvo's trimming process and identified specific aspects of the trimming process that were not generally known or readily ascertainable. Shanfield Decl., Ex. A, ¶¶178-189. For example, Dr. Shanfield explained that the diagrams of Qorvo's trimming process disclosed ████████████████████████████ *Id.*, ¶¶182-183. Dr. Shanfield explained that ████████████ were neither publicly available nor readily ascertainable at the time this information was obtained by Akoustis." *Id.* Dr. Shanfield also identified evidence that Akoustis used the ██████████████████ *Id.*, ¶¶206-207. Dr. Shanfield performed a similar analysis for other information contained in the Qorvo trimming diagrams. *See id.*, ¶¶185-186 (Qorvo's ██████████████); ¶¶187-188 (Qorvo's ██████████████); ¶¶190-224 (analyzing evidence that Akoustis used the information in the Qorvo design presentations); *see also* Shanfield Decl., Ex. B, ¶¶16-24 (responding to assertions from Akoustis expert that Qorvo trimming methods were publicly known and "impossible" for Akoustis to implement).

### 1.    Qorvo's EVB Design Rules and Schematics (Group 4)

Dr. Shanfield next analyzed four documents related to Qorvo's "evaluation boards." Shanfield Decl., Ex. A, ¶¶225-232. Evaluation Boards (or "EVBs") are printed circuit boards that are used to test the performance of BAW filters. Shanfield Decl., Ex. A, ¶51. In late 2016, Akoustis agreed to deliver EVBs for at least two projects. *Id.*, ¶234. Upon learning of this commitment, Mr. Houlden used his personal email account to contact Qorvo employees to solicit confidential information about how Qorvo designs EVBs. *Id.*, ¶¶226-227. Mr. Houlden then obtained copies of (i) confidential Qorvo EVB schematics and (ii) a confidential computer-aided design ("CAD") drawing of an EVB ██████. *Id.*, ¶¶243-244, 251-256; Faulkner Decl., Ex. A, ¶¶206, 216-219,

██████████████████████████████████████

225-228, 234-237. In seeking the latter, Mr. Houlden falsely told a Qorvo employee that there were no "IP concerns" with sending the confidential drawing, but Mr. Houlden nonetheless stated he "wanted to use your yahoo and my gmail account to make u feel more comfortable." Ex. VVV. Akoustis used the confidential Qorvo information to accelerate production of its own EVBs. Shanfield Decl., Ex. A, ¶¶245-249. For example, Mr. Houlden gave the CAD drawing to a CAD engineer at Akoustis with instructions to "replicate" the device. Ex. GG, Hodge Dep., 62:1-67:15.

For each of the EVB documents, Dr. Shanfield identified specific information that was not generally known or readily ascertainable. Shanfield Decl., Ex. A, ¶¶225-232. For example, Dr. Shanfield analyzed the email from Mr. Houlden soliciting information about Qorvo's design rules and identified specific technical design rules that were not generally known or readily ascertainable.[7] *Id.*, ¶¶226-228. Dr. Shanfield explained that this specific information was valuable because Akoustis could use the rules to more easily design EVBs, while also improving performance and balancing cost considerations. *Id.*, ¶228. Dr. Shanfield provided a similar analysis for the other Qorvo EVB documents. *See id.*, ¶¶229-230 (Qorvo EVB schematic); ¶¶231-232 (CAD drawing of Qorvo EVB ████████); ¶¶233-256 (analyzing evidence that Akoustis obtained and used the information in the Qorvo EVB documents).

### 2. Qorvo Product Development Process & Testing Procedures (Group 5)

Dr. Shanfield analyzed documents found at Akoustis concerning Qorvo's product development process and testing procedures. Shanfield Decl., Ex. A, ¶¶258-321. Dr. Shanfield

---

[7] Dr. Shanfield identified Qorvo's technical design rules in the email as: ████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████ Shanfield Decl., Ex. A, ¶227.

explained that such engineering documents are critical to ensure that products are developed in an organized and reliable way. *Id*., ¶¶52-57. Indeed, companies that purchase BAW filters often require their suppliers to have such robust engineering documentation in place. *Id*., ¶395. Dr. Shanfield opined that, to accelerate the process of building its engineering document library, Akoustis obtained and copied Qorvo's internal engineering procedures. *Id*., ¶¶283-321.

Given the large number of Qorvo's confidential product development and testing procedures found at Akoustis, Dr. Shanfield divided his analysis into four types of documents: (i) documents concerning the structure and content of Qorvo's engineering library (*id*., ¶¶260-261); (ii) documents reflecting Qorvo's product and technology development procedures (*id*., ¶¶262-270); (iii) documents describing Qorvo's requirements and traceability procedures (*id*., ¶¶271-277); and (iv) documents reflecting Qorvo's test plans and parameters (*id*., ¶¶279-281). For each type of document, Dr. Shanfield identified the specific information that was not generally known or readily ascertainable. *See, e.g.*, *id*., ¶¶263-269 (identifying Qorvo's ███████ for developing BAW filter products as not generally know, with pin cites reflecting that specific procedure).

### 3.    Qorvo Systems, Processes, and Procedures for Testing Reliability and Mean-Time-to-Failure (Group 6)

Dr. Shanfield next analyzed a confidential presentation concerning Qorvo's techniques for reliability and mean-time-to-failure ("MTTF") testing for BAW filters. Shanfield Decl., Ex. A, ¶¶322-368. Akoustis obtained the presentation in 2018 from a former Qorvo employee. The presentation was then widely circulated at Akoustis, including to the Chief Product Officer (Houlden), the Executive Vice President of Business Development (Aichele), the Director of Business Systems (Pat Lewis), and the Vice President of Quality (Morgan), who was tasked with developing reliability and MTTF testing at Akoustis. Exs. WW; XX; YY; ZZ. Akoustis used

████████████████████████

Qorvo's document to build its reliability testing program, with Mr. Morgan stating in 2019: "This is the primary document I have been referencing regarding methodology for 4 temp testing / MTTF determination." Ex. CC.

Dr. Shanfield provided a detailed, slide-by-slide analysis of the confidential reliability testing presentation. As with other confidential documents found at Akoustis, Dr. Shanfield identified the specific information found on each slide that was not publicly available or readily ascertainable. For example, Dr. Shanfield explained that slides 3, 21, 22, and 24 of the Qorvo reliability presentation disclose ██████████████████ providing estimates of mean-time-to-failure ("MTTF"). Shanfield Decl., Ex. A, ¶331. Dr. Shanfield then explained the ████████████████████████ *Id.*, ¶¶331-332; *see also id.*, ¶¶325-352 (identifying specific information of other slides that was both valuable and not generally known).

### 4.    Qorvo Manufacturing, Assembly, and Change Procedures (Group 7)

Dr. Shanfield next analyzed confidential documents found at Akoustis concerning Qorvo's manufacturing, assembly, and change procedures—documents concerning (i) product branding; (ii) product inspection; (iii) product assembly; (iv) "reflow" conditioning; (v) package qualification; and (vi) engineering change procedures. Shanfield Decl., Ex. A, ¶¶369-416. Dr. Shanfield again reviewed the confidential documents at issue and identified the specific information in each document that was not publicly available or readily ascertainable. *See id.* Dr. Shanfield explained why that specific information was valuable. *See id.* Dr. Shanfield also explained how Akoustis used the confidential Qorvo documents to short-cut the process of building its own manufacturing, assembly, and change procedures. *See id.*, ¶¶396-416.

### 5.    Qorvo Product Roadmaps and Prototypes (Group 8)

Dr. Shanfield next analyzed the confidential documents found at Akoustis concerning Qorvo's product roadmaps and prototypes. Shanfield Decl., Ex. A, ¶¶417-505. Dr. Shanfield

opined that "[o]btaining advanced information about the products that a company has under development—i.e., before the product is release publicly—is very valuable to competitors" because they can (i) save the time and resources necessary to perform their own market intelligence; (ii) dedicate resources to meet the schedule and performance of a competitor; (iii) devise strategies to offer differentiated products. *Id.*, ¶423. Dr. Shanfield opined that confidential information about the products Qorvo had under development was particularly valuable to Akoustis because it did not have the resources to perform the type of market research that Qorvo performs to build its product roadmaps. *Id.*, ¶424. Akoustis thus engaged in a continuous campaign to obtain confidential information about the products Qorvo had under development. *Id.*, ¶¶417-505. Akoustis was particularly focused on leveraging "private channels" and "personal relationships" in China and Korea to obtain Qorvo's information, even sanctioning its employees in paying bribes to get "key confidential information." *See* Exs. Q, R.

In performing his analysis, Dr. Shanfield identified five areas where Akoustis obtained confidential information about the products Qorvo had under development: (i) Qorvo's 5GHz BAW filters (Shanfield Decl., Ex. A, ¶¶442-468); (ii) Qorvo's Wi-Fi 6 products (*id.*, ¶¶469-476); (iii) Qorvo's automotive filters (*id.*, ¶¶477-493); (iv) Qorvo's "Band 41" filters (*id.*, ¶¶494-498); (v) Qorvo's 5G cellular products (*id.*, ¶¶499-505). For each type of product, Dr. Shanfield identified the specific confidential documents that Akoustis obtained and identified the information in each of those documents that was not generally known or readily ascertainable (e.g., anticipated product performance, product development and launch timelines). *See id.*, ¶¶442-505.

### G.   Akoustis Serves Three Expert Reports Addressing Trade Secrets

On December 20, 2023, Akoustis served three expert reports addressing Dr. Shanfield opinions. Dr. Robert Darveaux opined that the information Dr. Shanfield identified in trade secret groups 2-7 was generally known and not useful to Akoustis. Ex. AAA, at ¶¶72-292. For example,

Dr. Darveaux opined that "all of the Information Categories in the Qorvo Documents that Dr. Shanfield opines are trade secrets were generally known in the industry and available from public sources" and "much of the information in the Qorvo Documents was not useful to Akoustis." *Id.*, at ¶¶67-68. Dr. Clark Nguyen offered similar opinions on trade secret groups 2 and 3. *See* Ex. BBB, at ¶¶101-145. Dr. Nguyen opined, for example, that "Dr. Shanfield specifies various information that Qorvo considers trade secrets" but "this information appears to be well known in the industry, some of it for decades" and "Akoustis does not use the concepts described in Qorvo's documents." *Id.*, at ¶128. Dr. Michael Lebby addressed the information in trade secret groups 1 and 8, again opining that the information Dr. Shanfield identified in those groups was generally known and not useful to Akoustis. Ex. CCC, at ¶¶81-112. For example, Dr. Lebby opined: "the information that he [Dr. Shanfield] opined were trade secrets were actually widely known" and "much of the information could not have been used by Akoustis."[8] *Id.*, ¶81.

### H.   Akoustis Engages New Counsel and Argues for First Time that Qorvo Failed to Identify Trade Secrets Seven Months After Disclosures

On October 26, 2023—after Qorvo's initial, first supplemental, and second supplemental trade secret disclosures—a new law firm entered an appearance on behalf of Akoustis in this case. D.I. 371. On November 22, 2023, the day after Qorvo served Dr. Shanfield's expert report, Akoustis's new counsel sent an email tagged "urgent" challenging for the first time the sufficiency of Qorvo's trade secret disclosures. DeFosse Decl., ¶3. On November 28, 2023, counsel conferred. Akoustis's new counsel asserted that Qorvo had only disclosed "categories" of trade secrets and failed to identify any specific information that Qorvo alleged to qualify as a trade secret. *Id.*, ¶4.

---

[8] Dr. Lebby also purported to adopt and agree with the opinions of Dr. Darveaux and Dr. Nguyen on the information in trade secret groups 2-7. Ex. CCC (Lebby Rpt.), ¶¶113-114. Qorvo has moved to exclude those duplicative opinions of Dr. Lebby. *See* D.I. 453; 454.

Qorvo responded first that it was improper for Akoustis to wait until after the close of discovery and service of opening expert reports to suddenly argue for the first time that Qorvo's trade secret disclosures were insufficient. *Id.* Qorvo next explained that its disclosures were reasonably particular—Qorvo (i) identified the specific information it asserts as trade secrets; (ii) cited specific documents found at Akoustis disclosing that information; and (iii) served a 500-page expert report walking through those documents and identifying the specific trade secret information. Following the parties' conference, Akoustis did not file a motion with the Court seeking to strike Qorvo's disclosures or compel further disclosures. *Id.* Instead, Akoustis waited two months and recycled its "urgent" concern into a motion for summary judgment.

### I.      Infringement Analysis of Akoustis BAW Filters

In addition to its trade secret claims, Qorvo has also accused Akoustis of infringing two Qorvo patents—U.S. Patent Nos. 7,522,018 and 9,735,755. During discovery, Qorvo asked Akoustis to (i) identify the BAW filters that Akoustis has sold; (ii) produce documents showing the structure of those products; and (iii) provide samples of the products. Exs. DDD, at 9; EEE, at 5. Qorvo provided this information to its technical experts for the purpose of conducting an infringement analysis. On June 15, 2023, Qorvo served its final infringement contentions, which were based on the materials that Akoustis produced in discovery. Ex. FFF.

Qorvo separately asked Akoustis to identify any allegedly acceptable non-infringing alternatives. Ex. DDD, at 18. Prior to the final infringement contentions, Akoustis identified various hypothetical products that Akoustis contended would not infringe the asserted patents. Akoustis affirmatively stated that those hypothetical products were not on the market. *Id.*, at 19-20. On July 21, 2023, five weeks after the final infringement contentions, Akoustis served a short supplemental interrogatory response stating that *samples* of certain allegedly noninfringing alternatives had been "sold in commerce." *Id.*, at 20-21 (identifying samples 30, 31 and 34).

███████████████████████████████████

Akoustis did not provide any details on the purported sales. *Id.* For example, Akoustis did not update its other discovery responses to identify the date of the sales, the volume of the sales, or the customers to whom the samples were sold. *See id.*, at 10-11. Nor did Akoustis indicate that it had ceased production of the accused products in favor of the allegedly noninfringing alternatives. *See id.*, at 10-11, 19-22. In September and October 2023, Akoustis produced still further samples of allegedly non-infringing alternatives. *See id.*, at 21-22. Akoustis did not indicate whether those samples were ever sold on the market. *Id.*

**J.       Akoustis's Falsely Advertises "Single Crystal" Products**

After founding Akoustis in May 2014, Dr. Shealy determined that "we needed to get some IP filed." Ex. GGG, 85:1-21. Dr. Shealy's perspective was: ███████████████████

████████████████████████████████████████

███████████████████████████████████ *Id.*, 83:3-84:9. Within a month of founding Akoustis, Dr. Shealy had filed multiple patent applications claiming inventions related to "single crystal" technology. *See* Exs. HHH; III (June 6, 2014 patent applications).

Akoustis made "single crystal" technology the centerpiece of its marketing strategy. In particular, Akoustis used the purported performance benefits of "single crystal" as a way to differentiate itself from its competitors: "[W]hat you have to look at is you bring technology to market is how can you differentiate, you know, because obviously, you know, we're a startup company. If you're not differentiating, you're not going to get anywhere." Ex. JJJ, at 51:9-21.

While Akoustis performed experiments with single crystal technology, Akoustis was never able to manufacture a commercially viable single crystal product. *See, e.g.*, *id.*, 54:23-55:1 (Akoustis experimented with signal crystal technology for AKF-1938, but went into production with polycrystal products); *id.*, 269:10-271:5 ███████████████████

███████████████ *id.*, 58:13-25 (explaining "difficulties with single crystal"). Moreover,

███████████████████████████████████

████████████████ Akoustis's "single crystal" technology actually **under-performed** the polycrystalline technology. *See* Exs. LLL; MMM, at AKTS_00246460 ██████████████████

███████████████████████████████████████████████

█████████████████. By 2018, Akoustis's CEO had decreed █████████████████████

████████████████████████████. Ex. NNN, at AKTS_00080811. As Mr. Aichele explained, "when we found that the polycrystalline, you know, worked, you know, we decided to make the transition, you know, from single crystal to poly." Ex. JJJ, at 58:13-25.

Despite making the decision internally to transition to polycrystalline products, Akoustis continued to promote its products on the market as using purportedly superior "single crystal" technology. For example, the following was a common graphic in Akoustis marketing materials purporting to differentiate Akoustis products from others in the market:



Ex. E, at AKTS_00000214; *e.g.,* Ex. UUU, at AKTS_00024320 (January 2019 presentation: "We design and manufacture patented single crystal based BAW filters."); *id*. at AKTS_00024323 ("Why single crystal materials for BAW? … this is the innovation part of the company. It's high

power handling, high mechanical coupling in high sound velocity.").

Akoustis's advertising caused confusion in the market place. For example, Akoustis produced a market analysis report prepared in July 2021. At that point, Akoustis had never reached commercial production with any "single crystal" product and all of the Akoustis products referenced in the market report—A10155, AKF-1256, and A10165—were polycrystalline products. The market report, however, nonetheless stated that Akoustis uses "single crystal piezo" and asserted that the Akoustis "single crystal BAW" technology "seems to increase performances facing poly-crystal BAW." Ex. OOO, at AKTS_01039472, AKTS_01039474; *e.g.*, *id.* at AKTS_01039462 ("Akoustis had the idea to make a filter device based on a single crystal piezoelectric with the best performance on the market").

## III.   ARGUMENT

### A.   Akoustis Misappropriated Qorvo's Trade Secrets

Akoustis seeks summary judgment on Qorvo's trade secret misappropriation and civil conspiracy claims (Counts VI, VIII, and IX) on the grounds that Qorvo (i) failed to identify its trade secrets with reasonable particularity; and (ii) failed to significantly reduce its trade secret claims for trial. D.I. 443 ("AKTS Br.") at 12-18. Both arguments lack merit.

#### 1.   Qorvo identified its trade secrets with reasonable particularity

To prevail on its misappropriation claims, Qorvo must establish the existence of a trade secret. *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021). This requires Qorvo to come forward with evidence identifying the alleged trade secrets with a "reasonable degree of…specificity" such that a "jury could find that" Qorvo "established each statutory element of a trade secret." *Dow Chemical Canada, Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 346 (D. Del. 2012).

Qorvo has identified the asserted trade secrets in this case with specificity. Qorvo served trade secret disclosures in May 2023, July 2023, and October 2023. In each of those disclosures,

Qorvo enumerated groups of trade secrets, identified the specific information within those groups that Qorvo claims as trade secrets, and provided pin cites to the specific documents evidencing the trade secrets. ***Akoustis never challenged the specificity of those identifications.*** On November 17, 2023, Qorvo identified a subset of those previously-identified trade secrets, dividing them into ten groups that Qorvo intends to assert at trial.  For each group, Qorvo identified both pin cites to the trade secrets and the specific information Qorvo claims as a trade secret. *See* Part II.E. On November 21, 2023, Qorvo served Dr. Shanfield's expert report, which walks through trade secret groups 1-8, analyzes the confidential Qorvo documents found in Akoustis's files, and identifies the specific information that was not generally known or readily ascertainable. *See* Part II.F.

The level of "specificity" with which Qorvo identifies the asserted trade secrets is more than sufficient to allow a jury to assess whether the information Akoustis stole from Qorvo meets the statutory elements of a trade secret. Indeed, courts have repeatedly held that trade secrets are reasonably particular based on similar or less detailed evidence. *See, e.g.*, *Oakwood*, 999 F.3d at 907 (trade secrets identified with reasonable particularity where plaintiff "gave a very precise example by pointing to a particular document . . . and specified the contents of that document as containing trade secrets"); *SMH Enterprises, L.L.C. v. Krispy Krunchy Foods, L.L.C.*, 2021 WL 4460522, at *14 (E.D. La. Sept. 29, 2021) ("[P]laintiff provided specific excerpts of source code, architectural design, database structure, and/or algorithms used to implement these purported trade secrets. By pointing to 'tangible trade secret material,' the sort of 'information' protected under the DTSA . . . plaintiff has satisfied the requirement that it identify the alleged trade secret with 'sufficient particularity'."); *MicroVention, Inc. v. Balt USA, LLC*, No. 20-cv-02400, 2023 WL 4316880, at *6 (C.D. Cal. May 3, 2023) (plaintiff identified trade secrets with reasonable particularity when it "identified thousands of documents by Bates numbers or other methods").

████████████████████████████

Akoustis makes virtually no effort to engage with the evidence that Qorvo has identified as containing its trade secrets. Akoustis does not analyze the May, July, or October trade secret disclosures; Akoustis fails to address 102 out of the 104 trade secrets identified in Qorvo's November disclosure; Akoustis does not address any of the documents that Qorvo cited as evidence of the existence of the asserted trade secrets; and, perhaps most importantly, Akoustis does not address the detailed analysis set forth in Dr. Shanfield's report. Having entirely ignored the evidence that Qorvo already cited, Akoustis fails to carry its burden of showing the absence of any genuine issues of material facts. *See, e.g.*, *MicroVention, Inc. v. Balt USA, LLC*, No. 20-cv-02400, 2023 WL 4316880, at *6 (C.D. Cal. May 3, 2023) ("[A]t summary judgment…the defendant…bears the burden of showing that there is no genuine dispute of fact as to whether the plaintiff has defined the trade secrets with sufficient particularity."); *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 169 (D. Mass. 2023) (same).

The two "examples" that Akoustis cherry-picks from Qorvo's November disclosure (*see* AKTS Br. 15-16) only confirm that Qorvo has identified its trade secrets with specificity. In the first example, Qorvo identified "Qorvo's research ████████████████████████████ ████████████████████" as a trade secret. D.I. 447, Ex. 5 at 3. Qorvo cited to the specific document that discloses the research. *Id.* In his report, Dr. Shanfield opines that slides 2-6 of that presentation disclose specific research results that were not generally known or readily ██████████████████ █████████████████████ improve certain performance metrics of 5GHz BAW filters (Qp and spurious modes). Shanfield Decl., Ex. A, ¶¶127-128. Dr. Shanfield also reviewed the evidence showing that Akoustis used this research—e.g., that Mr. Houlden copied the presentation two days before leaving Qorvo and, upon arriving at Akoustis, provided the presentation to the Akoustis engineer tasked with developing Akoustis's 5GHz resonators. *Id.*, ¶¶156-173. Dr. Shanfield

███████████████████████████████████████████████

explained that Qorvo's research was particularly valuable to Akoustis because Akoustis was having difficulty with the same performance metrics addressed in the research. *Id.*, ¶¶172-173. Akoustis's assertion that the trade secret is so vague as to be meaningless is meritless. Akoustis's experts understood this asserted trade secret and provided their assessment as to why Qorvo's research does not meet the statutory elements of a trade secret. *See* Ex. AAA, ¶74; Ex. BBB, ¶107.

Akoustis's second example is equally meritless. Qorvo identified "Qorvo's template and rules for evaluation board ████████████████████████████ as a trade secret. D.I. 447, Ex. 5 at 6. Qorvo cited the document that includes ███████████████. *Id*. In his report, Dr. Shanfield analyzed the document and explained ███████████████ disclosed therein—that it is optimal to design an EVB using ████████████████████████████ ████████████ Shanfield Decl., Ex. A, ¶¶227-228. Akoustis's expert understood the alleged trade secret, but disagreed with Dr. Shanfield's opinion that it meets the statutory elements of a trade secret. Ex. AAA, ¶ 128.

Instead of addressing the evidence that Qorvo has cited, the centerpiece of Akoustis's summary judgment argument is the mantra that Qorvo's asserted trade secrets are "so vague" that "Dr. Shanfield testified that he would have to speculate as to their meaning." Dr. Shanfield said no such thing. During his deposition, Akoustis asked Dr. Shanfield about the significance Qorvo's November trade secret. Ex. PPP 150:19-151:8. Dr. Shanfield, who is not a lawyer and did not prepare the pleading, refused to speculate about the pleading. *Id.* Instead, Dr. Shanfield repeatedly offered to discuss the analysis of the asserted trade secrets in his report—"I identified trade secrets in detail in my report, and I would be happy to talk about those." *Id*.

Finally, Akoustis asserts that the asserted trade secrets in this case are the "paradigm" of trade secrets courts have rejected. AKTS Br. 16-17. **None of the cases Akoustis cites supports**

**this proposition**. In *NEXT Payment Solutions, Inc. v. Clearesult Consulting, Inc.*, No. 17-cv-8829, 2020 WL 2836778 (N.D. Ill. May 31, 2020), the court granted summary judgment because the plaintiff identified its trade secrets as generic tasks performed by a software program. *Id.* at *14. The trade secrets Qorvo identified here are not even remotely comparable to claiming the function of "processing data" as a trade secret. In *Arconic Inc. v. Novelis Inc.*, No. 17-cv-1434, 2020 WL 7247112 (M.D. Pa. Dec. 9, 2020), the court granted summary judgment because the plaintiff identified its trade secrets as 288 possible combinations of 16 "parameters" and 6 "steps" related to the pretreatment of aluminum. *Id*. at *17. But plaintiff admitted that all of the parameters and steps were generally known and never "separated its claimed trade secrets from the admittedly public information." *Id.* Here, Qorvo has not identified its trade secrets as compilations of public information. In *IDX Systems Corp. v. Epic Systems Corp.,* 285 F.3d 581 (7th Cir. 2002), the plaintiff identified its entire software program as a trade secret and cited the "complete documentation for the software" as support. *Id*. at 583-584. The Seventh Circuit held that "a plaintiff must do more than identify the kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *Id*. at 584. Unlike the plaintiff in *IDX*, Qorvo has identified specific and concrete information as trade secrets (*e.g.*, Qorvo's research on ███████████████████████ provided pin cites to confidential Qorvo document reflecting that information (e.g., slides 2-6 of the ████████████████ presentation), and served Dr. Shanfield's detailed analysis of the alleged trade secrets. Akoustis has not cited (and cannot cite) any case where such a disclosure was deemed to be insufficient.

### 2.    Qorvo narrowed the trade secrets it will present at trial

Akoustis also argues that Qorvo "makes a mockery" of the Court's order to significantly reduce its trade secret claims. AKTS Br. 15. Not so. Qorvo has identified ten trade secret groups that include 104 specific trade secrets. That is a significant reduction from the 85 groups and 397

trade secrets that Qorvo disclosed prior to November. Contrary to Akoustis's arguments, proceeding with the asserted will not create "a trial management nightmare" (AKTS Br. at 1). Qorvo has grouped the trade secrets together so that they can be more easily presented to the jury along common themes and in terms of how Akoustis benefited from the misappropriation to accelerate its entry into the market. Moreover, presentation of the trade secrets will be streamlined because many of the asserted trade secrets relate to the same confidential documents that Akoustis stole from Qorvo. For example, trade secret group 2 (Qorvo's BAW Filter and Resonator Designs) encompasses 25 specific trade secrets, but those trade secrets are found in three confidential Qorvo presentations. Similarly, trade secret group 6 (Qorvo Systems, Processes, and Procedures for Testing Reliability and Mean-Time-to-Failure) encompasses 32 specific trade secrets, but all of those trade secrets are found in the same confidential Qorvo presentation.

Akoustis's argument also lacks legal support. Akoustis does not cite a single case where a court granted summary judgment because the plaintiff identified too many misappropriated trade secrets. Indeed, Akoustis's assertion is repugnant—that it stole so many Qorvo documents (nearly 500,000) and so many Qorvo trade secrets that it should get a free pass for its illegal activities.

### B.    Akoustis Falsely Advertised Products as "Single Crystal"

Akoustis seeks summary judgment on Qorvo's false advertising claim (Count III) on the grounds that (i) Akoustis's statements concerning its "single crystal" products were true; (ii) there is no evidence of market confusion; and (iii) there is no evidence the "single crystal" statements were material. Akoustis is wrong on each count.

### 1.    Akoustis's advertisements were false

Akoustis first argues that it was free to advertise its products as using superior "single crystal" technology because, prior to 2018, Akoustis "shipped and/or sold pre-preproduction prototypes" to three customers that were single-crystal. AKTS Br. 19. That assertion is wrong on

multiple levels. The evidence in this case shows that (i) Akoustis was never able to produce a commercially viable single crystal product (Ex. JJJ, 54:23-55:1, 269:10-271:5); (ii) Akoustis thus transitioned to instead making polycrystalline products (*id.*, 58:13-25); but (iii) Akoustis nonetheless continued advertising its products as "single crystal," including products that are polycrystalline (Ex. E, at AKTS_00000195 (February 2019 presentation claiming to manufacture single crystal productions, including 5.2 GHz, 5.6 GHz, and 3.8 GHz BAW filters, none of which were single crystal)).  Shipping "pre-production prototypes" of single crystal filters prior to 2018 did not give Akoustis carte blanche to advertise products (e.g., 5GHz filters) as single crystal when they were, in fact, polycrystalline.  Evidence also shows that Akoustis continued to falsely claim that "single crystal" products have superior performance even after test results showed the opposite. *Compare id.* at AKTS_00000202 (February 2019 presentation claiming single crystal materials have better power handling) *with* Ex. MMM, at AKTS_00246459-60 (██████████ ███████████ single crystal product performed had worse power handling than polycrystalline product). As such, genuine disputes of material fact exist as to the truth of Akoustis's single crystal advertisements.

### 2.      Akoustis's advertisements caused confusion in the market

Akoustis next argues that there is no evidence that its "single crystal" statements had the tendency to deceive. AKTS Br. 19-20. But the evidence in this case indicates that there was confusion in the market concerning Akoustis's products. For example, a July 2021 market report discussing three polycrystalline Akoustis products incorrectly reported that Akoustis products used single crystal technology. Ex. OOO, at AKTS_01039474. A 2019 report made a similar mistake, incorrectly stating that, "[u]nlike its competitors," Akoustis uses "high-purity single crystal AlN

films" for its products.[9] Ex. QQQ, at QORVO_00012785; *e.g.*, Ex. RRR, at AKTS_00171041 (evidencing that Akoustis customer ███████ understood Akoustis was selling single crystal products with high power handling).

### 3.    Akoustis's false statements were material

Akoustis next argues that "the record is devoid of evidence that statements about single crystal technology were material to customers' purchasing decisions." AKTS Br. 20. Not so. Mr. Aichele, the Vice President of Business Development at Akoustis, explained why the "single crystal" advertising was so critical to Akoustis in breaking through with customers: "[W]hat you have to look at is you bring technology to market is how can you differentiate, you know, because obviously, you know, we're a startup company. If you're not differentiating, you're not going to get anywhere. So I was looking at what the advantages, you know, in the single crystal would have from [a] performance standpoint." Ex. JJJ, at 51:15-21; *see also* Ex. H, at 157:21-158:1 ("[A] lot of the investment we made in the piezo materials, you know, to the equipment to the process, to the IP was around single crystal. And that's what we were, you know, differentiating against others in the industry at the time."). Mr. Aichele also indicated that the claims Akoustis was making about single crystal products having better performance were material. Ex. H, at 171:15-18 (testifying that claims of better power handling are significant: "I mean this is a significant technology advantage that we have with single-crystal, so we're going to be promoting the heck out of it.").

---

[9] Akoustis also argues that summary judgment is appropriate because Qorvo did not submit consumer survey evidence. AKTS Br. 19-20. But courts have held that such evidence is not required. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 587 (3d Cir. 2002) ("When consumer deception can be determined by examining the . . . advertising on its face, the plaintiff is excused from the burden of demonstrating actual deception through the use of a consumer survey.")

### C.      Akoustis Engaged in Unfair Trade Practices

Akoustis seeks summary judgment on Qorvo's unfair trade practices claim (Count V), arguing that the claim fails (i) for the same reasons as the trade secret and false advertising claims; and (ii) because Akoustis did not systematically hire former Qorvo employees to obtain confidential information.  Again, Akoustis's arguments should be rejected.

Akoustis first asserts that summary judgment should be granted on the unfair competition claim "for the same reasons" as the trade secret claims. This argument has no merit. Even if Qorvo did not identify its trade secrets with "reasonable particularity" (it did), Qorvo has still identified evidence that Akoustis stole nearly 500,000 Qorvo documents and used those documents to accelerate its entry into the market. *See* Part II.C.-F. These facts give rise to an independent claim of unfair competition under North Carolina law. *See Bridgetree, Inc. v. Red F Mktg. LLC*, No.10-cv-00228, 2013 WL 443698, at *9-11 (W.D.N.C. Feb. 5, 2013) (separately instructing jury on trade secret and unfair competition claims and holding that "the evidence presented at trial indicating that Defendants discussed and implemented a business and employment plan to copy and use Plaintiff's confidential information satisfies the requisite element to show they committed an unfair or deceptive act or practice under North Carolina law").

Akoustis also argues that summary judgment is warranted because Akoustis merely engaged in the "routine hiring" of employees. AKTS Br. 26. The evidence indicates otherwise. Akoustis systematically targeted Qorvo employees with the intention of harming Qorvo. *See, e.g.*, Ex. K, at AKTS_00116274 ("Lora and I have Mike hitting Qorvo very hard right now, calling nearly every baw DE [Device Engineer]"); Ex. SSS, at AKTS_00221812 ("must be time to bend Qorvo over the barrel again, LOL"); Ex. GG, 129:16-22 ("[I]t seemed like Rowland [Houlden], when he came onboard, was only recruiting Qorvo folks is what it seemed like to me . . . and anytime you lose an engineer at a company, it hurts the company, right. . . . It obviously doesn't

look good for Qorvo if he's constantly taking employees."). Ultimately, Akoustis hired dozens of former Qorvo employees, placing many of those employees in key positions at Akoustis. Those employees then systematically shared large quantities of Qorvo's confidential information with Akoustis. *See* Part II.C. These activities cannot be minimized as merely the routine practice of hiring employees "with experience."

### D. Akoustis Is Not Entitled to a Declaration that its "Alternative" Designs Are Non-Infringing

Five weeks after Qorvo served its final infringement contentions, Akoustis served a supplemental interrogatory response stating for the first time that it had sold *samples* of certain allegedly non-infringing alternative products. *See* Part II.I., above. Akoustis now argues that it is entitled to "summary judgment" that the newly sold samples do not infringe the '755 patent because Qorvo did not file a motion seeking leave to amend its final infringement contentions to address the newly sold samples. Akoustis fails to cite **any authority** supporting its request. *See* AKTS Br. 29-30. The new/redesigned sample products are outside the scope of this case. They were not on-sale when the case was filed, nor when the final infringement contentions were served. As such, those new designs are not included in the products currently accused of infringement.

### E. Qorvo Will Not Pursue its RICO or Patent Marking Claims at Trial

Following the Court's claim construction order, Qorvo informed Akoustis that Qorvo would not pursue its patent marketing claims. In an effort to further streamline this case for trial, Qorvo will also voluntarily relinquish its RICO claim.

## IV. CONCLUSION

Qorvo respectfully requests that the Court deny Akoustis's motion for partial summary judgment with respect to Count II, III, V, VI, VIII, and IX. Qorvo does not oppose summary judgment on Count IV (false patent marking) or Court VII (RICO).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Eric K. Gill
Zachary Alper
Theodore Mayer
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

James C. Wald
Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

February 20, 2024

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Qorvo, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 20, 2024, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                    *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Ronald S. Lemieux, Esquire                       *VIA ELECTRONIC MAIL*
David S. Elkins, Esquire
Victoria Q. Smith, Esquire
SQUIRE PATTON BOGGS (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA  94304-1216
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)