# Exhibits Y-FF
# (Redacted in Their Entirety)

# Exhibit GG



# Transcript of Michael Hodge, II

**Date:** July 11, 2023
**Case:** Qorvo, Inc. -v- Akoustis Technologies, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2                      For the
 3             DISTRICT OF DELAWARE
 4
 5   QORVO, INC.,
 6       Plaintiff,           Case No.
 7   V.                       1:21-cv-01417-JPM
 8   AKOUSTIS TECHNOLOGIES, INC.
 9   And AKOUSTIS,
10       Defendants.
11   _____/
12
13
14
15          The deposition of MICHAEL HODGE, II, taken
16   at the instance of the Defendants pursuant to stipulations
17   contained herein; the reading and signing of the deposition
18   reserved before Tamika Burnette, Certified Court Reporter,
19   at 9:00 a.m., on July 11, 2023, at 10130 Perimeter Parkway,
20   Suite 200, Charlotte, North Carolina  28216.
21
22
23
24
25
```

**Page 2**

```
 1                 APPEARANCE PAGE
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4   SHEPPARD MULLIN RICHTER & HAMPTON, LLP
 5   BY:  Mr. Jonathan DeFosse, Esquire
 6        2099 Pennsylvania Avenue, Northwest
 7        Suite 100
 8        Washington, DC  20006
 9        (202) 747-1900
10        Jdefosse@sheppardmullin.com
11
12   SHEPPARD MULLIN RICHTER & HAMPTON, LLP
13   BY:  Mr. Eric K. Gill, Esquire
14        12275 El Camino Real
15        Suite 200
16        San Diego, California  92130
17        (858) 720-8900
18        Egill@sheppardmullin.com
19
20
21
22
23
24
25
```

**Page 3**

```
 1            APPEARANCE PAGE CONTINUED
 2
 3   ON BEHALF OF THE DEFENDANT:
 4   PILLSBURY WINTHROP SHAW PITTMAN, LLP
 5   BY:  Mr. David A. Jakopin, Esquire
 6        2550 Hanover Street
 7        Palo Alto, California  94304
 8        (650) 233-4790
 9        David.jakopin@pillsburylaw.com
10
11   PILLSBURY WINTHROP SHAW PITTMAN, LLP
12   BY:  Ms. Theresa A. Roozen, Esquire
13        1200 Seventeenth Street, Northwest
14        Washington, DC  20036
15        (202) 663-8185
16        Theresa.roozen@pillsburylaw.com
17
18   ALSO PRESENT:
19   Melody Adair, Videographer
20
21
22
23
24
25
```

**Page 4**

```
 1                    INDEX PAGE
 2
 3   WITNESS                                    PAGE
 4   MICHAEL HODGE, II
 5         EXAMINATION BY MR. DEFOSSE           8
 6         EXAMINATION BY MR. JAKOPIN           170
 7         EXAMINATION BY MR. DEFOSSE           216
 8         EXAMINATION BY MY. JAKOPIN           229
 9
10                    EXHIBITS
11
12   EXHIBIT             DESCRIPTION            PAGE
13   EXHIBIT NO. 1       DEPOSITION TRANSCRIPT  11
14   EXHIBIT NO. 2       NOTICE                 19
15   EXHIBIT NO. 3       LETTER                 21
16   EXHIBIT NO. 4       LETTER                 81
17   EXHIBIT NO. 5       QORVO FILTER DESIGN    85
18   EXHIBIT NO. 6       COMPOSITE EXHIBIT      90
19   EXHIBIT NO. 7       COMPOSITE EXHIBIT      90
20   EXHIBIT NO. 8       MEETING REQUEST        91
21   EXHIBIT NO. 9       AUTOMATED TEST PLAN    95
22   EXHIBIT NO. 10      SPREADSHEET            108
23   EXHIBIT NO. 11      A10252                 110
24   EXHIBIT NO. 12      PRODUCT OVERVIEW       113
25   EXHIBIT NO. 13      TEAM CHAT DIALOGUE     126
```

**5**

INDEX PAGE CONTINUED:

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT NO. 14 | E-MAIL CHAIN | 132 |
| EXHIBIT NO. 15 | E-MAIL CHAIN | 136 |
| EXHIBIT NO. 16 | 2018 TEAMS CHAT | 141 |
| EXHIBIT NO. 17 | E-MAIL CHAIN | 154 |
| EXHIBIT NO. 18 | TESTING PROCEDURES | 156 |
| EXHIBIT NO. 19 | RESUME | 171 |
| EXHIBIT NO. 20 | NDA AGREEMENT | 171 |
| EXHIBIT NO. 21 | FORM AGREEMENT | 172 |
| EXHIBIT NO. 22 | BATES 427862 | 172 |
| EXHIBIT NO. 23 | E-MAIL CHAIN | 174 |
| EXHIBIT NO. 24 | E-MAIL CHAIN | 174 |
| EXHIBIT NO. 25 | E-MAIL CHAIN | 176 |
| EXHIBIT NO. 26 | PUBLICATION | 177 |
| EXHIBIT NO. 27 | BATES 110963 | 179 |
| EXHIBIT NO. 28 | E-MAIL CHAIN | 181 |
| EXHIBIT NO. 29 | E-MAIL CHAIN | 183 |
| EXHIBIT NO. 30 | E-MAIL CHAIN | 184 |
| EXHIBIT NO. 31 | PUBLICATION | 184 |
| EXHIBIT NO. 32 | PUBLICATION | 186 |
| EXHIBIT NO. 33 | PATENT | 187 |
| EXHIBIT NO. 34 | PATENT | 188 |
| EXHIBIT NO. 35 | PATENT | 189 |

**6**

INDEX PAGE CONTINUED:

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT NO. 36 | PATENT | 190 |
| EXHIBIT NO. 37 | PATENT APPLICATION | 190 |
| EXHIBIT NO. 38 | PATENT APPLICATION | 192 |
| EXHIBIT NO. 39 | SLIDES | 193 |
| EXHIBIT NO. 40 | E-MAIL CHAIN | 193 |
| EXHIBIT NO. 41 | E-MAIL CHAIN | 195 |
| EXHIBIT NO. 42 | E-MAIL CHAIN | 196 |
| EXHIBIT NO. 43 | E-MAIL CHAIN | 197 |
| EXHIBIT NO. 44 | TRIM PLAN | 200 |
| EXHIBIT NO. 45 | 1252 VERSION | 202 |
| EXHIBIT NO. 46 | E-MAIL CHAIN | 204 |
| EXHIBIT NO. 47 | E-MAIL CHAIN | 208 |
| EXHIBIT NO. 48 | E-MAIL CHAIN | 209 |
| EXHIBIT NO. 49 | E-MAIL CHAIN | 212 |
| EXHIBIT NO. 50 | E-MAIL CHAIN | 213 |
| EXHIBIT NO. 51 | PRESENTATION | 214 |
| EXHIBIT NO. 52 | E-MAIL CHAIN | 214 |

**7**

Tuesday, July 11, 2023
9:00 a.m.

*       *       *

THE VIDEOGRAPHER:  Here begins Media Number 1 in the videotaped deposition of Michael Hodge, II, in the matter of Qorvo, Inc, vs. Akoustis Technologies Incorporated and Akoustis Incorporated in the United States District Court, district of Delaware; case Number 1:21-CV-01417-JPM.

Today's date is July 11, 2023.  The time on the video monitor is 9:13 a.m.  The videographer today is Melody Adair, representing Planet Depos.  This deposition is taking place at Regus Business Solutions.

Would counsel please voice-identify themselves and state whom they represent.

MR. DEFOSSE:  Good morning.  Jonathan DeFosse from Sheppard Mullin on behalf of Qorvo Inc.  With me today is also Eric Gill, also from Sheppard Mullin.

MR. JAKOPIN:  David Jakopin from Pillsbury Winthrop Shaw Pittman representing Akoustis.  Also with me today is Theresa Roozen, my colleague.

THE VIDEOGRAPHER:  The court reporter today is Tamika Burnette, representing Planet Depos.

**8**

I will swear in the witness, and then we may proceed.

Witness, can you please raise your right hand?

MICHAEL HODGE, II,
Called as a witness, having first been duly sworn in, testified as follows:

DIRECT EXAMINATION
BY MR. DEFOSSE:

Q.  Good morning, Mr. Hodge.

**A.  Good morning.**

Q.  As you heard, my name is John DeFosse, we met off the record.  I represent Qorvo in this matter, the plaintiff.

**A.  Okay.**

Q.  Could you state your full name for the record, please?

**A.  Full name is Michael David Hodge, II.**

Q.  You understand that you're testifying today under oath?

**A.  Yes.**

Q.  And that's the same oath that you would take if you were in a court of law?

**A.  Yes.**

Transcript of Michael Hodge, II
Conducted on July 11, 2023

7 (25 to 28)

25

1  A.  Yes.  I started as device engineer, just
2  because we were trying to build a technology at the
3  time, so I was try -- working on that and then
4  transitioned over to a design -- filter design engineer.
5  Q.  And did you hold the position of filter design
6  engineer at the time you left the company?
7  A.  No -- oh, sorry.  So I still was doing design,
8  but I took on a little bit more responsibility, so it
9  was -- it was technically a manager title, but it was
10 really -- I'm trying to think about it.  The title was
11 -- it was something along the lines of a foundry and
12 government program manager.
13 Q.  And were you a foundry/government program
14 manager at the time you left the company?
15 A.  Yes.  That was the last straw.  I was really
16 doing that for probably the last maybe two years I was
17 at Akoustis, yes, also designing as well.
18 Q.  So roughly 2020 to 2022?
19 A.  Yes.
20 Q.  Okay.  And during what time period did you hold
21 the position of filter design engineer?
22 A.  Let's see.  That should have been probably --
23 late 2016 is when I moved over to design filters.  Man,
24 I was still design filter when I left.
25 Q.  So you continued the responsibility of design

26

1  filters even after you took on the role of the manager?
2  A.  Right.  Yes.
3  Q.  And you were a device engineer, then, from
4  around June of 2015 until late 2016?
5  A.  That's right.  Yes.  That sounds about right.
6  Q.  What were your responsibilities as a device
7  engineer?
8  A.  Yes.  So we were -- at that time, I was working
9  on designing resonators.  So Akoustis resonators are
10 used as a building block to design Akoustis filters.
11    So at the time, the company was working on
12 our technology developing it, and so I was helping with
13 that design.  But what I was doing was multi-physics
14 simulations of different structures to try to figure
15 out, you know, to optimize what the structure should
16 look like and then work with the process and engineers
17 in order to implement that.
18 Q.  What were your responsibilities as a filter
19 design engineer?
20 A.  It was to design RF filters that utilized
21 acoustic resonators.  So I worked on several products
22 ranging from military to wireless infrastructure.
23 Mostly it was, you know, bandpass filters.
24 Q.  What products did you work on as a design
25 engineer?

27

1  A.  I assume you mean the released products that
2  are on the website?
3  Q.  Yes.  Let's start with the released products.
4  A.  Yes, that would be AKF1252, AQF-1938, and then
5  there's A10252, A10149.  I'm not sure of any other ones
6  that maybe were released off the top of my head.
7  There's maybe one I'm missing, but yes.
8  Q.  Are you familiar with the term "V2X"?
9  A.  V2X, no, I don't know what that term means.
10 Q.  Okay.  How about "vehicle to everything"?
11 A.  Oh.  Is that like an automotive application,
12 automotive radar?
13 Q.  (Nodding yes.)
14 A.  I've heard of that before, but I didn't work on
15 that stuff.  Another application with automotive.
16 Q.  And you said you left Akoustis in January of
17 '22?
18 A.  Yes.
19 Q.  And why did you leave?
20    MR. JAKOPIN:  Objection.  Relevance.
21    THE WITNESS:

22
23
24
25

28

1
2
3
4
5
6
7
8
9
10
11
12
13    So at some point it just made sense for me
14 to just get a fresh start somewhere elsewhere where I
15 could get back to my roots, being more technical, and
16 not doing so much of the managing stuff, which I didn't
17 like as much.
18 Q.  BY MR. DEFOSSE:  When you announced that you
19 planned to depart Akoustis --
20 A.  Yes.
21 Q.  -- did they offer to put you in a different
22 position?
23 A.  They did.  Yes.  At the time I was reporting to
24 Dave Aichele, and Dave offered me an opportunity.  We
25 had just hired, maybe six months prior to me leaving,

Transcript of Michael Hodge, II
Conducted on July 11, 2023

15 (57 to 60)

57

1    Q. On that last step, producing parts that are
2 competitive in the marketplace, how is that different
3 from just producing a product that is competitive?
4 Because I think you said producing competitive and then
5 --
6    **A. Oh. Oh, sorry, yes. Well, I mean, you want to**
7 **-- you can produce something that's maybe like a -- ASR**
8 **-- I guess maybe I wasn't being very clear. You just**
9 **need to produce -- you know, you can produce a filter,**
10 **but, you know, if it's not a good filter, nobody's going**
11 **to buy it, so what's the point.**
12    **And then -- and then you got to produce**
13 **something that someone would be willing to buy. And**
14 **then you need to produce something at some point, when**
15 **it's a competitive market, something that will beat your**
16 **competitor.**
17    Q. Okay.
18    **A. Yes.**
19    Q. Is there a challenge with respect to mask
20 producing a filter product once you've got a design that
21 you like?
22    **A. The answer is it depends on how complex the**
23 **design is. So there's different things that go into**
24 **building the filter. There are techniques that can be**
25 **used to modify the frequency of individual resonators on**

58

1 **the filter, that sort of thing. And if designers -- if**
2 **the product only works with, you know, a lot of**
3 **different resonators being offset in frequency, it can**
4 **be very challenging to manufacture -- or very small**
5 **offsets of frequencies, those are also very tough to**
6 **make, actually. So there's things that can be done in**
7 **the design to make it difficult. Yes.**
8    Q. Are you familiar with the term "qualification"?
9    **A. Yes.**
10    Q. What does qualification mean to you?
11    **A. It's where you stress a part or you operate a**
12 **part under some type of condition that would accelerate**
13 **the life of the part so that you can induce a failure**
14 **and then use that to -- you know, the physics of that**
15 **failure to back out what the lifetime of that part would**
16 **be in the marketplace. So it's a requirement for you to**
17 **actually get large purchase orders from a customer**
18 **because they're going to want to make sure that they**
19 **don't sell the part and it dies on the customer in a**
20 **week or something like that.**
21    Q. Would you consider qualification as being an
22 important part of the product of manufacturing?
23    **A. It's critical. Yes.**
24    Q. Did -- was -- Akoustis also tested products. I
25 think we talked about that already, right?

59

1    **A. Yes.**
2    Q. Yes. And what is --
3        MR. JAKOPIN: Objection. Vague and
4 ambiguous. I'm sorry.
5        MR. DEFOSSE: Sure.
6        MR. JAKOPIN: I should have let you
7 finished.
8        MR. DEFOSSE: No. It was my fault; I
9 started to talk before the objection was done.
10    Q. BY MR. DEFOSSE: So what is the significance of
11 testing in the context of a BAW filter product?
12        MR. JAKOPIN: Objection. Vague and
13 ambiguous.
14        THE WITNESS: Yes. I had discussed earlier
15 about, you know, testing the part for compliance with a
16 specification that a customer may have. Now I'm talking
17 about performance specifications. There's also testing
18 -- now, since we're on the subject of qualification,
19 there's also qualification testing. That's a different
20 set of tests, right?
21        So that's testing, like I said, the part
22 under environmental conditions or stress operating
23 conditions, and then what you normally do is you
24 evaluate these parts at different pole points, so like,
25 you know, say X amount of hours, some interval you

60

1 defined. Usually these are defined in -- there's
2 national standards that are usually called JEDEC
3 standards.
4        So it usually says these are the pole
5 points you need to do and you need to evaluate it, and
6 you're trying to look for shifts in performance to do
7 that induced stress. And at some point, you define that
8 shift in performance as a failure when it comes out of
9 compliance with what the customers are willing to
10 separate the product.
11    Q. BY MR. DEFOSSE: Did you ever come across
12 Qorvo's confidential information while you were working
13 at Akoustis?
14        MR. JAKOPIN: Objection. Vague and
15 ambiguous.
16        THE WITNESS: Are you asking about
17 documents that are marked "Qorvo confidential," that I
18 knew for sure were Qorvo confidential or...
19    Q. BY MR. DEFOSSE: So let's start with -- I'll
20 modify the question.
21    **A. Okay.**
22    Q. Thank you for asking.
23    **A. Yes.**
24    Q. Did you ever come across confidential Qorvo
25 documents while you were working at Akoustis?

Transcript of Michael Hodge, II
Conducted on July 11, 2023

16 (61 to 64)

**61**

1    A.  So I saw — so I had the one that I — there
2  was one document that I submitted as part of my subpoena
3  — I'm sorry, it was actually — it was a packet of
4  three different documents that were stapled together.
5  That was given to me one time to review.  At the same
6  time, I saw a similar document, but I never took
7  possession of it.  I just saw it.  It was given to
8  another individual in the company.  And then, other than
9  that, I can't think of any other documents that I saw
10 that were marked "Qorvo confidential" or "proprietary."
11    Q.  Okay.  For the -- for the packet of documents,
12 those are the documents that you referenced in Exhibit
13 Number 3?
14    A.  Yes.
15    Q.  Okay.  For the -- and how did you come into
16 possession of those three documents?
17    A.  Well, then — you know, it's — it was shortly
18 after Rowland Holden joined the company.  So this would
19 have been the fall of 2016.  He — he and I were sharing
20 an office at the time, and then he handed me these
21 documents one day and asked me to review them.
22         At the time he and I were having weekly
23 lunch meetings on Friday, and he asked me to review them
24 and then he wanted to talk about them at one of our
25 lunch meetings and, you know, what I knew about them.

**62**

1    Q.  Okay.  And you mentioned that there was another
2  occasion where you saw --
3    A.  Yes.
4    Q.  -- a Qorvo document, but you didn't take
5  possession of it?
6    A.  (Nodding yes.)
7    Q.  Can you tell me what that was?
8    A.  Same time period, it was a — Rowland gave a
9  packet of documents to a technician.  That document had
10 details about the PCB boards ▮▮▮▮▮▮ used for
11 building prototype filters.  So it defined, like, the
12 lines, you know, that you would draw the traces, the
13 launch, the dimensions ▮▮▮▮▮▮▮  That sort of
14 thing.
15    Q.  And who was the technician who Mr. Holden
16 provided that document to?
17    A.  David Dyer.
18    Q.  Could you spell that?
19    A.  David, D-A-V-I-D, and Dyer is D-Y-E-R.
20    Q.  And what was Mr. Dyer's role at Akoustis?
21    A.  He was the guy I was referencing earlier,
22 mentioned earlier when I said early on, you asked me how
23 many CAD engineers we had.  So he — he was hired to be
24 a technician to work in the test lab at Akoustis, and
25 then he was also, whenever things were slow in the lab,

**63**

1  he was doing CAD work and getting trained to do CAD
2  work.  So he would be the guy who drew PCB boards,
3  evaluation boards, and then he also would draw filters
4  for designers sometimes.
5    Q.  How do you know that Mr. Holden provided this
6  Qorvo confidential document to Mr. Dyer?
7    A.  Because he reported — David Dyer reported to
8  me at the time, and he showed that to me and said that
9  Rowland asked him to, you know, replicate ▮▮▮▮▮
10 ▮▮▮▮▮
11    Q.  Was Mr. Dyer -- did Mr. Dyer express any
12 surprise that Mr. Holden had the document and then
13 provided it to him?
14    A.  I don't recall anything like that.
15    Q.  Were you surprised when you saw that Mr. Holden
16 had given a Qorvo confidential document to Mr. Dyer?
17    A.  Yes.  I mean, it's — I was uncomfortable, yes,
18 I guess would be the way to describe it.
19    Q.  Okay.  And why uncomfortable?
20    A.  I — it didn't seem like it's appropriate to be
21 circulating documents marked "confidential" from another
22 company.
23    Q.  Do you know what Mr. Dyer did with that
24 document?
25    A.  I know we — we ordered some evaluation boards

**64**

1  that we modified the traces on, and the -- ▮▮▮▮
2  ▮▮▮▮▮▮ on these boards is not something -- it's
3  something you have to buy from a supplier.  If I
4  remember correctly, ▮▮▮▮▮▮▮ -- these suppliers
5  will sometimes do custom designs for you.
6         So they have an off-the-shelf design and
7  they have a custom design. ▮▮▮▮▮▮ was a custom
8  design, so they didn't sell it to you.  But if you
9  produced a drawing of that and then gave that to them,
10 then they would sell it to you, so I think that that's
11 what he was tasked with doing.  I believe that's what he
12 was tasked with doing, but I don't -- I never saw the
13 order go through and I didn't see the file drawing of it
14 or anything like that, but that was my understanding of
15 what he was tasked to do.
16    Q.  And so you think the drawing would have been
17 used to specify an ▮▮▮▮▮▮▮ --
18    A.  (Nodding yes.)
19    Q.  -- that would be supplied to Akoustis from a
20 third party.
21    A.  Correct.
22    Q.  And what would that ▮▮▮▮▮▮ be used for,
23 then?
24    A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Transcript of Michael Hodge, II
Conducted on July 11, 2023



65

1 ███████████████████████████
2 ████████ That's an example.
3    Q.  After the time that Mr. Dyer showed you the
4 Qorvo document that Mr. Holden had provided to him, did
5 you ever discuss that document with Mr. Dyer again?
6    A.  No.
7    Q.  Did you ever discuss that document with anyone
8 else at Akoustis?
9    A.  No.
10    Q.  Did you ever mention to any of the managers at
11 Akoustis that Mr. Holden had provided the Qorvo
12 confidential information to Mr. Dyer?
13    A.  I don't remember doing that.
14    Q.  Why -- why do you -- why would it have been
15 helpful to Akoustis to use this ███████ that's
16 described in the drawing?
17    A.  It will -- the -- you know, ████████ has
18 an influence on the performance measured on the part.  I
19 mean, in theory, it should all wash out anyway because
20 you should de-embed, that's the term in the industry for
21 removing the losses leading up to the part.  In theory,
22 you should end up with the same performance anyway, but
23 the more you can reduce the losses, the less you have to
24 take out or you have to -- less air you have to remove
25 from the measurement.  You know, the more accurate, the

66

1 better your measurement will be generally.  So you want
2 to still make the best possible performing board and
3 ████████ possible to get the best data.
4    Q.  Okay.  What's that data used for?
5    A.  The main thing you would use it for, initially,
6 would be to market it to a potential customer so that
7 they know you have a part that they would be interested
8 in, and then later on that data would be used to make a,
9 what's called a data sheet, which is a document
10 associated with a particular part number that anybody
11 can download off your website, and they would know how
12 this part would perform and where to go to buy it.
13    Q.  Do you know whether the ████████ that was
14 modeled after the Qorvo one was used in the development
15 of any particular products at Akoustis?
16       MR. JAKOPIN:  Objection.  Calls for
17 speculation.
18       THE WITNESS:  Yes.  I'll be honest with
19 you, I don't know the exact part -- I know there was a
20 specific -- ████████████ that we did use that we
21 got for a while that we would order in bulk, but whether
22 that was a different -- whether it was made from that
23 document or not, I don't know that for sure.
24    Q.  BY MR. DEFOSSE:  What's the company that
25 supplied the off ██████?

67

1    A.  It's been a while.  I want to say it's
2 ████████, but I could be wrong about that.
3 ████████████.  I remember we bought ████████ from
4 them for a while, but I don't remember if that's the
5 exact company or not.
6    Q.  Do you know over what period of time the custom
7 ████████ was purchased at Akoustis?
8    A.  So I oversaw some of the technicians; we were
9 ordering the same flavor ████████.  This was in
10 2016 through probably about 2017, '18, sometime in that
11 time frame.  I'm trying to remember now.  I handed over
12 the test lab, I think I mentioned earlier, to David
13 Breton and he may have gotten -- at that point I have no
14 idea ████████.  He may have went and ordered
15 something else after that, so I don't know.
16    Q.  Okay.
17    A.  Yes.
18    Q.  So when I first asked you if you had come
19 across Qorvo confidential information at Akoustis, you
20 asked if I was talking about documents or something
21 else?
22    A.  Uh-huh.
23    Q.  So we started with documents.  Let me just
24 clean that one up.
25    A.  Yes.

68

1    Q.  Are you aware of any other Qorvo confidential
2 documents that were used at Akoustis?
3    A.  I can't -- I can't think of any.  You know,
4 maybe at a very high level, someone may -- you know, we
5 may -- sometimes you look at, like, data sheets and
6 stuff like that, and you're like, "well, this is a good
7 template for presenting the data to a customer," but
8 that's a public document anyway.
9       So you may be influenced by the way you see
10 marketing materials put out to produce something in a
11 similar format or show similar graphs or something like
12 that or aspects of a part.  But I can't think of
13 anything, like, internal that was labeled -- that I knew
14 for sure -- like, you know, I may have seen a document,
15 but I didn't know it came from Qorvo.  That's possible
16 as well, I guess, is I -- but I didn't know that at the
17 time.
18    Q.  Okay.  Now let's shift to the other side.
19       Are you aware of any Qorvo confidential
20 information that was used at Akoustis that may not have
21 been reflected in a document that you received?
22    A.  Yes.  Just to be clear, you know there's --
23 when you're developing a technology, you know, one of
24 the things that you do is you read, review things that
25 have been published and that includes textbooks,

Transcript of Michael Hodge, II
Conducted on July 11, 2023



**77**

1  So, like David Dyer is an example of
2  someone who sat back there.  We had some interns that
3  summer, one of them was an African-American male named
4  Ronnie.  And I remember Cindy, who was our CFO at the
5  time, asked something about -- maybe some comment about
6  that he, and Rowland said something like, "oh, he's
7  black; heat can handle the heat" or something like that.
8  Q. BY MR. DEFOSSE:
9
10
11  MR. JAKOPIN:  Objection, relevance.
12  THE WITNESS:
13
14
15
16
17
18
19  So, yes, I do feel like that played into
20
21  it.
22
23
24
25

**78**

1
2
3
4  Q. BY MR. DEFOSSE:  Did Mr. Holden ever tell you
5  about allegations that had been made against him, that
6  he had stolen an intellectual property from a former
7  employer?
8  **A. Yes.  He told me a story one time about, I**
9  **think it was in Rockdale County or something like that.**
10  **Yes.**
11  Q. And what was involved in that?
12  **A. It's a long time ago since I heard this, but I**
13  **thought it was something along the lines of he left**
14  **Skyworks to go to Rockwell, and -- or I could have it**
15  **backwards, I'm sorry.  But, yes, one alleged that he**
16  **took intellectual property going from one to the other,**
17  **yes.**
18  Q. Did he say whether he had taken the
19  intellectual property?
20  MR. JAKOPIN:  Objection.  Calls for
21  speculation.
22  THE WITNESS:  Yes.  I just remember he's
23  saying it was a very painful process for him, so -- but,
24  you know, I -- I assumed the way he was telling the
25  story that he had actually done what he was accused of,

**79**

1  but I never heard him actually come out and say, "these
2  are the documents I took," or "I, for sure, did this and
3  this was the outcome."
4  Q. BY MR. DEFOSSE:  Why was Mr. Holden telling you
5  that he had been accused of an intellectual property
6  theft?
7  **A. I'm trying to remember.  I mean, this was at a**
8  **lunch meeting, by the way; it was a one-on-one with me.**
9  **You know, like I just mentioned, we had -- he and I had**
10  **one-on-one lunch meetings, and I'm trying to understand**
11  **why he was telling me that and what the context to that**
12  **discussion was.  I can't remember the context.  It could**
13  **have been related to these documents I gave to you that**
14  **he had given to me.  Maybe on how -- which -- yes.  It's**
15  **like "if you'd been through this before, why are you**
16  **doing it now?"  Right?**
17  **So it was a very bizarre, actually,**
18  **conversation.**
19  Q. Were others at Akoustis aware that Mr. Holden
20  had been accused of stealing intellectual property?
21  MR. JAKOPIN:  Objection.  Calls for
22  speculation.
23  THE WITNESS:  I never had that discussion
24  with anyone else.  Yes.
25  Q. BY MR. DEFOSSE:  And we discussed previously,

**80**

1  Mr. Holden, shortly after he arrived, gave you three
2  confidential documents from Qorvo?
3  **A. Yes.**
4  Q. Did Mr. Holden ever share any other Qorvo
5  confidential information with you other than those three
6  documents?
7  **A. I can't recall anything offhand.**
8  Q. What was your reaction when Mr. Holden handed
9  you the package of Qorvo information?
10  **A. I mean, repulsion, right, I didn't want to have**
11  **possession of these.  I didn't want to take them.  But**
12  **it was -- the reason I took them, the reason I reviewed**
13  **them, the reason I discussed them with him is because he**
14  **was recently the new hire.  He was -- it was made clear**
15  **he was now the big man in charge.  You know, I -- so I**
16  **just was like one of these.  "Let's just get through**
17  **this and then move on" sort of mindset that I had.  And**
18  **so that was really the reaction.  Yes.**
19  Q. Yes.  I mean, he was your boss; he told you to
20  look at them?
21  **A. Exactly, yes.  And he was sitting right there**
22  **beside me, so yes.**
23  Q. Did Mr. Holden tell you why he wanted you to
24  review the Qorvo materials?
25  **A. He asked if there was anything that would be**

Transcript of Michael Hodge, II
Conducted on July 11, 2023

81

1  useful in developing products that I could -- I could
2  learn from this was really the gist of it.
3      Q.  Okay.  Did he tell you how he had obtained the
4  presentations?
5      A.  I didn't ask him questions about that.
6      Q.  Okay.  When he handed them to you, did he like
7  pull them out of a -- like a -- his bag or some
8  particular area?
9      A.  Yes.  He had like a laptop bag that he carried
10 in and out of work and they were like in the front
11 pocket of that.
12     Q.  Are you aware of whether Mr. Holden had a --
13 like a repository of Qorvo materials that he would
14 extract things, like the package he gave you from?
15     A.  I never saw anything like that.
16     Q.  When he handed them to you, did you believe
17 that the package of material was confidential to Qorvo?
18     A.  I assumed it was, as soon as I got it, because
19 I mean, it's -- Qorvo has got this like really distinct
20 like black logo which really kills the print, but anyway
21 it was printed out, it's like -- and I remember seeing
22 that right before I left, right.  So I knew it was a
23 Qorvo document when it was handed to me just based on
24 the color and the logo when it was handed to me.  And
25 then as you -- as I reviewed it, then I saw that it was

82

1  marked -- the document was marked "confidential for
2  proprietary use."
3      Q.  Okay.
4         (Exhibit 4 marked for identification.)
5      Q.  BY MR. DEFOSSE:  Mr. Hodge, the court
6  reporter's handed you what's been marked as Exhibit
7  Number 4.
8         Could you tell me whether you recognize
9  this document?
10     A.  Yes.  This is a document that I typed up.  It
11 was really meant to be like a -- like a cover letter or
12 like a manifest for the package that I sent you that
13 contained the three documents, just so you'd know that
14 you got everything that was meant to be in there.
15     Q.  And just for the record, it says, in this
16 letter: "Enclosed with this cover letter are three
17 documents marked 'Qorvo confidential' and 'proprietary'
18 that were given to me by Rowland Holden shortly after he
19 joined Akoustis" --
20     A.  Right.
21     Q.  -- right?
22     A.  Yes.
23     Q.  And this cover letter was attaching the package
24 of Qorvo confidential information that we've been
25 discussing previously, right?

83

1      A.  Yes.
2      Q.  Okay.  Now, you say in the letter "I've not
3  reproduced these documents either in print or electronic
4  format.  These are the only copies that were in my
5  possession"?
6      A.  Yes.
7      Q.  Why not reproduce them in print or electronic
8  format.  Why did you decide not to do that?
9      A.  I mean, I can't do that; it's confidential,
10 yes.  So by producing that, it would be like me stealing
11 the documents again.
12     Q.  Yes.
13     A.  Yes.
14     Q.  So you were concerned that these were Qorvo
15 confidential materials and you didn't want to do
16 anything to further --
17     A.  Right.
18     Q.  -- copy or reproduce those documents?
19     A.  Exactly, yes.
20     Q.  How did the documents remain in your possession
21 after you left Akoustis?
22     A.  Yes.  That's -- yes, so that's the thing.  So I
23 -- like I told you about when I received the documents,
24 and what happened with them, and then my intention was
25 to destroy those documents because I didn't want

84

1  possession of them anymore.  And I thought I had done
2  that.  So, you know, I'd forgotten about them over the
3  years and just never even knew that I had them.
4         And how I discovered them was during
5  document requests for the Shen versus Akoustis case.  I
6  went through all -- I was -- you know, the counsel for
7  Akoustis, you know, he subpoenaed the documents for that
8  case, and he asked I go through every document that I
9  took from, you know, from Akoustis, everything like
10 that, right.  So I mentioned earlier I brought a small
11 box home with me when I cleaned out my office.
12        So in this box, it's mostly, you know,
13 textbooks that I bought, or personal textbooks, it's
14 like awards and, you know, things of that nature.  There
15 were a couple folders I had, one folder was like, you
16 know, explanation of benefits and stuff like that, when
17 I was there, just to remind what I had.  And then there
18 was a -- it was one folder -- so to explain this,
19 whenever I was -- joined Akoustis, I was given an award
20 of stock, but it's -- so I vested my stock on a monthly
21 basis; that's what I negotiated.  And so the company
22 would issue me, like, a paper certificate every month,
23 and then I had to go deposit that, like you would
24 deposit a check at a bank, I'd have to go to a Fidelity
25 office down the road, give that to them physically, sign

129

1  design engineer for Qorvo at this time that this
2  conversation happened, and he was applying for a design
3  engineering position at Akoustis.
4      Q.  Okay.  Did Akoustis end up hiring Mandek?
5      A.  We did not.
6      Q.  So at 12:40 p.m., you wrote to Mr. McClain:
7  Mandek coming in for another interview?
8      A.  Yes.
9      Q.  And Mr. McClain responded: Co-op?
10     A.  Yes.
11     Q.  And then you said, "must be time to bend Qorvo
12 over the barrel again, LOL."
13     A.  Yes.
14     Q.  What did you mean by that?
15     A.  I don't remember the context of this document.
16 My guess is it's -- it seemed like Rowland, when he came
17 onboard, was only recruiting Qorvo folks is what it
18 seemed like to me.  So it just seemed like -- you know,
19 and anytime you lose an engineer at a company, it hurts
20 the company, right.  So I felt like, you know -- yes.
21 It obviously doesn't look good for Qorvo if he's
22 constantly taking employees.
23     Q.  Did Mr. Holden ever express any preference to
24 you as far as hiring employees from Qorvo as opposed to
25 someplace else?

130

1      A.  I think he had a preference, but I think the
2  preference wasn't technical.  The preference was more,
3  he -- he kind of can speak their language and, like,
4  they're familiar with the processes he wanted to do, the
5  people -- you know, that sort of thing.  I felt it was
6  more of a familiarity thing.  That's the way I read it,
7  but anyway.
8      Q.  And by "the processes," he wanted to do the
9  familiarities because they were working on the same
10 processes?
11     A.  Oh, I meant processes as in like how you design
12 a product, you know, what's expected in a data sheet,
13 what's expected -- you know, what the level -- you know,
14 sometimes work cultures can vary from company to
15 company, so he -- I think it was more of a
16 work-culture-type thing is the way I saw it.  You know,
17 to be honest with you, you know, I don't know if I
18 stated this yet in this deposition, but, you know, as
19 far as technically, when it came to Qorvo, you know, I
20 didn't really find -- especially when it's talking about
21 the resonator technology, it's no different.  It's a
22 solidly mounted resonator compared to a suspended
23 resonator like Akoustis was doing -- I just want to make
24 sure that's on the record.  So anyway, just to clarify,
25 like earlier when you were asking me about the documents

131

1  that he had handed me about that filter and it sounds
2  like now you've -- it sounds like it may have been an
3  automotive filter, you know, that filter, you know, I
4  didn't really find any of that information useful for
5  designing filters, again, because it's such a different
6  technology.
7      Q.  So is that to say when he handed you the Qorvo
8  confidential information back in 2016, you took the time
9  to really go through and investigate all that
10 information and reach the conclusion that it wasn't
11 useful to you?
12     A.  Oh, I didn't have to reach -- I just looked at
13 it.  I mean, I looked at it, like, for instance, there's
14 a schematic in there, right.
15     Q.  Yes.
16     A.  A resonator, to tell you the size of the
17 resonator and all this stuff, if I was to take that and
18 put it on a mask -- this is hypothetical; it didn't
19 happen.  I'm just saying, hypothetically, if you were to
20 take those, put that on a mask fabricated in the fab, it
21 would not work.  It would not look like a filter.  It's
22 just that different.
23     Everything about a schematic and a design
24 of a resonator is dependent on the process and the stack
25 that it comes from.

132

1      So -- so anyway, I just want to make sure
2  that's clarified, right.  So it's really -- it would be
3  very difficult to take what was said in those documents
4  and just, like, directly apply it.  I mean, as a
5  technologist, it's interesting to see what other people
6  are doing, but that's just it.  It's a curiosity; it's
7  interesting, but as far as, like, is it actionable, that
8  I can do on my job and make, like, a better part, I
9  couldn't -- I would never make that claim.
10     Q.  Okay.
11         (Exhibit 14 marked for identification.)
12     Q.  BY MR. DEFOSSE:  All right.  Mr. Hodge, the
13 court reporter's handed you what's been marked as
14 Exhibit 14.
15     A.  Yes.
16     Q.  If you'll just take a minute, review the
17 document and refresh yourself as to what's going on
18 here.
19     A.  (Witness examining document.)
20         Okay.  Yes.  I've read this top part where
21 it references Qorvo.  It looks like this is me talking
22 about design here.  Okay.  Yes.  And then this is --
23 yes.  This is, like, a very early prototype of 1252.
24 Yes.
25     Q.  Okay.

229

1  one I forgot to ask at the time. If we could, maybe we
2  can wrap this up.
3              EXAMINATION
4       Q. BY MR. JAKOPIN:  We had taken a look at
5  Exhibit 5 earlier?
6       A. Yes.
7       Q. And the passband on that is significantly
8  different than the passband on the 1252 and the 1256.
9       A. Oh, yeah.
10      Q. Correct?
11      A. Yeah. It's much narrower. Yeah.
12      Q. Okay. Thank you.
13             MR. DEFOSSE:  No further questions. We can
14 go off the record.
15             THE VIDEOGRAPHER:  Okay. Stand by. This
16 marks the end of the deposition of -- of Michael Hodge.
17 We are going off the record at 4:24 p.m.
18             (Off the record.)
19             (Whereupon, proceedings were concluded at
20 4:24 p.m.)
21
22
23
24
25

230

1          CERTIFICATE OF NOTARY PUBLIC
2       I, Melody Adair, Notary Public,
3  do hereby certify that the aforementioned witness
4  was sworn before me at the aforemention location,
5  and that I am neither counsel for, related to, nor
6  employed by any of the parties to this case and
7  have no interest, financial or otherwise, in its
8  outcome.
9       IN WITNESS WHEREOF, I have hereunto set
10 my hand and affixed my notarial seal this 25th day,
11 of July, 2023.
12
13
14 My Commission Expires: May 16, 2028
15
16
17 _____
18 Melody Adair, Notary Public
19 for the State of North Carolina
20
21
22
23
24
25

231

1          CERTIFICATE OF REPORTER
2
3  STATE OF CALIFORNIA  )
4                       )
5  COUNTY OF LOS ANGELES )
6
7       I, TAMIKA M. BURNETTE, hereby certify
8  that the foregoing proceedings were taken before me at
9  the time and place therein designated; that a review of
10 the transcript was requested, and that the foregoing
11 pages numbered 1 through 229 are a true and correct
12 record of the aforesaid proceedings.
13      I further certify that I am not a relative,
14 employee, attorney or counsel of any of the parties, nor
15 am I a relative or employee of any of the parties'
16 attorneys or counsel connected with the action, nor am I
17 financially interested in the action.
18              Tamika Burnette
19
20      DATED this 25th day of July, 2023
21      _____
22          TAMIKA M. BURNETTE
23          CERTIFIED COURT REPORTER, RPR, CSR-14502
24
25

232

1          COURT REPORTER DISCLOSURE
2       Pursuant to Article 10.B of the Rules and
3  Regulations of the Board of Court Reporting of the
4  Judicial Council of California which states: "Each
5  court reporter shall tender a disclosure form at the
6  time of the taking of the deposition stating the
7  arrangements made for the reporting services of the
8  certified court reporter, by the court reporter's
9  employer, or the referral source for the deposition,
10 with any party to the litigation, counsel to the parties
11 or other entity. Such form shall be attached to the
12 deposition transcript." I make the following
13 disclosure:
14      I am a California Certified Court
15 Reporter. I am here as a representative of Planet
16 Depos. Planet Depos contacted to provide court
17 reporting services for the deposition. Planet Depos
18 will not be taking this deposition under any contract
19 that is prohibited by O.C.G.A. 91128(c).
20      Planet Depos has no contract/agreement to
21 provide court reporting services with any party to the
22 case, any counsel in the case, or any reporter or
23 reporting agency from whom a referral might have been
24 made to cover this deposition. Planet Depos will charge
25 its usual and customary rates to all parties in the

Transcript of Michael Hodge, II
Conducted on July 11, 2023

59 (233 to 236)

233

1  case, and a financial discount will not be given to any
2  party to this litigation.
3          Tamika M. Burnette, RPR, CSR14502
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

235

1          E R R A T A
2
3  PAGE    LINE      CHANGE
4  _____  _____  _____
5  Reason for
6  Change:_____
7  _____
8  Reason for
9  Change:_____
10 _____
11 Reason for
12 Change:_____
13 _____
14 Reason for
15 Change:_____
16 _____
17 Reason for
18 Change:_____
19 _____
20 Reason for
21 Change:_____
22 _____
23
24
25

234

1          INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over carefully and
4  make any necessary corrections.  You should state the
5  reason the in the appropriate space on the errata sheet
6  for any corrections that are made.
7        After doing so, please sign the errata sheet
8  and date it.  You are signing same subject to the
9  changes you have noted on the errata sheet, which will
10 be attached to your deposition.
11       It is imperative that you return the original
12 errata sheet to the deposing attorney within thirty (30)
13 days receipt of the deposition transcript by you.  If
14 you fail to do so, the deposition transcript may be
15 deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25

236

1      ACKNOWLEDGEMENT OF DEPONENT
2
3      I, _____, do hereby certify
4  that I have read the foregoing pages _____ to
5  _____ and that the same is a correct transcript of
6  the answers given by me to the questions therein
7  propounded, except for corrections or changes in form or
8  substances, if any, noted in the attached Errata Sheet.
9
10 _____
11 Date            Signature
12
13     Subscribed and sworn before me this _____ day of
14 _____, 2023.
15
16 My Commission
17 Expires:_____
18 _____Notary Public.
19
20
21
22
23
24
25

# Exhibits HH-PP
# (Redacted in Their Entirety)

# Exhibit QQ





# Transcript of Mary Winters

**Date:** September 12, 2023
**Case:** Qorvo, Inc. -v- Akoustis Technologies, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Mary Winters
Conducted on September 12, 2023

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF DELAWARE
 3   - - - - - - - - - - - - - -x
 4   QORVO, INC.,                :
 5          Plaintiff,           :
 6      v.                       :   Civil Action No.
 7   AKOUSTIS TECHNOLOGIES, INC. :   21-1417-JPM
 8   AND AKOUSTIS, INC.,         :
 9          Defendants.          :
10   - - - - - - - - - - - - - -x
11
12
13
14      Videotaped Deposition of MARY WINTERS
15           Regus Business Center
16          Charlotte, North Carolina
17         Tuesday, September 12, 2023
18               9:15 a.m.
19
20   Job No.: 505391
21   Pages: 1 - 144
22   Reported By: Cindy A. Hayden, RMR, CRR
23
24
25
```

---

**Page 2**

```
 1        Deposition of MARY WINTERS, held at the
 2   offices of:
 3
 4        Regus - Charlotte/University Executive Park
 5        301 McCullough Drive, Suite 400
 6        Charlotte, North Carolina  28262
 7
 8
 9
10
11
12        Pursuant to notice, before Cindy A. Hayden,
13   Notary Public in and for the State of North
14   Carolina.
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1           A P P E A R A N C E S
 2
 3   ON BEHALF OF PLAINTIFF:
 4        TIMOTHY P. CREMEN, ESQUIRE
 5        ROY D. JUNG, ESQUIRE
 6        SHEPPARD MULLIN RICHTER & HAMPTON LLP
 7        2099 Pennsylvania Avenue, NW, Suite 100
 8        Washington, D.C.  20006-6801
 9        202.747.1900
10        tcremen@sheppardmullin.com
11        rjung@sheppardmullin.com
12
13   ON BEHALF OF DEFENDANTS:
14        DAVID A. JAKOPIN, ESQUIRE
15        PILLSBURY WINTHROP SHAW PITTMAN LLP
16        2475 Hanover Street
17        Palo Alto, California  94304-1114
18        650.233.4790
19        david.jakopin@pillsburylaw.com
20
21   ALSO PRESENT:  Len Harris, Videographer
22               Drew Wright, General Counsel,
23               Akoustis Technologies
24
25
```

---

**Page 4**

```
 1              I N D E X
 2                                        PAGE
 3   EXAMINATION BY MR. CREMEN              10
 4
 5        PREVIOUSLY MARKED EXHIBITS
 6
 7   NUMBER        DESCRIPTION          PAGE
     EXHIBIT 227  Microsoft Teams Meeting invite  131
 8                for 1/28/20, Bates
                  AKTS_00090572
 9   EXHIBIT 228  Document titled Final Visual    132
10                Quality Control Inspection,
                  Bates AKTS_00090573-620
11
     EXHIBIT 229  Email dated 1/20/20, Subject:   133
12                Wafer Inspection Document
                  Review, Bates AKTS_00144175
13
     EXHIBIT 230  Document titled Final Visual    134
14                Quality Control Inspection,
                  Bates AKTS_00144176-223
15
16
17        NEWLY MARKED EXHIBITS
18   NUMBER        DESCRIPTION          PAGE
19   EXHIBIT 401  Plaintiff's Notice of           13
                  Deposition of Mary Winters
20                Pursuant to Fed. R. Civ. P.
                  30(b)(1)
21
     EXHIBIT 402  Akoustis screenshot Filter      38
22                Applications:  All Products
23   EXHIBIT 403  Document titled Akoustis        38
                  Revolutionizing the RF
24                Industry 2023 Product Catalog
25
```

Transcript of Mary Winters
Conducted on September 12, 2023

9

1          P R O C E E D I N G S
2                  * * *
3          THE VIDEOGRAPHER:  Here begins
4  Media Number 1 in the videotaped deposition of
5  Mary Winters in the matter of Qorvo, Incorporated,
6  versus Akoustis Technologies, Incorporated, and
7  Akoustis, Incorporated, for the United States
8  District Court, District of Delaware.  The case
9  number is 21-1417-JPM.
10          Today's date is September 12th, 2023.
11  The time on the video monitor is 9:15 a.m.  The
12  videographer today is Len Harris representing
13  Planet Depos.  This video deposition is taking
14  place at Regus - Charlotte - University Executive
15  Park, 301 McCullough Drive, Suite 400, in
16  Charlotte, North Carolina.
17          Would counsel please voice-identify
18  themselves and state whom they represent.
19          MR. CREMEN:  Timothy Cremen from
20  Sheppard Mullin on behalf of Plaintiff Qorvo.  And
21  with me today is Roy Jung, also with Sheppard
22  Mullin, on behalf of Qorvo.
23          MR. JAKOPIN:  This is David Jakopin
24  from Pillsbury Winthrop Shaw Pittman, representing
25  Akoustis.  With me here today is Drew Wright,

10

1  general counsel from Akoustis.
2          THE VIDEOGRAPHER:  The court reporter
3  today is Cindy Hayden representing Planet Depos.
4  The witness will now be sworn.
5                  * * *
6              MARY WINTERS,
7    having been first duly sworn, was examined and
8            testified as follows:
9                  * * *
10              EXAMINATION
11  BY MR. CREMEN:
12      Q.  Good morning.  Could you state your
13  name for the record?
14      A.  Mary Winters.
15      Q.  And, Ms. Winters, have you ever been
16  deposed before?
17      A.  Yes.
18      Q.  How many times?
19      A.  Once.
20      Q.  And just what was -- just a brief
21  description of the matter?
22      A.  It was a HR matter with an employee.
23      Q.  With Akoustis?
24      A.  Yes.
25      Q.  Okay.  So you might remember from --

11

1  from your last deposition the rules of the game,
2  but I'll go over a few of them just to start.
3          So I'll be asking questions, and you'll
4  answer them.  The court reporter will be recording
5  our conversation.  So in order for her to do that,
6  we should try to not talk over each other.
7      A.  Yep.
8      Q.  I'll try my best.  And we're going to
9  sit here a long day.  It's going to happen, but
10  let's just try to -- try to do our best.
11          And you understand that you can ask me
12  to clarify any questions you don't understand,
13  right?
14      A.  (Nonverbal response.)
15      Q.  Okay.
16      A.  Yes.
17      Q.  I'll try to take breaks every 60 or 90
18  minutes or so, such as when there's a natural break
19  in the conversation.  If you need a break before
20  that, just let me know.
21      A.  Okay.
22      Q.  The only time which -- that I don't
23  want to take a break is if there is a pending
24  question.
25      A.  Sure.

12

1      Q.  So we'll just answer the question and
2  then take a break.
3          Your counsel might make objections from
4  time to time.  Unless he tells you -- unless he
5  tells you not to answer, you should still answer
6  the question, okay?
7      A.  Okay.
8      Q.  And you understand that you're
9  testifying under oath today, right?
10      A.  Yes, I do.
11          MR. CREMEN:  Okay.  Let's see.  100.
12          MR. JAKOPIN:  We've already had a lot
13  of depositions with things that have been marked.
14  Let's try not -- you said 100?  What was the number
15  you're going to start at?
16          MR. CREMEN:  That's just the internal
17  number.  I'm not -- I'm not reusing -- I might
18  reuse an exhibit from before, but I'm not going to
19  use a previously marked one.
20          MR. JAKOPIN:  No.  All I'm trying to do
21  is make sure we don't duplicate numbers.
22          MR. CREMEN:  Right.  Yeah.
23          MR. JAKOPIN:  Okay.
24          MR. CREMEN:  No, we haven't.  We
25  haven't, so...

Transcript of Mary Winters
Conducted on September 12, 2023

16 (61 to 64)

61

1    A.  No, he is not.
2    Q.  Who is in charge of trimming now?
3    A.  So there's a couple people that reports
4  in to our Trim Work Center.  He's now the director,
5  but he was a manager before.
6    Q.  Who is that?
7    A.  Peter Mersich.
8    Q.  How many people work in the Trim Work
9  Center?
10    A.  So engineeringwise, there is one.  And
11  then there is the engineering tech.  And then
12  there's at least, I want to say, four
13  technicians/operators.
14        In addition, in Trim Work Center is the
15  testing, which -- I'm just going off the top of my
16  head -- there's another engineer and probably
17  another four to five technicians.  In addition to
18  it, the integration/yield team also works in
19  Trim Work Center.  So there's two or three people
20  in that group.  Sorry, in addition to the device
21  team.  They also support trim.  And software.
22  Sorry.  It's not a single step.
23    Q.  That's -- that's okay.
24        When Mr. Kwon was hired, was there
25  anyone else working on trim?

62

1    A.  No.  Sorry.  I keep thinking back to
2  the New York piece, but, yes, in terms from
3  North Carolina.
4    Q.  Okay.  Just for the New York piece, was
5  there anyone working --
6    A.  No.
7    Q.  Okay.  And then over time, did you add
8  people to deal with Mr. Kwon?
9    A.  Yes.
10    Q.  Who are those people?
11    A.  The people that were named.
12    Q.  And then when did -- when were those
13  people added, roughly?
14    A.  I would say added since -- over the
15  last six years.  So I'd have to go back and see
16  when each of them were hired.
17    Q.  Did -- did Mr. Kwon provide input on
18  trimming for the XBAW process?
19    A.  Yes.
20    Q.  What about the cavity process?
21    A.  When he started, yes.
22    Q.  What kind of input did he provide?
23    A.  He was a process engineer for trim.
24  So, really, around, you know, being able to bring
25  in manufacturing equipment and what that process

63

1  would be.  I'm just trying to remember.  We've
2  evolved a lot in the last six years.
3    Q.  So he -- so you mentioned two things.
4  So he --
5    A.  Yep.
6    Q.  -- identified equipment that you could
7  use for trimming; is that true?
8    A.  Yes.  So as we transitioned from R&D to
9  manufacturing -- this goes across the entire fab --
10  so one of the responsibilities from our process
11  engineering standpoint is to be able to identify
12  equipment from research to manufacturing.
13    Q.  Now, you mentioned transitioning from
14  R&D to --
15    A.  Manufacturing.
16    Q.  -- manufacturing?
17    A.  Uh-huh.
18    Q.  When did that transition occur?
19    A.  So it was occurring from 2017 until
20  even today, that part.
21    Q.  And then did Mr. Kwon provide input on
22  specific trimming process steps?
23    A.  Yes.
24    Q.  What kind of input?
25    A.  That's hard for me to recall, just -- I

64

1  mean, it's -- I'm assuming as a process engineer,
2  you know, process parameters, you know, from that
3  standpoint for that part.
4    Q.  Was he responsible for setting up the
5  trim operations for Akoustis's products?
6    A.  The trim in terms of the process sides,
7  the actual trimming, yes, yeah.  I imagine there's
8  a lot to trim than just the actual process.
9    Q.  What else is involved?
10    A.  For trimming?  So if it's an individual
11  layer, there's the -- the processing for actual
12  trimming, but there's the input, ████████
13  ██████████████████████████████████
14
15  There's a software that's needed to be able to do
16  that also.
17        As you get into Trim Work Center,
18  there's the probing of the, you know, filters, and
19  then feeding that information back into the Scia
20  tool to be able to know what to actually trim, to
21  where to trim.
22    Q.  What is a map?  You mentioned ████
23    A.  So you're actually -- so if you look at
24  the wafer and how it's built -- I talked about
25  process control monitoring, or you'll hear the word

Transcript of Mary Winters
Conducted on September 12, 2023

141

1    A.  Define "scale."
2    Q.  Beyond sample sets.
3    A.  **1435 was delivered to** ▮▮▮▮▮ **, my**
4  **understanding is, beyond sampling.**
5    Q.  Do you have any recollection of the
6  volume that was delivered?
7    **A.  I do not.**
8       MR. CREMEN:  All right.  Let's go off
9  the record for a minute.
10      THE VIDEOGRAPHER:  The time is
11  1:25 p.m.  We are off the record.
12          * * *
13      (Whereupon, there was a recess in the
14  proceedings from 1:25 p.m. to 1:27 p.m.)
15          * * *
16      THE VIDEOGRAPHER:  We are back on the
17  record.  The time is 1:27 p.m.
18      MR. CREMEN:  All right.  That's all I
19  have, Ms. Winters.  Thank you very much for your
20  time today.
21      Do you have any?
22      MR. JAKOPIN:  No.
23      THE VIDEOGRAPHER:  This concludes the
24  video deposition of Mary Winters.  The time is
25  1:27 p.m.  We are off the record.

142

1  (Deposition adjourned at 1:27 p.m.)
2    (Read and sign requested.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

143

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I, MARY WINTERS, do hereby acknowledge
4   that I have read and examined the foregoing
5   testimony, and the same is a true, correct and
6   complete transcription of the testimony given by me
7   and any corrections appear on the attached Errata
8   sheet signed by me.
9
10
11  _____   _____
12   (DATE)            (SIGNATURE)
13
14
15
16
17
18
19
20
21
22
23
24
25

144

1   CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2
3        I, CINDY A. HAYDEN, RMR-CRR, the
4   officer before whom the foregoing deposition was
5   taken, do hereby certify that the foregoing
6   transcript is a true and correct record of the
7   testimony given; that said testimony was taken by
8   me stenographically and thereafter reduced to
9   typewriting under my direction; that reading and
10  signing was requested; and that I am neither
11  counsel for, related to, nor employed by any of the
12  parties to this case and have no interest,
13  financial or otherwise, in its outcome.
14        IN WITNESS WHEREOF, I have hereunto set
15  my hand this 20th day of September 2023.
16  My commission expires April 7, 2027.
17
18
19
20
21  _____
22   NOTARY PUBLIC IN AND FOR
23   THE STATE OF NORTH CAROLINA
24
25

# Exhibit RR



# Transcript of Joonbum Kwon, Ph.D.

**Date:** October 20, 2023
**Case:** Qorvo, Inc. -v- Akoustis Technologies, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF DELAWARE
3    - - - - - - - - - - - - - x
4   QORVO, INC.,              :
5           Plaintiff,        :
6       v.              : C.A. No. 21-1417-JPM
7   AKOUSTIS TECHNOLOGIES,    :
8   INC. and AKOUSTIS, INC.,  :
9           Defendants.       :
10  - - - - - - - - - - - - - x
11
12
13  ████████████████████████████
14
15
16    Videotaped Deposition of JOONBUM KWON, Ph.D.
17            Fulton, Maryland
18         Friday, October 20, 2023
19             9:17 a.m.
20
21
22
23  Job No. 511747
24  Pages: 1 - 175
25  Reported by: Janet A. Hamilton, RDR

**Page 2**

1       Videotaped Deposition of JOONBUM KWON,
2   Ph.D., held at the offices of:
3
4
5
6       Regus Business Centers
7       8115 Maple Lawn Boulevard
8       Suite 350
9       Fulton, Maryland  20759
10      240.786.4500
11
12
13
14
15
16       Pursuant to Subpoena, before Janet A.
17  Hamilton, Registered Diplomate Reporter and Notary
18  Public in and for the State of Maryland.
19
20
21
22
23
24
25

**Page 3**

1            A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF:
3       ROY D. JUNG, ESQUIRE
4       TIMOTHY P. CREMEN, ESQUIRE
5       SHEPPARD MULLIN RICHTER & HAMPTON LLP
6       2099 Pennsylvania Avenue, NW
7       Suite 100
8       Washington, DC  20006
9       202.747.1900
10
11  ON BEHALF OF DEFENDANTS:
12      RIC MACCHIAROLI, ESQUIRE
13      PILLSBURY WINTHROP SHAW PITTMAN
14      1200 Seventeenth Street, NW
15      Washington, DC  20036
16      202.663.8000
17  ALSO PRESENT:
18      ANDREW STROMBERG, Videographer
19      KYONGSOOK KIM, Lead Interpreter
20      YOUSUN CHOI, Check Interpreter
21
22
23
24
25

**Page 4**

1            C O N T E N T S
2   EXAMINATION OF JOONBUM KWON, Ph.D.        PAGE
3       By Mr. Jung                            9
4       By Mr. Macchiaroli                   171
5
6
7
8            E X H I B I T S
9       (Attached to the transcript)
10  KWON DEPOSITION
11  Exhibit 645   Subpoena                    14
12  Exhibit 646   Non-Party Joonbum Kwon's    16
13      Objections and Responses to Plaintiff's
14      Subpoena to Testify at a Deposition in a
15      Civil Action
16  Exhibit 647   Employee Confidentiality and  31
17      Invention Assignment Agreement
18      QORVO_008422120 - QORVO_008422121
19  Exhibit 648   Termination Information      32
20      QORVO_00012283 - QORVO_00012286
21  Exhibit 649   E-mail string               49
22      AKTS_00475415 - AKTS_00475416
23  Exhibit 650   Trim Tool/Process -         49
24      Discussions (Akoustis)
25      AKTS_00475417 - AKTS_00475420

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023

---

**5**

E X H I B I T S   C O N T I N U E D

Exhibit 651   AKF1938 Die to Die/        50
    Laminate Date (Akoustis)
    AKTS_00475421 - AKTS_00475424
Exhibit 652   E-mail string             80
    AKTS_00076532 - AKTS_00076534
Exhibit 653   E-mail from Rama Vetury    94
    AKTS_00475922
Exhibit 654 Table                        94
    AKTS_00475923 - AKTS_00475923
Exhibit 655   E-mail from JB Kwon        100
    AKTS_00476299
Exhibit 656   Akoustis presentation     100
    AKTS_00476300 - AKTS_00476309
Exhibit 657   Table:  Selective Trimming 105
    AKTS_00407978 - AKTS_00407978
Exhibit 658   The DOE Plan for Selective 111
    Trim (Akoustis)
    AKTS_00611530 - AKTS_00611536
Exhibit 659   E-mail exchange           116
    AKTS_00079438
Exhibit 660   Abstract: "AlN Film Stress 116
    and Uniformity for BAW filters on 200mm wafers"
    AKTS_00079439 - AKTS_00079442

---

**6**

E X H I B I T S   C O N T I N U E D

Exhibit 661   E-mail exchange           160
    AKTS_00476746
Exhibit 662   Akoustis presentation:    160
    Trim Work Center Update
    AKTS_00476747 - AKTS_00476759

        EXHIBITS PREVIOUSLY MARKED

Exhibit 403   Akoustis 2023 Product Catalog
Exhibit 420   E-mail exchange
    AKTS_00076656 - AKTS_00076657
Exhibit 421   ████████████████████
    AKTS_00076658 - AKTS_00076662
Exhibit 435   E-mail
    AKTS_00037331
Exhibit 436   Trim System Evaluation Plan
    JB Kwon (Akoustis)
    AKTS_00037312 - AKTS_00037323
Exhibit 437   E-mail
    AKTS_00037338
Exhibit 438   Trim Work Center Update
    (Akoustis)
    AKTS_00037339 - AKTS_00037351

---

**7**

EXHIBITS PREVIOUSLY MARKED CONTINUED

Exhibit 452   E-mail string
    AKTS_00118852 - AKTS_00118854
Exhibit 453   Trim Calculation SiN Trims
    AKTS_00118855 - AKTS_00118859
Exhibit 454   E-mail exchange
    AKTS_00076553
Exhibit 455   Proposed Trimming Options
    (Akoustis)
    AKTS_00076554 - AKTS_00076556

---

**8**

P R O C E E D I N G S
- - - - -

           THE VIDEOGRAPHER:  Here begins media
number 1 in the videotaped deposition of Joonbum
Kwon in the matter of Qorvo, Inc. versus Akoustis
Technologies, Inc. and Akoustis, Inc. in the
court -- in the United States District Court for
the District of Delaware, case number 21-1417-JPM.
           Today's date is October 20, 2023.  The
time on the video monitor is 9:17 a.m.  The
videographer today is Andrew Stromberg
representing Planet Depos.
           This video deposition is taking place at
Regus Business Centers, 8115 Maple Lawn Boulevard,
Suite 350, Fulton, Maryland.
           Would counsel please voice identify
themselves and state whom they represent.
           MR. JUNG:  Roy Jung from Sheppard Mullin
on behalf of Qorvo, Inc. -- plaintiff Qorvo, Inc.,
and with me today is Timothy Cremen also with
Sheppard Mullin.
           MR. MACCHIAROLI:  Ric Macchiaroli with
Pillsbury Winthrop Shaw Pittman on behalf of
Akoustis.
           THE VIDEOGRAPHER:  The court reporter

---

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023

9

1  today is Jan Hamilton representing Planet Depos.
2  The witness and interpreters will now be sworn.
3      (The Lead Interpreter, Ms. Kyongsook Kim,
4  and Check Interpreter, Ms. Yousun Choi, were
5  administered the oath.)
6      -----
7      (Oath administered to the witness through
8  Lead Interpreter Kim)
9      THE WITNESS: I do.
10     THE REPORTER: Thank you.
11     THE VIDEOGRAPHER: You may proceed.
12     -----
13         JOONBUM KWON, Ph.D.,
14 a witness herein, being duly sworn, testified in
15 English as follows:
16     EXAMINATION BY COUNSEL FOR PLAINTIFF
17 BY MR. JUNG:
18  Q  Good morning.
19  **A  Good morning.**
20  Q  As you have heard, my name is Roy Jung.
21 I'm one of the attorneys representing Qorvo, Inc.
22 in this matter.
23     Could you state your name for the record?
24  **A  My name is Joonbum Kwon.**
25  Q  Have you ever been deposed before?

10

1  **A  No.  This is first time.**
2  Q  Okay.  Let's go over a few ground rules
3  and things before we start.  I'll be asking you
4  questions, and you'll be answering them, and the
5  reporter -- court reporter will be recording our
6  conversation.
7      Do you understand?
8  **A  Yes.**
9  Q  To do that, our back and forth will be
10 verbal, so I might ask you -- for you to clarify
11 the -- clarify an answer if you just nod and so
12 forth.
13     Do you understand?
14  **A  Yes.**
15  Q  To make the reporter's job easier, we have
16 to try to -- not to talk over each other.
17 Sometimes it happens, but I'll try my best to be
18 sure it gets done and you answer it before I ask
19 my next question, and I will ask you for you to do
20 the same, for me to finish up my question and for
21 you to answer.
22     Do you understand?
23  **A  Yes.**
24  Q  If you cannot understand a question, you
25 may actually ask -- if you would please tell me

11

1  that you do not understand the question, I'll
2  attempt to rephrase the question.
3      If you cannot understand the question, you
4  may also request Dr. Kim's assistant to translate
5  the question.  If you answer a question I ask
6  without really asking for me to clarify, I'm going
7  to assume that you understand the question.
8      Is that fair?
9  **A  Yeah.**
10  Q  If you answer a question I ask you
11 without -- where you answer without asking for
12 Dr. Kim's assistance, I am also going to assume
13 that you understood the question.
14     Is that also fair?
15  **A  (Witness nodded head.)**
16  Q  Could you please answer?
17  **A  Yes.**
18  Q  Thank you.  Are you being represented
19 today by counsel, Dr. Kwon?
20  **A  What was that?**
21  Q  Are you being represented by counsel
22 today, Dr. Kwon?
23     (Lead Interpreter Kim interpreting for the
24 witness.)
25  **A  Yes.**

12

1  Q  Could you please identify them?
2  **A  Ric.**
3  Q  So your counsel may make objection from
4  time to time.  I ask for you to pause before you
5  answer a question to give your counsel time to
6  object.
7  **A  Yes.**
8  Q  And unless instructed not to answer,
9  please answer the question.
10  **A  Okay.**
11  Q  Do you understand?
12  **A  Yes.**
13  Q  Okay.  I'll try to take breaks every 60 or
14 90 minutes.  There might be some natural break
15 points in between, but please let me know if you
16 need any breaks in between, please.
17  **A  Okay.**
18     THE VIDEOGRAPHER: Actually, is that mic
19 on your shirt?  Just try to angle it towards your
20 mouth.  It twists.  It's a little twist, but I'll
21 angle it --
22     THE WITNESS: Okay.  Got you.  Okay.
23     THE VIDEOGRAPHER: Perfect.  Thank you.
24 Sorry.
25  Q  The only thing I ask actually before you

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023

33

1    Q  During what period were you employed by
2  Akoustis Technology?
3    **A  I work in Akoustis 2017, around June to**
4  **2022, around October.**
5    Q  How did you come to be employed by
6  Akoustis?
7    **A  When I was in Qorvo, I'm trying to move to**
8  **new company.  So I apply some -- for some job link**
9  **in the job site, and then later one of the**
10  **recruiters contact me and introduce this, the**
11  **Akoustis Technology company.**
12    Q  Who was this recruiter?
13    **A  Aaron, I don't remember last name.  First**
14  **name is Aaron.**
15    Q  Why did you decide to join Akoustis?
16    **A  Akoustis Technology company was a startup**
17  **company, and the company team introduced their**
18  **company and their business.  So after listen to**
19  **them, I thought this company has potential to be**
20  **growing up in this market.  So that's why I joined**
21  **up.**
22    Q  Who was the company team that introduced
23  you to Akoustis?
24    **A  The one man, he is vice president of that**
25  **company.  So I don't remember his name.**

34

1    Q  Why did you think the company has
2  potential to be growing in the market?
3    **A  I don't remember.  At that time I thought**
4  **that the company had the potential to be growing,**
5  **but I don't remember now why I thought that.**
6    Q  What is single crystal?
7    **A  I don't remember.**
8    Q  After you contacted the recruiter, who was
9  your point of contact prior to the employment of
10  Akoustis?
11    **A  I don't remember.**
12    Q  Did you interview with Akoustis?
13    **A  Yes.**
14    Q  Did -- did you get a raise by moving to
15  Akoustis?
16    **A  Yes.**
17    Q  Did Akoustis offer better benefits?
18    **A  Yes.**
19    Q  Did Akoustis offer stock options?
20    **A  Yes.**
21    Q  Please tell me the positions you held
22  while at Akoustis.
23    **A  My position was senior process engineer,**
24  **and they -- my position was to develop trim**
25  **process.**

35

1    Q  Was that -- was senior process engineer
2  the first position you held at Akoustis?
3    **A  Typically process engineer is -- the main**
4  **one is to develop or sustain the process.  They**
5  **gave me the senior position because I work in five**
6  **years in TriQuint/Qorvo, and also I have a Ph.D.**
7  **degree and MEMS background.  That's why.**
8    Q  When you joined Akoustis, how many
9  employees were in the -- in --
10    **A  I don't remember.**
11    Q  How many employees were in New York?
12    **A  I don't remember.**
13    Q  When you joined Akoustis, how many senior
14  process engineers were in New York?
15    **A  I don't remember.**
16    Q  Did any other -- did any other process
17  engineer have experience in BAW resonators?
18    **A  I don't remember.**
19    Q  Did any other process engineer have
20  experience with BAW filters?
21    **A  I don't remember.**
22    Q  Did any other process engineer have
23  experience with trim process?
24    **A  I don't remember.**
25    Q  What was the state of Akoustis's trim

36

1  process when you were hired?
2      MR. MACCHIAROLI:  Objection, calls for
3  speculation.
4    **A  I don't remember.**
5    Q  Did Akoustis have an established trim
6  process when you joined Akoustis?
7    **A  I don't remember.**
8    Q  When you joined Akoustis, who was working
9  on the design?
10      MR. MACCHIAROLI:  Objection, vague.
11    **A  I don't remember.**
12    Q  Manufacturing?
13    **A  I don't remember.**
14    Q  Testing?
15    **A  I don't remember.**
16    Q  Trimming?
17    **A  I don't remember.**
18    Q  Qualifications?
19    **A  I don't remember.**
20    Q  Did Akoustis have a commercial product
21  when you were hired?
22    **A  I don't remember.**
23    Q  Was Akoustis trying to sell a product when
24  you were hired?
25    **A  I don't remember.**

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023

44 (173 to 176)

173

1      MR. JUNG:  Video as well.  Actually video
2  can actually be the regular.  Final within five
3  business days.
4      MR. MACCHIAROLI:  What is the standard
5  turnaround time?
6      THE VIDEOGRAPHER:  Standard is about two
7  weeks, ten business days, so about.
8      MR. MACCHIAROLI:  We'll take a standard
9  turnaround.  Is the rough gratis?
10     THE REPORTER:  I do not believe so.
11     MR. MACCHIAROLI:  I don't think we need a
12  rough.  We'll just take the standard.  If that
13  changes, I'll certainly let you know.
14     (Off the record at 3:06 p.m.)
15
16
17
18
19
20
21
22
23
24
25

174

1
2              * * *
3        ACKNOWLEDGMENT OF DEPONENT
4      I, JOONBUM KWON, Ph.D., do hereby
5  acknowledge that I have read and examined the
6  foregoing testimony, and the same is a true,
7  correct and complete transcription of the
8  testimony given by me, and any corrections appear
9  on the attached Errata sheet signed by me.
10
11
12
13  (DATE)             (SIGNATURE)
14
15
16
17
18
19
20
21
22
23
24
25

175

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2
3        I, Janet A. Hamilton, Registered Diplomate
4  Reporter and Notary Public before whom the
5  foregoing deposition was taken, do hereby certify
6  that the foregoing transcript is a true and
7  correct record of the testimony given; that said
8  testimony was taken by me stenographically and
9  thereafter reduced to typewriting under my
10  direction; that review was requested; and that I
11  am neither counsel for, related to, nor employed
12  by any of the parties to this case and have no
13  interest, financial or otherwise, in its outcome.
14        IN WITNESS WHEREOF, I have hereunto set my
15  hand this 26th day of October, 2023.
16
17
18
19
20
21
22  _____
23  Registered Diplomate Reporter
24  My commission expires
25  February 4, 2024.

# Exhibit SS
# (Redacted in Its Entirety)