IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

QORVO, INC.,

      Plaintiff,

vs.              |   NO. 21-CV-01417

AKOUSTIS TECHNOLOGIES,
INC., AND AKOUSTIS, INC.,

      Defendants.

_____

TRANSCRIPT OF THE DISPOSITIVE MOTIONS CONFERENCE

BEFORE THE

HONORABLE JON P. MCCALLA

MONDAY

MARCH 18, 2024

TINA DuBOSE GIBSON, RPR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

UNREDACTED TRANSCRIPT

1          A P P E A R A N C E S

2

3       Appearing on behalf of the Plaintiff:

4

5           JONATHAN R. DEFOSSE
            ROBERT M. MASTERS
6           Sheppard, Mullin, Richter & Hampton, LLP
            2099 Pennsylvania Avenue, NW
            Suite 100
7           Washington, DC  20006-6801
            (202) 747-1900
8           jdefosse@sheppardmullin.com
            rmasters@sheppardmullin.com

9

10          JENNIFER KLEIN AYERS
            Sheppard, Mullin, Richter & Hampton, LLP
11          2200 Ross Avenue
            20th Floor
            Dallas, Texas  75201
12          (469) 391-7414
            jayers@sheppartmullin.com

13

14          ROY D. JUNG
            Sheppard, Mullin, Richter & Hampton, LLP
            30 Rockefeller Plaza
15          New York, New York  10112
            (202) 747-2181
16          rjung@sheppardmullin.com

17          ANTHONY D. RAUCCI
            JEREMY A. TIGAN
18          Morris, Nichols, Arsht & Tunnell LLP
            1201 North Market Street, 16th Floor
19          Wilmington, Delaware 19899-1347
            (302) 351-9106
20          araucci@morrisnichols.com
            jtigan@morrisnichols.com

21

22

23

24

25

UNREDACTED TRANSCRIPT

```
1              Appearing on behalf of the Defendants:

2                  RONALD S. LEMIEUX
                   VICTORIA Q. SMITH
3                  DAVID S. ELKINS
                   XIAOMEI CAI
4                  MATTHEW STANFORD
                   RACHAEL A. HARRIS
5                  Squire Patton Boggs
                   1841 Page Mill Road
6                  Suite 150
                   Palo Alto, California 94304
7                  (650) 843-3330
                   ronald.lemieux@squirepb.com
8                  victoria.smith@squirepb.com
                   david.elkins@squirepb.com
9                  xiaomei.cai@squirepb.com
                   matthew.stanford@squirepb.com
10                 rachael.harris@squirepb.com

11

                   STEPHEN B. BRAUERMAN
12                 EMILY L. SKAUG
                   Bayard, PA
13                 600 North King Street, Suite 400
                   Wilmington,Delaware 19801
14                 (302) 655-5000
                   sbrauerman@bayardlaw.com
15                 eskaug@bayardlaw.com

16

          Also Present:   Greg Warder, Drew Wright
17

18

19

20

21

22

23

24

25
```

UNREDACTED TRANSCRIPT

```
 1                        MONDAY

 2                     MARCH 18, 2024

 3              ----------------------

 4

 5        THE COURT:  All right.  We're here in connection

 6  with two motions.  The Akoustis motion for partial summary

 7  judgment and also the plaintiff's motion for summary judgment

 8  on validity to the patents.

 9             This case is set for trial, and we are on

10  schedule for that.  We have a pretrial conference on April

11  the 19th, which will be at 9:30 Central time but 10:30

12  Eastern time.  Of course, that's our time in Delaware.  And

13  then, of course, the trial is on May the 6th.

14             I need to confirm how long the trial is going to

15  be, but we will need to work on that.  And we don't

16  necessarily -- well, you may want to tell me a little bit

17  about your thoughts on timing, but, really, we'll cover more

18  in a more final way on April the 19th.

19             I understand that Mr. Masters -- I'm going to

20  have to -- there he is -- will be handling the matter mostly

21  for Qorvo and, of course, Mr. DeFosse.  I'm looking for

22  everybody.

23        MR. DEFOSSE:  I'm here, Your Honor.

24        THE COURT:  There you are.  Absolutely.  There's

25  just a little dark background.  I couldn't quite tell if
```

UNREDACTED TRANSCRIPT

1   it -- good to see you.

2          And then who are we going to have speaking for

3   Akoustis?  I'm going to let you chime in so I don't have to

4   look for you.

5          MR. LEMIEUX:  Your Honor, this is Ronald Lemieux

6   for Akoustis.  I had a problem overnight.  So assuming that I

7   don't have to make a quick exit for other reasons, I'll be

8   arguing the summary judgment motion for Akoustis.  And my

9   colleague, Victoria Smith, will be arguing the validity

10  motion.

11         THE COURT:  All right.  I think everybody

12  understands that the case is going to trial.  Nobody is going

13  to be sufficiently able to prevail.  That's really not

14  anticipated, so we understand our situation there.

15         I had indicated at an earlier point in time in

16  connection with the trade secret question that -- anticipated

17  that there would be significant narrowing in connection with

18  trade secrets, and we can -- and there may be some discussion

19  about whether that narrowing has or has not occurred.  I

20  think there's three different positions perhaps on that.

21         But let's go to -- Mr. Masters -- Mr. DeFosse,

22  are you handling that one?

23         MR. DEFOSSE:  I'll be handling that one, Your

24  Honor, yes.

25         THE COURT:  Yes.  Do you want to tell me about

1    that?

2          MR. DEFOSSE:  Sure.  So we did take to heart the

3    Court's expectation that we reduce the number of trade

4    secrets at issue here.  Our initial identification of trade

5    secrets identified nearly 400 trade secrets.  We got that

6    down to 104, which we think was good progress and consistent

7    with what Your Honor was expecting.

8          Of the 104, I think it's important to note that

9    these have been grouped into ten groups that we've created to

10   make the issues more comprehensible for the jury, and a

11   number of the trade secrets relate to the same documents.

12   So, for example, out of the 104, 50 of the trade secrets

13   relate to two documents.  So I think we've gotten down

14   substantially from where we were at.  We think we're at a

15   position now where we can achieve juror comprehension and

16   present the case in an understandable way.

17         THE COURT:  All right.  I am going to ask just to

18   make sure that there's not been -- well, I'll let you -- I

19   know you go up to length of presentation.  We've talked about

20   it in the past.  Now, how is that going to work?

21         MR. DEFOSSE:  So, Your Honor, we would -- I know

22   you mentioned the -- I think a discussion on the length at

23   trial.  We expect or we would ask that we have 25 hours to do

24   that.  We're obviously working through witnesses right now.

25   We'll expect to call witnesses from Qorvo who will address

1    the trade secrets and talk about the ownership of those trade

2    secrets.

3              We'll have evidence from Akoustis on the

4    misappropriation of the trade secrets, and we'll have

5    testimony from our expert, Dr. Shanfield, who will walk

6    through each of the trade secrets and identify, you know, the

7    information that is not publicly available and why it's

8    valuable.

9              THE COURT:  Okay.  Let's go back to Akoustis,

10   then.  Of course, your position is there should be partial

11   summary judgment on this, and you raised an argument, so are

12   they -- go over what you want to, but -- by the way, we're

13   not taking forever today.  This is going to be fairly short.

14   I know that y'all expected that, and we're going to conclude.

15   We have some time limits here.  I just don't expect this to

16   be more than an hour.  It's a pretty straightforward

17   discussion.  Maybe less.

18             I'm sorry, let me go back to Akoustis on this

19   issue on the trade secret question.  I know you've got a lot

20   of things you said about that.  Anything that you want to

21   add?

22             MR. LEMIEUX:  Well, I just would like to point

23   out, Your Honor -- again, this is Mr. Lemieux -- that counsel

24   represents that they have somehow whittled this down to 104

25   trade secrets, which would be amazing.  I've done several

1   trade secret trials.  Never have we tried to try 104 trade

2   secrets.

3          But, nevertheless, in their actual identification

4   of trade secrets they intend to pursue at trial, that 104

5   actually relates to just bullet points, and those bullet

6   points are not single trade secrets that have been identified

7   where there's an algorithm or a formula or some manufacturing

8   technique in particular.

9          Those bullet points themselves contain multiple

10  other subcategories.  So really what they did was they took

11  ten categories, and then they have 104 subcategories under

12  that, and in each of those 104 subcategories, they have more

13  subcategories.

14         And the whole point of requiring an

15  identification with reasonable particularity for trial is to

16  allow the defendant an opportunity to, one, actually

17  prepare -- properly prepare for trial and not have to undergo

18  a trial by ambush situation.  And, in particular, the reason

19  a particularity requirement for trade secret cases is

20  especially important is because, unlike a patent case or a

21  trademark case or a copyright case where there's a government

22  document that sets out what's covered and what are the metes

23  and bounds of what's being asserted, a trade secret case

24  doesn't have that.

25         What constitutes a trade secret is really only in

1   the mind of the plaintiff, and unless they reasonably and

2   specifically identify the particular trade secret as opposed

3   to just simply giving us a category -- like, for example, one

4   of their bullet points, Your Honor, under their tax and

5   corporate compliance structure, they have a bullet point that

6   says proprietary and confidential methodologies related to

7   its tax calculation, including unique tax structures,

8   formulas, processes, and controls.

9           These are just subcategories that may potentially

10  contain trade secrets, Your Honor.  This is not, however, an

11  identification of a trade secret with reasonable

12  particularity.  And the case law in this district and in this

13  circuit is quite clear that if they fail -- they just want to

14  pretend they don't really have to do this, that this document

15  isn't necessary, that just look at our expert report, and

16  just look at documents to identify and that's sufficient.

17          That's not the law, Your Honor, respectfully, in

18  this circuit or in this district.  This district specifically

19  requires identification with reasonable particularity of the

20  actual trade secrets, and they haven't done so.

21          THE COURT:  All right.  And I am concerned about

22  that.  That's why I want to come back and have some more

23  discussion.  I think this is one of the more important issues

24  in the case, frankly.

25          And so let's go back to Mr. DeFosse.  Yes, sir?

1            MR. DEFOSSE:  Yes.  Thank you, Your Honor.

2            So --

3            THE COURT:  Address specifically the category

4       that was just discussed.  I think it's important.

5            MR. DEFOSSE:  Okay.  That's fine, Your Honor.  So

6       I have to find it in the documents.

7            We're looking at Exhibit 5 to Mr. Elkins'

8       Declaration, which is Docket Number 442.

9            THE COURT:  Yes.

10           MR. DEFOSSE:  And I believe that the bullet point

11      that Mr. Lemieux referred to is the first bullet point under

12      Category 10 on page 13?

13           MR. LEMIEUX:  That is correct.

14           MR. DEFOSSE:  And as Your Honor can see, we've

15      listed proprietary and confidential methodologies related to

16      Qorvo's tax calculation, including unique tax structures,

17      formulas, processes, and controls that assist Qorvo in its

18      tax preparation and that Qorvo validated over many years,

19      *See, e.g.*  And then we provide citations, pin citations to

20      one, two, three pages of documents that have been produced to

21      the other side.  And that's, I think, typical for all of the

22      bullet points that we've listed in the November disclosure.

23      We've gone through and we've put these trade secrets in

24      categories.

25           For each category, we've identified the specific

UNREDACTED TRANSCRIPT

1   information that we say is a trade secret.  For each of those

2   identifications, we've provided pin citations to documents

3   that have been produced to the other side or were actually

4   produced to us that there are files in most cases.

5          And for each of these, our expert has gone

6   through and provided a very detailed analysis.  I think the

7   other side pointed out it's in excess of 500 pages.  He's

8   walked through these same documents, and he's identified the

9   information in those documents that is not publicly available

10  and is valuable.

11         And I guess I would point out, Your Honor, that

12  this type of identification that we've made here is greater

13  than any of the identifications in any of the cases that

14  Akoustis has cited in their briefs.  We haven't just

15  identified categories.  We've identified the specific

16  information in those categories.  We haven't just blanketly

17  cited hundreds of pages of documents.  We've provided

18  specific pin citations to the documents where this is found.

19         We've provided the evidence from our expert who

20  has gone through these; and if the Court would be willing to

21  entertain it, I would suggest that the most on-point case

22  that's relevant here is the *MicroVention* case, which is a

23  case from last year in California where the exact same

24  arguments that Akoustis is raising here were brought up, lack

25  of particularity and this trial by ambush theory that they

1   have.

2          And the Court rejected both of those.  And I

3   think what's really particularly relevant about that case is

4   we're not in a situation here where we're talking about a

5   handful of documents that have been taken.  As the Court

6   knows, we're talking about half a million documents that have

7   been stolen here.  And that *MicroVention* case, it was 55,000

8   documents, and the Court noted there that even requiring a

9   plaintiff to go through and identify specific information in

10  those documents wouldn't be reasonable in that situation.

11         So we've gone beyond what's -- what was found

12  acceptable in that case.  There they had 12 categories of

13  trade secrets, and they just listed the document.  Here, we

14  have ten categories.  We've not only listed the documents,

15  we've identified the information in those documents and

16  submitted an expert report who's gone -- that goes through

17  each of those.

18         So I don't think Your Honor will find any case --

19  they certainly haven't cited one -- that has ever found this

20  type of identification to be inadequate.  Not a single case.

21  And we cited a number of cases in our papers that say that

22  this is adequate.

23         THE COURT:  Mr. Lemieux, this is an important

24  issue.  Anything that you want to add?  I will say that, at

25  this point in time, with the analysis that we have, it does

UNREDACTED TRANSCRIPT

1   appear that the motion will probably be denied.

2           Now, I always tell everybody it's not done until

3   you see it in writing at the last -- in the submittal by the

4   Court.  So that doesn't mean you've lost.  It means that

5   you're teetering a little bit here.  And so -- you know, what

6   else would you add? because we've been really concerned about

7   this issue.

8           MR. LEMIEUX:  You know, and with good reason,

9   Your Honor.  You know, I've read the prior hearings before I

10  was involved in the case, and the Court has consistently let

11  the plaintiffs know they need to whittle down their trade

12  secret case if we're going to go to trial on this.  And, like

13  I said, I've only been practicing 40 years, but I've never

14  seen a case go to trial with a hundred trade secrets.

15          But I would point out, Your Honor, this category

16  that he's looking at here, they didn't identify the specific

17  trade secrets, even in the bullet point we just read.  They

18  simply identified categories, and then they say in those

19  three documents, which, again, are only examples to *See, e.g.*

20  It's not even tied to, okay, you'll find the tax structure in

21  this document, and you'll find the tax calculation in this

22  document.  They just put, for example, look at these three

23  documents, and maybe you'll find this stuff.

24          And the courts -- many -- in all of the cases we

25  cited, Your Honor, they say that is not adequate.  You can't

1    just simply say here's a bunch of documents, you go there and

2    find it.  Or here is our 680-page report, you go find it.

3    We're entitled to know what is actually the secret.

4              THE COURT:  Right.  We agree with -- I mean, I'm

5    not disagreeing with the general propositions that you're

6    making, that you're asserting.  I think they may have done

7    significant -- we've had some cases where certainly trade

8    secrets just weren't adequately identified and ended up

9    certainly didn't make it all the way through.  But I'm -- I

10   think they've done a good bit more than some other situations

11   that you may have been confronted with.

12             You want to -- please take your last best three-

13   to five-minute shot on this one.  It's a big one.

14             MR. LEMIEUX:  Well, and what I would point out,

15   Your Honor, I guess it's just like I said, the practical

16   logistical problem this creates by their identification done

17   in this way.  We have no idea what trade secrets they're

18   actually going to pursue at trial.  They've given us 104

19   bullet points of possible categories, and I'm only going to

20   find out what the actual specific secret -- paying your taxes

21   is not a trade secret.  You know, complying with

22   Sarbanes-Oxley is not a trade secret.  Well, those are

23   categories they list here and what they're going to go to

24   trial on.

25             I'm not going to find out until we're actually in

1   trial, then, if they're allowed to proceed this way without

2   knowing what it is I need to prepare a case for, and that's

3   just wasteful.  That's wasteful of the Court's time.  That's

4   wasteful of the parties' time.  And that's one of the reasons

5   this requirement exists is precisely to avoid this type of

6   let's just throw a bunch of stuff in the corner, and say it's

7   there.  You go find it, and then we'll figure out and then

8   we'll do it at trial.  That kind of, you know, trial where

9   just throwing it up against the wall, Your Honor, is not what

10  the cases allow.

11          THE COURT:  I understand that.  I don't disagree

12  with that.

13          Mr. DeFosse, let's go back to that.  I think we

14  understand where the parties are on this, but I want you to

15  address those last couple of things that were raised by

16  counsel opposite.

17          MR. DEFOSSE:  Sure.  So, Your Honor, first point

18  would be we didn't just say the trade secret was paying

19  taxes.  We identified the methodologies that were in specific

20  documents on specific pages of those documents as the trade

21  secrets.

22          I guess my second point would be, while

23  Mr. Lemieux claims that he has no idea what trade secrets

24  we're pursuing, the other side submitted three expert reports

25  who have gone through the trade secrets that Dr. Shanfield's

1   identified.  They had no problem identifying the information

2   that Dr. Shanfield was discussing, and in some cases, they

3   claim to have identified the same information in the public

4   record.

5          So we obviously disagree with those opinions of

6   those experts, but the assertion that they have no idea what

7   the trade secrets are that are at issue here, I think just

8   falls flat.  Your Honor can see Exhibit 5 --

9          THE COURT:  Sure.  And I think that we often hear

10  that argument made.  So I think we've given everybody a

11  chance to further articulate and focus on what they -- I

12  think their -- the strength of their position, and we're

13  going to get something concluded on that.

14         Let's go to the single crystal technology

15  question.  I'm going to be candid now to the plaintiff that

16  this is one where I'm not so sure about it.  I do think --

17  there's a lot of discussion about single crystal, and there's

18  certainly a lot of discussion early on in the case.

19         Of course, if it's in light of the standard here,

20  you may be able to go forward.  I'm not quite sure, though.

21  So we're just going to start with the plaintiff on that.

22         MR. DEFOSSE:  Sure, Your Honor.

23         So as I understand it, Akoustis has raised three

24  arguments on the single crystal false advertising claim.

25         The first position that they've taken is that

UNREDACTED TRANSCRIPT

1   their statements were true.  I think that dispute boils down

2   to an issue of timing.  As I understand what they're arguing,

3   it is that at some point in time prior to 2018, Akoustis was

4   doing experimentation with single crystal technology; and,

5   therefore, all of their statements concerning single crystal

6   must be true or must not be false because they had this

7   experimentation.  And I think that's an oversimplification of

8   the issue here.

9          So the issue, there's not a dispute that there

10  was experimentation on single crystal technology.  There's

11  not a dispute that samples were created with single crystal

12  technology.  The point that we're making and the position we

13  would proceed to at trial is that at a certain point in time,

14  Akoustis made the decision that it was not moving forward

15  with single crystal technology, and it continued to advance

16  advertisements that were identifying products that were

17  polycrystalline as single crystal.  And that is, I think, a

18  classic example of false advertising.

19         The second flavor there, Your Honor, is that in

20  addition to identifying these polycrystalline products as

21  single crystal, they continued to assert that single crystal

22  technology achieved superior performance despite having test

23  reports saying the opposite, that the performance was less --

24  less good than the polycrystalline products.

25         So I think that's where the dispute comes down.

UNREDACTED TRANSCRIPT

1   We've identified in our documents evidence that we intend to

2   present on those issues.  I think there is a genuine dispute

3   of fact on this that the jury is going to have to decide

4   whether these statements were true or false, and it should be

5   up to the jury to decide whether the fact that they

6   experimented with single crystal technology at some point in

7   time or shipped prototypes is sufficient to allow them to

8   make the statements they made.

9           THE COURT:  Well, is there any situation where

10  the -- there is proof of actual deception?  I'm just going to

11  ask that.

12          MR. DEFOSSE:  Yes.  So I would say, yes, Your

13  Honor.  What we've cited in our papers are market reports

14  that are compiled by industry analysts who are looking at

15  this field and addressing the technology that's out there.

16          On multiple occasions, those very sophisticated

17  analysts were deceived as to the crystalline structure of

18  Akoustis's products and the resulting performance advantages.

19  We cited those in our paper, and I believe that is evidence

20  of deception.

21          THE COURT:  And explain to me, make sure I

22  understand how that's going to be admissible.

23          MR. DEFOSSE:  The reports from the market

24  analysis.  Your Honor, to be honest, I'm sorry, you caught me

25  off.  I have not thought about that, and I don't think the

 1  other side had raised until now that those reports are not

 2  admissible.  They relied on those same reports and --

 3          THE COURT:  Right.  Right.  I just -- I just want

 4  to make sure that I'm not then caught with a new argument

 5  late.  I can imagine sitting in a conference room in Delaware

 6  and somebody talking about that.

 7          MR. DEFOSSE:  Yes.  So the best I can do just off

 8  the -- you know, off the cuff here, Your Honor, is that those

 9  statements are obviously submitted for the truth of the

10  matter, so they're not hearsay.  They're submitted to show

11  that participants in the market had this understanding or

12  perception of what Akoustis was saying.  So it's not that the

13  products were actually single crystal because that's

14  obviously what we're disputing.  It's that the market issued

15  reports saying that these products were single crystal.

16          THE COURT:  Okay.  I'm just trying to think all

17  the way as far as I can on this.

18          MR. DEFOSSE:  And, Your Honor, sorry -- sorry.  I

19  didn't mean to --

20          THE COURT:  No, go right ahead.  Go right ahead.

21          MR. DEFOSSE:  I was going to make one more point

22  on the deception issue.  Actual deception is not -- also

23  would not be a reason to dismiss these or to grant summary

24  judgment on these claims.  Actual deception only comes into

25  play here for issues in money damages.

1          So certainly to the extent we want money damages,

2     that's something we'll have to show is a tendency to deceive,

3     but we're also seeking injunctive relief here.  And so the

4     claim should still go forward in any case even if there's not

5     sufficient evidence of tendency to deceive.

6          THE COURT:  That's actually kind of where I was

7     thinking we might end up.  Of course, we may have further

8     discussion later on, particularly as the evidence is

9     developed at trial, assuming we're still be dealing with this

10    issue.

11         But let's go back -- let's go to -- I'm not sure

12    who's handling this for the defense.

13         MR. LEMIEUX:  I'll be handling this, Your Honor.

14         THE COURT:  Sure.

15         MR. LEMIEUX:  I'll point out a couple of things.

16         One, the reports that Mr. DeFosse was referring

17    to are analyst reports.  Those are not consumers.  Those are

18    not purchasers of these products.  They're -- and what we

19    have to have here is potential to deceive actual consumers of

20    the products for this type of claim to be able to be merited.

21    There is no evidence of any confusion.

22         In fact, their own salesperson testified that,

23    no, he's not aware of any confusion either in the group when

24    we took his deposition.  And so there is -- as we put

25    forward, I heard some very interesting attorney argument from

UNREDACTED TRANSCRIPT

1   Mr. DeFosse, but there is no evidence that they put forward

2   in their opposition brief that could be relied on in any way

3   to satisfy a Lanham Act claim in this scenario.

4           The statements about single piezo layer are true.

5   They actually have sold such products and potential

6   components of such products to customers.  And there is no

7   evidence, even according to their own head of marketing, of

8   any actual confusion in the marketplace.  So they just

9   haven't presented any evidence, Your Honor, to get past that

10  burden.

11          THE COURT:  Mr. DeFosse, this was teetering on

12  the edge of possible grant but, of course, we have to be

13  cautious.  We understand the standard here.  And so I think

14  you probably made your full argument, but I don't want to --

15  I'm not saying you're going to -- it has always been an

16  interesting question in the case.  We're very interested in

17  it early on in the case, and I -- we just won't say any more

18  than that.  I just think I want to make sure I've got your

19  last best shot.  I'm not -- I don't want to -- then I want

20  to -- Mr. Lemieux, don't get overconfident here.  This is one

21  we've been thinking about for a long time.

22          MR. DEFOSSE:  Sure, Your Honor.  So I would make

23  two responses to Mr. Lemieux.

24          The first is the tendency to deceive customers

25  can be evidenced by the market reports themselves.  I'm not

1   aware of any case law that would say that you have to have

2   evidence that's generated from the customer itself to say, I

3   was deceived.  Obviously, that evidence would be valid, but

4   the market reports indicating that very sophisticated

5   analysts who are looking at these products were themselves

6   deceived, I think, can support a jury finding that there's a

7   tendency to deceive customers here.

8              And the second point --

9              THE COURT:  Hit me again with how you're going to

10  introduce them.  Tell me again how they're going to do it.

11  I'm just trying to work through it.

12             MR. DEFOSSE:  Yes, Your Honor.  As I understand

13  the issue you're anticipating is a hearsay problem that we

14  have statements by --

15             THE COURT:  Sure.  Sure.

16             MR. DEFOSSE:  -- third parties.  And my position,

17  again, would be that the -- what we're putting those

18  position -- those documents in is to show what was said in

19  the market, not the truth of what was said.  So the --

20  these -- the fact that market analysts were saying that the

21  products are single crystal products with superior

22  performance is the -- is the -- what we're presenting those

23  reports for.

24             And so that's not for the truth of what's

25  asserted in those documents.  It's not for the truth that

1    those products are single crystal products.  It's for

2    evidence of what people were saying, and I think that

3    evidence is admissible as nonhearsay, Your Honor.

4              THE COURT:  It may well be on that.

5              But let's go back to counsel opposite because

6    that's an issue I want to understand.

7              MR. LEMIEUX:  It's not -- they're still

8    attempting to use those reports, Your Honor, for basically

9    the statements made as the truth of the statements.  It's a

10   classic -- actually, it's a multiple hearsay issue.  I don't

11   think they can introduce them.

12             But even more importantly than that, Your Honor,

13   there's no evidence that these statements were influencing

14   customer decision-making, which, again, a requirement for

15   this kind of claim.

16             If you take a look at the *Newborn Bros.* case that

17   we cited to in our briefs -- I think it's at 481 F. Supp. 3d,

18   which is a 2020 decision -- it makes it clear that there has

19   to be some evidence of influencing customer decision-making,

20   and there is none.  There has been none provided by plaintiff

21   here whatsoever, which is fatal to its claim.

22             THE COURT:  Okay.  And we are going to go back

23   one last time, Mr. DeFosse, because no evidence of

24   influencing customer decisions.

25             MR. DEFOSSE:  Yes.  So that's the materiality

UNREDACTED TRANSCRIPT

1   element, Your Honor.  We've submitted testimony from

2   Mr. Aichele, who is the executive vice president of product

3   development on the other side, explaining how critical this

4   advertising was for Akoustis to get into the door with

5   customers and achieve its sales.  I think that is direct

6   evidence of the materiality of these statements.

7           I think you also have circumstantial evidence.

8   The fact that this has been the centerpiece of their

9   marketing campaign for years allows the jury to determine

10  that, well, this information must have been material to

11  customers because, otherwise, you wouldn't have expended this

12  amount of resources in pursuing that -- those statements.

13          THE COURT:  Okay.  Let's just -- I want to make

14  sure.  RICO claim is out, right, Mr. DeFosse?

15          MR. DEFOSSE:  We will not pursue that claim, Your

16  Honor, yes.

17          THE COURT:  And we've got that marked out, but I

18  just wanted to be sure.

19          On the poaching question, it's kind of an odd

20  situation here.

21          And so let's hear from plaintiff on -- defendant

22  on that as to why you might be right on that.

23          MR. LEMIEUX:  As pointed out, Your Honor, in that

24  particular circumstance, there have been, according to the

25  defendant's own damages expert, 19 people over a ten-year

UNREDACTED TRANSCRIPT

1   period that were cleared directly from Qorvo into Akoustis.

2   That's less than a quarter of 1 percent of Qorvo's workforce.

3   That's just --

4            THE COURT:  I'm going to ask you this question.

5   It always comes up when you have this sort of thing, though.

6   What if you have Einstein working for you and you steal

7   Einstein, but you also don't steal a bunch of other people,

8   does that matter?  Of course, Einstein might be important.

9   Well, maybe Oppenheimer, more appropriate.

10           MR. LEMIEUX:  None of these people rose to that

11  level of eminence in seriousness in terms of what they did.

12  These were just simply people who are regular inline

13  engineers, Your Honor.  There are only two major

14  semiconductor companies in the Charlotte area, so it's not

15  unusual that if one is going to work for one, or one is going

16  to work for the other.  In fact, I don't have the number in

17  front of me, but I suspect there are probably even more

18  people who have gone from Akoustis to Qorvo than the other

19  way around.  That's just kind of the normal hiring in any

20  given situation.  And it certainly isn't the kind of, you

21  know, targeted large-scale type of poaching that is

22  actionable under normal circumstances.

23           THE COURT:  All right.  Well, let's hear from

24  counsel opposite again.  I'm not -- I always said there may

25  be some flexibility as who's responding, so far it's been two

 1   people.

 2              MR. DEFOSSE:  Yes.  And it's still me, Your

 3   Honor.

 4              So the first thing I would say is Mr. Lemieux

 5   mentioned it's only 19 employees.  It's actually 43.

 6   Nineteen are just the number of employees who came directly

 7   from Qorvo.  Forty-three are the number of employees who

 8   they've hired who did work at Qorvo.  And the allegation here

 9   is that they were targeting Qorvo employees to hire in order

10   to obtain confidential information.  I think it's -- there's

11   a very substantial amount of evidence that that is what was

12   happening here.  That is unfair competition under New York

13   law.

14              Mr. Lemieux also mentioned that there's these two

15   companies in Charlotte, and there's only a few -- you know,

16   there's only a few semiconductor companies in that area.

17              THE COURT:  North Carolina law, right?

18              MR. LEMIEUX:  Yes, North Carolina law is unfair

19   competition.

20              THE COURT:  Those people in North Carolina are

21   glad to know that that's what they're being talked about.  I

22   think you said New York, and I think we're --

23              MR. DEFOSSE:  Oh, sorry.  I'm sorry.  I

24   apologize, Your Honor.  Yes, North Carolina law.

25              So the point I wanted to make on the Charlotte

1    issue is that Akoustis's recruiting here was not limited to

2    the Charlotte area.  And, in fact, most of this recruiting

3    was occurring outside of Charlotte, so they were calling --

4    we had one document where we submitted that they were calling

5    every Qorvo BAW device engineer in Florida trying to convince

6    them to move to Charlotte.  They recruited folks from our

7    facilities in Texas.  They were recruiting people in Boston.

8              So the argument that, well, this is just normal

9    flow of employees from one company to another in Charlotte

10   because they're in the same area just doesn't hold with the

11   facts here.  That's not what's happening.  They were

12   specifically targeting Qorvo employees in order to obtain our

13   confidential information, and we had a lot of evidence of

14   that.

15             THE COURT:  There's some indication, just going

16   back to counsel opposite, including a statement that "Laura

17   and I have Mike hitting Qorvo very hard right now calling

18   nearly every device engineer."

19             MR. LEMIEUX:  Well, sure --

20             THE COURT:  That doesn't sound so good.  It may

21   be okay.  What do you think?

22             MR. LEMIEUX:  Well, I would think, Your Honor, I

23   think if you ask most employment and HR departments if

24   they're looking for people to try to hire, they're looking

25   for people with the right skill sets, et cetera, that -- I'm

UNREDACTED TRANSCRIPT

1    sure Qorvo wasn't the only company they were trying to get

2    into it.  There were others that were available such as

3    Broadcom or others.  They're looking for skill sets, Your

4    Honor.  They're looking for people with the right credentials

5    and abilities here.  And so it's not surprising then that

6    some of those folks would come from Qorvo.

7              But even listening to what Mr. DeFosse just said,

8    even if you add in the other 20-some-odd people, that means

9    that over a ten-year period, they hired less than 1 percent

10   of Qorvo's workforce.  And I haven't heard any -- you know,

11   any representations at all from plaintiff that, oh, they

12   hired 43 percent of our engineers for this or that.  And the

13   fact that they were looking for people who weren't even

14   working at Qorvo anymore, but may have worked for Qorvo in

15   the past, you know, that's not particularly telling.  I have

16   worked at many law firms, Your Honor.  That doesn't

17   necessarily mean one thing or another.  It just means I'm a

18   lawyer.  And these people were engineers and worked for

19   engineering companies.

20             THE COURT:  I understand.  I think -- anything

21   final on that one from Mr. DeFosse?  But I think we've got

22   that one down.  I understand.  We understand where we are on

23   that.

24             MR. DEFOSSE:  Yes.  Thank you, Your Honor.

25             THE COURT:  The partial summary judgment in favor

1    of Akoustis on Count 2 in this case, I think that may not

2    be something we have to -- well, what about that quickly?

3                    MR. LEMIEUX:  Is that with, Your Honor, with the

4    regard to the noninfringing alternatives?

5                    THE COURT:  Yes.

6                    MR. LEMIEUX:  Yes.  And so we would simply draw

7    the Court's attention to the *In Re Personalweb Techs* case.

8    Basically, there's equitable claim preclusion that the

9    federal circuit has recognized in situations like this where

10   these products that are in existence, samples were actually

11   given to them prior to the close of discovery.

12                   They chose not to include them in their

13   infringement contentions or to have their experts look at

14   them, but that doesn't mean they get a free shot to go do it

15   again later at some later point in time given that they could

16   have pursued against these particular products during this

17   lawsuit had they so chosen to do so.

18                   And so given that they didn't have their experts

19   look at them, we're entitled to a finding in our favor, then,

20   pursuant to that doctrine on those noninfringing

21   alternatives.

22                   THE COURT:  Let's hear from counsel briefly and,

23   of course, I am a little mindful of time.  We're okay.  It's

24   just always helpful to hear from everybody.

25                   MR. DEFOSSE:  Thank you, Your Honor.

1          So I think what Mr. Lemieux just said is totally

2     wrong on the law and on the facts here.  These -- what

3     happened here was we served an interrogatory asking for the

4     other side to identify noninfringing alternatives.  That's a

5     damages issue.  It's the -- the question is:  At the time of

6     the hypothetical negotiation, were there other alternatives

7     that you could have adopted instead of this technology to

8     move forward?

9          They provided us with an identification of what

10    they claim to be noninfringing alternatives, and they

11    produced samples of those alternatives apparently to show

12    that they could have been produced, and then that was it.

13         We submitted our final infringement contentions.

14    You do not deal with noninfringing alternatives in

15    infringement contentions.

16         Six weeks later, they serve an updated

17    interrogatory on us saying, by the way, those noninfringing

18    alternatives, the samples were sold.  What are we supposed to

19    do with that?

20         The kind of hindsight analysis from Akoustis is,

21    well, you should have sought leave to amend your infringement

22    contentions and added these new products.  That's not what

23    happens in one of these cases.  Those are just -- those

24    products are just not in this case.

25         At some point, there may be an issue of whether

UNREDACTED TRANSCRIPT

1   they would be covered by the scope of any injunction that

2   could be issued following the jury trial, or this may be an

3   issue that is addressed in a future case, but that is not

4   something to be decided now.

5           What they want Your Honor to do is prejudge an

6   estoppel issue, and that's an issue for a future time and

7   doesn't -- so there should be no summary judgment here.  I

8   think, otherwise, the parties are in agreement that the

9   samples that may or may not have been sold are not at issue

10  in this case.

11          THE COURT:  Okay.  I think that really covers

12  most of what we need to cover in the Akoustis motion, and we

13  have the plaintiff's motion here.  I don't know if that's

14  going to take that long, but I'm going to let whoever is

15  handling it --

16          Mr. DeFosse, you may still be leading everything,

17  I don't know, but your motion in connection with the

18  particular patents involved.

19          MR. MASTERS:  Your Honor.  I will --

20          THE COURT:  Mr. Masters, yes, sir?  Absolutely.

21  Yes, sir?

22          MR. MASTERS:  I will handle this motion, and I

23  can be fairly brief.

24          Qorvo moved for summary judgment of the validity

25  of the U.S. patents, both the two patents in this case, on

1   five grounds, essentially:  the lack of enablement, one;

2   indefiniteness, two; three was inadequate written

3   description; four was anticipation; and the fifth theory was

4   obviousness.

5            In response, Akoustis does not contest the first

6   four of those theories, which was the lack of enablement,

7   indefiniteness, inadequate written description, and

8   anticipation.  Akoustis is, however, trying to preserve an

9   argument that the patent -- asserted patent claims are

10   invalid as being obvious under Section 103.

11            The problem with that, Your Honor, and why we

12   still believe this motion should be granted is that neither

13   Akoustis in its final infringement contentions nor their

14   expert, Dr. Nguyen, applied the necessary analysis under the

15   *Graham* factors or any other evidence or motivation to combine

16   the prior art.  That is a necessity under Section 103.

17            Obviousness is based on prior art, but,

18   ultimately, it is a question of law.  The inquiry rests on

19   factual determinations known as the *Graham* factors.

20            THE COURT:  Right.

21            MR. MASTERS:  And so there's two aspects with

22   respect to the '018 patent.  Akoustis, in their final

23   infringement contentions, never advanced an obviousness

24   combination on the two pieces of prior art -- or the prior

25   art, which they are referring to as the WO '740 publication.

UNREDACTED TRANSCRIPT

 1   In fact, they say the claims, 1 and 12, which are the

 2   asserted claims of the '018, are anticipated by WO '740, not

 3   obvious.

 4            And in Dr. Nguyen's expert report, he also

 5   advances a theory that the claims are anticipated by WO '740.

 6   He doesn't provide an obviousness analysis.  In fact, his

 7   expert report in paragraph 60, which was Exhibit B to our

 8   motion for summary judgment, states the WO '740 publication

 9   anticipates Claims 1-4, 6, 10, 12, and 14 of the '018 patent

10   and/or renders obvious on its own Claims 2, 5, 10, 12, and

11   13.

12            So Dr. Nguyen never addresses obviousness.  The

13   final infringement contentions did not address obviousness.

14   They were all based on the theory of anticipation, which was

15   not addressed in the response by Akoustis; and, therefore, we

16   believe that with respect to the '018 patent, the motion

17   should be granted in its entirety.

18            THE COURT:  That's succinct.  Let's hear from

19   counsel opposite.  I do think this is one where I really am

20   interested -- I'm always interested in what you have to say,

21   but I want to hear the best shot on this one, for sure.

22            Is that Ms. Smith?

23            MS. SMITH:  Yes.  Good morning, Your Honor.

24            THE COURT:  Good morning.  Tell me why they're

25   wrong.

1          MS. SMITH:  All right.  So, first of all, there

2    are -- I just want to address the issue of motivation to

3    combine.  So it's Akoustis's contention -- assertion that

4    there are genuine issues of material fact, and those two

5    issues are whether motivation to combine exists and whether

6    the combinations render certain elements obvious.

7          The question here is whether there is evidence

8    that a reasonable jury could consider and return a verdict

9    for Akoustis.  I want to address motivation to combine first.

10         Opposing counsel talks about the *Graham* factors,

11   but the *Graham* factors are not the only way to show

12   motivation to combine.  If you look at cases such as *Cross*

13   *Medical,* you'll see that in addition to the *Graham* factors,

14   there are other ways of showing motivation to combine, such

15   as implicit ways where you can find in narrow fields a common

16   knowledge of an existing problem in the field.

17         There are other ways of implicitly showing

18   motivation to combine, such as the references being in the

19   same narrow field or using the same techniques in that field.

20         Akoustis disclosed all three of these reasons,

21   and I'd like to just, at a very high level, go through the

22   infringement contentions to explain to Your Honor how

23   obviousness was disclosed there.

24         The anticipation and obviousness assertions begin

25   and -- begin on page 7 of the contentions, and they go all

UNREDACTED TRANSCRIPT

1    the way to page 14.  Right at the beginning, at page 7

2    through 9, there's a listing of the prior art references.

3         At page 10, in the third full paragraph, Akoustis

4    discloses that any prior art renders the asserted claims

5    obvious alone or in combination with the understanding of a

6    person of ordinary skill in the art.

7         And then in -- on pages 11 and 12 of the

8    contentions, Akoustis goes into the motivation to combine.

9    We stated that a POSITA would have been motivated to combine

10   the references for many reasons, and we identified those

11   reasons as being general knowledge of those skilled in the

12   art, common sense, and I quote:  From the fact that the

13   references are in the same field of endeavor and/or seek to

14   solve a common problem.  That's exactly what *Cross Medical*

15   addressed as being another way other than the *Graham* factors

16   to show an implicit motivation to combine.

17        Following that, in the invalidity contentions,

18   Akoustis then stated that the prior art references, as well

19   as the asserted patents were part of the same field of

20   acoustic resonators.  A person of ordinary skill in the art

21   would have been aware of these references and products and

22   would not have to reach out beyond the field to make any

23   combination.

24        So Akoustis then further explained that the

25   motivation to combine is also supported by the fact that the

1  techniques of varying electric thickness, which is what the

2  '018 patent is directed to, and passivation layer thickness,

3  which is what the '755 patent is directed to, these were

4  techniques known in the field.

5          So the invalidity contentions explain all three

6  of these ways of implicitly finding motivation to combine:

7  same field of endeavor, common problem to be solved, and

8  known techniques in the field.  These were all

9  characteristics of the identified prior art that had been

10 listed prior in the invalidity contentions in pages 7 through

11 9, and they all share how motivation to combine was implicit.

12          Now, Qorvo characterizes these statements as

13 boilerplate, but they are not.  Each of these prior art

14 references have these three characteristics, and it would

15 have been redundant for Akoustis to make a separate set of

16 statements for each prior art reference when they all have

17 the same characteristics.  And so that's the cover pleading

18 of the invalidity contentions.

19          I'll go to the charts, specifically for the '018

20 patent on page A2 and A3 of the '018 chart.  That refers

21 to -- that specifically refers to electromechanical coupling

22 values in the primary '740 patent, the primary reference for

23 obviousness, the '740 patent, and then combined it with the

24 background knowledge of a POSITA in understanding that

25 electromechanical coupling affects filter bandwidth.

UNREDACTED TRANSCRIPT

1          So, for example, the charts use the phrase,

2    skilled artisan would appreciate from the '740 publication,

3    as well as the phrase, which the skilled artisan would

4    recognize as providing a larger filter bandwidth.  That all

5    goes towards the background understanding of a person of

6    ordinary skill in the art, what they would bring to combine

7    with the '740 patent.

8          As for the charts for the '755 patent at B8, it

9    describes Hashimoto, which is the secondary reference for the

10   obviousness combination, and it describes Hashimoto as

11   teaching a resonator design that, quote, avoids generation of

12   laterally trapped waves, end quote.  This is exactly the

13   problem that the primary reference, DE '425 patent, is

14   solving, and that was commonly known to exist in the field.

15   So that's the invalidity contentions.

16         And with regard to Dr. Nguyen's report, the

17   report also echoes and further explains what was already

18   disclosed in the Akoustis invalidity contentions.

19         So starting with the '018 patent, if you look at

20   paragraph 55 of the report, it contains two sentences.  In

21   the first sentence, Dr. Nguyen discusses the, quote, age-old

22   practice, end quote, of designing electrodes to affect

23   performance.  And when he discusses this, he cites the '740

24   patent and specifically points to electrical --

25   electromechanical coupling.

UNREDACTED TRANSCRIPT

1          In the very next sentence in the same paragraph,

2     he explains that a POSITA would undoubtedly understand that

3     changing the relative thickness of the top and bottom

4     electrodes would affect performance.  And, of course,

5     performance includes bandwidth.  So all of this was part of

6     the background knowledge in the field.

7          And when Dr. Nguyen charted the Claim Element 1C,

8     which is what is at issue here, of the '018 patent, he

9     provided proof of this background knowledge that was existing

10    at the time by, again, you know, explaining about the

11    electromechanical coupling and then how it would contribute

12    to higher bandwidth.  And he ended that by citing to two

13    publications:  Zverev, which is spelled Z-V-E-R-V (*sic*),

14    which was published in the 1960s; and Gerber, which was

15    published in, I think 1985.

16         So by the time that the alleged inventions of the

17    '018 came along, this background knowledge was already very

18    well known.  And so Dr. Nguyen absolutely addressed this

19    obviousness combination.

20         And then with regard to the '755 patent, if you

21    look at paragraph 65, 6-5, of Dr. Nguyen's report, he

22    discusses the known problem and solution of varying the

23    thickness of the passivation layer to affect lateral wave

24    propagation.

25         He then cites to various references in a string

1   site, and it includes both the DE '425 patent, which is the

2   primary obviousness reference and Hashimoto.  Both of those

3   references are in the same site, and that's because they are

4   both in the same narrow field attacking the same problem and

5   using very similar techniques.  Known techniques in the

6   field, right?

7            When you go and look at the charts that

8   Dr. Nguyen created for the '755 patent and you look at the

9   charting elements for elements 9h and 10h, those are

10  identical as far as what Dr. Nguyen discussed.  And so what

11  Dr. Nguyen talked about in the charts was DE '425's teaching

12  of using boundary conditions in the passivation layer to

13  affect lateral wave creation.  And then he discusses a

14  POSITA's understanding of combining the teachings of DE '425

15  with Hashimoto's teaching regarding lateral propagation and

16  boundary conditions in acoustic resonators.

17           Specifically, I'd like to point Your Honor to the

18  title of Hashimoto.  Hashimoto is a book that is entitled *RF*

19  *Bulk Acoustic Wave Filters in Communications.*  And the

20  specific chapter that Dr. Nguyen cites to that contains the

21  relevant teaching is called BAW Device Basics, B-A-W.  And so

22  that is -- that shows the implicit motivation to combine with

23  DE '425.  Both of these are within the same narrow field.

24           So a genuine dispute does exist as to whether a

25  POSITA would have been motivated to combine the primary

1   references with background knowledge in the same narrow field

2   or a secondary reference in the same narrow field using the

3   same types of techniques to solve a common known problem.

4          And I would also -- I would also point, Your

5   Honor, to two cases that Qorvo cited in its -- in its -- I

6   think it's in their reply brief.  It's the *Eisai* case and the

7   *Mytee* case, where in both cases, the Court was ruling on a

8   motion for summary judgment of nonobviousness.  And because

9   there was no evidence of motivation to combine, summary

10   judgment was found.

11         So I want to address what so-called no evidence

12   was.  In the *Mytee* case, that was very simple.  The

13   challenger literally just stated it would have been obvious

14   to combine, end quote.  That's all that the challenger had

15   said about motivation to combine.  And so the district court

16   and the federal circuit agreed that there was no genuine

17   issue, that motivation to combine did not exist because there

18   was literally no evidence presented, right?

19         In the *Eisai* case, the technology was a chemical

20   compound, and in chemical compound cases what you do is you

21   start -- you choose a lead compound, and then you can combine

22   that with a structurally similar secondary compound.  And it

23   would be implicit motivation to combine those two compounds

24   just by the very fact that the structures are similar.

25         And what the *Eisai* case found was in the lead

UNREDACTED TRANSCRIPT

1  compound, there was a fluoride group that was stuck to it,

2  and it made the compound work.  That's what made the compound

3  work.  The secondary compound, in order to be added to the

4  primary compound, you'd have to remove that fluoride group

5  and then add the secondary compound.

6        And what the Court said was, well, since this

7  fluoride group is what makes that lead compound work, you

8  have to explain why you would remove that fluoride group.

9  It's not enough just to say that two structures are similar

10  and, therefore, you could add those two compounds together.

11  There was no -- and the patent challenger had not addressed

12  at all why the fluoride -- a person of ordinary skill would

13  have been motivated -- would have thought of removing the

14  group that made the compound work.  And that's why the judge

15  found there was -- no motivation to combine.  It's because

16  there was no explanation at all.

17        Here, unlike *Eisai* and *Mytee*, Akoustis has

18  provided disclosure and evidence upon which a reasonable jury

19  could find motivation to combine.  So whether that is clear

20  and convincing evidence is a question for the jury to decide,

21  and it would be improper to grant summary judgment in view of

22  this genuine dispute of material fact.

23        THE COURT:  I think we've -- and I've -- you've

24  gone over.  I don't have a problem with -- I'm looking at my

25  timing.  I want to go to Mr. Masters because, obviously,

UNREDACTED TRANSCRIPT

1    they're talking about what you said on page 4 of your

2    material, in part, most recently.  You don't have to look at

3    it.  Well, you can if you want to.

4              I do need a response on this.  I do think this

5    is -- I'm giving you -- are you set, there?

6              MR. MASTERS:  Page 4, I think so.  Is this on our

7    reply brief?

8              THE COURT:  It's in your material, right.  I

9    think.  Let me see.  Right.  Because we're talking about

10   *Mytee*, and I'm probably going to mispronounce it, *Eisai*.

11             MR. MASTERS:  Yes.  Your Honor, this is a *Mytee*

12   case and *Eisai* case, precisely.  There are general statements

13   that make reference to anticipation and obviousness of 15

14   references for the two patents in the final infringement

15   contentions.  There is no specifics in the FIC or the expert

16   report as to the reasons why an ordinary artisan would be

17   motivated to combine these references, absolutely no evidence

18   at all that even counsel could point to today.

19             Yes, there are times in the '755 patent where

20   they talk about the one German reference in Hashimoto, but

21   beyond that, there's no evidence of why an ordinary skill

22   artisan would have been motivated to combine those references

23   and what are the features that are being motivated to combine

24   what's missing.  There's a total lack of evidence here.

25             On the '018, not only is there a lack of

1  evidence, it's a complete head fake because they say it's

2  anticipated by the WO '740 publication.  And now they're

3  trying to argue obviousness.  So it went as it's anticipated.

4  Now they're trying to say it's obviousness.

5          And the problem at the end of the day, Your

6  Honor, is that they're going to want this expert to come in

7  and elaborate or expand on his report and to backfill and

8  provide the reasons for motivation and why somebody with

9  skill in the art would have been motivated to combine.  So

10  this is a total lack of coming forward with any evidence as

11  to why these patent claims are invalid as being obvious.

12          THE COURT:  I think the question -- I'm going to

13  go back briefly, but we are going to wrap up literally in a

14  minute or two.

15          Ms. Smith, I do want you to say, okay, what's the

16  precise evidence?  And I think you may have referenced things

17  already.  You have about a minute and a half.

18          MS. SMITH:  Okay.  The precise evidence is that

19  the prior art and the background knowledge of a person of

20  ordinary skill in the art, they're all in the same field.

21  It's a very narrow field of acoustic filters, and

22  specifically BAW filters, right?  They all discuss the common

23  problem of increasing bandwidth and reducing lateral wave

24  propagation.  And they all employ similar techniques that

25  were known in the field at the time.  So under *Cross Medical,*

1    those are ways that you can implicitly find motivation to

2    combine.  And --

3           THE COURT:  I'm sorry.  You've got one more --

4    you've got 30 seconds, and I'm going to give Mr. Masters, you

5    know, one minute, and then we're going to wrap up because I

6    have something else I have to get to.

7           MS. SMITH:  Okay.  And, you know, I would just --

8    I would just encourage Your Honor to review the entirety of

9    page 7 to 14 of the invalidity contentions, and you'll see,

10   if you read it in the totality, you will see that obviousness

11   was disclosed there.

12          THE COURT:  All right.  Well, we've got one

13   minute, Mr. Masters, and I think we're going to wrap it up.

14          MR. MASTERS:  Thank you, Your Honor.  I think our

15   briefs fully cover it.  I mean, they point, with respect to

16   the '018 patent, Dr. Nguyen's paragraphs 55 and 58, and that

17   is the sum and substance of their analysis, which is based on

18   anticipation.  Nothing on obviousness as to why they would be

19   motivated to combine.

20          Similarly, with respect to the '755 patent,

21   there's a bullet point in his report that says DE '425

22   publication in view of Hashimoto renders obvious claims

23   nonintent of the '755 patent.

24          He talks about both of them separately, but why

25   is it -- there evidence -- there is no evidence as to why a

UNREDACTED TRANSCRIPT

1   skilled artisan would have been motivated to combine these

2   two references.  He's merely talking about a couple of

3   references.

4           So with that, Your Honor, I'll rest unless you

5   have any specific questions.

6           THE COURT:  I think we need to go ahead and wrap

7   up.  We're going to try to stay on our schedule, which you

8   can't see on our calendar, but I need to stay on our

9   schedule.

10          MR. MASTERS:  Thank you.

11          THE COURT:  I am going to go back to Mr. Defosse.

12  I wish to say thank you, and you get -- if you want to say

13  anything else, you know -- I mean, you can just say, we're

14  wrapped up for today.  That would be a good one.

15          MR. DEFOSSE:  We're wrapped up for today, Your

16  Honor.  Thank you.

17          THE COURT:  Absolutely.

18          And Counsel Mr. Lemieux?

19          MR. LEMIEUX:  Yes.  And the only thing I will

20  agree with Mr. DeFosse today, Your Honor, is we're wrapped

21  up, and you can go ahead with your ongoing calendar.

22          THE COURT:  I appreciate it, gentlemen and

23  ladies.  Thanks so much.  It's always helpful.  Thank you

24  very much, and we're going to sign off now.

25          (Adjournment.)

UNREDACTED TRANSCRIPT

1                       **C E R T I F I C A T E**

2

3

4            I, TINA DuBOSE GIBSON, do hereby certify that the

5    foregoing 45 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the dispositive motions conference held on

8    the 18th day of March, 2024, in the matter of:

9

10   QORVO, INC.

11   vs.

12   AKOUSTIS TECHNOLOGIES, INC. and AKOUSTIS, INC.

13

14

15

16   Dated this 21st day of March, 2024.

17

18

19

20                        S/Tina DuBose Gibson

21                        _____
                          TINA DuBOSE GIBSON, RPR, RCR
                          Official Court Reporter
22                        United States District Court
                          Western District of Tennessee

23

24

25

                         UNREDACTED TRANSCRIPT

1

**'**

**'018** [12] - 32:22, 33:2, 33:9, 33:16, 36:2, 36:19, 36:20, 37:19, 38:8, 38:17, 42:25, 44:16
**'425** [5] - 37:13, 39:1, 39:14, 39:23, 44:21
**'740** [10] - 32:25, 33:2, 33:5, 33:8, 36:22, 36:23, 37:2, 37:7, 37:23, 43:2
**'755** [7] - 36:3, 37:8, 38:20, 39:8, 42:19, 44:20, 44:23

**1**

**1** [3] - 25:2, 28:9, 33:1
**1-4** [1] - 33:9
**10** [4] - 10:12, 33:9, 33:10, 35:3
**103** [2] - 32:10, 32:16
**104** [9] - 6:6, 6:8, 6:12, 7:24, 8:1, 8:4, 8:11, 8:12, 14:18
**10:30** [1] - 4:11
**10h** [1] - 39:9
**11** [1] - 35:7
**12** [5] - 12:12, 33:1, 33:9, 33:10, 35:7
**13** [2] - 10:12, 33:11
**14** [3] - 33:9, 35:1, 44:9
**15** [1] - 42:13
**150** [1] - 3:6
**18** [1] - 4:2
**1841** [1] - 3:5
**19** [2] - 24:25, 26:5
**1960s** [1] - 38:14
**19801** [1] - 3:13
**1985** [1] - 38:15
**19th** [2] - 4:11, 4:18
**1C** [1] - 38:7

**2**

**2** [2] - 29:1, 33:10
**20-some-odd** [1] - 28:8
**2018** [1] - 17:3
**2020** [1] - 23:18
**2024** [1] - 4:2
**25** [1] - 6:23

**3**

**30** [1] - 44:4
**302** [1] - 3:14
**3d** [1] - 23:17

**4**

**4** [2] - 42:1, 42:6
**40** [1] - 13:13
**400** [2] - 3:13, 6:5
**425's** [1] - 39:11
**43** [2] - 26:5, 28:12
**442** [1] - 10:8
**481** [1] - 23:17

**5**

**5** [3] - 10:7, 16:8, 33:10
**50** [1] - 6:12
**500** [1] - 11:7
**55** [2] - 37:20, 44:16
**55,000** [1] - 12:7
**58** [1] - 44:16

**6**

**6** [1] - 33:9
**6-5** [1] - 38:21
**60** [1] - 33:7
**600** [1] - 3:13
**65** [1] - 38:21
**650** [1] - 3:7
**655-5000** [1] - 3:14
**680-page** [1] - 14:2
**6th** [1] - 4:13

**7**

**7** [4] - 34:25, 35:1, 36:10, 44:9

**8**

**843-3330** [1] - 3:7

**9**

**9** [2] - 35:2, 36:11
**94304** [1] - 3:6
**9:30** [1] - 4:11
**9h** [1] - 39:9

**A**

**A2** [1] - 36:20
**A3** [1] - 36:20
**abilities** [1] - 28:5
**able** [3] - 5:13, 16:20, 20:20
**absolutely** [4] - 4:24, 38:18, 42:17, 45:17

**Absolutely** [1] - 31:20
**acceptable** [1] - 12:12
**according** [2] - 21:7, 24:24
**achieve** [2] - 6:15, 24:5
**achieved** [1] - 17:22
**acoustic** [3] - 35:20, 39:16, 43:21
**Acoustic** [1] - 39:19
**Act** [1] - 21:3
**actionable** [1] - 25:22
**actual** [8] - 8:3, 9:20, 14:20, 18:10, 19:22, 19:24, 20:19, 21:8
**add** [6] - 7:21, 12:24, 13:6, 28:8, 41:5, 41:10
**added** [2] - 30:22, 41:3
**addition** [2] - 17:20, 34:13
**address** [7] - 6:25, 10:3, 15:15, 33:13, 34:2, 34:9, 40:11
**addressed** [5] - 31:3, 33:15, 35:15, 38:18, 41:11
**addresses** [1] - 33:12
**addressing** [1] - 18:15
**adequate** [2] - 12:22, 13:25
**adequately** [1] - 14:8
**Adjournment** [1] - 45:25
**admissible** [3] - 18:22, 19:2, 23:3
**adopted** [1] - 30:7
**advance** [1] - 17:15
**advanced** [1] - 32:23
**advances** [1] - 33:5
**advantages** [1] - 18:18
**advertisements** [1] - 17:16
**advertising** [3] - 16:24, 17:18, 24:4
**affect** [4] - 37:22, 38:4, 38:23, 39:13
**affects** [1] - 36:25
**age** [1] - 37:21
**age-old** [1] - 37:21
**agree** [2] - 14:4, 45:20
**agreed** [1] - 40:16
**agreement** [1] - 31:8
**ahead** [4] - 19:20, 45:6, 45:21
**Aichele** [1] - 24:2
**Akoustis** [33] - 4:6, 5:3, 5:6, 5:8, 7:3, 7:9, 7:18, 11:14, 11:24, 16:23, 17:3, 17:14, 19:12, 24:4, 25:1, 25:18, 29:1, 30:20, 31:12, 32:5, 32:8, 32:13, 32:22, 33:15, 34:9, 34:20, 35:3, 35:8, 35:18, 35:24, 36:15, 37:18, 41:17
**Akoustis's** [3] - 18:18,

**27**:1, 34:3
**algorithm** [1] - 8:7
**allegation** [1] - 26:8
**alleged** [1] - 38:16
**allow** [3] - 8:16, 15:10, 18:7
**allowed** [1] - 15:1
**allows** [1] - 24:9
**alone** [1] - 35:5
**alternatives** [8] - 29:4, 29:21, 30:4, 30:6, 30:10, 30:11, 30:14, 30:18
**Alto** [1] - 3:6
**amazing** [1] - 7:25
**ambush** [2] - 8:18, 11:25
**amend** [1] - 30:21
**amount** [2] - 24:12, 26:11
**analysis** [7] - 11:6, 12:25, 18:24, 30:20, 32:14, 33:6, 44:17
**analyst** [1] - 20:17
**analysts** [4] - 18:14, 18:17, 22:5, 22:20
**anticipated** [6] - 5:14, 5:16, 33:2, 33:5, 43:2, 43:3
**anticipates** [1] - 33:9
**anticipating** [1] - 22:13
**anticipation** [6] - 32:3, 32:8, 33:14, 34:24, 42:13, 44:18
**apologize** [1] - 26:24
**appear** [1] - 13:1
**Appearing** [1] - 3:1
**applied** [1] - 32:14
**appreciate** [2] - 37:2, 45:22
**appropriate** [1] - 25:9
**April** [2] - 4:10, 4:18
**area** [4] - 25:14, 26:16, 27:2, 27:10
**argue** [1] - 43:3
**arguing** [3] - 5:8, 5:9, 17:2
**argument** [7] - 7:11, 16:10, 19:4, 20:25, 21:14, 27:8, 32:9
**arguments** [2] - 11:24, 16:24
**art** [17] - 32:16, 32:17, 32:24, 32:25, 35:2, 35:4, 35:6, 35:12, 35:18, 35:20, 36:9, 36:13, 36:16, 37:6, 43:9, 43:19, 43:20
**articulate** [1] - 16:11
**artisan** [5] - 37:2, 37:3, 42:16, 42:22, 45:1
**aspects** [1] - 32:21
**assert** [1] - 17:21
**asserted** [6] - 8:23, 22:25, 32:9, 33:2, 35:4, 35:19
**asserting** [1] - 14:6

2

**assertion** [2] - 16:6, 34:3
**assertions** [1] - 34:24
**assist** [1] - 10:17
**assuming** [2] - 5:6, 20:9
**attacking** [1] - 39:4
**attempting** [1] - 23:8
**attention** [1] - 29:7
**attorney** [1] - 20:25
**available** [3] - 7:7, 11:9, 28:2
**avoid** [1] - 15:5
**avoids** [1] - 37:11
**aware** [3] - 20:23, 22:1, 35:21

### B

**B-A-W** [1] - 39:21
**B8** [1] - 37:8
**backfill** [1] - 43:7
**background** [8] - 4:25, 36:24, 37:5, 38:6, 38:9, 38:17, 40:1, 43:19
**bandwidth** [5] - 36:25, 37:4, 38:5, 38:12, 43:23
**based** [3] - 32:17, 33:14, 44:17
**Basics** [1] - 39:21
**BAW** [3] - 27:5, 39:21, 43:22
**Bayard** [1] - 3:12
**begin** [2] - 34:24, 34:25
**beginning** [1] - 35:1
**behalf** [1] - 3:1
**best** [4] - 14:12, 19:7, 21:19, 33:21
**beyond** [3] - 12:11, 35:22, 42:21
**big** [1] - 14:13
**bit** [3] - 4:16, 13:5, 14:10
**blanketly** [1] - 11:16
**Boggs** [1] - 3:5
**boilerplate** [1] - 36:13
**boils** [1] - 17:1
**book** [1] - 39:18
**Boston** [1] - 27:7
**bottom** [1] - 38:3
**boundary** [2] - 39:12, 39:16
**bounds** [1] - 8:23
**BRAUERMAN** [1] - 3:11
**brief** [4] - 21:2, 31:23, 40:6, 42:7
**briefly** [2] - 29:22, 43:13
**briefs** [3] - 11:14, 23:17, 44:15
**bring** [1] - 37:6
**Broadcom** [1] - 28:3
**Bros** [1] - 23:16

**brought** [1] - 11:24
**Bulk** [1] - 39:19
**bullet** [11] - 8:5, 8:9, 9:4, 9:5, 10:10, 10:11, 10:22, 13:17, 14:19, 44:21
**bunch** [3] - 14:1, 15:6, 25:7
**burden** [1] - 21:10

### C

**CAI** [1] - 3:3
**calculation** [3] - 9:7, 10:16, 13:21
**calendar** [2] - 45:8, 45:21
**California** [1] - 3:16, 11:23
**campaign** [1] - 24:9
**candid** [1] - 16:15
**Carolina** [4] - 26:17, 26:18, 26:20, 26:24
**case** [40] - 4:9, 5:12, 6:16, 8:20, 8:21, 8:23, 9:12, 9:24, 11:21, 11:22, 11:23, 12:3, 12:7, 12:12, 12:18, 12:20, 13:10, 13:12, 13:14, 15:2, 16:18, 20:4, 21:16, 21:17, 22:1, 23:16, 29:1, 29:7, 30:24, 31:3, 31:10, 31:25, 40:6, 40:7, 40:12, 40:19, 40:25, 42:12
**cases** [13] - 8:19, 11:4, 11:13, 12:21, 13:24, 14:7, 15:10, 16:2, 30:23, 34:12, 40:5, 40:7, 40:20
**categories** [8] - 8:11, 10:24, 11:15, 11:16, 12:12, 12:14, 13:18, 14:19, 14:23
**Category** [1] - 10:12
**category** [4] - 9:3, 10:3, 10:25, 13:15
**caught** [2] - 18:24, 19:4
**cautious** [1] - 21:13
**centerpiece** [1] - 24:8
**Central** [1] - 4:11
**certain** [2] - 17:13, 34:6
**certainly** [6] - 12:19, 14:7, 14:9, 16:18, 20:1, 25:20
**cetera** [1] - 27:25
**challenger** [3] - 40:13, 40:14, 41:11
**chance** [1] - 16:11
**changing** [1] - 38:3
**chapter** [1] - 39:20
**characteristics** [3] - 36:9, 36:14, 36:17
**characterizes** [1] - 36:12
**Charlotte** [7] - 25:14, 26:15, 26:25, 27:2, 27:3, 27:6, 27:9
**chart** [1] - 36:20

**charted** [1] - 38:7
**charting** [1] - 39:9
**charts** [5] - 36:19, 37:1, 37:8, 39:7, 39:11
**chemical** [2] - 40:19, 40:20
**chime** [1] - 5:3
**choose** [1] - 40:21
**chose** [1] - 29:12
**chosen** [1] - 29:17
**circuit** [4] - 9:13, 9:18, 29:9, 40:16
**circumstance** [1] - 24:24
**circumstances** [1] - 25:22
**circumstantial** [1] - 24:7
**citations** [4] - 10:19, 11:2, 11:18
**cited** [9] - 11:14, 11:17, 12:19, 12:21, 13:25, 18:13, 18:19, 23:17, 40:5
**cites** [3] - 37:23, 38:25, 39:20
**citing** [1] - 38:12
**claim** [11] - 16:3, 16:24, 20:4, 20:20, 21:3, 23:15, 23:21, 24:14, 24:15, 29:8, 30:10
**Claim** [1] - 38:7
**claims** [9] - 15:23, 19:24, 32:9, 33:1, 33:2, 33:5, 35:4, 43:11, 44:22
**Claims** [2] - 33:9, 33:10
**classic** [2] - 17:18, 23:10
**clear** [3] - 9:13, 23:18, 41:19
**cleared** [1] - 25:1
**close** [1] - 29:11
**colleague** [1] - 5:9
**combination** [5] - 32:24, 35:5, 35:23, 37:10, 38:19
**combinations** [1] - 34:6
**combine** [31] - 32:15, 34:3, 34:5, 34:9, 34:12, 34:14, 34:18, 35:8, 35:9, 35:16, 35:25, 36:6, 36:11, 37:6, 39:22, 39:25, 40:9, 40:14, 40:15, 40:17, 40:21, 40:23, 41:15, 41:19, 42:17, 42:22, 42:23, 43:9, 44:2, 44:19, 45:1
**combined** [1] - 36:23
**combining** [1] - 39:14
**coming** [1] - 43:10
**common** [6] - 34:15, 35:12, 35:14, 36:7, 40:3, 43:22
**commonly** [1] - 37:14
**Communications** [1] - 39:19
**companies** [4] - 25:14,

26:15, 26:16, 28:19
**company** [2] - 27:9, 28:1
**competition** [2] - 26:12, 26:19
**compiled** [1] - 18:14
**complete** [1] - 43:1
**compliance** [1] - 9:5
**complying** [1] - 14:21
**components** [1] - 21:6
**compound** [12] - 40:20, 40:21, 40:22, 41:1, 41:2, 41:3, 41:4, 41:5, 41:7, 41:14
**compounds** [2] - 40:23, 41:10
**comprehensible** [1] - 6:10
**comprehension** [1] - 6:15
**concerned** [2] - 9:21, 13:6
**concerning** [1] - 17:5
**conclude** [1] - 7:14
**concluded** [1] - 16:13
**conditions** [2] - 39:12, 39:16
**conference** [2] - 4:10, 19:5
**confidential** [4] - 9:6, 10:15, 26:10, 27:13
**confirm** [1] - 4:14
**confronted** [1] - 14:11
**confusion** [3] - 20:21, 20:23, 21:8
**connection** [4] - 4:5, 5:16, 5:17, 31:17
**consider** [1] - 34:8
**consistent** [1] - 6:6
**consistently** [1] - 13:10
**constitutes** [1] - 8:25
**consumers** [2] - 20:17, 20:19
**contain** [2] - 8:9, 9:10
**contains** [2] - 37:20, 39:20
**contention** [1] - 34:3
**contentions** [18] - 29:13, 30:13, 30:15, 30:22, 32:13, 32:23, 33:13, 34:22, 34:25, 35:8, 35:17, 36:5, 36:10, 36:18, 37:15, 37:18, 42:15, 44:9
**contest** [1] - 32:5
**continued** [2] - 17:15, 17:21
**contribute** [1] - 38:11
**controls** [2] - 9:8, 10:17
**convince** [1] - 27:5
**convincing** [1] - 41:20
**copyright** [1] - 8:21
**corner** [1] - 15:6
**corporate** [1] - 9:5
**correct** [1] - 10:13
**counsel** [9] - 7:23, 15:16,

23:5, 25:24, 27:16, 29:22, 33:19, 34:10, 42:18

**Counsel** [1] - 45:18

**Count** [1] - 29:1

**couple** [3] - 15:15, 20:15, 45:2

**coupling** [4] - 36:21, 36:25, 37:25, 38:11

**course** [10] - 4:12, 4:13, 4:21, 7:10, 16:19, 20:7, 21:12, 25:8, 29:23, 38:4

**court** [1] - 40:15

**Court** [8] - 11:20, 12:2, 12:5, 12:8, 13:4, 13:10, 40:7, 41:6

**COURT** [51] - 4:5, 4:24, 5:11, 5:25, 6:17, 7:9, 9:21, 10:3, 10:9, 12:23, 14:4, 15:11, 16:9, 18:9, 18:21, 19:3, 19:16, 19:20, 20:6, 20:14, 21:11, 22:9, 22:15, 23:4, 23:22, 24:13, 24:17, 25:4, 25:23, 26:17, 26:20, 27:15, 27:20, 28:20, 28:25, 29:5, 29:22, 31:11, 31:20, 32:20, 33:18, 33:24, 41:23, 42:8, 43:12, 44:3, 44:12, 45:6, 45:11, 45:17, 45:22

**Court's** [3] - 6:3, 15:3, 29:7

**courts** [1] - 13:24

**cover** [4] - 4:17, 31:12, 36:17, 44:15

**covered** [2] - 8:22, 31:1

**covers** [1] - 31:11

**created** [3] - 6:9, 17:11, 39:8

**creates** [1] - 14:16

**creation** [1] - 39:13

**credentials** [1] - 28:4

**critical** [1] - 24:3

**Cross** [3] - 34:12, 35:14, 43:25

**crystal** [16] - 16:14, 16:17, 16:24, 17:4, 17:5, 17:10, 17:11, 17:15, 17:17, 17:21, 18:6, 19:13, 19:15, 22:21, 23:1

**crystalline** [1] - 18:17

**cuff** [1] - 19:8

**customer** [4] - 22:2, 23:14, 23:19, 23:24

**customers** [5] - 21:6, 21:24, 22:7, 24:5, 24:11

## D

**damages** [4] - 19:25, 20:1, 24:25, 30:5

**dark** [1] - 4:25

**DAVID** [1] - 3:3

**david.elkins@squirepb.com** [1] - 3:8

**DE** [6] - 37:13, 39:1, 39:11, 39:14, 39:23, 44:21

**deal** [1] - 30:14

**dealing** [1] - 20:9

**deceive** [5] - 20:2, 20:5, 20:19, 21:24, 22:7

**deceived** [3] - 18:17, 22:3, 22:6

**deception** [5] - 18:10, 18:20, 19:22, 19:24

**decide** [3] - 18:3, 18:5, 41:20

**decided** [1] - 31:4

**decision** [4] - 17:14, 23:14, 23:18, 23:19

**decision-making** [2] - 23:14, 23:19

**decisions** [1] - 23:24

**Declaration** [1] - 10:8

**defendant** [2] - 8:16, 24:21

**defendant's** [1] - 24:25

**Defendants** [1] - 3:1

**defense** [1] - 20:12

**Defosse** [14] - 4:21, 5:21, 9:25, 15:13, 20:16, 21:1, 21:11, 23:23, 24:14, 28:7, 28:21, 31:16, 45:11, 45:20

**DEFOSSE** [25] - 4:23, 5:23, 6:2, 6:21, 10:1, 10:5, 10:10, 10:14, 15:17, 16:22, 18:12, 18:23, 19:7, 19:18, 19:21, 21:22, 22:12, 22:16, 23:25, 24:15, 26:2, 26:23, 28:24, 29:25, 45:15

**Delaware** [2] - 4:12, 19:5

**denied** [1] - 13:1

**departments** [1] - 27:23

**deposition** [1] - 20:24

**describes** [2] - 37:9, 37:10

**description** [2] - 32:3, 32:7

**design** [1] - 37:11

**designing** [1] - 37:22

**despite** [1] - 17:22

**detailed** [1] - 11:6

**determinations** [1] - 32:19

**determine** [1] - 24:9

**developed** [1] - 20:9

**development** [1] - 24:3

**Device** [1] - 39:21

**device** [2] - 27:5, 27:18

**different** [1] - 5:20

**direct** [1] - 24:5

**directed** [2] - 36:2, 36:3

**directly** [2] - 25:1, 26:6

**disagree** [2] - 15:11, 16:5

**disagreeing** [1] - 14:5

**disclosed** [4] - 34:20, 34:23, 37:18, 44:11

**discloses** [1] - 35:4

**disclosure** [2] - 10:22, 41:18

**discovery** [1] - 29:11

**discuss** [1] - 43:22

**discussed** [2] - 10:4, 39:10

**discusses** [4] - 37:21, 37:23, 38:22, 39:13

**discussing** [1] - 16:2

**discussion** [7] - 5:18, 6:22, 7:17, 9:23, 16:17, 16:18, 20:8

**dismiss** [1] - 19:23

**dispute** [7] - 17:1, 17:9, 17:11, 17:25, 18:2, 39:24, 41:22

**disputing** [1] - 19:14

**district** [4] - 9:12, 9:18, 40:15

**Docket** [1] - 10:8

**doctrine** [1] - 29:20

**document** [6] - 8:22, 9:14, 12:13, 13:21, 13:22, 27:4

**documents** [24] - 6:11, 6:13, 9:16, 10:6, 10:20, 11:2, 11:8, 11:9, 11:17, 11:18, 12:5, 12:6, 12:8, 12:10, 12:14, 12:15, 13:19, 13:23, 14:1, 15:20, 18:1, 22:18, 22:25

**done** [6] - 7:25, 9:20, 13:2, 14:6, 14:10, 14:16

**door** [1] - 24:4

**down** [7] - 6:6, 6:13, 7:24, 13:11, 17:1, 17:25, 28:22

**Dr** [16] - 7:5, 15:25, 16:2, 32:14, 33:4, 33:12, 37:16, 37:21, 38:7, 38:18, 38:21, 39:8, 39:10, 39:11, 39:20, 44:16

**draw** [1] - 29:6

**Drew** [1] - 3:16

**during** [1] - 29:16

## E

**e.g** [2] - 10:19, 13:19

**early** [2] - 16:18, 21:17

**Eastern** [1] - 4:12

**echoes** [1] - 37:17

**edge** [1] - 21:12

**Einstein** [3] - 25:6, 25:7, 25:8

**Eisai** [6] - 40:6, 40:19,

40:25, 41:17, 42:10, 42:12

**either** [1] - 20:23

**elaborate** [1] - 43:7

**electric** [1] - 36:1

**electrical** [1] - 37:24

**electrodes** [2] - 37:22, 38:4

**electromechanical** [4] - 36:21, 36:25, 37:25, 38:11

**Element** [1] - 38:7

**element** [1] - 24:1

**elements** [3] - 34:6, 39:9

**ELKINS** [1] - 3:3

**Elkins'** [1] - 10:7

**EMILY** [1] - 3:12

**eminence** [1] - 25:11

**employ** [1] - 43:24

**employees** [6] - 26:5, 26:6, 26:7, 26:9, 27:9, 27:12

**employment** [1] - 27:23

**enablement** [2] - 32:1, 32:6

**encourage** [1] - 44:8

**end** [5] - 20:7, 37:12, 37:22, 40:14, 43:5

**endeavor** [2] - 35:13, 36:7

**ended** [2] - 14:8, 38:12

**engineer** [2] - 27:5, 27:18

**engineering** [1] - 28:19

**engineers** [3] - 25:13, 28:12, 28:18

**entertain** [1] - 11:21

**entirety** [2] - 33:17, 44:8

**entitled** [3] - 14:3, 29:19, 39:18

**equitable** [1] - 29:8

**eskaug@bayardlaw.com** [1] - 3:15

**especially** [1] - 8:20

**essentially** [1] - 32:1

**estoppel** [1] - 31:6

**et** [1] - 27:25

**evidence** [37] - 7:3, 11:19, 18:1, 18:19, 20:5, 20:8, 20:21, 21:1, 21:7, 21:9, 22:2, 22:3, 23:2, 23:3, 23:13, 23:19, 23:23, 24:6, 24:7, 26:11, 27:13, 32:15, 34:7, 40:9, 40:11, 40:18, 41:18, 41:20, 42:17, 42:21, 42:24, 43:1, 43:10, 43:16, 43:18, 44:25

**evidenced** [1] - 21:25

**exact** [1] - 11:23

**exactly** [2] - 35:14, 37:12

**example** [5] - 6:12, 9:3, 13:22, 17:18, 37:1

**examples** [1] - 13:19

**excess** [1] - 11:7

**executive** [1] - 24:2

4

**Exhibit** [3] - 10:7, 16:8, 33:7
**exist** [3] - 37:14, 39:24, 40:17
**existence** [1] - 29:10
**existing** [2] - 34:16, 38:9
**exists** [2] - 15:5, 34:5
**exit** [1] - 5:7
**expand** [1] - 43:7
**expect** [3] - 6:23, 6:25, 7:15
**expectation** [1] - 6:3
**expected** [1] - 7:14
**expecting** [1] - 6:7
**expended** [1] - 24:11
**experimentation** [3] - 17:4, 17:7, 17:10
**experimented** [1] - 18:6
**expert** [12] - 7:5, 9:15, 11:5, 11:19, 12:16, 15:24, 24:25, 32:14, 33:4, 33:7, 42:15, 43:6
**experts** [3] - 16:6, 29:13, 29:18
**explain** [4] - 18:21, 34:22, 36:5, 41:8
**explained** [1] - 35:24
**explaining** [2] - 24:3, 38:10
**explains** [2] - 37:17, 38:2
**explanation** [1] - 41:16
**extent** [1] - 20:1

## F

**facilities** [1] - 27:7
**fact** [15] - 18:3, 18:5, 20:22, 22:20, 24:8, 25:16, 27:2, 28:13, 33:1, 33:6, 34:4, 35:12, 35:25, 40:24, 41:22
**factors** [6] - 32:15, 32:19, 34:10, 34:11, 34:13, 35:15
**facts** [2] - 27:11, 30:2
**factual** [1] - 32:19
**fail** [1] - 9:13
**fairly** [2] - 7:13, 31:23
**fake** [1] - 43:1
**falls** [1] - 16:8
**false** [4] - 16:24, 17:6, 17:18, 18:4
**far** [3] - 19:17, 25:25, 39:10
**fatal** [1] - 23:21
**favor** [2] - 28:25, 29:19
**features** [1] - 42:23
**federal** [2] - 29:9, 40:16
**few** [2] - 26:15, 26:16
**FIC** [1] - 42:15
**field** [20] - 18:15, 34:16, 34:19, 35:13, 35:19, 35:22, 36:4, 36:7, 36:8, 37:14, 38:6,

39:4, 39:6, 39:23, 40:1, 40:2, 43:20, 43:21, 43:25
**fields** [1] - 34:15
**fifth** [1] - 32:3
**figure** [1] - 15:7
**files** [1] - 11:4
**filter** [2] - 36:25, 37:4
**filters** [2] - 43:21, 43:22
**Filters** [1] - 39:19
**final** [7] - 4:18, 28:21, 30:13, 32:13, 32:22, 33:13, 42:14
**fine** [1] - 10:5
**firms** [1] - 28:16
**first** [9] - 10:11, 15:17, 16:25, 21:24, 26:4, 32:5, 34:1, 34:9, 37:21
**five** [4] - 14:13, 32:1
**five-minute** [1] - 14:13
**flat** [1] - 16:8
**flavor** [1] - 17:19
**flexibility** [1] - 35:25
**Florida** [1] - 27:5
**flow** [1] - 17:15
**fluoride** [5] - 41:1, 41:4, 41:7, 41:8, 41:12
**focus** [1] - 16:11
**folks** [2] - 27:6, 28:6
**following** [2] - 31:2, 35:17
**forever** [1] - 7:13
**formula** [1] - 8:7
**formulas** [2] - 9:8, 10:17
**forty** [1] - 26:7
**forty-three** [1] - 26:7
**forward** [7] - 16:20, 17:14, 20:4, 20:25, 21:1, 30:8, 43:10
**four** [2] - 32:3, 32:6
**frankly** [1] - 9:24
**free** [1] - 29:14
**front** [1] - 25:17
**full** [2] - 21:14, 35:3
**fully** [1] - 44:15
**future** [2] - 31:3, 31:6

## G

**general** [3] - 14:5, 35:11, 42:12
**generated** [1] - 22:2
**generation** [1] - 37:11
**gentlemen** [1] - 45:22
**genuine** [5] - 18:2, 34:4, 39:24, 40:16, 41:22
**Gerber** [1] - 38:14
**German** [1] - 42:20
**given** [6] - 14:18, 16:10, 25:20, 29:11, 29:15, 29:18

**glad** [1] - 26:21
**government** [1] - 8:21
**Graham** [6] - 32:15, 32:19, 34:10, 34:11, 34:13, 35:15
**grant** [3] - 19:23, 21:12, 41:21
**granted** [2] - 32:12, 33:17
**greater** [1] - 11:12
**Greg** [1] - 3:16
**grounds** [1] - 32:1
**group** [6] - 20:23, 41:1, 41:4, 41:7, 41:8, 41:14
**grouped** [1] - 6:9
**groups** [1] - 6:9
**guess** [3] - 11:11, 14:15, 15:22

## H

**half** [2] - 12:6, 43:17
**handful** [1] - 12:5
**handle** [1] - 31:22
**handling** [6] - 4:20, 5:22, 5:23, 20:12, 20:13, 31:15
**hard** [1] - 27:17
**HARRIS** [1] - 3:4
**Hashimoto** [7] - 37:9, 37:10, 39:2, 39:18, 42:20, 44:22
**Hashimoto's** [1] - 39:15
**head** [2] - 21:7, 43:1
**hear** [7] - 16:9, 24:21, 25:23, 29:22, 29:24, 33:18, 33:21
**heard** [2] - 20:25, 28:10
**hearings** [1] - 13:9
**hearsay** [3] - 19:10, 22:13, 23:10
**heart** [1] - 6:2
**helpful** [2] - 29:24, 45:23
**high** [1] - 34:21
**higher** [1] - 38:12
**hindsight** [1] - 30:20
**hire** [2] - 26:9, 27:24
**hired** [3] - 26:8, 28:9, 28:12
**hiring** [1] - 25:19
**Hit** [1] - 22:9
**hitting** [1] - 27:17
**hold** [1] - 27:10
**honest** [1] - 18:24
**Honor** [60] - 4:23, 5:5, 5:24, 6:7, 6:21, 7:23, 9:4, 9:10, 9:17, 10:1, 10:5, 10:14, 11:11, 12:18, 13:9, 13:15, 13:25, 14:15, 15:9, 15:17, 16:8, 16:22, 17:19, 18:13, 18:24, 19:8, 19:18, 20:13, 21:9, 21:22, 22:12, 23:3,

23:8, 23:12, 24:1, 24:16, 24:23, 25:13, 26:3, 26:24, 27:22, 28:4, 28:16, 28:24, 29:3, 29:25, 31:5, 31:19, 32:11, 33:23, 34:22, 39:17, 40:5, 42:11, 43:6, 44:8, 44:14, 45:4, 45:16, 45:20
**hour** [1] - 7:16
**hours** [1] - 6:23
**HR** [1] - 27:23
**hundred** [1] - 13:14
**hundreds** [1] - 11:17
**hypothetical** [1] - 30:6

## I

**idea** [3] - 14:17, 15:23, 16:6
**identical** [1] - 39:10
**identification** [9] - 6:4, 8:3, 8:15, 9:11, 9:19, 11:12, 12:20, 14:16, 30:9
**identifications** [2] - 11:2, 11:13
**identified** [15] - 6:5, 8:6, 10:25, 11:8, 11:15, 12:15, 13:18, 14:8, 15:19, 16:1, 16:3, 18:1, 35:10, 36:9
**identify** [6] - 7:6, 9:2, 9:16, 12:9, 13:16, 30:4
**identifying** [3] - 16:1, 17:16, 17:20
**imagine** [1] - 19:5
**implicit** [5] - 34:15, 35:16, 36:11, 39:22, 40:23
**implicitly** [3] - 34:17, 36:6, 44:1
**important** [6] - 6:8, 8:20, 9:23, 10:4, 12:23, 25:8
**importantly** [1] - 23:12
**improper** [1] - 41:21
**inadequate** [3] - 12:20, 32:2, 32:7
**include** [1] - 29:12
**includes** [2] - 38:5, 39:1
**including** [3] - 9:7, 10:16, 27:16
**increasing** [1] - 43:23
**indefiniteness** [2] - 32:2, 32:7
**indicated** [1] - 5:15
**indicating** [1] - 22:4
**indication** [1] - 27:15
**industry** [1] - 18:14
**influencing** [2] - 23:13, 23:19, 23:24
**information** [11] - 7:7, 11:1, 11:9, 11:16, 12:9, 12:15, 16:1, 16:3, 24:10, 26:10,

27:13
**infringement** [9] - 29:13, 30:13, 30:15, 30:21, 32:13, 32:23, 33:13, 34:22, 42:14
**initial** [1] - 6:4
**injunction** [1] - 31:1
**injunctive** [1] - 20:3
**inline** [1] - 25:12
**inquiry** [1] - 32:18
**instead** [1] - 30:7
**intend** [2] - 8:4, 18:1
**interested** [3] - 21:16, 33:20
**interesting** [2] - 20:25, 21:16
**interrogatory** [2] - 30:3, 30:17
**introduce** [2] - 22:10, 23:11
**invalid** [2] - 32:10, 43:11
**invalidity** [7] - 35:17, 36:5, 36:10, 36:18, 37:15, 37:18, 44:9
**inventions** [1] - 38:16
**involved** [2] - 13:10, 31:18
**issue** [23] - 6:4, 7:19, 12:24, 13:7, 16:7, 17:2, 17:8, 17:9, 19:22, 20:10, 22:13, 23:6, 23:10, 27:1, 30:5, 30:25, 31:3, 31:6, 31:9, 34:2, 38:8, 40:17
**issued** [2] - 19:14, 31:2
**issues** [6] - 6:10, 9:23, 18:2, 19:25, 34:4, 34:5
**itself** [1] - 22:2

**J**

**judge** [1] - 41:14
**judgment** [12] - 4:7, 5:8, 7:11, 19:24, 28:25, 31:7, 31:24, 33:8, 40:8, 40:10, 41:21
**juror** [1] - 6:15
**jury** [9] - 6:10, 18:3, 18:5, 22:6, 24:9, 31:2, 34:8, 41:18, 41:20

**K**

**kind** [7] - 15:8, 20:6, 23:15, 24:19, 25:19, 25:20, 30:20
**King** [1] - 3:13
**knowing** [1] - 15:2
**knowledge** [8] - 34:16, 35:11, 36:24, 38:6, 38:9, 38:17, 40:1, 43:19
**known** [9] - 32:19, 36:4, 36:8, 37:14, 38:18, 38:22,

39:5, 40:3, 43:25
**knows** [1] - 12:6

**L**

**lack** [6] - 11:24, 32:1, 32:6, 42:24, 42:25, 43:10
**ladies** [1] - 45:23
**Lanham** [1] - 21:3
**large** [1] - 25:21
**large-scale** [1] - 25:21
**larger** [1] - 37:4
**last** [6] - 11:23, 13:3, 14:12, 15:15, 21:19, 23:23
**late** [1] - 19:5
**lateral** [4] - 38:23, 39:13, 39:15, 43:23
**laterally** [1] - 37:12
**Laura** [1] - 27:16
**law** [10] - 9:12, 9:17, 22:1, 26:13, 26:17, 26:18, 26:24, 28:16, 30:2, 32:18
**lawsuit** [1] - 29:17
**lawyer** [1] - 28:18
**layer** [4] - 21:4, 36:2, 38:23, 39:12
**lead** [3] - 40:21, 40:25, 41:7
**leading** [1] - 31:16
**leave** [1] - 30:21
**Lemieux** [11] - 5:5, 7:23, 10:11, 12:23, 15:23, 21:20, 21:23, 26:4, 26:14, 30:1, 45:18
**LEMIEUX** [17] - 3:2, 5:5, 7:22, 10:13, 13:8, 14:14, 20:13, 20:15, 23:7, 24:23, 25:10, 26:18, 27:19, 27:22, 29:3, 29:6, 45:19
**length** [2] - 6:19, 6:22
**less** [5] - 7:17, 17:23, 17:24, 25:2, 28:9
**level** [2] - 25:11, 34:21
**light** [1] - 16:19
**limited** [1] - 27:1
**limits** [1] - 7:15
**list** [1] - 14:23
**listed** [5] - 10:15, 10:22, 12:13, 12:14, 36:10
**listening** [1] - 28:7
**listing** [1] - 35:2
**literally** [3] - 40:13, 40:18, 43:13
**logistical** [1] - 14:16
**look** [13] - 5:4, 9:15, 9:16, 13:22, 23:16, 29:13, 29:19, 34:12, 37:19, 38:21, 39:7, 39:8, 42:2
**looking** [11] - 4:21, 10:7,

13:16, 18:14, 22:5, 27:24, 28:3, 28:4, 28:13, 41:24
**lost** [1] - 13:4

**M**

**major** [1] - 25:13
**manufacturing** [1] - 8:7
**MARCH** [1] - 4:2
**marked** [1] - 24:17
**market** [8] - 18:13, 18:23, 19:11, 19:14, 21:25, 22:4, 22:19, 22:20
**marketing** [2] - 21:7, 24:9
**marketplace** [1] - 21:8
**MASTERS** [7] - 31:19, 31:22, 32:21, 42:6, 42:11, 44:14, 45:10
**masters** [1] - 5:21
**Masters** [5] - 4:19, 31:20, 41:25, 44:4, 44:13
**material** [5] - 24:10, 34:4, 41:22, 42:2, 42:8
**materiality** [2] - 23:25, 24:6
**matter** [3] - 4:20, 19:10, 25:8
**MATTHEW** [1] - 3:4
**matthew.stanford@ squirepb.com** [1] - 3:9
**mean** [7] - 13:4, 14:4, 19:19, 28:17, 29:14, 44:15, 45:13
**means** [3] - 13:4, 28:8, 28:17
**Medical** [3] - 34:13, 35:14, 43:25
**mentioned** [3] - 6:22, 26:5, 26:14
**merely** [1] - 45:2
**merited** [1] - 20:20
**metes** [1] - 8:22
**methodologies** [3] - 9:6, 10:15, 15:19
**MicroVention** [2] - 11:22, 12:7
**might** [3] - 20:7, 24:22, 25:8
**Mike** [1] - 27:17
**Mill** [1] - 3:5
**million** [1] - 12:6
**mind** [1] - 9:1
**mindful** [1] - 29:23
**minute** [5] - 14:13, 43:14, 43:17, 44:5, 44:13
**misappropriation** [1] - 7:4
**mispronounce** [1] - 42:10
**missing** [1] - 42:24
**MONDAY** [1] - 4:1
**money** [2] - 19:25, 20:1

**morning** [2] - 33:23, 33:24
**most** [6] - 11:4, 11:21, 27:2, 27:23, 31:12, 42:2
**mostly** [1] - 4:20
**motion** [13] - 4:6, 4:7, 5:8, 5:10, 13:1, 31:12, 31:13, 31:17, 31:22, 32:12, 33:8, 33:16, 40:8
**motions** [1] - 4:6
**motivated** [9] - 35:9, 39:25, 41:13, 42:17, 42:22, 42:23, 43:9, 44:19, 45:1
**motivation** [21] - 32:15, 34:2, 34:5, 34:9, 34:12, 34:14, 34:18, 35:8, 35:16, 35:25, 36:6, 36:11, 39:22, 40:9, 40:15, 40:17, 40:23, 41:15, 41:19, 43:8, 44:1
**move** [2] - 27:6, 30:8
**moved** [1] - 31:24
**moving** [1] - 17:14
**MR** [48] - 4:23, 5:5, 5:23, 6:2, 6:21, 7:22, 10:1, 10:5, 10:10, 10:13, 10:14, 13:8, 14:14, 15:11, 16:22, 18:12, 18:23, 19:7, 19:18, 19:21, 20:13, 20:15, 21:22, 22:12, 22:16, 23:7, 23:25, 24:15, 24:23, 25:10, 26:2, 26:18, 26:23, 27:19, 27:22, 28:24, 29:3, 29:6, 29:25, 31:19, 31:22, 32:21, 42:6, 42:11, 44:14, 45:10, 45:15, 45:19
**MS** [4] - 33:23, 34:1, 43:18, 44:7
**multiple** [3] - 8:9, 18:16, 23:10
**must** [3] - 17:6, 24:10
**Mytee** [5] - 40:7, 40:12, 41:17, 42:10, 42:11

**N**

**narrow** [7] - 34:15, 34:19, 39:4, 39:23, 40:1, 40:2, 43:21
**narrowing** [2] - 5:17, 5:19
**nearly** [2] - 6:5, 27:18
**necessarily** [2] - 4:16, 28:17
**necessary** [2] - 9:15, 32:14
**necessity** [1] - 32:16
**need** [8] - 4:14, 4:15, 13:11, 15:2, 31:12, 42:4, 45:6, 45:8
**negotiation** [1] - 30:6
**never** [4] - 8:1, 13:13, 32:23, 33:12
**nevertheless** [1] - 8:3

6

**New** [2] - 26:12, 26:22
**new** [2] - 19:4, 30:22
**Newborn** [1] - 23:16
**next** [1] - 38:1
**Nguyen** [9] - 32:14, 33:12, 37:21, 38:7, 38:18, 39:8, 39:10, 39:11, 39:20
**Nguyen's** [4] - 33:4, 37:16, 38:21, 44:16
**nineteen** [1] - 26:6
**nobody** [1] - 5:12
**none** [3] - 23:20, 25:10
**nonhearsay** [1] - 23:3
**noninfringing** [6] - 29:4, 29:20, 30:4, 30:10, 30:14, 30:17
**nonintent** [1] - 44:23
**nonobviousness** [1] - 40:8
**normal** [3] - 25:19, 25:22, 27:8
**North** [5] - 3:13, 26:17, 26:18, 26:20, 26:24
**note** [1] - 6:8
**noted** [1] - 12:8
**nothing** [1] - 44:18
**November** [1] - 10:22
**number** [6] - 6:3, 6:11, 12:21, 25:16, 26:6, 26:7
**Number** [1] - 10:8

## O

**obtain** [2] - 26:10, 27:12
**obvious** [8] - 32:10, 33:3, 33:10, 34:6, 35:5, 40:13, 43:11, 44:22
**obviously** [6] - 6:24, 16:5, 19:9, 19:14, 22:3, 41:25
**obviousness** [17] - 32:4, 32:17, 32:23, 33:6, 33:12, 33:13, 34:23, 34:24, 36:23, 37:10, 38:19, 39:2, 42:13, 43:3, 43:4, 44:10, 44:18
**occasions** [1] - 18:16
**occurred** [1] - 5:19
**occurring** [1] - 27:3
**odd** [1] - 24:19
**often** [1] - 16:9
**old** [1] - 37:21
**on-point** [1] - 11:21
**one** [32] - 5:22, 5:23, 8:16, 9:3, 9:23, 10:20, 12:19, 14:13, 15:4, 16:16, 19:21, 20:16, 21:20, 23:23, 25:15, 27:4, 27:9, 28:17, 28:21, 28:22, 30:23, 32:1, 33:19, 33:21, 42:20, 44:3, 44:5, 44:12, 45:14

**ongoing** [1] - 45:21
**opinions** [1] - 16:5
**Oppenheimer** [1] - 25:9
**opportunity** [1] - 8:16
**opposed** [1] - 9:2
**opposing** [1] - 34:10
**opposite** [6] - 15:16, 17:23, 23:5, 25:24, 27:16, 33:19
**opposition** [1] - 21:2
**order** [3] - 26:9, 27:12, 41:3
**ordinary** [7] - 35:6, 35:20, 37:6, 41:12, 42:16, 42:21, 43:20
**otherwise** [2] - 24:11, 31:8
**outside** [1] - 27:3
**overconfident** [1] - 21:20
**overnight** [1] - 5:6
**oversimplification** [1] - 17:7
**own** [4] - 20:22, 21:7, 24:25, 33:10
**ownership** [1] - 7:1
**Oxley** [1] - 14:22

## P

**PA** [1] - 3:12
**page** [9] - 10:12, 34:25, 35:1, 35:3, 36:20, 42:1, 42:6, 44:9
**Page** [1] - 3:5
**pages** [6] - 10:20, 11:7, 11:17, 15:20, 35:7, 36:10
**Palo** [1] - 3:6
**paper** [1] - 18:19
**papers** [2] - 12:21, 18:13
**paragraph** [5] - 33:7, 35:3, 37:20, 38:1, 38:21
**paragraphs** [1] - 44:16
**part** [3] - 35:19, 38:5, 42:2
**partial** [3] - 4:6, 7:10, 28:25
**participants** [1] - 19:11
**particular** [6] - 8:8, 8:18, 9:2, 24:24, 29:16, 31:18
**particularity** [5] - 8:15, 8:19, 9:12, 9:19, 11:25
**particularly** [3] - 12:3, 20:8, 28:15
**parties** [3] - 15:14, 22:16, 31:8
**parties'** [1] - 15:4
**passivation** [3] - 36:2, 38:23, 39:12
**past** [3] - 6:20, 21:9, 28:15
**patent** [26] - 8:20, 32:9, 32:22, 33:9, 33:16, 36:2, 36:3, 36:20, 36:22, 36:23, 37:7, 37:8, 37:13, 37:19,

37:24, 38:8, 38:20, 39:1, 39:8, 41:11, 42:19, 43:11, 44:16, 44:20, 44:23
**patents** [6] - 4:8, 31:18, 31:25, 35:19, 42:14
**Patton** [1] - 3:5
**paying** [2] - 14:20, 15:18
**people** [15] - 23:2, 24:25, 25:7, 25:10, 25:12, 25:18, 26:1, 26:20, 27:7, 27:24, 27:25, 28:4, 28:8, 28:13, 28:18
**percent** [3] - 25:2, 28:9, 28:12
**perception** [1] - 19:12
**performance** [7] - 17:22, 17:23, 18:18, 22:22, 37:23, 38:4, 38:5
**perhaps** [1] - 5:20
**period** [2] - 25:1, 28:9
**person** [5] - 35:6, 35:20, 37:5, 41:12, 43:19
**Personalweb** [1] - 29:7
**phrase** [2] - 37:1, 37:3
**pieces** [1] - 32:24
**piezo** [1] - 21:4
**pin** [3] - 10:19, 11:2, 11:18
**plaintiff** [7] - 9:1, 12:9, 16:15, 16:21, 23:20, 24:21, 28:11
**plaintiff's** [2] - 4:7, 31:13
**plaintiffs** [1] - 13:11
**play** [1] - 19:25
**pleading** [1] - 36:17
**poaching** [2] - 24:19, 25:21
**point** [29] - 5:15, 7:22, 8:14, 9:5, 10:10, 10:11, 11:11, 11:21, 12:25, 13:15, 13:17, 14:14, 15:17, 15:22, 17:3, 17:12, 17:13, 18:6, 19:21, 20:15, 22:8, 26:25, 29:15, 30:25, 39:17, 40:4, 42:18, 44:15, 44:21
**pointed** [2] - 11:7, 24:23
**points** [7] - 8:5, 8:6, 8:9, 9:4, 10:22, 14:19, 37:24
**polycrystalline** [3] - 17:17, 17:20, 17:24
**POSITA** [4] - 35:9, 36:24, 38:2, 39:25
**POSITA's** [1] - 39:14
**position** [7] - 6:15, 7:10, 16:12, 16:25, 17:12, 22:16, 22:18
**positions** [1] - 5:20
**possible** [2] - 14:19, 21:12
**potential** [2] - 20:19, 21:5
**potentially** [1] - 9:9

**practical** [1] - 14:15
**practice** [1] - 37:22
**practicing** [1] - 13:13
**precise** [2] - 43:16, 43:18
**precisely** [2] - 15:5, 42:12
**preclusion** [1] - 29:8
**prejudge** [1] - 31:5
**preparation** [1] - 10:18
**prepare** [3] - 8:17, 15:2
**present** [2] - 6:16, 18:2
**Present** [1] - 3:16
**presentation** [1] - 6:19
**presented** [2] - 21:9, 40:18
**presenting** [1] - 22:22
**preserve** [1] - 32:8
**president** [1] - 24:2
**pretend** [1] - 9:14
**pretrial** [1] - 4:10
**pretty** [1] - 7:16
**prevail** [1] - 5:13
**primary** [6] - 36:22, 37:13, 39:2, 39:25, 41:4
**problem** [15] - 5:6, 14:16, 16:1, 22:13, 32:11, 34:16, 35:14, 36:7, 37:13, 38:22, 39:4, 40:3, 41:24, 43:5, 43:23
**proceed** [2] - 15:1, 17:13
**processes** [2] - 9:8, 10:17
**produced** [5] - 10:20, 11:3, 11:4, 30:11, 30:12
**product** [1] - 24:2
**products** [20] - 17:16, 17:20, 17:24, 18:18, 19:13, 19:15, 20:18, 20:20, 21:5, 21:6, 22:5, 22:21, 23:1, 29:10, 29:16, 30:22, 30:24, 35:21
**progress** [1] - 6:6
**proof** [2] - 18:10, 38:9
**propagation** [3] - 38:24, 39:15, 43:24
**properly** [1] - 8:17
**propositions** [1] - 14:5
**proprietary** [2] - 9:6, 10:15
**prototypes** [1] - 18:7
**provide** [3] - 10:19, 33:6, 43:8
**provided** [8] - 11:2, 11:6, 11:17, 11:19, 23:20, 30:9, 38:9, 41:18
**providing** [1] - 37:4
**public** [1] - 16:3
**publication** [5] - 32:25, 33:8, 37:2, 43:2, 44:22
**publications** [1] - 38:13
**publicly** [2] - 7:7, 11:9
**published** [2] - 38:14,

38:15
**purchasers** [1] - 20:18
**pursuant** [1] - 29:20
**pursue** [3] - 8:4, 14:18, 24:15
**pursued** [1] - 29:16
**pursuing** [2] - 15:24, 24:12
**put** [4] - 10:23, 13:22, 20:24, 21:1
**putting** [1] - 22:17

**Q**

**Qorvo** [19] - 4:21, 6:25, 10:17, 10:18, 25:1, 25:18, 26:7, 26:8, 26:9, 27:5, 27:12, 27:17, 28:1, 28:6, 28:14, 31:24, 36:12, 40:5
**Qorvo's** [3] - 10:16, 25:2, 28:10
**quarter** [1] - 25:2
**questions** [1] - 45:5
**quick** [1] - 5:7
**quickly** [1] - 29:2
**quite** [3] - 4:25, 9:13, 16:20
**quote** [6] - 35:12, 37:11, 37:12, 37:21, 37:22, 40:14

**R**

**RACHAEL** [1] - 3:4
**rachael.harris@squirepb.com** [1] - 3:10
**raised** [4] - 7:11, 15:15, 16:23, 19:1
**raising** [1] - 11:24
**Re** [1] - 29:7
**reach** [1] - 35:22
**read** [3] - 13:9, 13:17, 44:10
**really** [9] - 4:17, 5:13, 8:10, 8:25, 9:14, 12:3, 13:6, 31:11, 33:19
**reason** [3] - 8:18, 13:8, 19:23
**reasonable** [6] - 8:15, 9:11, 9:19, 12:10, 34:8, 41:18
**reasonably** [1] - 9:1
**reasons** [7] - 5:7, 15:4, 34:20, 35:10, 35:11, 42:16, 43:8
**recently** [1] - 42:2
**recognize** [1] - 37:4
**recognized** [1] - 29:9
**record** [1] - 16:4
**recruited** [1] - 27:6
**recruiting** [3] - 27:1, 27:2, 27:7

**reduce** [1] - 6:3
**reducing** [1] - 43:23
**redundant** [1] - 36:15
**reference** [8] - 36:16, 36:22, 37:9, 37:13, 39:2, 40:2, 42:13, 42:20
**referenced** [1] - 43:16
**references** [15] - 34:18, 35:2, 35:10, 35:13, 35:18, 35:21, 36:14, 38:25, 39:3, 40:1, 42:14, 42:17, 42:22, 45:2, 45:3
**referred** [1] - 10:11
**referring** [2] - 20:16, 32:25
**refers** [2] - 36:20, 36:21
**regard** [3] - 29:4, 37:16, 38:20
**regarding** [1] - 39:15
**regular** [1] - 25:12
**rejected** [1] - 12:2
**relate** [2] - 6:11, 6:13
**related** [2] - 9:6, 10:15
**relates** [1] - 8:5
**relative** [1] - 38:3
**relevant** [3] - 11:22, 12:3, 39:21
**relied** [2] - 19:2, 21:2
**relief** [1] - 20:3
**remove** [2] - 41:4, 41:8
**removing** [1] - 41:13
**render** [1] - 34:6
**renders** [3] - 33:10, 35:4, 44:22
**reply** [2] - 40:6, 42:7
**report** [12] - 9:15, 12:16, 14:2, 33:4, 33:7, 37:16, 37:17, 37:20, 38:21, 42:16, 43:7, 44:21
**reports** [13] - 15:24, 17:23, 18:13, 18:23, 19:1, 19:2, 19:15, 20:16, 20:17, 21:25, 22:4, 22:23, 23:8
**representations** [1] - 28:11
**represents** [1] - 7:24
**requirement** [3] - 8:19, 15:5, 23:14
**requires** [1] - 9:19
**requiring** [2] - 8:14, 12:8
**resonator** [1] - 37:11
**resonators** [2] - 35:20, 39:16
**resources** [1] - 24:12
**respect** [4] - 32:22, 33:16, 44:15, 44:20
**respectfully** [1] - 9:17
**responding** [1] - 25:25
**response** [3] - 32:5, 33:15, 42:4

**responses** [1] - 21:23
**rest** [1] - 45:4
**rests** [1] - 32:18
**resulting** [1] - 18:18
**return** [1] - 34:8
**review** [1] - 44:8
**RF** [1] - 39:18
**RICO** [1] - 24:14
**Road** [1] - 3:5
**Ronald** [1] - 5:5
**RONALD** [1] - 3:2
**ronald.lemieux@ squirepb.com** [1] - 3:7
**room** [1] - 19:5
**rose** [1] - 25:10
**ruling** [1] - 40:7

**S**

**sales** [1] - 24:5
**salesperson** [1] - 20:22
**samples** [5] - 17:11, 29:10, 30:11, 30:18, 31:9
**Sarbanes** [1] - 14:22
**Sarbanes-Oxley** [1] - 14:22
**satisfy** [1] - 21:3
**sbrauerman@bayardlaw.com** [1] - 3:14
**scale** [1] - 25:21
**scenario** [1] - 21:3
**schedule** [3] - 4:10, 45:7, 45:9
**scope** [1] - 31:1
**second** [3] - 15:22, 17:19, 22:8
**secondary** [5] - 37:9, 40:2, 40:22, 41:3, 41:5
**seconds** [1] - 44:4
**secret** [15] - 5:16, 7:19, 8:1, 8:19, 8:23, 8:25, 9:2, 9:11, 11:1, 13:12, 14:3, 14:20, 14:21, 14:22, 15:18
**secrets** [26] - 5:18, 6:4, 6:5, 6:11, 6:12, 7:1, 7:2, 7:4, 7:6, 7:25, 8:2, 8:4, 8:6, 9:10, 9:20, 10:23, 12:13, 13:14, 13:17, 14:8, 14:17, 15:21, 15:23, 15:25, 16:7
**Section** [2] - 32:10, 32:16
**See** [2] - 10:19, 13:19
**see** [9] - 5:1, 10:14, 13:3, 16:8, 34:13, 42:9, 44:9, 44:10, 45:8
**seek** [1] - 35:13
**seeking** [1] - 20:3
**semiconductor** [2] - 25:14, 26:16
**sense** [1] - 35:12

**sentence** [2] - 37:21, 38:1
**sentences** [1] - 37:20
**separate** [1] - 36:15
**separately** [1] - 44:24
**seriousness** [1] - 25:11
**serve** [1] - 30:16
**served** [1] - 30:3
**set** [3] - 4:9, 36:15, 42:5
**sets** [3] - 8:22, 27:25, 28:3
**several** [1] - 7:25
**shanfield** [1] - 16:2
**Shanfield** [1] - 7:5
**Shanfield's** [1] - 15:25
**share** [1] - 36:11
**shipped** [1] - 18:7
**short** [1] - 7:13
**shot** [4] - 14:13, 21:19, 29:14, 33:21
**show** [6] - 19:10, 20:2, 22:18, 30:11, 34:11, 35:16
**showing** [2] - 34:14, 34:17
**shows** [1] - 39:22
**sic** [1] - 38:13
**side** [7] - 10:21, 11:3, 11:7, 15:24, 19:1, 24:3, 30:4
**sign** [1] - 45:24
**significant** [2] - 5:17, 14:7
**similar** [5] - 39:5, 40:22, 40:24, 41:9, 43:24
**similarly** [1] - 44:20
**simple** [1] - 40:12
**simply** [5] - 9:3, 13:18, 14:1, 25:12, 29:6
**single** [19] - 8:6, 12:20, 16:14, 16:17, 16:24, 17:4, 17:5, 17:10, 17:11, 17:15, 17:17, 17:21, 18:6, 19:13, 19:15, 21:4, 22:21, 23:1
**site** [2] - 39:1, 39:3
**sitting** [1] - 19:5
**situation** [7] - 5:14, 8:18, 12:4, 12:10, 18:9, 24:20, 25:20
**situations** [2] - 14:10, 29:9
**Six** [1] - 30:16
**SKAUG** [1] - 3:12
**skill** [9] - 27:25, 28:3, 35:6, 35:20, 37:6, 41:12, 42:21, 43:9, 43:20
**skilled** [4] - 35:11, 37:2, 37:3, 45:1
**Smith** [3] - 5:9, 33:22, 43:15
**SMITH** [5] - 3:2, 33:23, 34:1, 43:18, 44:7
**so-called** [1] - 40:11
**sold** [3] - 21:5, 30:18, 31:9
**solution** [1] - 38:22

**solve** [2] - 35:14, 40:3
**solved** [1] - 36:7
**solving** [1] - 37:14
**sophisticated** [2] - 18:16, 22:4
**sorry** [7] - 7:18, 18:24, 19:18, 26:23, 44:3
**sort** [1] - 25:5
**sought** [1] - 30:21
**sound** [1] - 27:20
**speaking** [1] - 5:2
**specific** [10] - 10:25, 11:15, 11:18, 12:9, 13:16, 14:20, 15:19, 15:20, 39:20, 45:5
**specifically** [9] - 9:2, 9:18, 10:3, 27:12, 36:19, 36:21, 37:24, 39:17, 43:22
**specifics** [1] - 42:15
**spelled** [1] - 38:13
**Squire** [1] - 3:5
**standard** [2] - 16:19, 21:13
**STANFORD** [1] - 3:4
**start** [2] - 16:21, 40:21
**starting** [1] - 37:19
**statement** [1] - 27:16
**statements** [15] - 17:1, 17:5, 18:4, 18:8, 19:9, 21:4, 22:14, 23:9, 23:13, 24:6, 24:12, 36:12, 36:16, 42:12
**states** [1] - 33:8
**stay** [2] - 45:7, 45:8
**steal** [2] - 25:6, 25:7
**STEPHEN** [1] - 3:11
**still** [6] - 20:4, 20:9, 23:7, 26:2, 31:16, 32:12
**stolen** [1] - 12:7
**straightforward** [1] - 7:16
**Street** [1] - 3:13
**strength** [1] - 16:12
**string** [1] - 38:25
**structurally** [1] - 40:22
**structure** [3] - 9:5, 13:20, 18:17
**structures** [4] - 9:7, 10:16, 40:24, 41:9
**stuck** [1] - 41:1
**stuff** [2] - 13:23, 15:6
**subcategories** [5] - 8:10, 8:11, 8:12, 8:13, 9:9
**submittal** [1] - 13:3
**submitted** [7] - 12:16, 15:24, 19:9, 19:10, 24:1, 27:4, 30:13
**substance** [1] - 44:17
**substantial** [1] - 26:11
**substantially** [1] - 6:14
**succinct** [1] - 33:18
**sufficient** [3] - 9:16, 18:7,

20:5
**sufficiently** [1] - 5:13
**suggest** [1] - 11:21
**Suite** [2] - 3:6, 3:13
**sum** [1] - 44:17
**summary** [4] - 4:6, 4:7, 5:8, 7:11, 19:23, 28:25, 31:7, 31:24, 33:8, 40:8, 40:9, 41:21
**superior** [2] - 17:22, 22:21
**supp** [1] - 23:17
**support** [1] - 22:6
**supported** [1] - 35:25
**supposed** [1] - 30:18
**surprising** [1] - 28:5
**suspect** [1] - 25:17

## T

**talks** [2] - 34:10, 44:24
**targeted** [1] - 25:21
**targeting** [2] - 26:9, 27:12
**tax** [8] - 9:4, 9:7, 10:16, 10:18, 13:20, 13:21
**taxes** [2] - 14:20, 15:19
**teaching** [4] - 37:11, 39:11, 39:15, 39:21
**teachings** [1] - 39:14
**technique** [1] - 8:8
**techniques** [8] - 34:19, 36:1, 36:4, 36:8, 39:5, 40:3, 43:24
**technology** [10] - 16:14, 17:4, 17:10, 17:12, 17:15, 17:22, 18:6, 18:15, 30:7, 40:19
**Techs** [1] - 29:7
**teetering** [2] - 13:5, 21:11
**ten** [5] - 6:9, 8:11, 12:14, 24:25, 28:9
**ten-year** [2] - 24:25, 28:9
**tendency** [4] - 20:2, 20:5, 21:24, 22:7
**terms** [1] - 25:11
**test** [1] - 17:22
**testified** [1] - 20:22
**testimony** [2] - 7:5, 24:1
**Texas** [1] - 27:7
**THE** [51] - 4:5, 4:24, 5:11, 5:25, 6:17, 7:9, 9:21, 10:3, 10:9, 12:23, 14:4, 15:11, 16:9, 18:9, 18:21, 19:3, 19:16, 19:20, 20:6, 20:14, 21:11, 22:9, 22:15, 23:4, 23:22, 24:13, 24:17, 25:4, 25:23, 26:17, 26:20, 27:15, 27:20, 28:20, 28:25, 29:5, 29:22, 31:11, 31:20, 32:20,

33:18, 33:24, 41:23, 42:8, 43:12, 44:3, 44:12, 45:6, 45:11, 45:17, 45:22
**themselves** [3] - 8:9, 21:25, 22:5
**theories** [1] - 32:6
**theory** [4] - 11:25, 32:3, 33:5, 33:14
**therefore** [3] - 17:5, 33:15, 41:10
**they've** [4] - 14:10, 14:18, 16:25, 26:8
**thickness** [4] - 36:1, 36:2, 38:3, 38:23
**thinking** [2] - 20:7, 21:21
**third** [2] - 22:16, 35:3
**thoughts** [1] - 4:17
**three** [12] - 5:20, 10:20, 13:19, 13:22, 14:12, 15:24, 16:23, 26:7, 32:2, 34:20, 36:5, 36:14
**throw** [1] - 15:6
**throwing** [1] - 15:9
**tied** [1] - 13:20
**timing** [3] - 4:17, 17:2, 41:25
**title** [1] - 39:18
**today** [5] - 7:13, 42:18, 45:14, 45:15, 45:20
**together** [1] - 41:10
**took** [2] - 8:10, 20:24
**top** [1] - 38:3
**total** [2] - 42:24, 43:10
**totality** [1] - 44:10
**totally** [1] - 30:1
**towards** [1] - 37:5
**trade** [39] - 5:16, 5:18, 6:3, 6:4, 6:5, 6:11, 6:12, 7:1, 7:4, 7:6, 7:19, 7:25, 8:1, 8:4, 8:6, 8:19, 8:23, 8:25, 9:2, 9:10, 9:11, 9:20, 10:23, 11:1, 12:13, 13:11, 13:14, 13:17, 14:7, 14:17, 14:21, 14:22, 15:18, 15:20, 15:23, 15:25, 16:7
**trademark** [1] - 8:21
**trapped** [1] - 37:12
**trial** [20] - 4:9, 4:13, 4:14, 5:12, 6:23, 8:4, 8:15, 8:17, 8:18, 11:25, 13:12, 13:14, 14:18, 14:24, 15:1, 15:8, 17:13, 20:9, 31:2
**trials** [1] - 8:1
**tried** [1] - 8:1
**true** [4] - 17:1, 17:6, 18:4, 21:4
**truth** [5] - 19:9, 22:19, 22:24, 22:25, 23:9

**try** [3] - 8:1, 27:24, 45:7
**trying** [7] - 19:16, 22:11, 27:5, 28:1, 32:8, 43:3, 43:4
**two** [21] - 4:6, 6:13, 10:20, 21:23, 25:13, 25:25, 26:14, 31:25, 32:2, 32:21, 32:24, 34:4, 37:20, 38:12, 40:5, 40:23, 41:9, 41:10, 42:14, 43:14, 45:2
**type** [5] - 11:12, 12:20, 15:5, 20:20, 25:21
**types** [1] - 40:3
**typical** [1] - 10:21

## U

**U.S** [1] - 31:25
**ultimately** [1] - 32:18
**under** [9] - 8:11, 9:4, 10:11, 25:22, 26:12, 32:10, 32:14, 32:16, 43:25
**undergo** [1] - 8:17
**understandable** [1] - 6:16
**undoubtedly** [1] - 8:13
**unfair** [2] - 26:12, 26:18
**unique** [2] - 9:7, 10:16
**unless** [2] - 9:1, 45:4
**unlike** [2] - 8:20, 41:17
**unusual** [1] - 25:15
**up** [14] - 6:19, 11:24, 14:8, 15:9, 18:5, 20:7, 25:5, 43:13, 44:5, 44:13, 45:7, 45:14, 45:15, 45:21
**updated** [1] - 30:16

## V

**valid** [1] - 22:3
**validated** [1] - 10:18
**validity** [3] - 4:8, 5:9, 31:24
**valuable** [2] - 7:8, 11:10
**values** [1] - 36:22
**various** [1] - 38:25
**varying** [2] - 36:1, 38:22
**verdict** [1] - 34:8
**vice** [1] - 24:2
**Victoria** [1] - 5:9
**VICTORIA** [1] - 3:2
**victoria.smith@squirepb.com** [1] - 3:8
**view** [2] - 41:21, 44:22

## W

**walk** [1] - 7:5
**walked** [1] - 11:8
**wall** [1] - 15:9

9

**Warder** [1] - 3:16
**wasteful** [3] - 15:3, 15:4
**Wave** [1] - 39:19
**wave** [3] - 38:23, 39:13, 43:23
**waves** [1] - 37:12
**ways** [5] - 34:14, 34:15, 34:17, 36:6, 44:1
**weeks** [1] - 30:16
**whatsoever** [1] - 23:21
**whittle** [1] - 13:11
**whittled** [1] - 7:24
**whole** [1] - 8:14
**willing** [1] - 11:20
**Wilmington,Delaware** [1] - 3:13
**wish** [1] - 45:12
**witnesses** [2] - 6:24, 6:25
**WO** [5] - 32:25, 33:2, 33:5, 33:8, 43:2
**workforce** [2] - 25:2, 28:10
**wrap** [4] - 43:13, 44:5, 44:13, 45:6
**wrapped** [3] - 45:14, 45:15, 45:20
**Wright** [1] - 3:16
**writing** [1] - 13:3
**written** [2] - 32:2, 32:7

## X

**XIAOMEI** [1] - 3:3
**xiaomei.cai@squirepb.com** [1] - 3:9

## Y

**y'all** [1] - 7:14
**year** [3] - 11:23, 24:25, 28:9
**years** [3] - 10:18, 13:13, 24:9
**York** [2] - 26:12, 26:22

## Z

**Zverev** [1] - 38:13
**ZVERV** [1] - 38:13

UNREDACTED TRANSCRIPT