# Exhibit F.6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF DELAWARE

| | |
|---|---|
| QORVO, INC. | |
| Plaintiff, | C.A. No. 21-1417 (JPM) |
| v. | |
| AKOUSTIS TECHNOLOGIES, INC. and AKOUSTIS, INC. | **JURY TRIAL DEMANDED** |
| Defendants. | ▬▬▬▬▬▬▬ |

## THE AKOUSTIS DEFENDANTS' MOTIONS *IN LIMINE*

OF COUNSEL:

SQUIRE PATTON BOGGS (US) LLP

Ronald S. Lemieux
David S. Elkins
Victoria Q. Smith
1841 Page Mill Road, Suite 150
Palo Alto, California 94304
(650) 856-6500
ronald.lemieux@squirepb.com
david.elkins@squirepb.com
victoria.smith@squirepb.com

Rachael A. Harris
Matthew A. Stanford
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
rachael.harris@squirepb.com
matthew.stanford@squirepb.com

Xiaomei Cai
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
(602) 528-4000
xiaomei.cai@squirepb.com

Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Defendants Akoustis Technologies, Inc. and Akoustis, Inc.*

Defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively "Akoustis") respectfully move the Court *in limine* as set forth below.

**I.     AKOUSTIS' MOTION IN LIMINE NO. 1 TO PRECLUDE QORVO FROM OFFERING ANY EVIDENCE ON OR COMMENTING ABOUT ANY TRADE SECRETS BEYOND THOSE IN ITS FINAL TRADE SECRET DISCLOSURE OR "CONFIDENTIAL INFORMATION" BEYOND THAT DISCUSSED IN THE SHANFIELD REPORT**

In argument, Qorvo bandies about accusations to the effect that "Akoustis stole nearly 500,000 Qorvo documents and used those documents to accelerate its entry into the market." (D.I. 465 (Qorvo's Resp. to Akoustis' Mtn. for Summ. Judgment) at 29); D.I. 517 (Tr. Summ. Judgment Hrg.) at 12:5-7 ("[W]e're talking about half a million documents that have been stolen here."); D.I. 458 Ex. A (Bennis Report) at 39, 42 ("the trade secrets Akoustis is alleged to have misappropriated related to virtually every aspect of its business and ability to get to market in the timeframe that it did.")).  Such assertions are blatantly false, and cravenly designed for the sole purpose of inflaming the jury.  Qorvo's proffers of evidence and argument at trial regarding trade secret misappropriation and theft of "confidential information" should be limited to what it has included in Qorvo's Identification of Trade Secrets It Currently Expects to Present at Trial ("Qorvo's Trial Disclosure") (D.I. 442 Ex. 5) and the 1,523 instances of purported Qorvo "Confidential Information" identified in Appendix 4 to the Expert Report of Stanley Shanfield (D.I. 469 Ex. A) ("Appendix 4").[1]

First, these assertions are unsupported and false.  Dr. Shanfield's Expert Report and deposition testimony makes it clear that in opining Akoustis gained a 55-month head start

---

[1] Akoustis reurges that it is entitled to summary judgment on Qorvo's trade secret claims – whether asserted in its DTSA or state trade secret claims (Counts VI, VIII and IX) or violation of North Carolina's unfair competition law (Count V).  In the event the Court grants summary judgment, however, this motion remains relevant to the extent that Qorvo alleges violation of North Carolina's unfair competition law through Akoustis alleged "theft" of "confidential information."

advantage, he evaluated *only* the 1,523 documents listed in Appendix 4, which he ties to categories of Qorvo's asserted trade secrets, and "does not account for Akoustis's acquisition and use of confidential information beyond the Asserted Trade Secrets." (D.I. 469 Ex. A (Shanfield Report) ¶¶ 77, 509; Elkins Decl. Ex. 1 (Shanfield Tr.) at 147:4-13, 164:23.) Dr. Shanfield notes in passing the purported existence of the about 9,000 other instances of alleged Qorvo confidential materials produced by Akoustis, but he performed *zero* analysis regarding them, including whether the purported confidential materials contain any information that is not generally known or publicly ascertainable, were used by Akoustis, or had any economic value to Qorvo, Akoustis or anyone else. Similarly, Dr. Shanfield did not review, let alone evaluate, any of the 500,000 Qorvo email messages its forensic expert Mr. Faulkner found in Akoustis files. Whether the emails contain *any* purported Qorvo confidential information is unestablished because Mr. Faulkner did not perform such a search. (Elkins Decl. Ex. 2 (Faulkner Tr.) 41:23-42:7 (Q. "[D]id you specifically look for any Qorvo confidential materials there when you analyzed those emails? A. I didn't, no. I excluded those from my search process.")). Qorvo's breezy references to "half a million" Qorvo documents "stolen" by Akoustis grossly inflate the scope of Qorvo's claims at issue, and will severely prejudice Akoustis before the jury. Such assertions are the paradigm of purported evidence that is more prejudicial than probative and should be excluded under Federal Rule of Evidence 403.

Allowing Qorvo to reference or rely upon unanalyzed documents as a basis for its alleged head start-based claims would also unfairly prejudice Akoustis in a different manner. Permitting Qorvo to vaguely reference huge numbers of documents – without providing any proof that the documents were in fact confidential, that they derive independent economic value by not being generally know, or that they were actually used by Akoustis, effectively circumvents Qorvo's obligations to prove the elements of the trade secret misappropriation and unfair competition

claims.  Qorvo evidently seeks to use such gaudy numbers to fuel its "shock and awe" strategy to inflame the jury into rendering a lottery-range of damages award without focusing on each piece of evidence that Qorvo has actually developed and linked to its claims.  Rule 403 guards against such strategies.

The order sought here should preclude Qorvo from referencing alleged trade secrets outside the 104 actually asserted and the 1,523 purportedly confidential documents in Appendix 4 without regard to claim.  The head start opinion in Dr. Shanfield's Expert Report does not distinguish between trade secrets and confidential information.  (D.I. 469 Ex. A (Shanfield Report) ¶¶ 510-11 (providing one and only one head-start advantage analysis as a result of Akoustis "obtaining and using Qorvo's confidential information")).

Akoustis respectfully requests that the Court preclude Qorvo proffering evidence and argument at trial regarding trade secret misappropriation and theft of "confidential information" beyond the 104 purported trade secrets in Qorvo's Trial Disclosure and the 1,523 instances of purported Qorvo "Confidential Information" identified in Appendix 4.

## II.  AKOUSTIS' MOTION IN LIMINE NO. 2 TO EXCLUDE PLAINTIFF'S PROPOSED TRIAL EXHIBITS PTX-0001 AND PTX-0758

Akoustis moves to preclude Qorvo from using PTX-0001 and PTX-0758 at trial.  The proposed exhibits – both deposition transcripts from an unrelated employment action – comprise inadmissible hearsay and their use at trial would be more prejudicial than probative.

### A.  BACKGROUND

PTX-0001 and PTX-0758[2] each comprise deposition transcripts from testimony from *Ya "Annia" Shen v. Akoustis Technologies, Inc.*, C.A. No. 3:22-cv-103-FDW-DCK (W.D.N.C.) – an

---

[2] The first 20 pages of each deposition, along with any pages cited below, are attached to the Elkins Declaration as Exhibits 3 and 4.

employment action commenced by former employee Annia Shen against Akoustis (the "Shen Action").  Qorvo was not a party to the Shen Action, which has nothing to do with this case.

Specifically, PTX-0001 is the entire transcript of the September 15, 2022 deposition of Michael David Hodge, II taken by Akoustis in the Shen Action.  Mr. Hodge is an ex-Akoustis employee and is Ms. Shen's husband.  Meanwhile, Qorvo subpoenaed Mr. Hodge and took his deposition in *this case* on July 11, 2023.

PTX-0758 is the entire transcript of the individual deposition of Jeffrey Shealy taken by counsel for Ms. Shen in the Shen Action.  Mr. Shealy is an Akoustis founder and is the company's CEO.  Qorvo took Mr. Shealy's deposition *in this case* on November 15, 2023.  Mr. Shealey is on both Qorvo's and Akoustis' witness lists and will appear in person at trial.

### B.  QORVO'S USE OF PTX-0001 AND PTX-0758 IS NOT PERMITTED UNDER FED. R. CIV. P. 32

Federal Rule of Civil Procedure 32 governs the use of deposition testimony taken in other actions.  The rule provides in relevant part that deposition testimony from an earlier action "may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action."  Fed. R. Civ. P. 32(a)(8).

The Hodge and Shealy deposition transcripts from the Shen Action are not admissible under Fed. R. Civ. R. 32 because the Shen Action and the present case do not involve the same parties.  Shen is not a party to this case and Qorvo was not a party to the earlier action.  This fact alone precludes admissibility under Rule 32.  *See Ward v. Allis-Chalmers Pumps, Inc.*, No. 09-00247, 2010 WL 7746856, at *1 (E.D. Pa. Dec. 23, 2010) (prior deposition testimony not admissible under Rule 32 when the current defendant was not a party to the earlier action).

Equally fatal to admissibility under Rule 32 is the stark differences in the subject matter of the Shen Action and the present case. The employer-employee dispute of the Shen Action concerning wrongful discharge and employment discrimination has a completely different set of facts and issues than those in the present case regarding an intellectual property dispute between industry competitors.

### C.   PTX-0001 AND PTX-0758 ARE INADMISSIBLE HEARSAY

The Hodge and Shealy transcripts are inadmissible hearsay. Fed. R. Evid. 801(c), 802. The only potentially available exception lies with Federal Rule of Evidence 804(b)(1), providing in pertinent part that prior deposition testimony of a witness is not inadmissible hearsay if (i) "the declarant is unavailable" and (ii) the party against whom the testimony is now offered "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Rule 804. Neither proposed exhibit satisfies Rule 804(b)(1).

First, "it is an abuse of discretion for a district court to admit former testimony into evidence under Rule 804(b)(1) without a finding of unavailability." *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 165 (3d Cir. 1995). Mr. Shealy is Akoustis' co-founder and CEO; he will attend and testify at trial. He is not therefore unavailable. Further, Qorvo has not made any showing that Mr. Hodge meets any of the criteria for being unavailable under Rule 804(a), including that Qorvo has not been able to procure Mr. Hodge's attendance by reasonable means. *See* Fed. R. Evid. 804(a)(5); *Kirk*, 61 F.3d at 165 (party seeking admission failed to carry its burden and prove that she used "reasonable means" to enlist the declarant's service).

The second requirement of Rule 804(b)(1) is not met, either. In the Shen Action, Akoustis did not have any motives to develop the Hodge and Shealy deposition testimony in PTX-0001 or PTX-0758 that are similar to its motives for developing their testimony for *this case*. "The way to determine whether or not motives are similar is to look at the similarity of the issues and the context

in which the opportunity for examination previously arose." *Kirk*, 61 F.3d at 166 (quotations omitted). The Shen Action involved employment related claims made by Ms. Shen against her former employer, Akoustis. The present action is based on a vastly different universe of facts relating to Qorvo's trade secret, patent, and unfair business practices claims against its bulk acoustic wave filters competitor Akoustis. Put simply, the actions involve wholly different allegations and issues, require the application of different law, and seek dissimilar remedies.

Finally, the "earlier treatment of the witness [must be] the rough equivalent of what the party against whom the statement is offered would do at trial." *Kirk*, 61 F.3d at 166 (quotations omitted). The testimony that Akoustis sought from Mr. Hodge in the employment-related case brought by his wife is no way equivalent to the testimony that Akoustis would seek at trial of this case. Akoustis solicited only about 13 pages of redirect testimony from Mr. Shealy out of the 305 pages of his deposition testimony, and none of it is relevant to the present case, let alone the equivalent of what Akoustis would (and will) adduce from Mr. Shealy at trial.

Because neither PTX-0001 nor PTX-0758 meets all of Rule 804(b)(1)'s requirements, the two proposed exhibits are inadmissible and should be excluded.

### D.   EXHIBITS PTX-0001 AND PTX-0758 SHOULD BE EXCLUDED UNDER FED. R. EVID. 403 BECAUSE THEY ARE MORE PREJUDICIAL THAN PROBATIVE

The wholly different nature of the Shen Action and the present case makes the challenged exhibits irrelevant here. But even assuming arguendo that the transcripts bore some marginal relevance, their use should be excluded under Federal Rule of Evidence 403 because the prejudice to Akoustis far outweighs any potential relevance.

First, introducing deposition testimony from the Shen Action would confuse the jury and create a significant distraction by presenting issues unrelated to the technical and complex intellectual property dispute here. The large volume of alleged trade secrets that Qorvo asserts –

all 104 of which requires jurors to understand nuanced evidence regarding secrecy, their difference from information already known in the technical area, Akoustis' alleged use of them and damages – only heightens the threat of confusion. This diversion could mislead jurors into making decision based on irrelevant factors, waste their time, and impair their ability to assess the relevant evidence for the case objectively.

Second, the deposition testimony from the Shen Action, given the ex-employee's allegations of wrongful termination and employment discrimination, threatens to paint Akoustis with unrelated yet negative character evidence. For example, the jury might improperly infer from the employment allegations that because it was allegedly involved in a wrongful discharge or discrimination in the past, Akoustis is also likely to engage unfair trade practices, causing undue prejudice to Akoustis. The result would be to bias and unduly influence the jury against Akoustis.

Akoustis anticipates that Qorvo plans to place particular focus on part of the Shealy deposition from the Shen Action. There Ms. Shen's counsel asked a series of questions about Akoustis' hiring decision of Saurabh Gupta, who allegedly "replaced" Ms. Shen at Akoustis after making false representations about his patents in his resume. Mr Shealy – testifying as an individual and not on Akoustis' behalf – was asked about his personal views regarding the importance of patents. Against that backdrop, Mr. Shealy testified that compared to patents, he would "███████████████████████████████████████████ ████████████████████████████████████████████████ ███████." (Elkins Decl. Ex. 4 (PTX-0758) at 40:6-41:14 & 42:4-10.) Mr. Shealy is not a lawyer, yet Qorvo would doubtlessly try to trumpet his inartful lay response repeatedly to the jury. Attempting to explain it now would not cure the issue. Qorvo would argue, Mr. Shealy has a motivation to do so now that Akoustis faces allegations of misappropriating 104 of Qorvo's

purported trade secrets.  And Mr. Shealy's testimony explaining what he meant to say would still leave him looking bad.  The resulting prejudice far outweighs whatever de minimis relevance Qorvo will claim for the statement.  And it only reinforces why Rule 804(b)(1) does not apply to prior, unrelated deposition testimony about dissimilar facts and issues.

Finally, any deposition testimony from the Shen Action that inadvertently touches on the witness's view of trade secrets and hiring preferences risks being misconstrued as evidence of Akoustis' inclination towards trade secrets misappropriation or unfair competition.  Such testimony would unfairly bias the jury against Akoustis by insinuating misconduct based not on concrete evidence related to each alleged trade secret misappropriation or unfair competition practice, or on the specific legal criteria that must be met for each claim in the present case, but on generalized character assessment.  Such deposition testimony is not only highly prejudicial under Rule 403; its use is also expressly prohibited by Rule 404.  *See, e.g.*, Fed. R. Evid. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."); *Redcell Corp. v. A.J. Trucco, Inc.*, No. 20-CV-18 (JGLC), 2023 WL 8187843, at *5 (S.D.N.Y. Nov. 24, 2023) (exhibit showing allegedly improper prior hiring practice is impermissible character evidence under both Rule 404 and Rule 403).

**E.**    **C**ONCLUSION

Akoustis respectfully requests that the Court preclude Qorvo from using PTX-0001 and PTX-0758 at trial.

**III.    AKOUSTIS' MOTION IN LIMINE NO. 3:  QORVO SHOULD BE PRECLUDED FROM USING THE DEPOSITION TESTIMONY OF DR. MICHAEL LEBBY REFERENCING OR RELATING TO ILLICIT ACTIVITIES**

In his expert report, Dr. Lebby opined that it is commonly known in the electronics industry that, in Asia, information security is lax due to a difference in cultural norms and the way business

is conducted, and that information disclosed to business colleagues and acquaintances has a high likelihood of being shared with others.  (*See* Elkins Decl. Ex. 5 (Expert Report of Dr. Michael Lebby, the "Lebby Report") ¶¶ 100-101.)  At his deposition, however, Dr. Lebby was asked to speculate about the meaning of certain expense account references in two emails that he had no personal knowledge of and the contents of a large ZIP file that was attached to one of the emails. Dr. Lebby repeatedly stated that he did not know what specific information was referenced in the first email (Elkins Decl. Ex. 6 (Lebby Depo.) at 193:16-20; 194:15-19; 195:15-196:3); and that he could not recall off the top of his head what specific information was attached in a large .zip file to the second email (*id*. at 196:25-197:9; 198:3-4, 7; 199:1-4, 15).  In addition, Dr. Lebby explained that he had "no idea" for what activities the Akoustis employee had paid for using his expense account, and based on common rumor and innuendo about how some people conduct business in Asia, the spectrum of possible activities could range from ███████████████████████. (*E.g., id*. at 196:7-9 ("████████████████████████████████ ████████████████████████."))

No evidence reflects what the funds were actually used for.  Given Dr. Lebby's repeated response that he had no idea of what the funds might have been used for Akoustis' counsel asked Qorvo's counsel to refrain from any use or mention of this irrelevant and potentially highly prejudicial testimony at the upcoming trial.  Qorvo's counsel refused.

The only purpose that Dr. Lebby's speculative remarks regarding ██████████████████ ████████████ business practices in Asia could serve in this case is to inflame the jury and improperly insinuate that Akoustis had operated consistent with this improper character evidence and that the expense account had been used████████████████████████████ to obtain Qorvo's "confidential" information.  Not only would this be a highly speculative and

improper use of alleged character evidence, its prejudicial effect on the jury also greatly outweighs any possible probative value.  Therefore, under Federal Rules of Evidence 403 and 404, Qorvo should be prohibited from using any deposition testimony by Dr. Lebby referring to ███████ ███████████████████.

First and foremost, Dr. Lebby's statements are entirely speculative.  In *Knecht v. Balanescu*, an expert did not visit a crash site and instead relied on a state trooper's statement that evidence on a guardrail "would indicate possibly a PIT-type maneuver on the vehicle."  No. 4:16-CV-00549, 2017 WL 4883198, at *5 (M.D. Pa. Oct. 30, 2017).  The Court granted defendant's motion in limine to preclude the expert's references to a PIT maneuver because it was "based wholly on the testimony of [the state trooper], which was speculative at best."  *Id.* at *6.  Dr. Lebby's references to ███████████████████ are also "speculative at best."  Indeed, in his answers to Qorvo's line of questioning, Dr. Lebby repeatedly stated that he did not know what supposedly "confidential" information was referenced in the emails or for what activities the Akoustis expense funds were being used for.  (*See, e.g.,* Elkins Decl. Ex. 6 (Lebby Depo.) at 193:16-20; 194:15-19; 195:15-196:3; 196:25-197:9; 198:3-4, 7; 199:1-4, 15.)  Dr. Lebby's statements should be precluded for this reason.

Second, speculative remarks about ████████████████████████ that are alleged to occur during business dealings in Asia constitute improper character evidence intended simply to inflame the jury and create undue prejudice.  Fed. Rule. Evid. 403 and 404.  Dr. Lebby's remarks should also be precluded for this reason.

Finally, Dr. Lebby's statements are clearly more prejudicial than probative to any issue in this case.  Dr. Lebby has no knowledge of what the expense account funds were actually used for, so his references are irrelevant to any issue in this case and would be used by Qorvo at trial simply

imply that the funds were used for some unidentified improper purpose.  In *Belvin v. Electchester*, an employment discrimination case, defendant's expert included in his expert report descriptions of the defendant's and his parents' marital relationships, previous drinking and drug abuse, and prior arrest for drugs.  635 F. Supp. 3d 190, 200 (E.D.N.Y. 2022).  The Court noted that these facts were not relevant to the matter but, "[e]ven if the court were able to find a relevant purpose for these points, there would remain significant concerns about their prejudicial effect" because "[t]he primary effect of such references to [plaintiff's] (distant) past will be to embarrass and shame him before the jury."  *Id.* (quoting Fed. R. Evid. 403).  The Court thus precluded defendant from mentioning plaintiff's background and prior drug use and arrests.  Here, the simple mention of the general spectrum of alleged business practices in connection with Akoustis' expense funds would create a linkage that would do nothing but embarrass and unfairly prejudice Akoustis, while providing zero probative value as to whether such conduct actually occurred or whether the facts underlying the claims and defenses in the case are more or less probable.  Rule 403 specifically prohibits this type of evidence.  Dr. Lebby's remarks regarding ██████████████████ should be precluded for being this reason, as well.

Because Dr. Lebby's testimony referencing or relating to ██████████████████ ████████ is speculative, irrelevant,  an improper use of character evidence, and more prejudicial than probative, the Court should preclude its use at trial under Federal Rules of Evidence 403 and 404.

## IV. AKOUSTIS' MOTION IN LIMINE NO. 4 TO PRECLUDE EVIDENCE OR COMMENT REGARDING THE SUBJECT MATTER OF QORVO'S MOTION FOR SANCTIONS FOR CONTEMPT AND SPOLIATION

Qorvo improperly intends to introduce evidence and argument related to the subject matter basis of Plaintiff's Motion for Monetary and Adverse Inference Sanctions for Contempt and Spoliation (the "Sanctions Motion") (D.I. 347).

The subject matter of the Sanctions Motion is irrelevant to the issues to be determined at trial – namely, whether Akoustis misappropriated Qorvo's alleged trade secrets or engaged in unfair or deceptive trade practices. Akoustis' inadvertent reformatting of two laptops of terminated employees when a key Akoustis employee was absent for emergency surgery has no bearing on whether Akoustis engaged in misappropriation, whether Akoustis acted "willfully" in engaging in any conduct, or whether it committed any unfair or deceptive trade practices. The *only* possible purpose for using of evidence regarding the subject matter of the Sanctions Motion is to inflame the jury against Akoustis. Given the absence of any relevance to the subject matter of the action, sidetracking trial for the purpose of prejudicing Akoustis and wasting the jury's time is precisely what Rules 402, 403 and 404 are intended to preclude.

## A.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Qorvo's Motion for Sanctions contended that Akoustis failed to properly preserve certain ESI related to the present litigation. (D.I. 347.) Qorvo asserted that Akoustis engaged in such actions intentionally and in bad faith. In response, Akoustis described the unique circumstances surrounding the conduct at issue and explained how the mistaken actions occurred. (*See* D.I. 470 at 12.) The conduct took place during "during a period of medical emergency for the one person who was aware" that the ESI at issue should have been preserved. (*Id*.).

While Akoustis's conduct "arose from a far from perfect implementation of a litigation hold," the Court denied the Motion, holding that "this does not amount to showing of bad faith." (*Id*.).

## B.    ARGUMENT

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible." Rule 403 confers on the Court the discretion to exclude even relevant evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Further, under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

Evidence and argument related to the inadvertent destruction of a small amount of ESI (in comparison to all of the other evidence otherwise available to Qorvo) are irrelevant to the issues to be litigated at trial and would be highly prejudicial to Akoustis.  Akoustis expects that Qorvo will argue that the basis for subject matter of the Sanctions Motion is relevant to Qorvo's contention that Akoustis engaged in an unfair or deceptive practice or that it acted willfully with respect to its trade secret misappropriation claim.  The inadvertent reformatting is not relevant to that claim.  The Court has already found that Akoustis's action were neither intentional nor evidence of bad faith – which is why the Court denied Qorvo's request for adverse inference sanctions.  (*See* D.I. 348 at 2).

Nor is Akoustis's preservation conduct relevant to whether Akoustis engaged in willful or malicious trade secret misappropriation.  "Willful means intentionally," and "[m]alicious" means an action taken "in a manner which evidences a reckless and wanton disregard of the plaintiff's rights."  *Bridgetree, Inc. v. Red F Mktg. LLC*, No. 3:10-CV-00228-FDW, 2013 WL 443698, at *19 (W.D.N.C. Feb. 5, 2013).  The Court has determined such conduct did not occur.

Given the absence of relevance, the only purpose to be served through evidence and argument related to the subject of the Sanctions Motion is creating unfair prejudice, confusing the issues and misleading the jury.  In the Sanctions Motion, Qorvo asked the Court to permit it "to address the spoliation at trial and instructing the jury how to evaluate such spoliation."  (D.I. 348

at 16).  The Court denied the request.  Granting the present motion in limine is necessary to preclude Qorvo from doing that which the Court denied it the right to do.  (D.I. 370).

### C.    CONCLUSION

For the reasons set forth above, Akoustis respectfully requests that the Court preclude Qorvo from introducing evidence or presenting argument regarding the subject matter of Qorvo's Sanctions Motion.

### V.    AKOUSTIS' MOTION IN LIMINE NO. 5 TO PRECLUDE THE OPINIONS PRESENTED IN PARAGRAPHS 22 THROUGH 24 OF THE SUPPLEMENTAL SHANFIELD REPORT

Qorvo improperly intends to introduce evidence and arguments related to an unauthorized Supplemental Expert Report dated January 22, 2024, by its expert Dr. Stanley Shanfield.  (D.I. 469, Ex. B (Shanfield Suppl. Report)).  Without seeking leave of court or the consent of Defendant's counsel to do so, Qorvo unilaterally served an improper "Supplemental Report" on the eve of Dr. Shanfield's deposition, two months after the deadline for his Expert Report, five weeks after the service of Defendants' expert rebuttal reports, and after the depositions of Defendants' experts regarding those reports.

Paragraphs 22-24 of Dr. Shanfield's Supplemental Report respond to opinions by Akoustis's expert, Dr. Robert Darveaux, in his Rebuttal Expert Report regarding simulations contained in Dr. Shanfield's original report.  (D.I. 469, Ex. B (Shanfield Suppl. Report))  The Supplemental Report therefore introduces new evidence and arguments to which Akoustis' experts did not have the opportunity to respond to either in their Expert Rebuttal Reports or their depositions.  Supplemental or reply expert reports are not contemplated by the Amended Scheduling Order dated May 10, 2023 (D.I. 198).  Nor are they authorized by this District's Civil Local Rules.  Rather than seek permission from the Court, Qorvo unilaterally served this unauthorized expert report long after expert disclosure deadline and less than 24 hours before Dr.

- 14 -

Shanfield's deposition began.  This improper disclosure of new opinion evidence and arguments prejudiced Akoustis at a severe disadvantage because its experts did not have adequate time to consider the new evidence and arguments and advise Akoustis' counsel before the Shanfield deposition.  Because Akoustis' only opportunity to explore Dr. Shanfield's new opinions will be at trial, Dr. Shanfield should be precluded from testifying about them.  *See Novartis Pharms. Corp. v. Actavis, Inc.*, No. CV 12-366-RGA-CJB, 2013 WL 7045056, at *6 (D. Del. Dec. 23, 2013) (noting that evidence should be excluded in circumstances involving litigation conduct that violates the clear terms of a scheduling order, is unprofessional or inappropriate, and creates prejudice to the party against whom the evidence is offered); *see also Bridgestone Sports Co., Ltd. v. Acushnet Co.*, No. CIVA 05–132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007).

## A.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In its Amended Scheduling Order (D.I. 198), the Court set the deadline for initial expert witness disclosures for November 17, 2023, later extending that deadline to November 21, 2023 (D.I. 405).  The deadline for rebuttal expert reports was originally December 14, 2023, and was later extended to December 20, 2023 (*Id.*).  On November 21, Qorvo served, among others, two expert reports Dr. Stanley Shanfield:  one relating on the alleged misappropriation of trade secrets and one relating to alleged patent infringement.  Akoustis served its expert rebuttal reports on December 20, 2023.

The parties deposed each of the other side's experts during the period January 18-31, 2024. After the completion of the depositions of Akoustis' technical trade secret experts, Qorvo served the unauthorized Supplemental Report – including new material in paragraphs 22-24 that was the subject of Dr. Shanfield's original Expert Report and the subject of criticism in the Akoustis Expert Rebuttal Reports.

**B.**     **ARGUMENT**

Under Federal Rule of Evidence 403, the Court has discretion to exclude relevant evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

First, Qorvo cannot identify any authority which permits them to unilaterally serve a "supplemental" expert report after the deadline for rebuttal expert witness disclosures on December 20, 2023.  The Amended Scheduling Order (D.I. 198) governs the deadlines for expert disclosures.  Nothing in the Amended Scheduling Order (D.I. 198) nor the Local Rules provides Qorvo authorization for serving an additional expert report after the deadline for expert rebuttal reports.  In the absence of such authority, Qorvo could have petitioned the Court for authorization to serve Dr. Shanfield's Supplemental Report.  It did not.

Second, Qorvo's delay in serving Dr. Shanfield's Supplemental Report unduly prejudiced Akoustis's ability to consider and respond to the new arguments set forth therein.  This unauthorized expert report was served five weeks after the service of Akoustis' Expert Rebuttal Reports and after the depositions of Akoustis' rebuttal experts on this issue.  It was impossible for Akoustis' rebuttal experts to address these changes and new testimony in their own reports or during their own depositions.

In paragraphs 22-24 of his Supplemental Report, Dr. Shanfield offers new evidence and arguments in an attempt to rebut Dr. Darveaux's opinions related to Akoustis's alleged use of Qorvo's ███████████████████ in Akoustis's trimming procedures.  In support, Dr. Shanfield provides excerpts from four documents produced in discovery but not included in his original Expert Report.  This information is accompanied by new arguments relying on the new evidence to support Dr. Shanfield's opinions.  The documents were available to Dr. Shanfield

when he wrote his original opening report; he simply chose not to include them.  Dr. Shanfield should not be permitted to surprise Akoustis with new arguments and evidence after the deadlines for expert disclosures have passed.  This unduly prejudices Akoustis by hindering its ability to adequately consider and respond to the new evidence and arguments prior to trial.

Qorvo also may try to salvage the Supplemental Report by arguing it is merely a clarification of statements already made in his opening expert report.  Such an argument would not be accurate.  Dr. Shanfield's Supplemental Report is intended to be directly responsive to the rebuttal expert reports of two of Akoustis's experts, Dr. Darveaux and Dr. Nguyen.  Dr. Shanfield admitted as much during his deposition on January 26, 2024 – Q: "[]while you termed this a 'supplemental written report,' it's to respond to assertions and issues raised in the rebuttal reports of those two other experts?" A: "Yes…"  (Elkins Decl. Ex. 1 at 216:12-20.)

### C.      CONCLUSION

For the reasons set forth above, Akoustis respectfully requests that the Court issue an *in limine* order precluding Qorvo from introducing evidence or presenting argument regarding the subject matter of paragraphs 22-24 of Dr. Shanfield's Supplemental Expert Report.

## VI.    AKOUSTIS' MOTION IN LIMINE NO. 6 TO PRECLUDE MICHAEL LYSSE FROM OFFERING TESTIMONY AT TRIAL

Qorvo should be precluded from offering at trial the testimony of its longtime employee Michael Lysse.  Mr. Lysse is one of the *41* witnesses that Qorvo has identified on its Trial Witness List.  In meet and confer discussions for motions in limine, Akoustis' counsel did not believe that Mr. Lysse had ever been disclosed under Federal Rule of Civil Procedure 26(a)(1) or (e) as an "individual likely to have discoverable information … that [Qorvo] may use to support its claims or defenses."  Qorvo's counsel pointed out that he had been disclosed in *76*-page Qorvo's Fifth Amended and Supplemental Rule 26(a)(1) Disclosures ("Qorvo's Fifth Disclosure") – served on

November 15, 2023, the last day of fact discovery.  (Elkins Decl. Ex. 7.)  Qorvo has no excuse for disclosing Mr. Lysse more than two years after the case commenced, let alone on the day that discovery closed.

Rule 26(a)(1) requires that a party identify each individual likely to have discoverable information relevant to the case.  Rule 26(e) requires the party to supplement its initial disclosures if and when the party learns they are incomplete.  "The obligation to update initial disclosures is meant to ensure that the playing field remains level, narrow the relevant issues, and avoid 'undue prejudice and surprise' to the opposing party."  *Eli Lilly & Co. v. Actavis Elizabeth LLC*, No. 07-3770, 2010 WL 1849913, at *3 (D.N.J. May 7, 2010).  Rule 37(c)(1) provides sanctions in the form of excluding witnesses and materials not properly disclosed under Rule 26(a)(1) and (e) unless the lack of disclosure was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1).

Qorvo served its Fifth Disclosure on November 15, 2023 – the fact discovery cutoff date.  (See D.I. 313 ¶ 8 ("The Fact discovery deadline is extended until November 15, 2023.")).  Qorvo's Fifth Disclosure marked the first time Qorvo disclosed Mr. Lysse as a person likely to have discoverable information regarding Qorvo's information security policies and protocols.  He was disclosed as having information about "Qorvo's information security policies and protocols."  (Elkins Decl. Ex. 7 at 5.)

Mr. Lysse was not someone that Qorvo had just brought on.  His LinkedIn work experience in the box at right shows that Mr. Lysse has been an IT manager with increasing responsibility since Qorvo's founding.[3]



By delaying this disclosure until the last day of fact discovery, Qorvo manipulated its Rule 26(a)(1) and (e) disclosure obligations so that Akoustis could not anticipate that Mr. Lysse had information about the case sufficiently worthy to make him a trial witness.  While Mr. Lysse was mentioned three times during the deposition of Qorvo designee Michael Boyd on October 31, 2023, none of the mentions hints that Mr. Lysse's knowledge is anything other than trivial.  (Elkins Decl. Ex. 8 at 35:6-25, 37:1-14, 151:20-153:23.)

Having been at Qorvo since its creation by merger almost nine years ago, Mr. Lysse was not an unknown.  If Mr. Lysse has information sufficient to make him a trial witness, Qorvo had a plain obligation to disclose him more than two years after the case commenced.  "Disclosing"

---

[3] *See* https://www.linkedin.com/in/michael-lysse-97780159/details/experience/.

Mr. Lysse by burying him in a 76-page supplemental disclosure on the last day of discovery violates Qorvo's obligations under Rule 26(a)(1) & (e) and prejudices Akoustis.  Mr. Lysse should be excluded from trial.

Dated:   March 22, 2024

OF COUNSEL:

SQUIRE PATTON BOGGS (US) LLP

Ronald S. Lemieux
David S. Elkins
Victoria Q. Smith
1841 Page Mill Road
Suite 150
Palo Alto, California 94304
(650) 856-6500
ronald.lemieux@squirepb.com
david.elkins@squirepb.com
victoria.smith@squirepb.com

Rachael A. Harris
Matthew A. Stanford
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
rachael.harris@squirepb.com
matthew.stanford@squirepb.com

Xiaomei Cai
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
(602) 528-4000
xiaomei.cai@squirepb.com

Respectfully submitted,

*/s/ Ronald P. Golden III*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Defendants Akoustis Technologies, Inc. and Akoustis, Inc.*

- 20 -

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 22, 2024, copies of the attached

document were served via electronic mail on all counsel of record.


<u>*/s/ Ronald P. Golden III*      </u>
Ronald P. Golden III

## Motions
<u>1:21-cv-01417-JPM Qorvo, Inc. v.
Akoustis Technologies, Inc. et al</u>

PATENT

**U.S. District Court**

**District of Delaware**

### Notice of Electronic Filing

The following transaction was entered by Golden, Ronald on 3/22/2024 at 4:59 PM EDT and filed on 3/22/2024

| | |
|---|---|
| **Case Name:** | Qorvo, Inc. v. Akoustis Technologies, Inc. et al |
| **Case Number:** | <u>1:21-cv-01417-JPM</u> |
| **Filer:** | Akoustis Technologies, Inc. |
| | Akoustis, Inc. |

**Document Number:** <u>518</u>

**Docket Text:**
**[SEALED] MOTION in Limine - filed by Akoustis Technologies, Inc., Akoustis, Inc.. (Attachments: # (1) Certificate of Service)(Golden, Ronald)**

**1:21-cv-01417-JPM Notice has been electronically mailed to:**

Anthony David Raucci     araucci@morrisnichols.com, mnat_IP_eFiling@morrisnichols.com

David S. Elkins     david.elkins@squirepb.com, danni.fontana@squirepb.com

Eric K. Gill     egill@sheppardmullin.com, ksok@sheppardmullin.com

Jack B. Blumenfeld     Jbbefiling@mnat.com, jblumenfeld@mnat.com, mnat_IP_eFiling@morrisnichols.com

Jennifer Klein Ayers     jayers@sheppardmullin.com, 3515833420@filings.docketbird.com

Jeremy A. Tigan     JTigan@morrisnichols.com, jatefiling@mnat.com, mnat_IP_eFiling@morrisnichols.com

Jonathan R. DeFosse     jdefosse@sheppardmullin.com

Matthew A. Stanford     matthew.stanford@squirepb.com

Robert M. Masters     rmasters@sheppardmullin.com, mrpatrick@sheppardmullin.com

Ronald P. Golden , III     rgolden@bayardlaw.com, lfracek@bayardlaw.com, ntalarowski@bayardlaw.com

Ronald S. Lemieux     ronald.lemieux@squirepb.com, SFR_DCKT@squirepb.com

Roy D. Jung     rjung@sheppardmullin.com

Stephen B. Brauerman     sbrauerman@bayardlaw.com, lfracek@bayardlaw.com, ntalarowski@bayardlaw.com, tdevine@bayardlaw.com

Timothy P. Cremen    tcremen@sheppardmullin.com

Victoria Q. Smith    victoria.smith@squirepb.com, akoustis.caseteam@squirepb.com

Xiaomei Cai    xiaomei.cai@squirepb.com, SFR_DCKT@squirepb.com

Zachary Alper    zalper@sheppardmullin.com

**1:21-cv-01417-JPM Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499863-0
] [2d3c28f376981e3cb5f1f24aafc4dced06fbb1ff7b60b824c7edd3ae827a89c2440
15234ca646965ddf21e2d07807a3821289940b84006674fd390c61d1042e8]]
**Document description:**Certificate of Service
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499863-1
] [daa368ff8661731646823b05c68616fe32e27ba468bf9e2b10e993c42f661e8d4de
6790264b3132b80c6be239678be12c5123408ad39927db851e1653902a67e]]

# Exhibit F.7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QORVO, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:21-01417-JPM |
| v. | ) |
| | ) **DEMAND FOR JURY TRIAL** |
| AKOUSTIS TECHNOLOGIES, INC. and | ) |
| AKOUSTIS, INC. | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE* NOS. 1-6**

██████████████████████████████

Plaintiff Qorvo, Inc. ("Qorvo") hereby opposes the six motions *in limine* filed by Defendants Akoustis Technologies, Inc. and Akoustis Inc. (collectively, "Akoustis").

## I.  OPPOSITION TO AKOUSTIS'S MOTION IN LIMINE NO. 1 TO PRECLUDE QORVO FROM OFFERING ANY EVIDENCE ON OR COMMENTING ABOUT ANY TRADE SECRETS BEYOND THOSE IN ITS FINAL TRADE SECRET DISCLOSURE OR "CONFIDENTIAL INFORMATION" BEYOND THAT DISCUSSED IN THE SHANFIELD REPORT

Akoustis Motion in *Limine* ("MIL") No. 1 seeks to exclude evidence that Akoustis stole 500,000 Qorvo documents, plus 279 GB of additional Qorvo data. Akoustis argues that this evidence should be excluded because (1) it is "blatantly false"; and (2) "cravenly designed for the sole purpose of inflaming the jury." Neither argument has merit.

The evidence concerning the number of documents that Akoustis stole from Qorvo is based on the forensic inspection performed by Kevin Faulkner pursuant to the forensic inspection protocol adopted by the Court. *See* D.I. 299. Pursuant to that protocol, Mr. Faulkner was given access to data for 14 Akoustis custodians. Mr. Faulkner determined, among other things, that:

- Rama Vetury, Akoustis's Chief Device Scientist and a former Qorvo employee, created an image of his Qorvo computer and transferred 279 GB of data from that computer to Akoustis. D.I. 466 (Faulkner Feb. 24, 2024 Decl.), ¶17.

- Dr. Vetury also transferred more than 175,000 Qorvo emails to Akoustis. *Id*., ¶18.

- Todd Bender, Akoustis's Director of Tax and Treasury and a former Qorvo employee, transferred more than 320,000 Qorvo emails to Akoustis. *Id*.

- Rohan Houlden, Akoustis's Vice President of Product Engineering and a former Qorvo employee, had 6,303 Qorvo documents. Mr. Faulkner also determined that Mr. Houlden copied Qorvo documents onto an external hard drive into a folder entitled "Qorvo Laptop" two days before leaving Qorvo and subsequently transferred that information to Akoustis. Ex. A (Faulkner Rpt.), ¶¶60-62.[1]

---

[1] All exhibit citations refer to the Declaration of Jonathan R. DeFosse in Opposition to Akoustis Motions in Limine ("DeFosse MIL Declaration") unless otherwise indicated.

███████████████████████████

- Other Akoustis employees included in the forensic inspection obtained large volumes of Qorvo documents, including Robert Dry, Akoustis's Vice President of Operations (306 Qorvo file records) and David Dyer, an Akoustis Computer Aided Design Engineer (462 Qorvo file records). *Id.*, ¶¶76, 88.

Notably, Mr. Faulkner's determination that Akoustis obtained nearly 500,000 Qorvo document, plus 279 GB of Qorvo data, is likely **under-inclusive** of the number of documents Akoustis actually stole from Qorvo. Pursuant to the forensic inspection protocol, Mr. Faulkner was only given access to data for a small subset of Akoustis employees. Even for those employees, Mr. Faulkner did not receive a complete set of data. Akoustis destroyed during this case the computers of two of the custodians—Joel Morgan and Joonbum ("JB") Kwon—prior to the forensic inspection. Further, Mr. Faulkner was unable to analyze the computer of another custodian (Pat Lewis) because Akoustis withheld the decryption key for Mr. Lewis's data until near the close of fact discovery. Ex. A (Faulkner Rpt.), ¶22.

As set forth above, there is extensive evidentiary support for the assertion that Akoustis stole nearly 500,000 Qorvo documents, plus 279 GB of additional Qorvo data. The evidence includes the stolen documents themselves, which were produced from Akoustis's files, as well as Mr. Faulkner's forensic analysis. To the extent Akoustis wishes to challenge the credibility of Mr. Faulkner's analysis or the veracity of the evidence produced from its files, that is a matter to address to the jury, not a basis for exclusion. *Genuine Enabling Tech. v. Sony Corp.*, No. 17-cv-135, 2022 WL 17325656, at *3 (D. Del. Nov. 28, 2022) ("A motion to exclude evidence 'is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense'").

Akoustis also argues that the evidence concerning the scope of its theft should be excluded as "more prejudicial than probative." According to Akoustis, its theft of 500,000 documents from Qorvo would only be probative if Qorvo had performed a document-by-

document analysis and determined that every document contained trade secrets. There are multiple problems with this assertion.

First, Akoustis does not cite a single case holding that evidence concerning the scope and manner in which a defendant stole data is irrelevant to trade secret or unfair competition claims. Qorvo is entitled to present such evidence to show that Akoustis was engaged in a coordinated and malicious scheme to copy large amounts of data from Qorvo in hopes of obtaining Qorvo's confidential information. This scheme included transferring data to external hard drives, imaging entire Qorvo laptop computers, and stealing entire archives of Qorvo email accounts. Having stolen massive amounts of Qorvo's data, Akoustis employees then used the repositories of information to help Akoustis gain a head start in the market. *See, e.g.*, D.I. 468, Ex. Z ("Look what I have?"); Ex. AA ("found it"); Ex. BB ("Here you go . . .").

Evidence concerning the scope and manner of the data theft is highly probative of several issues in the case.  Such evidence is relevant to whether Akoustis engaged in an unfair or deceptive trade practice under North Carolina law—e.g., whether stealing 500,000 documents from a competitor is a practice that is "immoral, unethical, oppressive, [or] unscrupulous." *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 228 (N.C. 2013) (setting forth elements of unfair competition claim). The scope and manner of the data theft is also relevant to numerous issues under the Defend Trade Secrets Act (the "DTSA"), including (i) whether Akoustis used "improper means" to obtain Qorvo's documents (*see* 18 U.S.C. § 1839(6) (defining "improper means" to include "theft")); (ii) whether Akoustis "knew or had reasons to know" that the Qorvo documents were obtained in "breach of a duty to maintain secrecy" (*see id.*, § 1839(5), (6)); and (iii) whether Akoustis acted "willfully and maliciously" in stealing Qorvo's information (*Id.*, § 1836(b)(3)(C)). Further, the scope of the theft of information from Qorvo is relevant to Dr.

███████████████████████████

Shanfield's determination that Akoustis obtained a 55-month head start in the market and the calculation of damages provided by Qorvo's damages expert, Melissa Bennis.

Akoustis criticizes Qorvo for not performing a document-by-document analysis to show that each of the 500,000 stolen Qorvo documents contains confidential information. But a document-by-document analysis is not necessary to allow the jury to reasonably conclude that Akoustis sought and obtained confidential information when it imaged **entire Qorvo computers** and copied **entire Qorvo email archives**. *See, e.g.*, *Roebuck v. Drexel Univ.*, 852 F.2d 715, 731 (3d Cir. 1988) ("[A] jury is free to draw reasonable inferences from the evidence presented, using the common sense for which lay juries are most valued."). To the extent Akoustis wishes to argue that it was not seeking confidential information when it stole 500,000 documents from Qorvo, or that the theft of the documents should be discounted because it obtained non-confidential materials, Akoustis is free to make those arguments to the jury. But such arguments go to the weight of the evidence, not its relevance or admissibility. *See Liqwd, Inc. v. L'Oréal U.S., Inc.*, No. 17-14, 2019 WL 8014103, at *2 (D. Del. June 25, 2019) ("To the extent that a party challenges the probative value of the evidence, an attack upon the probative sufficiency of evidence relates not to admissibility but to the weight of the evidence and is a matter for the trier of fact to resolve."); *Genuine Enabling Tech.*, No. 17-cv-135, 2022 WL 17325656, at *3 ("A motion to exclude evidence 'is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense'").

Evidence that Akoustis stole 500,000 documents plus 279 GB of additional data from Qorvo is also not **unfairly** prejudicial.  As the Third Circuit has explained, "'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material." *Carter v. Hewitt*, 617 F.2d 961, 972 n.14

(3d Cir. 1980). "Unfair prejudice" means "the undue tendency to suggest a decision based on **improper considerations**." *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999) (emphasis added). Here, Akoustis is accused of engaging in a scheme to steal information from Qorvo to shortcut its entry into the market. Evidence that Akoustis did, in fact, steal large amounts of information from Qorvo is not an "improper consideration"; it is evidence goes directly to the merits of the asserted claims. *See JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mut. Life Ins. Co.*, No. 01-CIV-11523, 2002 WL 31867731, at *4 (S.D.N.Y. Dec. 23, 2002) ("[T]he term 'disguised loan' is highly relevant and precisely descriptive of what is involved. It does not constitute 'unfair' prejudice any more than would, say, a confession.").

## II. OPPOSITION TO AKOUSTIS'S MOTION *IN LIMINE* NO. 2 TO EXCLUDE PLAINTIFF'S PROPOSED TRIAL EXHIBITS PTX-0001 AND PTX-0758

Akoustis MIL No. 2 seeks to exclude transcripts of the depositions of Michael "David" Hodge (PTX-0001) and Jeffrey Shealy (PTX-0758) that were taken in a recent employment discrimination case against Akoustis—*Shen v. Akoustis Techs., Inc.*, No. 22-cv-103 (W.D.N.C.) (the "Shen Lawsuit"). Akoustis argues that the deposition transcripts are inadmissible under Fed. R. Civ. P. 32 and the rule against hearsay. Both assertions lack merit.

The plaintiff in the Shen Lawsuit accused Akoustis of fostering a hostile and unethical work environment. Dr. Hodge was an engineer at Akoustis from 2015 until 2022. Dr. Shealy is the CEO of Akoustis. During their depositions, Drs. Hodge and Shealy provided testimony relevant to the development of BAW filters at Akoustis, Akoustis's practices in hiring engineers from its competitors, and the theft of documents from Qorvo. For example, in describing the workplace environment at Akoustis, Dr. Hodge was asked about and described the theft of information from Qorvo:

███████████████████████████████████

- Rohan Houlden, Akoustis's Vice President of Product Engineering, "brought Qorvo IP whenever he left [for] Akoustis and shared that with the Engineering Team." Ex. B (Hodge Dep. Tr.), 231:8-10.

- "[Houlden] gave me three [Qorvo] presentations within the first couple of weeks of starting on a prototype WI-FI filter that Qorvo was developing, similar to the WI-FI 6. It detailed the design details of the filter packaging, simulations, performance, foundry metrics, so like frequencies, trim targets." *Id*., 233:2-12.

- "Then there was another [Qorvo] presentation that he gave me that was talking about shapes of resonators, how they changed the performance of the filter, what's good, what's bad, you know, the tradeoffs for each design." *Id*., 233:13-16.

- "Then [Houlden] also gave to an employee we had at the time, David Dyer, he gave him a power point packet from Qorvo that detailed their evaluation boards, their ███████████████, and then he asked David to redesign those boards to match the Qorvo ones for Akoustis and go ahead and use those drawings and try to go ahead and order that ██████████████████." *Id*., 233:19-25.

Under Rule 32, a transcript from deposition taken in a different lawsuit may "be used as allowed by the Federal Rules of Evidence." As discussed below, the Hodge deposition transcript is allowed under Fed. R. Evid. 804, while the Shealy transcript is allowed under Fed. R. Evid. 801(d).

The Hodge deposition transcript is admissible under Rule 804 because (i) Dr. Hodge is an unavailable witness; (ii) his testimony was given at a lawful deposition; and (iii) Akoustis was present at the deposition and had an opportunity and similar motive to examine Dr. Hodge. Akoustis disputes that Dr. Hodge is an unavailable witness. But the Hodge Transcript is clear on this point—Dr. Hodge is a non-party witness who resides in Huntersville, North Carolina, which is beyond the subpoena power of this Court. Ex. B (Hodge Dep. Tr.) at 7:9-11; *see also Hill v. Equitable Bank, Nat. Ass'n*, 115 F.R.D. 184, 185 (D. Del. 1987) ("Under Rule 32, the deposition of a witness, whether or not a party, is admissible at trial provided, inter alia, that the witness resides at a distance greater than 100 miles from the trial or hearing."); *In re Processed Egg*

*Prods. Antitrust Litig.*, No. 08-md-2002, 2019 WL 5395914, at *2 (E.D. Pa. Oct. 22, 2019) ("Here, Ms. Schnell is 'unavailable' for the purposes of Rule 804 because she lives outside of the Court's subpoena power, making (1) Ms. Schnell 'absent from the trial,' and (2) the defendants unable, 'by process or other reasonable means, to procure [her] attendance.'").

Akoustis also argues that the Hodge Transcript is inadmissible because "the Shen Action and the present case do not involve the same parties." But, contrary to Akoustis's arguments, a complete overlap of parties is not required under Rule 32(a)(8). *See Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d 1179, 1187 (3d Cir. 1978) ("[I]f it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party."); *Culver v. Asbestos Defendants (BP)*, No. 10-CV-3484, 2010 WL 5094698, at *4 (N.D. Cal. Dec. 8, 2010) (adopting interpretation of Third, Fourth, and Sixth Circuits that Rule 804's "predecessor in interest" limitation is meant to be read generously where former suit involved a party with similar motivation to cross-examine on similar issues as the present party); *In re Processed Egg Prods. Antitrust Litig.*, 2019 WL 5395914, at *1 ("The defendants agree that the DAPs were not parties to the Kansas action but argue that the deposition is still admissible under Federal Rule of Evidence 804(b)(1), rendering it also admissible under Rule 32(a)(8). The Court agrees and therefore denies the DAPs' motion.").

Akoustis also argues that it did not have a "similar motive" to examine Dr. Hodge in his prior deposition because it was an "employment discrimination" case with a "completely different set of facts and issues." This assertion is belied by Dr. Hodge's testimony. One of the central issues in the Shen case was whether Akoustis had fostered a workplace that was based on unethical conduct, including the theft of intellectual property from Qorvo. This was an express

line of questioning during Dr. Hodge's deposition. *See* Ex. B (Hodge Dep. Tr.), 231:8-233:25.

And Akoustis had every motive to examine Dr. Hodge on the issue to show that, contrary to the

allegations in the Shen Lawsuit, Akoustis did not engage in such unethical conduct. While the

precise causes of action in the Shen Lawsuit are different than those asserted here, Akoustis still

had a "**similar** motive" to develop Dr. Hodge's testimony. As such, the transcript is admissible.

*See United States v. Miles*, 290 F.3d 1341, 1353 (11th Cir. 2002) (in context of Fed. R. Evid.

804(b)(1), stating "similar motive does not mean identical motive"); *Fed. Hous. Fin. Agency v.*

*Merrill Lynch & Co.*, No. 11-Civ-6202, 2014 WL 798385, at *1 (S.D.N.Y. Feb. 28, 2014)

("[T]he motives to develop the testimony should be of substantially similar intensity to prove (or

disprove) the same side of a substantially similar issue").

      Use of the Shealy Transcript is also allowed under the Federal Rules of Evidence. Unlike

Dr. Hodge, Dr. Shealy will be present at trial.  As such, use of Dr. Shealy's transcript is allowed

for impeachment purposes under Rule 801(d). *See Erchul v. Starbucks Corp.*, 750 F. App'x 836,

839 (11th Cir. 2018) (holding plaintiffs could have moved into evidence a deposition transcript

from a Starbucks representative in a prior lawsuit to impeach Starbucks representative in current

lawsuit); *Burbank v. Davis*, 227 F. Supp. 2d 176, 179 (D. Me. 2002) ("Burbank could use the

Davis and Vogel depositions [from a different litigation] to impeach Vogel, Twomey, and Davis

(a party opponent) at trial."); *Boman & Kemp Rebar, Inc. v. J.D. Steel Co.*, No. 205-CV-00199,

2006 WL 2623898, at *2 (D. Utah Sept. 12, 2006) ("[T]he same deposition and hearing

transcripts [in another proceeding] are available to impeach a witness testifying at trial because

they are not hearsay in that event.").

      Akoustis also argues that the Hodge and Shealy Deposition Transcripts should be

excluded as more prejudicial than probative under Rule 403. Akoustis first makes a series of

generic and unexplained assertions—that transcripts would "confuse the jury," "create a significant distraction," and "mislead the jurors into making [a] decision based on irrelevant factors." These generic and superficial arguments should be rejected. Qorvo only expects to use testimony from the Shen Action to the extent it is relevant to the claims in this case—e.g., testimony concerning the theft of Qorvo's documents and the practice of hiring employees at Akoustis so that they can use trade secrets from their former employers. To the extent Akoustis has specific objections to specific testimony in the Hodge and Shealy Transcripts, those objections are more appropriately raised at the time Qorvo seeks to use that testimony.

Akoustis next argues that referring to the wrongful termination and employment discrimination claims against Akoustis would be improper "negative character evidence." Qorvo does not dispute this point and does not intend to introduce evidence of the nature of the lawsuit or claims against Akoustis. Indeed, Qorvo proposed that the parties agree to exclude arguments concerning other lawsuits, including the Shen Lawsuit. *See* Qorvo MIL No. 3. But **Akoustis** continues to oppose Qorvo's proposal to exclude arguments concerning other lawsuits.

Akoustis also argues that it would be unfair to allow Qorvo to use PTX-0758 when examining Dr. Shealy on whether Akoustis recruits employees based on their access to trade secrets from their prior companies. During his deposition in the Shen Lawsuit, Dr. Shealy testified that he prefers candidates that have trade secrets from their prior employers that could be used to design products for Akoustis. *See* Elkins Decl., Ex. 4 (PTX-0758), 40:6-41:3. Akoustis argues that Dr. Shealy's testimony should be excluded because it was an "inartful lay response" and, even if Dr. Shealy were allowed to explain his testimony during trial, that "would still leave him looking bad." There is no doubt that Dr. Shealy's admissions "leave him looking bad." But, again, there is nothing **unfair** about that effect of that testimony. Qorvo accuses

█████████████████████████████████

Akoustis of systematically recruiting Qorvo employees for the purpose of obtaining Qorvo's confidential information. Dr. Shealy **admitted** that one factor Akoustis considers when it hires employees is whether they have knowledge of trade secrets they could use to help Akoustis. That testimony is directly relevant to Qorvo's unfair competition claim and there is nothing improper about allowing the jury to hear and weigh such evidence.[2]

### III.   OPPOSITION TO AKOUSTIS'S MOTION *IN LIMINE* NO. 3 TO PRECLUDE QORVO FROM USING THE DEPOSITION TESTIMONY OF DR. MICHAEL LEBBY REFERENCING OR RELATING TO ILLICIT ACTIVITIES

In MIL No. 3, Akoustis seeks to exclude testimony **from its own expert**—Dr. Michael Lebby—related to his opinions on customary "competitive intelligence gathering in Asia." Akoustis argues that Dr. Lebby's testimony should be excluded as speculative, unfairly prejudicial, and improper "character" evidence. These arguments lack merit.

In his opening expert report, Qorvo's expert—Dr. Stanley Shanfield—analyzed evidence showing that Akoustis routinely used its employees in China and Korea to solicit Qorvo's confidential information. D.I. 469, Ex. A at ¶¶426-441. Dr. Shanfield noted, in particular, that Akoustis's Country Manager in Korea (SJ Kim) sent emails to his boss (Dave Aichele) stating that Mr. Kim was using his Akoustis expense account to obtain "key confidential information" about Qorvo and other competitors. *See id.*, ¶427; *see also* D.I. 468, Ex. Q ("Do me a favor that can you accept my expense claim of entertainment with ████████/Qorvo/████████ without the name of persons? Just put the name of company. The reason is that the guys share those key

---

[2] Akoustis also makes a passing reference to Dr. Shealy's testimony being inadmissible "character" evidence under Fed. R. Evid. 404. Not so. Dr. Shealy's testimony concerns Akoustis's hiring practices—the same practices that are at issue in this case. It is not evidence of a past "crime, wrong, or act" and the testimony would not be used to prove Akoustis's "character." Rather, the testimony about Akoustis's hiring considerations would be used to show the factors that Akoustis considers in recruiting employees—e.g., access to trade secrets.

confidential information with me based on personal relationship, but they are so sensitive with knowing their name with anyone in Akoustis."). Mr. Kim subsequently circulated multiple .zip files containing confidential Qorvo presentations, boasting "I always use my expense for the right purpose!" D.I. 468, Ex. R.

In his rebuttal opinion, Dr. Lebby opined that Dr. Shanfield had "a rather naïve view" regarding "competitive intelligence gathering in Asia." D.I. 474, Ex. C (Lebby Rpt.), ¶100. Dr. Lebby opined that "[c]ultural norms in Asia permit a higher level of information than is permitted elsewhere." *Id.*, ¶101. Dr. Lebby thus sought to dismiss Akoustis's efforts to solicit Qorvo's confidential information as merely industry-standard practices based on "cultural norms in Asia."

During his deposition, Qorvo asked Dr. Lebby whether Mr. Kim's use of his expense account to obtain "key confidential information" about Qorvo was a customary competitive intelligence gathering technique in Asia. Dr. Lebby initially sought to evade the question, stating that he "expect[s] employees to adhere to ethical procedures when doing expense claims." Ex. C (Lebby Dep. Tr.), 192:20-195:3. Dr. Lebby then testified that Mr. Kim's email to his boss may have been referring to the (purportedly) normal practice in Asia of hiring and exchanging information about prostitutes:

> I have no idea what this key confidential information could be. What I do know is when you go out to dinners in Asia, you know, there's a bunch of men talking about stuff, they share information that is confidential that has nothing whatever to do with the business they're in. It could be which prostitute they had sex with the night before. That's key confidential information.

*Id.*, 195:16-22; *see also id.*, 196:7-196:11 ("I don't know if that's a meal or that's taking them to a normal prostitute place which happens quite regularly in Asia."); 196:21-198:7 ("I mean, he

███████████████████████████████████████████

could be doing elicit activities in terms of, you know, going to prostitution houses for all I know. There's no detail in this email.").

Qorvo is entitled to rely on Dr. Lebby's deposition testimony during cross examination. Dr. Lebby opined that Akoustis's efforts to solicit Qorvo's confidential information in Korea and China were consistent with "cultural norms" in Asia. When Qorvo asked Dr. Lebby how his opinion applies to Mr. Kim's emails, he opined that the emails may relate to exchanging information about prostitutes, rather than confidential information about Qorvo. The jury is entitled to hear this testimony and judge for itself the credibility of Dr. Lebby's opinions. *See U.S. v. Green*, 617 F.3d 233, 251 (3d Cir. 2010) ("[E]vidence concerning a witness's credibility is always relevant, because credibility is always at issue[.]").

Notably, neither of the cases that Akoustis cites justify excluding Dr. Lebby's testimony in this case. Akoustis cites *Knecht v. Balanescu* for the proposition that speculative testimony is not admissible. No. 16-CV-00549, 2017 WL 4883198, at *5 (M.D. Pa. Oct. 30, 2017). In that case, the court granted the **defendants'** motion *in limine* to preclude portions of the **plaintiff's** expert testimony because the plaintiff's expert relied on "an inaccurate interpretation of speculative testimony" by a fact witness. *Id.* Here, by contrast, Akoustis is seeking to exclude testimony from its own expert, arguing that the expert himself was speculating when he provided testimony about his own opinions and the evidence he considered in forming those opinions. Ex. C (Lebby Dep. Tr.), 192:16-19 ("I did use this document, which is Exhibit 530, to form part of my opinions in this case. That is correct."). Akoustis cannot have it both ways—it cannot offer Dr. Lebby as an expert "competitive intelligence gathering" in Asia and then argue that his testimony on that exact topic and the evidence he considering was "speculative."

Akoustis also cites *Belvin v. Electchester Mgmt., LLC* for the proposition that evidence should be excluded when it is more prejudicial than probative. 635 F. Supp. 3d 190, 200 (E.D.N.Y. 2022). The court in *Belvin* excluded an expert's opinions regarding the plaintiff's drinking problems, drug use, and criminal background because that information was not relevant to the "claims or any possible defenses." *Id*. The holding in *Belvin* does not provide any support for Akoustis's motion. Dr. Lebby's testimony concerning Mr. Kim's emails is directly relevant to his opinion concerning the "cultural norms" and customary "competitive intelligence gathering in Asia." While Qorvo believes that Dr. Lebby's testimony is prejudicial—showing the lack of credibility of his opinions about Akoustis's practices—that prejudice does not qualify as unfair or undue prejudice. *See United States v. Heatherly*, 985 F.3d 254, 266 (3d Cir. 2021) (Rule 403 "does not protect defendants from devastating evidence in general.").

Finally, Akoustis argues that Dr. Lebby's testimony constitutes "improper character evidence." This makes no sense. Qorvo is not seeking to admit Dr. Lebby's testimony to show that Akoustis was acting "in accordance with the character or trait" of any particular person. Fed. R. Evid. 404. Dr. Lebby's testimony is about emails showing that Akoustis was using bribes to obtain Qorvo's "key confidential information," which directly undermines Dr. Lebby's opinion that Akoustis was merely engaged in routine "intelligence gathering" practices.

## IV.    OPPOSITION TO AKOUSTIS'S MOTION *IN LIMINE* NO. 4 TO PRECLUDE EVIDENCE OR COMMENT REGARDING THE SUBJECT MATTER OF QORVO'S MOTION FOR SANCTIONS FOR CONTEMPT AND SPOLIATION

In MIL No. 4, Akoustis seeks to exclude evidence or comment concerning "the subject matter" of Qorvo's Motion for Sanctions for Contempt and Spoliation (the "Sanctions Motion"). *See* D.I. 347.  Albeit somewhat unclear, Akoustis's motion appears to be directed to excluding evidence showing that it destroyed the laptops of JB Kwon and Joel Morgan after this lawsuit was filed and prior to the forensic inspection.

███████████████████████████████████

Qorvo is entitled to have its expert witnesses—Mr. Faulkner and Dr. Shanfield—answer basic factual questions as to why they were unable to review certain items of electronically stored information relating to Mr. Morgan and Mr. Kwon. For example, Mr. Faulkner should be able to explain that his forensic analysis was incomplete with respect to Dr. Kwon because Akoustis destroyed Dr. Kwon's laptop. Similarly, Dr. Shanfield should be able to explain why he was unable to identify the precise Qorvo document that Mr. Kwon copied when he created the Akoustis trimming process. Prohibiting Qorvo from introducing such evidence would be highly prejudicial, leaving the jury to believe that such evidence did not exist when, in fact, it was destroyed by Akoustis.

Akoustis argues that evidence concerning its destruction of the Kwon and Morgan laptops is irrelevant and "highly prejudicial." Not so. The evidence is relevant to explain the limitations imposed on Mr. Faulkner's forensic analysis and Dr. Shanfield's trade secret analysis and eliminate any negative inferences that the jury may draw as a result of those limitations. To the extent Akoustis wishes to argue that its destruction of the laptops was unintentional, Akoustis is free to submit testimony concerning the circumstances of the destruction.

Akoustis argues that Qorvo should be precluded from introducing evidence concerning the destruction of the laptops based on the Court's decision on the Motion for Sanctions. Notably, Akoustis does not cite any authority for this proposition. Indeed, courts have permitted evidence regarding the fact that evidence or data is missing even when a spoliation motion is denied. *See, e.g.*, *Speaks v. Mazda Motor Corp.*, No. 14-25, 2015 WL 4960344, at *3 (D. Mont. Aug. 19, 2015) ("While the Court denies Mazda's request for a sanction with respect to this issue, evidence that the subject vehicle's condition was altered at some point after the collision will be admissible to the extent it is relevant to the experts' testimony."); *Singh v. Penske Truck*

-14-

*Leasing Co.,* 2015 WL 80299, at *7 (S.D.N.Y Feb. 26, 2015) ("[T]his ruling applies only to plaintiffs' request for spoliation sanctions. It does not address the relevance or admissibility at trial of the fact that Penske lost the January 3 PM Checklist.").

## V.   OPPOSITION TO AKOUSTIS'S MOTION *IN LIMINE* NO. 5 TO PRECLUDE THE OPINIONS PRESENTED IN PARAGRAPHS 22 THROUGH 24 OF THE SUPPLEMENTAL SHANFIELD REPORT

In MIL No. 5, Akoustis seeks to exclude three paragraphs of the supplemental expert report that Dr. Shanfield prepared in response to evidence and argument included in the rebuttal expert reports of Dr. Robert Darveaux. Akoustis argues that the supplemental opinions are improper under Fed. R. Evid. 403 because they were untimely and Akoustis did not have an opportunity to cross examine Dr. Shanfield. Neither assertion is accurate.

During discovery, Akoustis witnesses developed selective amnesia when asked about Akoustis's trimming procedures. Mary Winters, Akoustis's Executive Vice President of Fab and Corporate Operations, testified that JB Kwon was responsible for setting up trim operations for Akoustis's products. Ex. D (Winters Dep. Tr.), 63:21-64:8.  Dr. Kwon, however, testified that he did not remember how he developed Akoustis's trimming process. *Id.*, Ex. E (Kwon Dep. Tr.), 35:8-40:17. Thus, when Dr. Shanfield served his initial expert report on November 21, 2023, Akoustis's fact witnesses were largely unable or unwilling to provide detailed information about the trimming procedures Akoustis adopted after hiring Dr. Kwon.

On December 20, 2023, Akoustis served the rebuttal report of Dr. Darveaux. In that report, Dr. Darveaux purported to identify, for the first time, a "process flow document" that provides "details" concerning Akoustis's trimming procedure. D.I. 474, Ex. G (Darveaux Rpt.), ¶103, n.54.  Akoustis had never previously identified these documents, including in response to Qorvo's interrogatories targeted to trimming. Based on the new document, Dr. Darveaux opined that it would have been impossible for Akoustis to use Qorvo's trimming procedure. *Id.*, ¶102.

At his deposition on January 18, 2024, Dr. Darveaux was unable to shed any light on how he had determined that this particular document provided the "details" on the trimming procedure that Akoustis implemented after hiring Dr. Kwon. *Id*., Ex. F (Darveaux Dep. Tr.), 191:3-192:15. During Dr. Darveaux's deposition, it also became clear that the "process flow document" referenced to other documents, including a "trim table." *Id*., 197:3-198:1. Qorvo presented Dr. Darveaux with the trim table during his deposition and he testified that the document "looks familiar" and provided his understanding of the document. *Id*., 200:8-208:23.

On January 22, 2024, Dr. Shanfield served a supplemental report addressing the new arguments and evidence cited for the first time in the Darveaux Report regarding Akoustis trimming processes (the "Supplemental Report"). D.I. 469, Ex. B. Akoustis deposed Dr. Shanfield on January 26, 2022.[3] Although Akoustis had the report for several days (and had attended Dr. Darveaux's deposition the preceding week), Akoustis declined to ask Dr. Shanfield any questions about the supplemental opinions, the "process flow" document that Dr. Darveaux had newly cited in his report, or the "trim table" that was presented at Dr. Darveaux's deposition.

Akoustis argues that paragraphs 22-24 of Dr. Shanfield's report should be excluded as untimely. Dr. Shanfield, however, had no reason to address the "process flow" document or related evidence at the time he served his initial report. Akoustis first identified that document as relevant in Dr. Darveaux's report. Dr. Shanfield then prepared and served his supplemental report one business day after Dr. Darveaux explanation of his opinions on January 18, 2024. Notably, the experts in this case—including Akoustis's own experts—each expressly reserved the ability to provide such supplementations based on new evidence identified by the opposing

---

[3] Akoustis incorrectly asserts that the Report was served "less than 24 hours before Dr. Shanfield's deposition began."

expert. *See, e.g.*, D.I. 474, Ex. G (Darveaux Rpt.) ¶316 ("I reserve the right to supplement this Report based on additional information, including documents produced, testimony, including without limitation the deposition testimony of Dr. Shanfield."). Moreover, courts routinely permit this type of supplementation. *See Alcoa, Inc. v. Alcan Rolled Prod.-Ravenswood LLC*, No. CV 06-451, 2020 WL 433856, at *3 (D. Del. Jan. 28, 2020) ("Generally, rebuttal evidence is proper in response to competing testimony and when expert reports are properly supplemented."); *MobileMedia Ideas, LLC v. Apple Inc.*, 907 F. Supp. 2d 570, 609 n.22 (D. Del. 2012), *rev'd in part on other grounds*, 780 F.3d 1159 (Fed. Cir. 2015); *Wilson v. Sundstrand Corp.*, Nos. 99-C-6944 & 99-C-6946, 2003 WL 22012673, at *6-8 (E.D. Ill. Aug. 25, 2003).

Akoustis's claims of prejudice also fall flat. Dr. Shanfield's Supplemental Report was served several days in advance of his deposition. Moreover, the paragraphs Akoustis seeks to strike (i) provide confirmation for an opinion that Dr. Shanfield already offered; and (ii) address evidence that was included in the report of Dr. Darveaux and used during Dr. Darveaux's deposition. Akoustis was thus aware of Dr. Shanfield's opinions and the evidence addressed in the paragraphs that Akoustis seeks to exclude. Under these circumstances, Akoustis has no viable claim of prejudice. *See, e.g.*, *Avco Corp. v. Turn & Bank Holdings, LLC*, No. 12-CV-01313, 2020 WL 3412659, at *5 (M.D. Pa. June 22, 2020) (finding no prejudice in a supplemental expert report that reinforced prior opinions in the initial expert report based on data used by the opposing party's expert); *MobileMedia Ideas*, 907 F. Supp. 2d at 609 n.22 (refusing to strike supplemental expert report where expert was examined about it at deposition and therefore "Apple had an opportunity to conduct rebuttal discovery."); *Allstate Ins. Co. v. Maytag Corp.*, No. 98-1462, 1999 WL 203349, at *6 (N.D. Ill. Mar. 30, 1999) (admitting supplemental report which was served in advance of expert's deposition and in response to rebuttal report).

## VI.    OPPOSITION TO AKOUSTIS'S MOTION *IN LIMINE* NO. 6 TO PRECLUDE MICHAEL LYSSE FROM OFFERING TESTIMONY AT TRIAL

Akoustis MIL No. 6 seeks to exclude testimony from Michael Lysse, Qorvo's Director of IT, Client Services, Security and Compliance. Akoustis does not dispute that Mr. Lysse has potentially relevant information.  Instead, Akoustis argues that Qorvo should be precluded from calling Mr. Lysse because "Qorvo ha[d] no excuse for disclosing Mr. Lysse" in supplemental disclosures served on the last day of discovery. Akoustis's argument again lacks merit.

As an initial matter, Akoustis partially quotes the disclosure standard under Rule 26(a)(1). The portion of the Rule that Akoustis omits (bolded below) is significant here, requiring disclosure of:

> the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—**that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment**[.]

Here, Qorvo was not aware of the possibility of calling Mr. Lysse as a witness to support its claims until shortly before serving the supplemental disclosures on November 15, 2023. As Akoustis notes, prior to the supplemental disclosures, Qorvo had already identified a large number of potential witnesses. On October 31, 2023, Akoustis took the deposition of Michael Boyd, Qorvo's Chief Information Security Officer. Mr. Boyd testified as a corporate designee on Qorvo's information security procedures. During the deposition, Mr. Boyd testified that Mr. Lysse is knowledgeable about certain historical information security practices. Ex. G (Boyd Dep. Tr.), 35:13-37:14. Following Mr. Boyd's deposition, Qorvo determined that there was a possibility it might call Mr. Lysse as a witness. Qorvo promptly supplemented its disclosures to add Mr. Lysse. Mr. Lysse was subsequently identified as a person with relevant information in the report of Qorvo's information security expert, Cuyler Robinson. D.I. 474, Ex. A (Robinson

Rpt.), ¶27; fn. 59, 61, 66, 73, 77. Akoustis then deposed Mr. Robinson, asking numerous questions concerning the information that Mr. Lysse provided. *Id.*, Ex. H (Robinson Dep. Tr.), 77:24-79:11, 108:2-109:8, 113:6-15.

Akoustis did not object to Qorvo's supplemental initial disclosures or move to strike those disclosures. Nor did Akoustis ask to depose Mr. Lysse out-of-time or make any other effort to cure the purported prejudice of Mr. Lysse's inclusion in the supplemental disclosures. Instead, Akoustis opted to pursue a "gotcha" strategy. It waited until the disclosure of its anticipated motions in *limine* in March 2024—**months** after Mr. Lysse was identified—to argue for the first time that the disclosure was improper. While Akoustis feigns shock that the updated disclosures were served at the close of discovery, both parties continued to work to supplement their disclosures right up to November 15, 2023. For example, Akoustis supplemented its interrogatory responses on November 14, 2023—the day before the close of discovery.

Courts have repeatedly rejected the tactics that Akoustis pursues in this case. For example, where (as here) a party is on notice of a relevant witness based on deposition testimony, courts have refused to exclude that witness even in the absence of supplemental disclosures. *See Weiland v. Linear Const., Ltd.*, No. 00–C-6172, 2002 WL 31307622, at *2 (N.D. Ill. Oct. 15, 2002) (denying motion *in limine* seeking to exclude witness whose identity was disclosed in a deposition); *accord In re Jacoby Airplane Crash*, No. 99-6073, 2007 WL 559801, at *10-11 (D.N.J. Feb. 14, 2007).

Courts have also held that there is nothing improper about disclosing a witness shortly before the close of fact discovery, even on the last day. *See Wherevertv, Inc. v. Comcast Cable Commc'ns, LLC*, No. 18-cv-529, 2023 WL 2664200, at *2 (M.D. Fla. Mar. 28, 2023) ("Neither [Rule 26(a)(1)(A)(i) nor Rule 37(c)(1)] contains an explicit bar on disclosing persons with

knowledge on the last day of discovery."); *Frye v. Escambia Cnty. Board of Ed.,* No. 08-00340, 2010 WL 1904465, at *3 (S.D. Ala. May 7, 2010) (denying motion to strike supplemental disclosures where added witnesses "were otherwise known to plaintiff during the discovery period").

Moreover, Akoustis's draconian demand to exclude Mr. Lysse as a witness should be rejected were, as here, Akoustis took no action to object to Mr. Lysse's disclosure or cure the alleged prejudice. *See, e.g.*, *Holak v. Kmart Corp.*, 12-cv-00304, 2014 WL 2565902, at *8 (E.D. Cal. June 6, 2014) ("The Court is cognizant that even though the disclosure met the deadline, disclosure on the last day of discovery certainly had the potential to prejudice Plaintiff . . . . However, Plaintiff took no action for over four months after receiving the disclosures, and only after the motion briefing period was underway. Plaintiff's inaction in this regard made the last-minute disclosure of the assistant manager witnesses harmless."); *Glazier v. Fox*, No. 2014-106, 2016 WL 424994, at *3 (D.V.I. Feb. 3, 2016) (holding "any prejudice or surprise that Defendant may claim is inconsequential" because "Defendant has had more than ample time to contact Plaintiff regarding any perceived deficiencies in the disclosure and to seek leave from the Court to conduct additional discovery.").

███████████████████████████████

Dated:  April 1, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jonathan DeFosse*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006
(202) 747-1900

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

Zachary Alper
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA 92130
(858) 720-8900

Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA 90067
(310) 228-3700

# Exhibit F.8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF DELAWARE

QORVO, INC.

        Plaintiff,

v.

AKOUSTIS TECHNOLOGIES, INC. and
AKOUSTIS, INC.

        Defendants.

C.A. No. 21-1417 (JPM)

**JURY TRIAL DEMANDED**

███████████████████████

## THE AKOUSTIS DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF ITS MOTION *IN LIMINE* NOS. 1-6

OF COUNSEL:

SQUIRE PATTON BOGGS (US) LLP

Ronald S. Lemieux
David S. Elkins
Victoria Q. Smith
1841 Page Mill Road, Suite 150
Palo Alto, California 94304
(650) 856-6500
ronald.lemieux@squirepb.com
david.elkins@squirepb.com
victoria.smith@squirepb.com

Rachael A. Harris
Matthew A. Stanford
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
rachael.harris@squirepb.com
matthew.stanford@squirepb.com

Xiaomei Cai
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
(602) 528-4000
xiaomei.cai@squirepb.com

Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Defendants Akoustis
Technologies, Inc. and Akoustis, Inc.*

I.      **THE COURT SHOULD GRANT MOTION IN LIMINE NO. 1 AND PRECLUDE QORVO FROM OFFERING ANY EVIDENCE ON OR COMMENTING ABOUT ANY TRADE SECRETS BEYOND THOSE IN ITS FINAL TRADE SECRET DISCLOSURE, OR ANY "CONFIDENTIAL INFORMATION" BEYOND THAT DISCUSSED IN THE SHANFIELD REPORT**

In its Opposition, Qorvo now alleges that Akoustis stole an "under-inclusive" tally of 500,000 documents, plus 279 GB of additional data.  It argues the evidence is relevant to its unfair competition and trade secrets claims, to Dr. Shanfield's head-start theory, and to Ms. Bennis' trade secret damages calculation of $66.1 million.  Qorvo has nothing to back up its argument.

Qorvo's trade secrets claims – if they survive summary judgment – are limited to the 104 categories of information identified.  Evidence supporting liability for the claims is limited to the opinions in Dr. Shanfield's Expert Report – which relies on specific documents identified in his report.  Waving around references to 500,000 other documents plus 279 GB of additional data, about which Dr. Shanfield neither refers nor opines, is not relevant to the trade secret claims.

Qorvo's Unfair and Deceptive Practices Claim (Count V) is limited to "(i) illegally and systematically poaching Qorvo employees to harm Qorvo's business, (ii) obtaining and using Qorvo *confidential information* from such employees as well as other Qorvo employees; and (iii) making false and misleading statements concerning the characteristics of the Akoustis BAW filters and Qorvo's BAW filters."  (D.I. 447 Ex. 19 (Qorvo's Response to Interrog. No. 10); D.I. 125 (Second Amended Complaint) ¶¶ 224-225 (limiting the claim to "Qorvo BAW Proprietary Information"[1]))  Qorvo does not allege a simple conversion claim, nor does its Second Amended Complaint allege facts from which such a claim could have been cobbled.  Qorvo has no expert opinions or testimony establishing the 500,000 other documents plus 279 GB of additional data,

---

[1] Qorvo defines "Qorvo BAW Proprietary Information" as "confidential and proprietary … technical expertise and know-how … [and] business information."  (D.I. 125 ¶ 22.)

*en masse*, as confidential or as Qorvo BAW Proprietary Information.  Consequently, such information is not relevant to its Unfair and Deceptive Practice Claim.

The information is not relevant to Dr. Shanfield's Report.  His Expert Reports "assess[es] how much of a head start benefit Akoustis obtained as a result of ***the use of Qorvo's confidential information***."  (D.I. 469 Ex. A (Shanfield Report) ¶¶ 510-11.)  Dr. Shanfield's Expert Report identified 1,523 items of purported "Qorvo Confidential Information" reviewed in connection with his Report.  (*Id.* App'x 4.)  He never mentions, much less analyzes, "500,000 other documents plus 279 GB of additional data."

The information is also not relevant to Ms. Bennis' Expert Report on Damages.  As with Dr. Shanfield, her Expert Report never mentions the "500,000 other documents plus 279 GB of additional data."  Her trade secret misappropriation damages opinion is based on Dr. Shanfield's head start calculation of 55 months.  (D.I. 458 Ex. A (Bennis Expert Report) at 38-41.)  As discussed above, his opinion does not even mention the large swath of challenged information.  Her trade secrets misappropriation damages opinion, based on a head start theory of unjust enrichment, is $66.1 million.  (*Id.* at 90 ("Opinion I":  "Assuming a head start advantage of 55 months, Akoustis has been unjustly enriched by at least $66.1 million.").)  Ms. Bennis does not have any damages opinion regarding "confidential information."  (*Id.* ("Opinion II":  Specifically, with respect to the confidential information, Akoustis has been unjustly enriched by virtue of being able to enter into the market and achieve revenue and profit prematurely. Assuming a head start advantage of 55 months, Akoustis has been unjustly enriched by at least $66.1 million.").

The "500,000 other documents plus 279 GB of additional data" has no description apart from the number of documents and gigabytes it includes and that it was taken by former Qorvo employees.  Absent a conversion claim that Qorvo never sought to make, this collection of material

is not relevant to any claim in the case.  Dr. Shanfield did not rely on it for (or even mention it in) his head start opinion regarding trade secret misappropriation.  Because Ms. Bennis neither mentions nor relies on it, Qorvo has no damages claim for Akoustis' possession of the 500,000 other documents plus 279 GB of additional data.

Any evidence regarding such information is wholly irrelevant.  Any trace relevance (the existence of which is nowhere to be found) is outweighed by the unfair prejudice to Akoustis as demonstrated earlier.  *United States v. Bey*, No. CR 16-290, 2017 WL 1547006, at \*7 (E.D. Pa. Apr. 28, 2017) (finding Rule 403 barred the challenged evidence because there was other evidence including deposition testimony available for the contested issues and the danger of impermissibly inflaming the jury was high).  Akoustis respectfully requests that Court grant MIL No. 1.

## II.    AKOUSTIS' MOTION IN LIMINE NO. 2 TO EXCLUDE PROPOSED TRIAL EXHIBITS PTX-0001 AND PTX-0758 SHOULD BE GRANTED

Qorvo's Opposition attempts to recast the issues of the *Shen* employment discrimination action into an investigation of Akoustis' "unethical conduct" in the competitive market to conjure a "similar motive" to satisfy Fed. R. Evid. 804.  Meanwhile, Qorvo mischaracterizes Dr. Shealy's prior testimony and intends to use it at trial to show Akoustis' purported hiring practice.  Qorvo's opposition to Akoustis' MIL No. 2 merely confirms the unfair prejudice to Akoustis that would result from use of such inadmissible prior testimony.

Qorvo fails to rebut Akoustis' showing that the prior testimony of Drs. Hodge and Shealy from the *Shen* employment discrimination action is inadmissible under Rule 32(a)(8).  Rule 32(a)(8) unequivocally requires "the same subject matter ***between*** the same parties," which is not satisfied here.  Fed. R. Civ. P. 32(a)(8) (emphasis added); *see Ward v. Allis-Chalmers Pumps, Inc.*, No. 09-00247, 2010 WL 7746856, at \*1 (E.D. Pa. Dec. 23, 2010).  None of the purported cases that Qorvo cites interpreting "predecessor in interest" under Fed. R. Evid. 804 remotely supports

its argument that a "complete overlap of parties is not required under Rule 32(a)(8)." (*See* Qorvo Opp. at 7.)  Further, Qorvo tacitly acknowledges that because Dr. Shealy will testify at trial, his prior testimony is not admissible under either Rule 32(a)(8) or Rule 804.  (*See id.* at 8.)

The admissibility of the prior Hodge testimony hinges on whether the "similar motive" limitation of Rule 804 is met.  It is not.  Qorvo concedes that the *Shen* Action involves completely different causes of action than the presence case – wrongful termination and employment discrimination.  The elements of such claims themselves demonstrate that the issues central to the *Shen* Action pertain to Ms. Shen's job performance and how Akoustis treated her and other employees under similar circumstances[2] – not how Akoustis treated its competitor companies.  The prior testimony of Dr. Hodge (and Dr. Shealy) was consistently developed to explore facts surrounding these foundational elements of the employment claims.  Akoustis had no motive in the Shen Action to delve into inquiries from Dr. Hodge (or Dr. Shealy) regarding Akoustis' competitive conduct or hiring practice in the market – such issues were simply not relevant there.

Qorvo cherry picks Dr. Hodge's prior testimony – all of it taken by Shen's counsel – to argue that the "central issues in the *Shen* Action" were whether "Akoustis [had] engaged in such unethical conduct" as "the theft of intellectual property from Qorvo."  (Opp. at 7 (citing Hodge Depo. at 231:8-10, 233:2-12; 233:13-16, 233:19-25).)  That Shen's counsel delved into such matters during the deposition is irrelevant.  None of the facts pled in Shen's Complaint, and none

---

[2] "[I]n order to demonstrate a prima facie case of disparate treatment under [Title VII and North Carolina Equal Employment Practices Act], [plaintiff] must show by a preponderance of the evidence that: (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances."  *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995).

of the elements of her employment discrimination claims, related to "unethical conduct" or "the theft of intellectual property from Qorvo." (*See* Elkins Reply Decl. Ex. 9 (Shen Complaint) ¶ 1.)

The three-page excerpt Qorvo cites is Dr. Hodge's hearsay about how Rohan Houlden, an Akoustis' ex-manager, allegedly obtained "IP" from some of his prior employers. This testimony was not responsive to questions from Ms. Shen's counsel and was completely disconnected from any issues litigated in that action.[3] (*Id.* at 230:25-231:2.) Precisely because such testimony was not relevant to any issues of the Shen case, Akoustis did not conduct any re-direct examination about it. *See Kirk*, 61 F.3d at 166 (requiring "rough equivalent" treatment of witnesses in both cases to show "similar motive"); *Fed. Hous. Fin. Agency v. Merrill Lynch & Co.*, No. 11 CIV. 6202 DLC, 2014 WL 798385, at *2 (S.D.N.Y. Feb. 28, 2014) (requiring "***substantially similar intensity*** . . . ***substantially*** similar issue") (emphasis added).

The vastly different facts and issues of the two cases further heighten the unfair prejudice that Akoustis will suffer under Rule 403 if the *Shen* Action testimony is not excluded.[4] No dispute exists that Qorvo deposed Dr. Hodge in *this* case. It explored extensively the issues related to Dr. Hodge's commentary in the Shen case. Dr. Hodge, when testifying in the relevant context of this case, volunteered to clarify and emphasize crucial points, such as affirming that the documents that Mr. Houlden allegedly shown him were not useful to the design of Akoustis' products. (*See* Elkins Reply Decl. Ex. 10 (Hodge Tr.) at 130:8-132:9.) The volume and context of Dr. Hodge's

---

[3] That Dr. Hodge – Ms. Shen's spouse – freelanced non-responsive testimony about matters apparently learned from the Complaint Qorvo had filed in this action 4.5 months earlier is neither surprising nor indicative of any overlap, as Dr. Hodge was motivated to do whatever *he* might have considered helpful to his wife's case, whether relevant or not.

[4] The test under Rule 403 considers (i) the strength of the evidence; (ii) the need for the evidence in light of the contested trial issues and the other evidence available to the party offering the evidence; and (iii) the danger that the evidence will inflame the jurors and cause them to insinuate misconduct on impermissible grounds. *See U.S. v. Sriyuth*, 98 F.3d 739, 747-48 (3d Cir. 1996).

testimony in the current case underscores the risk of introducing isolated excerpts from an unrelated context – it will mislead the jury and distort its understanding of the otherwise pertinent, clarified testimony Dr. Hodge provided in this case.

Qorvo argues that Dr. Shealy's testimony should be allowed for impeachment purposes under Rule 801(d). Rule 403 bars it because it is more prejudicial than probative. *U.S. v. Bey*, No. CR 16-290, 2017 WL 1547006, at *6 (E.D. Pa. Apr. 28, 2017) (evidence that is otherwise admissible under Rule 801(d) "remain[s] subject to the unfair prejudice standard in Rule 403").

Qorvo intends to present Dr. Shealy's testimony in *Shen* as a purported admission that **Akoustis** adopted a hiring practice of recruiting employees with knowledge of trade secrets. Such mischaracterization is entirely belied by the context in which Dr. Shealy testified in the Shen case, as discussed in Akoustis' opening brief. Dr. Shealy was never asked about Akoustis' hiring practice in the Shen case, much less any policy related to recruiting employee with knowledge of trade secrets; such issues were not relevant to the *Shen* case. Moreover, as Dr. Shealy emphasized during his deposition in that case, Akoustis is not his company. It is a public company, with a Human Resource department replete with established policies and procedures. (Elkins Opening Decl. Ex. 4 (PTX-0758 Shealy Tr.) at 20:18-20.) That Dr. Shealy's testimony suggests Akoustis' companywide practice lacks support. Allowing Qorvo to use such out-of-context soundbites from an unrelated case can only to inflame the jury and unfairly prejudice Akoustis.

Finally, Qorvo's attempt to use Dr. Shealy's prior testimony is prohibited by Rule 404(a), which bars the use of a person's character evidence to prove "on a particular occasion the person acted in accordance with the character or trait." While Qorvo contends such evidence was not character evidence but merely concerns Akoustis' "hiring practices," the argument lacks merit. Qorvo's suggestion of a purported hiring practice amounts to a thinly veiled attempt to establish

propensity and circumvent the rigorous examination of the facts surrounding each hiring decision in this case.

III.   **THE COURT SHOULD GRANT MOTION IN LIMINE NO. 3 TO EXCLUDE PORTIONS OF THE LEBBY DEPOSITION**

Dr. Lebby's opinions at issue here relate to the greater availability of competitor information in the business culture of Asia and the ***types*** of information willingly shared with others, not ***how*** that information is obtained.  In its deposition of Dr. Lebby, Qorvo repeatedly posed questions seeking speculative information regarding how certain competitive information was collected.  Dr. Lebby repeatedly testified that the exhibits presented to him did not indicate how the information was collected.  He therefore could not agree with the premise of Qorvo's questions that the information shared was legitimately considered confidential to anyone.  His transcript shows that Dr. Lebby attempted to stay within the scope of his report.  Qorvo is now attempting to misuse his deposition testimony to improperly inflame the jury with Dr. Lebby's comments that are irrelevant and completely speculative about something he repeatedly said he did not know – how the information was shared with Akoustis' representative in China.

Dr. Lebby opined that obtaining corporate information such as "samples, RF modules, and parts" is common competitive intelligence gathering in Asia because the business culture in Asia permits companies to share "a higher level of information than is permitted elsewhere."  (D.I. 519 Ex. 5 (Lebby Report) ¶¶ 100-101.)  Those in the industry commonly know that "[i]f you send documents or product [to Asia], then you should be aware that anything and everything is subject to public release."  (*Id.* ¶ 101.)  Dr. Lebby opines only that a higher level of information sharing occurs, not ***how*** that information is obtained.

During his deposition, Qorvo asked Dr. Lebby about two emails from an Akoustis employee related to his expense reports.  (*Id.* Ex. 6 (Lebby Dep. Tr.) at 191-200.)  Regarding the

first email (D.I. 468, Ex. Q), Qorvo's questions required Dr. Lebby to assume that the "key confidential information" mentioned referred to *corporate* information, and that the information was in fact confidential.  (D.I. 519 Ex. 6 (Lebby Dep. Tr.) at 192 ("Q:  Is it your opinion that Mr. Kim's use of expenses to obtain key confidential information was a common competitive intelligence gathering technique in the industry?").

Having no indication from the email as to the substance of the information conveyed, Dr. Lebby refused to concede that the information shared was actually confidential.  (*Id.* at 193:16-19 ("I don't know if in the discussion of the entertainment with the people that SJ Kim went out with, actual confidential information was conveyed or not.").)  When pressed, Dr. Lebby again stated, "I don't know whether information that was confidential was conveyed or not."  (*Id.* at 194:15-16.)  When pressed again, Dr. Lebby stated a third time that he had "no idea what this key confidential information could be."  (*Id.* at 195:15-16.)  After repeatedly stating that he could not determine from the documents showed him whether the information shared was actually confidential in nature, Dr. Lebby *speculated* that what was conveyed could be personal, not corporate.  (*Id.* at 195 (positing that the information could be of a personal nature but reiterating that he had no personal knowledge because "[i]t doesn't say what the confidential information is in Exhibit 530.") and 196:7-9)

Qorvo then moved on to the second email (D.I. 468, Ex. R) that attached a ZIP file with a non-descript filename, "Qorvo SC2020 (1).zip."  Without providing or otherwise identifying what was in the ZIP file, even after Dr. Lebby's request, Qorvo continued to pose questions to Dr. Lebby that required him to *speculate* as to how the information was obtained and as to the substance of the information.  Dr. Lebby again reiterated that he "[didn't] recall exactly what's in the zip file"

and that he "[didn't] know what Mr. Kim is using those expenses for" because "[i]t doesn't really say here."  (D.I. 518 Ex. 6 (Lebby Dep.) at 199:15-17.__

The cases addressed by Qorvo in its Opposition are inapposite.  *Green* states that credibility evidence is "always relevant."  *U.S. v. Green*, 617 F.3d 233, 251 (3d Cir. 2010).  But the core of this allegedly "discrediting" evidence is Dr. Lebby's disagreement that the two emails on their own show that confidential information had been conveyed – not the specifics of what he speculated could have been conveyed, or how.  No reason exists for allowing speculative testimony based on which party is seeking its preclusion, especially when such testimony is repeatedly disclaimed by the witness at the time it was elicited as speculative and outside of the scope of his expert report.  *Id.* at 12 (distinguishing *Knecht v. Balanscu*, No. 16-CV-00549, 2017 WL 4883198, at *5 (M.D. Pa. Oct. 30, 2017)).  Dr. Lebby's opinions in his report relate to only *what* information is commonly shared, not *how* that information is obtained.  *Id.* at 13 (distinguishing *Belvin v. Electchester Mgmt., LLC*, 635 F. Supp. 3d 190, 200 (E.D.N.Y. 2022).

Here, Qorvo is attempting  to use Dr. Lebby's testimony to show **how** companies obtain information in Asia. – a topic outside the scope of his report.  Akoustis respectfully requests that Dr. Lebby's speculative and highly inflammatory references to prostitution and illicit activities be precluded from use at trial.

## IV.   THE COURT SHOULD GRANT AKOUSTIS' MIL NO. 4 TO PRECLUDE EVIDENCE OR COMMENT REGARDING THE SUBJECT MATTER OF QORVO'S MOTION FOR SANCTIONS FOR CONTEMPT AND SPOLIATION

In MIL No, 4, Akoustis seeks to exclude evidence of the subject matter of the sanctions motion because it is (i) not relevant to the claims or defenses in this case, and (ii) more prejudicial than probative.  Qorvo nakedly asserts it is "entitled" to have its expert witnesses explain why they may have been unable to review certain material and to explicitly testify that certain materials were "destroyed" "after this lawsuit was filed and prior to the forensic inspection."  (Opp. at 14.)  But

Qorvo never explains why it experts must refer to the *destruction* of any materials, rather than simply stating the materials were *unavailable*. Details such as those Qorvo intends to introduce are irrelevant because they do not have a "tendency to [prove] a fact" that is "of consequence in determining the action" more or less probable than it would be without the evidence. Fed. R. Evid. 401. The facts here are highly prejudicial and would only serve to confuse and inflame the jury.

Qorvo's argument that allowing such testimony would limit a "negative inference" related to what a jury may think about its experts' review of forensic materials is pure speculation. Qorvo does not explain why any information about the circumstances under which the laptops became unavailable is relevant. This Court already found insufficient evidence of any bad faith or intentional conduct; no reason exists to introduce that evidence back into the case now. Qorvo's admission that it intends to do so indicates an attempt to take another bite at the "sanctions" apple.

None of Qorvo's cases alter this conclusion. They merely suggest that when the underlying facts may be relevant to the claims in the case, a court may allow such testimony to reach the jury. *See* Opp. at 14-15 (citing *Speaks v. Mazda Motor Corp.,* No. 14-25, 2015 WL 4960344, at *3 (D. Mont. Aug. 19, 2015) (recognizing the evidence related to the subject of a sanction motion may be introduced only if relevant, and even then only in a more neutral light)). Where, as here, evidence regarding the inadvertent destruction of evidence is not relevant to any actual issues in the case, courts will preclude the introduction of such information. *See EPAC Techs., Inc. v. Harpercollins Christian Publ'g, Inc.*, No. 3:12-CV-00463, 2019 WL 109371, at *10 (M.D. Tenn. Jan. 4, 2019) (granting motion in limine to preclude any discussion of spoliation when the court had already determined that the alleged spoliation was not a sanctionable offense, because "any such discussion, argument, or evidence relating to the alleged email spoliation would be irrelevant and likely confuse the jury").

Qorvo's claim of prejudice rings hollow.  Its Opposition Brief makes clear its intent to make unsubstantiated claims that Akoustis "stole" a half-million confidential documents, though Qorvo has no intent of trying to show that the documents are really confidential or contain legitimately confidential information.  Now it cries prejudice at not being to suggest that the jury speculate, without proof, that had the two laptops not been inadvertently reformatted because of a medical emergency, Qorvo would have had an untold number of additional documents that it could wave around as "confidential" without any testimony establishing their entitlement to that designation.  The only prejudice threatened here is to Akoustis if Qorvo is allowed to wave allegedly confidential information to the jury without actually proving anything.  That is the sanction Qorvo requested but was denied.

## V.  AKOUSTIS' MOTION IN LIMINE NO. 5 TO PRECLUDE THE OPINIONS PRESENTED IN PARAGRAPHS 22 THROUGH 24 OF THE SUPPLEMENTAL REPORT OF DR. SHANFIELD

Qorvo attempts to justify its unauthorized "supplemental" expert report in two ways.  (D.I. 469, Ex. B (Shanfield Suppl. Report)).  First, Qorvo claims that it allegedly only learned of the process flow document and trim table upon receiving Dr. Darveaux's Rebuttal Expert Report.  D.I. 474, Ex. G (Darveaux Report), ¶103 n.54.  Second, despite receiving Dr. Darveaux's Rebuttal Expert Report five weeks earlier, Qorvo chose to wait and serve the Supplemental Report less than 24 hours prior to the scheduled start of Dr. Shanfield's deposition.  Unforeseen travel delays and the intervening deposition of another Qorvo expert, however, pushed Dr. Shanfield's deposition from Tuesday to Friday.  Qorvo claims this schedule change provided Akoustis a sufficient opportunity to consider the substance of the Supplemental Report.  Qorvo's positions, however, are predicated on a false assumption – that it was allowed to supplement Dr. Shanfield's initial report without the Court's prior permission.

The deadlines for expert witness disclosures are set forth in the Amended Scheduling Order (May 10, 2023) (D.I. 198) and based on W.D. Tenn. Local Patent Rule (LPR) No. 5. LPR 5.1 provides for only two types of expert witness disclosures – initial and rebuttal. LPR 5.3 governs supplementation of expert witness disclosures:

> **5.3. Presumption against Supplementation of Reports**
> Amendments to, or supplementation of, expert reports after the deadlines provided herein are presumptively prejudicial and shall not be allowed, absent prior leave of Court upon a showing of good cause that the amendment or supplementation could not reasonably have been made earlier and that the opposing party is not unfairly prejudiced.

Qorvo never sought leave of this Court before serving its improper Supplemental Report. This alone is a sufficient reason to exclude Dr. Shanfield's Supplemental Report.

Even if the Court is inclined to look past this violation of its Local Rules, Qorvo cannot show good cause for supplementing Dr. Shanfield's initial report. Qorvo alleges that paragraphs 22-24 of Dr. Shanfield's Supplemental Report respond to Dr. Darveaux's reliance on a "new document[5]" in support of his opinion that Akoustis' trim process is different than Qorvo's trim process. The "new" process flow document, as well as the excerpts from the four documents provided by Dr. Shanfield in his supplemental expert report, were, however, in Qorvo's possession long before Dr. Shanfield served his initial expert report on November 21, 2023. Qorvo has not demonstrated good cause why Dr. Shanfield chose not to include these documents in his initial Expert Report. By waiting until the eve of Dr. Shanfield's deposition, Qorvo prevented Akoustis' expert from analyzing this new information and assisting Akoustis' counsel with the examination of Dr. Shanfield regarding the substance of his report. Dr. Shanfield should therefore be precluded from testifying about them at trial.

---

[5] AKTS_00641897.

Moreover, under the settled caselaw of this Circuit the new evidence and arguments presented in the Supplemental Report are not the type permitted under Rule 26 of the Federal Rules of Civil Procedure. *E.g., Novartis Pharms. Corp. v. Actavis, Inc.*, No. CV 12-366-RGA-CJB, 2013 WL 7045056, at *7-8 (D. Del. Dec. 23, 2013) (noting that supplementation under Rule 26 "is proper only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report" and "supplementation does not encompass rebuttal material."). Given Qorvo's violation of LPR 5.3 and settled caselaw – plus its inability to show good cause for allowing Dr. Shanfield to supplement his initial expert report, Qorvo should not be allowed to hide its improper submission of new evidence and arguments under the guise of FRCP Rule 26.

## VI.    THE COURT SHOULD GRANT AKOUSTIS' MIL NO. 6 AND PRECLUDE THE TRIAL TESTIMONY OF THE LATE-DISCLOSED MICHAEL LYSSE

Qorvo has the burden of establishing that its untimely disclosure of Michael Lysse was either substantially justified or harmless. *See Lee v. Kmart Corp.*, No. CV 2014-0079, 2016 WL 4373694, at *5 (D.V.I. Aug. 15, 2016) (excluding testimony from untimely disclosed fact witnesses). "The opposing party is not required, and should not be expected, to go on a fishing expedition to discover information that is clearly subject to Rule 26 voluntary disclosure." *Id.* at *12. Qorvo's Opposition does not dispute that it failed to disclose Mr. Lysse as a trial witness under Rule 26(a)(1) until the last day of fact discovery. (*See* Opp. at 18-20.)

Qorvo does not provide a legitimate justification for its failure to disclose Mr. Lysse as a witness or a description of the type of information Qorvo now seeks to present at trial. Instead, Qorvo contends that it was "not aware of the possibility of calling Mr. Lysse as a witness to support its claims until shortly before serving the supplemental disclosures," on the last day of discovery. (Opp. at 18.) That contention is belied by the surrounding circumstances. Mr. Lysse is no stranger

to Qorvo.  Akoustis' Opening Brief includes a screenshot of Mr. Lysse's LinkedIn resume.  He has been an employee with increasing responsibilities at Qorvo since its founding in 2015 (Opening Brief at 19.)  Qorvo had ample time during the two-year discovery period to provide notice to Akoustis of its intent to call Mr. Lysse as a trial witness before the close of the fact discovery on November 15, 2023.  *See* D.I. 313 ¶ 8.

Qorvo offers no explanation why Mr. Lysse somehow escaped its notice until November 16, 2023.  It mentions that Michael Boyd, one of Qorvo's corporate designees under Rule 30(b)(6), testified on October 31, 2023, that Mr. Lysse has some knowledge about "certain historical information security practices."  (Opp. at 18).  Qorvo presumably performed diligence in designating Mr. Boyd and prepared him to testify.  It *should have known* about Mr. Lysse long before Mr. Boyd's actual deposition.  If Qorvo thought that his knowledge of certain historical information security practices might be used at trial, Qorvo had an *obligation to supplement* its Rule 26(a)(1) disclosure *immediately* given the impending close of fact discovery.  But Qorvo did not do so. It delayed another two weeks *after* the Boyd deposition to finally disclose Mr. Lysse.

"[T]he mere mention of an individual's identity [in a deposition] … is not sufficient."  *Eli Lilly & Co. v. Actavis Elizabeth LLC*, No. 07-3770, 2010 WL 1849913, at *4 (D.N.J. May 7, 2010) ("Alleged 'disclosures' during discovery that are not facially apparent and require the drawing of further 'inferences' are insufficient to meet the requirements of Rule 26."); *Reed v. Wa. Area Metro. Transit Authority*, No. 1:14-cv-65, 2014 WL 2967920, at *2 (E.D. Va. July 1, 2014) ("Making a supplemental disclosure of a known fact witness a mere two days before the close of discovery...is not timely by any definition.").

That Mr. Robinson's report mentioned Mr. Lysse does not help, either.  Qorvo served Mr. Robinson's report on November 21, *after* the close of fact discovery.  Qorvo's counsel presumably

provided Mr. Robinson with the facts and documents known long beforehand.  Once Qorvo understood that its expert witness Robinson might rely on him, Qorvo had an obligation to disclose Mr. Lysse immediately.  Qorvo nowhere explains how or why Mr. Lysse's existence and possession of knowledge on which Qorvo might rely was unknown until November 16.

Courts exclude the testimony of witnesses not timely disclosed under Rule 26(a)(1) when, as here, the opposing party is prejudiced.  *See e.g. Flores*, 2019 WL 251948, at *4 (precluding the testimony of witness because there would be no time for the plaintiff to depose her or otherwise prepare a rebuttal).  Akoustis should not be required to assume that every individual who happens to be mentioned in a deposition is someone whom the disclosing party "may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(l)(A)(i); *Lee*, 2016 WL 4373694, at *12; *Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843, 862 (9th Cir. 2014) ("That another witness has made a passing reference in a deposition to a person with knowledge or responsibilities who could conceivably be a witness does not satisfy a party's disclosure obligations.  An adverse party should not have to guess which undisclosed witnesses may be called to testify.").  No justification exists for allowing Qorvo to manipulate its Rule 26(e) obligation and identify this witness for the first time on the last day of fact discovery.

Dated:  April 8, 2024

OF COUNSEL:

SQUIRE PATTON BOGGS (US) LLP

Ronald S. Lemieux
David S. Elkins
Victoria Q. Smith
1841 Page Mill Road
Suite 150

Respectfully submitted,

*/s/ Ronald P. Golden III*
   Stephen B. Brauerman (#4952)
   Ronald P. Golden III (#6254)
   BAYARD, P.A.
   600 N. King Street, Suite 400
   Wilmington, Delaware
   (302) 655-5000
   sbrauerman@bayardlaw.com

Palo Alto, California 94304
(650) 856-6500
ronald.lemieux@squirepb.com
david.elkins@squirepb.com
victoria.smith@squirepb.com

Rachael A. Harris
Matthew A. Stanford
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
rachael.harris@squirepb.com
matthew.stanford@squirepb.com

Xiaomei Cai
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
(602) 528-4000
xiaomei.cai@squirepb.com

rgolden@bayardlaw.com

*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

# Exhibit F.9

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF DELAWARE**

| | |
|---|---|
| QORVO, INC. | |
| Plaintiff, | C.A. No. 21-1417 (JPM) |
| v. | |
| AKOUSTIS TECHNOLOGIES, INC. and AKOUSTIS, INC. | **JURY TRIAL DEMANDED** |
| Defendants. | ████████████ |

**DECLARATION OF DAVID S. ELKINS IN SUPPORT OF
THE AKOUSTIS DEFENDANTS' MOTIONS IN LIMINE**

I, DAVID S. ELKINS, declare as follows:

1.      I am a partner of the law firm of Squire Patton Boggs (US) LLP and am one of the counsel of record for defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively "Akoustis") in this matter.  I make this declaration on my own personal knowledge or, where indicated, on information and belief formed after reasonable inquiry under the circumstances.  If called to do so, I could and would testify competently to the facts stated below.

2.      Attached as **Exhibit 1** is a true and correct copy of an excerpt from the transcript of the Deposition of Dr. Stanley Shanfield, dated January 26, 2024.

3.      Attached as **Exhibit 2** is a true and correct copy of an excerpt from the transcript of the Deposition of Mr. Kevin Faulkner, dated January 19, 2024.

4.      Attached as **Exhibit 3** is a true and correct copy of excerpts from Plaintiff's Proposed Trial Exhibit PTX-0001.

5.      Attached as **Exhibit 4** is a true and correct copy of excerpts from Plaintiff's Proposed Trial Exhibit PTX-0758.

6.      Attached as **Exhibit 5** is a true and correct copy of excerpts from the Expert Report of Dr. Michael Lebby, dated January 5, 2024.

7.      On March 15, 2024, I sent Qorvo's counsel Akoustis' List of Proposed Motions in Limine, describing each of the motions in limine in Akoustis' concurrently filed omnibus motion.

8.      During the parties' meet and confer on March 18, 2024, counsel for Qorvo stated that Qorvo could agree that it will not raise an unidentified "trade secret number 105," but would need clarification as to the scope of the proposed motion *in limine* because it contended that it should be permitted to reference other alleged Qorvo confidential information as, for example, background information for its unfair competition claim.

9.      Attached as **Exhibit 6** is a true and correct copy of an excerpt from the transcript of the Deposition of Dr. Michael Lebby, dated January 31, 2024.

10.     Attached as **Exhibit 7** is a true and correct copy of Qorvo's Fifth Amended and Supplemental Rule 26(a)(1) Disclosures dated November 15, 2023.

11.     Attached as **Exhibit 8** is a true and correct copy of excerpts from the transcript of the Deposition of Mr. Michael Boyd, dated October 31, 2023.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 22, 2024.

/s/ *David S. Elkins*
David S. Elkins

# EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4    - - - - - - - - - - - - - - -+

5    QORVO, INC.,                  |

6             Plaintiff,          | Case Number:

7       vs.                        | 1:21-cv-01417-JPM

8    AKOUSTIS TECHNOLOGIES,        |

9    INC., and AKOUSTIS, INC.,     |

10            Defendants.          |

11   - - - - - - - - - - - - - - -+

12

13   ███████████████  █  ███████████  ██████  ██████

14

15            Videotaped Deposition of

16            STANLEY SHANFIELD, Ph.D.

17            Friday, January 26, 2024

18                 9:15 a.m.

19

20

21   Reported by:

22   Laurie Donovan, RPR, CRR, CLR

23   Veritext Job No. 6391961

24

25   PAGES 1 - 256

                                   Page 1

1    the applicable industries, or with those who have

2    some reason to be able to make commercial use of

3    it?

4         A    In that list of 1,500 or so documents,

5    no.

6         Q    You believe that everything that was

7    presented to you for evaluation did ultimately

8    meet the requirements as something that could be a

9    protectable trade secret?

10        A    There were a total of about 9,000

11   documents.  The immensity of the task required me

12   to narrow it down to something I could manage,

13   which turned out to be about 1,500 documents.

14        All of those documents that I picked out

15   were, in themselves, Qorvo trade secrets, and may

16   have contained a sentence or a drawing that was --

17   or a table that would be known to a person of

18   skill, of ordinary skill, but the document itself

19   represented a Qorvo trade secret and confidential

20   information not readily known.

21        Q    In looking at what's been marked as

22   Shanfield Exhibit 1, is it -- am I correct in

23   saying that this document is broken down into ten

24   numerical categories, each of which is followed by

25   a number of bullet points that has information

Page 147

1     generally known in the industry to someone of

2     ordinary skill?

3         A    It's not the "mere use."  The way you

4     learn ████████████████████████████████████

      ██████████████████████████████████████████████

      ██████████████████████████████████████████on

7     the board you intend to provide to your customers.

8              Akoustis was able to bypass that work by

9     just using what Akoustis -- I'm sorry -- what

10    Qorvo had already learned about ██████████████████

      ██████████████████████████████  They were able to

12    apply Qorvo's knowledge directly to their

13    development board.

14        Q    And what evidence have you seen of

15    actual use by Akoustis of that information?

16        A    So I describe that starting in paragraph

17    233, and I'm talking about how Akoustis employees

18    acquired and considered and used this information,

19    this confidential information on Qorvo's

20    evaluation board, design rules and schematics, and

21    then I go into detail about what the use was.

22             As was the case with all of these

23    documents, all 1,500 that I evaluated, they were

24    circulated -- or I'm sorry.  They were taken by

25    people like Mr. Houlden from Qorvo, and they were

                                          Page 164

```
 1   Mr. Darveaux; is that right?

 2        A    No.

 3        Q    Well, "I am submitting the supplemental

 4   report to respond to assertions and issues raised

 5   in the rebuttal report of Dr. Robert Darveaux . .

 6   . and the rebuttal report of Dr. Clark Nguyen."

 7             That's what it says in number one.

 8        A    Right.

 9        Q    So --

10        A    That doesn't say "rebuttal to a

11   rebuttal."

12        Q    Okay, but your -- while you termed this

13   a "supplemental written report," it's to respond

14   to assertions and issues raised in the rebuttal

15   reports of those two other experts?

16        A    Yes, technical assertions and issues

17   that I needed to either clarify or focus on, as,

18   for example, Mr. Nguyen didn't seem to incorporate

19   the circuit design considerations in his

20   discussion of loss in acoustic resonators.

21        Q    My question was just simply:  This is

22   written to respond to, or as a rebuttal to, the

23   rebuttal reports of these other two gentleman,

24   correct?  That's what paragraph 1 says?

25        A    That's not what paragraph 1 says.
```

Page 216

```
 1   CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 2
 3           I, Laurie Donovan, Registered
 4   Professional Reporter, Certified Realtime
 5   Reporter, and notary public for the District
 6   of Columbia, the officer before whom the
 7   foregoing deposition was taken, do hereby
 8   certify that the foregoing transcript is a
 9   true and correct record of the testimony
10   given; that said testimony was taken by me
11   stenographically and thereafter reduced to
12   typewriting under my supervision; and that I
13   am neither counsel for, related to, nor
14   employed by any of the parties to this case
15   and have no interest, financial or otherwise,
16   in its outcome.
17           IN WITNESS WHEREOF, I have hereunto
18   set my hand and affixed my notarial seal this
19   2nd day of February 2024.
20
21
22   LAURIE DONOVAN, RPR, CRR
23   NOTARY PUBLIC IN AND FOR THE
24   DISTRICT OF COLUMBIA
25   My commission expires:  July 14, 2027
```

Page 256

# EXHIBIT 2

```
 1
 2      IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF DELAWARE
 3      ------------------------------------------X
        QORVO, INC.,
 4
                                    PLAINTIFF,
 5
             -against-          C.A. No.:
 6                              21-1417(JMP)
 7      AKOUSTIS TECHNOLOGIES, INC. and AKOUSTIS,
        INC.,
 8
                                    DEFENDANTS.
 9      ------------------------------------------X
10      ■ ■ ■ ■ ■ ■ ■ ■   ■ ■ ■ ■   ■ ■ ■ ■
11                        DATE: January 19, 2024
12                        TIME: 9:36 a.m.
13
14
15            VIDEOTAPED VIDEOCONFERENCE
16      DEPOSITION of the KEVIN FAULKNER, taken by
17      the Defendants, pursuant to a Notice, held
18      via Zoom, before Nicole Veltri, RPR, CRR, a
19      Notary Public of the State of New York.
20
21
22
23
24
25
                                        Page 1
```

```
 1              K. FAULKNER - AEO
 2    either Appendix C or Appendix D, does that
 3    mean you provided no opinion as to whether
 4    it is stored or accessed in the Akoustis
 5    devices you examined?
 6         A.    I'm trying to think if there
 7    was any instance of any other documents
 8    that I opined on about either their
 9    existence or access.  Yeah, as I mentioned
10    before, I had found those Qorvo PST email
11    container files and the Windows backups and
12    I opined on their existence.  But those
13    aren't -- I don't think I'd consider those
14    documents.  They're files.  Those files
15    would contain emails and attached documents
16    and all sorts of things, but I didn't -- I
17    wouldn't consider them themselves a
18    document.
19              But that's the first one that
20    jumps to mind that's not on this list that
21    I opined on.  I can't think of any others
22    off the top of my head right now.
23         Q.    Well, those Microsoft emails
24    you analyzed in addition to Appendix C and
25    D, did you specifically look for any Qorvo
```

Page 41

```
 1                  K. FAULKNER - AEO
 2    confidential materials there when you
 3    analyzed those emails?
 4         A.    I didn't, no.  I excluded those
 5    from my search process.  I searched for the
 6    files on the computer, not within the email
 7    containers.
 8         Q.    So is it correct to say that
 9    you searched for what's listed in Appendix
10    C and D within the approved listing and
11    reports to generate the other appendices
12    you provided in this case?
13         A.    I mean, I searched for what was
14    listed in Appendixes C and D across the
15    computer materials, the approved reports.
16    I believe also in some additional produced
17    data, there was, on my Materials Considered
18    List, there's a number of Bates numbers,
19    many of which represent, like, other
20    produced materials in this matter.
21              And I recall some of the
22    materials on Exhibit -- or, I'm sorry,
23    Appendix D were found in those file
24    listings and were also, I believe were
25    found in some of like, the produced emails.
```

Page 42

1

2                    C E R T I F I C A T E

3

4     STATE OF NEW YORK        )

                                :  SS.:

5     COUNTY OF SUFFOLK        )

6

7

8          I, NICOLE VELTRI, RPR, CRR, a Notary

9     Public for and within the State of New

10    York, do hereby certify:

11         That the witness whose examination is

12    hereinbefore set forth was duly sworn and

13    that such examination is a true record of

14    the testimony given by that witness.

15         I further certify that I am not

16    related to any of the parties to this

17    action by blood or by marriage and that I

18    am in no way interested in the outcome of

19    this matter.

20         IN WITNESS WHEREOF, I have hereunto

21    set my hand this 26th day of January 2024.

22

23

24

25         NICOLE VELTRI, RPR, CRR

                                        Page 170

# EXHIBIT 3

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 82 of 341 PageID #: 27068

Michael David Hodge , II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 1

1              IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                    CHARLOTTE DIVISION
          Civil Action No. 3:22-cv-103-FDW-DCK

3

4      YA "ANNIA" SHEN,                    :
                                           :
5                        Plaintiff,        :
                                           :
6                  vs.                     :
                                           :
7      AKOUSTIS TECHNOLOGIES,              :
       INC.,                               :
8                                          :
                      Defendant.           :
9
                              - - -

10

11

               DEPOSITION OF MICHAEL DAVID HODGE, II
12                  (Taken by the Defendant)
                  Charlotte, North Carolina
13                   November 15, 2022

14

15

16

17

18

19

20

21

22

23          Reported by:   Jackie J. Johnson

24                         Court Reporter

25                         Notary Public

PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989
7-11-23 Hodge

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 83 of 341 PageID #: 27069

Michael David Hodge , II          November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 2

APPEARANCES:

Van Kampen Law, PC
BY: JOSH VAN KAMPEN, ESQUIRE
315 E. Worthington Avenue
Charlotte, North Carolina 28203
josh@vankampenlaw.com
Attorney for Plaintiff
Fisher Phillips LLP
BY: DAVID J. KLASS, ESQUIRE
227 West Trade Street
Suite 2020
Charlotte, North Carolina 28202
dklass@fisherphillips.com
Attorney for Defendant

Also Present: Ya "Annia" Shen (via Zoom)

- - -

Deposition of MICHAEL DAVID HODGE, II, taken by
the Defendant, at Fisher Phillips, 227 West Trade
Street, Charlotte, North Carolina, on the 15th day of
November, 2022 at 9:30 a.m., before Jackie J. Johnson,
Court Reporter and Notary Public.

Page 3

CONTENTS

The Witness: MICHAEL DAVID HODGE, II
   By Mr. Klass...............................4
   By Mr. Van Kampen.........................215
   By Mr. Klass..............................275

   By Mr. Van Kampen.........................278

INDEX OF THE EXHIBITS

For the Defendant

Exhibit 1  E-mail from Annia Shen to Dave Hodge

   8/7/20.............................163

Exhibit 2  E-mail from Annia Shen to Dave Hodge

   11/20/20...........................164

Page 4

PROCEEDINGS

       Whereupon,
       MICHAEL DAVID HODGE, II
       having been duly sworn,
       was examined and testified as follows:
       EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MR. KLASS:
   Q. Good morning. Can you please state your name for
the Record?
   A. It's Michael David Hodge, II.
   Q. And do you go by David?
   A. I go by Dave.
   Q. Do you mind if I call you Dave?
   A. You can call me Michael, David or Dave is fine.
I respond to all of them.
   Q. Okay. Have you ever had your deposition taken
before?
   A. I have not.
   Q. Do you understand that you're now under oath?
   A. I do.
   Q. So you now have an obligation to tell the truth?
   A. That's right.
   Q. This is an informal setting. We're in a
conference room in my firm's office. but you're still
under oath, and there's no jury or judge present, but

Page 5

the deposition testimony you're about to give is subject
to the same oath and the same penalties of perjury that
would apply if you were in court giving testimony in
front of a judge or a jury; do you understand that?
   A. I understand.
   Q. Will you let me know if you do not understand one
of my questions?
   A. Yes.
   Q. If you don't tell me you don't understand, I will
assume you understand the question; is that fair?
   A. Fair. Yeah.
   Q. There's a court reporter here taking down my
questions and your answers. It's hard for her to
transcribe statements when we're both talking at the
same time.
       If you would please allow me to finish asking my
question before you begin providing your answer, and I
will attempt to let you finish answering before I start
my next question; is that okay?
   A. Yes.
   Q. Again, because we have a court reporter, she
needs verbal responses. So if you could say yes or no,
rather than shaking your head yes or no; is that okay?
   A. Yes.
   Q. And similarly, if you could say yes or no, rather

2 (Pages 2 - 5)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 84 of 341 PageID #: 27070

Michael David Hodge, II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.



Page 6

1  than saying uh-huh or uh-huh, because that can be hard
2  to interpret later in a transcript; is that fair?
3      A. Yes. That makes sense.
4      Q. If at any point during the deposition something
5  else occurs to you that is relevant to one of the
6  questions I've asked earlier, please feel free to let me
7  know so that I will have your most complete response on
8  the Record; can you do that?
9      A. Yes.
10     Q. During the deposition, Mr. Van Kampen or Josh may
11 make objections from time to time to certain of my
12 questions.
13     Once he has made the objection, you will still
14 answer the question, unless he instructs you not to do
15 so for some reason, and we can take that up at that
16 time; do you understand that?
17     A. Understood.
18     Q. Do you have any medical condition? Are you
19 taking any medications that would prevent you from
20 understanding my questions today or providing truthful
21 answers?
22     A. I'm not taking any medications.
23     Q. Okay. And do you have any medical condition that
24 would prevent you from understanding my questions or
25 providing truthful answers?

Page 7

1      A. I don't have any condition like that.
2      Q. Are you currently under the influence of alcohol
3  or drugs?
4      A. Just caffeine.
5      Q. Have you gone by any other names?
6      A. No.
7      Q. Where were you born?
8      A. I was born in Gastonia, North Carolina.
9      Q. And what is your current address?
10     A.
11
12     Q. Does anyone live there with you?
13     A. Yes.
14     Q. Who?
15     A. Annia.
16     Q. And that would be Annia Shen, the Plaintiff, in
17 this case?
18     A. Yes, that's correct.
19     Q. How long have you lived at that address?
20     A. Should be two years.
21     Q. Where did you live prior?
22     A. I lived in -- you want the full address?
23     Q. Yes.
24     A.
25

Page 8

1      Q. How long did you live there?
2      A. That was 11 years.
3      Q. How long have you lived with Ms. Shen?
4      A. Just two years. I guess it was October. Yeah,
5  around that time frame I sold my house. Yeah.
6      Q. You've been at your current residence?
7      A. At my current residence, yes.
8      Q. Have you lived there any time by yourself?
9      A. No. It was her house.
10     Q. So you moved into her house about two years ago?
11     A. Yes.
12     Q. You said you were born in Gastonia.
13        Do you have family in the Charlotte area?
14     A. Yeah, in Gaston County. Yeah.
15     Q. What are their last names?
16
17
18
19
20
21
22     Q. And I'm not picking on you. I ask these
23 questions of all my witnesses, mostly for jury pool
24 reasons.
25     A. Uh-huh. That's just my immediate family.

Page 9

1      That's good enough, right?
2      Q. Do you have any other brothers or sisters in the
3  area?
4      A. Just one sister. That's it.
5      Q. Are your parents in the area?
6      A. Yes.
7      Q. What are their names?
8      A.
9      Q. Do you have any extended relatives in the greater
10 Charlotte area, meaning grandparents, uncles, aunts,
11 cousins?
12     A. Yes.
13     Q. How many?
14     A. Yeah. I mean, I only have one grandparent still
15 alive. That's my mom's mom. Then cousins, I mean, it's
16 30 plus, 20, 30, right -- it's numerous.
17     Q. Your grandmother, what's her last name?
18     A.
19
20
21
22
23
24     Q. What are the last names of your cousins?
25

3 (Pages 6 - 9)

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 85 of 341 PageID #: 27071

Michael David Hodge , II                November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 10

4   Q. What's your current relationship status with Ms.
5   Shen?
6   A. We're engaged to be married.
7   Q. When did you become engaged?
8   A. We became engaged in January of '21.
9   Q. Have you ever been married before?
10  A. I have not.
11  Q. Do you have any children?
12  A. No.
13  Q. Have you ever been arrested?
14  A. No.
15  Q. Have you ever been a party to a civil lawsuit?
16  A. No.
17  Q. Have you ever filed for bankruptcy?
18  A. No.
19  Q. Have you ever filed a claim of discrimination
20  against any employer, whether in court or with an agency
21  like the Equal Employment Opportunity Commission?
22  A. I have not.
23  Q. Have you ever brought any type of claim or
24  lawsuit against one of your employers?
25  A. I have not.

Page 11

1   Q. Where did you attend college?
2   A. Undergrad North Carolina State.
3   Q. And you graduated?
4   A. Graduated, yeah, dual major, and then graduate
5   school at UNC Charlotte.
6   Q. When did you graduate from undergrad?
7   A. That was 2004.
8   Q. What was your major?
9   A. One was BS in computer engineering and then BS in
10  electrical engineering.
11  Q. And grad school, when did you graduate?
12  A. MS in electrical engineering was in 2000 -- it
13  would be 2007, and then PhD in electrical engineering
14  was 2014.
15  Q. Any other formal education?
16  A. No. I mean, other than primary, yeah.
17  Q. Do you have any other credentials or
18  certifications that you think are relevant to your
19  former positions at Akoustis?
20  A. I mean, I'm not really -- there's a professional
21  engineering licensure. I'm certified as the first part
22  of that, but I don't have any professional engineering
23  license. I don't think that matters. Fundamentals of
24  engineering is what it's called.
25  Q. And before you worked at Akoustis, where did you

Page 12

1   work? Did you work first at -- I'm looking at your
2   resume.
3   A. Yeah.
4   Q. Dot Metrics Technologies?
5   A. Yeah. Dot Metrics was when I was at UNCC. My
6   advisor for my Master's degree was Doctor Ed Stokes. So
7   that was his startup company. So I worked part-time for
8   that while I was getting my Master's.
9   Q. And then you worked for -- and that was in 2006,
10  2007?
11  A. Yeah.
12  Q. And starting in 2007. you started to work at RF
13  Micro Devices?
14  A. Yeah, that's right.
15  Q. Your resume says that you were a Design Engineer
16  until June of 2013 and then a Device Engineer --
17  A. Yeah.
18  Q. -- from June 2013 through I guess your time at
19  Akoustis, when you started?
20  A. Yeah. So around that time is -- I guess that was
21  2014, beginning of 2015 time frame, they merged with
22  TriQuint and became Qorvo. So I technically worked at
23  Qorvo for six months before resigning.
24      Actually, I didn't resign. Sorry. I was
25  released as part of a downsizing of our office, and then

Page 13

1   that's when I joined Akoustis.
2   Q. When you were a Design Engineer at RF, did you do
3   similar work to when you worked as a Design Engineer for
4   Akoustis?
5   A. I would say no, and that's because we are still
6   doing RF, but it's a completely different technology
7   than I was doing at Akoustis, so a high level.
8       At RFMD, I was doing military high power radars,
9   that type thing, components that would go in radar
10  systems and defense systems.
11      At Akoustis, we were doing RF filters that are
12  lower in power, more for your mobile devices, routers,
13  consumer Electronics, not military.
14  Q. What did you do as a Device Engineer for RF or
15  Qorvo?
16  A. Device Engineer for RFMD, and Qorvo, it was I was
17  working in the Foundry. So that means I was selling
18  design services to external customers.
19      So then I had to work with the Fab to make sure
20  we could run the processes that the customers were
21  requesting and also do yield analysis, do debugging of
22  the process if they had yield problems or liability
23  problems, that sort of thing.
24  Q. So you worked with the customers when you were
25  there?

4 (Pages 10 - 13)

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 86 of 341 PageID #: 27072

Michael David Hodge , II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 14

1    A. Yeah. The last year and-a-half, two years I was
2  there, I was in a customer facing role.
3    Q. Could you describe what roles or what job
4  functions were customer facing?
5    A. Yeah, usually it would be to educate them on our
6  product offerings and capabilities, and then usually
7  this was under NDA. Then they would tell me what their
8  requirements were for the products they're wanting to
9  design.
10   We'd find a matching process for their product.
11 Then I would guide them through the design process,
12 questions they may have about the capabilities of
13 design, validate that the things they're putting
14 together would be reasonable.
15   Then once they took delivery of the product, I
16 would provide them a quality control data that was
17 available for that wafer, and let them know that they
18 received a good wafer for devices.
19   Then if they had any questions, problems, that
20 sort of thing, we would debug that or I would start a
21 Corrective Action Report.
22   Q. And you said that was about the last year
23 and-a-half of your time there?
24   A. Yeah, about two years. Yeah.
25   It was kind of like a dual thing. So while I was

Page 15

1  doing Foundry, we were also like doing government
2  research work, that sort of thing. We had government
3  programs. So that was the other kind of customer that I
4  would interface with. So yeah, that was the two hats
5  that I wore.
6    Q. So to follow up on the Government customers.
7    When you were at Qorvo, you had government
8  contracts --
9    A. Yeah.
10   Q. -- experience?
11   Can you describe what that entailed?
12   A. Yeah. Usually it's you're either trying to work
13 through a program where the end deliverable is some
14 device that the U.S. Government or DARPA is interested
15 in seeing from a capability standpoint.
16   At the time, I was working with gallium nitride
17 high-electron mobility transistors which were called
18 HEMTs, and so we were looking at alternatives.
19   So traditionally, that's used for power
20 amplifiers, but we were looking at it for other
21 applications on the RF front end, like RF switches. So
22 there was some government programs around that.
23   Then we had some government programs related to
24 technology transfer from the Air Force Research Lab.
25   Q. Going back to your customer interfacing duties.

Page 16

1  How prevalent would you say they were the last year
2  and-a-half, two years at your time at Qorvo? Was that
3  like a daily activity that you had, weekly? I mean, how
4  fundamental to your position was that?
5    A. For the last year and-a-half, it was very
6  fundamental, because I completely moved out of design at
7  that point. I wasn't designing my own parts.
8    Typically, you don't want the person interfacing
9  doing foundry services also designing. It could be
10 perceived as a conflict of interest.
11   So then at that point, I was kind of solely
12 focused on the government programs and customers for
13 that last year and-a-half.
14   Q. Explain the conflict of interest to me.
15   A. If a customer is designing a part, they don't
16 want to feel like a Design Engineer is possibly
17 designing something that could be competing with their
18 part and maybe using knowledge that they're giving you.
19   The only way you could really design something
20 and still be providing foundry, you need to be doing
21 something completely different than what your customers
22 are doing.
23   Ethically, you want to keep a firewall in your
24 company between your external customers' design work and
25 your internal Design Team's design work. You don't want

Page 17

1  either/or to see the other one.
2    Q. For the government contracts work you did at
3  Qorvo, what time frame was that?
4    A. Really, the entire time.
5    We were always -- usually we had something, like
6  some type of program going. It was on and off.
7    Where there was a period there where we weren't
8  doing government contracts in the middle of that time.
9  But in the beginning, when I first started in 2007, '08,
10 we had some government programs looking at -- it was
11 looking at high voltage high breakdown devices, and then
12 those programs ended.
13   Then at that time, I moved more into a product
14 role, product development role, R&D role and, like I
15 said, these new applications for gallium nitride. So I
16 did that for the next five years or so, and that's
17 largely what I did my PhD work on, and this company was
18 gracious enough to let me do my PhD work on that, and
19 then I moved over to that.
20   Q. When you worked at Akoustis, I know you had a
21 couple different roles there.
22   A. Yeah.
23   Q. Did your government contracts background at Qorvo
24 ever assist you in any of the roles that you had at
25 Akoustis?

5 (Pages 14 - 17)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 87 of 341 PageID #: 27073

Michael David Hodge , II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

| Page 18 | Page 20 |
|---|---|
| 1  A. Sure. Yeah. | 1  Q. Other than those people you just referenced, did |
| 2      We, as a startup company, we had a lot of funding | 2  you have like direct interactions with those other |
| 3  through what's called SBIR, Small Business Innovative | 3  people who later came to Akoustis from Qorvo when you |
| 4  Research grants. Usually those are granted through the | 4  were at Qorvo? |
| 5  NSF, the National Science Foundation, or you can get | 5      A. No. |
| 6  them from DARPA as well. So we had both. We started | 6      Like to give you an example, like Rohan Houlden, |
| 7  out with the NSF grant. That's your typical for very | 7  he came from Qorvo, but I had seen Rohan in person at |
| 8  small companies. | 8  Qorvo RFMD, but I never interacted with him. |
| 9      So the work we were doing on the single-crystal | 9      Q. You mentioned Pinal Patel. |
| 10  aluminum nitride ball resonators early on at Akoustis, | 10     A. Uh-huh. |
| 11  that was the topic of the NSF grant we were looking at, | 11     Q. What was her role at Qorvo? |
| 12  single-crystal aluminium nitride ball resonators. So | 12     A. She got hired on originally as a technician, and |
| 13  that was the main thrust there. | 13  then she moved her way up to eventually being a Design |
| 14     Then towards the end of Akoustis, I actually went | 14  Engineer. |
| 15  -- so those programs were already in place when I joined | 15     Q. And how frequently did you work with her at |
| 16  Akoustis. Those were written by Jeff Shealy and those | 16  Qorvo? |
| 17  guys, right. | 17     A. Early on, quite a bit. |
| 18     Then later on, we acquired other programs, SDI | 18     The guy that hired me at RFMD, he just did |
| 19  programs through DARPA. That was what we called the PA | 19  government programs. He's actually the person that |
| 20  and MEMS program. That was the one I wrote during the | 20  hired Patel. So there was only two employees when she |
| 21  pandemic. | 21  first started. |
| 22     Then my last year at Akoustis, there was a Phase | 22     Then later on, I had my path that I went with the |
| 23  II four year DARPA program that we called -- DARPA likes | 23  R&D side, and then she went like a product development |
| 24  acronyms. It's called COFFEE. So anyway, that one we | 24  path with our traditional gallium nitride amplifiers. |
| 25  won as well, which was a pretty big deal, but that | 25  So she was in a different team, but we were in the same |

| Page 19 | Page 21 |
|---|---|
| 1  program didn't start until after I had already left. | 1  office. A couple cubes separated us. We talked |
| 2      Q. And you started working for Akoustis in 2015; is | 2  casually and talked about work, and we could talk about |
| 3  that right? | 3  design challenges and stuff like that. Yeah. |
| 4      A. That's right. Yeah. | 4      Q. What about Rama Vetury, did you work closely with |
| 5      Q. And you worked at Akoustis until what month and | 5  him at Qorvo? |
| 6  year? | 6      A. Yeah. He was my boss after my -- the person who |
| 7      A. Yeah. So I left in -- I think my last day was | 7  hired me, he left in 2009 to go work at Noble Research, |
| 8  the end of the first week of January, this year, '22. | 8  and after he left I was transitioned to work for Rama. |
| 9  Yeah. | 9      So whenever he -- my original boss' name is |
| 10     Q. While you worked at Akoustis from 2015 until | 10  Daniel Green, and so whenever he left, he left behind |
| 11  January 2022, did you have colleagues at Akoustis who | 11  some government programs that were active. So Rama took |
| 12  you had also worked with at Qorvo? | 12  those over. So he inherited me as an employee. |
| 13     A. Yes. | 13     Q. How long was he your boss at Qorvo? |
| 14     Q. Who were those? | 14     A. From 2009 to when I left in 2015. |
| 15     A. Various times at Qorvo -- well, I guess when you | 15     Q. What did you think of him as a boss? |
| 16  say Qorvo, I'm also going to lump that in with RFMD. | 16     A. Rama, let's see, he did a lot. He helped me in |
| 17  Okay. | 17  getting my PhD. I appreciate that. I'm grateful for |
| 18     Q. Yes. And I mean to do that too. | 18  that opportunity. But he also was someone that didn't |
| 19     A. Yeah, I wanted to make sure. | 19  want to take a lot of responsibility for a lot of the |
| 20     So Jeff Shealy, Dave Aichele, Sean Gibb, Rama | 20  work he did. So a lot of it was passed off to me. |
| 21  Vetury, Pinal Patel. Let's see who else. I think | 21     In that way, it actually worked out to be a good |
| 22  that's all the ones that I directly worked with. | 22  thing, because I got exposure to doing all the things of |
| 23     Now, later on, I would -- we would acquire more | 23  a manager or developer, writing programs, writing |
| 24  employees that also worked at RFMD Qorvo, but I didn't | 24  reports, presenting to upper management, presenting to |
| 25  work with them at my time at RFMD. | 25  customers. So he was pretty -- he was very hands off, I |

6 (Pages 18 - 21)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 88 of 341 PageID #: 27074

Michael David Hodge, II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 22

1  guess, in that regard. But also, I took on a bit of his
2  workload to help him out. but like I say, it gave me
3  some good exposure I felt like.
4      Q. Any concerns with his management capabilities?
5          MR. VAN KAMPEN: Just to clarify. Are you
6  talking about when he was at Qorvo?
7              MR. KLASS: At Qorvo.
8          THE WITNESS: I didn't think he was a very
9  good manager, to be honest with you.
10 BY MR. KLASS:
11     Q. Why do you say that?
12     A. How do I say this? Let's see. Not very good on
13 direction, right. He's a guy that he's kind of
14 arbitrary. He'll flip between priorities with things.
15 He's not very punctual.
16     So there's a lot of times we'd run up on a
17 deadline, and I wouldn't find out till it was like a
18 week before, when it was like three weeks of work to do.
19 So really bad on the time management thing in kind of
20 giving you the head's up.
21     You know, if you asked for him to fight for you
22 on some things like, you know, promotions or anything
23 like that to upper management, he usually would abstain
24 from that in order to kind of keep the peace with his
25 boss, which was Jeff Shealy at the time.

Page 23

1          Overall, on a personal level, I got along with
2  him, but I know a lot of folks prior to me working for
3  him and also within the company that didn't get along
4  with him very well.
5      Q. Was he ever your supervisor at Akoustis?
6      A. He was not.
7      In fact, that was a stipulation of him joining.
8  I told Jeff I couldn't report to him. So that was kind
9  of a stipulation to him joining Akoustis.
10     Q. I'm sorry. A stipulation of you joining or him
11 joining?
12     A. Jeff asked for my support -- so Rama joined after
13 I had already joined Akoustis. Jeff asked for my
14 support in him hiring Rama, and I said I would support
15 him hiring him, as long as I never reported to him, and
16 Jeff gave me assurances that that wouldn't happen.
17     Q. And when you were hired at Akoustis in 2015, who
18 were you hired by?
19     A. Jeff Shealy.
20     Q. Did anyone else interview you?
21     A. At Akoustis?
22     Q. Yes.
23     A. So at the time when I interviewed with Jeff, it
24 was -- the company was just Jeff Shealy, Mark
25 Boomgarden, Pinal Patel, and Pat Lewis.

Page 24

1          So I met -- I knew Pinal already. I met Pat.
2  Mark had a few questions just talking to me, because he
3  was kind of the co-founder, but it was really topical.
4  Really, the primary interviewer was Jeff Shealy, and I
5  negotiated with him.
6      Q. You said you negotiated with Jeff Shealy. What
7  did you negotiate?
8      A. Compensation, title, that sort of thing.
9      Q. In terms of the compensation that was offered to
10 you, what did that consist of?
11     A. It consisted of -- there was a base pay. It was
12 a bonus percentage. I was informed of the benefits, the
13 PTO, and then RSUs.
14     Q. And RSUs are what?
15     A. Restricted stock units or grants, you know.
16 They're shares of the company that vest over time.
17     Q. When you negotiated those items with Jeff Shealy,
18 were you able to ask for more than what was originally
19 offered?
20     A. I'm trying to remember how that went.
21     Yeah, he gave me the opportunity to -- really,
22 the way it worked is he just asked me what I thought,
23 you know. He actually opened it up with what I thought
24 was fair. He told me what he had -- what the level was
25 at the company, and then we just talked through some

Page 25

1  minor details around those parameters and then came to
2  an agreement.
3      Q. Did you have any understanding or feeling that
4  you could take a higher salary and receive lesser
5  benefits, like RSUs or, conversely, take a lower salary
6  with higher RSUs when you were negotiating?
7      A. To me, it seemed that was implied, to a degree.
8  The way I looked at it, it was a sliding scale. and you
9  need to decide if you want -- within bounds, right.
10     You can't walk in there and say, "I'll work for
11 free, and then I want 200,000 shares." I don't know.
12 I'm just making up a number. There's usually that
13 slider. I never found out what the bounds of that
14 slider was.
15     How I did this -- this is just simply how I did
16 it. How much money do I need to pay my bills and live
17 comfortably, and then the rest I'll take as a lottery
18 ticket on the upside. That was my thought process going
19 in there.
20     So I don't know how other people negotiated it,
21 but when I negotiated it, I just simply said, "This is
22 the amount I need to be comfortable living. and then I
23 want the rest as a lottery ticket."
24     Q. Why do you say lottery ticket?
25     A. Well, I mean, it's very well-known that you

7 (Pages 22 - 25)

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 89 of 341 PageID #: 27075

Michael David Hodge , II                        November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

|  | Page 26 |  | Page 28 |
|---|---|---|---|
| 1 | know, small businesses fail at a high rate. I mean, | 1 | vesting, but I chose to manage that risk, and Jeff |
| 2 | it's not a guaranteed thing, but if you believe in it | 2 | agreed with that. |
| 3 | and it takes off, there's a very high upside in the | 3 | Q. So when you vested every month, that would have |
| 4 | reward you may receive from sale of the shares. So | 4 | been your yearly vest amount divided by 12 for that |
| 5 | yeah, I guess, that's maybe a very loose way of saying | 5 | month? |
| 6 | it. | 6 | A. That's right. |
| 7 | I guess what I really should say is the upside of | 7 | Q. So was it your understanding that if you were let |
| 8 | the company fulfilling its mission and being successful, | 8 | go or the company failed, you would not be entitled to |
| 9 | there was a multiplier there compared to if I had just | 9 | any shares that had not vested at that point? |
| 10 | taken the dollar amount. I think that's implied. | 10 | A. So that's what the Employment Agreement says, but |
| 11 | I believed in the technology. I believed in the | 11 | in practice, I've never seen that applied. |
| 12 | mission. I liked the team, because I worked with them | 12 | Q. Explain. |
| 13 | before. I knew they were very business focused and | 13 | A. All right. I'll explain to you. |
| 14 | would do a good job of -- you know, a lot of us had a | 14 | So my time -- so let's just stick with those four |
| 15 | track record of success in the industry. So I thought | 15 | years that I vested my initial shares. That's the |
| 16 | that there was a good chance the company would be | 16 | riskiest time in the company, right. |
| 17 | successful. | 17 | During that time, people came and went. I saw |
| 18 | So I don't mean to say it was like the odds of a | 18 | people come and go, and I saw they still got all their |
| 19 | lottery ticket. I mean to say it's a high upside. I | 19 | shares, even though their Employment Agreement said they |
| 20 | felt there was a good chance that those shares would pay | 20 | weren't going to get their shares. That's just what I |
| 21 | off well. | 21 | heard on the side. |
| 22 | Q. Okay. So there was some risk involved in taking | 22 | I'll be honest with you, I never saw anyone's |
| 23 | the shares? | 23 | agreement that they were going to do that. That's a |
| 24 | A. Absolutely there's risk in taking the shares. | 24 | legal document, and obviously people can get in trouble |
| 25 | Q. And part of that is not just whether the company | 25 | for showing that. So I've never seen that document. |

|  | Page 27 |  | Page 29 |
|---|---|---|---|
| 1 | succeeds or the stock price goes up or down, but also | 1 | But just talking with folks and using -- people |
| 2 | whether you will be at the company when your shares | 2 | can communicate without revealing too much, but it was |
| 3 | vest? | 3 | heavily implied that they received shares, in many cases |
| 4 | A. Sure. There usually is a vesting schedule which | 4 | that I know of, that are confidential. I know of cases |
| 5 | is negotiable, by the way. I'll give you an example. | 5 | that aren't confidential. There are some that are |
| 6 | So by default, the typical way these are handed | 6 | public record. |
| 7 | out is it's a one year cliff. So what that means is you | 7 | For instance, Mark Boomgarden was a founder in |
| 8 | get zero shares for the first 12 months you're at the | 8 | the company. He is an officer of the company. All |
| 9 | company, kind of like a probationary period. You don't | 9 | distributions of his shares are subject to public |
| 10 | work out in the first 12 months, you get 0. You get | 10 | filings, because Akoustis is a public company. So there |
| 11 | 25 percent after 12 months. | 11 | is a public document that talks about what he received. |
| 12 | Typically, what they will do is they will give | 12 | Q. Any other employees who received shares when |
| 13 | you shares vesting on your anniversary. So you would | 13 | they've left the company, other than Boomgarden, where |
| 14 | basically get four distributions, 25 percent each on | 14 | that disclosure was public? |
| 15 | your anniversary. That's typically how it's done. | 15 | A. Not public, no. That's the only one I'm aware |
| 16 | I negotiated something different. I negotiated a | 16 | of. |
| 17 | one year cliff. I settled with that, but I wanted to | 17 | Q. Who do you believe received shares that were not |
| 18 | vest every month for the remaining 36 months of my | 18 | vested as of their separation date whose agreements were |
| 19 | vesting. I did that because there's a risk of failure | 19 | private? |
| 20 | of the company. I wanted to be sure I had the maximum | 20 | A. Alex Feldman, he was a process engineer that was |
| 21 | number of shares before the failure happened so that I | 21 | hired by Mark Boomgarden. It was implied, when he left, |
| 22 | could potentially max out what I could cash out. | 22 | that he was "made" whole is the word I heard. |
| 23 | So you're right. So there's a risk there. So | 23 | Then Sean Gibb, whenever he left, I know he had a |
| 24 | both things could happen. I could have been let go or | 24 | dispute about shares, and I heard that a reasonable |
| 25 | the company could have failed. So there's a risk of | 25 | agreement was made. |

8 (Pages 26 - 29)

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 90 of 341 PageID #: 27076

Michael David Hodge , II                     November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 30

1    Q. Anyone else?
2    A. So this is after that initial first four years.
3    We had a CFO. His name was John Kurtzweil. John was
4    let go at one point, and I know he entered into a legal
5    dispute with the company over compensation and shares,
6    but I don't know the outcome of that legal case.
7    Q. Anyone else during your time at Akoustis that you
8    think received shares that hadn't vested at the time of
9    their separation?
10   A. None comes to mind at the moment.
11       But just to be clear, I just want to add
12   something to that, though. Firing people at Akoustis is
13   a very rare event. So it's not like there was a big
14   sample size, as well, especially on the engineering
15   side.
16   Q. You mentioned Boomgarden before. He's a founder
17   of the company?
18   A. Yeah.
19   Q. Do you know what his position was when he left?
20   A. Chief Operating Officer, I believe, or Chief of
21   Operations, Chief Operating Officer. Yeah.
22   Q. How do you know that he received shares through
23   the public document or from someone else?
24   A. Akoustis.com, yeah.
25   Q. When did you become aware of that?

Page 31

1    A. I just did a search.
2    Q. When?
3    A. Well, I knew that he left.
4        So I'm good friends with Pat Lewis. So Pat Lewis
5    was Mark's right-hand man. So him and Mark are very
6    close. We talk outside of work. Of course, I asked,
7    and he just made a comment that Mark was -- Mark did
8    well or did okay.
9        Then he said, if you want to know, it's public,
10   because -- so I looked it up one time, just out of
11   curiosity.
12       By the way, all of our investor filings are on
13   the Akoustis.com website. You don't have to dig.
14   They're all clearly labeled, clear PDFs. You can pull
15   them up.
16       So I looked it up then, out of curiosity, and was
17   aware, and then I looked it up again more recently,
18   whenever it became relevant.
19   Q. Do you recall being aware of that when Ms. Shen
20   was still employed or was it afterward?
21   A. You mean Mark leaving the company?
22   Q. No. Becoming aware of the Shares Agreement
23   that's a public filing.
24   A. So you're saying when I became aware of that
25   agreement, Ms. Shen was already employed at Akoustis?

Page 32

1    Q. I'll rephrase.
2    A. Yeah.
3    Q. When you became aware of the public document
4    regarding Mr. Boomgarden's separation terms --
5    A. Yeah.
6    Q. -- including his shares, did you become aware of
7    that document when Ms. Shen was still employed with the
8    company or afterward?
9    A. When she was still employed, yeah.
10   Q. All right. So Alex Feldman --
11   A. Yeah.
12   Q. -- who did you hear from regarding his separation
13   terms?
14   A. Again, I didn't -- I don't know the details of
15   his terms, you know. I just -- Alex and I, we had a
16   decent personal relationship. We talked on the phone
17   every so often. I did ask him, and he said Mark helped
18   him out. So he said -- so he implied that Mark made
19   sure that he was made whole, but he wouldn't tell me the
20   details, because he's not legally able to tell the
21   details.
22   Q. So your source of information for Mr. Feldman
23   receiving shares or possibly receiving shares was from
24   Alex Feldman?
25   A. That's what I recall, yeah.

Page 33

1        The thing is Alex -- and let's see here. Yeah, I
2    think it was right after Alex left. I'm trying to
3    remember the conversation. But yeah, that's the best I
4    can remember right now. It's been a while.
5    Q. So did you hear that from anyone else to confirm
6    what Alex told you?
7    A. I have a memory of talking with Pat Lewis, and I
8    think Pat said something along those lines, because we
9    had talked about this one time. It became a topic of
10   conversation -- let's see here. How do I describe this?
11       So we had an -- this is kind of unrelated to the
12   question. We had a group of us that would meet every
13   Friday after work, and we would go to the D9 Brewery,
14   and we'd just talk life, politics, you know, the job
15   sometimes over some craft brews, right.
16       That regular group at the beginning, that was
17   kind of organized by Sean Gibb, and it was usually
18   myself, Sean, and Pat were like three of the people that
19   kind of went every week and just hung out. I'm pretty
20   sure that I heard that in one of those conversations, we
21   were just talking over the table.
22   Q. Not to get too far off topic. But who else would
23   go to those?
24   A. Yeah, so Dave Aichele, and then after Sean left,
25   Dave Aichele was kind of the guy who kind of organized

9 (Pages 30 - 33)

Case 1:21-cv-01417-JPM  Document 543-5  Filed 04/22/24  Page 91 of 341 PageID #: 27077

Michael David Hodge , II                        November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 34

1  that for a little while. Then later on, Rohan kind of
2  organized that, but that was going to a different bar,
3  Duckworth's, but typically most weeks, it would be Dave
4  Aichele, myself, Pat Lewis, Cindy Paine, who was the
5  CFO, at the time would sometimes join, Daeho Kim. Let's
6  see. Alex would sometimes join early on.
7       Like people like Pinal would never come really,
8  and then neither would Rama. Yeah. It was mostly the
9  group. Jeff joined us a few times, but didn't do it too
10 often.
11      Q. Did Ms. Shen ever go?
12      A. She would early -- when she first started, she
13 would just show up just to make an appearance. That's
14 kind of how some folks did it.
15      If they didn't really drink beer or anything like
16 that, they just kind of showed up to make an appearance.
17 At the beginning, she did that.
18      But a lot of folks, after the first few, if
19 they're not, you know, drinking alcohol, they usually
20 just wouldn't come, unless it was like there was a
21 reason we were going, you know, for like a birthday of
22 someone or something like that, an occasion.
23      Q. Okay. So going back to Alex Feldman.
24      So you heard from him that when he left, he was
25 made whole?

Page 35

1       A. Yeah.
2       Q. But you don't know what made whole means --
3       A. That's correct.
4       Q. -- more specifically?
5       A. That's correct.
6       Q. But you thought it -- it implied to you that
7  additional shares that had not vested yet were given to
8  him or did you even reach that level of certainty or
9  belief?
10      A. What would -- what would -- so let's approach it
11 from a different way.
12      What would not be made whole? What could be left
13 behind? All right. You get your salary. That's
14 guaranteed. You get your PTO. That's by law. I mean,
15 your benefits, nobody's going to continue your benefits.
16 So the only thing left is your shares. So being made
17 whole, what else would that imply? There's nothing else
18 it could possibly apply to. So by deduction, it's
19 reasonable to assume that.
20      Q. Sean Gibb, where was the source of your
21 information that he might have received shares?
22      A. Definitely Sean. That was a phone call.
23      Q. What did he tell you?
24      A. He said he was, you know, bound to not tell me
25 any details, but he just said, "We arrived at a

Page 36

1  reasonable agreement" is all he said.
2       Q. He didn't say anything about shares specifically?
3       A. He didn't say shares specifically, but again, by
4  deduction, the only thing that could have been withheld
5  from him comp-wise was RSUs. So if he was a -- he
6  arrived at a reasonable agreement, then that means it
7  implies to me an amount of shares was given to him.
8       Now, it's -- now, you can't assume it was
9  100 percent. So maybe it was. So was it one share or
10 was it all the shares? It's somewhere in that universe
11 of number. But some number was agreed to, yes.
12      Q. Did you hear that Sean Gibb had been given shares
13 from anyone else?
14      A. Like another company?
15      Q. Any other employee or person --
16      A. Oh, no.
17      Q. -- at Akoustis?
18      A. Absolutely not. No.
19      Q. And for both Alex Feldman and Sean Gibb, you
20 never actually saw their Separation Agreement or
21 anything in writing regarding what they might have
22 received?
23      A. No.
24      Q. And then finally, former CFO, Kurtzweil, do you
25 know if he actually received any shares that hadn't

Page 37

1  vested?
2       A. I understood that that was a part of his legal
3  case, and I think the outcome of that case is private.
4  So I don't know the outcome of that case.
5       Q. Did you ever discuss whether he received shares
6  with anyone?
7       A. I never contacted John after he left Akoustis.
8       Q. What's your knowledge of the legal case?
9       A. I don't know the outcome. I assume at this point
10 it's closed. I mean, it would be amazing if it went on
11 this long. So I just assume that it's concluded, but I
12 don't know the outcome.
13      Q. Did you ever talk to him about it?
14      A. I did not.
15      Q. And just to sort of close the loop on being
16 provided shares that had not vested when people
17 separated from Akoustis.
18      Other than Boomgarden, Feldman, Gibb, and
19 Kurtzweil, are you aware of anyone else who might have
20 received shares when they left Akoustis?
21      A. The only other person that could have -- would
22 possibly have been Cindy Paine. She was the CFO before
23 John Kurtzweil, but I don't -- I don't know if she
24 received any more or not. That's the only person I can
25 think of.

10 (Pages 34 - 37)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 92 of 341 PageID #: 27078

Michael David Hodge, II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 38

1   Q. I don't know if I asked, but what was Sean Gibb's
2   position when he left the company?
3        A. His title was Chief Material Scientist. He was
4   in charge of the development of all the single-crystal
5   aluminum nitride materials and growth.
6        Q. What department was he in?
7        A. Like there was no department. It was Pre-Fab
8   organization at the time. I would consider it just
9   Engineering.
10       Q. Who was his boss?
11       A. Jeff Shealy.
12       Q. And Alex Feldman, what department was he in when
13  he left?
14       A. Yeah, I mean, we're all engineers. He's an
15  engineer. He's a Process Engineer, though. He was
16  responsible for -- at the time, we were processing our
17  wafers at an external Fab. We didn't have our
18  fabrication facilities at the time. So he was in charge
19  of managing that relationship and, you know, just
20  working that external customer and that sort of thing
21  and coming up with, you know, ideas on how to process
22  the wafers better.
23       Q. Who was his boss when he left?
24       A. Mark Boomgarden.
25       Q. All right. So going back to your employment at

Page 39

1   Akoustis.
2        What position were you hired into?
3        A. It was a little fluid. I mean, I put on the
4   resume Device Engineer, because that's really the work I
5   was doing.
6        You have to understand. When we started at
7   Akoustis, we didn't have anything. We had materials.
8   So in order to make our product, which are RF filters,
9   there's gates you have to pass in order to get to an RF
10  filter. So the first thing you have to do is you have
11  to have an RF resonator, an acoustic resonator.
12       You might think of it like if you were trying to
13  build a lego set, you have to first build the lego
14  block, the lego blocks you can put together. So we
15  first had to make the blocks. So the resonator was the
16  block.
17       So the first thing I did was design and develop a
18  resonator. So the first few wafers we processed, the
19  things that we put on there that were resonators didn't
20  behave like a resonator.
21       So it was a process of debugging why it didn't
22  work, how it can change, how we can fix it. So that's
23  what I was working on at the time.
24       Then after we made the resonator work, then we
25  hired -- when we got it close to working, then we hired

Page 40

1   Daeho Kim who came in, and then he took over all that
2   work.
3        Then after that, I transitioned over into Filter
4   Design, because now we had the blocks, and then I
5   started making the lego sets.
6        Q. When did you make that transfer?
7        A. Let's see. That would have been, you know, it's
8   not really like a hard date you stop doing one thing and
9   start doing the other. It's like I slowly put down this
10  and started picking up something else. But I would say
11  that transition happened over the course of late 2016 to
12  probably mid 2017. Then I would say, by the end of
13  2017, I was full on Filter Designer at that point.
14       Q. What was your title during that time?
15       A. So during that time period, we also had hired
16  Rohan, and Rohan had this -- he wanted to start building
17  up this organization. So I was already at that point
18  given the title of Engineering Manager, but I managed
19  just a small team of technicians.
20       Then I was still doing -- the majority of my job
21  was to work as a Design Engineer, even though I didn't
22  have that exact title.
23       Q. And you became an Engineering Manager in 2017;
24  does that sound right?
25       A. That sounds right.

Page 41

1        Q. How long were you holding the manager position?
2        A. I mean, it's technically till the end.
3        I transitioned out of Rohan's team around the
4   Fall of 2020, I think, October. That's when I moved
5   over to working for Dave Aichele, and at that time, I
6   was still doing design work. I never really stopped
7   doing design work to a degree, but I started interfacing
8   -- we wanted to get a foundry business up and running.
9   So I started working on building that up. So that's
10  why, I think, on my resume, I put Foundry Engineering
11  Manager, because I was engineering a foundry business.
12       Before we had customers, I was still doing design
13  work. Then towards the end, the last probably six to
14  eight months I was at Akoustis, I really wasn't doing
15  any design work, because we had started bringing on
16  customers. I was helping them with their filter design.
17  So it didn't seem ethically right for me to continue to
18  design. So I dropped that.
19       Q. Okay. Let's go back a little bit.
20       When you became an Engineering Manager, and when
21  you -- and after Daeho was hired to be a Device
22  Engineer, did you do more or less the same thing until
23  you transferred to Dave Aichele in the Fall of 2020 or
24  did your job duties change during that time period, too?
25       A. Yeah, they morphed a little bit sure, because we

11 (Pages 38 - 41)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 93 of 341 PageID #: 27079

Michael David Hodge , II                 November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 42

1  were a growing company.
2      Early on I mentioned I managed a small group of
3  technicians.  So I built up a test lab, because the
4  thing is you build these things -- you design these
5  things.  At some point, someone's got to test it and
6  make sure it works.
7      So I got a lab started up, hired technicians,
8  grew them, because most of these folks were fresh out of
9  school.  I built up that lab.  That was one part of it.
10     Then later on, I transitioned that lab to another
11  individual.  His name is David Britton.  Then I moved
12  over to starting to design what we call a PDK.  It's
13  called a Process Design Kit.
14     Q.  When was that?  When did you make that
15  transition?
16     A.  Yeah.  That was probably 2019'ish time frame,
17  yeah.  Again, you know, it was a transition, right.  It
18  wasn't like this date.
19     Then that was when I started to build design
20  tools that would make the entire Engineering Team more
21  efficient, right.
22     So this is now giving them very clean models,
23  design environment so someone could can come in, and
24  they can just hit the ground running, instead of having
25  to like build things on their own.  It was a very manual

Page 43

1  project.
2      So I had another guy hired.  His name was Mike
3  McLean.  He is now the Director of Software there, but
4  he was a very good software genius.  So I leveraged him
5  to help build a lot of these design tools that we
6  eventually distributed to the Engineering Team to make
7  the team more efficient.
8      Before you continue, we were talking about the
9  share vesting earlier.
10     Q.  Yes.
11     A.  Can I add something else to that?
12     Q.  Of course.
13     A.  I just wanted to give you some context on where I
14  come from on that.  So maybe this will help you out a
15  little bit understand some of my answers.
16     So when I was at Qorvo, I graduated with my PhD
17  in 2014.  At the time, I was reporting to Rama, but the
18  guy who was really -- who Rama was also reporting to,
19  his name was Gordon Cook.  All right.  I kind of had a
20  dotted line to Gordon directly because, again, like I
21  said, you know, I was doing a lot of accountability
22  responsibility things that Rama was accountable for.  So
23  I reported to Gordon Cook a lot.
24     When I finished my PhD, Gordon told me at the
25  time, because the merger was going on, he could not give

Page 44

1  me a raise.  He was going to grant me some RSUs or
2  stock, right, from RFMD.
3      He gave me -- I can't remember the exact number
4  of shares.  It was X number of shares that would vest
5  over four years.  Just like I said, at your one year
6  anniversary, you get that extra 25 percent.  Okay.
7      I was granted that in the Fall of 2014 when I
8  graduated, and I was released in June of 2015.  The
9  company gave me all of my shares.
10     I had not even -- I was given that grant less
11  than a year before, and I was given every single share
12  that I was granted.
13     Even though the agreement said I was not -- I was
14  not to get any shares, I was given every share on the
15  way out the door.
16     Typically, what I've observed in this industry is
17  that Design Engineers in this field are very scarce is
18  what I would say.  It's a very specialized skill set,
19  and ball resonators it gets even more specialized.
20     If you go to any bulk acoustic wave company -- I
21  challenge you to do this tonight.  Go to Qorvo.  Go to
22  Skyworks.  Go to TriQuint.  Look at their careers page.
23  There will be a filter ball designer, filter designer on
24  there.  It's a perpetual job req, because there's not
25  enough of them.

Page 45

1      You generally do not want to have people leave
2  upset.  You generally want to keep people happy and keep
3  them.  So anyway, I don't think any of this is
4  irregular, because usually when people are on their way
5  out the door, you want them to be happy, and you want
6  them to think highly of you on the way out the door.
7      So I don't think any of these people I told you
8  in these agreements are irregular because, generally,
9  like I say, you're trying to keep people on good terms.
10     That was my impression when I was released at
11  Qorvo.  It was, basically, "We're going to let you go.
12  We want you to have good memories of Qorvo when you
13  think of Qorvo, because one day we may want you back."
14  All right.  So just a head's up on that.  I just wanted
15  to make that clear.
16     Q.  Thank you.
17     So your impression that it wasn't abnormal to
18  accelerate share vesting on termination was based on
19  your experience at Qorvo and, also, your knowledge that
20  Design Engineers can be hard to come by?
21     A.  That's right.  Yeah.
22     So you know, I don't have any specifics in my
23  time at Qorvo, but I am not aware of anyone who had
24  their shares clawed back from them or cut off when they
25  left.  I'm not aware of any of that happening either.

12 (Pages 42 - 45)

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 94 of 341 PageID #: 27080

Michael David Hodge , II                                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 46

1  Q. Let me ask this about Akoustis.
2  You said it's rare for people to leave
3  involuntarily, right?
4  A. Yeah.
5  Q. Are you aware of other people who left
6  involuntarily who, you know, did not receive shares that
7  were not vested at the time of separation?
8  A. You know, the only people I can remember that
9  left involuntarily were usually people outside of the
10 Engineering Team.
11 Like we had this guy, I can't remember his last
12 name, but his first name was Andrew. He was in Finance.
13 He was let go at the beginning of the pandemic.
14 We had a lady who worked in the Shipping
15 Department. She was let go. I would assume they
16 weren't given shares, but I don't know that.
17 I mean, like the Shipping lady, she probably
18 didn't have RSUs, but Andrew probably had negotiated --
19 I don't know. Maybe he didn't have any shares, to begin
20 with, anyway. I don't know. I don't have any idea what
21 his comp was.
22 Q. What about sticking with the engineering sphere.
23 A. Okay. Let's do that. All right. So we've got
24 to think who involuntarily left in the Engineering Team.
25 I'm trying to think outside of the people we've already

Page 47

1  listed, right.
2  I can't -- oh, yeah, sorry. We've had a few
3  folks. So we had a lady who worked in the Device
4  Engineering Team. Her name was Janet Gwynn. She
5  reported to Daeho Kim. Or she left on her own. She
6  resigned. Sorry. Take that back.
7  No. Everybody else that left, I can't think of
8  anyone who outright who left -- who involuntarily left.
9  Q. Okay. And is it your understanding people who
10 voluntarily leave will forfeit their unvested shares?
11 A. Who voluntarily left?
12 Q. Correct.
13 A. Yeah. Yeah, because it was your decision.
14 Right. So I forfeited shares when I left.
15 Q. But you were smart, and you got them every month?
16 A. Well, yeah, the initial ones, yes. I had all
17 those, because I was there for more than four years.
18 But every time we did a review period on a yearly
19 basis, there was an opportunity for the company to grant
20 you additional RSUs, which happened for me. Then later
21 on, we were granted options, as well, two year period
22 there. Then they stopped doing that.
23 But yeah, so there was still grants. There was
24 like a rolling -- you have a rolling list of grants that
25 are going. So yeah, at some point and within three

Page 48

1  years of some grant, so yeah, those shares I did
2  forfeit.
3  Q. What two years did they give options?
4  A. It seems like that was '18 and '19, I think.
5  Q. And they stopped doing that in '20?
6  A. That sounds right, yeah.
7  Options have a strike price. So below a certain
8  number, they become worthless. That number was moving
9  up. So it became unattractive for employees, right, as
10 the stock was going up. So people didn't want them. So
11 they were unpopular. So the management stopped giving
12 them out.
13 Q. So after 2019, do you recall being given any
14 options until you left in January of 2022?
15 A. I just remember getting two option grants, and
16 then after that, any grant I got was more RSUs. Yeah.
17 Q. Was that just for you or do you have an
18 understanding that that was sort of for everyone within
19 Engineering?
20 A. I mean, the amount varied from engineer to
21 engineer, but I think everyone got some amount, from
22 what I recall.
23 Q. I meant in terms of actually giving them, not the
24 quantity?
25 A. Oh, I don't think every engineer necessarily got

Page 49

1  them. I'm not -- I don't know for sure. I mean, it's
2  not like I polled everyone.
3  Q. Sure. But after 2019, when you stopped getting
4  stock options, are you aware that the company gave other
5  engineers stock options in 2020, 2021 or part of the
6  time in 2022 when you were there?
7  A. No. I can only speak to myself.
8  In '21, '22, six months before I resigned. I was
9  given more RSUs grants. So I still continued to get RSU
10 grants, but I never got any more options.
11 MR. KLASS: All right. Oh, and I didn't
12 mention this at the beginning, but any time you'd
13 like to take a break, just let me know.
14 THE WITNESS: Got you.
15 MR. KLASS: If I have a question out to you,
16 I'd like for you to answer it first, but otherwise we
17 can take a break whenever you'd like.
18 THE WITNESS: Oh, okay.
19 Do you guys need to take a break? Sorry.
20 I didn't know if you needed to take a break; is that
21 why you're saying that?
22 MR. KLASS: No.
23 MR. VAN KAMPEN: If you want to keep going.
24 THE WITNESS: How long are we going into
25 this?

13 (Pages 46 - 49)

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 95 of 341 PageID #: 27081

Michael David Hodge , II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 50

1    MR. KLASS: An hour. That's what made me
2  think of it.
3        THE WITNESS: Yeah. We can go longer.
4  That's fine, if everybody's okay.
5  BY MR. KLASS:
6    Q. So turning back to your roles at Akoustis. I'm
7  going to skip over a period.
8        But when you transferred to working for Dave
9  Aichele in the Fall of 2020, what was the position that
10 you transferred to?
11   A. It's kind of the correct way of -- the reality of
12 what happened was I really was transitioning bosses;
13 that is the way I would characterize it. I no longer
14 wanted to report to Rohan, and Alan gave me a landing
15 spot. I trusted him. I didn't mind working for him.
16 So I took that opportunity, but I still was kind of
17 doing the same job, you know. It's kind of, again, it's
18 a spectrum.
19       I was doing the same job the day after I
20 transitioned to working for Dave Aichele, and then I
21 slowly started taking on new tasks, and then I started
22 no longer taking on new tasks from Rohan is kind of how
23 that happened.
24   Q. Who initiated that transfer, was that you?
25   A. It was me. I had a weekly -- this was during the

Page 51

1  pandemic. So we used to -- Rohan and I would meet at
2  this picnic table outside in the front of the office
3  and, you know, I had told Rohan, you know, I had issues
4  with working with him. He came back to me one day, and
5  he said, "Well, you know, I had chatted with Aichele in
6  the hallway, and he just said, you know, "There's other
7  opportunities in the company, you know, that we can make
8  available."
9        I guess he must have had a conversation with
10 Rohan on the side, because Rohan, when we were talking
11 at the picnic table, he said, "Well, you know, if you
12 want to work for Aichele, you know, there's other
13 opportunities there."
14       I looked at it at the time as a way for me to get
15 more business development experience. I had received
16 feedback from peers and stuff that in order for me to
17 potentially shoot for higher positions in the corporate
18 order, I needed more exposure to the business side of
19 things, business experience. So I looked at an as a
20 good opportunity to shore up a weakness in my resume.
21 So Rohan suggested it at the picnic table, but I had
22 already been kind of thinking about it, and I had
23 already talked to Aichele about it. So we just kind of
24 made it happen.
25   Q. Do you recall what month you had the discussion

Page 52

1  with Rohan at the picnic table?
2    A. Yeah, it wasn't far behind. I think I said I
3  started -- I moved over in October 2020. It had to have
4  been September. It was pretty quick.
5    Q. Would you agree that your performance reviews are
6  generally issued around August of each year?
7    A. Yeah. They floated around. We weren't very
8  rigorous, especially early on. We got more rigorous
9  later on, but it was generally that time period. Yeah.
10   Q. Do you recall if this discussion was after your
11 performance review for 2020 or before?
12   A. I think it was after, yeah.
13   Q. What was the position that you transferred into?
14   A. Yeah. By the way, I'm pretty sure it was after
15 my performance review, because we thought it was a good
16 time, because Rohan -- it was a clean break, right. He
17 had just finished one year with me, and then I was
18 getting to start a new one with Aichele. So I remember
19 that now.
20       The role was -- well, I put on their Foundry
21 Engineering Manager. I mean, I'll be honest with you.
22 Dave, when I had the one-on-one, he said, "Could you
23 make up a title for yourself?"
24       Yeah, it was -- the idea was I was going to work
25 with Dave in engaging these customers to come in and

Page 53

1  design products in our Fab.
2        So the motivation here is that if you have a
3  Foundry, if you have spare capacity in your Fab, it
4  actually is not good, from a business standpoint, to
5  have spare capacity in your Fab. So having a Foundry
6  business is good for your Fab. It increases the
7  utilization of it. So that was the idea, and that was
8  what I think Jeff's and Dave's thought process was.
9  This was another business revenue, was another way to
10 drive capacity.
11       So that was the understanding, that I come to
12 work for Aichele, and we start up this Foundry business.
13 So that's why I put Foundry Engineering Manager. The
14 primary thing that I was working on was that but, again,
15 I was still designing filters at the time for key
16 customers.
17       I still was sitting in on engineering meetings
18 internally until we got the first customers, and then I
19 absconded from doing that, but yeah.
20   Q. When was that transition complete?
21   A. I would say it wasn't really complete until mid
22 '21, like May, June, something like that really, because
23 I was still doing a lot of engineering work at the time.
24       We had a key customer. I had a key part, you
25 know. The key customer, it required four separate

14 (Pages 50 - 53)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 96 of 341 PageID #: 27082

Michael David Hodge , II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

|  | Page 54 |
|---|---|
| 1 | filters into this product, and I was designing one of |
| 2 | the four filters, and I had to see that all the way to |
| 3 | the end before I could completely let go of my |
| 4 | engineering work. |
| 5 | Q. When you were doing the transition, and you were |
| 6 | still doing your design work, was Dave Aichele |
| 7 | supervising that work or was Rohan still doing that? |
| 8 | A. I mean, it technically was Rohan. We had |
| 9 | meetings, but it was pretty sparse. I would say, you |
| 10 | know, his attention was on other engineers and other |
| 11 | designs. At that point, I got it. It was mostly -- it |
| 12 | was pretty much there already. It was just kind of hand |
| 13 | holding it through. |
| 14 | So once you design a product, and it works, |
| 15 | there's still lots more work to do as far as qualifying |
| 16 | it, you know, characterizing, writing in data sheets. |
| 17 | So that's kind of like a turn to crank. It's pretty low |
| 18 | oversight. It's just someone has to be there to manage |
| 19 | it. I was able to run that pretty much on my own. |
| 20 | Q. For your new job duties, were those public facing |
| 21 | at all or customer facing? |
| 22 | A. Yeah. |
| 23 | Q. Can you just describe that? |
| 24 | A. Yeah. So I want to break it up into two parts, |
| 25 | and there's a reason why I didn't commingle these. |

|  | Page 55 |
|---|---|
| 1 | So I told you there was a foundry engineering |
| 2 | aspect, and then there was a government contract aspect. |
| 3 | So that first program we got, the SBIR, I called it |
| 4 | Piezo MEMS, that program was to start a Foundry for bulk |
| 5 | acoustic wave filters, because there was no such thing |
| 6 | as an open Foundry in the United States. So the |
| 7 | Government was wanting that as an opportunity for |
| 8 | government research institutions and universities to be |
| 9 | able to design these things in an open Foundry. |
| 10 | So while I was doing government work, it's |
| 11 | tightly aligned with my primary duty of starting up a |
| 12 | Foundry business at Akoustis. So they were really kind |
| 13 | of commingled. |
| 14 | So as part of my job, I had to talk to |
| 15 | universities, research labs, and other corporations to |
| 16 | gauge interest in, you know, participating this program |
| 17 | to design into it. |
| 18 | At the same time, I'm talking with, you know, |
| 19 | program managers at DARPA, and that sort of thing. So |
| 20 | it was a very wide slice of people I had to interact |
| 21 | with. |
| 22 | Q. And part of that also dealt with government |
| 23 | contracts work? |
| 24 | A. Yeah. So this SBIR was government contracts |
| 25 | work. So any time I'm talking about the Piezo MEMS |

|  | Page 56 |
|---|---|
| 1 | Program, I'm discussing it with a customer. So my hours |
| 2 | that week would be -- by the way, even though you're |
| 3 | salaried, you still have to keep track of a time card |
| 4 | when you're working on government programs, because then |
| 5 | they have a record that they can bill the Government. |
| 6 | So essentially my salary is being paid for by the |
| 7 | Government at that point. |
| 8 | Q. Did you have any work related to developing the |
| 9 | government contracts? |
| 10 | A. Yeah. I was the principal investigator on Piezo |
| 11 | MEMS. |
| 12 | So principal investigator means you're the |
| 13 | primary person that writes the proposal, assembles all |
| 14 | the pieces, the budget, and then submits it, and then |
| 15 | has to interact with what's called the Program Manager. |
| 16 | So I was the PI on Piezo MEMS and this COFFEE program I |
| 17 | told you about |
| 18 | Q. That requires, I guess, specialized skill or |
| 19 | knowledge to do that; would you agree? |
| 20 | A. Yeah. You need to be a good technical writer I |
| 21 | would say, and you need to be able to talk the |
| 22 | technology. |
| 23 | So the hardest part is really, being a PI, is the |
| 24 | challenge in filling that position is you've got to find |
| 25 | someone who's a good communicator, but at the same time |

|  | Page 57 |
|---|---|
| 1 | can really talk in detail on the technology. |
| 2 | Q. Did you find that your prior government contracts |
| 3 | work at Qorvo helped with that? |
| 4 | A. Yeah, because I was familiar with how the |
| 5 | meetings -- the how the reports are ran, how meetings |
| 6 | are ran, what the expectations are. Yes. |
| 7 | Q. And then when you finally transitioned in mid |
| 8 | 2021, up until you left in January 2022, did you hold |
| 9 | that same position? |
| 10 | A. Yes. |
| 11 | By the way, I just want to also be clear, because |
| 12 | you're drawing a distinction back to when I was at |
| 13 | Qorvo. So I just want to be clear. |
| 14 | All of the Program Managers I worked with at the |
| 15 | Government at Akoustis were a completely different set |
| 16 | of Program Managers than I worked with at Qorvo. I |
| 17 | wasn't leveraging relationships I had from Qorvo in the |
| 18 | government in order to get these. This was a pretty |
| 19 | different set of people. I just want to make that |
| 20 | clear. |
| 21 | Q. I understood. But in terms of the process and |
| 22 | the knowledge of the process and what is needed to work |
| 23 | in that sphere? |
| 24 | A. Yeah, that general skill set I was exposed to at |
| 25 | Qorvo, correct. |

15 (Pages 54 - 57)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 97 of 341 PageID #: 27083

Michael David Hodge, II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

|  | Page 58 |  | Page 60 |
|---|---|---|---|
| 1 | Q. So when you fully transferred duties in I would | 1 | A. Yeah. That was part of it, yeah. |
| 2 | say in the middle of 2021 up until you left in January | 2 | I would say a major part of -- I mean, I liked |
| 3 | of '22 -- | 3 | doing engineering work. In fact, if you asked Dave |
| 4 | A. Yes. | 4 | Aichele why I resigned, what I told him that day in the |
| 5 | Q. -- you had the same job duties during that time | 5 | office was I wanted to get back to doing engineering |
| 6 | period, six, seven months? | 6 | work. So I didn't want to leave that. But again, I |
| 7 | A. So yeah, during that time period when I was | 7 | didn't agree with the way Rohan was managing his team. |
| 8 | definitely no longer designing filters at Akoustis, what | 8 | Q. How so? |
| 9 | I was doing there was still working on the design tools, | 9 | A. Yeah. Very political, very not data driven. |
| 10 | because those design tools are actually a part of the | 10 | So the thing that got frustrating with me with |
| 11 | Piezo MEMS Program. | 11 | Rohan was that he would sometimes -- he had a circle |
| 12 | In the Piezo MEMS Program, we had to build this | 12 | that he seemed that he listened to more or valued their |
| 13 | design kit. So I became the natural person to take that | 13 | opinion more and, you know, even if that person wasn't |
| 14 | on, because while I'm developing that, I can also be | 14 | working on your design, and they made some comment about |
| 15 | working on the internal tools. So that was one aspect | 15 | your design, he would make you run down something that |
| 16 | of it. | 16 | was really a goose chase, in my opinion, and just was it |
| 17 | Then at that point, since we already had a tool | 17 | was inefficient. I think the results speak for |
| 18 | set, we had like what you might call a beta, in software | 18 | themselves, but anyway that's what I observed. |
| 19 | terms. I could then start engaging with customers to | 19 | Q. Who was his circle or the people that you think |
| 20 | kind of start designing preliminary designs on their | 20 | he trusted more? |
| 21 | Fab. So I did that with Dave Aichele on calls working | 21 | A. I mean, he heavily leaned on this guy, Frank Bi. |
| 22 | with these guys. Yes. Yeah. | 22 | He's an older gentleman who's been in this industry for |
| 23 | MR. KLASS: Okay. Let's take a five or | 23 | a long time. |
| 24 | ten minute break now, because I'm going to switch | 24 | But then even some Design Engineers, you know, |
| 25 | topics. | 25 | they may say something, and Rohan's one of these people, |

|  | Page 59 |  | Page 61 |
|---|---|---|---|
| 1 | THE WITNESS: Okay. | 1 | the last piece of information he hears, he seems to |
| 2 | (A brief recess was taken in the deposition) | 2 | elevate that piece of information more than something he |
| 3 | BY MR. KLASS: | 3 | may have heard a week ago. So some people are |
| 4 | Q. So you mentioned that your transfer to Dave | 4 | constantly communicating with Rohan. |
| 5 | Aichele's supervision was because you didn't want to | 5 | I perceive Saurabh Gupta to be one of those |
| 6 | report to Rohan anymore. | 6 | people, and he makes a lot of, in my opinion, |
| 7 | A. Yeah. | 7 | questionable engineering decisions. So I guess he spoke |
| 8 | Q. Can you explain that? | 8 | in a very convincing way that sometimes he would sway |
| 9 | A. Sure. Yeah. I can explain that. It's hard for | 9 | Rohan to, you know, on certain things. It didn't make |
| 10 | me to put my finger on it. | 10 | sense to me. |
| 11 | Sometime into '20, I wasn't -- I didn't really | 11 | Q. So you have Frank Bi; is it B-I or Bie? |
| 12 | agree with his direction of managing the way he was | 12 | A. I don't know how you say it. I just call him |
| 13 | leading the team. It started -- again, these things, | 13 | Frank. I don't know. Maybe it's Bi. I mean, |
| 14 | it's not a sudden thing. It's just a transition you | 14 | obviously, that's not his real name. |
| 15 | kind of notice over time, and one day you wake up, and | 15 | Q. And you mentioned Saurabh Gupta. |
| 16 | it's like what are we doing here. | 16 | Anyone else that you thought that he listened to |
| 17 | I didn't like the way he was driving the team, | 17 | more or that were what you called a circle? |
| 18 | the direction, and that was one part of it on that side. | 18 | A. Yeah. He had guys he was clearly advancing. So |
| 19 | Then on the other side, like I said, it was an | 19 | Saurabh was one. Guillermo Moreno was the other. |
| 20 | opportunity to shore up what I perceived as a weakness | 20 | Guillermo Moreno was brought over from Qorvo. He |
| 21 | in my resume. So there was an opportunity for me there. | 21 | had a background at Qorvo in what we would call like the |
| 22 | So it was kind of a win-win. | 22 | finite element simulation, kind of getting into the |
| 23 | Q. So your transition wasn't solely because you | 23 | physics of the device. So if he said something relating |
| 24 | didn't want to work with Rohan. Part of it was you | 24 | to that, obviously Rohan would go to that. |
| 25 | wanted -- you saw a path to further your own career? | 25 | It seemed to me that when we had new hires that |

16 (Pages 58 - 61)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 98 of 341 PageID #: 27084

Michael David Hodge , II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 62

1  came from a competitor in industry, so Saurabh came from
2  Qualcomm, and Guillermo came from Qorvo, that since that
3  was an engineer coming from a competitor, they must know
4  something we don't know. So I'm going to value their
5  opinion over someone who's been here four or five years.
6  Traditionally, it doesn't work that way, though. I
7  learned this. So I'll just give you my data point.
8      When we went through the merger from RFMD and
9  TriQuint and Qorvo, I was working with the Fab in
10 Greensboro. We were doing gallium nitride, again, like
11 I was talking about. Well, TriQuint was also doing
12 gallium nitride in the Fab in Dallas, Texas.
13     I remember we had -- what's the industry term.
14 We had warts in their process. They had warts in their
15 process. It's more of something you'd have to work
16 around. But our warts were different than the warts
17 that TriQuint had. So their engineers, right after the
18 merger happened, it was okay for us to communicate.
19 They sent a team of guys down there to talk to them
20 about their process, and the CEO wanted them to talk
21 about our process. So they wanted them to bring back
22 something to fix the warts in our process, right.
23     But it turns out, you know, if you develop these
24 things in a silo, usually you can't just pour it over
25 something that someone's done. It's like cooking a cake

Page 63

1  or a recipe, right. There's a certain way that it's
2  done, right.
3      So I found in the industry, usually a lot of
4  times if someone's coming over from somewhere else, they
5  don't usually know your process. So they're working
6  around a different set of warts than you have.
7      Q. Anyone other than Frank, Saurabh, and Guillermo
8  who you thought that he listened to a lot?
9      A. Daeho. Daeho he leaned on a lot, Daeho Kim.
10     Q. Anyone else?
11     A. Let's see here. Oh, and sometimes he would
12 listen to Pinal, right. Pinal, yeah. Those are --
13 those were the guys he was advancing and pushing, right,
14 to be the leaders on his team.
15     Q. All right. It sounds like at least for Saurabh
16 and Guillermo, at least part of that is because, in your
17 mind, is because they came recently from, well,
18 competitors. So he thought that they had secret
19 knowledge, so to speak?
20     A. Yeah. This was my fundamental problem with Rohan
21 as an Engineering Manager is Rohan has no background in
22 bulk acoustic wave filters. He actually has a technical
23 background at the end of the day. He's very good at
24 product, you know, interfacing with the customer, taking
25 a well engineered product and selling it in the market.

Page 64

1  He's good at knowing what the requirements at the end
2  are, but the requirements at the end are different than
3  the requirements to get to that end product, and he does
4  not have a background in doing that. He's not what I
5  could call a technologist that makes the details in and
6  out.
7      So in order to mask that weakness, I felt like he
8  leaned on these people like this as a crutch, and so
9  when they would tell him something, he has to take it as
10 truth, because he can't dispute it, because he doesn't
11 have the background or the understanding.
12     Q. So you mentioned five people.
13     A. Yeah.
14     Q. Frank, Saurabh, Guillermo, Daeho, and Pinal?
15     A. Yeah.
16     Q. Who he listened to more than others maybe?
17     A. I felt that way, yeah.
18     Q. Who are the others that he didn't listen to as
19 much, in your opinion?
20     A. Yeah. So again, those people generally had some
21 kind of management title, right. The titles were a
22 little bit loose at the company, but that's generally
23 what they were.
24     So if you had like a Design Engineer, like Runqui
25 Zahng was one. I'm trying to think who the other guys

Page 65

1  were. I guess I would put them as like individual
2  contributor engineers, not the managers, right, just
3  anybody like that.
4      We have this guy Ali Kourani; he's an Egyptian
5  guy. We have Carlos. I can't think of Carlos' last
6  name. He reports to Guillermo. These are all guys I
7  would talk about. I'm just saying, as an example, you
8  know, I don't think Rohan would necessarily listen to
9  them with as much authority as these guys.
10     The reason why is these guys, I'm telling you,
11 Ali, Runqui, Carlos, these are all guys we hired out of
12 university. We didn't hire them from a Qorvo. We
13 didn't hire them from a Qualcomm, right. But they're
14 very bright individuals, especially in the case of Ali
15 and Runqui. These guys came from very good programs.
16     Ali, I know his advisor at University of
17 Illinois. I talked with him a couple times early on at
18 Akoustis, a very sharp guy. So I know he's very
19 capable.
20     Q. Is it Runqui? How do you pronounce his name?
21     A. Yeah, Runqui.
22     Q. Runqui, Ali, and Carlos, they were all hired
23 straight from university?
24     A. I'm pretty sure, yes. Yeah. Carlos was from the
25 university as well. That's right.

17 (Pages 62 - 65)

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 99 of 341 PageID #: 27085

Michael David Hodge , II                                November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 66

1   Q. So in terms of experience level, you would agree
2   they were all less experienced than Pinal, Daeho,
3   Guillermo, Saurabh, and Frank in their roles, right?
4      A. Yeah. So that's why they weren't managers. But
5   at the same time, the other thing you'd want to ask is
6   what did this person do at the last company.
7      So I just told you about Guillermo was very
8   involved in the finite element simulation of a
9   resonator, but he was not a Design Engineer. So this
10  was his first foray into design engineering.
11     Q. Did, in your opinion, Rohan have a similar
12  conclusion, that this was sort of his first foray into
13  design engineering? Or do you think because Rohan
14  didn't, in your view, understand sort of the underlying
15  technology parts of it, is that something he could have
16  perceived himself?
17     A. Yeah. I'm probably -- I'd have to know -- I'm
18  having to make an inference on what was going through
19  his mind. It's hard for me to make that conclusion.
20     I would guess that he probably saw it all as the
21  same, and he just assumed, since Guillermo had done this
22  role at Qorvo, he must be an expert on all these topics.
23  But someone who's familiar with the details would know
24  that that's not necessarily true.
25     Q. Okay. Anyone other than Runqui, Ali, and Carlos

Page 67

1   who you felt that Rohan did not listen to as much as
2   others?
3      A. A lot of the guys I'm thinking of, they came a
4   little bit later, after I wasn't involved in the
5   engineering meetings as much.
6      There's another guy, I can't think of his name
7   right now. He's a Chinese guy. He worked for
8   Guillermo. He left on his own. There's another guy.
9   His name is Xu Han, X-U, last name is H-A-N, who was
10  recently let go from the company. Actually, that's
11  another involuntarily firing, but that happened after I
12  had already left. That's why I didn't list him earlier.
13     Q. If you know, what was Xu Han's experience level
14  when he came in?
15     A. Oh, yeah. So he had worked at -- where was Xu
16  Han at? He had worked at -- I believe he worked in the
17  industry, as like an intern level. So he been in the
18  industry. I want to say it was Skyworks. Yeah.
19     Q. You think he interned at Skyworks?
20     A. Yeah, I think that's right.
21     Actually, Runqui may have interned as well. I'd
22  have to double check his resume. It's been a while.
23     But yeah, it's not like these guys had zero.
24  When I say university grad, it's typically, in the
25  course of doing university work, that you would go work

Page 68

1   in the industry at some point in time.
2      Q. All right. Anyone else other than those four
3   people?
4      A. Let's see. Yeah, that's all the Design Engineers
5   I can remember.
6      We had Device Engineers, but those guys all
7   reported in to Daeho. Yeah, I guess I was just zeroing
8   in on design engineering.
9      So Daeho has two guys -- well, sorry. He had
10  three guys when I left. So he has Abhay. He had Imad,
11  and he has this guy named Nashaba that was straight out
12  of Georgia Tech. Actually, all these guys were out of
13  university.
14     So Nashaba came from Georgia Tech. Imad and
15  Abhay came from Carnegie Mellon, but I think Abhay was
16  doing post doc at Carnegie Mellon. I think he actually
17  did his PhD and everything in Japan.
18     In Japan, there's a guy who's a fundamental
19  founder of this technology that teaches. He got his PhD
20  under that guy.
21     So these guys are very, very good. But you know,
22  again, he would defer to Daeho rather than these guys.
23  Some of these guys, especially Abhay, for instance, is
24  actually a very bright individual. I would say Abhay
25  probably knows fundamentally the technology. He just

Page 69

1   doesn't have the experience of like Frank, but he could
2   be that one day. He's very good.
3      Q. So circling back to the effect this had on the
4   Engineering Department that made you want to not work or
5   report to Rohan anymore.
6      A. Right.
7      Q. How did Rohan listening to some of these people
8   you've mentioned over others affect your interest in
9   moving out?
10     A. Well, it was clear to me that we weren't going to
11  be executing on the products was my feeling at the time.
12  So we have customers. It's a small company.
13     When you're a small company with limited
14  resources, you have to be surgical. You have to find
15  the market you have a high probability of winning in,
16  and then you need to go win that business. That's what
17  we did early on.
18     So early on, we identified the WI-FI 6 market,
19  and we went after that one surgically, right. So I was
20  developing -- so that's two filters. I developed the
21  low bandwidth, and he had developed the high bandwidth.
22  We used good engineering judgment.
23     At the time, we didn't have Saurabh, Guillermo,
24  and all these guys. So Rohan listened to us, and we won
25  that business fairly easily, and we were very successful

18 (Pages 66 - 69)

|  | Page 70 |  | Page 72 |
|---|---|---|---|

Page 70

1  and shipped, you know, millions of parts, did very, very
2  well in that business.
3      Later on, these guys came in and, like I said, he
4  started to listen to the new person, and we started to
5  lose that business. It was already evident.
6      So there was a follow-on WI-FI 6E product that we
7  originally lost that because -- I don't know where it
8  stands today. Maybe they got it back. But we
9  originally lost business, because we made bad
10  engineering choices.
11      Q. What's the product number; do you recall?
12      A. That would be I think we called it 10165 and
13  10155. So that's the WI-FI 6E part. So that one lost
14  design slots because of delays, mostly due to bad
15  engineering decisions and poor engineering work.
16      Here's the thing. If you make a mistake on the
17  design or you make a bad assumption, it usually can be
18  easily verified if you do all the rigorous engineering
19  checks.
20      What happens is we do what you would call tape
21  out a mask. Let's creat the plates that go get
22  fabricated in the fabrication facility. Then you get
23  the wafers back. All right. That entire process is --
24  I mean, we like to try to say it's like a ten week
25  process, because a lot of times when you're cramming a

Page 71

1  bunch of stuff into Fab, it can -- there's some tools
2  that can take longer. So you're looking at 14 weeks.
3  So that's 14 weeks. So that's three months. You've
4  lost a quarter, and that's just -- when you get it back
5  now, you've got to go build it, test it. So now you've
6  lost another four, five weeks. So you can compound this
7  into a five month delay.
8      In the meantime, you know, these guys are just
9  shotgunning designs left and right. So they will be
10  able to stagger designs in the Fab. So you may have,
11  you know, eight months worth of work in the Fab that
12  comes out, and now you have to start all over because
13  you didn't get feedback on the first one or you didn't
14  make good choices on the first one. So I saw a lot of
15  that happen. I saw some other things, too.
16      Rohan would like shotgun a change in the design
17  without ever telling the designer. That happened once
18  or twice. It happened to one of my designs. So that
19  frustrated me. He completely changed the design of that
20  part, and then I got blamed and had to go dig into that
21  and find out why he changed some aspects of it.
22      Q. What part was that?
23      A. That was 10158.
24      Q. For the two parts that you mentioned before
25  regarding the WI-FI 6E, who were the designers on that?

Page 72

1      A. So 10165, that was such an important product.
2  All right. First of all, the first designer was
3  Guillermo. Then he couldn't deliver. So then it --
4  that question makes me want to answer who wasn't a
5  designer on it. So they basically pulled the entire
6  army on that one.
7      So we had Saurabh was designing one of the 55s.
8  Guillermo was designing 5565. Carlos was designing a
9  version. Runqui may have designed a version. I can't
10  remember exactly or not. He may have actually been
11  working on it.
12      I think, actually, Runqui picked up Saurabh's
13  part, so Saurabh can work on this one. They were all
14  coming in, and none of them worked. It was clear we
15  didn't have a good process.
16      Q. What was your level of knowledge regarding issues
17  with parts that you weren't personally working on?
18      A. Right.
19      Q. Like how did you know what their status was, what
20  the problems were --
21      A. Right.
22      Q. -- where the source of the problems were?
23      A. Yeah. That's a good question.
24      So I sat in on design reviews, and then we had a
25  weekly engineering meeting where it's like a roundtable.

Page 73

1  We all go into a conference room, and we talk about the
2  design we're working on, you know, your challenges, your
3  opportunities, that sort of thing, right.
4      So I saw these guys present every week, and the
5  problems and solutions they were coming up with just
6  were nonsensical to me. I tried to raise issues with
7  it, but I was again told I'm not working on that
8  project. So you know, we're going to go with what the
9  designer thinks.
10      Q. Told by Rohan?
11      A. Yeah.
12      Even other people like Pinal would even give what
13  I thought was good feedback to the designer, and it was
14  just completely disregarded. So it's not like these
15  problems weren't seen, but they -- you know, to give you
16  a personality check.
17      Like, for instance, Saurabh's a guy, and he's
18  what we used to say, "He's always in transmit mode,
19  never receive mode. He doesn't listen." It doesn't
20  matter if you gave him good feedback anyway. He's never
21  going to accept what you say. I mean, Saurabh was a
22  constant issue. He was the one holdout on the PDK
23  adoption. So just things like that. Yeah, it was just
24  bad communication, poor engineering work. But yeah, so
25  you asked how I knew this. So the engineering meetings

19 (Pages 70 - 73)

Case 1:21-cv-01417-JPM Document 543-5 Filed 04/22/24 Page 101 of 341 PageID #: 27087

Michael David Hodge , II                                November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 74

1   were one.
2       Then, you know, every now and then, I would talk
3   to the engineers, ask them if there's any support or
4   anything I could do to help. I'd ask them what they
5   were doing, what they were working on, that kind of
6   thing. I tried to give feedback, but again they know
7   better.
8       At some point, I don't want to force myself on
9   them, because I'm not designing the part. At the end of
10  the day, they're the ones responsible for it. So I
11  don't want to drive them to a different decision, but
12  I'd just point out the things that I thought didn't make
13  sense or what I would have done different. That's all I
14  can really do, right.
15      Between talking with the engineers, talking with
16  the CAD engineers who submit the designs, I kind of got
17  a sense of what was going out.
18  Q.  For Saurabh, you mentioned that he was the one
19  holdout for the PDK adoption?
20  A.  Yeah.
21  Q.  How long did he hold out?
22  A.  I don't think he's ever used it. In fact, that's
23  why he's not a Design Engineer, from what I understand,
24  for the company. He never would adopt it.
25  Q.  Who did you hear that from?

Page 75

1   A.  I still meet some, you know, every now and then
2   some folks that I used to manage. So I've heard that
3   from various people, right.
4       So I still am in contact with Mike McLean
5   clients, David Dyer, Kathy Davis, up until he just left
6   this past week, Marvin Ibro. Who else at the company do
7   I talk to?
8       I talk to, you know, I still talk to Dave
9   Aichele. I ran into him at IMS back in June, which is
10  a, you know, really big industry conference. I talked
11  to him. He asked me how things are going. So these
12  people will talk to me. Yeah.
13  Q.  Okay. But you don't have personal knowledge
14  about whether Saurabh adopted the PDK eventually or not,
15  right?
16          MR. VAN KAMPEN: Objection.
17  Mischaracterizes the testimony.
18  BY MR. KLASS:
19  Q.  You can answer.
20  A.  You're saying do I know specifically that he
21  didn't?
22  Q.  Do you have personal knowledge that he did or did
23  not?
24  A.  Before I left, I do. So as of January of '22, he
25  had not adopted it.

Page 76

1   Q.  When was that rolled out, the PDK?
2   A.  That was rolled out -- let's see. We started
3   rolling that out in -- I think we had an early
4   development end of 2020, beginning of '21, and it was
5   definitely rolled out by mid '21.
6       What it was, when I say rolled out, it was the
7   designers were encouraged to use the PDK, but also check
8   with their old methods to make sure they're getting
9   similar results.
10      If there was a dig discrepancy, you needed to
11  report that discrepancy so myself and my team could go
12  debug what the discrepancy was, and we could close it
13  out.
14      So Saurabh continued to report discrepancies.
15  That was his excuse for using the PDK. The reason he
16  had discrepancies is because -- let me back up a little
17  bit more here.
18      I'm trying to think how much context I should
19  give you here. Okay. Let's just go back to the
20  beginning of this.
21      So before there was the PDK, you have to have
22  something to design with as a designer, right. So we
23  call that a model. All right. And there's a couple
24  different ways you can build these models for an
25  Akoustis resonator. And I apologize for any jargon I'm

Page 77

1   ready to give you.
2       So there's two main models. There's what's
3   called a Butterworth Van Dyke Model, and that's a --
4   what would we call that? You would call that a
5   behavioral model.
6       What I mean by that is you measured something,
7   and you're modeling the behavior of something you've
8   already measured. So it could never tell you where
9   you're going. It can only tell you what you've produced
10  in the past.
11      Then there's another model called a Mason model.
12  A Mason model is considered a physical model where it's
13  taking in material properties. You bundle them
14  together. It makes a prediction of where you're going.
15      You can build a mason model and design something,
16  and then go build it, and you can compare it against
17  what you've built. So it should predict your
18  performance, right.
19      So if you're designing a new product, you would
20  rather have the Mason model, because if I only have the
21  BVD model, I've got to go build a bunch of resonators
22  first, measure them, extract them out, and then I can go
23  build. So I've lost like eight months, right.
24      But if I have a Mason model that's good, I can
25  build the filter today and get feedback on it in four

20 (Pages 74 - 77)

# EXHIBIT 4

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:22-cv-103-FDW-DCK

YA "ANNIA" SHEN,                )
                               )
          Plaintiff,           )
                               )
     vs.                       )
                               )
AKOUSTIS TECHNOLOGIES, INC.,   )
                               )
          Defendant.           )
_____)


VIDEO DEPOSITION

OF

JEFFREY B. SHEALY


At Charlotte, North Carolina

Tuesday, November 8, 2022

REPORTER:  DAYNA H. LOWE
          Notary Public

     REED & ASSOCIATES
     2401 Whirlaway Court
     Matthews, NC 28105
        980.339.3575

---

Page 2

```
 1              A P P E A R I N G
 2
 3    On Behalf of the Plaintiff:
 4        Mr. Joshua R. Van Kampen
          VAN KAMPEN LAW, PC
 5        315 East Worthington Avenue
          Charlotte, North Carolina 28203
 6        (704) 247-3245
          josh@vankampenlaw.com
 7
 8    On Behalf of the Defendant:
 9        Mr. David I. Klass
          FISHER & PHILLIPS, LLP
10        227 West Trade Street, Suite 2020
          Charlotte, North Carolina 28202
11        (704) 334-4565
          dklass@fisherphillips.com
12
13    Video Specialist:
14        Ms. Jennifer Podis, Planet Depos
15
      In Attendance:
16
          Ms. Ya "Annia" Shen
17        Mr. Drew Wright
          Ms. Kathleen Crimi
18
19
20
21              * * * * *
22
23
24
25
```

---

Page 4

```
 1              C O N T E N T S
 2                              PAGE
 3    Examination by Mr. Van Kampen . . . . . . . . . .  6
 4    Examination by Mr. Klass . . . . . . . . . . . . . 276
 5    Further Examination by Mr. Van Kampen  . . . . . . 288
 6    Further Examination by Mr. Klass . . . . . . . . . 304
 7    Further Examination by Mr. Van Kampen  . . . . . . 304
 8
 9              PLAINTIFF'S EXHIBITS
10    Number  1 - 2017 Performance Evaluation, Shen . . .  83
11    Number  2 - 2018 Performance Evaluation, Shen . . . 154
12    Number  3 - Email(s) 7/12/19 with attachment  . . . 222
13    Number  4 - 2019 Performance Evaluation, Shen . . . 156
14    Number  5 - 2020 Performance Evaluation, Shen . . . 162
15    Number  7 - Email(s) 12/18/16 with attachment . . .  70
16    Number 14 - Email(s) 4/12/19  . . . . . . . . . . . 135
17    Number 15 - Email(s) 5/3/19 . . . . . . . . . . . . 130
18    Number 21 - Employee Information Change Form  . . . 150
19    Number 25 - Email(s) 4/30/20 and 10/28/19 . . . . . 153
20    Number 28 - Email(s) 5/28/20 and 5/26/20  . . . . . 191
21    Number 32 - Email(s) 7/11/20  . . . . . . . . . . . 200
22    Number 33 - Email(s) 8/10/20  . . . . . . . . . . . 203
23    Number 36 - Email(s) 8/13/20  . . . . . . . . . . . 213
24    Number 37 - Email(s) 8/14/20  . . . . . . . . . . . 218
25              (Continued on next page)
```

```
 1         PLAINTIFF'S EXHIBITS (Continued)
 2
 3    Number 39  - Email(s) 8/19/19 . . . . . . . . . . 120
 4    Number 72  - Shen resume . . . . . . . . . . . . .  75
 5    Number 73  - Gupta resume . . . . . . . . . . . . 110
 6    Number 110 - 2020 Performance Evaluation, Houlden . 246
 7    Number 111 - 2021 Performance Review, Houlden  . . 249
 8    Letter A  - Business Conduct Guidelines . . . . . . 103
 9
10              * * * * *
```

DEPOSITION
EXHIBIT
758
PENGAD 800-631-6989

```
23    Reporter's Note:  This transcript contains quoted
      material.  Such material is reproduced as read or quoted
24    by the speaker.
25
```

1  (Pages 1 to 4)

Page 5

1       PROCEEDINGS
2            THE VIDEOGRAPHER:  Here begins Media Number
3   One in the videotaped deposition of Jeffrey Shealy in
4   the matter of Shen versus Akoustis Technologies, Inc.,
5   in the United States District Court for the Western
6   District of North Carolina, Charlotte Division,
7   Case Number 3:22-cv-103-FDW-DCK.  Today's date is
8   November 8th, 2022.  The time on the video monitor is
9   9:42 a.m.
10           The videographer today is Jennifer Podis,
11  representing Planet Depos.  This video deposition is
12  taking place at Van Kampen Law, PC, 315 East Worthington
13  Avenue, Charlotte, North Carolina.
14           Would counsel please voice identify
15  themselves and state whom they represent.
16           MR. VAN KAMPEN:  Sure.  Joshua Van Kampen
17  for the plaintiff.
18           MR. KLASS:  David Klass for defendant.
19           THE VIDEOGRAPHER:  The court reporter today
20  is Dayna Lowe, representing Planet Depos [sic].  Would
21  the reporter please swear in the witness.
22
23           JEFFREY B. SHEALY, upon first being duly
24  sworn, testified as follows:
25

Page 6

1            EXAMINATION BY MR. VAN KAMPEN
2   Q.  All right.  So, Mr. Shealy, good morning.  And I
3       usually go just on a first-name basis in
4       depositions.  Is it okay if I call you by your
5       first name?
6   A.  That will be fine.
7   Q.  Okay.  So do you prefer Jeffrey or Jeff?
8   A.  Jeff would be fine.
9   Q.  Okay.  And you can call me Josh.
10  A.  Okay.  Thank you, Josh.
11  Q.  Nice to meet you.  So a couple little things just
12      preliminarily and we'll just kind of dive right in.
13      It's important to me that you're comfortable, so if
14      the room's too hot, it's too cold, you let me know.
15      You need anything, you let me know.  If you need a
16      break, you let me know and I'll be happy to --
17      happy to accommodate that.
18           As a lawyer I'm still a work in progress, so
19      usually I ask a pretty good question, sometimes I
20      may ask a confusing question, so if at any point I
21      ask you a question that you have some confusion
22      about, you just let me know and I'll try to
23      rephrase it to the point where you and I are on the
24      same page.
25  A.  Okay.

Page 7

1   Q.  The flip side of that equation is that if you do
2       understand a question, that the obligation is to
3       answer the question that is -- that is asked.
4   A.  Okay.
5   Q.  And, you know, sometimes I may be asking you a
6       yes-or-no question, and it is okay to provide an
7       explanation around a yes-or-no answer, but my
8       request of you will be if I ask you a yes-or-no
9       answer to answer it and then you can provide
10      whatever context you want to, but to start with
11      that yes or no will help speed things along.
12  A.  Okay.
13  Q.  Let's see.  Your lawyer may object.  Unless he
14      instructs you not to answer, the objection's just
15      for the record, so I'm going to concentrate just on
16      my question to you, and understand that unless
17      there's an instruction not to answer, you know, you
18      and I are just going to keep going as objections
19      are made.
20           Exhibits.  All right.  So I gave you a big
21      exhibit notebook there.
22           MR. VAN KAMPEN:  David, we've got exhibits
23      that Kathleen's going to hand out to you
24      as we go.
25  Q.  So you're free to, you know, review the exhibits

Page 8

1       that have been presented to you.  I ask that you
2       not review exhibits in the notebook that I haven't
3       officially --
4   A.  Okay.
5   Q.  -- presented to you.  And then the deposition
6       notebook will stay in the room, you know, as we --
7       as we take breaks.
8   A.  Okay.
9   Q.  And if we're on a -- if we're on an exhibit and it
10      seems like you may need a decent amount of time to
11      review it, I'll probably go off the record at that
12      point while you review it, but if it's a -- if it's
13      a deal where you can review a document and do so in
14      like a 30-second time frame, we'll just all keep
15      going here as you review, but if you feel like you
16      need more time to review a document, you let me
17      know and we'll shut this off and back on.
18  A.  Okay.
19  Q.  All right.  So that's pretty much it for my initial
20      spiel.  So have you ever had your deposition taken
21      before?
22  A.  No.  This would be the first one.
23  Q.  Ah.  Well, congratulations on making it this far
24      without being deposed.  So I'm not -- good news for
25      you is that I'm not a bang-on-the-table kind of

2  (Pages 5 to 8)



Page 9

1    lawyer, so, you know, I'll be treating you, you
2    know, with respect throughout the process.
3    Obviously, that's a two-way street --
4  A. Uh-huh.
5  Q. -- but my approach will be to be respectful to you
6    the whole time.
7  A. Okay.
8  Q. And ultimately, you know, I'm just trying to get
9    facts on the record, and there's not a whole lot
10   that we know right now because all we've done is
11   written discovery, so part of this is going to be
12   you educating me about even some things about the
13   technical side or the business side. You're the
14   first witness, so just be patient with me if I ask
15   you some questions that you think that I might -- I
16   might or should know about already. And that's
17   pretty much it.
18       Okay. So you've never been deposed before.
19   Have you ever --
20  A. First time for everything.
21  Q. Yeah. Okay.
22  A. Thank you.
23  Q. Have you been -- have you been a party to a lawsuit
24   before, any sort of civil lawsuit where you were
25   named individually?

Page 10

1  A. Civil lawsuit?
2  Q. Yeah.
3  A. Never to my knowledge.
4  Q. All right. And then you said no depositions, so
5    have you never -- have you never testified under
6    oath or in court?
7  A. I've been in court but it was as a role of a jury.
8  Q. Oh, okay. Gotcha. All right. And where do you
9    currently reside? Just -- I'm not going to send
10   you anything --
11  A. Yeah, sure.
12  Q. -- but we always ask this question.
13  A.
14  Q. Okay. And how long have you lived there?
15  A. 2020 I believe I purchased the home there, and I've
16   been renovating and rebuilding so --
17  Q. Okay. And I guess what is your current marital
18   status?
19  A.
20  Q. Okay. And I guess at this point are you living
21   alone in the house?
22  A. As I said, my home's under construction so kind of
23   in between phases of the home but --
24  Q. Okay.
25  A. So I travel a fair amount. I have another

Page 11

1    residence in South Carolina, down at the beach,
2    which I spend quite a bit of time.
3  Q. Okay. But on a typical basis when you're --
4  A. Typical basis I'm either at my house -- I keep
5    my --
6
7  Q. Okay. And where is their home?
8  A.               and if you want the address I'd
9    be happy to.
10  Q. I don't think --
11  A.               . It's a couple miles from my
12   current home.
13  Q. Yes, sir. Okay. So with your house right now
14   that's been remodeled, are you living in that house
15   on a day-to-day basis at this point in time?
16  A. No. It is under construction so --
17  Q. Okay. So, for example, you know, when you left
18   this morning, where did you -- what house did you
19   come from?
20  A. I came from the --               .
21  Q. Okay.
22  A.
23
24   .
25  Q. You and I are in the same boat. Okay. So do

Page 12

1    they --
2  A. That is correct. As I said,               .
3  Q. Yes, sir. Okay. So are you living
4               while the house is
5    being remodeled?
6  A. I'm living there as well as hotels as well as my
7    place at the beach.
8
9
10   so --
11  Q. I'm sure he did. However, if we were to look back
12   before -- when was               ?
13  A. Saturday.
14  Q. All right. So if we looked at in the last 30 days
15   when you were working in Cornelius when you weren't
16   traveling, were you living
17               ?
18  A. That's correct. That's correct. As well as on the
19   road, as well as in hotels.
20  Q. Yes, sir. But when you're in Cornelius you --
21  A. When I'm in Cornelius, yes.
22  Q.                               ,
23   correct?
24  A. Yeah, that's correct.
25  Q.                               ?

3 (Pages 9 to 12)



Page 13

1   A. ▮▮▮▮▮▮▮
2   Q. And I don't want to dwell on the situation ▮▮▮
▮▮▮▮▮
▮▮▮▮▮▮▮.
5   A. Okay.
6   Q. ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮
15  Q. All right. So thank you for that. Now I'm going
16     to be asking you some questions that may seem a
17     little strange to you, but they're questions that
18     I'm asking for your position on certain things as
19     the CEO of your own company.
20  A. Okay.
21  Q. All right. So -- and I'm going to try to quickly
22     move through these so we can get through the
23     substance of the deposition, but if you need some
24     explanation or something for these --
25  A. Of course.

Page 14

1   Q. -- that's not a quick yes or no, you just let me
2      know.
3   A. Okay.
4   Q. All right. So do you believe, all things being
5      equal, that men and women should be held to the
6      same performance and conduct standards in the
7      workplace?
8   A. All things being equal, yes.
9   Q. And do you believe that, all things being equal,
10     that executives should be held to the same
11     performance -- or same conduct standard as you
12     would expect an individual contributor in your
13     company to be held to?
14  A. I believe from bottom of the company to the top of
15     the company the standards should be -- should be
16     held accordingly.
17  Q. Okay. But when you say accordingly, do you mean --
18  A. Accordingly to the standards that the company --
19     the culture of the company.
20  Q. Okay. So, for example, you know, you've got
21     several policies that your lawyer produced --
22  A. Yes.
23  Q. -- including like there was a business conduct
24     policy, there was a handbook.
25  A. Those apply bottom to top, if that helps.

Page 15

1   Q. And they apply equally, is that right?
2   A. There's one policy for the company.
3   Q. All right. I just want a yes or no. Do those
4      apply equally with respect to executives as they do
5      individual contributors, yes or no?
6   A. Yes, they -- yes, they do.
7   Q. Now, as CEO should you or any manager consider an
8      employee's race, national origin, or gender in
9      making a personnel decision?
10  A. No.
11  Q. And do you believe that a company should take
12     reasonable steps to ensure that its managers are
13     not taking personnel actions against their
14     employees based on, you know, race, national
15     origin, or sex?
16  A. Please repeat the question --
17  Q. Sure.
18  A. -- just to make sure I'm answering.
19  Q. Yeah. Do you think, as a CEO, that your company
20     should take reasonable steps to ensure that a
21     personnel action, in other words, like a
22     termination or a demotion, does not involve any
23     sort of discriminatory motive?
24  A. Yes. And we hire -- and we have a human resources
25     department that is set up, as well as we have --

Page 16

1      part of our quality policy within the company is
2      continuous improvement to have policies that are
3      consistent with your statement.
4   Q. Yes, sir. Okay. And so with respect to -- you
5      mentioned that you have an HR department, you know,
6      that plays that function. Is your expectation that
7      your HR professional would essentially examine a
8      personnel action to make sure that there isn't any
9      sort of potential discrimination or double standard
10     or inconsistency that's applied?
11  A. Yes, I would.
12  Q. Do you believe that a manager in your company who
13     is evaluating an employee's performance and then
14     completing an evaluation summarizing that
15     performance, that they should rely on and list only
16     accurate information in an evaluation?
17  A. Accuracy is a good thing, so yes.
18  Q. Okay. I told you some of these you would be like
19     why are you asking me this, but, you know, I've
20     got --
21  A. There are many other factors as well, but yes.
22  Q. All right.
23  A. Accuracy's a good thing.
24  Q. Yeah. Well, not only is it a good thing, isn't
25     your expectation that -- let's just flip it a

4  (Pages 13 to 16)

Page 17

1 little bit more. Would it be inappropriate or
2 would you view it as a misconduct issue if a
3 manager intentionally listed inaccurate information
4 in an evaluation?
5 A. My expectation is those evaluation forms are
6 accurate to the best of the knowledge of the
7 manager that is supplying them --
8 Q. Yes, sir.
9 A. -- to the company.
10 Q. Yes, sir. Okay. And if a manager intentionally
11 inserted inaccurate information into an employee's
12 evaluation, emphasis on intentional, would you view
13 that as a potential disciplinary action for
14 falsifying a company documentation?
15 A. If it was brought to my attention or I knew it to
16 be inaccurate, yes, I would -- I would certainly
17 raise the issue.
18 Q. Yes, sir. Okay. Is it important for you, as the
19 CEO of the company, for the evaluation process to
20 be fair?
21 A. Yes.
22 Q. If an employee believes that an evaluation contains
23 inaccurate information, is it appropriate for
24 the -- for the employee to then, in the comment
25 section of their evaluation, to list areas of

Page 18

1 disagreement with the manager's comments?
2 A. The evaluation form that the company provides has
3 a -- has sections that allow that feedback. I
4 would also add that there are other escalation
5 paths if they disagree as well.
6 Q. Okay. But, you know, if you were giving advice,
7 for example, to an employee who has let you know
8 that they disagreed with a manager's depiction of
9 their performance in an evaluation, would your
10 advice to that employee be you should identify
11 those parts that you disagree with in the
12 evaluation?
13 A. My feedback would be -- to any employee would be
14 to -- generally speaking when you see a manager
15 section and an employee section that are heavily
16 populated, there's significant misalignment,
17 perhaps disagreement between the two, and I
18 would -- my first -- my first feedback would be
19 could the two of you please get together and go
20 through the differences that are in the performance
21 form.
22 Q. Is it appropriate for a manager in your company to,
23 in light of what you told me, discourage an
24 employee from making comments in an evaluation
25 that -- pointing out inaccuracies in the manager's

Page 19

1 depiction?
2 A. Please repeat the question, just --
3 Q. Sure. Is it appropriate for a manager to
4 discourage an employee from inserting comments or
5 pointing out inaccuracies in their evaluations?
6 A. Each manager may have a different format. I think
7 what my -- my view is, is that if there's
8 disagreement between the two, they should get
9 together and resolve it. So that can be through
10 writing -- writing up an employee section. I'm not
11 sure if I answered your question completely.
12 Q. Well, like I said, sometimes we'll just go -- keep
13 asking them until we're on the same page.
14 A. Okay.
15 Q. So you've told me that an employee -- to the extent
16 an employee disagrees with a manager's depiction of
17 their performance on an evaluation that it's
18 appropriate to use the comment section to point
19 that out, correct?
20 A. Yes. That's an option open to the review process.
21 Q. Right. Okay. And once the employee -- let's say
22 in that scenario the employee has let the manager
23 know that they intend to either submit a rebuttal
24 or to put comments in there pointing out
25 inaccuracies. Is it appropriate, in your mind, for

Page 20

1 the manager to try to intimidate or to threaten or
2 to discourage the employee from exercising their
3 rights to do that?
4 A. I would not support such action.
5 Q. All right. And I guess is it ever, in your mind,
6 Jeff, appropriate for a manager to try to
7 intimidate or bully an employee?
8 A. I think we have an anti-bullying policy as we would
9 in our kids' school. We would have one in the
10 workplace, and I think that would be -- I think if
11 you reviewed the policies of the company, that
12 would be consistent with that statement.
13 Q. At your company would it be appropriate for a
14 manager to retaliate against an employee because
15 they exercised their rights to submit a rebuttal to
16 an evaluation or to make comments pointing out
17 inaccuracies in a -- in an evaluation?
18 A. First, if I could clarify, it's not my company,
19 it's a public company --
20 Q. Good point.
21 A. -- that I'm the head of. But to answer your
22 question directly, it would -- retaliation is not
23 appropriate. If retaliation occurs, it's not
24 appropriate. I think in a review where there's
25 disagreement, the parties have to come together and

5 (Pages 17 to 20)

Page 21

1  resolve those disagreements.
2  Q. Uh-huh. Okay. So building off of that point,
3  Jeff.
4  A. Okay.
5  Q. So in the scenario where you've got the employee
6  who has conveyed in comments that there's a
7  disagreement in the evaluation, something's
8  inaccurate, what would your -- so if I'm
9  understanding you correctly, your expectation at
10  that point would be for the manager to sit down
11  with the employee regarding the misalignment was
12  the term that you used, to try to come to some sort
13  of reconciliation or understanding. Is that fair?
14  A. I think I would -- if I could take a step back.
15  Q. Sure.
16  A. I would say as a company that has business
17  objectives, to execute on those business
18  objectives, that is very challenging to do if
19  there's misalignment within the organization, so in
20  order to be able to move forward, those differences
21  would need to be resolved or addressed in some form
22  or fashion.
23  Q. Yes, sir. Is one of your expectations of your
24  human resources personnel that if there is that
25  sort of misalignment, for human resources to get

Page 22

1  involved and try to assist with that?
2  A. Our human resources is involved in our review
3  process. That is one of the primary functions that
4  they serve within the company, and they work with
5  each and every manager in the company in order to
6  review data. They're doing that behind the scenes,
7  as well as working with the manager in the review
8  process, and if there's -- if there's difficult
9  discussions, then human resources would be
10  involved --
11  Q. Okay.
12  A. -- in those sorts of scenario situations. Even if
13  they're -- but they're an active -- my view of
14  human resources, which I believe is representative
15  of our company, is that human resources is an
16  active partner with the management of the company
17  in implementing the review process.
18  Q. Yes, sir. Okay. Sticking with human resources,
19  now, let's say if an employee has accused a manager
20  of some sort of misconduct or unethical behavior,
21  is your expectation that your human resources
22  department would conduct a prompt and thorough
23  investigation?
24  A. I would expect the matter to be addressed. Not
25  every issue rises to the level of an investigation,

Page 23

1  but certainly where there's accusations, those
2  would not only include human resources but they
3  would go up to the general counsel of the company
4  if there are legal issues associated with those or
5  in those accusations.
6  Q. But all things being equal, where you have a
7  manager who's accused of some sort of misconduct,
8  do you want your human resources department to take
9  it seriously and to conduct a prompt and thorough
10  investigation?
11  A. Yes, and part of that process would be escalation
12  to -- if there's -- misconduct is a -- misconduct
13  is a serious word, and I think that would rise to a
14  review from human resources as well as general
15  counsel who's on staff in order to, you know,
16  advise any oversight of any issues that are there.
17  Q. Yes, sir. Is it important for you -- let's say HR
18  is doing an investigation -- for HR to document its
19  investigation?
20  A. It is important that that investigation occurs.
21  Different managers have different styles of
22  documentation, and I would expect on -- if they
23  deemed the matter, certainly in the terms that you
24  use, as misconduct or misappropriate behavior, then
25  I would expect some type of documentation for the

Page 24

1  record unless the -- unless the information that's
2  already -- unless the information's already
3  documented in a review for example.
4  Q. Okay.
5  A. So if it's redundant -- if it's redundant
6  information, they may not sit and write a memo, but
7  if it's documented in some form of the file, then I
8  don't necessarily think that documenting it twice
9  is necessary.
10  Q. As CEO, is your expectation that a manager will do
11  their best to put an employee in a position to be
12  successful in their role?
13  A. We certainly strive for that, for alignment against
14  the corporate objectives of the company.
15  Q. Yes, sir. And so, for example, with be it a BAW --
16  is that the way you pronounce it, BAW filter?
17  A. Filter?
18  Q. Yeah. BAW filter design engineers, are those
19  relatively hard to come by in the market as far as
20  hiring goes?
21  A. There are -- filter design engineers, particularly
22  in the acoustic wave area, are -- there are certain
23  places you would go to recruit those, so it would
24  be -- it would be a skill set that you'd have to be
25  hunting for, as you would in other aspects of RF,

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

Page 25

1    so it's a specific skill set.
2    Q.  Yes, sir. Okay. So where you have -- let's say
3        you have a skilled BAW filter design engineer. Is
4        your expectation that -- or strike that.
5            Would your preference be, if you've got a
6        BAW filter design engineer -- let's say that
7        they're having some performance issues, whatever
8        they are.
9    A.  Okay.
10   Q.  Would your preference be that if those performance
11       issues could be dealt with, for example, through
12       performance management or progressive discipline
13       successfully, would your preference be to retain
14       that employee?
15   A.  My response to your statement is any employee
16       within our company that we invest time, energy, and
17       resources into, we don't make those investments
18       without long-term intent on retaining and growing
19       the employee as well as -- and growing the employee
20       along with the company.
21   Q.  Right. Now, as CEO, should a manager who's a
22       manager of design engineers allocate resources
23       equally among managers -- their design engineers
24       underneath them? In other words, not to have
25       favorites or to allocate resources unequally?

Page 26

1    A.  We have various projects by various customers, and
2        you balance the resources. Particularly in a small
3        startup, you would balance the resources as best
4        you can. We generally don't have excessive
5        resources to throw at problems, and you're making
6        those sorts of judgment decisions as business
7        conditions warrant. As customer needs change, you
8        can flex resources as it makes sense.
9    Q.  Yes, sir. All right. And I understand some
10       projects are going to have priority over others,
11       but I'm just saying all things being equal, let's
12       just say you're dealing with an equal number of
13       projects or equal priority --
14   A.  Okay.
15   Q.  -- and you've got the design engineers underneath
16       working on those. Is your expectation that a
17       manager would allocate resources equally and fairly
18       among those various design engineers?
19   A.  I would -- I would expect the first objective of
20       the manager is what does the -- what meets the
21       objective of the project, and in terms of
22       resources, if you -- you would not -- you would not
23       allocate resources -- it depends on the bandwidth
24       of the individual.
25            There's a lot of factors that go into the

Page 27

1    skill set. If the person's a good project manager
2    versus a manager level versus an individual
3    contributor, you would take those sorts of factors
4    into consideration as you're allocating resources.
5    Q.  I'll ask it another way.
6    A.  Okay.
7    Q.  Should a manager have or provide preferential
8        treatment to design engineers in the allocation of
9        resources because they like one engineer more than
10       another engineer?
11   A.  No.
12   Q.  All right. Now the topic's termination. Okay?
13   A.  Okay.
14   Q.  If you -- I don't want this to happen to you, okay,
15       because getting terminated sucks, but if you
16       were -- a decision was made to terminate -- for you
17       to be terminated, as the individual to be
18       terminated would you want to be provided as much
19       notice as possible --
20            MR. KLASS: Object to the form.
21   Q.  -- yourself?
22            MR. KLASS: You can answer.
23   A.  Okay. Please repeat the question.
24   Q.  Sure. As someone who is -- a decision's been made
25       to be terminated, okay, would you -- would your

Page 28

1    preference be to be informed that you were going to
2    be terminated as soon as possible so, for example,
3    you could begin looking for another job or begin
4    planning?
5            MR. KLASS: Object to the form. You can
6        answer.
7    A.  Okay. Since you mentioned it, I have been
8        terminated before and with no notice, and it's a
9        unfortunate thing. It's a emotional thing. It
10       is -- it can -- it can be -- it can come to you as
11       a surprise.
12            So now to your question, would I have
13       wanted -- putting myself in the situation, would I
14       have wanted to be given notice to find a job? I
15       would have wanted my manager to give me feedback in
16       my review that gives me feedback on my performance,
17       and that usually is a format where you would -- you
18       would take feedback and take personal
19       responsibility on career decisions, and I certainly
20       for myself, in my own -- my own experience, you
21       know, sometimes that's not clear until later in
22       time that that could be the case.
23            But, yes, I mean, clearly I think
24       people generally like to plan and, where possible,
25       I think there are other factors that go into that,

7  (Pages 25 to 28)

Page 29

1    but you didn't -- that doesn't address your
2    question, but I think I addressed your question,
3    unless you'd like me -- unless you want to
4    readdress.
5    Q.  Well, you talk about -- you know, you mentioned the
6    term "feedback" in review --
7    A.  Yeah.
8    Q.  -- in answering that question, so would your
9    expectation be of your manager, for example, that
10   if an employee was in jeopardy of losing their job,
11   that the manager convey that fact to the employee?
12   A.  If we're talking ideally speaking --
13   Q.  Yes.
14   A.  -- yes.  If you're talking about real world
15   situation, certainly when -- I'll use myself as an
16   example because we're talking about experiences and
17   knowledge here.  That's not always the case.
18   Q.  Yeah, I understand that it's not always the case,
19   but would your preference be, as the CEO of the
20   company, for your manager if they have in their
21   mind decided that this employee is in jeopardy of
22   losing their job, for that manager to convey that
23   to the employee so, for example, the employee could
24   try to improve or so that the --
25   A.  I believe that's consistent with the review

Page 30

1    process, and that's why we write -- it's a written
2    process so the feedback can be given to the
3    employee as honest feedback to their performance
4    from the manager's perspective, and that can allow
5    the employee to take feedback and act accordingly.
6    Q.  Right.  So I think I understand what you've
7    explained, that in the evaluation process if an
8    employee's job is in jeopardy that that would be a
9    vehicle to communicate that message, but in
10   addition, let's say you're outside of the normal
11   evaluation process and the manager has figured out
12   that this employee is in serious jeopardy of losing
13   their job.  Would your expectation be for the
14   manager to let the employee know?
15   A.  That --
16              MR. KLASS:  Object to the form.  You can
17              answer.
18   A.  Okay.  I don't see -- I don't see a direct
19   communication.  Generally when you start a
20   communication about losing job, that can -- that
21   can turn focus from redirecting effort on the work,
22   and the person would then -- that can -- that can
23   certainly degrade things from there.
24              But my experience is you focus -- to your
25   question, my experience and my preference is that

Page 31

1    the employee and the manager, where there's
2    differences where -- that they get on the same page
3    and resolve those differences in order to move
4    forward because generally when you find there's
5    differences, there are -- where there's differences
6    there's misalignment, where there's misalignment
7    there's loss of efficiency, where there's loss of
8    efficiency there's -- we can go down the road.
9    There's impact ultimately on the business
10   objectives of the company.
11   Q.  Right.
12   A.  So my preference is that the manager take -- work
13   to be -- to get alignment with the employee and
14   that our review process is a written process and
15   that's what it's intended to do.
16   Q.  Right.  But even if we're outside the timeline of
17   the evaluation process and the manager has decided
18   at that point this employee is in serious jeopardy
19   of losing their job, and understanding there needs
20   to be some messaging like not to discourage the
21   employee but also to put the employee on notice,
22   would your expectation be for the manager to be
23   transparent about -- with the employee about I
24   guess the situation they're in in terms of their
25   continued employment?

Page 32

1              MR. KLASS:  Object to the form.
2    A.  Okay.  Ideally speaking, yes.  In practice that's
3    not been my experience with -- in my career, that
4    that occurs always.
5    Q.  Okay.  Yes, sir.
6    A.  But we would strive to have direct communication
7    and be honest with employees on feedback and also
8    have -- and have them correct course so a
9    termination action would not have to occur.
10   Q.  Yes, sir.  So what are the -- thank you for that.
11   What are the situations where in your mind it is
12   okay for an employer to not inform the employee
13   that they're going to be terminated over say
14   30 days or 60 days?
15   A.  So please repeat the question just to make sure
16   I'm --
17   Q.  When would it be appropriate in your mind for a
18   company to not inform an employee that the
19   decision's been made to terminate them for 30 days
20   or 60 days for example?  Are there any
21   circumstances where you think it's okay once a
22   decision's been made to terminate them --
23   A.  I think --
24   Q.  Let me just finish for the court reporter.
25   A.  I'm sorry.

8 (Pages 29 to 32)

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA   980.339.3575

Page 33

1    Q. Is there any circumstance in your mind where it's
2       okay for an employer to conceal for as many as 30
3       or 60 days that an employee's been -- a decision's
4       been made to terminate them but they're not --
5       they're not informed of that?
6            MR. KLASS: Object to the form.
7    A. I would -- I would expect communication from -- I
8       would expect communication from the beginning of
9       employment through the review process to
10      communicate such material issues that would lead to
11      that situation. Whether it's written or verbal, I
12      would expect that communication to occur at some --
13      at some stage. If the performance is not meeting
14      up to snuff, I think that's a major -- that would
15      be a major message that if you look at -- I think
16      that would be the most documented approach.
17           If the situation is such where the parties
18      can resolve their differences, for example, on a
19      review, then such thing such as a performance
20      improvement plan, if both parties are in agreement
21      and aligned, would actually take place and try
22      to -- if you call it a get-well plan for lack of a
23      better term, it's an alignment plan, it's -- those
24      would be -- those are tools that are in the tool
25      box.

Page 34

1            If there is fundamental misalignment, then
2       there's generally communication breakdown and that
3       can lead to -- you know, communication's a very
4       good thing.
5    Q. All right. Almost done with these. With -- so
6       you're in a technology company, and I understand
7       that creativity and fostering creativity and
8       thinking outside of the box would be something very
9       important for your technical folks to be able to
10      do. Is that accurate or fair?
11   A. May I --
12   Q. Yeah, sure.
13   A. Okay. I would -- I'm in a technology -- we're in a
14      technology company and we're in that business.
15      We're actually an engineering firm, and what our
16      role is, is to -- whether it is in the -- where
17      we're developing technology, I would consider that
18      research and development. Where we're developing
19      product, I would consider that engineering.
20           Engineering is a discipline that creativity
21      is -- creativity -- the earlier you are in a
22      company, creativity where you, for example, lack
23      information you have to be creative in order to --
24      in order to solve a problem. As a company, if
25      you're in a design engineering environment,

Page 35

1       discipline, engineering disciplines, we all who
2       have engineering degrees go to school for
3       discipline, to solve problems in a disciplined
4       fashion for example.
5    Q. Okay.
6    A. So it's not abstract. What we do is not abstract.
7       It's not art. It is engineering discipline. And
8       so I apologize I went that direction with it, but
9       it seemed a little bit different than you
10      described.
11   Q. Sure. Yeah, that's fine. I guess what I'm trying
12      to get a sense for is where you have an employee
13      who believes that -- say there's some proposal
14      that's been made, okay, in connection with -- and
15      we can put it at whatever phase you want to, and
16      they believe that the proposal is not in the best
17      interest of the company, there's going to be a
18      problem with it, you know, later in production or
19      in the marketplace or that sort of thing. Do you
20      want that employee to feel safe to voice
21      disagreements, especially where they're motivated
22      by what's best for the company?
23   A. So the -- we have a culture in the company which is
24      open, which is we want the best idea in the room,
25      but there are constraints to that. There are

Page 36

1       manufacturing constraints and those -- I don't
2       expect any one employee to necessarily -- if you're
3       talking about engineering, or I can flip it and say
4       I don't expect an employee that's an engineer
5       working in the factory to understand the full
6       playing field of what is required in design
7       engineering. They're different disciplines, and so
8       unless you have access to all information, that's
9       why we have -- we have teams of people, teams of
10      engineers that have to collaborate, they have to --
11      they have to get along, and they have to work
12      together to come up with the best solution.
13           So there are no -- there are no -- in very
14      complex engineering problems, which I think would
15      characterize our business, there are not single
16      heroes that can make unilateral decisions across
17      the entire organization to sign different
18      organizations up for what they may or may not
19      believe could be best for the company. I would
20      think that would be -- that would be inconsistent
21      with the culture of the company.
22   Q. And I'm not saying that a particular engineer
23      refuses to cooperate with some decision that's been
24      made. I'm just saying where we're at the idea
25      phase of charting a course forward, we're not in

9 (Pages 33 to 36)

Page 37

1    production yet in the factory or anything like
2    that, do you want a free flow of information and
3    perspectives among, for example, design engineers?
4    A. Where --
5        MR. KLASS: Object to the form.
6    A. Where relevant, yes, and I would say if we have
7    procedures in place or we have -- we have norms or
8    procedures in how things are done, those may or --
9    those can be relevant or irrelevant, but in terms
10   of expressing, I would never tell anyone not to
11   express themself.
12   Q. Yes, sir. Okay.
13   A. Okay.
14   Q. What concerns -- new hypothetical. Okay? What
15   concerns would you have with a candidate who you
16   determined had been dishonest on a job application?
17   What concerns would you have about hiring somebody
18   who would be dishonest in a job application or
19   resume?
20       MR. KLASS: Object to the form.
21   A. If it was pointed to my attention during the -- if
22   I'm -- if I'm part of the interviewing team and it
23   was pointed to my attention, then that would have
24   been something that would have come out in a
25   roundtable, and I think it would be a consideration

Page 38

1    for employing the person.
2        The question is how material. There's a lot
3    of details. How material, how relevant, is it
4    relevant to what we're asking, so there are
5    different factors that would -- if they -- for
6    example, if they said they had a bachelor's in
7    engineering and they never went to school, I would
8    call that disqualifying. If they -- so that's an
9    example of a misrepresentation that would -- there
10   are certain disqualifiers, and I think those
11   disqualifiers would pop up and they would exit
12   rather quickly.
13   Q. Thank you. So thank you for explaining the
14   materiality consideration, which I understand now.
15   So is it important for you in hiring a design
16   engineer what their track record is in terms of
17   patents?
18   A. No.
19   Q. And why do you -- why do you say that?
20   A. Because we're not hiring someone to write patents.
21   We're hiring people to design RF circuits using
22   best engineering methods and skill sets that
23   they've been trained either before coming to work
24   for us or if we train them, but patents -- writing
25   patents or -- you mentioned patents so --

Page 39

1    Q. Well, do you write -- when you have a design
2    engineer who comes up with a new design, don't you
3    patent it?
4    A. Not always.
5    Q. Well, when do you patent -- when do you decide to
6    patent a design? For example, if you've got an
7    engineer who made a design like Annia did with
8    1256, you patented 1256, didn't you?
9    A. I would -- I'd like to look at a list to properly
10   comment, make sure I characterize. We took what
11   we -- what we -- a strategy of the company was to
12   patent the bands that are irrelevant of the
13   designs, so a design engineer might contribute
14   simulations to a concept, but the concept
15   supersedes the design, so I think that I would -- I
16   wouldn't define --
17   Q. Well, it's okay, but your attorney has provided me
18   a long, long list of patents that the company has
19   obtained. Your company does --
20   A. Yes.
21   Q. -- when it -- strike. Let me just finish.
22       So when the company does develop a new
23   design, for example, and it is going to be
24   competitive in the marketplace, you want to protect
25   your intellectual property, correct?

Page 40

1    A. That is correct.
2    Q. And you want engineers to come up with new
3    technology that will distinguish your product in
4    the marketplace, correct?
5    A. That's a fair statement.
6    Q. All right. So, then, let's circle back to this
7    notion about patents. Where you have a design
8    engineer who has a track record of, you know, being
9    part of developing patented technology, especially
10   in this space, BAW filters, are you really telling
11   me that that's not an important consideration?
12   A. I'm telling you it's not an important
13   consideration, and I'll tell you why.
14   Q. Okay.
15   A.

10 (Pages 37 to 40)

Page 41

4    Since you mentioned the list of patents, I
5  would also point -- there are a lot of -- if you
6  look at some of the authors of the patents, those
7  authors are marketing people, so that transcends
8  design engineering because there's different
9  strategies if you're developing patents of what
10  you're actually patenting, so it's a consideration
11  but I would far prefer an engineer coming into the
12  company who can design product, first-time-pass
13  success very efficiently as opposed to someone who
14  can come in and write patents.  We used to --
15  Q.  Let me just interrupt you because I think we're
16  going off on a tangent at this point.  I'm not
17  asking you -- obviously there are people that write
18  patents, design patents.  I'm not talking about
19  that.
20  A.  Okay.
21  Q.  I'm talking about a design engineer.  Don't you
22  want a design engineer to come up with a new
23  process or a new technology, a new method that
24  would be competitive in the marketplace and that
25  you then would want to protect with a patent?

Page 42

1  Don't you want that?
2    MR. KLASS:  Object to the form.  You can
3    answer.
4  A.

11    And so we're not always -- most of the --
12  most of the patents that -- if you went through our
13  list of patents, what you would find is most of our
14  patents are surrounding our core technology, which
15  is not circuits, and so if you look at -- if you
16  look at where we've moved into somewhat the circuit
17  range is more on some of the marketing areas in
18  terms of -- reflects our strategy around the
19  patents for those end markets, and those are not
20  necessarily designs.
21  Q.  Uh-huh.  Do you -- we can come back to the patent
22  thing later when I show you stuff.
23  A.  Okay, sure.
24  Q.  But in terms of -- because I've got to tell you.
25  So I've read a few resumes.  I've given job

Page 43

1  interviews.  I never exaggerated my qualifications.
2  A.  Okay.
3  Q.  Do you -- would you want to hire someone who, in
4  developing their resume, makes a conscious decision
5  to exaggerate their qualifications or to inflate
6  their qualifications, yes or no?
7    MR. KLASS:  Object to the form.
8  A.  If I knew that information to be false then, no, I
9  would not.
10  Q.  And I could show you some policies.  Isn't it
11  important for you that you want to hire people of
12  high integrity?
13  A.  Yes.
14  Q.  All right.  And you want to hire people who are
15  going to be honest with you once they're at work
16  about things they're working on or not working on,
17  successful or not successful, correct?
18  A.  We all strive for honesty, yes.
19  Q.  Wouldn't you -- wouldn't you have concerns that if
20  you have an employee who is dishonest on a resume
21  that that employee would also be dishonest once
22  they get a job?
23    MR. KLASS:  Object to the form.
24  A.  My expectation is -- I've seen a lot of -- I've
25  seen a lot of resumes, and people oftentimes --

Page 44

1  I've seen -- I've seen different versions of
2  resumes where people will tailor a resume for a
3  particular job function, so there's a lot of
4  creative license that goes into resumes.
5    As I indicated before, I would -- if it was
6  material, if it was -- and if it proved to be a
7  factor in our original decision in hiring, like
8  they had a bachelor's degree and they didn't have
9  one, that would certainly -- it's going to be --
10  it's going to be a function of relevance for sure.
11  Q.  I'm just asking --
12  A.  I can't --
13  Q.  Let me just -- I want to move on.
14  A.  Okay.
15  Q.  If you have an employee who has made a conscious
16  decision to falsify their resume, to mislead you on
17  their resume, okay, wouldn't you have concerns that
18  once they were hired that they might mislead you in
19  the performance of their work functions, yes or no?
20    MR. KLASS:  Object to the form.
21  A.  As you stated the question, the final part of the
22  question, please repeat.  Sorry.  I caught the
23  first part of it.
24  Q.  Wouldn't you have -- wouldn't you have concerns
25  that if they had made a conscious decision to be

Page 45

1    dishonest on their resume and mislead you --
2    A.   Anyone -- anyone who makes a conscious decision to
3         mislead or lie, that would be concerning, period.
4         What goes into -- as that applies to a resume, my
5         assumption is the company, where it has concerns --
6         for example, I keep going back to a degree.
7    Q.   I don't want to interrupt you but --
8    A.   Okay. Go ahead.
9    Q.   -- at that point you answered it --
10   A.   Okay. No worries.
11   Q.   -- and you've provided a lot of context at this
12        point.
13   A.   Thank you.
14   Q.   I didn't mean to -- I don't want to keep you all
15        here -- have you here all day.
16   A.   Okay.
17   Q.   So do you believe -- new topic. Okay? Do you
18        believe that a company should be honest and
19        accurate in its submissions to the U.S. Patent
20        Office?
21   A.   Yes.
22   Q.   And are you familiar with the fact that if a
23        company is dishonest in a submission to the
24        U.S. Patent Office that that can actually have
25        criminal implications?

Page 46

1              MR. KLASS: Object to the form.
2    A.   Yes, as well -- as well as invalidation of the
3         patent that you're paying for. Yes.
4    Q.   Yes, sir. Okay.
5    A.   Okay.
6    Q.   And is it important to you as CEO for patent
7         applications, regardless of whether it's criminal
8         or not or a patent could be rejected --
9    A.   Sure.
10   Q.   -- that they be accurate, the information in the
11        patents be accurate?
12   A.   Absolutely. And we -- and as -- we would -- all
13        the inventors would contribute to make sure -- and
14        review it to make sure there's accuracy.
15   Q.   Yes, sir. And would it ever be appropriate in your
16        mind to reward an employee by giving them
17        attribution as an inventor on a patent that they
18        didn't work on?
19             MR. KLASS: Object to the form.
20   Q.   Or that they didn't substantially contribute to?
21   A.   Where -- where -- please ask your question. I'll
22        try to stick to your question.
23   Q.   Is it -- you mentioned inventors.
24   A.   Yes.
25   Q.   Is it ever appropriate for someone to be identified

Page 47

1         and given attribution as an inventor --
2    A.   Yep.
3    Q.   -- of whatever this patented process is or what
4         have you, for that person to be listed as an
5         inventor in order to reward them?
6    A.   That would not be appropriate. I think some -- one
7         additional detail is where we may have parallel
8         ideas that are -- you know, in engineering we
9         strive to consolidate our ideas, and certainly in a
10        patent where you're trying to consolidate ideas in
11        a patent, then you may consolidate inventors in the
12        patent by getting all the ideas in the patent, then
13        everybody's contributing, and then it saves cost on
14        the company in the filing process. These patents
15        are expensive.
16             If you're going to choose to -- if you're
17        going to choose to file a patent, particularly in
18        the design area, many of those are often very hard
19        to enforce, and so you try to consolidate a lot of
20        those ideas into a patent.
21   Q.   I'm not asking about the consolidation. I'm just
22        asking is it ever -- I'm trying to make it simple
23        for you. Is it ever appropriate for a company who
24        wants to reward an employee, maybe for joining the
25        company in the first place or to retain the

Page 48

1         employee, is it ever appropriate for the company to
2         then list the employee as an inventor on a patent
3         application that they did not -- that they did not
4         work on or develop themselves?
5              MR. KLASS: Object to the form.
6    Q.   In general.
7    A.   It is not -- it is not appropriate to arbitrarily
8         add authors to a patent.
9    Q.   Uh-huh. And in your viewpoint, is it also
10        important to -- because if you've got -- let's say
11        you've got an engineer in this hypothetical who
12        actually -- I'm trying to make it easy for you
13        again -- who actually did 95 percent of the
14        development of this technology or design that's
15        being patented, and you've got somebody who really
16        was only tangentially involved at best and didn't
17        really contribute to it. In your mind, would it be
18        appropriate to, nevertheless, still include this
19        person who was tangentially involved in a patent
20        application?
21             MR. KLASS: Object to the form.
22   A.   If you've written -- if you've written patents
23        previously, there's a lot that goes into the
24        writing of patents. There can be what the
25        motivation is, what the market is. There's a lot

12  (Pages 45 to 48)

Page 49

1    of different aspects that go into making a solid
2    patent, so you're going to contribute many
3    contributions in some instances.  In some instances
4    the contributions are not always equal, but if they
5    contribute to it, it's not uncommon for them to be
6    listed on the patent if they contributed to the
7    patent.
8    Q.  Now, you mentioned you were on a jury.  If you are
9    sitting on a jury and in the case it was proven
10   that a company had discriminated against the
11   plaintiff and you saw the evidence and you
12   determined, yes, company, you discriminated against
13   this person, as a juror would you want to -- do you
14   think it's appropriate for the employee to be
15   compensated, for example, for their lost wages as a
16   result of the termination?
17        MR. KLASS:  Object to the form.
18   A.  As a jury, I would take instruction from the judge,
19   go back in the juror room and answer the question
20   the judge provided.
21   Q.  Well, I --
22   A.  You asked about being on a jury.  That's been my
23   experience so --
24   Q.  Yes, sir.  And if the jury -- if the instruction
25   is, once discrimination is proven, that the jury's

Page 50

1    instructed to then address the damages that a
2    plaintiff has suffered, for example, in lost wages,
3    I'm asking you personally, do you think it's
4    appropriate for a company to pay lost wages to an
5    employee against whom it has discriminated?
6         MR. KLASS:  Object to the form.
7    A.  I would listen to the judge.
8    Q.  I'm not asking you about the judge.  I'm asking
9    whether or not you think it's appropriate where a
10   company has been proven to have discriminated
11   against an employee, for that company to pay the
12   employee for their lost wages.
13   A.  I don't work in --
14        MR. KLASS:  Object to the form.
15   A.  I don't work in -- you asked me through the eyes of
16   a juror.  I very -- I remember the charge the judge
17   gave us is follow the instructions that the judge
18   gave us to go back in the jury room.  You're asking
19   me about the jury.
20   Q.  Let me -- let's just remove the jury room.  Okay?
21   I'm asking you.  You're a CEO.  You're sitting
22   there in the chair today.
23   A.  Okay.
24   Q.  Do you think it's appropriate if an employee -- if
25   a company has been proven to have discriminated

Page 51

1    against an employee, for that company to compensate
2    that employee for lost wages that it caused, yes or
3    no?
4         MR. KLASS:  Object to the form.
5    A.  I -- I do not support discrimination, and there
6    are -- there are remedies and I certainly support
7    someone pursuing those remedies.
8    Q.  Okay.  Now, having been terminated yourself --
9    A.  Yeah.
10   Q.  -- do you understand that losing a job, especially
11   losing a job abruptly where you're really surprised
12   by it, how that can kind of emotionally traumatize
13   an employee?
14        MR. KLASS:  Object to the form.
15   Q.  Or a person?
16   A.  It is an emotional event in life, yes.
17   Q.  All right.  Do you believe that employers should
18   pay employees that perform essentially the same
19   work equally, whether they're a woman or a man?
20        MR. KLASS:  Object to the form.
21   A.  Yes, and we strive to through human resources
22   oversight of our practices.  Certainly in our
23   company there are many factors to that
24   compensation, but that's to be reviewed by human
25   resources and through -- through -- I think I

Page 52

1    answered it.
2    Q.  Okay.
3    A.  Through human resources, through your experts in
4    human resources who tend to such matters --
5    Q.  Yes, sir.  So is your --
6    A.  -- and practices.
7    Q.  Is your expectation of your experts in human
8    resources for that to be something that they are
9    examining or keeping an eye out for, that people
10   are paid equally for equal work regardless of sex
11   or --
12   A.  So --
13   Q.  -- sex or race for example?
14   A.  So, yes, and through an annual review process,
15   which is written, that forces -- that forces a
16   review of data by human resources to ensure that
17   we're treating all employees the same.
18   Q.  Yes, sir.  Okay.
19   A.  And that we don't have any unfair practices in the
20   company.
21   Q.  Yes, sir.  All right.  Now, a new topic.
22        MR. KLASS:  If it's a new topic, do you mind
23        taking a five-minute break?
24        MR. VAN KAMPEN:  Sure.  Yeah, we can do
25        that.

13  (Pages 49 to 52)

Page 53

1    MR. KLASS: Thank you.
2    THE VIDEOGRAPHER: Stand by. We are going
3        off the record. The time is 10:44 a.m.
4    (Recess from 10:44 a.m. to 10:58 a.m.)
5    THE VIDEOGRAPHER: We are back on the
6        record. The time is 10:58 a.m.
7  Q. All right. So did you meet with your lawyers
8     during the break?
9  A. Yes.
10 Q. All right. And I'm not allowed to ask you anything
11    that you discussed with your lawyer, but based on
12    that meeting is there anything that you now need to
13    change in your testimony?
14 A. No.
15 Q. All right. So the next topic has to do with your
16    search for documents and information that might be
17    relevant to the case which is -- they call it the
18    discovery phase of the case. So have you been
19    asked to provide your cell phone to be searched for
20    like text messages or any content on your phone?
21 A. I have not --
22    MR. KLASS: I'm going to object on the basis
23        of attorney-client privilege and attorney
24        work product and instruct the witness not
25        to answer.

Page 54

1    MR. VAN KAMPEN: Well, that's not -- I think
2        you should know, David, that me merely
3        asking him what he did to search for
4        responsive information, it has nothing to
5        do with a communication, I'm asking him
6        what activity did he do, so I'm just
7        going to tell you if you're going to
8        instruct him not to answer at large about
9        what we did in the discovery process,
10       we're going to be back here for another
11       day, so let me -- just listen to my
12       questions more clearly. That was not an
13       objectionable question.
14   MR. KLASS: I disagree. Any actions that
15       Dr. Shealy took or did not take would
16       have been at counsel's instruction so --
17   MR. VAN KAMPEN: So you don't want me to
18       know whether or not he searched for -- he
19       searched his cell phone for responsive
20       information?
21   MR. KLASS: I think that's all covered under
22       attorney-client privilege and attorney-
23       client work -- or attorney work product.
24   MR. VAN KAMPEN: We're going to be back here
25       because of that.

Page 55

1  Q. All right. So I'm going to ask these questions for
2     the record. I'm sorry that we're having to go
3     through this rigamarole.
4        Have you searched your cell phone for any
5     documents or information that might be pertaining
6     to this case?
7        MR. KLASS: I object based on attorney-
8            client privilege and attorney work
9            product and instruct the witness not to
10           answer.
11 Q. Do you still -- have you been asked to search your
12    email, either your personal email or your work
13    email or your -- strike that.
14       Have you searched your work email for
15    information or documents that might be relevant to
16    this case?
17       MR. KLASS: I object based on attorney-
18           client privilege and attorney work
19           product and instruct the witness not to
20           answer.
21       MR. VAN KAMPEN: Why don't you just -- you
22           want to make a standing objection once?
23       MR. KLASS: I can make a standing objection
24           based on attorney work product and
25           attorney-client privilege to any

Page 56

1        activities he took to search for or
2        locate information or documents pursuant
3        to discovery requests by plaintiff in
4        this case.
5  Q. Have you been asked to search any -- well, strike
6     that.
7        In terms of apps that you use, Jeff, to text
8     with, do you use or have you used in the 2017,
9     2018, 2019, 2020 time frame WhatsApp as a texting
10    platform?
11 A. Yes, I use WhatsApp.
12 Q. And what about Snapchat? In that time frame have
13    you ever used Snapchat?
14 A. No. No.
15 Q. What about Facebook Messenger? Have you used --
16 A. I -- please continue.
17 Q. Have you used Facebook Messenger in that time
18    frame?
19 A. I am not on Facebook, so no.
20 Q. What about Instagram? Have you used the Instagram
21    text messaging function in that time frame?
22 A. Please repeat the time frame just for clarity.
23 Q. Sure. The time frame is 2017 through 2020.
24 A. No.
25 Q. Have you used any other texting platform other than

14  (Pages 53 to 56)

Page 57

1    your phone to send text messages in that time
2    frame?
3  A. I think we've -- phone plus WhatsApp.
4  Q. Yes, sir.
5  A. So --
6  Q. All right. And have you -- have you searched your
7    WhatsApp for any text messages that might be --
8    contain information or that might be relevant to
9    the case?
10       MR. KLASS: Same objection. I instruct the
11       witness not to answer that.
12       MR. VAN KAMPEN: I'll just ask you on the
13       record. Has the company or a vendor
14       searched Mr. Shealy's phone or his
15       WhatsApp for responsive information in
16       this case?
17       MR. KLASS: I'm not -- I'm not the deponent,
18       so that's not a proper question here.
19       MR. VAN KAMPEN: Well, so you're refusing to
20       answer the question?
21       MR. KLASS: I am not the deponent.
22       MR. VAN KAMPEN: All right. Just stating
23       for the record, you're refusing to even
24       tell me lawyer-to-lawyer if these
25       platforms have been searched?

Page 58

1        MR. KLASS: We have agreed upon a search
2        protocol previously and we've talked
3        about it previously through emails and
4        other communications.
5        MR. VAN KAMPEN: Well, if you did
6        communicate a protocol, then you should
7        be able to tell me now, David, whether or
8        not that has been searched or it's not
9        searched, but you're refusing to. I'll
10       move on.
11  Q. What about -- so say, for example, you've got -- I
12    know you juggle a lot as a CEO. I'm sure you get a
13    lot of things thrown at you. Do you have any I
14    guess process for taking notes on a daily basis?
15    So, for example, some people have a planner, so as
16    things happen during the day they're making notes
17    about this or that to keep things straight. Do you
18    do any sort of documentation like that?
19  A. Yes, I use a -- I don't know the proper term for it
20    but a mini notebook.
21  Q. Okay. And are those mini notebooks -- I guess have
22    you been using those sort of mini notebooks or that
23    method since 2017 to the present?
24  A. Yes.
25  Q. Okay. And have you maintained, I guess, copies of

Page 59

1    those notebooks, I guess, to have a historical
2    record as CEO of the company? Yeah?
3  A. Yes.
4  Q. All right. And do you continue to use that method
5    of those notebooks on a daily basis today?
6  A. Yes.
7  Q. All right. Have you been -- have you searched
8    those daily notebooks for any information or
9    documents that might be relevant to this case?
10       MR. KLASS: Same objection. I instruct the
11       witness not to answer.
12       MR. VAN KAMPEN: I'm asking you on the
13       record. Has the company or have you or
14       the vendor searched those notebooks for
15       information or documents that might be
16       relevant to this case?
17       MR. KLASS: I've already made my position
18       clear on this. You can continue to ask
19       the witness questions.
20       MR. VAN KAMPEN: So you're refusing to
21       answer.
22  Q. Jeff, at any point have you ever, yourself, taken
23    any steps to make sure that no documents have been
24    or information has been deleted or destroyed that
25    might be relevant to this case?

Page 60

1        MR. KLASS: I'm going to object based on
2        attorney-client privilege and attorney
3        work product and instruct the witness not
4        to answer.
5        MR. VAN KAMPEN: And are you refusing to
6        provide me information relating to what
7        steps Mr. Shealy or others at the company
8        took to preserve documents that might be
9        relevant to this case?
10       MR. KLASS: I think we had previously
11       communicated on this topic, and it was
12       relayed that shortly after a demand was
13       issued to the company, that the company
14       took steps to preserve relevant
15       documents.
16       MR. VAN KAMPEN: And you've refused to tell
17       me what steps, correct?
18       MR. KLASS: I can't remember what I've told
19       you in the past.
20       MR. VAN KAMPEN: Was a lit hold letter sent
21       out and when was it sent out?
22       MR. KLASS: I'm not the deponent. You can
23       ask the witness questions.
24       MR. VAN KAMPEN: Well, I'm just asking you
25       lawyer-to-lawyer for that.

15  (Pages 57 to 60)

Page 61

1    Q.  Okay. Getting back to -- what about -- because I
2        do this. I don't have nearly as big a company as
3        you do, but let's say there's an employee that
4        you're having some performance or personnel issues
5        with, and let's say it's become kind of an ongoing
6        thing. Have you, I guess, in terms -- for purposes
7        of your own documentation, for example, created a
8        folder relating to a particular employee that
9        you're having issues with? So, for example, like
10       an email folder where things are happening and
11       you're not happy or you're consolidating, you know,
12       emails in a particular folder relating to an
13       employee?
14   A.  So the proper -- the proper documentation would be
15       through human resources, so if I was a manager
16       dealing with a management issue, that's how I would
17       address it.
18   Q.  Yes, sir.
19   A.  So in terms of -- to me that's the -- that's the
20       file, so whether there's -- whether there would be
21       emails into human resources or, for example, a
22       signed -- a signed annual performance review, that
23       would go into the file, but that's the reservoir.
24   Q.  Yes, sir. Would your expectation of a manager be
25       that if they are creating documentation regarding

Page 62

1        their performance management of an employee, that
2        they provide that into the human resources file?
3    A.  I would say that's -- that would be -- how one
4        organizes is their preference. They could create a
5        folder, they could submit to human resources.
6        There's different methods of organizing and
7        document preservation or event preservation if they
8        were documenting events --
9    Q.  Well --
10   A.  -- if there was a performance issue.
11   Q.  I'm sorry to interrupt. But as CEO, I'm asking you
12       is your expectation, if you have a manager who is
13       performance managing an employee, a problem
14       employee, and they are creating notes about that
15       employee's performance issues or conduct, that
16       those notes be sent to human resources. Should
17       that -- should that be done?
18   A.  Not necessarily.
19           MR. KLASS: Object to the form.
20   A.  I need to slow down. Not necessarily, provided
21       there's documentation, documents are preserved.
22       Timing, that sort of thing, is not -- I gave you my
23       preference as I would organize, but each manager
24       may organize differently, but if we're documenting,
25       we're documenting.

Page 63

1    Q.  Okay.
2    A.  As a manager, I would -- certainly first and
3        paramount importance is document if there's issues.
4        I think the review process is a -- is a vehicle for
5        that. We're all busy, we're all managing different
6        people, different projects, and so provided there's
7        documentation in some form as needed, certainly on
8        material events. Not every conversation is going
9        to be documented. Those are verbal conversations,
10       and I think as managers we give verbal feedback on
11       a daily basis so --
12   Q.  If you were -- for you as CEO, if you're dealing
13       with a decision about whether or not to terminate
14       one of your executives, for example, or to demote
15       them, was your practice to take notes regarding
16       those sorts of personnel issues?
17           MR. KLASS: Object to the form.
18   A.  I would -- I certainly would take notes in my own
19       organizational way in terms of if I saw -- if I'm
20       in a meeting and I saw something that was alarming
21       or concerning, I would certainly jot it down in a
22       notebook, in my own notebook. In terms of
23       providing feedback, I have -- I don't think there's
24       enough hours in the day to document every
25       conversation, every piece of feedback, but I think

Page 64

1        part of -- part of managers is through that -- is
2        that feedback process, whether verbal or written.
3    Q.  Uh-huh. So later, at the end of the day, I've been
4        provided some evaluations for Mr. Houlden. Did
5        you -- for your performance management of
6        Mr. Houlden, did you have a -- I understand you
7        said your normal practice was send documentation to
8        human resources, but for him in particular did you
9        have a separate file that you kept relating to him?
10   A.  No, nothing -- nothing especially separate for
11       Mr. Houlden. That would be inconsistent with what
12       I would do for any manager.
13   Q.  Okay.
14   A.  And if I didn't answer your question, please follow
15       up.
16   Q.  All right. So what you're telling me is, if I
17       understand you correctly, you did not -- you did
18       not keep in a location, a particular location,
19       either an electronic location or a hard file
20       location, documents relating to Mr. Houlden or
21       issues with Mr. Houlden?
22   A.  I -- not that I can recall at this time. What --
23       if -- may I just --
24   Q.  Yeah, of course.
25   A.  Okay. If I solicit -- if I'm soliciting

16 (Pages 61 to 64)

Page 65

1    information, it may be in an email record, it could
2    be in an email record, which I would then reference
3    in a review, for example, if it was -- if it was --
4    you know, if it was relevant to a review, but in
5    terms of a specific folder or file cabinet or
6    something like that, no. And it certainly wasn't
7    any -- he's no different than any of the other
8    managers that report to me during that period of
9    time.
10   Q.  Yes, sir. Okay. Let's move on to Annia's hiring.
11       Were you involved in the decision to hire Annia
12       Shen?
13   A.  I was not the hiring manager. As I recall,
14       Mr. Houlden had a nonsolicitation agreement that
15       was part of his -- that was part of a relevant
16       agreement with his former employer, and Ms. Shen
17       was employed with that firm so I was asked to
18       assist, which I did so voluntarily.
19   Q.  Uh-huh. But you acknowledge that it was you who
20       was emailing Ms. Shen directly regarding
21       compensation terms and things like that, correct?
22   A.  Yes, and I -- I'll go back to my previous
23       statement, why I was involved, and that was in the
24       process. But, yes, I certainly emailed Ms. Shen
25       to -- I believe prior to our face-to-face meeting

Page 66

1    and also thereafter.
2    Q.  All right. And you interviewed Ms. Shen, correct?
3    A.  Yes, I did. I did. As I recall, I interviewed her
4        at a restaurant in Florida.
5    Q.  And did you fly in to Florida for that interview?
6    A.  Yes, I did.
7    Q.  All right. And was the recruitment of Ms. Shen I
8        guess a priority for you by virtue -- and for the
9        company by virtue of the fact the CEO flew in?
10   A.  We were -- we were assembling -- we had moved from
11       developing a core technology to adding product on
12       the back end of it, and so a strategic focus for
13       the company was to build out an engineering
14       department.
15   Q.  All right. And why did you need -- at that point,
16       Jeff, why did you need an engineering department?
17   A.  To design product, to -- to develop product for a
18       design and manufacturing business, which is what we
19       run.
20   Q.  All right. Who was your first filter engineer that
21       you hired?
22       MR. KLASS: Object to the form.
23   A.  The -- I'd have to look at org charts so I --
24       Ms. Shen was certainly at the -- near the top at
25       least in the design. If I said, you know, number

Page 67

1    of -- which designers that we hired, I just
2    don't -- I don't have the information in front of
3    me to -- you know, you asked me a specific, who was
4    first on there.
5        Ms. Shen was certainly near the top of the
6    list but we had hired other -- other engineers
7    that -- some had had -- that were working in device
8    that had exposure to filter design but I -- we were
9    building a department, and that's what I can say
10   for certain is that she was certainly near the top
11   of the list in terms of the number of -- you know,
12   the sequence of which she was hired in.
13   Q.  Let me just ask you a better question.
14   A.  Okay.
15   Q.  Was she the first BAW filter design engineer that
16       the company hired?
17   A.  I -- I don't have the -- I don't have the record in
18       front of me but I -- she was either number one,
19       maybe number two. Very much at the top of the
20       list.
21   Q.  All right. So when she arrived, I guess what --
22       and you were essentially building out a design
23       engineer department --
24   A.  That's correct.
25   Q.  -- what were -- versus her arriving, obviously, in

Page 68

1    a fully developed design engineer department with
2    process and whatnot --
3    A.  Yeah.
4    Q.  -- what did -- what did, from your viewpoint, Annia
5        need to do in terms of getting that engineering
6        department up and running?
7    A.  That was managed by Mr. Houlden. I'm not going to
8        speak for Mr. Houlden. And --
9    Q.  All right. So you don't -- you're not familiar
10       with, I guess, foundational work that she
11       contributed to in building out --
12   A.  I would defer to the manager of the department. I
13       participated in the hiring process, and in terms of
14       the -- you know, certainly the first BAW designs we
15       did in the company, they were not done by Ms. Shen.
16       I certainly know that I designed one of the first
17       filters that we actually demonstrated.
18   Q.  Prior to Ms. Shen's hire --
19   A.  Sure.
20   Q.  -- and I know it's a startup, right, so it's not
21       like you're going to make profit right away.
22   A.  Sure.
23   Q.  But prior to Ms. Shen's hiring, did Akoustis have a
24       BAW filter design on the market that was
25       profitable?

17 (Pages 65 to 68)

Page 69

1          MR. KLASS: Object to the form.
2     A.   Let me answer the first part, and then if there's
3          qualifiers, we were just starting up a design
4          engineering group so we were -- we had multiple
5          openings, and were filling those openings to get
6          into the product business. As I said, our vision
7          for the company was design and manufacturing.
8          Design doesn't help you if you don't have
9          anything -- if you don't have technology to
10         manufacture, so we were first a technology company
11         and then moving into a product company.
12    Q.   I see. Okay. So at that point am I correct -- so,
13         for example, we all know that 1256 was a product
14         that made it into the marketplace. It generated
15         revenue. Can you identify prior to Ms. Shen's
16         hiring a BAW filter design that was for sale in the
17         marketplace? I know you said you designed one.
18         I'm asking about the marketplace.
19    A.   We were just starting up a product catalog, which
20         would imply we didn't have any products in the
21         catalog.
22    Q.   Okay. The design that you came up with, did that
23         one result in a release of product in the
24         marketplace?
25    A.   It did not. It was a technology demonstrator.

Page 70

1     Q.   All right. Now, I'll have you look at Exhibit 7.
2          (Plaintiff's Exhibit 7 was introduced.)
3     A.   Just go to Tab 7?
4     Q.   Yes, sir. Yep.
5     A.   Thank you. I have it in front of me.
6     Q.   You do. All right. Now, do you see -- this is an
7          email that you send to Annia Shen, including a
8          chart that's describing, I guess, the salary and
9          then shares that are kind of -- that go along with
10         a particular salary?
11    A.   I -- yes, I see the email and what you just
12         referenced. Yes.
13    Q.   Yes, sir. And is this an email exchange that you
14         had with Annia Shen?
15    A.   Yes, this was an email exchange with Ms. Shen.
16    Q.   All right. Now, the proportions, or ratio I should
17         say, where you have a salary and then you have a
18         number of shares, where did that data come from?
19    A.   Not a one-word answer. The -- up until this time,
20         as you can appreciate, you mentioned you started up
21         your own company, when you start up a company you
22         have nothing, and so you're not going to have
23         databases of information, you're not going to
24         have -- you're not going to have industry surveys,
25         and so what is not shown in this exhibit is this

Page 71

1          was a follow-up. This was not the first email that
2          went to Ms. Shen.
3     Q.   Uh-huh.
4     A.   This was a follow-up email. We had -- as my memory
5          serves me, we had provided an offer to Ms. Shen and
6          that offer had -- I don't recall -- I don't have
7          the -- maybe it's in this book somewhere, but I
8          don't recall the initial offer letter that went to
9          Ms. Shen but we had provided an offer. She had
10         come back to me and said, you know, I'm --
11    Q.   Can I just interrupt you?
12    A.   Yes.
13    Q.   I'm sorry to do that, but my original question is
14         whether -- where these numbers came from. So
15         there's a proportion, right, it looks like. You
16         start at 70,000 -- or 65,000 you get 70,000 shares.
17         Is that -- was that based on offers that were
18         previously made or how were these numbers arrived
19         at?
20    A.   Recalling without a host of -- and the benefit of a
21         host of information from the company, what I recall
22         is that the salary was in line with expectation,
23         and we put an opportunity to earn some additional
24         restricted stock units in the original offer
25         letter. The feedback from Ms. Shen to me as I

Page 72

1          recall was --
2     Q.   Let me -- let me interrupt you.
3     A.   Okay. Sorry. Of course.
4     Q.   I don't want to know about that, the actual
5          discussions. Okay. So when you were -- when you
6          were providing her the value of the offers, you
7          were assuming that Akoustis -- a stock value of
8          $5.75. Is that right?
9     A.   That would occur -- yeah, so at --
10    Q.   How did you come up with that?
11    A.   I don't have -- I don't have the fair market value.
12         It says right under it the fair market value, so
13         that would be calculated on what the stock is
14         trading for on the Exchange, and that would have a
15         dollar associated with it with a number of shares.
16    Q.   All right. What is the -- but in the information
17         that you were providing her here, by virtue of
18         saying -- you give a total on the --
19    A.   Yes, sir.
20    Q.   -- of $402,500. What were you trying to convey to
21         Ms. Shen in identifying a number of $402,500?
22    A.   So with respect to a Exchange-traded stock, it can
23         go up, it can go down, so it has a value at a point
24         in time. As you can see in the column here where
25         it says four-year vest, if those -- the number of

18  (Pages 69 to 72)

Page 73

1    shares would vest over a period of four years so
2    they're not -- and with the assumption that the
3    stock stayed flat, could have gone up, could have
4    gone down, and so it's a -- it's a -- as the table
5    says, it's a fair market value when Akoustis shares
6    are at 5.75.
7    Q.  Okay.  But the method that you used to quantify the
8        value of the offer that you were making was -- was
9        it basically the stock trade at the time or the
10       value at the time?
11   A.  The number -- the number I would have selected was
12       where the company was trading at the time.
13   Q.  Yes, sir.  Okay.
14   A.  Okay?  But, again, it's an Exchange.  It can go up,
15       it can go down.
16   Q.  Yep.  Understood.
17   A.  It's market driven.
18   Q.  Did you -- as part of the interview process, did
19       you score Ms. Shen officially as -- I don't know if
20       there's a scoring mechanism you use or a ranking.
21       Was there in her hiring process?
22   A.  I am -- I am certain that I had a resume of
23       Ms. Shen, and I would have looked at that resume
24       and I would have communicated with Ms. Shen various
25       aspects of her experience, particularly focused in

Page 74

1    on the engineering design because that's what we
2    were hiring for.
3    Q.  Let me just interrupt you.  I'm just asking whether
4        or not there was a scoring process, 1 to 10, that
5        other people interviewed her and scored her.
6    A.  With regard to Ms. Shen I believe -- given it was a
7        remote interview, I do not recall having a
8        roundtable with others and providing a numerical
9        score.  I will say that's not uncommon when you
10       have multiple people interviewing a candidate.
11       They would come in and you say okay, give me a
12       score, you know, 1 through 5, but that can be
13       manager dependent as well, but in this particular
14       case I don't recall having a roundtable.
15   Q.  Okay.  So why did you decide to hire Ms. Shen?
16   A.  If you look at the history of the company, I -- and
17       you look at the history of myself, I put a -- I'm a
18       big fan of education.  Ms. Shen had gone to a
19       reputable school in Florida.  Ms. Shen had studied
20       some theoretical -- while not necessarily relevant
21       to what we were doing at Akoustis but had studied
22       some theoretical -- I don't have her resume in
23       front of me, but as I recall, if you look at her
24       history my recollection is that she had experience
25       in either MEMS or a relevant discipline.  Is

Page 75

1        there --
2    Q.  Yeah, let me help you.
3    A.  I'd be happy to.
4    Q.  It's Exhibit 72.
5           (Plaintiff's Exhibit 72 was introduced.)
6    A.  Okay, thanks.  Okay.  So she had relevant work
7        experience.  She had studied at University of
8        Central Florida.  I look at GPA and I sit in -- and
9        we try to hire smart people.
10   Q.  Right.
11   A.  And I would say everybody has their own hiring
12       strategy.  Certainly mine's not perfect but, you
13       know, if you're -- you try to hire smart people,
14       you try to hire relevant experience, and, you know,
15       you get -- you get an early read at -- you know, at
16       chemistry, can I work with this person.
17   Q.  Right.  And how did you -- how did you find her I
18       guess for the interview process in terms of you
19       said, you know, can I work with this person?
20   A.  Just repeat.  I'm sorry.  Want to make sure I
21       answer the question.
22   Q.  In terms of did she give a good interview?  Did you
23       feel like she was somebody that, you know, you
24       could work with?
25   A.  We had -- we had a one-hour interview at a

Page 76

1    restaurant in Florida, I don't remember the city,
2    but we had a one-hour, and you make certain
3    judgments by table manners, by -- you know, I've
4    certainly always asked people where are you in your
5    career, and we had appropriate conversations like
6    that over lunch as I recall.
7    Q.  Well, let me just say -- put it this way.  In your
8        mind did she give you a good interview?  I take it
9        she did because you hired her.
10   A.  The interview with Ms. Shen and the follow-up email
11       we just looked at would reflect a positive
12       interview.
13   Q.  Had you and the company -- were you interviewing,
14       actively interviewing, at the time you hired
15       Ms. Shen any other BAW filter design engineers?
16   A.  Best of my recollection we -- generally if you're
17       getting into an engineering department, you're
18       hiring multiple people.
19   Q.  Okay.
20   A.  So that -- but I --
21   Q.  Yes, sir.  Do you remember if the company
22       specifically hired a recruiter to assist with
23       filling this position?
24   A.  For certain our company has used recruiters, and I
25       believe in this particular instance Ms. Shen came

19 (Pages 73 to 76)

Page 77

1     to us through a recruiter.  That's my recollection.
2  Q. Yes, sir.  And I think there are different types of
3     recruiters.  As a company you can hire a recruiter
4     and say go find me a candidate, or there can be
5     recruiters who identify talent and then they kind
6     of reach out to the company with no affiliation or
7     connection to the company.  Which one was it?
8  A. As we were scaling up, we were doing targeted
9     searches against -- against roles we were trying to
10    fill, so it was not what I would call an incoming
11    inquiry.  It was -- it was a targeted search.
12 Q. All right.  Now, talking about the purpose of, you
13    know, creating filter designs, what is the
14    company's purpose?  It seems like a common sense
15    question, but what is Akoustis's purpose in
16    designing BAW filter designs?
17 A. The company was founded originally as a technology
18    company.  We -- I like to think that -- or my
19    belief is technology companies will struggle to be
20    profitable so you've got -- it depends on the
21    model, but in our particular instance the objective
22    of our company was a for-profit entity, and in
23    order to commercialize the core technology we had
24    developed, that would involve -- if you look at
25    public -- our public dec, for example, we would

Page 78

1     call our -- we would refer to ourselves as an IDM,
2     an integrated design and manufacturer, and I've
3     used that term -- I've used design and
4     manufacturing with you several times.  That's where
5     that comes from.
6            And that would be you have -- you have
7     engineering design teams working with core
8     technology teams working with materials, scientists
9     working with -- in our particular instance these
10    are very high-precision parts.  There's a whole
11    discipline in trimming.  So there's different core,
12    and so you have to put those pieces of the puzzle
13    together in order to build the product, and that
14    product would be ultimate to build a business, a
15    product business.  So we morphed from a technology
16    company into a product company, which is a product
17    business.
18 Q. Yes, sir.  And so is the notion that -- I know it's
19    common sense again, but you wanted to put design --
20    filter design product in the marketplace in order
21    to generate revenues and to generate profits?
22 A. Yes, and that's an ongoing mission.  In other
23    words, that has not changed.  That has not changed
24    since we -- since our first interview with
25    Ms. Shen.

Page 79

1  Q. And I think when I was asking you about patents and
2     you were explaining to me why in some instances
3     patents weren't important to the business, and was
4     that because, you know, if a patent is developed
5     and it didn't -- or technology or product --
6     technology process is patented and it doesn't
7     result in anything going into the marketplace, that
8     it didn't -- in terms of the company's overall
9     profit mission it didn't have an impact?
10 A. I think it's useful to understand context here.
11    The bulk acoustic wave industry has been around
12    longer than the -- longer than -- longer than the
13    expiration period of patents, and many of the
14    fundamental patents are -- many circuits have been
15    tried over the years, many technologies that go
16    into the core technology have had -- have been
17    around for years and so, you know, if you're -- and
18    so what our innovation was within our company,
19    which led to the patent portfolio, is the core
20    material science, the core technology.
21           That's where -- and I don't have a breakdown
22    of the patents, but if you look at the bulk
23    majority of where we create the moat for our
24    company would be in the core technology.
25 Q. Okay.  So I'll just give you a hypothetical.  What

Page 80

1     are you most concerned about?  So I'm trying to get
2     a notion for a design engineer.  Okay?
3  A. Uh-huh.
4  Q. So if you've got a design engineer who produces a
5     high quantity of designs but they're not -- there's
6     no market for them, you know, they're not going to
7     be revenue- or profit-generating, what value does
8     the fact that there are five designs that never
9     made it to the market have for the company?
10 A. Yeah.  So we -- we're revenue generating based upon
11    products, so products that get into the market,
12    they generate revenue, and the way a product
13    business or a product catalog business works is you
14    get a -- I'll call it a layering effect and
15    that's what -- that's how you build a revenue
16    stream on the products.  So I don't know if I
17    answered your question but I'd be happy to say more
18    if you want.
19 Q. Let me do it this way.  Would you rather have an
20    engineer who produces one BAW filter design that is
21    very market competitive and very revenue positive
22    for the company or an engineer who produces five
23    designs, none of which make money on the
24    marketplace?  Which of those two scenarios would
25    you prefer?

20  (Pages 77 to 80)

EXHIBIT 5

**CORRECTED**

**REBUTTAL REPORT OF DR. MICHAEL LEBBY
REGARDING TRADE SECRETS**

**JANUARY 5, 2024**

if you feel that a leak would not affect the product launch, initialization, or growth in the sector.

99.     I disagree with Dr. Shanfield's opinion that tear downs are performed on products only after their full release.  There are companies that are adept at getting hold of early samples to do tear downs.  Those companies write reports on the product or prototype teardowns and sell those reports. Yole is a company that does this type of work.  Regarding paragraph 421 of the Shanfield Report, while prototypes might be available to selected customers, companies do tear downs of early products (even before full release) thus creating data that is either public or quickly becomes public.

100.   Dr. Shanfield's opinions in paragraphs 425-505 are predominantly focused on how Akoustis came to be in possession of documents that Dr. Shanfield claims are confidential.  But there is scant, if any, discussion on whether Akoustis actually used the information.  Instead, Dr. Shanfield spends many paragraphs focusing on competitive intelligence gathering techniques that are common in the industry, such as obtaining samples, RF modules, and parts.  But instead of applying a realistic understanding of the industry, Dr. Shanfield presents a rather naïve view of it, especially with respect to competitive intelligence gathering in Asia.  For example, in paragraph 440 of his Report, Dr. Shanfield takes issue with Colin Hunt,

███████████████████████████████

an Akoustis employee who is trying to obtain samples of Qorvo products for testing.

Dr. Shanfield states:

> The [email exchange between Mr. Hunt and Steven Li, another Akoustis employee in China,] is telling. … Mr. Hunt either knew or should have known that the standard practice in industry was that prototype products were confidential and shared under NDAs. The implication of Mr. Hunt's email—that there could be some "channels" where prototypes are publicly available—is contrary to industry practice.

Yet, Mr. Hunt's email explicitly says, "By the way Steven, please make sure your channels are not breaking any NDA or agreement they have with Qorvo, I do not want us to undertake anything unethical."  According to Dr. Shanfield, giving explicit instructions not to break the law is tantamount to encouragement to break the law.

101.   The stance taken by Dr. Shanfield in paragraph 440 of his Report reflects a naïve understanding of doing business in Asia.  Cultural norms in Asia permit a higher level of information than is permitted elsewhere.  To do business in Asia is to be familiar with how Asia operates.  If you send documents or product, then you should be aware that anything and everything is subject to public release. When I do business in Asia, I assume everything is subject to public release, and I estimate if the information will be used or not.  While Akoustis may have seen information that related to Asia, Dr. Shanfield provides no evidence that Akoustis

actually used that information for its business.  In paragraph 422 of the Shanfield Report, there is discussion that confirms that the industry is leaky, especially in Asia.  It is generally known in the industry that Asia is always a good source of data even if the data will not be used.  For these reasons, I disagree with Dr. Shanfield's opinions in paragraphs 425-505 of his report.  I also reiterate that nowhere in paragraphs 425-505 does Dr. Shanfield show that or even address whether Akoustis used the information that Dr. Shanfield claims is confidential.

102.   I further disagree with Dr. Shanfield in paragraph 442 of his Report regarding the release of a filter product by Qorvo and the implication that Akoustis benefited.   The discussion revolves around Qorvo's release of filter product production in Nov 2020—more than 2 years after Akoustis began earning revenue from its FBAR product.  Again, Akoustis was far ahead of Qorvo at this point in time and did not use this information.  Dr. Shanfield certainly provides no evidence that it was used.

103.   I disagree with Dr. Shanfield's conclusions in paragraph 445 of his Report that a stamp of "Confidential: NDA Required" is proof positive of confidential information.  The slides shown in this paragraph contain information that is typically shown at public conferences.  Just because there is a "Confidential" label on the slide does not mean that it is.  Many companies in many fields present

Rebuttal Expert Report of Michael Lebby

## VII.  RESERVATION OF RIGHTS

155.  I expect to be called to provide expert testimony at trial regarding the opinions I have formed resulting from my research and investigation as set forth in this report. As part of my testimony, I may provide background information on acoustic wave filter technology, any reviewed patents, products, publications, or other evidence, and I reserve the right to use visual aids to illustrate my testimony.

Executed this 5th of January, 2024

_____
Michael Lebby

# EXHIBIT 6

1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF DELAWARE

3

4   QORVO, INC.,                    )
                                    )
5            Plaintiff,             )
                                    )
6       VS.                         )   NO. 21-1417 JPM
                                    )
7   AKOUSTIS TECHNOLOGIES, INC., )
    AKOUSTIS, INC.,                 )
8                                   )
             Defendants.            )
9   _____)

10

11

12

13

14         --   ████████████████████   --

15              ████████████████

16              IN-PERSON DEPOSITION OF
                   DR. MICHAEL LEBBY
17           WEDNESDAY, JANUARY 31, 2024

18

19

20

21

22

23

24   STENOGRAPHIC REPORTER:   CHRISTA YAN, CSR NO. 14316, RPR
                                                  _____
25

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                                      191

1      THE WITNESS:  The minute a document leaves the dock or

2    the four walls of your facility, there is a high

3    probability that information will leak.  And so when I do

4    business with Asia in general, any document or any

5    technology whether it's an evaluation board or a

6    prereleased product or a product or any information, I

7    always have to assume that information may find its way to

8    become public or may find its way into competitive hands.

9           And so the general rule of thumb when working

10   with Asia is always assume that the information, once it

11   leaves the company, could very well be leaked.

12   BY MR. DEFOSSE:

13     Q    Dr. Lebby, I've handed you what's been marked

14   previously as Exhibit 530.  For the record this is a

15   three-page email with the production number AKTS_00264715.

16          First page, Dr. Lebby, is this one of the

17   exhibits that you reviewed in connection with offering

18   your opinions in this report?

19     A    Yes, it is.  But I don't recall it in detail.

20     Q    Okay.  The part I'm interested in, well

21   actually -- strike that.

22          Can you look at the first page, at the top, you

23   see that this is an email from SJ Kim to Dave Aichele from

24   August of 2019; is that right?

25     A    You certainly have entered that correctly.  SJ

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                                    192

1    Kim is an Akoustis employee, I presume?

2         Q     Yeah, so SJ Kim is, if you look at the page 3 of

3    3 of Exhibit 530, it states that he's the country manager

4    sales director for Akoustis.

5         A     I do see that.

6         Q     Okay.  What I'm interested in is on page 203,

7    there's a postscript.  It says, PS, do me a favor, that

8    you can accept my expense claim of entertainment with

9    ███████/Qorvo/███████ without the name of the persons.

10   Just put the name of the company.  The reason is that the

11   guys share those key confidential information with me

12   based on personal relationship, but they are so sensitive

13   with knowing their name with anyone in Akoustis.

14          Do you see that?

15        A     I do see that.

16        Q     And you reviewed this as part of your -- as part

17   of forming your opinions in this case?

18        A     I did use this document, which is Exhibit 530, to

19   form part of my opinions in this case.  That is correct.

20        Q     Is it your opinion that Mr. Kim's use of expenses

21   to obtain key confidential information was a common

22   competitive intelligence gathering technique in the

23   industry?

24        MS. SMITH:  Objection; vague.

25        THE WITNESS:  So as I've just indicated on record, and

1    I've indicated in at least my expert report on paragraphs

2    97 to 112, that when I work with Asia in general, with any

3    information that goes outside of our four walls to Asia, I

4    have to prepare myself to know that information could leak

5    and could become public.  So the level of information I

6    utilize when I work with Asia is a lot more critically

7    reviewed than it is when I work with companies, for

8    example, in Europe and America in general.

9           Having said that, I do expect employees to adhere

10   to ethical procedures when doing expense claims.  And so

11   this indicates to me that this person is not filling out

12   the expense form as one would expect a normal employee to

13   do.  So for -- certainly, from my personal standpoint,

14   that would make me uncomfortable because this person is

15   not filling out forms correctly, on one hand.

16          On the other hand, I don't know if in the

17   discussion of the entertainment with the people that SJ

18   Kim went out with, actual confidential information was

19   conveyed or not.  So I actually don't know if this is a

20   common competitive intelligence gathering procedure.

21   Certainly, I would not put up with it in my company, and

22   certainly, when I look for information on competitors, in

23   this case, you know, ███████████████, and different

24   types of players with acoustic filters, I would go up to

25   normal market research companies and purchase those

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                          194

1    reports.
2            But this is clearly somebody who doesn't want to
3    fill an expense form correctly, and in my company, that
4    person wouldn't last.
5    BY MR. DEFOSSE:
6        Q    So is your problem with SJ Kim's statement that
7    he's not filling out expense forms correctly?  Or that
8    he's saying that he's using his expense report to obtain
9    key confidential information about competitors?
10       MS. SMITH:  Objection; vague, misquotes the document.
11       THE WITNESS:  As I've just indicated in the last
12   answer, so, you know, if this answer gets used in trial, I
13   would ask you to review my previous answer as part of the
14   complete answer.  But certainly, expense forms are not
15   being filled out correctly.  And I don't know whether
16   information that was confidential was conveyed or not.
17           That doesn't seem to me that there was any
18   details of any confidential information that was conveyed
19   in this entertainment.  So I actually don't know.  All I
20   know is that when I look for competitive information, I'll
21   go purchase the market research reports on one hand.
22           On the other hand, when I work with Asia, the
23   natural assumption is that any information leaving the
24   four walls of our facility could be subject to being given
25   to competitors, could be subject to public information.

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                                    195

1    And so we have to scrutinize that information with a

2    higher level of scrutiny than we do when we're working

3    with European and North American companies.

4    BY MR. DEFOSSE:

5        Q    I want to make sure we're looking at the same

6    portion of Exhibit 530.  You see the sentence where SJ Kim

7    says, The reason is that the guys share those key

8    confidential information with me based on personal

9    relationship.  But they are so sensitive with knowing

10   their name with anyone in Akoustis.

11           Did you interpret that sentence of Exhibit 530 as

12   meaning something other than that Mr. Kim's contacts were

13   sharing key confidential information with him?

14       MS. SMITH:  Objection; calls for speculation.

15       THE WITNESS:  I have no idea what this key

16   confidential information could be.  What I do know is when

17   you go out to dinners in Asia, you know, and there's a

18   bunch of men talking about stuff, they share information

19   that is confidential that has nothing whatever to do with

20   the business they're in.

21           It could be ███████████████████████████████

22   ████████████████████        That's key confidential information.

23   You don't want that information going through other

24   employees in companies.  So I don't know.  It doesn't say

25   what the confidential information is in Exhibit 530.  And

```
1    so how can I make a categorical answer to your question
2    when I have no idea what it is in the first place, number
3    one.
4            Number two, I have no idea what the discussion
5    was taking place between these people from the companies
6    he had entertainment with, has no idea what the
7    entertainment is.  I don't know if that's a meal ███
8    ████████████████████████████████████████████████
9    ████████████████████████          And thirdly, whenever you do
10   business with Asia, always assume information will leak
11   out.
12           And so I always take precautions that if I'm
13   working with Asia in general, I scrutinize the information
14   that leaves the company.  And lastly, it looks like the
15   expense reports have not been filled out correctly.  And
16   that's probably -- doesn't align with the procedures I
17   have, and I don't know what the procedures are in
18   Akoustis.
19           But that doesn't feel good in my eyes.
20   BY MR. DEFOSSE:
21       Q    Okay.  I'm handing you what's been marked
22   previously as Exhibit 531.  This is a one-page document
23   that's got the production number AKTS_00496841 on the
24   first page.
25           Dr. Lebby, do you recall reviewing as part of
```

1    your analysis in this case a series of emails from SJ Kim

2    to Dave Aichele and Colin Hunt attaching zip files of

3    confidential Qorvo information?

4        A    I certainly reviewed all the documents that were

5    pretended to me in this litigation.  I don't recall all

6    the details because there's thousands of documents.  But I

7    did look at all the documents.  And I'm reasonably

8    confident that Exhibit 531 is one document that I did

9    review.  But I don't recall any details.

10       Q    Okay.  Exhibit 531 is an email from Mr. Kim to

11   Mr. Aichele and Mr. Hunt dated August 7th, 2020; is that

12   right?

13       A    That is my understanding.  That is correct.

14       Q    And you see it attached as a zip file?

15       A    I see in Exhibit 531 a zip file is attached to

16   this email.

17       Q    Okay.  And then Mr. Kim writes in the body of his

18   email, Please don't ask me where did I get from.  Because

19   of size of attachment, I will send total three emails.

20   Frankly, I always use my expense for right purpose.  Do

21   you see that?

22       A    I do see that.

23       Q    Would you say that Mr. Kim's forwarding of a zip

24   file that he got by using his expense for the right

25   purpose is a common competitive intelligence gathering

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                          198

1    technique in the industry?

2        MS. SMITH:  Objection; vague.

3        THE WITNESS:  I have no idea of what the zip file

4    contains here.  I have no idea what the right purpose as

5    far as expenses were.  I mean, ███████████████████████

6    ███████████████████████████████████████████████████████

7    ██████████████████████        There's no detail in this email.

8    BY MR. DEFOSSE:

9        Q    I guess I'm confused by that answer.  Are you

10   suggesting that ████████████████████████████████████████

11   ██████████████████████████████████

12       A    I'm not suggesting anything of the kind.

13       Q    Are you suggesting that he was using his expense

14   report to ██████████████████████████████████████████████

15   ████████████████████████████████?

16       MS. SMITH:  Objection; misstates prior testimony.

17       THE WITNESS:  That completely misstates what I was

18   trying to say.

19   BY MR. DEFOSSE:

20       Q    Well, I'm asking you what you're trying to say

21   because you keep mentioning ███████████████████████████.

22   And I don't know how that fits with Exhibit 531 when

23   Mr. Kim says, I always use my expense for the right

24   purpose, while he's forwarding a zip file full of Qorvo

25   confidential information.

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                    199

1        A    I don't know what's in that zip file.

2        Q    You didn't review that zip file as part of your

3   analysis in this case?

4        A    Well, let's take a look at the zip file.

5        Q    You don't recall sitting here today, whether you

6   reviewed the three zip files full of Qorvo information

7   that Mr. Kim sent to Mr. Aichele when you opined that

8   Qorvo had not identified any trade secrets in this case?

9        MS. SMITH:   Objection; misstates prior testimony.

10       THE WITNESS:   You're completely misstating my previous

11   answers.   I don't know where you're coming from here.

12   I've given my answers very clear that all the information

13   that I've given -- that I've been given to see in this

14   litigation, I've reviewed.

15            I don't recall exactly what's in the zip file.   I

16   don't know what Mr. Kim is using these expenses for.   It

17   doesn't really say here.   And you're asking me to opine on

18   something where there's not a lot of detail.   And so I'm

19   giving you an answer where, you know, he could be using

20   his expenses for different purposes.

21            He doesn't even say what the purpose is.   He just

22   says, Use my expense for right purpose.   Well, I have no

23   idea what that is.   That could be plane tickets.   That

24   could be going to the opera. ████████████████████████████

25   ████████████████████████████████████████.

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                    200

1          It's already we've proved on the record from your

2     previous exhibit, which is Exhibit 530, he already lies on

3     his expense forms.  And that's something already I said on

4     record that I wouldn't accept in my company.  So I don't

5     know what this guy is talking about and I certainly don't

6     have no idea what he means by, quote, Use my expense for

7     right purpose, end quote.

8          MR. DEFOSSE:  Okay.  Let's go off the record.

9               (Recess taken.)

10    BY MR. DEFOSSE:

11         Q    So, Dr. Lebby, I'd like you to turn to page 64 of

12    your report and look at the section that's titled, The

13    Qorvo documents in Akoustis's possession contained no

14    trade secrets and Akoustis received no head start,

15    Section E.  Are you there?

16         A    I am there.

17         Q    Okay.  In paragraph 115 I understand that you've

18    opined or you've restated your opinion that you disagree

19    with Dr. Shanfield's opinion that any of the documents

20    contain actual trade secrets in this case, right?

21         A    I do make that statement in paragraph 115 of my

22    corrected expert report.

23         Q    Okay.  And then in paragraph 116, you state that

24    the information or the vast majority of the information

25    could have been obtained by Akoustis independently; is

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, Christa Yan, CSR No. 14316, do hereby declare:

 4        That, prior to being examined, the witness named in
      the foregoing proceeding was by me duly sworn pursuant to
 5    Section 30(f)(1) of the Federal Rules of Civil Procedure,
      and the proceeding is a true record of the testimony given
 6    by the witness as accurately as possible.  That said
      proceeding was taken down by me stenographically at the
 7    time therein named and thereafter reduced to text under my
      direction.

 8
          ____   That said witness was requested to review the
 9    transcript and make any changes to the transcript as a
      result of that review pursuant to Section 30(e) of the
10    Federal Rules of Civil Procedure.
          ____   No changes have been provided by the witness
11    during the period allowed.
          ____   The changes made by the witness are appended to
12    the transcript.
          ____   No request was made that the transcript be
13    reviewed pursuant to Section 30(e) of the Federal Rules of
      Civil Procedure.

14
          I further declare that I have no interest in the event
15    of the action.  I declare under penalty of perjury under
      the laws of the United States of America that the
16    foregoing is true and correct.

17        WITNESS my hand this 5th day of February 2024.

18

19

20

21    _____
      Christa Yan, CSR NO. 14316
22

23

24

25
```

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417 (JPM) |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | **DEMAND FOR JURY TRIAL** |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**QORVO'S FIFTH AMENDED AND SUPPLEMENTED
FED. R. CIV. P. 26(a)(1)(A) INITIAL DISCLOSURES**

In accordance with Federal Rule of Civil Procedure 26(a)(1)(A), Plaintiff Qorvo, Inc. ("Plaintiff" or "Qorvo") hereby supplements its initial disclosures as follows. These disclosures are based upon information currently and reasonably available to Qorvo. Qorvo reserves the right to further supplement, delete, or modify these disclosures as provided in Federal Rule of Civil Procedure 26(e) after further investigation and discovery. Further, Qorvo reserves the right to later object to (i) the testimony of individuals Qorvo has identified herein; and (ii) the admissibility of documents identified herein. Qorvo also reserves the right to object to discovery on any ground.

Qorvo does not represent that it is identifying every document, tangible thing, or witness that may be relevant to the issues in this lawsuit. Rather, Qorvo's disclosures represent a good faith effort to identify information required under Fed. R. Civ. P. 26.

## DISCLOSURES PURSUANT TO FED. R. CIV. P. 26

**Rule 26(a)(1)(A)(i):** "[T]he name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."

Qorvo is continuing to investigate its claims, including the identity of any additional individuals or entities who may have discoverable information,[1] and reserves the right to supplement these disclosures as necessary.

| No. | Individual | Contact | Subjects of Information |
|---|---|---|---|
| 1. | Alireza Tajic<br>Senior Member, Technical Staff, Qorvo<br>Inventor of U.S. Pat. No. 9,735,755 ("the '755 Patent") | To be contacted solely through Qorvo's counsel of record. | The invention of the '755 Patent |
| 2. | Gernot Fattinger<br>Senior Director Global EDA and BAW Research and Development, Qorvo<br>Inventor of the '755 Patent | To be contacted solely through Qorvo's counsel of record. | The invention of the '755 Patent; structure, operation, and features of BAW filters; market for BAW filters; confidential information available to David Breton and Guillermo Moreno Granado; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 3. | Robert Aigner<br>Senior Director of Research and Development, Qorvo | To be contacted solely through Qorvo's counsel of record. | Structure, operation, and features of BAW filters; market for BAW filters; the nature and value of confidential and trade secret information that Akoustis misappropriated |

---

[1] Defendants are in the exclusive possession of certain information related to Qorvo's claims. Qorvo expressly reserves the right to identify additional witnesses based on information Defendants produce during discovery.

| No. | Individual | Contact | Subjects of Information |
|-----|------------|---------|-------------------------|
| 4. | Kevin Schoenrock, Director Corporate Strategy and Planning, Qorvo | To be contacted solely through Qorvo's counsel of record. | Qorvo's corporate structure and business operations; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 5. | Scott Miller Senior Manager, Mobile Product Engineering, Qorvo | To be contacted solely through Qorvo's counsel of record. | Akoustis' efforts to obtain confidential information from Qorvo employees; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 6. | Scott Morris Advanced Packaging Manager, Qorvo | To be contacted solely through Qorvo's counsel of record. | Confidential information available to Robert Dry; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 7. | Steve Coley Product Quality Engineer, Qorvo | To be contacted solely through Qorvo's counsel of record. | Confidential information available to Paul Makowenskyj; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 8. | Brad Silvers Director of Customer Quality Engineering, Qorvo | To be contacted solely through Qorvo's counsel of record. | Confidential information available to Paul Makowenskyj; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 9. | Chandima Ganhewage Test Engineering Manager, Qorvo | To be contacted solely through Qorvo's counsel of record. | Confidential information available to William Schmid; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 10. | Yan Boutin Director of Quality Systems, Qorvo | To be contacted solely through Qorvo's counsel of record. | Confidential information available to Kindra Lane; the nature and value of confidential and trade secret information that Akoustis misappropriated |

| No. | Individual | Contact | Subjects of Information |
|---|---|---|---|
| 11. | Jim Dilla<br><br>Senior Business Analyst, Qorvo | To be contacted solely through Qorvo's counsel of record. | Confidential information available to Wendy Wright; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 12. | Edgar Lopez Valera<br><br>Direct of Supply Chain Integration, Qorvo | To be contacted solely through Qorvo's counsel of record. | Confidential information available to Wendy Wright the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 13. | Shawn Gibb<br><br>Product Line Manager, High Performance Solutions Business Unit, Qorvo | To be contacted solely through Qorvo's counsel of record. | Akoustis' efforts to recruit Qorvo employees and use Qorvo's confidential information; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 14. | Ali-Imran Bawangaonwala<br><br>Head of Marketing – V2X, Qorvo | To be contacted solely through Qorvo's counsel of record. | Mr. Bawangaonwala may have information concerning Akoustis' efforts to recruit Qorvo employees and use Qorvo's confidential information; the nature and value of confidential and trade secret information that Akoustis misappropriated |
| 15. | Mitali Pathak<br><br>Former Product Development Engineer at Qorvo | Current address and telephone unknown | Akoustis' efforts to obtain confidential information from Qorvo employees |
| 16. | Berry Leonard, Director of Automotive Product Line, Qorvo | To be contacted solely through Qorvo's counsel of record | The nature and value of confidential and trade secret information that Akoustis misappropriated. |
| 17. | Rob Kincaid, Senior Quality Engineer, Qorvo | To be contacted solely through Qorvo's counsel of record | The nature and value of confidential and trade secret information that Akoustis misappropriated. |

| No. | Individual | Contact | Subjects of Information |
|---|---|---|---|
| 18. | Shannon Beach, Senior Director of Tax, Qorvo | To be contacted solely through Qorvo's counsel of record | The nature and value of confidential and trade secret information that Akoustis misappropriated. |
| 19. | Gayle Talaby, Director of Global Compensation, Qorvo | To be contacted solely through Qorvo's counsel of record | The nature and value of confidential and trade secret information that Akoustis misappropriated. |
| 20. | Michael Boyd, Information Security Officer, Qorvo | To be contacted solely through Qorvo's counsel of record | Qorvo's information security policies and protocols. |
| 21. | Todd Martin, Chief Information Officer, Qorvo | To be contacted solely through Qorvo's counsel of record | Qorvo's information security policies and protocols. |
| 22. | Tony Testa, Director of Technical Marketing, Qorvo | To be contacted solely through Qorvo's counsel of record | Competition from Akoustis; the nature and value of confidential and trade secret information that Akoustis misappropriated. |
| 23. | Steven "Eric" Creviston, Senior Vice President and President of Connectivity & Sensors Group, Qorvo | To be contacted solely through Qorvo's counsel of record | Competition from Akoustis; the nature and value of confidential and trade secret information that Akoustis misappropriated; Qorvo's business and corporate structure; Qorvo's intellectual property; the harm to Qorvo from the theft of its intellectual property and trade secrets. |
| 24. | Michael Lysse, Director of IT, Client Services, Security and Compliance | To be contacted solely through Qorvo's counsel of record | Qorvo's information security policies and protocols. |
| 25. | Ramakrishna Vetury | Current address and telephone unknown | Mr. Vetury may have discoverable information relating to Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |

| No. | Individual | Contact | Subjects of Information |
|-----|-----------|---------|------------------------|
| 26. | Jeffrey B. Shealy | Current address and telephone unknown | Mr. Shealy may have information concerning Akoustis' marketing to potential customers and investors; Akoustis' efforts to recruit Qorvo employees; Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 27. | Rohan Houlden<br><br>Chief Executive Officer, Gallium Semiconductor | Current address and telephone unknown | Akoustis' efforts to recruit Qorvo employees; Akoustis marketing to potential customers and investors; Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 28. | Tom Sepenzis<br><br>Vice President, Corporate Development & Investor Relations, Akoustis | Current address and telephone unknown | Akoustis marketing to potential customers and investors; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 29. | Todd Bender<br><br>Fmr. Senior Tax Manager | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 30. | David Breton<br><br>Former Manager, BAW R&D, Technology at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |

| No. | Individual | Contact | Subjects of Information |
|---|---|---|---|
| 31. | Robert Dry<br><br>Former Director, IDP Product Packaging at Qorvo | Current address and telephone unknown | Akoustis' efforts to recruit Qorvo employees; Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 32. | David Aichele<br><br>Former Director, Business Development at Qorvo | Current address and telephone unknown | Akoustis marketing to potential customers and investors; Akoustis' efforts to recruit Qorvo employees; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 33. | Joel Morgan<br><br>Former Customer Quality Manager at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 34. | Jerry Gray<br><br>Former Product Manager at RFMD | Current address and telephone unknown | Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 35. | Kindra Lane<br><br>Former Senior NPI Planner at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 36. | Paul Makowenskyj<br><br>Former Senior Customer Quality Engineer at Qorvo | Current address and telephone unknown | Akoustis marketing to potential customers and investors; Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |

| No. | Individual | Contact | Subjects of Information |
|---|---|---|---|
| 37. | Guillermo Moreno Granado<br><br>Former Senior BAW Design Engineer at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 38. | William B. Schmid<br><br>Former Senior RF Test Engineer at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 39. | Wendy Wright<br><br>Former Senior System Business Analyst at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 40. | Tony Espinoza<br><br>Former Apps Manager at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 41. | David Hodge<br><br>Former Device Engineer at Qorvo | Current address and telephone unknown | Akoustis' efforts to recruit Qorvo employees; Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 42. | Joonbum Kwon<br><br>Former Plasma Process Engineer at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |

| No. | Individual | Contact | Subjects of Information |
|---|---|---|---|
| 43. | John Myrick<br><br>Former Package Engineer at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 44. | Ya "Annia" Shen<br><br>Former Design Engineer at Qorvo | Van Kampen Law<br><br>315 East Worthington Avenue<br>Charlotte, North Carolina 28203<br>(704) 919-0531 | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 45. | Daeho Kim<br><br>Director of Engineering, Akoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 46. | Mary Winters<br><br>Vice President, Wafer Fab at Akoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 47. | Colin Hunt<br><br>Vice President, Global Sales | Current address and telephone unknown | Akoustis marketing to potential customers and investors; Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 48. | Pat Lewis<br><br>Former Director of Business Systems at Akoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |

| No. | Individual | Contact | Subjects of Information |
|---|---|---|---|
| 49. | Seong-Jun "SJ" Kim<br><br>Former Country Manager – Sales Director at Akoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 50. | Steven Li<br><br>Country Manager at Akoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 51. | Westbrook "Brook" Hosse | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 52. | Saurabh Gupta<br><br>Design Engineer Manager at Akoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 53. | David Dyer<br><br>Computer Aided Design Engineer at Aoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 54. | Pinal Patel<br><br>Engineering Manager at Akoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |

| No. | Individual | Contact | Subjects of Information |
|-----|-----------|---------|-------------------------|
| 55. | Kenneth Boller<br><br>Corporate Controller at Akoustis | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 56. | Holly Johnson<br><br>Director of Human Resources at Akoustis | Current address and telephone unknown | Akoustis' efforts to recruit Qorvo employees. |
| 57. | Lora Shealy<br><br>Human Resources Manager at Akoustis | Current address and telephone unknown | Akoustis' efforts to recruit Qorvo employees. |
| 58. | Ahmad Abdelmajid<br><br>Former Director, Connectivity Application Engineering at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 59. | Michael Coolen<br><br>Former Technical Group Lead, Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use Qorvo's trade secrets and confidential information. |
| 60. | Alan Nicol<br><br>Former Staff Product Engineer at Qorvo | Current address and telephone unknown | Akoustis' unfair competition and efforts to obtain Qorvo confidential information; Akoustis' misappropriation and use of Qorvo trade secrets and confidential information. |
| 61. | One or more customers of Akoustis | Current addresses and telephone numbers unknown | The decision to purchase BAW filters from Akoustis; factors motivating such decision; the use of those filters; pre- and post-sale statements made by Akoustis concerning the filters. |

| No. | Individual | Contact | Subjects of Information |
|-----|-----------|---------|------------------------|
| 62. | One or more investors of Akoustis | Current address and telephone unknown | The decision to invest in Akoustis; statements Akoustis made promoting its business/products. |

In addition to the individuals identified above, Plaintiff anticipates that it will rely on the opinions of one or more expert witnesses on certain issues, including the nature of the trade secrets that Akoustis has misappropriated and the value of those trade secrets, the structure and function of BAW filters, infringement, validity, false advertising, and/or damages. Plaintiff will identify and disclose the opinions of any experts in conformance with the Federal Rules of Civil Procedure and the Court's Amended Scheduling Order.  Qorvo also reserves the right to rely on information discovered from any persons or entities identified in Defendants' Initial Disclosures.

Qorvo is continuing to investigate its claims and defenses and reserves the right to supplement these disclosures as necessary based on information learned during discovery.

**Rule 26(a)(1)(A)(ii): "[A] copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."**

| No. | Category | Location(s) |
|-----|----------|-------------|
| 1. | The '018 and '755 Patents and their prosecution histories | Qorvo, Inc.; Sheppard, Mullin, Richter & Hampton LLP |
| 2. | Documents relating to the conception and reduction to practice of the '018 and '755 Patents | Qorvo, Inc. |
| 3. | Documents relating to ownership and licensing, if any, of the '018 and '755 Patents | Qorvo, Inc. |
| 4. | Documents relating to the benefits of the inventions of the '755 and '018 patents | Qorvo, Inc. |

| No. | Category | Location(s) |
|---|---|---|
| 5. | Documents relating to the infringement of the '755 and '018 patents by the Accused Products[2] | Sheppard, Mullin, Richter & Hampton LLP |
| 6. | Documents relating to Akoustis' inducement of infringement of the '755 and '018 patents | Sheppard, Mullin, Richter & Hampton LLP |
| 7. | Documents relating to the confidentiality obligations of former Qorvo employees | Qorvo, Inc. |
| 8. | Documents relating to Akoustis' use and disclosure of Qorvo confidential information, including Qorvo's trade secrets | Akoustis Technologies, Inc., Qorvo, Inc. |
| 9. | Documents relating to Defendants' false advertising | Qorvo, Inc., Sheppard, Mullin, Richter & Hampton LLP |
| 10. | Documents relating to Qorvo's damages due to Akoustis' infringement, false advertising, false marking, unfair competition, trade secret misappropriation, and related illegal acts, including but not limited to sales and contracts lost to Akoustis | Qorvo, Inc. |

Qorvo may use any documents it produces to Akoustis to support its claims and defenses and responses to Akoustis' counterclaims and defenses, which have yet to be disclosed. In addition to the documents identified above, Qorvo may also use documents obtained through discovery from Akoustis or third-parties, as well as any other information it obtains in connection with this action. Qorvo reserves the right to assert a claim of privilege or immunity and withhold from production any documents, whether or not included above, that are protected from discovery by the attorney-client privilege, work product immunity, common-interest, or any other privilege or immunity.

---

[2] The Accused Products are identified in, for example, Qorvo's Complaint and LPR 3.1 Disclosures.

Pursuant to the phased disclosure approach discussed during the Case Management Conference and set out in Court's Amended Scheduling Order (D.I. 106), Qorvo also provides the following preliminary identification of the documents and things in the possession, custody and control of Akoustis on which Qorvo expects to rely.

| No. | Category | Location |
|---|---|---|
| 1. | Core technical documents showing the structure and operation of the Accused Products. Examples of such documents include: (i) Drawings/CAD data showing the construction of the Accused Products both in plan and cross section showing the construction of individual layers/components/active regions; (ii) manufacturing plans showing each step of the manufacturing/fabrication process for the Accused Products; (iii) documents identifying the material properties of each layer of the Accused Products; (iv) quality and testing documents including TEMs related to any quality, material, structural, and performance testing of the Accused Products. | Akoustis |
| 2. | Documents showing the location(s) at which Akoustis manufactures the Accused Products. | Akoustis |
| 3. | Documents showing the location(s) at which Akoustis tests the Accused Products. | Akoustis |
| 4. | Akoustis' offers to sell the Accused Products, including all marketing communications concerning the Accused Products. | Akoustis |
| 5. | Documents showing unit sales of the Accused Products, including the identity and location of the customers, the model number (or other indicia of part number), the date of each sale. | Akoustis |
| 6. | Documents showing (a) gross revenues; (b) cost of goods sold; (c) contribution margin; and (d) profit before taxes, net of any returns, allowances, or credits for the Akoustis BAW filters. | Akoustis |
| 7. | Any proposed, draft, or executed agreements with third parties involving the Accused Products including, e.g., development or supply contracts. | Akoustis |
| 8. | Any instructions Akoustis has provided to third parties on the use, installation, or incorporation into devices or systems of the Accused Products. | Akoustis |

| No. | Category | Location |
|---|---|---|
| 9. | Any documents referencing, directly or indirectly, the '018 or '755 patents (or their underlying applications) or reflecting Akoustis' knowledge of those patents. | Akoustis |
| 10. | Any documents related to any analysis of any Qorvo product, process, or technology, including any documents comparing performance, properties, design, or manufacturing of the Accused Products with any Qorvo product, process, or technology. | Akoustis |
| 11. | Akoustis statements to customers, potential customers, investors, and potential investors concerning Akoustis' single crystal technology. | Akoustis |
| 12. | Communications from customers, potential customers, investors, and potential investors concerning Akoustis' single crystal technology. | Akoustis |
| 13. | Communications to/from former Qorvo employees now employed by Akoustis discussing, disclosing, or otherwise relating to Qorvo confidential information and/or trade secrets. | Akoustis |
| 14. | Communications discussing Akoustis' attempts to recruit Qorvo employees. | Akoustis |
| 15. | Documents related to Akoustis' marketing and sales of its products. | Akoustis |

In addition to the above categories of documents, and without limiting the generality of those categories, Qorvo further identifies the specific documents listed in Attachment A as documents that Qorvo may use to support its claims or defenses in this matter. Copies of these documents have already been produced during discovery in this litigation and are available to Akoustis.

Qorvo is continuing to investigate the claims and reserves the right to supplement these disclosures, including the list of documents in Attachment A, as necessary. Thus, Qorvo further reserves the right to disclose additional documents that it may use to support its claims based on information learned during the course of this litigation, including during fact and expert discovery.

**Rule 26(a)(1)(A)(iii)**: "[A] computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered."

The amount of each category of damages cannot be finally calculated until fact discovery is complete. Qorvo will likely rely on expert analysis and opinions based on the experience and knowledge of the expert(s), discovery in this matter, and other relevant information, which has not been completed. Qorvo intends to seek damages permitted by statute, including the following categories of damages:

| Category of Damages/Nature of Injury | Computation |
|---|---|
| Reasonable royalties under 35 U.S.C. § 284 for Akoustis' infringement of the '755 patent and '018 patent | Qorvo expects to compute reasonable royalties based on the framework set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). Qorvo reserves the right to supplement this disclosure after receiving the necessary discovery. |
| Enhanced damages for willful infringement | Qorvo will compute enhanced damages for willful infringement pursuant to 35 U.S.C. § 284 as three times the damages Qorvo has suffered. |
| Disgorgement of profits Akoustis obtained as a result of its false advertising | Plaintiffs will compute profits according to 15 U.S.C. § 1117 by showing Akoustis' sales. Plaintiff will also ask the Court to enhance the profits award to fully compensate Plaintiffs for the false advertising, including the reputational harm that Plaintiff has suffered. Information necessary to determine Akoustis' sales is not reasonably available to Qorvo at this stage of the litigation and must be provided by Akoustis during discovery. Qorvo reserves the right to supplement this disclosure after receiving the necessary discovery. |

| Category of Damages/Nature of Injury | Computation |
| --- | --- |
| Disgorgement of the benefits Akoustis obtained from using Qorvo's confidential information in violation of N.C.G.S. § 75-1 | Qorvo will seek the disgorgement of any benefits Akoustis has obtained from the use of Qorvo's confidential information, including any cost savings arising from the use of Qorvo's confidential information and any unjust gains Akoustis captured as a result of using the confidential information. Information necessary to determine the amount of disgorgement is exclusively in the possession of Akoustis and therefore is not reasonably available to Qorvo at this stage of the litigation.  Qorvo reserves the right to supplement this disclosure after receiving the necessary discovery. |
| Exemplary damages for Akoustis' violation of N.C.G.S. § 75-1 | Qorvo will compute exemplary damages as at least three times the total damages, costs, and fees.  Qorvo reserves the right to supplement this disclosure after receiving the necessary discovery. |
| Damages sufficient to compensate Qorvo for Akoustis' trade secret misappropriation under N.C.G.S. §§ 66-52 et seq. and/or under the Defense of Trade Secrets Act (18 U.S.C. §1832 et seq.) | Qorvo expects to compute damages for the misappropriation of its trade secrets based on the actual loss caused by the misappropriation, Akoustis's unjust enrichment, and/or a reasonable royalty for the unauthorized use and disclosure of the trade secrets.  Qorvo currently expects that the actual loss damages will be computed, at least in part, on lost sales and price erosion.  Qorvo currently expects that the unjust enrichment damages will be computed, at least in part, based on avoided costs (including research and development costs) and the head start that Akoustis has obtained in producing and marketing its products. |
| Exemplary and punitive damages in view of Akoustis' violations of N.C.G.S. §§ 66-152 et seq. | Qorvo will compute exemplary and punitive damages as a multiple of the total damages, costs, and fees.  Qorvo reserves the right to supplement this disclosure after receiving the necessary discovery. |
| Exemplary and punitive damages in view of Akoustis' violations of the Defense of Trade Secrets Act (18 U.S.C. §1832 et seq.) | Qorvo will compute exemplary and punitive damages as at least two times the total damages, costs, and fees.  Qorvo reserves the right to supplement this disclosure after receiving the necessary discovery. |

| Category of Damages/Nature of Injury | Computation |
|---|---|
| Damages sufficient to compensate Qorvo for Akoustis' violations of 18 U.S.C. § 1961 and for its wrongful acts pursuant to a conspiracy in violation of North Carolina Law | Qorvo expects to compute such damages and reserves the right to supplement this disclosure in accordance with the scheduling order and applicable rules. |
| Exemplary damages and punitive damages in view of Akoustis' wrongful acts committed pursuant to a conspiracy in violation of North Carolina Law | Qorvo will compute exemplary and punitive damages as a multiple of the total damages, costs, and fees.  Qorvo reserves the right to supplement this disclosure after receiving the necessary discovery. |
| Treble and punitive damages in view of Akoustis' violation of 18 U.S.C. § 1961 | Qorvo will seek treble and punitive damages under 18 U.S.C. § 1961 of at least three times the total damages, costs, and fees.  Qorvo reserves the right to supplement this disclosure after receiving the necessary discovery. |
| Attorneys' fees, costs, and expenses | Qorvo will compute the amount of the attorneys' fees, costs, and expenses based on the reasonable fees, costs, and expenses incurred in connection with this litigation.  Qorvo cannot calculate those amounts— which include fees, costs, and expenses that will be incurred in the future—at this stage of the litigation. |

**Rule 26(a)(1)(A)(iv):** "[F]or inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment."

Qorvo is currently unaware of any such insurance agreement.

**ATTACHMENT A**

**Further Identification of Documents Pursuant to Rule 26(a)(1)(A)(ii)[3]**

| | | | |
|---|---|---|---|
| AKTS_00000001 | AKTS_00012220 | AKTS_00015405 | AKTS_00015908 |
| AKTS_00000120 | AKTS_00012294 | AKTS_00015412 | AKTS_00015911 |
| AKTS_00000138 | AKTS_00012702 | AKTS_00015416 | AKTS_00015952 |
| AKTS_00000139 | AKTS_00012710 | AKTS_00015419 | AKTS_00015960 |
| AKTS_00000140 | AKTS_00012750 | AKTS_00015427 | AKTS_00015985 |
| AKTS_00000141 | AKTS_00012869 | AKTS_00015433 | AKTS_00015986 |
| AKTS_00000142 | AKTS_00014296 | AKTS_00015462 | AKTS_00015988 |
| AKTS_00000143 | AKTS_00014816 | AKTS_00015479 | AKTS_00016008 |
| AKTS_00000144 | AKTS_00014817 | AKTS_00015491 | AKTS_00016014 |
| AKTS_00000145 | AKTS_00014818 | AKTS_00015495 | AKTS_00016020 |
| AKTS_00000146 | AKTS_00014828 | AKTS_00015512 | AKTS_00016025 |
| AKTS_00000169 | AKTS_00014900 | AKTS_00015514 | AKTS_00016043 |
| AKTS_00000308 | AKTS_00015015 | AKTS_00015516 | AKTS_00016044 |
| AKTS_00000682 | AKTS_00015094 | AKTS_00015518 | AKTS_00016046 |
| AKTS_00000837 | AKTS_00015103 | AKTS_00015533 | AKTS_00016047 |
| AKTS_00000883 | AKTS_00015124 | AKTS_00015553 | AKTS_00016050 |
| AKTS_00000972 | AKTS_00015140 | AKTS_00015557 | AKTS_00016055 |
| AKTS_00000997 | AKTS_00015146 | AKTS_00015576 | AKTS_00016063 |
| AKTS_00001103 | AKTS_00015148 | AKTS_00015581 | AKTS_00016075 |
| AKTS_00001127 | AKTS_00015151 | AKTS_00015584 | AKTS_00016091 |
| AKTS_00001320 | AKTS_00015155 | AKTS_00015585 | AKTS_00016094 |
| AKTS_00002062 | AKTS_00015158 | AKTS_00015590 | AKTS_00016102 |
| AKTS_00002246 | AKTS_00015163 | AKTS_00015627 | AKTS_00016105 |
| AKTS_00004821 | AKTS_00015166 | AKTS_00015630 | AKTS_00016106 |
| AKTS_00004878 | AKTS_00015170 | AKTS_00015641 | AKTS_00016140 |
| AKTS_00006149 | AKTS_00015173 | AKTS_00015659 | AKTS_00016142 |
| AKTS_00006165 | AKTS_00015191 | AKTS_00015682 | AKTS_00016144 |
| AKTS_00006168 | AKTS_00015200 | AKTS_00015696 | AKTS_00016147 |
| AKTS_00006863 | AKTS_00015203 | AKTS_00015699 | AKTS_00016150 |
| AKTS_00008234 | AKTS_00015206 | AKTS_00015704 | AKTS_00016154 |
| AKTS_00008345 | AKTS_00015209 | AKTS_00015708 | AKTS_00016167 |
| AKTS_00008369 | AKTS_00015212 | AKTS_00015711 | AKTS_00016183 |
| AKTS_00008379 | AKTS_00015222 | AKTS_00015740 | AKTS_00016184 |
| AKTS_00008714 | AKTS_00015226 | AKTS_00015743 | AKTS_00016191 |
| AKTS_00009054 | AKTS_00015234 | AKTS_00015756 | AKTS_00016198 |
| AKTS_00009125 | AKTS_00015237 | AKTS_00015760 | AKTS_00016202 |
| AKTS_00009785 | AKTS_00015253 | AKTS_00015765 | AKTS_00016206 |
| AKTS_00010141 | AKTS_00015301 | AKTS_00015769 | AKTS_00016208 |
| AKTS_00010604 | AKTS_00015304 | AKTS_00015773 | AKTS_00016210 |
| AKTS_00010816 | AKTS_00015357 | AKTS_00015776 | AKTS_00016229 |
| AKTS_00011029 | AKTS_00015380 | AKTS_00015779 | AKTS_00016292 |
| AKTS_00011098 | AKTS_00015384 | AKTS_00015781 | AKTS_00016303 |
| AKTS_00011115 | AKTS_00015387 | AKTS_00015791 | AKTS_00016311 |
| AKTS_00011835 | AKTS_00015389 | AKTS_00015879 | AKTS_00016319 |
| AKTS_00012154 | AKTS_00015393 | AKTS_00015905 | AKTS_00016327 |

---

[3] Documents are identified by beginning Bates number.

| | | | |
|---|---|---|---|
| AKTS_00016340 | AKTS_00021016 | AKTS_00022267 | AKTS_00023047 |
| AKTS_00016376 | AKTS_00021023 | AKTS_00022270 | AKTS_00023098 |
| AKTS_00016377 | AKTS_00021024 | AKTS_00022271 | AKTS_00023167 |
| AKTS_00016381 | AKTS_00021232 | AKTS_00022274 | AKTS_00023179 |
| AKTS_00016388 | AKTS_00021266 | AKTS_00022276 | AKTS_00023180 |
| AKTS_00016391 | AKTS_00021381 | AKTS_00022279 | AKTS_00023257 |
| AKTS_00016401 | AKTS_00021384 | AKTS_00022282 | AKTS_00023272 |
| AKTS_00016406 | AKTS_00021387 | AKTS_00022286 | AKTS_00023273 |
| AKTS_00016420 | AKTS_00021392 | AKTS_00022295 | AKTS_00023278 |
| AKTS_00016437 | AKTS_00021395 | AKTS_00022311 | AKTS_00023279 |
| AKTS_00016450 | AKTS_00021398 | AKTS_00022314 | AKTS_00023283 |
| AKTS_00016453 | AKTS_00021428 | AKTS_00022320 | AKTS_00023284 |
| AKTS_00016504 | AKTS_00021431 | AKTS_00022321 | AKTS_00023288 |
| AKTS_00016510 | AKTS_00021434 | AKTS_00022323 | AKTS_00023289 |
| AKTS_00016524 | AKTS_00021437 | AKTS_00022327 | AKTS_00023303 |
| AKTS_00016527 | AKTS_00021440 | AKTS_00022330 | AKTS_00023306 |
| AKTS_00016530 | AKTS_00021483 | AKTS_00022332 | AKTS_00023309 |
| AKTS_00016562 | AKTS_00021485 | AKTS_00022334 | AKTS_00023312 |
| AKTS_00016573 | AKTS_00021505 | AKTS_00022367 | AKTS_00023315 |
| AKTS_00016579 | AKTS_00021521 | AKTS_00022368 | AKTS_00023318 |
| AKTS_00016603 | AKTS_00021526 | AKTS_00022372 | AKTS_00023321 |
| AKTS_00016609 | AKTS_00021539 | AKTS_00022386 | AKTS_00023324 |
| AKTS_00016610 | AKTS_00021543 | AKTS_00022431 | AKTS_00023430 |
| AKTS_00016617 | AKTS_00021559 | AKTS_00022432 | AKTS_00023434 |
| AKTS_00016752 | AKTS_00021573 | AKTS_00022441 | AKTS_00023437 |
| AKTS_00016814 | AKTS_00021588 | AKTS_00022442 | AKTS_00023448 |
| AKTS_00016822 | AKTS_00021592 | AKTS_00022443 | AKTS_00023495 |
| AKTS_00016823 | AKTS_00021604 | AKTS_00022450 | AKTS_00023538 |
| AKTS_00016824 | AKTS_00021636 | AKTS_00022463 | AKTS_00023600 |
| AKTS_00016826 | AKTS_00021648 | AKTS_00022464 | AKTS_00023783 |
| AKTS_00016867 | AKTS_00021650 | AKTS_00022469 | AKTS_00023785 |
| AKTS_00016869 | AKTS_00021670 | AKTS_00022472 | AKTS_00023922 |
| AKTS_00016921 | AKTS_00021673 | AKTS_00022473 | AKTS_00023925 |
| AKTS_00016976 | AKTS_00021677 | AKTS_00022476 | AKTS_00023974 |
| AKTS_00017074 | AKTS_00021679 | AKTS_00022477 | AKTS_00023987 |
| AKTS_00017075 | AKTS_00021681 | AKTS_00022480 | AKTS_00024049 |
| AKTS_00017079 | AKTS_00021683 | AKTS_00022482 | AKTS_00024060 |
| AKTS_00018119 | AKTS_00021685 | AKTS_00022485 | AKTS_00024063 |
| AKTS_00018120 | AKTS_00021687 | AKTS_00022487 | AKTS_00024067 |
| AKTS_00018123 | AKTS_00021694 | AKTS_00022488 | AKTS_00024071 |
| AKTS_00019996 | AKTS_00021696 | AKTS_00022492 | AKTS_00024075 |
| AKTS_00020549 | AKTS_00021701 | AKTS_00022493 | AKTS_00024079 |
| AKTS_00020565 | AKTS_00021757 | AKTS_00022497 | AKTS_00024104 |
| AKTS_00020574 | AKTS_00021881 | AKTS_00022498 | AKTS_00024123 |
| AKTS_00020619 | AKTS_00021923 | AKTS_00022624 | AKTS_00024238 |
| AKTS_00020624 | AKTS_00021953 | AKTS_00022684 | AKTS_00024240 |
| AKTS_00020652 | AKTS_00021955 | AKTS_00022686 | AKTS_00024264 |
| AKTS_00020656 | AKTS_00021957 | AKTS_00022688 | AKTS_00024276 |
| AKTS_00020660 | AKTS_00021961 | AKTS_00022689 | AKTS_00024314 |
| AKTS_00020663 | AKTS_00021981 | AKTS_00022694 | AKTS_00024316 |
| AKTS_00020703 | AKTS_00022242 | AKTS_00022995 | AKTS_00024317 |
| AKTS_00020802 | AKTS_00022266 | AKTS_00023015 | AKTS_00024320 |

A-2

| | | | |
|---|---|---|---|
| AKTS_00024344 | AKTS_00025668 | AKTS_00029272 | AKTS_00045211 |
| AKTS_00024346 | AKTS_00025669 | AKTS_00032498 | AKTS_00045258 |
| AKTS_00024355 | AKTS_00025670 | AKTS_00033190 | AKTS_00045278 |
| AKTS_00024387 | AKTS_00025673 | AKTS_00033613 | AKTS_00045489 |
| AKTS_00024403 | AKTS_00025674 | AKTS_00033642 | AKTS_00045494 |
| AKTS_00024404 | AKTS_00025677 | AKTS_00034485 | AKTS_00045504 |
| AKTS_00024439 | AKTS_00025678 | AKTS_00035216 | AKTS_00045541 |
| AKTS_00024441 | AKTS_00025680 | AKTS_00035683 | AKTS_00045546 |
| AKTS_00024455 | AKTS_00025681 | AKTS_00035730 | AKTS_00045661 |
| AKTS_00024456 | AKTS_00025724 | AKTS_00036639 | AKTS_00045674 |
| AKTS_00024459 | AKTS_00025727 | AKTS_00036641 | AKTS_00045848 |
| AKTS_00024487 | AKTS_00025779 | AKTS_00036779 | AKTS_00046251 |
| AKTS_00024488 | AKTS_00025903 | AKTS_00037311 | AKTS_00046275 |
| AKTS_00024516 | AKTS_00026023 | AKTS_00037312 | AKTS_00046298 |
| AKTS_00024529 | AKTS_00026032 | AKTS_00037338 | AKTS_00046299 |
| AKTS_00024595 | AKTS_00026036 | AKTS_00037339 | AKTS_00046855 |
| AKTS_00024598 | AKTS_00026087 | AKTS_00037446 | AKTS_00046856 |
| AKTS_00024667 | AKTS_00026088 | AKTS_00037453 | AKTS_00047657 |
| AKTS_00024669 | AKTS_00026092 | AKTS_00037493 | AKTS_00048242 |
| AKTS_00024674 | AKTS_00026198 | AKTS_00037581 | AKTS_00048296 |
| AKTS_00024680 | AKTS_00026232 | AKTS_00037582 | AKTS_00048781 |
| AKTS_00024721 | AKTS_00026239 | AKTS_00037732 | AKTS_00048782 |
| AKTS_00024722 | AKTS_00026258 | AKTS_00037948 | AKTS_00048807 |
| AKTS_00024725 | AKTS_00026259 | AKTS_00037950 | AKTS_00048813 |
| AKTS_00024732 | AKTS_00026851 | AKTS_00037952 | AKTS_00048825 |
| AKTS_00024734 | AKTS_00026876 | AKTS_00037954 | AKTS_00048831 |
| AKTS_00024738 | AKTS_00026882 | AKTS_00039475 | AKTS_00048852 |
| AKTS_00024740 | AKTS_00026889 | AKTS_00041395 | AKTS_00048858 |
| AKTS_00024751 | AKTS_00026896 | AKTS_00041502 | AKTS_00048972 |
| AKTS_00025030 | AKTS_00026898 | AKTS_00041930 | AKTS_00049173 |
| AKTS_00025062 | AKTS_00026901 | AKTS_00041981 | AKTS_00049314 |
| AKTS_00025068 | AKTS_00026903 | AKTS_00042009 | AKTS_00049321 |
| AKTS_00025074 | AKTS_00026906 | AKTS_00042023 | AKTS_00049341 |
| AKTS_00025080 | AKTS_00026908 | AKTS_00042030 | AKTS_00049373 |
| AKTS_00025081 | AKTS_00026911 | AKTS_00042031 | AKTS_00049435 |
| AKTS_00025084 | AKTS_00026913 | AKTS_00042038 | AKTS_00049472 |
| AKTS_00025088 | AKTS_00026915 | AKTS_00042039 | AKTS_00049508 |
| AKTS_00025096 | AKTS_00026918 | AKTS_00042149 | AKTS_00049636 |
| AKTS_00025624 | AKTS_00026920 | AKTS_00042157 | AKTS_00050230 |
| AKTS_00025628 | AKTS_00026923 | AKTS_00042178 | AKTS_00050267 |
| AKTS_00025629 | AKTS_00026929 | AKTS_00042186 | AKTS_00050286 |
| AKTS_00025641 | AKTS_00026931 | AKTS_00042442 | AKTS_00050294 |
| AKTS_00025644 | AKTS_00026935 | AKTS_00042451 | AKTS_00050604 |
| AKTS_00025652 | AKTS_00026936 | AKTS_00042592 | AKTS_00050649 |
| AKTS_00025654 | AKTS_00026940 | AKTS_00043419 | AKTS_00051064 |
| AKTS_00025655 | AKTS_00026941 | AKTS_00043714 | AKTS_00051092 |
| AKTS_00025656 | AKTS_00026945 | AKTS_00044109 | AKTS_00051094 |
| AKTS_00025657 | AKTS_00026946 | AKTS_00044562 | AKTS_00051101 |
| AKTS_00025658 | AKTS_00026950 | AKTS_00044617 | AKTS_00051102 |
| AKTS_00025661 | AKTS_00026951 | AKTS_00044799 | AKTS_00051456 |
| AKTS_00025662 | AKTS_00027007 | AKTS_00045049 | AKTS_00051461 |
| AKTS_00025667 | AKTS_00027008 | AKTS_00045105 | AKTS_00051468 |

A-3

| | | | |
|---|---|---|---|
| AKTS_00051516 | AKTS_00061975 | AKTS_00063229 | AKTS_00076365 |
| AKTS_00052022 | AKTS_00061983 | AKTS_00063235 | AKTS_00076366 |
| AKTS_00052231 | AKTS_00062388 | AKTS_00063242 | AKTS_00076371 |
| AKTS_00052803 | AKTS_00062535 | AKTS_00063249 | AKTS_00076386 |
| AKTS_00053077 | AKTS_00062767 | AKTS_00063260 | AKTS_00076388 |
| AKTS_00053079 | AKTS_00062911 | AKTS_00063264 | AKTS_00076427 |
| AKTS_00053286 | AKTS_00062923 | AKTS_00063271 | AKTS_00076443 |
| AKTS_00053288 | AKTS_00062930 | AKTS_00063279 | AKTS_00076493 |
| AKTS_00054355 | AKTS_00062938 | AKTS_00063338 | AKTS_00076529 |
| AKTS_00054556 | AKTS_00062952 | AKTS_00063421 | AKTS_00076532 |
| AKTS_00056242 | AKTS_00062954 | AKTS_00064034 | AKTS_00076553 |
| AKTS_00056244 | AKTS_00062958 | AKTS_00064036 | AKTS_00076554 |
| AKTS_00056265 | AKTS_00062965 | AKTS_00065894 | AKTS_00076558 |
| AKTS_00056292 | AKTS_00062971 | AKTS_00065907 | AKTS_00076635 |
| AKTS_00056293 | AKTS_00062979 | AKTS_00065911 | AKTS_00076656 |
| AKTS_00056322 | AKTS_00062986 | AKTS_00066514 | AKTS_00076658 |
| AKTS_00056324 | AKTS_00062993 | AKTS_00066516 | AKTS_00076691 |
| AKTS_00056339 | AKTS_00062999 | AKTS_00067373 | AKTS_00076703 |
| AKTS_00056343 | AKTS_00063003 | AKTS_00067806 | AKTS_00076751 |
| AKTS_00056345 | AKTS_00063010 | AKTS_00067809 | AKTS_00076761 |
| AKTS_00056374 | AKTS_00063018 | AKTS_00069057 | AKTS_00076784 |
| AKTS_00056396 | AKTS_00063025 | AKTS_00069492 | AKTS_00076785 |
| AKTS_00056459 | AKTS_00063029 | AKTS_00069739 | AKTS_00076806 |
| AKTS_00056540 | AKTS_00063038 | AKTS_00069765 | AKTS_00076886 |
| AKTS_00056542 | AKTS_00063042 | AKTS_00069906 | AKTS_00076890 |
| AKTS_00056555 | AKTS_00063049 | AKTS_00071459 | AKTS_00076968 |
| AKTS_00056572 | AKTS_00063058 | AKTS_00072767 | AKTS_00076974 |
| AKTS_00056574 | AKTS_00063065 | AKTS_00072926 | AKTS_00076981 |
| AKTS_00056591 | AKTS_00063069 | AKTS_00072965 | AKTS_00076993 |
| AKTS_00056685 | AKTS_00063078 | AKTS_00073021 | AKTS_00077048 |
| AKTS_00056686 | AKTS_00063082 | AKTS_00073130 | AKTS_00077189 |
| AKTS_00056697 | AKTS_00063089 | AKTS_00073187 | AKTS_00077192 |
| AKTS_00056752 | AKTS_00063097 | AKTS_00073948 | AKTS_00077231 |
| AKTS_00056771 | AKTS_00063101 | AKTS_00073956 | AKTS_00077235 |
| AKTS_00056790 | AKTS_00063108 | AKTS_00074163 | AKTS_00077244 |
| AKTS_00056864 | AKTS_00063117 | AKTS_00074802 | AKTS_00077245 |
| AKTS_00057009 | AKTS_00063124 | AKTS_00075127 | AKTS_00077252 |
| AKTS_00057099 | AKTS_00063131 | AKTS_00075252 | AKTS_00077257 |
| AKTS_00057107 | AKTS_00063136 | AKTS_00075254 | AKTS_00077269 |
| AKTS_00057185 | AKTS_00063143 | AKTS_00075333 | AKTS_00077439 |
| AKTS_00057209 | AKTS_00063150 | AKTS_00075335 | AKTS_00077454 |
| AKTS_00057259 | AKTS_00063156 | AKTS_00075346 | AKTS_00077506 |
| AKTS_00057435 | AKTS_00063163 | AKTS_00075356 | AKTS_00077530 |
| AKTS_00057499 | AKTS_00063170 | AKTS_00075947 | AKTS_00077548 |
| AKTS_00057505 | AKTS_00063176 | AKTS_00075951 | AKTS_00077838 |
| AKTS_00057542 | AKTS_00063180 | AKTS_00076079 | AKTS_00077954 |
| AKTS_00057570 | AKTS_00063187 | AKTS_00076144 | AKTS_00078005 |
| AKTS_00058824 | AKTS_00063195 | AKTS_00076145 | AKTS_00078018 |
| AKTS_00060883 | AKTS_00063202 | AKTS_00076177 | AKTS_00078121 |
| AKTS_00060886 | AKTS_00063209 | AKTS_00076181 | AKTS_00078629 |
| AKTS_00061457 | AKTS_00063215 | AKTS_00076285 | AKTS_00078630 |
| AKTS_00061967 | AKTS_00063222 | AKTS_00076315 | AKTS_00078844 |

| | | | |
|---|---|---|---|
| AKTS_00078845 | AKTS_00083773 | AKTS_00085464 | AKTS_00088139 |
| AKTS_00078846 | AKTS_00083777 | AKTS_00085468 | AKTS_00088163 |
| AKTS_00078881 | AKTS_00083796 | AKTS_00085473 | AKTS_00088194 |
| AKTS_00078903 | AKTS_00083820 | AKTS_00085589 | AKTS_00088201 |
| AKTS_00078904 | AKTS_00083851 | AKTS_00085600 | AKTS_00088219 |
| AKTS_00079438 | AKTS_00083872 | AKTS_00085626 | AKTS_00088236 |
| AKTS_00079439 | AKTS_00083903 | AKTS_00085768 | AKTS_00088239 |
| AKTS_00079444 | AKTS_00083926 | AKTS_00085800 | AKTS_00088243 |
| AKTS_00079705 | AKTS_00083949 | AKTS_00085816 | AKTS_00088262 |
| AKTS_00079706 | AKTS_00083973 | AKTS_00085956 | AKTS_00088293 |
| AKTS_00079722 | AKTS_00083997 | AKTS_00086065 | AKTS_00088316 |
| AKTS_00080087 | AKTS_00084023 | AKTS_00086066 | AKTS_00088340 |
| AKTS_00080761 | AKTS_00084052 | AKTS_00086138 | AKTS_00088363 |
| AKTS_00080793 | AKTS_00084075 | AKTS_00086186 | AKTS_00088389 |
| AKTS_00080810 | AKTS_00084091 | AKTS_00086540 | AKTS_00088413 |
| AKTS_00080811 | AKTS_00084121 | AKTS_00086542 | AKTS_00088437 |
| AKTS_00080851 | AKTS_00084143 | AKTS_00086647 | AKTS_00088453 |
| AKTS_00080873 | AKTS_00084165 | AKTS_00086734 | AKTS_00088476 |
| AKTS_00080877 | AKTS_00084187 | AKTS_00086735 | AKTS_00088506 |
| AKTS_00080891 | AKTS_00084211 | AKTS_00086739 | AKTS_00088535 |
| AKTS_00080899 | AKTS_00084348 | AKTS_00086773 | AKTS_00088557 |
| AKTS_00080949 | AKTS_00084508 | AKTS_00086828 | AKTS_00088578 |
| AKTS_00081021 | AKTS_00084575 | AKTS_00087354 | AKTS_00088602 |
| AKTS_00081041 | AKTS_00084576 | AKTS_00087356 | AKTS_00088624 |
| AKTS_00081208 | AKTS_00084583 | AKTS_00087362 | AKTS_00088751 |
| AKTS_00081210 | AKTS_00084584 | AKTS_00087451 | AKTS_00089151 |
| AKTS_00082513 | AKTS_00084592 | AKTS_00087540 | AKTS_00089152 |
| AKTS_00082547 | AKTS_00084640 | AKTS_00087562 | AKTS_00089500 |
| AKTS_00082557 | AKTS_00084644 | AKTS_00087591 | AKTS_00089511 |
| AKTS_00082558 | AKTS_00084648 | AKTS_00087610 | AKTS_00089767 |
| AKTS_00082559 | AKTS_00084650 | AKTS_00087626 | AKTS_00090162 |
| AKTS_00082561 | AKTS_00084688 | AKTS_00087657 | AKTS_00090169 |
| AKTS_00082562 | AKTS_00084690 | AKTS_00087681 | AKTS_00090198 |
| AKTS_00082565 | AKTS_00084887 | AKTS_00087704 | AKTS_00090337 |
| AKTS_00082566 | AKTS_00084894 | AKTS_00087727 | AKTS_00090339 |
| AKTS_00082603 | AKTS_00084895 | AKTS_00087758 | AKTS_00090340 |
| AKTS_00082739 | AKTS_00084938 | AKTS_00087765 | AKTS_00090572 |
| AKTS_00082878 | AKTS_00084944 | AKTS_00087783 | AKTS_00090573 |
| AKTS_00082879 | AKTS_00084957 | AKTS_00087800 | AKTS_00090629 |
| AKTS_00082917 | AKTS_00084961 | AKTS_00087802 | AKTS_00090796 |
| AKTS_00082928 | AKTS_00085009 | AKTS_00087807 | AKTS_00090825 |
| AKTS_00082929 | AKTS_00085069 | AKTS_00087833 | AKTS_00090909 |
| AKTS_00082980 | AKTS_00085135 | AKTS_00087857 | AKTS_00090910 |
| AKTS_00083525 | AKTS_00085155 | AKTS_00087881 | AKTS_00090915 |
| AKTS_00083526 | AKTS_00085156 | AKTS_00087911 | AKTS_00090916 |
| AKTS_00083545 | AKTS_00085160 | AKTS_00087934 | AKTS_00090936 |
| AKTS_00083701 | AKTS_00085218 | AKTS_00087956 | AKTS_00090938 |
| AKTS_00083704 | AKTS_00085219 | AKTS_00087977 | AKTS_00090953 |
| AKTS_00083728 | AKTS_00085223 | AKTS_00088001 | AKTS_00090983 |
| AKTS_00083735 | AKTS_00085239 | AKTS_00088023 | AKTS_00090984 |
| AKTS_00083737 | AKTS_00085252 | AKTS_00088045 | AKTS_00091273 |
| AKTS_00083755 | AKTS_00085425 | AKTS_00088117 | AKTS_00092013 |

A-5

| | | | |
|---|---|---|---|
| AKTS_00092217 | AKTS_00106849 | AKTS_00119675 | AKTS_00127270 |
| AKTS_00092218 | AKTS_00106853 | AKTS_00119678 | AKTS_00127318 |
| AKTS_00092856 | AKTS_00108467 | AKTS_00119796 | AKTS_00127599 |
| AKTS_00092902 | AKTS_00109482 | AKTS_00121819 | AKTS_00127600 |
| AKTS_00092970 | AKTS_00109483 | AKTS_00121820 | AKTS_00128234 |
| AKTS_00092971 | AKTS_00110167 | AKTS_00122538 | AKTS_00128311 |
| AKTS_00092974 | AKTS_00110596 | AKTS_00122539 | AKTS_00128313 |
| AKTS_00092976 | AKTS_00110743 | AKTS_00122540 | AKTS_00128316 |
| AKTS_00093001 | AKTS_00110745 | AKTS_00122693 | AKTS_00128429 |
| AKTS_00093228 | AKTS_00110954 | AKTS_00122695 | AKTS_00128442 |
| AKTS_00093294 | AKTS_00110963 | AKTS_00122700 | AKTS_00128443 |
| AKTS_00093618 | AKTS_00114934 | AKTS_00122701 | AKTS_00128742 |
| AKTS_00094283 | AKTS_00115699 | AKTS_00122705 | AKTS_00128745 |
| AKTS_00094492 | AKTS_00115702 | AKTS_00122711 | AKTS_00128764 |
| AKTS_00095398 | AKTS_00115703 | AKTS_00122715 | AKTS_00128775 |
| AKTS_00095861 | AKTS_00115835 | AKTS_00122718 | AKTS_00128776 |
| AKTS_00095863 | AKTS_00115974 | AKTS_00122723 | AKTS_00129587 |
| AKTS_00095949 | AKTS_00115975 | AKTS_00122731 | AKTS_00129589 |
| AKTS_00096030 | AKTS_00115981 | AKTS_00122735 | AKTS_00129590 |
| AKTS_00096739 | AKTS_00116274 | AKTS_00122741 | AKTS_00129594 |
| AKTS_00097228 | AKTS_00117354 | AKTS_00122872 | AKTS_00129598 |
| AKTS_00097271 | AKTS_00117498 | AKTS_00124048 | AKTS_00129603 |
| AKTS_00097822 | AKTS_00117499 | AKTS_00124072 | AKTS_00129606 |
| AKTS_00098336 | AKTS_00117503 | AKTS_00124386 | AKTS_00129614 |
| AKTS_00098469 | AKTS_00117507 | AKTS_00124411 | AKTS_00129619 |
| AKTS_00098641 | AKTS_00117512 | AKTS_00124412 | AKTS_00129623 |
| AKTS_00098647 | AKTS_00117516 | AKTS_00124464 | AKTS_00129629 |
| AKTS_00098724 | AKTS_00117519 | AKTS_00125762 | AKTS_00130186 |
| AKTS_00098773 | AKTS_00117520 | AKTS_00125763 | AKTS_00130374 |
| AKTS_00098969 | AKTS_00117523 | AKTS_00126132 | AKTS_00130403 |
| AKTS_00098971 | AKTS_00117610 | AKTS_00126348 | AKTS_00130730 |
| AKTS_00098973 | AKTS_00117611 | AKTS_00126349 | AKTS_00131736 |
| AKTS_00099515 | AKTS_00117636 | AKTS_00126386 | AKTS_00131737 |
| AKTS_00101213 | AKTS_00117637 | AKTS_00126387 | AKTS_00131828 |
| AKTS_00102151 | AKTS_00117638 | AKTS_00126424 | AKTS_00131829 |
| AKTS_00102158 | AKTS_00118402 | AKTS_00126425 | AKTS_00131830 |
| AKTS_00102165 | AKTS_00118530 | AKTS_00126531 | AKTS_00131831 |
| AKTS_00102215 | AKTS_00118568 | AKTS_00126532 | AKTS_00131832 |
| AKTS_00102222 | AKTS_00118852 | AKTS_00126569 | AKTS_00131841 |
| AKTS_00102340 | AKTS_00118855 | AKTS_00126570 | AKTS_00131865 |
| AKTS_00102341 | AKTS_00118856 | AKTS_00126728 | AKTS_00131871 |
| AKTS_00102342 | AKTS_00118862 | AKTS_00126917 | AKTS_00131872 |
| AKTS_00102350 | AKTS_00118935 | AKTS_00126940 | AKTS_00131877 |
| AKTS_00102358 | AKTS_00118996 | AKTS_00126942 | AKTS_00131881 |
| AKTS_00103346 | AKTS_00118999 | AKTS_00126950 | AKTS_00131886 |
| AKTS_00103883 | AKTS_00119002 | AKTS_00126976 | AKTS_00131889 |
| AKTS_00103884 | AKTS_00119216 | AKTS_00126987 | AKTS_00132074 |
| AKTS_00103886 | AKTS_00119218 | AKTS_00127011 | AKTS_00132271 |
| AKTS_00103887 | AKTS_00119375 | AKTS_00127034 | AKTS_00132272 |
| AKTS_00105336 | AKTS_00119669 | AKTS_00127046 | AKTS_00132273 |
| AKTS_00105898 | AKTS_00119670 | AKTS_00127067 | AKTS_00132274 |
| AKTS_00105907 | AKTS_00119672 | AKTS_00127205 | AKTS_00132275 |

| | | | |
|---|---|---|---|
| AKTS_00132283 | AKTS_00138079 | AKTS_00140436 | AKTS_00144091 |
| AKTS_00132292 | AKTS_00138140 | AKTS_00140459 | AKTS_00144127 |
| AKTS_00132295 | AKTS_00138141 | AKTS_00140481 | AKTS_00144175 |
| AKTS_00132313 | AKTS_00138162 | AKTS_00140503 | AKTS_00144176 |
| AKTS_00132337 | AKTS_00138229 | AKTS_00140525 | AKTS_00144224 |
| AKTS_00132342 | AKTS_00138230 | AKTS_00140549 | AKTS_00144226 |
| AKTS_00132349 | AKTS_00138236 | AKTS_00140798 | AKTS_00144227 |
| AKTS_00132355 | AKTS_00138266 | AKTS_00140799 | AKTS_00144229 |
| AKTS_00132361 | AKTS_00138267 | AKTS_00140800 | AKTS_00144277 |
| AKTS_00132366 | AKTS_00138271 | AKTS_00140802 | AKTS_00144299 |
| AKTS_00132637 | AKTS_00138272 | AKTS_00140805 | AKTS_00144328 |
| AKTS_00132638 | AKTS_00138461 | AKTS_00140821 | AKTS_00144436 |
| AKTS_00132917 | AKTS_00138516 | AKTS_00140822 | AKTS_00144437 |
| AKTS_00132965 | AKTS_00138517 | AKTS_00141043 | AKTS_00144508 |
| AKTS_00133084 | AKTS_00138625 | AKTS_00141090 | AKTS_00144514 |
| AKTS_00134057 | AKTS_00138626 | AKTS_00141091 | AKTS_00144524 |
| AKTS_00134480 | AKTS_00139107 | AKTS_00141622 | AKTS_00144525 |
| AKTS_00134771 | AKTS_00139108 | AKTS_00141625 | AKTS_00144565 |
| AKTS_00135666 | AKTS_00139271 | AKTS_00141631 | AKTS_00144643 |
| AKTS_00135693 | AKTS_00139272 | AKTS_00141632 | AKTS_00144676 |
| AKTS_00135694 | AKTS_00139318 | AKTS_00141718 | AKTS_00144677 |
| AKTS_00135701 | AKTS_00139319 | AKTS_00142383 | AKTS_00144704 |
| AKTS_00135702 | AKTS_00139453 | AKTS_00142463 | AKTS_00144764 |
| AKTS_00136098 | AKTS_00139475 | AKTS_00142540 | AKTS_00144766 |
| AKTS_00136100 | AKTS_00139483 | AKTS_00142598 | AKTS_00144816 |
| AKTS_00136101 | AKTS_00139560 | AKTS_00142599 | AKTS_00144864 |
| AKTS_00136102 | AKTS_00139591 | AKTS_00142930 | AKTS_00144876 |
| AKTS_00136103 | AKTS_00139592 | AKTS_00142937 | AKTS_00144882 |
| AKTS_00136210 | AKTS_00139735 | AKTS_00143236 | AKTS_00145132 |
| AKTS_00136234 | AKTS_00139761 | AKTS_00143237 | AKTS_00145133 |
| AKTS_00136257 | AKTS_00139768 | AKTS_00143238 | AKTS_00145203 |
| AKTS_00136258 | AKTS_00139952 | AKTS_00143245 | AKTS_00145340 |
| AKTS_00136620 | AKTS_00139953 | AKTS_00143246 | AKTS_00145341 |
| AKTS_00136621 | AKTS_00140045 | AKTS_00143264 | AKTS_00145342 |
| AKTS_00137051 | AKTS_00140061 | AKTS_00143348 | AKTS_00145363 |
| AKTS_00137052 | AKTS_00140080 | AKTS_00143349 | AKTS_00145394 |
| AKTS_00137343 | AKTS_00140087 | AKTS_00143612 | AKTS_00145507 |
| AKTS_00137344 | AKTS_00140105 | AKTS_00143639 | AKTS_00146178 |
| AKTS_00137350 | AKTS_00140107 | AKTS_00143640 | AKTS_00146203 |
| AKTS_00137352 | AKTS_00140124 | AKTS_00143669 | AKTS_00146227 |
| AKTS_00137354 | AKTS_00140126 | AKTS_00143671 | AKTS_00146229 |
| AKTS_00137355 | AKTS_00140157 | AKTS_00143672 | AKTS_00146570 |
| AKTS_00137394 | AKTS_00140181 | AKTS_00143776 | AKTS_00146624 |
| AKTS_00137448 | AKTS_00140212 | AKTS_00143777 | AKTS_00146775 |
| AKTS_00137672 | AKTS_00140236 | AKTS_00143804 | AKTS_00146872 |
| AKTS_00137673 | AKTS_00140265 | AKTS_00143920 | AKTS_00146875 |
| AKTS_00137959 | AKTS_00140288 | AKTS_00143922 | AKTS_00146881 |
| AKTS_00137960 | AKTS_00140311 | AKTS_00143924 | AKTS_00146882 |
| AKTS_00137995 | AKTS_00140337 | AKTS_00143988 | AKTS_00146905 |
| AKTS_00138069 | AKTS_00140361 | AKTS_00143989 | AKTS_00146906 |
| AKTS_00138073 | AKTS_00140385 | AKTS_00144075 | AKTS_00146925 |
| AKTS_00138074 | AKTS_00140406 | AKTS_00144076 | AKTS_00146974 |

| | | | |
|---|---|---|---|
| AKTS_00146975 | AKTS_00149384 | AKTS_00154340 | AKTS_00159192 |
| AKTS_00146981 | AKTS_00149386 | AKTS_00154601 | AKTS_00159193 |
| AKTS_00147005 | AKTS_00149505 | AKTS_00154602 | AKTS_00159391 |
| AKTS_00147036 | AKTS_00149511 | AKTS_00154895 | AKTS_00159392 |
| AKTS_00147049 | AKTS_00149886 | AKTS_00154896 | AKTS_00159398 |
| AKTS_00147050 | AKTS_00149888 | AKTS_00154898 | AKTS_00159502 |
| AKTS_00147125 | AKTS_00149889 | AKTS_00155055 | AKTS_00159507 |
| AKTS_00147152 | AKTS_00150134 | AKTS_00155097 | AKTS_00159508 |
| AKTS_00147740 | AKTS_00150135 | AKTS_00155718 | AKTS_00159811 |
| AKTS_00147803 | AKTS_00150373 | AKTS_00155786 | AKTS_00160453 |
| AKTS_00147805 | AKTS_00150455 | AKTS_00155788 | AKTS_00160520 |
| AKTS_00147806 | AKTS_00150686 | AKTS_00155914 | AKTS_00160871 |
| AKTS_00147814 | AKTS_00150687 | AKTS_00156056 | AKTS_00160872 |
| AKTS_00147877 | AKTS_00150748 | AKTS_00156057 | AKTS_00161022 |
| AKTS_00147953 | AKTS_00150787 | AKTS_00156063 | AKTS_00161023 |
| AKTS_00147969 | AKTS_00150892 | AKTS_00156270 | AKTS_00161027 |
| AKTS_00148040 | AKTS_00151030 | AKTS_00156271 | AKTS_00161028 |
| AKTS_00148046 | AKTS_00151224 | AKTS_00156275 | AKTS_00161030 |
| AKTS_00148047 | AKTS_00151225 | AKTS_00156279 | AKTS_00162081 |
| AKTS_00148136 | AKTS_00151231 | AKTS_00156280 | AKTS_00162125 |
| AKTS_00148187 | AKTS_00151287 | AKTS_00156281 | AKTS_00162126 |
| AKTS_00148188 | AKTS_00151294 | AKTS_00156282 | AKTS_00162127 |
| AKTS_00148192 | AKTS_00151389 | AKTS_00156286 | AKTS_00162128 |
| AKTS_00148194 | AKTS_00151420 | AKTS_00156290 | AKTS_00163194 |
| AKTS_00148307 | AKTS_00151421 | AKTS_00156291 | AKTS_00163231 |
| AKTS_00148308 | AKTS_00151430 | AKTS_00156292 | AKTS_00163232 |
| AKTS_00148347 | AKTS_00151566 | AKTS_00156293 | AKTS_00163238 |
| AKTS_00148379 | AKTS_00151577 | AKTS_00156297 | AKTS_00163266 |
| AKTS_00148380 | AKTS_00151791 | AKTS_00156301 | AKTS_00163267 |
| AKTS_00148418 | AKTS_00151889 | AKTS_00156302 | AKTS_00163273 |
| AKTS_00148869 | AKTS_00151964 | AKTS_00156335 | AKTS_00163985 |
| AKTS_00148873 | AKTS_00152143 | AKTS_00156336 | AKTS_00163986 |
| AKTS_00148942 | AKTS_00152144 | AKTS_00156340 | AKTS_00165545 |
| AKTS_00148944 | AKTS_00152274 | AKTS_00157075 | AKTS_00166270 |
| AKTS_00148946 | AKTS_00152275 | AKTS_00157083 | AKTS_00167236 |
| AKTS_00148948 | AKTS_00152442 | AKTS_00157092 | AKTS_00167237 |
| AKTS_00148949 | AKTS_00152460 | AKTS_00157143 | AKTS_00167245 |
| AKTS_00148958 | AKTS_00152636 | AKTS_00157150 | AKTS_00168714 |
| AKTS_00148966 | AKTS_00152705 | AKTS_00157160 | AKTS_00168732 |
| AKTS_00148968 | AKTS_00152723 | AKTS_00157223 | AKTS_00171880 |
| AKTS_00148970 | AKTS_00152818 | AKTS_00157224 | AKTS_00172256 |
| AKTS_00148979 | AKTS_00152833 | AKTS_00157270 | AKTS_00172261 |
| AKTS_00148980 | AKTS_00152836 | AKTS_00157364 | AKTS_00172348 |
| AKTS_00148982 | AKTS_00152943 | AKTS_00157365 | AKTS_00173225 |
| AKTS_00148984 | AKTS_00153399 | AKTS_00157649 | AKTS_00174049 |
| AKTS_00149068 | AKTS_00153400 | AKTS_00157707 | AKTS_00174400 |
| AKTS_00149070 | AKTS_00153401 | AKTS_00157708 | AKTS_00174401 |
| AKTS_00149152 | AKTS_00153402 | AKTS_00157713 | AKTS_00174713 |
| AKTS_00149225 | AKTS_00153403 | AKTS_00158392 | AKTS_00176678 |
| AKTS_00149353 | AKTS_00153404 | AKTS_00158395 | AKTS_00176679 |
| AKTS_00149378 | AKTS_00153405 | AKTS_00159036 | AKTS_00176680 |
| AKTS_00149379 | AKTS_00153444 | AKTS_00159037 | AKTS_00176681 |

| | | | |
|---|---|---|---|
| AKTS_00176682 | AKTS_00194192 | AKTS_00196236 | AKTS_00199107 |
| AKTS_00177587 | AKTS_00194304 | AKTS_00196501 | AKTS_00199110 |
| AKTS_00177910 | AKTS_00194308 | AKTS_00196971 | AKTS_00199113 |
| AKTS_00177912 | AKTS_00194317 | AKTS_00196995 | AKTS_00199454 |
| AKTS_00177917 | AKTS_00194342 | AKTS_00197060 | AKTS_00200604 |
| AKTS_00177918 | AKTS_00194353 | AKTS_00197071 | AKTS_00200650 |
| AKTS_00177927 | AKTS_00194372 | AKTS_00197074 | AKTS_00201045 |
| AKTS_00178084 | AKTS_00194416 | AKTS_00197075 | AKTS_00201537 |
| AKTS_00178088 | AKTS_00194430 | AKTS_00197076 | AKTS_00202000 |
| AKTS_00178089 | AKTS_00194463 | AKTS_00197079 | AKTS_00202599 |
| AKTS_00178197 | AKTS_00194530 | AKTS_00197105 | AKTS_00202604 |
| AKTS_00178650 | AKTS_00194618 | AKTS_00197161 | AKTS_00202607 |
| AKTS_00178654 | AKTS_00194708 | AKTS_00197263 | AKTS_00202938 |
| AKTS_00178655 | AKTS_00194798 | AKTS_00197279 | AKTS_00202949 |
| AKTS_00179018 | AKTS_00194816 | AKTS_00197330 | AKTS_00203050 |
| AKTS_00179029 | AKTS_00194821 | AKTS_00197430 | AKTS_00203060 |
| AKTS_00179037 | AKTS_00194913 | AKTS_00197441 | AKTS_00203493 |
| AKTS_00179094 | AKTS_00194915 | AKTS_00197498 | AKTS_00203690 |
| AKTS_00179105 | AKTS_00194962 | AKTS_00197502 | AKTS_00203691 |
| AKTS_00179113 | AKTS_00194963 | AKTS_00197506 | AKTS_00203692 |
| AKTS_00179461 | AKTS_00194964 | AKTS_00197644 | AKTS_00203693 |
| AKTS_00179476 | AKTS_00194965 | AKTS_00197645 | AKTS_00203694 |
| AKTS_00180686 | AKTS_00194966 | AKTS_00197728 | AKTS_00203696 |
| AKTS_00180687 | AKTS_00194977 | AKTS_00197729 | AKTS_00203698 |
| AKTS_00180688 | AKTS_00195033 | AKTS_00197731 | AKTS_00203699 |
| AKTS_00180690 | AKTS_00195074 | AKTS_00198367 | AKTS_00203700 |
| AKTS_00180691 | AKTS_00195106 | AKTS_00198471 | AKTS_00203701 |
| AKTS_00180814 | AKTS_00195149 | AKTS_00198478 | AKTS_00203703 |
| AKTS_00180816 | AKTS_00195227 | AKTS_00198527 | AKTS_00203705 |
| AKTS_00180820 | AKTS_00195282 | AKTS_00198590 | AKTS_00203708 |
| AKTS_00180823 | AKTS_00195292 | AKTS_00198630 | AKTS_00203709 |
| AKTS_00180826 | AKTS_00195295 | AKTS_00198649 | AKTS_00204162 |
| AKTS_00180829 | AKTS_00195339 | AKTS_00198668 | AKTS_00204171 |
| AKTS_00180832 | AKTS_00195413 | AKTS_00198672 | AKTS_00204180 |
| AKTS_00180835 | AKTS_00195419 | AKTS_00198676 | AKTS_00204189 |
| AKTS_00184543 | AKTS_00195443 | AKTS_00198680 | AKTS_00204198 |
| AKTS_00185112 | AKTS_00195470 | AKTS_00198699 | AKTS_00204206 |
| AKTS_00186404 | AKTS_00195472 | AKTS_00198718 | AKTS_00204214 |
| AKTS_00186418 | AKTS_00195476 | AKTS_00198736 | AKTS_00204790 |
| AKTS_00186438 | AKTS_00195477 | AKTS_00198755 | AKTS_00204803 |
| AKTS_00187639 | AKTS_00195486 | AKTS_00198821 | AKTS_00204845 |
| AKTS_00188852 | AKTS_00195512 | AKTS_00198836 | AKTS_00204847 |
| AKTS_00188853 | AKTS_00195514 | AKTS_00198854 | AKTS_00204875 |
| AKTS_00188866 | AKTS_00195672 | AKTS_00198873 | AKTS_00204908 |
| AKTS_00188875 | AKTS_00195762 | AKTS_00198944 | AKTS_00204965 |
| AKTS_00188888 | AKTS_00195787 | AKTS_00199018 | AKTS_00204978 |
| AKTS_00188901 | AKTS_00195802 | AKTS_00199031 | AKTS_00204984 |
| AKTS_00192533 | AKTS_00195812 | AKTS_00199032 | AKTS_00205028 |
| AKTS_00192555 | AKTS_00195848 | AKTS_00199035 | AKTS_00205039 |
| AKTS_00192824 | AKTS_00195850 | AKTS_00199038 | AKTS_00205054 |
| AKTS_00193999 | AKTS_00195856 | AKTS_00199040 | AKTS_00205055 |
| AKTS_00194008 | AKTS_00196165 | AKTS_00199042 | AKTS_00205062 |

A-9

| | | | |
|---|---|---|---|
| AKTS_00205066 | AKTS_00210274 | AKTS_00212801 | AKTS_00221355 |
| AKTS_00205076 | AKTS_00210474 | AKTS_00212802 | AKTS_00221700 |
| AKTS_00205135 | AKTS_00210570 | AKTS_00212803 | AKTS_00221799 |
| AKTS_00205506 | AKTS_00210571 | AKTS_00212810 | AKTS_00221802 |
| AKTS_00205507 | AKTS_00210572 | AKTS_00212970 | AKTS_00221806 |
| AKTS_00205549 | AKTS_00210630 | AKTS_00213141 | AKTS_00221811 |
| AKTS_00205556 | AKTS_00210654 | AKTS_00213409 | AKTS_00221928 |
| AKTS_00205792 | AKTS_00210655 | AKTS_00214111 | AKTS_00221930 |
| AKTS_00205821 | AKTS_00210680 | AKTS_00214112 | AKTS_00222250 |
| AKTS_00205826 | AKTS_00210681 | AKTS_00214113 | AKTS_00222254 |
| AKTS_00205980 | AKTS_00210706 | AKTS_00214114 | AKTS_00222276 |
| AKTS_00205988 | AKTS_00210732 | AKTS_00214115 | AKTS_00222278 |
| AKTS_00206389 | AKTS_00210733 | AKTS_00214116 | AKTS_00222279 |
| AKTS_00206448 | AKTS_00210811 | AKTS_00214157 | AKTS_00222284 |
| AKTS_00206456 | AKTS_00210812 | AKTS_00214164 | AKTS_00222288 |
| AKTS_00206481 | AKTS_00210817 | AKTS_00214165 | AKTS_00222292 |
| AKTS_00206489 | AKTS_00210830 | AKTS_00214254 | AKTS_00222295 |
| AKTS_00206497 | AKTS_00210842 | AKTS_00214269 | AKTS_00222303 |
| AKTS_00206520 | AKTS_00210844 | AKTS_00214270 | AKTS_00222308 |
| AKTS_00207259 | AKTS_00210845 | AKTS_00214272 | AKTS_00222312 |
| AKTS_00207260 | AKTS_00210856 | AKTS_00214274 | AKTS_00222318 |
| AKTS_00207296 | AKTS_00210870 | AKTS_00214275 | AKTS_00222325 |
| AKTS_00207831 | AKTS_00211032 | AKTS_00215083 | AKTS_00222990 |
| AKTS_00208283 | AKTS_00211368 | AKTS_00215084 | AKTS_00223008 |
| AKTS_00208284 | AKTS_00211401 | AKTS_00215103 | AKTS_00223009 |
| AKTS_00209095 | AKTS_00211546 | AKTS_00215104 | AKTS_00223010 |
| AKTS_00209147 | AKTS_00211577 | AKTS_00215105 | AKTS_00223011 |
| AKTS_00209148 | AKTS_00211968 | AKTS_00215106 | AKTS_00223012 |
| AKTS_00209160 | AKTS_00211969 | AKTS_00215107 | AKTS_00223013 |
| AKTS_00209274 | AKTS_00211972 | AKTS_00215206 | AKTS_00223014 |
| AKTS_00209275 | AKTS_00211973 | AKTS_00215418 | AKTS_00223015 |
| AKTS_00209294 | AKTS_00211974 | AKTS_00215994 | AKTS_00223016 |
| AKTS_00209295 | AKTS_00211977 | AKTS_00215998 | AKTS_00223017 |
| AKTS_00209298 | AKTS_00211984 | AKTS_00216061 | AKTS_00223456 |
| AKTS_00209314 | AKTS_00211985 | AKTS_00216118 | AKTS_00223457 |
| AKTS_00209316 | AKTS_00211986 | AKTS_00216127 | AKTS_00223458 |
| AKTS_00209319 | AKTS_00211987 | AKTS_00216207 | AKTS_00224121 |
| AKTS_00209321 | AKTS_00211988 | AKTS_00216208 | AKTS_00224122 |
| AKTS_00209323 | AKTS_00211989 | AKTS_00216834 | AKTS_00224130 |
| AKTS_00209708 | AKTS_00211991 | AKTS_00216939 | AKTS_00224131 |
| AKTS_00209709 | AKTS_00211993 | AKTS_00216987 | AKTS_00224132 |
| AKTS_00209937 | AKTS_00211996 | AKTS_00217170 | AKTS_00224445 |
| AKTS_00209938 | AKTS_00211998 | AKTS_00217688 | AKTS_00224446 |
| AKTS_00210233 | AKTS_00211999 | AKTS_00217689 | AKTS_00224453 |
| AKTS_00210242 | AKTS_00212002 | AKTS_00217691 | AKTS_00224454 |
| AKTS_00210243 | AKTS_00212004 | AKTS_00217694 | AKTS_00224636 |
| AKTS_00210244 | AKTS_00212005 | AKTS_00218128 | AKTS_00224641 |
| AKTS_00210249 | AKTS_00212006 | AKTS_00220611 | AKTS_00224644 |
| AKTS_00210251 | AKTS_00212007 | AKTS_00220612 | AKTS_00224690 |
| AKTS_00210253 | AKTS_00212526 | AKTS_00220953 | AKTS_00224870 |
| AKTS_00210255 | AKTS_00212527 | AKTS_00220954 | AKTS_00224871 |
| AKTS_00210257 | AKTS_00212543 | AKTS_00221192 | AKTS_00224872 |

| | | | |
|---|---|---|---|
| AKTS_00225178 | AKTS_00234959 | AKTS_00239661 | AKTS_00247370 |
| AKTS_00225927 | AKTS_00235080 | AKTS_00239720 | AKTS_00247548 |
| AKTS_00225928 | AKTS_00235561 | AKTS_00239748 | AKTS_00247976 |
| AKTS_00225929 | AKTS_00235834 | AKTS_00239753 | AKTS_00247977 |
| AKTS_00225930 | AKTS_00236169 | AKTS_00240176 | AKTS_00247978 |
| AKTS_00225931 | AKTS_00238447 | AKTS_00240177 | AKTS_00247979 |
| AKTS_00226344 | AKTS_00238450 | AKTS_00240385 | AKTS_00247980 |
| AKTS_00226431 | AKTS_00238453 | AKTS_00240386 | AKTS_00247985 |
| AKTS_00226432 | AKTS_00238454 | AKTS_00240393 | AKTS_00248205 |
| AKTS_00226590 | AKTS_00238455 | AKTS_00240401 | AKTS_00248208 |
| AKTS_00226602 | AKTS_00238456 | AKTS_00240407 | AKTS_00248565 |
| AKTS_00226788 | AKTS_00238457 | AKTS_00241323 | AKTS_00248570 |
| AKTS_00227079 | AKTS_00238458 | AKTS_00241872 | AKTS_00248574 |
| AKTS_00227080 | AKTS_00238459 | AKTS_00242763 | AKTS_00248577 |
| AKTS_00227378 | AKTS_00238465 | AKTS_00242908 | AKTS_00248657 |
| AKTS_00228117 | AKTS_00238466 | AKTS_00242963 | AKTS_00248659 |
| AKTS_00228118 | AKTS_00238513 | AKTS_00242972 | AKTS_00248663 |
| AKTS_00228119 | AKTS_00238515 | AKTS_00243004 | AKTS_00248667 |
| AKTS_00228120 | AKTS_00238516 | AKTS_00243127 | AKTS_00248669 |
| AKTS_00228125 | AKTS_00238517 | AKTS_00243276 | AKTS_00248673 |
| AKTS_00228216 | AKTS_00238518 | AKTS_00243305 | AKTS_00249041 |
| AKTS_00228811 | AKTS_00238519 | AKTS_00243441 | AKTS_00249254 |
| AKTS_00228814 | AKTS_00238520 | AKTS_00243564 | AKTS_00249255 |
| AKTS_00229129 | AKTS_00238523 | AKTS_00244212 | AKTS_00249256 |
| AKTS_00232137 | AKTS_00238525 | AKTS_00244221 | AKTS_00249257 |
| AKTS_00232141 | AKTS_00238526 | AKTS_00244229 | AKTS_00249258 |
| AKTS_00232206 | AKTS_00238527 | AKTS_00244234 | AKTS_00249680 |
| AKTS_00232252 | AKTS_00238528 | AKTS_00244243 | AKTS_00250181 |
| AKTS_00232258 | AKTS_00238529 | AKTS_00244296 | AKTS_00250183 |
| AKTS_00232292 | AKTS_00238530 | AKTS_00244324 | AKTS_00250184 |
| AKTS_00232293 | AKTS_00238532 | AKTS_00244332 | AKTS_00250185 |
| AKTS_00232683 | AKTS_00238533 | AKTS_00244422 | AKTS_00250186 |
| AKTS_00232689 | AKTS_00238534 | AKTS_00244426 | AKTS_00250583 |
| AKTS_00232690 | AKTS_00238535 | AKTS_00244604 | AKTS_00250585 |
| AKTS_00232692 | AKTS_00238536 | AKTS_00244916 | AKTS_00250586 |
| AKTS_00232749 | AKTS_00238537 | AKTS_00244925 | AKTS_00250588 |
| AKTS_00232755 | AKTS_00238538 | AKTS_00244934 | AKTS_00250589 |
| AKTS_00232800 | AKTS_00238539 | AKTS_00245037 | AKTS_00250590 |
| AKTS_00232806 | AKTS_00238540 | AKTS_00245038 | AKTS_00250593 |
| AKTS_00232844 | AKTS_00238541 | AKTS_00245040 | AKTS_00250594 |
| AKTS_00232867 | AKTS_00238542 | AKTS_00245041 | AKTS_00250845 |
| AKTS_00233503 | AKTS_00238543 | AKTS_00245044 | AKTS_00251003 |
| AKTS_00233505 | AKTS_00238545 | AKTS_00245207 | AKTS_00251004 |
| AKTS_00233553 | AKTS_00238676 | AKTS_00245313 | AKTS_00251005 |
| AKTS_00233592 | AKTS_00238944 | AKTS_00245502 | AKTS_00251006 |
| AKTS_00233704 | AKTS_00238948 | AKTS_00245503 | AKTS_00251007 |
| AKTS_00233794 | AKTS_00239564 | AKTS_00245517 | AKTS_00251145 |
| AKTS_00233795 | AKTS_00239566 | AKTS_00245518 | AKTS_00251146 |
| AKTS_00233885 | AKTS_00239568 | AKTS_00246445 | AKTS_00251148 |
| AKTS_00233980 | AKTS_00239576 | AKTS_00246450 | AKTS_00251150 |
| AKTS_00234713 | AKTS_00239647 | AKTS_00246504 | AKTS_00251151 |
| AKTS_00234925 | AKTS_00239650 | AKTS_00246711 | AKTS_00251154 |
| | AKTS_00239657 | | |

| | | | |
|---|---|---|---|
| AKTS_00251156 | AKTS_00265438 | AKTS_00274896 | AKTS_00282378 |
| AKTS_00251158 | AKTS_00266116 | AKTS_00274912 | AKTS_00282941 |
| AKTS_00251159 | AKTS_00266152 | AKTS_00275239 | AKTS_00282942 |
| AKTS_00251162 | AKTS_00266162 | AKTS_00275517 | AKTS_00283996 |
| AKTS_00251163 | AKTS_00266172 | AKTS_00275756 | AKTS_00283998 |
| AKTS_00251164 | AKTS_00266338 | AKTS_00275812 | AKTS_00284259 |
| AKTS_00251165 | AKTS_00266369 | AKTS_00275813 | AKTS_00284398 |
| AKTS_00251167 | AKTS_00267216 | AKTS_00277019 | AKTS_00284595 |
| AKTS_00251171 | AKTS_00267902 | AKTS_00277020 | AKTS_00284707 |
| AKTS_00251173 | AKTS_00267969 | AKTS_00277021 | AKTS_00284709 |
| AKTS_00251176 | AKTS_00268028 | AKTS_00277028 | AKTS_00285186 |
| AKTS_00251184 | AKTS_00268828 | AKTS_00277029 | AKTS_00285678 |
| AKTS_00253307 | AKTS_00268829 | AKTS_00277031 | AKTS_00285681 |
| AKTS_00253613 | AKTS_00268830 | AKTS_00277032 | AKTS_00286115 |
| AKTS_00254885 | AKTS_00268837 | AKTS_00277040 | AKTS_00287871 |
| AKTS_00254922 | AKTS_00269020 | AKTS_00277043 | AKTS_00287903 |
| AKTS_00254923 | AKTS_00269926 | AKTS_00277044 | AKTS_00287904 |
| AKTS_00256280 | AKTS_00271074 | AKTS_00277046 | AKTS_00287916 |
| AKTS_00256423 | AKTS_00271076 | AKTS_00277047 | AKTS_00287921 |
| AKTS_00256728 | AKTS_00271185 | AKTS_00277048 | AKTS_00287946 |
| AKTS_00256987 | AKTS_00271186 | AKTS_00277055 | AKTS_00287946 |
| AKTS_00257569 | AKTS_00271201 | AKTS_00277056 | AKTS_00288032 |
| AKTS_00257717 | AKTS_00271289 | AKTS_00277057 | AKTS_00288034 |
| AKTS_00257820 | AKTS_00271290 | AKTS_00277443 | AKTS_00288121 |
| AKTS_00257821 | AKTS_00271498 | AKTS_00277444 | AKTS_00288123 |
| AKTS_00259355 | AKTS_00271499 | AKTS_00277451 | AKTS_00288160 |
| AKTS_00259936 | AKTS_00272076 | AKTS_00277476 | AKTS_00288164 |
| AKTS_00259937 | AKTS_00272077 | AKTS_00277698 | AKTS_00288169 |
| AKTS_00260980 | AKTS_00272993 | AKTS_00277875 | AKTS_00288169 |
| AKTS_00261384 | AKTS_00273118 | AKTS_00277877 | AKTS_00288173 |
| AKTS_00261430 | AKTS_00273119 | AKTS_00277908 | AKTS_00288351 |
| AKTS_00261444 | AKTS_00273627 | AKTS_00277909 | AKTS_00288377 |
| AKTS_00261915 | AKTS_00273628 | AKTS_00277911 | AKTS_00288504 |
| AKTS_00262071 | AKTS_00273630 | AKTS_00278071 | AKTS_00288634 |
| AKTS_00262338 | AKTS_00273637 | AKTS_00278326 | AKTS_00288656 |
| AKTS_00262826 | AKTS_00273641 | AKTS_00278327 | AKTS_00289533 |
| AKTS_00262833 | AKTS_00273642 | AKTS_00278600 | AKTS_00289535 |
| AKTS_00263015 | AKTS_00273815 | AKTS_00278602 | AKTS_00289683 |
| AKTS_00263279 | AKTS_00274035 | AKTS_00279037 | AKTS_00289752 |
| AKTS_00263280 | AKTS_00274081 | AKTS_00279081 | AKTS_00289943 |
| AKTS_00263317 | AKTS_00274308 | AKTS_00279094 | AKTS_00290095 |
| AKTS_00263318 | AKTS_00274309 | AKTS_00279197 | AKTS_00291246 |
| AKTS_00263321 | AKTS_00274313 | AKTS_00279415 | AKTS_00291264 |
| AKTS_00263323 | AKTS_00274314 | AKTS_00280772 | AKTS_00291636 |
| AKTS_00263416 | AKTS_00274331 | AKTS_00281312 | AKTS_00291717 |
| AKTS_00263422 | AKTS_00274786 | AKTS_00281428 | AKTS_00292322 |
| AKTS_00263524 | AKTS_00274795 | AKTS_00281429 | AKTS_00292371 |
| AKTS_00263531 | AKTS_00274797 | AKTS_00281612 | AKTS_00292376 |
| AKTS_00264715 | AKTS_00274802 | AKTS_00281624 | AKTS_00292378 |
| AKTS_00264873 | AKTS_00274804 | AKTS_00281823 | AKTS_00293035 |
| AKTS_00264915 | AKTS_00274825 | AKTS_00281825 | AKTS_00294697 |
| AKTS_00265435 | AKTS_00274840 | AKTS_00282314 | AKTS_00294700 |

| | | | |
|---|---|---|---|
| AKTS_00294703 | AKTS_00316314 | AKTS_00324480 | AKTS_00362735 |
| AKTS_00294728 | AKTS_00316315 | AKTS_00326234 | AKTS_00363805 |
| AKTS_00295346 | AKTS_00316320 | AKTS_00326235 | AKTS_00363806 |
| AKTS_00298226 | AKTS_00316325 | AKTS_00326738 | AKTS_00364117 |
| AKTS_00298227 | AKTS_00316326 | AKTS_00326739 | AKTS_00364956 |
| AKTS_00300048 | AKTS_00316329 | AKTS_00328075 | AKTS_00366582 |
| AKTS_00300079 | AKTS_00316971 | AKTS_00328084 | AKTS_00367307 |
| AKTS_00300090 | AKTS_00317000 | AKTS_00328093 | AKTS_00367507 |
| AKTS_00300091 | AKTS_00317850 | AKTS_00328246 | AKTS_00367810 |
| AKTS_00300093 | AKTS_00318521 | AKTS_00328251 | AKTS_00367886 |
| AKTS_00300094 | AKTS_00318857 | AKTS_00328252 | AKTS_00367890 |
| AKTS_00300096 | AKTS_00319239 | AKTS_00328369 | AKTS_00368562 |
| AKTS_00300423 | AKTS_00319701 | AKTS_00328380 | AKTS_00368955 |
| AKTS_00300672 | AKTS_00319702 | AKTS_00330694 | AKTS_00369401 |
| AKTS_00300673 | AKTS_00319731 | AKTS_00335410 | AKTS_00370379 |
| AKTS_00300675 | AKTS_00319738 | AKTS_00335489 | AKTS_00370703 |
| AKTS_00300676 | AKTS_00319823 | AKTS_00335492 | AKTS_00372178 |
| AKTS_00300678 | AKTS_00319837 | AKTS_00335572 | AKTS_00372996 |
| AKTS_00302681 | AKTS_00319856 | AKTS_00335578 | AKTS_00373132 |
| AKTS_00304362 | AKTS_00319863 | AKTS_00335587 | AKTS_00373851 |
| AKTS_00304363 | AKTS_00319882 | AKTS_00335648 | AKTS_00374509 |
| AKTS_00304638 | AKTS_00319889 | AKTS_00335657 | AKTS_00375672 |
| AKTS_00304921 | AKTS_00319898 | AKTS_00337083 | AKTS_00377025 |
| AKTS_00305593 | AKTS_00319905 | AKTS_00337330 | AKTS_00377028 |
| AKTS_00305724 | AKTS_00319980 | AKTS_00337332 | AKTS_00377082 |
| AKTS_00305725 | AKTS_00320178 | AKTS_00339428 | AKTS_00377083 |
| AKTS_00306375 | AKTS_00320185 | AKTS_00339809 | AKTS_00377236 |
| AKTS_00306383 | AKTS_00320263 | AKTS_00339958 | AKTS_00378520 |
| AKTS_00307308 | AKTS_00320265 | AKTS_00339959 | AKTS_00378523 |
| AKTS_00307569 | AKTS_00320266 | AKTS_00339976 | AKTS_00379096 |
| AKTS_00307570 | AKTS_00320273 | AKTS_00340666 | AKTS_00379630 |
| AKTS_00308097 | AKTS_00320280 | AKTS_00347209 | AKTS_00380200 |
| AKTS_00308098 | AKTS_00320415 | AKTS_00348361 | AKTS_00380201 |
| AKTS_00308699 | AKTS_00320416 | AKTS_00348362 | AKTS_00380983 |
| AKTS_00309188 | AKTS_00320631 | AKTS_00348363 | AKTS_00381153 |
| AKTS_00309268 | AKTS_00320632 | AKTS_00348448 | AKTS_00381183 |
| AKTS_00309271 | AKTS_00321196 | AKTS_00348449 | AKTS_00381186 |
| AKTS_00309522 | AKTS_00321203 | AKTS_00348450 | AKTS_00382012 |
| AKTS_00312712 | AKTS_00322491 | AKTS_00348451 | AKTS_00382013 |
| AKTS_00312899 | AKTS_00322637 | AKTS_00348540 | AKTS_00382014 |
| AKTS_00312900 | AKTS_00323121 | AKTS_00348608 | AKTS_00382015 |
| AKTS_00313576 | AKTS_00323123 | AKTS_00348620 | AKTS_00382241 |
| AKTS_00313577 | AKTS_00323146 | AKTS_00348970 | AKTS_00382242 |
| AKTS_00313753 | AKTS_00323510 | AKTS_00360143 | AKTS_00382243 |
| AKTS_00313881 | AKTS_00323513 | AKTS_00360145 | AKTS_00382244 |
| AKTS_00314051 | AKTS_00323514 | AKTS_00360200 | AKTS_00382245 |
| AKTS_00314052 | AKTS_00323515 | AKTS_00360202 | AKTS_00382246 |
| AKTS_00315825 | AKTS_00323714 | AKTS_00360630 | AKTS_00382247 |
| AKTS_00316012 | AKTS_00323718 | AKTS_00361687 | AKTS_00382248 |
| AKTS_00316309 | AKTS_00323947 | AKTS_00361716 | AKTS_00382250 |
| AKTS_00316310 | AKTS_00323948 | AKTS_00362238 | AKTS_00382437 |
| AKTS_00316313 | AKTS_00324375 | AKTS_00362719 | AKTS_00382439 |

| | | | |
|---|---|---|---|
| AKTS_00383135 | AKTS_00396802 | AKTS_00405670 | AKTS_00439544 |
| AKTS_00385338 | AKTS_00396806 | AKTS_00406351 | AKTS_00439556 |
| AKTS_00386071 | AKTS_00396811 | AKTS_00406352 | AKTS_00439586 |
| AKTS_00386073 | AKTS_00396813 | AKTS_00406521 | AKTS_00439622 |
| AKTS_00386075 | AKTS_00396814 | AKTS_00406536 | AKTS_00439623 |
| AKTS_00386265 | AKTS_00396818 | AKTS_00406592 | AKTS_00439631 |
| AKTS_00386266 | AKTS_00396819 | AKTS_00406632 | AKTS_00439691 |
| AKTS_00386267 | AKTS_00396820 | AKTS_00407557 | AKTS_00439692 |
| AKTS_00386269 | AKTS_00396821 | AKTS_00407813 | AKTS_00439694 |
| AKTS_00386271 | AKTS_00396822 | AKTS_00407860 | AKTS_00439696 |
| AKTS_00386272 | AKTS_00396823 | AKTS_00407943 | AKTS_00439738 |
| AKTS_00386274 | AKTS_00396824 | AKTS_00407978 | AKTS_00439749 |
| AKTS_00386276 | AKTS_00396825 | AKTS_00407983 | AKTS_00439789 |
| AKTS_00386277 | AKTS_00396826 | AKTS_00409963 | AKTS_00439800 |
| AKTS_00386278 | AKTS_00396827 | AKTS_00411504 | AKTS_00439807 |
| AKTS_00387248 | AKTS_00396828 | AKTS_00413328 | AKTS_00439811 |
| AKTS_00391563 | AKTS_00396829 | AKTS_00413593 | AKTS_00439812 |
| AKTS_00391590 | AKTS_00396830 | AKTS_00413597 | AKTS_00439813 |
| AKTS_00393480 | AKTS_00396831 | AKTS_00413598 | AKTS_00439850 |
| AKTS_00394300 | AKTS_00396832 | AKTS_00413605 | AKTS_00439853 |
| AKTS_00396266 | AKTS_00396833 | AKTS_00413609 | AKTS_00439876 |
| AKTS_00396267 | AKTS_00396834 | AKTS_00413618 | AKTS_00439887 |
| AKTS_00396270 | AKTS_00396835 | AKTS_00415698 | AKTS_00439901 |
| AKTS_00396272 | AKTS_00396836 | AKTS_00415954 | AKTS_00439919 |
| AKTS_00396275 | AKTS_00396837 | AKTS_00416242 | AKTS_00439937 |
| AKTS_00396277 | AKTS_00396838 | AKTS_00416926 | AKTS_00439938 |
| AKTS_00396280 | AKTS_00396839 | AKTS_00420727 | AKTS_00439946 |
| AKTS_00396282 | AKTS_00396840 | AKTS_00420970 | AKTS_00439947 |
| AKTS_00396639 | AKTS_00396841 | AKTS_00422246 | AKTS_00439951 |
| AKTS_00396649 | AKTS_00396842 | AKTS_00422332 | AKTS_00439953 |
| AKTS_00396650 | AKTS_00396843 | AKTS_00422451 | AKTS_00439960 |
| AKTS_00396657 | AKTS_00396844 | AKTS_00424083 | AKTS_00440000 |
| AKTS_00396660 | AKTS_00396845 | AKTS_00424104 | AKTS_00440042 |
| AKTS_00396665 | AKTS_00396846 | AKTS_00424129 | AKTS_00440053 |
| AKTS_00396672 | AKTS_00398038 | AKTS_00426444 | AKTS_00440064 |
| AKTS_00396679 | AKTS_00398039 | AKTS_00426668 | AKTS_00440066 |
| AKTS_00396690 | AKTS_00398046 | AKTS_00426678 | AKTS_00440067 |
| AKTS_00396695 | AKTS_00398059 | AKTS_00426801 | AKTS_00440068 |
| AKTS_00396699 | AKTS_00398072 | AKTS_00427862 | AKTS_00440128 |
| AKTS_00396703 | AKTS_00398081 | AKTS_00435098 | AKTS_00440165 |
| AKTS_00396709 | AKTS_00398664 | AKTS_00436385 | AKTS_00440166 |
| AKTS_00396712 | AKTS_00398665 | AKTS_00439085 | AKTS_00440169 |
| AKTS_00396719 | AKTS_00398667 | AKTS_00439096 | AKTS_00440183 |
| AKTS_00396727 | AKTS_00399135 | AKTS_00439104 | AKTS_00440201 |
| AKTS_00396745 | AKTS_00399447 | AKTS_00439118 | AKTS_00440224 |
| AKTS_00396766 | AKTS_00399455 | AKTS_00439127 | AKTS_00440235 |
| AKTS_00396771 | AKTS_00400356 | AKTS_00439143 | AKTS_00440253 |
| AKTS_00396777 | AKTS_00402286 | AKTS_00439438 | AKTS_00440254 |
| AKTS_00396782 | AKTS_00402286 | AKTS_00439440 | AKTS_00440255 |
| AKTS_00396792 | AKTS_00403531 | AKTS_00439482 | AKTS_00440256 |
| AKTS_00396795 | AKTS_00405312 | AKTS_00439493 | AKTS_00440257 |
| AKTS_00396797 | AKTS_00405425 | AKTS_00439504 | AKTS_00440259 |

A-14

| | | | |
|---|---|---|---|
| AKTS_00440266 | AKTS_00496342 | AKTS_00517271 | AKTS_00691369 |
| AKTS_00440277 | AKTS_00496664 | AKTS_00517282 | AKTS_00693295 |
| AKTS_00440319 | AKTS_00496666 | AKTS_00517318 | AKTS_00712285 |
| AKTS_00440330 | AKTS_00496672 | AKTS_00517319 | AKTS_00712287 |
| AKTS_00440370 | AKTS_00496841 | AKTS_00517330 | AKTS_00714140 |
| AKTS_00440374 | AKTS_00496842 | AKTS_00517408 | AKTS_00718491 |
| AKTS_00440376 | AKTS_00496871 | AKTS_00517409 | AKTS_00720463 |
| AKTS_00440436 | AKTS_00496906 | AKTS_00517415 | AKTS_00729493 |
| AKTS_00440473 | AKTS_00496940 | AKTS_00518851 | AKTS_00729495 |
| AKTS_00440476 | AKTS_00496962 | AKTS_00518852 | AKTS_00730555 |
| AKTS_00440494 | AKTS_00496974 | AKTS_00518853 | AKTS_00730557 |
| AKTS_00440505 | AKTS_00496975 | AKTS_00520235 | AKTS_00730559 |
| AKTS_00440528 | AKTS_00496988 | AKTS_00524881 | AKTS_00731144 |
| AKTS_00440546 | AKTS_00497006 | AKTS_00524892 | AKTS_00735365 |
| AKTS_00440560 | AKTS_00497032 | AKTS_00525899 | AKTS_00756796 |
| AKTS_00440561 | AKTS_00497056 | AKTS_00525900 | AKTS_00769215 |
| AKTS_00440569 | AKTS_00497058 | AKTS_00530075 | AKTS_00770932 |
| AKTS_00440570 | AKTS_00497091 | AKTS_00545738 | AKTS_00780614 |
| AKTS_00440721 | AKTS_00497112 | AKTS_00545742 | AKTS_00780615 |
| AKTS_00471343 | AKTS_00497140 | AKTS_00545752 | AKTS_00788159 |
| AKTS_00471348 | AKTS_00497165 | AKTS_00564564 | AKTS_00811405 |
| AKTS_00471885 | AKTS_00497190 | AKTS_00564565 | AKTS_00870896 |
| AKTS_00472874 | AKTS_00497210 | AKTS_00573082 | AKTS_00871244 |
| AKTS_00472877 | AKTS_00497248 | AKTS_00593276 | AKTS_00876579 |
| AKTS_00473803 | AKTS_00497250 | AKTS_00610949 | AKTS_00876580 |
| AKTS_00473815 | AKTS_00499398 | AKTS_00611530 | AKTS_00877505 |
| AKTS_00475415 | AKTS_00499399 | AKTS_00612349 | AKTS_00887399 |
| AKTS_00475417 | AKTS_00499400 | AKTS_00627291 | AKTS_00887412 |
| AKTS_00475421 | AKTS_00499401 | AKTS_00629768 | AKTS_00888149 |
| AKTS_00475922 | AKTS_00499402 | AKTS_00631821 | AKTS_00888329 |
| AKTS_00475923 | AKTS_00499403 | AKTS_00631968 | AKTS_00896647 |
| AKTS_00476299 | AKTS_00499404 | AKTS_00632050 | AKTS_00907759 |
| AKTS_00476300 | AKTS_00499405 | AKTS_00637646 | AKTS_00907830 |
| AKTS_00476746 | AKTS_00500836 | AKTS_00637737 | AKTS_00908089 |
| AKTS_00476747 | AKTS_00504307 | AKTS_00637738 | AKTS_00908377 |
| AKTS_00477316 | AKTS_00504308 | AKTS_00637771 | AKTS_00908386 |
| AKTS_00478534 | AKTS_00504315 | AKTS_00637772 | AKTS_00908603 |
| AKTS_00480227 | AKTS_00504453 | AKTS_00637883 | AKTS_00908604 |
| AKTS_00481460 | AKTS_00504458 | AKTS_00638844 | AKTS_00908650 |
| AKTS_00483128 | AKTS_00504765 | AKTS_00639211 | AKTS_00908742 |
| AKTS_00484501 | AKTS_00504766 | AKTS_00639230 | AKTS_00908775 |
| AKTS_00487276 | AKTS_00511981 | AKTS_00640617 | AKTS_00908776 |
| AKTS_00491117 | AKTS_00511982 | AKTS_00641370 | AKTS_00908816 |
| AKTS_00491118 | AKTS_00512148 | AKTS_00642776 | AKTS_00908821 |
| AKTS_00491119 | AKTS_00512149 | AKTS_00642832 | AKTS_00908849 |
| AKTS_00491417 | AKTS_00512160 | AKTS_00643360 | AKTS_00909058 |
| AKTS_00493639 | AKTS_00512162 | AKTS_00643776 | AKTS_00909889 |
| AKTS_00493641 | AKTS_00512177 | AKTS_00645479 | AKTS_00911925 |
| AKTS_00493647 | AKTS_00512179 | AKTS_00656094 | AKTS_00911974 |
| AKTS_00493746 | AKTS_00514786 | AKTS_00676128 | AKTS_00912813 |
| AKTS_00496334 | AKTS_00514787 | AKTS_00686544 | AKTS_00912839 |
| AKTS_00496336 | AKTS_00517270 | AKTS_00687337 | AKTS_00913269 |

A-15

| | | | |
|---|---|---|---|
| AKTS_00913391 | AKTS_00923038 | AKTS_00923791 | AKTS_00932720 |
| AKTS_00913458 | AKTS_00923044 | AKTS_00923794 | AKTS_00932725 |
| AKTS_00913752 | AKTS_00923263 | AKTS_00923817 | AKTS_00932727 |
| AKTS_00915716 | AKTS_00923270 | AKTS_00923900 | AKTS_00932728 |
| AKTS_00917569 | AKTS_00923271 | AKTS_00923905 | AKTS_00932733 |
| AKTS_00917636 | AKTS_00923282 | AKTS_00923984 | AKTS_00932739 |
| AKTS_00917643 | AKTS_00923287 | AKTS_00923993 | AKTS_00932744 |
| AKTS_00917715 | AKTS_00923292 | AKTS_00924027 | AKTS_00932765 |
| AKTS_00917718 | AKTS_00923303 | AKTS_00924039 | AKTS_00932771 |
| AKTS_00917807 | AKTS_00923308 | AKTS_00924075 | AKTS_00932797 |
| AKTS_00917809 | AKTS_00923314 | AKTS_00924095 | AKTS_00932801 |
| AKTS_00917812 | AKTS_00923340 | AKTS_00924116 | AKTS_00932802 |
| AKTS_00917848 | AKTS_00923342 | AKTS_00925795 | AKTS_00932803 |
| AKTS_00917938 | AKTS_00923343 | AKTS_00926385 | AKTS_00932814 |
| AKTS_00917948 | AKTS_00923354 | AKTS_00926408 | AKTS_00932815 |
| AKTS_00917952 | AKTS_00923360 | AKTS_00926417 | AKTS_00932817 |
| AKTS_00917959 | AKTS_00923372 | AKTS_00926426 | AKTS_00932831 |
| AKTS_00917962 | AKTS_00923379 | AKTS_00926445 | AKTS_00932832 |
| AKTS_00917965 | AKTS_00923380 | AKTS_00926454 | AKTS_00932833 |
| AKTS_00919284 | AKTS_00923381 | AKTS_00927053 | AKTS_00933252 |
| AKTS_00919285 | AKTS_00923382 | AKTS_00928076 | AKTS_00933507 |
| AKTS_00919286 | AKTS_00923383 | AKTS_00928644 | AKTS_00933519 |
| AKTS_00919306 | AKTS_00923384 | AKTS_00929231 | AKTS_00933615 |
| AKTS_00919327 | AKTS_00923391 | AKTS_00930573 | AKTS_00933650 |
| AKTS_00919346 | AKTS_00923392 | AKTS_00930790 | AKTS_00933700 |
| AKTS_00919374 | AKTS_00923393 | AKTS_00931214 | AKTS_00933721 |
| AKTS_00919388 | AKTS_00923394 | AKTS_00931222 | AKTS_00933872 |
| AKTS_00919389 | AKTS_00923408 | AKTS_00931235 | AKTS_00933911 |
| AKTS_00920051 | AKTS_00923409 | AKTS_00931441 | AKTS_00933914 |
| AKTS_00920056 | AKTS_00923410 | AKTS_00931602 | AKTS_00933915 |
| AKTS_00920311 | AKTS_00923424 | AKTS_00931610 | AKTS_00934746 |
| AKTS_00920325 | AKTS_00923433 | AKTS_00931675 | AKTS_00934815 |
| AKTS_00920329 | AKTS_00923434 | AKTS_00931747 | AKTS_00934907 |
| AKTS_00920342 | AKTS_00923435 | AKTS_00931838 | AKTS_00934921 |
| AKTS_00920413 | AKTS_00923440 | AKTS_00931844 | AKTS_00934923 |
| AKTS_00921682 | AKTS_00923444 | AKTS_00931914 | AKTS_00934939 |
| AKTS_00921694 | AKTS_00923446 | AKTS_00932105 | AKTS_00935033 |
| AKTS_00921703 | AKTS_00923451 | AKTS_00932121 | AKTS_00935136 |
| AKTS_00921727 | AKTS_00923452 | AKTS_00932178 | AKTS_00935259 |
| AKTS_00921903 | AKTS_00923453 | AKTS_00932193 | AKTS_00935636 |
| AKTS_00922206 | AKTS_00923473 | AKTS_00932295 | AKTS_00935703 |
| AKTS_00922274 | AKTS_00923487 | AKTS_00932314 | AKTS_00935906 |
| AKTS_00922282 | AKTS_00923488 | AKTS_00932358 | AKTS_00936044 |
| AKTS_00922288 | AKTS_00923489 | AKTS_00932638 | AKTS_00936054 |
| AKTS_00922298 | AKTS_00923604 | AKTS_00932658 | AKTS_00936061 |
| AKTS_00922304 | AKTS_00923609 | AKTS_00932669 | AKTS_00936062 |
| AKTS_00922316 | AKTS_00923667 | AKTS_00932677 | AKTS_00936067 |
| AKTS_00922400 | AKTS_00923721 | AKTS_00932687 | AKTS_00936116 |
| AKTS_00922423 | AKTS_00923730 | AKTS_00932694 | AKTS_00936196 |
| AKTS_00922442 | AKTS_00923769 | AKTS_00932702 | AKTS_00936345 |
| AKTS_00922972 | AKTS_00923774 | AKTS_00932713 | AKTS_00936597 |
| AKTS_00923015 | AKTS_00923785 | AKTS_00932718 | AKTS_00936601 |

A-16

| | | | |
|---|---|---|---|
| AKTS_00936606 | AKTS_00944194 | AKTS_00951763 | AKTS_00959716 |
| AKTS_00936618 | AKTS_00944195 | AKTS_00951764 | AKTS_00961420 |
| AKTS_00936628 | AKTS_00944196 | AKTS_00951765 | AKTS_00962016 |
| AKTS_00937079 | AKTS_00944197 | AKTS_00951766 | AKTS_00962064 |
| AKTS_00937088 | AKTS_00944198 | AKTS_00951767 | AKTS_00962874 |
| AKTS_00937098 | AKTS_00944199 | AKTS_00952603 | AKTS_00963114 |
| AKTS_00937189 | AKTS_00944200 | AKTS_00952613 | AKTS_00964606 |
| AKTS_00937201 | AKTS_00944201 | AKTS_00952740 | AKTS_00964639 |
| AKTS_00937244 | AKTS_00944202 | AKTS_00953214 | AKTS_00965395 |
| AKTS_00937251 | AKTS_00944203 | AKTS_00953566 | AKTS_00965400 |
| AKTS_00938246 | AKTS_00944204 | AKTS_00953589 | AKTS_00965406 |
| AKTS_00938608 | AKTS_00944205 | AKTS_00954991 | AKTS_00967563 |
| AKTS_00939780 | AKTS_00944206 | AKTS_00954993 | AKTS_00971791 |
| AKTS_00939914 | AKTS_00944207 | AKTS_00956718 | AKTS_00971795 |
| AKTS_00940158 | AKTS_00944504 | AKTS_00957172 | AKTS_00971796 |
| AKTS_00940375 | AKTS_00945489 | AKTS_00957174 | AKTS_00971855 |
| AKTS_00940390 | AKTS_00945545 | AKTS_00957175 | AKTS_00972162 |
| AKTS_00940563 | AKTS_00945600 | AKTS_00957287 | AKTS_00972191 |
| AKTS_00940565 | AKTS_00945601 | AKTS_00957290 | AKTS_00972231 |
| AKTS_00940653 | AKTS_00945602 | AKTS_00957292 | AKTS_00972322 |
| AKTS_00940697 | AKTS_00945603 | AKTS_00957306 | AKTS_00972344 |
| AKTS_00940701 | AKTS_00945604 | AKTS_00957894 | AKTS_00972377 |
| AKTS_00940717 | AKTS_00945605 | AKTS_00958492 | AKTS_00972569 |
| AKTS_00942236 | AKTS_00945606 | AKTS_00958505 | AKTS_00973264 |
| AKTS_00942428 | AKTS_00945607 | AKTS_00958525 | AKTS_00973424 |
| AKTS_00942693 | AKTS_00945608 | AKTS_00958543 | AKTS_00973448 |
| AKTS_00942721 | AKTS_00945609 | AKTS_00958568 | AKTS_00973472 |
| AKTS_00943740 | AKTS_00945610 | AKTS_00958574 | AKTS_00973498 |
| AKTS_00943766 | AKTS_00945611 | AKTS_00958583 | AKTS_00973597 |
| AKTS_00943794 | AKTS_00945612 | AKTS_00958584 | AKTS_00973601 |
| AKTS_00944049 | AKTS_00945613 | AKTS_00958585 | AKTS_00973640 |
| AKTS_00944127 | AKTS_00945614 | AKTS_00958643 | AKTS_00973641 |
| AKTS_00944174 | AKTS_00945615 | AKTS_00958844 | AKTS_00973645 |
| AKTS_00944175 | AKTS_00945616 | AKTS_00958910 | AKTS_00973711 |
| AKTS_00944176 | AKTS_00945647 | AKTS_00958956 | AKTS_00973719 |
| AKTS_00944177 | AKTS_00945657 | AKTS_00959087 | AKTS_00973729 |
| AKTS_00944178 | AKTS_00945942 | AKTS_00959130 | AKTS_00973730 |
| AKTS_00944179 | AKTS_00945994 | AKTS_00959209 | AKTS_00973732 |
| AKTS_00944180 | AKTS_00946313 | AKTS_00959400 | AKTS_00973733 |
| AKTS_00944181 | AKTS_00946361 | AKTS_00959437 | AKTS_00973763 |
| AKTS_00944182 | AKTS_00946362 | AKTS_00959469 | AKTS_00973765 |
| AKTS_00944183 | AKTS_00946363 | AKTS_00959476 | AKTS_00973769 |
| AKTS_00944184 | AKTS_00946364 | AKTS_00959477 | AKTS_00973821 |
| AKTS_00944185 | AKTS_00946365 | AKTS_00959478 | AKTS_00973859 |
| AKTS_00944186 | AKTS_00946437 | AKTS_00959497 | AKTS_00973945 |
| AKTS_00944187 | AKTS_00946452 | AKTS_00959516 | AKTS_00973946 |
| AKTS_00944188 | AKTS_00946656 | AKTS_00959517 | AKTS_00973998 |
| AKTS_00944189 | AKTS_00946680 | AKTS_00959542 | AKTS_00974031 |
| AKTS_00944190 | AKTS_00946681 | AKTS_00959561 | AKTS_00974071 |
| AKTS_00944191 | AKTS_00946682 | AKTS_00959576 | AKTS_00974094 |
| AKTS_00944192 | AKTS_00946683 | AKTS_00959577 | AKTS_00974095 |
| AKTS_00944193 | AKTS_00951745 | AKTS_00959661 | AKTS_00974105 |

A-17

| | | | |
|---|---|---|---|
| AKTS_00974152 | AKTS_00975495 | AKTS_00977999 | AKTS_00985544 |
| AKTS_00974153 | AKTS_00975497 | AKTS_00978079 | AKTS_00985646 |
| AKTS_00974290 | AKTS_00975499 | AKTS_00978101 | AKTS_00985716 |
| AKTS_00974292 | AKTS_00975612 | AKTS_00978246 | AKTS_00985717 |
| AKTS_00974323 | AKTS_00975624 | AKTS_00978337 | AKTS_00985824 |
| AKTS_00974325 | AKTS_00975646 | AKTS_00978339 | AKTS_00986009 |
| AKTS_00974327 | AKTS_00975647 | AKTS_00978374 | AKTS_00986027 |
| AKTS_00974362 | AKTS_00975660 | AKTS_00978397 | AKTS_00986035 |
| AKTS_00974431 | AKTS_00975670 | AKTS_00978485 | AKTS_00986055 |
| AKTS_00974462 | AKTS_00975676 | AKTS_00978500 | AKTS_00986838 |
| AKTS_00974493 | AKTS_00975680 | AKTS_00978638 | AKTS_00986857 |
| AKTS_00974495 | AKTS_00975699 | AKTS_00979477 | AKTS_00986858 |
| AKTS_00974527 | AKTS_00975704 | AKTS_00979483 | AKTS_00986869 |
| AKTS_00974582 | AKTS_00975712 | AKTS_00979507 | AKTS_00986898 |
| AKTS_00974616 | AKTS_00975720 | AKTS_00979534 | AKTS_00986927 |
| AKTS_00974654 | AKTS_00975721 | AKTS_00979536 | AKTS_00986929 |
| AKTS_00974690 | AKTS_00975722 | AKTS_00979540 | AKTS_00986930 |
| AKTS_00974706 | AKTS_00975723 | AKTS_00979541 | AKTS_00986941 |
| AKTS_00974769 | AKTS_00975857 | AKTS_00979550 | AKTS_00986956 |
| AKTS_00974805 | AKTS_00975858 | AKTS_00979554 | AKTS_00986969 |
| AKTS_00974809 | AKTS_00975972 | AKTS_00979578 | AKTS_00986978 |
| AKTS_00974811 | AKTS_00975981 | AKTS_00979580 | AKTS_00986984 |
| AKTS_00974850 | AKTS_00975998 | AKTS_00979607 | AKTS_00987000 |
| AKTS_00974852 | AKTS_00976037 | AKTS_00979608 | AKTS_00987016 |
| AKTS_00974855 | AKTS_00976041 | AKTS_00979973 | AKTS_00987024 |
| AKTS_00974857 | AKTS_00976045 | AKTS_00980396 | AKTS_00987027 |
| AKTS_00974858 | AKTS_00976235 | AKTS_00981150 | AKTS_00987028 |
| AKTS_00974859 | AKTS_00976237 | AKTS_00981293 | AKTS_00987044 |
| AKTS_00974899 | AKTS_00976258 | AKTS_00981726 | AKTS_00987061 |
| AKTS_00974938 | AKTS_00976269 | AKTS_00981942 | AKTS_00987066 |
| AKTS_00975052 | AKTS_00976281 | AKTS_00981989 | AKTS_00987075 |
| AKTS_00975091 | AKTS_00976306 | AKTS_00982059 | AKTS_00987078 |
| AKTS_00975127 | AKTS_00976307 | AKTS_00982067 | AKTS_00987085 |
| AKTS_00975129 | AKTS_00976450 | AKTS_00982068 | AKTS_00987090 |
| AKTS_00975131 | AKTS_00976466 | AKTS_00982499 | AKTS_00987096 |
| AKTS_00975133 | AKTS_00976559 | AKTS_00982608 | AKTS_00987103 |
| AKTS_00975137 | AKTS_00976562 | AKTS_00982736 | AKTS_00987189 |
| AKTS_00975165 | AKTS_00976581 | AKTS_00982830 | AKTS_00987194 |
| AKTS_00975167 | AKTS_00976606 | AKTS_00983305 | AKTS_00987216 |
| AKTS_00975169 | AKTS_00976736 | AKTS_00983458 | AKTS_00987284 |
| AKTS_00975192 | AKTS_00976898 | AKTS_00983956 | AKTS_00987288 |
| AKTS_00975214 | AKTS_00976928 | AKTS_00983966 | AKTS_00987302 |
| AKTS_00975216 | AKTS_00976930 | AKTS_00983995 | AKTS_00987376 |
| AKTS_00975267 | AKTS_00976934 | AKTS_00984018 | AKTS_00987381 |
| AKTS_00975270 | AKTS_00976971 | AKTS_00984495 | AKTS_00987386 |
| AKTS_00975355 | AKTS_00977179 | AKTS_00984502 | AKTS_00987389 |
| AKTS_00975371 | AKTS_00977229 | AKTS_00984524 | AKTS_00987395 |
| AKTS_00975416 | AKTS_00977836 | AKTS_00985284 | AKTS_00987411 |
| AKTS_00975421 | AKTS_00977838 | AKTS_00985287 | AKTS_00987416 |
| AKTS_00975477 | AKTS_00977882 | AKTS_00985295 | AKTS_00987425 |
| AKTS_00975483 | AKTS_00977926 | AKTS_00985301 | AKTS_00987430 |
| AKTS_00975489 | AKTS_00977998 | AKTS_00985323 | AKTS_00987477 |

| | | | |
|---|---|---|---|
| AKTS_00987527 | AKTS_00990228 | AKTS_00991607 | AKTS_00994767 |
| AKTS_00987530 | AKTS_00990242 | AKTS_00991608 | AKTS_00994863 |
| AKTS_00987531 | AKTS_00990276 | AKTS_00991615 | AKTS_00994870 |
| AKTS_00987534 | AKTS_00990310 | AKTS_00991631 | AKTS_00995240 |
| AKTS_00987589 | AKTS_00990324 | AKTS_00991635 | AKTS_00995252 |
| AKTS_00987713 | AKTS_00990370 | AKTS_00991636 | AKTS_00995303 |
| AKTS_00987726 | AKTS_00990378 | AKTS_00991637 | AKTS_00995322 |
| AKTS_00987825 | AKTS_00990388 | AKTS_00991821 | AKTS_00995341 |
| AKTS_00987831 | AKTS_00990390 | AKTS_00991822 | AKTS_00995345 |
| AKTS_00987837 | AKTS_00990397 | AKTS_00991830 | AKTS_00995349 |
| AKTS_00987859 | AKTS_00990398 | AKTS_00992190 | AKTS_00995353 |
| AKTS_00987887 | AKTS_00990419 | AKTS_00992200 | AKTS_00995372 |
| AKTS_00987920 | AKTS_00990433 | AKTS_00992240 | AKTS_00995390 |
| AKTS_00988273 | AKTS_00990459 | AKTS_00992242 | AKTS_00995391 |
| AKTS_00988338 | AKTS_00990464 | AKTS_00992244 | AKTS_00995410 |
| AKTS_00988343 | AKTS_00990465 | AKTS_00992246 | AKTS_00995427 |
| AKTS_00988349 | AKTS_00990475 | AKTS_00992440 | AKTS_00995498 |
| AKTS_00988355 | AKTS_00990476 | AKTS_00992765 | AKTS_00995514 |
| AKTS_00988361 | AKTS_00990483 | AKTS_00992840 | AKTS_00995532 |
| AKTS_00988367 | AKTS_00990484 | AKTS_00993046 | AKTS_00995550 |
| AKTS_00988374 | AKTS_00990505 | AKTS_00993307 | AKTS_00995551 |
| AKTS_00988382 | AKTS_00990519 | AKTS_00993798 | AKTS_00995626 |
| AKTS_00988658 | AKTS_00990530 | AKTS_00993807 | AKTS_00995703 |
| AKTS_00988683 | AKTS_00990545 | AKTS_00993808 | AKTS_00995719 |
| AKTS_00988741 | AKTS_00990573 | AKTS_00993830 | AKTS_00995720 |
| AKTS_00988776 | AKTS_00990582 | AKTS_00993912 | AKTS_00995721 |
| AKTS_00989004 | AKTS_00990594 | AKTS_00993913 | AKTS_00995724 |
| AKTS_00989229 | AKTS_00990600 | AKTS_00993942 | AKTS_00995727 |
| AKTS_00989492 | AKTS_00990733 | AKTS_00993972 | AKTS_00995729 |
| AKTS_00989495 | AKTS_00990748 | AKTS_00993977 | AKTS_00995731 |
| AKTS_00989516 | AKTS_00990876 | AKTS_00993978 | AKTS_00995738 |
| AKTS_00989619 | AKTS_00990891 | AKTS_00993979 | AKTS_00995741 |
| AKTS_00989771 | AKTS_00990907 | AKTS_00993980 | AKTS_00995744 |
| AKTS_00989824 | AKTS_00990912 | AKTS_00993981 | AKTS_00995974 |
| AKTS_00989915 | AKTS_00990928 | AKTS_00994197 | AKTS_00995985 |
| AKTS_00989931 | AKTS_00990946 | AKTS_00994208 | AKTS_00996035 |
| AKTS_00989948 | AKTS_00990985 | AKTS_00994282 | AKTS_00996206 |
| AKTS_00989949 | AKTS_00990994 | AKTS_00994360 | AKTS_00996223 |
| AKTS_00990064 | AKTS_00991012 | AKTS_00994454 | AKTS_00996293 |
| AKTS_00990065 | AKTS_00991022 | AKTS_00994500 | AKTS_00996294 |
| AKTS_00990084 | AKTS_00991026 | AKTS_00994516 | AKTS_00996295 |
| AKTS_00990118 | AKTS_00991036 | AKTS_00994562 | AKTS_00996307 |
| AKTS_00990127 | AKTS_00991043 | AKTS_00994666 | AKTS_00996313 |
| AKTS_00990135 | AKTS_00991447 | AKTS_00994678 | AKTS_00996324 |
| AKTS_00990138 | AKTS_00991458 | AKTS_00994716 | AKTS_00996333 |
| AKTS_00990142 | AKTS_00991488 | AKTS_00994720 | AKTS_00996334 |
| AKTS_00990147 | AKTS_00991490 | AKTS_00994724 | AKTS_00996344 |
| AKTS_00990154 | AKTS_00991492 | AKTS_00994728 | AKTS_00996359 |
| AKTS_00990155 | AKTS_00991506 | AKTS_00994730 | AKTS_00996361 |
| AKTS_00990164 | AKTS_00991560 | AKTS_00994731 | AKTS_00996364 |
| AKTS_00990172 | AKTS_00991561 | AKTS_00994764 | AKTS_00996377 |
| AKTS_00990218 | AKTS_00991562 | AKTS_00994765 | AKTS_00996392 |

A-19

| | | | |
|---|---|---|---|
| AKTS_00996418 | AKTS_01001641 | AKTS_01004649 | AKTS_01020538 |
| AKTS_00996435 | AKTS_01001642 | AKTS_01004650 | AKTS_01020542 |
| AKTS_00996435 | AKTS_01001670 | AKTS_01004651 | AKTS_01020543 |
| AKTS_00996504 | AKTS_01001678 | AKTS_01004652 | AKTS_01020552 |
| AKTS_00996738 | AKTS_01001686 | AKTS_01004708 | AKTS_01020685 |
| AKTS_00996739 | AKTS_01001694 | AKTS_01004741 | AKTS_01020894 |
| AKTS_00996748 | AKTS_01001702 | AKTS_01004845 | AKTS_01020918 |
| AKTS_00996749 | AKTS_01001710 | AKTS_01004976 | AKTS_01021402 |
| AKTS_00996778 | AKTS_01001723 | AKTS_01005073 | AKTS_01021770 |
| AKTS_00996787 | AKTS_01001745 | AKTS_01005085 | AKTS_01022038 |
| AKTS_00996796 | AKTS_01001775 | AKTS_01005099 | AKTS_01022039 |
| AKTS_00996804 | AKTS_01002759 | AKTS_01005489 | AKTS_01022182 |
| AKTS_00996812 | AKTS_01003299 | AKTS_01005704 | AKTS_01022255 |
| AKTS_00996947 | AKTS_01003330 | AKTS_01005899 | AKTS_01022360 |
| AKTS_00996983 | AKTS_01003530 | AKTS_01005934 | AKTS_01022592 |
| AKTS_00996995 | AKTS_01003566 | AKTS_01005936 | AKTS_01023010 |
| AKTS_00996996 | AKTS_01003589 | AKTS_01005939 | AKTS_01023145 |
| AKTS_00997012 | AKTS_01003652 | AKTS_01007441 | AKTS_01023701 |
| AKTS_00997024 | AKTS_01003670 | AKTS_01007442 | AKTS_01023901 |
| AKTS_00997025 | AKTS_01003671 | AKTS_01007443 | AKTS_01024046 |
| AKTS_00997026 | AKTS_01003672 | AKTS_01007444 | AKTS_01025964 |
| AKTS_00997039 | AKTS_01003681 | AKTS_01007446 | AKTS_01025965 |
| AKTS_00997111 | AKTS_01003698 | AKTS_01007447 | AKTS_01026088 |
| AKTS_00997152 | AKTS_01003704 | AKTS_01007450 | AKTS_01026132 |
| AKTS_00997153 | AKTS_01003825 | AKTS_01007541 | AKTS_01026461 |
| AKTS_00997169 | AKTS_01003958 | AKTS_01007602 | AKTS_01026529 |
| AKTS_00997493 | AKTS_01003992 | AKTS_01008148 | AKTS_01026553 |
| AKTS_00997495 | AKTS_01004088 | AKTS_01008149 | AKTS_01026605 |
| AKTS_00997513 | AKTS_01004103 | AKTS_01008150 | AKTS_01026629 |
| AKTS_00997739 | AKTS_01004145 | AKTS_01009704 | AKTS_01026846 |
| AKTS_00997784 | AKTS_01004148 | AKTS_01009999 | AKTS_01027505 |
| AKTS_00997816 | AKTS_01004157 | AKTS_01010155 | AKTS_01027663 |
| AKTS_00998395 | AKTS_01004166 | AKTS_01010492 | AKTS_01027713 |
| AKTS_00998401 | AKTS_01004167 | AKTS_01010548 | AKTS_01027867 |
| AKTS_00998407 | AKTS_01004197 | AKTS_01010613 | AKTS_01027874 |
| AKTS_00998626 | AKTS_01004198 | AKTS_01012163 | AKTS_01027886 |
| AKTS_00998632 | AKTS_01004199 | AKTS_01012164 | AKTS_01027887 |
| AKTS_00998695 | AKTS_01004200 | AKTS_01013589 | AKTS_01027902 |
| AKTS_00998989 | AKTS_01004201 | AKTS_01013602 | AKTS_01027911 |
| AKTS_00998990 | AKTS_01004203 | AKTS_01013608 | AKTS_01029014 |
| AKTS_00999259 | AKTS_01004205 | AKTS_01013616 | AKTS_01029396 |
| AKTS_00999340 | AKTS_01004366 | AKTS_01013629 | AKTS_01029402 |
| AKTS_00999346 | AKTS_01004369 | AKTS_01015249 | AKTS_01029520 |
| AKTS_00999866 | AKTS_01004509 | AKTS_01015253 | AKTS_01029525 |
| AKTS_00999888 | AKTS_01004511 | AKTS_01017118 | AKTS_01031423 |
| AKTS_01000187 | AKTS_01004577 | AKTS_01018016 | AKTS_01033404 |
| AKTS_01000194 | AKTS_01004578 | AKTS_01018366 | AKTS_01033465 |
| AKTS_01001595 | AKTS_01004579 | AKTS_01019291 | AKTS_01033478 |
| AKTS_01001615 | AKTS_01004589 | AKTS_01019348 | AKTS_01033480 |
| AKTS_01001620 | AKTS_01004590 | AKTS_01019427 | AKTS_01033485 |
| AKTS_01001632 | AKTS_01004591 | AKTS_01019582 | AKTS_01033520 |
| AKTS_01001633 | AKTS_01004624 | AKTS_01020529 | AKTS_01033547 |

A-20

| | | | |
|---|---|---|---|
| AKTS_01034052 | AKTS_01058547 | ATKS_00121819 | EXEC-TEK_00001300 |
| AKTS_01034055 | AKTS_01058552 | EXEC-TEK_00000002 | EXEC-TEK_00001302 |
| AKTS_01034058 | AKTS_01058554 | EXEC-TEK_00000011 | EXEC-TEK_00001304 |
| AKTS_01034388 | AKTS_01058567 | EXEC-TEK_00000012 | EXEC-TEK_00001306 |
| AKTS_01034938 | AKTS_01058572 | EXEC-TEK_00000027 | EXEC-TEK_00001309 |
| AKTS_01034946 | AKTS_01058582 | EXEC-TEK_00000029 | EXEC-TEK_00001314 |
| AKTS_01034971 | AKTS_01058585 | EXEC-TEK_00000033 | EXEC-TEK_00001316 |
| AKTS_01036374 | AKTS_01058595 | EXEC-TEK_00000034 | EXEC-TEK_00001318 |
| AKTS_01036589 | AKTS_01058597 | EXEC-TEK_00000151 | EXEC-TEK_00001320 |
| AKTS_01037160 | AKTS_01058606 | EXEC-TEK_00000339 | EXEC-TEK_00001323 |
| AKTS_01037359 | AKTS_01058613 | EXEC-TEK_00000366 | EXEC-TEK_00001326 |
| AKTS_01037367 | AKTS_01058618 | EXEC-TEK_00000567 | EXEC-TEK_00001330 |
| AKTS_01037376 | AKTS_01058628 | EXEC-TEK_00000764 | EXEC-TEK_00001335 |
| AKTS_01037576 | AKTS_01058637 | EXEC-TEK_00000767 | EXEC-TEK_00001341 |
| AKTS_01043043 | AKTS_01058644 | EXEC-TEK_00000772 | EXEC-TEK_00001348 |
| AKTS_01043052 | AKTS_01058653 | EXEC-TEK_00000773 | EXEC-TEK_00001353 |
| AKTS_01043067 | AKTS_01058662 | EXEC-TEK_00000774 | EXEC-TEK_00001359 |
| AKTS_01043093 | AKTS_01058670 | EXEC-TEK_00000775 | EXEC-TEK_00001366 |
| AKTS_01043112 | AKTS_01058688 | EXEC-TEK_00000794 | EXEC-TEK_00001373 |
| AKTS_01046023 | AKTS_01058689 | EXEC-TEK_00000796 | EXEC-TEK_00001380 |
| AKTS_01049685 | AKTS_01058742 | EXEC-TEK_00000799 | EXEC-TEK_00001387 |
| AKTS_01050041 | AKTS_01058743 | EXEC-TEK_00000801 | EXEC-TEK_00001394 |
| AKTS_01051772 | AKTS_01058744 | EXEC-TEK_00000803 | EXEC-TEK_00001401 |
| AKTS_01051799 | AKTS_01058745 | EXEC-TEK_00000806 | EXEC-TEK_00001409 |
| AKTS_01052342 | AKTS_01058746 | EXEC-TEK_00000810 | EXEC-TEK_00001418 |
| AKTS_01052348 | AKTS_01058747 | EXEC-TEK_00000814 | EXEC-TEK_00001427 |
| AKTS_01052387 | AKTS_01058748 | EXEC-TEK_00000817 | EXEC-TEK_00001434 |
| AKTS_01052391 | AKTS_01058749 | EXEC-TEK_00000822 | EXEC-TEK_00001441 |
| AKTS_01052399 | AKTS_01058764 | EXEC-TEK_00000825 | EXEC-TEK_00001449 |
| AKTS_01052403 | AKTS_01059235 | EXEC-TEK_00000828 | EXEC-TEK_00001458 |
| AKTS_01052427 | AKTS_01059255 | EXEC-TEK_00000830 | EXEC-TEK_00001466 |
| AKTS_01052429 | AKTS_01059270 | EXEC-TEK_00000831 | EXEC-TEK_00001474 |
| AKTS_01052430 | AKTS_01059299 | EXEC-TEK_00000841 | EXEC-TEK_00001483 |
| AKTS_01052432 | AKTS_01060527 | EXEC-TEK_00000849 | EXEC-TEK_00001492 |
| AKTS_01052435 | AKTS_01068050 | EXEC-TEK_00000852 | EXEC-TEK_00001542 |
| AKTS_01052437 | AKTS_01068302 | EXEC-TEK_00000855 | EXEC-TEK_00001552 |
| AKTS_01052740 | AKTS_01068302 | EXEC-TEK_00000881 | EXEC-TEK_00001562 |
| AKTS_01053686 | AKTS_01068314 | EXEC-TEK_00000884 | EXEC-TEK_00001574 |
| AKTS_01053691 | AKTS_01068527 | EXEC-TEK_00000889 | EXEC-TEK_00001586 |
| AKTS_01053699 | AKTS_01068529 | EXEC-TEK_00000892 | EXEC-TEK_00001597 |
| AKTS_01053721 | AKTS_01106659 | EXEC-TEK_00001279 | EXEC-TEK_00001609 |
| AKTS_01056101 | AKTS_01106660 | EXEC-TEK_00001280 | EXEC-TEK_00001621 |
| AKTS_01056237 | AKTS_01106663 | EXEC-TEK_00001284 | EXEC-TEK_00001632 |
| AKTS_01056241 | AKTS_01106750 | EXEC-TEK_00001285 | EXEC-TEK_00001652 |
| AKTS_01056254 | AKTS_01106754 | EXEC-TEK_00001286 | EXEC-TEK_00001663 |
| AKTS_01056270 | AKTS_01106775 | EXEC-TEK_00001287 | EXEC-TEK_00001689 |
| AKTS_01056319 | AKTS_01106793 | EXEC-TEK_00001288 | EXEC-TEK_00001693 |
| AKTS_01056376 | AKTS_01106818 | EXEC-TEK_00001289 | EXEC-TEK_00001700 |
| AKTS_01056386 | AKTS_01134078 | EXEC-TEK_00001290 | EXEC-TEK_00001702 |
| AKTS_01056852 | AKTS_01200261 | EXEC-TEK_00001294 | EXEC-TEK_00001704 |
| AKTS_01058541 | AKTS_01200287 | EXEC-TEK_00001296 | EXEC-TEK_00001708 |
| AKTS_01058544 | AKTS_01200300 | EXEC-TEK_00001298 | EXEC-TEK_00001713 |

A-21

| | | | |
|---|---|---|---|
| EXEC-TEK_00001768 | QORVO_00000716 | QORVO_00008386 | QORVO_00012257 |
| EXEC-TEK_00001769 | QORVO_00000719 | QORVO_00008762 | QORVO_00012261 |
| EXEC-TEK_00001770 | QORVO_00000720 | QORVO_00009255 | QORVO_00012266 |
| EXEC-TEK_00001776 | QORVO_00000724 | QORVO_00009262 | QORVO_00012270 |
| EXEC-TEK_00002145 | QORVO_00000729 | QORVO_00009394 | QORVO_00012279 |
| EXEC-TEK_00002151 | QORVO_00000733 | QORVO_00009485 | QORVO_00012283 |
| EXEC-TEK_00002153 | QORVO_00000735 | QORVO_00009581 | QORVO_00012287 |
| EXEC-TEK_00002156 | QORVO_00000823 | QORVO_00009681 | QORVO_00012292 |
| EXEC-TEK_00002158 | QORVO_00000837 | QORVO_00009705 | QORVO_00012293 |
| EXEC-TEK_00002166 | QORVO_00000841 | QORVO_00009787 | QORVO_00012303 |
| EXEC-TEK_00002169 | QORVO_00006931 | QORVO_00009822 | QORVO_00012304 |
| EXEC-TEK_00004206 | QORVO_00006943 | QORVO_00009854 | QORVO_00012308 |
| EXEC-TEK_00005388 | QORVO_00006945 | QORVO_00009902 | QORVO_00012312 |
| EXEC-TEK_00006512 | QORVO_00006948 | QORVO_00009950 | QORVO_00012315 |
| EXEC-TEK_00006513 | QORVO_00006951 | QORVO_00010054 | QORVO_00012323 |
| EXEC-TEK_00006519 | QORVO_00006955 | QORVO_00010117 | QORVO_00012325 |
| EXEC-TEK_00006520 | QORVO_00006974 | QORVO_00010125 | QORVO_00012329 |
| EXEC-TEK_00006528 | QORVO_00007000 | QORVO_00010224 | QORVO_00012333 |
| EXEC-TEK_00006529 | QORVO_00007004 | QORVO_00010332 | QORVO_00012337 |
| EXEC-TEK_00006562 | QORVO_00007007 | QORVO_00010429 | QORVO_00012341 |
| EXEC-TEK_00006563 | QORVO_00007012 | QORVO_00010473 | QORVO_00012345 |
| EXEC-TEK_00006616 | QORVO_00007016 | QORVO_00010586 | QORVO_00012346 |
| EXEC-TEK_00006617 | QORVO_00007020 | QORVO_00010620 | QORVO_00012350 |
| EXEC-TEK_00006627 | QORVO_00007027 | QORVO_00010626 | QORVO_00012354 |
| EXEC-TEK_00006629 | QORVO_00007034 | QORVO_00010710 | QORVO_00012356 |
| EXEC-TEK_00006756 | QORVO_00007041 | QORVO_00010747 | QORVO_00012362 |
| EXEC-TEK_00006757 | QORVO_00007048 | QORVO_00010854 | QORVO_00012366 |
| EXEC-TEK_00007685 | QORVO_00007055 | QORVO_00010892 | QORVO_00012368 |
| EXEC-TEK_00016943 | QORVO_00007062 | QORVO_00010923 | QORVO_00012373 |
| EXEC-TEK_00017222 | QORVO_00007069 | QORVO_00010953 | QORVO_00012374 |
| EXEC-TEK_00018462 | QORVO_00007076 | QORVO_00010959 | QORVO_00012376 |
| EXEC-TEK_00018463 | QORVO_00007083 | QORVO_00011163 | QORVO_00012378 |
| EXEC-TEK_00018464 | QORVO_00007090 | QORVO_00011197 | QORVO_00012382 |
| EXEC-TEK_00018465 | QORVO_00007097 | QORVO_00011200 | QORVO_00012434 |
| EXEC-TEK_00018466 | QORVO_00007104 | QORVO_00011206 | QORVO_00012454 |
| EXEC-TEK_00018467 | QORVO_00007141 | QORVO_00011242 | QORVO_00012489 |
| EXEC-TEK_00018468 | QORVO_00007272 | QORVO_00011333 | QORVO_00012664 |
| EXEC-TEK_00018643 | QORVO_00007304 | QORVO_00011469 | QORVO_00012716 |
| HODGE_000206 | QORVO_00007580 | QORVO_00011550 | QORVO_00012785 |
| HODGE_000210 | QORVO_00007586 | QORVO_00011557 | QORVO_00012785 |
| HODGE_000211 | QORVO_00007673 | QORVO_00011708 | QORVO_00012799 |
| HODGE_000212 | QORVO_00007811 | QORVO_00011756 | QORVO_00012840 |
| HODGE_000244 | QORVO_00007948 | QORVO_00011925 | QORVO_00012895 |
| QORVO_00000583 | QORVO_00008083 | QORVO_00012171 | QORVO_00013226 |
| QORVO_00000647 | QORVO_00008107 | QORVO_00012196 | QORVO_00013257 |
| QORVO_00000672 | QORVO_00008148 | QORVO_00012221 | QORVO_00013793 |
| QORVO_00000675 | QORVO_00008270 | QORVO_00012225 | QORVO_00013795 |
| QORVO_00000676 | QORVO_00008308 | QORVO_00012233 | QORVO_00013851 |
| QORVO_00000681 | QORVO_00008315 | QORVO_00012237 | QORVO_00013894 |
| QORVO_00000683 | QORVO_00008321 | QORVO_00012245 | QORVO_00013896 |
| QORVO_00000706 | QORVO_00008348 | QORVO_00012249 | QORVO_00013932 |
| QORVO_00000713 | QORVO_00008379 | QORVO_00012253 | QORVO_00013935 |

| | | | |
|---|---|---|---|
| QORVO_00013940 | QORVO_00015385 | QORVO_00016122 | QORVO_00017058 |
| QORVO_00013942 | QORVO_00015389 | QORVO_00016125 | QORVO_00017066 |
| QORVO_00013943 | QORVO_00015392 | QORVO_00016128 | QORVO_00017217 |
| QORVO_00013951 | QORVO_00015395 | QORVO_00016129 | QORVO_00017313 |
| QORVO_00013953 | QORVO_00015396 | QORVO_00016132 | QORVO_00017324 |
| QORVO_00014004 | QORVO_00015399 | QORVO_00016152 | QORVO_00017327 |
| QORVO_00014007 | QORVO_00015402 | QORVO_00016178 | QORVO_00017330 |
| QORVO_00014009 | QORVO_00015407 | QORVO_00016215 | QORVO_00017452 |
| QORVO_00014044 | QORVO_00015416 | QORVO_00016296 | QORVO_00017454 |
| QORVO_00014046 | QORVO_00015424 | QORVO_00016326 | QORVO_00017457 |
| QORVO_00014087 | QORVO_00015426 | QORVO_00016434 | QORVO_00017548 |
| QORVO_00014095 | QORVO_00015428 | QORVO_00016436 | QORVO_00017577 |
| QORVO_00014096 | QORVO_00015431 | QORVO_00016438 | QORVO_00017579 |
| QORVO_00014135 | QORVO_00015528 | QORVO_00016440 | QORVO_00017582 |
| QORVO_00014628 | QORVO_00015537 | QORVO_00016445 | QORVO_00017584 |
| QORVO_00014637 | QORVO_00015540 | QORVO_00016449 | QORVO_00017587 |
| QORVO_00014684 | QORVO_00015541 | QORVO_00016452 | QORVO_00017590 |
| QORVO_00014685 | QORVO_00015544 | QORVO_00016454 | QORVO_00017591 |
| QORVO_00014703 | QORVO_00015545 | QORVO_00016456 | QORVO_00017613 |
| QORVO_00014708 | QORVO_00015548 | QORVO_00016459 | QORVO_00017717 |
| QORVO_00014711 | QORVO_00015592 | QORVO_00016496 | QORVO_00017744 |
| QORVO_00014714 | QORVO_00015651 | QORVO_00016498 | QORVO_00017747 |
| QORVO_00014744 | QORVO_00015653 | QORVO_00016534 | QORVO_00017803 |
| QORVO_00014747 | QORVO_00015657 | QORVO_00016576 | QORVO_00017806 |
| QORVO_00014749 | QORVO_00015689 | QORVO_00016579 | QORVO_00017808 |
| QORVO_00014752 | QORVO_00015747 | QORVO_00016585 | QORVO_00017810 |
| QORVO_00014753 | QORVO_00015749 | QORVO_00016698 | QORVO_00017811 |
| QORVO_00014857 | QORVO_00015752 | QORVO_00016699 | QORVO_00017946 |
| QORVO_00014928 | QORVO_00015753 | QORVO_00016743 | QORVO_00018113 |
| QORVO_00014953 | QORVO_00015758 | QORVO_00016748 | QORVO_00018114 |
| QORVO_00014980 | QORVO_00015760 | QORVO_00016751 | QORVO_00018119 |
| QORVO_00014984 | QORVO_00015762 | QORVO_00016754 | QORVO_00018122 |
| QORVO_00014987 | QORVO_00015764 | QORVO_00016756 | QORVO_00018172 |
| QORVO_00014994 | QORVO_00015765 | QORVO_00016758 | QORVO_00018173 |
| QORVO_00015078 | QORVO_00015767 | QORVO_00016760 | QORVO_00018216 |
| QORVO_00015109 | QORVO_00015770 | QORVO_00016763 | QORVO_00018220 |
| QORVO_00015110 | QORVO_00015772 | QORVO_00016766 | QORVO_00018352 |
| QORVO_00015126 | QORVO_00015774 | QORVO_00016769 | QORVO_00018353 |
| QORVO_00015128 | QORVO_00015777 | QORVO_00016772 | QORVO_00018355 |
| QORVO_00015200 | QORVO_00015778 | QORVO_00016775 | QORVO_00018359 |
| QORVO_00015202 | QORVO_00015784 | QORVO_00016783 | QORVO_00018364 |
| QORVO_00015203 | QORVO_00015787 | QORVO_00016817 | QORVO_00018365 |
| QORVO_00015206 | QORVO_00015799 | QORVO_00016851 | QORVO_00018367 |
| QORVO_00015209 | QORVO_00015829 | QORVO_00016856 | QORVO_00018369 |
| QORVO_00015211 | QORVO_00015839 | QORVO_00016857 | QORVO_00018376 |
| QORVO_00015266 | QORVO_00015841 | QORVO_00016858 | QORVO_00018379 |
| QORVO_00015356 | QORVO_00015842 | QORVO_00016863 | QORVO_00018480 |
| QORVO_00015359 | QORVO_00015865 | QORVO_00016870 | QORVO_00018487 |
| QORVO_00015361 | QORVO_00015867 | QORVO_00016873 | QORVO_00018492 |
| QORVO_00015364 | QORVO_00015871 | QORVO_00017010 | QORVO_00018495 |
| QORVO_00015366 | QORVO_00015873 | QORVO_00017018 | QORVO_00018595 |
| QORVO_00015369 | QORVO_00016119 | QORVO_00017020 | QORVO_00018627 |

A-23

| | | | |
|---|---|---|---|
| QORVO_00018690 | QORVO_00020149 | QORVO_00020942 | QORVO_00022059 |
| QORVO_00018747 | QORVO_00020152 | QORVO_00020944 | QORVO_00022060 |
| QORVO_00018749 | QORVO_00020155 | QORVO_00020946 | QORVO_00022063 |
| QORVO_00018776 | QORVO_00020157 | QORVO_00020948 | QORVO_00022165 |
| QORVO_00018817 | QORVO_00020165 | QORVO_00020980 | QORVO_00022167 |
| QORVO_00018820 | QORVO_00020168 | QORVO_00020981 | QORVO_00022203 |
| QORVO_00018822 | QORVO_00020171 | QORVO_00021016 | QORVO_00022209 |
| QORVO_00018870 | QORVO_00020173 | QORVO_00021052 | QORVO_00022211 |
| QORVO_00018873 | QORVO_00020176 | QORVO_00021053 | QORVO_00022238 |
| QORVO_00018876 | QORVO_00020178 | QORVO_00021054 | QORVO_00022241 |
| QORVO_00018881 | QORVO_00020180 | QORVO_00021056 | QORVO_00022245 |
| QORVO_00018893 | QORVO_00020182 | QORVO_00021059 | QORVO_00022247 |
| QORVO_00018896 | QORVO_00020273 | QORVO_00021066 | QORVO_00022273 |
| QORVO_00018899 | QORVO_00020278 | QORVO_00021068 | QORVO_00022291 |
| QORVO_00018905 | QORVO_00020281 | QORVO_00021096 | QORVO_00022297 |
| QORVO_00019036 | QORVO_00020282 | QORVO_00021097 | QORVO_00022299 |
| QORVO_00019038 | QORVO_00020333 | QORVO_00021116 | QORVO_00022346 |
| QORVO_00019041 | QORVO_00020364 | QORVO_00021122 | QORVO_00022459 |
| QORVO_00019043 | QORVO_00020502 | QORVO_00021127 | QORVO_00022460 |
| QORVO_00019096 | QORVO_00020505 | QORVO_00021130 | QORVO_00022464 |
| QORVO_00019133 | QORVO_00020508 | QORVO_00021132 | QORVO_00022488 |
| QORVO_00019135 | QORVO_00020556 | QORVO_00021408 | QORVO_00022575 |
| QORVO_00019232 | QORVO_00020567 | QORVO_00021410 | QORVO_00022578 |
| QORVO_00019240 | QORVO_00020569 | QORVO_00021532 | QORVO_00022581 |
| QORVO_00019256 | QORVO_00020614 | QORVO_00021533 | QORVO_00022585 |
| QORVO_00019258 | QORVO_00020616 | QORVO_00021537 | QORVO_00022607 |
| QORVO_00019260 | QORVO_00020619 | QORVO_00021543 | QORVO_00022610 |
| QORVO_00019263 | QORVO_00020643 | QORVO_00021577 | QORVO_00022622 |
| QORVO_00019265 | QORVO_00020646 | QORVO_00021636 | QORVO_00022625 |
| QORVO_00019267 | QORVO_00020653 | QORVO_00021638 | QORVO_00022627 |
| QORVO_00019270 | QORVO_00020655 | QORVO_00021641 | QORVO_00022630 |
| QORVO_00019480 | QORVO_00020658 | QORVO_00021643 | QORVO_00022674 |
| QORVO_00019527 | QORVO_00020673 | QORVO_00021644 | QORVO_00022676 |
| QORVO_00019696 | QORVO_00020676 | QORVO_00021694 | QORVO_00022679 |
| QORVO_00019703 | QORVO_00020678 | QORVO_00021699 | QORVO_00023055 |
| QORVO_00019706 | QORVO_00020680 | QORVO_00021700 | QORVO_00023056 |
| QORVO_00019713 | QORVO_00020682 | QORVO_00021702 | QORVO_00023063 |
| QORVO_00019719 | QORVO_00020685 | QORVO_00021705 | QORVO_00023065 |
| QORVO_00019721 | QORVO_00020688 | QORVO_00021708 | QORVO_00023067 |
| QORVO_00019725 | QORVO_00020690 | QORVO_00021844 | QORVO_00023104 |
| QORVO_00019731 | QORVO_00020692 | QORVO_00021845 | QORVO_00023107 |
| QORVO_00019755 | QORVO_00020694 | QORVO_00021923 | QORVO_00023133 |
| QORVO_00019877 | QORVO_00020696 | QORVO_00021961 | QORVO_00023149 |
| QORVO_00020043 | QORVO_00020900 | QORVO_00021964 | QORVO_00023184 |
| QORVO_00020046 | QORVO_00020917 | QORVO_00021967 | QORVO_00023190 |
| QORVO_00020128 | QORVO_00020924 | QORVO_00021968 | QORVO_00023192 |
| QORVO_00020130 | QORVO_00020925 | QORVO_00021970 | QORVO_00023198 |
| QORVO_00020132 | QORVO_00020928 | QORVO_00021977 | QORVO_00023302 |
| QORVO_00020134 | QORVO_00020931 | QORVO_00021979 | QORVO_00023304 |
| QORVO_00020140 | QORVO_00020935 | QORVO_00021982 | QORVO_00023306 |
| QORVO_00020142 | QORVO_00020938 | QORVO_00021983 | QORVO_00023313 |
| QORVO_00020143 | QORVO_00020939 | QORVO_00022053 | |

A-24

| | | | |
|---|---|---|---|
| QORVO_00023320 | QORVO_00023719 | QORVO_00023911 | QORVO_00024098 |
| QORVO_00023385 | QORVO_00023722 | QORVO_00023915 | QORVO_00024101 |
| QORVO_00023388 | QORVO_00023725 | QORVO_00023918 | QORVO_00024105 |
| QORVO_00023419 | QORVO_00023733 | QORVO_00023922 | QORVO_00024108 |
| QORVO_00023421 | QORVO_00023736 | QORVO_00023925 | QORVO_00024111 |
| QORVO_00023422 | QORVO_00023738 | QORVO_00023928 | QORVO_00024119 |
| QORVO_00023429 | QORVO_00023742 | QORVO_00023930 | QORVO_00024124 |
| QORVO_00023536 | QORVO_00023744 | QORVO_00023934 | QORVO_00024128 |
| QORVO_00023538 | QORVO_00023748 | QORVO_00023938 | QORVO_00024132 |
| QORVO_00023541 | QORVO_00023752 | QORVO_00023941 | QORVO_00024135 |
| QORVO_00023553 | QORVO_00023754 | QORVO_00023944 | QORVO_00024139 |
| QORVO_00023554 | QORVO_00023757 | QORVO_00023947 | QORVO_00024142 |
| QORVO_00023555 | QORVO_00023760 | QORVO_00023950 | QORVO_00024146 |
| QORVO_00023557 | QORVO_00023768 | QORVO_00023954 | QORVO_00024149 |
| QORVO_00023558 | QORVO_00023772 | QORVO_00023958 | QORVO_00024152 |
| QORVO_00023582 | QORVO_00023775 | QORVO_00023961 | QORVO_00024156 |
| QORVO_00023583 | QORVO_00023778 | QORVO_00023964 | QORVO_00024158 |
| QORVO_00023585 | QORVO_00023781 | QORVO_00023967 | QORVO_00024161 |
| QORVO_00023592 | QORVO_00023785 | QORVO_00023970 | QORVO_00024164 |
| QORVO_00023594 | QORVO_00023788 | QORVO_00023973 | QORVO_00024167 |
| QORVO_00023601 | QORVO_00023791 | QORVO_00023980 | QORVO_00024170 |
| QORVO_00023604 | QORVO_00023803 | QORVO_00023982 | QORVO_00024173 |
| QORVO_00023609 | QORVO_00023806 | QORVO_00023986 | QORVO_00024177 |
| QORVO_00023613 | QORVO_00023810 | QORVO_00023992 | QORVO_00024180 |
| QORVO_00023617 | QORVO_00023812 | QORVO_00023998 | QORVO_00024184 |
| QORVO_00023621 | QORVO_00023819 | QORVO_00024002 | QORVO_00024187 |
| QORVO_00023625 | QORVO_00023822 | QORVO_00024006 | QORVO_00024190 |
| QORVO_00023628 | QORVO_00023825 | QORVO_00024010 | QORVO_00024194 |
| QORVO_00023633 | QORVO_00023828 | QORVO_00024014 | QORVO_00024198 |
| QORVO_00023637 | QORVO_00023831 | QORVO_00024017 | QORVO_00024201 |
| QORVO_00023640 | QORVO_00023834 | QORVO_00024021 | QORVO_00024204 |
| QORVO_00023644 | QORVO_00023837 | QORVO_00024025 | QORVO_00024206 |
| QORVO_00023650 | QORVO_00023841 | QORVO_00024027 | QORVO_00024210 |
| QORVO_00023653 | QORVO_00023845 | QORVO_00024031 | QORVO_00024213 |
| QORVO_00023656 | QORVO_00023848 | QORVO_00024035 | QORVO_00024217 |
| QORVO_00023659 | QORVO_00023851 | QORVO_00024038 | QORVO_00024221 |
| QORVO_00023663 | QORVO_00023854 | QORVO_00024042 | QORVO_00024224 |
| QORVO_00023667 | QORVO_00023858 | QORVO_00024045 | QORVO_00024227 |
| QORVO_00023670 | QORVO_00023861 | QORVO_00024048 | QORVO_00024230 |
| QORVO_00023673 | QORVO_00023864 | QORVO_00024051 | QORVO_00024233 |
| QORVO_00023676 | QORVO_00023867 | QORVO_00024054 | QORVO_00024236 |
| QORVO_00023679 | QORVO_00023870 | QORVO_00024058 | QORVO_00024239 |
| QORVO_00023682 | QORVO_00023874 | QORVO_00024061 | QORVO_00024242 |
| QORVO_00023685 | QORVO_00023877 | QORVO_00024064 | QORVO_00024245 |
| QORVO_00023693 | QORVO_00023881 | QORVO_00024067 | QORVO_00024253 |
| QORVO_00023696 | QORVO_00023885 | QORVO_00024074 | QORVO_00024256 |
| QORVO_00023699 | QORVO_00023888 | QORVO_00024077 | QORVO_00024258 |
| QORVO_00023702 | QORVO_00023891 | QORVO_00024081 | QORVO_00024262 |
| QORVO_00023705 | QORVO_00023894 | QORVO_00024085 | QORVO_00024265 |
| QORVO_00023709 | QORVO_00023902 | QORVO_00024088 | QORVO_00024268 |
| QORVO_00023713 | QORVO_00023905 | QORVO_00024091 | QORVO_00024271 |
| QORVO_00023716 | QORVO_00023909 | QORVO_00024094 | QORVO_00024274 |

| | | | |
|---|---|---|---|
| QORVO_00024277 | QORVO_00024472 | QORVO_00026066 | QORVO_00030143 |
| QORVO_00024280 | QORVO_00024475 | QORVO_00026067 | QORVO_00030496 |
| QORVO_00024283 | QORVO_00024478 | QORVO_00026077 | QORVO_00030529 |
| QORVO_00024291 | QORVO_00024480 | QORVO_00026086 | QORVO_00030563 |
| QORVO_00024298 | QORVO_00024484 | QORVO_00026095 | QORVO_00030593 |
| QORVO_00024301 | QORVO_00024487 | QORVO_00026096 | QORVO_00030776 |
| QORVO_00024305 | QORVO_00024491 | QORVO_00026097 | QORVO_00030865 |
| QORVO_00024309 | QORVO_00024493 | QORVO_00026107 | QORVO_00032653 |
| QORVO_00024312 | QORVO_00024496 | QORVO_00026108 | QORVO_00034429 |
| QORVO_00024315 | QORVO_00024500 | QORVO_00026117 | QORVO_00034626 |
| QORVO_00024317 | QORVO_00024527 | QORVO_00026118 | QORVO_00034714 |
| QORVO_00024321 | QORVO_00024537 | QORVO_00026119 | QORVO_00034746 |
| QORVO_00024325 | QORVO_00024540 | QORVO_00026130 | QORVO_00034822 |
| QORVO_00024328 | QORVO_00024544 | QORVO_00026139 | QORVO_00034897 |
| QORVO_00024331 | QORVO_00024564 | QORVO_00026149 | QORVO_00034925 |
| QORVO_00024338 | QORVO_00024574 | QORVO_00026150 | QORVO_00034932 |
| QORVO_00024344 | QORVO_00024587 | QORVO_00026151 | QORVO_00034983 |
| QORVO_00024347 | QORVO_00024595 | QORVO_00026152 | QORVO_00035002 |
| QORVO_00024349 | QORVO_00025017 | QORVO_00026162 | QORVO_00035070 |
| QORVO_00024352 | QORVO_00025025 | QORVO_00026172 | QORVO_00035106 |
| QORVO_00024355 | QORVO_00025095 | QORVO_00026173 | QORVO_00035120 |
| QORVO_00024358 | QORVO_00025163 | QORVO_00026183 | QORVO_00035126 |
| QORVO_00024362 | QORVO_00025234 | QORVO_00026184 | QORVO_00035135 |
| QORVO_00024364 | QORVO_00025305 | QORVO_00026194 | QORVO_00035154 |
| QORVO_00024367 | QORVO_00025376 | QORVO_00026195 | QORVO_00035160 |
| QORVO_00024374 | QORVO_00025498 | QORVO_00026196 | QORVO_00037425 |
| QORVO_00024378 | QORVO_00025568 | QORVO_00026206 | QORVO_00037660 |
| QORVO_00024381 | QORVO_00025570 | QORVO_00026215 | QORVO_00037766 |
| QORVO_00024385 | QORVO_00025641 | QORVO_00026224 | QORVO_00037874 |
| QORVO_00024389 | QORVO_00025655 | QORVO_00026225 | QORVO_00038098 |
| QORVO_00024392 | QORVO_00025934 | QORVO_00026226 | QORVO_00038195 |
| QORVO_00024396 | QORVO_00025944 | QORVO_00026238 | QORVO_00038292 |
| QORVO_00024399 | QORVO_00025953 | QORVO_00026251 | QORVO_00038467 |
| QORVO_00024402 | QORVO_00025962 | QORVO_00027204 | QORVO_00038564 |
| QORVO_00024405 | QORVO_00025971 | QORVO_00027413 | QORVO_00039248 |
| QORVO_00024411 | QORVO_00025972 | QORVO_00027811 | QORVO_00039338 |
| QORVO_00024415 | QORVO_00025973 | QORVO_00027844 | QORVO_00039577 |
| QORVO_00024418 | QORVO_00025982 | QORVO_00027962 | QORVO_00039601 |
| QORVO_00024421 | QORVO_00025983 | QORVO_00028032 | QORVO_00039630 |
| QORVO_00024424 | QORVO_00025984 | QORVO_00028033 | QORVO_00039638 |
| QORVO_00024427 | QORVO_00025993 | QORVO_00028035 | QORVO_00039639 |
| QORVO_00024431 | QORVO_00026002 | QORVO_00028036 | QORVO_00039646 |
| QORVO_00024434 | QORVO_00026003 | QORVO_00028211 | QORVO_00039655 |
| QORVO_00024437 | QORVO_00026014 | QORVO_00028282 | QORVO_00039656 |
| QORVO_00024440 | QORVO_00026027 | QORVO_00028334 | QORVO_00040320 |
| QORVO_00024444 | QORVO_00026039 | QORVO_00028336 | QORVO_00049019 |
| QORVO_00024447 | QORVO_00026040 | QORVO_00028644 | QORVO_00049354 |
| QORVO_00024450 | QORVO_00026053 | QORVO_00028828 | QORVO_00049468 |
| QORVO_00024453 | QORVO_00026054 | QORVO_00028829 | QORVO_00049580 |
| QORVO_00024457 | QORVO_00026055 | QORVO_00028965 | QORVO_00049825 |
| QORVO_00024459 | QORVO_00026056 | QORVO_00029571 | QORVO_00049925 |
| QORVO_00024465 | QORVO_00026065 | QORVO_00029636 | QORVO_00050023 |

A-26

| | | | |
|---|---|---|---|
| QORVO_00050205 | QORVO_00066935 | QORVO_00073363 | QORVO_00162758 |
| QORVO_00050310 | QORVO_00066991 | QORVO_00073369 | QORVO_00305213 |
| QORVO_00051267 | QORVO_00066992 | QORVO_00073375 | QORVO_00305222 |
| QORVO_00051357 | QORVO_00067030 | QORVO_00073393 | QORVO_00305223 |
| QORVO_00051869 | QORVO_00067031 | QORVO_00073400 | QORVO_00305229 |
| QORVO_00051957 | QORVO_00067079 | QORVO_00073407 | QORVO_00305231 |
| QORVO_00052978 | QORVO_00067220 | QORVO_00073429 | QORVO_00305319 |
| QORVO_00053080 | QORVO_00067328 | QORVO_00073436 | QORVO_00305320 |
| QORVO_00053124 | QORVO_00067329 | QORVO_00073457 | QORVO_00305324 |
| QORVO_00053168 | QORVO_00069632 | QORVO_00073472 | QORVO_00305326 |
| QORVO_00053227 | QORVO_00070185 | QORVO_00073539 | QORVO_00305327 |
| QORVO_00053384 | QORVO_00070936 | QORVO_00073544 | QORVO_00305331 |
| QORVO_00053443 | QORVO_00071021 | QORVO_00073562 | QORVO_00305336 |
| QORVO_00053445 | QORVO_00071821 | QORVO_00073567 | QORVO_00305340 |
| QORVO_00053484 | QORVO_00072075 | QORVO_00077165 | QORVO_00305341 |
| QORVO_00053528 | QORVO_00072324 | QORVO_00081619 | QORVO_00305342 |
| QORVO_00053567 | QORVO_00072324 | QORVO_00081691 | QORVO_00305344 |
| QORVO_00053643 | QORVO_00072517 | QORVO_00081914 | QORVO_00305346 |
| QORVO_00053682 | QORVO_00072535 | QORVO_00096315 | QORVO_00305347 |
| QORVO_00053878 | QORVO_00072536 | QORVO_00099146 | QORVO_00305360 |
| QORVO_00053982 | QORVO_00072553 | QORVO_00100677 | QORVO_00305386 |
| QORVO_00054021 | QORVO_00072556 | QORVO_00100799 | QORVO_00305388 |
| QORVO_00055227 | QORVO_00072575 | QORVO_00101015 | QORVO_00305394 |
| QORVO_00055239 | QORVO_00072592 | QORVO_00101145 | QORVO_00305396 |
| QORVO_00055349 | QORVO_00072609 | QORVO_00101588 | QORVO_00305406 |
| QORVO_00055455 | QORVO_00072622 | QORVO_00101803 | QORVO_00305408 |
| QORVO_00055565 | QORVO_00072636 | QORVO_00102979 | QORVO_00305410 |
| QORVO_00055912 | QORVO_00072647 | QORVO_00103010 | QORVO_00305412 |
| QORVO_00056015 | QORVO_00072830 | QORVO_00103041 | QORVO_00305414 |
| QORVO_00056126 | QORVO_00072914 | QORVO_00103072 | QORVO_00305419 |
| QORVO_00056251 | QORVO_00072937 | QORVO_00103103 | QORVO_00305423 |
| QORVO_00056361 | QORVO_00072940 | QORVO_00103134 | QORVO_00305424 |
| QORVO_00056543 | QORVO_00072955 | QORVO_00103166 | QORVO_00305426 |
| QORVO_00057299 | QORVO_00072963 | QORVO_00104671 | QORVO_00305428 |
| QORVO_00057437 | QORVO_00072966 | QORVO_00104702 | QORVO_00305430 |
| QORVO_00057627 | QORVO_00073021 | QORVO_00104733 | QORVO_00305438 |
| QORVO_00057762 | QORVO_00073028 | QORVO_00106697 | QORVO_00305442 |
| QORVO_00057874 | QORVO_00073090 | QORVO_00106822 | QORVO_00305446 |
| QORVO_00058197 | QORVO_00073097 | QORVO_00107403 | QORVO_00305449 |
| QORVO_00058976 | QORVO_00073103 | QORVO_00107456 | QORVO_00305451 |
| QORVO_00059379 | QORVO_00073109 | QORVO_00123297 | QORVO_00305453 |
| QORVO_00059388 | QORVO_00073124 | QORVO_00130241 | QORVO_00305456 |
| QORVO_00059417 | QORVO_00073141 | QORVO_00130241 | QORVO_00305473 |
| QORVO_00059418 | QORVO_00073158 | QORVO_00130335 | QORVO_00305490 |
| QORVO_00061057 | QORVO_00073169 | QORVO_00130391 | QORVO_00305512 |
| QORVO_00061087 | QORVO_00073175 | QORVO_00133066 | QORVO_00305529 |
| QORVO_00063152 | QORVO_00073189 | QORVO_00133247 | QORVO_00305543 |
| QORVO_00063834 | QORVO_00073196 | QORVO_00133995 | QORVO_00305559 |
| QORVO_00065110 | QORVO_00073202 | QORVO_00134021 | QORVO_00305577 |
| QORVO_00065756 | QORVO_00073207 | QORVO_00134051 | QORVO_00305596 |
| QORVO_00066858 | QORVO_00073215 | QORVO_00159182 | QORVO_00305601 |
| QORVO_00066934 | QORVO_00073232 | QORVO_00159798 | QORVO_00305603 |

| | | | |
|---|---|---|---|
| QORVO_00305605 | QORVO_00310294 | QORVO_00525719 | QORVO_00531627 |
| QORVO_00305607 | QORVO_00311788 | QORVO_00525750 | QORVO_00531795 |
| QORVO_00305609 | QORVO_00311841 | QORVO_00525779 | QORVO_00531796 |
| QORVO_00305611 | QORVO_00314573 | QORVO_00526001 | QORVO_00532240 |
| QORVO_00305613 | QORVO_00314633 | QORVO_00526106 | QORVO_00532289 |
| QORVO_00305615 | QORVO_00316083 | QORVO_00526211 | QORVO_00532338 |
| QORVO_00305619 | QORVO_00317996 | QORVO_00526317 | QORVO_00532387 |
| QORVO_00305621 | QORVO_00320975 | QORVO_00526424 | QORVO_00532437 |
| QORVO_00305629 | QORVO_00321029 | QORVO_00526524 | QORVO_00532487 |
| QORVO_00305637 | QORVO_00321892 | QORVO_00526772 | QORVO_00532537 |
| QORVO_00305652 | QORVO_00516066 | QORVO_00526932 | QORVO_00532589 |
| QORVO_00305656 | QORVO_00516067 | QORVO_00527030 | QORVO_00532641 |
| QORVO_00305659 | QORVO_00517805 | QORVO_00527152 | QORVO_00532691 |
| QORVO_00305687 | QORVO_00517850 | QORVO_00527372 | QORVO_00532744 |
| QORVO_00305694 | QORVO_00518367 | QORVO_00527491 | QORVO_00532798 |
| QORVO_00305942 | QORVO_00518584 | QORVO_00527529 | QORVO_00532854 |
| QORVO_00305944 | QORVO_00519825 | QORVO_00527567 | QORVO_00532911 |
| QORVO_00305945 | QORVO_00521254 | QORVO_00527605 | QORVO_00532975 |
| QORVO_00305946 | QORVO_00521621 | QORVO_00527641 | QORVO_00533120 |
| QORVO_00305947 | QORVO_00521660 | QORVO_00528009 | QORVO_00533270 |
| QORVO_00305953 | QORVO_00521785 | QORVO_00528053 | QORVO_00533417 |
| QORVO_00305956 | QORVO_00522608 | QORVO_00528116 | QORVO_00533561 |
| QORVO_00305964 | QORVO_00522708 | QORVO_00528161 | QORVO_00533673 |
| QORVO_00305969 | QORVO_00522953 | QORVO_00528387 | QORVO_00534317 |
| QORVO_00305973 | QORVO_00523127 | QORVO_00528427 | QORVO_00534433 |
| QORVO_00305979 | QORVO_00523299 | QORVO_00528468 | QORVO_00534435 |
| QORVO_00305980 | QORVO_00523319 | QORVO_00528509 | QORVO_00534476 |
| QORVO_00305984 | QORVO_00523339 | QORVO_00528547 | QORVO_00534517 |
| QORVO_00305988 | QORVO_00523359 | QORVO_00528586 | QORVO_00534560 |
| QORVO_00305996 | QORVO_00523380 | QORVO_00528713 | QORVO_00534603 |
| QORVO_00306726 | QORVO_00523401 | QORVO_00528824 | QORVO_00534646 |
| QORVO_00306731 | QORVO_00523482 | QORVO_00529011 | QORVO_00535000 |
| QORVO_00306736 | QORVO_00523708 | QORVO_00529203 | QORVO_00535044 |
| QORVO_00306741 | QORVO_00523733 | QORVO_00529341 | QORVO_00535088 |
| QORVO_00306742 | QORVO_00523782 | QORVO_00529480 | QORVO_00535175 |
| QORVO_00306743 | QORVO_00523807 | QORVO_00529594 | QORVO_00535283 |
| QORVO_00306744 | QORVO_00523830 | QORVO_00529730 | QORVO_00535403 |
| QORVO_00306745 | QORVO_00524057 | QORVO_00529841 | QORVO_00535516 |
| QORVO_00306747 | QORVO_00524151 | QORVO_00529979 | QORVO_00535622 |
| QORVO_00306776 | QORVO_00524245 | QORVO_00530480 | QORVO_00535732 |
| QORVO_00306830 | QORVO_00524352 | QORVO_00530531 | QORVO_00535837 |
| QORVO_00306920 | QORVO_00524462 | QORVO_00530585 | QORVO_00536008 |
| QORVO_00306941 | QORVO_00524573 | QORVO_00530639 | QORVO_00536407 |
| QORVO_00308919 | QORVO_00524680 | QORVO_00530697 | QORVO_00536455 |
| QORVO_00308972 | QORVO_00524785 | QORVO_00530850 | QORVO_00536503 |
| QORVO_00309024 | QORVO_00524879 | QORVO_00530993 | QORVO_00536550 |
| QORVO_00309178 | QORVO_00525213 | QORVO_00531136 | QORVO_00536596 |
| QORVO_00310195 | QORVO_00525249 | QORVO_00531137 | QORVO_00536647 |
| QORVO_00310234 | QORVO_00525364 | QORVO_00531139 | QORVO_00536873 |
| QORVO_00310249 | QORVO_00525462 | QORVO_00531214 | QORVO_00537000 |
| QORVO_00310264 | QORVO_00525560 | QORVO_00531217 | QORVO_00537068 |
| QORVO_00310279 | QORVO_00525593 | QORVO_00531372 | QORVO_00537131 |

| | | | |
|---|---|---|---|
| QORVO_00537201 | QORVO_00562810 | QORVO_00596898 | QORVO_00603531 |
| QORVO_00537833 | QORVO_00563047 | QORVO_00597050 | QORVO_00603545 |
| QORVO_00537882 | QORVO_00563276 | QORVO_00597109 | QORVO_00603547 |
| QORVO_00538663 | QORVO_00563751 | QORVO_00597198 | QORVO_00603549 |
| QORVO_00539121 | QORVO_00564133 | QORVO_00597449 | QORVO_00603551 |
| QORVO_00539182 | QORVO_00564169 | QORVO_00597520 | QORVO_00603553 |
| QORVO_00539245 | QORVO_00564990 | QORVO_00597984 | QORVO_00603555 |
| QORVO_00539307 | QORVO_00565186 | QORVO_00598039 | QORVO_00603557 |
| QORVO_00539369 | QORVO_00565423 | QORVO_00598172 | QORVO_00603559 |
| QORVO_00539432 | QORVO_00565629 | QORVO_00598248 | QORVO_00603561 |
| QORVO_00539495 | QORVO_00566498 | QORVO_00599018 | QORVO_00603563 |
| QORVO_00539558 | QORVO_00566857 | QORVO_00599116 | QORVO_00603565 |
| QORVO_00539629 | QORVO_00566982 | QORVO_00599232 | QORVO_00603567 |
| QORVO_00540054 | QORVO_00567000 | QORVO_00599578 | QORVO_00603570 |
| QORVO_00540087 | QORVO_00567018 | QORVO_00599749 | QORVO_00603572 |
| QORVO_00540145 | QORVO_00567048 | QORVO_00599752 | QORVO_00603575 |
| QORVO_00540268 | QORVO_00568232 | QORVO_00600169 | QORVO_00603584 |
| QORVO_00540390 | QORVO_00568282 | QORVO_00600607 | QORVO_00603587 |
| QORVO_00540574 | QORVO_00568562 | QORVO_00600653 | QORVO_00603589 |
| QORVO_00540882 | QORVO_00568584 | QORVO_00603406 | QORVO_00603592 |
| QORVO_00541049 | QORVO_00569287 | QORVO_00603410 | QORVO_00603597 |
| QORVO_00541195 | QORVO_00569380 | QORVO_00603412 | QORVO_00603601 |
| QORVO_00541524 | QORVO_00569382 | QORVO_00603414 | QORVO_00603603 |
| QORVO_00541663 | QORVO_00569435 | QORVO_00603416 | QORVO_00603605 |
| QORVO_00541889 | QORVO_00569977 | QORVO_00603418 | QORVO_00603607 |
| QORVO_00547212 | QORVO_00570120 | QORVO_00603420 | QORVO_00603610 |
| QORVO_00552961 | QORVO_00570356 | QORVO_00603435 | QORVO_00603614 |
| QORVO_00553488 | QORVO_00570787 | QORVO_00603437 | QORVO_00603616 |
| QORVO_00556526 | QORVO_00570984 | QORVO_00603440 | QORVO_00603618 |
| QORVO_00557358 | QORVO_00571134 | QORVO_00603442 | QORVO_00603620 |
| QORVO_00559407 | QORVO_00571179 | QORVO_00603444 | QORVO_00603623 |
| QORVO_00559512 | QORVO_00571220 | QORVO_00603447 | QORVO_00603625 |
| QORVO_00559552 | QORVO_00571351 | QORVO_00603449 | QORVO_00603627 |
| QORVO_00560008 | QORVO_00572499 | QORVO_00603453 | QORVO_00603629 |
| QORVO_00560048 | QORVO_00575835 | QORVO_00603455 | QORVO_00603631 |
| QORVO_00560362 | QORVO_00575898 | QORVO_00603457 | QORVO_00603633 |
| QORVO_00560774 | QORVO_00575960 | QORVO_00603460 | QORVO_00603635 |
| QORVO_00560895 | QORVO_00576022 | QORVO_00603462 | QORVO_00603647 |
| QORVO_00560986 | QORVO_00576502 | QORVO_00603470 | QORVO_00603649 |
| QORVO_00561083 | QORVO_00576675 | QORVO_00603472 | QORVO_00603651 |
| QORVO_00561400 | QORVO_00576788 | QORVO_00603474 | QORVO_00603653 |
| QORVO_00561503 | QORVO_00577606 | QORVO_00603476 | QORVO_00603655 |
| QORVO_00561610 | QORVO_00577923 | QORVO_00603478 | QORVO_00603663 |
| QORVO_00561721 | QORVO_00581292 | QORVO_00603480 | QORVO_00603665 |
| QORVO_00561820 | QORVO_00581614 | QORVO_00603482 | QORVO_00603667 |
| QORVO_00562251 | QORVO_00589306 | QORVO_00603491 | QORVO_00603690 |
| QORVO_00562454 | QORVO_00589337 | QORVO_00603493 | QORVO_00603693 |
| QORVO_00562559 | QORVO_00591385 | QORVO_00603495 | QORVO_00603695 |
| QORVO_00562590 | QORVO_00593519 | QORVO_00603497 | QORVO_00603697 |
| QORVO_00562761 | QORVO_00593723 | QORVO_00603499 | QORVO_00603699 |
| QORVO_00562763 | QORVO_00596746 | QORVO_00603501 | QORVO_00603701 |
| QORVO_00562784 | QORVO_00596813 | QORVO_00603529 | QORVO_00603707 |

| | | | |
|---|---|---|---|
| QORVO_00603709 | QORVO_00603852 | QORVO_00603992 | QORVO_00604149 |
| QORVO_00603711 | QORVO_00603854 | QORVO_00603994 | QORVO_00604151 |
| QORVO_00603713 | QORVO_00603856 | QORVO_00604002 | QORVO_00604153 |
| QORVO_00603715 | QORVO_00603858 | QORVO_00604004 | QORVO_00604155 |
| QORVO_00603717 | QORVO_00603860 | QORVO_00604008 | QORVO_00604157 |
| QORVO_00603719 | QORVO_00603862 | QORVO_00604010 | QORVO_00604159 |
| QORVO_00603721 | QORVO_00603864 | QORVO_00604012 | QORVO_00604161 |
| QORVO_00603723 | QORVO_00603866 | QORVO_00604014 | QORVO_00604164 |
| QORVO_00603725 | QORVO_00603868 | QORVO_00604016 | QORVO_00604167 |
| QORVO_00603727 | QORVO_00603870 | QORVO_00604032 | QORVO_00604169 |
| QORVO_00603729 | QORVO_00603872 | QORVO_00604034 | QORVO_00604171 |
| QORVO_00603731 | QORVO_00603874 | QORVO_00604036 | QORVO_00604174 |
| QORVO_00603733 | QORVO_00603881 | QORVO_00604038 | QORVO_00604176 |
| QORVO_00603735 | QORVO_00603883 | QORVO_00604040 | QORVO_00604178 |
| QORVO_00603743 | QORVO_00603886 | QORVO_00604042 | QORVO_00604180 |
| QORVO_00603745 | QORVO_00603888 | QORVO_00604045 | QORVO_00604182 |
| QORVO_00603747 | QORVO_00603892 | QORVO_00604047 | QORVO_00604186 |
| QORVO_00603751 | QORVO_00603894 | QORVO_00604051 | QORVO_00604188 |
| QORVO_00603753 | QORVO_00603896 | QORVO_00604053 | QORVO_00604196 |
| QORVO_00603755 | QORVO_00603898 | QORVO_00604055 | QORVO_00604198 |
| QORVO_00603757 | QORVO_00603901 | QORVO_00604057 | QORVO_00604200 |
| QORVO_00603759 | QORVO_00603905 | QORVO_00604059 | QORVO_00604202 |
| QORVO_00603761 | QORVO_00603907 | QORVO_00604062 | QORVO_00604209 |
| QORVO_00603763 | QORVO_00603910 | QORVO_00604064 | QORVO_00604211 |
| QORVO_00603765 | QORVO_00603912 | QORVO_00604066 | QORVO_00604218 |
| QORVO_00603768 | QORVO_00603914 | QORVO_00604073 | QORVO_00604220 |
| QORVO_00603770 | QORVO_00603916 | QORVO_00604075 | QORVO_00604224 |
| QORVO_00603772 | QORVO_00603918 | QORVO_00604077 | QORVO_00604227 |
| QORVO_00603774 | QORVO_00603920 | QORVO_00604079 | QORVO_00604229 |
| QORVO_00603776 | QORVO_00603922 | QORVO_00604081 | QORVO_00604232 |
| QORVO_00603778 | QORVO_00603924 | QORVO_00604083 | QORVO_00604234 |
| QORVO_00603781 | QORVO_00603926 | QORVO_00604085 | QORVO_00604236 |
| QORVO_00603784 | QORVO_00603928 | QORVO_00604087 | QORVO_00604238 |
| QORVO_00603786 | QORVO_00603930 | QORVO_00604089 | QORVO_00604243 |
| QORVO_00603790 | QORVO_00603932 | QORVO_00604092 | QORVO_00604245 |
| QORVO_00603792 | QORVO_00603934 | QORVO_00604094 | QORVO_00604247 |
| QORVO_00603794 | QORVO_00603936 | QORVO_00604096 | QORVO_00604251 |
| QORVO_00603796 | QORVO_00603939 | QORVO_00604098 | QORVO_00604255 |
| QORVO_00603798 | QORVO_00603942 | QORVO_00604102 | QORVO_00604257 |
| QORVO_00603800 | QORVO_00603945 | QORVO_00604104 | QORVO_00604259 |
| QORVO_00603804 | QORVO_00603947 | QORVO_00604106 | QORVO_00604270 |
| QORVO_00603806 | QORVO_00603949 | QORVO_00604108 | QORVO_00604278 |
| QORVO_00603828 | QORVO_00603951 | QORVO_00604125 | QORVO_00604280 |
| QORVO_00603830 | QORVO_00603954 | QORVO_00604129 | QORVO_00604282 |
| QORVO_00603836 | QORVO_00603956 | QORVO_00604132 | QORVO_00604284 |
| QORVO_00603838 | QORVO_00603958 | QORVO_00604134 | QORVO_00604286 |
| QORVO_00603840 | QORVO_00603962 | QORVO_00604136 | QORVO_00604288 |
| QORVO_00603842 | QORVO_00603964 | QORVO_00604138 | QORVO_00604290 |
| QORVO_00603844 | QORVO_00603966 | QORVO_00604140 | QORVO_00604293 |
| QORVO_00603846 | QORVO_00603968 | QORVO_00604142 | QORVO_00604295 |
| QORVO_00603848 | QORVO_00603988 | QORVO_00604144 | QORVO_00604297 |
| QORVO_00603850 | QORVO_00603990 | QORVO_00604147 | QORVO_00604299 |

A-30

| | | | |
|---|---|---|---|
| QORVO_00604301 | QORVO_00604457 | QORVO_00604632 | QORVO_00604916 |
| QORVO_00604303 | QORVO_00604459 | QORVO_00604674 | QORVO_00604926 |
| QORVO_00604305 | QORVO_00604461 | QORVO_00604680 | QORVO_00604928 |
| QORVO_00604307 | QORVO_00604463 | QORVO_00604683 | QORVO_00604930 |
| QORVO_00604309 | QORVO_00604465 | QORVO_00604690 | QORVO_00604932 |
| QORVO_00604312 | QORVO_00604467 | QORVO_00604692 | QORVO_00604934 |
| QORVO_00604333 | QORVO_00604469 | QORVO_00604694 | QORVO_00604936 |
| QORVO_00604335 | QORVO_00604471 | QORVO_00604696 | QORVO_00604999 |
| QORVO_00604337 | QORVO_00604475 | QORVO_00604698 | QORVO_00605001 |
| QORVO_00604346 | QORVO_00604481 | QORVO_00604701 | QORVO_00605003 |
| QORVO_00604348 | QORVO_00604484 | QORVO_00604703 | QORVO_00605005 |
| QORVO_00604350 | QORVO_00604487 | QORVO_00604705 | QORVO_00605007 |
| QORVO_00604352 | QORVO_00604489 | QORVO_00604768 | QORVO_00605010 |
| QORVO_00604354 | QORVO_00604491 | QORVO_00604770 | QORVO_00605012 |
| QORVO_00604356 | QORVO_00604493 | QORVO_00604772 | QORVO_00605016 |
| QORVO_00604359 | QORVO_00604495 | QORVO_00604780 | QORVO_00605018 |
| QORVO_00604368 | QORVO_00604498 | QORVO_00604782 | QORVO_00605021 |
| QORVO_00604370 | QORVO_00604500 | QORVO_00604784 | QORVO_00605024 |
| QORVO_00604373 | QORVO_00604502 | QORVO_00604786 | QORVO_00605031 |
| QORVO_00604375 | QORVO_00604504 | QORVO_00604788 | QORVO_00605033 |
| QORVO_00604377 | QORVO_00604506 | QORVO_00604792 | QORVO_00605035 |
| QORVO_00604379 | QORVO_00604508 | QORVO_00604800 | QORVO_00605037 |
| QORVO_00604381 | QORVO_00604510 | QORVO_00604806 | QORVO_00605039 |
| QORVO_00604383 | QORVO_00604512 | QORVO_00604808 | QORVO_00605041 |
| QORVO_00604386 | QORVO_00604517 | QORVO_00604810 | QORVO_00605057 |
| QORVO_00604388 | QORVO_00604524 | QORVO_00604812 | QORVO_00605060 |
| QORVO_00604390 | QORVO_00604526 | QORVO_00604816 | QORVO_00605065 |
| QORVO_00604393 | QORVO_00604529 | QORVO_00604818 | QORVO_00605067 |
| QORVO_00604395 | QORVO_00604532 | QORVO_00604820 | QORVO_00605069 |
| QORVO_00604397 | QORVO_00604534 | QORVO_00604823 | QORVO_00605071 |
| QORVO_00604399 | QORVO_00604536 | QORVO_00604825 | QORVO_00605073 |
| QORVO_00604405 | QORVO_00604538 | QORVO_00604827 | QORVO_00605075 |
| QORVO_00604409 | QORVO_00604540 | QORVO_00604829 | QORVO_00605077 |
| QORVO_00604411 | QORVO_00604542 | QORVO_00604831 | QORVO_00605082 |
| QORVO_00604413 | QORVO_00604546 | QORVO_00604833 | QORVO_00605084 |
| QORVO_00604415 | QORVO_00604548 | QORVO_00604836 | QORVO_00605086 |
| QORVO_00604417 | QORVO_00604574 | QORVO_00604838 | QORVO_00605089 |
| QORVO_00604419 | QORVO_00604577 | QORVO_00604840 | QORVO_00605091 |
| QORVO_00604421 | QORVO_00604599 | QORVO_00604842 | QORVO_00605093 |
| QORVO_00604423 | QORVO_00604601 | QORVO_00604844 | QORVO_00605095 |
| QORVO_00604425 | QORVO_00604603 | QORVO_00604846 | QORVO_00605098 |
| QORVO_00604427 | QORVO_00604605 | QORVO_00604878 | QORVO_00605100 |
| QORVO_00604435 | QORVO_00604609 | QORVO_00604880 | QORVO_00605102 |
| QORVO_00604437 | QORVO_00604611 | QORVO_00604883 | QORVO_00605104 |
| QORVO_00604440 | QORVO_00604613 | QORVO_00604886 | QORVO_00605106 |
| QORVO_00604442 | QORVO_00604617 | QORVO_00604892 | QORVO_00605108 |
| QORVO_00604444 | QORVO_00604619 | QORVO_00604899 | QORVO_00605110 |
| QORVO_00604446 | QORVO_00604621 | QORVO_00604901 | QORVO_00605112 |
| QORVO_00604448 | QORVO_00604623 | QORVO_00604903 | QORVO_00605114 |
| QORVO_00604450 | QORVO_00604625 | QORVO_00604905 | QORVO_00605116 |
| QORVO_00604453 | QORVO_00604627 | QORVO_00604908 | QORVO_00605211 |
| QORVO_00604455 | QORVO_00604629 | QORVO_00604914 | |

A-31

| | | | |
|---|---|---|---|
| QORVO_00605213 | QORVO_00605392 | QORVO_00605569 | QORVO_00605742 |
| QORVO_00605215 | QORVO_00605394 | QORVO_00605571 | QORVO_00605762 |
| QORVO_00605217 | QORVO_00605432 | QORVO_00605573 | QORVO_00605764 |
| QORVO_00605219 | QORVO_00605435 | QORVO_00605576 | QORVO_00605766 |
| QORVO_00605225 | QORVO_00605437 | QORVO_00605578 | QORVO_00605768 |
| QORVO_00605227 | QORVO_00605439 | QORVO_00605580 | QORVO_00605770 |
| QORVO_00605229 | QORVO_00605441 | QORVO_00605582 | QORVO_00605772 |
| QORVO_00605231 | QORVO_00605444 | QORVO_00605584 | QORVO_00605774 |
| QORVO_00605264 | QORVO_00605446 | QORVO_00605586 | QORVO_00605776 |
| QORVO_00605266 | QORVO_00605448 | QORVO_00605589 | QORVO_00605778 |
| QORVO_00605268 | QORVO_00605451 | QORVO_00605591 | QORVO_00605780 |
| QORVO_00605270 | QORVO_00605453 | QORVO_00605594 | QORVO_00605782 |
| QORVO_00605274 | QORVO_00605455 | QORVO_00605597 | QORVO_00605784 |
| QORVO_00605276 | QORVO_00605457 | QORVO_00605599 | QORVO_00605844 |
| QORVO_00605279 | QORVO_00605459 | QORVO_00605601 | QORVO_00605847 |
| QORVO_00605281 | QORVO_00605462 | QORVO_00605605 | QORVO_00605849 |
| QORVO_00605283 | QORVO_00605464 | QORVO_00605608 | QORVO_00605851 |
| QORVO_00605285 | QORVO_00605466 | QORVO_00605610 | QORVO_00605853 |
| QORVO_00605287 | QORVO_00605468 | QORVO_00605618 | QORVO_00605857 |
| QORVO_00605290 | QORVO_00605479 | QORVO_00605620 | QORVO_00605859 |
| QORVO_00605292 | QORVO_00605481 | QORVO_00605622 | QORVO_00605861 |
| QORVO_00605294 | QORVO_00605483 | QORVO_00605624 | QORVO_00605920 |
| QORVO_00605302 | QORVO_00605490 | QORVO_00605626 | QORVO_00605922 |
| QORVO_00605305 | QORVO_00605492 | QORVO_00605628 | QORVO_00605924 |
| QORVO_00605307 | QORVO_00605494 | QORVO_00605630 | QORVO_00605926 |
| QORVO_00605309 | QORVO_00605496 | QORVO_00605645 | QORVO_00605928 |
| QORVO_00605312 | QORVO_00605498 | QORVO_00605647 | QORVO_00605932 |
| QORVO_00605314 | QORVO_00605503 | QORVO_00605649 | QORVO_00605934 |
| QORVO_00605316 | QORVO_00605505 | QORVO_00605652 | QORVO_00605936 |
| QORVO_00605318 | QORVO_00605507 | QORVO_00605654 | QORVO_00605938 |
| QORVO_00605320 | QORVO_00605509 | QORVO_00605656 | QORVO_00605940 |
| QORVO_00605322 | QORVO_00605511 | QORVO_00605661 | QORVO_00605942 |
| QORVO_00605324 | QORVO_00605513 | QORVO_00605688 | QORVO_00605944 |
| QORVO_00605326 | QORVO_00605515 | QORVO_00605690 | QORVO_00605947 |
| QORVO_00605328 | QORVO_00605518 | QORVO_00605692 | QORVO_00605949 |
| QORVO_00605330 | QORVO_00605520 | QORVO_00605694 | QORVO_00605951 |
| QORVO_00605338 | QORVO_00605522 | QORVO_00605696 | QORVO_00605953 |
| QORVO_00605340 | QORVO_00605524 | QORVO_00605698 | QORVO_00605955 |
| QORVO_00605342 | QORVO_00605526 | QORVO_00605700 | QORVO_00605957 |
| QORVO_00605345 | QORVO_00605529 | QORVO_00605703 | QORVO_00605960 |
| QORVO_00605347 | QORVO_00605531 | QORVO_00605705 | QORVO_00605969 |
| QORVO_00605349 | QORVO_00605533 | QORVO_00605708 | QORVO_00605971 |
| QORVO_00605359 | QORVO_00605535 | QORVO_00605715 | QORVO_00605973 |
| QORVO_00605361 | QORVO_00605537 | QORVO_00605719 | QORVO_00605975 |
| QORVO_00605370 | QORVO_00605540 | QORVO_00605721 | QORVO_00605978 |
| QORVO_00605372 | QORVO_00605542 | QORVO_00605724 | QORVO_00605980 |
| QORVO_00605374 | QORVO_00605551 | QORVO_00605726 | QORVO_00605982 |
| QORVO_00605376 | QORVO_00605553 | QORVO_00605728 | QORVO_00605984 |
| QORVO_00605380 | QORVO_00605555 | QORVO_00605730 | QORVO_00605986 |
| QORVO_00605383 | QORVO_00605557 | QORVO_00605735 | QORVO_00605989 |
| QORVO_00605387 | QORVO_00605559 | QORVO_00605737 | QORVO_00605991 |
| QORVO_00605390 | QORVO_00605561 | QORVO_00605739 | QORVO_00605993 |

A-32

| | | | |
|---|---|---|---|
| QORVO_00605995 | QORVO_00606180 | QORVO_00606327 | QORVO_00606481 |
| QORVO_00605997 | QORVO_00606182 | QORVO_00606329 | QORVO_00606483 |
| QORVO_00605999 | QORVO_00606184 | QORVO_00606336 | QORVO_00606485 |
| QORVO_00606001 | QORVO_00606186 | QORVO_00606338 | QORVO_00606492 |
| QORVO_00606003 | QORVO_00606188 | QORVO_00606340 | QORVO_00606494 |
| QORVO_00606020 | QORVO_00606190 | QORVO_00606342 | QORVO_00606496 |
| QORVO_00606022 | QORVO_00606197 | QORVO_00606344 | QORVO_00606499 |
| QORVO_00606024 | QORVO_00606199 | QORVO_00606346 | QORVO_00606501 |
| QORVO_00606026 | QORVO_00606202 | QORVO_00606348 | QORVO_00606503 |
| QORVO_00606028 | QORVO_00606210 | QORVO_00606350 | QORVO_00606505 |
| QORVO_00606030 | QORVO_00606212 | QORVO_00606352 | QORVO_00606508 |
| QORVO_00606032 | QORVO_00606214 | QORVO_00606360 | QORVO_00606510 |
| QORVO_00606035 | QORVO_00606217 | QORVO_00606362 | QORVO_00606512 |
| QORVO_00606041 | QORVO_00606219 | QORVO_00606364 | QORVO_00606514 |
| QORVO_00606043 | QORVO_00606221 | QORVO_00606366 | QORVO_00606516 |
| QORVO_00606046 | QORVO_00606225 | QORVO_00606368 | QORVO_00606518 |
| QORVO_00606048 | QORVO_00606227 | QORVO_00606370 | QORVO_00606520 |
| QORVO_00606068 | QORVO_00606229 | QORVO_00606372 | QORVO_00606522 |
| QORVO_00606072 | QORVO_00606231 | QORVO_00606374 | QORVO_00606524 |
| QORVO_00606074 | QORVO_00606233 | QORVO_00606379 | QORVO_00606526 |
| QORVO_00606076 | QORVO_00606240 | QORVO_00606381 | QORVO_00606528 |
| QORVO_00606078 | QORVO_00606242 | QORVO_00606389 | QORVO_00606530 |
| QORVO_00606081 | QORVO_00606251 | QORVO_00606391 | QORVO_00606532 |
| QORVO_00606083 | QORVO_00606253 | QORVO_00606393 | QORVO_00606534 |
| QORVO_00606085 | QORVO_00606255 | QORVO_00606399 | QORVO_00606536 |
| QORVO_00606087 | QORVO_00606257 | QORVO_00606401 | QORVO_00606538 |
| QORVO_00606089 | QORVO_00606259 | QORVO_00606404 | QORVO_00606544 |
| QORVO_00606091 | QORVO_00606261 | QORVO_00606406 | QORVO_00606546 |
| QORVO_00606093 | QORVO_00606267 | QORVO_00606408 | QORVO_00606548 |
| QORVO_00606095 | QORVO_00606269 | QORVO_00606412 | QORVO_00606556 |
| QORVO_00606102 | QORVO_00606271 | QORVO_00606414 | QORVO_00606558 |
| QORVO_00606104 | QORVO_00606274 | QORVO_00606422 | QORVO_00606560 |
| QORVO_00606106 | QORVO_00606278 | QORVO_00606424 | QORVO_00606563 |
| QORVO_00606108 | QORVO_00606282 | QORVO_00606427 | QORVO_00606565 |
| QORVO_00606110 | QORVO_00606284 | QORVO_00606429 | QORVO_00606567 |
| QORVO_00606129 | QORVO_00606286 | QORVO_00606432 | QORVO_00606570 |
| QORVO_00606131 | QORVO_00606288 | QORVO_00606434 | QORVO_00606573 |
| QORVO_00606133 | QORVO_00606290 | QORVO_00606441 | QORVO_00606576 |
| QORVO_00606142 | QORVO_00606292 | QORVO_00606444 | QORVO_00606578 |
| QORVO_00606144 | QORVO_00606294 | QORVO_00606446 | QORVO_00606580 |
| QORVO_00606146 | QORVO_00606296 | QORVO_00606448 | QORVO_00606590 |
| QORVO_00606149 | QORVO_00606298 | QORVO_00606450 | QORVO_00606593 |
| QORVO_00606157 | QORVO_00606300 | QORVO_00606452 | QORVO_00606595 |
| QORVO_00606160 | QORVO_00606302 | QORVO_00606458 | QORVO_00606597 |
| QORVO_00606162 | QORVO_00606304 | QORVO_00606460 | QORVO_00606599 |
| QORVO_00606164 | QORVO_00606306 | QORVO_00606462 | QORVO_00606601 |
| QORVO_00606166 | QORVO_00606315 | QORVO_00606468 | QORVO_00606603 |
| QORVO_00606168 | QORVO_00606317 | QORVO_00606470 | QORVO_00606605 |
| QORVO_00606170 | QORVO_00606319 | QORVO_00606472 | QORVO_00606607 |
| QORVO_00606172 | QORVO_00606321 | QORVO_00606474 | QORVO_00606609 |
| QORVO_00606174 | QORVO_00606323 | QORVO_00606476 | QORVO_00606611 |
| QORVO_00606176 | QORVO_00606325 | QORVO_00606478 | QORVO_00606614 |

| | | | |
|---|---|---|---|
| QORVO_00606621 | QORVO_00606774 | QORVO_00606905 | QORVO_00607111 |
| QORVO_00606623 | QORVO_00606776 | QORVO_00606912 | QORVO_00607113 |
| QORVO_00606625 | QORVO_00606778 | QORVO_00606914 | QORVO_00607115 |
| QORVO_00606627 | QORVO_00606780 | QORVO_00606916 | QORVO_00607124 |
| QORVO_00606630 | QORVO_00606782 | QORVO_00606918 | QORVO_00607127 |
| QORVO_00606632 | QORVO_00606784 | QORVO_00606920 | QORVO_00607129 |
| QORVO_00606634 | QORVO_00606786 | QORVO_00606922 | QORVO_00607137 |
| QORVO_00606638 | QORVO_00606788 | QORVO_00606924 | QORVO_00607139 |
| QORVO_00606640 | QORVO_00606790 | QORVO_00606927 | QORVO_00607160 |
| QORVO_00606642 | QORVO_00606792 | QORVO_00606929 | QORVO_00607162 |
| QORVO_00606644 | QORVO_00606794 | QORVO_00606931 | QORVO_00607164 |
| QORVO_00606646 | QORVO_00606797 | QORVO_00606933 | QORVO_00607167 |
| QORVO_00606648 | QORVO_00606805 | QORVO_00606935 | QORVO_00607169 |
| QORVO_00606650 | QORVO_00606807 | QORVO_00606937 | QORVO_00607171 |
| QORVO_00606653 | QORVO_00606814 | QORVO_00606939 | QORVO_00607180 |
| QORVO_00606655 | QORVO_00606816 | QORVO_00606941 | QORVO_00607183 |
| QORVO_00606664 | QORVO_00606818 | QORVO_00606944 | QORVO_00607185 |
| QORVO_00606666 | QORVO_00606820 | QORVO_00606946 | QORVO_00607191 |
| QORVO_00606668 | QORVO_00606822 | QORVO_00606948 | QORVO_00607194 |
| QORVO_00606670 | QORVO_00606824 | QORVO_00606967 | QORVO_00607197 |
| QORVO_00606672 | QORVO_00606826 | QORVO_00606971 | QORVO_00607199 |
| QORVO_00606674 | QORVO_00606828 | QORVO_00606973 | QORVO_00607209 |
| QORVO_00606676 | QORVO_00606830 | QORVO_00606976 | QORVO_00607211 |
| QORVO_00606678 | QORVO_00606832 | QORVO_00606978 | QORVO_00607213 |
| QORVO_00606680 | QORVO_00606834 | QORVO_00606985 | QORVO_00607215 |
| QORVO_00606683 | QORVO_00606836 | QORVO_00606987 | QORVO_00607217 |
| QORVO_00606685 | QORVO_00606844 | QORVO_00606989 | QORVO_00607219 |
| QORVO_00606688 | QORVO_00606846 | QORVO_00606991 | QORVO_00607221 |
| QORVO_00606690 | QORVO_00606848 | QORVO_00606994 | QORVO_00607223 |
| QORVO_00606692 | QORVO_00606850 | QORVO_00606996 | QORVO_00607225 |
| QORVO_00606694 | QORVO_00606852 | QORVO_00607000 | QORVO_00607227 |
| QORVO_00606696 | QORVO_00606855 | QORVO_00607002 | QORVO_00607230 |
| QORVO_00606698 | QORVO_00606857 | QORVO_00607005 | QORVO_00607232 |
| QORVO_00606702 | QORVO_00606859 | QORVO_00607007 | QORVO_00607234 |
| QORVO_00606704 | QORVO_00606862 | QORVO_00607009 | QORVO_00607236 |
| QORVO_00606707 | QORVO_00606864 | QORVO_00607011 | QORVO_00607238 |
| QORVO_00606709 | QORVO_00606866 | QORVO_00607071 | QORVO_00607240 |
| QORVO_00606711 | QORVO_00606868 | QORVO_00607073 | QORVO_00607242 |
| QORVO_00606735 | QORVO_00606875 | QORVO_00607075 | QORVO_00607250 |
| QORVO_00606737 | QORVO_00606877 | QORVO_00607077 | QORVO_00607252 |
| QORVO_00606739 | QORVO_00606879 | QORVO_00607079 | QORVO_00607254 |
| QORVO_00606741 | QORVO_00606881 | QORVO_00607081 | QORVO_00607256 |
| QORVO_00606748 | QORVO_00606883 | QORVO_00607083 | QORVO_00607259 |
| QORVO_00606750 | QORVO_00606886 | QORVO_00607085 | QORVO_00607267 |
| QORVO_00606752 | QORVO_00606888 | QORVO_00607087 | QORVO_00607269 |
| QORVO_00606754 | QORVO_00606890 | QORVO_00607089 | QORVO_00607271 |
| QORVO_00606757 | QORVO_00606892 | QORVO_00607091 | QORVO_00607273 |
| QORVO_00606760 | QORVO_00606894 | QORVO_00607093 | QORVO_00607275 |
| QORVO_00606762 | QORVO_00606896 | QORVO_00607096 | QORVO_00607277 |
| QORVO_00606764 | QORVO_00606898 | QORVO_00607098 | QORVO_00607279 |
| QORVO_00606766 | QORVO_00606900 | QORVO_00607106 | QORVO_00607283 |
| QORVO_00606772 | QORVO_00606902 | QORVO_00607109 | QORVO_00607285 |

A-34

| | | | |
|---|---|---|---|
| QORVO_00607287 | QORVO_00607464 | QORVO_00607610 | QORVO_00607834 |
| QORVO_00607289 | QORVO_00607466 | QORVO_00607618 | QORVO_00607836 |
| QORVO_00607292 | QORVO_00607470 | QORVO_00607620 | QORVO_00607840 |
| QORVO_00607294 | QORVO_00607488 | QORVO_00607622 | QORVO_00607844 |
| QORVO_00607296 | QORVO_00607491 | QORVO_00607624 | QORVO_00607846 |
| QORVO_00607298 | QORVO_00607493 | QORVO_00607626 | QORVO_00607848 |
| QORVO_00607301 | QORVO_00607495 | QORVO_00607628 | QORVO_00607850 |
| QORVO_00607309 | QORVO_00607497 | QORVO_00607631 | QORVO_00607852 |
| QORVO_00607312 | QORVO_00607499 | QORVO_00607633 | QORVO_00607861 |
| QORVO_00607320 | QORVO_00607501 | QORVO_00607635 | QORVO_00607863 |
| QORVO_00607322 | QORVO_00607503 | QORVO_00607637 | QORVO_00607865 |
| QORVO_00607324 | QORVO_00607505 | QORVO_00607639 | QORVO_00607867 |
| QORVO_00607326 | QORVO_00607508 | QORVO_00607644 | QORVO_00607870 |
| QORVO_00607328 | QORVO_00607511 | QORVO_00607646 | QORVO_00607872 |
| QORVO_00607330 | QORVO_00607513 | QORVO_00607649 | QORVO_00607878 |
| QORVO_00607332 | QORVO_00607515 | QORVO_00607659 | QORVO_00607880 |
| QORVO_00607334 | QORVO_00607517 | QORVO_00607661 | QORVO_00607884 |
| QORVO_00607336 | QORVO_00607519 | QORVO_00607668 | QORVO_00607886 |
| QORVO_00607345 | QORVO_00607522 | QORVO_00607677 | QORVO_00607888 |
| QORVO_00607347 | QORVO_00607524 | QORVO_00607681 | QORVO_00607890 |
| QORVO_00607349 | QORVO_00607526 | QORVO_00607686 | QORVO_00607890 |
| QORVO_00607354 | QORVO_00607529 | QORVO_00607689 | QORVO_00607892 |
| QORVO_00607356 | QORVO_00607531 | QORVO_00607691 | QORVO_00607895 |
| QORVO_00607358 | QORVO_00607533 | QORVO_00607693 | QORVO_00607897 |
| QORVO_00607360 | QORVO_00607543 | QORVO_00607695 | QORVO_00607899 |
| QORVO_00607362 | QORVO_00607545 | QORVO_00607697 | QORVO_00607901 |
| QORVO_00607366 | QORVO_00607547 | QORVO_00607699 | QORVO_00607903 |
| QORVO_00607393 | QORVO_00607549 | QORVO_00607701 | QORVO_00607905 |
| QORVO_00607395 | QORVO_00607551 | QORVO_00607703 | QORVO_00607907 |
| QORVO_00607397 | QORVO_00607553 | QORVO_00607705 | QORVO_00607910 |
| QORVO_00607399 | QORVO_00607555 | QORVO_00607713 | QORVO_00607912 |
| QORVO_00607402 | QORVO_00607557 | QORVO_00607715 | QORVO_00607914 |
| QORVO_00607404 | QORVO_00607559 | QORVO_00607717 | QORVO_00607916 |
| QORVO_00607406 | QORVO_00607561 | QORVO_00607719 | QORVO_00607919 |
| QORVO_00607408 | QORVO_00607563 | QORVO_00607722 | QORVO_00607921 |
| QORVO_00607428 | QORVO_00607565 | QORVO_00607724 | QORVO_00607923 |
| QORVO_00607430 | QORVO_00607567 | QORVO_00607727 | QORVO_00607925 |
| QORVO_00607432 | QORVO_00607569 | QORVO_00607730 | QORVO_00607927 |
| QORVO_00607434 | QORVO_00607571 | QORVO_00607732 | QORVO_00607929 |
| QORVO_00607436 | QORVO_00607574 | QORVO_00607734 | QORVO_00607931 |
| QORVO_00607438 | QORVO_00607576 | QORVO_00607736 | QORVO_00607940 |
| QORVO_00607440 | QORVO_00607583 | QORVO_00607738 | QORVO_00607943 |
| QORVO_00607442 | QORVO_00607585 | QORVO_00607810 | QORVO_00607945 |
| QORVO_00607444 | QORVO_00607587 | QORVO_00607812 | QORVO_00607947 |
| QORVO_00607446 | QORVO_00607589 | QORVO_00607815 | QORVO_00607949 |
| QORVO_00607448 | QORVO_00607591 | QORVO_00607817 | QORVO_00607953 |
| QORVO_00607450 | QORVO_00607598 | QORVO_00607819 | QORVO_00607955 |
| QORVO_00607452 | QORVO_00607600 | QORVO_00607821 | QORVO_00607957 |
| QORVO_00607454 | QORVO_00607602 | QORVO_00607824 | QORVO_00607959 |
| QORVO_00607458 | QORVO_00607604 | QORVO_00607826 | QORVO_00607965 |
| QORVO_00607460 | QORVO_00607606 | QORVO_00607828 | QORVO_00607967 |
| QORVO_00607462 | QORVO_00607608 | QORVO_00607830 | QORVO_00607969 |

A-35

| | | | |
|---|---|---|---|
| QORVO_00607971 | QORVO_00608192 | QORVO_00608419 | QORVO_00608553 |
| QORVO_00607974 | QORVO_00608194 | QORVO_00608421 | QORVO_00608555 |
| QORVO_00607985 | QORVO_00608196 | QORVO_00608423 | QORVO_00608557 |
| QORVO_00607987 | QORVO_00608198 | QORVO_00608425 | QORVO_00608559 |
| QORVO_00607989 | QORVO_00608200 | QORVO_00608427 | QORVO_00608561 |
| QORVO_00607991 | QORVO_00608202 | QORVO_00608429 | QORVO_00608563 |
| QORVO_00607993 | QORVO_00608204 | QORVO_00608437 | QORVO_00608565 |
| QORVO_00607995 | QORVO_00608206 | QORVO_00608439 | QORVO_00608567 |
| QORVO_00607997 | QORVO_00608208 | QORVO_00608441 | QORVO_00608569 |
| QORVO_00608000 | QORVO_00608210 | QORVO_00608443 | QORVO_00608572 |
| QORVO_00608002 | QORVO_00608212 | QORVO_00608445 | QORVO_00608574 |
| QORVO_00608004 | QORVO_00608232 | QORVO_00608447 | QORVO_00608577 |
| QORVO_00608006 | QORVO_00608235 | QORVO_00608449 | QORVO_00608579 |
| QORVO_00608015 | QORVO_00608237 | QORVO_00608452 | QORVO_00608581 |
| QORVO_00608017 | QORVO_00608239 | QORVO_00608454 | QORVO_00608585 |
| QORVO_00608019 | QORVO_00608241 | QORVO_00608456 | QORVO_00608587 |
| QORVO_00608021 | QORVO_00608243 | QORVO_00608458 | QORVO_00608593 |
| QORVO_00608023 | QORVO_00608245 | QORVO_00608460 | QORVO_00608596 |
| QORVO_00608025 | QORVO_00608248 | QORVO_00608462 | QORVO_00608598 |
| QORVO_00608027 | QORVO_00608250 | QORVO_00608464 | QORVO_00608600 |
| QORVO_00608029 | QORVO_00608252 | QORVO_00608466 | QORVO_00608608 |
| QORVO_00608031 | QORVO_00608254 | QORVO_00608468 | QORVO_00608610 |
| QORVO_00608033 | QORVO_00608257 | QORVO_00608472 | QORVO_00608612 |
| QORVO_00608035 | QORVO_00608260 | QORVO_00608474 | QORVO_00608614 |
| QORVO_00608037 | QORVO_00608262 | QORVO_00608476 | QORVO_00608616 |
| QORVO_00608039 | QORVO_00608264 | QORVO_00608478 | QORVO_00608618 |
| QORVO_00608041 | QORVO_00608266 | QORVO_00608480 | QORVO_00608622 |
| QORVO_00608111 | QORVO_00608275 | QORVO_00608490 | QORVO_00608624 |
| QORVO_00608113 | QORVO_00608277 | QORVO_00608492 | QORVO_00608627 |
| QORVO_00608121 | QORVO_00608281 | QORVO_00608494 | QORVO_00608636 |
| QORVO_00608124 | QORVO_00608283 | QORVO_00608497 | QORVO_00608646 |
| QORVO_00608131 | QORVO_00608342 | QORVO_00608506 | QORVO_00608648 |
| QORVO_00608138 | QORVO_00608344 | QORVO_00608509 | QORVO_00608655 |
| QORVO_00608145 | QORVO_00608368 | QORVO_00608512 | QORVO_00608664 |
| QORVO_00608147 | QORVO_00608370 | QORVO_00608514 | QORVO_00608666 |
| QORVO_00608149 | QORVO_00608372 | QORVO_00608517 | QORVO_00608668 |
| QORVO_00608151 | QORVO_00608374 | QORVO_00608519 | QORVO_00608670 |
| QORVO_00608153 | QORVO_00608376 | QORVO_00608521 | QORVO_00608672 |
| QORVO_00608155 | QORVO_00608379 | QORVO_00608524 | QORVO_00608675 |
| QORVO_00608157 | QORVO_00608381 | QORVO_00608526 | QORVO_00608677 |
| QORVO_00608165 | QORVO_00608384 | QORVO_00608528 | QORVO_00608679 |
| QORVO_00608167 | QORVO_00608386 | QORVO_00608530 | QORVO_00608681 |
| QORVO_00608170 | QORVO_00608388 | QORVO_00608532 | QORVO_00608689 |
| QORVO_00608172 | QORVO_00608394 | QORVO_00608534 | QORVO_00608697 |
| QORVO_00608175 | QORVO_00608397 | QORVO_00608536 | QORVO_00608699 |
| QORVO_00608177 | QORVO_00608399 | QORVO_00608538 | QORVO_00608701 |
| QORVO_00608179 | QORVO_00608401 | QORVO_00608540 | QORVO_00608708 |
| QORVO_00608181 | QORVO_00608403 | QORVO_00608542 | QORVO_00608710 |
| QORVO_00608183 | QORVO_00608411 | QORVO_00608544 | QORVO_00608714 |
| QORVO_00608185 | QORVO_00608413 | QORVO_00608547 | QORVO_00608716 |
| QORVO_00608187 | QORVO_00608415 | QORVO_00608549 | QORVO_00608718 |
| QORVO_00608189 | QORVO_00608417 | QORVO_00608551 | QORVO_00608720 |

| | | | |
|---|---|---|---|
| QORVO_00608722 | QORVO_00608852 | QORVO_00609000 | QORVO_00609262 |
| QORVO_00608724 | QORVO_00608856 | QORVO_00609002 | QORVO_00609265 |
| QORVO_00608728 | QORVO_00608858 | QORVO_00609005 | QORVO_00609267 |
| QORVO_00608730 | QORVO_00608860 | QORVO_00609007 | QORVO_00609269 |
| QORVO_00608737 | QORVO_00608862 | QORVO_00609009 | QORVO_00609271 |
| QORVO_00608739 | QORVO_00608864 | QORVO_00609011 | QORVO_00609273 |
| QORVO_00608742 | QORVO_00608867 | QORVO_00609013 | QORVO_00609275 |
| QORVO_00608744 | QORVO_00608871 | QORVO_00609017 | QORVO_00609278 |
| QORVO_00608754 | QORVO_00608873 | QORVO_00609019 | QORVO_00609280 |
| QORVO_00608756 | QORVO_00608875 | QORVO_00609021 | QORVO_00609282 |
| QORVO_00608758 | QORVO_00608884 | QORVO_00609023 | QORVO_00609284 |
| QORVO_00608760 | QORVO_00608886 | QORVO_00609025 | QORVO_00609286 |
| QORVO_00608762 | QORVO_00608888 | QORVO_00609032 | QORVO_00609288 |
| QORVO_00608765 | QORVO_00608890 | QORVO_00609034 | QORVO_00609292 |
| QORVO_00608767 | QORVO_00608892 | QORVO_00609036 | QORVO_00609294 |
| QORVO_00608769 | QORVO_00608894 | QORVO_00609038 | QORVO_00609297 |
| QORVO_00608771 | QORVO_00608902 | QORVO_00609040 | QORVO_00609299 |
| QORVO_00608774 | QORVO_00608904 | QORVO_00609048 | QORVO_00609301 |
| QORVO_00608776 | QORVO_00608907 | QORVO_00609050 | QORVO_00609303 |
| QORVO_00608779 | QORVO_00608909 | QORVO_00609052 | QORVO_00609305 |
| QORVO_00608781 | QORVO_00608911 | QORVO_00609054 | QORVO_00609308 |
| QORVO_00608783 | QORVO_00608913 | QORVO_00609056 | QORVO_00609310 |
| QORVO_00608785 | QORVO_00608922 | QORVO_00609058 | QORVO_00609312 |
| QORVO_00608787 | QORVO_00608924 | QORVO_00609062 | QORVO_00609316 |
| QORVO_00608789 | QORVO_00608926 | QORVO_00609064 | QORVO_00609318 |
| QORVO_00608791 | QORVO_00608928 | QORVO_00609071 | QORVO_00609320 |
| QORVO_00608793 | QORVO_00608930 | QORVO_00609073 | QORVO_00609322 |
| QORVO_00608795 | QORVO_00608932 | QORVO_00609176 | QORVO_00609324 |
| QORVO_00608798 | QORVO_00608934 | QORVO_00609178 | QORVO_00609326 |
| QORVO_00608800 | QORVO_00608940 | QORVO_00609180 | QORVO_00609328 |
| QORVO_00608802 | QORVO_00608947 | QORVO_00609185 | QORVO_00609331 |
| QORVO_00608808 | QORVO_00608949 | QORVO_00609187 | QORVO_00609333 |
| QORVO_00608810 | QORVO_00608951 | QORVO_00609189 | QORVO_00609335 |
| QORVO_00608812 | QORVO_00608953 | QORVO_00609199 | QORVO_00609337 |
| QORVO_00608814 | QORVO_00608955 | QORVO_00609205 | QORVO_00609339 |
| QORVO_00608816 | QORVO_00608957 | QORVO_00609207 | QORVO_00609423 |
| QORVO_00608818 | QORVO_00608959 | QORVO_00609209 | QORVO_00609427 |
| QORVO_00608820 | QORVO_00608961 | QORVO_00609212 | QORVO_00609429 |
| QORVO_00608822 | QORVO_00608967 | QORVO_00609214 | QORVO_00609431 |
| QORVO_00608824 | QORVO_00608969 | QORVO_00609216 | QORVO_00609433 |
| QORVO_00608826 | QORVO_00608971 | QORVO_00609218 | QORVO_00609435 |
| QORVO_00608828 | QORVO_00608973 | QORVO_00609220 | QORVO_00609437 |
| QORVO_00608830 | QORVO_00608975 | QORVO_00609222 | QORVO_00609439 |
| QORVO_00608832 | QORVO_00608977 | QORVO_00609230 | QORVO_00609441 |
| QORVO_00608834 | QORVO_00608980 | QORVO_00609240 | QORVO_00609443 |
| QORVO_00608836 | QORVO_00608982 | QORVO_00609242 | QORVO_00609445 |
| QORVO_00608838 | QORVO_00608984 | QORVO_00609244 | QORVO_00609447 |
| QORVO_00608841 | QORVO_00608986 | QORVO_00609246 | QORVO_00609449 |
| QORVO_00608843 | QORVO_00608988 | QORVO_00609253 | QORVO_00609451 |
| QORVO_00608845 | QORVO_00608990 | QORVO_00609256 | QORVO_00609453 |
| QORVO_00608847 | QORVO_00608996 | QORVO_00609258 | QORVO_00609455 |
| QORVO_00608849 | QORVO_00608998 | QORVO_00609260 | QORVO_00609462 |

A-37

| | | | |
|---|---|---|---|
| QORVO_00609466 | QORVO_00609659 | QORVO_00609798 | QORVO_00610074 |
| QORVO_00609468 | QORVO_00609661 | QORVO_00609800 | QORVO_00610076 |
| QORVO_00609470 | QORVO_00609663 | QORVO_00609802 | QORVO_00610078 |
| QORVO_00609472 | QORVO_00609665 | QORVO_00609804 | QORVO_00610081 |
| QORVO_00609474 | QORVO_00609667 | QORVO_00609806 | QORVO_00610084 |
| QORVO_00609476 | QORVO_00609670 | QORVO_00609808 | QORVO_00610087 |
| QORVO_00609478 | QORVO_00609672 | QORVO_00609877 | QORVO_00610089 |
| QORVO_00609480 | QORVO_00609675 | QORVO_00609885 | QORVO_00610091 |
| QORVO_00609483 | QORVO_00609679 | QORVO_00609887 | QORVO_00610094 |
| QORVO_00609485 | QORVO_00609683 | QORVO_00609893 | QORVO_00610096 |
| QORVO_00609487 | QORVO_00609685 | QORVO_00609895 | QORVO_00610098 |
| QORVO_00609489 | QORVO_00609687 | QORVO_00609897 | QORVO_00610100 |
| QORVO_00609491 | QORVO_00609689 | QORVO_00609899 | QORVO_00610102 |
| QORVO_00609494 | QORVO_00609691 | QORVO_00609901 | QORVO_00610104 |
| QORVO_00609496 | QORVO_00609693 | QORVO_00609943 | QORVO_00610106 |
| QORVO_00609498 | QORVO_00609695 | QORVO_00609945 | QORVO_00610108 |
| QORVO_00609500 | QORVO_00609697 | QORVO_00609947 | QORVO_00610110 |
| QORVO_00609502 | QORVO_00609699 | QORVO_00609951 | QORVO_00610112 |
| QORVO_00609511 | QORVO_00609702 | QORVO_00609954 | QORVO_00610114 |
| QORVO_00609513 | QORVO_00609704 | QORVO_00609956 | QORVO_00610118 |
| QORVO_00609517 | QORVO_00609706 | QORVO_00609958 | QORVO_00610120 |
| QORVO_00609519 | QORVO_00609708 | QORVO_00609960 | QORVO_00610122 |
| QORVO_00609522 | QORVO_00609710 | QORVO_00609962 | QORVO_00610124 |
| QORVO_00609524 | QORVO_00609712 | QORVO_00609964 | QORVO_00610152 |
| QORVO_00609528 | QORVO_00609717 | QORVO_00609968 | QORVO_00610154 |
| QORVO_00609532 | QORVO_00609721 | QORVO_00609997 | QORVO_00610156 |
| QORVO_00609534 | QORVO_00609723 | QORVO_00609999 | QORVO_00610163 |
| QORVO_00609536 | QORVO_00609725 | QORVO_00610002 | QORVO_00610165 |
| QORVO_00609538 | QORVO_00609727 | QORVO_00610011 | QORVO_00610168 |
| QORVO_00609540 | QORVO_00609729 | QORVO_00610013 | QORVO_00610176 |
| QORVO_00609542 | QORVO_00609735 | QORVO_00610015 | QORVO_00610178 |
| QORVO_00609567 | QORVO_00609743 | QORVO_00610017 | QORVO_00610180 |
| QORVO_00609569 | QORVO_00609745 | QORVO_00610019 | QORVO_00610182 |
| QORVO_00609571 | QORVO_00609747 | QORVO_00610021 | QORVO_00610184 |
| QORVO_00609574 | QORVO_00609751 | QORVO_00610023 | QORVO_00610186 |
| QORVO_00609578 | QORVO_00609753 | QORVO_00610025 | QORVO_00610188 |
| QORVO_00609581 | QORVO_00609755 | QORVO_00610027 | QORVO_00610190 |
| QORVO_00609583 | QORVO_00609758 | QORVO_00610029 | QORVO_00610192 |
| QORVO_00609591 | QORVO_00609760 | QORVO_00610031 | QORVO_00610198 |
| QORVO_00609593 | QORVO_00609764 | QORVO_00610033 | QORVO_00610200 |
| QORVO_00609595 | QORVO_00609766 | QORVO_00610035 | QORVO_00610202 |
| QORVO_00609597 | QORVO_00609768 | QORVO_00610037 | QORVO_00610205 |
| QORVO_00609599 | QORVO_00609770 | QORVO_00610045 | QORVO_00610207 |
| QORVO_00609638 | QORVO_00609773 | QORVO_00610053 | QORVO_00610209 |
| QORVO_00609640 | QORVO_00609781 | QORVO_00610056 | QORVO_00610212 |
| QORVO_00609642 | QORVO_00609783 | QORVO_00610058 | QORVO_00610214 |
| QORVO_00609644 | QORVO_00609785 | QORVO_00610061 | QORVO_00610216 |
| QORVO_00609647 | QORVO_00609787 | QORVO_00610063 | QORVO_00610218 |
| QORVO_00609649 | QORVO_00609790 | QORVO_00610065 | QORVO_00610221 |
| QORVO_00609651 | QORVO_00609792 | QORVO_00610067 | QORVO_00610228 |
| QORVO_00609653 | QORVO_00609794 | QORVO_00610069 | QORVO_00610230 |
| QORVO_00609655 | QORVO_00609796 | QORVO_00610072 | QORVO_00610232 |

A-38

| | | | |
|---|---|---|---|
| QORVO_00610234 | QORVO_00610594 | QORVO_00610904 | QORVO_00611063 |
| QORVO_00610236 | QORVO_00610598 | QORVO_00610906 | QORVO_00611065 |
| QORVO_00610240 | QORVO_00610601 | QORVO_00610908 | QORVO_00611067 |
| QORVO_00610242 | QORVO_00610614 | QORVO_00610912 | QORVO_00611073 |
| QORVO_00610244 | QORVO_00610616 | QORVO_00610915 | QORVO_00611075 |
| QORVO_00610246 | QORVO_00610618 | QORVO_00610917 | QORVO_00611077 |
| QORVO_00610250 | QORVO_00610621 | QORVO_00610919 | QORVO_00611079 |
| QORVO_00610252 | QORVO_00610623 | QORVO_00610921 | QORVO_00611081 |
| QORVO_00610254 | QORVO_00610625 | QORVO_00610923 | QORVO_00611084 |
| QORVO_00610256 | QORVO_00610628 | QORVO_00610930 | QORVO_00611086 |
| QORVO_00610259 | QORVO_00610630 | QORVO_00610932 | QORVO_00611088 |
| QORVO_00610262 | QORVO_00610632 | QORVO_00610934 | QORVO_00611090 |
| QORVO_00610273 | QORVO_00610635 | QORVO_00610936 | QORVO_00611092 |
| QORVO_00610275 | QORVO_00610637 | QORVO_00610938 | QORVO_00611094 |
| QORVO_00610277 | QORVO_00610639 | QORVO_00610940 | QORVO_00611096 |
| QORVO_00610279 | QORVO_00610641 | QORVO_00610942 | QORVO_00611098 |
| QORVO_00610281 | QORVO_00610644 | QORVO_00610944 | QORVO_00611101 |
| QORVO_00610283 | QORVO_00610647 | QORVO_00610946 | QORVO_00611178 |
| QORVO_00610285 | QORVO_00610649 | QORVO_00610948 | QORVO_00611180 |
| QORVO_00610345 | QORVO_00610651 | QORVO_00610950 | QORVO_00611183 |
| QORVO_00610347 | QORVO_00610671 | QORVO_00610952 | QORVO_00611185 |
| QORVO_00610349 | QORVO_00610673 | QORVO_00610956 | QORVO_00611187 |
| QORVO_00610351 | QORVO_00610675 | QORVO_00610958 | QORVO_00611189 |
| QORVO_00610353 | QORVO_00610677 | QORVO_00610960 | QORVO_00611192 |
| QORVO_00610355 | QORVO_00610679 | QORVO_00610967 | QORVO_00611194 |
| QORVO_00610357 | QORVO_00610773 | QORVO_00610973 | QORVO_00611197 |
| QORVO_00610451 | QORVO_00610775 | QORVO_00610975 | QORVO_00611199 |
| QORVO_00610453 | QORVO_00610777 | QORVO_00610977 | QORVO_00611201 |
| QORVO_00610455 | QORVO_00610810 | QORVO_00610981 | QORVO_00611205 |
| QORVO_00610459 | QORVO_00610812 | QORVO_00610984 | QORVO_00611214 |
| QORVO_00610461 | QORVO_00610824 | QORVO_00610986 | QORVO_00611217 |
| QORVO_00610463 | QORVO_00610826 | QORVO_00610988 | QORVO_00611219 |
| QORVO_00610465 | QORVO_00610828 | QORVO_00610990 | QORVO_00611221 |
| QORVO_00610469 | QORVO_00610831 | QORVO_00611010 | QORVO_00611223 |
| QORVO_00610472 | QORVO_00610833 | QORVO_00611012 | QORVO_00611225 |
| QORVO_00610474 | QORVO_00610835 | QORVO_00611014 | QORVO_00611227 |
| QORVO_00610476 | QORVO_00610838 | QORVO_00611017 | QORVO_00611229 |
| QORVO_00610479 | QORVO_00610840 | QORVO_00611019 | QORVO_00611231 |
| QORVO_00610481 | QORVO_00610842 | QORVO_00611021 | QORVO_00611234 |
| QORVO_00610483 | QORVO_00610850 | QORVO_00611023 | QORVO_00611237 |
| QORVO_00610485 | QORVO_00610852 | QORVO_00611025 | QORVO_00611239 |
| QORVO_00610487 | QORVO_00610854 | QORVO_00611027 | QORVO_00611241 |
| QORVO_00610489 | QORVO_00610858 | QORVO_00611033 | QORVO_00611243 |
| QORVO_00610494 | QORVO_00610860 | QORVO_00611041 | QORVO_00611245 |
| QORVO_00610496 | QORVO_00610862 | QORVO_00611044 | QORVO_00611247 |
| QORVO_00610499 | QORVO_00610864 | QORVO_00611046 | QORVO_00611250 |
| QORVO_00610502 | QORVO_00610866 | QORVO_00611048 | QORVO_00611252 |
| QORVO_00610584 | QORVO_00610868 | QORVO_00611050 | QORVO_00611254 |
| QORVO_00610586 | QORVO_00610870 | QORVO_00611053 | QORVO_00611256 |
| QORVO_00610588 | QORVO_00610872 | QORVO_00611055 | QORVO_00611258 |
| QORVO_00610590 | QORVO_00610874 | QORVO_00611058 | QORVO_00611268 |
| QORVO_00610592 | QORVO_00610881 | QORVO_00611060 | QORVO_00611270 |

| | | | |
|---|---|---|---|
| QORVO_00611273 | QORVO_00611431 | QORVO_00611687 | QORVO_00611831 |
| QORVO_00611275 | QORVO_00611436 | QORVO_00611690 | QORVO_00611833 |
| QORVO_00611277 | QORVO_00611438 | QORVO_00611692 | QORVO_00611835 |
| QORVO_00611279 | QORVO_00611441 | QORVO_00611694 | QORVO_00611837 |
| QORVO_00611287 | QORVO_00611451 | QORVO_00611701 | QORVO_00611839 |
| QORVO_00611289 | QORVO_00611453 | QORVO_00611704 | QORVO_00611842 |
| QORVO_00611291 | QORVO_00611461 | QORVO_00611706 | QORVO_00611844 |
| QORVO_00611293 | QORVO_00611463 | QORVO_00611709 | QORVO_00611847 |
| QORVO_00611308 | QORVO_00611465 | QORVO_00611711 | QORVO_00611852 |
| QORVO_00611310 | QORVO_00611467 | QORVO_00611713 | QORVO_00611854 |
| QORVO_00611312 | QORVO_00611470 | QORVO_00611715 | QORVO_00611856 |
| QORVO_00611315 | QORVO_00611472 | QORVO_00611717 | QORVO_00611859 |
| QORVO_00611317 | QORVO_00611475 | QORVO_00611719 | QORVO_00611861 |
| QORVO_00611319 | QORVO_00611477 | QORVO_00611722 | QORVO_00611868 |
| QORVO_00611321 | QORVO_00611479 | QORVO_00611725 | QORVO_00611870 |
| QORVO_00611323 | QORVO_00611481 | QORVO_00611728 | QORVO_00611872 |
| QORVO_00611325 | QORVO_00611486 | QORVO_00611730 | QORVO_00611875 |
| QORVO_00611327 | QORVO_00611489 | QORVO_00611733 | QORVO_00611877 |
| QORVO_00611329 | QORVO_00611491 | QORVO_00611735 | QORVO_00611879 |
| QORVO_00611331 | QORVO_00611493 | QORVO_00611737 | QORVO_00611881 |
| QORVO_00611333 | QORVO_00611495 | QORVO_00611740 | QORVO_00611883 |
| QORVO_00611348 | QORVO_00611498 | QORVO_00611742 | QORVO_00611885 |
| QORVO_00611351 | QORVO_00611503 | QORVO_00611744 | QORVO_00611887 |
| QORVO_00611353 | QORVO_00611505 | QORVO_00611746 | QORVO_00611889 |
| QORVO_00611355 | QORVO_00611507 | QORVO_00611748 | QORVO_00611891 |
| QORVO_00611358 | QORVO_00611509 | QORVO_00611750 | QORVO_00611893 |
| QORVO_00611360 | QORVO_00611511 | QORVO_00611752 | QORVO_00611916 |
| QORVO_00611363 | QORVO_00611514 | QORVO_00611754 | QORVO_00611919 |
| QORVO_00611365 | QORVO_00611516 | QORVO_00611756 | QORVO_00611921 |
| QORVO_00611367 | QORVO_00611520 | QORVO_00611758 | QORVO_00611923 |
| QORVO_00611376 | QORVO_00611526 | QORVO_00611760 | QORVO_00611925 |
| QORVO_00611378 | QORVO_00611552 | QORVO_00611762 | QORVO_00611927 |
| QORVO_00611380 | QORVO_00611616 | QORVO_00611765 | QORVO_00611929 |
| QORVO_00611382 | QORVO_00611620 | QORVO_00611767 | QORVO_00611931 |
| QORVO_00611384 | QORVO_00611624 | QORVO_00611769 | QORVO_00611933 |
| QORVO_00611386 | QORVO_00611627 | QORVO_00611771 | QORVO_00611935 |
| QORVO_00611388 | QORVO_00611635 | QORVO_00611773 | QORVO_00611937 |
| QORVO_00611390 | QORVO_00611637 | QORVO_00611775 | QORVO_00611940 |
| QORVO_00611392 | QORVO_00611639 | QORVO_00611777 | QORVO_00611942 |
| QORVO_00611394 | QORVO_00611642 | QORVO_00611779 | QORVO_00611946 |
| QORVO_00611396 | QORVO_00611650 | QORVO_00611781 | QORVO_00611949 |
| QORVO_00611398 | QORVO_00611652 | QORVO_00611783 | QORVO_00611952 |
| QORVO_00611400 | QORVO_00611654 | QORVO_00611787 | QORVO_00611954 |
| QORVO_00611408 | QORVO_00611656 | QORVO_00611790 | QORVO_00611958 |
| QORVO_00611411 | QORVO_00611660 | QORVO_00611792 | QORVO_00611960 |
| QORVO_00611414 | QORVO_00611663 | QORVO_00611794 | QORVO_00611962 |
| QORVO_00611416 | QORVO_00611665 | QORVO_00611803 | QORVO_00611964 |
| QORVO_00611419 | QORVO_00611671 | QORVO_00611805 | QORVO_00611966 |
| QORVO_00611421 | QORVO_00611678 | QORVO_00611807 | QORVO_00611970 |
| QORVO_00611423 | QORVO_00611680 | QORVO_00611809 | QORVO_00611976 |
| QORVO_00611426 | QORVO_00611682 | QORVO_00611811 | QORVO_00611979 |
| QORVO_00611428 | QORVO_00611685 | QORVO_00611829 | QORVO_00611981 |

| | | | |
|---|---|---|---|
| QORVO_00611983 | QORVO_00612210 | QORVO_00612471 | QORVO_00612700 |
| QORVO_00611986 | QORVO_00612212 | QORVO_00612477 | QORVO_00612724 |
| QORVO_00611988 | QORVO_00612214 | QORVO_00612480 | QORVO_00612726 |
| QORVO_00611991 | QORVO_00612216 | QORVO_00612482 | QORVO_00612739 |
| QORVO_00611993 | QORVO_00612221 | QORVO_00612484 | QORVO_00612741 |
| QORVO_00611995 | QORVO_00612247 | QORVO_00612493 | QORVO_00612748 |
| QORVO_00611997 | QORVO_00612249 | QORVO_00612497 | QORVO_00612750 |
| QORVO_00611999 | QORVO_00612251 | QORVO_00612499 | QORVO_00612753 |
| QORVO_00612002 | QORVO_00612253 | QORVO_00612501 | QORVO_00612755 |
| QORVO_00612004 | QORVO_00612255 | QORVO_00612503 | QORVO_00612759 |
| QORVO_00612006 | QORVO_00612257 | QORVO_00612505 | QORVO_00612761 |
| QORVO_00612100 | QORVO_00612265 | QORVO_00612507 | QORVO_00612763 |
| QORVO_00612109 | QORVO_00612267 | QORVO_00612514 | QORVO_00612765 |
| QORVO_00612111 | QORVO_00612269 | QORVO_00612516 | QORVO_00612767 |
| QORVO_00612113 | QORVO_00612271 | QORVO_00612518 | QORVO_00612769 |
| QORVO_00612115 | QORVO_00612273 | QORVO_00612524 | QORVO_00612771 |
| QORVO_00612117 | QORVO_00612277 | QORVO_00612526 | QORVO_00612773 |
| QORVO_00612119 | QORVO_00612280 | QORVO_00612528 | QORVO_00612775 |
| QORVO_00612128 | QORVO_00612283 | QORVO_00612530 | QORVO_00612777 |
| QORVO_00612130 | QORVO_00612285 | QORVO_00612532 | QORVO_00612779 |
| QORVO_00612132 | QORVO_00612288 | QORVO_00612534 | QORVO_00612781 |
| QORVO_00612134 | QORVO_00612290 | QORVO_00612544 | QORVO_00612784 |
| QORVO_00612137 | QORVO_00612293 | QORVO_00612546 | QORVO_00612786 |
| QORVO_00612139 | QORVO_00612295 | QORVO_00612548 | QORVO_00612789 |
| QORVO_00612141 | QORVO_00612297 | QORVO_00612550 | QORVO_00612791 |
| QORVO_00612143 | QORVO_00612300 | QORVO_00612552 | QORVO_00612793 |
| QORVO_00612145 | QORVO_00612302 | QORVO_00612554 | QORVO_00612806 |
| QORVO_00612147 | QORVO_00612304 | QORVO_00612556 | QORVO_00612808 |
| QORVO_00612149 | QORVO_00612339 | QORVO_00612619 | QORVO_00612811 |
| QORVO_00612151 | QORVO_00612409 | QORVO_00612621 | QORVO_00612813 |
| QORVO_00612153 | QORVO_00612412 | QORVO_00612623 | QORVO_00612815 |
| QORVO_00612156 | QORVO_00612414 | QORVO_00612625 | QORVO_00612835 |
| QORVO_00612158 | QORVO_00612416 | QORVO_00612627 | QORVO_00612837 |
| QORVO_00612162 | QORVO_00612418 | QORVO_00612632 | QORVO_00612839 |
| QORVO_00612164 | QORVO_00612420 | QORVO_00612634 | QORVO_00612841 |
| QORVO_00612166 | QORVO_00612422 | QORVO_00612636 | QORVO_00612843 |
| QORVO_00612169 | QORVO_00612424 | QORVO_00612638 | QORVO_00612845 |
| QORVO_00612171 | QORVO_00612427 | QORVO_00612640 | QORVO_00612847 |
| QORVO_00612173 | QORVO_00612429 | QORVO_00612642 | QORVO_00612850 |
| QORVO_00612175 | QORVO_00612431 | QORVO_00612644 | QORVO_00612852 |
| QORVO_00612177 | QORVO_00612439 | QORVO_00612652 | QORVO_00612854 |
| QORVO_00612179 | QORVO_00612441 | QORVO_00612655 | QORVO_00612857 |
| QORVO_00612181 | QORVO_00612443 | QORVO_00612657 | QORVO_00612859 |
| QORVO_00612185 | QORVO_00612445 | QORVO_00612659 | QORVO_00612861 |
| QORVO_00612187 | QORVO_00612448 | QORVO_00612661 | QORVO_00612863 |
| QORVO_00612189 | QORVO_00612451 | QORVO_00612663 | QORVO_00612865 |
| QORVO_00612191 | QORVO_00612453 | QORVO_00612668 | QORVO_00612867 |
| QORVO_00612193 | QORVO_00612461 | QORVO_00612689 | QORVO_00612869 |
| QORVO_00612195 | QORVO_00612463 | QORVO_00612691 | QORVO_00612871 |
| QORVO_00612197 | QORVO_00612465 | QORVO_00612693 | QORVO_00612873 |
| QORVO_00612199 | QORVO_00612467 | QORVO_00612695 | QORVO_00612875 |
| QORVO_00612207 | QORVO_00612469 | QORVO_00612698 | QORVO_00612878 |

A-41

| | | | |
|---|---|---|---|
| QORVO_00612881 | QORVO_00613054 | QORVO_00613256 | QORVO_00613455 |
| QORVO_00612884 | QORVO_00613056 | QORVO_00613264 | QORVO_00613457 |
| QORVO_00612886 | QORVO_00613058 | QORVO_00613266 | QORVO_00613459 |
| QORVO_00612895 | QORVO_00613060 | QORVO_00613270 | QORVO_00613462 |
| QORVO_00612897 | QORVO_00613062 | QORVO_00613272 | QORVO_00613464 |
| QORVO_00612899 | QORVO_00613067 | QORVO_00613274 | QORVO_00613467 |
| QORVO_00612901 | QORVO_00613073 | QORVO_00613276 | QORVO_00613469 |
| QORVO_00612903 | QORVO_00613077 | QORVO_00613278 | QORVO_00613471 |
| QORVO_00612905 | QORVO_00613079 | QORVO_00613284 | QORVO_00613474 |
| QORVO_00612907 | QORVO_00613081 | QORVO_00613286 | QORVO_00613476 |
| QORVO_00612911 | QORVO_00613083 | QORVO_00613288 | QORVO_00613478 |
| QORVO_00612913 | QORVO_00613085 | QORVO_00613290 | QORVO_00613480 |
| QORVO_00612954 | QORVO_00613087 | QORVO_00613292 | QORVO_00613482 |
| QORVO_00612957 | QORVO_00613089 | QORVO_00613294 | QORVO_00613484 |
| QORVO_00612959 | QORVO_00613091 | QORVO_00613296 | QORVO_00613486 |
| QORVO_00612961 | QORVO_00613093 | QORVO_00613301 | QORVO_00613488 |
| QORVO_00612963 | QORVO_00613095 | QORVO_00613303 | QORVO_00613490 |
| QORVO_00612965 | QORVO_00613097 | QORVO_00613305 | QORVO_00613492 |
| QORVO_00612975 | QORVO_00613099 | QORVO_00613313 | QORVO_00613494 |
| QORVO_00612979 | QORVO_00613102 | QORVO_00613333 | QORVO_00613496 |
| QORVO_00612982 | QORVO_00613104 | QORVO_00613335 | QORVO_00613498 |
| QORVO_00612985 | QORVO_00613106 | QORVO_00613337 | QORVO_00613500 |
| QORVO_00612987 | QORVO_00613108 | QORVO_00613340 | QORVO_00613502 |
| QORVO_00612989 | QORVO_00613112 | QORVO_00613342 | QORVO_00613504 |
| QORVO_00612991 | QORVO_00613114 | QORVO_00613384 | QORVO_00613506 |
| QORVO_00612993 | QORVO_00613116 | QORVO_00613386 | QORVO_00613509 |
| QORVO_00612995 | QORVO_00613118 | QORVO_00613388 | QORVO_00613511 |
| QORVO_00612997 | QORVO_00613122 | QORVO_00613390 | QORVO_00613513 |
| QORVO_00612999 | QORVO_00613124 | QORVO_00613392 | QORVO_00613515 |
| QORVO_00613001 | QORVO_00613126 | QORVO_00613395 | QORVO_00613517 |
| QORVO_00613003 | QORVO_00613128 | QORVO_00613397 | QORVO_00613519 |
| QORVO_00613005 | QORVO_00613196 | QORVO_00613399 | QORVO_00613521 |
| QORVO_00613007 | QORVO_00613200 | QORVO_00613401 | QORVO_00613525 |
| QORVO_00613009 | QORVO_00613204 | QORVO_00613403 | QORVO_00613527 |
| QORVO_00613011 | QORVO_00613207 | QORVO_00613405 | QORVO_00613529 |
| QORVO_00613014 | QORVO_00613215 | QORVO_00613407 | QORVO_00613531 |
| QORVO_00613016 | QORVO_00613217 | QORVO_00613409 | QORVO_00613533 |
| QORVO_00613018 | QORVO_00613219 | QORVO_00613411 | QORVO_00613536 |
| QORVO_00613020 | QORVO_00613221 | QORVO_00613413 | QORVO_00613538 |
| QORVO_00613022 | QORVO_00613223 | QORVO_00613415 | QORVO_00613542 |
| QORVO_00613025 | QORVO_00613225 | QORVO_00613417 | QORVO_00613544 |
| QORVO_00613027 | QORVO_00613227 | QORVO_00613419 | QORVO_00613546 |
| QORVO_00613029 | QORVO_00613230 | QORVO_00613421 | QORVO_00613548 |
| QORVO_00613031 | QORVO_00613233 | QORVO_00613430 | QORVO_00613573 |
| QORVO_00613033 | QORVO_00613235 | QORVO_00613432 | QORVO_00613575 |
| QORVO_00613035 | QORVO_00613237 | QORVO_00613434 | QORVO_00613577 |
| QORVO_00613038 | QORVO_00613239 | QORVO_00613436 | QORVO_00613583 |
| QORVO_00613044 | QORVO_00613241 | QORVO_00613438 | QORVO_00613585 |
| QORVO_00613046 | QORVO_00613243 | QORVO_00613440 | QORVO_00613587 |
| QORVO_00613048 | QORVO_00613245 | QORVO_00613449 | QORVO_00613605 |
| QORVO_00613050 | QORVO_00613247 | QORVO_00613451 | QORVO_00613607 |
| QORVO_00613052 | QORVO_00613249 | QORVO_00613453 | QORVO_00613609 |

| | | | |
|---|---|---|---|
| QORVO_00613612 | QORVO_00613837 | QORVO_00614054 | QORVO_00614365 |
| QORVO_00613614 | QORVO_00613839 | QORVO_00614056 | QORVO_00614387 |
| QORVO_00613616 | QORVO_00613841 | QORVO_00614060 | QORVO_00614389 |
| QORVO_00613619 | QORVO_00613843 | QORVO_00614062 | QORVO_00614392 |
| QORVO_00613621 | QORVO_00613845 | QORVO_00614065 | QORVO_00614394 |
| QORVO_00613623 | QORVO_00613848 | QORVO_00614071 | QORVO_00614396 |
| QORVO_00613625 | QORVO_00613850 | QORVO_00614073 | QORVO_00614398 |
| QORVO_00613627 | QORVO_00613852 | QORVO_00614075 | QORVO_00614400 |
| QORVO_00613629 | QORVO_00613855 | QORVO_00614077 | QORVO_00614402 |
| QORVO_00613631 | QORVO_00613857 | QORVO_00614079 | QORVO_00614404 |
| QORVO_00613633 | QORVO_00613859 | QORVO_00614081 | QORVO_00614407 |
| QORVO_00613635 | QORVO_00613861 | QORVO_00614087 | QORVO_00614409 |
| QORVO_00613637 | QORVO_00613863 | QORVO_00614090 | QORVO_00614411 |
| QORVO_00613639 | QORVO_00613865 | QORVO_00614092 | QORVO_00614413 |
| QORVO_00613641 | QORVO_00613867 | QORVO_00614094 | QORVO_00614415 |
| QORVO_00613644 | QORVO_00613869 | QORVO_00614097 | QORVO_00614417 |
| QORVO_00613646 | QORVO_00613871 | QORVO_00614099 | QORVO_00614427 |
| QORVO_00613663 | QORVO_00613873 | QORVO_00614102 | QORVO_00614429 |
| QORVO_00613727 | QORVO_00613876 | QORVO_00614104 | QORVO_00614431 |
| QORVO_00613729 | QORVO_00613878 | QORVO_00614181 | QORVO_00614433 |
| QORVO_00613731 | QORVO_00613880 | QORVO_00614188 | QORVO_00614455 |
| QORVO_00613733 | QORVO_00613883 | QORVO_00614193 | QORVO_00614457 |
| QORVO_00613735 | QORVO_00613885 | QORVO_00614195 | QORVO_00614459 |
| QORVO_00613738 | QORVO_00613887 | QORVO_00614198 | QORVO_00614461 |
| QORVO_00613740 | QORVO_00613890 | QORVO_00614200 | QORVO_00614467 |
| QORVO_00613742 | QORVO_00613892 | QORVO_00614202 | QORVO_00614469 |
| QORVO_00613744 | QORVO_00613894 | QORVO_00614204 | QORVO_00614471 |
| QORVO_00613746 | QORVO_00613897 | QORVO_00614206 | QORVO_00614473 |
| QORVO_00613748 | QORVO_00613899 | QORVO_00614208 | QORVO_00614475 |
| QORVO_00613771 | QORVO_00613901 | QORVO_00614210 | QORVO_00614478 |
| QORVO_00613773 | QORVO_00613903 | QORVO_00614212 | QORVO_00614480 |
| QORVO_00613775 | QORVO_00613905 | QORVO_00614251 | QORVO_00614482 |
| QORVO_00613777 | QORVO_00613907 | QORVO_00614253 | QORVO_00614486 |
| QORVO_00613779 | QORVO_00613909 | QORVO_00614255 | QORVO_00614488 |
| QORVO_00613781 | QORVO_00613911 | QORVO_00614264 | QORVO_00614490 |
| QORVO_00613784 | QORVO_00613913 | QORVO_00614267 | QORVO_00614492 |
| QORVO_00613786 | QORVO_00613915 | QORVO_00614269 | QORVO_00614494 |
| QORVO_00613794 | QORVO_00613918 | QORVO_00614271 | QORVO_00614502 |
| QORVO_00613796 | QORVO_00613920 | QORVO_00614273 | QORVO_00614504 |
| QORVO_00613805 | QORVO_00613922 | QORVO_00614275 | QORVO_00614506 |
| QORVO_00613807 | QORVO_00613924 | QORVO_00614277 | QORVO_00614508 |
| QORVO_00613809 | QORVO_00613926 | QORVO_00614279 | QORVO_00614510 |
| QORVO_00613811 | QORVO_00613928 | QORVO_00614281 | QORVO_00614519 |
| QORVO_00613813 | QORVO_00613930 | QORVO_00614318 | QORVO_00614523 |
| QORVO_00613815 | QORVO_00613933 | QORVO_00614320 | QORVO_00614525 |
| QORVO_00613817 | QORVO_00613935 | QORVO_00614336 | QORVO_00614532 |
| QORVO_00613819 | QORVO_00613937 | QORVO_00614340 | QORVO_00614534 |
| QORVO_00613821 | QORVO_00613939 | QORVO_00614353 | QORVO_00614540 |
| QORVO_00613823 | QORVO_00613968 | QORVO_00614357 | QORVO_00614542 |
| QORVO_00613825 | QORVO_00613970 | QORVO_00614359 | QORVO_00614544 |
| QORVO_00613827 | QORVO_00613973 | QORVO_00614361 | QORVO_00614556 |
| QORVO_00613835 | QORVO_00614050 | QORVO_00614363 | QORVO_00614558 |

A-43

| | | | |
|---|---|---|---|
| QORVO_00614561 | QORVO_00614718 | QORVO_00614981 | QORVO_00615117 |
| QORVO_00614563 | QORVO_00614720 | QORVO_00614988 | QORVO_00615119 |
| QORVO_00614565 | QORVO_00614722 | QORVO_00614990 | QORVO_00615122 |
| QORVO_00614568 | QORVO_00614724 | QORVO_00614992 | QORVO_00615124 |
| QORVO_00614570 | QORVO_00614727 | QORVO_00614994 | QORVO_00615126 |
| QORVO_00614574 | QORVO_00614736 | QORVO_00614996 | QORVO_00615128 |
| QORVO_00614576 | QORVO_00614738 | QORVO_00614998 | QORVO_00615131 |
| QORVO_00614578 | QORVO_00614740 | QORVO_00615000 | QORVO_00615133 |
| QORVO_00614580 | QORVO_00614742 | QORVO_00615005 | QORVO_00615135 |
| QORVO_00614582 | QORVO_00614744 | QORVO_00615007 | QORVO_00615137 |
| QORVO_00614584 | QORVO_00614751 | QORVO_00615009 | QORVO_00615140 |
| QORVO_00614589 | QORVO_00614833 | QORVO_00615011 | QORVO_00615148 |
| QORVO_00614591 | QORVO_00614838 | QORVO_00615013 | QORVO_00615150 |
| QORVO_00614593 | QORVO_00614842 | QORVO_00615016 | QORVO_00615152 |
| QORVO_00614595 | QORVO_00614844 | QORVO_00615018 | QORVO_00615154 |
| QORVO_00614597 | QORVO_00614846 | QORVO_00615020 | QORVO_00615156 |
| QORVO_00614599 | QORVO_00614848 | QORVO_00615022 | QORVO_00615158 |
| QORVO_00614601 | QORVO_00614867 | QORVO_00615024 | QORVO_00615161 |
| QORVO_00614603 | QORVO_00614869 | QORVO_00615026 | QORVO_00615163 |
| QORVO_00614605 | QORVO_00614873 | QORVO_00615028 | QORVO_00615170 |
| QORVO_00614608 | QORVO_00614875 | QORVO_00615041 | QORVO_00615172 |
| QORVO_00614610 | QORVO_00614878 | QORVO_00615043 | QORVO_00615174 |
| QORVO_00614612 | QORVO_00614880 | QORVO_00615046 | QORVO_00615176 |
| QORVO_00614614 | QORVO_00614882 | QORVO_00615048 | QORVO_00615178 |
| QORVO_00614616 | QORVO_00614884 | QORVO_00615056 | QORVO_00615180 |
| QORVO_00614618 | QORVO_00614892 | QORVO_00615058 | QORVO_00615182 |
| QORVO_00614620 | QORVO_00614896 | QORVO_00615060 | QORVO_00615186 |
| QORVO_00614622 | QORVO_00614914 | QORVO_00615062 | QORVO_00615188 |
| QORVO_00614630 | QORVO_00614916 | QORVO_00615064 | QORVO_00615190 |
| QORVO_00614634 | QORVO_00614918 | QORVO_00615068 | QORVO_00615192 |
| QORVO_00614636 | QORVO_00614920 | QORVO_00615070 | QORVO_00615194 |
| QORVO_00614640 | QORVO_00614922 | QORVO_00615072 | QORVO_00615196 |
| QORVO_00614647 | QORVO_00614924 | QORVO_00615074 | QORVO_00615198 |
| QORVO_00614649 | QORVO_00614926 | QORVO_00615076 | QORVO_00615201 |
| QORVO_00614655 | QORVO_00614928 | QORVO_00615078 | QORVO_00615203 |
| QORVO_00614657 | QORVO_00614930 | QORVO_00615080 | QORVO_00615205 |
| QORVO_00614659 | QORVO_00614932 | QORVO_00615082 | QORVO_00615208 |
| QORVO_00614662 | QORVO_00614934 | QORVO_00615085 | QORVO_00615210 |
| QORVO_00614666 | QORVO_00614944 | QORVO_00615087 | QORVO_00615212 |
| QORVO_00614692 | QORVO_00614946 | QORVO_00615090 | QORVO_00615214 |
| QORVO_00614694 | QORVO_00614949 | QORVO_00615092 | QORVO_00615216 |
| QORVO_00614696 | QORVO_00614952 | QORVO_00615094 | QORVO_00615218 |
| QORVO_00614698 | QORVO_00614955 | QORVO_00615096 | QORVO_00615221 |
| QORVO_00614700 | QORVO_00614957 | QORVO_00615098 | QORVO_00615223 |
| QORVO_00614702 | QORVO_00614959 | QORVO_00615101 | QORVO_00615225 |
| QORVO_00614704 | QORVO_00614962 | QORVO_00615103 | QORVO_00615227 |
| QORVO_00614706 | QORVO_00614964 | QORVO_00615105 | QORVO_00615229 |
| QORVO_00614708 | QORVO_00614966 | QORVO_00615107 | QORVO_00615231 |
| QORVO_00614710 | QORVO_00614969 | QORVO_00615109 | QORVO_00615233 |
| QORVO_00614712 | QORVO_00614975 | QORVO_00615111 | QORVO_00615235 |
| QORVO_00614714 | QORVO_00614977 | QORVO_00615113 | QORVO_00615237 |
| QORVO_00614716 | QORVO_00614979 | QORVO_00615115 | QORVO_00615240 |

| | | | |
|---|---|---|---|
| QORVO_00615249 | QORVO_00615416 | QORVO_00615546 | QORVO_00615694 |
| QORVO_00615252 | QORVO_00615418 | QORVO_00615549 | QORVO_00615696 |
| QORVO_00615254 | QORVO_00615420 | QORVO_00615551 | QORVO_00615698 |
| QORVO_00615256 | QORVO_00615422 | QORVO_00615553 | QORVO_00615700 |
| QORVO_00615258 | QORVO_00615424 | QORVO_00615555 | QORVO_00615702 |
| QORVO_00615260 | QORVO_00615426 | QORVO_00615559 | QORVO_00615704 |
| QORVO_00615262 | QORVO_00615428 | QORVO_00615561 | QORVO_00615706 |
| QORVO_00615264 | QORVO_00615431 | QORVO_00615563 | QORVO_00615713 |
| QORVO_00615266 | QORVO_00615433 | QORVO_00615565 | QORVO_00615715 |
| QORVO_00615268 | QORVO_00615435 | QORVO_00615574 | QORVO_00615717 |
| QORVO_00615276 | QORVO_00615438 | QORVO_00615577 | QORVO_00615719 |
| QORVO_00615278 | QORVO_00615440 | QORVO_00615579 | QORVO_00615732 |
| QORVO_00615280 | QORVO_00615442 | QORVO_00615581 | QORVO_00615734 |
| QORVO_00615284 | QORVO_00615444 | QORVO_00615586 | QORVO_00615757 |
| QORVO_00615286 | QORVO_00615446 | QORVO_00615588 | QORVO_00615759 |
| QORVO_00615288 | QORVO_00615448 | QORVO_00615597 | QORVO_00615761 |
| QORVO_00615290 | QORVO_00615454 | QORVO_00615599 | QORVO_00615763 |
| QORVO_00615292 | QORVO_00615462 | QORVO_00615601 | QORVO_00615765 |
| QORVO_00615294 | QORVO_00615464 | QORVO_00615603 | QORVO_00615767 |
| QORVO_00615296 | QORVO_00615466 | QORVO_00615605 | QORVO_00615769 |
| QORVO_00615298 | QORVO_00615468 | QORVO_00615607 | QORVO_00615776 |
| QORVO_00615300 | QORVO_00615470 | QORVO_00615609 | QORVO_00615778 |
| QORVO_00615302 | QORVO_00615473 | QORVO_00615611 | QORVO_00615781 |
| QORVO_00615304 | QORVO_00615475 | QORVO_00615613 | QORVO_00615783 |
| QORVO_00615306 | QORVO_00615480 | QORVO_00615616 | QORVO_00615786 |
| QORVO_00615310 | QORVO_00615482 | QORVO_00615618 | QORVO_00615788 |
| QORVO_00615313 | QORVO_00615485 | QORVO_00615621 | QORVO_00615790 |
| QORVO_00615315 | QORVO_00615487 | QORVO_00615623 | QORVO_00615792 |
| QORVO_00615319 | QORVO_00615489 | QORVO_00615625 | QORVO_00615794 |
| QORVO_00615321 | QORVO_00615494 | QORVO_00615627 | QORVO_00615796 |
| QORVO_00615326 | QORVO_00615496 | QORVO_00615629 | QORVO_00615798 |
| QORVO_00615328 | QORVO_00615498 | QORVO_00615631 | QORVO_00615800 |
| QORVO_00615332 | QORVO_00615500 | QORVO_00615633 | QORVO_00615802 |
| QORVO_00615339 | QORVO_00615502 | QORVO_00615635 | QORVO_00615804 |
| QORVO_00615345 | QORVO_00615504 | QORVO_00615637 | QORVO_00615806 |
| QORVO_00615347 | QORVO_00615506 | QORVO_00615640 | QORVO_00615808 |
| QORVO_00615349 | QORVO_00615508 | QORVO_00615642 | QORVO_00615810 |
| QORVO_00615351 | QORVO_00615510 | QORVO_00615644 | QORVO_00615812 |
| QORVO_00615353 | QORVO_00615512 | QORVO_00615646 | QORVO_00615814 |
| QORVO_00615355 | QORVO_00615514 | QORVO_00615648 | QORVO_00615817 |
| QORVO_00615357 | QORVO_00615517 | QORVO_00615650 | QORVO_00615819 |
| QORVO_00615359 | QORVO_00615519 | QORVO_00615653 | QORVO_00615821 |
| QORVO_00615361 | QORVO_00615521 | QORVO_00615655 | QORVO_00615823 |
| QORVO_00615363 | QORVO_00615523 | QORVO_00615657 | QORVO_00615831 |
| QORVO_00615365 | QORVO_00615525 | QORVO_00615661 | QORVO_00615833 |
| QORVO_00615367 | QORVO_00615528 | QORVO_00615663 | QORVO_00615835 |
| QORVO_00615404 | QORVO_00615530 | QORVO_00615665 | QORVO_00615837 |
| QORVO_00615406 | QORVO_00615532 | QORVO_00615667 | QORVO_00615846 |
| QORVO_00615408 | QORVO_00615535 | QORVO_00615669 | QORVO_00615848 |
| QORVO_00615410 | QORVO_00615538 | QORVO_00615687 | QORVO_00615850 |
| QORVO_00615412 | QORVO_00615542 | QORVO_00615690 | QORVO_00615853 |
| QORVO_00615414 | QORVO_00615544 | QORVO_00615692 | QORVO_00615856 |

A-45

| | | | |
|---|---|---|---|
| QORVO_00615858 | QORVO_00616209 | QORVO_00616372 | QORVO_00616532 |
| QORVO_00615860 | QORVO_00616211 | QORVO_00616374 | QORVO_00616534 |
| QORVO_00615862 | QORVO_00616213 | QORVO_00616376 | QORVO_00616536 |
| QORVO_00615864 | QORVO_00616216 | QORVO_00616401 | QORVO_00616538 |
| QORVO_00615883 | QORVO_00616219 | QORVO_00616404 | QORVO_00616541 |
| QORVO_00615887 | QORVO_00616221 | QORVO_00616406 | QORVO_00616543 |
| QORVO_00615889 | QORVO_00616223 | QORVO_00616408 | QORVO_00616545 |
| QORVO_00615897 | QORVO_00616225 | QORVO_00616410 | QORVO_00616548 |
| QORVO_00615910 | QORVO_00616227 | QORVO_00616413 | QORVO_00616550 |
| QORVO_00615912 | QORVO_00616235 | QORVO_00616415 | QORVO_00616552 |
| QORVO_00615914 | QORVO_00616237 | QORVO_00616417 | QORVO_00616555 |
| QORVO_00615949 | QORVO_00616239 | QORVO_00616419 | QORVO_00616557 |
| QORVO_00615951 | QORVO_00616241 | QORVO_00616421 | QORVO_00616559 |
| QORVO_00615956 | QORVO_00616243 | QORVO_00616423 | QORVO_00616561 |
| QORVO_00615958 | QORVO_00616245 | QORVO_00616425 | QORVO_00616566 |
| QORVO_00615960 | QORVO_00616247 | QORVO_00616430 | QORVO_00616568 |
| QORVO_00615962 | QORVO_00616249 | QORVO_00616432 | QORVO_00616571 |
| QORVO_00615969 | QORVO_00616251 | QORVO_00616434 | QORVO_00616573 |
| QORVO_00615971 | QORVO_00616253 | QORVO_00616436 | QORVO_00616575 |
| QORVO_00615973 | QORVO_00616255 | QORVO_00616438 | QORVO_00616578 |
| QORVO_00615975 | QORVO_00616258 | QORVO_00616440 | QORVO_00616602 |
| QORVO_00615978 | QORVO_00616260 | QORVO_00616442 | QORVO_00616604 |
| QORVO_00615980 | QORVO_00616262 | QORVO_00616444 | QORVO_00616607 |
| QORVO_00615982 | QORVO_00616265 | QORVO_00616446 | QORVO_00616629 |
| QORVO_00615984 | QORVO_00616268 | QORVO_00616448 | QORVO_00616633 |
| QORVO_00616081 | QORVO_00616270 | QORVO_00616456 | QORVO_00616635 |
| QORVO_00616084 | QORVO_00616272 | QORVO_00616458 | QORVO_00616639 |
| QORVO_00616086 | QORVO_00616274 | QORVO_00616460 | QORVO_00616641 |
| QORVO_00616088 | QORVO_00616277 | QORVO_00616462 | QORVO_00616645 |
| QORVO_00616090 | QORVO_00616279 | QORVO_00616464 | QORVO_00616649 |
| QORVO_00616092 | QORVO_00616281 | QORVO_00616473 | QORVO_00616651 |
| QORVO_00616095 | QORVO_00616283 | QORVO_00616475 | QORVO_00616659 |
| QORVO_00616097 | QORVO_00616285 | QORVO_00616477 | QORVO_00616661 |
| QORVO_00616099 | QORVO_00616292 | QORVO_00616483 | QORVO_00616663 |
| QORVO_00616168 | QORVO_00616294 | QORVO_00616485 | QORVO_00616665 |
| QORVO_00616171 | QORVO_00616296 | QORVO_00616488 | QORVO_00616667 |
| QORVO_00616175 | QORVO_00616298 | QORVO_00616494 | QORVO_00616679 |
| QORVO_00616177 | QORVO_00616300 | QORVO_00616496 | QORVO_00616681 |
| QORVO_00616179 | QORVO_00616302 | QORVO_00616498 | QORVO_00616683 |
| QORVO_00616181 | QORVO_00616346 | QORVO_00616500 | QORVO_00616685 |
| QORVO_00616183 | QORVO_00616348 | QORVO_00616504 | QORVO_00616688 |
| QORVO_00616185 | QORVO_00616350 | QORVO_00616506 | QORVO_00616690 |
| QORVO_00616188 | QORVO_00616352 | QORVO_00616508 | QORVO_00616692 |
| QORVO_00616190 | QORVO_00616354 | QORVO_00616510 | QORVO_00616701 |
| QORVO_00616192 | QORVO_00616356 | QORVO_00616512 | QORVO_00616703 |
| QORVO_00616194 | QORVO_00616358 | QORVO_00616514 | QORVO_00616705 |
| QORVO_00616196 | QORVO_00616360 | QORVO_00616516 | QORVO_00616708 |
| QORVO_00616198 | QORVO_00616362 | QORVO_00616518 | QORVO_00616716 |
| QORVO_00616200 | QORVO_00616364 | QORVO_00616520 | QORVO_00616718 |
| QORVO_00616202 | QORVO_00616366 | QORVO_00616525 | QORVO_00616720 |
| QORVO_00616204 | QORVO_00616368 | QORVO_00616527 | QORVO_00616722 |
| QORVO_00616207 | QORVO_00616370 | QORVO_00616529 | QORVO_00616759 |

| | | | |
|---|---|---|---|
| QORVO_00616762 | QORVO_00616997 | QORVO_00617173 | QORVO_00617310 |
| QORVO_00616764 | QORVO_00616999 | QORVO_00617175 | QORVO_00617312 |
| QORVO_00616766 | QORVO_00617001 | QORVO_00617177 | QORVO_00617314 |
| QORVO_00616768 | QORVO_00617007 | QORVO_00617179 | QORVO_00617316 |
| QORVO_00616770 | QORVO_00617009 | QORVO_00617182 | QORVO_00617322 |
| QORVO_00616785 | QORVO_00617011 | QORVO_00617184 | QORVO_00617326 |
| QORVO_00616787 | QORVO_00617013 | QORVO_00617186 | QORVO_00617334 |
| QORVO_00616791 | QORVO_00617021 | QORVO_00617188 | QORVO_00617336 |
| QORVO_00616793 | QORVO_00617023 | QORVO_00617190 | QORVO_00617339 |
| QORVO_00616799 | QORVO_00617029 | QORVO_00617192 | QORVO_00617341 |
| QORVO_00616801 | QORVO_00617032 | QORVO_00617194 | QORVO_00617343 |
| QORVO_00616803 | QORVO_00617034 | QORVO_00617197 | QORVO_00617345 |
| QORVO_00616806 | QORVO_00617072 | QORVO_00617200 | QORVO_00617347 |
| QORVO_00616808 | QORVO_00617074 | QORVO_00617202 | QORVO_00617349 |
| QORVO_00616810 | QORVO_00617076 | QORVO_00617204 | QORVO_00617352 |
| QORVO_00616812 | QORVO_00617078 | QORVO_00617206 | QORVO_00617354 |
| QORVO_00616814 | QORVO_00617080 | QORVO_00617209 | QORVO_00617358 |
| QORVO_00616816 | QORVO_00617082 | QORVO_00617211 | QORVO_00617361 |
| QORVO_00616818 | QORVO_00617084 | QORVO_00617219 | QORVO_00617363 |
| QORVO_00616830 | QORVO_00617087 | QORVO_00617222 | QORVO_00617367 |
| QORVO_00616838 | QORVO_00617089 | QORVO_00617225 | QORVO_00617380 |
| QORVO_00616842 | QORVO_00617094 | QORVO_00617227 | QORVO_00617383 |
| QORVO_00616844 | QORVO_00617096 | QORVO_00617229 | QORVO_00617385 |
| QORVO_00616846 | QORVO_00617098 | QORVO_00617231 | QORVO_00617388 |
| QORVO_00616848 | QORVO_00617100 | QORVO_00617233 | QORVO_00617390 |
| QORVO_00616850 | QORVO_00617102 | QORVO_00617235 | QORVO_00617392 |
| QORVO_00616853 | QORVO_00617104 | QORVO_00617237 | QORVO_00617394 |
| QORVO_00616855 | QORVO_00617111 | QORVO_00617241 | QORVO_00617397 |
| QORVO_00616857 | QORVO_00617114 | QORVO_00617243 | QORVO_00617399 |
| QORVO_00616864 | QORVO_00617116 | QORVO_00617245 | QORVO_00617401 |
| QORVO_00616868 | QORVO_00617118 | QORVO_00617247 | QORVO_00617403 |
| QORVO_00616872 | QORVO_00617120 | QORVO_00617256 | QORVO_00617405 |
| QORVO_00616875 | QORVO_00617122 | QORVO_00617258 | QORVO_00617407 |
| QORVO_00616877 | QORVO_00617125 | QORVO_00617260 | QORVO_00617409 |
| QORVO_00616880 | QORVO_00617127 | QORVO_00617262 | QORVO_00617412 |
| QORVO_00616882 | QORVO_00617129 | QORVO_00617264 | QORVO_00617417 |
| QORVO_00616884 | QORVO_00617131 | QORVO_00617266 | QORVO_00617420 |
| QORVO_00616966 | QORVO_00617133 | QORVO_00617274 | QORVO_00617422 |
| QORVO_00616968 | QORVO_00617135 | QORVO_00617276 | QORVO_00617424 |
| QORVO_00616970 | QORVO_00617137 | QORVO_00617278 | QORVO_00617426 |
| QORVO_00616972 | QORVO_00617139 | QORVO_00617280 | QORVO_00617428 |
| QORVO_00616974 | QORVO_00617141 | QORVO_00617282 | QORVO_00617430 |
| QORVO_00616976 | QORVO_00617143 | QORVO_00617284 | QORVO_00617432 |
| QORVO_00616978 | QORVO_00617145 | QORVO_00617286 | QORVO_00617434 |
| QORVO_00616980 | QORVO_00617148 | QORVO_00617288 | QORVO_00617436 |
| QORVO_00616982 | QORVO_00617150 | QORVO_00617290 | QORVO_00617442 |
| QORVO_00616984 | QORVO_00617152 | QORVO_00617292 | QORVO_00617444 |
| QORVO_00616986 | QORVO_00617154 | QORVO_00617294 | QORVO_00617446 |
| QORVO_00616988 | QORVO_00617165 | QORVO_00617302 | QORVO_00617454 |
| QORVO_00616990 | QORVO_00617167 | QORVO_00617304 | QORVO_00617456 |
| QORVO_00616992 | QORVO_00617169 | QORVO_00617306 | QORVO_00617459 |
| QORVO_00616994 | QORVO_00617171 | QORVO_00617308 | QORVO_00617461 |

| | | | |
|---|---|---|---|
| QORVO_00617463 | QORVO_00617718 | QORVO_00617909 | QORVO_00618038 |
| QORVO_00617465 | QORVO_00617721 | QORVO_00617911 | QORVO_00618068 |
| QORVO_00617467 | QORVO_00617724 | QORVO_00617913 | QORVO_00618070 |
| QORVO_00617469 | QORVO_00617729 | QORVO_00617915 | QORVO_00618072 |
| QORVO_00617472 | QORVO_00617733 | QORVO_00617917 | QORVO_00618075 |
| QORVO_00617495 | QORVO_00617735 | QORVO_00617919 | QORVO_00618077 |
| QORVO_00617497 | QORVO_00617738 | QORVO_00617921 | QORVO_00618080 |
| QORVO_00617503 | QORVO_00617740 | QORVO_00617923 | QORVO_00618082 |
| QORVO_00617505 | QORVO_00617742 | QORVO_00617925 | QORVO_00618084 |
| QORVO_00617507 | QORVO_00617744 | QORVO_00617927 | QORVO_00618086 |
| QORVO_00617509 | QORVO_00617746 | QORVO_00617929 | QORVO_00618088 |
| QORVO_00617511 | QORVO_00617748 | QORVO_00617935 | QORVO_00618090 |
| QORVO_00617513 | QORVO_00617750 | QORVO_00617938 | QORVO_00618092 |
| QORVO_00617515 | QORVO_00617752 | QORVO_00617940 | QORVO_00618094 |
| QORVO_00617517 | QORVO_00617754 | QORVO_00617942 | QORVO_00618097 |
| QORVO_00617519 | QORVO_00617756 | QORVO_00617944 | QORVO_00618112 |
| QORVO_00617527 | QORVO_00617760 | QORVO_00617946 | QORVO_00618114 |
| QORVO_00617529 | QORVO_00617783 | QORVO_00617948 | QORVO_00618116 |
| QORVO_00617532 | QORVO_00617785 | QORVO_00617950 | QORVO_00618120 |
| QORVO_00617536 | QORVO_00617787 | QORVO_00617952 | QORVO_00618127 |
| QORVO_00617539 | QORVO_00617789 | QORVO_00617954 | QORVO_00618129 |
| QORVO_00617541 | QORVO_00617798 | QORVO_00617956 | QORVO_00618131 |
| QORVO_00617543 | QORVO_00617800 | QORVO_00617963 | QORVO_00618133 |
| QORVO_00617545 | QORVO_00617802 | QORVO_00617965 | QORVO_00618135 |
| QORVO_00617547 | QORVO_00617804 | QORVO_00617971 | QORVO_00618137 |
| QORVO_00617549 | QORVO_00617806 | QORVO_00617973 | QORVO_00618141 |
| QORVO_00617560 | QORVO_00617808 | QORVO_00617975 | QORVO_00618143 |
| QORVO_00617562 | QORVO_00617810 | QORVO_00617977 | QORVO_00618145 |
| QORVO_00617564 | QORVO_00617812 | QORVO_00617979 | QORVO_00618185 |
| QORVO_00617566 | QORVO_00617820 | QORVO_00617981 | QORVO_00618187 |
| QORVO_00617568 | QORVO_00617822 | QORVO_00617991 | QORVO_00618189 |
| QORVO_00617570 | QORVO_00617824 | QORVO_00617993 | QORVO_00618193 |
| QORVO_00617575 | QORVO_00617826 | QORVO_00617995 | QORVO_00618217 |
| QORVO_00617576 | QORVO_00617834 | QORVO_00617997 | QORVO_00618220 |
| QORVO_00617578 | QORVO_00617836 | QORVO_00617999 | QORVO_00618222 |
| QORVO_00617655 | QORVO_00617838 | QORVO_00618001 | QORVO_00618224 |
| QORVO_00617657 | QORVO_00617840 | QORVO_00618003 | QORVO_00618226 |
| QORVO_00617661 | QORVO_00617842 | QORVO_00618005 | QORVO_00618228 |
| QORVO_00617663 | QORVO_00617844 | QORVO_00618007 | QORVO_00618230 |
| QORVO_00617666 | QORVO_00617855 | QORVO_00618009 | QORVO_00618273 |
| QORVO_00617668 | QORVO_00617864 | QORVO_00618011 | QORVO_00618275 |
| QORVO_00617670 | QORVO_00617866 | QORVO_00618013 | QORVO_00618277 |
| QORVO_00617672 | QORVO_00617868 | QORVO_00618015 | QORVO_00618279 |
| QORVO_00617680 | QORVO_00617870 | QORVO_00618017 | QORVO_00618281 |
| QORVO_00617699 | QORVO_00617878 | QORVO_00618019 | QORVO_00618283 |
| QORVO_00617701 | QORVO_00617892 | QORVO_00618021 | QORVO_00618286 |
| QORVO_00617703 | QORVO_00617894 | QORVO_00618023 | QORVO_00618288 |
| QORVO_00617706 | QORVO_00617898 | QORVO_00618025 | QORVO_00618290 |
| QORVO_00617709 | QORVO_00617900 | QORVO_00618027 | QORVO_00618292 |
| QORVO_00617711 | QORVO_00617902 | QORVO_00618032 | QORVO_00618294 |
| QORVO_00617714 | QORVO_00617904 | QORVO_00618034 | QORVO_00618296 |
| QORVO_00617716 | QORVO_00617906 | QORVO_00618036 | QORVO_00618298 |

| | | | |
|---|---|---|---|
| QORVO_00618302 | QORVO_00618509 | QORVO_00618701 | QORVO_00618822 |
| QORVO_00618304 | QORVO_00618511 | QORVO_00618703 | QORVO_00618829 |
| QORVO_00618306 | QORVO_00618513 | QORVO_00618705 | QORVO_00618831 |
| QORVO_00618309 | QORVO_00618543 | QORVO_00618707 | QORVO_00618833 |
| QORVO_00618311 | QORVO_00618551 | QORVO_00618709 | QORVO_00618835 |
| QORVO_00618315 | QORVO_00618553 | QORVO_00618711 | QORVO_00618838 |
| QORVO_00618318 | QORVO_00618555 | QORVO_00618714 | QORVO_00618846 |
| QORVO_00618320 | QORVO_00618557 | QORVO_00618717 | QORVO_00618848 |
| QORVO_00618322 | QORVO_00618559 | QORVO_00618719 | QORVO_00618850 |
| QORVO_00618325 | QORVO_00618561 | QORVO_00618722 | QORVO_00618852 |
| QORVO_00618333 | QORVO_00618565 | QORVO_00618724 | QORVO_00618854 |
| QORVO_00618335 | QORVO_00618567 | QORVO_00618726 | QORVO_00618862 |
| QORVO_00618337 | QORVO_00618569 | QORVO_00618728 | QORVO_00618868 |
| QORVO_00618339 | QORVO_00618571 | QORVO_00618731 | QORVO_00618870 |
| QORVO_00618341 | QORVO_00618573 | QORVO_00618733 | QORVO_00618872 |
| QORVO_00618343 | QORVO_00618576 | QORVO_00618743 | QORVO_00618874 |
| QORVO_00618352 | QORVO_00618578 | QORVO_00618745 | QORVO_00618877 |
| QORVO_00618354 | QORVO_00618582 | QORVO_00618747 | QORVO_00618879 |
| QORVO_00618356 | QORVO_00618584 | QORVO_00618749 | QORVO_00618881 |
| QORVO_00618358 | QORVO_00618592 | QORVO_00618751 | QORVO_00618883 |
| QORVO_00618360 | QORVO_00618594 | QORVO_00618753 | QORVO_00618885 |
| QORVO_00618362 | QORVO_00618596 | QORVO_00618755 | QORVO_00618887 |
| QORVO_00618365 | QORVO_00618615 | QORVO_00618757 | QORVO_00618889 |
| QORVO_00618367 | QORVO_00618617 | QORVO_00618759 | QORVO_00618891 |
| QORVO_00618369 | QORVO_00618619 | QORVO_00618761 | QORVO_00618893 |
| QORVO_00618371 | QORVO_00618621 | QORVO_00618763 | QORVO_00618895 |
| QORVO_00618373 | QORVO_00618626 | QORVO_00618765 | QORVO_00618904 |
| QORVO_00618375 | QORVO_00618628 | QORVO_00618767 | QORVO_00618906 |
| QORVO_00618377 | QORVO_00618630 | QORVO_00618769 | QORVO_00618912 |
| QORVO_00618383 | QORVO_00618632 | QORVO_00618771 | QORVO_00618914 |
| QORVO_00618386 | QORVO_00618638 | QORVO_00618773 | QORVO_00618916 |
| QORVO_00618450 | QORVO_00618640 | QORVO_00618775 | QORVO_00618919 |
| QORVO_00618452 | QORVO_00618642 | QORVO_00618777 | QORVO_00618921 |
| QORVO_00618454 | QORVO_00618644 | QORVO_00618780 | QORVO_00618933 |
| QORVO_00618456 | QORVO_00618647 | QORVO_00618782 | QORVO_00618935 |
| QORVO_00618458 | QORVO_00618656 | QORVO_00618784 | QORVO_00618937 |
| QORVO_00618460 | QORVO_00618658 | QORVO_00618787 | QORVO_00618939 |
| QORVO_00618462 | QORVO_00618660 | QORVO_00618789 | QORVO_00618944 |
| QORVO_00618464 | QORVO_00618662 | QORVO_00618791 | QORVO_00618948 |
| QORVO_00618467 | QORVO_00618664 | QORVO_00618793 | QORVO_00618950 |
| QORVO_00618469 | QORVO_00618666 | QORVO_00618796 | QORVO_00618952 |
| QORVO_00618473 | QORVO_00618668 | QORVO_00618798 | QORVO_00618954 |
| QORVO_00618475 | QORVO_00618671 | QORVO_00618800 | QORVO_00618957 |
| QORVO_00618477 | QORVO_00618673 | QORVO_00618802 | QORVO_00618961 |
| QORVO_00618479 | QORVO_00618681 | QORVO_00618804 | QORVO_00618963 |
| QORVO_00618482 | QORVO_00618683 | QORVO_00618807 | QORVO_00618966 |
| QORVO_00618484 | QORVO_00618685 | QORVO_00618809 | QORVO_00618969 |
| QORVO_00618487 | QORVO_00618687 | QORVO_00618811 | QORVO_00618971 |
| QORVO_00618494 | QORVO_00618689 | QORVO_00618813 | QORVO_00618975 |
| QORVO_00618503 | QORVO_00618691 | QORVO_00618815 | QORVO_00618977 |
| QORVO_00618505 | QORVO_00618693 | QORVO_00618817 | QORVO_00618979 |
| QORVO_00618507 | QORVO_00618699 | QORVO_00618820 | QORVO_00618981 |

| | | | |
|---|---|---|---|
| QORVO_00618983 | QORVO_00619292 | QORVO_00619418 | QORVO_00619633 |
| QORVO_00618985 | QORVO_00619294 | QORVO_00619420 | QORVO_00619635 |
| QORVO_00618987 | QORVO_00619296 | QORVO_00619422 | QORVO_00619637 |
| QORVO_00618989 | QORVO_00619298 | QORVO_00619424 | QORVO_00619639 |
| QORVO_00618991 | QORVO_00619300 | QORVO_00619426 | QORVO_00619641 |
| QORVO_00618994 | QORVO_00619302 | QORVO_00619429 | QORVO_00619643 |
| QORVO_00618996 | QORVO_00619305 | QORVO_00619431 | QORVO_00619645 |
| QORVO_00618998 | QORVO_00619308 | QORVO_00619448 | QORVO_00619647 |
| QORVO_00619004 | QORVO_00619310 | QORVO_00619450 | QORVO_00619649 |
| QORVO_00619007 | QORVO_00619312 | QORVO_00619498 | QORVO_00619651 |
| QORVO_00619009 | QORVO_00619314 | QORVO_00619500 | QORVO_00619653 |
| QORVO_00619011 | QORVO_00619316 | QORVO_00619508 | QORVO_00619656 |
| QORVO_00619014 | QORVO_00619318 | QORVO_00619510 | QORVO_00619658 |
| QORVO_00619016 | QORVO_00619320 | QORVO_00619512 | QORVO_00619660 |
| QORVO_00619018 | QORVO_00619322 | QORVO_00619514 | QORVO_00619666 |
| QORVO_00619020 | QORVO_00619324 | QORVO_00619519 | QORVO_00619668 |
| QORVO_00619022 | QORVO_00619326 | QORVO_00619521 | QORVO_00619675 |
| QORVO_00619030 | QORVO_00619328 | QORVO_00619523 | QORVO_00619677 |
| QORVO_00619033 | QORVO_00619330 | QORVO_00619525 | QORVO_00619679 |
| QORVO_00619036 | QORVO_00619333 | QORVO_00619538 | QORVO_00619681 |
| QORVO_00619038 | QORVO_00619337 | QORVO_00619540 | QORVO_00619683 |
| QORVO_00619041 | QORVO_00619339 | QORVO_00619542 | QORVO_00619687 |
| QORVO_00619043 | QORVO_00619341 | QORVO_00619544 | QORVO_00619689 |
| QORVO_00619150 | QORVO_00619343 | QORVO_00619546 | QORVO_00619691 |
| QORVO_00619155 | QORVO_00619350 | QORVO_00619548 | QORVO_00619698 |
| QORVO_00619157 | QORVO_00619352 | QORVO_00619550 | QORVO_00619705 |
| QORVO_00619159 | QORVO_00619354 | QORVO_00619552 | QORVO_00619707 |
| QORVO_00619161 | QORVO_00619356 | QORVO_00619555 | QORVO_00619714 |
| QORVO_00619163 | QORVO_00619358 | QORVO_00619558 | QORVO_00619716 |
| QORVO_00619165 | QORVO_00619360 | QORVO_00619560 | QORVO_00619719 |
| QORVO_00619167 | QORVO_00619362 | QORVO_00619562 | QORVO_00619721 |
| QORVO_00619170 | QORVO_00619364 | QORVO_00619571 | QORVO_00619729 |
| QORVO_00619172 | QORVO_00619366 | QORVO_00619573 | QORVO_00619736 |
| QORVO_00619174 | QORVO_00619368 | QORVO_00619575 | QORVO_00619738 |
| QORVO_00619176 | QORVO_00619370 | QORVO_00619578 | QORVO_00619740 |
| QORVO_00619184 | QORVO_00619372 | QORVO_00619580 | QORVO_00619742 |
| QORVO_00619186 | QORVO_00619374 | QORVO_00619582 | QORVO_00619744 |
| QORVO_00619188 | QORVO_00619382 | QORVO_00619584 | QORVO_00619746 |
| QORVO_00619190 | QORVO_00619384 | QORVO_00619586 | QORVO_00619750 |
| QORVO_00619192 | QORVO_00619386 | QORVO_00619588 | QORVO_00619752 |
| QORVO_00619194 | QORVO_00619388 | QORVO_00619590 | QORVO_00619754 |
| QORVO_00619196 | QORVO_00619390 | QORVO_00619593 | QORVO_00619758 |
| QORVO_00619198 | QORVO_00619392 | QORVO_00619596 | QORVO_00619760 |
| QORVO_00619200 | QORVO_00619394 | QORVO_00619598 | QORVO_00619762 |
| QORVO_00619207 | QORVO_00619401 | QORVO_00619600 | QORVO_00619764 |
| QORVO_00619209 | QORVO_00619403 | QORVO_00619602 | QORVO_00619766 |
| QORVO_00619277 | QORVO_00619405 | QORVO_00619604 | QORVO_00619768 |
| QORVO_00619279 | QORVO_00619407 | QORVO_00619611 | QORVO_00619770 |
| QORVO_00619281 | QORVO_00619409 | QORVO_00619613 | QORVO_00619772 |
| QORVO_00619283 | QORVO_00619411 | QORVO_00619625 | QORVO_00619775 |
| QORVO_00619285 | QORVO_00619413 | QORVO_00619627 | QORVO_00619783 |
| QORVO_00619290 | QORVO_00619416 | QORVO_00619630 | QORVO_00619785 |

| | | | |
|---|---|---|---|
| QORVO_00619787 | QORVO_00619956 | QORVO_00620206 | QORVO_00620507 |
| QORVO_00619789 | QORVO_00619958 | QORVO_00620209 | QORVO_00620509 |
| QORVO_00619791 | QORVO_00619963 | QORVO_00620212 | QORVO_00620511 |
| QORVO_00619793 | QORVO_00619966 | QORVO_00620214 | QORVO_00620513 |
| QORVO_00619818 | QORVO_00619968 | QORVO_00620216 | QORVO_00620544 |
| QORVO_00619820 | QORVO_00619970 | QORVO_00620218 | QORVO_00620546 |
| QORVO_00619822 | QORVO_00619972 | QORVO_00620221 | QORVO_00620552 |
| QORVO_00619824 | QORVO_00619974 | QORVO_00620223 | QORVO_00620554 |
| QORVO_00619827 | QORVO_00620032 | QORVO_00620225 | QORVO_00620558 |
| QORVO_00619830 | QORVO_00620035 | QORVO_00620227 | QORVO_00620560 |
| QORVO_00619832 | QORVO_00620037 | QORVO_00620250 | QORVO_00620562 |
| QORVO_00619835 | QORVO_00620039 | QORVO_00620252 | QORVO_00620564 |
| QORVO_00619837 | QORVO_00620041 | QORVO_00620260 | QORVO_00620573 |
| QORVO_00619839 | QORVO_00620044 | QORVO_00620262 | QORVO_00620575 |
| QORVO_00619841 | QORVO_00620069 | QORVO_00620264 | QORVO_00620578 |
| QORVO_00619849 | QORVO_00620071 | QORVO_00620266 | QORVO_00620580 |
| QORVO_00619855 | QORVO_00620083 | QORVO_00620268 | QORVO_00620582 |
| QORVO_00619857 | QORVO_00620085 | QORVO_00620270 | QORVO_00620586 |
| QORVO_00619859 | QORVO_00620087 | QORVO_00620272 | QORVO_00620588 |
| QORVO_00619861 | QORVO_00620089 | QORVO_00620274 | QORVO_00620590 |
| QORVO_00619863 | QORVO_00620091 | QORVO_00620276 | QORVO_00620592 |
| QORVO_00619865 | QORVO_00620093 | QORVO_00620278 | QORVO_00620599 |
| QORVO_00619867 | QORVO_00620095 | QORVO_00620286 | QORVO_00620601 |
| QORVO_00619869 | QORVO_00620097 | QORVO_00620359 | QORVO_00620603 |
| QORVO_00619872 | QORVO_00620099 | QORVO_00620361 | QORVO_00620605 |
| QORVO_00619874 | QORVO_00620101 | QORVO_00620363 | QORVO_00620607 |
| QORVO_00619876 | QORVO_00620118 | QORVO_00620368 | QORVO_00620609 |
| QORVO_00619878 | QORVO_00620123 | QORVO_00620370 | QORVO_00620613 |
| QORVO_00619880 | QORVO_00620125 | QORVO_00620372 | QORVO_00620621 |
| QORVO_00619887 | QORVO_00620130 | QORVO_00620393 | QORVO_00620623 |
| QORVO_00619889 | QORVO_00620137 | QORVO_00620402 | QORVO_00620625 |
| QORVO_00619891 | QORVO_00620139 | QORVO_00620404 | QORVO_00620627 |
| QORVO_00619893 | QORVO_00620146 | QORVO_00620406 | QORVO_00620629 |
| QORVO_00619895 | QORVO_00620148 | QORVO_00620429 | QORVO_00620631 |
| QORVO_00619897 | QORVO_00620150 | QORVO_00620431 | QORVO_00620633 |
| QORVO_00619899 | QORVO_00620152 | QORVO_00620447 | QORVO_00620651 |
| QORVO_00619901 | QORVO_00620159 | QORVO_00620450 | QORVO_00620656 |
| QORVO_00619903 | QORVO_00620161 | QORVO_00620454 | QORVO_00620658 |
| QORVO_00619911 | QORVO_00620163 | QORVO_00620457 | QORVO_00620660 |
| QORVO_00619913 | QORVO_00620165 | QORVO_00620459 | QORVO_00620662 |
| QORVO_00619917 | QORVO_00620167 | QORVO_00620461 | QORVO_00620664 |
| QORVO_00619920 | QORVO_00620170 | QORVO_00620463 | QORVO_00620666 |
| QORVO_00619922 | QORVO_00620172 | QORVO_00620465 | QORVO_00620670 |
| QORVO_00619931 | QORVO_00620174 | QORVO_00620472 | QORVO_00620673 |
| QORVO_00619933 | QORVO_00620176 | QORVO_00620478 | QORVO_00620677 |
| QORVO_00619935 | QORVO_00620185 | QORVO_00620486 | QORVO_00620679 |
| QORVO_00619937 | QORVO_00620187 | QORVO_00620488 | QORVO_00620685 |
| QORVO_00619939 | QORVO_00620190 | QORVO_00620490 | QORVO_00620687 |
| QORVO_00619941 | QORVO_00620192 | QORVO_00620492 | QORVO_00620689 |
| QORVO_00619945 | QORVO_00620194 | QORVO_00620499 | QORVO_00620691 |
| QORVO_00619951 | QORVO_00620196 | QORVO_00620503 | QORVO_00620693 |
| QORVO_00619953 | QORVO_00620198 | QORVO_00620505 | QORVO_00620695 |

| | | | |
|---|---|---|---|
| QORVO_00620697 | QORVO_00620826 | QORVO_00621161 | QORVO_00842117 |
| QORVO_00620699 | QORVO_00620828 | QORVO_00621179 | QORVO_00842120 |
| QORVO_00620701 | QORVO_00620830 | QORVO_00621180 | QORVO_00842122 |
| QORVO_00620703 | QORVO_00620832 | QORVO_00622621 | QORVO_00842125 |
| QORVO_00620705 | QORVO_00620834 | QORVO_00623767 | QORVO_00842132 |
| QORVO_00620707 | QORVO_00620836 | QORVO_00624636 | QORVO_00842142 |
| QORVO_00620709 | QORVO_00620838 | QORVO_00635353 | QORVO_00842147 |
| QORVO_00620711 | QORVO_00620840 | QORVO_00643138 | QORVO_00842154 |
| QORVO_00620714 | QORVO_00620842 | QORVO_00652695 | QORVO_00842157 |
| QORVO_00620716 | QORVO_00620844 | QORVO_00664604 | QORVO_00842166 |
| QORVO_00620718 | QORVO_00620846 | QORVO_00664626 | QORVO_00842171 |
| QORVO_00620720 | QORVO_00620848 | QORVO_00664628 | QORVO_00842177 |
| QORVO_00620722 | QORVO_00620850 | QORVO_00664630 | QORVO_00842181 |
| QORVO_00620724 | QORVO_00620852 | QORVO_00664990 | QORVO_00842185 |
| QORVO_00620726 | QORVO_00620854 | QORVO_00665605 | QORVO_00842192 |
| QORVO_00620728 | QORVO_00620856 | QORVO_00672495 | QORVO_00842204 |
| QORVO_00620730 | QORVO_00620858 | QORVO_00677421 | QORVO_00842207 |
| QORVO_00620732 | QORVO_00620860 | QORVO_00680460 | QORVO_00842211 |
| QORVO_00620734 | QORVO_00620862 | QORVO_00686714 | QORVO_00842216 |
| QORVO_00620736 | QORVO_00620864 | QORVO_00762548 | QORVO_00842221 |
| QORVO_00620738 | QORVO_00620866 | QORVO_00820637 | QORVO_00842228 |
| QORVO_00620740 | QORVO_00620868 | QORVO_00840829 | QORVO_00842233 |
| QORVO_00620742 | QORVO_00620870 | QORVO_00840830 | QORVO_00842237 |
| QORVO_00620745 | QORVO_00620872 | QORVO_00840845 | QORVO_00842245 |
| QORVO_00620747 | QORVO_00620874 | QORVO_00841499 | QORVO_00842259 |
| QORVO_00620749 | QORVO_00620876 | QORVO_00841500 | QORVO_00842276 |
| QORVO_00620751 | QORVO_00620878 | QORVO_00841557 | QORVO_00842293 |
| QORVO_00620755 | QORVO_00620890 | QORVO_00841584 | QORVO_00842296 |
| QORVO_00620757 | QORVO_00620909 | QORVO_00841655 | QORVO_00842300 |
| QORVO_00620759 | QORVO_00620936 | QORVO_00841666 | QORVO_00842304 |
| QORVO_00620765 | QORVO_00620942 | QORVO_00841668 | QORVO_00842311 |
| QORVO_00620767 | QORVO_00620956 | QORVO_00841728 | QORVO_00842317 |
| QORVO_00620769 | QORVO_00620974 | QORVO_00841737 | QORVO_00842321 |
| QORVO_00620771 | QORVO_00620977 | QORVO_00841742 | QORVO_00842326 |
| QORVO_00620773 | QORVO_00620984 | QORVO_00841798 | QORVO_00842337 |
| QORVO_00620775 | QORVO_00620986 | QORVO_00841801 | QORVO_00842342 |
| QORVO_00620777 | QORVO_00620987 | QORVO_00841802 | QORVO_00842349 |
| QORVO_00620791 | QORVO_00621006 | QORVO_00841842 | QORVO_00842358 |
| QORVO_00620793 | QORVO_00621013 | QORVO_00841848 | QORVO_00842365 |
| QORVO_00620795 | QORVO_00621029 | QORVO_00841857 | QORVO_00842372 |
| QORVO_00620797 | QORVO_00621030 | QORVO_00841872 | QORVO_00842378 |
| QORVO_00620799 | QORVO_00621032 | QORVO_00841876 | QORVO_00842385 |
| QORVO_00620801 | QORVO_00621062 | QORVO_00841878 | QORVO_00842388 |
| QORVO_00620803 | QORVO_00621069 | QORVO_00841879 | QORVO_00842392 |
| QORVO_00620808 | QORVO_00621073 | QORVO_00841885 | QORVO_00842400 |
| QORVO_00620810 | QORVO_00621077 | QORVO_00842023 | QORVO_00842406 |
| QORVO_00620813 | QORVO_00621094 | QORVO_00842030 | QORVO_00842410 |
| QORVO_00620816 | QORVO_00621099 | QORVO_00842065 | QORVO_00842412 |
| QORVO_00620818 | QORVO_00621116 | QORVO_00842066 | QORVO_00842416 |
| QORVO_00620820 | QORVO_00621136 | QORVO_00842103 | QORVO_00842419 |
| QORVO_00620822 | QORVO_00621140 | QORVO_00842104 | QORVO_00842423 |
| QORVO_00620824 | QORVO_00621143 | QORVO_00842113 | QORVO_00842427 |

| | | | |
|---|---|---|---|
| QORVO_00842431 | QORVO_00842776 | QORVO_00843773 | QORVO_00889558 |
| QORVO_00842440 | QORVO_00842788 | QORVO_00843781 | QORVO_00889565 |
| QORVO_00842443 | QORVO_00842797 | QORVO_00843994 | QORVO_00889570 |
| QORVO_00842446 | QORVO_00842807 | QORVO_00844016 | QORVO_00889573 |
| QORVO_00842452 | QORVO_00842813 | QORVO_00844041 | QORVO_00889576 |
| QORVO_00842458 | QORVO_00842816 | QORVO_00844058 | QORVO_00889580 |
| QORVO_00842465 | QORVO_00842822 | QORVO_00850325 | QORVO_00889614 |
| QORVO_00842468 | QORVO_00842826 | QORVO_00854271 | QORVO_00889617 |
| QORVO_00842472 | QORVO_00842833 | QORVO_00854274 | QORVO_00889667 |
| QORVO_00842476 | QORVO_00842839 | QORVO_00854275 | QORVO_00889677 |
| QORVO_00842482 | QORVO_00842846 | QORVO_00854276 | QORVO_00889694 |
| QORVO_00842486 | QORVO_00842852 | QORVO_00854279 | QORVO_00889747 |
| QORVO_00842493 | QORVO_00842856 | QORVO_00855245 | QORVO_00889748 |
| QORVO_00842502 | QORVO_00842868 | QORVO_00855246 | QORVO_00889749 |
| QORVO_00842514 | QORVO_00842927 | QORVO_00855248 | QORVO_00889750 |
| QORVO_00842522 | QORVO_00842928 | QORVO_00855266 | QORVO_00889751 |
| QORVO_00842531 | QORVO_00842963 | QORVO_00855268 | QORVO_00889793 |
| QORVO_00842538 | QORVO_00842964 | QORVO_00855270 | QORVO_00889796 |
| QORVO_00842546 | QORVO_00842965 | QORVO_00855274 | QORVO_00889806 |
| QORVO_00842553 | QORVO_00843001 | QORVO_00888028 | QORVO_00889807 |
| QORVO_00842565 | QORVO_00843002 | QORVO_00888031 | QORVO_00889812 |
| QORVO_00842571 | QORVO_00843003 | QORVO_00888032 | QORVO_00889815 |
| QORVO_00842577 | QORVO_00843036 | QORVO_00888040 | QORVO_00889818 |
| QORVO_00842587 | QORVO_00843038 | QORVO_00888044 | QORVO_00889829 |
| QORVO_00842594 | QORVO_00843071 | QORVO_00888053 | QORVO_00889839 |
| QORVO_00842600 | QORVO_00843072 | QORVO_00889471 | QORVO_00889844 |
| QORVO_00842607 | QORVO_00843107 | QORVO_00889474 | QORVO_00889849 |
| QORVO_00842616 | QORVO_00843108 | QORVO_00889476 | QORVO_00889853 |
| QORVO_00842622 | QORVO_00843145 | QORVO_00889483 | QORVO_00889947 |
| QORVO_00842628 | QORVO_00843184 | QORVO_00889486 | QORVO_00889952 |
| QORVO_00842634 | QORVO_00843224 | QORVO_00889489 | QORVO_00889957 |
| QORVO_00842644 | QORVO_00843244 | QORVO_00889491 | QORVO_00889960 |
| QORVO_00842649 | QORVO_00843271 | QORVO_00889492 | QORVO_00889974 |
| QORVO_00842659 | QORVO_00843309 | QORVO_00889494 | QORVO_00889978 |
| QORVO_00842668 | QORVO_00843341 | QORVO_00889495 | QORVO_00889987 |
| QORVO_00842675 | QORVO_00843342 | QORVO_00889499 | QORVO_00889991 |
| QORVO_00842691 | QORVO_00843343 | QORVO_00889504 | QORVO_00890004 |
| QORVO_00842697 | QORVO_00843344 | QORVO_00889510 | QORVO_00890030 |
| QORVO_00842711 | QORVO_00843354 | QORVO_00889515 | QORVO_00890036 |
| QORVO_00842716 | QORVO_00843355 | QORVO_00889519 | QORVO_00890057 |
| QORVO_00842724 | QORVO_00843567 | QORVO_00889523 | QORVO_00890081 |
| QORVO_00842726 | QORVO_00843571 | QORVO_00889526 | QORVO_00890095 |
| QORVO_00842728 | QORVO_00843602 | QORVO_00889527 | QORVO_00890104 |
| QORVO_00842730 | QORVO_00843630 | QORVO_00889530 | QORVO_00890108 |
| QORVO_00842734 | QORVO_00843638 | QORVO_00889533 | QORVO_00890111 |
| QORVO_00842736 | QORVO_00843661 | QORVO_00889536 | QORVO_00890116 |
| QORVO_00842743 | QORVO_00843681 | QORVO_00889538 | QORVO_00890122 |
| QORVO_00842750 | QORVO_00843686 | QORVO_00889540 | QORVO_00890518 |
| QORVO_00842752 | QORVO_00843706 | QORVO_00889542 | QORVO_00890539 |
| QORVO_00842757 | QORVO_00843732 | QORVO_00889545 | QORVO_00890540 |
| QORVO_00842761 | QORVO_00843768 | QORVO_00889550 | QORVO_00890611 |
| QORVO_00842766 | QORVO_00843772 | QORVO_00889553 | |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Eric K. Gill
Zachary Alper
Theodore Mayer
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

James C. Wald
Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

November 15, 2023

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiff Qorvo, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 15, 2023, copies of the foregoing were caused to be served upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                    *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

David A. Jakopin, Esquire                        *VIA ELECTRONIC MAIL*
Dianne L. Sweeney, Esquire
Ryan Selness, Esquire
PILLSBURY WINTHROP SHAW PITTMAN LLP
2550 Hanover Street
Palo Alto, CA  94304-1115
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Robert C.F. Pérez, Esquire                       *VIA ELECTRONIC MAIL*
Riccardo Macchiaroli, Esquire
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Boulevard, 14th Floor
McLean, VA  22102-4856
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

David L. Stanton, Esquire                        *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, 36th Floor
Los Angeles, CA  90017-5524
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Theresa A. Roozen, Esquire                       *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC  20036-3006
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Shani Rivaux, Esquire                                    *VIA ELECTRONIC MAIL*
PILLSBURY WINTHROP SHAW PITTMAN LLP
600 Brickell Avenue, Suite 3100
Miami, FL  33131
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Ronald S. Lemieux, Esquire                              *VIA ELECTRONIC MAIL*
David S. Elkins, Esquire
Victoria Q. Smith, Esquire
SQUIRE PATTON BOGGS (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA  94304-1216
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

*/s/ Jeremy A. Tigan*

_____
Jeremy A. Tigan (#5239)

2

# EXHIBIT 8

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4    QORVO, INC.,                    )
                                     )
5            Plaintiff,              )
                                     )
6       vs.                          ) CASE NO. 21-1417-JPM
                                     )
7    AKOUSTIS TECHNOLOGIES, INC.     )
     and AKOUSTIS, INC.,             )
8                                    )
             Defendants.             )
9    _____)

10                  ███████████████

11               ███████████████████

12            █████████████████████████

13

14      VIDEO-RECORDED DEPOSITION OF MICHAEL BOYD,

15      at Regus, 5 Centerpointe Drive, Suite 400,

16      Lake Oswego, Oregon, commencing at 9:15 a.m.

17      PST, on Tuesday, October 31, 2023, before

18      Marla Sharp, RPR, CLR, CCRR, CA CSR 11924,

19      OR CSR 17-0446, WA CSR 3408.

20

21

22

23

24

25

 1      A    Again, I'm not sure in the documents that I
 2  reviewed if -- which of those may have been RFMD or
 3  TriQuint or Qorvo.  So I don't want to say I did or
 4  didn't.  I'm not sure if any of them are specific to
 5  RFMD.
 6      Q    If you wanted to find out about RFMD's
 7  practices for identifying or branding or
 8  safeguarding confidential and proprietary
 9  information, is there anyone at Qorvo you would
10  speak with?
11      A    Yes.
12      Q    Who is that?
13      A    Well, I would probably start with my
14  supervisor, the chief information officer, and then
15  some of the longer-term employees who were part
16  of -- IT employees, potentially, who were RFMD
17  employees prior to the merger.
18      Q    Do you know the names of any RFMD -- former
19  RFMD employees who are still at Qorvo?
20      A    I do.
21      Q    And who -- what are their names?
22      A    Michael Lysse is probably the one that most
23  comes to mind.
24      Q    How do you spell Michael's last name?
25      A    Lima Yankee Sierra Sierra Echo.



Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 220 of 341 PageID #: 27206

1    Q     What do you remember Michael Lychee --

2    A     Lysse.

3    Q     -- Lysse telling you about the procedures

4    at RFMD related to information security?

5    A     I remember him base -- generally describing

6    why we had what tools we had for different

7    information technology, infrastructure, and security

8    solutions that we had.

9    Q     And what tools are those that Michael and

10   you talked about that related to RFMD's

11   infrastructure?

12   A     Device management, network management.  I

13   think those are the only ones that would have been

14   back in the RFMD era prior to the merger.

15   Q     Other than device management and network

16   management systems, are you aware of any other data

17   security technology in use at RFMD?

18   A     No, I'm not.

19   Q     Are you aware of any of the data security

20   practices in place at RFMD other than those related

21   to device management and network management?

22   A     I am not.

23   Q     Do you know anything about TriQuint's

24   policies, procedures, or practices directed to

25   identifying, branding, or safeguarding documents and



1              information in e-mail or SharePoint or

2              OneDrive?)

3              THE WITNESS:  Because we have designated

4    data storage locations for that type of information.

5    BY MR. STANTON:

6       Q    Are those storage locations more secure

7    than the ones that are listed on this slide under

8    "Do Not Save Data Here"?

9       A    No.

10      Q    So OneDrive for Business is as secure as

11   the ITAR file share at Qorvo?

12      A    It's very different, so it's hard to define

13   "more secure" versus "less secure."

14           The driving factor there is the government

15   has not certified OneDrive for Business for

16   government information based on the US residency or

17   citizenship of the people that manage those cloud

18   services.

19      Q    Got it.

20           Mark next in order Exhibit 185 [sic].

21           (Deposition Exhibit 1185 was marked for

22           identification.)

23   BY MR. STANTON:

24      Q    This is a document produced by Qorvo in the

25   case under Bates No. 00842846.  It has a date at the

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 222 of 341 PageID #: 27208

1   top of July 14th, 2023.  It's titled "Using Boldon

2   James Classifier - Data Classification for Windows."

3   And it looks like it has an author, by

4   Michael Lysse, and that it was authored two months

5   prior to the date on the document.

6          Does that -- is that accurate, based upon

7   what you see here, that the document would have been

8   authored in May of 2023?

9      A    I'm sorry.  Where are you seeing May of

10  2023?

11     Q    I'm looking at the date at the top which

12  has the July date.  And then right under the

13  "Authored by Michael Lysse" under the title, then

14  right under there it says "2 months ago."

15     A    I don't -- I'm not sure if this was a --

16  because this is -- this could have been a screen- --

17  I don't know how this was printed.  So this could

18  have been done years ago and it says "2 months ago"

19  in the body of what was captured.

20         And then, when this was extracted and

21  printed in July of this year -- I would not think

22  this was authored two months ago.  It may have been

23  updated two months ago.

24         So I can't say without looking at the

25  electronic record what the document history is.



Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 223 of 341 PageID #: 27209

1      Q     Okay.  Do you know when Qorvo first issued

2   a Knowledge Base article related to the Boldon James

3   Classifier system?

4      A     I do not.

5      Q     Has this Knowledge Base article been

6   published since you have been the chief information

7   security officer?

8            MR. MASTERS:  Object to form.

9            You may answer.

10           THE WITNESS:  I believe this one has been

11   in the Knowledge Base since my arrival at Qorvo.

12   BY MR. STANTON:

13     Q     Okay.  So since your arrival at Qorvo, has

14   the ability to classify Office documents as

15   "Unrestricted," "Private," "Sensitive," or

16   "Critical" been in place?

17     A     Yes.

18     Q     It says in the first full paragraph:

19           "We have made the decision to use

20           the Classifier product from Boldon

21           James."

22           Do you know who made that decision?

23     A     I do not.

24     Q     Do you know when they made that -- when

25   that decision was made?

1                  CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2              I, Marla Sharp, certified shorthand

3      reporter licensed in California, Oregon, and

4      Washington, hereby certify:

5              That the foregoing video-recorded

6      deposition of MICHAEL BOYD was taken before me on

7      October 31, 2023, at the time set forth therein, at

8      which time the witness was duly sworn by me;

9              That the testimony of the witness and all

10     colloquy and objections made at the time of the

11     deposition were recorded stenographically by me and

12     thereafter transcribed, said transcript being a true

13     copy of my shorthand notes thereof;

14             That review of the transcript was neither

15     requested nor waived before completion of the

16     deposition?; ( ) that the witness has failed or

17     refused to approve the transcript.

18             I further certify I am neither financially

19     interested in the action nor a relative or employee

20     of any attorney of any of the parties.

21             In witness whereof, I have subscribed my

22     name and signature this date, November 9, 2023.

23     _____

24     Marla Sharp
       RPR, CLR, CCRR, CA CSR 11924,
25     OR CSR 17-0446, WA CSR 3408

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 22, 2024, copies of the attached

document were served via electronic mail on all counsel of record.


<u>/s/ Ronald P. Golden III</u>
Ronald P. Golden III

**Other Documents**

<u>1:21-cv-01417-JPM Qorvo, Inc. v.
Akoustis Technologies, Inc. et al</u>

PATENT

**U.S. District Court**

**District of Delaware**

**Notice of Electronic Filing**

The following transaction was entered by Golden, Ronald on 3/22/2024 at 5:02 PM EDT and filed on 3/22/2024

| | |
|---|---|
| **Case Name:** | Qorvo, Inc. v. Akoustis Technologies, Inc. et al |
| **Case Number:** | <u>1:21-cv-01417-JPM</u> |
| **Filer:** | Akoustis Technologies, Inc. |
| | Akoustis, Inc. |
| **Document Number:** | <u>519</u> |

**Docket Text:**
**[SEALED] DECLARATION re [518] MOTION in Limine** *Declaration of David S. Elkins* **by Akoustis Technologies, Inc., Akoustis, Inc.. (Attachments: # (1) Exhibit 1, # (2) Exhibit 2, # (3) Exhibit 3, # (4) Exhibit 4, # (5) Exhibit 5, # (6) Exhibit 6, # (7) Exhibit 7, # (8) Exhibit 8, # (9) Certificate of Service)(Golden, Ronald)**

**1:21-cv-01417-JPM Notice has been electronically mailed to:**

Anthony David Raucci    araucci@morrisnichols.com, mnat_IP_eFiling@morrisnichols.com

David S. Elkins    david.elkins@squirepb.com, danni.fontana@squirepb.com

Eric K. Gill    egill@sheppardmullin.com, ksok@sheppardmullin.com

Jack B. Blumenfeld    Jbbefiling@mnat.com, jblumenfeld@mnat.com, mnat_IP_eFiling@morrisnichols.com

Jennifer Klein Ayers    jayers@sheppardmullin.com, 3515833420@filings.docketbird.com

Jeremy A. Tigan    JTigan@morrisnichols.com, jatefiling@mnat.com, mnat_IP_eFiling@morrisnichols.com

Jonathan R. DeFosse    jdefosse@sheppardmullin.com

Matthew A. Stanford    matthew.stanford@squirepb.com

Robert M. Masters    rmasters@sheppardmullin.com, mrpatrick@sheppardmullin.com

Ronald P. Golden , III    rgolden@bayardlaw.com, lfracek@bayardlaw.com, ntalarowski@bayardlaw.com

Ronald S. Lemieux    ronald.lemieux@squirepb.com, SFR_DCKT@squirepb.com

Roy D. Jung    rjung@sheppardmullin.com

Stephen B. Brauerman    sbrauerman@bayardlaw.com, lfracek@bayardlaw.com, ntalarowski@bayardlaw.com,

tdevine@bayardlaw.com

Timothy P. Cremen    tcremen@sheppardmullin.com

Victoria Q. Smith    victoria.smith@squirepb.com, akoustis.caseteam@squirepb.com

Xiaomei Cai    xiaomei.cai@squirepb.com, SFR_DCKT@squirepb.com

Zachary Alper    zalper@sheppardmullin.com

**1:21-cv-01417-JPM Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-0
] [80a1d01b3a866b67392467b52c1dbf546f55142e649e7c55bb6ae7084a9957118fd
b3712d5d9600e9f839898469c5e4909b2df6428b37c555fb9e2a3eaffdb1f]]
**Document description:**Exhibit 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-1
] [c60afaa8fdb85e692b077aefddc5020757e165f0f1ef65cba43b8257447ff0bb279
871ccb609be095d11bae3ba4bf0177d00c1b02dfb981bb326e8293946e870]]
**Document description:**Exhibit 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-2
] [c98d35138dcffe4ffff12c9f4275037eb1d48099861a8513dbb26468f06bc3bf0c3
4fca193c51c5bd79804b4fa50baefd9ac822185198566d68892c8d24b2d43]]
**Document description:**Exhibit 3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-3
] [3e9e9a75f6a9149a2c9c9707d46faaf1bf1d4d3be640b75d917ddd42ea0f176d59f
60d7c93bb3eba0406ca055a94a94e7d6d1c09a84cf50cb437246692627cfe]]
**Document description:**Exhibit 4
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-4
] [8710bdb4afd0f60b081bd0efbea76ae71a37348d7c8faa79b29b98b12783c6225fe
925f8c835b9d6718a87662a946e9c9b65565e0a7d70561a130c6a8d98eb30]]
**Document description:**Exhibit 5
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-5
] [bccc76d8565789ef8dd808a399bc75c63ce0214672ec5c36fc453a8789c6093bb0e
1ca5ba88637d8ebfc2029420e13af9ea5215a42d27b3373d3c3d94243f02c]]
**Document description:**Exhibit 6
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-6

] [6e376be0016b682e451132ba216d83f5db394753fc014c8d6a043e19f0875cdff5c
a9dbec6ebd2383d185850cfc60af0b7f63cf98bbaec14f4baa7cbff407d49]]

**Document description:**Exhibit 7
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-7
] [7c68cd4722ed08196640df4cbd76c5493d77401a4b6d9d469560046bc09439bb4dc
f02e46e11e5842c801fb25b6aa620a8424dde8de2fef9826c43d2db822721]]

**Document description:**Exhibit 8
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-8
] [a34b2067198b33dae7adccc2cd9099d7a06872776828c59930e5dd5f8e95f34eb45
1285fff3a546506d42762a9040efbb7008a0a8de450ed135cde2cb761907f]]

**Document description:**Certificate of Service
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/22/2024] [FileNumber=5499872-9
] [a6c523a4505ce4f1c03e2f5dee29e170c2f4935a9a259cd4653a0efc89526087396
82526222b7cda5d307dede2fe0b5bb5db1d2d795ea04d9a716a624353d6f3]]

# Exhibit F.10

███████████████████████████

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QORVO, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. 21-01417-JPM |
| v. | ) |
| | ) ██████████████████████ |
| AKOUSTIS TECHNOLOGIES, INC. and | ) |
| AKOUSTIS, INC. | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**DECLARATION OF JONATHAN DEFOSSE IN SUPPORT OF PLAINTIFF'S**
**OPPOSITIONS TO DEFENDANTS' MOTIONS *IN LIMINE* NOS. 1-6**

I, Jonathan DeFosse, declare as follows:

1.      I am an attorney at the law firm of Sheppard, Mullin, Richter & Hampton LLP and counsel for Plaintiff in this matter. I am an active member of the Bar for the District of Columbia and admitted *pro hac vice* to practice in the District of Delaware. I make this Declaration based on personal knowledge and would testify competently to the matters herein if called to do so.   I provide this Declaration in support of Plaintiff Qorvo, Inc.'s ("Qorvo") Opposition to Defendants' Akoustis Technologies, Inc.'s and Akoustis, Inc.'s (collectively, "Akoustis") Motions *in Limine* Nos. 1-6 (the "Opposition").

2.      Attached as **Exhibit A** are true and correct copies of relevant excerpts as cited in the Opposition from Expert Report of Kevin Faulkner, served on November 21, 2023.

3.      Attached as **Exhibit B** are true and correct copies of relevant excerpts as cited in the Opposition from the deposition transcript of Michael "David" Hodge, dated November 15, 2022, in the lawsuit *Shen v. Akoustis Techs., Inc*., No. 22-cv-103 (W.D.N.C.).

-1-

4.      Attached as **Exhibit C** are true and correct copies of relevant excerpts as cited in the Opposition from the deposition transcript of Dr. Michael Lebby, dated January 31, 2024.

5.      Attached as **Exhibit D** are true and correct copies of relevant excerpts as cited in the Opposition from the deposition transcript of Mary Winters, dated September 12, 2023.

6.      Attached as **Exhibit E** are true and correct copies of relevant excerpts as cited in the Opposition from the deposition transcript of Joonbum Kwon, dated October 20, 2023.

7.      Attached as **Exhibit F** are true and correct copies of relevant excerpts as cited in the Opposition from the deposition transcript of Dr. Robert Darveaux, dated January 18, 2024.

8.      Attached as **Exhibit G** are true and correct copies of relevant excerpts as cited in the Opposition from the deposition transcript of Michael Boyd, dated October 31, 2023.

9.      Attached as **Exhibit H** are true and correct copies of relevant excerpts as cited in the Opposition from the deposition transcript of Cuyler Robinson, dated January 24, 2024.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 1, 2024.

*/s/ Jonathan R. DeFosse*
Jonathan DeFosse

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| QORVO, INC.,<br><br>        Plaintiff,<br><br>        v.<br><br>AKOUSTIS TECHNOLOGIES, INC., and<br>AKOUSTIS, INC.,<br><br>        Defendants. | Case No. 1:21-01417-JPM |

**<u>EXPERT REPORT OF KEVIN T. FAULKNER</u>**

███████████████████████████████████████████

21.     Notably, Todd Bender and Rama Vetury, former Qorvo employees, retained a total of 105 Microsoft Outlook email container files with each container file storing numerous email messages. The email container files retained by Mr. Bender contained over 800,000 Qorvo email messages (over 320,000 unique Qorvo email messages), with messages ranging in date from 1999 to 2017, totaling 162 GB in size. The email container files retained by Mr. Vetury contained over 300,000 Qorvo email messages (over 175,000 unique Qorvo email messages), with messages ranging in date from 2002 to 2014, totaling 55 GB in size. Also, Mr. Vetury, retained seven dates of computer backups containing all files and data from his Qorvo computer, ranging from May 30, 2014 to January 4, 2015. These backups of his Qorvo computer totaled 279 GB in size.

22.     Akoustis has not produced all data sources that may contain Qorvo Confidential Materials, including, but not limited to, Akoustis computers used at earlier points in time for several custodians were not produced for inspection; the Akoustis computers of Mr. Morgan and Mr. Kwon that Akoustis destroyed were not produced for inspection; numerous removable drives including some that were connected to multiple custodians' computers were not produced for inspection; and a specific removable drive where Mr. Houlden accessed and copied data from a folder named "Qorvo laptop" was not produced for inspection.

███████████████████████████████████████

- Qorvo Confidential Materials on Network Shares.xlsx" for additional details surrounding these records. The same network shares from which Mr. Vetury accessed the Qorvo Confidential Materials were also accessed by at least six other custodians, as can be found by filtering for the same server and shared folders in "Appendix I - Combined USB Detective Timeline.xlsx." Data from these network shares was not produced for inspection under the Forensic Inspection Protocol (D.I. 299).

### E.    Rohan Houlden

#### 1.    Data Sources and Usage Timeframes

60.    For Mr. Houlden, I analyzed two Dell Inspiron laptops (F11545-1-AB1-E001 and F11545-1-AB1-E003), one Dell Latitude laptop (F11545-2-JT5-E015), one Apple iPhone 12 mini mobile device (Unit42-E102), and an export of his Akoustis email account (Unit42-E129).

61.    The hard drive format date, indicating when the computer appears to have been put into use, on Mr. Houlden's Dell Inspiron laptop (F11545-1-AB1-E003) is July 11, 2017, and April 11, 2020, on the Dell Latitude laptop (F11545-2-JT5-E015). Mr. Houlden's other Dell Inspiron laptop (F11545-1-AB1-E001) has a hard drive format date of August 26, 2015, which predates when Mr. Houlden joined Akoustis. My analysis shows that this 2015 date may relate to the IT setup process of the laptop. Analysis of Mr. Houlden's user profile on this computer indicates that

he may have started using his user profile, and therefore began using the computer, on September 19, 2016.

### 2. Qorvo Files Found

62.    I conducted a file name and MD5 hash value search for the Qorvo Confidential Materials across the Approved File Listings/Reports for Mr. Houlden's data set. The search identified a total of 6,303 file records, which represent 852 unique Qorvo Confidential Materials file names and 859 unique MD5 hash values. See "Appendix F - X-Ways Forensic File Listing of Qorvo Confidential Materials.xlsx" for additional details surrounding these file records. Below are a few examples of the paths in which these file records for Qorvo Confidential Materials were located:

     a.  $Recycle.Bin\S-1-5-21-1258258877-2766036129-496988709-1001\$R7H279G.com\Docs_Backup\Engineering\Qorvo pdp docs\

     b.  documents 2\rohan\Must Have\May\

     c.  documents3\rohan\11p filter\

     d.  Users\Rohan\Documents\OneDrive - akoustis.com\Docs_Backup\Engineering\Qorvo pdp docs\

### 3. Access of Qorvo Files

63.    I conducted a file name search across the Approved File Listings/Reports for Mr. Houlden's data set to identify file records associated with

2.     **Qorvo Files Found**

76.    I conducted a file name and MD5 hash value search for the Qorvo Confidential Materials across the Approved File Listings/Reports for Mr. Dry's data set. The search identified a total of 306 file records, which represent 173 Qorvo Confidential Materials file names and 119 unique MD5 hash values. See "Appendix F - X-Ways Forensic File Listing of Qorvo Confidential Materials.xlsx" for additional details surrounding these file records. Below are a few examples of the paths in which these file records for Qorvo Confidential Materials were located:

   a.  Package Suppliers & Technology\CIRTEK Qorvo\

   b.  Package Suppliers & Technology\Corp Slides\

   c.  Users\RobertDry\OneDrive - Akoustis, Inc\Desktop\OLD PC FILES\K&S GGI\Released Documents\AKTS Ops Docs\

   d.  Users\RobertDry\OneDrive - Akoustis, Inc\Desktop\Released Documents\AKTS Ops Docs\

3.     **Access of Qorvo Files**

77.    I conducted a file name search across the Approved File Listings/Reports for Mr. Dry's data set to identify file records associated with access of Qorvo Confidential Materials. The search identified nine unique file records, which represent seven unique file names. See "Appendix N - Axiom Jump

## 2.   Qorvo Files Found

88.    I conducted a file name and MD5 hash value search for the Qorvo Confidential Materials across the Approved File Listings/Reports for Mr. Dyer's data set. The search identified a total of 462 file records, which represent 77 unique Qorvo Confidential Materials file names and 84 unique MD5 hash values. See "Appendix F - X-Ways Forensic File Listing of Qorvo Confidential Materials.xlsx" for additional details surrounding these file records. Below are a few examples of the paths in which these file records for Qorvo Confidential Materials were located:

a.   Users\ddyer\OneDrive - Akoustis, Inc\Desktop\New folder (3)\New folder (2)\test plans\

b.   Users\ddyer.CORP\OneDrive - Akoustis, Inc\Documents\AWR Projects\Data\

c.   Users\ddyer.CORP\OneDrive - Akoustis, Inc\Desktop\New folder (3)\New folder (2)\work\

## 3.   Access of Qorvo Files

89.    I conducted a file name search across the Approved File Listings/Reports for Mr. Dyer's data set to identify file records associated with access of Qorvo Confidential Materials. For Mr. Dyer's two computers, a search of the Axiom Jump List Report identified two unique file records, which represent one unique file name. See "Appendix N - Axiom Jump Lists.xlsx" for additional details

Dated: November 21, 2023

By: _____

Kevin T. Faulkner

# Exhibit B

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                    CHARLOTTE DIVISION
           Civil Action No. 3:22-cv-103-FDW-DCK
3
4    YA "ANNIA" SHEN,                :
                                     :
5                   Plaintiff,       :
                                     :
6            vs.                     :
                                     :
7    AKOUSTIS TECHNOLOGIES,          :
     INC.,                           :
8                                    :
                    Defendant.       :
9
                                        - - -
10
11
            DEPOSITION OF MICHAEL DAVID HODGE, II
12              (Taken by the Defendant)
               Charlotte, North Carolina
13                November 15, 2022
14
15
16
17
18
19
20
21
22
23        Reported by:  Jackie J. Johnson
24                      Court Reporter
25                      Notary Public

```
                                                        Page 2

1                        A P P E A R A N C E S:

2

                    Van Kampen Law, PC
3                   BY:   JOSH VAN KAMPEN, ESQUIRE
                    315 E. Worthington Avenue
4                   Charlotte, North Carolina  28203
                    josh@vankampenlaw.com
5                   Attorney for Plaintiff
6                   Fisher Phillips LLP
                    BY:  DAVID I. KLASS, ESQUIRE
7                   227 West Trade Street
                    Suite 2020
8                   Charlotte, North Carolina  28202
                    dklass@fisherphillips.com
9                   Attorney for Defendant
10

11                  Also Present:  Ya "Annia" Shen (via
12                  Zoom)

13

14

15

16                              - - -

17

18

19

20

21          Deposition of MICHAEL DAVID HODGE, II, taken by
22      the Defendant, at Fisher Phillips, 227 West Trade
23      Street, Charlotte, North Carolina, on the 15th day of
24      November, 2022 at 9:30 a.m., before Jackie J. Johnson,
25      Court Reporter and Notary Public.
```

Page 4

```
 1                      P R O C E E D I N G S

 2                      Whereupon,

 3                      MICHAEL DAVID HODGE, II

 4                      having been duly sworn,

 5               was examined and testified as follows:

 6               EXAMINATION BY COUNSEL FOR THE DEFENDANT

 7      BY MR. KLASS:

 8         Q.  Good morning.  Can you please state your name for

 9      the Record?

10         A.  It's Michael David Hodge, II.

11         Q.  And do you go by David?

12         A.  I go by Dave.

13         Q.  Do you mind if I call you Dave?

14         A.  You can call me Michael, David or Dave is fine.

15      I respond to all of them.

16         Q.  Okay.  Have you ever had your deposition taken

17      before?

18         A.  I have not.

19         Q.  Do you understand that you're now under oath?

20         A.  I do.

21         Q.  So you now have an obligation to tell the truth?

22         A.  That's right.

23         Q.  This is an informal setting.  We're in a

24      conference room in my firm's office, but you're still

25      under oath, and there's no jury or judge present, but
```

Michael David Hodge , II                November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 7

1          A.  I don't have any condition like that.

2          Q.  Are you currently under the influence of alcohol

3     or drugs?

4          A.  Just caffeine.

5          Q.  Have you gone by any other names?

6          A.  No.

7          Q.  Where were you born?

8          A.  I was born in Gastonia, North Carolina.

9          Q.  And what is your current address?

10         A.  ████████████████████████████████████████

11    ██    ████████ .

12         Q.  Does anyone live there with you?

13         A.  Yes.

14         Q.  Who?

15         A.  Annia.

16         Q.  And that would be Annia Shen, the Plaintiff, in

17    this case?

18         A.  Yes, that's correct.

19         Q.  How long have you lived at that address?

20         A.  Should be two years.

21         Q.  Where did you live prior?

22         A.  I lived in -- you want the full address?

23         Q.  Yes.

24         A.  Would be ███████████████████████████████

██         ██████████████████

Page 231

1              at Akoustis, to have reservations about a candidate

2              because of concerns about their ethics?

3                          MR. KLASS:  Object to form.

4                          THE WITNESS:  So generally, my experience is

5                  that no one brings this up, because everybody expects

6                  everything to be above board.

7                          But the only thing I will say.  You phrased

8                  it in terms of managers at Akoustis.  So Rohan bought

9                  Qorvo IP whenever he left Akoustis and shared that

10                 with the Engineering Team.  So he apparently was okay

11                 with taking IP from a former employer, former

12                 company, and distributing it to engineers.

13                         So that's one reason why Rohan may not have

14                 seen an issue with what Saurabh did, because he's

15                 done it himself.  He did it at Akoustis, and he did

16                 it previously at his former employer, Rockwell

17                 Collins.

18                         He told me one time when we were having

19                 lunch together about Skyworks or Rockwell Collins.  I

20                 can't remember if it was Skyworks or Rockwell

21                 Collins.  I think it was Skyworks suing Rockwell

22                 Collins.  He went from one to the other.  He was

23                 deposed for stealing IP, and there was some legal

24                 case about that that got resolved.

25          BY MR. VAN KAMPEN:

Michael David Hodge, II          November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 232

1      Q.   Let's break it into pieces.

2      A.   I'm sorry.  Yeah.

3      Q.   You said that turned quickly.

4           What was the company, Collins?

5      A.   Rockwell Collins was a company, and then Skyworks

6      is another company.  Rohan went from one to the other in

7      Iowa, and he was accused of stealing IP from one of the

8      companies going to the other.  I think it was Skyworks.

9      Q.   Now, what knowledge are you basing that testimony

10     on?

11     A.   Rohan telling me about it over lunch.

12     Q.   And this was while you were both working at

13     Akoustis?

14     A.   Yeah.  We had lunch meetings where we would

15     discuss things, and he was telling me about his

16     experience he had at one time.

17     Q.   Do you recall whether or not that was fairly

18     early in your employment with Akoustis or more recent?

19     A.   It was probably early in his employment.  He came

20     after that, almost a year later, right.  So it was

21     probably -- if I had to guess, it was probably 2017-2018

22     time frame.

23     Q.   All right.  Now, same topic, but then you

24     testified about a second piece where you said Mr.

25     Houlden had taken IP technology from -- was that

Michael David Hodge , II                    November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 233

1      Qualcomm or no?

2          A.   Qorvo.

3          Q.   It was Qorvo.

4               How do you know that?  What is the basis for your

5      testimony?

6          A.   He gave me three presentations within the first

7      couple of weeks of starting on a prototype WI-FI filter

8      that Qorvo was developing, similar to the WI-FI 6.  It

9      detailed the design details of the filter packaging,

10     simulations, performance, foundry metrics, so like

11     frequencies, trim targets.  Then there was another slide

12     where it had the packaging details.

13              Then there was another presentation that he gave

14     me that was talking about shapes of the resonators, how

15     they changed the performance of the filter, what's good,

16     what's bad, you know, the tradeoffs for each design.  It

17     was three presentations.  It's about 50 pages, just

18     under 50 pages of documentation.

19              Then he also gave to an employee we had at the

20     time, David Dyer, he gave him a power point packet from

21     Qorvo that detailed their evaluation boards, their

22     ███████████████████████, and then he asked David to

23     redesign those boards to match the Qorvo ones for

24     Akoustis and go ahead and use those drawings and try to

25     go ahead and order that ██████████████████.

Michael David Hodge , II                     November 15, 2022
Shen, Ya "Annia" v. Akoustis Technologies, Inc.

Page 282

1                      CERTIFICATE OF REPORTER

2

3        STATE OF NORTH CAROLINA   )

4

5        COUNTY OF GASTON          )

6

7                    I, JACKIE J. JOHNSON, the official

8        before whom the foregoing deposition was taken,

9        according to the emergency video notarization

10       requirements contained in G.S. 10B-25, do hereby certify

11       that the witness whose testimony appears in the

12       foregoing deposition was duly sworn by me; that the

13       testimony of said witness was taken by me to the best of

14       my ability and thereafter reduced to typewriting under

15       my direction; that I am neither counsel for nor employed

16       by any of the parties to the action in which this

17       deposition was taken, and further, that I am not a

18       relative or employee of any attorney or counsel employed

19       by the parties thereto, nor financially or otherwise

20       interested in the outcome of the action.

21

22

23                    JACKIE J. JOHNSON

24

25                    MY COMMISSION EXPIRES:  August 30, 2026

# Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4   QORVO, INC.,                    )
                                     )
 5           Plaintiff,              )
                                     )
 6       VS.                         )   NO. 21-1417 JPM
                                     )
 7   AKOUSTIS TECHNOLOGIES, INC.,    )
     AKOUSTIS, INC.,                 )
 8                                   )
             Defendants.             )
 9   _____)

10

11

12

13

14   ███████████████████████████████████████████

15           ██████████████████████████████

16             IN-PERSON DEPOSITION OF
                  DR. MICHAEL LEBBY
17          WEDNESDAY, JANUARY 31, 2024

18

19

20

21

22

23

24   STENOGRAPHIC REPORTER:  CHRISTA YAN, CSR NO. 14316, RPR
                                              _____
25
```

1      BE IT REMEMBERED that on WEDNESDAY, the 31ST DAY OF

2    JANUARY, 2024, at the hour of 9:02 a.m., Pacific Standard

3    Time, of said day, at Four Embarcadero Center, 17th Floor,

4     San Francisco, California 94111, before me personally,

5     CHRISTA YAN, a Certified Shorthand Reporter, State of

6    California, personally appeared DR. MICHAEL LEBBY, who was

7    examined as a witness in said cause; that said transcript

8    format was prepared in accordance with California Code of

9                    Regulations Section 2473.

10                          --oOo--

11                    DR. MICHAEL LEBBY,

12    the Witness, called on behalf of the Defendant, being duly

13    sworn to state the truth, the whole truth, and nothing but

14          the truth, testified on oath as follows:

15                         EXAMINATION

16    BY MR. DEFOSSE:

17      Q    Good morning, Dr. Lebby.  Thank you for being

18    here with us today.  How many times have you testified in

19    any type of litigation previously?

20      A    When you mean testified are you looking for

21    testified at trial or just depositions or both?

22      Q    Let's start with depositions.  How many times

23    have you been deposed?

24      A    At least 60 times.

25      Q    Okay.  And how many times have you testified at

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                                192

1    Kim is an Akoustis employee, I presume?

2        Q    Yeah, so SJ Kim is, if you look at the page 3 of

3    3 of Exhibit 530, it states that he's the country manager

4    sales director for Akoustis.

5        A    I do see that.

6        Q    Okay.  What I'm interested in is on page 203,

7    there's a postscript.  It says, PS, do me a favor, that

8    you can accept my expense claim of entertainment with

9    ███████/Qorvo/███████ without the name of the persons.

10   Just put the name of the company.  The reason is that the

11   guys share those key confidential information with me

12   based on personal relationship, but they are so sensitive

13   with knowing their name with anyone in Akoustis.

14            Do you see that?

15       A    I do see that.

16       Q    And you reviewed this as part of your -- as part

17   of forming your opinions in this case?

18       A    I did use this document, which is Exhibit 530, to

19   form part of my opinions in this case.  That is correct.

20       Q    Is it your opinion that Mr. Kim's use of expenses

21   to obtain key confidential information was a common

22   competitive intelligence gathering technique in the

23   industry?

24       MS. SMITH:  Objection; vague.

25       THE WITNESS:  So as I've just indicated on record, and

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                                    193

1    I've indicated in at least my expert report on paragraphs
2    97 to 112, that when I work with Asia in general, with any
3    information that goes outside of our four walls to Asia, I
4    have to prepare myself to know that information could leak
5    and could become public.  So the level of information I
6    utilize when I work with Asia is a lot more critically
7    reviewed than it is when I work with companies, for
8    example, in Europe and America in general.
9            Having said that, I do expect employees to adhere
10   to ethical procedures when doing expense claims.  And so
11   this indicates to me that this person is not filling out
12   the expense form as one would expect a normal employee to
13   do.  So for -- certainly, from my personal standpoint,
14   that would make me uncomfortable because this person is
15   not filling out forms correctly, on one hand.
16           On the other hand, I don't know if in the
17   discussion of the entertainment with the people that SJ
18   Kim went out with, actual confidential information was
19   conveyed or not.  So I actually don't know if this is a
20   common competitive intelligence gathering procedure.
21   Certainly, I would not put up with it in my company, and
22   certainly, when I look for information on competitors, in
23   this case, you know, Qualcomm, Samsung, and different
24   types of players with acoustic filters, I would go up to
25   normal market research companies and purchase those

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                              194

1    reports.

2          But this is clearly somebody who doesn't want to

3    fill an expense form correctly, and in my company, that

4    person wouldn't last.

5    BY MR. DEFOSSE:

6    Q    So is your problem with SJ Kim's statement that

7    he's not filling out expense forms correctly?  Or that

8    he's saying that he's using his expense report to obtain

9    key confidential information about competitors?

10   MS. SMITH:  Objection; vague, misquotes the document.

11   THE WITNESS:  As I've just indicated in the last

12   answer, so, you know, if this answer gets used in trial, I

13   would ask you to review my previous answer as part of the

14   complete answer.  But certainly, expense forms are not

15   being filled out correctly.  And I don't know whether

16   information that was confidential was conveyed or not.

17         That doesn't seem to me that there was any

18   details of any confidential information that was conveyed

19   in this entertainment.  So I actually don't know.  All I

20   know is that when I look for competitive information, I'll

21   go purchase the market research reports on one hand.

22         On the other hand, when I work with Asia, the

23   natural assumption is that any information leaving the

24   four walls of our facility could be subject to being given

25   to competitors, could be subject to public information.

1   And so we have to scrutinize that information with a

2   higher level of scrutiny than we do when we're working

3   with European and North American companies.

4   BY MR. DEFOSSE:

5        Q    I want to make sure we're looking at the same

6   portion of Exhibit 530.  You see the sentence where SJ Kim

7   says, The reason is that the guys share those key

8   confidential information with me based on personal

9   relationship.  But they are so sensitive with knowing

10  their name with anyone in Akoustis.

11            Did you interpret that sentence of Exhibit 530 as

12  meaning something other than that Mr. Kim's contacts were

13  sharing key confidential information with him?

14       MS. SMITH:  Objection; calls for speculation.

15       THE WITNESS:  I have no idea what this key

16  confidential information could be.  What I do know is when

17  you go out to dinners in Asia, you know, and there's a

18  bunch of men talking about stuff, they share information

19  that is confidential that has nothing whatever to do with

20  the business they're in.

21            It could be which prostitute they had sex with

22  the night before.  That's key confidential information.

23  You don't want that information going through other

24  employees in companies.  So I don't know.  It doesn't say

25  what the confidential information is in Exhibit 530.  And

1   so how can I make a categorical answer to your question

2   when I have no idea what it is in the first place, number

3   one.

4          Number two, I have no idea what the discussion

5   was taking place between these people from the companies

6   he had entertainment with, has no idea what the

7   entertainment is.  I don't know if that's a meal or that's

8   taking them to a normal prostitute place which happens

9   quite regularly in Asia.  And thirdly, whenever you do

10  business with Asia, always assume information will leak

11  out.

12         And so I always take precautions that if I'm

13  working with Asia in general, I scrutinize the information

14  that leaves the company.  And lastly, it looks like the

15  expense reports have not been filled out correctly.  And

16  that's probably -- doesn't align with the procedures I

17  have, and I don't know what the procedures are in

18  Akoustis.

19         But that doesn't feel good in my eyes.

20  BY MR. DEFOSSE:

21     Q    Okay.  I'm handing you what's been marked

22  previously as Exhibit 531.  This is a one-page document

23  that's got the production number AKTS_00496841 on the

24  first page.

25         Dr. Lebby, do you recall reviewing as part of

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                              197

1    your analysis in this case a series of emails from SJ Kim

2    to Dave Aichele and Colin Hunt attaching zip files of

3    confidential Qorvo information?

4        A    I certainly reviewed all the documents that were

5    pretended to me in this litigation.  I don't recall all

6    the details because there's thousands of documents.  But I

7    did look at all the documents.  And I'm reasonably

8    confident that Exhibit 531 is one document that I did

9    review.  But I don't recall any details.

10       Q    Okay.  Exhibit 531 is an email from Mr. Kim to

11   Mr. Aichele and Mr. Hunt dated August 7th, 2020; is that

12   right?

13       A    That is my understanding.  That is correct.

14       Q    And you see it attached as a zip file?

15       A    I see in Exhibit 531 a zip file is attached to

16   this email.

17       Q    Okay.  And then Mr. Kim writes in the body of his

18   email, Please don't ask me where did I get from.  Because

19   of size of attachment, I will send total three emails.

20   Frankly, I always use my expense for right purpose.  Do

21   you see that?

22       A    I do see that.

23       Q    Would you say that Mr. Kim's forwarding of a zip

24   file that he got by using his expense for the right

25   purpose is a common competitive intelligence gathering

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                              198

1    technique in the industry?

2        MS. SMITH:  Objection; vague.

3        THE WITNESS:  I have no idea of what the zip file

4    contains here.  I have no idea what the right purpose as

5    far as expenses were.  I mean, he could be doing elicit

6    activities in terms of, you know, going to prostitution

7    houses for all I know.  There's no detail in this email.

8    BY MR. DEFOSSE:

9        Q    I guess I'm confused by that answer.  Are you

10   suggesting that Mr. Kim found Qorvo's confidential

11   information at a prostitution house?

12       A    I'm not suggesting anything of the kind.

13       Q    Are you suggesting that he was using his expense

14   report to buy prostitutes for Qorvo employees in order to

15   get their confidential information?

16       MS. SMITH:  Objection; misstates prior testimony.

17       THE WITNESS:  That completely misstates what I was

18   trying to say.

19   BY MR. DEFOSSE:

20       Q    Well, I'm asking you what you're trying to say

21   because you keep mentioning prostitutes and prostitution.

22   And I don't know how that fits with Exhibit 531 when

23   Mr. Kim says, I always use my expense for the right

24   purpose, while he's forwarding a zip file full of Qorvo

25   confidential information.

Transcript of Dr. Michael Lebby
Conducted on January 31, 2024                                    247

```
 1                    REPORTER'S CERTIFICATE

 2

 3       I, Christa Yan, CSR No. 14316, do hereby declare:

 4       That, prior to being examined, the witness named in
     the foregoing proceeding was by me duly sworn pursuant to
 5   Section 30(f)(1) of the Federal Rules of Civil Procedure,
     and the proceeding is a true record of the testimony given
 6   by the witness as accurately as possible.  That said
     proceeding was taken down by me stenographically at the
 7   time therein named and thereafter reduced to text under my
     direction.
 8
         ____   That said witness was requested to review the
 9   transcript and make any changes to the transcript as a
     result of that review pursuant to Section 30(e) of the
10   Federal Rules of Civil Procedure.
         ____   No changes have been provided by the witness
11   during the period allowed.
                The changes made by the witness are appended to
12   the transcript.
         ____   No request was made that the transcript be
13   reviewed pursuant to Section 30(e) of the Federal Rules of
     Civil Procedure.
14
         I further declare that I have no interest in the event
15   of the action.  I declare under penalty of perjury under
     the laws of the United States of America that the
16   foregoing is true and correct.

17       WITNESS my hand this 5th day of February 2024.

18

19

20

21   _____
     Christa Yan, CSR NO. 14316
22

23

24

25
```

# Exhibit D

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3   - - - - - - - - - - - - -x

4   QORVO, INC.,                    :

5            Plaintiff,             :

6      v.                          :    Civil Action No.

7   AKOUSTIS TECHNOLOGIES, INC.  :    21-1417-JPM

8   AND AKOUSTIS, INC.,            :

9            Defendants.            :

10  - - - - - - - - - - - - - -x

11

12  ████████████████████████████

13

14      Videotaped Deposition of MARY WINTERS

15          Regus Business Center

16        Charlotte, North Carolina

17        Tuesday, September 12, 2023

18              9:15 a.m.

19

20  Job No.:  505391

21  Pages:  1 - 144

22  Reported By:  Cindy A. Hayden, RMR, CRR

23

24

25

Transcript of Mary Winters
Conducted on September 12, 2023                    10

| | | |
|---|---|---|
| 1 | general counsel from Akoustis. | 09:17:10 |
| 2 | THE VIDEOGRAPHER:  The court reporter | 09:17:11 |
| 3 | today is Cindy Hayden representing Planet Depos. | 09:17:12 |
| 4 | The witness will now be sworn. | 09:17:15 |
| 5 | * * * | |
| 6 | MARY WINTERS, | |
| 7 | having been first duly sworn, was examined and | |
| 8 | testified as follows: | |
| 9 | * * * | |
| 10 | EXAMINATION | |
| 11 | BY MR. CREMEN: | 09:17:28 |
| 12 | Q.   Good morning.  Could you state your | 09:17:28 |
| 13 | name for the record? | 09:17:30 |
| 14 | A.   Mary Winters. | 09:17:30 |
| 15 | Q.   And, Ms. Winters, have you ever been | 09:17:32 |
| 16 | deposed before? | 09:17:34 |
| 17 | A.   Yes. | 09:17:35 |
| 18 | Q.   How many times? | 09:17:35 |
| 19 | A.   Once. | 09:17:36 |
| 20 | Q.   And just what was -- just a brief | 09:17:41 |
| 21 | description of the matter? | 09:17:41 |
| 22 | A.   It was a HR matter with an employee. | 09:17:41 |
| 23 | Q.   With Akoustis? | 09:17:43 |
| 24 | A.   Yes. | 09:17:44 |
| 25 | Q.   Okay.  So you might remember from -- | 09:17:47 |

Transcript of Mary Winters
Conducted on September 12, 2023                        63

| | | |
|---|---|---|
| 1 | would be.  I'm just trying to remember.  We've | 10:28:45 |
| 2 | evolved a lot in the last six years. | 10:28:53 |
| 3 | Q.   So he -- so you mentioned two things. | 10:28:55 |
| 4 | So he -- | 10:28:57 |
| 5 | A.   Yep. | 10:28:57 |
| 6 | Q.   -- identified equipment that you could | 10:28:58 |
| 7 | use for trimming; is that true? | 10:28:59 |
| 8 | A.   Yes.  So as we transitioned from R&D to | 10:29:01 |
| 9 | manufacturing -- this goes across the entire fab -- | 10:29:05 |
| 10 | so one of the responsibilities from our process | 10:29:07 |
| 11 | engineering standpoint is to be able to identify | 10:29:11 |
| 12 | equipment from research to manufacturing. | 10:29:13 |
| 13 | Q.   Now, you mentioned transitioning from | 10:29:16 |
| 14 | R&D to -- | 10:29:19 |
| 15 | A.   Manufacturing. | 10:29:21 |
| 16 | Q.   -- manufacturing? | 10:29:22 |
| 17 | A.   Uh-huh. | 10:29:22 |
| 18 | Q.   When did that transition occur? | 10:29:23 |
| 19 | A.   So it was occurring from 2017 until | 10:29:25 |
| 20 | even today, that part. | 10:29:30 |
| 21 | Q.   And then did Mr. Kwon provide input on | 10:29:32 |
| 22 | specific trimming process steps? | 10:29:49 |
| 23 | A.   Yes. | 10:29:52 |
| 24 | Q.   What kind of input? | 10:29:53 |
| 25 | A.   That's hard for me to recall, just -- I | 10:29:54 |

Transcript of Mary Winters
Conducted on September 12, 2023                          64

| | | |
|---|---|---|
| 1 | mean, it's -- I'm assuming as a process engineer, | 10:30:00 |
| 2 | you know, process parameters, you know, from that | 10:30:04 |
| 3 | standpoint for that part. | 10:30:06 |
| 4 | Q. Was he responsible for setting up the | 10:30:09 |
| 5 | trim operations for Akoustis's products? | 10:30:14 |
| 6 | A. The trim in terms of the process sides, | 10:30:18 |
| 7 | the actual trimming, yes, yeah. I imagine there's | 10:30:21 |
| 8 | a lot to trim than just the actual process. | 10:30:25 |
| 9 | Q. What else is involved? | 10:30:31 |
| 10 | A. For trimming? So if it's an individual | 10:30:34 |
| 11 | layer, there's the -- the processing for actual | 10:30:40 |
| 12 | trimming, but there's the input, so the metrology | 10:30:44 |
| 13 | associated with it, to be able to give a map that | 10:30:49 |
| 14 | goes back into the trimmer to be able to trim. | 10:30:51 |
| 15 | There's a software that's needed to be able to do | 10:30:54 |
| 16 | that also. | 10:30:56 |
| 17 | As you get into Trim Work Center, | 10:30:57 |
| 18 | there's the probing of the, you know, filters, and | 10:30:59 |
| 19 | then feeding that information back into the Scia | 10:31:04 |
| 20 | tool to be able to know what to actually trim, to | 10:31:08 |
| 21 | where to trim. | 10:31:12 |
| 22 | Q. What is a map? You mentioned a map. | 10:31:13 |
| 23 | A. So you're actually -- so if you look at | 10:31:16 |
| 24 | the wafer and how it's built -- I talked about | 10:31:20 |
| 25 | process control monitoring, or you'll hear the word | 10:31:23 |

Transcript of Mary Winters
Conducted on September 12, 2023                    144

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2

3           I, CINDY A. HAYDEN, RMR-CRR, the

4    officer before whom the foregoing deposition was

5    taken, do hereby certify that the foregoing

6    transcript is a true and correct record of the

7    testimony given; that said testimony was taken by

8    me stenographically and thereafter reduced to

9    typewriting under my direction; that reading and

10   signing was requested; and that I am neither

11   counsel for, related to, nor employed by any of the

12   parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14           IN WITNESS WHEREOF, I have hereunto set

15   my hand this 20th day of September 2023.

16   My commission expires April 7, 2027.

17

18

19

20

21   _____

22       NOTARY PUBLIC IN AND FOR

23       THE STATE OF NORTH CAROLINA

24

25

# Exhibit E

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3     - - - - - - - - - - - - x

4   QORVO, INC.,                :

5           Plaintiff,          :

6     v.                        : C.A. No. 21-1417-JPM

7   AKOUSTIS TECHNOLOGIES,      :

8   INC. and AKOUSTIS, INC.,    :

9           Defendants.         :

10    - - - - - - - - - - - - x

11

12

13   ████████████████████████

14

15

16    Videotaped Deposition of JOONBUM KWON, Ph.D.

17              Fulton, Maryland

18          Friday, October 20, 2023

19               9:17 a.m.

20

21

22

23   Job No. 511747

24   Pages:  1 - 175

25   Reported by:  Janet A. Hamilton, RDR

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023                          9

```
 1    today is Jan Hamilton representing Planet Depos.        09:17:48

 2    The witness and interpreters will now be sworn.        09:17:52

 3          (The Lead Interpreter, Ms. Kyongsook Kim,

 4    and Check Interpreter, Ms. Yousun Choi, were

 5    administered the oath.)

 6                        -----

 7          (Oath administered to the witness through

 8    Lead Interpreter Kim)

 9          THE WITNESS:  I do.                              09:18:44

10          THE REPORTER:  Thank you.                        09:18:45

11          THE VIDEOGRAPHER:  You may proceed.              09:18:51

12                        -----

13               JOONBUM KWON, Ph.D.,                        09:16:38

14    a witness herein, being duly sworn, testified in

15    English as follows:

16          EXAMINATION BY COUNSEL FOR PLAINTIFF

17    BY MR. JUNG:

18      Q   Good morning.                                   09:18:53

19      A   Good morning.                                   09:18:54

20      Q   As you have heard, my name is Roy Jung.         09:18:54

21    I'm one of the attorneys representing Qorvo, Inc.      09:18:57

22    in this matter.                                        09:18:59

23          Could you state your name for the record?       09:19:00

24      A   My name is Joonbum Kwon.                        09:19:02

25      Q   Have you ever been deposed before?             09:19:04
```

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023                    35

| | | |
|---|---|---|
| 1 | Q   Was that -- was senior process engineer | 10:03:46 |
| 2 | the first position you held at Akoustis? | 10:03:51 |
| 3 | A   Typically process engineer is -- the main | 10:04:02 |
| 4 | one is to develop or sustain the process.  They | 10:04:08 |
| 5 | gave me the senior position because I work in five | 10:04:19 |
| 6 | years in TriQuint/Qorvo, and also I have a Ph.D. | 10:04:24 |
| 7 | degree and MEMS background.  That's why. | 10:04:31 |
| 8 | Q   When you joined Akoustis, how many | 10:04:34 |
| 9 | employees were in the -- in -- | 10:04:37 |
| 10 | A   I don't remember. | 10:04:41 |
| 11 | Q   How many employees were in New York? | 10:04:42 |
| 12 | A   I don't remember. | 10:04:45 |
| 13 | Q   When you joined Akoustis, how many senior | 10:04:47 |
| 14 | process engineers were in New York? | 10:04:54 |
| 15 | A   I don't remember. | 10:04:58 |
| 16 | Q   Did any other -- did any other process | 10:05:01 |
| 17 | engineer have experience in BAW resonators? | 10:05:03 |
| 18 | A   I don't remember. | 10:05:08 |
| 19 | Q   Did any other process engineer have | 10:05:09 |
| 20 | experience with BAW filters? | 10:05:11 |
| 21 | A   I don't remember. | 10:05:14 |
| 22 | Q   Did any other process engineer have | 10:05:18 |
| 23 | experience with trim process? | 10:05:21 |
| 24 | A   I don't remember. | 10:05:25 |
| 25 | Q   What was the state of Akoustis's trim | 10:05:28 |

| | | |
|---|---|---|
| 1 | process when you were hired? | 10:05:31 |
| 2 | MR. MACCHIAROLI:  Objection, calls for | 10:05:33 |
| 3 | speculation. | 10:05:46 |
| 4 | A  I don't remember. | 10:05:46 |
| 5 | Q  Did Akoustis have an established trim | 10:05:48 |
| 6 | process when you joined Akoustis? | 10:05:52 |
| 7 | A  I don't remember. | 10:05:56 |
| 8 | Q  When you joined Akoustis, who was working | 10:06:10 |
| 9 | on the design? | 10:06:13 |
| 10 | MR. MACCHIAROLI:  Objection, vague. | 10:06:15 |
| 11 | A  I don't remember. | 10:06:20 |
| 12 | Q  Manufacturing? | 10:06:21 |
| 13 | A  I don't remember. | 10:06:24 |
| 14 | Q  Testing? | 10:06:26 |
| 15 | A  I don't remember. | 10:06:28 |
| 16 | Q  Trimming? | 10:06:28 |
| 17 | A  I don't remember. | 10:06:32 |
| 18 | Q  Qualifications? | 10:06:33 |
| 19 | A  I don't remember. | 10:06:35 |
| 20 | Q  Did Akoustis have a commercial product | 10:06:39 |
| 21 | when you were hired? | 10:06:42 |
| 22 | A  I don't remember. | 10:06:46 |
| 23 | Q  Was Akoustis trying to sell a product when | 10:06:49 |
| 24 | you were hired? | 10:06:52 |
| 25 | A  I don't remember. | 10:06:55 |

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023                              37

| | | |
|---|---|---|
| 1 | Q  Was Akoustis developing a product at the | 10:06:57 |
| 2 | time you were hired? | 10:07:00 |
| 3 | A  I don't remember. | 10:07:07 |
| 4 | Q  Did Akoustis have a functional resonator | 10:07:09 |
| 5 | when you were hired? | 10:07:12 |
| 6 | A  I don't remember. | 10:07:15 |
| 7 | Q  Do you remember anything about Akoustis's | 10:07:21 |
| 8 | business when you were hired? | 10:07:35 |
| 9 | A  No, I don't remember. | 10:07:38 |
| 10 | Q  Did Akoustis have a functional filter | 10:07:40 |
| 11 | design when you were hired? | 10:07:43 |
| 12 | A  I don't remember. | 10:07:46 |
| 13 | Q  When was -- when did Akoustis make the | 10:07:48 |
| 14 | first functional resonator design? | 10:07:53 |
| 15 | A  I don't remember. | 10:07:56 |
| 16 | Q  When did Akoustis make the first | 10:07:58 |
| 17 | functional filter design? | 10:07:59 |
| 18 | A  I don't remember. | 10:08:02 |
| 19 | Q  What was Akoustis's first commercial | 10:08:03 |
| 20 | product? | 10:08:06 |
| 21 | A  I don't remember. | 10:08:09 |
| 22 | Q  During your time at Akoustis, did Akoustis | 10:08:11 |
| 23 | have a single crystal design? | 10:08:13 |
| 24 | A  I don't remember. | 10:08:18 |
| 25 | Q  What was the first filter fabrication | 10:08:24 |

| | | |
|---|---|---|
| 1 | process at Akoustis? | 10:08:31 |
| 2 | MR. MACCHIAROLI:  Objection, vague. | 10:08:34 |
| 3 | A  I don't remember. | 10:08:37 |
| 4 | Q  What things did you do on a day-to-day | 10:08:39 |
| 5 | basis as a senior process engineer? | 10:08:58 |
| 6 | A  It -- it was similar to what I'd done at | 10:09:06 |
| 7 | Qorvo, try to maintain, sustain process, keep | 10:09:15 |
| 8 | monitoring process parameters to see, yeah. | 10:09:19 |
| 9 | Q  Who did you work on -- who did you work | 10:09:27 |
| 10 | with on a daily basis? | 10:09:30 |
| 11 | A  I don't remember. | 10:09:38 |
| 12 | Q  Who did you generally work with? | 10:09:41 |
| 13 | A  I don't remember. | 10:09:48 |
| 14 | Q  What does develop trim process mean? | 10:09:51 |
| 15 | A  We -- we have to optimize trim process, | 10:10:05 |
| 16 | its parameters, to implement required frequence | 10:10:20 |
| 17 | bands range based on customer requirements. | 10:10:31 |
| 18 | Q  Does Akoustis trim its BAW filters? | 10:10:36 |
| 19 | A  Yes. | 10:10:42 |
| 20 | Q  Does Akoustis trim all of its BAW filters? | 10:10:46 |
| 21 | MR. MACCHIAROLI:  Objection, calls for | 10:10:51 |
| 22 | speculation, vague. | 10:10:53 |
| 23 | A  I don't know.  I don't remember. | 10:10:57 |
| 24 | Q  How does Akoustis trim its BAW filters? | 10:11:02 |
| 25 | MR. MACCHIAROLI:  Calls for speculation. | 10:11:16 |

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023                    39

| | | |
|---|---|---|
| 1 | A  I don't remember. | 10:11:21 |
| 2 | Q  On a day-to-day basis, have you performed | 10:11:33 |
| 3 | trimming on a BAW filter? | 10:11:37 |
| 4 | A  Yes, I did. | 10:11:42 |
| 5 | Q  Could you explain your role from the | 10:11:44 |
| 6 | beginning? | 10:11:48 |
| 7 | A  I work on developing and optimize the trim | 10:11:55 |
| 8 | process. | 10:12:02 |
| 9 | Q  What does the optimize the trim process | 10:12:04 |
| 10 | mean? | 10:12:07 |
| 11 | A  Try to make it to implement desired trim | 10:12:11 |
| 12 | amount from the wafers and to look at if there are | 10:12:22 |
| 13 | any defect on the wafers after trimming. | 10:12:32 |
| 14 | Q  When you joined Akoustis, has Akoustis | 10:12:37 |
| 15 | trimmed a single BAW filter? | 10:12:42 |
| 16 | A  I don't remember. | 10:12:44 |
| 17 | Q  Any barricades or difficulties you faced | 10:12:51 |
| 18 | while trying to optimize the trim process? | 10:12:54 |
| 19 | A  I don't remember. | 10:12:57 |
| 20 | Q  What does desired trim amount mean? | 10:13:03 |
| 21 | A  As I say, if you cannot make desired trim | 10:13:11 |
| 22 | amount, that means we cannot make desired | 10:13:15 |
| 23 | frequence range, frequence bands. | 10:13:20 |
| 24 | Q  What would cause -- strike that. | 10:13:23 |
| 25 | Did Akoustis face difficulty to meet the | 10:14:08 |

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023

40

| | | |
|---|---|---|
| 1 | desired trim amount? | 10:14:11 |
| 2 | A  I don't remember. | 10:14:13 |
| 3 | Q  Did Akoustis face difficulty to meet | 10:14:24 |
| 4 | desired frequency range? | 10:14:33 |
| 5 | A  I don't remember. | 10:14:34 |
| 6 | Q  When you were employed as a senior process | 10:14:36 |
| 7 | engineer, was there anyone else working on | 10:14:39 |
| 8 | trimming? | 10:14:42 |
| 9 | A  I don't remember. | 10:14:43 |
| 10 | Q  Was there a process for trimming when you | 10:14:44 |
| 11 | joined Akoustis? | 10:14:48 |
| 12 | MR. MACCHIAROLI:  Objection, asked and | 10:14:53 |
| 13 | answered. | 10:14:56 |
| 14 | A  I don't remember. | 10:14:56 |
| 15 | Q  When you left Akoustis, did Akoustis have | 10:15:19 |
| 16 | an established trim process? | 10:15:22 |
| 17 | A  I don't remember. | 10:15:26 |
| 18 | Q  Could Akoustis trim at scale? | 10:15:27 |
| 19 | A  Can you repeat your answer [sic]? | 10:15:34 |
| 20 | Q  Could Akoustis trim BAW filters at scale? | 10:15:35 |
| 21 | A  I don't remember. | 10:15:52 |
| 22 | Q  Did you face any difficulty as a senior | 10:16:09 |
| 23 | process engineer? | 10:16:12 |
| 24 | MR. MACCHIAROLI:  Objection, vague. | 10:16:14 |
| 25 | A  I don't know. | 10:16:19 |

Transcript of Joonbum Kwon, Ph.D.
Conducted on October 20, 2023

175

```
1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2

3           I, Janet A. Hamilton, Registered Diplomate

4    Reporter and Notary Public before whom the

5    foregoing deposition was taken, do hereby certify

6    that the foregoing transcript is a true and

7    correct record of the testimony given; that said

8    testimony was taken by me stenographically and

9    thereafter reduced to typewriting under my

10   direction; that review was requested; and that I

11   am neither counsel for, related to, nor employed

12   by any of the parties to this case and have no

13   interest, financial or otherwise, in its outcome.

14           IN WITNESS WHEREOF, I have hereunto set my

15   hand this 26th day of October, 2023.

16

17

18

19

20

21

22

23   Registered Diplomate Reporter

24   My commission expires

25   February 4, 2024.
```

# Exhibit F

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4        - - - - - - - - - - - - x

5      QORVO, INC.,                :

6              Plaintiff,          :

7          v.                      :

8                                  :   C.A. NO. 21-1417 JPM

9      AKOUSTIS TECHNOLGIES,       :

10     INC., et al.,               :

11             Defendants.         :

12       - - - - - - - - - - - - x

13     ████████████████████████████████

14

15            Deposition of ROBERT DARVEAUX, PhD

16                  Conducted Virtually

17               Thursday, January 18, 2024

18                    11:04 a.m. EST

19

20

21     Job No.:  521333

22     Pages: 1 - 259

23     Reported By: Karen Klerekoper, CSR-4250, RPR

24

25

1                P R O C E E D I N G S

2           (Oath stipulation read and agreed by

3    counsel and witness.)

4           ROBERT DARVEAUX, PhD, having been duly

5    sworn testified as follows:

6                     EXAMINATION

7    BY MR. DeFOSSE:

8       Q  Good morning, Dr. Darveaux.  My name is

9    Jon DeFosse.  I'm one of the attorneys

10   representing Qorvo in this matter.  I would like

11   to thank you for taking the time to speak with us

12   today.

13          Could you please state your full name and

14   address for the record?

15      A  Robert Francis Darveaux, ███████████

16   ████████████

17      Q  How many times have you testified before,

18   Dr. Darveaux?

19      A  Testified in a trial, I believe three

20   times; and depositions, I think this is going to

21   be my seventh one now.

22      Q  You understand that your testimony today

23   is under oath just as if you were in a court of

24   law?

25      A  Yes.

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                              191

```
1            (Marked for identification Exhibit 890,
2    AKTS_00641897, Excel spreadsheet.)
3        Q  And I'll identify Exhibit 890 for the
4    record as an Excel spreadsheet that was produced
5    to us in native format with the production number
6    AKTS_00641897.
7        A  Okay, I have the spreadsheet open.
8        Q  Okay.  And do you recognize Exhibit 890 as
9    the more detailed description of the process steps
10   that you referred to in your report at
11   paragraph 103?
12       A  Yes.
13       Q  Okay.  And you opined in your report that
14   process steps 181 through 210 reflect Akoustis'
15   trimming process; is that right?
16       A  Correct.
17       Q  Okay.  How do you know that steps 181
18   through 210 reflect Akoustis' trimming process?
19       A  Because I read the document and looked at
20   the different process steps, and that's the
21   portion of the process flow that -- that gets into
22   the trimming.
23           I mean, I read it, that's how I know.
24       Q  I guess my question is, how do you know
25   this document, as opposed to any other documents
```

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                                    192

1    that were produced, is the one that reflects

2    Akoustis' trimming process?

3        A   Okay.  So, first of all, I don't know how

4    many variations there are in Akoustis' trimming

5    process.

6            What I had with me to work with were

7    documents produced by Akoustis.  Some -- you know,

8    one was a PowerPoint document that I found.  This

9    one happened to be an Excel spreadsheet.

10           They seemed to agree with each other and,

11   they seemed to disagree basically with what I had

12   heard from an engineer, you know, in general

13   terms, as I describe.

14           So, that's how I came to my conclusion.

15   I'm not sure what more to tell you there.

16       Q   Okay.  Could I ask you to turn to step

17   181.

18       A   Yes.

19       Q   Which is, let's see, row 1,102 on my

20   spreadsheet.

21       A   Yep, I'm there.

22       Q   Okay.  Is there anything between steps 181

23   and step 210 that indicates to you that Akoustis

24   is directly measuring the trim thickness?

25       A   So, it says in step 181:

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                      197

1   ████████████████████████████████████████

2   ██████████████████████████ .

3        Q  If you look at process step 185 and you go

4   to column G of the spreadsheet, I see there is a

5   reference to:  Trim target.  See trim table.

6           Do you see that?

7        A  Yes, I do.

8        Q  And if you go down to step 195 and look at

9   column G, it says:  Trim removal amount.  See trim

10  table.

11          Do you have a sense of what the trim table

12  is?

13       A  So, I -- I do not see the trim table in

14  this document.

15          If it's there, I didn't see it.  My

16  expectation is that is some relationship that's

17  says how much -- if you're trying to change the

18  frequency desired amount or the thickness of

19  desired amount, you know, what -- what should be

20  the tool settings to achieve that change.

21          I assume that's what it means, but I do

22  not -- I did not see that trim table.  I don't --

23  I don't have it in front of me.  I could tell you

24  if you showed it to me, probably, but that's --

25  that's what my assumption would be what that

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                                    198

1    means.

2         Q  Does Akoustis recalculate ████████

3    ███████████████████████████████████████?

4         A  I don't believe they do after ████

5    ██████████████.

6         I think in some of the verbal

7    conversations we had with DH, he talked about

8    lot -- you know, there's things you can do on a

9    lot-by-lot basis.  There is things you can do on a

10   design-by-design basis.

11        I do not believe they ████████████████

12   ████████████████████████████.  I don't -- I

13   don't believe that's practical to do, even.

14        But you know, maybe on a lot basis, or

15   maybe on a design basis, like that, ████████████

16   ██████████████.

17        Q  Other than your conversation with Mr. Kim,

18   did you review any documents that would indicate

19   whether Akoustis is ████████████████████████████

20   ██████████████?

21        A  I -- I don't -- I don't believe I reviewed

22   any sort of process document to that effect or

23   PowerPoint slide or a thing like -- anything like

24   that.

25        Q  Okay.  Does Akoustis calculate trim

1   know, the higher your accuracy is, but the more

2   your yield loss is, because you're typically

3   throwing away those sites.

4        MR. DeFOSSE:  All right.  Let's go off the

5   record.

6        (Off the record.)

7   BY MR. DeFOSSE:

8        Q  Dr. Darveaux, I would like ask you to open

9   Exhibit 891 on the ShareFile site.

10       (Marked for identification Exhibit 891,

11  AKTS_00021881, Excel spreadsheet.)

12       A  Okay, I have it open.

13       MR. DeFOSSE:  All right.  I'll identify

14  Exhibit 891 for the record as a spreadsheet that

15  was produced to us in native format with the

16  production number AKTS_00021881.

17       Q  Dr. Darveaux, do you recognize what's been

18  marked as Exhibit 891?

19       A  I believe so.  I mean, it looks familiar.

20  There is several sheets here, so I'm not sure if I

21  saw every sheet, but I -- it does look familiar.

22       Q  Okay.  I'd ask you to turn to the sheet

23  that has the title:  Saved stacks MSET073.

24       Do you see that?

25       A  Yes.

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                              201

1        Q   Okay.  And were you able to go to that
2    sheet?
3        A   I see that sheet, yeah.
4        Q   Okay.  What does MSET073 mean?
5        A   I don't know.
6        Q   Do you know what MSET is a reference to,
7    generally?
8        A   It could be a mask set.  I -- I honestly
9    don't know.
10       Q   Okay.  That's my understanding, too, that
11   it's a mass set.
12           All right.  So, I would like you to go to
13   row 24 through 28 of the save stacks MSET073 sheet
14   of Exhibit 891.
15           Let me know when you're there.
16       A   Yeah, okay.
17       Q   Okay.  And if you look in column S, you'll
18   see that there is a sensitivity -- a reference to
19   silicon nitride sensitivity.
20           Do you see that?
21       A   I do.
22       Q   Okay.  And if you highlight column S, row
23   25, there's a number that is 3.16.
24           Do you see that?
25       A   I see that.

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                        202

1       Q   And do you see in the formula bar that

2   3.16 is a calculated value?

3       A   Yep.

4       Q   In looking at that value or that

5   calculation, can you tell me how 3.16 was

6   calculated here on the safe stacks MSET 073

7   spreadsheet?

8       A   Okay.  So, it says you take the value at

9   ███████████████████████████████████████

10  ████

11      ████████████████████████████████

12  ███████████████████████████████████████

13  ███████████████████████████

14      ████████████████████████████████████

15  ████

16      █████████████████████████

17      Q   Okay.

18      A   ███████████████████████████████████

19  █████████

20      █████████████████████████████████████

21  ██████████

22      ████████████████████████████████

23  ████████████████████████████████████████

24  ████████████████████████████████

25  ██████████████████████

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                    203

```
1        Q  Okay.  ███████████████████████████
2    ███████████████████████████████.
3           Did you have that same value?
4        A  Yes, I see that.
5        Q  And that ██████████████████████████
6    ██████████████████████████████████████
7    █████   is that right?
8           MS. SMITH:  Objection, calls for
9    speculation.
10       A  Yeah, I honestly -- I don't know.
11       Q  Okay.
12       A  So, I -- I can't tell from any -- I'm just
13   looking at the row headings and things.  I
14   don't -- I can't tell what that means.
15       Q  Okay.  If you look in ██████████████████
16   ██████████████████?
17       A  Yeah, I see there's --
18       Q  And then --
19       A  -- 24, 57, 79, 12, ██████████████████████
20   and FFT.
21       Q  And I believe in the last process document
22   we looked at, you had interpreted ██████████████
23   ████████████████████████████?
24       A  ██████████████████████████████████.
25       Q  Yeah.
```

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                    204

1      A  That makes sense.

2      Q  Okay.  And so, applying those same

3   understandings to this spreadsheet, would the

4   value that's in ████████████████████

5   ████████████████████████████████████?

6         MS. SMITH:  Objection, calls for

7   speculation.

8      A  I don't -- I don't know.  It might be

9   ████████████████████.  I'm not sure.  I

10  honestly didn't make the spreadsheet.  I can

11  interpret it some right now, but I'm honestly not

12  sure.  It's not really labeled what ████████

13  means, I don't know what that means.

14     Q  Okay.

15     A  It might be ████████████████████, but

16  I'm not sure.

17     Q  Okay.  But in any case, the sensitivity

18  figure in ████████████████████████

19  ████████████████████████████████

20  ██████████████████; is that right?

21     A  That's -- yeah, that's correct and that

22  was my understanding going into this, that that --

23  that's -- when the word "sensitivity" is used,

24  that's what -- that's what that means.  ████████

25  ████████████████████████████████

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                                205

1  ████████████████████████████████████

2  ██████ .

3       But essentially what ███████████████████

4  ████████████████████████████████████████

5  ████████████████████████████████████

6  ██████████████████████████████ .

7    Q  Okay.  And would you agree with me if you

8  look at ████████████████████████████████

9  ████████████████████████████████

10 ███████████████████████████████████ ?

11      MS. SMITH:  Objection, calls for

12 speculation.

13    A  So, this spreadsheet ███████████████████

14 ██████████████████████████████ .

15      What we don't know and what you asked me

16 before is, do they -- do they use ████

17 ██████████████████████████████ ?  Do they use

18 that -- my interpretation was, did you mean did

19 they -- are they ████████████████████████

20 ████████████████████████████ ?  I

21 don't know that.

22      They may just monitor that, right?  They

23 might -- they may just ██████████████████████

24 ██████████████ .

25      I -- I don't know what know do in terms of

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                    206

1    ████████████████████████        Or what they do with

2    ███████████████, I don't know.

3        Q   Okay.  Just I want to make sure I

4    understand what you are saying is possible here.

5            You're saying it's possible ████████

6    ██████████████████████████████████████████████

7    ██████████████████████████████.

8            MS. SMITH:  Object --

9        Q   Is that what you're saying?

10       A   I'm saying --

11           MS. SMITH:  Objection, misstates prior

12   testimony.

13       A   What I'm saying is, I don't know.

14   Clearly, they -- █████████████████████████

15   ████████████████████████████████████████████

16   ███████████████.

17           What I don't know is, because they're

18   measuring these things, what I don't know is what

19   they do with that.

20           Do they ████████████████████████████

21   █████████████████████████████████████████████

22   ████████████.

23           Or ██████████████████████████████████

24   ████████████████████████████████████

25   I -- I don't know.

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                               207

1   ████████████████████████████████

2   ████████████████████████████████████

3   ████████████████████████████████████

4   ██████████████████

5   ████████████████████████████████

6   And this spreadsheet shows what I -- was my

7   understanding just from even reading, you know,

8   Fattinger's original slide.

9        But -- ████████████████████████

10  ████████████████████   I -- I do not know.

11       Q  Okay.  Could I ask you to pull up

12  Exhibit 453 again.

13       A  453, go it.

14       Q  Okay.  And go to the second page of

15  Exhibit 453.

16       A  Okay.

17       Q  And look, again, ████████████████

18  ████████████████████████████████████

19  ██████████

20       A  I'm looking at it.

21       Q  Is the sensitivity ████████████████

22  ██████████████   green box what is also reflected

23  in Exhibit 891 in the cells that we just looked

24  at?

25       MS. SMITH:  Objection, vague, calls for

Transcript of Robert Darveaux, Ph.D.
Conducted on January 18, 2024                    208

1    speculation.

2        A   So, the calculation in the green box --

3    there's a -- well, there's a couple green boxes.

4    But the bottom green box of this slide, it says:

5    ████████████████████████████████████

6    ████████████████████████████████████

7        So, then it has an equation.  Sensitivity

8    ████████████████████████████████████

9    ██████████████████████████████████████████

10   ██████████████████████████████████████████

11   █████████████████████████

12       That basic concept is meaningful that

13   ████████████████████████████████████████

14   ██████████████████████████████████

15   ███████████████████████████████████████████

16   █████████████

17       So, your question is, is the ████████

18   ██████████████████████████████

19   ███████████████████████████████████████████

20   ████████████████████

21       It appears to be, but what I don't know is

22   ███████████████████████████████████████████

23   ████████████.  I -- I don't know those things.

24       Q   All right.  So, Dr. Darveaux, could I ask

25   you to please turn back to your report,

1     CERTIFICATE OF SHORTHAND REPORTER NOTARY PUBLIC

2          I, Karen Klerekoper, the officer before

3     whom the foregoing proceedings were taken, do

4     hereby certify that the foregoing transcript is a

5     true and correct record of the proceedings; that

6     said proceedings were taken by me stenographically

7     and thereafter reduced to typewriting under my

8     supervision; that review was NOT requested; and

9     that I am neither counsel for, related to, nor

10    employed by any of the parties to this case and

11    have no interest, financial or otherwise, in its

12    outcome.

13      IN WITNESS WHEREOF, I have hereunto set my hand

14    and affixed my notarial seal this 22nd day of

15    January 2024.

16

17

18    MY COMMISSION EXPIRES:

19    OCTOBER 7, 2024

20

21    _____

22    NOTARY PUBLIC IN AND FOR THE STATE OF MICHIGAN

23

24

25

# Exhibit G

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    QORVO, INC.,                     )
                                      )
5            Plaintiff,               )
                                      )
6        vs.                          ) CASE NO. 21-1417-JPM
                                      )
7    AKOUSTIS TECHNOLOGIES, INC.      )
     and AKOUSTIS, INC.,              )
8                                     )
             Defendants.              )
9    _____)

10

11

12

13

14      VIDEO-RECORDED DEPOSITION OF MICHAEL BOYD,

15      at Regus, 5 Centerpointe Drive, Suite 400,

16      Lake Oswego, Oregon, commencing at 9:15 a.m.

17      PST, on Tuesday, October 31, 2023, before

18      Marla Sharp, RPR, CLR, CCRR, CA CSR 11924,

19      OR CSR 17-0446, WA CSR 3408.

20

21

22

23

24

25

Case 1:21-cv-01417-JPM   Document 543-5   Filed 04/22/24   Page 295 of 341 PageID #: 27281

1    witness.

2            THE VIDEOGRAPHER:  My name is Ryan Kidder.

3    And the court reporter is Marla Sharp with TP One,

4    who will now swear or affirm the witness.

5                        MICHAEL BOYD,

6             having been first duly sworn,

7            was examined and testified as follows:

8            THE COURT REPORTER:  Thank you.

9            Counsel, you may proceed.

10                       EXAMINATION

11   BY MR. STANTON:

12       Q    Good morning, Mr. Boyd.

13       A    Good morning.

14       Q    Would you please state your full name for

15   the record.

16       A    My name is Michael Currie Boyd.

17       Q    And what is the city and state of your

18   residence?

19       A    Lake Oswego, Oregon.

20       Q    And do you work in an office in Oregon?

21       A    I do.

22       Q    Where is that located?

23       A    The office is in Hillsboro, Oregon.

24       Q    What's that address?

25       A    I don't actually know off the top of my

1      A      Again, I'm not sure in the documents that I

2   reviewed if -- which of those may have been RFMD or

3   TriQuint or Qorvo.  So I don't want to say I did or

4   didn't.  I'm not sure if any of them are specific to

5   RFMD.

6      Q      If you wanted to find out about RFMD's

7   practices for identifying or branding or

8   safeguarding confidential and proprietary

9   information, is there anyone at Qorvo you would

10  speak with?

11     A      Yes.

12     Q      Who is that?

13     A      Well, I would probably start with my

14  supervisor, the chief information officer, and then

15  some of the longer-term employees who were part

16  of -- IT employees, potentially, who were RFMD

17  employees prior to the merger.

18     Q      Do you know the names of any RFMD -- former

19  RFMD employees who are still at Qorvo?

20     A      I do.

21     Q      And who -- what are their names?

22     A      Michael Lysse is probably the one that most

23  comes to mind.

24     Q      How do you spell Michael's last name?

25     A      Lima Yankee Sierra Sierra Echo.



1      Q      And where is Michael located?

2      A      He works in Greensboro, North Carolina.

3      Q      Have you spoken to Michael about RFMD's

4   policies or practices related to information

5   security?

6      A      Yes.

7      Q      What was the reason for that discussion?

8      A      We've generally talked about contracts and

9   licensing that, when I have reviewed our technology

10   road map, for example, talked about the history of

11   licenses that we've had with different vendors or

12   service providers.

13      Q      Are you referring to vendors and service

14   providers for information security technology and

15   services?

16      A      Information technology in general, which

17   sometimes includes security components.

18      Q      But you did not speak to him about policies

19   or procedures related to information security; is

20   that correct?

21      A      I have not spoken with him, in my

22   recollection, about policies.

23      Q      Mm-hmm.

24      A      Procedures, maybe, as it relates to some of

25   those technologies that we use.



1       Q       What do you remember Michael Lychee --

2       A       Lysse.

3       Q       -- Lysse telling you about the procedures

4    at RFMD related to information security?

5       A       I remember him base -- generally describing

6    why we had what tools we had for different

7    information technology, infrastructure, and security

8    solutions that we had.

9       Q       And what tools are those that Michael and

10   you talked about that related to RFMD's

11   infrastructure?

12      A       Device management, network management.  I

13   think those are the only ones that would have been

14   back in the RFMD era prior to the merger.

15      Q       Other than device management and network

16   management systems, are you aware of any other data

17   security technology in use at RFMD?

18      A       No, I'm not.

19      Q       Are you aware of any of the data security

20   practices in place at RFMD other than those related

21   to device management and network management?

22      A       I am not.

23      Q       Do you know anything about TriQuint's

24   policies, procedures, or practices directed to

25   identifying, branding, or safeguarding documents and



1              CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2              I, Marla Sharp, certified shorthand

3    reporter licensed in California, Oregon, and

4    Washington, hereby certify:

5              That the foregoing video-recorded

6    deposition of MICHAEL BOYD was taken before me on

7    October 31, 2023, at the time set forth therein, at

8    which time the witness was duly sworn by me;

9              That the testimony of the witness and all

10   colloquy and objections made at the time of the

11   deposition were recorded stenographically by me and

12   thereafter transcribed, said transcript being a true

13   copy of my shorthand notes thereof;

14             That review of the transcript was neither

15   requested nor waived before completion of the

16   deposition?; ( ) that the witness has failed or

17   refused to approve the transcript.

18             I further certify I am neither financially

19   interested in the action nor a relative or employee

20   of any attorney of any of the parties.

21             In witness whereof, I have subscribed my

22   name and signature this date, November 9, 2023.

23             _____

24             Marla Sharp
               RPR, CLR, CCRR, CA CSR 11924,
25             OR CSR 17-0446, WA CSR 3408

# Exhibit H

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4     QORVO, INC.                    )
                                      )
 5               Plaintiff,           )
                                      )
 6     vs.                            ) No. 21-1417 (JPM)
                                      )
 7     AKOUSTIS TECHNOLOGIES, INC.    )
       And AKOUSTIC, INC.,            )
 8                                    )
                 Defendants.          )
 9

10            REMOTE VIDEOTAPED DEPOSITION

11                     Via ZOOM of

12                  CUYLER ROBINSON

13                  January 24, 2024

14                     9:00 A.M.

15

16            ██████████████

17            ████████████████████

18          ██████████████████████████████

19

20

21

22

23     STENOGRAPHICALLY REPORTED BY:

       JO ANN LOSOYA, CSR, RPR, CRR

24     LICENSE #:  084-002437

25
```

Page 1

```
 1    administer the oath.

 2                        (Witness sworn at 9:12 a.m.)

 3    WHEREUPON:

 4                        CUYLER ROBINSON,

 5    called as a witness herein, having been first duly

 6    sworn, was examined and testified as follows:

 7                    E X A M I N A T I O N

 8    BY MS. SMITH:

 9         Q.    Good morning, Mr. Robinson.  How are you

10    today?

11         A.    Good.  How are you?

12         Q.    I'm good.  Thank you.

13               I represent Akoustis, and I will be

14    taking your deposition today.  My name is Victoria

15    Smith.  I would like to ask you a few preliminary

16    questions first.

17               Have you ever been deposed before?

18         A.    Yes.

19         Q.    How many times?

20         A.    Five or six.

21         Q.    Have you ever testified in a courtroom

22    before?

23         A.    Yes.

24         Q.    How many times?

25         A.    Three times.
```

1    was scheduled.

2         Q.    Prior to speaking to Mr. Lysse, did you

3    request to speak to Mr. Lysse or did -- or was it

4    suggested to you to speak to Mr. Lysse?

5         A.    Similar answer, but I think his name was

6    referenced by Michael Boyd during our discussion so

7    that's, you know, how his name was identified and

8    then later he was available to speak with me.

9         Q.    Other than Mr. Martin, Mr. Boyd, and

10   Mr. Lysse, did you speak to any other Qorvo

11   employees about your report or in preparation for

12   your report?

13        A.    I did not speak to other employees in

14   preparing my report.  But on some of these calls,

15   there were other in-house attorneys from Qorvo on

16   some of the calls, but they were just listening.  I

17   didn't speak to them.

18        Q.    So you did not speak to anybody in

19   Qorvo's legal department; is that correct?

20        A.    I mean, they introduced themselves, they

21   said their names and titles, but I didn't ask them

22   questions or gather information from them beyond

23   that.

24        Q.    Okay.  Who is Mr. Lysse?

25        A.    Well, I have his title here in my report.

Page 77

```
 1    It is director of infrastructure, operations, and
 2    client services.
 3         Q.    What is your understanding as to why
 4    Mr. Boyd suggested you talk to Mr. Lysse?
 5         A.    Mr. Lysse had worked at Qorvo for a
 6    number of years and even had worked there before
 7    Mr. Boyd, and while his title -- his current title,
 8    he oversees a number of different things, but just
 9    having been in an information technology role and
10    having worked at Qorvo for a number of years, and my
11    review, I was, you know, looking at the time frame
12    of Qorvo since its inception, it was helpful for me
13    to talk to him and, you know, understand what some
14    of Qorvo's practices were in years prior.
15         Q.    So you relied on Mr. Lysse's knowledge
16    from what time frame of Qorvo's -- Qorvo's
17    existence?
18         A.    Well, since he had been an employee, and
19    I believe he had been there since 2015, but I'd have
20    to check to see exactly when he started but he had
21    worked in a number of different roles over the
22    years.
23         Q.    What is your understanding of why -- I'm
24    sorry.  Let me rephrase that.
25                   What is your understanding of
```

Page 78

 1   Mr. Lysse's responsibilities at Qorvo that makes him

 2   relevant to the subject matter of your report?

 3       A.    Well, I think in certain sections of my

 4   report, I have got footnotes where I cite back to

 5   what I specifically relied upon but, in general, he

 6   was familiar with Qorvo's technology systems, their

 7   file servers.  He had knowledge of some their VPN

 8   technologies and other specific things that were in

 9   use at Qorvo historically and -- so those are just

10   some examples of things he was aware of because of

11   his -- what he had worked on in the past at Qorvo.

12       Q.    So what is your understanding of

13   Mr. Boyd's responsibilities at Qorvo that makes him

14   relevant to the subject matter of your report?

15       A.    Well, currently he's the chief

16   information security officer and he's the senior

17   person as far as dedicated information security

18   employees or resources that -- the most senior

19   person out of all of those employees and, you know,

20   he was able to speak to a number of policies,

21   procedures, specific technologies that Qorvo had in

22   place.

23       Q.    What is your understanding of

24   Mr. Martin's responsibilities at Qorvo that makes

25   him relevant to the subject matter of your report?

Page 79

1    prior.

2         Q.    Okay.  So how far back was Mr. Boyd able

3    to speak to?

4         A.    He began employment I believe in 2019,

5    you know, around then.  And then he was aware of

6    what they were doing, you know, up until that point.

7    But to go back to 2018, '17, '16, '15, that's where

8    speaking to Mr. Lysse was helpful because he was

9    there and he was aware of relevant procedures and

10   topics and other things that Qorvo was doing during

11   that time frame.

12        Q.    Okay.  What did Mr. Lysse tell you about

13   the Termination Workstation Recovery Procedures in

14   the 2015 to 2016 time frame?

15        A.    I didn't specifically discuss this

16   document with Mr. Lysse.

17        Q.    Did you discuss with Mr. Lysse procedures

18   that the IT department would have implemented when

19   an employee was terminated back in 2015 or 2016?

20        A.    Not -- not procedures that they

21   implemented.  Things that they did.  Activities that

22   they took.

23        Q.    Okay.  What activities were they?

24        A.    Retrieving assets, disabling accounts,

25   removing access, physical access to the building.

Page 108

```
 1    You know, those are some of the topics that we
 2    discussed.
 3        Q.    So back in the 2015 to 2016 time frame,
 4    that's when Mr. Lysse would have information
 5    about -- about steps that IT took when an employee
 6    was terminated; is that right?
 7        A.    Yeah, I mean, he was an employee then so
 8    he was able to speak to it.
 9        Q.    Okay.  Earlier you had mentioned
10    monitoring, ongoing monitoring of employee
11    activities on Qorvo computers.  Was this monitoring
12    implemented back in 2015 and 2016?
13        A.    So the -- I mean, there's a number of
14    different things that would be available to monitor.
15    Taking the context of posttermination reviews and
16    other things, that relates to their Digital Guardian
17    data loss prevention solution and that was
18    implemented -- they started working on it in 2018
19    and then it was implemented in 2019.  It actually
20    replaced a different type of monitoring solution
21    that they had in place and it gave them more
22    features.
23        Q.    Right.  I'm just talking about monitoring
24    in general, not the specific systems yet.
25                        Was there monitoring of Qorvo
```

Page 109

 1     you know, Mr. Boyd described based on his experience

 2     and time frame and Mr. Lysse also confirmed that

 3     when an employee leaves, these are the procedures,

 4     with the lowercase P, if you will, or the steps

 5     involved when that occurs.

 6          Q.    Okay.  And what -- what those procedures

 7     were, outside of this Exhibit 3, is just simply what

 8     Mr. Boyd, Mr. Lysse informed you of and you were not

 9     aware of a document that actually says those

10     procedures; is that right?

11          A.    I wasn't showing them documents and

12     asking them to explain them.  I was talking to them

13     about, like, what happens when an employee leaves,

14     what do you do, who gets notified.  You know, it was

15     that type of conversation.

16          Q.    Okay.  I have marked at Exhibit 4, a

17     document with Bates-stamped QORVO_00621179.

18                    I have also marked as Exhibit 5, a

19     document bearing Bates-stamps QORVO_00621180.

20                    I have also marked as Exhibit 6, a

21     document bearing Bates-stamped QORVO_070854274.

22                         (Deposition Exhibit 4 was marked

23                          for identification.)

24

25

                                        Page 113

```
 1              REPORTER CERTIFICATE

 2

 3         I, JO ANN LOSOYA, a Certified Shorthand

 4    Reporter within and for the State of Illinois, do

 5    hereby certify:

 6                    That previous to the commencement

 7    of the examination of the witness, the witness was

 8    duly sworn to testify the whole truth concerning the

 9    matters herein; That the foregoing deposition

10    transcript was reported stenographically by me, and

11    the foregoing constitutes a true record of the

12    testimony given and the proceedings had; That the

13    said deposition was taken before me at the time and

14    place specified; That I am not a relative or

15    employee or attorney or counsel, nor a relative or

16    employee of such attorney or counsel for any of the

17    parties hereto, nor interested directly or

18    indirectly in the outcome of this action.

19              IN WITNESS WHEREOF, I do hereunto set my

20    hand this day, January 29, 2024.

21

22

23

24

      JO ANN LOSOYA, CSR, RPR, CRR

25    C.S.R. 84-002437

                                        Page 186
```

# Exhibit F.11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF DELAWARE**

| | |
|---|---|
| QORVO, INC. | |
| Plaintiff, | C.A. No. 21-1417 (JPM) |
| v. | |
| AKOUSTIS TECHNOLOGIES, INC. and AKOUSTIS, INC. | **JURY TRIAL DEMANDED** |
| Defendants. | ▮▮▮▮▮▮▮ |

**REPLY DECLARATION OF DAVID S. ELKINS IN SUPPORT OF**
**THE AKOUSTIS DEFENDANTS' MOTIONS IN LIMINE**

I, DAVID S. ELKINS, declare as follows:

1.      I am a partner of the law firm of Squire Patton Boggs (US) LLP and am one of the counsel of record for defendants Akoustis Technologies, Inc. and Akoustis, Inc. (collectively "Akoustis") in this matter. I make this declaration on my own personal knowledge or, where indicated, on information and belief formed after reasonable inquiry under the circumstances. If called to do so, I could and would testify competently to the facts stated below.

2.      Attached as **Exhibit 9** is a true and correct copy of the Complaint filed in the Shen Action, dated March 11, 2022.

3.      Attached as **Exhibit 10** is a true and correct copy of excerpts from the transcript of the Deposition of Dr. Michael David Hodge from the above-referenced case, dated July 11, 2023.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 8, 2024.

/s/ *David S. Elkins*
David S. Elkins

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:22-cv-103**

| | |
|---|---|
| YA "ANNIA" SHEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) |
| | ) |
| AKOUSTIS TECHNOLOGIES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**<u>DEFENDANT'S NOTICE OF REMOVAL</u>**

Defendant Akoustis Technologies, Inc. ("Defendant"), represented by the undersigned counsel, hereby gives notice of removal of the above-captioned action to the United States District Court for the Western District of North Carolina, Charlotte Division, from the General Court of Justice, Superior Court Division, Mecklenburg County, State of North Carolina (Case No. 22-CVS-2643). This action is removed pursuant to 28 U.S.C. §§ 1331 and 1441 for the reasons set forth below:

1.     The above captioned action was filed on February 18, 2022, in the General Court of Justice, Superior Court Division in Mecklenburg County, North Carolina. Defendant's counsel accepted service of the Summons and Complaint on February 18, 2022. A copy of all process and pleadings served on Defendant in this matter are attached hereto as **Exhibit A**.

2.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff Ya "Annia" Shen's ("Plaintiff") second and third causes of action arise under federal law.

1

3.      Specifically, in her Complaint, Plaintiff's second cause of action alleges the Defendant unlawfully discriminated and retaliated against her because of her race, national origin, and sex in violation of Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 2000e-3. (*See* Compl. ¶¶ 27-33.) Plaintiff's third cause of action alleges Defendant violated the Equal Pay Act of 1963, 290 U.S.C. § 206(d). (*See* Compl. ¶¶ 34-41.)

4.      Defendant submits this Notice of Removal without waiving any defenses to the claims asserted by Plaintiff or conceding that Plaintiff has pled claims upon which relief may be granted. Defendant hereby reserves any and all rights to assert any defenses to Plaintiff's Complaint, including but not limited to, issues relating to venue and personal jurisdiction.

5.      Defendant hereby reserves the right to amend or supplement this Notice of Removal.

6.      The state court from which this action was removed is within the Court's District and Division, and, therefore, venue is appropriate in this Division. Defendant preserves the ability to transfer this matter, upon information and belief, if the matter has been improperly initiated in the wrong county.

7.      A copy of the Notice of Removal attached as **Exhibit B** will be filed with the Clerk of Court for Mecklenburg County, North Carolina, promptly after the notice is filed with this Court as required by 28 U.S.C. §1446(d).

8.      By copy of this Notice of Removal and in accordance with the attached Certificate of Service, Defendant is providing notice to Plaintiff in this action and advising her of this filing pursuant to 28 U.S.C. § 1446(d).

9.      Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Defendant's Corporate Disclosure Statement is being filed contemporaneously with this notice.

2

WHEREFORE, Defendant, Akoustis Technologies, Inc., hereby gives notice that the above-referenced action pending in the General Court of Justice, Superior Court Division of Mecklenburg County, North Carolina has been removed to this Court.

Dated this the 11th day of March, 2022.                    Respectfully submitted,

By:     */s/ David I. Klass*
        David I. Klass (NC Bar No. 53342)
        Virginia M. Wooten (NC Bar No. 48180)
        **FISHER PHILLIPS LLP**
        227 West Trade Street, Suite 2020
        Charlotte, North Carolina 28202
        Telephone:  (704) 334-4565
        Facsimile:  (704) 334-9774
        dklass@fisherphillips.com
        vwooten@fisherphillips.com
        *ATTORNEYS FOR DEFENDANT*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:22-cv-103**

YA "ANNIA" SHEN,                           )
                                           )
              Plaintiff,                   )
                                           )
       V.                                  )
                                           )
AKOUSTIS TECHNOLOGIES, INC.,               )
                                           )
              Defendant.                   )
                                           )

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on the date listed below, the foregoing Notice of Removal was electronically filed with the Clerk of Court using the CM/ECF system, which will send electronic notice to Plaintiff's counsel:

Josh Van Kampen
**Van Kampen Law, PC**
315 East Worthington Avenue
Charlotte, NC 28203
josh@vankampenlaw.com
Attorney for Plaintiff

This the 11th day of March, 2022.

                          Respectfully submitted,

              By:    */s/ David I. Klass*
                     David I. Klass
                     **FISHER PHILLIPS LLP**

4

# EXHIBIT A

# STATE OF NORTH CAROLINA

_____ Mecklenburg _____ County

File No.
22 CV5 2643

In The General Court Of Justice
☐ District  ☒ Superior Court Division

*Name Of Plaintiff*
Ya "Annia" Shen

*Address*
8145 Kalson St

*City, State, Zip*
Huntersville          NC          28078

## VERSUS

**CIVIL SUMMONS**

☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

*Name Of Defendant(s)*
Akoutis Technologies, Inc.

*Date Original Summons Issued*
February 18, 2022

*Date(s) Subsequent Summons(es) Issued*

### To Each Of The Defendant(s) Named Below:

*Name And Address Of Defendant 1*
Akoutis Technologies, Inc.
9805-A Northcross Center Court

Huntersville          NC          28078

*Name And Address Of Defendant 2*

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

*Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*
Joshua R. Van Kampen
Van Kampen Law, PC
315 E. Worthington Ave.
Charlotte          NC          28203

*Date Issued*
2.18 2022

*Time*
12:30    ☐ AM  ☒ PM

*Signature*

☒ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court

☐ **ENDORSEMENT (ASSESS FEE)**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

*Date Of Endorsement*

*Time*
☐ AM  ☐ PM

*Signature*

☐ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | | | Name Of Defendant |
|---|---|---|---|---|
| | | ☐ AM | ☐ PM | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | | | Name Of Defendant |
|---|---|---|---|---|
| | | ☐ AM | ☐ PM | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 6/16
© 2016 Administrative Office of the Courts

| STATE OF NORTH CAROLINA | File No. 22 CVS 2643 |
|---|---|

Mecklenburg _____ County *FILED*

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| Name And Address Of Plaintiff 1 | |
|---|---|

Ya "Annia" Shen
8145 Kalson St

2022 FEB 18 P 12: 30

MECKLENBURG
NC 28078 C CO

Huntersville          NC 28078

**GENERAL**

**CIVIL ACTION COVER SHEET**
☒ INITIAL FILING      ☐ SUBSEQUENT FILING

Name And Address Of Plaintiff 2

BY _____

Rule 5(b), General Rules of Practice for Superior and District Courts

Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)

Joshua R. Van Kampen
Van Kampen Law, PC
315 E. Worthington Ave.

**VERSUS**

| Name Of Defendant 1 | | |
|---|---|---|

Akoutis Technologies, Inc.
9805-A Northcross Center Court

Huntersville          NC      28078

| Summons Submitted ☒ Yes ☐ No | |
|---|---|

| Name Of Defendant 2 | |
|---|---|

| Summons Submitted ☐ Yes ☐ No | |
|---|---|

Charlotte                    NC      28203

| Telephone No. 704-247-3245 | Cellular Telephone No. 704-890-8735 |
|---|---|
| NC Attorney Bar No. 32168 | Attorney E-Mail Address josh@vankampenlaw.com |

☒ Initial Appearance in Case   |   ☐ Change of Address

Name Of Firm
Van Kampen Law, PC
FAX No.

Counsel for
☒ All Plaintiffs   ☐ All Defendants   ☐ Only (list party(ies) represented)

☒ Jury Demanded In Pleading
☐ Complex Litigation

☐ Amount in controversy does not exceed $15,000
☐ Stipulate to arbitration

| **TYPE OF PLEADING** | |
|---|---|

(check all that apply)

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) (see Note)
☐ Change Venue (CHVN)
☒ Complaint (COMP)
☐ Confession Of Judgment (CNJF)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) Assess Court Costs
☐ Crossclaim (list on back) (CRSS) Assess Court Costs
☐ Dismiss (DISM) Assess Court Costs
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

(check all that apply)

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint (list Third Party Defendants on back) (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other (specify and list each separately)

**NOTE:** All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must either include a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.

AOC-CV-751, Rev. 1/14
© 2014 Administrative Office of the Courts          (Over)

| CLAIMS FOR RELIEF | | |
|---|---|---|
| ☐ Administrative Appeal (ADMA)<br>☐ Appointment Of Receiver (APRC)<br>☐ Attachment/Garnishment (ATTC)<br>☐ Claim And Delivery (CLMD)<br>☐ Collection On Account (ACCT)<br>☐ Condemnation (CNDM)<br>☐ Contract (CNTR)<br>☐ Discovery Scheduling Order (DSCH)<br>☐ Injunction (INJU) | ☐ Limited Driving Privilege - Out-Of-State<br>Convictions (PLDP)<br>☐ Medical Malpractice (MDML)<br>☐ Minor Settlement (MSTL)<br>☐ Money Owed (MNYO)<br>☐ Negligence - Motor Vehicle (MVNG)<br>☐ Negligence - Other (NEGO)<br>☐ Motor Vehicle Lien G.S. 44A (MVLN)<br>☐ Possession Of Personal Property (POPP) | ☐ Product Liability (PROD)<br>☐ Real Property (RLPR)<br>☐ Specific Performance (SPPR)<br>☒ Other *(specify and list each separately)*<br>1. Wrongful Discharge<br>2. Violation of Title VII of the Civil Rights Act of 1964<br>3. Violations of the Equal Pay Act of 1963 |

Date   2\1r\22                  Signature Of Attorney/Party

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ **Additional Plaintiff(s)** |
|---|---|
| | |
| | |
| | |
| | |
| | |

| No. | ☐ **Additional Defendant(s)**   ☐ **Third Party Defendant(s)** | **Summons Submitted** |
|---|---|---|
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*

FILED

STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
                                SUPERIOR COURT DIVISION
MECKLENBURG COUNTY 2022 FEB 18 P 12: 30    CASE NO. _____

                MECKLENBURG CO., C.S.C.        22 CVS 2643

YA "ANNIA" SHEN,        BY_____        )

                Plaintiff,        )                **COMPLAINT**

        v.                        )        **JURY TRIAL DEMANDED**

                                )
AKOUSTIS TECHNOLOGIES, INC.,
                                )
                Defendant

---

## INTRODUCTION

1.        Akoustis Technologies, Inc. ("Akoustis" or "Defendant"), has one set of rules for

Asian females employees, and another set of rules for its overwhelmingly male workforce. On

paper, Ya "Annia" Shen ("Annia" or "Plaintiff") should have been a heralded, rising star at

Akoustis. Annia was the very first filter design engineer Akoustis hired and was among the first

twenty employees hired overall.  She excelled in every facet an engineer would be judged

objectively: she published multiple papers, secured multiple patents, and developed the filter

product that brought in the highest revenue for Akoustis in the marketplace – one of only two

filter products that ever-generated revenue. Annia excelled despite having a superior, Rohan

Houlden, who was openly derisive and disrespectful to Annia and other female Akoustis

employees.

2.        Akoustis allowed a toxic culture to fester that empowered Houlden to act out

towards Annia during her tenure at Akoustis. Houlden systematically undermined Annia's

oversight as an Engineering Manager by not supporting Annia taking disciplinary action towards junior male engineers; he tried to bully her into not disputing a wholly unwarranted and factually inaccurate performance evaluation of her work; he stood by and watched other male employees bully Annia whenever she voiced an opinion; and ultimately promoted unqualified male subordinates to management positions while Annia was demoted only after 14 months to her promotion into management. These actions were supported by Akoustis by not taking the necessary actions to hold Houlden accountable but also it clearly show the double standard that was part of the company culture.

3.      In completing the full cycle of discrimination, Akoustis added insult to injury by terminating Annia in a way to cause the most harm. Akoustis fired Annia eighty-one (81) days before she was to vest 17,500 shares, and in doing so Akoustis pocketed approximately $262,500 (at $15 per share) that Annia earned in sweat equity. In the past, Akoustis has publicly reported accelerated stock vesting for male employees, but not for Annia. Furthermore, Akoustis offered Annia only a two-week severance, a paltry sum given her contributions, and substantially less than what Akoustis is believed to have paid to similarly situated, departing male employees.

4.      Akoustis was given ample opportunity to change course and to resolve this matter amicably but refused to do so. Accordingly, Annia turns to this Court to hold Akoustis accountable for its blatant and persistent pattern of discrimination toward Annia.  Plaintiff therefore brings claims against Akoustis for wrongful discharge in violation of North Carolina public policy (County I), violations of Title VII of the Civil Rights Act of 1964 (Count II); and violations of the Equal Pay Act of 1963 (Count III).

2

## I.    PARTIES, JURISDICTION & VENUE

5.      Plaintiff is a resident of Mecklenburg County, North Carolina.

6.      Defendant is a Delaware corporation with its principal office located in Huntersville, North Carolina, a part of Mecklenburg County, North Carolina.

7.      At all relevant times, Plaintiff worked for Defendant at its Huntersville, North Carolina location. Venue is proper in Mecklenburg County pursuant to N.C.G.S. § 1-79.

8.      Plaintiff seeks damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

## II.    FACTUAL STATEMENT

9.      On or around February 27, 2017, the Plaintiff joined Defendant as a Staff Design Engineer on the Design Engineering Team.  She was about the 20th employee for Defendant.

10.     Plaintiff was the first and only female Chinese design engineer in the company and one of only four Asian engineers on the Engineering team.

11.     Plaintiff's duties included designing and developing Bulk Acoustic Wave ("BAW") filters.

12.     Plaintiff was the most productive design engineer, publishing multiple papers, securing multiple patents, and her products are believed to have generated the most revenue for Defendant in her tenure. Prior to the Plaintiff working for Defendant, Defendant had yet to launch a profitable filter product in the marketplace.

13.     Plaintiff maintained an exemplary work record throughout her almost four-year tenure with Defendant. During her employment as a Staff Design Engineer, Plaintiff received no disciplinary or performance issues, and had no attendance or tardiness issues. Plaintiff only received positive reviews until the year she was terminated in 2020. In addition, Plaintiff received

3

annual raises (albeit not in sufficient amounts to achieve pay equity) and performance-based bonuses until 2020, the year she was terminated.

14.     During her employment, Defendant openly tolerated their employee Houlden's, aggressive, hostile, and even profane treatment of employees like the Plaintiff. Houlden openly used terms that demonstrated a misogynist view toward women, such as regular use of the term "bitching" to describe an employee complaining and described closing a deal as getting a customer "pregnant." Houlden was also consistently dismissive of female engineers when they expressed ideas and appeared to interpret females asserting themselves as a direct challenge to his authority.

15.     Not surprisingly, given its embrace of employees like Houlden, Defendant lagged behind in gender diversity. Of twenty-eight (28) middle management level employees at the time, only approximately five (5) were women. Further, out of the ten (10) executive-level employees, only one (1) was a woman.

16.     On or about January 2019, Plaintiff was promoted from Staff Design Engineer to Engineering Manager. On paper, Plaintiff's new position was responsible for training and leading a team of three other male design engineers.

17.     However, Defendant allowed an unhealthy work dynamic to flourish as Houlden actively undermined the Plaintiff in the assertion of her managerial authority, while protecting underperforming males reporting to her. While Houlden openly discouraged female employees, like the Plaintiff, from sharing their opinions, he solicited and valued input from male managers and was also known to give second and even third chances to sub-par male engineers.

a.     Houlden also failed to support Plaintiff's attempt to performance manage one of her male staff design engineers (hereinafter, "John Doe 1"). In March 2019, it was evident to the Plaintiff that John Doe I did not possess the skills listed on his resume. When the

4

Plaintiff attempted to address John Doe 1's performance issues with Houlden and HR, he dismissed her concerns, telling her to "let it go." Instead, Defendant Houlden removed John Doe 1 from Plaintiff's chain of command and had them report directly to him.

b.        Additionally, in November 2019, another male engineer (hereinafter, "John Doe 2") was hired into a position that was to report directly to Plaintiff. However, upon start of his employment with Defendant, John Doe 2 reported to Houlden instead. Like John Doe 1, John Doe 2 also oversold his qualifications for the position and struggled in the role.

c.        On or around March 2020, Houlden demoted the Plaintiff from an Engineering Manager to an individual contributor as Senior Staff Engineer. Houlden provided no clear explanation for the adverse action at the time, but later claimed she was demoted "based on the consultant's recommendation." This justification is pretextual. To the contrary, the consultant emailed the Plaintiff stating he makes it a practice not to make recommendations about participant's work positions.

d.        In contrast, Houlden promoted John Doe 2 to Engineering Manager in August 2020 and John Doe 1 to Engineering Manager in November 2020, despite their having overstated their qualifications and greatly struggling in their existing engineering duties.

e.        Holden continued to treat the Plaintiff much more harshly and rudely than her male counterparts. In August 2020, Houlden filled the Plaintiff's performance review with false criticism and unnecessary negative comments. When the Plaintiff opposed the discriminatory treatment and attempted to fill in the "employee comments" portion of the performance evaluation, Houlden bullied the Plaintiff, stating that she "shouldn't go off and write a bible study," "don't do that bullshit with me," and "no one is going to read" her comments.

5

f.      On September 17, 2020, Plaintiff submitted a detailed rebuttal establishing the false bases for Houlden's evaluation of her.

g.      Houlden's hostile treatment of the Plaintiff became more open and apparent over time with other employees joined in on the discriminatory treatment of her. On November 4th, 2020, Daeho Kim ("Kim"), a colleague on the device team, rudely interrupted the Plaintiff during a team meeting, screaming at her to "stop, stop, just stop." Just like with John Does 1 and 2, Defendant Houlden seemingly had no issue with Kim's conduct.

h.      On or about December 14, 2020, Houlden abruptly terminated the Plaintiff, where he accused the Plaintiff of having an argument with Kim, an apparent reference to the November 4th meeting in which Kim was the aggressor. Houlden also referenced the Plaintiff's opposition to his discriminatory performance review stating, "I told you on your review, don't do a thesis on the feedback on your review to me, you don't listen."

18.      Defendant also discriminated against the Plaintiff with regards to her severance and stock. Defendant offered the Plaintiff a mere two (2) weeks of base and COBRA insurance. This offer was grossly deficient when compared to the packages believed to be offered individuals outside the Plaintiff's protected class.

19.      Defendant also forfeited the Plaintiff's unvested Restricted Stock Awards ("RSA"). Every year for the first four years of employment 25% of the Plaintiff's shares were to be vested. Defendant fired the Plaintiff only two (2) months and three (3) weeks away from vesting the remaining 25% of RSA shares. In contrast, as a courtesy, on at least three (3) occasions, Defendant is believed to have allowed other white male employees to accelerate the vesting of their remaining shares.

6

20.     The Plaintiff is also believed to have been paid a disproportionately lower salary compared to counterparts outside her protected class(es). While the Plaintiff voluntarily took a lower salary at the start of her employment in exchange for more RSAs in early 2017, Defendant perpetuated the lower salary by providing her raises that failed to bring her into alignment with her male peers as the RSAs passed. Defendant's abrupt termination of the Plaintiff shortly before her remaining 25% of stocks were scheduled to vest only further magnified the unequal pay.

## IV.     LEGAL CLAIMS

### COUNT I
#### *(Wrongful Discharge in Violation of North Carolina Public Policy)*

21.     The allegations contained in the foregoing paragraphs are incorporated by reference herein.

22.     The public policy of the state of North Carolina as set forth in the Equal Employment Practices Act, N.C. Gen. Stat. § 143-422 *et seq.*, prohibits employers from discriminating against an employee because of the employee's sex, national origin, and/or race.

23.     Defendant is, and at all relevant times, was a covered employer under the public policies of the state of North Carolina.

24.     Defendant violated these public policies by terminating the Plaintiff because she is a female of Asian descent, discriminating against her sex, race, and/or national origin.

25.     As a proximate cause of Defendant's wrongful conduct, Plaintiff has suffered lost income, lost bonuses and commissions, and other fringe benefits, diminished earning capacity, damage to reputation, medical expenses, consequential damages, and other damages in an amount sufficient to invoke Superior Court jurisdiction under N.C.G.S. §7A-243, and is otherwise entitled to recover compensatory damages in a sufficient amount to invoke Superior Court jurisdiction under N.C.G.S. §7A-243.

7

26.     Defendant's actions were done maliciously, willfully or wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages in a sufficient amount to invoke Superior Court jurisdiction under N.C.G.S. §7A-243.

## Count II
### *(Violations of Title VII of the Civil Rights Act of 1964)*

27.     The allegations contained in the foregoing paragraphs are incorporated by reference herein.

28.     Plaintiff is, and at all relevant times, was an employee covered by the protections of Title VII.

29.     Defendant is, and at all relevant times was, an employer as defined in 42 U.S.C. § 2000e(b) and subject to the prohibitions of Title VII.

30.     Title VII prohibits discrimination in the terms and conditions of employment based on sex, national origin, and race.

31.     Defendant engaged in unlawful employment practices by discriminating against her because of her sex, race, and/or national origin by: (i) discriminating against her in pay and benefits (including with respect to her salary, accelerating the vesting of shares upon termination and severance pay); (ii) subjecting her to an unlawful hostile work environment; and (iii) by wrongfully terminating her.

32.     As a proximate cause of the unlawful acts of Defendant, Plaintiff has suffered lost wages, lost bonuses and other fringe benefits, diminished earning capacity, reputational damages, emotional distress, anxiety, humiliation, expenses, and other damages and is therefore entitled to recover compensatory damages and consequential damages in an amount sum sufficient that

8

subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

33.     Defendant's actions were done maliciously, willfully, or wantonly or in a manner that recklessly disregarded Plaintiff's rights. As a result of this outrageous conduct, Plaintiff is entitled to recover punitive damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243, treble damages and punitive damages.

## COUNT III
### *(Violations of the Equal Pay Act of 1963)*

34.     The allegations contained in the foregoing paragraphs are incorporated by reference herein.

35.     Defendant is, and at all relevant times, was an employer under the Equal Pay Act ("EPA").

36.     Plaintiff is, and at all relevant times, was an employee under the provisions of the Equal Pay Act.

37.     The Equal Pay Act requires that men and women in the same workplace be given equal pay for equal work. All forms of pay are covered by this law, including with respect to stock issuances and severance pay. 29 U.S.C. §206(d)(1) (1938).

38.     Defendant violated the EPA by paying the Plaintiff at a lesser rate than comparable male peers during her employment, by not accelerating her stock shares when she was terminated (as it has done with comparable male employees) and by paying her less severance than it had paid to comparable male employees.

40.     Defendant lacked a good faith or reasonable grounds to discriminate against Plaintiff in this fashion such that liquidated damages are recoverable.

9

41.     Defendant's actions were done maliciously, willfully, or wantonly or in a manner that recklessly disregarded Plaintiff's rights such that a three year look back period is appropriate.

## JURY TRIAL DEMANDED

WHEREFORE, the Plaintiff prays the Court to:

1.     Enter a judgment against Defendant and order Defendant to pay Plaintiff compensatory damages in excess of an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243 and punitive damages;

2.     Enter a judgement awarding Plaintiff liquidated and punitive damages;

3.     Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

4.     Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances, including front pay; and

5.     Grant Plaintiff a trial of this matter by a jury.

This the 18th day of February, 2022.

Josh Van Kampen (NC Bar No. 32168)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: 704-247-3245
Fax: 704-749-2638
josh@vankampenlaw.com
*Attorney for Plaintiff*

10

# EXHIBIT B

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBURG**

**IN THE GENERAL COURT OF
JUSTICE SUPERIOR COURT DIVISION
22-CVS-2643**

| | |
|---|---|
| YA "ANNIA" SHEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) |
| | ) **NOTICE OF REMOVAL** |
| AKOUSTIS TECHNOLOGIES, INC., | ) |
| | ) |
| Defendant. | ) |

To:   Elisa Chinn-Gary
      Clerk of the Mecklenburg County Superior Court
      832 E. 4th Street
      Charlotte, North Carolina 28202

PLEASE TAKE NOTICE the Defendant, Akoustis Technologies, Inc. ("Defendant"), through the undersigned counsel, has this day served for filing a Notice of Removal in the United States District Court for the Western District of North Carolina, Charlotte Division, for the removal of this action from the General Court of Justice, Superior Court Division, Mecklenburg County, State of North Carolina.  A copy of the Notice of Removal filed with the federal court is attached hereto as Exhibit A.

Dated this 11th day of March, 2022.          Respectfully submitted,

                                             By: _____
                                             David I. Klass (NC Bar No. 53342)
                                             Virginia M. Wooten (NC Bar No. 48180)
                                             **FISHER PHILLIPS LLP**
                                             227 West Trade Street, Suite 2020
                                             Charlotte, North Carolina 28202
                                             Telephone:  (704) 334-4565
                                             Facsimile:  (704) 334-9774
                                             dklass@fisherphillips.com
                                             vwooten@fisherphillips.com
                                             *ATTORNEYS FOR DEFENDANT*

1

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBURG**

**IN THE GENERAL COURT OF**
**JUSTICE SUPERIOR COURT DIVISION**
**22-CVS-2643**

| | |
|---|---|
| **YA "ANNIA" SHEN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **V.** | ) |
| | ) |
| **AKOUSTIS TECHNOLOGIES, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2022, I have this day served a copy of the foregoing Notice of

Removal by placing a copy of same in the United States mail, postage prepaid and addressed to:

Josh Van Kampen
**Van Kampen Law, PC**
315 East Worthington Avenue
Charlotte, NC 28203
josh@vankampenlaw.com
Attorney for Plaintiff

This the 11th day of March, 2022.

Respectfully submitted,

By:     /s/ Syneetra Hill
        Syneetra Hill
        **FISHER PHILLIPS LLP**

2

# EXHIBIT 10



# Transcript of Michael Hodge, II

**Date:** July 11, 2023
**Case:** Qorvo, Inc. -v- Akoustis Technologies, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Michael Hodge, II
Conducted on July 11, 2023                               8

```
 1                I will swear in the witness, and then we     09:14:12
 2      may proceed.                                            09:14:14
 3                Witness, can you please raise your right      09:14:16
 4      hand?
 5                     MICHAEL HODGE, II,
 6                Called as a witness, having first
 7                been duly sworn in, testified as
 8                follows:
 9                     DIRECT EXAMINATION
10      BY MR. DEFOSSE:
11          Q.   Good morning, Mr. Hodge.                       09:14:29
12          A.   Good morning.                                  09:14:31
13          Q.   As you heard, my name is John DeFosse, we met  09:14:32
14      off the record.  I represent Qorvo in this matter, the  09:14:37
15      plaintiff.                                              09:14:39
16          A.   Okay.                                          09:14:39
17          Q.   Could you state your full name for the record, 09:14:40
18      please?                                                 09:14:42
19          A.   Full name is Michael David Hodge, II.          09:14:42
20          Q.   You understand that you're testifying today    09:14:45
21      under oath?                                             09:14:48
22          A.   Yes.                                           09:14:48
23          Q.   And that's the same oath that you would take if 09:14:48
24      you were in a court of law?                             09:14:52
25          A.   Yes.                                           09:14:53
```

Transcript of Michael Hodge, II
Conducted on July 11, 2023

130

```
 1        A.  I think he had a preference, but I think the      12:22:19
 2    preference wasn't technical.  The preference was more,     12:22:21
 3    he -- he kind of can speak their language and, like,       12:22:24
 4    they're familiar with the processes he wanted to do, the   12:22:31
 5    people -- you know, that sort of thing.  I felt it was     12:22:33
 6    more of a familiarity thing.  That's the way I read it,    12:22:36
 7    but anyway.                                                12:22:39
 8        Q.  And by "the processes," he wanted to do the        12:22:40
 9    familiarities because they were working on the same        12:22:42
10    processes?                                                 12:22:44
11        A.  Oh, I meant processes as in like how you design    12:22:45
12    a product, you know, what's expected in a data sheet,      12:22:49
13    what's expected -- you know, what the level -- you know,   12:22:52
14    sometimes work cultures can vary from company to           12:22:54
15    company, so he -- I think it was more of a                 12:22:57
16    work-culture-type thing is the way I saw it.  You know,    12:23:00
17    to be honest with you, you know, I don't know if I         12:23:03
18    stated this yet in this deposition, but, you know, as      12:23:06
19    far as technically, when it came to Qorvo, you know, I     12:23:09
20    didn't really find -- especially when it's talking about   12:23:13
21    the resonator technology, it's no different.  It's a       12:23:18
22    solidly mounted resonator compared to a suspended          12:23:23
23    resonator like Akoustis was doing -- I just want to make   12:23:26
24    sure that's on the record.  So anyway, just to clarify,    12:23:27
25    like earlier when you were asking me about the documents   12:23:29
```

Transcript of Michael Hodge, II
Conducted on July 11, 2023

131

| | | |
|---|---|---|
| 1 | that he had handed me about that filter and it sounds | 12:23:32 |
| 2 | like now you've -- it sounds like it may have been an | 12:23:35 |
| 3 | automotive filter, you know, that filter, you know, I | 12:23:37 |
| 4 | didn't really find any of that information useful for | 12:23:40 |
| 5 | designing filters, again, because it's such a different | 12:23:43 |
| 6 | technology. | 12:23:46 |
| 7 |     Q.  So is that to say when he handed you the Qorvo | 12:23:46 |
| 8 | confidential information back in 2016, you took the time | 12:23:51 |
| 9 | to really go through and investigate all that | 12:23:54 |
| 10 | information and reach the conclusion that it wasn't | 12:23:57 |
| 11 | useful to you? | 12:24:00 |
| 12 |     A.  Oh, I didn't have to reach -- I just looked at | 12:24:00 |
| 13 | it.  I mean, I looked at it, like, for instance, there's | 12:24:03 |
| 14 | a schematic in there, right. | 12:24:05 |
| 15 |     Q.  Yes. | 12:24:07 |
| 16 |     A.  A resonator, to tell you the size of the | 12:24:08 |
| 17 | resonator and all this stuff, if I was to take that and | 12:24:08 |
| 18 | put it on a mask -- this is hypothetical; it didn't | 12:24:09 |
| 19 | happen.  I'm just saying, hypothetically, if you were to | 12:24:13 |
| 20 | take those, put that on a mask fabricated in the fab, it | 12:24:20 |
| 21 | would not work.  It would not look like a filter.  It's | 12:24:22 |
| 22 | just that different. | 12:24:22 |
| 23 |         Everything about a schematic and a design | 12:24:23 |
| 24 | of a resonator is dependent on the process and the stack | 12:24:25 |
| 25 | that it comes from. | 12:24:29 |

Transcript of Michael Hodge, II
Conducted on July 11, 2023                              132

| | | |
|---|---|---|
| 1 | So -- so anyway, I just want to make sure | 12:24:30 |
| 2 | that's clarified, right.  So it's really -- it would be | 12:24:33 |
| 3 | very difficult to take what was said in those documents | 12:24:37 |
| 4 | and just, like, directly apply it.  I mean, as a | 12:24:40 |
| 5 | technologist, it's interesting to see what other people | 12:24:44 |
| 6 | are doing, but that's just it.  It's a curiosity; it's | 12:24:46 |
| 7 | interesting, but as far as, like, is it actionable, that | 12:24:51 |
| 8 | I can do on my job and make, like, a better part, I | 12:24:54 |
| 9 | couldn't -- I would never make that claim. | 12:24:57 |
| 10 |     Q.  Okay. | 12:24:58 |
| 11 |         (Exhibit 14 marked for identification.) | 12:25:18 |
| 12 |     Q.  BY MR. DEFOSSE:  All right.  Mr. Hodge, the | 12:25:44 |
| 13 | court reporter's handed you what's been marked as | 12:25:45 |
| 14 | Exhibit 14. | 12:25:48 |
| 15 |     A.  Yes. | 12:25:48 |
| 16 |     Q.  If you'll just take a minute, review the | 12:25:50 |
| 17 | document and refresh yourself as to what's going on | 12:25:53 |
| 18 | here. | 12:25:56 |
| 19 |     A.  (Witness examining document.) | 12:25:57 |
| 20 |         Okay.  Yes.  I've read this top part where | 12:26:24 |
| 21 | it references Qorvo.  It looks like this is me talking | 12:26:27 |
| 22 | about design here.  Okay.  Yes.  And then this is -- | 12:26:30 |
| 23 | yes.  This is, like, a very early prototype of 1252. | 12:26:34 |
| 24 | Yes. | 12:26:39 |
| 25 |     Q.  Okay. | 12:26:39 |

Transcript of Michael Hodge, II
Conducted on July 11, 2023                                    231

```
1                    CERTIFICATE OF REPORTER

2

3               STATE OF CALIFORNIA  )

4                                    )

5               COUNTY OF LOS ANGELES)

6

7                    I, TAMIKA M. BURNETTE, hereby certify

8       that the foregoing proceedings were taken before me at

9       the time and place therein designated; that a review of

10      the transcript was requested, and that the foregoing

11      pages numbered 1 through 229 are a true and correct

12      record of the aforesaid proceedings.

13                    I further certify that I am not a relative,

14      employee, attorney or counsel of any of the parties, nor

15      am I a relative or employee of any of the parties'

16      attorneys or counsel connected with the action, nor am I

17      financially interested in the action.

18                        Tamika Burnette

19

20               DATED this 25th day of July, 2023

21               _____

22                    TAMIKA M. BURNETTE

23               CERTIFIED COURT REPORTER, RPR, CSR-14502

24

25
```