EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

QORVO, INC.,                       |
                                   |
          Plaintiff,               |
                                   |
vs.                                |   NO. 21-CV-01417
                                   |
AKOUSTIS TECHNOLOGIES,             |
INC., AND AKOUSTIS, INC.,          |
                                   |
          Defendants.              |
_____


TRANSCRIPT OF THE MOTION HEARING

BEFORE THE

HONORABLE JON P. MCCALLA


TUESDAY

APRIL 2, 2024


TINA DuBOSE GIBSON, RPR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103


UNREDACTED TRANSCRIPT

1              A P P E A R A N C E S

2

3

        Appearing on behalf of the Plaintiff:
4

5            JONATHAN R. DEFOSSE
             ROBERT M. MASTERS
6            Sheppard, Mullin, Richter & Hampton, LLP
             2099 Pennsylvania Avenue, NW
7            Suite 100
             Washington, DC  20006-6801
8            (202) 747-1900
             jdefosse@sheppardmullin.com
9            rmasters@sheppardmullin.com

10

             JENNIFER KLEIN AYERS
11           Sheppard, Mullin, Richter & Hampton, LLP
             2200 Ross Avenue
12           20th Floor
             Dallas, Texas  75201
13           (469) 391-7414
             jayers@sheppartmullin.com
14

15           JEREMY A. TIGAN
             Morris, Nichols, Arsht & Tunnell LLP
16           1201 North Market Street, 16th Floor
             Wilmington, Delaware 19899-1347
17           (302) 351-9106
             jtigan@morrisnichols.com
18

19

20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

1          Appearing on behalf of the Defendants:

2              RONALD S. LEMIEUX
               VICTORIA Q. SMITH
3              DAVID S. ELKINS
               XIAOMEI CAI
4              MATTHEW STANFORD
               Squire Patton Boggs
5              1841 Page Mill Road
               Suite 150
6              Palo Alto, California 94304
               (650) 843-3330
7              ronald.lemieux@squirepb.com
               victoria.smith@squirepb.com
8              david.elkins@squirepb.com
               xiaomei.cai@squirepb.com
9              matthew.stanford@squirepb.com

10

               STEPHEN B. BRAUERMAN
11             Bayard, PA
               600 North King Street, Suite 400
12             Wilmington,Delaware 19801
               (302) 655-5000
13             sbrauerman@bayardlaw.com

14

         Also Present:   Drew Wright

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

```
 1                        TUESDAY

 2                      APRIL 2, 2024

 3                 ----------------------

 4

 5        THE COURT:  All right.  We have three Daubert

 6  motions that we're going to talk about today.  We have

 7  extensive materials on them.  I suggest that you make your

 8  best point, and if you start repeating your brief, I suggest

 9  you stop because that's not going to help us any.  But we do

10  have some interesting situations.

11        We're going to start with Qorvo's motion to

12  exclude expert Irwin, and we do understand that there might

13  be -- well, as to each of these, there are actually real

14  questions as to whether or not the individual should testify.

15  Some more so than others, I might say.  But you can probably

16  surmise who might not be appropriate in this case.  But I'm

17  not going to -- I'm not going to tell you.

18        So we're going to start with Qorvo's motion in

19  this.  I'm looking to who is going to lead on that?

20        Is it Ms. Ayers?

21        MS. AYERS:  It is, Your Honor.  Good morning.  I

22  will be leading on behalf of Plaintiff Qorvo with respect to

23  Ms. Irwin.

24        THE COURT:  Okay.  And, obviously, there are some

25  issues here.  There is -- obvious -- we all understand that
```

UNREDACTED TRANSCRIPT

1    *Daubert* is not for the purpose of eliminating or making

2    judgments regarding credibility of witnesses.  So we know

3    that.  And the question is whether they have an adequate

4    methodology, for example, whether they've employed that

5    methodology.

6             And, of course, is their opinion factually based

7    or is it simply talk?  Is it simply you might say hot air?

8    Is it really something that's not supported at all in the

9    record, among other things?  Of course, we can go through the

10   factors under *Daubert* if you want to.  We'll be glad to do

11   that.

12            We have the -- we have page 3 of your material,

13   which I'm not sure if it's -- yeah, it is -- on the avoided

14   costs associated with use of confidential Qorvo information

15   and so forth.  And so I want to -- I really am interested in

16   what you're going to say about this.  I understand that,

17   however, the witness did say that she was assuming that these

18   were trade secrets.

19            Do you agree with that, even though she might

20   have said there were no misappropriated trade secrets.

21            MS. AYERS:  Thank you, Your Honor.

22            So I do agree with you that the witness has

23   opined and has testified that she has assumed

24   misappropriation of trade secrets occurred.

25            Fundamentally, the issue with her opinions is not

UNREDACTED TRANSCRIPT

1    that lack of assumption.  It's that that assumption is -- has

2    a disconnect between the opinion that she's offering and the

3    opinions that she has admittedly relied upon from

4    Drs. Darveaux and Lebby.

5             And I think that your focus on page 3 and the

6    calculations that she employed with respect to her opinions

7    is an important one.  So when you look at the table on page 3

8    of Qorvo's motion, what Ms. Irwin does is she goes through

9    each of the groups of trade secrets that Qorvo has identified

10   that Akoustis misappropriated.  And what she's done is she

11   has identified the total number of engineering hours and the

12   total costs associated with each one of those groups.

13            And she has admitted in her deposition testimony

14   and in her report, quite frankly, that she does not have the

15   expertise necessary in order to identify those engineering

16   hours or to identify those costs.

17            She has admittedly relied upon Akoustis's

18   technical experts, Drs. Darveaux and Lebby, for both of those

19   numbers, and that she applies a value associated with

20   engineering hours and then calculates out that value in order

21   to reach her ultimate number, which is what her opinion

22   ultimately is in the case.

23            And the problem with her reliance upon

24   Drs. Darveaux and Lebby is that their opinions and those

25   hours estimates are completely predicated upon the fact that

UNREDACTED TRANSCRIPT

1  they are opining that Akoustis took no trade secret

2  information from Qorvo.

3          And what I mean by that is when you look at

4  Dr. Darveaux's and Dr. Lebby's opinions, which we have quoted

5  from extensively in our reply brief, as an example, a portion

6  of Dr. Darveaux's opinions from his expert report and certain

7  parts of his testimony, those hours estimates are predicated

8  upon Akoustis's employees going to the Internet and looking

9  for information that is publicly available and then compiling

10  that information themselves.

11          And so Drs. Darveaux and Lebby did not ultimately

12  offer an opinion as to how many hours Akoustis saved when it

13  misappropriated Qorvo's trade secrets.  Drs. Darveaux and

14  Lebby provide opinions as to the total hours it would take an

15  Akoustis employee to identify publicly available information

16  on the Internet and then regurgitate that in a document that

17  would be useful to Akoustis.

18          And so the totality of what their opinions are is

19  that there were no trade secrets that were taken from Qorvo,

20  and they simply saved a couple of hours with each grouping by

21  not having to search the Internet and identify the publicly

22  available information that Akoustis ultimately took from

23  Qorvo.

24          And so we have a situation here where Akoustis's

25  experts are kind of talking out of both sides of their

UNREDACTED TRANSCRIPT

1   mouths.  Drs. Darveaux and Lebby are going to opine that

2   Akoustis took no Qorvo trade secrets.  That's their --

3              THE COURT:  I'm not sure that Dr. Lebby is going

4   to opine to that.

5              MS. AYERS:  Okay.  Okay.  Well, Dr. Darveaux --

6              THE COURT:  He may.  He may, but I -- he's got

7   some rather odd statements to deal with.

8              MS. AYERS:  Sure.  And I appreciate that

9   commentary, Your Honor.

10             Dr. Darveaux will certainly and Akoustis would

11  like for Dr. Lebby to opine that Qorvo -- that Akoustis took

12  no Qorvo trade secrets, and at most, they saved a couple of

13  hours of time.  And Ms. Irwin --

14             THE COURT:  I want to know exactly how -- well,

15  let's go to counsel opposite.  We understand -- I think we've

16  got the argument down.

17             Let's go to counsel opposite.

18             MS. AYERS:  Thank you, Your Honor.

19             THE COURT:  Absolutely.  It's helpful.  Good

20  start here.  And let's go to counsel opposite.  And who is

21  responding?

22             Is it Ms. Smith?

23             MR. ELKINS:  No, Your Honor.  It's Dave Elkins

24  here for Akoustis.

25             THE COURT:  Okay.  Mr. Elkins.  Absolutely.

UNREDACTED TRANSCRIPT

1          Okay.  It's a fairly simple calculation here,
2   page 3.  Is that pretty well how it's calculated?

3          MR. ELKINS:  Yes, that's how it's calculated.

4          THE COURT:  Now, let me ask this:  How does this
5   particular witness know what would be a reasonable time for
6   each of these activities?

7          MR. ELKINS:  Ms. Irwin, as she may, is relying on
8   the experts, Drs. Darveaux and Lebby.

9          THE COURT:  That may not work out very well.
10  What documents is she relying on to show that the timelines
11  are appropriate?  Does this amount of calculation --

12         MR. ELKINS:  She --

13         THE COURT:  You have to do a lot in *Daubert,* so
14  you may get to put it on, but it's kind of interesting.

15         MR. ELKINS:  Yeah.  She's relying on -- they did
16  an extensive analysis, each of them, in their reports, and
17  they testified to that in response to questioning from
18  counsel at their depositions about their estimates of the
19  time that it would take for somebody to recreate the alleged
20  trade secrets.  And while Ms. --

21         THE COURT:  Okay.  And just tell me right now.
22  Did they point to precisely every place on the -- on the
23  Internet where they found each of -- just to be sure, just go
24  ahead on that.

25         MR. ELKINS:  Yes, they did, but it's not just the

UNREDACTED TRANSCRIPT

1  Internet, Your Honor.  It's also documents that are --

2              THE COURT:  Sure.

3              MR. ELKINS:  There's a term "teardowns," so there

4  are companies out there, multiple companies out there who

5  will acquire products that companies put out, and they will

6  tear down --

7              THE COURT:  Right.

8              MR. ELKINS:  -- semiconductors layer by layer,

9  and they're expensive to get.  Those costs are reflected in

10  Ms. Irwin's analysis, as you can see, that there's the cost

11  to obtain the information.

12              THE COURT:  Right.

13              MR. ELKINS:  Some cases 10,000 or $30,000.  And

14  that is -- that is calculated along with the labor costs,

15  fully loaded labor costs that it would take somebody, and she

16  took the most highly paid Akoustis engineer in that position,

17  including, you know, unemployment benefits and payroll tax

18  baked in to arrive at an hourly rate, and she multiplied that

19  by the hours.

20              Now, Ms. Ayers has suggested that, you know, they

21  would have spent a couple of hours searching on the Internet.

22  The number of hours estimated by Drs. Lebby and Darveaux is

23  1,213 hours.  That is not a small lift.

24              THE COURT:  1,216?

25              MR. ELKINS:  1,216 hours.

UNREDACTED TRANSCRIPT

1          THE COURT:  Right.  I thought you said 13.  Okay.

2          MR. ELKINS:  I'm sorry.  Yeah, 1,216.  That's

3    reflected in the chart at the bottom.

4          THE COURT:  I know that.  I know that.  What I

5    was saying is I think you may have misspoke.  Go ahead.

6          MR. ELKINS:  So it's not a matter of just looking

7    on the Internet.  It's a matter of, yes, looking on the

8    Internet because there are a lot of documents and, you know,

9    if we go to trial, you will be hearing a lot of evidence

10   about, you know, these alleged trade secrets being all over

11   the place on the Internet, including with Qorvo's little

12   statements about being confidential and proprietary.

13         And some of those -- some of those documents are

14   what they're talking about, but others is the -- you know,

15   other sources of the same information.  It's not easy to

16   compile.  That's why it takes 1,216 hours.  But it is a

17   substantial amount.  And under Rule 702, Ms. Irwin is

18   completely justified in relying on the opinions of other

19   experts who do have the technical capabilities that she lacks

20   to provide the kind of information on which she relies here.

21         THE COURT:  Sure.  Sure.

22         Anything else that you want to say on this

23   particular one?  Does the fact that she is coming from a

24   position, I think, that she doesn't believe any trade secrets

25   were taken, but she's going to make the assumption?  Does

1   that undermine it in some way?

2            MR. ELKINS:  No.  I mean, every damages expert on

3   the defense must assume liability.

4            THE COURT:  Sure.

5            MR. ELKINS:  That's a given, right?  Otherwise,

6   there would be, you know -- you could --

7            THE COURT:  Right.

8            MR. ELKINS:  You would never have it.  And in --

9   really what I heard Ms. Ayers saying here in her argument is

10  that it is Drs. Lebby and Darveaux who allegedly are speaking

11  out of two sides of their mouths.

12           That is a -- if that is really the problem that

13  Qorvo has here, then it should have brought a -- it should

14  have directed its *Daubert* challenge against them.  Now,

15  obviously, they have brought the motion against Dr. Lebby.

16           THE COURT:  Right.

17           MR. ELKINS:  You've made remarks about that, but

18  they have not challenged Dr. Darveaux's testimony.

19           THE COURT:  Right.

20           MR. ELKINS:  And Ms. Irwin did exactly what a

21  defense damages expert is supposed to do.  She assumes

22  liability.  She assumes that the information that is

23  encompassed by the 104 categories of trade secrets alleged by

24  Qorvo could have been replicated in a, you know, very long

25  and expensive analysis but could have been replicated because

UNREDACTED TRANSCRIPT

1    that's what Drs. Darveaux and Lebby show in their reports.

2    And she can appropriately rely on that.

3            If the jury doesn't believe Drs. Darveaux and

4    Lebby, then, you know, the jury can so indicate in the

5    verdict form.  But Ms. Irwin did everything that she is

6    supposed to do.

7            I also want to say that, you know, given this --

8    you know, this semantics issue that on which Qorvo hangs its

9    hat, you know, if this was really the conundrum that it

10   portrays, then no defense expert could ever testify about an

11   avoided costs unjust enrichment theory because, on the one

12   hand, they have to assume liability.

13           On the other hand, they must assume that the

14   trade secrets alleged could have been obtained in a different

15   manner by not --

16           THE COURT:  I think we've covered that.  We've

17   got that.  I appreciate that.  I think that's always useful.

18           MR. ELKINS:  Okay.  Thank you.

19           THE COURT:  Well, let's go back -- I was trying

20   to let Ms. Ayers sort of think through about how she's going

21   to respond to that.  This is one where it looks like a pretty

22   basic calculation.  I think the fundamental issue is possibly

23   whether Dr. Lebby is going to come in or not, and then you

24   did not challenge the material from Darveaux.

25           So where does that leave you?

UNREDACTED TRANSCRIPT

1          MS. AYERS:  So, Your Honor, I have two points

2     that I kind of want to make before we wrap up the arguments

3     on this motion.

4          THE COURT:  Sure.

5          MS. AYERS:  First, Ms. Irwin knowingly opined as

6     to a damage model where she knew Drs. Darveaux and Lebby were

7     predicating their opinions on the public availability

8     information.  And I just want to call your attention --

9          THE COURT:  Sure, sure.

10         MS. AYERS:  -- to page 3 of our motion, which is

11    quoting paragraph 77 of Ms. Irwin's report --

12         THE COURT:  Sure.

13         MS. AYERS:  -- where she says that for each of

14    the eight groups Dr. Shanfield identifies, Drs. Darveaux and

15    Lebby purport to identify the time it would take to -- a

16    typical Akoustis engineer to find information publicly and

17    the cost to purchase such information.

18         Importantly here, the jury is not going to reach

19    damages if trade secrets are all over the Internet because,

20    fundamentally, under both the DTSA and the North Carolina

21    trade secret statute, trade secrets are defined as

22    information that is not publicly available.

23         THE COURT:  Right, right.

24         MS. AYERS:  And so I disagree with Mr. Elkins

25    that the issue we have is truly with Dr. Darveaux's and

UNREDACTED TRANSCRIPT

1  Dr. Lebby's opinions.  I mean, obviously, we brought a

2  *Daubert* paper against Dr. Lebby.  The problem isn't that

3  Dr. Darveaux is opining that the information Akoustis took

4  was publicly available and an Akoustis employee could have

5  found that information in ten hours or eight hours or 16

6  hours.

7          The problem is that Drs. Darveaux and Lebby

8  offered no opinions upon which Ms. Irwin could rely, that

9  attempted to identify the total amount of time that Akoustis

10  would have required to recreate the information they took if

11  it were not publicly available on the Internet.  And that's

12  what Ms. Irwin predicated her opinion on, and she knew at the

13  time that she offered her opinion that it was based upon the

14  public availability of this information.

15          And so, you know, our concern and the reason why

16  we brought our *Daubert* paper is that a jury is supposed to

17  stop and not even reach the question of damages in the

18  verdict form if they've determined that a trade secret was

19  not taken.

20          THE COURT:  That's correct.  That is correct.

21          MS. AYERS:  And so I think, fundamentally, that's

22  our concern and our issue and why Ms. Irwin's -- why

23  Ms. Irwin's opinions here are not reliable and kind of don't

24  fit the facts of the case as set forth by the opinions that

25  Akoustis is offering through its technical witnesses.

UNREDACTED TRANSCRIPT

```
 1                 THE COURT:  Okay.  All right.  I think we've got
 2      this one down really.
 3                 Anything else?
 4                 MR. ELKINS:  Your Honor.
 5                 THE COURT:  Yes, sir?
 6                 MR. ELKINS:  If I could, just very briefly.
 7                 THE COURT:  Sure.
 8                 MR. ELKINS:  I apologize for interrupting here.
 9                 First, Ms. Irwin testified and she admitted that
10      if the jury disagrees with Drs. Darveaux and Lebby --
11                 THE COURT:  Right.  She said that.
12                 MR. ELKINS:  -- then -- yeah.  Then this doesn't
13      go anywhere.
14                 THE COURT:  Right.
15                 MR. ELKINS:  But the notion that you could --
16                 THE COURT:  If they disagree with Darveaux and
17      Lebby regarding the availability to independently obtain the
18      information, and then, of course, yes, and that's correct.  I
19      agree with you.
20                 MR. ELKINS:  Correct.  But the issue here is that
21      absolute secrecy is not required to qualify as a trade
22      secret.
23                 THE COURT:  No, that's true.
24                 MR. ELKINS:  We quoted the Restatement of Unfair
25      Competition (Third) in Section 39 in our brief where it says,
```

UNREDACTED TRANSCRIPT

1    the information must be secret, but it need not be absolute.

2    It only requires secrecy sufficient to confer an actual or

3    potential economic advantage on one who possesses the

4    information.  Thus, the requirement of secrecy is satisfied

5    if it would be difficult or costly for others to acquire it

6    without resorting to misappropriation.

7              And that's what we're talking about here.

8              THE COURT:  Right.

9              MR. ELKINS:  1,216 hours and, you know, over

10   $300,000 is not a small lift, and that was our point.  And

11   that was the point that I really wanted to make in response.

12             THE COURT:  Right.  I'm going to let Ms. Ayers

13   say one last thing if she wants to, but I think this one is

14   pretty straightforward, and we probably know what we need to

15   do, but we'll tell you later in a written order.

16             Ms. Ayers?

17             MS. AYERS:  Thank you so much, Your Honor, for

18   the opportunity.

19             I would say that our reply addresses the last

20   argument that Akoustis made kind of head on.  And

21   Drs. Darveaux and Lebby made no attempt to identify a unified

22   process design or operation of which, in unique combination,

23   although publicly available, was secret in order to opine as

24   to whether or not Akoustis took Qorvo's trade secrets.

25             They straight up just said the information is

UNREDACTED TRANSCRIPT

1   publicly available on the Internet.  There's nothing trade

2   secret here.  That opinion is reiterated over and over and

3   over again.  And, unfortunately, for Ms. Irwin, she has to

4   rely upon that opinion for purposes of opining as to the

5   avoided costs that she's offered.  And that's why her opinion

6   should be excluded under *Daubert.*

7        THE COURT:  All right.  I think we've got it.

8   And thank you both for that pretty concise representation.

9        Now, we've got an interesting thing with

10  Dr. Lebby.  He apparently has great familiarity with some

11  subjects that I'm sort of surprised about.  And so this is a

12  little odd.  Let's hear from whoever is going to lead for

13  Qorvo on that.

14       And I'm assuming that that is Mr. DeFosse?

15       MR. DEFOSSE:  That's right, Your Honor.  Good

16  morning.  Thank you.

17       THE COURT:  How are you doing today?

18       MR. DEFOSSE:  I'm doing well.  Thank you very

19  much for asking.

20       THE COURT:  Good.

21       MR. DEFOSSE:  So we've asked to exclude

22  Dr. Lebby's opinions on four topics.  I think only three of

23  those are still at issue, I think.  Akoustis has agreed that

24  one of the -- one of the grounds should be granted, and

25  that's on trade secret groups 2 through 7, where Dr. Lebby

UNREDACTED TRANSCRIPT

1   merely purported to incorporate by reference and agree with

2   the opinions of the other experts.

3           THE COURT:  Right.  I'm just going to check back,

4   but that's absolutely correct, and I don't think that's even

5   an issue here.  Let me check back with -- I'm not sure who

6   I'm going to.

7           Ms. Smith?

8           MS. SMITH:  Your Honor, good morning.  Yes, it's

9   me again.

10          THE COURT:  How are you?

11          MS. SMITH:  I'm good.  Thank you, Your Honor.

12          So, you know, there's no dispute that Dr. Lebby

13  is not opining on groups 2 through 7.  The only thing I

14  wanted to clarify is that of the numbered paragraphs in the

15  Lebby report that are listed in argument in that section,

16  it's only paragraphs 113 and 114 that relate only to groups 2

17  through 7.  The other paragraphs, which are paragraphs 3, 4,

18  72 to 75, 115, and 116 do cover groups 1 and 8, which are

19  what Dr. Lebby opines on.

20          THE COURT:  Okay.  Good deal.

21          Let's go back to Mr. DeFosse.

22          MR. DEFOSSE:  Thank you, Your Honor.

23          The second area we've asked for exclusion of

24  Dr. Lebby's opinions is on information security.  We've

25  proposed two grounds for excluding the opinions on those --

UNREDACTED TRANSCRIPT

1    on that topic.

2            First is that Dr. Lebby doesn't have any

3    qualifications to opine on information security topics.  And

4    the second is that his opinions are not reliable.  They're

5    just conclusory *ipse dixit* from an expert.

6            On the qualifications, I think most of the points

7    have been made in the briefs already, so I don't want to

8    belabor that too much unless Your Honor has questions.

9            I think the issue there comes down to two points.

10   One is whether having general experience in the electronics

11   industry qualifies Dr. Lebby to talk about information

12   security practices.  To us, this is corollary or analogous to

13   the cases in the Third Circuit where a party is asked to

14   offer expert testimony from a doctor and argued that, well,

15   they had medical training, and they're in the medical field.

16   And the Court has said, no, just because you have medical

17   training doesn't mean that you're entitled to opine on a

18   specific medical condition.

19           And that's what's really happened here.  He's

20   trying to leverage general experience into opining on a very

21   detailed, specific complex topic that you really need

22   specialized knowledge to talk about.  So that's the first

23   issue there.

24           I think the second issue in response to our

25   motion, the other side has attempted to attribute some

UNREDACTED TRANSCRIPT

1   specialized knowledge to Dr. Lebby concerning his specific

2   experience with information security.  I think the problem

3   with that is none of that has been disclosed.

4          It wasn't disclosed in his expert report.  Your

5   Honor can review the paragraphs dealing with his

6   qualifications.  There's not a single mention of any

7   expertise, knowledge, or anything related to information

8   security.  And the arguments in the opposition are merely, I

9   think, attorney arguments.

10         They, for example, said that Dr. Lebby created

11  information security policies.  There's no basis for that.

12  Dr. Lebby hasn't testified to that.  He hasn't included that

13  in a declaration.  It certainly wasn't in his report.

14         So I think to the extent we get beyond the

15  general knowledge and they're arguing that there's some

16  specialized knowledge or experience here, there's nothing in

17  the record to support that.

18         THE COURT:  Let's talk about information

19  security.  That does seem like a problem for the defense.

20         So I think, Ms. Smith, are we coming back to you?

21         MS. SMITH:  Yes.  Yes, Your Honor.

22         So, Your Honor, you have to consider what we're

23  talking about here.  We're talking about trade secrets, which

24  is a -- it's not just any confidential information.  It's a

25  very specialized form of confidential information, and it's

1   the kind of information that companies generally do not trust

2   the patent system to provide adequate protection and damages,

3   and so they keep it within the company.  So trade secrets are

4   few and far between.  And they're --

5          THE COURT:  Why do you think that that's actually

6   really the case?  It's true that they may not trust the

7   patent system in that regard, but some things would be

8   difficult to obtain a patent on, but they're certainly very

9   important in terms of processes, et cetera.  And, of course,

10  you can't get a patent on certain types of information at

11  all.  It's just information, like business plans, right?

12         MS. SMITH:  Right.

13         THE COURT:  So that argument doesn't really go

14  across the field, right?

15         MS. SMITH:  Well, the reason why I speak to that

16  is because the need-to-know basis for trade secrets is a way

17  of keeping trade secrets secret.  So the more people who know

18  about a trade secret, the more likely it's going to leak out

19  of the organization.

20         THE COURT:  Well, if they're all employees of the

21  company, though, then that's not -- you can't really consider

22  that, right?  I mean, that's not real appropriate to consider

23  that.  Although, it might be a little bit of a factor, but

24  say, generally, it's necessary for everybody in a certain

25  department to know about it, so that would be unusual, right?

1        MS. SMITH:  Well, it wouldn't be unusual for

2   specific people within the company to know about it, right.

3   But --

4        THE COURT:  You can't utilize it if it -- what

5   you do, that's the reason you emphasize trade secret

6   procedures.  You have confidentiality agreements and so

7   forth.  Go ahead.  I just -- now, if you let everybody in the

8   world know about it, that's a big problem.  If you take it to

9   a trade show, and you show everybody, that's a problem.  But

10  I don't think we have any incidents like that, do we?

11       MS. SMITH:  Well, there are certain -- there are

12  certain documents that are presented at conferences that have

13  the confidential label on it.

14       THE COURT:  Sure.

15       MS. SMITH:  Right?  So we can assume that -- we

16  can either assume that the employees are not aware that those

17  are actually confidential information or they are and they've

18  taken it to the trade shows, right?  So it's either one or

19  the other.

20       But the reason why Dr. Lebby is -- has specific

21  experience for information security, even though he does not

22  have certification, is because he has affirmatively dealt

23  with trade secrets both in -- sorry, Your Honor.

24       THE COURT:  I'm sorry.  Go through that again.

25  So where has he -- where did he -- was the architect of a

1    trade secret policy?  Just tell me exactly where.

2              MS. SMITH:  Well, he testified in his current

3    role as a CEO of a small startup company, there is no

4    information security department because there's -- there

5    aren't a lot of employees.

6              THE COURT:  Right.

7              MS. SMITH:  He's the CEO, and he's the one who is

8    basically the person who sets the -- you know, sets the rules

9    for how to handle all confidential information.  And he's one

10   of only two people designated in his company to even speak to

11   the public about any technology of his company because he --

12   only he can be sure, him and one other person, can be sure to

13   understand the rules so well that they will know what they

14   can say or what they can't say.

15             THE COURT:  Okay.  Well, let's go back on this.

16   I think it's an important issue, though.

17             Let's go back to counsel opposite on this.

18   Information security, what's wrong with their argument?

19             MR. DEFOSSE:  As I understand what Ms. Smith has

20   said, it's, I think, equivalent to what I was arguing, Your

21   Honor, which is that he has general experience in this

22   industry.  So he has experience with trade secrets.

23             Well, basically, a very large population of folks

24   have some exposure to trade secrets.  He's the CEO of a

25   company, and he's ultimately responsible.  The buck stops

UNREDACTED TRANSCRIPT

1   with him.  That doesn't qualify you to offer very specific

2   testimony about what qualifies as reasonable information

3   security practices; otherwise, any CEO in any industry that

4   has secret information would be an expert in information

5   security.

6              You know, I think Your Honor's question to

7   Ms. Smith, when did he create an information security policy,

8   he has not.  At least there's no evidence that he has.  The

9   answer was, well, he's the CEO and he's the person who can

10  speak to the public and he's ultimately responsible.

11             But here the issue is we have a report from our

12  expert, Dr. Robinson, who is a real information security

13  expert, who has gone through the frameworks that you use to

14  determine whether you've applied reasonable security

15  measures.  He's identified policies.  He's applied his

16  experience to those issues.

17             And Dr. Lebby doesn't have any experience with

18  that type of -- in that area of the world.  I mean, he has

19  exposure to it, sure.  He has what you would say is

20  familiarity.  A doctor who went to medical school may learn

21  about all kinds of illnesses, but they're not able to offer

22  expert testimony in a court of law about those illnesses just

23  because they had some exposure or familiarity.  So I think

24  that's the problem.  We're talking about general experience

25  not justifying specific specialized testimony.

UNREDACTED TRANSCRIPT

 1          THE COURT:  Any further reply on that?  I think

 2   there's -- may be an issue there, a problem there.

 3          MS. SMITH:  Yes, sir, I do have a reply on that.

 4          So, Your Honor, I encourage you to look at the

 5   *Better Holdco* case.  So there's a statement that appeared in

 6   the -- in Qorvo's reply where they pointed out that the

 7   security expert in that case was a CEO in the relevant

 8   industry and had a certification.

 9          But if you look at the case, the certification is

10   not for information security.  It's actually for a

11   marketing -- it's a marketing certification, and it's for

12   understanding Facebook marketing concepts.  And this is at

13   the top of the reply on page 3.

14          So this certification is not even for information

15   security.  In *Better Holdco,* the expert was simply a CEO who

16   was in the relevant industry, had no information security

17   certification, but had a wealth of practical work experience

18   in securing his own company's information.  And that's

19   Dr. Lebby to a T.

20          So even though, you know -- I mean, I think Qorvo

21   wants to characterize Dr. Lebby's experience as general, but

22   it isn't just general exposure to information policies.  He

23   actually trained employees on how to apply these policies.

24   That's in paragraph 129 of his expert report.

25          And he -- his experience in these large

UNREDACTED TRANSCRIPT

1   corporations is that there's a formal procedure to follow and

2   document trade secrets such as in a log book, right, and

3   that's in paragraph 131.  So he has specific experience in

4   this matter.

5           And so he's done exactly what the *Better Holdco*

6   expert did, which is there was a hundred-page document there

7   that described the opposing party's information security

8   system.  The expert did not go through that whole thing.  He

9   did not use that methodology.

10          What he did was he focused on one deficiency and

11  explained why that deficiency was basically a chink in the

12  armor that brought the whole house down.  And all he did was

13  focus on one deficiency.  That's what qualified him, and that

14  is also what should qualify Dr. Lebby.

15          THE COURT:  All right.

16          Counsel opposite, just one a brief reply on that.

17  We have a couple of other things to cover here.

18          MR. DEFOSSE:  Sure.  The *Better Holdco* case, Your

19  Honor, the expert there had specific experience with Facebook

20  ad words.  The security policies governing the Facebook ad

21  words, which the CEO was certified to deal with, was the

22  issue.  That's not Dr. Lebby here.

23          Ms. Smith said that he trained employees.

24  Paragraph 129 of his report, he trained employees that when

25  they present materials in the public, they should not be

UNREDACTED TRANSCRIPT

1    marked as confidential.  That's not an information security

2    policy.  That's the opposite of an information security

3    policy.

4           Ms. Smith said that he worked or has exposure to

5    trade secret log books.  Again, the trade secret log book is

6    not an information security policy.  He does not have

7    experience with the policies that are at issue in this case.

8           THE COURT:  Do you want to talk about the other

9    opinions that this expert would present?  There's some

10   interesting things.  I think you might want to.

11          MR. DEFOSSE:  Yes.  Thank you, Your Honor.

12          So the next one I would go to is on information

13   security, if the Court rules in our favor on his expertise,

14   it doesn't need to reach this issue.  But if the Court should

15   find that Dr. Lebby does have expertise in information

16   security, I would direct Your Honor to paragraph 130 of his

17   report, and that is on the issue now of the reliability of

18   his opinions and the *ipse dixit* nature of those opinions.

19          I believe paragraph 130 of his report is a fair

20   summary of the information security opinion that he holds.

21   It has three, kind of, legs to the stool, three premises that

22   underlie it, and this paragraph illustrates the kind of --

23   the unreliable nature of the opinion.

24          He starts by saying that a critical defect in

25   Qorvo's security planning is what appears to be a habitual

UNREDACTED TRANSCRIPT

29

1   and indiscriminate labeling of public information as

2   confidential.

3               THE COURT:  Right.  He's saying it's overly

4   inclusive.

5               MR. DEFOSSE:  Yeah, no citation.  He doesn't cite

6   a single document.

7               When I asked him in his deposition to identify

8   for me the specific documents you considered in forming your

9   opinions, his response was:  So if you look at chapter Roman

10  numeral V of my corrected expert report that begins on

11  paragraph 125 and continues through paragraph 151, I do not

12  cite any documents that I reviewed in this litigation, so I

13  don't think I can answer your questions.

14              That's page 223 of his testimony.  So he just

15  makes the statement it's a classic *ipse dixit.*  Qorvo

16  over-designates materials as confidential because I say so.

17  No citations, no basis.

18              Then he jumps to the next assertion that the

19  over-designation of information leads employees to view the

20  confidential label as unreliable.  Again --

21              THE COURT:  That is again his position, correct.

22              MR. DEFOSSE:  That's his position, no citation,

23  no basis.  I asked him what is the evidence for Qorvo

24  employees being confused about the confidentiality

25  designations?  He said he has no evidence.  Again, I mean,

UNREDACTED TRANSCRIPT

1    just totally classic *ipse dixit.*

2            And then he goes on, and I think this is the

3    biggest leap, he says towards the end of that paragraph, the

4    result is Qorvo's confidential information falls outside the

5    protection of its security policies.  What's the link there?

6    That -- I mean, and again, there's no basis for that.  He

7    doesn't cite any instance in which a Qorvo confidential

8    document falls outside of the information security policy.

9    It's just him again saying it, trust me, I'm an expert, and

10   Qorvo's security policies are not applying to its

11   confidential documents.  So --

12           THE COURT:  Okay.  I mean, let's hear the

13   response on that.  I think we've got the point there, but we

14   do need to hear a response.

15           MS. SMITH:  So, Your Honor, when Dr. Lebby was

16   asked in his deposition to cite to any particular document

17   that was over-designated, he responded with regard to

18   specifically paragraph 130, and saying that he did not cite

19   any in that particular paragraph.  But in the very next

20   sentence, he went on to say that over-designated documents

21   reflect --

22           THE COURT:  Let me just ask this:  What's the

23   authority for that?  It's kind of got a common sense

24   argument, which, of course, is not going to work very well.

25   But, you know, if you designate everything as confidential,

UNREDACTED TRANSCRIPT

1    nobody treats anything as confidential, which I understand.

2    I understand the argument.  But what's the academic support

3    for that position?

4           MS. SMITH:  Well, I don't know if this is

5    academic, but Dr. Lebby, in his career, he has had to train

6    engineers to figure out how to define -- how to identify what

7    is confidential and what is not.  And this is particularly

8    important for engineers before they go to conferences because

9    that's when they're going to be coming face-to-face with the

10   public, and they need to know where is the line and so --

11          THE COURT:  There's no -- there's no academic

12   support for the position.  What's the case law support for

13   the position that over-designation eliminates or removes

14   confidentiality or trade secret status?

15          MS. SMITH:  Well, so over-designation is -- I

16   would have to go back to the statute itself because the

17   statute -- the relevant statute that relates to -- that

18   relates to what is a trade secret, a trade secret is defined

19   as something -- some information where the owner of the

20   information has taken reasonable measures to keep it secret,

21   right?  And part of the --

22          THE COURT:  Absolutely.  Very important.

23   Absolutely.

24          MS. SMITH:  Right.  So the -- if you want to take

25   reasonable measures, you have to make sure that your

UNREDACTED TRANSCRIPT

1    employees know how to identify what is a trade secret because

2    if the employee can't -- doesn't know that something is a

3    trade secret, it doesn't matter if you have the best protocol

4    in the world.  It's not going to be --

5              THE COURT:  I mean, there's a little bit of

6    confusion there because you're saying if they don't know it's

7    a trade secret, but what if it says confidential trade secret

8    on it?  That's enough, isn't it?

9              MS. SMITH:  That's enough; however, we're not --

10   I'm not aware of any document in this case that has an

11   identification that it is a trade secret.

12             THE COURT:  Right.

13             MS. SMITH:  And, in fact, there is an internal

14   designation that Qorvo uses where the -- where the term is

15   "critical."  They use the term critical, and they include

16   trade secrets in this particular designation of critical.

17   However, we also haven't seen any documents that I know of

18   where that term critical is labeled onto a document either.

19             THE COURT:  Okay.  So I think you -- you told me

20   that then -- that you don't rely on a specific case in this

21   regard that's on the over-designation.  I want to make sure.

22   There may be a case that talks about over-designation.  I

23   just want to make sure.

24             MS. SMITH:  That's correct.  Akoustis does not

25   rely on a particular --

UNREDACTED TRANSCRIPT

1           THE COURT:  That's perfectly fine.  I just wanted

2    to make sure that we're not missing something there.

3           Mr. DeFosse, any other comment on that?

4           MR. DEFOSSE:  No.  In the interest of time, Your

5    Honor, I would be happy to move on.

6           THE COURT:  You've got something else you want to

7    tell us about on this one?

8           MR. DEFOSSE:  Yes.  Sure.

9           So there's two other areas where we've asked to

10   exclude Dr. Lebby's opinions.

11          THE COURT:  Right.

12          MR. DEFOSSE:  The next one is his opinion that

13   Akoustis was ahead of Qorvo in the development of 5 gigahertz

14   BAW filters.

15          THE COURT:  I am really fascinated by that.

16   That's a very interesting proposition.  Yes, sir.

17          MR. DEFOSSE:  Yeah, an interesting proposition,

18   but as we discovered when we talked to Dr. Lebby and tried to

19   figure out what was the basis for his opinion on that, one

20   that's entirely untethered to any evidence, and I think

21   that's the problem we have with that opinion, Your Honor.  I

22   think the relevant paragraph that we want to look at, if you

23   have Dr. Lebby's report, is paragraph 76.

24          THE COURT:  Right.

25          MR. DEFOSSE:  It's where he says that Akoustis

UNREDACTED TRANSCRIPT

1    was -- he said, quote, technologically and commercially ahead

2    of Qorvo with not only the development of 5 gigahertz range

3    filters but especially with FBAR filters for applications in

4    wireless RF bandwidths.

5              And so I asked Dr. Lebby -- we were curious about

6    this statement.  I asked him in his deposition, well, what's

7    the basis for this?  When did Akoustis start to develop its 5

8    gigahertz filters to provide your basis.  And he said, well,

9    I didn't do that analysis.  That was done by Dr. Darveaux.

10   And he pointed us to paragraph 77 of his report where he

11   refers to Dr. Darveaux's analysis in Section 8, and he gives

12   the title of Section 8 of Dr. Darveaux's expert report.

13             I would note that this paragraph is interesting

14   in the first instance because Dr. Lebby confirmed to me that

15   he never reviewed Dr. Darveaux's expert report prior to

16   submitting his own expert report, so one wonders how is it

17   that in paragraph 77 of Dr. Lebby's report, he's referring

18   and adopting specific opinions in a specific section of an

19   expert report, which he repeatedly testified he did not

20   review prior to serving his report.

21             Then the next problem with this is I asked

22   Dr. Darveaux during his deposition did he attempt to

23   determine when Akoustis began developing its 5 gigahertz

24   filters.  And his answer was, no, that's not an analysis I

25   did.

UNREDACTED TRANSCRIPT

1          So what we have here is Dr. Lebby offering on the

2     back of Dr. Darveaux an opinion that Akoustis was ahead in

3     the development of 5 gigahertz filters, that is based on

4     nothing, on air.  And that's, you know, I think, improper.

5     So if you've got any questions, but I think I've covered

6     that.

7               THE COURT:  Well, I think you've covered it.

8               Let's let Ms. Smith come back on that.

9               I'm always reminded of during the war, World War

10     II, remember the allied effort, although it turned out to be

11     saboteurs who got rid of the heavy water that was being

12     removed from Norway and was going to be put on a ship.  And,

13     of course, you remember that heavy water was then -- the

14     ship -- but the ferry was blown up.  I think that -- I can't

15     remember now.  I think seven Norwegian passengers died in the

16     accident, so it was a terrible thing.

17               But, of course, the heavy water that they were

18     utilizing actually turned out not to be the best route to an

19     atomic bomb.  Not that that's -- that's just the way that is.

20               But my question is, okay, where were -- what was

21     their development process that shows that they were ahead of

22     Akoustis, specifically?  And you see what I'm saying?  I'm

23     saying, okay, we've got a development process that's going on

24     here, and we've got a timeline that you're saying shows

25     that -- well, you're not saying, but Dr. Lebby is saying that

UNREDACTED TRANSCRIPT

1   shows that Akoustis was ahead.

2          I'm really interested in how they were ahead and

3   what evidence there is that they were, in fact, ahead other

4   than just saying they were ahead.  It should be very fact

5   specific.  It should tell us this is how they were ahead.

6   Tell me how they were ahead.  Tell me what Dr. Lebby is

7   relying on to say that they were ahead.  Maybe that's the

8   best way to put that because I know it's his opinion, not

9   yours.

10          But, yes?

11          MS. SMITH:  Okay.  So, Your Honor, first thing I

12   wanted to clarify was Dr. Lebby, in his deposition, did

13   correct what he had testified about not having spoken to

14   Dr. Darveaux.

15          THE COURT:  Correct.

16          MS. SMITH:  He did correct it, and he did

17   remember actually before Christmas before it was due, they

18   did have a couple of meetings to discuss their opinions.

19          THE COURT:  Right.  At least one or two, right?

20          MS. SMITH:  Exactly.  And so that was part of the

21   discussion.  And the -- here are the two dates that Dr. Lebby

22   relied upon from Dr. Darveaux.  And this was the date of

23   Akoustis's incorporation in May of 2014, and then the date of

24   Akoustis's first shipment of its prototype in August of 2017.

25   I don't believe that --

UNREDACTED TRANSCRIPT

1              THE COURT:  Now, did the prototype work?

2              MS. SMITH:  That, I don't know, but it was

3    shipped in 2017 to a customer.  So --

4              THE COURT:  Right.  It is correct it was shipped

5    to a customer.  That is correct.  Is that the prototype?  Did

6    that lead to a production model?

7              MS. SMITH:  That did lead to a production model,

8    as far as I know.  And I think the production model, they

9    first started to receive -- receive revenue in July of -- in

10   fiscal year 2019.

11             THE COURT:  Let's go to Mr. DeFosse.  Did that

12   lead to a production model?

13             MR. DEFOSSE:  The shipped product was AKF1252 --

14             THE COURT:  Yes.

15             MR. DEFOSSE:  -- in late 2017, and that was the

16   first commercial launched product that they ultimately sold.

17   I believe there was some more engineering that went on

18   between late 2017 and when the product was sold, but that

19   product did ultimately go into production, yes.

20             THE COURT:  Right.

21             So how -- Ms. Smith, so your position is that

22   we're looking at that prototype and how -- tell me how that's

23   ahead.

24             MS. SMITH:  All right.  So here's where Dr. Lebby

25   talks about that.  It's in paragraph 79 of his expert report.

```
 1    And what he does is he takes these particular dates from
 2    Dr. Darveaux's report, which I don't believe has been
 3    disputed as to their accuracy, and he interposes between them
 4    internal e-mails from Qorvo.
 5                And so, for example, before June of 2017, when
 6    Akoustis acquired STC-MEMS, which is the fab facility that
 7    actually can manufacture these components for Akoustis,
 8    before that, in March of 2017, Qorvo, in an e-mail by its own
 9    assessment, said that it was two years away from releasing
10    its new 5.2 and 5.7 gigahertz devices.
11                The director of Qorvo's design engineering team
12    said, we are slow, and that -- and he explains that the FBAR
13    technology that Akoustis uses is, quote, simpler to create
14    new frequencies, and other than that, it should be a similar
15    effort.  But he also observed that technology and product
16    development at Qorvo is slow, and a new company without
17    having to produce millions of parts per day, such as
18    Akoustis, can be quite agile compared to us.
19                So that was in March of 2017, right?
20                THE COURT:  Right.
21                MS. SMITH:  If you move forward to July of 2018,
22    when Akoustis began earning product revenue, after that, in
23    November 2018, Qorvo general manager, Cees Links, states,
24    quote, ██████████████████████████████████████████████
25    ████████████████████████████████████████████
```

UNREDACTED TRANSCRIPT

1          And she goes on to -- and Leah Giovan, who is

2     Qorvo's director of global sourcing, states that Qorvo's then

3     existing business focus and manufacturing plan were blocking

4     Qorvo's progress in 5 gigahertz development.

5          So Qorvo had all of these other products that

6     they were also focusing on, and it was taking up a lot of

7     effort and funding from the FBAR 5 gigahertz filters at

8     Qorvo, and that's why it wasn't moving forward as quickly as

9     a company such as Akoustis where that was all they did 24/7.

10    That was their focus.  That's why they were formed.

11         THE COURT:  We're just going to go back to

12    Mr. DeFosse.  There is some support for the proposition that

13    there was a technological difference on this particular

14    product.

15         MR. DEFOSSE:  Your Honor, what I would -- the way

16    I would characterize it is what Ms. Smith just went through

17    is evidence that at some point in time, Akoustis had a

18    product that was more advanced than Qorvo to come into

19    market, and I think there is evidence to support that they,

20    in fact, introduced their product to market before us.

21         The point is that in order to do that, they took

22    our information.  And the problem with Dr. Lebby's opinion,

23    for example, is that he's taken -- he's justified the

24    stealing of information in 2016 dealing with Qorvo's 5

25    gigahertz BAW filters based on his opinion that, well,

UNREDACTED TRANSCRIPT

1    Akoustis was already ahead of Qorvo and, therefore, didn't

2    need this information, but at that time, they weren't ahead

3    of Qorvo.

4           What really happened here was Qorvo had been

5    developing filters for more than a decade.  In 2016, Akoustis

6    decided that it wanted to move from being a research and

7    development company to a company that makes products.

8           In order to take that step, what it did was it

9    hired a general manager from Qorvo, whose name you'll see a

10   lot over the next few months, named Ron Holden.  Mr. Holden

11   stole dozens of technical and business confidential documents

12   about 5 gigahertz filters.  Akoustis brought those documents

13   on board.  They copied them into their own --

14          THE COURT:  I think your point is that -- as I

15   understand your point is that, in fact, Akoustis was not

16   ahead on its own.  Akoustis was only ahead, if they were

17   ahead, and they apparently were somewhat ahead, based on the

18   information that they acquired from Qorvo, but does that make

19   Dr. Lebby's opinion that Akoustis was ahead of Qorvo at some

20   point inappropriate?  It may be that it's allowed, but it's

21   just that they got ahead the wrong way.

22          MR. DEFOSSE:  Your Honor, I think -- I see

23   exactly where you're going, and what I would say is the

24   opinion is not inadmissible because there's contrary evidence

25   or evidence that he didn't consider that he should have

UNREDACTED TRANSCRIPT

1    considered.  I would say that's fodder for cross-examination,

2    typically.

3              The problem here is that he based his opinion --

4    in order to say that Akoustis was ahead and apply this

5    opinion to Qorvo, he made an assumption that they were ahead

6    that was not supported by any of the documents that Ms. Smith

7    just referred to, that he relied on Dr. Darveaux for, which

8    is fictitious, which was analysis that wasn't done.  And then

9    he's applied that indiscriminately, which makes the opinion

10   unreliable.

11             If he had limited his opinion to here, in 2017,

12   there was some evidence from Qorvo e-mails that they were

13   still working on BAW filters, and I opine that based on

14   Akoustis evidence, Akoustis was further along, fine, but

15   that's not what he did here.

16             He offered an expert opinion that Akoustis was

17   ahead of Qorvo in the development of 5 gigahertz filters, and

18   we see in Akoustis's opposition brief, they're now portraying

19   that as a factual assumption.  It wasn't a factual

20   assumption.  That was the opinion itself that he offered and,

21   you know, basing an expert opinion on something that never --

22   an analysis that never took place is, I think, improper.

23             THE COURT:  All right.

24             Ms. Smith, we get a last shot at that, but I

25   think we're going to wrap that one up.  With our time, we

UNREDACTED TRANSCRIPT

1    probably used a little more than we intended to.

2              Yes, ma'am.

3              MS. SMITH:  Okay.  The last point I want to point

4    out to Your Honor, is just that the technologies were

5    different.  The technologies that both companies were working

6    on were indeed BAW filters, but Qorvo was focused more on

7    SMR, and Akoustis was focused on FBAR.  And so I think Your

8    Honor should take into consideration that difference in the

9    technology, even though it's in the same group, type of

10   filters and resonators, they are different.

11             THE COURT:  Right.  And that's the same idea that

12   we get when we get to the Norwegian issue, just sort of

13   different technologies.

14             Now I'm going to go back to Mr. DeFosse just 30

15   seconds at the most on that.  Different technology is pretty

16   important.

17             MR. DEFOSSE:  They're not really different

18   technologies, Your Honor.  So 30 -- I'll try in 30 seconds.

19             The difference between an SMR and an FBAR filter

20   is what material is used to make sure that the sound waves or

21   the waves remain in the active region.  FBAR uses an air

22   cavity.  SMR uses a Bragg reflector.  They operate as the

23   functional equivalence.  If you want to say it, the magic in

24   an acoustic resonator happens in the active region, which is

25   the same between the two types of devices.

                    UNREDACTED TRANSCRIPT

1          THE COURT:  I understand.  I think -- that's all

2   helpful to know.  I know we've got a little bit of a time

3   squeeze here, but it's important.  And then we've got the

4   Akoustis motion to exclude Ms. Bennis.  This is interesting

5   because we certainly were looking for, and we may -- we

6   haven't found what -- maybe it's out there.

7          The issue of secondary sources that support using

8   revenue without cost to calculate unjust enrichment, head

9   start damages, secondary sources for that information.  And

10  so I think that's actually a -- really a question for -- and

11  I'm not sure who is answering this.  It's probably not

12  Mr. DeFosse.  He's probably going to hand that off to

13  somebody else.

14          Ms. Ayers, looks like it's you?

15          MS. AYERS:  That is a question for me.  And I'm

16  happy to start, Your Honor.  I'm not quite sure I understood

17  your question as it's directed to Qorvo and our response, so

18  if you could rephrase it, I'd be happy to answer it directly.

19          THE COURT:  What we're talking about, are there

20  secondary sources?  Is this something that's well versed in

21  academic journals, is it well understood that support using

22  revenue without cost to calculate unjust enrichment head

23  start damages?  And I'm interested in the head start just

24  like we were in the previous one.  I think there's some

25  really interesting things here.  We're interested in this

UNREDACTED TRANSCRIPT

44

```
1    head start damage calculation, how you do it.

2            We all understand -- I think we all understand

3    that in startups, there is going to be a period where there's

4    no significant revenue, there's not a profit, and so forth

5    and so on, but there's got to be a way to calculate it.  And

6    so what are the secondary sources that support, however,

7    using revenue without cost to calculate unjust enrichment

8    head start damages?  Does that help at all?

9            MS. AYERS:  It does help, Your Honor.  And I'm

10   going to answer your question, but I want to start by kind of

11   reminding the Court that Ms. Bennis is not disgorging

12   Akoustis's revenue.

13           THE COURT:  I know.  We know that.  I've got that

14   down.

15           MS. AYERS:  Okay.  She's just shifting in time

16   when Akoustis would have made that revenue.  And there is

17   actually case law, which we cite in our response, that

18   discusses whether or not the time value of money --

19           THE COURT:  Sure.

20           MS. AYERS:  -- can be an unjust enrichment that a

21   wrongdoing defendant receives.  And so --

22           THE COURT:  I don't think anybody probably

23   disputes that that can be the case really.

24           MS. AYERS:  So I think the fundamental question

25   is whether or not Ms. Bennis's calculation of the time value
```

UNREDACTED TRANSCRIPT

1    of money is an accepted economic principle and,

2    fundamentally, under 702, it is.  Akoustis admits as much in

3    its reply.

4           Akoustis doesn't take issue with whether or not

5    the time value of money is accepted economic principle.  They

6    don't take issue with Ms. Bennis's calculation, the

7    mathematical formula that she actually used to calculate

8    Akoustis's time value of money.  They do have some concern

9    with the inputs into her formula, but they didn't bring

10   *Daubert* on that.  That's fodder for cross that they can use

11   in front of a jury.

12          And so at the core, what they're trying to argue

13   is, yes, you can use -- yes, the time value of money can be

14   an economic benefit.  Yes, the time value of money has a

15   mathematical formula that is proper and correct.  Their reply

16   even says at page 3, footnote 1, that the time value of money

17   can be an economic benefit recovered by a harmed party in a

18   case for misappropriation of trade secrets.

19          And so at their core issue, they're simply

20   arguing that the time value of money cannot be recoverable

21   from a head start.  And I would argue that fundamentally

22   doesn't really make sense when you understand what a head

23   start is supposed to be measuring.

24          So, ultimately, the Third Circuit in *Sabre GLBL*

25   has recognized that head start damages are intended to

UNREDACTED TRANSCRIPT

```
1    measure the impact of the head start to a misappropriating

2    defendant's development and operations.

3              And while Sabre GLBL focused on a valuation, a

4    business valuation that an expert performed where the expert

5    compared the current value of the misappropriating defendant

6    with the misappropriation that occurred and then created a

7    hypothetical but-for world where the defendant did not

8    misappropriate that and then compared those two total

9    business valuations together, that doesn't indicate that

10   Ms. Bennis's methodology is improper because what she did was

11   actually work with real-world dollars and she simply shifted

12   the time in which Akoustis would have earned those real-world

13   dollars by 55 months, which is the head start benefit that

14   Dr. Shanfield identified.

15             And she applied the very basic economic

16   mathematical formula for measuring the time value of Akoustis

17   getting that revenue 55 months earlier than they would have

18   actually earned it.

19             THE COURT:  Right.  We've got all that.  I think

20   the answer was either that you don't have a secondary source

21   you're going to point me to or you were just getting ready to

22   tell me what it is.

23             MS. AYERS:  So I don't have a secondary source

24   that says the time value of money is --

25             THE COURT:  We understand time value of money.
```

UNREDACTED TRANSCRIPT

1    Don't go there.  We've beaten that one up.  It's probably

2    going to die right in front us.  But we do need to understand

3    this issue as it relates to using -- doing a calculation

4    using revenue without cost.

5                And I understand that that may make common sense,

6    but that's not the test here.  But it's got to make

7    method- -- it's got to be a methodology that is recognized

8    either in the case law or is recognized academically as a

9    legitimate exercise of this type of calculation.  So I

10   think -- I think I'm hearing you don't have a secondary

11   source.

12               MS. AYERS:  Well, I don't have a secondary

13   source, Your Honor, but I do have case law.  So the Sedona

14   Conference --

15               THE COURT:  Well, take one more shot then, your

16   best case because I think we -- give it a shot.

17               MS. AYERS:  Sure.  So the best case in which

18   we've cited in our brief at page 14, Your Honor, is *U.S. v.*

19   *Allegheny Ludlum Corp.*  And that case specifically talked

20   about the time value of money being an appropriate

21   calculation of an economic benefit that an unjustly enriched

22   defendant received.

23               THE COURT:  Right.  It's really not quite

24   addressing the question I've asked.  I understand.  You're

25   asking me to take a situation where we're not going to

UNREDACTED TRANSCRIPT

1    consider the cost.  We're just going to consider the revenue

2    received.  Now, I can imagine that that might make sense, but

3    I'd like to have something that backs that up.

4              MS. AYERS:  So *U.S. v. Allegheny Ludlum Corp.*

5    actually does deal with revenue received, Your Honor.

6              THE COURT:  Okay.

7              MS. AYERS:  And so in that case -- in that case,

8    the issue was not a misappropriation of trade secret claim.

9    It was whether or not a defendant was unjustly enriched by

10   receiving money that it should not have as a part of its

11   violations of the EPA.

12             And so that case actually does walk through the

13   calculation of using the time value of money, recognizing the

14   unjust enrichment based upon the defendant's receipt of

15   revenue, and then disgorged the time value of that revenue

16   against the defendant because they should have paid for

17   certain things that they did not as a part of their

18   violations of the EPA.

19             And so it's not particularly within the context

20   of the appropriation of trade secret case, but it is within

21   the context of revenue itself and how the time value of money

22   is actually calculated.

23             THE COURT:  I think you may be proposing

24   something that is new.  I would like to find out that it is

25   an established methodology.  And I'm working on that one.

1          Okay.  Well, I mean, we'll do a little searching

2    here, but I suggest that you may want to do some there, and

3    if you can find something that's going to be more persuasive,

4    I suggest you submit that in the next -- by -- this is

5    Tuesday.  By end of day on Thursday.  This is just a matter

6    of -- you know exactly what we're looking for and so does

7    everybody else.  So anybody that wants to submit something,

8    of course, may do so.  I think we've covered that.

9          Well, let's go back to counsel opposite.

10         MR. ELKINS:  Your Honor, I think I know where

11   you're going, and based on your statements, probably you

12   don't want to hear a reiteration from me.

13         THE COURT:  Well, I would love to, but I think

14   we'll run out of time.

15         MR. ELKINS:  What I would say is in the *U.S. v.*

16   *Allegheny Ludlum Corporation* --

17         THE COURT:  Yes.

18         MR. ELKINS:  -- it was an unjust enrichment case,

19   but not for the reason that Ms. Ayers said.  It wasn't

20   revenue that was received.  It was costs that were avoided,

21   the same issue that we talked about with respect to

22   Ms. Irwin's opinion.

23         And in that case, there was a penalty assessed

24   for violation of the Clean Water Act, and the penalty was

25   calculated on the amount that the defendant saved by not

UNREDACTED TRANSCRIPT

1   spending money on measures intended to clean up its unclean

2   water emissions.

3          And so it had held on to revenue that it should

4   have spent to comply.  And the Court said, look, not only did

5   you save that money, but you were able to make that money

6   saved work for you.  So, essentially, it's like, you know,

7   prejudgment interest.

8          THE COURT:  Sure.

9          MR. ELKINS:  You get that.  And when we said on

10  page 3 of our reply, yeah, the time value of money can

11  enhance revenue or enhance damages in the case of, say,

12  the -- if the defendant had lost profits, which are not

13  alleged here, because the defendant didn't have any profits.

14  If it had lost profits or if it had avoided costs, you could

15  enhance those by applying interest, which is the time value

16  of money.

17          Your Honor, I sense that you got exactly our

18  point, which is that what we're talking about here is revenue

19  and enhancing that revenue by the time value of money doesn't

20  change the nature of what we're talking about, which is

21  revenue untethered to any costs.

22          The only thing that I want to leave you with is

23  something that we cited in our brief.  It's at page 4 of our

24  opening brief, and in the middle there, there's a block quote

25  about where Ms. Bennis, in her expert report, is opining on

UNREDACTED TRANSCRIPT

1    this notion that receiving revenue prematurely created a

2    benefit.

3              And she said, in part, by receiving revenues

4    early due to the head start benefit received from the

5    misappropriated trade secrets, Akoustis has benefitted by

6    reducing its total borrowed capital.

7              Now, she never analyzes whether or not Akoustis,

8    in fact, borrowed any capital, but the only way that Akoustis

9    could have reduced its -- a requirement to borrow capital

10   would be if it received revenue without any intended costs.

11   You have to take those costs into account.

12             And the point here is that whether they were

13   incurred, you know, in the actual world or in a but-for

14   world, you have to take those costs into account, on the cost

15   for generating the revenue at issue into account, otherwise,

16   you're not assessing the benefit.  And the benefit to the

17   defendant is the touchstone of the unjust enrichment analysis

18   here, and that's something that Ms. Bennis did not take into

19   account and she never analyzes in her expert report.

20             THE COURT:  All right.

21             And, Ms. Ayers, you understand what we need here.

22   I need a little more from --

23             MS. AYERS:  I do, but I have one brief response,

24   Your Honor, before we break, if you'll entertain me.

25             THE COURT:  Sure.  Absolutely.  Absolutely.

UNREDACTED TRANSCRIPT

1          MS. AYERS:  So Mr. Elkins, when he was describing

2     the *U.S. v. Allegheny* case, indicated that what was being

3     measured as the unjust enrichment was that the defendant had

4     held on to revenue by not spending it.  And here we have an

5     analogous situation.

6          Akoustis made revenue 55 months earlier than it

7     should have.  Dr. Shanfield's opinions is that Akoustis was

8     able to enter the market and generate revenue 55 months

9     earlier than it otherwise would have been able to do had it

10    not stolen Qorvo's trade secret information.

11         And so when Mr. Elkins is talking about the cost

12    that Ms. Bennis should have accounted for, what they're not

13    flagging for the Court is the 55 months of costs that it

14    would have had in the but-for world, had it actually not

15    misappropriated Qorvo's trade secrets and started generating

16    revenue 55 months later.

17         And so the damage number here is actually going

18    to go up when we take into consideration the costs that

19    Akoustis avoided because all Ms. Bennis is doing is making

20    the determination of the value of Akoustis receiving revenue

21    55 months earlier than it otherwise would have been able to

22    do.

23         And so I do think that the *U.S. v. Allegheny* case

24    is actually quite analogous here because the defendant was

25    unjustly enriched through the time value of money by holding

UNREDACTED TRANSCRIPT

53

1    on to revenue that it wasn't entitled to, and here we have

2    the exact same, you know, situation where Akoustis earned

3    revenue and gained revenue and had revenue that it otherwise

4    would not had begun and to make for 55 months.  But I

5    understand the Court's admonition, and we will submit

6    something.

7              THE COURT:  Okay.  And, of course, counsel

8    opposite can reply, and it would be two days after that.

9    Well, it would be hopefully, hopefully, by the end of the day

10   on Friday.  We obviously are very interested in this

11   question.

12             Well, I think we've covered what we had to today.

13   It's always useful to hear from everybody.  It does help us

14   as we move through the process.

15             I think that -- let's see, Mr. Elkins, are you

16   the senior one on your team?

17             MR. ELKINS:  Mr. Lemieux and I share that

18   distinction.

19             THE COURT:  I think I knew that, but I was

20   letting you be senior today, so we appreciate having

21   everybody here.

22             Mr. DeFosse, you're not the senior one on your

23   team, are you?

24             MR. DEFOSSE:  No, that would be Mr. Masters, Your

25   Honor.

UNREDACTED TRANSCRIPT

1            THE COURT:  Absolutely.  Mr. Masters.  But we

2    appreciate everybody.  Helpful.  We are working on it.  I'm

3    looking forward to getting that material on Thursday, and I'm

4    also looking forward to getting any response by the end of

5    day on Friday.  This is all quite important, and we're going

6    to get it taken care of.  Thank you all very much.

7            MR. ELKINS:  Thank you, Your Honor.

8            MS. AYERS:  Thank you, Your Honor.

9            (Adjournment.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

1        **C E R T I F I C A T E**

2

3

4            I, TINA DuBOSE GIBSON, do hereby certify that the

5    foregoing 54 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the motion hearing held on the 2nd day of

8    April, 2024, in the matter of:

9

10   QORVO, INC.

11   vs.

12   AKOUSTIS TECHNOLOGIES, INC., AND AKOUSTIS, INC.

13

14

15

16   Dated this 5th day of April, 2024.

17

18

19

20                        S/Tina DuBose Gibson
                          _____
21                        TINA DuBOSE GIBSON, RPR, RCR
                          Official Court Reporter
22                        United States District Court
                          Western District of Tennessee
23

24

25

## $

**$30,000** [1] - 10:13
**$300,000** [1] - 17:10

## 1

**1** [2] - 19:18, 45:16
**1,213** [1] - 10:23
**1,216** [5] - 10:24, 10:25, 11:2, 11:16, 17:9
**10,000** [1] - 10:13
**104** [1] - 12:23
**113** [1] - 19:16
**114** [1] - 19:16
**115** [1] - 19:18
**116** [1] - 19:18
**125** [1] - 29:11
**129** [2] - 26:24, 27:24
**13** [1] - 11:1
**130** [3] - 28:16, 28:19, 30:18
**131** [1] - 27:3
**14** [1] - 47:18
**150** [1] - 3:5
**151** [1] - 29:11
**16** [1] - 15:5
**1841** [1] - 3:5
**19801** [1] - 3:12

## 2

**2** [4] - 4:2, 18:25, 19:13, 19:16
**2014** [1] - 36:23
**2016** [2] - 39:24, 40:5
**2017** [8] - 36:24, 37:3, 37:15, 37:18, 38:5, 38:8, 38:19, 41:11
**2018** [2] - 38:21, 38:23
**2019** [1] - 37:10
**2024** [1] - 4:2
**223** [1] - 29:14
**24/7** [1] - 39:9

## 3

**3** [9] - 5:12, 6:5, 6:7, 9:2, 14:10, 19:17, 26:13, 45:16, 50:10
**30** [3] - 42:14, 42:18
**302** [1] - 3:12
**39** [1] - 16:25

## 4

**4** [2] - 19:17, 50:23
**400** [1] - 3:11

## 5

**5** [11] - 33:13, 34:2, 34:7, 34:23, 35:3, 38:25, 39:4, 39:7, 39:24, 40:12, 41:17
**5.2** [1] - 38:10
**5.7** [1] - 38:10
**55** [8] - 46:13, 46:17, 52:6, 52:8, 52:13, 52:16, 52:21, 53:4

## 6

**600** [1] - 3:11
**650** [1] - 3:6
**655-5000** [1] - 3:12

## 7

**7** [3] - 18:25, 19:13, 19:17
**702** [2] - 11:17, 45:2
**72** [1] - 19:18
**75** [1] - 19:18
**76** [1] - 33:23
**77** [3] - 14:11, 34:10, 34:17
**79** [1] - 37:25

## 8

**8** [3] - 19:18, 34:11, 34:12
**843-3330** [1] - 3:6

## 9

**94304** [1] - 3:6

## A

**able** [5] - 25:21, 50:5, 52:8, 52:9, 52:21
**absolute** [2] - 16:21, 17:1
**absolutely** [4] - 8:19, 8:25, 19:4, 31:22
**Absolutely** [4] - 31:23, 51:25, 54:1
**academic** [4] - 31:2, 31:5, 31:11, 43:21
**academically** [1] - 47:8
**accepted** [2] - 45:1, 45:5
**accident** [1] - 35:16

**account** [4] - 51:11, 51:14, 51:15, 51:19
**accounted** [1] - 52:12
**accuracy** [1] - 38:3
**acoustic** [1] - 42:24
**acquire** [2] - 10:5, 17:5
**acquired** [2] - 38:6, 40:18
**Act** [1] - 49:24
**active** [2] - 42:21, 42:24
**activities** [1] - 9:6
**actual** [2] - 17:2, 51:13
**ad** [2] - 27:20
**addresses** [1] - 17:19
**addressing** [1] - 47:24
**adequate** [2] - 5:3, 22:2
**Adjournment** [1] - 54:9
**admits** [1] - 45:2
**admitted** [2] - 6:13, 16:9
**admittedly** [2] - 6:3, 6:17
**admonition** [1] - 53:5
**adopting** [1] - 34:18
**advanced** [1] - 39:18
**advantage** [1] - 17:3
**affirmatively** [1] - 23:22
**agile** [1] - 38:18
**agree** [4] - 5:19, 5:22, 16:19, 19:1
**agreed** [1] - 18:23
**agreements** [1] - 23:6
**ahead** [26] - 9:24, 11:5, 23:7, 33:13, 34:1, 35:2, 35:21, 36:1, 36:2, 36:3, 36:4, 36:5, 36:6, 36:7, 37:23, 40:1, 40:2, 40:16, 40:17, 40:19, 40:21, 41:4, 41:5, 41:17
**air** [3] - 5:7, 35:4, 42:21
**AKF1252** [1] - 37:13
**Akoustis** [59] - 6:10, 7:1, 7:12, 7:15, 7:17, 7:22, 8:2, 8:10, 8:11, 8:24, 10:16, 14:16, 15:3, 15:4, 15:9, 15:25, 17:20, 17:24, 18:23, 32:24, 33:13, 33:25, 34:7, 34:23, 35:2, 35:22, 36:1, 38:6, 38:7, 38:13, 38:18, 38:22, 39:9, 39:17, 40:1, 40:5, 40:12, 40:15, 40:16, 40:19, 41:4, 41:14, 41:16, 42:7, 43:4, 44:16, 45:2, 45:4, 46:12, 46:16, 51:5, 51:7, 51:8, 52:6, 52:7, 52:19, 52:20, 53:2
**Akoustis's** [8] - 6:17, 7:8, 7:24, 36:23, 36:24, 41:18, 44:12, 45:8
**alleged** [5] - 9:19, 11:10, 12:23, 13:14, 50:13
**allegedly** [1] - 12:10

**Allegheny** [5] - 47:19, 48:4, 49:16, 52:2, 52:23
**allied** [1] - 35:10
**allowed** [1] - 40:20
**Alto** [1] - 3:6
**amount** [4] - 9:11, 11:17, 15:9, 49:25
**analogous** [3] - 20:12, 52:5, 52:24
**analysis** [9] - 9:16, 10:10, 12:25, 34:9, 34:11, 34:24, 41:8, 41:22, 51:17
**analyzes** [2] - 51:7, 51:19
**answer** [6] - 25:9, 29:13, 34:24, 43:18, 44:10, 46:20
**answering** [1] - 43:11
**apologize** [1] - 16:8
**appeared** [1] - 26:5
**Appearing** [1] - 3:1
**applications** [1] - 34:3
**applied** [4] - 25:14, 25:15, 41:9, 46:15
**applies** [1] - 6:19
**apply** [2] - 26:23, 41:4
**applying** [2] - 30:10, 50:15
**appreciate** [4] - 8:8, 13:17, 53:20, 54:2
**appropriate** [4] - 4:16, 9:11, 22:22, 47:20
**appropriately** [1] - 13:2
**appropriation** [1] - 48:20
**APRIL** [1] - 4:2
**architect** [1] - 23:25
**area** [2] - 19:23, 25:18
**areas** [1] - 33:9
**argue** [2] - 45:12, 45:21
**argued** [1] - 20:14
**arguing** [3] - 21:15, 24:20, 45:20
**argument** [8] - 8:16, 12:9, 17:20, 19:15, 22:13, 24:18, 30:24, 31:2
**arguments** [3] - 14:2, 21:8, 21:9
**armor** [1] - 27:12
**arrive** [1] - 10:18
**assertion** [1] - 29:18
**assessed** [1] - 49:23
**assessing** [1] - 51:16
**assessment** [1] - 38:9
**associated** [3] - 5:14, 6:12, 6:19
**assume** [5] - 12:3, 13:12, 13:13, 23:15, 23:16
**assumed** [1] - 5:23
**assumes** [2] - 12:21, 12:22
**assuming** [2] - 5:17, 18:14
**assumption** [6] - 6:1,

11:25, 41:5, 41:19, 41:20
**atomic** [1] - 35:19
**attempt** [2] - 17:21, 34:22
**attempted** [2] - 15:9, 20:25
**attention** [1] - 14:8
**attorney** [1] - 21:9
**attribute** [1] - 20:25
**August** [1] - 36:24
**authority** [1] - 30:23
**availability** [3] - 14:7, 15:14, 16:17
**available** [8] - 7:9, 7:15, 7:22, 14:22, 15:4, 15:11, 17:23, 18:1
**avoided** [6] - 5:13, 13:11, 18:5, 49:20, 50:14, 52:19
**aware** [2] - 23:16, 32:10
**Ayers** [9] - 4:20, 10:20, 12:9, 13:20, 17:12, 17:16, 43:14, 49:19, 51:21
**AYERS** [25] - 4:21, 5:21, 8:5, 8:8, 8:18, 14:1, 14:5, 14:10, 14:13, 14:24, 15:21, 17:17, 43:15, 44:9, 44:15, 44:20, 44:24, 46:23, 47:12, 47:17, 48:4, 48:7, 51:23, 52:1, 54:8

## B

**backs** [1] - 48:3
**baked** [1] - 10:18
**bandwidths** [1] - 34:4
**based** [9] - 5:6, 15:13, 35:3, 39:25, 40:17, 41:3, 41:13, 48:14, 49:11
**basic** [2] - 13:22, 46:15
**basing** [1] - 41:21
**basis** [8] - 21:11, 22:16, 29:17, 29:23, 30:6, 33:19, 34:7, 34:8
**BAW** [5] - 33:14, 38:25, 39:25, 41:13, 42:6
**Bayard** [1] - 3:11
**beaten** [1] - 47:1
**began** [2] - 34:23, 38:22
**begins** [1] - 29:10
**begun** [1] - 53:4
**behalf** [2] - 3:1, 4:22
**belabor** [1] - 20:8
**benefit** [8] - 45:14, 45:17, 46:13, 47:21, 51:2, 51:4, 51:16
**benefits** [1] - 10:17
**benefitted** [1] - 51:5
**Bennis** [6] - 43:4, 44:11, 50:25, 51:18, 52:12, 52:19
**Bennis's** [3] - 44:25, 45:6,

46:10
**best** [6] - 4:8, 32:3, 35:18, 36:8, 47:16, 47:17
**Better** [4] - 26:5, 26:15, 27:5, 27:18
**between** [6] - 6:2, 22:4, 37:18, 38:3, 42:19, 42:25
**beyond** [1] - 21:14
**big** [1] - 23:8
**biggest** [1] - 30:3
**bit** [3] - 22:23, 32:5, 43:2
**block** [1] - 50:24
**blocking** [1] - 39:3
**blown** [1] - 35:14
**board** [1] - 40:13
**Boggs** [1] - 3:4
**bomb** [1] - 35:19
**book** [2] - 27:2, 28:5
**books** [1] - 28:5
**borrow** [1] - 51:9
**borrowed** [2] - 51:6, 51:8
**bottom** [1] - 11:3
**Bragg** [1] - 42:22
**BRAUERMAN** [1] - 3:10
**break** [1] - 51:24
**brief** [9] - 4:8, 7:5, 16:25, 27:16, 41:18, 47:18, 50:23, 50:24, 51:23
**briefly** [1] - 16:6
**briefs** [1] - 20:7
**bring** [1] - 45:9
**brought** [6] - 12:13, 12:15, 15:1, 15:16, 27:12, 40:12
**buck** [1] - 24:25
**business** [5] - 22:11, 39:3, 40:11, 46:4, 46:9
**but-for** [3] - 46:7, 51:13, 52:14

## C

**CAI** [1] - 3:3
**calculate** [5] - 43:8, 43:22, 44:5, 44:7, 45:7
**calculated** [5] - 9:2, 9:3, 10:14, 48:22, 49:25
**calculates** [1] - 6:20
**calculation** [10] - 9:1, 9:11, 13:22, 44:1, 44:25, 45:6, 47:3, 47:9, 47:21, 48:13
**calculations** [1] - 6:6
**California** [1] - 3:6
**cannot** [1] - 45:20
**capabilities** [1] - 11:19
**capital** [3] - 51:6, 51:8, 51:9
**care** [1] - 54:6
**career** [1] - 31:5
**Carolina** [1] - 14:20

**case** [30] - 4:16, 6:22, 15:24, 22:6, 26:5, 26:7, 26:9, 27:18, 28:7, 31:12, 32:10, 32:20, 32:22, 44:17, 44:23, 45:18, 47:8, 47:13, 47:16, 47:17, 47:19, 48:7, 48:12, 48:20, 49:18, 49:23, 50:11, 52:2, 52:23
**cases** [2] - 10:13, 20:13
**categories** [1] - 12:23
**cavity** [1] - 42:22
**Cees** [1] - 38:23
**CEO** [8] - 24:3, 24:7, 24:24, 25:3, 25:9, 26:7, 26:15, 27:21
**certain** [6] - 7:6, 22:10, 22:24, 23:11, 23:12, 48:17
**certainly** [4] - 8:10, 21:13, 22:8, 43:5
**certification** [6] - 23:22, 26:8, 26:9, 26:11, 26:14, 26:17
**certified** [1] - 27:21
**cetera** [1] - 22:9
**challenge** [2] - 12:14, 13:24
**challenged** [1] - 12:18
**change** [1] - 50:20
**chapter** [1] - 29:9
**characterize** [2] - 26:21, 39:16
**chart** [1] - 11:3
**check** [2] - 19:3, 19:5
**chink** [1] - 27:11
**Christmas** [1] - 36:17
**Circuit** [2] - 20:13, 45:24
**citation** [2] - 29:5, 29:22
**citations** [1] - 29:17
**cite** [6] - 29:5, 29:12, 30:7, 30:16, 30:18, 44:17
**cited** [2] - 47:18, 50:23
**claim** [1] - 48:8
**clarify** [2] - 19:14, 36:12
**classic** [2] - 29:15, 30:1
**Clean** [1] - 49:24
**clean** [1] - 50:1
**combination** [1] - 17:22
**coming** [3] - 11:23, 21:20, 31:9
**comment** [1] - 33:3
**commentary** [1] - 8:9
**commercial** [1] - 37:16
**commercially** [1] - 34:1
**common** [2] - 30:23, 47:5
**companies** [5] - 10:4, 10:5, 22:1, 42:5
**company** [11] - 22:3, 22:21, 23:2, 24:3, 24:10, 24:11, 24:25, 38:16, 39:9, 40:7

**company's** [1] - 26:18
**compared** [3] - 38:18, 46:5, 46:8
**Competition** [1] - 16:25
**compile** [1] - 11:16
**compiling** [1] - 7:9
**completely** [2] - 6:25, 11:18
**complex** [1] - 20:21
**comply** [1] - 50:4
**components** [1] - 38:7
**concepts** [1] - 26:12
**concern** [3] - 15:15, 15:22, 45:8
**concerning** [1] - 21:1
**concise** [1] - 18:8
**conclusory** [1] - 20:5
**condition** [1] - 20:18
**confer** [1] - 17:2
**Conference** [1] - 47:14
**conferences** [2] - 23:12, 31:8
**confidential** [19] - 5:14, 11:12, 21:24, 21:25, 23:13, 23:17, 24:9, 28:1, 29:2, 29:16, 29:20, 30:4, 30:7, 30:11, 30:25, 31:1, 31:7, 32:7, 40:11
**confidentiality** [3] - 23:6, 29:24, 31:14
**confirmed** [1] - 34:14
**confused** [1] - 29:24
**confusion** [1] - 32:6
**consider** [6] - 21:22, 22:21, 22:22, 40:25, 48:1
**consideration** [2] - 42:8, 52:18
**considered** [2] - 29:8, 41:1
**context** [2] - 48:19, 48:21
**continues** [1] - 29:11
**contrary** [1] - 40:24
**conundrum** [1] - 13:9
**copied** [1] - 40:13
**core** [2] - 45:12, 45:19
**corollary** [1] - 20:12
**Corp** [2] - 47:19, 48:4
**Corporation** [1] - 49:16
**corporations** [1] - 27:1
**correct** [12] - 15:20, 16:18, 19:4, 29:21, 32:24, 36:13, 36:15, 36:16, 37:4, 37:5, 45:15
**Correct** [1] - 16:20
**corrected** [1] - 29:10
**cost** [9] - 10:10, 14:17, 43:8, 43:22, 44:7, 47:4, 48:1, 51:14, 52:11
**costly** [1] - 17:5
**costs** [16] - 5:14, 6:12,

6:16, 10:9, 10:14, 10:15, 13:11, 18:5, 49:20, 50:14, 50:21, 51:10, 51:11, 51:14, 52:13, 52:18
  **counsel** [8] - 8:15, 8:17, 8:20, 9:18, 24:17, 27:16, 49:9, 53:7
  **couple** [5] - 7:20, 8:12, 10:21, 27:17, 36:18
  **course** [9] - 5:6, 5:9, 16:18, 22:9, 30:24, 35:13, 35:17, 49:8, 53:7
  **COURT** [102] - 4:5, 4:24, 8:3, 8:6, 8:14, 8:19, 8:25, 9:4, 9:9, 9:13, 9:21, 10:2, 10:7, 10:12, 10:24, 11:1, 11:4, 11:21, 12:4, 12:7, 12:16, 12:19, 13:16, 13:19, 14:4, 14:9, 14:12, 14:23, 15:20, 16:1, 16:5, 16:7, 16:11, 16:14, 16:16, 16:23, 17:8, 17:12, 18:7, 18:17, 18:20, 19:3, 19:10, 19:20, 21:18, 22:5, 22:13, 22:20, 23:4, 23:14, 23:24, 24:6, 24:15, 26:1, 27:15, 28:8, 29:3, 29:21, 30:12, 30:22, 31:11, 31:22, 32:5, 32:12, 32:19, 33:1, 33:6, 33:11, 33:15, 33:24, 35:7, 36:15, 36:19, 37:1, 37:4, 37:11, 37:14, 37:20, 38:20, 39:11, 40:14, 41:23, 42:11, 43:1, 43:19, 44:13, 44:19, 44:22, 46:19, 46:25, 47:15, 47:23, 48:6, 48:23, 49:13, 49:17, 50:8, 51:20, 51:25, 53:7, 53:19, 54:1
  **court** [1] - 25:22
  **Court** [6] - 20:16, 28:13, 28:14, 44:11, 50:4, 52:13
  **Court's** [1] - 53:5
  **cover** [2] - 19:18, 27:17
  **covered** [5] - 13:16, 35:5, 35:7, 49:8, 53:12
  **create** [2] - 25:7, 38:13
  **created** [3] - 21:10, 46:6, 51:1
  **credibility** [1] - 5:2
  **critical** [5] - 28:24, 32:15, 32:16, 32:18
  **cross** [2] - 41:1, 45:10
  **cross-examination** [1] - 41:1
  **curious** [1] - 34:5
  **current** [2] - 24:2, 46:5
  **customer** [2] - 37:3, 37:5

## D

  **damage** [3] - 14:6, 44:1, 52:17
  **damages** [10] - 12:2, 12:21, 14:19, 15:17, 22:2, 43:9, 43:23, 44:8, 45:25, 50:11
  **Darveaux** [27] - 6:4, 6:18, 6:24, 7:11, 7:13, 8:1, 8:5, 8:10, 9:8, 10:22, 12:10, 13:1, 13:3, 13:24, 14:6, 14:14, 15:3, 15:7, 16:10, 16:16, 17:21, 34:9, 34:22, 35:2, 36:14, 36:22, 41:7
  **Darveaux's** [8] - 7:4, 7:6, 12:18, 14:25, 34:11, 34:12, 34:15, 38:2
  **date** [2] - 36:22, 36:23
  **dates** [2] - 36:21, 38:1
  **Daubert** [9] - 4:5, 5:1, 5:10, 9:13, 12:14, 15:2, 15:16, 18:6, 45:10
  **Dave** [1] - 8:23
  **DAVID** [1] - 3:3
  **david.elkins@squirepb.com** [1] - 3:8
  **days** [1] - 53:8
  **deal** [4] - 8:7, 19:20, 27:21, 48:5
  **dealing** [2] - 21:5, 39:24
  **dealt** [1] - 23:22
  **decade** [1] - 40:5
  **decided** [1] - 40:6
  **declaration** [1] - 21:13
  **defect** [1] - 28:24
  **defendant** [12] - 44:21, 46:5, 46:7, 47:22, 48:9, 48:16, 49:25, 50:12, 50:13, 51:17, 52:3, 52:24
  **defendant's** [2] - 46:2, 48:14
  **Defendants** [1] - 3:1
  **defense** [4] - 12:3, 12:21, 13:10, 21:19
  **deficiency** [3] - 27:10, 27:11, 27:13
  **define** [1] - 31:6
  **defined** [2] - 14:21, 31:18
  **DeFosse** [8] - 18:14, 19:21, 33:3, 37:11, 39:12, 42:14, 43:12, 53:22
  **DEFOSSE** [20] - 18:15, 18:18, 18:21, 19:22, 24:19, 27:18, 28:11, 29:5, 29:22, 33:4, 33:8, 33:12, 33:17, 33:25, 37:13, 37:15, 39:15, 40:22, 42:17, 53:24
  **department** [2] - 22:25,

24:4
  **deposition** [6] - 6:13, 29:7, 30:16, 34:6, 34:22, 36:12
  **depositions** [1] - 9:18
  **described** [1] - 27:7
  **describing** [1] - 52:1
  **design** [2] - 17:22, 38:11
  **designate** [1] - 30:25
  **designated** [3] - 24:10, 30:17, 30:20
  **designates** [1] - 29:16
  **designation** [7] - 29:19, 31:13, 31:15, 32:14, 32:16, 32:21, 32:22
  **designations** [1] - 29:25
  **detailed** [1] - 20:21
  **determination** [1] - 52:20
  **determine** [2] - 25:14, 34:23
  **determined** [1] - 15:18
  **develop** [1] - 34:7
  **developing** [2] - 34:23, 40:5
  **development** [11] - 33:13, 34:2, 35:3, 35:21, 35:23, 38:16, 38:25, 39:4, 40:7, 41:17, 46:2
  **devices** [2] - 38:10, 42:25
  **die** [1] - 47:2
  **died** [1] - 35:15
  **difference** [3] - 39:13, 42:8, 42:19
  **different** [6] - 13:14, 42:5, 42:10, 42:13, 42:15, 42:17
  **difficult** [2] - 17:5, 22:8
  **direct** [1] - 28:16
  **directed** [2] - 12:14, 43:17
  **directly** [1] - 43:18
  **director** [2] - 38:11, 39:2
  **disagree** [2] - 14:24, 16:16
  **disagrees** [1] - 16:10
  **disclosed** [2] - 21:3, 21:4
  **disconnect** [1] - 6:2
  **discovered** [1] - 33:18
  **discuss** [1] - 36:18
  **discusses** [1] - 44:18
  **discussion** [1] - 36:21
  **disgorged** [1] - 48:15
  **disgorging** [1] - 44:11
  **dispute** [1] - 19:12
  **disputed** [1] - 38:3
  **disputes** [1] - 44:23
  **distinction** [1] - 53:18
  **dixit** [4] - 20:5, 28:18, 29:15, 30:1
  **doctor** [2] - 20:14, 25:20
  **document** [6] - 7:16, 27:2, 27:6, 29:6, 30:8, 30:16,

32:10, 32:18
  **documents** [13] - 9:10, 10:1, 11:8, 11:13, 23:12, 29:8, 29:12, 30:11, 30:20, 32:17, 40:11, 40:12, 41:6
  **dollars** [2] - 46:11, 46:13
  **done** [4] - 6:10, 27:5, 34:9, 41:8
  **down** [6] - 8:16, 10:6, 16:2, 20:9, 27:12, 44:14
  **dozens** [1] - 40:11
  **Dr** [62] - 7:4, 7:6, 8:3, 8:5, 8:10, 8:11, 12:15, 12:18, 13:23, 14:14, 14:25, 15:1, 15:2, 15:3, 18:10, 18:22, 18:25, 19:12, 19:19, 19:24, 20:2, 20:11, 21:1, 21:10, 21:12, 23:20, 25:12, 25:17, 26:19, 26:21, 27:14, 27:22, 28:15, 30:15, 31:5, 33:10, 33:18, 33:23, 34:5, 34:9, 34:11, 34:12, 34:14, 34:15, 34:17, 34:22, 35:1, 35:2, 35:25, 36:6, 36:12, 36:14, 36:21, 36:22, 37:24, 38:2, 39:22, 40:19, 41:7, 46:14, 52:7
  **Drew** [1] - 3:14
  **Drs** [16] - 6:4, 6:18, 6:24, 7:11, 7:13, 8:1, 9:8, 10:22, 12:10, 13:1, 13:3, 14:6, 14:14, 15:7, 16:10, 17:21
  **DTSA** [1] - 14:20
  **due** [2] - 36:17, 51:4
  **during** [2] - 34:22, 35:9

## E

  **e-mail** [1] - 38:8
  **e-mails** [2] - 38:4, 41:12
  **early** [1] - 51:4
  **earned** [3] - 46:12, 46:18, 53:2
  **earning** [1] - 38:22
  **easy** [1] - 11:15
  **economic** [7] - 17:3, 45:1, 45:5, 45:14, 45:17, 46:15, 47:21
  **effort** [3] - 35:10, 38:15, 39:7
  **eight** [2] - 14:14, 15:5
  **either** [5] - 23:16, 23:18, 32:18, 46:20, 47:8
  **electronics** [1] - 20:10
  **eliminates** [1] - 31:13
  **eliminating** [1] - 5:1
  **ELKINS** [33] - 3:3, 8:23, 9:3, 9:7, 9:12, 9:15, 9:25, 10:3,

4

10:8, 10:13, 10:25, 11:2,
11:6, 12:2, 12:5, 12:8, 12:17,
12:20, 13:18, 16:4, 16:6,
16:8, 16:12, 16:15, 16:20,
16:24, 17:9, 49:10, 49:15,
49:18, 50:9, 53:17, 54:7

**Elkins** [6] - 8:23, 8:25,
14:24, 52:1, 52:11, 53:15
**emissions** [1] - 50:2
**emphasize** [1] - 23:5
**employed** [2] - 5:4, 6:6
**employee** [3] - 7:15, 15:4,
32:2
**employees** [10] - 7:8,
22:20, 23:16, 24:5, 26:23,
27:23, 27:24, 29:19, 29:24,
32:1
**encompassed** [1] - 12:23
**encourage** [1] - 26:4
**end** [4] - 30:3, 49:5, 53:9,
54:4
**engineer** [2] - 10:16, 14:16
**engineering** [5] - 6:11,
6:15, 6:20, 37:17, 38:11
**engineers** [2] - 31:6, 31:8
**enhance** [3] - 50:11, 50:15
**enhancing** [1] - 50:19
**enriched** [3] - 47:21, 48:9,
52:25
**enrichment** [9] - 13:11,
43:8, 43:22, 44:7, 44:20,
48:14, 49:18, 51:17, 52:3
**enter** [1] - 52:8
**entertain** [1] - 51:24
**entirely** [1] - 33:20
**entitled** [2] - 20:17, 53:1
**EPA** [2] - 48:11, 48:18
**equivalence** [1] - 42:23
**equivalent** [1] - 24:20
**especially** [1] - 34:3
**essentially** [1] - 50:6
**established** [1] - 48:25
**estimated** [1] - 10:22
**estimates** [3] - 6:25, 7:7,
9:18
**et** [1] - 22:9
**evidence** [12] - 11:9, 25:8,
29:23, 29:25, 33:20, 36:3,
39:17, 39:19, 40:24, 40:25,
41:12, 41:14
**exact** [1] - 53:2
**exactly** [8] - 8:14, 12:20,
24:1, 27:5, 36:20, 40:23,
49:6, 50:17
**examination** [1] - 41:1
**example** [5] - 5:4, 7:5,
21:10, 38:5, 39:23
**exclude** [4] - 4:12, 18:21,

33:10, 43:4
**excluded** [1] - 18:6
**excluding** [1] - 19:25
**exclusion** [1] - 19:23
**exercise** [1] - 47:9
**existing** [1] - 39:3
**expensive** [2] - 10:9, 12:25
**experience** [16] - 20:10,
20:20, 21:2, 21:16, 23:21,
24:21, 24:22, 25:16, 25:17,
25:24, 26:17, 26:21, 26:25,
27:3, 27:19, 28:7
**expert** [32] - 4:12, 7:6, 12:2,
12:21, 13:10, 20:5, 20:14,
21:4, 25:4, 25:12, 25:13,
25:22, 26:7, 26:15, 26:24,
27:6, 27:8, 27:19, 28:9,
29:10, 30:9, 34:12, 34:15,
34:16, 34:19, 37:25, 41:16,
41:21, 46:4, 50:25, 51:19
**expertise** [4] - 6:15, 21:7,
28:13, 28:15
**experts** [5] - 6:18, 7:25, 9:8,
11:19, 19:2
**explained** [1] - 27:11
**explains** [1] - 38:12
**exposure** [5] - 24:24,
25:19, 25:23, 26:22, 28:4
**extensive** [2] - 4:7, 9:16
**extensively** [1] - 7:5
**extent** [1] - 21:14

## F

**fab** [1] - 38:6
**face** [2] - 31:9
**face-to-face** [1] - 31:9
**Facebook** [3] - 26:12,
27:19, 27:20
**facility** [1] - 38:6
**fact** [8] - 6:25, 11:23, 32:13,
36:3, 36:4, 39:20, 40:15,
51:8
**factor** [1] - 22:23
**factors** [1] - 5:10
**facts** [1] - 15:24
**factual** [2] - 41:19
**factually** [1] - 5:6
**fair** [1] - 28:19
**fairly** [1] - 9:1
**falls** [2] - 30:4, 30:8
**familiarity** [3] - 18:10,
25:20, 25:23
**far** [2] - 22:4, 37:8
**fascinated** [1] - 33:15
**favor** [1] - 28:13
**FBAR** [6] - 34:3, 38:12,
39:7, 42:7, 42:19, 42:21

**ferry** [1] - 35:14
**few** [2] - 22:4, 40:10
**fictitious** [1] - 41:8
**field** [2] - 20:15, 22:14
**figure** [2] - 31:6, 33:19
**filter** [2] - 38:25, 42:19
**filters** [14] - 33:14, 34:3,
34:8, 34:24, 35:3, 39:7,
39:25, 40:5, 40:12, 41:13,
41:17, 42:6, 42:10
**fine** [2] - 33:1, 41:14
**first** [9] - 14:5, 16:9, 20:2,
20:22, 34:14, 36:11, 36:24,
37:9, 37:16
**fiscal** [1] - 37:10
**fit** [1] - 15:24
**flagging** [1] - 52:13
**focus** [4] - 6:5, 27:13, 39:3,
39:10
**focused** [4] - 27:10, 42:6,
42:7, 46:3
**focusing** [1] - 39:6
**fodder** [2] - 41:1, 45:10
**folks** [1] - 24:23
**follow** [1] - 27:1
**footnote** [1] - 45:16
**form** [3] - 13:5, 15:18,
21:25
**formal** [1] - 27:1
**formed** [1] - 39:10
**forming** [1] - 29:8
**formula** [4] - 45:7, 45:9,
45:15, 46:16
**forth** [4] - 5:15, 15:24, 23:7,
44:4
**forward** [4] - 38:21, 39:8,
54:3, 54:4
**four** [1] - 18:22
**frameworks** [1] - 25:13
**frankly** [1] - 6:14
**frequencies** [1] - 38:14
**Friday** [2] - 53:10, 54:5
**front** [2] - 45:11, 47:2
**fully** [1] - 10:15
**functional** [1] - 42:23
**fundamental** [2] - 13:22,
44:24
**fundamentally** [5] - 5:25,
14:20, 15:21, 45:2, 45:21
**funding** [1] - 39:7

## G

**gained** [1] - 53:3
**general** [9] - 20:10, 20:20,
21:15, 24:21, 25:24, 26:21,
26:22, 38:23, 40:9
**generally** [2] - 22:1, 22:24

**generate** [1] - 52:8
**generating** [2] - 51:15,
52:15
**gigahertz** [12] - 33:13, 34:2,
34:8, 34:23, 35:3, 38:10,
38:25, 39:4, 39:7, 39:25,
40:12, 41:17
**Giovan** [1] - 39:1
**given** [2] - 12:5, 13:7
**glad** [1] - 5:10
**GLBL** [2] - 45:24, 46:3
**global** [1] - 39:2
**governing** [1] - 27:20
**granted** [1] - 18:24
**great** [1] - 18:10
**grounds** [2] - 18:24, 19:25
**group** [1] - 42:9
**grouping** [1] - 7:20
**groups** [5] - 6:9, 6:12,
14:14, 18:25, 19:13, 19:16,
19:18

## H

**habitual** [1] - 28:25
**hand** [3] - 13:12, 13:13,
43:12
**handle** [1] - 24:9
**hangs** [1] - 13:8
**happy** [3] - 33:5, 43:16,
43:18
**harmed** [1] - 45:17
**hat** [1] - 13:9
**head** [12] - 17:20, 43:8,
43:22, 43:23, 44:1, 44:8,
45:21, 45:22, 45:25, 46:1,
46:13, 51:4
**hear** [5] - 18:12, 30:12,
30:14, 49:12, 53:13
**heard** [1] - 12:9
**hearing** [2] - 11:9, 47:10
**heavy** [3] - 35:11, 35:13,
35:17
**held** [2] - 50:3, 52:4
**help** [4] - 4:9, 44:8, 44:9,
53:13
**Helpful** [1] - 54:2
**helpful** [2] - 8:19, 43:2
**highly** [1] - 10:16
**hired** [1] - 40:9
**Holdco** [4] - 26:5, 26:15,
27:5, 27:18
**Holden** [1] - 40:10
**holden** [1] - 40:10
**holding** [1] - 52:25
**holds** [1] - 28:20
**Honor** [43] - 4:21, 5:21, 8:9,
8:18, 8:23, 10:1, 14:1, 16:4,

17:17, 18:15, 19:8, 19:11, 19:22, 20:8, 21:5, 21:21, 21:22, 23:23, 24:21, 26:4, 27:19, 28:11, 28:16, 30:15, 33:5, 33:21, 36:11, 39:15, 40:22, 42:4, 42:8, 42:18, 43:16, 44:9, 47:13, 47:18, 48:5, 49:10, 50:17, 51:24, 53:25, 54:7, 54:8
**Honor's** [1] - 25:6
**hopefully** [2] - 53:9
**hot** [1] - 5:7
**hourly** [1] - 10:18
**hours** [19] - 6:11, 6:16, 6:20, 6:25, 7:7, 7:12, 7:14, 7:20, 8:13, 10:19, 10:21, 10:22, 10:23, 10:25, 11:16, 15:5, 15:6, 17:9
**house** [1] - 27:12
**hundred** [1] - 27:6
**hundred-page** [1] - 27:6
**hypothetical** [1] - 46:7

**I**

**idea** [1] - 42:11
**identification** [1] - 32:11
**identified** [4] - 6:9, 6:11, 25:15, 46:14
**identifies** [1] - 14:14
**identify** [10] - 6:15, 6:16, 7:15, 7:21, 14:15, 15:9, 17:21, 29:7, 31:6, 32:1
**II** [1] - 35:10
**illnesses** [2] - 25:21, 25:22
**illustrates** [1] - 28:22
**imagine** [1] - 48:2
**impact** [1] - 46:1
**important** [8] - 6:7, 22:9, 24:16, 31:8, 31:22, 42:16, 43:3, 54:5
**importantly** [1] - 14:18
**improper** [3] - 35:4, 41:22, 46:10
**inadmissible** [1] - 40:24
**inappropriate** [1] - 40:20
**incidents** [1] - 23:10
**include** [1] - 32:15
**included** [1] - 21:12
**including** [2] - 10:17, 11:11
**inclusive** [1] - 29:4
**incorporate** [1] - 19:1
**incorporation** [1] - 36:23
**incurred** [1] - 51:13
**indeed** [1] - 42:6
**independently** [1] - 16:17
**indicate** [2] - 13:4, 46:9
**indicated** [1] - 52:2

**indiscriminate** [1] - 29:1
**indiscriminately** [1] - 41:9
**individual** [1] - 4:14
**industry** [5] - 20:11, 24:22, 25:3, 26:8, 26:16
**information** [68] - 5:14, 7:2, 7:9, 7:10, 7:15, 7:22, 10:11, 11:15, 11:20, 12:22, 14:8, 14:16, 14:17, 14:22, 15:3, 15:5, 15:10, 15:14, 16:18, 17:1, 17:4, 17:25, 19:24, 20:3, 20:11, 21:2, 21:7, 21:11, 21:18, 21:24, 21:25, 22:11, 22:10, 22:11, 23:17, 23:21, 24:4, 24:9, 24:18, 25:2, 25:4, 25:7, 25:12, 26:10, 26:14, 26:16, 26:18, 26:22, 27:7, 28:1, 28:2, 28:6, 28:12, 28:15, 28:20, 29:1, 29:19, 30:4, 30:8, 31:19, 31:20, 39:22, 39:24, 40:2, 40:18, 43:9, 52:10
**inputs** [1] - 45:9
**instance** [2] - 30:7, 34:14
**intended** [4] - 42:1, 45:25, 50:1, 51:10
**interest** [3] - 33:4, 50:7, 50:15
**interested** [5] - 5:15, 36:2, 43:23, 43:25, 53:10
**interesting** [9] - 4:10, 9:14, 18:9, 28:10, 33:16, 33:17, 34:13, 43:4, 43:25
**internal** [3] - 32:13, 38:4, 38:24
**Internet** [12] - 7:8, 7:16, 7:21, 9:23, 10:1, 10:21, 11:7, 11:8, 11:11, 14:19, 15:11, 18:1
**interposes** [1] - 38:3
**interrupting** [1] - 16:8
**introduced** [1] - 39:20
**ipse** [4] - 20:5, 28:18, 29:15, 30:1
**Irwin** [13] - 4:12, 4:23, 6:8, 8:13, 9:7, 11:17, 12:20, 13:5, 14:5, 15:8, 15:12, 16:9, 18:3
**Irwin's** [5] - 10:10, 14:11, 15:22, 15:23, 49:22
**issue** [27] - 5:25, 13:8, 13:22, 14:25, 15:22, 16:20, 18:23, 19:5, 20:9, 20:23, 20:24, 24:16, 25:11, 26:2, 27:22, 28:7, 28:14, 28:17, 42:12, 43:7, 45:4, 45:6, 45:19, 47:3, 48:8, 49:21, 51:15
**issues** [2] - 4:25, 25:16
**itself** [3] - 31:16, 41:20,

48:21

**J**

**journals** [1] - 43:21
**judgments** [1] - 5:2
**July** [2] - 37:9, 38:21
**jumps** [1] - 29:18
**June** [1] - 38:5
**jury** [6] - 13:3, 13:4, 14:18, 15:16, 16:10, 45:11
**justified** [2] - 11:18, 39:23
**justifying** [1] - 25:25

**K**

**keep** [2] - 22:3, 31:20
**keeping** [1] - 22:17
**kind** [11] - 7:25, 9:14, 11:20, 14:2, 15:23, 17:20, 22:1, 28:21, 28:22, 30:23, 44:10
**kinds** [1] - 25:21
**King** [1] - 3:11
**knowingly** [1] - 14:5
**knowledge** [5] - 20:22, 21:1, 21:7, 21:15, 21:16

**L**

**label** [2] - 23:13, 29:20
**labeled** [1] - 32:18
**labeling** [1] - 29:1
**labor** [2] - 10:14, 10:15
**lack** [1] - 6:1
**lacks** [1] - 11:19
**large** [2] - 24:23, 26:25
**last** [4] - 17:13, 17:19, 41:24, 42:3
**late** [2] - 37:15, 37:18
**launched** [1] - 37:16
**law** [5] - 25:22, 31:12, 44:17, 47:8, 47:13
**layer** [1] - 10:8
**lead** [5] - 4:19, 18:12, 37:6, 37:7, 37:12
**leading** [1] - 4:22
**leads** [1] - 29:19
**Leah** [1] - 39:1
**leak** [1] - 22:18
**leap** [1] - 30:3
**learn** [1] - 25:20
**least** [2] - 25:8, 36:19
**leave** [1] - 13:25, 50:22
**Lebby** [49] - 6:4, 6:18, 6:24, 7:11, 7:14, 8:1, 8:3, 8:11, 9:8, 10:22, 12:10, 12:15,

13:1, 13:4, 13:23, 14:6, 14:15, 15:2, 15:7, 16:10, 16:17, 17:21, 18:10, 18:25, 19:12, 19:15, 19:19, 20:2, 20:11, 21:1, 21:10, 21:12, 23:20, 25:17, 26:19, 27:14, 27:22, 28:15, 30:15, 31:5, 33:18, 34:5, 34:14, 35:1, 35:25, 36:6, 36:12, 36:21, 37:24
**Lebby's** [10] - 7:4, 15:1, 18:22, 19:24, 26:21, 33:10, 33:23, 34:17, 39:22, 40:19
**legitimate** [1] - 47:9
**legs** [1] - 28:21
**Lemieux** [1] - 53:17
**LEMIEUX** [1] - 3:2
**letting** [1] - 53:20
**leverage** [1] - 20:20
**liability** [3] - 12:3, 12:22, 13:12
**lift** [2] - 10:23, 17:10
**likely** [1] - 22:18
**limited** [1] - 41:11
**line** [1] - 31:10
**link** [1] - 30:5
**Links** [1] - 38:23
**listed** [1] - 19:15
**litigation** [1] - 29:12
**loaded** [1] - 10:15
**log** [3] - 27:2, 28:5
**look** [7] - 6:7, 7:3, 26:4, 26:9, 29:9, 33:22, 50:4
**looking** [9] - 4:19, 7:8, 11:6, 11:7, 37:22, 43:5, 49:6, 54:3, 54:4
**looks** [2] - 13:21, 43:14
**lost** [2] - 50:12, 50:14
**love** [1] - 49:13
**Ludlum** [3] - 47:19, 48:4, 49:16

**M**

**ma'am** [1] - 42:2
**magic** [1] - 42:23
**mail** [1] - 38:8
**mails** [2] - 38:4, 41:12
**manager** [2] - 38:23, 40:9
**manner** [1] - 13:15
**manufacture** [1] - 38:7
**manufacturing** [1] - 39:3
**March** [2] - 38:8, 38:19
**marked** [1] - 28:1
**market** [3] - 39:19, 39:20, 52:8
**marketing** [3] - 26:11, 26:12

6

**Masters** [2] - 53:24, 54:1
**material** [4] - 5:12, 13:24, 42:20, 54:3
**materials** [3] - 4:7, 27:25, 29:16
**mathematical** [3] - 45:7, 45:15, 46:16
**matter** [5] - 11:6, 11:7, 27:4, 32:3, 49:5
**MATTHEW** [1] - 3:4
**matthew.stanford@ squirepb.com** [1] - 3:9
**mean** [12] - 7:3, 12:2, 15:1, 20:17, 22:22, 25:18, 26:20, 29:25, 30:6, 30:12, 32:5, 49:1
**measure** [1] - 46:1
**measured** [1] - 52:3
**measures** [4] - 25:15, 31:20, 31:25, 50:1
**measuring** [2] - 45:23, 46:16
**medical** [5] - 20:15, 20:16, 20:18, 25:20
**meetings** [1] - 36:18
**MEMS** [1] - 38:6
**mention** [1] - 21:6
**merely** [2] - 19:1, 21:8
**method** [1] - 47:7
**methodology** [6] - 5:4, 5:5, 27:9, 46:10, 47:7, 48:25
**middle** [1] - 50:24
**might** [8] - 4:12, 4:15, 4:16, 5:7, 5:19, 22:23, 28:10, 48:2
**Mill** [1] - 3:5
**millions** [1] - 38:17
**misappropriate** [1] - 46:8
**misappropriated** [5] - 5:20, 6:10, 7:13, 51:5, 52:15
**misappropriating** [2] - 46:1, 46:5
**misappropriation** [5] - 5:24, 17:6, 45:18, 46:6, 48:8
**missing** [1] - 33:2
**misspoke** [1] - 11:5
**model** [5] - 14:6, 37:6, 37:7, 37:8, 37:12
**money** [21] - 44:18, 45:1, 45:5, 45:8, 45:13, 45:14, 45:16, 45:20, 46:24, 46:25, 47:20, 48:10, 48:13, 48:21, 50:1, 50:5, 50:10, 50:16, 50:19, 52:25
**months** [9] - 40:10, 46:13, 46:17, 52:6, 52:8, 52:13, 52:16, 52:21, 53:4
**morning** [3] - 4:21, 18:16, 19:8

**most** [4] - 8:12, 10:16, 20:6, 42:15
**motion** [8] - 4:11, 4:18, 6:8, 12:15, 14:3, 14:10, 20:25, 43:4
**motions** [1] - 4:6
**mouths** [2] - 8:1, 12:11
**move** [4] - 33:5, 38:21, 40:6, 53:14
**moving** [1] - 39:8
**MR** [52] - 8:23, 9:3, 9:7, 9:12, 9:15, 9:25, 10:3, 10:8, 10:13, 10:25, 11:2, 11:6, 12:2, 12:5, 12:8, 12:17, 12:20, 13:18, 16:4, 16:6, 16:8, 16:12, 16:15, 16:20, 16:24, 17:9, 18:15, 18:18, 18:21, 19:22, 24:19, 27:18, 28:11, 29:5, 29:22, 33:4, 33:8, 33:12, 33:17, 33:25, 37:13, 37:15, 39:15, 40:22, 42:17, 49:10, 49:15, 49:18, 50:9, 53:17, 53:24, 54:7
**MS** [51] - 4:21, 5:21, 8:5, 8:8, 8:18, 14:1, 14:5, 14:10, 14:13, 14:24, 15:21, 17:17, 19:8, 19:11, 21:21, 22:12, 22:15, 23:1, 23:11, 23:15, 24:2, 24:7, 26:3, 30:15, 31:4, 31:15, 31:24, 32:9, 32:13, 32:24, 36:11, 36:16, 36:20, 37:2, 37:7, 37:24, 38:21, 42:3, 43:15, 44:9, 44:15, 44:20, 44:24, 46:23, 47:12, 47:17, 48:4, 48:7, 51:23, 52:1, 54:8
**multiple** [1] - 10:4
**multiplied** [1] - 10:18
**must** [3] - 12:3, 13:13, 17:1

**N**

**name** [1] - 40:9
**named** [1] - 40:10
**nature** [3] - 28:18, 28:23, 50:20
**necessary** [2] - 6:15, 22:24
**need** [11] - 17:1, 17:14, 20:21, 22:16, 28:14, 30:14, 31:10, 40:2, 47:2, 51:21, 51:22
**need-to-know** [1] - 22:16
**never** [6] - 12:8, 34:15, 41:21, 41:22, 51:7, 51:19
**new** [4] - 38:10, 38:14, 38:16, 48:24
**next** [4] - 28:12, 29:18, 30:19, 33:12, 34:21, 40:10,

49:4
**nobody** [1] - 31:1
**none** [1] - 21:3
**North** [2] - 3:11, 14:20
**Norway** [1] - 35:12
**Norwegian** [2] - 35:15, 42:12
**note** [1] - 34:13
**nothing** [3] - 18:1, 21:16, 35:4
**notion** [2] - 16:15, 51:1
**November** [1] - 38:23
**number** [4] - 6:11, 6:21, 10:22, 52:17
**numbered** [1] - 19:14
**numbers** [1] - 6:19
**numeral** [1] - 29:10

**O**

**observed** [1] - 38:15
**obtain** [3] - 10:11, 16:17, 22:8
**obtained** [1] - 13:14
**obvious** [1] - 4:25
**obviously** [4] - 4:24, 12:15, 15:1, 53:10
**occurred** [2] - 5:24, 46:6
**odd** [2] - 8:7, 18:12
**offer** [4] - 7:12, 20:14, 25:1, 25:21
**offered** [5] - 15:8, 15:13, 18:5, 41:16, 41:20
**offering** [3] - 6:2, 15:25, 35:1
**one** [33] - 6:7, 6:12, 11:23, 13:11, 13:21, 16:2, 17:3, 17:13, 18:24, 20:10, 23:18, 24:7, 24:9, 24:12, 27:10, 27:13, 27:16, 28:12, 33:7, 33:12, 33:19, 34:16, 36:19, 41:25, 43:24, 47:1, 47:15, 48:25, 51:23, 53:16, 53:22
**opening** [1] - 50:24
**operate** [1] - 42:22
**operation** [1] - 17:22
**operations** [1] - 46:2
**opine** [7] - 8:1, 8:4, 8:11, 17:23, 20:3, 20:17, 41:13
**opined** [2] - 5:23, 14:5
**opines** [1] - 19:19
**opining** [6] - 7:1, 15:3, 18:4, 19:13, 20:20, 50:25
**opinion** [28] - 5:6, 6:2, 6:21, 7:12, 15:12, 15:13, 18:2, 18:4, 18:5, 28:20, 28:23, 33:12, 33:19, 33:21, 35:2, 36:8, 39:22, 39:25, 40:19,

40:24, 41:3, 41:5, 41:9, 41:11, 41:16, 41:20, 41:21, 49:22
**opinions** [27] - 5:25, 6:3, 6:6, 6:24, 7:4, 7:6, 7:14, 7:18, 11:18, 14:7, 15:1, 15:8, 15:23, 15:24, 18:22, 19:2, 19:24, 19:25, 20:4, 28:9, 28:18, 29:9, 33:10, 34:18, 36:18, 52:7
**opportunity** [1] - 17:18
**opposing** [1] - 27:7
**opposite** [8] - 8:15, 8:17, 8:20, 24:17, 27:16, 28:2, 49:9, 53:8
**opposition** [2] - 21:8, 41:18
**order** [7] - 6:15, 6:20, 17:15, 17:23, 39:21, 40:8, 41:4
**organization** [1] - 22:19
**otherwise** [6] - 12:5, 25:3, 51:15, 52:9, 52:21, 53:3
**outside** [2] - 30:4, 30:8
**over-designated** [2] - 30:17, 30:20
**over-designates** [1] - 29:16
**over-designation** [5] - 29:19, 31:13, 31:15, 32:21, 32:22
**overly** [1] - 29:3
**own** [5] - 26:18, 34:16, 38:8, 40:13, 40:16
**owner** [1] - 31:19

**P**

**PA** [1] - 3:11
**page** [12] - 5:12, 6:5, 6:7, 9:2, 14:10, 26:13, 27:6, 29:14, 45:16, 47:18, 50:10, 50:23
**Page** [1] - 3:5
**paid** [2] - 10:16, 48:16
**Palo** [1] - 3:6
**paper** [2] - 15:2, 15:16
**paragraph** [18] - 14:11, 26:24, 27:3, 27:24, 28:16, 28:19, 28:22, 29:11, 30:3, 30:18, 30:19, 33:22, 33:23, 34:10, 34:13, 34:17, 37:25
**paragraphs** [5] - 19:14, 19:16, 19:17, 21:5
**part** [5] - 31:21, 36:20, 48:10, 48:17, 51:3
**particular** [8] - 9:5, 11:23, 30:16, 30:19, 32:16, 32:25, 38:1, 39:13
**particularly** [2] - 31:7,

48:19

**parts** [2] - 7:7, 38:17
**party** [2] - 20:13, 45:17
**party's** [1] - 27:7
**passengers** [1] - 35:15
**patent** [4] - 22:2, 22:7, 22:8, 22:10
**Patton** [1] - 3:4
**payroll** [1] - 10:17
**penalty** [2] - 49:23, 49:24
**people** [3] - 22:17, 23:2, 24:10
**per** [1] - 38:17
**perfectly** [1] - 33:1
**performed** [1] - 46:4
**period** [1] - 44:3
**person** [3] - 24:8, 24:12, 25:9
**persuasive** [1] - 49:3
**place** [3] - 9:22, 11:11, 41:22
**Plaintiff** [1] - 4:22
**plan** [1] - 39:3
**planning** [1] - 28:25
**plans** [1] - 22:11
**point** [15] - 4:8, 9:22, 17:10, 17:11, 30:13, 39:17, 39:21, 40:14, 40:15, 40:20, 42:3, 46:21, 50:18, 51:12
**pointed** [2] - 26:6, 34:10
**points** [3] - 14:1, 20:6, 20:9
**policies** [8] - 21:11, 25:15, 26:22, 26:23, 27:20, 28:7, 30:5, 30:10
**policy** [6] - 24:1, 25:7, 28:2, 28:3, 28:6, 30:8
**population** [1] - 24:23
**portion** [1] - 7:5
**portraying** [1] - 41:18
**portrays** [1] - 13:10
**position** [8] - 10:16, 11:24, 29:21, 29:22, 31:3, 31:12, 31:13, 37:21
**possesses** [1] - 17:3
**possibly** [1] - 13:22
**potential** [1] - 17:3
**practical** [1] - 26:17
**practices** [2] - 20:12, 25:3
**precisely** [1] - 9:22
**predicated** [3] - 6:25, 7:7, 15:12
**predicating** [1] - 14:7
**prejudgment** [1] - 50:7
**prematurely** [1] - 51:1
**premises** [1] - 28:21
**Present** [1] - 3:14
**present** [2] - 27:25, 28:9
**presented** [1] - 23:12

**pretty** [5] - 9:2, 13:21, 17:14, 18:8, 42:15
**previous** [1] - 43:24
**principle** [2] - 45:1, 45:5
**problem** [14] - 6:23, 12:12, 15:2, 15:7, 21:2, 21:19, 23:8, 23:9, 25:24, 26:2, 33:21, 34:21, 39:22, 41:3
**procedure** [1] - 27:1
**procedures** [1] - 23:6
**process** [4] - 17:22, 35:21, 35:23, 53:14
**processes** [1] - 22:9
**produce** [1] - 38:17
**product** [9] - 37:13, 37:16, 37:18, 37:19, 38:15, 38:22, 39:14, 39:18, 39:20
**production** [5] - 37:6, 37:7, 37:8, 37:12, 37:19
**products** [3] - 10:5, 39:5, 40:7
**profit** [1] - 44:4
**profits** [3] - 50:12, 50:13, 50:14
**progress** [2] - 38:24, 39:4
**proper** [1] - 45:15
**proposed** [1] - 19:25
**proposing** [1] - 48:23
**proposition** [3] - 33:16, 33:17, 39:12
**proprietary** [1] - 11:12
**protection** [2] - 22:2, 30:5
**protocol** [1] - 32:3
**prototype** [4] - 36:24, 37:1, 37:5, 37:22
**provide** [4] - 7:14, 11:20, 22:2, 34:8
**public** [7] - 14:7, 15:14, 24:11, 25:10, 27:25, 29:1, 31:10
**publicly** [6] - 7:9, 7:15, 7:21, 14:16, 14:22, 15:4, 15:11, 17:23, 18:1
**purchase** [1] - 14:17
**purport** [1] - 14:15
**purported** [1] - 19:1
**purpose** [1] - 5:1
**purposes** [1] - 18:4
**put** [4] - 9:14, 10:5, 35:12, 36:8

## Q

**Qorvo** [38] - 4:22, 5:14, 6:9, 7:2, 7:19, 7:23, 8:2, 8:11, 8:12, 12:13, 12:24, 13:8, 18:13, 26:20, 29:15, 29:23, 30:7, 32:14, 33:13, 34:2,

38:4, 38:8, 38:16, 38:23, 39:5, 39:8, 39:18, 40:1, 40:3, 40:4, 40:9, 40:18, 40:19, 41:5, 41:12, 41:17, 42:6, 43:17
**Qorvo's** [17] - 4:11, 4:18, 6:8, 7:13, 11:11, 17:24, 26:6, 28:25, 30:4, 30:10, 38:11, 39:2, 39:4, 39:24, 52:10, 52:15
**qualifications** [3] - 20:3, 20:6, 21:6
**qualified** [1] - 27:13
**qualifies** [2] - 20:11, 25:2
**qualify** [3] - 16:21, 25:1, 27:14
**questioning** [1] - 9:17
**questions** [4] - 4:14, 20:8, 29:13, 35:5
**quickly** [1] - 39:8
**quite** [6] - 6:14, 38:18, 43:16, 47:23, 52:24, 54:5
**quote** [4] - 34:1, 38:13, 38:24, 50:24
**quoted** [2] - 7:4, 16:24
**quoting** [1] - 14:11

## R

**range** [1] - 34:2
**rate** [1] - 10:18
**rather** [1] - 8:7
**reach** [4] - 6:21, 14:18, 15:17, 28:14
**ready** [1] - 46:21
**real** [5] - 4:13, 22:22, 25:12, 46:11, 46:12
**real-world** [2] - 46:11, 46:12
**really** [21] - 5:8, 5:15, 12:9, 12:12, 13:9, 16:2, 17:11, 20:19, 20:21, 22:6, 22:13, 22:21, 33:15, 36:2, 40:4, 42:17, 43:10, 43:25, 44:23, 45:22, 47:23
**reason** [5] - 15:15, 22:15, 23:5, 23:20, 49:19
**reasonable** [5] - 9:5, 25:2, 25:14, 31:20, 31:25
**receipt** [1] - 48:14
**receive** [2] - 37:9
**received** [6] - 47:22, 48:2, 48:5, 49:20, 51:4, 51:10
**receives** [1] - 44:21
**receiving** [4] - 48:10, 51:1, 51:3, 52:20
**recognized** [3] - 45:25, 47:7, 47:8

**recognizing** [1] - 48:13
**record** [2] - 5:9, 21:17
**recoverable** [1] - 45:20
**recovered** [1] - 45:17
**recreate** [2] - 9:19, 15:10
**reduced** [1] - 51:9
**reducing** [1] - 51:6
**reference** [1] - 19:1
**referred** [1] - 41:7
**referring** [1] - 34:17
**refers** [1] - 34:11
**reflect** [1] - 30:21
**reflected** [2] - 10:9, 11:3
**reflector** [1] - 42:22
**regard** [3] - 22:7, 30:17, 32:21
**regarding** [2] - 5:2, 16:17
**region** [2] - 42:21, 42:24
**regurgitate** [1] - 7:16
**reiterated** [1] - 18:2
**reiteration** [1] - 49:12
**relate** [1] - 19:16
**related** [1] - 21:7
**relates** [3] - 31:17, 31:18, 47:3
**releasing** [1] - 38:9
**relevant** [4] - 26:7, 26:16, 31:17, 33:22
**reliability** [1] - 28:17
**reliable** [2] - 15:23, 20:4
**reliance** [1] - 6:23
**relied** [4] - 6:3, 6:17, 36:22, 41:7
**relies** [1] - 11:20
**rely** [5] - 13:2, 15:8, 18:4, 32:20, 32:25
**relying** [5] - 9:7, 9:10, 9:15, 11:18, 36:7
**remain** [1] - 42:21
**remarks** [1] - 12:17
**remember** [4] - 35:10, 35:13, 35:15, 36:17
**reminded** [1] - 35:9
**reminding** [1] - 44:11
**removed** [1] - 35:12
**removes** [1] - 31:13
**repeatedly** [1] - 34:19
**repeating** [1] - 4:8
**rephrase** [1] - 43:18
**replicated** [2] - 12:24, 12:25
**reply** [11] - 7:5, 17:19, 26:1, 26:3, 26:6, 26:13, 27:16, 45:3, 45:15, 50:10, 53:8
**report** [24] - 6:14, 7:6, 14:11, 19:15, 21:4, 21:13, 25:11, 26:24, 27:24, 28:17, 28:19, 29:10, 33:23, 34:10,

34:12, 34:15, 34:16, 34:17, 34:19, 34:20, 37:25, 38:2, 50:25, 51:19

**reports** [2] - 9:16, 13:1
**representation** [1] - 18:8
**required** [2] - 15:10, 16:21
**requirement** [2] - 17:4, 51:9
**requires** [1] - 17:2
**research** [1] - 40:6
**resonator** [1] - 42:24
**resonators** [1] - 42:10
**resorting** [1] - 17:6
**respect** [3] - 4:22, 6:6, 49:21
**respond** [1] - 13:21
**responded** [1] - 30:17
**responding** [1] - 8:21
**response** [10] - 9:17, 17:11, 20:24, 29:9, 30:13, 30:14, 43:17, 44:17, 51:23, 54:4
**responsible** [2] - 24:25, 25:10
**Restatement** [1] - 16:24
**result** [1] - 30:4
**revenue** [33] - 37:9, 38:22, 43:8, 43:22, 44:4, 44:7, 44:12, 44:16, 46:17, 47:4, 48:1, 48:5, 48:15, 48:21, 49:20, 50:3, 50:11, 50:18, 50:19, 50:21, 51:1, 51:10, 51:15, 52:4, 52:6, 52:8, 52:16, 52:20, 53:1, 53:3
**revenues** [1] - 51:3
**review** [2] - 21:5, 34:20
**reviewed** [2] - 29:12, 34:15
**RF** [1] - 34:4
**rid** [1] - 35:11
**Road** [1] - 3:5
**robinson** [1] - 25:12
**role** [1] - 24:3
**Roman** [1] - 29:9
**Ron** [1] - 40:10
**RONALD** [1] - 3:2
**ronald.lemieux@ squirepb.com** [1] - 3:7
**route** [1] - 35:18
**Rule** [1] - 11:17
**rules** [3] - 24:8, 24:13, 28:13
**run** [1] - 49:14

## S

**saboteurs** [1] - 35:11
**Sabre** [2] - 45:24, 46:3
**satisfied** [1] - 17:4
**save** [1] - 50:5
**saved** [5] - 7:12, 7:20, 8:12,

49:25, 50:6
**sbrauerman@bayardlaw. com** [1] - 3:13
**school** [1] - 25:20
**search** [1] - 7:21
**searching** [2] - 10:21, 49:1
**second** [3] - 19:23, 20:4, 20:24
**secondary** [8] - 43:7, 43:9, 43:20, 44:6, 46:20, 46:23, 47:10, 47:12
**seconds** [2] - 42:15, 42:18
**secrecy** [3] - 16:21, 17:2, 17:4
**secret** [27] - 7:1, 14:21, 15:18, 16:22, 17:1, 17:23, 18:2, 18:25, 22:17, 22:18, 23:5, 24:1, 25:4, 28:5, 31:14, 31:18, 31:20, 32:1, 32:3, 32:7, 32:11, 48:8, 48:20, 52:10
**secrets** [28] - 5:18, 5:20, 5:24, 6:9, 7:13, 7:19, 8:2, 8:12, 9:20, 11:10, 11:24, 12:23, 13:14, 14:19, 14:21, 17:24, 21:23, 22:3, 22:16, 22:17, 23:23, 24:22, 24:24, 27:2, 32:16, 45:18, 51:5, 52:15
**Section** [3] - 16:25, 34:11, 34:12
**section** [2] - 19:15, 34:18
**securing** [1] - 26:18
**security** [31] - 19:24, 20:3, 20:12, 21:2, 21:8, 21:11, 21:19, 23:21, 24:4, 24:18, 25:3, 25:5, 25:7, 25:12, 25:14, 26:7, 26:10, 26:15, 26:16, 27:7, 27:20, 28:1, 28:2, 28:6, 28:13, 28:16, 28:20, 28:25, 30:5, 30:8, 30:10
**Sedona** [1] - 47:13
**see** [6] - 10:10, 35:22, 40:9, 40:22, 41:18, 53:15
**seem** [1] - 21:19
**semantics** [1] - 13:8
**semiconductors** [1] - 10:8
**senior** [3] - 53:16, 53:20, 53:22
**sense** [5] - 30:23, 45:22, 47:5, 48:2, 50:17
**sentence** [1] - 30:20
**serving** [1] - 34:20
**set** [1] - 15:24
**sets** [2] - 24:8
**seven** [1] - 35:15
**Shanfield** [2] - 14:14, 46:14

**Shanfield's** [1] - 52:7
**share** [1] - 53:17
**shifted** [1] - 46:11
**shifting** [1] - 44:15
**ship** [2] - 35:12, 35:14
**shipment** [1] - 36:24
**shipped** [3] - 37:3, 37:4, 37:13
**shot** [3] - 41:24, 47:15, 47:16
**show** [4] - 9:10, 13:1, 23:9
**shows** [4] - 23:18, 35:21, 35:24, 36:1
**side** [1] - 20:25
**sides** [2] - 7:25, 12:11
**significant** [1] - 44:4
**similar** [1] - 38:14
**simple** [1] - 9:1
**simpler** [1] - 38:13
**simply** [6] - 5:7, 7:20, 26:15, 45:19, 46:11
**single** [2] - 21:6, 29:6
**situation** [4] - 7:24, 47:25, 52:5, 53:2
**situations** [1] - 4:10
**slow** [2] - 38:12, 38:16
**small** [3] - 10:23, 17:10, 24:3
**Smith** [12] - 8:22, 19:7, 21:20, 24:19, 25:7, 27:23, 28:4, 35:8, 37:21, 39:16, 41:6, 41:24
**SMITH** [27] - 3:2, 19:8, 19:11, 21:21, 22:12, 22:15, 23:1, 23:11, 23:15, 24:2, 24:7, 26:3, 30:15, 31:4, 31:15, 31:24, 32:9, 32:13, 32:24, 36:11, 36:16, 36:20, 37:2, 37:7, 37:24, 38:21, 42:3
**SMR** [3] - 42:7, 42:19, 42:22
**sold** [2] - 37:16, 37:18
**somewhat** [1] - 40:17
**sorry** [3] - 11:2, 23:23, 23:24
**sort** [3] - 13:20, 18:11, 42:12
**sound** [1] - 42:20
**source** [4] - 46:20, 46:23, 47:11, 47:13
**sources** [5] - 11:15, 43:7, 43:9, 43:20, 44:6
**sourcing** [1] - 39:2
**speaking** [1] - 12:10
**specialized** [5] - 20:22, 21:1, 21:16, 21:25, 25:25
**specific** [14] - 20:18, 20:21,

21:1, 23:2, 23:20, 25:1, 25:25, 27:3, 27:19, 29:8, 32:20, 34:18, 36:5
**specifically** [3] - 30:18, 35:22, 47:19
**spending** [2] - 50:1, 52:4
**spent** [2] - 10:21, 50:4
**spoken** [1] - 36:13
**squeeze** [1] - 43:3
**Squire** [1] - 3:4
**STANFORD** [1] - 3:4
**start** [18] - 4:8, 4:11, 4:18, 8:20, 34:7, 43:9, 43:16, 43:23, 44:1, 44:8, 44:10, 45:21, 45:23, 45:25, 46:1, 46:13, 51:4
**started** [2] - 37:9, 52:15
**starts** [1] - 28:24
**startup** [1] - 24:3
**startups** [1] - 44:3
**statement** [3] - 26:5, 29:15, 34:6
**statements** [3] - 8:7, 11:12, 49:11
**states** [2] - 38:23, 39:2
**status** [1] - 31:14
**statute** [4] - 14:21, 31:16, 31:17
**STC** [1] - 38:6
**STC-MEMS** [1] - 38:6
**stealing** [1] - 39:24
**step** [1] - 40:8
**STEPHEN** [1] - 3:10
**still** [2] - 18:23, 41:13
**stole** [1] - 40:11
**stolen** [1] - 52:10
**stool** [1] - 28:21
**stop** [2] - 4:9, 15:17
**stops** [1] - 24:25
**straight** [1] - 17:25
**straightforward** [1] - 17:14
**Street** [1] - 3:11
**subjects** [1] - 18:11
**submit** [3] - 49:4, 49:7, 53:5
**submitting** [1] - 34:16
**substantial** [1] - 11:17
**sufficient** [1] - 17:2
**suggest** [4] - 4:7, 4:8, 49:2, 49:4
**suggested** [1] - 10:20
**Suite** [2] - 3:5, 3:11
**summary** [1] - 28:20
**support** [9] - 21:17, 31:2, 31:12, 39:12, 39:19, 43:7, 43:21, 44:6
**supported** [2] - 5:8, 41:6
**supposed** [4] - 12:21, 13:6, 15:16, 45:23

surmise [1] - 4:16
surprised [1] - 18:11
system [3] - 22:2, 22:7, 27:8

**T**

table [1] - 6:7
talks [2] - 32:22, 37:25
tax [1] - 10:17
team [3] - 38:11, 53:16, 53:23
tear [1] - 10:6
teardowns [1] - 10:3
technical [4] - 6:18, 11:19, 15:25, 40:11
technological [1] - 39:13
technologically [1] - 34:1
technologies [4] - 42:4, 42:5, 42:13, 42:18
technology [5] - 24:11, 38:13, 38:15, 42:9, 42:15
ten [1] - 15:5
term [4] - 10:3, 32:14, 32:15, 32:18
terms [1] - 22:9
terrible [1] - 35:16
test [1] - 47:6
testified [7] - 5:23, 9:17, 16:9, 21:12, 24:2, 34:19, 36:13
testify [2] - 4:14, 13:10
testimony [8] - 6:13, 7:7, 12:18, 20:14, 25:2, 25:22, 25:25, 29:14
THE [102] - 4:5, 4:24, 8:3, 8:6, 8:14, 8:19, 8:25, 9:4, 9:9, 9:13, 9:21, 10:2, 10:7, 10:12, 10:24, 11:1, 11:4, 11:21, 12:4, 12:7, 12:16, 12:19, 13:16, 13:19, 14:4, 14:9, 14:12, 14:23, 15:20, 16:1, 16:5, 16:7, 16:11, 16:14, 16:16, 16:23, 17:8, 17:12, 18:7, 18:17, 18:20, 19:3, 19:10, 19:20, 21:18, 22:5, 22:13, 22:20, 23:4, 23:14, 23:24, 24:6, 24:15, 26:1, 27:15, 28:8, 29:3, 29:21, 30:12, 30:22, 31:11, 31:22, 32:5, 32:12, 32:19, 33:1, 33:6, 33:11, 33:15, 33:24, 35:7, 36:15, 36:19, 37:1, 37:4, 37:11, 37:14, 37:20, 38:20, 39:11, 40:14, 41:23, 42:11, 43:1, 43:19, 44:13, 44:19, 44:22, 46:19, 46:25, 47:15, 47:23, 48:6,

48:23, 49:13, 49:17, 50:8, 51:20, 51:25, 53:7, 53:19, 54:1
themselves [1] - 7:10
theory [1] - 13:11
therefore [1] - 40:1
they've [3] - 5:4, 15:18, 23:17
Third [3] - 16:25, 20:13, 45:24
three [4] - 4:5, 18:22, 28:21
Thursday [2] - 49:5, 54:3
timeline [1] - 35:24
timelines [1] - 9:10
title [1] - 34:12
today [4] - 4:6, 18:17, 53:12, 53:20
together [1] - 46:9
took [10] - 7:1, 7:22, 8:2, 8:11, 10:16, 15:3, 15:10, 17:24, 39:21, 41:22
top [1] - 26:13
topic [2] - 20:1, 20:21
topics [2] - 18:22, 20:3
total [6] - 6:11, 6:12, 7:14, 15:9, 46:8, 51:6
totality [1] - 7:18
totally [1] - 30:1
touchstone [1] - 51:17
towards [1] - 30:3
trade [52] - 5:18, 5:20, 5:24, 6:9, 7:1, 7:13, 7:19, 8:2, 8:12, 9:20, 11:10, 11:24, 12:23, 13:14, 14:19, 14:21, 15:18, 16:21, 17:24, 18:1, 18:25, 21:23, 22:3, 22:16, 22:17, 22:18, 23:5, 23:9, 23:18, 23:23, 24:1, 24:22, 24:24, 27:2, 28:5, 31:14, 31:18, 32:1, 32:3, 32:7, 32:11, 32:16, 45:18, 48:8, 48:20, 51:5, 52:10, 52:15
train [1] - 31:5
trained [3] - 26:23, 27:23, 27:24
training [2] - 20:15, 20:17
treats [1] - 31:1
trial [1] - 11:9
tried [1] - 33:18
true [2] - 16:23, 22:6
truly [1] - 14:25
trust [4] - 22:1, 22:6, 30:9, 38:24
try [1] - 42:18
trying [3] - 13:19, 20:20, 45:12
Tuesday [1] - 49:5
TUESDAY [1] - 4:1

turned [2] - 35:10, 35:18
two [12] - 12:11, 14:1, 19:25, 20:9, 24:10, 33:9, 36:19, 36:21, 38:9, 42:25, 46:8, 53:8
type [3] - 25:18, 42:9, 47:9
types [2] - 22:10, 42:25
typical [1] - 14:16
typically [1] - 41:2

**U**

U.S [5] - 47:18, 48:4, 49:15, 52:2, 52:23
ultimate [1] - 6:21
ultimately [8] - 6:22, 7:11, 7:22, 24:25, 25:10, 37:16, 37:19, 45:24
unclean [1] - 50:1
under [5] - 5:10, 11:17, 14:20, 18:6, 45:2
underlie [1] - 28:22
undermine [1] - 12:1
understood [2] - 43:16, 43:21
unemployment [1] - 10:17
Unfair [1] - 16:24
unfortunately [1] - 18:3
unified [1] - 17:21
unique [1] - 17:22
unjust [9] - 13:11, 43:8, 43:22, 44:7, 44:20, 48:14, 49:18, 51:17, 52:3
unjustly [3] - 47:21, 48:9, 52:25
unless [1] - 20:8
unreliable [3] - 28:23, 29:20, 41:10
untethered [2] - 33:20, 50:21
unusual [2] - 22:25, 23:1
up [9] - 14:2, 17:25, 35:14, 39:6, 41:25, 47:1, 48:3, 50:1, 52:18
useful [3] - 7:17, 13:17, 53:13
uses [4] - 32:14, 38:13, 42:21, 42:22
utilize [1] - 23:4
utilizing [1] - 35:18

**V**

valuation [2] - 46:3, 46:4
valuations [1] - 46:9
value [23] - 6:19, 6:20, 44:18, 44:25, 45:5, 45:8,

45:13, 45:14, 45:16, 45:20, 46:5, 46:16, 46:24, 46:25, 47:20, 48:13, 48:15, 48:21, 50:10, 50:15, 50:19, 52:20, 52:25
verdict [2] - 13:5, 15:18
versed [1] - 43:20
VICTORIA [1] - 3:2
victoria.smith@squirepb.com [1] - 3:7
view [1] - 29:19
violation [1] - 49:24
violations [2] - 48:11, 48:18

**W**

walk [1] - 48:12
wants [3] - 17:13, 26:21, 49:7
war [1] - 35:9
War [1] - 35:9
Water [1] - 49:24
water [4] - 35:11, 35:13, 35:17, 50:2
waves [2] - 42:20, 42:21
wealth [1] - 26:17
whole [2] - 27:8, 27:12
Wilmington,Delaware [1] - 3:12
wireless [1] - 34:4
witness [3] - 5:17, 5:22, 9:5
witnesses [2] - 5:2, 15:25
wonders [1] - 34:16
words [2] - 27:20, 27:21
world [9] - 23:8, 25:18, 32:4, 46:7, 46:11, 46:12, 51:13, 51:14, 52:14
World [1] - 35:9
wrap [2] - 14:2, 41:25
Wright [1] - 3:14
written [1] - 17:15
wrongdoing [1] - 44:21

**X**

XIAOMEI [1] - 3:3
xiaomei.cai@squirepb.com [1] - 3:8

**Y**

year [1] - 37:10
years [1] - 38:9