# Exhibit B

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
 4     QORVO, INC.                          )
                                            )
 5              Plaintiff,                  )
                                            )
 6     vs.                                  ) No. 21-1417 (JPM)
                                            )
 7     AKOUSTIS TECHNOLOGIES, INC.          )
       And AKOUSTIC, INC.,                  )
 8                                          )
                Defendants.                 )
 9
10              REMOTE VIDEOTAPED DEPOSITION
11                      Via ZOOM of
12                     MELISSA BENNIS
13                   January 23, 2024
14                       9:00 A.M.
15
16
17
18            SUBJECT TO THE PROTECTIVE ORDER
19
20
21
22
23   STENOGRAPHICALLY REPORTED BY:
     JO ANN LOSOYA, CSR, RPR, CRR
24   LICENSE #:  084-002437
25
                                                    Page 1
```

```
 1            APPEARANCES
         (All participants appearing remotely)
 2
 3   SHEPPARD MULLIN LLP
     ROBERT MASTERS
 4   2099 Pennsylvania Ave NW
     Suite 100
 5   Washington DC 20006
     (202) 747-2312
 6   rmasters@sheppardmullen.com
         Appeared on behalf of Plaintiffs.
 7
 8   SQUIRE PATTON BOGGS
     DAVID S. ELKINS
 9   CHANEL O'NEILL
     1841 Page Mill Road
10   Suite 150
     Palo Alto, California 94304
11   (650) 843-3378
     david.elkins@squirepb.com
12
         Appeared on behalf of Defendants.
13
14
15
16
     VIDEOGRAPHER: Kevin Duncan
17
     CONCIERGE TECH: Mitch Reisbord
18
19
20
21
22
23
24
25
                                             Page 2
```

```
 1   THE VIDEOGRAPHER: Good morning. We are
 2   going on the video record at 9:02 a.m. on
 3   January 23, 2024.
 4        Here begins the virtual
 5   video-recorded deposition of Ms. Melissa Bennis
 6   taken on behalf of defendant in the case matter of
 7   Qorvo, Inc. versus Akoustis Technologies, Inc., et
 8   al., filed in the U.S. District Court for the
 9   District of Delaware, bearing Case
10   No. 21-1417 (JPM).
11        My name is Kevin Duncan, and I am a
12   legal videographer representing Veritext Legal
13   Solutions. The court reporter today is Ms. JoAnn
14   Losoya.
15        Counsel, will you please identify
16   yourselves and affiliations, starting with the
17   noticing party.
18        MR. ELKINS: David Elkins of Squire
19   Patton Boggs, and I represent the Akoustis
20   defendants.
21        MR. MASTERS: Robert Masters of Sheppard
22   Mullin, on behalf of the plaintiff, Qorvo, Inc., and
23   the witness.
24        THE VIDEOGRAPHER: Thank you, Counsel.
25        Will the court reporter please
                                              Page 4
```

```
 1               EXAMINATION
 2   Witness                      Page   Line
 3   MELISSA BENNIS
 4    By Mr. Elkins                 5    10
 5
 6             ***************
 7           INDEX OF EXHIBITS
 8   EXHIBIT        DESCRIPTION             PAGE
 9   Exhibit 1   Expert Report of Melissa A.    8
10               Bennis
11   Exhibit 2   Expert Rebuttal Report of    11
12               Carlyn Irwin
13   Exhibit 3   Expert Report of Dr.         30
14               Stanley Shanfield
15   Exhibit 4   Sedona Commentary on         65
16               Monetary Remedies in Trade
17               Secret Litigation
18   Exhibit 5   Sedona Disputed Issues in    65
19               Awarding Unjust Enrichment
20               Damages in Trade Secret
21               Cases
22
23
24
25
                                             Page 3
```

```
 1   administer the oath.
 2        (Witness sworn at 9:03 a.m.)
 3        THE VIDEOGRAPHER: Thank you.
 4        You may proceed.
 5   WHEREUPON:
 6        MELISSA BENNIS,
 7   called as a witness herein, having been first duly
 8   sworn, was examined and testified as follows:
 9             E X A M I N A T I O N
10   BY MR. ELKINS:
11    Q.  Good morning, Ms. Bennis, again.
12    A.  Good morning.
13    Q.  So I'm -- you've had your deposition
14   taken before, correct?
15    A.  Correct.
16    Q.  Do you feel comfortable dispensing with
17   the list of all the things that we're supposed to do
18   during the deposition?
19    A.  I do if you do.
20    Q.  Okay. I do too.
21        The only two things I will say is, as
22   you probably already know, if you need to take a
23   break before I suggest one, feel free to raise your
24   hand; we'll do it.
25        And the other is just wanted to
                                              Page 5
```

```
 1            You can turn to Page 150 of your
 2   report.
 3       A.   Yes, I am there.  And yes, that's
 4   correct.
 5       Q.   And you are not -- you're assuming
 6   liability for the poaching, right?  You are not
 7   opining that that Akoustis actually poached the
 8   employees, correct?
 9       A.   I'm assuming liability as is required in
10   my role.
11       Q.   Did you discuss any aspects of the
12   employee poaching claim with Dr. Shanfield?
13       A.   I don't recall that.  I don't believe so.
14       Q.   So based on -- starting at Page 48 of
15   your report, you run through an analysis of the
16   costs of replacing -- the cost to Qorvo of replacing
17   its employees who allegedly were poached by
18   Akoustis, correct?
19       A.   Yes, generally speaking.
20       Q.   And you state here -- this is the first
21   full paragraph on Page 48, "As discussed above,
22   these costs include the cost to recruit and train
23   new employees as well as such other items as lost
24   knowledge and productivity.  I'm aware of one
25   Akoustis document that quantifies these expenses
```
Page 94

```
 1   based on relative skill level of each employee."
 2            Did I read that correctly?
 3       A.   Yes.
 4       Q.   And the Akoustis document that you
 5   identified is a ▓▓▓▓▓ valuation of identifiable
 6   subject assets and liabilities in connection with
 7   the acquisition of RFM Integrated Device, Inc. as of
 8   October 15, 2021, a document that Akoustis produced
 9   in this case, correct?
10       A.   I think with one correction.  You might
11   have said identifiable assets and I think the
12   document referred to intangible assets, but in
13   general I agree.
14       Q.   Oh, yeah, I meant to say subject assets.
15   And all I was doing was reading the title of the
16   document in footnotes 245 and 246 of your report.
17       A.   I see, okay.
18       Q.   So in essence, you relied on the ▓▓▓▓▓
19   valuation of the RFMI's workforce to calculate the
20   per employee cost of replacing allegedly poached
21   Qorvo employees, did I get that correct?
22       A.   Given its relevance for employees in this
23   area, yes, I did, that's correct.
24       Q.   Okay.  So explain to me why you relied on
25   that particular valuation for RFMI employee
```
Page 95

```
 1   replacement costs?
 2       A.   Well, frankly, I thought the document was
 3   extraordinarily helpful in that it was a -- it was
 4   part of a -- like as mentioned, the acquisition, it
 5   was an attempt to evaluate the replacement under a
 6   replacement cost method, under the cost approach to
 7   recreate a workforce.  So it was really on point in
 8   my opinion in terms of trying to establish a
 9   reasonable value to assume -- a reasonable value to
10   assign to the need for replacing employees.
11       Q.   So you spoke to Leslie Stoddard, who is
12   the human resources connect analyst at Qorvo in
13   connection with at least some aspects of information
14   regarding the employee poaching claim?
15       A.   That's correct.
16       Q.   And it appears that you spoke to
17   Ms. Stoddard to ensure that your damages model for
18   employee poaching was not overinclusive of employees
19   who probably were not, in fact, poached, right?
20       A.   Or said inversely to help identify the
21   ones that did go directly from Qorvo to Akoustis and
22   were understood to have been poached.
23       Q.   Did you discuss with Ms. Stoddard or ask
24   her whether or not the 19 employees that are the
25   foundation of your damages analysis were actually
```
Page 96

```
 1   replaced?
 2       A.   I don't remember having that
 3   conversation, no.
 4       Q.   So you don't know whether or not all of
 5   the 19 were, in fact, replaced by Qorvo, correct?
 6       A.   That's right.
 7       Q.   How did you happen to get in touch with
 8   Ms. Stoddard?  Did you make a request through
 9   counsel to speak with somebody in HR?
10       A.   That's exactly right.
11       Q.   Did you seek any information from Qorvo
12   directly regarding its own costs in that it incurs
13   in replacing employees of these various positions
14   that are identified in your report?
15       A.   I, again, didn't make an attempt to
16   calculate Qorvo's actual losses given the existence
17   of this very relevant report as produced by Akoustis
18   with respect to what it would cost to replace these
19   specific types of employees as performed by ▓▓▓▓▓.
20   So I took comfort in the fact that this was I
21   thought, again, an analysis that was right on point
22   for purposes making a reasonable damages assessment
23   should liability be found for employee poaching
24   here.
25       Q.   How would you compare RFM to Qorvo?
```
Page 97

```
 1    A.   I don't know that I tried to think about
 2  it in quite that way.  Again, I think because it was
 3  an Akoustis acquisition, these employees were --
 4  let's see what it says exactly.
 5           It was an attempt to value employees
 6  as part of that acquisition by Akoustis.  Like I
 7  mentioned, it felt right on point for trying to
 8  estimate the value of like kind employees.
 9    Q.   Is it the value of like kind employees or
10  is it really the costs inherent in replacing lost
11  employees?
12    A.   Well, I mean, I'm thinking of those as
13  one and the same, what is the replacement cost to
14  replace like kind employees.
15    Q.   Right.  So this is -- what you're doing
16  for your poaching damages calculation is you're
17  trying to determine the direct harm to Qorvo from --
18  resulting from the poaching, correct?
19    A.   If Qorvo is forced to replace -- it's a
20  replacement cost calculation.  If Qorvo has suffered
21  from employee poaching by Akoustis, what is the harm
22  in the event Qorvo then has to engage in efforts to
23  rehire, retrain?  What are kind of the industry
24  standards for determining those types of costs.
25  That's what         had put forth, and that's why I
```
Page 98

```
 1  relied on that.
 2    Q.   So would you agree with me that Qorvo is
 3  a much larger entity than RFMI was at the time it
 4  was acquired by Akoustis?
 5    A.   Yes, I believe that to be true.
 6    Q.   There's an enormous difference in the
 7  companies in terms of economies of scale, correct?
 8    A.   I don't know that that necessarily
 9  impacts hiring any one individual.
10    Q.   Do you know whether RFMI uses recruiters
11  or used recruiters at the time of its acquisition?
12    A.   If RFMI --
13    Q.   Yeah.
14    A.   Well, again, given that this is a
15  valuation of the workforce as part of the
16  acquisition of those employees by Akoustis, I'm not
17  sure I follow.
18    Q.   Well, so if you see the chart on Page 49,
19  this would have been the -- this is the cost of
20  replacing employees at RFMI should the need arise
21  after its acquisition, correct?
22    A.   As is described on Page 48 of my report,
23         performed an analysis or performed a valuation
24  analysis on RFMI's assembled workforce, and this was
25  part of the majority ownership position that
```
Page 99

```
 1  Akoustis took of RFMI.  So, again, it's an attempt
 2  to value the workforce that was brought over as an
 3  asset.
 4    Q.   Based on cost --
 5    A.   Correct.
 6    Q.   -- analysis?
 7           Which is why you said you considered
 8  them to be one and the same for purposes of the
 9  report, right?
10    A.   Yeah.  I mean, it's a proxy for what it
11  costs a business to assemble a workforce.
12    Q.   So you're engaged on Qorvo's behalf,
13  right?
14    A.   Yes.
15    Q.   You had access to information from the
16  company client through Qorvo's counsel, correct?
17    A.   Generally speaking, yes.
18    Q.   So for each Qorvo employee allegedly
19  poached by Akoustis who was replaced, don't you
20  think Qorvo would have information with which to
21  calculate the actual costs of replacing her or him?
22    A.   Perhaps.
23    Q.   Why didn't you ask for that?
24    A.   Because upon reviewing this        document
25  that did exactly from more of an auditor industry
```
Page 100

```
 1  perspective of a replacement cost for work -- for a
 2  workforce that is acquired by Akoustis when we're
 3  talking about employees that were poached from Qorvo
 4  to go to Akoustis, it frankly couldn't have felt
 5  more on point.
 6    Q.   When an employer loses an employee on --
 7  to whatever, you know, a -- let's limit ourselves to
 8  undesired attrition, meaning the employee left on
 9  their own volition.  For a period of time before
10  that employee is replaced, there is a savings by the
11  employer in terms of the amount of salary and
12  benefits and payroll tax that it foregoes during
13  that period when it is looking for a replacement,
14  correct?
15    A.   Technically speaking, I think that cost,
16  yes, would not be incurred.
17    Q.   Did you take that cost savings into
18  account in your analysis?
19    A.   Well, that also makes the assumption that
20  there's absolutely nothing done to bridge the gap or
21  to achieve the same tasks so to speak that that
22  employee left would have otherwise been responsible
23  for.
24    Q.   You mean through hiring a temp employee?
25    A.   It could be that.  It could be paying
```
Page 101

26 (Pages 98 - 101)

```
 1            REPORTER CERTIFICATE
 2
 3         I, JO ANN LOSOYA, a Certified Shorthand
 4   Reporter within and for the State of Illinois, do
 5   hereby certify:
 6             That previous to the commencement
 7   of the examination of the witness, the witness was
 8   duly sworn to testify the whole truth concerning the
 9   matters herein; That the foregoing deposition
10   transcript was reported stenographically by me, and
11   the foregoing constitutes a true record of the
12   testimony given and the proceedings had; That the
13   said deposition was taken before me at the time and
14   place specified; That I am not a relative or
15   employee or attorney or counsel, nor a relative or
16   employee of such attorney or counsel for any of the
17   parties hereto, nor interested directly or
18   indirectly in the outcome of this action.
19             IN WITNESS WHEREOF, I do hereunto set my
20   hand this day, January 28, 2024.
21
22         [signature]
           JO ANN LOSOYA, CSR, RPR, CRR
23         C.S.R. 84-002437
24
25
                                          Page 110
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127