# EXHIBIT A

09:40:24 1  If you increase the bandwidth, you may let some more

09:40:27 2  frequencies through, and what that ends up giving you, on

09:40:31 3  a cell phone using this filter, is a clear signal.  Like,

09:40:38 4  the voice sounds better or you can stream videos if the

09:40:42 5  bandwidth is larger, where you wouldn't be able to do it

09:40:45 6  with a narrow bandwidth.

09:40:52 7          **MR. LEMIEUX:**  Excuse me, Your Honor.  I just

09:40:53 8  wanted to clarify, this transcript is being sealed because

09:40:55 9  there is confidential information.

09:40:58 10         **THE COURT:**  I think all material has covered

09:41:01 11 confidential information.  All this information is

09:41:08 12 confidential, and there's no one in the room who was not

09:41:13 13 allowed to be in the room, I hope.  I didn't see anybody.

09:41:19 14         **MR. LEMIEUX:**  I didn't see anyone, Your Honor.

09:41:20 15 I just wanted to make sure the transcript is being

09:41:22 16 treated --

09:41:23 17         **THE COURT:**  Absolutely.  Thanks very much.

09:41:26 18 **BY MR. DeFOSSE:**

09:41:33 19 **Q.**  All right.

09:41:36 20         **MR. DeFOSSE:**  Can we go to PDX-6.196.

09:41:41 21     And Your Honor, may I approach?

09:41:44 22         **THE COURT:**  You may.

09:41:44 23 **BY MR. DeFOSSE:**

09:42:03 24 **Q.**  Dr. Shanfield, I've handed you also a hard copy of

09:42:06 25 the images that you see on the Slide 6.196 to assist you.

*Shanfield - Direct*

09:42:14 1    If we look at this graph, can you explain to the jury

09:42:17 2  what we see on the left-hand side?

09:42:20 3  **A.**   So what you see there is the structures I constructed

09:42:25 4  in the simulation.   The top structure is the structure

09:42:30 5  that uses the '018 patent, and the bottom structure is

09:42:37 6  what the prior art was of structures at the time of that

09:42:43 7  patent.   So there's thicknesses that are different in

09:42:48 8  each.

09:42:48 9  **Q.**   Okay.   And when you say that there's thicknesses that

09:42:52 10  are different in each, what do you mean?

09:42:54 11  **A.**   So if you remember, the resonators that make up

09:42:59 12  filters have these two metal electrodes, metal on top,

09:43:03 13  metal on the bottom.   And if you make the metal on the top

09:43:07 14  thinner than on the bottom, what the '018 patent says is

09:43:10 15  that you'll get better bandwidth.

09:43:13 16    So that's what I'm simulating here by doing thinner

09:43:19 17  on the top, thicker on the bottom, versus the same

09:43:22 18  thickness top and bottom.

09:43:23 19  **Q.**   Okay.   And just so we're clear, on the upper

09:43:27 20  right-hand side of the slide, in the blue box, that's the

09:43:32 21  Akoustis product that Qorvo is accusing of infringement;

09:43:35 22  is that right?

09:43:36 23  **A.**   Upper left-hand side.

09:43:37 24  **Q.**   Upper left-hand side.   In the blue box?

09:43:39 25  **A.**   Yes, that's correct.

*Shanfield – Direct*

**Q.**   And on the lower left-hand side of the green box, that is a prior art product where the thickness of electrodes is the same?

**A.**   That's correct.

**Q.**   So the difference between the lower box and the upper box is, in the lower box, the electrodes are the same thickness.  In the upper box, in the Akoustis product, the electrodes have different thicknesses?

**A.**   That's correct.

**Q.**   And where did you get the structures for the thicknesses of the electrodes, the information on that?

**A.**   From a combination of Dr. Heinrich and Dr. Bravman.

**Q.**   Who the jury will hear from --

**A.**   Yes.

**Q.**   -- later today?

Okay.  So you received the Akoustis structures and the prior art structures, and you ran a computer simulation; is that right?

**A.**   That's correct, yes.

**Q.**   And what was the result of the computer simulation?

**A.**   The result was that the '018 patent works.  It does increase the bandwidth, as taught in that patent.

**Q.**   Okay.  So did you see that the Akoustis product had an increased filter bandwidth?

**A.**   I did.

*Shanfield – Direct*

**Q.**   Can you explain to the jury how you can see that in the computer simulation results on the right-hand side of 196?

**A.**   Yes.  If you look at what I've circled in red, what you see is a green line, and it's -- what it's representing is the energy leakage, the rate of energy leakage of the prior art product.  And as -- and that's been plotted as a function of frequency in the range of the circle.  You see that green line goes zooming up. That means that energy leakage is way up at the band edge. And the blue line is the structure with the '018 details included.  And, there, the blue line stays low.  So at the band edge, the loss is low.  And that ends up making a bigger bandwidth.  So that is how I got my result.

**Q.**   Okay.  So the blue line represents the Akoustis product?

**A.**   Yes.

**Q.**   And by having the blue line below the green line in the red circle, you can see that the bandwidth of the Akoustis product has increased?

**A.**   That's correct.

**Q.**   I'd like to turn to the '755 patent now.

        **MR. DeFOSSE:**  And if we could pull up PDX-6.199.

*Shanfield − Direct*

09:46:19  1    **BY MR. DeFOSSE:**

09:46:19  2    **Q.**   You were also asked to perform computer simulations

09:46:22  3    with respect to this patent, correct?

09:46:24  4    **A.**   Yes, that's right.

09:46:25  5    **Q.**   And, again, your simulations only related to one part

09:46:29  6    of the patent claim?

09:46:30  7    **A.**   That's right.

09:46:31  8    **Q.**   And the other parts are going to be addressed by

09:46:33  9    Dr. Bravman; is that right?

09:46:34 10    **A.**   Yes.

09:46:34 11    **Q.**   And for your simulations, which aspect of the claim

09:46:39 12    was relevant?

09:46:42 13    **A.**   Again, it was at the bottom of -- it's Claim 9.  And

09:46:46 14    what it's talking about is an arrangement in the structure

09:46:53 15    of the resonators such that there's less loss from the

09:47:00 16    resonator.

09:47:01 17    **Q.**   So you simulated whether the Akoustis product would

09:47:07 18    result in having less energy loss?

09:47:11 19    **A.**   Yes.  Energy leakage is the same thing.

09:47:14 20    **Q.**   Okay.

09:47:14 21         **MR. DeFOSSE:**  If we go to PDX-6.200.

09:47:19 22    **BY MR. DeFOSSE:**

09:47:19 23    **Q.**   Does this slide show the computer simulation that you

09:47:22 24    ran?

09:47:23 25    **A.**   Yes, it does.

*Shanfield – Direct*

09:47:24 1    **Q.**   And on the left-hand side, in the blue box, what is

09:47:28 2    that?

09:47:29 3    **A.**   So the blue box, again, is practicing what the

09:47:34 4    details are of the '755 patent and represent the Akoustis

09:47:39 5    device.  And the structure below is representative of a

09:47:46 6    device that does not practice '755 details.

09:47:53 7    **Q.**   And what's in the green box?

09:47:57 8    **A.**   That -- I'm sorry.  That's the bottom one.

09:47:58 9        The green box is what the structure is that does not

09:48:02 10   practice the '755 patent.

09:48:04 11   **Q.**   Okay.  So the blue box is the Akoustis product.  The

09:48:07 12   green box is the prior art?

09:48:08 13   **A.**   Prior art, yes.

09:48:10 14   **Q.**   Okay.  And did you determine whether, with your

09:48:14 15   simulation, the Akoustis product has less energy leakage?

09:48:21 16   **A.**   Yes, I did.

09:48:21 17   **Q.**   Okay.  And is that shown in the graph on the

09:48:23 18   right-hand side?

09:48:24 19   **A.**   Yes, it is.

09:48:24 20   **Q.**   How is that?

09:48:26 21   **A.**   So now, here, you're interested in the passband, and

09:48:33 22   I circled the passband of the filter.  So that's the --

09:48:34 23   when I call it a "passband," I mean the frequency around

09:48:37 24   5.6 gigahertz in this graph.  And what you see is the

09:48:45 25   Akoustis structure with the blue line has less loss in

*Shanfield – Cross*

1    this passband than the green line, which is the prior art

2    structure.  The green line is above the blue line in that

3    frequency range.

4    **Q.**    Okay.  Dr. Shanfield.  Thank you.

5              **MR. DeFOSSE:**  I will pass the witness.

6              **THE COURT:**  Cross-examination.

7                        CROSS EXAMINATION

8    **BY MR. LEMIEUX:**

9    **Q.**    Good morning, Dr. Shanfield.  You'll have to excuse

10   me as I grab my materials right here.  You covered a lot

11   of ground, so I have a lot of questions for you.

12        In your analysis of the various groups of trade

13   secrets, you looked at numerous e-mails and other

14   materials that were presented to you from counsel for

15   plaintiff, right?

16   **A.**    What I did was take the material that had been

17   discovered on Akoustis' computers and narrowed down what I

18   wanted to look at and did it like a funnel arrangement

19   where I tried to narrow it down to the point where I

20   wouldn't have to spend three years looking at it.

21   **Q.**    And you said you wanted to do this to try to figure

22   out whether or not Akoustis received some type of

23   head-start benefit from its use or access or exposure to

24   this Qorvo information; is that right?

25   **A.**    Well, I was looking for, I think I had it in my

*Shanfield – Cross*

```
09:50:59  1  slide, these characteristics of whether it was known or
09:51:06  2  would be confidential information, whether there was an
09:51:11  3  awareness that the people handling that information was
09:51:15  4  confidential, whether there was economic value.  So I
09:51:21  5  don't mean to go through the whole list.  But that's the
09:51:24  6  characteristics I was looking for when I looked at the
09:51:28  7  group of -- this huge pile of data.
09:51:31  8  Q.   So your head-start calculation is based on what you
09:51:35  9  believe to be the time and expense that Akoustis avoided
09:51:39 10  by allegedly using Qorvo's information and materials has a
09:51:43 11  shortcut; is that right?
09:51:45 12  A.   I estimated the time savings; I didn't go into
09:51:49 13  expense.
09:51:50 14  Q.   And so, in fact, the GAN chart that you showed up
09:51:54 15  here earlier is all just an estimate of time involved in
09:51:58 16  doing so; is that right?
09:51:59 17  A.   It's not a GAN chart.
09:52:02 18  Q.   Sorry?
09:52:03 19  A.   It looks like a GAN chart, but, actually, it's just,
09:52:05 20  when I say, "year 1, year 2," those are meant to be
09:52:12 21  arbitrary times.  It doesn't mean it started in year 1
09:52:16 22  that Akoustis was founded, for example.  It's -- year 1 is
09:52:20 23  the year that this -- my experience tells me a startup
09:52:30 24  company would save this amount of time in doing these
09:52:34 25  tasks first.  So it just put in order all the tasks so I
```

*Shanfield – Cross*

1   could make sure I accounted for how they were done in

2   parallel and not overestimate time savings.

3   **Q.**   So you divided them into year time periods on your

4   chart -- Year 1, Year 2, Year 3, Year 4, Year 5 -- that's

5   right?  I saw that accurately, didn't I?

6   **A.**   It's not divided.  I should have called it "Year A,

7   Year B, Year C, Year D."  They're not -- they are in order

8   in terms of how I would see a startup company executing

9   these tasks.

10   **Q.**   Okay.  And in terms of the order that you would see

11   them executing a task, I would assume that if something in

12   your chart was further over to the left, it's because you

13   believed that would have been a task they would have

14   attended to earlier in their formation, the items you

15   listed towards the right-hand side are items that you

16   would consider they would have gotten to later in their

17   attention; is that right?

18   **A.**   No.

19   **Q.**   So that the right to left -- or, excuse me, the left

20   to right head start you've calculated, that doesn't

21   actually mean that?

22   **A.**   What it means is I am plotting the benefit, the

23   savings in time the company realized, and I am putting

24   approximately where that savings might have been realized,

25   but it's somewhat arbitrary.  I just wanted to place it in

*Shanfield – Cross*

have to be at when the moment this company was founded. The advantage could have been realized somewhere else in the history of the company.  I just wanted to make sure, and I'm roughly accounting for how the sequence of benefits took place, but I didn't try and predict the history of the company itself.

**Q.**   Now, you've mentioned several times, Dr. Shanfield, that you based these determinations in terms of number of months when they would occur on your experience running a startup company; is that right?

**A.**   That's partly what I did, yes.  I also accounted for what I knew, for example, Qorvo would do, what I saw in my experience in corporate life too.

**Q.**   Well, your last experience in running a startup company was in 2003, wasn't it?

**A.**   Yes, that's right.

**Q.**   Okay.  So you haven't run one for over 20 years?

**A.**   Yes.

**Q.**   And in determining the months that you were looking at for each period of each activity, is that estimation based on some published journal somewhere, some study, or is this just a number that you literally have generated yourself out of thin air?

**A.**   In every case, I considered where I could find information that would give me a reference point.  In some

*Shanfield – Cross*

10:01:08  1   cases, I thought about projects that I had done in

10:01:12  2   corporate life recently at Draper Labs maybe as few as two

10:01:17  3   years ago.  Other cases, I talked to somebody at Qorvo to

10:01:24  4   see how long this took.  In other cases, I looked back in

10:01:28  5   the records I had before we sold our company as to when

10:01:32  6   and what we did so that I remembered, and, you know, I had

10:01:37  7   some kind of sense of what made -- what would be fair and

10:01:42  8   what made sense in a startup company.

10:01:44  9   **Q.**   Now, you made reference a moment ago to Draper Labs.

10:01:48 10   Draper Labs is not a manufacturing company, is it?

10:01:51 11   **A.**   No.  And so that was more in the development aspects

10:01:53 12   and the procedure aspects, because we do provide low --

10:01:58 13   low-rate manufacturing in some cases.

10:02:01 14   **Q.**   So, for example, in terms of, you know, assembly,

10:02:03 15   packaging, and all that, that's not anything that Draper

10:02:08 16   Labs does, right?

10:02:09 17   **A.**   Yeah.  I think I used my experience in assembly and

10:02:12 18   packaging from -- I ran a 24/7 semiconductor company that

10:02:17 19   delivered hundreds of millions of parts a year.

10:02:20 20   **Q.**   When was that, Dr. Shanfield?

10:02:22 21   **A.**   That was in the '90s.

10:02:24 22   **Q.**   In the '90s.  And have there been any changes?

10:02:26 23   **A.**   And my experience with all the requirements you need

10:02:29 24   to be able to do that manufacturing.  So that's where I

10:02:32 25   looked when I thought about, well, what does it take to

*Shanfield — Cross*

1  different demands on it, much more advanced in general,

2  much more expensive kind of technology.

3  **Q.**   So taking you back in to your determination of how

4  you assigned a certain amount of months for each of the

5  activities that you looked at here, is that assessment of

6  months for each task, like I said, is that based on any

7  other peer-reviewed or trade journal or any other

8  published material other than your own private estimation

9  that you did for this case?

10  **A.**   I think I did look in one case at a publication

11  that -- I'm trying to recall exactly what the subject

12  matter was.  I remember.  It was in setting up a

13  reliability facility.  I had a pile of publications, and I

14  glanced through them and looked at what, both what we had

15  done at Raytheon, and also what people who had published

16  information about -- evaluating filter reliability had

17  done so that I got a perspective, I saw the named

18  companies.  So I guess I did in that case look at actual

19  published information.

20  **Q.**   So you believe that in that particular instance, you

21  may have seen something.  If you had seen it, that would

22  have been included as a reference to your expert report,

23  correct, as something you relied on?

24  **A.**   I don't recall whether it was or not, but I do recall

25  I spent a lot of time making sure I was coming up with a

*Shanfield – Cross*

10:05:57 1   reasonable number based on the best information I could

10:05:59 2   find, whether it was published document.  A lot of times

10:06:03 3   this stuff isn't published because companies don't want to

10:06:07 4   share what it actually took for them to develop their

10:06:09 5   reliability setup.  So I had to kind of read in between

10:06:14 6   the lines in documents I read --

10:06:17 7   **Q.**   So, again, Dr. Shanfield, my question to you --

10:06:19 8   **A.**   -- (indiscernible).

10:06:19 9        (Reporter clarification.)

10:06:19 10  **BY MR. LEMIEUX:**

10:06:19 11  **Q.**   I'm sorry.  And I didn't mean to interrupt you.

10:06:25 12  That's actually my fault.

10:06:28 13       So, Dr. Shanfield, getting back to my question.  If

10:06:30 14  you had actually relied on something, it would be

10:06:33 15  reflected in your expert report, correct, because you have

10:06:36 16  an obligation to disclose every publication you relied on

10:06:39 17  in rendering your opinions in this case?

10:06:42 18  **A.**   I agree.

10:06:43 19  **Q.**   So if there isn't such a reference in your expert

10:06:46 20  report, because there wasn't one, correct?

10:06:49 21  **A.**   I don't recall.  There were so many documents.  I

10:06:52 22  just don't recall.

10:06:53 23  **Q.**   Now, again, getting to this time period of how you

10:06:56 24  get it, it sounds to me like if there is no published

10:07:00 25  guides for you to look at to determine this, then each of

*Shanfield - Cross*

10:07:02  1   these time periods is really just your guesstimate of what

10:07:06  2   you assigned to each of these tasks, both as to when they

10:07:09  3   would occur and how long it would take to make them

10:07:13  4   accomplished; isn't that correct?

10:07:15  5   **A.**   I'm not sure what you mean by "guesstimates."  Like I

10:07:18  6   said, dependent on the time period we're talking about,

10:07:23  7   and the activity, as to where I went.  I even asked

10:07:27  8   colleagues in one case.  So I looked for sources that made

10:07:33  9   me feel comfortable that I was estimating correctly in

10:07:37 10   every case.

10:07:38 11   **Q.**   Okay.  And the sources that you relied on were what

10:07:43 12   exactly?

10:07:45 13   **A.**   Dependent on the time period we're talking about.

10:07:48 14   Like I said, in the case of the reliability benefit, the

10:07:55 15   head start.  I actually talked to an old friend who had

10:08:00 16   set up a facility.  I looked at published papers on

10:08:05 17   reliability of filter devices, and in some cases, there

10:08:09 18   was -- at least, reading between the lines some hint of

10:08:14 19   what it would take.

10:08:15 20   **Q.**   But, again, Dr. Shanfield, if you had relied on a

10:08:19 21   conversation with an unnamed old friend, if that was the

10:08:22 22   basis for your opinion, you would have had to disclose

10:08:24 23   that in your expert report as something that you

10:08:27 24   considered in arriving at your opinion, right?

10:08:30 25   **A.**   That's right.

*Shanfield – Cross*

**Q.**   And so if there is nothing in your report identifying this unnamed old friend, then that was not something that you relied on in coming to your opinion in this case, was it?

**A.**   That's right.  I agree.

**Q.**   And you mentioned, you said you thought you talked to Qorvo.  On which of these items in any of these groups that you've identified did you talk to Qorvo to find out how long it took them to develop the alleged trade secret in this case?

**A.**   I talked with people at Qorvo about all of these items.  I didn't necessarily think they had the only word on it, but I reviewed them to make sure what they were saying.

**Q.**   And, again, if you had discussed any -- with any particular Qorvo individual, any of these particular trade secrets, that would have been listed in your report as well, correct, as sources that you relied on?

**A.**   Yes.

**Q.**   And as you sit here today, can you identify the names of any Qorvo individuals that you spoke to in arriving at these estimates?

**A.**   Sure.  Dr. Aigner, I probably got him tired out discussing this with him.

**Q.**   Which categories did you discuss with Dr. Aigner?

*Shanfield – Cross*

**A.**   I talked about all of them.  In some cases, he said he didn't know.  So, but I wanted to go through all of them.

**Q.**   And in situations where Dr. Aigner reported to you that he didn't know, then how did you come up with your estimate?

**A.**   It depended.  Maybe you want to pick a particular time period and how I estimated it?  I've given you a couple of examples; I don't want to keep...

**Q.**   Well, for example, one of the items you took was the evaluation of 5.2 and 5.6 gigahertz products?

**A.**   Yes.

**Q.**   And those were products that Akoustis actually came to market with before Qorvo, correct?

**A.**   Yes.

**Q.**   Because, in fact, Qorvo was actually looking at Akoustis products to fill in gaps in its product line because it had not devoted the R&D resources to come up with products for the Wi-Fi space in those frequencies, correct?

**A.**   That's correct, yes.

**Q.**   So you estimated quite a long time period there as to the evaluation of something that Akoustis actually already had products in and Qorvo was a latecomer to that area.  Why did you estimate the 22 months that you claim it would

*Shanfield – Cross*

**BY MR. LEMIEUX:**

**Q.**   Here, you've evaluated what you believe to be the
head-start advantages in various items in Group 5; is that
correct?

**A.**   Yes, that's correct.

**Q.**   And in your evaluation of the head start that was
allegedly provided here, did you review at all the library
of processes and development documents that were already
in place at the New York fab facility?

**A.**   I don't recall, frankly.  There's so many documents.
I have to go back in my report and check.

**Q.**   I can tell you, Dr. Shanfield, you did not.  At least
it was not listed in your report as items that you had
reviewed in arriving at your opinion.

**A.**   Okay.

**Q.**   So when you estimate the advantage of creating a
technology development process or product development
process, applicable testing procedures, parameters, you
had no idea of what was already actually in place at the
New York fab facility for these purposes, do you?

**A.**   Well, actually, I did because I had seen it.  But it
didn't matter.  I didn't use that.  What I'm aware of that
testing BAW filters is really specialized, and there's a
lot of detail to getting it right.  And that is not
something that the MEMS fab had the ability of doing, in

*Shanfield – Cross*

the information I had available.

**Q.**   So you believe a fab has years of experience in making MEMS devices, has no procedures in place for testing the devices its making?

**A.**   Remember, the testing that you have to do for MEMS filter is RF testing at high frequency, much higher than any MEMS normally runs.  There's no MEMS resonator at that frequency that's any good.  No MEMS facility I've ever seen has the kind of testing that -- you have to calibrate that testing in a very elaborate way with S parameter measurements.  All of that is really specialized, and particular to BAW filters.

     So that was, my view, something that was not established at the fab.  And I took that into account.

**Q.**   But you've listed --

         **THE COURT:**  It's 10:30, and, of course, we have a ways to go.  This is our 15-minute morning break.  So, remember, don't discuss the case among yourself.  Don't let anybody talk to you about it.  Of course we will come back and resume.  Keep an open mind.  Fifteen minutes. Thanks very much.

     (The jury exits the courtroom at 10:31 a.m.)

         **THE COURT:**  Everyone can be seated.  The witness will be able to step down for a 15-minute break. Can't talk with anybody about answers given, so forth.

*Shanfield – Cross*

10:31:52  1    But this is our morning break.

10:31:56  2              Anything else before we take that break right

10:31:58  3    now?

10:32:00  4              **MR. LEMIEUX:**  No, I don't think so, Your Honor.

10:32:01  5              **THE COURT:**  Let's give everybody a chance to

10:32:03  6    have that break.  We will see everybody -- I will see you

10:32:07  7    in about 13 minutes.  Thank you very much.

10:32:59  8         (Whereupon, a recess was taken.)

10:46:49  9              **THE COURT:**  You may be seated.  We can have the

10:46:54 10    witness back on the stand, and the jury can come in.

10:47:30 11         (The jury enters the courtroom at 10:47 a.m.)

10:47:55 12              **THE COURT:**  Everybody can be seated, and

10:47:57 13    counsel may proceed.

10:47:58 14    **BY MR. LEMIEUX:**

10:48:00 15    **Q.**    Doctor, just before the break here, we were talking

10:48:04 16    about the operation of New York fab.  I wanted to make

10:48:07 17    sure I understood your testimony you've never actually

10:48:09 18    reviewed the fab's library of processes controls

10:48:13 19    procedures, have you?

10:48:18 20    **A.**    No, I don't think so.

10:48:21 21    **Q.**    So your opinion in this case is rendered without

10:48:23 22    actually looking at the actual procedures and processes

10:48:27 23    that are used in their fabrication in the manufacturing

10:48:31 24    facility in New York, correct?

10:48:32 25    **A.**    That's correct, but what that --

*Shanfield — Cross*

**Q.**   So, again, packaging and assembly information used by Qorvo isn't going to be of much use to Akoustis if that function is handled by a third party for Akoustis; isn't that right?

**A.**   I disagree.

**Q.**   All right.  Dr. Shanfield, I'd like to just, then, move on to your involvement in the assessment of potential patent infringement in this case.

**A.**   Sure.

**Q.**   You were asked to conduct certain simulations for purposes of other experts in this case to comment on; is that right?

**A.**   Yes.  That's a good description, yes.

**Q.**   And you performed those simulations, and those simulations produced certain graphs that you've referred to in your testimony here today; is that right?

**A.**   Well, I performed dozens of simulations, but I am showing the results from a few.

**Q.**   And the simulations you ran, they didn't consistent of consist of actually physical testing of Akoustis devices, did they?

**A.**   No.

**Q.**   It's just computer modeling in an attempt to project what actual testing would show, right?

**A.**   Yes.  That was, I think --

*Shanfield - Cross*

**Q.**   And for the original --

**A.**   -- you heard from testimony and witnesses that, in

fact, Dr. Aigner, the modeling is the way people design

these devices now.  You can't build lots of different

variations.  It just takes too long and it's too hard, and

the modeling has gotten so good in the BAW resonators and

filters that you end up very accurately predicting what

the real world will do.  So modeling is the Number 1

approach, and the first approach you take in designing and

deciding what you are going to build.

**Q.**   Okay.  So while modeling is a potentially useful

device in designing figures, that's not the question I

asked you.

   We were looking at, looking at actual finished

devices and whether you did any physical testing of the

actual finished device?

**A.**   I didn't do any.  It was cross-sections taken of

actual physical devices.

**Q.**   So, again, what you did was you tried to create a

computer model of what it would predict the actual device

would do in operation, correct?

**A.**   No.  What I did was, I took the data that was

supplied to me from scanning electron microscope images

and measurements of the actual device, and I took those

dimensions.  I put them in a model that I know gives

*Shanfield — Cross*

11:54:14 1    accurate results, have long experience with it, and I

11:54:19 2    tested that model.  I made dozens of simulations to make

11:54:24 3    sure the model behaved properly as expected.  And then I

11:54:29 4    did the simulations I was asked to do.

11:54:34 5    **Q.**   And simulations, as we heard from both Dr. Aigner and

11:54:37 6    Dr. Fattinger when they were on the witness stand, are

11:54:40 7    very complicated, aren't they?

11:54:42 8    **A.**   Yes.

11:54:42 9    **Q.**   And they consist of multiple variables that have to

11:54:45 10   be considered in order to produce a useful prediction;

11:54:49 11   isn't that right?

11:54:50 12   **A.**   That's correct.  Takes a lot of work to get it to

11:54:53 13   work, correct.

11:54:53 14   **Q.**   And --

11:54:53 15   **A.**   It's got to be checked a lot.

11:54:56 16   **Q.**   And if there is a mistake if one of those variables,

11:54:58 17   it's going to end up producing a result that's incorrect

11:55:01 18   or not useful, right?

11:55:03 19   **A.**   Yes.  A mistake is very unlikely, because I did the

11:55:06 20   same as all people who do modeling a lot do, and I tested

11:55:12 21   the model to make sure, in the range of parameters I was

11:55:15 22   looking at, that it behave the way I know the physical

11:55:19 23   world behaves.  So that you could check if there's

11:55:21 24   something wrong, you will see it in one of its

11:55:24 25   predictions.

*Shanfield – Cross*

**Q.**   Now, you produced an expert report that contained --
well, let me step back for a second.  So the results of
the computer modeling that you do, produced the graphs
that we saw up on the screen earlier this morning?

**A.**   Yes.

**Q.**   And in your original expert report, you produced
certain graphs that you believed depicted the actual
operation of the Akoustis devices, correct?

**A.**   It predicted the performance of, in some cases,
Akoustis devices; in some cases what was the state of the
art at the time.

**Q.**   And you reviewed your expert report, didn't you, to
make sure that it was accurate before it was provided to
counsel for Akoustis?

**A.**   Yes.

**Q.**   And, in fact, didn't it turn out that the graphs that
you provided in your original expert report were
incorrect?

**A.**   I made a mistake of pasting the wrong graph into one
page, and the simulation itself that I pasted in was
correct, but it was not the one that I meant to refer to
in my writing.  So I did, indeed.

**Q.**   And even though that report was produced at towards
the end of November of 2023, you didn't notice that
mistake for several months; isn't that true?

*Shanfield — Cross*

11:56:50  1    **A.**    That's true.  I have a full-time job.  I have lots of

11:56:53  2    other things to worry about.

11:56:54  3    **Q.**    And, in fact, you didn't notice that mistake until it

11:56:57  4    was pointed out in the rebuttal reports submitted by

11:57:00  5    Akoustis' expert; isn't that true?

11:57:02  6    **A.**    No, that's not true.

11:57:03  7    **Q.**    And isn't it also true that you weren't aware of this

11:57:06  8    until Dr. Bravman, who we'll hear from later, pointed out

11:57:10  9    the mistake to you in your expert report?

11:57:12 10    **A.**    That's not true.

11:57:14 11    **Q.**    So if Dr. Bravman testifies that he had to point this

11:57:20 12    mistake out to you, he would be incorrect in that

11:57:23 13    testimony?

11:57:24 14    **A.**    Dr. Bravman pointed to that plot and found it wasn't

11:57:27 15    consistent with the language I was referring to, and I

11:57:33 16    looked at it and immediately knew what I had done, and I

11:57:37 17    pasted in the right plot.

11:57:41 18    **Q.**    And so you had to change your report, didn't you?

11:57:43 19    Had to supplement it to put in different graphs than what

11:57:47 20    you had included in your original report?

11:57:50 21    **A.**    I pasted in the wrong graph.  I took that out and put

11:57:53 22    the right one in.  The simulations were all correct.

11:57:56 23    There were no errors.

11:58:10 24              **MR. LEMIEUX:**  No further questions for this

11:58:11 25    witness, Your Honor.

*Heinrich - Direct*

15:05:45  1    in size.  You see the schematic on the left side there.

15:05:49  2         And I had to cut the packaging open to get the real

15:05:54  3    device out, and I had a little micro saw that is a very

15:05:57  4    small, very fine circular saw here that turns very slowly.

15:06:02  5    And in about 15, 20 minutes I can get the real device out

15:06:07  6    of it.

15:06:08  7              MR. TIGAN:  Let's turn to the next slide, 9.6.

15:06:13  8    BY MR. TIGAN:

15:06:13  9    Q.    Here, you have Step Number 2.  What does that entail?

15:06:16 10    A.    So what you see on the right side is the system that

15:06:18 11    I used for sample preparation prior to sample preparation

15:06:20 12    imaging.  This is a scanning electron microscope with some

15:06:27 13    students in front of it, not on the sample, obviously.

15:06:28 14    But on the left side, you see a scanning electromicrograph

15:06:33 15    or image of -- top view of one of the resonators, and that

15:06:37 16    was AKF1256 here.

15:06:43 17              MR. TIGAN:  Okay.  Let's go to the next slide.

15:06:45 18    BY MR. TIGAN:

15:06:45 19    Q.    And I would like to ask you what Step 3 is.

15:06:48 20    A.    Yes.  So this scanning electron microscope is also

15:06:51 21    equipped with ion beam that I use to remove material from

15:06:56 22    the surfaces.  What you see on these labeled micrograph on

15:06:59 23    the left side is this resonator we named LR6.  You see

15:07:05 24    this little oval that is magnified there, and you see this

15:07:09 25    little slightly tilted line there.  This is micro section,

*Heinrich − Direct*

15:07:13  1    but I'm still viewing it from top.  And above these two

15:07:17  2    rectangles that you see there above and below, these are

15:07:20  3    the material that I removed from the sample during the

15:07:24  4    cross-section preparation.

15:07:26  5    **Q.**   Okay.

15:07:27  6          **MR. TIGAN:**  Let's go to the next slide, 9.8.

15:07:30  7    **BY MR. TIGAN:**

15:07:30  8    **Q.**   And I believe this is Step 4.  Can you walk us

15:07:33  9    through what you've put on here?

15:07:34 10    **A.**   Yes.  So there you are seeing me putting the sample

15:07:39 11    into my transmission electron microscope.  And I analyzed

15:07:44 12    the cross-sections of these materials.  You see -- on top

15:07:48 13    left, you see an image of whole cross-section that I

15:07:53 14    prepared.  It looks a little bit like a piece of bacon,

15:07:56 15    but you have to imagine this piece of bacon being about

15:08:00 16    5,000 times smaller in every direction, so in thickness,

15:08:04 17    length, and width, right?  And in the bottom view you see

15:08:08 18    a cross-section view of the same sample that is just at

15:08:12 19    higher magnification with some calibrated thickness

15:08:18 20    measurements that I did.

15:08:19 21          **MR. TIGAN:**  And if we can remove that blow-out.

15:08:22 22    **BY MR. TIGAN:**

15:08:22 23    **Q.**   I just want to confirm that, on the top left, is that

15:08:24 24    an entire resonator cross-section?

15:08:27 25    **A.**   That's a cross-section across the entire resonator,

*Heinrich - Cross*

15:08:30 1    yes.

15:08:30 2    **Q.**   And like I said, we won't go through all of these,

15:08:32 3    but just to confirm, did you perform these same steps for

15:08:35 4    all of the cross-sections that you go through in the

15:08:38 5    appendixes?

15:08:39 6    **A.**   Yes.

15:08:40 7    **Q.**   One last question for you.  We're going to wrap up

15:08:42 8    quickly.  Could you characterize the margin of error for

15:08:46 9    your measurements here?

15:08:48 10   **A.**   Yes.  My margin of error of the calibrations of the

15:08:50 11   microscope is about 1 to 2 percent.

15:08:55 12   **Q.**   Okay.  That's all the questions I have for now?

15:08:57 13          **MR. TIGAN:**   I pass the witness, Your Honor.

15:08:58 14          **THE COURT:**   Cross-examination.

15:08:59 15                   CROSS EXAMINATION

15:09:01 16   **BY MS. SMITH:**

15:09:01 17   **Q.**   Good afternoon, Dr. Heinrich.  How are you?

15:09:04 18   **A.**   Good afternoon.  Thank you.

15:09:05 19   **Q.**   You testified that you were provided with samples of

15:09:09 20   19 different Akoustis products, right?

15:09:12 21   **A.**   Correct, yes.

15:09:12 22   **Q.**   And you received multiple samples for each of the

15:09:16 23   products?

15:09:17 24   **A.**   Correct.

15:09:17 25   **Q.**   You tested only one sample of each product?

*Bravman − Direct*

BY MR. MASTERS:

Q.   Very briefly, Dr. Bravman, did you also consider
Dr. Heinrich's cross-section?

A.   Yes.  As I indicated, I also considered and used the
information provided by Dr. Shanfield, and Dr. Heinrich.
You just saw this.  This is just a summary slide.

     Again, I did this kind of work personally starting as
a graduate student, and so I'm very familiar with this and
how these figures and information is produced.

Q.   Okay.

          MR. MASTERS:  And, Mr. Faison, can we project
PDX-10.10.

BY MR. MASTERS:

Q.   And did you also rely on Dr. Shanfield's simulations?

A.   Yes.  At the end of Dr. Shanfield's testimony here
today, he described his work in doing finite element
modeling.  This is a computer-based model involving, in
this case, mechanical interactions between various places
in a model structure.  And I'll touch on this a little bit
more again, but you heard about this at somewhat length
this morning from Dr. Shanfield.

     This is a standard modeling procedure.  And so this
is something that I personally do not do, but I've used
throughout my career when done by others.

Q.   Dr. Bravman, let's turn to the '018 patent.

*Bravman − Cross*

16:44:47 1  to understand why have you grouped the helper and the

16:44:50 2  shunt in the series all as part of the top electrode?  If

16:44:53 3  they're not part of it, why wouldn't you have listed them

16:44:56 4  elsewhere?

16:44:56 5  **A.**   Because they all have top and bottom electrodes.

16:44:59 6  **Q.**   Okay.  So, in this case, these helper and shunt

16:45:02 7  series, those are both showing larger sizes than the

16:45:05 8  bottom electrode layer?

16:45:07 9  **A.**   Correct.

16:45:08 10 **Q.**   Okay.

16:45:12 11         **MR. LEMIEUX:**  If we could go to Page PDX-10.10.

16:45:20 12 **BY MR. LEMIEUX:**

16:45:20 13 **Q.**   These are showing some of the diagrams or information

16:45:23 14 you received from Dr. Shanfield, right −−

16:45:26 15 **A.**   Yes.

16:45:26 16 **Q.**   −− that assisted you in your analysis?

16:45:28 17 **A.**   Yes.

16:45:29 18 **Q.**   And on the graphs here, the larger graphs that are in

16:45:32 19 the middle, they say "lateral energy flux."

16:45:36 20        What's the unit of measurement that's along that

16:45:38 21 axis?

16:45:39 22 **A.**   I don't know what the unit is.  It's probably −−

16:45:42 23 because this is a finite element model −− it was relative.

16:45:45 24 And so one would be a baseline.  But, again, I didn't

16:45:49 25 produce these.  And so Dr. Shanfield would have to answer

*Bravman - Cross*

**Q.**   Okay.  And so it's fair to say that your infringement

opinion, then, is based upon the simulations run by

Dr. Shanfield, in part, and in part by the testing done by

Dr. Heinrich?

**A.**   Of course.

**Q.**   Now, earlier in this case, Dr. Shanfield -- and we

talked about it a little bit in his testimony today --

produced an original expert report that had the kind of

graphic information we saw here a moment ago.  But it

wasn't these graphs, was it?

**A.**   I don't recall exactly what was in his report

vis-a-vis these we have seen today.  But as you recounted,

or someone recounted earlier today, I found that there was

one that was erroneously included in his report.  It just

didn't match his description.

**Q.**   Right.  And, in fact, you brought that, then, to

Dr. Shanfield's attention.  And then he ran new testing or

produced a new graph in a supplemental report; is that

right?

**A.**   He didn't do new testing.  My understanding is he

simply corrected his cut-and-paste error.

**Q.**   And so if your original opinion, however, on

infringement was based upon the material that had been

provided by Dr. Shanfield in his original report, wasn't

it?

*Bravman - Cross*

**A.**   A study which yielded to me, as a worker of skill,
that this must be an error, only one.  And I reported that
faithfully.  And when it was corrected, it doesn't change
my opinion at all.

**Q.**   Well, it wasn't corrected for several months, isn't
that true?

**A.**   I'm not aware of the timing.  I did my job and I
reported it.

**Q.**   You submitted your original expert report in this
case in November of 2023; isn't that right?

**A.**   Sounds about right.

**Q.**   And Dr. Shanfield also produced his original report
in November of 2023?

**A.**   If you represent that, I'll take that at your word.

**Q.**   Well, because, in fact, your infringement opinion
relied upon analysis that he was doing.  So that was the
report that you were relying on at the time, correct?

**A.**   It obviously could not have been after my report.
That's correct.

**Q.**   Okay.  So we agree, then, that you were relying on
the original report submitted by Dr. Shanfield in this
case?

**A.**   Yes.

**Q.**   And so your infringement opinion, then, relied on
something that ultimately turned out to be not correct,

*Bravman – Redirect*

16:53:21 1   which you noticed months later; is that right?

16:53:24 2   **A.**   It had one clearly cut-and-paste error in it.  That's

16:53:28 3   right.

16:53:40 4   **Q.**   I just want to check -- just bear with me for a

16:53:46 5   moment here.  I may be done.

16:54:03 6       Now, you spoke for a few minutes at the end of your

16:54:07 7   testimony, Dr. Bravman, about what was called the '360

16:54:11 8   patent.

16:54:13 9   **A.**   Yes.

16:54:13 10  **Q.**   And you're not a patent licensing expert, are you?

16:54:15 11  **A.**   No.

16:54:17 12  **Q.**   So any opinions you may have as to the value is

16:54:21 13  something that's outside the area of your expertise and

16:54:24 14  outside what you've been asked to do in this case,

16:54:26 15  correct?

16:54:27 16  **A.**   Monetary value, for sure outside my expertise.

16:54:31 17  **Q.**   Okay.

16:54:31 18           **MR. LEMIEUX:**  No further questions.

16:54:32 19           **THE COURT:**  Redirect?

16:54:33 20                    REDIRECT EXAMINATION

16:54:34 21  **BY MR. MASTERS:**

16:54:38 22  **Q.**   Dr. Bravman, counsel asked you about the

16:54:44 23  cut-and-paste error in Dr. Shanfield's report.

16:54:47 24  **A.**   Yes.

16:54:49 25  **Q.**   Is it your understanding that there was both a

1682

| | |
|---|---|
| 08:47:16 1 | THE COURT:  Okay.  Yes, sir. |
| 08:47:17 2 | MR. ELKINS:  So, Ms. Bennis will be testifying. |
| 08:47:20 3 | As Your Honor knows, we move to exclude her trade secrets |
| 08:47:24 4 | opinion under Daubert and Rule 702, for purposes of ensuring |
| 08:47:32 5 | that we have made a full, a full record for future purposes. |
| 08:47:36 6 | THE COURT:  Sure. |
| 08:47:37 7 | MR. ELKINS:  We just like to renew our motion, |
| 08:47:39 8 | Your Honor.  We believe it's well taken, and that under |
| 08:47:42 9 | amended Rule 702, the Court has an obligation to exercise |
| 08:47:47 10 | its gatekeeping obligations by excluding those opinions, |
| 08:47:52 11 | understanding you have already ruled, Your Honor. |
| 08:47:55 12 | THE COURT:  I'm just checking.  The nice thing I |
| 08:47:59 13 | have two screens that actually work today. |
| 08:48:01 14 | MR. ELKINS:  And that was the only thing that I |
| 08:48:03 15 | wanted to say before we began.  Thank you. |
| 08:48:07 16 | THE COURT:  Thank you.  I think we're all set. |
| 08:48:10 17 | I hope the witness is ready today.  Okay.  I see the witness |
| 08:48:15 18 | is. |
| 08:49:00 19 | I think we're trying to send you a revised |
| 08:50:19 20 | verdict form.  We'll get it to you fairly soon. |
| 08:50:27 21 | (Jury entering the courtroom at 8:50 a.m.) |
| 08:50:56 22 | THE COURT:  All right.  Everyone can be seated. |
| 08:51:06 23 | And that was some bad traffic I think coming in.  Is that |
| 08:51:10 24 | right?  I know somebody -- I thought someone reported that. |
| 08:51:15 25 | So I think we're all set.  We're starting a little late |

Bennis - direct

09:05:18  1    Q.      How did you calculate the unjust enrichment damages

09:05:22  2    here?

09:05:23  3    A.      This analysis started, the starting point for it was

09:05:29  4    Dr. Shanfield's analysis.  So again, last week we heard that

09:05:34  5    all of the acquisition of confidential important information

09:05:40  6    allowed Akoustis to move into the market and do all the

09:05:44  7    business related things it was doing at least 55 months

09:05:47  8    early.

09:05:48  9            So it then turns to what benefit did that help

09:05:53 10    Akoustis achieve.  Well, earning revenue.  It earned revenue

09:05:56 11    earlier than it otherwise would have.  So the analysis then,

09:06:00 12    the test for me, is how do you put a dollar figure on that?

09:06:03 13    How do you figure out the benefit of having that revenue

09:06:06 14    sooner than you otherwise would have?

09:06:08 15    Q.      And how did you determine the monetary value of

09:06:11 16    Akoustis obtaining a 55-month head-start to get into the

09:06:15 17    market?

09:06:16 18    A.      My analysis measured the monetary value by evaluating

09:06:21 19    the time value of having money earlier rather than later.

09:06:26 20    Q.      What do you mean by the time value of money?

09:06:30 21    A.      The time value of money is a very widely known

09:06:34 22    studied economic concept.  To break it down more simply, the

09:06:41 23    concept is that having a dollar today, is always better than

09:06:45 24    having a dollar tomorrow.  And the reason being, if I have

09:06:48 25    that dollar today, I can invest that dollar, I can earn

Bennis - direct

09:06:53  1   interest on that dollar.  If I'm a company, I can use that

09:06:56  2   dollar to buy things, to build things, to make more money.

09:07:00  3   So there is power in having money sooner rather than later,

09:07:04  4   is the general concept.

09:07:07  5   Q.     Did you prepare a slide that illustrates the time

09:07:10  6   value of the revenue Akoustis received 55 months early?

09:07:13  7   A.     I did.

09:07:14  8   Q.     Mr. Faison, can you please pull up PDX-11.4.

09:07:21  9   A.     What you will see here is a bar graph, and what this

09:07:24 10   does is take Akoustis's annual revenues as it reported in

09:07:29 11   its SEC filings, this is the filing with the Securities and

09:07:34 12   Exchange Commission, on an annual basis starting in 2016,

09:07:37 13   run it through present.  And it says if, in fact, these

09:07:43 14   revenues would have been delayed by 55 months, what would be

09:07:48 15   the differential in the time value of that money of having

09:07:53 16   it later, shifted out 55 months versus earlier.

09:08:00 17   Q.     So is your damages calculation the money itself that

09:08:03 18   Akoustis received?

09:08:05 19   A.     It's not.  And this is important.  It's not the

09:08:08 20   revenue.  Under this analysis, Akoustis keeps the revenue

09:08:13 21   that it's earned.  It's really only measuring the benefit --

09:08:16 22   the benefit by virtue of examining the time value, the

09:08:20 23   differential in having that revenue earlier.  And I have

09:08:24 24   measured that using an interest calculation.

09:08:27 25          And I guess another thing to note, what this

09:08:30  1    analysis also assumes is that Qorvo -- or rather Akoustis

09:08:35  2    could have gotten in the market, it could have actually

09:08:39  3    developed a saleable product, it could have made all the

09:08:42  4    same sales, it could have accomplished the exact same growth

09:08:46  5    rate despite the fact that the revenues would be shifting

09:08:49  6    into a point in time when the start of the revenue

09:08:52  7    generation would have been right in the middle of the Covid

09:08:56  8    pandemic, so there are some general assumptions, if you

09:09:01  9    will, about shifting the money forward as is.

09:09:03 10    Q.     Mr. Faison, can you please pull up PDX-11.5.

09:09:08 11           Ms. Bennis, does PDX-11.5 show the analysis that

09:09:12 12    you performed in this case?

09:09:13 13    A.     It does.  And I realize this looks very busy.  And

09:09:17 14    I'm not going to walk through all of the numbers.  But this

09:09:19 15    is the schedule that appeared within my report that really

09:09:22 16    kind of shows an interest calculation and how one works.

09:09:27 17           So I'll just point out a few important things

09:09:31 18    that will hopefully make a little bit more sense.

09:09:35 19           You'll see that these are again, these annual

09:09:40 20    revenue streams, row C, total Akoustis revenue.  In 2016,

09:09:46 21    Akoustis reported $254,844 in revenue.  Those revenue

09:09:51 22    streams as reported run all the way through present.  The

09:09:55 23    summation of all those equals 113.7 million in revenue that

09:10:00 24    Akoustis has reported.

09:10:03 25           Below that are all the different interest

Bennis - direct

09:10:07 1   calculations, and an interest rate you'll see of 14.8.  14.8
09:10:12 2   is important because that is the -- that was the active
09:10:16 3   interest rate that I employed as of present day in order to
09:10:20 4   bring all of those revenue streams up to the present value.
09:10:25 5   In order to evaluate as of a given point in time, what the
09:10:29 6   value of that revenue would be such that I can compare it to
09:10:32 7   what that revenue would be if the same revenue streams were
09:10:37 8   shifted forward 55 months.
09:10:39 9   Q.     Why did you choose to use 14.8 percent as your
09:10:43 10  interest rate?
09:10:44 11  A.     14.8 percent is the -- it's the weighted average cost
09:10:50 12  of capital, commonly abbreviated was a WACC, rate of
09:10:56 13  Akoustis, so it comes directly from Akoustis's financial
09:11:00 14  model, it reflects their debt and equity structure.  It's an
09:11:05 15  interest rate that companies use all the time because it
09:11:07 16  reflects their own unique financing abilities and position.
09:11:12 17  They use it to evaluate investment decisions and to
09:11:16 18  generally make money on how to finance their operation and
09:11:20 19  their decisions.
09:11:20 20  Q.     And did you use Akoustis' WACC in the economic
09:11:25 21  formulas that are shown on the slide to determine the
09:11:28 22  present value of the revenues that Akoustis received, and
09:11:30 23  the benefit of the 55-month head-start?
09:11:34 24  A.     I did.  So again, on this particular slide, you'll
09:11:38 25  see that once the interest rate of 14.8 percent as of

09:11:42 1    present day, as of the time of this analysis, is applied to

09:11:46 2    the 113 million in total Akoustis revenues, the present

09:11:51 3    value of having all of those revenue streams as early as

09:11:55 4    2016, means that that same 113 million today is worth 140

09:12:01 5    million.  And if you think about that, that makes sense

09:12:03 6    because they had the benefit of saying 2016 that $254,000

09:12:09 7    number, if you look down at the bottom, in today's dollars

09:12:13 8    over all those additional years, is actually worth 821,508.

09:12:20 9    Because they have the money, and they have been able to

09:12:22 10   invest it and do things with it, that's the concept in

09:12:25 11   economics about the value of a dollar.

09:12:27 12   Q.      Once you determine the present value of the revenue

09:12:30 13   that Akoustis actually received, what did you do next?

09:12:35 14   A.      So next, I performed the same exercise, and in fact I

09:12:40 15   think I have another exhibit from my report.  Yes.

09:12:45 16           So this took all of those annual revenue streams

09:12:49 17   and simply shifted them forward 55 months.  So you'll know

09:12:53 18   that because, say in the first column you'll see the date is

09:13:00 19   2022, it used to be 2016, we shifted those revenue streams

09:13:05 20   55 months into the future.  You know the revenue stream is

09:13:08 21   the same because we're still looking at the same

09:13:12 22   $113 million figure, but instead of that $254,834 number

09:13:18 23   that you see in the first column, being 800-some thousand

09:13:23 24   like we saw in the last slide, because it's now a lot closer

09:13:26 25   to present, that same revenue stream is only worth $436,000,

Bennis - direct

09:13:33  1    highlighted down at the bottom.  That's the difference of

09:13:35  2    having that money for a lesser period of time as we get

09:13:39  3    closer to present.

09:13:40  4            And then similarly, because we're measuring the

09:13:44  5    money as of present value, or as of now, because certain of

09:13:47  6    these revenue streams got pushed out into 2025, 2026, '27,

09:13:52  7    '28, we actually have to discount those back, because in the

09:13:56  8    real world, Akoustis wouldn't have had those yet.  So those

09:14:00  9    get -- those get reduced by the same interest calculation

09:14:04 10    and therefore the present value of those revenue streams

09:14:08 11    equals 74 million, 74.8 million as you'll see.  So that's

09:14:15 12    the time value of money concept.

09:14:16 13    Q.    So how did you use the present value of the revenue

09:14:20 14    that Akoustis actually received, and the present value of

09:14:23 15    the revenue that Akoustis would have received without

09:14:27 16    misappropriating Qorvo's trade secrets in order to calculate

09:14:31 17    Qorvo's damages in this case?

09:14:33 18    A.    So I think the next slide will show you, and it

09:14:36 19    really becomes quite simple.

09:14:38 20            You simply take the difference, look at the

09:14:41 21    differential between one revenue stream and the other, and

09:14:44 22    the difference represents again, not the revenue dollars

09:14:47 23    themselves, but just the benefit of having those at an

09:14:51 24    earlier point in time.  So the benefit is measured of the

09:14:54 25    head-start to be the $66,114,093 figure.

Bennis - direct

09:15:01 1   Q.      Ms. Bennis, the slide at PDX-11.7 says date of

09:15:06 2   original analysis, 11/23.  Can you tell the jury what that

09:15:09 3   means?

09:15:09 4   A.      Yeah.  So I mentioned that my report analysis was

09:15:12 5   finalized and issued back in November.  And so at that point

09:15:16 6   in time, we knew that the trial, the decision of the jury

09:15:23 7   would be happening now, so it made sense to run the analysis

09:15:26 8   through now.  But at that point in time in November, fiscal

09:15:30 9   year 2024, which we heard testimony last week runs from

09:15:36 10  July 1st through June 30th of a year, was not yet complete.

09:15:40 11  So in fact, if you go back a couple of slides, you'll see --

09:15:45 12  Q.      11.5.

09:15:47 13  A.      That last column 2024, EST, EST stands for estimated.

09:15:53 14  The estimate comes from Akoustis's own files, this is what

09:15:56 15  Akoustis projected that it was going to earn in it's fiscal

09:15:59 16  year 2024 on a whole.

09:16:06 17  Q.      Have you performed any updated calculations based

09:16:10 18  upon information presented to you during trial?

09:16:13 19  A.      Yes.  So last week when I was listening like you, I

09:16:18 20  heard the testimony of Mr. Aichele that suggested that their

09:16:22 21  --  that Akoustis's fiscal year 2024 results were going to

09:16:27 22  be 28 million in total, which was different than the

09:16:30 23  projections that they had made back that were available at

09:16:34 24  the time of my report.  So for the benefit of the jury to

09:16:37 25  see what that would look like, I ran that number through the

Bennis - direct

09:16:41  1    model.  When you run that projection, it's not complete, so

09:16:45  2    we don't know if that's ultimately how it will end up, but

09:16:48  3    if you run that figure through the model, performing the

09:16:53  4    same economic analysis, you get a total head-start damages

09:16:59  5    figure of 50.3 million.

09:17:03  6    Q.    Ms. Bennis, I want to make sure that your testimony

09:17:06  7    for the jury is clear.  The calculation that you provided to

09:17:08  8    PDX-11.7, which is the prior slide, Mr. Faison, was based

09:17:13  9    upon information that you received from Akoustis's own files

09:17:17 10    relating to what it thought it's revenue streams were going

09:17:21 11    to be for 2024; is that correct?

09:17:24 12    A.    That's correct.

09:17:24 13    Q.    And if we flip to the next slide, 11.8, you have

09:17:28 14    updated those calculations within your own model based upon

09:17:32 15    testimony that Mr. Aichele provided to the jury, is that

09:17:35 16    correct?

09:17:35 17    A.    That's correct.

09:17:38 18    Q.    When you calculated the unjust enrichment benefit to

09:17:43 19    Akoustis, did you consider how the trade secrets impacted

09:17:46 20    Akoustis's costs?

09:17:47 21    A.    Yes.  So recall when Dr. Shanfield talked about those

09:17:51 22    analysis, that he really only talked about the benefit of

09:17:54 23    the head-start in -- by virtue of the time saved.  But in

09:17:58 24    reality, companies incur real research and development hard

09:18:04 25    expenses.  So this analysis again, is only looking at the

Bennis - direct

09:40:40  1    that the trade secret misappropriation, of the confidential

09:40:44  2    information is really -- it's affected the business

09:40:49  3    strategies, the design of the filters, the testing, all of

09:40:53  4    the different elements that help actually build and test and

09:40:56  5    make a product successful.

09:40:58  6    Q.     Mr. Faison, could you please go back to PDX-11.2.

09:41:02  7              MS. AYERS:  Your Honor, may I approach?

09:41:05  8              THE COURT:  You may.

09:41:17  9    BY MS. AYERS:

09:41:25 10    Q.     Ms. Bennis, do you recognize the document that I just

09:41:27 11    handed you?

09:41:28 12    A.     I do.

09:41:28 13    Q.     Can you explain to the jury what it is?

09:41:31 14    A.     Yes.  So this is Appendix C, as it was included in my

09:41:36 15    report.  And what I did here was, with respect to the trade

09:41:40 16    secret misappropriation and unfair competition -- or

09:41:43 17    misappropriation of confidential information analysis, is

09:41:47 18    because Dr. Shanfield's analysis considered a period of

09:41:52 19    55 months, but he also included really the benefit in

09:41:57 20    monthly increments.  I have actually run these monthly

09:42:01 21    increments through the model such that there is an analysis

09:42:05 22    for damages under a head-start period of one month all the

09:42:09 23    way up to 54 months, in addition to the 55 months.  So this

09:42:13 24    is the appendix that simply runs the figures through the

09:42:18 25    model in monthly increments.

Bennis - cross

09:43:38  1   just make sure that the jury understands the construct for

09:43:43  2   damages experts testifying in court.  And you would agree

09:43:49  3   with me that the construct in any lawsuit, let's say it's

09:43:54  4   intellectual property, products liability, employment, is

09:43:57  5   that there are no -- there is no damages without liability;

09:44:02  6   correct?

09:44:03  7   A.      Yes.

09:44:04  8   Q.      But because the jury typically has not heard all of

09:44:09  9   the evidence from both sides, especially when the Plaintiff

09:44:12 10   puts on its case, the damages experts are asked to assume

09:44:18 11   liability for purposes of their testimony so that if the

09:44:24 12   jury having heard all of the evidence finds liability, then

09:44:28 13   they have an understanding about how to assess damages, if

09:44:31 14   any; is that correct?

09:44:32 15   A.      Yes.

09:44:34 16   Q.      So both you and Ms. Irwin, Carolyn Irwin, Akoustis's

09:44:40 17   damages expert, come in assuming liability, but you're not

09:44:44 18   testifying as to liability, correct?

09:44:46 19   A.      Correct.  I did mention that at the beginning, yes.

09:44:48 20   Q.      So let me just recap.  In essence, you have three

09:44:55 21   different damages opinions.  You have one as to trade secret

09:44:58 22   misappropriation; correct?

09:45:00 23   A.      Yes.

09:45:00 24   Q.      And that is based on an unjust enrichment theory

09:45:06 25   using a head-start.  And that is for $66.1 million; correct?

Bennis - cross

09:45:11  1    A.      Yes.

09:45:13  2    Q.      And then you have an opinion regarding unfair

09:45:18  3    competition damages.  The first part of that is the benefit

09:45:22  4    of the head start to Akoustis, but that's from both trade

09:45:29  5    secrets and confidential information, correct?

09:45:34  6    A.      Yes.  Trade secrets as I understand it are subsumed

09:45:37  7    in confidential information, yes.

09:45:39  8    Q.      Okay.  So there is a bucket there of confidential

09:45:44  9    information, some of which are trade secrets and some of

09:45:47 10    which is just confidential information, but not trade

09:45:50 11    secrets?

09:45:50 12    A.      Yes, generally.

09:45:51 13    Q.      And that, your opinion for that also is based on an

09:45:56 14    unjust enrichment theory based on a head start, and it's

09:46:00 15    $66.1 million?

09:46:01 16    A.      That's right.

09:46:02 17    Q.      And there is also the second component of unfair

09:46:06 18    competition is the poaching damages, those are direct

09:46:10 19    damages to Qorvo; correct?

09:46:11 20    A.      Correct.

09:46:12 21    Q.      And that's 809,000?

09:46:14 22    A.      Yes.

09:46:15 23    Q.      And then number 3, you have the patent infringement

09:46:18 24    damages of $279,000?

09:46:20 25    A.      Correct.  Sounds right.

1722

Bennis - cross

09:49:30  1   A.        That's my understanding.

09:49:32  2   Q.        Okay.  You have calculated no damages for Qorvo's

09:49:36  3   actual loss, correct?

09:49:36  4   A.        Correct, I evaluated unjust enrichment, right.

09:49:40  5   Q.        You didn't attempt to calculate or to measure the

09:49:44  6   damages caused by misappropriation alleged against Akoustis

09:49:50  7   as measured by imposition of a reasonable royalty either,

09:49:55  8   correct?

09:49:55  9   A.        I did not reevaluate the reasonable royalty for the

09:49:59 10   claims of trade secret, that's correct.

09:50:00 11   Q.        And you don't really have a specific reason why you

09:50:02 12   did not express an opinion regarding the amount of Qorvo's

09:50:09 13   actual damages, correct?

09:50:11 14   A.        I think when we're phased with the task of evaluating

09:50:17 15   damages, sometimes there are choices to be made about what's

09:50:20 16   the most saleable, there is no question, there was no

09:50:27 17   question once the evidence kind of was laid out, the benefit

09:50:31 18   to Akoustis of obtaining this information.  And so because

09:50:36 19   there was such a clear head start benefit, it made sense to

09:50:40 20   evaluate the unjust enrichment accordingly.

09:50:43 21            There is no question that there are actual

09:50:46 22   losses to Qorvo.  The loss of the confidential nature of its

09:50:52 23   own information.  But for purposes of the damages analysis

09:50:55 24   that I performed, I focused on that second prong, and that

09:50:58 25   is unjust enrichment enjoyed by Akoustis.

Bennis - cross

09:51:01 1   Q.      But since they're additive, Qorvo could have claimed

09:51:05 2   more damages if it had actual damages to show, you just

09:51:09 3   didn't do that, correct?

09:51:10 4   A.      So, I made several conservatives in my analysis.

09:51:15 5   Like I mentioned, there were elements of unjust enrichment

09:51:19 6   that I also did not include.

09:51:20 7   Q.      And unjust enrichment measures the benefit realized

09:51:25 8   by the Defendant as a result of its use of the trade

09:51:28 9   secrets, correct?

09:51:29 10  A.      Yes.

09:51:29 11  Q.      There is no benefit without use, right?

09:51:33 12  A.      The unjust enrichment in this case follows the --

09:51:39 13  yes, the benefit from the use, yes, agree.

09:51:47 14  Q.      So let's focus now on unjust enrichment, which is

09:51:51 15  what you did calculate with respect to the trade secret

09:51:55 16  misappropriation element here.

09:51:56 17          And you would agree with me that court cases and

09:52:01 18  literature in the area recognizes three primary categories

09:52:07 19  of unjust enrichment in trade secret cases, correct?

09:52:13 20  Defendants' profits is one.  Head start benefit is another,

09:52:19 21  and avoided costs is the third.  Right?

09:52:27 22  A.      I certainly have done lots of reading and analysis

09:52:30 23  that evaluate unjust enrichment in a variety of ways.  Those

09:52:35 24  are certainly some of the ways that I have seen, yes, in

09:52:41 25  thinking about it.

Bennis - cross

09:54:05 1   said in the past it has -- it has showed a small gross

09:54:11 2   profit; correct?

09:54:13 3   A.      I am aware that Akoustis has shown a small gross

09:54:17 4   profit.

09:54:18 5   Q.      We'll look at a table from your report so that we can

09:54:22 6   make that clear.

09:54:22 7           So you understand what avoided costs are?

09:54:28 8   A.      Yes.

09:54:28 9   Q.      And it's the costs -- they would be the development

09:54:34 10  costs that a Defendant avoids by using plaintiffs' trade

09:54:41 11  secrets; correct?

09:54:43 12  A.      Yes, generally speaking.

09:54:46 13  Q.      And I assume that you understand that avoided costs

09:54:52 14  is also a way to measure the benefit to a Defendant from a

09:54:57 15  head start?

09:54:59 16  A.      Yes, I think I mentioned that.

09:55:01 17  Q.      You did not attempt to calculate the benefit to

09:55:06 18  Akoustis from an-- on the basis of an avoided cost

09:55:11 19  methodology, correct?

09:55:12 20  A.      So like I mentioned earlier, my calculations

09:55:17 21  evaluated the time element of that benefit, it did not

09:55:21 22  evaluate any of the hard research development expenses that

09:55:25 23  are typically incurred by businesses.

09:55:27 24  Q.      So that would be yes, you did not calculate an

09:55:30 25  avoided cost calculation?

Bennis - cross

A.      I did not add into my damages overall calculations, those types of expenses.

Q.      And we spoke at length in January during your deposition, do you remember that?

A.      I do.

Q.      And you suggested the reason for not attempting to calculate avoided costs was that you did not have the information to calculate that, do you recall that?

A.      So in instances like this one, and in general, Akoustis -- there are no such records in the files of Akoustis because it didn't do it.  It didn't engage in the research and development expenses that it instead misappropriated.

        So there are instances where one can use, for instance, like in this case, Qorvo's research and development expenses as a proxy or as an estimate for what it would take for Akoustis or a company in its position to do the same thing.  They're Qorvo's trade secrets, so I know we heard testimony last week that Qorvo spent a billion dollars in BAW filter research and development over the course of twenty years.  Just to finish the analysis --

Q.      Well, you're not answering my question.  In fairness, I asked you, didn't you say that, and you went off on a tangent to put in front of the jury information that you wanted it to hear.  So you know, your counsel can always

Bennis - cross

10:05:53  1    capital equipment.  It's being consumed by the costs of

10:05:57  2    revenue.  And that's really the problem with your theory is

10:06:00  3    you're trying to infer a benefit from revenue without taking

10:06:06  4    real world facts into account; right?

10:06:09  5    A.      No, I disagree completely.

10:06:12  6    Q.      Okay.

10:06:13  7    A.      And again --

10:06:14  8    Q.      Let's say you're aware that the courts rely on

10:06:25  9    publications that have considered expert witness

10:06:29 10    methodologies for estimating a head start benefit to a

10:06:33 11    Defendant having endorsed expert opinions using the amount

10:06:36 12    of the Defendant's incremental products, that's the

10:06:42 13    Defendant's profits, right?

10:06:43 14    A.      I believe so, yes.

10:06:45 15    Q.      And in a head start, they have also approved the use

10:06:50 16    of the increased value of the Defendant's company, company

10:06:56 17    value, as a result of a head start it obtained, you're aware

10:07:00 18    of that, right?

10:07:01 19    A.      Which is what all these types of things get to, yeah.

10:07:05 20    Q.      But you did not perform a valuation of Akoustis as a

10:07:11 21    company, correct?

10:07:12 22    A.      My analysis focuses just on the isolated benefit.

10:07:16 23    Q.      Right.  And you're aware, because I asked you at your

10:07:21 24    deposition, you're aware of the Sedona Conference, right?

10:07:25 25    A.      Yes.

Bennis - cross

| | |
|---|---|
| 10:11:33 1 | MR. ELKINS:  Your Honor, we would move the |
| 10:11:35 2 | Sedona Conference Journal Volume XIX, Number 2, into |
| 10:11:39 3 | evidence. |
| 10:11:41 4 | MS. AYERS:  Objection, Your Honor. |
| 10:11:41 5 | THE COURT:  Objection sustained. |
| 10:11:45 6 | BY MR. ELKINS: |
| 10:11:45 7 | Q.    Let's look -- |
| 10:11:46 8 | THE COURT:  It's inconsistent with the portion |
| 10:11:53 9 | of the 803 series of rules. |
| 10:11:57 10 | BY MR. ELKINS: |
| 10:11:58 11 | Q.    Can you go to page 39, 39 of 81, which is not here, |
| 10:12:04 12 | but I think it's at page 684.  Well, let me do this without |
| 10:12:36 13 | the document. |
| 10:12:38 14 | When we spoke at your deposition in January, you |
| 10:12:48 15 | could not recall at that time having ever previously |
| 10:12:51 16 | performed a head start estimate of benefit in a trade secret |
| 10:13:01 17 | case before this one, is that accurate? |
| 10:13:06 18 | A.    A head start benefit? |
| 10:13:11 19 | Q.    Yes. |
| 10:13:17 20 | A.    I'm not sure that I have. |
| 10:13:21 21 | Q.    And while you're -- you're looking at the -- at least |
| 10:13:28 22 | in direct examination, you said that you're looking at the |
| 10:13:31 23 | time value of money received by Akoustis.  The money |
| 10:13:39 24 | received is revenue in this case; correct? |
| 10:13:42 25 | A.    Yes. |

Bennis - cross

10:13:42 1   Q.     And you could not at your deposition, identify a

10:13:49 2   single court case where a court approved using a Delta N

10:13:56 3   revenue as adjusted for the time value of money as a basis

10:14:01 4   for estimating a head start benefit, correct?

10:14:05 5   A.     That's right.

10:14:06 6   Q.     And you cannot identify a single informative

10:14:11 7   publication approving using revenue as the basis for

10:14:16 8   estimating a head start benefit in a trade secret case;

10:14:21 9   correct?

10:14:24 10  A.     I mean, I certainly can't cite to every publication

10:14:28 11  that's ever been authored.  I can't think of any examples.

10:14:31 12  I think every analysis that I see, both that I perform and

10:14:35 13  others in my shoes perform, are unique to the facts and

10:14:38 14  circumstances present in the analysis that we're asked to

10:14:41 15  perform.  So what I did in this particular case, was what I

10:14:47 16  felt fit best with the facts.

10:14:51 17  Q.     Even though there was no prior basis for doing it;

10:14:55 18  right?

10:14:55 19  A.     Well, like we have discussed, I mean, the measure of

10:14:58 20  a head start benefit is right in line with what's

10:15:04 21  appropriate to evaluate in the case of trade secret

10:15:07 22  misappropriation like we have here.

10:15:10 23  Q.     Now, in your but for world, in your but for world is

10:15:18 24  what damages experts call what should have happened but for

10:15:24 25  the facts that give rise to liability, in this case trade

11:10:53  1    of the research and development expenses that Akoustis

11:10:56  2    incurred.  What was the majority of those research and

11:11:01  3    development expenses incurred?

11:11:04  4    A.      According to this particular schedule, you can see

11:11:07  5    that those, the majority that has been incurred in preceding

11:11:14  6    years.

11:11:15  7    Q.      For the benefit of the jury, can you point out what

11:11:18  8    Akoustis research and development expenses were in 2016?

11:11:22  9    A.      $1,758,701.

11:11:28 10    Q.      What are the research and development expenses that

11:11:30 11    Akoustis is incurring right now in 2023 and 2022?

11:11:33 12    A.      Fiscal year 2022, it recorded approximately

11:11:38 13    35.7 million.  Fiscal year 2023, it recorded approximately

11:11:44 14    33.2 million.

11:11:45 15    Q.      Mr. Elkins also asked you questions about the 104

11:11:50 16    trade secrets that Qorvo initially asserted against Akoustis

11:11:56 17    which have now for efficiency sake for the jury been dropped

11:12:01 18    down to somewhere in the range of the forties.  Was your

11:12:04 19    original head start analysis that you performed in November

11:12:08 20    based upon Groups 1 through 8 of Dr. Shanfield's report?

11:12:13 21    A.      That's correct.

11:12:14 22    Q.      And was your analysis based upon the 55-month head

11:12:18 23    start that Dr. Shanfield opined to during trial?

11:12:22 24    A.      Yes.

11:12:24 25              MS. AYERS:  I have no further questions for this

11:14:14  1    have been adjusted and some steps are being taken out of the

11:14:20  2    instructions right now.  So I'll start with lead counsel for

11:14:23  3    the defense.  Hopefully I have got the right lead counsel.

11:14:28  4             MR. ELKINS:  We will --

11:14:32  5             MR. LEMIEUX:  I'll defer to my colleague.

11:14:34  6             THE COURT:  I think that's what he told me, is

11:14:37  7    that right?  We're set to go.

11:14:38  8             MR. ELKINS:  Your Honor, we have two brief

11:14:44  9    Rule 50(a) motions to bring.  The first one we could not

11:14:47 10    bring until we heard testimony, and I will be extremely

11:14:53 11    brief.

11:14:53 12             The basis of this motion, Your Honor, is that

11:14:57 13    the head start duration estimated by Dr. Shanfield coupled

11:15:01 14    with the head start damages opinion from Ms. Bennis relying

11:15:06 15    on Dr. Shanfield's defective, in our view, estimate may not

11:15:13 16    be considered by the jury.  Together, they are the bases of

11:15:17 17    Qorvo's head start benefit theory.  And together, they do

11:15:20 18    not meet the standard for the admission of expert evidence.

11:15:25 19             I am not going to repeat the admissibility

11:15:32 20    tenants of Rule 702.  The Court is well aware of them.  But

11:15:38 21    I do believe that one, in this Court earlier this year, the

11:15:46 22    Court stated to satisfy the reliability requirement, the

11:15:49 23    expert testimony must be based on the methods and procedures

11:15:53 24    of science, not on subjective belief and unsupported

11:15:58 25    speculation.  And that is of extreme relevance in this case.

Ms. Bennis's calculation is entirely premised on Dr. Shanfield's conclusion that a 55-month head start is reasonable.  Dr. Shanfield admitted on cross-examination at trial that he has no facts or publications to support his 55-month head start calculation, or the individual trade secret by month calculations that comprise it.

While he considered where he could find information that would give him a reference point for each trade secret period, he admitted that he relied on his own belief about things.  And I am citing to the trial record at 1381 through 1403.

Those beliefs are an improper basis for expert opinion under Federal Rule of Evidence 702.

He relied on his own work at Draper Labs, which he admitted was not a manufacturing company; his conversations with unnamed people at Qorvo, although he did identify Dr. Aigner, though he admitted Dr. Aigner did not know for some categories.  He relied on his own corporate experience which ended in 2003, more than twenty years ago.  He relied on an unnamed publication that was not in his report.  And he relied on an old colleague with whom he spoke, also not in his report.

Nothing about his testimony -- nothing about his head start duration opinion as provided in his opinion is reliable, and therefore it's inadmissible.

11:17:48  1          And for the reasons set forth in our prior

11:17:51  2     Daubert motion, Ms. Bennis's head start benefit opinion is

11:17:56  3     based on revenue rather than profit.  It does not meet the

11:18:00  4     standards for the admission of opinion testimony under 702,

11:18:03  5     but is rendered even more unreliable by her reliance on

11:18:08  6     Dr. Shanfield's head start duration estimate.

11:18:12  7          And that, too, expert witnesses are combining

11:18:16  8     unreliable opinions to spin a tail of head start fantasy

11:18:21  9     renders the Court's gatekeeping role even more imperative in

11:18:27 10     this case than it usually is.  The Court should instruct the

11:18:31 11     jury to disregard the two opinions, and without admissible

11:18:35 12     evidence regarding the value of Akoustis's purported head

11:18:38 13     start benefit, that issue should be removed from the jury's

11:18:42 14     purview.

11:18:43 15          That's all I have on that, Your Honor.

11:18:46 16     Mr. Lemieux has a related, but separate motion.

11:18:48 17          THE COURT:  Okay.  We will -- before we do that,

11:18:51 18     we'll hear a brief response on this head start question.

11:18:57 19          MS. AYERS:  Thank you, Your Honor.

11:18:58 20          As you know, Rule 703 allows an expert's

11:19:04 21     opinions to be based on fact and data that the expert has

11:19:07 22     personally observed in this case.  Dr. Shanfield testified

11:19:10 23     at length regarding the misappropriation.  He also testified

11:19:14 24     at length regarding how he calculated his head start

11:19:19 25     55-month analysis.  Through his testimony, he identified

11:20:47 1    formulas that accountants use every day in order to actually

11:20:51 2    analyze and measure the time value of revenue that a company

11:20:55 3    receives.

11:20:56 4            THE COURT:  All right.  This has been

11:21:01 5    established and addressed to some degree already, and so

11:21:07 6    time value analysis is very important in a case.  And the

11:21:15 7    unjust enrichment in light of the standard will be denied.

11:21:22 8    We're ready for the second matter.

11:21:27 9            I will say this, this is something we really

11:21:28 10   worked on.  I wish I had a case that told us exactly what to

11:21:37 11   do.  All of us have looked for that, and we have not been

11:21:40 12   able to do that, so it's an interesting and challenging

11:21:43 13   question.  It is a challenging question.  Counsel, you got

11:21:46 14   the second part.

11:21:47 15           MR. LEMIEUX:  It's a related 50(a) motion, Your

11:21:50 16   Honor.  That basically under the North Carolina Unfair

11:21:54 17   Competition Act that has been alleged in this case, it has

11:21:57 18   three requirements.  One, that there be an unfair deceptive

11:22:00 19   act or practice.  Two, that it will be in or affecting

11:22:04 20   commerce.  And three, that it proximally causes actual

11:22:08 21   injury to the claimant.  As we heard Ms. Bennis' testimony,

11:22:11 22   she did not provide any opinion whatsoever on actual injury

11:22:15 23   to the Plaintiff in this case.

11:22:18 24           They chose to follow an unjust enrichment which

11:22:21 25   is just simply the benefit allegedly received by the

**BY MR. LEMIEUX::**

**Q.**    Has Dr. Heinrich, then, Professor Nguyen, introduced

a new variable that has to be accounted for during this

cleaving process?

**A.**    Yes.  I would say yes.

**Q.**    If we can now look back at exhibit --

Demonstrative 2.03.

Now, you've mentioned a second requirement for

Element 1C, Professor Nguyen.  It is also not infringed,

in your opinion, by the Akoustis devices.

Could you explain what you mean by that?

**A.**    Yes.  I think we have a demonstrative to help with

us.

**MR. LEMIEUX:**  Can we have Demonstrative 2.05,

please.

**THE WITNESS:**  Yes.  So this is the simulation

that was submitted to claim that this last part of that

Element 1C in the '018 patent was infringed.  However, if

you look at this data, there are some significant problems

with that data.

So first of all, I can point out a couple of

things, right.  There's no units on this.  I think that's

been pointed out before.  That's a pretty big deal,

actually.  Let me say more about this later on when we

talk about the other patent.

*Nguyen – Direct*

1    For now, if you look at this data, what they

2    did was they sort of looked at the right side of this, saw

3    that the green was larger than the blue.  And I think

4    there is an animation we can put in.

5         Yeah.  So they looked at that part, saying the

6    green was larger than the blue.  But you've got to look at

7    this part, too.  You can't just look at one event.  So if

8    we circle this part right here, the blue is higher than

9    the green.  So you can't even make much out of this in

10   terms of claiming that green is necessarily higher than

11   the blue.

12        But, you know, all of that is nonsense.  I

13   don't have to talk about any of this.  It would be a

14   complete waste of time, because look at the Y axis of

15   this.  It is lateral energy flux, plotting lateral energy

16   flux versus frequency.  Remember what the patent requires

17   is that the bandwidth increase.  This is not bandwidth.

18   They're not measuring bandwidth.  They needed to measure

19   bandwidth.  And so what do I mean by "bandwidth."  I have

20   a demonstrative that can help explain.

21        So this is a plot that I think you've seen

22   several times over this trial.  And so what this plot is,

23   is sort of the energy through the device as a function of

24   frequency.

25        And so if this is the filter -- so each device

*Nguyen – Direct*

**A.** Oh, yeah.

**Q.** And in this case, Dr. Shanfield stated that he did not do any actual testing or measurements, and I believe Dr. Bravman agreed with that.

Instead, what did they do?

**A.** They, instead, did simulations like the one that you showed there. And that simulation doesn't even have much to do with bandwidth. It has more to do with loss, which are different quantities of this plot here. And it's even difficult to determine how much loss you've got out of the leakage of it. You certainly cannot determine the bandwidth off of that.

**Q.** So instead of the proxy simulations that Dr. Shanfield performed, he should have been able to physically measure the bandwidth.

Could we go back to -- well, first, let me ask you, Professor Nguyen: Are you aware of any measurements that were done by the plaintiff in this case related to the bandwidth that were performed on the actual accused devices?

**A.** If they measured it, we were not supplied with the measurements.

**Q.** Now, are you aware of whether Qorvo or its experts had samples of the accused devices on which they could have performed actual physical bandwidth testing?

*Nguyen – Direct*

09:19:45  1   do with loss.  So I can't say it's completely

09:19:48  2   inappropriate.  But let's take a look at what we're

09:19:51  3   looking at here.  So this is lateral energy flux versus

09:19:54  4   frequency.

09:19:55  5         These lines, vertical lines indicate the

09:19:58  6   passband for the resonator itself.  And the blue curve

09:20:02  7   corresponds to the offending device, the accused device,

09:20:06  8   which means the device for which N is not equal to 1.  The

09:20:10  9   green curve corresponds, I guess, a reference device where

09:20:14 10   N is equal to 1.  So this device in green would not

09:20:20 11   infringe the patent.

09:20:22 12         On the first set of data that was sent, notice

09:20:25 13   how the blue curve is much larger than the green curve?

09:20:28 14   What this means is the blue curve, the device that

09:20:31 15   actually satisfies and infringes the patent -- well, not

09:20:35 16   infringes the patent, but satisfies the element where N is

09:20:38 17   not equal to 1, actually is losing more energy than the

09:20:42 18   green one.

09:20:43 19         So in this actual curve, this is saying that

09:20:47 20   this device does not infringe the patent.  It's outright

09:20:50 21   saying that.  And I put that in my initial report.

09:20:52 22   Interestingly enough, a month later -- I'm not sure how

09:20:57 23   many weeks later after this, this data came in.  And you

09:21:02 24   heard that it was blamed on a clerical error of some sort.

09:21:07 25   Right?

09:21:08 1          And so in this data now, if you look at some

09:21:09 2     parts of this, oh, there's a part where the green is

09:21:12 3     greater than the blue.  This is the part that the Qorvo

09:21:16 4     experts pointed out as, you know, the reference device

09:21:21 5     being worse than the accused device because it has more

09:21:25 6     energy.  But, you know, you have to look at all of this

09:21:27 7     range.  You can't just look at this portion.  You've got

09:21:29 8     to look at this portion, you've got to look at that

09:21:32 9     portion.

09:21:33 10         So if we can move the animation forward.

09:21:35 11         What you really have to do is look at the

09:21:37 12    shaded regions here.  Which has more of the shaded

09:21:40 13    regions?  So on this one, obviously there's more of this

09:21:42 14    shaded region where the blue is higher than the green.

09:21:46 15    Obvious, here, this device does not infringe, according to

09:21:49 16    this simulation.

09:21:50 17         If you go back to this here, I don't know.  Is

09:21:53 18    the blue more than the green?  Is the green more than the

09:21:56 19    blue?  I'm not sure I can tell.  And, you know, even if

09:21:58 20    you wanted to count all the boxes, you know, sum up the

09:22:03 21    boxes, say which one has more boxes than the other -- so

09:22:05 22    the little boxes, I'm talking about the grid there.

09:22:08 23         You still couldn't conclude that here because

09:22:10 24    let's look at the rest of this plot.  There are no units

09:22:14 25    here.  That is a huge issue.  So think of yourself, say,

1    wanting to bake a cake or something and you're asking your

2    friend, how much sugar do I need.  And your friend says,

3    well, you need two.

4         The first thing that's going to come to your

5    mind is two what?  Two tablespoons?  Two teaspoons?  Two

6    cups?  How much sugar do I need?  And without that, you're

7    not really going to be able to bake the cake.  I guess you

8    could go forward.  It may not taste fantastic.

9         And so it's no different than science and

10   engineering.  You can't just put up a plot with no units

11   and say, all right, there it is.  We need units to know

12   exactly what we're looking at.  And, in fact, if you look

13   at units that you think it ought to be -- so the units it

14   ought to be for lateral energy flux is watts per square

15   meter.  That is the international standard unit that you

16   would use.

17        And if I plug in watts per square meter here,

18   and I actually calculate out the watts, which is what I

19   really need to compare the power through this device, the

20   amount of watts this corresponds to because the device is

21   so small, is on the order of 10 to the minus 19.  What

22   does 10 to the minus 19 mean?

23        You've already seen this 10 to the minus 10.

24   That's a very small number.  What that means when you say

25   10 to the minus 10 is you're going to put nine zeros in

*Nguyen — Direct*

09:23:33  1   front of the number.  Say if I'm looking at this peak

09:23:35  2   here, that looks like 3.  I'm going to put a decimal point

09:23:38  3   and nine zeros in front of that.

09:23:41  4           So in the power that I calculated, 10 to the

09:23:43  5   minus 19, that would be three times 10 to the minus 19.

09:23:46  6   Let me go ahead and count that out to you.  That's

09:23:50  7   0.000000000000000000.  That's a lot of zeros.  This is a

09:24:03  8   tiny signal that we're looking at.

09:24:06  9           And so this is being done by finite element

09:24:10 10   simulation.  Finite element simulation, I think you've

09:24:12 11   heard from the Qorvo experts, is not an easy thing to do.

09:24:15 12   This is something where you can try the simulation first,

09:24:17 13   but you can't just run one simulation.  Remember, you have

09:24:20 14   to run several of them in order to get it right.  That's

09:24:24 15   because just small differences in the inputs you put into

09:24:28 16   this -- in this case, it takes meshing.  A small

09:24:31 17   difference in the meshing, small difference maybe in --

09:24:33 18   anything you can put into this will change the result.

09:24:37 19           You've got to get it to the point that once you

09:24:39 20   start making differences, changes, the result doesn't

09:24:41 21   change much.

09:24:42 22           Well, the amount of excursion and signal here

09:24:46 23   is so small that one needs to suspect whether the

09:24:49 24   precision of the software is good enough to even delineate

09:24:53 25   this with this.  And when I look at these two curves,

*Nguyen – Direct*

because this is such a small scale right here, I wonder if this really is a correct simulation, not really a clerical error, but just has some change in the meshing of the finite element that yields this.

So same device, same two plots there. I wonder about that because the precision of the software, I don't think, is good enough to predict losses this small.

**BY MR. LEMIEUX:**

**Q.**   So, Professor Nguyen, in your opinion, then, is the testing that was performed by Dr. Shanfield sufficient to prove the final element of the Claim 9 of the '755 patent?

**A.**   It is not sufficient.

**Q.**   And could you briefly summarize why the testing that was performed by -- or the simulations, excuse me -- performed by Dr. Shanfield insufficient to actually prove the power loss that it is allegedly measuring?

**A.**   Okay. So three different things. One, no units on these plots. Second, just the analysis here of trying to get all the areas in these shaded regions I don't think was done correctly. Finally, the total signal you're looking at here is so small, I don't think the software has the precision to predict this accurately.

**Q.**   Now, Dr. Bravman, when he testified, he admitted that he didn't know what the units were either on this vertical index, and yet still offered an opinion of infringement.

*Irwin - Direct*

10:25:24 1    when you have accelerating losses.  As you will see, it

10:25:28 2    makes no sense.

10:25:30 3    **Q.**   What is your second opinion?

10:25:32 4    **A.**   That a different damages approach called the avoided

10:25:37 5    costs method, which I will explain, is a better fit for

10:25:41 6    calculating any benefit that Akoustis gained from

10:25:46 7    misappropriating and using the trade secrets.

10:25:54 8    **Q.**   Did you calculate Akoustis' avoided cost benefit?

10:25:56 9    **A.**   I did.  And, again, I think it was a better fit for

10:25:57 10   this case, and it ends up being around $305,000.

10:26:05 11   **Q.**   Do you have any opinions about Ms. Bennis' unfair

10:26:08 12   competition opinions in this case?

10:26:09 13   **A.**   I do.

10:26:12 14   **Q.**   What are they?

10:26:13 15   **A.**   So her calculation of the employee poaching is

10:26:19 16   fundamentally flawed.  First, she did no research on

10:26:22 17   whether or not Akoustis -- excuse me -- Qorvo actually

10:26:23 18   replaced the employees that were allegedly poached, yet

10:26:28 19   her calculation, at least she represented it to be the

10:26:31 20   cost that Qorvo incurred to replace those employees or

10:26:34 21   to -- the cost associated with losing them.

10:26:37 22        Second, she assumed that every one of the 19 people

10:26:40 23   she discussed with the HR director at Qorvo was poached.

10:26:45 24   Whereas, I understand that the plaintiff's argument here

10:26:49 25   is that employees were poached because they had access to

*Irwin – Direct*

1  it allegedly suffered?

2  **A.**   No.  I've not seen any evidence, and nobody has

3  pointed me to any lost sales by Qorvo.

4  **Q.**   So did you see any issues with Ms. Bennis'

5  calculation of the head start benefit in this case?

6  **A.**   Yes.  There are three key issues -- I think if you go

7  to the next slide, they are summarized high level.

8       First, as we'll get into, she only focuses on

9  revenue.  And that's just fundamentally flawed.  She

10  doesn't include any costs related to the production of the

11  BAW filters.  And then setting aside the fact that she

12  completely ignores costs, she's overstated revenue in two

13  important ways.

14       First, she's including revenue that had nothing to do

15  with the BAW filters that embody the alleged trade

16  secrets.  And then, second, she, initially at least,

17  overstated the projected 2024 fiscal year revenue.

18  **Q.**   I understand you have a slide with respect to the

19  last two points?

20  **A.**   I do.  So just with respect to the overstating of

21  revenue, she presented two numbers in her testimony.  She

22  had a $66 million number and a $50 million number.  The

23  second and third point I make here represents 54 percent

24  of her $50 million calculation.

25       If you were to benchmark that off of her $66 million

*Irwin – Direct*

10:34:05 1    calculation, this error -- these combined errors are

10:34:10 2    65 percent of her $66 million, which is -- just

10:34:14 3    demonstrates the sensitivity of these two errors.  Again,

10:34:18 4    setting aside the fact that she didn't look at costs at

10:34:21 5    all.

10:34:21 6    **Q.**   Now, can we go back to the first point, ignoring

10:34:30 7    costs relating to production of BAW filters.  Can you

10:34:32 8    explain what you mean by that in little bit more detail?

10:34:37 9    **A.**   Yes.  So it's important to understand that you can't

10:34:41 10   sell a product without making it.  And she doesn't account

10:34:46 11   for any costs associated with the revenue that she's

10:34:50 12   modeling.

10:34:51 13       She's tried to model the time value of that revenue,

10:34:54 14   but that revenue isn't available 100 percent to Akoustis

10:35:00 15   because they spent more money making and selling the

10:35:03 16   product than they actually earned in selling it to date.

10:35:10 17   **Q.**   By the way, I neglected to ask you, Ms. Irwin, in

10:35:14 18   your experience, have -- as a testifying expert, have you

10:35:19 19   ever analyzed the head start benefit in one or more cases

10:35:25 20   before?

10:35:25 21   **A.**   Yes.  Many.  Over the course of 30 years, it's

10:35:29 22   probably 20 to 25 times, and I've testified about the head

10:35:32 23   start period probably eight times in the last 12 years or

10:35:38 24   so.

10:35:39 25   **Q.**   Okay.  And I understand that you referred to, in your

*Irwin – Direct*

10:47:39 1  benefit any of the types of costs that you just mentioned?

10:47:44 2  **A.**  No.

10:47:45 3  **Q.**  So what did she do?

10:47:48 4  **A.**  She simply looks at revenue and measures the time.

10:47:51 5  What she calls the "time value of money."  The difference

10:47:54 6  between receiving the revenue and at the time that they

10:47:58 7  actually did, and then modeling it 55 months later, and

10:48:01 8  then taking the difference between those two present

10:48:03 9  values and calling that the benefit that Akoustis

10:48:07 10  received.

10:48:07 11      But as we'll see, they haven't made any money off the

10:48:11 12  gross profit level.  So there's been no benefit under this

10:48:14 13  model or methodology.

10:48:17 14  **Q.**  In your opinion, is relying on revenue alone to

10:48:24 15  calculate the head-start benefit consistent with the

10:48:26 16  principles governing your area of practice?

10:48:29 17  **A.**  No.  It's inconsistent with most basic financial

10:48:33 18  principles that I taught at USC, and I'm sure Ms. Bennis

10:48:37 19  studied as well.

10:48:39 20  **Q.**  And so is calculating the head-start benefit based on

10:48:44 21  revenue, even if it's discounted by the time value of

10:48:48 22  money, an accepted practice at all?

10:48:51 23  **A.**  No.  Now, let me back up a bit.  I don't disagree at

10:48:55 24  all with the concept of time value of money.  Again,

10:48:57 25  that's a very basic concept in finance.  It's the notion

*Irwin - Direct*

10:49:01  1   that a dollar today is worth more than a dollar in a year

10:49:05  2   or 55 months.  But you have to understand what you have

10:49:10  3   available to actually invests and earn money on.

10:49:14  4        So another example is, say I inherit $10,000 from my

10:49:20  5   grandmother.  Thank you, Grandma.  And if I just receive

10:49:23  6   that money, it's available for me to invest, to buy a

10:49:27  7   business, to help buy a house, whatever.  But let's say

10:49:30  8   the IRS gets involved and says, No, no, no, you don't get

10:49:34  9   to keep the entire 10,000, you have to pay some taxes on

10:49:37 10   that.

10:49:38 11        Say the taxes came out to be about 3,000 -- I'm from

10:49:39 12   California, so it would probably be higher -- but the

10:49:42 13   difference that I have is only $7,000 that's available to

10:49:47 14   invest.  The time value of money is only applicable to

10:49:50 15   what's available to invest.  Revenue is not available to

10:49:55 16   invest.

10:49:55 17        Only after you pay for some sort of costs -- and you

10:49:56 18   can debate which level here is relevant, but you have to

10:50:00 19   at least pay for the cost of revenue or the cost of sales

10:50:04 20   before you determine anything that's available to invest.

10:50:07 21   **Q.**  So hypothetically, let's assume that in the slide

10:50:11 22   that we have in front of us, Slide 8, that the cost of

10:50:16 23   revenue -- that the inflow and outflow were flipped, so

10:50:20 24   that would -- would that give you a gross profit of

10:50:25 25   $3.1 million?

*Irwin – Direct*

10:50:27  1   **A.**   Yes.  So if the revenue was 30 million and the cost

10:50:31  2   of revenue was 27, you would have $3 million available to

10:50:35  3   invest.  The opposite is true here.  So it actually costs,

10:50:38  4   at least in fiscal 2023 -- and that's been true for a lot

10:50:41  5   of years now -- the cost of revenue has exceeded the

10:50:45  6   actual revenue.

10:50:46  7   **Q.**   So in that case, could you, then, apply the time

10:50:49  8   value of money principle that Ms. Bennis tried to use in

10:50:56  9   her calculation?

10:50:58 10   **A.**   You could, but you would get a result that indicates

10:51:01 11   that this is not the right methodology.  In other words,

10:51:03 12   you could get a nonsensical result.

10:51:06 13   **Q.**   Okay.  We'll talk about that in a second.

10:51:07 14       Are you aware of any texts or scholarly articles,

10:51:12 15   like the Sedona Conference journal, approving Ms. Bennis'

10:51:17 16   methodology of using only revenue to measure the

10:51:21 17   head-start benefit?

10:51:22 18   **A.**   I am not.

10:51:25 19   **Q.**   Do any texts or articles, of which you are aware,

10:51:29 20   discuss Ms. Bennis' revenue methodology at all?

10:51:35 21   **A.**   Not as she's applied it here.

10:51:37 22   **Q.**   What effect does not including costs have on

10:51:41 23   Ms. Bennis' estimate of the head-start benefit?

10:51:44 24   **A.**   It makes it completely unreliable.

10:51:46 25   **Q.**   Okay.  And is that not offset by her use of the time

*Irwin - Direct*

1    value of money?

2    **A.**    No.   Again, the only amount that's available to earn,

3    you know -- and can receive any time value of money to

4    benefit from is the difference between the revenue you

5    bring in and the cost to make the -- to generate the

6    revenue.   You have to include costs.

7    **Q.**    Okay.   So could one fix Ms. Bennis' estimate of head

8    start benefit by accounting for Akoustis' costs?

9    **A.**    You could.   Again, it generates a nonsensical result,

10   and I can demonstrate how that's -- how it comes out.   But

11   the fundamental reason why you can't really fix it is the

12   head start methodology is intended for a defendant that

13   has accelerated profit.   All of the examples that I read

14   to you from the Sedona conference materials talked about

15   accelerated profits.   We could debate whether it's gross

16   profit or operating income, but they all talk about

17   profit.   And in this case, as you can see, Akoustis at the

18   gross profit level -- so that's just sales minus the cost

19   of sales -- had a very small profit for several years, and

20   then massive losses at the gross profit level through

21   2023.

22        And the cumulative gross profit losses for all of

23   that period of time is over $10 million.   So there's not

24   hundreds of millions or $60 million to invest; there's

25   negative $10 million to invest at the gross profit level.

*Irwin - Direct*

10:53:31  1    **Q.**   Does a company benefit from a head start on losses?

10:53:35  2    **A.**   No, not under this methodology.  The math doesn't

10:53:40  3    work.

10:53:40  4    **Q.**   Okay.  So what impact would including costs have on

10:53:44  5    Ms. Bennis' estimate?

10:53:45  6    **A.**   So if you go to the next slide, what you will see is,

10:53:48  7    so I've laid out in Ms. Bennis' methodology that generated

10:53:53  8    her $66 million, and the only thing I changed was, instead

10:53:57  9    of revenue, I used the gross profit numbers that you saw

10:54:01 10    on the previous slide and dropped them into her model.  As

10:54:05 11    a result, in the actual world, Akoustis has lost

10:54:09 12    $21 million in value.  And in the delayed, they've lost

10:54:16 13    $11 million.  This means that they are worse off in the

10:54:19 14    actual world where they allegedly misappropriated than in

10:54:25 15    the world where they would have been delayed.

10:54:27 16        In other words, it would have benefited Akoustis to

10:54:29 17    allegedly misappropriate.  And that's -- so I can't assume

10:54:32 18    damages and then have a negative damages number.  That's

10:54:36 19    just nonsense.  What that tells me as a practitioner is

10:54:38 20    that this is not the right methodology, the head start

10:54:41 21    method doesn't fit the facts in this case because there is

10:54:44 22    no benefit to any acceleration in losses.

10:54:48 23    **Q.**   Okay.  So let me back up.  We originally started by

10:54:54 24    you identifying three issues:  Ignoring costs related to

10:54:59 25    the production of BAW filters.  The second one was