# EXHIBIT B

# The Sedona Conference Journal

Volume 24                                                    2023

# The Sedona Conference Commentary on Monetary Remedies in Trade Secret Litigation

The Sedona Conference



Recommended Citation:

The Sedona Conference, *Commentary on Monetary Remedies in Trade Secret Litigation*, 24 SEDONA CONF. J. 349 (2023).

For this and additional publications see: https://thesedonaconference.org/publications.

# THE SEDONA CONFERENCE COMMENTARY ON MONETARY REMEDIES IN TRADE SECRET LITIGATION

*A Project of The Sedona Conference Working Group (WG12) on Trade Secrets*

*Author:*

The Sedona Conference

*Editors-in-Chief:*

David Almeling                    Victoria Cundiff

James Pooley

*Managing Editors:*

Jim W. Ko                    Casey Mangan

*Senior Editors:*

David Bohrer                    Erik W. Weibust

*Contributing Editors:*

John Bone                    Amy Candido

Christopher Gerardi                    Carol Ludington

Matthew Lynde                    Alex Reese

Abraham Y. Skoff

*WG12 Judicial Advisors:*

Hon. Laurel Beeler                    Hon. Juliana Earp

Hon. James L. Gale (ret.)

*Staff Editor:*

David Lumia

Copyright 2023, The Sedona Conference.
All Rights Reserved.

The opinions expressed in this publication, unless otherwise attributed, represent consensus views of the members of The Sedona Conference's Working Group 12. They do not necessarily represent the views of any of the individual participants or their employers, clients, or any organizations to which they may belong, nor do they necessarily represent official positions of The Sedona Conference.

We thank all of our Working Group Series Annual Sponsors, whose support is essential to our ability to develop Working Group Series publications. For a listing of our sponsors, click on the "Sponsors" navigation bar on the homepage of our website.

This publication may be cited as follows:

> The Sedona Conference, *Commentary on Monetary Remedies in Trade Secret Litigation,* 24 SEDONA CONF. J. 349 (2023).

## PREFACE

Welcome to the July 2023 Final, Post-Public-Comment Version of The Sedona Conference *Commentary on Monetary Remedies in Trade Secret Litigation*, a project of The Sedona Conference Working Group 12 on Trade Secret Law (WG12). This is one of a series of Working Group commentaries published by The Sedona Conference, a 501(c)(3) research and educational institute dedicated to the advanced study of law and policy in the areas of antitrust law, complex litigation, intellectual property rights, and data security and privacy law. The mission of The Sedona Conference is to move the law forward in a reasoned and just way.

The mission of WG12, formed in February 2018, is "to develop consensus and nonpartisan principles for managing trade secret litigation and well-vetted guidelines for consideration in protecting trade secrets, recognizing that every organization has and uses trade secrets, that trade secret disputes frequently intersect with other important public policies such as employee mobility and international trade, and that trade secret disputes are litigated in both state and federal courts." The Working Group consists of members representing all stakeholders in trade secret law and litigation.

The WG12 *Commentary* drafting team was launched in November 2018. Earlier drafts of this publication were a focus of dialogue at the WG12 Annual Meeting in Reston, Virginia, in September 2022, the Sedona Conference on Trade Secrets in Denver, Colorado, in May 2022, the WG12 Annual Meeting in Phoenix, Arizona in December 2021, the WG12 Annual Meeting, Online, in November 2020, the WG12 Annual Meeting in Charlotte, North Carolina, in November 2019, and the WG12 Inaugural Meeting in Los Angeles, California, in November 2018. The editors have reviewed the comments received through the Working Group Series review and comment process.

This *Commentary* represents the collective efforts of many individual contributors. On behalf of The Sedona Conference, I thank in particular David Almeling and Victoria Cundiff, the Vice-Chair and Chair of WG12, and James Pooley, the now Chair Emeritus of WG12, who serve as the Editors-in-Chief of this *Commentary*, and David Bohrer and Erik W. Weibust, who serve as the Senior Editors of this *Commentary*. I also thank everyone else involved for their time and attention during this extensive drafting and editing process, including our Contributing Editors John Bone, Amy Candido, Christopher Gerardi, Carol Ludington, Matthew Lynde, Alex Reese, and Abraham Y. Skoff.

The drafting process for this *Commentary* has also been supported by the Working Group 12 Steering Committee and Judicial Advisors. The statements in this *Commentary* are solely those of the nonjudicial members of the Working Group; they do not represent any judicial endorsement of any recommended practices.

We encourage your active engagement in the dialogue. Membership in The Sedona Conference Working Group Series is open to all. The Series includes WG12 and several other Working Groups in the areas of electronic document management and discovery, cross-border discovery and data protection laws, international data transfers, data security and privacy liability, patent remedies and damages, and patent litigation best practices. The Sedona Conference hopes and anticipates that the output of its Working Groups will evolve into authoritative statements of law, both as it is and as it should be.

Craig W. Weinlein
Executive Director
The Sedona Conference
July 2023

# TABLE OF CONTENTS

FOREWORD ...................................................................................355

MONETARY REMEDIES IN TRADE SECRET LITIGATION
    PRINCIPLES AT A GLANCE...................................................357

MONETARY REMEDIES IN TRADE SECRET LITIGATION
    GUIDELINES AT A GLANCE..................................................358

I.    INTRODUCTION....................................................................359

II.   AN OVERVIEW OF MONETARY REMEDIES IN TRADE
      SECRET DISPUTES................................................................362

      A. Brief Historical Background of Monetary
         Relief in Trade Secret Cases ......................................365

      B. Three Categories of Recoverable Damages..............368

         1. Actual loss ............................................................370

         2. Unjust enrichment ...............................................384

         3. Reasonable royalties............................................391

      C. Speculation and Reasonable Certainty....................399

      D. Theories of Monetary Relief in Trade Secret Cases
         May Overlap, But No Double Counting is
         Permitted ....................................................................400

      E. Additional Issues .......................................................401

         1. Timing...................................................................401

         2. Causation..............................................................403

         3. Apportionment .....................................................406

         4. Interplay between monetary remedies for
            misappropriation of trade secrets and other
            legal theories, including breach of contract........412

         5. Interplay between monetary remedies and
            equitable remedies in trade secret cases .............415

6. Applying patent damages rules to trade secret
   damages analyses .................................................422

7. Improper acquisition but no use or disclosure...426

### FOREWORD

The available remedies for trade secret misappropriation drive and define litigation on these claims. Recognizing this, The Sedona Conference created drafting teams of its members to identify, organize, and present consensus, nonpartisan principles on available remedies for trade secret misappropriation, which include both nonmonetary and monetary remedies. The previously published *Commentary on Equitable Remedies in Trade Secret Litigation* provides principles for nonmonetary remedies. This *Commentary* provides them for monetary remedies.

The rules for what money a successful trade secret claimant can recover are easy to state but often difficult to apply. This *Commentary* seeks to be a resource to assist parties and decision-makers in addressing monetary remedies and suggests effective methods for determining whether, and in what amount, to award monetary relief for trade secret misappropriation.

To achieve these aims, this *Commentary* focuses on the statutory and decisional law that provides for the three core types of damages in trade secret cases: actual loss, unjust enrichment, and, in many cases, royalties. This *Commentary* also analyzes the difficult issues that must be grappled with regarding such damages, including apportionment, causation, reasonable certainty, the applicability and inapplicability of patent damages law precedent in trade secret cases, and many more.

David Almeling
Victoria Cundiff
James Pooley
    Editors-in-Chief and Working Group 12
    Steering Committee Vice-Chair, Chair, and Chair Emeritus

David Almeling
David Bohrer
Erik W. Weibust
    Senior Editors

## MONETARY REMEDIES IN TRADE SECRET LITIGATION
## PRINCIPLES AT A GLANCE

PRINCIPLE NO. 1 – Monetary remedies should fairly compensate the trade secret owner for damages sustained as a result of misappropriation.

PRINCIPLE NO. 2 – The existence of damages and the measurement of a monetary damages award for misappropriation must not be speculative, but the amount of damages need not be proved with mathematical certainty.

PRINCIPLE NO. 3 – Multiple theories of measuring damages for misappropriation may be applied so long as there is no double counting.

## MONETARY REMEDIES IN TRADE SECRET LITIGATION
## GUIDELINES AT A GLANCE

GUIDELINE NO. 1 – The duration of the trade secret damages period should align with the elimination of defendant's unfair commercial advantage.

GUIDELINE NO. 2 – A trade secret plaintiff bears the burden to prove that defendant's misappropriation was the proximate cause of its damages.

GUIDELINE NO. 3 – In cases where multiple trade secrets are asserted, the trade secret claimant should provide evidence of apportionment of damages or evidence why an apportionment is not appropriate.

GUIDELINE NO. 4 – Claims for trade secret misappropriation and for misuse of confidential information in breach of contractual obligations are not necessarily interchangeable. Liability and remedies under each theory should be analyzed separately.

GUIDELINE NO. 5 – From the outset of a case, the parties should consider all available equitable and monetary remedies, since the parties' positions on equitable remedies will affect their positions on monetary remedies and vice versa.

GUIDELINE NO. 6 – Patent damages law and theory may or may not be applicable in a particular case, and care should be taken before importing patent damages law and theory.

# I. INTRODUCTION

There is more variability in the principles and guidance for awarding trade secret damages—and thus more opportunity for ambiguity—than for other areas of intellectual property.

The issue is not a lack of textual definition in trade secret damages law. State legislatures have widely adopted the Uniform Trade Secrets Act's (UTSA) formulation that "damages" may be awarded for "actual loss" or "unjust enrichment" that is "caused by" misappropriation, and that in lieu of other measures a court may "impose[ ] liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." The Defend Trade Secrets Act's (DTSA) damages provisions borrow the same language.[1] While virtually every state recognizes those three methods—actual loss, unjust enrichment, and royalties—potential confusion arises because statutory phrases and terms are too often cited without adequate discussion of the aims and intended application of the remedies on which the statutory language is based.

Moreover, existing precedent is derived from cases in which courts apply different rules from different states, resulting in a body of law that is far from uniform.[2] The extensive efforts to

---

1. 18 U.S.C. § 1836(b)(3)(B)(i)-(ii); Uniform Trade Secrets Act (UTSA), § 3(a). As discussed below, New York, unlike other states, has not adopted a version of the UTSA and instead applies New York common law of trade secrets and the Restatement (First) of Torts § 757. New York's view of unjust enrichment is different from the Defend Trade Secrets Act (DTSA) and the UTSA.

2*. See* Telex Corp. v. Int'l Bus. Mach. Corp., 510 F.2d 894, 930 (10th Cir. 1975) ("[U]nfortunately the general law as to the proper measure of damages in a trade secrets case is far from uniform."); Am. Sales Corp. v. Adventure Travel, Inc., 862 F. Supp. 1476, 1479 (E.D. Va. 1994) ("Computing damages in a trade secrets case is not cut and dry."); Litton Sys., Inc. v. Ssangyong Cement Indus. Co., No. C-89-3832 VRW, 1993 WL 317266, at *2 (N.D. Cal. Aug. 19, 1993) (observing that the principles governing trade secret damages "allow

codify and harmonize the common law of trade secrets have not achieved the desired uniformity.[3]

Against this backdrop of uncertainty and less developed guidelines, courts have embraced the flexibility principle advanced by the Fifth Circuit in *University Computing v. Lykes-Youngstown Corp.*, a 1974 pre-UTSA decision applying Georgia common law of trade secrets and the Restatement (First) of Torts, section 757. In the underlying case, the jury awarded damages for trade secret misappropriation despite the absence of any demonstrable losses to the plaintiff or any success in commercializing the misappropriated trade secrets by the defendants. The Fifth Circuit nonetheless affirmed a jury verdict awarding money damages, approving the trial court's instruction to the jury that it should consider what would constitute a reasonable royalty for unrestricted use of the trade secrets. The Fifth Circuit stated that "every [trade secret] case requires a *flexible and imaginative approach* to the problem of damages" and that "each case is controlled by its own peculiar facts and circumstances."[4]

---

broad latitude in fashioning appropriate remedies"); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45, Reporters' Note (AM. LAW INST. 1995) ("The cases reflect considerable flexibility in the calculation of appropriate monetary relief in trade secret actions."); MODEL JURY INSTRUCTIONS 8.06[4], at 400 (AM. BAR ASS'N, 3d ed. 1996) (in trade secret cases, "lost profits, unjust enrichment, gains, or other benefits are not consistently applied concepts from jurisdiction to jurisdiction, and may be subject to differing standards under various state laws").

3. James Pooley, *The Myth of the Trade Secret Troll: Why the Defend Trade Secrets Act Improves the Protection of Commercial Information*, 23 GEO. MASON L. REV. 1045, 1050 (2016). The efforts to codify and harmonize trade secret law encompass the 1939 Restatement (First) of Torts, section 757, the original and amended UTSA in 1979 and 1985, respectively, and the 1995 Restatement (Third) of Unfair Competition, section 45.

4. Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 538 (5th Cir. 1974) (emphasis added) (quoting Enter. Mfg. Co. v. Shakespeare Co., 141 F.2d 916, 920 (6th Cir. 1944)).

Flexibility and uniformity can be compatible. The need to stay flexible in measuring trade secret damages will always have a place in the pantheon of governing principles. But in its implementation, flexibility should not be divorced from commercial reality, nor should it dissuade courts and lawyers from seeking to develop and apply a more consistent set of damages principles and guidelines.

In the following sections, this *Commentary* identifies consensus principles and suggests effective methods for determining whether, and in what amount, to award monetary relief for trade secret misappropriation. This *Commentary* expands on and complements the precedent developed over recent decades and describes the key components of the statutory framework for awarding monetary remedies for trade secret misappropriation. The aim is to review the current state of the law, flag potential issues, and suggest defensible methods for measuring damages.

## II. AN OVERVIEW OF MONETARY REMEDIES IN TRADE SECRET DISPUTES

A successful claimant in a trade secrets case may recover both the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation not computed in the actual loss.[5] An actual loss award is measured by the amount of the loss sustained by the plaintiff due to the misappropriation. An unjust enrichment award is measured by the amount of the benefit conferred on the defendant due to the misappropriation.

Damages caused by misappropriation may also be measured by a reasonable royalty for the defendant's unauthorized disclosure or use of a trade secret.[6] While most states explicitly provide reasonable royalty damages as a separate form of recovery, a handful do not. Further, California and a few other states allow recovery of a reasonable royalty only if damages are not provable by the other methods or if the value of provable damages would be less than the royalty.[7]

These three remedies—actual loss, unjust enrichment, and royalties—are the main damages theories in trade secret law, and each is discussed in detail below.

In addition, exemplary (i.e., punitive) damages are often potentially recoverable,[8] as are attorneys' fees. These are not addressed here but are scheduled to be addressed in a future Commentary by this Working Group.

This overview focuses on the types of damages that apply in most trade secret cases across the three main sources of trade secret law: the Defend Trade Secrets Act (DTSA), the Uniform

---

5. UTSA § 3(a); DTSA, 18 U.S.C. § 1836(b)(3)(B)(i).

6. UTSA § 3(a); DTSA, 18 U.S.C. § 1836(b)(3)(B)(ii).

7. See the chart and related discussion of state-specific differences in statutory reasonable royalty damages, in the next section.

8. UTSA §§ 3(b) and 4; DTSA, 18 U.S.C §§ 1836(b)(3)(C) and (D).

Trade Secrets Act (UTSA), and common law (which applies primarily to New York, the only state not to adopt the UTSA). To be sure, there are differences among these sources and even more differences in how courts interpret them. Some of those differences are noted in the discussion that follows, but practitioners are encouraged to consult the applicable law in the applicable jurisdiction. For ease of use, this framework is also set forth in the chart form below.

| Potential Remedy | DTSA | UTSA | New York |
|---|---|---|---|
| *Actual losses* | **Yes** | **Yes** | **Yes** |
| *Unjust enrichment* | **Yes,** *if no double counting* | **Yes,** *if no double counting* | **No,** *at least as to defendant's avoided development costs and any other gain by defendant that is not used as a proxy for plaintiff's actual losses* |

| Potential Remedy | DTSA | UTSA | New York |
|---|---|---|---|
| *Reasonable royalty* | **Yes** | **Yes,** *but only available in certain states if neither actual loss nor unjust enrichment is provable, or if value of such would be less than royalty* | **Yes** |
| *Exemplary damages* | **Yes,** *if willful and malicious* | **Yes,** *if willful and malicious* | **Yes,** *if egregious and/or willful and malicious* |
| *Attorneys' Fees* | **Yes,** *in certain circumstances* | **Yes,** *in certain circumstances* | **No,** *only if an independent statutory or contractual basis exists* |

This *Commentary* uses the term "monetary remedies" to refer to both money damages and restitutionary remedies.

*A. Brief Historical Background of Monetary Relief in Trade Secret Cases*

Trade secret law remains a relatively recent creation. "Unlike other forms of intellectual property that can trace their origins back several hundreds of years, trade secret law is a creation of state court opinions from the middle of the 19th century."[9] Formal efforts to harmonize trade secret law did not begin until 1939 with the codification of the Restatement (First) of Torts, which established liability for misappropriation of trade secrets.[10] The Restatement's only reference to damages for trade secret misappropriation, however, is found in comment b, which has more to do with the type of trade secret being protected and contrasting between the availability of injunctive relief and damages than any specific measures of damages in the event of proven misappropriation.[11]

Recognizing "the commercial importance of state trade secret law to interstate business," which through the 1960s "ha[d] not developed satisfactorily" either in "less populous and more

---

9. Brian T. Yeh, Cong. Research Serv., R43714, Protection of Trade Secrets: Overview of Current Law and Legislation, at 5 (2016); *see also* Trade Secret, Legal Information Institute, https://www.law.cornell.edu/wex/trade_secret (last visited May 17, 2023) ("Prior the the [sic] development of the UTSA, improper use or disclosure of a trade secret was traditionally a common law tort. Sections 757 and 758 of the Restatement of Torts (1939) set forth the basic principles of trade secret law that were widely adopted by U.S. courts.").

10. RESTATEMENT (FIRST) OF TORTS §§ 757–758 (AM. LAW INST. 1939); *see also* Ramon A. Klitzke, *The Uniform Trade Secrets Act*, 64 MARQ. L. REV. 277, 282 (1980) ("The development of the law of trade secrets, as a creature of the common law, was greatly facilitated by the adoption of sections 757 through 759 (regarding trade secrets and trade information) of the first Restatement of Torts in 1939. The Restatement was the first attempt to enunciate the generally accepted principles of trade secrets law. Its principles became primary authority by adoption in virtually every reported case.").

11. Restatement (First) of Torts §§ 757–758, cmt. b (Am. Law Inst. 1939).

agricultural jurisdictions" or "states in which there has been significant litigation," the National Conference of Commissioners of Uniform State Laws set about to create a uniform body of law. In 1968, it "voted to authorize the appointment of a Special Committee on Uniform Trade Secrets Protection Act to investigate the question of drafting an act on the subject" of trade secret law. After fits and starts, the UTSA was approved on August 9, 1979, and recommended for enactment in all 50 states. Since then, 49 states have adopted the UTSA in one form or another, most recently Massachusetts, which adopted the UTSA in 2018.[12] The lone holdout is New York.

Section 3 of the UTSA sets forth the following framework for measuring damages in the event of a proven misappropriation:

> (a) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.
>
> (b) If willful and malicious misappropriation exists, the court may award exemplary damages in

---

12. UTSA With 1985 Amendments, Prefatory Note, at 1–3; MASS. GEN. LAWS ch. 93, § 42, *et seq.*

> an amount not exceeding twice any award made
> under subsection (a).

In other words, the UTSA provides for recovery of: (1) actual losses, (2) unjust enrichment, (3) reasonable royalties, and (4) exemplary damages.

The availability of a reasonable royalty as a measure of damages was not explicitly added to the UTSA until it was amended in 1985; it was not in the original version.[13]

Section 4 of the UTSA provides for the recovery of attorneys' fees under certain specified circumstances.

---

13. It is unclear why the original 1979 version of the UTSA did not reference reasonable royalties, particularly because reasonable royalties were used as a measure of damages before its enactment, including in the Fifth Circuit's seminal 1974 *University Computing* decision. *See* Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 536–41 (5th Cir. 1974) (analyzing availability of reasonable royalty as a measure of damages for trade secret misappropriation and upholding jury instruction permitting award of the same); *see also, e.g.*, Carter Prods., Inc. v. Colgate-Palmolive Co., 214 F. Supp. 383, 388 (D. Md. 1963) ("damages for the misappropriation of the trade secrets as well as for the patent infringement may properly be allowed on the basis of a reasonable royalty"). Curiously, the prefatory note to the UTSA's 1985 amendment attempts to explain this omission by pointing out that "[t]he recent decision in *Aronson v. Quick Point Pencil Co.*, 99 S. Ct. 1096, 201 USPQ 1 (1979) reaffirmed *Kewanee* and held that federal patent law is not a barrier to a contract in which someone agrees to pay a continuing royalty in exchange for the disclosure of trade secrets concerning a product," and highlighting the uneven development of trade secret law. *See* UTSA With 1985 Amendments, Prefatory Note, at 1. But the *Aronson* decision did not create a new right to reasonable royalties for proven trade secret misappropriation, so this reference is peculiar. Indeed, the *Kewanee* decision that *Aronson* "reaffirmed" was decided in 1974 and did not even address reasonable royalties, but rather involved preemption. *See* Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974) (holding that state law forbidding misappropriation of trade secrets was not preempted by federal patent law).

Unfortunately, the UTSA's codification efforts did not yield all the benefits expected to flow from uniform applications of the law. States adopted slightly different versions of the UTSA. Even where the language is the same, some states interpret it differently than others, which has created state-specific nuances that detract from the UTSA's intended uniformity.[14]

In 2016, Congress enacted the Defend Trade Secrets Act.[15] The DTSA, which amended the Economic Espionage Act, established a private civil cause of action in federal court for trade secret misappropriation. The DTSA's damages provisions (which include actual losses, unjust enrichment, reasonable royalties, and exemplary damages)[16] are "drawn directly" from Section 3 of the UTSA, and the availability of attorneys' fees under the DTSA is "modeled on" Section 4 of the UTSA.[17]

In sum, despite some differences in the applicability of monetary remedies under the DTSA, UTSA, and common law, they at least feature largely consistent forms of recoverable damages.

## *B. Three Categories of Recoverable Damages*

**Principle No. 1 – Monetary remedies should fairly compensate the trade secret owner for damages sustained as a result of misappropriation.**

---

14. For example, the West Virginia Uniform Trade Secrets Act does not include a prohibition on double counting unjust enrichment damages and actual losses. *See* W. VA. CODE § 47-22-3 (2015). There is no right to a jury under the California Uniform Trade Secrets Act on the issue of reasonable royalty, CAL. CIV. CODE § 3426.3(c) (1984), while most other states do permit a jury right. And there is a mixed bag among the states with respect to exemplary damages in terms of the permissible amount and who makes the determination (judge vs. jury).

15. 18 U.S.C. § 1836, *et seq.*

16. 18 U.S.C. § 1836(b)(3)(B).

17. S. REP. NO. 114-220, pt. III., at 8–9 (2016).

When measuring the amount of a monetary remedy, the goal is to provide fair compensation for the losses sustained or the advantages gained as a result of misappropriation. Each of the three methods of measuring damages (actual loss, unjust enrichment, and reasonable royalty damages) provides a lens through which to measure the impact of misappropriation.[18] Actual loss damages is a traditional common law tort remedy[19] measured by the plaintiff's losses due to misappropriation.[20] Unjust enrichment damages aims to prevent the defendant's unjust enrichment and is measured by defendant's gain due to misappropriation.[21] Reasonable royalty damages aim to derive a usage-based payment that would have been set in a hypothetical negotiation between the trade secret owner (as a willing licensor) and the misappropriator (as a willing licensee) for the misappropriator's use of a trade secret.[22]

---

18. As discussed below, the failure to provide sufficient evidence tying any of these measurements to misappropriation may cause a court to exclude them as unduly speculative and unreliable.

19. *See* RESTATEMENT (SECOND) OF TORTS §§ 901 cmt. a, 902, 903, 906 (AM. LAW INST. 1979) ("This first purpose of tort law leads to compensatory damages").

20. UTSA § 3(a); DTSA § 1836(b)(3)(B).

21. UTSA § 3(a); DTSA § 1836(b)(3)(B). A potential source of confusion is that restitution law provides both a free-standing substantive basis for establishing liability (e.g., as a stand-alone claim asserting unjust enrichment) and as is the case with trade secret misappropriation, an alternate available remedy. DAN B. DOBBS & CAPRICE L. ROBERTS, LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 4.1, at 370 (3d ed. 2018) ("Restitution remedies may flow from a freestanding cause of action based on unjust enrichment or may piggyback on other causes of action such as contracts, torts, fiduciary duties, and intellectual property.").

22. In some instances, the determination of a reasonable royalty may be presented as an approximation of plaintiff's lost revenue or other actual losses, *see* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. b (AM. LAW INST. 1975), or as an approximation of defendant's avoided costs of

That there are several types of potentially available methods for measuring damages reflects the need for flexibility in calculating misappropriation damages.[23] For example, depending upon the circumstances in a specific case, it may be difficult to establish the existence or amount of the plaintiff's actual losses or the defendant's unjust enrichment. In most jurisdictions, these different approaches are not exclusive of one another, and a plaintiff may elect a hybrid measurement of its damages based on one or more approach.[24]

1. Actual loss

The DTSA, every state's version of the UTSA, and New York common law all explicitly provide for the recovery of damages for actual loss caused by trade secret misappropriation. Actual loss is a measure of harm caused to the plaintiff, as opposed to gains or unjust enrichment benefiting the defendant (which is addressed in the next section). The goal of awarding damages

---

developing a competing product or other unjust enrichment, *see id*. cmt. g, and BladeRoom Grp. Ltd. v. Facebook, Inc., No. 5:15-CV-01370-EJD, 2018 WL 1611835 (N.D. Cal. Apr. 3, 2018) (defendant's expert properly used reasonable royalty method to measure defendant's unjust enrichment from unauthorized use of the trade secret (applying California's version of UTSA), *rev'd on other grounds*, 11 F.4th 1010 (9th Cir. 2021)).

23. Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 536–39 (5th Cir. 1974); *see also* Bohnsack v. Varco, L.P., 668 F.3d 262, 280 (5th Cir. 2012) (noting that the variety of approaches to trade secret damages "demonstrates the 'flexible' approach used to calculate damages for claims of misappropriation of trade secrets" (citation omitted)).

24. *See, e.g.*, Agilent Techs., Inc. v. Kirkland, No. 3512-VCS, 2010 WL 610725, at *28–31 (Del. Ch. Feb. 18, 2010) (applying the Delaware enactment of the UTSA, the court's award combined consistent lost profit damages and unjust enrichment damages).

for actual loss is to compensate the plaintiff for any harm caused by the defendant.[25]

Although "actual losses" are often thought of as "lost sales" or "lost profits," the concept is broader than that. Actual loss may be measured in various ways, including (a) lost profits (both past and demonstrable/nonspeculative future lost profits) from lost sales or price erosion; (b) increased costs incurred as a result of the misappropriation (sometimes set forth as a separate measure of actual loss or sometimes used as a measure of lost profits); (c) lost royalties (whether in the form of a fully paid up lump-sum payment for access to the trade secrets or a running royalty for the misappropriator's use); and (d) diminution or destruction of value (either of the trade secret claimant's business or of the trade secret itself).

### a. Lost profits

Lost profits are among the most common measures of actual loss.[26] Lost profits often result from diverted sales or price erosion.[27]

---

25. *See supra* Section II(B)(1) for a discussion of actual losses as a damages remedy.

26. *See* West Plains, L.L.C. v. Retzlaff Grain Co., No. 8:13-CV-47, 2016 WL 165698, at *2 (D. Neb. 2016) ("The Court recognizes that lost profits and unjust enrichment are the most common methods to measure damages in misappropriation cases.") (citing, *inter alia*, DeVries v. Starr, 393 F.2d 9, 19 (10th Cir. 1968) ("Loss of profits, where reasonably ascertainable, have been the usual measure of compensatory damages in cases like these.")); *see also Agilent Techs.*, 2010 WL 610725, at *27 ("The loss suffered by the plaintiff, such as lost profits, is the usual indicator of damage").

27. The term "lost profits" is at times used in this *Commentary* to refer to lost profits from lost sales or price erosion. However, "lost profits" may also be used to refer to other forms of actual loss such as increased costs incurred as a result of the misappropriation. *See, e.g.*, Cacique, Inc. v. Stella Foods, Inc., No. B139433, 2002 WL 705675, at *6 (Cal. Ct. App. Apr. 24, 2002) (noting that

Lost profits are not always an appropriate measure of trade secret damages; they must be proved, case by case. One underlying theory of lost profits damages is that "but for" the defendant's misappropriation of trade secrets, the plaintiff would have achieved a higher level of profits by making all, or some, of the sales diverted by the defendant. Such a theory may not be viable if the plaintiff cannot establish a causal link between the lost profits and the misappropriation. Moreover, a plaintiff is unlikely to establish lost sales under this theory if, for example, the trade secret owner would not have been able to procure, manufacture, market, sell, and finance the products or services necessary to generate a profit on defendant's sales—because, say, the trade secret owner lacked the marketing or manufacturing capacity to do so. Any lost profits calculation also must be based on an adequately supported damages period and account for other factors that could have caused some portion of the harm independent of the misappropriation.

*Lost sales.* In the case of lost sales, lost profits are typically calculated by determining lost revenue and then deducting the incremental or avoided costs that would have been incurred in producing the lost revenue. Lost revenue is generally the difference between the plaintiff's actual revenue during the loss period and the but-for revenue. Lost revenue derives from sales shown to have been diverted by the misappropriation; if the misappropriation prevented the plaintiff from making sales, the profits that would have flowed from those sales are diverted (i.e., lost). After determining the amount of lost revenue, the

"the owner of trade secrets who has been victimized by misappropriation of its trade secrets may suffer lost profits because the owner did not make sales that were diverted to the wrongdoer, or the owner incurred increased expenses in connection with the sales that it did make, or the owner cut its prices to compete with the wrongdoer") (citing Lam, Inc. v. Johns-Manville Corp., 718 F. 2d 1056, 1065 (Fed. Cir. 1983) ("Lost profits may be in the form of diverted sales, eroded prices, or increased expenses.")).

costs that the plaintiff would have incurred to generate that revenue (also called incremental or avoided costs) must be calculated. These incremental or avoided costs are then subtracted from the lost revenue to calculate lost profits.

*Lost revenue.* Determining lost revenue can be challenging. One approach is to focus on the defendant's actual sales and determine what portion of those sales was diverted as a result of the misappropriation. Another approach is to establish the trade secret owner's but-for revenues (i.e., those revenues that the trade secret owner would have made but for the trade secret misappropriation). A difference between the but-for and actual revenues may be lost revenues attributed to the trade secret misappropriation (assuming that a causal link is properly established). But-for revenue may be determined in various ways, such as by looking at the parties' actual sales before, during, and after the damages period (information typically available from the parties' financial and business records), market information and analysis, business plans, capacity considerations, and other factors that could have affected the plaintiff's level of revenues. Market structure may also impact these calculations. For example, in multiplayer markets where competing products do not rely on the trade secrets at issue, a plaintiff must, as part of its causation case, provide some reasonable evidence that customers would have bought from it rather than its competitors to establish a lost profits theory.[28] In determining but-for sales in a

---

28. *See, e.g.*, Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc., 511 F. App'x 398, 404 (6th Cir. 2013) (finding no error in jury instruction requiring plaintiff to show that customers would have purchased its products but for the misappropriation); Suburban Graphics Supply Corp. v. Nagle, 5 A.D.3d 663, 666 (N.Y. App. Div. 2004) (lost profits limited to those "resulting from the defendant's actual diverting" of customers) (quoting Allan Dampf, P.C. v. Bloom, 127 A.D.2d 719, 720 (N.Y. App. Div. 1987)). This evidence can take the form of a market share analysis. *See* Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc., 35 F.3d 1226, 1245 (8th Cir. 1994) ("The court relied on

multiplayer market, it may be appropriate to consider the plaintiff's market share of the properly defined relevant market.

Lost profits are then calculated by subtracting incremental costs from the lost revenue. Incremental or avoided costs are the costs associated with producing and selling the claimed lost sales volume. An obvious example of an incremental cost is material used to produce a product. Other production costs, as well as certain selling and marketing expenses, may also be incremental. Determining which costs are incremental, and their amount, may be informed by such factors as the parties' actual cost detail (including detail of cost of goods sold and operating expenses); an understanding of which costs are fixed, variable, or semivariable; and various analytical approaches.

*Price erosion.* Price erosion damages may be available when "a defendant's misappropriation enabled it to enter the market and compete directly with the plaintiff," and the plaintiff lowered its prices (or was unable to pass along price increases) as a result.[29] Price erosion damages may be available even if there are multiple players in the same product market, so long as the plaintiff's adverse pricing impacts are the result of

---

Holden's actual sales figures, the known productive capacity of Pioneer's parent lines, Pioneer's profitability history and a reasonable estimate of Pioneer's lost share of the 'look-alike' market.").

29. Stanacard, LLC v. Rubard LLC, No. 12-Civ.-5176 (CM), 2016 WL 6820741, at *2 (S.D.N.Y. Nov. 10, 2016) (refusing to exclude expert testimony on price erosion damages). Note that merely showing the defendant misappropriated and competed may not be sufficient; some evidence that the unlawful competition actually motivated the plaintiff to reduce its prices appears to be necessary. *See In re* Jonatzke, 478 B.R. 846, 866 (Bankr. E.D. Mich. 2012) (finding insufficient evidence of price erosion where expert merely "assume[d] that any erosion . . . must have been because of" the misappropriation).

misappropriation.[30] Price erosion damages may include both past losses and projected future losses caused by the misappropriation.[31]

The underlying theory of lost profits from price erosion is that "but for" the defendant's misappropriation of trade secrets, the plaintiff would have sold its product(s) at higher prices than it actually did (either because it lowered its prices or could not increase its prices because of the defendant's misappropriation). Lost profits from price erosion are typically calculated by subtracting the plaintiff's actual revenue from its but-for revenue without price erosion for the applicable damages period. Again, this math is simple, but determining and supporting the inputs typically may require actual data from both parties (and possibly others), market information, evidence to demonstrate a causal link between the misappropriation and pricing impacts, and other information and analysis. Actual sales volume, prices, and revenue are typically available from the parties' financial and business records. The analysis of price erosion may be facilitated by sales detail such as customer detail, detail of sales by product, detail of sales by month (or other frequencies), price exception

---

30. Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1120 (Fed. Cir. 1996) ("Roton reduced its prices in response to Stanley's entry in the market. Though there were others in the market, Zero and Pemko, with lower prices, Roton perceived their products to be inferior and saw no need to lower its prices in response to their entry."); *but see* PQ Labs, Inc. v. Yang Qi, No. 12-0450 CW, 2014 WL 4954161, at \*5 (N.D. Cal. Sept. 30, 2014) (holding that evidence admitted during bench trial did not support price erosion damages because, among other things, it "ignore[d] numerous other competitors in the market").

31. *Roton Barrier*, 79 F.3d at 1120 (affirming both past and future price erosion damages). As to future price erosion damages, the court found that testimony showing that the plaintiff would need a "period of time" to "reestablish its prices and margins" was sufficient to sustain the damages awarded by the trial court. *Id.*

reports or other documents reflecting price adjustments made and reasons for them, and market information. Supporting a price erosion claim may also be assisted by information from other competitors, customers, market information, and other analysis. For example, one important analytical issue with price erosion claims is the need to assess the sensitivity of customer purchases to higher prices (i.e., whether and to what extent customers would have purchased the same volume of goods at the claimed higher prices). Because price erosion claims assert that a claimant's prices would have been higher but for the erosion, it is important to consider whether there are sales that would not have been made at the higher prices and remove them from the lost sales/profits analysis. That can be accomplished by measuring the price elasticity of demand.[32] Price erosion calculations typically also consider other potential supply or demand drivers that could have pushed prices down, such as the entrance of new competitors into the relevant market, the introduction of new suitable nonaccused alternative products, or changing customer preferences, among other factors.[33] The information and analysis appropriate to address price erosion will differ based on the facts and circumstances of each situation.

Where a plaintiff obtains an injunction against the misappropriator's sales, the amount and duration of price erosion may be lessened. But an injunction may not immediately end a price erosion damage claim. Even after an injunction, a plaintiff sometimes may not be able to return its prices to levels that would

---

32. Price elasticity of demand is a measure of the change in the quantity demanded or purchased of a product in relation to its price change. Expressed mathematically, it may be expressed as Price Elasticity of Demand = Percent Change in Quantity Demanded divided by Percent Change in Price.

33. *See Roton Barrier*, 79 F.3d at 1120; *Stanacard*, 2016 WL 6820741, at *2 (refusing to exclude expert testimony on price erosion and holding that arguments about "market factors" went to the weight of the expert's testimony).

have existed but for the misappropriation. As a result, price erosion damages may continue during a postinjunction period.

### b. Increased costs or expenses

Another measure of actual loss damages is the increased costs or expenses that the plaintiff incurred as a result of the defendant's misappropriation.[34] As noted above, sometimes these costs or expenses are simply included in the calculation of lost profits. When that occurs, care should be taken to avoid double counting.

To be recoverable, a plaintiff must first prove that the increased costs or expenses were proximately caused by the misappropriation.[35] Be aware, however, that the cost of

---

34. *See, e.g.*, Food Services of America, Inc. v. Carrington, No. CV-12-00175-PHX-GMS, 2013 WL 4507593, at \*14 (D. Ariz. Aug. 23, 2013) ("The Arizona Supreme Court has stated that when the wrongful act of a defendant 'makes it necessary to incur expense to protect [the plaintiff's] interest, such costs and expenses . . . should be treated as the legal consequences of the original wrongful act and may be recovered as damages.'" (citing U.S. Fid. & Guar. Co. v. Frohmiller, 71 Ariz. 377, 380 (Ariz. 1951)). Other state courts determining damages under statutes modeled after the UTSA have found "out-of-pocket expenses" sustained as a result of misappropriation to be an element of damages. *See, e.g.*, Dozor Agency, Inc. v. Rosenberg, 218 A.2d 583, 585–86 (Pa. 1966); Telex Corp., v. Int'l Bus. Mach. Corp., 510 F.2d 894, 931 (10th Cir. 1975) (noting that expenses incurred in strengthening security measures after misappropriation would be damages in some circumstances); *see also* Synergetics, Inc. v. Hurst, 477 F.3d 949, 960 (8th Cir. 2007) (affirming award of damages including out-of-pocket expenses).

35. *See* Computer Sciences Corp. v. Computer Assocs. Int'l, Inc., Nos. CV 98-1374-WMB SHX, CV 98-1440-WMB SHX, 1999 WL 675446, at \*13 (C.D. Cal. Aug. 12, 1999) ("CSC musters little response to CA's causation argument beyond citing cases in which courts have upheld as damages expenses incurred by a plaintiff in protecting itself against actions taken by those who had misappropriated its trade secrets . . . . These cases merely identify the types of expenses that can be proximately caused by a misappropriation of trade

investigating *whether* there was misappropriation or damage caused by increased costs or expenses is not necessarily recoverable, particularly where there is no evidence that the defendant actually used the trade secrets.[36] Accordingly, sufficient information and analysis needs to be gathered and presented to demonstrate a causal link between the misappropriation and increased costs.

### c. Research & development costs

Some courts have used a plaintiff's development costs as a measure of the plaintiff's actual loss resulting from misappropriation. "The cost to create property has long been considered an appropriate factor in computing damages, so long as the 'property . . . is injured or destroyed by the wrongful or negligent act of another.'"[37] But there are exceptions and qualifications. For example, one court "excluded expert testimony purporting to measure damages by R&D costs, noting that such costs do not bear a necessary relation to the market value of the research once developed," and holding that "the 'cost to create or duplicate' method could generate the same value for a worthless trade

---

secrets; they do nothing to eviscerate the requirement that a defendant's wrongful acts be a 'but for' cause of plaintiff's damages.") (citations omitted).

36.  *See*, *e.g.*, News Am. Mktg. In-Store, Inc. v. Marquis, 862 A.2d 837, 846 (Conn. App. Ct. 2004) (distinguishing *Dozor*, 218 A.2d 583, on the grounds that in *News Am.*, no use was established, and the out-of-pocket expenses awarded in *Dozor* "were incurred by the plaintiff while attempting to mitigate and reverse the harm actually caused by the defendant's conduct," whereas in this case, "the 'out-of-pocket expenses' suffered by the plaintiff amount to nothing more than costs incurred in the course of investigating whether the plaintiff had suffered an injury as a result of [the defendant's] misconduct.").

37.  W.L. Gore & Assoc., Inc. v. GI Dynamics, Inc., 872 F. Supp. 2d 883, 892 (D. Ariz. 2012) (quoting Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 370 (9th Cir. 1947)).

secret and a trade secret worth millions of dollars."[38] And some courts, including the Fifth Circuit in *University Computing v. Lykes-Youngstown Corp.*, have held that research and development costs are recoverable only where the entire value of the trade secret has been destroyed, such as where the trade secret was publicly disclosed.[39] In other cases, "where the trade secrets developed by the research have been demonstrated to have actual value . . . courts have measured damages, at least in part, by development costs."[40]

---

38. *Id.* (citing Applied Hydrogel Tech., Inc. v. Raymedica, Inc., No. 06-CV-2254-DMS-POR, 2008 WL 5500756, at *2 (S.D. Cal. Oct. 7, 2008)).

39. *See, e.g.*, Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 538 (5th Cir. 1974) ("This measure of damages simply uses the plaintiff's actual costs, and in our view is frequently inadequate in that it fails to take into account the commercial context in which the misappropriation occurred."); Softel, Inc. v. Dragon Med. and Sci. Commc'ns, Inc., 118 F.3d 955, 969 (2d Cir. 1997) (rejecting claim that plaintiff was entitled to R&D costs as a measure of damages, because "[h]ere, Dragon did not publish Softel's secrets, and therefore did not destroy their value to Softel, other than to the extent that Dragon itself used them."); Telecom Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc., No. 1:95-CV-00649-WBH, 2000 WL 35568637, at *8 n.16 (N.D. Ga. July 26, 2000) ("The broad measure of damages advocated by Rolm [including R&D costs] is available only where the value of the trade secret is completely destroyed, such as where general disclosure to the public occurs, or where unjust enrichment calculations are speculative, neither of which occurred here.").

40. *W.L. Gore & Assoc.*, 872 F. Supp. 2d at 892 (citing Telex Corp. v. Int'l Bus. Mach. Corp., 510 F.2d 894, 931 (10th Cir. 1975) (affirming a damages award based on research costs when "the trial court first found that IBM had expended $10,000,000 on the development of the Aspen project . . . and that Gruver and others had left IBM half way through the development program")); *see also, e.g.*, Leatt Corp. v. Innovative Safety Tech., LLC, 09-CV-1301-IEG-BGS, 2010 WL 11442713, at *5 (S.D. Cal. Aug. 24, 2010) (finding plaintiff's claimed R&D costs to be "an appropriate substitute of [plaintiff's] actual losses due to the misappropriation").

Companies typically track R&D expenditures and often maintain R&D time records with descriptions of projects, technologies, or other relevant details. These records may be useful in identifying development time and expenditures related to asserted trade secrets, particularly where the asserted trade secrets represent a plaintiff's primary technology. But asserted trade secrets often relate to only a portion of a company's technology, development time, and development efforts. In these situations, a company's R&D records commonly do not identify time or expenditures by specific trade secret, and tracing these expenditures to the specific trade secrets at issue in a particular litigation may prove challenging (making apportionment determinations more challenging as well). Therefore, additional analysis, estimates, or other information may be necessary to quantify and adequately support development costs related to asserted trade secrets.

### d. Diminution or destruction of value

Value is often defined as the price that a reasonable buyer or investor would pay for a business or asset and/or the value to the owner of being able to sell or license the asset. The American Society of Appraisers Business Valuation Standards Glossary defines fair market value as:

> The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length, in an open and unrestricted market, when neither is under compulsion to buy or sell and

> when both have reasonable knowledge of the relevant facts.[41]

Diminution or destruction of value in trade secret misappropriation damages is often addressed as the diminution or destruction of either (1) the value of a business or (2) the value of a trade secret. (There can also be other value-based actual loss theories, such as the value of a lost business opportunity.)

*Business value.* In certain circumstances, trade secret plaintiffs may prove damages based on diminution or destruction of a business's value caused by misappropriation. This measure of damages "focuses upon the change in worth of a going concern after total or almost total destruction" caused by misappropriation.[42]

A leading case approving this theory is *Wellogix, Inc. v. Accenture LLP*, which involved the defendant's misappropriation of Wellogix's software. At trial, the plaintiff's damages expert valued its damages at $27.8 million, based partly on an $8.5 million investment in Wellogix by venture capital groups in exchange for a 31 percent equity stake.[43] The plaintiff's software expert testified that "the total value of Wellogix went to zero" after the alleged misappropriation.[44] According to its CEO, Wellogix was the only company offering that type of software from 2000 to 2005.[45] The jury awarded $26.2 million in compensatory

---

41. *International Glossary of Business Valuation Terms*, NAT'L ASS'N OF CERTIFIED VALUATORS AND ANALYSTS (June 08, 2001), https://www.nacva.com/content.asp?contentid=166.

42. C. A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1053 (5th Cir. 1981). Note that the court in *May Marine* was discussing loss of business value as a measure of damages for breach of contract, not trade secret misappropriation.

43. 716 F.3d 867, 879 (5th Cir. 2013).

44. *Id.* at 880.

45. *Id.* at 873.

damages, which the Fifth Circuit upheld on appeal, emphasizing the "'flexible' approach used to calculate damages for claims of misappropriation of trade secrets."[46] Other courts have also acknowledged that loss or destruction of business value may be an appropriate measure of damages in trade secrets cases.[47]

As demonstrated by *Wellogix*, value estimates can be facilitated by the existence of offers to invest or valuations done for nonlitigation purposes. In these circumstances, it is important to establish the nexus between the value estimates and the asserted trade secrets (versus other factors that may have contributed to the valuation) and/or to demonstrate that the misappropriation was the cause of the loss or destruction of value.

*Trade secret value.* Plaintiffs in trade secrets cases may also pursue damages based on the destruction or diminution of the fair market value of the trade secret itself.[48] For example, in

---

46. *Id*. at 880 (quoting Bohnsack v. Varco, L.P., 668 F.3d 262, 280 (5th Cir. 2012)); *see also* Vianet Grp. PLC v. Tap Acquisition, Inc., No. 3:14-CV-3601-B, 2016 WL 4368302, at \*22 (N.D. Tex. Aug. 16, 2016) (citing *Wellogix* and denying summary judgment as to a destruction of business value theory).

47. *See, e.g.*, Keystone Transportation Sols., LLC v. Nw. Hardwoods, Inc., No. 5:18-CV-00039, 2019 WL 1770162, at \*5 (W.D. Va. Apr. 22, 2019) (refusing to exclude expert opinion on lost business value); CardioVention, Inc. v. Medtronic, Inc., 483 F. Supp. 2d 830, 845–46 (D. Minn. 2007) (refusing to exclude expert opinion on damages that the court described variously as "loss of business value damages" and "the value of the loss of the secret"); Matter of Mandel, 720 F. App'x 186, 188 (5th Cir. 2018) (approving a "lost asset" damages theory based on the value of "companies comparable" to the plaintiff).

48. *See, e.g.*, Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 535 (5th Cir. 1974) ("[N]ormally the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has *in some way* destroyed the value of the secret. The most obvious way this is done is through publication, so that no secret remains. Where the plaintiff retains the use of the secret, as here, and where there has been no effective disclosure of the secret through publication *the total value* of the secret to the plaintiff is an inappropriate measure.") (emphasis added) (citations omitted); *see also*

*Quintel Technology v. Huawei Technologies USA,* the court permitted a damages expert to offer testimony quantifying trade secret misappropriation damages "in terms of [plaintiff's] actual loss as measured by the investment value of the trade secrets at issue."[49] The expert calculated "what a reasonable investor would have paid for the secrets, using detailed development cost information provided by [plaintiff] and applying a price-to-book ratio based upon market reports."[50] Some courts do not recognize this measure of damages, however, and it can be difficult to quantify.[51]

In the case of a start-up or emerging technology company, the company's valuation is closely tied to the value of its trade

---

Precision Plating & Metal Finishing Inc. v. Martin-Marietta Corp., 435 F.2d 1262, 1263–64 (5th Cir. 1970) (upholding award of fair market value of trade secret where that value was completely destroyed); Joe N. Pratt Ins. v. Doane, No. V-07-07, 2009 WL 3157337, at *10 (S.D. Tex. Sept. 25, 2009) ("When utilizing the 'market value' measure of damages, the trier of fact can measure damages based upon what a reasonably prudent investor would have paid for the trade secret." (citation omitted)).

49.   No. 4:15-CV-307, 2018 WL 626355, at *8 (E.D. Tex. Jan. 30, 2018), *order clarified*, 2018 WL 6930270 (E.D. Tex. Feb. 27, 2018).

50.   *Id.* at *8.

51.   *See, e.g.*, Resdev, LLC v. Lot Builders Ass'n Inc., No. 6:04-CV-01374-GAP-DAB, 2005 WL 1924743, at *4 (M.D. Fla. Aug. 10, 2005) (rejecting the argument that diminution of a trade secret's value constitutes "loss"); GTAT Corp. v. Fero, No. CV-17-55-M-DWM, 2017 WL 2303973, at *6 (D. Mont. May 25, 2017) (noting that "the diminution in the value of trade secrets and confidential information cannot generally be addressed through the payment of damages"); Wellness Coaches USA, LLC v. MGM Resorts Int'l, No. 2:15-CV-01593-JAD-CWH, 2015 WL5146701, at *6 (D. Nev. Sept. 1, 2015) ("[L]oss of a property interest in and diminution in value of trade secrets and confidential information are the types of harms that are not readily addressed through payment of economic damages"); Medtronic MiniMed, Inc. v. Nova Biomedical Corp., No. CV-08-00788-SJO-PJWx, 2009 WL 10670877, at *10 (C.D. Cal. Aug. 18, 2009) (excluding evidence of diminution in value of plaintiff's trade secret).

secret technology, and the company's investment value may be tantamount to or at least closely related to the investment value of the trade secret. In some cases, the investment value may be reflected in the total value of the business minus its tangible assets or its ability to raise venture capital. In cases where the business value is destroyed or almost destroyed by the misappropriation, the "investment value" and "lost business value" may be one and the same.

2. Unjust enrichment

Whereas an actual loss reflects the amount of the plaintiff's loss due to misappropriation, unjust enrichment measures the benefit conferred on the defendant due to the misappropriation. The UTSA and the DTSA both provide unjust enrichment damages as a remedy for trade secret misappropriation. Under the UTSA § 3(a) (1985): "Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." Under the DTSA, the complainant may recover "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss."[52]

Unjust enrichment can take many forms. "Simply put," the Seventh Circuit recently concluded, "there is no single way to measure the benefit conferred on a defendant; the measurement is context dependent. The important considerations are that a judge or jury calculates the benefit to the defendant—not the loss to the plaintiff—and that this calculation is done with reasonable certainty."[53] While the considerations vary, certain categories of

---

52. 18 U.S.C. § 1836(b)(3)(B)(i)(II).

53. Epic Sys. Corp. v. Tata Consultancy Servs., 980 F.3d 1117, 1130 (7th Cir. 2020).

unjust enrichment remedies arise repeatedly: defendant's profits, avoided development costs, and commercial advantage or head-start benefit. (Potential categories also include defendants' increased profitability or market share caused by the misappropriation, defendants' total value if caused by the misappropriation, and others.)

One category of unjust enrichment is sales by defendant that, absent the misappropriation, would not have been made by defendant.[54] Where a plaintiff can prove that the defendant would not have achieved these sales but for the misappropriation, the defendant has been unjustly enriched.

Unjust enrichment damages can also reflect the development costs the defendant avoided through the misappropriation.[55] Plaintiffs have succeeded in obtaining major awards on this

---

54. These unjust enrichment damages may include both diverted sales and nondiverted sales. Diverted sales are sales by defendant that would have instead been made by plaintiff but for the misappropriation. To the extent these sales are also included in a plaintiff's lost profits claim, care should be taken to avoid double-counting. Nondiverted sales are sales by defendant that, absent the misappropriation, would not have been made by plaintiff. These also represent unjust enrichment sales.

55. *E.g.*, GlobeRanger Corp. v. Software AG US of America, Inc., 836 F.3d 477, 499 (5th Cir. 2016) (plaintiff awarded $19.7 million in development costs avoided by defendant); SW Energy Prod. Co. v. Berry-Helfand, 491 S.W.3d 699, 710–11 (Tex. 2016) ("development costs the defendant avoided by the misappropriation" recognized as basis for damages). *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmts. f, d (AM. LAW INST. 1995); Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 535–36 (5th Cir. 1974). *See also*, *Epic Sys.*, 980 F.3d at 1130 ("avoided research and development costs have been awarded when the defendants gained a significant head start in their operations").

basis.[56] There is, however, conflicting authority on the viability and applicability of this measure of damages.[57]

Focusing solely on the measure of overall profits, there is a circuit split over the appropriate measure of a defendant's profits, and courts may consider various setoffs that the defendant properly establishes. Guidance is mixed on the nature and required strength of the nexus between costs and incremental revenues in unjust enrichment calculations. For example, when courts allow costs to be included because they have a "sufficient nexus" to the incremental revenues, disagreement routinely emerges about what that term means. While some courts adopt the incremental approach, others adopt the full absorption method, by which some allocated portion of overhead expenses may be added to incremental expenses to determine the costs to be subtracted. When the law requires that allocations be made— or at least where doing so is an option—a variety of approaches can be used to determine what costs should be subtracted.

Another category of unjust enrichment damages is the benefit to the defendant of being able to develop a competing business or product faster than would have been possible absent misappropriation. The rationale for this type of recovery is that the

---

56. *E.g.*, Judgment, ASML US Inc. v. XTAL, No. 16-CV-295051 (Santa Clara Super. Ct., May 3, 2019) (plaintiff awarded $845 million for defendant's saved development costs); *Epic Sys.*, 980 F.3d at 1130 ($140 million in saved development costs where defendants obtained a head start through the misappropriation).

57. *Compare Epic Systems Corp. v. Tata Consultancy Services, Ltd.*, 980 F.3d 1117, 1132-33 (7th Cir. 2020) (upholding a $140 million award based on avoided costs and the associated head start that the defendant achieved through misappropriation) *with Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, No. 21-1370, 2023 WL 3636674, at *17 (2d Cir. May 25, 2023) (vacating a $285 million award based on avoided costs as "unavailable under the specific facts of this case" because, in part, the plaintiff "suffered no compensable harm beyond that actual loss").

misappropriation has given the defendant an unfair temporal advantage over its competitors. Specific examples include:

- Plaintiff awarded damages measured by defendant's incremental profits on sales over a period of time representative of the research and development time the misappropriation allowed defendant to bypass.[58]

- Defendant required to disgorge damages based on the increased value of defendant's company due to being two years further along than it otherwise would have been in developing and commercializing its products.[59]

- Plaintiff awarded damages based on defendant's profits on sales that began one year earlier than would have been possible without misappropriation—and without which the defendant could not have launched its product at a key trade show.[60]

- Plaintiff entitled to recover damages measured by defendant's profits during a three-year head start on developing a competitive bid and business model for fixed-wing aircraft market'.[61]

---

58. Sensormatic Elecs. Corp. v. Tag Co. US, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008).

59. Sabre GLBL, Inc. v. Shan, 779 Fed. App'x 843, 851 (3d Cir. 2019).

60. Alifax Holding Spa v. Alcor Sci. Inc., 404 F. Supp. 3d 552, 556 (D.R.I. 2019) (court denied renewed Rule 50 motion for judgment as matter of law and accepted and applied head-start damage theory but granted Rule 59 new trial on damages due to potentially prejudicial errors in the admission of supporting proofs).

61. TKC Aerospace. Inc. v. Phoenix Heliparts, Inc., No. CV-2011-018889, 2015 Ariz. Super. LEXIS 981, at *1 (Ariz. Super. Ct. Jan. 30, 2015) (court

This "head start" approach, often referred to as "lead time" damages, is widely followed.[62] Similar to the application of damages measurement rules, the determination of the head-start period is highly dependent on the facts of each particular case.[63]

accepted head-start damages theory but deemed the underlying evidence of defendant's profits not sufficiently reliable to support such an award).

62. *See, e.g.*, Nite Glow Indus. Inc. v. Cent. Garden & Pet Co., Nos. 2020-1897, 2020-1983, 2021 WL 2945556, at *6–8 (Fed. Cir. July 14, 2021) (reversing award of $11 million for misappropriation of idea claim brought under New Jersey common law; looking to trade secret misappropriation law for guidance, the Federal Circuit found that plaintiff had failed to provide evidence attributing the award to head-start damages); Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc., 895 F.3d 1304, 1317–18 (Fed. Cir. 2018) (vacating the jury's monetary award for misappropriation of trade secrets because "evidence supporting [the] claim to monetary relief for trade secret misappropriation did not limit the covered sales to a head-start period, and that omission [could not] be deemed harmless").

63. For example, in TurnKey Sols. Corp. v. Hewlett Packard Enter. Co., No. 15-CV-01541-CMA-CBS, 2017 WL 3425140, at *6–7 (D. Colo. Aug. 9, 2017), the court denied Hewlett Packard's motion for summary judgment limiting TurnKey's damages for trade secret misappropriation and breach of confidentiality agreement to the period prior to the publication of the trade secrets in plaintiff's patent application. In reaching this decision, the court stated: "To the extent HPE is requesting that this Court limit TurnKey's damage award based on the publication of the patent application, the Court declines to do so. The patent application does not necessarily absolve HPE of all post-publication damages that flow from its alleged pre-publication misappropriation." *Id.* Similarly, in Federal Express Corp. v. Accu-Sort Sys., Inc., No. 01-2503 Ma/A, 2005 WL 8156707, at *18 (W.D. Tenn. Mar. 30, 2005), the court denied Accu-Sort's motion for summary judgment seeking a determination "that the time for which FedEx can claim damages ends when FedEx published its patent documents [disclosing] the information at issue in this case." *Id.* at *17. The court recognized generally that "FedEx cannot claim trade secret protection for any information that has been made available to the public by way of a patent," *see id.*, but further recognized that "an act of misappropriation can cause plaintiff to lose profits, or a defendant to receive illicit gains, after the trade secret is made public." *Id.* (collecting cases). "[I]f the 'head start' gained by the defendant through misappropriation continues to

Certain other practical considerations are unique to the head-start approach, including whether the burden of proving the duration of head-start damages falls on the plaintiff (as part of its prima facie case of establishing harm and damages) or the defendant (as an affirmative defense).[64] Courts also consider how the time periods are to be calculated: e.g., based on the head start over the plaintiff's *good-faith competitors* or *the plaintiff itself*, the time it would take defendant to *discover* the trade secret absent misappropriation, or the time necessary to *independently develop* the trade secret into a commercially viable product. And they look at whether the commercial advantage derived from misappropriation should be based on an objective approach that focuses on the actions and capabilities of a good-faith competitor or on a subjective approach that focuses on the actions and capabilities of the misappropriator.

The head-start theory of unjust enrichment damages should not be confused with the test of the same name for determining the accounting period for damages. The latter refers to the "head start" or "lead time" rule, adopted in some jurisdictions, that the damages assessed against a trade secret defendant may be limited to the time it would have taken the defendant to discover the secret without misappropriation or to develop a comparable product without the use of plaintiff's trade secrets.[65] The head-start damages theory awards damages based on a temporal

---

disadvantage the plaintiff after the date plaintiff receives its patent, the plaintiff may collect damages for profits that accrue during this 'extra' limited time period." *Id.*

64.  *See, e.g.*, *Nite Glow*, at 2021 WL 2945556, at *6–8 ("Determination of head start damages was part of plaintiffs' burden of proof, not an affirmative defense as to which defendants would bear the burden of proof.").

65.  Agilent Techs., Inc. v. Kirkland, 2010 WL 610725, at *26 n.230 (Del. Ch. Feb. 18, 2010) (collecting cases).

advantage; the head-start accounting period rule imposes a temporal limitation on the amount of damages awarded.

As a coda on unjust enrichment, New York is the only jurisdiction that does not allow recovery of a defendant's unjust enrichment measured as its avoided development costs—at least where these costs are not used as a proxy for the plaintiff's actual losses. This guidance is premised on a 4–3 decision by the New York Court of Appeals in *E.J. Brooks v. Cambridge Security Seals,* which announced a significant departure from the DTSA and UTSA on unjust enrichment damages.[66] Responding to a question certified to it by the Second Circuit, the Court of Appeals held that under New York common law, a trade secret owner may not recover the development costs the defendant avoided due to its unlawful activity under theories of trade secret theft, unfair competition, or unjust enrichment. In the case of trade secret theft, the court found that damages "must be measured by the losses incurred by the plaintiff," explaining that the avoided cost measure of damages "does not consider the effect of misappropriation on the *plaintiff.* Because this figure is tied to the defendant's gains rather than the plaintiff's losses, it is not a permissible measure of damages."[67]

*E.J. Brooks* has spawned a number of questions and potential strategies relating to unjust enrichment in New York. To provide a few examples: contrary to some courts and commentators, the holding may not be so broad as to support the interpretation that unjust enrichment is unavailable under New York common law; the case might have been decided differently if the plaintiff had been able to introduce evidence of its own development costs; and the court in *E.J. Brooks* stated that in unfair competition cases

---

66. E.J. Brooks Co. v. Cambridge Security Seals, 31 N.Y.3d 441, 453–56 (N.Y. 2018).

67. *Id.* at 454.

"courts may award a defendant's unjust gains as a proxy for compensatory damages," suggesting that evidence of the defendant's avoided development costs may be admissible and relevant to measuring the plaintiff's lost profits.[68]

### 3. Reasonable royalties

#### a. The availability of reasonable royalty damages varies state to state

Under the language of the UTSA and the DTSA, damages for trade secret misappropriation may be measured by the imposition of liability for a reasonable royalty "[i]n lieu of damages measured by any other methods."[69] Given that the majority of states follow the UTSA on this point without modification, a plaintiff may freely choose in most jurisdictions whether to pursue actual damages or a reasonable royalty damages measure.

Four states—California, Indiana, Georgia, and Illinois—allow a reasonable royalty measure of damages only if other damages are not provable.[70] And Virginia allows reasonable royalty

---

68. *See id*. at 466; *see also* Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc., 895 F.3d 1304, 1320 (Fed. Cir. 2018) (the Federal Circuit suggested that evidence of a defendant's gains due to misappropriation might be used as a "case-specific proxy for [plaintiff's] losses or reasonable royalties").

69. Emphasis added. *See* UTSA § 3(a) ("In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."); *see also* 18 U.S.C. § 1836(b) (same).

70. CAL. CIV. CODE § 3426.3(b); IND. CODE § 24-2-3-4(b); GA. CODE ANN. § 10-1-763(A); 765 ILL. COMP. STAT. ANN. 1065/4(A); *see also, e.g*., Cacique, Inc. v. Robert Reiser & Co., 169 F.3d 619 (9th Cir. 1999) (applying California law) (holding that royalties cannot be awarded as damages if actual damages or unjust enrichment is provable).

damages only where the plaintiff is "unable to prove a greater amount of damages by other methods of measurement."[71]

Five states—Alaska, Arkansas, Connecticut, Louisiana, and Washington—do not expressly authorize reasonable royalty damages under any circumstances.[72] At least one court has interpreted the lack of an express authorization to mean that reasonable royalty damages are not available.[73] But in the other states, it remains unclear if the lack of express authorization completely forecloses the plaintiff's ability to pursue reasonable royalties when no other remedy is available.

> b. Measuring reasonable royalty damages—Two leading methodologies

While the UTSA and DTSA allow for the measurement of trade secret damages using a reasonable royalty in certain circumstances, they do not specify how to measure a reasonable royalty or what constitutes a reasonable royalty under those

---

71. *See* VA. CODE ANN. § 59.1-338(A). ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. If a complainant is unable to prove a greater amount of damages by other methods of measurement, the damages caused by misappropriation can be measured exclusively by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.").

72. ALASKA STAT. ANN. § 45.50.915 (West 2007); ARK. CODE ANN. § 4-75-606 (West 2004); CONN. GEN. STAT. ANN. § 35-53 (West 2005); LA. REV. STAT. ANN. § 51:1433 (2003); WASH. REV. CODE ANN. § 19.108.030 (West 2013).

73. *See* Veritas Corp. v. Microsoft Corp., No. 2:06-CV-0703-JCC, 2008 U.S. Dist. LEXIS 112135 (W.D. Wash. Feb. 26, 2008) (denying defendant's motion to exclude testimony of plaintiff's damages expert on the basis that the Washington state statute excludes royalty damages finding defendant's unjust enrichment could be measured by a reasonable royalty).

circumstances.[74] In the absence of guidance, most courts have tended to rely on either *University Computing v. Lykes-Youngstown Corp.*, a leading Fifth Circuit case on pre-UTSA, common law trade secret misappropriation damages, or *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, a leading case on reasonable royalty damages for patent infringement.[75] This section provides an overview of these two methodologies and the issues courts face when applying these approaches.

i. University Computing v. Lykes-Youngstown Corp.

*University Computing* is a trade secret misappropriation case involving two companies that entered into a joint venture to offer computer services in the southeastern United States.[76] During the formation of the joint venture, the defendants misappropriated a trade secret computerized inventory system from the plaintiff.[77] The defendants intended to sell the system to their own customers but had not sold the system to anyone before

---

74. *See* Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc., No. 5:18-cv-00039, 2019 WL 1770162, at \*4 (W.D. Va. Apr. 22, 2019) ("The Defend Trade Secrets Act is silent on what qualifies as a 'reasonable royalty' for defendant's use of a misappropriated trade secret" (citation omitted)).

75. Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 538 (5th Cir. 1974); Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified by*, Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc., 446 F.2d 295 (2d. Cir. 1971). *See, e.g.*, Votto v. Am. Car Rental, Inc., No. CV-010456354S, 2003 WL 1477029 (Conn. Super. Ct. 2003) (applying *Georgia-Pacific* factors to trade secret misappropriation), *amended and superseded by* 2003 WL 21716003 (Conn. Super. Ct. 2003), *judgment aff'd*, 871 A.2d 981 (Conn. 2005). *Keystone Transp.*, 2019 WL 1770162, at \*4 (recognizing *University Computing* as "a leading case on calculating a reasonable royalty" (citation omitted)).

76. *Univ. Computing*, 504 F.2d at 527.

77. *Id*. at 527–29.

their misappropriation was discovered. Thus, the trial court record did not show any specific loss to the plaintiff or any actual profits by the defendants from their misappropriation.[78]

The Fifth Circuit explained that "the law looks to the time at which the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage, provided he does in fact put the idea to a commercial use."[79] The Fifth Circuit adopted a reasonable royalty measure of damages based on "the fiction that a license was to be granted at the time of beginning the infringement, and them [sic] to determine what the license price should have been."[80] It held that the proper reasonable royalty measure calculates "what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place."[81] Evaluating the trial court's jury instructions, the Fifth Circuit affirmed that a willing licensee-willing licensor hypothetical negotiation construct was an accurate statement of the law on reasonable royalty, finding that the jury should determine "what amount would be paid as a reasonable royalty for the unrestricted use of said computer program" by a willing buyer to a willing seller.[82] The Fifth Circuit identified five non-exhaustive factors to consider in a reasonable royalty analysis:

> 1. the resulting and foreseeable changes in the parties' competitive posture;

---

78. *Id.* at 535–36. Under these circumstances, the parties agreed that the reasonable royalty standard was the appropriate damages measure but were "unable to agree on what the measure entails." *See id.* at 536.

79. *Id.*

80. *Id.* at 537 (quoting Egry Register Co. v. Standard Register Co., 23 F.2d 438, 443 (6th Cir. 1928)).

81. *Id.* at 539.

82. *Id.* at 540.

2. the prices past purchasers or licensees may have paid;

3. the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business;

4. the nature and extent of the use the defendant intended for the secret; and

5. whatever other unique factors might have affected the parties' agreement, such as the ready availability of alternative processes.[83]

The Fifth Circuit ultimately affirmed the jury award of $220,000 based on expert testimony on the plaintiff's prior offer to sell its trade secrets to a third party for that amount.[84]

*University Computing* was a leading common law case on trade secret damages when the UTSA's 1985 amendment addressing statutory royalty damages was drafted.[85] Many courts interpreting UTSA-based statutory royalty provisions have either adopted *University Computing*'s five-factor test or have referenced the decision in their analysis.[86]

---

83. *Id*. at 539.

84. *Id*. at 543–46.

85. See Richard F. Dole, Jr., Statutory Royalty Damages Under the Uniform Trade Secrets Act and the Federal Patent Code, 16:2 VAND. J. ENT. & TECH. L. 223, 230–34 (Winter 2014).

86. *See, e.g.*, Steves and Sons, Inc. v. Jeld-Wen, Inc., No. 3:16-CV-545, 2018 WL 2172502, at *7 (E.D. Va. May 10, 2018) ("courts within the Fourth Circuit have turned to *University Computing*, which 'is a leading case on calculating a reasonable royalty'") (citations omitted); Ajaxo Inc. v. E*Trade Fin. Corp., 115 Cal. Rptr. 3d 168, 179–80 (Cal. Ct. App. 2010); Olson v. Nieman's, Ltd., 579 N.W.2d 299, 310–11 (Iowa 1998); Huawei Techs. Co. v. Yiren Huang, No. 4:17-CV-00893, 2019 WL 2395276, at *5 (E.D. Tex. June 6, 2019) (denying motion to strike reasonable royalty expert opinion under *University Computing* where expert relied on two development agreements giving other party access to

As a final note regarding *University Computing*, the Fifth Circuit stated that to be entitled to reasonable royalty damages, the "defendant must have actually put the trade secret to some commercial use."[87] But where the relevant trade secret statute does not require use to find misappropriation, defendants cannot wield *University Computing* to import an otherwise nonexistent commercial use requirement. Courts have been forced to clarify that use is not required to state a claim under the UTSA and the DTSA, emphasizing that improper acquisition alone is sufficient to state a claim for trade secret misappropriation under those statutes.[88] Of course, if improper acquisition alone is sufficient to

---

any and all of defendant's trade secrets); Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc., No. 5:18-cv-00039, 2019 WL 1770162, at *4 (W.D. Va. Apr. 22, 2019) (approving of expert's "fees-per-container" royalty methodology in DTSA case because it attempts to measure the "actual value of what has been appropriated" under *University Computing*) (quoting *Univ. Computing*, 504 F.2d at 537); *see also* Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc., 416 F.3d 505, 510–11 (6th Cir. 2005).

87. *Univ. Computing*, 504 F.2d at 539.

88. Numerous cases have found that misappropriation is properly pleaded under the UTSA and the DTSA based solely on improper acquisition. *See, e.g.*, Source Prod. & Equip. Co. v. Schehr, No. 16-17528, 2017 WL 3721543, at *4 (E.D. La. Aug. 29, 2017) (finding plaintiffs may plead a DTSA misappropriation claim by alleging plausible facts "in support of either the defendants' acquisition or their use of trade secrets"); Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp., No. 16-2499, 2017 WL 1105648, at *3 (E.D. Pa. Mar. 24, 2017) (noting DTSA explicitly contemplates three independent bases for liability, and improper acquisition alone constitutes a misappropriation); Lane v. Brocq, No. 15 C 6177, 2016 WL 1271051, at *13 (N.D. Ill. Mar. 28, 2016) (finding liability under Illinois UTSA attaches for improper acquisition of a trade secret); Williams-Sonoma Direct, Inc. v. Arhaus, LLC, 109 F. Supp. 3d 1009, 1018 (W.D. Tenn. 2015) (finding evidence of acquisition by improper means sufficient under Tennessee UTSA); ATS Prods., Inc. v. Champion Fiberglass, Inc., No. c-13-02403-SI, 2014 WL 466016, at *2 (N.D. Cal. Feb. 3, 2014) (denying motion to dismiss after finding that acquisition, without use, was sufficient to support a misappropriation claim under California UTSA); Hertz v. Luzenac Grp., 576 F.3d 1103, 1115 (10th Cir. 2009) (finding improper

state a claim for trade secret misrepresentation, the next question is whether improper acquisition alone is a sufficient basis for reasonable royalty damages.

When evaluating a royalty, whether fully paid up or on a running royalty basis, the parties will need to consider the useful life and expected future use of the trade secret(s). Reasonable royalties are typically based on the parties' expectations at the time of the hypothetical negotiation, which is generally considered to be on the eve of the misappropriation.

### ii. *Georgia-Pacific* 15-factor test

Courts have also used the *Georgia-Pacific* approach to determine reasonable royalty damages in trade secret misappropriation cases, despite the decision primarily addressing patent infringement.[89] Like the *University Computing* court, the court in *Georgia-Pacific* began with a willing licensor-willing licensee construct. The court hypothesized that the plaintiff is a willing licensor negotiating a reasonable royalty license with the defendant,

---

acquisition of trade secret alone sufficient under Colorado UTSA); Semper/Exeter Paper Co. v. Henderson Specialty Paper LLC., No. SACV 09-0672 AG (MLGx), 2009 WL 10670619, at *5 (C.D. Cal. Sept. 21, 2009) (finding "improper acquisition" alone sufficient to state a claim where former employee sent trade secrets from his work email to a personal email) (quoting San Jose Const., Inc. v. S.B.C.C., Inc., 155 Cal. App. 4th 1528, 1544 (Cal. Ct. App. 2007) ("[U]nder the UTSA 'misappropriation' can occur through improper *acquisition* of a trade secret, not only through use."); Dealertrack, Inc. v. Huber, 460 F. Supp. 2d 1177, 1184 (C.D. Cal. 2006) (denying motion to dismiss California UTSA claim for failing to plead use of trade secrets because plaintiffs properly pleaded improper acquisition). The question of what remedy can be afforded for acquisition liability remains a subject for discussion.

89. *See, e.g.,* O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005), *amended on other grounds*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006), *aff'd per curiam*, 221 F. App'x 996 (Fed. Cir. 2007) (unpublished decision); LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp. 2d 182, 186 n.7 (S.D.N.Y. 2002).

who is a willing licensee, at the time the infringement began — a construct referred to as the "hypothetical negotiation[ ]."[90] To determine the reasonable royalty that would result from the hypothetical negotiation, the *Georgia-Pacific* court identified 15 categories of evidence to consider.[91]

The many significant differences between patents and trade secrets mean that the *Georgia-Pacific* factors should not simply be imported into trade secret misappropriation cases without thoughtful consideration. For example, many of the *Georgia-Pacific* factors are based on benchmark licenses or royalties for the technology (e.g., factors 1, 2, 3, and 4) that are highly unlikely to exist in trade secret cases where the value of the trade secret depends on keeping it a secret. Moreover, many other *Georgia-Pacific* factors (e.g., factors 6, 8, and 10) are traditionally analyzed through sales of commercialized products; yet if the parties are engaging in a reasonable royalty analysis because actual loss and unjust enrichment are not provable, it may be because the trade secret misappropriation occurred in a nascent market that, by definition, does not have commercialized products. Additionally, some argue that the entire construct of a hypothetical negotiation to license one's most fiercely guarded trade secrets to a competitor is inconsistent with the whole point of having trade secrets. Thus, finding appropriate data points to inform such a negotiation can be especially challenging in a trade secret case.[92]

---

90. Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120–22 (S.D.N.Y. 1970).

91. *Id.* at 1120.

92. An analysis of trade secret damages awards supports this reasoning—just under five percent of damages awards for trade secrets claims were for a reasonable royalty from 2000 to 2014. Elizabeth A. Rowe, *Unpacking Trade Secret Damages*, 55 HOUS. L. REV. 155, 175 (2017). The vast majority of damages awarded in trade secrets cases are for compensatory damages, including lost profits and unjust enrichment. *Id.* ("Approximately 85% of the awards consisted of compensatory damages.").

In many instances, this problem is exacerbated when courts must turn to the reasonable royalty measure as the damages measure of last resort when actual loss and unjust enrichment fail to provide a nonspeculative measure.

*C. Speculation and Reasonable Certainty*

> **Principle No. 2 – The existence of damages and the measurement of a monetary damages award for misappropriation must not be speculative, but the amount of damages need not be proved with mathematical certainty.**

Once the fact of misappropriation is proved, trade secret cases have expressly relaxed the level of certainty required to measure the amount of money to award as damages.[93] The law requires only that some reasonable basis for computing damages be used, and that damages may be computed even if the result reached is an approximation.[94] Illustrative are the jury instructions in recent trade secret trials that the amount of damages did

---

93. *See, e.g.*, Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc., 35 F.3d 1226, 1245 (8th Cir. 1994) ("If it is speculative and uncertain whether [trade secret] damages have been sustained, recovery is denied. [But] [i]f the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." (citations omitted)); Stanacard, LLC v. Rubard LLC, 12 Civ. 5176 (CM), 2016 WL 6820741, at *4 (S.D.N.Y. Nov. 10, 2016); Weston v. Buckley, 677 N.E.2d 1089, 1093 (Ind. Ct. App. 1997) ("Although [a damages award for trade secret misappropriation] cannot be based upon mere speculation or guesswork, no degree of mathematical certainty is required in the damage calculation." (citation omitted)).

94. *See, e.g.*, Sargon Enters., Inc. v. Univ. of S. Cal., 55 Cal. 4th 747, 774 (Cal. 2012); Meister v. Mensinger, 230 Cal. App. 4th 381, 396–97 (Cal. Ct. App. 2014); Leoni v. Bemis Co., 255 N.W.2d 824, 825 (Minn. 1977); Storage Tech. Corp. v. Cisco Sys., Inc., 395 F.3d 921, 928–29 (8th Cir. 2005).

not need to be shown with "mathematical precision," so long as the jurors did not "speculate or guess in awarding damages."[95]

A general rule in most jurisdictions is that if damages are difficult to establish, an injured party need only prove damages with reasonable certainty.[96] For example, in *Stanacard, LLC v. Rubard LLC*, the court stated that: "The rule which proscribes the recovery of uncertain and speculative damages applies where the fact of damages is uncertain, not where the amount is uncertain . . . . Damages are not rendered uncertain because they cannot be calculated with absolute exactness . . . . Their extent may be established 'as a matter of just and reasonable inference, although the result be only approximate.'"[97]

*D. Theories of Monetary Relief in Trade Secret Cases May Overlap, But No Double Counting is Permitted*

## **Principle No. 3 – Multiple theories of measuring damages for misappropriation may be applied so long as there is no double counting.**

As long as there is no double counting, damages for trade secret misappropriation can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.[98]

---

95.   Jury Instructions at 37, Steves and Sons, Inc. v. Jeld-Wen, Inc., No. 3:16-CV-545, 2018 WL 2172502 (E.D. Va. May 10, 2018) D.I. 1614 (verdict for plaintiff); Final Jury Instructions at 41–42, BladeRoom Grp. Ltd. v. Facebook, Inc., 2018 WL 1611835 (N.D. Cal. May 7, 2018) D.I. 827-1 (same).

96.   Spector v. Fireman's Fund Ins. Co., 451 Fed. App'x 130, 134 (3d Cir. 2011) (quoting ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 669–70 (3d Cir. 1998)).

97.   *Stanacard*, 2016 WL 6820741 at \*4; *See also Weston*, 677 N.E.2d at 1093.

98.   UTSA With 1985 Amendments § 3(a) and related comments ("Damages can include both the actual loss caused by misappropriation and the unjust

For example, when both lost profits and unjust enrichment damages are claimed, it is important to address the extent to which there is overlap between these damage claims. In those instances where there is complete overlap, basing an award on the higher amount can typically eliminate any double counting. However, in situations where there is partial overlap between different damages measures, it is important that there be sufficient detail and information providing a basis for elimination of any potential double counting.

## *E. Additional Issues*

In addition to the core principles described above, other issues repeatedly arise when assessing damages in trade secret cases. This section addresses several such issues, including timing, causation, apportionment, and the interplay between monetary remedies for trade secret misappropriation and other legal theories and equitable remedies.

### 1. Timing

> **Guideline No. 1 – The duration of the trade secret damages period should align with the elimination of defendant's unfair commercial advantage.**

In defining a damages period, it is widely recognized that trade secret damages are recoverable for the period of time necessary to eliminate the unfair commercial advantage gained

---

enrichment caused by misappropriation that is not taken into account in computing actual loss." "As long as there is no double counting, Section 3(a) adopts the principle of the recent cases allowing recovery of both a complainant's actual losses and a misappropriator's unjust benefit that are caused by misappropriation.").

from actionable misappropriation.[99] This concept, well grounded in UTSA principles and related commentary, is sometimes described as the "head start rule" or as extending damages as long as necessary to remedy a "head start or other unfair advantage."[100]

The secrecy period is the time the trade secrets were unknown or not ascertainable through proper means. One can be liable for trade secret misappropriation only if the misappropriation takes place during this secrecy period.[101] The duration of the damages period for trade secret misappropriation, however, may extend beyond the secrecy period as necessary to eliminate

---

99. The UTSA does not expressly limit the time for calculating money damages. However, the comments to Section 3 of the UTSA, which permits monetary damages, adopts the time limits stated in Section 2, which permits injunctive relief. UTSA § 3 cmt. ("Like injunctive relief, a monetary recovery for trade secret misappropriation is appropriate only for the period in which information is entitled to protection as a trade secret, plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation."). *See also id.*, § 2(a) ("[An] injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.").

100. RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 45 cmt. h (AM. LAW INST. 1995) (extending monetary relief "to the extent necessary to remedy a head start or other unfair advantage attributable to defendant's prior access to information").

101. A court may determine the secrecy period would have ended earlier than the rest of the market would otherwise have ascertained the trade secret if the court finds the defendant would have independently ascertained the trade secret earlier than that. *See, e.g.*, Agilent Techs. v. Kirkland, 2010 WL 610725 (Del. Ch. Feb. 18, 2010) (awarding lost profits and unjust enrichment damages for a three-year period representing the time it would have taken defendant to develop commercially viable and competitive product absent the unauthorized use of plaintiff's trade secrets, plus an additional year of lost-profit damages beyond the head-start period to address defendant's increased market share).

any unfair commercial advantage or other financial impact due to the trade secret misappropriation.[102] Courts have rejected efforts by defendants to limit damages to the head start gained in their development of a competing product where this excludes or could exclude the plaintiff's recovery for other losses or other ways the defendant has been unjustly enriched.[103]

2. Causation

### Guideline No. 2 – A trade secret plaintiff bears the burden to prove that defendant's

102. *See e.g.*, Federal Express Corp. v. Accu-Sort Sys., Inc., No. 01-2503 Ma/A, 2005 WL 8156707, at \*17–18 (W.D. Tenn. Mar. 30, 2005) (denying motion for summary judgment seeking to cut off damages as of issuance of patent and stating, "an act of misappropriation can cause plaintiff to lose profits, or a defendant to receive illicit gains, after the trade secret is made public . . . . Whether and to what extent any such damages may be measured by profits Accu-Sort made after FedEx sought or received its patents remains a disputed question of fact."); *see also* TurnKey Sols. Corp. v. Hewlett Packard Enter. Co., No. 15-cv-01541-CMA-CBS, 2017 WL 3425140, at \*6 (D. Colo. Aug. 9, 2017) (denying Hewlett Packard's motion for summary judgment limiting Turn-Key's damages for trade secret misappropriation and breach of confidentiality agreement to the period prior to the publication of the trade secrets in plaintiff's patent application).

103. Johns Manville Corp. v. Knauf Insulation, LLC, No. 15-CV-00531-RBJ-KLM, 2017 WL 4222621, at \*8–10 (D. Colo. Sept. 22, 2017) (denying defendant's motion for summary judgment seeking to limit plaintiff's damages to the head-start period); Sabre GLBL, Inc. v. Shan, 779 Fed. App'x 843, 851 (3d Cir. 2019) (rejecting challenge to arbitrator's award of head-start damages based on lack of evidence of saved development costs because head-start damages and saved development costs are not "the same thing"); Alifax Holding SpA v. Alcor Sci. Inc., 404 F. Supp. 3d 552, 573 (D.R.I. 2019) (head-start damages was one of two alternative approaches for calculating unjust enrichment damages); *Agilent Techs.*, 2010 WL 610725, at \*27 (to prevent what the court deemed "underenforcement" and in order to avoid having to enter an injunction enjoining sales of the defendant's competing product, the court awarded an additional year of actual loss damages beyond the head-start period).

**misappropriation was the proximate cause of its damages.**

A plaintiff alleging misappropriation of trade secrets must prove proximate causation to receive damages for its lost sales, its lost profits, or disgorgement of a defendant's profits.[104] The plaintiff also bears the burden to prove causation of its own losses (whether sales or profits).[105]

Regarding disgorgement, a plaintiff generally must show that the defendant's misappropriation proximately caused the defendant's unjust enrichment.[106] After that showing, the

---

104.  *See* 18 U.S.C. § 1836(b)(3)(B)(i) (authorizing award for "actual loss caused by the misappropriation" and disgorgement of "any unjust enrichment caused by the misappropriation"); UTSA With 1985 Amendments § 3 (same); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 (AM. LAW INST. 1995) (plaintiff may seek monetary relief for "pecuniary loss . . . caused by" misappropriation or "pecuniary gain resulting from" misappropriation).

105.  *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. b (AM. LAW INST. 1995) ("The plaintiff bears the burden of proving the fact and cause of any loss for which recovery is sought"); *see also, e.g.*, *In re* TXCO Res., Inc., 475 B.R. 781, 822–23 (Bankr. W.D. Tex. 2012) (applying Texas law: "In order to recover actual damages, [aggrieved party] was first required to show that [alleged misappropriator's] use of [aggrieved party's] trade secrets proximately caused [it] to suffer a specific injury"); Scentsational Techs., LLC v. Pepsico, Inc., No. 13-CV-8645 (KBF), 2018 WL 2465370, at \*7 (S.D.N.Y. May 23, 2018), *aff'd*, 773 F. App'x 607 (Fed. Cir. 2019) ("[I]n order to hold a party liable for lost profits [due to misappropriation], a plaintiff must establish proximate causation by the defendant."); Firetrace USA., LLC v. Jesclard, 800 F. Supp. 2d 1042, 1055 (D. Ariz. 2010) (summary judgment appropriate where plaintiff failed to show disclosure or use was "substantial factor" in development of competing product); Hunter Bldgs. & Mfg., L.P. v. MBI Glob., L.L.C., 436 S.W.3d 9, 18 (Tex. App. 2014) ("To recover lost profits, the plaintiff must produce evidence from which the jury reasonably may infer that the lost-profits damages for which recovery is sought have resulted from the conduct of the defendant.").

106.  *See, e.g.*, Propulsion Techs., Inc. v. Attwood Corp., 369 F.3d 896, 905 (5th Cir. 2004) (finding judgment as a matter of law appropriate where "there is

burden then shifts to the defendant to apportion the value of the defendant's profits or other benefit attributable to its wrongdoing.[107] Notwithstanding any burden shifting, then, the ultimate proof of proximate causation regarding disgorgement of a defendant's profits or unjust benefits will likely remain the responsibility of the plaintiff.

On the other hand, courts have generally not required plaintiffs to show proximate causation before awarding reasonable royalties.[108] Some states, such as California and Delaware, explicitly provide that reasonable royalties may be available in the absence of proof of actual damages or disgorgement.[109] A

no evidence that [defendant] used trade secrets to generate [its] profits"); GeoMetWatch Corp. v. Hall, No. 1:14-CV-60-JNP, 2018 WL 6240991 at *15 (D. Utah Nov. 27, 2018) (granting summary judgment against unjust enrichment theory under Utah Uniform Trade Secrets Act for plaintiff's failure to show defendants were enriched by "sales attributable to the use of the trade secret"); *In re* Nortel Networks, Inc., No. 09-10138(KG), 2016 WL 491639, at *9 (Bankr. D. Del. Feb. 8, 2016) ("The plaintiff bears the burden of demonstrating that defendant's misappropriation proximately caused its unjust enrichment.") (citing Total Care Physicians, P.A. v. O'Hara, No. Civ.A. 99C-11-201JRS, 2003 WL 21733023, at *2 (Del. Super. July 10, 2003)).

107. *See* Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 539 (5th Cir. 1974) ("If the defendant enjoyed actual profits, a type of restitutionary remedy can be afforded the plaintiff—either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success.").

108. *See* 18 U.S.C. § 1836(b)(3)(B)(ii) ("in lieu of damages measured by other methods, the damages caused by the misappropriation [may be] measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret"); UTSA With 1985 Amendments § 3 (same).

109. *See, e.g.*, CAL. CIV. CODE § 3426.3(b) ("If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited."); DEL. CODE ANN. tit. 6, § 2003 ("In lieu of

reasonable royalty, however, "attempts to measure the value to the defendant to what he appropriated," even where no profit was realized as a counterfactual "reasonable estimate of value" of the trade secret.[110] It is thus not generally subjected to proof of proximate cause.[111] Nevertheless, as the value of a reasonable royalty is generally tied (at least in part) to the scope of the misappropriation, facts relating to proximate causation should remain relevant to the determination of a reasonable royalty.[112]

3. Apportionment

> ### Guideline No. 3 – In cases where multiple trade secrets are asserted, the trade secret claimant should provide evidence of apportionment

damages measured [by actual loss or unjust enrichment], the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty").

110. *Univ. Computing*, 504 F.2d at 537–38.

111. *See, e.g.*, *In re* TXCO Res., Inc., 475 B.R. 781, 825 (Bankr. W.D. Tex. 2012) ("As opposed to an award of damages for lost profits, which requires the plaintiff to prove proximate causation and damages with reasonable certainty, an award of damages based on a reasonable royalty does not require the plaintiff to prove a specific injury."); Atl. Inertial Sys. v. Condor Pac. Indus. of Cal., No. 2:08-CV-02947-CAS, 2015 WL 3825318, at \*7 (C.D. Cal. June 18, 2015) (rejecting defendant's argument that reasonable royalty could not be awarded where there was no proof of proximate cause); DiscoverOrg Data, LLC v. Bitnine Glob., Inc., No. 19-CV-08098-LHK, 2020 WL 6562333, at \*9 (N.D. Cal. Nov. 9, 2020) (awarding reasonable royalty despite admitted lack of evidence of proximate cause).

112. *See, e.g.*, *Atl. Inertial Sys.*, 2015 WL 3825318, at \*6 (factor in determining value of reasonable royalty under California law includes "whether some benefit, pecuniary or otherwise, accrued to the misappropriating defendant"); *In re TXCO*, 475 B.R. at 826 (factor in determining value of reasonable royalty under Texas law includes "the nature and extent of the use the defendant intended for the secret").

> **of damages or evidence why an apportion-
> ment is not appropriate.**

A related issue to causation is "apportionment"—that is, to focus the damages on scope of the relevant trade secrets and not anything else. Apportionment in trade secret damages refers to two issues. First, the product or service in question may or may not have parts or components unrelated to the trade secrets. If so, an evaluation should be done as to the trade secrets' "integral nature" in the product, and their contributions to total product value. Second, if there are multiple trade secrets, an additional evaluation should be done as to different trade secrets' contributions to value, if they are separable.

### a. Product Value Apportionment

Where the product or service accused of incorporating misappropriated trade secrets is complex enough to have several constituent parts, only some of which contain one or more trade secrets, the valuation question arises as to the relative importance, or contribution, of the trade secrets to the value of the whole product or service. This question is specific to the scope of the trade secrets and the nature of the accused product or service.

It may be that the entire value of the product is fairly attributed to the trade secrets because they are the primary driver of the demand for the product. Often, though, there are multiple drivers of demand, especially for complex products. Techniques of demand-side analysis[113] exist that may shed light on the question of the relative contribution of the trade secrets to the total value of the product. If the trade secrets do not easily map to

---

113. Two such examples are hedonic feature regressions, which explore the degree to which external and internal factors affect demand, and conjoint customer surveys, a research technique used to quantify values of individual features of a product or service.

product features visible to the customer, it may be that they contribute value by reducing costs an identifiable amount, thereby contributing to incremental profit. Through all these types of analysis, it is important to avoid ad hoc techniques and to tie the chosen methods closely to the facts of the trade secrets and products in the case. For example, the court in *Waymo v. Uber* criticized Waymo's expert's reliance on the Uber document concerning incremental profits because there was "no apportionment for the *legitimate* elements of the Ottomotto acquisition."[114] The Southern District of New York reached a similar requirement in *In re Avaya, Inc.*, holding that apportionment is required where a product includes both legitimately acquired benefits and misappropriated trade secrets.[115] The *Avaya* court borrowed heavily from patent law in its ruling that apportioning the value of a trade secret based on "the cost or price of a component compared to the cost of the entire multi-component product" was appropriate.[116]

### b. Multiple Trade Secret Apportionment

Where multiple trade secrets are asserted, one should assess apportionment of damages among the various claimed trade secrets. While trade secret law remains unsettled regarding

---

114. Waymo LLC v. Uber Techs., Inc., No. C-17-00939-WHA, 2017 WL 5148390, at \*4, \*6 (N.D. Cal. Nov. 6, 2017). *See also* StoneCoat of Texas, LLC v. ProCal Stone Design, LLC, 426 F. Supp. 3d 311, 352 (E.D. Tex. 2019) ("Plaintiffs have not presented evidence that provides any means of distinguishing revenue [defendants] gained from other sources from revenue gained through misappropriation of [the trade secrets], let alone a calculation of profits from the relevant portion of revenue." (citation omitted)).

115. *In re* Avaya Inc., No. 17-10089 (SMB), 2018 WL 1940381, at \*8 (Bankr. S.D.N.Y. Apr. 23, 2018), *aff'd,* 602 B.R. 445 (S.D.N.Y. May 6, 2019).

116. *Id.*, at \*8–9 ("Arnold properly measured the unjust enrichment by apportioning the value of the trade secrets to the entire PSU based on the cost of their components.").

whether apportionment is required, courts are increasingly likely to require some element of apportionment. The likelihood that apportionment will be required increases when the trade secret plaintiff asserts larger numbers of trade secrets or the accused product/service at issue is a composite of accused and nonaccused components. Upon investigation, it may be the case that each asserted trade secret is so integral to the product that it is truly impossible to apportion value between them.[117] It may also be the case that each trade secret, or subsets of the asserted trade secrets, overlap in their contribution to product value, such that the total damages amount results as long as the jury finds liability for at least one, or one group, of the trade secrets. Or, as the *LivePerson v. [24]7.AI*[118] case (below) illustrates, it may be possible to parse out what parts of damages result from the infringement of certain trade secrets, such that adding up the parts generates the total damages should the jury find liability for all the asserted trade secrets.

The following representative opinions illustrate some instances where the courts have emphasized the importance of addressing multiple trade secret apportionment as part of their damages analysis.

In *O2 Micro International v. Monolithic Power Systems*, the plaintiff alleged eleven trade secrets were misappropriated, but the jury found only five of the trade secrets were misappropriated, and only one misappropriated trade secret resulted in the defendant being unjustly enriched.[119] Since the plaintiff's

---

117. *See, e.g.*, Huawei Techs. Co. v. Yiren Huang, No. 4:17-CV-00893, 2019 WL 2395276, at *3 (E.D. Tex. June 6, 2019) ("[Plaintiff] is a small start-up company . . . the asserted trade secrets are an integral part of the . . . research and development and it is not possible to identify and apportion research and development expenses that are tied solely to the ten trade secrets.").

118. No. 17-CV-01268-JST, 2018 WL 6257460 (N.D. Cal. Nov. 30, 2018).

119. 399 F. Supp. 2d 1064, 1076–77 (N.D. Cal. 2005).

damages expert "provided the jury with a damages calculation based on an assumption that all of the trade secrets were misappropriated," the jury was "then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages."[120] As a result, the court vacated the jury's award of \$12 million unjust enrichment damages for the misappropriation of trade secrets on the grounds that the plaintiff failed to prove unjust enrichment damages for the trade secrets that the jury found to have been misappropriated.[121]

Following the practical logic in *O2 Micro*, courts frequently require apportionment of damages among individual trade secrets.[122] For example, in *LivePerson*, the court excluded a damages expert's opinion "because he does not apportion trade secret misappropriation damages among particular alleged trade secrets, and offers no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case."[123] The plaintiff's expert addressed the court's concerns in a supplemental report, apportioning the trade secrets by (1) apportioning damages by customers with whom the trade secret was associated, (2) apportioning damages to three categories of trade secrets, and (3) apportioning damages within those categories.[124] The court accepted the new apportionment despite the defendant's concerns about using a "per-unit calculation."[125]

---

120. *Id*.

121. *Id*. at 1077.

122. *See, e.g.*, Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc., 895 F.3d 1304, 1317 (Fed. Cir. 2018), *cert. denied*, 139 S.Ct. 2741 (2019); Ford Motor Co. v. Versata Software, Inc., No. 15-11624, 2018 WL 10733561, at *10–11 (E.D. Mich. July 9, 2018).

123. 2018 WL 6257460, at *2.

124. *Id*. at *2.

125. *Id*. at *3–4.

But apportionment may not be required if the facts suggest otherwise. For example, in *BladeRoom Group v. Emerson Electric*, the jury awarded the plaintiff $10 million in lost profit damages and $20 million in unjust enrichment damages for the defendant's misappropriation of the plaintiff's trade secrets.[126] Posttrial, the defendant challenged the sufficiency of the evidence to support the damages award, in part because "the jury was not asked to apportion damages among the trade secrets."[127] The court rejected the defendant's argument and upheld the damages awards, stating: "Relevant California authority does *not* require an apportionment of damages."[128] The court reasoned that in the absence of a rule requiring apportionment, the plaintiff "could argue that since its trade secrets encompass the designs and methods used to create parts of a unified structure, the misappropriation of any of the asserted trade secrets would have caused all of the damages it sought."[129]

Similarly, in *Huawei Technologies v. Yiren Huang*, the court permitted the plaintiff's expert to testify that it was not possible to apportion damages by trade secret because the trade secrets were all integral to the product.[130] The court reasoned that "failure to apportion is not fatal" to the expert's opinion because

---

126.    331 F. Supp. 3d 977, 979 (N.D. Cal. 2018).

127.    *Id*. at 989.

128.    *Id.* (emphasis added).

129.    *Id.*; *see also* Sabre GLBL, Inc. v. Shan, 779 Fed. App'x 843, 852 (3d Cir. 2019); CardiAQ Valve Techs., Inc. v. Neovasc Inc., No. 14-CV-12405-ADB, 2016 WL 6465411, at *11–12 (D. Mass. Oct. 31, 2016) (denying motion for new trial on damages where jury found three of six asserted trade secrets misappropriated and expert did not testify as to reasonable royalty for each trade secret because court found jury had reasonable basis to conclude that the individual trade secrets misappropriated solved the same challenges and gave defendant the same head start).

130.    2019 WL 2395276, at *3 (E.D. Tex. June 6, 2019).

whether the full amount of damages is attributable to the misappropriation of trade secrets is for the jury to decide.[131] Accordingly, "any challenges to that model and allocation scheduled set forth in the [Expert] Report is best handled on cross-examination."[132]

4. Interplay between monetary remedies for misappropriation of trade secrets and other legal theories, including breach of contract

> **Guideline No. 4 – Claims for trade secret misappropriation and for misuse of confidential information in breach of contractual obligations are not necessarily interchangeable. Liability and remedies under each theory should be analyzed separately.**

The UTSA "displaces conflicting tort, restitutionary, and other . . . civil remedies for misappropriation of a trade secret,"[133] but "does not affect: (1) contractual remedies, whether or not based upon misappropriation of a trade secret." [134] The DTSA does not "preempt or displace any other remedies."[135] Accordingly, actions for breach of contract are consistent with both trade secret statutes. In fact, many trade secret cases include claims seeking monetary damages for breach of confidentiality or nondisclosure agreements by former employees or business partners. In reviewing these claims, courts undertake as a separate inquiry the interpretation and enforceability of these contracts.

---

131. *Id.* at \*4.

132. *Id*.

133. UTSA § 7(a).

134. UTSA § 7(b).

135. 18 U.S.C. § 1838.

The elements of liability and remedies for a breach of contract or other asserted claims do not mirror the elements of liability and remedies for misappropriation of trade secrets. For example, while protectable trade secrets require proof of reasonable efforts by the owner to maintain secrecy and that the information to be protected derives independent economic value from having been kept secret, a contractual obligation of confidentiality is not necessarily tethered to the same requirements.[136] In addition, the timeliness of a contract claim is often based on the accrual of the cause of action, i.e., as of the date of breach, while the timeliness of a misappropriation claim is based on the date the trade secret owner discovered (or reasonably should have discovered) the misappropriation.[137] Remedies differ in many aspects as well, including that punitive damages generally are not available for breach of contract but are available for willful trade secret misappropriation.[138] In short, breach of contract claims have different elements and damage theories from statutory trade secret

---

[136].   *See, e.g.*, FLA. STAT. § 542.335 (in the course of defining "legitimate business interests" that may be protected in written restrictive covenant, this Florida statute expressly differentiates "trade secrets" from "valuable confidential or business information that otherwise does not qualify as trade secrets" (emphasis added)).

[137].   *See* Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd., No. N15C-08-168-AML-CCLD, 2019 WL 6726836, at \*8 (Del. Super. Ct. Dec. 4, 2019) (the statute of limitations for breach of contract begins to run "at the time of the wrongful act" (the accrual of the cause of action); in comparison, the statute of limitations for trade secret misappropriation under Delaware's UTSA "begins to run after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." (citations omitted)).

[138].   UTSA § 3(b).

claims; a success on one group of claims is no guarantee of success on the other.[139]

In addition, the resolution of contractual or other legal claims, on the one hand, and trade secret claims on the other, may influence the resolution of each other in particular disputes.[140] For example, a nondisclosure agreement may define and give notice of the trade secrets being protected, and may set a time limit during which information designated under the agreement is deemed confidential. The danger to the trade secret holder is that a failure to include material could be argued as a waiver, and a contractually set time limit—which may have been set before the parameters of the trade secret were fully understood—may then be determinative on the duration of trade secret protection under the law.[141] For another example, if the trade secret holders fail to comply with the confidentiality requirements specified in the nondisclosure agreement, a waiver may be found (or at least claimed).[142]

---

139. *E.g.*, AcryliConUSA, LLC v. Silikal GmbH, 985 F.3d 1350 (11th Cir. 2021); OrthoFix, Inc. v. Hunter, 630 F. App'x 566 (6th Cir. 2015); Whiteslate, LLP v. Dahlin, 20-CV-1782 W (BGS), 2021 WL 2826088 (S.D. Cal. July 7, 2021).

140. *See, e.g.*, BladeRoom Group Ltd v Emerson Electric Co., 11 F.4th 1010, 1017, 1022–24 (9th Cir. 2021) (holding that district court erred in interpreting Emerson's confidentiality obligations under the nondisclosure agreement and thus vacated the jury's findings not just on breach of contract, but also its findings on misappropriation of trade secrets, its award of damages for breach of contract and trade secret misappropriation, and its determination that defendant willfully and maliciously misappropriated plaintiff's trade secrets (for which the district court awarded punitive damages)).

141. *See, e.g.*, Silicon Image, Inc. v. Analogix Semiconductor, Inc., No. C-07-00635 JCS, 2008 WL 166950, at *8, *16–17 (N.D. Cal. Jan. 17, 2008); On-Line Techs. v. Perkin Elmer Corp., 141 F. Supp. 2d 246, 256 (D. Conn. 2001); DB Riley, Inc. v. AB Engineering Corp., 977 F. Supp 84, 91 (D. Mass. 1997); ECT Int'l, Inc. v. Zwerlein, 597 N.W.2d 479, 484–85 (Wis. Ct. App. 1999).

142. *See, e.g.*, Convolve, Inc. v. Compaq Computer Corp., 527 F. App'x 910, 925 (Fed. Cir. 2013).

5. Interplay between monetary remedies and equitable remedies in trade secret cases

> **Guideline No. 5 – From the outset of a case, the parties should consider all available equitable and monetary remedies, since the parties' positions on equitable remedies will affect their positions on monetary remedies and vice versa.[143]**

Under the appropriate circumstances, courts are empowered to grant both damages and injunctive relief.[144] Given the facts of a particular case, the parties and the court should consider how the approach to monetary relief may affect the entitlement to injunctive relief and vice versa.[145]

To obtain interim or permanent injunctive relief, the moving party must establish that, absent relief, it will suffer irreparable harm. As part of this assessment, courts focus on whether monetary relief is possible to quantify under the circumstances and if it will make the movant whole, such that the movant has an "adequate remedy at law" and therefore is not entitled to injunctive relief.[146]

---

143. See also The Sedona Conference, Commentary on Equitable Remedies in Trade Secret Litigation, Guideline 13, 23 SEDONA CONF. J. 591, 721 (2022) [hereinafter Sedona Trade Secret Equitable Remedies].

144. Steves & Sons, Inc. v. Jeld-Wen, Inc., No. 3:16-CV-545, 2018 WL 6272893, at \*4 (E.D. Va. Nov. 30, 2018) (interpreting DTSA and Texas UTSA and collecting cases).

145. Whether injunctive relief is available to remedy trade secret misappropriation and, if so, in what form is discussed in *Sedona Trade Secret Equitable Remedies*, *supra* note 143.

146. DVD Copy Control Assn., Inc. v. Kaleidescape, Inc., 176 Cal. App. 4th 697, 702, 726 (Cal. Ct. App. 2009); *See, e.g.*, Bladeroom Grp. Ltd. v. Emerson Elec. Co., No. 5:15-cv-01370-EJD, 2019 WL 1117537, at \*2 (N.D. Cal. Mar. 11, 2019) ("In other words, to say that the harm is irreparable is simply another

Movants often cite the loss of business goodwill or threats to established customer relationships as circumstances that are difficult if not impossible to compensate with money damages, but they must show these claims to be true, not just recite conclusory or speculative allegations.[147]

Enlisting economic experts at an early stage to assist the court in deciding a motion for interim injunctive relief can cut both

---

way of saying that pecuniary compensation would not afford adequate relief or that it would be extremely difficult to ascertain the amount that would afford appropriate relief") (*citing DVD Copy Control*, 176 Cal. App. 4th at 722), *rev'd on other grounds, vacated judgment and post-verdict orders and remanded for new trial on breach of contract, misappropriation and damages, and vacated award of attorneys' and expert witness fees by*, 11 F.4th 1010, 1022, 1024 (9th Cir. 2021).

147. *See generally* the discussion in the *Sedona Trade Secret Equitable Remedies*, *supra* note 143, at 694 n.194 (*citing In re* Document Techs. Litig., 275 F. Supp. 3d 454, 469 (S.D.N.Y. 2017) (rejecting "conclusory statements from [plaintiff's] Chief Integration Officer that the company saw 'harm to [its] good will' because of the defendant's 'abrupt' departure," finding that it is precisely such 'unsubstantiated testimony, disconnected from proof that any customers have actually ceased doing business with [plaintiff] or testimony from any clients that they think less of the company, that New York courts have held is insufficient to show actual or imminent harm to a plaintiff's "goodwill"); Katch, LLC v. Sweetser, 143 F. Supp. 3d 854, 875 (D. Minn. 2015) (finding that plaintiff had offered no explanation as to why damages would be impossible to measure or any more difficult than any other situation in which a party claims damages based on lost profits); Rapco Foam, Inc. v. Sci. Applications, Inc., 479 F. Supp. 1027, 1031 (S.D.N.Y. 1979) (finding that claiming there would be a "loss of competitive advantage" absent relief was not in itself sufficient to warrant injunctive relief where plaintiff presented no evidence concerning its position in the marketplace, the nature of competition within that market, or the impact of the misappropriation sufficient to show that any loss of competitive damages would not be measurable in money damages)); *See also* Cutera, Inc. v. Lutronic Aesthetics, Inc., 444 F. Supp. 3d 1198, 1208 (E.D. Cal. 2020); TGG Mgmt. Co. v. Petraglia, No. 19-CV-2007-BAS-KSC, 2020 U.S. Dist. LEXIS 6376, at \*22–23 (S.D. Cal. Jan. 14, 2020); Founder Starcoin, Inc. v. Launch Labs, Inc., No. 18-CV-972-JLS-(MDD), 2018 WL 3343790, at \*13–14 (S.D. Cal. July 9, 2018).

ways. Depending on the nature of the alleged trade secrets and their misappropriation, the proffered testimony may show either the futility of attempting to measure money damages or the likelihood of developing a plausible claim for money damages.[148]

Where damages awarded at the end of a case compensate a forward-looking injury, courts will often deny the request for injunctive relief as duplicative of the monetary relief, even if the damages award is less than the movant requested.[149] Where, however, the damages award is found to compensate for past harm, it may be appropriate to enter a forward-looking permanent injunction to prevent the future use of the trade secrets.[150]

As with other aspects of monetary and equitable relief, the assessment of a damages award and its effect on the entitlement to injunctive relief is fact specific. In making such determinations, courts often cite the positions the parties have taken throughout the case. For example, where the plaintiff's damages expert testified at trial about damages for harmful competition occurring in the future—and the jury instructions did not limit the temporal scope of damages (i.e., the concept of future damages was consistent with those instructions)—the damages award may be sufficient to make the plaintiff whole without

---

148. *Sedona Trade Secret Equitable Remedies*, *supra* note 143, at 698 n.201 (collecting cases).

149. *Id*. at 720 n.245–46 (collecting cases).

150. *See, e.g.*, TMRJ Holdings, Inc. v. Inhance Techs., LLC, 540 S.W.3d 202, 209 (Tex. App. 2018) (finding that permanent injunction was not duplicative of lump-sum reasonable royalty award, stating: "[A] damages award that compensates a plaintiff for past damages combined with relief to prevent future damages does not constitute a double recovery."); Steves & Sons, Inc. v. Jeld-Wen, Inc., No. 3:16-CV-545, 2018 WL 6272893, at \*4–5 (Nov. 30, 2018, E.D. Va.) (collecting cases for the proposition that reasonable royalties for past use of the trade secrets and permanent injunctions preventing future use can co-exist without running afoul of the one-satisfaction rule).

need for injunctive relief.[151] Alternatively, damages awards for the development costs avoided by the misappropriating party may not be sufficient, absent an injunction, to compensate the plaintiff for harm from future unauthorized disclosures of the trade secrets,[152] or for future gains from misappropriated trade

---

151. *Bladeroom Grp*., 2019 WL 1117537, at *3 (rejecting plaintiff's argument that permanent injunction was necessary to prevent harmful competition continuing into the future, citing testimony of plaintiff's damages expert purporting to quantify this injury: "Given this testimony, it is apparent BladeRoom believed at trial that its losses from future competition could be compensated with monetary damages . . . . Simply put, the trial evidence shows that BladeRoom's injury from future competition could be reduced to an amount of money, and a permanent injunction cannot be ordered merely because the requesting party did not receive the full extent of the legal relief it sought. The jury awarded BladeRoom the damages it found would fairly compensate BladeRoom for loss due to competition through 2020, and an injunction 'would be redundant of the legal relief which the jury has already awarded.'" (citations omitted)); Whiteside Biomechanics, Inc. v. Sofamor Danek Grp., Inc., 88 F. Supp. 2d 1009, 1020 (E.D. Mo. 2000) (denying permanent injunction, stating: "[T]he jury instructions did not limit the temporal scope of damages and that the concept of damages extending into the future is not inconsistent with the instructions given . . . . [P]laintiff's evidence and argument clearly contemplated and sought a damage award including future damages . . . . On this record, the Court concludes that the jury's damage award, though much smaller than plaintiff desired, represents the amount the jury believed would 'fairly compensate plaintiff for damages proximately caused by defendant's use of plaintiff's trade secrets' both to the date of verdict and in the future." (citation omitted)).

152. Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., No. 15-Civ.-211-(LGS), 2021 WL 1553926, at *13 (S.D.N.Y. Apr. 20, 2021) (the award of damages for avoided development costs deemed inadequate compensation in view of trial record demonstrating likely dissemination of trade secrets in the future and resulting irreparable harm if this conduct was not enjoined; *rev'd and remanded*, 2023 WL 3636674, at *17 (2d Cir. May 25, 2023) in part in light of trial court's entry of permanent injunction barring further use or disclosure of trade secrets).

secrets that had not been used or commercially implemented at the time of trial.[153]

Whether a permanent injunction may be duplicative of a lump-sum reasonable royalty award presents some unique issues. Generally, the jury (or court sitting in equity) calculates the amount of a lump-sum royalty based on a hypothetical negotiation of what a willing plaintiff and willing defendant would have settled on as a one-time payment to license the trade secrets at the time the misappropriation began. This negotiation often considers the future use of the trade secrets and the effect of that use on the parties' competitive positions.[154] In other words, a lump-sum reasonable royalty is often future-facing and may overlap with an injunction prohibiting the trade secrets' use. Some courts have refused to enter a permanent injunction in addition to a lump-sum royalty on these grounds.[155] Others have

---

153. Syntron Bioresearch, Inc. v. Fan, No. D033894, 2002 WL 660446, at *12–13 (Cal. Ct. App. Apr. 23, 2002) (rejecting the argument that the entry of a permanent injunction enjoining future use or implementation of trade secrets that had not been used or commercially implemented as of the time of trial amounted to a double recovery — the damages award was distinguished as compensating plaintiff's actual losses and defendant's avoided development costs).

154. *TMRJ Holdings*, 540 S.W.3d at 210. ("The concept, in application, asks what a tortfeasor would have paid had it bought the technology rather than misappropriated it. The jury charge's definitions thus incorporate both the future earnings of the tortfeasor and the loss of revenue and future worth to the owner in determining the present value of the technology.").

155. *See, e.g.*, *Steves & Sons*, 2018 WL 6272893, at *6–7 (denying permanent injunction in addition to lump-sum reasonable royalty, stating: "Having secured a reasonable royalty award based on what [the expert] told the jury, Jeld-Wen cannot now be heard to argue that Steves should be enjoined permanently from using the misappropriated trade secrets that [the expert] said that Steves could use for as long as it wanted in any way that it wanted if the jury would award damages in the amount of $9.9 million"). Cardiaq Valve Techs. v. Neovasc Inc., No. 14-cv-12405-ADB, 2016 WL 6465411, at *8 (D.

found that permanent injunctive relief can coexist with a lump-sum royalty without running afoul of the double-recovery rule.[156] Equitable relief includes not just injunctive relief but also certain types of monetary remedies that are awarded by the court and not by the jury or fact-finder.[157] For example, both the UTSA and the DTSA expressly provide that in exceptional circumstances an injunction may condition a defendant's future use on the defendant's payment of a reasonable royalty.[158] The comments to the UTSA describe this remedy as a "royalty order

Mass. Oct. 31, 2016) (denying permanent injunction in addition to a "future-facing" lump-sum reasonable royalty award that did not distinguish between past and future use of the trade secrets but rather approximated the sum that the defendant, in the fictional negotiation, would have been willing to pay to use the trade secrets indefinitely), *aff'd*, 708 Fed. App'x 654, 667–68 (Fed. Cir. Sept. 1, 2017).

156. *TMRJ Holdings*, 540 S.W.3d at 210–11 (While the court acknowledged that both the lump-sum royalty and the permanent injunction "conceivably redress [plaintiff's] future economic injury caused by [defendant]," it reasoned that the damages award alone did not make plaintiff whole for two reasons: first, the derivation of the royalty from the present value of the trade secrets to the defendant regardless of whether the plan to use them in the future comes to fruition; and second, the evidence showed that plaintiff never intended to make the trade secrets commercially available or to be licensed to third parties.); Sonoco Prods. Co. v. Johnson, 23 P.3d 1287, 1290 (Colo. App. 2001) (awarding lump-sum damages that plaintiff's counsel argued in closing represented both development costs and royalty for plaintiff's lost business; on this record there was no indication that damages were forward-looking or based on future gains realized by defendant related to the misappropriated information).

157. The focus of this *Commentary* is how to measure monetary remedies that may be available for trade secret misappropriation, including monetary "legal" remedies that are decided by the trier of fact as well as monetary "equitable" remedies that are decided by the court sitting in equity. While *Sedona Trade Secret Equitable Remedies*, *supra* note 143, also discusses monetary equitable relief, it reserves for this *Commentary* the question of how to calculate this relief.

158. UTSA § 2(b); DTSA, 18 USC § 1836(b)(3)(A)(iii).

injunction" and indicate that exceptional circumstances are those rendering prohibitive injunctions inequitable or impractical, including "a person's reasonable reliance on acquisition of a misappropriated trade secret in good faith and without reason to know of its prior misappropriation."[159] The royalty order injunction should be distinguished from the separate statutory remedy allowing for the recovery of a reasonable royalty as an alternative form of compensatory damages.[160] The former is an equitable remedy awarded by the court; the latter is a legal remedy that, depending on the jurisdiction, is decided by either the court or the jury.[161]

Some courts have held certain other monetary remedies—including an accounting of profits, disgorgement of the misappropriator's profits, and the misappropriator's avoided research and development costs (at least those not offered as a proxy for the plaintiff's lost profits or royalties)—to be an equitable "restitution" for which there is no right to jury trial. Instead, the court awards those remedies exercising its independent judgment.[162] In such cases, a jury may be asked for a nonbinding advisory opinion.[163]

---

159. UTSA § 2(b), Cmt.

160. UTSA § 3(a), Cmt.

161. Steves & Sons, Inc. v. Jeld-Wen, Inc., No. 3:16-CV-545, 2018 WL 6272893, at \*4 n.6 (the court distinguished between a royalty order injunction from the separate statutory remedy of reasonable royalty damages that had been awarded by the jury "under an entirely different provision, which allows for a reasonable royalty as a form of compensatory damages").

162. *Sedona Trade Secret Equitable Remedies*, *supra* note 143, at 621 n.31 (collecting cases).

163. Order, Motorola Solutions, Inc. v. Hytera Commc'ns Corp., No. 1:17-CV-1973 (N.D. Ill. Oct. 19, 2020) D.I. 1088 (deemed jury award of avoided research and development costs under DTSA advisory); *id*., Order (N.D. Ill. Jan. 8, 2021) D.I. 1099 (separate order awarding avoided research and development costs).

6.  Applying patent damages rules to trade secret damages analyses

> **Guideline No. 6 – Patent damages law and theory may or may not be applicable in a particular case, and care should be taken before importing patent damages law and theory.**

It is sometimes suggested that patent damages law can be imported wholesale into trade secret cases. This is wrong. While it may be appropriate in certain instances to import certain aspects of patent damages law, noteworthy differences exist between litigation involving trade secret misappropriation and patent infringement, setting up unique challenges that should be evaluated before simply importing damages guidance from patent law.

To be sure, there is some overlap between the form of damages measures that may be awarded for patent infringement and those that may be awarded for trade secret misappropriation.[164] While unjust enrichment may not be claimed in patent infringement (other than design patents), actual loss and reasonable royalties are available patent infringement remedies.

But it is also clear that trade secret misappropriation damages are unique and do not fit neatly into the patent infringement framework. Indeed, it is because of the many distinct differences between patent infringement and trade secret misappropriation

---

164.    For a thorough discussion of patent damages, see the publications and presentations published by The Sedona Conference Working Group 9 (Patent Damages and Remedies) including, *e.g.*, The Sedona Conference, *Commentary on Patent Damages and Remedies, Public Comment Version* (June 2014) [hereinafter *Sedona Patent Damages*], *available at*: https://thesedonaconference.org/publication/Patent_Damages_and_Remedies, and The Sedona Conference, *Commentary on Patent Reasonable Royalty Determinations* (Dec. 2016), *available at*: https://thesedonaconference.org/publication/Patent_Damages_and_Remedies.

that a more "flexible and imaginative"[165] approach propounded by the Fifth Circuit is necessary to properly compensate for the latter.

The following demonstrate some of the reasons for exercising caution in using patent damages law in trade secret cases:

- A plaintiff in patent infringement matters is always entitled to reasonable royalty damages at a minimum,[166] while royalty damages in trade secret litigation are not a floor and, depending on the jurisdiction, may not be available.

- There is a fundamental conceptual difference between a license for a trade secret and one for a patent: while patent infringement is a strict liability offense, trade secret misappropriation is not.

- A patent is a property right granted by a government that permits the owner to exclude others from practicing an invention for a defined period of time in exchange for public disclosure of the invention. A trade secret is information that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

- To obtain a patent one must generally invent or discover a new and useful process, machine, manufacture, or composition of matter. A trade

---

165. Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 538 (5th Cir. 1974) (quoting Enter. Mfg. Co. v. Shakespeare Co., 141 F.2d 916, 920 (6th Cir. 1944)).

166. 35 U.S.C. § 284.

secret may comprise information that is not new or novel so long as the statutory elements of its definition are met.

- A patent infringer's actions cannot destroy the patent; even if a patent is infringed, a patent owner's right to exclude others from practicing the patent remains intact. A trade secret, however, may be destroyed when it is misappropriated and disclosed or used by the misappropriator.

- Patents have statutory terms. Trade secrets can have an indefinite life, which may—all else being equal—add value to them.

- Trade secrets can be used if they are discovered independently or reverse engineered. Patents cannot be used without a license until they expire.

- It is reasonable—indeed, common—for a patent owner and a licensee to make simultaneous use of a patent. That is not ordinarily true of a trade secret.

For these reasons, while the concept of a reasonable royalty for a license to use a patent makes evident economic and business sense, that is not necessarily the case for a trade secret. Arguably, a hypothetical negotiation to license trade secrets to one's competitor is inconsistent with the inherent value of the trade secrets.

In addition, some courts have turned to apportionment principles from patent law when evaluating trade secret damages, such as consideration of the entire-market-value rule.[167] The

---

167. For a background discussion of the entire-market-value rule, *see Sedona Patent Damages*, *supra* note 164, Section I.E.2 (Current State of the Law

entire-market-value rule dictates that "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."[168] Assuming the applicability of this rule to trade secret matters, plaintiffs can only recover damages for the value of the entire product where they can prove that the misappropriated features drive demand for the product as a whole, and, in fact, courts have excluded damages experts for failing to apportion damages to account only for the portion of the product that came from the misappropriated trade secrets.[169] Of note, however, unlike in patent litigation where the patent at issue has limitations and claims, courts applying the entire-market-value rule in trade secret cases have allowed for "overall idea[s]" that contribute to the formation of a product, in addition to the

---

Regarding the Determination of a Reasonable Royalty—Entire Market Value Rule and Apportionment); for full discussion of the application of the entire-market-value rule for a patent reasonable royalty determination, *see id.*, Part III.B.1. (Determining the Royalty Rate—The Entire Market Value Rule (EMVR)).

168. MSC Software Corp. v. Altair Eng'g, Inc., No. 07-12807, 2015 WL 13273227, at *4 (E.D. Mich. Nov. 9, 2015) (citing VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1326 (Fed. Cir. 2014)) (excluding opinions of damages expert for failing to apportion damages to account for the portion of the product that came from the misappropriated trade secrets); *see also* Ford Motor Co. v. Versata Software, Inc., No. 15-CV-10628-MFL-EAS (consolidated with No. 15-11624), 2017 U.S. Dist. LEXIS 144833, (E.D. Mich Aug. 7, 2017) (citing to ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010), a patent case, and excluding expert testimony which failed to apportion value between the features of the software protected by intellectual property and the other features).

169. *Id*.

misappropriated trade secrets, to be included in the royalty calculation.[170]

In short, courts, parties, and experts must consider the similarities and, importantly, the differences between patents and trade secrets when evaluating whether, and how, patent damages law may be applied in evaluating trade secret damages.

7. Improper acquisition but no use or disclosure

Depending on the jurisdiction, a plaintiff may or may not be entitled to recover damages for actual loss based on wrongful acquisition alone. For example, in *Oakwood Labs. v. Thanoo*, the Third Circuit examined the term "use" and found "[i]n accordance with its ordinary meaning and within the context of the DTSA, the 'use' of a trade secret encompasses all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as 'assist[ing] or accelerat[ing] research or development.'"[171] The court also rejected the district court's view that because the plaintiff had not alleged that it had suffered lost sales or investment opportunities or partnerships because of the defendants' actions, it could not state a claim for misappropriation. "By

---

170. *See* Bianco v. Globus Med., Inc., No. 2:12-CV-00147-WCB, 2014 WL 5462388, at \*18–19 (E.D. Tex. Oct. 27, 2014) (upholding a damages award based on the entire market value of a product where the defendant had previously paid royalties on the net sales of the entire product and the trade secrets related to the overall product, not a single subcomponent or feature); *see also* Steves and Sons, Inc. v. Jeld-Wen, Inc., No. 3:16-CV-545, 2018 WL 4844173, at \*10 (E.D. Va. Oct. 4, 2018) (accepting damages expert's testimony that the reasonable royalty calculation did not, under the circumstances presented, need to be tied to a specific number of trade secrets but rather reflected a hypothetical payment for access to an entire field of knowledge, not knowing which intellectual property assets would be most important).

171. 999 F.3d 892, 910 (3d Cir. 2021) (citation omitted).

statutory definition, trade secret misappropriation *is* harm . . . . [E]ven if it is true that the Defendants have not yet launched a competing product, that does not mean that Oakwood is uninjured. It has lost the exclusive use of trade secret information, which is a real and redressable harm."[172]

Similarly, a trade secret holder may be entitled to injunctive relief and attorneys' fees (where the misconduct is sufficiently egregious) based on threatened misappropriation or where there is actual misappropriation but no actual loss.

Plaintiffs have also attempted to secure nominal damages as distinct from actual damages for statutory-based trade secret misappropriation.[173] In certain instances, however, courts have held that there is no recovery of nominal damages for statutory-based trade secret misappropriation.[174]

---

172. *Id.* at 913–14 (citations omitted).

173. Nominal damages refers to damages inferred as a matter of law or policy upon the showing of the invasion of a legal right, as opposed to monetary relief awarded upon proof of actual injury, loss, or harm. *See* AlphaMed Pharms. Corp. v. Arriva Pharms., Inc., 432 F. Supp. 2d 1319, 1335–36 (S.D. Fla. 2006) (The court distinguished between recovery of nominal damages under Florida common law and damages available under Florida's UTSA: "To be sure, Florida law does permit the award of nominal damages 'when the breach of an agreement or invasion of a right is established, since the law infers some damage to the injured party, where there is insufficient evidence presented to ascertain the particular amount of loss, the award of nominal damages is proper.'" (citations omitted)).

174. This principle was apparent in MSC.Software Corp. v. Altair Eng'g, Inc., 281 F. Supp. 3d 660, 661 (E.D. Mich. 2017), in which the court granted defendant's motion for summary judgment after plaintiff's damages expert had been excluded in a Daubert order, holding that "the weight of authority holds that MSC is not entitled to nominal damages under the circumstances." *Id*. The authority considered by the court in *MSC* included a leading case out of the Eleventh Circuit, *AlphaMed Pharms.*, 432 F. Supp. 2d at 1335–36, *aff'd*, 294 Fed. App'x 501 (11th Cir. 2008) in which the court vacated a jury award of nominal damages of $1 for trade secret misappropriation under Florida's

UTSA. The court expressly held that nominal damages are not recoverable under the UTSA and granted judgment as a matter of law in defendants' favor based on plaintiff's failure to satisfy its burden of proving actual damages. *Id*.