# EXHIBIT A

*Shanfield — Cross*

**Q.**   Now, you produced an expert report that contained --
well, let me step back for a second.  So the results of
the computer modeling that you do, produced the graphs
that we saw up on the screen earlier this morning?

**A.**   Yes.

**Q.**   And in your original expert report, you produced
certain graphs that you believed depicted the actual
operation of the Akoustis devices, correct?

**A.**   It predicted the performance of, in some cases,
Akoustis devices; in some cases what was the state of the
art at the time.

**Q.**   And you reviewed your expert report, didn't you, to
make sure that it was accurate before it was provided to
counsel for Akoustis?

**A.**   Yes.

**Q.**   And, in fact, didn't it turn out that the graphs that
you provided in your original expert report were
incorrect?

**A.**   I made a mistake of pasting the wrong graph into one
page, and the simulation itself that I pasted in was
correct, but it was not the one that I meant to refer to
in my writing.  So I did, indeed.

**Q.**   And even though that report was produced at towards
the end of November of 2023, you didn't notice that
mistake for several months; isn't that true?

*Shanfield — Cross*

11:56:50  1    **A.**   That's true.  I have a full-time job.  I have lots of

11:56:53  2    other things to worry about.

11:56:54  3    **Q.**   And, in fact, you didn't notice that mistake until it

11:56:57  4    was pointed out in the rebuttal reports submitted by

11:57:00  5    Akoustis' expert; isn't that true?

11:57:02  6    **A.**   No, that's not true.

11:57:03  7    **Q.**   And isn't it also true that you weren't aware of this

11:57:06  8    until Dr. Bravman, who we'll hear from later, pointed out

11:57:10  9    the mistake to you in your expert report?

11:57:12 10    **A.**   That's not true.

11:57:14 11    **Q.**   So if Dr. Bravman testifies that he had to point this

11:57:20 12    mistake out to you, he would be incorrect in that

11:57:23 13    testimony?

11:57:24 14    **A.**   Dr. Bravman pointed to that plot and found it wasn't

11:57:27 15    consistent with the language I was referring to, and I

11:57:33 16    looked at it and immediately knew what I had done, and I

11:57:37 17    pasted in the right plot.

11:57:41 18    **Q.**   And so you had to change your report, didn't you?

11:57:43 19    Had to supplement it to put in different graphs than what

11:57:47 20    you had included in your original report?

11:57:50 21    **A.**   I pasted in the wrong graph.  I took that out and put

11:57:53 22    the right one in.  The simulations were all correct.

11:57:56 23    There were no errors.

11:58:10 24           **MR. LEMIEUX:**   No further questions for this

11:58:11 25    witness, Your Honor.

*Shanfield – Redirect*

11:58:15  1          **THE COURT:**  Redirect.

11:58:16  2                         REDIRECT EXAMINATION

11:58:18  3    **BY MR. DeFOSSE:**

11:58:26  4    **Q.**   Dr. Shanfield, I'd like to start with where

11:58:28  5    Mr. Lemieux started.  I think he had a number of nitpicks

11:58:32  6    of your opinions, and I'd like to kind of take a step back

11:58:35  7    and talk about your head-start analysis.

11:58:38  8    **A.**   Sure.

11:58:39  9    **Q.**   That was based on your experience in project

11:58:41 10    management analysis; is that right?

11:58:43 11    **A.**   That's right.

11:58:44 12    **Q.**   Now, you've run companies?

11:58:46 13    **A.**   Yes, I have.

11:58:47 14    **Q.**   And you've managed fabrication facilities?

11:58:51 15    **A.**   I have, yes.

11:58:52 16    **Q.**   And you've worked on the design of RF products?

11:58:55 17    **A.**   Yes, I have.

11:58:55 18    **Q.**   And the marketing of RF products?

11:58:59 19    **A.**   Yes.

11:58:59 20    **Q.**   And you've been in this industry for more than

11:59:01 21    30 years, right?

11:59:02 22    **A.**   That's correct.

11:59:02 23    **Q.**   And you're currently working in the semiconductor

11:59:07 24    industry, right?

11:59:07 25    **A.**   That's right.

***Shanfield – Redirect***

11:59:08  1    **Q.**   In this case, you were asked to look at a lot of

11:59:11  2    information, right?

11:59:12  3    **A.**   That's correct, yes.

11:59:13  4    **Q.**   Including -- well, do you recall how many

11:59:16  5    confidential documents you identified were in the files of

11:59:20  6    Akoustis?

11:59:21  7    **A.**   We started with more than a half a million documents,

11:59:24  8    and I had to narrow that down to a number that I could

11:59:28  9    look at and sort through to identify trade secrets.  It

11:59:31 10    was in the order of 20,000 or so, ten to 20,000, and I

11:59:36 11    narrowed that down to 1500, so it was a huge number of

11:59:39 12    documents.

11:59:40 13    **Q.**   So you identified 1500 confidential document in

11:59:44 14    Akoustis' files?

11:59:45 15    **A.**   That's correct.

11:59:46 16    **Q.**   And out of those documents, you identified 46 trade

11:59:50 17    secrets that we talked about yesterday and today?

11:59:52 18    **A.**   Yes, that's right.

11:59:53 19    **Q.**   You put them into eight groups?

11:59:56 20    **A.**   Yes.

11:59:56 21    **Q.**   And you concluded that Akoustis had received a

12:00:00 22    head-start benefit; is that right?

12:00:02 23    **A.**   That's right.

12:00:02 24    **Q.**   And what do you believe that benefit was from those

12:00:05 25    trade secrets?

*Shanfield – Redirect*

**A.**    The benefit was the ability to get something done

sooner than they otherwise would have.  So the time saved.

**Q.**    Okay.  And in terms of the time saved, how many

months was it?

**A.**    Total of 55 months.

**Q.**    And is that consistent with your 30 years of

experience in this industry, that that's a reasonable of

time to have saved?

**A.**    It is.  I actually made sure it was a sane amount,

and wanted confirmation of that by checking with, for

example, with Qorvo development work, the pace that Qorvo

development worked at.

**Q.**    Mr. Lemieux also, I think, suggested at various

points in his examination that Akoustis had purchased this

fabrication facility in New York.

      Do you recall that?

**A.**    Yes.

**Q.**    And that this facility had already had procedures in

place, and so Akoustis couldn't have stolen Qorvo's trade

secrets because of that.

**A.**    Yes, he said.

**Q.**    Was that facility in New York manufacturing RF

filters?

**A.**    No.

**Q.**    And did you see evidence in this case that, in fact,

*Bravman – Cross*

16:44:47 1    to understand why have you grouped the helper and the

16:44:50 2    shunt in the series all as part of the top electrode?  If

16:44:53 3    they're not part of it, why wouldn't you have listed them

16:44:56 4    elsewhere?

16:44:56 5    **A.**   Because they all have top and bottom electrodes.

16:44:59 6    **Q.**   Okay.  So, in this case, these helper and shunt

16:45:02 7    series, those are both showing larger sizes than the

16:45:05 8    bottom electrode layer?

16:45:07 9    **A.**   Correct.

16:45:08 10   **Q.**   Okay.

16:45:12 11          **MR. LEMIEUX:**  If we could go to Page PDX-10.10.

16:45:20 12   **BY MR. LEMIEUX:**

16:45:20 13   **Q.**   These are showing some of the diagrams or information

16:45:23 14   you received from Dr. Shanfield, right --

16:45:26 15   **A.**   Yes.

16:45:26 16   **Q.**   -- that assisted you in your analysis?

16:45:28 17   **A.**   Yes.

16:45:29 18   **Q.**   And on the graphs here, the larger graphs that are in

16:45:32 19   the middle, they say "lateral energy flux."

16:45:36 20       What's the unit of measurement that's along that

16:45:38 21   axis?

16:45:39 22   **A.**   I don't know what the unit is.  It's probably --

16:45:42 23   because this is a finite element model -- it was relative.

16:45:45 24   And so one would be a baseline.  But, again, I didn't

16:45:49 25   produce these.  And so Dr. Shanfield would have to answer

*Bravman − Cross*

16:45:53  1   that question.  I asked him, was this a linear scale or

16:45:55  2   log rhythmic scale.  He told me it was a linear scale and

16:45:59  3   relative values of energy loss or flux, laterally.

16:46:03  4   **Q.**   But we know -- we don't know what the .5, .11, .5 --

16:46:04  5   what that actually would measure to in a physical

16:46:09  6   measurement, we have no idea?

16:46:11  7   **A.**   Well, first of all, there's a times 10 to the minus

16:46:14  8   10 in the upper -- at the top there.  So these are very

16:46:17  9   small units, whatever they are.  If I read that, I don't

16:46:22 10   recall.  But because the patent speaks to relative

16:46:26 11   changes, it doesn't specify quantitative bars to be

16:46:32 12   surpassed.  It just says better, broader bandwidth, things

16:46:37 13   like that.

16:46:38 14        In this case, we're showing that type of -- only

16:46:42 15   semiquantitative effects.  This certainly suffices.  This

16:46:46 16   is Dr. Shanfield's work.

16:46:47 17   **Q.**   Because the bottom axis, we understand, that's

16:46:50 18   frequency.  That's measuring specific frequencies?

16:46:52 19   **A.**   Yes.

16:46:52 20   **Q.**   And so the vertical axis, though, is measuring

16:46:59 21   something we don't know relative to itself?

16:47:03 22   **A.**   Yeah.  The absolute value or the unit here, for the

16:47:06 23   purposes of showing that the alleged benefit of the patent

16:47:10 24   is obtained, that suffices.

16:47:15 25   **Q.**   If someone wanted -- or needed, I guess we should

*Bravman – Cross*

16:49:56  1    different story.  But I take that, that is reality and a

16:50:00  2    model is a model.  So I don't see how you could say it

16:50:04  3    could be more accurate.  Your assessments of the real

16:50:08  4    device may be done improperly.  The microscope may not be

16:50:11  5    calibrated right.  That is reality and the other thing's a

16:50:15  6    model."

16:50:15  7        So a simulation is just a prediction of what we think

16:50:19  8    actually is happening in the physical world, correct?

16:50:21  9    **A.**   By definition, that's what a model is.

16:50:24 10    **Q.**   Okay.  Thank you.

16:50:25 11    **A.**   There's no dispute about that.

16:50:28 12    **Q.**   Now, Dr. Shanfield testified earlier that he hadn't

16:50:31 13    conducted any actual physical tests of the accused

16:50:34 14    devices, that all he had done was run certain simulations

16:50:39 15    to produce what would appear to be these graphic results;

16:50:42 16    isn't that true?

16:50:43 17    **A.**   He did not do physical tests.  That's right.  He ran

16:50:46 18    finite element models with 3- and 400,000 calculational

16:50:50 19    data points.

16:50:51 20    **Q.**   And you've done no physical testing.  You've done no

16:50:53 21    testing of these devices, right?  You rely on

16:50:55 22    Dr. Shanfield and you rely on Dr. Heinrich for their --

16:50:59 23    for their tests?

16:51:00 24    **A.**   It's been plain about that from the beginning.

16:51:05 25    That's right.

*Bravman — Cross*

**Q.**   Okay.  And so it's fair to say that your infringement opinion, then, is based upon the simulations run by Dr. Shanfield, in part, and in part by the testing done by Dr. Heinrich?

**A.**   Of course.

**Q.**   Now, earlier in this case, Dr. Shanfield -- and we talked about it a little bit in his testimony today -- produced an original expert report that had the kind of graphic information we saw here a moment ago.  But it wasn't these graphs, was it?

**A.**   I don't recall exactly what was in his report vis-a-vis these we have seen today.  But as you recounted, or someone recounted earlier today, I found that there was one that was erroneously included in his report.  It just didn't match his description.

**Q.**   Right.  And, in fact, you brought that, then, to Dr. Shanfield's attention.  And then he ran new testing or produced a new graph in a supplemental report; is that right?

**A.**   He didn't do new testing.  My understanding is he simply corrected his cut-and-paste error.

**Q.**   And so if your original opinion, however, on infringement was based upon the material that had been provided by Dr. Shanfield in his original report, wasn't it?

1645

*Bravman — Cross*

**A.**   A study which yielded to me, as a worker of skill,
that this must be an error, only one.  And I reported that
faithfully.  And when it was corrected, it doesn't change
my opinion at all.

**Q.**   Well, it wasn't corrected for several months, isn't
that true?

**A.**   I'm not aware of the timing.  I did my job and I
reported it.

**Q.**   You submitted your original expert report in this
case in November of 2023; isn't that right?

**A.**   Sounds about right.

**Q.**   And Dr. Shanfield also produced his original report
in November of 2023?

**A.**   If you represent that, I'll take that at your word.

**Q.**   Well, because, in fact, your infringement opinion
relied upon analysis that he was doing.  So that was the
report that you were relying on at the time, correct?

**A.**   It obviously could not have been after my report.
That's correct.

**Q.**   Okay.  So we agree, then, that you were relying on
the original report submitted by Dr. Shanfield in this
case?

**A.**   Yes.

**Q.**   And so your infringement opinion, then, relied on
something that ultimately turned out to be not correct,

1646

*Bravman – Redirect*

16:53:21 1    which you noticed months later; is that right?

16:53:24 2    **A.**    It had one clearly cut-and-paste error in it.  That's

16:53:28 3    right.

16:53:40 4    **Q.**    I just want to check -- just bear with me for a

16:53:46 5    moment here.  I may be done.

16:54:03 6         Now, you spoke for a few minutes at the end of your

16:54:07 7    testimony, Dr. Bravman, about what was called the '360

16:54:11 8    patent.

16:54:13 9    **A.**    Yes.

16:54:13 10   **Q.**    And you're not a patent licensing expert, are you?

16:54:15 11   **A.**    No.

16:54:17 12   **Q.**    So any opinions you may have as to the value is

16:54:21 13   something that's outside the area of your expertise and

16:54:24 14   outside what you've been asked to do in this case,

16:54:26 15   correct?

16:54:27 16   **A.**    Monetary value, for sure outside my expertise.

16:54:31 17   **Q.**    Okay.

16:54:31 18            **MR. LEMIEUX:**  No further questions.

16:54:32 19            **THE COURT:**  Redirect?

16:54:33 20                    REDIRECT EXAMINATION

16:54:34 21   **BY MR. MASTERS:**

16:54:38 22   **Q.**    Dr. Bravman, counsel asked you about the

16:54:44 23   cut-and-paste error in Dr. Shanfield's report.

16:54:47 24   **A.**    Yes.

16:54:49 25   **Q.**    Is it your understanding that there was both a

10:47:39  1    benefit any of the types of costs that you just mentioned?

10:47:44  2    **A.**   No.

10:47:45  3    **Q.**   So what did she do?

10:47:48  4    **A.**   She simply looks at revenue and measures the time.

10:47:51  5    What she calls the "time value of money."  The difference

10:47:54  6    between receiving the revenue and at the time that they

10:47:58  7    actually did, and then modeling it 55 months later, and

10:48:01  8    then taking the difference between those two present

10:48:03  9    values and calling that the benefit that Akoustis

10:48:07 10    received.

10:48:07 11         But as we'll see, they haven't made any money off the

10:48:11 12    gross profit level.  So there's been no benefit under this

10:48:14 13    model or methodology.

10:48:17 14    **Q.**   In your opinion, is relying on revenue alone to

10:48:24 15    calculate the head-start benefit consistent with the

10:48:26 16    principles governing your area of practice?

10:48:29 17    **A.**   No.  It's inconsistent with most basic financial

10:48:33 18    principles that I taught at USC, and I'm sure Ms. Bennis

10:48:37 19    studied as well.

10:48:39 20    **Q.**   And so is calculating the head-start benefit based on

10:48:44 21    revenue, even if it's discounted by the time value of

10:48:48 22    money, an accepted practice at all?

10:48:51 23    **A.**   No.  Now, let me back up a bit.  I don't disagree at

10:48:55 24    all with the concept of time value of money.  Again,

10:48:57 25    that's a very basic concept in finance.  It's the notion

*Irwin – Direct*

10:49:01  1    that a dollar today is worth more than a dollar in a year

10:49:05  2    or 55 months.  But you have to understand what you have

10:49:10  3    available to actually invests and earn money on.

10:49:14  4         So another example is, say I inherit $10,000 from my

10:49:20  5    grandmother.  Thank you, Grandma.  And if I just receive

10:49:23  6    that money, it's available for me to invest, to buy a

10:49:27  7    business, to help buy a house, whatever.  But let's say

10:49:30  8    the IRS gets involved and says, No, no, no, you don't get

10:49:34  9    to keep the entire 10,000, you have to pay some taxes on

10:49:37  10   that.

10:49:38  11        Say the taxes came out to be about 3,000 -- I'm from

10:49:39  12   California, so it would probably be higher -- but the

10:49:42  13   difference that I have is only $7,000 that's available to

10:49:47  14   invest.  The time value of money is only applicable to

10:49:50  15   what's available to invest.  Revenue is not available to

10:49:55  16   invest.

10:49:55  17        Only after you pay for some sort of costs -- and you

10:49:56  18   can debate which level here is relevant, but you have to

10:50:00  19   at least pay for the cost of revenue or the cost of sales

10:50:04  20   before you determine anything that's available to invest.

10:50:07  21   **Q.**   So hypothetically, let's assume that in the slide

10:50:11  22   that we have in front of us, Slide 8, that the cost of

10:50:16  23   revenue -- that the inflow and outflow were flipped, so

10:50:20  24   that would -- would that give you a gross profit of

10:50:25  25   $3.1 million?

*Irwin - Direct*

value of money?

**A.**    No.   Again, the only amount that's available to earn, you know -- and can receive any time value of money to benefit from is the difference between the revenue you bring in and the cost to make the -- to generate the revenue.  You have to include costs.

**Q.**    Okay.  So could one fix Ms. Bennis' estimate of head start benefit by accounting for Akoustis' costs?

**A.**    You could.  Again, it generates a nonsensical result, and I can demonstrate how that's -- how it comes out.  But the fundamental reason why you can't really fix it is the head start methodology is intended for a defendant that has accelerated profit.  All of the examples that I read to you from the Sedona conference materials talked about accelerated profits.  We could debate whether it's gross profit or operating income, but they all talk about profit.  And in this case, as you can see, Akoustis at the gross profit level -- so that's just sales minus the cost of sales -- had a very small profit for several years, and then massive losses at the gross profit level through 2023.

And the cumulative gross profit losses for all of that period of time is over $10 million.  So there's not hundreds of millions or $60 million to invest; there's negative $10 million to invest at the gross profit level.

*Irwin - Direct*

10:53:31 1   **Q.**   Does a company benefit from a head start on losses?

10:53:35 2   **A.**   No, not under this methodology.  The math doesn't

10:53:40 3   work.

10:53:40 4   **Q.**   Okay.  So what impact would including costs have on

10:53:44 5   Ms. Bennis' estimate?

10:53:45 6   **A.**   So if you go to the next slide, what you will see is,

10:53:48 7   so I've laid out in Ms. Bennis' methodology that generated

10:53:53 8   her $66 million, and the only thing I changed was, instead

10:53:57 9   of revenue, I used the gross profit numbers that you saw

10:54:01 10   on the previous slide and dropped them into her model.  As

10:54:05 11   a result, in the actual world, Akoustis has lost

10:54:09 12   $21 million in value.  And in the delayed, they've lost

10:54:16 13   $11 million.  This means that they are worse off in the

10:54:19 14   actual world where they allegedly misappropriated than in

10:54:25 15   the world where they would have been delayed.

10:54:27 16       In other words, it would have benefited Akoustis to

10:54:29 17   allegedly misappropriate.  And that's -- so I can't assume

10:54:32 18   damages and then have a negative damages number.  That's

10:54:36 19   just nonsense.  What that tells me as a practitioner is

10:54:38 20   that this is not the right methodology, the head start

10:54:41 21   method doesn't fit the facts in this case because there is

10:54:44 22   no benefit to any acceleration in losses.

10:54:48 23   **Q.**   Okay.  So let me back up.  We originally started by

10:54:54 24   you identifying three issues:  Ignoring costs related to

10:54:59 25   the production of BAW filters.  The second one was

12:03:21  1          THE COURT:  All right.  Well, thank you very

12:03:22  2     much.  And we'll have you may step down.

12:03:26  3          I will turn to the defense, will there be any

12:03:28  4     additional evidence from the defense?

12:03:31  5          MR. ELKINS:  No, Your Honor.  We rest.

12:03:32  6          THE COURT:  All right.

12:03:33  7          Will there be any additional evidence from the

12:03:35  8     plaintiff?

12:03:37  9          MR. MASTERS:  No, Your Honor.

12:03:38 10          THE COURT:  All right.  Ladies and gentlemen,

12:03:40 11     the parties have rested their case.  We'll have the final

12:03:46 12     arguments of counsel and the final instructions on the

12:03:48 13     law.

12:03:49 14          Time has slipped a little bit, but that's okay.

12:03:54 15     It is 12:03, so we are going to take our lunch break at

12:04:01 16     this time.  We will plan on coming back at 12:50, giving

12:04:06 17     people two extra minutes.  And at that time, we will have

12:04:09 18     closing arguments in the case.

12:04:11 19          We will take a break after that, and we'll have

12:04:12 20     final instructions after closing arguments.

12:04:16 21          You all may be excused, but, of course, do not

12:04:19 22     discuss the case amongst yourself.  Don't let anyone talk

12:04:22 23     to you about it so you can keep an open mind.  You still

12:04:25 24     have a ways to go.  I will let you be excused to the jury

12:04:28 25     room.  Thank you.