EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYNTEL STERLING BEST SHORES MAURITIUS LIMITED, and SYNTEL, INC., | 1:15-CV-00211 (LGS) (SDA) |
| Plaintiffs and Counterclaim-Defendants, | Hon. Lorna G. Schofield |
| v. | |
| THE TRIZETTO GROUP, INC. and COGNIZANT TECHNOLOGY SOLUTIONS CORP., | |
| Defendants and Counterclaim-Plaintiffs. | |

## PERMANENT INJUNCTION ORDER

Based on the jury's finding that Syntel Sterling Best Shores Mauritius Limited and Syntel,

Inc. (collectively "Syntel") misappropriated The TriZetto Group, Inc. and Cognizant Technology

Solutions Corp. (collectively "TriZetto") trade secrets and infringed TriZetto's copyrights, this

Court finds:

1. TriZetto has succeeded on the merits of its claims against Syntel.

2. TriZetto has suffered and will continue to suffer the following irreparable harms caused by Syntel's ongoing trade secret misappropriation and copyright infringement absent permanent injunctive relief:

   a. Harm to TriZetto's business through Syntel's ongoing use, duplication, dissemination, and advertisement of products containing or incorporating and service claiming the benefit of TriZetto's Trade Secret Information and/or Copyrighted Works (including without limitation source code or object code), especially in view of Syntel's demonstrated unwillingness to cease misappropriating and infringing absent an injunction from the Court;
   b. Harm to TriZetto's business through ongoing and future lost sales of products and services, and lost market share; and
   c. Harm to TriZetto's reputation as an innovator and the value of TriZetto's intellectual property.

3. Syntel will suffer no undue hardship or harm as a result of granting TriZetto's Motion, as Syntel will still be able to continue with legitimate business activities.

4. The harm to TriZetto substantially outweighs any potential harm to Syntel, and the public interest weighs in favor of protecting trade secrets and copyrights by permanently enjoining Syntel.

5. For purposes of this injunction, the term "TriZetto's Trade Secret Information" means any confidential information copied or derived from, in whole or in part, TriZetto's 104 trade secrets at issue in this case concerning Facets, including confidential technical documentation, source code, and source code libraries. This also includes information found in Syntel technical documentation, source code, and source code libraries that are copied or derived from such TriZetto trade secrets. The 104 trade secrets at issue in this case are listed here by name:

   1. Facets

   2. DDBLD

   3. Upgrade Framework

   4. Facets Data Dictionary

   5. Accounting User Guide

   6. Accumulator Batch Import and Export Subsystem Guide

   7. Application Support User Guide

   8. Audit Archive Guide

   9. Authorization Evaluation Criteria

   10. Batch Contention Matrix

   11. Billing User Guide

   12. Capitation/Risk Allocation User Guide

   13. CDH Account Management Guide

   14. CDH Adapter Administration Guide

   15. CDH Adapter Installation and Upgrade Guide

16. CDH Adapter Reference Guide

17. Claims Processing User Guide

18. Claims Reference User Guide

19. Clinical Editing Procedure Listing

20. Clinical Editing Resource Guide

21. Commission User Guide

22. Conversion Guide

23. Customer Service User Guide

24. Data Dictionary Guide

25. Data Models Guide

26. Database Changes (spreadsheet)

27. Database Maps – prior releases

28. DBA Notes (spreadsheet)

29. Dental Claims User Guide

30. Dental Plan User Guide

31. Disability User Guide

32. EDI 270/271 Subsystem Guide

33. EDI 276/277 Version Subsystem Guide

34. EDI 278 Version Subsystem Guide

35. EDI 820 + 820 HIX Subsystem Guide

36. EDI 834 Inbound Version Subsystem Guide

37. EDI 834 Outbound Version Subsystem Guide

38. EDI 835 Version Subsystem Guide

39. EDI 837 Inbound Version Subsystem Guide

40. EDI 837 Outbound Version Subsystem Guide

41. Electronic Claims Guide

42. Extensibility Guide

43. Facets Accumulator Synchronization Guide

44. Facets CES Adapter Guide

45. Facets Change Package Enhancements

46. Facets ClaimCheck Adapter Guide

47. Facets ClaimsXten Adapter Guide

48. Facets Release Notes

49. Facets TCS Integration Guide

50. Facets TriZetto Elements Guide (formerly Facets TMS Guide)

51. Facets/MACESS Interface Guide

52. Getting Started Guide

53. Guided Benefit Configuration User Guide

54. HIPAA Privacy User Guide

55. Installation Guide

56. Integration Services Library (ISL) Developers Guide

57. Letters Guide

58. Medical Plan Models User Guide

59. Medical Plan Reference User Guide

60. Medical Plan Resource User Guide

61. Medical Provider Agreement & Pricing Profile User Guides

62. Medicare Guide

63. Membership Maintenance Subsystem Guide

64. NetworX Broadcasting

65. NetworX Calculation Bean Training

66. NetworX Calculations and Qualifiers

67. NetworX Pricer System Administration

68. NetworX Qualifier Bean Training

69. NetworX System Administration

70. ORM - Archive

71. ORM - Billing

72. ORM - Capitation

73. ORM - CDH

74. ORM - Claims

75. ORM - Directory

76. ORM - Disability

77. ORM - EDI

78. ORM - HIPAA Privacy

79. ORM - Intro

80. ORM - Medicare

81. ORM - Member

82. ORM - Privacy

83. ORM - Provider

84. ORM - System

85. ORM - Tax

86. ORM - TriZetto Medicare Solutions

87. ORM - Utilization Management

88. ORM - Vision

89. Provider Batch Import Subsystem Guide

90. Provider User Guide

91. Reporting Guide

92. Services Guides (ISL)

93. Subscriber ID Conversion Guide

94. Subscriber/Member User Guide

95. System Administration User Guide

96. System Reference Manual

97. TriZetto Upgrade Framework Guide

98. Utilization Management Import Subsystem Guide

99. Utilization Management Processing User Guide

100. Utilization Management Reference User Guide

101. Workflow User Guide

102. Facets Test Cases

103. Facets Automation Scripts

104. Facets Custom Code Impact Tool

6.       For purposes of this injunction, the term "TriZetto's Copyrighted Works" means any computer program created by TriZetto for use, in whole or in part, in its Facets product or related products and services supporting customer implementation or use of Facets that was adjudicated at trial in this matter, or not colorably different.

**IT IS on this 17th day of May, 2021 hereby ORDERED as follows:**

**I. Permanent Injunction on Sales, Distribution, and Disclosure.**

Syntel and Atos-Syntel Inc., their officers, agents, servants, employees, distributors and resellers of any type, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, are permanently enjoined from performing any of the following actions:

(1) possessing, accessing, reviewing, using, or disclosing TriZetto's Trade Secret Information, in whole or in part, anywhere in the world;

(2) making, offering to sell, selling, or otherwise distributing anywhere in the world any product substantially derived from TriZetto's Trade Secret Information;

(3) advertising, promoting, offering to sell, selling, or otherwise providing services anywhere in the world using or claiming the benefit of TriZetto's Trade Secret Information; and

(4) reproducing, distributing, making available, or creating derivative works based on, in whole or in part, from TriZetto's Copyrighted Works anywhere in the world.

Notwithstanding the foregoing:

1. Pursuant to the Third Party Access Agreement entered into on May 3, 2013 between TriZetto Corporation and Syntel Inc. (which was admitted at trial as exhibit PTX-838), and for as long as and to the extent Syntel, Inc. or any parent, subsidiary, affiliate of, or entity that is wholly owned or controlled by any entity constituting Syntel, Inc. (collectively, "Syntel, Inc." in this paragraph only) have rights under such Third Party Access Agreement, Syntel, Inc. may possess, access, review, and use TriZetto's Trade Secret Information and may reproduce, make available to CDPHP, or create derivative works based on, in whole or in part, from TriZetto's Copyrighted Works, to the extent such materials are provided by CDPHP, and solely for the purpose of performing the following services for CDPHP: (i) system integration services to install or implement materials

CDPHP has licensed from TriZetto; (ii) integration of software or data with any of such licensed materials; (iii) development of reports to be run off data stored in the databases within any of such licensed materials; and (iv) other development and maintenance services related to such licensed materials, provided that such TriZetto Trade Secret Information and TriZetto Copyrighted Works shall be treated for this purpose as "TriZetto Confidential Information" and "TriZetto IP" obtained by Syntel, Inc. from TriZetto pursuant to the Master Services Agreement dated June 30, 2012, as amended, between TriZetto and Syntel's affiliate Syntel Sterling Best Shores Mauritius Limited.

2.  Pursuant to the January 3, 2008 Master Software License and Services Agreement between TriZetto and Blue Shield of California and the amendments thereto (the "TriZetto-BSC Agreement"), and the September 21, 2015 Application Development and Maintenance Services Agreement between Syntel, Inc. and Blue Shield of California and the amendments thereto (the "Syntel-BSC Agreement"), and for as long as and to the extent Atos Syntel, Inc. or its affiliates and subcontractors approved by Blue Shield of California under the Syntel-BSC Agreement (collectively, "Atos Syntel, Inc." in this paragraph only) have rights under such TriZetto-BSC Agreement and Syntel-BSC Agreement, Atos Syntel, Inc. may possess, review, access and use TriZetto's Trade Secret Information and TriZetto's Copyrighted Works to the extent such materials were provided to Syntel, Inc. or are provided to Atos Syntel, Inc. by Blue Shield of California, and solely in connection with providing services to Blue Shield of California pursuant to the Syntel-BSC Agreement.

II. **Removal and Quarantine of TriZetto Trade Secret Information and Copyrighted Works.**

Syntel, their officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, shall undertake the following steps to remove from their possession and quarantine any TriZetto Trade Secret Information or Copyrighted Works, *see* 18 U.S.C. § 1836(3)(A)(ii); 17 U.S.C. § 502(a):

(1)  Syntel will engage an e-discovery vendor to assist with the identification, collection, and removal of any TriZetto Trade Secret Information and Copyrighted Works, while also preserving all data in connection with Syntel's obligations in pending litigations in the U.S. and other countries.

(2)  Syntel will inspect the following data sources in its possession:

  a.  Any database or document management systems in use at Syntel;

  b.  The mailboxes contained in Syntel's corporate email servers for all current custodians in this litigation, as well as each Syntel employee who is currently advertising, selling, or providing Facets-related services to customers;

  c.  Syntel computers, laptops, hard drives, and other storage media (including USB drives, network-based storage drives) belonging to all current custodians in this litigation, as well as each Syntel employee who is currently advertising, selling, or providing Facets-related services to customers; and

  d.  Paper files belonging to all current custodians in this litigation, as well as each Syntel employee who is currently advertising, selling, or providing Facets-related services to customers.

(3)  Prior to inspection and removal of any TriZetto Trade Secret Information and Copyrighted Works, and in order to satisfy Syntel's discovery obligations and the litigation holds in place in this and other litigations, the e-discovery vendor will create and preserve a copy of each of the data sources listed above (hereinafter "Preserved Files"). The Preserved Files shall be maintained by the e-discovery vendor, and any TriZetto Trade Secret Information and Copyrighted Works contained therein shall only be accessible by Syntel's outside counsel (including experts, vendors, etc.) in connection with pending or future litigation between

TriZetto and Syntel without express written permission by the Court, obtained after providing notice to TriZetto. In addition, notwithstanding any other aspect of this Order, Syntel's outside counsel (including experts, vendors, and other permitted entities or individuals retained thereby solely for purpose of litigation) in any pending litigation may retain the files they have until those litigations are concluded, consistent with the protective orders and other law and regulations applicable in those cases.

(4)     Syntel will remove from its possession and quarantine the following:

    a.     TriZetto's Trade Secret Information and TriZetto's Copyrighted Works (including source code libraries) that TriZetto contends were improperly acquired by Syntel. Syntel will provide to TriZetto a copy of all such documents and source code. Syntel may retain any TriZetto-branded documents properly in its possession, provided those documents are specifically identified in writing to TriZetto.

    b.     All other documents or source code (including source code libraries) in Syntel's possession that contain, in whole or in part, information copied from TriZetto's Trade Secret Information and TriZetto's Copyrighted Works, or that Syntel's counsel, in connection with Syntel's technical experts, can reasonably determine, based on the evidence submitted at trial, was derived from TriZetto's Trade Secret Information or TriZetto's Copyrighted Works.

(5)     The documents and source code identified and removed pursuant to Section II(4) above shall be quarantined by the e-discovery vendor, consistent with Section II(3) above.

(6)     Syntel shall complete the identification, collection, and quarantine of TriZetto Trade Secret Information and Copyrighted Works within ninety (90) days of the date of this Order. In the event Syntel is unable to comply in that time frame, Syntel may make application to the Court for a modification of this Order, or for other relief. The Court acknowledges that the circumstances of the coronavirus epidemic may require additional time, including because counsel may not be able to travel to India during the prescribed time frame, and will accommodate reasonable requests for additional time for reasons related to the epidemic or otherwise.

### III.  TriZetto Audit Rights To Ensure Compliance with Injunction Order

TriZetto may conduct audits of Syntel, their officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, to ensure compliance with this Order, as follows:

(1)     TriZetto may audit, through audits conducted by an independent third party, and in compliance the Protective Order in this case, the following data sources in Syntel's possession:

    a.     Any database or document management systems in use at Syntel, including but not limited to databases containing Syntel's source code;

    b.     The mailboxes contained in Syntel's corporate email servers for all current custodians in this litigation, as well as each Syntel employee who is currently advertising, selling, or providing Facets-related services to customers;

    c.     Syntel computers, laptops, hard drives, and other storage media (including USB drives, network-based storage drives) belonging to all current custodians in this litigation, as well as each Syntel employee who is currently advertising, selling, or providing Facets-related services to customers; and

    d.     Paper files belonging to all current custodians in this litigation, as well as each Syntel employee who is currently advertising, selling, or providing Facets-related services to customers.

(2)     The findings of such audits will be available only to TriZetto's outside attorneys, the independent third party auditor, the Court, and Syntel and its attorneys.

(3)     If the auditor finds that Syntel may not be in compliance with the terms of this Order, the auditor shall provide written notice and a copy of his findings to Syntel and one of TriZetto's in-house attorneys to permit TriZetto to understand the reason(s) and extent of Syntel's non-compliance.

(4)     The audits may be conducted a maximum of twice per calendar year, during the course of normal business hours, and upon electronic or written notice of at least five business days to Syntel. The parties will use good faith efforts to conduct the audit in a manner least disruptive to Syntel's normal business activities.


**SO ORDERED** on this 18th day of May, 2021,


**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

EXHIBIT B

KeyCite Blue Flag – Appeal Notification
Appeal Filed by   Comet Technologies USA, Inc., Et Al v. Xp Power, LLC,
9th Cir.,   April 25, 2023

2022 WL 4625149
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

COMET TECHNOLOGIES
USA INC., and others, Plaintiffs,
v.
XP POWER LLC, Defendant.

Case No. 20-cv-06408-NC
|
Signed September 30, 2022

**Attorneys and Law Firms**

Adam R. Alper, Akshay Sunil Deoras, Kyle Calhoun, Kirkland & Ellis LLP, San Francisco, CA, Argie Lagrimas Mina, Michael Woodrow De Vries, Samuel Francis Blake, Sharre S. Lotfollahi, Sarah Brooke Mikosz, Kirkland and Ellis LLP, Los Angeles, CA, Jun Young Patrick Pak, Arnold & Porter Kaye Scholer LLP, Los Angeles, CA, Jason Michael Wilcox, Pro Hac Vice, Kirkland & Ellis LLP, Washington DC, Kat Li, Kirkland & Ellis LLP, Austin, TX, Leslie M. Schmidt, Pro Hac Vice, Kirkland and Ellis LLP, New York, NY, Megan Margaret New, Pro Hac Vice, Kirkland Ellis LLP, Chicago, IL, for Plaintiffs.

Joseph Farrell, Latham & Watkins, Costa Mesa, CA, Abigail Parr, Blake Richard Davis, Latham and Watkins LLP, San Francisco, CA, Dixie C. Tauber, Thomas Yeh, Latham & Watkins LLP, Los Angeles, CA, Jeffrey G. Homrig, Patricia Young, Latham & Watkins LLP, Menlo Park, CA, Laura Zenzerovich, Pro Hac Vice, Matthew W. Walch, Russell Drach Mangas, Pro Hac Vice, Latham & Watkins LLP, Chicago, IL, Razi Safi, Pro Hac Vice, Latham Watkins LLP, Washington, DC, Stephen D. O'Donohue, Pro Hac Vice, Latham Watkins LLP, New York, NY, for Defendant.

**ORDER GRANTING PERMANENT INJUNCTION
WITH RESPECT TO TRADE SECRETS D, E, AND L**

Re: ECF 409

Nathanael M. Cousins, United States Magistrate Judge

**\*1** Following a jury trial on trade secret misappropriation, a jury found that XP misappropriated three of Comet's trade secrets under the Defend Trade Secrets Act. 18 U.S.C. § 1836(b)(3)(A). Further, the jury found that the misappropriation was willful and malicious, awarding significant punitive damages. ECF 406 (Verdict).

In light of the jury's findings, Comet seeks an order from the Court to permanently enjoin XP from using Comet's trade secrets in the development of their products. Comet's proposed injunction seeks: (1) a permanent injunction on sales, distribution, and disclosure of the trade secrets; (2) removal and quarantine of trade secret information; and (3) the ability to ensure compliance through auditing procedures.

The injunction is GRANTED with respect to Trade Secrets D, E, and L and is DENIED with respect to Trade Secret S.

**I. BACKGROUND**

A detailed history of this case has been recounted in other orders, and so the court summarizes here only those facts necessary required to assess the propriety of an injunction. At issue at trial were four alleged Comet trade secrets: (1) Trade Secret D: Da Vinci RF Generator Control, Digital Measurement, and Software; (2) Trade Secret E: Next Generation RF Matching Network; (3) Trade Secret L: Kiyo Matching Network; and (4) Trade Secret S: AMAT Matching Network.

The jury found that all four alleged trade secrets were, in fact, trade secrets. It found that Trade Secrets D and E were misappropriated, causing damage to Comet. With respect to Trade Secret L, the Jury found that it was used or acquired through improper means but that that use was not a substantial factor in causing damages. ECF 406.

However, with respect to Trade Secret S, the jury found that it was not used or acquired by improper means. ECF 406. This suggests either that the jury credited XP's argument that a competitor company, Applied Material, had some intellectual property rights to Trade Secret S under the Global Supply Agreement between AMAT and Comet. Def. Ex. 5234, or that the jury believed that the information contained within it was otherwise available to XP in non-secret forums.

For the reasons elaborated below, the Court will issue an injunction tracking that verdict. The future use of Trade Secrets D and E will be enjoined. Although the jury found that the improper use or acquisition of Trade Secret L had not caused damages at the time of verdict, that finding does not preclude future damages. It also suggests that Comet has not been monetarily compensated for the improper use or acquisition. Accordingly, the future use of Trade Secret L will be enjoined as well.

However, the jury found differently with Trade Secret S, finding that that trade Se cret was not acquired or used through improper means. In so finding, it appears to have credited XP's argument that the information was available in non-secret forums or had previously been disclosed outside Comet. Accordingly, the Court will not enjoin the future use of Trade Secret S.

## II. DISCUSSION

### A. Legal Standard

**\*2**  The Defend Trade Secrets Act (DTSA) authorizes federal courts to grant permanent injunctions to prevent actual or threatened trade secret misappropriation. 18 U.S.C. § 1836(b)(3)(A). "Injunctions in the area of trade secrets are governed by the principles applicable to injunctions in general." *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1449 (2002).

To determine whether a permanent injunction should issue, courts consider whether a prevailing plaintiff has demonstrated: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

The Court concludes that the balancing of those factors supports the issuance of a permanent injunction subject to the parameters noted above.

### B. Analysis

#### 1) Irreparable Injury

The first issue is whether Comet will suffer irreparable injury in the absence of an injunction. A finding of misappropriation is generally adequate for a finding of irreparable injury in trade secret cases. *Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, No. 19-cv-4162 SBA, 2021 WL 1186335, at \*10 (N.D. Cal. Mar. 1, 2021). Although the "Ninth Circuit has not reached the question of whether a court may presume irreparable harm in trade secrets cases[,] ... courts within this District have consistently reached the conclusion that a plaintiff 'will suffer irreparable harm if its proprietary information is misappropriated.' " *Id.*

A trade secret plaintiff may also demonstrate irreparable injury through a loss in market share. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-cv-3428 PSG, 2013 WL 890126, at \*9 (N.D. Cal. Jan. 23, 2013) ("[c]ommercial advantage is grounds for finding irreparable harm"); *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, No. 08-cv-7497 KBF, 2014 WL 1883474, at \*12-13 (S.D.N.Y. May 9, 2014) ("[I]t is well-established that a movant's loss of current or future market share may constitute irreparable harm.") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007)).

Given the jury's finding that XP willfully and maliciously misappropriated Trade Secrets D, E, and L, the Court finds irreparable injury to Comet. In addition, the record contains myriad evidence, credited by the jury, that XP made use of the trade secret information in developing its future products, leaving Comet vulnerable to further future market share loss.

Because the jury did not find that Trade Secret S was used or acquired through improper means, the Court does not conclude irreparable injury from its past use, or potential future use.

#### 2) Monetary Damages are Inadequate

Next, the Court must consider the adequacy of monetary damages awarded by the jury. "An injunction may be used to eliminate any unfair head start a defendant may have gained by improper use of confidential information, and is appropriate if it 'place[s the defendant] in the position it would have occupied if the breach' had not occurred." *Netlist Inc. v. Diablo Techs. Inc.*, No. 13-cv-05962 YGR, 2015 WL 153724, at \*7 (N.D. Cal. Jan. 12, 2015); *see also Brocade Commc'ns Sys.*, 2013 WL 890126, at \*9 (entering injunction where defendant failed to provide evidence of inevitable discovery "through proper means" or "evidence about how long those proper means would take"). Injunctions can also

Case 1:21-cv-01417-JPM   Document 645-1   Filed 08/15/24   Page 16 of 37 PageID #: 31831

Comet Technologies USA Inc. v. XP Power LLC, Not Reported in Fed. Supp. (2022)

issue to remedy the loss of secrecy of a trade secret, which is not compensable in monetary terms. *Id.*

**\*3** Here, the damages awarded by the jury compensated for past harm, but they did not address ongoing or future harm from the future development of XP products based on Comet trade secrets. What's more, the Court does not understand either damages expert to have urged the jury to consider future harm in awarding unjust enrichment damages.

Therefore, the Court concludes that even the significant monetary award given by the jury does not adequately compensate and is not sufficient to prevent future harm against Comet.

### 3) Balance of Hardships

The Court concludes that the balance of the hardships favors Comet. While an injunction would place restrictions on XP, those restrictions are necessary to ensure that XP follows the law. Additionally, the Court is persuaded that regulation and oversight of XP's activities is especially appropriate in light of the jury's finding that the misappropriation was "willful and malicious." Comet's theory of the case, which was apparently credited by the jury, implicates much of XP's leadership team, not just a few bad apples, making a company-wide injunction appropriate and not unduly harmful.

With respect to the relative hardships of the parties, the record at trial amply demonstrates that Comet has faced and will continue to face significant hardship from the disclosure of their trade secrets, including the loss of market shares, reputatio nal harm, and loss of customers. By contrast, nothing in this order prohibits XP from doing its own research and development to make its own products.

Additionally, the Court finds that Comet's proposed audit does not unduly burden XP and is necessary to prevent dissemination or further use of the Trade Secrets D, E, or L.

Accordingly, the balance of hardships weighs in favor of Comet.

### 4) Public Interest

The Court concludes that the public interest favors the issuance of an injunction. Courts in trade secret cases have consistently held that the public interest favors the vindication of intellectual property rights. *See Lam Rsch. Corp. v. Deshmukh*, 2005 WL 8173156, at \*3 (W.D. Wash. Jan. 3,

2005) (quoting *PepsiCo Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995)); *Intertek Testing Servs. v. Pennisi*, 443 F. Supp. 3d 303, 347 (E.D.N.Y. 2020) ("injunctive relief would serve the public interest by ensuring that ... protecting plaintiff's ... secrecy of its trade secrets and confidential information."). As a result, "[c]ourts often find that the public has a strong interest in protecting intellectual property rights," *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019) ("an injunction would also promote fair and lawsuit competition in an emerging market.").

Although the jury did find that Trade Secret S, the AMAT Matching Network was a trade secret, the jury found that it was not used or acquired through improper means. As a result, the public interest in protecting intellectual property and promoting fair competition does not apply with equal force regarding that trade secret.

Accordingly, the public interest favors an injunction on Trade Secrets D, E, and L subject to the provisions below.

### III. CONCLUSION

The Court concludes that Comet has shown that (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

### IV. TERMS OF INJUNCTION

#### I. Terms

**\*4** For purposes of this injunction, the term "Comet's Trade Secret Information" means any confidential information copied or derived from, in whole or in part from those Comet trade secrets which the jury found were used or acquired through improper means, which are listed here by name:

• Trade Secret D: Da Vinci RF Generator Control, Digital Measurement, and Software

• Trade Secret E: Next Generation RF Matching Network

• Trade Secret L: Kiyo Matching Network

XP, their officers, agents, servants, employees, distributors, and resellers of any type, and all those persons in active concert or participation with any of them who receive actual

Case 1:21-cv-01417-JPM    Document 645-1    Filed 08/15/24    Page 17 of 37 PageID #: 31832

Comet Technologies USA Inc. V. XP Power LLC, Not Reported in Fed. Supp. (2022)

notice of the order by personal service or otherwise, are permanently enjoined from performing any of the following actions:

(1) possessing, accessing, reviewing, using, or disclosing Comet's Trade Secret Information, in whole or in part, anywhere in the world;

(2) making, offering to sell, selling, or otherwise distributing anywhere in the world any product derived from Comet's Trade Secret Information; and

(3) advertising, promoting, offering to sell, selling, or otherwise providing services anywhere in the world using or claiming the benefit of Comet's Trade Secret Information.

## II. Removal and Quarantine of Comet Trade Secret Information.

XP, their officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, shall undertake the following steps to remove from their possession and quarantine any information associated with trade Secrets D, E and L, *see* 18 U.S.C. § 1836(3)(A)(ii):

(1) XP will engage an e-discovery vendor to assist with the identification, collection, and removal of any Comet Trade Secret Information, while also preserving all data in connection with XP's obligations in pending litigations in the U.S. and other countries.

(2) XP will inspect the following data sources in its possession:

   a. Any database or document management systems in use at XP;

   b. The mailboxes contained in XP's corporate email servers for all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products;

   c. XP computers, laptops, hard drives, and other storage media (including USB drives, network-based storage drives) belonging to all current custodians in this litigation, as well as each each XP employee who is currently designing, developing, researching,

advertising, marketing, or selling RF Power products; and

   d. Paper files belonging to all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products.

(3) Prior to inspection and removal of any Comet Trade Secret Information, and in order to satisfy XP's discovery obligations and the litigation holds in place in this and other litigations, the e-discovery vendor will create and preserve a copy of each of the data sources listed above (hereinafter "Preserved Files"). The Preserved Files shall be maintained by the e-discovery vendor, and any Comet Trade Secret Information contained therein shall only be accessible by XP's outside counsel (including experts, vendors, etc.) in connection with pending or future litigation between Comet and XP without express written permission by the Court, obtained after providing notice to Comet. In addition, notwithstanding any other aspect of this Order, XP's outside counsel (including experts, vendors, and other permitted entities or individuals retained thereby solely for purpose of litigat ion) in any pending litigation may retain the files they have until those litigations are concluded, consistent with the protective orders and other law and regulations applicable in those cases.

**\*5** (4) XP will remove from its possession and quarantine the following:

   a. Comet's Trade Secret Information (including source code libraries) that Comet contends were improperly acquired by XP. XP will provide to Comet a copy of all such documents and source code.

   b. All other documents or source code (including source code libraries) in XP's possession that contain, in whole or in part, information copied from Comet's Trade Secret Information, or that XP's counsel, in connection with XP's technical experts, can reasonably determine, based on the evidence submitted at trial, was derived from Comet's Trade Secret Information.

(5) The documents and source code identified and removed pursuant to Section II(4) above shall be quarantined by the e-discovery vendor, consistent with Section II(3) above.

(6) XP shall complete the identification, collection, and quarantine of Comet Trade Secret Information within sixty (60) days of the date of this Order. In the event XP is unable to comply in that time frame, XP may make application to the Court for a modification of this Order, or for other relief.

### III. Comet Audit Rights.

Comet may conduct audits of XP, their officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, to ensure compliance with this Order, as follows:

(1) Comet may audit, through audits conducted by an independent third party chosen by Comet, and in compliance the Protective Order in this case, the following data sources in XP's possession:

    a. Any database or document management systems in use at XP, including but not limited to databases containing XP's source code;

    b. The mailboxes contained in XP's corporate email servers for all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products;

    c. XP computers, laptops, hard drives, and other storage media (including USB drives, network-based storage drives) belonging to all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products; and

    d. Paper files belonging to all current custodians in this litigation, as well as each XP employee who is currently designing, developing, researching, advertising, marketing, or selling RF Power products.

(2) The findings of such audits will be available only to Comet's outside attorneys, the independent third-party auditor, the Court, and XP and its attorneys.

(3) If the auditor finds that XP may not be in compliance with the terms of this Order, the auditor shall provide written notice and a copy of his findings to XP and one of Comet's in-house attorneys to permit Comet to understand the reason(s) and extent of XP's non-compliance.

(4) The audits may be conducted a maximum of twice per calendar year, during the course of normal business hours, and upon electronic or written notice of at least five business days to XP. The parties will use good faith efforts to conduct the audit in a manner least disruptive to XP's normal business activities.

**\*6** The Court retains jurisdiction to enforce this injunction.

### IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2022 WL 4625149

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C

Case 1:21-cv-00417-JRM Document 6451   Filed 08/15/21   Page 20 of 37   Page ID #:31835

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLERGAN, INC., | CASE NO. SACV 11-446 AG (Ex) |
| Plaintiff, | INJUNCTION ORDER |
| v. | |
| MERZ PHARMACEUTICALS, LLC, et al., | |
| Defendants. | |
| _____ | |
| MERZ PHARMACEUTICALS, LLC, et al., | |
| Counterclaimants, | |
| v. | |
| ALLERGAN, INC. | |
| Counter-Defendant. | |
| _____ | |

1  Merz Pharmaceuticals, LLC and Merz Aesthetics, Inc. (together, "Merz Defendants"),

2  their affiliated companies, officers, directors, agents, representatives, and employees who

3  receive notice of this Order, and Erin Sullivan, Sheri Tremmel, Amber Prumer, Jacqueline Luby,

4  Amy F. Finn, Jeffrey Riordan, and Timothy D. Byrns (together, "Individual Defendants") are

5  ENJOINED from:

6      1.    retaining, disclosing, or using Allergan's trade secrets;

7      2.    providing or selling Xeomin, or soliciting purchases of Xeomin, in the facial

8          aesthetics market for a period of ten months from the date of this Order;

9      3.    providing or selling Xeomin, or soliciting purchases of Xeomin, in the therapeutics

10          market for a period of ten months from the date of this Order to Allergan

11          customers identified in Trial Exhibits 262, 263, 565, 1070, 1104, 1105, 1217,

12          1219, 1220, 1232, 1234, 1235, except to

13          •    customers who voluntarily and without solicitation request to purchase

14              Xeomin for therapeutic purposes from Merz Defendants, provided that

15              sworn declarations are submitted that such requests were made voluntarily

16              and without solicitation;

17      4.    providing or selling dermal filler products, or soliciting purchases of dermal filler

18          products, in the facial aesthetics market for a period of ten months from the date of

19          this Order, except to

20          •    customers who voluntarily and without solicitation request to purchase

21              dermal filler products from Merz Defendants, provided that sworn

22              declarations are submitted that such requests were made voluntarily and

23              without solicitation, or

24          •    customers who purchased dermal filler products from Merz Defendants

25              (including BioForm Medical) between July 1, 2009 and June 30, 2010,

26              provided that sworn declarations are submitted identifying such customers;

27      Merz Defendants are further ORDERED to conduct a search, using industry standard

28  forensic tools, for Allergan trade secrets by examining physical locations and electronic data

sources used in their business operations (including, but not limited to, the files, computers, and portable devices used by the Individual Defendants in the course and scope of their employment with the Merz Defendants) using the standards promulgated by the Electronic Discovery Reference Model (www.edrm.net), and remove all Allergan trade secrets from those locations and sources. This "Examination and Remediation Process" shall extend to all employees of Merz Defendants, except those employees working in the Finance or Manufacturing departments. The Examination and Remediation Process shall be fully documented in a written report provided to the Court and counsel for Allergan. Unless the Court later orders otherwise, on noticed motion, Merz Defendants may seek to modify or terminate the provisions of portions of this Injunction on the grounds that they have satisfied the Examination and Remediation Process and that modification or termination of the Injunction is warranted by principles of equity. Allergan may be permitted to examine, conduct discovery on, and contest the sufficiency of the Examination and Remediation Process in an evidentiary hearing. Any modification or termination of the terms of this Injunction may also apply to the Individual Defendants.

The Court further ORDERS Merz Defendants to implement or continue corporate compliance programs to (1) ensure compliance with this Injunction; and (2) prevent, deter, and detect existing and future violations of Cal. Civ. Code § 3426 *et seq.* Merz Defendants shall report to the Court the status of these programs six, 12, and 18 months from the date of this Order.

Allergan has the duty to serve this Order as is necessary for its enforcement.


IT IS SO ORDERED.

DATED: March 9, 2012

_____
Andrew J. Guilford
United States District Judge

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

E.I. DUPONT DE NEMOURS
AND COMPANY,

     Plaintiff,

v.                        Civil Action No. 3:09cv58

KOLON INDUSTRIES, INC.,

     Defendant.

## INJUNCTION ORDER

For the reasons set forth in the accompanying MEMORANDUM OPINION, the Court finds that:

(1) Absent injunctive relief, the plaintiff, E.I. du Pont de Nemours and Company ("DuPont"), will suffer significant hardship by virtue of the loss of the trade secrets which the jury found had been willfully and maliciously misappropriated by Kolon Industries, Inc. ("Kolon") and used by Kolon in the making of its para-aramid product, Heracron®;

(2) Upon entry of injunctive relief, Kolon will suffer no significant hardship except those it has wrought by its unlawful conduct;

(3) The balance of the hardships shows that the hardships faced by DuPont, absent injunctive relief, significantly outweigh the hardships faced by Kolon;

(4)   The public interest will be served by the grant of an injunction;

(5)   Injunctive relief is necessary to afford DuPont the full measure of protection to which its trade secrets are entitled under law, notwithstanding the damage award previously entered herein; and for the reasons set forth in the accompanying MEMORANDUM OPINION, and pursuant to the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-337A, it is hereby ORDERED that E.I. du Pont de Nemours and Company's MOTION FOR PERMANENT INJUNCTION (Docket No. 1553) is granted, and it is further ORDERED that:

(A)   Kolon, its parents, subsidiaries, affiliates, employees, officers and directors are permanently enjoined from processing, publishing, disclosing, or using in any form or for any purpose the 149 trade secrets of Plaintiff, E. I. du Pont de Nemours and Company ("DuPont"), described in Exhibit P-1255 which is hereto and incorporated herein, which were found to have been misappropriated by the jury on September 14, 2011 ("DuPont's Trade Secrets");

(B)   Kolon is enjoined, for a period of twenty years beginning on the date this Permanent Injunction is entered, and with no geographic limitation, from manufacturing, using, marketing, promoting, selling, distributing, offering for sale, or soliciting customers for any para-aramid products;

2

(C)  Not later than October 1, 2012, Kolon shall return to DuPont all documents and other media reflecting DuPont's Trade Secrets, including any copies thereof;

(D)  Kolon immediately shall remove DuPont's Trade Secrets from all of its competitive computers and computer networks and those of its officers, directors, agents and employees;

(E)  By October 1, 2012, Kolon shall file a pleading reciting under oath upon penalty of perjury that it has complied with the provisions of paragraphs (3) and (4) above;

(F)  By October 31, 2012, Kolon shall allow a forensic expert approved by the Court, but at DuPont's expense, to have sufficient access to Kolon's computers and computer networks to confirm that DuPont's Trade Secrets have been removed therefrom;

(G)  By October 31, 2012, Kolon shall account to DuPont for all uses made of DuPont's Trade Secrets, including, but not limited to, identifying each and every person exposed to DuPont's Trade Secrets, identifying each and every location at which DuPont's Trade Secrets were stored, and identifying all disclosures of DuPont's Trade Secrets outside Kolon, with such identification to include disclosure, intentional or inadvertent, to any para-aramid competitor, customer, or supplier; and

(H)  Within twenty-four (24) hours of the entry of this INJUNCTION ORDER, Kolon shall deliver to its parents, subsidiaries,

3

officers, directors and employees a copy of this INJUNCTION ORDER (for now without showing Exhibit P-1255) and, by September 14, 2012, shall file a pleading certifying compliance with this paragraph.

The Court shall retain jurisdiction of this matter for the purposes of enforcing the INJUNCTION ORDER and assuring compliance with its terms.

It is so ORDERED.

_____/s/_____ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 30, 2012
11:40 AM

4

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EPIC SYSTEMS CORPORATION,

                      Plaintiff,

    v.

TATA CONSULTANCY SERVICES
LIMITED and TATA AMERICA
INTERNATIONAL CORPORATION d/b/a
TCA America,

                      Defendants.

OPINION AND ORDER

14-cv-748-wmc

---

There are a number of post-trial motions pending. In this opinion and order, the court addresses those motions concerning the court's entry of a permanent injunction (dkt. #888). Specifically, the court addresses: (1) plaintiff Epic Systems Corporation's motion to amend the injunction (dkt. #909); (2) the appointment of a monitor; and (3) the parties' recent filings concerning defendants' compliance, or lack thereof, with the injunction.

OPINION

**I. Plaintiff's Motion to Amend Injunction**

Plaintiff requests several changes to the permanent injunction, providing the court with a redlined version reflecting the proposed changes. The court will address each in turn. *First*, plaintiff seeks to include the jury's finding of breach of the Standard Consultant Agreement as an additional basis for ordering injunctive relief -- in addition to the two other bases already listed for misappropriation of trade secrets and the CAFA violation. Curiously, this proposed change is in the court's order explaining the breadth

and conditions of the permanent injunction, rather than in the language of the injunction itself.  The court previously considered plaintiff's request but rejected it because of the lack of support of the availability of injunctive relief as part of the breach of contract claim.  While the contract states that a violation of the Agreement may cause "irreparable harm," this serves as an insufficient basis to order injunctive relief, especially where the statutory claims provide expressly for that remedy.  Moreover, plaintiff utterly fails to describe how it is prejudiced from the preamble to the injunction not listing the breach of contract claim as a basis for ordering injunctive relief.  The inclusion of that claim does not substantively change the reach or requirements of the injunction.  As such, that specific request is denied at this time as moot.

*Second*, Epic takes issue with the injunction remaining in effect for four years, seeking deletion of that reference.  The court will maintain the four-year timeline, however, finding that any value of the confidential information, which was obtained in 2014, would be limited value by the end of the four-year period in 2020, or at least plaintiff has failed to demonstrate otherwise.  Relatedly, and to be fair to Epic, the court will not impose the proposed two-year limit added by Epic to the redlined version at § 3.d.

*Third*, Epic seeks to amend the description of "Confidential Information" in § 2.d to include "any other Epic confidential information as defined in the parties' Standard Consultant Agreement (Trial Ex. 3) [that] TCS acquired from Epic personnel or by accessing UserWeb or Kaiser Permanente."  Epic contends that this change is necessary because "TCS employees did not access and view only the documents that were actually

downloaded; rather, TCS employees viewed materials directly on the UserWeb and would also copy and paste into emails and word documents the contents of documents accessed through the UserWeb." (Pl.'s Br. (dkt. #910) 5.) The court understands plaintiff's concern, but instead of adopting Epic's proposed language, will simply add "including the content of the documents" after "the documents" in the definition. This specific request is, therefore, granted in part and denied in part.[1]

*Fourth*, Epic responds to the court's invitation to specify individuals who are not permitted to work on software development for TCS in § 3.d. The court will adopt plaintiff's proposal, finding the language sufficiently clear and narrow. To address TCS's concern about it being overbroad, the court, however, will insert "directly" before "supervised or managed." As such, this request is granted with a minor modification.

*Fifth*, Epic seeks to include a requirement that TCS provide written notice to all TCS employees about the permanent injunction. TCS did not oppose this change. As such, the court will adopt it as unopposed.

*Sixth*, Epic seeks to include language indicating that the costs of the monitor -- which the court placed on Epic -- could be shifted to TCS if TCS were to violate the injunction. The possibility of cost-shifting need not be spelled out in the injunction, since the court retains the authority to impose such payment as part of remedial relief should it find TCS in contempt. Nonetheless, the court sees no reason not to state

---

[1] The court will also correct the name of the Agreement from "Standard Consul<u>ting</u> Agreement" to "Standard Consult<u>ant</u> Agreement."

expressly the possibility of cost-shifting.  Accordingly, the court will make that change, with the understanding that any shift in costs still rests within this court's discretion.

*Seventh*, as a minor request, Epic seeks to include language that the court retains jurisdiction to modify the injunction (in addition to enforcing it).  TCS does not oppose this change.  As such, the court will adopt it as well.

Consistent with the court's rulings, the amended permanent injunction appears below.

## II. Appointment of Monitor

The permanent injunction includes the appointment of a monitor.  Not surprisingly, the parties could not agree on a monitor.  Epic submitted four possible monitors, including as its first pick, Samuel Rubin of Stroz Friedberg, LLC, who also served as an expert in this case.  (Pl.'s Submission (dkt. #925).)  For their part, defendants submitted Navigant Consulting, Inc.  (Defs.' Submission (dkt. #923).)  All of the proposed monitors appear qualified to fill the role.  Rubin and his firm Stroz Freidberg have the advantage, of course, of already being familiar with the facts of this case, the technology involved, and TCS's system and practices for data management.  TCS opposed Rubin's appointment on the basis of bias, arguing that he would "step into the monitoring role not as an objective third party but as Epic's expert."  (Defs.' Submission (dkt. #923) 4.)  The court does not agree that Rubin's prior experience with this case somehow biases him in a way that he would now exploit in the position of monitor to benefit Epic.  Instead, his knowledge and prior experience will provide him with a significant head-start in providing the services contemplated by the permanent

4

injunction. Moreover, given that Epic will be directing the monitor's work and paying for the monitor's expenses, Rubin's selection is certainly the most efficient. As such, the court will appoint Samuel Rubin of Stroz Friedberg, LLC, as monitor, subject to the understanding that both he and his firm may not act as Epic's retained expert in any capacity going forward in this lawsuit.

## III. Defendants' Compliance with Injunction

Finally, TCS's Chief Security Officer Ajit Menon submitted a detailed declaration describing TCS's efforts to date to comply with the injunction as required by § 8 of the Permanent Injunction. (Dkt. #936.) In response, plaintiff complains that Menon's account further illustrates TCS's failings to conduct a timely investigation and take the necessary steps to assess the actual dispersion of Epic confidential information and the reach of the unlawful access. (Dkt. #939.) This concern, while legitimate, is beside the point. Stated another way, Epic's concern was addressed at trial and reflected in the jury's significant damages award. There is nothing further to be gained in its argument that TCS's steps taken post-trial, highlight its earlier failings. As for the report itself, the court is satisfied that TCS has taken the initial steps required by the injunction, and leaves to Mr. Rubin the job of confirming compliance.

ORDER

IT IS ORDERED that:

1) Plaintiff Epic System Corporation's motion to modify the permanent injunction (dkt. #911) is GRANTED IN PART AND DENIED IN PART.

2) The parties' joint motion for extension of time regarding their submission regarding appointment of a monitor (dkt. #915) is GRANTED.

3) The court appoints Samuel Rubin of Stroz Friedberg, LLC as the monitor as described in § 4 of the Amended Permanent Injunction detailed below.

AMENDED PERMANENT INJUNCTION

IT IS FURTHER ORDERED that plaintiff Epic Systems Corporation's request for entry of permanent injunction is GRANTED and an Amended Permanent Injunction pursuant to Federal Rule of Civil Procedure 65 is ENTERED as follows:

1. This Permanent Injunction shall remain in full force and effect for four years from its effective date of this order.

2. For purposes of this Permanent Injunction, the following terms apply:

    a. "Epic" shall mean plaintiff Epic Systems Corporation.

    b. "TCS" shall mean Tata Consultancy Services Limited and Tata America International Corporation.

    c. "Trade Secret" shall mean the documents contained in Trial Exhibit No. 1247, limited to those documents (or portions of such documents) that are a trade secret as defined in the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90(1)(c).

    d. "Confidential Information" shall mean the documents, including the content of the documents, contained in Trial Exhibit Nos. 2100 and 2101 that (i) are not trade secrets; and (ii) are "confidential information" as defined in the parties' Standard Consultant Agreement (Trial Ex. 3).

3. Except as expressly set forth in the opinion above, TCS and their respective affiliates, successors, officers, agents, servants, employees, and attorneys and any and all other persons who are in active concert or participation with any of

6

them (all collectively referred to as "Enjoined Parties"), are permanently enjoined, anywhere in the world, from the following:

a.  using any Epic Trade Secret or Confidential Information for any reason, including but not limited in the design, development, enhancement, or marketing of any TCS software providing solutions in the areas of electronic health records, electronic medical records, and hospital management systems, or any other healthcare software solutions, including but not limited to Med Mantra (as most broadly defined, including but not limited to, TCS-HIS, Med Mantra in use at Apollo Hospitals in India, British American Hospital in Mauritius, Tata Cancer Hospital in India, Tata Cancer Institute in India, and Med Mantra modules in development at DaVita Healthcare Partners, Inc. and Quest Diagnostics, Inc.) (collectively, "TCS EHR Products");

b.  possessing or retaining any Epic Trade Secret or Confidential Information in any form, including on any servers or other electronic computer systems of TCS or any other electronic or hard-copy media at TCS;

c.  accessing or attempting to access any non-public Epic servers or systems, including Epic' internet portal known as UserWeb; and

d.  permitting any TCS employee or consultant or agent who performed software testing on Epic's software in connection with TCS's work for Kaiser, directly supervised or managed such testing, or otherwise had access to any Epic Trade Secret or Confidential Information, including, but not limited to Naresh Yallapragada, Venugopal Reddy, and Madhavi Mukerji, to work on, or assist in, directly or indirectly, the design, development, enhancement, or marketing of any TCS EHR Products.

7

4. For the next two years, unless extended by the court upon a showing of good cause, TCS shall not resist, hamper, delay, or otherwise interfere with the activities of a monitor to be appointed consistent with the procedure outlined in the above opinion. The monitor shall be paid by Epic and have unfettered access at any time, to monitor TCS's development and implementation of any TCS EHR Products to ensure that TCS does not improperly use any of Epic's Trade Secrets or Confidential Information, as described below. In particular, TCS shall permit the monitor to:

    a. Confirm that TCS employees, consultants, and agents do not have access to Epic's internet portal known as UserWeb or to any of Epic's Trade Secret or Confidential Information.

    b. Confirm that TCS does not possess or retain any Epic Trade Secret or Confidential Information on any of its servers, shared drives, shared domains, or other places of electronic information storage.

    c. Talk with any TCS employee who might be able to assist the monitor in determining whether Epic Trade Secret or Confidential Information was or is being used in the design, development, enhancement, or marketing of any TCS EHR Products. TCS shall provide the ombudsman or monitor with unfettered access to these TCS employees.

    d. Examine, evaluate, and analyze TCS's electronic information, including TCS's proxy logs, domain logs, active directory logs, software, servers, shared drives, and shared domains, to determine whether any Epic Trade Secret or Confidential Information was or is being used or is intended to be used in the design, development, enhancement, or marketing of any TCS EHR Products. TCS shall provide the monitor with unfettered access to this electronic information.

5. Epic shall have the ability to confidentially provide the monitor with the type of information Epic deems necessary to monitor TCS's development and implementation of any TCS EHR Product to ensure that TCS does not improperly use any of Epic's Trade Secret or Confidential Information.

6. Except by leave of court, the monitor shall not disclose the substance or outcome of its ongoing investigation, except for (1) the procedures or tasks undertaken; and (2) any evidence of violations of the permanent injunction.

7. TCS shall provide written notice to all TCS employees who performed work for Kaiser Permanente and all employees who work (or worked during the relevant time period) on the design, development, enhancement, or marketing of any TCS EHR Products, that the Permanent Injunction has been issued and its terms.

8. Within 60 court days of the effective date of this Permanent Injunction, TCS shall file and serve a report in writing and under oath setting forth in detail the manner and form with which TCS has complied with the Permanent Injunction.

9. Violation of the Permanent Injunction shall be subject to all applicable penalties, including contempt of court and shifting the reasonable expenses that Epic has paid for the monitor to TCS.

10. This court shall retain continuing jurisdiction over Epic, TCS and the Enjoined Parties and the action for the purpose of enforcing or modifying the Permanent Injunction.

Entered this 2nd day of November, 2016.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

9