IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **PUBLIC VERSION** |
| | ) | |
| v. | ) | C.A. No. 21-1417 (JPM) |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | ▮▮▮▮▮▮▮▮▮▮▮ |
| AKOUSTIS, INC., | ) | ▮▮▮ |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF PLAINTIFF QORVO, INC.'S
MOTION FOR ATTORNEYS' FEES**

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Zachary Alper
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Qorvo, Inc.*

**Confidential Version Filed: June 17, 2024**
**Public Version Filed: August 15, 2024**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................1

    A.    Qorvo Files Lawsuit Against Akoustis ....................................................1

    B.    Qorvo Amends Complaint After Discovery Reveals Theft of Trade Secrets..........2

    C.    Forensic Inspection Reveals Theft of an Immense Volume of Qorvo Files............3

    D.    Jury Finds Akoustis Liable for Misappropriating Qorvo's Trade Secrets ...............4

    E.    Jury Finds the Misappropriation Was Willful and Malicious...................................5

        1.    Akoustis stole more than 500,000 files from Qorvo...................................5

        2.    The scheme to steal Qorvo's trade secrets was pervasive ..........................6

        3.    Akoustis widely disseminated Qorvo's trade secrets...................................7

        4.    Top executives at Akoustis sanctioned and participated in the misappropriation ...................................................................................9

III.  LEGAL STANDARDS ........................................................................................11

IV.  ARGUMENT......................................................................................................13

    A.    Qorvo Should Be Awarded Its Attorneys' Fees ....................................................13

        1.    Qorvo is the prevailing party ...................................................................13

        2.    The jury found the misappropriation was willful and malicious ...............13

        3.    The conduct at issue in this case justifies an award of attorneys' fees ......13

    B.    Qorvo's Attorneys' Fees Are Reasonable...............................................................16

        1.    Qorvo's attorneys billed a reasonable number of hours ...........................16

        2.    Rates are reasonable and consistent with market rates .............................19

V.    CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Blum v. Stenson*,
  465 U.S. 886 (1984)..................................................................................................19

*Comet Techs. USA Inc. v. XP Power LLC*,
  C.A. No. 20-6408, D.I. 503 (N.D. Cal. Nov. 4, 2022)............................................19

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  2014 WL 792137 (E.D. Va. Feb. 25, 2014), *vacated on other grounds*
  (June 12, 2014)........................................................................................................19

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)..............................................................................12, 13, 16, 18

*Jack Tyler Engineering Co. v. Environment-One Corp.*,
  No. 07-cv-2393, 2009 WL 2382256 (W.D. Tenn. July 31, 2009)...........................18

*Lanni v. New Jersey*,
  259 F.3d 146 (3d Cir. 2001)....................................................................................12

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
  C.A. No. 17-14-JFB, D.I. 1184 (D. Del. Mar. 24, 2020).........................................19

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
  C.A. No. 17-14-JFB-SRF, 2019 WL 6840353 (D. Del. Dec. 16, 2019) *aff'd in
  part, rev'd in part, dismissed in part*, *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855
  F. App'x 701 (Fed. Cir. 2021) ..........................................................................19, 20

*Loughner v. Univ. of Pittsburgh*,
  260 F.3d 173 (3d Cir. 2001)....................................................................................12

*Motorola Solutions, Inc. v. Hytera Comms. Corp., Ltd.*,
  C.A. No. 17-01973, 2021 WL 12139698 (N.D. Ill. Oct. 15, 2021)...................18, 20

*Perdue v. Kenny A. ex rel. Winn*,
  559 U.S. 542 (2010)......................................................................................16, 17, 19

*Syntel Sterling Best Shores Mauritius, Ltd. v. The Trizetto Group, Inc.*,
  C.A. No. 15-0211, 2024 WL 1116090 (S.D.N.Y. Mar. 13, 2024) ..............13, 18, 20

*View Eng'ng, Inc. v. Robotic Vision Sys., Inc.*,
  208 F.3d 981 (Fed. Cir. 2000)..................................................................................20

*Wi-LAN Inc. v. Sharp Elecs. Corp.*,
 C.A. No. 15-379-LPS, 2022 WL 1224901 (D. Del. Apr. 25, 2022)........................................20

**Statutes**

18 U.S.C. § 1836(b)(3)(D) ...................................................................................................................11

N.C.G.S. § 66-154(d) ...........................................................................................................................11

N.C.G.S. § 75-16.1(1) ..........................................................................................................................12

**Rules**

Fed. R. Civ. P. 59 .................................................................................................................................12

## I.      INTRODUCTION

Federal and North Carolina law both authorize courts to award attorneys' fees to a prevailing party in a trade secret case where the party has established that the trade secret misappropriation was willful and malicious. A fee award is warranted in this case. Qorvo established at trial that Akoustis' top management sanctioned and participated in a brazen, multi-year scheme to steal Qorvo's trade secret as a short-cut to competing in the market for BAW filters. Akoustis amassed more than 500,000 files stolen from Qorvo; Akoustis' Chief Device Scientist imaged his entire Qorvo laptop for use at Akoustis; Akoustis' Chief Product Offer copied files onto an external drive two days before leaving Qorvo and uploaded those files to his Akoustis computer within a week of arriving at the company; Akoustis's Executive Vice President of Business Development sanctioned paying bribes for Qorvo's "key confidential information" in Korea; Akoustis' CEO testified in another case that he preferred to recruit employees with trade secrets they could use to benefit Akoustis. The willful and malicious conduct in this case was pervasive and provides a model for when an award of attorneys' fees is appropriate.

## II.     STATEMENT OF FACTS

### A.      Qorvo Files Lawsuit Against Akoustis

Qorvo and Akoustis are competitors in the market for bulk acoustic wave ("BAW") filters. Trial Tr. at 293:9-294:7, 449:24-450:11, 533:24-534:8. Qorvo's predecessor companies worked for nearly 20 years and invested in excess of $1 billion to develop BAW filter technology. *Id.*, at 372:15-373:19, 375:12-15. Qorvo launched its first commercial BAW filter products in 2010. *Id.*

Akoustis was formed in 2014 by Dr. Jeffrey Shealy, a former executive at RF Micro Devices, Inc. ("RFMD"), one of Qorvo's predecessor companies. *Id.*, at 1116:22-1117:5. Akoustis initially focused on the research and development of "single-crystal" technology. *Id.*, 1118:18-21. In September 2016, Akoustis shifted its focus to making commercial BAW filter products.

1

Akoustis hired Rohan Houlden, the General Manager of the Wireless Connectivity Business Unit at Qorvo, as Vice President of Product Engineering. *Id*., 672:16-20, 685:4-12. At that time, Akoustis could not even make a working resonator, which is a necessary building block of a BAW filter. *Id*., 673:12-24. But, within a year, Akoustis began sampling BAW filters. *Id*., 956:17-957:5.

Prior to filing this case, Qorvo became increasingly concerned that Akoustis was engaging in unlawful activities. *See* Trial Tr. 309:15-310:7. Akoustis had hired an unusually large number of former Qorvo employees. *See id.* Akoustis also entered the market for BAW filters much faster than should have been possible. *Id*., 1266:12-1267:10. In 2021, Qorvo's concerns reached a new level when it received a report that Akoustis asked a Qorvo employee to share confidential information during a job interview. *Id*., 309:15-310:7. Qorvo then purchased and tested an Akoustis product and discovered that Akoustis was infringing two Qorvo patents. *Id*. On October 4, 2021, Qorvo filed this lawsuit asserting claims for patent infringement, false advertising, false patent marking, and unfair trade practices under North Carolina law. D.I. 1, ¶¶67-132. The unfair competition claim was based on the allegation that Akoustis was recruiting Qorvo employees to obtain Qorvo's confidential information. *Id*., ¶¶46-58.

### B.    Qorvo Amends Complaint After Discovery Reveals Theft of Trade Secrets

Discovery in this case revealed that Akoustis' activities were far worse than imagined. On April 19, 2022, Qorvo served requests for production seeking documents referring to any Qorvo confidential information. DeFosse Decl., ¶51. For eight months, Akoustis delayed producing documents. *Id*.. Then, between November 2022 and January 2023, Akoustis produced the first evidence of its long-running scheme to steal Qorvo's confidential information. *Id*.. On February 8, 2023, Qorvo filed the Second Amended Complaint asserting additional claims related to the theft of its trade secrets—misappropriation claims under the Defend Trade Secrets Act ("DTSA") and the North Carolina Trade Secret Protection Act ("NCTSPA"). *See* D.I. 125, ¶¶206-277.

### C.       Forensic Inspection Reveals Theft of an Immense Volume of Qorvo Files

Given the revelations concerning the existence of confidential Qorvo documents in Akoustis' files, Qorvo served a request to inspect Akoustis' computer systems on May 5, 2023. DeFosse Decl., ¶2. Akoustis initially agreed that such an inspection would be appropriate. *See* D.I. 199 at 6-7 (May 10, 2023 Status Conference). But Akoustis subsequently raised a constantly-evolving and meritless series of objections intended to obstruct the inspection. *See* D.I. 270 (setting forth Akoustis' efforts to prevent the inspection). On August 11, 2023, having attempted to negotiate the forensic inspection with Akoustis for more than three months, Qorvo was finally forced seek assistance from the Court. *See id*. On August 21, 2023, the Court authorized Qorvo to proceed with the forensic inspection with respect to the electronic devices of up to 15 Akoustis employees. D.I. 289; *see also* D.I. 299 (Forensic Inspection Order).

The reason for Akoustis' efforts to obstruct the forensic inspection quickly became apparent. The inspection revealed that Akoustis had improperly withheld from discovery massive quantities of files that Akoustis stole from Qorvo. In particular, the forensic inspection revealed that Akoustis withheld (i) hundreds of thousands of Qorvo email files; and (ii) multiple copies of a Qorvo laptop computer made by Akoustis' Chief Device Scientist (Dr. Rama Vetury), representing 279 GB of additional Qorvo data that Akoustis stole. Trial Tr. 812:5-813:5, 816:2-18. Akoustis has never offered any explanation for why it withheld these materials from discovery.

The forensic inspection also revealed that Akoustis had destroyed the laptops of two central figures in the misappropriation scheme—Dr. JB Kwon, the former Qorvo engineer who stole Qorvo's trimming algorithms, and Joel Morgan, who developed Akoustis' reliability testing procedures based on a confidential Qorvo testing presentation. *See* D.I. 470 (holding Akoustis failed to take reasonable steps to preserve the laptops, but declining to issue sanctions due to the lack of prejudice to Qorvo). The Kwon and Morgan laptops were destroyed in November and

December 2022. *See* D.I. 377, ¶¶9, 11. Akoustis has never explained why these laptops were not searched for responsive documents prior to their destruction.[1] Nor has Akoustis ever offered any explanation for why it concealed the destruction of the laptops for more than eight months, only admitting to the spoliation of evidence when the forensic inspection revealed the misconduct.

### D.     Jury Finds Akoustis Liable for Misappropriating Qorvo's Trade Secrets

On May 17, 2024, following an eight-day trial, the jury determined that Akoustis misappropriated 39 trade secrets from Qorvo (the "Misappropriated Trade Secrets"). *See* D.I. 601. During trial, Qorvo organized and presented the Misappropriated Trade Secrets in eight groups:

    (1) Qorvo's business plans for Wi-Fi products (6 Misappropriated Trade Secrets);

    (2) Qorvo's BAW filter and resonator designs (16 Misappropriated Trade Secrets);

    (3) Qorvo's trimming methods and procedures (3 Misappropriated Trade Secrets);

    (4) Qorvo's evaluation board design rules and schematics (1 Misappropriated Trade Secret);

    (5) Qorvo's product development process and testing procedures (2 Misappropriated Trade Secrets);

    (6) Qorvo's systems, processes, and procedures for testing reliability and mean-time-to-failure of parts (5 Misappropriated Trade Secrets);

    (7) Qorvo's manufacturing and assembly procedures (1 Misappropriated Trade Secret); and

    (8) Qorvo's product roadmaps and product prototypes (5 Misappropriated Trade Secrets).

*See* D.I. 601; *see also, e.g.*, Trial Tr. (May 9) 1228:14-1229:12.  Collectively, the Misappropriated Trade Secrets related to nearly every aspect of Akoustis' operations. The jury determined that Akoustis was unjustly enriched as the result of the misappropriation of 37 of the Misappropriated

---

[1] Akoustis identified Kwon and Morgan as employees with relevant information in February 2022, two months before Qorvo served its April 2022 document requests. *See* D.I. 377, ¶7. Yet, Akoustis failed to produce information from the Kwon and Morgan computers before they were destroyed.

Trade Secrets and awarded Qorvo $31,315,214 in unjust enrichment damages.

### E.    Jury Finds the Misappropriation Was Willful and Malicious

The jury also found that Akoustis' misappropriation had been willful and malicious and awarded Qorvo $7,000,000 in punitive damages. *See* D.I. 601. The record is replete with evidence showing egregious nature of the misappropriation in this case, supporting the jury's finding of willful and malicious conduct.

### 1.    Akoustis stole more than 500,000 files from Qorvo

The volume of the materials that Akoustis stole from Qorvo as part of the misappropriation scheme is, standing alone, evidence of the egregious misconduct in this case. In total, Akoustis obtained more than 500,000 Qorvo files, plus 279 GB of additional data. Trial Tr. 812:5-813:5, 816:2-18, 853:16-19. This includes entire Qorvo email archives and a complete copy of a Qorvo engineering computer.[2] *Id.* The volume of materials that Akoustis stole from Qorvo was so massive that Qorvo's technical expert—Dr. Stanley Shanfield—could not reasonably review all of the stolen files prior to the close of discovery.[3] Trial Tr. 1228:14-1229:12. Instead, Dr. Shanfield reviewed a subset of the stolen files and, from that subset alone, identified more than 1,000

---

[2] Akoustis has repeatedly argued that there is no evidence that the Qorvo email archives and engineering computer contain confidential files. *See e.g.*, Trial Tr. 2488:8-9 ("And they talk about it, but it's never been analyzed. Nobody knows what's in it."). But the wholesale nature of the copying alone—i.e., copying **every file** stored on a Qorvo engineering computer and **every email** sent or received by certain Qorvo employees, including **every internal email**—is itself proof that Akoustis obtained confidential information.

[3] Akoustis has repeatedly chided Qorvo's experts for not reviewing and analyzing every individual file that Akoustis stole from Qorvo. *See, e.g.*, Trial Tr. 852:4-11, 854:17-23, 2488:8-9. In so arguing, Akoustis fails to acknowledge not only the immense volume of the stolen materials, but also that Akoustis **improperly withheld** the materials from discovery for **17 months**—until September 2023, shortly before the close of fact discovery and service of expert reports. Although the stolen materials were directly responsive to Qorvo's April 2022 discovery requests, Akoustis only produced the stolen materials after it was caught during the forensic inspection.

confidential Qorvo documents containing hundreds of Qorvo's trade secrets. *Id*.; *see also* D.I. 447-4 (Qorvo's Second Supplemental Identification of Trade Secrets).

### 2.   The scheme to steal Qorvo's trade secrets was pervasive

Evidence of the pervasive nature of the misappropriation also supports the jury's finding of willful and malicious conduct. This is not a case where the misappropriation is tied to a single incident. To the contrary, Akoustis' scheme occurred over several years and involved a multitude of techniques for obtaining Qorvo's information. As noted above, Akoustis copied entire Qorvo email accounts (Trial Tr. 852:4-853:24) and imaged an entire Qorvo engineering computer (*id*., 816:2-817:2). Akoustis also used external hard drives to transfer files from Qorvo computers to Akoustis computers, many of which were never produced. *Id*., 818:6-15; 821:21-822:19. Before leaving to work at Akoustis, former Qorvo employees used their personal email accounts to transfer files to Akoustis. *See, e.g.*, Ex. 22. Akoustis employees also routinely used their personal email accounts to solicit and receive confidential Qorvo documents. *See, e.g.*, Exs. 77, 78. At least one Akoustis employee waited to quit his job at Qorvo so he could keep his electronic devices long enough to transfer files to Akoustis. *See* Ex. 10, Ex. 219; Trial Tr. 1272:19-1273:8. Akoustis continuously solicited confidential Qorvo materials from customers and business partners who were subject to NDA agreements. *See, e.g.*, Ex. 161, Ex. 162, Trial Tr. 1041:2-1042:12. Akoustis used company expense accounts to bribe contacts in Korea to obtain "key confidential information" about Qorvo and other competitors. S*ee* Ex. 140, Ex. 142. And Akoustis borrowed confidential Qorvo prototypes from a customer so that Akoustis could run tests on the prototypes. *See, e.g.*, Ex. 179; Ex. 166; Trial Tr. 1046:1-1047:23.

In addition to these techniques for obtaining Qorvo's confidential information, Akoustis had other misappropriation mechanisms that it refused to disclose. For example, Akoustis' Vice President of Final Operations (Robert Dry) had selective amnesia when asked how he obtained

confidential Qorvo documents. *See, e.g.*, Trial Tr. 1097:23-24 ("I have no recollection of where these came from."), 1103:16-18 (same), 1112:6-16 (same). Dr. Kwon similarly could not recall where he had obtained the Qorvo trimming algorithms that he used in drafting the Akoustis trim plan. *See, e.g., id.*, 1209:21-1210:21 ("I don't remember."), 1215:4-15 ("I don't recall that. I do not remember that."). Dr. Shealy admitted that he had possession of a confidential RFMD document, but provided no explanation as to how he obtained the document. *See id.*, 1140:2-21.

### 3. Akoustis widely disseminated Qorvo's trade secrets

The jury's finding of willful and malicious conduct also has substantial support in the evidence that Akoustis not only stole huge volumes of files from Qorvo, but those materials were also widely disseminated at Akoustis. Indeed, Qorvo's confidential documents were found in the files of **40 different Akoustis employees**. Trial Tr. (May 10) 1361:23-1362:15. The actual dissemination of Qorvo's confidential information is likely much more widespread. Document discovery and the forensic inspection in this case were limited to only a small subset of the employees at Akoustis. Moreover, Akoustis did not provide the vast majority of relevant electronic devices for the employees who were centrally involved in the misappropriation. For example, no electronic devices were available for Dr. Shealy for a seven-year period from 2014 to 2021. Trial Tr. 858:6-23. No electronic devices were available for David Aichele, the Executive Vice President of Business Development, for the six-year period between 2015 and 2021. Trial Tr. 864:25-865:4. Mr. Houlden used 37 removable drives that were identified only through the forensic inspection, but never produced or provided. Trial Tr. 819:21-820:14. Dr. Vetury, who copied his entire Qorvo email account and imaged his entire Qorvo computer, also used 69 removable drives not produced or made available for inspection. Trial Tr. 864:4-11.

The Akoustis employees involved in the solicitation, dissemination, and use of Qorvo's information admitted that they knew the materials were confidential. For example, Mr. Houlden

testified repeatedly that the materials he stole from Qorvo were confidential and he had no authorization to share those materials with Akoustis. *See, e.g.*, Trial Tr. 757:10-18, 759:18-780:8, 763:2-23, 764:18-765:2, 768:7-768:12, 772:15-21, 775:7-16. Mr. Aichele, Mr. Dry, and Dr. Shealy all offered similar testimony.[4] *See, e.g., id.*, 894:12-24, 906:12-22 (Aichele); *id.*, 1095:14-19, 1098:6-1099:8 (Dry); *id.*, 1140:6-8 (Shealy). SJ Kim, Akoustis's Country Manager for Korea, expressly identified the materials he obtained using his expense account as "key confidential information." *See* Ex. 140 at 2. Dr. Dave Hodge, the Akoustis engineer assigned to develop 5 GHz BAW filters, testified that he immediately recognized the confidential nature of Qorvo engineering presentations he received from Mr. Houlden and felt "repulsion" when got those presentations. Trial Tr. 614:2-16, 615:13-23. Nonetheless—in a textbook example of willful and malicious behavior—all of the Akoustis employees involved in the misappropriation knowingly disregarded Qorvo's confidentiality rights and continued to solicit, disseminate, and use the Qorvo documents.

Instead of refraining from the solicitation and use of Qorvo's confidential documents, Akoustis employees took steps to evade detection. For example:

- On September 14, 2016, Mr. Houlden saved confidential Qorvo files to an external hard drive. Trial Tr. 832:17-833:24. Two days later, he lied to Qorvo—representing that he had returned all of his Qorvo files. *See* Ex. 55 at §5. After arriving at Akoustis and transferring Qorvo's files, Mr. Houlden told Dr. Shealy that he wanted to avoid "any reason for Qorvo IT to look at my computer." Ex. 104. As a result, Akoustis delayed issuing a press release that would have alerted "Qorvo IT" that Mr. Houlden was now working for a competitor. *See* Trial Tr. 792:9-13.

- In November 2016, Mr. Houlden solicited confidential engineering drawings of a Qorvo RF connector from a current Qorvo employee. *See* Ex. 221. To avoid detection, Mr. Houlden (i) incorrectly told the Qorvo employee that there were "no IP concerns" with the request, and (ii) stated that he "wanted to use your yahoo and my gmail

---

[4] Dr. Kwon testified that he could not "remember" whether the trimming algorithms he stole from Qorvo were confidential. Trial Tr. 1211:3-4. But, despite this testimony, Dr. Kwon was clearly aware of the confidentiality of the trimming information. *See id.*, 1214:21-25 (Kwon testifying that he cannot discuss the trimming performed at Northrop Grumman because "[t]his is confidential").

account" to transfer the information. *Id.*

- In October 2017, Akoustis drafted presentations that reproduced Qorvo's confidential trimming algorithms. When a member of the Akoustis Board of Directors asked for a copy, Akoustis altered the presentation to remove references to "Qorvo" to hide the origin of the information. *Compare* Ex. 213 at 3, 4 *with* Ex. 220 at 3, 8; Trial Tr. 1835:17-1836:21; 1837:20-23.

- In September 2021, Mr. Houlden used his personal email account to solicit confidential Qorvo materials from a former Qorvo employee.  Ex. 77. In forwarding the materials to his Akoustis email, Mr. Houlden deleted the name of the person who sent him the emails. Ex. 78. Mr. Houlden then modified the documents to remove Qorvo's logo and confidentiality legend before circulating the materials at Akoustis. Ex. 80, Ex. 82. Mr. Dry adopted a similar practice of removing Qorvo logos before circulating them. *See* Ex. 196; *see also* Trial Tr. 1108:10-12 ("I've edited out references to Qorvo because I didn't want to be showing a document around that we would be discussing as an example that had Qorvo written on it.").

### 4. Top executives at Akoustis sanctioned and participated in the misappropriation

The active and widespread involvement of Akoustis' top executives in the misappropriation scheme also supports the jury's finding of willful and malicious conduct. Akoustis' CEO, Dr. Shealy, aptly demonstrated the culture of misappropriation at Akoustis when he testified in another case that he prefers to hire employees who have trade secrets (rather than employees named as inventors on patents) because the employees can use the trade secrets to benefit Akoustis.[5] Trial Tr. 1168:24-1171:2. Dr. Shealy was also directly involved in modifying and circulating confidential Qorvo documents. *See* Ex. 6, Ex. 205; Trial Tr. 835:23-837:15.[6]

---

[5] Incredibly, Dr. Shealy sought to explain-away his prior testimony by implying that his lengthy statement was a **transcription error**. Trial Tr. (May 9) 1170:2-1171:9.

[6] Dr. Shealy testified, under oath, that the only modification he made to the RFMD document was to change the logo. Trial Tr. 1173:8-16. Not so. Akoustis produced version 1.0 of the "Akoustis" new technology development procedure—a RFMD document that Dr. Shealy had re-saved with an Akoustis logo. *Compare* Ex. 6 *with* Ex. 205. Akoustis improperly withheld version 1.1 of the same document from discovery. *See id.*, 861:17-862:21. Mr. Faulkner found that version during the forensic inspection and discovered, contrary to Dr. Shealy's **sworn testimony**, that he had "heavily" edited the RFMD document. *See id.*

Further, Dr. Shealy frequently received and reviewed confidential Qorvo materials. *See, e.g.*, Ex. 137 (Shealy commenting on confidential Qorvo presentation); Ex. 177 (Hunt telling Shealy that he has "arms out in China to see if we can get a couple of samples" of Qorvo prototypes); Ex. 180 (receiving test results from confidential Qorvo prototypes); Exs. 91 and 132 (confidential Qorvo datasheets); Exs. 82 and 83 (Qorvo product requirements documents). There is no evidence that Dr. Shealy ever admonished anyone for disseminating Qorvo's confidential information, despite Akoustis policies purportedly prohibiting such conduct. To the contrary, when Mr. Houlden informed Dr. Shealy that he wanted to avoid "any reason for Qorvo IT to look at my computer," Dr. Shealy's response was: "Got it. Let's discuss Monday." Ex. 104.

Numerous other executives directly participated in and encouraged the misappropriation:

- **Rohan Houlden (Chief Product Officer)**. Mr. Houlden stole Qorvo business plans and engineering documents, uploaded the documents to Akoustis' computer systems, and circulated the materials to other Akoustis employees. *See, e.g.*, Ex. 8, Ex. 9, Ex. 22, Trial Tr. 604:14-604:23, 609:6-9, 832:17-833:24, 834:22-835:22. Mr. Houlden also routinely solicited confidential Qorvo documents and circulated those documents to others at Akoustis. *See, e.g.*, Ex. 7, Ex. 14, Ex. 59, Ex. 62, Ex. 65, Ex. 66, Ex. 67, Ex. 69, Exs. 71-73, Exs. 75-84, Exs. 110A-110D, Ex. 122, Ex. 221.

- **Dave Aichele (Executive Vice President of Business Development)**. Mr. Aichele routinely solicited Qorvo confidential information using Akoustis Country Managers in China and Korea as intermediaries and then circulated the confidential information to Akoustis employees. *See, e.g.*, Exs. 27 and 133 (confidential roadmap for WiFi 6e); Exs. 52, 53, 91, 131, 132, 163, 166 (confidential datasheets for 5GHz BAW filters); Exs. 121, 137 (confidential presentation on automotive filters). Mr. Aichele admitted at his deposition (before trying to change his testimony at trial) that his practice was to circulate confidential information whenever he thought it would help Akoustis make strategic decisions. Trial Tr. 900:11-902:21. Mr. Aichele even sanctioned Akoustis' Country Manager in Korea (SJ Kim) in using his expense account to obtain "key confidential information" concerning Qorvo and other competitors. *See, e.g.*, Ex. 140 (SJ Kim informing Mr. Aichele how he was using his expense account); Ex. 142 (one year later, SJ Kim forwarding Mr. Aichele three zip files of confidential information).

- **Mary Winters (Executive Vice President of Fabrication)**. As part of her oversight of Akoustis' manufacturing facility, Ms. Winters was ultimately responsible for trimming. On three occasions, Dr. Kwon sent Ms. Winters Qorvo's confidential trimming algorithms in connection with drafting the Akoustis trim plan. *See* Exs. 12, 123 (July 28, 2017); Exs. 208, 209 (August 16, 2017); Exs. 210, 211 (October 25,

2017). On each occasion, the algorithms were expressly identified as Qorvo's trimming process. *See, e.g.*, Ex. 208 ("The enclosed shows how QORVO does SiN trimming."). Ms. Winters never objected, nor admonished Dr. Kwon. Trial Tr. 1826:15-22. When a member of the Akoustis Board of Directors (Art Geiss) requested the Akoustis trimming presentation, Ms. Winters sent him a version that included the Qorvo trimming algorithms, but with references to Qorvo removed. *Compare* Ex. 213 at 3, 4 *with* Ex. 220 at 3, 8; Trial Tr. 1830:2-17; 1836:3-11.

- **Rama Vetury (Chief Device Scientist).**  As discussed above, Dr. Vetury copied his entire Qorvo email account and imaged his Qorvo laptop for use at Akoustis.

- **Colin Hunt (President of Global Sales).** Mr. Hunt arranged to "borrow" samples of confidential Qorvo prototype filters and have those samples shipped to the United States (from China) for testing. *See, e.g.*, Exs. 177, 180.

- **Robert Dry (Vice President of Final Operations).** Mr. Dry obtained and circulated numerous confidential Qorvo documents related to manufacturing and assembling BAW filters. *See* Ex. 37. As noted above, Mr. Dry also adopted the practice of stripping Qorvo labels from the confidential documents before circulating them.

- **Joel Morgan (Vice President of Quality).** Mr. Morgan developed Akoustis' reliability testing procedures based on a confidential Qorvo testing presentation that Mr. Houlden obtained and circulated. *See, e.g.*, Exs. 72, 73, 226.

Each of these employees was a high-level executive at Akoustis, showing the pervasiveness of the misappropriation. Notably, despite having a company policy that prohibited the use of third-party confidential information, Akoustis never disciplined any employee involved in the long-running scheme to misappropriate Qorvo's trade secrets. Trial Tr. 1943:25-1944:4.

## III.   LEGAL STANDARDS

The Defendant Trade Secret Act and the North Carolina Trade Secrets Protection Act both give the Court discretion to award attorneys' fees to a prevailing party in cases where there has been willful and malicious trade secret misappropriation. 18 U.S.C. § 1836(b)(3)(D) ("In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may . . . if . . . the trade secret was willfully and maliciously misappropriated, award reasonable attorneys' fees to the prevailing party."); N.C.G.S. § 66-154(d) ("If willful and malicious

misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party.").[7]

The Court has "substantial discretion" in determining what constitutes reasonable attorney's fees. *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001). To determine a reasonable fee award, courts use the lodestar method to calculate a presumptively reasonable fee. *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 177 (3d Cir. 2001). This method requires that the court multiply the number of hours reasonably spent on the litigation by the reasonable hourly rate for the work completed. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* at 437.

If plaintiff's claims for relief "involve a common core of facts" or are "based on related legal theories," or if "time is devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis," such claims "cannot be viewed as a series of discrete claims." *Hensley*, 461 U.S. at 435. "Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* "In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.* "The result is what matters." *Id.*

---

[7] The North Carolina Unfair and Deceptive Trade Practices Act ("NCUDPTA") also gives the Court discretion to award attorneys' fees to the prevailing party. N.C.G.S. § 75-16.1(1) ("the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party . . . upon a finding by the presiding judge that . . . [t]he party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit…."). Qorvo is simultaneously seeking to amend the jury verdict under Rule 59 to find that Akoustis violated the NCUDPTA. If the Court grants Qorvo's motion, the NCUDPTA would provide another basis for awarding attorneys' fees in this case.

12

## IV.     ARGUMENT

### A.     Qorvo Should Be Awarded Its Attorneys' Fees

Under the relevant provisions of the DTSA and NCTSPA, the Court may award a "prevailing party" its attorneys' fees if a trade secret was "willfully and maliciously misappropriated." Qorvo respectfully submits that both the jury's verdict and the conduct at issue in this case fully justify awarding Qorvo its attorneys' fees.

#### 1.     Qorvo is the prevailing party

As a threshold matter, there should be no dispute that Qorvo is a "prevailing party" in this matter. The jury determined that Akoustis misappropriated 39 trade secrets from Qorvo (out of 46 presented at trial) and awarded Qorvo $31,315,215 in compensatory damages based on Akoustis' unjust enrichment. *See* D.I. 601. As such, Qorvo succeeded on a "significant issue in litigation" and achieved at least "some of the benefit" it sought in bringing suit. *Hensley*, 461 U.S. at 433.

#### 2.     The jury found the misappropriation was willful and malicious

There should also be no dispute that the jury's verdict triggers the fee provisions of the DTSA and NCTSPA. The jury expressly found that Akoustis' misappropriation was willful and malicious and awarded Qorvo $7,000,000 in punitive damages based on that finding. *See* D.I. 601. As set forth above, the jury's verdict was supported by substantial and overwhelming evidence. *See* Part II.E. The Court is thus authorized to award fees in this case. *See Syntel Sterling Best Shores Mauritius, Ltd. v. The Trizetto Group, Inc.*, C.A. No. 15-0211, 2024 WL 1116090, at *4 (S.D.N.Y. Mar. 13, 2024) (holding plaintiff entitled to fee award based on jury verdict of willful and malicious misappropriation).

#### 3.     The conduct at issue in this case justifies an award of attorneys' fees

The conduct at issue in this case strongly favors allowing Qorvo to recover the fees it has incurred. As is apparent from Part II.E, above, this is not a run-of-the-mill trade secret case. Over

the course of a multi-year period, Akoustis continuously misappropriated trade secrets from Qorvo as a shortcut to entering the market for BAW filters. *See* Trial Tr. 1386:8-13. The 39 trade secrets that Akoustis misappropriated (*see* D.I. 601) touched on nearly every aspect of Akoustis' operations, including market research, business planning, product design and development, product testing, manufacturing, and sales.  *See* Part II.D. The misappropriation scheme was widespread. Akoustis stole hundreds of thousands of Qorvo's files and disseminated Qorvo's confidential information to at least 40 different Akoustis employees. *See* Part II.E.1-3. The scheme involved the outright theft of documents, misrepresentations, deception, "borrowing" confidential prototypes, bribery, and inducing breaches of countless NDAs and employee confidentiality agreements. *See* Part II.E.2-3. The misappropriation scheme was run from the top; it involved nearly every high-level Akoustis executive including the CEO, the Chief Product Officer, the Executive Vice Presidents of Business Development and Fabrication, the Vice Presidents of Quality and Final Operations, and the Chief Device Scientist, to name only a few. *See* Part II.E.4.

Akoustis' conduct in this litigation also justifies an award of fees. Contrary to its recent claims of contrition and rehabilitation, Akoustis repeatedly sought to evade detection of its misconduct over the course of this lawsuit. Akoustis delayed producing evidence of the misappropriation scheme for eight months—until late 2022. *See* Part II.B. Even then, Akoustis produced only a tiny fraction of the documents it had stolen from Qorvo. *See* Part II.C. Akoustis then obstructed Qorvo's efforts to conduct a forensic inspection for more than three months, requiring Qorvo to obtain relief from the Court. *See id*. The forensic inspection ultimately revealed (i) hundreds of thousands of Qorvo emails Akoustis withheld from discovery; (ii) 279 GB of Qorvo data withheld from discovery; and (iii) the destruction of laptop computers for two employees directly involved in the misappropriation. *See id*. Although Akoustis has argued (and the Court has

accepted) that the laptop destruction was unintentional, Akoustis has never explained why the files on those laptops were withheld from discovery prior to the destruction.

The efforts to obstruct discovery were also pervasive throughout depositions in this case. Akoustis executives directly involved in stealing Qorvo's trade secrets consistently denied their activities or developed sudden cases of amnesia when confronted with their misconduct. For example, Mr. Houlden testified, under oath, that he returned all of Qorvo's confidential documents when he left the company. Trial Tr. 688:14-689:1. Contrary to his sworn testimony, the forensic inspection revealed that Mr. Houlden had, in fact, copied confidential Qorvo documents to an external hard drive two days before leaving the company and then transferred those files to Akoustis almost immediately after he joined. *Id.*, 832:17-833:24. Mr. Aichele testified at his deposition that he was not aware of any possession or use of Qorvo confidential information at Akoustis. DeFosse Decl., Ex. 35, 60:17-23. But Mr. Aichele repeatedly saved, circulated, and discussed Qorvo confidential documents with employees at Akoustis. *See, e.g.*, Exs. 121-139. Dr. Shealy testified in his deposition that he was not aware of ever violating his confidentiality obligations to RFMD. DeFosse Decl., Ex. 36, 56:25-58:2. But the forensic inspection again revealed that Dr. Shealy had both modified and circulated RFMD's confidential technology development procedures at Akoustis. *See* Ex. 6, Ex. 205; Trial Tr. 835:23-837:15. Mr. Dry testified that he could not recall where he was obtaining the numerous confidential Qorvo documents he circulated at Akoustis. Trial Tr. 1097:23-24, 1103:16-18, 1112:6-16. Dr. Kwon spent hours in his deposition responding "I don't remember" to nearly every question related to his theft of Qorvo's trimming algorithms. *See, e.g.*, Trial Tr. 1209:21-1210:21, 1215:4-15.

Under these circumstances—where Akoustis engaged in a long-running misappropriation scheme sanctioned by top management and the efforts to cover-up the scheme extended into

15

discovery in this case—an award of fees is more than warranted. Indeed, it would be difficult to identify any trade secret case with facts that are more egregious than those present here.

**B.    Qorvo's Attorneys' Fees Are Reasonable**

In performing a lodestar analysis, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. Here, Qorvo seeks to recover fees for 15,520.4 hours that attorneys worked on the relevant portions of this case. As discussed below, the time Qorvo's attorneys dedicated to this matter is typical of comparable trade secret cases and reasonable given the highly complex nature of the lawsuit and Akoustis' repeated attempts to prevent discovery of its misconduct. The hourly rates of Qorvo's attorneys are also reasonable. Indeed, the rates Qorvo seeks are substantially discounted and lower than rates often charged in the market. Based on the lodestar analysis, Qorvo seeks a total of $12,116,123.3 in attorney's fees. Again, this is reasonable and consistent with fee awards in similar cases.

**1.    Qorvo's attorneys billed a reasonable number of hours**

As set forth in more detail in the DeFosse and Tigan declarations and associated exhibits, Qorvo seeks to recover fees for 15,520.4 hours related to this matter, which is a reasonable number of hours to have expended on this litigation.[8] Qorvo respectfully submits that the following factors support the reasonableness of Qorvo's fee request.

<u>Complexity and stakes of the litigation</u>. As the Supreme Court has recognized, "the novelty and complexity of a case" should be "reflected in the number of billable hours recorded by counsel." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010). Here, Qorvo prevailed on

---

[8] At an appropriate time, Qorvo expects to submit a supplement to this motion for fees seeking recovery of additional fees incurred in connection with this motion, post-trial briefing, any appeal in this case, and any other matter that should be reasonably included in the fee award.

highly complex claims related to a scheme by a direct competitor to misappropriate Qorvo's trade secrets. *See* Part II. As discussed above, Akoustis stole a very large volume of information from Qorvo over a multi-year period. *See id.* As of October 2023, Qorvo had identified **397 trade secrets** in the materials that Akoustis obtained. Given the scope of Akoustis' unlawful conduct, it is not surprising that this case has generated more than 600 court filings. DeFosse Decl., ¶2. Qorvo produced 77,937 documents (comprising 891,138 pages), while Akoustis produced 202,244 documents (comprising 1,211,162 pages). *Id.* Qorvo was also forced to respond to extensive discovery requests from Akoustis—19 interrogatories, 269 requests for production, and 300 requests for admission. *Id.* The parties conducted 33 depositions. *Id.* Dr. Shanfield's expert report concerning the misappropriation of Qorvo's trade secrets was more than 500 pages. *Id.* The 8-day trial in this matter included testimony from 27 witnesses and the introduction of 355 exhibits. *Id.* In short, this is a highly complex matter with significant stakes for Qorvo, including stopping a direct competitor from using Qorvo's trade secrets to compete unfairly in the market.

Akoustis efforts to evade detection. The reasonableness of Qorvo's hours should also be assessed in light of Akoustis' efforts to resist and evade discovery. This was not a straight-forward case where Akoustis produced evidence of its wrongdoing upon request. Akoustis waited eight months before it even began producing documents evidencing the misappropriation. Akoustis then obstructed Qorvo's request for the forensic inspection for more than three months. It was only after the Court compelled the inspection that Akoustis finally came clean about the documents it had been withholding from discovery and its destruction of evidence. Akoustis' discovery tactics materially increased the hours Qorvo's attorneys were required to dedicate to this matter.

Detailed review of attorney invoices. Qorvo's attorneys have also gone to great lengths to review their invoices in this matter and identify the time entries that are reasonably related to the

trade secret claims. *See generally* DeFosse Decl., Tigan Decl. This has resulted in a material reduction in the number of hours for which Qorvo is seeking recovery. In total, Qorvo's attorneys worked approximately 18,708.4 hours (to-date) on this litigation. Although most of those hours relate to the trade secret claims, attorneys also billed time related solely to Qorvo's claims for patent infringement, false patent marking, false advertising, RICO, and civil conspiracy. As a result, partners at Qorvo's law firms reviewed every time entry and excluded entries unrelated to the trade secret claims.[9] DeFosse Decl., ¶5; Tigan Decl., ¶5. Qorvo's law firms also made discretionary reductions, entirely eliminating certain timekeepers from this free request. As a result of this detailed review, Qorvo seeks fees only for 15,520.4 of the 18,708.4 hours that the attorneys worked on this lawsuit. Qorvo has also reduced the number of timekeepers from 46 to 29.

    <u>Comparisons of similar cases</u>. The time Qorvo's attorneys dedicated to this case also compares favorably to the number of hours worked in comparable trade secret cases. *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 2024 WL 1116090, at *6 (S.D.N.Y. Mar. 13, 2024) (granting fees of $14.5 million and finding 21,000 hours reasonable for complex trade secret case); *Motorola Solutions, Inc. v. Hytera Comms. Corp., Ltd*., C.A. No. 17-01973, 2021 WL 12139698, at *3-*4 (N.D. Ill. Oct. 15, 2021) (granting fee award of $34.2 million in complex trade secret case, noting that 17,554 was only a portion of the hours awarded); *see*

---

[9] In performing this analysis, Qorvo's attorneys applied the guidance in *Hensley* that work on interrelated facts and legal theories need not be excluded from a fee request. *Hensley*, 461 U.S. at 438 ("Given the interrelated nature of the facts and legal theories in this case, the District Court did not err in refusing to apportion the fee award mechanically on the basis of respondents' success or failure on particular issues."); *see also Jack Tyler Engineering Co. v. Environment-One Corp.*, No. 07-cv-2393, 2009 WL 2382256, at *8 (W.D. Tenn. July 31, 2009) (rejecting defendant's argument that a fee award should be where plaintiff's unsuccessful claims arose from the same core facts as the successful claim). As such, Qorvo has included work in this fee motion that was done for the unfair competition and conspiracy claims where there is a common nexus with the trade secret claims—e.g., a scheme to misappropriate Qorvo's confidential information.

also *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 2014 WL 792137, at *12 (E.D. Va. Feb. 25, 2014), *vacated on other grounds* (June 12, 2014) (awarding $18.3 million to plaintiff in trade secret case); DeFosse Decl., Ex. 37, *Liqwd, Inc. v. L'Oreal USA, Inc.*, C.A. No. 17-14-JFB, D.I. 1184 (D. Del. Mar. 24, 2020) (Judgment) (awarding $13.5M in attorneys' fees and other compensable expenses in case involving trade secrets, patents, and breach of NDA); DeFosse Decl., Ex. 38, *Comet Techs. USA Inc. v. XP Power LLC*, C.A. No. 20-6408, D.I. 503 at 2 (N.D. Cal. Nov. 4, 2022) (prevailing party fee motion seeking fees for 21,090 hours). The size of Qorvo's legal team is also comparable to the team representing Akoustis in this matter. For example, 17 attorneys from three law firms have entered appearances for Akoustis in this matter, compared to 15 attorneys from two law firms for Qorvo.

### 2.    Rates are reasonable and consistent with market rates

The rates charged by Sheppard Mullin and Morris Nichols—between $175 and $1327.5 per hour—are also reasonable and "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). As a threshold matter, "the quality of a prevailing party's counsel's representation" should be "reflected in the reasonable hourly rate." *Purdue*, 559 U.S. at 553. Here, Qorvo's law firms are well-recognized for the quality of the service they provide. For example, Sheppard Mullin is ranked among the "Best Law Firms" in the country and its intellectual property litigation practice has received a national tier one rating. *See* DeFosse Decl., ¶7. Morris Nichols' attorneys, including the individual attorneys working on this case, have been found to be "highly qualified" and their rates have been found reasonable by courts in this District. *Liqwd, Inc. v. L'Oreal USA, Inc.*, C.A. No. 17-14-JFB-SRF, 2019 WL 6840353, at *13, (D. Del. Dec. 16, 2019) *aff'd in part, rev'd in part, dismissed in part*, *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701 (Fed. Cir. 2021). The jury's verdict is also evidence of the skill of Qorvo's attorneys in this case.

Economic surveys also confirm the reasonableness of the rates that Qorvo's attorneys charge. For example, Sheppard Mullin's and Morris Nichol's hourly rates are consistent with market rates reflected in economic surveys prepared by the consulting firm PwC. Exhibits 39 and 40 of the DeFosse Declaration are excerpts of the 2023 and 2024 Revenue Management Reports that PwC creates. *See* DeFosse Decl., Exs. 39, 40. These reports, identify hourly rate information from dozens of national law firms, broken down by attorney ranking, for IP practices at over 40 national litigation firms. They indicate the rates Sheppard Mullin and Morris Nichols charged Qorvo on this matter are under market. For example, Exhibit 40, demonstrates that the median 2023 rates for equity partners were between ████████████, depending on the level of experience (compared to ████████████ for Sheppard Mullin's partners on this case). Similar data is shown for non-equity partners (DeFosse Decl. Ex. 40, p. 42) and associates (*id.*, p. 64). *See also* DeFosse Decl., Ex. 40; *Wi-LAN Inc. v. Sharp Elecs. Corp.*, C.A. No. 15-379-LPS, 2022 WL 1224901, at *4 (D. Del. Apr. 25, 2022) (relying on economic survey as evidence of reasonable rates); *View Eng'ng, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 987 (Fed. Cir. 2000) (same).

Additionally, Courts have also routinely found rates higher than those charged here to be reasonable. *See, e.g., Syntel*, 2024 WL 1116090, at *6 (finding rates ranging from $585 for junior attorneys to $1,765 for lead attorneys as reasonable); *Liqwd*, 2019 WL 6840353, at *12 (finding hourly rates for core attorneys of $705 to $1,040 as reasonable nearly five years ago); *Motorola*, 2021 WL 12139698, at *1-*2 (finding hourly rates between $555 and $1565 reasonable).

In sum, the rates that Qorvo's law firms charged (ranging from $175 to $1327.5) are reasonable based on the skill of the lawyers in this matter and prevailing market rates.

## V.   CONCLUSION

Qorvo respectfully requests that the Court award its reasonable attorneys' fees relating to Qorvo's trade secrets claims as set forth herein.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Qorvo, Inc.*

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Eric K. Gill
Zachary Alper
Theodore Mayer
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

James C. Wald
Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

June 17, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 17, 2024, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                    *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Ronald S. Lemieux, Esquire                       *VIA ELECTRONIC MAIL*
David S. Elkins, Esquire
Victoria Q. Smith, Esquire
SQUIRE PATTON BOGGS (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA  94304-1216
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Xiaomei Cai, Esquire                             *VIA ELECTRONIC MAIL*
SQUIRE PATTON BOGGS (US) LLP
2325 E. Camelback Road, Suite 700
Phoenix, AZ  85016
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Rachael A. Harris, Esquire                       *VIA ELECTRONIC MAIL*
Matthew A. Stanford, Esquire
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)