# Exhibits 1-34
# (Redacted in Their Entirety)

# Exhibit 35

Transcript of David Aichele
Conducted on September 15, 2023

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

QORVO, INC.,                    ) C.A. No. 21-1417 JPM
                                )
                                )
        Plaintiff,              )
                                )
                                )
  v.                            )
                                )
AKOUSTIS TECHNOLOGIES, INC.,    )
and AKOUSTIS, INC.,             )
                                )
        Defendants.             )
_____      )

                ** ▮▮▮▮▮▮▮▮▮▮ **

        VIDEOTAPED DEPOSITION OF

                DAVID AICHELE

        Charlotte, North Carolina

        Friday, September 15, 2023

                8:38 a.m.

Reported by:  Christine A. Taylor, RPR
Job No.: 505394

---

**Page 2**

                APPEARANCES

For the Plaintiff:

    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
    BY: JONATHAN R. DeFOSSE, ESQ.
        ROY JUNG, ESQ.
        2099 Pennsylvania Avenue, NW, Suite 100
        Washington, D.C.  20006
        202.747.1900
        jdefosse@sheppardmullin.com
        rjung@sheppardmullin.com

For the Defendants:

    PILLSBURY WINTHROP SHAW PITTMAN, LLP
    BY: DAVID A. JAKOPIN, ESQ.
        2550 Hanover Street
        Palo Alto, California  94304
        650.233.4046
        david.jakopin@pillsburylaw.com

Also Present:

    Drew Wright, Akoustis

    Len Harris, Videographer

---

**Page 3**

                C O N T E N T S

                                            PAGE

EXAMINATION BY MR. DeFOSSE                    21

                * * *

                E X H I B I T S

EXHIBIT      DESCRIPTION                     PAGE

Exhibit 468   10/29/2015 E-mails, Subject: RE:    67
              New Qorvo BAW Advanced
              Development results, Bates
              AKTS_00069739 - 69740

Exhibit 469   8/25/16 E-mails, Subject: Re:       74
              Akoustis, Bates AKTS_00115835 -
              115837

Exhibit 470   ALEO - 9/2/16 E-mails, Subject:     80
              RE: SAW filters from 600 Mhz to
              1000 Mhz, Bates AKTS_00471343 -
              471347

Exhibit 471   AEO - Spreadsheet produced in       83
              native - Bates AKTS_00471348

Exhibit 472   AEO - 1/7/19 E-mails, Subject:      85
              RE: B25x Comparison, Bates
              AKTS_00244229 - 244230

---

**Page 4**

Exhibit 473   AEO - 2/27/19 E-mail, Subject:      88
              The spec of QpQ1298, Bates
              AKTS_00135693

Exhibit 474   AEO - QPQ1298 Target Data Sheet,    88
              Bates AKTS_00135694 - 135700

Exhibit 475   AEO - 9/28/19 E-mails, Subject:     93
              Re: Saurabh, Bates AKTS_00135701

Exhibit 476   AEO - QPQ1298 Target Data Sheet,    93
              Bates AKTS_00135702 - 135708

Exhibit 477   AEO - 11/13/19 E-mail, Subject:     96
              The meeting with CMCC, Bates
              AKTS_00041092 - 51093

Exhibit 478   QPQ1298 Target Data Sheet, Bates    96
              AKTS_00051094 - 51100

Exhibit 479   AEO - 11/13/19 E-mail, Subject:     99
              CMCC/Xiaomi/H3, Bates
              AKTS_00041101

Exhibit 480   QPQ1298 Target Data Sheet, Bates    99
              AKTS_00051102 - 51108

Exhibit 481   AEO - 11/26/19 E-mails, Subject:    102
              RE: A10249 Simulations, Bates
              AKTS_00051456 - 51460

Exhibit 482   QPQ1298 Target Data Sheet, Bates    102
              AKTS_00051461 - 51467

Exhibit 483   885136 2437 mhZ BAW Filter,         102

Transcript of David Aichele
Conducted on September 15, 2023

6 (21 to 24)

---

21

1  in Charlotte, North Carolina.
2      Would counsel please voice identify
3  themselves and state whom they represent.
4      MR. DeFOSSE:  Jonathan DeFosse from
5  Sheppard Mullin on behalf of Qorvo, Inc.  Here
6  with me today is Roy Jung also from Sheppard
7  Mullin.
8      MR JAKOPIN:  David Jakopin from
9  Pillsbury Winthrop Shaw Pittman representing
10  Akoustis.  With me here today is Drew Wright,
11  general counsel of -- general counsel of Akoustis.
12      THE VIDEOGRAPHER:  The court reporter
13  today is Christine Taylor representing Planet
14  Depos.  The witness will now be sworn.
15                 - - -
16          DAVID AICHELE,
17  having first been duly sworn, was examined
18      and testified as follows:
19                 - - -
20          EXAMINATION
21 BY MR. DeFOSSE:
22  Q   Good morning, Mr. Aichele.
23  **A   Good morning.**
24  Q   As you heard, my name is John DeFosse.
25 I'm one the lawyers representing Qorvo in this

---

22

1  matter.
2      Could you please state for me your full
3  name.
4  **A   David Maxwell Aichele.**
5  Q   And your current address?
6  **A**   ████████████████████████████
7  ████████████ .
8  Q   And you understand that you're here
9  today being deposed in the lawsuit that Qorvo,
10  Inc., filed against Akoustis and Akoustis
11  Technologies, Inc.; right?
12  **A   I do.**
13  Q   Have you ever been deposed before?
14  **A   Yes, I have.**
15  Q   On how many occasions?
16  **A   Once.**
17  Q   Okay.  I'm going to review some ground
18  rules which may sound familiar to you to help us
19  facilitate an easy day today.
20      First, you understand that you're
21  testifying under oath today?
22  **A   Correct.**
23  Q   And that's the same oath that you would
24  take in a court of law if you were testifying in
25  front of a jury?

---

23

1  **A   Yes.**
2  Q   Everything that I say and that you say
3  today is being written down by our court reporter,
4  so I ask that your answers be audible and not
5  shakes of the head or uh-huhs; okay?
6  **A   Understand.**
7  Q   If you don't understand a question I ask
8  today, I'd ask you please just to let me know and
9  I'll try to rephrase the question; okay?
10  **A   Okay.**
11  Q   If you answer a question that I ask
12  without asking me to rephrase it, I'm going to
13  assume that you understood that question; is that
14  fair?
15  **A   Yes.**
16  Q   There may be objections throughout the
17  day.  You can go ahead and answer the questions
18  without waiting for permission unless your counsel
19  instructs you not to answer; okay?
20  **A   Okay.**
21  Q   We're going to take breaks about every
22  hour.  If you need a break in between that time,
23  just let me know, and if there's a question
24  pending, we'll finish the answer, and then we'll
25  go off the record.

---

24

1  **A   Okay.**
2  Q   Is there any reason that you would be
3  unable to testify fully and truthfully today?
4  **A   No reason.**
5  Q   What is your -- are you currently
6  employed at Akoustis?
7  **A   Yes, I am.**
8  Q   What's your current position?
9  **A   Executive vice president of business**
10 **development.**
11  Q   And when did you first start working for
12 Akoustis?
13  **A   I believe it was May of 2015 or 2014.  I**
14 **can't remember.  It's in that range though.**
15  Q   Okay.  Have you been with Akoustis since
16 the company was formed?
17  **A   I was with the company about a year**
18 **after it was formed.**
19  Q   Okay.  Was there someone in your
20 position prior to you being hired at Akoustis?
21  **A   I think they had a consultant there for**
22 **about three, four months prior to me, but no**
23 **permanent employees as far as I'm aware of.**
24  Q   And was your position when you joined
25 Akoustis also the executive vice president of

Transcript of David Aichele
Conducted on September 15, 2023

15 (57 to 60)

57

1  crystal in the earlier phases of the development
2  process and the relationship and then it
3  transitioned to polycrystalline.
4      Q  So once the product, AKF-1938, went into
5  commercial production, it was -- the
6  polycrystalline materials were used?
7      A  Correct.
8      Q  Okay.  Why the switch from the single
9  crystal materials to the polycrystalline materials
10 for the AKF-1938?
11     A  Mainly is the acquisition of STC-MEMS,
12 which is the fab that we bought up in New York.
13 So prior to that, you know, we had a foundry
14 agreement with a -- you know, a fab that was doing
15 our process.  And so when we acquired STC, we
16 transferred, you know, the process, which we
17 owned.  It was an agreement between us and the
18 foundry partner.  We transferred the process into
19 the STC-MEMS fab and continued with the
20 development utilizing the single crystal.  We
21 actually bought a MOCVD reactor.
22         So prior to that time, you know, we were
23 having the material, the single crystal
24 outsourced, so we had a material company
25 delivering the wafers with the material growth on

58

1  it.  And then we had the foundry partner that was
2  doing all of the fabrication.
3          So when we acquired STC-MEMS, we
4  transferred, you know, the technology into the
5  STC-MEMS.  We bought a reactor and got the reactor
6  up and running.  And we kept on with the
7  development of the -- you know, the single crystal
8  with our process, but then recognized that they
9  also had -- the fab had a polycrystalline
10 capability.  So they had a -- the equipment
11 sputtering, so we started doing some development
12 on that.
13         There are some difficulties with single
14 crystal because of the reaction, the temperatures,
15 that you can't deposit on -- at least at the time
16 you could not deposit on silicon, which is a low
17 cost substrate.  So you have to deposit on a
18 fairly expensive substrate called silicon carbide.
19 And also there were yield issues at the time with
20 the single crystal.  And this application did not
21 require, you know, some of the benefits of high
22 power.  And when we found that the
23 polycrystalline, you know, worked, you know, we
24 decided to make the transition, you know, from
25 single crystal to poly.

59

1      Q  Did you see a drop-off when you moved to
2  poly in terms of the performance of the AKF-1938?
3      A  No, not on that -- not on that design.
4      Q  Other than AKF-1938, has Akoustis gone
5  into commercial production with any other -- well,
6  strike that.  That was not right.
7          Has Akoustis gone into production --
8  commercial production with any part that's using
9  single crystal materials?
10     A  Not presently.
11     Q  Previously has Akoustis gone into
12 commercial production with any part using single
13 crystal materials?
14     A  Yeah, not previously, not presently.
15 Through the scope, we have not released product
16 into production, but we have done a lot of
17 development with the single crystal.
18     Q  Now, Mr. Aichele, you understand that
19 one of the claims in this lawsuit by my client,
20 Qorvo, is that Akoustis has misappropriated
21 Qorvo's confidential information.  Are you aware
22 of that?
23     A  Correct.
24     Q  Are you aware of any use of Qorvo
25 confidential information at Akoustis?

60

1      A  Other than I guess discussions
2  internally, not -- not in the sense of what you
3  just defined, no.
4      Q  You said other than discussions
5  internally, what did you mean by that?
6      A  It -- I think what I'm saying is other
7  than obviously discussions here, you know, that
8  this is what's going to be discussed.
9      Q  Okay.  So let me just stop you there.  I
10 don't want you tell me anything that you've
11 discussed with Mr. Jakopin or Mr. Wright or
12 attorneys.
13     A  No, I'm not.
14     Q  So let's -- I'm going to go back to my
15 first question.  Let's try it again.
16     A  Okay.
17     Q  Mr. Aichele, are you aware of any use of
18 Qorvo confidential information at Akoustis?
19     A  No, I'm not.
20     Q  Did you have any possession of Qorvo
21 confidential information in your files at
22 Akoustis?
23     A  Not that I'm aware.
24     Q  And then I take it from that answer that
25 you're not aware of ever saving any Qorvo

Transcript of David Aichele
Conducted on September 15, 2023

78 (309 to 312)

309

1    Q  Okay.  Do you know whether Mr. Houlden's
2  access or circulation of Qorvo confidential
3  materials had any role in the company's decision
4  to part ways with him?
5    **A  No, I do not.**
6    MR. DeFOSSE:  All right.  Thank you for
7  your time today.  I appreciate it.
8    I will pass the witness.
9    MR JAKOPIN:  No questions.
10    MR. DeFOSSE:  We're done.
11    THE WITNESS:  Thank you very much.
12    MR. DeFOSSE:  Thank you.
13    THE VIDEOGRAPHER:  This concludes the
14  video deposition of David Aichele.  The time is
15  6:59 p.m.  We are off the record -- I'm sorry,
16  4:59 p.m.  We are off the record.
17    - - -
18    (Read and sign reserved.)
19    - - -
20    (Deposition concluded at 4:59 p.m.)
21    - - -
22
23
24
25

310

1  STATE OF NORTH CAROLINA )
2    ) CERTIFICATE OF TRANSCRIPT
2  COUNTY OF UNION      )
3    I, CHRISTINE A. TAYLOR, RPR, a Notary Public
4  within and for the State of North Carolina, do
5  hereby certify:
6    That DAVID AICHELE, the witness whose
7  deposition is hereinbefore set forth, having
8  produced satisfactory evidence of identification
9  and having been first duly sworn by me, and that
10  such deposition is a true record of the testimony
11  given by such witness.
12    I further certify that I am not financially
13  interested in the outcome of this action, a
14  relative, employee, attorney or counsel of any of
15  the parties, nor am I a relative or employee of
16  such attorney or counsel.
17    IN WITNESS WHEREOF, I have hereunto set my
18  hand this 27th day of September, 2023.
19
20    _____
21    CHRISTINE A. TAYLOR
    Registered Professional Reporter
22    Notary Public 19960530077
23
24
25

311

1    DEPOSITION ERRATA SHEET
2
3  Our Assignment No:  505394
4  Case Caption:  Qorvo, Inc. v. Akoustis
5  Technologies, Inc., et al.
6
7    DECLARATION UNDER PENALTY OF PERJURY
8    I declare under penalty of perjury that
9  I have read the entire transcript of my deposition
10  taken in the captioned matter or the same has been
11  read to me, and the same is true and accurate,
12  save and except for changes and/or corrections, if
13  any, as indicated by me on the DEPOSITION ERRATA
14  SHEET hereof, with the understanding that I offer
15  these changes as if still under oath.
16    Sign on the _____ day of
17  _____, 20 __.
18
19
20    _____
21    DAVID AICHELE
22
23
24
25

312

1    DEPOSITION ERRATA SHEET
2
3  Page No. _____ Line No. _____ Change to: _____
4  _____
5  Reason for Change: _____
6  Page No. _____ Line No. _____ Change to: _____
7  _____
8  Reason for Change: _____
9  Page No. _____ Line No. _____ Change to: _____
10  _____
11  Reason for Change: _____
12  Page No. _____ Line No. _____ Change to: _____
13  _____
14  Reason for Change: _____
15  Page No. _____ Line No. _____ Change to: _____
16  _____
17  Reason for Change: _____
18  Page No. _____ Line No. _____ Change to: _____
19  _____
20  Reason for Change: _____
21
22  SIGNATURE: _____  DATE:_____
23    DAVID AICHELE
24
25

# Exhibit 36

Transcript of Jeffrey Shealy, Ph.D.
Conducted on November 15, 2023

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3
 4   QORVO, INC.,
 5            Plaintiff,
 6      vs.            CASE NO:  21-1417 JPM
 7   AKOUSTIS TECHNOLOGIES, INC.,
     and AKOUSTIS, INC.,
 8
            Defendants.
 9
10            * * * * * * *
11
12      ** ATTORNEYS' EYES ONLY **
13
14   VIDEOTAPED DEPOSITION OF JEFFREY SHEALY, Ph.D.
15            Charlotte, North Carolina
16            Wednesday, November, 2023
17               9:16 a.m. EDT.
18
19
20
21
22   Job No.: 511228
23   Pages: 1 - 300
24   Reported by: Jillian Doctor, RPR,
25
```

---

**Page 2**

```
 1          A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3        SHEPPARD, MULLIN, RICHTER & HAMPTON,
          LLP
 4        2099 Pennsylvania Avenue, NW, Suite 100
          Washington, D.C.  20006
 5        BY:  Jonathan R. DeFosse, Esquire
               Robert M. Masters, Esquire
 6             Jdefosse@sheppardmullin.com
               Rmasters@sheppardmullin.com
 7
 8   FOR THE DEFENDANTS:
 9        SQUIRE PATTON BOGGS, LLP
          1841 Page Mill Road, Suite 150
10        Palo Alto, California 94304
          BY:  Ronald S. Lemieux, Esquire
11             Ronald.lemieux@squirepb.com
12        - and -
13
14        AKOUSTIS TECHNOLOGIES
          9805-A Northcross Center Ct.
15        Huntersville, North Carolina  28078
          BY:  Drew Wright, Esquire
16             Dwright@akoustis.com
17
18
19
20   VIDEOGRAPHER:
21        Merinda Evans
22
23
24        JILLIAN DOCTOR, RPR, CRR
          COURT REPORTER
25
```

---

**Page 3**

```
 1            I N D E X
 2   EXAMINATION                    PAGE
 3   By Mr. DeFosse                   9
 4
 5            * * * * * *
 6   EXHIBITS
 7   Deposition Exhibit 757          10
 8     Plaintiff's Notice of Deposition
 9   Deposition Exhibit 758          11
10     Videotaped deposition transcript of Mr. Shealy
11   Deposition Exhibit 759          34
12     Bates AKTS_00981942 through AKTS_00981948
13   Deposition Exhibit 760          50
14     Qorvo_00012270 through Qorvo_00012278
15   Deposition Exhibit 761          65
16     AKTS_01062283 through AKTS_01062660
17   Deposition Exhibit 762          82
18     AKTS_00595118 through AKTS_00595190
19   Deposition Exhibit 763          86
20     AKTS_00594153 through AKTS_00594239
21   Deposition Exhibit 764          93
22     Patent application for Wafer Scale Packaging
23   Deposition Exhibit 765          94
24     AKTS_00442307 through AKTS_00442371
25
```

---

**Page 4**

```
 1   EXHIBITS CONTINUED
 2   Deposition Exhibit 766          95
 3     AKTS_00594567 through AKTS_00594673
 4   Deposition Exhibit 767          96
 5     AKTS_01050041 through AKTS_01050093
 6   Deposition Exhibit 768          105
 7     AKTS_00683474 through AKTS_00683490
 8   Deposition Exhibit 769          117
 9     AKTS_00110239 through AKTS_00110252
10   Deposition Exhibit 770          121
11     AKTS_00069844 through AKTS_00069864
12   Deposition Exhibit 771          125
13     AKTS_00028554 through AKTS_00028577
14   Deposition Exhibit 772          131
15     AKTS_00686236 through AKTS_00686292
16   Deposition Exhibit 773          136
17     AKTS_00207645 through AKTS_00207649
18   Deposition Exhibit 774
19     Skipped in Numbering
20   Deposition Exhibit 775
21     Skipped in Numbering
22   Deposition Exhibit 776
23     Skipped in Numbering
24   Deposition Exhibit 777
25     Skipped in Numbering
```

Page 5

1  EXHIBITS CONTINUED
2  Deposition Exhibit 778
3    Skipped in Numbering
4  Deposition Exhibit 779            142
5    AKTS_00209147 through AKTS_00209159
6  Deposition Exhibit 780            157
7    AKTS_00209803 through AKTS_00209807
8  Deposition Exhibit 781            161
9    AKTS_00209896 through AKTS_00209903
10 Deposition Exhibit 782            168
11   AKTS_00876580
12 Deposition Exhibit 783            169
13   AKTS_00876579
14 Deposition Exhibit 784            172
15   AKTS_00756796 through AKTS_00756817
16 Deposition Exhibit 785            177
17   AKTS_00888149 through AKTS_00888158
18 Deposition Exhibit 786            179
19   AKTS_01068302 through AKTS_01068311
20 Deposition Exhibit 787            183
21   AKTS_01068314 through AKTS_01068323
22 Deposition Exhibit 788            187
23   AKTS_01003958 through AKTS_01003990
24 Deposition Exhibit 789            256
25   AKTS_00016450 through AKTS_00016451

Page 6

1  EXHIBITS CONTINUED
2  Deposition Exhibit 790            265
3    AKTS_00080811 through AKTS_00080813
4  Deposition Exhibit 791            275
5    AKTS_00024320 through AKTS_00024329
6  Deposition Exhibit 792            278
7    AKTS_00126728 through AKTS_00126729
8  Deposition Exhibit 793            282
9    AKTS_00439044
10 Deposition Exhibit 794            290
11   November 10th, 2023 Press Release
12 PREVIOUSLY MARKED EXHIBITS
13
14 Deposition Exhibit Number 460        164
15
16 Deposition Exhibit Number 174        188
17
18 Deposition Exhibit Number 119        204
19
20 Deposition Exhibit Number 120        204
21
22 Deposition Exhibit Number 564        215
23
24 Deposition Exhibit Number 137        231
25

Page 7

1  PREVIOUSLY MARKED EXHIBITS CONTINUED
2  Deposition Exhibit Number 138        231
3
4  Deposition Exhibit Number 139        231
5
6  Deposition Exhibit Number 159        234
7
8  Deposition Exhibit Number 160        234
9
10 Deposition Exhibit Number 502        239
11
12 Deposition Exhibit Number 151        241
13
14 Deposition Exhibit Number 152        241
15
16 Deposition Exhibit Number 154        246
17
18 Deposition Exhibit Number 155        246
19
20 Deposition Exhibit Number 140        253
21
22
23
24
25

Page 8

1      THE VIDEOGRAPHER:
2        Here begins Videotape Number 1 in the
3  videotaped deposition of Jeffrey Shealy in the
4  matter of Qorvo, Inc. versus Akoustis
5  Technologies, Inc., et al. in the United States
6  District Court for the District of Delaware, Case
7  Number 21-1417JPM.
8        Today's date is November 15th, 2023 and
9  the time on the video monitor is 9:16 a.m.
10       The videographer today is Merinda Evans
11 representing Planet Depos.  This video deposition
12 is taking place at Regus Charlotte University
13 Executive Park, 301 McCullough Drive, Suite 400,
14 Charlotte, North Carolina.
15       Would counsel please voice identify
16 yourselves and state whom you represent.
17 MR. DeFOSSE:
18       Jonathan DeFosse from Sheppard Mullin
19 here on behalf of Qorvo.  I'm with my colleague
20 Robert Masters, also from Sheppard Mullin.
21 MR. LEMIEUX:
22       Robert Lemieux from Squire Benton Boggs
23 representing the defendants, and accompanying me
24 is general counsel for the defendants Drew
25 Wright.

Transcript of Jeffrey Shealy, Ph.D.
Conducted on November 15, 2023

9

1  THE VIDEOGRAPHER:
2        Would you raise your right hand.
3        JEFFREY SHEALY,
4        having been first duly sworn,
5  was examined and testified as follows:
6  THE VIDEOGRAPHER:
7        You may proceed.
8              EXAMINATION
9  BY MR. DeFOSSE:
10 Q       All right.  Mr. Shealy, good morning.
11 My name is Jonathan DeFosse.  We met off the
12 record.  I'm one of the attorneys for Qorvo in
13 this matter.  Could you please state your full
14 name for the record?
15 A       Yeah.  I'm Jeffrey Blanton Shealy.
16 Q       And what is your current address?
17 A       My current address is ████████
18 ████████████████████
19 Q       And you understand that you're being
20 deposed today in a lawsuit that was brought by
21 Qorvo, Inc. against Akoustis, Inc. and Akoustis
22 Technologies, Inc.?
23 A       Yes, sir.
24 Q       I'm going to hand you what's been
25 marked as Deposition Exhibit 757.

10

1        (DEPOSITION EXHIBIT NUMBER 757
2        WAS MARKED FOR IDENTIFICATION.)
3  BY MR. DeFOSSE:
4  Q       Okay.  I'll identify Exhibit 757 for
5  the record as the plaintiff's notice of
6  deposition of Jeffrey Shealy pursuant to Federal
7  Rule of Civil Procedure 30(b)1.  Do you
8  understand that you're here today to testify in
9  response to this deposition notice?
10 A       Yes, sir.
11 Q       Okay.  You have been deposed
12 previously.  Is that correct?
13 A       Yes, sir, I have.
14 Q       On how many occasions?
15 A       I believe only one.
16 Q       Okay.  And what was that occasion?
17 A       That was an employment matter.
18 Q       Okay.  And was that an employment
19 matter that was brought against Akoustis by Mia
20 Shen?
21 A       Yes, it was.
22 Q       Who was Ms. Shen?
23 A       Ms. Shen was a design engineer that had
24 worked for Akoustis Technologies.
25 Q       And what was the nature of Ms. Shen's

11

1  action against Akoustis?
2  A       The nature of the action as I
3  understand it is -- was -- I believe it was an
4  affirmative action case.
5  Q       Okay.
6  A       That was brought post-employment.
7  Q       Okay.  And is Ms. Shen's action still
8  pending against Akoustis?
9  A       No, sir, it's not.
10 Q       How was that action resolved?
11 A       That was settled with an insurance
12 company.
13 Q       Okay.  I'm handing you what's been
14 marked as Exhibit 758.
15 A       Okay.
16        (DEPOSITION EXHIBIT NUMBER 758
17        WAS MARKED FOR IDENTIFICATION.)
18 BY MR. DeFOSSE:
19 Q       Do you recognize Exhibit 758,
20 Mr. Shealy?
21 A       Give me a moment and I'll --
22 Q       Please.
23 A       -- answer your question.  I believe I
24 do recognize it.  Although I'm not -- I've not
25 reviewed it before, but I recognize I believe

12

1  what the contents are.
2  Q       Okay.  And what do you understand
3  Exhibit 758 to be?
4  A       This appears to be a video deposition
5  that I took with regards to Ms. Shen's claim
6  against the company.
7  Q       Okay.  And so that's a record of the
8  testimony you provided in the deposition you
9  referred to before.  Is that right?
10 A       That is correct.
11 Q       Okay.  Sitting here today, are you
12 aware of any testimony that you provided in that
13 matter that was incorrect?
14 A       I'm not aware of any.  I've not
15 reviewed the document that's been presented to
16 me.  But I'm not aware of anything walking out of
17 that deposition that was incorrect.
18 Q       Okay.  And you understood when you took
19 that deposition that you were under oath in that
20 case as well?
21 A       Yes, I do, sir.
22 Q       And you did your best to answer
23 questions truthfully and honestly in that
24 deposition?
25 A       I did.

Transcript of Jeffrey Shealy, Ph.D.
Conducted on November 15, 2023

14 (53 to 56)

53

1  Q       And you understood that you were not
2  entitled to use RFMD proprietary information
3  after you left the company in February of 2014?
4  A       That's correct.
5  Q       If you look at the middle of the page
6  that ends in 271, you'll see that there is a
7  subparagraph that says D, return of documents and
8  property.  Do you see that?
9  A       Yes, I do.
10 Q       Okay.  Were you able to review that
11 when you looked at the confidentiality provision?
12 If not, I'd just ask you to take a moment to read
13 that paragraph.
14 A       Okay.  I've reviewed it.
15 Q       Okay.  You understand that under the
16 return of documents and property paragraph, you
17 were required to return -- return to RFMD all
18 documents and data that contain proprietary
19 information; correct?
20 A       That's correct.
21 Q       Upon your termination from the company;
22 right?
23 A       That is correct.
24 Q       Sitting here today, are you aware of
25 any instance in which you violated the provisions

54

1  under the confidentiality agreement with RFMD?
2  MR. LEMIEUX:
3       Objection.  Form.
4  A       The agreement is -- the agreement has a
5  scope related to a competitive business, which is
6  radio frequency integrated circuits which are
7  active devices which were the devices that the
8  company was manufacturing, designing and
9  manufacturing.  And so I'm familiar with the
10 term.  I'm not -- I'm not -- I'm looking here.
11 In terms of the -- could you please repeat the
12 question?  Make sure I answer your question.
13 BY MR. DeFOSSE:
14 Q       Sure.  Sitting here today, are you
15 aware of having violated any provision of the
16 confidentiality agreement that's been marked as
17 Exhibit 760?
18 MR. LEMIEUX:
19      Objection.  Form.
20 A       No.
21 BY MR. DeFOSSE:
22 Q       Okay.  If we look specifically back at
23 the Section 1, Confidentiality, Paragraph A,
24 Nondisclosure Proprietary Information, that's --
25 we looked at that provision previously.  Do you

55

1  recall?
2  A       I'm sorry.  Please repeat the question.
3  Just make sure I'm looking where you want me to.
4  Q       Sure.  I'd like you to look at
5  Section 1, Confidentiality, Paragraph A,
6  Nondisclosure Proprietary Information.  Are you
7  with me?
8  A       Yes.  I'm with you.
9  Q       And you agree with me that under this
10 paragraph you were prohibited from at any time
11 disclosing or using the proprietary information
12 of RFMD; correct?
13 MR. LEMIEUX:
14      Objection.  Form.
15 A       On Page 3 it's scoped to a competing
16 business, which is radio frequency integrated
17 circuits.  Which my understanding of that is
18 active devices.  And that's the competing
19 business that the company was operating in when I
20 left.  That business did not include anything in
21 the way of filters as we were not -- we had no
22 activity.  We weren't -- there was no activity in
23 the company to my knowledge.
24 BY MR. DeFOSSE:
25 Q       Okay.  Could you point to me where

56

1  you're talking about --
2  A       Yes, sir.
3  Q       -- the agreement scoping to particular
4  devices?
5  A       It mentions competitive business.
6  Bottom of Page 3 of the document, which -- which
7  states the business of designing, developing,
8  manufacturing radio frequency integrated circuit
9  devices.  My understanding of RFIC devices are
10 active -- active devices such as the company was
11 manufacturing while I was there.
12 Q       Okay.  And --
13 A       Those would be gallium arsenide, for
14 example.
15 Q       So just to be clear, the provision
16 you're pointing to appears on the page that ends
17 in 272.  Is that right?
18 A       Yes.  I'm sorry.
19 Q       And that appears under the portion of
20 this agreement that is entitled Prohibition
21 Against Solicitation?
22 A       Oh, okay.
23 Q       Is that right?
24 A       It does, yes.
25 Q       I'd like to turn back now to

Transcript of Jeffrey Shealy, Ph.D.
Conducted on November 15, 2023

57

1  Paragraph 1, which is the confidentiality
2  provisions.
3  A      Yes.
4  Q      And look at the top of the page that
5  ends in 271.
6  A      Okay.
7  Q      And start -- there is a sentence that
8  starts, "At all times." Do you see that? It's
9  halfway through the paragraph.  It says, "At all
10 times both during the period of the employment by
11 the employer and after termination of that
12 employment for any reason, employee agrees to
13 keep in the strictest confidence and trust all
14 proprietary information and employee will not use
15 any proprietary information or disclose any
16 proprietary information to any person without the
17 prior express written consent of employer except
18 as may be necessary in the ordinary course of
19 performing employee's duties for employer." Do
20 you see that?
21 A      I do see that.
22 Q      Sitting here today, are you aware of
23 having violated that provision of Exhibit 760?
24 MR. LEMIEUX:
25        Objection. Form.

58

1  A      I am not aware of violating that
2  sitting here today.
3  BY MR. DeFOSSE:
4  Q      So sitting here today, you're not aware
5  of ever having disclosed or used any proprietary
6  information of RFMD?
7  A      Disclosed information.  Please repeat
8  the question.
9  Q      Sure. I'm going to try it again.
10 Sitting here today, you're not aware of any
11 instance on which you disclosed the proprietary
12 information of RFMD after your termination --
13 after the termination of your employment?
14 A      Sitting here today, I am aware of some
15 documents that -- that as engineers -- when I
16 left the company, I had 13 years of records. And
17 engineers are hoarders and so forth.  So I
18 certainly had no intent of doing it. So I would
19 say I'm not aware of disclosure, but I am aware
20 that as an engineer who hoards documents that
21 when I was removing personal ones, most engineers
22 can typically have folders.  And when I left the
23 company, it was pretty abrupt.  And when you have
24 intermingled personal and -- it's difficult to --
25 I didn't go through document by document.

59

1  Q      Okay.  So you would agree with me that
2  you did violate Provision D on Page 271 that
3  required you to return all documents belonging to
4  RFMD?
5  MR. LEMIEUX:
6        Objection. Form.
7  A      Upon termination as I was going through
8  documents, my intent was to leave the documents
9  behind.  As I've learned today, not all documents
10 were left behind.  And I think that is a product
11 of a rush to exit grabbing personal belongings,
12 documents intermingled.
13 BY MR. DeFOSSE:
14 Q      Okay.  And if we turn back to the
15 Subparagraph A at the top of 271.
16 A      Yes.
17 Q      Are you aware of any instance in which
18 you used the proprietary information of RFMD
19 after your termination from the company?
20 A      The information that the company and
21 the business the company was engaged in which
22 would be related to the documents.  Those
23 documents being electronic documents.  We've --
24 I'm not aware where I've used electronic
25 documents for these passive devices that we're

60

1  using. Or that we're manufacturing.
2        The businesses are very different.  For
3  example, drawings.  These things are specific to
4  the type of the device.  So I'm not aware of
5  using electronic documents for -- for the
6  passive. So, you know, the documents that I had
7  that came over, I'm not aware of using those in
8  the company.
9  Q      You mentioned electronic documents.
10 What do you mean by that?
11 A      No, no. I'm sorry.  Electronic
12 devices.  So if, for example, if a layout drawing
13 or engineering records is for an electronic type
14 of device, that would not apply to a different
15 type of device.  So using that, I'm not aware
16 of -- I'm not aware of the benefit of using one
17 for the other.  So -- and certainly in my role as
18 a founder of developing new technology, I
19 wasn't -- I wasn't -- I wasn't developing
20 documents for the company or developing various,
21 you know, a lot of the specifics that would go on
22 in the company.
23 Q      Okay.
24 A      So I was just trying to develop a new
25 technology.

Transcript of Jeffrey Shealy, Ph.D.
Conducted on November 15, 2023

75 (297 to 300)

297

1  Q      Based on the information you've had
2  access to, do you believe that Akoustis should
3  issue an apology to Qorvo?
4  MR. LEMIEUX:
5       Objection. Form.
6  A      I believe we have made statements to
7  Qorvo during -- during pre-mediation meeting that
8  were sincere.
9  MR. DeFOSSE:
10 Q    Sincere meaning Akoustis sincerely
11 believes that apology is warranted here?
12 MR. LEMIEUX:
13      Objection. Form.
14 A      I think the company is -- approached
15 this as -- the way the company approached this
16 was we believe -- we believe there are some
17 things Qorvo thinks we've done, which we haven't.
18 And we're certainly -- we certainly had made an
19 attempt to have a dialogue about that, as well as
20 try to come to some settlement agreement.
21 MR. DeFOSSE:
22      Okay. I'm set. I'll pass the witness.
23 MR. LEMIEUX:
24      Okay. No questions.
25 MR. DeFOSSE:

298

1       Thank you, Mr. Shealy. We appreciate
2  your time today. We can go off the record.
3  THE VIDEOGRAPHER:
4       Going off the record. The time is now
5  17:55.
6  MR. LEMIEUX:
7       I'd like the rough. I don't need the
8  final expedited.
9  MR. DeFOSSE:
10      Rough tonight. Expedited final
11 tomorrow, please.
12 (Whereupon, the deposition concluded at 5:55 p.m.
13 EDT.)
14
15
16
17
18
19
20
21
22
23
24
25

299

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Merinda Evans, Notary Public,
3  do hereby certify that the aforementioned witness
4  was sworn before me at the aforemention location,
5  and that I am neither counsel for, related to, nor
6  employed by any of the parties to this case and
7  have no interest, financial or otherwise, in its
8  outcome.
9       IN WITNESS WHEREOF, I have hereunto set
10 my hand and affixed my notarial seal this 16th day,
11 of November, 2023.
12
13
14  *Merinda E. Evans*
15
16
17 _____
18 Merinda Evans, Notary Public
19 for the State of North Carolina
20
21
22
23
24
25

300

1       C E R T I F I C A T E
2
3       I do hereby certify that the above and
4  foregoing transcript of proceedings in the matter
5  aforementioned was taken down by me in machine
6  shorthand, and the questions and answers thereto
7  were reduced to writing under my personal
8  supervision, and that the foregoing represents a
9  true and correct transcript of the proceedings
10 given by said witness upon said hearing.
11      I further certify that I am neither of
12 counsel nor of kin to the parties to the action,
13 nor am I in anywise interested in the result of
14 said cause.
15
16  *Jillian Doctor*
17
18 _____
19 JILLIAN DOCTOR, RPR,
20 CERTIFIED REALTIME REPORTER
   November 16, 2023
21
22
23
24
25

# Exhibit 37

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIQWD, INC. and OLAPLEX LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. No. 17-14 (JFB) (SRF) |
| | ) | |
| L'ORÉAL USA, INC., L'ORÉAL USA | ) | |
| PRODUCTS, INC, L'ORÉAL USA S/D, | ) | |
| INC., and REDKEN 5TH AVENUE NYC, | ) | |
| L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## FINAL JUDGMENT

This action was tried before a jury beginning August 5, 2019, with the Honorable Joseph

F. Bataillon presiding. On August 12, 2019, the jury rendered a verdict. The verdict was

accompanied by a verdict form, which was signed by the foreperson and all jurors as a

unanimous verdict, and was accepted by the Court and filed in a redacted form by the Clerk (D.I.

1060). On August 16, 2019, the Court issued a Permanent Injunction (D.I. 1073). On August

20, 2019, the Court entered a non-final Judgment on the Jury Verdict (D.I. 1078), which invited

post-trial briefing. The parties fully submitted post-trial briefing as of October 29, 2019. *See*

D.I. 1127 (Scheduling Stipulation). Thereafter, on December 16, 2019, the Court issued its

Memorandum and Order resolving the parties' post-trial motions (D.I. 1162).

Pursuant to the Court's Memorandum and Order on post-trial motions (D.I. 1162), the

Jury Verdict (D.I. 1060), and the court's entry of Judgment on the Jury Verdict (D.I. 1078), final

judgment is hereby entered as follows:

1. IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in

favor of plaintiffs Liqwd, Inc. and Olaplex LLC (together, "Plaintiffs") and against defendants

L'Oréal USA, Inc., L'Oréal USA Products, Inc., L'Oréal USA S/D, Inc., and Redken 5th Avenue NYC, L.L.C. (together, "Defendants") on Plaintiffs' claims of infringement of U.S. Patent No. 9,498,419 (the "'419 Patent"), infringement of U.S. Patent No. 9,668,954 (the "'954 Patent," and together with the '419 Patent, the "Asserted Patents"), trade secret misappropriation, and breach of contract;

2.    IT IS FURTHER ORDERED AND ADJUDGED that judgement be and hereby is entered in favor of Plaintiffs and against Defendants with respect to Plaintiffs claims for enhanced damages under 35 U.S.C. § 284 and for a declaration that this case is exceptional under 35 U.S.C. § 285;

3.    IT IS FURTHER ORDERED AND ADJUDGED that judgment be and hereby is entered in favor of Plaintiffs and against Defendants with respect to Plaintiffs' claims that Defendants' infringement of the Asserted Patents was willful and that Defendants' trade secret misappropriation was willful and malicious;

4.    IT IS FURTHER ORDERED AND ADJUDGED that judgment be and hereby is entered in favor of Plaintiffs and against Defendants in the amount of $66,167,843, which amount is the sum of:

    a.  $24,960,000.00 in compensatory damages for all four of Plaintiffs' causes of action;

    b.  $24,960,000.00 in exemplary damages arising from Plaintiffs' patent infringement and trade secret misappropriation causes of action;

    c.  $13,514,913 in attorney fees and other compensable fees;

    d.  $2,732,930 in pre-judgment interest, calculated upon the $24,960,000 compensatory damages award for the period of June 6, 2017 to December 16,

2019 at the prime rate as of June 6, 2017, compounded quarterly;

5. IT IS FURTHER ORDERED AND ADJUDGED that Defendants shall pay Plaintiffs post-judgment interest at the statutory interest rate pursuant to 28 U.S.C. § 1961 in the amount of $2,813.49 per day beginning the day this Final Judgment is entered and ending the day upon which Defendants fully satisfy this Final Judgment;

6. IT IS FURTHER ORDERED AND ADJUDGED that judgment be and hereby is entered in favor of Plaintiffs and against Defendants with respect to Defendants' defense that the asserted claims of the Asserted Patents are invalid;

7. IT IS FURTHER ORDERED AND ADJUDGED that judgment be and hereby is entered in favor of Plaintiffs and against Defendants on Defendants' Counterclaims (D.I. 650), and that Defendants' counterclaims are hereby dismissed;

8. IT IS FURTHER ORDERED AND ADJUDGED that judgment be and hereby is entered in favor of Plaintiffs and against Defendants on each of Defendants' Affirmative Defenses (D.I. 650).

IT IS SO ORDERED.

DATED this ___24th___ day of ___March___ 20_20_.

BY THE COURT:

_____
Senior United States District Judge

# Exhibit 38

Adam Alper (SBN: 196834)
*adam.alper@kirkland.com*
Akshay Deoras (SBN: 301962)
*akshay.deoras@kirkland.com*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

Michael W. De Vries (SBN: 211001)
*michael.devries@kirkland.com*
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC.,
COMET AG AND YXLON
INTERNATIONAL GMBH

Sharre Lotfollahi (SBN: 258913)
*sharre.lotfollahi@kirkland.com*
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Leslie M. Schmidt (*pro hac vice*)
*leslie.schmidt@kirkland.com*
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Kat Li (*pro hac vice*)
*kat.li@kirkland.com*
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
Telephone:    (512) 678-9100
Facsimile:    (512) 678-9101

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMET TECHNOLOGIES USA INC., a Delaware corporation, COMET AG, a Swiss corporation, and YXLON INTERNATIONAL GMBH, a German corporation,<br><br>          Plaintiffs,<br><br>    v.<br><br>XP POWER LLC, a California Limited Liability Company,<br><br>          Defendant. | CASE NO. 5:20-cv-6408<br><br>**PLAINTIFFS' MOTION FOR ATTORNEY FEES FROM XP POWER** |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND ...................................................................................................2

    A.    XP Willfully and Maliciously Misappropriated Comet's Trade Secrets .................2

    B.    XP Purposefully Concealed Its Theft from Comet ...................................................6

    C.    XP's Defenses Have Been Objectively Unreasonable............................................7

    D.    XP's Unreasonable Litigation Positions Forced Comet to Spend Many Additional Hours on this Case ..............................................................................................9

III.   ARGUMENT .......................................................................................................12

    A.    Comet Should Be Awarded Its Attorneys' Fees under the Law ...........................12

    B.    Comet's Attorneys' Fees Are Reasonable ...........................................................15

        1.    Legal Standard .................................................................................................16

        2.    Comet's Attorney Hours Are Reasonable.......................................................16

        3.    Comet's Proposed Rates Are Reasonable .......................................................18

IV.   CONCLUSION....................................................................................................19

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Banas v. Volcano Corp.*,
47 F. Supp. 3d 957 (N.D. Cal. 2014) ...................................................................19

*Blanchard v. Bergeron*,
489 U.S. 87 (1989)...............................................................................................16

*Camacho v. Bridgeport Fin., Inc.*,
523 F.3d 973 (9th Cir. 2008) .........................................................................16, 18

*El du Pont de Nemours and Co. v. Kolon Indus., Inc.*,
No. 3:09-cv-58, 2014 WL 792137 (E.D. Va. Feb. 25, 2014) ............................14, 17

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*,
No. CV13-07563-DMG, 2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) .............8

*Language Line Servs., Inc. v. Language Servs. Assocs., LLC*,
No. C 10-02605 JW, 2010 WL 2764714 (N.D. Cal. July 13, 2010) ....................8

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
No. CV 17-14-JFB-SRF, 2019 WL 6840353 (D. Del. Dec. 16, 2019)...............12

*Mathis v. Spears*,
857 F.2d 749 (Fed. Cir. 1988)..............................................................................19

*Mattel, Inc v. MGA Entm't, Inc.*,
705 F.3d 1108 (9th Cir. 2013) .............................................................................17

*Mattel, Inc. v. MGA Entm't, Inc.*,
No. CV 04-9049 DOC .........................................................................................17

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
No. 1:17-CV-01973, 2021 WL 3076780 (N.D. Ill. Mar. 10, 2021) ...................12

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
No. 1:17-CV-01973, Dkt. No. 1250 (N.D. Ill. Oct. 15, 2021)............................17

*Nasiri v. T.A.G. Protective Serv's Inc.*,
No. 18-cv-01170-NC, 2021 WL 4226207 (Sept. 16, 2021) ...............................13

*OmniGen Research, LLC v. Yongqiang Wang*,
No. 6:16-CV-268-MC, 2017 WL 5505041 (D. Or. Nov. 16, 2017)....................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Oracle USA, Inc. v. Rimini St., Inc.*,
  209 F. Supp. 3d 1200 (D. Nev. 2016), *aff'd in part, vacated in part, rev'd in part*, 879
  F.3d 948 (9th Cir. 2018), *rev'd in part*, 139 S. Ct. 873, 203 L. Ed. 2d 180 (2019)................17

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
  549 F.3d 1381 (Fed. Cir. 2008)................................................................17

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
  208 F.3d 981 (Fed. Cir. 2000)................................................................18

**Statutes**

18 U.S.C. § 1836(b)(3)(D)................................................................12

## I.    INTRODUCTION

There is no serious question that this is the quintessential type of case in which substantial attorneys fees should be awarded.  As shown at trial and by the jury's highly-detailed and decisive verdict, XP engaged in a years-long scheme to blatantly steal Comet's industry-leading semiconductor manufacturing equipment technologies, to create a "next-generation" product line to replace its outdated Comdel products and boost its flagging corporate profits at the expense of Comet's hard-earned market position and reputation.  XP's bad faith is confirmed not only by the sheer volume of materials it stole—amounting to thousands of confidential files, schematics, specifications, computer aided designs, and code—but also by its calculated attempts to conceal its use of Comet's trade secrets for nearly four years.  Contrary to one of XP's central trial themes, this theft was perpetrated by *XP*:  as the evidence confirmed, XP's senior-most executives—including its former and present CEOs, numerous senior vice presidents, its CTO, and its Board of Directors—all knew of XP's "willful conduct,"[1] and yet allowed it to freely progress.  This went on for years and involved many at the company, well beyond those who had come from Comet:  as shown at trial, two years after the theft began, XP's CTO and Director of Engineering were still studying Comet's technologies to design their new products.  And even *after* this lawsuit was filed, XP took aggressive measures to avoid responsibility—evading discovery, hiding evidence, dragging out and multiplying the proceedings, baselessly challenging essentially every issue in the case, and refusing to admit even the most basic (and internally undisputed) facts.  XP also repeatedly (and improperly) re-raised issues it had lost, and attempted to introduce excluded evidence at trial to mislead the jury—all the while claiming that "there's nothing wrong" with what happened here, and that it reflects "normal" corporate conduct (Trial Tr. 55:24-56:8), a claimed state of affairs it knew was false.

Yet in all of that, XP has never once accepted responsibility for its wrongdoing, instead choosing to blame *Comet*—the victim of XP's illegal acts—for what happened.  *See* Trial Tr. 1330:11-1331:3 (XP closing argument).  Such indifference to the facts and law—and disregard of any notion of corporate responsibility—is precisely why the law provides for fee shifting in a case like this one.  That is

---

[1]    Trial Tr. 841:23-842:4 ("Q. And you admit now, four years after that lawsuit [against Doug Beuerman] was filed, that of the four engineers indicated as working on XP's RF match technology here, [XP] has concluded that three of the four have engaged in wrongful conduct with respect to [Comet's] information.  Do you agree? [XP CEO]: Willful conduct, yes.").

particularly so here, where XP's chosen litigation strategy greatly complicated these proceedings and came at a tremendous, undue legal cost to Comet in its attempts to vindicate its lawful rights.

The law fully supports awarding Comet's requested fees. First, as to *whether* Comet is entitled to recoup its fees, it undisputedly is. Under the DTSA, "reasonable attorney's fees [can be awarded] to the prevailing party" if "the trade secret was willfully and maliciously misappropriated." That requirement was satisfied when the jury awarded punitive damages sought by Comet, which per the Court's jury instructions required the jury to find "XP's acts of trade secret misappropriation were willful and malicious." Trial Tr. 1260:7-10.

Second, as to the *amount* of fees, Comet proposes that the Court adopt the widely accepted "lodestar method," under which the number of hours reasonably expended on the litigation is multiplied by reasonable hourly rates. In this case, Comet seeks compensation for 15,466 attorney hours and 5,624 paralegal hours that it spent overcoming XP's numerous unjustified attempts to evade legal responsibility for its malfeasance—an amount that does not include any of its attorney time spent on the prior 2018 lawsuit, and includes significant voluntary reductions from the actual attorney time spent on this suit as well. Using industry rates confirmed by industry databases, such as the commonly-used database provided by the legal-consultancy firm Valeo Partners ("Valeo"), as well as those actually agreed to by Comet, this totals at least $16,630,931.25 in reasonable attorneys' fees. These hours were fully justified, considering the breadth and scope of XP's theft and extent of XP's litigation misconduct. They are also at least in-line with—and likely lower than—XP's attorney fees relating to its chosen counsel, Latham & Watkins, as discussed below. Comet respectfully requests that its motion for attorneys' fees be granted.

## II.   BACKGROUND

### A.   XP Willfully and Maliciously Misappropriated Comet's Trade Secrets

As confirmed by the jury's verdict, XP willfully and maliciously misappropriated Comet's trade secrets. Dkt. No. 406 at 5; *see also* Dkt. No. 469 (permanent injunction order finding that "the record contains myriad evidence, credited by the jury, that XP made use of the trade secret information in developing its future products"). The scope of XP's theft is vast. XP stole **thousands** of highly-confidential materials—including technical documents, schematics, designs, internal presentations, and code—that disclosed Comet's most valuable and secret RF matching network and generator technology.

*E.g.*, Trial Tr. 444:19-445:11, 443:15-21. Indeed, lead XP engineer Mr. Chris Mason copied "every single bit of information that was on his [Comet] laptop" to a disk drive and then brought that drive to work with him at XP. *E.g.*, Trial Tr. 457:6-12 (Shanfield), 390:4-391:8 (Faulkner). XP cannot dispute that Comet's trade secrets were improperly taken and possessed by the leaders of XP's next-generation RF development—Mr. Beuerman and Mr. Mason; and XP encouraged that theft, including by providing Mr. Beuerman and Mr. Mason lucrative employment offers after receiving their promise to deliver a "turnkey match design" to XP. *See* PX3004 at 12:19-22; Dkt. No. 253-33, Warner Dep. Tr. at 192:14-20. At trial, XP's technical expert addressing liability issues admitted that these XP leaders "took Comet trade secret materials from Comet when they left and, in that regard, stole Comet's trade secrets." Trial Tr. 1043:3-8. This undisputed theft of Comet's trade secrets was independently and separately confirmed by significant factual, technical, and forensic evidence and testimony. *E.g.*, Trial Tr. 161:8-162:8, 498:11-14, 499:11-500:24, 505:20-509:6, 526:7-10, 385:8-17, 938:3-18, 957:25-958:24, 975:25-976:5, 959:9-21; 960:1-4, 1053:13-18, 1054:20-1055:9.

XP did not just willfully ***acquire*** Comet's trade secrets, it willfully and brazenly ***used*** them. Its engineers admitted to accessing and using Comet's trade secrets (including years after Comet sued for misappropriation), and openly asked themselves "[w]hat are we going to do when the expert witness looks at what we are doing and we are using what Comet is using?" PX3360; Dkt. No. 253-28, Mason Dep. Tr. 164:15-18, 286:10-15; Dkt. No. 253-23, Beuerman Dep. Tr. 107:23-108:1, 108:4-108:11, 254:3-272:21. At trial, Comet's technical and forensic experts explained how XP executed its years-long campaign to use Comet's trade secrets to develop competing next-generation RF technology. This included testimony from technical expert Dr. Shanfield, who explained how his analysis of XP's technical documents confirmed XP's use of Comet's trade secrets. *E.g.*, Trial Tr. 498:11-14 (Da Vinci RF Generator Control); 508:1-520:11 (Kiyo matching network). It also included forensic analysis conducted by Mr. Faulkner, who explained that for years after XP had been informed of the theft, XP continued to possess and access volumes of trade secret files stolen from Comet, distribute Comet's trade secrets among its engineers, and then tried to conceal its use by hiding and creating copies of the drives that were purportedly sequestered. *E.g.*, Trial Tr. 389:10-390:3, 391:4-8, 395:11-18, 481:12-482:5, 841:3-7; *see also* Dkt. No. 253-28, Mason Dep. Tr. at 184:1-17 (explaining that he maintained external drives like the ones containing Comet's trade

1    secrets so that he could share with other XP engineers).  And XP's own liability experts confirmed XP's

2    use of Comet's trade secrets—acknowledging that these engineers XP hired from Comet to lead XP's

3    development took and accessed Comet's confidential technical information while working at XP and "still

4    had . . . and continued to access certain Comet source documents" until at least July 2021, years after

5    Comet first sued XP for trade secret theft.  Trial Tr. 1092:24-1093:7 (Spencer), 1041:18-24, 1043:3-15,

6    1044:4-10 (Phinney), 1150:24-1152:6 (Cowen).   In view of this overwhelming evidence, XP was

7    ultimately forced to admit during the trial its willful misappropriation of Comet's trade secret materials.

8    Trial Tr. 841:23-842:4.

9          Despite after-the-fact attempts to claim ignorance, XP's senior-most executives were fully aware

10   that the Comet engineers they tasked with developing XP next-generation technology to replace XP's

11   legacy Comdel equipment were using Comet's trade secrets to implement XP's technological overhaul.

12   As the Court's permanent injunction order noted, XP's theft went up to the highest levels of the company.

13   Dkt. No. 469 at 5 (finding that the jury's verdict "implicates much of XP's leadership team, not just a few

14   bad apples, making a company-wide injunction appropriate and not unduly harmful").   In particular,

15   although XP *claimed* that it diligently investigated Comet's claims, ensured that Comet's trade secrets did

16   not and would not make their way into XP, and did not know about the massive theft carried out by its

17   senior engineers, *e.g.*, Trial Tr. 62:23-65:4, 1324:14-16, the evidence showed that the engineers hired from

18   Comet *told* XP, including XP President Mike Laver and Vice President Jay Warner, in 2018 that they had

19   taken and used Comet documents (*see, e.g.*, Trial Tr. 840:6-8, 854:20-23 (Penny), 1096:7-10 (Spencer);

20   Dkt. No. 253-26, Laver Dep. Tr. at 170:24-171:4; Dkt. No. 253-33, Warner Dep. Tr. at 55:6-19; Dkt. No.

21   253-23, Beuerman Dep. Tr. at 137:15-138:8), they presented technical development materials that raised

22   "red flags" to XP (Trial Tr. 948:15-949:5), and they left forensic data on their XP laptops that confirmed

23   for XP that Comet's trade secrets had been loaded onto XP's systems.  Trial Tr. 856:10-13 (Penny)

24   (learned in 2018 that external drives plugged into Mr. Beuerman's XP laptop had "Comet" files on it);

25   PX3535-3536 (email to XP Power President, Mike Laver, regarding internal investigation of Mr.

26   Beuerman's XP laptop, noting that "I did find a suspicious USB hard drive" and that "this is most likely

27   the USB stick Comet mentioned").  The record is replete with examples confirming that senior engineers

28   and executives at XP knew about the theft and use of Comet's technology: a former-Comet contractor and

current XP engineer, Mr. Ma, distributed source code to XP's senior engineers and executives, including XP CTO Paul Rummel, that was "instantly recognizable" as Comet code (Trial Tr. 481:16-482:12), Mr. Beuerman emailed Comet 3D sensor designs to XP's president with a note stating that the sensor would "be the same as the one presented to me in a different setting [at Comet] earlier this year" (PX3234), and XP's own Board of Directors, which included former CEO Duncan Penny and current CEO Gavin Griggs, acknowledged in 2019 that Mr. Beuerman had brought Comet "data into XP Power." PX3524.5. Despite knowing that the leaders of its next generation RF power development had stolen and used Comet's trade secrets, and despite acknowledging that it would have been "more prudent" to have fired them earlier, XP allowed its engineers to continue to develop XP's next-generation RF generator and match products based on Comet's trade secrets for *years*. *E.g.*, Trial Tr. 860:23-861:1 ("Q: Despite concluding that Mr. Beuerman had done something wrong with respect to Comet data at XP, XP took no steps against Mr. Beuerman based on that, right? [XP CEO]: Correct."), 859:20-860:11 (XP's CEO acknowledging that XP did not reassign Mr. Beuerman, Mr. Mason, or any other XP employee to a different group or change their responsibilities in response to Comet's lawsuit), 861:2-9 (XP's CEO admitted that it would have been "more prudent" to have terminated Mr. Mason earlier), 961:5-16 (engineer confirming that XP did not make any changes to development of next generation RF products in response to Comet's allegations).

When XP finally terminated Mr. Beuerman, it did not set the development based on Comet's trade secrets to the side and start from scratch. Instead, the XP executives tasked with carrying the next-generation RF development forward (Mr. Rummel and Mr. Irvine), picked up right where Mr. Beuerman left off with the use of Comet's trade secrets, including by gathering, studying, and "distilling down" all of the stolen Comet technology in order to continue using Comet's trade secrets to develop XP's next-generation RF products. Trial Tr. 950:25-951:19, 953:22-23, 954:23-955:7, 956:5-10 (Rummel). These executives had no answer for their reprehensible conduct, shockingly claiming they "did not pay attention" to the fact that XP's engineers had stolen Comet's trade secrets, because it was not their responsibility, and never did anything to change course, even after being sued by Comet. Dkt. 253-32, (Rummel Dep Tr.) at 151:7-14; Dkt. No. 253-33, (Warner Dep. Tr.) at 38:24-39:2; Trial Tr. (Penny) at 859:20-23.

### B. XP Purposefully Concealed Its Theft from Comet

From the time Comet first informed XP that it had discovered the theft, XP made every effort to conceal the extent of that theft and continued use of Comet's trade secrets. Indeed, soon after Comet first informed XP of the theft in March 2018, Doug Beuerman told XP that he not only stole Comet's trade secret documents, but had used them to create roadmap presentations that he presented to XP's development team. *E.g.*, Dkt. No. 253-23 (Beuerman Dep. Tr.) at 120:22-121:8, 121:18-20 (acknowledging that he told XP that he had "screwed up when it came to using Comet's documents at XP"). Yet, XP repeatedly denied for nearly three years that there was any evidence that any Comet materials touched XP's systems, made their way into XP's documents, or were shared with other XP engineers. *See, e.g.*, Dkt. No. 254-50, XP Dec. 20, 2018 Resp. to Interrog. No. 11; Dkt. No. 25 at 3-5 (XP Dec. 9, 2020 Case Management Statement); Dkt. No. 140-8, XP Feb. 19, 2021 Resp. to Interrog. No. 7. These efforts to conceal XP's misappropriation show the willfulness of XP's conduct and exemplify the necessary fees Comet was forced to incur to prosecute that theft.[2]

XP took many steps to keep the truth from coming out. For example, XP delayed termination of Mr. Beuerman so that, in addition to continuing to develop XP's next-generation products with Comet's trade secrets, he would not turn on XP and reveal to Comet (or others) the extent of XP's misappropriation. Trial Tr. 857:6-858:19 ("Q. You were concerned that if you gave [Mr. Beuerman] a written warning, he might turn states evidence and tell Comet that he had brought a lot of Comet materials over to XP, right? [XP's CEO:]. Yes. In exchange for getting immunity from Comet, yes, that was my concern. Q. XP, your company, decided that although it concluded Mr. Beuerman did something wrong, it wanted to wait to do anything about it because it was worried that Mr. Beuerman might turn around and say, to [Comet], 'Oh, yes, I did have a lot of information, and I did bring it in.'? [XP's CEO:]. Or even worse. Even worse. That he could do something even worse than that."); PX3524 (October 2019 XP Board meeting minutes noting that Mr. Beuerman brought third party data into XP Power but would receive a written warning only after the "conclusion of the Comet legal case").

---

[2] As the Court knows, Comet had previously filed a lawsuit against XP, which after several years of litigation and attempted mediation to no avail, was refiled in 2020 before this Court. Comet is not requesting its fees incurred during that litigation and mediation process, during which XP obstructed Comet's attempts to discover the extent of XP's use of its trade secrets. Dkt. No. 25 at 2-3.

XP also waited several months following Comet's initial trade secret lawsuit to implement any document preservation measures, permitting the destruction of relevant documents and data showing the extent of XP's misappropriation. *See* Dkt. No. 183 at Ex. 33, R. Mangas 3/23/21 email to K. Calhoun. For example, after Comet first filed suit in March 2018, Mr. Beuerman instructed Mr. Mason to "delete anything from Comet," which Mr. Mason acknowledged would have included Comet proprietary information brought to XP. Dkt. No. 253-28 (Mason Tr.) at 228:16-20, 229:20-230:1, 230:8-25. Expert forensic analysis confirms that not only did these senior XP engineers delete and wipe their personal laptops and external storage devices after they had been caught, but that XP deleted or otherwise altered forensic data on Mr. Beuerman's XP laptop after determining that he had used it to access Comet documents, destroying valuable evidence that would have expedited the investigation into and discovery of XP's expansive misappropriation. Trial Tr. 384:1-21, 395:11-396:1.

These efforts allowed XP to use Comet's trade secrets for years, which would have continued had Comet not incurred significant fees to investigate and uncover XP's misappropriation. Indeed, XP repeatedly assured Comet in the prior litigation and in this one that any stolen materials were sequestered by at least June 2018. Dkt. No. 25 at 4 (XP CMC statement: "None of these former Comet employees had access to any device containing any alleged Comet confidential information since June 2018 at the latest…."). But intensive discovery and forensic analysis—much of which was obtained over XP's objection, after numerous conferrals and several motions to compel—showed that XP had not sequestered those materials, as repeatedly claimed, but instead surreptitiously made copies of them and transferred them over to other, previously-undisclosed external drives, thus allowing XP to continue reaping the benefits of its theft. *See, e.g.*, Trial Tr. 392:3-395:18 (Comet's forensic expert testifying that Mr. Mason deleted Comet trade secret documents from a drive that was turned over for discovery but only after he had cloned Comet trade secret materials over to a separate drive that he withheld from discovery and continued to use at XP).

### C.    XP's Defenses Have Been Objectively Unreasonable

Instead of denying that Comet's trade secrets were stolen and used by XP's engineers for the development of XP's next generation RF products (which XP denied through discovery but could not credibly deny at trial), XP attempted to excuse its willful theft through a litany of baseless defenses that

1    were not supported by the law or the facts.  Comet was forced to spend years litigating and investigating

2    this case to uncover the extent of XP's theft, only to have XP walk its earlier denials back at trial and rely

3    on defenses that were stricken or had no factual foundation.

4           For example, XP claimed that it could not be responsible for the theft carried out by the leaders of

5    its RF development because XP had no knowledge of it.  *See, e.g.*, Trial Tr. 1306:1-1312:10, 1329:24-

6    1330:10.  But Mr. Beuerman and Mr. Mason knew that they took and used Comet's trade secrets so that

7    they could do what XP hired them to do: develop XP's next-generation RF power products.  *E.g.*, Trial

8    Tr. 1044:15-1045:10 (Phinney).  As a matter of well-established respondeat superior principles, XP "the

9    company" is undisputedly responsible for that willful conduct.  *Language Line Servs., Inc. v. Language*

10   *Servs. Assocs., LLC*, No. C 10-02605 JW, 2010 WL 2764714, at *3 (N.D. Cal. July 13, 2010) (corporation

11   is liable for its employee's conduct whenever the employee is acting "within the scope of [their]

12   employment."); *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, No. CV13-07563-DMG (JCGX), 2013

13   WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013).  Indeed, XP's CEO admitted at trial, as he must, that "the

14   way that XP acts is through its employees."  Trial Tr. 842:5-15 (Penny).  And as XP's own expert

15   acknowledged, "if the jury finds that Mr. Beuerman and Mr. Mason were using Comet trade secrets for

16   the purposes of the tasks they were hired to perform, XP is liable for trade secret misappropriation."  Trial

17   Tr. 1046:2-21.  And this Court recognized that XP's theft went to the highest levels of the company.  Dkt.

18   No. 469 at 5.

19          These excuses were joined by numerous other baseless defenses, including XP's claim that none

20   of Comet's trade secrets were in fact trade secrets, that the trade secrets were publicly known (*e.g.*, Trial

21   Tr. 1323:11-18), that Comet's trade secrets were readily ascertainable by just opening up its products (*e.g.*,

22   *id.* 1319:19-24), that Comet did not treat its trade secrets as secret (*e.g.*, *id.* 1321:25-1322:21, 1324:21-

23   23), and that Comet did not own certain of its trade secrets (*e.g.*, *id.* 1320:12-14).

24          As a last-ditch plea to the jury, and emblematic of its refusal to take responsibility, XP argued that

25   it acted in good faith all along by investigating the theft and telling its engineers not to use Comet's trade

26   secrets, and then contended that "maybe none of this [lawsuit] would have happened" had ***Comet*** "been

27   more transparent" or "told XP about [Comet's] specific allegations."  Trial Tr. 1330:11-1331:3.  Not so.

28   XP was aware of the theft and use of Comet's trade secrets since at least March 2018, and its attempts to

blame its engineers as well as the victim of the theft (Comet) instead of taking corrective action harmed Comet. *See supra.* XP's attempt to shift the blame and feign ignorance was not reasonable.

### D. XP's Unreasonable Litigation Positions Forced Comet to Spend Many Additional Hours on this Case

Since March 2018, Comet has sought to efficiently resolve this matter in a way that protected its valuable trade secrets and compensated it for the significant harm caused by XP's theft. Indeed, in January 2019, Comet agreed to a joint dismissal of the original lawsuit to allow the parties to mediate Comet's claims; but after attempting for more than a year to resolve this dispute out of Court, Comet was forced to refile the litigation in September 2020 and present its case to the jury in March 2022. As explained above and below, in the four years between Comet first notifying XP of the theft and a jury confirming XP's misappropriation, XP continued using Comet's trade secrets, took affirmative steps to conceal the extent of its theft and use, delayed and obfuscated discovery, and advanced litigation positions that lacked any valid basis and/or had already been rejected by the Court. XP's chosen litigation strategy and efforts to buy more time as it attempted to bury the extent of its misappropriation forced Comet to incur significant unnecessary attorneys' fees.

XP worked to prevent efficient resolution of Comet's claims by taking unreasonable litigation positions. For example, XP repeatedly attempted to raise its unclean hands defense despite the Court's order denying XP's motion for leave to amend its answer to include that defense. Dkt. No. 242 (Order denying XP motion to amend, finding that "XP was not diligent in presenting its unclean hands defense"). XP opposed Comet's motion for summary judgment regarding XP's unclean hands defense and motion to exclude XP's experts' opinions regarding unclean hands, despite XP being aware that its unclean hands defense was no longer viable. Dkt. Nos. 170 (XP's Opp. to Comet's Mot. to Exclude Expert Opinions), 175-2 (XP's Opp. to Comet's Mot. for Partial Summary Judgment). And XP opposed Comet's motion *in limine* regarding XP's unclean hands defense despite the Court's denial of XP's motion to amend. Dkt. No. 274 (XP MIL Opp.). The Court ruled in Comet's favor on all three motions. Dkt. Nos. 247 (SJ Order), 290 (*Daubert* Order), 303 (MIL Order). Despite those rulings, XP persisted in designating deposition testimony and attempting to introduce exhibits related to its unclean hands defense at trial. *See, e.g.*, Trial Tr. 230:9-232:13 (ruling that XP could not present deposition designations because the

exclusion of that "defense has been granted at summary judgment and is not an issue for trial"), 892:21-893:5, 905:13-908:4.  XP's relentless attempts to reintroduce its unclean hands defense forced Comet and the Court to waste time and resources constantly relitigating a long-settled matter.  And despite those efforts to police XP, its attorneys still displayed excluded evidence relating to its unclean hands defense to the jury.  *See, e.g.*, Trial Tr. 1073:12-22, 1076:25-1077:6.[3]

XP also attempted to use the parties' previous mediation efforts to shield itself from evidence and testimony establishing XP's knowledge of its misappropriation—an issue it hotly contested throughout the litigation.  In particular, XP claimed that the company's knowledge regarding Mr. Beuerman's delivery of Comet's trade secrets to XP, and then use of Comet's trade secrets at XP, was only revealed to XP during the parties' mediation in 2019.  *See, e.g.*, Dkt. No. 338 at 1 ("XP's only awareness of certain evidence and the specific allegations arising from it came through mediation communications.").  By tying its knowledge of the misappropriation to those mediation efforts, XP argued in its pre-trial objections that such evidence should be excluded under the Court's ruling on Comet's MIL 3—which barred introduction of the parties' mediation communications.  *See* Dkt. No. 303 at 3.  But XP was aware of the misappropriation well before any mediation was initiated in 2019, including because Mr. Beuerman told XP about his theft and use of Comet trade secrets in ***2018***.  *See* Trial Tr. 854:6-23, 856:10-13 (XP CEO, Penny), Dkt. No. 253-26, (Laver Dep. Tr.) at 170:24-171:4; Dkt. No. 253-33, (Warner Dep. Tr.) at 55:6-19; Dkt. No. 253-23 (Beuerman Dep. Tr.) at 120:22-121:8, 121:18-20.  The Court ultimately permitted introduction of this evidence (Trial Tr. 424:9-428:25), but only after Comet was forced to expend resources fighting XP on facts that XP's own executives admitted.

XP's wasteful pre-trial motion practice also included moving for summary judgment on multiple, highly-factual issues—including whether XP misappropriated Comet's trade secrets, whether Comet adequately identified certain trade secrets, and whether Comet owned its trade secrets.  Dkt. No. 111.  The Court denied each of XP's summary judgment arguments and concluded that there was "***significant evidence*** from which a reasonable trier of fact could conclude that XP accessed and used Comet trade

---

[3] XP also violated the Court's MIL rulings by eliciting testimony and making closing arguments regarding communications between Comet and XP during the parties' mediation, despite the Court's prohibition of "mediation communications to be brought up during the trial."  Trial Tr. 428:20-25, 817:3-6, 819:3-16, 1309:25-1310:9; 1330:18-1331:5; Dkt. No. 303 at 3.

secrets to develop XP products." Dkt. No. 247 at 6-7 (emphasis added). As another example of XP's wasteful pre-trial motion practice, XP filed *three* separate *Daubert* motions, each on multiple issues, which the Court found to be "excessive." Dkt. No. 163. Undeterred by the Court's denial of all three of those motions (Dkt. Nos. 247, 290), XP continued to advance the same rejected arguments in its motions *in limine* (Dkt. No. 261 at MILs 6-8), which were again denied. Dkt. No. 303.

XP also intentionally caused other unnecessary delays and expenses during the course of discovery. For example, despite repeated representations that Mr. Mason did not have access to Comet's trade secrets since June 2018, forensic data produced from Mr. Mason's XP laptop on June 20, 2021 confirmed that he continued accessing and using Comet's trade secrets to develop XP's competing next-generation RF products. While this information had been known to XP, Comet's counsel promptly notified XP's counsel with this discovery, including by identifying individual Comet materials by file path and file name as it was stored and accessed on Mr. Mason's laptop, and requested that the previously-undisclosed external devices used to transfer Comet's trade secrets be turned over. Dkt. 126-17, K. Calhoun 6/22/2021 email to XP counsel at 4-6. Despite having this information in hand, Mr. Mason (represented by XP's counsel) offered false testimony on XP's theft and ongoing use of Comet's trade secrets by initially denying under oath that he had any Comet files. Dkt. No. 253-28 (Mason Dep. Tr.) at 63:10-64:2, 80:23-81:15, 82:18-84:11. But when confronted with the forensic evidence, Mr. Mason was forced to admit to XP's ongoing use of Comet materials. *Id.* at 157:15-160:5; 286:3-15. XP then remarkably claimed that it first learned of Mr. Mason's continued use of Comet's trade secrets at his deposition, *e.g.*, Dkt. No. 64 at 3-5, and then used the timing of this belated "discovery" to justify their refusal to produce the external devices containing Comet's trade secret materials, forcing Comet to move to compel. *Id.* The Court granted Comet's motion (Dkt. No. 79), but only after Comet was forced to expend significant resources uncovering additional misappropriation evidence that had been readily available to XP. After XP finally provided those devices per the Court's order, Comet discovered that they contained volumes of Comet trade secret information, including a cloned-image of Mr. Mason's Comet laptop that he took with him to XP, causing Comet to expend additional resources on supplemental expert discovery.

As another example, despite being required to complete its core technical production by February 19, 2021 (Dkt. No. 30), XP's "core technical production" inexplicably excluded technical materials created by the XP engineers directly involved in the theft, including by collecting documents from internal repositories that XP knew those engineers did not contribute to or use. *See* Ex. 1, at 13-16 (P. Park 3/16/2021 email to R. Mangas and P. Young). Comet repeatedly identified these deficiencies to XP, but XP refused to supplement its core technical production, forcing Comet to spend time and resources uncovering the gaps in XP's technical production, drafting discovery gripe email after discovery gripe email, participating in several meet and confers, and drafting a motion to compel that ultimately led to XP's agreement to supplement its deficient production nearly two months after it was ordered to do so. *Id.* (3/25/2021 email) at 1-12. Other examples of XP's discovery tactics include delaying its ESI productions until the eve of fact depositions, over-reporting the number of ESI search term hits to unilaterally limit Comet's discovery efforts under the ESI order, failing to timely produce Comet documents that were stored on XP's own laptops, and failing to produce external devices used to store Comet's trade secret materials during XP's RF development efforts. *See, e.g.*, Dkt. 126-17, K. Calhoun 6/22/2021 email to XP counsel. At bottom, despite having all the evidence and knowledge of its extensive theft in its possession, XP forced Comet's attorneys to spend months investigating and piecing together XP's expansive and egregious misappropriation of Comet's trade secrets over XP's repeated objections.

## III. ARGUMENT

### A. Comet Should Be Awarded Its Attorneys' Fees under the Law

Under the DTSA, "reasonable attorney's fees [can be awarded] to the prevailing party" if "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D). Here, the jury explicitly found that "Comet proved that XP ***willfully and maliciously misappropriated*** one or more of Comet's trade secrets," and awarded $20 million in exemplary damages. Dkt. No. 406 at 5 (emphasis added). Courts routinely find that such exemplary-damages awards support an award of attorney fees under the DTSA. *See, e.g.*, *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, No. 1:17-CV-01973, 2021 WL 3076780, at *3 (N.D. Ill. Mar. 10, 2021) (finding an award of attorney's fees under the DTSA was appropriate and "further supported by the jury's verdict awarding exemplary damages"); *Liqwd, Inc. v. L'Oreal USA, Inc.*, No. CV 17-14-JFB-SRF, 2019 WL 6840353, at *11 (D. Del. Dec. 16, 2019)

1 (awarding fees under DTSA where "jury found in favor of the plaintiffs on the issue" of exemplary
2 damages). Moreover, the Court held that Comet is entitled to a permanent injunction in order to it protect
3 from further irreparable harm caused by XP's willful and malicious misappropriation, further confirming
4 that an award of attorneys' fees is appropriate. Dkt. No. 469.

5       There is no question that an award of fees is the right result here. XP's wrongful conduct, its
6 disregard of the facts and law, unnecessary complications of the proceedings, evasive tactics, and refusal
7 to take any responsibility for its actions all unequivocally support an attorneys' fees award. *See, e.g.*,
8 *OmniGen Research, LLC v. Yongqiang Wang*, No. 6:16-CV-268-MC, 2017 WL 5505041, at *28 (D. Or.
9 Nov. 16, 2017) (granting attorneys' fees in trade secret case where "Defendants' conduct in this case was
10 unjustifiable"; defendants asserted "defenses which had no basis in fact" and "repeatedly disobeyed the
11 Court's orders").

12       To the extent XP argues that Comet is not entitled to fees, or that a downward adjustment of fees
13 is warranted, because Comet prevailed on less than the number of trade secrets originally asserted—*i.e.*
14 in light of (1) Comet's good faith efforts to streamline the case for trial by withdrawing certain component-
15 level trade secrets generally encompassed by those asserted at trial; (2) the jury's finding that Comet's
16 AMAT trade secret was not improperly acquired or used by XP (Dkt. No. 406); and/or (3) the Court's
17 judgment regarding Comet's cost and pricing information trade secret ("Trade Secret T") (Trial Tr.
18 757:13-758:5)—that argument would be wrong under the law. "When a plaintiff is a prevailing party
19 because he or she succeeded on only some claims for relief, courts conduct a two-part analysis: 'First, did
20 the plaintiff fail to prevail on claims that were unrelated to [those] on which he succeeded? Second, did
21 the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for
22 making a fee award?'" *Nasiri v. T.A.G. Protective Serv's Inc.*, No. 18-cv-01170-NC, 2021 WL 4226207,
23 at *6 (Sept. 16, 2021) (internal citation omitted). Here, Comet's only claim against XP in this case was
24 for trade secret misappropriation, and Comet prevailed on that claim when the jury determined that XP
25 willfully and maliciously misappropriated Comet's trade secrets. Second, Comet's level of success—an
26 award of more than half its requested compensatory damages, exemplary damages that doubled
27 compensatory damages, and an order permanently enjoining XP from continuing to use or disclose
28 Comet's trade secrets to develop XP's competitive next generation RF technology— readily supports the

fees incurred by Comet, particularly in light of XP's efforts to conceal its misappropriation and conduct during discovery.

Moreover, the intertwined and iterative relationship among Comet's trade secrets confirms that fees were appropriately spent on discovery into information related to trade secrets that were withdrawn prior to trial and the AMAT trade secret because that information was directly relevant to the trade secrets the jury found misappropriated and the jury's damages award. As the Court will recall, Comet's trade secrets were related in at least two respects: ***First***, each generation of Comet's RF technology "all build on each other," such that Comet's next generation RF technology builds off its Kiyo trade secret technology, and its Kiyo trade secret technology builds off its trade secret AMAT technology. Trial Tr. 141:15-24. Accordingly, discovery into and fact development of Comet's first generation AMAT trade secret would have been necessary regardless of whether Comet asserted or prevailed on that trade secret at trial. ***Second***, the next generation and Kiyo matching network trade secrets Comet prevailed on at trial covered entire systems comprised of component-level technology that Comet also maintains as trade secret. Thus, Comet withdrawing those component-level trade secrets to streamline the case for trial while it presented the system-level encompassing those components trade secrets at trial likewise cannot reasonably be argued to have wasted discovery efforts.

Moreover, Comet's efforts to narrow the number of trade secrets for trial was conducted in response to XP's request, *see* Dkt. No. 252 at 26 (asking the Court to order Comet to reduce the number of asserted trade secrets by half), and in response to the Court's recommendation that Comet reduce the number of trade secrets and trial exhibits (which were primarily driven by the large number of trade secret documents misappropriated by XP). *See* Ex. 2, Pretrial Conf. Tr. at 36:11-37:5. Under similar facts, courts refuse to reduce fees for trade secrets that were withdrawn as part of efforts to present a concise case at trial. *See, e.g.*, *El du Pont de Nemours and Co. v. Kolon Indus., Inc.*, No. 3:09-cv-58, 2014 WL 792137, at *3-5 (E.D. Va. Feb. 25, 2014) (refusing to reduce fees based on trade secrets withdrawn prior to trial, where at the urging of the Court, the trade secret plaintiff "reduced the number of trade secrets to be tried in an effort to present a concise case that could be understood by a jury").

Although a reduction to Comet's fee request is not warranted based on the successful outcome of its claim for trade secret misappropriation, Comet nevertheless conservatively implemented a blanket

reduction of $2 million, which is in addition to another approximately $2 million in reductions relating to hours spent on the matter (explained in further detail below).

### B. Comet's Attorneys' Fees Are Reasonable

As set forth above, it is indisputable that XP's theft was sprawling in scope and that its tactics unnecessarily complicated these proceedings. Comet was thus required to expend substantial attorney resources in prosecuting its claims—both in terms of the size of its attorney team and the number of hours it spent on the matter. To calculate the amount of attorneys' fees it should be awarded, Comet proposes that the Court adopt the widely accepted lodestar method, under which the number of hours reasonably expended on the litigation is multiplied by reasonable hourly rates. Using this method, Comet seeks compensation for 18 attorneys that spent a total of 15,466 hours over the course of the nearly two-years that *this* case has been pending, and eight paralegals who spent a total of 5,624 hours over that same period. Comet further proposes that the Court adopt attorney rates and fees based on those actually agreed to and incurred by Comet (Jardim Decl. ¶ 3), the reasonableness of which is confirmed by published, widely used industry databases, such as the Valeo database. Using these metrics, Comet seeks a total of $16,630,931.25 in attorneys' fees, which represents a nearly 20% discount of the total fees Comet incurred in this case. Jardim Decl. ¶ 3; Lotfollahi Decl. ¶¶ 7-8. This request is consistent with the complexities of this case, as reflected by XP's own legal fees in this case, which totaled at least £10.5 million (~$13.6 million) by the end of 2021 (*i.e.* does not include XP's 2022 fees, including for the two-week-long trial beginning on March 14, 2022, the months of intensive litigation that preceded it, and any post-trial work). Ex. 3 (https://corporate.xppower.com/~/media/Files/X/XP-Power/reports-and-presentations/all-year-ar/annual-reports/ar2021.pdf) at 39.[4]

Although the hours spent by all of Comet's attorneys in this case were necessary to deal with XP's actions, Comet proactively made several additional reductions totaling approximately $2 million in fees (in addition to the $2 million blanket reduction discussed above in Section III.A), to ensure that its request is conservative. Lotfollahi Decl. ¶¶ 7-8. For example, Comet's fee calculation excludes hours spent by

---

[4] As part of the parties' meet and confer process, XP would not confirm whether it disputed the reasonableness of Comet's requested attorneys hours worked and rates. XP would also not disclose the total fees it has incurred for this case, which may be greater than Comet's requested fees.

attorneys second-chairing depositions (including where such attendance allowed for junior attorneys to gain experience taking and defending depositions), excludes hours attorneys spent assisting or attending Court hearings, and limited hours for trial attendance to only the six attorneys who were seated at counsels' table. *Id.* Moreover, while attorneys from Kirkland and Ellis conducted weekly team meetings to allow for efficient communication and allocation of responsibilities, Comet excluded all hours related to these regularly-occurring internal meetings. *Id.* And as previously stated, Comet is not seeking its fees for the years it spent litigating this dispute before the current lawsuit was re-filed in 2020.

### 1. Legal Standard

"'District courts must calculate awards for attorneys' fees using the "lodestar" method,' and the amount of that fee must be determined on the facts of each case." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008) (citations omitted). "[T]he established standard when determining a reasonable hourly rate is the 'rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation.'" *Id.* at 979. The lodestar figure is presumptively a reasonable fee award. *Id.* District courts may "adjust [the] lodestar calculation by other factors" *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989), such as the experience, reputation and ability of the attorneys, as well as the difficulty of the issues presented and the amount at stake. *Hensley*, 461 U.S. at 430 n.3.

### 2. Comet's Attorney Hours Are Reasonable

As explained below, the hours included in Comet's request were reasonable, devoted to this litigation alone, and necessary to prove XP's theft, particularly in light of XP's efforts to conceal the theft and hide behind unreasonable defenses. *First*, the number of attorneys and total hours per attorney is reasonable in view of the size of this case. Comet is only seeking compensation for 18 attorneys[5] and on average 35 hours per month per attorney over the nearly-two-year period since filing the complaint in this case. Considering the size of this case—*e.g.,* nearly 500 court filings, over one million documents produced, 196 hours of depositions, over 800 trial exhibits—those numbers are very reasonable. It is also

---

[5] Due to the departure of or leave taken by certain team members that began working on this matter when the Complaint was filed, several team members were added to the case during the course of discovery and then pre-trial, such that the number of attorneys who consistently worked the majority of the matter is closer to 10.

reasonable by comparison to XP—which had over 10 attorneys formally appear and incurred at least over $13 million in legal fees months before this case even reached the pretrial and trial phases.  Indeed, numerous other cases of similar scope have been found to support larger teams, hours, and total fees.  *See, e.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*, No. CV 04-9049 DOC RNBX, 2011 WL 3420603, at *2 (C.D. Cal. Aug. 4, 2011), aff'd sub nom. *Mattel, Inc v. MGA Entm't, Inc.*, 705 F.3d 1108 (9th Cir. 2013) (awarding over $100 million in fees in copyright case); *Oracle USA, Inc. v. Rimini St., Inc.*, 209 F. Supp. 3d 1200, 1216 (D. Nev. 2016), *aff'd in part, vacated in part, rev'd in part*, 879 F.3d 948 (9th Cir. 2018), *rev'd in part*, 139 S. Ct. 873, 203 L. Ed. 2d 180 (2019), and *vacated in part*, 922 F.3d 879 (9th Cir. 2019) (awarding $28.5 million in fees in copyright case); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 2014 WL 792137, at *12 (E.D. Va. Feb. 25, 2014), *vacated on other grounds* (June 12, 2014) (awarding $18.3 million in fees to plaintiff in trade secret case); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (affirming an award of $16.8 million fee award in litigation that lasted two years and required nine days of trial); Ex. 4, *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, No. 1:17-CV-01973, Dkt. No. 1250 at 3-7 (N.D. Ill. Oct. 15, 2021) ($34.3 million fee award in trade secret case where plaintiff was represented by several of the same Kirkland attorneys representing Comet).

*Second*, Comet's attorney hours are justified.  There can be no question that XP's theft was extensive: XP stole thousands of Comet's confidential files which collectively took over a hundred engineers years to develop.  *E.g.*, Trial Tr. 97:6-98:23, 600:4-16.  This material included Comet's trade secrets related to the Da Vinci RF Generator Control, Digital Measurement, and Software, and the Next Generation RF Matching Network, both of which comprised, and relied upon, years of research and development in both previous-generation and next-generation technology.  *Id*.  Moreover, the case required complex forensic analysis to trace the stolen materials from the numerous external devices used to execute the theft, through XP's computers where they were saved and accessed, and into XP's research and development of next-generation RF products, requiring substantial attorney hours both in terms of requesting and obtaining forensic and technical materials in discovery, reviewing and analyzing them, and working with experts to fully understand their import with regard to XP's willful misappropriation.  *E.g.*, Trial Tr. 364:1-8, 373:18-396:1, 482:23-483:16, 486:21-487:21.  This work could have been avoided had XP disclosed what it knew all along: that the leaders of its next generation RF development stole,

maintained, and used Comet's trade secrets to create a competing product. XP's continued concealment and denial of its theft required further, significant time to uncover and address. *See* Section II *supra*.

*Third*, the litany of bad faith tactics XP deployed throughout the case multiplied the proceedings and drove up Comet's legal expenses. This includes re-raising its unclean hands defense multiple times both before and during trial, refusing to produce relevant documents and forensic data, forcing Comet to prepare and/or file multiple motions to compel and exclude on the same subjects, to name just a few. This is compounded by XP's ultimate bad faith: its continued use of Comet's trade secret information. Dkt. No. 469 at 3-5 (injunction order finding that the "record contains myriad evidence, credited by the jury, that XP made use of the trade secret information in developing its future products, leaving Comet vulnerable to further future market share loss" and that "the record at trial amply demonstrates that Comet has faced and will continue to face significant hardship from the disclosure of their trade secrets, including the loss of market shares, reputational harm, and loss of customers").

### 3. Comet's Proposed Rates Are Reasonable

The rates for Comet's attorneys—which range from $625 to $1,765—are reasonable for a matter like this and are consistent with those of comparable attorneys at similar firms. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) ("'To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.' As we have noted, '[a]ffidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community, and rate determinations in other cases . . . are satisfactory evidence of the prevailing market rate.'") (citation omitted). Indeed, Courts in other districts have found that similar rates charged by several of the same attorneys representing Comet were reasonable. Ex. 4, (finding that Kirkland & Ellis's 2017-2019 rates, which ranged between $1565 to $555, were reasonable).

For example, Kirkland's rates are in line with the rates reported by Valeo Partners, a consulting firm that maintains a database with the actual rates and legal fees charged by attorneys as reported in court filings. Courts often use the rates set forth in Valeo's database to determine attorneys' fee awards. *See, e.g.*, *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 987 (Fed. Cir. 2000) (using economic

survey as evidence of reasonable fees and awarding fees based on rates shown in survey); *Mathis v. Spears*, 857 F.2d 749, 755–56 (Fed. Cir. 1988) (reliance on industry surveys is proper); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 965 (N.D. Cal. 2014); *Regeneron*, 2018 WL 3425013, at *4. Per the 2022 Valeo Attorney Hourly Rate Report, senior partners at AmLaw 10 firms nationwide charged $1,536 per hour in 2022; partners charged $1,314; senior associates charged $1,025; and associates charged $769. Ex. 5 (Valeo Attorney Hourly Rate Report) at 162; *compare with* Lotfollahi Decl. ¶¶ 5-6 (Kirkland rates). Valeo's reported rates for XP's counsel Latham and Watkins (an AmLaw 2 firm), are again consistent with Kirkland's rates here, with senior Latham and Watkins partners charging on average $1,882, partners charging $1,289, senior associates charging $1,028, and associates charging $638. *Id.* at 396. Kirkland's rates (ranging from $1,765 to $625), when combined with the reasonable hours and skill level of the attorneys required for this case, provides a reasonable amount of fees, particularly in view of circumstances present here.

## IV. CONCLUSION

For the reasons stated above, Comet respectfully asks the Court to hold that it is entitled to its requested reasonable attorneys' and paralegal fees.

DATED: November 4, 2022

Respectfully submitted,

KIRKLAND & ELLIS LLP

By: /s/ Sharre Lotfollahi
Adam R. Alper (SBN: 196834)
adam.alper@kirkland.com
Akshay Deoras (SBN: 301962)
akshay.deoras@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:     (415) 439-1400
Facsimile:     (415) 439-1500

Michael W. De Vries (SBN: 211001)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Sharre Lotfollahi (SBN: 258913)
sharre.lotfollahi@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:     (310) 552-4200
Facsimile:     (310) 552-5900

Leslie M. Schmidt (pro hac vice)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Kat Li (pro hac vice)
kat.li@kirkland.com
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
Telephone:     (512) 678-9100
Facsimile:     (512) 678-9101

Attorneys for Plaintiffs
COMET TECHNOLOGIES USA INC., COMET AG
AND YXLON INTERNATIONAL GMBH

1

## CERTIFICATE OF SERVICE

2        I, Sharre Lotfollahi, an attorney, hereby certify that on November 4, 2022, I caused a true and

3 correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of

4 record.

5  DATED:  November 4, 2022               */s/ Sharre Lotfollahi*

6                                        Sharre Lotfollahi

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibits 39-40
# (Redacted in Their Entirety)