IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | **PUBLIC VERSION** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417 (JPM) |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | **DEMAND FOR JURY TRIAL** |
| AKOUSTIS, INC., | ) | |
| | ) | ███████████████ |
| Defendants. | ) | |

## QORVO, INC.'S ANSWERING BRIEF IN OPPOSITION TO THE AKOUSTIS DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Zachary Alper
SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

*Attorneys for Plaintiff Qorvo, Inc.*

**Confidential Version Filed: July 25, 2024**
**Public Version Filed: August 15, 2024**

**TABLE OF CONTENTS**

<b>Page</b>

I.    Introduction ................................................................................................................... 1

II.    Factual Background ....................................................................................................... 1

   A.   Qorvo Spent Decades Developing BAW Filter Technology ............................... 1

   B.   Akoustis Steals Qorvo's Trade Secrets to Accelerate Its Market Entry ............................ 2

      1.   Akoustis steals Qorvo's market analysis and business plans ....................... 2

      2.   Akoustis steals Qorvo's resonator and filter designs.................................... 3

      3.   Akoustis steals Qorvo's trimming procedures............................................... 4

      4.   Akoustis steals drawings of Qorvo's customized RF connector ................... 6

      5.   Akoustis steals Qorvo's product testing procedures..................................... 6

      6.   Akoustis steals Qorvo's reliability testing procedures ................................. 7

      7.   Akoustis steals Qorvo's product roadmaps and prototypes........................... 7

   C.   Dr. Shanfield Opined that Akoustis Obtained a 55-Month Head Start........................... 8

   D.   Ms. Bennis Analyzed the Value to Akoustis of Entering the Market Early ................... 10

   E.   The Jury Awarded a Portion of the Requested Damages ............................... 10

III.    Legal Standard ............................................................................................................. 11

IV.    Argument ..................................................................................................................... 11

   A.   Akoustis Cannot Challenge the Admissibility of Evidence under Rule 50 ..................... 11

   B.   The Court Properly Admitted Ms. Bennis' Testimony on Damages............................... 12

      1.   Akoustis waived any objections to Ms. Bennis' qualifications................................. 12

      2.   Ms. Bennis applied a reliable and accepted methodology........................................ 12

         a.   Qorvo is entitled to damages "for any unjust enrichment".................................... 13

         b.   Ms. Bennis determined the time value of money to Akoustis ............................... 13

         c.   Ms. Bennis considered Akoustis' costs ................................................................ 15

      3.   Ms. Bennis adopted a methodology that fit the facts of the case ............................. 17

   C.   The Court Properly Admitted Dr. Shanfield's Testimony................................. 17

   D.   Substantial Evidence Beyond the Expert Opinions Supports the Award ........................ 19

   E.   Judgment as a Matter of Law Is Not an Appropriate Remedy ......................... 20

V.    Conclusion ................................................................................................................... 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alarm.com, Inc. v. Securenet Techs.*,
   No. 15-807-RGA, 2019 WL 3996883 (D. Del. Aug. 23, 2019) ...............................18

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
   No. 21-704-MAK, 2022 WL 3021560 (D. Del. July 29, 2022) ............................19

*Apple Inc. v. Samsung Elecs. Co.*,
   839 F.3d 1034 (Fed. Cir. 2016)...........................................................................17

*Apple Inc. v. Wi-LAN Inc.*,
   25 F.4th 960 (Fed. Cir. 2022) ...............................................................................20

*Bayer Healthcare LLC v. Baxalta Inc.*,
   407 F. Supp. 3d 462 (D. Del. 2019).......................................................................20

*Braun Elevator Co. v. Thyssenkrupp Elevator Corp.*,
   379 F. Supp. 2d 993 (W.D. Wis. 2005) .................................................................18

*Bullen v. Chaffinch*,
   336 F. Supp. 2d 342 (D. Del. 2004).......................................................................11

*EpicSys. Corp. v. Tata Consultancy Servs.*,
   980 F.3d 1117 (7th Cir. 2020) ...............................................................................13

*Evolved Wireless, LLC v. Apple Inc.*,
   No. 15-543-JFB-SRF, 2019 WL 1178517 (D. Del. Mar. 12, 2019)......................16

*Honeywell Intern. v. Universal Avionics Systems*,
   426 F. Supp. 2d 211 (D. Del. 2006).......................................................................17

*Int'l Constr. Prods. v. Caterpillar Inc.*,
   Civil Action 15-108-RGA, 2024 WL 1494335 (D. Del. Apr. 3, 2024)..................19

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
   No. 09-cv-80, 2015 WL 2379485 (D. Del. May 18, 2015) ...................................11

*Mathis v. Borough of Old Forge*,
   No. 3:08-CV-1240, 2021 WL 639018 (M.D. Pa. Feb. 18, 2021)...........................12

*Mondis Tech. Ltd v LG Elecs.*,
   No. CV 15-4431, 2020 WL 1933979 (D.N.J. Apr. 22, 2020) ................................20

*Mondis Tech. v. LG Elecs.*,
No. 15-4431 (SRC), 2023 WL 3749992 (D.N.J. June 1, 2023)............................................20

*Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*,
No. 08-cv-931, 2015 WL 3605143 (E.D.N.Y. June 5, 2015)....................................12

*Raithborne Land Co. v. Ascent Energy, Inc.*,
610 F.3d 249 (5th Cir. 2010) ...............................................................................15

*Roche Diagnostics Ops., Inc. v. Abbott Diabetes Care*,
756 F. Supp. 2d 598 (D. Del. 2010)...............................................................11, 12

*Sabre GLBL, Inc. v. Shan*,
779 F. App'x 843 (3d Cir. 2019) ..........................................................................15

*SimpleAir, Inc. v. Google Inc.*,
77 F. Supp. 3d 569 (E.D. Tex. 2014) ...................................................................12

*Thabault v. Chait*,
541 F.3d 512 (3d Cir. 2008)..................................................................................20

*U.S. v. Allegheny Ludlum Corp.*,
366 F.3d 164 (3d Cir. 2004)..................................................................................15

*U.S. v. Torlai*,
728 F.3d 932 (9th Cir. 2013) ................................................................................15

*Versata Software, Inc. v. SAP*,
717 F.3d 1255 (Fed. Cir. 2013)............................................................................12

*Wellogix, Inc. v. Accenture, L.L.P.*,
716 F.3d 867 (5th Cir. 2013) ................................................................................13

## Statutes

18 U.S.C. § 1836(b)(3)(B)(i)(II)..........................................................................13

## Rules

Fed. R. Civ. P. 50.......................................................................................... *passim*

Fed. R. Evid. 702 ..................................................................................1, 12, 19

## I. INTRODUCTION

The evidence in this case supports the jury's award of unjust enrichment damages. The eight-day trial included testimony from 17 fact witnesses, 10 experts, and 355 exhibits. That evidence established that Akoustis stole Qorvo's trade secrets and used them to accelerate its entry into the market. Akoustis ignores nearly all of the evidence supporting the jury's unjust enrichment award. Instead, Akoustis repeats arguments the Court has already rejected—that the opinions of Melissa Bennis and Dr. Stanley Shanfield were inadmissible under Rule 702.

As a threshold matter, the Court should deny the motion because it is procedurally improper. While Rule 50 permits challenges to the **sufficiency** of the evidence, it does not allow re-litigation of **admissibility** determinations. Akoustis' motion is also substantively meritless. As the Court previously held, the Bennis and Shanfield opinions were admissible under Rule 702. Moreover, even without the challenged expert testimony, there is substantial evidence supporting the damages award. Finally, the requested relief—entry of judgment in favor of Akoustis—is unwarranted. Akoustis does not challenge the jury's verdict on liability—*i.e.*, that Akoustis willfully and maliciously stole 37 Qorvo trade secrets. Even if the jury's damages calculation lacked sufficient support (it did not), the proper remedy here would be a new trial on damages.

## II. FACTUAL BACKGROUND

### A. Qorvo Spent Decades Developing BAW Filter Technology

The trade secrets in this case relate to bulk acoustic wave ("BAW") filters. Qorvo first began developing BAW filters in the 1990s. Tr. 364:20-365:4, 373:8-14. BAW filter technology is extremely complex. Tr. 373:15-24. Each BAW filter is roughly "the size of a grain of sand." Tr. 367:18-22. Within a BAW filter, there are typically between 10 to 20 BAW resonators—structures built with different layers of materials that are designed to vibrate. Tr. 369:4-18. BAW filter resonators must be arranged to allow desired radio frequencies to pass through the filter, while

blocking undesirable frequencies. *Id*. BAW filters are very difficult to develop and commercialize because there are "many elements that you need to get just right to make it work." Tr. 373:15-24.

Robert Aigner, the Senior Director of Research and Development at Qorvo, explained the long and arduous process of developing BAW filter technology. Due to the complexity of the technology, it took Qorvo nearly 20 years to launch its first commercial BAW filter. Tr. 363:11-12, 373:15-24. Qorvo also invested more than $1 billion in BAW filter research and development. Tr. 375:12-15. Eric Creviston, the President of Qorvo's Connectivity and Sensory Group, testified that Qorvo currently spends about $650 million annually on research and development. Tr. 295:8-10. Qorvo also employs 200 engineers who are dedicated to developing BAW filter technology. Tr. 289:1-4. Despite having decades of experience, a staff of 200 engineers, and investing hundreds of millions of dollars per year in research and development, Dr. Aigner explained that it typically takes Qorvo four to five years to develop a new generation of BAW filters. Tr. 374:25-375:15.

### B.    Akoustis Steals Qorvo's Trade Secrets to Accelerate Its Market Entry

Akoustis was formed in 2014 by Jeffrey Shealy, a former Qorvo executive. Tr. 1116:22-1117:5. In 2016, Akoustis decided focus on making commercial BAW filter products. Tr. Tr. 890:7-892:20. Unlike Qorvo, Akoustis did not invest the time and resources necessary to develop its own technology. Instead, Akoustis engaged in a scheme to steal and use Qorvo's trade secrets.

### 1.    Akoustis steals Qorvo's market analysis and business plans

The first step in Akoustis' scheme targeted Qorvo's business plans. Qorvo dedicates substantial resources to analyzing markets and developing these plans. *E.g.*, Tr. 483:25-484:6, 490:2-8. Tony Testa, Qorvo's current General Manager of Wireless Connectivity, explained that the plans are "a roadmap of how to be successful in selling these products into these markets." Tr. 489:25-490:1. Unsurprisingly, it takes Qorvo years to develop them. Tr. 483:25-484:6, 490:2-8.

In September 2016, Akoustis hired Rohan Houlden to be its Vice President of Product

Engineering. *Id*., 672:16-20, 685:4-12. At that time, Mr. Houlden was Qorvo's General Manager of Wireless Connectivity. Tr. 685:4-12. On September 8, 2016, while still working at Qorvo, Mr. Houlden used his personal email account to send Dave Aichele, Akoustis' Executive Vice President of Business Development, a confidential Qorvo Statement of Work ("SOW") for 5GHz BAW filters. Ex. 22. The SOW identified performance specifications Qorvo planned to target and analyzed likely competition and customers. *Id*. On September 14, 2016, before leaving Qorvo, Mr. Houlden copied additional Qorvo business plans to an external hard drive. Tr. 832:17-833:24. Mr. Houlden left Qorvo on September 16, 2016 after signing a Severance Agreement in which he falsely claimed he returned all Qorvo documents. Tr. 687:8-25, 762:5-21. On September 21, 2016, Mr. Houlden transferred the documents he stole to Akoustis. Tr. 821:21-822:19, 839:8-18, 841:2-842:2. The stolen documents detailed the market opportunity for 5GHz BAW filters and also indicated that Qorvo expected to have a "gap" in that product line. Tr. 491:11-493:10

Mr. Testa explained why Mr. Houlden went to such lengths to steal Qorvo's business plans—they handed Akoustis "a clear path of where [it] should go focus . . . to be successful." Tr. 490:9-16; 493:7-13. Not surprisingly, within a few weeks of receiving Qorvo's plans, Mr. Aichele circulated an "Akoustis" business plan proposing development of 5GHz BAW filters. *E.g.,* Ex. 124; Tr. 889:25-892:20. The "Akoustis" plan directly copied the analysis and target specifications that Mr. Houlden illicitly sent to Mr. Aichele. *Compare* Ex. 22 *with* Ex. 124.

### 2.    Akoustis steals Qorvo's resonator and filter designs

Having decided to focus on developing 5GHz BAW filters, Akoustis immediately confronted another major problem—the company lacked the technical capability to produce them. Tr. 673:12-24. Mr. Houlden again provided the unlawful solution to Akoustis' problem—before leaving Qorvo, he stole Qorvo's research and designs for 5GHz BAW resonators and filters. *See* Exs. 8, 9. Dr. Aigner described the critical importance of these documents at trial. Tr. 378:22-

394:13. One disclosed the procedures that Qorvo developed to test and evaluate the performance of different resonator shapes. Tr. 380:9-21; Ex. 8. The other was a "cookbook" that shows all the steps to "go from a resonator to a filter."[1] Tr. 383:7-15; Ex. 9. Dr. Aigner explained that Qorvo had worked "[t]wenty years, at least" to develop the trade secrets reflected in these design documents. Tr. 403:16-18. He explained that the documents Akoustis stole would allow a competitor to take the information Qorvo spent 20 years (and more than $1 billion) developing and use it as a shortcut to compete against Qorvo. Tr. 403:6-15. This "would significantly reduce the time a competitor needs to evaluate and start researching a competing part." Tr. 384:20-23.

In the Fall of 2016, Mr. Houlden printed copies of the stolen presentations, brought them to work in his laptop bag, and gave them to Dr. Dave Hodge, the engineer hired to develop Akoustis' 5GHz BAW filter products. Tr. 604:14-23, 609:6-9. Consistent with Dr. Aigner's testimony, Akoustis used the presentations to "significantly reduce the time" needed to develop its BAW filters. Indeed, when Akoustis stole the presentations, it was incapable of even making a functioning BAW resonator. Tr. 673:18-24. Approximately one year later, Akoustis began sampling its BAW filters. Tr. 956:17-957:5. During that time, Akoustis spent $1,758,701 on research and development. Ex. 286. As such, with the benefit of Qorvo's trade secrets, it took Akoustis one year and $1.7M to accomplish something that took Qorvo nearly 20 years and $1 billion to accomplish.

### 3.    Akoustis steals Qorvo's trimming procedures

Akoustis' misappropriation scheme did not stop with Qorvo's resonator designs. To produce commercial BAW filters, a company must be able to "trim" the filters. Tr. 389:10-12, 405:25-406:9. Trimming is used to adjust performance of a BAW filter to control manufacturing

---

[1] Akoustis also stole another BAW filter design presentation from Qorvo in 2020. Ex. 10. That presentation showed "in detail" the technologies that Qorvo was developing for its next generation filters. Tr. 395:5-14 (explaining "this is information that nobody is supposed to have").

variations. Tr. 388:21-389:9, 389:16-390:9. It involves "shaving off tiny amounts of material" from the resonator (as little as a few atoms), which changes mass and the resonator's performance. *Id*. Trimming is "remarkably important." Tr. 389:10-12. As such, Qorvo developed a series of trade secret algorithms to successfully trim its filters. *Id*.; Ex. 11.

Akoustis did not know how to trim BAW filters. Tr. 1896:3-9. Rather than spending years developing its own process, Akoustis opted to steal Qorvo's trade secrets. Akoustis hired Joonbum ("JB") Kwon, a Qorvo trim engineer. Tr. 1896:10-15. Before leaving Qorvo, Dr. Kwon copied Qorvo's trimming algorithms. Ex. 12; Tr. 409:20-22. During discovery, Akoustis destroyed Dr. Kwon's computer, so it was impossible to determine how many documents Dr. Kwon stole from Qorvo. D.I. 348. But emails established that Dr. Kwon incorporated Qorvo's algorithms into Akoustis' trim plan and circulated the algorithms to Akoustis' Chief Device Scientist (Rama Vetury), Director of Device Engineering (Daeho Kim), and Executive Vice President of Fabrication (Mary Winters). Ex. 12; Ex. 123; Ex. 208; Ex. 209; Tr. 410:8-10 (Kwon copied the algorithms all the way down to the "colors of the boxes.").

Dr. Vetury confirmed that the algorithms were "helpful" for the Akoustis trim plan. Ex. 215. Later, Akoustis grew concerned about the trail of documents reflecting its reliance on Qorvo's trade secret algorithms. But, rather than expunging the algorithms from its system, Akoustis altered its trim plan to make it appear that it was using "industry standard" algorithms, rather than algorithms stolen from "Qorvo." *Compare, e.g.*, Ex. 213 *with* Ex. 220; Tr. 1835:2-7.

Dr. Aigner's testimony again reveals why Akoustis went to such lengths to steal Qorvo's algorithms. Dr. Aigner explained that trimming is "the key to being successful" in the BAW filter business. Tr. 405:25-406:9. He also explained that he "personally spent twenty years" developing the procedures that Akoustis stole (*id*., 410:18-25), those procedures are an essential part of the

process for producing BAW filters (*id*.), and they would have been extremely valuable to Akoustis and Qorvo's other competitors (*id*., 407:4-5, 407:25-408:1, 408:21-24).

### 4. Akoustis steals drawings of Qorvo's customized RF connector

Akoustis also stole Qorvo's trade secrets concerning its customized radio frequency ("RF") connectors. To test the performance of BAW filters, they are mounted on an evaluation board and connected to testing equipment using a RF connector. Tr. 412:6-11. Qorvo uses customized RF connectors that work "significantly better" than off-the-shelf connectors, allowing "measurements with more accuracy." Tr. 413:7-12. Rather than developing its own connectors, Mr. Houlden used his personal email account to solicit confidential drawings from a Qorvo employee. Ex. 221. Mr. Houlden then gave the drawings to a computer-aided design engineer at Akoustis (David Dyer) with instructions to "replicate these traces." Tr. 605:4-9, 606:1-3. Akoustis used the replicated drawing to obtain a customized part that copied the Qorvo part. Tr. 606:16-607:4; Ex. 222.

### 5. Akoustis steals Qorvo's product testing procedures

Akoustis also stole Qorvo's product testing procedures. Indeed, over the course of multiple years, Akoustis stole a large number of Qorvo's evaluation board test plans, characterization test plans, qualification test plans, and multiple products requirements documents. *E.g.,* Exs. 7, 33, 34, 35, 61, 76, 79. Akoustis widely distributed these documents to its engineers. *E.g.*, Exs. 65, 75. Akoustis also modified these documents to remove Qorvo's logo and confidentiality legend before using them. *E.g.*, Exs. 62, 82, 83 ("I would start with this.").

Testimony again revealed why Akoustis stole Qorvo's test plans rather than developing its own. It took Qorvo "many years" to create testing procedures that "make sure it meets the goals of what the customer needs." Tr. 312:16-313:8. Dr. Gernot Fattinger, Qorvo's Vice President of Technology, explained the benefit Akoustis received. Tr. 547:8-11, 556:11-557:23 ("All of those things materialize at the end of the day as faster development cycle time, less resources, less money

invested into development of the part."), 560:20-560:25 ("Knowledge about the test specifications delivers knowledge about the process variability, delivers knowledge about what parameters are important to test, how tightly they need to be tested.").

### 6.   Akoustis steals Qorvo's reliability testing procedures

Akoustis also stole Qorvo's trade secrets concerning product reliability testing. A supplier is required to perform such testing to prove that "the parts will live for a long, long time." Tr. 413:24-414:13. Over the years, Qorvo developed proprietary methods for BAW filter reliability testing. *Id.* These methods "are not industry standard and there is a lot of know-how involved in putting together the systems to test these parts." *Id.* In 2018, Akoustis stole Qorvo's proprietary reliability testing procedures. *See* Exs. 14, 66. The material included details on how to: set up a testing system, perform the testing, and evaluate the data. Tr. 415:16-22; 417:24-419:12.

As before, testimony revealed the massive benefit to Akoustis of stealing Qorvo's procedures. Dr. Aigner explained that Qorvo developed the stolen testing procedures over the course of 25 years. Tr. 417:3-8, 419:24-420:2. These procedures allow a significant reduction in the amount of time required for testing parts. Tr. 419:13-23. Dr. Aigner explained the benefit a competitor would obtain from these procedures—they "would be a great starting point for anybody in this field to get a head start." Tr. 416:22-417:2. Internal Akoustis documents confirmed that Akoustis used the Qorvo trade secrets to obtain that head start. In 2019, Joel Morgan, Akoustis' Vice President of Quality, confirmed that the confidential Qorvo presentation was "the primary document" he referenced for reliability testing. Exs. 72, 73; *see also* Ex. 226 (re-circulating the presentation to the Akoustis engineer responsible for reliability testing); Tr. 727:10-729:1.

### 7.   Akoustis steals Qorvo's product roadmaps and prototypes

To gain a head start on product development, Akoustis also continuously stole Qorvo's product roadmap and prototype trade secrets. For example, Akoustis stole numerous confidential

documents describing the performance and features of Qorvo's prototypes and future products. Exs. 23-28; Tr. 1045:20-1047:6. Akoustis even "borrowed" physical samples of Qorvo prototypes—inducing a Qorvo customer to breach its nondisclosure agreement. Tr. 1047:7-20. Akoustis also approved paying bribes to obtain Qorvo's "key confidential information." Ex. 138; Ex. 142 ("I aways use my expense for right purpose!"); Tr. 923:3-22.

Again, witness testimony revealed why Akoustis undertook the risk of this continuous misconduct—information about the products that Qorvo has under development is "crucial information and very secret." Tr. 378:15-17; Tr. 292:6-293:8. Having information on Qorvo's prototypes gives competitors a head start—they would know "specific performance features that we are leveraging," "where we want to differentiate design," and what customers want in the design. Tr. 504:24-505:9; *see also id.*, 513:25-514:7, 516:12-19, 517:16-24; Tr. 520:17-22.

## C. Dr. Shanfield Opined that Akoustis Obtained a 55-Month Head Start

In addition to the evidence summarized above, Qorvo presented testimony from Dr. Shanfield, an industry expert who has worked with semiconductor technology and RF devices for more than 40 years. Tr. 1224:3-10. Dr. Shanfield's experience encompasses researching and developing BAW filters, manufacturing, trimming, product testing, performing market analysis and business planning, and customer engagement. Tr. 1221:13-1223:22, 1225:18-1227:4.

Dr. Shanfield worked for more than a year to analyze the trade secrets in this case. Tr. 1228:7-11. He reviewed more than 10,000 documents and identified at least 1,400 confidential Qorvo documents found within the files of 40 Akoustis employees. Tr. 1228:14-1229:12, 1361:23-15. During more than three and a half hours of trial testimony, Dr. Shanfield walked through each trade secret and explained how Akoustis stole and used the trade secret to accelerate its entry into the market. He also identified the evidence and testimony supporting his opinions. Tr. 1231:3-1251:6 (market analysis and business plans), 1251:10-1273:21 (BAW resonator and filter designs),

-8-

1273:22-1287:7 (trimming procedures), 1287:8-1293:22 (customized RF connector), 1293:23-1311:25 (product development and testing procedures), 1312:1-1317:8, 1330:2-1335:23 (reliability testing procedures), 1335:24-1348:20 (manufacturing and assembly procedures), 1348:21-1361:19 (product prototypes and roadmaps).

Dr. Shanfield also estimated the length of the head start Akoustis obtained from stealing Qorvo's trade secrets. In particular, Dr. Shanfield correlated the trade secrets with the practical tasks Akoustis needed to perform to enter and compete in the market. Tr. 1363:13-1364:10. Dr. Shanfield then determined how much time Akoustis saved in performing those tasks as a result of having the trade secrets. *Id*. The analysis was based both on Dr. Shanfield's experience in the industry and evidence provided by the witnesses in this case. *Id*.

For example, Dr. Shanfield testified that Akoustis obtained a nine-month head start advantage as a result of stealing Qorvo's business plans. In addition to his own experience (Tr. 1225:24-1226:9), Dr. Shanfield relied on testimony from Mr. Testa about "how much work goes into these" business plans. Tr. 1235:24-1236:10. Dr. Shanfield explained that it typically takes a company a year (at least) to create actionable business plans. Tr. 1365:21-23 ("[Y]ou've heard this from other witnesses, it might take a year to do that kind of analysis."); *see also* Tr. 483:25-484:6, 490:2-8, 1237:8-14. Instead, within a few weeks of obtaining Qorvo's trade secrets, Akoustis had drafted a plan to kickoff development of 5GHz BAW filters—addressing an attractive market where Qorvo expected to have a gap in its product line. *See* Part II.B.1, above. Dr. Shanfield thus determined (conservatively) that Akoustis saved nine months performing the tasks necessary to analyze the market and create a business plan. Tr. 1365:6-1366:11.

Dr. Shanfield performed the same type of detailed analysis for each of the trade secrets. Tr. 1366:14-1375:9 (summarizing analysis). He opined that—after accounting for the tasks that

Akoustis could perform in parallel—Akoustis obtained a cumulative 55-month head start from stealing Qorvo's trade secrets. Tr. 1374:8-1376:3. Dr. Shanfield explained that Dr. Aigner's testimony also supported his estimate. Dr. Aigner testified that it would typically take Qorvo four-to-five years to launch a new BAW filter product, despite having decades of experience, a large staff of engineers, and large investments in research and development. Tr. 1375:10-1376:3. Here, Akoustis went from not even having a working resonator to producing BAW filters in about a year. Tr. 673:18-24; 956:17-957:5. Dr. Shanfield concluded that his head start estimate "fit" the facts of the case and "was definitely in the right magnitude." Tr. 1375:10-1376:3.

### D.    Ms. Bennis Analyzed the Value to Akoustis of Entering the Market Early

Qorvo's damages expert, Ms. Bennis, evaluated the benefit that Akoustis received due to its misappropriation of Qorvo's trade secrets and opined that it was unjustly enriched in the amount of $50.3 million because it earned revenue 55 months earlier than it otherwise would have been able to do absent the misappropriation. Tr. 1692:14-1694:4; 1699:17-1700:5. Ms. Bennis determined the amount of Akoustis' unjust enrichment by calculating the present value of the revenue Akoustis actually received and comparing it to the value of that revenue if it was earned 55 months later in time. Tr. 1694:5-16. Importantly, Ms. Bennis' damages calculation does not "disgorge" or otherwise seek to recover the revenue that Akoustis earned. Tr. 1694:17-24 ("Under this analysis, Akoustis keeps the revenue that it's earned."). Instead, Ms. Bennis used a well-known interest formula and Akoustis' own weighted average cost of capital in her calculations. Tr. 1696:20-24. Ms. Bennis determined and opined that the time value of money was an appropriate measure of damages because Akoustis' misappropriation allowed it to get into "the market and doing all of its business activities" earlier than it otherwise would have. Tr. 1692:10-13.

### E.    The Jury Awarded a Portion of the Requested Damages

After deliberations, the jury returned a unanimous verdict, finding that Akoustis had

willfully and maliciously misappropriated 39 trade secrets from Qorvo. The jury further found that Akoustis was unjustly enriched by its misappropriation of 37 trade secrets. The jury awarded Qorvo $31,315,215 in unjust enrichment damages and $7,000,000 in exemplary damages.

## III.   LEGAL STANDARD

"Motions for judgment as a matter of law are granted sparingly and only in those circumstances in which the record is critically deficient of the minimum quantum of evidence in support of the verdict." *Bullen v. Chaffinch,* 336 F. Supp. 2d 342, 346 (D. Del. 2004). Under this standard, "the court may not weigh the evidence, evaluate the credibility of the witnesses, or substitute its own version of the facts[.]" *Roche Diagnostics Ops., Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 601 (D. Del. 2010). "Rather, the court must determine whether the evidence reasonably supports the jury's verdict[,]" viewing it in the light most favorable to Qorvo. *Id.*

## IV.   ARGUMENT

Akoustis argues it is entitled to judgment as a matter of law because the opinions of Ms. Bennis and Dr. Shanfield were inadmissible and cannot support the award of unjust enrichment damages. Akoustis, however, merely repeats the very same inadmissibility arguments the Court previously rejected. These arguments are procedurally improper and substantively meritless.

### A.   Akoustis Cannot Challenge the Admissibility of Evidence under Rule 50

While Akoustis styles its motion as one seeking judgment as a matter of law, Akoustis is actually challenging the Court's prior decisions on the admissibility of evidence. *E.g.*, Mot. 9, 15-16, 18-19 (arguing the Bennis and Shanfield opinions were inadmissible). It is well-established, however, that "**challenges to the admissibility of evidence are improper in motions challenging the sufficiency of evidence**." *Masimo Corp. v. Philips Elec. N. Am. Corp.*, No. 09-cv-80, 2015 WL 2379485, at *20 (D. Del. May 18, 2015) (emphasis added). The verdict loser "may challenge these rulings on appeal, but **as arguments for JMOL they are unavailing**." *Id.* (emphasis added).

The Federal Circuit's holding in *Versata Software, Inc. v. SAP*, 717 F.3d 1255 (Fed. Cir. 2013) is instructive. There, the verdict loser sought to challenge the admissibly of expert testimony "[u]nder the guise of the sufficiency of the evidence." *Id*. at 1264. The Federal Circuit held such challenges to admissibility are "improperly raised" under Rule 50. *Id*. Other courts agree. *E.g., Mathis v. Borough of Old Forge*, No. 3:08-CV-1240, 2021 WL 639018, at *24 n.12 (M.D. Pa. Feb. 18, 2021); *Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-cv-931, 2015 WL 3605143, at *15 (E.D.N.Y. June 5, 2015). The Court should deny Akoustis' Rule 50 motion.

### B.    The Court Properly Admitted Ms. Bennis' Testimony on Damages

If the Court reaches Akoustis' admissibility arguments, those arguments should also be rejected as substantively meritless. As the Court previously held, Ms. Bennis' damages opinions satisfies Rule 702's requirements. D.I. 553.

### 1.    Akoustis waived any objections to Ms. Bennis' qualifications

Although Akoustis waived any argument that Ms. Bennis lacked the qualifications to offer an expert opinion on head start damages (Tr. Tr. 1688:9-14), it nonetheless argues that the jury should have credited Ms. Irwin's opinion over Ms. Bennis' opinion because Ms. Irwin had more experience opining on head start benefits. Mot. 7, 12. The jury, however, was free to weigh the credibility of the opposing experts and reject Ms. Irwin's opinions. *E.g.*, *SimpleAir, Inc. v. Google Inc.*, 77 F. Supp. 3d 569, 578 (E.D. Tex. 2014) ("Confronted with such competing testimony, the jury was free to consider the credibility of the witnesses, weigh the competing evidence, determine who had persuaded them, and then award damages accordingly."). Such determinations are not subject to attack under Rule 50. *Roche Diagnostics*, 756 F. Supp. 2d at 601.

### 2.    Ms. Bennis applied a reliable and accepted methodology

The crux of Akoustis' argument is that Ms. Bennis' damages model is unreliable. Repeating the same arguments the Court already rejected, Akoustis asserts that Ms. Bennis relied

on "bare revenue" and failed to account for the costs that Akoustis incurred in generating those revenues. *See* Mot. 2, 11, 12. Akoustis argues that Ms. Bennis' "revenue-only" damages calculation was inadmissible because unjust enrichment can only be based on "the defendant's *profits*," not its revenues. *Id.* at 11. These arguments are legally and factually meritless.

### a.    Qorvo is entitled to damages "for any unjust enrichment"

As an initial matter, Akoustis improperly seeks to restrict the types of benefits that can form the basis for an award of unjust enrichment damages. The DTSA, however, permits a plaintiff to recover damages "for **any** unjust enrichment caused by the misappropriation." 18 U.S.C. §1836(b)(3)(B)(i)(II). The Sedona Conference Journal, which Akoustis cites, explains that unjust enrichment damages are intended to measure "the benefit conferred on the defendant due to the misappropriation." D.I. 616, Ex. B at 384. This "can take many forms"—"[s]imply put . . . **there is no single way to measure the benefit conferred on a defendant; the measurement is context dependent**." *Id.* (quoting *EpicSys. Corp. v. Tata Consultancy Servs.*, 980 F.3d 1117, 1130 (7th Cir. 2020)) (emphasis added); *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013) ("This variety of approaches demonstrates the 'flexible' approach used to calculate damages[.]")

### b.    Ms. Bennis determined the time value of money to Akoustis

Here, the record established that Akoustis willfully and maliciously stole dozens of Qorvo's trade secrets to accelerate its entry into the market. *See* Parts II.B.1-7. Ms. Bennis determined that Akoustis benefited from the trade secret misappropriation because it was able to generate revenues 55 months early. Tr. 1693:1-1695:9. Accelerating this income allowed Akoustis to fund and expand its operations without seeking other sources of financing. Tr. 1693:1-1695:9, 1742:24-1743:7. Ms. Bennis' methodology thus measured the economic value to Akoustis of receiving cash flows 55 months earlier in time. Tr. 1693:1-1695:9, 1727:9-1729:23.

Akoustis seeks to spin Ms. Bennis' damages calculation as a "revenue-only." Mot. 11. That

argument is incorrect and misleading. To be clear, **Ms. Bennis' model does not seek the return of revenues** that Akoustis earned because it misappropriated Qorvo's trade secrets. Trial Tr. 1694:17-1695:9. To the contrary, Ms. Bennis assumed that Akoustis would have earned the same revenues regardless of whether it stole Qorvo's trade secrets. In the "but for" world, however, Akoustis would have earned those revenues 55 months later in time. As such, a material benefit to Akoustis was receiving (and having use) of income earlier in time—*i.e.*, the time value of money.

Akoustis attacks Ms. Bennis' methodology as "*sui generis*." But Ms. Bennis' model is based on the "core financial principle that states a sum of money is worth more now than in the future." *E.g.*, Ex. D, Catherine Cote, *Time Value of Money (TVM): A Primer*, Harv. Bus. Sch. Online (June 16, 2022), https://online.hbs.edu/blog/post/time-value-of-money (last visited Apr. 4, 2024). This "core financial principle" recognizes that cash flows are more valuable today than in the future because the recipient can make use of the money. *E.g.,* Ex. D ("In this example, the present value of Project A . . . is greater than Project B[] because Project A[] will be received one year sooner. In that year, you could . . . pay expenses without risk.").

Akoustis also attacks Ms. Bennis' methodology as "untested." But Ms. Bennis calculated the time value of money to Akoustis using a well-accepted "present value" formula that is widely available in economic literature. Trial Tr. 1695:19-168:25. For example, Ms. Bennis' methodology is reflected in *Essentials of Financial Management*, published by Liverpool University Press. *See* Ex. A at §3. There are numerous other secondary sources recognizing both the economic benefit of the time value of money and the methodology that Ms. Bennis used to calculate that economic benefit. *E.g.*, *id.*, Ex. B, Christian Szylar, *Risk Mgmt. Under UCTIS III/IV: New Challenges for the Fund Indus*., at 254 (2010) (defining present value); *id.*, Ex. C, Mohammad Rahman, *Time Value of Money: A Case Study on Its Concept and Its Application in Real Life Problems*, 1-1 *Int'l*

*J. of Rsch. In Finance and Mgmt.* 18 (2018) (describing calculation).

Despite its attacks on Ms. Bennis' methodology, Akoustis **admits** the time value of money confers a measurable economic benefit. Mot. 8. Indeed, Akoustis quotes Ms. Irwin: "I don't disagree at all with the concept of the time value of money. Again, that's a very basic concept in finance." *Id*. (quoting Tr. 2356:20-2357:3).[2] But Akoustis argues the time value of money only attaches to early receipt of "profits." *Id.* at 2. Akoustis' position finds no support in the economic literature, which recognizes that the time value of money applies broadly to any "cash flow," not solely to profits. *E.g.,* Exs. A-D. The benefit to a company of receiving funds today rather than in the future does not depend on whether the company is profitable. Indeed, one premise of the methodology is that receiving money immediately allows a company to use it to pay expenses. *E.g.,* Ex. D (receiving cash flows immediately allows a company to "pay expenses without risk").

Akoustis also argues that Ms. Bennis' methodology is "newly invented" and "without support in case law." Mot. 1, 3, 7, 10, 11. Again, this is incorrect. *See e.g.*, D.I. 553; *Sabre GLBL, Inc. v. Shan*, 779 F. App'x 843 (3d Cir. 2019); *U.S. v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 (3d Cir. 2004); *U.S. v. Torlai*, 728 F.3d 932, 945 n.11 (9th Cir. 2013); *Raithborne Land Co. v. Ascent Energy, Inc.*, 610 F.3d 249, 257 (5th Cir. 2010).

### c.    Ms. Bennis considered Akoustis' costs

Akoustis argues throughout the motion that Ms. Bennis failed to consider whether Akoustis incurred costs as a result of misappropriating Qorvo's trade secrets. *See* Mot. 7, 8, 15. This argument is simply incorrect. Ms. Bennis testified that she considered Akoustis' costs. Tr. 1730:21-17:31-16. She determined, however, that it would have been inappropriate to offset those costs against the time value of money because Akoustis **avoided costs** as a result of its

---

[2] Notably, Ms. Irwin used the present value calculation in her damages model. Tr. 2366:16-25.

misappropriation. *Id.*; *see also* Tr. 1726:9-1727:8. As such, rather than incurring higher costs to accelerate its entry into the market, Akoustis was able to enter the market early while **also** lowering its costs by stealing Qorvo's trade secrets. *See* Tr. 1700:18-1701:4; Tr. 1725:17-1727:8. Notably, Akoustis' experts **agreed with Ms. Bennis**, expressly and repeatedly testifying that Akoustis avoided costs to the extent it misappropriated Qorvo's trade secrets. Tr. 2154:25-2155:4, 2241:6-2242:16, 2341:8-10.

Tellingly, despite criticizing Ms. Bennis (wrongly) for not considering costs, Akoustis never analyzed the costs that Ms. Bennis should have allegedly included. Instead, Akoustis argued generically that "costs" must be included, without pointing to particular costs or explaining how they were connected to its misappropriation. As Ms. Bennis testified, Akoustis would have incurred costs regardless of whether it stole Qorvo's trade secrets. Tr. 1759:1-1760:14. Indeed, a substantial portion of the "costs" that Akoustis generically references ($68.9 million), were incurred only after Qorvo filed the lawsuit. *Id.* More fundamentally, even if Akoustis had identified the specific costs it believed Ms. Bennis failed to consider, that would not support excluding Ms. Bennis' opinions. It is well settled that such alleged flaws go to the weight of the testimony, not its admissibility. *See e.g, Evolved Wireless, LLC v. Apple Inc.*, No. 15-543-JFB-SRF, 2019 WL 1178517, at *3 (D. Del. Mar. 12, 2019).[3]

Akoustis was free to (and did) raise the alleged "flaws" in Ms. Bennis' model during trial. Indeed, Akoustis extensively quotes from Ms. Irwin's efforts to persuade the jury that "you have to include costs." Mot. 7-8. After considering all of the evidence, including the opinions of both experts, the jury rejected Akoustis' argument and found that Ms. Bennis properly accounted for

---

[3] Akoustis also argues, in passing, that Ms. Bennis included revenues in her model that were not attributable to the trade secret misappropriation. Ms. Bennis disagreed. Tr. 1742:13-1744:2. This dispute also goes to weight and not admissibility.

costs. That decision is not subject to attack under Rule 50. *E.g.*, *Honeywell Intern. v. Universal Avionics Systems*, 426 F. Supp. 2d 211, 226 (D. Del. 2006) ("the credibility of each expert and the weight given the evidence presented was to be determined by the jury and deference must be given to the jury's decision."); *Apple Inc. v. Samsung Elecs. Co*., 839 F.3d 1034 (Fed. Cir. 2016).

### 3.    Ms. Bennis adopted a methodology that fit the facts of the case

Akoustis makes a passing reference to Ms. Irwin opining that the time value of money calculation was not a proper "fit" for the facts of this case. Mot. 8. Ms. Bennis, however, explained the opposite—that she selected her methodology because it "fit best with the facts" of Akoustis' misappropriation. *See* Tr. 1736:15-16. Indeed, there are several unique aspects of this case that make it well-suited for a damages model based on the time value of money. First, the breadth of the trade secret misappropriation was staggering—touching nearly every aspect of Akoustis' business and allowing the company to enter the market early. Thus, unlike many trade secret cases, the benefit here was not limited to a specific product. Second, Akoustis was an unprofitable start-up company at the time it used the trade secrets to gain early entry into to the market. As such, using "defendant's profits" as a measure of damages would not accurately measure of the benefit Akoustis received from stealing the trade secrets. Third, the significant length of the head start (55 months) made the time value of money a material component of the benefit to Akoustis from the misappropriation. In other cases, where the defendants obtain a shorter advantage, the time value of money may play a less significant role. Under these circumstances, Ms. Bennis reasonably determined that the time value of money methodology was a good "fit" for the facts of the case.

## C.    The Court Properly Admitted Dr. Shanfield's Testimony

Akoustis argues that Dr. Shanfield's expert opinion was also inadmissible because it was "speculative," "subjective," "pure '*ipse dixit*,'" and merely a "guestimate." Despite this laundry list of rhetorical barbs, Akoustis' argument has no merit. First and foremost, Akoustis waived any

challenge to Dr. Shanfield's head start methodology. Qorvo served the expert report disclosing Dr. Shanfield's methodology on November 21, 2023. The deadline to challenge Dr. Shanfield's opinions under *Daubert* was February 9, 2024. Akoustis did not file a motion. Nor did Akoustis object to the admissibility of Dr. Shanfield's opinions when he testified. Under these circumstances, "[c]ourts have rejected post trial evidentiary challenges to an expert's methodology, even when characterized as a challenge to the sufficiency of the evidence." *Braun Elevator Co. v. Thyssenkrupp Elevator Corp.*, 379 F. Supp. 2d 993, 1001 (W.D. Wis. 2005); *Alarm.com, Inc. v. Securenet Techs.*, No. 15-807-RGA, 2019 WL 3996883, at *7 (D. Del. Aug. 23, 2019).

Courts have explained that such untimely post-trial arguments are improper because "the failure to object prior to the admission of the evidence deprived the proponent of the opportunity to offer additional foundation for the reliability of the expert's methodology." *Braun*, 379 F. Supp. 2d at 1001. That is exactly the case here. Had Akoustis raised a timely objection, Qorvo would have had the opportunity to provide additional foundation for the reliability of Dr. Shanfield's methodology. *See, e.g.*, Ex. E at 481-500 (Shanfield expert report, dedicating 19 pages to explaining the methodology underlying the head start estimates). Having failed to timely object to Dr. Shanfield's methodology, Akoustis cannot do so now under the guise of attacking the sufficiency of the evidence. *Alarm.com*, 2019 WL 3996883, at *7.

Akoustis' challenge to Dr. Shanfield's methodology is also substantively meritless. Akoustis argues that Dr. Shanfield's opinion was "subjective" because the 55-month head start was "plucked from thin air" without identifying a "specific source" or "support." Mot. 17. In so arguing, Akoustis ignores **hours** of testimony during which Dr. Shanfield painstakingly explained the value of each trade secret and the benefit to Akoustis of using it. *E.g.,* 1231:3-1361:19; *see*

*also* Part II.C. Akoustis also ignores Dr. Shanfield's testimony that he used Qorvo's development time as a benchmark to assess the reasonableness of his estimates. Tr. 1375:10-1376:3.

Moreover, Akoustis' argument that Dr. Shanfield failed to apply "methods and procedures of science" (Mot. 17) ignores Dr. Shanfield's qualification to testify as an industry expert in this case. Tr. 1224:19-25. Dr. Shanfield's application of his knowledge and experience in the industry to estimate the time benefit to Akoustis of using Qorvo's trade secrets satisfies the reliability requirement of Rule 702. *See, e.g.*, *Allscripts Healthcare, LLC v. Andor Health, LLC*, No. 21-704-MAK, 2022 WL 3021560, at *25 & n. 202 (D. Del. July 29, 2022) ("[T]he relevant reliability concerns will focus upon personal knowledge and experience of the witness and the methodology used will be applying that experience to the facts of the case."); *Int'l Constr. Prods. v. Caterpillar Inc.*, Civil Action 15-108-RGA, 2024 WL 1494335, at *1-2 (D. Del. Apr. 3, 2024).

### D.    Substantial Evidence Beyond the Expert Opinions Supports the Award

Akoustis' motion should also be denied because substantial evidence in the record beyond expert testimony supports the award of $31.3 million in unjust enrichment damages. Here, the jury was properly instructed that "[t]here can be multiple forms of unjust enrichment," including "the value of the temporal advantage a defendant obtains" and "avoided costs." D.I. 596 at 32.

There was extensive testimony concerning both the time and cost of developing the trade secrets that Akoustis stole from Qorvo. *See* Parts II.A and II.B. For example, the jury heard testimony from Dr. Aigner that it took Qorvo 20 years and $1 billion to develop BAW filter technology. *See id.* Dr. Aigner also testified that many of the trade secrets that Akoustis stole took years, sometimes decades, to develop. *Id.* Mr. Creviston testified that Qorvo spends $650 million in research and development annually. Meanwhile, the jury received evidence that Akoustis spent only $1.7 million on research and development in 2016 and 2017, the time period during which Akoustis went from not having a working resonator to sampling BAW filters. Ex. 286.

Based on the evidence submitted, a reasonable jury could have determined that Akoustis avoided costs of $31.3 million as a result of stealing Qorvo's trade secrets—*i.e.*, accepting the contentions from Akoustis' experts that damages should be determined based on avoided costs, but finding those experts vastly understated such costs. As such, even if the Court did conclude that it should have excluded Ms. Bennis' or Dr. Shanfield's testimony, substantial evidence would still support the verdict. *E.g.*, *Thabault v. Chait*, 541 F.3d 512, 532 (3d Cir. 2008) ("A jury's damages award will not be upset so long as there exists sufficient evidence on the record[.]"); *Bayer Healthcare LLC v. Baxalta Inc.*, 407 F. Supp. 3d 462, 480 (D. Del. 2019); *Mondis Tech. v. LG Elecs.*, No. 15-4431 (SRC), 2023 WL 3749992, at *18 (D.N.J. June 1, 2023).

### E.    Judgment as a Matter of Law Is Not an Appropriate Remedy

Under Rule 50, the Court may "allow judgment on the verdict," "order a new trial," or "direct the entry of judgment as a matter of law." Here, Akoustis asks the Court for a windfall—an order directing entry of judgment in favor of Akoustis despite the jury's finding that Akoustis willfully and maliciously stole 39 trade secrets from Qorvo. If the Court determines that (i) it should have excluded the opinions of Ms. Bennis or Dr. Shanfield, and (ii) such exclusion would have negated the basis for the damages award, the proper relief here would be to order a new trial on damages. *E.g.*, *Mondis Tech. Ltd v LG Elecs.*, No. CV 15-4431, 2020 WL 1933979, at *1-2 (D.N.J. Apr. 22, 2020) (holding that the "best and most just remedy" is a new trial after the plaintiff's principal damages theory was found invalid); *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973–76 (Fed. Cir. 2022) (granting a new trial limited to damages after determining that multiple expert opinions on damages should not have been presented to the jury).

## V.    CONCLUSION

For the reasons set forth above, the Court should deny Akoustis' motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____

OF COUNSEL:

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Qorvo, Inc.*

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Zachary Alper
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

July 25, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 25, 2024, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                          *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Ronald S. Lemieux, Esquire                             *VIA ELECTRONIC MAIL*
David S. Elkins, Esquire
Victoria Q. Smith, Esquire
SQUIRE PATTON BOGGS (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA  94304-1216
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Xiaomei Cai, Esquire                                   *VIA ELECTRONIC MAIL*
SQUIRE PATTON BOGGS (US) LLP
2325 E. Camelback Road, Suite 700
Phoenix, AZ  85016
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Rachael A. Harris, Esquire                             *VIA ELECTRONIC MAIL*
Matthew A. Stanford, Esquire
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

                                        */s/ Jeremy A. Tigan*
                                        _____
                                        Jeremy A. Tigan (#5239)