IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | **PUBLIC VERSION** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1417 (JPM) |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. and | ) | **DEMAND FOR JURY TRIAL** |
| AKOUSTIS, INC., | ) | |
| | ) | ████████████ |
| Defendants. | ) | |

**QORVO, INC.'S ANSWERING BRIEF IN OPPOSITION TO
THE AKOUSTIS DEFENDANTS' MOTION FOR A NEW
TRIAL OR IN THE ALTERNATIVE REMITTITUR**

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Zachary Alper
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

**Confidential Version Filed: July 25, 2024**
**Public Version Filed: August 15, 2024**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

*Attorneys for Plaintiff Qorvo, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    Introduction ................................................................................................................... 1

II.   Factual Background .......................................................................................................... 3

    A.    Qorvo Spends Decades Developing BAW Filter Technology ........................................ 3

    B.    Qorvo Presents Evidence that Akoustis Misappropriated its Trade Secrets ................... 3

    C.    Dr. Shanfield Opined that Akoustis Obtained a 55-Month Head Start ........................... 5

    D.    Akoustis Argues the Alleged Trade Secrets Were "Known" and Not Useful ................ 7

    E.    Ms. Bennis Analyzed the Value to Akoustis of Entering the Market Early ................... 7

    F.    Ms. Irwin Values the Avoided Costs as a Result of the Misappropriation ........................ 8

    G.    Drs. Shanfield, Heinrich, and Bravman Opine on Patent Infringement ........................... 9

    H.    Akoustis Presents Testimony from Dr. Nguyen on Infringement .................................. 10

    I.    The Jury Returns its Verdict ....................................................................................... 11

III.  Legal Standard ................................................................................................................ 12

IV.   Argument ......................................................................................................................... 13

    A.    Akoustis Does Not Identify Any Irreconcilable Inconsistency in the Verdict .............. 13

        1.    Akoustis waived its objection to the allegedly inconsistent verdict ........................... 13

        2.    The jury's findings are easily reconciled ................................................................ 13

        3.    Any inconsistency was harmless ............................................................................ 16

    B.    Extensive Evidence Supports the Trade Secret Damages Award ................................ 16

    C.    The Weight of the Evidence Supports the Jury's Finding of Infringement .................. 18

V.    Conclusion ...................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Boyanowski v. Cap. Area Intermediate Unit*,
   215 F.3d 396 (3d Cir. 2000)..................................................................................16

*Brode v. Cohn*,
   966 F.2d 1237 (8th Cir. 1992) ...............................................................................13

*Carrier Corp. v. Goodman Glob., Inc.*,
   162 F. Supp. 3d 345 (D. Del. 2016).......................................................................12

*Del. & Hudson Ry. Co. v. Knoedler Mfrs., Inc.*,
   805 Fed.Appx. 149 (3d Cir. Feb. 12, 2020)...........................................................13

*Frank C. Pollara Group, LLC v. Ocean View Investment Holding, LLC*,
   784 F.3d 177 (3d Cir. 2015)...................................................................................13

*Gallich v. Baltimore & O.R. Co.*,
   372 U.S. 108 (1963) ...............................................................................................12

*GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co.*,
   474 F. Supp. 1357 (W.D. Pa. 1979).......................................................................19

*Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*,
   300 F. Supp. 3d 610 (D. Del. 2018).......................................................................18

*Gusdonovich v. Bus. Info. Co.*,
   705 F. Supp. 262 (W.D. Pa. 1987).........................................................................20

*Monaco v. City of Camden*,
   366 Fed. Appx. 330 (3d Cir. 2010)..................................................................12, 13

*Olefins Trading, Inc. v. Han Yang Chem Corp.*,
   9 F.3d 282 (3d Cir. 1993).................................................................................12, 16

*Repa v. Napierkowski*,
   19-cv-0101, 2022 WL 3228207 (W.D. Pa. Aug. 10, 2022).....................................19

*Tviim, LLC v. Mcafee, Inc.*,
   851 F.3d 1356 (Fed. Cir. 2017)..............................................................................16

*U.S. v. Brennan*,
   326 F.3d 176 (3d Cir. 2003)...................................................................................18

*White v. Celotex Corp.*,
    878 F.2d 144 (4th Cir. 1989) ................................................................................................13

**Rules**

Fed. R. Civ. P. 59 ................................................................................................................12

Fed. R. Civ. P. 61 ................................................................................................................16

Fed. R. Evid. 702 ................................................................................................................2

## I.       INTRODUCTION

Following an eight-day trial, which included testimony from 27 witnesses and 355 exhibits, the jury found, after two days of deliberations, that Akoustis willfully and maliciously stole more than three dozen trade secrets from Qorvo and infringed two of Qorvo's patents. The jury awarded Qorvo $31.6 million in compensatory damages and $7 million in exemplary damages due to Akoustis' willful and malicious behavior. Akoustis now moves to nullify the jury's verdict, demanding a new trial on the trade secret liability, trade secret damages, and the patent infringement. Akoustis' motion should be denied.

Akoustis does not (and cannot) argue that the jury's findings of trade secret misappropriation were contrary to the clear weight of the evidence. Indeed, the evidence Qorvo presented at trial was overwhelming. Unable to challenge the weight of the evidence, Akoustis argues that the jury's trade secret verdict contains "irreconcilable inconsistencies" with respect to interrogatories the jury answered for five of the 46 alleged trade secrets. But Akoustis waived any such objection when it failed to raise the alleged inconsistencies before the jury was discharged. Moreover, the alleged inconsistencies are easily reconciled—the jury concluded that five of the alleged trade secrets did not meet the statutory definition for a "trade secret" (as Akoustis argued), but also found that Akoustis had nonetheless stolen that information from Qorvo and benefited from the use of the information. Finally, and perhaps most importantly, the alleged inconsistencies were harmless because they had no effect on the overall verdict. Indeed, the jury verdict form (and the verdict itself) make clear that the jury did not award any damages with respect to the five alleged trade secrets for which Akoustis argues "irreconcilable inconsistencies."

Akoustis' demand for a new trial (or, in the alternative, remittitur) with respect to trade secret damages is equally meritless. Akoustis argues that the damages award is against the "clear weight of the evidence" because it is based on opinions of Melissa Bennis and Stanley Shanfield

that should have been excluded as inadmissible under Rule 702. Akoustis raises the same arguments in its motion for judgment as a matter of law. *See* D.I. 610. Qorvo provides its full response to the arguments concerning the admissibility of the opinions of Ms. Bennis and Dr. Shanfield in Qorvo's opposition to the JMOL motion. By way of summary, Ms. Bennis applied a widely-recognized methodology—indeed a "core financial principal"—to reliably measure the benefit Akoustis obtained from using Qorvo's trade secrets to enter the market 55 months early. The Court has already rejected Akoustis' attack on Ms. Bennis' methodology on three prior occasions and should do so again. The Court should also reject the attack on Dr. Shanfield's methodology. Akoustis waived any argument that Dr. Shanfield's opinions were inadmissible when it opted not to object to Dr. Shanfield's opinions before or during trial. Moreover, Dr. Shanfield's estimate of the head start Akoustis obtained was properly based on his 40 years of relevant experience and fully supported by an extensive evidentiary record.

Akoustis' demand for a new trial on the patent infringement claims also falls short. Akoustis argues that the jury's infringement findings were contrary to the clear weight of the evidence. But Akoustis simply ignores the evidence Qorvo's experts presented, which included cross-sectional analyses using an electron microscope, computer simulations of different resonator structures, Akoustis' design and manufacturing documents, and a limitation-by-limitation explanation of infringement. Akoustis does not (and cannot) point to any contrary evidence because its expert (Clark Nguyen) did not perform a cross-sectional analysis or run any simulations. Instead of addressing the weight of the evidence, Akoustis recycles marginal (and flawed) criticisms of Qorvo's simulations that Dr. Nguyen raised at trial. But the jury considered those criticisms, weighed the evidence, assessed the credibility of the experts, and reasonably concluded that Akoustis infringed the asserted patents. There is no colorable argument that the

jury's verdict is contrary to the great weight of the evidence.

## II.     FACTUAL BACKGROUND

### A.     Qorvo Spends Decades Developing BAW Filter Technology

The trade secrets at issue in this case relate to bulk acoustic wave ("BAW") filters. BAW filter technology is extremely complex. Tr. 373:15-24. Qorvo first began developing BAW filter technology in the 1990s. Tr. 364:20-365:4, 373:8-14. Qorvo invested more than $1 billion in R&D and worked nearly 20 years to launch its first commercial BAW filter product in 2010. Tr. 363:11-12, 373:15-24, 375:12-15.

### B.     Qorvo Presents Evidence that Akoustis Misappropriated its Trade Secrets

Akoustis was formed in 2014 by Jeffrey Shealy, a former Qorvo executive. Tr. 1116:22-1117:5. Akoustis initially focused on the research and development of "single-crystal" technology. *Id.*, 1118:18-21. In 2016, however, Akoustis decided to focus on making commercial BAW filter products. Unlike Qorvo, Akoustis did not invest the time and resources necessary to develop its own technology. Instead, Akoustis engaged in a scheme to steal and use Qorvo's trade secrets.

At trial, Qorvo presented evidence that Akoustis misappropriated 46 trade secrets, which Qorvo organized into eight groups—Qorvo's: (1) business plans; (2) BAW filter and resonator designs; (3) trimming methods and procedures; (4) evaluation board design rules and schematics; (5) product development process and testing procedures; (6) systems, processes, and procedures for testing reliability and mean-time-to-failure of parts; (7) manufacturing and assembly procedures; and (8) product roadmaps and prototypes. For every alleged trade secret, Qorvo presented fact testimony identifying the trade secret and explaining its value. *See* Tr. 311:22-316:17 (Eric Creviston—group 1), 377:19-421:9 (Robert Aigner—groups 2-4, and 6)  476:11-521:19 (Tony Testa—groups 1 and 8), 549:7-580:25 (Gernot Fattinger—groups 5 and 7).

Qorvo also presented evidence, largely through the testimony of Akoustis' own employees,

establishing that Akoustis stole and used Qorvo's trade secrets. This included hundreds of exhibits and testimony from Jeffery Shealy (CEO), David Aichele (Executive Vice President of Business Development), Rohan Houlden (Chief Product Officer), Robert Dry (Vice President of Final Operations), Colin Hunt (Vice President of Sales), Rama Vetury (Chief Device Scientist), and Joonbum Kwon (Senior Process Engineer). Further, Qorvo presented testimony from Dr. Shanfield explaining the significance of each trade secret, why the trade secret was valuable, and how Akoustis had stolen the trade secrets. During his testimony, Dr. Shanfield identified the exhibits and witness testimony supporting his opinions. Tr. 1228:14-1362:15.

The evidence that Akoustis stole and used Qorvo's trade secrets to accelerate its entry into the market was overwhelming. Akoustis copied entire Qorvo email accounts (Tr. 852:4-853:24) and imaged an entire Qorvo engineering computer (Tr. 816:2-817:2). Akoustis used external hard drives to transfer Qorvo's files to Akoustis. Tr. 818:6-15; 821:21-822:19. Before leaving to work at Akoustis, former Qorvo employees used personal email accounts to transfer files to Akoustis. *E.g.*, Ex. 22. Akoustis employees also routinely solicited and received confidential Qorvo documents using their personal e-mail accounts. *E.g.*, Exs. 77, 78. At least one Akoustis employee delayed quitting his job at Qorvo so he could transfer files to Akoustis. Ex. 10, Ex. 219; Trial Tr. 1272:19-1273:8. Akoustis continuously solicited confidential Qorvo materials from Qorvo's customers who were subject to NDAs. *E.g.*, Ex. 161, Ex. 162, Trial Tr. 1041:2-1042:12. Akoustis used company expense accounts to bribe contacts and obtain "key confidential information" about Qorvo. Ex. 140, Ex. 142. And Akoustis "borrowed" and tested confidential Qorvo prototypes from a customer subject to a NDA. *E.g.*, Ex. 179; Ex. 166; Trial Tr. 1046:1-1047:23.

The Akoustis employees involved in the solicitation, dissemination, and use of Qorvo's information admitted that they knew the materials were confidential. For example, Mr. Houlden

testified repeatedly that the materials he stole from Qorvo were confidential and he had no authorization to share those materials with Akoustis. *E.g.*, Trial Tr. 757:10-18, 759:18-780:8, 763:2-23, 764:18-765:2, 768:7-768:12, 772:15-21, 775:7-16. Mr. Aichele, Mr. Dry, and Dr. Shealy all offered similar testimony. *E.g.,* Tr. 894:12-24, 906:12-22 (Aichele); Tr. 1095:14-19, 1098:6-1099:8 (Dry); Tr. 1140:6-8 (Shealy). SJ Kim, Akoustis's Country Manager for Korea, expressly identified the materials he obtained as "key confidential information." Ex. 140 at 2. Dave Hodge, the Akoustis engineer assigned to develop 5GHz BAW filters, testified that he immediately recognized the confidential nature of Qorvo's engineering presentations and felt "repulsion" when he received them. Tr. 614:2-16, 615:13-23. Nonetheless—in a textbook example of willful and malicious behavior—all of the Akoustis' employees disregarded Qorvo's confidentiality rights and continued to solicit, disseminate, and use the Qorvo documents.

## C.     Dr. Shanfield Opined that Akoustis Obtained a 55-Month Head Start

Qorvo also presented testimony from Dr. Shanfield opining that Akoustis entered the market 55 months early as a result of stealing Qorvo's trade secrets. To reach his opinion, Dr. Shanfield correlated the stolen trade secrets with the practical tasks Akoustis needed to perform to enter and compete in the market. Tr. 1363:13-1364:10. Dr. Shanfield then determined how much time Akoustis saved in performing those tasks as a result of having the trade secrets. *Id*. Dr. Shanfield's opinions were based on his more than 40 years' of experience in the industry, which included experience in project management analysis and the exact areas where Akoustis had stolen Qorvo's trade secrets—*e.g.*, researching and developing BAW filters, manufacturing, trimming, product testing, performing market analysis and business planning, and customer engagement. Tr. 1221:13-1223:22, 1224:3-10, 1225:18-1227:4, 1463:4-25, 1464:24-1465:12. Dr. Shanfield's head start opinion also found support in the testimony of numerous fact witnesses who testified how long it took Qorvo to perform tasks encompassed in Dr. Shanfield's analysis. Tr. 1464:24-1465:12;

*see also* Oppo. to D.I. 610, Part II.A.-II.C.

For example, Dr. Shanfield testified that Akoustis obtained a nine-month head start advantage as a result of stealing Qorvo's business plans. In addition to his own experience (Tr. 1225:24-1226:9), Dr. Shanfield also relied on testimony from Mr. Testa about "how much work goes into these" business plans. Tr. 1235:24-1236:10. Dr. Shanfield explained that it typically takes a company a year (at least) to create actionable business plans. Tr. 1365:21-23; *see also* Tr. 483:25-484:6, 490:2-8 (Mr. Testa testifying it takes Qorvo years to develop its business plans). Instead, within a few weeks of obtaining Qorvo's trade secrets, Akoustis had drafted a plan to kickoff development of 5GHz BAW filters—addressing an attractive market where Qorvo expected to have a gap in its product line. *See* Oppo. to D.I., Part II.B-C. Dr. Shanfield thus determined (conservatively) that Akoustis had saved nine months performing the tasks necessary to analyze the market and create a business plan. Tr. 1365:6-1366:11.

Dr. Shanfield performed the same type of detailed analysis for each of the trade secrets. Tr. 1366:14-1375:9 (summarizing analysis). He opined that—after accounting for the tasks that Akoustis could perform in parallel—Akoustis obtained a cumulative 55-month head start from stealing Qorvo's trade secrets. Tr. 1374:8-1376:3. Dr. Shanfield explained that Dr. Aigner's testimony also supported his estimate. Dr. Aigner testified that it would typically take Qorvo four-to-five years to launch a new BAW filter product, despite having decades of experience, a large staff of engineers, and large investments in research and development. Tr. 1375:10-1376:3. Here, Akoustis went from not even having a working resonator to producing BAW filters in about a year. Tr. 673:18-24; 956:17-957:5. Dr. Shanfield thus concluded that his head start estimate "fit" the

facts of the case and "was definitely in the right magnitude." Tr. 1375:10-1376:3.[1]

### D.     Akoustis Argues the Alleged Trade Secrets Were "Known" and Not Useful

Akoustis did not dispute that it stole large volumes of Qorvo's documents. Tr. 272:17-273:12, 2480:10-20. Instead, Akoustis argued: (i) the stolen information was "known" to others in the industry and therefore did not meet the definition of a "trade secret"; and (ii) Akoustis was not unjustly enriched because the information had no use to Akoustis. For example, Akoustis presented testimony from Robert Darveaux to rebut the opinions of Dr. Shanfield. Dr. Darveaux opined that he reviewed all of the documents Dr. Shanfield analyzed and concluded: "there were no trade secrets" and "Akoustis had no head-start from having these documents." Tr. 2154:19-24.

Dr. Darveaux also disputed Dr. Shanfield's opinions concerning the head start advantage Akoustis obtained. Tr. 2053:16-18. Dr. Darveaux testified that assuming there were trade secrets, the total benefit to Akoustis was saving 194 hours—*i.e.*, Dr. Darveaux opined that it would have taken one engineer less than 5 weeks to replicate all of the trade secrets Akoustis stole. Tr. 2063:19-2065:6. Dr. Darveaux also opined that Akoustis saved $264 in document downloading costs. *Id.*

### E.     Ms. Bennis Analyzed the Value to Akoustis of Entering the Market Early

Qorvo's damages expert, Ms. Bennis, evaluated the benefit that Akoustis received due to its misappropriation of Qorvo's trade secrets and opined that it was unjustly enriched in the amount

---

[1] Akoustis argues that Dr. Shanfield's head start analysis did not consider the "library" of manufacturing processes Akoustis acquired when it purchased its New York fabrication facility. *See* Mot. 1, 5. Beyond general references to the purported existence of this "library" of documents, Akoustis presented little evidence concerning the content of the documents, the use of the documents, or how the documents would have impacted the head start analysis. Further, Akoustis fails to acknowledge that the New York facility was not manufacturing BAW filters prior to the acquisition. Tr. 1465:22-24, 1809:2-13. Akoustis also ignores the evidence that, after the acquisition, Akoustis transferred its process to the fabrication facility (not the other way around). Tr. 1811:10-22. Akoustis also ignores the evidence that Akoustis used Qorvo's documents to create procedures for the fabrication facility. Tr. 1465:25-1469:2. Finally, Akoustis ignores the fact that the STC MEMS library documents Akoustis offered into evidence had not been updated since 2012 and had nothing to do with BAW filters. Tr. 1811:10-1813:16.

of $50.3 million because it earned revenue 55 months earlier than it otherwise would have been able to do absent the misappropriation. Tr. 1692:14-1694:4; 1699:17-1700:5. Ms. Bennis determined the amount of Akoustis' unjust enrichment by calculating the present value of the revenue Akoustis actually received and comparing it to the value of that revenue if it was earned 55 months later in time. Tr. 1694:5-16. Importantly, Ms. Bennis's damages calculation does not "disgorge" or otherwise seek to recover the revenue that Akoustis earned. Tr. 1694:17-24 ("Under this analysis, Akoustis keeps the revenue that [it] earned.") Instead, Ms. Bennis used a well-known interest formula and Akoustis' own weighted average cost of capital in her calculations. Tr. 1696:20-24. Ms. Bennis determined and opined that the time value of money was an appropriate measure of damages because Akoustis' misappropriation allowed it to get into "the market and doing all of its business activities" earlier than it otherwise would have. Tr. 1692:10-13.

### F.    Ms. Irwin Values the Avoided Costs as a Result of the Misappropriation

To rebut Ms. Bennis' opinions, Akoustis presented Carlyn Irwin as its damages expert. Ms. Irwin opined that to the extent Akoustis misappropriated Qorvo's trade secrets, the amount of operational costs Akoustis avoided spending because of that misappropriation was the best measure of damages. Tr. 2341:3-7. Ms. Irwin testified that these "avoided costs" included "things like research and development" and "other types of operating costs." Tr. 2399:13-2400:2. Ms. Irwin relied upon the expert opinions of Drs. Darveaux and Lebby to calculate Akoustis's so-called avoided costs. Tr. 2365:5-14. Ms. Irwin admitted that if the jury rejected Drs. Darveaux's and Lebby's hours estimates, she did not "really calculate[] the harm to Qorvo[.]" Tr. 2405:17-2406:4. But, Ms. Irwin further testified that the jury could "take [her] analysis and adjust it however they see fit. . . . [and] that's why [she] gave all the detail [she]" provided so that her analysis and opinions "can be used" by the jury. *Id.*

### G.  Drs. Shanfield, Heinrich, and Bravman Opine on Patent Infringement

Qorvo presented testimony from three expert witnesses related to its patent infringement claims. Dr. Helge Heinrich testified that he performed a cross-sectional analysis of the accused Akoustis products. Tr. 1573:14-25. Dr. Heinrich explained that, using an electron microscope, he measured the physical structures of the accused products' BAW resonators. Tr. 1573:14-1580:6. Akoustis did not perform any cross-sectional analysis, and also did not present any measurements to rebut Dr. Heinrich's opinions.

Dr. Shanfield testified that he used computer simulations to determine the impact of the structural features on relevant performance criteria. Tr. 1376:16-1377:8. Multiple Qorvo and Akoustis witnesses confirmed that using such simulations is routine when designing BAW filters. *See, e.g.*, Tr. 385:12-386:2 (discussing Qorvo's use of simulations), 387:6-19 (same), 584:6-16 (same), 585:11-24 (same), 600:14-23 (explaining Akoustis use of simulations to design filters), 673:25-674:22 (same), 678:20-679:7 (same); 945:23-946:19 (same).

For the '018 patent, Dr. Shanfield testified that he used simulations to determine if the Akoustis products' resonator structure resulted in increased filter bandwidth. Tr. 1378:6-21, 1380:3-1382:22. Dr. Shanfield explained the simulations showed increased bandwidth because the structure resulted in lower energy loss at the edge of the frequency band, which "mak[es] a bigger bandwidth." Tr. 1382:1-14. For the '755 patent, Dr. Shanfield explained that he used simulations to determine if the Akoustis products' resonator structure prevented energy leakage in the relevant passband of the filter. Tr. 1382:22-1383:19, 1384:14-1385:3. Again, Dr. Shanfield testified the simulations proved the structure reduced leakage. Tr. 1384:14-1385:3. Akoustis did not perform any computer simulations (nor any other type of analysis) to rebut Dr. Shanfield's testimony.

Dr. Bravman testified that 18 Akoustis products infringe the '018 patent and 19 infringe the '755 patent. Tr. 1622:17-25. Dr. Bravman identified the evidence he relied upon, including Dr.

Heinrich's measurements and Dr. Shanfield's simulations, and he explained why Akoustis' products satisfy each claim limitation. Tr. 1590:15-1622:25. For example, Dr. Bravman testified that Dr. Shanfield's simulations proved that use of the patented structures in Akoustis' products resulted in increased bandwidth for the '018 patent and reduced energy loss for the '755 patent. Tr. 1609:15-1610:16 Tr. 1618:10-1619:8.

### H.   Akoustis Presents Testimony from Dr. Nguyen on Infringement

Akoustis presented testimony from Dr. Nguyen in an attempt to rebut Qorvo's infringement case. Dr. Nguyen did not: (i) perform a cross-sectional analysis; (ii) take any measurements of the accused products; or (iii) run any simulations to determine the impact of the structural features on performance. Instead, Dr. Nguyen offered criticisms of the evidence that Qorvo presented.

Dr. Nguyen argued that Dr. Shanfield's simulations were unreliable because he did not label the units of measurement on the vertical axis of certain graphs that explained the simulations' results. Tr. 2289:14-25, 2305:23-2306:22. Dr. Nguyen did not dispute that the graphs (and underlying simulations) compared energy loss. *See* Tr. 1379:24-1382:21, 1383:23-1385:3 (Dr. Shanfield explaining the simulations for the '018 and '755 patents). Moreover, Dr. Bravman testified that labeling units of measurement was not needed to prove infringement because the claims are directed to relative changes in performance, not any particular unit of measurement. Tr. 1640:13-1641:24. Dr. Nguyen disagreed with Dr. Bravman's testimony. Tr. 2308:23-2309:11.

Dr. Nguyen also argued that using simulations to test performance does not "make any sense." Tr. 2282:14-2283:3. Instead of performing simulations, Dr. Nguyen opined that Qorvo should have measured Akoustis' physical devices and compared the performance of those devices to "some nice matching circuit." Tr. 2292:11-23. He did not explain where Qorvo was supposed to obtain "some nice matching circuit." Nor did he explain why he failed to conduct physical testing if it was so easy. Dr. Nguyen also failed to explain why performance simulations were

inadequate when both Qorvo and Akoustis witnesses testified that companies routinely use simulations to determine performance in the ordinary course of business. *See* Part II.G, above.

### I.    The Jury Returns its Verdict

The jury returned a unanimous verdict, finding that Akoustis willfully and maliciously misappropriated 39 of Qorvo's trade secrets. The jury further found that Akoustis was unjustly enriched when it misappropriated 37 of those trade secrets. The jury awarded Qorvo $31,315,215 in compensatory damages and $7,000,000 in exemplary damages. The jury also found that Akoustis infringed the '018 and '755 patents and awarded Qorvo $279,808 in patent damages.

For the trade secret claims, Question 1(a) instructed the jury to "write 'YES' or 'No' in each column of the table below":

| ALLEGED TRADE SECRET | Has Qorvo established by the greater weight or preponderance of the evidence that (a) this alleged trade secret qualifies as a trade secret and (b) Akoustis is liable for trade secret misappropriation for this trade secret? | Has Qorvo established by a greater weight or preponderance of the evidence that Akoustis was unjustly enriched by misappropriating this trade secret? |
|---|---|---|
| Group 1 | | |
| 1.1 | yes | yes |
| 1.2 | yes | yes |
| 1.3 | yes | yes |

As reflected above, the first column of Question 1(a) had two sub-parts: "(a) this alleged trade secret qualifies as a trade secret"; and "(b) Akoustis is liable for trade secret misappropriation for this trade secret." The jury was required to write "No" in this column if either subpart was untrue. For the 46 alleged trade secrets, the Jury responded as follows to Question 1(a):

| No. of Alleged Trade Secrets | Response to Column 1 | Response to Column 2 |
|---|---|---|
| 37 alleged trade secrets | "Yes" | "Yes" |
| 2 alleged trade secrets | "Yes" | "No" |
| 5 alleged trade secrets | "No" | "Yes" |
| 2 alleged trade secrets | "No" | "No" |

Question 1(b) of the verdict form then asked the jury to specify the amount of unjust enrichment damages. The Court instructed the jury to limit the damages to only those alleged trade secrets for which the jury had answered "Yes" and "Yes" in Question 1(a):

> *IF YOU ANSWERED "YES" IN BOTH COLUMNS FOR ANY ALLEGED TRADE SECRET IN QUESTION 1(a), THEN ANSWER QUESTIONS 1(b) AND 1(c) BELOW. IF YOU DID NOT ANSWER "YES" IN BOTH COLUMNS FOR ANY ALLEGED TRADE SECRET IN QUESTION 1(a), WRITE "N/A" IN QUESTION 1(b) AND 1(c) AND MOVE ON TO QUESTION 2.*
>
> **Question No. 1(b):**
>
> State the amount Akoustis was unjustly enriched by misappropriating Qorvo's trade secrets as to which you have answered "Yes" and "Yes" in Question 1(a) above.
>
> $ 31,315,215.00

## III.    LEGAL STANDARD

Under Rule 59, a new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." The Third Circuit has held that "the district court's power to grant a new trial motion is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand." *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289 (3d Cir. 1993). "[T]he purpose of this rule is to ensure that the trial court does not supplant the jury verdict with its own interpretation of the facts." *Id.* at 290. For example, a new trial may be granted under Rule 59 when "the jury's verdict is against the clear weight of the evidence" such that "a miscarriage of justice would result if the verdict were to stand." *Carrier Corp. v. Goodman Glob., Inc.*, 162 F. Supp. 3d 345, 351 (D. Del. 2016).

Courts also recognize that a new trial may be warranted if the jury's verdict is inconsistent. *Monaco v. City of Camden*, 366 Fed. Appx. 330, 331 (3d Cir. 2010). "However, a court may order a new trial based on inconsistent verdicts only if no rational jury could have brought back the verdicts that were returned." *Id.* As such, "the court must view the facts in the light most favorable to the verdict." *Id.* at 332; *Gallich v. Baltimore & O.R. Co.*, 372 U.S. 108, 119 (1963) (courts have

a duty "to attempt to harmonize the answers, if it is possible under a fair reading of them.").

## IV.   ARGUMENT

Upholding the jury's verdict would not result in a miscarriage of justice.

### A.   Akoustis Does Not Identify Any Irreconcilable Inconsistency in the Verdict

Akoustis first argues that the Court should order a new trial because the jury returned an inconsistent verdict form. Mot. 14. This argument should be rejected on at least three grounds.

#### 1.   Akoustis waived its objection to the allegedly inconsistent verdict

First, Akoustis cannot object to the alleged inconsistency in the verdict because it failed to raise the objection before the Court discharged the jury. In *Frank C. Pollara Group, LLC v. Ocean View Investment Holding, LLC*, 784 F.3d 177 (3d Cir. 2015), the Third Circuit joined with "a number of our sister circuits and h[eld] that, if a party fails to object to an inconsistency in a general verdict before the jury is excused, that party waives any objection in that regard." *Id*. at 191; *see also Del. & Hudson Ry. Co. v. Knoedler Mfrs., Inc.*, 805 Fed.Appx. 149, 153-54 (3d Cir. Feb. 12, 2020) ("because CP did not challenge the verdict's inconsistency before the jury was discharged, CP has waived any subsequent challenge as to inconsistency."); *White v. Celotex Corp.*, 878 F.2d 144, 146 (4th Cir. 1989); *Brode v. Cohn*, 966 F.2d 1237, 1239 (8th Cir. 1992).

Here, after the verdict was read, the Court held a side bar and asked: "Anything else that we need to go over with the panel before I discharge the jury?" Akoustis responded: "No" and "I don't see anything in there." Tr. 2638:13-16. The court then discharged the jury. Tr. 2642:18-19. Under these circumstances, Akoustis cannot now object that the jury's answers in columns 1 and 2 of Question 1(a) are internally inconsistent.

#### 2.   The jury's findings are easily reconciled

Second, Akoustis' argument fails because the alleged inconsistencies in the verdict form can be reconciled. *See Monaco*, 366 Fed. Appx. at 331. Akoustis makes sweeping assertions that

the jury's verdict "was inconsistent on its face" and the "inconsistencies cannot be reconciled." Mot. 15. But Akoustis' argument only relates to five of the 46 trade secrets at issue in this case—Trade Secret Nos. 5.1, 5.2, 5.3, 7.1 and 7.4. For those five alleged trade secrets, the jury answered "No" in column 1 of Question 1(a), followed by a "Yes" in column 2:

| ALLEGED TRADE SECRET | Has Qorvo established by the greater weight or preponderance of the evidence that (a) this alleged trade secret qualifies as a trade secret and (b) Akoustis is liable for trade secret misappropriation for this trade secret? | Has Qorvo established by a greater weight or preponderance of the evidence that Akoustis was unjustly enriched by misappropriating this trade secret? |
|---|---|---|
| Group 5 | | |
| 5.1 | No | Yes |
| 5.2 | No | Yes |
| 5.3 | No | Yes |
| Group 7 | | |
| 7.1 | No | Yes |
| 7.4 | No | Yes |

Contrary to Akoustis' argument, these answers are easy to harmonize—the jury concluded that the five alleged trade secrets did not meet the statutory definition of a "trade secret" (subpart (a) of column 1), but concluded that Akoustis nonetheless stole the information from Qorvo (subpart (b) of column 1) and benefited from the use of that information (column 2).

This reconciliation of the allegedly inconsistent findings is consistent with the arguments and evidence advanced at trial. Akoustis argued that the alleged trade secrets did not qualify as trade secrets because the information was known outside of Qorvo. For example, Trade Secret Nos. 5.1, 5.2, and 5.3 relate to Qorvo's product development process and documents for tracking development phases. Tr. 551:6-557:23. Akoustis specifically argued that these alleged trade secrets were not "trade secrets" because the information was known. *See, e.g.*, Tr. 1774:21-1775:3 (Ms. Winters claiming to have studied "gate phasing" at Cornell), 1781:23-1782:4 (Ms. Winters purporting to provide examples of a phase gate process), 2110:1-19 (Dr. Darveaux claiming that the "concept or format" of product development stages and gates "has been around for some time"). Trade Secret No. 7.1 relates to Qorvo's procedures for qualifying packaging. Akoustis

argued that this information was known to companies that perform packaging. *See, e.g.*, Tr. 2137:6-2140:24. Trade Secret 7.4 relates to Qorvo's procedures for inspecting products. Again, Akoustis argued that this is a "common thing" that is done in "pretty much every factory." Tr. 2149:10-2150:4. Given these arguments, a rational jury could have answered "No" in column 1, finding that alleged Trade Secret Nos. 5.1, 5.2, 5.3, 7.1, and 7.4 did not qualify as "trade secrets" pursuant to the jury instructions. *See* D.I. 569 at 23 ("Secrecy").

Despite the jury's finding in column 1, it could have also rationally found that Akoustis misappropriated the alleged trade secrets from Qorvo and obtained an unjust benefit from using those trade secrets. *See* D.I. 569 at 29 ("'Use' of a Trade Secret"), 30 ("Trade Secret Damages Generally"). Qorvo presented extensive evidence that Akoustis (i) stole the confidential documents reflecting the five alleged trade secrets and (ii) used those documents. For example, Qorvo established that Jeffery Shealy stole a copy of Qorvo's confidential new technology development procedures (*see* Ex. 6), re-saved the document as the "Akoustis" new technology development procedure (*see* Ex. 205), revised the document (*see id.*; Tr. 835:23-838:14), and circulated the revised procedures to others at Akoustis (*see id.*). Qorvo similarly established that Robert Dry stole a copy of Qorvo's confidential product inspection procedures (*see* Ex. 40), modified those procedures (including by removing the Qorvo logo) (*see id.*), circulated the procedures to numerous other engineers at Akoustis (*see* Exs. 191, 196, 290), and scheduled meetings for the express purpose of reviewing and adopting the procedures at Akoustis (*see* Exs. 197, 292).

Given the evidence presented, even if the jury concluded that the alleged trade secrets did not meet the statutory definition of "trade secrets" (thus answering "no" in column 1 due to sub-part (a) of the question), the jury could also have rationally found that Akoustis misappropriated the alleged trade secrets and obtained an unjust benefit, thus answering "yes" in column 2.

### 3. Any inconsistency was harmless

Third, Akoustis' argument fails because the alleged inconsistences did not impact the award of damages and, as such, would not result in a "miscarriage of justice." Even if there were an irreconcilable inconsistency in a small subset of the jury's answers to Question 1(a) (there is not), that inconsistency had no impact on the overall verdict. Indeed, Question No. 1(b) ensured that the jury would only award damages for "trade secrets as to which you have answered 'Yes' and 'Yes' in Question 1(a) above":

**Question No. 1(b):**

State the amount Akoustis was unjustly enriched by misappropriating Qorvo's trade secrets as to which you have answered "Yes" and "Yes" in Question 1(a) above.

$ _31,315,215.00_

Not surprisingly, Akoustis studiously avoids any reference to Question 1(b) because it makes clear that Trade Secret Nos. 5.1, 5.2, 5.3, 7.1 and 7.4 were **not included** in the damages award. "Inconsistent jury verdicts are an unfortunate fact of life in law, and should not, in and of themselves, be used to overturn otherwise valid verdicts." *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000). Where, as here, the alleged inconsistency had no impact on the overall verdict, that inconsistency is not a "miscarriage of justice" and cannot provide a basis for a new trial. *Olefins*, 9 F.3d at 289 (new trial is only appropriate if the verdict would result in a "miscarriage of justice"); *Tviim, LLC v. Mcafee, Inc.*, 851 F.3d 1356, 1365 (Fed. Cir. 2017) (denying motion and holding "even if we were to find an inconsistent verdict … any potential error by the jury … was harmless"). As set forth in Rule 61, "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."

### B. Extensive Evidence Supports the Trade Secret Damages Award

Akoustis next seeks a new trial on trade secret damages, arguing that the jury's award is

"against the weight of the evidence" because it is based on inadmissible opinions from Melissa Bennis and Stanley Shanfield. Mot. 16. Akoustis argues that "all of Qorvo's evidence of the alleged 'head-start' or unjust enrichment should be excluded for its failure to use an accepted and documented methodology." Mot. 17. Akoustis raises the same arguments in support of its motion for judgement as a matter of law. *See* D.I. 610. Akoustis' arguments should be rejected for the reasons Qorvo sets forth fully in its JMOL answering brief and summarizes below.

First, the previously rejected challenges to Ms. Bennis' methodology lack merit. Ms. Bennis did not base her damages calculation on "bare revenue." Oppo. to D.I. 610, Parts II.D, IV.B.2.b. She used the "core financial principal" of the time value of money to determine Akoustis' benefit. *Id*. Contrary to Akoustis' claims, the economic benefit measured by the time value of money, as well as the manner of measuring that benefit, are widely accepted. *Id*. Also contrary to Akoustis' arguments, Ms. Bennis expressly considered Akoustis' costs and determined that those costs did not increase as a result Akoustis' misappropriation. *Id*., Parts II.D, IV.B.2.c.

Second, Akoustis waived the challenge to Dr. Shanfield's head-start methodology. *Id*., Part IV.C. Dr. Shanfield disclosed his opinions and the basis for those opinions in November 2023. Akoustis did not challenge the reliability of Dr. Shanfield's opinions under *Daubert* or seek to exclude those opinions either before or during Dr. Shanfield's testimony. Having failed to challenge that methodology, Akoustis is barred from doing so now in a post-trial motion. *Id*.

Third, the newfound arguments concerning Dr. Shanfield's "*ipse dixit*" opinions are meritless. *Id*. Dr. Shanfield testified for over three and a half hours, stepping though each alleged trade secret, identifying the value of that trade secret, and explaining how Akoustis benefited from the misappropriation. Throughout his testimony, Dr. Shanfield cited the exhibits and testimony that supported his opinions. Dr. Shanfield relied on that record evidence and his 40 years'

-17-

experience in the industry, to estimate the duration of Akoustis' head start. Dr. Shanfield also used Qorvo's experience as a benchmark to test the reasonableness of his estimates. *Id.*, Parts II.C, IV.C.

In the alternative to granting a new trial, Akoustis asks the Court to grant remittitur of the trade secret award to $305,000 on the grounds that Ms. Bennis and Dr. Shanfield offered inadmissible opinions. Mot. 17-18. This argument fails for the same reasons set forth above. Further, Akoustis does not satisfy the requirements for remittitur. The standard for granting remittitur is the same as the standard for granting a motion for judgment as a matter of law—the jury award is entitled to deference and reviewed for substantial evidence. *Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 3d 610, 625-26 (D. Del. 2018). Remittitur is only proper if "the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Id.* Akoustis does not argue the amount of the award is "grossly excessive or monstrous." For the reasons set forth above and in Qorvo's opposition to the JMOL motion, the award in this case is supported by substantial evidence.

### C.   The Weight of the Evidence Supports the Jury's Finding of Infringement

Akoustis argues that a new trial is required on the patent infringement claims because the jury purportedly disregarded the weight of the evidence. This argument is, again, meritless. The Third Circuit has explained that "[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *U.S. v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003). Akoustis fails to establish that this is such an "exceptional case." To the contrary, the jury's findings that Akoustis infringed the '018 and '755 patents are supported by the testimony of three experts. Dr. Heinrich performed a cross-sectional analysis to determine the dimensions of the accused products. Tr. 1573:1-25. Dr. Shanfield performed computer simulations to determine the impact of the accused resonators' performance—(i) whether adopting the '018 patent's structure resulted in increasing the

-18-

bandwidth; and (ii) whether adopting the '755 patent's structure resulted in reducing lateral leakage. Tr. 1379:24-1385:3. Based on Drs. Heinrich and Shanfield's analysis and Akoustis design and manufacturing documents, Dr. Bravman then explained, on a limitation-by-limitation basis, why the Akoustis products practiced the inventions of the '018 and '755 patents. Tr. 1590:15-1622:25.

Despite its arguments that the jury's verdict is "contrary to the weight of the evidence," Akoustis does not point to any evidence that rebuts the detailed analysis that Drs. Heinrich, Shanfield, and Bravman preformed and presented to the jury. For example, Akoustis did not perform a cross-sectional analysis or conduct performance simulations. Nor did Akoustis point to any contemporaneous engineering documents showing lack of infringement. Moreover, even if Akoustis had submitted contrary evidence (it did not), that would not provide grounds for a new trial. Courts routinely hold that "[w]here . . . the trial produces conflicting evidence subject to two interpretations, the court should not substitute its judgment for that of the jury and order a new trial." *See Repa v. Napierkowski*, 19-cv-0101, 2022 WL 3228207, at *9 (W.D. Pa. Aug. 10, 2022). Indeed, "when the evidence is in conflict, a trial judge should be more reluctant to grant a new trial." *GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co.*, 474 F. Supp. 1357, 1362 (W.D. Pa. 1979).

Unable to identify any evidence (much less the great weight of the evidence) contradicting the infringement finding, Akoustis reverts to criticisms that Dr. Nguyen levied at the simulations Dr. Shanfield performed. Akoustis argues the simulations were "unreliable" because Dr. Shanfield did not label units of measurement on certain graphs. But Akoustis never challenged the reliability of Dr. Shanfield's opinions under *Daubert*. Further, contrary to Akoustis' argument that Dr. Nguyen testified "without challenge" (*see* Mot. 18), Dr. Bravman expressly disagreed, testifying that providing labels for units of measurement was irrelevant because the claims are not limited to

any particular unit. *See* Tr. 1640:13-1641:24. The jury was free to weigh the credibility of the opposing expert. *See, e.g.*, *Gusdonovich v. Bus. Info. Co.*, 705 F. Supp. 262 (W.D. Pa. 1987) ("[D]isputes over testimony or the credibility of witnesses will not justify a new trial.").

Akoustis also argues, that the jury could not have credited Dr. Shanfield's simulations because Dr. Nguyen does not "think" simulation software is sufficiently precise to measure performance. Mot. 20. Again, Dr. Nguyen's testimony was not "without challenge"—both Dr. Shanfield and Dr. Bravman testified that the simulations did, in fact, reflect the performance aspects encompassed in the asserted claims of the '018 and '755 patents. Tr. 1379:24-1385:3, 1609:15-1622:25. Moreover, Dr. Nguyen's skepticism of simulations is contrary to testimony from both Qorvo and Akoustis fact witnesses. *See* Part II.G, above.

Finally, Akoustis argues that the '755 and '018 patent claims require evaluating performance "over the entire band pass." Mot. 19-20. Akoustis cites 22 lines of Dr. Nguyen's testimony in support of this position. *Id*. There are at least two fundamental problems with this argument. First, Akoustis did not seek to construe the '018 or '755 patent claims to require evaluation of performance across "the entire band pass." Indeed, even in its post-trial brief, Akoustis does not identify where that supposed limitation is found in the claims. Second, as with Dr. Nguyen's other criticisms, Drs. Shanfield and Bravman offered contrary testimony. For example, Dr. Shanfield explained that to evaluate whether a design improves the bandwidth of a filter, it is necessary to look at the band edges (which control bandwidth), not at "the entire band pass." Tr. 1381:16-1382:14. Both Dr. Shanfield and Dr. Bravman testified that the simulations confirmed the performance benefits required by the claims. Tr. 1379:24-1385:3, 1609:15-1610:16; 1618:10-1620:4. Again, the jury was free to weigh the credibility of these competing opinions.

## V.    CONCLUSION

For the reasons set forth above, the Court should deny Akoustis' motion.

███████████████████

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ *Jeremy A. Tigan*
_____

OF COUNSEL:

Robert M. Masters
Jonathan R. DeFosse
Timothy P. Cremen
Roy D. Jung
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006-6801
(202) 747-1900

Zachary Alper
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, CA  92130-4092
(858) 720-8900

Kazim A. Naqvi
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA  90067
(310) 228-3700

Jennifer Klein Ayers
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
(469) 391-7400

July 25, 2024

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Qorvo, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 25, 2024, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                    *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Ronald S. Lemieux, Esquire                       *VIA ELECTRONIC MAIL*
David S. Elkins, Esquire
Victoria Q. Smith, Esquire
SQUIRE PATTON BOGGS (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA  94304-1216
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Xiaomei Cai, Esquire                             *VIA ELECTRONIC MAIL*
SQUIRE PATTON BOGGS (US) LLP
2325 E. Camelback Road, Suite 700
Phoenix, AZ  85016
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

Rachael A. Harris, Esquire                       *VIA ELECTRONIC MAIL*
Matthew A. Stanford, Esquire
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
*Attorneys for Defendants Akoustis*
*Technologies, Inc. and Akoustis, Inc.*

*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)