## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF DELAWARE

QORVO, INC.

        Plaintiff,

v.

AKOUSTIS TECHNOLOGIES, INC. and
AKOUSTIS, INC.

        Defendants.

C.A. No. 21-1417 (JPM)

**JURY TRIAL DEMANDED**

## THE AKOUSTIS DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## MOTION FOR A NEW TRIAL OR IN THE ALTERNATIVE REMITTITUR

OF COUNSEL:

SQUIRE PATTON BOGGS (US) LLP

Ronald S. Lemieux
David S. Elkins
Victoria Q. Smith
1841 Page Mill Road, Suite 150
Palo Alto, California 94304
(650) 856-6500
ronald.lemieux@squirepb.com
david.elkins@squirepb.com
victoria.smith@squirepb.com

Rachael A. Harris
Matthew A. Stanford
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

Xiaomei Cai
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
(602) 528-4000

Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Defendants Akoustis
Technologies, Inc. and Akoustis, Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

I.    INTRODUCTION ........................................................................................................... 1

II.   FACTUAL BACKGROUND ........................................................................................... 2

    A.  Qorvo's Trade Secret Misappropriation Claims ................................................. 2

    B.  Pre-Trial Proceedings ......................................................................................... 3

    C.  Qorvo's Trade Secret Misappropriation Benefit Calculation ........................ 3

        1.  Dr. Shanfield's Testimony About How He Calculated The Duration Of Akoustis' Head Start ...................................................... 4

        2.  Ms. Bennis' Testimony About How She Calculated The Monetary Value Of Akoustis' Head Start/Unjust Enrichment ................................... 6

        3.  Akoustis' Rule 50(a) Motions At Trial ................................................... 7

        4.  Akoustis' Expert Testimony on Damages ...................................................... 8

    D.  Qorvo's Patent Infringement Claims ................................................................. 8

    E.  The Jury Verdict ................................................................................................. 11

III.   LEGAL STANDARD FOR A NEW TRIAL OR REMITTITUR ................................... 13

IV.   ARGUMENT ................................................................................................................. 14

    A.  The Court Should Grant A New Trial On Damages Based On The Inconsistent Verdict Form ..................................................................................... 14

    B.  The Court Should Grant A New Trial On Damages Or In The Alternative Order Remittitur Because The Jury Verdict Was Against The Weight Of Evidence In View Of The Inadmissible Damages Expert Testimony ..................................................................................... 16

    C.  A NEW TRIAL SHOULD BE ORDERED ON THE PATENT INFRINGEMENT CLAIMS BECAUSE THE JURY'S VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE. ............................ 18

VI.   CONCLUSION ............................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Inc. v. Wi-LAN Inc*.,
  25 F.4th 960 (Fed. Cir. 2022) ...................................................................................17

*Bhaya v. Westinghouse Elec. Corp.*,
  922 F.2d 184 (3d Cir. 1990)......................................................................................14

*Callaway Golf Co. v. Acushnet Co.*,
  576 F.3d 1331 (Fed. Cir. 2009).............................................................................15, 17

*Carrier Corp. v. Goodman Glob., Inc.*,
  162 F. Supp. 3d 345 (D. Del. 2016) ..........................................................................15

*Custer v. Terex Corp.*,
  196 Fed. Appx. 733 (11th Cir. 2006) ........................................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...................................................................................3, 4, 5, 6

*Essex v. Prince George's County Maryland*,
  17 Fed. Appx. 107 (4th Cir. 2001) ............................................................................14

*Evans v. Port Auth. of N.Y. & N.J.*,
  273 F.3d 346 (3d Cir. 2001)......................................................................................18

*Georgia-Pac. Corp. v. U.S. Gypsum Co.*,
  195 F.3d 1322 (Fed. Cir. 1999).................................................................................18

*Gumbs v. Pueblo Int'l, Inc.*,
  823 F.2d 768 (3d Cir. 1987)......................................................................................17

*Holmes v. Wack*,
  464 F.2d 86 (10th Cir. 1972) ....................................................................................18

*Huston v. Thomas Shows, Inc.*,
  587 F.2d 375 (8th Cir. 1978) ....................................................................................15

*LG Elecs. USA, Inc. v. Whirlpool Corp.*,
  798 F. Supp. 2d 541 (D. Del. 2011)...........................................................................13

*Malley-Duff & Assocs., Inc. v. Crown Life Ins*.,
  734 F.2d 133 (3d Cir. 1984)......................................................................................16

1101786398\17\AMERICAS

*McMillan v. Weeks Marine, Inc.*,
   478 F. Supp. 2d 651 (D. Del. 2007) ....................................................................14, 17

*MFS, Inc. v. DiLazaro*,
   771 F. Supp. 2d 382 (E.D. Pa. 2011) .........................................................................14

*Monaco v. City of Camden*,
   366 Fed. Appx. 330 (3d Cir. 2010) .............................................................................14

*Roebuck v. Drexel Univ.*,
   852 F.2d 715 (3d Cir. 1988) .......................................................................................14

*Shopify Inc. v. Express Mobile, Inc.*,
   No. CV 19-439 RGA, 2024 WL 2260900 (D. Del. May 17, 2024) ....................19, 20

*Virginian Ry. Co. v. Armentrout*,
   166 F.2d 400 (4th Cir. 1948) ......................................................................................14

*Will v. Comprehensive Accounting Corp.*,
   776 F.2d 665 (7th Cir. 1985) ......................................................................................15

*Williamson v. Consol. Rail Corp.*,
   926 F.2d 1344 (3d Cir. 1991) .....................................................................................13

**Statutes**

18 U.S.C. § 1836(b)(3)(B) .....................................................................................................2

N.C. Gen. Stat. § 66-154(b) ...................................................................................................2

**Other Authorities**

11 Fed. Prac. & Proc. Civ. § 2815 (3d ed.) ..........................................................................18

Fed. R. Civ. P. 59 ..........................................................................................................1, 13, 14

*https://en.wikipedia.org/wiki/Gantt_chart* (last accessed June 13, 2024) .........................5

1101786398\17\AMERICAS

## I.   <u>INTRODUCTION</u>

Pursuant to Fed. R. Civ. P. 59, Defendants Akoustis Technologies, Inc. and Akoustis, Inc. ("Akoustis") move this Court for a new trial on Plaintiff Qorvo, Inc. ("Qorvo") claims for patent infringement, damages for trade secret misappropriation, or in the alternative remittitur of the jury's award on trade secret damages.

First, the Court should grant a new trial on trade secret damages because the jury returned an inconsistent verdict form and allowing that form to stand would be manifestly unjust. On the trade secrets claim, the jury was asked for each alleged trade secret whether (1) the information qualified as a trade secret and was misappropriated by Akoustis; and (2) Akoustis was unjustly enriched by any such misappropriation. For more than 10% of the alleged 46 trade secrets, the jury returned an inconsistent verdict—answering "no" to the first question, and "yes" to the second—showing a misunderstanding of the law and jury instructions on this claim. The Court should grant a new trial on trade secret damages to allow for correction of this error.

Second, the Court should also grant a new trial on damages, or in the alternative remittitur, because Akoustis suffered extreme and manifest prejudice when the Court allowed Ms. Bennis to testify and provide an opinion on Qorvo's claim for unjust enrichment. For the same reasons set forth in Akoustis' Renewed Motion for Judgment as a Matter of Law (filed concurrently herewith), Ms. Bennis' testimony was unreliable and inadmissible because she (1) calculated unjust enrichment using a *sui generis*, untested, and unreliable methodology; (2) based her calculation on all of Akoustis' revenue, even revenue completely untethered to the trade secrets at issue; and (3) relied on Dr. Shanfield's improper conclusion that Akoustis obtained a 55-month head start, even though Dr. Shanfield admitted that he had not reviewed any of the Defendants' actual manufacturing processes or materials used at its New York fabrication facility nor could he point to or identify any peer-reviewed articles, scholarly publications or case law to support his arbitrary

and *ipse dixit* methodology for calculating the alleged head start.  Allowing the verdict for unjust enrichment to stand based on the impermissible combination of Ms. Bennis' unreliable testimony and Dr. Shanfield's speculative calculation of the alleged unjust enrichment or "head start" is manifestly unsupported by any reported decisions of this Court or the Third Circuit. Akoustis respectfully requests that the Court either grant a new trial on trade secret damages or grant remittitur in the amount of that proposed by Akoustis' expert—$305,000.

Finally, Akoustis respectfully requests a new trial on the issue of alleged patent infringement. The jury's verdict was against the clear weight of the evidence presented at trial and constitutes a manifest miscarriage of justice.  On their face, the graphs resulting from Dr. Shanfield's simulations that were presented at trial fail to prove the increase in performance across the entire pass band of the device as required by the claims.  Without such evidence, Qorvo fails to satisfy its burden of proof regarding infringement and the jury's verdict must be set aside.

## II.   FACTUAL BACKGROUND

### A.   QORVO'S TRADE SECRET MISAPPROPRIATION CLAIMS

Qorvo's Second Amended Complaint, the operative pleading in this case, alleged counts for misappropriation of trade secrets under both the Defend Trade Secrets Act ("DTSA") and the equivalent North Carolina state law statute.  (D.I. 125.)

The DTSA provides three forms of monetary recovery for trade secret misappropriation: (i)(a) actual loss caused by the misappropriation of the trade secret; and (i)(b) unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; *or* (ii) in lieu of the other two methodologies, the imposition of a reasonable royalty for the unauthorized disclosure or use of the trade secret. 18 U.S.C. § 1836(b)(3)(B). The North Carolina trade secret law is virtually identical. *See N.C. Gen. Stat. § 66-154(b)*. Qorvo chose to pursue  a theory of unjust enrichment to Akoustis as it only remedy.  (*See* D.I. 456-458.)

- 2 -

## B.   PRE-TRIAL PROCEEDINGS

As discussed more completely in its concurrently filed motion under Rule 50(b), Akoustis moved before trial pursuant to Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–92 (1993) to exclude the testimony and opinions of Melissa Bennis, Qorvo's sole expert on the monetary value of Akoustis' alleged head start or unjust enrichment.  (D.I. 456, 457, 458 ("Bennis *Daubert* Motion").)  There, Akoustis argued Ms. Bennis' opinion regarding the monetary value of Akoustis' head start/unjust enrichment is based on an unsound methodology and thus unreliable.

Despite the Court's recognition that "Ms. Bennis' method lacks a testable hypothesis and Plaintiffs have not shown it is subject to peer review…," the Court decided to permit the testimony. The Court stated its belief that Ms. Bennis' methodology was "well-based in accepted techniques," and that the "only distinction between Ms. Bennis' technique and that accepted by other courts is the substitution of revenue as an input for profit or incremental increase in business value."  (D.I. 553 at 5-6.)

## C.   QORVO'S TRADE SECRET MISAPPROPRIATION BENEFIT CALCULATION

At trial, Ms. Bennis' trial testimony unfolded in a manner consistent with her expert damages report and deposition testimony, as foretold by the Bennis *Daubert* Motion.  Ms. Bennis neither calculated nor provided an opinion regarding Qorvo's actual damages, if any, or damages in the form of a reasonable royalty.  (Decl. of David S. Elkins in Support of Akoustis' Motion for Judgement as Matter of Law ("Elkins Decl.") Ex. A (Trial Transcript) at 1722:2-10.)  Ms. Bennis' only opinion on trade secret misappropriation was her opinion regarding the calculation of the unjust enrichment benefit to Akoustis based on a head start theory.  (*Id.* at 1718:20-1719:1.) Ms. Bennis' head start unjust enrichment benefit calculation turned on Dr. Shanfield's conclusion

- 3 -

regarding the duration of the purported "head start" and her decision to use a *sui generis* and untested methodology for calculating that benefit monetarily.  (*Id.* at 1693:1-14.)

### 1. Dr. SHANFIELD'S TESTIMONY ABOUT HOW HE CALCULATED THE DURATION OF AKOUSTIS' HEAD START

As noted, Ms. Bennis relied exclusively on Dr. Shanfield's testimony as the foundation and only evidentiary support for the scope or duration of Akoustis' alleged head start. Dr. Shanfield testified about both the cumulative 55-month head start and the duration of the alleged head start for each of the eight trade secrets groups that Qorvo pursued at trial.

During cross-examination, however, Dr. Shanfield could not identify the sources for his opinions regarding the duration of either the 55-month cumulative head start or the specific head start period for each alleged trade secret or trade secret group.  Asked about the bases for his head start periods, Dr. Shanfield initially testified that he "considered where I could find information that would give me a reference point." (*Id.* at 1392:19-1393:8.)  But he was unable to tie a specific source to a specific head start duration for any of the alleged trade secret groups.  Rather, Dr. Shanfield's testimony made clear that he did not know from where he drew the head start durations.

For example, at one point he testified that he relied on "an old friend who had set up a facility" to determine head start durations.  (*Id.* at 1397:11-19.)  But Dr. Shanfield was later forced to admit that he could not have actually relied on that "old friend" because no such reference appeared in his expert report.  (*Id.* at 1397:20-1398:5.)  Dr. Shanfield also claimed he had "talked with people at Qorvo about all of these items.  I didn't necessarily think they had the only word on it, but I reviewed them to make sure what they were saying." (*Id.* at 1398:6-14.)  When pushed to identify the specific individuals at Qorvo he spoke to, however, Dr. Shanfield could only identify Qorvo's Dr. Aigner – but even then, he could not link his discussions with Dr. Aigner to

- 4 -

a head start duration for any particular trade secret or group of trade secrets.  (*Id.* at 1398:15-1399:9.)

Similarly, Dr. Shanfield testified that he *thought* that he reviewed a peer-reviewed article or other trade publication in determining the duration of the head start for reliability testing.  (*Id.* at 1395:3-19.)   Ultimately, however, he was unable to name a specific publication and was eventually again compelled to admit that he must not have done so because he was unable to identify the publication or whether that publication was listed in his expert report.  (*Id.* at 1395:3–19; 1396:11–22.)

Dr. Shanfield also admitted that he did not account for the real-world circumstances of Akoustis (and specifically Akoustis' acquisition of the New York Fab facility and its library of processes and development documents) when determining the appropriate head start period for Group 5, related to the creation of technology development processes:

> Q.      And in your evaluation of the head start that was allegedly provided here, did you review at all the library of processes and development documents that were already in place at the New York fab facility?
>
> A.      I don't recall, frankly. There's so many documents. I have to go back in my report and check.
>
> Q.      I can tell you, Dr. Shanfield, you did not. At least it was not listed in your report as items that you had reviewed in arriving at your opinion.
>
> A.      Okay.

(*Id.* at 1412:6-1413:1; 1414:15-25.)

Finally, even though his ultimate opinion was expressed in the form of a time-based "head start," when asked about the Gantt chart[1] presented to the jury as an exhibit (Tr. Ex. 228 (Appx 5

---

[1] A Gantt chart is a type of bar chart reflecting a project schedule; the tasks to be performed are shown on the vertical axis, and time intervals on the horizontal axis.  *See* https://en.wikipedia.org/wiki/Gantt_chart (last accessed June 13, 2024).

to Dr. Shanfield's Expert Report)) to support his testimony regarding the length of the alleged head start, Dr. Shanfield admitted that although the information was presented in the form of a Gantt chart, it was not really a Gantt chart and the time variables indicated on the chart were just "arbitrary" and not really related to time. (*Id.* at 1386:14-1387:2; 1387:19-1388:3.)

### 2.   MS. BENNIS' TESTIMONY ABOUT HOW SHE CALCULATED THE MONETARY VALUE OF AKOUSTIS' HEAD START/UNJUST ENRICHMENT

After the conclusion of Dr. Shanfield's testimony, Qorvo called Ms. Bennis to testify regarding the monetary amount by which Akoustis was allegedly unjustly enriched by this 55-month head start. Before she did so, Akoustis renewed its Bennis *Daubert* Motion. The Court denied the renewed motion. (*Id.* at 1682:2-20.)

Ms. Bennis made clear that she relied on Dr. Shanfield's opinion regarding the 55-month duration of the head start in estimating the unjust enrichment benefit to Akoustis. (*Id.* at 1693:1-14; 1716:13-25 (relying on Appendix C of her report, which also reflected Dr. Shanfield's analysis, which considered a period of 55 months, and also the alleged benefit in monthly increments); 1760:22-24 ("Q. And was your analysis based upon the 55-month head start that Dr. Shanfield opined to during trial? A. Yes.").) Ms. Bennis testified how her benefit calculation measured the difference between (i) the revenue that Akoustis actually received with (ii) the but-for world where Akoustis would have received the same amount of revenue after a 55-month delay, where both amounts are discounted to present value as of June 30, 2024 using a 14.8% weighted average cost of capital. (*Id.* at 1693:15-1698:12.) Subtracting the but-for world revenue from the actual world revenue resulted in a difference – and thus "benefit" of the head start – of $66,114,093. (*Id.* at 1698:13-25.) She then testified that using the more up-to-date revenue data for Akoustis fourth quarter of fiscal year 2024 to which David Aichele had testified earlier, "you get a total head[ ]start damages figure of [$]50.3 million." (*Id.* at 1699:17-1700:5.) She could have based her calculation

- 6 -

of Akoustis' head start benefit on any increased company value derived from the head start but chose not to do so.  (*Id.* at 1732:15-22.)

Ms. Bennis had never before estimated the benefit of a head start in a trade secret case before this one.  (*Id.* at 1735:14-20.)  She could not identify a single case where a court approved using her *sui generis* head start calculation methodology.  (*Id.* at 1736:1-5.)  She could not identify a single publication approving the use of revenue as the basis for estimating a head start benefit in a trade secret case.  (*Id.* at 1736:6-16.)  She acknowledged that Qorvo chose not to estimate Akoustis' benefit under any other form of unjust enrichment, including Akoustis' avoided costs. (*Id.* at 1725:13-1726:2.)

### 3.   AKOUSTIS' RULE 50(A) MOTIONS AT TRIAL

After Ms. Bennis testified, Akoustis orally moved pursuant to Rule 50(a) for judgment as a matter of law with respect to, among other things, the trade secret unjust enrichment calculation (including that component of Qorvo's claim under the North Carolina Unfair and Deceptive Trade Practices Act).  Without any admissible evidence on which to base her calculation, the existing unreliability of Ms. Bennis' opinion testimony (as established in the Bennis Daubert Motion) was compounded by her reliance on Dr. Shanfield's unreliable and inadmissible opinion regarding the duration of the asserted head start.  Akoustis argued "that t[w]o expert witnesses are combining unreliable opinions to spin a [tale] of head[ ]start fantasy[,] render[ing] the Court's gatekeeping role even more imperative in this case than it usually is.  The Court should instruct the jury to disregard the two opinions, and without admissible evidence regarding the value of Akoustis'[] purported head[ ]start benefit, that issue should be removed from the jury's purview."  (*Id.* at 1762:8-1764:16.)  The Court denied that motion.  (*Id.* at 1766:4-8.)

- 7 -

### 4.   AKOUSTIS' EXPERT TESTIMONY ON DAMAGES

Akoustis then called its witnesses, including its damages expert, Carlyn Irwin.  Ms. Irwin testified regarding the flaws in Ms. Bennis' methodology, and also provided an alternative theory of unjust enrichment in the form of avoided costs.  Ms. Irwin confirmed the information contained in her expert report and explained that even assuming Akoustis' liability for trade secret misappropriation, the damages should amount to no more than $305,000 in avoided costs.  (*See id*. at 2341:3-10.)  Qorvo did not challenge Ms. Irwin's opinion at trial.

### D.   QORVO'S PATENT INFRINGEMENT CLAIMS

At trial, Qorvo asserted claims for infringement of claims 1 and 12 of U.S. Patent No. 7,522,018 ("'018 Patent") and claims 9 and 10 of U.S. Patent No. 9,735,755 ("'755 Patent"). Qorvo relied on expert testimony from three experts: Dr. Helge Heinrich, Dr. Stanley Shanfield, and Dr. John Bravman.  Dr. Heinrich analyzed samples of the alleged Akoustis devices by cutting each device in half to create a cross section, imaging the cross section using microscopy imaging, and measuring the dimensions of various layers and structures within each of the devices.  (*See id. at* 1578:19-1580:6.)  Dr. Shanfield claimed to create computer simulations to estimate the performance of the alleged Akoustis devices, using the measurements from Dr. Heinrich for some of the multitude of variables and parameters necessary for the simulations.  (*Id*. at 1459:19–1460:13.)

Dr. Shanfield presented his simulations in the form of two plot graphs. Dr Shanfield testified that one plot graph showed that the performance of the claimed resonator increased when the top electrode is thinner than the bottom electrode, as compared to a resonator in which the top and bottom electrodes have the same thickness, as required by the '018 patent.  (*Id*. at 1379:24 – 1382:21.)  The other plot graph purported to show that the relative thickness differential between certain layers in the outer region and the active region of the BAW resonator created in Akoustis'

filter products are acoustically matched in such a manner that one or more wavelengths that cause energy leakage into the outer region are not excited in the active region, as required by the '755 patent. (*Id*. at 1383:2 – 1385:3.) Dr. Shanfield subsequently admitted, however, that he was forced to correct an error in the simulation graphs initially proffered in support of the alleged infringement of the '755 patent by the alleged Akoustis devices. (*Id*. at 1461:16-1462:2.)

During cross-examination, Dr. Shanfield admitted that the simulations were an attempt to project what actual testing would have shown, though he admitted he did not conduct any physical testing of the Akoustis products. (*Id*. at 1458:19-25.) Dr. Shanfield also stated that all computer simulations consist of multiple variables, each of which must be correct in order for the results to be correct and useful. (*Id*. at 1460:5-13.)

Dr. Bravman provided an expert opinion on behalf of Qorvo that the alleged Akoustis products infringed the '018 and '755 patents based on the cross-sections and measurements from Dr. Heinrich and the simulation graphs from Dr. Shanfield. (*See id*. at 1645:1-5.) Dr. Bravman's infringement opinion is predicated on the accuracy and reliability of Dr. Heinrich's and Dr. Shanfield's analyses. (*Id*. at 1604:14-15 (Q. And did you also rely on Dr. Shanfield's simulations? A. Yes.); 1645:1-5 (Q. Okay. And so it's fair to say that your infringement opinion, then, is based upon the simulations run by Dr. Shanfield, in part, and in part by the testing done by Dr. Heinrich? A. Of course.). Despite relying on the simulation graphs from Dr. Shanfield to conclude that the alleged Akoustis devices infringed the '018 and '755 patents, Dr. Bravman could not explain the fundamental information necessary to understanding any plot graph—namely its units of measurement. When asked to identify the unit of measurement used for the vertical axis representing the lateral energy flux, Dr. Bravman admitted "I don't know what the unit is." (*Id*. at 1640:18-22.)

Dr. Bravman also acknowledged that the initial infringement opinion included in his expert report with respect to the '755 patent was based on the erroneous simulation plot graphs included in Dr. Shanfield's initial report and it was not until months later that Dr. Bravman realized the error.  (*Id*. at 1646:24-1647:3 (Q. And so your infringement opinion, then, relied on something that ultimately turned out to be not correct, which you [only] noticed months later; is that right? A. That's right.).)

Akoustis' patent expert, Dr. Clark Nguyen, testified at trial regarding the accuracy and reliability of the simulation graphs provided by Dr. Shanfield, and found multiple critical and unchallenged problems with the simulation graphs and the data shown therein.

For example, when discussing the '018 patent, Dr. Nguyen testified that "this is the simulation that was submitted to claim that this last part of that Element 1C in the '018 Patent was infringed. However, if you look at this data, there are some significant problems with that data."  (*Id*. at 2289:16-20.)   When discussing the simulations related to the '755 patent, Dr. Nguyen testified that the results shown in the simulation graphs do not show infringement by the accused Akoustis devices.  (*See id*. at 2305:1-19.)

Dr. Nguyen explained that the foundational premise of the plot graphs used by Dr. Shanfield and Dr. Bravman to establish infringement was not reliable.   Fundamentally, Dr. Nguyen testified that the lack of units on the vertical axis of plot graphs means the simulation graphs cannot be interpreted or understood.  For example, Dr. Nguyen stated: "There are no units here. That is a huge issue… You can't just put up a plot with no units and say, all right, there it is. We need units to know exactly what we're looking at."  (*Id*. at 2305:23-2306:12.)  In addition, Dr. Nguyen testified that the values of lateral energy flux being plotted are so small ($10^{-19}$ and $10^{-}$

[20]) that the "the precision of the software, I don't think, is good enough to predict losses this small." (*Id*. at 2307:22-2308:7.)

Finally, Dr. Nguyen demonstrated that even if you accepted the graphs as accurately depicting the predicted results of actual testing, the results of the testing were inconclusive and self-contradicting.  For example, the claim limitations of the '018 Patent require an increase in performance across the ***entire pass band***, not just isolated portions thereof.  (*See id*. at 2290:1-11; 2293:2-12; 2304:12-2305:19.)  Tellingly, Qorvo did not cross-examine Dr. Nguyen on any of these points.

### E.     THE JURY VERDICT

After hearing the testimony, the jury rendered a verdict in favor of Qorvo on the patent infringement claims and the federal and state law trade secret misappropriation claims.  For the trade secret misappropriation claims, the jury was asked to find whether for each of the 46 alleged trade secrets Qorvo had established by the greater weight or preponderance of the evidence that (a) this alleged secret qualifies as a trade secret; and (b) Akoustis is liable for trade secret misappropriation of the trade secret.  In the second column, the jury was asked "Has Qorvo established by the greater weight or preponderance of the evidence that Akoustis was unjustly enriched by misappropriating this trade secret."  (D.I. 601)

**For each of the ALLEGED TRADE SECRETS that Plaintiff Qorvo presented at trial, please answer the following questions as instructed in this section:**

**Question No. 1(a):**

*Please write "YES" or "NO" in each column of the table below.*

| ALLEGED TRADE SECRET | Has Qorvo established by the greater weight or preponderance of the evidence that (a) this alleged trade secret qualifies as a trade secret and (b) Akoustis is liable for trade secret misappropriation for this trade secret? | Has Qorvo established by a greater weight or preponderance of the evidence that Akoustis was unjustly enriched by misappropriating this trade secret? |
|---|---|---|

1101786398\17\AMERICAS

On the final verdict form, the jury answered in the following manner two subparts of Question 1: For 37 of the 46 alleged trade secrets, the jury answered yes to both columns.  As seen below, for two of the remaining trade secrets, the jury answered no to both columns.  For two others, the jury answered yes to the first column and no to the second.  Finally, as seen in the screenshot below, for the remaining five trade secrets, the jury answered no to the first column and yes to the second.

| | | |
|---|---|---|
| Group 5 | | |
| 5.1 | No | Yes |
| 5.2 | No | Yes |
| 5.3 | No | Yes |
| 5.4 | Yes | Yes |
| 5.5 | Yes | Yes |
| Group 6 | | |
| 6.1 | Yes | No |
| 6.2 | No | No |
| 6.3 | Yes | Yes |
| 6.4 | Yes | Yes |
| 6.5 | Yes | Yes |
| 6.6 | Yes | Yes |
| Group 7 | | |
| 7.1 | No | Yes |
| 7.2 | Yes | No |
| 7.3 | No | No |
| 7.4 | No | Yes |

The jury then awarded Qorvo $31,315,215.00 on the trade secret claims, based on the theory of unjust enrichment.  (*Id.*)

Before the final verdict form was submitted to the jury, Akoustis proposed multiple different verdict forms.  Before trial began, Akoustis proposed a verdict form that for each alleged trade secret, asked the jury to make specific findings.  (D.I. 536.)  If the jury answered "no" to any individual question, it would not answer the next question in line. For example, if the jury answered "no" to the first four questions regarding the existence of a trade secret, it would not be asked to evaluate whether the alleged trade secret was misappropriated or whether there was any unjust enrichment.  (*See id.* at 3 (instructing jury not to answer additional questions if it does not first find the existence of a trade secret).)

After the Court rejected that initial proposed form, Akoustis proposed during trial a slightly modified form.  (Elkins Decl. Ex D (May 6, 2024 email and attachment).)  That proposed form provided instructions and sought to ask the jury to determine the following:[2]

**For each of the ALLEGED TRADE SECRETS that Plaintiff Qorvo presented at trial, please answer the following questions as instructed in this section:**

**Question No. 1(a):**

~~*Please write "YES" or "NO" in each column of the table below.*~~ *For each ALLEGED TRADE SECRET, first write "YES" or "NO" in Column 1. If you answered "YES" in Column 1 for any ALLEGED TRADE SECRET, then answer the questions in Columns 2 and 3. If you answered "NO" in Column 1 for any ALLEGED TRADE SECRET, then write "N/A" in Columns 2 and 3.*

| ALLEGED TRADE SECRET | (1) Has Qorvo established by the greater weight or preponderance of the evidence that the alleged trade secret qualifies as a trade secret? | (2) Has Qorvo established by the greater weight or preponderance of the evidence that Akoustis is liable for trade secret misappropriation for this trade secret? | (3) Has Qorvo established by a greater weight or preponderance of the evidence that Akoustis was unjustly enriched by misappropriating this trade secret? |
|---|---|---|---|
| 1 | | | |

The Court did not accept this proposal.  After some additional discussion the Court adopted the verdict form ultimately submitted to the jury.  (*See* D.I. 601.)  The jury also rendered a verdict in favor of Qorvo on the patent infringement claims, finding that the accused Akoustis devices infringed claims 1 and 12 of the '018 patent and claims 9 and 10 of the '755 patent.  (*See* D.I. 601.)

## III.   LEGAL STANDARD FOR A NEW TRIAL OR REMITTITUR

A new trial may be granted "on all or some of the issues . . . after a jury trial." Fed. R. Civ. P. 59(a). A new trial is warranted where the "damages award is excessive," or the verdict "was against the weight of the evidence [and] a miscarriage of justice would result" if the verdict is allowed to stand.  *Williamson v. Consol. Rail Corp.,* 926 F.2d 1344, 1352 (3d Cir. 1991); *LG Elecs. USA, Inc. v. Whirlpool Corp.,* 798 F. Supp. 2d 541, 558 (D. Del. 2011). A new trial also may be

---

[2] The tracked changes in this image reflect Akoustis' proposed changes to the Court's proposed jury verdict form. Elkins Decl. Ex. D.

granted even if there is legally sufficient evidence precluding judgment as a matter of law. *Roebuck v. Drexel Univ.,* 852 F.2d 715, 735–36 (3d Cir. 1988).  The "court need not view the evidence in the light most favorable to the verdict winner, a distinction from similar motions under Rule 50." *McMillan v. Weeks Marine, Inc.,* 478 F. Supp. 2d 651, 655 (D. Del. 2007).  Ultimately, "[w]hile according due respect to the findings of the jury," a trial judge "should not hesitate to set [it] aside [and order a] new trial in any case where the ends of justice so require." *Virginian Ry. Co. v. Armentrout,* 166 F.2d 400, 408 (4th Cir. 1948).

## IV.   ARGUMENT

### A.   THE COURT SHOULD GRANT A NEW TRIAL ON DAMAGES BASED ON THE INCONSISTENT VERDICT FORM

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1).  "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court."  *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir. 1990).  Among other reasons, a new trial may be granted when the verdict is contrary to the great weight of the evidence or when there were erroneous rulings that caused substantial prejudice to the moving party.  A verdict is contrary to the great weight of the evidence when "a miscarriage of justice would result if the verdict were to stand or when the court believes the verdict results from jury confusion."  *MFS, Inc. v. DiLazaro*, 771 F. Supp. 2d 382, 464 (E.D. Pa. 2011).

As multiple federal courts have recognized, "the proper remedy for an inconsistent verdict [is] a new trial." *Essex v. Prince George's County Maryland,* 17 Fed. Appx. 107, 117 (4th Cir. 2001) (citation omitted); *Monaco v. City of Camden,* 366 Fed. Appx. 330, 331 (3d Cir. 2010) ("Inconsistent general verdicts may constitute grounds for ordering a new trial.") (citation

- 14 -

omitted); *Huston v. Thomas Shows, Inc.,* 587 F.2d 375, 377 (8th Cir. 1978) (reversing and remanding for new trial based on inconsistent special verdict); *Custer v. Terex Corp.,* 196 Fed. Appx. 733, 739 (11th Cir. 2006) ("[T]he appropriate remedy for an internally inconsistent general verdict is an order for a new trial; *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 678 (7th Cir. 1985) ("A district court also may find inconsistent verdicts an adequate ground for a new trial") ."); *Callaway Golf Co. v. Acushnet Co.,* 576 F.3d 1331, 1345 (Fed. Cir. 2009) (vacating and remanding for a new trial based on the conclusion that "the verdict form returned by the jury reflect[ed] an irreconcilable inconsistency" with regard to the general verdicts).

The verdict form returned by the jury here was inconsistent on its face; the inconsistencies cannot be reconciled by the Court. The first column asked the jury to determine if the alleged trade secret actually qualified as a trade secret **and** if that trade secret was misappropriated. In five instances, the jury answered "no" to the first column, but also answered "yes" to the second column. (*See* D.I. 601 at 2-3.) The result is that for at least five alleged trade secrets, the jury determined that Akoustis was unjustly enriched by conduct that the jury first determined was not actionable. Such a verdict is inconsistent and irreconcilable with the law and the instructions given to the jury in this case. This Court instructed the jury that "[i]f you find that Qorvo proved that Akoustis misappropriated Qorvo's trade secrets, then you must decide whether Qorvo is entitled to damages on its claim for misappropriation of trade secrets." (D.I. 596.) Of course, Akoustis could not have been unjustly enriched by any alleged "misappropriation" if the jury found that no misappropriation of a valid trade secret occurred in the first instance—as they did for these five alleged trade secrets.

The verdict is inconsistent with the law and cannot be reconciled. Accordingly, the Court should grant a new trial on the misappropriation claims. *Carrier Corp. v. Goodman Glob., Inc.,*

162 F. Supp. 3d 345, 380 (D. Del. 2016) (granting new trial where there were inconsistent jury findings); *Malley-Duff & Assocs., Inc. v. Crown Life Ins.*, 734 F.2d 133 (3d Cir. 1984) (reversing and remanding for new trial when the verdict form answers were inconsistent and irreconcilable when because "in so far as jury's conclusion that defendant conspired to tortiously interfere with insurance agency's contract with Canadian life insurance carrier must have been based on agreement to do unlawful act, but jury also determined that defendants had not tortiously interfered with agency's contractual relationship with carrier.").

### B. THE COURT SHOULD GRANT A NEW TRIAL ON DAMAGES OR IN THE ALTERNATIVE ORDER REMITTITUR BECAUSE THE JURY VERDICT WAS AGAINST THE WEIGHT OF EVIDENCE IN VIEW OF THE INADMISSIBLE DAMAGES EXPERT TESTIMONY

The Court may also grant a new trial on damages or remittitur when the award is excessive, against the weight of evidence, or the product of undue prejudice from erroneously included expert testimony.  Akoustis is entitled to a new trial on damages because the jury's award for unjust enrichment was not based on admissible record evidence, and the failure to strike Ms. Bennis' testimony was prejudicial error.  As set forth more fully above and in Akoustis' concurrent Motion for Judgment as a Matter of Law, the Court should strike Ms. Bennis' testimony for three reasons—the first two relate to Ms. Bennis' flawed methodology for calculating unjust enrichment.  (*See* Akoustis' concurrent Motion for Judgment as a Matter of Law Section IV.A.)

The third reason is that Ms. Bennis relies on Dr. Shanfield's speculative, unsubstantiated *ipse dixit* testimony regarding the 55-month head start period.  As Dr. Shanfield testified at trial, each component of the 55-month head start period was seemingly plucked from thin air as he provided no specific source, analysis, or other support for how he arrived at those monthly allocations.  Dr. Shanfield's trial testimony made clear that while he may have "considered where [he] could find information that would give him a reference point" for the head start periods, he

- 16 -

did not actually find such information that he could reasonably identify nor did he review or consider the actual documents and procedures used in the New York Fab facility to make Akoustis' products. (Elkins Decl. Ex. A at 1392:19-1393:8; *see also supra* at pp. 4-6.)  The Court should therefore strike Dr. Shanfield's testimony regarding the duration of the head start period.  Without admissible evidence from Dr. Shanfield, Ms. Bennis' testimony simply compounds juror confusion because it also does not rest on admissible, reliable evidence.  Indeed, all of Qorvo's evidence of alleged "head-start" or unjust enrichment should be excluded for its failure to use an accepted and documented methodology.  (*See* Akoustis' concurrent Motion for Judgment as a Matter of Law Section IV.B.)

The erroneous inclusion of the inadmissible expert testimony and opinions resulted in Akoustis suffering severe and manifest prejudice and a verdict that was not supported by admissible evidence.  In such cases, courts routinely grant a new trial.  For example, in *McMillan v. Weeks Marine, Inc.*, 478 F. Supp. 2d 651, 658–59 (D. Del. 2007), the Court concluded in a post-trial motion that the damages expert "testimony was both unsupported and beyond the scope of his expert reports.  Because the Court finds that Mr. Bunin's testimony was integral to the jury's verdict on lost wages, the Court concludes that Defendant suffered undue prejudice warranting a new trial on damages."  *See also Apple Inc. v. Wi-LAN Inc*., 25 F.4th 960, 975–76 (Fed. Cir. 2022) (affirming the district court's grant of a new trial because defendant's damages expert relied upon the faulty advice of a technical expert, rendering the damages testimony inadmissible and subject to exclusion.)

Alternatively, this Court should order remittitur to the maximum supported by the admissible evidence to be found in the trial record.  *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987).  Notwithstanding a jury's award, a district court may, in its discretion, use its

remittitur power to reduce that award. *See Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 354 (3d Cir. 2001). In granting a remittitur, the Court "condition[s] a denial of the motion for a new trial upon the filing by the plaintiff of a remittitur in a stated amount. In this way the plaintiff is given the option of either submitting to a new trial or of accepting the amount of damages that the court considers justified." 11 Fed. Prac. & Proc. Civ. § 2815 (3d ed.); *Holmes v. Wack*, 464 F.2d 86, 89 (10th Cir. 1972).

In the event the Court does not grant Akoustis' Rule 50(b) Motion or award a new trial, Akoustis respectfully requests that Qorvo's damages for trade secret misappropriation be remitted to an amount not exceeding $305,000—the amount Akoustis' expert Carlyn Irwin opined would be the maximum unjust enrichment award based on an avoided costs theory of recovery. (Elkins Decl. Ex. A (Tr.) at 2341:3-10.)

### C.   A NEW TRIAL SHOULD BE ORDERED ON THE PATENT INFRINGEMENT CLAIMS BECAUSE THE JURY'S VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE.

A new trial may be granted when a verdict on patent infringement is contrary to the weight of the evidence. *See Georgia-Pac. Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1333 (Fed. Cir. 1999) (affirming the grant of a new trial on the issue of infringement when evidence did not support a finding that the accused product met the claims limitations). Here, Qorvo failed to introduce sufficient evidence to support a finding of infringement of claims 1 and 12 of the '018 Patent and claims 9 and 10 of the '755 Patent.

Qorvo relies exclusively on Dr. Bravman's interpretations of Dr. Shanfield's plot graphs to establish infringement for both patents-in-suit. However, the simulation plots are unreliable, and thus insufficient to support the jury's verdict of infringement. Dr. Nguyen testified at trial – without challenge – that the simulation plots (applicable to both patents) have three fatal flaws:

(i) no units on the vertical axis; (ii) inconclusive results as to infringement; and (iii) the values of the data are too small to obtain meaningful results.

First, the plot graphs contain no units on the vertical axis, the lack of which makes interpreting the plot scientifically impossible. Neither Drs. Shanfield nor Bravman, much less the jury, could credibly understand or interpret the results depicted in the graphs without knowing the units of measurement. Dr. Nguyen illustrated this flaw: "[s]o think of yourself, say, wanting to bake a cake or something and you're asking your friend, how much sugar do I need[?] And your friend says, well, you need two. The first thing that's going to come to your mind is two what? [Two] tablespoons? Two teaspoons? Two cups? How much sugar do I need? And without that, you're not really going to be able to bake the cake." (Elkins Decl. A at 2305:23-2306:12.) The complexity of the data analysis required here only compounds this issue. Even Dr. Bravman, Qorvo's infringement expert, admitted that the did not know the units. (*Id*. at 1640:18-22.) This renders the simulation plots and data inherently unreliable and requiring a new trial. *See Shopify Inc. v. Express Mobile, Inc.,* No. CV 19-439 RGA, 2024 WL 2260900, at *5-6 (D. Del. May 17, 2024) (granting a new trial on the grounds that the expert testimony was unclear and conflicting such that "[i]t would be nearly impossible for the jury to figure out" the question of infringement.).

Second, the plot graphs are unreliable, inconsistent, and unable to support a finding of infringement because the data shown in the plots is inconclusive. Dr. Nguyen explained that the results of each simulation must be evaluated over the ***entire pass band*** (black vertical lines in each plot) to determine whether or not the elements of the claims are satisfied; the data cannot be separated for different portions of the pass band and evaluated in isolation. (*Id*. at 2290:1-11; 2304:12-2305:24.) Examining the complete simulation results reveals that those results are inconclusive because the data contradicts itself. Certain portions of the data support infringement

and other portions do not.  (*Id.* at 2293:2-12; 2305:1-19.)  These inconclusive and seemingly contradictory results cannot serve as the basis for the jury's verdict of infringement.  *See Shopify, supra,* at \*5-6.

Third, the data differences allegedly shown by the plot graphs are too small to be meaningful for establishing infringement.  The values allegedly depicted are in terms of $10^{-19}$ and $10^{-20}$.  (Elkins Decl. A at 2306:12-21.)  Dr. Nguyen explained (again without challenge), however, that the software used to generate the plot graphs is not adequate to produce accurate results at such infinitesimal values.  (*See id.* at 2307:22-2308:7 ("I don't think [the software], is good enough to predict losses this small.")).

Taken together, these flaws establish that the simulations plots, on which Qorvo's entire infringement case rests, are unreliable.  The graphs fatally lack units on the vertical axis, show inconclusive data, and the software used to create them lacks the precision required to create reliable results at such small values.  The cumulative nature of these deficiencies creates an unreliable basis for proving anything and certainly not one capable of supporting the jury's finding of infringement.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Akoustis' Motion for a New Trial on patent infringement and/or damages for trade secret misappropriation and/or alternatively order remittitur in the amount of $305,000.

Dated:   June 17, 2024

OF COUNSEL:

SQUIRE PATTON BOGGS (US) LLP

Ronald S. Lemieux
David S. Elkins
Victoria Q. Smith
1841 Page Mill Road
Suite 150
Palo Alto, California 94304
(650) 856-6500
ronald.lemieux@squirepb.com
david.elkins@squirepb.com
victoria.smith@squirepb.com

Rachael A. Harris
Matthew A. Stanford
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
rachael.harris@squirepb.com
matthew.stanford@squirepb.com

Xiaomei Cai
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
(602) 528-4000
xiaomei.cai@squirepb.com

Respectfully submitted,

*/s/ Ronald P. Golden III*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Defendants Akoustis Technologies, Inc. and Akoustis, Inc.*

1101786398\17\AMERICAS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 17, 2024, copies of the attached document were served via electronic mail on all counsel of record.

<u>*/s/ Ronald P. Golden III*</u>
Ronald P. Golden III