# EXHIBIT 1

Creviston - direct

16:38:07 1   system, more complimentary sort of electronic devices.

16:38:12 2   **Q.**   Can you briefly explain what a semiconductor chip is

16:38:15 3   as it relates here to BAW filters?

16:38:18 4   **A.**   Yeah, a semiconductor chip itself is a chip that you

16:38:21 5   can use to do operations where the electricity flows through

16:38:25 6   it and you can make it make decisions and have different

16:38:29 7   outputs versus inputs, that sort of process, when it comes

16:38:31 8   to filters, filters themselves and aren't fully

16:38:35 9   semiconducting but they're fitted with very similar

16:38:38 10   processes so they still look like chips, and they're used to

16:38:41 11   filter two signals out primarily, so you got many different

16:38:44 12   functions within especially a mobile phone today, it's very

16:38:48 13   complex and they compliment each other.

16:38:50 14   **Q.**   Let's talk a little bit about RF signals.  If I can,

16:38:54 15   Mr. Buchbinder, project MDX-1.2.

16:38:58 16       And have you prepared a slide to assist the jury

16:39:01 17   in understanding radio frequency?

16:39:02 18   **A.**   To attempt it.  You're all familiar with

16:39:08 19   probably AM/FM radios, these are operating on the same basic

16:39:10 20   principle, so a radio frequency wave is a wave of energy

16:39:14 21   that is able to travel through the air long distances, so

16:39:17 22   AM/FM radio was relatively crude.  You moved to mobile

16:39:21 23   phones or to televisions, these are higher bandwidth, they

16:39:25 24   have more data, more information, also operating at higher

16:39:28 25   frequencies, and over time it just continues to move up in

Creviston - direct

16:39:31 1   frequency and broader in band, it gets more and more

16:39:35 2   complicated to process all of these radio signals that are

16:39:38 3   in the air.

16:39:38 4   **Q.**   And how does RF filters fit into this?

16:39:42 5   **A.**   So filters are a key element of that because they can

16:39:46 6   help filter through just the signal that you want to have

16:39:49 7   through and not let the other ones through, so the device

16:39:53 8   doesn't get completely jammed.  Like in the old days with

16:39:56 9   that radio, you turn the FM dial and sometimes you would

16:40:01 10   hear two stations at once, they were both coming through.

16:40:04 11   It was too sloppy and obvious in the mobile phone today you

16:40:07 12   can't have that, you need crystal clear.  You're processing

16:40:11 13   much more data, video and pictures so forth, it has to be

16:40:15 14   really crisp channels. The information is key to making

16:40:18 15   sure you get the information you want and all the other

16:40:21 16   noise doesn't come through.

16:40:22 17   **Q.**   What type of RF filters does Qorvo make?

16:40:25 18   **A.**   We make multiple filters, a surface acoustic wave

16:40:29 19   type of filter which is slightly lower frequencies, SAW

16:40:40 20   filters and BAW filters.

16:40:40 21   **Q.**   And have you prepared a series of slides to

16:40:42 22   illustrate the functions of a BAW filter?

16:40:48 23   **A.**   Yes.

16:40:48 24   **Q.**   Can you, Mr. Buchbinder, project 1.3?

16:40:52 25   **A.**   Yes.  So as we're speaking, as we were speaking,

Creviston - direct

16:40:56 1   there is many different frequencies at any time in this air

16:41:00 2   or in a communication channel, a filter is made to pass the

16:41:05 3   desired frequency that the device is looking for and then

16:41:08 4   block all those other frequencies that are hitting the phone

16:41:12 5   or other device.

16:41:12 6   **Q.**   And can you project 1.4, please, thank you.

16:41:16 7       And Mr. Creviston, what are illustrating here on

16:41:20 8   PDX-1.4?

16:41:21 9   **A.**   This is sort of a simple explanation of what the

16:41:23 10   filter actually sees coming into it, it looks like a lot of

16:41:27 11   noise, there is the desired path, the desired signal as well

16:41:31 12   as a lot of other noise that's out there in the air and when

16:41:34 13   it comes out of that filter you're just getting the

16:41:37 14   frequencies or two information that you intended to get to

16:41:40 15   the receiver.

16:41:42 16   **Q.**   And can you project PDX-1.5, and Mr. Creviston, can

16:41:47 17   you explain what's being illustrated on this slide?

16:41:50 18   **A.**   So this is what would happen if you took your phone

16:41:53 19   and opened it up, you would see inside what's called a

16:41:57 20   printed circuit board or PC board like you would have a

16:42:00 21   computer, that's this sort of greenish big rectangle and

16:42:05 22   then all those shiny and black rectangles on top of it and

16:42:09 23   the really small ones are different electronic components,

16:42:12 24   so these are the parts, you can see it's actually very, very

16:42:15 25   complicated today.

Creviston - direct

16:42:16 1       So the function of this board is to take from

16:42:18 2   the antenna, everything it pulls down from the air, and at

16:42:22 3   the end of going through all of those electronics and all

16:42:26 4   those pieces of PC board and out the other side it will come

16:42:31 5   out the speaker and you hear a person's voice or you see on

16:42:33 6   the screen the data, right, so this is what takes you from

16:42:35 7   the very complicated noisy environment that you can't hear

16:42:39 8   but the antenna does, it takes it and creates just what the

16:42:43 9   user is intending to get from that.  Right?

16:42:45 10       So it's very complicated and you will see from

16:42:49 11   here we're showing an example of one of our products that

16:42:52 12   has filter elements in it, also has filter elements, low

16:42:56 13   noise elements, a lot of other functionality in it, if you

16:43:00 14   looked at that you can pick out one device, that device is

16:43:04 15   only about a quarter inch a side, our device, it says -- you

16:43:09 16   open it up, it says filters on there, we're showing a

16:43:13 17   picture on the lower right of what that filter actually

16:43:16 18   looks like, it's almost like an arch the way the resonators

16:43:20 19   are built there on that substrate.

16:43:22 20   **Q.**   Mr. Creviston, let's talk a little bit more about

16:43:25 21   Qorvo's.  Can you tell the jury the revenues for Qorvo in

16:43:30 22   the last year?

16:43:32 23   **A.**   Yeah, roughly three-and-a-half billion dollars.

16:43:32 24   **Q.**   About how many employees does Qorvo currently have?

16:43:38 25   **A.**   We have around 8,500 worldwide.

---

**368**

Aigner - direct

09:15:56 1    THE COURT:  You may.  Sure.

09:16:09 2    A.    So once we have completed the wafer, it gets sent

09:16:14 3    down and then we have by a precision laser machine that cuts

09:16:19 4    it into small pieces, those small pieces are assembled on a

09:16:24 5    laminate strip.  A laminate strip is kind of the carrier on

09:16:28 6    which we deliver the product to the customer.  That's what

09:16:31 7    you're going to find when cut in small pieces, again, in

09:16:35 8    your phones.

09:16:35 9    If you look here, you see those silver really

09:16:40 10   small things on there.  This is individual BAW dies, chips,

09:16:46 11   they're about the size of a square millimeter.  As we can

09:16:53 12   see.  So that's our filter.  You can hand it around if you

09:17:09 13   want.

09:17:12 14   Q.    Thank you, Dr. Aigner.

09:17:16 15   THE COURT:  We'll wait until everybody has

09:17:18 16   looked and then we'll collect it.  This is another

09:17:21 17   demonstrative, though?

09:17:22 18   MR. DeFOSSE:  This is another demonstrative,

09:17:23 19   Your Honor.  And Your Honor, while they're doing that,

09:17:35 20   perhaps, we have not numbered these, but maybe we should

09:17:38 21   assign a letter for identification.

09:17:39 22   THE COURT:  I think we should.  We'll give

09:17:42 23   demonstrative A and demonstrative B, that means you won't

09:17:47 24   see them again unless they're used as demonstratives, unless

09:17:50 25   they're received and given a number, demonstratives A and B.

---

**369**

Aigner - direct

09:17:56 1    Thank you.

09:17:56 2    MR. DeFOSSE:  Thank you, Your Honor.

09:17:57 3    BY MR. DeFOSSE:

09:17:58 4    Q.    Thank you, Dr. Aigner.  So you have now shown the

09:18:01 5    jury an example of what a BAW filter looks like in a wafer

09:18:05 6    and on a laminate strip.  Could you explain to the jury what

09:18:10 7    the difference is between a BAW filter and a BAW resonator?

09:18:16 8    A.    So a BAW filter requires several ball resonators to

09:18:22 9    work.  A resonator is the basic building block.  And you can

09:18:26 10   think of a resonator as a string of a guitar.  You pick it

09:18:32 11   and it will vibrate at a certain frequency.  That's also

09:18:36 12   what BAW resonators do, but at a much, much higher

09:18:40 13   frequency.  But it's important to understand that it's very

09:18:45 14   frequency selective.  And you put several of the resonators

09:18:49 15   together in the right configuration, ten, maybe twenty,

09:18:53 16   depending on the filter type, and you can create a filter

09:18:57 17   that let's certain waves pass and others will be rejected

09:19:02 18   all based on frequency.

09:19:04 19   Q.    And each of the BAW filters that you were showing a

09:19:09 20   moment ago, how many resonators are there?

09:19:11 21   A.    There could be between ten and twenty depending on

09:19:16 22   the case.

09:19:17 23   MR. DeFOSSE:  Could I ask Mr. Buchbinder to pull

09:19:20 24   up PDX 2.3.

09:19:24 25   BY MR. DeFOSSE:

---

**370**

Aigner - direct

09:19:25 1    Q.    Dr. Aigner, can you explain what is shown on this

09:19:30 2    slide?

09:19:32 3    A.    Yes.  So what you saw on this laminate strip, the

09:19:38 4    little gray things that's shown on the left image here

09:19:42 5    turned around.  So this is the side where the actual

09:19:45 6    resonators are located, we have this grayish polygons here

09:19:51 7    and there are about ten of them.  Each of the resonators is

09:19:55 8    built up of a piezo layer, with a top and a bottom

09:20:03 9    electrode.

09:20:03 10   Q.    Can you point where the piezo layer is on the top and

09:20:08 11   bottom of the demonstrative?

09:20:09 12   A.    It is the greenish material is the piezo layer, the

09:20:19 13   top, the gray later is the layer on the bottom, this is

09:20:23 14   basically the engine of the resonator, this is what drives

09:20:27 15   the resonator, this is what picks the string.  And piezo

09:20:31 16   materials have the property that they can transform

09:20:37 17   electrical signal into deformation and vice versa, that's

09:20:42 18   how we create the vibrations and how we pick them up again

09:20:47 19   to create a signal that goes on in your phone.

09:20:52 20   Q.    As part of your responsibilities at Qorvo, have you

09:20:55 21   analyzed SMR resonators?

09:20:59 22   A.    Yes, I have.

09:21:00 23   Q.    What is an SMR resonator?

09:21:03 24   A.    SMR stands for solidly mounted resonator.  It's a

09:21:08 25   solidly mounted resonator, what I just showed, the engine of

---

**371**

Aigner - direct

09:21:13 1    the resonator, the resonating film, it sits on solid layers.

09:21:20 2    So one of the criteria is that we want it to resonate

09:21:27 3    freely, not getting damped and the layers are constructed

09:21:31 4    such that there is no damping occurring, virtually no

09:21:36 5    damping.

09:21:36 6    Q.    Mr. Buchbinder, can we pull PDX 2.3 up again.

09:21:40 7    And Dr. Aigner, could you point out in PDX 2.3

09:21:44 8    what are the layers that you are saying sit on top of a

09:21:48 9    solid layer?

09:21:48 10   A.    The bottom electrode, the gray layer in the middle

09:21:52 11   picture, below that bottom electrode, you have layers that

09:21:57 12   will allow the structure to freely vibrate.

09:22:01 13   Q.    Have you also analyzed FBAR resonators as part of

09:22:06 14   your work at Qorvo?

09:22:08 15   A.    Yes, I have.

09:22:09 16   Q.    In what context?

09:22:10 17   A.    Well our main competitors are using FBAR, Broadcom is

09:22:15 18   our biggest competitor, Skyworks is another competitor also

09:22:20 19   using FBAR.  So we look around for what other companies do

09:22:24 20   all the time to understand the differences in our

09:22:27 21   performance and in their performance.  But there is really

09:22:31 22   none.

09:22:31 23   We compete for the same slots of the major BAW

09:22:35 24   manufacturers, the ones in California, typically, and we do

09:22:41 25   the same, we apply the same principals, we do the same -- we

---

372

Aigner - direct

09:22:46  1  apply to the same markets.

09:22:49  2  Q.    Dr. Aigner, when did Broadcom first introduce FBAR

09:22:54  3  type resonators into the market?

09:22:55  4  A.    Broadcom did that in 2001, 2002 time frame.

09:23:02  5  Q.    FBAR resonators are not a technology that Akoustis

09:23:05  6  invented, right?

09:23:06  7  A.    No, not at all.

09:23:08  8  Q.    Are SMR resonators and FBAR resonators different

09:23:14  9  types of technology?

09:23:15  10  A.    No, they're not, they're using the same principle to

09:23:19  11  drive the resonates to create the engine of your resonator

09:23:23  12  that just a different implementation of how you keep the

09:23:28  13  waive of the resonates from being passed into the

09:23:32  14  suspension.

09:23:32  15  Q.    I would like to return now to when you joined

09:23:37  16  TriQuint in 2006.

09:23:39  17       What was the status of BAW filter technology at

09:23:42  18  TriQuint at that time?

09:23:43  19  A.    TriQuint had just acquired the startup TFR

09:23:50  20  Technologies in Bend, Oregon.  They had a more than ten-year

09:23:55  21  history of doing BAW filter for military applications, so

09:23:58  22  when we started, we had some foundation and we made it a

09:24:02  23  commercially viable process in the following years.

09:24:06  24  Q.    And when were you able to achieve the

09:24:09  25  commercialization of a BAW filter at TriQuint?

---

373

Aigner - direct

09:24:13  1  A.    Yes, we did.

09:24:14  2  Q.    And what year?

09:24:15  3  A.    In 2010 we had our major launch in one of the

09:24:25  4  iPhones, the first two or three generations.

09:24:29  5  Q.    And what frequency range did that product work in?

09:24:33  6  A.    At that time, the most important frequency was

09:24:38  7  1.9-gigahertz.

09:24:40  8  Q.    At the time you had arrived at TriQuint in 2006, had

09:24:45  9  the company acquired any BAW filter technology before your

09:24:51  10  arrival?

09:24:52  11  A.    TriQuint had acquired TFR Technologies back in 2004.

09:25:00  12  Q.    That was the company that was in Oregon that you

09:25:03  13  mentioned earlier?

09:25:04  14  A.    That's right, yes.

09:25:05  15  Q.    From the time that TriQuint and its predecessor

09:25:09  16  started to research BAW filter technology until the time

09:25:11  17  that the company launched its first BAW filter product, how

09:25:15  18  long did it take?

09:25:15  19  A.    There was close to twenty years.

09:25:19  20  Q.    Why did it take twenty years?

09:25:21  21  A.    It's complicated technology.  There was no tool

09:25:29  22  available to do the depositions for the layers required and

09:25:33  23  there are many, many elements that you need to get just

09:25:35  24  right to make it work.

09:25:38  25  Q.    Did TriQuint continue to develop BAW filter products

---

374

Aigner - direct

09:25:42  1  after that first iPhone product was introduced in 2010?

09:25:46  2  A.    Yes, we did.

09:25:48  3  Q.    And can you remind the jury when TriQuint merged with

09:25:53  4  RFMD to form Qorvo?

09:25:55  5  A.    We merged with RFMD at the end of 2015.

09:25:59  6  Q.    So between 2010 and 2015, how many BAW filter

09:26:03  7  products did TriQuint develop?

09:26:06  8  A.    We developed approximately a hundred products in that

09:26:11  9  time frame before the merger.

09:26:13  10  Q.    As of 2015, how many BAW filters had TriQuint sold?

09:26:20  11  A.    At that time, I estimate we had sold about 10 billion

09:26:26  12  BAW filters to the markets in approximately 2 or 3 billion

09:26:33  13  individual products because there can be more than one

09:26:36  14  filter in one product.

09:26:40  15  Q.    After TriQuint and RFMD merged to form Qorvo, did you

09:26:45  16  retain responsibility for the BAW filter research program?

09:26:48  17  A.    Yes, I did.

09:26:49  18  Q.    Until when?

09:26:50  19  A.    Until spring 2019.

09:26:54  20  Q.    Between 2015 and 2019, how many BAW filter products

09:26:58  21  did Qorvo launch?

09:27:01  22  A.    Well, the activity ramped up significantly.  We

09:27:06  23  estimate we launched another 200 products in this time

09:27:10  24  frame.

09:27:10  25  Q.    As of 2016, the company had more than twenty years

---

375

Aigner - direct

09:27:14  1  experience in developing BAW filters?

09:27:16  2  A.    That's correct, yes.

09:27:17  3  Q.    And at that time with twenty years of experience in

09:27:20  4  developing BAW filters, how long did Qorvo estimate it would

09:27:24  5  take to develop a new BAW filter product?

09:27:27  6  A.    Well, developing a new generation of process,

09:27:31  7  deploying it to product development and ramping is typically

09:27:35  8  a four to five-year time frame for us.

09:27:38  9  Q.    And that was for Qorvo, even with twenty years of

09:27:42  10  experience?

09:27:42  11  A.    That's right, yes.

09:27:44  12  Q.    How much money did TriQuint and Qorvo invest in the

09:27:48  13  research and development of BAW filters?

09:27:52  14  A.    A rough estimate would be in excess of $1 billion

09:27:56  15  total.

09:27:59  16  Q.    Did Qorvo develop any trade secrets related to BAW

09:28:03  17  filters during your time as the head of the BAW research

09:28:07  18  group?

09:28:07  19  A.    Yes, we certainly did.

09:28:08  20  Q.    Generally speaking, what role did trade secrets play

09:28:12  21  at Qorvo?

09:28:13  22  A.    Trade secrets play a big role because not everything

09:28:17  23  that we do can be reverse engineered or can be patented.

09:28:21  24  Some things are just not visible on the final product, but

09:28:27  25  they are very important to success.  So we keep those as a

---

448

Aigner - cross

11:28:14 1 and layers?

11:28:14 2 A. But they're merely different implementation of the

11:28:18 3 same thing.

11:28:20 4 Q. So they're different types of devices to achieve the

11:28:24 5 same end result; right?

11:28:26 6 A. They are slight differences in the devices, but their

11:28:30 7 similarities between them by far are bigger than the

11:28:34 8 differences.

11:28:35 9 Q. Well, you would agree that an FBAR structure you

11:28:39 10 would never have the reflector levels that you have in an

11:28:42 11 SMR, isn't that true?

11:28:43 12 A. You would not use the reflectors in an FBAR.

11:28:47 13 Q. And would you also agree that the position, size, and

11:28:53 14 dimensions of the reflectors in an SMR are very important?

11:28:59 15 A. Yes, they are important, there is no way to make

11:29:06 16 those reflectors, that's not disputed here.

11:29:09 17 Q. Without those reflectors, an SMR resonator would not

11:29:13 18 achieve the functionality it's designed for, isn't that

11:29:17 19 true?

11:29:18 20 A. So I don't understand what you mean take away, I

11:29:23 21 mean, there is no support, the resonator would float in the

11:29:26 22 air, it would have to do something to support it.

11:29:29 23 Q. So the SMR resonator wouldn't work if those

11:29:32 24 reflectors were removed, the SMR wouldn't work, would it?

11:29:35 25 A. The principle would work, the implementation would

449

Aigner - cross

11:29:38 1 have to be changed.

11:29:39 2 Q. And it would work in what sense, that the top

11:29:43 3 portion, the electrode, and the piezo layer would still

11:29:48 4 potentially work, but -- perhaps you can walk me through why

11:29:53 5 an SMR resonator or filter, excuse me, would still work if

11:29:57 6 you removed the actual reflector levels?

11:30:01 7 A. It would work in a sense that the device physics is

11:30:05 8 the same.

11:30:06 9 Q. But would it actually --

11:30:09 10 A. The engine is still there, just the engine is not

11:30:12 11 there, there are still engine mounts, you still need to

11:30:15 12 support it in some way.

11:30:17 13 Q. So if you build an SMR reflector and didn't include

11:30:21 14 the reflectors, you believe those are simply engine mounts

11:30:25 15 and don't actually perform any other useful purpose within

11:30:28 16 that device as a filter?

11:30:30 17 A. They do have some advantages for sure, some

11:30:36 18 disadvantages as well.

11:30:37 19 Q. And what are the advantages in using an SMR variation

11:30:42 20 of a BAW filter?

11:30:44 21 A. Well, we believe that for our factory infrastructure

11:30:49 22 it's the better choice, we don't need to make an air cavity,

11:30:53 23 which is an advantage for us, we instead make solid layers.

11:30:59 24 Q. And you believe that your design is superior to the

11:31:02 25 FBAR design used by, as you testified, Broadcom, Akoustis,

450

Aigner - cross

11:31:06 1 and other manufacturers, is that right?

11:31:09 2 A. I would say it's a wash, we compete for the same

11:31:12 3 slots, sometimes we win, sometimes we lose. We perform in

11:31:17 4 the very same markets with the very same performance.

11:31:20 5 Q. I agree with you, they perform in the same markets,

11:31:23 6 sure, I'm just wondering do you believe there is an

11:31:27 7 advantage to your SMR versus an FBAR design?

11:31:29 8 A. The factory infrastructures that we have established,

11:31:32 9 for sure, for somebody else, not sure, probably not. Most

11:31:36 10 companies that are big in the market use FBAR today. We

11:31:40 11 chose to use SMR way back.

11:31:50 12 Q. Dr. Aigner, did you ever have any conversations with

11:31:57 13 engineers at Akoustis regarding the development of their

11:32:01 14 FBAR products?

11:32:02 15 A. Yes.

11:32:04 16 Q. And when did you start having those discussions with

11:32:07 17 them?

11:32:11 18 A. Probably very early in Akoustis's life. 2015,

11:32:25 19 probably, 2014, maybe.

11:32:27 20 Q. And what was the purpose of you reaching out and

11:32:30 21 discussing BAW technology with Akoustis?

11:32:36 22 A. Well, they had made some claims in publications and

11:32:42 23 the web page that were not credible and they started

11:32:47 24 publishing some papers that were full of glaring errors, and

11:32:53 25 as a member of this field, I'm a very senior person, and I'm

451

Aigner - cross

11:33:00 1 part of an industry group and conference organizer in this

11:33:06 2 field, I just didn't want them to publish papers full of

11:33:10 3 glaring errors, so I reached out to them to tell them, you

11:33:14 4 know, I think you have a few mistakes in your papers.

11:33:20 5 Q. In fact, you offered to help Akoustis with evaluation

11:33:24 6 of its product, didn't you?

11:33:26 7 A. That was at a later time.

11:33:28 8 Q. At the time, but you did agree to, you offered to

11:33:32 9 help them evaluate their product and test their product for

11:33:35 10 them?

11:33:35 11 A. Yeah, not just me, there was a group of people

11:33:39 12 involved in that.

11:33:39 13 Q. And you say you started that in 2015. Was this a

11:33:43 14 common practice of yours to speak to people at other BAW

11:33:46 15 companies and offer your assistance in helping to evaluate

11:33:50 16 their products?

11:33:51 17 A. I don't see it as assistance, it was just a

11:33:54 18 conversation between scientists to make sure everybody

11:33:57 19 publishes rigorous scientific papers.

11:34:03 20 Q. If I could show you --

11:34:09 21 MR. LEMIEUX: Your Honor, if I can have

11:34:12 22 permission to approach the witness?

11:34:14 23 THE COURT: You may.

11:34:14 24 BY MR. LEMIEUX:

11:34:24 25 Q. And what I have handed the witness for identification

669

```
08:43:32   1   then of course you cannot consider the other person's term
08:43:35   2   because it would be based on something on which the jury has
08:43:39   3   to determine, they would not find that information to be
08:43:43   4   reliable.  We have to make sure that that's the case.  We
08:43:49   5   can get that at the very beginning.
08:43:51   6        MS. AYERS:  Of course, Your Honor, we would not
08:43:52   7   object to a limiting instruction being read to the jury
08:43:54   8   before Mr. Faulkner even testifies and we're happy to work
08:43:58   9   with the defense counsel on the language of that.
08:44:00  10        THE COURT:  Well, you all work very well
08:44:02  11   together, so give that a shot.  And otherwise, tell me what
08:44:07  12   you want to say and what defense wants to say, but I think
08:44:10  13   that some instruction probably is appropriate.
08:44:13  14        MS. AYERS:  Of course, Your Honor.
08:44:14  15        THE COURT:  Absolutely.  I know that we need to
08:44:16  16   -- the jury is now waiting, and --
08:44:20  17        MR. ELKINS:  If Your Honor would permit me, I
08:44:22  18   just need thirty seconds to make my record, Your Honor.
08:44:25  19        THE COURT:  Sure.
08:44:25  20        MR. ELKINS:  I believe this is not only
08:44:27  21   inappropriate because it's not in Mr. Faulkner's report,
08:44:30  22   Mr. Faulkner's report does not -- he never saw
08:44:35  23   Mr. Shanfield's report before he turned in his own report.
08:44:37  24   He does not rely on that.  I think there is a reference to
08:44:40  25   forty documents that he discussed with Mr. Shanfield, but
```

670

```
08:44:44   1   not 9,000.
08:44:46   2        THE COURT:  Well that's --
08:44:47   3        MR. ELKINS:  And I believe this is a
08:44:50   4   Section 403, or Rule 403 issue, and just with respect, Your
08:44:54   5   Honor, I just wanted to make our objection to any reference
08:44:57   6   to confidential documents.  They can say Qorvo documents,
08:45:01   7   Qorvo materials, that's not going to prejudice their case.
08:45:05   8   Mr. Shanfield can testify later and testify to whatever he's
08:45:08   9   going to testify in terms of characterizing them if it's
08:45:12  10   within the scope of his opinion.  But having a different
08:45:16  11   expert do something that he did not do in his expert report
08:45:19  12   we believe is both improper and prejudicial.
08:45:23  13        THE COURT:  I understand the issue there, and I
08:45:26  14   think everybody understands what is allowed, so I think we
08:45:28  15   need to bring the panel in.  We're going to look for that
08:45:33  16   draft at 1 o'clock.  Okay.
08:46:09  17        (Jury entering the courtroom at 8:46 a.m.)
08:46:22  18        THE COURT:  Everyone can be seated.  ████████
08:46:35  19   has had some matters that -- issues that she needs to take
08:46:40  20   care of, and we talked about that yesterday to some degree.
08:46:44  21   And since they were not capable of being resolved in a
08:46:48  22   different way, we allowed her to be excused.  I don't want
08:46:52  23   the rest of you think that you're going anywhere, right?
08:46:54  24   We're good on that.  But we did give every opportunity to
08:47:00  25   try to work that out.  We always do.  But we also are very
```

671

```
08:47:04   1   respectful of the fact that sometimes things can't be worked
08:47:07   2   out and it didn't work out.  That's the thing that it is.  I
08:47:11   3   see ██████ already moved over to that seat.  So we are
08:47:15   4   ready to go.  We are ready to resume today and counsel, you
08:47:20   5   may proceed.
08:47:21   6        MR. MASTERS:  Good morning, Your Honor.  Thank
08:47:23   7   you.
08:47:23   8        THE COURT:  Good morning.
08:47:24   9        MR. MASTERS:  The next witness that plaintiff
08:47:26  10   calls is Qorvo's former employee and Akoustis's Chief
08:47:32  11   Product Officer, Rohan Houlden.  It will be by video.
08:47:35  12        THE COURT:  Once again, it's a video deposition.
08:47:37  13   You will not see it again.  So this is that opportunity to
08:47:43  14   agree that exhibits are marked during the deposition, they
08:47:46  15   will be sequentially marked so that when you see that
08:47:49  16   person's name on the witness list, you will then also see
08:47:55  17   numbers below that and you will see also the reference
08:47:57  18   number that was used during the deposition.  That's to make
08:48:01  19   sure it's very simple for you to follow and I think for
08:48:03  20   everybody else to keep up.
08:48:05  21        Ready to proceed.
08:48:06  22        (Videotape deposition of Rohan Houlden:)
08:48:08  23   Q.   Good morning, Mr. Houlden.  As you heard, my name is
08:48:11  24   Jonathan DeFosse.  I'm one of the attorneys representing
08:48:14  25   Qorvo in the matter.  You understand that you're testifying
```

672

```
08:48:18   1   under oath today?
08:48:18   2   A.   Yes.
08:48:19   3   Q.   What is your current job?
08:48:21   4   A.   I am at Gallium Semiconductor.
08:48:25   5   Q.   What's your position at Gallium Semiconductor?
08:48:30   6   A.   CEO.
08:48:31   7   Q.   What's the nature of Gallium Semiconductor's
08:48:34   8   business?
08:48:34   9   A.   Working on gallium nitride products for 5G
08:48:41  10   infrastructure and defense and Aerospace.
08:48:45  11   Q.   And prior to July of 2022, where were you employed?
08:48:49  12   A.   I was employed at Akoustis.
08:48:55  13   Q.   And that's the defendant in the matter, Akoustis,
08:48:55  14   Inc.?
08:48:55  15   A.   Yes.
08:48:56  16   Q.   When did you start working at Akoustis, Inc.?
08:49:00  17   A.   Late September, 2016.
08:49:03  18   Q.   When you accepted your position at Akoustis in late
08:49:03  19   September 2016, what was your role at the company?
08:49:17  20   A.   VP of product engineering.
08:49:19  21   Q.   Did your position at Akoustis change between
08:49:26  22   September 2016 and July of 2022?
08:49:28  23   A.   Yes.
08:49:31  24   Q.   And how is that?
08:49:32  25   A.   Late 2017, I become the Chief Product Officer.
```

845

Faulkner - direct

| | | |
|---|---|---|
| 13:59:38 | 1 | regard to an Akoustis employee's access of Trial Exhibit 14? |
| 13:59:43 | 2 | **A.**    Yes, I found this particular file, Trial Exhibit 14 |
| 13:59:49 | 3 | was attached to a series of e-mails between different |
| 13:59:53 | 4 | Akoustis employees.  And I have listed on the right a little |
| 13:59:57 | 5 | table of the sender and recipients, and the dates when the |
| 14:00:02 | 6 | messages were sent, each of them attaching this document to |
| 14:00:06 | 7 | the e-mail. |
| 14:00:09 | 8 | **Q.**    Did you review any of the e-mails that you discovered |
| 14:00:14 | 9 | attached Trial Exhibit 14, which is the BAW SAW filter |
| 14:00:20 | 10 | reliability testing document? |
| 14:00:22 | 11 | **A.**    Yes. |
| 14:00:23 | 12 | **Q.**    Mr. Buchbinder, can you please pull up PDX 5.30. |
| 14:00:29 | 13 |         Mr. Faulkner, can you explain to the jury what |
| 14:00:34 | 14 | you discovered with respect to access of Trial Exhibit 14? |
| 14:00:39 | 15 | **A.**    Certainly.  This is one of those e-mail messages, I |
| 14:00:44 | 16 | have blown up on the right side.  It was sent on |
| 14:00:48 | 17 | August 15th, of 2018 from Pat Lewis to Rohan Houlden.  It |
| 14:00:53 | 18 | includes the file, Trial Exhibit 14 as an attachment, and it |
| 14:00:57 | 19 | has a little message in the body that says "PG 4-5 should |
| 14:01:05 | 20 | look very familiar." |
| 14:01:06 | 21 | **Q.**    Did you find any other evidence that Akoustis |
| 14:01:09 | 22 | accessed the BAW SAW reliability testing PowerPoint that is |
| 14:01:13 | 23 | Trial Exhibit 14? |
| 14:01:15 | 24 | **A.**    Yes. |
| 14:01:15 | 25 | **Q.**    Mr. Buchbinder, could you please pull up PDX 5.31? |

846

Faulkner - cross

| | | |
|---|---|---|
| 14:01:20 | 1 |         Can you explain to the jury what you discovered |
| 14:01:24 | 2 | when you analyzed whether or not Akoustis employees accessed |
| 14:01:28 | 3 | Trial Exhibit 14? |
| 14:01:29 | 4 | **A.**    Certainly.  This is another one of those e-mail |
| 14:01:33 | 5 | messages that I have blown up on the right.  This one is a |
| 14:01:36 | 6 | little later in time.  It looks like April 18th of 2019. |
| 14:01:41 | 7 | And this is where Mr. Morgan accessed the file and attached |
| 14:01:46 | 8 | it to an e-mail sending it to Mr. Houlden and Mr. Aichele, |
| 14:01:52 | 9 | and again, wrote a little message in the e-mail as well, and |
| 14:01:56 | 10 | I have highlighted a portion of it here.  It says, "This is |
| 14:01:59 | 11 | the primary document I have been referencing regarding |
| 14:02:02 | 12 | methodology for three temp testing/MTTF determination." |
| 14:02:12 | 13 |         MS. AYERS:  I have no further questions, Your |
| 14:02:14 | 14 | Honor. |
| 14:02:14 | 15 |         THE COURT:  Cross-examination. |
| 14:02:16 | 16 |         MS. CAI:  Thank you, Your Honor. |
| 14:02:17 | 17 |         CROSS-EXAMINATION |
| 14:02:18 | 18 | BY MS. CAI: |
| 14:02:23 | 19 | **Q.**    Good afternoon, Mr. Faulkner, I am Xiaomai Cai.  I am |
| 14:02:28 | 20 | one of the defense attorneys for Akoustis.  It's very nice |
| 14:02:31 | 21 | to meet you again, this time in person. |
| 14:02:33 | 22 | **A.**    Nice to meet you again as well, in person. |
| 14:02:36 | 23 | **Q.**    So Mr. Faulkner, you testified that for your forensic |
| 14:02:43 | 24 | analysis you found about over 9,000 files across Akoustis's |
| 14:02:48 | 25 | devices: right? |

847

Faulkner - cross

| | | |
|---|---|---|
| 14:02:49 | 1 | **A.**    In total, across all of them, yes, over 9,000 files. |
| 14:02:53 | 2 | **Q.**    So the 9,000 files was based on your search for a |
| 14:02:58 | 3 | list of Qorvo files that you received from another expert in |
| 14:03:03 | 4 | this case, Dr. Shanfield: right? |
| 14:03:06 | 5 | **A.**    I received through counsel, yes, it was a list from |
| 14:03:11 | 6 | Dr. Shanfield provided to counsel who provided it to me and |
| 14:03:14 | 7 | that was the list of file names, MD5 Hash values that I was |
| 14:03:21 | 8 | searching for. |
| 14:03:22 | 9 | **Q.**    So do you understand those files were from |
| 14:03:26 | 10 | Dr. Shanfield when you provided that -- when you provided |
| 14:03:32 | 11 | your report? |
| 14:03:36 | 12 | **A.**    I don't recall what I understood at the time.  I knew |
| 14:03:42 | 13 | I got them from counsel.  And I know sitting here today that |
| 14:03:47 | 14 | that came from Dr. Shanfield, that he relied on them in his |
| 14:03:52 | 15 | report. |
| 14:03:52 | 16 | **Q.**    So you did not review those documents individually to |
| 14:04:02 | 17 | see their contents, correct? |
| 14:04:05 | 18 | **A.**    That's correct, I didn't go through the contents of |
| 14:04:08 | 19 | each of those documents, no. |
| 14:04:19 | 20 | **Q.**    You are -- just wanted to be sure.  Do you have any |
| 14:04:26 | 21 | experience in the research, design, or development of any |
| 14:04:29 | 22 | Akoustis filters? |
| 14:04:33 | 23 | **A.**    No, I don't. |
| 14:04:33 | 24 | **Q.**    And do you have any educational background in this |
| 14:04:37 | 25 | field? |

848

Faulkner - cross

| | | |
|---|---|---|
| 14:04:37 | 1 | **A.**    No, not in filters. |
| 14:04:39 | 2 | **Q.**    So you don't consider yourself to be qualified to |
| 14:04:42 | 3 | testify about any confidentiality in this field, correct? |
| 14:04:51 | 4 | **A.**    I would say that I don't think that I would |
| 14:04:56 | 5 | understand the nature of designing filters and what |
| 14:05:01 | 6 | information about their design might be confidential versus |
| 14:05:01 | 7 | not confidential, if that's what you mean. |
| 14:05:09 | 8 | **Q.**    So you don't actually offer any opinion as to whether |
| 14:05:14 | 9 | a document you found is confidential or not: correct? |
| 14:05:19 | 10 | **A.**    I would say that I don't offer any independent |
| 14:05:22 | 11 | opinion on that, no. |
| 14:05:31 | 12 | **Q.**    So among the 9,000 files you found, would you agree |
| 14:05:39 | 13 | that about over 99 percent of them were just from Akoustis |
| 14:05:47 | 14 | custodians? |
| 14:05:49 | 15 | **A.**    I haven't run the math, but I do recall that two of |
| 14:05:53 | 16 | the Akoustis custodians had over a thousand files each, |
| 14:05:57 | 17 | Mr. Houlden and Mr. Vetury, so I know they had the lion's |
| 14:06:02 | 18 | share, but I'm afraid I didn't do the math to see what |
| 14:06:05 | 19 | percentage that was. |
| 14:06:06 | 20 | **Q.**    So you testified about 6,300 files were actually |
| 14:06:13 | 21 | found from Dr. Houlden, is that correct? |
| 14:06:17 | 22 | **A.**    Yes, over 6,300. |
| 14:06:19 | 23 | **Q.**    And another 2,300 files from Dr. Rama Vetury, is that |
| 14:06:24 | 24 | correct? |
| 14:06:28 | 25 | **A.**    Off the top of my head it was either 22 or 2,300, |

849

Faulkner - cross

14:06:33 1 somewhere in that range.

14:06:34 2 Q. So those two kind of add up to about 8600? Sorry to

14:06:41 3 impose the math on you.

14:06:42 4 A. So, 8,600 out of, I think the total was like 93,

14:06:48 5 9,400, again, it's the lion share, I don't know if that's 93

14:06:53 6 versus 94 versus 90 percent, but it's certainly the

14:06:57 7 majority.

14:06:58 8 Q. And do you recall you found about 460 files from

14:07:03 9 Dr. David Dyer's data?

14:07:09 10 A. I don't recall the exact number for David Dyer. I

14:07:14 11 believe it was on my slides, but I don't recall the number

14:07:19 12 off the top of my head.

14:07:21 13 Q. Do you recall you found about 310 files from

14:07:26 14 Dr. Robert Dry's data?

14:07:28 15 A. Somebody has pulled up my chart and this is very

14:07:32 16 helpful. I see 306 for Mr. Dry.

14:07:37 17 Q. So if I tell you the files you found from these four

14:07:43 18 individuals add up to about 9,400 documents, does that sound

14:07:52 19 about right?

14:07:54 20 A. Let me see.

14:08:06 21 It is certainly over 9,000. It very well may be

14:08:11 22 9,400, I didn't do the full math, but it's from the -- from

14:08:17 23 the limited devices that I was able to examine, that's what

14:08:21 24 I found and those individuals have the lion share.

14:08:26 25 Q. So for your forensic analysis, you also examined the

850

Faulkner - cross

14:08:30 1 data from Ms. Mary Winters, correct?

14:08:34 2 A. Yes. For whatever was provided, yes.

14:08:39 3 Q. Do you recall how many files were found from her

14:08:44 4 data?

14:08:47 5 A. I don't recall the number of her files off the top of

14:08:52 6 my head. I believe it was a fairly low number from the

14:08:57 7 limited devices I was able to examine from her, though.

14:09:00 8 Q. If I told you you only found one file from her data

14:09:04 9 set, do you have any reason to disagree?

14:09:07 10 A. No, that sounds possible.

14:09:10 11 Q. And you also found no forensic artifacts indicating

14:09:16 12 she ever accessed that one file; right?

14:09:21 13 A. I believe from the -- again, limited data that I had

14:09:24 14 from Ms. Winters, that very well is possible.

14:09:29 15 Q. You also searched for the data, data sets from

14:09:39 16 Dr. Daeho Kim?

14:09:39 17 A. I recall that name being one of the ones I examined,

14:09:43 18 yes.

14:09:43 19 Q. You also found no forensic artifacts showing access

14:09:47 20 by Dr. Daeho Kim, that is correct?

14:09:51 21 A. Again, from the limited computer systems that I was

14:09:54 22 provided to examine, I don't believe I found any for Daeho

14:09:59 23 Kim.

14:10:00 24 Q. You also examined the data files of Mr. David

14:10:06 25 Aichele, is that correct?

851

Faulkner - cross

14:10:09 1 A. Yes, I think he was on the list on my chart, if I

14:10:14 2 recall.

14:10:16 3 Q. And you didn't find any forensic artifacts showing he

14:10:21 4 ever accessed any Qorvo files you searched; is that right?

14:10:36 5 A. I don't -- I don't recall if we had any for

14:10:40 6 Mr. Aichele or not. If I did, they would be in the

14:10:44 7 spreadsheets that were entered as trial exhibits from my

14:10:48 8 report. But I don't recall if there were any in there or

14:10:53 9 not.

14:10:54 10 Q. Will reviewing your report help to refresh your

14:10:59 11 memory?

14:10:59 12 A. I think I would have to review -- well, perhaps, yes,

14:11:03 13 because my report would have noted what I found, or

14:11:06 14 summarized what I found.

14:11:09 15 MS. CAI: Your Honor, may I approach the witness

14:11:11 16 to hand over a document?

14:11:13 17 THE COURT: You may.

14:11:40 18 THE WITNESS: Thank you. My recollection is

14:11:47 19 indeed refreshed.

14:11:49 20 BY MS. CAI:

14:11:50 21 Q. You may close that binder.

14:11:52 22 A. Okay. It is closed.

14:11:53 23 Q. So now testifying from your present memory, do you

14:11:58 24 recall that you found no forensic artifacts indicating

14:12:01 25 access by Mr. David Aichele?

852

Faulkner - cross

14:12:05 1 A. Yes, for the limited computer systems I examined for

14:12:09 2 Mr. Aichele, I did not find any forensic artifacts of

14:12:14 3 access.

14:12:14 4 Q. And you also testified earlier that you found about

14:12:18 5 500,000 Qorvo e-mails in Akoustis's forensic data, is that

14:12:24 6 right?

14:12:24 7 A. Yes.

14:12:25 8 Q. And you testified that you did not look at the

14:12:30 9 individuals of those e-mails: is that right?

14:12:34 10 A. Yes. That's right, I didn't dig through that set of

14:12:37 11 e-mails.

14:12:38 12 Q. So to be clear, those 5,000 -- or 500,000 e-mails are

14:12:45 13 not freestanding e-mails you found, right?

14:12:48 14 A. I think I understand your question. They weren't

14:12:51 15 freestanding, as in stored as individual separate messages

14:12:56 16 on the computers, they were stored within these PST

14:13:00 17 container files. It's a type of file that stores like a

14:13:04 18 whole mailbox of e-mail, and there were several of these PST

14:13:08 19 files for each of the two employees that had Qorvo e-mail.

14:13:15 20 Q. Are the PST and -- are the PST files common e-mail

14:13:19 21 container files?

14:13:23 22 A. Yes, they are.

14:13:25 23 Q. You have forensic tools to analyze the contents of

14:13:30 24 them if you request it, correct?

14:13:33 25 A. I have tools that can analyze what's in the PST file,

849

Faulkner - cross

14:06:33 1 somewhere in that range.

14:06:34 2 Q.    So those two kind of add up to about 8600?  Sorry to

14:06:41 3 impose the math on you.

14:06:42 4 A.    So, 8,600 out of, I think the total was like 93,

14:06:48 5 9,400, again, it's the lion share, I don't know if that's 93

14:06:53 6 versus 94 versus 90 percent, but it's certainly the

14:06:57 7 majority.

14:06:58 8 Q.    And do you recall you found about 460 files from

14:07:03 9 Dr. David Dyer's data?

14:07:09 10 A.    I don't recall the exact number for David Dyer.  I

14:07:14 11 believe it was on my slides, but I don't recall the number

14:07:19 12 off the top of my head.

14:07:21 13 Q.    Do you recall you found about 310 files from

14:07:26 14 Dr. Robert Dry's data?

14:07:28 15 A.    Somebody has pulled up my chart and this is very

14:07:32 16 helpful.  I see 306 for Mr. Dry.

14:07:37 17 Q.    So if I tell you the files you found from these four

14:07:43 18 individuals add up to about 9,400 documents, does that sound

14:07:52 19 about right?

14:07:54 20 A.    Let me see.

14:08:06 21       It is certainly over 9,000.  It very well may be

14:08:11 22 9,400, I don't do the full math, but it's from the -- from

14:08:17 23 the limited devices that I was able to examine, that's what

14:08:21 24 I found and those individuals have the lion share.

14:08:26 25 Q.    So for your forensic analysis, you also examined the

850

Faulkner - cross

14:08:30 1 data from Ms. Mary Winters, correct?

14:08:34 2 A.    Yes.  For whatever was provided, yes.

14:08:39 3 Q.    Do you recall how many files were found from her

14:08:44 4 data?

14:08:47 5 A.    I don't recall the number of her files off the top of

14:08:52 6 my head.  I believe it was a fairly low number from the

14:08:57 7 limited devices I was able to examine from her, though.

14:09:00 8 Q.    If I told you you only found one file from her data

14:09:04 9 set, do you have any reason to disagree?

14:09:07 10 A.    No, that sounds possible.

14:09:10 11 Q.    And you also found no forensic artifacts indicating

14:09:16 12 she ever accessed that one file; right?

14:09:21 13 A.    I believe from the -- again, limited data that I had

14:09:24 14 from Ms. Winters, that very well is possible.

14:09:29 15 Q.    You also searched for the data, data sets from

14:09:39 16 Dr. Daeho Kim?

14:09:39 17 A.    I recall that name being one of the ones I examined,

14:09:43 18 yes.

14:09:43 19 Q.    You also found no forensic artifacts showing access

14:09:49 20 by Dr. Daeho Kim, that is correct?

14:09:51 21 A.    Again, from the limited computer systems that I was

14:09:54 22 provided to examine, I don't believe I found any for Daeho

14:09:59 23 Kim.

14:10:00 24 Q.    You also examined the data files of Mr. David

14:10:06 25 Aichele, is that correct?

851

Faulkner - cross

14:10:09 1 A.    Yes, I think he was on the list on my chart, if I

14:10:14 2 recall.

14:10:16 3 Q.    And you didn't find any forensic artifacts showing he

14:10:21 4 ever accessed any Qorvo files you searched; is that right?

14:10:36 5 A.    I don't -- I don't recall if we had any for

14:10:40 6 Mr. Aichele or not.  If I did, they would be in the

14:10:44 7 spreadsheets that were entered as trial exhibits from my

14:10:48 8 report.  But I don't recall if there were any in there or

14:10:53 9 not.

14:10:54 10 Q.    Will reviewing your report help to refresh your

14:10:59 11 memory?

14:10:59 12 A.    I think I would have to review -- well, perhaps, yes,

14:11:03 13 because my report would have noted what I found, or

14:11:06 14 summarized what I found.

14:11:09 15       MS. CAI:  Your Honor, may I approach the witness

14:11:11 16 to hand over a document?

14:11:13 17       THE COURT:  You may.

14:11:43 18       THE WITNESS:  Thank you.  My recollection is

14:11:47 19 indeed refreshed.

14:11:49 20 BY MS. CAI:

14:11:50 21 Q.    You may close that binder.

14:11:52 22 A.    Okay.  It is closed.

14:11:53 23 Q.    So now testifying from your present memory, do you

14:11:58 24 recall that you found no forensic artifacts indicating

14:12:01 25 access by Mr. David Aichele?

852

Faulkner - cross

14:12:05 1 A.    Yes, for the limited computer systems I examined for

14:12:09 2 Mr. Aichele, I did not find any forensic artifacts of

14:12:14 3 access.

14:12:14 4 Q.    And you also testified earlier that you found about

14:12:18 5 500,000 Qorvo e-mails in Akoustis's forensic data, is that

14:12:24 6 right?

14:12:24 7 A.    Yes.

14:12:25 8 Q.    And you testified that you did not look at the

14:12:30 9 individuals of those e-mails: is that right?

14:12:34 10 A.    Yes.  That's right, I didn't dig through that set of

14:12:37 11 e-mails.

14:12:38 12 Q.    So to be clear, those 5,000 -- or 500,000 e-mails are

14:12:45 13 not freestanding e-mails you found, right?

14:12:48 14 A.    I think I understand your question.  They weren't

14:12:51 15 freestanding, as in stored as individual separate messages

14:12:56 16 on the computers, they were stored within these PST

14:13:00 17 container files.  It's a type of file that stores like a

14:13:04 18 whole mailbox of e-mail, and there were several of these PST

14:13:08 19 files for each of the two employees that had Qorvo e-mail.

14:13:15 20 Q.    Are the PST and -- are the PST files common e-mail

14:13:19 21 container files?

14:13:23 22 A.    Yes, they are.

14:13:25 23 Q.    You have forensic tools to analyze the contents of

14:13:30 24 them if you request it, correct?

14:13:33 25 A.    I have tools that can analyze what's in the PST file,

853

Faulkner - cross

14:13:38 1 yes.

14:13:38 2 Q. So you mean you have forensic tools to extract the
14:13:43 3 individual e-mails from the PST files and then do further
14:13:49 4 inspections?

14:13:49 5 A. Yes, I have such tools.

14:13:53 6 Q. You just did not do such an analysis in this case;
14:13:57 7 correct?

14:13:58 8 A. It wasn't something that I was needed for since those
14:14:02 9 e-mails were Qorvo materials that were then returned to
14:14:06 10 Qorvo's counsel, others were able to look through those
14:14:11 11 e-mails and didn't need my expertise.

14:14:14 12 Q. So you do not provide any opinion as to what's
14:14:18 13 contained in these e-mails?

14:14:20 14 A. Only that it's Qorvo mailbox, Qorvo e-mails, nothing
14:14:27 15 beyond that.

14:14:29 16 Q. The majority of the e-mails came from the user
14:14:33 17 profile, Mr. Todd Bender, correct?

14:14:41 18 A. The two users were Mr. Bender and Mr. Vetury. I
14:14:47 19 don't recall which of them had more than the other, frankly.

14:15:04 20 Q. So if I tell you you found about 320,000 Qorvo
14:15:15 21 e-mails in Mr. Todd Bender's files, do you have any reason
14:15:19 22 to disagree?

14:15:22 23 A. No sounds right, I think it was over 320,000, 327,000
14:15:28 24 total.

14:15:29 25 Q. So do you understand that Todd Bender's work relates

854

Faulkner - cross

14:15:34 1 to tax at Akoustis?

14:15:37 2 A. Relates -- I'm sorry, to tax?

14:15:40 3 Q. Do you understand that Mr. Todd Bender's work relates
14:15:44 4 to text and treasury at Akoustis?

14:15:49 5 A. I think I remember seeing his title at Akoustis, but
14:15:57 6 I don't know beyond his title what his work entails. I
14:16:00 7 think his title was something about tax or finance or
14:16:03 8 something like that.

14:16:05 9 Q. And the rest of the e-mails came from the user
14:16:08 10 profile of Dr. Rama Vetury, correct?

14:16:11 11 A. Yes, that's correct.

14:16:16 12 Q. You did not find any evidence that Dr. Vetury's
14:16:21 13 e-mail contained files were ever accessed by anyone, do you?

14:16:30 14 A. I think from the -- again, limited computer devices
14:16:34 15 that I looked at, I don't recall seeing specifically access
14:16:38 16 to those files.

14:16:42 17 Q. You also testified earlier that you found about 279
14:16:50 18 gigabytes of backup files, also from Dr. Vetury's data,
14:16:55 19 correct?

14:16:59 20 A. Yes, that's right.

14:17:00 21 Q. And you did not analyze what's contained in those
14:17:05 22 backup files, right?

14:17:06 23 A. That's right.

14:17:06 24 Q. So you don't know the contents of those backup files?

14:17:10 25 A. Well, I know that the contents are information from

855

Faulkner - cross

14:17:14 1 his Qorvo computer, but I didn't then go digging through the
14:17:18 2 documents or anything like that, I examined them enough to
14:17:22 3 figure out this wasn't a back up of his Akoustis computer or
14:17:26 4 something like that, but I did not review all the documents.

14:17:29 5 Q. And you did not search for the list of documents you
14:17:34 6 received -- the list of Qorvo files you received from
14:17:39 7 counsel for Qorvo in those backup files; right?

14:17:43 8 A. That's correct. Again, like the e-mails, those were
14:17:47 9 provided over to Qorvo's counsel, so my skills, my work
14:17:53 10 wasn't needed to go through them and figure out what was in
14:17:56 11 there, unlike the Akoustis computers that can't go to
14:18:02 12 Qorvo's counsel, my work is needed to dig through them.

14:18:06 13 Q. Again, you have forensic tools allowing to you
14:18:11 14 inspect the contents if requested, right?

14:18:13 15 A. Yes, I have the tools to do it.

14:18:19 16 Q. So what's contained in those Qorvo -- sorry, in those
14:18:24 17 backup files and e-mail files can be any Qorvo information;
14:18:29 18 is that right?

14:18:29 19 A. Yes, it could be. Again, I haven't reviewed them so
14:18:35 20 I don't know what individual documents may be in there.

14:18:37 21 Q. And they may not even be Qorvo information, right, it
14:18:42 22 could be personal information?

14:18:43 23 A. If that's what was on Dr. Vetury's Qorvo laptop, it
14:18:49 24 certainly could be.

14:18:50 25 Q. Do you have any evidence that Dr. Vetury ever opened

856

Faulkner - cross

14:18:54 1 these backup files?

14:18:56 2 A. From the limited computers that I examined for
14:19:01 3 Dr. Vetury, I don't recall seeing any evidence of him
14:19:03 4 opening those.

14:19:07 5 Q. Do you have any evidence that these backup files were
14:19:13 6 ever accessed by anyone at Akoustis?

14:19:21 7 A. I don't believe from the systems that I looked at
14:19:24 8 that I saw any evidence of them being accessed.

14:19:36 9 Q. And you testified that you inspected forensic access
14:19:40 10 relating to accessing of files, is that right?

14:19:45 11 A. Yes, that's one of the things I testified about.

14:19:47 12 Q. And you pointed to several forensic artifacts, such
14:19:53 13 as junk list link files and the utility files to indicate
14:19:58 14 the access: right?

14:20:00 15 A. Those were some of the artifacts I looked at, yes.

14:20:09 16 Q. By accessing a file, you mean opening a file, right?

14:20:13 17 A. Yes. Generally that -- yes, that's what I mean by
14:20:18 18 accessing.

14:20:20 19 Q. Would you agree that merely having possession of a
14:20:25 20 file does not necessarily mean accessing a file?

14:20:33 21 A. Absolutely, yeah, you can have a file and not open
14:20:33 22 it, then you may possess it and not access it.

14:20:37 23 Q. If it is accessed, you would have for those forensic
14:20:44 24 analysis you did for this case, you would see a forensic
14:20:48 25 artifacts showing up in one of those spreadsheets you

869

14:41:28  1   Q.   I'm sorry?

14:41:30  2   A.   Or in RFMD?

14:41:31  3   Q.   At RFMD.  My apologies.

14:41:36  4   A.   In -- when I joined RFMD, I was -- I ran the team.

14:41:40  5   Actually let me take it back.  When I joined RFMD, I was a

14:41:43  6   process engineer.  I soon was given the responsibility of

14:41:46  7   running the whole team.  I did that from 2004 until 2008.

14:41:52  8   And by 2008, we had -- it was fully production-ready.  We

14:42:00  9   actually ran some pile lot production out of the Fab in

14:42:04  10  Charlotte, and it was good enough to be handed off to the

14:42:07  11  Fab in Greensboro.

14:42:12  12        So that happened in 2008.  So I -- I was a

14:42:18  13  process engineer and then ran the entire technology.

14:42:20  14  Q.   Okay.  And then why did you leave RFMD?

14:42:23  15  A.   After the merger with TriQuint, I didn't really find

14:42:30  16  a good home.  I think I told you the last thing I did was

14:42:36  17  supporting business.  My technical interest, I guess,

14:42:43  18  did not align with what I was doing then.  So, yeah.

14:42:56  19  Q.   At that point, did you begin looking for another

14:43:06  20  position, or were you recruited?

14:43:08  21  A.   I was -- not clear exactly how to answer that,

14:43:15  22  because obviously I had been working with Jeff from 2002.  I

14:43:23  23  knew he started this company, and I knew -- I knew him.  I

14:43:28  24  knew he started this company, and I got to the point where I

14:43:32  25  was not really interested in the work that I was doing.

870

14:43:43  1         And I guess you could say it was a mix of both.

14:43:47  2   I reached out to him.  He reached out to me.  I can't recall

14:43:50  3   exactly who reached out when, what, all of that, but I had

14:43:56  4   been in touch with him.

14:43:58  5   Q.   Okay.  Did -- you start at Akoustis in August or

14:44:02  6   September of 2015, is that right?

14:44:04  7   A.   Yeah, I think that's -- that's what I said, right.

14:44:11  8   Q.   Okay.  And you're still at Akoustis today?

14:44:24  9   A.   Yes.

14:44:25  10  Q.   So why don't we walk through each of your positions

14:44:28  11  that you've had at Akoustis since you began.  It might be

14:44:32  12  easiest to start at a high level, and then I'll ask you

14:44:36  13  about each position.  So what was your first position?

14:44:41  14  A.   So I was hired at Akoustis to run the device

14:44:44  15  technology.  We developed a resonator technology.  I did

14:44:48  16  that for some length of time, a couple of years or -- I did

14:44:56  17  that from the day I joined until about 2000 -- I can't

14:45:04  18  recall if it was the beginning of 2018 or the end of 2017 or

14:45:13  19  the middle of 2018, somewhere in that time frame.  So I did

14:45:18  20  that for -- for that duration.  And then I did filter design

14:45:23  21  from -- RF filter design from that point until, say, January

14:45:29  22  of 2022.

14:45:33  23        And then I've been working on DARPA programs

14:45:39  24  since either December of 2021 and -- somewhere in that --

14:45:44  25  that transition between 2021 and 2022 -- let's say

871

14:45:49  1   January 2022 until now, to date.

14:45:54  2   Q.   So when you -- when you started at Akoustis, did

14:45:58  3   Akoustis have a functional resonator design?

14:46:02  4   A.   When I started, I -- they had something.  I would not

14:46:08  5   call it a functional resonator design.  I mean, it didn't --

14:46:13  6   maybe it resonated, I guess, when I first came -- the way in

14:46:21  7   which we were measuring the resonator also wasn't so

14:46:25  8   accurate.  It was -- if it did resonate, it did not resonate

14:46:31  9   very well.

14:46:32  10        So I guess it depends on your definition of

14:46:38  11  "functional."  It depends on what metrics you associate with

14:46:41  12  that.

14:46:41  13  Q.   Were the -- when you had to fab the prototypes, or

14:46:46  14  make the prototypes, were they done internally at Akoustis

14:46:50  15  or by one of your other vendors?

14:46:52  16  A.   Okay.  So before we had our New York fab, everything

14:46:56  17  we built was in our foundry, not -- when I say "our

14:47:02  18  foundry," not the one we owned, but the one we contracted

14:47:05  19  the work to.  So whatever comes back on the wafer, the wafer

14:47:09  20  is manufactured by the foundry; right?  So I'm not sure how

14:47:14  21  else to answer your question.

14:47:14  22  Q.   You answered it.

14:47:15  23  A.   Okay.

14:47:16  24  Q.   So I think you said, before you were hired by

14:47:19  25  Akoustis, you had -- you had not worked on the RF filters

872

14:47:23  1   before; is that right?

14:47:26  2   A.   Correct.

14:47:27  3   Q.   And had you worked on --

14:47:29  4   A.   Correct.

14:47:30  5   Q.   And -- nor on resonators, correct?

14:47:33  6   A.   No, no, no RF filters or resonators.

14:47:37  7   Q.   The -- you mentioned a few people that you -- that

14:47:40  8   worked on the resonator -- resonator design in this -- when

14:47:40  9   you had this initial position.  Did any of them have

14:47:47  10  previous experience working on resonators?

14:47:49  11  A.   As far as I know, no.  Yeah, as far as I know, no.

14:47:58  12  Q.   From the time you were hired up until the time of the

14:48:02  13  New York Fab acquisition, do you recall Akoustis hiring

14:48:07  14  anyone that had background in resonator design?

14:48:14  15  A.   Yeah.  The most -- the most important person we hired

14:48:17  16  was Daeho, Daeho Kim.  And he was the -- we were looking for

14:48:23  17  someone who -- who knew resonators inside out from, like --

14:48:28  18  like someone who has done a Ph.D. in resonators and so on.

14:48:34  19  And -- and he was that guy.

14:48:38  20        He -- so he knew -- he knew two things that were

14:48:42  21  very helpful, obviously.  He -- he knew resonators from his

14:48:47  22  academic work, and I think he was briefly a professor, and

14:48:51  23  his -- his industry experience.  So he was an expert in the

14:48:54  24  domain.  And, also, he had knowledge of MEMS processes.  So

14:49:01  25  he was a critical hire for the technology piece of it.

*Aichele - Cross* 1014

09:04 1 has to recognize and sign and acknowledge, and they all
09:04 2 state pretty much the same thing in different words,
09:04 3 basically, that any individual that joins Akoustis will
09:04 4 not bring in any third party intellectual property or
09:04 5 inventions.
09:04 6 Q.   What happens to an employee who violates those
09:04 7 policies?
09:04 8 A.   You know, obviously, it has to be raised, you know,
09:04 9 as a violation, you know.  And I believe if it's raised as
09:04 10 a violation, it should go to our HR director and then also
09:05 11 to general counsel.
09:05 12 Q.   Who decides the consequences, if any, if an employee
09:05 13 is found to have violated the policies you mentioned?
09:05 14 A.   My understanding is that, you know, that the HR
09:05 15 director and also general counsel would bring that before
09:05 16 our CEO, which is Dr. Shealy, and determinations would be
09:05 17 made at that point.
09:05 18 Q.   I think you testified yesterday about discussions
09:05 19 that you had with a couple of people who were based in
09:05 20 Asia.  Have you had occasions to discuss company policies
09:05 21 regarding third-party information with anybody else at
09:05 22 Akoustis?
09:05 23 A.   Yes.  I think I had discussions with Rohan at the
09:05 24 time, and then, obviously, my main interactions and focus
09:06 25 has been more with the sales team.  And, again, it's

*Aichele - Cross* 1015

09:06 1 really, you know -- and I've done this for many years,
09:06 2 collecting competitive information.  And, you know, with
09:06 3 the sales organization is that and/or others, you know, in
09:06 4 the, I guess, the outside that share information.  There
09:06 5 is competitive information, then there's truly
09:06 6 confidential information.  You've just got to be careful.
09:06 7 But competitive information is something everybody
09:06 8 does in the industry.  It's not exclusive to Akoustis.
09:06 9 You've just got to make sure that, you know, if it is
09:06 10 truly confidential, we don't need it, we don't want it.
09:06 11 It's not anything that we want to bring in.
09:06 12 Q.   Is it -- can it be hard to make that distinction?
09:06 13 A.   Yeah.  You know, documents can be marked confidential
09:06 14 that are basically in the public domain, you know, and a
09:06 15 lot of people have been tainted, or, I guess, numb to it,
09:06 16 they may ignore it.  I think it's clear certain documents,
09:06 17 you know, that were shared yesterday, they are truly
09:07 18 confidential, and we should not have had them.  The price
09:07 19 book -- I'll give an example too.  And that is something,
09:07 20 though, that was not used.  And but it is hard to make
09:07 21 distinctions, you know, with, you know, certain documents.
09:07 22 Q.   Did you ever speak with Mr. Houlden about sharing
09:07 23 documents that appeared to come from Qorvo?
09:07 24 A.   Yes.  I remember having conversations with him
09:07 25 regarding those documents, but not specifics that I can

*Aichele - Cross* 1016

09:07 1 recall.
09:07 2 Q.   Did you take any action in connection with
09:07 3 Mr. Houlden sharing documents that appeared to come from
09:07 4 Qorvo apart from your discussions with him?
09:07 5 A.   No, I did not.
09:07 6 Q.   Well, given the company's policies that you discussed
09:07 7 a few minutes ago, why didn't you?
09:07 8 A.   I would highlight several reasons.  You know, first
09:07 9 is that we did have an NDA with Qorvo.  And Rohan was
09:07 10 having -- Mr. Houlden was having multiple discussions with
09:08 11 multiple people within Qorvo.  And so anything that he
09:08 12 would send me, I don't know exactly where he got it, you
09:08 13 know, if it was through, obviously, you know, right
09:08 14 channels or incorrect channels.  So I just didn't raise,
09:08 15 you know, any visibility to me on that as being a concern.
09:08 16 The second thing is, our technology is completely
09:08 17 different than Qorvo.  We have this cap back freestanding
09:08 18 type area on top and bottom.  And the XBAW process is
09:08 19 completely different to Qorvo's SMR.  And nothing I saw in
09:08 20 any of those documents tainted us with any kind of trade
09:08 21 secret, you know, that I thought would raise the level of
09:08 22 concern.
09:08 23 Third thing is -- I just touched on that earlier, but
09:08 24 just to reiterate.  You know, for many years I've been in
09:08 25 the industry, you know, I've made mistakes and, you know,

*Aichele - Cross* 1017

09:08 1 put in "Confidential" when I didn't need to put
09:08 2 "Confidential" in the tag.  I've used presentations that
09:08 3 were confidential in a public domain.  I am positive that,
09:09 4 you know, I did this at R&D, I'm positive Qorvo still does
09:09 5 that today.
09:09 6 And so when I see documents, you know, it maybe
09:09 7 didn't raise a level.  I didn't know exactly where it came
09:09 8 from.
09:09 9 The last part is just on the business intelligence.
09:09 10 We were leading the market.  We were ahead of it.  You
09:09 11 know, we showed the 1903.  I shared data sheets now today
09:09 12 that I'm sure that are, you know, marked "Confidential"
09:09 13 that get out into the public domain.  I don't look at the
09:09 14 trade data sheet as a trade secret.  I look at the data
09:09 15 sheet as a contract to the market to the customers.  It
09:09 16 doesn't tell you how to design.  It doesn't tell you how
09:09 17 to -- you know, how to fabricate the device.  It basically
09:09 18 shows you the kind of response.
09:09 19 So it's -- again, I don't really hold a lot
09:09 20 personally, you know, to data sheets.  I know they're
09:09 21 going to get leaked.  And this business is intelligent.
09:09 22 We were ahead on the market, so I didn't pay attention too
09:09 23 much.
09:09 24 Nevertheless, you know, Rohan was an officer of the
09:10 25 company.  He shared, you know, the documents, I believe,

09:10  1   based on the discovery here that, you know, were

09:10  2   confidential.  And, you know, I should have raised that.

09:10  3   You know, it's a lesson learn.  It's something that I am

09:10  4   applying now more diligently than I did prior to, you

09:10  5   know, this lawsuit.  And it's something that I do regret.

09:10  6   **Q.**   We heard the context of Mr. Houlden's deposition,

09:10  7   indicated that he was no longer at Akoustis at that time.

09:10  8        Do you know the circumstances of Mr. Houlden's

09:10  9   departure from Akoustis?

09:10  10  **A.**   Yes, I do.

09:10  11  **Q.**   How is it that you know that?

09:10  12  **A.**   When -- of my two depositions.  One was an individual

09:10  13  deposition, and the other one I was a representative of

09:10  14  Akoustis, you know, for certain topics.  So I talked with

09:10  15  Dr. Shealy prior to my Akoustis deposition.

09:10  16  **Q.**   What did you learn about Mr. Houlden's separation

09:11  17  from the company?

09:11  18  **A.**   What I learned is that Mr. Houlden was terminated due

09:11  19  to, basically, not meeting personal goals and/or job

09:11  20  responsibilities.  And so it's a performance-based

09:11  21  termination.

09:11  22  **Q.**   When did that termination take place?

09:11  23  **A.**   I believe it was around the middle of 2022.

09:11  24  **Q.**   What role, if any, did this case play in

09:11  25  Mr. Houlden's termination?

09:11  1   **A.**   Absolutely nothing.

09:11  2   **Q.**   Why is that?

09:11  3   **A.**   You know, it -- I don't know exactly the time of, you

09:11  4   know, when a lot of this confidential information and the

09:11  5   discovery phase was made evident.  You know, originally,

09:11  6   when the lawsuit came in, it was more, I believe, on IP

09:11  7   infringement and so forth.

09:11  8        So that's just my viewpoint, is that -- the true

09:11  9   decision.  And, you know, we set out metrics and our

09:11  10  goals, you know, in the beginning of the 20 -- let's see,

09:11  11  if it was 2022, would have been middle of 2021.  So those

09:11  12  metrics are measured at the middle of 2022.  That's when

09:12  13  we do a review.  And I believe Jeff, maybe with guidance

09:12  14  from the board, they decided to do the termination based

09:12  15  on performance issues.

09:12  16  **Q.**   Thank you.

09:12  17       Okay.  We're going to switch gears.  I'm just going

09:12  18  to show you a series of four documents pretty quickly.

09:12  19  **A.**   Okay.

09:12  20  **Q.**   And just to be transparent, they're just to get them

09:12  21  into the record.  Other people will testify about them.

09:12  22       So the first one I'd like to show you is DTX-0558.

09:12  23       **MR. ELKINS:**   May I approach?

09:12  24       **THE COURT:**   You may.  I have a screen over

09:13  25  here.  Most of the time, I can see everything, so I'm

09:13  1   going to let the courtroom deputy keep the exhibits.

09:13  2   **BY MR. ELKINS:**

09:13  3   **Q.**   Mr. Aichele, do you recognize what you have in your

09:13  4   hands that has been marked as DTX-0558?

09:13  5   **A.**   Yes, I do, in general.

09:13  6   **Q.**   What is it?

09:13  7   **A.**   It is an e-mail to me from Rohan, and it has in it an

09:13  8   e-mail communication between himself and Robert Aigner

09:13  9   from Qorvo.

09:13  10  **Q.**   Do you recognize the e-mail thread subject matter?

09:13  11  **A.**   Yes, I do.

09:13  12  **Q.**   What -- what is it, generally?

09:13  13  **A.**   You know, Rohan -- and, again, Rohan and

09:13  14  Robert Aigner were periodically meeting face to face and

09:13  15  through e-mail exchanges.  And Robert Aigner was also

09:13  16  engaged with other technical people within the company,

09:13  17  myself included.

09:13  18       And in this e-mail it looks like Rohan had posted

09:14  19  several questions to Robert Aigner, and Robert Aigner

09:14  20  responded back in this e-mail addressing the third

09:14  21  question, which was about power handling and really

09:14  22  providing some technical insight on power handling.

09:14  23       He also shared information as to FBAR, which is a

09:14  24  acoustic technology.  And their electrode structure, and

09:14  25  Qorvo's SMR structure, which is the SMR using

09:14  1   aluminum-copper as electrode, and explaining the

09:14  2   advantages and disadvantages of the material.

09:14  3   **Q.**   Okay.  Thank you.

09:14  4        **MR. ELKINS:**   Your Honor, we have move PTX-0558

09:14  5   into evidence.

09:14  6        **THE COURT:**   Received as 156.

09:14  7        (Trial Exhibit No. 156 was admitted into

09:14  8   evidence.)

09:14  9   **BY MR. ELKINS:**

09:14  10  **Q.**   Mr. Aichele, I'm going to show you another document.

09:15  11       **MR. ELKINS:**   Permission to approach,

09:15  12  Your Honor?

09:15  13       **THE COURT:**   You may.

09:15  14  **BY MR. ELKINS:**

09:15  15  **Q.**   Mr. Aichele, do you recognize what has been marked

09:15  16  for identification as DTX-0580?

09:15  17  **A.**   Yes, I do.

09:15  18  **Q.**   What is it?

09:15  19  **A.**   This is an internal Akoustis document that defines

09:15  20  procedures for design development and maintenance of our

09:15  21  process and our products.

09:15  22       **MR. ELKINS:**   Your Honor, move DTX-0580 into

09:15  23  evidence.

09:15  24       **THE COURT:**   Marked and received as 157.

09:15  25       (Trial Exhibit No. 157 was admitted into

*Hunt – Deposition Designation*   1090

| | | |
|---|---|---|
| 11:06 | 1 | sheet for QPF7552, correct? |
| 11:07 | 2 | **A.** Correct. |
| 11:07 | 3 | **Q.** That's a Wi-Fi 6 front-end module? |
| 11:07 | 4 | **A.** Yes. |
| 11:07 | 5 | **Q.** And this data sheet's also classified as private, |
| 11:07 | 6 | correct? |
| 11:07 | 7 | **A.** Yes. |
| 11:07 | 8 | **Q.** You weren't authorized by Qorvo to have this data |
| 11:07 | 9 | sheet, were you? |
| 11:07 | 10 | **A.** Not knowingly, no. |
| 11:07 | 11 | **Q.** Will you please state your full name for the record? |
| 11:07 | 12 | (Playing of video deposition concluded.) |
| 11:07 | 13 | **THE COURT:** All right. That concludes the |
| 11:07 | 14 | deposition of Mr. Hunt. |
| 11:07 | 15 | There will be 16 numbers added to our exhibit |
| 11:07 | 16 | list. They will be 172 through 187. And at the end, you |
| 11:07 | 17 | get a list, which will at least show a way to link |
| 11:07 | 18 | everything together as you look at the materials, and then |
| 11:07 | 19 | the exhibits that you have will have -- I'm sure both |
| 11:08 | 20 | numbers on them, but it will have our sequential numbers |
| 11:08 | 21 | in the case. |
| 11:08 | 22 | Counsel, who will our next witness be? |
| 11:08 | 23 | (Trial Exhibit Nos. 172, 173, 174, 175, 176, |
| 11:08 | 24 | 177, 178, 179, 180, 181, 182, 183, 184, 185, 186 and 187 |
| 11:08 | 25 | were admitted into evidence.) |

*Dry – Deposition Designation*   1091

| | | |
|---|---|---|
| 11:08 | 1 | **MR. ALPER:** Your Honor, permission to approach |
| 11:08 | 2 | with the binders for the exhibits? |
| 11:08 | 3 | **THE COURT:** Sure. No problem. Understand I |
| 11:08 | 4 | believe it's Mr. Dry; is that right? |
| 11:08 | 5 | **MR. ALPER:** Plaintiffs next witness is Akoustis |
| 11:08 | 6 | VP of assembly and test operations Mr. Robert Dry by |
| 11:08 | 7 | video. |
| 11:08 | 8 | (Deposition designation of Robert Dry plays as |
| 11:08 | 9 | follows: |
| 11:08 | 10 | **Q.** Could you state your full name for the record. |
| 11:08 | 11 | **A.** Yes, Robert Charles Dry. |
| 11:08 | 12 | **Q.** Could you tell me what your current position is? |
| 11:08 | 13 | **A.** I'm the VP of final operations at Akoustis |
| 11:09 | 14 | Technologies. |
| 11:09 | 15 | **Q.** And for how long have you been working at Akoustis? |
| 11:09 | 16 | **A.** Since October 2019. I don't know the exact date the |
| 11:09 | 17 | date. It was around about mid-October. |
| 11:09 | 18 | **Q.** Where did you work prior to Akoustis? |
| 11:09 | 19 | **A.** I worked at Qorvo in Texas, Richardson. And RFMD in |
| 11:09 | 20 | Greensboro. And prior to that, I had -- I worked in the |
| 11:09 | 21 | UK for a company called Filtronic. And prior to that, a |
| 11:09 | 22 | company called Electronica. And prior to that, a company |
| 11:09 | 23 | called Plessey. There's a couple other companies as well |
| 11:09 | 24 | if you wish those. |
| 11:09 | 25 | **Q.** What were your responsibilities as the vice president |

*Dry – Deposition Designation*   1092

| | | |
|---|---|---|
| 11:09 | 1 | of final operations at Akoustis? |
| 11:10 | 2 | **A.** I was responsible for supporting what we call the |
| 11:10 | 3 | back end, so post fab. So activities after wafers came |
| 11:10 | 4 | out of the fab became my responsibility. |
| 11:10 | 5 | **Q.** So, Mr. Dry, I've actually handed you what's been |
| 11:10 | 6 | mark as Exhibits 200, 201, and 202. |
| 11:10 | 7 | Mr. Dry, do you recognize Exhibits 200 through 202? |
| 11:10 | 8 | **A.** I do. |
| 11:10 | 9 | **Q.** And what are they? |
| 11:10 | 10 | **A.** 200 is an e-mail. I don't actually recall sending |
| 11:10 | 11 | the e-mail, but it's definitely come from myself, from my |
| 11:10 | 12 | AOL account, to Rohan Houlden. And it shares two |
| 11:10 | 13 | documents. Looking at the documents, one is some |
| 11:10 | 14 | information on pricing for a ceramic package. And the |
| 11:10 | 15 | other one is images of -- cartoon images of different |
| 11:11 | 16 | package types. |
| 11:11 | 17 | **Q.** Why did you send this to Mr. Houlden's personal |
| 11:11 | 18 | e-mail account? |
| 11:11 | 19 | **A.** I have no recollection of why that would have been |
| 11:11 | 20 | the case. He sent -- I was responding to the same e-mail |
| 11:11 | 21 | that he sent to me. |
| 11:11 | 22 | **Q.** Okay. In December of 2016, when you sent this e-mail |
| 11:11 | 23 | to Mr. Houlden, you were working at Qorvo? |
| 11:11 | 24 | **A.** That's correct. |
| 11:11 | 25 | **Q.** And you had a Qorvo e-mail account, right? |

*Dry – Deposition Designation*   1093

| | | |
|---|---|---|
| 11:11 | 1 | **A.** I did. |
| 11:11 | 2 | **Q.** Why did you use your personal e-mail account to send |
| 11:11 | 3 | this information to Mr. Houlden? |
| 11:11 | 4 | **A.** I do not recall. |
| 11:11 | 5 | **Q.** Was there a concern that you didn't want Qorvo to see |
| 11:11 | 6 | that you were sending this information to Mr. Houlden? |
| 11:11 | 7 | **A.** As I said, I don't recall. |
| 11:11 | 8 | **Q.** Can you think of any other reason you would have used |
| 11:11 | 9 | your personal e-mail account to send the attachments to |
| 11:11 | 10 | Mr. Houlden? |
| 11:12 | 11 | **A.** Only other than convenience. |
| 11:12 | 12 | **Q.** Okay. If we go to Exhibit 201. |
| 11:12 | 13 | **A.** Okay. |
| 11:12 | 14 | **Q.** This appears to be a spreadsheet listing prices for |
| 11:12 | 15 | packages; is that right? |
| 11:12 | 16 | **A.** That's correct. |
| 11:12 | 17 | **Q.** Is this information from Qorvo SAP system? |
| 11:12 | 18 | **A.** I don't recall. |
| 11:12 | 19 | **Q.** But this is -- the information in Exhibit 201 is |
| 11:12 | 20 | Qorvo's information, right? |
| 11:12 | 21 | **A.** Looking through this, yes. |
| 11:12 | 22 | **Q.** Is there a reason it would have been more convenient |
| 11:12 | 23 | for you to obtain Qorvo's information using -- and send |
| 11:12 | 24 | Qorvo's information using your personal e-mail account |
| 11:12 | 25 | rather than your Qorvo e-mail account? |

*Dry – Deposition Designation*                    1098

| | | |
|---|---|---|
| 11:18 | 1 | documents? |
| 11:18 | 2 | **A.**  I do, yes. |
| 11:18 | 3 | **Q.**  Did you have authorization to share these Qorvo |
| 11:18 | 4 | documents with Akoustis? |
| 11:18 | 5 | **A.**  I did not. |
| 11:18 | 6 | **Q.**  And you would agree with me that Exhibit 222 and 223 |
| 11:18 | 7 | are confidential documents? |
| 11:18 | 8 | **A.**  It states that on them, yes. |
| 11:18 | 9 | **Q.**  How were Exhibits 222 and 223 used by Akoustis? |
| 11:18 | 10 | **A.**  They were used as examples of a standard.  We didn't |
| 11:18 | 11 | actually use either document.  We created our own |
| 11:18 | 12 | documents completely.  The inspection document, our own |
| 11:18 | 13 | inspection document, is a very, very diluted, looks |
| 11:18 | 14 | nothing like this particular document at all.  I think |
| 11:18 | 15 | it's got two pages and eight pictures in it.  So my intent |
| 11:18 | 16 | was to get some level of detail applied to a document that |
| 11:18 | 17 | we would be using, and this was the example that I used to |
| 11:19 | 18 | drive that.  But in the end, we didn't do anything like |
| 11:19 | 19 | this. |
| 11:19 | 20 | **Q.**  If we look at the first page of Exhibit 222, at the |
| 11:19 | 21 | top, it's kind of near the top, there's a bolded, all |
| 11:19 | 22 | caps, it says "CONFIDENTIAL." |
| 11:19 | 23 | Do you see that? |
| 11:19 | 24 | **A.**  I do. |
| 11:19 | 25 | **Q.**  It says:  (Reading) |

*Dry – Deposition Designation*                    1099

| | | |
|---|---|---|
| 11:19 | 1 | Property of Qorvo, Inc.  Do not reproduce, copy of |
| 11:19 | 2 | transfer to any third party without express permission |
| 11:19 | 3 | from Qorvo. |
| 11:19 | 4 | Do you see that? |
| 11:19 | 5 | **A.**  I do. |
| 11:19 | 6 | **Q.**  You didn't have express permission from Qorvo to |
| 11:19 | 7 | transfer this document to Mr. Hosse? |
| 11:19 | 8 | **A.**  I did not. |
| 11:19 | 9 | **Q.**  In retrospect, would you agree with me that it was |
| 11:19 | 10 | not proper to send this document to Mr. Hosse? |
| 11:19 | 11 | **A.**  I absolutely agree that in retrospect, I shouldn't |
| 11:19 | 12 | have sent these documents or certainly should have sought |
| 11:19 | 13 | permission before I did.  So yeah, it was an error on my |
| 11:19 | 14 | part. |
| 11:19 | 15 | **Q.**  If we can turn to Exhibit 223. |
| 11:19 | 16 | **A.**  Yeah. |
| 11:19 | 17 | **Q.**  It says at the top "General Products Inspection |
| 11:20 | 18 | Procedure." |
| 11:20 | 19 | **A.**  Yeah. |
| 11:20 | 20 | **Q.**  And it appears to me that this document may have been |
| 11:20 | 21 | modified in some way.  Would you agree with that? |
| 11:20 | 22 | **A.**  Yes.  It doesn't have the Qorvo emblems on it or |
| 11:20 | 23 | nomenclature, by the looks of it. |
| 11:20 | 24 | **Q.**  Do you recall having gone through and removed the |
| 11:20 | 25 | Qorvo nomenclature from this document before sending it to |

*Dry – Deposition Designation*                    1100

| | | |
|---|---|---|
| 11:20 | 1 | Mr. Hosse? |
| 11:20 | 2 | **A.**  I believe I did. |
| 11:20 | 3 | **Q.**  And why did you do that? |
| 11:20 | 4 | **A.**  Because I wanted it to be used as an example rather |
| 11:20 | 5 | than specific, and it didn't make sense to me to have an |
| 11:20 | 6 | example with Qorvo written all over it. |
| 11:20 | 7 | **Q.**  Did you have a concern in January 2020 about sending |
| 11:20 | 8 | documents to other folks at Akoustis that had Qorvo's |
| 11:20 | 9 | confidentiality legends on them? |
| 11:20 | 10 | **A.**  I really didn't think about it.  I mean, reflecting |
| 11:20 | 11 | back, it was -- I should have thought more carefully about |
| 11:20 | 12 | it.  There was a huge amount going on at the time, |
| 11:21 | 13 | personally, as well as at work, I was trying to support |
| 11:21 | 14 | the business in ways that I've -- that I've seen done by |
| 11:21 | 15 | other people in the industry over many years.  But |
| 11:21 | 16 | certainly, when I sit here today and reflect on this, it |
| 11:21 | 17 | was some errors of judgment here on may part. |
| 11:21 | 18 | **Q.**  Mr. Dry, could I ask you to turn in Exhibit 223 -- |
| 11:21 | 19 | **A.**  Yeah. |
| 11:21 | 20 | **Q.**  -- to what's on the top right-hand corner, it says |
| 11:21 | 21 | Page 7 of 19? |
| 11:21 | 22 | **A.**  Yeah. |
| 11:21 | 23 | **Q.**  And I'll identify for the record, the production |
| 11:21 | 24 | number on the bottom of that page is AKTS_00144097. |
| 11:21 | 25 | Are you there? |

*Dry – Deposition Designation*                    1101

| | | |
|---|---|---|
| 11:21 | 1 | **A.**  I am, yes. |
| 11:21 | 2 | **Q.**  On this Page 7 of 19 and then continuing towards the |
| 11:21 | 3 | back of Exhibit 223 -- |
| 11:21 | 4 | **A.**  Right. |
| 11:21 | 5 | **Q.**  -- there's a series of pictures -- |
| 11:21 | 6 | **A.**  Correct, yeah. |
| 11:21 | 7 | **Q.**  -- that have been annotated.  Do you see that? |
| 11:21 | 8 | **A.**  Yes. |
| 11:21 | 9 | **Q.**  Is Akoustis -- or has Akoustis used any of these |
| 11:22 | 10 | pictures for the -- for its inspection guidelines? |
| 11:22 | 11 | **A.**  Absolutely not. |
| 11:22 | 12 | **Q.**  Okay. |
| 11:22 | 13 | **A.**  Just -- |
| 11:22 | 14 | **Q.**  Are these pictures applicable or inapplicable to |
| 11:22 | 15 | products that Akoustis? |
| 11:22 | 16 | **A.**  Inapplicable. |
| 11:22 | 17 | **Q.**  Okay.  And is that because these are different kinds |
| 11:22 | 18 | of devices? |
| 11:22 | 19 | **A.**  Yes, these are -- appear to be all active devices. |
| 11:22 | 20 | And as I explained earlier, "active" means electrically |
| 11:22 | 21 | biased.  These don't -- these are not managed devices, |
| 11:22 | 22 | which is the focus of Akoustis' product portfolio. |
| 11:22 | 23 | **Q.**  Okay.  Mr. Dry, I've handed you what's been marked as |
| 11:22 | 24 | Exhibit 224, 225, and 226. |
| 11:22 | 25 | All right.  So I'd like to start with Exhibit 224. |

Shealy - Direct                    1150

BY MR. MASTERS:

Q.   Yes.  "Interesting to note their slide says filter
and Wi-Fi module."  So their plan is to integrate in FEM,
front end module, right?

A.   Yes, sir, that's what it says.

        MR. MASTERS:  And, Your Honor, may I approach?

        THE COURT:  You may.

BY MR. MASTERS:

Q.   Dr. Shealy, Exhibit PTX-152 has been entered into
evidence already as Trial Exhibit 136, is what was
captured and sent to Mr. Aichele by Mr. Kim and then sent
to you; isn't that, correct?

A.   Yes, I believe so.

Q.   And it was a photograph of Qorvo's confidential
information concerning some BAW technology, correct?

A.   It was a picture of a slide, yes, sir, a PowerPoint
slide.

Q.   And it was for use in the automotive industry,
correct?

A.   Yes.  So it would be consistent with the e-mail, sir.

Q.   And Akoustis is working in the automotive industry
today, right?  That's an industry that you are going
after?

A.   That's an industry that we entered when we acquired a
division called RFMI, but we have development ongoing.

---

Shealy - Direct                    1151

I'd have to look.  We also had filed a very early patent
that's issued.  I'd have to line up the timelines of that,
sir.

Q.   So Qorvo's information in the automotive industry
would be helpful to you here, correct?  Having
understanding of some competitors and what they're doing?

A.   I think my testimony would be, by 2019, this is a
Wi-Fi band architecture, and we had already entered mass
production in the Wi-Fi market at this time.  This was
2019.

Q.   Okay.

A.   So it was the year we penetrated the Wi-Fi market.
So the information, the band information, I believe you
could find on Google because those channels are -- those
aren't defined by Qorvo or Akoustis, they are defined by
the industry standard.

Q.   Okay.  Dr. Shealy, let's shift gears a little bit.

A.   Okay.

Q.   You are a board member, correct?

A.   Uhmm.  A director of the company yes, sir.

Q.   And you sit on the board of directors, right?

A.   Yes, sir, I do.

Q.   And Jerry Neal does as well?

A.   Yes, sir.

Q.   And he was formerly with RFMD, correct?

---

Shealy - Direct                    1152

A.   Jerry Neal had retired prior to my departure from
RFMD, yes, sir, but he was --

Q.   Susan --

A.   -- one of the founders of RFMD, yes.

Q.   Suzanne Rudy is on the Akoustis board of directors,
correct?

A.   She is.

Q.   And Arthur Geiss, also on the board of directors?

A.   That is what these are, all current members of the
board.

Q.   Mr. Geiss came from RFMD, correct?

A.   Mr. Geiss retired from RFMD 20 years ago.  I don't
know the time frame, but he retired several years ago.

Q.   Suzanne Rudy came from Qorvo, correct?

A.   Suzanne Rudy was treasurer of Qorvo once Qorvo was
formed, and she was treasurer of the company, the
financial expert.

        MR. MASTERS:  Your Honor, may I approach?

        THE COURT:  You may.

BY MR. MASTERS:

Q.   Dr. Shealy, I've handed you what's been marked as
793.  Do you recognize it?

A.   Yes, sir, I do recognize it.

Q.   It is a unanimous written consent from the board of
directors of the Akoustis technologies?

---

Shealy - Direct                    1153

A.   Yes, it is, sir.

        MR. MASTERS:  I move for admission PTX-793.

        THE COURT:  Marked and received as 206.

        (Trial Exhibit No. 206 was admitted into
evidence.)

        MR. MASTERS:  Mr. Faison, could you please
project.

BY MR. MASTERS:

Q.   So this is a written directive of the Akoustis board
of directors, correct?

A.   Yes, it is, sir.

Q.   It's called a "Unanimous Written Consent," right?

A.   It is the equivalent of an order by the board, yes.

Q.   All right.  And this order was issued on May 1 of
2023, correct?

A.   So verify the date, but May 1, 2023, yes, sir.

        MR. MASTERS:  And if we can highlight the
first, whereas clause.

BY MR. MASTERS:

Q.   Okay.  See that, Dr. Shealy?  It says, "Whereas the
corporation."  Do you see that?

A.   Yes, sir.

Q.   The last clause.  So "the corporation is vigorously
defending itself in pending litigation with Qorvo, but
also recognizes that it will be some time before there is

*Shealy - Direct*                    1154

12:32  1    a final determination regarding Qorvo's claims."

12:32  2         Did I read that right?

12:32  3    A.   Yes, sir, I'm following along.

12:32  4    Q.   "Including whether any of the documents that Qorvo

12:32  5    has identified in its allegations are, in fact,

12:32  6    confidential to Qorvo," right?

12:32  7    A.   Yes, sir, I'm following along.

12:32  8    Q.   They're referring to documents that Akoustis had,

12:32  9    correct?

12:32  10   A.   I believe they are referring to what this was, as I

12:32  11   understood it, was an order to go find documents and

12:32  12   remove them.

12:32  13   Q.   But the question here is that -- whether any of the

12:32  14   documents that Qorvo has identified in its allegations

12:32  15   are, in fact, confidential to Qorvo, right?  That was the

12:32  16   question as stated?

12:33  17   A.   I concur with the language in the UQC, sir.  Yes.

12:33  18        MR. MASTERS:  And can we highlight the "now

12:33  19   therefore" two paragraphs down.

12:33  20   BY MR. MASTERS:

12:33  21   Q.   "The board then authorized and directed the company

12:33  22   management to purge and permanently erase from the

12:33  23   company's record the disputed document, including

12:33  24   approximately 450 documents identify by Qorvo."

12:33  25        Do you see that?

*Shealy - Direct*                    1155

12:33  1    A.   Yes, sir, I'm following along with you.

12:33  2    Q.   They're referring to 450 of Qorvo's document that

12:33  3    were found in Akoustis' files, correct?

12:33  4    A.   I -- there's a protective order on this case, so I

12:33  5    don't know the number, and I followed along.  If counsel

12:33  6    is telling us there's 450 documents, I had no reason to

12:33  7    challenge them.

12:33  8    Q.   Is your testimony today you don't know?

12:33  9    A.   My testimony is, I don't know -- I don't know the

12:34  10   number of documents in dispute.  There's a protective

12:34  11   order on this case, and I've not been advised.

12:34  12   Q.   But, Dr. Shealy, you did sign this unanimous written

12:34  13   consent; isn't that correct?  As a member of the board of

12:34  14   directors, you signed this?

12:34  15   A.   I did, and the board was advised by Pillsbury, which

12:34  16   is also, you know, our formal counsel here had advised the

12:34  17   board given the knowledge they had about the case.

12:34  18   Q.   450 documents were identified as of May 1, 2023,

12:34  19   correct?

12:34  20   A.   I -- there's a protective order; I've not seen the

12:34  21   timeline of what documents are.  If Pillsbury tells us

12:34  22   there were 450 documents, I have no reason to dispute it.

12:34  23   They made this recommendation to our board.

12:34  24   Q.   And you signed this directive?

12:34  25   A.   Sir, my signature is on the final page there.  Yes,

*Shealy - Direct*                    1156

12:34  1    sir.

12:34  2    Q.   You have no reason -- I'll withdraw the question.

12:34  3        MR. MASTERS:  Can we go down and highlight the

12:35  4    second from the last "further resolved."

12:35  5    BY MR. MASTERS:

12:35  6    Q.   Another paragraph:  "The board authorizes and directs

12:35  7    the corporation's management to develop and implement

12:35  8    without reference to or use of the disputed documents,

12:35  9    replacement versions of any disputed documents for which

12:35  10   the corporation has an ongoing business need."

12:35  11        Do you see that?

12:35  12   A.   I'm following along.  Yes, I see it, sir.

12:35  13        MR. MASTERS:  And could we go to the next

12:35  14   "further resolved."  It spans the page.

12:35  15   BY MR. MASTERS:

12:35  16   Q.   Further resolved that the board authorizes and

12:35  17   directs the corporation's management to engage in a review

12:35  18   of the corporation's current compliance policies and

12:35  19   procedures related to the protection of intellectual

12:35  20   property rights and the handling of confidential

12:35  21   information."

12:35  22        MR. MASTERS:  Move on to the next page.

12:35  23   BY MR. MASTERS:

12:35  24   Q.   -- "and ensuring that all Akoustis employee

12:36  25   understand and comply with these mandatory obligations."

*Shealy - Direct*                    1157

12:36  1        Do you see that?

12:36  2    A.   Yes, sir, I see it.

12:36  3    Q.   Has the board taken any action against any employee

12:36  4    of Akoustis?

12:36  5    A.   As of this date, we still have protective order.  The

12:36  6    board does not --

12:36  7    Q.   The answer is "no"?

12:36  8    A.   The answer is "no," given we don't have the

12:36  9    information.

12:36  10   Q.   Has Akoustis -- has Akoustis taken any action against

12:36  11   any employees as of this date?

12:36  12   A.   Any employee?  I mean, we've had --

12:36  13   Q.   With respect to this case and the taking of Qorvo's

12:36  14   confidential information.

12:36  15   A.   No.  There's not -- the information is not available.

12:36  16   We don't make decisions without information in front of

12:36  17   us, and the extent of documents that are at issue in this

12:36  18   case have not been presented neither to the board nor to

12:36  19   me.  So I certainly couldn't vote on it in good faith,

12:36  20   because I don't know -- I would need information -- I need

12:37  21   more information, which I'm precluded from given the

12:37  22   protective order in this case.

12:37  23   Q.   Okay.  Are you precluded from looking at confidential

12:37  24   information in the files or looking at any files within

12:37  25   Akoustis' possession?

14:00  1   if you micromanage, you're going to lose your best people.
14:00  2   You can -- you want to inspire them, get them -- let them
14:01  3   lead, get out of their way, and go solve another difficult
14:01  4   problem, because there's always problems to go solve in
14:01  5   these companies.
14:01  6   Q.   Now, Dr. Shealy, we've heard testimony in this case
14:01  7   that suggests that there are copies of a number of Qorvo
14:01  8   documents and presentations and templates, many of which
14:01  9   were labeled confidential and proprietary that were found
14:01  10  on various computers belonging to Akoustis employees.
14:01  11       Is that something that's allowed under the company's
14:01  12  policy?
14:01  13  A.   I will reiterate what I said earlier.  I don't have
14:01  14  the specifics of those numbers, given the protective
14:01  15  orders, but bringing documents into the company is not --
14:01  16  it is strictly prohibited in the confidentiality agreement
14:01  17  an employee signs on day one as a contingent of them
14:01  18  coming to work.
14:01  19       In addition, we have added additional measures,
14:01  20  business conduct guidelines, which the board has -- we
14:01  21  built those from the ground up, and the board has enacted
14:02  22  those.  So those would be policies the company has taken
14:02  23  steps to put into place.  The confidentiality has been
14:02  24  since day one.  BCG, or business conduct guidelines, is a
14:02  25  program we've enacted through our general counsel and

14:02  1   outside counsel to make sure we insist upon the highest
14:02  2   standards.
14:02  3   Q.   Now, were you personally ever aware of Qorvo
14:02  4   materials being discussed at Akoustis by former Qorvo
14:02  5   employees?
14:02  6   A.   Repeat the question.  I'm sorry.
14:02  7   Q.   Yes.  Were you personally aware that the Qorvo
14:02  8   materials were being discussed at Akoustis by former Qorvo
14:02  9   employees?
14:02  10  A.   Materials would have been discussed.  We were under
14:02  11  nondisclosure with Qorvo.  And, actually, had development
14:02  12  activity.  So there certainly would be discussion of
14:02  13  materials related to specs that we had received, and those
14:02  14  sorts of materials, I certainly was aware of.  I was in
14:03  15  receipt of those sorts of materials from their
14:03  16  procurement, and also their chief technology officer who,
14:03  17  you know, was evaluating and testing our technology.
14:03  18  Q.   Were you ever aware, Dr. Shealy, of any Qorvo
14:03  19  confidential proprietary information being used in the
14:03  20  development of Akoustis technology?
14:03  21  A.   No.  No.  We didn't need it.  We were building a
14:03  22  different type of technology, and I would also state that
14:03  23  our transfer flow MEMS process, which is a flip -- is a
14:03  24  removal process, I don't think you could take process
14:03  25  recipes from another company, run it in our process, and

14:03  1   it wouldn't work.  And I don't think you could take ours
14:03  2   and run it in their tool sets and it wouldn't work.  So
14:03  3   there's highly customized and engineered processes to
14:03  4   build our technology.  And that started from the MEMS
14:03  5   folks we acquired.
14:03  6   Q.   But, Dr. Shealy, we were shown through various
14:04  7   witnesses here that several former Qorvo employees did
14:04  8   copy their e-mail folders, and sometimes other materials
14:04  9   and presentations they had received at Qorvo, and
14:04  10  apparently transferred some of those, at least, to their
14:04  11  Akoustis laptops.
14:04  12       Was this conduct encouraged or approved by company
14:04  13  management?
14:04  14  A.   No.  Again, confidentiality documents were in place,
14:04  15  and still are in place today, business conduct guidelines
14:04  16  that prohibit that type of behavior.  The challenge for
14:04  17  the company as we were a small startup is we did not
14:04  18  have -- we didn't have the trust-but-verify IT systems to
14:04  19  see what was being plugged in.  In the early stages of a
14:04  20  startup, you're handing out computers, putting people to
14:04  21  work, trying to innovate on the technology.  If people are
14:04  22  plugging things into a laptop, don't have a direct way of
14:04  23  policing that.
14:05  24       Part of the BCG that I mentioned, part of what we've
14:05  25  been forced to do with the DARPA contracts that we are

14:05  1   currently working on, they insisted on, and they've been
14:05  2   helping us pay for IT upgrades to our system in order to
14:05  3   be able to prevent outside intruders, be able to police
14:05  4   kind of inside documents.  That's a capability we did not
14:05  5   have, you know, prior to, you know -- these contracts have
14:05  6   been with us, you know, three or four years.
14:05  7       MR. LEMIEUX:  Your Honor, may I have permission
14:05  8   to approach the witness with an exhibit?
14:05  9       THE COURT:  You may.
14:06  10      MR. LEMIEUX:  I've handed the witness what's
14:06  11  been marked for identification purposes as Exhibit
14:06  12  DTX-0634.
14:06  13  BY MR. LEMIEUX:
14:06  14  Q.   Ask you to take a look at that, Dr. Shealy, and tell
14:06  15  us whether or not you've seen this document before.
14:06  16  A.   Yes, I've seen the document before.  I'm a coauthor
14:06  17  of this paper.
14:06  18  Q.   What is this exhibit?
14:06  19  A.   This exhibit is a IEEE, which IEEE is the Institute
14:06  20  of Electrical Electronics Engineers.  It is the gold
14:06  21  standard in electrical engineering.  This was a paper
14:06  22  submitted to a conference called the International
14:06  23  Ultrasonic Symposium, IUS.  And this paper, as I recall --
14:06  24  I don't see the date on it.  As I recall, this paper was
14:06  25  published in 2018 if my memory serves me correct.

BY MR. LEMIEUX:

Q.   And what is this paper based on?

A.   This paper was -- so the IUS is the, really the premier ultrasonics acoustic wave conference.  This particular year, it was held in Kobe, Japan.  It was -- so we solicited -- we began taking the -- with our new XBAW process, we wanted to demonstrate to the industry the potential of the single crystal XBAW technology we were producing.

So this paper outlines various things about the technology, figures of merit, power handling, that we measured.  It had reliability of the single crystal material, much higher powers, and we demonstrated, in my view for the first time, approximately a 2X enhancement in the power handling of a single crystal BAW in our process compared to a polycrystalline BAW in our process.

So it really demonstrated the superior thermal conductivity of single crystal material, which can be leveraged for power applications.  And that's what the paper demonstrates.  Really, it's not a theory paper; this is all measured data, and it's data out of our lab, and --

Q.   If I could ask you, what is this paper based on?

A.   Oh, this is based upon our XBAW technology, which the experiment and the control in here are single crystal material and polycrystalline material, all built in our

fab in New York State.

Q.   Is this based on the research and development work that is done at Akoustis?

A.   One hundred percent; and it is 100 percent internal data.  We didn't outsource of any this.  This was our data.  In addition, I'd have to look and see what contracts we had running, but we were also sharing this with the government agencies that we were talking to at the time as -- if we had contracts at that time, these would be some of the deliverables we would share with them.

MR. LEMIEUX:   Your Honor, I'd like to move to admit DTX-634 into evidence.

THE COURT:   Marked and received as 207.

(Trial Exhibit No. 207 was admitted into evidence.)

BY MR. LEMIEUX:

Q.   Dr. Shealy, I believe Mr. Masters asked you this question, but I just wanted to make sure I understand properly.

Does Akoustis currently offer any BAW filters that use a single crystal technology for the creation of the resonator?

A.   Yes.  So we had an early -- the earliest project that we had was a 1938 project.  That was for defense.  What we

currently offer is a product, I believe, I called it 10161, or the 161 product.  The 161 product is a -- for HPE Aruba.  In an enterprise router, they have multiple bands within that router.  I think we have approximately 32 filters in their router box.  And, again, it's an enterprise router that would be in a building like this servicing all users.

So the 161 device is 6.1 gigahertz single crystal piezoelectric that we were able to tune to get maximum Q, and it had better power handling than the polycrystalline material.  So, again, back to the philosophy of better is the enemy of good enough.  Use polycrystalline when -- because it works in our process, we use that, but when we need bump in performance, in this particular case of the 161, we used that, and were able to win the entire platform of the HPE Aruba with all of our filters, both narrow band, which are custom, as well as wide band.

Q.   Dr. Shealy, was there ever a time when Akoustis only offered polycrystalline products?

A.   We were in development of single crystal from the founding of the company until present time.  We were engaged, we had different customers in defense in 5G network infrastructure, in -- such as ███████████ that we were working on.

We have had -- the first three years of the company, we outsourced single crystal materials.  We brought that capability, and if you toured our fab in New York, you would see, you know, the tool set that is producing the single crystal material.  It is -- we also have currently won two phases of a new DARPA program where we're using a blend of single crystal and polycrystalline materials to actually do something called "overmoding the resonator," which allows you to multiply frequency of operations.

So, you know, this is sub-6 gigahertz technology.  We're now -- we've already delivered 18 gigahertz filter samples using our P3F technology to the government.  And we've got -- that's led us to multiple defense customers working -- doing design work in our foundry.

MR. LEMIEUX:   No, further questions for this witness, Your Honor.  I will pass.

THE COURT:   Cross-examination, and redirect.

MR. MASTERS:   Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MASTERS:

Q.   Dr. Shealy, you referred to Avago today as having a monopoly position.

They're the big company in the field, right?  In the market?

A.   They have the highest market share with their FBAR

Shealy – Redirect                    1194

14:13  1    technology, yes.  That would be Broadcom.

14:13  2    Q.   And the market is extremely lucrative for the BAW

14:13  3    filters, correct?

14:13  4    A.   I would characterize it, if you're okay, yes, it's

14:13  5    lucrative, and I would call it the premium market in the

14:13  6    industry.

14:13  7    Q.   Multibillion dollars annually?

14:13  8    A.   I believe the -- if you look at the -- I would steer

14:13  9    you to our website.  We put numbers that are published.

14:13  10   The mobile market alone is close to 10 billion.

14:13  11   Q.   $10 billion, around this time?

14:13  12   A.   Ten to 13 billion, something like that, sir.

14:13  13   Q.   And you would agree with me that to stay competitive

14:13  14   in this field, and to compete with people like Broadcom,

14:13  15   your intellectual property is one of your core assets of

14:13  16   your company, isn't it?

14:14  17   A.   I certainly would say our intellectual property is a

14:14  18   core asset to our company, yes, sir.

14:14  19   Q.   It's extremely important to stay competitive in this

14:14  20   market, right?

14:14  21   A.   Our IP is -- our IP is core to our success, yes.

14:14  22   Q.   And Qorvo's IP is important to Qorvo, right?

14:14  23   A.   And Qorvo's IP is important to Qorvo.

14:14  24   Q.   And you would not share your IP and give it away to

14:14  25   any other competitor in this field, would you?

Shealy – Redirect                    1195

14:14  1    A.   Unless there was some agreement --

14:14  2    Q.   No agreement.  You would not give your IP --

14:14  3    A.   Oh, independent -- oh, I'm sorry, sir.

14:14  4    Q.   You would not give your IP to another company, or let

14:14  5    somebody take your IP out of the company to compete in

14:14  6    this market; isn't that correct?

14:14  7    A.   Unless we had an agreement with a -- nondisclosures

14:14  8    and we were working very closely together.

14:14  9    Q.   No agreements, you're not working closely --

14:14  10   A.   Okay.

14:14  11   Q.   -- another company, third party, they're coming into

14:14  12   the market, you're not going to give them your IP so they

14:14  13   can compete in this $13 billion market.

14:15  14        Isn't that a true statement?

14:15  15   A.   I believe that's a true statement, yeah.

14:15  16   Q.   Thank you.

14:15  17   A.   Thank you, sir.

14:15  18        MR. MASTERS:  Can we project, please, DTX-634

14:15  19   that I think counsel marked as Trial Exhibit 207.

14:15  20   BY MR. MASTERS:

14:15  21   Q.   Your article.  Your an author on this article?

14:15  22   A.   Yes, sir.  I'm the third author on this article.

14:15  23   Q.   Okay.  And 2018, you published, you believe?

14:15  24   A.   Mr. Vetury, or Dr. Vetury was the lead author and he

14:15  25   presented at the conference in Kobe, Japan.

Shealy – Redirect                    1196

14:15  1    Q.   Based on products in your lab?

14:15  2    A.   I don't -- I believe if you look at the paper, the

14:16  3    paper is a technology paper as well as the filters that we

14:16  4    show here, as well as the resonator data, and the

14:16  5    devices were built in our lab in Upstate New York.

14:16  6    Q.   Okay.  BAW filters are passive devices?

14:16  7    A.   It's a capacitor.  It is a highly sophisticated

14:16  8    capacitor, but it is a passive device.  Yes, sir.

14:16  9    Q.   Thank you.

14:16  10        And that means that you cannot get more energy out of

14:16  11   the filter than the amount of energy going in, correct?

14:16  12   A.   I would say, overall, in the physical world we live

14:16  13   in, you can't violate Mother Nature, physics of Mother

14:16  14   Nature.

14:16  15   Q.   So with a passive device, the energy coming out

14:16  16   cannot be greater than the energy going into this passive

14:16  17   device, right?

14:17  18   A.   I would point you to conservation energy.

14:17  19   Q.   Would you say yes to my question?

14:17  20   A.   In any system, including a BAW device.

14:17  21        MR. MASTERS:  Can we go to Page 2, please.  Top

14:17  22   right.  Can we zoom in on the purple.  Can you zoom in on

14:17  23   the top.

14:17  24   BY MR. MASTERS:

14:17  25   Q.   So this is what's known as a Smith chart, right?

Shealy – Redirect                    1197

14:17  1    A.   The -- yes.  So it's a Bode plot on the left, and

14:17  2    that would be a Smith chart on the right.

14:17  3    Q.   Prepared for a conference?

14:17  4    A.   It was taken from our -- it was taken from our

14:17  5    engineering data at the company and formatted for the

14:17  6    conference.  Yes, sir.

14:17  7    Q.   Not peer-reviewed, correct?

14:17  8    A.   The paper had gone in and we were selected by the

14:17  9    committee.  In fairness to your question, if it was a IEEE

14:18  10   journal, those can be more what I would refer to as

14:18  11   peer-reviewed.  But a committee reviewed our paper and the

14:18  12   data and they accepted it for publication.

14:18  13   Q.   But not peer-reviewed, as in the classic sense of a

14:18  14   peer-reviewed technical article, correct?

14:18  15   A.   I would argue it's an IEEE conference.  The people

14:18  16   there are very -- and this is the premium in -- involved.

14:18  17   So for the committee to accept it, they wanted to see it

14:18  18   presented in the conference.

14:18  19   Q.   Okay.  And if we look at the circle around --

14:18  20   from, say, 3:00 to 5:00, if you will, you have dots that

14:18  21   are plotted on the outside of that circle, correct?

14:18  22   A.   It would be useful to blow up that segment if you

14:18  23   wanted to evaluate that.

14:19  24   Q.   Well, with our technology --

14:19  25   A.   It looks like it's on the edge of the Smith chart,

Shealy – Redirect                  1198

1    sir.

2    Q.   And it's actually physically impossible, because

3    these are passive devices, to get more energy out of the

4    BAW filter.  And by having the dots on the outside of the

5    circle, is physically impossible.

6         Would you agree with me?

7    A.   What I -- my experience with these measurements is

8    that any error you would have in the calibration could

9    give you that.  But I don't see -- I see the red block

10   here, but that -- the line thickness that's chosen to show

11   the data is right on the edge of the Smith chart.

12   Q.   So it's either a calibration error or you subtracted

13   more losses than you should have for how this BAW filter

14   was being analyzed?

15   A.   I'm looking at the data, and I see it on the edge of

16   the Smith chart, which is -- that's a good calibration,

17   from what I see.

18   Q.   But on the outside, that's physically impossible

19   and --

20   A.   I would want to see a blowup of that chart.  Take the

21   data and blow it up, if we're going to have that

22   conversation.  It looks like it's on the edge of the Smith

23   chart, which isn't defying any physics whatsoever.

24   Q.   Okay.

25   A.   It's a very high --

Shealy – Redirect                  1199

1         MR. MASTERS:  Take that chart down.

2    BY MR. MASTERS:

3    Q.   Dr. Shealy, you talked about computer systems having

4    trust and verify software, correct?

5    A.   Not computer system.  Our IT system.

6    Q.   Fair enough.  Trust and verify IT systems, which

7    provides a way of policing what comes on to computers

8    within your organization, correct?

9    A.   That is correct.

10   Q.   Came later in time at Akoustis, correct?

11   A.   It did.

12   Q.   And in this instance, it took the board of directors

13   20 months after the complaint was filed to issue a

14   directive that you remove 450 documents from the computer

15   systems; isn't that correct?

16   A.   The -- my answer to that is, we were advised by our

17   counsel to do that.  We were in a -- we were in a hold --

18   we could not touch our servers --

19   Q.   Excuse me, Doctor.  I am not asking what counsel

20   advised you.

21   A.   Okay.

22   Q.   Your board of directors gave you an instruction to

23   remove the 450 Qorvo documents 20 months after this

24   complaint was filed; isn't that, correct.

25   A.   I'll stand with the dates that -- there.  I don't

Shealy – Redirect                  1200

1    have the time lines.

2    Q.   And that was May 1, 2023, the board of directors said

3    remove 450 documents.  And then the forensic inspection in

4    September 2023.  So, three, four, months later, showed

5    hundreds of thousands of documents, Qorvo documents, on

6    your computer systems; isn't that, correct?

7    A.   Sir, there's a protective order in this case, which I

8    have not seen the data you're mentioning.  And the only

9    other clarification I would give is we had a document

10   hold.  We could not destroy any documents once the

11   discovery process of this case started.  So there was no

12   removing documents off our servers.

13   Q.   So as a member of the board and CEO of this company,

14   you're going to hide behind a protective order; is that

15   your testimony?

16   A.   We have had a -- we had a Court issue us an order to

17   freeze and protect the integrity of the data, which means

18   you cannot go and delete computers, you cannot go delete

19   servers.  You can't touch it.  And the forensic people

20   that came, it was -- everything was in lockdown and

21   freeze.  It was only until our counsel in this case

22   basically advised the board, for reasons I don't know at

23   this point -- but they advised us to issue that and begin

24   a process.  And then that got frozen, so we con do that.

25   Q.   One more question.  The forensic inspector was only

Shealy – Recross                  1201

1    able to inspect the computers that existed in September,

2    but not the computers and computer devices that were no

3    longer in place at Akoustis; isn't that true?

4    A.   Sir, I can't -- I can't comment on that.

5    Q.   No, further questions, Your Honor.

6    A.   I have no working knowledge on what was inspected or

7    not inspected.

8         THE COURT:  All right.  Thank you very much.

9         MR. LEMIEUX:  Your Honor, because he was my

10   direct, I think I can redirect.

11        THE COURT:  Sure.

12        MR. LEMIEUX:  It's only a single question, Your

13   Honor.

14             RECROSS EXAMINATION

15   BY MR. LEMIEUX:

16   Q.   Dr. Shealy, Mr. Masters there tried to make it appear

17   that there was a long period of time between the filing of

18   the lawsuit and the action that was taken by the board.

19        Are you aware of the fact that the trade secret

20   claims that were added to this case were only added in

21   February of 2023?

22   A.   Yes, I am aware of that.

23   Q.   And was the action taken by the board -- that was in

24   May of 2023, correct?

25   A.   That is correct.

*Shanfield - Direct*    1238

```
15:19   1   the place to look.  If they think there's an opportunity
15:19   2   that hasn't been addressed, they've done the work of
15:19   3   figuring out where that opportunity is.  You can go
15:19   4   address that before they do.
15:19   5       It also -- and so that's -- you're learning what
15:19   6   Qorvo, your competitor, is doing; and, second, you're
15:19   7   getting the benefit of their market analysis to figure out
15:20   8   where the payoff might be.  And both of those items are
15:20   9   high value.
15:20  10   Q.  Did you also form opinions in this case as to whether
15:20  11   Akoustis obtained and used the trade secrets in Group 1?
15:20  12   A.  Yes, I did.
15:20  13   Q.  Okay.  And what opinion did you reach?
15:20  14   A.  I had a way of approaching that question in each of
15:20  15   these groups you'll hear about, but in my -- my conclusion
15:20  16   was simple, that they had made use of it.  And there were
15:20  17   lots of evidence of that.
15:20  18   Q.  Okay.  And at a high level, how was it that Akoustis
15:20  19   used the trade secrets in Group 1?
15:20  20   A.  In that area, what I realized in looking through
15:20  21   their documents, was that Akoustis was going after, for
15:20  22   example, the 5 gigahertz market and Wi-Fi routers.  And
15:20  23   the -- I'm sorry, ████████████████████████████████
15:21  24   ████████████████████████
15:21  25       And at the point where this information was received
```

*Shanfield - Direct*    1239

```
15:21   1   by Akoustis, ████████████████████████████████████████
15:21   2   ████████████████████████████████████████████████████
15:21   3   ██████████████████████████████████████     ███     ████
15:21   4   ████████████████████████████████████████      ████████
15:21   5   ████████████████████████████████████████████████████
15:21   6   ████████████████████████████████████████████████
15:21   7   ████████████████████████████████████████████████████
15:21   8   ██████████████████
15:21   9       Well, Akoustis, in my opinion, took that information
15:21  10   and realized there was a real opportunity because Qorvo
15:21  11   had identified this gap.  And this is the perfect place
15:21  12   for Akoustis to go in there first.  And that's, indeed,
15:21  13   what they did.
15:22  14       So it was -- my view of it, in looking over the
15:22  15   timeline, I hope to make that point -- or show evidence of
15:22  16   that -- it was clear they had used that information, the
15:22  17   valuable business plan information in order to decide what
15:22  18   their business needed to do.
15:22  19   Q.  You mentioned the timeline, Dr. Shanfield.  Maybe we
15:22  20   can pull up 6.16.
15:22  21       Is this what you meant?
15:22  22   A.  Yes, exactly.
15:22  23   Q.  And at a high level, can you tell the jury what you
15:22  24   have done here?
15:22  25   A.  This is my methodology because I wanted to make sure
```

*Shanfield - Direct*    1240

```
15:22   1   I could really prove there was, not only misappropriation,
15:22   2   but use.  And the best way, I think, of showing that, was
15:22   3   showing what happened with documents.  So this is a
15:22   4   timeline.  This is kind of the basis for my explanation.
15:22   5   Q.  Okay.  I'd like to walk through, at least quickly,
15:22   6   some of the dates on this.
15:22   7       And, first, I want to ask you:  Why does your
15:22   8   timeline start in August of 2016?
15:23   9   A.  Well, that that was the date that Rohan Houlden was
15:23  10   offered the position of VP of product engineering at
15:23  11   Akoustis.  He was a general manager at Qorvo.
15:23  12   Q.  Okay.
15:23  13       MR. DeFOSSE:  If we could go to PDX-6.17,
15:23  14   please.
15:23  15   BY MR. DeFOSSE:
15:23  16   Q.  Okay.  The next date on your timeline was
15:23  17   September 8th, 2016?
15:23  18   A.  Yes.
15:23  19   Q.  What's the relevance of that date, to your opinions?
15:23  20   A.  So this is before Houlden joined Akoustis.  So he's a
15:23  21   Qorvo employee.  And he sends Dave Aichele, who's the VP
15:23  22   of business development at Akoustis, this statement of
15:23  23   work, which was one of the business plans I just showed
15:23  24   you.
15:23  25       And he says, "This is the latest statement of work FL
```

*Shanfield - Direct*    1241

```
15:23   1   is working on."  Florida.  And Florida is where the
15:23   2   development takes place.
15:23   3       So it came from Houlden's personal e-mail account,
15:24   4   not his business account.  And it went straight to the
15:24   5   Akoustis executive, Dave Aichele.
15:24   6   Q.  So this is Trial Exhibit 22, right?
15:24   7   A.  Yes, correct.
15:24   8   Q.  And to you, what's the significance?  Why does it
15:24   9   support your analysis that this plan came from
15:24  10   Mr. Houlden's personal account?
15:24  11   A.  Well, I know that colleagues of mine in the industry,
15:24  12   if you're working out in the open and transparent, you'd
15:24  13   use your company account to communicate.  If -- and the
15:24  14   fact that he wasn't using it meant there was something he
15:24  15   apparently didn't want to have exposed in using company
15:24  16   e-mail.  So he used his personal e-mail account.
15:24  17       MR. DeFOSSE:  If we could go to 6.18, please.
15:24  18   BY MR. DeFOSSE:
15:24  19   Q.  This was the next date on your timeline,
15:24  20   September 14th.  What happened on that day that was
15:24  21   relevant to you?
15:24  22   A.  Yeah.  I thought this was quite relevant.
15:25  23   Mr. Houlden, he was still an employee at Qorvo.  He gets a
15:25  24   thumb drive and fills it up with documents.  This is just
15:25  25   three of many more that he put on this thumb drive.
```

Shanfield - Direct                                    1242

15:25  1   Q.   And are the three documents that you've listed on
15:25  2   PDX-6.18, the confidential business plans that you
15:25  3   included in Group 1?
15:25  4   A.   That's correct, yes.
15:25  5   Q.   Okay.  And in your experience in this industry, is it
15:25  6   routine practice for an employee to put such materials
15:25  7   onto a USB thumb drive?
15:25  8   A.   God, no.  You'd flag immediately if somebody saw you
15:25  9   do it.
15:25 10        MR. DeFOSSE:  If we go to 6.19, please.
15:25 11   BY MR. DeFOSSE:
15:25 12   Q.   The next date on your timeline is two days later, on
15:25 13   September 16.  Why is that date relevant to your analysis?
15:25 14   A.   Yeah.  This date was bothersome to me to see.
15:25 15   Mr. Houlden, this is his last day at Qorvo, signs a
15:26 16   severance agreement.  He makes ████████ in severance pay.
15:26 17   And his severance agreement is saying he's returning all
15:26 18   Qorvo's property to Qorvo.  Well, he just -- and two days
15:26 19   before, he had put the stuff on a thumb drive and was
15:26 20   intending to take it somewhere.  Well, you'll find out
15:26 21   where.
15:26 22   Q.   Is it common in this industry for employers to ask
15:26 23   employees to sign confidentiality obligations as they're
15:26 24   leaving the company?
15:26 25   A.   Yes.  Everybody in this business knows that everybody

Shanfield - Direct                                    1243

15:26  1   involved is subject to one of these confidentiality
15:26  2   agreements, and that you can't take documents out of one
15:26  3   technology company and bring them to another.  That's --
15:26  4   without any signature at all, you would know you can't do
15:26  5   that.  This just highlights it.
15:26  6   Q.   And in your opinion, based on your more than 30 years
15:26  7   of experience in this industry, would the folks at
15:27  8   Akoustis have known that Mr. Houlden was not permitted to
15:27  9   bring Qorvo confidential information with him to the
15:27 10   company?
15:27 11   A.   They definitely would.  There was a number of former
15:27 12   Qorvo employees at Akoustis and they had signed such
15:27 13   agreements as well.
15:27 14   Q.   Okay.
15:27 15        MR. DeFOSSE:  If we could move to PDX-6.20.
15:27 16   BY MR. DeFOSSE:
15:27 17   Q.   This is September 21st, so a few days after
15:27 18   Mr. Houlden's last day of Qorvo; is that right?
15:27 19   A.   Yes.
15:27 20   Q.   What happened on that day that was relevant to your
15:27 21   analysis?
15:27 22   A.   So here is where Mr. Houlden now takes this thumb
15:27 23   drive full of data and documents, and transfers it into
15:27 24   Akoustis' system, computer system, and he puts it in a
15:27 25   folder that's called "Strategy."  So clearly, the business

Shanfield - Direct                                    1244

15:27  1   plans, in his mind, were part of the strategy that he was
15:28  2   bringing to Akoustis.
15:28  3        MR. DeFOSSE:  If we could go to 6.21, please.
15:28  4   BY MR. DeFOSSE:
15:28  5   Q.   Okay.  You've included an October 9th, 2016 e-mail on
15:28  6   this slide, which was marked as Trial Exhibit 104.
15:28  7        What's the relevance of this e-mail to you?
15:28  8   A.   Yeah.  Well, here, now, Mr. Houlden is writing an
15:28  9   e-mail on Sunday that says he's realized there's going to
15:28 10   be a press release announcing that he's been hired.  And
15:28 11   he says, Well, hold on a minute, the press release looks
15:28 12   good, but I'm not sure of all the pros, but I've listed
15:28 13   some of the cons.
15:28 14        Well, the con is, he writes, "I think I'm clean, but
15:28 15   I want to delay as long as I can, any reason for Qorvo IT
15:28 16   to look at my computer and what I looked at on the
15:29 17   intranet."
15:29 18        "Intranet," meaning "Qorvo's intranet."
15:29 19   Q.   And Mr. Houlden references contracts in Outlook.
15:29 20        Do you see that?
15:29 21   A.   Yes.
15:29 22   Q.   Yeah.  And he sent this to Jeffrey Shealy, the CEO,
15:29 23   who we just saw testify a few moments ago, right?
15:29 24   A.   Yes.
15:29 25   Q.   What, based on your experience in this industry,

Shanfield - Direct                                    1245

15:29  1   would this -- well, let me ask this:  Would it have been a
15:29  2   red flag to Jeff Shealy if this was sent to him?
15:29  3   A.   Absolutely.  That would be the point where the CEO,
15:29  4   Mr. Shealy, would be -- or Dr. Shealy, would be saying,
15:29  5   Wait a minute.  What are you talking about?  You can't do
15:29  6   that.
15:29  7   Q.   Okay.
15:29  8        MR. DeFOSSE:  If we go to PDX-2.22.
15:29  9   BY MR. DeFOSSE:
15:29 10   Q.   What's relevant here?
15:29 11   A.   Well, this is the response from Dr. Shealy.  He says,
15:29 12   and he writes back to Rohan, "Got it."  In other words, he
15:30 13   gets what he's talking about.  "Let's discuss Monday."
15:30 14   And wants to discuss it in person.  Basically, he's fine
15:30 15   with it.
15:30 16   Q.   Okay.
15:30 17        MR. DeFOSSE:  PDX-6.23, please.
15:30 18   BY MR. DeFOSSE:
15:30 19   Q.   October 13th, 2016.  What's the relevance of that
15:30 20   date to your analysis?
15:30 21   A.   Yeah.  As I alluded to earlier, once this Qorvo
15:30 22   5 gigahertz statement of work was sent over to
15:30 23   David Aichele, the VP of business development at Akoustis,
15:30 24   he creates these slides and asks for a call to action with
15:30 25   a market priority of the 5 gigahertz Wi-Fi.  The very

Shanfield – Direct
1250

15:52 1 that Mr. Houlden had confidentiality obligations that
15:52 2 prohibited him from sharing Qorvo confidential
15:52 3 information?
15:52 4 A.   Yes.  Again, even if I wasn't showing this, it would
15:52 5 be understood by somebody seasoned in the business, like
15:52 6 Dr. Shealy or Dave Aichele -- they would know this is not
15:52 7 allowed.  And, of course, these confidentiality agreements
15:52 8 have formalized that understanding.
15:52 9 Q.   And in this case, did Dr. Shealy and Mr. Aichele also
15:52 10 sign the same confidentiality obligations with RFMD that
15:52 11 Mr. Houlden did?
15:52 12 A.   Yes.  Exactly.  RFMD that became Qorvo.
15:52 13 Q.   I'm going to move to the next trade secret group in a
15:52 14 minute, but first I wanted to pause.  The jury has heard a
15:52 15 lot about FBAR versus SMR resonators?
15:52 16 A.   Yes.
15:53 17 Q.   Are the trade secrets in Trade Secret Group 1
15:53 18 relevant to all BAW filters?
15:53 19 A.   Yes, of course.  I mean, the marketing information
15:53 20 that was -- that Qorvo had produced and the analysis all
15:53 21 applied whether they were FBAR or a surface mount -- a
15:53 22 solidly mounted resonator SMR.  So it was -- it had the
15:53 23 same benefit.
15:53 24 I think we heard from Dr. Shealy that one of the main
15:53 25 players in this market is Avago Broadcom, right?

Shanfield – Direct
1251

15:53 1 A.   Yes, right.
15:53 2 Q.   Who has FBAR filters?
15:53 3 A.   Yes, they do.
15:53 4 Q.   Does Qorvo compete with Broadcom and Avago in the
15:53 5 market?
15:53 6 A.   Yes, they do.
15:53 7 MR. DeFOSSE:  If we could go to Slide PDX-6.28,
15:53 8 please.
15:53 9 BY MR. DeFOSSE:
15:53 10 Q.   I'd like to talk about Trade Secret Group 2 now.
15:54 11 Can you remind the group how many trade secrets are
15:54 12 in this group?
15:54 13 A.   There's a total of 16 here.
15:54 14 Q.   And just at a high level, what is the nature of the
15:54 15 trade secrets in Group 2?
15:54 16 A.   Group 2 was what I would consider the treasure chest
15:54 17 of BAW filter and resonator designs by Qorvo.
15:54 18 Q.   What do you mean by "treasure chest"?
15:54 19 A.   In other words, it would -- it would give you a
15:54 20 blueprint for how to make a BAW resonator that's as good
15:54 21 as ones Qorvo makes.
15:54 22 Q.   Now, I'd like to discuss the trade secrets in this
15:54 23 group.  If we could turn to PDX-6.29.
15:54 24 How many documents did you include in your analysis
15:54 25 of the trade secrets in Group 2?

Shanfield – Direct
1252

15:54 1 A.   I picked out three.  I didn't want to overwhelm
15:54 2 everybody with all the documents.
15:54 3 Q.   And are the three documents that you picked out
15:54 4 reflected on PDX-6.29?
15:55 5 A.   Yes, they are.
15:55 6 Q.   And those were marked as Trial Exhibits 8, 9, and 10?
15:55 7 A.   Correct.
15:55 8 Q.   And was there any witness in this trial who addressed
15:55 9 these three documents?
15:55 10 A.   Yes, there was.
15:55 11 This was addressed by Dr. Aigner.
15:55 12 MR. DeFOSSE:  If we could go to PDX-6.30.
15:55 13 BY MR. DeFOSSE:
15:55 14 Q.   What specific trade secrets did you identify in this
15:55 15 document?
15:55 16 A.   So this took a little bit of study.  As I said, this
15:55 17 is confidential information, and I had to understand it
15:55 18 myself.  And what this is, is subtle effect that actually
15:55 19 has a big impact on the filter performs. ████████
15:55 20 ████████████████████████████████████
15:55 21 ████████████████████████████████████
15:56 22 ████████████████████████████████████
15:56 23 ████████████████████████████████████
15:56 24 ████████████████████████
15:56 25 Q.   Okay.  Just so the record is clear, the slide we're

Shanfield – Direct
1253

15:56 1 looking at has a reproduction of Trial Exhibit 8 on it?
15:56 2 A.   That's correct.
15:56 3 Q.   Which is the ████████████████ presentation?
15:56 4 A.   Yes.
15:56 5 Q.   Does the trade secret information contained in
15:56 6 Qorvo's research into resonator shape ████████████
15:56 7 ████████?
15:56 8 A.   No, it does not.
15:56 9 Q.   Why is that?
15:56 10 A.   That's because ████████████████████
15:56 11 ████████████████████████████████████
15:56 12 ████████████████████████████████████
15:56 13 ████████████████████████
15:56 14 ████████████    ████    ████████████
15:56 15 ████████
15:56 16 Q.   What do you mean by ████████████
15:56 17 A.   ████████████████████████████████
15:56 18 ████████████████████████████████████
15:56 19 ████████████████████████████████████
15:57 20 ████████████████████████████████████
15:57 21 ████████████████████
15:57 22 Q.   Okay.  All right.
15:57 23 MR. DeFOSSE:  And if we could go to PDX-6.31.
15:57 24 BY MR. DeFOSSE:
15:57 25 Q.   This is the second document in Trade Secret Group 2;

*Shanfield - Direct*                                                          1270

16:19  1   Q.   Okay.

16:19  2          MR. DeFOSSE:   If we could go to PDX-6.45.

16:20  3          Okay.  Your Honor, may I approach?

16:20  4          THE COURT:   You may.

16:20  5   BY MR. DeFOSSE:

16:20  6   Q.   Dr. Shanfield, I've handed you what's marked for

16:20  7   identification as PTX-1005.  I think it's the same

16:20  8   document that you have here.

16:20  9          Have you considered this document as part of your

16:20  10  analysis?

16:20  11  A.   Yes, I did.

16:20  12  Q.   And is this an internal Akoustis e-mail exchange?

16:20  13  A.   Yes, that's exactly what it is.

16:20  14          MR. DeFOSSE:   Your Honor, Plaintiff would move

16:20  15  for admission of PTX-1005.

16:20  16          THE COURT:   All right.  That's going to be

16:20  17  marked and received as 218.

16:20  18          (Trial Exhibit No. 218 was admitted into

16:20  19  evidence.)

16:20  20  BY MR. DeFOSSE:

16:20  21  Q.   Dr. Shanfield, at this time, in February, March of

16:21  22  2020, when Akoustis found out that Qorvo is now

16:21  23  prototyping products that have superior performance, what

16:21  24  happened next?

16:21  25  A.   Well, Mr. Houlden was looking for ways to find

---

*Shanfield - Direct*                                                          1271

16:21  1   information about Qorvo's product.  And he found a guy who

16:21  2   was a senior RF test engineer at Qorvo who was interested

16:21  3   in coming to Akoustis, and he wanted to meet with him.

16:21  4   And it turned out it was at a Panera.  It was my idea to

16:21  5   put the sign up there because -- I call it the "Panera

16:21  6   meeting," because they then have a discussion there.

16:21  7   Q.   Okay.

16:21  8          MR. DeFOSSE:   And if we could go to the slide

16:22  9   PDX-6.46.

16:22  10  BY MR. DeFOSSE:

16:22  11  Q.   The Panera meeting, according to your timeline, is

16:22  12  February 27th, 2020; is that right?

16:22  13  A.   That's right.

16:22  14  Q.   Okay.  So about a week later, what happened?

16:22  15  A.   Yeah.  So a week later, this file is downloaded by

16:22  16  Mr. Schmitt, the RF engineer, who was at Qorvo.  This

16:22  17  has this information that's being shown there.

16:22  18  Q.   Okay.  And that's the meta data in the middle of this

16:22  19  slide?

16:22  20  A.   That's correct.  That shows that it was downloaded.

16:22  21  Q.   So in about a week after he met with Mr. Houlden,

16:22  22  Mr. Schmitt went back to Qorvo and obtained a copy of this

16:22  23  Akoustis technology presentation?

16:22  24  A.   That's correct.

16:22  25          MR. DeFOSSE:   Your Honor, may I approach?

---

*Shanfield - Direct*                                                          1272

16:22  1          THE COURT:   You may.

16:22  2          MR. DeFOSSE:   Okay.  Could we go to PDX-6.47,

16:23  3   please.

16:23  4   BY MR. DeFOSSE:

16:23  5   Q.   Now, Dr. Shanfield, I've handed you what's been

16:23  6   marked as PTX-1077.

16:23  7          Is this a document that you analyzed as part of your

16:23  8   analysis of Trade Secret Group 2?

16:23  9   A.   Yes, it was.

16:23  10  Q.   And is this an e-mail from Brian Schmitt, the Qorvo

16:23  11  engineer who we were just discussing?

16:23  12  A.   Yes, it is.

16:23  13          MR. DeFOSSE:   Your Honor, Plaintiffs would move

16:23  14  for the admission of PTX-1077.

16:23  15          THE COURT:   Marked and received as 219.

16:23  16          (Trial Exhibit No. 219 was admitted into

16:23  17  evidence.)

16:23  18  BY MR. DeFOSSE:

16:23  19  Q.   Dr. Shanfield, could you explain to the jury why you

16:23  20  found this document to be significant in your analysis?

16:23  21  A.   Yes.  I found it significant and a little amusing,

16:23  22  too.  He's talking about -- Mr. Schmitt now has taken the

16:23  23  job at Akoustis.  It turned out, though, that he was still

16:23  24  employed by Qorvo while he was working at Akoustis.  There

16:24  25  was some overlap there.  And he's talking about how he has

---

*Shanfield - Direct*                                                          1273

16:24  1   to return his stuff this coming Wednesday.  So he's now at

16:24  2   Akoustis and he's got this document with him.

16:24  3   Q.   And Mr. Schmitt is the employee from Qorvo who took

16:24  4   this document to Akoustis after meeting with Mr. Houlden

16:24  5   at Panera?

16:24  6   A.   Right.  And it seemed to me like that discussion they

16:24  7   had must have been, Hey, we could use this information.

16:24  8   And Mr. Schmitt ends up having it with him.

16:24  9   Q.   Okay.  Before we shift to Trade Secret Group 3, I

16:24  10  think we talked about this a little bit with some of the

16:24  11  trade secrets already, but I want to make sure that you

16:24  12  agree for all.

16:24  13          Is there any distinction between FBAR resonators and

16:24  14  SMR resonators with respect to the trade secrets in trade

16:24  15  Secret Group 2?

16:25  16  A.   No.  They're not.  I mean, the information that's

16:25  17  being revealed here would apply in both cases, that

16:25  18  circuit information, the product specifications, the

16:25  19  layout, all of that is not specific to SMR and would

16:25  20  apply.  And if we had time we could walk through it, and I

16:25  21  could show in detail how that's true.

16:25  22  Q.   Okay.  Dr. Shanfield, I'd like to go to Trade Secret

16:25  23  Group 3 now.

16:25  24          MR. DeFOSSE:   And if we could pull up PDX-6.49.

16:25  25

Shanfield - Cross                    1414

1  But this is our morning break.

2            Anything else before we take that break right

3  now?

4            MR. LEMIEUX:  No, I don't think so, Your Honor.

5            THE COURT:  Let's give everybody a chance to

6  have that break.  We will see everybody -- I will see you

7  in about 13 minutes.  Thank you very much.

8            (Whereupon, a recess was taken.)

9            THE COURT:  You may be seated.  We can have the

10  witness back on the stand, and the jury can come in.

11            (The jury enters the courtroom at 10:47 a.m.)

12            THE COURT:  Everybody can be seated, and

13  counsel may proceed.

14  BY MR. LEMIEUX:

15  Q.   Doctor, just before the break here, we were talking

16  about the operation of the New York fab.  I wanted to make

17  sure I understood your testimony you've never actually

18  reviewed the fab's library of processes controls

19  procedures, have you?

20  A.   No, I don't think so.

21  Q.   So your opinion in this case is rendered without

22  actually looking at the actual procedures and processes

23  that are used in their fabrication in the manufacturing

24  facility in New York, correct?

25  A.   That's correct, but what that --

---

Shanfield - Cross                    1415

1  Q.   That's okay.  That's all I asked you.  Correct.

2  Thanks.

3            Now, one of the other documents that you mentioned as

4  part of this is this technology development document,

5  which I believe we've seen that had a front page that had

6  been modified by Dr. Shealy; is that right?

7  A.   Which one are you talking about?

8  Q.   The products developments document -- technology

9  development document.  Sorry.

10  A.   Oh, okay.  Yes.

11  Q.   Okay.  And you've used that as a basis for stating

12  that this was somehow used or otherwise misused by

13  Akoustis; is that right?

14  A.   That's correct.

15  Q.   And did you look beyond the first page of that

16  document, in terms of what else had been changed, if

17  anything, in that document other than the confidentiality

18  provision you noted on Page 1?

19  A.   I looked through the entire document.

20  Q.   And you would agree, then, that in that entire

21  document -- the rest of the document still says RFMD;

22  there was no changes in the rest of the document, correct?

23  A.   In the document we were able to recover, that's true.

24  Q.   And that's the only document that, in Mr. Faulkner's

25  analysis, was revealed to be shown on Dr. Shealy's

---

Shanfield - Cross                    1416

1  computer in that regard was that document, and there was

2  evidence that it was sent to Mr. Rohan -- or Rohan --

3  excuse me -- Houlden, and apparently there was also a copy

4  that was sent to Mary Winters that Mr. Faulkner said

5  wasn't opened by her.

6            Did you hear that testimony?

7  A.   What I heard Mr. Faulkner say is that he didn't have

8  access to the time periods where it most likely would have

9  been opened by her.

10  Q.   And if the intention was to change that document into

11  something that was going to be actually used by Akoustis,

12  don't you believe there would have been more changes than

13  simply the first face page?

14  A.   What I observed in looking through the many documents

15  is, in cases where Mr. Faulkner was able to recover or

16  find metadata of a document, there had been multiple

17  revisions, there was sometimes three or four revisions,

18  and not all of them were able to be -- were made available

19  to Mr. Faulkner.

20            In my view, given the blackout periods that he had to

21  deal with.  And I am of the -- I have the impression that

22  with documents where it was available, there was revision

23  after revision as different features were added, there

24  might have been changes.

25  Q.   And so, Dr. Shanfield, let me ask you, were you aware

---

Shanfield - Cross                    1417

1  of any evidence, whatsoever, that anything was changed to

2  that new technology development document other than the

3  logo on the first page and the confidentiality paragraph

4  on the first page?

5  A.   No.

6  Q.   Okay.  So the idea that somehow this might have been

7  changed in the future, that's speculation on your part,

8  correct?

9  A.   It's more than that.

10  Q.   Well, you've seen no evidence of any form of that

11  document that had been changed, other than the very

12  initial one that Dr. Shealy sent out; is that right?

13  A.   I considered two factors in that document, because

14  that its value is very high, and I -- my presumption was

15  there was -- and it isn't just presumption.  There was so

16  much evidence of use of documents where those documents

17  were available in discovery, I was of the opinion, and I

18  have been of the opinion, that it was a culture of usage

19  of confidential information.

20            Given the value of that document, I thought, in

21  particular, that one was going to be likely used, whether

22  it was discovered by Mr. Faulkner or not.

23  Q.   And so I understand, Dr. Shanfield, you like to make

24  very broad generalizations as to what you believe the use

25  is.  But I'm asking you specifically as to this document,

1688

Bennis - direct

08:58:17 1 Q.   Have you received any awards for the work that you
08:58:20 2 have done throughout your professional career?
08:58:22 3 A.   I have.  There is an industry group known as the I AM
08:58:27 4 1000, Intellectual Asset Management 1000 Group, and I have
08:58:31 5 been honored by them for the last six years running as a
08:58:35 6 recommended economics expert.  And I was also honored by the
08:58:39 7 Illinois CPA Society several years ago as a woman to watch
08:58:44 8 in the CPA industry.
08:58:47 9          MS. AYERS:  Your Honor, at this time we offer
08:58:50 10 Melissa Bennis as an expert in the field of damages.
08:58:52 11          MR. ELKINS:  No objection, Your Honor.
08:58:53 12          THE COURT:  She's received as a person who can
08:58:56 13 express an opinion in the area of damages.
08:58:58 14          You may proceed.
08:59:00 15 BY MS. AYERS:
08:59:00 16 Q.   Ms. Bennis, I would like to talk to you about your
08:59:03 17 approach to damages in this case.  Did you prepare any slide
08:59:06 18 to help the jury understand your testimony today?
08:59:08 19 A.   I did.
08:59:09 20 Q.   Mr. Faison, can you please display PDX-11.1?
08:59:17 21          Are these the slides that you assisted in the
08:59:20 22 preparation of?
08:59:21 23 A.   Yes.
08:59:21 24 Q.   Let's start with your damages conclusion.  Have you
08:59:24 25 made a determination of the damages in this case?

1689

Bennis - direct

08:59:26 1 A.   Yes, I have.
08:59:27 2 Q.   What materials did you consider in coming to your
08:59:31 3 conclusion?
08:59:32 4 A.   So like with most cases, this case did not differ.  I
08:59:39 5 examined many, many, many files and documents from the files
08:59:41 6 of both Qorvo and Akoustis.  I read deposition transcripts,
08:59:47 7 so here in court last week we saw video versions of some of
08:59:51 8 those.  I reviewed the written transcripts of the
08:59:54 9 depositions, all the exhibits that are marked and shown in
08:59:57 10 those depositions.  I held conversations with Dr. Shanfield
09:00:01 11 and Dr. Rothman to get a better appreciation for the
09:00:05 12 technical details behind the trade secrets and patents.  I
09:00:09 13 also spoke to Dr. Fattinger at Qorvo for the same purpose,
09:00:15 14 as well as a HR representative at Qorvo.
09:00:19 15          MS. AYERS:  Mr. Faison, can you please display
09:00:22 16 PDX-11.2.
09:00:23 17          Ms. Bennis, can you summarize your opinions
09:00:27 18 regarding Qorvo's damages for the jury?
09:00:29 19 A.   Yes.  So the damages calculations I have grouped into
09:00:34 20 three categories, they follow the claims that have been
09:00:36 21 asserted by Qorvo against Akoustis.  But the first up is the
09:00:40 22 trade secret misappropriation damages.  This relates to
09:00:45 23 again, Qorvo's claims that Akoustis has misappropriated all
09:00:48 24 the different information that we've heard about.
09:00:51 25          We heard that allowed Akoustis to achieve a

1690

Bennis - direct

09:00:55 1 head-start into the market to get there earlier, so I have
09:01:00 2 evaluated the damages under those claims and under that
09:01:06 3 benefit as being $66,114,093.
09:01:11 4          Under the claims of unfair competition, there is
09:01:14 5 a claim, of course, that Akoustis had misappropriated
09:01:18 6 Qorvo's confidential information, so this is again a little
09:01:22 7 broader than just misappropriation of the trade secrets,
09:01:25 8 this includes other confidential information as well.  But
09:01:28 9 given that it's much the same actions, the benefit is the
09:01:32 10 same, it helps Akoustis get ahead.  I have measured the
09:01:39 11 benefit in the same way, so in essence, the 66.1 million
09:01:44 12 once again.
09:01:45 13          Separately under the unfair competition, I have
09:01:48 14 evaluated Qorvo's claim of employee poaching.  Of course we
09:01:53 15 have heard evidence that suggest that the poaching exercise
09:01:55 16 was intended to get at the trade secrets and confidential
09:02:00 17 information, however this category of damages is strictly
09:02:03 18 related to the business costs of losing the employees, of
09:02:08 19 having to replace them, but the real cost of business when
09:02:12 20 things like this happen.
09:02:13 21          And then the last category of damages relates to
09:02:16 22 the patent infringement.  So should Akoustis be found to
09:02:20 23 infringe one or both of the patents that have been asserted,
09:02:23 24 the damages associated with the use just through trial just
09:02:28 25 as today is $279,808.

1691

Bennis - direct

09:02:32 1 Q.   I would like to break down each one of those category
09:02:35 2 of damages for the jury and talk about them a little bit
09:02:38 3 more with you today.  Did your -- and let's start with the
09:02:42 4 trade secrets claim, Ms. Bennis.
09:02:43 5          Did your damages analysis evaluate the benefit
09:02:46 6 that Akoustis received due to misappropriation of the trade
09:02:51 7 secrets contained in all eight groups of trade secret
09:02:53 8 identified during testimony in this trial?
09:02:55 9 A.   Yes.
09:02:56 10 Q.   How did you evaluate the technical benefit that the
09:03:00 11 misappropriation of these trade secrets provided to
09:03:03 12 Akoustis?
09:03:05 13 A.   So as I mentioned, I'm not the technical expert, I left
09:03:08 14 that expertise to Dr. Shanfield and Dr. Rothman, so my
09:03:13 15 conversations were to educate me on the technical aspects,
09:03:17 16 and the benefits derived from the information.
09:03:20 17 Q.   And did Dr. Shanfield identify any benefits that
09:03:26 18 Akoustis received as a result of its misappropriation of
09:03:30 19 Qorvo's trade secrets?
09:03:31 20 A.   Yes.
09:03:31 21 Q.   Can you please display PDX-11.3.
09:03:35 22          Ms. Bennis, can you explain at a high level what
09:03:39 23 benefits Dr. Shanfield identified?
09:03:41 24 A.   Yes.  So these should not come as a surprise by this
09:03:45 25 point.  You heard about these last week.  The

---

1692

Bennis - direct

09:03:48  1   misappropriation benefited Akoustis in that it allowed it to
09:03:54  2   identify a track area to target for its own product
09:03:58  3   development. It identified gaps in Qorvo's product lines,
09:04:01  4   so it where to move. And importantly, it allowed us to skip
09:04:07  5   unnecessary R & D, or research and development efforts
09:04:09  6   needed to produce a working resonator, we heard testimony
09:04:13  7   about that: to create a high quality evaluation board;
09:04:16  8   implement reliable testing processes; achieve high yield
09:04:21  9   manufacturing which is good for the bottom line or the
09:04:24  10  profitability using Qorvo's techniques. And all of these
09:04:31  11  things helped in getting Akoustis to the market and doing
09:04:31  12  all of its business activities earlier than it otherwise
09:04:35  13  would have.
09:04:35  14  Q.      Can you explain to the jury how you calculated
09:04:38  15  Qorvo's trade secret damages based upon your understanding
09:04:41  16  of the possible categories of available damages for
09:04:44  17  misappropriation of trade secrets?
09:04:47  18  A.      Yes. So there are various ways in which someone in
09:04:53  19  my shoes can calculate or evaluate the damages that's
09:04:58  20  dictated by the case law. One of those categories is called
09:05:01  21  unjust enrichment. So that is what I have focused on for
09:05:05  22  purposes of my analysis. And what that really means is
09:05:10  23  enrichment, meaning benefits that Akoustis achieved by doing
09:05:13  24  something unjustly or unfairly. So Akoustis's unjust
09:05:17  25  enrichment.

---

1693

Bennis - direct

09:05:18  1   Q.      How did you calculate the unjust enrichment damages
09:05:22  2   here?
09:05:23  3   A.      This analysis started, the starting point for it was
09:05:29  4   Dr. Shanfield's analysis. So again, last week we heard that
09:05:34  5   all of the acquisition of confidential important information
09:05:40  6   allowed Akoustis to move into the market and do all the
09:05:44  7   business related things it was doing at least 55 months
09:05:47  8   early.
09:05:48  9         So it then turns to what benefit did that help
09:05:53  10  Akoustis achieve. Well, earning revenue. It earned revenue
09:05:56  11  earlier than it otherwise would have. So the analysis then,
09:06:00  12  the test for me, is how do you put a dollar figure on that?
09:06:03  13  How do you figure out the benefit of having that revenue
09:06:06  14  sooner than you otherwise would have?
09:06:08  15  Q.      And how did you determine the monetary value of
09:06:11  16  Akoustis obtaining a 55-month head-start to get into the
09:06:15  17  market?
09:06:16  18  A.      My analysis measured the monetary value by evaluating
09:06:21  19  the time value of having money earlier rather than later.
09:06:26  20  Q.      What do you mean by the time value of money?
09:06:30  21  A.      The time value of money is a very widely known
09:06:34  22  studied economic concept. To break it down more simply, the
09:06:41  23  concept is that having a dollar today, is always better than
09:06:44  24  having a dollar tomorrow. And the reason being, if I have
09:06:48  25  that dollar today, I can invest that dollar, I can earn

---

1694

Bennis - direct

09:06:53  1   interest on that dollar. If I'm a company, I can use that
09:06:56  2   dollar to buy things, to build things, to make more money.
09:07:00  3   So there is power in having money sooner rather than later,
09:07:04  4   is the general concept.
09:07:07  5   Q.      Did you prepare a slide that illustrates the time
09:07:10  6   value of the revenue Akoustis received 55 months early?
09:07:13  7   A.      I did.
09:07:14  8   Q.      Mr. Faison, can you please pull up PDX-11.4.
09:07:21  9   A.      What you will see here is a bar graph, and what this
09:07:24  10  does is take Akoustis's annual revenues as it reported in
09:07:29  11  its SEC filings, this is the filing with the Securities and
09:07:34  12  Exchange Commission, on an annual basis starting in 2016,
09:07:37  13  run it through present. And it says if, in fact, these
09:07:43  14  revenues would have been delayed by 55 months, what would be
09:07:48  15  the differential in the time value of that money of having
09:07:53  16  it later, shifted out 55 months versus earlier.
09:08:00  17  Q.      So is your damages calculation the money itself that
09:08:03  18  Akoustis received?
09:08:05  19  A.      It's not. And this is important. It's not the
09:08:08  20  revenue. Under this analysis, Akoustis keeps the revenue
09:08:13  21  that it's earned. It's really only measuring the benefit --
09:08:18  22  the benefit by virtue of examining the time value, the
09:08:23  23  differential in having that revenue earlier. And I have
09:08:24  24  measured that using an interest calculation.
09:08:27  25        And I guess another thing to note, what this

---

1695

Bennis - direct

09:08:30  1   analysis also assumes is that Qorvo -- or rather Akoustis
09:08:35  2   could have gotten in the market, it could have actually
09:08:39  3   developed a saleable product, it could have made all the
09:08:42  4   same sales, it could have accomplished the exact same growth
09:08:46  5   rate despite the fact that the revenues would be shifting
09:08:49  6   into a point in time when the start of the revenue
09:08:52  7   generation would have been right in the middle of the Covid
09:08:56  8   pandemic, so there are some general assumptions, if you
09:09:01  9   will, about shifting the money forward as is.
09:09:03  10  Q.      Mr. Faison, can you please pull up PDX-11.5.
09:09:08  11        Ms. Bennis, does PDX-11.5 show the analysis that
09:09:12  12  you performed in this case?
09:09:13  13  A.      It does. And I realize this looks very busy. And
09:09:17  14  I'm not going to walk through all of the numbers. But this
09:09:19  15  is the schedule that appeared within my report that really
09:09:22  16  kind of shows an interest calculation and how one works.
09:09:27  17        So I'll just point out a few important things
09:09:31  18  that will hopefully make a little bit more sense.
09:09:35  19        You'll see that these are again, these annual
09:09:40  20  revenue streams, row C, total Akoustis revenue. In 2016,
09:09:46  21  Akoustis reported $254,844 in revenue. Those revenue
09:09:51  22  streams as reported run all the way through present. The
09:09:55  23  summation of all those equals 113.7 million in revenue that
09:10:00  24  Akoustis has reported.
09:10:03  25        Below that are all the different interest

---

1696

Bennis - direct

09:10:07  1    calculations, and an interest rate you'll see of 14.8.  14.8
09:10:12  2    is important because that is the -- that was the active
09:10:16  3    interest rate that I employed as of present day in order to
09:10:20  4    bring all of those revenue streams up to the present value.
09:10:25  5    In order to evaluate as of a given point in time, what the
09:10:29  6    value of that revenue would be such that I can compare it to
09:10:32  7    what that revenue would be if the same revenue streams were
09:10:37  8    shifted forward 55 months.
09:10:39  9    Q.    Why did you choose to use 14.8 percent as your
09:10:43  10   interest rate?
09:10:44  11   A.    14.8 percent is the -- it's the weighted average cost
09:10:50  12   of capital, commonly abbreviated was a WACC, rate of
09:10:56  13   Akoustis, so it comes directly from Akoustis's financial
09:11:00  14   model, it reflects their debt and equity structure.  It's an
09:11:05  15   interest rate that companies use all the time because it
09:11:07  16   reflects their own unique financing abilities and position.
09:11:12  17   They use it to evaluate investment decisions and to
09:11:16  18   generally make money on how to finance their operation and
09:11:20  19   their decisions.
09:11:20  20   Q.    And did you use Akoustis' WACC in the economic
09:11:25  21   formulas that are shown on the slide to determine the
09:11:28  22   present value of the revenues that Akoustis received, and
09:11:30  23   the benefit of the 55-month head-start?
09:11:34  24   A.    I did.  So again, on this particular slide, you'll
09:11:38  25   see that once the interest rate of 14.8 percent as of

1697

Bennis - direct

09:11:42  1    present day, as of the time of this analysis, is applied to
09:11:46  2    the 113 million in total Akoustis revenues, the present
09:11:51  3    value of having all of those revenue streams as early as
09:11:55  4    2016, means that that same 113 million today is worth 140
09:12:01  5    million.  And if you think about that, that makes sense
09:12:03  6    because they had the benefit of saying 2016 that $254,000
09:12:09  7    number, if you look down at the bottom, in today's dollars
09:12:13  8    over all those additional years, is actually worth 821,508.
09:12:20  9    Because they have the money, and they have been able to
09:12:22  10   invest it and do things with it, that's the concept in
09:12:25  11   economics about the value of a dollar.
09:12:27  12   Q.    Once you determine the present value of the revenue
09:12:30  13   that Akoustis actually received, what did you do next?
09:12:35  14   A.    So next, I performed the same exercise, and in fact I
09:12:40  15   think I have another exhibit from my report.  Yes.
09:12:45  16           So this took all of those annual revenue streams
09:12:49  17   and simply shifted them forward 55 months.  So you'll know
09:12:53  18   that because, say in the first column you'll see the date is
09:13:00  19   2022, it used to be 2016, we shifted those revenue streams
09:13:05  20   55 months into the future.  You know the revenue stream is
09:13:09  21   the same because we're still looking at the same
09:13:12  22   $113 million figure, but instead of that $254,834 number
09:13:18  23   that you see in the first column, being 800-some thousand
09:13:23  24   like we saw in the last slide, because it's now a lot closer
09:13:26  25   to present, that same revenue stream is only worth $436,000,

1698

Bennis - direct

09:13:33  1    highlighted down at the bottom.  That's the difference of
09:13:35  2    having that money for a lesser period of time as we get
09:13:39  3    closer to present.
09:13:40  4            And then similarly, because we're measuring the
09:13:44  5    money as of present value, or as of now, because certain of
09:13:47  6    these revenue streams got pushed out into 2025, 2026, '27,
09:13:52  7    '28, we actually have to discount those back, because in the
09:13:56  8    real world, Akoustis wouldn't have had those yet.  So those
09:14:00  9    get -- those get reduced by the same interest calculation
09:14:04  10   and therefore the present value of those revenue streams
09:14:08  11   equals 74 million, 74.8 million as you'll see.  So that's
09:14:15  12   the time value of money concept.
09:14:16  13   Q.    So how did you use the present value of the revenue
09:14:20  14   that Akoustis actually received, and the present value of
09:14:23  15   the revenue that Akoustis would have received without
09:14:27  16   misappropriating Qorvo's trade secrets in order to calculate
09:14:31  17   Qorvo's damages in this case?
09:14:33  18   A.    So I think the next slide will show you, and it
09:14:36  19   really becomes quite simple.
09:14:38  20           You simply take the difference, look at the
09:14:41  21   differential between one revenue stream and the other, and
09:14:44  22   the difference represents, not the revenue dollars
09:14:47  23   themselves, but just the benefit of having those at an
09:14:51  24   earlier point to present.  So the benefit is measured of the
09:14:54  25   head-start to be the $66,114,093 figure.

1699

Bennis - direct

09:15:01  1    Q.    Ms. Bennis, the slide at PDX-11.7 says date of
09:15:06  2    original analysis, 11/23.  Can you tell the jury what that
09:15:09  3    means?
09:15:09  4    A.    Yeah.  So I mentioned that my report analysis was
09:15:12  5    finalized and issued back in November.  And so at that point
09:15:16  6    in time, we knew that the trial, the decision of the jury
09:15:23  7    would be happening now, so it made sense to run the analysis
09:15:26  8    through now.  But at that point in time in November, fiscal
09:15:30  9    year 2024, which we heard testimony last week runs from
09:15:36  10   July 1st through June 30th of a year, was not yet complete.
09:15:40  11   So in fact, if you go back a couple of slides, you'll see --
09:15:45  12   Q.    11.5.
09:15:47  13   A.    That last column 2024, EST, EST stands for estimated.
09:15:53  14   The estimate comes from Akoustis's own files, this is what
09:15:56  15   Akoustis projected that it was going to earn in it's fiscal
09:15:59  16   year 2024 on a whole.
09:16:06  17   Q.    Have you performed any updated calculations based
09:16:10  18   upon information presented to you during trial?
09:16:13  19   A.    Yes.  So last week when I was listening like you, I
09:16:18  20   heard the testimony of Mr. Aichele that suggested that their
09:16:22  21   -- that Akoustis's fiscal year 2024 results were going to
09:16:27  22   be 28 million in total, which was different than the
09:16:30  23   projections that they had made back that were available at
09:16:34  24   the time of my report.  So for the benefit of the jury to
09:16:37  25   see what that would look like, I ran that number through the

1700

Bennis - direct

09:16:41  1    model.  When you run that projection, it's not complete, so
09:16:45  2    we don't know if that's ultimately how it will end up, but
09:16:48  3    if you run that figure through the model, performing the
09:16:53  4    same economic analysis, you get a total head-start damages
09:16:59  5    figure of 50.3 million.
09:17:03  6    Q.    Ms. Bennis, I want to make sure that your testimony
09:17:06  7    for the jury is clear.  The calculation that you provided to
09:17:08  8    PDX-11.7, which is the prior slide, Mr. Faison, was based
09:17:13  9    upon information that you received from Akoustis's own files
09:17:17 10    relating to what it thought it's revenue streams were going
09:17:21 11    to be for 2024; is that correct?
09:17:24 12    A.    That's correct.
09:17:24 13    Q.    And if we flip to the next slide, 11.8, you have
09:17:28 14    updated those calculations within your own model based upon
09:17:32 15    testimony that Mr. Aichele provided to the jury, is that
09:17:35 16    correct?
09:17:35 17    A.    That's correct.
09:17:38 18    Q.    When you calculated the unjust enrichment benefit to
09:17:43 19    Akoustis, did you consider how the trade secrets impacted
09:17:46 20    Akoustis's costs?
09:17:47 21    A.    Yes.  So recall when Dr. Shanfield talked about those
09:17:51 22    analysis, that he really only talked about the benefit of
09:17:54 23    the head-start in -- by virtue of the time saved.  But in
09:17:58 24    reality, companies incur real research and development hard
09:18:04 25    expenses.  So this analysis again, is only looking at the

1701

Bennis - direct

09:18:08  1    head-start benefit as defined by a time period, it has not
09:18:12  2    included any types of hard research and development
09:18:16  3    personnel material type expenses that would typically be
09:18:20  4    incurred.
09:18:24  5          MS. AYERS:  Your Honor, may I approach?
09:18:26  6          THE COURT:  You may.
09:18:46  7    BY MS. AYERS:
09:18:51  8    Q.    Ms. Bennis, do you recognize the document that I just
09:18:54  9    handed you?
09:18:55 10    A.    I do.
09:18:55 11    Q.    Can you explain to the jury what it is?
09:18:57 12    A.    Yes.  So these are the three schedules that we
09:19:01 13    actually just looked at on the screen that show both the
09:19:07 14    time value calculation at present as well as that shifted
09:19:12 15    into the future, and then the differential that results in
09:19:15 16    the $66 million calculation.  So these were the exhibits
09:19:18 17    from my report.
09:19:19 18          MS. AYERS:  Your Honor, I move to enter
09:19:23 19    PTX-1004, Exhibit 3, Schedule 1: PTX-1004, Exhibit 3,
09:19:28 20    Schedule 2: and PTX-1004, Exhibit 3, Schedule 3, into
09:19:33 21    evidence.
09:19:33 22          THE COURT:  Marked and received as 280, 281 and
09:19:38 23    282.
09:19:38 24          (Trial Exhibit Nos. 280, 281 and 282 were
09:19:40 25    admitted into evidence.)

1702

Bennis - direct

09:19:40  1    BY MS. AYERS:
09:19:45  2    Q.    Let's move on to your next category of damages,
09:19:48  3    Ms. Bennis, which is for those -- which are the damages for
09:19:51  4    Qorvo's claims of unfair competition.  You mentioned
09:19:54  5    previously that you calculated two categories of those
09:19:57  6    damages?
09:19:58  7    A.    I did.
09:20:00  8    Q.    Mr. Faison, can you please pull up PDX-11.9.
09:20:05  9          Let's start with the first amount listed under
09:20:10 10    unfair competition on this slide.  Can you explain to the
09:20:11 11    jury what this number relates to?
09:20:14 12    A.    Yes.  As I mentioned, the claim under unfair
09:20:19 13    competition that all of the different confidential
09:20:21 14    information was also misappropriated despite the fact I
09:20:25 15    understand that the broader amount of information, the
09:20:30 16    benefit, the idea of the benefit, the idea is that the
09:20:33 17    benefit is the same, it allowed a head-start, so therefore
09:20:37 18    the measurements and the mechanisms employed to get to a
09:20:41 19    computation of that benefit is the same.
09:20:44 20    Q.    And what is the second category of damages under
09:20:48 21    Qorvo's unfair competition claim?
09:20:51 22    A.    The second category is what I mentioned to be the
09:20:55 23    employee poaching damages, so again, poaching, taking
09:20:59 24    employees from one company to another.  And this is intended
09:21:03 25    to be separate again from the value of the information and

1703

Bennis - direct

09:21:05  1    the benefits received by Akoustis, but rather the
09:21:09  2    computation of damages to a business of having losing
09:21:14  3    employees and having to replace and retrain, and all of
09:21:17  4    those real business expenses that are incurred as a result
09:21:20  5    of these actions.
09:21:21  6    Q.    Mr. Faison, can you please go to PTX-11.10.
09:21:25  7          Can you give the jury an example of some of the
09:21:28  8    cost that a company incurs when an employee leaves the
09:21:32  9    company?
09:21:32 10    A.    Sure.  So there is lots of articles and basically
09:21:40 11    industry knowledge and statistic and studies about these
09:21:43 12    real costs to business of losing employees.  So this is just
09:21:47 13    an example of an article that talked about all of the
09:21:51 14    different costs, hiding costs, real costs to companies and
09:21:55 15    it does include things like number four and number five of
09:21:59 16    time and money associated with hiring replacement and cost
09:22:02 17    of training new people.
09:22:04 18    Q.    How did you calculate the cost to Qorvo of losing
09:22:07 19    it's assembled workforce?
09:22:11 20    A.    So for purposes of this analysis, there was actually
09:22:15 21    a document within the files of Akoustis, and what that
09:22:19 22    document was, was a valuation performed by ███ which you
09:22:25 23    know is a well-known audit advisory firm, and what happened
09:22:30 24    was I think it was in 2021, Akoustis acquired a business
09:22:35 25    called RFMI, and apart of that acquisition, which is not

1712

Bennis - direct

09:34:41 1 **Q.** And can you explain to the jury what this document
09:34:43 2 is?
09:34:45 3 **A.** So this, again, was a financial forecast from
09:34:49 4 Akoustis's own files. You'll see at the top there it says
09:34:53 5 five years strategic plan.
09:34:56 6 **Q.** And Mr. Faison, if you'll scroll up in the sheet.
09:34:59 7 Where did you get this five-year forecast,
09:35:07 8 Ms. Bennis?
09:35:07 9 **A.** So this was straight from the files at Akoustis. It
09:35:11 10 was -- at the bottom it labeled the fact that these were
09:35:15 11 projections performed by Akoustis in June of 2022, and it
09:35:19 12 was their outlook for their next five years.
09:35:23 13 MS. AYERS: Your Honor, I move to admit JTX-003A
09:35:27 14 into evidence.
09:35:28 15 THE COURT: Marked and received as 284.
09:35:31 16 (Trial Exhibit No. 284 was admitted into
09:35:32 17 evidence.)
09:35:32 18 BY MS. AYERS:
09:35:33 19 **Q.** Mr. Faison, can you please display PDX-11.31.
09:35:37 20 Ms. Bennis, can you please explain to the jury
09:35:42 21 what information in Akoustis's five-year strategic forecast
09:35:46 22 impacted your analysis of the sale and profitability of
09:35:49 23 products incorporating the patented technology for purposes
09:35:53 24 of the *Georgia-Pacific* factor?
09:35:54 25 **A.** So these were kind of the salient points to pull out

1713

Bennis - direct

09:35:58 1 of that spreadsheet to highlight. That Akoustis sold 61.6
09:36:06 2 million BAW filter units through 2023, those are actual
09:36:10 3 results. But according to this five-year strategic plan,
09:36:14 4 ████████████████████████████████████████████
09:36:18 5 ████████████████████████████████████████████
09:36:23 6 ████████████████████████████████████████████
09:36:28 7 ██████████████████████████████████████
09:36:34 8 ████████████████████████████████████████████
09:36:40 9 ██████████████████. That's the point of this forecast.
09:36:44 10 ████████████████████████████████████████████
09:36:50 11 in BAW filter products.
09:36:51 12 And the reason this is pertinent, is because
09:36:56 13 there is a lot of upside in this market. We heard a lot of
09:37:01 14 testimony that this is a billion dollars market, billions of
09:37:06 15 BAW filters being sold, there is very healthy profit margins
09:37:09 16 to be made, and so sitting at that hypothetical negotiation,
09:37:13 17 Akoustis is going to say I need to make sure I get a patent
09:37:17 18 license so that I can practice these patents and sell these
09:37:19 19 products and achieve the upside, and get my piece of the
09:37:26 20 market that I'm after here.
09:37:26 21 So the sales and profitability are always on the
09:37:29 22 minds of parties when they think how much they have to gain
09:37:33 23 as a licensee, as the person taking the license.
09:37:37 24 **Q.** Mr. Faison, can you please return back to PDX-11.16.
09:37:41 25 The last *Georgia-Pacific* factor that you

1714

Bennis - direct

09:37:45 1 mentioned was the relationship between the parties. Can you
09:37:48 2 please tell us what impact that had on the
09:37:51 3 hypothetical negotiation under *Georgia-Pacific*?
09:37:54 4 **A.** The relationship of the parties is what is evaluated
09:37:59 5 under *Georgia-Pacific* factor number 5, and the reason why it
09:38:02 6 matters is because when you have a license like this one
09:38:05 7 that was between Cornell and Akoustis, Cornell is the
09:38:10 8 university, it's a research center, so it's not
09:38:13 9 manufacturing products and competing with Akoustis, Qorvo
09:38:16 10 is. So it's typically -- it typically has the effect of
09:38:21 11 increasing the royalty rate, both demanded and paid when
09:38:25 12 there is a license between competitors as opposed a research
09:38:30 13 institution and a manufacturer.
09:38:31 14 **Q.** After your consideration of those factors, as well as
09:38:34 15 all the other *Georgia-Pacific* factors, what is your opinion
09:38:37 16 regarding the royalty rate that Akoustis and Qorvo would
09:38:40 17 have agreed to for a license to the asserted patents?
09:38:43 18 **A.** So it's my opinion that the parties would have agreed
09:38:46 19 on a royalty rate of -- as a result of a negotiation of at
09:38:51 20 least one percent.
09:38:52 21 **Q.** And Mr. Faison, can you please pull up PDX-11.21.
09:38:57 22 Applying this analysis, if the jury finds that
09:39:01 23 Akoustis infringes Qorvo's patent, what are the damages that
09:39:06 24 Qorvo are entitled to?
09:39:08 25 **A.** You'll see on this slide I have summarized the

1715

Bennis - direct

09:39:12 1 accused product revenue that only starts as of October 2021,
09:39:15 2 since that's the date that this lawsuit was filed and
09:39:18 3 continues through present, begin the fiscal year 2024
09:39:22 4 results are estimated there. So that amount of revenue is
09:39:26 5 then multiplied by the royalty rate to get the royalty
09:39:29 6 damages for the use of those patents. That to date equals
09:39:33 7 $279,808.
09:39:36 8 It's important to note that if there is a
09:39:38 9 finding of infringement, that there is the ability for the
09:39:41 10 Court to suggest a license going forward. So in a typical
09:39:46 11 licensing negotiation, for context, the consideration
09:39:51 12 would be for a payment being paid until the expiration of
09:39:55 13 the patent. So in this case, I think one of the patents
09:39:58 14 expired in 2035. But this is what the damages date.
09:40:04 15 **Q.** Can you explain to the jury why your damages for
09:40:07 16 patents infringement is so much lower than the damages that
09:40:10 17 you calculated for misappropriation of Qorvo's trade
09:40:13 18 secrets?
09:40:13 19 **A.** Sure. Again, the patent damages for two reasons,
09:40:17 20 really, they are -- they're is an important element of the
09:40:23 21 BAW filters for cells, but they're for a discreet
09:40:26 22 functionality. This is also only reflective of the sale to
09:40:29 23 date, we saw those projections that expect the BAW filter
09:40:33 24 sales to grow very large numbers into the future. But the
09:40:37 25 other difference is just overall scope, what we've heard is

1720

Bennis - cross

09:46:23   1    Q.    So I'm going to first -- first I'm going to do just
09:46:27   2    like Ms. Ayers did, we're going to talk about trade secret
09:46:31   3    misappropriation first, and then we'll talk about unfair
09:46:34   4    competition and then last, we'll talk about patent
09:46:37   5    infringement.
09:46:37   6          So first, to set the table regarding the types
09:46:41   7    of damages that are available to a Plaintiff that believes
09:46:46   8    it is -- it has been damaged by trade secret
09:46:51   9    misappropriation, there are basically under both federal
09:46:58  10    law, which Qorvo is suing under, and state law, which Qorvo
09:47:02  11    is also suing under, there is essentially three different
09:47:06  12    types of damages available; correct?
09:47:13  13    A.    Generally speaking, yes, there is three categories of
09:47:16  14    which various analysis can be evaluated.
09:47:18  15    Q.    Better said.  Thank you.
09:47:19  16          So the first type of damage, is damages for
09:47:25  17    actual loss suffered by the Plaintiff for trade secret
09:47:28  18    misappropriation; correct?
09:47:29  19    A.    Yes.
09:47:30  20    Q.    So those would be direct damages, actual damages
09:47:33  21    suffered by the Plaintiff in this case, Qorvo; right?
09:47:37  22    A.    Yes, those can be measured, that's right.
09:47:40  23    Q.    The second is essentially unjust enrichment that
09:47:45  24    basically as you have said, the benefit enjoyed or
09:47:49  25    accumulating to the Defendant from use of the plaintiff's

1722

Bennis - cross

09:49:30   1    A.    That's my understanding.
09:49:32   2    Q.    Okay.  You have calculated no damages for Qorvo's
09:49:36   3    actual loss, correct?
09:49:36   4    A.    Correct, I evaluated unjust enrichment, right.
09:49:40   5    Q.    You didn't attempt to calculate or to measure the
09:49:44   6    damages caused by misappropriation alleged against Akoustis
09:49:50   7    as measured by imposition of a reasonable royalty either,
09:49:55   8    correct?
09:49:55   9    A.    I did not reevaluate the reasonable royalty for the
09:50:00  10    claims of trade secret, that's correct.
09:50:00  11    Q.    And you don't really have a specific reason why you
09:50:02  12    did not express an opinion regarding the amount of Qorvo's
09:50:09  13    actual damages, correct?
09:50:11  14    A.    I think when we're phased with the task of evaluating
09:50:17  15    damages, sometimes there are choices to be made about what's
09:50:20  16    the most saleable, there is no question, there was no
09:50:27  17    question once the evidence kind of was laid out, the benefit
09:50:31  18    to Akoustis of obtaining this information.  And so because
09:50:36  19    there was such a clear head start benefit, it made sense to
09:50:40  20    evaluate the unjust enrichment accordingly.
09:50:43  21          There is no question that there are actual
09:50:46  22    losses to Qorvo.  The loss of the confidential nature of its
09:50:52  23    own information.  But for purposes of the damages analysis
09:50:55  24    that I performed, I focused on that second prong, and that
09:50:58  25    is unjust enrichment enjoyed by Akoustis.

1721

Bennis - cross

09:47:56   1    trade secrets: correct?
09:47:57   2    A.    I agree.
09:47:58   3    Q.    And finally, if neither Category 1 nor Category 2
09:48:05   4    really fits, then at a minimum, the Plaintiff can collect
09:48:10   5    what's known as a reasonable royalty for trade secret
09:48:14   6    misappropriation, I'm not saying it's the same, but
09:48:18   7    reasonable royalty in the same vain that you talked about
09:48:21   8    regarding patent infringement damages, right?
09:48:24   9    A.    I don't know that I would think of it as being
09:48:28  10    related to fit, I think it's more related to the idea of the
09:48:33  11    actual loss or unjust enrichment of difficult to calculate
09:48:38  12    for various reasons, which there can be various reasons,
09:48:42  13    that the trade secret holder is still due compensation as a
09:48:49  14    result of a bad act, so a reasonable royalty can be
09:48:52  15    evaluated to still make sure there is compensation for the
09:48:56  16    harm that's been imposed.
09:48:58  17    Q.    Category 1, Category 2.  So we have actual
09:48:58  18    damages, Category 1.  Category 2 is unjust enrichment of the
09:49:02  19    Defendant.  Those are actually additive, aren't they?
09:49:08  20    A.    They are, to the extent they don't overlap.
09:49:11  21    Q.    So a Plaintiff can recover its actual damages, and it
09:49:14  22    can also recover for the Defendants' unjust enrichment
09:49:19  23    benefit, so long as elements of each do not overlap as you
09:49:24  24    just said; correct?
09:49:29  25

1723

Bennis - cross

09:51:01   1    Q.    But since they're additive, Qorvo could have claimed
09:51:05   2    more damages if it had actual damages to show, you just
09:51:09   3    didn't do that, correct?
09:51:10   4    A.    So, I made several conservatives in my analysis.
09:51:15   5    Like I mentioned, there were elements of unjust enrichment
09:51:19   6    that I also did not include.
09:51:20   7    Q.    And unjust enrichment measures the benefit realized
09:51:25   8    by the Defendant as a result of its use of the trade
09:51:28   9    secrets, correct?
09:51:29  10    A.    Yes.
09:51:29  11    Q.    There is no benefit without use, right?
09:51:33  12    A.    The unjust enrichment in this case follows the --
09:51:39  13    yes, the benefit from the use, yes, agree.
09:51:47  14    Q.    So let's focus now on unjust enrichment, which is
09:51:51  15    what you did calculate with respect to the trade secret
09:51:55  16    misappropriation element here.
09:51:56  17          And you would agree with me that court cases and
09:52:01  18    literature in the area recognizes three primary categories
09:52:07  19    of unjust enrichment in trade secret cases, correct?
09:52:13  20    A.    Defendants' profits is one.  Head start benefit is another,
09:52:19  21    and avoided costs is the third.  Right?
09:52:27  22    A.    I certainly have done lots of reading and analysis
09:52:30  23    that evaluate unjust enrichment in a variety of ways.  Those
09:52:35  24    are certainly some of the ways that I have seen, yes, in
09:52:41  25    thinking about it.

1732

Bennis - cross

10:05:53 1 capital equipment.  It's being consumed by the costs of
10:05:57 2 revenue.  And that's really the problem with your theory is
10:06:00 3 you're trying to infer a benefit from revenue without taking
10:06:06 4 real world facts into account; right?
10:06:09 5 **A.**    No, I disagree completely.
10:06:12 6 **Q.**    Okay.
10:06:13 7 **A.**    And again --
10:06:14 8 **Q.**    Let's say you're aware that the courts rely on
10:06:25 9 publications that have considered expert witness
10:06:29 10 methodologies for estimating a head start benefit to a
10:06:33 11 Defendant having endorsed expert opinions using the amount
10:06:36 12 of the Defendant's incremental products, that's the
10:06:42 13 Defendant's profits, right?
10:06:43 14 **A.**    I believe so, yes.
10:06:45 15 **Q.**    And in a head start, they have also approved the use
10:06:50 16 of the increased value of the Defendant's company, company
10:06:56 17 value, as a result of a head start it obtained, you're aware
10:07:00 18 of that, right?
10:07:01 19 **A.**    Which is what all these types of things get to, yeah.
10:07:05 20 **Q.**    But you did not perform a valuation of Akoustis as a
10:07:11 21 company, correct?
10:07:12 22 **A.**    My analysis focuses just on the isolated benefit.
10:07:16 23 **Q.**    Right.  And you're aware, because I asked you at your
10:07:21 24 deposition, you're aware of the Sedona Conference, right?
10:07:25 25 **A.**    Yes.

---

1733

Bennis - cross

10:07:26 1 **Q.**    And it's a well respected nonpartisan, nonprofit
10:07:31 2 research and educational institute, right?
10:07:34 3 **A.**    Yes.
10:07:34 4 **Q.**    And among other things, it's dedicated to the
10:07:38 5 advanced study of law and policy in the area of antitrust
10:07:42 6 law, complex litigation, intellectual property rights and
10:07:45 7 data security and practicing law, correct?
10:07:49 8 **A.**    I'll take your word for it.
10:07:51 9 **Q.**    And it publishes an autonomous journal that includes
10:07:56 10 articles, commentaries and other publications, right?
10:08:00 11 **A.**    Yes, I think groups like that often produce --
10:08:05 12 **Q.**    We discussed a particular publication by the Sedona
10:08:10 13 Conference, it published the Sedona Conference Commentary on
10:08:15 14 Monetary Remedies in Trade Secret Litigation, do you
10:08:19 15 remember that?
10:08:19 16 **A.**    I do.
10:09:21 17         MR. ELKINS:  May I approach, Your Honor?
10:09:23 18         THE COURT:  You may.
10:09:34 19 BY MR. ELKINS:
10:09:44 20 **Q.**    As I want to do, I sometimes forget to look at
10:09:47 21 things, so I'm looking at documents.  Before I have you do
10:09:50 22 that, Ms. Bennis, let me back up to the last document that I
10:09:53 23 showed you.  Mr. Brown, if you could put back on Appendix A,
10:09:57 24 Schedule 4.  There you go.
10:10:01 25         And could you focus on the lines right

---

1734

Bennis - cross

10:10:04 1 underneath operating expenses.
10:10:08 2 **A.**    Okay.
10:10:09 3 **Q.**    And I just wanted to note, so you prepared this
10:10:17 4 spreadsheet for your own report; correct?
10:10:21 5 **A.**    I did.  I prepared this from an Akoustis material,
10:10:28 6 Form 10K filings, yes.
10:10:30 7 **Q.**    And you put --
10:10:31 8 **A.**    Amalgamated them.
10:10:33 9 **Q.**    Amalgamated into a useful fashion.  One thing I
10:10:36 10 wanted to confirm is, you have there a total of 152 point,
10:10:43 11 almost, $152.7 million in research and development from
10:10:48 12 fiscal year '16 through '23; correct?
10:10:52 13 **A.**    Yes.
10:10:53 14         MR. ELKINS:  Your Honor, we would offer Exhibit
10:10:56 15 A, Schedule 4 from Ms. Bennis's report into evidence.
10:11:00 16         THE COURT:  Marked and received as 286.
10:11:07 17         (Trial Exhibit No. 286 was admitted into
10:11:08 18 evidence.)
10:11:08 19         MR. ELKINS:  Thank you.
10:11:09 20 BY MR. ELKINS:
10:11:09 21 **Q.**    Okay.  Sorry for that detour.
10:11:13 22 Let's go back to the Sedona Conference paper.
10:11:20 23 And does this appear to be a true and correct copy of the
10:11:25 24 article that we discussed at your deposition?
10:11:28 25 **A.**    Yes, I believe so.

---

1735

Bennis - cross

10:11:33 1         MR. ELKINS:  Your Honor, we would move the
10:11:35 2 Sedona Conference Journal Volume XIX, Number 2, into
10:11:39 3 evidence.
10:11:41 4         MS. AYERS:  Objection, Your Honor.
10:11:41 5         THE COURT:  Objection sustained.
10:11:45 6 BY MR. ELKINS:
10:11:45 7 **Q.**    Let's look --
10:11:46 8         THE COURT:  It's inconsistent with the portion
10:11:53 9 of the 803 series of rules.
10:11:57 10 BY MR. ELKINS:
10:11:58 11 **Q.**    Can you go to page 39, 39 of 81, which is not here,
10:12:04 12 but I think it's at page 684.  Well, let me do this without
10:12:36 13 the document.
10:12:38 14         When we spoke at your deposition in January, you
10:12:48 15 could not recall at that time having ever previously
10:12:51 16 performed a head start estimate of benefit in a trade secret
10:13:01 17 case before this one, is that accurate?
10:13:06 18 **A.**    A head start benefit?
10:13:11 19 **Q.**    Yes.
10:13:17 20 **A.**    I'm not sure that I have.
10:13:21 21 **Q.**    And while you're -- you're looking at the -- at least
10:13:28 22 in direct examination, you said that you're looking at the
10:13:31 23 time value of money received by Akoustis.  The money
10:13:39 24 received is revenue in this case; correct?
10:13:42 25 **A.**    Yes.

---

1752

Bennis - cross

10:57:55 1 that I wouldn't include as an employee, if there was not an
10:57:59 2 attempt to replace them.
10:58:02 3 Q. Okay. So you eliminated Mr. Houlden, for example,
10:58:06 4 because you understood from Ms. Stoddard that he was -- his
10:58:16 5 position was eliminated at Qorvo, right?
10:58:18 6 A. That's right.
10:58:19 7 Q. And you eliminated Mr. Shealy from the list because
10:58:22 8 he left Qorvo and then took a few months to found Akoustis;
10:58:28 9 right?
10:58:28 10 A. That's right.
10:58:29 11 Q. You included Mr. Kwon, though, J.B. Kwon, you saw him
10:58:38 12 testify in deposition, right?
10:58:42 13 A. On video, yes.
10:58:42 14 Q. Yes. And you read his deposition as one of the
10:58:45 15 materials that you had before you issued your report; right?
10:58:49 16 A. Yes.
10:58:49 17 Q. And you heard him testify that he was the one who
10:58:53 18 decided to leave Qorvo, and applied through a recruiter.
10:58:59 19 A. I did hear that.
10:59:00 20 Q. So why did you include him?
10:59:02 21 A. I think it was my understanding, again, based on
10:59:07 22 conversations, the belief was that it was a poaching
10:59:10 23 exercise, so he was included.
10:59:17 24 Q. So if somebody said that, they were seeking to leave
10:59:21 25 voluntarily and approached Akoustis, you still counted that

1753

10:59:25 1 as a poaching exercise?
10:59:27 2 A. I can't think of any other examples like that.
10:59:31 3 Q. Okay. So would you agree with me that there are
10:59:39 4 three important issues in determining the harm to Qorvo from
10:59:43 5 poaching. One, first, did Qorvo replace the departed
10:59:48 6 employee. That would be one issue to look at; correct?
10:59:53 7 A. It could be.
10:59:55 8 Q. Number two, was the employee poached; right?
10:59:59 9 A. Yes, that could be.
11:00:01 10 Q. And third would be, what's the incremental amount of
11:00:04 11 money that Qorvo spent for, maybe through indirect means,
11:00:12 12 but the harm to Qorvo from having to replace that poached
11:00:19 13 employee, right?
11:00:20 14 A. In general, these are costs incurred with having to
11:00:22 15 deal with these types of issues.
11:00:25 16 Q. Let's take first, whether Qorvo replaced any or all
11:00:29 17 of the nineteen employees that are on your list. At your
11:00:33 18 deposition in January 2024, you confirmed that that was a
11:00:38 19 question you didn't ask, correct?
11:00:40 20 A. That's right.
11:00:41 21 Q. So you spoke with Ms. Stoddard, but you didn't ask
11:00:44 22 her whether or not Qorvo replaced any of the nineteen
11:00:48 23 employees that are on your poached list?
11:00:54 24 A. Yes, we spoke through again the various employees and
11:00:55 25 her understanding of their departures and such. The

1754

Bennis - cross

11:01:00 1 interesting part about this type of analysis is, these
11:01:04 2 training type costs and search costs and things of that
11:01:04 3 nature aren't necessarily something you see in black and
11:01:11 4 white on a company's financial statement, which is why you
11:01:14 5 have valuations like the one we saw for ████, or we have the
11:01:19 6 U.S. Laborer Statistic Bureau, which is a government entity
11:01:21 7 that puts out studies that I used in another analysis that
11:01:27 8 helps document what these costs are to other companies
11:01:30 9 because the costs are real.
11:01:31 10 Q. No one is disputing that, Ms. Bennis. I want to make
11:01:36 11 sure that I understand that -- so Qorvo possibly chose to
11:01:40 12 replace some, all or none of the nineteen people, but you
11:01:46 13 don't know that; correct?
11:01:46 14 A. Right. I understand that again, hiring some of these
11:01:52 15 positions is very iterative, and my discussion with Stoddard
11:01:56 16 did not prove that to be any different at Qorvo.
11:01:59 17 Q. Let's consider the question now whether any of the
11:02:03 18 nineteen were actually poached. So you understand that for
11:02:08 19 the employee poaching claim in this case, Qorvo does not
11:02:15 20 allege that Akoustis engaged in unfair business practices
11:02:19 21 simply by targeting and attempting to recruit Qorvo
11:02:24 22 employees generally, right?
11:02:26 23 A. Can you ask that again?
11:02:29 24 Q. Sure. You understand that in the day-to-day world,
11:02:34 25 competitors will recruit employees from other competitors

1755

Bennis - cross

11:02:39 1 all the time; correct?
11:02:42 2 A. Generally speaking, yes.
11:02:45 3 Q. And there is nothing wrong with that; correct?
11:02:48 4 A. Right.
11:02:49 5 Q. And what happens -- and in this case, what Qorvo
11:02:55 6 alleges is that its allegations concern Akoustis's alleged
11:03:03 7 practices of hiring certain Qorvo employees for the purpose
11:03:06 8 of having those employees misappropriate Qorvo's
11:03:10 9 confidential information and trade secrets for Akoustis's
11:03:17 10 use. Would you agree with that characterization of claims?
11:03:21 11 A. Yes, I share that understanding.
11:03:23 12 Q. But you undertook no analysis, whether any evidence
11:03:27 13 suggest that Akoustis specifically targeted any of the
11:03:31 14 nineteen employees on your list for the express purpose of
11:03:39 15 having those employees misappropriate Qorvo's confidential
11:03:39 16 information and trade secrets for Akoustis's use; correct?
11:03:43 17 A. Yes. I assumed liability, so I assumed the poaching
11:03:46 18 exercises as charged by Qorvo.
11:03:50 19 Q. But you also created a list of nineteen people?
11:03:53 20 A. Yes. Within the confines of the evidence and the
11:03:57 21 discussions with Ms. Stoddard, yes.
11:04:01 22 Q. And did you not talk to Dr. Shanfield about who he
11:04:06 23 believed among the nineteen employees on your list actually
11:04:11 24 is for whom he had evidence that they accessed or brought
11:04:19 25 over Qorvo confidential information to Akoustis; correct?

1756

Bennis - cross

| | | |
|---|---|---|
| 11:04:22 | 1 | A. No, I don't think he and I talked about that. |
| 11:04:33 | 2 | Q. So then comes the incremental expense to Qorvo for |
| 11:04:39 | 3 | replacing each employee, whom it replaced, and who was |
| 11:04:44 | 4 | poached, and you would agree with me -- I mean, you heard |
| 11:04:49 | 5 | from Mr. Creviston, who testified first, he's the client |
| 11:04:55 | 6 | representative of Qorvo, and he testified that Qorvo is a |
| 11:04:59 | 7 | three-and-a-half billion dollars enterprise with 8,000 |
| 11:05:03 | 8 | employees or something like that, worldwide, do you remember |
| 11:05:05 | 9 | that? |
| 11:05:06 | 10 | A. Something like that, yes. |
| 11:05:08 | 11 | Q. Okay. So wouldn't you expect an enterprise that |
| 11:05:15 | 12 | large to track the incremental costs of having to -- |
| 11:05:19 | 13 | incremental costs to the company of unwanted employee |
| 11:05:23 | 14 | attrition? |
| 11:05:23 | 15 | A. No, not necessarily. |
| 11:05:25 | 16 | Q. I'm sorry. I couldn't hear you. |
| 11:05:26 | 17 | A. No, not necessarily. |
| 11:05:28 | 18 | Q. Okay. But you don't know whether it has or not |
| 11:05:31 | 19 | because you never asked Ms. Stoddard for that information, |
| 11:05:36 | 20 | correct? |
| 11:05:37 | 21 | A. Again, our conversation revolved around the actual |
| 11:05:41 | 22 | employees, like I mentioned before in my experience, these |
| 11:05:44 | 23 | are not necessarily black and white expenses that are |
| 11:05:46 | 24 | recorded in financial statements, but they're well |
| 11:05:50 | 25 | understood to be costs to businesses, and employee |

1757

Bennis - cross

| | | |
|---|---|---|
| 11:05:53 | 1 | attrition. |
| 11:05:54 | 2 | Q. Okay. So you spoke with Ms. Stoddard about the |
| 11:06:01 | 3 | circumstances of the departures of the forty-three people to |
| 11:06:04 | 4 | get to the list of nineteen; right? |
| 11:06:06 | 5 | A. Yes. |
| 11:06:07 | 6 | Q. But you did not ask her whether or not any of the |
| 11:06:09 | 7 | nineteen had been replaced by Qorvo; right? |
| 11:06:14 | 8 | A. Right. |
| 11:06:14 | 9 | Q. And did you not ask her whether Qorvo tracks the |
| 11:06:17 | 10 | incremental cost of unwanted attrition on an employee basis, |
| 11:06:21 | 11 | correct? |
| 11:06:21 | 12 | A. Right, for the reasons I explained. |
| 11:06:25 | 13 | Q. So, while you rely on the ███ analysis, and I heard |
| 11:06:32 | 14 | your testimony, I understood it, but you conducted no |
| 11:06:36 | 15 | analysis based on Qorvo's information to determine whether |
| 11:06:41 | 16 | or not the per employee costs in the ███ analysis, was a |
| 11:06:45 | 17 | good proxy for what Qorvo's actual incremental cost from |
| 11:06:53 | 18 | unwanted employee attrition was; correct? |
| 11:06:58 | 19 | A. When I came across the ███ valuation, as accountants |
| 11:07:03 | 20 | go, I was excited because that is something that is -- it's |
| 11:07:08 | 21 | spot on to what I was looking for. It talked about employee |
| 11:07:10 | 22 | costs versus employees in the BAW filter industry, not only |
| 11:07:14 | 23 | that, but in the walls of Akoustis. These were the same job |
| 11:07:17 | 24 | titles, was a spot-on third-party analysis for the costs |
| 11:07:21 | 25 | that can be associated with assembling a workforce. |

1758

Bennis - redirect

| | | |
|---|---|---|
| 11:07:28 | 1 | Q. So the third category of damages about which you |
| 11:07:32 | 2 | opined was patent infringement damages, correct? |
| 11:07:35 | 3 | A. Yes. |
| 11:07:35 | 4 | Q. And I imagine that it will come as some relief to you |
| 11:07:40 | 5 | and to the jury, and to the Court, for me to say that I |
| 11:07:44 | 6 | don't have any questions about that. So thank you for your |
| 11:07:46 | 7 | time. |
| 11:07:48 | 8 | THE COURT: Redirect. |
| 11:07:53 | 9 | MS. AYERS: Yes, Your Honor, thank you. |
| 11:07:55 | 10 | REDIRECT EXAMINATION |
| 11:07:56 | 11 | BY MS. AYERS: |
| 11:07:57 | 12 | Q. Ms. Bennis, is a head start damage analysis one of |
| 11:08:02 | 13 | the acceptable ways to measure a Defendant's unjust |
| 11:08:08 | 14 | enrichment benefit as you understand the law? |
| 11:08:13 | 15 | A. Yes. |
| 11:08:16 | 16 | Q. And are you aware of court cases and conference |
| 11:08:20 | 17 | papers like Sedona Conference that entitle the Plaintiff to |
| 11:08:25 | 18 | recover the entire fair market value of a misappropriating |
| 11:08:29 | 19 | company? |
| 11:08:29 | 20 | A. Yes. In fact, I was perusing that particular |
| 11:08:35 | 21 | document on the break just now. |
| 11:08:37 | 22 | Q. But you're not opining here today that Qorvo is |
| 11:08:41 | 23 | entitled to recover the entire fair market value of |
| 11:08:45 | 24 | Akoustis, correct? |
| 11:08:45 | 25 | A. I am not. |

1759

Bennis - redirect

| | | |
|---|---|---|
| 11:08:46 | 1 | Q. Can you remind the jury what unjust enrichment |
| 11:08:52 | 2 | benefit Akoustis did receive to which you are opining? |
| 11:08:56 | 3 | A. The benefit I measured again, is just the value of |
| 11:08:59 | 4 | that head start. It's meaningful to get into a market |
| 11:09:03 | 5 | earlier, the benefits as a result of being able to enter the |
| 11:09:08 | 6 | market earlier than otherwise one could accomplish, so that |
| 11:09:12 | 7 | isolated benefit is what I measured here. |
| 11:09:15 | 8 | Q. Let's pull up PDX-4 again. |
| 11:09:22 | 9 | Ms. Bennis, in PDX-4, which identified the delay |
| 11:09:28 | 10 | in Akoustis's receipt of revenue under the head start model, |
| 11:09:33 | 11 | would Akoustis have occurred operating expenses from 2016 to |
| 11:09:38 | 12 | 2020? |
| 11:09:39 | 13 | A. Yes, it would have. |
| 11:09:42 | 14 | Q. And let's pull up Schedule 4, Appendix A. |
| 11:09:50 | 15 | Ms. Bennis, would Akoustis have incurred R & D |
| 11:10:09 | 16 | expenses under the 55-month delay from 2016 to 2020? |
| 11:10:16 | 17 | A. Yes, the idea here is even in the instance where |
| 11:10:21 | 18 | Akoustis would have had to go through its own research and |
| 11:10:25 | 19 | development expenses and do all the things that it would |
| 11:10:27 | 20 | have needed to do to get a product to market on its own. It |
| 11:10:31 | 21 | still is a business, so it still incurs employee costs, they |
| 11:10:36 | 22 | have to pay people, it has to finance debt, it has to do all |
| 11:10:39 | 23 | the things that a business has to do just by virtue of |
| 11:10:46 | 24 | existing. |
| 11:10:49 | 25 | Q. Mr. Elkins asked you questions regarding the totality |

1908

Johnson - direct

16:11:00  1   her, again, education, experience, you know, all that,
16:11:04  2   compared to the job.  And then also we'll look internally,
16:11:09  3   too, how does that candidate compare internally so that
16:11:13  4   we're considering what we call internal equity, so we can
16:11:18  5   make sure the compensation is fair and consistent within the
16:11:22  6   company, so there are a lot of factors we look at.
16:11:24  7   Q.      How does Akoustis communicate job offers?
16:11:28  8   A.      Initially, the hiring manager will contact, typically
16:11:32  9   the hiring manager will contact the candidate and make the
16:11:36 10   job offer, and then somebody on the HR team will follow-up
16:11:40 11   in writing with the offer letter and other documents that we
16:11:44 12   need to send to that candidate.
16:11:46 13   Q.      Okay.  I am going to hand you a couple of documents
16:11:49 14   that I would like to talk to you about.
16:11:52 15           MR. ELKINS:  Your Honor, may I approach the
16:11:54 16   witness?
16:11:55 17           THE COURT:  You may.
16:12:09 18   BY MR. ELKINS:
16:12:11 19   Q.      Ms. Johnson, I have handed you two documents.  The
16:12:13 20   first one I would like you to look at is marked for
16:12:16 21   identification as PTX-666, perhaps not the best number.
16:12:24 22   A.      Right.
16:12:25 23   Q.      But it's entitled employee confidentiality
16:12:28 24   proprietary information, and patent and invention assignment
16:12:33 25   agreement.  Do you have that in front of you?

1909

Johnson - direct

16:12:35  1   A.      I do.
16:12:35  2   Q.      Do you recognize it?
16:12:37  3   A.      Yes.
16:12:37  4   Q.      What is it?
16:12:39  5   A.      It's got a very long name, we call it our
16:12:44  6   confidentiality and IP agreement.  It's really very lengthy.
16:12:48  7   It contains a lot of really important information.  To sum
16:12:52  8   it up, we're communicating with candidates and employees
16:12:57  9   what our expectations are in how they treat company's
16:13:02 10   confidential and proprietary information while they work at
16:13:06 11   Akoustis and when they leave, among other things, there is a
16:13:11 12   lot of really important information in there.
16:13:13 13           MR. ELKINS:  Your Honor, we move exhibit
16:13:15 14   PTX-0666 into evidence.
16:13:19 15           THE COURT:  Marked and received as 301.
16:13:22 16           (Trial Exhibit No. 301 was admitted into
16:13:22 17   evidence.)
16:13:22 18   BY MR. ELKINS:
16:13:30 19   Q.      Ms. Johnson, do you know when the confidentiality and
16:13:33 20   IP agreement was adopted?
16:13:35 21   A.      Yeah.  It was adopted shortly after 2014, after the
16:13:41 22   company formed.
16:13:42 23   Q.      How was it used at Akoustis?
16:13:44 24   A.      Initially, it's used during the offer, candidate
16:13:50 25   offer process we talked about earlier, either at the time of

1910

Johnson - direct

16:13:53  1   the job offer or after a candidate has accepted, right then.
16:13:58  2   We will send this document to them and ask that they read
16:14:02  3   it, understand it, have time to review it because they'll be
16:14:06  4   expected to sign it on their first day at work.
16:14:10  5   Q.      Can we go to Section 8.2?
16:14:13  6           Can you -- well, maybe if you, it's two long
16:14:38  7   sentences, if you bear with me, maybe just read it to the
16:14:38  8   jury.
16:14:38  9   A.      Okay.  "Use of confidential information of other
16:14:41 10   persons.  I represent that I have not brought, and will not
16:14:46 11   bring with me to the company or use at the company any
16:14:49 12   materials or documents of an employer or a former employer
16:14:53 13   that are not generally available to the public, unless
16:14:56 14   express written authorization from such employer for their
16:15:00 15   possession and use has been obtained.  I also understand
16:15:12 16   that I am not to breach any obligation of confidentiality
16:15:17 17   that I have to any employer or former employer, and agree to
16:15:21 18   fulfill all such obligation during the period of my
16:15:25 19   affiliation with the company."
16:15:28 20   Q.      Why does Akoustis include that provision in its
16:15:32 21   confidentiality and IP agreement?
16:15:34 22   A.      Because we want to clearly communicate to candidates
16:15:39 23   and employees, that we do not want them to bring anything
16:15:42 24   proprietary from a company or competitor into our company.
16:15:46 25   Our company works really hard to create our own IP, and our

1911

Johnson - direct

16:15:51  1   own products.  We don't want that to be tainted by some
16:15:54  2   other company's information.  We don't -- we want to
16:15:59  3   100 percent own our IP.  We've worked really hard and spent
16:16:03  4   a lot of time and money on that.
16:16:05  5   Q.      You can put that document away.
16:16:07  6           The other document I brought up to you is marked
16:16:11  7   PTX-0665 for identification.  It's entitled, code of ethics
16:16:18  8   and conduct.  Do you recognize that?
16:16:19  9   A.      Yes.
16:16:20 10   Q.      What is it?
16:16:21 11   A.      It's our code of ethics.  It's, again, you know,
16:16:27 12   fairly lengthy.  It's really important to us.  In a
16:16:30 13   nutshell, we use this to communicate to employees what our
16:16:35 14   expectations are for how they conduct themselves in all
16:16:40 15   aspects of their job, you know, at Akoustis, that we expect
16:16:45 16   them to perform their job with the highest level of
16:16:50 17   integrity and ethics in everything that they do.
16:16:53 18   Q.      To whom does the code apply?
16:16:55 19   A.      To all employees.
16:16:56 20           MR. ELKINS:  Your Honor, we move what's been
16:16:58 21   marked for identification as PTX-0665 into evidence.
16:17:02 22           THE COURT:  Marked and received as 302.
16:17:04 23           (Trial Exhibit No. 302 was admitted into
16:17:04 24   evidence.)
16:17:04 25   BY MR. ELKINS:

1912

Johnson - direct

16:17:05 1    Q.      How does a new employee find out about the code of

16:17:08 2    ethics and conduct?

16:17:09 3    A.      On their first day of work, we have a new hire

16:17:13 4    orientation and we, we being a member of human resources

16:17:20 5    conduct this initial orientation and we share with them that

16:17:24 6    this is one of the documents, one of the policies that they

16:17:27 7    will need to read, and understand, so we kind of go over it

16:17:32 8    with them at a high level and then they are expected to read

16:17:36 9    it, and eventually like sign off on it during their employee

16:17:42 10   hire.

16:17:42 11   Q.      On this page is a section titled honest and ethical

16:17:46 12   conduct.  Would you please read it to the jury?

16:17:48 13   A.      "The company's policy is to promote high standards of

16:17:52 14   integrity by conducting its affairs honestly and ethically.

16:17:56 15   Each employee must act with integrity and observe the

16:18:00 16   highest ethical standards of business conduct in his or her

16:18:03 17   dealings with the company's customers, suppliers, partners,

16:18:07 18   service procedures, competitors, employees, and anyone else

16:18:10 19   with whom he or she has contact in the course of performing

16:18:15 20   his or her job."

16:18:18 21   Q.      So I'm going to ask you the same question I asked

16:18:20 22   about 8.2, the confidentiality and IP agreement.  Why does

16:18:24 23   Akoustis include this particular provision in the code of

16:18:28 24   ethics and conduct?

16:18:29 25   A.      Well, I mean, we're -- again, we're creating IP and

1913

Johnson - direct

16:18:34 1    products.  We again are making sure employees understand and

16:18:40 2    are informed about what our expectations are and how they

16:18:45 3    conduct themselves within their job and with anybody that

16:18:48 4    they deal with while working at Akoustis which is again,

16:18:52 5    high ethics and integrity.

16:18:55 6    Q.      I'm going to show you two more documents, if you'll

16:19:03 7    bear with me.

16:19:17 8           MR. ELKINS:  Your Honor, permission to approach

16:19:19 9    again?

16:19:20 10          THE COURT:  You may.

16:19:38 11   BY MR. ELKINS:

16:19:45 12   Q.      The first document I handed you, or at least the one

16:19:49 13   on top is marked for identification as PTX-0315.  It's

16:19:54 14   entitled business conduct guidelines dated April 20, 2022.

16:20:00 15   Do you recognize it?

16:20:02 16   A.      Yes.

16:20:04 17   Q.      And again, can you please explain what it is?

16:20:05 18   A.      Yes.  We call it for short, our BCG.  It's -- it is

16:20:12 19   again, it's very lengthy, it goes through all kinds of areas

16:20:18 20   and communicates to employees what we expect and how they

16:20:24 21   conduct themselves, you know, again in the course of doing

16:20:27 22   their jobs.  So it contains, you know, our code of ethics,

16:20:31 23   non-retaliation, non-harassment, how managers should perform

16:20:35 24   their jobs, how we conduct ourselves through social media,

16:20:40 25   so a lot of ground is covered in this document.  It's really

1914

Johnson - direct

16:20:44 1    critical to our company.

16:20:46 2           MR. ELKINS:  Your Honor, we move what's been

16:20:49 3    marked for identification as PTX-0315 into evidence.

16:20:52 4           THE COURT:  Marked and received as 303.

16:20:55 5           (Trial Exhibit No. 303 was admitted into

16:20:56 6    evidence.)

16:20:56 7    BY MR. ELKINS:

16:20:57 8    Q.      Ms. Johnson, this, as I mentioned in introducing this

16:21:01 9    document, it's dated April 2022, I can't even say it

16:21:08 10   anymore, 2022.  Is that when it was adopted?

16:21:11 11   A.      No, it was initially adopted in 2019.

16:21:15 12   Q.      And does, as you call it, the BCG play a part in the

16:21:20 13   onboarding process for new employees?

16:21:22 14   A.      Yes.  It's like the same thing I said earlier about

16:21:25 15   the code of conduct.  During the new hire orientation on day

16:21:29 16   one of employment, we go over this with them at a high level

16:21:33 17   with a new hire.  And we ask that they read it, make sure

16:21:39 18   they understand it.  And additionally, we have a video, a

16:21:44 19   BCG video that they watch to reinforce, because there is so

16:21:49 20   much in here that we don't want to leave it up to somebody

16:21:53 21   to read this whole thing, we need to reinforce it, so we

16:21:56 22   created the video for that as well.  Then they'll sign a

16:21:59 23   document saying that they did complete all of that, they

16:22:02 24   understood, and all that.

16:22:03 25   Q.      Is the BCG only for new hires?

1915

Johnson - direct

16:22:07 1    A.      No, it's for new hires, it's for all employees.

16:22:13 2    Q.      And you mentioned with respect to the code of ethics

16:22:18 3    and conduct and the confidentiality and IP agreement that

16:22:22 4    new hires have to sign those documents.  Do new hires, and

16:22:28 5    indeed the existing employees need to sign the BCG?

16:22:31 6    A.      Yes, they do, they sign a document that includes the

16:22:35 7    BCG and again, that they've read it and understand it.

16:22:42 8    Q.      Can you please turn to page 9 of this -- of this

16:22:53 9    exhibit?  And you see the heading, respecting others

16:23:04 10   intellectual property rights?

16:23:06 11   A.      Yes.

16:23:06 12   Q.      Could can you please read to us just the first three

16:23:10 13   sentences of that section?

16:23:10 14   A.      Okay.  "We also respect intellectual property rights

16:23:13 15   of others.  This means we must never knowingly infringe on

16:23:18 16   the valid copyrights, trademarks, patents or trade secrets

16:23:22 17   of others, including your former employers.  You must not

16:23:27 18   share with Akoustis any confidential information or

16:23:30 19   intellectual property of your former employers, unless given

16:23:35 20   explicit permission to do so from your former employer and

16:23:38 21   the legal department."

16:23:42 22   Q.      How is that section different, if at all, from the

16:23:47 23   sections that you read from the confidentiality and IP

16:23:51 24   agreement and the code of ethics?

16:23:55 25   A.      It's not really different.  I mean, there may be

1916

Johnson - direct

16:23:59 1    different words used, but again, we're reinforcing our
16:24:04 2    expectations not to share IP from another company or you
16:24:09 3    know, a competitor that you worked with, don't bring it into
16:24:14 4    the company, we don't want it.  And we're just restating
16:24:17 5    that here.
16:24:21 6    Q.    We can take that document down.  The other document I
16:24:26 7    handed to you is marked for identification as PTX-1476, it's
16:24:31 8    entitled annual compliance certification.  Do you recognize
16:24:35 9    it?
16:24:35 10   A.    Yes.
16:24:37 11   Q.    What is it?
16:24:38 12   A.    It's the document that we use for both new hires and
16:24:44 13   employees to certify, I talked earlier about how they are
16:24:49 14   expected to sign off that they did receive and did read and
16:24:52 15   understood, that's what this document is.  So it list the
16:24:55 16   BCG, code of ethics and some other compliance related
16:24:59 17   policies that we have to again certify that they're saying
16:25:04 18   yes, we read all that and we understand it.
16:25:06 19         MR. ELKINS:  Your Honor, we move into evidence
16:25:07 20   the document marked for identification as PTX-1476.
16:25:11 21         THE COURT:  Marked and received as 304.
16:25:17 22         (Trial Exhibit No. 304 was admitted into
16:25:18 23   evidence.)
16:25:18 24   BY MR. ELKINS:
16:25:18 25   Q.    Whom at the company is expected to -- well, first of

1917

Johnson - direct

16:25:21 1    all, can we zoom in on Section 2.  And what is this section
16:25:33 2    for, Ms. Johnson?
16:25:34 3    A.    It is listing the policies that the employee is
16:25:41 4    attesting that they read.
16:25:44 5    Q.    And the attestation is at the very bottom?
16:25:47 6    A.    Correct.
16:25:49 7    Q.    And whom at the company is expected to sign
16:25:53 8    compliance certification?
16:25:55 9    A.    All employees, new hires, employees will review on a
16:26:01 10   -- every now and then they'll review it as well.
16:26:14 11   Q.    So if you bear with me, I want to ask you some
16:26:17 12   questions about three exhibits that are related.  So if you
16:26:22 13   give me a moment, I will bring them all up to you at once.
16:26:59 14         MR. ELKINS:  May I approach, Your Honor?
16:27:01 15         THE COURT:  You may.
16:27:17 16   BY MR. ELKINS:
16:27:38 17   Q.    Ms. Johnson, I've handed you what has been marked
16:27:42 18   for identification as PTX-0669, 670, and 671.  And I have
16:27:54 19   given them to you because as I said, they are related.
16:28:00 20         Let's start with PTX-669, do you recognize it?
16:28:02 21   A.    Yes.
16:28:02 22   Q.    What is it?
16:28:04 23   A.    It's an e-mail from me to my boss, Ken Boller, in May
16:28:11 24   of 2020.  It's entitled Rohan's comp information so it was
16:28:16 25   sharing with my manager some compensation information that

1918

Johnson - direct

16:28:19 1    Rohan Houlden had given me.  There are two attachments to
16:28:23 2    it.
16:28:23 3    Q.    We have heard, in fact, we have heard testimony from
16:28:27 4    Mr. Houlden in this case before you arrived, but just
16:28:29 5    generally, can you remind us who Mr. Houlden was as of
16:28:35 6    May 27th, 2020, the date of this e-mail?
16:28:37 7    A.    Yes, Rohan was our Chief Product Officer at the time.
16:28:41 8    Q.    And why were you sending an e-mail entitled Rohan's
16:28:50 9    comp info to Mr. Boller?
16:28:52 10   A.    A couple of reasons.  Primarily because Rohan had
16:28:56 11   shared it with me prior to this, and wanted it to be used
16:29:01 12   for our comp work.  I was sharing it with Ken who is my
16:29:09 13   boss, in passing basically sharing it with him to support
16:29:13 14   some conversations we were having.  We were getting ready to
16:29:16 15   start our own compensation project.
16:29:20 16   Q.    Okay.  Before you go any further, let me --
16:29:26 17         MR. ELKINS:  Let me move, Your Honor, what has
16:29:28 18   been marked for identification as PTX-669 into evidence.
16:29:31 19         THE COURT:  Marked and received as 305.
16:29:36 20         (Trial Exhibit No. 305 was admitted into
16:29:36 21   evidence.)
16:29:36 22   BY MR. ELKINS:
16:29:39 23   Q.    And if you could blow it up so we just see,
16:29:42 24   Ms. Johnson's e-mail and the top part, so the part in blue
16:29:48 25   with the underlinings, are those attachments?

1919

Johnson - direct

16:29:51 1    A.    Yes.
16:29:51 2    Q.    And you testified that you were embarking on a
16:29:59 3    project and you needed to discuss something with Mr. Boller.
16:30:03 4    Can you add a little more color to that?
16:30:06 5    A.    Yes.  So I was brought in to Akoustis to, you know,
16:30:14 6    lead obviously HR, but also to develop more structure and
16:30:18 7    process as the company was growing and maturing, we needed
16:30:22 8    to have that.  One of the areas that I identified we needed
16:30:26 9    was more structure around our compensation, we didn't have
16:30:30 10   -- really didn't -- we didn't have a good structure.  So I
16:30:38 11   was going to be starting a project, or seeking for approval
16:30:43 12   to have a project around that.
16:30:44 13         Further, Rohan had shared this data at some
16:30:49 14   point before this e-mail, a few months maybe before this.
16:30:55 15   He had wanted to use it, and you know, I didn't, but -- so
16:31:03 16   that, you know, is kind of I guess the color.
16:31:03 17   Q.    What did Mr. Houlden want to use the information he
16:31:12 18   sent you for, what was the purpose that he wanted to use
16:31:19 19   it for?
16:31:17 20   A.    He wanted to use it for our own comp structure as
16:31:22 21   well as, you know, to -- in order to make job offers and
16:31:29 22   compensate employees, I mean, that's kind of all hand in
16:31:33 23   hand, so that's what he wanted to use it for.
16:31:33 24   Q.    Okay.  Let's -- let me ask you to look at what's been
16:31:41 25   marked for identification as PTX-0670.  And can you tell us

2210

Lebby - direct

| | | |
|---|---|---|
| 16:29:26 | 1 | categories I have been asked to look at are Categories 1 and |
| 16:29:30 | 2 | 8 of Dr. Shanfield's report of the Qorvo's alleged trade |
| 16:29:34 | 3 | secrets.  So I have been looking at Categories 1 and 8, and |
| 16:29:37 | 4 | Dr. Darveaux looked at Categories 2 to 7. |
| 16:29:41 | 5 | Q.   What are Categories 1 and 8? |
| 16:29:44 | 6 | A.   Category number 1 is business plans for the Wi-Fi |
| 16:29:48 | 7 | market.  And Category 8 is roadmaps and prototypes. |
| 16:30:08 | 8 | MS. SMITH:  Your Honor, may I approach the |
| 16:30:09 | 9 | witness? |
| 16:30:10 | 10 | THE COURT:  You may. |
| 16:30:16 | 11 | BY MS. SMITH: |
| 16:30:30 | 12 | Q.   Dr. Lebby, I just handed you DTX 480.  Do you |
| 16:30:37 | 13 | recognize this document? |
| 16:30:38 | 14 | A.   Yes, I do. |
| 16:30:40 | 15 | Q.   What is this document? |
| 16:30:42 | 16 | A.   This is a BAW filter comparison document.  It's a |
| 16:30:48 | 17 | market report.  It is authored by the company, a French |
| 16:30:53 | 18 | company called Yole, Y-O-L-E, and the date of it is 2022. |
| 16:31:01 | 19 | Q.   Did you use this document when you were forming your |
| 16:31:04 | 20 | opinions? |
| 16:31:05 | 21 | A.   Yes, I did. |
| 16:31:09 | 22 | MS. SMITH:  Your Honor, I move for DTX 480 to be |
| 16:31:13 | 23 | entered into the evidence. |
| 16:31:14 | 24 | MR. NAQVI:  Objection, Your Honor. |
| 16:31:15 | 25 | THE COURT:  Objection sustained.  On the same |

2211

Lebby - direct

| | | |
|---|---|---|
| 16:31:18 | 1 | basis as the 803 objections previously raised in this area. |
| 16:31:41 | 2 | MS. SMITH:  May I show the report, Your Honor? |
| 16:31:43 | 3 | THE COURT:  Yes, I mean, can you show it to the |
| 16:31:45 | 4 | witness, sure. |
| 16:31:46 | 5 | MS. SMITH:  But I cannot display it? |
| 16:31:48 | 6 | THE COURT:  Take a look at Rule 803.17, that |
| 16:31:53 | 7 | will tell you what you can do. |
| 16:31:55 | 8 | BY MS. SMITH: |
| 16:31:56 | 9 | Q.   Dr. Lebby, would you turn to page 2 of the document. |
| 16:32:13 | 10 | A.   I am there. |
| 16:32:15 | 11 | Q.   All right.  What's on page 2? |
| 16:32:18 | 12 | A.   Page 2 is a table -- |
| 16:32:21 | 13 | THE COURT:  It's 803 subpart 18.  Go ahead. |
| 16:32:28 | 14 | Q.   What's on page 2? |
| 16:32:31 | 15 | A.   Page 2 is a -- the first page of a table of contents. |
| 16:32:38 | 16 | It already shows it goes into over 126 pages.  It covers an |
| 16:32:46 | 17 | overview of the market, BAW filters, company profiles in |
| 16:32:53 | 18 | this market, the RF market, some of the competitors in the |
| 16:32:58 | 19 | market, it has a section on physical analysis, so what this |
| 16:33:04 | 20 | company is doing is taking -- looking at the physical |
| 16:33:07 | 21 | filters that are in these front end filter modules by a |
| 16:33:13 | 22 | number of different companies.  It does a comparison by |
| 16:33:16 | 23 | doing some analysis and then goes through some detailed |
| 16:33:19 | 24 | manufacturing process to make these filters. |
| 16:33:23 | 25 | So I would like to go through this report and ask you |

2212

Lebby - direct

| | | |
|---|---|---|
| 16:33:36 | 1 | what kind of information you would get from this report in |
| 16:33:41 | 2 | order to create business plans and roadmaps. |
| 16:33:46 | 3 | Q.   What's on page 145 of this report? |
| 16:33:56 | 4 | A.   Page 145 is entitled synthesis of the cost analysis. |
| 16:34:02 | 5 | And what it is a table with a number of competitive |
| 16:34:07 | 6 | companies like Skyworks, Broadcom, TileUni, Akoustis, Ross, |
| 16:34:16 | 7 | which is Chinese company, Qorvo, Texas Instruments, and it |
| 16:34:22 | 8 | compares different costs of the wafers, the die costs, and |
| 16:34:25 | 9 | the die costs per millimeter of all these different |
| 16:34:29 | 10 | companies. |
| 16:34:29 | 11 | For example, it lists which ones make SAW and |
| 16:34:35 | 12 | which ones makes SMR. ████████████████████ |
| | | ██  █ ████████████████████████ |
| | | ██  █ ████████████████████████ |
| | | ██  █ ████████████████████████ |
| | | ██  █ ████████████████████████ |
| 16:35:07 | 18 | Q.   How are the creators of this report able to determine |
| 16:35:12 | 19 | costs on such a granular level? |
| 16:35:15 | 20 | A.   So they do a lot of reverse breakdowns and reverse |
| 16:35:20 | 21 | costing analysis, and they're looking to detail how those |
| 16:35:22 | 22 | chips are fabricated. |
| 16:35:27 | 23 | For example, on this page it's got the wafer |
| 16:35:29 | 24 | cost, the wafer cost for ██████████████████ And so they |
| | | ██  █ ██████████████████████████ |

2213

Lebby - direct

| | | |
|---|---|---|
| 16:35:41 | 1 | estimate the size of it, they got the size of the wafer |
| 16:35:44 | 2 | here, they got the process from doing the reverse breakdown |
| 16:35:47 | 3 | and they see how two chips are being fabricated.  This is a |
| 16:35:52 | 4 | typical thing.  And then they can work out exactly what the |
| 16:35:55 | 5 | chip costs are, what the yields are and they can put that |
| 16:35:59 | 6 | into a spreadsheet which is part of this 170 page report. |
| 16:36:04 | 7 | And so I would say they may not align exactly to |
| 16:36:09 | 8 | the numbers you'll find internally to companies, but it |
| 16:36:13 | 9 | gives you a pretty good idea of the relative costs each |
| 16:36:17 | 10 | company is achieving through their manufacturing processes. |
| 16:36:21 | 11 | Q.   Have you ever worked at a company whose product was |
| 16:36:29 | 12 | the subject of a teardown report? |
| 16:36:35 | 13 | A.   I believe at Motorola when I was there, some of the |
| 16:36:40 | 14 | products we had were subject to teardown.  But I haven't |
| 16:36:43 | 15 | seen the reports.  I believe that's the case.  I know when I |
| 16:36:46 | 16 | was there, I ordered quite a number of teardown reports of |
| 16:36:50 | 17 | different competitor's products.  In fact, in my deposition |
| 16:36:54 | 18 | in February, I told opposing counsel I purchased two reports |
| 16:36:58 | 19 | at Light Wave just in December this year for the team |
| 16:37:02 | 20 | because we really wanted to look into what the competitive |
| 16:37:06 | 21 | products actually were like, so we went out and purchased a |
| 16:37:08 | 22 | couple of reports.  I don't think they were $10,000, I think |
| 16:37:11 | 23 | they were about $7,000. |
| 16:37:14 | 24 | So in terms of the products I have developed, I |
| 16:37:17 | 25 | believe Motorola, somebody may have looked at those |

*Irwin - Direct*
2366

So we have a total avoided hours of roughly 100.  I
assumed an hourly rate of $110 per hour, and that's
basically the highest paid engineer at Akoustis.  I wanted
to be conservative.  I added in some employee costs,
employer costs for tax and divided by 1800 hours and came
up with a cost of $110 per hour.

If you extrapolate that out, you get cost of
$167,000.  I assumed all of that was spent back in fiscal
2016, so even though you -- just to be super conservative,
and I didn't know exactly when that -- those -- when those
hours would have been spent.  I wanted to be -- just take
the beneficial view of it to Qorvo.  I assumed all of that
was spent back in fiscal 2016, and I brought it forward at
Ms. Bennis' weighted average cost of capital to the date
of trial.  So that's how you get from 167,000 to 293,000.

Q.   Okay.  So just, in that case, you are using the time
value of money on an investment that -- for purposes of
estimating the avoided cost benefit would have taken place
in 2016?

A.   That's exactly, right.  So in this methodology, I've
basically identified $167,000 that Akoustis didn't have to
spend that was available for investment in some fashion,
and they would have earned interest on that.  And so the
present value of 167,000 from fiscal year 2016 is 293.
But these are on costs, not on revenue.

*Irwin - Direct*
2367

Q.   So unlike revenue, money you save presumably is
available for you to invest or do something more
productive with?
A.   Absolutely.
Q.   And by assuming that Akoustis would have had to
undertake the work that it avoided in 2016, as opposed to
spread over later years, you've maximized the amount of
the time value of money here?
A.   Correct.  I've tried to be as generous in my
calculations to Qorvo as possible.
Q.   And just one -- just to clarify, too, if I can use --
I really like this little gizmo.

So here, you're talking about engineer cost per hour
calculated using a pretty healthy salary of $186,000?
A.   Correct.
Q.   And then you're adding to that the contribution that
Akoustis would have to make for SSI, Medicare, and then
you divided that by an expected 1800 hours?
A.   Correct.  One thing I want to clarify.  My present
value calculation is -- incorporates Ms. Bennis' 14.8
weighted average cost of capital, but it also considers
what Akoustis' weighted average cost of capital was over
the entire period.  It fluctuated quarter to quarter, so
we did a calculation, and when you do a weighted
calculation and divide it by the 1/T -- or not divide it.

*Irwin - Direct*
2368

You take it to a 1/T power, you get 6.8 percent.  Which,
just to be very clear, it incorporates her 14.8 percent,
but I relied on Akoustis' actual weighted average cost of
capital as reported by Bloomberg over the entire period.
Q.   Okay.

So you mentioned in your explanation regarding this
slide, that you asked Darveaux and Lebby to estimate the
amounts of time that -- as well as the purchases that the
$40,264 up there -- that it would take to independently
have created the alleged trade secrets back in 2016.

Does your calculation include the cost to recreate
all of the alleged trade secrets that are discussed in
Dr. Shanfield's report on which Ms. Bennis relies in her
head start benefit calculations?
A.   Yes.  My understanding of Dr. Shanfield -- excuse
me -- Dr. Darveaux and Dr. Lebby's methodology was, when
they identified information in Akoustis' records that
reflected or was consistent with the alleged trade secrets
documents, they each assigned in their own expert opinion
a number of engineering hours it would take to
independently go out and recreate that exact information.

So in other words, you identify a problem, and you
say, okay, how am I going to solve this problem, not
knowing how to solve the problem.  And then you go out and
you independently research how do I solve this problem.

*Irwin - Direct*
2369

And then that's basically their methodology as I
understand it.
Q.   Okay.  Before we move onto the unfair competition
opinions, can you summarize the key points that you've
covered regarding the issue of unjust enrichment benefit
to Akoustis?
A.   Yes.  So, again, Ms. Bennis' head start methodology
is not appropriate in this case because we don't have
accelerated profits.  As the Sedona conference and other
materials contemplate, we have accelerated losses.  As we
know that Akoustis hasn't had any profits, so you can't
use that methodology either.

The third option is avoided costs, and based on the
information that I received from Doctors Darveaux and
Lebby, the overall avoided costs based on those
calculations is $293,000.
Q.   All right.  Let's talk about Ms. Bennis opinion
regarding unfair competition, in particular the employee
poaching issue.

And so you stated -- you summarized -- you briefly
summarized your opinion regarding Ms. Bennis' opinions
regarding the alleged employee poaching.

Can you just set the table here for the discussion in
more detail?
A.   Sure.  So my understanding is Ms. Bennis met with an

2534

1  Act and the North Carolina Trade Secrets Protection Act.

2      Under both claims, for each trade secret that Qorvo

3  identifies, Qorvo has to prove by a preponderance of the

4  evidence the following elements:  (1) the existence of a

5  trade secret; and (2) misappropriation of that trade

6  secret.

7      Under federal Defend Trade Secret Act, Qorvo has to

8  also prove by a preponderance of the evidence that each

9  trade secret at issue is related to a product or service

10 used in, or intended for use in, interstate or foreign

11 commerce.

12     I will note that in commercial cases, interstate or

13 foreign commerce is fairly routinely established by

14 showing shipments from state to state, or country to

15 country.

16     In deciding the misappropriation of trade secrets

17 issue, you must first decide whether Qorvo owned an

18 identifiable trade secret or trade secrets.  The term

19 "trade secret" means all forms and types of financial,

20 business, scientific, technical, economic, or engineering

21 information, including patterns, plans, compilations,

22 program devices, formulas, designs, prototypes, methods,

23 techniques, processes, procedures, programs, or codes,

24 whether tangible or intangible, and whether or how stored,

25 compiled, or memorized -- memorialized physically,

2535

1  electronically, graphically, photographically, or in

2  writing if:

3      (1) the information is secret;

4      (2) the owner of the information has taken reasonable

5  measures to keep such information secret; and.

6      (3) the information derives independent economic

7  value, actual or potential, from not being generally known

8  to, and not being readily ascertainable through proper

9  means by, another person who can obtain economic value

10 from the disclosure or use of the information.

11     In articulating a trade secret, it is not enough for

12 Qorvo to point to a broad general class.  Rather, Qorvo

13 has the burden of identifying concrete information that it

14 contends constitutes it's trade secrets.  By its

15 definition, a "trade secret" concerns information.  By

16 contrast, an employee's general knowledge, skills,

17 experience, talents, or abilities cannot be trade secrets.

18     To determine whether a trade secret exists, you must

19 decide whether the information was, indeed, secret when

20 Akoustis allegedly wrongfully obtain it.  That is, when

21 Akoustis' allegedly wrongful conduct occurred.  Matters

22 that are generally known to the public at large or to

23 people in the trade business, are not trade secrets.  Nor

24 can information be considered a trade secret if it would

25 be ascertainable with reasonable ease of publicly

2536

1  available information.  In addition, a trade secret must

2  possess enough originality so that it can be distinguished

3  from everyday knowledge.

4      Absolute secrecy is not necessary for information to

5  qualify as a trade secret.  There is no requirement that

6  no one else in the world possess the information.  Rather,

7  Qorvo must demonstrate that the information was known only

8  to it or to a few others who have also treated the

9  information as a trade secret.

10     To qualify as a trade secret, the information must

11 derive independent economic value from the fact that it is

12 not generally known or not readily ascertainable by proper

13 means.  To derive independent economic value from not

14 being generally known means that the information gives a

15 business a competitive advantage over other businesses

16 that do not know the information.  Information that is

17 generally known or understood within an industry, even if

18 not known to the public at large, does not qualify as a

19 trade secret.  But information that requires considerable

20 time, effort, and expense to duplicate, even if it is

21 derived from public sources, can still qualify as a trade

22 secret.  Absolute secrecy, in the sense that no one else

23 in the world possesses the information, is not required.

24     Qorvo must prove by a preponderance of the evidence

25 that it took reasonable measures to protect the secrecy of

2537

1  its trade secrets.  There is no precise definition of what

2  "reasonable measures" are; what is reasonable depends on

3  the situation.  Factors you may wish to consider in

4  evaluating whether "reasonable measures" were taken could

5  include the following:

6      1.  Whether Qorvo made it a practice to inform its

7  employees or others involved within its business that the

8  information was a trade secret and/or was to be kept

9  confidential;

10     2.  Whether Qorvo required employees or others

11 involved with its business to sign confidentiality

12 agreements regarding the information or agreements not to

13 compete in areas that could use the information;

14     3.  Whether Qorvo restricted access to the

15 information on a "need to know" basis; or.

16     4.  Whether Qorvo generally maintained reasonable

17 security to protect the alleged trade secret, and did not

18 voluntarily disclose it to others, except in confidence.

19     If you find that Qorvo has proven by a preponderance

20 of the evidence that a trade secret existed, then you must

21 decide whether that trade secret information was

22 misappropriated by Akoustis.

23     To approve misappropriation occurred, Qorvo must

24 prove by a preponderance of the evidence that:

25     (1) Akoustis acquired Qorvo's trade secret knowing

2538

1　or having reason to know that the trade secret was

2　acquired by improper means; or.

3　　　(2)　Akoustis disclosed or used Qorvo's trade secret

4　without Qorvo's express or implied consent, and Akoustis:

5　　　(a)　Used improper means to acquire knowledge of the

6　trade secret; or.

7　　　(b)　At the time of the disclosure or use of the

8　trade secret, knew or had reason to know that knowledge of

9　the trade secret was:

10　　　(i)　Derived from or through a person who used

11　improper means to acquire it; or.

12　　　(ii)　Acquired under circumstances giving rise to a

13　duty to maintain its secrecy or limit its use; or.

14　　　(iii)　Derived from or through a person who owed a

15　duty to Qorvo to maintain its secrecy or limit its use.

16　　　"Improper means" in acquiring a trade secret can

17　arise in three types of circumstances:

18　　　(a)　where Qorvo [sic] itself obtained the trade

19　secret by its own improper conduct.

20　　　(b)　where Qorvo [sic] obtained the trade secret from

21　a third party who Akoustis -- let me read that one again.

22　I may have read it inappropriately.　Let me go back and

23　read one, two, three.

24　　　Three types of circumstances would be improper means

25　for acquiring the trade secret:

2539

1　　　(a)　whether Akoustis itself obtained the trade secret

2　by its own improper conduct.

3　　　(b)　where Akoustis obtained the trade secret from a

4　third party who Akoustis knew had reason to know acquired

5　the trade secret by improper means, and.

6　　　(3), or (c) where Akoustis induced another to obtain

7　the trade secret by improper means.

8　　　It would be improper for Akoustis to acquire trade

9　secret information by theft, bribery, trespass,

10　misrepresentation, or corporate espionage, such as

11　wiretapping.　It would also be improper for Akoustis to

12　acquire the information from a third party who Akoustis

13　knew or had reason to know either used improper means to

14　acquire the information or breached a duty of

15　confidentiality in disclosing the information.　Where

16　Akoustis acquired the information from a third party in

17　one of the circumstances, Akoustis' conduct is only

18　improper if Akoustis knew or should have known that it was

19　acquiring a trade secret belonging another.

20　　　Last, it would be improper for Akoustis to induce

21　another to either use improper means to acquire the

22　information or to breach a duty of confidentiality that

23　person owed to Qorvo.

24　　　Because improper means can cover a wide variety of

25　circumstances, it may be helpful to identify situations

2540

1　that the law would not consider "improper means."　It is

2　not improper to acquire information through independent

3　development, research of public resources (such as, for

4　example, trade directories, patent filings, or even will

5　telephone book), or purchase of a product that contains

6　trade secrets and then disassembling it to analyze those

7　secrets (a process called "reverse engineering").

8　Similarly, a party who obtains information by mistake, or

9　without knowledge or reason to know that the information

10　is a trade secret, has not acquired the trade secret

11　through improper means.

12　　　A defendant who is acquired trade secret information

13　by improper means has no right to use or disclose the

14　information in any way whatsoever.　Thus, any use or

15　disclosure by a defendant who has acquired a trade secret

16　by improper means is wrongful.

17　　　To prove "use" of a trade secret, Qorvo must prove by

18　a preponderance of the evidence that Akoustis used the

19　alleged trade secrets without Qorvo's consent.　That is,

20　Akoustis must -- I'm going to say that one again.

21　　　To prove "use" by a trade secret -- use of a trade

22　secret, Qorvo must prove by a preponderance of the

23　evidence that Akoustis used the trade secrets without

24　Qorvo's consent.

25　　　"Use" has a broad definition in trade secret law.　As

2541

1　a general matter, any exploitation of a trade secret that

2　is likely to result in injury to the trade secret owner or

3　enrichment to the defendant is a "use."　The unauthorized

4　use need not extend to every aspect or feature of the

5　trade secret; use of any substantial portion of the secret

6　is sufficient to subject the actor to liability.　Use

7　requires the productive use of the trade secret.　Merely

8　possessing a trade secret without utilizing a trade secret

9　is note "use."　But you may find that possession of a

10　trade secret, or the circumstances surrounding the

11　possession of trade secrets, are circumstantial evidence

12　of "use."

13　　　I will now instruct you on the law that you must

14　follow in determining compensatory damages in the context

15　of trade secret.　The purpose of compensatory damages is

16　to award, as far as possible, just and fair compensation

17　for the loss, if any, which resulted from the defendants'

18　violation of a plaintiff's rights.　Compensatory damages

19　are not intended to punish the defendant.

20　　　You must not take these instructions as implying my

21　view about which party is entitled to your verdict in this

22　case.　Instructions regarding the measure of damages are

23　given for your guidance in the event that you find in

24　favor of Qorvo from a preponderance of the evidence in the

25　case in accordance with the other instructions.

2542

1    If you find that Qorvo proved that Akoustis
2    misappropriated Qorvo's trade secrets, you must decide
3    whether Qorvo is entitled to damages on its claim for
4    misappropriation of trade secrets.
5    Qorvo has the burden of proving whether Akoustis
6    caused the damage that Qorvo is claiming by a
7    preponderance of the evidence.  Qorvo must prove the
8    amount of damages with reasonable certainty, but need not
9    prove the amount of damages with mathematical precision.
10   However, Qorvo is not entitled to damages that are remote
11   or speculative.
12   If you determine that Qorvo is entitled to damages,
13   you may award Qorvo an amount that represents the benefit
14   actually received by Akoustis.  This is called "unjust
15   enrichment."  Regardless of whether you find that Qorvo
16   itself suffered losses, if you find that Akoustis
17   benefited from using a trade secret belonging Qorvo, then
18   you may award the monetary value that you attribute to
19   those benefits and that Qorvo has proven by a
20   preponderance of the evidence.
21   There can be multiple forms of unjust enrichment.
22   One form of unjust enrichment can be measured by a
23   "head start" theory.  The head start theory measures the
24   value of the temporal advantage a defendant obtains from
25   its use of the trade secrets.  The "head start" period is

2543

1    the time it would have taken Akoustis to develop its
2    products and compete in the market absent any
3    misappropriation.  That is, not using the alleged trade
4    secrets until they were generally known or legitimately
5    acquired elsewhere.
6    The second point of unjust enrichment is called
7    "avoided costs."  Avoided costs are the amount that
8    Akoustis would have incurred to achieve the same result
9    without the use of the appropriated trade secrets.
10   If you find for Qorvo, on its trade secret claims,
11   you may, but are not required to, assess exemplary damages
12   against Akoustis.  The purpose of exemplary damages are to
13   punish a defendant for its conduct and to deter it and
14   others from engaging in similar conduct in the future.
15   For Qorvo to recover exemplary damages, you must
16   first find that Qorvo has proven by a preponderance of the
17   evidence that Akoustis' acts were willful and malicious.
18   "Willful and malicious" means that such intentional acts
19   or gross negligence of duty as to exhibit a reckless
20   indifference of the rights of others on the part of the
21   wrongdoer, and an entire want of care so as to raise the
22   presumption that the entity at fault is conscious of the
23   consequences of its carelessness.
24   Qorvo contends that Akoustis engaged in unfair and
25   deceptive trade practices in violation of North Carolina

2544

1    law.  So I'm switching slightly.  I want you to note that.
2    Qorvo alleges that Akoustis engaged in one or more of
3    the following unfair or deceptive acts:
4    1.  Akoustis misappropriated Qorvo's trade secrets.
5    That may sound redundant because we just finished the
6    discussion under a different theory, but, of course, now
7    we're going to the North Carolina law.
8    So Qorvo alleges that Akoustis engaged in one or more
9    of the following unfair or deceptive acts:
10   1.  Akoustis misappropriated Qorvo's trade secrets;
11   2.  Akoustis hired former Qorvo employees as part of
12   a scheme to acquire Qorvo's confidential information;
13   3.  Akoustis obtained or used Qorvo's confidential
14   information unfairly or deceptively.
15   So you can see this is a different claim.  And we'll
16   talk about that in terms of how it may also be referred to
17   in some other occasions in the instructions.
18   To succeed on its claim for unfair and deceptive
19   trade practices, Qorvo must prove each of the following by
20   a preponderance of the evidence:
21   (1)  Akoustis committed an unfair or deceptive act or
22   practice;
23   (2) -- I think our numbers are wrong here.  I will
24   fix them -- Akoustis' conduct was in or affecting
25   commerce; and.

2545

1    (3)  Akoustis' conduct caused Qorvo injury.
2    A practice is unfair when it offends established
3    public policy or when the act or practice is "immoral,
4    unethical, oppressive, unscrupulous, or substantially
5    injurious to consumers."  A party commits an unfair act or
6    practice when it engages in conduct that amounts to an
7    inequitable assertion of its power or position.  For an
8    act or practice to be deceptive, it must have "the
9    capacity or tendency to deceive" or proof of actual
10   deception -- but proof of actual deception is not
11   required.
12   A violation of a statute or other law is not
13   automatically an unfair or deceptive practice or act.
14   Qorvo must prove that conduct was unfair or deceptive.
15   Deliberate acts or deceit or bad faith do not have to be
16   shown, rather Qorvo must demonstrate that the act or
17   practice possesses the tendency and capacity to mislead or
18   create the likelihood of deception.
19   As a general matter, Akoustis has the freedom to
20   compete, including to divert business not only from
21   competitors generally, but also from Qorvo.  You may only
22   find Akoustis liable for unfair and deceptive trade
23   practices if you determine that the harm to Qorvo resulted
24   from particular methods of competition determined to be
25   unlawful.

2546

1   To succeed on the second element, plaintiff must
2   prove that the defendants' conduct was either "in
3   commerce," or that it "affected commerce."
4        Conduct is "in commerce" when it involves a business
5   activity.  Conduct "affects commerce" whenever a business
6   activity is adversely or substantially affected.  A
7   business activity is the way a business conducts its
8   regular day-to-day activities or affairs, such as the
9   purchase or sale or goods or whatever other activities the
10  business regularly engages in and for which it is
11  organized.
12       The third element requires that Qorvo prove by a
13  preponderance of the evidence that Akoustis' conduct
14  proximately caused injury to Qorvo.  To prove this, Qorvo
15  must prove:
16       (a) that Qorvo has suffered an injury; and
17       (b) that Akoustis' conduct was the proximate cause of
18  any injury to Qorvo.
19       Proximate cause is a cause that in a natural and
20  continuous sequence produces the injury, and is a cause
21  that a reasonable and prudent person could have foreseen
22  with produces such injury or other similar injurious
23  result.
24       In connection with its Unfair and Deceptive Trade
25  Practices claim, Qorvo seeks the recovery of compensatory

2547

1   damages.  Qorvo seeks recovery of damages for actual loss.
2        In determining compensatory damages based on actual
3   loss, you may consider whether Qorvo suffered any
4   measurable loss as a result of Akoustis' conduct.  In this
5   case, Qorvo claims that its business was affected, and
6   that it suffered monetary loss due to the loss -- due to
7   the cost to recruit, hire, and train additional employees
8   based on Akoustis' unlawful hiring of Qorvo employees.
9        Qorvo's damages, if any, are to be reasonably
10  determined from the evidence presented in the case.  Qorvo
11  is not required to prove with mathematical certainty the
12  extent of its injury in order to recover damages.  You may
13  not award, however, any damages based upon your
14  speculation or conjecture.
15       Now, and the verdict form will help us as we go
16  through that, because it's broken down in a way, I think,
17  to assist you as you put all of this together.
18       I'm going to turn to patent infringement theory in
19  this case.
20       Qorvo has alleged that Akoustis has directly
21  infringed Claims 1 and 12 of the '018 patent and Claims 9
22  and 10 of the '755 patent.  I will refer to those as "the
23  asserted claims."  Infringement is assessed on a
24  claim-by-claim basis.  To prove infringement, Qorvo must
25  prove that the requirements for direct infringement are

2548

1   met by a preponderance of the evidence, that is, that it
2   is more likely than not that all requirements of direct
3   infringement have been proven.
4        Akoustis denies that it has infringed the asserted
5   claims.  Your job in this portion, certainly, is to decide
6   whether Akoustis has infringed the asserted claims in the
7   patents.
8        The specific questions that you must answer relate to
9   patent infringement.  And the specific questions that you
10  must answer relate to patent infringement, and are listed
11  on the verdict form that I will give to you as we conclude
12  the instruction on the substantive theories of the
13  parties.
14       Here are the issues that you must decide in this
15  context, in the patent context:
16       Whether Qorvo has proven by a preponderance of the
17  evidence that Akoustis infringes Claim 1 and/or 12 of the
18  '018 patent.
19       If you decide Akoustis has proven -- excuse me -- if
20  you decide that Qorvo has proven that Akoustis infringes
21  Claims 1 and/or 12 of the '018 patent, whether Qorvo has
22  proven by a preponderance of the evidence that Akoustis
23  willfully infringes.
24       If you decide that Qorvo has proven that Akoustis
25  infringes Claims 1 and/or 12 of the '018 patent, what

2549

1   amount of monetary damages Qorvo has proven by a
2   preponderance of the evidence.
3        And whether Akoustis has proven by a preponderance of
4   the evidence -- it's difficult because they sound alike to
5   be confusing, so I will say that one again correctly.
6        Whether Qorvo has proven by a preponderance of the
7   evidence that Akoustis infringes Claims 9 and/or 10 of the
8   '755 patent.
9        If you decide that Akoustis has proven -- excuse me.
10  If you decide that Qorvo -- I'm going to get Ms. Duvall to
11  come up here and read this.  She said, no.
12       If you decide that Qorvo has proven that Akoustis
13  infringes Claims 9 and/or 10 of the '755 patent, whether
14  Qorvo has proven by a preponderance of the evidence that
15  Akoustis willfully infringes.  And if you decide that
16  Qorvo has proven that Akoustis infringes Claims 9 and/or
17  10 of the '755 patent, what amount of monetary damages
18  Qorvo has proven by a preponderance of the evidence?
19       I will now give you some further instructions
20  regarding patent infringement.  I have a few changes.
21       Before you decide many of the issues in this patent
22  portion of the case, you will need to understand the role
23  of patent claims.
24       Now, I told you earlier, I'm going to go through
25  several pages of this, but then I'm going to tell you that