# EXHIBIT F
# (REDACTED IN ITS ENTIRETY)

# EXHIBIT G
# (REDACTED IN ITS ENTIRETY)

# EXHIBIT H

07:49:15

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3

   QORVO, INC.,                    ) VOLUME 2
4                                  )
                  Plaintiff,       )
5                                  ) C.A. No. 21-1417(JPM)
   v.                              )
6                                  )
   AKOUSTIS TECHNOLOGIES, INC.,)
7  and AKOUSTIS, INC.,            )
                                   )
8                 Defendants.      )

9

10                   Tuesday, May 7, 2024
                     8:30 a.m.
                     Jury Trial
11

12                   844 King Street
                     Wilmington, Delaware
13

14  BEFORE:  THE HONORABLE JON P. McCALLA
                 United States District Court Judge
15

16

17  APPEARANCES:

18
                     MORRIS NICHOLS ARSHT & TUNNELL LLP
19                   BY:  JEREMY A. TIGAN, ESQ.

20
                     -and-
21
                     SHEPPARD MULLIN RICHTER & HAMPTON LLP
22                   BY:  ROBERT M. MASTERS, ESQ.
                     BY:  JONATHAN R. DeFOSSE, ESQ.
23                   BY:  KAZIM A. NAQVI, ESQ.
                     BY:  JENNIFER AYERS, ESQ.
24

25                        Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2
                    BAYARD, P.A.
3                   BY:  STEPHEN B. BRAUERMAN, ESQ.
                    BY:  RONALD P. GOLDEN, III, ESQ.
4
                    -and-
5
                    SQUIRE PATTON BOGGS (US)LLP
6                   BY:  RONALD S. LEMIEUX, ESQ.
                    BY:  DAVID S. ELKINS, ESQ.
7                   BY:  VICTORIA Q. SMITH, ESQ.
                    BY:  XIAOMEI CAI, ESQ.
8                   BY:  RACHAEL A. HARRIS, ESQ.
                    BY:  MATTHEW A. STANFORD, ESQ.
9

10                          Counsel for the Defendants

11

12

13              _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

08:26:59 14

08:27:00 15            THE COURT:  You may be seated.  I understand

08:27:01 16    there maybe one thing that we have to go over, hopefully it

08:27:05 17    won't be long.  So we're still checking on the status of the

08:27:08 18    cockatoo, but it is apparently here.

08:27:11 19            MR. DeFOSSE:  Good morning, Your Honor.

08:27:12 20    Actually two issues, I think.

08:27:15 21            THE COURT:  Sure.

08:27:16 22            MR. DeFOSSE:  The first is the Houlden

08:27:19 23    deposition video, we want to let the Court know there is a

08:27:22 24    possibility we would need to start that video this

08:27:25 25    afternoon.

08:27:28  1          THE COURT:  That's fine, we've already done it

08:27:30  2  all.  We asked for some additional information on the one

08:27:33  3  question that was unresolved and we did not receive any

08:27:37  4  additional case law or anything else to support the position

08:27:40  5  of defendant on the objection and therefore we have all

08:27:45  6  matters resolved.

08:27:46  7          MR. DeFOSSE:  Thank you, Your Honor.  The other

08:27:48  8  issue relates to some exhibits with the witness et cetera

08:27:51  9  coming up this morning.

08:27:52 10          THE COURT:  Sure.

08:27:52 11          MR. DeFOSSE:  Our second and fourth witness.

08:27:55 12  First would be Robert Aigner and the fourth witness will be

08:27:59 13  Gernot Fattinger.  We received last night at about

08:28:03 14  10:45 p.m. twenty-five objections, or objections to

08:28:05 15  twenty-five exhibits.

08:28:07 16          THE COURT:  They should have been submitted

08:28:08 17  earlier?

08:28:09 18          MR. DeFOSSE:  They should have been submitted at

08:28:11 19  9 o'clock, Your Honor.

08:28:12 20          THE COURT:  Did you get them?

08:28:13 21          MR. DeFOSSE:  We got them at 10:45.

08:28:16 22          THE COURT:  Oh, they were late?

08:28:17 23          MR. DeFOSSE:  They were late and also past the

08:28:19 24  meet and confer deadline that was 10:00 p.m.  We've asked

08:28:22 25  that the objections be withdrawn.  I don't think our friends

08:28:25  1    on other side are willing to do that.

08:28:26  2            THE COURT:  Why did you submit them late?

08:28:30  3            MR. ELKINS:  Good morning, Your Honor.

08:28:31  4            THE COURT:  Late is not good.

08:28:32  5            MR. ELKINS:  Well, first, we had to go see a

08:28:36  6    physical demonstrative which was part of the list, and so we

08:28:40  7    had to go to the hotel where plaintiff's counsel were

08:28:45  8    staying to visit the demonstrative.

08:28:46  9            THE COURT:  Sure.

08:28:47 10            MR. ELKINS:  We didn't get that invitation until

08:28:51 11    almost 9 o'clock, so we got our stuff over and got there and

08:28:55 12    we should have in retrospect sent over the objections to the

08:29:00 13    non-demonstrative before that, but we didn't get it done.

08:29:04 14            I will say, Your Honor, that the objections that

08:29:08 15    we made are the same ones that we made in the list that we

08:29:16 16    exchanged before the pretrial conference and they're really

08:29:20 17    just the normal ones that if they lay a foundation to get

08:29:24 18    them in for authenticity and a hearsay exception, then those

08:29:29 19    are the only issues.  So we would expect them to lay the

08:29:33 20    proper foundation, we just reiterated those, and so that's

08:29:36 21    the story, Your Honor.

08:29:37 22            THE COURT:  Sure.  Basically if they lay a

08:29:39 23    proper foundation, we don't have a problem.  And if there is

08:29:42 24    a hearsay objection, it may be that it's received only for

08:29:45 25    notice, I'm sure or it may not be hearsay, is that our

08:29:49   1    situation?

08:29:49   2           MR. ELKINS:  That is it, Your Honor.

08:29:50   3           THE COURT:  That's pretty straightforward.  Now

08:29:55   4    that won't come up for a little bit, right?

08:29:57   5           MR. DeFOSSE:  That will be the second witness,

08:29:59   6    so it depends how long the cross-examination is for the

08:30:02   7    first witness, Your Honor.  I would say when we -- the

08:30:04   8    reason we do these exchanges, as the Court knows, is there

08:30:08   9    are a very large volume of objections that are lodged to the

08:30:12 10    exhibits, I think something like in the range of

08:30:14 11    eighty percent of our exhibits have objections to them, and

08:30:17 12    they're just every objection under the federal rules, so

08:30:20 13    that's why we have this process in place to let us know

08:30:23 14    which ones they're maintaining and see which ones are

08:30:29 15    resolved.

08:30:30 16           We don't want a situation like last night,

08:30:32 17    because we got no objections, we finalized our examination

08:30:35 18    outlines, we put the witnesses to bed, and then we get

08:30:37 19    objections and we're like where do we go with this if the

08:30:41 20    Court sustains --

08:30:42 21           THE COURT:  I understand the mechanical

08:30:44 22    problems, I think everybody is working hard, I really don't

08:30:47 23    have a criticism, it just should have gotten done quicker,

08:30:51 24    but everybody is working hard, but we got to keep working

08:30:54 25    harder or we won't get through the case, that's really the

08:30:58  1    main thing, we really have a tight schedule here.  I don't

08:31:01  2    think we have to rule on those at this point in time,

08:31:03  3    because we're going to be able to see if we have any

08:31:05  4    problems, I think that's what I was hearing from counsel as

08:31:08  5    I understand it.

08:31:09  6            Mr. Elkins, I think we'll be able to look and

08:31:14  7    see if there was problem with foundation.

08:31:16  8            MR. ELKINS:  Correct, with Mr. Creviston

08:31:17  9    yesterday, I think counsel was laying a foundation and --

08:31:21  10           THE COURT:  Most of the time, just make sure

08:31:24  11   that you do lay a proper predicate for a particular exhibit.

08:31:28  12           MR. DeFOSSE:  We can, Your Honor, but I'm sorry,

08:31:30  13   I would like some clarity of how we're going to do this

08:31:34  14   going forward because what we would like to do coming in is

08:31:38  15   to know where there is going to be an objection.  For

08:31:40  16   example, we have authenticity objections to --

08:31:44  17           THE COURT:  I didn't really understand there was

08:31:46  18   genuine issues to authenticity, the documents are basically

08:31:49  19   ones that no one is asserting are not accurate depictions of

08:31:53  20   particular information.

08:31:54  21           MR. ELKINS:  The issue is that with respect to

08:31:57  22   documents that have been produced by Akoustis that Qorvo

08:32:03  23   claims are its documents, yes, it appears to be, it has a

08:32:08  24   Qorvo logo on it and things like that, but we would expect

08:32:12  25   them to have a witness who says yeah, it's a Qorvo document.

08:32:15  1                    THE COURT:  Well, if it's an Akoustis document

08:32:17  2        that has Qorvo on it, it's going to come in because

08:32:20  3        obviously one of the assertions is that Akoustis

08:32:23  4        misappropriated particular materials and we're simply

08:32:28  5        showing I received that material through an Akoustis

08:32:31  6        witness.

08:32:31  7                    MR. ELKINS:  We're not, and we're not objecting

08:32:34  8        on the grounds of authenticity or hearsay as to Akoustis,

08:32:39  9        but we would just like they would put in a normal Qorvo

08:32:44 10        document, we would expect one of their witnesses to say

08:32:47 11        yeah, in fact that's a Qorvo document and if it's

08:32:50 12        confidential, it's confidential, it says that on the

08:32:54 13        document, but how do we know that it's really confidential

08:32:57 14        because they could have just marked all of their documents

08:33:01 15        confidential as we think the evidence will show.

08:33:04 16                    THE COURT:  We're not going through that

08:33:05 17        exercise of challenging every document that comes in, or

08:33:09 18        saying well -- yes it's got confidential on it, but we don't

08:33:13 19        know if it's confidential, perhaps we have somebody on the

08:33:16 20        stand that says it is confidential, if the document says it

08:33:20 21        got confidential on it, you can cross-examine, you can check

08:33:23 22        on it, you can come in and challenge the document, but I

08:33:26 23        think from an efficiency point of view it doesn't seem to be

08:33:30 24        a real issue that many of the documents that Akoustis had

08:33:32 25        did have confidential indications on them, and you and I can

08:33:38  1    both acknowledge that some of that information might be more

08:33:41  2    important than others.

08:33:42  3              MR. ELKINS:  Yeah, and they -- for example, they

08:33:45  4    took depositions of our witnesses.

08:33:47  5              THE COURT:  Sure.

08:33:47  6              MR. ELKINS:  Who had them in custody, you know

08:33:50  7    the custody chain show that a particular Akoustis witness

08:33:53  8    had it appear it was produced in somebody's files, does this

08:33:57  9    appear to be a Qorvo document?  Yes, it does.  We're not

08:34:01 10    going to say oh, now you have to put on a Qorvo person to

08:34:05 11    also get it in.

08:34:06 12              THE COURT:  I think we're going to be okay.  I'm

08:34:08 13    trying to listen carefully here.  I think we're going to be

08:34:12 14    all right on this.  It seems like we'll be able to move

08:34:15 15    through it, and I just, I agree that Mr. DeFosse,

08:34:19 16    Mr. Masters, so forth, have an obligation to set a little

08:34:22 17    more of a background on the documents, and you're right

08:34:25 18    about that.

08:34:25 19              MR. ELKINS:  That's the only point I was making.

08:34:28 20              THE COURT:  I think they do ask maybe one or two

08:34:32 21    more questions in that regard if they can, but they don't

08:34:35 22    have to have the author, a Qorvo author of the document be

08:34:38 23    on the stand first and say oh, yeah, that's a Qorvo

08:34:41 24    document.  That would be just, it would be terribly time

08:34:44 25    consuming, and on an issue as to which there doesn't seem to

08:34:49  1   be any real debate.

08:34:51  2           MR. ELKINS:  A good example, Your Honor, is

08:34:52  3   yesterday Mr. Creviston testified about two documents.

08:34:55  4           THE COURT:  Yes.

08:34:55  5           MR. ELKINS:  And we did not object -- I mean, I

08:34:58  6   don't think he was the author of it.

08:34:59  7           THE COURT:  No.

08:35:01  8           MR. ELKINS:  We did not object on that ground.

08:35:02  9           THE COURT:  Correct.  Correct.  He was not.

08:35:04 10           MR. DeFOSSE:  Your Honor, I think we're fine, I

08:35:08 11   understand Your Honor would like to address this as we go.

08:35:11 12   I guess the situation I'm trying to avoid is showing up in

08:35:14 13   court not just today but every day going forward not knowing

08:35:18 14   what objections they're maintaining because the status quo

08:35:21 15   as I understand it from them --

08:35:23 16           THE COURT:  Today we're going to go forward this

08:35:25 17   way, I think our point, my point, your point, everybody's

08:35:30 18   point is to the degree those can be as to which notice can

08:35:34 19   be given in advance, it's going to save us a lot of time,

08:35:38 20   and I think -- I think -- I think Akoustis's counsel is

08:35:42 21   trying to do that.

08:35:43 22           MR. ELKINS:  Yes, Your Honor.

08:35:43 23           THE COURT:  We just had a busy day yesterday.

08:35:46 24           MR. ELKINS:  First, let me apologize to counsel,

08:35:49 25   it was our fault we didn't get those in, it won't happen

08:35:54 1    again.  We have a system in place now.  If there is a

08:35:57 2    problem with getting objections on time, we will let them

08:36:00 3    know in advance, and if they have a problem, we're not going

08:36:03 4    to squawk and we'll show them the same courtesy.

08:36:06 5              THE COURT:  What we're going to try to do and

08:36:08 6    I'll tell the jury, I'll tell them two things, one thing is

08:36:13 7    objections will often be an objection such as 401, not

08:36:17 8    relevant, very short, but reference to a number, that would

08:36:21 9    be useful.  You know, 602, 611, whatever it's going to be,

08:36:26 10   just help us all move quickly through it because I know

08:36:30 11   everybody is time concerned.  Okay.  I think we're good.

08:36:33 12             The other point is that we will have the

08:36:36 13   requirement that all the examination of the witness take

08:36:39 14   place at the same time, we're not going to have the witness

08:36:42 15   recalled, that simply takes up unnecessary time when the

08:36:46 16   witness has to be repositioned in terms of context and so

08:36:51 17   forth.  We'll just tell them that.

08:36:53 18             So Akoustis won't be penalized in any way in

08:36:56 19   that regard, just say that Akoustis will also be presenting,

08:36:59 20   assuming that the witness is answering more than three

08:37:02 21   questions from Qorvo, then Akoustis will just go ahead and

08:37:08 22   present all the testimony.  And some plaintiffs really don't

08:37:11 23   like that, but that's so much more efficient.  Does that

08:37:15 24   make sense to everybody?  I think I have said -- I know I

08:37:18 25   tell everybody this in every case.

08:37:21  1                  MR. ELKINS:  Certainly I think that's the way we

08:37:23  2     understood we were going to proceed, Your Honor.

08:37:24  3                  THE COURT:  And we probably talked about it.

08:37:27  4                  MR. ELKINS:  There are only three witnesses I

08:37:29  5     believe who are affected by that.

08:37:30  6                  THE COURT:  I think so.

08:37:31  7                  MR. ELKINS:  And Mr. Aichele, Mr. Shealy, and

08:37:34  8     then Mr. Testa, who will testify later today, we called them

08:37:38  9     in our case, it will probably be just a cross-examination.

08:37:42 10     I doubt it will go outside the scope, but if it needs to,

08:37:45 11     then we've --

08:37:47 12                  THE COURT:  Sure.

08:37:47 13                  MR. ELKINS:  We disclosed the documents.

08:37:49 14                  THE COURT:  I'll just remind the jury that

08:37:52 15     that's how we're handling it.  It all sounds good.  I think

08:37:56 16     we're ready.  All the jurors got here.

08:38:14 17                  The cockatoo made it to the third floor.  You

08:38:42 18     will be alerted to the fact that objection orders will be

08:38:45 19     entered shortly, so some of this staff may want to be

08:38:50 20     alerted to that, because it is important to the

08:38:56 21     videographer.  And we're going to have our witness come back

08:38:59 22     to the witness stand.  I know we're anxious to do that, so

08:39:04 23     you'll be here for the jury.  Remember that the non-staff

08:39:09 24     personnel, that is any folks don't stand, of course all of

08:39:14 25     you do stand when the panel gets here.

08:39:17  1              COURT CLERK:  Ready for them, Judge?

08:39:19  2              THE COURT:  We're all set.

08:39:20  3              COURT CLERK:  All rise.

08:39:21  4              (Jury entering the courtroom at 8:39 a.m.)

08:39:38  5              THE COURT:  You can be seated as you come in,

08:39:40  6    but I know you're sorting people out.  And we're going to

08:39:50  7    get Mr. McVay in front of that line on the second row.

08:39:55  8    Everybody can be seated because we are ready to proceed.

08:40:02  9              Counsel may proceed.  This is cross-examination

08:40:03 10    of the witness.

08:40:04 11              I will tell you one thing, it doesn't really so

08:40:07 12    much apply to this witness, but it will to all witnesses

08:40:10 13    really is that all of their testimony is presented at one

08:40:13 14    time, so if, Qorvo will call somebody that Akoustis will

08:40:18 15    also call, this is not necessarily the case with this

08:40:21 16    witness, then all the testimony is presented at the same

08:40:24 17    time.  That's to be more efficient, otherwise the witness

08:40:28 18    would be recalled and what we might call the defense case

08:40:32 19    that will mean they would have to be reoriented, you have to

08:40:36 20    be reoriented, it takes about fifteen, twenty minutes, we

08:40:39 21    certainly want to be more efficient than that.  So it

08:40:42 22    doesn't matter who calls the witness, all their testimony

08:40:45 23    will be presented at that time.

08:40:47 24              Counsel, I think we're ready as soon as you are.

08:40:50 25              MR. ELKINS:  Thank you, Your Honor.  I just

Creviston - cross

08:40:53 1    wanted to get my documents ready and I have done that.

08:40:57 2                        CROSS-EXAMINATION

08:40:58 3    BY MR. ELKINS:

08:40:59 4    Q.      Good morning, Mr. Creviston.

08:41:00 5    A.      Good morning.

08:41:01 6    Q.      You probably heard me introduce myself during jury

08:41:08 7    voir dire yesterday, I'm David Elkins, one of the lawyers

08:41:11 8    for the Akoustis defendants and good to meet you, although

08:41:14 9    at a distance this morning.

08:41:15 10                I am going to do cross-examination, so go back

08:41:22 11   over some of the things to which you testified yesterday.  I

08:41:25 12   will refer to some documents that Mr. Masters asked you to

08:41:30 13   look at.  I saw yesterday you had a binder.  I take it you

08:41:34 14   do not have that binder with you?

08:41:35 15   A.      No, not today.

08:41:36 16   Q.      Then I will, with the Court's permission at the

08:41:39 17   proper time, I will pass those documents up.

08:41:42 18                THE COURT:  Not a problem at all.

08:41:43 19                MR. ELKINS:  And I presume for anything that was

08:41:46 20   marked yesterday, the Court already has those documents.

08:41:49 21                THE COURT:  Right.

08:41:49 22                MR. ELKINS:  Okay.

08:41:50 23   BY MR. ELKINS:

08:41:51 24   Q.      Let me ask you, you testified yesterday a little bit

08:41:54 25   about Qorvo's interactions with customers, potential

Creviston - cross

08:42:00  1    customers.  And would you agree with me that the purchasers

08:42:05  2    and potential purchasers of BAW filters are rather

08:42:10  3    sophisticated?

08:42:11  4    A.      In general they are, yes.

08:42:15  5    Q.      And would you also agree that the functional

08:42:17  6    specifications that -- for a particular BAW filter are

08:42:23  7    provided to Qorvo in one of two ways, either custom

08:42:28  8    specifications from a customer, or a functional

08:42:32  9    specification for a particular industry standard like Wi-Fi

08:42:37  10    6?

08:42:37  11    A.      Not actually for the -- the majority of the filters

08:42:40  12    that we use we put them inside modules so the entire

08:42:44  13    function of the module is specified by the customer.  We

08:42:47  14    internally determine what that filter itself should do.

08:42:50  15    Q.      And the modules, those are mostly, I think they are

08:42:55  16    called front end modules or FEM's?

08:42:59  17    A.      Yes.

08:43:00  18    Q.      And the other way is that Qorvo supplies, I won't say

08:43:06  19    off-the-shelf because certainly they're not off the shelf,

08:43:09  20    but essentially you offer BAW filters that are intended to

08:43:14  21    help customers build products that comply with a certain

08:43:19  22    industry standard, as I said Wi-Fi 6, for example, that

08:43:23  23    would implicate the 5-gigahertz BAW filters like the QPQ1903

08:43:31  24    or 1904?

08:43:32  25    A.      Yeah, very, very few, but there are some cases of

Creviston - cross

08:43:35 1    what we would call a discrete filter that you're describing.

08:43:38 2    Q.    Would you also agree with me that customers generally

08:43:42 3    make decisions about whether to buy a BAW filter based on

08:43:45 4    whether or not the filter first meets the functional

08:43:48 5    specification?

08:43:49 6    A.    That's one of many requirements.

08:43:51 7    Q.    Correct.  Also they're going to look at the vendor,

08:43:54 8    right?

08:43:54 9    A.    Yeah, quality, right, pricing, of course, reputation,

08:43:59 10   reliability.

08:44:00 11   Q.    The ability to meet the customer's needs?

08:44:02 12   A.    Uh-huh.

08:44:03 13   Q.    Okay.  So I had mentioned the QPQ1903 and 1904.

08:44:10 14   Those are Qorvo BAW filters that are intended to help

08:44:15 15   customers build products that comply with the Wi-Fi 6

08:44:19 16   specification, right?

08:44:20 17   A.    I'm actually not familiar with the parts that were

08:44:25 18   not in my portfolio, but they may be.

08:44:29 19   Q.    I think you actually were in mobile products up until

08:44:33 20   2022?

08:44:33 21   A.    Uh-huh.  That's right.

08:44:37 22   Q.    And I'll remind you, you just need to speak up.

08:44:42 23   A.    Pardon?

08:44:43 24   Q.    I thought you said uh-huh.

08:44:44 25   A.    Yeah.  Yeah.  That's true.

Creviston - cross

08:44:46  1    Q.      Okay.  And the Wi-Fi 6 standard fell into areas

08:44:53  2    covered about a couple of other groups within Qorvo's other

08:44:57  3    mobile products right?

08:44:58  4    A.      That's correct.

08:44:59  5    Q.      And one of them was wireless connectivity?

08:45:03  6    A.      Yeah, the wireless connectivity, it was a Wi-Fi based

08:45:08  7    product.

08:45:09  8    Q.      And also, I think it's infrastructure and defense

08:45:12  9    products or IDP is the other one?

08:45:14 10    A.      Yeah, exactly.

08:45:15 11    Q.      Okay.  And you testified that in 2017 through say

08:45:26 12    2019, Qorvo was engaging with Akoustis about possibly

08:45:31 13    acquiring 5-gigahertz filters to meet certain needs that

08:45:38 14    Qorvo might have, correct?

08:45:39 15    A.      That's correct.

08:45:40 16    Q.      And those were actually BAW filters in the

08:45:42 17    5-gigahertz range?

08:45:44 18    A.      Yes, that's right, specifically for Wi-Fi

08:45:47 19    applications that we hadn't prior tested, we had a much

08:45:51 20    bigger market in mobile phones and that's what I was

08:45:54 21    responsible for, we had the vast majority of the budget, we

08:45:57 22    were directing our internal efforts toward mobile and

08:46:01 23    looking to build portfolio if we could with Wi-Fi.

08:46:05 24    Q.      In fact, Qorvo wasn't able to, or at least decided

08:46:09 25    not to allocate resources to develop 5-gigahertz BAW filters

348

Creviston - cross

08:46:15 1   because the mobile products division of which you were

08:46:19 2   president, and I think you still lead, right, as part of

08:46:23 3   your portfolio?

08:46:24 4   A.     No, I'm in a different role now.

08:46:26 5   Q.     It was because the mobile products group had a very,

08:46:29 6   very large order to meet with a very important customer in

08:46:35 7   Cupertino?

08:46:35 8   A.     Well, many, many customers, that's one, but many.

08:46:39 9   And mobile handset trails the infrastructure, so the

08:46:43 10  infrastructure part of the business would be 5-gigahertz

08:46:46 11  first, although it's a very small business compared to the

08:46:50 12  mobile group, as mobile phones don't have a filter so that's

08:46:53 13  already in the structure, so it trailed.

08:46:56 14  Q.     So, and you understand that Qorvo did not begin even

08:47:06 15  developing the -- what became the QPQ1903 and 1904

08:47:14 16  5-gigahertz BAW filters until 2018?

08:47:17 17  A.     So process development would be continuing along with

08:47:21 18  the whole family of technologies.  The product itself,

08:47:24 19  though, came out, we were developing in that time frame.

08:47:28 20  Q.     And you know that Akoustis actually had product in

08:47:33 21  the market in 2018?

08:47:36 22  A.     They did not have any product that met our

08:47:38 23  specifications.  Nothing we could have used or we would have

08:47:41 24  used it.

08:47:42 25  Q.     And isn't it true that the Qorvo 1903 and 1904, drop

08:47:52  1    the QPQ for now, they weren't even in the market until the

08:47:56  2    end of 2020?

08:47:57  3    A.      I don't know exactly when they hit the market, but

08:48:01  4    nineteen or twenty, in that time frame.

08:48:03  5    Q.      Okay.  I would like to show you a document.  It is --

08:48:13  6    it was originally marked as DTX-272.  It's now trial

08:48:17  7    Exhibit 5.

08:48:18  8              MR. ELKINS:  And if I can approach the witness?

08:48:20  9              THE COURT:  You may.

08:48:21 10              MR. ELKINS:  Thank you.

08:48:38 11    Q.      Mr. Creviston, do you recognize what was marked as

08:48:43 12    Trial Exhibit 5 from yesterday?

08:48:44 13    A.      Yes, I do.

08:48:46 14    Q.      And this is an e-mail thread among you, Ted

08:48:54 15    Gillenwater and Craig Callahan whom you briefly identified

08:49:00 16    yesterday?

08:49:00 17    A.      Yes.

08:49:01 18    Q.      And just for context, can you remind us who

08:49:06 19    Mr. Callahan is?

08:49:07 20    A.      He was the person in charge of my quality in mobile

08:49:11 21    products at the time.

08:49:12 22    Q.      Okay.  And I think you testified that Mr. Gillenwater

08:49:18 23    is essentially the chief technology officer for mobile

08:49:24 24    products?

08:49:24 25    A.      That's correct.

Creviston - cross

08:49:26  1    Q.      And at the bottom of this first page, Mr. Callahan is

08:49:33  2    asking you at your staff meeting, and this is on August 26,

08:49:41  3    2020, at your staff meeting, "Sorry, Jesse.  At your staff

08:49:47  4    meeting, will you be able to share any outcome from your

08:49:51  5    discussion Monday night on strategies to deal with

08:49:55  6    Akoustis?"

08:49:55  7          What did you understand Mr. Callahan to be

08:49:59  8    referring to regarding your strategies to deal with

08:50:02  9    Akoustis?

08:50:02  10   A.      Essentially they were just becoming more and more

08:50:05  11   noise in the market as Akoustis was making claims about

08:50:08  12   their products.  As we talked about yesterday, they had

08:50:12  13   targeted a lot of our employees that had gone over there.

08:50:15  14   The primary issue was the fact that they were making claims

08:50:18  15   about products, making claims about competitiveness against

08:50:22  16   us which we didn't agree with.

08:50:24  17   Q.      If you go to the top, or the next one up, this is

08:50:28  18   your response here in the middle of the page to

08:50:32  19   Mr. Gillenwater, or excuse me, to Mr. Callahan, but you're

08:50:36  20   adding Mr. Gillenwater to the conversation, correct?

08:50:38  21   A.      Uh-huh.  Yes.

08:50:40  22   Q.      And here you say you didn't recall any particular

08:50:46  23   strategies coming out of it.  More an understanding of why

08:50:49  24   we are not able to compete with them today in the places

08:50:53  25   (tiny niches, really) where they were winning, or are

Creviston - cross

08:50:58  1    winning, excuse me.

08:50:59  2         What were you referring to with respect to the

08:51:02  3    places or tiny niches where Akoustis was winning?

08:51:07  4    A.    Yeah, my recollection is again, that was sort of the

08:51:10  5    infrastructure piece of Wi-Fi, which would have been in our

08:51:14  6    other operating group but a much, much smaller business than

08:51:18  7    what we were focusing on in the mobile phone part of the

08:51:21  8    business.

08:51:21  9    Q.    And in winning, you meant that they were winning

08:51:25 10    customer orders, correct?

08:51:27 11    A.    Yeah, that would be the implication.  I don't know at

08:51:30 12    the time if they really had anything substantial.  We called

08:51:33 13    them tiny niches because they were picking up little pieces

08:51:37 14    of business here and there and talking a lot about those

08:51:40 15    particular wins.

08:51:43 16    Q.    I want to -- I'm going to switch gears now.

08:51:47 17         You're familiar, I expect, with a product

08:51:54 18    management system called the phase gate process?

08:51:59 19    A.    Uh-huh.

08:52:00 20    Q.    And I apologize --

08:52:02 21    A.    Yes.

08:52:03 22    Q.    Yes.  I'm sorry.  We always have to have a clear

08:52:06 23    record.

08:52:06 24    A.    Understood.

08:52:07 25    Q.    And it's not a natural way to speak between two

Creviston - cross

08:52:10  1    people.

08:52:10  2                But it's a project management technique, right?

08:52:14  3    A.    Yes, it is.

08:52:15  4    Q.    And it guides a project from conception to launch?

08:52:18  5    A.    Correct.

08:52:20  6    Q.    And it involves breaking down a project into distinct

08:52:24  7    phases, they're sometimes called stages?

08:52:27  8    A.    Correct.

08:52:27  9    Q.    And it's separated by decision points, correct?

08:52:31 10    A.    Correct.

08:52:31 11    Q.    And each stage generally has its own scope, its own

08:52:36 12    objectives, and activities?

08:52:38 13    A.    That's correct.

08:52:39 14    Q.    And at the end of each phase, the work is reviewed at

08:52:44 15    a gate to see if the project is ready to move forward?

08:52:49 16    A.    That's correct.

08:52:50 17    Q.    Okay.  Then the project manager decides whether to

08:52:53 18    move forward, make modifications, or just end the project?

08:52:58 19    A.    Correct.

08:52:59 20    Q.    Who is Patricia Groots?

08:53:03 21    A.    So Pat Groots currently is one of our operations

08:53:10 22    people within Qorvo.

08:53:13 23    Q.    Did you supervise her in the 2005, 2006 period?

08:53:18 24    A.    I don't believe she was ever in my organization.

08:53:22 25    Q.    Okay.  I am going to show you another document that

Creviston - cross

08:53:28  1    we saw yesterday.  This one is Trial Exhibit 6.  It had been

08:53:33  2    marked as PTX 785.

08:53:37  3                  MR. ELKINS:  May I approach?

08:53:38  4                  THE COURT:  You may.

08:53:49  5                  MR. MASTERS:  Your Honor?

08:53:50  6                  THE COURT:  Yes, sir.

08:53:51  7                  MR. MASTERS:  This is a document that we had

08:53:53  8    requested the Court be sealed.

08:53:55  9                  THE COURT:  It is to be sealed.  It's marked as

08:53:58 10    confidential.  I don't know if we have anybody in the

08:54:00 11    courtroom.

08:54:02 12                  MR. MASTERS:  I don't believe so, just so the

08:54:04 13    record is reflecting.

08:54:07 14                  THE COURT:  Absolutely.  It's a really good

08:54:09 15    reason for that, because if they don't announce and tell us

08:54:12 16    that it is a confidential or a sealed document, then it

08:54:16 17    becomes public, and so each time that happens, they should

08:54:21 18    announce that.  It doesn't affect you, you can look at

08:54:25 19    everything you want to.

08:54:27 20    BY MR. ELKINS:

08:54:30 21    Q.     Mr. Creviston, will you please turn to page 10 of

08:54:36 22    Trial Exhibit 6.

08:54:40 23    A.     Yes.

08:54:40 24    Q.     And you'll see the revision history; correct?

08:54:45 25    A.     Yes.

Creviston - cross

08:54:45  1   Q.      And would you agree with me that Patty Groots appears

08:54:51  2   to be -- excuse me, Groots, I mispronounced her name, Groots

08:54:56  3   appears to have prepared this document in March 2005?

08:54:59  4   A.      Correct.

08:55:00  5   Q.      And it also appears that she made some modest

08:55:04  6   revisions in August of 2005?

08:55:07  7   A.      Yes.

08:55:08  8   Q.      And if you flip to the front page, you'll see that

08:55:16  9   she made some modest revisions in January of 2006; correct?

08:55:21  10  A.      Correct.

08:55:23  11  Q.      You don't have any personal knowledge of how many

08:55:25  12  hours Ms. Groots spent creating this document, do you?

08:55:30  13  A.      No, I would not.  But it's not Ms. Groots that

08:55:34  14  contributes the content, of course, it comes from the people

08:55:36  15  that do our program management and design, engineering and

08:55:41  16  marketing people.

08:55:42  17  Q.      Let me rephrase that.  You don't have any personal

08:55:45  18  knowledge regarding how many hours were spent creating this

08:55:48  19  document at all, do you?

08:55:50  20  A.      Creating the document, of course I don't know how

08:55:55  21  long it took to make the document.  The work that goes into

08:55:57  22  the material, that's substantial.  The process itself is

08:56:01  23  many people continuously working to develop this process for

08:56:09  24  years.

08:56:17  25  Q.      Yesterday you testified this is a very, very valuable

Creviston - cross

08:56:21 1  document.

08:56:22 2  A.    The process itself is very valuable to us, yes.

08:56:25 3  Q.    So the document is not very valuable, is that what

08:56:27 4  you're saying?

08:56:28 5  A.    The document documents the process, so it reflects of

08:56:31 6  course all the work that went into the process.

08:56:35 7  Q.    Let's go to page 3 of the document.  And let's go to

08:56:53 8  Section 9, procedure.  And the first step in this procedure

08:57:05 9  that you said is very, very valuable is concept initiation,

08:57:13 10  coming up with an idea.  Do you characterize that as not

08:57:18 11  generally known outside Qorvo, coming up with an idea?

08:57:22 12  A.    Coming up with an idea itself is not the value in the

08:57:27 13  process for sure.  The documentation of what constitutes the

08:57:32 14  concept and then how you formalize it, bring it into

08:57:35 15  reality.

08:57:36 16  Q.    Well, what about the next step, beginning a

08:57:40 17  feasibility study to determine whether or not the idea might

08:57:44 18  work.  Is that an idea that is not generally known outside

08:57:47 19  of Qorvo?

08:57:48 20  A.    People phrase it in different ways, developing a

08:57:53 21  common methodology, but the whole organization understands

08:57:56 22  where you are in the process, what we call it and how that's

08:58:00 23  defined is unique to us.

08:58:01 24  Q.    Is that something that other companies don't do?

08:58:04 25  A.    They may do it in other ways.  The longer the company

Creviston - cross

08:58:08  1    has been in business, the more they have matured the

08:58:11  2    process, the more they would be likely to do that.

08:58:14  3    Q.      Let's go to the top of the next page and let's focus

08:58:18  4    on the pre alpha activities.  And you understand that this

08:58:27  5    document describes certain stages, the pre alpha, alpha,

08:58:33  6    then there is a beta stage, and then there is a pre-release

08:58:36  7    and release stage, correct?

08:58:38  8    A.      Uh-huh.

08:58:39  9    Q.      So this is the pre-alpha activities.  And the process

08:58:45  10   here is described as ███████████████████████████

08:58:51  11   ███████████ .

08:58:52  12   A.      Yes.

08:58:53  13   Q.      Defining ███████████████████████████████

08:58:59  14   ████████████████████████████████████████████

08:59:06  15   ███████████████████████████████████████████████

08:59:12  16   ██████    Correct?

08:59:13  17   A.      That's correct.

08:59:16  18   Q.      Would you agree with me that those are not trade

08:59:23  19   secrets that are known only to Qorvo?

08:59:25  20   A.      The individual items, I mean, the trade secret is

08:59:31  21   it's actually when we perform these functions.  I know as a

08:59:34  22   small company we did not have the maturity to do this level

08:59:38  23   of work up front, so that's really the key is making sure

08:59:42  24   the organization is aligned and doing the work upfront and

08:59:46  25   at every stage you're prepared to go on, so generally people

Creviston - cross

08:59:49  1    have a certain flow, what works in our industry with our

08:59:53  2    customers is what we developed here.

08:59:56  3    Q.      Let's go to the alpha phase at the top of page 5.

09:00:11  4    Again, none of these individual steps in the alpha phase are

09:00:17  5    unknown in the industry, are they?

09:00:20  6    A.      Not necessarily.  But there is a lot of others as

09:00:23  7    well that are not unknown.  So the specific actions we do at

09:00:28  8    specific times is what we've learned over time and what

09:00:32  9    works in our industry with our customers.

09:00:35 10    Q.      Where is that in this document?

09:00:36 11    A.      It's what the document covers, the flow of

09:00:40 12    activities, when we do which activity.

09:00:42 13    Q.      But this flow of activities is not unknown in the

09:00:46 14    industry, is it?

09:00:47 15    A.      At the high level, of course you start with an idea

09:00:50 16    and end up with a product.  How you get from beginning to

09:00:53 17    the end, where you determine -- so each of these gates

09:00:58 18    determined a certain amount of maturity of the product,

09:01:01 19    level of investment we're committing and the communication

09:01:04 20    of the entire organization, where we are at that time,

09:01:08 21    that's a mature process that takes a company a long time to

09:01:11 22    develop.

09:01:11 23    Q.      It's how you implement these processes, correct,

09:01:14 24    that's where the -- that's where the customization comes for

09:01:18 25    an organization like Qorvo, correct?

Creviston - cross

09:01:19  1    A.      It's determining a standard work process and defining

09:01:24  2    it in standard terms that we all communicate with.

09:01:29  3    Q.      Yesterday you testified that this document has been

09:01:36  4    improved over a couple of decades as you learn more things

09:01:41  5    in your technology development process.  And you integrate

09:01:45  6    the document, update it and continually improve on it.  That

09:01:50  7    is not -- where is that reflected in this document?

09:01:54  8    A.      So, I don't know how many other revisions of the

09:01:58  9    document itself, but within each of these things, the terms

09:02:01 10    and what we do in each of the stage gates, we continue to

09:02:05 11    refine it while we learn.

09:02:07 12    Q.      You presented this document, this is the exact same

09:02:10 13    revision about which you testified yesterday?

09:02:14 14    A.      Uh-huh.

09:02:14 15    Q.      None of that, none of what you just described is

09:02:17 16    anywhere in this document, is it?

09:02:19 17    A.      I don't know how it could be in the document.  It's

09:02:22 18    behind each of these actions, like what an alpha PDK means,

09:02:27 19    what does that mean, it's determined internally, and we

09:02:30 20    continue to improve our process for developing a alpha PDK.

09:02:40 21    Q.      Okay.  So that definition is not in this document, is

09:02:44 22    it?

09:02:45 23    A.      No, I don't believe it is.

09:02:57 24    Q.      You talked briefly about an evaluation board test

09:03:01 25    plan yesterday, and just so the jury understands, an

Creviston - cross

09:03:04  1    evaluation board is a printed circuit board that's set up

09:03:08  2    for evaluating a component for a particular application;

09:03:12  3    correct?

09:03:12  4    A.      That's correct.

09:03:13  5    Q.      Qorvo sells evaluation boards?

09:03:17  6    A.      We do sell evaluation boards, yes.

09:03:20  7    Q.      In fact, Qorvo sells a bunch of them on its Qorvo

09:03:24  8    store site?

09:03:25  9    A.      That's correct, yes.

09:03:26  10   Q.      Let me give you the document about which you

09:03:32  11   testified before I ask any questions on it.  This was marked

09:03:36  12   yesterday as Trial Exhibit 7 and before that it was PTX

09:03:40  13   1089?

09:03:42  14            MR. ELKINS:  May I approach?

09:03:43  15            THE COURT:  You may.

09:03:53  16   BY MR. ELKINS:

09:04:02  17   Q.      So this is Trial Exhibit 7 from yesterday about which

09:04:06  18   you testified.  So this is a plan for testing an evaluation

09:04:12  19   board; correct?

09:04:14  20   A.      Correct.

09:04:14  21   Q.      And not just any evaluation board, but this is a

09:04:17  22   particular Qorvo evaluation board, right?

09:04:20  23   A.      Correct.

09:04:21  24   Q.      And are you personally familiar with that particular

09:04:24  25   Qorvo evaluation board?

Creviston - cross

09:04:27  1   A.      No, I am not.

09:04:27  2   Q.      Did Qorvo ever sell it?

09:04:30  3   A.      I don't know.

09:04:31  4   Q.      Do you know who Kris Cheramie is, the author of this

09:04:37  5   document?

09:04:37  6   A.      No, I do not.

09:04:38  7   Q.      Do you know if that's a man or a woman?

09:04:40  8   A.      No, I do not.

09:04:44  9   Q.      Do you have any personal knowledge whether this

09:04:47 10   evaluation board is still in use?

09:04:49 11   A.      No, I do not.

09:04:50 12   Q.      Do you have any knowledge about whether this

09:04:52 13   evaluation board was ever in use?

09:04:53 14   A.      No, I do not.  This was not in my business unit.

09:05:02 15   Q.      How, if at all, does this document have any value

09:05:05 16   from not being generally known?

09:05:07 17   A.      From not being generally known.  So in the comments

09:05:11 18   and in the test parameters, the exact limits we set, the way

09:05:15 19   we characterize the device, and all the specific parameters

09:05:18 20   in which we characterize it.

09:05:21 21   Q.      Okay.  This is for a particular Qorvo evaluation

09:05:24 22   board; right?

09:05:24 23   A.      That's correct.

09:05:25 24   Q.      And again, you don't know whether or not it was ever

09:05:30 25   used outside Qorvo, right?

Creviston - redirect

09:05:31  1    A.      I do not know.

09:05:34  2    Q.      Okay.

09:05:34  3            MR. ELKINS:  Those are all the questions I have.

09:05:36  4    Thank you, Mr. Creviston.

09:05:38  5            THE COURT:  All right.  Redirect.

09:05:45  6                    REDIRECT EXAMINATION

09:05:46  7    BY MR. MASTERS:

09:05:48  8    Q.      Good morning, Mr. Creviston.

09:05:50  9    A.      Good morning.

09:05:50 10    Q.      Just a couple of questions on redirect with respect

09:05:54 11    to TX 6, Trial Exhibit 6.

09:06:00 12            Do you have the document?  And it was marked

09:06:13 13    PTX-785.

09:06:15 14    A.      Yes.

09:06:20 15    Q.      So counsel asked you questions about individual

09:06:24 16    activities that are set forth in TX 6.  Do you recall that?

09:06:27 17    A.      Yes.

09:06:28 18    Q.      Is the value of TX 6, this new technology development

09:06:35 19    document with respect to the individual activities or the

09:06:38 20    collection as a whole?

09:06:39 21    A.      The collection as a whole.

09:06:40 22    Q.      And would competitors find this process that's set

09:06:45 23    out in TX 6 to be valuable?

09:06:48 24    A.      Absolutely.

09:06:49 25    Q.      And based on your experience, would a company

Creviston - redirect

09:06:52  1    starting out find the document like TX 6 valuable as well?

09:06:56  2    A.      In particular, a company that's starting out because

09:07:01  3    it gives a big jump start on the maturity of the process

09:07:04  4    that we developed over a long period of time.

09:07:07  5                MR. MASTERS:  Thank you.  No further questions.

09:07:09  6                THE COURT:  Thanks very much.  And we're going

09:07:12  7    to let you step down.

09:07:14  8                Who will our next witness be.

09:07:16  9                MR. MASTERS:  Your Honor, Qorvo will next call

09:07:19 10    Dr. Robert Aigner.  Mr. DeFosse will do the examination.

09:07:24 11                THE COURT:  All right.  The witness will come

09:07:35 12    forward and be sworn.  Please come forward and raise your

09:07:50 13    right hand.

09:07:51 14                COURT CLERK:  Step right over here.  Please

09:07:56 15    remain standing and raise your right hand.  Please state and

09:08:00 16    spell your name for the record.

09:08:01 17                THE WITNESS:  My name is Robert Aigner.

09:08:04 18                COURT CLERK:  Spell your name for the record,

09:08:04 19    please.

09:08:07 20                THE WITNESS:  R-O-B-E-R-T, A-I-G-N-E-R.

09:08:14 21                ROBERT AIGNER, having been duly sworn was

09:08:18 22    examined and testified as follows:

09:08:26 23                THE COURT:  You may be seated.

09:08:28 24                MR. DeFOSSE:  Your Honor, I have binders of

09:08:30 25    exhibits for Dr. Aigner, which I would like to provide to

Aigner - direct

| | | |
|---|---|---|
| 09:08:36 | 1 | your staff and yourself. |
| 09:08:37 | 2 | THE COURT:  All right. |
| 09:08:43 | 3 | DIRECT EXAMINATION |
| 09:08:43 | 4 | BY MR. DeFOSSE: |
| 09:08:45 | 5 | Q.    Good morning, Dr. Aigner. |
| 09:08:47 | 6 | A.    Good morning. |
| 09:08:48 | 7 | Q.    Could you please introduce yourself to the jury? |
| 09:08:50 | 8 | A.    My name is Robert Aigner. |
| 09:08:55 | 9 | Q.    And where do you work, Dr. Aigner? |
| 09:08:57 | 10 | A.    I work at Qorvo in the Florida facility. |
| 09:09:01 | 11 | Q.    What's your position at Qorvo? |
| 09:09:03 | 12 | A.    I am a senior director of Research and Development. |
| 09:09:09 | 13 | Q.    How long have you worked at Qorvo? |
| 09:09:12 | 14 | A.    I have been there for eighteen years. |
| 09:09:14 | 15 | Q.    Where do you currently live? |
| 09:09:17 | 16 | A.    I live in Apopka, Florida, just west of Orlando. |
| 09:09:23 | 17 | Q.    Do you have family? |
| 09:09:24 | 18 | A.    I do.  I am married and have three daughters. |
| 09:09:29 | 19 | Q.    May I ask when you first joined Qorvo? |
| 09:09:32 | 20 | A.    I joined TriQuint, which became Qorvo, and I joined |
| 09:09:37 | 21 | in 2006. |
| 09:09:38 | 22 | Q.    What was your position at TriQuint in 2006? |
| 09:09:42 | 23 | A.    Initially I was the manager of a newly founded BAW |
| 09:09:48 | 24 | group. |
| 09:09:49 | 25 | Q.    And what were your responsibilities as the manager of |

Aigner - direct

09:09:51  1    that group?

09:09:53  2    A.      It was my responsibility to make BAW commercially

09:09:58  3    viable technology for the company, recruit raw talent, and

09:10:05  4    start researching processes to make it a commercial

09:10:09  5    technology.

09:10:10  6    Q.      How long did you serve as the manager of the BAW

09:10:13  7    research group?

09:10:15  8    A.      I served until 2019 in different functions.

09:10:22  9    Q.      Would you tell the jury how you first got involved in

09:10:24 10    working with BAW filter technology?

09:10:27 11    A.      I made my Ph.D. in micromechanical technologies in

09:10:34 12    Munich, Germany, and got hired by Infineon, a German

09:10:41 13    company.  The company was soon after becoming very

09:10:43 14    interested in creating RF filters, and I was the chosen

09:10:49 15    person to explore and lead this effort because I was the

09:10:54 16    only one with micro machining background and knowledge about

09:10:58 17    the radio frequency systems.

09:11:02 18    Q.      In what year did you earn your Ph.D.?

09:11:05 19    A.      It was in 1996.

09:11:08 20    Q.      When you first started working on BAW filter

09:11:12 21    technology, were there any BAW filters that were available

09:11:15 22    in the market?

09:11:16 23    A.      There were none in the broad market nor consumer

09:11:22 24    applications, there was one company that had deployed BAW

09:11:26 25    technology for military applications.

Aigner - direct

09:11:28  1    Q.      Where was that company located?

09:11:30  2    A.      In Oregon.

09:11:32  3    Q.      What was the name of that company?

09:11:33  4    A.      The name was TFR Technology.

09:11:37  5    Q.      Overall, how many years have you worked with BAW

09:11:41  6    filter technology?

09:11:42  7    A.      It's been a total of twenty-five years for me.

09:11:46  8    Q.      Have you received any patents related to BAW filter

09:11:50  9    technology?

09:11:50 10    A.      I have almost a hundred U.S. patents in this field.

09:11:56 11    Q.      Before we go any further, Dr. Aigner, I would like to

09:12:00 12    ask you to explain Qorvo's BAW filter technology for the

09:12:03 13    jury.   Could we start by explaining what a BAW filter is at

09:12:07 14    a high level?

09:12:08 15    A.      A BAW filter is a component that all of you have in

09:12:13 16    your smart phone that sorts out waves coming from the

09:12:17 17    antenna.   It let's the waves cross to represent your signal,

09:12:23 18    and it blocks all the waves that come from other cell phones

09:12:26 19    or microwave ovens, or any other nature of radio.

09:12:31 20    Q.      Are BAW filters found in any devices other than cell

09:12:35 21    phones?

09:12:35 22    A.      BAW filters can also be found in Wi-Fi routers, in

09:12:41 23    automotive applications, and in a number of other wireless

09:12:45 24    applications on the market.

09:12:47 25    Q.      How are BAW filters made?

Aigner - direct

09:12:53  1    A.        BAW filters are made in a semiconductor factory.  We

09:12:58  2    build on silicone wafers, layer by layer, microstructure

09:13:03  3    layers, and build on top of each other, until we have a

09:13:07  4    completed device.

09:13:10  5                  MR. DeFOSSE:  Your Honor, may I approach the

09:13:12  6    witness?

09:13:13  7                  THE COURT:  You may.

09:13:26  8    BY MR. DeFOSSE:

09:13:28  9    Q.    Dr. Aigner, I just handed you a demonstrative

09:13:31 10    exhibit.  Could you identify for the jury what I've handed

09:13:35 11    you?

09:13:36 12    A.        So what I have to show to you here is a silicone

09:13:42 13    wafer, eight inch, from our Texas factory, it's a BAW wafer.

09:13:49 14    And if you look very closely you're going to see a structure

09:13:53 15    and lines and columns.  Those are the BAW filters.  There is

09:13:57 16    a total of approximately 50,000 on one wafer this size.

09:14:04 17                  MR. DeFOSSE:  Your Honor, the demonstrative

09:14:07 18    Dr. Aigner is holding is little small, would it be okay if

09:14:10 19    he walks in front of the jury box?

09:14:12 20                  THE COURT:  That's okay.  Do we have -- we don't

09:14:14 21    have any other type of -- that's fine.  Are we going to mark

09:14:20 22    this as an exhibit?

09:14:21 23                  MR. DeFOSSE:  This is a demonstrative.

09:14:22 24                  THE COURT:  That's what I understood.

09:14:24 25                  It's a demonstrative, so you probably won't see

Aigner - direct

09:14:26  1    it again and you wouldn't see it in the jury room unless

09:14:29  2    it's marked as an exhibit.  Take a look.  Yes, sir, you may.

09:14:33  3              MR. DeFOSSE:  We would pass this around, Your

09:14:36  4    Honor, we're afraid it will break and cut someone.

09:14:40  5              THE COURT:  Don't do that.  We'll do it the way

09:14:43  6    you suggest.

09:14:45  7    BY MR. DeFOSSE:

09:14:45  8    Q.    Dr. Aigner, can you explain to the jury what it is

09:14:47  9    you're showing them on this wafer?

09:14:50 10    A.    If you look carefully, you see --

09:14:53 11              THE COURT:  Let's put a lapel mic there because

09:14:56 12    I'm watching to see who can hear.  Have you got one there?

09:15:02 13              MR. DeFOSSE:  Dr. Aigner, if you could step back

09:15:04 14    for just a second.  We're going to get you mic'd up.

09:15:16 15              THE COURT:  The courtroom is a little

09:15:18 16    complicated folks.  I think we can go ahead and try, if

09:15:21 17    somebody cannot hear, they just need to raise their hand.

09:15:25 18              THE WITNESS:  You can see small structures on

09:15:27 19    here, the typical small instruction represent one BAW,

09:15:31 20    they're about the size of a grain of sand, like a millimeter

09:15:35 21    by a millimeter, therefore a wafer like this, you are going

09:15:39 22    to find 50,000.

09:15:49 23    Q.    Dr. Aigner, once you return that to its case?

09:15:53 24              MR. DeFOSSE:  Your Honor, may I approach?  I

09:15:55 25    have another demonstrative.

Aigner - direct

09:15:56  1          THE COURT:  You may.  Sure.

09:16:09  2  A.      So once we have completed the wafer, it gets sent

09:16:14  3  down and then we have by a precision laser machine that cuts

09:16:19  4  it into small pieces, those small pieces are assembled on a

09:16:24  5  laminate strip.  A laminate strip is kind of the carrier on

09:16:28  6  which we deliver the product to the customer.  That's what

09:16:31  7  you're going to find when cut in small pieces, again, in

09:16:35  8  your phones.

09:16:35  9          If you look here, you see those silver really

09:16:40 10  small things on there.  This is individual BAW dies, chips,

09:16:46 11  they're about the size of a square millimeter.  As we can

09:16:53 12  see.  So that's our filter.  You can hand it around if you

09:17:09 13  want.

09:17:12 14  Q.      Thank you, Dr. Aigner.

09:17:16 15          THE COURT:  We'll wait until everybody has

09:17:18 16  looked and then we'll collect it.  This is another

09:17:21 17  demonstrative, though?

09:17:22 18          MR. DeFOSSE:  This is another demonstrative,

09:17:23 19  Your Honor.  And Your Honor, while they're doing that,

09:17:35 20  perhaps, we have not numbered these, but maybe we should

09:17:38 21  assign a letter for identification.

09:17:39 22          THE COURT:  I think we should.  We'll give

09:17:42 23  demonstrative A and demonstrative B, that means you won't

09:17:47 24  see them again unless they're used as demonstratives, unless

09:17:50 25  they're received and given a number, demonstratives A and B.

Aigner - direct

09:17:56  1    Thank you.

09:17:56  2            MR. DeFOSSE:  Thank you, Your Honor.

09:17:57  3    BY MR. DeFOSSE:

09:17:58  4    Q.    Thank you, Dr. Aigner.  So you have now shown the

09:18:01  5    jury an example of what a BAW filter looks like in a wafer

09:18:05  6    and on a laminate strip.  Could you explain to the jury what

09:18:10  7    the difference is between a BAW filter and a BAW resonator?

09:18:16  8    A.    So a BAW filter requires several BAW resonators to

09:18:22  9    work.  A resonator is the basic building block.  And you can

09:18:26 10    think of a resonator as a string of a guitar.  You pick it

09:18:32 11    and it will vibrate at a certain frequency.  That's also

09:18:36 12    what BAW resonators do, but at a much, much higher

09:18:40 13    frequency.  But it's important to understand that it's very

09:18:45 14    frequency selective.  And you put several of the resonators

09:18:49 15    together in the right configuration, ten, maybe twenty,

09:18:53 16    depending on the filter type, and you can create a filter

09:18:57 17    that let's certain waves pass and others will be rejected

09:19:02 18    all based on frequency.

09:19:04 19    Q.    And each of the BAW filters that you were showing a

09:19:09 20    moment ago, how many resonators are there?

09:19:11 21    A.    There could be between ten and twenty depending on

09:19:16 22    the case.

09:19:17 23            MR. DeFOSSE:  Could I ask Mr. Buchbinder to pull

09:19:20 24    up PDX 2.3.

09:19:24 25    BY MR. DeFOSSE:

Aigner - direct

09:19:25  1    Q.      Dr. Aigner, can you explain what is shown on this

09:19:30  2    slide?

09:19:32  3    A.      Yes.  So what you saw on this laminate strip, the

09:19:38  4    little gray things that's shown on the left image here

09:19:42  5    turned around.  So this is the side where the actual

09:19:45  6    resonators are located, we have this grayish polygons here

09:19:51  7    and there are about ten of them.  Each of the resonators is

09:19:55  8    built up of a piezo layer, with a top and a bottom

09:20:03  9    electrode.

09:20:03  10   Q.      Can you point where the piezo layer is on the top and

09:20:08  11   bottom of the demonstrative?

09:20:09  12   A.      It is the greenish material is the piezo layer, the

09:20:19  13   top, the gray layer is the layer on the bottom, this is

09:20:23  14   basically the engine of the resonator, this is what drives

09:20:27  15   the resonator, this is what picks the string.  And piezo

09:20:31  16   materials have the property that they can transform

09:20:37  17   electrical signal into deformation and vice versa, that's

09:20:42  18   how we create the vibrations and how we pick them up again

09:20:47  19   to create a signal that goes on in your phone.

09:20:52  20   Q.      As part of your responsibilities at Qorvo, have you

09:20:55  21   analyzed SMR resonators?

09:20:59  22   A.      Yes, I have.

09:21:00  23   Q.      What is an SMR resonator?

09:21:03  24   A.      SMR stands for solidly mounted resonator.  It's a

09:21:08  25   solidly mounted resonator, what I just showed, the engine of

09:21:13 1    the resonator, the resonating film, it sits on solid layers.

09:21:20 2    So one of the criteria is that we want it to resonate

09:21:27 3    freely, not getting damped and the layers are constructed

09:21:31 4    such that there is no damping occurring, virtually no

09:21:36 5    damping.

09:21:36 6    Q.    Mr. Buchbinder, can we pull PDX 2.3 up again.

09:21:40 7          And Dr. Aigner, could you point out in PDX 2.3

09:21:44 8    what are the layers that you are saying sit on top of a

09:21:48 9    solid layer?

09:21:48 10   A.    The bottom electrode, the gray layer in the middle

09:21:52 11   picture, below that bottom electrode, you have layers that

09:21:57 12   will allow the structure to freely vibrate.

09:22:01 13   Q.    Have you also analyzed FBAR resonators as part of

09:22:06 14   your work at Qorvo?

09:22:08 15   A.    Yes, I have.

09:22:09 16   Q.    In what context?

09:22:10 17   A.    Well our main competitors are using FBAR, Broadcom is

09:22:15 18   our biggest competitor, Skyworks is another competitor also

09:22:20 19   using FBAR.  So we look around for what other companies do

09:22:24 20   all the time to understand the differences in our

09:22:27 21   performance and in their performance.  But there is really

09:22:31 22   none.

09:22:31 23         We compete for the same slots of the major BAW

09:22:35 24   manufacturers, the ones in California, typically, and we do

09:22:41 25   the same, we apply the same principals, we do the same -- we

Aigner - direct

09:22:46 1    apply to the same markets.

09:22:49 2    Q.    Dr. Aigner, when did Broadcom first introduce FBAR

09:22:54 3    type resonators into the market?

09:22:55 4    A.    Broadcom did that in 2001, 2002 time frame.

09:23:02 5    Q.    FBAR resonators are not a technology that Akoustis

09:23:05 6    invented, right?

09:23:06 7    A.    No, not at all.

09:23:08 8    Q.    Are SMR resonators and FBAR resonators different

09:23:14 9    types of technology?

09:23:15 10   A.    No, they're not, they're using the same principle to

09:23:19 11   drive the resonates to create the engine of your resonator

09:23:23 12   that just a different implementation of how you keep the

09:23:28 13   wave of the resonators from being passed into the substrate.

09:23:32 14   Q.    I would like to return now to when you joined

09:23:37 15   TriQuint in 2006.

09:23:39 16         What was the status of BAW filter technology at

09:23:42 17   TriQuint at that time?

09:23:43 18   A.    TriQuint had just acquired the startup TFR

09:23:50 19   Technologies in Bend, Oregon.  They had a more than ten-year

09:23:55 20   history of doing BAW filter for military applications, so

09:23:58 21   when we started, we had some foundation and we made it a

09:24:02 22   commercially viable process in the following years.

09:24:06 23   Q.    And when were you able to achieve the

09:24:09 24   commercialization of a BAW filter at TriQuint?

09:24:13 25   A.    Yes, we did.

Aigner - direct

09:24:14  1    Q.      And what year?

09:24:15  2    A.      In 2010 we had our major launch in one of the

09:24:25  3    iPhones, the first two or three generations.

09:24:29  4    Q.      And what frequency range did that product work in?

09:24:33  5    A.      At that time, the most important frequency was

09:24:38  6    1.9-gigahertz.

09:24:40  7    Q.      At the time you had arrived at TriQuint in 2006, had

09:24:45  8    the company acquired any BAW filter technology before your

09:24:51  9    arrival?

09:24:52 10    A.      TriQuint had acquired TFR Technologies back in 2004.

09:25:00 11    Q.      That was the company that was in Oregon that you

09:25:03 12    mentioned earlier?

09:25:04 13    A.      That's right, yes.

09:25:05 14    Q.      From the time that TriQuint and its predecessor

09:25:09 15    started to research BAW filter technology until the time

09:25:11 16    that the company launched its first BAW filter product, how

09:25:15 17    long did it take?

09:25:15 18    A.      There was close to twenty years.

09:25:19 19    Q.      Why did it take twenty years?

09:25:21 20    A.      It's complicated technology.  There was no tool

09:25:29 21    available to do the depositions for the layers required and

09:25:33 22    there are many, many elements that you need to get just

09:25:36 23    right to make it work.

09:25:38 24    Q.      Did TriQuint continue to develop BAW filter products

09:25:42 25    after that first iPhone product was introduced in 2010?

Aigner - direct

09:25:46  1    A.      Yes, we did.

09:25:48  2    Q.      And can you remind the jury when TriQuint merged with

09:25:53  3    RFMD to form Qorvo?

09:25:55  4    A.      We merged with RFMD at the end of 2015.

09:25:59  5    Q.      So between 2010 and 2015, how many BAW filter

09:26:03  6    products did TriQuint develop?

09:26:06  7    A.      We developed approximately a hundred products in that

09:26:11  8    time frame before the merger.

09:26:13  9    Q.      As of 2015, how many BAW filters had TriQuint sold?

09:26:20 10    A.      At that time, I estimate we had sold about 10 billion

09:26:26 11    BAW filters to the markets in approximately 2 or 3 billion

09:26:33 12    individual products because there can be more than one

09:26:36 13    filter in one product.

09:26:40 14    Q.      After TriQuint and RFMD merged to form Qorvo, did you

09:26:45 15    retain responsibility for the BAW filter research program?

09:26:48 16    A.      Yes, I did.

09:26:49 17    Q.      Until when?

09:26:50 18    A.      Until spring 2019.

09:26:54 19    Q.      Between 2015 and 2019, how many BAW filter products

09:26:58 20    did Qorvo launch?

09:27:01 21    A.      Well, the activity ramped up significantly.  We

09:27:06 22    estimate we launched another 200 products in this time

09:27:10 23    frame.

09:27:10 24    Q.      As of 2016, the company had more than twenty years

09:27:14 25    experience in developing BAW filters?

Aigner - direct

09:27:16  1    A.      That's correct, yes.

09:27:17  2    Q.      And at that time with twenty years of experience in

09:27:20  3    developing BAW filters, how long did Qorvo estimate it would

09:27:24  4    take to develop a new BAW filter product?

09:27:27  5    A.      Well, developing a new generation of process,

09:27:31  6    deploying it to product development and ramping is typically

09:27:35  7    a four to five-year time frame for us.

09:27:38  8    Q.      And that was for Qorvo, even with twenty years of

09:27:42  9    experience?

09:27:42 10    A.      That's right, yes.

09:27:44 11    Q.      How much money did TriQuint and Qorvo invest in the

09:27:48 12    research and development of BAW filters?

09:27:52 13    A.      A rough estimate would be in excess of $1 billion

09:27:56 14    total.

09:27:59 15    Q.      Did Qorvo develop any trade secrets related to BAW

09:28:03 16    filters during your time as the head of the BAW research

09:28:07 17    group?

09:28:07 18    A.      Yes, we certainly did.

09:28:08 19    Q.      Generally speaking, what role did trade secrets play

09:28:12 20    at Qorvo?

09:28:13 21    A.      Trade secrets play a big role because not everything

09:28:17 22    that we do can be reverse engineered or can be patented.

09:28:23 23    Some things are just not visible on the final product, but

09:28:27 24    they are very important to success.  So we keep those as a

09:28:31 25    trade secret.

Aigner - direct

09:28:32  1    Q.      Did you receive any training on how to handle trade

09:28:35  2    secrets at Qorvo?

09:28:36  3    A.      Yes, we did.

09:28:38  4    Q.      And do the employees who work for you receive

09:28:41  5    training on how to handle trade secrets?

09:28:43  6    A.      Yes.  Everybody -- everybody signs for a

09:28:47  7    confidentiality at the time they join the company and we

09:28:50  8    also mark documents confidential.  We do not share within

09:28:56  9    the company, you're only going to see documents you need to

09:29:01 10    know about, not everybody can see everything.  We do use

09:29:04 11    passwords, we are very careful not to spill out our secrets

09:29:10 12    to anyone.

09:29:13 13    Q.      At what point did Qorvo implement those steps to

09:29:17 14    protect its trade secrets?

09:29:18 15    A.      They were in place even before Qorvo existed, so they

09:29:22 16    were in place back down to 2006.

09:29:27 17            MR. DeFOSSE:  Your Honor, I am now going to move

09:29:29 18    on to the trade secret portion of my examination of

09:29:32 19    Dr. Aigner, so I would ask, I think the courtroom does not

09:29:35 20    have anyone.

09:29:36 21            THE COURT:  Yes, if anyone is not affiliated

09:29:39 22    with the firms they need to be excused.  That includes

09:29:47 23    executives, there might be some executives who need to be

09:29:51 24    excused.  Seeing as no one falls into that category, this is

09:29:55 25    all of course confidential.  And I don't think you'll be

Aigner - direct

09:30:00  1   able to use it anywhere else, but don't ever try it.

09:30:05  2   BY MR. DeFOSSE:

09:30:06  3   Q.    Dr. Aigner, now I would like to discuss some of the

09:30:10  4   Qorvo trade secrets at issue in this case.  Have you been

09:30:12  5   involved in identifying the trade secrets that Qorvo alleges

09:30:15  6   that Akoustis to have misappropriated?

09:30:18  7   A.    Yes.

09:30:19  8   Q.    Could I ask that PDX 2.4 be brought up,

09:30:25  9   Mr. Buchbinder.

09:30:26 10         Dr. Aigner, can you tell the jury what's

09:30:30 11   reflected in exhibit, demonstrative Exhibit 2.4?

09:30:35 12   A.    This lists the groups of trade secrets that we have

09:30:39 13   identified.

09:30:40 14   Q.    And how many groupings of trade secrets has Qorvo

09:30:44 15   identified in this case?

09:30:45 16   A.    There are eight groups, each of them having multiple

09:30:49 17   trade secrets in them.

09:30:51 18   Q.    Dr. Aigner, I would like to ask you questions today

09:30:54 19   about groups 2, 3, 4, and 6.  And I am going to start with

09:31:01 20   group 2.

09:31:02 21         What involvement have you had with the design of

09:31:06 22   BAW filters and resonators at Qorvo?

09:31:10 23   A.    That was my responsibility.  My group did that work.

09:31:14 24   Q.    Mr. Buchbinder, can I ask you to pull up

09:31:18 25   demonstrative Exhibit 2.6.

Aigner - direct

09:31:20  1            Dr. Aigner, could you explain to the jury what's

09:31:27  2    reflected in demonstrative 2.6?

09:31:31  3    A.      For group two, which covers BAW filter and resonator

09:31:36  4    designs, we list all the trade secrets that we identified.

09:31:41  5    Q.      Can you tell the jury at a high level what is the

09:31:45  6    nature of the information in the trade secret group 2?

09:31:49  7    A.      As I explained earlier, the BAW resonator is the

09:31:53  8    fundamental building block, the engine of our devices.  And

09:31:58  9    the research into how this engine can be optimized is of

09:32:02 10    crucial importance to us, along with when you have the

09:32:06 11    engine, how you use it to create filters.  And that's

09:32:10 12    described in most of the documents here.

09:32:12 13            Furthermore, there is measurement data in there.

09:32:18 14    There is also what we call roadmap data in there.  Roadmap

09:32:23 15    for us is how we plan our future technologies which is

09:32:27 16    crucial information and very secret for us.

09:32:31 17            MR. DeFOSSE:  Your Honor, may I approach the

09:32:33 18    witness?

09:32:33 19            THE COURT:  You may.

09:32:50 20    BY MR. DeFOSSE:

09:32:51 21    Q.      Dr. Aigner, I have handed you what's been marked for

09:32:54 22    identification as PTX 0078.  Do you recognize this document?

09:33:00 23    A.      Yes.

09:33:01 24    Q.      What is it?

09:33:03 25    A.      This is research and engineering document relating to

Aigner - direct

09:33:10  1   resonator designs for 5-gigahertz resonators.

09:33:14  2             MR. DeFOSSE:  Your Honor, we would offer

09:33:17  3   PTX-0078 into evidence.

09:33:18  4             THE COURT:  Marked and received as 8 in the

09:33:21  5   case.

09:33:21  6             (Trial Exhibit No. 8 was admitted into

09:33:22  7   evidence.)

09:33:22  8   BY MR. DeFOSSE:

09:33:24  9   Q.     Thank you Mr. Buchbinder.

09:33:26 10            Does --

09:33:30 11            MR. DeFOSSE:  Sorry, Your Honor, what exhibit

09:33:31 12   number was this?

09:33:33 13            THE COURT:  This should be 8.  I think all of

09:33:43 14   you know you may see both numbers, but these are sequential

09:33:47 15   so.

09:33:51 16   BY MR. DeFOSSE:

09:33:52 17   Q.     Dr. Aigner, does Exhibit 8, 5G polygons versus

09:33:56 18   rectangles, contain any of the trade secrets that Qorvo

09:34:03 19   contends were taken?

09:34:03 20   A.     Yes, it does.

09:34:04 21   Q.     Mr. Buchbinder, can I ask you to pull up along side

09:34:04 22   Exhibit 8, PDX 2.8.

09:34:10 23            Dr. Aigner, if you could look at PDX 2.8.  Could

09:34:13 24   you tell the jury what's reflected on that slide?

09:34:16 25   A.     This reflects the research we have done into

09:34:21  1    resonator shapes to optimize performance of our resonators.

09:34:25  2    Q.      Does Qorvo consider its research into the

09:34:29  3    relationship between resonator shape and performance to be a

09:34:32  4    trade secret?

09:34:32  5    A.      Yes, we do.

09:34:33  6    Q.      And is that trade secret contained in Exhibit 8?

09:34:36  7    A.      Yes, it is.

09:34:38  8    Q.      Could you identify for the jury where Qorvo's

09:34:41  9    research into the resonator shape and performance is

09:34:44 10    reflected in Exhibit 8?

09:34:46 11    A.      If we look at page 4, this is engineering and

09:34:55 12    research documentation and █████████████████████████

09:35:01 13    ████████████████████████████████████████████████████

09:35:06 14    ██████████████████████████████████████████

09:35:11 15    █████████████████████████████████████████████

09:35:19 16    ████████████████████████████████████████████████████

09:35:23 17    ██████████████████████████████████████████████

09:35:26 18    ██████████████████████████████████

09:35:29 19    █████████████████    That's not obvious.  That's what we

09:35:34 20    consider a trade secret.

09:35:35 21    Q.      What is the value of this research shown on slide 4

09:35:40 22    of Exhibit 8 to competitors in this industry?

09:35:44 23    A.      So you see this slide ████████████████████████

09:35:50 24    ████████████████████████████████████████████████████

09:35:54 25    ████████████████████████████████████████████████████

Aigner - direct

09:35:59  1  ████████████████████████████████████████

09:36:03  2  ████████████████████████████████████████

09:36:07  3  ████████████████████████████████████████

09:36:13  4  ██████████████████████ and the method we have

09:36:19  5  derived to do that we have considered a trade secret.

09:36:22  6  Q.     Does the research into resonator shape reflected in

09:36:26  7  Exhibit 8 apply to FBAR resonators?

09:36:30  8  A.     Yes, it applies the same way, the same methods, the

09:36:33  9  same physical principles apply and the same methods.

09:36:37  10  Q.     Is Qorvo's research into resonator shape generally

09:36:40  11  known in the industry?

09:36:42  12  A.     No, it's not.  The methods we have derived to analyze

09:36:48  13  are proprietary to Qorvo.

09:36:51  14  Q.     Are the methods that Qorvo uses to assess resonator

09:36:55  15  shape maintained as confidential at the company?

09:36:58  16  A.     They are.

09:36:59  17  Q.     And is there anyway that a person would know that by

09:37:03  18  looking at Exhibit 8?

09:37:05  19  A.     Yeah.  On the bottom of the slide you see the

09:37:08  20  marking, confidential and proprietary information, that

09:37:12  21  you're going to see on many of our engineering presentations

09:37:18  22  so that we consider trade secrets.

09:37:20  23  Q.     Did you learn as part of this lawsuit that Akoustis

09:37:23  24  obtained a copy of Exhibit 8?

09:37:26  25  A.     Yes, we learned that.

Aigner - direct

09:37:27  1   Q.      Did Akoustis have authorization to have Exhibit 8?

09:37:31  2   A.      No.

09:37:34  3              MR. DeFOSSE:  Your Honor, may I approach the

09:37:36  4   witness?

09:37:36  5              THE COURT:  You may.

09:37:52  6   BY MR. DeFOSSE:

09:37:57  7   Q.      Dr. Aigner, I have handed you what's been marked for

09:38:01  8   identification as PTX 0149.  Do you recognize this document?

09:38:05  9   A.      Yes, I do.

09:38:06 10   Q.      What is it?

09:38:08 11   A.      This is an engineering presentation detailing the

09:38:13 12   steps that need to be taken for the design of the

09:38:16 13   5-gigahertz filter.

09:38:19 14              MR. DeFOSSE:  Your Honor, we would offer PTX

09:38:23 15   0149 into evidence.

09:38:24 16              THE COURT:  Marked and received as 9.

09:38:25 17              (Trial Exhibit No. 9 was admitted into

09:38:29 18   evidence.)

09:38:29 19              THE COURT:  A lot of these are marked for

09:38:31 20   attorneys' eyes only, so we're still in the confidential

09:38:34 21   area.

09:38:34 22              MR. DeFOSSE:  Yes.  And I would say, Your Honor,

09:38:37 23   the rest of my examination of Dr. Aigner will be the same.

09:38:40 24              THE COURT:  That's what I understand.

09:38:42 25              MR. DeFOSSE:  Thank you.

Aigner - direct

09:38:42  1              THE COURT:  I don't have anybody in the

09:38:44  2      courtroom, though, who is inappropriate as I understand it.

09:38:48  3              MR. DeFOSSE:  Yes, I believe that's the case,

09:38:50  4      Your Honor.

09:38:51  5      BY MR. DeFOSSE:

09:38:51  6      Q.      Dr. Aigner, could you explain to the jury at a high

09:38:55  7      level what is the significance of Exhibit 9 that's just been

09:38:59  8      handed to you?

09:39:00  9      A.      Exhibit 9 describes in very significant detail how

09:39:05 10      you go from a resonator to a filter, what steps you need to

09:39:09 11      take, what methods you need to apply, what simulations we do

09:39:13 12      and how we put that on an experimental wafer that I showed

09:39:20 13      you before.  Think of it as a cookbook that shows you all

09:39:24 14      the steps you need to take until you have a completed dish.

09:39:28 15      Q.      And does Qorvo share this cookbook with its

09:39:33 16      competitors?

09:39:33 17      A.      No, we do not.

09:39:34 18      Q.      Does this cookbook contain any of the trade secrets

09:39:38 19      in group two?

09:39:39 20      A.      Yes, it does.

09:39:40 21      Q.      Mr. Buchbinder, if I could ask you to pull up PTX 2.9

09:39:46 22      alongside Exhibit 9.

09:39:47 23              Dr. Aigner, can you explain for the jury what's

09:39:50 24      shown on PDX 2.9, the left-hand side there?

09:39:55 25      A.      This exhibit we identified trade secrets related to

Aigner - direct

09:40:00  1    designing of 5-gigahertz filter.

09:40:04  2    Q.      The first trade secret listed on PDX 2.9 is expected

09:40:09  3    product specifications.  Do you see that?

09:40:11  4    A.      Yes.

09:40:11  5    Q.      Can you show me where in Exhibit 9 that trade secret

09:40:16  6    is found?

09:40:17  7    A.      If you go to page 3.

09:40:23  8    Q.      And what is the nature of the information shown here

09:40:27  9    on page 3?

09:40:28 10    A.      Page 3 describes in detail what the filter we design

09:40:35 11    is supposed to do, how it's going to work, what performance

09:40:39 12    it's going to have.  And there is information in there that

09:40:42 13    requires significant system know-how.  For example, the

09:40:49 14    attenuation, the frequency ranges, so it really shows what

09:40:52 15    we were aiming for, what kind of product we make, and how

09:40:56 16    it's important to the customer.  None of this information

09:41:00 17    would be public at the time this -- at the stage where this

09:41:05 18    development was.

09:41:06 19    Q.      What would be the value of this information to

09:41:09 20    Qorvo's competitors?

09:41:11 21    A.      It would significantly reduce the time a competitor

09:41:15 22    needs to evaluate and start researching a competing part.

09:41:19 23    Q.      And why is that?

09:41:22 24    A.      Because they would exactly know what to aim for.

09:41:27 25    They would have more information than we had when we started

Aigner - direct

09:41:31  1    this activity.

09:41:32  2    Q.    Is the information reflected on slide 3 relevant to

09:41:37  3    SMR resonators?

09:41:38  4    A.    Yes, it is.

09:41:39  5    Q.    Is it relevant to FBAR resonators?

09:41:42  6    A.    Absolutely.  We work on the same customer specs,

09:41:48  7    there is no difference if it's an FBAR or SMR, we work for

09:41:53  8    the same performance specs for the customer, they're

09:41:56  9    interchangeable.

09:41:57  10   Q.    Mr. Buchbinder, can I ask you to return to PDX 2.9?

09:42:03  11          The next item on the trade secret list, 2.3 is

09:42:08  12   respected circuit layout, schematic, and simulations.  Could

09:42:13  13   you explain at a high level what circuit layout, schematics,

09:42:18  14   and simulations are to the jury?

09:42:20  15   A.    So when you have your resonator, you need to group it

09:42:23  16   and connect it to create the filter.  Ten, twenty

09:42:28  17   resonators, typically.  How you do that is very specific to

09:42:31  18   the filter.  There are many tricks of the trade.  And all of

09:42:36  19   that is described in here.  So circuit layout will look at

09:42:42  20   one in a minute, but that tells you how the different

09:42:45  21   elements in your filters are connected to each other.

09:42:48  22          The layout is kind of the top down view showing

09:42:53  23   how its, the resonators are placed, how they're physically

09:42:58  24   locates in order of the filter chip.  And the simulations

09:43:01  25   show you how we make a prediction of the performance of the

Aigner - direct

09:43:05  1    filter and optimize it before we even manufacture it.

09:43:09  2    Q.      Dr. Aigner, could you actually show the jury or

09:43:12  3    identify for the jury where the circuit layout, schematics,

09:43:17  4    or simulations are found in Exhibit 9?

09:43:22  5    A.      On page 14.

09:43:27  6    Q.      And what is shown on page 14?

09:43:29  7    A.      On page 14, that's what we call a layout.  So that's

09:43:32  8    one filter chip, size approximately one millimeter by a

09:43:38  9    millimeter, what I demonstrated with the laminate strip.

09:43:44 10    This is the drawing basically that we need to manufacture

09:43:46 11    it.  It shows in detail where the resonators are located, it

09:43:50 12    shows how large the resonators are, and a few other things

09:43:56 13    that are related to the resonator performance.

09:43:59 14    Q.      What is the frequency band of the filter that's shown

09:44:03 15    here on slide 14?

09:44:04 16    A.      That's a 5-gigahertz filter.

09:44:06 17    Q.      What was the year in which Qorvo created this

09:44:10 18    research presentation?

09:44:11 19    A.      That was in late 2015.

09:44:15 20    Q.      2015.

09:44:17 21            Could you show us where there is a schematic in

09:44:20 22    Exhibit 9?

09:44:21 23    A.      On the following page 15.  So this is a circuit

09:44:32 24    schematic, now the resonators, you don't know their location

09:44:36 25    but you know how they're electrically connected to each

Aigner - direct

09:44:38  1   other.  There are a total of ten resonators in this filter,

09:44:43  2   along with some other components, and then ███████████

09:44:47  3   ██████████████████████████████████████████████████████

09:44:54  4   ███████████████████.

09:44:55  5   Q.    Can you identify for the jury where the simulations

09:44:59  6   are found in Exhibit 9?

09:45:01  7   A.    There is one in -- on page 16.  So simulation is

09:45:13  8   prediction of how this filter will perform before we have

09:45:17  9   measured the data.  So we can see what needs to be

09:45:22 10   optimized, where we would fall short or where we can

09:45:26 11   improve.

09:45:26 12          And  ████████████████████████████████████████

09:45:33 13   ███████████████████████████████████████████████████████

09:45:40 14   █████████████████████████████████████████████████████

09:45:43 15   █████████████████████████████████████████████████████

09:45:46 16   ████████████████████████████████, those are included

09:45:49 17   here, that's what we do with electromagnet specific

09:45:54 18   simulation.

09:45:55 19   Q.    Are the circuit layouts, schematics, and simulations

09:46:00 20   that we just looked at on page 14, 15 and 16 of Exhibit 9

09:46:04 21   something a competitor could obtain from publicly available

09:46:08 22   information?

09:46:08 23   A.    No, they could not.

09:46:09 24   Q.    Was the filter that reflected in those exhibits

09:46:12 25   available for purchase in 2015?

Aigner - direct

09:46:14  1    A.      No, it was not.

09:46:15  2    Q.      What would be the value to a competitor of obtaining

09:46:19  3    the information that we just looked at on pages 14, 15, and

09:46:22  4    16?

09:46:23  5    A.      They would immediately understand what Qorvo filters

09:46:29  6    is capable of, and they would get the cookbook of how to do

09:46:33  7    the same thing, it would be of tremendous importance to them

09:46:38  8    to speed up, catching up with us in the same application.

09:46:42  9    Q.      Are the schematics, simulations, and layouts that we

09:46:48  10   just looked at on those slides relevant to both SMR and FBAR

09:46:53  11   filters?

09:46:53  12   A.      Yes, they absolutely are, there is no difference

09:46:56  13   whatsoever, circuit, schematics, the layouts, the same rules

09:47:01  14   apply to those technologies.

09:47:03  15   Q.      Are Mr. Buchbinder, if we could go back to PDX 2.9?

09:47:09  16   2.9 is filter trimming, parameters analysis.

09:47:13  17           Could you identify for the jury where that

09:47:14  18   information is found on Exhibit 9?

09:47:16  19   A.      It's found on page 17.

09:47:19  20   Q.      And at a high level, what is the significance of this

09:47:22  21   information on page 17?

09:47:24  22   A.      So when we talk about trimming, this is a method we

09:47:29  23   have to use to fine adjust the frequency of our filter.  You

09:47:34  24   can think of it like tuning your guitar before you play with

09:47:38  25   a group.  They need to be in tune.  And we do the trimming

Aigner - direct

09:47:44  1    by shaving off tiny amounts of material from the top

09:47:48  2    surface, we change the mass, we change the frequency at

09:47:51  3    which it vibrates.

09:47:52  4    Q.    When you say tiny amounts of material, what do you

09:47:56  5    mean?

09:47:56  6    A.    That can be just a few layers of atoms.

09:48:00  7    Q.    A few layers of atoms?

09:48:02  8    A.    Yes.

09:48:02  9    Q.    Is that a change that's visible to the naked eye?

09:48:06 10    A.    No, it's not.  But it's remarkably important for the

09:48:10 11    frequency of our devices, in particular 5-gigahertz.

09:48:14 12    Q.    Is the information that is shown on page 17 of

09:48:19 13    Exhibit 9 something that's publicly available?

09:48:22 14    A.    No, it's not.

09:48:22 15    Q.    Does Qorvo maintain this information as confidential?

09:48:25 16    A.    Yes, we do.

09:48:26 17    Q.    Why?

09:48:27 18    A.    Because there is no way a competitor could tell from

09:48:30 19    looking at our product how we exactly did this.  And it's

09:48:35 20    important to our performance to do that, moreover, it's

09:48:40 21    important to what we call manufacturing yield.  If you don't

09:48:45 22    do trimming, we throw away most of our filters because they

09:48:49 23    don't meet the specifications.  If we do trimming, we can

09:48:53 24    correct for slight manufacturing variations and get nearly

09:48:57 25    all the filters that are on a wafer to work for us, and to

Aigner - direct

09:49:02  1    be a product we can sell.

09:49:04  2    Q.      Is the information reflected on page 17 of Exhibit 9

09:49:07  3    relevant to both SMR and FBAR resonators?

09:49:11  4    A.      Yes, it is.  Trimming is something that works on the

09:49:14  5    very top of the resonator, where there is no difference

09:49:17  6    between FBAR and SMR resonators in how they react to

09:49:22  7    removing a few atoms of material, they're exactly the same

09:49:27  8    method applied.

09:49:28  9    Q.      Mr. Buchbinder, if could go back to exhibit PDX 2.9.

09:49:33 10            Dr. Aigner, 2.5 on this list is tile

09:49:39 11    information.  Can you show the jury where Qorvo's trade

09:49:43 12    secret related to tile information is found in Exhibit 9?

09:49:46 13    A.      It's found on page 19.

09:49:51 14    Q.      And at a high level, what is tile information?

09:49:54 15    A.      So if you remember, I showed you the wafer.  On the

09:50:00 16    wafer, you saw rows and columns.  And about the size of a

09:50:06 17    thumbnail, that's one tile.  In one tile, we place the

09:50:11 18    individual filters.  So it's basically like in your bathroom

09:50:15 19    where the tiles repeat itself, we do the same during

09:50:19 20    manufacturing of our wafers, the structure and the printing

09:50:23 21    is basically we print in tiles, there are approximately

09:50:27 22    hundred tiles printed on a wafer.  And within one tile, you

09:50:32 23    have filters, those would be that on the left row and in the

09:50:36 24    middle row there are filters.  Then there is a number of

09:50:39 25    other structures that we use for research to optimize

Aigner - direct

09:50:45  1    performance to make sure that we understand the process

09:50:48  2    fully and that we can repeat the process if needed.  Those

09:50:54  3    would never be shipped even if the part is in production,

09:50:57  4    only the filters would be shipped, not the other structures

09:51:01  5    that are included in the tile.

09:51:02  6    Q.     Does Qorvo consider its tile information to be a

09:51:06  7    trade secret?

09:51:06  8    A.     Yes, we do.

09:51:07  9    Q.     Why?

09:51:08 10    A.     Because the other structures that are placed on a

09:51:12 11    tile, they are a result of ten years of learning how to do

09:51:17 12    this.  There is some know how involved in understanding what

09:51:23 13    structures you will need and what structures you benefit

09:51:27 14    from to improve your performance and to get more information

09:51:31 15    than you get with just measuring filters.

09:51:34 16    Q.     What is the value of this tile information to Qorvo's

09:51:37 17    competitors?

09:51:38 18    A.     It would apply to our competitors in the same way,

09:51:41 19    understanding what structures are useful in the research

09:51:44 20    phase, what structures are useful to control your process

09:51:48 21    more tightly, those things are important to everybody.

09:51:52 22    Q.     Mr. Buchbinder, if we could return to PDX 2.9?

09:51:56 23           Dr. Aigner, next on the list, 2.6 is

09:52:00 24    electromagnetic modeling assumptions.  Can you show the jury

09:52:06 25    with those are found in Exhibit 9?

Aigner - direct

09:52:09  1    A.        Pages 24 and 25, but let's go to 24.

09:52:16  2    Q.        And what is shown on page 24 of Exhibit 9?

09:52:20  3    A.        So I touched on that before. ███████████

09:52:26  4    ████████████████████████████████████████████████████

09:52:31  5    ████████████████████████████████████████████████

09:52:34  6    ███████████████████████████████████████ That's

09:52:39  7    done with electromagnetic simulations.  The principle of

09:52:44  8    electromagnetic simulations are known, but the methods we

09:52:49  9    apply to the filters and our values is not known and there

09:52:52 10    is significant know how that is put into that to understand

09:52:55 11    and to get good predictions.

09:52:57 12    Q.        Are Qorvo's electromagnetic modeling assumptions

09:53:02 13    publicly available?

09:53:03 14    A.        No, they are not.

09:53:04 15    Q.        Do you hold those as trade secrets?

09:53:05 16    A.        Yes, we do.

09:53:07 17    Q.        Would they be valuable to your competitors?

09:53:11 18    A.        Yes.

09:53:11 19    Q.        Are Qorvo electromagnetic modeling assumptions

09:53:17 20    applicable to both FBAR and SMR?

09:53:21 21    A.        Yes, with we talk about both of our packages, it's

09:53:24 22    nothing to do with how the resonator is made.

09:53:27 23    Q.        I forgot to ask you on the one tile information, is

09:53:30 24    Qorvo trade secrets related to tile information equally

09:53:34 25    applicable to SMR and FBAR resonators?

Aigner - direct

09:53:38  1    A.      Yes, it is, you face the same challenges FBAR and

09:53:44  2    SMR, it's all about accurately getting the frequency into

09:53:47  3    the target that you need and predicting all the secondary

09:53:51  4    effects that you will find.

09:53:53  5    Q.      Mr. Buchbinder, if we could go back to PDX 2.9?

09:53:58  6    Dr. Aigner, last on this list is simulation results,

09:54:01  7    including ████████████████████████.  Can you

09:54:05  8    identify for the jury where that trade secret is found in

09:54:08  9    Exhibit 9?

09:54:13 10    A.      Page 11 is a good example.

09:54:20 11    Q.      And at a high level, what's being shown here on

09:54:23 12    page 11?

09:54:23 13    A.      So page 11 is a simulation that includes a model ██

09:54:31 14    ████████████████████████████.  This is not

09:54:34 15    obvious.  It's something very important.  ████████████

09:54:40 16    ████████████████████████████████████████

09:54:44 17    ████████████████████████████████████████

09:54:48 18    █████████████████████████████████

09:54:50 19    ███████████████████████████████

09:54:54 20    ████████████████████        That's included here.

09:54:58 21    Q.      Is this information that was publicly available?

09:55:00 22    A.      No, it's not.

09:55:01 23    Q.      Would this information have been valuable to Qorvo's

09:55:05 24    competitors?

09:55:05 25    A.      Yes.  Everybody faces similar challenges in this

Aigner - direct

09:55:10  1   business.

09:55:11  2   Q.      Is the information on page 11 of Exhibit 9 applicable

09:55:14  3   to both SMR and FBAR filters?

09:55:17  4   A.      Yes, ████████████████████████████████████

09:55:20  5   ██████████████████████████████████████████████████████

09:55:23  6   ████████████

09:55:26  7   Q.      Did you learn as part of this litigation that

09:55:28  8   Akoustis had obtained a copy of Exhibit 9?

09:55:31  9   A.      Yes, we learned that.

09:55:32 10   Q.      Did Akoustis have authorization to have this

09:55:36 11   cookbook?

09:55:36 12   A.      No.

09:55:39 13           MR. DeFOSSE:  Your Honor, may I approach.

09:55:41 14           THE COURT:  You may.

09:56:02 15   Q.      Dr. Aigner, I have handed you what's been marked for

09:56:04 16   identification as exhibit PTX 0720.  Do you recognize this

09:56:09 17   document?

09:56:10 18   A.      Yes, I do.

09:56:11 19   Q.      What is it?

09:56:12 20   A.      It's a presentation I prepared for business leaders

09:56:18 21   and the groups developing our products.

09:56:21 22           MR. DeFOSSE:  Your Honor, we would offer into

09:56:23 23   evidence what's been marked as Exhibit 720.

09:56:26 24           THE COURT:  Marked and received as 10 in the

09:56:28 25   case.

09:56:29  1          (Trial Exhibit No. 10 was admitted into

09:56:29  2  evidence.)

09:56:29  3  BY MR. DeFOSSE:

09:56:33  4  Q.     Dr. Aigner, could you explain to the jury why this

09:56:36  5  document is significant?

09:56:37  6  A.     This document is Qorvo's outlook at the technologies

09:56:43  7  we want to work on in the following years.  So this is

09:56:47  8  information that nobody is supposed to have.  It shows in

09:56:51  9  detail what technologies we have available today or are

09:56:56 10  about to be released and what we want to do in the following

09:56:59 11  years, to improve in very much detail certain filter

09:57:06 12  parameters, it also shows what frequencies we want to work

09:57:09 13  on.

09:57:09 14  Q.     And if we could pull up, Mr. Buchbinder, PDX 2.106

09:57:14 15  alongside Exhibit 10.

09:57:17 16          Dr. Aigner, what's shown on PDX 2.10?

09:57:22 17  A.     This lists four identified trade secrets related to

09:57:27 18  our roadmap.  And related to 5-gigahertz filters, and an

09:57:34 19  improvement to our piezo material.

09:57:36 20  Q.     Are these technologies that were under development at

09:57:39 21  Qorvo to introduce in the market at a future time?

09:57:42 22  A.     Yes, they were.

09:57:43 23  Q.     And maybe more quickly than we did in the last

09:57:47 24  exhibit, could you walk through Exhibit 720, and identify

09:57:50 25  for the jury where these trade secrets are found?

Aigner - direct

09:57:53  1  A.      The first one is on page 4, innovation vectors.  This

09:58:01  2  shows in detail what the items are that we want to work on.

09:58:07  3  We want to reduce size, size is one of the most important

09:58:11  4  factors, guaranteeing your success in this business.  Phones

09:58:15  5  get smaller all the time.  The inside is more packed and you

09:58:21  6  want a bigger battery so size is super important for us.

09:58:25  7  The other ones are performance parameters, every year our

09:58:29  8  customers ask us to be a little better than the year before.

09:58:32  9          And then operating frequency, they're going up,

09:58:36 10  we are now up to 8-gigahertz, the 5-gigahertz was on the

09:58:41 11  roadmap back then.

09:58:41 12          It shows years, calendar years and it shows

09:58:46 13  which technologies we're going to use to deploy to improve

09:58:51 14  those innovation vectors.

09:58:54 15  Q.      Dr. Aigner, could you next point the jury to where S

09:59:02 16  perimeter measurements and simulations for Qorvo's 5 gig?

09:59:02 17  A.      Yes.  Page 8.  Page 8 shows simulation measurement

09:59:10 18  for a 5-gigahertz demonstrated that we made, it shows

09:59:15 19  frequency axis and it shows the insertion loss, how much

09:59:22 20  your signals are interrelated and how much the unwanted

09:59:26 21  signals are rejected.  That tells you everything you need to

09:59:30 22  know about the performance of our filter.

09:59:33 23  Q.      And Mr. Buchbinder, if we could go back to PDX 2.10.

09:59:40 24          We just looked at trade secret 2.9, is that

09:59:43 25  right, Dr. Aigner?

Aigner - direct

09:59:43  1    A.      That's correct, yes.

09:59:45  2    Q.      Could you show the jury what trade secret 2.10

09:59:49  3    product design details including two and three dimensional

09:59:52  4    layouts is shown in Exhibit 10?

09:59:53  5    A.      Page 10.  So for a 5-gigahertz filter here we show

09:59:59  6    again the filter layout.  On the left image you see all the

10:00:03  7    resonators that are involved, quite a large number of them.

10:00:08  8    You also see a 3D drawing of the filter in its package.  And

10:00:15  9    on the bottom you see the performance parameters that we

10:00:21  10   have achieved for this product as well.

10:00:25  11   Q.      Was this information publicly available?

10:00:27  12   A.      No, it was not.

10:00:29  13   Q.      If we could go back to exhibit PDX 2.10.  Next on the

10:00:35  14   list is trade secret 2.11, measured data for coupling and

10:00:41  15   quality factor versus percentage of scandium nitride and

10:00:47  16   observations of performance tradeoffs?

10:00:49  17   A.      That would be page 15.

10:00:51  18   Q.      15.  And maybe before you explain what's here, just

10:00:56  19   at a high level, what is scandium doping?

10:01:01  20   A.      Scandium doping is a method to enhance the action of

10:01:06  21   our engine to make it more wide.  So we get a wider

10:01:12  22   bandwidth filter which in turn allows higher data rates in

10:01:17  23   all the new bands that your latest phones have.

10:01:20  24   Q.      Now scandium doping is known in the industry

10:01:24  25   generally, right?

Aigner - direct

| | | |
|---|---|---|
| 10:01:25 | 1 | A.      That's correct. |
| 10:01:26 | 2 | Q.      Does Qorvo have any trade secrets related to scandium |
| 10:01:32 | 3 | doping? |
| 10:01:32 | 4 | A.      So, there is more than to just know there is scandium |
| 10:01:36 | 5 | in the piezo layer, you need to have methods to study it and |
| 10:01:40 | 6 | to extract the data that you need for your devices and |
| 10:01:43 | 7 | that's shown here.  So what we see here is different |
| 10:01:48 | 8 | ingredients, different percentages of scandium added, that |
| 10:01:53 | 9 | the purple curve is no scandium added, ███████████████ |
| 10:01:58 | 10 | ████████████████████████████████████ |
| 10:02:02 | 11 | ██████████████████████████████████████ |
| 10:02:05 | 12 | ███████████████████████████████████████ |
| 10:02:09 | 13 | ███████████ |
| 10:02:10 | 14 |         But there is more you can see here and that's |
| 10:02:12 | 15 | not public. ████████████████████████████ |
| 10:02:16 | 16 | ████████████████████████████████████ |
| 10:02:20 | 17 | ████████      so that's something you need to know to be able |
| 10:02:23 | 18 | to deploy a scandium dope material in your filters. |
| 10:02:27 | 19 | Q.      Mr. Buchbinder, if I could ask you to pull up PDX |
| 10:02:32 | 20 | 2.11. |
| 10:02:32 | 21 |         Dr. Aigner, we've got several additional trade |
| 10:02:36 | 22 | secrets identified on this slide.  I would like to start |
| 10:02:38 | 23 | with 2.12, 2.13 and 2.14 and see if we can't do those |
| 10:02:45 | 24 | together.  Could you identify for the jury where those trade |
| 10:02:48 | 25 | secrets are found in Exhibit 720? |

10:02:51  1    A.      Starting with page 23.

10:02:58  2    Q.      And I see on here it says CRF, what is CRF?

10:03:02  3    A.      CRF is an acronym to remember coupled resonator

10:03:07  4    filters.  So if you think of the resonator again with its

10:03:10  5    engine, we put the second resonator on top of it so we have

10:03:13  6    basically two engines working and they also talk to each

10:03:16  7    other.  That allows it to make a much tighter, smaller

10:03:20  8    filter with similar performance.  We call it a coupled

10:03:24  9    resonator filter.

10:03:25 10    Q.      Are the images shown on page 23 of Qorvo devices?

10:03:30 11    A.      They are.

10:03:31 12    Q.      Are these images publicly available?

10:03:33 13    A.      No, they are not.

10:03:35 14    Q.      And can you move on to CRF simulation data for █████

10:03:41 15    █████████?

10:03:44 16    A.      That would be the next page, 24.  So this is based on

10:03:49 17    what we just saw.  █████████████████████████████████████████

10:03:57 18    ████████████████████████████████████████████████████████████

10:04:01 19    █████████████████████████████████████████████

10:04:06 20    █████████████████████████████████████████████████████

10:04:09 21    ████████████████████████████████████████████████

10:04:13 22    ███████████████████████████████████████████████████████

10:04:17 23    █████████████████████████████████████████████████████████

10:04:21 24    ████████████████████████████████████  And it will be a very big

10:04:27 25    advantage for size reduction.

Aigner - direct

10:04:28  1    Q.      Are the simulations shown on slide 24 something that

10:04:32  2    was publicly available?

10:04:33  3    A.      No.

10:04:33  4    Q.      What about the images on slide 24?

10:04:35  5    A.      No, those were not public, either.

10:04:38  6    Q.      And then the next trade secret related to U-BAW

10:04:43  7    applications, is that right?

10:04:45  8    A.      Yeah.  U-BAW, we call it micro BAW because it targets

10:04:51  9    size predominantly and it's a package technology that allows

10:04:55 10    us to take out unused area on the filter dye.  What is shown

10:05:02 11    on the left, page 29 is an image top down and you now can

10:05:07 12    see the resonators that look probably familiar to you

10:05:10 13    already.  But you see the ███████████████████████████

10:05:14 14    ██████████████████████████████████████████████████

10:05:18 15    ████████████████████████████████████████████████████

10:05:24 16    ████████████████    but that makes filters much smaller.

10:05:27 17            The image shows details about the size, it also

10:05:30 18    shows how they're packaged and it shows in simulations and

10:05:34 19    measurements that the filters perform really well, we have

10:05:37 20    not lost anything reducing the size of BAW filters by that

10:05:42 21    much.

10:05:42 22    Q.      Were these simulations publicly available?

10:05:45 23    A.      No, they were not.

10:05:46 24    Q.      If we could return to PDX 2.11.  The last two trade

10:05:52 25    secrets here relate to temperature control technologies.

Aigner - direct

10:05:55  1  Could you please describe those trade secrets for the jury?

10:05:58  2  A.    Yes.  So when you use your filter to transmit, your

10:06:03  3  phone also transmits, they get hot because there is some

10:06:07  4  small losses.  And you don't want the filters to overheat,

10:06:10  5  you don't want your phone to overheat, either.  So it's

10:06:14  6  important for filters with high transmit powers to have a

10:06:18  7  good way to get the heat out of the filters.  And we have

10:06:21  8  come up with some innovative methods to do that which are

10:06:25  9  described in these trade secrets.

10:06:27 10  Q.    Can you show us wherein Exhibit 10 those trade

10:06:30 11  secrets are reflected?

10:06:31 12  A.    Page 36 is the first one.  So on the left, this is a

10:06:38 13  cross-section of the device ████████████████████████

10:06:41 14  ████████████████████████████████████████████████████████

10:06:46 15  ██████████████████████████████████████████████████

10:06:50 16  ██████████████████████████████████████████████████████

10:06:53 17  ████████████████████████████████████████████████████████████

10:06:58 18  ██████████████████████████████████████████████████████

10:07:03 19  ████████████████████████████████████████████

10:07:07 20  ██████████████████████████████████████████████████████

10:07:10 21  ██████████████████████████████████████████████████████

10:07:14 22  ██████████████████████

10:07:17 23        Page 37, this shows the experimental results,

10:07:25 24  measured results of the method I just described.  Different

10:07:31 25  variance of filters for each of those, it shows how much

Aigner - direct

10:07:34 1    improvement we obtained by using this method.  Significant

10:07:37 2    reduction in the temperature increases the filters constant

10:07:43 3    power that we transmit, so that's very important for us to

10:07:46 4    keep the filters and to prevent them from overheating.

10:07:51 5    Q.    Were Qorvo's strategies for controlling temperature

10:07:54 6    publicly available?

10:07:55 7    A.    No, they were not.

10:07:57 8    Q.    We have just walked through -- well, sorry, let me

10:08:02 9    take a step back.  Just to avoid confusion, I want to go

10:08:05 10   back to the first page of Exhibit 10.  I think this is

10:08:10 11   probably clear.  But on the first page it says acoustic

10:08:13 12   technology update, 2019, do you see that?

10:08:15 13   A.    Yes.

10:08:16 14   Q.    Does acoustic here refer to Akoustis?

10:08:19 15   A.    No, acoustic is because its bulk acoustic wave,

10:08:25 16   acoustic is the method our filters are based on, it has

10:08:29 17   nothing to do with the company that is in this lawsuit.

10:08:32 18   Q.    Was this document confidential to Qorvo?

10:08:35 19   A.    Yes.

10:08:35 20   Q.    Is there a way you could tell that by looking at the

10:08:38 21   document?

10:08:38 22   A.    Yes.  It's marked.

10:08:40 23   Q.    And where is it marked?

10:08:42 24   A.    On the bottom again.

10:08:44 25   Q.    Okay.  Did you learn as part of this lawsuit that

Aigner - direct

10:08:49  1    Akoustis had obtained a copy of Exhibit 10?

10:08:52  2    A.    Yes, we learned that.

10:08:53  3    Q.    Was Akoustis authorized to have this document?

10:08:55  4    A.    No.

10:08:57  5    Q.    Now, we have just gone through 21 trade secrets in

10:09:01  6    group 2.  And I wonder if you could wrap that up by just

10:09:05  7    telling the jury what the overall significance of a

10:09:07  8    competitor having those trade secrets is to Qorvo?

10:09:11  9    A.    This is something that we have worked on for fifteen

10:09:17 10    or twenty years.  It's hard work.  It's a lot of things that

10:09:22 11    can go wrong and there are a lot of elements involved to be

10:09:26 12    successful in this kind of field.  It's just unfair for

10:09:30 13    somebody to take the information and to use it to develop

10:09:36 14    competing technology.

10:09:38 15    Q.    How many years did Qorvo work to develop the trade

10:09:42 16    secrets that are reflected in group two?

10:09:44 17    A.    Twenty years, at least.

10:09:47 18    Q.    I would like to move to trade secret group 3 now, and

10:09:50 19    if we could pull up PDX 2.12.  This trade secret group

10:09:57 20    relates to trimming and procedures, and I'm hoping that you

10:10:00 21    can remind the jury, I think you told them a little about

10:10:04 22    trimming, at a high level, what is trimming?

10:10:06 23    A.    Trimming a defined correction of frequency in a

10:10:11 24    process, it sets the frequency right where it exactly needs

10:10:14 25    to be.

404

Aigner - direct

10:10:15  1   Q.      And this was, I believe I remember your testimony,

10:10:18  2   this is where you remove a few atoms from a filter, for

10:10:22  3   example?

10:10:22  4   A.      That's correct, yes.

10:10:23  5   Q.      How are the atoms removed from the filter as part of

10:10:27  6   the trimming?

10:10:28  7   A.      There is a tool that uses an ion beam and it scans

10:10:32  8   across the wafer to remove the amount of material you want

10:10:35  9   to be removed in each location on the wafer.

10:10:41 10   Q.      In general, are trimming techniques known in the

10:10:46 11   industry?

10:10:46 12   A.      Trimming is known.

10:10:48 13   Q.      But does Qorvo have any trade secrets related to

10:10:51 14   trimming?

10:10:51 15   A.      Yes, we do.

10:10:52 16   Q.      If we could pull up PDX 2.13.

10:10:56 17           Dr. Aigner, what's reflected in this exhibit --

10:11:03 18   in this demonstrative?

10:11:04 19   A.      So there are three trade secrets we identified that

10:11:09 20   relate to the methods and algorithms that Qorvo uses to trim

10:11:15 21   BAW filters.

10:11:16 22           MR. DeFOSSE:  Your Honor, may I approach?

10:11:18 23           THE COURT:  You may.

10:11:27 24   BY MR. DeFOSSE:

10:11:35 25   Q.      Dr. Aigner, I have handed you what's been marked for

Aigner - direct

10:11:38  1    identification as PTX 1141.  Do you recognize this document?

10:11:43  2    A.      Yes, I do.

10:11:44  3    Q.      What is it?

10:11:45  4    A.      It's a document to train people how Qorvo's trimming

10:11:52  5    process works.

10:11:53  6              MR. DeFOSSE:  Your Honor, we would offer into

10:11:55  7    evidence PTX 1141.

10:11:57  8              THE COURT:  Marked and received as 11.

10:12:00  9              (Trial Exhibit No. 11 was admitted into

10:12:01 10    evidence.)

10:12:01 11              MR. DeFOSSE:  And is that Exhibit 11, Your

10:12:04 12    Honor?

10:12:04 13              THE COURT:  Yes.  11.

10:12:05 14              MR. DeFOSSE:  Sorry.

10:12:07 15    BY MR. DeFOSSE:

10:12:08 16    Q.      Dr. Aigner, can you explain to the jury what the

10:12:11 17    purpose of Exhibit 11 is?

10:12:13 18    A.      When new people join our company or our group, we

10:12:18 19    teach them what has been learned before, and this is one

10:12:23 20    example of a document that is used for training of new

10:12:27 21    employees.

10:12:28 22    Q.      Mr. Buchbinder, can I ask you to pull up PDX 2.13

10:12:35 23    beside Exhibit 11.

10:12:37 24              Dr. Aigner, I would like you to first explain at

10:12:41 25    a high level to the jury the significance of trade secret

Aigner - direct

10:12:44  1    **3.1?**

10:12:45  2    A.        **Trimming is the key to being successful in this**

10:12:51  3    **business.   Even so the trimming equipment has been around**

10:12:55  4    **for a while and it had a big role in using it for the**

10:13:00  5    **industry, but then the recipes that you use for your device,**

10:13:03  6    **that's something everybody keeps secret because it gives you**

10:13:07  7    **an advantage if you do it well.   So trimming is a very**

10:13:11  8    **important part of what we do.**

10:13:14  9    Q.        **Is trade secret 3.1 related to the amount of material**

10:13:18 10    **that you remove when you're shaving off those atoms?**

10:13:22 11    A.        **That's right, yes.**

10:13:23 12    Q.        **Could you show the jury where that trade secret is**

10:13:26 13    **reflected in Exhibit 1141?**

10:13:29 14    A.        **One example is on page 16.** ███████████████████

10:13:40 15    ████████████████████████████████████████████████

10:13:45 16    ████████████████████████████████████████████

10:13:50 17    ████████████████████████████████████████████

10:13:53 18    ██████████████████████████    **So it shows -- this**

10:13:56 19    **shows an algorithm, it shows exactly what input parameters,**

10:14:00 20    **what data you need to feed into the algorithm to get a good**

10:14:04 21    **result.**

10:14:04 22              **And if you look, there is multiple levels of**

10:14:08 23    **data and equations, how they are -- how you calculate what**

10:14:14 24    **trimming amount you're going to item for.**

10:14:18 25    Q.        **Was Qorvo's trimming sensitivity calculation publicly**

Aigner - direct

| | |
|---|---|
| 10:14:22 1 | **known?** |
| 10:14:22 2 | A.     No, it was not. |
| 10:14:24 3 | Q.     Does this calculation have value to your competitors? |
| 10:14:27 4 | A.     It certainly would. |
| 10:14:30 5 | Q.     Is the trimming method that's reflected on page 16 of |
| 10:14:35 6 | Exhibit 11 applicable to both SMR and FBAR resonator? |
| 10:14:43 7 | A.     Yes it is, the trimming happens on the very surface |
| 10:14:45 8 | of the device, there is no difference between how it behaves |
| 10:14:49 9 | between an SMR and a FBAR. |
| 10:14:52 10 | Q.     If we could go back to PDX 2.13. |
| 10:14:55 11 |     Dr. Aigner, the second trade secret relates to |
| 10:14:58 12 | Qorvo's ███████████████████.  Could you identify for |
| 10:15:03 13 | the jury where trade secret 3.2 is found in Exhibit 11? |
| 10:15:08 14 | A.     Page 17. |
| 10:15:11 15 | Q.     And at a high level, what's shown here on page 17? |
| 10:15:14 16 | A.     Page 17 shows the strategy we apply when we have a |
| 10:15:21 17 | filter that's likely deviating from its goal, its target to |
| 10:15:27 18 | get it to exactly line up with where we want it to be in |
| 10:15:32 19 | frequency.  And it uses what was shown before, ███ |
| 10:15:35 20 | ██████████████████████████████████████████ |
| 10:15:40 21 | ████████████. |
| 10:15:41 22 | Q.     Was this trade secret publicly known? |
| 10:15:44 23 | A.     No, it was not. |
| 10:15:45 24 | Q.     Would it have had value to your competitors? |
| 10:15:48 25 | A.     Yes. |

408

Aigner - direct

10:15:49  1    Q.       Is the trade secret reflected on page 17 applicable

10:15:52  2    to both SMR and FBAR resonator?

10:15:55  3    A.       Yes, it is.

10:15:56  4    Q.       PDX, if we could return to PDX 2.13.  Last trade

10:16:03  5    secret on this list is the goal for Qorvo's ███████████

10:16:08  6    ██████████████████    Could you show the jury where that trade

10:16:12  7    secret is reflected on Exhibit 11?

10:16:14  8    A.       Page 18.

10:16:15  9    Q.       Again, at a high level, what's shown here on page 18?

10:16:18 10    A.       So very often a filter ████████████████████████████████

10:16:22 11    ████████████████████████████████████████████████████████████

10:16:27 12    ████████████████████████████████████████████████████████████

10:16:32 13    █████████    And that's shown on the algorithm on this page.  So

10:16:37 14    you trim ████████████████████████████    with an algorithm ████████

10:16:43 15    ████████████████████████████████████████████████████████

10:16:48 16    Q.       Is this algorithm a trade secret at Qorvo?

10:16:51 17    A.       Yes, it is.

10:16:52 18    Q.       Was it publicly known?

10:16:54 19    A.       No.

10:16:54 20    Q.       Would it have been valuable to your competitors?

10:16:57 21    A.       Yes.  Everybody faces the same challenges to get

10:17:00 22    filters into the target.  Nobody is able to manufacture them

10:17:05 23    accurately enough to get away without trimming.

10:17:08 24    Q.       And is this trade secret applicable to both FBAR and

10:17:12 25    SMR resonators?

Aigner - direct

10:17:14  1    A.       Yes, it is, same challenges in both.

10:17:24  2                    MR. DeFOSSE:  Your Honor, may I approach?

10:17:25  3                    THE COURT:  You may.

10:17:36  4    BY MR. DeFOSSE:

10:17:49  5    Q.       Dr. Aigner, did you learn as part of this litigation

10:17:51  6    that Akoustis had obtained Qorvo's trimming procedures?

10:17:55  7    A.       Yes, I became aware of that.

10:17:58  8    Q.       I have just handed you what's been marked for

10:18:01  9    identification as Exhibit 453.  Do you recognize the

10:18:05 10    contents of this document?

10:18:07 11    A.       Yes, I do.

10:18:10 12                    MR. DeFOSSE:  Your Honor, may we offer into

10:18:12 13    evidence Exhibit 453?

10:18:13 14                    THE COURT:  Yes, marked and received as trial

10:18:16 15    Exhibit 12.

10:18:17 16                    (Trial Exhibit No. 12 was admitted into

10:18:18 17    evidence.)

10:18:18 18    BY MR. DeFOSSE:

10:18:19 19    Q.       Dr. Aigner, what are the contents of Exhibit 453?

10:18:23 20    A.       This document shows the algorithms that Qorvo

10:18:29 21    developed in a presentation from Akoustis.

10:18:32 22    Q.       And just so the jury was clear, do you understand

10:18:35 23    that this document, which is now Exhibit 12, is an Akoustis

10:18:39 24    file?

10:18:40 25    A.       Yes.

Aigner - direct

10:18:42  1    Q.      Now, Dr. Aigner, I would like to do, if we could, a

10:18:46  2    comparison between the document that was found in Akoustis's

10:18:48  3    files and Qorvo's trimming procedures.  Could you identify

10:18:55  4    for the jury if there is anything in Exhibit 12 that

10:18:59  5    corresponds to the trade secrets we just looked at in

10:19:02  6    Exhibit 11?

10:19:04  7    A.      Exhibit 11, page 16 is strikingly similar to, the

10:19:13  8    same as what you see on page 2 of Exhibit 12.  They haven't

10:19:20  9    even changed the colors of the boxes.

10:19:25 10            Then --

10:19:27 11    Q.      Is that the only instance where the Akoustis document

10:19:31 12    has directly copied the Qorvo trimming procedures?

10:19:33 13    A.      No.  It goes on, page 17 on Exhibit 11, compare it to

10:19:40 14    page 3 on Exhibit 12.  Strikingly similar, the same.  And

10:19:50 15    again, page 18 on Exhibit 11 compared to page 4 on

10:19:58 16    Exhibit 12.

10:20:00 17    Q.      What was your reaction when you learned that Akoustis

10:20:03 18    had obtained Qorvo's trimming procedures?

10:20:06 19    A.      I was upset.

10:20:08 20    Q.      Why is that?

10:20:10 21    A.      Trimming is an essential part of our process.  I have

10:20:16 22    personally spent twenty years developing this.  It felt like

10:20:22 23    a betrayal to see the fruits of our work in somebody else 's

10:20:29 24    hands without permission.

10:20:30 25    Q.      I would like to move on to trade secret group 4 now.

Aigner - direct

10:20:34  1    Mr. Buchbinder, could you pull up PDX 2.15.

10:20:39  2             Trade secret 4 relates to Qorvo's evaluation

10:20:45  3    board design rules and schematics.  Could you explain to the

10:20:48  4    jury what an evaluation board is?

10:20:49  5    A.     Yes.  I have shown you a laminate strip earlier so

10:20:58  6    the products on this are about two by three-millimeter in

10:21:03  7    size, they're too small to measure directly.  So what we do

10:21:07  8    is we put them on another kind of board, this board has

10:21:11  9    connectors on it so that cables can be attached and they can

10:21:15 10    be more conveniently measured by us and by our customers for

10:21:21 11    examination purposes, that's why they call it an evaluation

10:21:25 12    board.

10:21:25 13    Q.     How important is an evaluation board technology?

10:21:27 14    A.     You need them all the time, you need them multiple

10:21:31 15    times in every project you work on.

10:21:33 16    Q.     Have you heard the term RF connector?

10:21:36 17    A.     Yes.

10:21:37 18    Q.     What is a RF connector?

10:21:39 19    A.     That's the connector where the RF cable is screwed

10:21:46 20    to.  Think of it like a plug, a socket on your wall.  That's

10:21:52 21    what RF.

10:21:54 22    Q.     Mr. Buchbinder, could I ask you to pull up PDX 2.16.

10:21:59 23             Dr. Aigner, what's reflected on PTX 2.16?

10:22:03 24    A.     So the RF connectors, they are quite important for

10:22:08 25    measuring correctly.  And we have our own designs to make

Aigner - direct

10:22:13  1    this possible.  And it's reflected in the trade secret 4.4.

10:22:18  2            MR. DeFOSSE:  Your Honor, may I approach?

10:22:19  3            THE COURT:  You may.

10:22:35  4    BY MR. DeFOSSE:

10:22:37  5    Q.    Dr. Aigner, I have handed you what's been marked for

10:22:40  6    identification as PTX 1142.  Do you recognize this document?

10:22:45  7    A.    Yes.

10:22:46  8    Q.    What is it?

10:22:47  9    A.    It's a drawing of the connector we use in many of our

10:22:55 10    evaluation boards.

10:22:56 11            MR. DeFOSSE:  Your Honor, we offer into evidence

10:22:58 12    PTX 1142.

10:23:00 13            THE COURT:  Marked and received as 13.

10:23:05 14            (Trial Exhibit No. 13 was admitted into

10:23:05 15    evidence.)

10:23:05 16    BY MR. DeFOSSE:

10:23:06 17    Q.    Dr. Aigner, can you explain to the jury at a high

10:23:10 18    level what is shown in Exhibit 13?

10:23:12 19    A.    Well, this is a technical drawing that allows to

10:23:18 20    construct this connector.  It shows all the dimensions, it

10:23:21 21    shows the materials to be used.  And it also shows the

10:23:25 22    tolerances for each of the dimensions here, which are

10:23:28 23    important.  And it shows the exact physical structure of the

10:23:32 24    connector.

10:23:33 25    Q.    Does Qorvo consider the design of this particular RF

413

Aigner - direct

10:23:38  1  connector to be a trade secret?

10:23:39  2  A.     Yes, we do.

10:23:40  3  Q.     You would agree with me that RF connectors generally

10:23:44  4  are available on the market, right?

10:23:46  5  A.     They are.

10:23:46  6  Q.     Why does Qorvo consider this particular design to be

10:23:49  7  a trade secret?

10:23:50  8  A.     Because we found that this one works significantly

10:23:54  9  better for our purposes, and it allows us measurements with

10:23:59 10  more accuracy, that's why do use it and why wanted to keep

10:24:03 11  it a secret.

10:24:04 12  Q.     Is the design of the RF connector here in

10:24:10 13  Exhibit 1142 relevant to both filters that have SMR

10:24:15 14  resonators and FBAR resonators?

10:24:17 15  A.     Yes, it is, there is no difference whatsoever.  Once

10:24:20 16  you have a packaged part, this is really the outside world

10:24:23 17  we talk about.

10:24:25 18  Q.     Did Akoustis have authorization to use the customized

10:24:29 19  design of Qorvo's RF connector?

10:24:32 20  A.     No.

10:24:34 21  Q.     I would like to move to trade secret group 6 now.

10:24:39 22  Mr. Buchbinder, could you pull up PTX 2.18.

10:24:44 23          So, Dr. Aigner, trade secret group 6 is related

10:24:48 24  to Qorvo's systems, processes, and procedures for testing

10:24:51 25  reliability and mean-time-to-failure of parts.  Could you

Aigner - direct

10:24:58 1    explain to the jury at a high level what reliability testing

10:25:01 2    is?

10:25:02 3    A.      So when we ship parts to a customer, the customer

10:25:07 4    wants proof from us that the parts will live for a long,

10:25:12 5    long time.  You don't want your phone to fail for our

10:25:16 6    components.  So we have methods in place to test our parts

10:25:20 7    to prove that they are reliable, that happens multiple time

10:25:25 8    during research and also during product development and

10:25:28 9    continues on when we ship the parts.  Those methods have

10:25:32 10   evolved over the years, they're not industry standard and

10:25:36 11   there is a lot of know-how involved in putting together the

10:25:40 12   systems to test these parts.

10:25:42 13   Q.      To be clear, are there generally known reliability

10:25:46 14   testing information on the market?

10:25:48 15   A.      Yes, there is.

10:25:49 16   Q.      But does Qorvo have trade secrets to the way it

10:25:54 17   performs reliability testing?

10:25:55 18   A.      Yes, we do.

10:25:56 19   Q.      Mr. Buchbinder, could I ask you to pull up PDX 2.19.

10:26:01 20           And Dr. Aigner, what's reflected on PDX 2.19?

10:26:05 21   A.      So this shows six trade secrets identified, they all

10:26:10 22   relate to reliability and reliability testing.  And methods

10:26:15 23   associated with that.

10:26:16 24           MR. DeFOSSE:  Your Honor, may I approach?

10:26:18 25           THE COURT:  You may.  We will probably take a

Aigner - direct

10:26:28  1    **break at 10:30.**

10:26:36  2    **BY MR. DeFOSSE:**

10:26:38  3    **Q.    Dr. Aigner, I have handed you what's been marked for**

10:26:41  4    **identification as PTX 0099.  Do you recognize this document?**

10:26:46  5    **A.    Yes, I do.**

10:26:47  6    **Q.    What is it?**

10:26:48  7    **A.    It's a document summarizing the reliability and life**

10:26:53  8    **testing methods used at Qorvo.**

10:26:56  9              **MR. DeFOSSE:  Your Honor, we would offer into**

10:26:58 10    **evidence PTX 0099.**

10:27:01 11              **THE COURT:  Marked and received as 14.**

10:27:04 12              **(Trial Exhibit No. 14 was admitted into**

10:27:04 13    **evidence.)**

10:27:04 14    **BY MR. DeFOSSE:**

10:27:05 15    **Q.    Dr. Aigner, can you explain to the jury at a high**

10:27:08 16    **level the significance of Exhibit 14?**

10:27:11 17    **A.    This exhibit shows in quite some detail how we put**

10:27:17 18    **testing systems together, what the models we apply and what**

10:27:23 19    **considerations we make in evaluating the performance and**

10:27:28 20    **power lifetime durability of our parts, a lot of data is**

10:27:33 21    **included, a lot of examples are included.**

10:27:36 22    **Q.    Is this document confidential to Qorvo?**

10:27:39 23    **A.    Yes, it is.**

10:27:40 24    **Q.    Is there a way you would know that by looking at the**

10:27:43 25    **document?**

Aigner - direct

10:27:43 1   A.      Once again, it's labeled on the bottom of the -- of

10:27:48 2   every slide.

10:27:50 3   Q.      Now, Mr. Buchbinder, if we could pull up PDX 2.20.

10:27:57 4           Dr. Aigner, how many trade secrets does Qorvo

10:28:20 5   assert in this case are disclosed in Exhibit 14?

10:28:24 6   A.      There are six.

10:28:26 7   Q.      I would like to start with the first one, testing

10:28:29 8   systems and processes to ensure efficiency.  Is that 6.1, do

10:28:34 9   you see that?

10:28:36 10  A.      Yes.

10:28:36 11  Q.      At a high level, what is trade secret 6.1?

10:28:40 12  A.      So our testing, this is quite equipment intensive.

10:28:44 13  You want to test many parts simultaneously because you need

10:28:48 14  statistical data, and how you put this together, what

10:28:51 15  equipment you use and how you connect it up is quite some

10:28:54 16  work we have done in the past, and learning steps we have

10:28:59 17  made.  Page 6 shows an example of a system diagram that we

10:29:06 18  use in power testing.

10:29:10 19  Q.      Was this information generally known in the industry?

10:29:13 20  A.      No, it was not.

10:29:15 21  Q.      What's the value of this information to Qorvo's

10:29:18 22  competitors?

10:29:19 23  A.      Well, everybody in this field needs to do power

10:29:22 24  testing, so everybody needs to put a system together to do

10:29:26 25  this efficiently and this would be a great starting point

417

Aigner - direct

10:29:29 1    for anybody in this field to get a head start.

10:29:32 2    Q.    How long did Qorvo work on developing the system

10:29:36 3    that's reflected on page 6 of Exhibit 14?

10:29:40 4    A.    The systems we used have evolved over time, but work

10:29:47 5    is based on this, started twenty-five years ago, even before

10:29:51 6    SAW was in existence at Qorvo, TriQuint had soft field

10:29:57 7    testing which is very similar.

10:29:59 8    Q.    If we could go back, Mr. Buchbinder to PDX 2.20?

10:30:06 9          The next trade secret on this list is the

10:30:10 10   configuration of the testing systems.  Could you identify

10:30:12 11   for the jury where that trade secret is reflected in

10:30:17 12   Exhibit 14?

10:30:19 13   A.    Pages 7, page 7 is an example.

10:30:26 14   Q.    Okay.  I notice there a picture of a gentleman on

10:30:30 15   page 7.  Who is that?

10:30:31 16   A.    That's Shawn Bawl, that's the expert in Florida doing

10:30:35 17   this kind of testing for the past 25 years.

10:30:37 18   Q.    And what is page 7 of Exhibit 14 showing?

10:30:42 19   A.    It shows how the system is put together and what

10:30:47 20   criteria we use to select the cables and connectors and

10:30:51 21   stuff like that.

10:30:54 22   Q.    Mr. Buchbinder, if we could go back to PDX 2.20.

10:30:59 23         Dr. Aigner, exhibit -- trade secret 6.3, 6.4 and

10:31:09 24   6.5 all relate to temperature testing, is that right?

10:31:12 25   A.    That's correct, yes.

10:31:13  1    Q.      Could you take the jury to where those three trade

10:31:16  2    secrets are shown in Exhibit 99 and explain to the jury the

10:31:20  3    significance of those trade secrets?

10:31:23  4    A.      So when you operate a filter at the high power level,

10:31:28  5    I mentioned before it starts to heat up a little bit, and it

10:31:31  6    changes some of its characteristics.  And that when you test

10:31:36  7    for power is important.  So you need to account for it, you

10:31:40  8    need to understand it very accurately.  What's shown on

10:31:44  9    page 15 is a description of the method we use to account for

10:31:49 10    the self heating effect in our filters.  And some details,

10:31:55 11    the block diagram in the bottom tells you which equipment

10:31:59 12    you're going to need and how you put it together.

10:32:02 13            Then on the following pages we give examples of

10:32:06 14    how it's applied.  Page 16 shows self heating data for an

10:32:15 15    example of a BAW filter, so you increase the power you put

10:32:19 16    through the filter and you see the temperature starts

10:32:22 17    increasing and ███████████████████████████████████████████

10:32:27 18    ██████████████████████████████████████████████████████████

10:32:33 19    ████████████

10:32:33 20            Page 17 shows again the self heating for a

10:32:41 21    specific device measured and modeled and again, you can see

10:32:45 22    ██████████████████████████████████████████████████████

10:32:51 23    ████████████████████████████████████████████.

10:32:54 24    Understanding that is important for us because when we do

10:32:58 25    our testing, we want the lifetime of the filter has to be

10:33:03  1    10,000 hours say in a phone, you don't want it to fail after

10:33:07  2    half a year when you use it, so 10,000 hours, we can't test

10:33:12  3    our parts for 10,000 hours, so there are methods in place to

10:33:15  4    accelerate this testing.

10:33:17  5              What we do is we start at a higher temperature,

10:33:20  6    the lifetime is shorter there and we need to understand how

10:33:23  7    much shorter we call it acceleration factor.  So we test at

10:33:28  8    a higher temperature and at a higher power and we can

10:33:31  9    predict how the part will survive at the lower temperature

10:33:35 10    and lower power.  But there is a lot of method and a lot of

10:33:40 11    know-how behind how to do this in a good way.

10:33:43 12    Q.    How many hours does it take Qorvo to do this

10:33:46 13    temperature testing?

10:33:48 14    A.    This is case dependent, again there is ███████████

10:33:55 15    ████████████████████████████████████████████████████████

10:33:58 16    ██████████████████████████████████████████████████, we

10:34:03 17    know that the part is good to live for 10,000 hours under

10:34:07 18    normal conditions.

10:34:07 19    Q.    Qorvo is able because of its trade secrets to test

10:34:11 20    the parts ████████████████████████ in order to get what

10:34:14 21    10,000 hours of testing would show?

10:34:16 22    A.    Yes, that's what we do.

10:34:17 23    Q.    How long did it take Qorvo to develop its temperature

10:34:20 24    testing trade secrets?

10:34:22 25    A.    Well, they have evolved over the past 25 years, and

Aigner - direct

10:34:26  1    they -- they are quite sophisticated by now.  If you look at

10:34:32  2    page 23, this is our results.  Here we show ████████████

10:34:42  3    ████████████████████████████████████████████████████████

10:34:50  4    ████████████████████████████████████████████████

10:34:53  5              We know from the data we have extracted that ██

10:34:57  6    ████████████████████████████████████████████████

10:35:05  7    ██████████████████████████████████████████████████████

10:35:09  8    ████████████████████████████

10:35:11  9              THE COURT:  Counsel, we do need a break.  Is

10:35:14 10    this good right now?

10:35:15 11              MR. DeFOSSE:  If I could just finish up this

10:35:17 12    document, Your Honor, I only have a couple more questions on

10:35:20 13    it.  Two more questions.

10:35:22 14    BY MR. DeFOSSE:

10:35:22 15    Q.    Dr. Aigner, you were just pointing the jury to

10:35:25 16    page 23, does this reflect any of the trade secrets that we

10:35:28 17    see on PDX 2.20?

10:35:30 18    A.    Yes, that's correct.

10:35:31 19    Q.    Could we pull up PDX 2.20, Mr. Buchbinder.

10:35:35 20              Which trade secret is associated with the

10:35:39 21    information on page 23 of Exhibit 14 that you were just

10:35:42 22    showing the jury?

10:35:43 23    A.    That would be 6.5, 6.6.

10:35:52 24    Q.    Thank you, Dr. Aigner.  So last questions on this

10:35:55 25    document.

10:35:55  1                 This was a confidential Qorvo document?

10:35:58  2    A.      Yes.

10:35:58  3    Q.      Did you learn that Akoustis had obtained this

10:36:01  4    document as part of this litigation?

10:36:03  5    A.      Yes, we learned that.

10:36:05  6    Q.      Okay.  Did Akoustis have authorization to have this

10:36:07  7    document?

10:36:08  8    A.      No.

10:36:10  9                 MR. DeFOSSE:  This would be a good time.

10:36:11 10                 THE COURT:  We're going to take our

10:36:13 11    fifteen-minute break at this time.  Don't discuss the case

10:36:15 12    amongst yourself, don't let anybody talk with you about the

10:36:19 13    case and we'll see you in fifteen minutes.  Of course

10:36:23 14    continue to keep an open mind we talked about at the start.

10:36:27 15    After you're excused, we'll stay here for just a moment.  So

10:36:31 16    we'll let you be excused to the jury room.

10:36:34 17                 (Jury exiting the courtroom at 10:36 a.m.)

10:36:59 18                 THE COURT:  All right.  We'll let everybody be

10:37:03 19    seated just for a moment.  The witness may or may not know

10:37:06 20    that during the break you should not talk with someone about

10:37:09 21    the testimony you have given.  That's the key here.  Talk

10:37:13 22    about other things that might come up, but nothing about the

10:37:17 23    testimony that's given.  Of course that eliminates

10:37:20 24    essentially coaching.

10:37:21 25                 We have a fourteen-minute break.  We'll see you

| | |
|---|---|
| 10:37:24 1 | all in about twelve minutes.  Anything else before we do |
| 10:37:27 2 | that? |
| 10:37:36 3 | (Discussion off the record.) |
| 10:37:37 4 | THE COURT:  They have a potential plan for our |
| 10:37:39 5 | one juror who has the cockatoo, so we're going on to see |
| 10:37:43 6 | what we can do about that.  Everybody else, maybe a couple |
| 10:37:46 7 | of counsel may want to stay and check, everybody else can be |
| 10:37:49 8 | excused, you can sort of step down.  I better ask, what's |
| 10:37:53 9 | the cockatoo plan?  I'm trying to let everybody else take |
| 10:37:59 10 | that break because you may want a restroom break.  The |
| 10:38:02 11 | witness may want a restroom break and we'll get a couple of |
| 10:38:06 12 | counsel on that. |
| 10:50:06 13 | (Side-bar discussion:) |
| 10:50:06 14 | THE COURT:  Yes, sir. |
| 10:50:06 15 | COURT CLERK:  So really quick, we have a hotel |
| 10:50:06 16 | lined up and everything.  Would the parties be amenable to |
| 10:50:06 17 | splitting the cost of pet fee, $75 pet fee? |
| 10:50:06 18 | MR. ELKINS:  Absolutely. |
| 10:50:06 19 | COURT CLERK:  That's truly the only option we |
| 10:50:06 20 | have as far as anything to accommodate this juror. |
| 10:50:06 21 | MR. ELKINS:  I assume that fact will not be made |
| 10:50:06 22 | known. |
| 10:50:06 23 | THE COURT:  No, they won't know. |
| 10:50:06 24 | MR. ELKINS:  The jury? |
| 10:50:06 25 | THE COURT:  It will look like it's come from the |

10:50:06  1   Court.  But we're not funded to do that, therefore, we have

10:50:06  2   to -- if you want to, and if you don't want to, you don't

10:50:06  3   have to, it's not a big deal.

10:50:06  4          MR. MASTERS:  No, we're fine.  We're happy to

10:50:06  5   share that cost.  We'll add it into the meal fee.  We have a

10:50:06  6   pet fee, that's fine.

10:50:06  7          MR. ELKINS:  Pet fee.

10:50:06  8          THE COURT:  Pet fee.  I think that's a good

10:50:06  9   resolution.  I hate to lose an eleventh juror right now,

10:50:06 10   because I may lose a couple of jurors along the way.  That

10:50:06 11   takes care of that.  Let's go through the exhibit and make

10:50:06 12   sure.

10:50:06 13          MR. LEMIEUX:  Your Honor, there is an exhibit

10:50:06 14   that is a declaration that was filed by the witness in

10:50:06 15   another matter.  And maybe you want to have John up here for

10:50:06 16   this.

10:50:06 17          MR. MASTERS:  I need to get Mr. DeFosse.

10:50:06 18          THE COURT:  Right.

10:50:06 19          Tell you what, can you tell me what it's about

10:50:06 20   and we'll let Mr. DeFosse address it.  Tell me what it's

10:50:06 21   about.

10:50:06 22          MR. LEMIEUX:  There is a declaration in another

10:50:06 23   case that was filed in another case that is publicly

10:50:06 24   available that contains all of this alleged trade secret

10:50:06 25   information that we have been talking about.  And that I

10:50:06  1    would like to establish the fact that he did, it's in a

10:50:06  2    court file, it's available to the public now, I checked

10:50:06  3    again yesterday, this goes to trade secrets.

10:50:06  4            THE COURT:  Sure, I understand.  Where was it

10:50:06  5    filed?

10:50:06  6            MR. LEMIEUX:  It's in District of Arizona in

10:50:07  7    another action I'm sure.  I'm not going to go into the

10:50:07  8    claims of that case, I'm not going to do an analysis, but

10:50:07  9    this is clearly relevant to the public availability of this

10:50:07 10    information.

10:50:07 11            THE COURT:  Sure.  I'm sure that that does come

10:50:07 12    up.  It's come up before in other cases so it's not new.  I

10:50:07 13    don't know if Mr. DeFosse has anything to the contrary.

10:50:07 14    It's usually used as an impeachment document, this is it

10:50:07 15    true it was filed in another case.  This was 2011.

10:50:07 16            MR. LEMIEUX:  Yes.

10:50:07 17            THE COURT:  I can see that some of the material

10:50:07 18    is about the same or similar, but I can't tell how much of

10:50:07 19    it is because I've only had it about fifteen seconds.

10:50:07 20    Anything about that?  Anything that's filed publicly in

10:50:07 21    another case -- now, it requires a little examination as to

10:50:07 22    see whether it remained in the public record, you said it

10:50:07 23    did, so I'm not going to doubt you.

10:50:07 24            MR. LEMIEUX:  I could ask the Court to take

10:50:07 25    judicial notice of the fact if you go on page 3, there will

10:50:07 1   be a report write-up.

10:50:07 2           THE COURT:  Arizona case, United States District

10:50:07 3   Court 09-01531.  And I think everybody can check that.  We

10:50:07 4   can all do that.

10:50:07 5           MR. MASTERS:  The condition under which it was

10:50:07 6   filed.  Not that they -- the company intentionally published

10:50:07 7   the document, but it was submitted in a court case.

10:50:07 8           THE COURT:  Right.  But if it is submitted and

10:50:07 9   not placed under seal, then it becomes part of the public

10:50:07 10  document, of the documents to the public.  I can't do a

10:50:07 11  comparison, but I can see that there is -- these don't look

10:50:07 12  identical at all, some of the materials that we're looking

10:50:07 13  at are different, I understand that.

10:50:07 14          MR. MASTERS:  They are.

10:50:07 15          THE COURT:  But this is normal

10:50:07 16  cross-examination.  So anything else.  I don't know

10:50:07 17  Mr. Masters, this puts you in a bad spot, you can check with

10:50:07 18  Mr. DeFosse, he probably knows all about it.

10:50:07 19          MR. MASTERS:  He's much more prepared than I am.

10:50:07 20          THE COURT:  On this particular issue?

10:50:07 21          MR. MASTERS:  On this particular issue.

10:50:07 22          MR. LEMIEUX:  I'm going to be honest with you,

10:50:07 23  Your Honor, just simply to establish the fact that anything

10:50:07 24  that is in there is a matter of public record availability.

10:50:07 25          THE COURT:  That would be correct.

10:50:07  1            MR. LEMIEUX:  So other witnesses later who say I

10:50:07  2    am able to get this information publicly and this is the

10:50:07  3    source.

10:50:07  4            MR. MASTERS:  Here comes Mr. DeFosse.

10:50:07  5            THE COURT:  You're absolutely right.  That's not

10:50:08  6    going to change what anybody else has to say.  So check with

10:50:08  7    him briefly.  The witness did file a declaration in an

10:50:08  8    Arizona proceeding, U.S. District Court of Arizona

10:50:08  9    09-101531, it's declaration by him in support of TriQuint's

10:50:08 10    motion to seal, which is sort of an interesting question by

10:50:08 11    itself.  But it was filed on September the 29th of 2011.

10:50:08 12    You're aware of that?

10:50:08 13            MR. DeFOSSE:  I am aware of that.

10:50:08 14            THE COURT:  It's something that -- it's just

10:50:08 15    clearing that they can use this in cross.  I don't think it

10:50:08 16    was being used as an exhibit.  I don't think you're supposed

10:50:08 17    to do that.

10:50:08 18            MR. LEMIEUX:  It would have to be part of the

10:50:08 19    record, Your Honor, I mean, so that --

10:50:08 20            THE COURT:  I have to look and make sure it's

10:50:08 21    not a 403 problem and we may have to be very specific about

10:50:08 22    what is being utilized in it.  So you both see the problem

10:50:08 23    there which we don't want to give them 500 pages and say

10:50:08 24    well, it's in there somewhere and you already have it

10:50:08 25    tagged.  I can see you're all set.  I think you might --

10:50:08  1          MR. LEMIEUX:  The tags actually are just showing

10:50:08  2  -- pursuant to the court order there were certain items that

10:50:08  3  were ordered redacted and where I have a tag is actually

10:50:08  4  where there were redactions.

10:50:08  5          THE COURT:  Sure.  I see what you're saying.

10:50:08  6          MR. LEMIEUX:  So if you go to this page here,

10:50:08  7  I'm sorry, this has been redacted.

10:50:08  8          THE COURT:  Did you also indicate how many pages

10:50:08  9  of this document are identical to or very close to the

10:50:08 10  materials that this witness has been testing?

10:50:08 11          MR. LEMIEUX:  All I want to be able to introduce

10:50:08 12  this for, Your Honor, this was filed, this was publicly

10:50:08 13  available, other witnesses will rely on the information in

10:50:08 14  there.  I'm not otherwise going to cross-examine him, this

10:50:08 15  is simply is his declaration, he signed it.

10:50:09 16          THE COURT:  The issue is not that you can't use

10:50:09 17  it, you can use it, the question is because it's a large

10:50:09 18  document, many pages, 195, it may be that only eight pages

10:50:09 19  are really proper cross-examination.  I don't know that.

10:50:09 20  And so -- have you discussed this.

10:50:09 21          MR. DeFOSSE:  We've not discussed this

10:50:09 22  specifically.  The additional concern I have, Your Honor, is

10:50:09 23  the one that we had in our motion in limine about references

10:50:09 24  to other proceedings that are out there.  And so I'm

10:50:09 25  concerned that if the document is introduced and filing it a

10:50:09  1    court proceeding and TriQuint is involved and things like

10:50:09  2    that, that creates prejudice because then the jury is

10:50:09  3    thinking about what's going on in this other proceeding.  So

10:50:09  4    I think --

10:50:09  5         THE COURT:  That's not -- I mean, I understand

10:50:09  6    the argument, and I've heard it, and the fact that it is

10:50:09  7    appropriate to use the document.  The question is, which

10:50:09  8    portions of the document are properly admitted for purposes

10:50:09  9    of cross-examination, I don't know.  And the fact is that if

10:50:09 10    it's eight pages, we may need to consider whether only those

10:50:09 11    eight pages are the ones that are proper to receive.

10:50:09 12    Because we don't want to give them -- we've had this come up

10:50:09 13    in other matters, we don't want to give jurors that has as

10:50:09 14    much material that does not go to the point that counsel was

10:50:09 15    making, that counsel is making because it gets lost and I

10:50:09 16    think you want it to be specific.  Maybe you don't.

10:50:09 17         MR. LEMIEUX:  I am not going to get into

10:50:09 18    specifics with this witness.  But I do need to be able to

10:50:09 19    use it.  There will be subsequent witnesses who will rely on

10:50:09 20    portions of this.  And so if I don't have this into

10:50:09 21    evidence, then their foundation for their testimony is not

10:50:09 22    there.  I just simply want to establish that a declaration

10:50:09 23    was filed, it is publicly available and another witness will

10:50:09 24    put into context specific parts of this.  I'm not going to

10:50:09 25    question him on those parts.

10:50:09  1              MR. DeFOSSE:  We're happy to work with them,

10:50:09  2    Your Honor, about --

10:50:09  3              THE COURT:  I think there needs to be some

10:50:09  4    exchange between both sides on this because it has to be

10:50:09  5    something that is appropriate cross-examination, and it --

10:50:10  6    it's like handing somebody an encyclopedia, saying there is

10:50:10  7    something in there and did you file this, and the answer is

10:50:10  8    well, let's find a page which is an issue.  I think that's

10:50:10  9    probably necessary to avoid the problem under the rules.

10:50:10 10    Certainly, I'm not trying to help either side, I just don't

10:50:10 11    want to create juror confusion.  I don't want the

10:50:10 12    distraction.

10:50:10 13              MR. LEMIEUX:  My intention is not to show them

10:50:10 14    the pages to create a confusion, it will only be brought up

10:50:10 15    later by other witnesses as they're shown information that

10:50:10 16    they believe is not trade secret but is actually publicly

10:50:10 17    available.

10:50:10 18              THE COURT:  I think we have gone over where we

10:50:10 19    are on this, I have advised the parties to confer and that's

10:50:10 20    all I can do.  I understand there could be problems in the

10:50:10 21    receipt of the entire document and I've already heard

10:50:10 22    everybody so that's all I can do.  I'm going to let

10:50:10 23    everybody take a short break.  I mean, I understand we have

10:50:10 24    left four or five minutes.

10:50:10 25              COURT CLERK:  About three.

Aigner - direct

| | | |
|---|---|---|
| 10:50:10 | 1 | (A brief recess was taken.) |
| 10:55:49 | 2 | THE COURT:  All right.  You may be seated. |
| 10:55:52 | 3 | MR. GOLDEN:  Can I have a moment?  I'm waiting |
| 10:55:55 | 4 | on my folks. |
| 10:55:56 | 5 | THE COURT:  It will go faster without lead |
| 10:56:00 | 6 | counsel. |
| 10:56:00 | 7 | MR. GOLDEN:  I never considered this. |
| 10:56:01 | 8 | THE COURT:  That's fine. |
| 10:56:02 | 9 | MR. GOLDEN:  Thank you. |
| 10:56:03 | 10 | THE COURT:  No problem.  Ready to bring the |
| 10:56:05 | 11 | panel in.  We'll get a time count at the lunch break. |
| 10:56:25 | 12 | MR. DeFOSSE:  Thank you, Your Honor. |
| 10:56:33 | 13 | (Jury entering the courtroom at 10:56 a.m.) |
| 10:56:42 | 14 | THE COURT:  Everyone can be seated.  You need to |
| 10:57:09 | 15 | know that when we end up with side-bars during the break, |
| 10:57:12 | 16 | that is timed, also, so the time is moving the case along, |
| 10:57:20 | 17 | we're not wasting time. |
| 10:57:21 | 18 | Counsel, you may proceed. |
| 10:57:22 | 19 | MR. DeFOSSE:  Thank you, Your Honor. |
| 10:57:23 | 20 | BY MR. DeFOSSE: |
| 10:57:24 | 21 | Q.     Dr. Aigner, before we went on break we were talking |
| 10:57:27 | 22 | about Qorvo's reliability testing.  Do you recall that? |
| 10:57:29 | 23 | A.     Yes, I do. |
| 10:57:30 | 24 | Q.     Is the reliability testing that was reflected in the |
| 10:57:34 | 25 | Exhibit 14 applicable to both SMR and FBAR filters? |

Aigner - direct

10:57:39  1    A.        Yes, it is.

10:57:39  2    Q.        And I would like to return to that issue generally.

10:57:44  3    Mr. Buchbinder, if I could ask you to pull up PDX 2.22.

10:58:45  4              MR. DeFOSSE:  There seems to be some difficulty

10:58:47  5    with the equipment, Your Honor.

10:58:50  6              THE COURT:  Okay.

10:59:17  7              MR. DeFOSSE:  Are we going to be able to get

10:59:20  8    this to work?  2.22.

10:59:34  9    BY MR. DeFOSSE:

10:59:34 10    Q.        We'll try this without the exhibit, Dr. Aigner.

10:59:37 11    We've talked a lot today about SMR resonators and FBAR

10:59:43 12    resonators.  Can you tell the jury what is the structural

10:59:47 13    difference between an SMR resonator and a FBAR resonator?

10:59:52 14    A.        So while there are mostly similarities, there is one

10:59:59 15    difference and that is how the engine is supported from the

11:00:05 16    carrier substrate.  If you look at the left image here, that

11:00:10 17    represents an SMR resonator, you see that top electrode, the

11:00:18 18    bottom electrode, and then you have a series of layers

11:00:23 19    below, those are the layers that we implement to bounce back

11:00:28 20    the waves to allow free vibration.  In the FBAR, you have

11:00:34 21    the very same on the top, then you have an air cavity below

11:00:40 22    the structure, air does the same thing, it allows the wave

11:00:47 23    to bounce back and allows free vibration.

11:00:51 24    Q.        And so the difference between the two filters is

11:00:54 25    essentially the existence of an air cavity in an FBAR

Aigner - cross

11:00:58  1    filter?

11:00:58  2    A.      Well, air cavities exist also in SMR, but it's on the

11:01:03  3    top of the structure.  So air is on top of the top

11:01:07  4    electrode, in an SMR, but the bottom air is replaced by what

11:01:13  5    we call an acoustic reflector, which is a solid material.

11:01:18  6    Q.      Does the presence of an air cavity in an FBAR filter

11:01:22  7    have any impact on the utility of Qorvo's trade secrets in

11:01:27  8    groups 2, 3, 4, or 6 that you addressed today?

11:01:31  9    A.      In this group, it does not make a difference, they

11:01:34 10    all are based on the same physics and the same principles

11:01:38 11    will apply, many of them even have nothing to do with how

11:01:42 12    the resonator exactly looks like.

11:01:45 13                MR. DeFOSSE:  Thank you, Dr. Aigner.  Pass the

11:01:47 14    witness.

11:01:49 15                THE COURT:  Cross-examination.

11:01:55 16                     CROSS-EXAMINATION

11:02:12 17    BY MR. LEMIEUX:

11:02:18 18    Q.      Good morning, Dr. Aigner.

11:02:19 19    A.      Good morning.

11:02:20 20    Q.      Earlier in your testimony you mentioned that during

11:02:24 21    the time you were at -- let me step back for a second.

11:02:29 22                You're familiar with the concept of a phase gate

11:02:33 23    development strategy, is that correct?

11:02:34 24    A.      Yes.

11:02:35 25    Q.      And in your prior employment by Infineon, before you

Aigner - cross

11:02:41 1   ever joined TriQuint, did Infineon employ a phase gate

11:02:46 2   development strategy?

11:02:47 3   A.      Yes.

11:02:47 4   Q.      So is it fair to say that phase gate development

11:02:50 5   strategies are a relatively common tool used by many

11:02:54 6   companies to develop new technology to ultimately

11:02:58 7   commercially available products?

11:03:00 8   A.      I would agree.

11:03:02 9   Q.      And so the use of a phase gate development strategy

11:03:06 10  is not a trade secret of Qorvo, right?

11:03:10 11  A.      No.

11:03:13 12  Q.      Now, you also in your earlier testimony, you were

11:03:17 13  speaking about resonators and how those are the building

11:03:20 14  blocks of the filters that we have been discussing here.

11:03:24 15  It's the basic building block I believe is what you said.

11:03:27 16  Now the shape of the resonator that is used by Qorvo, is

11:03:32 17  that a rectangular or a polygon shaped resonator; correct?

11:03:37 18  A.      Amongst others, yes.

11:03:40 19  Q.      And does Qorvo use any oval or elliptical shaped

11:03:44 20  resonators?

11:03:45 21  A.      None of our shapes have sharp corners, so there is

11:03:50 22  always a segment of the circle involved.  You can call that

11:03:56 23  -- you could call that a curved surface.

11:03:58 24  Q.      I believe if we pull your document up, I believe it's

11:04:02 25  PDX 2.3.  If we could pull that exhibit back up, please?  If

Aigner - cross

11:04:24  1    we get 2.3.  The drawing here is showing Qorvo BAW filter

11:04:31  2    and the resonators that are being used there, all of those

11:04:35  3    are polygon shape, correct?

11:04:37  4    A.      Polygons is rounded corners.

11:04:40  5    Q.      Rounded corners.  Okay.  But they're not elliptical,

11:04:45  6    you know what an elliptical or an oval is correct?

11:04:48  7    A.      I know what an elliptical is.  Oval is not so well

11:04:51  8    defined in my opinion.

11:04:53  9    Q.      An oval, circular track that is slightly elongated

11:04:58 10    you're not --

11:04:59 11            THE COURT:  They have very different dimensions,

11:05:02 12    so maybe you can be more specific in your question.

11:05:06 13            MR. LEMIEUX:  Sure.

11:05:07 14    BY MR. LEMIEUX:

11:05:07 15    Q.      Dr. Aigner, you're very experienced with the shapes

11:05:09 16    of resonators, correct?

11:05:11 17    A.      Correct.

11:05:12 18    Q.      And you can look at the shapes that are being

11:05:15 19    employed here in Exhibit 2.3 and agree with me that they're

11:05:18 20    polygons even if they have rounded corners, right?

11:05:21 21    A.      That's correct.

11:05:21 22    Q.      They're not circular, are they?

11:05:24 23    A.      They're not circular.

11:05:26 24    Q.      And are you familiar with the shape of the resonators

11:05:29 25    used in Akoustis's devices?

Aigner - cross

11:05:32  1    A.      I have seen examples.

11:05:34  2    Q.      Okay.  And they're not the same shape as the ones

11:05:37  3    used in the Qorvo devices, are they?

11:05:40  4    A.      Some of them approach something in between a polygon

11:05:45  5    and an ellipse.

11:05:47  6    Q.      But they're not polygons, are they?

11:05:49  7    A.      Everything is a polygon.

11:05:51  8    Q.      Everything is a polygon, even an ellipse is a

11:05:55  9    polygon, sir?

11:05:56 10    A.      In reality, the way you draw it, everything is a

11:05:59 11    polygon.  Polygon just means there are multiple corners,

11:06:02 12    that's a definition of a polygon.

11:06:05 13    Q.      So in your definition, then, an ellipse is the same

11:06:09 14    as a polygon?

11:06:10 15    A.      It's not the same, but an ellipse is a polygon.

11:06:15 16    Q.      I'm sorry, I'm not sure I understood.  You said

11:06:18 17    they're not the same but an ellipse is a polygon?

11:06:21 18    A.      Polygon is a much bigger category than an ellipse.

11:06:24 19    Q.      So you believe ellipses fall within the category of

11:06:29 20    polygons?

11:06:29 21    A.      The way they're drawn they would be polygons.

11:06:32 22    Q.      Does Qorvo use any ellipses in its resonator shapes?

11:06:36 23    A.      Not in products today.

11:06:41 24    Q.      And, in fact, the summary that you were looking at

11:06:48 25    earlier, and I'm sorry that I didn't actually mark down what

Aigner - cross

11:06:53 1    exhibit that was, that was a discussion of polygons versus

11:06:58 2    rectangles in terms of resonator shapes?

11:07:00 3    A.    The examples given were rectangles because they're

11:07:06 4    rounded corners and polygons with rounded corners but the

11:07:09 5    methodology applies to any shape.

11:07:20 6    Q.    Now, you mentioned earlier that everyone at Qorvo,

11:07:23 7    including yourself, receives training on how to handle

11:07:26 8    confidential information.  Is that right?

11:07:28 9    A.    That's correct.

11:07:29 10   Q.    And that there is a tremendous focus placed on how to

11:07:34 11   handle such information at Qorvo; correct?

11:07:38 12   A.    Yes.

11:07:40 13   Q.    And so if a document was filed in a public proceeding

11:07:46 14   by Qorvo, it would have been carefully reviewed to determine

11:07:51 15   whether or not it contained confidential Qorvo information;

11:07:55 16   right?

11:07:56 17   A.    I would assume so, yes.

11:08:01 18   Q.    And that I believe your testimony was that those

11:08:07 19   measures have been in place at least since 2006, is that

11:08:10 20   right?

11:08:10 21   A.    That's right.

11:08:15 22   Q.    If we could pull up Exhibit 8, please, TX, Court's

11:08:24 23   Exhibit 8.  While they're trying to find Exhibit 8.  Here we

11:09:01 24   go.

11:09:01 25         This is what we were referring to a minute ago,

Aigner - cross

11:09:04  1    wasn't it, Dr. Aigner, that this is the presentation that

11:09:06  2    you claim contained the Qorvo trade secrets is this

11:09:10  3    presentation on polygons versus rectangle, is that correct?

11:09:15  4    A.      That's correct.

11:09:15  5    Q.      And in that discussion, there is no discussion there

11:09:19  6    of ellipses or ellipticals or ovals, correct?

11:09:23  7    A.      There is a discussion about the methodology used to

11:09:28  8    shapes.

11:09:28  9    Q.      And it's a discussion in the concept of polygons

11:09:31 10    versus rectangles, right?

11:09:33 11    A.      Those are the examples presented.

11:09:42 12    Q.      If we could look at slide 4, I believe it is, or

11:09:46 13    page 4.

11:09:50 14            You testified earlier, Dr. Aigner, that the

11:09:54 15    trade secret that's being represented here is ██████

11:09:59 16    ████████████████████████████████████████████████████

11:10:03 17    ███████████████    is that right?

11:10:06 18    A.      My testimony was that this is ██████████████████

11:10:09 19    █████████████████████████████████.

11:10:12 20    Q.      And I believe you also said that what you're trying

11:10:15 21    to establish here in this ████████████████████████████

11:10:18 22    ████████████████████████████, is that right?

11:10:21 23    A.      That's what the goal is of optimizing the shape.

11:10:26 24    Q.      So if the objective is to ████████████████, how would

11:10:31 25    you know how to do that from just looking at this graph?

Aigner - cross

| 11:10:34 | 1 | A.    You would experiment ███████████████ |
| 11:10:38 | 2 | ██████████████████████ what methods to apply. |
| 11:10:41 | 3 | Q.    So is the trade secret, then, that you would have to |
| 11:10:44 | 4 | do experimentation in order to figure out how to solve this |
| 11:10:48 | 5 | problem? |
| 11:10:50 | 6 | A.    For a limited amount, yes. |
| 11:10:53 | 7 | Q.    You would agree with me that this graph here doesn't |
| 11:10:56 | 8 | actually show the trade secret or the experimentation, does |
| 11:11:00 | 9 | it? |
| 11:11:00 | 10 | A.    It shows the trade secret. |
| 11:11:02 | 11 | Q.    I'm sorry? |
| 11:11:03 | 12 | A.    It does show the trade secret. |
| 11:11:05 | 13 | Q.    And is the trade secret the experimentation and how |
| 11:11:08 | 14 | to eliminate that, how does this graph show the |
| 11:11:12 | 15 | experimentation, how does it show any of the steps involved, |
| 11:11:16 | 16 | how would you know how to conduct the experiments? |
| 11:11:18 | 17 | A.    The trade secret is not the experimentation, the |
| 11:11:21 | 18 | trade secret is to know what to look at in your results. |
| 11:11:38 | 19 | Q.    And again, in trying to determine the difference in |
| 11:11:42 | 20 | the value of different resonator shapes, that's to determine |
| 11:11:46 | 21 | which performed better for purposes of the filters they're |
| 11:11:50 | 22 | placed in? |
| 11:11:51 | 23 | A.    Generally, yes.  But there are other criteria as |
| 11:11:55 | 24 | well. |
| 11:11:56 | 25 | Q.    What other criteria would there be? |

439

Aigner - cross

11:11:59  1    A.      Some resonator shapes are more favorable in terms of

11:12:06  2    layout.

11:12:07  3    Q.      And when you say more favorable in terms of layout,

11:12:10  4    what do you mean by that?

11:12:13  5    A.      You would be able to fit more resonators on the same

11:12:17  6    space.

11:12:17  7    Q.      And is a rectangle or a polygon is one shape more

11:12:24  8    conducive to laying out more resonators than the other?

11:12:29  9    A.      That very much depends on the case of the filter.

11:12:33 10    Q.      Well the filter is the collection of the resonators,

11:12:36 11    correct?

11:12:36 12    A.      That's correct.

11:12:37 13    Q.      Okay.  So again, is there a particular shape of

11:12:41 14    resonator that lends itself to being more conducive to

11:12:45 15    having more resonators in a particular filter?

11:12:47 16    A.      It only applies if the resonators limit your die size

11:12:53 17    or your chip size, which is not the case in many

11:12:57 18    applications.

11:13:04 19    Q.      If we could pull up PDX 2.9.  And looking at

11:13:12 20    category, or trade secret page 2.2 on page 3.  I believe

11:13:27 21    it's Exhibit 9, page 3.  Do we not have that exhibit?  If we

11:14:07 22    could pull up Exhibit 9, Trial Exhibit 9.  Do we not have

11:14:24 23    Trial Exhibit 9?

11:14:26 24            If we could go to page 3.

11:14:29 25            MR. DeFOSSE:  Your Honor, we understand that

Aigner - cross

11:14:30  1   there is a third party in the courtroom who is not subject

11:14:33  2   to the protective order.

11:14:35  3              THE COURT:  Okay.  I didn't know that.  That

11:14:37  4   person should be excused.  Sorry about that, we're going to

11:14:46  5   have to let that individual be excused.

11:14:58  6              MR. DeFOSSE:  Thank you.

11:14:59  7              THE COURT:  Thank you.

11:15:01  8              MR. LEMIEUX:  Thank you, Mr. DeFosse.

11:15:05  9   BY MR. LEMIEUX:

11:15:05 10   Q.     Now, Dr. Aigner, you stated that this information was

11:15:11 11   extremely valuable and is critical because it contains the

11:15:16 12   specs for the performance of the device that you were

11:15:18 13   developing?

11:15:20 14   A.     It's called a design goals, yes.

11:15:23 15   Q.     And aren't those design goals a function of the

11:15:27 16   industry spec that the customers are striving to achieve?

11:15:35 17   A.     Only part of those would be.

11:15:38 18   Q.     Part of what's up here is actually an industry spec,

11:15:42 19   correct?

11:15:42 20   A.     A small fraction, yes.

11:15:44 21   Q.     And the other specification that you're driving to

11:15:47 22   actually comes from your customers, right, it's not your

11:15:50 23   spec, what you're trying to achieve is what your customers

11:15:53 24   want you to produce, correct?

11:15:55 25   A.     No, that's not true.

Aigner - cross

11:15:56  1    Q.      So you pay no attention to what your customers are

11:16:00  2    asking for in their specifications?

11:16:01  3    A.      Of course we do, but they want a lot of things and we

11:16:06  4    can't meet all of them.

11:16:07  5    Q.      So this is kind of a desired wish list of what you're

11:16:12  6    trying to achieve at your next level of product, right?

11:16:14  7    A.      No.

11:16:15  8    Q.      This is not?

11:16:16  9    A.      It's not a wish list, it's what we have confirmed we

11:16:20 10    can do.

11:16:20 11    Q.      Okay.  And so this may or may not be everything that

11:16:24 12    your customers want, but it at least, you believe, satisfies

11:16:28 13    some of their requests, is that right?

11:16:30 14    A.      We state here critical specs, those are the things

11:16:33 15    that we know the customer cares most about.  The rest we try

11:16:38 16    to meet as good as possible.

11:16:41 17    Q.      If the customer doesn't want it, you don't spend time

11:16:45 18    trying to design and build it, correct?

11:16:47 19    A.      I don't understand your question.

11:16:48 20    Q.      Well, sure.  I mean, the reason that you're doing

11:16:51 21    this and undergoing this exercise is because your customers

11:16:54 22    have asked you for a device that can meet certain

11:16:57 23    performance criteria, isn't that right?

11:17:00 24    A.      It can be an open market part where there is no

11:17:04 25    customer at the time we design it and there would not be any

Aigner - cross

11:17:07  1    input from the customer.

11:17:08  2    Q.       So in that case, it's probably an industry

11:17:10  3    specification that you were setting benchmarks for, isn't

11:17:13  4    that right?

11:17:14  5    A.       No, it would be our understanding of the system and

11:17:16  6    what's needed in this market that will allow us to derive

11:17:21  7    this goal, this design goal.

11:17:23  8    Q.       So in setting those goals, what role, then, does the

11:17:26  9    industry specification play in that process?

11:17:29 10    A.       The industry defines the frequency at which the part

11:17:33 11    operates and then the system design that we come up with

11:17:38 12    defines how much attenuation we need for other applications.

11:17:47 13    Q.       Now, you're familiar with the use of simulations to

11:17:50 14    try to simulate performance of a particular devices,

11:17:54 15    correct?

11:17:54 16    A.       Yes.

11:17:54 17    Q.       And would you agree with me that simulations are only

11:17:59 18    as good as the variables selected to run the simulation

11:18:05 19    with?

11:18:05 20    A.       Yes.

11:18:06 21    Q.       So in parlance, kind of garbage in, garbage out, is

11:18:14 22    that right?

11:18:14 23    A.       I have heard that expression, yes.

11:18:19 24    Q.       Now, you mentioned during your testimony that

11:18:24 25    trimming was extremely important, and do you believe that

Aigner - cross

11:18:29  1    that's true for any type of device, whether it's FBAR, SMR,

11:18:33  2    in your opinion, trimming is critical, is that right?

11:18:37  3    A.      That's right.

11:18:38  4    Q.      And the purpose of the trimming is to fine tune the

11:18:42  5    frequency at which the resonator is operating at?

11:18:45  6    A.      That's correct.

11:18:47  7    Q.      And is trimming also determined by the manufacturers

11:18:52  8    of the trimming tools that are available?

11:18:55  9    A.      No.

11:18:56 10    Q.      So in your opinion, how many manufacturers are there

11:19:01 11    for trimming tools in your industry?

11:19:04 12    A.      There is at least one big one and one smaller one.

11:19:10 13    Q.      And do those companies provide any instructions or

11:19:14 14    guidance as to how you use their devices to effect trimming?

11:19:20 15    A.      Not to the degree that you need to succeed.

11:19:23 16    Q.      That's not the answer -- that's not the question I

11:19:25 17    asked you, sir.  Do those companies actually provide

11:19:29 18    information and guidance as to how their trimming tools are

11:19:33 19    to be used?

11:19:33 20    A.      They provide you with instructions how to run the

11:19:37 21    trimming tools.  They will not tell you what the input data

11:19:40 22    is for the application, how to do that.

11:20:02 23    Q.      If we could pull up, please, Exhibit 13.  PTX 1142.

11:20:20 24    Now, this is one of the items that I believe you testified

11:20:23 25    is a Qorvo trade secret; is that right?

Aigner - cross

11:20:26  1    A.      I did.

11:20:26  2    Q.      And doesn't it indicate in the lower right-hand

11:20:31  3    corner above the PTX box that this is actually a document

11:20:36  4    that originates from ███████?

11:20:42  5    A.      ███████ is the contractor that manufactures the

11:20:46  6    parts for us.

11:20:47  7    Q.      This is their drawing, right, not yours, not Qorvo's?

11:20:50  8    A.      This was put together as a collaboration between the

11:20:54  9    manufacturer and us as the designer.

11:20:57 10    Q.      If we could go back to the full drawing again.  And

11:21:00 11    if we look in the lower left-hand corner this says these

11:21:08 12    drawings specifications and other data are and remain the

11:21:12 13    product property of ███████.  Do you still believe this is

11:21:16 14    a Qorvo document even though it seems to state to the

11:21:19 15    contrary on the document itself?

11:21:20 16    A.      I believe there was an NDA in place between ███████

11:21:24 17    and Qorvo to use this connector only for our orders.

11:21:30 18    Q.      Do you see anywhere on this document that the

11:21:34 19    indication or the limitations that you were trying to place

11:21:38 20    upon this document?

11:21:41 21    A.      Let me take a closer look at it.  It's too small on

11:21:45 22    my screen.

11:21:46 23    Q.      No, please, go ahead.

11:22:04 24    A.      (Witness reviewing document.)  I do not see it on the

11:22:43 25    CAD drawing.

Aigner - cross

11:22:44  1    Q.      So everything that's actually on the face of this

11:22:47  2    document indicates that it is the property of ████████

11:22:49  3    Company; is that right?

11:22:57  4    A.      I cannot confirm that.

11:23:03  5    Q.      If we could go to I believe this was part of

11:23:10  6    demonstrative Exhibit 2.20.  If we go to page 6 of this

11:24:13  7    document, please.  And then page 23, I'm sorry.

11:24:22  8          If they can find it we'll show it up there.  Do

11:24:42  9    you recall, Dr. Aigner, there was a picture shown during the

11:24:44 10    questioning by Mr. DeFosse of a testing configuration

11:24:48 11    testing system, and I believe you made reference to a

11:24:50 12    particular colleague of yours that runs that particular

11:24:53 13    piece of equipment?

11:24:54 14    A.      Yes, I recall.

11:24:56 15    Q.      On that page, was there actually any criteria

11:25:00 16    identified for selecting the cables and connectors that go

11:25:06 17    into that testing system?

11:25:09 18    A.      There were no part numbers mentioned, but you could

11:25:13 19    see what you would need to do to put it together.

11:25:16 20    Q.      The pictures shown there would show you the specific

11:25:20 21    parts, items that would be necessary in your opinion to

11:25:23 22    build that system?

11:25:24 23    A.      It would certainly be helpful.

11:25:27 24    Q.      Here we go.  And so you believe that just these

11:25:30 25    pictures alone would be enough to be able to rebuild this

11:25:33  1    system?

11:25:34  2    A.    There is not these pictures alone, you have all the

11:25:39  3    other pictures, this is a pretty long document here.

11:25:42  4    Q.    Right.  But is there anywhere in that document that

11:25:46  5    actually lists out the criteria for selecting the cables and

11:25:49  6    connectors that are otherwise depicted in these pictures?

11:25:53  7    A.    No, there is not that detail.

11:25:55  8    Q.    And yet that's what you identified as the valuable

11:25:58  9    trade secret was the criteria for selecting the cables and

11:26:01 10    connectors, isn't that correct?

11:26:03 11    A.    It's the impression how it's put together, that's how

11:26:06 12    I testified.

11:26:06 13    Q.    And you would agree that those criteria are not

11:26:10 14    listed or appear on this page, do they?

11:26:12 15    A.    But one of skill in the art would understand what is

11:26:16 16    shown here and would be able to reproduce it.

11:26:21 17    Q.    Now, when you were discussing the differences between

11:26:25 18    an SMR and an FBAR device, I believe you testified that

11:26:32 19    they're the same except that in an SMR it's a solid material

11:26:37 20    that has gray reflectors used in order to contact the way it

11:26:43 21    works versus an air cavity in an FBAR, right?

11:26:47 22    A.    I don't think I used the expression gray reflector.

11:26:51 23    Q.    That's what is actually contained in the SMR in the

11:26:55 24    substrate material are actually gray reflectors, that's

11:26:59 25    what's showed up on the image?

Aigner - cross

11:27:01  1    A.      That's one expression we used.

11:27:05  2    Q.      Do those reflectors play a critical role in the

11:27:09  3    operation of the resonator?

11:27:11  4    A.      That depends very much on the case, I cannot

11:27:14  5    generalize.

11:27:14  6    Q.      If you took the reflectors out, would it operate in

11:27:18  7    the same way an SMR resonator, would it operate in the same

11:27:21  8    way if you didn't include the reflectors?

11:27:23  9    A.      It operates on the same principles.

11:27:26 10    Q.      Would it still be able to achieve its purpose if you

11:27:29 11    took out the reflectors of an SMR, would it still work?

11:27:33 12    A.      You would have to do a lot of other things as well.

11:27:36 13    Q.      And so an FBAR filter doesn't have those reflectors,

11:27:43 14    does it?

11:27:44 15    A.      No, it does not use the reflectors it uses.

11:27:48 16    Q.      You have to do other things to make sure that

11:27:50 17    resonator works in the desired way that you want it to,

11:27:53 18    right?

11:27:53 19    A.      The same physical principles apply, they are the same

11:27:59 20    markets.

11:27:59 21    Q.      But you have to do different things to it, because

11:28:02 22    you would agree, wouldn't you, that an FBAR, which has an

11:28:05 23    air cavity below it doesn't have the same physical

11:28:08 24    structures as a SMR, which includes these reflector levels

11:28:14 25    and layers?

Aigner - cross

11:28:14  1    A.      But they're merely different implementation of the

11:28:18  2    same thing.

11:28:20  3    Q.      So they're different types of devices to achieve the

11:28:24  4    same end result; right?

11:28:26  5    A.      There are slight differences in the devices, but

11:28:30  6    their similarities between them by far are bigger than the

11:28:34  7    differences.

11:28:35  8    Q.      Well, you would agree that an FBAR structure you

11:28:39  9    would never have the reflector levels that you have in an

11:28:42 10    SMR, isn't that true?

11:28:43 11    A.      You would not use the reflectors in an FBAR.

11:28:47 12    Q.      And would you also agree that the position, size, and

11:28:53 13    dimensions of the reflectors in an SMR are very important?

11:28:59 14    A.      Yes, they are important, there is no easy way to make

11:29:06 15    those reflectors, that's not disputed here.

11:29:09 16    Q.      Without those reflectors, an SMR resonator would not

11:29:13 17    achieve the functionality it's designed for, isn't that

11:29:17 18    true?

11:29:18 19    A.      So I don't understand what you mean take away, I

11:29:23 20    mean, there is no support, the resonator would float in the

11:29:26 21    air, it would have to do something to support it.

11:29:29 22    Q.      So the SMR resonator wouldn't work if those

11:29:32 23    reflectors were removed, the SMR wouldn't work, would it?

11:29:35 24    A.      The principle would work, the implementation would

11:29:38 25    have to be changed.

449

Aigner - cross

11:29:39  1   Q.      And it would work in what sense, that the top

11:29:43  2   portion, the electrode, and the piezo layer would still

11:29:48  3   potentially work, but -- perhaps you can walk me through why

11:29:53  4   an SMR resonator or filter, excuse me, would still work if

11:29:57  5   you removed the actual reflector levels?

11:30:01  6   A.      It would work in a sense that the device physics is

11:30:05  7   the same.

11:30:06  8   Q.      But would it actually --

11:30:09  9   A.      The engine is still there, just the engine mount is

11:30:12 10   not there, there are still engine mounts, you still need to

11:30:15 11   support it in some way.

11:30:17 12   Q.      So if you build an SMR reflector and didn't include

11:30:21 13   the reflectors, you believe those are simply engine mounts

11:30:25 14   and don't actually perform any other useful purpose within

11:30:28 15   that device as a filter?

11:30:30 16   A.      They do have some advantages for sure, some

11:30:36 17   disadvantages as well.

11:30:37 18   Q.      And what are the advantages in using an SMR variation

11:30:43 19   of a BAW filter?

11:30:44 20   A.      Well, we believe that for our factory infrastructure

11:30:49 21   it's the better choice, we don't need to make an air cavity,

11:30:53 22   which is an advantage for us, we instead make solid layers.

11:30:59 23   Q.      And you believe that your design is superior to the

11:31:02 24   FBAR design used by, as you testified, Broadcom, Akoustis,

11:31:06 25   and other manufacturers, is that right?

Aigner - cross

11:31:09  1    A.      I would say it's a wash, we compete for the same

11:31:12  2    slots, sometimes we win, sometimes we lose.  We perform in

11:31:17  3    the very same markets with the very same performance.

11:31:20  4    Q.      I agree with you, they perform in the same markets,

11:31:23  5    sure, I'm just wondering do you believe there is an

11:31:27  6    advantage to your SMR versus an FBAR design?

11:31:29  7    A.      The factory infrastructures that we have established,

11:31:32  8    for sure, for somebody else, not sure, probably not.  Most

11:31:36  9    companies that are big in the market use FBAR today.  We

11:31:40 10    chose to use SMR way back.

11:31:50 11    Q.      Dr. Aigner, did you ever have any conversations with

11:31:57 12    engineers at Akoustis regarding the development of their

11:32:01 13    FBAR products?

11:32:02 14    A.      Yes.

11:32:04 15    Q.      And when did you start having those discussions with

11:32:07 16    them?

11:32:11 17    A.      Probably very early in Akoustis's life.  2015,

11:32:25 18    probably, 2014, maybe.

11:32:27 19    Q.      And what was the purpose of you reaching out and

11:32:30 20    discussing BAW technology with Akoustis?

11:32:36 21    A.      Well, they had made some claims in publications and

11:32:42 22    the web page that were not credible and they started

11:32:47 23    publishing some papers that were full of glaring errors, and

11:32:53 24    as a member of this field, I'm a very senior person, and I'm

11:33:00 25    part of an industry group and conference organizer in this

Aigner - cross

11:33:06  1   field, I just didn't want them to publish papers full of

11:33:10  2   glaring errors, so I reached out to them to tell them, you

11:33:14  3   know, I think you have a few mistakes in your papers.

11:33:20  4   Q.      In fact, you offered to help Akoustis with evaluation

11:33:24  5   of its product, didn't you?

11:33:26  6   A.      That was at a later time.

11:33:28  7   Q.      At the time, but you did agree to, you offered to

11:33:32  8   help them evaluate their product and test their product for

11:33:35  9   them?

11:33:35 10   A.      Yeah, not just me, there was a group of people

11:33:39 11   involved in that.

11:33:39 12   Q.      And you say you started that in 2015.  Was this a

11:33:43 13   common practice of yours to speak to people at other BAW

11:33:46 14   companies and offer your assistance in helping to evaluate

11:33:50 15   their products?

11:33:51 16   A.      I don't see it as assistance, it was just a

11:33:54 17   conversation between scientists to make sure everybody

11:33:57 18   publishes rigorous scientific papers.

11:34:03 19   Q.      If I could show you --

11:34:09 20              MR. LEMIEUX:  Your Honor, if I can have

11:34:12 21   permission to approach the witness?

11:34:14 22              THE COURT:  You may.

11:34:24 23   BY MR. LEMIEUX:

11:34:24 24   Q.      And what I have handed the witness for identification

11:34:26 25   purposes is DTX 0005.

Aigner - cross

| | |
|---|---|
| 11:34:44 1 | Do you recognize this document, Dr. Aigner? |
| 11:34:49 2 | A.    Yes. |
| 11:34:50 3 | Q.    I'm sorry, you have to answer. |
| 11:34:51 4 | A.    Okay.  Yes. |
| 11:34:53 5 | Q.    And does this reflect e-mail exchanges between you |
| 11:34:58 6 | and Dave Aichele at Akoustis in 2015? |
| 11:35:02 7 | A.    Yes, it does. |
| 11:35:06 8 | Q.    And if we could turn -- |
| 11:35:11 9 | MR. LEMIEUX:  If I could actually move this into |
| 11:35:14 10 | evidence, Your Honor. |
| 11:35:14 11 | THE COURT:  Marked and received as 15. |
| 11:35:17 12 | (Trial Exhibit No. 15 was admitted into |
| 11:35:18 13 | evidence.) |
| 11:35:18 14 | BY MR. LEMIEUX: |
| 11:35:22 15 | Q.    If you could turn to page 2 of this exhibit.  Is this |
| 11:35:32 16 | information that you had sent to Mr. Aichele at Akoustis? |
| 11:35:45 17 | A.    Yes. |
| 11:35:47 18 | Q.    And, in fact, if I could ask you to turn to page 3 of |
| 11:35:50 19 | this exhibit, down at the bottom, it appears to be an e-mail |
| 11:35:54 20 | from you to Mr. Aichele referring to a meeting that you had |
| 11:35:59 21 | had in Greensboro, North Carolina, is that right? |
| 11:36:02 22 | A.    That's correct, yes. |
| 11:36:03 23 | Q.    Do you recall that meeting? |
| 11:36:05 24 | A.    I remember it, yes. |
| 11:36:06 25 | Q.    Was that a meeting that you had offered to have with |

Aigner - cross

11:36:09  1    him or did he invite you?

11:36:12  2    A.      I think it was an invite that went out to multiple

11:36:15  3    people at Qorvo.

11:36:19  4    Q.      Have you seen actually that invite go out to anyone

11:36:24  5    else besides yourself?

11:36:26  6    A.      I don't recall the invite from nine years ago.

11:36:31  7    Q.      And then when you met with Mr. Aichele, did you meet

11:36:34  8    with anybody else from Qorvo at that meeting?

11:36:40  9    A.      I'm sure there were others.

11:36:42 10    Q.      Who do you believe accompanied you?

11:36:48 11    A.      I believe Todd Gillenwater, most likely Bob Sowell.

11:37:01 12    Q.      Is there any reason why in these e-mail

11:37:03 13    communications between yourself and Mr. Aichele then, they

11:37:07 14    are not copied on any of those communications?

11:37:10 15    A.      I think it was just a discussion on a certain point

11:37:17 16    here.

11:37:20 17    Q.      And as a result of this meeting, did you offer to

11:37:24 18    share certain information with Mr. Aichele regarding BAW

11:37:29 19    filter design?

11:37:31 20    A.      "Share information" is a big word.  What are you

11:37:35 21    referring to?

11:37:36 22    Q.      Well, did you offer to help evaluate their products

11:37:39 23    or to provide them with information you were aware of from

11:37:43 24    other conferences, et cetera?

11:37:44 25    A.      Yes, scientific papers, we share freely in this

Aigner - cross

11:37:50  1    industry.

11:37:50  2    Q.      At this time in 2015, these were friendly

11:37:53  3    interactions between you and Mr. Aichele?

11:37:57  4    A.      I would say so, yes.

11:38:03  5    Q.      And did these interactions continue all the way up

11:38:08  6    through 2017?

11:38:11  7    A.      On and off, yes.

11:38:13  8    Q.      And at some point in time, did Qorvo consider

11:38:19  9    evaluating Akoustis's products for purposes of filling in

11:38:23 10    holes in its own product lineup?

11:38:26 11    A.      No.

11:38:28 12    Q.      And just so that we're clear, are you saying that

11:38:32 13    Qorvo never considered Akoustis or that they ultimately just

11:38:36 14    decided not to use Akoustis for their own reasons?

11:38:39 15    A.      I am not leading a business unit so I can't testify

11:38:44 16    to what was considered, but I saw no point doing that.

11:38:53 17    Q.      In addition to Mr. Aichele, did you also share

11:38:56 18    communications and information with Mr. Rohan Houlden?

11:39:00 19    A.      Yes, I did.

11:39:01 20    Q.      And Mr. Houlden was a former colleague at Qorvo,

11:39:06 21    correct?

11:39:08 22    A.      He was at Qorvo.

11:39:11 23    Q.      And he was at Qorvo at the same time you were, isn't

11:39:15 24    that right?

11:39:16 25    A.      We had an overlap, yes.

Aigner - cross

11:39:18  1    Q.      And why did you -- why did you start to share

11:39:23  2    information or correspondence with Mr. Houlden even after he

11:39:27  3    left Qorvo and was no longer there?

11:39:30  4    A.      It was a friendly relationship.  I wanted to point

11:39:34  5    out to him and the other colleagues at Akoustis that there

11:39:39  6    are glaring errors in the papers, that was the only purpose.

11:39:42  7    Q.      And, in fact, you offered to help evaluate their

11:39:45  8    product for purposes of helping, or educate them as to the

11:39:50  9    problems they were having?

11:39:52  10   A.      At the time, the early discussions with Houlden were

11:39:57  11   not about products, they were not nearly at the stage where

11:40:01  12   they could have any product or product development.  They

11:40:03  13   had some early results and they published papers about them

11:40:08  14   that had glaring errors in them.

11:40:11  15   Q.      So at the time when you're discussing matters with

11:40:13  16   Mr. Houlden in 2018, that was about resonator design, wasn't

11:40:17  17   it?

11:40:18  18   A.      No.

11:40:18  19   Q.      It was not.

11:40:22  20          MR. LEMIEUX:  Your Honor, if I can have

11:40:23  21   permission to please approach the witness?

11:40:26  22          THE COURT:  You may.

11:40:40  23   BY MR. LEMIEUX:

11:40:45  24   Q.      I have handed the witness what is marked for

11:40:46  25   identification purposes as DTX 0011.

Aigner - cross

11:40:53 1          Dr. Aigner, do you recognize the contents of

11:40:56 2  this exhibit?

11:41:00 3  A.      I do.

11:41:02 4  Q.      And what do you believe is contained in this exhibit?

11:41:15 5  A.      It's a conversation related to the status of

11:41:21 6  Akoustis' development at the time.

11:41:26 7          MR. LEMIEUX:  Your Honor, if I could move

11:41:27 8  exhibit DTX 0011 into evidence.

11:41:32 9          THE COURT:  Marked and received as 16.

11:41:35 10          (Trial Exhibit No. 16 was admitted into

11:41:36 11  evidence.)

11:41:36 12  BY MR. LEMIEUX:

11:41:40 13  Q.      This is now in December of 2016.  And it's an e-mail

11:41:46 14  in the middle here from you to Mr. Houlden.  And it says

11:41:52 15  subject regarding follow-up.  What type of information are

11:41:57 16  you providing to Mr. Houlden in this e-mail?

11:42:00 17  A.      I am providing him the general available knowledge in

11:42:04 18  the industry and in our field that apparently Akoustis

11:42:08 19  didn't have at the time.

11:42:10 20  Q.      And what kind of information is that more

11:42:13 21  specifically?

11:42:14 22  A.      The requirements of what a duplexer needs to be able

11:42:19 23  to do today.

11:42:20 24  Q.      And are you also explaining to him how testing a

11:42:25 25  single resonator for power handling can be tricky?

Aigner - cross

11:42:28  1    A.      Yes.

11:42:30  2    Q.      And are you sharing with him techniques then for

11:42:33  3    attempting to test resonators?

11:42:36  4    A.      No, I don't.

11:42:39  5    Q.      And so the reasons that you're providing him with why

11:42:44  6    it's difficult, that is not something that you think would

11:42:47  7    be useful to someone?

11:42:47  8    A.      No, not necessarily.

11:42:50  9    Q.      And so even though you're listing them in your

11:42:54 10    document, you don't actually consider any of the information

11:42:57 11    contained in this exhibit to be useful?

11:42:59 12    A.      People of skill in the art would already know these

11:43:03 13    things but apparently Akoustis people didn't know it.

11:43:06 14    Q.      Had you been given Akoustis' resonator for testing or

11:43:10 15    evaluation purposes at this point?

11:43:12 16    A.      At this point, I don't believe so.

11:43:34 17            MR. LEMIEUX:  Your Honor, if I could approach

11:43:35 18    the witness, please?

11:43:37 19            THE COURT:  You may.

11:43:44 20    BY MR. LEMIEUX:

11:43:45 21    Q.      I would like to hand you, Dr. Aigner, something

11:43:47 22    that's been marked for identification purposes as DTX 0012.

11:44:11 23            Dr. Aigner, do you recognize what's been put in

11:44:14 24    front of you as exhibit DTX 0012?

11:44:18 25    A.      Yes, I do.

Aigner - cross

11:44:20  1    Q.      And is this an e-mail discussion between yourself and

11:44:29  2    Rama Vetury at Akoustis?

11:44:33  3    A.      Yes.

11:44:34  4            MR. LEMIEUX:  Your Honor, if I could move

11:44:36  5    exhibit DTX 0012 into evidence.

11:44:38  6            THE COURT:  Marked and received as 17.

11:44:40  7            (Trial Exhibit No. 17 was admitted into

11:44:41  8    evidence.)

11:44:41  9    BY MR. LEMIEUX:

11:44:48 10    Q.      If I could direct your attention, Dr. Aigner, down to

11:44:51 11    the bottom of the first page.  Mr. Vetury seems to be asking

11:44:58 12    "Would you have time today to chat briefly for a few minutes

11:45:01 13    regarding resonator measurements?"

11:45:03 14    A.      I see that.

11:45:04 15    Q.      And did you subsequently have discussions with

11:45:09 16    Mr. Vetury regarding resonator measurements?

11:45:13 17    A.      I believe we had a call.

11:45:16 18    Q.      And that was to discuss resonator measurements?

11:45:21 19    A.      It was to discuss what they had published and what I

11:45:25 20    thought was wrong about it.

11:45:29 21    Q.      And, in fact, you shared with him some material that

11:45:32 22    you had gotten from another third-party source as well, is

11:45:36 23    that correct?

11:45:36 24    A.      That's all public information that comes from other

11:45:39 25    conferences I had attended.

Aigner - cross

11:45:40  1    Q.      And so the point being is that he had questions for

11:45:44  2    you regarding resonator measurements, and you were willing

11:45:48  3    to talk to him about it, is that right?

11:45:50  4    A.      I was willing to talk to him about it, the paper they

11:45:54  5    had published had glaring errors, that I just couldn't

11:45:57  6    accept as reasonable scientific rigorous publication.

11:47:20  7    Q.      Dr. Aigner, would you agree with me that information

11:47:25  8    that is publicly available cannot constitute a trade secret?

11:47:34  9    A.      Agree.

11:47:37 10    Q.      So that information of Qorvo's that is publicly

11:47:41 11    available would not constitute a Qorvo trade secret.  Would

11:47:45 12    you agree with that?

11:47:47 13    A.      With the disclaimer that time when it becomes

11:47:51 14    publicly available matters.

11:47:53 15    Q.      But you would agree that once it becomes publicly

11:47:56 16    available, that information is no longer a trade secret; is

11:48:00 17    that right?

11:48:00 18    A.      That's correct.

11:48:00 19    Q.      Do you recall submitting a declaration in another

11:48:08 20    matter that contained Qorvo information regarding Qorvo's

11:48:17 21    BAW technology?

11:48:21 22    A.      I believe there were several declarations.  I'm not

11:48:25 23    sure which one you're referring to.

11:48:28 24            MR. LEMIEUX:  If I could approach the witness,

11:48:29 25    then, Your Honor?

Aigner - cross

| | | |
|---|---|---|
| 11:48:30 | 1 | THE COURT:  You may. |
| 11:48:31 | 2 | MR. DeFOSSE:  Your Honor, I believe this is the |
| 11:48:32 | 3 | document that we had the side-bar on. |
| 11:48:34 | 4 | THE COURT:  That is correct. |
| 11:48:36 | 5 | MR. DeFOSSE:  Would it be possible to approach, |
| 11:48:38 | 6 | Your Honor? |
| 11:48:38 | 7 | THE COURT:  You may. |
| 11:54:09 | 8 | (Side-bar discussion:) |
| 11:54:09 | 9 | MR. DeFOSSE:  I thought we had a resolution on |
| 11:54:09 | 10 | this, Your Honor, that they would submit excerpts that were |
| 11:54:09 | 11 | pulled out, that's why I raised this, because it appeared |
| 11:54:09 | 12 | they were going to hand the entire document over. |
| 11:54:09 | 13 | THE COURT:  That would be my understanding. |
| 11:54:09 | 14 | MR. ELKINS:  So my suggestion is, Your Honor, I |
| 11:54:09 | 15 | believe that because this was filed in the District of |
| 11:54:09 | 16 | Arizona, it is available in the public record. |
| 11:54:09 | 17 | THE COURT:  Sure. |
| 11:54:09 | 18 | MR. ELKINS:  That we could ask and the Court |
| 11:54:09 | 19 | should provide judicial notice of a fact that these |
| 11:54:09 | 20 | documents were publicly filed -- |
| 11:54:09 | 21 | THE COURT:  That's not a problem. |
| 11:54:09 | 22 | MR. ELKINS:  -- in court and then we could short |
| 11:54:09 | 23 | circuit it and we could just -- the thing is we want our |
| 11:54:09 | 24 | expert to be able to use it. |
| 11:54:09 | 25 | THE COURT:  He can't use things that are not |

Aigner - cross

11:54:09 1    relevant to the case.

11:54:09 2              MR. ELKINS:  Correct.

11:54:09 3              THE COURT:  That's not going to help anybody.

11:54:09 4              MR. ELKINS:  No.  So we have chosen the things

11:54:09 5    on which our expert would rely.

11:54:09 6              THE COURT:  You clipped too much stuff.

11:54:09 7              MR. DeFOSSE:  I also haven't seen the clips.

11:54:09 8              MR. ELKINS:  It looks like a lot.

11:54:09 9              THE COURT:  It looks like almost the entire

11:54:09 10   document.  I don't think -- explain to me our situation.

11:54:09 11             MR. ELKINS:  So, for example, Dr. Aigner

11:54:09 12   testified that trimming information is top secret.

11:54:09 13             THE COURT:  And that doesn't mean the concept of

11:54:09 14   trimming is top secret?

11:54:09 15             MR. ELKINS:  Correct.

11:54:09 16             THE COURT:  You understand that?

11:54:09 17             MR. ELKINS:  Correct.

11:54:09 18             THE COURT:  It's specific data as to trimming

11:54:09 19   can be top secret, or very important.

11:54:09 20             MR. ELKINS:  Correct.  But that data here was

11:54:09 21   supplied in this public --

11:54:09 22             THE COURT:  Is that identical to something

11:54:09 23   that's been produced earlier?

11:54:09 24             MR. ELKINS:  I don't know if the document is

11:54:09 25   identical, but the information in it is of the same caliber.

11:54:09 1                    THE COURT:  That's not the same thing.  That's

11:54:09 2       not the same thing because one, it's 401 and 403, it can be

11:54:09 3       very confusing because if it's something that looks kind of

11:54:09 4       like it, for example, if I said that the process and

11:54:09 5       temperature, if the process and temperature had to be

11:54:10 6       127 degrees celsius ten years ago and now we've determined

11:54:10 7       that that doesn't work, I'm only going to use 113 degrees,

11:54:10 8       that's different.  That's just different.  That's not the

11:54:10 9       same.

11:54:10 10                   MR. ELKINS:  But if it contains the same process

11:54:10 11      steps, that were part of the material --

11:54:10 12                   THE COURT:  I don't think -- I think we run the

11:54:10 13      risk here, the same process.  It's the precise data that is

11:54:10 14      critical.

11:54:10 15                   MR. ELKINS:  That's not what he testified.

11:54:10 16                   MR. LEMIEUX:  That's not what is claimed as

11:54:10 17      trade secret, Your Honor, they claimed the process.

11:54:10 18                   MR. DeFOSSE:  I mean, I would disagree

11:54:10 19      obviously, we put up the algorithms that are on the slide.

11:54:10 20                   MR. ELKINS:  But the algorithms were only a part

11:54:10 21      of what he said.  He didn't limit it to the algorithms, it

11:54:10 22      was a very broad statement.  And if it fits --

11:54:10 23                   THE COURT:  I'll put it like this, if there are

11:54:10 24      material differences in these documents from the documents

11:54:10 25      being considered as trade secrets, then that poses a 403

issue with using it.

MR. ELKINS: Correct.

THE COURT: And our job is not to confuse people but to help them understand. So I can't tell, I haven't had a chance to look at it.

Let me ask counsel, where are we?

MR. DeFOSSE: I had shared some concerns with the Court about the volume that was there. We had reached agreement during the break that they would submit it with just the pages that were going to be relevant. I haven't seen the pages and I don't know what's there.

THE COURT: What we'll do is we'll allow you -- obviously I can't allow you to hand the document up. We can mark it as an ID document. I will tell the jury that it's evidence received for identification. We'll receive the information about it, and then portions of that document may ultimately be received in evidence. I don't know which portions, I can't tell right now.

And also you made clear to me you weren't trying to introduce that material through this witness at this time anyway, you were going to introduce it with other witnesses.

MR. DeFOSSE: That's perfectly acceptable.

MR. LEMIEUX: Have him identify that he did sign this.

THE COURT: Absolutely. Absolutely not a

Aigner - cross

11:54:11 1    problem at all.

11:54:11 2                    (End of side-bar.)

11:54:16 3                    THE COURT:  We're going to receive the document

11:54:18 4    for identification only.  I think it's going to be

11:54:20 5    identified by the witness, we'll see it and they're going to

11:54:23 6    ask questions about it.  But since we're receiving a larger

11:54:28 7    document, we can't tell at this time as to whether the

11:54:32 8    entire document is receivable by me or you as exhibits in

11:54:36 9    the case.  There are some issues there under the rules.  And

11:54:39 10   they're going to work on those issues.

11:54:41 11                   So sometimes we identify a document, we ask a

11:54:44 12   few questions about it to identify the document, and then we

11:54:50 13   will resolve the issue as to which portions of that document

11:54:53 14   are appropriately received into evidence at a later time.

11:54:57 15                   Counsel may proceed.

11:54:59 16                   MR. LEMIEUX:  If I may approach the witness,

11:55:01 17   then, Your Honor?

11:55:02 18                   THE COURT:  Certainly.  Absolutely.

11:55:11 19                   MR. LEMIEUX:  And what I have handed the witness

11:55:12 20   is marked for identification purposes as DTX 0034.

11:55:20 21                   THE COURT:  Yes.  That's marked and received for

11:55:22 22   identification only.  So it will have 18 for identification.

11:55:26 23   If it's never received, then you won't receive the full

11:55:31 24   document, but portions of it received, then we will see

11:55:34 25   those portions are that are received.

Aigner - cross

11:55:37  1              (Trial Exhibit No. 18 was admitted into

11:55:41  2      evidence.)

11:55:41  3      BY MR. LEMIEUX:

11:55:42  4      Q.      Dr. Aigner, have you seen this document before?

11:55:45  5      A.      It appears so, yes.

11:55:48  6      Q.      What is it?

11:55:50  7      A.      It's a document related to a patent lawsuit in

11:55:55  8      Arizona back in 2011.

11:56:00  9      Q.      This document is a declaration that you signed under

11:56:04 10      penalty of perjury; is that correct?

11:56:06 11      A.      I did.

11:56:07 12      Q.      And that is your signature on page 2 of this

11:56:11 13      document?

11:56:11 14      A.      Yes.

11:56:13 15      Q.      And to the best of your knowledge, the information

11:56:19 16      that's contained in the declaration, it was true and

11:56:22 17      accurate at the time it was submitted?

11:56:26 18      A.      Yes.

11:56:39 19              MR. LEMIEUX:  Assuming, Your Honor, that you

11:56:41 20      would not like to be getting further into the substance of

11:56:44 21      this declaration then, I would have no further questions.

11:56:47 22              THE COURT:  I understood that it was really

11:56:49 23      something to be identified by the witness and there may be

11:56:51 24      questions later on from other witnesses, I think that's

11:56:54 25      correct.

Aigner - redirect

BY MR. LEMIEUX:

11:56:54  1

11:56:55  2  Q.      If I understand, then, Dr. Aigner, this document, the

11:56:58  3  information that's contained in it was true and accurate at

11:57:02  4  the time it was submitted in that other proceeding; is that

11:57:09  5  right?

11:57:09  6  A.      That's right.

11:57:14  7  Q.      And this document relates to BAW information?

11:57:20  8  A.      It does.

11:57:23  9          MR. LEMIEUX:  No further questions, then, for

11:57:25  10  this witness, Your Honor.

11:57:26  11          THE COURT:  All right.  Thanks very much.

11:57:28  12          Redirect.

11:57:31  13                  REDIRECT EXAMINATION

11:57:32  14  BY MR. DeFOSSE:

11:57:36  15  Q.      Dr. Aigner, I'm going to be very brief.  When

11:57:39  16  Mr. Lemieux began his examination of you, he asked you a

11:57:43  17  question about the Infineon product development process, do

11:57:46  18  you recall that?

11:57:46  19  A.      I recall that.

11:57:47  20  Q.      Did Infineon make its product development process

11:57:50  21  publicly available?

11:57:51  22  A.      No.

11:57:52  23  Q.      Did Infineon create that process by taking a process

11:57:56  24  from its competitors and stripping off their labels?

11:57:59  25  A.      No, they did not.

467

Aigner - redirect

11:58:00  1    Q.      Does Qorvo provide its product development process to

11:58:04  2    its competitors?

11:58:05  3    A.      No.

11:58:08  4    Q.      Mr. Lemieux also asked you a few questions concerning

11:58:14  5    Exhibit 13.  And could I ask Mr. Buchbinder to pull that up,

11:58:19  6    which has been marked for identification as 1142.

11:58:25  7            Dr. Aigner, do you recall the exhibit we are

11:58:35  8    looking at here?

11:58:36  9    A.      Yes.

11:58:36 10    Q.      If you look in the bottom right-hand corner, there is

11:58:40 11    a heading there that says Customer Outline Drawing.  Do you

11:58:44 12    see that?

11:58:45 13    A.      Yes, I see that.

11:58:46 14    Q.      What is the significance of a customer outline

11:58:49 15    drawing?

11:58:50 16    A.      It means that it's a customer specific, the drawing

11:58:55 17    came from a customer.

11:59:00 18            MR. DeFOSSE:  Your Honor, may I approach?

11:59:01 19            THE COURT:  You may.

11:59:11 20    BY MR. DeFOSSE:

11:59:19 21    Q.      Dr. Aigner, I have handed you what's been marked for

11:59:22 22    identification as PTX 1557.  Do you recognize this document?

11:59:34 23    A.      This is a nondisclosure agreement.

11:59:39 24    Q.      And who are the parties to this nondisclosure

11:59:42 25    agreement?

Aigner - redirect

11:59:44  1    A.       That would be Qorvo on one side and it is ████████ on

11:59:59  2    the other side.

12:00:00  3              MR. DeFOSSE:  Your Honor, we would move into

12:00:02  4    evidence PTX 1557.

12:00:09  5              THE COURT:  Marked and received as 19.

12:00:12  6              (Trial Exhibit No. 19 was admitted into

12:00:14  7    evidence.)

12:00:14  8    BY MR. DeFOSSE:

12:00:14  9    Q.       Can you remind the jury, is ████████ the company that

12:00:17 10    created or manufactured the custom parts?

12:00:21 11    A.       That's correct.

12:00:21 12    Q.       This is a nondisclosure agreement between Qorvo and

12:00:26 13    ████████?

12:00:26 14    A.       Yes.

12:00:27 15    Q.       If you could look at the second paragraph, the first

12:00:29 16    whereas clause.  Can you tell the jury what the purpose of

12:00:37 17    the nondisclosure agreement was with ████████?

12:00:41 18    A.       We entered into a nondisclosure agreement generally

12:00:45 19    to be able to discuss things that are not to be disclosed

12:00:49 20    outside of this discussion on other companies or uninvolved

12:00:53 21    parties.  That's the case here.

12:00:59 22    Q.       I apologize, doctor?

12:01:00 23    A.       This particular case, it was about manufacture design

12:01:04 24    tests performance of RF interconnect systems, which is

12:01:08 25    connected with BAW.

Aigner - redirect

12:01:12  1    Q.      Dr. Aigner, Mr. Lemieux also asked you about the

12:01:18  2    differences between FBAR and SMR resonators, do you recall

12:01:24  3    that?

12:01:24  4    A.      Yes.

12:01:24  5    Q.      I believe that you testified previously the

12:01:27  6    difference is the presence of an air cavity in an FBAR

12:01:31  7    resonator as opposed to reflectors in an SMR resonator; is

12:01:35  8    that right?

12:01:35  9    A.      That's correct.

12:01:35 10    Q.      Do any of the trade secrets that Qorvo has accused

12:01:40 11    Akoustis of misappropriating in this case relate to the

12:01:43 12    reflector, the reflector portion of an SMR resonator?

12:01:47 13    A.      None apply to reflectors.

12:01:52 14    Q.      Mr. Lemieux also provided you with some

12:01:55 15    correspondence between yourself and employees at Akoustis,

12:01:57 16    do you recall that?

12:01:58 17    A.      Yes, I do.

12:01:59 18    Q.      And I believe you testified that you were attempting

12:02:01 19    to alert Akoustis of some errors in papers that it had

12:02:05 20    published, is that right?

12:02:06 21    A.      That's right.

12:02:07 22    Q.      Did you ever offer to provide Akoustis any trade

12:02:11 23    secrets?

12:02:11 24    A.      No, I did not.

12:02:12 25    Q.      At the time you were providing Akoustis with

Aigner - recross

12:02:16  1  assistance with their published papers, did you know that

12:02:19  2  Akoustis had taken any of Qorvo's trade secrets?

12:02:22  3  A.      I did not know that.

12:02:25  4          MR. DeFOSSE:  That's all, Your Honor.  Thank

12:02:28  5  you.

12:02:28  6          THE COURT:  All right.

12:02:29  7          MR. LEMIEUX:  Your Honor, if I can have several

12:02:32  8  questions on recross?

12:02:34  9          THE COURT:  There is under Rule 611 no such

12:02:36 10  thing.  I will allow you one question.  We'll see how one

12:02:45 11  question works.

12:02:46 12                  RECROSS-EXAMINATION

12:02:46 13  BY MR. LEMIEUX:

12:02:46 14  Q.      Dr. Aigner, Mr. DeFosse was just showing you again

12:02:52 15  the ███████  drawing.

12:02:53 16  A.      Yes.

12:02:53 17  Q.      Is there anything in the nondisclosure agreement he

12:02:57 18  just had you look at that changes the fact that this is

12:02:59 19  still an ██████  drawing and not a Qorvo drawing?

12:03:04 20  A.      It was probably placed on an ██████  template for

12:03:10 21  manufacturing purposes.  It doesn't mean that it's not Qorvo

12:03:14 22  information.

12:03:18 23  Q.      So the question simply is this an ██████  drawing or

12:03:21 24  is this a Qorvo drawing?

12:03:22 25  A.      The label on it says ██████ .

Aigner - recross

12:03:26  1    Q.       Thank you very much.

12:03:27  2    A.       It says Customer Outline Drawing.

12:03:30  3                  MR. LEMIEUX:  Thank you.

12:03:31  4                  THE COURT:  Thank you very much.  And we are

12:03:33  5    going to let you step down at this time.

12:03:39  6                  Who is our next witness going to be.

12:03:43  7                  MR. DeFOSSE:  Your Honor, our next witness will

12:03:50  8    be Anthony Testa.

12:03:50  9                  Your Honor, may I approach and take the

12:03:53 10    demonstrative, physical demonstratives?

12:03:54 11                  THE COURT:  You may.

12:03:55 12                  MR. DeFOSSE:  Thank you.

12:04:18 13                  THE COURT:  The witness should come forward.

12:04:21 14                  MS. AYERS:  Your Honor, Qorvo calls Anthony

12:04:25 15    Testa as its next witness.

12:04:26 16                  THE COURT:  If you'll come forward, raise your

12:04:28 17    right hand, the clerk will swear you in.

12:04:32 18                  COURT CLERK:  Please remain standing and raise

12:04:34 19    your right hand.  Please state and spell your name for the

12:04:38 20    record.

12:04:38 21                  THE WITNESS:  Anthony Testa.  A-N-T-H-O-N-Y,

12:04:42 22    T-E-S-T-A.

12:04:44 23                  ANTHONY TESTA, having been duly sworn, was

12:04:49 24    examined and testified as follows:

12:04:51 25                       DIRECT EXAMINATION

Testa - direct

12:04:51  1   BY MS. AYERS:

12:04:56  2   Q.      Good morning, Mr. Testa.  Can you please introduce

12:05:00  3   yourself to the jury.

12:05:00  4   A.      Good morning, my name is Anthony Testa.

12:05:02  5   Q.      Mr. Testa, sometimes it can be very difficult to hear

12:05:06  6   people in the courtroom.  If you could please speak into the

12:05:08  7   microphone so everybody can hear you, I would appreciate it.

12:05:12  8   A.      Absolutely.

12:05:13  9   Q.      Can you tell the jury where you currently work?

12:05:15 10   A.      Sure.  I work at Qorvo.

12:05:17 11   Q.      Can you provide the jury with a brief overview of

12:05:20 12   your educational background?

12:05:21 13   A.      After high school, I attended the United States

12:05:25 14   Military Academy at West Point.  I studied aerospace

12:05:27 15   engineering there.  Upon graduation I was commissioned as a

12:05:30 16   U.S. Army officer, spent five years in active duty.  After

12:05:35 17   that, I went to RF Micro Devices, which I continued my

12:05:41 18   education and had an MBA in global management in 2006.

12:05:44 19   Q.      And when did you first begin working at Qorvo?

12:05:47 20   A.      It was back in 1999.

12:05:49 21   Q.      Was Qorvo called Qorvo in 1999?

12:05:52 22   A.      It was not.  It was RF Micro Devices.

12:05:55 23   Q.      Did RF Micro Devices have a nickname?

12:05:58 24   A.      It did, it eventually became known as RFMD.

12:06:01 25   Q.      Can you remind the jury for a moment what the

Testa - direct

12:06:04 1    relationship is between RFMD and Qorvo?

12:06:06 2    A.      Sure.  In 2015, RFMD and TriQuint Semiconductor

12:06:13 3    merged together to create Qorvo.

12:06:14 4    Q.      What was your title when you first joined RFMD?

12:06:17 5    A.      I first joined as a sales engineer.

12:06:20 6    Q.      And are you still a sales engineer today?

12:06:22 7    A.      I am not.

12:06:23 8    Q.      Can you provide the jury with a brief overview of how

12:06:28 9    your role has changed since 1999?

12:06:30 10   A.      Sure.  As a sales engineer, I started focusing in

12:06:35 11   parts of Europe.  I eventually grew through the management

12:06:39 12   chain in sales and eventually led our entire sales force.

12:06:43 13   From there I moved to different business development roles

12:06:47 14   within Qorvo.  Eventually moving into business unit, which

12:06:50 15   was our connectivity business unit doing marketing and

12:06:53 16   product line management, from there I've recently been

12:06:56 17   leading our connectivity components unit as the general

12:07:00 18   manager.

12:07:00 19   Q.      And can you explain to the jury what the connectivity

12:07:05 20   components group does?

12:07:06 21   A.      Sure.  So connectivity components essentially is

12:07:09 22   focused on our Wi-Fi portion of the business, as well as

12:07:12 23   some of our general products in our internet type solutions,

12:07:17 24   so we have BAW filters and other front end solutions that we

12:07:21 25   provide into the space.

Testa - direct

12:07:22  1   Q.      And what type of products that consumers would use

12:07:26  2   that these BAW filters and products go into?

12:07:29  3   A.      Predominately in the Wi-Fi side, they go into your

12:07:34  4   WiFi routers that you have at home, either those you buy at

12:07:36  5   the store or those that get issued to you from the cable or

12:07:39  6   internet providers.  Also the Wi-Fi routers you would

12:07:43  7   connect into, whether in an airport or hotel or any public

12:07:47  8   space.

12:07:49  9   Q.      Do you know what type of BAW filters Akoustis sells?

12:07:52 10   A.      I do.

12:07:53 11   Q.      Okay.  And what type of filters does Akoustis sell?

12:07:57 12   A.      Those are FBAR.

12:07:59 13   Q.      Are you generally familiar, as the general manager in

12:08:03 14   charge of marketing and selling for Qorvo Wi-Fi filters,

12:08:08 15   what the SMR and BAW filter do?

12:08:14 16   A.      Yes.

12:08:14 17   Q.      From a marketing perspective, do customers you sell

12:08:20 18   BAW filters to care whether you are selling them a FBAR or

12:08:24 19   SMR?

12:08:24 20   A.      They do not, they focus on price, performance, size,

12:08:28 21   availability.

12:08:31 22   Q.      Can you explain to the jury how Qorvo determines what

12:08:34 23   customers it wants to sell to and which products it wants to

12:08:37 24   research, create, and sell?

12:08:39 25   A.      Sure.  There is a yearly process that we used to go

Testa - direct

12:08:43  1    through the business strategy from the entire group.

12:08:47  2    Through that it's pulling from experiences we have from all

12:08:51  3    the different product groups we have within Qorvo and it

12:08:55  4    simulates basically an answer of what products we want to

12:08:58  5    target and what customers we want to sell to, essentially

12:09:00  6    what business we want to be in.

12:09:02  7    Q.      And after Qorvo determines what business it wants to

12:09:05  8    be in, what does it do next in order to ultimately develop

12:09:11  9    and sell the products?

12:09:12 10    A.      Yeah, we would go through and make a funding

12:09:15 11    decision, so we would decide to actually invest into these

12:09:19 12    products, we would focus which targets we want to sell them

12:09:23 13    to, what the performance of those specific products and that

12:09:26 14    would give us back how much it's going to cost essentially

12:09:29 15    and how much we'll make back in business.

12:09:32 16    Q.      And generally speaking, can you explain to the jury

12:09:35 17    what role trade secrets play at Qorvo with respect to its

12:09:39 18    business plans, product road maps, and prototypes?

12:09:43 19    A.      Yeah, essentially all of that is trade secret, it is

12:09:46 20    our essentially go to market filing of our business plan.

12:09:51 21    So we are using all the different methodologies internal,

12:09:55 22    all the analysis we have done from the experience we have,

12:09:57 23    the on sight visits that we do through the customer regions,

12:10:02 24    and concrete this plan so it's absolutely secret in terms of

12:10:06 25    how we go to business.

Testa - direct

12:10:07 1    Q.      Do the employees that report to you receive training

12:10:10 2    on how to handle trade secrets?

12:10:12 3    A.      They do.  So as they join Qorvo, they sign an

12:10:16 4    agreement which shows that they will keep our information

12:10:20 5    proprietary, confidential, as they go through that, they'll

12:10:24 6    get a yearly update where they have to resign and review

12:10:27 7    that material.  And we also train them on ways to mark the

12:10:32 8    materials to show that they are confidential and

12:10:33 9    proprietary.

12:10:34 10   Q.      And Mr. Testa, I would like to talk to you today

12:10:39 11   about Qorvo's trade secrets in this case.  Did you assist in

12:10:42 12   the preparation of slides today, so that the jury can better

12:10:45 13   understand your testimony?

12:10:46 14   A.      I did.

12:10:46 15   Q.      Mr. Buchbinder, can you please display PDX 3.1.

12:10:52 16           Mr. Testa, can you tell the jury what is shown

12:10:58 17   on this slide?

12:10:59 18   A.      Yes.  These are the eight trade secret groups that

12:11:03 19   Qorvo is claiming Akoustis took from Qorvo without

12:11:06 20   permission.

12:11:06 21   Q.      Do any of the trade secret groups shown in PDX 3.1

12:11:12 22   relate to the work that you are responsible for managing at

12:11:16 23   Qorvo?

12:11:16 24   A.      Yes, I'm responsible for groups one and group eight.

12:11:20 25   Q.      Mr. Testa, I would like to start by talking with you

Testa - direct

12:11:23  1    today about group 1.  Mr. Buchbinder, can you please display

12:11:29  2    PDX 3.2?

12:11:30  3              Mr. Testa, we're going to go through each one of

12:11:34  4    these trade secrets in group 1.  But can you describe at a

12:11:38  5    high level what these trade secrets are?

12:11:40  6    A.    Yeah.  This is essentially deciding what base

12:11:44  7    businesses we will participate in, what customers we will

12:11:48  8    sell to, what those products need to perform to or achieve.

12:11:52  9    How much it will cost us to develop those solutions, and

12:11:55 10    then how much money we'll make back as a company.

12:12:00 11              MS. AYERS:  Your Honor, may I approach the

12:12:01 12    witness to hand him the first three exhibits that relate to

12:12:04 13    this trade secret group?

12:12:06 14              THE COURT:  You may.

12:12:38 15              You may step forward.

12:12:42 16              MR. CREMEN:  I have binders, Your Honor.

12:12:44 17              THE COURT:  That's fine.

12:12:46 18              You may say why don't I get the binders, you're

12:12:51 19    not going to look in the binders until they're called into

12:12:54 20    evidence, and it is second place, everybody needs to focus

12:12:57 21    on the testimony as it's given, and I hate to say it, the

12:13:00 22    binders seem to extract the focus, you'll have the exhibits

12:13:04 23    at the end of the case, absolutely, not a problem.

12:13:08 24    BY MS. AYERS:

12:13:12 25    Q.    Mr. Testa, do you recognize the document that has a

Testa - direct

12:13:15  1    label PTX 127?

12:13:17  2    A.    I do.

12:13:17  3    Q.    How do you recognize this document?

12:13:19  4    A.    I was responsible for parts of the analysis that's

12:13:23  5    included in this document.

12:13:24  6    Q.    Does this document reflect regularly conducted

12:13:28  7    analysis that Qorvo employees perform?

12:13:29  8    A.    It does.

12:13:30  9    Q.    And does Qorvo routinely keep and record the research

12:13:34 10    analysis that it performs as a part of its routine business

12:13:37 11    practices?

12:13:37 12    A.    It does.

12:13:38 13           MS. AYERS:  Your Honor, I offer this document in

12:13:40 14    evidence.

12:13:40 15           THE COURT:  Marked and received as the next

12:13:43 16    numbered document which should be 20.

12:13:46 17           (Trial Exhibit No. 20 was admitted into

12:13:47 18    evidence.)

12:13:47 19    BY MS. AYERS:

12:13:50 20    Q.    Mr. Testa, could you please look at the document that

12:13:53 21    has the label PTX 0128.

12:13:57 22    A.    Yes.

12:13:58 23    Q.    Do you recognize this document?

12:14:00 24    A.    I do.

12:14:00 25    Q.    How do you recognize this document?

479

Testa - direct

12:14:03  1    A.      Myself and the team were responsible for pulling this

12:14:06  2    together.

12:14:06  3    Q.      And do you regularly record information that is

12:14:10  4    reflected in this document?

12:14:12  5    A.      I do.

12:14:13  6    Q.      Do you routinely keep and record internal product

12:14:17  7    strategies as a part of Qorvo's routine business practices?

12:14:21  8    A.      I do.

12:14:21  9            MS. AYERS:  Your Honor, I offer this document

12:14:23 10    into evidence.

12:14:24 11            THE COURT:  Marked and received as 21.

12:14:28 12            (Trial Exhibit No. 21 was admitted into

12:14:29 13    evidence.)

12:14:29 14    BY MS. AYERS:

12:14:29 15    Q.      And last one, Mr. Testa.  Can you look at the

12:14:32 16    document that is labeled PTX 718?

12:14:35 17    A.      Yes.

12:14:35 18    Q.      Do you recognize this document?

12:14:36 19    A.      I do.

12:14:36 20    Q.      How do you recognize this document?

12:14:38 21    A.      My team created this document.

12:14:40 22    Q.      Okay.  And does Qorvo and its employees regularly

12:14:44 23    record the information that is contained in this document?

12:14:46 24    A.      Yes.

12:14:46 25    Q.      And does it routinely keep and record this

12:14:49  1   information as a part of its routine business practices?

12:14:51  2   A.    Yes.

12:14:52  3          MS. AYERS:  Your Honor, I offer this document

12:14:54  4   into evidence.

12:14:55  5          THE COURT:  Marked and received as 22.

12:14:57  6          (Trial Exhibit No. 22 was admitted into

12:14:59  7   evidence.)

12:14:59  8   BY MS. AYERS:

12:15:00  9   Q.    Mr. Testa, I would like -- first of all,

12:15:03 10   Mr. Buchbinder, could you please display PDX 3.3.

12:15:08 11          Mr. Testa, could you explain to the jury what

12:15:12 12   information is shown on PDX 3.3?

12:15:15 13   A.    Yes.  These are the three documents just received.

12:15:18 14   And identified as containing trade secrets.

12:15:22 15   Q.    And I'm going to ask you some questions about each

12:15:25 16   one of these.  Mr. Buchbinder, if you could please display

12:15:29 17   PDX 3.4.

12:15:31 18          I would like to start with the first document

12:15:36 19   which is Exhibit 20.  Mr. Testa, IDP market segment analysis

12:15:42 20   feels pretty complicated to me.  Can you explain to the jury

12:15:46 21   at a high level what this document is and why Qorvo performs

12:15:51 22   an IDP market analysis?

12:15:54 23   A.    Sure.  IDP stands for infrastructure and defense

12:15:59 24   product group, so it is the smaller of the two divisions

12:16:02 25   that were in Qorvo at this time.  It essentially is all the

Testa - direct

12:16:06 1    businesses outside of your cellular phone business.  So

12:16:09 2    within here we've got defense, wi-fi businesses, Bluetooth

12:16:15 3    type businesses, other connectivity type businesses that we

12:16:18 4    participate in.  This analysis goes through a review of all

12:16:21 5    the businesses that Qorvo participates in, looks at the

12:16:24 6    health of those businesses, are they growing, are they

12:16:28 7    declining, as well as the ability for Qorvo to create

12:16:32 8    products in those businesses.

12:16:33 9    Q.    Can you explain to the jury what the trade secret

12:16:36 10   information is that's contained in this document?

12:16:38 11   A.    Yeah, the entire analysis that's in here is

12:16:41 12   confidential to Qorvo.  It's our view of the business that

12:16:44 13   exists in the market, how we're going to invest and

12:16:48 14   participate in that business with customers and the types of

12:16:51 15   products and money we will make back from those businesses.

12:16:55 16   Q.    Is there anything on this report that indicates it

12:16:59 17   contains Qorvo's confidential and trade secret information?

12:17:01 18   A.    Yes.  On the footer of the document we state clearly

12:17:07 19   that it is confidential and proprietary information.

12:17:13 20   Q.    Mr. Testa, can you please identify for the jury where

12:17:16 21   in Exhibit 20 Qorvo analyzed its customers to determine how

12:17:21 22   to best spend its money on research and development?

12:17:29 23   A.    If we go to Akoustis page 197076.

12:17:36 24   Q.    Mr. Buchbinder, if you could please display

12:17:39 25   Exhibit 20, which is PTX 127, page 6.

Testa - direct

12:17:43  1           Mr. Testa, there is a lot happening on this page

12:17:52  2  and I want to go ahead and breakdown the information for the

12:17:55  3  jury.  Can you please first explain to the jury what

12:17:59  4  information is shown in the first column entitled market

12:18:03  5  segment?

12:18:04  6  A.      Yeah, the market segment is basically just to capture

12:18:08  7  the different businesses that Qorvo is participating in and

12:18:12  8  these would be separate product lines within the overall

12:18:15  9  group.

12:18:16 10  Q.      And is there a particular market segment that you are

12:18:20 11  responsible for?

12:18:20 12  A.      Yeah.  The connectivity segments in this case were

12:18:24 13  covering the Wi-Fi, consumer premise equipment, and this is

12:18:28 14  again the Wi-Fi routers both at your home and in public

12:18:32 15  places, as well as some of these other connectivity markets

12:18:36 16  we talked about.

12:18:38 17  Q.      Is that the second line?

12:18:39 18  A.      That is correct.

12:18:40 19  Q.      In this market segment.

12:18:43 20           Can you explain to the jury what SAM means?

12:18:47 21  A.      SAM is the Serviceable Available Market.  This is a

12:18:51 22  capture of how much money is available to buy the types of

12:18:55 23  products that we can develop for this space, so it's a

12:18:58 24  capture of the business we are going after.  And this would

12:19:01 25  show progressively in Qorvo's view do we think that market

12:19:05  1  is growing or not, is it a healthy market.

12:19:08  2  Q.     Can you explain to the jury what type of information

12:19:11  3  is contained in the columns entitled market attractiveness?

12:19:16  4  A.     Yes.  So this is specific to that business that we've

12:19:19  5  identified in the market segment column.  And it's

12:19:22  6  highlighting again different size categories, the growth

12:19:26  7  rate, whether or not we believe this is an attractive area

12:19:30  8  for us to invest money and spend the products towards.

12:19:34  9  Q.     And what information is contained within the business

12:19:37 10  strength column?

12:19:38 11  A.     The business strength then is Qorvo's analysis on our

12:19:43 12  ability to actually create the right products for that

12:19:46 13  market that we can capture that business that's available

12:19:49 14  that we identified.

12:19:51 15  Q.     Why is some of the information on this page red, some

12:19:56 16  of it green, and some of it yellow?

12:19:58 17  A.     This is a sort of quick key map we would call it, or

12:20:02 18  a score card, which shows green is good, those are areas

12:20:07 19  where there is strength and ability for Qorvo to participate

12:20:10 20  in and strong, the yellow is intermediate, so there is

12:20:14 21  probably some risk there that we have identified, but it's

12:20:17 22  overcome-able.  The red would be clear areas of weakness

12:20:20 23  that we want to identify as we make these decisions.

12:20:24 24  Q.     How did Qorvo create this document?

12:20:26 25  A.     This is based on the years of participating in these

Testa - direct

12:20:29 1    market segments, communicating with customers, the business

12:20:33 2    we already have ongoing and understanding that growth rate,

12:20:36 3    as well as our analysis across all these different business

12:20:40 4    and product groups from the technologies that we had

12:20:43 5    internally.

12:20:43 6    Q.    Is the information that is shown on this page

12:20:46 7    publicly available or generally known to others in the

12:20:49 8    industry?

12:20:50 9    A.    Absolutely not.

12:20:51 10   Q.    Is the information that is displayed on this page

12:20:55 11   Qorvo's trade secret information?

12:20:56 12   A.    Yes.

12:20:57 13   Q.    Why does Qorvo keep secret its internal market

12:21:01 14   analysis and assessments?

12:21:03 15   A.    We certainly do not want to identify where we think

12:21:07 16   our strengths and weaknesses are in, as we compete in the

12:21:10 17   open market, and this is an actual conglomerate portfolio of

12:21:15 18   where we want to do business, so we do not want competitors

12:21:18 19   to know specifically what we think are strong areas that we

12:21:22 20   want to go after and grow and what are weak areas that we

12:21:25 21   want to get away from.

12:21:26 22   Q.    Is this sort of like a report card?

12:21:28 23   A.    It is, yes.

12:21:29 24   Q.    And in this report card, how does Qorvo assess itself

12:21:35 25   internally with respect to the Wi-Fi CPE market?

485

Testa - direct

```
12:21:38  1    A.      Yeah, in this case we see ███████████   that
12:21:42  2    we predicted over a few years, we think ████████
12:21:46  3    ███████████████████████████    We assess where
12:21:49  4    we were in relation with competitors from a Qorvo
12:21:52  5    perspective with our products and technology across all the
12:21:56  6    solutions that we deliver into this market, so it's beyond
12:21:59  7    Wi-Fi, it covers other portions of Qorvo.  And then we
12:22:03  8    scored ourself as a business strength as mostly green with a
12:22:07  9    few intermediate areas where we think are overcome able but
12:22:12 10    are weaker than our strengths.
12:22:14 11    Q.      And does this information include BAW filters?
12:22:17 12    A.      It does, as part of the products, yes.
12:22:21 13    Q.      Based on your experience, would the information in
12:22:24 14    this document be helpful to a company that is selling FBAR
12:22:28 15    filters?
12:22:28 16    A.      Yes, absolutely.
12:22:29 17    Q.      Can you explain to the jury why?
12:22:31 18    A.      Sure.  Again, these customers and these businesses
12:22:34 19    are looking for filter solutions.  They're currently buying
12:22:39 20    different technologies even outside of BAW, so this was
12:22:43 21    opportunities for any type of BAW to move in which brings a
12:22:47 22    benefit of size and size reduction into these different
12:22:51 23    customers.
12:22:51 24    Q.      Do you understand that a copy of Exhibit 20 was found
12:22:55 25    in Akoustis's files?
```

Testa - direct

12:22:56  1   A.      I do.

12:22:57  2   Q.      When did Qorvo first learn that Akoustis obtained a

12:23:00  3   copy of this Exhibit 20?

12:23:02  4   A.      After the lawsuit was filed.

12:23:04  5   Q.      Did Qorvo give permission to Akoustis to have

12:23:08  6   Exhibit 20?

12:23:09  7   A.      We did not.

12:23:10  8   Q.      Mr. Buchbinder, if you could please display PDX 3.5.

12:23:15  9           Mr. Testa, can you please explain to the jury

12:23:22 10   what a CPE Wi-Fi E strategy review is, which has been

12:23:26 11   admitted into evidence as Exhibit 21?

12:23:28 12   A.      Yeah.  So CPE stands for consumer premise equipment.

12:23:33 13   Again, this is the consumer premise would be the Wi-Fi

12:23:37 14   routers in your home, whether you purchased it or were given

12:23:40 15   it from an internet provider.  The E stands for enterprise,

12:23:44 16   so this would be again the public space Wi-Fi routers that

12:23:47 17   you would connect to.  The E after Wi-Fi is short for

12:23:52 18   executive in this case, so this is an in depth review of

12:23:56 19   that second line in that report card that we just shared, so

12:24:00 20   this is a much more in depth view of this specific Wi-Fi

12:24:04 21   category.

12:24:04 22   Q.      And Mr. Testa, I think you testified earlier that you

12:24:07 23   are a general manager of Qorvo.  How many people directly or

12:24:11 24   indirectly report to you?

12:24:12 25   A.      I have 137 employees right now.

487

Testa - direct

12:24:14  1   Q.      And how many of your employees in your department

12:24:18  2   receive a copy of a report like the one that's been admitted

12:24:22  3   into evidence as Exhibit 21?

12:24:23  4   A.      This would be a handful of roughly five employees in

12:24:27  5   our business and marketing team.

12:24:29  6   Q.      Who at Qorvo receives this type of internal strategy

12:24:34  7   review?

12:24:34  8   A.      So we would present this to my boss, Eric Creviston,

12:24:39  9   as well as the executive staff, the CEO and his team in

12:24:43 10   making the decisions of where want to invest money going

12:24:47 11   forward.

12:24:47 12   Q.      Would Qorvo ever give the information in this CPE

12:24:50 13   Wi-Fi strategy review to a competitor?

12:24:53 14   A.      We would never give it this it a competitor.

12:24:55 15   Q.      Can you explain to the jury why you would not do

12:24:57 16   that?

12:24:58 17   A.      This has a very detailed plan in the specific market

12:25:01 18   of the types of products we have, where we're doing

12:25:04 19   business, where we see opportunity to create new products,

12:25:06 20   and the types of performances we need to deliver to be

12:25:11 21   successful in doing that on top of the financial strength,

12:25:14 22   what it will cost to do that and how much money we can earn

12:25:17 23   back after.

12:25:19 24   Q.      What are the trade secrets that are included in this

12:25:21 25   document?

12:25:22  1   A.      So this would include again the trade secrets one

12:25:26  2   through, this goes in depth of the types of products, the

12:25:31  3   customers we're going to service, what performance is

12:25:34  4   required, and then the financial support it would cost and

12:25:38  5   how much money we could earn back.

12:25:40  6   Q.      Is there anything on this document that indicates

12:25:41  7   that it contains Qorvo's trade secret information?

12:25:44  8   A.      Yes.  The document is labeled with confidential and

12:25:48  9   proprietary.

12:25:50 10   Q.      And Mr. Testa, I think you testified that this

12:25:54 11   document shows where -- it identifies the customers that

12:25:59 12   Qorvo wants to sell to and how to successfully do that.  Can

12:26:03 13   you please tell the jury where inside of this document that

12:26:06 14   information is located?

12:26:16 15   A.      If you can go to Akoustis page 203696 and 697.

12:26:24 16   Q.      Mr. Buchbinder, if you could please display pages 7

12:26:28 17   and 8 of Exhibit 21.

12:26:30 18          Mr. Testa, I would like for you to explain to

12:26:42 19   the jury what information is shown on these two pages,

12:26:45 20   starting with what a market target is?

12:26:48 21   A.      The market target breaks up the different groupings

12:26:51 22   for those Wi-Fi routers that we talked about, so the retail

12:26:55 23   grouping is where you would go to Best Buy or Wal-Mart and

12:26:59 24   buy a router for yourself.  The gateway is one that would be

12:27:02 25   delivered to you from an internet provider, whether it's

Testa - direct

12:27:06  1  fiber or cable or the others, and the enterprises are again

12:27:09  2  are ones that service these public areas or workplaces or

12:27:13  3  schools.  The ODM or strategic channels that are shown in

12:27:17  4  here are partners of those main customers that actually

12:27:20  5  build the equipment for them, so the manufacturing is not

12:27:24  6  always done by those customers.

12:27:26  7  Q.    And why does Qorvo track and analyze all of the

12:27:31  8  companies that are within the supply chain for the end

12:27:35  9  products that ultimately go to consumers and companies?

12:27:38 10  A.    Yeah, the second page is the channel analysis and

12:27:42 11  this is where we spend years developing and we upgrade every

12:27:46 12  year.  This really shows the flow of the main customers in

12:27:49 13  each of these areas that are buying the majority of those

12:27:52 14  products, our key targets, those are fairly publicly known

12:27:56 15  as you see brand names in the stores and see names on Wi-Fi

12:28:00 16  routers in public places.  But then we go into again how

12:28:04 17  much money they have available to spend on the types of

12:28:07 18  products that we can design, what the share split is between

12:28:11 19  us and some other competitors, who their key partners are

12:28:15 20  that would influence the type of products we need to design

12:28:18 21  and then who actually manufacturers those because sometimes

12:28:21 22  they'll give the decision capability to those secondary

12:28:24 23  manufacturers so we have to sell our product there as well.

12:28:27 24        This is basically a roadmap of how to be

12:28:31 25  successful in selling these products into these markets.

Testa - direct

12:28:34  1    Q.      How much work did it take Qorvo to analyze and

12:28:40  2    synthesize all of this information?

12:28:41  3    A.      This specific, especially the channel analysis, this

12:28:44  4    is years of work of visiting customers and partners around

12:28:48  5    the globe and traveling and building this original model and

12:28:51  6    then again every year going through an analysis of updating

12:28:56  7    all the percentages that we see here.

12:28:58  8    Q.      Beyond how much time it took Qorvo to actually create

12:29:02  9    this report, is there any reason why Qorvo would not want

12:29:05 10    its competitor to have it?

12:29:06 11    A.      Yeah, this is basically handing over a clear path of

12:29:09 12    where the competitors should go focus after we identified

12:29:14 13    all the areas and partners that these customers use to go be

12:29:17 14    successful and compete against us.

12:29:19 15    Q.      Is the information on these two pages, publicly

12:29:23 16    available or generally known to others in the industry?

12:29:25 17    A.      Absolutely not.

12:29:26 18    Q.      Can you explain to the jury why this information is

12:29:29 19    not publicly known?

12:29:31 20    A.      Outside of the main customers that we identified that

12:29:33 21    do show up in public records or just in common as you see

12:29:37 22    them in stores or from procedures, the analysis, the

12:29:40 23    dollars, the percentages and how they're partnered and who

12:29:45 24    they use, that's all proprietary, that's not a market or

12:29:50 25    annual type of reports.

Testa - direct

12:29:50 1    Q.      Why does Qorvo keep this information secret?

12:29:53 2    A.      This was our go to market plan, a successful plan to

12:29:57 3    go build this business and create a business for Qorvo, so

12:30:00 4    we would keep this trade secret.

12:30:04 5    Q.      Mr. Testa, does this exhibit also include

12:30:07 6    confidential or trade secret information about the type of

12:30:11 7    products Qorvo was developing or planning to develop?

12:30:14 8    A.      Yes.

12:30:15 9    Q.      Can you please tell the jury where they can find that

12:30:18 10   in Exhibit 21?

12:30:23 11   A.      If we go to page Akoustis-203703.

12:30:34 12   Q.      Can you tell the jury what kind of information is

12:30:37 13   included on this page?

12:30:39 14   A.      This is a snapshot report card of the types of

12:30:43 15   products that Qorvo is currently developing and shipping to

12:30:48 16   these customers in these different segmentations that they

12:30:51 17   have themselves or the products that they offer.  It goes

12:30:54 18   through the types of products, the level of denigration that

12:30:58 19   we have, and then certainly you can see a split between the

12:31:01 20   2.5-gigahertz and 5-gigahertz, those are the two main

12:31:05 21   frequency bands that Wi-Fi operates on.

12:31:07 22   Q.      And are BAW filter information included on this page?

12:31:10 23   A.      Yes, the bottom row is our filter view, so we looked

12:31:14 24   at the available market that we can potentially earn in that

12:31:19 25   space and then different type of filters and whether or not

Testa - direct

12:31:22  1    Qorvo participating there.

12:31:23  2    Q.      If a product is green on this page, what does that

12:31:26  3    mean?

12:31:26  4    A.      That means it's in preproduction or production state,

12:31:29  5    so at that point we're engaged heavily with customers and

12:31:33  6    it's either already public or very close to release to the

12:31:36  7    open market.

12:31:37  8    Q.      If a problem is yellow on this page, what does that

12:31:42  9    mean?

12:31:42  10   A.      That means we have made the decision to spend money

12:31:45  11   and invest and create this product, that can be early

12:31:48  12   stages, early on doing the paper evaluations and choosing

12:31:52  13   the product we want to do to choosing prototypes of this

12:31:56  14   material.

12:31:56  15   Q.      Does Qorvo publicly disclose when its products are in

12:32:00  16   development?

12:32:00  17   A.      We do not.

12:32:00  18   Q.      Can you explain to the jury why you do not disclose

12:32:03  19   that information publicly?

12:32:04  20   A.      It would be projecting again what our next solution

12:32:07  21   are, and give competitors an opportunity to plan how they

12:32:11  22   would compete against those in the next phase, so we keep

12:32:14  23   that to customers that we sample and partner with and that

12:32:17  24   is under secrecy that we work with.

12:32:21  25   Q.      What is the information in red mean?

Testa - direct

12:32:24  1    A.      Red is identifying the basic portfolio, the full

12:32:28  2    types of solutions we want to have but that we haven't

12:32:31  3    funded yet, we haven't made a decision to spend money to

12:32:35  4    create these or we don't have the money yet available to

12:32:38  5    create these so they would be staged out in time.

12:32:41  6    Q.      Does Qorvo publicly disclose when it has gaps in its

12:32:45  7    product development life, like for the products it's

12:32:48  8    selling?

12:32:48  9    A.      No.

12:32:48  10   Q.      Why not?

12:32:49  11   A.      That would be a clear indication to competitors

12:32:51  12   that's an area for them to invest and compete against us.

12:32:55  13   Q.      Can a competitor go to Qorvo.com and determine what

12:33:01  14   types of gaps Qorvo has in its product offerings looking at

12:33:05  15   the publicly available information on your website?

12:33:08  16   A.      They can only see the publicly released products, the

12:33:12  17   products that are in the market.  They would have no

12:33:15  18   visibility from that website of what we're developing or

12:33:18  19   what we want to develop into these spaces.

12:33:21  20   Q.      Is the information on Exhibit 21 that is presently

12:33:28  21   shown on the screen specific to a single product?

12:33:31  22   A.      It is not.

12:33:33  23   Q.      Based on your experience, would the information in

12:33:37  24   this document be helpful to the company that is selling FBAR

12:33:40  25   filters?

Testa - direct

12:33:40  1    A.      Yes, that bottom row would be definitely interesting.

12:33:43  2    Q.      Do you understand that a copy of this executive level

12:33:47  3    strategy review was found in Akoustis's files?

12:33:50  4    A.      I do.

12:33:50  5    Q.      When did you become aware that Akoustis obtained a

12:33:53  6    copy of Exhibit 21?

12:33:55  7    A.      After the lawsuit was initiated.

12:33:57  8    Q.      Did Qorvo give its permission for Akoustis to have

12:34:00  9    Exhibit 21?

12:34:01 10    A.      We did not.

12:34:02 11    Q.      Mr. Buchbinder, could you please display PDX 3.5.

12:34:12 12            Mr. Testa, can you please explain to the jury

12:34:15 13    what a statement of work is?

12:34:17 14    A.      Yes.  So this is after we have made a decision in the

12:34:21 15    types of products we want to develop, this would be the

12:34:24 16    first document that we would create from the marketing and

12:34:27 17    business teams guiding the organization on what the

12:34:31 18    requirements are and giving the engineers an idea of what's

12:34:34 19    required to create this as well as the financial's and

12:34:38 20    spending it would take to build it, and the money we can

12:34:42 21    potentially make back if we're successful with it.

12:34:45 22    Q.      Is the information in Qorvo's presentation trade

12:34:50 23    secrets to Qorvo?

12:34:50 24    A.      Yes.

12:34:51 25    Q.      Can you explain to the jury why?

Testa - direct

12:34:52  1    A.      This is that early development that hasn't even

12:34:55  2    started from an engineering spending at this time, this is

12:34:58  3    concept work that we are considering, so it is secret

12:35:02  4    concept work for Qorvo.

12:35:03  5    Q.      Mr. Testa, can you explain to the jury what the

12:35:06  6    little X's mean in the black box that is shown on this

12:35:09  7    screen?

12:35:10  8    A.      Yes.  So this is identifying the part number would be

12:35:14  9    carried there and if there is X's, it's still preliminary,

12:35:18 10    we haven't even identified a formal part number for this.

12:35:21 11    Q.      Does Qorvo publicly disclose information about the

12:35:24 12    performance of its products before it is publicly sold?

12:35:27 13    A.      We do not.

12:35:28 14    Q.      Why not?

12:35:30 15    A.      Again, it would just give indication publicly to our

12:35:33 16    competitors of what we're working towards and where we're

12:35:37 17    trying to differentiate as a company.

12:35:39 18    Q.      Is there anything on this document that indicates

12:35:41 19    that it contains Qorvo's confidential proprietary and trade

12:35:45 20    secret information?

12:35:46 21    A.      Yes, the same footer that shows it as proprietary and

12:35:50 22    confidential.

12:35:52 23    Q.      Mr. Testa, can you please tell the jury where

12:35:57 24    information relating to Qorvo's product specifications of

12:36:03 25    performance is found in this document?

Testa - direct

12:36:10  1    A.       If you turn to Akoustis page 115979.

12:36:17  2    Q.       Mr. Testa, can you explain to the jury what

12:36:19  3    information is found in the left-hand column of this page

12:36:24  4    under electrical specifications?

12:36:27  5    A.       These are the core features that the customers are

12:36:29  6    looking at specific to this filter product.  So you can

12:36:32  7    consider if you were buying a computer the size of the hard

12:36:35  8    drive, the speed of the processor, the graphics that are

12:36:39  9    capable.

12:36:40 10    Q.       And can you tell the jury what information is shown

12:36:43 11    under specifications?

12:36:44 12    A.       Yeah.  These are specifications from a currently

12:36:48 13    public filter that's selling into this market, this is not a

12:36:52 14    BAW filter, it's a different type of filter that was

12:36:54 15    actively being used at this time, and how they performed to

12:36:58 16    those key features.

12:36:59 17    Q.       And can you explain to the jury what information is

12:37:01 18    shown in the third column?

12:37:03 19    A.       Yep.  The third column is just a preliminary target

12:37:07 20    that we're essentially assessing our technology with a BAW

12:37:10 21    filter against this existing technology in the market and do

12:37:13 22    we think we can compete, are we in the family with the

12:37:17 23    specifications, and the difference in why BAW would be

12:37:21 24    important here beyond some of the very slight differences in

12:37:26 25    performance, is the fact that this could be ten times

Testa - direct

12:37:30  1    smaller than what the current solutions are selling, and as

12:37:34  2    Wi-Fi is moving into a mesh network, you have multiple Wi-Fi

12:37:39  3    routers in the home at times, the customers want them as

12:37:43  4    small as possible so they're just not big eyesores.

12:37:46  5    Q.      How does Qorvo determine what product features and

12:37:49  6    performance specifications to target in its WiFi BAW

12:37:53  7    filters?

12:37:53  8    A.      So this is an analysis that goes through our

12:37:56  9    engagement across the market, so multiple customers, as well

12:38:00 10    as looking internally to Qorvo's technology and our

12:38:04 11    processes, what do we think we're able to do, why can we

12:38:07 12    compete and then more importantly where do want to

12:38:10 13    differentiate to stand out to customers to be successful.

12:38:13 14    Q.      Is there anything else in this document, Mr. Testa,

12:38:18 15    that is highly confidential, proprietary and trade secret

12:38:23 16    information to Qorvo?

12:38:30 17    A.      Specifically on page Akoustis-115983.

12:38:39 18    Q.      Mr. Testa, can you explain to the jury what

12:38:43 19    information on this page is proprietary and trade secret to

12:38:48 20    Qorvo?

12:38:48 21    A.      Yeah, there is, of course, some of the big customer

12:38:51 22    names that we talked about that are more public and

12:38:54 23    understood.  But this starts going into the specifics of the

12:38:57 24    financials, what Qorvo's cost would be to manufacture these

12:39:01 25    filters, how much we would sell them for, that ASP, average

Testa - direct

12:39:05 1  selling price, so that would be the sale price that we will

12:39:09 2  sell to our customers and how much money we think we can

12:39:12 3  make over a certain period.  This cost basis and what we

12:39:17 4  show here is based on the fact that at this time Qorvo is

12:39:20 5  selling about a billion BAW filters a year into the market.

12:39:25 6  We were an industry leader in BAW filters.  In these

12:39:28 7  markets, which are much smaller than the core markets in the

12:39:32 8  cell phones, we're able to leverage that as an organization

12:39:35 9  to bring that value and creation here.

12:39:38 10 Q.     Why doesn't Qorvo want its competitors to know how

12:39:41 11 much it costs Qorvo internally to make its products?

12:39:45 12 A.     That could absolutely impact how competitors would

12:39:48 13 price the product if they were trying to under cut us, if

12:39:51 14 they were trying to compare their capability to even

12:39:54 15 participate in this market, so it would be extremely

12:39:58 16 confidential information for the organization.

12:39:59 17 Q.     Based on your experience, would the information in

12:40:02 18 this document be helpful to a company that sells FBAR

12:40:06 19 filters?

12:40:06 20 A.     Absolutely.

12:40:10 21 Q.     Do you understand that a copy of this statement of

12:40:14 22 work at Exhibit 22 was found in Akoustis's files?

12:40:18 23 A.     I do.

12:40:18 24 Q.     When did Qorvo first learn that Akoustis obtained a

12:40:22 25 copy of Exhibit 22?

Testa - direct

12:40:24  1    A.      After the lawsuit was initiated.

12:40:27  2    Q.      Did Qorvo give its permission for Akoustis to have

12:40:30  3    Exhibit 22?

12:40:30  4    A.      We did not.

12:40:32  5            MS. AYERS:  Your Honor, I'm about to move on to

12:40:34  6    the next trade secret group, I'm happy to do that, or if

12:40:38  7    this is a good point and time to break for lunch, I'm happy

12:40:41  8    to stop now.

12:40:43  9            THE COURT:  We'll stop right at quarter to 1:00.

12:40:51 10    BY MS. AYERS:

12:40:52 11    Q.      Mr. Buchbinder, can you please display PDX 3.7.

12:40:56 12            Mr. Testa, can you describe at a high level the

12:41:02 13    nature of the trade secrets that are contained in group 8?

12:41:05 14    A.      Yes.  At a high level this will go through the next

12:41:08 15    step after all the deep analysis on the markets and the

12:41:12 16    businesses that we want to participate in.  This will show

12:41:15 17    the kind of products we want to develop so it will be a

12:41:18 18    roadmap of the different instances and products we would

12:41:21 19    spend money on as well as moving into the phase of

12:41:24 20    development where we actually have prototypes or early

12:41:27 21    samples that we would deliver to our partners and customers.

12:41:32 22            MS. AYERS:  Your Honor, may I approach to hand

12:41:33 23    the witness the next four exhibits that are in this trade

12:41:37 24    secret group?

12:41:37 25            THE COURT:  You may.

Testa - direct

12:42:01  1   BY MS. AYERS:

12:42:14  2   Q.     Mr. Testa, I would like for to you look at the four

12:42:17  3   documents that I just handed you which have reference labels

12:42:20  4   of PTX 528, PTX 529, PTX 566 and PTX 638.  Do you recognize

12:42:28  5   these four documents?

12:42:29  6   A.     I do.

12:42:30  7   Q.     Can you explain what they are?

12:42:33  8   A.     Sure.  These are product data sheets that my team

12:42:36  9   would put together.  So this is basically explaining what

12:42:39 10   the product is, all the features, performance

12:42:42 11   characteristics that we then go to sale.

12:42:46 12   Q.     Does Qorvo routinely keep and report information

12:42:50 13   about its products in data sheets?

12:42:51 14   A.     We do.

12:42:52 15   Q.     As a part of its routine base practices?

12:42:55 16   A.     Yes, absolutely.

12:42:56 17          MS. AYERS:  Your Honor, I offer into evidence

12:42:57 18   the documents that have reference numbers PTX 528, PTX 529,

12:43:04 19   PTX 566 and PTX 638.

12:43:08 20          THE COURT:  Separately marked?

12:43:11 21          MS. AYERS:  We should separately mark.

12:43:12 22          THE COURT:  23, 24, 25, and 26, separately

12:43:16 23   marked and received as exhibits.

12:43:17 24          (Trial Exhibit Nos. 23, 24, 25, and 26 were

12:43:18 25   admitted into evidence.)

Testa - direct

12:43:18  1                    MS. AYERS:  Your Honor, may I approach the

12:43:42  2      witness to hand the witness the next two exhibits in this

12:43:45  3      group?

12:43:46  4                    THE COURT:  You may.

12:44:04  5      BY MS. AYERS:

12:44:07  6      Q.    Mr. Testa, can you please look at the document that

12:44:09  7      is labeled PTX 569?

12:44:12  8      A.    Yes.

12:44:13  9      Q.    And can you tell me if you recognize this document?

12:44:17 10      A.    I do.

12:44:18 11      Q.    How do you recognize this document?

12:44:20 12      A.    My marketing people put this document together.

12:44:23 13      Q.    Does this document reflect regularly conducted

12:44:26 14      marketing analysis decisions that Qorvo employees performed?

12:44:29 15      A.    Yes.

12:44:29 16      Q.    Does Qorvo routinely keep and record its marketing

12:44:33 17      analysis as a part of its routine business practice?

12:44:36 18      A.    Yes.

12:44:38 19                    MS. AYERS:  Your Honor, I offer PTX 569 into

12:44:41 20      evidence.

12:44:41 21                    THE COURT:  Marked and received as 27.

12:44:45 22                    (Trial Exhibit No. 27 was admitted into

12:44:46 23      evidence.)

12:44:46 24      BY MS. AYERS:

12:44:48 25      Q.    Mr. Testa, I would like for you to look at the

Testa - direct

12:44:50  1  document that is labeled PTX 509.

12:44:57  2  A.      Yes.

12:44:57  3  Q.      Do you recognize this document?

12:44:58  4  A.      I do.

12:44:59  5  Q.      How do you recognize this document?

12:45:01  6  A.      This is an automotive analysis simulation for a BAW

12:45:06  7  filter to be developed.

12:45:08  8  Q.      Does this document reflect regular conducted analysis

12:45:13  9  of automotive filters Qorvo performs as a part of its

12:45:16 10  routine business practices?

12:45:17 11  A.      It does.

12:45:18 12          MS. AYERS:  Your Honor, I offer the document

12:45:20 13  that is labeled PTX 509 into evidence.

12:45:23 14          THE COURT:  Marked and received as 28.

12:45:25 15          (Trial Exhibit No. 28 was admitted into

12:45:25 16  evidence.)

12:45:25 17  BY MS. AYERS:

12:45:28 18  Q.      Mr. Testa, I would like to go back to the very first

12:45:31 19  document that I handed you.  Which is PTX -- which is now

12:45:40 20  labeled Exhibit 20 and it has a reference number of PTX 528.

12:45:44 21          First, Mr. Buchbinder --

12:45:46 22          THE COURT:  Exhibit 23, is that right?  We'll

12:45:53 23  check.

12:45:54 24          MS. AYERS:  You are correct, Your Honor.

12:45:55 25          THE COURT:  Thank you.

Testa - direct

12:45:57  1                    MS. AYERS:  My apologies.

12:46:00  2    BY MS. AYERS:

12:46:00  3    Q.      Mr. Buchbinder, could you please display PDX 3.9.

12:46:05  4                    Mr. Testa, can you please explain to the jury

12:46:23  5    what information is shown on PDX 3.9?

12:46:27  6    A.      These are four data sheets for four separate products

12:46:31  7    that are preliminary in nature where we are creating the

12:46:35  8    target specifications that we will deliver to our customers

12:46:38  9    in the market.

12:46:38 10    Q.      Is information contained in preliminary data sheets

12:46:42 11    trade secret to Qorvo?

12:46:43 12    A.      Yes.

12:46:44 13    Q.      Can you explain to the jury why?

12:46:45 14    A.      Yes, this is again the preliminary targets that we

12:46:49 15    are going to develop towards to compete in this space and

12:46:53 16    within so we would keep this internal.

12:46:55 17    Q.      Mr. Testa, I would like to discuss the document that

12:46:57 18    is labeled PTX 23 with you.

12:47:01 19    A.      Okay.

12:47:01 20    Q.      Could you please identify for the jury where Qorvo

12:47:06 21    confidential data sheets contained information about the

12:47:09 22    features that Qorvo is anticipating releasing the product?

12:47:13 23    A.      Yes.  Specifically in this data sheet it would be

12:47:17 24    Akoustis-146976.

12:47:20 25    Q.      Mr. Buchbinder, could you please display PTX 0528,

Testa - direct

12:47:26  1    page 2.

12:47:27  2              Can you please explain to the jury what they are

12:47:30  3    seeing?

12:47:30  4    A.      Yes.  This is a much more detailed feature list again

12:47:34  5    of what the product will do, a broader detail that would

12:47:40  6    certainly not be public at this time for a preliminary

12:47:44  7    product.  So we use this document early in preliminary stage

12:47:48  8    to engage our partners and our customers to get feedback

12:47:53  9    before times we even spend money to start building and

12:47:57 10    engineering prototype and product, this is a tool that helps

12:48:00 11    us get reassurance, if you will, on targeting the right

12:48:04 12    performance.

12:48:05 13    Q.      If Qorvo uses this document in connection with its

12:48:08 14    partners and customers, how is this document and the

12:48:11 15    information contained within it a trade secret to Qorvo?

12:48:14 16    A.      Yeah, so before we would give a preliminary data

12:48:18 17    sheet or a prototype sample to a customer, we had a

12:48:22 18    nondisclosure agreement that would be signed.  So the

12:48:24 19    customer has to agree with us to treat that confidential, to

12:48:28 20    not share that information with any third parties so they

12:48:31 21    understand this is just our tool with them to get feedback

12:48:34 22    and try to get them the best product we can.

12:48:37 23    Q.      Why doesn't Qorvo wants its competitors to know what

12:48:41 24    it is targeting with respect to its products before those

12:48:44 25    products are publicly released?

Testa - direct

12:48:46  1    A.       This would create an unfair competitive advantage

12:48:50  2    where they would know what we're specifically doing, not so

12:48:53  3    much that we are creating a filter for this market, but what

12:48:56  4    are the specific performance features that we are leveraging

12:48:59  5    on, just like anything, it's very hard to have the best car,

12:49:03  6    the fastest car, the cheapest car all be in one product, we

12:49:07  7    have to choose where we want to differentiate design for our

12:49:11  8    customers and so this is the tool that we use.

12:49:14  9           THE COURT:  If we want to take our lunch break,

12:49:18 10    this is a forty-five-minute lunch break.  I know you all

12:49:21 11    understand that we really need to stay on a strict schedule

12:49:24 12    if we want to complete the project, so of course everybody

12:49:29 13    understands.

12:49:30 14           Don't discuss the case among yourself.  Don't

12:49:32 15    let anybody talk to you.  Do keep an open mind.  We have a

12:49:36 16    long way to go.  We're making good progress.  We'll excuse

12:49:40 17    you at this time for lunch.  I'm going to stay here for just

12:49:44 18    a couple minutes, but you are excused at this time.

12:49:47 19           MS. AYERS:  Thank you, Your Honor.

12:49:53 20           (Jury exiting the courtroom at 12:49 p.m.)

12:50:08 21           THE COURT:  Everybody can be seated for just a

12:50:11 22    moment.  The witness, the testimony you have given, they

12:50:14 23    can't go back and go over that.  Things are coming up, of

12:50:19 24    course, the lawyers would -- but we will preclude you from

12:50:34 25    being able to go back, don't ask them.

Testa - direct

12:50:39  1                    THE WITNESS:  Understand.

12:50:40  2                    THE COURT:  We are going to let you be excused

12:50:42  3    at this time.  I'm going to check with lawyers at this

12:50:45  4    moment here, and we have preliminary time lines here.  You

12:50:57  5    will be excused.

12:50:58  6                    THE WITNESS:  Thank you.

12:50:59  7                    THE COURT:  Anybody want to know the time?

12:51:01  8                    MS. AYERS:  I do.

12:51:02  9                    COURT CLERK:  I can have a discussion.

12:51:04 10                    THE COURT:  I need to know the time first.  I

12:51:08 11    may not agree with you.  I'm probably going to agree with

12:51:13 12    you.

12:51:23 13                    I know there is some work to be done on the

12:51:25 14    documents that were initially presented and of course we'll

12:51:28 15    try to do that as soon as possible.  I think we're making

12:51:33 16    progress.  With this witness, how much time do we have,

12:51:35 17    another thirty minutes?

12:51:37 18                    MS. AYERS:  Hopefully less than that, Your

12:51:38 19    Honor.

12:51:38 20                    THE COURT:  Okay.  That just helps counsel

12:51:41 21    opposite to know when to be ready to go.

12:51:44 22                    MS. AYERS:  Of course.

12:51:44 23                    THE COURT:  I want to confirm exactly who will

12:51:46 24    be the next witnesses in the case, from the plaintiff's

12:51:49 25    point of view, I know you have given us a list already, I

Testa - direct

12:51:52  1    want to make sure I know exactly where we are at for the

12:51:55  2    rest of the day and at the end of the day we'll check for

12:51:58  3    tomorrow.

12:51:58  4              MS. AYERS:  Your Honor, Qorvo's next witness is

12:52:03  5    Gernot Fattinger.

12:52:03  6              THE COURT:  Exactly.  After that?

12:52:04  7              MS. AYERS:  After that we will be calling an

12:52:08  8    Akoustis witness by videotape deposition.

12:52:11  9              THE COURT:  Who will that be?

12:52:12 10              MS. AYERS:  It's Hodge.  You have already

12:52:15 11    looked -- it's Mr. Hodge, Your Honor.

12:52:17 12              THE COURT:  Okay.  And then after that?

12:52:19 13              MS. AYERS:  After that is Mr. Houlden, Your

12:52:22 14    Honor.

12:52:22 15              THE COURT:  Okay.  Now you should have all of

12:52:24 16    the rulings in connection with those.  We filed them this

12:52:30 17    morning, is that correct?

12:52:31 18              MS. AYERS:  That's correct, Your Honor, and we

12:52:33 19    are working hard to cut the videotape deposition of

12:52:36 20    Mr. Houlden.

12:52:36 21              THE COURT:  Okay.  So that should take care of

12:52:38 22    that.  After Houlden, Houlden will take quite a bit of time.

12:52:43 23    How long is that going to take now?

12:52:44 24              MS. AYERS:  I think the current run time for

12:52:47 25    both parties is three hours for Mr. Houlden.  It was three

Testa - direct

12:52:50 1    hours before we received Your Honor's rulings, and it will

12:52:54 2    be slightly less than three hours based on Your Honor's

12:52:56 3    rulings.

12:52:57 4              THE COURT:  Who is after Houlden?

12:52:59 5              MS. AYERS:  After Mr Houlden is one of Qorvo's

12:53:03 6    expert witnesses, Mr. Faulkner.

12:53:04 7              THE COURT:  I think we got a good plan for the

12:53:06 8    rest of the day.  It should get us there and look at the

12:53:09 9    time for tomorrow at the end of today's testimony.  I think

12:53:16 10   that's it.  Anything else that we need to discuss?  I'm not

12:53:20 11   soliciting anything.

12:53:21 12             MR. ELKINS:  Just if I could ask, and I'll ask

12:53:24 13   counsel, but do you anticipate, my guess would be that I

12:53:28 14   don't know how long you have for Fattinger, but --

12:53:31 15             MS. AYERS:  We're not going to get to

12:53:33 16   Mr. Faulkner today.

12:53:34 17             MR. ELKINS:  I doubt you would finish

12:53:37 18   Mr. Houlden.

12:53:38 19             THE COURT:  We'll probably be staying until 5:15

12:53:42 20   and maybe a little longer.  We'll see how that goes.

12:53:47 21   Everybody needs a short break at this time.  Thank you all

12:53:51 22   very much.

12:53:52 23             (A luncheon recess was taken.)

13:34:23 24             THE COURT:  Everybody can be seated.  We're back

13:34:23 25   in session.  Bring the jury in unless there is something

Testa - direct

13:34:23  1    else, bring the jury in.

13:34:32  2                MS. AYERS:  Your Honor, would you like the

13:34:33  3    witness to be seated or do you want to wait for the jury?

13:34:36  4                THE COURT:  Yes, the witness can come back up

13:34:42  5    here.

13:34:43  6                (Jury entering the courtroom at 1:34 p.m.)

13:35:23  7                THE COURT:  Everyone can be seated.  Counsel may

13:35:38  8    proceed.

13:35:39  9                MS. AYERS:  Thank you, Your Honor.

13:35:41 10    BY MS. AYERS:

13:35:41 11    Q.      Mr. Testa, before the lunch break we were talking

13:35:43 12    about Exhibit 23 and page 2 of Exhibit 23.

13:35:50 13    A.      Yes.

13:35:50 14    Q.      Mr. Buchbinder, I think this is the page 2 of

13:36:01 15    Exhibit 25.  Thank you, sir.

13:36:07 16                Mr. Testa, does Qorvo ever publicly disclose its

13:36:14 17    product data sheets?

13:36:16 18    A.      After the product is released to production and

13:36:19 19    becomes public, yes.

13:36:20 20    Q.      And Mr. Testa, again, it's very hard to hear

13:36:24 21    sometimes if you don't speak into the microphone, and I want

13:36:27 22    to make sure that everybody in the courtroom can hear your

13:36:29 23    testimony.

13:36:30 24                If Qorvo posts its product data sheet online

13:36:34 25    after a product goes to market, why does it go to such great

Testa - direct

13:36:38  1   lengths to protect the secrecy of the data sheet before

13:36:41  2   then?

13:36:41  3   A.      Prior to the product being in the market, it again is

13:36:45  4   confidential in how we are designing the products, what we

13:36:48  5   were differentiating in that product, and how we are

13:36:51  6   engaging the customers in that space, so it is confidential

13:36:56  7   and once it becomes public and those products become into

13:36:58  8   the market, there is often teardown reports and other things

13:37:02  9   that disclose the method at that point.  We'll put it on the

13:37:06  10  website, we'll allow the customers to have visibility of it

13:37:10  11  after it's formally released.

13:37:12  12  Q.      Does Qorvo ever share its preliminary and

13:37:15  13  confidential data sheets for products not yet released out

13:37:20  14  in the market with its customers without a nondisclosure

13:37:23  15  agreement?

13:37:23  16  A.      We would not without a nondisclosure agreement.

13:37:27  17  Q.      Mr. Buchbinder, could you please display the first

13:37:31  18  page of Exhibit Number 24 and Exhibit Number 25, which is

13:37:35  19  PTX 529 and PTX 566.

13:37:39  20          Mr. Testa, do these two data sheets contain

13:37:50  21  Qorvo's trade secret information?

13:37:52  22  A.      They do.

13:37:53  23  Q.      How can you tell if they contain Qorvo's trade secret

13:37:57  24  information?

13:37:57  25  A.      There is confidential NDA required water marks across

Testa - direct

13:38:01  1    the documents and also on top of the 904 it says proposed.

13:38:07  2    Q.      Mr. Buchbinder, if you could please display the

13:38:10  3    second page of these two exhibits for the jury.

13:38:13  4             Mr. Testa, does Exhibit 25 and Exhibit 24

13:38:22  5    contain the same type of information that we just discussed

13:38:26  6    with respect to Exhibit Number 23?

13:38:29  7    A.      They do.

13:38:34  8    Q.      Mr. Buchbinder, if you could please display PTX 26.

13:38:46  9    I'm sorry, Mr. Buchbinder, it is Exhibit Number 26, PTX 638.

13:38:53 10             Mr. Testa, can you please explain to the jury

13:38:57 11    whether or not this Exhibit 26, which has a reference mark

13:39:00 12    of PTX 638, contains Qorvo's trade secret information?

13:39:05 13    A.      Yes, it does.

13:39:06 14    Q.      How can you tell?

13:39:07 15    A.      This one is identified as private on top and

13:39:12 16    confidential, so this would be an early preliminary data

13:39:15 17    sheet for this device.

13:39:17 18    Q.      Mr. Buchbinder, can you please display for the jury

13:39:21 19    page 2 of PTX 26, which is 638?

13:39:24 20             Mr. Testa, is this the same type of information

13:39:29 21    that Qorvo holds as a trade secret before a product is

13:39:32 22    publicly released?

13:39:33 23    A.      Yes, this is going through the features and

13:39:35 24    performance that we were specifying for this product.

13:39:37 25    Q.      Mr. Testa, we just walked through four preliminary

Testa - direct

13:39:41  1   and confidential data sheets that relate to Qorvo's BAW

13:39:45  2   filters.  Do any of those data sheets anywhere in the

13:39:49  3   document discuss whether or not Qorvo BAW filter products

13:39:53  4   use SMR resonators?

13:39:55  5   A.      They do not, and that is not information we would

13:39:59  6   include on the data sheet.

13:40:00  7   Q.      Why isn't that information that Qorvo includes on the

13:40:03  8   data sheet?

13:40:03  9   A.      Because the customer need is for a filter, so they

13:40:07 10   are not questioning us on the type of technology we bring,

13:40:11 11   they want to make sure it's reliable, that we can ship in

13:40:15 12   volume, that it meets the performance we say it will, and we

13:40:20 13   will sell it at a price that's attractive to them for their

13:40:24 14   business.

13:40:24 15   Q.      Do you understand that a copy of each of these

13:40:26 16   exhibits containing Qorvo's preliminary and confidential

13:40:30 17   data sheets were found in Akoustis's files?

13:40:33 18   A.      I do.

13:40:33 19   Q.      When did Qorvo first learn that Akoustis obtained a

13:40:37 20   copy of these exhibits?

13:40:38 21   A.      After the lawsuit was filed.

13:40:39 22   Q.      Did Qorvo give its permission for Akoustis to have

13:40:43 23   these exhibits?

13:40:43 24   A.      We did not.

13:40:44 25   Q.      Mr. Buchbinder, could you please display PDX 310?

Testa - direct

13:40:48  1           Mr. Testa, can you please explain to the jury

13:40:53  2   what products are shown on this slide?

13:40:56  3   A.      Yes.  This is the QPQ1903, this is the 5.2-gigahertz

13:41:04  4   BAW filter, and the QPQ1904, which is 5.6-gigahertz BAW

13:41:10  5   filter.

13:41:10  6   Q.      Do the objects shown on this slide contain any trade

13:41:13  7   secrets from group 8?

13:41:14  8   A.      Yes, these are prototype samples, these again are the

13:41:19  9   early samples that we would engage our customers and

13:41:21 10   partners with, which is now a physical representation of the

13:41:24 11   part, it's their first look at the actual performance and

13:41:28 12   they would use these boards to test the parts and provide

13:41:31 13   its feedback again, even if the parties meet their

13:41:35 14   requirements or if there are areas they would prefer

13:41:38 15   different types of specifications.

13:41:39 16   Q.      How does an evaluation board differ from the

13:41:42 17   information that is contained on a data sheet?

13:41:43 18   A.      The data sheet could start as early as just a

13:41:47 19   preliminary target of what we would like to go do in concept

13:41:52 20   and that would go to the engineering team.  This is now a

13:41:55 21   physical sample, so we had budgeted and spent money to build

13:41:59 22   prototypes of this device which we'll send out to the

13:42:02 23   customers and our partners to evaluate.

13:42:04 24   Q.      Why does Qorvo maintain the secrecy of its evaluation

13:42:08 25   boards before its products are sold on the open market?

Testa - direct

13:42:11  1    A.       Yeah, for the same reason as the data sheets,

13:42:14  2    although this can take it even another step because now you

13:42:17  3    can really test a device over all kinds of different

13:42:20  4    conditions to see how it performs, where a data sheet just

13:42:24  5    because of its size and text is limited, so this is a true

13:42:27  6    physical representation of the product.

13:42:31  7              MS. AYERS:  Your Honor, may I approach the

13:42:32  8    witness to hand him two physical demonstratives?

13:42:36  9              THE COURT:  You may.

13:42:46 10    BY MS. AYERS:

13:42:49 11    Q.       Mr. Testa, can you explain what the two physical

13:42:53 12    objects I just handed you are?

13:42:55 13    A.       Yes, these are two evaluation boards for the 1903 and

13:42:58 14    1904 filters.

13:42:59 15    Q.       Are the two evaluation boards that you have in your

13:43:03 16    hand the exact same type of evaluation boards that Qorvo

13:43:06 17    used in August of 2020?

13:43:07 18    A.       They are.

13:43:10 19    Q.       Can you explain to the jury what the gold prongs on

13:43:14 20    those two boards are?

13:43:16 21    A.       Yes.  These would be an input and an output of the

13:43:20 22    device as you're testing it.  Very similar to if you were

13:43:23 23    connecting your TV through a cable box, this would take that

13:43:27 24    type of cable and allow the customer to evaluate the actual

13:43:30 25    filter.

Testa - direct

13:43:30 1    Q.      And where is the actual filter on this evaluation

13:43:34 2    board?

13:43:34 3    A.      So the filter itself is inside of the black dot in

13:43:38 4    the center of this.  That black dot is an over molded die

13:43:44 5    where the filter actually sits inside of that package, this

13:43:47 6    is packaging the filter so that can be placed on electronics

13:43:52 7    boards in the customer's hands.

13:43:54 8    Q.      Do you understand that Akoustis obtained an

13:43:57 9    evaluation board for both the QPQ1903 and QPQ1904 before

13:44:02 10   those products were commercially sold?

13:44:03 11   A.      I do.

13:44:04 12   Q.      When did Qorvo first learn that Akoustis obtained

13:44:07 13   these boards?

13:44:08 14   A.      After the lawsuit was filed.

13:44:10 15   Q.      Did Qorvo give its permission to Akoustis to have

13:44:13 16   these boards?

13:44:13 17   A.      We did not.

13:44:15 18   Q.      Does Qorvo sell its boards on its website at

13:44:19 19   Qorvo.com?

13:44:20 20   A.      Once the public -- the product is released to the

13:44:23 21   public, we do sell it on the website.

13:44:27 22   Q.      Is the information that the boards allow someone to

13:44:32 23   output trade secret information to Qorvo prior to the sale

13:44:37 24   of the evaluation board publicly on its website?

13:44:40 25   A.      Absolutely, yes.

Testa - direct

13:44:44   1   Q.      Mr. Buchbinder, I would like to display PDX 3.11.

13:44:51   2           Mr. Testa, can you explain to the jury what

13:44:57   3   Exhibit Number 27 is, which has a reference number of PTX

13:45:02   4   0569?

13:45:03   5   A.      Yep.  This is a product roadmap and description.  So

13:45:06   6   this is a tool we would use when we go visit customers to

13:45:10   7   share with them what products we have already available in

13:45:13   8   this market and then also open up to our customers under NDA

13:45:17   9   what we're developing and get ideas for new products as we

13:45:23  10   go and investigate with the customers.

13:45:25  11   Q.      Does Qorvo ever share its product roadmaps with

13:45:28  12   customers without executing a nondisclosure agreement with

13:45:31  13   those customers?

13:45:32  14   A.      We do not.

13:45:32  15   Q.      Why not?

13:45:33  16   A.      Because the information here again is confidential,

13:45:36  17   it's leading into concepts and new targets that we want to

13:45:41  18   keep isolated from competition.

13:45:42  19   Q.      Mr. Testa, can you identify for the jury where

13:45:46  20   specifically within this document Qorvo has information that

13:45:49  21   it wants to keep isolated from the competition?

13:46:00  22   A.      Specific to BAW filters it would be Akoustis

13:46:08  23   page 232183 and 184.

13:46:11  24   Q.      Mr. Buchbinder, those have reference number of PTX

13:46:15  25   569, page 38 and 39.  And can you please display those

Testa - direct

13:46:21  1    side-by-side?

13:46:21  2             Mr. Testa, can you explain to the jury what

13:46:26  3    information is shown on these two pages of Exhibit 27?

13:46:31  4    A.    Yes.  So these are two concept designs that we wanted

13:46:35  5    to engage customers to get feedback on.  They are simulated

13:46:40  6    results, so again, this would be we have now funded the

13:46:45  7    projects so we're committed to do them, and we've engaged

13:46:48  8    our engineers to do computer level designs to show us what

13:46:52  9    we believe we can get in terms of performance.  We would

13:46:55 10    take this again to our customers and share where we are

13:46:58 11    targeting the performance and get their feedback.

13:47:01 12    Q.    Is this information a Qorvo trade secret in February

13:47:04 13    of 2021?

13:47:05 14    A.    Yes.

13:47:05 15    Q.    What information can a competitor learn if it has

13:47:09 16    access to the results of simulations that Qorvo runs on its

13:47:14 17    preliminary products?

13:47:15 18    A.    Yeah.  They certainly can understand what the

13:47:19 19    specific products themselves are able to do and the type of

13:47:23 20    performance we're trying to go to the market with.  They can

13:47:26 21    also start gathering what capabilities our technology itself

13:47:31 22    has as we're trying to design the filters in these high

13:47:35 23    frequencies.

13:47:35 24    Q.    Is there anything on these pages that indicate they

13:47:37 25    contain Qorvo trade secret information?

Testa - direct

13:47:39 1    A.      Yes, both the footer, which shows it is confidential

13:47:42 2    and proprietary, but these also have a development preview

13:47:47 3    only confidential stamp on them.

13:47:49 4    Q.      Mr. Testa, does anything on these two pages relate in

13:47:53 5    any way to whether or not is the filters that are shown here

13:47:57 6    are SMR or FBAR filters?

13:48:00 7    A.      They do not.

13:48:00 8    Q.      Do you understand that a copy of this exhibit was

13:48:05 9    found in Akoustis's file?

13:48:07 10   A.      I do.

13:48:08 11   Q.      When did Qorvo first learn that Akoustis obtained a

13:48:12 12   copy of Exhibit 27?

13:48:13 13   A.      After the lawsuit was filed.

13:48:14 14   Q.      Did Qorvo give its permission to Akoustis to have

13:48:17 15   Exhibit 27?

13:48:18 16   A.      We did not.

13:48:19 17   Q.      Mr. Buchbinder, could you please display PDX 312.

13:48:23 18           Mr. Testa, could you please explain to the jury

13:48:32 19   what is shown in PDX 312, which relates to Exhibit 28?

13:48:37 20   A.      Yes.  This is early work on an automotive BAW filter

13:48:41 21   that's used for next generation safety communications

13:48:47 22   between vehicles so they know where they're located without

13:48:50 23   having to use radar or line of sight, as well as vehicles

13:48:54 24   communicating with street lamps and other infrastructure,

13:48:58 25   which would basically lead to autonomous vehicles and safety

Testa - direct

13:49:02  1    factors where cars will absolutely know where they are

13:49:06  2    located for safety braking purposes.

13:49:08  3    Q.      Why do cars have BAW filters?

13:49:10  4    A.      There are several BAW filters in vehicles, so the

13:49:14  5    cellular connection that's in there has a lot of BAW

13:49:18  6    filters, which allows communication to the cell phone

13:49:21  7    towers.  There is other filters with communications of

13:49:24  8    vehicles now for Bluetooth and this vehicular standards.

13:49:28  9    There is also new standards that allows presence detection

13:49:32 10    in vehicles, so it's just part of the communications blanks

13:49:36 11    and BAW filters are used prevalent in the vehicle.

13:49:39 12    Q.      Is the QPQ2200 a cellular BAW filter that's found in

13:49:44 13    cars, a Bluetooth filter that's found in cars, or a

13:49:47 14    different type of BAW filter found in cars?

13:49:50 15    A.      Specifically this is a Band 47, or a vehicle to

13:49:53 16    vehicle type device, so this would be a cellular band but

13:49:57 17    it's used separately where it doesn't have to speak to

13:50:00 18    cellular towers, again this enables the vehicles to

13:50:03 19    communicate just in proximity to themselves.

13:50:06 20    Q.      Mr. Testa, does this Exhibit 28 contain any trade

13:50:16 21    secret information to Qorvo?

13:50:17 22    A.      It does.

13:50:17 23    Q.      Can you please tell the jury where that trade secret

13:50:20 24    information can be found within this exhibit?

13:50:23 25    A.      Yes.  Page Akoustis-53291.

Testa - direct

13:50:30  1   Q.      Can you explain to the jury what information is shown

13:50:36  2   on this slide?

13:50:37  3   A.      Yes.  So this is an analysis and an output of the

13:50:42  4   simulation based on our automotive team's engagement with

13:50:46  5   several of the major automotive manufacturers.  As we create

13:50:51  6   these products, these BAW devices for the different

13:50:54  7   customers and different markets, you have to do it at a

13:50:57  8   level where you can make the product fit multiple customers.

13:51:02  9   If you try to do a custom device for every deal you're

13:51:06 10   packing, it's just not profitable, you can't afford to do

13:51:09 11   that, so you have to get inputs from all these different

13:51:12 12   vendors and then consolidate that into what we are going to

13:51:16 13   go to market with, and that's really where that information

13:51:21 14   comes into play with how are we actually going to attack

13:51:24 15   this opportunity.

13:51:24 16   Q.      How long did it take Qorvo to gather information from

13:51:29 17   multiple customers and then analyze and determine

13:51:31 18   specifically how it wanted to build this BAW filter?

13:51:33 19   A.      This team specifically had been engaged in the lead

13:51:37 20   automotive vendors for at least a couple of years in

13:51:40 21   preparing to this point getting simulations out.

13:51:43 22   Q.      Is the information that is shown on this slide trade

13:51:46 23   secret to Qorvo?

13:51:47 24   A.      Yes.

13:51:47 25   Q.      Is there anything in this document that indicates

Testa - cross

13:51:50 1   Qorvo believes the document contains trade secret

13:51:53 2   information?

13:51:53 3   A.      Yes, it has again for internal use only, confidential

13:51:56 4   and proprietary information.

13:51:59 5   Q.      Does any information on this page indicate whether or

13:52:02 6   not the QPQ2200 has an SMR resonator or a FBAR resonator?

13:52:09 7   A.      It does not.

13:52:10 8   Q.      Why is the information shown on this page valuable to

13:52:14 9   Qorvo?

13:52:14 10  A.      This is again simulated performance that we want to

13:52:18 11  take to the customers to solve their business problem and

13:52:22 12  insure that this communication safety can work.  This was a

13:52:25 13  fairly new application for uses in vehicles, and this

13:52:31 14  automotive market also runs a very long time, so when you

13:52:35 15  get a design win with a customer, you win a deal, it will

13:52:40 16  run in that automobile for sometimes seven to ten years, so

13:52:44 17  it's very important, it has a lot of volume ties to it, so

13:52:49 18  it's very strategic in terms of earning new business.

13:52:51 19           MS. AYERS:  Thank you, Mr. Testa.

13:52:52 20           Your Honor, I have no further questions at this

13:52:54 21  time.  And I pass the witness.

13:52:55 22           THE COURT:  Cross-examination.

13:53:16 23                  CROSS-EXAMINATION

13:53:21 24  BY MR. ELKINS:

13:53:26 25  Q.      Good afternoon, Mr. Testa.  I'm David Elkins, I'm one

Testa - cross

13:53:30  1    of the lawyers representing Akoustis.  It's good to meet

13:53:32  2    you.

13:53:33  3    A.      Good afternoon, sir.

13:53:37  4    Q.      So I wanted to start with some preliminary questions.

13:53:51  5    The answers to which I think you know, but I wanted to

13:53:55  6    confirm that the lion share of R & D work for new BAW

13:54:01  7    filters takes place in the Apopka, Florida design center,

13:54:06  8    does it not?

13:54:06  9    A.      That's correct.

13:54:07  10   Q.      And that's where Mr. Aigner, who testified already,

13:54:12  11   and Gernot Fattinger, who is after you today, they both work

13:54:18  12   there and are high ranking employees of the R & D group,

13:54:22  13   right?

13:54:22  14   A.      That is correct.

13:54:22  15   Q.      And Qorvo manufacturers the die for its BAW filters

13:54:30  16   at a manufacturing and test facility, I think it's in

13:54:35  17   Richardson, Texas?

13:54:36  18   A.      That is correct.

13:54:37  19   Q.      And then Qorvo has the wafers shipped down, I think

13:54:41  20   you have a facility in Costa Rica, and that's where they're

13:54:46  21   sliced and diced and packaged?

13:54:48  22   A.      That's correct, for the discrete devices, we may send

13:54:51  23   them elsewhere if it's an integrated device that includes

13:54:56  24   BAW filters with other solutions.

13:54:57  25   Q.      Like in a front-end module or FEM?

Testa - cross

13:55:01 1    A.      Exactly, yes.

13:55:02 2    Q.      I'm going to start off by showing you a document and

13:55:05 3    I'm going to apologize if it looks like I'm fumbling around

13:55:10 4    for documents because I am.  And I would like to show you

13:55:21 5    what's been marked as exhibit DTX 201.

13:55:28 6              MR. ELKINS:  Permission to approach, Your Honor?

13:55:31 7              THE COURT:  You may.

13:55:48 8    BY MR. ELKINS:

13:55:48 9    Q.      Would you mind taking a gander at Exhibit 201, and

13:55:54 10   let me know when you have had a chance to do that.

13:55:58 11   A.       (Witness reviewing document.)  Yes, I am ready.

13:56:06 12   Q.      Do you recognize the document?

13:56:07 13   A.      I do.

13:56:08 14   Q.      Can you tell us what it is?

13:56:09 15   A.      Sure.  It is an e-mail thread that started with a

13:56:14 16   public release that Akoustis sent to the market.  And from

13:56:18 17   there, I forwarded that on to several different employees,

13:56:23 18   including my boss at the office.

13:56:26 19             MR. ELKINS:  Your Honor, we would like to move

13:56:27 20   what was marked as DTX 201 into evidence.

13:56:31 21             THE COURT:  Without objection, marked and

13:56:35 22   received as 29.

13:56:36 23              (Trial Exhibit No. 29 was admitted into

13:56:37 24   evidence.)

13:56:37 25   BY MR. ELKINS:

Testa - cross

13:56:40  1    Q.      Okay.  So the thread participants, I think you

13:56:45  2    identified them that they include Cees Links?

13:56:48  3    A.      Correct, Cees Links.

13:56:50  4    Q.      Did I pronounce that correctly?

13:56:51  5    A.      It's Cees Links.

13:56:53  6    Q.      Cees, thank you.  And at the time he was your boss,

13:56:57  7    right?

13:56:57  8    A.      He was my general manager, correct.

13:56:59  9    Q.      And he was the general manager of the Wireless

13:57:02 10    Connectivity Group?

13:57:04 11    A.      That is correct.

13:57:05 12    Q.      And what was -- and at the time what was your role?

13:57:08 13    A.      So I was the marketing director.

13:57:10 14    Q.      And then Bob Baeten, I don't think -- I don't know if

13:57:15 15    I pronounced that correctly?

13:57:16 16    A.      That's right.

13:57:17 17    Q.      And he was a design engineering director at Apopka

13:57:21 18    Florida at that R & D center?

13:57:23 19    A.      He was located in Greensboro, he was our chief

13:57:26 20    engineer.

13:57:27 21    Q.      Okay.  And Wilco Vanhoogstraeten?

13:57:30 22    A.      Yes.

13:57:31 23    Q.      Hopefully I got that close.

13:57:32 24    A.      Good job on that.

13:57:34 25    Q.      All right.  And at the time, he was a tech director

Testa - cross

13:57:38  1    in Dallas?

13:57:38  2    A.      That's correct, Texas.

13:57:40  3    Q.      Both he and Mr. Links joined Qorvo from Green Peek

13:57:46  4    Technologies?

13:57:46  5    A.      That is correct.

13:57:46  6    Q.      And that was an acquisition in 2015?

13:57:50  7    A.      Yes.

13:57:50  8    Q.      Okay.  The bottom e-mail just, I'm on the very bottom

13:58:06  9    of the exhibit --

13:58:11 10             MR. ELKINS:  Your Honor, I neglected to remember

13:58:14 11    which exhibit this is, so I apologize.

13:58:16 12             THE COURT:  29.

13:58:17 13             MR. ELKINS:  29, thank you.

13:58:19 14    BY MR. ELKINS:

13:58:19 15    Q.      At the bottom of Exhibit 29, there is a reference to

13:58:24 16    tri-band routers?

13:58:24 17    A.      Yes.

13:58:25 18    Q.      5-gigahertz BAW focused on tri-band routers, what are

13:58:30 19    those?

13:58:31 20    A.      So tri-band routers came to market originally in

13:58:36 21    2016, the first system was the Eero Mesh Wi-Fi system.  This

13:58:40 22    was where you had multiple Wi-Fi routers in your home, and

13:58:44 23    it allowed just a greater capacity given all the new Wi-Fi

13:58:49 24    devices that are coming into the house.  So it split some of

13:58:52 25    the frequency, which the Wi-Fi travels on, and that made

Testa - cross

13:58:56  1   these filters important for that application.

13:58:59  2   Q.      And was that -- that was created pursuant to

13:59:05  3   standard, was it not?

13:59:07  4   A.      It was tied to the Wi-Fi 6 standard as part of Wi-Fi

13:59:12  5   Alliance, correct.

13:59:12  6   Q.      Was that also IEEE 80211 AX?

13:59:16  7   A.      That is correct.

13:59:19  8   Q.      And they have, basically they use three bands or

13:59:22  9   three frequencies of filters, right?

13:59:24 10   A.      Yes.

13:59:25 11   Q.      So 2.5, 5.2 and 5.7?

13:59:29 12   A.      Correct.

13:59:35 13   Q.      And as you said, those are for both the consumer and

13:59:39 14   the enterprise markets?

13:59:41 15   A.      That is correct.

13:59:45 16   Q.      So above the e-mail from you at the bottom, is an

13:59:49 17   e-mail from Alex -- I'm going to let you pronounce his last

13:59:53 18   name because I will butcher it.

13:59:55 19   A.      Sure, that is Zajac.

13:59:57 20   Q.      Who is Alex Zajac?

13:59:59 21   A.      He's an engineering director in Apopka, Florida.

14:00:04 22   Q.      And his comment is, "And we are two years away from

14:00:08 23   releasing our new 5.2 and 5.7-gigahertz devices.  We are

14:00:14 24   slow."

14:00:18 25             And that's on March 3rd of 2017.  Yeah, 2017.

Testa - cross

14:00:28  1   If you can see the date on the e-mail?

14:00:30  2   A.    Yes.

14:00:30  3   Q.    Okay.  And you agree that Qorvo was kind of slow in

14:00:37  4   deciding whether to invest in the development of high

14:00:40  5   frequency BAW filters?

14:00:41  6   A.    Qorvo was investing in the mobile side of the

14:00:44  7   business which was three quarters of the corporation

14:00:47  8   business.  My team was certainly invested to bringing

14:00:52  9   5-gigahertz products to market, so I was a definitely a big

14:00:56 10   proponent of finding opportunities to get filters as quickly

14:01:00 11   as we could.

14:01:01 12   Q.    And that would require the investment and the work to

14:01:04 13   be done at the R & D officer in Apopka in order to create --

14:01:09 14   A.    For the general creation, correct.

14:01:12 15   Q.    At the top, in the top, it looks like Mr. Zajac also

14:01:17 16   is, he's replying to Mr. Vanhoogstraeten's e-mail, and he

14:01:25 17   says among other things, I think they're talking -- well,

14:01:31 18   let me go back down.

14:01:33 19        At the very bottom of the e-mail, you were

14:01:39 20   sending, you said, this is the March 3rd at 9:19 a.m., FYI.

14:01:51 21   Akoustis public endorsement of 5-gigahertz BAW focused on

14:01:55 22   tri-band routers.  There is an extremely long hyperlink at

14:01:59 23   the bottom.

14:01:59 24        So you were talking about Akoustis, Mr. Zajac

14:02:05 25   said and we're two years away from releasing our new lines

Testa - cross

14:02:09  1    and then Mr. Vanhoogstraeten ask does their technology allow

14:02:16  2    it to create filter in different bands faster and easier

14:02:20  3    with lower upfront or are we in a similar horse race with

14:02:25  4    similar tools?  Your e-mail at the top for Mr. Zajac's

14:02:30  5    e-mail at the top is a response to Mr. Vanhoogstraeten?

14:02:34  6    A.    Yes.

14:02:34  7    Q.    And Mr. Zajac says he's not sure whether they use a

14:02:39  8    SMR or FBAR style resonator, he says "The FBAR is simpler to

14:02:43  9    create new frequencies because they do not have a reflective

14:02:47 10    stack."

14:02:47 11          Is that a reference to the reflector that is

14:02:53 12    within the substrate of an SMR device?

14:02:58 13    A.    That is correct.

14:02:59 14    Q.    And Mr. Zajac says, other than that, it should be a

14:03:06 15    similar effort, but keep in mind that technology and product

14:03:09 16    development at Qorvo is slow, a new company without having

14:03:13 17    to produce millions of parts per day can be quite agile

14:03:18 18    compared to us.

14:03:19 19          You don't have any reason to disagree with that

14:03:22 20    sentiment, do you?

14:03:23 21    A.    The investment again was very heavy into the biggest

14:03:27 22    part of our business, so without knowing what Alex is

14:03:30 23    specifically engaging here, we had made decisions not to

14:03:33 24    invest in that 5-gigahertz until we were able to move funds

14:03:39 25    to that, yeah.

Testa - cross

14:03:49  1    Q.      Let me ask you a few questions about a new document.

14:03:55  2    A.      Sure.

14:03:56  3              MR. ELKINS:  May I approach?

14:03:57  4              THE COURT:  You may.

14:04:02  5    BY MR. ELKINS:

14:04:16  6    Q.      Mr. Testa, what I handed you is what was previously

14:04:20  7    marked for identification as exhibit DTX 0217.  My first

14:04:26  8    question is going to be if you recognize this?

14:04:31  9    A.      I do.

14:04:32 10    Q.      Can you tell us what it is, please?

14:04:34 11    A.      Sure.  This is an e-mail thread from Leah Giovan to

14:04:41 12    Cees Links, my manager who is a sourcing director at

14:04:50 13    Outsource Supply.

14:04:50 14    Q.      And I think later on in the thread is someone named

14:04:58 15    Brian Belut?

14:04:59 16    A.      Correct.  Brian Belut was the VP of engineering for

14:05:03 17    the Infrastructure and Defense Product Group.  This was

14:05:06 18    everything that was not cell phone focused again.

14:05:09 19    Q.      And at the time, the IDP, Infrastructure and Defense

14:05:13 20    Product Groups sat next to your group, which was Wireless

14:05:17 21    Connectivity?

14:05:18 22    A.      We were part of that group.

14:05:20 23    Q.      Okay.  Thank you.

14:05:21 24    A.      Yes.

14:05:26 25    Q.      I want to focus on the bottom e-mail, which is at the

14:05:34  1    end of the thread.   Actually so we can put it up, I'll move

14:05:38  2    it into evidence.

14:05:40  3              MR. ELKINS:   Your Honor, this is DTX 0217.

14:05:46  4              THE COURT:   I believe you're asking to have it

14:05:51  5    as the next marked exhibit, which will be 30.

14:05:54  6              (Trial Exhibit No. 30 was admitted into

14:05:55  7    evidence.)

14:05:55  8    BY MR. ELKINS:

14:05:57  9    Q.      Okay.   Now we can show the last e-mail, which is on

14:06:02 10    page 3 of the document.   And this is from Mr. Links to Leah

14:06:07 11    Giovan, copied to you, "Hi Leah, I do not trust the progress

14:06:12 12    of our internal development of 5-gigahertz BAW filter.   How

14:06:17 13    are we progressing on Akoustis?   Can I do something to help?

14:06:24 14    Cees."   This is November 4th, 2018.   The mention of Akoustis

14:06:28 15    relates to an effort by Ms. Giovan to determine whether

14:06:31 16    Akoustis can supply BAW filters for the wireless

14:06:35 17    connectivity and IDP units, correct?

14:06:40 18    A.      That is correct.

14:06:42 19    Q.      And Ms. Giovan responds and slightly, we've got kind

14:06:51 20    of a split page, but she responds on the same day, everybody

14:06:56 21    is e-mailing on Sunday, November 4th, 2018.   And she replies

14:07:06 22    that she is moving forward to get samples of a 5.2-gigahertz

14:07:10 23    Wi-Fi filter from Akoustis, ETA mid November.   Todd G, who I

14:07:16 24    assume is Todd Gillenwater?

14:07:18 25    A.      Correct.

Testa - cross

14:07:19  1   Q.      "Is putting together a test plan for the sample test.

14:07:22  2   Please see e-mail thread attached.  This is political both

14:07:26  3   within Qorvo as well as with Akoustis, so I am treading

14:07:30  4   lightly to achieve the goal.  I will keep you posted."

14:07:34  5          Did you have an understanding of what Ms. Giovan

14:07:38  6   meant regarding the political remark?

14:07:40  7   A.      So specifically any time we are looking at either

14:07:43  8   partnering with a competitor or evaluating a potential

14:07:46  9   purchase or an acquisition, it is sensitive when the

14:07:51 10   corporation already has in-house capabilities.  So there was

14:07:54 11   a lot of focus and trust in the volume and quality

14:07:58 12   capability that Qorvo already was able to deliver.

14:08:03 13          So again, I was working very closely with Leah

14:08:07 14   to evaluate not only Akoustis, but several other startups

14:08:10 15   that were either filters or filter-like technologies.  This

14:08:14 16   was highly important for my business to grow.

14:08:18 17   Q.      Okay.  I next want to skip up to the top of page 2 of

14:08:22 18   the exhibit.  This is Ms. Giovan's reply on Monday the 5th,

14:08:31 19   so it's the next day at 11:55.  Again, it's to you,

14:08:37 20   Mr. Links, and Mr. Belut.  And pardon me, Ms. Giovan says,

14:08:50 21   "Step 1 is we need to be certain that Akoustis can actually

14:08:52 22   produce a filter that has performance matching their own

14:08:55 23   data sheet.  There are certain factions within Qorvo that

14:08:58 24   are very vocal that they cannot.  Once we have verified that

14:09:03 25   they can, in fact, make a filter with the samples comings to

Testa - cross

14:09:06  1    us within the next few weeks, then we will provide them with

14:09:09  2    WCON specs requirements to obtain pricing and timeline to

14:09:14  3    support.  I've already engaged with Tony T. on this."

14:09:20  4              Did you understand her comments about the

14:09:22  5    certain factions within Qorvo that are very vocal that

14:09:26  6    Akoustis cannot produce a filter that matches its own data

14:09:30  7    sheet?

14:09:30  8    A.      Yeah, the information to date was definitely

14:09:33  9    concerning when we looked at performance and for our

14:09:37 10    specific business again, the wireless connectivity business

14:09:40 11    for the routers, we had very different requirements as she's

14:09:44 12    identified here.  One of them being power handling, that was

14:09:48 13    a significant quality concern that we had for this new

14:09:51 14    technology.

14:09:53 15    Q.      The power handling concern for this new technology

14:09:57 16    was because of the increase in gigahertz?

14:10:01 17    A.      Not -- well, it has the implication because of the

14:10:04 18    higher frequency, but the wireless routers have a higher

14:10:09 19    output power that they use.  And again, since Qorvo is

14:10:14 20    selling a lot more than just the BAW filter and we use these

14:10:18 21    filters to integrate within our products, the value of the

14:10:22 22    filter as we showed in that other page was selling for

14:10:24 23    roughly ███████████████████ worth of content on

14:10:31 24    the other parts of the Wi-Fi that we sell into there.  So

14:10:34 25    the quality for our products is a huge concern and if we

14:10:38  1   were to bring something in-house that didn't meet that or

14:10:40  2   couldn't ship in high supply, we would impact that demand

14:10:44  3   and that business to Qorvo.  So we were definitely giving it

14:10:48  4   a close look and my team was highly involved with the

14:10:52  5   evaluations.

14:10:53  6   Q.      Thank you.

14:10:56  7   A.      Yes, sir.

14:10:57  8   Q.      I would like to skip up to the very top of the

14:11:00  9   document.  And this e-mail at 12:05 on November 5th is from

14:11:15 10   Ms. Giovan and again this is the same group, Mr. Links,

14:11:19 11   Mr. Belut, and you.  And she states in the second paragraph,

14:11:30 12   "All the words and intentions are right, it is just that as

14:11:34 13   long as the 5-gigahertz development is behind a major Newton

14:11:38 14   ramp, and (19 plus BAW filters all being tweaked to

14:11:46 15   optimize/fix performance), this development is going to take

14:11:50 16   a backseat."

14:11:51 17           The Newton ramp was BAW filter development for

14:11:57 18   Qorvo's Mobile Products Group?

14:11:58 19   A.      That is correct.

14:12:01 20   Q.      And that was a very large mobile phone manufacturer,

14:12:05 21   Cupertino?

14:12:05 22   A.      Yes, sir.

14:12:06 23   Q.      And at the time it was absorbing all of the available

14:12:11 24   resources at the Apopka design center?

14:12:14 25   A.      At the 2018 time we were starting to develop our high

Testa - cross

14:12:19  1    frequency process, but we certainly did not have our filters

14:12:22  2    out to sample to the market yet.

14:12:25  3    Q.    Okay.  And in the meantime, competitors including

14:12:29  4    Akoustis were getting their 5-gigahertz products out into

14:12:32  5    the market, right?

14:12:32  6    A.    That's correct, there were other competitors

14:12:34  7    engaging.

14:12:36  8    Q.    Yes.

14:12:37  9          One more document.  You can put that one down,

14:12:52 10    Mr. Testa.

14:12:53 11    A.    Yes, sir.

14:12:57 12          MR. ELKINS:  May I approach, Your Honor?

14:12:59 13          THE COURT:  You may.

14:13:07 14    BY MR. ELKINS:

14:13:19 15    Q.    So what I have handed you, Mr. Testa, is another

14:13:22 16    e-mail thread with Ms. Giovan and others, including you, it

14:13:28 17    has been marked for identification as DTX 0203.  Once again,

14:13:34 18    I'm going to ask you to take a look and see if you recognize

14:13:38 19    it?

14:13:39 20    A.    I do, yes, sir.

14:13:39 21    Q.    Can you describe this document?

14:13:41 22    A.    This is a document where a CEO was asking for a

14:13:44 23    status update of the evaluation, and included Todd

14:13:49 24    Gillenwater, who was leading the R & D group within our

14:13:53 25    mobile team.  Bob Riverworth, and Leah Giovan as a sourcing

Testa - cross

14:13:59 1    agent, further add ons got put on after that as it went

14:14:04 2    higher in the thread.

14:14:05 3    Q.      And Mr. Riverworth is the CEO of Qorvo?

14:14:10 4    A.      That's correct.

14:14:11 5            MR. ELKINS:  Your Honor, we offer what's been

14:14:13 6    marked as DTX 0203 into evidence.

14:14:17 7            THE COURT:  Marked and received as 31.

14:14:19 8            (Trial Exhibit No. 31 was admitted into

14:14:20 9    evidence.)

14:14:20 10   BY MR. ELKINS:

14:14:21 11   Q.      And we already discussed Mr. Gillenwater, he was the,

14:14:25 12   or he is perhaps the CTO and the VP of Mobile Engineering?

14:14:30 13   A.      That's correct.

14:14:32 14   Q.      So in the bottom e-mail on this first page, the one

14:14:37 15   from Mr. Gillenwater, he is writing to Mr. Bruggeworth and

14:14:42 16   Ms. Giovan that, "We have taken all the data and provided it

14:14:47 17   back to Akoustis.  Overall, I thought their data looked fine

14:14:50 18   and is probably the best part available for these frequency

14:14:54 19   bands."

14:14:54 20           And then it goes on, and talks about other

14:14:57 21   things.

14:14:57 22           The data that Mr. Gillenwater was talking about

14:15:04 23   had been -- that came from his group's testing a BAW filter

14:15:10 24   from Akoustis, the AKF-1252?

14:15:13 25   A.      Yes, sir.

Testa - cross

Q.      In the middle of that page, Ms. Giovan is writing to James Klein, he was the president of -- the IDP president?

A.      Yes.

Q.      And Roger Hall, who was he?

A.      He was the general manager of the defense and Aerospace group.

Q.      And Doug Bostrom?

A.      At that time Doug Bostrom was the VP of Engineering for James Klein.

Q.      For the IDP group?

A.      Yes.

Q.      After -- so Ms. Giovan writes to that group plus Brian Belut that, "FYI, the Akoustis 5.6-gigahertz filter inquiry for mobile.  My impression was that the sample parts 5.2-gigahertz that we looked at from Akoustis last month performed poorly.  I guess my impression was incorrect according Todd's note below."

        And then she writes to James she's not pushing Akoustis as a supplier, but she wants to be sure that IDP is aware of the option to get 5-gigahertz filters in hand from what is now approximately two years late?

        Would you agree with me, Mr. Testa, that the market first began needing the 5-gigahertz BAW filters back in 2016 when you mentioned that Qorvo launched its first measuring network product?

Testa - cross

14:16:50  1    A.      Yes, it was the first time that BAW or that standard

14:16:53  2    filters for the 5-gigahertz for Wi-Fi were necessary.

14:16:57  3    Q.      So by March 2019, when these e-mails were written,

14:17:00  4    Qorvo's own 5-gigahertz BAW filters for purposes of your

14:17:05  5    business unit and IDP were about three years late, right?

14:17:09  6    A.      From the time that we originally would like to have

14:17:11  7    them, absolutely, yes.

14:17:13  8    Q.      And isn't it true that Qorvo did not actually get its

14:17:18  9    5-gigahertz BAW filters, the QPQ1903 and 1904 into

14:17:25 10    production into the market in the end of 2020?

14:17:29 11    A.      2020, we were sampling soon after this time in 2019,

14:17:34 12    but took them to production in 2020.

14:17:36 13    Q.      We can take that document down.

14:17:38 14            You talked a little -- in fact, you talked

14:17:47 15    several times during Qorvo's counsel's examination regarding

14:17:55 16    what customers are looking for in BAW filters in particular.

14:18:00 17    And would you agree with me that in marketing BAW filters to

14:18:07 18    customers on, or potential customers, what's most important

14:18:11 19    to the customers is the filter's performance?

14:18:14 20    A.      The filter's performance is one aspect.  The whole

14:18:19 21    product you definitely have to look at quality, you have to

14:18:21 22    look at supply viability, high volume creation and of course

14:18:25 23    the pricing for the market.

14:18:28 24    Q.      Okay.  And you said several times that customers

14:18:35 25    really don't care whether a BAW is a SMR or a FBAR, correct?

Testa - cross

14:18:43  1    A.      Agree.

14:18:44  2    Q.      Would you also agree that customers generally don't

14:18:47  3    care about the composition of the piezoelectric layer?

14:18:52  4    A.      Agreed.

14:18:52  5    Q.      You're familiar with Akoustis's former use of

14:18:55  6    marketing statements about single crystal technology?

14:18:58  7    A.      Yes.

14:19:00  8    Q.      And you're unaware of any instances where a customer

14:19:03  9    did not purchase a Qorvo product because of Akoustis's

14:19:06  10   single crystal marketing statements, correct?

14:19:09  11   A.      That's correct.

14:19:09  12   Q.      And you're unaware of any instances where customers

14:19:12  13   or potential customers expressing confusion regarding

14:19:16  14   Akoustis's single crystal technology, correct?

14:19:18  15   A.      That's correct.

14:19:32  16   Q.      Mr. Testa, I know that you don't have x-ray vision

14:19:36  17   and can't see all of the documents that Akoustis produced in

14:19:40  18   this case, but you're not -- you have no personal knowledge

14:19:46  19   regarding Akoustis's use of any confidential Qorvo

14:19:51  20   materials, correct?

14:19:52  21   A.      I was not privy to know when they received it or how

14:19:57  22   they received it.

14:19:58  23   Q.      On direct examination, you looked at several

14:20:01  24   preliminary data sheets, I think we have the 1903, the 1904,

14:20:08  25   I'm talking about the Qorvo part numbers and then a couple

Testa - cross

14:20:11 1    of front end modules, and I'll refer to those in a second.

14:20:18 2    Once a preliminary -- well, let me just ask you specifics so

14:20:23 3    that we aren't talking in generalities.  If I can hand you,

14:20:29 4    turn back to what was marked for identification as PTX 0528.

14:20:43 5              MS. AYERS:  That's Exhibit 23.

14:20:45 6              MR. ELKINS:  Thank you, Jennifer.  And it's now

14:20:50 7    Trial Exhibit 28.

14:20:51 8              MS. AYERS:  23.

14:20:52 9              MR. ELKINS:  23.

14:20:55 10   BY MR. ELKINS:

14:20:56 11   Q.    Do you see the -- at the very bottom above the mark

14:21:00 12   put on by lawyers to produce this document, so the

14:21:04 13   attorneys' eyes only subject to protective order is just a

14:21:08 14   mark done in the context of the litigation, but I'm talking

14:21:11 15   about the very small print that says QPQ1903 data sheet and

14:21:16 16   then there is a code after it?

14:21:18 17   A.    Yes.

14:21:20 18   Q.    Is that a date?

14:21:21 19   A.    It is.

14:21:22 20   Q.    Okay.  So this is -- this preliminary data sheet is

14:21:26 21   as of March 2nd, 2020?

14:21:29 22   A.    That's correct.

14:21:31 23   Q.    How long between this date of March 2nd, 2020, and

14:21:39 24   when the actual data sheet came out?

14:21:44 25   A.    The product was released I believe as we said near

Testa - cross

14:21:48  1    the end or end of 2020, so another five, six months.

14:21:54  2    Q.     And isn't it true that at least in the past, Qorvo

14:21:58  3    would post its preliminary data sheets on its website?

14:22:02  4    A.     That is not true, we would post a landing page, which

14:22:06  5    indicates that we have a new development coming.  There

14:22:10  6    would be links on that landing page to data sheets and to

14:22:13  7    other collateral, which lead to a landing page which

14:22:18  8    basically says thanks for your interest in this device, it's

14:22:22  9    preliminary, please contact our sales manager or sales rep

14:22:26 10    in your region for more information.

14:22:29 11    Q.     We looked at several PowerPoint, or you looked at

14:22:39 12    several PowerPoint with Qorvo counsel as she was examining

14:22:43 13    you.  And the PowerPoints all have the legend, they had a

14:22:48 14    copyright notice at the very bottom, and so if we could pull

14:22:54 15    up, if you'd like, what was marked as PTX 569.  And I have

14:23:04 16    forgotten what trial exhibit it is, but if we go to the

14:23:08 17    second page.

14:23:11 18               THE COURT:  27.

14:23:12 19               MR. ELKINS:  27.  Thank you very much.

14:23:13 20    Q.     Can we blow up the little footer there?  There we go.

14:23:18 21               So the copyright notice Qorvo U.S., Inc., and

14:23:24 22    then Qorvo Confidential and Proprietary Information.  And

14:23:27 23    you testified about how that signifies that the document is

14:23:31 24    confidential, is that correct?

14:23:33 25    A.     Yes.

Testa - cross

14:23:33  1    Q.      Isn't that put on every PowerPoint presentation

14:23:36  2    created at Qorvo?

14:23:39  3    A.      It is a standard template so that there is

14:23:43  4    confidentiality identified if it goes public, we would

14:23:47  5    remove it if we do public presentations and other public

14:23:51  6    releases.

14:23:51  7    Q.      So it's a default that every presentation using the

14:23:56  8    Qorvo template has this already embedded in the background?

14:24:00  9    A.      Yeah, essentially all information created within

14:24:03 10    Qorvo is confidential.  So it is the standard default.

14:24:08 11    Q.      You mentioned teardowns briefly.  Can you tell us

14:24:14 12    what a teardown is?

14:24:15 13    A.      Yes.  Once a product is released into the market,

14:24:20 14    there are third-party organizations which will do an

14:24:23 15    examination of the product.  So cell phones are very good

14:24:28 16    example, it will go through and actually take apart the cell

14:24:31 17    phone as a teardown and it will identify the types of

14:24:35 18    components and technologies that are in there for market

14:24:39 19    knowledge.  Again, that occurs after the product has been

14:24:42 20    released and something is out in the public where people can

14:24:46 21    actually physically buy one and do the same thing

14:24:50 22    themselves.

14:24:51 23    Q.      You have seen teardowns performed by third parties of

14:24:54 24    Qorvo products?

14:24:55 25    A.      I have, yes.

Testa - redirect

| | |
|---|---|
| 14:24:55 1 | Q. And they're also available regarding competitor |
| 14:24:59 2 | products, too, right? |
| 14:25:00 3 | A. The teardowns themself would be at the box level, at |
| 14:25:05 4 | the product level. I have not seen competitive teardowns |
| 14:25:10 5 | that strip the molding off our device to show silicone |
| 14:25:17 6 | technology. |
| 14:25:17 7 | Q. I'm not going to ask you about that. |
| 14:25:20 8 | A. Okay. |
| 14:25:21 9 | MR. ELKINS: Those are all the questions I have. |
| 14:25:23 10 | Thank you very much, Mr. Testa. |
| 14:25:25 11 | THE WITNESS: Thank you. |
| 14:25:25 12 | THE COURT: Redirect. |
| 14:25:28 13 | MS. AYERS: Thank you, Your Honor. |
| 14:25:28 14 | REDIRECT EXAMINATION |
| 14:25:33 15 | BY MS. AYERS: |
| 14:25:36 16 | Q. Mr. Testa, I have just a few questions for you. |
| 14:25:38 17 | Mr. Buchbinder, could you please pull up |
| 14:25:43 18 | reference number DTX 0201, which was entered into evidence |
| 14:25:47 19 | as Exhibit 29. |
| 14:25:51 20 | Mr. Testa -- thank you very much, |
| 14:26:10 21 | Mr. Buchbinder. |
| 14:26:11 22 | Mr. Testa, do you recall Mr. Elkins asking you |
| 14:26:13 23 | questions about this document? |
| 14:26:14 24 | A. I do. |
| 14:26:14 25 | Q. In March of 2017, were you aware that Akoustis had |

Testa - redirect

14:26:20  1  taken Qorvo's trade secrets?

14:26:22  2  A.    I was not.

14:26:22  3  Q.    During your testimony with Mr. Elkins, he asked you

14:26:25  4  if Akoustis, or if Qorvo sampled Akoustis's products in

14:26:30  5  2017, 2018, 2019, do you recall that?

14:26:33  6  A.    I do not recall it.  Can you say again, that he --

14:26:36  7  Q.    Mr. Elkins asked you whether or not Qorvo received

14:26:40  8  samples of Akoustis's products, do you recall that?

14:26:42  9  A.    Yes.

14:26:42 10  Q.    Were the samples provided to Qorvo by Akoustis under

14:26:46 11  a nondisclosure agreement between the two parties?

14:26:49 12  A.    Yes.

14:26:49 13  Q.    And did that nondisclosure agreement allow Qorvo to

14:26:53 14  tear down the sample?

14:26:55 15  A.    No.

14:26:59 16  Q.    Mr. Buchbinder, you can take that exhibit down.

14:27:04 17        Mr. Testa, do you know if Akoustis advertised

14:27:16 18  single crystal technology as better performance and better

14:27:20 19  power handling?

14:27:21 20  A.    I do.

14:27:23 21  Q.    And can you tell the jury ultimately why Qorvo

14:27:28 22  decided not to purchase Akoustis's BAW filters for purposes

14:27:33 23  of integrating it into its other products?

14:27:35 24  A.    Sure.  So I think I mentioned earlier, so I was

14:27:40 25  certainly eager to get 5-gigahertz filters and solutions to

14:27:44  1   the market, so Akoustis, as well as other startup companies

14:27:47  2   were under evaluation.  The earlier evaluations we actually

14:27:51  3   performed on those samples that we received showed us

14:27:55  4   concern both in thermal performance which in these access

14:27:59  5   points and Wi-Fi routers, because of this new tri-band mesh,

14:28:05  6   there are twelve different radio links in this device and

14:28:10  7   that creates a lot of heat.  That heat when it impacts a

14:28:14  8   filter actually changes the filter from where it's trying to

14:28:18  9   filter the response.

14:28:20 10         So that filter temperature drift, that was a

14:28:27 11   concern that was identified by our CTOS as well.  And if

14:28:30 12   that over large volume productions was not stable,

14:28:33 13   essentially the device would not meet the requirements for

14:28:35 14   the customer.

14:28:36 15         On the other side was the power handling I

14:28:38 16   mentioned.  So because of this device and the access points,

14:28:42 17   they have points in time when they're turned on where

14:28:45 18   they're actually is a very big power spike, you think of it

14:28:49 19   almost as a voltage spike when you plug in an electronic

14:28:53 20   device.  That spike can cause damage and we saw damage on

14:28:56 21   some of these early samples that again really concerned us

14:29:00 22   because our intent was to go to integrated solutions where

14:29:03 23   we put that BW filter in with our other products.  If that

14:29:07 24   was going to break or cause quality issues, again the

14:29:10 25   financial impact as I mentioned was ten fold of the other

Testa - redirect

14:29:14  1    parts we were selling just to have this additional BAW

14:29:17  2    filter part.  So it was a very big concern in quality.

14:29:23  3           At the time we got through more and more of

14:29:25  4    these evaluations where the performance started looking

14:29:28  5    better as our team was stating, we then had already started

14:29:32  6    ours, as well, and our team was very adamant with sticking

14:29:36  7    with an internal make versus spending money at that time on

14:29:40  8    either a partnership or acquisition.

14:29:41  9    Q.    Mr. Buchbinder, can you please display the first page

14:29:45  10   of Acoustics - of TX 203, which is Exhibit 31.

14:29:56  11          And Mr. Testa, this is one of the exhibits that

14:29:58  12   Mr. Elkins examined you regarding, and I would like to

14:30:01  13   direct your attention to the March 20th, 2019 e-mail from

14:30:05  14   Todd -- no, Mr. Buchbinder, one down.

14:30:09  15          Can you explain to the jury what the reference

14:30:17  16   to thermal performance is in Mr. Gillenwater's e-mail to

14:30:24  17   Ms. Giovan?

14:30:24  18   A.    Yeah.  So this again goes back to as we started

14:30:29  19   testing this device over temperature and we would do that

14:30:31  20   from making the device very cold, which may exist in an

14:30:35  21   outdoor access point, to very hot, if it's in let's say your

14:30:40  22   cable box at the house, you always hear the fans and stuff

14:30:43  23   going, it's getting very hot.  The performance of the filter

14:30:46  24   again is how does it drift, does it stay on frequency where

14:30:50  25   it needs to filter or will it move as it gets increasingly

14:30:55  1    hotter and hotter.  That was something that we saw as a

14:30:58  2    concern, specifically on this 5.2 part, as well as again as

14:31:02  3    the power handling as I mentioned was a quality concern,

14:31:06  4    which is even a bigger concern for our team at that time.

14:31:09  5            MS. AYERS:  Thank you Mr. Testa.  I have no

14:31:11  6    further questions.

14:31:12  7            THE COURT:  Thank you very much.  You may step

14:31:14  8    down.

14:31:15  9            THE WITNESS:  Thanks.

14:31:17 10            THE COURT:  Who is your next witness, please?

14:31:21 11            MR. TIGAN:  Good afternoon, Your Honor.  Qorvo

14:31:24 12    calls Gernot Fattinger as its next witness.

14:31:38 13            THE COURT:  Please come forward and raise your

14:31:41 14    right hand to be sworn in.

14:31:43 15            COURT CLERK:  Please remain standing and raise

14:31:45 16    your right hand.  Please state and spell your name for the

14:31:48 17    record.

14:31:48 18            THE WITNESS:  Gernot, G-E-R-N-O-T, last name

14:31:53 19    F-A-T-T-I-N-G-E-R.

14:31:57 20            GERNOT FATTINGER, having been duly sworn, was

14:32:02 21    examined and testified as follows:

14:32:07 22            MR. TIGAN:  Your Honor, before we begin, may I

14:32:12 23    approach with two binders for the witness and the Court?

14:32:17 24            THE COURT:  You may.

14:32:23 25                    DIRECT EXAMINATION

Fattinger - direct

BY MR. TIGAN:

Q.      Good afternoon, Dr. Fattinger.  Just a reminder as I
get situated here that it's a big room and we both want to
speak into our respective microphones and at a moderate pace
for the court reporter.

A.      Absolutely.

Q.      To start, could you introduce yourself to the jury,
please?

A.      Yes.  My name is Gernot Fattinger.  I am the
Vice-president of Technology for Qorvo.

Q.      And as Vice-president of Technology, just in general,
what do you do for the company?

A.      I oversee technology development, as well as
developing of the roadmaps of technologies for the future.

Q.      And where do you live?

A.      I live near Orlando, Florida.

Q.      About how long have you worked for Qorvo or one of
its predecessors?

A.      Since 2006.

Q.      And could you tell us just a little bit about your
educational background, please?

A.      Yes.  I have a Ph.D. in semiconductor physics from
the University of Kent in Austria.

Q.      And just in general, in between obtaining your Ph.D.
and working for Qorvo, what kind of work experience did you

Fattinger - direct

14:33:37   1    have?

14:33:37   2    A.      I worked on acoustic wave technology for a German

14:33:43   3    semiconductor company until I was hired in 2006 from a

14:33:47   4    predecessor of Qorvo.

14:33:48   5    Q.      What was that predecessor?

14:33:50   6    A.      It ways Sawtech first and then became TriQuint

14:33:55   7    Semiconductor, and after that became after the merger with

14:33:58   8    RFMD was Qorvo.

14:33:59   9    Q.      Prior to the merger, what kinds of technology in

14:34:02  10    general were you working on?

14:34:03  11    A.      So I started out working in 2006 as a BAW engineer, I

14:34:08  12    was the first BAW engineer at Qorvo.  Worked for many, many

14:34:13  13    years as a BAW engineer, later as a BAW engineering manager.

14:34:18  14    And then as the years went by, got responsibility for more

14:34:23  15    and more technologies within Qorvo.

14:34:26  16    Q.      And speaking of years going by, about how many years

14:34:30  17    have you worked with BAW technology?

14:34:32  18    A.      Total of twenty-five years pretty much exactly.

14:34:36  19    Q.      And do you have any patents where you're listed as an

14:34:39  20    inventor that concern BAW filter technology?

14:34:42  21    A.      Yes, numerous patents.

14:34:43  22    Q.      About how many?

14:34:45  23    A.      I didn't count them.  Many, many.

14:34:47  24    Q.      Okay.  Have you been involved in identifying the

14:34:52  25    trade secrets that Qorvo contends Akoustis misappropriated

Fattinger - direct

14:34:55  1   in this case?

14:34:56  2   A.      Yes.

14:34:57  3   Q.      And did you assist in the preparation of some slides

14:34:59  4   to help us go through your testimony today?

14:35:01  5   A.      Yes, I did.

14:35:02  6   Q.      Mr. Buchbinder, if we could pull up PDX 4.1.

14:35:07  7           Doctor, just in general, what are we seeing on

14:35:10  8   the screen right now?

14:35:11  9   A.      That's a list of the different trade secret groups.

14:35:14 10   Q.      And can we turn to 4.2, please.

14:35:18 11           Which two groups are you here to talk about

14:35:21 12   today?

14:35:21 13   A.      I'm going to talk first about group 5, Qorvo's

14:35:26 14   product development process and associated testing

14:35:29 15   procedures.  And later on, I'm going to talk about group 7,

14:35:33 16   which is about the manufacturing and assembly procedures.

14:35:36 17   Q.      Since we have group 5 up on the screen, can you just

14:35:39 18   in short tell us what Qorvo's product development process

14:35:43 19   and testing procedures, what are those and what's involved?

14:35:46 20   A.      So that's fundamentally for all the technologies that

14:35:51 21   we have in Qorvo, describes how we develop real technology,

14:35:56 22   what steps do we go through, what deliveries to do at

14:36:00 23   different stages in the development process, it basically

14:36:02 24   gives us a master plan on how we develop technologies.

14:36:05 25   Q.      What's been your personal involvement in this area at

Fattinger - direct

14:36:09  1    Qorvo?

14:36:10  2    A.     As part of the engineer team at Qorvo over the last,

14:36:15  3    well, since 2006, I have contributed over time to improve

14:36:21  4    the development process, to find new features of the

14:36:25  5    development process and to generally oversee the further

14:36:28  6    development of the process, the refinement of the process.

14:36:31  7    Q.     Could we pull up slide 4.3, please.

14:36:35  8           And, Doctor, just in general, we'll go through

14:36:38  9    this in more detail, but what's reflected on this slide?

14:36:41 10    A.     So that's the trade secrets pertaining to Qorvo's

14:36:46 11    product development process and testing procedures.

14:36:50 12           MR. TIGAN:  Your Honor, may I approach with the

14:36:52 13    first exhibit?

14:36:53 14           THE COURT:  You may.

14:37:04 15    BY MR. TIGAN:

14:37:08 16    Q.     So Doctor, I have handed you what the parties

14:37:11 17    previously marked as PTX 739.  Do you recognize this

14:37:15 18    document.  And take a minute if you need it.

14:37:18 19    A.     Yeah, I recognize this document.  That's the document

14:37:22 20    that describes Qorvo's technology and product development

14:37:26 21    process.

14:37:27 22    Q.     Okay.

14:37:27 23           MR. TIGAN:  Your Honor, I move for the admission

14:37:29 24    of this document as I believe exhibit, will it be 32?

14:37:32 25           THE COURT:  32, marked and received.

Fattinger - direct

14:37:34  1                    (Trial Exhibit No. 32 was admitted into

14:37:35  2    evidence.)

14:37:35  3    BY MR. TIGAN:

14:37:36  4    Q.        What kind of information is in this document, Doctor?

14:37:39  5    A.        So that's probably best explained by-- I don't know

14:37:42  6    by picking a page.  Let's pick page number, let me see,

14:37:48  7    let's go to Page Number 6.

14:37:50  8    Q.        Okay.  Please pull up page 6, please.

14:37:54  9    A.        So let's pick as an example the middle section here,

14:37:58 10    the technology development process.  So as you can see, this

14:38:05 11    document describes the development process going from the

14:38:08 12    left to the right in several stages, in this case in seven

14:38:14 13    stages labeled TD-1 through TD-7, they all have different

14:38:18 14    names.  What's important is at the bottom of that popup that

14:38:23 15    we see here, there is a list of deliveries for each of the

14:38:27 16    technology development stages that describe what tasks have

14:38:33 17    to be performed in every stage and what the developments are

14:38:38 18    for those stages.

14:38:39 19    Q.        Why is that information important to Qorvo?

14:38:43 20    A.        Knowing upfront what development and what has to be

14:38:49 21    performed at each stage of the development process prevents

14:38:52 22    surprises, they know they have to ███████████████████████

14:38:56 23    ██████████  I don't -- I'm not in danger to later on

14:39:02 24    represent the volume.

14:39:06 25    Q.        Can we pull slide 4.4 up on screen, please, where we

Fattinger - direct

14:39:11   1   have this same excerpt.

14:39:12   2            What are seeing here, Dr. Fattinger?

14:39:14   3   A.     This is the same popup that we looked at, for

14:39:17   4   example, the product development process as a part of the

14:39:20   5   same page that we saw before.  And this kind of information

14:39:24   6   pertains to the 5.1 and 5.2 that lists on the top in terms

14:39:34   7   of trade secrets for the technology and product development

14:39:36   8   process.

14:39:37   9   Q.     Is the information we're talking about right now

14:39:39  10   confidential to Qorvo?

14:39:40  11   A.     Absolutely, every one of those documents is marked as

14:39:43  12   proprietary, confidential.

14:39:45  13   Q.     And could a competitor benefit if it had information

14:39:49  14   like this?

14:39:49  15   A.     Absolutely.  As pointed out before, knowing the

14:39:52  16   sequence of items, the deliverables, what do I need to look

14:39:58  17   at is of course the recipe to shorten technology development

14:40:03  18   time and prevent unforeseen surprises.

14:40:06  19            MR. TIGAN:  Your Honor, may I approach again?

14:40:08  20            THE COURT:  You may.

14:40:29  21   BY MR. TIGAN:

14:40:35  22   Q.     Doctor, I've handed you two exhibits that kind of go

14:40:39  23   together that the parties previously marked as PTX 111 and

14:40:43  24   PTX 114.  And just for a clean record, let's start with PTX

14:40:49  25   111.  Do you recognize this document?

Fattinger - direct

14:40:51  1   A.      Yes, that is a -- I recognize the format, that's a

14:40:56  2   product requirements document, referred to as a PRD.

14:40:59  3   Q.      And likewise would PTX 114, pick that up, please, do

14:41:04  4   you recognize this document?

14:41:05  5   A.      That's the same kind of document, the product

14:41:08  6   requirement.

14:41:10  7          MR. TIGAN:  Your Honor, I move to admit these

14:41:12  8   documents as Exhibit 33 and 34 respectively.

14:41:16  9          THE COURT:  33 and 34, marked and received.

14:41:20 10          (Trial Exhibit Nos. 33 and 34 were admitted into

14:41:20 11   evidence.)

14:41:20 12   BY MR. TIGAN:

14:41:22 13   Q.      Dr. Fattinger, what kind of information is in the two

14:41:24 14   documents that you have in front of you now?

14:41:25 15   A.      There is a lot of information in there, for example,

14:41:30 16   it contains, if you go with the cover page of the document

14:41:32 17   of 111, it contains a general overview of the product that

14:41:40 18   is described in this product requirement document, amongst

14:41:46 19   other things, a part number, the revision of the part, the

14:41:50 20   requirements, some key features, and almost three quarters

14:41:57 21   down a cost target.  So how much the part was supposed to

14:42:02 22   cost.

14:42:03 23   Q.      And we have the Excel, what we call the native

14:42:08 24   version up on the screen right now.  Do you see the tabs at

14:42:12 25   the bottom?

Fattinger - direct

14:42:12  1    A.       Yes, I do.

14:42:13  2    Q.       Okay.  Mr. Buchbinder, can we hit the specifications

14:42:17  3    tab, please.  Thank you.

14:42:18  4             Doctor, what are we seeing on the specifications

14:42:21  5    tab?

14:42:22  6    A.       So on the specifications tab, that's part of a pretty

14:42:28  7    long distance, we can scroll up and down, the specification

14:42:33  8    table describes how the part has performed, all the

14:42:37  9    different performance parameters, including in some cases

14:42:41 10    the two big values, the minimum and the maximum values, the

14:42:46 11    window that we have to hit with that part.  And that's for

14:42:51 12    every aspect of the performance of that part.

14:42:54 13             MR. TIGAN:  And, Your Honor, I was remiss.  I

14:42:56 14    just want to pause and note for the record that while we're

14:42:59 15    going through 5 and group 7 of the trade secrets, we want to

14:43:03 16    make sure that the courtroom is sealed, we have the right

14:43:06 17    people in here.

14:43:07 18             THE COURT:  That is correct.  I don't know that

14:43:09 19    anyone else has entered as far as I can tell.  Make sure you

14:43:14 20    look around.

14:43:15 21             MR. TIGAN:  Thank you.

14:43:15 22    BY MR. TIGAN:

14:43:16 23    Q.       Doctor, let's go to PTX 114 and kind of go through

14:43:19 24    the same steps.  Can we look at the overview tab on PTX 114

14:43:24 25    which is now in the record as Exhibit 34?

Fattinger - direct

14:43:26 1  A.      Sure.

14:43:26 2  Q.      What are we seeing on this one?

14:43:28 3  A.      Similar format as before, on the very top part

14:43:33 4  number, in this case, QPF4551, some numbers for document

14:43:40 5  instance, iterations, revisions, a general description, a

14:43:45 6  description of the part, and then a list of key features,

14:43:49 7  features in that case not being filled in at the very bottom

14:43:53 8  a cost target for the part.

14:43:55 9  Q.      And Mr. Buchbinder, let's again hit the

14:43:58 10 specifications tab on this one down at the bottom.

14:44:04 11          And, Doctor, what are we seeing here?  Is this a

14:44:08 12 similar type of information?

14:44:09 13 A.      Yes, similar to the part before, that's exhaustive

14:44:15 14 list of all the specifications, required to design and

14:44:20 15 manufacture the part.

14:44:20 16 Q.      Since this is only a two-week trial, I won't go

14:44:24 17 through all the other tabs, but is there other types of

14:44:27 18 confidential trade secret information in these documents?

14:44:29 19 A.      Yeah, in some cases there is also tests data in some

14:44:35 20 of those documents, test conditions, and test conditions,

14:44:38 21 for example, here to the production test tab, if you want to

14:44:44 22 go over there.

14:44:44 23 Q.      No, let's move on so we don't get too detailed here.

14:44:48 24 But let's go to demonstrative slide 4.5, if we can.

14:44:52 25          Doctor, now that we have talked about these two

Fattinger - direct

14:44:55 1    documents, which trade secrets have you identified as?

14:44:59 2    A.    Those documents, those PRD documents contain

14:45:03 3    procedures for tracking and documenting the product

14:45:05 4    development process, 5.3, they also contain 5.4, the

14:45:11 5    technical differentiators, cost targets as we saw on the

14:45:15 6    cover page before, and that one tab referenced again that

14:45:19 7    contains 5.5, testing procedures and specific parameters and

14:45:24 8    conditions for testing.

14:45:24 9    Q.    These types of documents, what's their value to

14:45:27 10   Qorvo?

14:45:28 11   A.    The value of the spec definitions is rather obvious,

14:45:36 12   it defines how the part has to perform, what the part has to

14:45:39 13   do, any competitor having that spec definition in hand knows

14:45:44 14   exactly what kind of part Qorvo was developing and what

14:45:49 15   parameters are important and to what degree.

14:45:51 16          For the tests specifications, I would go a step

14:45:59 17   further, test specifications typically take into account the

14:46:01 18   process, variability, if you're going to manufacture

14:46:05 19   something, how similar is one part to the next one.  It also

14:46:09 20   takes into account the capability of my testing equipment,

14:46:13 21   how accurately can I test what I want to test.  And that

14:46:17 22   knowledge tells anybody who has those documents in hand not

14:46:24 23   only what is the part you're manufacturing, but it also

14:46:29 24   tells the competitor how capable is our technology, what is

14:46:32 25   your process variation, what is your testing capability, it

Fattinger - direct

14:46:36  1    goes beyond just the part.

14:46:37  2    Q.    Are these types of documents kept as confidential at

14:46:40  3    Qorvo?

14:46:40  4    A.    Absolutely.

14:46:41  5    Q.    How do you know?

14:46:42  6    A.    Well, they're marked -- the cover page is marked as

14:46:46  7    confidential.  I can always recognize that document as

14:46:52  8    something that we will typically, that we always keep in

14:46:55  9    Qorvo's document control system, the document control system

14:46:59 10    is access restricted, you have to have a password and access

14:47:04 11    is given on a need-to-know basis.

14:47:06 12    Q.    How could a competitor benefit from obtaining these

14:47:10 13    documents or documents like them?

14:47:11 14    A.    Yeah, some already out before, knowing specifications

14:47:16 15    allows to design exactly for the same part without the part

14:47:20 16    being on the market already, time, knowing test conditions,

14:47:25 17    knowing process variability helps with not running into the

14:47:31 18    same pitfalls that we run into along the way.  All those

14:47:38 19    things materialize at the end of the day as faster

14:47:42 20    development cycle time, less resources, less money invested

14:47:46 21    into the development of the part.

14:47:48 22              MR. TIGAN:  Your Honor, may I approach with the

14:47:49 23    next exhibit?

14:47:51 24              THE COURT:  You may.

14:47:57 25    BY MR. TIGAN:

Fattinger - direct

14:48:05  1    Q.      Dr. Fattinger, I have given you what the parties have

14:48:08  2    previously marked as PTX 88.  Do you recognize this

14:48:12  3    document?

14:48:12  4    A.      Yes, I recognize that.  That's a device form

14:48:18  5    indication test plan.

14:48:19  6              MR. TIGAN:  Your Honor, I move for the admission

14:48:20  7    of this document into evidence.

14:48:21  8              THE COURT:  Marked and received as 35.

14:48:24  9              (Trial Exhibit No. 35 was admitted into

14:48:25 10    evidence.)

14:48:25 11    BY MR. TIGAN:

14:48:25 12    Q.      In general what type of information is in this

14:48:28 13    particular document?

14:48:32 14    A.      A device qualification test plan contains information

14:48:37 15    as the part is qualified, by qualification, I mean exposing

14:48:41 16    the part to several defined very harsh conditions, high

14:48:45 17    temperature, high humidity, and after that exposure happens,

14:48:49 18    the part needs to be tested again, we need to verify that

14:48:52 19    the part still works.  And this document defines how all the

14:48:57 20    verifications are to happen.

14:48:59 21    Q.      This is another native document, we'll just take a

14:49:02 22    look at a couple of things if that's okay.  Let's hit the

14:49:06 23    red tab, test specification and conditions.  Can you tell us

14:49:08 24    what we're looking at here?

14:49:10 25    A.      Here we're looking at the different specifications

Fattinger - direct

14:49:12 1   for testing the part and the dark band, as well as the test

14:49:18 2   limits, the upper and lower limits, those limits, a certain

14:49:24 3   parameter for a part is where it needs to be to pass the

14:49:28 4   qualification test.

14:49:29 5   Q.     And what about the test specification and conditions

14:49:32 6   tab, can we get that one up.   The green tab.   There we go.

14:49:42 7   And I don't see much here, but I do see some icons.   What

14:49:47 8   are we looking at?

14:49:48 9   A.     Those icons are embedded Excel documents.   So if we

14:49:53 10  were in the native Excel file document, we would see in the

14:49:57 11  case of the lower most item, for example.

14:49:59 12  Q.     Mr. Buchbinder could you help by opening that lower

14:50:05 13  icon?

14:50:05 14  A.     So that is the data, is the names of what's called a

14:50:10 15  gauge R & R study, a Gage R & R study is a study of the test

14:50:17 16  equipment that tells us something about how much potential

14:50:20 17  error, how much variation do I get from a test equipment.

14:50:24 18  And I need to take that into account when I look at the

14:50:28 19  parameter of my product, the parameter of my product varies

14:50:31 20  a certain amount but I know my test system already

14:50:36 21  contributes a certain percent of the variables I need to

14:50:39 22  take into account.   And that provides additional knowledge

14:50:42 23  to anybody having that document about what kind of test

14:50:45 24  systems we are using, how much variability they need to take

14:50:50 25  into account and that of course again helps with the testing

Fattinger - direct

14:50:53  1    of the product.

14:50:55  2    Q.    Is that information important to have for someone in

14:50:59  3    the field?

14:50:59  4    A.    Absolutely, that's why this study is done.

14:51:01  5    Q.    Let's pull up slide 4.6, please, where we have some

14:51:05  6    excerpts of this document.  And close that out.

14:51:10  7          Dr. Fattinger, what are we seeing here in

14:51:15  8    relation to this document?

14:51:16  9    A.    Those are screen shots of tabs from the document, and

14:51:23 10    it applies, the content of the document applies to trade

14:51:29 11    secret 5.5, the testing procedures, parameters and

14:51:32 12    conditions.

14:51:32 13    Q.    And is this information confidential to Qorvo?

14:51:35 14    A.    Absolutely.

14:51:36 15    Q.    And I think we touched on this, but how could this

14:51:40 16    help a competitor like Akoustis or one of the others in the

14:51:43 17    market?

14:51:43 18    A.    Knowledge about test specifications, delivers

14:51:48 19    knowledge about the process variability, delivers knowledge

14:51:51 20    about what parameters are important to test, how tightly

14:51:55 21    they need to be tested, and having like to gauge R & R study

14:52:01 22    tells the competitor how good the temperature is and how

14:52:05 23    much variability is expected in the test system.

14:52:08 24    Q.    And just finished looking at the four documents in

14:52:11 25    group 5 so just a couple of kind of summary questions if I

Fattinger - direct

14:52:14  1   may.   These documents, do they pertain to BAW filters?

14:52:19  2   A.      Yes.

14:52:19  3   Q.      And the jury has heard some of this already, but do

14:52:23  4   they pertain to SMR filters?

14:52:25  5   A.      Yes.   Part of the effective apply to every

14:52:29  6   technology.

14:52:29  7   Q.      Would that include FBAR filters?

14:52:34  8   A.      It's actually technology agnostic.

14:52:37  9   Q.      Why is that the case?

14:52:38 10   A.      The procedures, for example having specs, is

14:52:40 11   something that is not limited to a BAW filter.   Building

14:52:45 12   another part and another technology let's say an amplifier

14:52:49 13   also requires a list of specs, so does building a switch, so

14:52:54 14   does building a micro controller, for example.

14:52:57 15   Q.      Let's move on to group 7 and we'll pull up slide 4.7

14:53:02 16   and just so the jury can orient itself.   What does group 7

14:53:06 17   pertain to?

14:53:07 18   A.      Those are the trade secrets pertaining to the Qorvo

14:53:10 19   manufacturing and assembly procedures.

14:53:11 20   Q.      What does that mean at Qorvo?

14:53:13 21   A.      So manufacturing and embodiment assembly procedures

14:53:17 22   describe how we manufacture our parts and how we assemble

14:53:21 23   our components into the product that we eventually sell.

14:53:25 24   Q.      What's your personal involvement in these types of

14:53:28 25   activities at the company?

Fattinger - direct

14:53:29  1    A.      I have been involved over the years in the definition

14:53:31  2    and the continued development of those processes.

14:53:35  3    Q.      Let's pull up the next slide, which is 4.8.  What is

14:53:39  4    reflected here?  And, again, we can go into the detail in

14:53:42  5    just a moment.

14:53:43  6    A.      Again, these are screen shots of four of the

14:53:47  7    documents here.  Six of the documents, six actually,

14:53:50  8    pertaining to group 7, specifically to the trade secret

14:53:54  9    group 7.1 through 7.4.

14:53:58 10            MR. TIGAN:  Your Honor, may I approach again?

14:54:01 11            THE COURT:  You may.

14:54:07 12    BY MR. TIGAN:

14:54:15 13    Q.      Doctor, I have just handed you a document the parties

14:54:18 14    previously marked as PTX 253.  Do you recognize what this

14:54:24 15    document is?

14:54:24 16    A.      Yes, I do.  It's a package fortification data

14:54:28 17    document.

14:54:29 18            MR. TIGAN:  Your Honor, I move for the admission

14:54:31 19    of this document.

14:54:32 20            THE COURT:  Marked and received as 36.

14:54:35 21            (Trial Exhibit No. 36 was admitted into

14:54:36 22    evidence.)

14:54:36 23    BY MR. TIGAN:

14:54:38 24    Q.      Let's go into more detail.  What types of information

14:54:42 25    would we see in this document?

Fattinger - direct

14:54:44   1   A.      As we see, data collection templates for the

14:54:50   2   qualification of packages, subdivided in different sections

14:54:56   3   here, the purple is instructions, references, qualification

14:55:00   4   data, and so on.

14:55:01   5   Q.      You just said the word package.  What does that mean

14:55:05   6   in respect to what we're talking about?

14:55:07   7   A.      Yeah.  So Qorvo is a semiconductor company, which

14:55:13   8   means our smallest components, the semiconductor chips, they

14:55:20   9   are manufactured on a big silicone disks.  I believe one of

14:55:23  10   them has been shown previously here.  That silicone disk can

14:55:31  11   contain, depending on the size of the silicone disk and

14:55:35  12   depending on the size of the individual component, it can

14:55:38  13   contain tens of thousands or hundreds of thousands of little

14:55:42  14   circuits.  And in order to sell those little circuits, one

14:55:47  15   needs to cut that silicone disk in pieces, so we saw it, we

14:55:53  16   literally take a saw and saw it into pieces, and then we

14:55:57  17   need to put those pieces into something that can be handled

14:56:02  18   and that can be soldered on a circuit board in a phone, for

14:56:08  19   example.  In order to do that, we put those little pieces,

14:56:12  20   sometimes one, sometimes many, many pieces together in one

14:56:15  21   little plastic box or package as we call it, and that

14:56:20  22   plastic package on the bottom, it's just a rectangle box

14:56:25  23   like plastic, and on the bottom there are patches of metal

14:56:30  24   that allow us to make electrical connections to the inside

14:56:34  25   of the package, allow us to use little pieces of silicone.

Fattinger - direct

14:56:38  1    Q.      Mr. Buchbinder, can you take us to page 9 of this

14:56:41  2    document, please.

14:56:42  3            So, I think two questions ago you referred to

14:56:45  4    this document as a template?

14:56:47  5    A.      That's right.

14:56:47  6    Q.      What does template mean in this context?

14:56:50  7    A.      So template in this context means a collection, a

14:56:55  8    list, a table of all the parameters that need to be

14:57:00  9    collected and recorded and looked at during the process of

14:57:04 10    package qualification.

14:57:05 11    Q.      And just ballpark, how many parameters?

14:57:08 12    A.      Oh, hundreds.  Twenty-five, thirty pages.  Every page

14:57:15 13    contains, I don't know, twenty parameters, so we're looking

14:57:19 14    at many, many parameters.

14:57:20 15    Q.      Thank you.

14:57:21 16            Can we go to slide PDX 4.9.

14:57:25 17            So having looked at this document, Doctor, have

14:57:27 18    you identified a trade secret it's pertinent to?

14:57:30 19    A.      It pertains to 7.1 processes and procedures for

14:57:36 20    package qualification.

14:57:37 21    Q.      And this document, and likewise documents, what is

14:57:40 22    the value of them to Qorvo?

14:57:42 23    A.      So knowing which parameters need to be looked at when

14:57:47 24    qualifying a package is, of course, valuable in the sense

14:57:50 25    that -- if I wouldn't have that table, I don't know what I

Fattinger - direct

14:57:55  1    don't know.  If something goes wrong and I didn't record the

14:57:58  2    data beforehand, they'll never be able to figure out what

14:58:03  3    went wrong in the development of the product and volume and

14:58:07  4    they'll have quality issues.  Knowing which parameters to

14:58:10  5    look at, what data to record, what pitfalls to avoid, that's

14:58:14  6    what a template does, it helps tremendously in the

14:58:18  7    development process.

14:58:18  8    Q.    Is that how a competitor would benefit if it had this

14:58:22  9    information?

14:58:22 10    A.    Absolutely.

14:58:23 11    Q.    Does Qorvo maintain this document as confidential?

14:58:26 12    A.    That's a confidential document, yes.

14:58:30 13            MR. TIGAN:  Your Honor, may I approach?

14:58:32 14            THE COURT:  You may.

14:58:40 15    BY MR. TIGAN:

14:58:48 16    Q.    Doctor, I've just handed you what we've marked as PTX

14:58:52 17    751.  Take a moment.  Do you recognize this document?

14:58:55 18    A.    I recognize it, it's self director specification.

14:59:00 19            MR. TIGAN:  Your Honor, I move for admission of

14:59:01 20    this document into evidence.

14:59:02 21            THE COURT:  Marked and received as 37.

14:59:05 22            (Trial Exhibit No. 37 was admitted into

14:59:05 23    evidence.)

14:59:05 24    BY MR. TIGAN:

14:59:06 25    Q.    Doctor, what kind of information is in Exhibit 37?

Fattinger - direct

14:59:12  1   A.      It's laid out in the table of contents, it specifies

14:59:17  2   amongst administrative information like definitions and

14:59:20  3   acronyms, it specifies the roles and responsibilities of the

14:59:24  4   subcontractor assembly, specification for subcontractor

14:59:28  5   assembly, quality records that need to be kept during

14:59:32  6   assembly, and so on and so forth.

14:59:34  7   Q.      So are these assembly instructions?

14:59:37  8   A.      Yes, specifications.

14:59:38  9   Q.      Let's flip over to page 7, Mr. Buchbinder, if we can.

14:59:44 10          This is a good page, Doctor.  Can you tell us

14:59:47 11   what we're seeing here?

14:59:48 12   A.      If you don't mind, I pull up one example here.

14:59:51 13   Q.      Sure.

14:59:52 14   A.      In general, the page talks about wire bond

14:59:57 15   specification, I talk about the package, I talk how to

15:00:01 16   connect the metal heads on the outside to the silicone

15:00:05 17   pieces, the silicone chips on the inside.  And often times

15:00:09 18   the way that the connection is being made by means of a

15:00:13 19   tiny, tiny gold, copper, or aluminum wire, and that process

15:00:18 20   of connecting two chips on or a chip in the package with the

15:00:25 21   wires is called wire bonding, that's why the page talks

15:00:28 22   about wire bond.

15:00:30 23          And the way they execute the wire bonding, what

15:00:34 24   shape the wire has, how thick it is, what force used to

15:00:38 25   attach it, that is specified in the wire bond specifications

567

Fattinger - direct

15:00:42  1    in that subcontractor assembly document.

15:00:46  2    Q.      Can we look at your supplied 4.10, please?  Does the

15:00:50  3    information we have been talking about and other information

15:00:52  4    in this document pertain to any trade secrets identified in

15:00:55  5    this case?

15:00:56  6    A.      Absolutely.  Yes.

15:00:57  7    Q.      Which one?

15:00:58  8    A.      That case specifically 7.2, the format and the

15:01:03  9    details of the assembly instructions.

15:01:05 10    Q.      And is this document maintained as confidential at

15:01:07 11    Qorvo?

15:01:07 12    A.      Yes, it is.

15:01:08 13    Q.      And why is it valuable to Qorvo?

15:01:12 14    A.      Knowing how to assemble a part, for example, knowing

15:01:17 15    how to make a wire bond, how high, how close can I get to

15:01:22 16    the die page, how hard do I have to push it down and attach

15:01:26 17    it to the pads on the bottom, that is of course information

15:01:29 18    that has been developed painstakingly, many, many trial and

15:01:34 19    error episodes over the last many, many years of the

15:01:38 20    existence of Qorvo.  Not telling to do that and just being

15:01:42 21    able to come in and use the parameters as they are described

15:01:45 22    in the document is a massive time resource and cost saver.

15:01:50 23    Q.      Is that why a competitor could benefit from this?

15:01:53 24    A.      That could be certainly a reason.

15:01:56 25    Q.      Okay.

Fattinger - direct

15:01:59  1                    MR. TIGAN:  Your Honor, may I approach with the

15:02:01  2    next two exhibits?

15:02:03  3                    THE COURT:  You may.

15:02:12  4    BY MR. TIGAN:

15:02:26  5    Q.      So, Doctor, I have handed you what we've previously

15:02:29  6    labeled as PTX 249, as well as PTX 251.  Let's go through

15:02:35  7    them one by one again.  Do you recognize PTX 249?

15:02:39  8    A.      Yeah.  PTX 249 talks about the implementation

15:02:44  9    requirements for a procedure called reflow preconditioning.

15:02:49 10    Q.      Do you recognize PTX 251?

15:02:53 11    A.      Yes, PTX 251 is similar set of requirements for 143

15:03:01 12    reflow plus temperature, five times temperature.

15:03:05 13                    MR. TIGAN:  Your Honor, I move the admission of

15:03:06 14    these two documents.

15:03:07 15                    THE COURT:  Marked and received as 38 and 39.

15:03:10 16                    (Trial Exhibit Nos. 38 and 39 were admitted into

15:03:10 17    evidence.)

15:03:10 18    BY MR. TIGAN:

15:03:13 19    Q.      Mr. Buchbinder, can we put 249 up on the screen

15:03:13 20    please.

15:03:17 21                    I would like to talk just a little bit about the

15:03:21 22    previous documents we looked at.  Did you see Qorvo logos on

15:03:25 23    them?

15:03:27 24    A.      Yes.

15:03:32 25    Q.      What about there document, how do you know it's a

Fattinger - direct

15:03:35  1    Qorvo document?

15:03:35  2    A.     Well, the performance tells it's a Qorvo document,

15:03:39  3    but not only that, I see the template, the Qorvo document

15:03:44  4    number in the lower right corner, the FOR something

15:03:50  5    something is typically a format that we use in Qorvo or

15:03:55  6    control documents.

15:03:56  7           I also just noticed that on page 2, it says for

15:04:01  8    the implementation of Qorvo STC pre-conditioning.

15:04:10  9    Q.     Is that what you are referring to?

15:04:11 10    A.     Yes.

15:04:12 11    Q.     Let's do the same exercise with what is now

15:04:15 12    Exhibit 39, also marked as PTX 251.  I don't see a Qorvo

15:04:20 13    logo up at the top, but how are you recognizing this as a

15:04:24 14    Qorvo document?

15:04:25 15    A.     You are correct.  That's correct.  The same comment

15:04:28 16    as before about the document numbers, POL on the very top

15:04:32 17    and the FOR document number on the very bottom right.  Also

15:04:38 18    flipping through the document.

15:04:45 19    Q.     Let's flip to page 6 if we can.

15:04:47 20    A.     I see on page 5 and on page 4, names of the business

15:04:53 21    units in Qorvo, or business units as they used to be back

15:04:58 22    then.

15:04:58 23    Q.     Where is that, just so the jury can see that?

15:05:01 24    A.     That would be Section 6.2 where mobile products and

15:05:07 25    6.2.1 and key products in 6.2.2.  So mobile products and

Fattinger - direct

15:05:16  1    IDP, standing for infrastructure and defense products, those

15:05:20  2    used to be business units in Qorvo up until recently.

15:05:24  3    Q.    Let's turn to that next page, page 6, because we

15:05:29  4    glossed over that quickly.  What did you mention here?

15:05:32  5    A.    That's a revision history of the document from 2012

15:05:39  6    to 2017.

15:05:44  7    Q.    So taking the two documents together, what are they?

15:05:48  8    And I see the words "reflow."  Can you explain that for us?

15:05:52  9    A.    So I talked before about package, and how does a

15:05:56 10    package have metal pads on the bottom and those metal pads,

15:06:01 11    the purpose of those metal pads is to allow electric

15:06:06 12    connections from the outside world to the inside of the

15:06:08 13    package.

15:06:09 14          When we sell these parts to our customers, they

15:06:13 15    would like to take those parts and put them on the circuit

15:06:17 16    boards, they're computer boards, phone boards, whatever.

15:06:20 17    And the way to do that is they you use solder, which is

15:06:26 18    basically a tin metal alloy, and when the tin metal alloy is

15:06:33 19    heated up to a certain minimum temperature it becomes

15:06:38 20    liquid.  And that liquid metal at an elevated temperature

15:06:44 21    will be used to connect metal pads on the bottom of our

15:06:47 22    parts to equivalent metal pads on the circuit boards, and

15:06:51 23    once it cools down again, that metal becomes solid again and

15:06:56 24    the connection is established.

15:06:58 25          And knowing how exactly to execute on that what

Fattinger - direct

15:07:02  1   we call reflow process because it becomes liquid, it becomes

15:07:06  2   flowing and then it becomes solid again, knowing how to

15:07:09  3   exactly execute that is important to get a good connection.

15:07:13  4   Q.    Let's see if you can tell us just a little bit more.

15:07:17  5   Let's turn to what's now Exhibit 38, PTX 249, and go to

15:07:23  6   Section 6, please.  So Section 6 is short, but how does it

15:07:31  7   relate to what you were just telling us about?

15:07:33  8   A.    So executing that process is one thing to the best of

15:07:38  9   our knowledge.  The other thing is the keeping records of

15:07:41 10   that process.  So any variability in any of the parameters

15:07:46 11   of the process could have a detrimental affect on the

15:07:49 12   quality of those connections.  So 66 outlines which

15:07:55 13   parameters need to be recorded throughout that process and

15:07:58 14   before and after the process, wait times and so on and so

15:08:01 15   forth.

15:08:02 16   Q.    And likewise, let's go to what's PTX 251, or

15:08:07 17   Exhibit 39 in evidence and likewise go to sections 6 and 7

15:08:11 18   of that document, please.  And what else are we seeing about

15:08:17 19   reflow here, Doctor?

15:08:18 20   A.    So, Section 6.1 specifies for which packages that

15:08:25 21   reflow procedure has to be implemented.  And which package

15:08:31 22   types are examined.  And Section 6.2 on the bottom similarly

15:08:39 23   specifies which customers require us to implement that

15:08:46 24   reflow procedure and which customers have a result and

15:08:52 25   business units.

Fattinger - direct

15:08:53  1    Q.      Let's pull up PDX 411, Mr. Buchbinder.

15:08:57  2            So having talked about these two documents, a

15:09:00  3    little bit, Doctor, did you identify as a misappropriated

15:09:05  4    trade secret they're relevant to?

15:09:06  5    A.      Absolutely, both documents are relevant here

15:09:09  6    specifically to trade secrets from 7.3, processes,

15:09:15  7    procedures, and requirements for reflow conditioning.

15:09:19  8    Q.      And why is the information in these documents

15:09:22  9    valuable to Qorvo?

15:09:23 10    A.      Well, not knowing which parameters, for example, in

15:09:26 11    this case here on the screen, which parameters have to be

15:09:31 12    recorded again exposes a competitor to missing out on the

15:09:34 13    information that is obviously needed since to put in there

15:09:40 14    to successfully concrete a part.

15:09:42 15            Similarly the lower right corner, knowing which

15:09:46 16    customers require that up front, of course is a time saver.

15:09:50 17    Q.      And just so we're clear, are both documents

15:09:53 18    maintained as confidential by Qorvo?

15:09:55 19    A.      Yes, both are.

15:09:57 20    Q.      How do you know that?

15:09:58 21    A.      We talked already about the document number before,

15:10:00 22    that document number indicates that it's -- that the

15:10:04 23    document is stored in a controlled, in our controlled

15:10:07 24    document control system, access restricted, need to know

15:10:13 25    basis.

Fattinger - direct

15:10:13   1   Q.      Okay.  And finally, how could a competitor like

15:10:16   2   Akoustis benefit from having documents like this in their

15:10:20   3   position?

15:10:20   4   A.      We already touched that before.  Knowing, for

15:10:23   5   example, which customer requires which specific conditions

15:10:27   6   allows a competitor to address specific customers based on

15:10:31   7   their capabilities, it allows them to develop procedures

15:10:34   8   like that before they're being asked for it, and that saves

15:10:39   9   time, saves resources.

15:10:44  10           MR. TIGAN:  Your Honor, may I approach?

15:10:45  11           THE COURT:  You may.

15:11:11  12   BY MR. TIGAN:

15:11:12  13   Q.      All right.  Doctor, I have handed you two documents

15:11:14  14   again previously marked as PTX 223 and 225.  We'll again try

15:11:21  15   to keep a clean record and go one by one.

15:11:23  16           Do you recognize 223?

15:11:25  17   A.      Yes, I do recognize it as the general product

15:11:27  18   inspection procedures.

15:11:29  19   Q.      And PTX 225?

15:11:31  20   A.      Similarly, I recognize it as the final visual quality

15:11:36  21   control inspection procedures.

15:11:38  22           MR. TIGAN:  Your Honor, I move both documents

15:11:40  23   into evidence, please.

15:11:42  24           THE COURT:  Yes.  They're marked and received as

15:11:48  25   40 and 41.

Fattinger - direct

15:11:50  1              MR. TIGAN:  That's what I have as well.

15:11:52  2              (Trial Exhibit Nos. 40 and 41 were admitted into

15:11:53  3     evidence.)

15:11:53  4     BY MR. TIGAN:

15:11:53  5     Q.     What kind of information -- let's take them together

15:11:56  6     to start.  What kind of information is in these two

15:11:59  7     documents?

15:11:59  8     A.     Those documents talk about generally about the vision

15:12:04  9     or visual inspection which is as the name suggests, a

15:12:07 10     machine operating using a camera looking at our parts and

15:12:10 11     making decisions based on those images that our part is

15:12:15 12     passing or failing.

15:12:17 13     Q.     Why don't we put up 223 on the screen because I think

15:12:21 14     there are some things we should look at, kind of like we did

15:12:24 15     with the prior documents, how do you recognize this as being

15:12:28 16     a Qorvo document?

15:12:29 17     A.     It is again unfortunately the Qorvo logo, but the

15:12:32 18     format is clearly a Qorvo format.  I also have seen this

15:12:36 19     document before at Qorvo so I know it's a Qorvo document.

15:12:42 20     And I believe in one of those documents looking through it

15:12:46 21     before, the last page, for example, of the document, 2223.

15:12:53 22     Q.     What page are you on, Doctor?

15:12:56 23     A.     The last page.

15:12:57 24     Q.     Last page.  Okay.

15:12:58 25     A.     So I recognize the names of the engineers who

Fattinger - direct

15:13:03 1  contributed to the different revisions here, those are Qorvo

15:13:07 2  engineers specifically in our Dallas factory.

15:13:11 3           THE COURT:  I'm going to ask the person who is

15:13:13 4  highlighting it, don't do it in blue, do it in yellow.

15:13:19 5           MR. TIGAN:  Helpful, Your Honor.  Thank you.

15:13:21 6  BY MR. TIGAN:

15:13:21 7  Q.      Can we flip briefly to page 5 of the document?

15:13:26 8  Anything on here that indicates it's a Qorvo document?

15:13:31 9  A.      Let's see.

15:13:33 10  Q.      Actually --

15:13:36 11  A.      Other than me recognizing the graph as something that

15:13:41 12  I have seen before.  And the knowing the text below as well

15:13:46 13  as -- well, there is also a reference to another Qorvo

15:13:50 14  document, I'm very familiar with SP 14902 at the bottom

15:13:57 15  here.

15:13:58 16  Q.      Let's put up PTX 225, which I believe is Exhibit 41

15:14:03 17  quickly and go through the same exercise.  How do you

15:14:06 18  recognize this as being a Qorvo?

15:14:08 19  A.      Again, I know the format, it's a slightly different

15:14:12 20  format that we use before, tri-band.

15:14:18 21  Q.      Why don't we flip to page 28, there is something I

15:14:21 22  would like to ask you about there.  Anything on here that

15:14:24 23  stands out?

15:14:25 24  A.      Oh, yeah, I recognize that one, yes.  So if we focus

15:14:29 25  our attention to the lower most image, Figure 25, there is a

Fattinger - direct

15:14:35  1    piece of text in there, EG-186 and below that TQS, so I

15:14:42  2    recognize both EG-186 is our Richardson, Texas based

15:14:51  3    nomenclature for chips, so that's how we identify our

15:14:56  4    products in our factory, EG and a number, and the label

15:15:01  5    below means -- TQS means TriQuint Semiconductor, and I can

15:15:08  6    see a little bit of the copyright logo on there, half the

15:15:11  7    copyright logo on there.

15:15:13  8    Q.    Let's zoom back out, please.  And I think I saw at

15:15:16  9    the top of both documents a reference to visual quality

15:15:21 10    inspection or visual quality control inspection?

15:15:24 11    A.    Right.

15:15:24 12    Q.    Can you tell us about that?

15:15:26 13    A.    Yes.  So many of the characteristics of our parts can

15:15:31 14    be measured electrically, but other features, specifically

15:15:39 15    features that are on our chips due to processing issues that

15:15:46 16    could lead down to road to quality problems, right, we could

15:15:50 17    sell that part, we could put it in a customer's phone, for

15:15:54 18    example, on your phone, the phone doesn't work anymore, we

15:15:58 19    had something on our silicone chips that shouldn't have been

15:16:03 20    here.  And that's why we do the optical inspection step.

15:16:07 21         And this document here outlines all the

15:16:10 22    different failures that can happen, all the different

15:16:15 23    problems that we can have that one can identify operating,

15:16:19 24    so it's a collection of the experience we made over the last

15:16:24 25    many, many years in terms of what can happen that's

Fattinger - direct

15:16:28  1  detrimental to our device and how can we identify that

15:16:35  2  optically using this optic inspection process.

15:16:38  3          So a big portion of the document is a collection

15:16:41  4  of example pictures that tell us this is what a defect looks

15:16:46  5  like, if you have something like that, don't sell the part.

15:16:51  6  Q.    I think it would be helpful to show the jury.  Can we

15:16:53  7  pull up PTX 223 and I think flip to page 7, if we can.

15:17:00  8          Is this the type of thing you were just

15:17:04  9  referring to?

15:17:04 10  A.    Yeah, I think that the bottom is a pretty visual

15:17:08 11  example.  So the way this structures look like it should be

15:17:12 12  ███████████████████████████████████████████

15:17:16 13  ████████████████████████████████████████████████

15:17:19 14  ███████████████████████████████████████████████

15:17:25 15  ██████████████████████████████████████████████

15:17:29 16  █████████ and the part doesn't work anymore.

15:17:32 17  Q.    Let's flip to page 10, maybe we can find one more for

15:17:36 18  you to talk about.  Any of these you would like to explain?

15:17:39 19  A.    Sure.  Pick the top most one here, so what you're

15:17:44 20  looking at here, as I talked before about those silicone

15:17:49 21  discs that you need to cut into the chips, ███████████

15:17:53 22  ███████████████████████████████████████████

15:17:58 23  ███████████████████████████████████████████████

15:18:02 24  ███████████████████████████████████████████████

15:18:05 25  ███████████████████████████████████████████████

Fattinger - direct

15:18:08  1  ████████████████████████████████████████

15:18:17  2  ████████████████████████████████████████

15:18:21  3  ████████████████████████████████████████

15:18:25  4  ████████████████████████████████████████████

15:18:32  5  ██████████████████████████████████

15:18:35  6  ████████████████████████████████, it's also

15:18:39  7  something that can again lead to failure of that part, say

15:18:44  8  two years after we put it in a phone.

15:18:47  9  Q.      Okay.  Let's pull up your slide 4.12 to summarize

15:18:52 10  these two.  And which trade secret have you identified as

15:18:55 11  these documents relating to?

15:18:57 12  A.      Trade secret relevant here is the optimal equipment

15:19:00 13  processing procedures and badge lines for inspecting

15:19:04 14  products for defects.

15:19:05 15  Q.      And just briefly because I think we touched on this,

15:19:08 16  how is all this useful to Qorvo?

15:19:10 17  A.      As I already pointed out before, specifically those

15:19:16 18  different pictures and the knowledge about what kind of

15:19:18 19  defects can occur, that's a combination of many, many years

15:19:24 20  of running into those issues, and figuring out that hey,

15:19:28 21  this is something we don't want.

15:19:30 22              If a new company gets their hands on that, they

15:19:37 23  know from the get go what we had to learn painfully over the

15:19:42 24  last twenty years.

15:19:43 25  Q.      Are both of these documents maintained as

Fattinger - direct

15:19:47  1    confidential at Qorvo?

15:19:48  2    A.     Yes, they are.

15:19:49  3    Q.     We've run through group 7, but I want to ask you

15:19:52  4    similar questions as we wrap that up.  We've talked about

15:19:55  5    these group 7 documents, do these relate to BAW filters?

15:20:00  6    A.     Yes, they do.

15:20:01  7    Q.     What about SMR filters?

15:20:02  8    A.     Yes, they do as well.

15:20:04  9    Q.     And FBAR filters?

15:20:07  10   A.     Yes, they did.

15:20:08  11   Q.     Why do they pertain to both?

15:20:10  12   A.     Again, they are again generic across many, many

15:20:14  13   technologies, going through the document here you'll find

15:20:16  14   pictures for BAW filters, one will find pictures for FBAR,

15:20:21  15   it doesn't matter, it's technology agnostic.

15:20:25  16   Q.     We talked about group 5 and group 7 and individual

15:20:28  17   documents in both groups.  Just to confirm, were all the

15:20:31  18   documents kept as confidential and secret at Qorvo, were

15:20:34  19   there any exceptions?

15:20:35  20   A.     No.

15:20:35  21   Q.     How do you know that?

15:20:36  22   A.     I saw indications confidential proprietary on all of

15:20:40  23   them, I saw the document control numbers on all of them and

15:20:43  24   I know from my personal experience at Qorvo, those documents

15:20:46  25   were in the Qorvo document control system.

Fattinger - direct

15:20:48  1   Q.      And that document control system, how is access

15:20:52  2   restricted?

15:20:52  3   A.      Password restricted, one needs a network log in, and

15:20:57  4   then to access specifically to the system is provided on a

15:21:00  5   need to know business basis.

15:21:01  6   Q.      To your knowledge, has Qorvo made any of the

15:21:05  7   documents we talked about so far public?

15:21:07  8   A.      Not that I know of.

15:21:09  9   Q.      And can the information we talked about be obtained

15:21:12  10  by simply looking at Qorvo's commercial products?

15:21:15  11  A.      No.

15:21:16  12  Q.      Why not?

15:21:20  13  A.      Let's take as an example the optical inspection here,

15:21:24  14  the purpose of the optical inspection is to weed out the

15:21:28  15  cases that we see in these different images.  So just to do

15:21:34  16  that, any parts that actually make it to our customers, that

15:21:37  17  anybody could look at would not have any of these defects.

15:21:41  18  Q.      And did you become aware at some point that Akoustis

15:21:44  19  had copies of all of these documents?

15:21:46  20  A.      Yes.

15:21:47  21  Q.      And did Qorvo ever give Akoustis permission to have

15:21:51  22  these documents?

15:21:51  23  A.      Not to my knowledge.

15:21:53  24  Q.      Okay.  We've finished the trade secret portion, so I

15:21:56  25  would like to change topics to a final topic.

Fattinger - direct

15:21:59  1              MR. TIGAN:  And if I may approach one more time,

15:22:01  2    Your Honor?

15:22:01  3              THE COURT:  You may.

15:22:01  4    BY MR. TIGAN:

15:22:19  5    Q.      I have just handed you what the parties have

15:22:23  6    previously marked as PTX 1716.  Could you please identify it

15:22:29  7    for us?

15:22:29  8    A.      Yes.  That's a patent on which I am the co-inventor.

15:22:35  9    Q.      Okay.  Can we pull up your demonstrative 4.13,

15:22:41 10    please, Mr. Buchbinder.

15:22:42 11              And can we just call it the '755 patent today so

15:22:47 12    I don't jumble up all the numbers over and over again?

15:22:50 13    A.      Yes.

15:22:51 14    Q.      This may be the biggest softball, but how are you

15:22:54 15    familiar with this document?

15:22:55 16    A.      Well, I was a co-inventor on the document and

15:23:01 17    collaborated with my co-inventor here to the preparation of

15:23:04 18    the document.

15:23:05 19              MR. TIGAN:  Your Honor, I move this into

15:23:06 20    evidence, please.

15:23:07 21              THE COURT:  Marked and received as 42.

15:23:09 22              (Trial Exhibit No. 42 was admitted into

15:23:10 23    evidence.)

15:23:10 24    BY MR. TIGAN:

15:23:10 25    Q.      So were you involved in drafting this document?

Fattinger - direct

15:23:14  1    A.      Yes, I was.

15:23:15  2    Q.      And let's turn to slide -- your next slide 4.14.  And

15:23:24  3    just in general, could you explain to the jury what the

15:23:27  4    invention is in this patent?

15:23:29  5    A.      Sure.  So BAW resonators, in general, consist -- of

15:23:41  6    piezoelectric layer, piezoelectric like the piezo light that

15:23:48  7    you have at home, you push it, it sparks.  Two electrodes,

15:23:52  8    one at the top and one at the bottom to try to get to the

15:23:56  9    electricity to the piezo layer.

15:23:59 10            If one applies electricity to the piezo layer,

15:24:03 11    things start moving, mechanically moving up and down.  And

15:24:07 12    that mechanical movement of course if no proper measures are

15:24:12 13    taken to contain that movement in the resonator, it can leak

15:24:16 14    out to the left, to the right, anywhere.

15:24:18 15    Q.      And where are we seeing this on the screen?

15:24:21 16    A.      In this case, the green layers are the electrodes or

15:24:25 17    pieces of metal, and the blue layer is the piezoelectric

15:24:30 18    layer.  And the big red arrows left and right, if we focus

15:24:35 19    on the left figure here, that's the loss.  So this is a case

15:24:39 20    where no proper measures have been taken to prevent the

15:24:44 21    loss.

15:24:44 22    Q.      Why are the loss arrows of a different size on the

15:24:49 23    right?

15:24:49 24    A.      On the right-hand side, the subject of the invention

15:24:52 25    has been implemented, specifically and I want to point your

Fattinger - direct

15:24:58  1    attention to the orange and purple layers here, so the key

15:25:05  2    of the invention that the purple layer outside the electrode

15:25:12  3    of the device, to the left and the right has a different

15:25:17  4    thickness than the layer in orange on top of the device,

15:25:22  5    both layers here.

15:25:26  6            Getting the difference between the thickness of

15:25:28  7    the orange and the thickness of the purple part just right

15:25:32  8    gets us to a condition that we call acoustic matching, we'll

15:25:37  9    talk about on the next page.  And that minimizes that

15:25:40 10    acoustic vibration, the vibration is generated, it minimizes

15:25:46 11    that vibration leaking to the left and the right.

15:25:49 12    Q.    Have you heard the term lateral loss?

15:25:52 13    A.    Lateral in that case refers to left and right.

15:25:56 14    Q.    You promised you would show us on the next page, so

15:25:59 15    can we flip over.  And this is titled acoustic matching,

15:26:04 16    what is that?

15:26:05 17    A.    So, we talked before about the evaporation that

15:26:10 18    generate in a BAW device like this one.  The evaporation

15:26:16 19    here symbolized by that squiggly pattern here and similarly

15:26:24 20    to what I explained to the previous page, we can minimize

15:26:28 21    that squiggly pattern, the wave, the mechanical energy, we

15:26:34 22    can prevent it from exiting left and right from the device

15:26:37 23    by applying the invention, and if we get to this point that

15:26:43 24    that leakage is minimized, ideally, you don't have it there

15:26:48 25    anymore, that's the condition we call acoustic matching.

Fattinger - direct

15:26:52  1   Q.      How do you measure that, how do you measure whether a

15:26:55  2   structure is acoustically matched?

15:26:58  3   A.      So the easiest way to do that is to look at the

15:27:02  4   structure in terms of simulation, refer to simulations, we

15:27:09  5   are talking about computer programs that basically calculate

15:27:11  6   how the device behaves.

15:27:14  7           And one easy way once we have the computer

15:27:20  8   program that tells us hey, this device is moving like this

15:27:23  9   or like that, then we can go in and we can analyze that data

15:27:28 10   by looking at how much mechanical energy is actually flowing

15:27:32 11   from the center portion of that device to the outside

15:27:36 12   portion of that device, that's called lateral energy flux.

15:27:40 13   So how much energy goes from the middle to the outside.

15:27:46 14   Q.      Are there other ways to visualize acoustic matching?

15:27:49 15   A.      There is other ways, we previously used --

15:27:53 16   Q.      Let's flip to the next slide, I apologize, can we go

15:27:57 17   to the next slide, please?

15:27:59 18   A.      Look, for example, here at the parameter called

15:28:01 19   mechanical energy density.  Mechanical energy density means

15:28:07 20   if I have a wave in an area, if I have an acoustic

15:28:11 21   vibration, a mechanical vibration in an area, I can

15:28:14 22   symbolize that by different shades of gray here.  And again

15:28:18 23   the left portion here is basically half of the device view

15:28:23 24   that we had on the previous page, without the invention, and

15:28:26 25   on the right-hand side here a similar device portion but

Fattinger - direct

15:28:31  1    with the invention applied.  And it's a little hard to see

15:28:36  2    here because there is no color block, originally it was a

15:28:40  3    color block, but the right-hand side in that orange, red

15:28:46  4    ellipsoid region there is less mechanical energy on the

15:28:50  5    outside which means that we have less energy flux from the

15:28:53  6    inside of the device where the energy is generated to the

15:28:57  7    outside.

15:28:58  8    Q.    We can take that down just for a moment.  You

15:29:00  9    referred to these computer simulations.  How accurate are

15:29:04 10    they?

15:29:05 11    A.    So if we come over the years with a lot of investment

15:29:09 12    and research, extremely accurate, now to the point that we

15:29:14 13    are most of the time refraining from even running hardware

15:29:19 14    until we really get -- so actually creating the part,

15:29:22 15    measuring them, until we get to the last iteration of what

15:29:26 16    we're trying to achieve.

15:29:28 17    Q.    That was my question, why wouldn't you make a

15:29:30 18    hardware prototype and test it?

15:29:32 19    A.    One could, but it's always way cheaper and way faster

15:29:36 20    to just run the computer program than to actually physically

15:29:39 21    make something.

15:29:40 22    Q.    Does the invention in your patent apply to both SMR

15:29:43 23    and FBAR filters?

15:29:44 24    A.    Yes, it does.

15:29:45 25    Q.    Why is that?

Fattinger - direct

15:29:46 1    A.      So fundamentally the resonator structure is the same,

15:29:50 2    you have a top electrode and a bottom electrode.

15:29:54 3    Q.      You might want to slow down for the court reporter.

15:29:56 4    A.      You have a top electrode, you have a bottom

15:29:59 5    electrode, you have a piezo layer and the invention

15:30:02 6    addresses lateral energy loss.  And looking at an FBAR

15:30:08 7    structure, the lateral energy loss on an FBAR structure is

15:30:13 8    there in the very same way as an SMR structure.  In an FBAR

15:30:17 9    structure there is actually deformative loss factor, so

15:30:22 10   therefore it's even more important for an FBAR than for an

15:30:27 11   SMR.

15:30:28 12   Q.      I did want to ask you, are you proud that you're an

15:30:30 13   inventor on this patent?

15:30:32 14   A.      Sure.  Anything an engineer can do to improve the

15:30:35 15   products of the company makes me happy.

15:30:38 16   Q.      The last few questions and then I'll take a seat and

15:30:41 17   let my colleague ask you some questions.

15:30:44 18          Can we turn to the last demonstrative in

15:30:46 19   Dr. Fattinger's slide deck, please.  It should be the last

15:30:51 20   page.  There we go.

15:30:59 21          Is this a demonstrative that you located to show

15:31:01 22   the jury today?

15:31:03 23   A.      Yes, I did.

15:31:03 24   Q.      And what are we seeing here?

15:31:05 25   A.      On the left-hand side, we are seeing very simplified

Fattinger - direct

15:31:09 1  cross-section sketch of an SMR resonator, we talked before

15:31:16 2  about the piezoelectric layer in bright green, the top

15:31:20 3  electrode and the bottom electrode in teal, and then the

15:31:25 4  substrate on the very bottom.  And on the right-hand side a

15:31:30 5  similar device, an FBAR, top electrodes and in teal, a

15:31:35 6  bottom electrode in teal, piezoelectric layer sandwiched in

15:31:40 7  between and the substrate on the very bottom.

15:31:42 8  Q.    And on the bottom I am seeing the red and the green.

15:31:47 9  What are those?

15:31:48 10 A.    I can speculate here, they're obviously an incomplete

15:31:55 11 list of the features that we see on the top.  I can see a

15:31:58 12 piezo layer in red left and right, I can see a top side air

15:32:03 13 cavity basically on top of the top electrodes, there is

15:32:07 14 nothing, air, and I can only guess what is meant here by

15:32:15 15 backside activity.  The backside activity refers to the

15:32:20 16 activity.

15:32:21 17 Q.    Well, the red and green just to simplify is that part

15:32:25 18 of the structure the filter structure?

15:32:27 19 A.    No, it's not a part of the structure.  It's a list of

15:32:30 20 features or bullet points.

15:32:32 21 Q.    I know you haven't been able to be in the courtroom

15:32:34 22 but the jury has heard about air cavity.  Is it the FBAR

15:32:38 23 that has the air cavity?

15:32:39 24 A.    Yes.

15:32:40 25 Q.    Can you explain whether there is any significance to

Fattinger - direct

15:32:43  1    that?

15:32:43  2    A.    So the air cavity is one way to keep acoustic energy

15:32:48  3    in the BAW resonator.  The acoustic reflector in an SMR

15:32:55  4    serves the exact same purpose, namely keeping the energy in

15:32:59  5    the resonator.

15:33:01  6    Q.    And do you understand that these images were from an

15:33:05  7    Akoustis document?

15:33:05  8    A.    Yes.

15:33:06  9    Q.    And just to finish up, are the top portions of these

15:33:12  10   filters identical?

15:33:12  11   A.    Yes.

15:33:13  12   Q.    And do they both have a top electrode?

15:33:15  13   A.    Yes, they do.

15:33:16  14   Q.    And a poly crystal piezo layer?

15:33:19  15   A.    Yes, they do.

15:33:20  16   Q.    And bottom electrode?

15:33:21  17   A.    Absolutely.

15:33:22  18   Q.    Substrate?

15:33:23  19   A.    Yes.

15:33:23  20   Q.    And a top side air cavity?

15:33:25  21   A.    Uh-huh.

15:33:26  22           MR. TIGAN:  Thank you, Doctor.  That's all I

15:33:28  23   have for the moment.

15:33:28  24           I'll pass the witness.

15:33:30  25           THE COURT:  We're going to take our

Fattinger - cross

15:33:32  1    fifteen-minute break.  It's 3:30.  We'll be back at 3:45 and

15:33:39  2    we'll start the cross-examination of the witness.  You may

15:33:43  3    step down.  You may not talk to anybody about your

15:33:46  4    testimony.  We'll let you be excused right now and give you

15:33:51  5    fifteen minutes.  I'll stay here for just a while.

15:33:55  6              (Jury exiting the courtroom at 3:33 p.m.)

15:34:11  7              THE COURT:  All right.  Everybody can be seated.

15:34:16  8    Of course you may step down.  Everybody will have a restroom

15:34:20  9    break.  I don't think we have anything else we need to go

15:34:23 10    over.  We'll be staying I'm sure until 5:30 today.

15:34:26 11              Nothing else?  Thank you very much.

15:34:31 12              COURT CLERK:  All rise.

15:35:06 13              (A brief recess was taken.)

15:47:19 14              THE COURT:  You may be seated.  You may bring

15:47:24 15    the jury in.

15:47:57 16              (Jury entering the courtroom at 3:47 p.m.)

15:48:11 17              THE COURT:  All right.  Counsel may proceed.

15:48:26 18    Everyone can be seated.

15:48:29 19                    CROSS-EXAMINATION

15:48:29 20    BY MR. LEMIEUX:

15:48:30 21    Q.     Good afternoon, Mr. Fattinger.

15:48:32 22    A.     Good afternoon.

15:48:33 23    Q.     Excuse me if I mispronounce your name.

15:48:36 24    A.     Perfectly fine.

15:48:37 25    Q.     Earlier in your testimony, Mr. Fattinger, you

Fattinger - cross

15:48:41  1    indicated that you were familiar with the phase gate product

15:48:45  2    development process, is that correct?

15:48:47  3    A.      That's correct.

15:48:48  4    Q.      And you also maintain that that is something that is

15:48:51  5    a trade secret of Qorvo?

15:48:53  6    A.      Yes.

15:48:53  7    Q.      And you're familiar that other businesses also use

15:48:58  8    Phase Gate Development processes?

15:48:59  9    A.      Not firsthand.

15:49:00 10    Q.      Did you use one at all at your prior -- did you work

15:49:04 11    at Infineon before you came to work for TriQuint?

15:49:07 12    A.      Yes.

15:49:07 13    Q.      And did Infineon have a Phase Gate Development

15:49:11 14    process?

15:49:11 15    A.      Not that I know of.

15:49:13 16    Q.      If I could ask to bring up, I believe it's

15:49:23 17    Exhibit 34, Trial Exhibit 34, page 2.

15:49:34 18            Mr. Fattinger, could you tell me what type of

15:49:37 19    product this particular document relates to?

15:49:41 20    A.      Yes.  It is a Wi-Fi high power front-end module.

15:49:48 21    Q.      I'm sorry, a front-end module?

15:49:50 22    A.      Yes.

15:49:51 23    Q.      So this is not a BAW filter, it's for a more

15:49:55 24    complicated device, correct?

15:49:57 25    A.      Yes, it could contain a BAW filter, but the device

Fattinger - cross

15:50:00  1   itself is not just a filter.

15:50:03  2   Q.      If the company didn't make front-end modules, this

15:50:07  3   document would be not as much relevance to them, would it?

15:50:11  4   A.      No.  So the Wi-Fi front-end module, a Wi-Fi power

15:50:17  5   amplifier, the specifications of such a device, since it is

15:50:22  6   always used in the radio, like in a cell phone, for example,

15:50:29  7   the specifications of such device are relevant to use the

15:50:36  8   best possible filter device in case one wants to sell a

15:50:40  9   filter device in a similar system.

15:50:42 10   Q.      Well, in terms of the cost, cost information that's

15:50:46 11   mentioned here that you said was important, this costing

15:50:50 12   information, though, is for a front-end module, not for a

15:50:55 13   BAW filter, correct?

15:50:56 14   A.      Correct.

15:50:57 15   Q.      If you could turn back to I think it's Exhibit 33,

15:51:02 16   which was PTX 0088, what type of device is this particular

15:51:25 17   document for, which you also say was very important?

15:51:28 18   A.      See from the purple section here, that it's a single

15:51:34 19   pole double throw switch.

15:51:35 20   Q.      A switch is not a BAW filter, is it?

15:51:38 21   A.      It is not.

15:51:39 22   Q.      So if you don't make switches, then this document has

15:51:42 23   less importance to you than if you did, correct?

15:51:44 24   A.      Similarly to the question before about the amplifier,

15:51:51 25   knowing the characteristics of a switch is important in

Fattinger - cross

15:51:54  1    designing the best possible filter performance.

15:52:00  2    Q.    But the particular layout of the switch, that's not

15:52:07  3    going to tell you how to build your BAW filter, is it?

15:52:10  4    A.    The layout of the switch is not defined in the

15:52:13  5    document.

15:52:14  6    Q.    And the specifications for the switch are not the

15:52:17  7    same as the specifications for the filter itself, are they?

15:52:20  8    A.    That's correct, but they have a bearing on how the

15:52:24  9    filter is specified.

15:52:29 10    Q.    If I could ask you then to please turn to Exhibit 41,

15:52:46 11    which is I think PTX 0225 in your binder.    Trial Exhibit 41.

15:52:56 12    This is a visual quality inspection document?

15:52:59 13    A.    That's correct, yes.

15:53:01 14    Q.    Are you aware of tools now that perform a visual

15:53:07 15    inspection rather than relying on a manual inspection?

15:53:11 16    A.    Yes.

15:53:12 17    Q.    And are those tools in wide use in your industry?

15:53:16 18    A.    Yes.

15:53:27 19    Q.    If I could ask you now to then to turn to Trial

15:53:34 20    Exhibit 38.    And if you could please look at page 4 of that

15:53:51 21    document.

15:53:58 22    A.    Uh-huh.

15:53:59 23    Q.    Is the implementation requirements for reflow

15:54:03 24    precondition, does that come from a JEDEC standard?

15:54:06 25    A.    Yes.

Fattinger - cross

15:54:06  1   Q.      As the JEDEC standard, that's reflected on page 4 of

15:54:12  2   the document?

15:54:12  3   A.      That's correct.

15:54:12  4   Q.      And JEDEC is a public standard?

15:54:15  5   A.      Yes.

15:54:15  6   Q.      And the purpose of a JEDEC is to encourage uniformity

15:54:19  7   in terms of implementation, correct?

15:54:22  8   A.      Yes, which JEDEC standard I think is relevant, it's a

15:54:26  9   different product otherwise, it requires different regional

15:54:30 10   profiles.

15:54:30 11   Q.      Because different products will have different

15:54:33 12   characteristics and so therefore there may be a different

15:54:36 13   JEDEC standard for different products, correct?

15:54:38 14   A.      That's not only dependent on the product, but also on

15:54:43 15   the assembly requirements of the customer.

15:54:47 16   Q.      Mr. Fattinger, do you have any personal knowledge as

15:54:50 17   to whether or not Akoustis even performs a reflow or

15:54:56 18   reconditioning process?

15:54:57 19   A.      No.

15:54:59 20   Q.      And do you have any personal knowledge as to whether

15:55:06 21   or not Akoustis has ever used what was marked as Exhibit 88

15:55:13 22   -- excuse me, Exhibit 37, is that right?  Exhibit 35, I'm

15:55:21 23   sorry.

15:55:22 24   A.      Can you point me?

15:55:23 25   Q.      It's 088.

Fattinger - cross

15:55:26  1    A.      What was the question regarding that?

15:55:28  2    Q.      Do you have any personal knowledge that Akoustis has

15:55:31  3    actually used the information that's reflected in this

15:55:34  4    document?

15:55:34  5    A.      No personal knowledge.

15:55:37  6    Q.      Do you have any personal knowledge that Akoustis has

15:55:40  7    used any of the information that's reflected in Exhibit 33?

15:55:45  8    A.      Which is PTX number?

15:55:48  9    Q.      0111.

15:56:01 10    A.      No, no personal knowledge.

15:56:03 11    Q.      In fact, do you have any personal knowledge that

15:56:05 12    Akoustis has ever used any of the trade secrets that you

15:56:08 13    testified to today?

15:56:09 14    A.      No, no personal knowledge.

15:56:11 15    Q.      Now, you've talked about simulations, and simulations

15:56:17 16    are dependent upon the variables that are used to create

15:56:20 17    them, is that right?

15:56:21 18    A.      That is one parameter, yes, also the physical

15:56:26 19    understanding that what I am simulating actually makes sense

15:56:30 20    from a physics point of view, among other parameters.

15:56:34 21    Q.      Are simulations generally-- are they complicated in

15:56:38 22    terms of determining which variables to use and not use?

15:56:41 23    A.      Yeah, they can be pretty complicated, pretty complex.

15:56:44 24    Q.      Are the results of a simulation then useful if a

15:56:48 25    wrong variable or if the simulation is missing an important

Fattinger - cross

15:56:52  1  variable?

15:56:55  2  A.      Well, that obviously depends on the application, if

15:56:58  3  that variable is relevant in that particular application.

15:57:02  4  If it is, and they're useless, it's not, then they might

15:57:06  5  still be useful.

15:57:11  6  Q.      And just one final question.  Regarding your patent,

15:57:26  7  congratulations on that.  I'm always very impressed with

15:57:30  8  engineers who are able to get their own patents.

15:57:32  9  A.      Thank you.

15:57:33  10 Q.      If we looked at page 4 of your patent --

15:57:38  11 A.      Yes.

15:57:39  12 Q.      -- and the figures that are depicted there, those are

15:57:43  13 both SMR filters, correct?

15:57:47  14 A.      SMR resonators.

15:57:49  15 Q.      SMR resonators, I'm sorry.

15:57:53  16         And, in fact, on page 6, the resonators depicted

15:57:57  17 there, that's also an SMR resonator?

15:58:00  18 A.      That is correct.

15:58:02  19 Q.      And if you removed the reflective layers, the

15:58:08  20 tungsten, looks like silicone oxide layers of an SMR filter,

15:58:13  21 would it work?

15:58:13  22 A.      Yes.

15:58:14  23 Q.      And would it work as well as one that has those

15:58:17  24 materials embedded in it?

15:58:18  25 A.      So if you replace it with a cavity, yes.

Fattinger - cross

15:58:22  1    Q.      No, I'm not asking if you replace the cavity, if you

15:58:25  2    took an SMR filter and simply removed the reflective

15:58:29  3    material from the base, would it work in the way that it's

15:58:32  4    intended?

15:58:32  5    A.      If I remove the reflective material and left just

15:58:36  6    nothing there, which is by definition a cavity.

15:58:39  7    Q.      What if it is simply replaced by other substrate

15:58:44  8    material?

15:58:44  9    A.      Like what?

15:58:44 10    Q.      The rest of what you depict here as substrate,

15:58:48 11    silicone oxide without the tungsten?

15:58:50 12    A.      Just one layer of silicone oxide?

15:58:53 13    Q.      It could be multiple layers, just a solid block of

15:58:57 14    substrate?

15:58:57 15    A.      You have to distinguish between multiple layers of

15:59:00 16    silicone oxide.

15:59:02 17    Q.      Your figure here, Mr. Fattinger, shows a layer of

15:59:06 18    silicone oxide and a layer of tungsten and another layer of

15:59:09 19    silicone oxide and another layer of tungsten.  If I removed

15:59:14 20    those tungsten layers, would this SMR filter operate in the

15:59:17 21    way that it's designed and intended?

15:59:19 22    A.      Again with a cavity there when you remove the

15:59:22 23    tungsten.

15:59:22 24    Q.      I'm not leaving a cavity, I'm removing those

15:59:26 25    reflective materials.

Fattinger - redirect

15:59:27  1    A.      How would the structure look like?

15:59:29  2    Q.      I just described it for you, no tungsten, just

15:59:32  3    silicone oxide there, it's still solid material?

15:59:35  4    A.      One block of silicone oxide?

15:59:38  5    Q.      Yes.

15:59:38  6    A.      It would not work.

15:59:40  7    Q.      It would not work?

15:59:42  8    A.      Right.

15:59:43  9            MR. LEMIEUX:  That's all the questions I have,

15:59:44  10   Your Honor.

15:59:45  11           THE COURT:  All right.  Redirect.

15:59:46  12               REDIRECT EXAMINATION

15:59:48  13   BY MR. TIGAN:

15:59:50  14   Q.      I'll be very brief, Dr. Fattinger.  On your

15:59:54  15   cross-examination, you were asked about the reflow process

15:59:58  16   and the JEDEC standard, if I'm pronouncing that correctly?

16:00:02  17   A.      Correct.

16:00:02  18   Q.      Does that standard provide all the information Qorvo

16:00:05  19   needs to know to perform its reflow process?

16:00:08  20   A.      No, it just provides the particulars of the

16:00:11  21   temperature profile.

16:00:13  22   Q.      You were also asked a series of questions about your

16:00:16  23   personal knowledge about what Akoustis is doing.  Have you

16:00:18  24   ever worked at Akoustis?

16:00:19  25   A.      No.

16:00:19  1    Q.       And would there be any way for you to have personal

16:00:23  2    knowledge about how Akoustis makes its filters?

16:00:25  3    A.       No.

16:00:26  4    Q.       Okay.  One last thing about your patent.  It's PTX

16:00:34  5    1716.  If we could put page 15 up on the screen, please.

16:00:38  6             I believe you were asked about some of the

16:00:42  7    figures and whether they were SMR or FBAR.  Do you recall

16:00:46  8    that?

16:00:46  9    A.       Correct.  Yes, I recall that.

16:00:47  10   Q.       And Mr. Buchbinder, can we, in column 7, go down to

16:00:54  11   line 55 to I think 57.  And what does it say, Doctor?

16:00:59  12   A.       It says in examples of Figures 2B and 4, the BAW

16:01:05  13   resonator labeled 66 here is an SMR type BAW resonator.

16:01:09  14   However, the concepts disclosed here in are equally

16:01:12  15   applicable to film bulk acoustic resonator or FBAR type BAW

16:01:18  16   resonators.

16:01:20  17            MR. TIGAN:  Thank you, Doctor.  That's all I

16:01:22  18   have today.

16:01:22  19            THE COURT:  Thanks very much.  You may step

16:01:25  20   down.  And who is your next witness going to be?

16:01:34  21            MR. CREMEN:  Your Honor, Qorvo will call Michael

16:01:39  22   Hodge whose video deposition clips will be played on the

16:01:42  23   screen.

16:01:43  24            THE COURT:  All right.  Ladies and gentlemen,

16:01:45  25   they will play a video deposition and although the witness

599

16:01:53  1   is not here in court, it's the same as any other live

16:01:56  2   testimony.  Listen carefully.  You do not get a chance to

16:01:59  3   rehear this, just like a witness who is in the courtroom,

16:02:02  4   you hear them one time, so pay the same attention you would

16:02:06  5   as if the witness was sitting on the witness stand.

16:02:09  6            We're ready to proceed.

16:02:09  7            (Videotape deposition of Michael Hodge:)

16:02:15  8   Q.    Good morning, Mr. Hodge.  Mr. Hodge, the court

16:02:18  9   reporter's handed you what has been marked as Hodge

16:02:20 10   deposition Exhibit 3.  Do you recognize this document?

16:02:22 11   A.    Yes.  This looks to be the letter that I sent to try

16:02:25 12   to describe to you my efforts to find these documents, and I

16:02:29 13   also created a manifest of a physical document that I mailed

16:02:36 14   you.  Yes.

16:02:37 15   Q.    And during what period were you employed by Akoustis

16:02:42 16   Technologies?

16:02:42 17   A.    It would have been -- it was summer of 2015.  I think

16:02:46 18   it was July 2015, June or July 2015 to January of '22.

16:02:54 19   Q.    And could you tell me what positions you held while

16:02:57 20   you were at Akoustis?

16:02:59 21   A.    Yes.  I started as a device engineer, because we were

16:03:04 22   trying to build a technology at the time, so I was try --

16:03:07 23   working on that and then transitioned over to a design --

16:03:11 24   filter design engineer.

16:03:12 25   Q.    Okay.  And during what time period did you hold the

16:03:15 1    position of filter design engineer?

16:03:17 2    A.    Let's see.    That should have been probably -- late

16:03:22 3    2016 is when I moved over to design filters.    And, I was

16:03:28 4    still design filter when I left.

16:03:31 5    Q.    So you continued the responsibility of design filters

16:03:35 6    even after you took on the role of the manager?

16:03:38 7    A.    Right.    Yes.

16:03:39 8    Q.    And you were a device engineer, then, from around

16:03:43 9    June of 2015 until late 2016?

16:03:47 10    A.    That's right.    Yes.    That sounds about right.

16:03:50 11    Q.    What were your responsibilities as a device engineer?

16:03:52 12    A.    Yes.    So we were -- at that time I was working on

16:03:56 13    designing resonators.    So Akoustis resonators are used as a

16:04:01 14    building block to design Akoustis filters.    So at the time

16:04:08 15    the company was working on our technology developing it, and

16:04:12 16    so I was helping with that design.    But what I was doing was

16:04:16 17    multi-physics simulations of different structures to try to

16:04:21 18    figure out, you know, to optimize what the structure should

16:04:26 19    look like and then work with the process and engineers in

16:04:29 20    order to implement that.

16:04:31 21    Q.    What were your responsibilities as a filter design

16:04:36 22    engineer?

16:04:36 23    A.    It was to design RF filters that utilized acoustic

16:04:41 24    resonators.    So I work on several products ranging from

16:04:45 25    military to wireless infrastructure.    Mostly it was, you

16:04:52 1    know, bandpass filters.

16:04:59 2    Q.      What products did you work on as a design engineer?

16:05:03 3    A.      I assume you mean the released products that are on

16:05:07 4    the website?

16:05:09 5    Q.      Yes.  Let's start with the released products?

16:05:12 6    A.      Yes, that would be AKF-1252, AKF-1938, and then

16:05:20 7    there's A10252, A10149.  I'm not sure of any other ones that

16:05:28 8    maybe were released off the top of my head.  There's maybe

16:05:36 9    one I'm missing, but yes.

16:05:38 10   Q.      Prior to your work at Akoustis, where were you

16:05:43 11   working?

16:05:44 12   A.      I worked at Qorvo, RF Micro Devices.  It was really

16:05:51 13   RF Micro Devices.  They merged with TriQuint.  I think that

16:05:55 14   was announced in 2014.  And then the merger, if I remember

16:06:00 15   correctly, went through in January of 2015, and then I left

16:06:03 16   in summer of 2015.  So it's Qorvo for about six months at

16:06:08 17   the one company.  Yes.

16:06:10 18   Q.      As a design engineer at RFMD, what type of products

16:06:14 19   did you work on?

16:06:15 20   A.      Primarily I was working on -- well, the technology I

16:06:18 21   worked with was gallium nitride, high electron mobility

16:06:23 22   transmitters.  People call it HEMT, HEMT, that was the -- so

16:06:29 23   I was doing the design of RF filters primarily with those.

16:06:33 24   Some light amplifier design work, but mostly, sorry, not

16:06:37 25   filters, did I say filters?  I did not mean filters.  I

16:06:41 1    didn't do filters at all.  RF switches.

16:06:43 2    Q.    Did you ever work on BAW filters for Qorvo?

16:06:46 3    A.    No, I never worked on BAW filters for Qorvo.

16:06:49 4    Q.    Would you describe Akoustis as an early-stage or

16:06:53 5    start up company?

16:06:53 6    A.    Yeah.  It was early stage.  I think I was like

16:06:57 7    employee number ten.  And yeah, it was -- we were -- they

16:07:01 8    were running wafers at the time with an external foundry

16:07:05 9    when I joined.  So yeah, that was the stage at that point.

16:07:09 10   Q.    When Akoustis decided to design a new filter, what

16:07:13 11   would be the first step in the process?

16:07:15 12   A.    Yes, it's -- the first step is when you go to design

16:07:20 13   a filter, you first want to make sure that it's worth

16:07:24 14   pursuing, right.  So you would have a meeting with someone

16:07:27 15   from marketing or -- to understand what the market needs.

16:07:31 16   So you would see like a rough general skeleton of like a

16:07:36 17   spec sheet.  You would look at parameters such as, you know,

16:07:40 18   the frequency, the band of the operation, the loss required

16:07:44 19   in the band or the loss required -- or the rejection needed,

16:07:48 20   if it was a stock filter.

16:07:51 21         But anyway, the loss -- what the rejection was

16:07:55 22   outside of the band, and that was -- that's usually how you

16:07:59 23   would start.  And then other things like nonlinear

16:08:02 24   parameters such as like, you know, heart monitors, stuff

16:08:06 25   like that, IMD, all this stuff may come in later on.  But

16:08:10  1   yes, it's mostly just loss and rejection and frequency.

16:08:14  2   Q.      And you said that -- it was in a meeting with the

16:08:18  3   marketing function?

16:08:18  4   A.      That's it.

16:08:20  5   Q.      Who would be in the marketing function at arc?

16:08:23  6   A.      Most of the time it was there, it was David Aichele

16:08:26  7   who we would have meetings with.

16:08:27  8   Q.      And how did Mr. Aichele know what was needed in the

16:08:31  9   market?

16:08:32 10   A.      Yeah, I mean, I knew he engaged with the market, like

16:08:37 11   he would go on road trips to visit various potential

16:08:40 12   customers that we would -- and just really find out what

16:08:43 13   their needs were.  Find out what they're lacking, what they

16:08:47 14   don't see in the market, you know, what could fill a gap in

16:08:50 15   their product line, what would enable them to develop new

16:08:53 16   products.  That sort of thing.  You know, I had meetings

16:08:55 17   with him, you know, every so often.  And he would tell me

16:08:59 18   about his -- you know, he's talked about this customer, they

16:09:02 19   need this to they would like this thing.  Sometimes it would

16:09:05 20   be -- maybe, you know, something further out.  He, you know,

16:09:08 21   he doesn't necessarily have a rough, a spec now.  But I'm

16:09:12 22   trying the give you a heads up.  But I understood that he

16:09:15 23   developed these guidelines from talking to customers is the

16:09:17 24   way I understood it.

16:09:18 25   Q.      I'm sorry.  You may have said this, but I missed it.

16:09:20 1    Who -- what function in Akoustis is responsible for the

16:09:25 2    circuit engineering tools?

16:09:26 3    A.       The circuit engineer -- all the circuit engineering

16:09:30 4    -- well the design engineers are responsible for running the

16:09:33 5    tools to design the filter and then there usually are

16:09:37 6    software tools that plug into this design tool such as --

16:09:42 7    like the industry standard it's called a PDK or a product

16:09:46 8    development kit, so that's mostly what people were referring

16:09:49 9    to.  So we had like a -- a design I would call it more like

16:09:53 10   a proceeding PDK, it was a little bit like a home brewed

16:09:58 11   custom solution.  And that was used to assist the designers

16:10:01 12   in using their circuit tools in order to design filters.

16:10:05 13   But so yes, so there was -- now these circuit tools to

16:10:09 14   design these filters, they incorporated models that were --

16:10:13 15   that you could use -- that you could modify to produce what

16:10:19 16   you think would be the performance of the part once we

16:10:22 17   manufactured it, and then it was up to the device

16:10:26 18   engineering team to tell you can we actually manufacture a

16:10:28 19   part that would replicate that -- the thing that the model

16:10:32 20   is saying it can do.

16:10:34 21   Q.       Okay.  Was there a name for the models that Akoustis

16:10:37 22   used?

16:10:37 23   A.       There were just standard models that you can read

16:10:41 24   about in literature on an acoustic wave devices.  So we had

16:10:46 25   two different models.  There is a mason model -- is -- it's

16:10:50  1    like a two-and-a-half D model where you can provide, you

16:10:54  2    know, material -- you basically provide physical parameters

16:10:58  3    of the stack, like what goes in the stack of the resonator

16:11:02  4    and then the Mason model should you be able to produce an

16:11:05  5    output of a resonator, and then you can use it to build it

16:11:10  6    with that.

16:11:10  7    Q.      Is the Mason model implemented in a software program?

16:11:14  8    A.      Yes.  So the mason model is just the -- it's a series

16:11:18  9    of equations that have been published, very well-known, I

16:11:22 10    mean there's books written about it.  And I took these

16:11:26 11    equations.  This was right when we started filter

16:11:28 12    development.

16:11:29 13            So this would have been late -- the very end of

16:11:33 14    2016, I think.  That's when I implemented our first Mason

16:11:37 15    models, so I built all the equations into a project in AWR

16:11:44 16    Microsoft Office.  That was the software we were using at

16:11:46 17    the time.

16:11:47 18    Q.      And was the Mason model implemented in the software

16:11:52 19    and this way used up until the time you left Akoustis?

16:11:55 20    A.      Yes.  So that model was eventually -- we eventually

16:11:59 21    did some -- what was called PDK development.  So I told you

16:12:03 22    that -- that's was really -- that's really the -- so when I

16:12:07 23    created this model, as I described early on, it was a page

16:12:11 24    of equations in the software that we would get referenced,

16:12:15 25    right?

606

16:12:16  1   Q.      Whether a new product was designed at Akoustis, how

16:12:19  2   were the layer, dimensions, and materials determined?

16:12:22  3   A.      That was determined by -- so when I told you about

16:12:24  4   the designer would go and do a feasibility study on what the

16:12:28  5   resonator performs would need to be in order to meet the

16:12:31  6   specifications of the fill.  So then you have a meeting.

16:12:35  7   There's an engineering meeting with the device engineering

16:12:39  8   team and then they hear what the designer says they need,

16:12:43  9   and then they make an estimation on what they can provide.

16:12:47 10   And the device engineer team is the one that designs the

16:12:51 11   stack, and I guess they do that in conjunction with the Fab,

16:12:55 12   yes, process engineers.

16:13:00 13   Q.      Are you aware of anyone at Akoustis using Qorvo's

16:13:04 14   design data to concrete designs?

16:13:06 15   A.      I don't know of any -- anything like that going on.

16:13:10 16   Q.      Does Akoustis perform any physical testing on its

16:13:16 17   products?

16:13:17 18   A.      Yes.  Of course.  It does -- you characterize the

16:13:21 19   part electrically; small signal, large signal.  So it is

16:13:26 20   also the small -- you know lower power, understand the power

16:13:31 21   points and then the large power, understanding the power

16:13:35 22   happening, linear, that sort of thing, it's standard in

16:13:39 23   acoustic engineering.

16:13:40 24   Q.      When you joined Akoustis in 2015, what challenges was

16:13:45 25   the company facing to become profitable?

16:13:48  1    A.      When I joined, it was earlier in the development, so

16:13:52  2    we -- they -- we were still trying to just produce a

16:13:56  3    resonator.  So a BAW resonator, when it's not resonating, is

16:14:02  4    just a capacitor.  So that's what we were essentially

16:14:06  5    producing when I started and then we had to develop a

16:14:09  6    process in order to make it resonate.  Then we got to point

16:14:14  7    where we could make it resonate and then there is a point

16:14:17  8    once you resonate, then you got to make it where it's

16:14:20  9    competitive.  And then once you make it competitive, you got

16:14:23 10    to make it great, so it's actually -- you can produce good

16:14:26 11    parts in the market that are actually competitive in the

16:14:29 12    market place.

16:14:29 13    Q.      On that last step, producing parts that are

16:14:32 14    competitive in the marketplace, how is that different from

16:14:34 15    just producing a product that is competitive?  Because I

16:14:37 16    think you said producing competitive and then --

16:14:40 17    A.      Oh.  Oh sorry, yes.  Well, I mean, you want to -- you

16:14:43 18    can produce something that's maybe like a -- ASR -- I guess

16:14:48 19    maybe I wasn't being very clear.  You just need to produce

16:14:54 20    -- you know, you can produce a filter, but you know, if it's

16:14:57 21    not a good filter nobody is going to buy it, so what's the

16:15:01 22    point.  Then you got to produce something that someone would

16:15:04 23    be willing to buy.  Then you need to produce something at

16:15:06 24    some point when it's a competitive market, something that

16:15:09 25    will beat your competitor.

16:15:10 1    Q.      What is the significance of testing in the context of

16:15:12 2    a BAW filter product?

16:15:14 3    A.      Yeah, I had discussed earlier about, you know,

16:15:18 4    testing the part for compliance with the specification that

16:15:21 5    the customer may have, now I'm talking about performance

16:15:24 6    specifications.  There is also testing -- now since we are

16:15:29 7    on the subject of qualifications, there is also

16:15:31 8    qualification testing, that a different set of tests, right?

16:15:35 9    So that's testing, like I said the part under environmental

16:15:38 10   conditions or stress, operating conditions, and then what

16:15:41 11   you normally do is you evaluate these parts at different

16:15:44 12   pole points, so like, you know, say X amounts of hours, some

16:15:48 13   interval you defined.  Usually these are defined in --

16:15:52 14   there's national standards, they're called JEDEC standards.

16:15:58 15          So it usually says these are the pole points you

16:16:00 16   need to do and you need to evaluate it, and you're trying to

16:16:03 17   look for shifts in performance to do that, induced stress.

16:16:08 18   And at some point you define that shift in performance as a

16:16:10 19   failure when it comes out of compliance with what the

16:16:14 20   customers are willing to separate the product.

16:16:17 21   Q.      Did you ever come across confidential Qorvo documents

16:16:20 22   while you were working at Akoustis?

16:16:22 23   A.      So I saw -- so I had the one that I -- there was one

16:16:26 24   document that I submitted as part of my subpoena -- I'm

16:16:30 25   sorry, it was actually -- it was a packet of three different

16:16:34 1    documents that were stapled together.  That was given to me

16:16:37 2    one time to review.  At the same time, I saw a similar

16:16:41 3    document, but I never took possession of it.  I just saw it.

16:16:46 4    It was given to another individual in the company.  And

16:16:48 5    then, other than that, I can't think of any other documents

16:16:51 6    that I saw that were marked "Qorvo confidential" or

16:16:55 7    "proprietary."

16:16:57 8    Q.    Okay.  For the -- for the packet of documents, those

16:17:05 9    are the documents that you referenced in Exhibit Number 3?

16:17:10 10   A.    Yes.

16:17:11 11   Q.    Okay.  For the -- and how did you come into

16:17:14 12   possession of those three documents?

16:17:16 13   A.    Well, then -- you know, it's -- it was shortly after

16:17:22 14   Rohan Houlden joined the company.  So this would have been

16:17:25 15   the fall of 2016.  He -- he and I were sharing an office at

16:17:30 16   the time, and then he handed me these documents one day and

16:17:33 17   asked me to review them.  At the time, he and I were having

16:17:39 18   weekly lunch meetings Friday, and he asked me to review them

16:17:43 19   and then he wanted to talk about them at one of our lunch

16:17:47 20   meetings, and you know, what I knew about them.

16:17:49 21   Q.    Okay.  And you mentioned that there was another

16:17:53 22   occasion where you saw --

16:17:55 23   A.    Yes.

16:17:57 24   Q.    -- a Qorvo document, but you didn't take possession

16:18:00 25   of it.  Can you tell me what that was?

16:18:02  1   A.      The same time period, it was Rohan gave a packet of

16:18:06  2   documents to a technician.  That document had details about

16:18:09  3   the PCB boards and the connectors used for building

16:18:17  4   prototype filters.  So it defined, like, the lines, you

16:18:21  5   know, that drew the traces, the launch, the dimensions of

16:18:26  6   the connector, that sort of thing.

16:18:28  7   Q.      And who was the technician who Mr. Houlden provided

16:18:31  8   that document to?

16:18:32  9   A.      David Dyer.

16:18:34 10   Q.      Could you spell that?

16:18:35 11   A.      David, D-A-V-I-D and Dyer, is D-Y-E-R.

16:18:40 12   Q.      And what was Mr. Dyer's role at Akoustis?

16:18:44 13   A.      He was the guy I was referencing earlier, mentioned

16:18:48 14   earlier when I said early on, you asked me how many CAD

16:18:52 15   engineers, we had, he was hired to be a technician to work

16:18:55 16   in the test lab at Akoustis, and then he was also, whenever

16:18:59 17   things were slow in the lab, he was doing CAD work and

16:19:02 18   getting trained to do CAD work.  So he would be the guy who

16:19:05 19   drew PCB boards, boards and then he also would draw filters

16:19:11 20   for designers sometimes.

16:19:12 21   Q.      How do you know that Mr. Houlden provided this Qorvo

16:19:17 22   confidential document to Mr. Dyer?

16:19:19 23   A.      Because he reported -- David Dyer reported to me at

16:19:22 24   the time and he showed that to me and said that Rohan asked

16:19:27 25   him to you know, replicate these traces in this connector.

16:19:31 1    Q.      Was there Dyer -- did Mr. Dyer express any surprise

16:19:35 2    that Mr. Houlden had the document and then provided it to

16:19:38 3    him?

16:19:38 4    A.      I don't recall anything like that.

16:19:40 5    Q.      Were you surprised when you saw that Mr. Houlden had

16:19:45 6    given a Qorvo confidential document to Mr. Dyer?

16:19:47 7    A.      Yeah.  I mean, it's -- I was uncomfortable, yes, I

16:19:52 8    guess would be the way to describe it.

16:19:54 9    Q.      Okay.  And why uncomfortable?

16:19:56 10   A.      I -- it didn't seem like it's appropriate to be

16:20:01 11   circulating documents marked confidential from another

16:20:06 12   company.

16:20:07 13   Q.      Do you know what Mr. Dyer did with that document?

16:20:11 14   A.      I know we -- we ordered some evaluation boards that

16:20:16 15   we modified the traces on, and the -- the RF connector on

16:20:21 16   these boards is not something -- it's something you have to

16:20:25 17   buy from a supplier.  If I remember correctly, that

16:20:29 18   connector -- these suppliers will sometimes do custom

16:20:33 19   designs for you.  So they have an off-the-shelf design and

16:20:37 20   they have a custom design.  That connector was a custom

16:20:40 21   design, so they didn't sell it to you.  But if you produced

16:20:43 22   a drawing of that and then gave that to them, then they

16:20:48 23   would sell it to you, so I think that's what he was

16:20:51 24   requested to do.  I believe, I never saw the order go

16:20:55 25   through and I didn't see the file drawing or anything, but

16:20:58  1    that was my understanding of what he was tasked to do.

16:21:01  2    Q.    And so you think the drawing would have been used to

16:21:04  3    specify an RF connector --

16:21:07  4    A.    (Nodding yes.)

16:21:10  5    Q.    -- that would be supplied to Akoustis from a third

16:21:13  6    party?

16:21:13  7    A.    Correct.

16:21:13  8    Q.    And what would that RF connector be used for then?

16:21:17  9    A.    It's what you used to interface with the test

16:21:20  10   equipment.  So you have a cable that goes from the board to

16:21:23  11   the test equipment, such as an VNA, vehicular network

16:21:27  12   analyzer.  That's an example.

16:21:31  13   Q.    Why -- why do you -- why would it have been helpful

16:21:35  14   to Akoustis to use this RF connector that's described in the

16:21:40  15   drawing?

16:21:40  16   A.    It will -- the -- you know, the connector has an

16:21:45  17   influence on the performance measured on the part.  I mean,

16:21:48  18   in theory, it should all wash out anyway because you should

16:21:54  19   de-embed, that's the term in the industry for removing the

16:21:58  20   losses leading up to the part.  In theory, you should end up

16:22:02  21   with the same performance anyway, but the more you can

16:22:05  22   reduce the losses, the less you have to take out or you have

16:22:08  23   to -- less air you have to remove from the measurement.  You

16:22:13  24   know the more accurate, the better your measurement will be.

16:22:17  25   So you want to still make the best possible performing board

16:22:20  1    and connections as possible to get the best data.

16:22:23  2    Q.    Do you know whether the RF connector that was modeled

16:22:26  3    after the Qorvo one was used in the development of any

16:22:29  4    particular products at Akoustis?

16:22:34  5    A.    Yes.  I'll be honest with you, I don't know the exact

16:22:39  6    part -- I know there was a spec -- a custom connector that

16:22:43  7    we did use that we got for a while that we would order in

16:22:47  8    bulk, but whether that was a different -- whether it was

16:22:50  9    made from that document or not, I don't know that for sure.

16:22:53 10    Q.    What's the company that supplied the RF connector?

16:22:57 11    A.    It's been a while.  I want to say it's ▮▮▮▮▮▮ but

16:23:11 12    I could be wrong about that.  I remember we bought

16:23:16 13    connectors from them for a while, but I don't remember if

16:23:18 14    that's the exact company or not.

16:23:21 15    Q.    So we -- you mentioned Rohan Houlden a few times

16:23:26 16    today?

16:23:26 17    A.    Yes.

16:23:26 18    Q.    What was his position at Akoustis while you were at

16:23:28 19    the company?

16:23:29 20    A.    Chief Product Officer was his title, but

16:23:33 21    functionally, he kind of operated like you would expect like

16:23:37 22    a CTO would operate at a tech company.  He's mainly involved

16:23:41 23    in the day-to-day of the technical team.

16:23:47 24    Q.    And we discussed previously Mr. Houlden, shortly

16:23:51 25    after he arrived, gave you three confidential documents from

16:23:54  1    Qorvo?

16:23:55  2    A.      Yes.

16:23:56  3    Q.      What was your reaction when Mr. Houlden handed you

16:24:02  4    the package of Qorvo information?

16:24:05  5    A.      I mean, repulsion, right, I didn't want to have

16:24:09  6    possession of these.  I didn't want to take them.  But it

16:24:12  7    was -- the reason I took them, the reason I reviewed them,

16:24:15  8    the reason I discussed them with him is because he was

16:24:18  9    recently the new hire, it was made clear he was now the big

16:24:21 10    man in charge.  You know I -- so I just was like one of

16:24:25 11    these, eyelets just get through this and then move on a sort

16:24:30 12    of mindset that I had.  And so that was really the reaction.

16:24:34 13    Yes.

16:24:35 14    Q.      Yes.  I mean, he was your boss; he told you to look

16:24:39 15    at them?

16:24:40 16    A.      Exactly, yes.  And he was sitting right there beside

16:24:44 17    me, so yes.

16:24:44 18    Q.      Did Mr. Houlden tell you why he wanted you to review

16:24:47 19    the Qorvo materials?

16:24:49 20    A.      He asked if there was anything that would be useful

16:24:52 21    in developing products that I could -- I could learn from

16:24:55 22    this was really the gift of it.

16:25:00 23    Q.      Did he tell you how he had obtained the

16:25:03 24    presentations?

16:25:03 25    A.      I didn't ask him questions about that, no.

16:25:06 1    Q.       When handed them to you, did he like pull them out of

16:25:09 2    I -- like his bag or some particular area?

16:25:12 3    A.       Yeah.  He had like a laptop bag that he carried in

16:25:16 4    and out of work and they were like in the front pocket of

16:25:19 5    that.

16:25:19 6    Q.       Okay.  Are you aware of whether Mr. Houlden had a,

16:25:23 7    like a repository of Qorvo materials that he could extract

16:25:26 8    things, like the package he gave you from?

16:25:28 9    A.       I never saw anything like that.

16:25:30 10   Q.       When he handed them to you, did he handed them to

16:25:33 11   you, did you believe the package of material was

16:25:34 12   confidential to Qorvo?

16:25:36 13   A.       I assumed it was, as soon as I got it, because I

16:25:42 14   mean, it's Qorvo has got this like really distinct black

16:25:48 15   logo, which really kills the print, but anyway, it was

16:25:51 16   printed out, it's like, and I remember seeing that right

16:25:55 17   before I left, right, so I knew it was Qorvo document when

16:25:58 18   it was handed to me just based on the color and the logo

16:26:01 19   when it was handed to me.  And then as I viewed it --the

16:26:05 20   document was marked confidential.

16:26:08 21   Q.       Mr. Hodge, the court reporter handed you what's been

16:26:11 22   marked as Exhibit Number 5.  If you'd take just a minute and

16:26:15 23   look at it and tell me if you recognize this document?

16:26:18 24   A.       Yes.  So this is the first of three documents that I

16:26:21 25   sent you as part of the subpoena why.  It's a -- it's Qorvo

16:26:27 1    filter design document.

16:26:31 2    Q.    Mr. Hodge, the court reporter has handed you what's

16:26:34 3    marked as Exhibit 6.  I would like you to take a minute and

16:26:37 4    look at that and tell me if you recognize this document?

16:26:40 5    A.    (Witness complying.)

16:26:43 6          This looks like the second of the three

16:26:46 7    documents that I sent you.

16:26:50 8    Q.    Meaning the second of the three documents that

16:26:52 9    Mr. Rohan provided to you?

16:26:54 10   A.    That's correct, yes.

16:26:55 11   Q.    Okay.  Mr. Hodge, the court reporter has handed you

16:26:58 12   what's been marked as Exhibit 7.

16:27:00 13   A.    Right.

16:27:01 14   Q.    If you could take a minute and look at that document

16:27:03 15   and tell me if you recognize that document?

16:27:04 16   A.    Yes.  This is the third document that I sent you

16:27:10 17   that, again, was provided by Rohan.

16:27:11 18   Q.    Okay.  And what do you understand was shown in

16:27:15 19   Exhibit 7?

16:27:16 20   A.    Yes.  This is -- this looks like an engineering

16:27:20 21   experiment to understand the performance trade office due to

16:27:23 22   the shape of the acoustic resonator.

16:27:26 23   Q.    Okay.  At Akoustis, was there a standard shape for

16:27:31 24   the resonator?

16:27:32 25   A.    I mean, we had standard shapes that we were to design

16:27:36  1    with.  And we had shapes that went in certain areas of the

16:27:41  2    circuit.  Yes.  That's correct.

16:27:42  3    Q.    Okay.  What was the standard shape that you were to

16:27:45  4    design with?

16:27:46  5    A.    It's neither of these shapes.

16:27:48  6    Q.    So what would the standard shape that you designed

16:27:51  7    with?

16:27:52  8    A.    It's -- I don't know how you'd describe -- I mean,

16:27:56  9    here's -- internally we called it an egg.

16:27:59 10    Q.    An egg?

16:28:00 11    A.    Yes.

16:28:00 12    Q.    So it's oval?

16:28:02 13    A.    Oval-ish, yes.

16:28:04 14    Q.    Mr. Hodge, the court reporter has handed you what's

16:28:07 15    been marked as Exhibit Number 11.

16:28:10 16    A.    Yes.

16:28:12 17    Q.    Do you recognize this document at all?

16:28:14 18    A.    So this is -- do I -- so this is from the same time

16:28:20 19    period, March 17, 2020, it's Qorvo -- it looks like the

16:28:25 20    Qorvo version of the 1252, the 5.2-gigahertz filter, so yes.

16:28:34 21            Yes.

16:28:36 22    Q.    And at what point was A10252 developed?

16:28:41 23    A.    Yeah, I don't remember the exact date, but it was

16:28:44 24    probably in this time frame, around 2020 sounds about right.

16:28:48 25    That would seem about right, but it was -- yes.

16:28:50  1    Q.      Were you involved in the development of A10252?

16:28:57  2    A.      Yes, I was.  Yes.

16:28:58  3    Q.      Okay.  And that was to, I think you said, improve the

16:29:02  4    functionality of the --

16:29:03  5    A.      Yes.

16:29:05  6    Q.      -- AKF-1252?

16:29:07  7    A.      Yes.  So it was to improve the -- all aspects:  Loss,

16:29:12  8    out of band rejection were the two main drivers of it.

16:29:15  9    There was -- like I said, there was an advancement in our

16:29:20 10    processing capabilities and materials.  We had gotten better

16:29:24 11    performance at low 5-gigahertz than we did back in 2017.  I

16:29:29 12    mean, you would expect it to improve over time.  So I knew

16:29:32 13    we were capable of doing better jobs, so -- and I think

16:29:36 14    David kind of agreed for us to do, like an updated part, a

16:29:43 15    refreshed part, yes.

16:29:44 16    Q.      Okay.  And you understand that the Qorvo QPQ1903

16:29:48 17    ultimately became a competitor for AKF-1252 and the A10252?

16:29:56 18    A.      Yeah, I don't remember all the Qorvo part numbers,

16:29:58 19    but based on this, the context, I would assume a 1903 is a

16:30:03 20    5.2-gigahertz filter.  Those are similar, targeting the same

16:30:07 21    market.  Yes.

16:30:07 22    Q.      Okay.  If we look at the body -- well, first of all,

16:30:11 23    exhibit 11 is an e-mail from Mr. Aichele to Mr. Houlden and

16:30:16 24    yourself, right?

16:30:17 25    A.      Yes.

16:30:17  1    Q.       And the date is March 17, 2020?

16:30:19  2    A.       Uh-huh.

16:30:21  3    Q.       The subject is Qorvo 5.2-gigahertz BAW filter?

16:30:24  4    A.       Yes.

16:30:24  5    Q.       You see there is an attachment to this e-mail, right?

16:30:28  6    A.       Yes.

16:30:29  7    Q.       And that's -- the attachment has got the title

16:30:32  8    QPQ1903.PDF?

16:30:35  9    A.       Yes.

16:30:35 10    Q.       And then Mr. Aichele has a very short message in the

16:30:38 11    body that says, "note the rejection in harmonics."  Do you

16:30:43 12    see that?

16:30:43 13    A.       I see that, yes.

16:30:44 14    Q.       What's he referring to there?

16:30:45 15    A.       He's saying the -- so that's what I was saying that's

16:30:49 16    the -- in the 1252, what you want is you need -- this is --

16:30:53 17    so the Wi-Fi 6, there is a load, so the bottom half of the

16:30:58 18    -- so between 5 to 6-gigahertz range, the lower parts of

16:31:02 19    that range, 1252 should be passing those frequencies and

16:31:05 20    should be rejecting the frequencies at the high end of the

16:31:08 21    range.  So what he's saying here is he's saying how well

16:31:12 22    does that frequency -- that filter do at it, rejecting the

16:31:16 23    high, you know, so like 56 to like 59 that range.

16:31:20 24    Q.       Okay.  Mr. Hodge, the court reporter has handed you

16:31:23 25    what's been marked as Exhibit 12.

16:31:25  1    A.      Yes.

16:31:26  2    Q.      It's a multipage document.

16:31:28  3    A.      Yes.

16:31:29  4    Q.      The top of the first page it says product overview?

16:31:32  5    A.      Yes.

16:31:33  6    Q.      Do you recognize this document?

16:31:35  7    A.      This looks like a data sheet for Qorvo QPQ1903.

16:31:41  8    Q.      Okay.  Than do you see that the status sheet has

16:31:46  9    actually got a watermark on it?

16:31:48 10    A.      Yes.  It says confidential NDA required, yes.

16:31:51 11    Q.      And then if you go to the third page of the document

16:31:57 12    --

16:31:57 13    A.      (Witness complying.)

16:31:59 14    Q.      It's identified as a draft?

16:32:01 15    A.      Yes.

16:32:03 16    Q.      Did Mr. Aichele -- first of all, do you recall having

16:32:08 17    a meeting with Mr. Aichele to discuss the Exhibit 12?

16:32:13 18    A.      (Witness examining document.)  This sounds like

16:32:17 19    something that probably happened.  We did have meetings

16:32:20 20    every now and then to talk about, you know, what can we do

16:32:23 21    to make parts better, what can we -- is there something we

16:32:26 22    can do to make the yield better or something like that, so

16:32:29 23    these meetings kind of happened.  Yes.

16:32:31 24    Q.      But do you recall a specific meeting about this

16:32:34 25    product sheet?

16:32:35  1    A.      Yes, I don't remember this specific meeting.  Again,

16:32:39  2    this is happening in March of 2020, so I was working very

16:32:42  3    heavily on that government proposal.  Also, this is about

16:32:45  4    time when the lockdown stuff was going on with Covid, so

16:32:49  5    those things stick out in my mind.  This does not.  But this

16:32:53  6    -- this I would have probably looked at a little more

16:32:55  7    closely.  This would have been more interesting, I think,

16:32:58  8    because I was designing the filter, right.

16:33:00  9    Q.      Would it be an advantage to Akoustis to get advanced

16:33:04 10    information on what the characteristics of a Qorvo

16:33:08 11    competitive product was going to be?

16:33:10 12    A.      The reason you -- it would be would be if it says --

16:33:16 13    if it's something better is about to hit the market, you

16:33:20 14    could potentially reduce the lag between when you have time

16:33:24 15    to respond with you with a better product, that's true.

16:33:27 16    Q.      So you could get to the market sooner?

16:33:29 17    A.      Yes, to get to the market sooner.

16:33:30 18    Q.      You don't recall asking Mr. Aichele where he would

16:33:33 19    have gotten the confidential data sheet?

16:33:36 20    A.      I did not ask.  I don't remember asking that.

16:33:38 21    Q.      Was that common at Akoustis to see competitor's

16:33:41 22    confidential data sheets?

16:33:44 23            Just --

16:33:46 24    A.      I mean, I just can't remember.  I mean, maybe you

16:33:49 25    guys have more e-mails.  I don't -- I can't remember.

16:33:52 1    Q.      Okay.  Well, and I just want to clarify because I

16:33:55 2    know there are publicly available data sheets.

16:33:58 3    A.      Yes, that's true.  So the -- you know.

16:34:00 4    Q.      And you do get -- as you said, could go on a website

16:34:04 5    and get a publicly available data sheet, so that would be

16:34:07 6    common, I assume?

16:34:07 7    A.      Yes.  And I get there is a water mark here drawing my

16:34:11 8    attention to it.  But probably downloading this and looking

16:34:14 9    at my computer, I probably, I'm looking at the text, I don't

16:34:18 10   really notice the watermark, I'm more drawn like to the big

16:34:22 11   bold bottom of the document, confidential, this, I probably

16:34:25 12   would have overlooked it.

16:34:27 13   Q.      If you focused on it?

16:34:29 14   A.      I think I would have seen it, but I don't think I

16:34:31 15   focused on it.

16:34:32 16   Q.      Mr. Hodge, if you had focused on the watermark

16:34:35 17   confidential NDA required, with what would you have done

16:34:38 18   with this document?

16:34:46 19   A.      You know, to be honest with you, it really -- it's

16:34:49 20   something -- it's kind of like a -- good to know when you're

16:34:53 21   designing something, but at the end of the day, I'm going to

16:34:56 22   make the best filter I'm going to make, right?

16:34:59 23           So, I guess what it tells you is it benchmarks

16:35:03 24   where you stand with your current design.  But I wouldn't --

16:35:06 25   this doesn't -- it's not like it's going to actually make my

16:35:09  1    filter perform better by me reading this.

16:35:12  2    Q.      If you had received information that a competitor was

16:35:15  3    planning to introduce a filter --

16:35:17  4    A.      Yes.

16:35:18  5    Q.      -- with better performance than the one that you were

16:35:21  6    currently designing --

16:35:23  7    A.      Yes.

16:35:24  8    Q.      -- would that cause you to make any different choices

16:35:26  9    on what you were doing?

16:35:27 10    A.      It's outside of my control, honestly.  I'm trying to

16:35:31 11    make -- design the best possible filter with the technology

16:35:34 12    I have available and it's really up to Dave Aichele and the

16:35:37 13    marketing guys to decide if they can.

16:35:40 14    Q.      Okay.

16:35:41 15    A.      So this, you know, like I say, it was -- you know,

16:35:44 16    this was -- he -- you know, I don't know, again, why bring

16:35:47 17    me into this, right?  This discussion, because I'm going to

16:35:50 18    do, it's just making me aware, I think of what if

16:35:53 19    competitors are doing, but it didn't influence anything over

16:35:57 20    -- I didn't do anything different.

16:35:58 21    Q.      Were you ever involved in recruiting Qorvo employees?

16:36:01 22    A.      I was involved with -- let me see here.  Let me just

16:36:07 23    define what I mean by that.  So I would do phone screens for

16:36:11 24    technical folks and I would also interview them whenever

16:36:15 25    they came on site.  But as far as like reaching out and like

16:36:21  1    -- by the time I'm phone screening them, you know, either a

16:36:27  2    recruiter or Rohan has already put in -- give me the contact

16:36:31  3    notice and told me this is the date and time that you call

16:36:34  4    this person or meet this person.  So yes, that was for

16:36:37  5    everybody, not just Qorvo, but everybody.

16:36:39  6    Q.    Was there a focus at Akoustis on hiring Qorvo

16:36:43  7    employees?

16:36:44  8    A.    Honestly, I don't think that there was a -- there was

16:36:47  9    a target.  To be honest with you, we interviewed people from

16:36:52 10    Skyworks, Broadcom, Samsung, Qorvo, so it wasn't that --

16:36:56 11    Qualcomm, so it wasn't that Qorvo was special.  I think the

16:37:01 12    thing there is obvious that there agencies have some

16:37:04 13    familiarity with the Qorvo culture and the people because of

16:37:08 14    the people we started with at the base level.

16:37:11 15          And also their Qorvo offices are located on the

16:37:15 16    East Coast, that made it a lower barrier to recruiting,

16:37:19 17    because my experience was any time you contacted someone at

16:37:21 18    Broadcom or that was like in the bay area, it was impossible

16:37:25 19    to get people to move from California down here, so yes, so

16:37:28 20    I would -- so like my recollection was it was a lower

16:37:31 21    barrier to recruit people from the East Coast.

16:37:33 22    Q.    Mr. Hodge, the court reporter has handed you what has

16:37:37 23    been marked as Exhibit 13.

16:37:38 24    A.    Yes.

16:37:38 25    Q.    Take a minutes and look through Exhibit 13 and tell

16:37:41  1    me if you recognize this document?

16:37:42  2    A.    It just looks like a teams conversation with Mike

16:37:50  3    McCain, who is the software guy.

16:37:53  4    Q.    Okay.  All right.  If we go to the second page of the

16:37:57  5    document, which is Akoustis -- or at the bottom it says

16:38:07  6    AKTS_00221812.

16:38:10  7    A.    I'm sorry, which page?

16:38:12  8    Q.    It's the very second page.

16:38:14  9    A.    Second page.  Okay.  Got it.

16:38:15 10    Q.    And it ends in the numbers 12 at the bottom

16:38:20 11    right-hand corner?

16:38:21 12    A.    Oh, yes.  812.  Yes.

16:38:24 13    Q.    Okay.  So I'd like to direct your attention to your

16:38:28 14    message at 12:40 p.m. and have you --

16:38:33 15    A.    12:40?

16:38:35 16    Q.    Yes, 12:40 p.m.

16:38:38 17    A.    About Mandek coming here for another interview.

16:38:41 18    Q.    Yes.  Just read the next few or as much as you need

16:38:45 19    for context?

16:38:46 20    A.    Okay.  Yes, got context.

16:38:48 21    Q.    Okay.  So first, who is -- Mandek, is Mandek a

16:38:55 22    person?

16:38:55 23    A.    Mandek, his name is Mandek, his last name is

16:39:00 24    Richardson, he was a filter design engineer for Qorvo at

16:39:05 25    this time that this conversation happened and he was

16:39:07 1   applying for a design engineering position at Akoustis.

16:39:10 2   Q.      Okay.  Did Akoustis end up hiring Mandek?

16:39:13 3   A.      We did not.

16:39:14 4   Q.      So at 12:40 p.m., you wrote to Mr. McCain, "Mandek

16:39:20 5   coming in for another interview."

16:39:22 6   A.      Yes.

16:39:22 7   Q.      And Mr. McCain responded, "Co-opt."

16:39:26 8   A.      Yes.

16:39:27 9   Q.      And then you said, "Must be time to bend Qorvo over

16:39:31 10  the barrel again, LOL."

16:39:33 11  A.      Yes.

16:39:33 12  Q.      What did you mean by that?

16:39:35 13  A.      I don't remember the context of this document.  My

16:39:39 14  guess is it seemed like Rohan when he came on board was only

16:39:44 15  recruiting Qorvo folks is what it seemed like to me.  So it

16:39:48 16  just seemed like, you know, and any time you lose an

16:39:51 17  engineer at a company, it hurts the company, right.  So I

16:39:54 18  felt like, you know -- yes.  It obviously doesn't look good

16:39:59 19  for Q if he's constantly taking employees.

16:40:02 20  Q.      And by the processes, he wanted to do the

16:40:06 21  familiarities because they were working on the same

16:40:09 22  processes?

16:40:10 23  A.      Oh, I meant processes as in like how you design a

16:40:13 24  product, you know, what's expected in a data sheet, what's

16:40:16 25  respected -- you know, what the level -- you know, sometimes

16:40:19  1    work cultures can vary from company to company, so he -- I

16:40:23  2    think it was more of a work culture type thing is the way I

16:40:26  3    saw it.

16:40:26  4              You know, to be honest with you, you know, I

16:40:29  5    don't know if I stated this yet in this deposition, but you

16:40:33  6    know, as far as technically when it came to Qorvo, you know,

16:40:36  7    I didn't really find -- especially when it's talking about

16:40:40  8    the resonator technology, it's so different.  It's a solidly

16:40:44  9    mounted resonator compared to a suspended resonator like

16:40:48 10    Akoustis was doing, I just want to make sure that's on the

16:40:51 11    record.

16:40:51 12              So anyway, just to clarify like earlier when you

16:40:54 13    were asking me about the documents that he had handed me

16:40:56 14    about that filter, it sounds like now -- it sounds like it

16:41:00 15    may have been an automotive filter, you know that filter,

16:41:04 16    you know, I didn't really find any of that information

16:41:06 17    useful for designing filters again because it's just a

16:41:10 18    different technology.

16:41:10 19    Q.    So is that to say when he landed you the Qorvo

16:41:15 20    confidential information back in 2016, you took the time to

16:41:18 21    really go through and investigate all that information and

16:41:20 22    reach the conclusion that it wasn't useful to you?

16:41:23 23    A.    Oh, I didn't have to reach -- I just looked at it.  I

16:41:27 24    mean, I looked at it, for instance there's a schematic, a

16:41:30 25    resonator, to tell you the size of the resonator and all

16:41:33 1  this stuff, if I was to take that and put it on a map.

16:41:37 2  Hypothetical, if you were to take those and put it on a map

16:41:40 3  and fabricate, it would not work, it would not look like a

16:41:44 4  filter, it's just that different.  Everything about a

16:41:46 5  schematic and the design of a resonator is dependent on the

16:41:50 6  process and the stack that it comes from.

16:41:54 7          So anyway, I just want to make sure that's

16:41:57 8  clarified, right.  So it's really, it would be very

16:42:01 9  difficult to take what was said in those documents and just

16:42:05 10 directly apply it.  I mean, as a technologist, it's

16:42:09 11 interesting to see what other people are doing, but that's

16:42:12 12 just it.  It's curiosity, it's an interesting, but as far as

16:42:16 13 like is it actionable that I can do on my job and make like

16:42:20 14 a better part, I couldn't, I would never make that claim.

16:42:23 15 Q.     Mr. Hodge, the court reporter has handed you what's

16:42:26 16 been marked as Exhibit 16.  Could you please take a minute

16:42:30 17 and look at this document and let me know whether you

16:42:32 18 recognize this document?

16:42:35 19 A.     Yes.  So another conversation with myself and Mike.

16:42:39 20 Team 's message than -- but, yes.  That's what it is.

16:42:51 21 Q.     You had said in your testimony earlier that at RF

16:42:57 22 Micro Devices you were working on switches?

16:42:58 23 A.     Yes.

16:43:01 24 Q.     Did RF Micro Devices side make any filters?

16:43:05 25 A.     Not that I'm aware of.

629

16:43:13 1    Q.      I'll hand you a document marked as Exhibit 22.   Do

16:43:16 2    you recognize this?

16:43:19 3    A.      Yes.   I don't remember this exact document, but it

16:43:22 4    looks like a study of some earlier resonator developments

16:43:25 5    that were done at Akoustis.

16:43:27 6    Q.      So on the first page, Bates 427862, you'll see where

16:43:35 7    it says wafer AKS103?

16:43:41 8    A.      Yes.

16:43:43 9    Q.      So did Akoustis have a system in place for all of the

16:43:47 10   different wafers it had processed to be able to know which

16:43:51 11   ones was in which ways?

16:43:55 12   A.      Yes.   There was a wafer number in the system, but it

16:43:59 13   "involved overtime."   I don't remember their system, but

16:44:02 14   yes, like I said, this looks very early.

16:44:04 15   Q.      Okay.   So if you look at the -- third page, Bates

16:44:09 16   427864, you'll see it says design 124-516, wide and narrow.

16:44:21 17   A.      Does -- 120516, yes, got it.   Yes.

16:44:26 18   Q.      And those are plots of the characteristics of that

16:44:30 19   particular resonator for that particular design; correct?

16:44:39 20   A.      Yes.   These are S parameters plots, yes, for that

16:44:43 21   resonator, yes.

16:44:44 22   Q.      And in the center, you'll see in black, there is an

16:44:47 23   overview.   Is that a plan view of that product?

16:44:51 24   A.      Yes.   It's a -- it's a resonator that's under

16:44:55 25   development -- yes, it's the die.   Yes, it's the CAD drawing

16:44:59  1    of the resonator, yep.

16:45:00  2    Q.      The top view?

16:45:01  3    A.      Yes, top down.

16:45:02  4    Q.      And the resonator that's there is shown as having the

16:45:06  5    five sides?

16:45:06  6    A.      Yes.  As you can see there is two on here, there is

16:45:12  7    something that goes back to back, yes.

16:45:14  8    Q.      And so I guess my question is, competitors review

16:45:17  9    other competitor's products all the time, don't they?

16:45:20 10    A.      Yes.  That's been my experience in the industry.

16:45:23 11    Q.      And that's not a bad thing, is it?

16:45:25 12    A.      It depends on who you ask, I guess, but yes, it seems

16:45:29 13    pretty common.

16:45:30 14    Q.      And in your testimony earlier, I think you talked

16:45:33 15    about the difference between an FBAR and I believe you were

16:45:37 16    thinking of an SMR?

16:45:40 17    A.      Yeah, as I mentioned earlier at the beginning that I

16:45:44 18    reviewed the patents this weekend, I saw one of the patents

16:45:47 19    that Qorvo claims is referred the to a SMR, but yes, SMR is

16:45:53 20    the way to call it, yes.

16:45:54 21    Q.      And what's the difference between those two?

16:45:56 22    A.      So the primary difference is the FBAR, the piezo film

16:46:02 23    was suspended in air with electrodes on either side of it.

16:46:07 24    So the acoustic interface on either boundary is air.  On the

16:46:14 25    SMR, SBAR, however you want to call it, the technology that

16:46:18  1    Qorvo utilizes, the air interface is on the top, but on the

16:46:23  2    bottom there is no air interface, it's mounted on another

16:46:27  3    wafer, so they have to manager that interface.

16:46:32  4    Q.    An interface used a blank reflector, correct?

16:46:37  5    A.    That's correct.

16:46:37  6    Q.    So that there is no air gap, it's just a solidly

16:46:41  7    mounted resonator?

16:46:43  8    A.    Yes, the technology, the key thing you need to keep

16:46:46  9    the waves confined in the resonator or keep the qualities to

16:46:49 10    the point of the brag reflect is to make sure wafer does

16:46:53 11    not.

16:46:54 12    Q.    Now, all of the resonators that Akoustis makes are

16:46:58 13    all FBARs, correct?

16:47:00 14    A.    Correct, we've never done SMR.

16:47:03 15    Q.    Are you aware of Qorvo doing any FBARs?

16:47:06 16    A.    I'm not aware of that.

16:47:09 17    Q.    Now, Exhibit 1 of the attachments is one page with

16:47:18 18    Bates 201054, which I believe is one of the wall print

16:47:23 19    PowerPoint's that are attached.  Do you recognize that?

16:47:26 20    A.    Yes.  This was an early mask.  We were developing

16:47:31 21    resonators early in the company.  Yes.  So it looks like

16:47:35 22    this was to generate, as you said, all of the wall artwork

16:47:40 23    for the office.

16:47:41 24    Q.    Now, are these early masks, actual masks that had

16:47:46 25    been made?

632

16:47:47 1  A.      Yes.

16:47:48 2  Q.      And these masks are showing different shapes of

16:47:51 3  resonators at that time for masks that had been made?

16:47:55 4  A.      This masks looks like it was a study on resonators,

16:47:59 5  the shapes to understand the differences in trade office

16:48:02 6  between them, is what I'm taking from them.

16:48:04 7  Q.      And that was being done in December of 2015?

16:48:07 8  A.      Yes.

16:48:09 9  Q.      Great.  I'm going to hand you a document with a Bates

16:48:14 10 range of 36779 through 36789.  Do you recognize this?

16:48:22 11 A.      So if first -- the cover is an e-mail from David

16:48:28 12 Aichele asking me to send him S parameter files of a

16:48:33 13 representative 1252 part and he's asking me to be in bed

16:48:37 14 just, you know, because he wants the best possible

16:48:39 15 performance.

16:48:40 16 Q.      So by that time you actually had measured data rather

16:48:44 17 than simulated data for what was going to be the 1252?

16:48:48 18 A.      Yes.

16:48:50 19 Q.      I'll mark as Exhibit 48 a document having the Bates

16:48:54 20 range of 155055 through 155066.

16:49:01 21         Do you recognize that?

16:49:02 22 A.      Yeah, it looks like a comparison of -- so I mentioned

16:49:07 23 earlier, the 10252, was an evolution of 1252.  This was --

16:49:13 24 it looks like an e-mail to Frank, who is a device engineer

16:49:18 25 and copied to Rohan, and this is comparing the two versions

16:49:22  1    of 1252 to the Qorvo QPQ1903 case, so that they could see

16:49:29  2    clearly the performance differences.

16:49:42  3    Q.      So turning to Bates page 155058, according to what

16:49:53  4    was measured here, you showed the original 1252 in green,

16:49:57  5    the 10252 in blue, and the QPQ1903 in red?

16:50:03  6    A.      Right.

16:50:06  7    Q.      Correct?

16:50:07  8    A.      Yes.

16:50:07  9    Q.      And so you have the three curves to show the S 21;

16:50:13 10    that's a small signal, 21 pass band?

16:50:20 11    A.      Yes.

16:50:21 12    Q.      It then shows the results overlaid are these three

16:50:25 13    different filters; correct?

16:50:27 14    A.      Correct.  Yep.

16:50:28 15    Q.      And this is the kind of thing that -- well, as a

16:50:32 16    company, you're looking to see how you compared to --

16:50:36 17    A.      Yeah.

16:50:38 18    Q.      Yeah.  Having a chart that shows this pass band,

16:50:42 19    doesn't tell you how to do anything to make yours better,

16:50:45 20    does it?

16:50:46 21    A.      Absolutely not.  No, it's just data.

16:50:48 22    Q.      What do you mean by it's just data?

16:50:51 23    A.      You go and read it off the data sheet, you know, the

16:50:55 24    customers don't see its performance, I mean, this doesn't

16:50:58 25    give you the insight on how to make this thing.

16:51:01 1    Q.    Nor does it give you insight into how you make your

16:51:05 2    thing better?

16:51:05 3    A.    No, maybe just a benchmark showing where you can

16:51:08 4    improve your design, if a customer like, gives you an

16:51:12 5    example we're talking about the same page you brought up,

16:51:14 6    the lower side, you know the high side, the customer comes

16:51:17 7    back and says I need that loss to be more evened out it

16:51:21 8    would be good to know.

16:51:22 9    Q.    And that would be the kind of thing a customer would

16:51:24 10   tell you?

16:51:25 11   A.    Yeah, they would tell you that either way, yeah.

16:51:32 12              (End of video deposition.)

16:51:44 13              THE COURT:  There will be a series of exhibits

16:51:46 14   that were submitted and you saw the numbers, they'll get a

16:51:51 15   number also here.  Just like the other ones, we'll just add

16:51:57 16   eventually so as you look at the witnesses on the witness

16:51:59 17   list, and you'll see the numbers, you'll know those were

16:52:03 18   introduced during that witness to the testimony.  I think

16:52:06 19   that there were twelve of those exhibits; is that right?

16:52:08 20              MR. CREMEN:  Yes, Your Honor.  Before we call

16:52:10 21   our next witness, if it's okay with the Court, we would like

16:52:13 22   to move into evidence in the order that they came in certain

16:52:17 23   exhibits that Qorvo introduced at the deposition and I

16:52:20 24   believe Akoustis would like to do the same for their

16:52:22 25   exhibits.

16:52:22  1          THE COURT:  Well, we can receive them all

16:52:24  2  because everybody understands they should be marked.  So

16:52:27  3  what we'll do is they'll be marked exhibits, let me check,

16:52:33  4  up to Exhibit 44 -- 54, is that correct?  54, if you add 12

16:52:42  5  to 42, I think it still adds up to 54, hopefully.  So we're

16:52:48  6  going to mark those, and they will be marked to save time,

16:52:51  7  they'll be marked, you don't see me mark them, do you?  No.

16:52:57  8  They'll be marked during the evening.  So that puts us all

16:53:02  9  the way up to 54.

16:53:03 10          And now, I know that this is really -- I think

16:53:08 11  this may be more efficient.  Do you mind doing it that way?

16:53:11 12          MR. CREMEN:  I agree, Your Honor.  Thank you.

16:53:13 13          THE COURT:  We will handle it that way.  So that

16:53:16 14  takes up to 54.

16:53:17 15          Now, who will our next witness be?

16:53:21 16          MR. CREMEN:  We will call Mr. Rohan Houlden, who

16:53:24 17  will also be played via video deposition testimony.

16:53:27 18          THE COURT:  Go ahead and start that because we

16:53:29 19  all have a premium on time.  We're going to stay until about

16:53:33 20  5:30 if that's okay.

16:53:36 21          A JUROR:  I have a three-hour drive, Your Honor.

16:53:38 22          THE COURT:  You're not going home, are you?

16:53:41 23          A JUROR:  I have to.  I have to retrieve my

16:53:44 24  bird.

16:53:49 25          THE COURT:  Okay.  Let's talk about that at

16:53:54  1   side-bar.  Come around, please.

17:14:16  2                  (Side-bar discussion:)

17:14:16  3                  THE COURT:  Obviously we don't understand what's

17:14:16  4   going on.  Is the bird on the third floor?

17:14:16  5                  A JUROR:  Remember this morning, I didn't bring

17:14:16  6   it with me.  It's entirely too cold to bring it with me.  I

17:14:16  7   asked if the temperature was the same in his office and you

17:14:16  8   told me he could not adjust the temperature.

17:14:16  9                  THE COURT:  Wait a minute, that's not what

17:14:16 10   anybody said.  I know you talked about the bird being

17:14:16 11   wrapped up.  Okay.

17:14:16 12                  A JUROR:  This morning when I walked in, you

17:14:16 13   asked if the bird made it and I said no, sir.

17:14:16 14                  COURT CLERK:  I was under the impression it was

17:14:16 15   on the third floor.

17:14:16 16                  A JUROR:  No, I told you this morning that I

17:14:16 17   didn't bring him for two reasons.

17:14:16 18                  THE COURT:  Let me talk to counsel for a minute.

17:14:16 19                  A JUROR:  Okay.

17:14:16 20                  MR. MASTERS:  We see this all the time.

17:14:16 21                  THE COURT:  Well, I do see things happen all the

17:14:16 22   time, that is true.  Never with a cockatoo.  I think we've

17:14:16 23   had different dogs, but that's about it.  Thoughts here?

17:14:16 24   I'm a little concerned about this now.

17:14:16 25                  MR. MASTERS:  Yeah, I agree.

17:14:16  1    MR. ELKINS:  I'm just concerned that we are at a

17:14:16  2    point that if we're going to lose anybody else, we might get

17:14:16  3    a little low and we've got everything, all she has to do is

17:14:17  4    come back tomorrow.

17:14:17  5    MR. MASTERS:  I agree.  We can convince her.

17:14:17  6    (Discussion off the record.)

17:14:17  7    THE COURT:  We're sort of kidding you guys, we

17:14:17  8    got the white sound on, you can talk pretty formally.

17:14:17  9    MR. MASTERS:  I'm just saying maybe we can try

17:14:17 10    to set the plan for today, because we do have a place for

17:14:17 11    her.

17:14:17 12    THE COURT:  If the bird is not going to come up,

17:14:17 13    we are going to have a problem here, so that's what I need

17:14:17 14    to know, if the cockatoo -- this is a little strange anyway,

17:14:17 15    but if the cockatoo is not going to show up tomorrow, it's

17:14:17 16    going to be cold on the third floor.  I think we're done.

17:14:17 17    Does that make sense?

17:14:17 18    MR. MASTERS:  I think we would like to give it

17:14:17 19    another day is what you're saying?

17:14:17 20    THE COURT:  No, I'm not saying that, because I

17:14:17 21    don't think the temperature on the third floor is going to

17:14:17 22    change.

17:14:17 23    MR. ELKINS:  If we have the hotel for tonight

17:14:17 24    and it can be paid for, she can take the bird to her hotel

17:14:17 25    room and adjust the temperature and leave the bird there,

17:14:17  1    come here, and go back.

17:14:17  2            THE COURT:  Let's check on that.  Make sure

17:14:17  3    that's going to work.  We need to know one other thing, a

17:14:17  4    couple more things.

17:14:17  5            A JUROR:  Sure.

17:14:17  6            THE COURT:  So the plan is you'll get the bird

17:14:17  7    today.

17:14:17  8            A JUROR:  And I can't drive back this evening.

17:14:17  9    I drove six hours yesterday, Your Honor.

17:14:17 10            THE COURT:  Bless your heart.

17:14:17 11            A JUROR:  I'm doing you guys a favor.  If it's

17:14:17 12    too much, I can clearly step away from this trial.

17:14:17 13    Obviously my animal is more important than someone doing

17:14:17 14    wrong.  I did not bring him for two reasons, and I told you

17:14:18 15    that this morning.  A, it was foggy on the shore and I can't

17:14:18 16    see a mile in front of me.  I'm not going to travel and get

17:14:18 17    in an accident.  You guys were unsure if you would find a

17:14:18 18    location that would accept my bird.

17:14:18 19            THE COURT:  Right.  We did have a place on the

17:14:18 20    third floor.

17:14:18 21            A JUROR:  No, I mean as in staying here, so I

17:14:18 22    was told to proactively bring him.  I wasn't okay with that

17:14:18 23    at 6 o'clock this morning when I left.

17:14:18 24            THE COURT:  Let me check with counsel one more

17:14:18 25    time.

17:14:18  1          A JUROR:  Sure.

17:14:18  2          THE COURT:  Thank you.  We have got a very

17:14:18  3  active person.  I am very concerned that as she said she's

17:14:18  4  more concerned about the bird than she is about this case.

17:14:18  5  That's not a good indicator, gentlemen.

17:14:18  6          MR. MASTERS:  Did you ask if she would bring it

17:14:18  7  in tomorrow to the hotel?

17:14:18  8          THE COURT:  We're not pet managers here,

17:14:18  9  fellows.  Our objective is to have jurors sit here and

17:14:18 10  decide the case fairly and impartially and focus on the

17:14:18 11  evidence in this case, and frankly not be concerned about

17:14:18 12  something else distracting them from paying attention.  We

17:14:18 13  don't have -- is there an objection from the plaintiff to

17:14:19 14  allowing this juror to be excused?

17:14:19 15          MR. MASTERS:  We would object that, unless she's

17:14:19 16  unwilling to bring it tomorrow morning.  We now have --

17:14:19 17          THE COURT:  We're not going on this schedule

17:14:19 18  anymore.  This is unacceptable to get this case concluded.

17:14:19 19  And you both know that.  We will not get this case concluded

17:14:19 20  if we don't do this time frame, if we continue with this.

17:14:19 21  And we're not going to take a break at 5 o'clock each day to

17:14:19 22  go take care of a cockatoo.  And we're not going to delay

17:14:19 23  the proceedings to care for a cockatoo.  This is bordering

17:14:19 24  on rather odd to say the least.  I'm more concerned,

17:14:19 25  however, about the state of mind of our juror.  We need to

17:14:19  1   focus on the task.  It's concerning.  Do you not think it is

17:14:19  2   concerning?

17:14:19  3              MR. MASTERS:  If the drive is concerning her

17:14:19  4   more --

17:14:19  5              THE COURT:  That's not good, she has to make a

17:14:19  6   three-hour drive home, a three-hour drive back, we don't do

17:14:19  7   that in the District of Delaware, we get people hotels.

17:14:19  8   This is a problem.

17:14:19  9              MR. ELKINS:  The only thing I'll say, Your

17:14:19 10   Honor, we have expended an enormous amount of time to try to

17:14:20 11   accommodate here.  And apart from her last minute decision

17:14:20 12   about the fog, suffering plans, we've got everything set up.

17:14:20 13   And so we could ask her if there is going to be any further

17:14:20 14   issues.  There shouldn't be.  I think the hotel is in

17:14:20 15   Newark, which is --

17:14:20 16              COURT CLERK:  Fifteen-minute drive.

17:14:20 17              MR. ELKINS:  And I don't think it should be an

17:14:20 18   issue.  But we can ask her.

17:14:20 19              THE COURT:  I think we can ask her if this is

17:14:20 20   just too much, because, do you understand what I'm saying,

17:14:20 21   we just need to know about that.  If it's just too much for

17:14:20 22   the juror, then we don't ask people to make extraordinary

17:14:20 23   sacrifices in terms of safety.  And that's what I'm

17:14:20 24   concerned about.  I don't want to wake up tomorrow morning

17:14:20 25   and find out that somebody has a terrible accident on the

17:14:20  1    interstate because we didn't use our common sense.  Let's

17:14:20  2    check and see.  I need to ask her.

17:14:20  3            We need to ask a question, because what I am

17:14:20  4    worried about is your safety.

17:14:20  5            A JUROR:  Yes, sir.

17:14:20  6            THE COURT:  And do you see what I'm saying

17:14:20  7    because this -- our job is to actually never make -- to make

17:14:20  8    sure that all of you are okay.

17:14:20  9            A JUROR:  Absolutely.

17:14:20 10            THE COURT:  And to make sure that we're not

17:14:20 11    exposing you to an unnecessary risk.  And I'm -- do you see

17:14:20 12    what I'm saying?  And it's a long drive.

17:14:20 13            A JUROR:  Sir, if I didn't think I could handle

17:14:20 14    it, I wouldn't offer to do it, but if you feel more

17:14:20 15    comfortable with someone taking my place, that's perfectly

17:14:20 16    fine, I have other things that I can be doing currently.

17:14:21 17            THE COURT:  Right.  You need to tell me, I'm

17:14:21 18    sure, we're glad to have you, you know that, we want to try

17:14:21 19    to help take care of everything.  But I don't want you to

17:14:21 20    have an accident driving up here or driving home and it's a

17:14:21 21    long trip and you've got a lot on your mind.  So just let us

17:14:21 22    know, is this something that's pretty unreasonable for us to

17:14:21 23    be doing?  If it is, you just tell us.

17:14:21 24            A JUROR:  If it was unreasonable, I wouldn't

17:14:21 25    offer to do it, but I feel like it's too much for you guys,

17:14:21  1    so I'm going to go ahead and excuse myself and find someone

17:14:21  2    else to step in for me.

17:14:21  3              THE COURT:  There is no one else to find.

17:14:21  4              A JUROR:  That's why I tried to accommodate you

17:14:21  5    guys with my bird, but I feel like it's just not working.

17:14:21  6              THE COURT:  Right.  And you see why I'm worried,

17:14:21  7    bad weather, fog, difficulty in getting up here.

17:14:21  8              A JUROR:  And that was completely out of my

17:14:21  9    control.

17:14:21 10              THE COURT:  There is nothing you can do about

17:14:21 11    it, nothing at all.  I don't want you to feel like we are

17:14:21 12    pressuring you to stay.

17:14:21 13              A JUROR:  Not by any means, by any means I

17:14:21 14    don't, I just have to handle my business a certain way

17:14:21 15    because my bird is all I have.

17:14:21 16              THE COURT:  I fully understand.  I fully

17:14:21 17    understand.  Would you feel more comfortable if we let you

17:14:21 18    be excused, would that be better?

17:14:21 19              A JUROR:  I don't mind partaking, but if you

17:14:21 20    guys feel like it's too much, then please excuse me now

17:14:21 21    before I get any further invested in this, if that makes any

17:14:22 22    sense to you.

17:14:22 23              THE COURT:  We would like to hear, would you

17:14:22 24    prefer to do that?

17:14:22 25              A JUROR:  To excuse me, sure.  I'm fine with

17:14:22  1    that.

17:14:22  2                THE COURT:  That would be better.

17:14:22  3                A JUROR:  That's fine.  It's neither here nor

17:14:22  4    there for me.  It's only a three-hour drive, it's two hours

17:14:22  5    in regular traffic.  The reason it takes me three hours is

17:14:22  6    yesterday there was a major accident and this morning I

17:14:22  7    couldn't see beyond my headlights, that's how foggy it was.

17:14:22  8    And I have a video that I took this morning if you would

17:14:22  9    like to see it, I took it -- just all this going back and

17:14:22 10    forth is holding the trial up, so go ahead and excuse me so

17:14:22 11    they can get on with their business, because I don't want to

17:14:22 12    hold them up.  And I apologize in advance.

17:14:22 13                THE COURT:  No.  No.  Let me check, we've got

17:14:22 14    two options, one is to -- you can bring the cockatoo here

17:14:22 15    and get you situated tomorrow, and then see how that works.

17:14:22 16                A JUROR:  Or I could come up first thing in the

17:14:22 17    morning and leave like I did the past two days.  If I leave

17:14:22 18    by 5 o'clock, I'll have time to stop and drop him off and

17:14:22 19    come here by 8:15.  He said it's only fifteen minutes up the

17:14:23 20    beltway.  That's completely up to you, I don't mind

17:14:23 21    partaking, but I'm not going to constantly be an issue with

17:14:23 22    you guys.  It's kind of like when I went to boot camp years

17:14:23 23    ago, and they said don't make your last name known because

17:14:23 24    you're going to be in trouble the -- I will really -- they

17:14:23 25    lost my uniform.

17:14:23 1          THE COURT:  You were in boot camp?

17:14:23 2          A JUROR:  Yes, Fort Jackson.  It was July, it

17:14:23 3  was a little warm, wool socks and long sleeves, but again I

17:14:23 4  made myself known with my own issues, so I don't want to

17:14:23 5  keep holding these guys up, because they have more important

17:14:23 6  things to do and I can go back to my cardiologist and he'll

17:14:23 7  be happy to have me back, so it's your call.

17:14:23 8          THE COURT:  Okay.  Let me check one more time,

17:14:23 9  what we want to do, we may make a different decision and we

17:14:23 10  wanted to try tomorrow would be the idea, and you honestly

17:14:23 11  have to tell me if it's a problem, and if you feel like it

17:14:23 12  doesn't work, then I need you to tell me.

17:14:23 13          A JUROR:  Absolutely.

17:14:23 14          THE COURT:  You promise?

17:14:23 15          A JUROR:  I'm a bluntly honest woman, sir.

17:14:23 16          THE COURT:  I know.  I think that's what we're

17:14:23 17  probably going to do, because we want -- you know we don't

17:14:24 18  give up our jurors readily, we want to try and help make it

17:14:24 19  work out.  And I want you to help me.

17:14:24 20          A JUROR:  Absolutely.

17:14:24 21          THE COURT:  But, you know, if it's not working

17:14:24 22  for you, I want -- and then if it's a distraction for you,

17:14:24 23  which is the real concern.

17:14:24 24          A JUROR:  He's not a distraction.  I feed him, I

17:14:24 25  water him, and he's good to go.  He's not a distraction,

17:14:24 1    which I'm kind of floored that the hotel next door won't

17:14:24 2    allow him.  He wouldn't come out of his cage.

17:14:24 3                THE COURT:  Do you have a picture of him?

17:14:24 4                A JUROR:  I absolutely do.

17:14:24 5                THE COURT:  We all want to see.  We all want to

17:14:24 6    see.

17:14:24 7                A JUROR:  This is him this morning.  He's three.

17:14:24 8                THE COURT:  He's very pretty.

17:14:24 9                A JUROR:  He's a Latino with red eyes.

17:14:24 10               THE COURT:  Yeah.  Really nice looking bird.

17:14:24 11               A JUROR:  His name is Nigel.

17:14:24 12               THE COURT:  Nigel, he loves you very much.

17:14:24 13               A JUROR:  He does.  He sits on my shoulder when

17:14:24 14   I clean, when I cook, if I eat.  If I take a shower, he's on

17:14:24 15   the shower curtain.  My son joined the navy and I am left

17:14:24 16   with the bird.

17:14:24 17               THE COURT:  As I said, we're going to give it a

17:14:24 18   try, and as I said, you have to promise me that if it's

17:14:24 19   really a problem that you will tell me because we don't want

17:14:24 20   you to be worrying about Nigel.

17:14:24 21               A JUROR:  I won't be worried about him.  He

17:14:24 22   doesn't go very far.

17:14:24 23               THE COURT:  But you see what I'm saying?

17:14:24 24               A JUROR:  Absolutely I do.

17:14:24 25               THE COURT:  Because if that was the problem.

| | | |
|---|---|---|
| 17:14:24 | 1 | Now what's your schedule for today, are you going -- |
| 17:14:25 | 2 | A JUROR:  I'm going to go home and get the bird. |
| 17:14:25 | 3 | Would you rather I come up first thing in morning?  I don't |
| 17:14:25 | 4 | know if you paid for this afternoon. |
| 17:14:25 | 5 | THE COURT:  You're fine.  The Court is not |
| 17:14:25 | 6 | worried about that. |
| 17:14:25 | 7 | THE JUROR:  I know, but I am.  I'm a single |
| 17:14:25 | 8 | parent. |
| 17:14:25 | 9 | THE COURT:  We're looking -- either or, you can |
| 17:14:25 | 10 | come back this evening or come back -- |
| 17:14:25 | 11 | A JUROR:  If you want me to wait until |
| 17:14:25 | 12 | 5 o'clock. |
| 17:14:25 | 13 | THE COURT:  Is that better for you? |
| 17:14:25 | 14 | A JUROR:  Yes, probably. |
| 17:14:25 | 15 | THE COURT:  Let's do that.  And I think we've |
| 17:14:25 | 16 | got a good understanding, and you will not hesitate to speak |
| 17:14:25 | 17 | to me -- |
| 17:14:25 | 18 | A JUROR:  Yes, sir. |
| 17:14:25 | 19 | THE COURT:  -- if there is an issue. |
| 17:14:25 | 20 | A JUROR:  Uh-huh. |
| 17:14:25 | 21 | THE COURT:  I want you to be careful driving. |
| 17:14:25 | 22 | A JUROR:  I will, I drove a two-and-a-half ton |
| 17:14:25 | 23 | for the Army, I think I got this.  I would speak up if I |
| 17:14:25 | 24 | didn't. |
| 17:14:25 | 25 | THE COURT:  Why don't you have a seat and we'll |

17:14:25  1   check with counsel.  Thanks very much.

17:14:25  2                  A JUROR:  Yes, sir.

17:14:25  3                  THE COURT:  All right.  I agreed to go along

17:14:25  4   with everybody.  I think we'll probably be okay.  That's all

17:14:25  5   we can do.  Now we'll adjust our schedule a little bit.

17:14:25  6   What we'll do is we'll come in tomorrow at, like we always

17:14:25  7   do, we're here early, you're here early, I remember this

17:14:25  8   young man, be sure you're here early.

17:14:25  9                  MR. GOLDEN:  I was one of the first people here

17:14:25 10   this morning.

17:14:25 11                  THE COURT:  We'll start right at 8:30, and we'll

17:14:25 12   move as fast as we can.

17:14:25 13                  MR. MASTERS:  Are you adjourning for the day?

17:14:25 14                  THE COURT:  We're going to have to because she

17:14:25 15   has to go home.  That was the whole point.

17:14:26 16                  MR. MASTERS:  Our next witness is a video

17:14:26 17   deposition.

17:14:26 18                  THE COURT:  She asked to go home.  So I was

17:14:26 19   trying to get it a little further along.  I'm going to check

17:14:26 20   and see how many hours we have for the last day.

17:14:26 21                  (Discussion off the record.)

17:14:26 22                  THE COURT:  We have to average over seven a day.

17:14:26 23   And we actually -- we needed to average seven-and-a-half.

17:14:26 24                  MR. MASTERS:  That's impressive.

17:14:26 25                  THE COURT:  Well, you know.

17:14:26  1                    MR. MASTERS:  More for the jury.

17:14:26  2                    THE COURT:  So what we're going to do --

17:14:26  3                    MR. MASTERS:  We did the calculations, too, like

17:14:26  4       seven-and-a-half hours a day.

17:14:26  5                    THE COURT:  Well, if we can't get to closing

17:14:26  6       arguments on schedule, we've got to get to it on, we're

17:14:26  7       planning on get to it which day, now, closing arguments

17:14:26  8       Thursday?

17:14:26  9                    MR. MASTERS:  Maybe, hoping.

17:14:26 10                    THE COURT:  He's agreeable.

17:14:26 11                    MR. MASTERS:  Hoping maybe Wednesday, Thursday

17:14:26 12       for sure.

17:14:26 13                    THE COURT:  Right, exactly, because all of us

17:14:26 14       recognize -- good, we're in good shape.  All right.  Thank

17:14:27 15       you all very much.

17:14:27 16                    (End of side-bar.)

17:14:27 17                    THE COURT:  We're actually going to have to

17:14:27 18       leave today because -- and that's okay.  That's all right.

17:14:27 19       Our concern is always to make sure that each one of you is

17:14:27 20       okay.  And so today that's what we need to do.  And if one

17:14:27 21       of you has an issue that comes up, you can tell me about it.

17:14:27 22       I can give a little leeway here because we have got a tight

17:14:27 23       schedule.  And then that means that we will stay on the

17:14:27 24       schedule we had today, but tomorrow we'll be able to stay

17:14:27 25       somewhat later.  And also on Thursday.  On Friday I realize

17:14:27  1   there is a little bit of commuting that goes on at that time

17:14:27  2   and we'll work on that a little bit if we can.  All right.

17:14:27  3   Well, we've had a pretty good time and our time was working

17:14:27  4   okay.  And so don't be concerned about that at all.

17:14:27  5          All of you have a very pleasant evening but

17:14:27  6   there are seven things to remember.  First thing, don't let

17:14:27  7   anybody talk with you about the case if they try to, don't

17:14:27  8   -- at home don't tell anybody about the case either, you

17:14:27  9   know, limit the discussion there, still, limit the case to

17:14:28 10   what you hear in the court.

17:14:28 11          The fourth thing, don't speak to -- now you have

17:14:28 12   seen all these people, don't speak to any of the witnesses,

17:14:28 13   lawyers or parties or people who are associated with the

17:14:28 14   case in any way.

17:14:28 15          And the fifth thing is what?  Don't do any

17:14:28 16   research of any kind of material, absolute prohibition on

17:14:28 17   that.  That means the simplest kind of research or anything

17:14:28 18   about the case.

17:14:28 19          The sixth thing is that you have to avoid the

17:14:28 20   media that might be about this case or cases like it, and it

17:14:28 21   would be more likely that it would be something like a case

17:14:28 22   like this.

17:14:28 23          And the seventh thing is to continue to keep an

17:14:28 24   open mind.

17:14:28 25          So that's our situation.  We will be starting

17:14:28  1   up, we've had that discussion at side-bar, everybody

17:14:28  2   understands, everybody is good on this, we're going to start

17:14:28  3   in here at 8:30 tomorrow.  And we'll have a pretty strict

17:14:28  4   schedule.  And we'll go a little longer because it just

17:14:28  5   helps us so much to pick up a half hour here or there and

17:14:28  6   we're getting to go home on that at the end of two weeks as

17:14:28  7   opposed to a longer period of time.  I'm not saying that's

17:14:28  8   exactly what's going to happen, but that's our goal and we

17:14:28  9   told you we were going to try to do it, and we're making

17:14:28 10   every effort to do it.

17:14:28 11          I appreciate everybody's patience today.

17:14:28 12   Hopefully you had a reasonably decent lunch, and we will see

17:14:28 13   all of you, because we start in here at 8:30, what time will

17:14:29 14   I see you tomorrow?

17:14:29 15          A JUROR:  8:15.

17:14:29 16          THE COURT:  About 8:15, did I hear that part,

17:14:29 17   8:15.  And some of you I saw a little earlier than that, so

17:14:29 18   don't worry about that, I'll be here quite a bit before

17:14:29 19   then.  So thank you all very much and we'll see you

17:14:29 20   tomorrow.

17:14:29 21          (Jury exiting the courtroom at 5:14 p.m.)

17:14:38 22          THE COURT:  All of you be seated, please.  You

17:14:41 23   all thought you were going to get to leave early, but we

17:14:44 24   have to get the exhibits marked, that shouldn't be a

17:14:47 25   problem, you don't need me to do that.  But I have got some

17:14:51  1    -- if you will work with staff, you're going to get those

17:14:54  2    numbers in there.  So that will take care of that.

17:14:58  3              Your final day tally, your tally on this, on the

17:15:02  4    timeline on the deposition, most, we're going to have to do

17:15:07  5    a little calculation there, unless you have already done the

17:15:11  6    calculation, and we will recheck it.

17:15:14  7              So looking out there to -- I'll look to the

17:15:17  8    plaintiff first, you already -- I think we had a

17:15:20  9    calculation, we had a calculation, did you have a

17:15:21 10    calculation?

17:15:22 11              MR. MASTERS:  Well, I don't have after today, so

17:15:25 12    we have been keeping it.

17:15:26 13              THE COURT:  I meant on the deposition time.

17:15:29 14              MR. MASTERS:  Oh, that's pretty easy to do.

17:15:35 15              THE COURT:  So do we have an undisputed

17:15:38 16    deposition time, because we had it pretty close there for a

17:15:41 17    minute.

17:15:44 18              MR. MASTERS:  Pretty close meaning equal or

17:15:46 19    total time?

17:15:46 20              THE COURT:  No, not equal.

17:15:48 21              MR. MASTERS:   I meant you had it between the

17:15:50 22    parties or the time --

17:15:52 23              THE COURT:  I just need to know how much time

17:15:53 24    you ran on plaintiff's questions and how much time you ran

17:15:56 25    on defense questions.

17:15:58  1            MR. MASTERS:  We are pulling that.

17:16:00  2            THE COURT:  I think we can run it.  If I can

17:16:02  3    finish that right now, that would be a great help to the

17:16:07  4    staff.

17:16:11  5            MR. ELKINS:  So Your Honor, I think we can give

17:16:13  6    it to you.  The plaintiff's designations came in at 25:40.

17:16:21  7    And defendant designations came in at 22:36.

17:16:28  8            THE COURT:  I think we can -- by your agreement

17:16:32  9    and that's my observation because we have been overall the

17:16:36 10    material earlier, that looks entirely correct, 25:40 for the

17:16:41 11    plaintiff and 22:36.  Actually, I'm going to wait just a

17:16:47 12    minute to see if we have a preliminary tally, do you want to

17:16:50 13    know where you are today?  You're pretty close.  We have a

17:16:53 14    goal for today, and obviously we're going to miss it a

17:16:56 15    little bit, but that's okay.

17:17:03 16            And I told you at the end of each day, I would

17:17:06 17    ask you who the next series of witnesses were going to be.

17:17:10 18    So I know we had a preliminary list earlier, but I need to

17:17:15 19    make sure that I have plaintiff's witnesses in order with

17:17:20 20    which they're going to appear.  Of course, we know part of

17:17:22 21    that all right.  But yes, sir.

17:17:24 22            MR. MASTERS:  So the next witness to be called

17:17:27 23    is Rohan Houlden by video.

17:17:30 24            THE COURT:  Yes, sir.

17:17:31 25            MR. MASTERS:  That's a fairly long video.

17:17:33  1                  THE COURT:  It is.  And of course if you will

17:17:35  2      just redo the calculations on that in light -- I did take

17:17:39  3      out some material there, if you'll redo that, I would

17:17:42  4      appreciate.  You may already have it.

17:17:45  5                  MR. MASTERS:  Next will be Kevin Faulkner, he

17:17:47  6      will be live.

17:17:48  7                  THE COURT:  Yes, sir.

17:17:49  8                  MR. MASTERS:  After Mr. Faulkner, it is Rama

17:17:54  9      Vetury, by video.  And then after Mr. Vetury, plaintiffs

17:18:03 10      plan to call Mr. Aichele, live.

17:18:08 11                  THE COURT:  What do you project on that time,

17:18:11 12      what do you project on that time?

17:18:13 13                  MR. MASTERS:  Mr. Aichele, in particular?

17:18:17 14                  THE COURT:  Any idea about how long that will

17:18:21 15      be?

17:18:21 16                  MR. MASTERS:  I think our direct examination of

17:18:23 17      him will be forty-five to sixty minutes.

17:18:27 18                  THE COURT:  Yes, sir.

17:18:28 19                  MR. MASTERS:  We have it written down on a white

17:18:31 20      board back at the war room, but I can't remember.

17:18:34 21                  THE COURT:  Not a problem.  So we have -- and

17:18:36 22      we've already looked at the third individuals, and we have

17:18:46 23      -- we already filed that.  There were no sustained

17:18:51 24      objections.  So everything is overruled.  So that was all

17:18:54 25      in.

17:18:54  1                    MR. MASTERS:  Thank you.

17:18:55  2                    THE COURT:  So that takes care of that.  And

17:18:57  3    then I'm going to ask you, I think we have got our next

17:19:01  4    deposition almost prepped on the who is your one after

17:19:07  5    Mr. Aichele.

17:19:08  6                    MR. MASTERS:  It was the one after.

17:19:11  7                    THE COURT:  You just finished --

17:19:13  8                    MR. MASTERS:  We finished Dr. Hodge.

17:19:16  9                    THE COURT:  We got those four.

17:19:17 10                    MR. MASTERS:  That's ready, Vetury, and then

17:19:20 11    after that is Hunt.

17:19:24 12                    THE COURT:  Okay.  The fifth one is Hunt, right?

17:19:27 13                    MR. MASTERS:  Yes.

17:19:28 14                    THE COURT:  Okay.  And the sixth one, are we

17:19:32 15    going to get all the way through everybody tomorrow?

17:19:35 16                    MR. MASTERS:  That would be Robert Dry, it's

17:19:38 17    possible.

17:19:39 18                    THE COURT:  Sure.  Okay.

17:19:42 19                    MR. ELKINS:  Your Honor, just so you know, so

17:19:44 20    Mr. Aichele is also one of our witnesses, mine will take

17:19:57 21    about an hour, maybe a little bit more, and then I suspect

17:20:00 22    that there will be cross after that.

17:20:03 23                    THE COURT:  Okay.  And there will be some

17:20:07 24    redirect?

17:20:10 25                    MR. ELKINS:  Yes.

17:20:11 1                    THE COURT:  It will be cross.  I mean, it's a

17:20:13 2      mix.

17:20:13 3                    MR. ELKINS:  We'll have, I'll combine cross and

17:20:16 4      then direct examination, and then I was saying that I would

17:20:20 5      expect Mr. Masters or whomever is handling him to probably

17:20:23 6      do a cross on my direct.

17:20:25 7                    THE COURT:  I understand that.

17:20:27 8                    MR. ELKINS:  Of course, they don't have to.

17:20:30 9                    THE COURT:  They might.  They might.  Okay.  Not

17:20:32 10     a problem.

17:20:36 11                   COURT CLERK:  So for plaintiffs I have you guys

17:20:39 12     at 5 hours, 32 minutes and 44 seconds, with the remaining

17:20:44 13     time of 19 hours, 27 minutes and 16 seconds.

17:20:48 14                   For defendants, I have you at 2 hours,

17:20:53 15     56 minutes and 33 seconds.  The remaining time of 22 hours

17:20:58 16     3 minutes and 27 seconds.

17:21:02 17                   THE COURT:  Okay.  And that's how we have to

17:21:05 18     stay on schedule.  I'll tell you our goal was to get a

17:21:11 19     little closer to get into another almost thirty minutes

17:21:17 20     which would have put us a little closer.

17:21:21 21                   Okay.  Well, I appreciate everybody's efforts

17:21:25 22     today, and we're going to have a busy day tomorrow.

17:21:28 23                   Anything else?

17:21:28 24                   MR. MASTERS:  Nothing from the plaintiffs, Your

17:21:30 25     Honor.

17:21:30  1                    MR. ELKINS:  Nothing from defendants, Your

17:21:32  2     Honor.

17:21:32  3                    THE COURT:  Thank you all very much.

17:21:34  4                    COURT CLERK:  All rise.

17:21:37  5                    (Court adjourned at 5:21 p.m.)

          6

          7              I hereby certify the foregoing is a true and
                accurate transcript from my stenographic notes in the proceeding.
          8

          9                                   /s/ Dale C. Hawkins
                                           Official Court Reporter
         10                                 U.S. District Court

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

# EXHIBIT I

07:48:17

1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF DELAWARE
2

3    QORVO, INC.,                    ) VOLUME 3
                                     )
4              Plaintiff,            )
                                     ) C.A. No. 21-1417(JPM)
5    v.                              )
                                     )
6    AKOUSTIS TECHNOLOGIES, INC.,)
     and AKOUSTIS, INC.,            )
7                                    )
               Defendants.           )
8

9                     Wednesday, May 8, 2024
                      8:30 a.m.
10                    Jury Trial

11

12                    844 King Street
                      Wilmington, Delaware
13

14   BEFORE:  THE HONORABLE JON P. McCALLA
             United States District Court Judge
15

16   APPEARANCES:

17

18                 MORRIS NICHOLS ARSHT & TUNNELL LLP
                   BY:  JACK B. BLUMENFELD, ESQ.
                   BY:  JEREMY A. TIGAN, ESQ.
19                 BY:  ANTHONY D. RAUCCI, ESQ.

20                 -and-

21                 SHEPPARD MULLIN RICHTER & HAMPTON LLP
                   BY:  ROBERT M. MASTERS, ESQ.
22                 BY:  JONATHAN R. DeFOSSE, ESQ.
                   BY:  TIMOTHY P CREMEN, ESQ.
23                 BY:  ROY D. JUNG, ESQ.
                   BY:  ZACHARY ALPER, ESQ.
24                 BY:  KAZIM A. NAQVI, ESQ.
                   BY:  JENNIFER KLEIN AYERS, ESQ.
25                       Counsel for the Plaintiff

1

APPEARANCES CONTINUED:

2

3          BAYARD, P.A.
           BY:  STEPHEN B. BRAUERMAN, ESQ.
4          BY:  RONALD P. GOLDEN, III, ESQ.

5          -and-

6          SQUIRE PATTON BOGGS (US)LLP
           BY:  RONALD S. LEMIEUX, ESQ.
7          BY:  DAVID S. ELKINS, ESQ.
           BY:  VICTORIA Q. SMITH, ESQ.
8          BY:  XIAOMEI CAI, ESQ.
           BY:  RACHAEL A. HARRIS, ESQ.
9          BY:  MATTHEW A. STANFORD, ESQ.

10

                      Counsel for the Defendants

11

12

13              _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

14

15

07:48:44 16          THE COURT:  You may be seated.  We got to get

08:27:47 17  our jurors straightened out.  We're still missing two.  So

08:27:51 18  see how it goes on that.  One of them is ████████.

08:27:57 19  In connection with the verdict form, looks like this is

08:28:08 20  something that approaches what we submitted but without any

08:28:13 21  group descriptions, so we'll say group 1, 2, 3, 4, et

08:28:18 22  cetera.  Descriptions are a problem, defense properly

08:28:22 23  pointed that out.  What we would do is we add two on the

08:28:33 24  verdict instruction at the end, something to the effect, you

08:28:36 25  will note that the form of verdict utilizes the eight

08:28:42 1   alleged trade secret groups that the plaintiff owes in the

08:28:47 2   present days.  The Court is not making any factual

08:28:53 3   determinations as to the alleged trade secrets or the

08:28:56 4   organization or whether or not each is a trade secret and

08:29:01 5   we'll add more language there.

08:29:03 6           The verdict form for objection is only for your

08:29:06 7   convenience.  All questions of fact are for you, the jury,

08:29:09 8   to resolve.  My concern, I think the defense is not

08:29:13 9   incorrect, and we need to be careful there.  And I want to

08:29:17 10  be -- I'm looking for more guidance from defense.  But I

08:29:22 11  think we have to have some organizational structure so the

08:29:27 12  jury can go through it logically, so that seems to be a way

08:29:30 13  to do that.

08:29:31 14          So since I got a few minutes because I don't

08:29:34 15  have my jurors here yet, we're not going to debate it, but

08:29:39 16  we are conscious of that, our goal is to get an almost

08:29:48 17  usable -- they're subject to a little change -- verdict form

08:29:50 18  by noon, we can look at it again, and all of you need to

08:29:54 19  know that.

08:29:55 20          MR. ELKINS:  Your Honor, I think, I'm not

08:29:58 21  concerned about having them in the order that they are done.

08:30:01 22  What I do have a concern is that they match up exactly how

08:30:07 23  -- I mean, they can be in the same numerical order, but I

08:30:11 24  think it's leaning too far in that direction just in terms

08:30:17 25  of tipping the Court's hat toward the plaintiff and its

08:30:21  1    vision of how these things should be organized.  They are

08:30:25  2    free, Mr. Masters, or whom does closing is free to use

08:30:30  3    demonstratives, use the special verdict form, I would expect

08:30:33  4    that they do that anyway, and they can put whatever thoughts

08:30:38  5    they want.

08:30:38  6            My concern is just not having the special

08:30:41  7    verdict form, you know, include the Court's imprimatur on

08:30:45  8    how they are organizing them and correlating them so they

08:30:50  9    can be easily understandable to the jury.  Let's face it,

08:30:53 10    they need to be understandable to the jury, that's our point

08:30:56 11    about specificity, but we don't agree that they're capable

08:31:00 12    of being organized in the manner that they have.  They've

08:31:03 13    done, you know, they've done an effective job already in

08:31:07 14    their examinations in terms of lining them up with evidence,

08:31:14 15    so I don't think they need anymore help from the Court in

08:31:17 16    terms of the special verdict form's organization.  That's my

08:31:20 17    point, Your Honor.

08:31:20 18            THE COURT:  Do you have any other thoughts about

08:31:22 19    how we might do it, because it seems like with the note that

08:31:25 20    we would add making it very clear, and then they won't have

08:31:29 21    the group names above it, because if you have a concern

08:31:34 22    about that.

08:31:34 23            MR. ELKINS:  Correct.  My concern is the

08:31:37 24    numbering system and the group names, if they want to list

08:31:39 25    them 1 through 46 in the same order that they're presenting

08:31:43 1   them, I don't have a problem with that.  I think that that's

08:31:46 2   not -- I think that that's a reasonable middle ground.  But

08:31:51 3   I do have -- you know, a problem with, you know, 1.1, 1.2,

08:31:56 4   1.3.

08:31:57 5           THE COURT:  Right.  We're almost certainly going

08:32:00 6   to have to have an attachment so that they will understand

08:32:03 7   what one is or 1.1 is, generally, what it is alleged to be,

08:32:10 8   and so that's, your concern is with that?

08:32:15 9           MR. ELKINS:  No, my concern, I think a list --

08:32:17 10  we've always taken the case that having a list is very

08:32:21 11  important.  Our -- what we wrote in our last submission by

08:32:28 12  e-mail.

08:32:28 13          THE COURT:  Right.

08:32:29 14          MR. ELKINS:  Is that I think that given the way

08:32:31 15  that they're phrased now, they're very lose and while they

08:32:36 16  have again from what I saw yesterday, you know, they have

08:32:41 17  finally got -- I mean, what we have been asking for for

08:32:46 18  two-and-a-half years in this case is that kind of

08:32:48 19  specificity, now that we have it, they can put that

08:32:52 20  specificity in there so that the jury understands what

08:32:56 21  they're supposed to be analyzing.

08:33:00 22          THE COURT:  Let's put it together and see how it

08:33:03 23  looks, have a final listing here and you do agree that we

08:33:09 24  need to put something on the form of the verdict so it's

08:33:12 25  clean, not the endorsement of the Court.

08:33:15  1              MR. ELKINS:  Yes.

08:33:17  2              THE COURT:  Let's see what we can do.  I'm

08:33:20  3    sorry, anything else from Mr. Masters, since, do we have

08:33:23  4    everybody now?

08:33:38  5              Okay.  We just got word from ▮▮▮▮▮▮▮▮▮ that

08:33:42  6    she's not coming today.  She's certainly a person of strong

08:33:49  7    opinions.  We can't stop the trial because of that.  And can

08:33:55  8    we put the voicemail on the record?  We can -- I haven't

08:34:01  9    heard the voicemail.

08:34:03 10              MR. ELKINS:  Well, all I have to say is you were

08:34:07 11    right yesterday.

08:34:08 12              THE COURT:  I don't know about that.

08:34:09 13              MR. ELKINS:  Well, you have been proven.

08:34:11 14              THE COURT:  We were just -- well, everybody

08:34:15 15    understands that when a juror absences themselves that the

08:34:23 16    Court doesn't stop trial.  And therefore, what I would --

08:34:28 17    rather than putting her in a position where she would be in

08:34:31 18    contempt, because I don't want to do that, that's not the

08:34:35 19    thing to do.  Her life is complicated enough as it is it

08:34:40 20    sounded like, we would simply excuse her and tell the jury

08:34:44 21    that she had been excused.  Because they need to know,

08:34:47 22    they're going to know she's not here.

08:34:49 23              Anything else, anything else from Mr. Masters?

08:34:52 24    I'm trying to give him a chance to say something, too.

08:34:55 25              MR. MASTERS:  Well, I was just thinking about

08:34:57  1    Nigel.  I'm going to miss talking about Nigel.

08:35:02  2                THE COURT:  Nigel, we're going to miss Nigel.

08:35:06  3                MR. ELKINS:  We never got the meet him.

08:35:07  4                MR. MASTERS:  We knew a lot about him.

08:35:09  5                To the verdict form.

08:35:10  6                THE COURT:  So both of you agree that we need to

08:35:14  7    excuse her and this is essentially a request by the juror to

08:35:17  8    be excused because of personal conflicts in terms of her

08:35:22  9    ability to be available.

08:35:23 10                MR. MASTERS:  At this point, Your Honor, we'll

08:35:25 11    follow your guidance on this.  And I think we've tried

08:35:29 12    enough over the past couple of days and enough is enough, we

08:35:32 13    need to move on.

08:35:33 14                THE COURT:  So we're going to let her be

08:35:36 15    excused.  We'll put that on the record.  Yes, sir.

08:35:38 16                MR. MASTERS:  Back to the verdict form, the

08:35:42 17    critical component is that the jury is able to understand

08:35:46 18    what they're deliberating.

08:35:48 19                THE COURT:  We understand.

08:35:49 20                MR. MASTERS:  With respect to the trade secrets,

08:35:51 21    and our entire presentation for clarity is the groupings

08:35:56 22    that gets them into -- and the groupings don't add anything

08:36:01 23    more than how they should look at these trade secrets and

08:36:07 24    how they were presented, especially by the witnesses

08:36:09 25    yesterday, they went through all eight, each one had their

08:36:12  1   own categories.  And we believe those groupings will assist

08:36:16  2   the jury in understanding the trade secrets when they're

08:36:18  3   deliberating.  And just the raw numbers of 1 through 46 may

08:36:22  4   not quite do.

08:36:23  5            THE COURT:  We're going to attach the brief

08:36:28  6   descriptive language in an attachment, which is going to

08:36:31  7   show 1.1, 1.2, 1.3, I'm just not going -- let's try that,

08:36:38  8   take a look at it, and we're going to do that, we'll get it

08:36:41  9   to you a little after noon.

08:36:43 10            MR. MASTERS:  Thank you.

08:36:43 11            THE COURT:  And you may find this is going to be

08:36:45 12   okay.  You may say it's not okay, but let's wait.  Now that

08:36:49 13   we know that, we have our other juror, right?

08:36:52 14            COURT CLERK:  Right.

08:36:53 15            THE COURT:  Now that we know we've got as many

08:36:55 16   people as we're going to get, we will bring the jury in and

08:36:58 17   we will let Mr. --

08:37:06 18            MR. ELKINS:  Your Honor, I believe, I understand

08:37:08 19   that we have -- I know we have one issue regarding evidence.

08:37:12 20            MS. AYERS:  If I want to raise it.

08:37:15 21            THE COURT:  Let Ms. Ayers come up.

08:37:17 22            MR. ELKINS:  It's with respect to an expert,

08:37:21 23   Kevin Faulkner, who I will not testify until this afternoon

08:37:25 24   after lunch -- well, maybe he'll testify before lunch.

08:37:28 25            MS. AYERS:  He's testifying after --

08:37:30  1          THE COURT:  Okay.  Come up, Rule 1, come up and

08:37:35  2    talk to the mic.  Number two, talk to me, that makes sense,

08:37:39  3    make sure we have a very appropriate exchange.

08:37:41  4          MR. ELKINS:  He will, because I think we'll take

08:37:44  5    our lunch break at 12:30 or 12:45, I think he will start his

08:37:48  6    testimony before lunch.  And the issue pertains to the

08:37:52  7    demonstrative slide deck that plaintiff has prepared for

08:37:56  8    him.  And we have unresolved objections to it.

08:38:01  9          THE COURT:  And I don't think I have seen those

08:38:03 10    yet, so that may be that they have been submitted and they

08:38:08 11    weren't brought to my attention.

08:38:09 12          MR. ELKINS:  No, Your Honor.

08:38:11 13          THE COURT:  Just pass them up real quick, and I

08:38:13 14    need to look at it.  These are not exhibits, of course, and

08:38:19 15    I know -- and what's the basic problem here.

08:38:25 16          MR. ELKINS:  The nature of the issue, Your

08:38:26 17    Honor, is that Mr. Faulkner is a forensic expert regarding

08:38:31 18    the source and location of documents.  As you know, you

08:38:36 19    ordered pursuant to stipulation the forensic examination of

08:38:42 20    various Akoustis materials that are stored electronically.

08:38:46 21    He prepared a report and an analysis, a very detailed one

08:38:51 22    with voluminous exhibits.  But the nature of it is that he

08:38:56 23    did not analyze the documents, he's not a lawyer, he's not

08:39:00 24    an expert in what constitutes confidential information.  Yet

08:39:05 25    his entire demonstrative deck is sprinkled with

08:39:08  1    characterizations of the documents as confidential.  Yet he

08:39:12  2    never performed that analysis himself.

08:39:14  3          As he states in his expert report, counsel for

08:39:21  4    Qorvo provided him a list of confidential -- what they

08:39:25  5    called Qorvo confidential information and he is parroting

08:39:30  6    the words that they provided to him.  So he is, even though

08:39:34  7    he has not opined that these materials of confidential and

08:39:38  8    he has no idea or ability to so testify, because he's

08:39:42  9    parroting the characterization that counsel gave him

08:39:45 10    throughout this document it reflects that these are

08:39:48 11    confidential Qorvo materials.

08:39:49 12          That is an issue of fact on which the plaintiff

08:39:53 13    bears the burden of proof.  Mr. Faulkner is incapable of

08:39:57 14    opining on that.  It is not within the scope of his report.

08:40:01 15    And those references should be removed.  And that is the

08:40:04 16    crux of our dispute.

08:40:07 17          THE COURT:  Quickly a response, but we are going

08:40:09 18    to get started very soon.

08:40:11 19          MS. AYERS:  Thank you, Your Honor.

08:40:13 20          As Mr. Elkins noted --

08:40:17 21          THE COURT:  We will start in about nine minutes.

08:40:22 22          MS. AYERS:  As Mr. Elkins noted Mr. Faulkner

08:40:25 23    identified the defined term Qorvo confidential materials in

08:40:29 24    paragraph 15 of his report.  While he notes that he received

08:40:32 25    that list from counsel, in Dr. Shanfield's report at

08:40:36  1    paragraph 77 and at paragraphs 506 through 509,

08:40:42  2    Dr. Shanfield identifies and indicates that he created the

08:40:45  3    list of materials that Mr. Faulkner analyzed, Dr. Shanfield

08:40:50  4    indicates at paragraph 77 of his report that he has included

08:40:54  5    an appendix four of a non-exhaustive listing of the Qorvo

08:40:59  6    confidential information that he has reviewed and he

08:41:02  7    understands from his discussion with Mr. Faulkner that

08:41:05  8    Mr. Faulkner's forensic analysis identified more than 9,000

08:41:09  9    instances of these files on the electronic devices that he

08:41:13 10    examined for the fifteen Akoustis employees.

08:41:15 11            Mr. Faulkner's presentation indicates that he

08:41:18 12    relied upon Dr. Shanfield for the list of materials in order

08:41:23 13    to determine the amount of Qorvo confidential material that

08:41:27 14    is included in his report and discussed in his report.  All

08:41:32 15    of the facts that are listed in Mr. -- in the opinions that

08:41:37 16    are list entered the demonstratives tie back to

08:41:42 17    Mr. Faulkner's expert report and paragraphs within his

08:41:45 18    expert report with respect to each one of the custodians

08:41:48 19    that is discussed within the demonstratives and we think

08:41:50 20    it's appropriate for Mr. Faulkner to opine as to the

08:41:54 21    information that he discovered based upon his reliance of

08:41:58 22    Dr. Shanfield's identification of those materials within his

08:42:02 23    expert report.

08:42:02 24            THE COURT:  What I'm going to need is a brief

08:42:05 25    limiting instruction, a clarifying instruction to the panel,

08:42:11  1  because the defense is not incorrect that we need to caution

08:42:17  2  them about how this might be received, so can you either

08:42:26  3  submit that or -- I know that people are anxious to do this,

08:42:31  4  but we do have a case to try and we do have jurors waiting.

08:42:35  5       MS. AYERS:  Of course, Your Honor, we can submit

08:42:37  6  that, but I thought one of the limiting instructions that

08:42:39  7  the parties previously worked on addressed this issue as

08:42:42  8  well with respect to the ruling on your motion in limine.

08:42:45  9  So I don't know if --

08:42:46 10       THE COURT:  Well, we can consider using that.  I

08:42:49 11  think we might need something a little more.

08:42:51 12       MS. AYERS:  Okay.  Would you like --

08:42:53 13       THE COURT:  That would be -- very soon, I'm

08:42:57 14  assuming you have got thousands of people out there.

08:43:00 15       MS. AYERS:  Would you like for us, Your Honor,

08:43:02 16  to modify the instruction that was previously submitted?

08:43:06 17       THE COURT:  You can attempt to do that or you

08:43:09 18  can also write something slightly, I think the defense is

08:43:16 19  not wrong, we have to make it clear, for example, you have

08:43:19 20  to make it clear that someone is relying on someone's

08:43:24 21  information, he determined that that information is not

08:43:26 22  worthy of being credible or it's not factually accurate,

08:43:32 23  then of course you cannot consider the other person's term

08:43:35 24  because it would be based on something on which the jury has

08:43:39 25  to determine, they would not find that information to be

08:43:43  1    reliable.  We have to make sure that that's the case.  We

08:43:49  2    can get that at the very beginning.

08:43:51  3          MS. AYERS:  Of course, Your Honor, we would not

08:43:52  4    object to a limiting instruction being read to the jury

08:43:54  5    before Mr. Faulkner even testifies and we're happy to work

08:43:58  6    with the defense counsel on the language of that.

08:44:00  7          THE COURT:  Well, you all work very well

08:44:02  8    together, so give that a shot.  And otherwise, tell me what

08:44:07  9    you want to say and what defense wants to say, but I think

08:44:10 10    that some instruction probably is appropriate.

08:44:13 11          MS. AYERS:  Of course, Your Honor.

08:44:14 12          THE COURT:  Absolutely.  I know that we need to

08:44:16 13    -- the jury is now waiting, and --

08:44:20 14          MR. ELKINS:  If Your Honor would permit me, I

08:44:22 15    just need thirty seconds to make my record, Your Honor.

08:44:25 16          THE COURT:  Sure.

08:44:25 17          MR. ELKINS:  I believe this is not only

08:44:27 18    inappropriate because it's not in Mr. Faulkner's report,

08:44:30 19    Mr. Faulkner's report does not -- he never saw

08:44:35 20    Mr. Shanfield's report before he turned in his own report.

08:44:37 21    He does not rely on that.  I think there is a reference to

08:44:40 22    forty documents that he discussed with Mr. Shanfield, but

08:44:44 23    not 9,000.

08:44:46 24          THE COURT:  Well that's --

08:44:47 25          MR. ELKINS:  And I believe this is a

08:44:49  1   Section 403, or Rule 403 issue, and just with respect, Your

08:44:54  2   Honor, I just wanted to make our objection to any reference

08:44:57  3   to confidential documents.  They can say Qorvo documents,

08:45:01  4   Qorvo materials, that's not going to prejudice their case.

08:45:05  5   Mr. Shanfield can testify later and testify to whatever he's

08:45:08  6   going to testify in terms of characterizing them if it's

08:45:12  7   within the scope of his opinion.  But having a different

08:45:16  8   expert do something that he did not do in his expert report

08:45:19  9   we believe is both improper and prejudicial.

08:45:23 10        THE COURT:  I understand the issue there, and I

08:45:26 11   think everybody understands what is allowed, so I think we

08:45:28 12   need to bring the panel in.  We're going to look for that

08:45:33 13   draft at 1 o'clock.  Okay.

08:46:09 14        (Jury entering the courtroom at 8:46 a.m.)

08:46:22 15        THE COURT:  Everyone can be seated.  ████████

08:46:35 16   has had some matters that -- issues that she needs to take

08:46:40 17   care of, and we talked about that yesterday to some degree.

08:46:44 18   And since they were not capable of being resolved in a

08:46:48 19   different way, we allowed her to be excused.  I don't want

08:46:52 20   the rest of you think that you're going anywhere, right?

08:46:56 21   We're good on that.  But we did give every opportunity to

08:47:00 22   try to work that out.  We always do.  But we also are very

08:47:04 23   respectful of the fact that sometimes things can't be worked

08:47:07 24   out and it didn't work out.  That's the thing that it is.  I

08:47:11 25   see Mr. McVay already moved over to that seat.  So we are

08:47:15  1    ready to go.  We are ready to resume today and counsel, you

08:47:20  2    may proceed.

08:47:21  3                MR. MASTERS:  Good morning, Your Honor.  Thank

08:47:23  4    you.

08:47:23  5                THE COURT:  Good morning.

08:47:24  6                MR. MASTERS:  The next witness that plaintiff

08:47:26  7    calls is Qorvo's former employee and Akoustis's Chief

08:47:32  8    Product Officer, Rohan Houlden.  It will be by video.

08:47:35  9                THE COURT:  Once again, it's a video deposition.

08:47:37 10    You will not see it again.  So this is that opportunity to

08:47:43 11    agree that exhibits are marked during the deposition, they

08:47:46 12    will be sequentially marked so that when you see that

08:47:49 13    person's name on the witness list, you will then also see

08:47:55 14    numbers below that and you will see also the reference

08:47:57 15    number that was used during the deposition.  That's to make

08:48:01 16    sure it's very simple for you to follow and I think for

08:48:03 17    everybody else to keep up.

08:48:05 18                Ready to proceed.

08:48:06 19                (Videotape deposition of Rohan Houlden:)

08:48:08 20    Q.    Good morning, Mr. Houlden.  As you heard, my name is

08:48:11 21    Jonathan DeFosse.  I'm one of the attorneys representing

08:48:14 22    Qorvo in the matter.  You understand that you're testifying

08:48:18 23    under oath today?

08:48:18 24    A.    Yes.

08:48:19 25    Q.    What is your current job?

08:48:21  1    A.      I am at Gallium Semiconductor.

08:48:25  2    Q.      What's your position at Gallium Semiconductor?

08:48:30  3    A.      CEO.

08:48:31  4    Q.      What's the nature of Gallium Semiconductor's

08:48:34  5    business?

08:48:34  6    A.      Working on gallium nitride products for 5G

08:48:41  7    infrastructure and defense and Aerospace.

08:48:45  8    Q.      And prior to July of 2022, where were you employed?

08:48:49  9    A.      I was employed at Akoustis.

08:48:50 10    Q.      And that's the defendant in the matter, Akoustis

08:48:55 11    Inc.?

08:48:55 12    A.      Yes.

08:48:56 13    Q.      When did you start working at Akoustis, Inc.?

08:49:00 14    A.      Late September, 2016.

08:49:03 15    Q.      When you accepted your position at Akoustis in late

08:49:13 16    September 2016, what was your role at the company?

08:49:17 17    A.      VP of product engineering.

08:49:19 18    Q.      Did your position at Akoustis change between

08:49:26 19    September 2016 and July of 2022?

08:49:28 20    A.      Yes.

08:49:31 21    Q.      And how is that?

08:49:32 22    A.      Late 2017, I become the Chief Product Officer.

08:49:41 23    Q.      What were your responsibilities as VP of product

08:49:44 24    engineering?

08:49:44 25    A.      Trying to -- on the back-end trying to do testing of

08:49:50  1   the filters and production authorization of the filters.

08:49:56  2   Q.      You said "product authorization" of the --

08:50:04  3   A.      Product -- product authorization.  Testing the

08:50:07  4   filters.  Really after the filter is designed, after it's

08:50:11  5   designed, I was getting -- getting the filters out to

08:50:15  6   market, you know, the part of taking data, characterizing

08:50:18  7   parts, you know, data sheets, just getting them ready for

08:50:22  8   market.

08:50:25  9   Q.      Okay.  As the VP of product engineering, did you have

08:50:29 10   responsibility for the design of filters?

08:50:30 11   A.      For the first year, we really did not have a process,

08:50:33 12   so we really weren't doing any design of filters.  We were

08:50:37 13   really looking at just individual resonators, trying to get

08:50:41 14   a resonator to work.

08:50:43 15   Q.      After the first year, was Akoustis able to get a

08:50:49 16   resonator to work?

08:50:51 17   A.      Not in the first year, but probably within

08:50:57 18   fifteen months.

08:50:59 19   Q.      And to put some dates on this, at what point in time

08:51:03 20   was Akoustis able to get a resonator that worked?

08:51:06 21   A.      Say October of 2017.

08:51:09 22   Q.      And once Akoustis had gotten a resonator to work, the

08:51:17 23   company then moved on to designing a filter; is that fair?

08:51:22 24   A.      Yes.  You have -- you -- once you get a resonator,

08:51:26 25   you characterize the resonator to get some models, and then

08:51:30 1    from those models or that resonator, then you design

08:51:34 2    filters.

08:51:35 3    Q.    Okay.  And what do you mean by "models."

08:51:39 4    A.    Simulations.  You have to characterize an individual

08:51:42 5    resonator, the performance of a resonator, and then a filter

08:51:46 6    consists of seven to fifteen different resonators.  So you

08:51:51 7    characterize the resonator just like if you would do

08:51:54 8    anything else, characterizing a transistor, if you were

08:51:59 9    doing an amplifier or base amp, so you characterize the

08:52:03 10   resonator.  You have characteristics of that resonator.  And

08:52:06 11   then when you run your simulation tool, design engineers use

08:52:10 12   those different resonators to form a filter.

08:52:13 13   Q.    Okay.  What simulation tool was Akoustis using in

08:52:17 14   October of 2017?

08:52:19 15   A.    It's called AWR.  I forget the -- the full name.

08:52:25 16   Q.    Okay.  Is there another name associated with it, for

08:52:28 17   example, the software company that creates the simulator?

08:52:33 18   A.    Yeah, but I forget the name of the company.

08:52:36 19   Q.    Okay.  So starting in October 2017, once there's a

08:52:40 20   working resonator, did you become responsible for the

08:52:43 21   development of the BAW filters as VP of product engineering?

08:52:49 22   A.    Yes, I had design engineers working for me that were

08:52:52 23   working on the designs of those filters.

08:52:54 24   Q.    Okay.  And prior to October 2017, during the

08:52:58 25   development of the resonators, were you responsible for that

08:53:01 1    activity as well?

08:53:03 2    A.    I was not involved, but people that worked for me

08:53:06 3    were involved in that creation.

08:53:08 4    Q.    So you supervised the folks at Akoustis who were

08:53:12 5    responsible for developing a working resonator?

08:53:15 6    A.    Yes.

08:53:16 7    Q.    And who were the people at Akoustis that were working

08:53:18 8    on developing a functioning resonator?

08:53:21 9    A.    Daeho.  I forget Daeho's last name, and then there

08:53:28 10   was another gentleman, Frank B.  And then there was a lady,

08:53:34 11   Pinal Patel.  And then there's also all the people up in the

08:53:42 12   fab in Chester, that was led by that team was Mary Winters.

08:53:45 13   Q.    Was David Hodge involved in the development of

08:53:51 14   resonators?

08:53:51 15   A.    Very little.  Very little.

08:53:53 16   Q.    When did Mr. Hodge become involved in the product

08:53:57 17   development process?

08:53:59 18   A.    He was at the company when I started.  So he was

08:54:03 19   involved in some testing of some resonators.  From that time

08:54:07 20   period up until probably September of 2017, I guess.

08:54:17 21   Q.    What was Mr. Hodge's job at Akoustis, at the time you

08:54:23 22   started?

08:54:24 23   A.    Do not recall.  Probably design engineer, I would

08:54:31 24   guess.

08:54:32 25   Q.    Was Mr. Hodge responsible for the development of BAW

08:54:39  1    filters?

08:54:40  2    A.    Yes.

08:54:42  3    Q.    Which is the stage after developing the resonators?

08:54:46  4    A.    Yes.

08:54:46  5    Q.    Okay.  So Mr. Hodge would have taken resonators

08:54:50  6    developed by Mr. Kim, Mr. B, and Ms. Patel and then use

08:54:56  7    those resonator designs to design a filter?

08:54:59  8    A.    Resonator models, yes.  So Pinal would make the

08:55:03  9    models -- there was a lot of other people more involved in

08:55:07 10    Rochester, but they were the three key people in Akoustis in

08:55:10 11    Charlotte.

08:55:11 12    Q.    Okay.  Who were the key people in Rochester?

08:55:16 13    A.    I can't remember.  They all worked for Mary.

08:55:21 14    Q.    Okay.

08:55:22 15    A.    I think one gentleman was Ken.  There was a lot of

08:55:25 16    people up there.  I never -- I only went up there once or

08:55:30 17    twice.  I didn't know them very well.

08:55:31 18    Q.    Did any of the folks in Rochester report to you as

08:55:35 19    vice-president of product engineer?

08:55:37 20    A.    No.

08:55:38 21    Q.    As Chief Product Officer, did any of the folks in

08:55:40 22    Rochester report to you?

08:55:42 23    A.    No.

08:55:43 24    Q.    So who would have then supervised the activities of

08:55:47 25    Akoustis in Rochester?

08:55:49  1    A.      Mary.

08:55:49  2    Q.      Mary.  Okay.

08:55:51  3            Mary Winters?

08:55:52  4    A.      Mary Winters, yes.

08:55:54  5    Q.      Okay.  When you became the Chief Product Officer in

08:55:58  6    late 2017.  Did your responsibilities for the development of

08:56:01  7    BAW filters follow you into that role?

08:56:06  8    A.      Yes.

08:56:07  9    Q.      Okay.  So basically when you moved to being Chief

08:56:12 10    Product Officer, you kept the responsibilities you had as

08:56:14 11    vice-president of product engineering, and then on top of

08:56:17 12    those responsibilities, you became responsible for

08:56:19 13    operations?

08:56:21 14    A.      Yes.

08:56:22 15    Q.      What position did you hold when you left Akoustis in

08:56:26 16    July of 2022?

08:56:27 17    A.      That same position.

08:56:30 18    Q.      Meaning Chief Product Officer?

08:56:32 19    A.      Yes.

08:56:33 20    Q.      Okay.  So I'm trying to put ourselves back in the

08:56:39 21    October 2017 time frame.  You now have a working resonator

08:56:42 22    model.  Were there priorities that were set at the company

08:56:45 23    as to what to do next?

08:56:47 24    A.      We were looking at a Band-41 filter -- I can't

08:56:51 25    remember the exact order what we were working on back in

08:56:54  1    October.  But we were working -- I know we were working on

08:56:58  2    some Band-41 filters, maybe some -- a 1938 filter for ████,

08:57:05  3    military for ████.  And then possibly started working on the

08:57:12  4    1252 for Wi-Fi.

08:57:15  5    Q.     How did Akoustis determine which products it was

08:57:19  6    interested in developing?

08:57:21  7    A.     Mr. Aichele, VP of Marketing.

08:57:26  8    Q.     And would Mr. Aichele come to you and say,

08:57:32  9    Mr. Houlden, I'd like you to please develop a -- a filter

08:57:37 10    product for ████, is that the way it would work?

08:57:40 11    A.     Yeah, he would -- he would provide a spec, ████, the

08:57:44 12    customer, the specs come from customers, so he would -- he

08:57:48 13    would be dealing and negotiating with customers and get --

08:57:51 14    eventually reach an agreement on a spec.  And then he would

08:57:54 15    refine a specification that the design engineers would have

08:57:58 16    to try to design to and meet.

08:58:00 17    Q.     So can you walk me through, once you have a working

08:58:05 18    resonator model, what were the milestones that Akoustis

08:58:08 19    needed to achieve in order to bring a product to market?

08:58:12 20    A.     Well, the design engineer would have to run

08:58:15 21    simulations and try -- and when you run those simulations,

08:58:20 22    try to meet the customer's spec.

08:58:25 23    Q.     Okay.

08:58:28 24    A.     And then once you -- once the engineer showed his

08:58:32 25    simulations could meet the customer spec, then you -- the

08:58:36  1   design engineer would give the design to a layout person, a

08:58:40  2   CAD person and that CAD person would then layout the filter.

08:58:45  3   And then people in Rochester would then fabricate that

08:58:50  4   filter.

08:58:51  5   Q.      When you say fabricate the filter, do you mean

08:59:03  6   fabricate prototypes of the filter?

08:59:06  7   A.      Yes.  Yes.  Thank you.  Yes.

08:59:07  8   Q.      Okay.  And what would Akoustis then do with the

08:59:10  9   prototypes of the filter?

08:59:12 10   A.      So after the wafers come out of the Fab, you then

08:59:16 11   bring them back to Charlotte, they would dice them.  We'd go

08:59:23 12   get them diced somewhere, and then we would go off and try

08:59:27 13   to package them in the lab or at least assemble them in a

08:59:32 14   lab and then try to test them.

08:59:34 15   Q.      And when you say package in the lab, was the lab in

08:59:38 16   Charlotte as well?

08:59:39 17   A.      Yeah, it was a little prototype lab, yeah.

08:59:42 18   Q.      And what do you mean by package?

08:59:44 19   A.      You could either put the die on a -- on a laminate

08:59:50 20   and wire bond it, or you could put the die in a ceramic

08:59:55 21   package and then wire bond, so basically your die --

08:59:58 22   attaching the die down on to a substance or a material and

09:00:03 23   then wire bonding it out.

09:00:04 24   Q.      Now, taking a step back, you said that after the --

09:00:08 25   after the device engineers had the simulations they would be

09:00:12  1    provided to -- or have a CAD layout; right?

09:00:20  2    A.    Can you ask that question again?

09:00:23  3    Q.    Sure.

09:00:24  4          Once the device engineers had working

09:00:26  5    simulations that would meet the customer specifications, the

09:00:30  6    next step was to provide the simulations for CAD layout?

09:00:35  7    A.    No, you -- you used the word "device engineer" twice.

09:00:40  8    Q.    Okay?

09:00:40  9    A.    It would be a design engineer.

09:00:42 10    Q.    Okay.  What's the difference between a design

09:00:46 11    engineer and a device engineer?

09:00:48 12    A.    A design engineer designs the filters, the device

09:00:53 13    engineer designs the resonator.

09:00:54 14    Q.    Okay.  So once the design engineer has working

09:00:58 15    simulations that would meet a customer specification, the

09:01:02 16    next step was CAD layout; is that right?

09:01:05 17    A.    Yes.

09:01:06 18    Q.    What -- what is CAD layout?

09:01:09 19    A.    Computer-aided design.

09:01:11 20    Q.    Okay.

09:01:12 21    A.    So you would -- you would layout all the different

09:01:15 22    layers required for the Fab to process the filter.

09:01:19 23    Q.    And then the next step in the process was fabrication

09:01:28 24    of the filter.  What's involved in the fabrication of the

09:01:31 25    filter?

09:01:32 1   A.    I -- I couldn't answer that because I'm not a Fab

09:01:35 2   person.

09:01:36 3   Q.    Okay.  At a high level, what's the output of a

09:01:39 4   fabrication?

09:01:39 5   A.    A wafer.

09:01:40 6   Q.    A wafer.

09:01:41 7          And a wafer would have multiple filters on a

09:01:44 8   single wafer?

09:01:44 9   A.    Yes.

09:01:45 10  Q.    And then that wafer would go to Charlotte and it

09:01:49 11  would be cut or diced, is that right?

09:01:53 12  A.    We didn't -- we did not have dicing capability in

09:01:57 13  Charlotte, and I do not recall.  We may have sent it

09:02:00 14  elsewhere, to California, somewhere else to get it diced and

09:02:04 15  then shipped it to Charlotte.

09:02:07 16  Q.    Okay.  And once you had the die in Charlotte, they

09:02:12 17  would be packaged in the lab we talked about?

09:02:14 18  A.    Yes.

09:02:14 19  Q.    And then you said they would be tested?

09:02:17 20  A.    Yes.

09:02:17 21  Q.    How would the packaged dies be tested?

09:02:23 22  A.    You would place it on an evaluation board and then

09:02:27 23  connect it up to a VNA, a Vector Network Analyzer.

09:02:32 24  Q.    And if the further testing indicates that the filter,

09:02:35 25  it would meet the customer requirements, what would happen

09:02:38   1    next?

09:02:39   2    A.      Then -- then the VP of marketing would probably say,

09:02:42   3    hey, let's sample 2 or 3 on an evaluation board to

09:02:48   4    customers.   And then the next step would be to show

09:02:51   5    customers our performance.

09:02:53   6    Q.      Okay.   During your time at Akoustis, did any BAW

09:02:57   7    filter products make it all the way through the process we

09:03:06   8    talked about to be sent to customers on evaluation boards?

09:03:14   9    A.      Yes.

09:03:15  10    Q.      Okay.   How many products?

09:03:17  11    A.      A lot.

09:03:21  12    Q.      A lot.   Okay.   What are you -- what would you say is

09:03:25  13    a lot here?

09:03:25  14    A.      You mean over my entire period?

09:03:28  15    Q.      Yes.

09:03:28  16    A.      More than twenty.   Less than 100.   Probably between

09:03:32  17    twenty and fifty.

09:03:33  18    Q.      Do you recall what the first product is that Akoustis

09:03:36  19    was able to get through the development process to the point

09:03:38  20    where it could be sent to customers on evaluation boards?

09:03:42  21    A.      1938.

09:03:45  22    Q.      And what was 1938?

09:03:49  23    A.      Oh, 1938 is for a military project, for ███████

09:03:56  24    company called ████.

09:03:58  25    Q.      Okay.   And after -- oh, about what time frame was the

09:04:12  1    1938 product shipped on evaluation boards?

09:04:19  2    A.    I don't recall.

09:04:23  3    Q.    Okay.

09:04:23  4    A.    It would be -- I would think early 2018 would be my

09:04:28  5    guess.

09:04:28  6    Q.    You mentioned earlier a product with a number 1252?

09:04:31  7    A.    Yes.

09:04:32  8    Q.    Do you recall that?

09:04:32  9    A.    Yes.

09:04:33 10    Q.    And that's a Wi-Fi product?

09:04:35 11    A.    Yes.

09:04:35 12    Q.    Did the 1252 product make it to the stage of having

09:04:40 13    evaluation boards that could be sent to customers?

09:04:43 14    A.    Yes.

09:04:43 15    Q.    Okay.  And when was that?

09:04:46 16    A.    I would think 2018 as well.

09:04:50 17    Q.    Back to the 1938, did ████ ultimately order that

09:05:00 18    product from Akoustis?

09:05:01 19    A.    Yes.

09:05:04 20    Q.    And do you recall when the finished product was

09:05:08 21    shipped to ████?

09:05:13 22    A.    I do not.

09:05:14 23    Q.    Or when the orders were made?

09:05:15 24    A.    I think in ████ case, they -- they gave us NRE to

09:05:21 25    develop it.  So -- nonrecurring engineering, NRE.  So --

09:05:28  1    which is like the down payment or money for -- to develop

09:05:35  2    the part, for research and developing the part.

09:05:46  3              So as a part of that NRE contract, which I'm not

09:05:49  4    familiar with, Mr. Aichele, would who was the VP of

09:05:55  5    Marketing, a part of that contract would probably -- they

09:05:58  6    would give money over certain stages and a part of those

09:06:01  7    payments you would have to provide samples, at certain gates

09:06:07  8    of the contract.

09:06:08  9    Q.    Prior to joining Akoustis in late September 2016, you

09:06:13 10    were working at Qorvo?

09:06:14 11    A.    Yes.

09:06:14 12    Q.    Okay.  And how long were you working at Qorvo?

09:06:19 13    A.    I worked -- Qorvo was a formation of a merger of RFMD

09:06:25 14    and TriQuint, so probably worked for seventeen years at

09:06:31 15    RFMD/Qorvo, officially probably only eighteen months at

09:06:40 16    Qorvo.

09:06:45 17    Q.    When did you start at RFMD?

09:06:52 18    A.    I think it was June 1st of '99, I believe.

09:06:59 19    Q.    And when was the merger of RFMD and TriQuint, what

09:07:06 20    year?

09:07:08 21    A.    It was announced in January 2014, but it took a long

09:07:13 22    time to get an approval with different things.  I think it

09:07:18 23    officially became Qorvo in January 2015.

09:07:22 24    Q.    Okay.  What was your position in September 2016 when

09:07:25 25    you left Qorvo?

09:07:27   1    A.       General manager of -- well, I'm not sure what my

09:07:31   2    title was, to tell you the truth, in September 2016.  I was

09:07:37   3    the general manager in July 2016.  And my boss, James Klein,

09:07:44   4    wanted to reduce the number of his direct reports, so that

09:07:50   5    position was eliminated and he asked me to go find a

09:07:55   6    different job within the company.

09:07:58   7    Q.       What were your responsibilities as the general

09:08:01   8    manager of the Wireless Connectivity Business Unit?

09:08:06   9    A.       To grow -- to grow and manage the business.

09:08:12  10    Q.       And what's involved in growing -- well, first of all,

09:08:17  11    what is the business of the Wireless Connectivity Business

09:08:20  12    Unit at Qorvo or what was the business in July 2016?

09:08:23  13    A.       In July 2016, I was responsible for a lot of Wi-Fi --

09:08:29  14    our core business was Wi-Fi PA's, that was our core

09:08:35  15    business.  We also did smart energy, and I also did

09:08:41  16    automotive.

09:08:42  17    Q.       You said Wi-Fi PA's.

09:08:45  18    A.       Yes.

09:08:46  19    Q.       What are Wi-Fi PA's?

09:08:48  20    A.       Power amplifiers.

09:08:50  21    Q.       After the general manager position that you held was

09:08:53  22    eliminated in July 2016, were you offered another position

09:08:56  23    at Qorvo?

09:08:57  24    A.       Yes.  They had proposed some -- I don't think I was

09:09:02  25    ever officially offered, but I was asked to look around the

09:09:06  1  company, talk to other people to find a potential job that I

09:09:11  2  would be interested in.

09:09:13  3  Q.      When did you start considering moving to Akoustis?

09:09:18  4  A.      After I learned mid July that my job as general

09:09:25  5  manager would become redundant.

09:09:27  6  Q.      And how did the opportunity at Akoustis arise?

09:09:31  7  A.      After I learned my job was becoming redundant, I

09:09:37  8  called the CEO, Jeff Shealy.

09:09:40  9  Q.      Okay.  And did you know Mr. Shealy from working

09:09:44 10  together previously?

09:09:44 11  A.      Yes.

09:09:45 12  Q.      And did you provide Qorvo notice that you were going

09:09:47 13  to leave the company?

09:09:48 14  A.      Yeah, they put me on garden leave, where I was

09:09:54 15  looking -- you know, I was struggling to find a job that I

09:09:57 16  was interested in.  And I asked for a severance package.

09:10:02 17  But I was still, you know, very -- I had been working at

09:10:07 18  Qorvo and RFMD for seven years, a lot of close friends, so I

09:10:12 19  really was very reluctant to leave, but I couldn't --

09:10:16 20  unfortunately couldn't find a job that I really was

09:10:19 21  interested in and -- and someone that I would be interested

09:10:22 22  in working for.

09:10:23 23  Q.      Mr. Houlden, I've handed you a copy of what's been

09:10:27 24  marked as Exhibit 77.  I will identify this for the record

09:10:31 25  as a five-page document.  The first page of which has the

09:10:35  1   Bates number Qorvo_00012287.  And at the top of the document

09:10:44  2   it says, "Severance agreement and release of all claims."

09:10:49  3   Do you see that?

09:10:49  4   A.    Yes.

09:10:51  5   Q.    Do you recognize what's been marked as Exhibit 77?

09:10:54  6   A.    Yes.

09:10:56  7   Q.    And what is Exhibit 77?

09:10:58  8   A.    It's a severance agreement.

09:11:01  9   Q.    And it's a severance agreement between Qorvo and --

09:11:07 10   and yourself?

09:11:08 11   A.    Yes.

09:11:09 12   Q.    And this was the agreement that you executed upon the

09:11:13 13   termination of your employment at Qorvo?

09:11:15 14   A.    Yes.

09:11:16 15   Q.    If we look at the first page of Exhibit 77 in --

09:11:20 16   under the paragraph that says:   "Number one, termination of

09:11:25 17   employment and severance pay."

09:11:28 18          Do you see that?

09:11:29 19   A.    Yes.  Yes.

09:11:30 20   Q.    It indicates that your last date of employment at

09:11:33 21   Qorvo was September 16, 2016; is that right?

09:11:36 22   A.    Yes.

09:11:36 23   Q.    And is that correct, was that your last day of

09:11:39 24   employment at Qorvo?

09:11:40 25   A.    I do believe.

09:11:41  1    Q.      Okay.  And if we look at -- on page 1 of Exhibit 77,

09:11:46  2    paragraph 1(B), it indicates there that you were provided a

09:11:52  3    severance package; is that right?

09:11:54  4    A.      Yes.

09:11:54  5    Q.      And you received  ███████  in severance from Qorvo?

09:12:02  6    A.      Yes.

09:12:03  7    Q.      Now, in consideration for the severance package, you

09:12:07  8    agreed to a few conditions for the termination of your

09:12:11  9    employment; is that right?

09:12:12 10    A.      Yes.

09:12:14 11    Q.      I'd like you to turn to page 3 of Exhibit 77.

09:12:21 12            And take a look at paragraph 5.

09:12:25 13    A.      Yes.

09:12:31 14    Q.      Under paragraph 5, you agreed that you would return

09:12:35 15    to Qorvo any -- any property of Qorvo that was in your

09:12:40 16    possession; right?

09:12:43 17    A.      Yes.

09:12:44 18    Q.      And that included any files or documents that you had

09:12:47 19    in your possession; right?

09:12:49 20    A.      Yes.

09:12:49 21    Q.      You did not do that when you left your employment at

09:12:53 22    Qorvo; correct?

09:12:54 23    A.      No, I did.

09:12:57 24    Q.      You returned all files and documents that you had

09:13:00 25    from Qorvo when you left your employment?

09:13:02  1    A.      I believe I did at that time.

09:13:05  2    Q.      I think you mentioned already, when you joined

09:13:08  3    Akoustis, the company was working on developing resonators?

09:13:12  4    A.      Yes.

09:13:13  5    Q.      When you left Qorvo, you retained Qorvo confidential

09:13:18  6    documents concerning resonator design; is that right?

09:13:23  7    A.      No.  I don't believe so.

09:13:25  8    Q.      Mr. Houlden, I handed you what's been marked as

09:13:30  9    Exhibit 78.

09:13:31 10    A.      Okay.

09:13:32 11    Q.      I'll identify this for the record as a six-page

09:13:36 12    document, the first page has the production number

09:13:41 13    AKTS_00204965.  And on the first page, there's a slide that

09:13:49 14    says, "Qorvo all around you 5G nine polygons versus

09:13:57 15    rectangle."

09:13:59 16            Do you see that?

09:14:00 17    A.      Yes.

09:14:01 18    Q.      Okay.  Now, the number at the bottom, it starts with

09:14:04 19    AKTS.

09:14:08 20            Do you see that?

09:14:09 21    A.      Yes.

09:14:10 22    Q.      That means that this was produced from Akoustis's

09:14:13 23    files.  Okay?

09:14:14 24    A.      Okay.

09:14:15 25    Q.      And, in particular, the metadata that was provided

09:14:20  1    with this document indicates that this was found in your

09:14:23  2    files at Akoustis?

09:14:24  3    A.      Okay.

09:14:25  4    Q.      Do you recognize this document?

09:14:26  5    A.      No.

09:14:28  6    Q.      You would agree with me that this is a Qorvo

09:14:34  7    document; correct?

09:14:35  8    A.      Yes.

09:14:36  9    Q.      You would agree that this is a confidential Qorvo

09:14:40 10    document?

09:14:40 11    A.      Is confidential written there?  Yes, I see

09:14:45 12    confidential, yes.

09:14:47 13    Q.      And this is a document that concerns aspects of

09:14:50 14    resonator design?

09:14:51 15    A.      Layout of resonators, not a design.

09:14:56 16    Q.      Okay.  So the -- the layout of resonators --

09:15:01 17    A.      Right.

09:15:02 18    Q.      -- for example, to be used in a filter?

09:15:05 19    A.      Not in an Akoustis's filter, but possibly in a Qorvo

09:15:10 20    filter.

09:15:14 21    Q.      When you left Qorvo, you retained a copy of this

09:15:17 22    confidential document?

09:15:18 23    A.      I do not recall.

09:15:20 24    Q.      You took this document, Exhibit 78, with you to

09:15:24 25    Akoustis; right?

09:15:28  1    A.    I -- I do not recall.  I don't believe so.  I do not

09:15:32  2    recall.

09:15:33  3    Q.    You provided excerpts of this document to Dave Hodge

09:15:36  4    in October 2016; is that right?

09:15:40  5    A.    I do not recall.

09:15:41  6    Q.    Do you recall providing excerpts of any Qorvo

09:15:45  7    confidential documents to Mr. Hodge in 2016?

09:15:47  8    A.    No.

09:15:50  9    Q.    You did not have authorization to share Exhibit 78

09:15:56 10    with anyone at Akoustis; is that correct?

09:16:00 11    A.    That is correct.

09:16:00 12    Q.    Mr. Houlden, I've handed you what's been previously

09:16:08 13    marked as Exhibit 7?

09:16:09 14    A.    Yes.

09:16:09 15    Q.    I'll identify Exhibit 7 for the record as a four-page

09:16:13 16    document.  The first page of which has the production number

09:16:18 17    Hodge_000206, and at the top it says, "rectangle versus

09:16:26 18    polygon resonator."

09:16:29 19           Do you see that?

09:16:30 20    A.    Yes.

09:16:31 21    Q.    Do you recognize what's been marked as Exhibit 7?

09:16:36 22    A.    No.

09:16:36 23    Q.    If you compare Exhibit 7 to Exhibit 78, would you

09:16:41 24    agree with me that Exhibit 7 is excerpts of Exhibit 78?

09:16:46 25    A.    Yes.

09:16:50  1   Q.      Mr. Hodge testified that in October 2016 you handed

09:16:56  2   him what's been marked as Exhibit 7.

09:17:02  3   A.      Okay.

09:17:02  4   Q.      Do you recall doing that?

09:17:04  5   A.      No.

09:17:05  6   Q.      Mr. Hodge testified that you asked him to review

09:17:08  7   Exhibit 7 and have a meeting with him to discuss its

09:17:11  8   contents.

09:17:12  9           Do you recall that?

09:17:13 10   A.      Okay.  No.

09:17:14 11   Q.      Okay.  Do you have any reason to dispute what

09:17:17 12   Mr. Hodge testified about --

09:17:19 13   A.      No.

09:17:21 14   Q.      And again, you agree that you did not have

09:17:24 15   authorization from Qorvo to share what's been marked as

09:17:27 16   Exhibit 7 with Mr. Hodge?

09:17:29 17   A.      Correct.

09:17:30 18   Q.      Mr. Houlden, I've handed you what's been marked as

09:17:34 19   Exhibit 79.

09:17:35 20   A.      Yes.

09:17:35 21   Q.      This is a two-page document that has the production

09:17:39 22   number AKTS_00075127 on the first page.

09:17:46 23   A.      Yes.

09:17:47 24   Q.      I'd like to take a minute and give you a chance to

09:17:50 25   review this document.  And my first question will be, do you

09:17:53 1   recognize this?

09:17:54 2   A.      I do not recognize it.

09:17:55 3   Q.      So if we start on the second page of the Exhibit 79,

09:18:01 4   there's an e-mail from an e-mail account with the address

09:18:06 5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

09:18:10 6           Do you see that?

09:18:13 7   A.      Yes.

09:18:14 8   Q.      Does that e-mail account belong to you?

09:18:16 9   A.      Yes.

09:18:17 10  Q.      So this is a personal e-mail account of yours?

09:18:21 11  A.      Yes.

09:18:21 12  Q.      On November 23rd, 2016, when this e-mail was sent,

09:18:25 13  you were no longer working at Qorvo; right?

09:18:29 14  A.      Correct.

09:18:29 15  Q.      You -- at this time, you were working at Akoustis?

09:18:32 16  A.      Yes.

09:18:32 17  Q.      And you wrote this e-mail to someone named Mike.

09:18:37 18          Do you see that?

09:18:38 19  A.      Yes.

09:18:39 20  Q.      Is that Mike Coolen?

09:18:43 21  A.      Yes.

09:18:43 22  Q.      Who is Mike Coolen?

09:18:45 23  A.      Mike Coolen is a head technician in Boston.

09:18:51 24  Q.      Okay.  And in November 2016, Mr. Coolen was working

09:18:55 25  at Qorvo?

| | | |
|---|---|---|
| 09:18:55 | 1 | A.      I do -- I do not know.  He -- he left Qorvo and I do |
| 09:19:01 | 2 | not recall when he left. |
| 09:19:05 | 3 | Q.      At the time you e-mailed Mr. Coolen on November 23rd, |
| 09:19:11 | 4 | 2016, did you believe he was working at Qorvo? |
| 09:19:14 | 5 | A.      I do not recall.  He could have been.  I do not |
| 09:19:18 | 6 | recall when he left. |
| 09:19:20 | 7 | Q.      Okay.  So when you e-mailed Mr. Coolen, you asked |
| 09:19:24 | 8 | Mr. Coolen about the design of evaluation test boards, is |
| 09:19:41 | 9 | that right? |
| 09:19:41 | 10 | A.      Yes. |
| 09:19:41 | 11 | Q.      And you were particularly interested in the design of |
| 09:19:44 | 12 | test boards that were used at Qorvo? |
| 09:19:47 | 13 | A.      Wasn't at Qorvo, would have been at my -- what he -- |
| 09:19:51 | 14 | what he did for me and my group in the Wireless Connectivity |
| 09:19:57 | 15 | Business Unit, yes. |
| 09:19:57 | 16 | Q.      Okay.  When you were at Qorvo? |
| 09:19:59 | 17 | A.      Yes. |
| 09:19:59 | 18 | Q.      You were interested in obtaining information from |
| 09:20:02 | 19 | Mr. Coolen concerning the evaluation test boards that |
| 09:20:06 | 20 | Mr. Coolen made for you for the Wireless Connectivity |
| 09:20:10 | 21 | Business Unit at Qorvo? |
| 09:20:12 | 22 | A.      Yeah, I think -- I'm looking at this.  We're asking |
| 09:20:16 | 23 | questions about a ▮▮▮▮▮▮▮▮.  So I was asking |
| 09:20:19 | 24 | questions about ▮▮▮▮▮▮▮▮ for an evaluation board that |
| 09:20:24 | 25 | we never used -- we never ended up using at Akoustis, but I |

09:20:28  1    was asking questions about ███████████.

09:20:31  2    Q.      Okay.  And specifically the ███████████    that were

09:20:34  3    used at Qorvo?

09:20:38  4    A.      Yeah, I'm a little confused there, because I'm asking

09:20:43  5    him about ███████████, but we didn't end up using ████████

09:20:48  6    ██████ at -- in my group either, because ███████████ was

09:20:52  7    very expensive.  It's like a Mercedes.  And so we did not

09:20:57  8    use Mercedes material because if you send it to China or any

09:21:02  9    customers, they think you need Mercedes material to get your

09:21:06 10    parts working.  So I'm -- I'm trying to -- so if you read in

09:21:11 11    my e-mail, I said, most of our GSO Wi-Fi ████████████

09:21:18 12    boards.  So we're talking about different things.  He -- we

09:21:22 13    were using ███████████ at Qorvo, and I'm asking him about

09:21:26 14    ██████.

09:21:27 15            So it's a little bit different.  So it's a --

09:21:31 16    I'm asking him for general knowledge on the layout of

09:21:35 17    boards, not specifically to do with Qorvo, because Qorvo --

09:21:39 18    at Qorvo we used ███████████.

09:21:43 19            If you see my original e-mail there, I said we

09:21:47 20    -- I believe most of our GSO Wi-Fi ███████████ uses that, and

09:21:52 21    I'm asking about ███████████  So it's not really specifically to

09:21:56 22    do with a Qorvo board.

09:21:58 23    Q.      Why were you e-mailing Mr. Coolen from your personal

09:22:02 24    account as opposed to your Akoustis e-mail account?

09:22:06 25    A.      I don't know.  It looks like it was on Thanksgiving

09:22:09  1    day.  If I look at -- Thursday, November 24th.  So I was

09:22:13  2    just probably home.  Thanksgiving morning.  My kids are

09:22:16  3    still in bed.  I can't believe I'm actually e-mailing

09:22:20  4    Thanksgiving day, but looks like I am.

09:22:23  5    Q.      You forwarded Mr. Coolen's e-mail to Pinal Patel?

09:22:28  6    A.      Yes.

09:22:28  7    Q.      Ms. Patel was a senior design engineer at Akoustis at

09:22:33  8    this time?

09:22:33  9    A.      I'm not sure what her title was at that time.  But

09:22:38 10    she was a design engineer, she wore many hats.  So whether

09:22:42 11    her title was design, I'm not sure.

09:22:44 12    Q.      You told Ms. Patel that you would discuss the design

09:22:49 13    information from Mr. Coolen with her; right?

09:22:54 14    A.      Right.

09:22:54 15    Q.      If we look at the -- the top e-mail, you say "we can

09:22:58 16    discuss on Friday but wanted to forward in case I forgot.

09:23:01 17    Qorvo uses ███████████████████████████████████.  Do

09:23:08 18    you see that?

09:23:08 19    A.      Yeah, I did see that, but -- yeah, but I'm -- I'm a

09:23:14 20    bit confused why I sent it to her because in -- in Mike's

09:23:23 21    e-mail it says they use ███.  So I don't know why I said

09:23:26 22    ███.  That may have been a typo.  Because Mike clearly

09:23:30 23    says he's using ███, they're not -- they weren't using

09:23:35 24    ███████ stuff, so I'm not sure why I put it there.

09:23:38 25    Q.      If you look at the bottom of the first page?

09:23:39  1    A.        Yep.

09:23:40  2    Q.        There is an e-mail from Mr. Coolen on November 24,

09:23:45  3    2016, and it says, "In Boston" -- at the bottom of the page.

09:23:51  4    "In Boston we moved to ████████████████████████ for the top

09:23:55  5    layer."  Do you see that?

09:23:56  6    A.        No, I do not see that.

09:23:58  7    Q.        It's the very bottom line on Exhibit 79, first page.

09:24:01  8    A.        Oh, okay.  Below the thing.  I didn't see that,

09:24:04  9    right.

09:24:05 10              So yeah, he did switch it.  Okay.  Hang on.  "We

09:24:16 11    use ████████████████████████████ elsewhere."  Okay.

09:24:21 12              Yeah, I was -- all right.  Yeah.  I was unaware

09:24:27 13    of that because typically ████████████████████████████

09:24:30 14    ████████████████████████ so I'm a bit surprised by

09:24:35 15    that.

09:24:36 16    Q.        Okay.  But does this refresh your recollection now

09:24:38 17    that you were discussing Qorvo's evaluation boards?

09:24:42 18    A.        Yeah.  It's really -- it's really a material, so

09:24:45 19    really, we're talking car tires, we're talking -- are we

09:24:49 20    using Michelin tires, or are we using Firestone tires.  So I

09:24:54 21    was finding out that Qorvo was using Michelin tires.

09:24:56 22    Q.        I'll identify this for the record as a two-page

09:25:00 23    document, the first page of which has the production number

09:25:03 24    AKTS_0021074.  Give you a chance just to take a look at

09:25:17 25    this.  And my first question will be whether you recognize

09:25:19  1    this document?

09:25:20  2    A.    I do not recognize it.

09:25:21  3    Q.    If we look, it appears that the second page and half

09:25:26  4    of the first page is the same e-mail conversation that we

09:25:31  5    marked as Exhibit 79; is that right?

09:25:33  6    A.    Right.

09:25:35  7    Q.    Okay.  And then it appears that in the top half of

09:25:39  8    the first page of Exhibit 80, there are some further

09:25:42  9    discussions between you and Mr. Coolen seeking information

09:25:45 10    about Qorvo's evaluation test boards; is that right?

09:25:50 11    A.    Right.

09:25:53 12          So I think it was more discussion, because if

09:26:07 13    you look at Mr. Coolen's e-mail, he says "any reputable

09:26:14 14    board manufacturer you use will verify your line width and

09:26:17 15    stack up to 50 on."

09:26:19 16          So again, if you look at this information, this

09:26:21 17    is just public information you get off the web.  And then

09:26:24 18    when you go off and do the design, and then he said, "Any

09:26:28 19    reputable board manufacturer will verify everything."

09:26:33 20    Q.    Is there a reason that you were e-mailing Mr. Coolen

09:26:36 21    at his personal gmail account rather than his Qorvo e-mail

09:26:41 22    address?

09:26:41 23    A.    I do not recall.  I'm not even sure if he -- where he

09:26:46 24    was at that stage.  I guess it was Thanksgiving weekend, so

09:26:50 25    I assume he was at home as well.

09:27:04  1          Yes.  All this dialogue on these e-mails was

09:27:09  2  over Thanksgiving weekend.  So I assume I'm e-mailing to him

09:27:14  3  to his home because he's probably more likely to be checking

09:27:18  4  his home e-mail address than his work e-mail address.

09:27:22  5  Q.      Okay.  And what you wanted was to see what Qorvo was

09:27:25  6  sending to the board shops?

09:27:27  7  A.      Right.  Right.  As an example.  Yeah.  I don't know

09:27:31  8  -- I don't know what those files are.  Obviously he's trying

09:27:34  9  to help me.  He probably sent more information than I

09:27:37 10  requested.  And I can't -- from -- from that it's hard to --

09:27:40 11  hard to see what they are.

09:27:44 12          We would not use them anyway because you would

09:27:47 13  calculate the line within your board, so usually AWR.  So if

09:27:51 14  he sent something generic off the internet like the -- so

09:27:58 15  some of these other things here, transmission line, these

09:28:01 16  files, transmission line EXED, transmission line, CPW,

09:28:07 17  they're probably all generic software tools off the internet

09:28:11 18  that he's trying to help us, but we would not use them.

09:28:14 19          We would use AWR, which is a higher standard,

09:28:18 20  much more expensive, much more accurate tool.

09:28:23 21  Q.      All right.  Mr. Houlden, I've handed you what's been

09:28:26 22  marked as Exhibit 84.  I'll identify this for the record as

09:28:30 23  a one-page document.  The production number is

09:28:34 24  AKTS_00210811.

09:28:38 25          Mr. Houlden, do you recognize this document?

09:28:42  1    A.      No.

09:28:43  2    Q.      This appears to be a series of e-mails, the first was

09:28:47  3    on December 14, 2016, from Steve.Oglesby@Qorvo.com.  Do you

09:28:59  4    see that?

09:28:59  5    A.      Yes.

09:28:59  6    Q.      Do you recall ever asking Mr. Oglesby after you left

09:29:04  7    Qorvo for confidential information about Qorvo?

09:29:06  8    A.      I may have had discussions as friends and ---and

09:29:10  9    talking things.  I would not have specifically requested

09:29:13 10    confidential information.

09:29:14 11    Q.      Okay.  Do you recall Mr. Oglesby ever sending you

09:29:20 12    Qorvo confidential information?

09:29:21 13    A.      No, I do not.

09:29:22 14    Q.      Mr. Houlden I've handed you what's been marked as

09:29:26 15    Exhibit 85.  It's a one-page document with a production

09:29:29 16    number AKTS-00210812.  This is the attachment to

09:29:37 17    Mr. Oglesby's e-mail to you which we marked as Exhibit 84.

09:29:43 18    Do you recognize this exhibit --

09:29:45 19    A.      You mean 85?

09:29:47 20    Q.      The e-mail is 84.  The attachment is 85.

09:29:50 21    A.      Okay.  Yes, sorry.

09:29:51 22    Q.      Do you recognize Exhibit 85?

09:29:52 23    A.      No, I do not.

09:29:54 24    Q.      Do you recognize what Exhibit 85 is?

09:29:56 25    A.      It's a connector.

09:29:57  1    Q.      Okay.  An RF connector for an evaluation board?

09:30:01  2    A.      Yes.

09:30:02  3    Q.      Okay.  Did you ask Mr. Oglesby to send you

09:30:06  4    information on the RF connectors that Qorvo was using with

09:30:09  5    its evaluation boards?

09:30:11  6    A.      I do not recall, but we did not use this connector.

09:30:15  7    Q.      Okay.  Is that the type of thing Mr. Oglesby would

09:30:18  8    just do out of the blue, send you unsolicited information?

09:30:24  9    A.      I may have had discussions with him about connectors,

09:30:28 10    generic connectors, and he may have -- I may have not

09:30:33 11    specifically requested it.  I mean friends -- friends are

09:30:36 12    always trying to help you.  I mean, you'll see in my e-mails

09:30:39 13    that I had discussions with Robert Aigner, the CTO of Qorvo

09:30:44 14    in Florida, and he's sending e-mails to me.  That's what

09:30:48 15    friends and colleagues do, they -- they offer people to help

09:30:52 16    out.  I don't specifically know why he sent this document.

09:30:55 17    We did not use this connector.  Maybe he -- he sent I want

09:30:59 18    as an example.  But we chose-we -- we did not use this

09:31:02 19    connector.

09:31:03 20    Q.      Let me start with a different question, then.  Do you

09:31:05 21    know who Mr. David Dyer is?

09:31:07 22    A.      Yes.  He's a -- he was a, a CAD technician at -- at

09:31:13 23    Akoustis.

09:31:13 24    Q.      Okay.  Did you ever provide Mr. Dyer with schematics

09:31:17 25    of the RF connector that Qorvo was using for its evaluation

09:31:21  1  boards?

09:31:21  2  A.      I do not recall.

09:31:22  3  Q.      David Hodge testified that he was in the room with

09:31:26  4  you when you handed Mr. Dyer schematics of Qorvo's RF

09:31:30  5  connectors.  Do you have any reason to doubt Mr. Hodge's

09:31:34  6  testimony?

09:31:34  7  A.      I'm not -- I wasn't -- I do not recall handing Qorvo

09:31:39  8  connectors or information to David Dyer.  I may have.  I --

09:31:45  9  I do not recall.  And do not -- and Hodge would not know if

09:31:52 10  we actually ended up using them ever because he was involved

09:31:57 11  -- was not involved in the eval board.

09:31:59 12  Q.      After you left Qorvo in September of 2016, you

09:32:03 13  obtained a number of confidential Qorvo documents concerning

09:32:06 14  the testing of products.

09:32:09 15          Do you recall that?

09:32:11 16  A.      Testing of products.  No, I do not recall that.

09:32:15 17  Q.      Do you know a person named Alan Nicol?

09:32:21 18  A.      Yes.

09:32:22 19  Q.      Who is Mr. Nicol?

09:32:24 20  A.      Mr. Nicol is a retired Scottish gentleman located in

09:32:28 21  San Diego.

09:32:30 22  Q.      Retired from Qorvo?

09:32:32 23  A.      He worked at many companies, but, yes, I'm not sure

09:32:36 24  what the last company, who he worked for, who he retired

09:32:38 25  from.

09:32:39  1    Q.      Mr. Nicol's was a product engineer at Qorvo until

09:32:42  2    2018; is that right?

09:32:43  3    A.      I do not recall when he left.

09:32:45  4    Q.      Okay.  In 2017, you contacted Mr. Nicol and asked him

09:32:49  5    to send you confidential Qorvo test plans?

09:32:53  6    A.      I do not recall that.

09:32:55  7    Q.      Okay.  You wanted to use Qorvo test plans to develop

09:32:59  8    test plans for Akoustis; is that right?

09:33:01  9    A.      Mr. Nicol would not have a test plan that I could

09:33:07 10    really readily use at Akoustis.  Maybe as a boil plate or a

09:33:11 11    template or something, but there's nothing in the test plan

09:33:16 12    that Alan Nicol would send us we would use at Akoustis.

09:33:22 13    Because Mr. Nicol's -- did not work on filters.

09:33:25 14    Q.      Mr. Houlden, I've handed you what's been marked as

09:33:29 15    Exhibit 86.  I'll identify this for the record as a single

09:33:32 16    page document.  At the bottom there's the product deduction

09:33:35 17    number AKTS_00211968.

09:33:41 18            Do you recognize this document?

09:33:43 19    A.      No.

09:33:47 20    Q.      So this is an e-mail dated February 23rd, 2017;

09:33:53 21    right?

09:33:54 22    A.      Yes.

09:33:57 23    Q.      At this time you were already working at Akoustis;

09:34:01 24    correct?

09:34:02 25    A.      Yes.

09:34:02  1    Q.      The e-mail is from Mr. Nicol's; right?

09:34:08  2    A.      Yes.

09:34:10  3    Q.      To your personal gmail account?

09:34:13  4    A.      Yes.

09:34:15  5    Q.      Mr. -- you and Mr. Nicol spoke prior to him sending

09:34:21  6    this e-mail; is that correct?

09:34:23  7    A.      I do not recall.

09:34:24  8    Q.      Well, it says in the first line of the e-mail, "Good

09:34:29  9    to catch up with you the other day."

09:34:32  10           Do you see that?

09:34:32  11   A.      Must have, yes.

09:34:33  12   Q.      Okay.  When you spoke with Mr. Nicol, you asked him

09:34:37  13   to send you Qorvo test plans?

09:34:40  14   A.      Must have, yes.

09:34:42  15   Q.      And Mr. Nicol followed up with this e-mail attaching

09:34:46  16   three of those plans?

09:34:47  17   A.      Yes.

09:34:48  18   Q.      You understood that Mr. Nicol was not authorized to

09:34:53  19   share these Qorvo test plans with Akoustis; correct?

09:34:56  20   A.      Correct.

09:34:57  21   Q.      And Mr. Nicol sent these test plans to your personal

09:35:01  22   account as opposed to your account at Akoustis?

09:35:04  23   A.      Yes.

09:35:05  24   Q.      Do you know why?

09:35:06  25   A.      I do not.

09:35:08  1    Q.      Mr. Houlden, I've handed you what's been marked as

09:35:13  2    plaintiff's Exhibit 87.  I'll identify this for the record

09:35:16  3    as a multi page document, the first page of which has the

09:35:24  4    production number AKTS_00211969.

09:35:31  5            Do you see that?

09:35:35  6    A.      Yes.

09:35:36  7    Q.      This is an evaluation board test plan for a Qorvo

09:35:40  8    product?

09:35:41  9    A.      Yes.

09:35:43 10    Q.      You understood that this evaluation board test plan

09:35:46 11    from Qorvo was a confidential document?

09:35:48 12    A.      I did not realize it was confidential, but it

09:35:52 13    specifies as confidential, yes.

09:35:53 14    Q.      And what you mean is, at the bottom of every page are

09:35:57 15    the words "Qorvo confidential"?

09:36:00 16    A.      Right.

09:36:01 17    Q.      And this was one of the documents that Mr. Nicol

09:36:04 18    forwarded to you in February of 2017?

09:36:08 19    A.      Yes.

09:36:09 20    Q.      And this was for use by Akoustis in drafting its own

09:36:15 21    test plans?

09:36:15 22    A.      This was a switch, so we would not have used this as

09:36:22 23    -- as a draft to make a test plan for a filter.  This is a

09:36:28 24    switch.  Akoustis did not make switches.

09:36:30 25    Q.      So, Mr. Houlden, I'm handing you a computer.

09:36:34  1    A.      Yes.

09:36:35  2    Q.      And I've also handed you what's been marked as

09:36:39  3    Exhibit 88.

09:36:39  4    A.      Okay.

09:36:40  5    Q.      Exhibit 88 is a document produced in native format.

09:36:44  6    It's an Excel spreadsheet that was attached to Exhibit 86,

09:36:49  7    Mr. Nicol's e-mail to you.  I think it will be easier if you

09:36:55  8    use the computer version, which is the native Excel

09:36:59  9    spreadsheet that I have in front of you.

09:37:02 10    A.      Okay.

09:37:02 11    Q.      Now, you recognize Exhibit 88 as a Qorvo device

09:37:06 12    qualification test plan?

09:37:09 13    A.      For a switch, yes.

09:37:13 14    Q.      Okay.  And you understood that this test plan was

09:37:17 15    confidential; right?

09:37:18 16    A.      Yes, it says -- specifies confidential, yes.

09:37:21 17    Q.      Okay.  And if you turn to the first tab in the device

09:37:26 18    --

09:37:26 19    A.      You mean header?

09:37:28 20    Q.      That says header.

09:37:30 21    A.      Yes.

09:37:30 22    Q.      And you look at Row 5.  Are you there?

09:37:32 23    A.      Yes.  The confidential document, yes.

09:37:35 24    Q.      Yeah.  There's a confidentiality warning, right?

09:37:38 25    A.      Yes, yes.

09:37:39  1    Q.        It states in bolded italics, "This is a

09:37:42  2    confidentiality document."

09:37:43  3              Do you see that?

09:37:43  4    A.        Yes.

09:37:43  5    Q.        And then it says, "This document and the information

09:37:46  6    herein is the property of Qorvo and is issued in strict

09:37:51  7    confidence.  Do not reproduce it, copy it, or give it to a

09:37:55  8    third party without express permission from Qorvo."

09:37:57  9              Do you see that?

09:37:58 10    A.        Yes.

09:37:58 11    Q.        Did you understand Mr. Nicol to have express

09:38:01 12    permission from Qorvo to share this document with you?

09:38:04 13    A.        He -- he did not.

09:38:07 14    Q.        All right.  I've handed you what's been marked for

09:38:11 15    the record as Exhibit 89.  I will identify this as a

09:38:15 16    document that was produced in native format, an Excel

09:38:19 17    spreadsheet.  The natively produced document had the

09:38:23 18    production number AKTS_00211973 on it.

09:38:30 19              Mr. Houlden, I'd ask you to look at the native

09:38:38 20    version, which is on the computer in front of you.

09:38:42 21    A.        Yes.  Yes.

09:38:43 22    Q.        Do you recognize this as a characterization test plan

09:38:46 23    for an Qorvo product?

09:38:47 24    A.        Yes.

09:38:50 25    Q.        And this characterization test plan was a

09:38:58  1    confidential Qorvo document, correct?

09:39:00  2    A.    Yes.

09:39:00  3    Q.    At the time Mr. Nicol sent the characterization test

09:39:03  4    plan, was Akoustis trying to develop its own test plans for

09:39:07  5    products?

09:39:07  6    A.    What time frame?

09:39:24  7    Q.    February 2017.

09:39:26  8    A.    Could have been.  We -- we should have had test plans

09:39:30  9    prior to that.  But could have been more document then --

09:39:33 10    because, again, we started -- I know when I joined in

09:39:37 11    September 2016, we were already testing parts, we were

09:39:39 12    testing resonators maybe.  So hard to know.

09:39:42 13    Q.    Was part of your responsibility upon arriving at

09:39:46 14    Akoustis to develop a set of test plans that the company

09:39:49 15    could use?

09:39:50 16    A.    Probably the -- for the test engineer, if we had --

09:39:56 17    probably Dave Hodge was involved, but he was kind of doing

09:40:00 18    design and test, so it was probably Dave Hodge at the time.

09:40:05 19    Q.    If -- if I could ask you to turn back to Exhibit 86.

09:40:09 20    A.    Yes.

09:40:11 21    Q.    You'll see that Mr. Nicol sent these confidential

09:40:18 22    Qorvo test plans to you on February 23rd, 2017; right?

09:40:23 23    A.    Yes.

09:40:24 24    Q.    Do you recall what you did upon receiving the test

09:40:27 25    plans from Mr. Nicol?

09:40:29  1    A.      No.

09:40:30  2    Q.      Mr. Houlden, I've handed you what's been marked as

09:40:34  3    Exhibit 90.

09:40:34  4    A.      Right.

09:40:35  5    Q.      For the record, this is a one-page document with the

09:40:38  6    production number AKTS_00117498.

09:40:45  7    A.      Right.

09:40:45  8    Q.      You see that this is an e-mail from yourself to --

09:40:50  9    sorry.  This is an e-mail from yourself to Mr. Lewis and

09:40:54 10    Dave Aichele.  Do you see that?

09:40:58 11    A.      Yes.

09:40:58 12    Q.      And it's dated February 23rd, 2017?

09:41:02 13    A.      Yes.

09:41:02 14    Q.      And this is an e-mail you sent after receiving the

09:41:06 15    confidential Qorvo test plans from Mr. Nicol on the same

09:41:11 16    day; correct?

09:41:12 17    A.      Yes.

09:41:13 18    Q.      The subject of your e-mail is AKF-1938 test plans --

09:41:20 19    A.      Yes.

09:41:21 20    Q.      -- right?

09:41:21 21            AKF-1938 is referring to an Akoustis product?

09:41:26 22    A.      Yes.  We talked about that earlier, that was one of

09:41:29 23    the first filters we did for the company, ███ military

09:41:34 24    customer in ███ .

09:41:35 25    Q.      And in February of 2017, Akoustis was developing test

09:41:40  1    plans for that 1938 product --

09:41:42  2    A.      Yes.

09:41:43  3    Q.      -- right?

09:41:45  4            And you forwarded the Qorvo test plans to

09:41:49  5    Mr. Lewis and Mr. Aichele to use in the creation of the

09:41:53  6    Akoustis test plans; correct?

09:41:56  7    A.      I think it was just for letting them know as an

09:42:00  8    example of what a -- a test plan looks like.  Because I

09:42:03  9    think those other documents above there, the 300, 400, 500,

09:42:08 10    600 is possibly the document -- test plans that I generated.

09:42:13 11            So the 8009 is a switch test plan.

09:42:17 12            And so -- and then the 1938 is a filter, so

09:42:22 13    they're very different.  There's little value in the switch

09:42:25 14    test plan, other than the titles, the template.

09:42:30 15            You may -- rather than me spending an hour

09:42:34 16    writing purpose, scope, responsibility, reference,

09:42:37 17    definitions, procedure, all the contents of that has no

09:42:41 18    value.  The test and conditions has no value.  It's a

09:42:45 19    switch.  It's a very different -- all those things has no

09:42:52 20    value.

09:42:52 21            The only thing that is of value is the template

09:42:55 22    and the headings, so when you write the test plan, you don't

09:42:59 23    have to think, oh, what do I need to do next and do next.

09:43:03 24    So that's -- if you look, that's possibly the only value I

09:43:07 25    got out.

09:43:08  1    Q.        You forwarded the Qorvo confidential test plans to

09:43:11  2    Mr. Lewis and Mr. Aichele, along with the test plans that

09:43:15  3    you had drafted?

09:43:16  4    A.        Yes.

09:43:17  5    Q.        The test plans you drafted were based on the Qorvo

09:43:21  6    confidential test plans?

09:43:22  7    A.        Only the template.  There was no -- no contents.  The

09:43:25  8    contents would have no value because it's a switch.  So it's

09:43:30  9    only the headings.

09:43:32 10    Q.        So the question for Exhibit 92 and 93 is the same as

09:43:36 11    the last exhibit, which is -- are Exhibits 92 and 93 the

09:43:41 12    same documents that were attached to Mr. Nicol's e-mail to

09:43:44 13    you earlier on February 23rd, 2017?

09:43:52 14    A.        The exhibits you just handed me, 92 and 93, appear to

09:43:56 15    be different; right?  One has two pages and one has three

09:44:00 16    pages.  So are you implying they're the same document?

09:44:05 17    Q.        Let me take these one at a time.  So if you look at

09:44:11 18    Exhibit 92 --

09:44:15 19    A.        Yes.

09:44:17 20    Q.        -- on the second page of Exhibit 92, on the top

09:44:22 21    left-hand corner it says "characterization test plan";

09:44:27 22    correct?

09:44:28 23    A.        Yes.

09:44:28 24    Q.        Now, if you go back to Exhibit 88.

09:44:32 25    A.        Yes.

09:44:34 1    Q.    Is that also the characterization test plan?

09:44:57 2    A.    No.  Looks like it calls it the qualification test

09:45:01 3    plan.  It doesn't say it's the characterization test plan.

09:45:09 4    Q.    So maybe, in essence, you received three Qorvo test

09:45:14 5    plans from Mr. Nicol on February 23rd, 2017; right?

09:45:21 6    A.    Yes.

09:45:22 7    Q.    And you forwarded those three test plans to

09:45:26 8    Mr. Aichele and Mr. Lewis later that same day?

09:45:29 9    A.    Yes.

09:45:29 10   Q.    And when you forwarded those test plans you knew that

09:45:37 11   Mr. Nicol did not have prior authorization to share those

09:45:41 12   confidential Qorvo documents with you?

09:45:42 13   A.    Yes.

09:45:43 14   Q.    Mr. Houlden, I've handed you what's been marked as

09:45:46 15   Exhibit 96.  It's a multi page document, the first page has

09:45:50 16   the production number AKTS_00117507.  In the top right-hand

09:45:57 17   corner it says AKF-400 evaluation board test plan.  Do you

09:46:03 18   see that?

09:46:03 19   A.    Yes.

09:46:03 20   Q.    This is another of the attempts to your

09:46:08 21   February 23rd, 2017, e-mail to Mr. Lewis and Mr. Aichele; is

09:46:12 22   that right?

09:46:12 23   A.    Yes.

09:46:12 24   Q.    And specifically, this is an evaluation board test

09:46:16 25   plan for AKF 1938?

09:46:21  1   A.       Yes.

09:46:21  2   Q.       Okay.  And did you draft this document?

09:46:24  3   A.       Possibly.  Mr. Hodge's may have or may have been in a

09:46:32  4   combination of the both, because if you look at -- on page

09:46:36  5   -- top of page 2, and a lot of the things on page 1, a lot

09:46:44  6   of these things come from the customer ███.  And so a lot

09:46:48  7   of the specs probably come from ███.  So whether I did it

09:46:52  8   or Mr. Hodge or a combination, hard to determine, because on

09:46:57  9   page 5 no one -- we didn't really specify the author so --

09:47:02 10   but a lot of -- all the information, all the tables are most

09:47:08 11   likely coming from ███ spec.

09:47:11 12           So the ███ has a spec.  So most of the contents

09:47:16 13   would be coming from ███.  So whether I copied and pasted

09:47:20 14   all the ███ requirements or someone else in Hodge's team or

09:47:26 15   Pat's team, TBD.

09:47:28 16   Q.       Mr. Houlden, I've handed you a copy of Exhibit 97 --

09:47:33 17   A.       Yes.

09:47:34 18   Q.       -- which is a multi page e-mail.  The production

09:47:37 19   number on the first page is AKTS_00155718.

09:47:46 20   A.       Yes.

09:47:46 21   Q.       Just take one second and let you take a look at this.

09:47:52 22   And tell me if you recognize this document?

09:47:55 23   A.       No, I do not.

09:48:04 24   Q.       I want you to go to the second page of the document

09:48:06 25   and you'll see on the bottom of that page there's a

09:48:09  1    January 12, 2001, e-mail from Bradford Bersin.  Do you see

09:48:15  2    that?

09:48:15  3    A.      Yes.

09:48:15  4    Q.      Who is Bradford Bersin?

09:48:17  5    A.      Bradford Bersin was a product manager.  He was hired

09:48:23  6    as a JMO that we hired to manage all of our projects.

09:48:30  7    Q.      The subject of his e-mail is EVB Doc brainstorming.

09:48:35  8    Do you see that?

09:48:35  9    A.      Okay.

09:48:36 10    Q.      Do you recall in January of 21 having a brainstorming

09:48:40 11    session with Mr. Bersin concerning evaluation board

09:48:43 12    documents?

09:48:47 13    A.      No.

09:48:49 14    Q.      If you look at the third page of Exhibit 97 at the

09:48:53 15    bottom of Mr. Bersin's e-mail, you'll see there's a line

09:48:57 16    there that says -- starts with "any old company."

09:49:02 17               Do you see that?

09:49:02 18    A.      Yes.

09:49:02 19    Q.      Mr. Bersin said, "any old company -400 or -480

09:49:11 20    documents."  Do you see that?

09:49:12 21    A.      Yes.

09:49:12 22    Q.      Do you understand that Mr. Bersin was asking about

09:49:16 23    Qorvo test plans which had the -- which were designated as

09:49:21 24    -400 or -480 documents?

09:49:26 25    A.      No, no, no -- he's going to proposing board docs.

09:49:36  1   He's got -400 written there and he's got -480 written there.

09:49:41  2   Any of -400 -- I don't know what -- that's a pretty vague

09:49:45  3   statement what he's referring to there.  "Any old company

09:49:49  4   400-480 documents."  So he's -- he's written this in 2021.

09:49:55  5   So we've been around writing test plans and evaluation board

09:49:58  6   documents for three or four years -- or two or three years,

09:50:02  7   so I'm not really understanding what he's asking there.

09:50:08  8   Q.     Okay.  So you didn't understand him to be asking for

09:50:11  9   Qorvo test plans?

09:50:12 10   A.     I don't think he's interpreting that as Qorvo test

09:50:15 11   plans there, yes, I don't believe so.

09:50:17 12   Q.     Okay.  Mr. Houlden, just to be clear.  If we go to

09:50:21 13   the first page of 97, Exhibit 97.

09:50:23 14   A.     Yes.

09:50:24 15   Q.     And we look at the top e-mail chain?

09:50:26 16   A.     Yes.

09:50:28 17   Q.     You are on this e-mail chain.

09:50:31 18   A.     I'm on the last one.  I'm not on -- I guess the --

09:50:35 19   I'm not on the original ones, though, right?  Bradford's

09:50:40 20   communicating with a Dave Breton.  Dave Breton and them are

09:50:44 21   communicating on page -- what is it, the second and third

09:50:47 22   page, 19 and 20.  And then somehow Bradford includes -- hang

09:50:52 23   on.  Dave Breton and Bradford are communicating.

09:51:00 24          And then on another e-mail Bradford forwards it

09:51:04 25   to Jerry and I.  And then the next e-mail -- then -- then

09:51:09  1    the last e-mail was me.  Yes.

09:51:16  2    Q.      Okay.  Just --

09:51:17  3    A.      All right.  So now I understand, yes, yes.

09:51:21  4    Q.      Okay.  So you would agree with me that each of the

09:51:23  5    e-mails in Exhibit 97 you ultimately received?

09:51:27  6    A.      Yes.  Down the bottom.  Yes, so I can -- I can see --

09:51:32  7    I'm starting to understand the flow of the e-mails.

09:51:35  8    Q.      Okay.  And you were a recipient of the first e-mail

09:51:38  9    on January 12, 2021, at 3:04 p.m. when Mr. Bersin asked

09:51:43 10    whether anyone had any old company -400 or -480 documents;

09:51:49 11    right?

09:51:49 12    A.      I'm still a little bit confused because that -400 and

09:52:04 13    -480 documents we're using -- his e-mail, Bradford Bersin's

09:52:10 14    e-mail that he sent on Tuesday, January the 12thth, he's

09:52:16 15    writing -- he's proposing E board documents.  So they're

09:52:20 16    probably coming up with an ISO 9000 plate.  So he's

09:52:25 17    referring -400 and -480.  So when he says any old company

09:52:32 18    -400, -480 documents, I believe he's referring that

09:52:35 19    statement to Akoustis and not Qorvo, that's my belief.

09:52:37 20    Q.      And then January 12th, 2021, 3:23 p.m.

09:52:42 21    A.      Yes.  Three -- three --

09:52:44 22    Q.      3:23 p.m.  Mr. Breton follows up with Mr. Bersin and

09:52:50 23    says --

09:52:50 24    A.      Yes, yes.

09:52:52 25    Q.      -- "did we get anywhere on the -400, -480 documents."

09:52:59  1    Right?

09:52:59  2    A.    Yes.  Again, I think David Breton is referring to

09:53:04  3    Akoustis 400, 480 documents there.

09:53:07  4    Q.    If we move one e-mail up in the chain, four minutes

09:53:10  5    later, January 12, 2021, at 3:27 p.m. Mr. Bersin responds,

09:53:15  6    "I have not -- that was really for Jerry and Rohan as they

09:53:20  7    are former Qorvo/RFMD employees.  I was not and do not have

09:53:25  8    any contacts at Qorvo."

09:53:28  9              Do you see that?

09:53:29 10    A.    Yes.

09:53:29 11    Q.    Do you understand now that the -400 and -480

09:53:33 12    documents that they were looking for were Qorvo documents?

09:53:35 13    A.    Yes.  That's -- looks like it's inferring that, yes.

09:53:40 14    Q.    Okay.  And then Mr. Breton where is back at 3:31 p.m.

09:53:44 15    on January 12, 2021, so four minutes later, "Hmmm.  Okay.

09:53:53 16    Can you ping that again to see if they have a document."

09:53:58 17              Do you see that?

09:53:58 18    A.    Yes.

09:53:59 19    Q.    What he's referring to is can he ping Jerry or Rohan,

09:54:03 20    who were the former Qorvo employees to see whether they have

09:54:06 21    copies of these Qorvo test documents; right?

09:54:09 22    A.    Right.  Yes.

09:54:11 23    Q.    Okay.  And then the last, that's when the e-mail then

09:54:14 24    goes to you from Mr. Bersin and says, "FYI, I do not have

09:54:20 25    any Qorvo contacts to reach out to."  Right?

09:54:23  1    A.      Yes.

09:54:24  2    Q.      Okay.  And then you responded, "Sorry, I was meant to

09:54:28  3    get last weekend."

09:54:31  4    A.      Yes.

09:54:34  5    Q.      Do you see that?

09:54:34  6    A.      Yes.

09:54:35  7    Q.      And by that you meant, you meant to get the Qorvo

09:54:39  8    test documents last weekend.

09:54:42  9    A.      Yes.  But that doesn't make sense if I had the --

09:54:45  10   yeah.  I -- yes.  That's what it says.  Because I already

09:54:50  11   had documents from Alan Nicol from three years prior, so I'm

09:54:57  12   not really understanding the gist of the conversation, but

09:55:03  13   yes, it clearly says that.

09:55:05  14   Q.      Okay.  And then the next e-mail shall -- the next

09:55:08  15   thing you say in your e-mail was, "Jerry, did you by chance

09:55:12  16   connect with Ahmad."

09:55:14  17   A.      Yes.

09:55:14  18   Q.      Who is Ahmad?

09:55:16  19   A.      Ahmad is someone that also used to work at Qorvo.

09:55:20  20   And is at a start up and would also be developing his own

09:55:25  21   ISO 9,000 documents.

09:55:27  22   Q.      And you thought that Ahmad may have some old Qorvo

09:55:31  23   test plans that he could share?

09:55:32  24   A.      No.  You get with Ahmad because ISO documents are

09:55:37  25   very generic.  Every company has them.  So Ahmad, because

09:55:42  1  he's at a new company, he's been having to write his own

09:55:46  2  documents.  I was probably communicating with Jerry that we

09:55:50  3  don't need to get Qorvo's documents if Ahmad has ISO

09:55:56  4  documents that we could use.

09:55:56  5  Q.      What company was Ahmad working at in 2021?

09:55:59  6  A.      Danger Devices, I think it's called.

09:56:03  7  Q.      Did Akoustis have an agreement with Danger Devices,

09:56:07  8  that Danger Device test plans could be shared with Akoustis?

09:56:11  9  A.      No, but Ahmad's a friend and we help one another.

09:56:15 10  Q.      What is Ahmad's last name again?

09:56:18 11  A.      Abdelmajid.

09:56:25 12  Q.      Could you spell that?

09:56:26 13  A.      A-B-D-E-L-M-A-J-I-D.  I'm not 100 percent sure, but

09:56:33 14  close.

09:56:39 15  Q.      All right.  Mr. Houlden, I've handed you what has

09:56:42 16  been marked as Exhibits 98 and 99.

09:56:46 17  A.      Yes.

09:56:47 18  Q.      Mr. Houlden, do you recognize what's been marked as

09:56:51 19  Exhibits 98 and 99?

09:56:52 20  A.      No.

09:56:52 21  Q.      Exhibit 98 is an e-mail from John Myrick to you on

09:56:57 22  August 18th -- August 15, 2018; right?

09:57:05 23  A.      Yes.

09:57:06 24  Q.      Who is John Myrick?

09:57:08 25  A.      John Myrick got terminated from Qorvo and we hired

| | | |
|---|---|---|
| 09:57:13 | 1 | him as a contract employee, maybe even a part-time employee |
| 09:57:17 | 2 | at Akoustis. |
| 09:57:21 | 3 | Q.     Okay.  So Mr. Myrick was a thermal engineer? |
| 09:57:27 | 4 | A.     Yes. |
| 09:57:28 | 5 | Q.     And he worked at Qorvo prior to contracting for |
| 09:57:32 | 6 | Akoustis? |
| 09:57:33 | 7 | A.     Yes. |
| 09:57:34 | 8 | Q.     And he sent you at 2:34 p.m. on August 15, 2018, a |
| 09:57:40 | 9 | Qorvo presentation on RF power life and reliability testing? |
| 09:57:48 | 10 | A.     Yes. |
| 09:57:50 | 11 | Q.     What -- at what time was Mr. Myrick hired at |
| 09:57:54 | 12 | Akoustis? |
| 09:57:55 | 13 | A.     I do not know. |
| 09:57:56 | 14 | Q.     Did you recruit him? |
| 09:57:59 | 15 | A.     I believe I was informed that he got fired or let go |
| 09:58:05 | 16 | at an RIF, I forget when it was, and then I -- we hired him |
| 09:58:13 | 17 | maybe thirty -- may have been full time thirty hours a week. |
| 09:58:17 | 18 | I forget.  He wasn't forty hours a week.  But he worked |
| 09:58:21 | 19 | thirty hours a week. |
| 09:58:22 | 20 | Q.     If you turn to Exhibit 99, which is the attachment to |
| 09:58:27 | 21 | 98. |
| 09:58:27 | 22 | A.     Yes.  Sorry, John. |
| 09:58:31 | 23 | Q.     Yeah.  You understood that Exhibit 99 was a |
| 09:58:34 | 24 | confidential Qorvo document? |
| 09:58:35 | 25 | A.     Yes. |

09:58:38  1    Q.      And you understood that Mr. Myrick didn't have
09:58:41  2    authorization to share this document with Akoustis; correct?
09:58:44  3    A.      Correct.
09:58:45  4    Q.      Were you surprised when Mr. Myrick sent this
09:58:48  5    presentation to you?
09:58:49  6    A.      Yeah.  Yes.  Because if you look at the subject, you
09:58:53  7    may find this interesting.  So I was not aware of this
09:58:57  8    document.  So I did not request this document from him.  But
09:59:00  9    he -- he sent it.
09:59:04  10   Q.      And when Mr. Myrick sent this document in August of
09:59:09  11   2018, Akoustis was working on reliability testing; is that
09:59:14  12   right?
09:59:14  13   A.      Yes.  Well, we would have been doing some testing.
09:59:18  14   Joel Morgan, the VP of quality, was responsible for the
09:59:26  15   reliability testing.
09:59:28  16   Q.      You forwarded the confidential Qorvo presentation
09:59:31  17   that Mr. Myrick sent to you to other people at Akoustis?
09:59:34  18   A.      I do not recall.
09:59:36  19   Q.      Mr. Houlden, I've handed you what's been marked as
09:59:40  20   Exhibits 100 and 101.  Do you recognize Exhibits 100 and
09:59:45  21   101?
09:59:46  22   A.      No.
09:59:47  23   Q.      Exhibit 100 is an e-mail from yourself to Mr. Morgan?
09:59:52  24   A.      Yes.
09:59:53  25   Q.      Joel Morgan?

09:59:54 1    A.       Yes.

09:59:55 2    Q.       And Joel Morgan is the person at Akoustis who was,

09:59:59 3    you mentioned was working on reliability testing in August

10:00:02 4    of 2018?

10:00:03 5    A.       That's his responsibility, yes.

10:00:04 6    Q.       And you forwarded Mr. Myrick's -- the confidential

10:00:10 7    Qorvo presentation that Mr. Myrick sent to you to Mr. Morgan

10:00:15 8    on August 15, 2018?

10:00:17 9    A.       Yes.

10:00:18 10   Q.       About twenty-six minutes after Mr. Myrick sent you

10:00:21 11   the presentation?

10:00:31 12           Why did you think that the presentation from

10:00:33 13   Mr. Myrick would be relevant to Mr. Morgan?

10:00:36 14   A.       Well, looking at it, it would not be.  I clearly did

10:00:43 15   not open it.  So if you look at the document, clearly I did

10:00:46 16   not open it because again, twenty-four minutes I had no

10:00:58 17   time, we got a lot of e-mails.  I didn't forward it.  So the

10:01:02 18   test set up and how they're doing everything is very

10:01:05 19   different than what -- how we did it at Akoustis.

10:01:08 20           If you look at it on pages -- but even all the

10:01:11 21   pages from page -- just the whole procedure, the block

10:01:17 22   diagrams or switches, it's a very manual, hand-built

10:01:22 23   solution, and Mr. Morgan did not want to do anything like

10:01:32 24   this, so he went off and bought a Mercedes test solution

10:01:37 25   from Becker in Germany.

10:01:38 1    Q.    Okay.  So your recollection is you didn't review

10:01:43 2    what's been marked as Exhibit 101, the confidential

10:01:49 3    presentation from Mr. Myrick?

10:01:57 4    A.    If I reviewed, I must've reviewed very briefly,

10:02:01 5    because Mr. Morgan had already gone down the path of buying

10:02:05 6    a Becker box and not -- not using this type of test set up.

10:02:10 7    Q.    Okay.  Were you in the habit of forwarding irrelevant

10:02:15 8    information to Mr. Morgan?

10:02:17 9    A.    Yes.  Because if -- if I haven't looked at it, I'm

10:02:21 10   not responsible for it.  I'm working a lot of hours.  If I

10:02:25 11   didn't -- you know, sometimes if I'm not responsible, my

10:02:29 12   value in his eyes would be different.  But in this case, in

10:02:36 13   twenty-four minutes, there's a very good chance I did not

10:02:39 14   open it -- clearly I did not look at it closely because

10:02:42 15   their test set up is -- is completely different than our

10:02:46 16   test set up.

10:02:46 17   Q.    Mr. Houlden, I've handed you what's been marked as

10:02:52 18   Exhibits 102 and 103.  Exhibit 102 is an e-mail from

10:02:56 19   yourself to Mr. Lewis, Pat Lewis, is that right?

10:02:58 20   A.    Yes.

10:02:58 21   Q.    Who is Pat Lewis?

10:02:59 22   A.    Pat Lewis was director of IT and -- at -- at

10:03:05 23   Akoustis.

10:03:05 24   Q.    Okay.  And this is another e-mail from August 15,

10:03:10 25   2018; right?

10:03:11  1    A.      Yes.

10:03:12  2    Q.      And again, you forwarded the confidential Qorvo

10:03:16  3    presentation to Mr. Myrick sent to you earlier that day?

10:03:21  4    A.      Yes.

10:03:21  5    Q.      This is an e-mail that you sent at 3:10 p.m.?

10:03:25  6    A.      Yes.

10:03:26  7    Q.      Right.  So that's ten minutes after you sent the same

10:03:29  8    presentation to Mr. Lewis?

10:03:31  9    A.      Yes.

10:03:32 10    Q.      And in the subject that you have here from Mr. Lewis

10:03:36 11    is, "some light reading."

10:03:39 12    A.      Right.

10:03:40 13    Q.      Is that right?

10:03:41 14    A.      Yep.

10:03:41 15    Q.      And what you were referring to is -- as some light

10:03:45 16    reading was the confidential Qorvo presentation attached

10:03:48 17    which has been marked as Exhibit 103?

10:03:50 18    A.      Yes.

10:03:51 19    Q.      And then in the body of your e-mail to Mr. Lewis, you

10:03:55 20    say, "pages 4 to 5 should look very familiar."

10:04:00 21    A.      Yes.

10:04:01 22    Q.      So at least as of 3:10 p.m. on August 15, 2018, you

10:04:06 23    had reviewed the contents of the confidential Qorvo

10:04:09 24    presentation that Mr. Myrick sent to you?

10:04:16 25    A.      Yes.

10:04:17  1    Q.      And can you look at pages 4 to 5 --

10:04:20  2    A.      Yes.

10:04:20  3    Q.      -- of Exhibit 103?

10:04:22  4    A.      Yes.

10:04:23  5    Q.      What is it on pages 4 to 5 that you thought would

10:04:26  6    look familiar to Mr. Lewis?

10:04:29  7    A.      Right.   I should have had a smiley face after that.

10:04:34  8    Because it was something that -- we had proposed something

10:04:37  9    similar to Mr. Morgan and he declined to do it.   He wanted

10:04:41 10    to go the Mercedes route than building something by hand.

10:04:46 11    So it was more of a smiley face in gist because that -- that

10:04:51 12    was what Pat and I suggested Mr. Morgan to do but he

10:04:54 13    declined and went off and did his own system.

10:04:57 14    Q.      So your recollection, sitting here today, is that

10:04:59 15    Mr. Morgan was not using the RF power life and reliability

10:05:04 16    testing that Mr. Lewis -- from Qorvo's presentation that

10:05:07 17    Mr. Myrick sent to you?

10:05:09 18    A.      Right.   Nor -- nor the set up or nor how they

10:05:14 19    calculate the activation energy.   Mr. Morgan used a "Satoh".

10:05:24 20    A gentleman called Satoh, S-A-T-O-H, paper, to calculate his

10:05:31 21    activation energy and REL testing.

10:05:34 22    Q.      Mr. Houlden, I've handed you what's been marked as

10:05:38 23    Exhibits 104 and 105.   For the report, Exhibit 104 is an

10:05:43 24    e-mail with the production number AKTS_00126569.   And

10:05:51 25    Exhibit 105 is the attachment to Exhibit 104.   Exhibit 105

726

10:05:56  1    has the production number AKTS_00126570.

10:06:04  2              Mr. Houlden, Exhibit 104 is an e-mail from

10:06:08  3    yourself to Dave Aichele; is that right?

10:06:11  4    A.    Yes.

10:06:11  5    Q.    And again, you've forwarded Mr. Aichele the

10:06:16  6    confidential Qorvo presentation that Mr. Myrick sent to you

10:06:20  7    on August 15, 2018?

10:06:21  8    A.    Yes.

10:06:23  9    Q.    And your e-mail to Mr. Aichele was on August 16,

10:06:29 10    2018; right?

10:06:29 11    A.    Okay.

10:06:35 12    Q.    So that's the day after Mr. Myrick forwarded you this

10:06:40 13    confidential Qorvo presentation?

10:06:41 14    A.    Yes.

10:06:41 15    Q.    So that's now one, two, three folks at -- at -- at

10:06:46 16    Akoustis who you forwarded this presentation to; right?

10:06:50 17    A.    Yes.

10:06:50 18    Q.    Clearly you thought this presentation had some

10:06:55 19    relevance?

10:06:56 20    A.    I don't believe so.  But he may -- he may gather

10:07:01 21    something out of it, but I don't think there was anything

10:07:04 22    particularly relevant to Akoustis because our filter setup

10:07:08 23    was different.  Our calculation of active energy that

10:07:14 24    Mr. Morgan was doing was different.  And everything else on

10:07:19 25    there, all the different things, racking and -- yeah, I

10:07:23  1   don't see there would be much value.  But everyone has an --

10:07:29  2   if you look on one of the page -- I forget what page number

10:07:34  3   it is.  They have an SMR, we have an FBAR, so -- their

10:07:38  4   filter is a diesel engine, ours is an electric engine.  So I

10:07:44  5   -- I'm thinking little value, but you forward it, some

10:07:47  6   people may get something out of it.

10:07:50  7   Q.     Okay.  Mr. Houlden, I've handed you what's been

10:07:54  8   marked as Exhibits 106 and 107?

10:07:57  9   A.     Yes.

10:07:57 10   Q.     Mr. Houlden, do you recognize Exhibits 106 and 107?

10:08:01 11   A.     Yes.  No, I do not recognize them, but I have them in

10:08:04 12   front of me.

10:08:05 13   Q.     Okay.  If we look at Exhibit 106, the e-mail, at the

10:08:09 14   bottom of the e-mail chain there's an e-mail from you to

10:08:13 15   Mr. Aichele, and Mr. Morgan on April 18, 2019, with the

10:08:18 16   subject, "Light reading."

10:08:22 17   A.     Right.

10:08:22 18   Q.     And then if we move up the next chain, we have an

10:08:27 19   e-mail from Mr. Morgan to yourself and Mr. Aichele on

10:08:31 20   April 18, 2019.  Do you see that?

10:08:36 21   A.     Yes.

10:08:36 22   Q.     And you see that Mr. Morgan attaches the confidential

10:08:40 23   Qorvo presentation that Mr. Myrick sent to Akoustis in 2018.

10:08:47 24   A.     Okay.

10:08:48 25   Q.     Do you see that?

10:08:51 1   A.      Yes.

10:08:51 2   Q.      And Mr. Morgan states that in fact, he was using this

10:08:58 3   confidential Qorvo presentation, right?

10:08:59 4   A.      Mr. Morgan says this is a -- I've been referencing

10:09:06 5   this document regarding the methodology to three temp

10:09:09 6   testing MTTF determination.  But at some time, Mr. Morgan

10:09:18 7   switched to the Satoh paper.  So that must have been at a

10:09:24 8   later date when Mr. Morgan changed his plans from 2019, from

10:09:29 9   2022, that he no longer followed this and he -- and he --

10:09:32 10  and he switched to the Satoh paper.

10:09:35 11  Q.      What is MTTF?

10:09:38 12  A.      Meantime to failure.

10:09:40 13  Q.      Meantime to failure testing?

10:09:42 14  A.      Yes.

10:09:42 15  Q.      As of April 18, 2019, the primary document that

10:09:46 16  Mr. Morgan had been referencing for meantime to failure

10:09:53 17  testing was the confidential Qorvo reliability testing

10:09:57 18  document that you forwarded to him in 2018?

10:10:01 19  A.      Yeah, he found it unreliable and he switched to the

10:10:04 20  Satoh paper.

10:10:07 21  Q.      Do you recall when Mr. Morgan switched to the Satoh

10:10:10 22  paper?

10:10:10 23  A.      No, I do not.  Clearly probably after April of 2019.

10:10:15 24  Q.      Mr. Houlden, I've handed you what's been marked as

10:10:19 25  Exhibits 108 and 109.  Exhibit 108 is an e-mail with the

10:10:24  1    Bates production number AKTS_00137343.  And Exhibit 109 is

10:10:32  2    the -- the attachment to Exhibit 108, which has the

10:10:36  3    production number AKTS_00137350.

10:10:44  4    A.     Okay.

10:10:47  5    Q.     So Exhibit 108, do you recognize this document?

10:10:52  6    A.     No.

10:10:54  7    Q.     Okay.  This Attachment 109 reflects the HTOL testing

10:11:01  8    performed at Qorvo?

10:11:02  9    A.     This would be a document that I believe I made that I

10:11:06 10    was probably going by memory of what we tested, because if

10:11:11 11    you look at the bottom half, the test duration, and on the

10:11:17 12    back, I think reliability as tasked, I think I've captured

10:11:25 13    that from Google or the internet.

10:11:27 14             So I've made this document.  I think I generated

10:11:31 15    -- this is probably a word file.  I'm not sure where you got

10:11:34 16    it from, the other file.  This is just a man-made document

10:11:37 17    by me.

10:11:38 18    Q.     What is HTOL?

10:11:40 19    A.     High -- high temp operating life.

10:11:42 20    Q.     And Exhibit 109 reflects your recollection of how

10:11:49 21    Qorvo performed high temperature operating life testing?

10:11:54 22    A.     Right.  Which Mr. Morgan, again, did not agree with

10:12:02 23    and he did his own testing a different way.  He thought this

10:12:05 24    was inadequate, because ██████████████████████████████████

10:12:10 25    █████████████████████████████████████████████████████████.

10:12:13  1    ███████████████████████████████████████████

10:12:17  2    ███████████.  So I think -- I believe -- you can follow-up

10:12:21  3    with Mr. Morgan, he did not follow this.

10:12:24  4    Q.    Mr. Houlden, I'm going to hand you what has been

10:12:27  5    marked as Exhibit 110.  For the record, Exhibit 110 is a

10:12:32  6    one-page document with the production number AKTS_00145340.

10:12:41  7          Mr. Houlden, this appears to be an Outlook

10:12:47  8    calendar invite from yourself to Mr. Lewis, Mr. Gray, and

10:12:52  9    Mr. Hodge; is that right?

10:12:54 10    A.    Yes.

10:12:55 11    Q.    For a meeting in conference room two?

10:12:57 12    A.    Yes.

10:12:58 13    Q.    Is that a conference room that was at Akoustis?

10:13:00 14    A.    Yes.

10:13:01 15    Q.    And the subject of the meeting was "Review Qorvo

10:13:06 16    RVTM."  Do you see that?

10:13:08 17    A.    Yes.

10:13:08 18    Q.    What does RVTM stand for?

10:13:11 19    A.    It would be a test matrix.  I forget what the RV

10:13:16 20    stands for.  Maybe -- yeah, I would be speculating.  Maybe

10:13:20 21    VT -- V stands for voltage test matrix maybe.

10:13:24 22    Q.    How about requirements traceability and verification

10:13:29 23    matrix?

10:13:30 24    A.    Okay.  Yeah.  You obviously -- yes, I would say yes.

10:13:34 25    Q.    Yes.  Okay.

10:13:35  1            Now, so you invited Mr. Lewis.  Can you remind

10:13:40  2  us who Mr. Lewis was?

10:13:41  3  A.      He -- he was director of IT but he also had like

10:13:46  4  software people working for him.

10:13:48  5  Q.      Okay.  And you also invited Mr. Gray.  Who is Jerry

10:13:52  6  Gray?

10:13:52  7  A.      Jerry Gray is the portfolio manager or -- no, he's

10:13:56  8  the product manager.  So he manages the NPI products.

10:14:04  9  Q.      And finally --

10:14:05 10  A.      New Product Introductions.

10:14:07 11  Q.      Sorry.  Finally you invited Dave Hodge.  What was

10:14:10 12  Mr. Hodge's position?

10:14:11 13  A.      Dave Hodge, he was a design engineer, but he also was

10:14:15 14  acting as a lab manager as well early on in the company.

10:14:23 15  Q.      What was the purpose of this meeting that -- that you

10:14:26 16  scheduled for March of 2020?

10:14:28 17  A.      Probably to highlight to them and show them what a --

10:14:36 18  when you characterize parts, what type -- what -- a format

10:14:40 19  of what it would look like or what it should look like,

10:14:45 20  giving them an example of an idea or an example of what a

10:14:48 21  test matrix looks like and the types of tests when you test

10:14:52 22  the product.

10:14:53 23  Q.      You attached two documents to your calendar

10:14:57 24  invitation, do you see that?

10:14:59 25  A.      Yes.

10:14:59  1    Q.      Both appear to be spreadsheets, is that right?

10:15:02  2    A.      They're Excel files, yes.

10:15:05  3    Q.      Okay.  And they're both Qorvo files, is that right?

10:15:08  4    A.      Yes.

10:15:09  5    Q.      Okay.  I'm going to hand you a printed out copy of

10:15:12  6    the spreadsheets, but I'm also going to give you the

10:15:16  7    computer, it has the native version.

10:15:19  8    A.      Okay.

10:15:20  9    Q.      Okay.  So first I'll hand you the printed copy.

10:15:23 10            Mr. Houlden, I've handed you what's been marked

10:15:27 11    as Exhibits 111 and 112.  I'd like you to start with

10:15:32 12    Exhibit 111, which was produced in native format with

10:15:37 13    production number AKTS_00145341.

10:15:46 14            Do you understand that Exhibit 111 is a product

10:15:50 15    requirements document?

10:15:50 16    A.      It's a product requirements document for a front-end

10:15:55 17    module that Akoustis does not do.

10:15:57 18    Q.      Okay.  And you understand that products requirement

10:16:00 19    document -- product requirement documents at Qorvo were

10:16:05 20    confidential files?

10:16:07 21    A.      Yes.

10:16:08 22    Q.      Now, this is a products requirement document,

10:16:13 23    Exhibit 111 is -- for QPF7250; is that right?

10:16:20 24    A.      Yes.

10:16:20 25    Q.      And you can see that if you go to the overview tab on

10:16:24  1    Exhibit 111 native version.

10:16:27  2    A.      Yes, I'm at the overview tab.

10:16:31  3    Q.      And if you look at the bottom of -- well, so at the

10:16:35  4    top of the overview tab you can see the -- the product

10:16:39  5    number that this product requirements document is for;

10:16:42  6    right?

10:16:43  7    A.      Yes.

10:16:43  8    Q.      And that's QPF7250?

10:16:46  9    A.      Yes.

10:16:46 10    Q.      And then if you scroll to the bottom of the overview

10:16:50 11    tab, there's a confidentiality legend there, right?

10:16:54 12    A.      Yes.

10:16:54 13    Q.      And this product requirement document marked as

10:16:57 14    Exhibit 111 is identified as Qorvo confidential and

10:17:00 15    proprietary information?

10:17:03 16    A.      Yes.

10:17:03 17    Q.      Did you have authorization from Qorvo to share this

10:17:06 18    Exhibit 111 with Mr. Lewis, Mr. Gray, or Mr. Hodge?

10:17:12 19    A.      No.

10:17:12 20    Q.      And can you verify for me that the version of the

10:17:15 21    spreadsheet on the computer appears to be the same as the

10:17:18 22    printed out version of the spreadsheet that I handed you as

10:17:24 23    Exhibit 112?

10:17:24 24    A.      Yes.

10:17:25 25    Q.      Now if -- working on the native version of

10:17:28  1    Exhibit 112, could I ask you to turn to the overview tab?

10:17:31  2    A.    Yes, I think I'm on it.

10:17:33  3    Q.    And you'll see that this is another products

10:17:35  4    requirement document from Qorvo; right?

10:17:37  5    A.    Yes.

10:17:38  6    Q.    And this one is for a product with the number

10:17:44  7    QPF4551.

10:17:44  8    A.    Correct.  It's another front-end module that has a PA

10:17:49  9    switch NLNA, which Akoustis did not do those products, nor

10:17:54 10    do we do front-end modules.

10:17:56 11    Q.    The document that has been marked as Exhibit 112 is a

10:18:02 12    confidential Qorvo document?

10:18:03 13    A.    I can't see it, but in the printout it shows it, so

10:18:08 14    yes.

10:18:09 15    Q.    Okay.  And if you scroll to the bottom of the

10:18:12 16    overview tab, you'll see that, again, there's a

10:18:17 17    confidentiality legend on that?

10:18:19 18    A.    Yes.

10:18:19 19    Q.    And more generally, you understood that product

10:18:22 20    requirement documents at Qorvo were confidential?

10:18:23 21    A.    Yes.

10:18:26 22    Q.    And you did not have authorization to share this

10:18:28 23    document with Mr. Lewis, Mr. Gray, or Mr. Hodge; correct?

10:18:32 24    A.    Correct.

10:18:32 25    Q.    Where did you get the products requirement documents

735

10:18:35  1   that have been marked as Exhibits 111 and 112?

10:18:38  2   A.      The 4551 is probably a twelve-year old document.  So

10:18:44  3   I do not know.  The other document I did not recognize, but

10:18:49  4   the 4551 is a very, very old document.  So I do not know

10:18:54  5   where I -- where I located that from.

10:18:57  6   Q.      Mr. Houlden, I've handed you what's been marked as

10:19:01  7   Exhibit 113.  This is a one-page document with the

10:19:04  8   production number AKTS_0348448.

10:19:10  9              Do you have Exhibit 113 in front of you?

10:19:14 10   A.      Yes.

10:19:14 11   Q.      Do you recognize this document?

10:19:15 12   A.      No.

10:19:18 13   Q.      This is a -- an e-mail from Ahmad 0912 to Houlden

10:19:27 14   house, which is listed as R-H-O-U-L-D-E-N at

10:19:37 15   T-R-I-A-D@RR.com.  Do you see that?

10:19:38 16   A.      Yes.

10:19:38 17   Q.      Okay.  Starting with the Ahmad 0912 e-mail address,

10:19:44 18   do you know who that is?

10:19:44 19   A.      That would be Ahmad.

10:19:46 20   Q.      Ahmad.  And what's Ahmad's last name?

10:19:48 21   A.      Abdelmajid.

10:19:51 22   Q.      Okay.  And Mr. Abdelmajid was e-mailing a Houlden

10:19:56 23   house e-mail account.  Does that belong to you?

10:19:59 24   A.      Yes.

10:19:59 25   Q.      Is that a personal e-mail account?

10:20:01  1   A.      Yes.

10:20:02  2   Q.      The subject of the e-mail is PRD?

10:20:06  3   A.      Yes.

10:20:06  4   Q.      And you understand that refers to product requirement

10:20:09  5   document?

10:20:09  6   A.      Yes.

10:20:10  7   Q.      And it looks like Mr. Abdelmajid attached a

10:20:15  8   spreadsheet to his e-mail to you; correct?

10:20:17  9   A.      Yes.

10:20:20 10   Q.      Now, do you understand why Mr. Abdelmajid was sending

10:20:25 11   this spreadsheet to your personal e-mail account?

10:20:29 12   A.      No.

10:20:29 13   Q.      Did Mr. Abdelmajid have your e-mail account at

10:20:37 14   Akoustis?

10:20:37 15   A.      Yes.  And he would have had my gmail account, too.

10:20:43 16   Q.      Mr. Houlden, I've handed you what's been marked as

10:20:46 17   Exhibit 114.  This is a file that was produced -- or a

10:20:52 18   printout of a file that was produced in native format.  The

10:20:55 19   production number for the file was AKTS_00348449.  This is

10:21:02 20   the attachment or was produced as the attachment to

10:21:06 21   Exhibit 113.  Do you recognize Exhibit 114?

10:21:09 22   A.      No.

10:21:13 23   Q.      If you turn to page 1 of Exhibit 114, this appears to

10:21:18 24   be a printout of the product requirement document for

10:21:29 25   QPF4551, right?

10:21:30  1    A.      Yes.

10:21:32  2    Q.      And if you could pull up the printout for

10:21:36  3    Exhibit 112.

10:21:36  4    A.      Yes.

10:21:44  5    Q.      Would you agree with me that Exhibit 114 and

10:21:48  6    Exhibit 112 appear to be the same document?

10:21:50  7    A.      Yes.

10:21:51  8    Q.      Did -- so Mr. Abdelmajid has forwarded you, on

10:21:57  9    September 14, 2021, a confidential Qorvo document; correct?

10:22:02 10    A.      Yes.

10:22:03 11    Q.      To your personal e-mail account?

10:22:05 12    A.      Yes.

10:22:06 13    Q.      Did you ask Mr. Abdelmajid to send you this document?

10:22:10 14    A.      I do not recall.  Because this is -- does not have a

10:22:14 15    filter in it, so I'm trying to understand why he sent it to

10:22:18 16    me.

10:22:19 17    Q.      Was Mr. Abdelmajid in the habit of sending you random

10:22:24 18    documents, random confidential Qorvo documents?

10:22:27 19    A.      Not random, but people, ex-employees, friends, even

10:22:31 20    including Robert Aigner in Florida would send you e-mails

10:22:40 21    thinking friends try to help.  So I do not recall.  I may

10:22:43 22    have requested this from him, I do not recall.

10:22:45 23    Q.      Do you recall Mr. Aigner ever sending you as an

10:22:49 24    attachment a confidential Qorvo document?

10:22:52 25    A.      I do not recall, but we did share a lot of

10:22:55 1    information in e-mails.

10:22:57 2    Q.      Okay.  But you don't recall any instance on -- on

10:22:59 3    which Mr. Aigner sent you confidential Qorvo information?

10:23:06 4    A.      Confidential is vague.  At RFMD/Qorvo, every

10:23:11 5    document, every PowerPoint, word file had confidential in

10:23:14 6    the bottom whether it was confidential or not.  So did

10:23:20 7    Mr. Aigner ever send me a confidential document?  No, but if

10:23:24 8    you look at -- you must have all my e-mails, and so some of

10:23:28 9    the material he has sent one may consider confidential.

10:23:33 10   Q.      Okay.  Just backing up.  Explore that answer a

10:23:37 11   minute.  You said every document at Qorvo has the legend

10:23:41 12   confidential on it?

10:23:43 13   A.      Nearly all documents, especially power points.

10:23:46 14   Clearly all the PDP documents.  Most documents at Qorvo and

10:23:52 15   RFMD always had confidential on the bottom of it.

10:23:59 16   Q.      You understood that what's been marked as Exhibit 112

10:24:03 17   was in fact a confidential Qorvo document?

10:24:07 18   A.      112.

10:24:09 19   Q.      Sorry, I meant 114.  The spreadsheet that

10:24:14 20   Mr. Abdelmajid sent you.

10:24:19 21   A.      Right.  The -- the front end module, which has a PA

10:24:24 22   switch LNA with no filter is -- at Qorvo it shows that it's

10:24:29 23   listed as confidential proprietary, yes.

10:24:31 24   Q.      Did you ever work with product requirement documents

10:24:33 25   during your time at Qorvo?

10:24:36  1    A.       Probably early on in my career.

10:24:41  2    Q.       And you understand that Qorvo did not share product

10:24:44  3    requirement documents outside the company; right?

10:24:47  4    A.       Well, a product requirements document becomes a data

10:24:51  5    sheet, so 4551, this document is the same as the data sheet

10:24:56  6    of 4551, which is on the internet, which is public

10:25:01  7    information.

10:25:01  8             So one would question whether this is

10:25:05  9    proprietary or confidential or not because the data sheet of

10:25:09 10    the 4551 is publicly available on the internet.

10:25:13 11    Q.       I just want to make sure I understand your testimony

10:25:16 12    here.

10:25:16 13    A.       Yeah.

10:25:17 14    Q.       I thought you had told me you understood that whether

10:25:20 15    Mr. Abdelmajid sent you this product requirement document on

10:25:25 16    September 14, 2021, that this document was a confidential

10:25:29 17    Qorvo document.  Are you changing that testimony?

10:25:32 18    A.       No, no, it specifies it there.

10:25:35 19    Q.       Mr. Houlden, I've handed you what's been marked as

10:25:38 20    Exhibits 115 and 116.  Mr. Houlden, do you recognize

10:25:43 21    Exhibits 115 and 116?

10:25:44 22    A.       No.

10:25:46 23    Q.       Okay.  So if we look at Exhibit 115, there's two

10:25:50 24    e-mails in this exhibit; is that right?

10:25:56 25    A.       Yes.

10:25:57  1    Q.       The bottom e-mail in the chain was sent on

10:26:00  2    September 14, 2021?

10:26:02  3    A.       Yes.

10:26:05  4    Q.       At 11:16 a.m.?

10:26:07  5    A.       Yes.

10:26:07  6    Q.       And it was sent to an address that says Houlden

10:26:11  7    house.

10:26:11  8    A.       Yes.

10:26:11  9    Q.       The subject of the e-mail is PRD; right?

10:26:15 10    A.       Yes.

10:26:15 11    Q.       You understand that the e-mail reflected on the

10:26:19 12    bottom part of Exhibit 115 is the e-mail that Mr. Abdelmajid

10:26:25 13    sent you which has been marked as Exhibit 113?

10:26:28 14    A.       Yes.

10:26:31 15    Q.       Now, at 11:36 a.m. on September 14, 2021, you

10:26:37 16    forwarded Mr. Abdelmajid's e-mail from your home address to

10:26:43 17    your work address; is that right?

10:26:47 18    A.       Someone did.  I'm not sure.  It may have been a

10:26:51 19    family member, because I don't use that address.  So

10:26:54 20    Mr. Ahmad may have sent it by mistake.  I would say someone

10:26:58 21    from my house sent it to my work e-mail.

10:27:01 22    Q.       Who else in your house has access to the Houlden

10:27:05 23    house e-mail?

10:27:06 24    A.       My wife and three kids.

10:27:08 25    Q.       Okay.  Do you use the Houlden house e-mail?

10:27:11  1    A.       No.   Very rarely.   Maybe taxes, I think at the end of

10:27:15  2    the year taxes, I kind of bounce between, but taxes

10:27:19  3    primarily.

10:27:19  4    Q.       Now, if you look at Exhibit 116 --

10:27:22  5    A.       Yes.

10:27:23  6    Q.       -- that is the same attachment that Mr. Abdelmajid

10:27:27  7    sent to you at 11:16 a.m. on September 14, 2021?

10:27:33  8    A.       Yes.

10:27:35  9    Q.       Which is the confidential Qorvo product requirement

10:27:38 10    document; right?

10:27:39 11    A.       Yes.

10:27:40 12    Q.       Now, when you or someone at your house forwarded

10:27:45 13    Mr. Abdelmajid's e-mail from the Houlden house account to

10:27:50 14    the Akoustis account --

10:27:55 15    A.       Right.

10:27:56 16    Q.       -- the "from" in Mr. Abdelmajid's e-mail was deleted;

10:28:03 17    right?

10:28:03 18    A.       Yeah.   I can't -- I don't understand that.

10:28:07 19    Q.       Do you know why Mr. Abdelmajid's -- why

10:28:11 20    identification of Mr. Abdelmajid as the sender of the

10:28:16 21    original e-mail would have been obscured?

10:28:20 22    A.       Yeah.   I'm looking.   Tuesday -- this is -- this is

10:28:25 23    11:00 a.m.; right?   So I would -- I would be in -- I would

10:28:29 24    typically be in Charlotte.   I don't know.   I -- I can -- I

10:28:34 25    do not recall why that would be missing.

10:28:37  1    Q.      Is it your hypothesis that your wife or one of your

10:28:42  2    three kids would have, for some reason, deleted

10:28:47  3    Mr. Abdelmajid --

10:28:49  4    A.      No, I don't think so.

10:28:50  5    Q.      Is that something you would have done in order to

10:28:52  6    avoid having Mr. Abdelmajid's e-mail reflected in your

10:28:57  7    Akoustis account?

10:28:58  8    A.      Doubt -- doubtful because I haven't done that in is

10:29:01  9    the past.

10:29:01 10    Q.      But you knew Mr. Abdelmajid was not authorized to

10:29:04 11    send you this document?

10:29:05 12    A.      That is correct.

10:29:06 13    Q.      And so it seems to me that you might have wanted to

10:29:11 14    ensure his and anonymity when you forwarded it to your work

10:29:17 15    account?

10:29:17 16    A.      Doubtful, but -- and I'm not sure I even sent it, but

10:29:21 17    there's a chance.  I'm not sure what else was missing, but

10:29:25 18    yes.

10:29:25 19    Q.      Okay.  Mr. Houlden, I've handed you what's been

10:29:29 20    marked as Exhibit 117.  This was a document that was

10:29:32 21    produced in native format with the production number

10:29:38 22    AKTS_00348540.  Do you recognize what's been marked as

10:29:49 23    Exhibit 117?

10:29:49 24    A.      No.

10:29:50 25    Q.      Okay.  You would agree with me that this is another

10:29:53 1    version of a products requirement document?

10:29:56 2    A.      Yeah, but it doesn't have a part number on there.

10:29:59 3    Did you notice that?  Part number is blank up there.

10:30:02 4    Q.      I did notice that.

10:30:04 5            Do you have any idea of what may have happened

10:30:08 6    there?

10:30:08 7    A.      No.  Is it -- wait.  But is it -- but the FEM

10:30:13 8    description explains it, though.  This FEM is a high power

10:30:25 9    26 DBM front-end module footprint, previous wave 11AC.  11AC

10:30:33 10   is very old.  So 11AC is like WiFi5.  So it's probably quite

10:30:38 11   an old -- well, it says 2017, 2019, so I don't know, maybe

10:30:44 12   four or five years old, front end module, which again, I

10:30:47 13   don't do front end modules.  We don't switches, PA, LANs.

10:30:53 14   Q.      You would agree with me that Exhibit 117 appears to

10:30:56 15   be a Qorvo document?

10:30:57 16   A.      Yes, Qorvo confidential on page 1, yes.

10:31:10 17   Q.      Okay.  So if you could put side-by-side Exhibit 117

10:31:14 18   and then pull out Exhibit 116?  So Exhibit 116 is the Qorvo

10:31:20 19   product requirement document that was forwarded from the

10:31:28 20   Houlden house e-mail to your work e-mail on September 14,

10:31:35 21   2021, at 11:36; right?

10:31:39 22   A.      Okay.  Yes.

10:31:41 23   Q.      Okay.  And then Exhibit 117 appears to be a modified

10:31:44 24   version of that document; right?

10:31:47 25   A.      Yes.

10:31:48  1  Q.      And, in particular, someone has deleted the Qorvo

10:31:51  2  logo from the top left-hand corner; right?

10:31:56  3  A.      Yes.

10:31:57  4  Q.      And has deleted the Qorvo product number; right?

10:32:00  5  A.      Yes.

10:32:01  6  Q.      And then if you look at the bottom of page 1 of

10:32:05  7  Exhibit 117, someone's also deleted the Qorvo

10:32:09  8  confidentiality legend?

10:32:10  9  A.      No, it still has -- it has Qorvo confidential on both

10:32:14 10  of them.

10:32:15 11  Q.      Okay.  If you look at Exhibit 116, at the bottom --

10:32:19 12  A.      Yeah.  Oh, I see.  Yeah, yeah, they eliminated the

10:32:24 13  statement but they've left the template and the Qorvo

10:32:27 14  confidential in the -- the footer.

10:32:30 15  Q.      The footer.

10:32:31 16  A.      Yes.

10:32:32 17  Q.      Right.  So just so that our record is clear, in the

10:32:36 18  version of the Qorvo product requirement document that's

10:32:38 19  been marked as Exhibit 116, there's a legend at the bottom

10:32:42 20  that says, "Printed copy of this document is considered an

10:32:46 21  uncontrolled copy unless control copy designator is

10:32:49 22  identified, Qorvo, Inc., confidential proprietary

10:32:53 23  information."  Right?

10:32:54 24  A.      Yes.

10:32:55 25  Q.      You see that on Exhibit 116?

10:32:58 1  A.      Yes.

10:32:59 2  Q.      Okay.  And then on Exhibit 117, that legend has been

10:33:02 3  deleted?

10:33:03 4  A.      Yes.

10:33:03 5  Q.      So do you recall whether you made these modifications

10:33:07 6  to the Qorvo product requirement document after it was

10:33:10 7  forwarded to your Akoustis e-mail account?

10:33:13 8  A.      I do not recall.

10:33:15 9          THE COURT:  We're going to take a break, I know

10:33:18 10 you need a morning break.  You're going to get a

10:33:21 11 twenty-minute break, probably a good idea, and then I'll

10:33:24 12 give them a chance to go over something.  We're going to try

10:33:28 13 to stay on schedule, but you'll have a little longer break

10:33:31 14 this morning.  Do not discuss the case among yourselves.  Do

10:33:35 15 not let anyone talk to you about it.  We're going let you be

10:33:39 16 excused to the jury room.  I'm going to stay here with

10:33:43 17 counsel for just a second.

10:33:45 18          (Jury exiting the courtroom at 10:33 a.m.)

10:34:09 19         THE COURT:  You may be seated.  Okay.  The

10:34:21 20 question, the only question that has been raised, and I

10:34:25 21 might note that motions in limine, this is not a motion in

10:34:28 22 limine situation, but the Faulkner testimony and the court

10:34:32 23 would have been a motion in limine situation, we're not

10:34:35 24 going to go to that, that's not what we're talking about.

10:34:37 25 The question is whether or not the demonstratives which have

10:34:41  1    been tendered to the Court at this time are demonstratives

10:34:44  2    that can be used in their current form.

10:34:46  3           Now I understand that the objection is that they

10:34:49  4    cannot be, and that's pretty straightforward.  And the

10:34:52  5    reason maybe, when was the demonstrative turned over, I

10:34:57  6    think it was just recently.

10:34:58  7           MR. ELKINS:  Last night at 7 o'clock.

10:35:00  8           THE COURT:  That's what I understood, I wanted

10:35:02  9    to be sure that was right.  There are problems here.  There

10:35:06 10    are problems in connection with the use of the word used

10:35:11 11    because that is a conclusion, and the jury would -- those

10:35:19 12    can be eliminated, most of the headers have a problem in

10:35:23 13    them, so we just need to be aware of that.

10:35:26 14           There is a problem with the use of the word

10:35:28 15    "confidential", because some of these documents, many of the

10:35:31 16    documents while it's understood may or may not be

10:35:35 17    confidential, so the reference to confidential is confusing

10:35:39 18    under 403 and it's a problem.  That doesn't mean -- I

10:35:45 19    understand that would be included in the testimony, his

10:35:48 20    report to a limited -- the negative determination whether it

10:35:54 21    they were confidential, he was making a determination

10:35:57 22    whether or not there was a confidential indication on the

10:35:59 23    document which is totally different as we've heard from

10:36:02 24    numerous people, so the use of the world confidential here

10:36:06 25    is confusing under 403 and not appropriate.

10:36:12  1          There is also the word "took", that's not going

10:36:16  2     to be in there.  That's got to go away if you want to use it

10:36:20  3     at all.  So those are all problems.

10:36:23  4          Now, I could just eliminate everything in the

10:36:27  5     materials that have been submitted, because they do create

10:36:32  6     problems and they attempt to take things away from the jury

10:36:35  7     and suggest things that they would not make a determination

10:36:38  8     on as I understand it.  But I am going to give the plaintiff

10:36:42  9     an opportunity to try to fix this, if they want to.  But, of

10:36:47  10    course, I think that defense counsel is a hundred percent

10:36:50  11    right that if they don't get it right, they don't get to use

10:36:53  12    it.  That's pretty well the way it is.

10:36:55  13         So I wanted to let you know where we are right

10:36:58  14    now, I am going to continue to look at it some more, we

10:37:02  15    always do, I'm going to pull up some more things to look at

10:37:05  16    those, but since we're just dealing with these

10:37:09  17    demonstratives, I think that they do have an issue which has

10:37:15  18    been properly raised by the defense and the Court is ruling

10:37:17  19    in favor of the defense's position on this.

10:37:21  20         But I'm also, as we would always, give either

10:37:24  21    side a chance to modify the materials.  So I think everybody

10:37:32  22    understand what you generally need to do if you want to try

10:37:37  23    to use them, then we will see what you can do in that

10:37:45  24    regard.  And I think we'll have a review of it again.

10:37:50  25         Anything else on this?  I think everybody knows

10:37:52  1    where we are.

10:37:53  2                    MS. AYERS:  May I approach, Your Honor?

10:37:55  3                    THE COURT:  Sure.  You can certainly go to

10:37:57  4    podium.

10:37:58  5                    MS. AYERS:  I just wanted to note for the record

10:38:00  6    that we do think that Mr. Faulkner's expert report

10:38:03  7    adequately discloses --

10:38:05  8                    THE COURT:  It doesn't disclose that he's making

10:38:08  9    determinations as to whether something is confidential.

10:38:10 10    He's just making a determination of whether that appears in

10:38:13 11    the materials as listed.  And one of the questions as raised

10:38:18 12    by the defense is well, some of the things say confidential,

10:38:21 13    but they're not.  Did I get that right, defense counsel?

10:38:25 14                    MR. ELKINS:  Yes, Your Honor.

10:38:25 15                    MS. AYERS:  We understand the Court's ruling, I

10:38:27 16    just wanted to note for purposes of preservation that we do

10:38:31 17    think that Mr. Faulkner's report adequately discloses --

10:38:35 18                    THE COURT:  Tell me where, because I have looked

10:38:36 19    at it.  Tell me where, exactly where.

10:38:42 20                    MS. AYERS:  Of course, Your Honor.  So

10:38:44 21    Mr. Faulkner identifies in paragraph 15 that he received a

10:38:50 22    list of documents that has been identified as confidential

10:38:55 23    material.  And he references that list as appendix C to his

10:38:59 24    expert report, Your Honor, in paragraph 15.

10:39:03 25                    THE COURT:  Right.  Qorvo's counsel, unit 42

10:39:09  1    received from Qorvo's counsel, a list of documents they have

10:39:12  2    identified as Qorvo's confidential materials.  This list is

10:39:18  3    included with this report as Appendix C, unit 42 also

10:39:26  4    received a list of certain documents that Qorvo's technical

10:39:31  5    expert, Dr. Shanfield, analyzed in his report, so that any

10:39:39  6    forensic analysis could be included in this report.  He

10:39:43  7    didn't make any determinations whether anything was

10:39:46  8    confidential.  Right?

10:39:47  9            MS. AYERS:  That is correct.

10:39:48 10            THE COURT:  Okay.  You have answered the

10:39:49 11    question.  He didn't do that.  And we don't want to confuse

10:39:53 12    the jury.  And this would have an impact on the jury.  I

10:39:59 13    looked through it, maybe once or twice, it's not going to be

10:40:02 14    a big deal, but I think the repeated use of some of the

10:40:05 15    terms is simply going to embed in their minds something that

10:40:08 16    he's not really reporting on.  And we don't want to do that.

10:40:13 17            MS. AYERS:  We understand, Your Honor, and we

10:40:14 18    will remove the word confidential from the demonstratives

10:40:17 19    with respect to the files.  Additionally, I do have a

10:40:20 20    question with regard to your ruling on the word "use", would

10:40:23 21    it be acceptable to use the word access because that is what

10:40:27 22    Mr. Faulkner determined as a part of his report.

10:40:30 23            THE COURT:  He did say that.  He did say that.

10:40:32 24    And of course he can't determine used because he didn't make

10:40:36 25    that determination, either.  It's always tough to ask this

10:40:40 1   on the fly and particularly defense counsel wasn't able to

10:40:44 2   see what it looks like yet.  Closer, though.

10:40:49 3             MS. AYERS:  We will revise the demonstratives to

10:40:51 4   remove the word confidential and to also change any use of

10:40:54 5   the word "use" to "access".

10:40:58 6             THE COURT:  Do you remember the other one,

10:40:59 7   "took"?

10:41:00 8             MS. AYERS:  Yes.

10:41:00 9             THE COURT:  "Took" is like really sounding bad.

10:41:04 10            MS. AYERS:  We will change that to possessed.

10:41:08 11  Because ultimately --

10:41:10 12            THE COURT:  That's probably okay.  That's

10:41:11 13  consistent with his report and that's probably okay.  I'm

10:41:14 14  sorry we had to go through this so quickly but I'm really

10:41:18 15  mindful of our time constraints and a good objection by the

10:41:22 16  defense.  Let's take a look at what they bring back, but

10:41:25 17  it's going to be vastly improved over what we got.

10:41:28 18            MS. AYERS:  We appreciate the Court's guidance

10:41:31 19  in advance of our ability to put this witness on the stand,

10:41:34 20  so thank you very much.

10:41:35 21            THE COURT:  I wanted to get to it as quickly as

10:41:38 22  I could.  If anybody else has anything like that, we can get

10:41:41 23  to it, the quicker the better.

10:41:43 24            MR. ELKINS:  Thank you, Your Honor.

10:41:44 25            THE COURT:  Thank you very much.  I know we need

10:41:47 1    the break, I don't know how many minutes, twelve, something

10:41:50 2    like that, and we'll put -- this time all goes really to the

10:41:55 3    plaintiff.

10:41:57 4              COURT CLERK:  All rise.

10:41:58 5              (A brief recess was taken.)

10:52:34 6              THE COURT:  All right.  You may be seated.  We

10:52:54 7    can bring the jury in.

10:53:19 8              (Jury entering the courtroom at 10:53 a.m.)

10:53:46 9              THE COURT:  Everyone can be seated.  And we'll

10:54:01 10   resume the deposition testimony.

10:54:03 11             (Videotape deposition of Rolan Houlden

10:54:08 12   continued:)

10:54:14 13   Q.      Okay.  Are you familiar with metadata?

10:54:17 14   A.      Metadata, no.  I don't believe so.

10:54:19 15   Q.      I've handed you what's been mashed as Exhibit 118?

10:54:24 16   A.      Yes.

10:54:25 17   Q.      This is the printout of the metadata that was

10:54:28 18   produced to us along with Exhibit 117.

10:54:31 19   A.      Right.

10:54:33 20   Q.      And the metadata identifies who is the custodian or

10:54:38 21   the -- whose files the document was found in.  Okay?

10:54:45 22   A.      Okay.

10:54:46 23   Q.      This metadata reflected in Exhibit 118 reflects that

10:54:52 24   Exhibit 117 was found in the files of -- in your files.

10:54:55 25             Do you see that, on the first page?

10:54:57 1    A.       Yeah, the D4, D4 all custodians.  Yes.

10:55:03 2    Q.       And also if you look at the date of the creation of

10:55:05 3    this document it says September 14, 2021, do you see that?

10:55:08 4    A.       Okay.  Yes.

10:55:09 5    Q.       That's the same date on which the Qorvo product

10:55:12 6    requirement document was forwarded from your personal home

10:55:15 7    address to your Akoustis work address; right?

10:55:18 8    A.       Okay.  Yes.

10:55:20 9    Q.       And if you also look at the Exhibit 118, the metadata

10:55:25 10   --

10:55:25 11   A.       Yes.

10:55:26 12   Q.       -- the file name for Exhibit 117 is provided; right?

10:55:30 13   A.       Yes.  11AC, FEM stat.

10:55:34 14   Q.       Does that mean anything to you?

10:55:36 15   A.       Just mean, 11AC means it's old.  And a FEM means that

10:55:41 16   it's not applicable to anything we do at Akoustis.

10:55:44 17   Q.       At the time in September 2021 when this Qorvo

10:55:48 18   document was sent to you, were you working on creating

10:55:52 19   product requirement documents for Akoustis?

10:55:53 20   A.       I -- I -- 2021?  Possibly.  I do not recall.

10:56:15 21   Q.       Okay.  I've handed you what's been marked as

10:56:20 22   Exhibit 119.  This is an e-mail that was produced with the

10:56:22 23   production number AKTS_00162120.

10:56:29 24            Do you recognize this document?

10:56:31 25   A.       No.

10:56:32  1    Q.      Okay.  On September 14, 2021, at 5:25 a.m., Jeff

10:56:39  2    Shealy sent an e-mail to yourself and Dave Aichele.  Do you

10:56:45  3    see that?

10:56:46  4    A.      Yes.

10:56:47  5    Q.      And the subject of the e-mail was "Wi-Fi 6 EPA

10:56:52  6    specs."

10:56:53  7            Do you see that?

10:56:53  8    A.      Yes.

10:56:54  9    Q.      Okay.  And do you understand that that's referring to

10:56:56 10    Wi-Fi 6E power amplifier specs?

10:57:00 11    A.      Yes.

10:57:01 12    Q.      Okay.  And Mr. Shealy asked, "Gents, can you send me

10:57:06 13    a spec on Wi-Fi 6 EPA either in stand-alone or FEM

10:57:12 14    configuration?"

10:57:14 15            Do you see that?

10:57:15 16    A.      Yes.

10:57:15 17    Q.      And FEM refers to front-end module?

10:57:19 18    A.      Yes.  Which we do not do at Akoustis.

10:57:21 19    Q.      But Mr. Shealy was asking you to send him a

10:57:23 20    specification?

10:57:24 21    A.      Yes, I'm not sure why, but he did.

10:57:26 22    Q.      And then -- so that -- he sent that message at

10:57:30 23    5:25 a.m. on September 14, 2021, --

10:57:34 24    A.      Right.

10:57:34 25    Q.      -- right.

10:57:35  1                    And then if I understand the timeline right, Mr.

10:57:41  2      Abdelmajid sent you the Qorvo confidential PR -- PRD

10:57:46  3      document at 11:16 a.m. on the same day.

10:57:51  4      A.      Yes.

10:57:52  5      Q.      Okay.  And then that document was forwarded from your

10:57:56  6      home address to your work address about twenty minutes later

10:58:00  7      on September 14th; right?

10:58:06  8      A.      Right.

10:58:07  9      Q.      Okay.  And then if we look back at Exhibit 119, it

10:58:11 10      looks like at 6:22 p.m. you forwarded Mr. Shealy a document

10:58:18 11      that's referred to as 11AC FEM spec .XLSX; right?

10:58:27 12      A.      Yes.

10:58:28 13      Q.      And you recall that's the title of the modified PRD

10:58:32 14      document that was found in your files?

10:58:35 15      A.      Yes.

10:58:35 16      Q.      Okay.  So it appears that Mr. Shealy asked for a

10:58:39 17      specification for a Wi-Fi 6E power amplifier or a front-end

10:58:46 18      module, you asked Mr. Abdelmajid if he had something to send

10:58:51 19      you, he sent you a confidential Qorvo document, you modified

10:58:54 20      the document to remove references to Qorvo and you sent it

10:58:57 21      to Mr. Shealy?

10:58:59 22      A.      But when I asked Mr. Ahmad, I wouldn't necessarily be

10:59:03 23      asking for a Qorvo document, I'd be asking for any front-end

10:59:08 24      module.  And clearly Wi-Fi 6E, we did not -- Mr. Shealy

10:59:13 25      asked for a Wi-Fi 6 EPA.  That is not what Mr. Ahmad sent.

10:59:19  1    He sent a Wi-Fi 5, very old Wi-Fi 5 front-end module.  So

10:59:26  2    what he sent is not what I would have probably requested.

10:59:34  3    Q.    You used the document Mr. Abdelmajid sent you to send

10:59:39  4    to Mr. Shealy?

10:59:41  5    A.    I did send it to Mr. Shealy.  Whether Mr. Shealy used

10:59:46  6    it or not, I don't know, because it wasn't what he wanted.

10:59:49  7    Q.    Okay.  I've handed you what's been marked as

10:59:53  8    Exhibit 120.  I'll identify this for the record as a

10:59:56  9    document that was produced in native format with the

10:59:58 10    production number AKTS_001628.

11:00:06 11          Mr. Houlden, this was the attachment to

11:00:11 12    Exhibit 119.  Okay?

11:00:13 13    A.    Okay.

11:00:15 14    Q.    Meaning this is the document that you sent to

11:00:20 15    Mr. Shealy --

11:00:22 16    A.    Yes.

11:00:23 17    Q.    -- on September 14, 2021; right?

11:00:26 18    A.    Yes.

11:00:27 19    Q.    And this appears to be the modified version of the

11:00:30 20    Qorvo product requirement document that we discussed earlier

11:00:33 21    and marked as Exhibit 117; correct?

11:00:38 22    A.    Yes, yes, yes, yes.

11:00:41 23    Q.    Now, Mr. Abdelmajid has sent you numerous

11:00:47 24    confidential Qorvo documents over the years; is that fair to

11:00:51 25    say?

11:00:51  1    A.      Yes, he has sent -- you've shown me, I don't know,

11:00:56  2    four or five different documents, I forget -- I'm losing

11:00:59  3    track of the documents, but yes, I think Mr. Abdelmajid sent

11:01:02  4    me.

11:01:02  5    Q.      You said Mr. Abdelmajid would send you documents to

11:01:06  6    help.  You mean help Akoustis?

11:01:08  7    A.      Just help.  Thinking he would help me.  Clearly, none

11:01:11  8    of the documents that he sent had any IP or trade secrets.

11:01:15  9    Sometimes there were little value.  We were really looking

11:01:20 10    for like templates.  The con -- it's really not the content.

11:01:24 11    There's nothing in there, the content of -- is of value,

11:01:28 12    it's more the templates to show the software engineers, this

11:01:32 13    is what I want you to go design.

11:01:34 14    Q.      On the last occasion we looked at, exhibit --

11:01:37 15    Exhibit 116 and 117 -- or 115 and 116, you actually asked

11:01:47 16    Mr. Abdelmajid to send you those documents; right?

11:01:54 17    A.      Can you --

11:01:56 18    Q.      Sorry.  In response to -- sorry.  Exhibits 115 and

11:02:01 19    116, Mr. Abdelmajid sent to you a confidential Qorvo product

11:02:07 20    requirement document; right?

11:02:09 21    A.      He sent a Qorvo document, but I wasn't -- I wasn't

11:02:14 22    asked -- asking or looking for a Qorvo document, I was

11:02:19 23    looking -- Mr. Jeff was looking for a spec for a Wi-Fi 6

11:02:25 24    EPA, right.  And that's not what Mr. Ahmad sent.  So when he

11:02:31 25    was not able to probably find a Wi-Fi 6 EPA spec, he -- he

11:02:38  1    must have sent this Qorvo spec.

11:02:43  2    Q.    Okay.  Mr. Houlden, I've handed you what's been

11:02:49  3    marked as Exhibits 121, 122, 123, 124 and 125.  Mr. Houlden,

11:02:56  4    do you recognize what's been marked as Exhibits 121

11:02:59  5    through 125?

11:03:00  6    A.    No.

11:03:00  7    Q.    You would agree with me that this is an e-mail from

11:03:04  8    Mr. Abdelmajid to yourself on February 18, 2021?

11:03:09  9    A.    Yes.

11:03:11 10    Q.    And again, Mr. Abdelmajid has sent you a number of

11:03:15 11    confidential Qorvo documents; right?

11:03:18 12    A.    Yes.

11:03:20 13    Q.    Okay.  In particular, he sent you four different

11:03:24 14    confidential Qorvo documents?

11:03:25 15    A.    Yes.

11:03:28 16    Q.    Did you ask Mr. Abdelmajid to send you these

11:03:31 17    confidential Qorvo documents?

11:03:33 18    A.    I do not recall.  I'm looking at the date to see --

11:03:39 19    2021.  So this is prior -- I do not recall.

11:03:43 20    Q.    Did Mr. Abdelmajid have authority from Qorvo to send

11:03:47 21    you these materials?

11:03:49 22    A.    No.  They're all -- they're very old PAs and switches

11:03:55 23    and LNAs, there -- there are no switches, actually.  It may

11:04:00 24    be an old front end module, an old PA, an old switch that we

11:04:06 25    don't do at Akoustis.

11:04:07  1          So, again, I'm -- I'm trying to recollect why,

11:04:11  2   if I did ask him and why he would send them, because we

11:04:14  3   don't do any of these products at Akoustis and never did do

11:04:18  4   any of these products at Akoustis or these types of products

11:04:21  5   at Akoustis.

11:04:23  6   Q.    We discussed earlier packaging.  Do you recall that?

11:04:26  7   A.    Yes.

11:04:27  8   Q.    Packaging in short, would be putting a casing around

11:04:31  9   a semiconductor device; is that right?

11:04:35 10   A.    Types of packaging, but these -- these packages are

11:04:40 11   very different.  These packages are probably QFNs, they're

11:04:45 12   plastic packages, so you can't put filters in these types of

11:04:49 13   packages.  So I'm still trying to understand why -- the

11:04:53 14   relevance of these documents because not only do we not make

11:04:56 15   these parts, we don't even use these types of packages.

11:05:00 16   Q.    We discussed earlier packaging, do you recall that?

11:05:02 17   A.    Yes.

11:05:03 18   Q.    Packaging, in short, would be putting a casing around

11:05:06 19   a semiconductor device, is that right?

11:05:12 20   A.    Types of packaging, but these -- these packages are

11:05:16 21   very different.  These packages are probably QFNs.  They're

11:05:20 22   plastic packages, so you can't put filters in these types of

11:05:24 23   packages.  So I'm still trying to understand why -- the

11:05:29 24   relevance of these documents, but not only do we not make

11:05:32 25   these parts, we don't even use these types of packages.

11:05:35  1    Q.      Your position on Mr. Abdelmajid's e-mail of Qorvo

11:05:39  2    confidential documents to you is you don't understand what

11:05:41  3    the relevance of those documents is?

11:05:42  4    A.      Right, to Akoustis, as of today.  Maybe back in

11:05:46  5    February 2021 it had something different, but we -- we never

11:05:50  6    did develop PAs, had no intentions of doing PAs, never did

11:05:54  7    switches, never did FEM, so -- and none of these things had

11:06:00  8    filters.  Never did PAs.  Never did switches, never did

11:06:04  9    low-noise amplifiers.  I'm acronymizing that LNA as low

11:06:11 10    noise amplifier, so I apologize.

11:06:13 11    Q.      And you never did FEMs?

11:06:16 12    A.      And we never did front-end modules.

11:06:19 13    Q.      Front-end modules?

11:06:21 14    A.      Is an FEM.

11:06:22 15    Q.      I'm handing you what has been marked as Exhibit 126.

11:06:26 16    I'll identify this for the record as a multipage PowerPoint

11:06:30 17    presentation.  The first page of which has the Bates number

11:06:33 18    AKS -- AKTS_00196501.

11:06:41 19            Mr. Houlden, I'd ask you to take a quick look at

11:06:47 20    this document and tell me if you recognize it?

11:06:49 21    A.      I do not recognize it.

11:06:51 22    Q.      This is a document that was produced to us by

11:06:56 23    Akoustis from your files.

11:06:58 24    A.      Okay.

11:06:59 25    Q.      Would you agree with me that this is a confidential

11:07:02  1    Qorvo document?

11:07:03  2    A.    Yes.  It has confidential written here, yes.

11:07:06  3    Q.    You would agree with me that Exhibit 126 is a

11:07:12  4    confidential Qorvo document?

11:07:14  5    A.    Yes.

11:07:16  6    Q.    And you did not have authorization to share this

11:07:18  7    document with Akoustis?

11:07:19  8    A.    Did I?  I don't even know if I shared it with

11:07:24  9    Akoustis.  I don't recall sharing it with Akoustis.

11:07:28 10    Q.    Yes.  And particularly out of your files at Akoustis?

11:07:32 11    A.    Right.  So if it was in my -- if it was -- so if it

11:07:37 12    was in my files, if it was in my files, but did I share it?

11:07:43 13    Because it's a PA, and we don't do PAs at Akoustis, so I

11:07:47 14    would be a little surprised if I shared it with other people

11:07:51 15    at Akoustis, but I may have, if you said that -- I know I

11:07:57 16    may have had a record of it somewhere.

11:08:02 17            But we don't do power amplifiers at Akoustis so

11:08:05 18    this wouldn't really bring any value to anyone at Akoustis.

11:08:08 19    Q.    So in your view, we should add Exhibit 126 to the

11:08:13 20    growing pile of irrelevant documents from Qorvo?

11:08:17 21    A.    Probably little value, yes.

11:08:18 22    Q.    And you don't have any idea why you would have taken

11:08:21 23    this document with you to Akoustis?

11:08:23 24    A.    Right.  Because Akoustis doesn't do power amplifiers.

11:08:26 25    Q.    Okay.  Mr. Houlden, I've marked as Exhibit 127 a

11:08:32 1    multi page document.   The first page of this is -- got the

11:08:36 2    production number AKTS-00197071.   I ask you, do you

11:08:50 3    recognize what's been marked as Exhibit 127?

11:08:52 4    A.      No, I do not.

11:08:53 5    Q.      On the first page of this Exhibit 127, you can see

11:08:56 6    that this is a Qorvo presentation?

11:08:58 7    A.      Yes.

11:08:59 8    Q.      And it concerns the IDP market segment analysis.   Do

11:09:04 9    you see that?

11:09:04 10   A.      Yes.

11:09:04 11   Q.      What does IDP mean?

11:09:07 12   A.      Infrastructure and defense.

11:09:11 13   Q.      Okay.   And the date on this is June 2015?

11:09:15 14   A.      Yes.

11:09:15 15   Q.      So this would have been during the time frame when

11:09:18 16   you were still a general manager of wireless connectivity at

11:09:22 17   Qorvo?

11:09:23 18   A.      Yes.

11:09:25 19   Q.      Did Akoustis develop products for the IDP market?

11:09:30 20   A.      Well, it definitely -- well, we had one defense

11:09:34 21   customer, but infrastructure and defense was really GAN.

11:09:41 22   They were really working -- they were really focused in

11:09:45 23   Texas and really GAN focused.   So yes, we had one defense

11:09:50 24   customer, Akoustis, and tried to get in the infrastructure

11:09:55 25   market, but really not -- no really key infrastructure

11:10:03  1    customers.  So it wasn't really a market that we focused on.

11:10:07  2    Q.    Exhibit 127 is a confidential Qorvo document?

11:10:10  3    A.    Yes.

11:10:10  4    Q.    You did not have authorization to share this document

11:10:14  5    with Akoustis?

11:10:14  6    A.    Right.  And I'm not sure I shared it.  But I did not

11:10:20  7    have the -- can you rephrase the question again?

11:10:23  8    Q.    You did not have --

11:10:25  9    A.    I did not have the right to have it.

11:10:28 10    Q.    This is a document that under your obligations,

11:10:31 11    pursuant to Exhibit 77, you were required to return to

11:10:34 12    Qorvo?

11:10:35 13    A.    Right.  I'm not sure how I obtained this document, so

11:10:44 14    I'm not saying that I did not return all my documents.  I'm

11:10:48 15    not sure how -- I do not recall -- I have never seen -- I

11:10:53 16    cannot recall this document.  So I don't know when -- how I

11:10:56 17    got this document, and if I failed to return it when I

11:10:58 18    terminated or left in September 2016.

11:11:01 19    Q.    And you also don't know why you would have brought

11:11:04 20    this document to Akoustis?

11:11:05 21    A.    I do not know why this document was on my laptop, if

11:11:10 22    that's where you said you found it, because it has no value

11:11:13 23    to Akoustis.

11:11:14 24    Q.    Mr. Houlden, I've handed you what has been marked as

11:11:18 25    Exhibit 128.  I'll identify this for the record as a multi

11:11:21 1    page document with a production number on the first page as

11:11:24 2    AKTS 00203690.

11:11:28 3              The first page of this document says CPE Wi-Fi E

11:11:34 4    strategy review, and has the date February 2016.

11:11:37 5              Do you see that?

11:11:38 6    A.    Yes.

11:11:38 7    Q.    Do you recognize this document?

11:11:40 8    A.    No.

11:11:41 9    Q.    And in February of 2016 you were still working as a

11:11:45 10    general manager at Qorvo?

11:11:47 11    A.    Yes.

11:11:47 12    Q.    What does CPE mean?

11:11:48 13    A.    Consumer premise equipment.

11:11:51 14    Q.    What is a CPE Wi-Fi E strategy review?

11:11:55 15    A.    I don't know what the E stands for.

11:11:57 16    Q.    This is another confidential Qorvo document?

11:12:10 17    A.    Yes.

11:12:15 18    Q.    You did not have authorization to share this document

11:12:19 19    with Akoustis?

11:12:20 20    A.    Correct.

11:12:20 21    Q.    And do you know why this document would have been

11:12:24 22    found in your files at Akoustis?

11:12:26 23    A.    No, I do not.

11:12:27 24    Q.    Mr. Houlden, I've handed you what has been marked as

11:12:32 25    Exhibit 129.  I will identify it for the record as a

11:12:35  1    multipage document with the production number on the first

11:12:40  2    page of AKTS-00205076.

11:12:47  3                On the first page of this document it says

11:12:52  4    "Qorvo" and then "grow IDP, CPE Wi-Fi revenue and fiscal

11:12:59  5    year 2017" and identifies the author as James Klein.  Do you

11:13:05  6    see that?

11:13:05  7    A.     Yes.

11:13:05  8    Q.     And the date of this document says last update

11:13:08  9    May 19th, 2016?

11:13:09 10    A.     Yes.

11:13:10 11    Q.     And again, this was during the time when you were the

11:13:13 12    general manager of the Wireless Connectivity Business Unit

11:13:17 13    at Qorvo?

11:13:18 14    A.     Yes.

11:13:18 15    Q.     So again you would agree with me that this is a

11:13:21 16    confidential Qorvo presentation?

11:13:25 17    A.     Yes.  It's a corporate Qorvo presentation, maybe

11:13:31 18    James Klein to me.

11:13:33 19    Q.     The question was, is this a confidential Qorvo

11:13:38 20    presentation?

11:13:39 21    A.     Yes.  It is a confidential presentation, yes.

11:13:43 22    Q.     Okay.  And again, you did not have authorization to

11:13:46 23    share Exhibit 129 with anyone at Akoustis?

11:13:49 24    A.     No.

11:13:52 25    Q.     And do you have any idea how this file would have

11:13:55  1    ended up in your files -- how this document would have ended

11:13:59  2    up in your files at Akoustis?

11:14:00  3    A.     No.

11:14:01  4    Q.     Mr. Houlden, I've handed you what has been marked as

11:14:06  5    Exhibit 130.  This is a multipage document, the first page

11:14:09  6    of which has the production number AKTS-00206497.

11:14:17  7           Do you recognize this document?

11:14:20  8    A.     No.

11:14:20  9    Q.     On the first page of this document there's the title,

11:14:26 10    "grow IDP, CPE Wi-Fi revenue in fiscal year 2017."  Do you

11:14:34 11    see that?

11:14:35 12    A.     Yes.

11:14:35 13    Q.     And the author of this document is listed as Rohan

11:14:39 14    Houlden?

11:14:39 15    A.     Yes.

11:14:39 16    Q.     Do you know why you brought this document with you to

11:14:42 17    Akoustis?

11:14:42 18    A.     No, I do not.  It does look to be in response of my

11:14:50 19    compensation package of Exhibit 129.  So it is probably a

11:14:54 20    file to James Klein as a result of his feedback of -- of my

11:15:00 21    yearly goals.  A review of the status of my yearly goals.

11:15:13 22    Q.     You would agree with me that this is a confidential

11:15:16 23    Qorvo document that's been marked as Exhibit 134?

11:15:20 24    A.     Well it's confidential, but the data all comes from

11:15:22 25    customers.  Customer sets the spec, so I'm not really sure.

11:15:26  1    It comes from customers, so could go to Cisco, Netgear,

11:15:30  2    Broadcom, Qualcomm and get this.  So this may be -- yeah,

11:15:33  3    you get it from customers.

11:15:35  4    Q.    Did Akoustis go to Cisco, Netgear, Qualcomm, and

11:15:40  5    other companies to collect this data?

11:15:42  6    A.    Yes.

11:15:42  7    Q.    Mr. Houlden, I've handed you what's been marked as

11:15:48  8    Exhibit 135.  I'll identify this for the record as a

11:15:51  9    multipage document that has the production number

11:15:53 10    AKTS-00202599 on it.

11:15:59 11          The first page says, "Qorvo statement of work

11:16:05 12    5-gigahertz UNII2C-3, Wi-Fi BAW filter."  Do you see that?

11:16:14 13    A.    Yes.

11:16:15 14    Q.    What is a 5-gigahertz UNII2C-3 Wi-Fi BAW filter?

11:16:20 15    A.    It is a 5.6-gigahertz filter.

11:16:24 16    Q.    Did Akoustis have a 5.6-gigahertz filter in

11:16:29 17    development?

11:16:30 18    A.    At what time frame?

11:16:33 19    Q.    After 2015.

11:16:35 20    A.    Yes, much -- much after.  Three years later, four

11:16:39 21    years later, maybe 2018, 2019.

11:16:43 22    Q.    Okay.  You would agree with me that Exhibit 135 is a

11:16:47 23    confidential Qorvo document?

11:16:48 24    A.    Yes, it is labeled "confidential."

11:16:52 25    Q.    You didn't have authorization to share Exhibit 135

11:16:57  1    with Akoustis?

11:16:57  2    A.    No, I did not.

11:16:59  3    Q.    And you didn't have authorization to bring

11:17:01  4    Exhibit 135 with you to Akoustis?

11:17:03  5    A.    No.

11:17:03  6    Q.    Mr. Houlden, I've handed you what has been marked as

11:17:07  7    Exhibit 136.  On the first page of this document there's the

11:17:11  8    production number AKTS-00203493.

11:17:16  9            Do you recognize what has been marked as

11:17:22 10    Exhibit 136?

11:17:22 11    A.    No.

11:17:23 12    Q.    Again, this is a Qorvo presentation.  The front page

11:17:28 13    -- first page of which says, "statement of work, 5-gigahertz

11:17:32 14    UNII2C-3 Wi-Fi BAW diplexer, is that right?

11:17:41 15    A.    Yes.

11:17:41 16    Q.    What is a Wi-Fi BAW diplexer?

11:17:44 17    A.    A diplexer -- a diplexer is where you have two

11:18:00 18    filters that are connected together and work simultaneously.

11:18:04 19            I know Akoustis never did one.  I'm not sure

11:18:07 20    even if Qorvo ever made one, maybe not in my time there.

11:18:12 21    Q.    Would having a 5.2-gigahertz BAW filter and a

11:18:17 22    5.6-gigahertz BAW filter working in tangent be a diplexer?

11:18:23 23    A.    No.  That is not what the spec is here.  The spec is

11:18:27 24    trying to get a 1256 to work with a V2X filter.

11:18:37 25    5.6-gigahertz filter to work with a V2X filter.

11:18:42  1    Q.      And by V2X, you mean automotive filter?

11:18:46  2    A.      Yes.  And Akoustis did not do automotive, so this

11:18:52  3    would be of no value to Akoustis.

11:18:54  4    Q.      You would agree with me that Exhibit 136 is a

11:18:57  5    confidential Qorvo presentation?

11:18:58  6    A.      Yes.

11:18:58  7    Q.      You had no authorization to take this presentation

11:19:02  8    with you to Akoustis?

11:19:03  9    A.      Correct.

11:19:05 10    Q.      And you didn't have any authorization to share this

11:19:09 11    presentation with anyone at Akoustis?

11:19:11 12    A.      I do not recall sharing this document with anyone at

11:19:13 13    Akoustis.

11:19:13 14    Q.      Okay.  And you didn't have authorization to do so?

11:19:18 15    A.      Right.

11:19:19 16    Q.      Mr. Houlden, I've handed you what has been marked as

11:19:23 17    Exhibits 137, 138, and 139.  If we look at Exhibit 137 for a

11:19:27 18    moment, this is an e-mail to you from Mr. Aichele; is that

11:19:33 19    right?

11:19:33 20    A.      Yes.

11:19:34 21    Q.      The e-mail is dated January 7, 2020?

11:19:39 22    A.      Okay.

11:19:40 23    Q.      Is that right?

11:19:40 24    A.      Yes.

11:19:41 25    Q.      And the subject is Qorvo 5.2-gigahertz.  Do you see

11:19:45 1    that?

11:19:45 2    A.    Yes.

11:19:46 3    Q.    And Mr. Aichele says, "Attached is a 5.2-gigahertz

11:19:50 4    data and data sheet."

11:19:54 5    A.    Yes.

11:19:54 6    Q.    "Word on the street is that they will be sampling the

11:19:59 7    5.6-gigahertz after CNY.   Thanks, Dave."

11:20:06 8    A.    Okay.

11:20:07 9    Q.    How is this information relevant to you?

11:20:08 10   A.    He's probably -- you know, it is very common in the

11:20:12 11   industry to get competitor's parts, salespeople get

11:20:16 12   competitors parts, it's very common in the practice.   We did

11:20:21 13   it at RFMD/Qorvo, clearly Mr. Aichele has done the same

11:20:26 14   thing.   So he's obviously went and got some samples of Qorvo

11:20:29 15   parts that Qorvo sampled to their customers.   Mr. Aichele

11:20:33 16   has probably got them back and probably taken some data.

11:20:37 17   And our parts are already in production, so he is probably

11:20:41 18   wanting to just show me for information of what the

11:20:45 19   performance of Qorvo's soon to be parts are compared to our

11:20:50 20   parts that are already into production.

11:20:54 21   Q.    Okay.   At this time in January of 2020, was Akoustis

11:20:58 22   working on a second generation of Wi-Fi 5-gigahertz

11:21:03 23   products?

11:21:06 24   A.    I do not know.   We were already -- 5.2 and 5.6 are

11:21:11 25   Wi-Fi 5 parts.   Once we developed 1252 and 1256, we went on

11:21:17 1   to Wi-Fi 6 and 6 E.  I think at some time we went back, but

11:21:22 2   our focus at this time in January 2020, I would say we were

11:21:27 3   not working on -- I am not 100 percent sure -- but I believe

11:21:32 4   we were not working on second generation 52 and 56.  We were

11:21:37 5   working on future generation of products that no one else

11:21:41 6   had had.

11:21:42 7   Q.    And do you know whether Akoustis had an NDA with

11:21:46 8   Qorvo that would have entitled Akoustis to have this

11:21:49 9   confidential data sheet?

11:21:50 10  A.    No, they did not.  Well, Akoustis and Qorvo did have

11:21:55 11  some NDAs in place, because they looked at purchasing us, so

11:22:00 12  I'm not sure what the NDA, as I was not involved in that due

11:22:05 13  diligence.  But I would think not, but I cannot answer that.

11:22:09 14  Q.    Was there someone at Qorvo who was sending you

11:22:13 15  intelligence reports?

11:22:15 16  A.    No.  You could -- typically, when you visit

11:22:19 17  customers, customers -- if you visit customers anywhere in

11:22:23 18  Silicon Valley, Taiwan, China, you can -- any -- any

11:22:30 19  presentation made to a customer, you know shortly thereafter

11:22:34 20  that customer will share that information.

11:22:36 21  Q.    Mr. Houlden, I've handed you a copy of Exhibit 144.

11:22:41 22  I'll identify this for the record as a multi page document.

11:22:45 23  The first page is production number AKTS_00197279.  On the

11:22:54 24  front of the first page it says "Qorvo automotive product

11:22:58 25  line strategy connectivity."

11:23:00  1                    Do you see that?

11:23:01  2    A.       Yes.

11:23:01  3    Q.       Do you recognize this document?

11:23:02  4    A.       No.

11:23:03  5    Q.       While you were the general manager of the Wireless

11:23:09  6    Connectivity Business Unit at Qorvo, I think you mentioned

11:23:11  7    you had responsibility for the automotive product line?

11:23:14  8    A.       Yes, I incubated automotive within RFMD and then once

11:23:20  9    Qorvo came about, I kept that business unit or product line.

11:23:23 10    Q.       Okay.  And this Exhibit 144 is a confidential Qorvo

11:23:27 11    business plan for the automotive product line?

11:23:30 12    A.       Yeah.  That's an old strategy, it looks like from

11:23:35 13    2015, maybe.

11:23:36 14    Q.       How did you obtain a copy of this document?

11:23:38 15    A.       I do not recall.  We did not do automotive at

11:23:42 16    Akoustis.  So I mandated that we did not do that because

11:23:48 17    small companies, it takes a long time to get the business.

11:23:52 18    And I continually told Mr. Aichele we're not doing

11:23:56 19    automotive.  So I'm not sure if it was on my laptop, why, it

11:24:00 20    would have little value.

11:24:02 21    Q.       So you left Akoustis in July 2022.  Akoustis was not

11:24:06 22    developing an automotive product line?

11:24:08 23    A.       Definitely not a product line.  I know Mr. Aichele

11:24:11 24    was always interested in doing an automotive product, but I

11:24:14 25    kept telling him no.  So we did not have an automotive

11:24:19  1    product when I was there.  I think maybe we had started

11:24:26  2    looking at one, or he went around my back and talked to an

11:24:29  3    engineer a little bit to get one going, but it was not a

11:24:32  4    focus at Akoustis.

11:24:34  5    Q.    Mr. Houlden, I've handed you what has been marked as

11:24:37  6    Exhibit 146.  It's a multipage document, the first page of

11:24:42  7    which has the production number AKTS_00198854.  On the front

11:24:50  8    page it says, "Qorvo automotive product line strategy

11:24:55  9    connectivity."

11:24:57 10            Do you see that?

11:24:57 11    A.    Yes.

11:24:58 12    Q.    Again, this appears to be a confidential Qorvo

11:25:02 13    business plan concerning the automotive product line; is

11:25:06 14    that right?

11:25:06 15    A.    Yes.

11:25:07 16    Q.    You did not have authorization to have this document

11:25:11 17    at Akoustis; correct?

11:25:13 18    A.    Correct.

11:25:14 19    Q.    Mr. Houlden, I've handed you what has been marked as

11:25:19 20    Exhibit 148.  This is a multipage document with the

11:25:22 21    production number on the first page as AKTS_00205066.  Do

11:25:30 22    you recognize this document?

11:25:34 23    A.    No.

11:25:36 24    Q.    It looks like it is a financial analysis of an

11:25:42 25    automotive product line; is that fair?

11:25:46  1    A.      I think that what it is is auto LTE.  Previously --

11:25:52  2    when is this date dated -- 2015.  So previously, in 2013,

11:25:58  3    14, 2012, we were probably doing Wi-Fi in automotive.  We

11:26:02  4    went off and did some LNAs in automotive for Sirius/XM.  But

11:26:09  5    I think what they're looking at here is going off and doing

11:26:12  6    LTE which is 4G.  So they are looking at possibly taking

11:26:16  7    some existing RFMD, Qorvo, and possibly TriQuint, 4GPAs, and

11:26:23  8    getting them, doing advance qualification work, AEC-Q100

11:26:29  9    quals on those devices and justifying the return on the --

11:26:33 10    return on the investment and the heads required to go off

11:26:36 11    and get involved in LTE automotive market segment.

11:26:41 12    Q.      Would that operation have been something that you

11:26:48 13    were supervising as the GM of wireless connectivity at

11:26:54 14    Qorvo?

11:26:58 15    A.      It may have reporting my function -- my -- my -- at

11:27:04 16    wireless connectivity, we didn't do any LTE.  And we don't

11:27:08 17    do any LTE at Akoustis either, that's 4G.  So really what we

11:27:13 18    were probably looking at there is, for the first time ever,

11:27:15 19    taking some products from the cellular side of the company

11:27:19 20    and trying to bring them over to the IDP side and doing some

11:27:23 21    qualification testing.

11:27:24 22            So you would be taking products from other

11:27:27 23    business units, so I would have almost zero knowledge on LTE

11:27:33 24    and this.  And whether it fell in my group or not, it was

11:27:37 25    probably TBD at this stage.  But probably because I owned

11:27:41  1    automotive, maybe I would, but my team had no -- LTE -- when

11:27:46  2    you do LTE and your -- your designs and power amplifier

11:27:51  3    designs are very, very complicated and you're working with

11:27:55  4    Qualcomm chip sets.

11:27:56  5              So my team and I did not have the skill set to

11:27:59  6    probably do LTE.  I think they did -- after I left -- after

11:28:04  7    I left, they took automotive out of my business unit and

11:28:07  8    opened up a new business unit and maybe they're doing LTE

11:28:11  9    today.  But as you can see, FY17, that's really calendar

11:28:17 10    year '16, calendar year '17.  There was very little revenues

11:28:22 11    in LTE so my business unit wasn't really involved.

11:28:25 12    Q.    Do you know how this document ended up in your files?

11:28:28 13    A.    No idea.

11:28:29 14    Q.    You would agree with me that this is a confidential

11:28:33 15    Qorvo document?

11:28:33 16    A.    Yes, it is a confidential document, yes.

11:28:40 17    Q.    And not one that you were authorized to have at

11:28:43 18    Akoustis?

11:28:43 19    A.    Correct.

11:28:44 20    Q.    Mr. Houlden, I've handed you what has been marked as

11:28:49 21    Exhibit 149.  It's a multipage document.  The first page has

11:28:53 22    the production number AKTS-00204845.  The first page says

11:29:00 23    "Qorvo EG 5877, QPQ1901Q, 802.11P, V2X, final circuit layout

11:29:16 24    and tile."

11:29:17 25              Do you see that?

11:29:17  1    A.      Yes.

11:29:17  2    Q.      Do you recognize this presentation?

11:29:19  3    A.      No.

11:29:19  4    Q.      So would you agree with me that this presentation

11:29:23  5    that's been marked as Exhibit 149 shows the final circuit

11:29:27  6    layout and tile for the QPQ1901Q product at Qorvo?

11:29:32  7    A.      Yes.

11:29:32  8    Q.      You would agree with me that this is a confidential

11:29:35  9    Qorvo presentation?

11:29:37 10    A.      Yes.

11:29:38 11    Q.      And you did not have authorization to share this

11:29:40 12    document with Akoustis, right?

11:29:42 13    A.      Yeah, and I don't believe -- I don't believe I did.

11:29:46 14    Q.      So Mr. Houlden, I've handed you what's been marked as

11:29:51 15    Exhibit 150.

11:29:53 16    A.      Okay.

11:29:53 17    Q.      This is a printout of the metadata that was produced

11:30:01 18    to us along with Exhibit 149?

11:30:03 19    A.      Okay.

11:30:03 20    Q.      As you can see, this indicates that the custodian of

11:30:07 21    this document was Rohan Houlden?

11:30:09 22    A.      Yes.

11:30:10 23    Q.      And the creation date of Exhibit 149 was May 13,

11:30:17 24    2016?

11:30:17 25    A.      Yes.

| | | |
|---|---|---|
| 11:30:19 | 1 | Q.      In May of 2016, would you have been working on |
| 11:30:30 | 2 | 802.11P V2X products at Qorvo? |
| 11:30:32 | 3 | A.      I would not have worked on the products, but this |
| 11:30:35 | 4 | particular product may have been in my business unit. |
| 11:30:38 | 5 | Q.      Okay.  So it's possible that someone would have sent |
| 11:30:41 | 6 | you this presentation as -- as part of supervising the |
| 11:30:44 | 7 | automotive product line? |
| 11:30:45 | 8 | A.      Yes, a marketing guy or someone may have sent this to |
| 11:30:48 | 9 | me. |
| 11:30:49 | 10 | Q.      Okay.  I think I asked this already, but just to make |
| 11:30:51 | 11 | sure, you didn't have authorization to have this |
| 11:30:54 | 12 | confidential Qorvo presentation marked as Exhibit 149 in |
| 11:30:58 | 13 | your files at Akoustis? |
| 11:30:59 | 14 | A.      No, I did not. |
| 11:31:02 | 15 | Q.      If we look at Exhibit 150, on the second page, it |
| 11:31:07 | 16 | gives the document author of Exhibit 149 as Jeff Galipeau. |
| 11:31:17 | 17 | A.      What page are you on? |
| 11:31:19 | 18 | Q.      The second page of Exhibit 150. |
| 11:31:22 | 19 | A.      Oh, yeah. |
| 11:31:23 | 20 | Q.      It says doc authored, Jeff Galipeau, do you see that? |
| 11:31:27 | 21 | A.      Yes. |
| 11:31:27 | 22 | Q.      Do you know who Mr. Galipeau is? |
| 11:31:30 | 23 | A.      He -- I believe he is a designer in Florida. |
| 11:31:34 | 24 | Q.      Okay.  Meaning a design engineer at Qorvo? |
| 11:31:39 | 25 | A.      I believe so.  In Florida.  Yes. |

777

11:31:44  1    Q.      Okay.  What relevance -- turning back to Exhibit 149,

11:31:51  2    what relevance would this document have had at Akoustis?

11:31:59  3    A.      Very, very little.  Because I kept telling

11:32:03  4    Mr. Aichele, we won't be doing automotive.  So we -- in the

11:32:08  5    first three or four years I was there, we did not work on

11:32:12  6    automotive.

11:32:15  7    Q.      Okay.  You provided Exhibit 149 to David Hodge; is

11:32:21  8    that right?

11:32:21  9    A.      I do not recall that.  I may have, if you go back.

11:32:25 10    Q.      I've handed you what has been marked previously as

11:32:42 11    Exhibit Number 5.

11:32:44 12    A.      Okay.  So I have not seen this.

11:32:46 13    Q.      Do you agree with me that Exhibit 149 and Exhibit 5

11:32:50 14    are the same document?

11:32:51 15    A.      Yes.

11:32:52 16    Q.      Okay.  And for the record, Exhibit 5, which was

11:32:56 17    previously identified during Mr. Hodge's deposition, has the

11:33:00 18    production number Hodge 000212 on it.  Having seen

11:33:07 19    Exhibit 5, does that refresh your recollection as to whether

11:33:13 20    you provided Exhibit 149 to Mr. Hodge?

11:33:16 21    A.      I must have.  I do not recall, but I trust you that I

11:33:22 22    must have.

11:33:22 23    Q.      Well, Dr. Hodge testified that you handed him a hard

11:33:26 24    copy --

11:33:27 25    A.      Okay.

11:33:28  1    Q.      -- of Exhibit 5 --

11:33:29  2    A.      Okay.

11:33:30  3    Q.      -- in his office.  Does that sound right?

11:33:33  4    A.      If he testified, yes.

11:33:34  5    Q.      Okay.  But you agree with me that you did not have

11:33:37  6    authorization to give Exhibit 5 to Dr. Hodge?

11:33:39  7    A.      Yes.  That is correct.  I did not.

11:33:42  8    Q.      In other words, it looks like Exhibit 6 was possibly

11:33:46  9    printed out and then scanned?

11:33:47 10    A.      Yeah, one page couldn't come through.  That's why I

11:33:51 11    kind of struggled there.  Yeah.  All right.  After -- after

11:33:55 12    you get through that one.  Yeah, they look -- yes.  I agree.

11:33:59 13    Most of the pages are the same, yes.

11:34:01 14    Q.      Okay.  And again, Dr. Hodge testified that you handed

11:34:05 15    him Exhibit 6 in a hard copy in his office --

11:34:09 16    A.      Okay.

11:34:10 17    Q.      -- in October 2016?

11:34:12 18    A.      Okay.

11:34:12 19    Q.      Do you have any recollection of doing that?

11:34:15 20    A.      No.

11:34:15 21    Q.      Do you have any reason to dispute Mr. Hodge's

11:34:18 22    testimony on that?

11:34:19 23    A.      No reason to dispute it.

11:34:21 24    Q.      Okay.  Do you know how you selected the excerpts of

11:34:25 25    Exhibit 149 that are reflected in Exhibit 6?  How you

11:34:29  1    compiled these particular slides?

11:34:33  2    A.    Maybe I just deleted those two title pages, maybe.

11:34:39  3    Q.    Again, you didn't have authorization from Qorvo to

11:34:47  4    share Exhibit 6 with Dr. Hodge?

11:34:49  5    A.    No, I did not.

11:34:51  6    Q.    And do you have any recollection as to why you were

11:34:54  7    providing Exhibit 6 to Dr. Hodge in October 2016?

11:34:57  8    A.    No, because we had no filter process.  And we had --

11:35:01  9    and we weren't doing automotive.  We couldn't even make --

11:35:05 10    successfully make a resonator, so we were at no stage ready

11:35:09 11    to design filters.

11:35:10 12    Q.    Mr. Houlden, I've handed you what has been marked

11:35:15 13    Exhibit 156.  For the record, this is a multipage document.

11:35:20 14    It's got on the first page production number AKTS-00202000.

11:35:27 15    On the top right-hand side, it says "wireless

11:35:34 16    infrastructure, infrastructure and defense products, Nokia

11:35:38 17    5G radio architecture request for information response."  On

11:35:43 18    the left-hand side it has Qorvo.

11:35:46 19              Mr. Houlden, do you recognize Exhibit 156?

11:35:48 20    A.    No.

11:35:49 21    Q.    Does Exhibit 156 appear to be a Qorvo response to a

11:35:54 22    request for information from Nokia?

11:35:56 23    A.    Yes.

11:35:57 24    Q.    And in particular, Nokia requested information

11:36:01 25    related to 5G?

11:36:02  1    A.      Yes, yes, yes.

11:36:04  2    Q.      What is 5G?

11:36:06  3    A.      That's a cell phone standard, 3G, 4G, 5G.

11:36:12  4    Q.      Did Akoustis develop any 5G products?

11:36:23  5    A.      No.  We developed -- we tried to develop a 4G for

11:36:30  6    ███████   We did not do anything for Nokia.   ███████   come in

11:36:38  7    and gave us some NRE money.  So it may have been 5G.  I take

11:36:44  8    that back.  I think ███████ wanted us to go off and develop

11:36:47  9    a 3.4 to 3.5, a very narrow band, 100 megahertz PA for a

11:36:55 10    filter for ███████ .  It's very narrow band, so you wouldn't

11:37:01 11    think it's 5G, but it may have been.

11:37:04 12    Q.      You would understand this submission from Qorvo to be

11:37:07 13    a confidential document?

11:37:08 14    A.      Yes.

11:37:09 15    Q.      Do you have any idea how this Qorvo submission ended

11:37:13 16    up in your files at Akoustis?

11:37:15 17    A.      No.  But, again, this is primarily gallium nitride

11:37:20 18    PAs, and we did not do gallium nitride PAs at Akoustis, so

11:37:27 19    this would fall into that bucket of very little value at

11:37:30 20    Akoustis.

11:37:31 21    Q.      If you turn to page 2 of Exhibit 160, with the

11:37:37 22    production number AKTS_00141633 on it.

11:37:44 23    A.      Yes.

11:37:45 24    Q.      How was the -- this product or this presentation,

11:37:48 25    this Qorvo presentation that Mr. Aichele forwarded relevant

11:37:51 1   to the work you were doing at Akoustis?

11:37:53 2   A.     Zero.

11:37:54 3   Q.     This is another irrelevant Qorvo confidential

11:37:59 4   document that was circulated at Akoustis?

11:38:04 5   A.     Well Mr. Aichele may not have thought it was

11:38:07 6   irrelevant, but I did, because we couldn't do those building

11:38:10 7   blocks.  We couldn't even do these modules in ten years if

11:38:14 8   we wanted to.  Look at all the complexity of those diplexers

11:38:19 9   and the switches and the LNAs and the control, the LNA

11:38:23 10  control, the PA switch control.  We just didn't have that

11:38:26 11  technology.  I mean, you've got to be a very large

11:38:31 12  multi-billion dollar company to have all those different

11:38:33 13  design blocks.  We were just doing simple filters.  So you

11:38:36 14  just -- you know, you just have to ignore marketing people

11:38:40 15  sometimes.

11:38:41 16  Q.     Did you write back to Mr. Aichele and tell him,

11:38:45 17  "Dave, this is all irrelevant.  Stop sending me these

11:38:48 18  confidential Qorvo presentations."?

11:38:52 19  A.     No, I didn't, but he knew.

11:38:54 20  Q.     Mr. Houlden, I've handed you what has been marked as

11:38:58 21  Exhibit 161.  This is a multipage document.  The first page

11:39:02 22  has the production number AKTS_00198736.  And it says on the

11:39:12 23  first page, "Qorvo D and A strategy 22 September 2015."

11:39:19 24          Do you see that?

11:39:21 25  A.     Yes.

11:39:22  1    Q.      Okay.  D and A strategy refers to defense and

11:39:26  2    Aerospace products; is that right?

11:39:28  3    A.      Correct.

11:39:30  4    Q.      And in September 2015, you were still working at

11:39:33  5    Qorvo as the general manager of the wireless connectivity

11:39:39  6    development --

11:39:41  7    A.      Yes.

11:39:42  8    Q.      Business unit?

11:39:42  9    A.      Yes.

11:39:43 10    Q.      Did defense and Aerospace fall within your area of

11:39:46 11    responsibility at Qorvo?

11:39:48 12    A.      No.

11:39:49 13    Q.      Any idea why you would have had a copy of this

11:39:52 14    defense and Aerospace strategy presentation?

11:39:56 15    A.      No idea.

11:39:57 16    Q.      Any idea how this document would have ended up in

11:40:01 17    your files at Akoustis?

11:40:02 18    A.      No idea.  This is all gallium nitride PAs and we were

11:40:06 19    not in that business.  So little to no value at Akoustis.

11:40:11 20    Q.      Mr. Houlden, I've handed you a copy of Exhibits 163

11:40:16 21    and 164.  For the record, Exhibit 163 is an e-mail with the

11:40:21 22    production number AKTS_00076365.

11:40:28 23              Exhibit 164 is the attachment to Exhibit 163.

11:40:33 24    Exhibit 164 was produced in native format.  The production

11:40:39 25    number for that file was AKTS_00076366.  It is a multipage

11:40:48  1    spreadsheet.

11:40:50  2              Mr. Houlden, now that I've handed you

11:40:55  3    Exhibits 163 and 164, do you recall receiving Qorvo's

11:40:59  4    worldwide compensation structure?

11:41:01  5    A.      No, I do not recall receiving it.

11:41:03  6    Q.      Okay.  Exhibit 163 is an e-mail; is that right?

11:41:08  7    A.      Yes.

11:41:09  8    Q.      And the sender of the e-mail was Rohan Houlden, is

11:41:13  9    that right?

11:41:13 10    A.      That is me, yes.

11:41:14 11    Q.      That's you, okay.  And this is an e-mail that you

11:41:18 12    sent on May 29th, 2017?

11:41:20 13    A.      Yes.

11:41:21 14    Q.      And you sent it to someone whose e-mail address is

11:41:26 15    LauraShealy@bellsouth.net.

11:41:30 16    A.      Correct.

11:41:30 17    Q.      Who is -- whose the other than of that e-mail

11:41:33 18    address?

11:41:33 19    A.      Laura Shealy was -- is the wife of the CEO, Jeff

11:41:38 20    Shealy.  And she was the HR manager, I guess, would be her

11:41:42 21    title in 2017.

11:41:43 22    Q.      Okay.  And then if you look at the Exhibit 164, it is

11:41:49 23    a massive spreadsheet.  The first page says "2015

11:42:00 24    compensation tool box main."

11:42:04 25              Do you see that?

11:42:04  1    A.      Sorry.  Repeat that?

11:42:06  2    Q.      The first page of Exhibit 164 says, "2015

11:42:11  3    compensation tool box-main" at the top?

11:42:15  4    A.      Yes.  Okay.  Yes.

11:42:16  5    Q.      And then if you look underneath it says "Qorvo

11:42:19  6    compensation - global.  Qorvo compensation - U.S."  Do you

11:42:25  7    see that?

11:42:25  8    A.      Yes.

11:42:26  9    Q.      And then there is also TriQuint legacy compensation

11:42:29 10    structure?

11:42:30 11    A.      Yes.

11:42:31 12    Q.      This is confidential Qorvo information that is

11:42:33 13    reflected in Exhibit 164; right?

11:42:36 14    A.      Yes.

11:42:36 15    Q.      It says right on the first page, "Confidential, For

11:42:40 16    Internal Use Only."

11:42:42 17    A.      Yes.

11:42:42 18    Q.      And in any case, you would expect a company's

11:42:46 19    worldwide compensation structure to be confidential; right?

11:42:49 20    A.      Yes.

11:42:50 21    Q.      You don't recall sending Ms. Shealy Qorvo's worldwide

11:42:54 22    compensation structure in May of 2017?

11:42:57 23    A.      No.

11:42:58 24    Q.      How would this world wide compensation structure have

11:43:02 25    been relevant to Ms. Shealy's work at Akoustis?

11:43:05 1    A.        She was -- she was probably trying to put a

11:43:08 2    compensation plan together.  So instead of -- probably would

11:43:12 3    have saved her some time and money versus trying to go off

11:43:17 4    to Monster.com and Indeed.com, and try to come up with

11:43:22 5    salary ranges and titles for North Carolina, she could

11:43:27 6    extrapolate out of this.  But I don't think she -- I believe

11:43:31 7    she never used it.  And I can -- now looking at it, it's

11:43:36 8    very complicated.  She didn't use it because the

11:43:39 9    compensation scheme at Akoustis was very different than the

11:43:43 10   compensation scheme at Qorvo.

11:43:46 11   Q.        Just so I'm clear, you don't recall sending Qorvo's

11:43:51 12   global compensation structure to Ms. Shealy, but you do

11:43:55 13   recall that Ms. Shealy never used Qorvo's global

11:43:59 14   compensation structure?

11:44:00 15   A.        I don't know if I remember Laura Shealy not using it,

11:44:05 16   but I think I had further on discussions with the new HR

11:44:10 17   lady, Holly, Holly Steward, or something.  So I'm not sure

11:44:16 18   what Laura did with this document.

11:44:21 19   Q.        And you recall discussing Qorvo's confidential

11:44:24 20   compensation structure with Ms. Shealy's replacement at

11:44:28 21   Akoustis?

11:44:29 22   A.        I don't know if I recall discussing the Qorvo scheme

11:44:33 23   with Holly.  But we never -- she never implemented it

11:44:38 24   because the scheme was very different than Qorvo.

11:44:40 25   Q.        Mr. Houlden, I've handed you what has been marked as

11:44:44 1  Exhibits 165 and 166.  Exhibit 165 is an e-mail that has the

11:44:50 2  production number AKTS-100139271.  And Exhibit 166 is an

11:44:58 3  attachment to Exhibit 165.  It was produced in native format

11:45:02 4  with the production number AKTS-00139272.  Starting with

11:45:10 5  Exhibit 166, the attachment, you recognize this has the same

11:45:13 6  compensation structure that you sent to Ms. Shealy in 2017?

11:45:17 7  A.     It looks to be -- seems to be less or thin or

11:45:25 8  something.  But, yes, I think it's similar, yes.

11:45:27 9  Q.     And if we go to Exhibit 165, this is your e-mail

11:45:32 10 attaching Qorvo's confidential compensation structure in

11:45:38 11 July of 2019; right, Mr. Houlden?

11:45:38 12 A.     Yes.

11:45:41 13 Q.     Did you have authorization from Qorvo to share the

11:45:44 14 compensation toolbox with Ms. Shealy in 2017?

11:45:48 15 A.     No.

11:45:49 16 Q.     Mr. Houlden, I'd like you to please return to

11:45:54 17 Exhibit 77, which is your severance agreement, which we

11:45:58 18 pulled out twice already today.  We're looking at

11:46:01 19 Exhibit 77?

11:46:02 20 A.     Right.

11:46:02 21 Q.     I would like you to look at page 3 of Exhibit 77,

11:46:06 22 paragraph 6.  There is a provision for the non-solicitation

11:46:09 23 of employees, right?

11:46:11 24 A.     Yes.

11:46:11 25 Q.     And you had agreed that as of September 16, 2016, you

11:46:17 1    would not attempt to directly or indirectly solicit, divert

11:46:22 2    or hire away, or attempt to solicit, divert or hire away, to

11:46:27 3    or for employees's self or any such company or business

11:46:31 4    organization any employee of Qorvo; is that right?

11:46:33 5    A.    Correct.

11:46:33 6    Q.    So you understood that you were barred for one year

11:46:37 7    from soliciting directly or indirectly Qorvo employees,

11:46:41 8    right?

11:46:41 9    A.    Right.

11:46:42 10   Q.    To come work at Akoustis?

11:46:44 11   A.    Right.

11:46:45 12   Q.    If we could look now at Exhibit 174 which I've handed

11:46:49 13   you.

11:46:49 14   A.    Okay.

11:46:50 15   Q.    Do you recognize this e-mail?

11:46:51 16   A.    No.  This is a long time ago, no.

11:46:53 17   Q.    Okay.  I think you told me earlier today that you did

11:46:57 18   not attempt to recruit Qorvo employees within one year of

11:47:01 19   September 16, 2016; is that right?

11:47:02 20   A.    Correct.

11:47:03 21   Q.    Okay.  If we look at Exhibit 174, I'd like to start

11:47:07 22   at the bottom with the e-mail from Mr. Shealy to yourself.

11:47:10 23   A.    Okay.

11:47:11 24   Q.    On October 7th.  At this point, you had already

11:47:16 25   accepted a position at Akoustis, right?

11:47:18  1    A.      Yes.

11:47:18  2    Q.      And, in fact, Mr. Shealy was e-mailing your Akoustis

11:47:21  3    account on October 7, 2016?

11:47:24  4    A.      Yes.

11:47:25  5    Q.      And this is approximately three weeks after you

11:47:27  6    signed your severance agreement with Qorvo?

11:47:30  7    A.      Yes.

11:47:31  8    Q.      And as I understand this, Mr. Shealy was asking you

11:47:34  9    for comments on a press release that he intended to issue

11:47:39 10    the following week announcing your hire at Akoustis, right?

11:47:42 11    A.      Yes.

11:47:42 12    Q.      And you wrote back to Mr. Shealy, now moving up to

11:47:46 13    the October 9, 2016, e-mail, do you see that?

11:47:50 14    A.      Yes.

11:47:50 15    Q.      And you noted to Mr. Shealy that there were a number

11:47:53 16    of cons to issuing a press release --

11:47:56 17    A.      Yes.

11:47:57 18    Q.      -- at this time; right?  And then you listed out the

11:48:00 19    disadvantages of Akoustis issuing a press release announcing

11:48:05 20    your hire, right?

11:48:06 21    A.      Right.

11:48:07 22    Q.      The first you said, kind of midway through under the

11:48:10 23    label, "cons" says, "Laura and I have Mike hitting Qorvo

11:48:16 24    very hard right now, calling nearly every BAW DE, looking

11:48:21 25    for the two -- for the best two people willing to move to

| | | |
|---|---|---|
| 11:48:25 | 1 | CLT."  Do you see that? |
| 11:48:27 | 2 | A.    Yes. |
| 11:48:27 | 3 | Q.    First of all, Laura is Laura Shealy? |
| 11:48:30 | 4 | A.    Yes. |
| 11:48:30 | 5 | Q.    And Mike is Mike Ortiz? |
| 11:48:33 | 6 | A.    Yes. |
| 11:48:33 | 7 | Q.    Mike Ortiz is a recruiter, right? |
| 11:48:37 | 8 | A.    Yes. |
| 11:48:37 | 9 | Q.    "Hitting Qorvo very hard right now, calling nearly |
| 11:48:41 | 10 | every BAW DE."  Does DE stand for device engineer? |
| 11:48:46 | 11 | A.    Probably design engineer. |
| 11:48:48 | 12 | Q.    Design engineer.  Okay.  So you and Ms. Shealy had |
| 11:48:52 | 13 | asked Mr. Ortiz to call Akoustis's design engineers, trying |
| 11:49:00 | 14 | to hirer the two best people who were willing to move to |
| 11:49:05 | 15 | CLT; right? |
| 11:49:05 | 16 | A.    Yeah.  Yes.  Laura already had met with some.  Laura |
| 11:49:11 | 17 | had been already doing that prior to me starting, but yes. |
| 11:49:14 | 18 | Q.    CLT means Charlotte? |
| 11:49:16 | 19 | A.    Yes. |
| 11:49:17 | 20 | Q.    "We will be making a number of offers the next few |
| 11:49:20 | 21 | weeks," is the next sentence, do you see that? |
| 11:49:22 | 22 | A.    Yes. |
| 11:49:23 | 23 | Q.    And by number of offers, you mean offers of |
| 11:49:26 | 24 | employment to Qorvo employees to come work at Akoustis? |
| 11:49:29 | 25 | A.    Yes. |

11:49:29  1    Q.    And then you say, "Rather not rock the apple cart

11:49:33  2    right now."  Do you see that?

11:49:34  3    A.    Yes.

11:49:34  4    Q.    And that was referring to issuing the press release,

11:49:39  5    you were concerned that that would rock the apple cart?

11:49:41  6    A.    Yes.

11:49:41  7    Q.    And then you say, "Plus, prefer not to make it easy

11:49:46  8    for Qorvo of how Mike found the names of all these people."

11:49:50  9          Do you see that?

11:49:51 10    A.    Yes.

11:49:52 11    Q.    Did the names for the Qorvo employees who Mike Ortiz

11:49:57 12    was calling come from you?

11:49:58 13    A.    I believe I gave him a few names, but he had most of

11:50:01 14    his own names.  But I did give a few names.  You referenced,

11:50:05 15    there was a couple of things today, like Jeff Galipeau,

11:50:10 16    there was two or three people that I knew there that I gave

11:50:14 17    him names to.

11:50:17 18    Q.    Okay.  So that he could recruit them to come to

11:50:20 19    Akoustis?

11:50:20 20    A.    Right.

11:50:21 21    Q.    Okay.  And what did you mean by, "Prefer not to make

11:50:25 22    it easy for Qorvo to find of how Mike found the names."?

11:50:30 23    A.    Yeah, I'm not sure.

11:50:43 24    Q.    Your concern was that Qorvo would read the press

11:50:47 25    release and then look at what you were doing and see that

11:50:50  1  you had provided names to Mike Ortiz?

11:50:52  2  A.      Yeah, if we hired him.  Possibly, yes.

11:50:57  3  Q.      And then you said, "though, I think I am clean, I

11:51:01  4  want to delay as long as I can, any reason for Qorvo IT to

11:51:05  5  look at my computer and what I looked at on the internet,

11:51:10  6  I.E. contacts in Outlook."

11:51:13  7          Do you see that?

11:51:14  8  A.      Yes.

11:51:14  9  Q.      So you were concerned that Qorvo IT would look at

11:51:17 10  what you had been doing on your computer and find something

11:51:20 11  that would be problematic for you?

11:51:23 12  A.      Right, because when I'm conversing with Florida, I'm

11:51:26 13  looking up -- I'm conversing with those people on day-to-day

11:51:31 14  activities while I'm at Qorvo.  So obviously with Jeff

11:51:35 15  Galipeau, I was working with those, I had access and

11:51:38 16  different things.  So, you know, I thought I was clean, but

11:51:41 17  you know, there is no reason to have anyone look and try to

11:51:44 18  connect dots if there was no dots to connect.

11:51:49 19  Q.      When you said you thought you were clean, you meant

11:51:52 20  you thought there was no evidence that you had done --

11:51:54 21  A.      Right.

11:51:55 22  Q.      That you had provided names, for example to

11:51:57 23  Mr. Ortiz?

11:51:59 24  A.      I just thought I was clean.  Following the rules of

11:52:01 25  my solicitor agreement, I thought I was clean.

11:52:04  1    Q.      And this was an e-mail you wrote to Mr. Shealy, the

11:52:07  2    CEO of Akoustis?

11:52:08  3    A.      Yes.

11:52:09  4    Q.      And he said, got it, let's discuss Monday, right?

11:52:12  5    A.      Yes.

11:52:12  6    Q.      And ultimately, do you recall whether the press

11:52:18  7    release was issued?

11:52:19  8    A.      Yes, it was.

11:52:20  9    Q.      And it was delayed by how long?

11:52:22 10    A.      Maybe a couple of weeks.

11:52:24 11    Q.      Would you agree with me that Exhibit 174 reflects a

11:52:28 12    violation of your severance agreement with Qorvo?

11:52:30 13    A.      I guess it's possibly a fine line because I was not

11:52:42 14    talking to the employees and we never hired -- we never

11:52:45 15    hired any of those employees that I knew.

11:52:48 16    Q.      Okay.  So in your view, providing lists of names and

11:52:51 17    instructions to a recruiter on who to call at Qorvo so that

11:52:57 18    those folks could be hired at Akoustis was not directly or

11:53:00 19    indirectly attempting to hire a Qorvo employee?

11:53:04 20    A.      I guess I was not directly, but indirectly, I guess I

11:53:08 21    was in default of that by giving Mike a couple of names.

11:53:16 22    Q.      Exhibit 175, which has the production number

11:53:22 23    AKTS-00209275.

11:53:23 24            Do you recognize Exhibits 175 and 176?

11:53:27 25    A.      No.

11:53:28 1   Q.      It appears that Exhibit 175 is an e-mail from David

11:53:32 2   Dyer to your personal e-mail account on October 18, 2016;

11:53:37 3   right?

11:53:37 4   A.      Yes.

11:53:40 5   Q.      And Mr. Dyer at this time he sent the e-mail was an

11:53:46 6   engineering technician at Qorvo; right?

11:53:48 7   A.      He was not an employee.  He was part-time or

11:53:53 8   contract.  Qorvo would not hire him.  Part of the reason why

11:53:57 9   I left -- part of the reason I left Qorvo is James Klein, my

11:54:03 10  boss, was not a fan of growing people and building a team.

11:54:07 11  He liked to hire experienced, expensive engineers, and

11:54:11 12  didn't have the patience to grow young kids.  And David Dyer

11:54:17 13  was a young kid that James Klein didn't want to hire.  He

11:54:21 14  didn't -- he did not like hiring temps. I think David was a

11:54:30 15  temp.  I think James says, I don't like temps.  I don't like

11:54:35 16  to hire temps.

11:54:37 17  Q.      If you look at Exhibit 176, you'll see Mr. Dyer's

11:54:42 18  resume?

11:54:42 19  A.      Yes.

11:54:43 20  Q.      All right.  And you see he's got a section on

11:54:46 21  experience?

11:54:46 22  A.      Yes.

11:54:47 23  Q.      And he reports that from November of 2015 to present,

11:54:52 24  so that would have been October of 2016, he was an

11:54:55 25  electronic technician at Qorvo?

11:54:57  1    A.      Yes, but my understanding, to my belief, he was not

11:55:01  2    an employee.  He was a temp wanting to get hired.  And Qorvo

11:55:05  3    did not hire him.  He was looking for full-time employment

11:55:12  4    somewhere.

11:55:14  5    Q.      Not to recruit these folks to Akoustis?

11:55:17  6    A.      No.  Because what we found out is all these filtered

11:55:21  7    people down here, they all do diesel engines.  So when I

11:55:27  8    found out that we actually make electric engine, these are

11:55:32  9    all diesel mechanics, so they had no value at Akoustis.  We

11:55:36 10    hired one person in the unit and did not work out, so as you

11:55:40 11    will find that we hired very few Qorvo people because they

11:55:45 12    were diesel mechanics.

11:55:47 13    Q.      Did you try to hire Robert Aigner away from Qorvo?

11:55:56 14    A.      No.

11:55:57 15    Q.      Would you agree with me that the effort to higher

11:56:00 16    Qorvo employees to come work at Akoustis was a near

11:56:02 17    continuous endeavor at Akoustis from the time you arrived in

11:56:07 18    October 2016 until the time you left in July of 2022?

11:56:11 19    A.      No.

11:56:11 20    Q.      Mr. Houlden, I've handed you what's been marked as

11:56:15 21    Exhibit 179.  This is a text exchange that has the

11:56:21 22    production number AKTS_00422451.  It appears to be a

11:56:29 23    conversation between yourself and Mike Ortiz; is that right?

11:56:35 24    A.      Yes.

11:56:35 25    Q.      Mike Ortiz is the recruiter who Akoustis used to

| | | |
|---|---|---|
| 11:56:39 | 1 | recruit folks to come work at Akoustis; right? |
| 11:56:43 | 2 | A.    Okay. |
| 11:56:43 | 3 | Q.    So it looks like you're working with Mr. Ortiz to |
| 11:56:47 | 4 | fill a role of project manager. |
| 11:56:50 | 5 | A.    Yes. |
| 11:56:51 | 6 | Q.    He says, "Okay.  I will dig into Qorvo and see what I |
| 11:56:55 | 7 | can come up with." |
| 11:56:57 | 8 | Do you see that? |
| 11:56:57 | 9 | A.    Yes.  This is in '22.  Yes. |
| 11:57:01 | 10 | Q.    Mr. Ortiz wrote to you, "I have a list of 60 Qorvo |
| 11:57:07 | 11 | project managers I'm going after.  Please send me a job |
| 11:57:10 | 12 | description as soon as you can.  Thank you." |
| 11:57:12 | 13 | A.    Right. |
| 11:57:12 | 14 | Q.    Did you write back to Mr. Ortiz and say, "No need to |
| 11:57:15 | 15 | target the 60 Qorvo target managers, hire from somewhere |
| 11:57:20 | 16 | else."? |
| 11:57:20 | 17 | A.    No. |
| 11:57:22 | 18 | Q.    Mr. Houlden, I'm going to hand you Exhibit 182, it's |
| 11:57:26 | 19 | just a cover sheet for us to keep track of.  This is a |
| 11:57:29 | 20 | document that was produced in native format with the |
| 11:57:32 | 21 | production number AKTS-00370379.  I'm handing you a computer |
| 11:57:41 | 22 | that has that document open on it.  I provided the same to |
| 11:57:46 | 23 | your counsel.  I'd like you to take a look at Exhibit 182 in |
| 11:57:50 | 24 | the native format and tell me if you recognize this |
| 11:57:53 | 25 | spreadsheet. |

11:57:55  1    A.      No.

11:57:58  2    Q.      Okay.  You mentioned to me earlier today -- and feel

11:58:02  3    free to please scroll through Exhibit 182.  You mentioned

11:58:06  4    the me earlier today that you were keeping a spreadsheet

11:58:08  5    that had green, yellow, and red highlighting on it.

11:58:12  6    A.      Yes.

11:58:12  7    Q.      And 182, Exhibit 182 appears to have all of that type

11:58:16  8    of highlighting on it?

11:58:18  9    A.      Yes.

11:58:18 10    Q.      Is this the spreadsheet that you were referring to?

11:58:21 11    A.      Yes, the one that -- yeah, I think you referenced a

11:58:24 12    document, the red file or something that I sent to Cameron,

11:58:27 13    is that what you're referring to.

11:58:28 14    Q.      The red list?

11:58:29 15    A.      The red list.  So down at the bottom of this excel

11:58:34 16    file, there are about ten or twelve people that is in that

11:58:37 17    red list, yes.

11:58:38 18    Q.      And this Excel file is a list of Qorvo employees that

11:58:41 19    Akoustis was considering recruiting?

11:58:43 20    A.      This is a list of employees, all different types of

11:58:47 21    employees, with a pH -- people from everywhere.  You have

11:58:54 22    Northrup in here, Ph.D. of Virginia Tech, Ph.D. of Perdue, a

11:59:00 23    Broadcom person, someone in Montreal, Munich, Skyworks,

11:59:06 24    there were some Qorvo people, particularly in the red list.

11:59:09 25    There was a lot that Guillermo said do not recommend not to

11:59:15  1    hire.  So we were not calling them or anything because he

11:59:17  2    said do not hire.

11:59:18  3    Q.      You mentioned Guillermo, who do you mean Guillermo?

11:59:26  4    A.      Well, just a name here.  Guillermo was one of our

11:59:29  5    employees and he said not to hire all these Qorvo people

11:59:32  6    because they weren't very good.  They weren't team players.

11:59:35  7    They weren't very collaborative.

11:59:37  8    Q.      And Guillermo is Guillermo Moreno?

11:59:41  9    A.      Yes.

11:59:41 10    Q.      All right.  So Exhibit 182 that you're looking at in

11:59:45 11    native version is a list of folks from all different

11:59:48 12    companies that Akoustis was considering hiring?

11:59:52 13    A.      Yes.

11:59:53 14    Q.      Exhibit 183, this is an e-mail exchange with the

11:59:59 15    production number on the first page AKTS-00014900.

12:00:06 16            Does this document look familiar with you --

12:00:12 17    familiar to you?

12:00:13 18    A.      No.

12:00:13 19    Q.      If you look back on the first e-mail at the back of

12:00:17 20    Exhibit 183, you will see it starts with an e-mail from

12:00:21 21    yourself to Mr. Morgan in January of 2018.

12:00:25 22    A.      Yes.

12:00:26 23    Q.      And the subject of the e-mail was director packaging

12:00:30 24    and tests.  Do you see that?

12:00:31 25    A.      Yes.

12:00:31 1    Q.       And you asked Mr. Morgan, "Do you know any good

12:00:35 2    candidates?"

12:00:37 3    A.       Right.

12:00:37 4    Q.       And Mr. Morgan wrote back and said, "Not that isn't

12:00:42 5    associated with Qorvo, but if I think of anyone, I'll let

12:00:45 6    you know."

12:00:46 7    A.       Okay.

12:00:47 8    Q.       Right?

12:00:47 9    A.       Yeah.

12:00:48 10   Q.       And then you said, "Who from Qorvo do you think would

12:00:51 11   be good?"

12:00:52 12   A.       Right.

12:00:52 13   Q.       And then Mr. Morgan provided you a list of a number

12:00:56 14   of names of people at Qorvo who he thought might be good for

12:00:59 15   director of packaging and test; right?

12:01:02 16   A.       Yes.

12:01:02 17   Q.       And you also asked what does he think about someone

12:01:05 18   named Pat Pare?

12:01:07 19   A.       Right.

12:01:08 20   Q.       Was Pat Pare an Qorvo employee?

12:01:10 21   A.       I believe so.

12:01:11 22   Q.       Ultimately, Akoustis did hire director of packaging

12:01:15 23   and test from Qorvo, right?

12:01:17 24   A.       This is -- this is 2018; right?  So this was probably

12:01:27 25   right after Mr. Boomgarten left; right?  So we didn't hire

12:01:34  1    -- did we hire a director of packaging and test?

12:01:38  2    Q.      Maybe I can make it easier.

12:01:40  3    A.      I don't recall in 2018 or anything like that we hired

12:01:45  4    anyone.  Because these people on this list, I didn't think

12:01:48  5    were a good fit, didn't have the experience, what I was

12:01:51  6    looking for.  So I don't recall hiring a director of

12:01:55  7    packaging and test.

12:01:56  8    Q.      Ultimately, Akoustis hired Robert Dry as its director

12:02:00  9    of packaging and test; right?

12:02:02  10   A.      Was he director?  He ended up reporting to Jeff

12:02:06  11   Shealy.  Was he director or VP?

12:02:09  12   Q.      Ultimately Akoustis hired Robert Dry as the

12:02:14  13   vice-president of packaging and testing?

12:02:16  14   A.      Yeah, like eighteen months, two years after this

12:02:18  15   e-mail trail, yes.

12:02:19  16   Q.      And Mr. Dry was an Qorvo employee at the time he was

12:02:23  17   hired by Akoustis?

12:02:25  18   A.      He was -- he had had a job offer from Cree or

12:02:31  19   Wolfspeed and he was in the process of looking for a house

12:02:33  20   in Arkansas that he was looking at accepting the job at Cree

12:02:38  21   or Wolfspeed.  I think it was Wolfspeed he was looking to

12:02:42  22   move to.

12:02:43  23   Q.      Okay.  But my question was at the time Mr. Dry was

12:02:46  24   hired at Akoustis, he was working at Qorvo; is that right?

12:02:49  25   A.      I don't think he started at Wolfspeed.  You need to

| | |
|---|---|
| 12:02:53 | 1 |
| 12:02:58 | 2 |
| 12:02:59 | 3 |
| 12:03:13 | 4 |
| 12:03:15 | 5 |
| 12:03:19 | 6 |
| 12:03:23 | 7 |
| 12:03:24 | 8 |
| 12:09:19 | 9 |
| 12:09:19 | 10 |
| 12:09:19 | 11 |
| 12:09:19 | 12 |
| 12:09:19 | 13 |
| 12:09:19 | 14 |
| 12:09:19 | 15 |
| 12:09:19 | 16 |
| 12:09:19 | 17 |
| 12:09:20 | 18 |
| 12:09:20 | 19 |
| 12:09:20 | 20 |
| 12:09:20 | 21 |
| 12:09:20 | 22 |
| 12:09:20 | 23 |
| 12:09:20 | 24 |
| 12:09:20 | 25 |

1  check with Mr. Dry on that.

2  Q.      Okay.

3              (End of videotape deposition.)

4              THE COURT:  All right.  That concludes that

5  deposition.  And we're ready for the next witness.  I do

6  need to get one thing from counsel at side-bar.  And we'll

7  be ready.

8              (Side-bar discussion:)

9              THE COURT:  Okay.  One, I need to know how many

10  exhibits were there total.

11             MR. MASTERS:  So I was going to ask Your Honor,

12  there were quite a few.

13             THE COURT:  I know.

14             MR. MASTERS:  And I wanted to just double-check

15  the list and confer with defense.  Can we do it at the end

16  of the court day.

17             THE COURT:  We will we need to do it now because

18  we're going to be marking exhibits.

19             MR. MASTERS:  Can we just start where we were

20  with this next witness?

21             THE COURT:  I just need to know now how many

22  approximately.

23             MR. MASTERS:  There is fifty-five.

24             THE COURT:  Fifty-five.  What we'll do is add

25  fifty-five to the number.  If it turns out that it's not

12:09:20  1    consistent, then we understand.

12:09:20  2              MR. MASTERS:  We might have to add one or two.

12:09:20  3              THE COURT:  We'll just add fifty-six.  We're

12:09:20  4    able to add.  That's not a problem.  The next thing was, is

12:09:20  5    that okay, we'll just add fifty-six?

12:09:20  6              MR. MASTERS:  Do we have the numbers so I can

12:09:20  7    just write down the numbers where we're going, our last

12:09:20  8    number?

12:09:20  9              COURT CLERK:  The last number was --

12:09:20 10              THE COURT:  Because we added to a previous list

12:09:20 11    we added --

12:09:20 12              COURT CLERK:  The last number we have is 54.

12:09:20 13              MR. MASTERS:  54.

12:09:20 14              THE COURT:  54.  And we're going to add

12:09:20 15    fifty-six.  And that makes 110.  So that's pretty easy.  So

12:09:20 16    our next will be 111.  And if we have an issue, we can fix

12:09:20 17    that.  That's not a problem.

12:09:20 18              Okay.  In connection with the revised, did you

12:09:20 19    take a look at the revisions?

12:09:20 20              MR. ELKINS:  I did.

12:09:20 21              THE COURT:  I did request Exhibit B and I did

12:09:20 22    not specify where Faulkner had reviewed the testimony of

12:09:20 23    Houlden, unless there is -- you got a bunch of numbers here,

12:09:20 24    that's worthless pretty much to me, if you cannot show me

12:09:20 25    where he reviewed the Houlden testimony, then those are out.

12:09:20  1                    MS. AYERS:  Okay.

12:09:20  2                    THE COURT:  Those are out.  I take it he didn't,

12:09:20  3    did he?

12:09:21  4                    MS. AYERS:  For the record, he actually sat and

12:09:21  5    listened to him before his testimony here today.

12:09:21  6                    THE COURT:  Right.  But he didn't include that

12:09:21  7    in his report.

12:09:21  8                    MS. AYERS:  He did not.

12:09:21  9                    THE COURT:  He could have looked at them earlier

12:09:21 10    and he didn't.

12:09:21 11                    MS. AYERS:  Of course, Your Honor.

12:09:21 12                    THE COURT:  So that's out.

12:09:21 13                    MS. AYERS:  That's no problem.

12:09:21 14                    THE COURT:  The next thing is over on page, we

12:09:21 15    just got to be efficient here.  On page -- it's the page

12:09:21 16    under possessed Qorvo materials, at the bottom it has, these

12:09:21 17    two individuals.  As you know that their devices were

12:09:21 18    destroyed in the process, we have a special instruction in

12:09:21 19    that regard.

12:09:21 20                    And so I hate to give a -- I need to give a

12:09:21 21    limited instruction at that time, I know there were some

12:09:21 22    files that were recovered.  But I think the devices that are

12:09:21 23    referenced are the computers, laptop computers.

12:09:21 24                    MR. ELKINS:  I believe that that matches the

12:09:21 25    limine instruction.

12:09:21  1                    THE COURT:  I think it does, too.

12:09:21  2                    MS. AYERS:  We met and conferred last night

12:09:21  3    regarding that and we adjusted that language for the

12:09:21  4    purposes of satisfying counsel's objection.

12:09:21  5                    THE COURT:  It says all the data deleted, is

12:09:21  6    there a problem there?

12:09:21  7                    MS. AYERS:  We initially had computers and they

12:09:21  8    requested that we change it to data.

12:09:21  9                    THE COURT:  The problem is there is a limiting

12:09:21 10    instruction.  So why should we leave that in?

12:09:21 11                    MS. AYERS:  We can take it out, Your Honor, if

12:09:21 12    you give me --

12:09:21 13                    THE COURT:  That will take care of it.

12:09:21 14                    MS. AYERS:  If you give me fifteen minutes.

12:09:21 15                    THE COURT:  We'll start the witness, or we can

12:09:21 16    just -- either that or give a limiting instruction which

12:09:21 17    probably is better given at the end of the case, because I

12:09:21 18    don't know exactly where we're going to end up with that

12:09:21 19    information, so sure, somebody can take that out.

12:09:21 20                    MS. AYERS:  What I might be able to do, if you

12:09:21 21    let me look at my trial tech, I might have him redact.

12:09:21 22                    THE COURT:  I think that takes care of it now,

12:09:21 23    it's a lot better.

12:09:21 24                    MR. ELKINS:  All the other issues were taken

12:09:21 25    care of.  I raised a testimony, a testimony issue and

12:09:21 1    Ms. Ayers and I have agreed, she's told me her approach, I

12:09:21 2    have no issues with that.  The only other thing is I just

12:09:21 3    got, I didn't --

12:09:21 4              THE COURT:  I think I just saw that, too.

12:09:22 5              MR. ELKINS:  The only issue, this is related to

12:09:22 6    the same objection we raised about the slides, is that if

12:09:22 7    the jury gets this and it says contains confidential

12:09:22 8    information subject to protective order, on every page --

12:09:22 9              MS. AYERS:  Mr. Elkins, we are only submitting

12:09:22 10   this exhibit for his CV.  I'm okay with removing the back

12:09:22 11   half of that document, the only purpose it is submitted for

12:09:22 12   is the purpose of his CV.

12:09:22 13             THE COURT:  I think that takes care of it.

12:09:22 14             MR. ELKINS:  Absolutely.

12:09:22 15             THE COURT:  We got it all taken care of and get

12:09:22 16   the witness sworn and good luck with your IT person.

12:09:22 17             Thank you.

12:09:22 18             MS. AYERS:  Will you give me one moment so I can

12:09:22 19   have my trial director redact that line?

12:09:22 20             THE COURT:  I'll wait for one moment.

12:09:22 21             MR. MASTERS:  Thank you, Your Honor.

12:09:22 22             MR. ELKINS:  Thank you.

12:09:27 23             (End of side-bar discussion.)

12:09:37 24             THE COURT:  We're making one adjustment on one

12:09:43 25   slide.  We'll find out how quick they are.

12:11:37 1                Ms. Ayers, are we all set?

12:11:39 2                MS. AYERS:  We are close to all set, Your Honor.

12:11:41 3    We have issues with electronic transmission by e-mail, but

12:11:46 4    Mr. Buchbinder will have the document soon.

12:11:49 5                THE COURT:  Okay.  Thank you.  We have added

12:11:55 6    numbers so we'll come out with the correct text number.  And

12:11:59 7    then of course you saw all the exhibits that were

12:12:02 8    introduced, they will be re-numbered so that they will have

12:12:05 9    both numbers on them, and it will be through 110.  It may be

12:12:09 10   that there is one less than that, but we're going to start

12:12:12 11   with, as they're introduced, 111.  We'll start at 111.  You

12:14:18 12   may see on one document a deletion or a redaction, it may

12:14:24 13   just show a black line, I'm not sure which.  Don't make any

12:14:28 14   inference from that, it's simply that we had to exclude

12:14:32 15   based on what has been submitted.

12:17:11 16               You may call your next witness.

12:17:13 17               MS. AYERS:  Thank you, Your Honor.  We call

12:17:15 18   Kevin Faulkner.

12:17:16 19               THE COURT:  The witness will come forward and

12:17:21 20   approach the clerk and be sworn.

12:17:26 21               COURT CLERK:  Please raise your right hand.

12:17:29 22   Please state and spell your full name for the record.

12:17:33 23               THE WITNESS:  Kevin Thomas Faulkner, K-E-V-I-N,

12:17:39 24   T-H-O-M-A-S, F-A-U-L-K-N-E-R.

12:17:44 25               KEVIN THOMAS FAULKNER, having been duly sworn,

12:17:49  1   was examined and testified as follows:

12:17:52  2                        DIRECT EXAMINATION

12:18:00  3   BY MS. AYERS:

12:18:02  4   Q.      Good afternoon, Mr. Faulkner.

12:18:03  5   A.      Good afternoon.

12:18:04  6   Q.      Can you please introduce yourself to the jury.

12:18:07  7   A.      Certainly.  I'm Kevin Faulkner.  I live in New York

12:18:11  8   City with my wife, my four-year old daughter, and my

12:18:14  9   one-and-a-half year old son, and I'm a forensic examiner, I

12:18:18 10   have been doing that for the past twenty years.

12:18:21 11   Q.      And can you explain to the jury what work you were

12:18:24 12   asked to do in this case?

12:18:26 13   A.      Certainly.  In this case, I was asked to examine

12:18:31 14   certain computer systems and other devices from Akoustis

12:18:36 15   employees and look for any Qorvo information present on

12:18:40 16   those systems.  I was also asked to look at what, if

12:18:44 17   anything, I could figure out about what people did with any

12:18:47 18   Qorvo information that was present.  Such as did they open

12:18:51 19   it, did they copy it, did they make changes to it, that sort

12:18:56 20   of thing.

12:18:57 21   Q.      And have you rendered any overall opinions in this

12:19:00 22   case?

12:19:00 23   A.      I have.

12:19:01 24   Q.      And what are your opinions?

12:19:03 25   A.      I found in my examination that there was a good deal

Faulkner - direct

12:19:08  1  of Qorvo information present on the Akoustis computers that

12:19:13  2  I examined, and that many of the files were opened to

12:19:17  3  different points in time, that changes were made to some of

12:19:21  4  those files, and things like that.

12:19:22  5  Q.    And before we get into the details of your analysis

12:19:25  6  in this case, I would like to talk a little bit about your

12:19:28  7  background.

12:19:30  8  A.    Okay.

12:19:31  9         MS. AYERS:  Your Honor, may I approach the bench

12:19:33 10  to hand Mr. Faulkner PTX 1720, which is Appendix A?

12:19:39 11         THE COURT:  You may.

12:19:54 12  BY MS. AYERS:

12:20:02 13  Q.    Mr. Faulkner, do you recognize exhibit -- rather, PTX

12:20:08 14  1720?

12:20:08 15  A.    Yes.  This is my CV.

12:20:10 16  Q.    And is PTX 1720 a true and correct copy of your CV?

12:20:17 17  A.    Yes, I think there is a couple more testimony matters

12:20:20 18  that I have performed since this CV was submitted, but

12:20:26 19  otherwise it's correct.

12:20:27 20         MS. AYERS:  Your Honor, I offer into evidence

12:20:29 21  the document with the reference number PTX 1720.

12:20:32 22         THE COURT:  Marked and received as 111.

12:20:38 23         (Trial Exhibit No. 111 was admitted into

12:20:40 24  evidence.)

12:20:40 25  BY MS. AYERS:

Faulkner - direct

12:20:42  1    Q.    Mr. Buchbinder, could you please show the jury

12:20:45  2    Exhibit 111.

12:20:48  3          While Mr. Buchbinder is pulling up your CV --

12:21:03  4    Mr. Buchbinder, I apologize, it is PTX 1721, which was

12:21:09  5    admitted into evidence just now as Exhibit 111.

12:21:13  6          Mr. Faulkner, can you please tell the jury where

12:21:17  7    you currently work?

12:21:18  8    A.    Yes.  I work at a company called Palo Alto Networks

12:21:23  9    in a Call Unit 42.

12:21:25 10    Q.    What is Palo Alto Networks?

12:21:27 11    A.    Palo Alto Networks is one of the largest cyber

12:21:32 12    security companies, they make products and software that

12:21:35 13    help protect computers from hackers and things like that.

12:21:38 14    Q.    And what is Unit 42?

12:21:40 15    A.    Unit 42 is a consulting group within Palo Alto

12:21:45 16    Networks, so this group helps to investigate hacking and

12:21:50 17    intrusion types of things.  They consult with companies on

12:21:53 18    how to better protect their information.  And they also

12:21:56 19    provide digital forensics investigation and testimony like I

12:22:00 20    am doing here today.

12:22:01 21    Q.    And what is digital forensics?

12:22:04 22    A.    Digital forensics is, it's the analysis of digital

12:22:11 23    information, so computers, computer storage devices, mobile

12:22:16 24    phones, things like that, to analyze and try to figure out

12:22:20 25    something about what happened on that device and report upon

12:22:23  1   it, like in court.

12:22:26  2   Q.      In terms of trade secrets related matters, what type

12:22:30  3   of knowledge or experience do you have?

12:22:32  4   A.      I have worked on many dozens, if not hundreds of

12:22:37  5   trade secrets matters in my career.  Some of those have gone

12:22:41  6   to trial, and I have testified in other trials in trade

12:22:46  7   secrets matters.  But many others stop before that point.

12:22:50  8   Q.      Have you done any work with respect to digital

12:22:54  9   forensics outside of the litigation context?

12:22:58 10   A.      Yes.  I also do quite a bit of work on internal

12:23:02 11   investigations, when companies investigate some issue.  I

12:23:09 12   worked on things like recovering data from iPhones, even.

12:23:12 13   Q.      Do you currently have any certifications related to

12:23:16 14   your field of expertise?

12:23:18 15   A.      Yes.  I have one certification called the CCE or

12:23:23 16   Certified Computer Examiner, that's put out by a group

12:23:27 17   called the International Society of Computer Forensic

12:23:31 18   Examiners.  And another certification I hold is the GCFE,

12:23:35 19   that's put out by a group called GIAC, and it's GIAC

12:23:45 20   Computer Forensic Examiner.

12:23:46 21           MS. AYERS:  Your Honor, at this time based on

12:23:48 22   his education, training, and professional experience, Qorvo

12:23:52 23   tenders Mr. Kevin Faulkner as an expert in the field of

12:23:56 24   digital forensics.

12:23:59 25           MS. CAI:  No objection, Your Honor.

Faulkner - direct

12:24:00  1              THE COURT:  He's recognized as an expert in the

12:24:02  2      field of digital forensics.

12:24:07  3              Proceed.

12:24:08  4              MS. AYERS:  Thank you, Your Honor.

12:24:09  5      BY MS. AYERS:

12:24:10  6      Q.    Mr. Faulkner, I would like to talk a little bit more

12:24:12  7      about the specific work that you performed in this case.

12:24:14  8      First, before we start, did you assist in the preparation of

12:24:18  9      slides as a part of preparing for your testimony today?

12:24:21 10      A.    Yes, I did.

12:24:22 11      Q.    Mr. Buchbinder, can you please pull up PDX 5.2.

12:24:28 12              Mr. Faulkner, are these the slides that you

12:24:33 13      prepared for your testimony today?

12:24:36 14      A.    Yes.

12:24:37 15      Q.    Mr. Faulkner, can you tell the jury what you did as

12:24:41 16      an expert in this case?

12:24:43 17      A.    Certainly.  I examined computer devices, so computers

12:24:50 18      and other storage devices from Akoustis employees.  I

12:24:54 19      searched for Qorvo materials, Qorvo information on those

12:24:58 20      devices.  Any information that I identified, I provided to

12:25:04 21      counsel for Akoustis who reviewed it for any sort of

12:25:07 22      privilege issues and then produced it to counsel for Qorvo

12:25:11 23      so that the other experts involved in the case could look

12:25:14 24      through that information and understand what it means.

12:25:17 25              I also investigated whether or not any of the

Faulkner - direct

12:25:22  1    documents found were opened or modified or things like that.

12:25:26  2    Q.      Did your forensic investigation involve the use of

12:25:32  3    metadata?

12:25:34  4    A.      Yes, it did.

12:25:36  5    Q.      And can you explain to the jury what metadata is?

12:25:39  6    A.      Certainly.  Metadata just means data about data.

12:25:44  7    It's information about something else.  So, for example, a

12:25:48  8    file can have information in it, metadata about that file

12:25:52  9    could be the file's name or a date when the file was created

12:25:56 10    and things like that.

12:25:57 11    Q.      And did your investigation require or use what's

12:26:02 12    called MD5 Hash?

12:26:06 13    A.      Yes, it did.  MD5 Hash is a -- it's a mathematical

12:26:13 14    calculation on a set of data, it comes up with a little

12:26:17 15    number that represents that data and if another file is the

12:26:23 16    same, it will have the name MD5 Hash, but if there is any

12:26:27 17    differences between the file, then it will not have the same

12:26:30 18    MD5 Hash, so it's kind of like a fingerprint or DNA for

12:26:36 19    being able to match two files as being the same or

12:26:39 20    different.  If you change one little thing, you change a

12:26:42 21    coma to a period in a file, then it will have a totally

12:26:45 22    different MD5 Hash.

12:26:47 23    Q.      Were you able to determine if Akoustis possessed any

12:26:50 24    Qorvo information as a part of your forensic investigation?

12:26:53 25    A.      Yes, I was able to determine that.

Faulkner - direct

12:26:55  1    Q.      Mr. Buchbinder, could you please pull up PDX 5.3.

12:27:00  2            Mr. Faulkner, can you explain to the jury how

12:27:05  3    many Qorvo files you found on the computers and other

12:27:09  4    electronic devices of Akoustis's employees?

12:27:12  5    A.      Certainly.

12:27:14  6            The first point here, the over 9,000 files, that

12:27:19  7    refers to a list of Qorvo files that I received from another

12:27:25  8    expert in this case, Dr. Shanfield.  He reviewed

12:27:30  9    information, he compiled a list and provided that to me of

12:27:34 10    certain Qorvo files, Qorvo materials.

12:27:37 11            I then searched across all of the Akoustis

12:27:41 12    devices that I had access to looking for those files either

12:27:44 13    by file name or by the MD5 Hash that we just talked about.

12:27:49 14    And I identified over 9,000 instances of those Qorvo files

12:27:54 15    from Dr. Shanfield present on the Akoustis systems.

12:27:57 16            In addition to that, I also found over 500,000

12:28:03 17    unique Qorvo e-mail messages that were brought over to

12:28:08 18    Akoustis by two of the -- two of the Akoustis employees that

12:28:14 19    I looked into.

12:28:17 20            There are more e-mails than that, but that was

12:28:20 21    the unique set of e-mails between the two people.

12:28:23 22            And then in addition, I also found 279 gigabytes

12:28:29 23    of data from a Qorvo computer that was present on computer

12:28:35 24    devices for one of the Akoustis employees.  So these were

12:28:39 25    backups of the computer, like a copy of their Qorvo computer

Faulkner - direct

12:28:44  1    present on their Akoustis devices, taken at several

12:28:50  2    different points in time from that Qorvo computer.

12:28:53  3    Q.      And Mr. Buchbinder, can you please display reference

12:28:59  4    number PTX 1725N, which is Appendix F, the file named

12:29:08  5    Appendix F.

12:29:09  6             THE COURT:  Just so everybody understands, these

12:29:12  7    are demonstratives.  You will not have them.  It's the

12:29:17  8    testimony that is important that counts.  If you have a

12:29:20  9    discrepancy between the demonstrative and testimony,

12:29:22  10   obviously you will accept the testimony and disregard

12:29:25  11   anything on the demonstrative that you deem inconsistent.

12:29:30  12            Counsel may proceed.

12:29:31  13            MS. AYERS:  Thank you, Your Honor.

12:29:33  14   BY MS. AYERS:

12:29:33  15   Q.      Mr. Faulkner, do you recognize this native file which

12:29:36  16   has a reference number of PTX 1725?

12:29:39  17   A.      Yes.

12:29:40  18   Q.      Can you tell the jury what this file is?

12:29:44  19   A.      This file is a list of those Qorvo materials that I

12:29:51  20   found present on various different Akoustis devices.  The

12:29:55  21   over 5,000.

12:29:59  22   Q.      Mr. Faulkner, can you please explain what information

12:30:04  23   is found in column A of this file?

12:30:06  24   A.      A lists the custodian, meaning the Akoustis employee

12:30:12  25   that this device and this finding relates to.

Faulkner - direct

12:30:15  1    Q.      And what does column B --

12:30:17  2            THE COURT:  Let me suggest that our TX cut that

12:30:23  3    out and blow that up, if it's possible.  It's pretty

12:30:26  4    routinely done, but I'm sure it is.

12:30:29  5            MS. AYERS:  It's a native file, Your Honor.

12:30:31  6            THE COURT:  That's not a problem -- well, that's

12:30:33  7    not -- that actually --

12:30:36  8            MS. AYERS:  I too have eyes that make it

12:30:38  9    difficult to see small print, Your Honor.

12:30:44 10    BY MS. AYERS:

12:30:45 11    Q.      Mr. Faulkner, can you please explain the contents of

12:30:49 12    column B?

12:30:50 13    A.      So the second column there is the device, that's an

12:30:54 14    identifier for which computer or which removable drive it

12:30:59 15    was on which I found this Qorvo item.

12:31:05 16    Q.      And can you explain what is in column D?

12:31:08 17    A.      D is the key word, and in this instance meaning a

12:31:16 18    file name I was searching for.  Again I searched by file

12:31:19 19    name and also MD5 Hash, so that was the file name that I was

12:31:23 20    searching for and found it to match here.

12:31:25 21    Q.      And can you explain what column E means?

12:31:29 22    A.      So E says at the very top hash hit, I mean MD5 Hash,

12:31:35 23    this is saying whether or not this particular file match on

12:31:41 24    MD5 Hash with the list that I was provided from

12:31:43 25    Dr. Shanfield, so if it says true, then it matched on that

Faulkner - direct

12:31:47 1    hash, but if it says fails, then it did not match.

12:31:50 2    Q.    Can you explain why there are faults in the MD5

12:31:53 3    hashes in your list of files?

12:31:57 4    A.    Absolutely, again, I was searching by both name and

12:32:00 5    hash, if it matched on name or if it matched on hash, I

12:32:05 6    included that as a match.  So the ones that say false on MD5

12:32:09 7    Hash hit means that that file is not exactly the same as the

12:32:14 8    version that was provided in a list to me by Dr. Shanfield,

12:32:20 9    but the names still matched.  Same name but something has

12:32:24 10   changed in the content.

12:32:25 11            MS. AYERS:  Your Honor, I offer this native

12:32:27 12   document which has a reference number of PTX 1725 into

12:32:31 13   evidence.

12:32:32 14            THE COURT:  Marked and received as 112.

12:32:35 15            (Trial Exhibit No. 112 was admitted into

12:32:42 16   evidence.)

12:32:42 17   BY MS. AYERS:

12:32:42 18   Q.    When you were performing your forensic inspection,

12:32:45 19   Mr. Faulkner, were you able to identify the specific files

12:32:48 20   that each individual employee possessed?

12:32:52 21   A.    Yes, I was.

12:32:53 22   Q.    Mr. Buchbinder, could you please display PDX 5.4 for

12:32:59 23   the jury?

12:33:00 24            Mr. Faulkner, can you please explain to the jury

12:33:06 25   what is shown on PDX 75.4 using Mr. Vetury as an example?

Faulkner - direct

12:33:12  1    A.      Certainly.  So Mr. Vetury is the bottom row in this

12:33:17  2    list.  And you can see on the left most column it has the

12:33:21  3    person's name, the Akoustis's employees' name, so for that

12:33:26  4    example, Rama Vetury, the next column over has their title

12:33:32  5    at Akoustis, in this case, principal engineer.  The next

12:33:35  6    column lists what Qorvo data that I found for that

12:33:38  7    particular Akoustis employee.

12:33:42  8            So for Mr. Vetury out of those 9,000 plus files

12:33:46  9    I found in total, 2,273 of those files were found

12:33:51 10    particularly on Mr. Vetury's devices.  For him, I also found

12:33:59 11    175,075 unique Qorvo e-mails.  He was one of the two

12:34:03 12    employees I mentioned before that had a large set of Qorvo

12:34:07 13    e-mails present on his Akoustis devices.  And he is also the

12:34:11 14    individual for which I found the 279 gigabytes of backup

12:34:17 15    data from a Qorvo computer present on one of his devices.

12:34:26 16    Q.      Mr. Faulkner, can you explain to the jury what backup

12:34:30 17    data is?

12:34:30 18    A.      Yes, this backup data is a copy of all the

12:34:34 19    information from the source computer, in this case his Qorvo

12:34:39 20    computer, taken at different points in time.  So there is

12:34:42 21    one backup on a given date and then there is additional

12:34:46 22    backups at other dates.  And all of that in total across all

12:34:50 23    the dates that were backed up sums out to 279 gigabytes of

12:34:55 24    data.

12:34:56 25    Q.      Will a forensic examination like the one that you

Faulkner - direct

12:34:59  1   performed identify every single document that a person

12:35:02  2   possessed that belonged to another company?

12:35:05  3   A.      No, it won't.

12:35:06  4   Q.      Can you explain to the jury why not?

12:35:09  5   A.      Well, for a couple of reasons.  Number one, it's not

12:35:15  6   going to find documents that have been changed so much that

12:35:20  7   I can't tell that they are a Qorvo document anymore.  For

12:35:24  8   example, I was saying before I matched on file names and

12:35:28  9   hash values, if the name is totally different and the

12:35:31 10   contents is different, but it really was a Qorvo document

12:35:34 11   that has been changed so much, I'm not going to match it on

12:35:38 12   name or hash value and I wouldn't even find it in some key

12:35:42 13   word searching that I performed initially to find that total

12:35:45 14   set of possible Qorvo documents.  Again, for example, the

12:35:49 15   name Qorvo or one of its other names like RFMD has been

12:35:53 16   removed from that file.

12:35:55 17           Second, I'm not looking at everything that ever

12:36:01 18   existed, I'm looking at what was available and what was

12:36:04 19   provided to me to investigate.  So you see all the way on

12:36:07 20   the right-hand column, I have noted that for several of

12:36:13 21   these Akoustis employees, I didn't necessarily get every

12:36:17 22   computer they ever used.

12:36:20 23           Mr. Vetury, again, as an example, the bottom

12:36:23 24   row, he started at Akoustis in August of 2015, but the

12:36:29 25   computer that I received from him started in January of

Faulkner - direct

12:36:32  1    2016.   I didn't get that first computer or computers he was

12:36:36  2    using.   I got from January 2016 and forward.

12:36:40  3                And last, the removal of the devices, like USB

12:36:46  4    thumb drives, or external hard drives, or things like that.

12:36:50  5    I didn't get all of those that had been used, connected, or

12:36:55  6    plugged in by the Akoustis employees that I examined.   I got

12:36:59  7    some of them, but when I looked at their computer systems, I

12:37:03  8    found connection information about other drives that I

12:37:07  9    didn't receive.   And I listed here that, you know, again for

12:37:13 10    Mr. Vetury, there were sixty-nine of these removable devices

12:37:17 11    that I did not receive that he had connected to his computer

12:37:21 12    systems.

12:37:22 13    Q.    Did you review any of the e-mail accounts of the

12:37:27 14    Akoustis employees included in your investigations to

12:37:31 15    determine what information was included in their e-mails?

12:37:34 16    A.    Not for my work identifying the Qorvo files that went

12:37:41 17    toward that 9,000 number that I mentioned before, over

12:37:46 18    9,000.   That did not include the e-mails, that was only

12:37:49 19    files on the computer, e-mails were separate.   I later

12:37:52 20    looked at some e-mails when focusing on some specific

12:37:56 21    documents that I'll talk about later, but I didn't include

12:37:59 22    that when searching across the computers for Qorvo

12:38:02 23    information, Qorvo files.

12:38:04 24    Q.    Mr. Faulkner, I would like to walk through this

12:38:06 25    particular analysis that you performed with respect to what

Faulkner - direct

12:38:12  1  Qorvo information Akoustis possessed using Mr. Houlden as an

12:38:16  2  example.

12:38:17  3  A.      Okay.

12:38:22  4  Q.      Did you find any Qorvo files on Mr. Houlden's

12:38:26  5  computer?

12:38:27  6  A.      Yes.  I found 6,303 instances or copies of Qorvo

12:38:36  7  files on Mr. Houlden's computer systems.

12:38:38  8  Q.      Mr. Buchbinder, can you please pull up PDX 5.5?

12:38:44  9          Can you explain to the jury how you found 6,303

12:38:51 10  Qorvo files, but only 852 of those files had any file names,

12:38:58 11  and 859 only had unique MD5 Hash values?

12:39:03 12  A.      Yes.  While those 850 and change numbers were the

12:39:08 13  unique by name or hash, there were so many copies of those

12:39:13 14  files that it actually added up to 6,303 across multiple

12:39:18 15  different computer systems and in different folders on those

12:39:21 16  computers.

12:39:23 17  Q.      And was Akoustis -- strike that.

12:39:27 18          Was the production of information that you

12:39:30 19  looked at with respect to Mr. Houlden's materials incomplete

12:39:36 20  in any regard?

12:39:37 21  A.      It was.  I did not receive a Microsoft one drive or

12:39:41 22  share point data, had some server data for Mr. Houlden, I

12:39:46 23  did receive that for other Akoustis employees.  And I did

12:39:49 24  not receive thirty-seven unique removable drives from Mr.

12:39:55 25  Houlden that I saw connected to his different Akoustis

Faulkner - direct

12:39:57 1    computers.  Notably six of those removable drives that I

12:40:02 2    didn't receive were also connected to the computers of other

12:40:06 3    Akoustis employees that I investigated.

12:40:09 4         One of them even had a folder on it named Qorvo

12:40:14 5    laptop.  A removable drive that I did not receive, I could

12:40:21 6    not examine, but I found indications on some of the

12:40:25 7    computers of Mr. Houlden that recorded some forensic

12:40:30 8    artifacts, little bits of information that I could pull

12:40:33 9    together and see that there was a Qorvo laptop folder on

12:40:37 10   this removable drive even though I didn't have that

12:40:40 11   removable drive.

12:40:41 12   Q.    Did you find any evidence that Mr. Houlden possessed

12:40:45 13   many of the documents submitted into evidence at this trial?

12:40:49 14   A.    Yes, I did.

12:40:51 15   Q.    Mr. Buchbinder, could you please pull up PDX 5.6.

12:40:56 16        Mr. Faulkner, can you please explain to the jury

12:41:04 17   what information is included in the chart on this slide?

12:41:07 18   A.    Certainly.  So this is a portion of the list that I

12:41:14 19   talked about before, matching on file names and MD5 Hash

12:41:18 20   value.  This is specifically for Mr. Houlden's devices, and

12:41:22 21   there was a new column added all the way to the left where

12:41:26 22   it lists the trial exhibit number, or Mr. Houlden's

12:41:29 23   deposition exhibit number for the ones that match.

12:41:31 24   Q.    And just so that your testimony is clear, Mr.

12:41:34 25   Faulkner, the information that relates to custodian device

Faulkner - direct

12:41:41  1    keyword hash hit and name is found in Exhibit 112, which was

12:41:47  2    Appendix F; is that correct?

12:41:48  3    A.      Yes, that's right.

12:41:51  4    Q.      Mr. Faulkner, if a person wanted to search

12:41:55  5    Exhibit 112, which is your Appendix F, for the file names

12:41:59  6    that you see displayed here on PDX 5.6, would they find all

12:42:04  7    the file names that are listed here?

12:42:06  8    A.      Yes.

12:42:14  9    Q.      Did you analyze whether or not Mr. Houlden returned

12:42:19 10    everything -- every file that was a Qorvo file to Qorvo when

12:42:22 11    he left his company?

12:42:24 12    A.      I did analyze that, yes.

12:42:28 13    Q.      And did your forensic inspection show how Mr. Houlden

12:42:33 14    came to possess those Qorvo files?

12:42:36 15    A.      Some of them, yes.

12:42:38 16    Q.      I would like to walk the jury through that.

12:42:42 17    Mr. Buchbinder, can you please display PDX 5.8?

12:42:47 18            Mr. Faulkner, can you please explain to the jury

12:42:58 19    the results of your forensic inspection of Mr. Houlden's

12:43:02 20    devices?

12:43:03 21    A.      Certainly.

12:43:04 22            So I mentioned before a removable drive, a USB

12:43:10 23    thumb drive that had a Qorvo laptop folder on it.  I'm

12:43:15 24    listing up top here a few of the folder names that I saw

12:43:18 25    related to that Qorvo laptop folder on that removable drive

Faulkner - direct

12:43:22 1    and they included folders like 5G and 5-gigahertz Wi-Fi

12:43:28 2    filter inside of Qorvo laptop.

12:43:30 3         My analysis showed that files were copied into

12:43:35 4    those folders, and other folders, on specifically

12:43:40 5    September 14th of 2016.

12:43:42 6         A few days later, September 16th is when

12:43:46 7    Mr. Houlden executes a severance agreement and departs from

12:43:51 8    Qorvo, that's his last day at Qorvo.  And then below the red

12:43:55 9    line, that's when he starts working at Akoustis on

12:43:58 10   September 19th, 2016.

12:44:01 11        And on September 21st, I found that that

12:44:05 12   removable drive, that again, I didn't get, but just looking

12:44:09 13   at the computers for Mr. Houlden, I can see that drive was

12:44:13 14   plugged into his Akoustis computer and that twelve folders

12:44:17 15   that included Qorvo information were copied over on to his

12:44:21 16   Akoustis computer.

12:44:22 17   Q.    Mr. Faulkner, did you also analyze whether or not

12:44:25 18   Mr. Houlden accessed the Qorvo files that you discovered on

12:44:30 19   his devices?

12:44:31 20   A.    Yes, I analyzed that as well.

12:44:34 21   Q.    Mr. Buchbinder, could you please pull up PTX 1733,

12:44:41 22   which is it entitled Appendix N, axiom jump list.  And could

12:44:50 23   you please blow up the first few columns, Mr. Buchbinder.

12:44:57 24   Thank you.

12:44:59 25        Mr. Faulkner, do you recognize PTX 1733?

Faulkner - direct

12:45:03  1    A.       Yes, this is one of the appendixes to my report.

12:45:07  2    Q.       Can you explain what information is found in PTX

12:45:15  3    1733?

12:45:16  4    A.       Certainly.  This is information specifically for the

12:45:22  5    Qorvo materials that I found information on on the Akoustis

12:45:29  6    devices, again, listing which employee or custodian in the

12:45:34  7    first column, which device and then the rest of this is all

12:45:38  8    information from one of the types of forensic artifacts that

12:45:44  9    I look at when I'm investigating what types of files

12:45:47 10    somebody opened or accessed.  This one is specifically an

12:45:50 11    artifact called jump lists.

12:45:55 12              MS. AYERS:  Your Honor, I move to admit PTX 1733

12:45:58 13    into evidence.

12:45:59 14              THE COURT:  Marked and received as 113.

12:46:04 15              (Trial Exhibit No. 113 was admitted into

12:46:05 16    evidence.)

12:46:05 17    BY MS. AYERS:

12:46:05 18    Q.       Mr. Faulkner, in your response just now, you

12:46:09 19    indicated that this was one of the reports that you

12:46:12 20    generated that show where Akoustis's employees accessed the

12:46:18 21    files contained in Exhibit 112.  Were there other reports

12:46:27 22    that you created that show when an Akoustis employee

12:46:32 23    accessed a file that was contained in Exhibit 112?

12:46:37 24    A.       Yes, there were others as well.

12:46:39 25    Q.       Mr. Buchbinder, can you please display PTX 1726,

Faulkner - direct

12:46:44 1    which is entitled Appendix G, X ways forensic file listing

12:46:51 2    utility access artifacts.

12:46:55 3              Mr. Faulkner, do you recognize PTX 1726?

12:47:01 4    A.      I do.  This is another appendix from my report.

12:47:06 5    Q.      What are entitled access artifacts very briefly?

12:47:11 6    A.      This is just a different forensic artifact that also

12:47:15 7    shows what files have been opened, specifically for

12:47:18 8    Microsoft Office documents.

12:47:21 9              MS. AYERS:  Your Honor, I move to admit PTX 1726

12:47:26 10   into evidence.

12:47:27 11             THE COURT:  Marked and received as 114.

12:47:31 12             (Trial Exhibit No. 114 was admitted into

12:47:31 13   evidence.)

12:47:32 14             THE COURT:  And we are going to take our lunch

12:47:34 15   break at this time.  Ladies and gentlemen, we'll come back

12:47:37 16   in forty-five minutes.  I appreciate your patience today.

12:47:41 17   Don't discuss the case amongst yourselves, nor let anybody

12:47:45 18   to talk to you about the case.  Continue to keep that in

12:47:48 19   mind.  We still have a ways to go, although we are making

12:47:53 20   good progress.  I'm going to let you be excused to the jury

12:47:57 21   room for lunch.  I'll sit here just for a moment.  Thanks

12:48:01 22   very much.

12:48:01 23             (Jury exiting the courtroom at 12:48 p.m.)

12:48:24 24             THE COURT:  We'll let everyone be seated.

12:48:29 25             THE WITNESS:  Would you like me to step down?

Faulkner - direct

12:48:31  1          THE COURT:  You're good right now, because I

12:48:33  2     have to tell you as the testimony you have given, counsel

12:48:36  3     cannot discuss that with you.  Of course you haven't

12:48:40  4     completed your testimony, there is something else they can

12:48:46  5     discuss, but anything that you have testified to is part of

12:48:48  6     the record.

12:48:51  7          THE WITNESS:  Yes, Your Honor.

12:48:52  8          THE COURT:  That's how we're going to handle

12:48:53  9     that.  You will get -- we will come back at 1:30.  That

12:48:58 10     means that you're to be here five minutes in advance so we

12:49:02 11     can start right on time.  Thank you very much.  You may step

12:49:06 12     down.

12:49:06 13          THE WITNESS:  Understood.  Thank you, Your

12:49:08 14     Honor.

12:49:08 15          THE COURT:  I do need to check and make sure as

12:49:12 16     to exactly where we are with everything else.  We have -- we

12:49:22 17     have four more witnesses for this afternoon.  Will we get to

12:49:29 18     Mr. Dryer?  Do you think we will or not?

12:49:41 19          MR. MASTERS:  Well, Your Honor, maybe part of

12:49:44 20     the wild card is Mr. Aichele, since he is their witness and

12:49:51 21     they will be doing a direct of him after we do our cross.

12:49:54 22          THE COURT:  I agree.

12:49:55 23          MR. MASTERS:  Your question is if we get to

12:49:56 24     Mr. Dyer, I'm optimistic we will.

12:50:00 25          THE COURT:  That will be good.

Faulkner - direct

12:50:01  1          MR. MASTERS:  And even if we had more time, we

12:50:04  2   would then plan to play the video deposition of Mr. Kwon,

12:50:07  3   since it's not too long.

12:50:08  4          THE COURT:  I believe you have all that

12:50:11  5   material.  We did not get a response to Kwon.  We will make

12:50:16  6   sure they got it.

12:50:17  7          MR. MASTERS:  It's short.

12:50:20  8          THE COURT:  It is short, we looked at it.  I

12:50:22  9   don't think there are any objections.  I don't think there

12:50:25 10   were any -- there is one that was sustained.  I have got it.

12:50:29 11   I have got it.  We'll look at it again.

12:50:31 12          MR. MASTERS:  Thank you.

12:50:32 13          THE COURT:  We'll take one more look and try to

12:50:34 14   get that out for you.  Okay.  I think that's it.  We will be

12:50:38 15   staying until 5:30 today.  We're not going through that

12:50:41 16   situation again.

12:50:49 17          COURT CLERK:  Currently plaintiffs are at

12:50:52 18   7 hours 49 minutes and 34 seconds.  Defendants are at

12:50:58 19   4 hours 25 minutes and 1 second.

12:51:02 20          MR. MASTERS:  Thank you.

12:51:05 21          THE COURT:  I think we will have a day in which

12:51:10 22   we add pretty well to that.  That's useful.  We know what we

12:51:14 23   plan to check on.  Are there going to be anymore

12:51:17 24   demonstratives?  I think everybody understands what we

12:51:20 25   cannot do with demonstratives now, and I want to make sure

Faulkner - direct

12:51:23  1    that I check with defense counsel on that, because I'm not

12:51:26  2    sure who is in charge now.  I have two folks over there who

12:51:29  3    look like they're in charge.

12:51:31  4                Yes, sir, the one standing up.

12:51:32  5                MR. ELKINS:  We understand the drill with

12:51:35  6    demonstratives, Your Honor, and it's goose and gander.

12:51:42  7                THE COURT:  If there is a problem right now on a

12:51:46  8    demonstrative, of course, we have taken out the types of

12:51:53  9    language, we're taking things away from the jury, are we

12:51:56 10    okay with the rest of the demonstratives for the day?

12:51:58 11                MR. ELKINS:  I believe this is the only one,

12:52:00 12    correct?

12:52:01 13                MS. AYERS:  Yes, I think that's correct.

12:52:03 14                THE COURT:  Okay.  You can speak to me, because

12:52:05 15    you know, he's not really going to --

12:52:08 16                MS. AYERS:  I know, Your Honor, what I'm trying

12:52:10 17    to determine is if we have any demonstratives for

12:52:13 18    Mr. Aichele.  We do not have any demonstratives.

12:52:15 19                THE COURT:  That's what I was checking, I want

12:52:17 20    to make sure how we are doing.  It really helps us if we

12:52:22 21    know as much in advance as you can, and of course you know

12:52:26 22    we'll review it and take the steps necessary to make it

12:52:30 23    conform with the rules, is that it.

12:52:32 24                MR. ELKINS:  I'm just going to offer an idea I

12:52:35 25    had, Your Honor, is something that you did in the last trial

Faulkner - direct

12:52:37  1    which is, it's up to you whether it would be helpful, but in

12:52:41  2    the event that we have any unresolved disputes at the end of

12:52:46  3    the evening, would you like us to e-mail Ms. Curry and just

12:52:52  4    let her know and not argue, in a non-argumentative way that

12:52:58  5    we do have an issue and here it is.

12:53:00  6            THE COURT:  That's helpful because we actually

12:53:02  7    start work pretty early and that's helpful.  Hopefully we're

12:53:06  8    getting e-mails, you know what I'm saying?  Hopefully we

12:53:10  9    don't get any e-mails, but earlier is better.  We'll

12:53:14  10    probably get through it particularly if it's like it was

12:53:19  11    today.  We're going to let everybody be excused for lunch

12:53:22  12    and we will see you all -- be back five minutes in advance.

12:53:26  13    Thank you very much.

12:53:27  14            COURT CLERK:  All rise.

12:53:28  15            (A luncheon recess was taken.)

13:32:26  16            THE COURT:  You may be seated.  And on the

13:32:33  17    deposition, I do want to get a piece of information, and

13:32:40  18    that will be that the document that is referenced on

13:32:45  19    page 120, 155, column 24, it's going to be referenced, so

13:32:59  20    will you get that, somebody bring that up, promptly, that

13:33:04  21    will be helpful.  We'll be completed on that.

13:33:07  22            All set?

13:33:12  23            MR. MASTERS:  Your Honor, can I get that number

13:33:15  24    again, please?

13:33:16  25            THE COURT:  Sure.  Page 120, and it's 155:24 for

Faulkner - direct

13:33:28  1    starts.

13:33:36  2                    MR. MASTERS:  Is that the Kwon transcript?

13:33:40  3                    THE COURT:  Yes, it is.  They're talking about

13:33:43  4    trimming.  And I'm going to look at the document.

13:33:50  5                    MR. MASTERS:  You just want a copy of the

13:33:51  6    document?

13:33:51  7                    THE COURT:  You got it already?  That's pretty

13:33:54  8    quick.

13:33:54  9                    MR. MASTERS:  I hope.  No promises.

13:33:58 10                    THE COURT:  When it's ready just hand it up,

13:34:00 11    we'll take a look.

13:34:02 12                    MR. MASTERS:  Okay.

13:34:02 13                    THE COURT:  We're all set.  Counsel in place.

13:34:04 14    We need to get the witness back on the witness stand.  We'll

13:34:10 15    start in about thirty seconds.  You should have a draft of

13:34:25 16    the final jury instructions.  All right.  I think we're

13:34:29 17    ready.  We're closing in on the verdict form.

13:34:45 18                    (Jury entering the courtroom at 1:34 p.m.)

13:35:05 19                    THE COURT:  All right, everyone can be seated.

13:35:16 20    And counsel may proceed.

13:35:17 21                    MS. AYERS:  Thank you, Your Honor.

13:35:20 22    BY MS. AYERS:

13:35:20 23    Q.    Mr. Faulkner, before the lunch break, we were

13:35:22 24    discussing reports that you created which show where

13:35:26 25    Akoustis employees accessed certain Qorvo files, do you

Faulkner - direct

13:35:33  1   recall that testimony?

13:35:34  2   A.      Yes.

13:35:34  3   Q.      And I think that there are a few more reports that I

13:35:38  4   would like to discuss with you.  Mr. Buchbinder, can you

13:35:41  5   please display PTX 1730 which is entitled Appendix K,

13:35:47  6   materials on network shares?

13:35:49  7          Mr. Faulkner, do you recognize this PTX 1730?

13:36:00  8   A.      I do.

13:36:00  9   Q.      And what is it?

13:36:04 10   A.      This is a list specifically of things opened from

13:36:07 11   network server locations.  A little over further to the

13:36:10 12   right, past column D, there are file names and then a list

13:36:16 13   of folders on a server where these files are stored.

13:36:23 14          MS. AYERS:  Your Honor, I move PTX 1730 into

13:36:28 15   evidence.

13:36:28 16          THE COURT:  Marked and received as 115.

13:36:31 17          (Trial Exhibit No. 115 was admitted into

13:36:33 18   evidence.)

13:36:33 19   BY MS. AYERS:

13:36:34 20   Q.      Mr. Buchbinder, could you please pull up and display

13:36:37 21   PTX 1731, which is Appendix L, which is entitled Active

13:36:42 22   Recycle Bin Artifacts.

13:36:46 23          Mr. Faulkner, do you recognize this exhibit?

13:36:49 24   A.      I do.

13:36:49 25   Q.      And can you explain what the contents of this exhibit

13:36:53  1    is?

13:36:54  2    A.      Yes.   This is a list of Qorvo files found in recycle

13:37:02  3    bins on different Akoustis computers.   When you delete

13:37:05  4    something to a recycle bin, it keeps track of where it came

13:37:10  5    from and when it was deleted, things like that, that's all

13:37:14  6    contained here.

13:37:14  7              MS. AYERS:   Your Honor, I move to admit PTX 1731

13:37:17  8    into evidence.

13:37:18  9              THE COURT:   Marked and received as 116.

13:37:20 10              (Trial Exhibit No. 116 was admitted into

13:37:23 11    evidence.)

13:37:23 12    BY MS. AYERS:

13:37:24 13    Q.      Mr. Buchbinder, could you please display 1732, which

13:37:28 14    is a file entitled Appendix M, Axiom LNK files.

13:37:37 15              Mr. Faulkner, do you recognize this document?

13:37:39 16    A.      Yes, I do.

13:37:40 17    Q.      Mr. Buchbinder, could you blow it up just a little

13:37:44 18    bit?

13:37:44 19              Thank you very much, sir.   What is the document

13:37:50 20    with the reference number PTX 1732, which has a title of

13:37:58 21    Axiom LNK files?

13:38:02 22    A.      This is a list of files that had a forensic artifact

13:38:07 23    called link files, or LNK files, and relate to files that

13:38:11 24    are opened or accessed by users on the Akoustis computers.

13:38:18 25    Q.      Mr. Buchbinder, could you please display PTX 1735,

Faulkner - direct

13:38:27  1  which is a file entitled Appendix M, Axiom jump list.

13:38:40  2          Actually, I apologize, Your Honor, that has

13:38:43  3  already been entered into evidence as Exhibit 113.

13:38:47  4          Mr. Buchbinder, let's pull that down and pull up

13:38:49  5  PTX 1735, which is Appendix P, Axiom locally accessed files

13:38:57  6  and folders.

13:39:06  7          Mr. Faulker, do you recognize 1735, which is the

13:39:43  8  axiom locally accessed files and folders?

13:39:45  9  A.      Yes, this is another list of files that were accessed

13:39:49 10  on the Akoustis computers based on another set of forensic

13:39:54 11  artifacts.

13:39:55 12          MS. AYERS:  Your Honor, I move PTX 1735 into

13:39:58 13  evidence.

13:39:58 14          THE COURT:  Marked and received as 117.

13:40:01 15          (Trial Exhibit No. 117 was admitted into

13:40:01 16  evidence.)

13:40:03 17          MS. AYERS:  And I apologize, Mr. Faulkner and

13:40:05 18  Your Honor, I failed to move into evidence PTX 1732, which

13:40:09 19  is the Axiom LNK files.  I move that into evidence as well,

13:40:14 20  Your Honor.

13:40:14 21          THE COURT:  18.

13:40:15 22          MS. AYERS:  Thank you, Your Honor.

13:40:17 23          (Trial Exhibit No. 118 was admitted into

13:40:18 24  evidence.)

13:40:18 25          THE COURT:  118.

Faulkner - direct

13:40:20  1              MS. AYERS:  Yes, correct.  Thank you, Your

13:40:22  2    Honor.

13:40:22  3    BY MS. AYERS:

13:40:23  4    Q.      Can you explain what PTX 117, axiom locally accessed

13:40:28  5    files and folders contains, Mr. Faulkner?

13:40:30  6    A.      Yes.  Again, it's a list of the Qorvo materials that

13:40:36  7    I was searching for, and any forensic artifacts relating to

13:40:41  8    opening or accessing those files locally stored on

13:40:46  9    Akoustis's computers.

13:40:50 10    Q.      Mr. Buchbinder, could you please pull up PTX 1736,

13:40:56 11    which is Appendix Q, Axiom Windows Timeline Activity.

13:41:05 12    Mr. Faulkner, can you please -- well, first of all, do you

13:41:09 13    recognize PTX 1736?

13:41:10 14    A.      Yes, I do.

13:41:11 15    Q.      Can you please tell the jury what this is?

13:41:14 16    A.      This is another list of some files that were

13:41:18 17    accessed, Qorvo files that were accessed on Akoustis

13:41:23 18    computers, this one coming from a forensic artifact called

13:41:27 19    the Windows Timeline.

13:41:28 20    Q.      What is Windows Timeline?

13:41:30 21    A.      It's function of the Windows operating system that

13:41:33 22    keeps track of some of the different files that were opened.

13:41:36 23    All of these reports come from different forensic artifacts

13:41:41 24    and together they can kind of show me the best picture

13:41:45 25    possible of what I know and what was accessed.  Each one has

Faulkner - direct

13:41:48 1    a little bit different piece of the puzzle to tell.

13:41:51 2              MS. AYERS:  Your Honor, I move PTX 1736 into

13:41:55 3    evidence.

13:41:55 4              THE COURT:  Marked and received as 119.

13:41:58 5              (Trial Exhibit No. 119 was admitted into

13:41:59 6    evidence.)

13:41:59 7    BY MS. AYERS:

13:42:00 8    Q.     And this is the last one, Mr. Faulkner.

13:42:03 9    Mr. Buchbinder, can you please pull up 1737, which is

13:42:08 10   Appendix R, Axiom Edge Chromium Web History.

13:42:13 11             Mr. Faulkner, can you please explain to the jury

13:42:17 12   what -- first of all, do you recognize this exhibit, sir?

13:42:19 13   A.     I do.

13:42:20 14   Q.     Can you explain to the jury what this exhibit is?

13:42:22 15   A.     This is another set of files, Qorvo files, that were

13:42:28 16   opened on Akoustis devices, this one coming from the web

13:42:34 17   browser, Microsoft Edge, you might think of web browsers as

13:42:39 18   only accessing websites, they do often track some for local

13:42:44 19   documents that were opened as well.

13:42:46 20             MS. AYERS:  Your Honor, I move to admit PTX 1737

13:42:52 21   into evidence.

13:42:53 22             THE COURT:  Marked and received as 120.

13:42:55 23             (Trial Exhibit No. 120 was admitted into

13:42:56 24   evidence.)

13:42:56 25             MS. AYERS:  Thank you, Your Honor.

Faulkner - direct

13:42:57  1    BY MS. AYERS:

13:43:01  2    Q.      Mr. Faulkner, before we started walking through each

13:43:05  3    of the exhibits that identify when an Akoustis employee

13:43:09  4    accessed files, I asked you if you reviewed any of

13:43:15  5    Mr. Houlden's data to determine whether or not Mr. Houlden

13:43:18  6    accessed any Qorvo files.  Do you recall that?

13:43:21  7    A.      Yes, I recall.

13:43:23  8    Q.      And did you do that, sir?

13:43:25  9    A.      Yes, I did.

13:43:25 10    Q.      Mr. Buchbinder, can you please pull up PDX 5.9.

13:43:33 11            Mr. Faulkner, can you please summarize the types

13:43:36 12    of Qorvo information that you found that Mr. Houlden's

13:43:40 13    devices possessed and which Mr. Houlden accessed?

13:43:44 14    A.      Certainly.  Again, I found that Mr. Houlden had a

13:43:50 15    number of the Qorvo files that I was searching for present

13:43:52 16    on his Akoustis devices.  The top half of this slide is

13:43:57 17    showing some of the example folders that included those

13:44:00 18    files.  And you can see that in kind of bold there, some of

13:44:05 19    the bolder names are things like must have, engineering, and

13:44:10 20    Qorvo PDP docs.  Down below, I'm listing out an example of a

13:44:17 21    file that was accessed on Mr. Houlden's computer.  This one

13:44:22 22    is entitled BAW SAW filter reliability testing, FL2015.PPTX,

13:44:31 23    which is Trial Exhibit 14 that we've seen earlier.

13:44:34 24    Q.      And if a person wanted to search the exhibits that we

13:44:39 25    just admitted into evidence to find the BAW, SAW filter

Faulkner - direct

13:44:45  1    reliability testing document, and the access date that

13:44:49  2    relates to that document, how would they go about doing

13:44:54  3    that?

13:44:54  4    A.    Well if they have the native files, the spreadsheets,

13:44:57  5    you can then either filter or search with an Excel to search

13:45:01  6    for that name or even just a part of that name, like BAW SAW

13:45:05  7    filter and you would find it.  If you were working on paper

13:45:08  8    it might be a little more tedious scrolling through to try

13:45:12  9    to look for that name.

13:45:13  10   Q.    I would like to move on to Mr. Rama Vetury,

13:45:18  11   Mr. Faulkner, was Mr. Vetury one of the Akoustis employees

13:45:22  12   included in your forensic inspection?

13:45:24  13   A.    Yes.

13:45:25  14   Q.    And did you find any of Qorvo's files on Mr. Vetury's

13:45:30  15   devices?

13:45:30  16   A.    I did.

13:45:30  17   Q.    Mr. Buchbinder, can you please pull up PDX 5.10.

13:45:37  18         Mr. Faulkner, can you explain to the jury what

13:45:42  19   you found on Mr. Vetury's devices?

13:45:45  20   A.    Certainly.  I found a total of 2,273 copies of these

13:45:54  21   Qorvo materials on Mr. Vetury's Akoustis devices.  I noted

13:46:00  22   here also that I was not able to look at his first computer

13:46:04  23   or computers that he used at Akoustis, but rather just from

13:46:10  24   January of 2016 and forward.  That's what I focused on and

13:46:17  25   that's where I found these files.  I also found he had

13:46:21 1    sixteen removable drives connected that were not provided

13:46:24 2    for analysis.  And eight of those were connected to other

13:46:28 3    Akoustis employees computers and their names are highlighted

13:46:31 4    here.

13:46:38 5    Q.    Mr. Buchbinder, I would like to pull up PDX 5.11.

13:46:42 6          Mr. Faulkner, can you explain to the jury the

13:46:45 7    information that they see on this slide of your

13:46:49 8    demonstratives?

13:46:50 9    A.    Certainly.  This again is an excerpt of the

13:46:55 10   information from my list of over 9,000 files focusing on

13:47:00 11   specifically on Mr. Vetury and some of his devices.  And

13:47:03 12   there is a column that I added on the left side noting Trial

13:47:07 13   Exhibit number, or Mr. Vetury's deposition exhibit number

13:47:11 14   for some of those files that matched.

13:47:15 15   Q.    Did you conduct any analysis as to whether Mr. Vetury

13:47:19 16   accessed any of the Qorvo files?

13:47:21 17   A.    Yes.

13:47:22 18   Q.    Mr. Buchbinder, can you please pull up PDX 5.12.

13:47:27 19         Can you explain to the jury the information that

13:47:31 20   is shown on this slide?

13:47:33 21   A.    Certainly.  The top half again is a list of folders

13:47:39 22   where I found Mr. Vetury had stored some of the Qorvo

13:47:44 23   materials that I searched for.  These are just some

13:47:47 24   examples, but I have highlighted a few names that stuck out

13:47:50 25   to me, like RFMD technical, recent process info, controlled

Faulkner - direct

13:47:58  1    FAB documents and such.

13:48:00  2            The bottom half is an example of one file that

13:48:03  3    Mr. Vetury accessed, this one he accessed in October 26th of

13:48:10  4    2017, its name is Trim CALC-SIN, which wraps around to the

13:48:20  5    next line which I failed to highlight, trims.PPTX, there,

13:48:25  6    and that's a document that we have seen here at trial, it's

13:48:28  7    Exhibit 12.

13:48:29  8    Q.      And Mr. Faulkner, if a person wanted to search and

13:48:32  9    find Trial Exhibit Number 12 within the exhibits that we

13:48:36 10    just submitted, how would they go about doing that?  Would

13:48:39 11    they use the same process you just described?

13:48:42 12    A.      Yes, it would be the same process, searching in the

13:48:44 13    native files or looking through paper.

13:48:47 14    Q.      Mr. Faulkner, did you also conduct a deeper analysis

13:48:50 15    to determine whether or not Akoustis employees accessed

13:48:54 16    certain documents that have been entered into evidence in

13:48:58 17    this case?

13:48:58 18    A.      Yes, I did.

13:49:08 19    Q.      Did your forensic investigation determine how

13:49:11 20    Mr. Houlden obtained the IDP market segment analysis?

13:49:16 21    A.      Yes, it did.

13:49:24 22    Q.      Did your forensic analysis also determine how

13:49:29 23    Mr. Houlden obtained the CPE Wi-Fi E strategy review?

13:49:33 24    A.      Yes.

13:49:33 25    Q.      Finally, did your investigation determine how

Faulkner - direct

13:49:36  1  Mr. Houlden obtained the statement of work for 5-gigahertz

13:49:41  2  Wi-Fi BAW filters?

13:49:42  3  A.     Yes, for that one as well.

13:49:44  4  Q.     Mr. Buchbinder, can you please pull up PDX 5.17.

13:49:49  5         Mr. Faulkner, can you explain to the jury what

13:49:58  6  your forensic investigation found with respect to Trial

13:50:02  7  Exhibit 20, Trial Exhibit 21, and Trial Exhibit 22?

13:50:06  8  A.     Certainly.  For those three trial exhibit files, I

13:50:10  9  found that they were all saved into the Qorvo laptop folder

13:50:15 10  on that removable drive that I didn't examine but I was able

13:50:19 11  to see artifacts through the computers it was plugged into

13:50:23 12  on September 14th, shortly before Mr. Houlden left Qorvo.

13:50:31 13  His last day was the 16th, and then on the 21st he connected

13:50:36 14  that removable drive to one of his Akoustis computers and

13:50:39 15  copied the files over.

13:50:40 16  Q.     Did you find any other evidence that Mr. Houlden

13:50:43 17  accessed Trial Exhibit 20, Trial Exhibit 21, and Trial

13:50:48 18  Exhibit 22?

13:50:48 19  A.     Yes.

13:50:49 20  Q.     Mr. Buchbinder, can you please pull up PDX 5.18.

13:50:54 21         Mr. Faulkner, can you please explain to the jury

13:51:04 22  what the information on this slide is showing?

13:51:07 23  A.     Yes.  I found that the two dates that I have listed

13:51:12 24  on the screen here in 2018 and 2021, these files were copied

13:51:17 25  to other devices, other locations on Mr. Houlden's Akoustis

Faulkner - direct

13:51:23  1    computer systems.

13:51:26  2    Q.    Mr. Faulkner, would the exhibits that we admitted

13:51:30  3    into evidence earlier, which begins with Exhibit 114 and

13:51:34  4    runs through Exhibit 120, show you when Mr. Houlden printed

13:51:40  5    a document?

13:51:42  6    A.    No, those do not include information about whether

13:51:46  7    things were printed.

13:51:47  8    Q.    Can you explain to the jury why information relating

13:51:51  9    to when Mr. Houlden accessed documents does not show when a

13:51:56 10    document is printed?

13:51:58 11    A.    The little bits of information that get left behind

13:52:04 12    on a computer when you do different things vary quite a bit

13:52:07 13    based on what that thing is.  And specifically for printing,

13:52:11 14    there is just not a lot left behind on computers these days.

13:52:15 15    It's quite rare to find very many artifacts about printing.

13:52:21 16    Opening files, accessing them, there is a lot more

13:52:25 17    artifacts.

13:52:25 18    Q.    Mr. Faulkner, did your forensic analysis determine

13:52:29 19    how Mr. Houlden obtained the 5G polygon sources rectangle

13:52:34 20    document that is Trial Exhibit A?

13:52:35 21    A.    Yes.

13:52:36 22    Q.    Mr. Buchbinder, can you please pull up PDX 5.21?

13:52:43 23    Yes, you can pull up PDX 5.21.

13:52:46 24          Mr. Faulkner, can you please explain to the jury

13:52:53 25    what information you found with respect to Mr. Houlden's

Faulkner - direct

13:52:56  1   access of PDX -- of Trial Exhibit 8?

13:53:01  2   A.      Certainly.  This file, Trial Exhibit 8 was among the

13:53:07  3   files copied into that Qorvo laptop folder on a removable

13:53:12  4   drive on September 14th.  Then Mr. Houlden left Qorvo,

13:53:16  5   joined Akoustis, and on the 21st of September, 2016, it was

13:53:20  6   copied specifically into a folder under his documents

13:53:25  7   folder, and the subfolder names are Rohan/11P filter, that's

13:53:30  8   where the file was copied to.

13:53:33  9           There were then additional copies made in 2018

13:53:36 10   and 2021, as I listed there.

13:53:40 11   Q.      Mr. Faulkner, did your forensic analysis also look at

13:53:44 12   what Mr. Houlden did with the QPQ1901Q, final circuit layout

13:53:50 13   and tile document, which is Trial Exhibit 9?

13:53:52 14   A.      Yes, it did.

13:53:55 15   Q.      Mr. Buchbinder can you please pull up PDX 5.22?

13:54:06 16           Mr. Faulkner, can you please explain to the jury

13:54:08 17   what information that you found with respect to

13:54:12 18   Mr. Houlden's access to Trial Exhibit Number 9?

13:54:19 19   A.      Certainly Trial Exhibit 9 was copied into that Qorvo

13:54:23 20   laptop folder, the removable drive, connected to his

13:54:26 21   Akoustis computer on September 21st of 2016.  It was copied

13:54:31 22   into that same 11P filter folder.  And then the file was

13:54:37 23   opened or copied on several other dates in 2016, 2017, 2018,

13:54:43 24   as well as 2021.

13:54:46 25   Q.      Do you recall an instance where Dr. Shealy,

Faulkner - direct

13:54:49  1  Akoustis's CEO, accessed an RFMD new technology development

13:54:55  2  document?

13:54:55  3  A.      Yes, I recall that.

13:54:56  4  Q.      Mr. Buchbinder, can you please pull up PDX 5.24.

13:55:01  5          Can you tell the jury what your forensic

13:55:04  6  analysis determined with respect to Dr. Shealy's access to

13:55:08  7  Trial Exhibit 6?

13:55:09  8  A.      Yes.  I found that Trial Exhibit 6, he had several

13:55:16  9  different versions of this document, initially renamed it

13:55:20 10  removing the RF name that was originally on it and changing

13:55:24 11  it to a name beginning with AKTS, which I understand is an

13:55:30 12  abbreviation for Akoustis.  He then made modifications to

13:55:33 13  the document and saved it a couple of times.

13:55:36 14  Q.      Mr. Faulkner, do you recall what modifications

13:55:40 15  Dr. Shealy made to Trial Exhibit 6?

13:55:45 16  A.      Yes.  Yes, I do.

13:55:47 17  Q.      Mr. Buchbinder, can you please pull up PDX 5.25.

13:55:54 18          Mr. Faulkner, can you please explain to the jury

13:55:57 19  what is shown on this slide?

13:55:59 20  A.      This is a side-by-side comparison of two of the

13:56:04 21  versions of the -- this set of documents.  The original RFMD

13:56:12 22  version versus the Akoustis version ending in revone.doc.

13:56:19 23  And I have highlighted here some similarities and some

13:56:22 24  differences.  You can see the logo has been changed from

13:56:26 25  RFMD to Akoustis.  It still says new technology development

Faulkner - direct

13:56:30  1    but the name of the company is changed.  The document

13:56:33  2    numbers different, the author has been changed, but the

13:56:37  3    owner is listed the same, and in that confidentiality

13:56:41  4    language, beneath the little rectangle, much of the wording

13:56:48  5    is the same, but things like RFMD have been replaced by

13:56:52  6    Akoustis and a couple of words have been removed, including

13:56:55  7    the last sentence that says e-mail address for more

13:57:00  8    information, that got removed, but the table of contents

13:57:03  9    below that is the same.

13:57:08  10   Q.    Mr. Faulkner, did you determine if Dr. Shealy shared

13:57:13  11   any version of the Akoustis tech development document that

13:57:16  12   was re-branded with any other person at Akoustis?

13:57:20  13   A.    Yes.

13:57:21  14   Q.    What version of the Akoustis tech development

13:57:25  15   document did Dr. Shealy share with others at Akoustis?

13:57:29  16   A.    That was the rev 1.1 version of the document, the

13:57:34  17   most recent one.

13:57:38  18   Q.    Who did Dr. Shealy share version 1.1 of the Akoustis

13:57:43  19   branded version of Trial Exhibit 6 with?

13:57:47  20   A.    I believe it was a couple of people.  I believe it

13:57:51  21   included Ms. Winters, and I believe Mr. Houlden.

13:57:58  22   Q.    And is Ms. Winters in the courtroom today?

13:58:01  23   A.    She is.

13:58:03  24   Q.    Who is she?

13:58:04  25   A.    I know she is an Akoustis employee.  I'm afraid I

Faulkner - direct

13:58:10  1    don't know her exact title.  I understand she's a corporate

13:58:14  2    representative.

13:58:15  3    Q.      Did you analyze what Mr. Houlden did after he

13:58:19  4    received the Akoustis branded version of Trial Exhibit 6?

13:58:23  5    A.      Yes.

13:58:24  6    Q.      Mr. Buchbinder, can you please pull up PDX 5.27.

13:58:30  7            Can you tell the jury what you discovered about

13:58:33  8    Mr. Houlden's activity after Dr. Shealy sent him the

13:58:43  9    Akoustis branded version of Trial Exhibit 6?

13:58:46 10    A.      Yes.  Mr. Houlden saved the document and then

13:58:49 11    accessed it on several different dates, including in 2018,

13:58:56 12    2019, and into 2021.

13:59:00 13    Q.      Did anyone else have a copy of Trial Exhibit 6 on

13:59:04 14    their devices?

13:59:06 15    A.      Yes.  I also found twelve copies of Trial Exhibit 6

13:59:11 16    on Mr. Vetury's computer systems at Akoustis.

13:59:15 17    Q.      Did your forensic analysis identify any access of the

13:59:21 18    SAW and BAW filter power life reliability testing document

13:59:25 19    by an Akoustis employee?

13:59:27 20    A.      Yes.

13:59:28 21    Q.      Mr. Buchbinder, can you please pull up PDX 5.29?

13:59:33 22            Can you explain to the jury what you found with

13:59:38 23    regard to an Akoustis employee's access of Trial Exhibit 14?

13:59:43 24    A.      Yes, I found this particular file, Trial Exhibit 14

13:59:49 25    was attached to a series of e-mails between different

Faulkner - direct

13:59:53  1    Akoustis employees.  And I have listed on the right a little

13:59:57  2    table of the sender and recipients, and the dates when the

14:00:02  3    messages were sent, each of them attaching this document to

14:00:06  4    the e-mail.

14:00:09  5    Q.    Did you review any of the e-mails that you discovered

14:00:14  6    attached Trial Exhibit 14, which is the BAW SAW filter

14:00:20  7    reliability testing document?

14:00:22  8    A.    Yes.

14:00:23  9    Q.    Mr. Buchbinder, can you please pull up PDX 5.30.

14:00:29 10          Mr. Faulkner, can you explain to the jury what

14:00:34 11    you discovered with respect to access of Trial Exhibit 14?

14:00:39 12    A.    Certainly.  This is one of those e-mail messages, I

14:00:44 13    have blown up on the right side.  It was sent on

14:00:48 14    August 15th, of 2018 from Pat Lewis to Rohan Houlden.  It

14:00:53 15    includes the file, Trial Exhibit 14 as an attachment, and it

14:00:57 16    has a little message in the body that says "PG 4-5 should

14:01:05 17    look very familiar."

14:01:06 18    Q.    Did you find any other evidence that Akoustis

14:01:09 19    accessed the BAW SAW reliability testing PowerPoint that is

14:01:14 20    Trial Exhibit 14?

14:01:15 21    A.    Yes.

14:01:15 22    Q.    Mr. Buchbinder, could you please pull up PDX 5.31?

14:01:20 23          Can you explain to the jury what you discovered

14:01:24 24    when you analyzed whether or not Akoustis employees accessed

14:01:28 25    Trial Exhibit 14?

Faulkner - cross

14:01:29  1    A.       Certainly.  This is another one of those e-mail

14:01:33  2    messages that I have blown up on the right.  This one is a

14:01:36  3    little later in time.  It looks like April 18th of 2019.

14:01:41  4    And this is where Mr. Morgan accessed the file and attached

14:01:46  5    it to an e-mail sending it to Mr. Houlden and Mr. Aichele,

14:01:52  6    and again, wrote a little message in the e-mail as well, and

14:01:56  7    I have highlighted a portion of it here.  It says, "This is

14:01:59  8    the primary document I have been referencing regarding

14:02:02  9    methodology for three temp testing/MTTF determination."

14:02:12 10             MS. AYERS:  I have no further questions, Your

14:02:14 11    Honor.

14:02:14 12             THE COURT:  Cross-examination.

14:02:16 13             MS. CAI:  Thank you, Your Honor

14:02:17 14                  CROSS-EXAMINATION

14:02:18 15    BY MS. CAI:

14:02:23 16    Q.       Good afternoon, Mr. Faulkner, I am Xiaomai Cai.  I am

14:02:28 17    one of the defense attorneys for Akoustis.  It's very nice

14:02:31 18    to meet you again, this time in person.

14:02:33 19    A.       Nice to meet you again as well, in person.

14:02:36 20    Q.       So Mr. Faulkner, you testified that for your forensic

14:02:42 21    analysis you found about 9,000 files across Akoustis's

14:02:48 22    devices; right?

14:02:49 23    A.       In total, across all of them, yes, over 9,000 files.

14:02:53 24    Q.       So the 9,000 files was based on your search for a

14:02:58 25    list of Qorvo files that you received from another expert in

Faulkner - cross

14:03:03 1  this case, Dr. Shanfield; right?

14:03:06 2  A.      I received through counsel, yes, it was a list from

14:03:11 3  Dr. Shanfield provided to counsel who provided it to me and

14:03:14 4  that was the list of file names, MD5 Hash values that I was

14:03:21 5  searching for.

14:03:22 6  Q.      So do you understand those files were from

14:03:26 7  Dr. Shanfield when you provided that -- when you provided

14:03:32 8  your report?

14:03:36 9  A.      I don't recall what I understood at the time.  I knew

14:03:42 10 I got them from counsel.  And I know sitting here today that

14:03:47 11 that came from Dr. Shanfield, that he relied on them in his

14:03:52 12 report.

14:03:52 13 Q.      So you did not review those documents individually to

14:04:02 14 see their contents, correct?

14:04:05 15 A.      That's correct, I didn't go through the contents of

14:04:08 16 each of those documents, no.

14:04:19 17 Q.      You are -- just wanted to be sure.  Do you have any

14:04:26 18 experience in the research, design, or development of any

14:04:29 19 Akoustis filters?

14:04:31 20 A.      No, I don't.

14:04:33 21 Q.      And do you have any educational background in this

14:04:37 22 field?

14:04:37 23 A.      No, not in filters.

14:04:39 24 Q.      So you don't consider yourself to be qualified to

14:04:42 25 testify about any confidentiality in this field, correct?

14:04:51  1    A.      I would say that I don't think that I would

14:04:56  2    understand the nature of designing filters and what

14:05:01  3    information about their design might be confidential versus

14:05:06  4    not confidential, if that's what you mean.

14:05:09  5    Q.      So you don't actually offer any opinion as to whether

14:05:14  6    a document you found is confidential or not; correct?

14:05:19  7    A.      I would say that I don't offer any independent

14:05:22  8    opinion on that, no.

14:05:31  9    Q.      So among the 9,000 files you found, would you agree

14:05:39 10    that about over 99 percent of them were just from Akoustis

14:05:47 11    custodians?

14:05:49 12    A.      I haven't run the math, but I do recall that two of

14:05:53 13    the Akoustis custodians had over a thousand files each,

14:05:57 14    Mr. Houlden and Mr. Vetury, so I know they had the lion's

14:06:02 15    share, but I'm afraid I didn't do the math to see what

14:06:05 16    percentage that was.

14:06:06 17    Q.      So you testified about 6,300 files were actually

14:06:13 18    found from Dr. Houlden, is that correct?

14:06:17 19    A.      Yes, over 6,300.

14:06:19 20    Q.      And another 2,300 files from Dr. Rama Vetury, is that

14:06:28 21    correct?

14:06:28 22    A.      Off the top of my head it was either 22 or 2,300,

14:06:33 23    somewhere in that range.

14:06:34 24    Q.      So those two kind of add up to about 8600?  Sorry to

14:06:41 25    impose the math on you.

Faulkner - cross

14:06:42  1    A.      So, 8,600 out of, I think the total was like 93,

14:06:48  2    9,400, again, it's the lion share, I don't know if that's 93

14:06:53  3    versus 94 versus 90 percent, but it's certainly the

14:06:57  4    majority.

14:06:58  5    Q.      And do you recall you found about 460 files from

14:07:03  6    Dr. David Dyer's data?

14:07:09  7    A.      I don't recall the exact number for David Dyer.  I

14:07:14  8    believe it was on my slides, but I don't recall the number

14:07:19  9    off the top of my head.

14:07:21 10    Q.      Do you recall you found about 310 files from

14:07:26 11    Dr. Robert Dry's data?

14:07:28 12    A.      Somebody has pulled up my chart and this is very

14:07:32 13    helpful.  I see 306 for Mr. Dry.

14:07:37 14    Q.      So if I tell you the files you found from these four

14:07:43 15    individuals add up to about 9,400 documents, does that sound

14:07:52 16    about right?

14:07:54 17    A.      Let me see.

14:08:06 18              It is certainly over 9,000.  It very well may be

14:08:11 19    9,400, I didn't do the full math, but it's from the -- from

14:08:17 20    the limited devices that I was able to examine, that's what

14:08:21 21    I found and those individuals have the lion share.

14:08:26 22    Q.      So for your forensic analysis, you also examined the

14:08:30 23    data from Ms. Mary Winters, correct?

14:08:34 24    A.      Yes.  For whatever was provided, yes.

14:08:39 25    Q.      Do you recall how many files were found from her

Faulkner - cross

14:08:42  1    data?

14:08:47  2    A.    I don't recall the number of her files off the top of

14:08:52  3    my head.  I believe it was a fairly low number from the

14:08:57  4    limited devices I was able to examine from her, though.

14:09:00  5    Q.    If I told you you only found one file from her data

14:09:04  6    set, do you have any reason to disagree?

14:09:07  7    A.    No, that sounds possible.

14:09:10  8    Q.    And you also found no forensic artifacts indicating

14:09:16  9    she ever accessed that one file; right?

14:09:21 10    A.    I believe from the -- again, limited data that I had

14:09:24 11    from Ms. Winters, that very well is possible.

14:09:29 12    Q.    You also searched for the data, data sets from

14:09:39 13    Dr. Daeho Kim?

14:09:39 14    A.    I recall that name being one of the ones I examined,

14:09:43 15    yes.

14:09:43 16    Q.    You also found no forensic artifacts showing access

14:09:49 17    by Dr. Daeho Kim, that is correct?

14:09:51 18    A.    Again, from the limited computer systems that I was

14:09:54 19    provided to examine, I don't believe I found any for Daeho

14:09:59 20    Kim.

14:10:00 21    Q.    You also examined the data files of Mr. David

14:10:06 22    Aichele, is that correct?

14:10:09 23    A.    Yes, I think he was on the list on my chart, if I

14:10:14 24    recall.

14:10:16 25    Q.    And you didn't find any forensic artifacts showing he

Faulkner - cross

14:10:21 1    ever accessed any Qorvo files you searched; is that right?

14:10:36 2    A.    I don't -- I don't recall if we had any for

14:10:40 3    Mr. Aichele or not.  If I did, they would be in the

14:10:44 4    spreadsheets that were entered as trial exhibits from my

14:10:48 5    report.  But I don't recall if there were any in there or

14:10:53 6    not.

14:10:54 7    Q.    Will reviewing your report help to refresh your

14:10:59 8    memory?

14:10:59 9    A.    I think I would have to review -- well, perhaps, yes,

14:11:03 10   because my report would have noted what I found, or

14:11:06 11   summarized what I found.

14:11:09 12          MS. CAI:  Your Honor, may I approach the witness

14:11:11 13   to hand over a document?

14:11:13 14          THE COURT:  You may.

14:11:45 15          THE WITNESS:  Thank you.  My recollection is

14:11:47 16   indeed refreshed.

14:11:49 17   BY MS. CAI:

14:11:50 18   Q.    You may close that binder.

14:11:52 19   A.    Okay.  It is closed.

14:11:53 20   Q.    So now testifying from your present memory, do you

14:11:58 21   recall that you found no forensic artifacts indicating

14:12:01 22   access by Mr. David Aichele?

14:12:05 23   A.    Yes, for the limited computer systems I examined for

14:12:09 24   Mr. Aichele, I did not find any forensic artifacts of

14:12:14 25   access.

Faulkner - cross

14:12:14  1    Q.      And you also testified earlier that you found about

14:12:18  2    500,000 Qorvo e-mails in Akoustis's forensic data, is that

14:12:24  3    right?

14:12:24  4    A.      Yes.

14:12:25  5    Q.      And you testified that you did not look at the

14:12:30  6    individuals of those e-mails; is that right?

14:12:34  7    A.      Yes.  That's right, I didn't dig through that set of

14:12:37  8    e-mails.

14:12:38  9    Q.      So to be clear, those 5,000 -- or 500,000 e-mails are

14:12:45 10    not freestanding e-mails you found, right?

14:12:48 11    A.      I think I understand your question.  They weren't

14:12:51 12    freestanding, as in stored as separate individual messages

14:12:56 13    on the computers, they were stored within these PST

14:13:00 14    container files.  It's a type of file that stores like a

14:13:04 15    whole mailbox of e-mail, and there were several of these PST

14:13:08 16    files for each of the two employees that had Qorvo e-mail.

14:13:15 17    Q.      Are the PST and -- are the PST files common e-mail

14:13:22 18    container files?

14:13:23 19    A.      Yes, they are.

14:13:25 20    Q.      You have forensic tools to analyze the contents of

14:13:30 21    them if you request it, correct?

14:13:33 22    A.      I have tools that can analyze what's in the PST file,

14:13:38 23    yes.

14:13:38 24    Q.      So you mean you have forensic tools to extract the

14:13:43 25    individual e-mails from the PST files and then do further

Faulkner - cross

14:13:49  1    inspections?

14:13:49  2    A.      Yes, I have such tools.

14:13:53  3    Q.      You just did not do such an analysis in this case;

14:13:57  4    correct?

14:13:58  5    A.      It wasn't something that I was needed for since those

14:14:02  6    e-mails were Qorvo materials that were then returned to

14:14:06  7    Qorvo's counsel, others were able to look through those

14:14:11  8    e-mails and didn't need my expertise.

14:14:14  9    Q.      So you do not provide any opinion as to what's

14:14:18 10    contained in these e-mails?

14:14:20 11    A.      Only that it's Qorvo mailbox, Qorvo e-mails, nothing

14:14:27 12    beyond that.

14:14:29 13    Q.      The majority of the e-mails came from the user

14:14:33 14    profile, Mr. Todd Bender, correct?

14:14:41 15    A.      The two users were Mr. Bender and Mr. Vetury.   I

14:14:47 16    don't recall which of them had more than the other, frankly.

14:15:04 17    Q.      So if I tell you you found about 320,000 Qorvo

14:15:15 18    e-mails in Mr. Todd Bender's files, do you have any reason

14:15:19 19    to disagree?

14:15:22 20    A.      No sounds right, I think it was over 320,000, 327,000

14:15:28 21    total.

14:15:29 22    Q.      So do you understand that Todd Bender's work relates

14:15:34 23    to tax at Akoustis?

14:15:37 24    A.      Relates -- I'm sorry, to tax?

14:15:40 25    Q.      Do you understand that Mr. Todd Bender's work relates

Faulkner - cross

14:15:44  1    to tax and treasury at Akoustis?

14:15:49  2    A.      I think I remember seeing his title at Akoustis, but

14:15:57  3    I don't know beyond his title what his work entails.  I

14:16:00  4    think his title was something about tax or finance or

14:16:03  5    something like that.

14:16:05  6    Q.      And the rest of the e-mails came from the user

14:16:08  7    profile of Dr. Rama Vetury, correct?

14:16:11  8    A.      Yes, that's correct.

14:16:16  9    Q.      You did not find any evidence that Dr. Vetury's

14:16:21 10    e-mail contained files were ever accessed by anyone, do you?

14:16:30 11    A.      I think from the -- again, limited computer devices

14:16:34 12    that I looked at, I don't recall seeing specifically access

14:16:38 13    to those files.

14:16:42 14    Q.      You also testified earlier that you found about 279

14:16:50 15    gigabytes of backup files, also from Dr. Vetury's data,

14:16:55 16    correct?

14:16:57 17    A.      Yes, that's right.

14:17:00 18    Q.      And you did not analyze what's contained in those

14:17:05 19    backup files, right?

14:17:06 20    A.      That's right.

14:17:07 21    Q.      So you don't know the contents of those backup files?

14:17:10 22    A.      Well, I know that the contents are information from

14:17:14 23    his Qorvo computer, but I didn't then go digging through the

14:17:18 24    documents or anything like that, I examined them enough to

14:17:22 25    figure out this wasn't a back up of his Akoustis computer or

14:17:26  1    something like that, but I did not review all the documents.

14:17:29  2    Q.        And you did not search for the list of documents you

14:17:34  3    received -- the list of Qorvo files you received from

14:17:39  4    counsel for Qorvo in those backup files; right?

14:17:43  5    A.        That's correct.  Again, like the e-mails, those were

14:17:47  6    provided over to Qorvo's counsel, so my skills, my work

14:17:53  7    wasn't needed to go through them and figure out what was in

14:17:56  8    there, unlike the Akoustis computers that can't go to

14:18:02  9    Qorvo's counsel, my work is needed to dig through them.

14:18:06 10    Q.        Again, you have forensic tools allowing to you

14:18:11 11    inspect the contents if requested, right?

14:18:13 12    A.        Yes, I have the tools to do it.

14:18:19 13    Q.        So what's contained in those Qorvo -- sorry, in those

14:18:24 14    backup files and e-mail files can be any Qorvo information;

14:18:29 15    is that right?

14:18:29 16    A.        Yes, it could be.  Again, I haven't reviewed them so

14:18:35 17    I don't know what individual documents may be in there.

14:18:37 18    Q.        And they may not even be Qorvo information, right, it

14:18:42 19    could be personal information?

14:18:43 20    A.        If that's what was on Dr. Vetury's Qorvo laptop, it

14:18:49 21    certainly could be.

14:18:50 22    Q.        Do you have any evidence that Dr. Vetury ever opened

14:18:54 23    these backup files?

14:18:56 24    A.        From the limited computers that I examined for

14:19:01 25    Dr. Vetury, I don't recall seeing any evidence of him

Faulkner - cross

14:19:03  1  opening those.

14:19:07  2  Q.    Do you have any evidence that these backup files were

14:19:13  3  ever accessed by anyone at Akoustis?

14:19:21  4  A.    I don't believe from the systems that I looked at

14:19:24  5  that I saw any evidence of them being accessed.

14:19:36  6  Q.    And you testified that you inspected forensic access

14:19:40  7  relating to accessing of files, is that right?

14:19:45  8  A.    Yes, that's one of the things I testified about.

14:19:47  9  Q.    And you pointed to several forensic artifacts, such

14:19:53 10  as junk list link files and the utility files to indicate

14:19:58 11  the access; right?

14:20:00 12  A.    Those were some of the artifacts I looked at, yes.

14:20:09 13  Q.    By accessing a file, you mean opening a file, right?

14:20:13 14  A.    Yes.  Generally that -- yes, that's what I mean by

14:20:18 15  accessing.

14:20:20 16  Q.    Would you agree that merely having possession of a

14:20:25 17  file does not necessarily mean accessing a file?

14:20:30 18  A.    Absolutely, yeah, you can have a file and not open

14:20:33 19  it, then you may possess it and not access it.

14:20:37 20  Q.    If it is accessed, you would have for those forensic

14:20:43 21  analysis you did for this case, you would see a forensic

14:20:48 22  artifacts showing up in one of those spreadsheets you

14:20:52 23  prepared; is that right?

14:20:54 24  A.    You can.  Not necessarily will.  The artifacts

14:20:58 25  capture what they capture.  There isn't always a forensic

Faulkner - cross

14:21:03  1   artifact for everything that's happened on a computer, and

14:21:06  2   moreover, I don't have all the computers that were used at

14:21:10  3   all the relevant times.  So I have the computers that I

14:21:14  4   have, and examined those, and found the accessed artifacts

14:21:18  5   that I found.  But you can't then flip that around and say

14:21:21  6   well, if I didn't find an accessed artifact, then it

14:21:25  7   certainly wasn't accessed, that's the case, it may have been

14:21:29  8   accessed on an earlier computer that I didn't examine.

14:21:33  9   Q.     So for your forensic inspection in this case, if

14:21:38 10   there is no forensic artifacts found in one of the reports

14:21:46 11   you provide, you have no evidence that it was accessed,

14:21:49 12   right?

14:21:50 13   A.     That's right, yeah, from the computers that I did

14:21:53 14   examine with whatever the limitations were on each of them,

14:21:58 15   I reported what I found.

14:22:09 16   Q.     And does copying a file mean accessing, without a

14:22:18 17   forensic artifact showing access, means access a file to

14:22:23 18   you?

14:22:24 19   A.     I think it depends on what you mean by access.

14:22:27 20   Copying a file certainly isn't the same thing as opening a

14:22:32 21   file.  When you copy a file, it doesn't automatically open

14:22:35 22   or anything like that, you can't see the contents of it just

14:22:38 23   by copying it.  But you did go click on a file, drill down

14:22:42 24   into a folder, find the fire, click on that and then copy it

14:22:48 25   over to another location, so in that sense you accessed it

Faulkner - cross

14:22:52  1    but you didn't open it, so they're not the same thing.

14:22:55  2    Q.    Okay.  You're saying that just by copying, that can

14:23:03  3    be -- accessing a file?

14:23:08  4    A.    I'm saying that depending on how you define access,

14:23:13  5    then copying certainly could be.  Again, if you were

14:23:17  6    choosing which files to take off of an old computer and

14:23:21  7    bring them to a new computer even without opening them,

14:23:24  8    you're still accessing the folders, accessing the files, and

14:23:28  9    pick out what you want to copy to bring over to your new

14:23:31 10    computer if it gets replaced, for example.  So it's not the

14:23:34 11    same as opening them, it doesn't leave the same artifacts,

14:23:37 12    like these link files and jump list and other artifacts that

14:23:42 13    were in the appendixes to my report that have become

14:23:46 14    exhibits, those are actually related to opening files, not

14:23:49 15    just copying.  Depending what you mean by access, copying a

14:23:54 16    file could be a form of access, opening a file could be a

14:23:59 17    form of access.

14:24:00 18    Q.    So you testified earlier that Dr. Houlden copies --

14:24:06 19    copied TX 20, TX 21, and TX 22, these three files to other

14:24:14 20    devices; right?

14:24:16 21    A.    Yes, I remember Trial Exhibit, 21, and 22, yes.

14:24:22 22    Q.    And you concluded that Dr. Houlden then accessed

14:24:27 23    those files by copying those three documents; is that right?

14:24:35 24    A.    I think where I had evidence of him copying them, I

14:24:39 25    just said that he copied them and copied them to another

Faulkner - cross

14:24:43 1   folder, things like that.  Where I had evidence of actually

14:24:46 2   opening something, I said that.

14:24:49 3   Q.     So for those three trial exhibits, what I meant is TX

14:24:54 4   20, 21 and 22, do you have any forensic artifacts showing

14:24:59 5   that they are -- they were in fact accessed?

14:25:03 6   A.     You mean like opened accessed?

14:25:06 7   Q.     Correct.

14:25:08 8   A.     I have to refer back to something to refresh my

14:25:11 9   recollection.  I don't recall.  I think there were so many

14:25:15 10  files that I looked at and some of them I found access -- or

14:25:18 11  evidence of copying, others I found evidence of opening.  I

14:25:25 12  don't recall if I had opening artifacts on those ones or

14:25:29 13  not, but if I did, then they will be in the trial exhibits

14:25:32 14  from my report.

14:25:33 15  Q.     So do you recall one of the demonstrative -- one

14:25:39 16  slide of the demonstrative you prepared indicate that those

14:25:42 17  three files were copied, right?

14:25:46 18  A.     I remember the demonstratives talking about copying

14:25:50 19  them, on September 14th, 2016, and then copying them again

14:25:55 20  on September 21st, if that's the one you're referring to.

14:25:59 21  Q.     And that's all you found with those three trial

14:26:03 22  exhibits?

14:26:03 23  A.     I don't know if that's all I found, I also said I

14:26:07 24  don't recall if there were also artifacts at opening, but if

14:26:10 25  there were, they would be in those trial exhibits that came

Faulkner - cross

14:26:15  1    from my report.

14:26:29  2    Q.      Mr. Faulkner, you testified that one of the reasons

14:26:34  3    you may not detect all of the artifacts is because sometimes

14:26:42  4    when a document is drastically changed, you may not show up

14:26:48  5    in the search result.  Is that correct?

14:26:51  6    A.      The files, not the artifacts, but yes, when searching

14:26:56  7    for things like keywords, if those keywords no longer exist

14:27:02  8    in that Qorvo document because they have been removed, then

14:27:05  9    I'm not going to find that document using that set of

14:27:08 10    keywords.

14:27:09 11    Q.      Do you have any evidence in this case that you can

14:27:12 12    provide showing such a significant change has happened to

14:27:17 13    any Qorvo files?

14:27:19 14    A.      Yes.

14:27:20 15    Q.      Can you show me that?

14:27:26 16    A.      Your Honor, I might need a side-bar.  The question

14:27:29 17    calls for -- may I?

14:27:34 18            THE COURT:  Yes.  That's fine.  Come around.

14:29:03 19            (Side-bar discussion:)

14:29:03 20            THE COURT:  Yes.  Excuse me.  Go ahead, only one

14:29:03 21    person at a time.  This is counsel, you have asked the

14:29:03 22    question, and therefore, he may answer the question.

14:29:03 23            MS. AYERS:  Go ahead.

14:29:03 24            THE WITNESS:  May I answer the question?  The

14:29:03 25    question calls for information that is protected by the

Faulkner - cross

14:29:03 1    court ordered forensic protocol in which I am not allowed to

14:29:03 2    discuss the contents of the document unless it has been

14:29:03 3    produced.

14:29:03 4              THE COURT:  I understand that, but she asked it.

14:29:03 5              THE WITNESS:  Okay.

14:29:03 6              THE COURT:  No, that's a hundred percent right,

14:29:03 7    and you should not do it unless counsel opposite asks you,

14:29:03 8    but if your counsel asks you the first time, you couldn't do

14:29:03 9    it, hundred percent correct.

14:29:03 10             THE WITNESS:  Understood.  Then I will answer.

14:29:08 11             (End of side-bar.)

14:29:10 12             THE COURT:  Counsel.  The witness may proceed.

14:29:11 13   The question has been posed.

14:29:13 14             THE WITNESS:  Yes, I did find such an example.

14:29:17 15   We looked earlier today in my direct testimony at copies of

14:29:21 16   a RFMD document where the court, the RFMD logo had been

14:29:28 17   removed and instead the Akoustis logo was put on.  And I

14:29:32 18   mentioned that there were multiple copies, multiple versions

14:29:36 19   of that document.  The most recent version, version Rev 1.1

14:29:41 20   is the file name, was the version that was sent out to other

14:29:45 21   Akoustis employees.  That version had been modified so

14:29:48 22   heavily that it did not hit on my keywords when I searched

14:29:52 23   for it, so I didn't find that file.  I found the first three

14:29:55 24   versions, I didn't find the fourth.

14:29:57 25             I then sent the files I found, the three

Faulkner - cross

14:30:01  1    versions out for review by counsel and those three versions

14:30:05  2    were produced to RSI to use, but the fourth one was not,

14:30:10  3    because it didn't have the keywords, I didn't know about it

14:30:13  4    until much later when digging through the information.

14:30:16  5            What I found is in that most recent version, Rev

14:30:22  6    1.1, throughout the body of the document, all the references

14:30:25  7    to RFMD had been removed and Akoustis had been placed in it

14:30:29  8    instead.  References to document numbers and things like

14:30:33  9    that had been replaced with placeholders beginning with

14:30:38 10    AKTS.  The list of revisions to the document had been

14:30:42 11    removed and replaced with just something like Shealy,

14:30:49 12    initial version.

14:30:50 13            And also there was a reference to some sort of

14:30:54 14    like document control system or something that I guess

14:30:58 15    applied to RFMD, which was just removed since it didn't

14:31:02 16    apply to Akoustis.  So that would be an example of a

14:31:05 17    document that had been so heavily modified that it just

14:31:09 18    didn't even turn up in my search process.

14:31:29 19    BY MS. CAI:

14:31:30 20    Q.    So Dr. Faulkner, you list all the forensic images

14:31:34 21    that Akoustis provided to you for inspection in an

14:31:39 22    appendixes, is that right?

14:31:39 23    A.    I believe I did list them, I'm not Dr. Faulkner,

14:31:43 24    though, just Mr. Faulkner.

14:31:58 25    Q.    So, and you provided the data size of those forensic

Faulkner - redirect

14:32:03  1   images there, correct?

14:32:05  2   A.     I would expect so, I don't specifically recall, but

14:32:10  3   that seems very possible, seems like something I would list.

14:32:14  4   Q.     Would you agree that the total size of such data is

14:32:17  5   about 32,000 gigabytes?

14:32:21  6   A.     I don't know the number but I wouldn't be surprised

14:32:25  7   if that's right, I know it was a good bit of data.

14:32:29  8               MS. CAI:  I have no more questions, Your Honor.

14:32:33  9               Thank you, Mr. Faulkner.

14:32:34 10               THE COURT:  All right.  Redirect.

14:32:38 11               MS. AYERS:  Your Honor, I just have a few

14:32:44 12   additional questions for Mr. Faulkner.

14:32:47 13                    REDIRECT EXAMINATION

14:32:47 14   BY MS. AYERS:

14:32:48 15   Q.     Mr. Buchbinder, could you please pull up PDX 5.4.

14:32:54 16               Mr. Faulkner, could you please explain to the

14:32:59 17   jury what devices of Dr. Shealy's you did not have access to

14:33:05 18   for purposes of your forensic inspection?

14:33:08 19   A.     Certainly.

14:33:09 20               As I have noted on the far right, this is the

14:33:13 21   second to bottom row for Dr. Jeffrey Shealy.  I did not have

14:33:18 22   his devices from 2014 all the way up to February of 2021.  I

14:33:24 23   only got his February 2021 and forward computer, so for all

14:33:29 24   those previous years, I didn't have his computer to see what

14:33:32 25   he was accessing or possessing.

Faulkner - redirect

14:33:35  1   Q.      Could you also identify for the jury what devices of

14:33:39  2   Mr. Vetury that you did not have access to?

14:33:43  3   A.      For Mr. Vetury -- or maybe Dr. Vetury, I did not have

14:33:50  4   the first computer, computers that he used at Akoustis

14:33:54  5   between August of 2015 and January of 2016.  And I also did

14:34:00  6   not have the sixty-nine different removable drives that were

14:34:04  7   all connected to his Akoustis computers, but were not

14:34:08  8   provided to me for analysis.

14:34:10  9   Q.      Do you recall whether or not you offered opinions

14:34:13 10   regarding which computer systems used by Ms. Winters that

14:34:20 11   you had access to?

14:34:21 12   A.      I'm sorry, are you asking if I recall --

14:34:25 13   Q.      Offering opinions regarding which computer systems of

14:34:28 14   Ms. Winters you had access to?

14:34:31 15   A.      Yes.

14:34:32 16   Q.      Do you remember the dates upon which the computers

14:34:38 17   possessed by Ms. Winters related to?

14:34:41 18   A.      I do.  It was June 23rd of 2020 and forward.

14:34:47 19   Q.      So you did not have access to any of Ms. Winters's

14:34:51 20   computer systems prior to June of 2020; is that correct?

14:34:54 21   A.      That's right.

14:34:55 22   Q.      Finally, with respect to Mr. Aichele, can you explain

14:34:58 23   to the jury what devices of Mr. Aichele you did not have

14:35:02 24   access to?

14:35:03 25   A.      For Mr. Aichele I didn't have his devices between May

14:35:06 1    of 2015 and May of 2021, so just after that.

14:35:12 2                MS. AYERS:  I have no further questions, Your

14:35:14 3    Honor.

14:35:14 4                THE COURT:  All right.  Thank you very much.

14:35:16 5    We'll let you step down.  Thank you.

14:35:18 6                THE WITNESS:  Thank you, Your Honor.  Shall I

14:35:23 7    leave these here?

14:35:25 8                THE COURT:  I think we'll gather them up.

14:35:27 9    That's not a problem.

14:35:28 10               Who will our next witness be?

14:35:32 11               MR. MASTERS:  Your Honor, plaintiff calls next

14:35:40 12   Rama Vetury, who is an Akoustis principal engineer, and that

14:35:44 13   will be by video.

14:35:45 14               THE COURT:  That will be by deposition.  Ladies

14:35:48 15   and gentlemen, like all the other depositions, this is the

14:35:50 16   only time we will see that, it is as though that individual

14:35:54 17   were here in person in court, the individual has obviously

14:35:58 18   been sworn, this is your opportunity to hear and see that

14:36:01 19   testimony.

14:36:02 20               Counsel may proceed.

14:36:04 21               MR. MASTERS:  Your Honor, may I approach with a

14:36:07 22   document that you requested?

14:36:08 23               THE COURT:  Sure.

14:36:08 24               (Videotape deposition of Rama Vetury:)

14:36:15 25   Q.    Good morning.  Could you state your name for the

14:36:16   1    record, please?

14:36:17   2    A.    Yeah, my name is Rama Vetury.  I go by Rama.

14:36:21   3    Q.    What was your next job?

14:36:23   4    A.    I was hired by Jeff Shealy to work at RF Micro

14:36:34   5    Devices.

14:36:34   6    Q.    That was in 2002?

14:36:39   7    A.    Best as I recall, yes.

14:36:43   8    Q.    Did you know Jeff Shealy before then?

14:36:45   9    A.    No.

14:36:45  10    Q.    And how long were you at RFMD?

14:36:47  11    A.    So whenever I joined sometime, I think, in 2002 until

14:36:53  12    I left to join Akoustis, I was with RFMD in a variety of

14:36:58  13    different roles.  So I believe I left RFMD to join Akoustis

14:37:02  14    in -- I'm thinking the end of August or early September in

14:37:11  15    2015.

14:37:16  16    Q.    So starting at the beginning, what positions did you

14:37:20  17    have at RFMD?

14:37:22  18    A.    Oh, wow.

14:37:27  19    Q.    Generally?

14:37:30  20    A.    So I was hired to work on the gallium nitride

14:37:33  21    process, because that was my background in my Ph.D.  So I

14:37:36  22    did that from 2002 until about 2008.  In 2008, the process

14:37:42  23    was transferred from the Charlotte lab to the main factory

14:37:52  24    in Greensboro.  So I worked on that transition, and I

14:37:56  25    actually worked in the Greensboro site for -- from 2008

14:38:02  1    until 2009 or '10.  I can't remember exactly.  I worked in

14:38:08  2    Greensboro on -- on that -- on the same technology, but in a

14:38:14  3    different location.

14:38:15  4            And then in 2010 -- I was actually commuting

14:38:21  5    back and forth between Charlotte and Greensboro.  It was a

14:38:26  6    bit much.  And so I came back to Charlotte.  Work in the --

14:38:30  7    in the business unit.  I started working on government

14:38:33  8    programs, programs we had with the Navy and the Air Force, I

14:38:38  9    think, or mainly the Air Force, from 2009-10, that time

14:38:42 10    frame, to 2013.  So I did that for a few years.  And in that

14:38:47 11    same time, I also worked on a RF switch.  So I developed

14:38:56 12    that, in addition to working on the programs.

14:39:01 13            And in 2013 -- around about 2013, somewhere in

14:39:06 14    that time frame, Jeff asked me to run the business unit for

14:39:09 15    the foundry.  So we had a -- we had a foundry business unit.

14:39:16 16    I worked in that, and then I took over that business unit

14:39:20 17    somewhere in the 2013 time frame.  I did that for a couple

14:39:30 18    of years until, say, 2015.

14:39:32 19            And then RFMD shut down after the merger with

14:39:38 20    Qorvo --

14:39:41 21    Q.    The merger with who?

14:39:44 22    A.    Qorvo -- with TriQuint.  Sorry, sorry.  When RFMD

14:39:50 23    merged with TriQuint and became Qorvo, we -- we could not

14:39:54 24    have two separate foundry businesses.  So there was only

14:39:58 25    one.  So then I -- the one in Dallas -- based out of Dallas

14:40:03  1    was -- was the main one.

14:40:04  2              So then I did something else in Greensboro.

14:40:08  3    Worked for a brief period with another business unit.  I

14:40:12  4    cannot recall -- it was -- it was brief.  I cannot recall

14:40:15  5    who -- I should recall that, but I can't recall the name of

14:40:19  6    the business unit or my boss, really.  That's -- that's

14:40:23  7    embarrassing.  I wish ---I can't recall it.  But that was

14:40:27  8    just for a brief -- brief few months, I think.  Less than a

14:40:31  9    year.

14:40:31 10    Q.    And what kind of work did you do in that last

14:40:35 11    position?

14:40:35 12    A.    That one was really not that interesting or

14:40:42 13    remarkable.  I'm sorry.  I hope whoever was my boss then is

14:40:49 14    not hearing this.  But it was more like a marketing business

14:40:53 15    development -- technical marketing.  It wasn't very -- I

14:40:57 16    don't know.  It wasn't very deep technically.  It was about

14:41:01 17    creating data sheets and selling parts, essentially.  It was

14:41:07 18    more supporting the business.

14:41:11 19    Q.    Going back to your first positions at Qorvo relating

14:41:15 20    to the gallium nitride, did you -- was it development and

14:41:18 21    then production?  Were those the two positions?

14:41:25 22    A.    In -- in Qorvo --

14:41:28 23    Q.    I'm sorry?

14:41:30 24    A.    Or in RFMD?

14:41:31 25    Q.    At RFMD.  My apologies.

14:41:36  1    A.      In -- when I joined RFMD, I was -- I ran the team.

14:41:40  2    Actually let me take it back.  When I joined RFMD, I was a

14:41:43  3    process engineer.  I soon was given the responsibility of

14:41:46  4    running the whole team.  I did that from 2004 until 2008.

14:41:52  5    And by 2008, we had -- it was fully production-ready.  We

14:42:00  6    actually ran some pile lot production out of the Fab in

14:42:04  7    Charlotte, and it was good enough to be handed off to the

14:42:07  8    Fab in Greensboro.

14:42:12  9            So that happened in 2008.  So I -- I was a

14:42:18 10    process engineer and then ran the entire technology.

14:42:20 11    Q.      Okay.  And then why did you leave RFMD?

14:42:23 12    A.      After the merger with TriQuint, I didn't really find

14:42:30 13    a good home.  I think I told you the last thing I did was

14:42:36 14    supporting business.  And my technical interest, I guess,

14:42:43 15    did not align with what I was doing then.  So, yeah.

14:42:56 16    Q.      At that point, did you begin looking for another

14:43:06 17    position, or were you recruited?

14:43:08 18    A.      I was -- not clear exactly how to answer that,

14:43:15 19    because obviously I had been working with Jeff from 2002.  I

14:43:23 20    knew he started this company, and I knew -- I knew him.  I

14:43:28 21    knew he started this company, and I got to the point where I

14:43:32 22    was not really interested in the work that I was doing.

14:43:43 23            And I guess you could say it was a mix of both.

14:43:47 24    I reached out to him.  He reached out to me.  I can't recall

14:43:50 25    exactly who reached out when, what, all of that, but I had

14:43:56  1    been in touch with him.

14:43:58  2    Q.    Okay.  Did -- you start at Akoustis in August or

14:44:02  3    September of 2015, is that right?

14:44:04  4    A.    Yeah, I think that's -- that's what I said, right.

14:44:11  5    Q.    Okay.  And you're still at Akoustis today?

14:44:24  6    A.    Yes.

14:44:25  7    Q.    So why don't we walk through each of your positions

14:44:28  8    that you've had at Akoustis since you began.  It might be

14:44:32  9    easiest to start at a high level, and then I'll ask you

14:44:36 10    about each position.  So what was your first position?

14:44:41 11    A.    So I was hired at Akoustis to run the device

14:44:44 12    technology.  We developed a resonator technology.  I did

14:44:48 13    that for some length of time, a couple of years or -- I did

14:44:56 14    that from the day I joined until about 2000 -- I can't

14:45:04 15    recall if it was the beginning of 2018 or the end of 2017 or

14:45:13 16    the middle of 2018, somewhere in that time frame.  So I did

14:45:18 17    that for -- for that duration.  And then I did filter design

14:45:23 18    from -- RF filter design from that point until, say, January

14:45:29 19    of 2022.

14:45:33 20              And then I've been working on DARPA programs

14:45:39 21    since either December of 2021 and -- somewhere in that --

14:45:44 22    that transition between 2021 and 2022 -- let's say

14:45:49 23    January 2022 until now, to date.

14:45:54 24    Q.    So when you -- when you started at Akoustis, did

14:45:58 25    Akoustis have a functional resonator design?

14:46:02  1    A.      When I started, I -- they had something.  I would not

14:46:08  2    call it a functional resonator design.  I mean, it didn't --

14:46:13  3    maybe it resonated, I guess, when I first came -- the way in

14:46:21  4    which we were measuring the resonator also wasn't so

14:46:25  5    accurate.  It was -- if it did resonate, it did not resonate

14:46:31  6    very well.

14:46:32  7            So I guess it depends on your definition of

14:46:38  8    "functional."  It depends on what metrics you associate with

14:46:41  9    that.

14:46:41  10   Q.      Were the -- when you had to fab the prototypes, or

14:46:46  11   make the prototypes, were they done internally at Akoustis

14:46:50  12   or by one of your other vendors?

14:46:52  13   A.      Okay.  So before we had our New York fab, everything

14:46:56  14   we built was in our foundry, not -- when I say "our

14:47:02  15   foundry," not the one we owned, but the one we contracted

14:47:05  16   the work to.  So whatever comes back on the wafer, the wafer

14:47:09  17   is manufactured by the foundry; right?  So I'm not sure how

14:47:13  18   else to answer your question.

14:47:14  19   Q.      You answered it.

14:47:15  20   A.      Okay.

14:47:16  21   Q.      So I think you said, before you were hired by

14:47:19  22   Akoustis, you had -- you had not worked on the RF filters

14:47:23  23   before; is that right?

14:47:26  24   A.      Correct.

14:47:27  25   Q.      And had you worked on --

14:47:29  1    A.      Correct.

14:47:30  2    Q.      And -- nor on resonators, correct?

14:47:33  3    A.      No, no, no RF filters or resonators.

14:47:37  4    Q.      The -- you mentioned a few people that you -- that

14:47:40  5    worked on the resonator -- resonator design in this -- when

14:47:44  6    you had this initial position.  Did any of them have

14:47:47  7    previous experience working on resonators?

14:47:49  8    A.      As far as I know, no.  Yeah, as far as I know, no.

14:47:58  9    Q.      From the time you were hired up until the time of the

14:48:02 10    New York Fab acquisition, do you recall Akoustis hiring

14:48:07 11    anyone that had background in resonator design?

14:48:14 12    A.      Yeah.  The most -- the most important person we hired

14:48:17 13    was Daeho, Daeho Kim.  And he was the -- we were looking for

14:48:23 14    someone who -- who knew resonators inside out from, like --

14:48:28 15    like someone who has done a Ph.D. in resonators and so on.

14:48:34 16    And -- and he was that guy.

14:48:38 17            He -- so he knew -- he knew two things that were

14:48:42 18    very helpful, obviously.  He -- he knew resonators from his

14:48:47 19    academic work, and I think he was briefly a professor, and

14:48:51 20    his -- his industry experience.  So he was an expert in the

14:48:55 21    domain.  And, also, he had knowledge of MEMS processes.  So

14:49:01 22    he was a critical hire for the technology piece of it.

14:49:06 23    Q.      When was he hired?

14:49:08 24    A.      I don't recall the exact date, but I think it was in

14:49:15 25    2017, maybe early 2017.  I can't -- I can't remember

14:49:20 1    exactly.

14:49:21 2    Q.        Have you ever worked on a resonator that used single

14:49:25 3    crystal aluminum nitride?

14:49:29 4    A.        Yeah.  I think some of the early work was all single

14:49:34 5    crystal aluminum nitride.

14:49:37 6    Q.        Do you know if Akoustis's current products used

14:49:44 7    single crystal aluminum nitride?

14:49:47 8    A.        I think some of them do.

14:49:49 9    Q.        Is the -- is the -- does the X BAW process use single

14:49:53 10   crystal aluminum nitride?

14:49:56 11   A.        The X BAW process can use single -- any kind of

14:49:59 12   material, it's a flexible process.

14:50:01 13   Q.        Earlier we talked about selecting resonators that

14:50:04 14   have been previously designed.  Do you know who designed

14:50:08 15   those resonators?

14:50:17 16   A.        That is the device team.

14:50:24 17   Q.        As part of your roles at Akoustis, have you ever

14:50:29 18   become aware of Qorvo confidential information?

14:50:33 19   A.        I can't recall specifically, but there may be some.

14:50:41 20   Q.        Do you recall anything in -- anything specifically?

14:50:46 21   A.        No, I don't recall specifics like that.

14:50:49 22   Q.        Have you ever seen a document bearing an Qorvo

14:50:53 23   confidential label?

14:50:56 24   A.        I can't recall.

14:50:58 25   Q.        Have you ever had -- have you ever heard from anyone

14:51:04  1  that they have Qorvo confidential information?

14:51:18  2  A.    No, I have not heard from anyone.

14:51:21  3  Q.    Were you ever aware that anyone at Akoustis possessed

14:51:26  4  Qorvo confidential information?

14:51:27  5  A.    I handed over some documents as part of the

14:51:32  6  discovery, like, a few weeks ago, whatever.  I had a hard

14:51:36  7  drive with some information on it.  So I -- I don't know if

14:51:40  8  other people, but I can tell you what I did.

14:51:45  9  Q.    Do you know what trimming is?

14:51:48 10  A.    Yes.

14:51:48 11  Q.    What is it?

14:51:50 12  A.    So trimming is the -- the process in which you adjust

14:51:55 13  the thickness of the final layer that's accessible at the

14:52:00 14  end of the device construction to fine-tune the frequency.

14:52:08 15  Q.    Do you know who is responsible for trimming?

14:52:12 16  A.    Right now?  Actually, I don't.  I don't know who in

14:52:18 17  -- in Mary's organization actually does the trimming.

14:52:20 18  Q.    Do you recall Akoustis ever hiring anyone to do

14:52:23 19  trimming?

14:52:24 20  A.    I recall that we -- towards the end, when I was

14:52:44 21  handing off device to Daeho, I think we hired one person to

14:52:49 22  do trimming --

14:52:52 23  Q.    Who was that?

14:52:58 24  A.    -- to work for Daeho, I think, or maybe worked for

14:53:04 25  Mary, anyway.

14:53:05  1    Q.      Who was that?

14:53:06  2    A.      I think it was J.B.  I don't recall his full name.  I

14:53:10  3    think he went by J.B., or we called him J.B.

14:53:14  4    Q.      Yeah.  Was it J.B. Kwon?

14:53:17  5    A.      Possibly.  I don't recall the last name for sure.

14:53:20  6    Q.      Do you recall if he had any particular experience

14:53:23  7    that was useful to Akoustis?

14:53:25  8    A.      No.

14:53:27  9    Q.      Okay.  This is 415.  This is 452.  Too many.  This is

14:53:34 10    453.

14:53:36 11            Do you know what Exhibits 415, 452 and 453 are?

14:53:41 12    A.      You're asking me if I know what these are?  These are

14:53:45 13    e-mails.  And this looks like a document of some kind.

14:53:49 14    Q.      And you are a recipient on these e-mails; correct?

14:53:55 15    A.      Yes.

14:53:58 16    Q.      Okay.  If we look at 452 to start with, there is an

14:54:03 17    e-mail from you that bridges the first and second pages from

14:54:18 18    July 25th, 2017.  Do you see that e-mail?

14:54:26 19    A.      Right.  July 25th, 2017.  Yes.

14:54:32 20    Q.      Do -- in this time frame, were you developing a

14:54:36 21    trimming plan for your products?

14:54:41 22    A.      We would have been -- I think we would have been --

14:54:48 23    this is all about the trimming.  This is also the time frame

14:54:52 24    that I was handing things off to Daeho, and Daeho was the

14:54:56 25    expert on -- I had no -- I had nothing in my background or

14:55:01 1    knowledge about trimming.  So Daeho was the expert.  And I

14:55:09 2    can't recall if Daeho -- if J.B. worked for Daeho or J.B.

14:55:14 3    worked -- I think J.B. worked for Mary.  And I think Daeho

14:55:19 4    at that point worked for me, or maybe he didn't.  I don't

14:55:22 5    know when he transitioned.  Maybe he still did, because

14:55:26 6    obviously he still -- it looks like that.  So he was the --

14:55:29 7    he was the guy who knew.  I was just his manager.

14:55:33 8    Q.    Okay.  Do you -- have you ever -- do you have any

14:55:38 9    experience with trimming at all?

14:55:44 10   A.    No.  I mean, when you're a designer, you're a

14:55:49 11   consumer of trimming.  You ask for something.  You say, "I

14:55:55 12   want to get 2,500 angstroms."  It gets done in the Fab.  How

14:56:02 13   they do it is --

14:56:04 14   Q.    Okay.  Let's look at -- I'm sorry.  What are we on?

14:56:10 15   452?

14:56:10 16         Okay.  Let's look at 453, which is the

14:56:14 17   attachment to Mr. Kwon's e-mail in 452.  Do you recall

14:56:20 18   asking Mr. Kwon for the information that's in 453?

14:56:29 19   A.    I don't recall that.

14:56:33 20   Q.    Okay.  Do you know what V2X means in the context of

14:56:38 21   filters?

14:56:38 22   A.    Yeah.  V2X means vehicle to everything, right, so

14:56:43 23   it's the communications, vehicle to everything.  V2X, X

14:56:49 24   meaning everything.  At least that's how I interpret X.  So

14:56:53 25   it's a communication standard for communications from a

14:56:56  1    vehicle.

14:56:57  2    Q.    Has Akoustis ever tried to develop a V2X filter?

14:57:02  3    A.    I think so, yeah.

14:57:03  4    Q.    Were you involved with it?

14:57:06  5    A.    I think so.  I think I was involved with the C-V2X

14:57:10  6    filter or the V2X filter.  The part numbers are not the same

14:57:14  7    maybe.  That's a name in marketing.  So I have no idea what

14:57:17  8    they are.  Meaning, I don't recall what they are.  But,

14:57:20  9    yeah, I think I did some design for that.

14:57:22 10    Q.    Yes.  Let's do that over again.  154 is AKTS_138271.

14:57:32 11    155 is AKTS_138272 through 274.  Do you recognize these

14:57:40 12    documents?

14:57:40 13    A.    No, I don't recognize them.  But I -- but I read -- I

14:57:47 14    read what -- what the e-mail says.

14:57:49 15    Q.    So the e-mail in Exhibit 154 is from David Aichele, I

14:58:00 16    think -- is that how you say it?

14:58:02 17    A.    Aichele.

14:58:03 18    Q.    From Mr. Aichele to you, correct?

14:58:06 19    A.    Correct.

14:58:07 20    Q.    Okay.  Do you have any recollection as to why

14:58:10 21    Mr. Aichele sent this e-mail to you?

14:58:12 22    A.    I don't have a recollection, but I can -- he's

14:58:16 23    communicating a spec to me.

14:58:20 24    Q.    Okay.  Let's look at 155 now.  Do you recall seeing

14:58:30 25    Exhibit 155 before?

14:58:36 1    A.    I -- I can't recall this specific one.

14:58:46 2    Q.    You'll see at the bottom of the slides in the black

14:58:52 3    boarder there is a "Qorvo Confidential and Proprietary

14:58:58 4    Information" label.  Do you see that?

14:58:59 5    A.    Yes.

14:58:59 6    Q.    Earlier today, we talked about resonator development.

14:59:03 7    Remember?

14:59:04 8    A.    Right.

14:59:08 9    Q.    Do you recall any particular difficulties that

14:59:11 10   Akoustis had with its resonator development while you were

14:59:13 11   there -- while you were -- while that was in your job

14:59:18 12   responsibility?

14:59:18 13   A.    I mean, that's a little broad.  What I can say is

14:59:23 14   that we had to work on improving the form, right?

14:59:31 15   Essentially you're working on improving the form.

14:59:34 16         So there were a variety of challenges all during

14:59:38 17   the process.  I can't -- I would be hard-pressed to recall

14:59:42 18   any specific one.  But I'm sure there were a whole bunch as

14:59:45 19   we went from, like, pretty low form to a pretty good form.

14:59:50 20   Yeah.

14:59:50 21   Q.    What was the time frame from going to the low form to

14:59:55 22   the pretty good form?

14:59:57 23   A.    I would say from whenever I joined until the late

15:00:01 24   2017 time frame maybe or the early 2018 time frame.

15:00:06 25   Somewhere 2017.  I guess -- I guess maybe I should say it a

15:00:13 1  little differently.  Form improved -- I don't know if it

15:00:22 2  improved, you know, non-linear, nothing improves linear,

15:00:27 3  right, so it went up, maybe pressed, and then went up again,

15:00:31 4  some, that kind of thing.  And we were working on different

15:00:34 5  frequencies maybe.  So it's also form active frequency.  So

15:00:38 6  you would have to go back and check to figure out exactly

15:00:40 7  where we were with respect to different frequencies and

15:00:43 8  different forms, I think.  But overall, we worked on form

15:00:47 9  improvement in that time frame.

15:00:50 10  Q.      Has Akoustis ever made an SMR resonator?

15:00:55 11  A.      No.  Not that -- I mean, not to the best of my

15:01:00 12  knowledge, no.

15:01:02 13  Q.      Do you know why?

15:01:03 14  A.      No.  We -- we were in a -- our whole vector was the

15:01:11 15  other direction, right?  It was -- the X BAW process is like

15:01:16 16  -- the whole thing with the X BAW process is that you want

15:01:20 17  to have two air interfaces because the appearance miss match

15:01:27 18  between, a -- between air and any other material is -- is

15:01:40 19  going to be the most broadband.  So the best technology to

15:01:44 20  build is something that has -- looks like the cartoon of the

15:01:49 21  resonator, right.  The cartoon of a resonator has a

15:01:53 22  piezoelectric with metals on both sides and some dial

15:01:57 23  electric and air.  So if you have air on both sides, air,

15:02:01 24  air on both sides, then you get the best broadband

15:02:03 25  reflection, so that's what we want to build, we don't want

15:02:07  1    to build something that looks like an SMR.

15:02:10  2                    (End of videotape.)

15:02:21  3                    THE COURT:  Who will your next witness be?

15:02:24  4                    MR. MASTERS:  Your Honor, plaintiff's next call

15:02:30  5    Mr. Aichele.  And Mr. DeFosse will do the examination.

15:02:35  6                    THE COURT:  All right.

15:02:46  7                    MR. DeFOSSE:  Your Honor, we have some fairly

15:02:49  8    voluminous binders.

15:02:52  9                    THE COURT:  Ladies and gentlemen, we're going to

15:02:53 10    take our afternoon break for you guys at this time.  I get

15:02:56 11    to stay here and keep working.  Don't discuss the case

15:03:00 12    amongst yourselves.  Do not let anyone talk to you about it.

15:03:04 13    We'll see you in a theoretical fifteen minutes.

15:03:10 14                    COURT CLERK:  All rise.

15:03:11 15                    (Jury exiting the courtroom at 3:03 p.m.)

15:03:31 16                    THE COURT:  So everybody can be seated.

15:03:33 17                    Yes, sir, go ahead.

15:03:35 18                    MR. DeFOSSE:  Yes, Your Honor.  So I was just

15:03:37 19    asking if the Court would like to have the binders that we

15:03:39 20    prepared because they are, this is one set here, and I

15:03:42 21    didn't want to crowd Your Honor with a lot of materials.

15:03:46 22                    THE COURT:  One set or two binders?

15:03:49 23                    MR. DeFOSSE:  It's two binders.

15:03:50 24                    THE COURT:  That's fine.

15:03:54 25                    MR. DeFOSSE:  As long as they are out, one other

15:03:57  1    issue I want to raise with Your Honor, we're going to be

15:04:01  2    covering some of the trade secrets materials with

15:04:03  3    Mr. Aichele.  I'm not planning to dive into details as I did

15:04:06  4    with the other witnesses, I think out of an abundance of

15:04:10  5    caution, we could seal the courtroom at the appropriate

15:04:12  6    time.

15:04:12  7            THE COURT:  I agree with you, we'll have to let

15:04:15  8    a couple of people be excused.  Absolutely, that's not a

15:04:18  9    problem.  Have we gotten some initial comments -- we have

15:04:22 10    comments again on the verdict form, we're still working on

15:04:26 11    that, I think we're very close to what we will actually need

15:04:29 12    to use.  Would you like a short break before we start?

15:04:32 13            MR. DeFOSSE:  I would, Your Honor, yes.

15:04:34 14            THE COURT:  Yes, sir, Mr. Masters, I see you're

15:04:36 15    standing up so must be something here.

15:04:39 16            MR. MASTERS:  I have the exhibits and the time

15:04:41 17    for Mr. Vetury's deposition.

15:04:43 18            THE COURT:  Yes, that would be helpful.

15:04:46 19            MR. MASTERS:  And there is three exhibits, so,

15:04:50 20    that have to be marked.

15:04:51 21            THE COURT:  That will add three to our number.

15:04:54 22    And that should put us about, what's your number there,

15:04:59 23    one--

15:05:01 24            COURT CLERK:  It will be 123.

15:05:03 25            THE COURT:  We will be through 123.  We're

Aichele - direct

15:05:06  1    starting at 124.

15:05:09  2                MR. DeFOSSE:  Your Honor, may I raise very

15:05:11  3    quickly.  One of the issues that I had with Mr. Aichele's

15:05:14  4    exhibits is I believe some of them came through or will have

15:05:17  5    been introduced through Mr. Houlden's deposition today, so I

15:05:21  6    was --

15:05:21  7                THE COURT:  You can use that number, that's

15:05:24  8    fine, because we don't introduce repeat exhibits and you're

15:05:29  9    a hundred percent right about that.

15:05:30 10                MR. DeFOSSE:  Thank you.

15:05:31 11                THE COURT:  What else do we need to go over?

15:05:34 12    Okay.  I think we're set.  We'll take that short -- well,

15:05:39 13    somewhat short break, we'll see you all in about, it looks

15:05:43 14    like no later than thirteen minutes, probably that means

15:05:49 15    about eleven.

15:05:49 16                Thanks very much.

15:05:50 17                COURT CLERK:  All rise.

15:05:51 18                (A brief recess was taken.)

15:19:24 19                THE COURT:  All right.  Everybody can be seated.

15:19:28 20    Can we bring the panel in?  The witness should be in the

15:19:31 21    room ready to go.

15:19:41 22                (Jury entering the courtroom at 3:19 p.m.)

15:20:21 23                THE COURT:  All right.  Everyone can be seated.

15:20:30 24    Counsel may proceed.  Who will your next witness be?

15:20:34 25                MR. DeFOSSE:  Thank you, Your Honor.  Plaintiff

Aichele - direct

15:20:37 1    calls David Aichele.

15:20:38 2                 THE COURT:  Step here to the podium towards the

15:20:41 3    deputy clerk and raise your right hand and he will swear you

15:20:44 4    in.

15:20:44 5                 COURT CLERK:  Please remained standing and raise

15:20:47 6    your right hand.  Please state and spell your name for the

15:20:50 7    record.

15:20:50 8                 THE WITNESS:  David Aichele, D-A-V-I-D,

15:20:56 9    A-I-C-H-E-L-E.

15:20:57 10                 DAVID AICHELE, having been duly sworn, was

15:21:01 11   examined and testified as follows:

15:21:08 12                 THE COURT:  Counsel may proceed.

15:21:09 13                 MR. DeFOSSE:  Thank you, Your Honor.

15:21:10 14                      DIRECT EXAMINATION

15:21:10 15   BY MR. DeFOSSE:

15:21:11 16   Q.    Good afternoon, Mr. Aichele.

15:21:12 17   A.    Good afternoon.

15:21:13 18   Q.    You currently work for Akoustis, is that right?

15:21:15 19   A.    Correct.

15:21:16 20   Q.    You are the executive Vice President of Business

15:21:19 21   Development?

15:21:19 22   A.    Correct.

15:21:20 23   Q.    And you first started work at Akoustis in 2015?

15:21:25 24   A.    Correct.

15:21:26 25   Q.    You were, in fact, one of the first employees at the

Aichele - direct

15:21:30  1    company; is that right?

15:21:30  2    A.    I believe I was number five.

15:21:33  3    Q.    And prior to working at Akoustis, you worked at a

15:21:36  4    company that was called T 1 Visions, is that right?

15:21:39  5    A.    Now called T1V.

15:21:42  6    Q.    And that was from 2012 to 2015?

15:21:46  7    A.    Correct.  About two-and-a-half years.

15:21:49  8    Q.    And prior to working at T1V, you worked at RFMD; is

15:21:54  9    that right?

15:21:54 10    A.    Correct.

15:21:54 11    Q.    For approximately eight years, from 2004 to 2012?

15:22:00 12    A.    Correct.

15:22:01 13    Q.    In your position as executive Vice President of

15:22:05 14    Business Development at Akoustis, you basically manage the

15:22:09 15    front end of the company's operations, is that fair?

15:22:12 16    A.    Correct.

15:22:13 17    Q.    And that includes responsibility for the sales and

15:22:16 18    marketing teams?

15:22:17 19    A.    Correct.

15:22:19 20    Q.    You're also responsible for business development at

15:22:22 21    Akoustis?

15:22:23 22    A.    Correct.

15:22:24 23    Q.    And business development includes developing products

15:22:27 24    strategies and marketing strategies?

15:22:30 25    A.    Correct.

Aichele - direct

15:22:31  1    Q.      And, for example, as part of your responsibility, you

15:22:35  2    are responsible for developing product roadmaps?

15:22:39  3    A.      Correct.

15:22:40  4    Q.      At the time you joined Akoustis in 2015, you

15:22:46  5    considered the mobile phone market segment to be crucial to

15:22:52  6    Akoustis's success; is that right?

15:22:53  7    A.      Correct.

15:22:56  8    Q.      But over time, the market opportunity for Akoustis

15:23:00  9    changed; is that right?

15:23:00 10    A.      Correct.

15:23:01 11    Q.      And you realized that getting into the mobile phone

15:23:06 12    segment was going to be difficult for a company like

15:23:09 13    Akoustis?

15:23:09 14    A.      We're a small company, yes.

15:23:14 15    Q.      And also prior to 2015, there were already companies

15:23:17 16    that had BAW filters on the market; is that right?

15:23:21 17    A.      Correct.

15:23:21 18    Q.      Including TriQuint?

15:23:23 19    A.      Correct.

15:23:25 20    Q.      So part of what you were doing at the company is you

15:23:29 21    were trying to figure out what market there would be that

15:23:34 22    would be more forgiving for Akoustis?

15:23:36 23    A.      Correct.

15:23:45 24             MR. DeFOSSE:  Now, Your Honor, I'm going to

15:23:47 25    proceed now into discuss some of the trade secrets in this

Aichele - direct

15:23:50  1    case.

15:23:51  2                THE COURT:  All right.  If there is anyone in

15:23:53  3    the courtroom who is not allowed to be here for those, and I

15:23:57  4    think everybody has excused themselves, and they should be

15:24:00  5    excused at this time.  It looks like we're okay.  And you

15:24:03  6    can proceed.

15:24:04  7                MR. DeFOSSE:  Thank you, Your Honor.

15:24:10  8                May I approach the witness?

15:24:12  9                THE COURT:  You may.

15:24:20 10    BY MR. DeFOSSE:

15:24:33 11    Q.        Mr. Aichele, I've handed you what's previously been

15:24:37 12    marked in this case as Exhibit 22.  It was previously marked

15:24:40 13    as PTX 0718 for identification, but it's now Exhibit 22.

15:24:47 14    Just take a moment to look at it.  And you recognize this as

15:24:53 15    an e-mail to yourself; is that right?

15:24:58 16    A.        That is correct.

15:24:59 17    Q.        And it was sent by Mr. Rohan Houlden, is that right?

15:25:04 18    A.        Yes, correct.

15:25:05 19    Q.        And the date of the e-mail was September 8th, 2016?

15:25:10 20    A.        Correct.

15:25:12 21    Q.        And Mr. Houlden included an attachment to his e-mail,

15:25:18 22    is that right?

15:25:18 23    A.        Yes, he did.

15:25:19 24    Q.        So I would like to first look at the body of the

15:25:22 25    e-mail.  And Mr. Buchbinder, if we could pull up PTX 718,

Aichele - direct

15:25:30  1    Exhibit 22.  Thank you.

15:25:31  2                 So, Mr. Aichele, the message here is a little

15:25:35  3    cryptic and I was hoping you could help us decipher this.

15:25:38  4    Mr. Houlden said to you, "Latest SOW, FL working on."  Do

15:25:45  5    you see that?

15:25:45  6    A.        Yes I do.

15:25:46  7    Q.        What does SOW mean?

15:25:49  8    A.        I believe it means statement of work.

15:25:50  9    Q.        And FL here is a reference to Florida, is that right?

15:25:54 10    A.        I believe so.

15:25:56 11    Q.        And you understood that the reference to Florida here

15:25:59 12    was because that's where Qorvo develops its BAW filter

15:26:04 13    designs; is that right?

15:26:04 14    A.        I believe so.

15:26:06 15    Q.        At the time Mr. Houlden sent you this e-mail in

15:26:10 16    September of 2016, on September 8th, he was not yet an

15:26:16 17    employee at Akoustis, correct?

15:26:17 18    A.        I'm not exactly sure on the time when he started, but

15:26:21 19    it's possible, because I believe he started the latter part

15:26:24 20    of 2016.

15:26:25 21    Q.        At this time you understood that Mr. Houlden was

15:26:28 22    still working at Qorvo?

15:26:29 23    A.        I'm not aware of the exact time that he departed

15:26:34 24    Qorvo.

15:26:34 25    Q.        Can you look at the attachment to Mr. Houlden's

Aichele - direct

15:26:37  1    e-mail to yourself?  Would you agree with me that he has

15:26:43  2    sent you a Qorvo statement of work?

15:26:46  3    A.      Yes, I agree with you.

15:26:48  4    Q.      And this is a statement of work for a 5-gigahertz BAW

15:26:54  5    filter; is that right?

15:26:56  6    A.      Yes, it is.

15:26:57  7    Q.      And you would also agree with me that this statement

15:27:01  8    of work is labeled as confidential, right?

15:27:03  9    A.      Yes, I do.

15:27:04 10    Q.      If I could ask you to go to page 5 of Exhibit 22.

15:27:11 11    A.      I'm there.

15:27:12 12    Q.      And it's page 6 of the document, Mr. Buchbinder, if

15:27:17 13    you wouldn't mind.  Thank you.

15:27:19 14            On page 5 of the statement of work, Qorvo has

15:27:24 15    included a target technical outline; is that right?

15:27:27 16    A.      Correct.

15:27:27 17    Q.      And this indicates the technical specifications that

15:27:31 18    Qorvo was targeting for its 5.6-gigahertz product, is that

15:27:36 19    right?

15:27:36 20    A.      Correct.

15:27:37 21    Q.      And at this time, the 5.6-gigahertz product is

15:27:41 22    identified as QPQ19XX, do you see that?

15:27:45 23    A.      Yes, I do.

15:27:47 24    Q.      And that's in the far, third column; is that right?

15:27:52 25    A.      Correct.

Aichele - direct

15:27:53  1    Q.      And that's because at this time, Qorvo did not have a

15:27:57  2    5.6-gigahertz product on the market?

15:28:00  3    A.      I do not believe they did at this time.

15:28:03  4    Q.      Now, when Mr. Houlden sent you this confidential

15:28:08  5    Qorvo statement of work, you didn't object?

15:28:11  6    A.      To his e-mail?  Correct.

15:28:14  7    Q.      And you didn't admonish him for sending you

15:28:18  8    confidential Qorvo materials, correct?

15:28:20  9    A.      Right.

15:28:20 10    Q.      And, in fact, you retained this document once he sent

15:28:24 11    it to you, is that right?

15:28:25 12    A.      Potentially, I'm not sure of retaining it.  It was

15:28:29 13    obviously discovered in my files, then I did.

15:28:32 14    Q.      And you used this document in order to prepare the

15:28:36 15    Akoustis 5-gigahertz market summary, is that right?

15:28:40 16    A.      I referenced I think Qorvo's competitor, I didn't use

15:28:44 17    this document specifically.

15:28:59 18            MR. DeFOSSE:  Your Honor, may I approach the

15:29:01 19    witness?

15:29:01 20            THE COURT:  You may.

15:29:18 21    BY MR. DeFOSSE:

15:29:21 22    Q.      Mr. Aichele, I've handed you what's been marked for

15:29:24 23    identification as PTX 0779.  This is an e-mail to yourself;

15:29:30 24    is that correct?

15:29:33 25    A.      This --

Aichele - direct

15:29:33  1    Q.      I'm sorry an e-mail from yourself to other managers

15:29:37  2    at Akoustis, is that right?

15:29:37  3    A.      Yes, correct.

15:29:39  4                MR. DeFOSSE:  Your Honor, we would offer PTX

15:29:42  5    0779 into evidence.

15:29:44  6                THE COURT:  Marked and received as 124.

15:29:49  7                (Trial Exhibit No. 124 was admitted into

15:29:50  8    evidence.)

15:29:50  9    BY MR. DeFOSSE:

15:29:51 10    Q.      Mr. Aichele, you circulated the Akoustis 5-gigahertz

15:29:56 11    market summary on October 13th, 2016; is that right?

15:30:00 12    A.      Correct.

15:30:01 13    Q.      This is roughly one month after Mr. Houlden sent you

15:30:05 14    the confidential Qorvo statement of work?

15:30:09 15    A.      Correct.

15:30:09 16    Q.      I would like to turn to slide 2 of the presentation

15:30:14 17    that was attached to exhibit --

15:30:18 18                MR. DeFOSSE:  I'm sorry, Your Honor, what was

15:30:19 19    the exhibit number?

15:30:21 20                THE COURT:  124.

15:30:22 21                MR. DeFOSSE:  124.  Thank you.

15:30:24 22    Q.      To 124, please.

15:30:26 23                And page 3, Mr. Buchbinder, please.  Thank you.

15:30:31 24                Mr. Aichele, you list on slide two of your

15:30:36 25    Akoustis summary "market priorities", is that right?

Aichele - direct

15:30:39  1    A.      Correct.

15:30:40  2    Q.      And you include the letters IMHO.  What does that

15:30:46  3    stand for?

15:30:46  4    A.      In my honest opinion.

15:30:48  5    Q.      And you have listed 5-gigahertz Wi-Fi as the number

15:30:53  6    one market priority, is that right?

15:30:55  7    A.      Correct.

15:30:55  8    Q.      And that's above mobile?

15:30:59  9    A.      Correct.

15:31:00 10    Q.      Now, I would like you to turn to page 8 of the

15:31:02 11    presentation.  Actually page 8 this time, Mr. Buchbinder.

15:31:13 12    Sorry.  I'm switching it up on you.  There we go.

15:31:16 13            On page 8, you've identified specifications of

15:31:20 14    potential competitors for Akoustis in this market; is that

15:31:25 15    right?

15:31:25 16    A.      Correct.

15:31:26 17    Q.      Including Qorvo?

15:31:28 18    A.      Correct.

15:31:28 19    Q.      And if Mr. Buchbinder, we can zoom in on the second

15:31:33 20    column.  Thank you.

15:31:34 21            You have copied this information in the second

15:31:40 22    column of your 5-gigahertz market plan from the Qorvo

15:31:44 23    statement of work; is that right?

15:31:45 24    A.      It's possible.  I don't remember.  It's been years

15:31:48 25    ago.  I was aware of Qorvo working on these 5-gigahertz

Aichele - direct

15:31:54  1    filters and there was other information that might have come

15:31:57  2    in, too, as well, but it's possible you had used it from the

15:32:00  3    statement of work.

15:32:01  4    Q.    And, in fact, if we look at the second box up top,

15:32:05  5    you have copied it down to the Qorvo QPQ19xx, right?

15:32:11  6    A.    Correct.

15:32:12  7    Q.    Now, if we could go to the last page of the

15:32:16  8    presentation.  Thank you, Mr. Buchbinder.

15:32:21  9              The presentation concludes with a call to

15:32:24 10    action.  Is that right?

15:32:25 11    A.    Correct.

15:32:27 12    Q.    And it says, "make decision to kick off or hold on

15:32:31 13    low and high band 5-gigahertz designs."  Right?

15:32:35 14    A.    Correct.

15:32:36 15    Q.    And Akoustis, in fact, made the decision to move

15:32:40 16    forward with the 5-gigahertz designs; is that right?

15:32:43 17    A.    Correct.

15:32:46 18    Q.    Now, we can take that down, Mr. Buchbinder.  Thank

15:32:51 19    you.

15:32:51 20              The 5-gigahertz statement of work that

15:32:53 21    Mr. Houlden sent you was not the only confidential document

15:32:57 22    that he shared with you, was it?

15:33:01 23    A.    Correct.

15:33:08 24              MR. DeFOSSE:  Your Honor, may I approach the

15:33:09 25    witness?

Aichele - direct

15:33:10  1          THE COURT:  You may.

15:33:35  2          MR. DeFOSSE:  Your Honor, I believe these two

15:33:37  3  exhibits were marked for identification as PTX 104 and 105,

15:33:41  4  and will be admitted as part of the deposition testimony of

15:33:45  5  Mr. Houlden.

15:33:47  6          THE COURT:  All right.  Do you want to ask one

15:33:50  7  or two questions first?

15:33:51  8          MR. DeFOSSE:  Sure, I can.

15:33:51  9  BY MR. DeFOSSE:

15:33:54 10  Q.     Mr. Aichele, you recognize what's been marked as PTX

15:33:59 11  0104 as an e-mail to yourself from Mr. Houlden, is that

15:34:04 12  fair?

15:34:04 13  A.     Yes.

15:34:04 14  Q.     And exhibit that's been marked for identification as

15:34:07 15  PTX 0105 is an attachment to that e-mail, correct?

15:34:11 16  A.     It appears so, yes.

15:34:13 17  Q.     Thank you.

15:34:14 18          THE COURT:  So that's marked and received as 125

15:34:18 19  and 126.

15:34:19 20          (Trial Exhibit Nos. 125 and 126 were admitted

15:34:21 21  into evidence.)

15:34:21 22  BY MR. DeFOSSE:

15:34:27 23  Q.     Mr. Buchbinder, could you please pull up what's been

15:34:30 24  marked as PTX 0104, now Exhibit 125.

15:34:37 25          Now, Mr. Aichele, in this e-mail, Mr. Houlden

Aichele - direct

15:34:43  1    has sent you an attachment.  Do you see that?

15:34:46  2    A.    Yes, I do.

15:34:47  3    Q.    And the attachment is called the BAW SAW filter

15:34:52  4    reliability testing FL 2015; is that right?

15:34:56  5    A.    Yes, it is.

15:34:58  6    Q.    And the subject of the e-mail says "some light

15:35:02  7    reading", right?

15:35:04  8    A.    Correct.

15:35:05  9    Q.    And if you look at the attachment to the e-mail,

15:35:08 10    which is now Exhibit 126, you'll see that this is a

15:35:12 11    confidential Qorvo presentation; is that right?

15:35:15 12    A.    Correct.

15:35:16 13    Q.    When Mr. Houlden sent you this confidential Qorvo

15:35:20 14    presentation, you did not admonish him, did you?

15:35:23 15    A.    No, I did not.

15:35:25 16    Q.    Or object to receiving the presentation?

15:35:27 17    A.    No, I did not.

15:35:30 18    Q.    Now, Mr. Aichele, Mr. Houlden is not the only

15:35:34 19    Akoustis employee who circulated Qorvo confidential

15:35:37 20    information, is he?

15:35:38 21    A.    Correct.

15:35:39 22    Q.    And, in fact, you yourself have been involved in

15:35:42 23    soliciting and circulating Qorvo confidential information?

15:35:46 24    A.    I would not say soliciting, but I have been in I

15:35:50 25    guess distributing confidential information.

Aichele - direct

15:36:15  1          MR. DeFOSSE:  Your Honor, may I approach the

15:36:16  2     witness?

15:36:17  3          THE COURT:  You may.

15:36:18  4          MR. DeFOSSE:  Thank you.

15:36:51  5     BY MR. DeFOSSE:

15:36:52  6     Q.    Mr. Aichele, I have handed you what's been marked for

15:36:55  7     identification as PTX-0521, PTX-0522, and PTX-0523.  Do you

15:37:07  8     recognize PTX-0521 as an e-mail from Steven Li to yourself

15:37:13  9     in January of 2020?

15:37:14 10     A.    Correct.

15:37:15 11     Q.    And PTX-0522 and 0523 are attachments to that e-mail?

15:37:24 12     A.    It appears so, yes.

15:37:26 13          MR. DeFOSSE:  Your Honor, plaintiff would offer

15:37:28 14     PTX-0521, 0522, and 0523 into evidence.

15:37:34 15          THE COURT:  Marked and received as 127, 128, and

15:37:38 16     129.

15:37:38 17          (Trial Exhibit Nos. 127, 128, and 129 were

15:37:39 18     admitted into evidence.)

15:37:39 19     BY MR. DeFOSSE:

15:37:43 20     Q.    Starting with Exhibit 127, Mr. Aichele, this was an

15:37:47 21     e-mail from Steven Li to yourself in January of 2020, is

15:37:52 22     that right?

15:37:52 23     A.    Correct.

15:37:53 24     Q.    And can you say who Steven Li is?

15:37:57 25     A.    Steven Li was the country director for Akoustis

Aichele - direct

15:38:02  1    covering greater China and he was a contractor.

15:38:04  2    Q.    And he reported to you, is that right?

15:38:07  3    A.    Correct.

15:38:08  4    Q.    And in this e-mail, Mr. Li is providing you with a

15:38:12  5    recap of the meeting he had with China's company named

15:38:16  6    Tenda, is that right?

15:38:18  7    A.    Correct.

15:38:19  8    Q.    And Tenda is a Chinese Wi-Fi company, is that right?

15:38:22  9    A.    I believe so.

15:38:23 10    Q.    I would like to look on the -- at the fifth bullet

15:38:29 11    under key takeaways on the first page of Exhibit 127 if you

15:38:38 12    could.

15:38:41 13    A.    Yes.

15:38:43 14    Q.    Thank you.

15:38:44 15          In this bullet, Mr. Li reports that Qorvo had

15:38:49 16    started to promote their 5.2 and 5.6-gigahertz filters, do

15:38:55 17    you see that?

15:38:55 18    A.    Yes, I do.

15:38:56 19    Q.    And Mr. Li states that he's attaching to this e-mail

15:38:59 20    evaluation data and spec; is that right?

15:39:04 21    A.    Yes.  Correct.

15:39:06 22    Q.    And if we look at the top of Mr. Li's e-mail, you can

15:39:09 23    see that there are two attachments there?

15:39:12 24    A.    Yes, I do.

15:39:14 25    Q.    The first is a JPEG file, is that right?

Aichele - direct

15:39:18  1    A.      Correct.

15:39:18  2    Q.      You understand a JPEG file is a photo file?

15:39:22  3    A.      Correct.

15:39:22  4    Q.      And the other attachment is a PDF, is that right?

15:39:26  5    A.      Correct.

15:39:27  6    Q.      And both attachments make reference to a Qorvo part

15:39:31  7    number, correct?

15:39:33  8    A.      Correct.

15:39:36  9    Q.      Now, if we could go, please, to PTX 0523.  This is

15:39:46 10    one of the attachments that Mr. Li sent you in January of

15:39:50 11    2020, is that right?

15:39:52 12    A.      Correct.

15:39:52 13    Q.      And you would agree with me that this document was

15:39:55 14    water marked?

15:39:56 15    A.      Correct.

15:39:56 16    Q.      And the watermark specifically says confidential NDA

15:40:02 17    required?

15:40:02 18    A.      Correct.

15:40:05 19    Q.      And if we could turn, Mr. Buchbinder, to the page 3

15:40:08 20    of Exhibit 126.

15:40:13 21            Mr. Aichele, would you agree with me that on

15:40:16 22    this page there is an additional watermark that says draft?

15:40:20 23    A.      Correct.

15:40:22 24    Q.      When Mr. Li sent you this information, there was no

15:40:26 25    admonishment from you that he was sending confidential Qorvo

Aichele - direct

15:40:31  1    files the you?

15:40:32  2    A.      Correct.

15:40:32  3    Q.      Sorry?

15:40:33  4    A.      Correct, there was no admonishment.

15:40:36  5    Q.      Thank you.

15:40:37  6            Instead, what you did was you circulated the

15:40:41  7    information that Mr. Li had sent to you to other people at

15:40:44  8    Akoustis, right?

15:40:45  9    A.      Possible, yes.

15:40:58 10            MR. DeFOSSE:  Your Honor, may I approach the

15:40:59 11    witness?

15:41:01 12            THE COURT:  You may.

15:41:26 13    BY MR. DeFOSSE:

15:41:30 14    Q.      Mr. Aichele, I've handed you what's been marked for

15:41:33 15    identification as exhibits PTX 137, 138, and 139.  Would you

15:41:40 16    agree with me that PTX 137 is an e-mail from yourself to

15:41:44 17    Mr. Houlden and to Jeffrey Shealy, the CEO of Akoustis?

15:41:49 18    A.      Correct.

15:41:50 19    Q.      And Exhibits 138 and 139 are attachments to that

15:41:53 20    e-mail?

15:41:55 21    A.      Yes, it appears so.

15:41:58 22            MR. DeFOSSE:  Your Honor, we would offer into

15:42:00 23    evidence exhibits PTX 137, 138, and 139.

15:42:05 24            THE COURT:  Marked and received as 130, 131, and

15:42:08 25    132.

Aichele - direct

15:42:09  1              (Trial Exhibit Nos. 130, 131, and 132 were

15:42:10  2      admitted into evidence.)

15:42:10  3      BY MR. DeFOSSE:

15:42:13  4      Q.      Starting with the e-mail, which is Exhibit 130,

15:42:17  5      Mr. Aichele, this was sent on January 7th, 2020; is that

15:42:24  6      right?

15:42:24  7      A.      Yes, it was.

15:42:25  8      Q.      And this was the same day that Mr. Li sent to you the

15:42:29  9      confidential Qorvo data sheet; is that right?

15:42:31 10      A.      Yes, it appears so.

15:42:33 11      Q.      And you passed that on to Mr. Houlden, who was the

15:42:36 12      Vice President of Product Development; is that right?

15:42:39 13      A.      At this time he may have been the CPO, but either VP

15:42:45 14      of Engineering or CPO.

15:42:48 15      Q.      By CPO, you mean Chief Product Officer?

15:42:52 16      A.      Yes.

15:42:52 17      Q.      I think I mentioned earlier, Dr. Shealy is the CEO of

15:42:57 18      Akoustis?

15:42:58 19      A.      Right.

15:42:58 20      Q.      You attached two files to your e-mails to them,

15:43:02 21      right?

15:43:02 22      A.      Correct.

15:43:03 23      Q.      Those are the two files that Mr. Li sent to you,

15:43:06 24      right?

15:43:06 25      A.      It appears so, yes.

15:43:07  1   Q.      Including the confidential data sheet?

15:43:10  2   A.      It appears so, yes.

15:43:11  3   Q.      And you -- it was the standard practice of yours, in

15:43:16  4   fact, to forward such documents, right?

15:43:19  5   A.      I would say it's the standard practice to forward

15:43:23  6   business intelligence and business technical marketing

15:43:26  7   information, this is one example.

15:43:28  8   Q.      And you would forward such documents regardless of

15:43:31  9   whether they were confidential as long as you thought they

15:43:34 10   would help the strategic decisions that Akoustis was making?

15:43:37 11   A.      No, I wouldn't say that it -- you know, if it was

15:43:41 12   marked confidential, I wouldn't forward it for that purpose,

15:43:45 13   it was mainly forwarded documents that I felt were relevant

15:43:49 14   to sharing and informing at the time I was supporting this,

15:43:52 15   we were already engaged with the 5.2 and 5.6 filter in the

15:43:57 16   market and the main competitors we were competing with was

15:44:01 17   not Qorvo, and this was just me sharing information that,

15:44:05 18   you know, that Qorvo was eventually coming out to the market

15:44:08 19   with product, you know, they were probably a couple years

15:44:12 20   late, so it was raising awareness, which actually would help

15:44:16 21   us in obvious having more competitors that have BAW

15:44:20 22   technology out in the market, that was my main goal for

15:44:23 23   sharing at the time.

15:44:24 24   Q.      You were forwarding this information to assist

15:44:26 25   Akoustis in making strategic decisions, correct?

Aichele - direct

15:44:29  1    A.       No, I think it was more just informing and raising

15:44:32  2    awareness.  We had already made our strategic decisions to

15:44:37  3    invest and engage in this market segment.

15:44:39  4            MR. DeFOSSE:  Your Honor, may I approach the

15:44:41  5    witness?

15:44:41  6            THE COURT:  You may.

15:44:55  7    BY MR. DeFOSSE:

15:44:57  8    Q.       Mr. Aichele, do you recall that I deposed you in this

15:45:00  9    case on September 15th of 2023?

15:45:02 10    A.       Yes.

15:45:02 11    Q.       And when you provided your testimony at that

15:45:06 12    deposition, you were under oath; is that right?

15:45:08 13    A.       Yes.

15:45:08 14    Q.       And I think the answer you just gave me is maybe not

15:45:12 15    quite the same as the answer I got before, so I would like

15:45:15 16    to ask you to take a look at it quickly for me.

15:45:18 17    A.       Sure.

15:45:18 18    Q.       So I'm going to direct you to page 190 of the

15:45:22 19    deposition transcript.  And I would like to ask you to look

15:45:36 20    at line 10.  There is a question, do you see it there?

15:45:39 21    A.       Line 10, yes.

15:45:41 22    Q.       And then your answer begins at line 13?

15:45:46 23    A.       Yes, I do see that.

15:45:48 24    Q.       In September of 2023, I asked you:

15:45:52 25            "QUESTION:  Would it have been a standard

Aichele - direct

15:45:54 1   practice of yours" --

15:45:56 2              MR. ELKINS:  Objection, Your Honor.  Is this --

15:45:58 3              THE COURT:  Objection is overruled.

15:46:00 4   Q.      "QUESTION:  Would it have been a standard practice of

15:46:02 5   yours to forward documents received that have watermarks on

15:46:05 6   them?"

15:46:06 7              Do you see that?

15:46:07 8   A.      Yes, I do see that.

15:46:08 9   Q.      And your answer was:

15:46:09 10             "ANSWER:  It's not specific to confidential

15:46:11 11  information that I would draw attention to.  It's mainly

15:46:15 12  just sharing information that I thought would help, you

15:46:19 13  know, as a com corporation, you know?  You know, make

15:46:24 14  strategic decisions.  So if it had a confidential or not

15:46:28 15  confidential, I would forward the documents if I thought it

15:46:32 16  was a relevant or raised awareness."

15:46:38 17             Do you see that?

15:46:38 18  A.      Yes, I do.

15:46:46 19  Q.      Now, you circulated Qorvo's confidential 5-gigahertz

15:46:51 20  data sheet because you thought it would be helpful to

15:46:55 21  Akoustis, is that right?

15:46:55 22  A.      Again, I'll reiterate that I think my main purpose

15:46:59 23  for sharing it was to raise awareness as I stated here in

15:47:03 24  the deposition that you took back in September.

15:47:40 25             MR. DeFOSSE:  Your Honor, may I approach?

15:47:42   1          THE COURT:  You may.

15:47:54   2   BY MR. DeFOSSE:

15:47:55   3   Q.      Mr. Aichele, I have handed you what's previously been

15:47:59   4   marked in this case as Exhibits 47 and 48.  Would you agree

15:48:04   5   with me that Exhibit 47, which on your copy is identified as

15:48:08   6   PTX 0011, is an e-mail from yourself to Mr. Houlden and

15:48:13   7   Dr. Dave Hodge?

15:48:15   8   A.      Correct.

15:48:16   9   Q.      And what's been marked on your copy as PTX 0012 is

15:48:21  10   the attachment to that e-mail?

15:48:24  11   A.      It appears so, yes.

15:48:27  12   Q.      Mr. Buchbinder, could we bring up PTX 0011.

15:48:32  13          So, Mr. Aichele, this is Exhibit 47.  This is an

15:48:44  14   e-mail from yourself to Mr. Houlden and Mr. Hodge; right?

15:48:48  15   A.      Correct.

15:48:48  16   Q.      And this was sent in March of 2020?

15:48:53  17   A.      Correct.

15:48:53  18   Q.      This is roughly two months after Mr. Li first sent up

15:48:59  19   Qorvo's confidential data sheet, is that right?

15:49:01  20   A.      Yes.

15:49:01  21   Q.      And would you agree with me that at this time, two

15:49:05  22   months later, you were still circulating the same

15:49:09  23   confidential data sheet to folks at Akoustis?

15:49:12  24   A.      Yes.

15:49:12  25   Q.      Including to Dr. Hodge, who was working on developing

Aichele - direct

15:49:16  1    Akoustis's 5.2-gigahertz filter, right?

15:49:19  2    A.    The next generation, yes.

15:49:27  3    Q.    Now you noted to Dr. Hodge in your e-mail, note the

15:49:30  4    rejection and harmonics.  Do you see that?

15:49:33  5    A.    Yes, I do.

15:49:34  6    Q.    And that was a reference to the confidential Qorvo

15:49:37  7    data sheet that you sent?

15:49:39  8    A.    Yes, it was.

15:49:43  9    Q.    Now, the confidential Qorvo data sheet that we have

15:49:47  10   been discussing is not the only confidential Qorvo document

15:49:50  11   that Steven Li sent to you, is it?

15:49:53  12   A.    Off the top of my head, I don't know.  I don't

15:50:27  13   remember.

15:50:27  14   Q.    Mr. Aichele, I've handed you what's been marked for

15:50:31  15   identification as PTX 567.  Would you agree with me that

15:50:35  16   that is an e-mail from Mr. Li to yourself and Colin Hunt in

15:50:40  17   February of 2021?

15:50:43  18   A.    Correct.

15:50:45  19          MR. DeFOSSE:  Your Honor, we would move or offer

15:50:47  20   for admission PTX 567.

15:50:49  21          THE COURT:  Marked and received as Exhibit 133.

15:50:54  22          (Trial Exhibit No. 133 was admitted into

15:50:55  23   evidence.)

15:50:55  24   BY MR. DeFOSSE:

15:50:56  25   Q.    Mr. Aichele, can I first ask you who Colin Hunt is?

Aichele - direct

15:50:59  1    A.      Colin Hunt is the VP of sales at Akoustis.

15:51:03  2    Q.      And does he report to you?

15:51:05  3    A.      Yes, he does.

15:51:07  4    Q.      Now, on February 2nd, or sorry, February 22nd of

15:51:15  5    2021, Mr. Li is writing to provide you and Mr. Hunt with a

15:51:19  6    Wi-Fi 6 E update for mobile.  Do you see that?

15:51:24  7    A.      Yes, I do.

15:51:25  8    Q.      And I would like to look, Mr. Buchbinder, if we

15:51:28  9    could, there is a little letter D on the first page at the

15:51:33 10    bottom.  Thank you.

15:51:34 11            Mr. Aichele, Mr. Li said in his e-mail to you,

15:51:40 12    "Please also find the detailed BAW diplexer on page 22

15:51:43 13    inside the Qorvo Wi-Fi presentation."  Do you see that?

15:51:48 14    A.      Yes, I do.

15:51:53 15            MR. DeFOSSE:  Your Honor, may I approach?

15:51:54 16            THE COURT:  You may.

15:52:09 17    BY MR. DeFOSSE:

15:52:11 18    Q.      Mr. Aichele, I have handed you what's been marked

15:52:14 19    previously as Exhibit 27 in this case.  It was marked for

15:52:19 20    identification as PTX 569.  Do you recognize this as the

15:52:24 21    attachment to Mr. Li's e-mail to you that was just marked as

15:52:29 22    Exhibit 133?

15:52:30 23    A.      It appears so, yes.

15:52:32 24    Q.      And you would agree with me that this is a Qorvo

15:52:35 25    presentation?

Aichele - direct

15:52:36  1    A.      Yes, I would agree.

15:52:39  2    Q.      Mr. Buchbinder, would you mind?  Thank you.

15:52:42  3            Could I ask you, Mr. Aichele, to turn to page 31

15:52:47  4    of this presentation.  And you see -- give you a few minutes

15:52:57  5    to get there.

15:53:10  6            On page 31 of Exhibit 27, there are reports on

15:53:16  7    products that Qorvo is prototyping, is that right?

15:53:21  8    A.      Yes, it appears so.

15:53:22  9    Q.      And then if you could look at pages 32 through 39,

15:53:26 10    just flip through them quickly.  And Mr. Buchbinder, if you

15:53:29 11    could do the same, please?

15:53:38 12            You would agree with me that every page that we

15:53:56 13    just looked at had a box on it that was labeled

15:53:59 14    developmental preview only, confidential?

15:54:02 15    A.      Correct.

15:54:03 16    Q.      And when Mr. Li sent this to you, you were aware that

15:54:07 17    this was a confidential Qorvo document?

15:54:09 18    A.      Yes, that it was posted Qorvo confidential and

15:54:12 19    proprietary information, I do recognize that.

15:54:15 20    Q.      You didn't admonish Mr. Li for sending this to you?

15:54:19 21    A.      I don't remember if I admonished him on this case

15:54:22 22    specifically, but I did have discussions with him in the

15:54:25 23    past on sharing confidential information that would rise to

15:54:28 24    the level that was something that was proprietary or

15:54:32 25    nonpublic information, I don't know if I admonished him on

Aichele - direct

15:54:35  1    this specific document.

15:54:36  2    Q.      What did you admonish him on?

15:54:39  3    A.      Mainly -- you have to look at the China market, the

15:54:43  4    Asian market, there is prolific sharing of information, so

15:54:47  5    my caution to him and my other employee in the Asian market

15:54:50  6    is be careful on collecting information, they were very good

15:54:54  7    at doing market intelligence and my concern was if they're

15:54:58  8    collecting confidential information, they may also be

15:55:01  9    sharing confidential information outside.

15:55:03 10          So it was mainly on, please, collect your market

15:55:06 11    information, but make sure that you're not collecting things

15:55:09 12    that are considered to be proprietary and confidential.  So

15:55:13 13    that was basically my admonishment, I did that probably one

15:55:17 14    or two times with Steven.

15:55:20 15    Q.      In this instance, with this Wi-Fi product roadmap,

15:55:24 16    you had actually asked Mr. Li to get this presentation for

15:55:27 17    you, didn't you?

15:55:28 18    A.      I don't remember.  I don't know.

15:55:57 19    Q.      Mr. Aichele, I've handed you what's been marked for

15:56:02 20    identification as PTX-0623.  You would agree with me that

15:56:07 21    this is an e-mail from yourself to Mr. Li from July of 2020?

15:56:12 22    A.      Correct.

15:56:13 23          MR. DeFOSSE:  Your Honor, we would offer

15:56:17 24    PTX-0623 into evidence.

15:56:18 25          THE COURT:  Marked and received as 134.

Aichele - direct

15:56:20  1                (Trial Exhibit No. 134 was admitted into

15:56:22  2   evidence.)

15:56:22  3   BY MR. DeFOSSE:

15:56:24  4   Q.      Mr. Buchbinder, could we pull it up, please.

15:56:26  5                So, I would like to start, Mr. Aichele, with the

15:56:30  6   context of the top e-mail in this chain from yourself to

15:56:34  7   Mr. Li.  You state to him that you're going to provide some

15:56:37  8   input in orange.  Do you see that?

15:56:38  9   A.      Yes, I do.

15:56:39 10   Q.      And that meant that you were going to go through the

15:56:41 11   e-mail that he had sent you and put your comments in orange?

15:56:47 12   A.      Correct.

15:56:50 13   Q.      I would like to turn to page 2, and you can see at

15:56:53 14   the top of page 2, Mr. Li is providing you with some notes

15:56:57 15   on a meeting with Netgear in Taiwan.  Is that right?

15:57:01 16   A.      Yes.

15:57:02 17   Q.      And then what I want to focus on is at the bottom

15:57:05 18   there is a bullet that starts in the meeting.  If we could

15:57:09 19   pull that up, Mr. Buchbinder?

15:57:10 20                Your orange font makes it a little hard to read,

15:57:16 21   but I hope the jury can see it here.  So Mr. Li told you

15:57:20 22   that in this meeting, he had obtained some information about

15:57:24 23   Qorvo's Wi-Fi 6 E roadmap, is that right?

15:57:28 24   A.      Correct.

15:57:29 25   Q.      And he said to you "I'll try to find the roadmap from

Aichele - direct

15:57:33  1   Qorvo."  Right?

15:57:36  2   A.      Correct.

15:57:36  3   Q.      And this is apparently not the occasion on which you

15:57:41  4   admonish Mr. Li not to get that information, correct?

15:57:45  5   A.      Correct.

15:57:45  6   Q.      What you said to Mr. Li is, "Thank you.  It will be

15:57:48  7   very helpful if you can get Qorvo Wi-Fi 6 E information and

15:57:53  8   samples of the QPQ1903 and 1904."

15:57:57  9           Right?

15:57:57  10  A.      Correct.

15:57:57  11  Q.      You knew at the time that you sent this e-mail that

15:58:01  12  not only was this roadmap confidential, but the QPQ1903 and

15:58:06  13  1904 were not on the market, right?

15:58:08  14  A.      At the time that this e-mail went out, I believe

15:58:14  15  Qorvo did have products that were in the market and that

15:58:17  16  they were sampling and I wasn't specifically asking him to

15:58:20  17  go get confidential information.  Again, it's trying to be

15:58:24  18  smart with analysis and looking at competitors that are

15:58:26  19  coming into the market.

15:58:27  20          So roadmaps, you know, they are shared, you

15:58:31  21  know, with sales organizations and they sometimes may be

15:58:34  22  confidential, they may not be confidential.  Really what I

15:58:37  23  was asking for is you know, any information they could

15:58:40  24  share, even if it's customers, it would be helpful so that

15:58:44  25  we can keep our finger on the pulse, know what our

Aichele - direct

15:58:47 1    competition is doing, and really deliver the best solution

15:58:50 2    for Akoustis.

15:58:58 3                MR. DeFOSSE:  Your Honor, may I approach?

15:58:59 4                THE COURT:  You may.

15:59:18 5    BY MR. DeFOSSE:

15:59:28 6    Q.    Mr. Aichele, I have just handed you what's been

15:59:33 7    marked for identification as PTX-0151 and 0152.  The

15:59:41 8    PTX-0151 is an e-mail from yourself to the CEO of Akoustis,

15:59:44 9    Mr. Shealy and Mr. Houlden, is that right?

15:59:46 10   A.    Correct.

15:59:48 11   Q.    And PTX 0152 is the attachment to that e-mail?

15:59:55 12   A.    It appears so, yes.

15:59:57 13               MR. DeFOSSE:  Your Honor, plaintiff would offer

15:59:58 14   into evidence PTX 0151 and 0152.

16:00:03 15               THE COURT:  Marked and received as 135 and 136.

16:00:06 16               (Trial Exhibit Nos. 135 and 136 were admitted

16:00:07 17   into evidence.)

16:00:07 18   BY MR. DeFOSSE:

16:00:13 19   Q.    Now, Mr. Aichele, the first e-mail in this chain is

16:00:17 20   from a gentleman named S.J. Kim, do you see that?

16:00:20 21   A.    Yes, I do.

16:00:21 22   Q.    Who is S.J. Kim?

16:00:23 23   A.    S.J. Kim was the country director for South Korea,

16:00:28 24   and he was an employee of Akoustis.

16:00:30 25   Q.    And Mr. Kim reported to you, right?

Aichele - direct

16:00:32  1    A.      Correct.

16:00:33  2    Q.      And if we look at Mr. Kim's e-mail, he writes to you

16:00:37  3    in May of 2019, "As we guessed, Qorvo is developing Wi-Fi

16:00:44  4    coexistence filters for 5.2 and 5.6-gigahertz."

16:00:49  5            Do you see that?

16:00:49  6    A.      Yes I do.

16:00:49  7    Q.      And he says, "In addition, they are also developing

16:00:53  8    V2X filter for automotive market as well."

16:00:57  9            Do you see that?

16:00:57 10    A.      Yes, I do.

16:00:57 11    Q.      He says, "Please refer to captured presentation

16:01:01 12    material of Qorvo."

16:01:03 13            Do you see that?

16:01:03 14    A.      Yes, I do.

16:01:04 15    Q.      Just for context, V2X is a type of automotive BAW

16:01:08 16    filter product, is that right?

16:01:10 17    A.      V2X is a standard that a BAW filter would be used

16:01:16 18    for.

16:01:16 19    Q.      If we can turn to the attachment to your e-mail,

16:01:20 20    Exhibit 136.  We see here that there is what appears to be a

16:01:28 21    photograph that was taken of a computer screen; right?

16:01:31 22    A.      It appears so, yes.

16:01:33 23    Q.      And this is what Mr. Kim had sent to you in this

16:01:36 24    e-mail?

16:01:37 25    A.      It appears so, yes.

Aichele - direct

16:01:38  1   Q.      And you would agree with me that this is a

16:01:41  2   confidential Qorvo presentation, right?

16:01:43  3   A.      Yes, it does have a mark in there.

16:01:45  4   Q.      This again was not one of the occasions in which you

16:01:50  5   admonished your employees not to send you confidential

16:01:53  6   information?

16:01:53  7   A.      I do not believe I admonished him in regard to this

16:01:57  8   specific e-mail.

16:01:58  9   Q.      In fact, what you did is you wrote back to him and

16:02:01 10   asked him to give you more information from this

16:02:04 11   presentation, isn't that right?

16:02:05 12   A.      It's possible, yes.

16:02:08 13               MR. DeFOSSE:  Your Honor, may I approach?

16:02:10 14               THE COURT:  You may.

16:02:19 15   BY MR. DeFOSSE:

16:02:37 16   Q.      Mr. Aichele, I've handed you what's been marked for

16:02:41 17   identification as PTX-502.  Would you agree with me that

16:02:44 18   this is an e-mail exchange between yourself, Mr. Houlden,

16:02:48 19   and Mr. Shealy?

16:02:50 20   A.      Yes.  It appears so.

16:02:53 21               MR. DeFOSSE:  Your Honor, plaintiff would offer

16:02:54 22   into evidence PTX 502.

16:02:57 23               THE COURT:  Marked and received as 137.

16:03:00 24               (Trial Exhibit No. 137 was admitted into

16:03:00 25   evidence.)

16:03:00 1    BY MR. DeFOSSE:

16:03:03 2    Q.    Mr. Aichele, this is a continuation of the e-mail

16:03:06 3    chain that we just looked at with Mr. Kim; is that right?

16:03:10 4    A.    Yes, it appears so.

16:03:12 5    Q.    After Mr. Kim sent you the confidential Qorvo

16:03:15 6    presentation picture, you forwarded that on to the middle

16:03:21 7    e-mail, to the CEO of Akoustis and to Mr. Houlden, right?

16:03:27 8    A.    Yes, it appears so.

16:03:28 9    Q.    And neither of those gentlemen objected to you

16:03:33 10    sending them that presentation, right?

16:03:35 11    A.    I do not believe they did.

16:03:37 12    Q.    If we could move up one more e-mail in the chain.

16:03:40 13    Then you e-mailed them again in succession and you said,

16:03:44 14    "The picture right below V2X simulation (or measured)

16:03:49 15    plot."

16:03:49 16         Do you see that?

16:03:50 17    A.    Yes, I do.

16:03:50 18    Q.    And then you say, "Asked S.J. if he got a screen shot

16:03:55 19    of that one as well."

16:03:57 20         Do you see that?

16:03:57 21    A.    Yes, I do.

16:03:58 22    Q.    And what you meant was did S.J. Kim get a screen shot

16:04:02 23    of the next page of that confidential Qorvo presentation,

16:04:04 24    right?

16:04:05 25    A.    I believe that's what that means, yes.

Aichele - direct

16:04:07  1    Q.    If we go to the top e-mail in the chain, that's from

16:04:10  2    the CEO of Akoustis, right?

16:04:12  3    A.    Correct.

16:04:13  4    Q.    And he doesn't say please stop circulating this

16:04:17  5    confidential Qorvo information, does he?

16:04:19  6    A.    No, he does not.

16:04:20  7    Q.    Instead what he's noting is what he finds interesting

16:04:23  8    in the materials you sent?

16:04:26  9    A.    Yes, it appears so.

16:04:38 10            MR. DeFOSSE:  Your Honor, may I approach?

16:04:40 11            THE COURT:  You may.

16:04:52 12    BY MR. DeFOSSE:

16:04:57 13    Q.    Mr. Aichele, I've handed you what's been marked for

16:05:00 14    identification as PTX 1062.  This is an e-mail from yourself

16:05:06 15    to Mr. Kim in May of 2019; is that right?

16:05:11 16    A.    Correct.

16:05:12 17            MR. DeFOSSE:  Your Honor, plaintiff would offer

16:05:14 18    into evidence PTX 1062.

16:05:17 19            THE COURT:  Marked and received as 138.

16:05:19 20            (Trial Exhibit No. 138 was admitted into

16:05:19 21    evidence.)

16:05:19 22    BY MR. DeFOSSE:

16:05:22 23    Q.    If we could go to the last page of this e-mail chain.

16:05:31 24    Sorry, one page up, Mr. Buchbinder.  Thank you.

16:05:34 25            You would agree with me that this e-mail is

16:05:37  1    starting with the same e-mail that we have seen twice

16:05:40  2    already now where Mr. Kim was telling you that he had

16:05:44  3    captured presentation material of Qorvo; is that right?

16:05:47  4    A.    Yes, it appears so.

16:05:49  5    Q.    And then the e-mail above that is one we haven't

16:05:53  6    seen, that's a new response from you to Mr. Kim, is that

16:05:57  7    right?

16:05:57  8    A.    Yes, it is.

16:05:57  9    Q.    And this is what you were telling the CEO and

16:06:00 10    Mr. Houlden that you had asked Mr. Kim to get some more

16:06:05 11    information, right?

16:06:06 12    A.    Correct.

16:06:07 13    Q.    And you say, "Hi, S.J.  Yes, my latest update is that

16:06:15 14    they will have received V2X filters out of the Fab this week

16:06:19 15    and start evaluation."

16:06:21 16          Do you see that?

16:06:22 17    A.    Yes, I do see that.

16:06:24 18    Q.    Okay.  And if we zoom back out.  Thank you,

16:06:27 19    Mr. Buchbinder.

16:06:28 20          The next e-mail up, you say, "Did you get a

16:06:33 21    screen shot of QPQ2200Q right below the shot you took?

16:06:38 22    Interested in seeing the profile."

16:06:42 23          Right?

16:06:42 24    A.    Yes, correct.

16:06:43 25    Q.    And, in fact, Mr. Kim was responsive to your request,

Aichele - direct

16:06:47  1  right?

16:06:48  2  A.      His response in the preceding -- or the next e-mail,

16:06:55  3  yes.

16:06:58  4  Q.      Yes.

16:07:01  5          MR. DeFOSSE:  Your Honor, may I approach?

16:07:03  6          THE COURT:  You may.

16:07:14  7  BY MR. DeFOSSE:

16:07:17  8  Q.      Mr. Aichele, I have handed you what's been marked for

16:07:23  9  identification as PTX 1100.  Would you agree with me that

16:07:30 10  this is the e-mail exchange between yourself and Mr. Kim?

16:07:34 11  A.      Correct.

16:07:35 12          MR. DeFOSSE:  Your Honor, plaintiff would offer

16:07:36 13  into evidence PTX 1100.

16:07:39 14          THE COURT:  Marked and received as 139.

16:07:42 15          (Trial Exhibit No. 139 was admitted into

16:07:44 16  evidence.)

16:07:44 17  BY MR. DeFOSSE:

16:07:47 18  Q.      And Mr. Aichele, would you agree that this is Mr. Kim

16:07:51 19  responding to your request by providing you the scan data of

16:07:55 20  the QPQ2200Q, the Qorvo, right?

16:08:00 21  A.      It would appear so, yes.

16:08:02 22  Q.      This is the day after you had asked him if he could

16:08:05 23  get you more information about this confidential Qorvo

16:08:09 24  presentation?

16:08:09 25  A.      Yes, it appears so.

Aichele - direct

16:08:11  1    Q.      And Mr. Buchbinder, if we could look at the

16:08:16  2    attachment to Exhibit 139.  And if we could go down.  This

16:08:24  3    is the screen shot shown on the screen now, which is page 4

16:08:29  4    of the document in slide 20 of the presentation that Mr. Kim

16:08:33  5    had already sent you, right?

16:08:34  6    A.      It appears so, yes.

16:08:36  7    Q.      If we go to the next page.  This is the screen shot

16:08:39  8    that you were asking Mr. Kim if he could additionally get

16:08:43  9    for you, right?

16:08:44 10    A.      It appears so, yes.

16:08:47 11    Q.      Now, Mr. Aichele -- we can take this one down,

16:08:51 12    Mr. Buchbinder.

16:08:51 13            Mr. Aichele, you were aware that there was at

16:08:54 14    least one employee in your sales organization at Akoustis

16:08:58 15    who was bribing people to get confidential Qorvo

16:09:01 16    information, right?

16:09:02 17    A.      No, I am not aware of an employee bribing.

16:09:26 18    Q.      Mr. Aichele, I've handed you what's been marked as

16:09:35 19    PTX 50 -- sorry, 530, PTX 530 for identification.  You would

16:09:43 20    agree with me that this is an e-mail exchange between

16:09:45 21    yourself and Mr. Kim, right?

16:09:47 22    A.      Correct.

16:09:47 23            MR. DeFOSSE:  Your Honor, plaintiff would offer

16:09:49 24    into evidence PTX 530.

16:09:51 25            THE COURT:  Marked and received as 140.

16:09:54  1          (Trial Exhibit No. 140 was admitted into

16:09:54  2  evidence.)

16:09:54  3  BY MR. DeFOSSE:

16:09:57  4  Q.      Mr. Aichele, the Mr. Kim who is sending you this

16:10:00  5  e-mail in Exhibit 530 is the same Mr. Kim who had sent you

16:10:04  6  the confidential Qorvo presentation we just looked at, is

16:10:08  7  that right?

16:10:08  8  A.      Correct.

16:10:09  9  Q.      And, in fact, this e-mail was sent in August of 2019,

16:10:12 10  just a few months after he sent you that confidential

16:10:15 11  presentation, correct?

16:10:16 12  A.      Correct.

16:10:17 13  Q.      Now, what I am interested in is the postscript to

16:10:23 14  Mr. Kim's e-mail.  And Mr. Buchbinder, if we could pull that

16:10:28 15  up so the jury could see that, please?

16:10:31 16          Mr. Aichele, in this postscript to his e-mail to

16:10:46 17  you, Mr. Kim says, "Do me a favor, that you can accept my

16:10:51 18  expense claim of entertainment with Qualcomm/Qorvo/Samsung

16:10:58 19  without the name of the persons?"

16:11:01 20          Do you see that?

16:11:01 21  A.      Yes, I do.

16:11:02 22  Q.      Then he goes on to explain why it is he didn't want

16:11:05 23  to put those names in his expense report right?

16:11:08 24  A.      Correct.

16:11:08 25  Q.      Mr. Kim writes in the next sentence, "Just put the

Aichele - direct

16:11:14  1    name of company.  The reason is that the guys share those

16:11:17  2    key confidential information with me based on personal

16:11:20  3    relationship, but they are so sensitive with knowing their

16:11:23  4    name with anyone in Akoustis."

16:11:25  5              Do you see that?

16:11:26  6    A.      Yes, I do.

16:11:26  7    Q.      And then Mr. Kim goes on to suggest a couple of ways

16:11:30  8    that he could avoid identifying who was providing him with

16:11:33  9    the key confidential information, right?

16:11:35 10    A.      Correct.

16:11:35 11    Q.      He says he could just make up a fake name.  Right?

16:11:43 12    He says, "I may put in any name in the report instead of

16:11:47 13    them."

16:11:47 14    A.      Yep, I got it.

16:11:48 15    Q.      But that doesn't make sense.  So his solution was let

16:11:52 16    me just put in their initial in the report so no one will

16:11:56 17    know who is providing the key confidential information about

16:12:00 18    Qorvo or Samsung, right?

16:12:03 19    A.      Yes.

16:12:03 20    Q.      And then he asked for your guidance to on this,

16:12:06 21    right?

16:12:06 22    A.      Yes.

16:12:06 23    Q.      This is one of the occasions where you went back to

16:12:09 24    Mr. Kim and said please do not use your expense report to

16:12:13 25    obtain key confidential information about Qorvo or Samsung?

Aichele - direct

16:12:20   1   A.        Excuse me?

16:12:20   2   Q.        You didn't admonish Mr. Kim for using his expense

16:12:24   3   account for obtaining key confidential information about

16:12:28   4   Qualcomm, Qorvo, or Samsung, did you?

16:12:31   5   A.        I do believe I had a conversation with S.J., in that

16:12:34   6   conversation it goes to a point I made earlier, I think I

16:12:37   7   provided guidance to him, so it's not bribing in the

16:12:42   8   industry, they usually take competitors out to lunch and to

16:12:48   9   do competitive analysis, so my guidance to him is be careful

16:12:52  10   when you're having these meetings because obviously if

16:12:57  11   you're soliciting information from them that may be

16:12:58  12   confidential, I believe he may be doing the same thing back

16:13:01  13   to them, so my guidance to you is, you know, obviously have

16:13:05  14   these competitive market analysis, but don't try to take any

16:13:10  15   confidential information.

16:13:12  16            And then also indicated to him file your expense

16:13:17  17   reports, that's what we provide for guidance.  I don't

16:13:20  18   remember saying he could use fake names or that he could put

16:13:23  19   initials, that I remember.

16:13:30  20            MR. DeFOSSE:  Your Honor, may I approach?

16:13:32  21            THE COURT:  You may.

16:13:46  22   BY MR. DeFOSSE:

16:13:52  23   Q.    Mr. Aichele, I've handed you what's been marked as

16:13:56  24   PTX 0564 for identification.  You would agree with me that

16:14:01  25   is an e-mail exchange between yourself and the CEO of

Aichele - direct

16:14:07  1    Akoustis, Jeffrey Shealy?

16:14:09  2    A.      Correct.

16:14:09  3            MR. DeFOSSE:  Your Honor, plaintiff would offer

16:14:11  4    into evidence PTX 0564.

16:14:15  5            THE COURT:  Marked and received as 141.

16:14:15  6            (Trial Exhibit No. 141 was admitted into

16:14:16  7    evidence.)

16:14:16  8    BY MR. DeFOSSE:

16:14:16  9    Q.      So on this first page, if we look at it, it looks

16:14:21 10    like you're forwarding an e-mail to Mr. Shealy as CEO,

16:14:25 11    right?

16:14:25 12    A.      Correct.

16:14:26 13    Q.      And if we pull that out, we can see that this is the

16:14:30 14    same e-mail that Mr. Kim previously sent you with

16:14:34 15    information about Qualcomm, right?

16:14:36 16    A.      Correct.  It appears so.

16:14:37 17    Q.      So now what I'm interesting in in this e-mail, I

16:14:40 18    would like to go to the signature block for Mr. Kim's

16:14:43 19    e-mail, and it seems like there is something that's missing

16:14:46 20    here.  Is that right?

16:14:47 21    A.      Correct.

16:14:47 22    Q.      You edited out his postscript where he said that he

16:14:52 23    was using his expense account to obtain key confidential

16:14:55 24    information?

16:14:56 25    A.      Correct.

Aichele - direct

16:14:59  1    Q.      Now, this e-mail from Mr. Kim in 2019 was not the

16:15:03  2    only time that he told you he was using his expense account

16:15:06  3    to get confidential information from Qorvo, right?

16:15:10  4    A.      I believe there were probably some other ones, I know

16:15:15  5    I had conversations with him on that as well.

16:15:48  6    Q.      Mr. Aichele, I have handed you what's been marked for

16:16:22  7    identification as PTX 531 through PTX 536.  Would you agree

16:16:30  8    with me that is an e-mail to yourself from Mr. Kim and the

16:16:36  9    attachments to that e-mail?

16:16:38 10    A.      Correct.

16:16:38 11            MR. DeFOSSE:  Your Honor, plaintiff would offer

16:16:40 12    into evidence PTX 531 through 536.

16:16:45 13            THE COURT:  Marked and received as 142, 143,

16:16:52 14    144, 145, 146, I believe that will be it.  And maybe 147.

16:17:06 15            (Trial Exhibit Nos. 142, 143, 144, 145, 146, and

16:17:08 16    147 were admitted into evidence.)

16:17:08 17            MR. DeFOSSE:  Yes, 147.

16:17:10 18            THE COURT:  147.  Yes.

16:17:12 19            MR. DeFOSSE:  Thank you.

16:17:12 20    BY MR. DeFOSSE:

16:17:16 21    Q.      Thank you, Mr. Buchbinder.  If we could look at the

16:17:18 22    cover e-mail that Mr. Kim sent you.  You would agree with me

16:17:24 23    that this is in August of 2020; is that right?

16:17:28 24    A.      Correct.

16:17:28 25    Q.      So this is about a year after Mr. Kim had told you

Aichele - direct

16:17:31 1  that he was using his expense account to obtain key

16:17:36 2  confidential information, right?

16:17:38 3  A.      Correct.

16:17:38 4  Q.      And just looking at the first portion of the e-mail

16:17:41 5  with the to and from, you see there is a zip file that's

16:17:46 6  attached to this?

16:17:46 7  A.      Yes, I do.

16:17:47 8  Q.      It says "Qorvo SC2020" and then one in parenthesis

16:17:56 9  Zip?

16:17:56 10  A.      Correct.

16:17:56 11  Q.      And then we have Mr. Kim's message to you.  "Please

16:18:00 12  don't ask me where did I get from...because of size of

16:18:07 13  attachment, I will send total three e-mails."

16:18:10 14          Do you see that?

16:18:11 15  A.      Yes, I do.

16:18:11 16  Q.      And then he says, "Frankly, I always use my expense

16:18:17 17  for the right purpose!"

16:18:19 18          Exclamation point, right?

16:18:21 19  A.      Yes, I see that.

16:18:22 20  Q.      And you see that included in Mr. Kim's e-mail, this

16:18:27 21  one that I gave you, Exhibit 142, he included five Qorvo

16:18:34 22  presentations; is that right?

16:18:39 23  A.      Correct.

16:18:41 24  Q.      And four of those presentations are marked as

16:18:43 25  confidential; right?

Aichele - direct

16:19:02  1    A.      Correct.

16:19:12  2             MR. DeFOSSE:  Your Honor, may I approach?

16:19:15  3             THE COURT:  You may.

16:19:33  4    BY MR. DeFOSSE:

16:19:35  5    Q.      Mr. Aichele, I have handed you what's been marked for

16:19:55  6    identification as PTX 537, 542, 550, and 551.  Would you

16:20:05  7    agree with me that PTX 537 is an e-mail to yourself and

16:20:12  8    Mr. Hunt from S.J. Kim?

16:20:15  9    A.      Correct.

16:20:16 10    Q.      Exhibit 542 is an e-mail to yourself and Mr. Hunt

16:20:21 11    from S.J. Kim?

16:20:25 12    A.      Correct.

16:20:26 13    Q.      Exhibit 550 is an e-mail to yourself and Mr. Hunt

16:20:31 14    from S.J. Kim?

16:20:33 15    A.      Correct.

16:20:33 16    Q.      And Exhibit 551 is the attachment to Exhibit 550; is

16:20:40 17    that right?

16:20:40 18    A.      Correct.

16:20:41 19             MR. DeFOSSE:  Your Honor, plaintiff would offer

16:20:43 20    into evidence PTX 537, 542, 550, and 551.

16:20:50 21             THE COURT:  Marked and received as 148, 149,

16:20:54 22    150, and 151.

16:20:56 23             (Trial Exhibit Nos. 148, 149, 150, and 151 were

16:20:57 24    admitted into evidence.)

16:20:57 25    BY MR. DeFOSSE:

Aichele - direct

16:21:01  1    Q.        Thank you, Mr. Buchbinder.

16:21:02  2             So if -- actually could we start down at the

16:21:06  3    e-mail in the middle.  Just to remind us why we're looking

16:21:10  4    at this, Mr. Aichele.  Mr. Kim said in his first e-mail to

16:21:14  5    you with Zip file attachment number one, that he was going

16:21:17  6    to send you a total of three e-mails; is that right?

16:21:21  7    A.        Correct.

16:21:21  8    Q.        If we can zoom out of this, Mr. Buchbinder.  And go

16:21:25  9    to the top of this e-mail.

16:21:30  10            Exhibit 537 is the second of the zip files that

16:21:34  11   Mr. Kim sent to you; is that right?

16:21:38  12   A.        It appears so, yes.

16:21:40  13   Q.        If we could go to Exhibit 149, which was previously

16:21:46  14   PTX 542.  And look at the top of that e-mail.  This is the

16:21:53  15   third zip file of materials that he sent to you on the same

16:21:57  16   day?

16:21:57  17   A.        It appears so, yes.

16:21:59  18   Q.        If we could go to PTX 550.

16:22:03  19            In addition to sending you three zip files full

16:22:07  20   of Qorvo confidential information on August -- in August of

16:22:11  21   2020, Mr. Kim also sent you Qorvo's entire IDP quarterly

16:22:17  22   price book; is that right?

16:22:18  23   A.        It appears so, yes.

16:22:24  24   Q.        Mr. Buchbinder, if we could pull up PTX 551, and it

16:22:29  25   would be great if we have the native version of that.

Aichele - direct

16:22:37  1              Mr. Aichele, you would agree with me that this

16:22:45  2     reflects financial information of Qorvo concerning the

16:22:50  3     products that it sells; is that right?

16:22:52  4     A.      Yes, it appears so.

16:22:53  5     Q.      Including information on things such as volume

16:22:57  6     discounts?

16:23:01  7     A.      Where do you see that?

16:23:05  8     Q.      If we can keep scrolling, Mr. Buchbinder.   Stop.

16:23:11  9              Do you agree --

16:23:12 10     A.      Yes, I see that now.

16:23:15 11     Q.      You would agree with me that Exhibit 551 is

16:23:19 12     confidential information?

16:23:20 13     A.      Yes, I would.

16:23:21 14     Q.      And you never admonished Mr. Kim for sending you this

16:23:25 15     document, did you?

16:23:26 16     A.      I believe that at this time Colin was managing S.J.

16:23:31 17     Kim, and Colin was also, because I eventually when I hired

16:23:36 18     on Colin, he then took over responsibilities to manage S.J.

16:23:40 19     and Steven Li, who is the other country director in China,

16:23:44 20     and I believe Colin had a conversation with S.J. upon

16:23:48 21     receipt of these materials.

16:23:49 22     Q.      You deferred to Mr. Hunt to have a conversation with

16:23:53 23     S.J. at that point?

16:23:54 24     A.      He was the direct manager and had that

16:23:58 25     responsibility.

Aichele - cross

16:23:59  1    Q.       Thank you, Mr. Aichele.

16:24:02  2             MR. DeFOSSE:  I'll pass the witness.

16:24:16  3                       CROSS-EXAMINATION

16:24:17  4    BY MR. ELKINS:

16:24:34  5    Q.       Good afternoon, Mr. Aichele.

16:24:35  6    A.       Good afternoon.

16:24:37  7    Q.       I am first going to examine you regarding the

16:24:41  8    contents of Mr. DeFosse's examination.  And then with the

16:24:46  9    Court's permission, then we'll conduct your direct

16:24:50 10    examination now, so you don't have to come back next week.

16:24:53 11             THE COURT:  We discussed this earlier, it's much

16:24:56 12    more efficient, and so rather than having the witness come

16:25:00 13    back in "the defense case", we're presenting it all at one

16:25:05 14    time, it's much more efficient, everybody appreciates that,

16:25:09 15    it's good for all of us in terms of efficiency.

16:25:14 16             Sir, you may proceed.

16:25:15 17             MR. ELKINS:  Thank you, Your Honor.

16:25:16 18    BY MR. ELKINS:

16:25:17 19    Q.       First, I want to ask you about some of the documents

16:25:21 20    that Mr. DeFosse examined you about.  And the first one is

16:25:28 21    -- was marked for identification as PTX 779, it's the first

16:25:33 22    one you looked at.  And it is -- it was admitted into

16:25:40 23    evidence as Trial Exhibit 124, which won't be marked on

16:25:45 24    yours yet.

16:25:47 25    A.       I see it.

Aichele - cross

16:26:06  1    Q.    So just to refresh our recollection, this -- before

16:26:17  2    this, we looked at a document from Qorvo that had the -- had

16:26:31  3    some information regarding a 5-gigahertz product that was

16:26:39  4    marked with the number 19XX.  Do you remember that?

16:26:43  5    A.    Yes, I do.

16:26:45  6    Q.    And what was your understanding about that?  Was that

16:26:52  7    an existing product?

16:26:53  8    A.    No, it was not an existing product.  My understanding

16:26:56  9    is it was a development, so more than likely it was in the

16:27:01 10    design phase, simulation phase.

16:27:03 11    Q.    It was a proposed product?

16:27:05 12    A.    Proposed product.

16:27:06 13    Q.    And did having the specifications, or at least the

16:27:13 14    proposed specifications for a proposed Qorvo product at that

16:27:18 15    stage influence any decision making at Akoustis regarding

16:27:23 16    whether or not to kick off or hold on a 5-gigahertz product

16:27:33 17    from Akoustis?

16:27:34 18    A.    Absolutely not.  If I can expand on that at the time.

16:27:39 19    The market that we're going after was a Wi-Fi access point

16:27:44 20    and we had done our market assessment, market analysis, and

16:27:48 21    we were looking at tri band architectures, so access points

16:27:53 22    going to enterprise buildings or in your home, and one of

16:27:56 23    the key customers we had was a company called Eero and we

16:28:00 24    were engaged with them, and that was really a phase that we

16:28:04 25    were making a decision to start development for the Wi-Fi

Aichele - cross

16:28:08  1   and move away from the 5G mobile and the competitors at the

16:28:12  2   time were dielectric resonators, so they were the ones that

16:28:16  3   were influencing us.  So our analysis, I was really looking

16:28:20  4   at those as a competitor and offering a value proposition.

16:28:24  5          We were the first BAW players to really enter

16:28:26  6   that market and provide a solution.  You know, having a

16:28:30  7   finger on the pulse of what Qorvo was doing, you know, was

16:28:33  8   interesting, it helped to provide some of the market, you

16:28:38  9   know, competitive analysis, but it did not influence and it

16:28:40 10   did not sway us or, you know, ask us, in fact, if you look

16:28:45 11   at the package outlines, the package outline is completely

16:28:49 12   different from ours, Their organization, so that's really

16:28:51 13   what we focused our efforts on.

16:28:55 14   Q.    I also want to ask you about another document,

16:29:01 15   actually before we go there, did you use the proposed

16:29:11 16   specifications for that proposed Qorvo product in

16:29:15 17   determining what specifications you needed for Akoustis's

16:29:20 18   5-gigahertz BAW filters?

16:29:23 19   A.    No, we did not.  I mean, it's mainly you do a

16:29:26 20   compliance table, where you compare the competition.  And

16:29:31 21   again, if you look in my business plan, it highlighted the

16:29:36 22   dielectric resonators, and there is one page where I'm

16:29:40 23   specifically comparing against the dielectric resonators, so

16:29:45 24   our solution was really competing against them, and they

16:29:47 25   offered the best performance, but they were large factors,

Aichele - cross

16:29:51  1   so our advantage that we trim the size down, a little

16:29:56  2   trimmed off in the performance, the electrical specs we were

16:29:59  3   trying to was to compete against the dielectrics, so that's

16:30:03  4   what's influenced our design.

16:30:05  5           MR. ELKINS:  I'm having a little -- maybe my

16:30:08  6   hearing is going, but if there is a microphone, maybe you

16:30:12  7   can put it more directly close to your mouth.

16:30:15  8           THE COURT:  There should be a mic there.

16:30:19  9           THE WITNESS:  It's red now, is it on?

16:30:22 10           THE COURT:  It's on.

16:30:23 11   A.      Can you hear me?

16:30:25 12   Q.      I can hear you, just try to boost your voice.

16:30:28 13   A.      Project.

16:30:42 14   Q.      If you give me a second, I have to adjust binders,

16:30:46 15   switch them, in any event.

16:30:52 16           If you'll look at the exhibit that was marked as

16:30:56 17   PTX 569.  And it was entered into evidence as Trial

16:31:02 18   Exhibit 27 before you testified.  So it's entitled Wi-Fi

16:31:07 19   product roadmap update, and it's dated November 2020?

16:31:16 20   A.      Yes, I see it.

16:31:17 21   Q.      Do you remember reviewing this with Mr. DeFosse?

16:31:22 22   A.      I believe so, yes.

16:31:26 23   Q.      Okay.  And do you remember seeing this document at

16:31:30 24   the time that you received it?

16:31:33 25   A.      I looked through depositions and obviously recently,

16:31:40  1    I have a little bit of a recollection of this material in

16:31:43  2    this document.

16:31:45  3    Q.      At the time did you find it useful?

16:31:47  4    A.      Not particularly.  Again, I think it's just a market

16:31:52  5    intelligence, market analysis, you know, our strategy, and

16:31:56  6    our development plans, you know, were really based on our

16:32:00  7    assessment, and usually we would be about twelve to

16:32:04  8    fifteen months ahead of the competition.  When a customer is

16:32:09  9    needed, I received this kind of information, I didn't really

16:32:12 10    pay attention at the time if it was confidential or not, I

16:32:15 11    would look at it and put it aside because it didn't really

16:32:19 12    add significant value other than I saw the competition

16:32:21 13    coming you know in the BAW technology, which actually gave

16:32:24 14    credibility on the plan and the strategy that we had of

16:32:28 15    being first to market.

16:32:30 16    Q.      By the way, when you were discussing the last

16:32:34 17    document, I got so distracted with going to the next

16:32:37 18    exhibit, I forgot to ask the follow-up question.  You talked

16:32:41 19    about dielectric resonators, what are those?

16:32:43 20    A.      Dielectric resonators are a, you know, a form of you

16:32:48 21    know, filters that are basically using ceramic materials to

16:32:53 22    create ceramic resonators, they're very large in size and

16:32:57 23    they're fairly cheap to manufacture, they're manufactured

16:33:01 24    primarily in China and Taiwan, and I believe Korea, so

16:33:05 25    they're about ten times larger in size, but they're very

16:33:09  1    effective from a performance standpoint.

16:33:11  2              So the advantage on a BAW filter being small in

16:33:14  3    size is that you can fit more into, if you look at the home

16:33:20  4    mesh networks, you have smaller devices that are plugged in

16:33:24  5    throughout the home, you do a four-by-four line, that means

16:33:28  6    four antennas and the four filters, a small filter is more

16:33:34  7    attractive compared to dielectric resonators.

16:33:36  8    Q.    When you were making a kickoff for the BAW decision

16:33:40  9    that we examined in Exhibit 779, which is Trial Exhibit 124,

16:33:45 10    you had just opposed specifications for a proposed

16:33:51 11    5-gigahertz filter against specifications for several

16:33:58 12    dielectric resonators it looked like from Chinese companies,

16:34:03 13    do you remember that?

16:34:04 14    A.    Yes.  Correct.

16:34:04 15    Q.    Why were you comparing a proposed BAW filter to the

16:34:08 16    dielectric resonators?

16:34:10 17    A.    It really, it was two things, one is customer specs,

16:34:13 18    so we had, you know, multiple key customers that we were

16:34:16 19    engaged with, if you know the brands, Netgear, Google, Eero,

16:34:22 20    which is Amazon now, all of them were using dielectric

16:34:26 21    resonators they weren't using BAW, so we were actually trail

16:34:30 22    blazing and being the first solution into the market.  So we

16:34:32 23    had to do a competitive analysis against their filters or we

16:34:38 24    would not get meaningful engagement.  And then we had to

16:34:41 25    show how we differentiate, so really hit the electrical

16:34:45 1    specs, being competitive in price, and also having a much

16:34:50 2    smaller form factor is very attractive, and that's how we

16:34:54 3    secured our first high volume customer.

16:34:57 4    Q.      You reviewed several exhibits with Mr. DeFosse, or

16:35:04 5    actually he reviewed them with you.  And these are the

16:35:07 6    numbers, they were PTX-151, 152, 502, 1062, and 1100, which

16:35:18 7    translate to trial Exhibits 135 through 139.  But these were

16:35:23 8    e-mails with S.J. Kim and they related to the V2X, the

16:35:29 9    proposed V2X filter from Qorvo.  Do you recall that?

16:35:33 10   A.      Yes, I do.

16:35:34 11   Q.      What benefit, if any, did Akoustis derive from the

16:35:37 12   information that you received from Mr. Kim?

16:35:40 13   A.      I mean, again, it's competitive market intelligence

16:35:44 14   that is helpful you know in really providing some feedback,

16:35:49 15   we were not focused on the automotive market, so it was

16:35:53 16   really a 5.9-gigahertz was probably the most interesting,

16:35:57 17   because it's up in the higher frequency, but since we

16:36:00 18   weren't really focused on it, we did some R & D efforts on

16:36:04 19   it but never really produced a product in that time frame.

16:36:08 20   Q.      Did having those materials, those Qorvo materials

16:36:15 21   from Mr. Kim enable Akoustis to get any kind of head start

16:36:21 22   in its business, vis-a-vis is the competition?

16:36:25 23   A.      No.  None.  As I mentioned, we weren't really focused

16:36:29 24   on the automotive market back then, of course we are a lager

16:36:34 25   in that respect, so it did not give us any advantage and

Aichele - cross

16:36:39  1    really was not useful or beneficial.

16:36:40  2    Q.      You also reviewed a lot of, well, at least some

16:36:46  3    e-mails, and then he admitted into evidence a bunch of

16:36:51  4    attachments that came from Mr. Kim.  These or all, I think

16:36:55  5    there were ten or eleven of them at the end of Mr. DeFosse's

16:36:59  6    examination of you.  PTX 531, 532, 533, 534, all the way to

16:37:09  7    537 and then 542, 550, 551, he didn't ask you anything about

16:37:17  8    the actual presentations.  Were any of those presentations

16:37:25  9    remotely related to Akoustis's business?

16:37:28 10    A.      I think there was one that was remotely related and

16:37:32 11    that was the wireless connectivity one that had, in the last

16:37:38 12    four slides, some of their filter strategy.  But just

16:37:42 13    expanding on that as I talked about, you know, Colin was

16:37:46 14    managing S.J. when he received those documents.

16:37:51 15    99.9 percent sure he had a conversation with him regarding

16:37:55 16    accepting this information.  When I received this

16:37:58 17    information, I regret that I didn't pay much attention to

16:38:02 18    it, that it had been marked confidential, I regret that I

16:38:05 19    saved it.

16:38:05 20            But I can tell you that it held no meaning to

16:38:08 21    me.  There really was nothing of value.  It was information,

16:38:12 22    you know, that I had seen before when I was at R & D

16:38:17 23    training sessions and strategies, but none of this was

16:38:20 24    relevant to Akoustis.

16:38:20 25                    DIRECT EXAMINATION

Aichele - direct

16:38:25  1    BY MR. ELKINS:

16:38:25  2    Q.      Okay.  I'm going to shift gears now.  And we'll

16:38:35  3    conduct your direct examination by Akoustis.  And just

16:38:40  4    because we didn't give you an opportunity at the start, the

16:38:46  5    jury already knows your name.  Can you tell the jury a

16:38:48  6    little bit more about yourself?

16:38:50  7    A.      Sure.  My name is Dave Aichele.  I live in

16:38:56  8    Huntersville, North Carolina.  I have lived there for

16:38:58  9    twenty-four years.  I am executive vice-president of

16:39:01 10    business development at Akoustis, I have been there for nine

16:39:03 11    years, pretty much from the start, I was one of the first

16:39:06 12    five employees before we became public.  It's been a very

16:39:10 13    enjoyable ride for the last nine years.  I have been married

16:39:14 14    for thirty years coming this year, I have two fantastic

16:39:17 15    kids, one is a boy and one is a girl, I actually shouldn't

16:39:21 16    say they are kids, they're adults now, so that's a short

16:39:24 17    introduction.

16:39:26 18    Q.      Congratulations on the thirty years and adulting

16:39:31 19    children.  So in your own words, can you describe Akoustis's

16:39:35 20    business for the jury?

16:39:35 21    A.      Yeah, Akoustis is a RF, you know, majority of our

16:39:40 22    effort is as an RF BAW filter company.  Focusing on where a

16:39:46 23    lot of our investment and activity is in RF BAW technology,

16:39:51 24    delivering high frequency ultra wideband width, that's where

16:39:57 25    we try to differentiate.  Targeting right now, the main

Aichele - direct

16:40:00  1    markets we focus on are Wi-Fi access points, 5G

16:40:05  2    infrastructure, which are base stations, also really

16:40:09  3    investing a lot of time and effort into the defense market

16:40:11  4    and more recently the automotive market and then 5G mobile,

16:40:16  5    so those are our main focuses.

16:40:18  6    Q.    Can you just elaborate a little bit, I think

16:40:21  7    Mr. DeFosse asked you a little bit about it, so I don't want

16:40:25  8    you to repeat anything that you said, but give a little more

16:40:29  9    closer regarding what your role is as executive Vice

16:40:32 10    President of Business Development?

16:40:32 11    A.    Yeah, I tried to, besides being the title of

16:40:37 12    executive vice-president of business development, I try to

16:40:41 13    be included within the organization as well, really staying

16:40:44 14    connected to all the different work centers within the

16:40:47 15    company.  I just enjoy working from a technical aspect and

16:40:51 16    an operational aspect.  But I head up the front end of the

16:40:55 17    company as well, so sales, marketing, business development,

16:40:58 18    and also product management, and then also I am an

16:41:03 19    application engineer, as well.

16:41:04 20    Q.    For those who are not in business development itself,

16:41:07 21    can you describe what is the distinguishing characteristics

16:41:13 22    are of business development versus marketing?

16:41:15 23    A.    So, so sales, you know, obviously focused on selling

16:41:21 24    products that you have today.  Business development is more

16:41:24 25    in driving product strategies, market strategies and being

Aichele - direct

16:41:28  1    one of the first, you know, roles that engages with tier one

16:41:34  2    customers that you want to really develop a product

16:41:36  3    portfolio, so they work closely, internally, to drive the

16:41:41  4    product strategies, but they work externally as well with

16:41:45  5    the sales organization to keep customers.

16:41:47  6    Q.    You mentioned product management, can you explain

16:41:50  7    that briefly?

16:41:51  8    A.    Yes, product management is a role within Akoustis, it

16:41:55  9    varies between different companies, but it's a role within

16:41:58 10    Akoustis that's responsible for what we call NPI, new

16:42:03 11    product introduction, the role is to manage, they don't

16:42:06 12    manage people directly, they really manage the process and

16:42:09 13    the product development, but take the concept, which is what

16:42:11 14    we call cradle, and bring it to production release, and then

16:42:15 15    ultimately to end of life, which is the grave.  So it's that

16:42:19 16    development process that they manage which is a gate phase

16:42:23 17    program to go from concept through to production and

16:42:26 18    release.

16:42:26 19    Q.    You also mentioned applications engineering briefly,

16:42:30 20    what is that?

16:42:30 21    A.    Application engineering is a resource within the

16:42:33 22    company that is really addressing technical inquiries and

16:42:38 23    standards bodies, helping customers ultimately trying to get

16:42:42 24    our products designed into their end application.

16:42:46 25    Q.    So you already testified with Mr. DeFosse that you

Aichele - direct

16:42:52  1  joined Akoustis in 2015.  Have you been the executive Vice

16:42:58  2  President of Business Development since you joined?

16:42:59  3  A.      No.  I actually started in May of 2015, so it's going

16:43:04  4  on nine years this month, and I started as a VP of business

16:43:08  5  development.  Had that role for about five years, and then

16:43:11  6  was promoted to executive Vice President of Business

16:43:14  7  Development and had that role for about four years.

16:43:16  8  Q.      Did your role change at all when you were promoted?

16:43:19  9  A.      No, not really.

16:43:20 10  Q.      Can you tell us a little bit about -- actually tell

16:43:23 11  us what you can about your higher education background?

16:43:27 12  A.      I have a bachelors of science in electrical

16:43:31 13  engineering that I received from Ohio University.

16:43:34 14  Q.      Do you have any other degrees?

16:43:35 15  A.      Yes, I also have a masters in business administration

16:43:39 16  from University of Colorado in Boulder, which has an

16:43:42 17  emphasis on technical marketing.

16:43:45 18  Q.      You testified earlier that you came to Akoustis from

16:43:49 19  T1V.  Can you tell us what T1V's business is?

16:43:54 20  A.      T1V, which used to be called T1 Vision, so I was

16:43:59 21  executive vice-president of sales and marketing there.  It

16:44:01 22  is an interactive software company focusing on mainly the

16:44:08 23  enterprise market.

16:44:08 24  Q.      How long were you at T1V?

16:44:11 25  A.      About two-and-a-half years.

Aichele - direct

16:44:12  1   Q.      I think you testified that you were there from 2012

16:44:18  2   through --

16:44:18  3   A.      2012 to basically the beginning of 2015.

16:44:23  4   Q.      Okay.  And before that you were at RFMD, correct?

16:44:25  5   A.      Yes, correct, I was at RFMD.

16:44:27  6   Q.      And you testified that you were there from 2004 all

16:44:31  7   the way through to 2012?

16:44:33  8   A.      2012, I think it was to the end of 2012, so almost

16:44:38  9   nine years.

16:44:39 10   Q.      Did you ever work at Qorvo?

16:44:40 11   A.      No, I did not.

16:44:42 12   Q.      What was your role or what was your position at RFMD?

16:44:47 13   A.      My position at RFMD mainly was director of business

16:44:51 14   development, where I was responsible for doing what I

16:44:53 15   defined as business development role for really three

16:44:56 16   categories, one was what we called high power amplifiers

16:44:59 17   which was a technology called gallium nitride, also

16:45:02 18   responsible for you know, high rail devices, which are used

16:45:07 19   in space applications in NASA, and then also high frequency

16:45:12 20   what they call gas mimic, which is targeting applications

16:45:16 21   like point to point radio, that was my main responsibility.

16:45:20 22   I also had other roles while I was there, I managed a

16:45:22 23   portion of the sales department for about a year-and-a-half.

16:45:26 24   I also managed the gallium nitride high power amplifier

16:45:31 25   engineering group for about a year-and-a-half, as well.

Aichele - direct

16:45:33  1    Q.      Did you do any work regarding BAW filters at RFMD?

16:45:36  2    A.      No, I did not.

16:45:38  3    Q.      Did RFMD design or manufacture BAW filters when you

16:45:41  4    worked there?

16:45:41  5    A.      No, they did not.  You know, the formation of Qorvo

16:45:46  6    is when they got access to the BAW technology, and that

16:45:49  7    happened between the merger of RFMD and TriQuint, in the

16:45:54  8    beginning of 2015.  TriQuint had BAW technology, RFMD did

16:45:58  9    not, so once the two companies merged, then that's where the

16:46:03  10   Qorvo BAW technology came from.

16:46:05  11   Q.      Before we -- I would like to take you through, and

16:46:09  12   very briefly, but through Akoustis's history, but I think it

16:46:13  13   would help the jury to understand just a very basics, the

16:46:18  14   ABC's of the semiconductor design and manufacturing flow.

16:46:25  15   So most people have heard the term semiconductor.  You have

16:46:29  16   been in the industry for quite a while.  What does it mean?

16:46:32  17   A.      Yeah.  It's not an easy concept to truly grasp unless

16:46:37  18   you actually lived it.  But semiconductor crosses -- I think

16:46:40  19   everybody knows an integrated like an Intel Pentium chip

16:46:45  20   that is used in computer or a Qualcomm chip that is used in

16:46:48  21   mobile phones so those are integrated circuits that are

16:46:52  22   either digital or you can have analog.

16:46:54  23          So the semiconductor process is actually the

16:46:56  24   process where you will fab these integrated circuits on a

16:47:00  25   substrate or a whichever was in a foundry or fab, and this

Aichele - direct

16:47:04 1   is a parallel manufacturing process that you can create,

16:47:07 2   thousands, tens of thousands of dies on a single substrate,

16:47:10 3   so the economy of scales are very good to produce high

16:47:14 4   volume, and obviously drive the cost down, but it's a very

16:47:18 5   high-tech process.

16:47:19 6   Q.    So say I have an idea to make a new semiconductor

16:47:24 7   device, let's say I want to make a new BAW filter, what's

16:47:28 8   the first step toward taking that idea to, that concept to?

16:47:34 9   A.    I think the first step is really defining the

16:47:37 10  specification, and that specification is going to be used as

16:47:42 11  you bring the concept of the design all the way from design

16:47:46 12  phase to production.

16:47:48 13  Q.    Okay.  How are the specifications determined?

16:47:50 14  A.    Mainly in two ways, I think, one is really soliciting

16:47:56 15  customer feedback and really looking at it, you can do it

16:47:59 16  from two ways, one you actually focus on one customer where

16:48:04 17  they give you the specifications or you're collecting all

16:48:07 18  the different customers and trying to find a solution that

16:48:10 19  would address the majority of those customers basis.

16:48:13 20          So an example is if you're looking at buying

16:48:17 21  access points, I mentioned the mobile, or I should say the

16:48:22 22  home market segment, Netgear, Google, you would collect

16:48:26 23  information from those guys because you don't want to do a

16:48:30 24  specific product, you want to try to cover all of them, you

16:48:33 25  would collect that information and try to define the spec to

Aichele - direct

16:48:36 1   give to the team to start going after.

16:48:39 2   Q.    What I would like to do is kind of explore that idea

16:48:42 3   just a little bit with a document.

16:48:44 4            MR. ELKINS:  Your Honor, may I approach the

16:48:45 5   witness?

16:48:46 6            THE COURT:  You may.

16:48:55 7   BY MR. ELKINS:

16:49:03 8   Q.    Mr. Aichele, I have handed you what was marked for

16:49:06 9   identification as exhibit DTX 0560.  Do you recognize it?

16:49:15 10  A.    Yes, I do.

16:49:16 11  Q.    What is it?

16:49:17 12  A.    This is actually a letter that I sent to Malcolm

16:49:21 13  Asher, who is part of Peloton Systems, which is a company

16:49:26 14  that is located in Israel.

16:49:28 15  Q.    Why were you sending him a letter?

16:49:30 16  A.    This is actually, there were two ways that we really

16:49:34 17  went to market, one is to develop custom products or

16:49:37 18  products that customers would pay NRE, which is called

16:49:41 19  nonrecurring engineering charge, the other way is we develop

16:49:44 20  what I call a catalog part, this is an example of us

16:49:48 21  providing him a statement of work, you know, and really

16:49:52 22  making sure that the specifications that were defined in

16:49:56 23  this statement were, he understands what we're committed to

16:50:00 24  delivering.

16:50:01 25           MR. ELKINS:  Your Honor, we'll move what's been

Aichele - direct

16:50:03  1    marked as DTX 0560 into evidence.

16:50:07  2                THE COURT:  Without objection, marked and

16:50:09  3    received as 152.

16:50:11  4                (Trial Exhibit No. 152 was admitted into

16:50:13  5    evidence.)

16:50:13  6                MR. ELKINS:  I'm sorry, Your Honor, 152?

16:50:15  7                THE COURT:  152.

16:50:16  8                MR. ELKINS:  Thank you.

16:50:20  9    BY MR. ELKINS:

16:50:22 10    Q.    Mr. Aichele, in what's now been marked as Trial

16:50:25 11    Exhibit 152, is a section entitled description, and there

16:50:30 12    are two charts below that.  And there are some drawings also

16:50:39 13    that says proposed package.  Let's first focus on the first

16:50:45 14    chart, which says specifications, electrical

16:50:48 15    characteristics.  What's described there?

16:50:50 16    A.    These are small signals, install signals means low

16:50:55 17    power, and defining critical functions or critical

16:50:59 18    parameters for a filter.  And the customer specs are the

16:51:04 19    ones that are in the white column, and then you can see on

16:51:08 20    the right with the Akoustis, we say okay, and that means

16:51:11 21    that we can meet the specifications.

16:51:14 22    Q.    So was the source of the electrical and mechanical

16:51:20 23    specifications here ELTA?

16:51:22 24    A.    Correct.

16:51:23 25    Q.    What is the proposed package drawing below?

Aichele - direct

16:51:27  1    A.    The proposed package is their request or

16:51:30  2    recommendation on the, you know the package outline that

16:51:35  3    they would like to see.

16:51:38  4    Q.    How often do customers provide specifications like

16:51:41  5    this?

16:51:41  6    A.    You know for NRE projects, all the time, because it

16:51:45  7    is a contract between us and the customer that we want to

16:51:48  8    make sure that we all agree, you know what we're going to

16:51:51  9    target.  And in general, you will always receive

16:51:55 10    specifications for mark up and feedback, specifications will

16:52:00 11    define, I look at every customer that we engage with, I

16:52:04 12    really need to know what they're asking for so that we can

16:52:07 13    be successful.

16:52:08 14    Q.    Now, do you -- are all of Akoustis BAW filter

16:52:14 15    products, do they all come from unique customer

16:52:19 16    specifications?

16:52:19 17    A.    Not always.  As I mentioned earlier, when we do

16:52:23 18    custom products it's going to be a unique specification.

16:52:27 19    And sometimes we'll try to make it a dual use part where

16:52:30 20    we're actually designing it for this one customer, and the

16:52:34 21    agreement is we can sell this out in the open market as

16:52:37 22    well.  The other one is we receive multiple inputs from many

16:52:41 23    different customers and then we try to create what we call a

16:52:45 24    catalog part, or a marketing part, but a lot of that is

16:52:49 25    getting feedback and questioning their specifications.

Aichele - direct

16:52:51 1   Q.      With how many customers will you discuss a set of

16:52:55 2   proposed specifications before you make a go or no go

16:53:00 3   decision regarding one of these more general parts?

16:53:03 4   A.      Yes, a standard product.  Yeah, I would say we want

16:53:07 5   to at least have two to three tier one customers input, and

16:53:13 6   tier one are defined as the markets leaders in that

16:53:17 7   particular market segment.  And then we'll probably get a

16:53:20 8   couple of tier two as well, so I would say up to about five.

16:53:24 9   Q.      Can you give us an example of who might be a tier one

16:53:28 10  type customer and who might be a Type 2?

16:53:30 11  A.      Yeah.  So if I look at the enterprise market, which

16:53:33 12  are the routers that you see outside in the hallway in the

16:53:36 13  courtroom, you know, tier one is going to be Cisco company,

16:53:39 14  I think everybody may recognize Cisco brand, the other one

16:53:42 15  is HPE Aruba, those are two that I call tier ones and then I

16:53:48 16  would put Extreme or there is a couple of other smaller

16:53:52 17  players as tier two, so Cisco owns forty-five, fifty percent

16:53:57 18  of the market, so I definitely want to get their feedback

16:54:00 19  and then I would continue to go down that list.

16:54:03 20  Q.      So we were talking, I was asking you about taking

16:54:07 21  concept, taking the semiconductor product concept to

16:54:14 22  execution, and we talked about the specifications, what

16:54:19 23  happens after you have a set of specifications?

16:54:22 24  A.      With respect to BAW filters, the next step is once we

16:54:26 25  have the specification defined then you get into the design

Aichele - direct

16:54:29  1    phase.  And so the main thing is that our device and

16:54:32  2    modeling team will create resonator models, and resonator

16:54:36  3    models are really the building block of a filter, of a BAW

16:54:40  4    filter.  Those resonator models are provided to the

16:54:44  5    software, or to I should say two design engineers and they

16:54:47  6    utilize an EDA, which is a software to start doing the

16:54:51  7    design, start doing the simulations.

16:54:54  8            So that is really the next phase where they go

16:54:56  9    from having the models to actually doing the simulations to

16:55:00  10   locking down the design and then we do what we call a cross

16:55:04  11   functional design review, so you have all different aspects

16:55:07  12   of the company looking at the design.  And then basically

16:55:10  13   freeze, that design, there may be some design variance.

16:55:14  14   Q.    Did you mention EDA?

16:55:16  15   A.    So Electronic Data Achievement software, it's a tool

16:55:22  16   that the designers use to do design simulations.

16:55:26  17   Q.    Once you have your design locked, what happens next?

16:55:31  18   A.    Then it moves into the manufacturing phase.  So the

16:55:35  19   next step is as I mentioned, semiconductor process, is you

16:55:40  20   know, creating what they call mask, and mask is used to

16:55:45  21   print integrated circuits on to a substrate, whichever, the

16:55:50  22   layout is done on the mask and you cure the mask and then

16:55:53  23   you run it through the fab or the foundry depending on if

16:55:56  24   your Fab less, and then once the wafers are completed

16:56:00  25   they're tested and then they move to the next phase.

Aichele - direct

16:56:03  1    Q.      You mentioned something, fabless.  What does that

16:56:06  2    mean?

16:56:06  3    A.      So some companies are, the history of Akoustis we

16:56:11  4    were fabless for about four years.  And that is we used an

16:56:16  5    outside foundry, so an outside foundry is a third party that

16:56:20  6    will actually take our designs and use their processes to

16:56:24  7    manufacture your own products, you own the product, you

16:56:27  8    don't own the process.  A fab company actually owns the

16:56:30  9    manufacturing semiconductor fab.

16:56:32 10    Q.      So is the word fab and the term foundry, are they

16:56:39 11    synonymous?

16:56:41 12    A.      Not really.  If you use fab, if you own your own fab,

16:56:45 13    but you can also, sort of, so an example is Akoustis now

16:56:49 14    offers foundry services for our BAW filter, we offer foundry

16:56:55 15    services even though we own the fab, so they're not

16:56:59 16    typically synonymous.

16:57:01 17    Q.      Once the part is in the fab, or foundry, what happens

16:57:06 18    next?

16:57:07 19    A.      So going through the fab is really what we call the

16:57:11 20    front end of the process, you actually have the devices, you

16:57:15 21    know that are manufactured on a carrier substrate which a

16:57:18 22    wafer.  Once you're done with the front end, which you

16:57:22 23    actually test, you create a pick map, you then send it off

16:57:27 24    to the back end of the process, which is grinding the wafer

16:57:31 25    down and then you dice it, which really means you cut it up,

16:57:35  1    if I got one wafer and I dice it, I now create 10,000 or

16:57:40  2    20,000 or 40,000 dies, and those dies with the pick map are

16:57:44  3    sent to the assembly house that will actually pick the die,

16:57:48  4    place it in a package, which is really the packages, and

16:57:51  5    making an electrical, so it's mechanical cover, and then

16:57:56  6    also electrical connection, and then they test it and then

16:57:59  7    it ships off to the end customer.

16:58:01  8    Q.    So now I would like to cover a little bit of

16:58:06  9    Akoustis's chronology.  I want to start with what Akoustis

16:58:09 10    was doing when you joined in April or May of 2015?

16:58:14 11    A.    Yeah.  So this is very small, there was only five of

16:58:18 12    us at the time, and it really was the R & D phase of the

16:58:21 13    company.  You know, it was focusing on single crystal

16:58:26 14    technology and developing bulk acoustic wave resonators,

16:58:31 15    which is the building block of the filter, and eventually

16:58:34 16    filters.  Really focusing on a very attractive market

16:58:38 17    segment at the time.  You know that market segment at the

16:58:42 18    time that I joined was really dominated by two players, one

16:58:47 19    involving Broadcom, which was a big player, owned a majority

16:58:52 20    of the market, and the other was Qorvo through the

16:58:55 21    acquisition through R & D and trade market, which was the

16:58:58 22    other player, this was an opportunity to bring a new

16:59:01 23    innovative technology to the market and potentially be a

16:59:05 24    third player in the market.

16:59:07 25    Q.    Why did Akoustis focus on BAW filters as opposed to

Aichele - direct

16:59:12 1    perhaps a multifaceted approach?

16:59:15 2    A.    One is, you know, too much distractions, you don't

16:59:20 3    execute.  So it really was a hyper focus on making single

16:59:24 4    crystal technology and developing the best bulk acoustic

16:59:31 5    wave technology is the main focus and the market segment was

16:59:33 6    very attractive, so we actually went public, and that was

16:59:36 7    the catalyst that allowed us to continue to fund the company

16:59:40 8    through the stages, we really had to address three things,

16:59:44 9    funding the company, bringing the technology to the market

16:59:46 10   and finding a way to penetrate the markets as well.

16:59:49 11   Q.    You mentioned that the market segment was very

16:59:52 12   attractive.  Why was it attractive in your view?

16:59:56 13   A.    The point I think I raised earlier was it was a very

17:00:00 14   large market, multiple billions of dollars, mainly used in

17:00:04 15   the mobile phone, one good example is Apple, it is

17:00:09 16   absolutely a major player, a tier one player, and they use a

17:00:13 17   lot of BAW filters in their architectures, and it was really

17:00:17 18   accommodated by two key players, Broadcom and Qorvo, and

17:00:21 19   there was innovation that we believe that could be brought

17:00:24 20   to the market that could differentiate and we could grab a

17:00:28 21   piece of that market segment.

17:00:29 22   Q.    Now, you also mentioned the phrase single crystal, we

17:00:34 23   have heard some other testimony about it before you arrived.

17:00:37 24   But what does it mean to you?

17:00:39 25   A.    Single crystal is a, you know crystalline deposition

Aichele - direct

17:00:44 1    of materials, what they call, you know, three five materials

17:00:50 2    that are on the compound chart, and it's a deposition of

17:00:55 3    this crystal material that aligns with the orientation of a

17:00:59 4    substrate, so it creates very high performance materials,

17:01:05 5    you know and it can be different compositions of different

17:01:09 6    materials.

17:01:09 7    Q.    Why did single crystal become a focus for the

17:01:14 8    company?

17:01:14 9    A.    Single crystal was in the industry for many years,

17:01:18 10    you know, prior to the formation of Akoustis and it's used

17:01:21 11    in active place, so a good example of it is gallium nitride

17:01:25 12    is a high powered, it is used in high power RF amplifiers

17:01:31 13    that are used in defense applications for radar or base

17:01:35 14    station, and it's also used in high voltage applications

17:01:39 15    like you know, devices that would go into -- so the concept,

17:01:45 16    Jeff Shealy as the founder really had the idea, and he's

17:01:48 17    been a material scientist for many years, he had the idea of

17:01:51 18    let's take single crystal and let's apply it to bulk

17:01:56 19    acoustic wave, passive devices.

17:02:05 20    Q.    What role, if any, did industry standards have to

17:02:10 21    play in your view regarding the attractiveness of the BAW

17:02:15 22    filter market going forward?

17:02:17 23    A.    The main thing when we started was the 4G LTE, so

17:02:24 24    everybody at the time in early 2010 to 2015, 4G LT was on

17:02:32 25    everybody's phone.  That's when we came in and looked at

Aichele - direct

17:02:36  1   diving into that market segment, I found it to be very

17:02:39  2   difficult to penetrate that market segment, so I started

17:02:43  3   looking at the standards, looking at 5G, which is on

17:02:48  4   horizon, the 4G/5G standards that usually evolve every ten

17:02:52  5   years, so 5G was on the standard, and it was moving up

17:02:56  6   higher in frequency.  And also I started looking at other

17:02:59  7   standards, the Wi-Fi is what we call IEEE, that's a standard

17:03:03  8   which was also developing and utilizing higher frequencies

17:03:06  9   as well.  So I started looking at our technology and trying

17:03:10 10   to find a way to push the company and our development phase

17:03:14 11   into higher frequencies.

17:03:19 12   Q.     Mr. Aichele, I would like to use another document to

17:03:25 13   punctuate your testimony.

17:03:34 14              MR. ELKINS:  Your Honor, may I approach the

17:03:35 15   witness?

17:03:36 16              THE COURT:  You may.

17:03:49 17   BY MR. ELKINS:

17:03:51 18   Q.     Mr. Aichele, what I have handed you and what you have

17:03:54 19   in front of you now has been marked for identification as

17:03:58 20   PTX 694.  Do you recognize it?

17:04:02 21   A.     Yes, I do.

17:04:03 22   Q.     What is it?

17:04:05 23   A.     Even without my glasses, August 2018 investor

17:04:10 24   presentation.

17:04:11 25   Q.     What is an investor presentation?

Aichele - direct

17:04:15  1    A.      An investor presentation is used, you know, by the

17:04:20  2    company to educate, you know, the investor market primarily,

17:04:26  3    the main continuing thing that we were doing at the time was

17:04:29  4    continuing to raise money to fund the company.  So the

17:04:32  5    investor we want to highlight key things about the company,

17:04:36  6    executive management, also key milestones that you're able

17:04:39  7    to achieve and where you differentiate.  And obviously the

17:04:44  8    big one is the attractiveness of the market you're

17:04:47  9    targeting.

17:04:47 10    Q.      Does Akoustis create investor presentations on a

17:04:52 11    regular basis?

17:04:53 12    A.      Yes.  We periodically update the investor decks just

17:04:57 13    to make sure that it's fresh and it's got the latest

17:04:59 14    information.

17:05:00 15    Q.      And deck, is that another word for presentation?

17:05:04 16    A.      Investor presentation.

17:05:05 17    Q.      What involvement, if any, do you have in preparing

17:05:09 18    investor presentations?

17:05:10 19    A.      Mainly inputs, you know, so I don't manage the IR

17:05:17 20    side of the company, which is really the responsibility of

17:05:19 21    creating these investor presentations.  Obviously I have

17:05:23 22    very good visibility to the markets and I provide inputs to

17:05:27 23    help them script the message.

17:05:29 24    Q.      When you use jargon like IR, I'm going to ask you

17:05:33 25    what it means?

Aichele - direct

17:05:34 1   A.      Investor relations.

17:05:37 2            MR. ELKINS:  Your Honor, we move what's been

17:05:38 3   marked for identification as PTX 0694 into evidence.

17:05:44 4            THE COURT:  Marked and received as 153, I

17:05:46 5   believe.

17:05:46 6            (Trial Exhibit No. 153 was admitted into

17:05:47 7   evidence.)

17:05:47 8   BY MR. ELKINS:

17:05:49 9   Q.      Mr. Aichele, could you please turn to page 5 of Trial

17:05:53 10  Exhibit 153.  And it should have milestones achieved?

17:05:59 11  A.      Yes, I'm there.

17:06:00 12  Q.      What is depicted on this presentation slide?

17:06:03 13  A.      It's a linear chronology of major milestones or you

17:06:08 14  know, I guess notable milestones from the beginning of the

17:06:11 15  company in May 2014 all the way to August of 2018.

17:06:16 16  Q.      I would like to walk through just a handful of

17:06:19 17  milestones just so we can get a better picture regarding

17:06:22 18  Akoustis's history.  So the first one I would like to ask

17:06:26 19  you about is below the blue timeline.  And I believe it says

17:06:34 20  July 16th, produced World's first single crystal BAW RF

17:06:39 21  filters.  What does that mean?

17:06:41 22  A.      You know, as I mentioned when I joined, you know, we

17:06:45 23  were in that R & D phase and we were working with an outside

17:06:49 24  foundry, which is a partnership we created.  And it was an

17:06:54 25  agreement that we made that we owned the process but they

Aichele - direct

17:06:56  1   were the foundry to actually produce it.  And working with

17:07:00  2   them, we had actually created what we believe is the world's

17:07:05  3   first single crystal BAW filter.

17:07:08  4   Q.      Above the blue line, if you go above and to the right

17:07:12  5   to November 16th, you'll see November 16 first 2.5-gigahertz

17:07:20  6   3.7-gigahertz single crystal filters.  Why is that a

17:07:25  7   milestone?

17:07:25  8   A.      So that first milestone we just discussed probably

17:07:29  9   really didn't you know, have a lot of definition on the

17:07:32 10   specifications we had demonstrated a resonator performance

17:07:36 11   and actually produced a BAW filter response.  This one up

17:07:41 12   here, you know, it's more focused on two reasons, one is

17:07:45 13   that we've actually got center frequencies that we're

17:07:49 14   focusing on, 2.5 and 3.7 and the other aspect is what I

17:07:53 15   highlighted moving up higher frequency, traditional BAW

17:07:57 16   filters in the mobile market operating in 1.8 to

17:08:01 17   2.7-gigahertz.  So we're pushing it up into the higher

17:08:06 18   frequencies, 3.7 is a good example.

17:08:09 19   Q.      Okay.  I would like to jump about six months later in

17:08:12 20   the timeline, still, now we're on the bottom, and it's

17:08:18 21   May 17th, it says first 5.8-gigahertz BAW demo wafer from

17:08:26 22   NYSTC fab, can you explain that to us?

17:08:28 23   A.      There is two main things to note.  One is we have now

17:08:32 24   pushed it up to 5.8-gigahertz.  So this was a major

17:08:36 25   milestone, and the other one is we actually demoed this out

Aichele - direct

17:08:40  1  of a new partnership collaboration we had with New York STC

17:08:46  2  MEMS, so we were working in an outside foundry, we were

17:08:49  3  having a lot of problems with that outside foundry, the

17:08:52  4  equipment set wasn't optimal, the yields were very poor,

17:08:56  5  they were delivering very minimal amount of usable die, so

17:09:02  6  we started searching the market for another partner and we

17:09:06  7  identified STC MEMS as that partner, and this was the first

17:09:10  8  deliverable out of the collaboration with STC MEMS.

17:09:14  9  Q.    So following a month later we're now on top of the

17:09:18  10  blue timeline, and it's noted as a key event, June 17th

17:09:24  11  closed the acquisition of 150-millimeter STCNC Fab, what's

17:09:31  12  that?

17:09:32  13          THE COURT:  Be sure to state the year.

17:09:35  14          MR. ELKINS:  I'm sorry?

17:09:36  15          THE COURT:  Be sure you state the year each

17:09:38  16  time.

17:09:39  17          MR. ELKINS:  I'm sorry, June 2017, closed

17:09:42  18  acquisition of 150 STC New York Fab.

17:09:48  19          Thank you.

17:09:48  20  A.    Yeah, so this, if you read that May 17th, 2017, date,

17:09:53  21  that was a trial run with STC MEMS, where we took the

17:09:58  22  process that we owned at the outside foundry, transferred it

17:10:01  23  into the STC MEMS facilities, produced the results which

17:10:05  24  gave confidence to Akoustis and the Board of Directors, and

17:10:10  25  then at the time SSTC MEMS was owned by the State of New

Aichele - direct

17:10:14  1   York, it was a facility run by SUNY, the State University of

17:10:20  2   New York and the state negotiated with us to acquire the

17:10:24  3   full facility.  So we acquired a 130,000 square foot

17:10:30  4   facility from the State of New York and brought all the

17:10:33  5   employees in to Akoustis.

17:10:34  6   Q.    What did the New York Fab do before Akoustis acquired

17:10:37  7   it in June 2017?

17:10:38  8   A.    So STC MEMS, so MEMS is a micro electrical,

17:10:44  9   electrical mechanical solutions, and they were a center of

17:10:48 10   excellence for MEMS, so they were really the foundry for

17:10:51 11   customers that were fabless that needed access to MEMS

17:10:55 12   processes to develop devices that go into their end

17:10:59 13   products.

17:11:00 14   Q.    Okay.  Let's speed this along.  We're going to go to

17:11:04 15   the right of that, in September 2017, industry's first

17:11:07 16   single crystal 5-gigahertz Wi-Fi BAW RF filter protos to

17:11:14 17   multiple clients.  You're going to have to decode that one

17:11:19 18   for us.

17:11:19 19   A.    There is two major things here.  You know, as I

17:11:22 20   mentioned in the outside foundry that we had, we were really

17:11:25 21   concerned about the manufacture-ability.  Once we moved it

17:11:29 22   into the STC MEMS Fab, we would stabilize it, we probably

17:11:34 23   hadn't probably, we had not gotten to acceptable yields.

17:11:38 24   And that didn't stop us from saying that we want to start

17:11:43 25   sampling devices to customers, so we had to select a few

17:11:47  1   customers that we sampled to really get technical feedback

17:11:51  2   so that we can continue to make improvements in the design.

17:11:58  3   Q.      Let me move to the right.  And down below the line to

17:12:05  4   March of 2018.  XB1 process frozen, begin qualification.

17:12:12  5   What is XB1 process mean?

17:12:15  6   A.      So that's a very key milestone.  When we were in the

17:12:19  7   outside foundry, we had a process that we called cavity

17:12:25  8   back, so it's what they call a FBAR, like which is a

17:12:29  9   freestanding bulk acoustic resonator structure if you look

17:12:32 10   at the cross-section of it, and cavity back is you have the

17:12:39 11   cavity on the back of the filter to create that air cavity

17:12:42 12   on the top and bottom.

17:12:44 13           It was a hard process, when we transferred it

17:12:46 14   into the STC MEMS, it really was analyzed by the operations

17:12:51 15   and the process engineers, this is not a process, this

17:12:53 16   cavity back process is not something we can go to market, so

17:12:57 17   it was a combination of our device engineers at Akoustis

17:13:01 18   that worked very closely with the process engineers, who had

17:13:05 19   a lot of MEMS experience to take the bulk acoustic wave

17:13:10 20   experience, take the MEMS experience and they created what

17:13:13 21   we call XBAW, which is the trademark we use, XB1 is actually

17:13:19 22   the first process that came out of that.

17:13:22 23           We had spent a significant amounts of time

17:13:25 24   developing this new XBAW process, and what's key here, is we

17:13:30 25   got to the point where we froze it, once you froze it, you

Aichele - direct

17:13:33  1   start qualification, in the industry if you do not lock down

17:13:36  2   and qualify a process, you cannot go to production, that is

17:13:40  3   something that every fab company wants to make sure you got

17:13:43  4   a process that you feel confident that any product you

17:13:46  5   deliver is going to be robust.  So this was a very key

17:13:50  6   milestone for us.

17:13:51  7   Q.    Last milestone I'm going to ask you with is right

17:13:55  8   before March 2018, AKF 1252, BAW RF filter product

17:14:03  9   announcement, why was that a milestone?

17:14:07 10   A.    If you go back to that September 17th, 2017,

17:14:11 11   statement you can see I didn't really specify that that was

17:14:13 12   a 5.2-gigahertz filter, it was just our first filter, now

17:14:18 13   that we have got a process that we have locked down and we

17:14:21 14   started qualification, we are starting to accelerate really

17:14:25 15   creating a product that we can get out to the market so that

17:14:28 16   was the first AKF 1252, it was one of the first products

17:14:32 17   that we made a product announcement and started sampling to

17:14:37 18   multiple customers.

17:14:41 19   Q.    We can take that one down.  I am going to show you

17:14:45 20   another document.

17:14:47 21   A.    Okay.

17:15:00 22           MR. ELKINS:  May I approach, Your Honor?

17:15:02 23           THE COURT:  You may.

17:15:08 24   BY MR. ELKINS:

17:15:20 25   Q.    I've handed you, Mr. Aichele, what has been premarked

Aichele - direct

17:15:23 1   for identification as PTX 0403.  Do you recognize it?

17:15:30 2   A.    Yes, I do.

17:15:31 3   Q.    Can you tell us what it is?

17:15:33 4   A.    It's a product catalog.

17:15:36 5   Q.    From?

17:15:38 6   A.    From Akoustis.

17:15:39 7   Q.    Okay.  And is there a date on it?

17:15:44 8   A.    It's a 2023 product catalog from Akoustis.

17:15:47 9   Q.    What's the purpose of a product catalog?

17:15:50 10  A.    A product catalog is really a marketing tool or

17:15:53 11  literature, you know, that the sales organization can share

17:15:57 12  with customers, distributors, and for customers to really

17:16:01 13  look through to identify products that may be of interest

17:16:04 14  and meet their requirements.

17:16:07 15  Q.    What was your involvement with the creation of this

17:16:12 16  2023 product catalog marked PTX 0403, if any?

17:16:17 17  A.    Mainly supervision and then final approval,

17:16:21 18  authorization.

17:16:23 19           MR. ELKINS:  Your Honor, we move what was marked

17:16:25 20  as PTX 0403 into evidence.

17:16:27 21           THE COURT:  Marked and received as 154.

17:16:31 22           (Trial Exhibit No. 154 was admitted into

17:16:32 23  evidence.)

17:16:32 24           MR. ELKINS:  Thank you.

17:16:33 25  BY MR. ELKINS:

Aichele - direct

17:16:33  1    Q.      Mr. Aichele, I'm going to ask you to turn to page 3

17:16:40  2    of -- and this is presentation page 3.  This has at the very

17:16:55  3    top the term XBAW, which you talked a little bit in

17:17:00  4    connection with the milestone timeline.  So this is a -- I

17:17:08  5    think it's two pages worth of explanation regarding XBAW.

17:17:13  6    Why is it being highlighted in the product catalog?

17:17:16  7    A.      Yeah, a lot of the investment that we're making on

17:17:20  8    the company is with respect to the market opportunities and

17:17:23  9    the technology of our XBAW technology.  So it is the main

17:17:28 10    focus on the technology side that we want to make sure that

17:17:31 11    we're educating the customers.

17:17:39 12    Q.      Have you heard -- and actually I made a mistake, I

17:17:46 13    think on the milestone schedule, or excuse me, on the

17:17:51 14    milestone timeline, it's actually, there is something called

17:17:58 15    XB1 process frozen?

17:18:00 16    A.      Right.

17:18:01 17    Q.      And what I should have asked you, is there a

17:18:05 18    relationship between the XBAW and XB1?

17:18:08 19    A.      I think I mentioned that but just to reiterate, the

17:18:12 20    XBAW is a trademark, which is the overriding definition of

17:18:15 21    our process.  If you look at XBAW, there is really five

17:18:19 22    pillars that we emphasize of where we believe this

17:18:22 23    technology is differentiable and again it's this combination

17:18:29 24    of a MEMS process, our original process that we introduced,

17:18:32 25    and you know the XBAW is an overriding.  XB1 is considered

Aichele - direct

17:18:37  1   to be the first process, so it has a certain, you know, flow

17:18:41  2   that it follows, certain, what they call traveler within the

17:18:46  3   fab.

17:18:48  4   Q.    Okay.  Can we turn to presentation page 5, please,

17:18:54  5   Mr. Brown.  And it should be solutions at the top.

17:18:59  6         So at the very top of this page is a description

17:19:06  7   of XBAW RF BAW filters, I think we've heard what those are.

17:19:12  8   Underneath it, though, it talks about something called an

17:19:16  9   SAW.  What is that a reference to?

17:19:18 10   A.    SAW was a -- so BAW is a microcrystal technology,

17:19:24 11   which is different from SAW, SAW is also considered an

17:19:28 12   acoustic technology, it is called surface acoustic wave,

17:19:32 13   whereas BAW is call bulk acoustic wave, the difference is a

17:19:37 14   SAW filter is basically a different technology but basically

17:19:41 15   does the same thing.

17:19:41 16   Q.    Is there a difference between an RFR BAW filter and a

17:19:47 17   RF SAW filter?

17:19:48 18   A.    Yes, there is, there is three ways you can define the

17:19:52 19   filter.  SAW typically operates at a lower frequency so from

17:19:56 20   three gigs, it's typically lower power and also the

17:20:00 21   performance is not as good, so it's more of a commodity

17:20:04 22   based product.  Whereas BAW is really in the 1.8 and pushing

17:20:09 23   up to 8-gigahertz, so it goes up much higher in frequency

17:20:13 24   and it also offers some more power and it's much more

17:20:19 25   technology.  It's -- there is three clear additional

Aichele - direct

17:20:22  1    particulars.  So the SAW technology, if you can satisfy a

17:20:41  2    customer's requirement with SAW, then he'll use SAW, but if

17:20:45  3    you need the performance, you'll typically use BAW.

17:20:48  4    Q.    In the description here under SAW the first sentence,

17:20:53  5    under the title, there is a reference to a long heritage

17:20:58  6    from RFMi, the pioneer in SAW and low power RF technologies.

17:21:06  7    What is RFMi?

17:21:08  8    A.    So RFMi, there is a history there, but RFMi was a

17:21:15  9    company many years ago, one of the dominant players in SAW

17:21:21  10   technology.  They actually were bought by Marauda in 2012

17:21:26  11   and Marauda is a big Japanese company.  And then Marauda

17:21:32  12   spun them out in I think it was around 2019 and it created a

17:21:36  13   company called RFMi, we actually acquired RFMi in 2021, 2022

17:21:45  14   time frame.

17:21:46  15   Q.    Did you have any involvement in that acquisition

17:21:49  16   process?

17:21:50  17   A.    Yes, I did.  I actually brought RFMi to Akoustis for

17:21:56  18   evaluation.  And then once we signed a nonbinding LOI, which

17:22:03  19   is called a letter of intent, I was involved in the due

17:22:06  20   diligence, you know, the due diligence involves technical

17:22:11  21   assessment, market assessment, financial assessment.  And

17:22:18  22   did within the company, and then we did go through with the

17:22:21  23   acquisition, RFMi reports to me as well.

17:22:27  24   Q.    What technology, if any, has RFMi acquired from

17:22:32  25   Akoustis?

17:22:32  1    A.      No technology.

17:22:32  2    Q.      Who manufactures -- well, I'll ask you first, does

17:22:36  3    RFMi fabricate its own SAW filters?

17:22:39  4    A.       No, they actually are fabless company, so whereas

17:22:43  5    Akoustis, we own our own fab supporting the BAW technology,

17:22:48  6    RFMi was fabless when we acquired them.

17:22:51  7    Q.      And where does RFMi have its SAW filters fabricated?

17:23:00  8    A.       Primarily in a company called Tai-Saw, which is a

17:23:05  9    foundry that they use located in Taiwan.

17:23:10 10    Q.      I would like to turn to presentation page 8, if you

17:23:17 11    would.  And we're still in Trial Exhibit 154.  Are you

17:23:23 12    there?

17:23:23 13    A.      Yes, I am.

17:23:24 14    Q.      So the title says BAW filters for 5 and 6-gigahertz

17:23:29 15    bands.  What's described on this page?

17:23:31 16    A.      These are products that we're releasing into

17:23:35 17    production that we put into the catalog mainly focused on

17:23:39 18    BAW filters on this page for you know the 5 and the

17:23:41 19    6-gigahertz bands.

17:23:44 20    Q.      How many BAW filters has Akoustis released for

17:23:48 21    production?

17:23:49 22    A.      Currently I believe it's around seventeen that have

17:23:53 23    been fully released to production.

17:23:55 24    Q.      Okay.  Let's go to the next page, page 9.  And at the

17:24:02 25    top, there is a reference to BAW filters for 2.4-gigahertz

Aichele - direct

17:24:07  1    Wi-Fi band.  What are those?

17:24:10  2    A.    These actually are parts that came through with the

17:24:14  3    RFMi acquisition, so these are lower frequency BAW filters,

17:24:18  4    2.4-gigahertz, so they actually had released that into

17:24:22  5    production prior to us acquiring them.

17:24:25  6    Q.    And what Akoustis technology, if any, is included in

17:24:31  7    the RFMi BAW filters at the 2.4-gigahertz band?

17:24:34  8    A.    With these current products, none.

17:24:37  9    Q.    You can put that exhibit away.

17:24:49 10          What was Akoustis first RF BAW filter released

17:24:53 11    for production?

17:24:54 12    A.    There is two products that were the leading two

17:24:57 13    products that we released to production, the AKF-1252 and

17:25:02 14    the AKF-1938.

17:25:04 15    Q.    When were they released for production?

17:25:07 16    A.    I don't know exactly when they were released to

17:25:09 17    production, but I would say somewhere in the beginning of

17:25:09 18    2020.

17:25:14 19    Q.    Now, I started off the direct examination, or at

17:25:18 20    least a little bit into it after your introduction by asking

17:25:22 21    you to describe Akoustis when you joined it in spring of

17:25:29 22    2015.  How would you describe Akoustis now?

17:25:32 23    A.    I would describe it as a, you know, commercial

17:25:36 24    company now, and you know, we have addressed a lot of the

17:25:40 25    technical milestones, and the market milestones and the

Aichele - direct

17:25:43  1    financial milestones continue to fund the company, and we

17:25:48  2    have launched seventeen products into production.  We've got

17:25:50  3    a very strong customer base.  We've made some

17:25:54  4    diversification, offset some of the challenges that we see

17:25:58  5    in the market by acquisition of RFMi, so we're in a very

17:26:03  6    good position from a commercial standpoint.

17:26:06  7    Q.      So you discussed Akoustis's acquisition of the STC

17:26:12  8    MEMS Fab, that's in Upstate New York?

17:26:14  9    A.      That's in Upstate New York, below Rochester.

17:26:18 10    Q.      And you discussed the acquisition of RFMi, when did

17:26:21 11    that take place?

17:26:22 12    A.      We took a majority ownership of 51 percent around

17:26:26 13    October of '20 or '21 and had some -- or had certain

17:26:31 14    milestones that they had to achieve and then we took 100

17:26:35 15    percent ownership of it around July of 2022.

17:26:38 16    Q.      Any other acquisitions that Akoustis has made?

17:26:41 17    A.      Yes, we made an acquisition in the beginning of 2023

17:26:45 18    of a company called Grinding and Dicing Services

17:26:49 19    Incorporated, or GDSi.

17:26:53 20    Q.      What does GDSi do?

17:26:56 21    A.      They offer premium back end services, mainly dicing,

17:27:00 22    I mentioned that in the process, grinding and dicing.

17:27:03 23    Q.      Why did Akoustis acquire GDSI?

17:27:06 24    A.      Really I think for, not I think, but I know for two

17:27:10 25    reasons, one is that GDSi actually a supplier to Akoustis

Aichele - direct

17:27:15  1    and we used them a lot in what we call an NPI process, new

17:27:20  2    product introduction, we looked at this in a way that they

17:27:24  3    brought new revenue stream along, which was good, but we

17:27:27  4    have looked at this as being a very important capability

17:27:30  5    that would help us streamline and reduce our cycling for

17:27:35  6    NPI.

17:27:35  7            The other reason was a little more strategic.

17:27:38  8    If you know the Chip Act, the U.S. government is trying to

17:27:42  9    bring onshore into the U.S. semiconductor processes, and

17:27:47 10    this acquisition bolted on very well to the fab, which is

17:27:53 11    the front end process, that would allow us to position

17:27:55 12    ourselves for, you know, government funding to continue to

17:27:59 13    expand Akoustis.

17:28:00 14    Q.      Did this -- so is Akoustis's supply chain all in the

17:28:06 15    United States at this point?

17:28:06 16    A.      No, we -- the GDSi acquisition is mainly for NPI,

17:28:14 17    it's mainly the small volume, quick cycle time.  If you look

17:28:18 18    at our fab for the BAW technology is in the U.S.  We do have

17:28:23 19    the back end services side or back end where I explained

17:28:26 20    where you take the wafer, you grind it, you dice it, you

17:28:29 21    package it and then you test, those are what we call the

17:28:32 22    assembly houses, so those are third-party houses that we

17:28:37 23    contract with.  We have one in the US.  And several over in

17:28:42 24    Asia.

17:28:42 25    Q.      Has Akoustis provided any technology to GDSi?

Aichele - direct

17:28:47  1   A.      No.  GDSi has their own technology.

17:28:50  2   Q.      Has Akoustis provided any Qorvo technology to GDSi.

17:28:56  3   A.      No.

17:28:56  4   Q.      I ask the same question regarding RFMi, has Akoustis

17:29:03  5   supplied any Qorvo technology to RFMi?

17:29:05  6   A.      No.

17:29:06  7   Q.      Given your role as executive vice-president of

17:29:09  8   Akoustis, do you have an understanding of how much revenue

17:29:14  9   RFMi and DDSI contribute to Akoustis's overall revenue?

17:29:20 10   A.      Yes, I do.

17:29:20 11   Q.      How is it that you know that?

17:29:23 12   A.      I managed the front end of the company.  So the

17:29:26 13   revenue is in my purview, so I watch it very closely.

17:29:31 14   Q.      What is Akoustis's fiscal year?

17:29:34 15   A.      Fiscal year is typically July, not typically, always

17:29:39 16   July, beginning of July to end of June, and so right now

17:29:43 17   we're actually in what we call fiscal year FY24, so that

17:29:49 18   started in July 1st of 2023, and then it will end this June

17:29:53 19   of 2024.

17:29:55 20   Q.      So you're in the four quarter of fiscal year 2024?

17:30:00 21   A.      Yeah, we're currently in the fourth quarter.

17:30:03 22   Q.      Is Akoustis a public company?

17:30:04 23   A.      Yes, we are.

17:30:05 24   Q.      What financial disclosures, if any, does Akoustis

17:30:08 25   need to make as a public company?

Aichele - direct

17:30:10  1    A.      We follow, we're listed on the NASDAQ, so obviously

17:30:14  2    we're required to disclose the proper documentation, driven

17:30:20  3    by what the SEC requirements are, and that includes things

17:30:23  4    like a 10Q, which is a quarterly, update, which include

17:30:28  5    financial's and information about the company and 10Ks which

17:30:32  6    are annual reports, there is also ongoing documents that may

17:30:37  7    be disclosed like 8Ks, as well.

17:30:40  8    Q.      What was the last fiscal quarter for which Akoustis

17:30:44  9    provided its publicly available financial report?

17:30:48  10   A.      The last quarter that we actually published was Q2 of

17:30:53  11   FY24, which ended last December.

17:30:56  12   Q.      December 31st, 2023?

17:30:59  13   A.      2023, correct.

17:31:01  14   Q.      On the basis of the public financial reports for

17:31:04  15   quarter 1 and quarter 2 of fiscal year 2024, do you have

17:31:10  16   revenue expectations for fiscal year for the total fiscal

17:31:15  17   year of 2024 by source?

17:31:18  18   A.      Yes, I do.  So I have to sort of do an extrapolation,

17:31:25  19   do a run rate, this is not public or published information,

17:31:29  20   but if I were to extrapolate out, I believe the FY24 numbers

17:31:34  21   will end a little bit above 28 million in total revenue, and

17:31:39  22   then if you look at the three main sources, Akoustis XBAW

17:31:45  23   revenue will be about 15 million, and then the GDSi revenue,

17:31:50  24   I believe will probably come in around 7.4, 7.5 million, and

17:31:55  25   then the RFMi revenue will come in around 6.4, 6.5 million.

17:32:03  1    Q.      Okay.

17:32:03  2              MR. ELKINS:  Your Honor, I'm going to go to a

17:32:05  3    different topic.

17:32:06  4              THE COURT:  We're at a point where we would

17:32:08  5    normally stop today.  Thank you.  We're going to see you

17:32:12  6    tomorrow.  I'll check and see exactly how we're doing and

17:32:16  7    I'm going to project when we will wrap things up.  So we

17:32:23  8    will know then.  Well, we have had a lot to listen to today.

17:32:27  9    So have a good night.  Let's rest.  Don't discuss the case

17:32:32 10    amongst yourselves.  Don't let anybody talk to you about it.

17:32:35 11    Keep an open mind.  We have a long way to go.  The witness

17:32:39 12    will be back tomorrow.  I'm going to let all of you be

17:32:42 13    excused and I'm going to stay here for a moment.  Have a

17:32:47 14    good night.

17:32:48 15              COURT CLERK:  All rise.

17:32:49 16              (Jury exiting the courtroom at 5:32 p.m.)

17:33:06 17              THE COURT:  Everyone can be seated.

17:33:09 18              Of course the witness, we'll ask you just to be

17:33:12 19    here a little early.  We will start here at 8:30.  So we may

17:33:19 20    want to recheck that with me.  They know to come in right on

17:33:24 21    the start time.  I think everybody did on that.  You'll have

17:33:28 22    to be here at least five minutes in advance.  I know you'll

17:33:31 23    be here well in advance of that.

17:33:33 24              The nice thing is you cannot talk about the

17:33:35 25    testimony you have given, with your counsel or with anybody

17:33:39  1    else.  All I can say is if there is something coming up, you

17:33:44  2    can discuss about that.  So be careful in that regard and we

17:33:48  3    will see you tomorrow at least five minutes before 8:30,

17:33:51  4    maybe 8:25, and we're going to start at 8:25 to get back to

17:33:57  5    a little better schedule.  We'll let you step down at this

17:34:00  6    time.  Thank you very much.

17:34:01  7            Counsel, I think we're doing pretty well.  I

17:34:04  8    think you must be about within thirty minutes of striking,

17:34:08  9    is that about right?

17:34:09  10           MR. ELKINS:  You have nailed it.  I hope to be

17:34:11  11   faster than that, Your Honor.

17:34:12  12           THE COURT:  Okay.  That's good.  We have that

17:34:14  13   and then of course we'll have a re -- we'll have sort of

17:34:18  14   redirect and we'll really have cross when we start back.

17:34:22  15   And we're looking at that being in the range of what,

17:34:26  16   forty minutes or so?

17:34:27  17           MR. DeFOSSE:  It depends on what's left of

17:34:30  18   Mr. Elkins, but I would say less than that at the time,

17:34:33  19   currently.

17:34:33  20           THE COURT:  That's fine.  Now at the end of each

17:34:35  21   day, we go over exactly who is going to be here.  We already

17:34:40  22   have Colin Hunt.  I believe we have finished it.  I know we

17:34:46  23   have finished it, but I don't know that we've submitted.

17:34:49  24           On Dry, I think we basically have pretty much

17:34:53  25   wrapped that up.  We had one question on at least one on

17:34:58  1     one.  Kwon.  Kwon, you're right.  On Kwon we needed one more

17:35:04  2     piece of information to make a final determinations there,

17:35:07  3     and I did ask about it earlier.  I assume that that's been

17:35:10  4     submitted.  Somebody was listening when I asked for it.

17:35:13  5     Sounds like they weren't.

17:35:15  6                  MR. MASTERS:  I can pass the exhibit up.

17:35:20  7                  THE COURT:  You guys need to learn to give it to

17:35:23  8     me.

17:35:23  9                  MR. MASTERS:  It's my fault.

17:35:24 10                  THE COURT:  That's okay.  But I do need that.

17:35:27 11                  MR. MASTERS:  That's what Your Honor requested

17:35:29 12     regarding Kwon deposition.

17:35:31 13                  THE COURT:  So this is a little confusing if we

17:35:33 14     don't get at least -- because we've got a lot of things

17:35:37 15     going, the courtroom deputy has got a whole lot of things to

17:35:42 16     hold on to.  We have got separate tasks up here.

17:35:45 17                  MR. MASTERS:  May I approach?

17:35:46 18                  THE COURT:  Absolutely.  Come help us out.  We

17:35:51 19     didn't know it was here.  It's not anybody's fault.  And

17:36:03 20     again, if we ask for something it needs to come to my staff

17:36:06 21     and not the courtroom deputy, it's not fair to them, not

17:36:10 22     fair to us, so we would have finished it if we had it

17:36:14 23     earlier.  I will need a list of everybody else who is going

17:36:22 24     to appear.  So we have got a deposition to finish.  We need

17:36:28 25     to get the rest of the day completely nailed down.

17:36:37  1          MR. DeFOSSE:  So obviously we'll start with

17:36:41  2   Mr. Aichele.

17:36:42  3          THE COURT:  Let's run through everybody because

17:36:45  4   if you changed the order I will need to know that.

17:36:48  5          MR. MASTERS:  We'll follow Mr. Aichele with the

17:36:49  6   video deposition of Colin Hunt and then the video deposition

17:36:53  7   of Robert Dry.

17:36:54  8          THE COURT:  Okay.  Just making sure.  Let's take

17:36:56  9   a look, okay.  And then we have it looks like the correct

17:37:04 10   document with the trim work center data, we will look

17:37:08 11   through this, we just couldn't do it without that, I don't

17:37:11 12   think it would take long to wrap it up now that we have got

17:37:15 13   that.  We have got Hunt, Dry, and let's go through the rest.

17:37:21 14          MR. DeFOSSE:  And then Dr. Shealy will be called

17:37:24 15   next.  And then we have a video of Dr. Kwon, J.B. Kwon and

17:37:29 16   then if there is time remaining tomorrow, we will begin with

17:37:33 17   Dr. Shanfield.

17:37:35 18          THE COURT:  Okay.  And I'm just going to ask you

17:37:38 19   who is going to be after Shanfield?

17:37:40 20          MR. DeFOSSE:  After Shanfield in some order Your

17:37:42 21   Honor, but not entirely decided yet.

17:37:44 22          THE COURT:  I understand that, that's why we go

17:37:46 23   over it again, don't we are.

17:37:48 24          MR. DeFOSSE:  So we have Michael Boyd, who is

17:37:50 25   the chief security officer, chief information security

17:37:54  1   officer of our client, Mr. Robinson who is our only measures

17:37:58  2   expert.

17:37:58  3           THE COURT:  Sure.

17:37:59  4           MR. DeFOSSE:  And then we have Helge Heinrich

17:38:03  5   who is one, who performed some analysis of the allegedly

17:38:07  6   infringing devices, and John Bravman, who is the expert for

17:38:12  7   the plaintiffs on infringement.  And finally Melissa Bennis,

17:38:18  8   who is the damages expert.

17:38:20  9           THE COURT:  Okay.  Well, that's helpful.  And

17:38:24 10   we'll repeat that every time because I know it might shift

17:38:27 11   just a little bit.  Well, I'm hoping it won't, but you never

17:38:30 12   know.  So we will do that.

17:38:33 13           Now, when do you now project -- and a lot of

17:38:36 14   that is going to include witnesses, I believe, let me check

17:38:40 15   that, that will not have to be recalled.  So that's going to

17:38:53 16   include a lot of material.  That will leave about how many

17:38:56 17   for the defense case.

17:38:58 18           MR. ELKINS:  I can tell you exactly, Your Honor.

17:38:59 19           THE COURT:  Well, and that's okay.  I hope -- I

17:39:03 20   can't tell for sure, but that's your call, but we could be

17:39:09 21   down to -- it could be down to four or five, but I'm not

17:39:21 22   sure.  I can't tell.  I'm just being optimistic.  I'm

17:39:29 23   counting the ones you're almost certain to call.

17:39:32 24           MR. ELKINS:  Yes.  By my count that's seven.

17:39:34 25   There are -- Mr. Nixon will just be candid, Mr. Nixon would

17:39:42  1    come into testify for ten minutes depending on whether or

17:39:46  2    not we need him to talk about why two laptops were erased,

17:39:55  3    but I don't think we need to do that unless you're planning

17:39:58  4    to raise that issue again.

17:40:00  5                THE COURT:  So we might -- our goal is to find

17:40:04  6    out exactly where we end up, it's not just we can and then

17:40:08  7    exactly when we're going to end.  I obviously need to, I'm

17:40:14  8    not sure we are going to make it but get close to finish --

17:40:19  9    when are we going to finish the plaintiff's case, which day?

17:40:23 10                MR. MASTERS:  We expect Monday, Your Honor.

17:40:25 11                THE COURT:  That's what it's looking like, too.

17:40:30 12    What time Monday?

17:40:33 13                MR. DeFOSSE:  We hope it will be in the morning.

17:40:35 14                THE COURT:  And that will be the goal.

17:40:37 15                MR. DeFOSSE:  That's the goal.

17:40:37 16                THE COURT:  That will be the goal and the reason

17:40:39 17    we had a discussion, the two of you talked about it, is the

17:40:43 18    defense has to know exactly when they're going to go.

17:40:47 19                MR. DeFOSSE:  I understand.  It depends on how

17:40:49 20    long the defense goes with Mr. Aichele tomorrow and with

17:40:53 21    Dr. Shealy.

17:40:53 22                THE COURT:  Absolutely.  So that would give us a

17:40:56 23    chance to get Monday and then the defense case, because

17:41:01 24    you've used -- you put in a fair amount of it already, is

17:41:07 25    that going to leave you somewhere, that's going to cut you

17:41:11  1    down to two-and-a-half days.

17:41:15  2            MR. ELKINS:  I imagine, I would say three days

17:41:17  3    to be conservative, if we can start on the afternoon of

17:41:21  4    Monday, I would -- that would be ideal because then we could

17:41:25  5    do, you know, closing and instructions, or at least closing

17:41:29  6    on Thursday, and instructions in the morning.

17:41:32  7            THE COURT:  Right.

17:41:33  8            MR. ELKINS:  And let them deliberate.

17:41:35  9            THE COURT:  That's the goal for everybody.

17:41:37 10            MR. ELKINS:  Yeah.

17:41:37 11            THE COURT:  Well, we're going to work really

17:41:40 12    hard to get there.  Let's see what else we got to get.

17:41:43 13            Oh, I think that we had talked about this

17:41:45 14    earlier internally is Todd Bender is no longer being called.

17:41:53 15            MR. DeFOSSE:  Currently we don't expect to call

17:41:55 16    Mr. Bender.

17:41:56 17            THE COURT:  That's what we ascertained but we

17:41:59 18    weren't sure.  Everybody is okay with that.

17:42:02 19            MR. DeFOSSE:  Yes.

17:42:03 20            THE COURT:  Okay.  That's useful.  So we have

17:42:06 21    got designations but we don't have to do them.

17:42:09 22            MR. DeFOSSE:  That's correct, Your Honor.

17:42:11 23            THE COURT:  I want to make sure we got that

17:42:13 24    covered.

17:42:13 25            MR. DeFOSSE:  Sorry.

17:42:14 1                    THE COURT:  That's fine, we all got lengthy to

17:42:16 2      do.

17:42:17 3                    MR. ELKINS:  And I also think Your Honor,

17:42:18 4      without Mr. Bender, we will not need to call Mr. Bowler, who

17:42:22 5      is on our amended witness list.

17:42:26 6                    THE COURT:  Right.  So I've got to make a note

17:42:28 7      there.  Okay.  So that's helpful, too.

17:42:37 8                    Now, hopefully we don't have any more things

17:42:41 9      come up like came up with yesterday.  So we will start -- we

17:42:47 10     should be able to start, then, at 8:30.  And we'll push all

17:42:54 11     the way through.  That's where we are.

17:42:57 12                   MR. ELKINS:  What?

17:43:02 13                   THE COURT:  I think we can take care of that.  I

17:43:05 14     think that's really where we were going and appreciate

17:43:08 15     everybody, we made a super effort, but the staff made a

17:43:11 16     great effort, I feel like they have gone way above and

17:43:16 17     beyond.  So this was a lot of work, wasn't it?

17:43:23 18                   COURT CLERK:  For sure.

17:43:24 19                   THE COURT:  It was a lot of work.  And you're

17:43:26 20     right.  Okay.  We'll be here early, we are area always here

17:43:33 21     early.  I plan oncoming out -- by the way, if there are

17:43:38 22     demonstratives as to which there is a problem and you find

17:43:40 23     that out tonight, go ahead and send us something.  I don't

17:43:44 24     think there likely to be, but I don't know.  But if there

17:43:49 25     are, I rather know it's coming so we have a chance to take a

17:43:54  1   look at it.

17:43:55  2              And I think that you have gotten some guidance

17:43:57  3   on what will not be permitted in the demonstratives anyway.

17:44:02  4   All right, Mr. DeFosse, so we're probably just not going to

17:44:06  5   go in that direction and that would be helpful to everybody.

17:44:09  6   Your clients will understand that you made every effort but

17:44:13  7   it didn't work out.

17:44:15  8              All right.  I think we covered everything.

17:44:17  9              Thank you all very much and I will see you

17:44:20 10   promptly at 8:15 and then we'll have the jury in at 830.

17:44:25 11   Thanks very much.

17:44:26 12              I'm going to have to come back in here and clean

17:44:29 13   up, you folks shall leave at least, I'm going to check on

17:44:32 14   some other things first.

17:44:34 15              (Court adjourned at 5:44 p.m.)

         16

         17              I hereby certify the foregoing is a true and
              accurate transcript from my stenographic notes in the proceeding.

         18

         19                      /s/ Dale C. Hawkins
                               Official Court Reporter
         20                       U.S. District Court

         21

         22

         23

         24

         25

# EXHIBIT J

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3   QORVO, INC.,                  )
                                   )
 4              Plaintiff,         )
                                   )   C.A. No. 21-1417-JPM
 5    v.                           )   Volume 4
                                   )
 6   AKOUSTIS TECHNOLOGIES, INC.   )
     AND AKOUSTIS, INC.,           )
 7                                 )
                Defendants.        )
 8                                 )

 9

10

11              Thursday, May 9, 2024
                      8:14 a.m.
12                   Jury Trial

13

14                844 King Street
               Wilmington, Delaware
15

16   BEFORE: THE HONORABLE JON PHIPPS MCCALLA
         United States District Court Judge
17

18

19   APPEARANCES:

20

21           MORRIS NICHOLS ARSHT & TUNNELL
             BY:  JEREMY A. TIGAN, ESQ.
22
                 -and-
23

24

25
```

1    APPEARANCES CONTINUED:

2

3            SHEPPARD, MULLIN, RICHTER & HAMPTON
             BY:  ROBERT M. MASTERS, ESQ.
4            BY:  JONATHAN R. DEFOSSE, ESQ.
             BY:  ZACHARY ALPER, ESQ.
5

6                        Counsel for the Plaintiff

7

8

9

10           BAYARD, P.A.
             BY:  STEPHEN B. BRAUERMAN, ESQ.
11
             –and–
12
             SQUIRE PATTON BOGGS
13           BY:  DAVID S. ELKINS, ESQ.
             BY:  RONALD S. LEMIEUX, ESQ.
14           BY:  VICTORIA Q. SMITH, ESQ.
                         Counsel for the Defendants
15

16                   – – – – – – – – – –

17

18                 P R O C E E D I N G S

19

08:11   20        (Proceedings commenced in the courtroom beginning at

08:11   21    8:14 a.m.)

08:12   22

08:14   23            **THE COURT:**  You may be seated.

08:14   24            As to the question was, was this referenced in

08:14   25    the report.  First question.  So the answer?

08:14   1          **MR. DeFOSSE:**  Yes, Your Honor.

08:14   2          **THE COURT:**  Well, if that's the case, then, any

08:14   3   further information on this if it's referenced in court,

08:14   4   the expert can rely on information that will be received

08:14   5   in the future.  Not maybe the best way to do it, but it's

08:14   6   okay and, of course, it can also rely on things that end

08:14   7   up being hearsay.  Other things like that depending on

08:14   8   certain factors.  This case appears that all this material

08:14   9   will be ultimately received; is that correct?

08:14   10          **MR. DeFOSSE:**  Well, Your Honor, I just want to

08:14   11   make clear there will not be a sponsoring fact witness for

08:14   12   the materials.  So the witnesses, obviously, we have a

08:14   13   limited amount of time here, and they are witnesses who

08:14   14   are outside the control of the Court.  So we won't have

08:15   15   the individual fact witnesses, but this was material that

08:15   16   was in the record produced by the other side, and I

08:15   17   believe is admissible.  And as we said, I think that the

08:15   18   expert has the foundation to talk about it since it was

08:15   19   part of his analysis as an expert.

08:15   20          **THE COURT:**  It was disclosed during the

08:15   21   discovery, and he was able to rely on it.

08:15   22          **MR. DeFOSSE:**  Yes.

08:15   23          **THE COURT:**  There's no issue about its

08:15   24   authenticity?

08:15   25          **MR. DeFOSSE:**  I do not believe there is, Your

08:15  1    Honor.

08:15  2              **THE COURT:**  What about the other side?

08:15  3              **MR. STANFORD:**  Your Honor, hi.  My name is

08:15  4    Matthew Stanford.  I don't think you've heard from me yet.

08:15  5    I think I saw you on the Zoom conferences.

08:15  6              **THE COURT:**  Okay.  Absolutely.

08:15  7              **MR. STANFORD:**  So our issue here is that -- so

08:15  8    this evidence is not otherwise admissible, and we are

08:15  9    going to be showing it to the jury on the demonstrative

08:15  10   slides.  That's just going to cause them to be confused.

08:15  11   They have been seeing admissible evidence --

08:15  12             **THE COURT:**  There's no question about

08:15  13   authenticity?

08:15  14             **MR. STANFORD:**  No.

08:15  15             **THE COURT:**  The issue only is whether or not it

08:15  16   will be received through another witness.

08:15  17             **MR. STANFORD:**  Right.  Which I believe it will

08:16  18   not be received through another witness.

08:16  19             **THE COURT:**  I'm not sure it has to be received

08:16  20   through another witness.  What's the authority on that?

08:16  21             **MR. STANFORD:**  Well, it's our understanding

08:16  22   that from 703, you can ask an expert to rely on

08:16  23   inadmissible evidence, but it's the fact that they are

08:16  24   showing it to the jury.

08:16  25             If Dr. Shanfield wants to stand up there and

08:16  1   discuss these e-mails, that's perfectly fine.  We have no

08:16  2   objection to that.  It's the fact that we are showing it

08:16  3   to them on the demonstrative.  And --

08:16  4        **THE COURT:**  We are going to give the

08:16  5   instruction on demonstratives, as you know.

08:16  6        **MR. STANFORD:**  Yes.

08:16  7        **THE COURT:**  Which is if there was something in

08:16  8   the demonstrative that is not received into evidence, you

08:16  9   should ultimately disregard that.

08:16  10       **MR. STANFORD:**  But my concern is just that if

08:16  11  we show it to them and they've only been seeing admissible

08:16  12  evidence so far up on the screen, they will be confused

08:16  13  about, well, now when I'm seeing evidence, I'm not exactly

08:16  14  sure when it's admissible and when it's not, what I can

08:16  15  consider as far as turning in my verdict and when I

08:16  16  cannot.

08:16  17       **THE COURT:**  I think it's probably a part of the

08:16  18  report, so let's talk about that.

08:16  19       **MR. DeFOSSE:**  Yes.  Your Honor, I think the

08:16  20  issue with this is, I would dispute that it's

08:16  21  inadmissible.  It's authentic.  It's not hearsay.  You

08:17  22  have a foundation question, but it's in his report as part

08:17  23  of his analysis, so he has foundation.  I believe it is

08:17  24  admissible, so there's not this distinction between

08:17  25  inadmissible and admissible.

08:17   1          As backup, even if it were inadmissible, I

08:17   2   think we could show it they just wouldn't get it into

08:17   3   evidence, you know, in the jury room.

08:17   4          **THE COURT:**  I'm sorry.  I am not getting the

08:17   5   real time.

08:17   6          I'm okay.  Go ahead.

08:17   7          **MR. DeFOSSE:**  Okay.  So just to close, Your

08:17   8   Honor.  I think the document is admissible.  There's not

08:17   9   an authentication problem; there's not a hearsay issue.

08:17   10  The expert has foundation because he considered it in his

08:18   11  report.

08:18   12         **THE COURT:**  You're correct in that regard.

08:18   13  Having had a chance to review the material, it's clear

08:18   14  that it is material what an expert could look and rely

08:18   15  upon.  I don't think it's confusing to the panel.  We will

08:18   16  give an instruction at the end, of course, that if

08:18   17  something is shown as demonstrative, they are not evidence

08:18   18  if it was not received in an appropriate way.  I think

08:18   19  that covers that.

08:18   20         Frankly, we've seen a lot of these e-mails, in

08:18   21  this context.  It's completely consistent with everything

08:18   22  else that we received in the past, and, of course there's

08:18   23  no question of its authenticity.  I think that covers it.

08:18   24  I think an expert, of course, has some leeway.

08:18   25         **MR. DeFOSSE:**  Could I just -- I just want to be

08:18   1    clear with the Court.  We do plan, when Dr. Shanfield

08:18   2    talks about that exhibit to ask for its admission into

08:18   3    evidence as well because we believe that it's authentic,

08:18   4    it's not hearsay, and there's foundation.

08:19   5            THE COURT:  That's what I would say.

08:19   6            MR. DeFOSSE:  Okay.  Thank you.

08:19   7            MR. STANFORD:  I'm sorry, Your Honor.  Do you

08:19   8    mind if I --

08:19   9            THE COURT:  We'd love to hear from you, but not

08:19   10   for very long.

08:19   11           MR. STANFORD:  I'll make it very brief.  I

08:19   12   promise.

08:19   13           Well, these e-mails, I believe, would be

08:19   14   considered hearsay.  They are not business records.  They

08:19   15   don't fall into the business record exception.  They are

08:19   16   from employees that have not entered these into evidence

08:19   17   through testimony, and so I think they would not --

08:19   18           THE COURT:  Let's go quickly.  Let's go a

08:19   19   little bit quickly.  The first one is from Mr. Houlden,

08:19   20   right?

08:19   21           MR. STANFORD:  Correct.

08:19   22           THE COURT:  Clearly, an official with Akoustis?

08:19   23           MR. STANFORD:  Yes.

08:19   24           THE COURT:  He is copying other individuals who

08:19   25   are with Akoustis.  He is sending information to

08:19   1   Mr. Dunham and Dry who is for Qorvo.  This is entirely

08:19   2   consistent with everything else that we've received in so

08:19   3   many respects in this case.  It seems both authentic and

08:19   4   useful in this matter.  So no question about who it came

08:19   5   from, right?

08:20   6           MR. STANFORD:  Understood.

08:20   7           THE COURT:  No question about that.  And, of

08:20   8   course, it looks it's something that it could be received

08:20   9   under the 800 series of rulings, it looks like to the

08:20  10   Court.

08:20  11           Now, the next one, let's see, is from

08:20  12   Mr. Abdelajid.  And I'm going to spell it for the court

08:20  13   reporter.  It's Abdelmadjid  A-B-D-E-L-M-A-J-I-D.  He's a

08:20  14   former Qorvo employee.  He was -- there was no previous

08:20  15   testimony.  He was a source for Houlden -- that's

08:20  16   H-O-U-L-D-E-N -- in this matter.  The only thing that's

08:20  17   different about this one, it's a little -- a little

08:20  18   different, I'm a little concerned about this -- was

08:20  19   Jerry Gray, he was the manager at Akoustis who hadn't

08:20  20   really appeared and is not going to, as I understand it.

08:20  21           MR. STANFORD:  That's correct.

08:20  22           THE COURT:  But he is from -- this particular

08:20  23   individual, who was Houlden's source, has been established

08:20  24   by the evidence already.  So it has the indicia of

08:20  25   reliability and, generally, can be received in this type

08:21  1    of case.  It might well be cases where it wouldn't be

08:21  2    appropriate.  Of course, we understand the nature of the

08:21  3    allegations in the case.

08:21  4           Then, of course, we have the e-mail from

08:21  5    Mr. Vetury.  And I'll spell that for the court reporter.

08:21  6    It's V-E-T-U-R-Y.  He is a chief device scientist at the

08:21  7    defendant, and it is sent to Arbin Ibro, I-B-R-O.  And

08:21  8    it's subject is "2" -- excuse me, is "S2P for Qorvo to

08:21  9    compare," and it says, "Please send me the S2P of Qorvo

08:21  10   part."  So it's consistent with everything else that we've

08:21  11   seen in the case.  And, of course, it's from the

08:21  12   defendant.

08:22  13          The defendants' the person who can make a

08:22  14   statement in that regard.  So it looks to me like that,

08:22  15   these would typically be admissible under the 800 series

08:22  16   of rules, I believe.

08:22  17          Now, you want to get this one right.  If that's

08:22  18   wrong, you need to tell us.

08:22  19          **MR. DeFOSSE:**  Yes, Your Honor.  So they're

08:22  20   party admissions, I think, under nine --

08:22  21          **THE COURT:**  Party admissions?

08:22  22          **MR. DeFOSSE:**  Yes.  And to the extent there are

08:22  23   e-mails from third parties in there, I believe they're

08:22  24   adoptive admissions as well.  So I don't think we're going

08:22  25   to have a hearsay problem with these.

08:22   1          **THE COURT:**  It appears to be, correct.  And,

08:22   2   again, it's entirely consistent with everything I've seen.

08:22   3   There's been a lot of information received already in the

08:22   4   case to indicate that this is something for an expert to

08:22   5   consider in forming his opinion.  And, again, we know that

08:22   6   experts can also rely on information that might actually

08:22   7   not be received in this case; however, this does appear to

08:22   8   be receivable information.

08:22   9          We did look at this.  Initially, of course, our

08:22   10  concern was pretty much what the defense had.  And I think

08:23   11  that's now been answered.  So we're going to go ahead on

08:23   12  that.  Let's watch our time.  I know we've got to do that.

08:23   13         Okay.  We've got seven minutes to start.  I do

08:23   14  want to go over, I've got it here.  Let me check that.

08:23   15  This time is split, basically, half and half.  I think

08:23   16  that's pretty well the way we were dealing with that.

08:23   17  Most everybody had a chance to participate.  So this time

08:23   18  will be split between the plaintiff and defendant.

08:23   19         We have -- I am mindful of the fact that the

08:23   20  plaintiff is on, it seems to me, a schedule that is so

08:23   21  tight that you run some risk.  And I've tried bringing it

08:23   22  up at this point anytime proceeding, that you could run

08:24   23  out of time.  And I have -- has the plaintiff thought

08:24   24  through that?  Because you have a ways to go.

08:24   25         And, Mr. Masters, I'm not -- I don't have to

08:24  1    worry about you running out of time.  I have to worry

08:24  2    about somebody asking me for more time when we have had a

08:24  3    cautionary discussion about that.  And I'm not saying -- I

08:24  4    don't exactly know where you are, I know you planned it

08:24  5    out minute by minute, but I think we had one or two things

08:24  6    that went longer than you anticipated.

08:24  7            Did I get that right?

08:24  8        MR. MASTERS:  Absolutely.  A couple things did

08:24  9    go longer than anticipated; however, schedule-wise, part

08:24  10   of the unknown for this week is how long defense has with

08:24  11   Mr. Aichele today, and then Dr. Shealy, who's called later

08:24  12   today.

08:24  13           But if they were fairly short, we were going to

08:24  14   get Bennis in on maybe late Friday, if not, first thing

08:25  15   Monday morning.  And then --

08:25  16       THE COURT:  That's what we really have to short

08:25  17   for, because otherwise you're --

08:25  18       MR. MASTERS:  Our preference --

08:25  19       THE COURT:  -- in a bit of ditch because then

08:25  20   you have a cross-examination, closing statements and so

08:25  21   forth.  And -- is that how you're thinking?

08:25  22       MR. MASTERS:  That's how we're thinking.  And

08:25  23   we had some information yesterday that I think Mr. Boller

08:25  24   and Mr. Nixon will not be appearing on the defense --

08:25  25       THE COURT:  Right.

08:25   1          MR. MASTERS:  -- which also helps us.  Plus, we

08:25   2   overcounted the cross for Aichele -- Mr. Aichele and so I

08:25   3   think it's tight, but we understand Your Honor's

08:25   4   limitations.  I was thinking --

08:25   5          THE COURT:  It's just something we try to do

08:25   6   routinely so that we don't end up in a situation with a

08:25   7   tiny amount of time left -- not tiny, actually -- for

08:25   8   their closing arguments.  They had enough left, but not

08:25   9   quite.  And I'm not in a position to extend time because

08:26  10   that's not fair to counsel since everybody is planning on

08:26  11   that.  So everybody's good on that.

08:26  12          MR. ELKINS:  Okay.  Thank you.

08:26  13          THE COURT:  Everybody understands what we're

08:26  14   doing, so I think we're perfectly fine.  You've got your

08:26  15   sheets in front of you which give you final update.  Good.

08:26  16   I think we're all good.

08:26  17          I think you'll notice that Vivian is with us

08:26  18   today.  And this is Alex's birthday today.  He's very

08:27  19   young.  You might want to know because he's been with us

08:27  20   and he will be back on Monday.  Vivian has it fully under

08:27  21   control, right Vivian?

08:27  22          THE CLERK:  Yeah.  I do, Judge.

08:27  23          THE COURT:  We are checking one thing up here.

08:27  24   This is not on the time.

08:27  25          Special verdict form.  Since we have a few

08:27  1   minutes, we need to discuss that.  I think they have not

08:27  2   seen it.

08:27  3           Basically, we did adopt the defendants'

08:27  4   question on Page 2.  That's good argument for that, and we

08:28  5   think that's the meritorious argument on that.

08:28  6           I'm going to read that so there's not a

08:28  7   question about what I'm talking about.  That's -- when you

08:28  8   get the columns, the three columns, under the alleged

08:28  9   trade secret you have a set of numbers.  We are going to

08:28  10  leave the numbers where they were.  That's what they've

08:28  11  seen.

08:28  12          We are not making the statements -- you know we

08:28  13  have the disclaimer and the Court's statement at the

08:28  14  beginning that we're not making a statement about that.

08:28  15  We're not making a determination that -- says, "The Court

08:28  16  is not making any factual determinations as to the alleged

08:28  17  trade secrets, their organization, or whether they are

08:28  18  properly grouped together, or whether or not each is a

08:28  19  trade secret.  The verdict form's organization is only for

08:28  20  your convenience.  All questions of fact are for you, the

08:28  21  jury, to decide."

08:28  22          So I think that takes care of it.  Everybody's

08:28  23  going to understand.  We just had to write it down in some

08:28  24  way, and that's the way we have written it down.

08:29  25          Now, on Page 2, which is under "trade secret

08:29  1    misappropriation" under the Trade Secrets Act, the

08:29  2    North Carolina Trade Secrets Act, under that column, what

08:29  3    that now says, and I think we concluded on this, is "has

08:29  4    Qorvo established, by the greater weight or a

08:29  5    preponderance of the evidence that, A, the alleged trade

08:29  6    secret qualifies as a trade secret, and B, Akoustis is

08:29  7    liable for misappropriation for this trade secret?"

08:29  8         Then, of course, you've got 1.1, 1.2, so forth.

08:29  9    I really -- I think this is the right resolution on that.

08:29  10   And that's the language that was proposed by the defense.

08:29  11   The groupings -- we're going to say Group 1, Group 2, just

08:29  12   because you have to have a way to get through the

08:29  13   material.

08:29  14        And, again, we're saying we're not agreeing or

08:30  15   disagreeing with that.  Jury can do it any way they want

08:30  16   to.  But they have to have a mechanism to get through the

08:30  17   material.

08:30  18        So I think that's -- I think -- Mr. Elkins, I

08:30  19   think you prevailed on that argument; is that right?

08:30  20        **MR. ELKINS:**  Well, Your Honor, I think we have

08:30  21   prevailed since we wanted the extra column, but we thank

08:30  22   Your Honor for understanding our point regarding the --

08:30  23   that one column.  We appreciate what you've done.

08:30  24        **THE COURT:**  I think really -- I think it does

08:30  25   help.  I think it was a good clarification.  I'm going to

08:30  1   check with Mr. DeFosse -- well, you concede on that point

08:30  2   or you just wish it was different?

08:30  3            He's thinking about it.

08:30  4            **MR. DeFOSSE:**  I'm checking my audience here.

08:30  5            **THE COURT:**  Mr. Masters is saying --

08:30  6            **MR. DeFOSSE:**  We're okay, Your Honor.  Thank

08:30  7   you.

08:30  8            **THE COURT:**  Okay.  So I think now -- I'm trying

08:30  9   to check.  I think now -- and then, also, we'll run some

08:30  10  of the materials together because they were separated in

08:30  11  some of the copies, and you should be able to see them

08:31  12  all.

08:31  13           I think that covers the verdict form.  I think

08:31  14  it's finalized.  Mr. Masters, you're standing, so I want

08:31  15  to see what you say.

08:31  16           **MR. MASTERS:**  It's not on the verdict form.  I

08:31  17  wanted to just update on the exhibits that were used in

08:31  18  Mr. Houlden's deposition yesterday with the sheet.

08:31  19           **THE COURT:**  Yes, sir.  That's fine.

08:31  20           **MR. MASTERS:**  Just a little housekeeping

08:31  21  matter.

08:31  22           **THE COURT:**  We're going to probably docket this

08:31  23  as the anticipated verdict form in the case, having been

08:31  24  the subject of a discussion with counsel.  This was our

08:31  25  conference on that point.

08:31  1          Yes, sir.

08:31  2              **MR. MASTERS:**  There are also seven more

08:31  3      exhibits that have to be moved into evidence from the

08:31  4      Houlden deposition, which we believe would be starting at

08:31  5      155.

08:31  6              **THE COURT:**  Okay.  Yes, sir.  We are keeping

08:32  7      the jury out there.  We told them to stay on schedule.  So

08:32  8      we're now a minute and a half past where we should be.

08:32  9              **MR. MASTERS:**  May I pass these up?

08:32  10              **THE COURT:**  Sure.

08:33  11              Are we all set?  We are ready to bring our

08:33  12      panel in, and we will resume this matter.

08:33  13              We have our witness ready?

08:33  14              **MR. ELKINS:**  Yes, we do, Your Honor.

08:33  15              **THE COURT:**  You can come up.  It's easier if

08:34  16      you are already up here.

08:34  17          (The jury enters the courtroom at 8:34 a.m.)

08:34  18              **THE COURT:**  You can be seated.

08:34  19              Sorry we started so late, but we started

08:34  20      earlier.  We actually finalized some things that are for

08:34  21      the end of the case.  That's quite good, actually.

08:34  22              Our witness may be seated and counsel may

08:34  23      proceed.

08:34  24              **MR. ELKINS:**  Thank you, Your Honor.

08:34  25              Ms. Archer, David Elkins for defendants.  Good

08:35  1    morning.

08:35  2             DAVID AICHELE, after having been previously

08:35  3    duly sworn or affirmed, was questioned and testified as

08:35  4    follows:

08:35  5                        CROSS EXAMINATION

08:35  6    BY MR. ELKINS:

08:35  7    **Q.**    Good morning, Mr. Shealy -- excuse me, Mr. Aichele.

08:35  8    **A.**    Good morning, Mr. Elkins.

08:35  9    **Q.**    I don't know why I said that.  I apologize.

08:35  10            **THE COURT:**  He was trying to promote you.

08:35  11            **THE WITNESS:**  Yes.  I was going to make a

08:35  12   different answer.

08:35  13   BY MR. ELKINS:

08:35  14   **Q.**    So we're going to resume your direct examination, and

08:35  15   we had just finished discussing yesterday about the three

08:35  16   sources of revenue for Akoustis.

08:35  17           Now I'd like to shift gears.  And, actually, I'd like

08:35  18   to revisit an exhibit on which you were examined by

08:35  19   Mr. DeFosse yesterday.  And that exhibit is -- was marked

08:35  20   as PTX-779.  It was admitted into evidence as Trial

08:35  21   Exhibit 124.

08:35  22            **MR. ELKINS:**  And, Mr. Brown, if you could just

08:35  23   go to the second page so that we can see the attachment.

08:35  24   BY MR. ELKINS:

08:36  25   **Q.**    Do you generally -- generally -- I can't speak this

*Aichele - Cross*

08:36   1   morning either -- recall this exhibit?

08:36   2   **A.**   Yes, I do.

08:36   3   **Q.**   Okay.  If we go back -- I want to ask you first, in

08:36   4   terms of when you created it.  This presentation is dated

08:36   5   September 2016, as you can see on this page.

08:36   6           **MR. ELKINS:**  If we go back to Page 1,

08:36   7   Mr. Brown.

08:36   8   **BY MR. ELKINS:**

08:36   9   **Q.**   You'll see that it appears that this e-mail that you

08:36   10  sent attaching it was sent on October 13th, 2016.

08:36   11          When did you actually create that presentation that

08:36   12  is the attachment?

08:36   13  **A.**   Well, the date that I have in there is

08:36   14  September 2016, but I was working on it prior to that.

08:36   15          A little background on that is, you know, when I

08:36   16  started the company in May 2015, it was mainly focusing on

08:36   17  the 4G LTE market, which was a large market.

08:37   18          And I spent probably about a year traveling to Asia,

08:37   19  visiting with customers, and really recognized that it was

08:37   20  going to be a very difficult market segment for us to

08:37   21  penetrate based on -- you know, we were still in the R&D

08:37   22  phase, and obviously had some large competitors we were

08:37   23  competing against.

08:37   24          So it was probably about that time frame in 2016,

08:37   25  early, that I started looking at the Wi-Fi market.  I

08:37  1    started meeting with customers and chipset vendors that

08:37  2    make the chipset that work for Wi-Fi, customers like

08:37  3    Cisco.  Chipset vendors like Quantenna, Marvell, Qualcomm,

08:37  4    and then started, you know, deriving the market strategy

08:37  5    and really pulling it together around the middle of 2016

08:37  6    and then sharing with the organization toward the latter

08:37  7    part of 2016.

08:37  8            **MR. ELKINS:**  Mr. Brown, if we can go to Page 2

08:37  9    of the presentation, which is Page 3 of the exhibit,

08:37  10   please.

08:37  11   **BY MR. ELKINS:**

08:37  12   **Q.**   So this slide is obviously entitled "Market

08:38  13   Priorities."

08:38  14            "IMHO," I assume, means "in my humble opinion"?

08:38  15   **A.**   Yes.

08:38  16   **Q.**   And so here you've listed four things.  Can you --

08:38  17   are these in order of priority?

08:38  18   **A.**   Yes, they are.  That's, you know, part of what I just

08:38  19   explained is that, you know, mobile was our initial

08:38  20   strategy, but, really, because of the competitive nature,

08:38  21   I thought that the 5 gigahertz, you know, was a better

08:38  22   market for us to start targeting.  And we started pushing

08:38  23   the technology up in higher frequency.  And mobile became

08:38  24   Number 2.

08:38  25            But it was still important, and it was a lot of the

08:38  1  emphasis where the company, you know, was going to drive

08:38  2  towards longer term.

08:38  3       Then I started looking at the other market segments

08:38  4  listed below, wireless infrastructure and also military.

08:38  5  And, actually, military was one of our first customers,

08:38  6  you saw the letter yesterday, from ███, which was, I

08:38  7  think dated November 2016.  We started engaging with them

08:38  8  early in 2016 to drive up higher frequency as well.

08:39  9       **MR. ELKINS:**  I'd like to go to the next page,

08:39  10  Mr. Brown, and can we focus on the boxed portion

08:39  11  underneath?  There we go.

08:39  12  **BY MR. ELKINS:**

08:39  13  **Q.**   Here, it appears that you were telling yourself, or

08:39  14  perhaps telling your audience, that the total market

08:39  15  expected to grow from $14.8 billion in 2015 to $33 billion

08:39  16  in 2020.  To what does this refer?

08:39  17  **A.**   This is -- you know, looking at the Wi-Fi by

08:39  18  application.  It's kind of hard to read everything, but,

08:39  19  you know, Wi-Fi is used in many, many different

08:39  20  applications.

08:39  21       So I'm looking at the total market potential and

08:39  22  highlighting that here is very attractive as well, you

08:39  23  know, compared to the mobile side.  Some of this may

08:39  24  include the mobile use of Wi-Fi, as well as fixed wireless

08:39  25  access, which is the routers you see in your home, plus

08:39  1    PCs and other devices as well.

08:39  2    **Q.**   I have two follow-up questions.  One, you used the

08:40  3    jargon TAM.

08:40  4    **A.**   Total available market.

08:40  5    **Q.**   Okay.  And, second, the total market was expected to

08:40  6    more than double from 2015 to 2020.

08:40  7         Was that an epiphany just in September 2015?

08:40  8    **A.**   I mean, it was based on market research and market

08:40  9    data and, obviously, looking at where the growth potential

08:40  10   would be longer term.

08:40  11        **MR. ELKINS:**  Can we go to the next slide,

08:40  12   please.

08:40  13   **BY MR. ELKINS:**

08:40  14   **Q.**   Can you -- can you walk us through what you were

08:40  15   intending to convey here through your opportunity slide?

08:40  16   **A.**   Yes.  The standards we talked about yesterday -- 4G,

08:40  17   5G bands -- the unlicensed standards are what you see up

08:40  18   there as IEEE 802.11, and then you see, you know, a suffix

08:40  19   at the end.  These are different standards.

08:41  20        The new standard that we are starting to disclose is

08:41  21   standard 802.11AC, which was basically moving into

08:41  22   5 gigahertz, and it was expanding the ability of the Wi-Fi

08:41  23   systems to increase their data rates.  So I started

08:41  24   looking at that, looking at, really, the premises

08:41  25   equipment, which is the fixed hardware.  And then, you

08:41  1    know, I was talking to the chipset vendors and customers,

08:41  2    understanding our competitive landscape there.  As you can

08:41  3    see, at the time, it was these dielectric resonator

08:41  4    suppliers and really we were the first company that was

08:41  5    coming into the market with the BAW technology.

08:41  6        Basically, I highlighted Qorvo because there was

08:41  7    communications from the customers I was talking to.  Qorvo

08:41  8    was looking at this market segment as well, but they had

08:41  9    limited offering.  Their focus was mainly lower frequency.

08:42  10        **MR. ELKINS:**  Can we go to Page 8 of the

08:42  11   document, which is Slide 7, which, I think -- there we go.

08:42  12   That's it.

08:42  13   **BY MR. ELKINS:**

08:42  14   **Q.**  This -- this slide refers to another acronym

08:42  15   UNII2E+3, high-band competitors.  What does that refer to?

08:42  16   **A.**  So I don't know exactly what that acronym stands for,

08:42  17   but we call it UNII, and so UNII is -- are definitions of

08:42  18   the unlicensed spectrum of these higher frequencies.

08:42  19        So when you see UNII2E+3, what that typically means

08:42  20   is the higher end of the 5 gigahertz.  So it's from 5.49

08:42  21   to 5.835 gigahertz.  There's also an acronym UNII 1+2A,

08:43  22   which is the lower band of the 5 gigahertz band.  And

08:43  23   mainly what I'm highlighting here is the competitive

08:43  24   landscape that we were exposed to.  And you see the

08:43  25   different competitors that we highlight, and this was

*Aichele - Cross*

08:43    1    shared yesterday as well.

08:43    2    **Q.**    Now, at the time, was Qorvo actually a competitor in

08:43    3    the 5 gigahertz frequency range for BAW filters?

08:43    4    **A.**    Not that I saw from an active selling and promoting

08:43    5    of solutions and sampling of customers.  It was all

08:43    6    competing against the DR competitors.

08:43    7    **Q.**    Okay.  But -- and Mr. DeFosse examined you, and I

         8    think that you had seen a document that referred to

         9    QPQ19XX, and I think you testified yesterday that you

        10    understood that was a proposed product; is that right?

08:43   11    **A.**    Correct.

08:43   12    **Q.**    And the dielectric resonator vendors that you have

08:44   13    listed here, Cirocomm, Patron, Shang Shin and Sorshin,

08:44   14    were they already existing in the 5 gigahertz frequency

08:44   15    range?

08:44   16    **A.**    Correct.  They were already in couple bands.  I call

08:44   17    them current suppliers to the customers we were engaged

08:44   18    with.

08:44   19              **MR. ELKINS:**  Let's go to the next slide,

08:44   20    please.

08:44   21              If we could just frame around so everybody can

08:44   22    see it more easily.  Thank you.

08:44   23    **BY MR. ELKINS:**

08:44   24    **Q.**    Akoustis target UNII specs -- again, UNII is the

08:44   25    unlicensed frequency range?

*Aichele - Cross*

**A.**   Correct.

**Q.**   What are you showing in this slide?

**A.**   Mainly, you know, our comparison against the DR
competitors.  So, in our strategy, I need to present -- we
have an opportunity to really penetrate and replace,
potentially, these DR providers.  It was a significant
market opportunity.

So I really, you know, analyzed who the incumbents
were and that's the DR compares -- the slide is really
that comparison showing the low 5.2 gigahertz compared to
DR and where the advantages are.

And then also on the 5.6 gigahertz or 7 gigahertz,
what are the advantages and disadvantages because our main
advantages was size, but you also have to look at the
electrical performance as well.

**Q.**   Were you focusing on moving Akoustis into the
5 gigahertz frequency range for all filters before you saw
that Qorvo document with a proposed is QPQ19XX product
discussed?

**A.**   You mean the e-mail from Rohan?

**Q.**   Yes?

**A.**   Absolutely.  As I mentioned, I started traveling in
early 2016, middle of 2016, visiting with customers,
visiting with chipset vendors to really understand the
landscape better and propose a strategy that I could stand

08:46  1    behind because we have limited resources, we have to

08:46  2    conserve cash, got to make bets in the right area.

08:46  3    **Q.**    Okay.  Thank you.

08:46  4    **A.**    You're welcome.

08:46  5              **MR. ELKINS:**  We can put that exhibit to the

08:46  6    side.

08:46  7    **BY MR. ELKINS:**

08:46  8    **Q.**    I'd like to switch gears again.  I'd like to discuss

08:46  9    with you some facts relating to Qorvo's claim of false

08:46  10   advertising regarding Akoustis' single crystal BAW filter

08:46  11   technology.

08:46  12        And what I would like to do is go back to what was

08:46  13   marked as PTX-694, which was entered into evidence as

08:46  14   Trial Exhibit 153.  And what I'd like to focus on is the,

08:47  15   all caps phrase that is immediately under the investor

08:47  16   presentation box that says "innovation in single crystal

08:47  17   BAW wave technology."

08:47  18        To what does that refer?

08:47  19   **A.**    So, you know, it's a tag line that we used in our --

08:47  20   you know, as you can see in this investor presentation,

08:47  21   really what it represents is that when we started the

08:47  22   company, it was based on the innovation in single crystal

08:47  23   technology.  I explained yesterday that single crystal has

08:47  24   been around for many years.  It is done in active devices.

08:47  25   The premise of the company was really introducing single

08:47 1    crystal technology to a passive device.  And this is the

08:47 2    differentiator, and it's excited, you know, the market

08:47 3    opportunities, and the investors, you know, to show we

08:47 4    have a focused approach here.

08:47 5    **Q.**    Now, you used -- in explaining this, you used the

08:48 6    past tense in saying "used."  Does that mean you don't use

08:48 7    that phrase any longer?

08:48 8    **A.**    Correct.  We do not use that tag line anymore.

08:48 9    **Q.**    Okay.  But when Akoustis did use it, did you use it

08:48 10   in context other than presentations?

08:48 11   **A.**    Yes.  We used it in press releases.  We used it in,

08:48 12   you know, marketing literature, you know.  I'm sure it was

08:48 13   in, obviously the investor presentation, and customer

08:48 14   presentations as well.

08:48 15           **MR. ELKINS:**  Let me go to Slide 12, please.

08:48 16   **BY MR. ELKINS:**

08:48 17   **Q.**    Obviously titled, "Why single crystal for BAW?"

08:48 18   What's the purpose of putting this slide in the investor

08:48 19   presentation for -- I think it was September.  I can't

08:48 20   even read it on the document -- excuse me -- August of

08:48 21   2018?  What's the purpose of this slide?

08:48 22   **A.**    You know, the concept here, again, was novel.  And,

08:49 23   you know, when you're taking a novel concept to market,

08:49 24   you need to really try to help educate and clarify what

08:49 25   the advantages are that you are going to bring to the

08:49  1    market with this technology.

08:49  2        And so this is a hopefully straightforward slide that

08:49  3    you could talk to -- when you're meeting with investors

08:49  4    and what it really highlights is three advantages, high

08:49  5    thermal conductivity is one of them.  The other one is

08:49  6    high mechanical coupling.

08:49  7        At the time, that was a true statement.  The

08:49  8    technology has continued to evolve.  We had to improve on

08:49  9    that.  And then, also, the premise of high sound velocity

08:49  10   as well.

08:49  11   **Q.**   Why are those benefits?

08:49  12   **A.**   It really, you know, highlights below, you know, why

08:49  13   those benefits -- I'll focus on two of them, the high

08:49  14   thermal conductivity is really allowing you to do a higher

08:50  15   power.  So the thermal conductivity single crystal is

08:50  16   better than other materials and so you can push a -- you

08:50  17   know, more power into the BAW filter without damaging or

08:50  18   having catastrophic failure.

08:50  19       The other one is high sound velocity.  You can see in

08:50  20   the graph here there's a Y axis, which is looking at sound

08:50  21   velocity.  It's the parameter that you're trying to

08:50  22   measure there.  With higher sound velocity, you can go to

08:50  23   a thicker piezo material, which means you can go up higher

08:50  24   in frequency.  And that's part of our premise, was

08:50  25   pushing, you know, the technology into higher frequency.

08:50  1    **Q.**   This presentation is from August of 2018.  Obviously

08:50  2    we're several years past there.  Is it Akoustis' position

08:50  3    that the benefits that are mentioned here regarding the

08:50  4    use of single crystal remain true today?

08:51  5    **A.**   Correct.

08:51  6    **Q.**   I'd like to move to another document.

08:51  7              **MR. ELKINS:**  And, Mr. Brown, if you could pull

08:51  8    up what was marked as PTX-0695.  Don't pull it up yet.

08:51  9    Let's talk to Mr. Aichele about it first.

08:51  10             May I approach, Your Honor?

08:51  11             **THE COURT:**  You may.

08:51  12   **BY MR. ELKINS:**

08:51  13   **Q.**   Mr. Aichele, do you recognize the document that you

08:51  14   have in front of you that was marked for identification as

08:51  15   PTX-695?

08:52  16   **A.**   Yes, I do.

08:52  17   **Q.**   What is it?

08:52  18   **A.**   This is a letter from -- or e-mail, I should say,

08:52  19   from Joel Morgan, who is our VP of quality at the time, to

08:52  20   Jeff Shealy, myself, and others within the organization.

08:52  21   **Q.**   It appears to be -- have an attachment that -- to it.

08:52  22   Can you -- do you recognize that attachment?

08:52  23   **A.**   Yes, I do.

08:52  24   **Q.**   And, generally, what does that attachment show?

08:52  25   **A.**   It's a presentation basically comparing the power

*Aichele - Cross*

08:52  1  handling capability.  What is said here is EPI.  So

08:52  2  silicon, EPI is another terminology for single crystal

08:52  3  versus poly on a silicon substrate.

08:52  4        MR. ELKINS:  Your Honor, Akoustis moves into

08:52  5  evidence the document that was marked PTX-0695.

08:53  6        THE COURT:  Marked and received as 155.(Trial

08:53  7  Exhibit No. 155 was admitted into evidence.)

08:53  8  BY MR. ELKINS:

08:53  9  Q.  So this is the -- this is the e-mail from Mr. Morgan

08:53  10  to you, Mr. Shealy, Mary Winters, and Shawn Gibb?

08:53  11  A.  Correct.

08:53  12  Q.  Who is Shawn Gibb?

08:53  13  A.  Shawn Gibb at the time was director of materials at

08:53  14  Akoustis.

08:53  15  Q.  Where does he work now?

08:53  16  A.  I think he used to work at Qorvo.  I think he just

08:53  17  recently left Qorvo and is now somewhere else.

08:53  18  Q.  Okay.  So let's look at the presentation that's

08:53  19  attached.  And just -- so this is measuring the max power

08:53  20  capability of epi.  What does sic mean?

08:53  21  A.  That is it silicon carbide, and that is the substrate

08:54  22  that we would deposit the epi material onto.

08:54  23  Q.  Versus poly and then it says Si.  What does that

08:54  24  mean?

08:54  25  A.  Poly is the poly crystalline material.  And Si is the

*Aich - Cross*

08:54   1   silicon substrate we would deposit on.

08:54   2           **MR. ELKINS:**  Let's go to the next slide.

08:54   3   **BY MR. ELKINS:**

08:54   4   **Q.**   What does -- what does this slide show you?

08:54   5   **A.**   It shows you basically a test setup and that there

08:54   6   are certain MSETs -- M-S-E-T is a MSET.  And that MSET was

08:54   7   used to fabricate, you know, a -- I guess, a BAW filter

08:54   8   using the poly.  And then a BAW filter using the epi

08:54   9   material.  And then what we have is the data that was

08:54   10  taken, which you can see on the table to the right, which

08:54   11  indicates, basically, DBN, which is a measurement, and W,

08:55   12  a W, which is translating DBM to watts is that translation

08:55   13  there, at what temperature, what modulation, which is a

08:55   14  signal that we use at what frequency we tested it, and

08:55   15  then you can see the XB1 process.

08:55   16      And then it shows you the delta.  And the one box

08:55   17  above where you see 36.87.  That is DBN output power.  And

08:55   18  then it shows you 33.11 for the other device.  So the 36

08:55   19  was related to the -- to the single crystal, and then the

08:55   20  33 was related to the poly crystal.

08:55   21      And it shows that you get about 3DB more power

08:55   22  handling with the poly crystal material, which is about

08:55   23  double the power handling.  So 30DBM is 1 watt, 33 DBM

08:55   24  would be 2 watts, 36 DBM, would be 4 watts.

08:56   25  **Q.**   So these -- the two die that were being tested here,

*Aichele - Cross*

08:56  1  were they -- were they the same other than the difference

08:56  2  between the polycrystalline material on one and the single

08:56  3  crystal material on the other?

08:56  4  **A.**   Yes.   That's a very important point to state, in that

08:56  5  we really wanted to do apples to apples comparison.   We

08:56  6  didn't want to have a different design on one material and

08:56  7  another design on a different material.   We wanted it to

08:56  8  have the same design utilizing two different materials so

08:56  9  that we could do an apples to apples comparison.

08:56  10      So in the manufacturing flow, the design, the testing

08:56  11  were all the same.   The only thing that was different was

08:56  12  the material selection.

08:56  13  **Q.**   So what was your takeaway from the testing that

08:56  14  Mr. Morgan shared with you?

08:56  15  **A.**   We did further testing beyond this one, but my

08:56  16  takeaway was that the theory that single crystal offers

08:56  17  higher power handling was validated by this test and other

08:57  18  tests, and the theory really comes around that in view of

08:57  19  the single crystal, you know, it's Tom Figaro type of

08:57  20  layers.   There's no defects, there's no grading

08:57  21  boundaries, which means it improves thermal -- the --

08:57  22  lowers the thermal resistance.   So you get better heat

08:57  23  spreading out of material versus poly.   It's more of a

08:57  24  stressor that has grain boundaries and has a higher

08:57  25  thermal resistance and, therefore, is not as good as

08:57  1    conducting, and letting the power or heat escape.

08:57  2    **Q.**   Thank you.

08:57  3         **MR. ELKINS:**  We can take the slide down.

08:57  4    **BY MR. ELKINS:**

08:57  5    **Q.**   So earlier you -- you confirmed that Akoustis no

08:57  6    longer uses the innovation through single crystal

08:57  7    technology.  Tag line, I think you called it.  Why not?

08:57  8    **A.**   Again, this is -- you know, a lot of my

08:57  9    responsibilities in, you know, marketing the company.  And

08:57  10   so, you know, as we evolve as a company, and as we grow,

08:58  11   you know, we need to, you know, adjust accordingly.

08:58  12       When we brought to the XB1 process, you know, to a

08:58  13   point where we had frozen it and we wanted to move forward

08:58  14   with it, single crystal offers the advantages that I

08:58  15   highlighted, but it also has some disadvantages.  Those

08:58  16   disadvantages are that the silicon carbide substrate that

08:58  17   I highlighted is ten times more expensive than a silicon

08:58  18   wafer.  A silicon wafer can cost you $200.  A silicon

08:58  19   carbide wafer can cost you $2,000.

08:58  20       In addition to operations really highlighted that the

08:58  21   single crystal on single -- silicon carbide is not high

08:58  22   yielding.

08:58  23       So, you know, we had, you know, really a difficult,

08:58  24   you know, hurdle that we had to overcome if we really

08:58  25   wanted to get to those high-volume, low-cost applications.

08:58  1        Then we found that New York actually had a PVD, which

08:58  2   is a physical vapor deposition where they could do poly

08:59  3   deposition.

08:59  4        So, in addition to these power tests, we started

08:59  5   doing DOEs, design of experiments, and running short

08:59  6   loops, which is being able to do quick analysis to see

08:59  7   that we could get the response, you know, that we were

08:59  8   looking for electrically, you know, with the

08:59  9   polycrystalline material.

08:59  10        And it also offers advantages that the single crystal

08:59  11   could be enough to go higher fractional bandwidth.  It's a

08:59  12   thing called doping.  We had some limitations in the

08:59  13   single crystal material.

08:59  14        So we really analyzed that.  Once we felt that we had

08:59  15   a -- you know, a good path forward, we started introducing

08:59  16   poly into -- into the selection materials.  And that's one

08:59  17   of the things that I highlighted yesterday, sort of

08:59  18   external process, essentially, five pillars, and one of

08:59  19   them is material selection.

08:59  20        We are the only, you know, company that offers BAW

08:59  21   selections in the market today that has single crystal and

08:59  22   polycrystalline.  They are tools within our operations and

09:00  23   also designers need to access.

09:00  24   **Q.**  Have you replaced the innovation through single

09:00  25   crystal tag line --

09:00  1  **A.**   Yes, we have.

09:00  2  **Q.**   -- with a new one?

09:00  3  **A.**   Yes, we have.

09:00  4  **Q.**   What is the new tag line?

09:00  5  **A.**   It's -- I mean, we don't use it in our -- you know,

09:00  6  on the tag line in the presentation, but we do call it

09:00  7  out, we say high purity, not piezo.

09:00  8  **Q.**   What does that refer to?

09:00  9  **A.**   It's just the selection of material we believe based

09:00  10  on the equipment set that we've procured and installed,

09:00  11  you know, for our poly, which we have bought new equipment

09:00  12  and upgraded, and also with our single crystal that these

09:00  13  are high purity piezo materials we can choose from.

09:00  14  **Q.**   Has Akoustis abandoned its single crystal technology?

09:00  15  **A.**   Absolutely not.

09:00  16  **Q.**   But how is it offered today, if at all?

09:00  17  **A.**   It's still offered.  You know, and we actually had to

09:00  18  pull single crystal back, you know, to bring it back into

09:00  19  the R&D phase because of what I mentioned before, it

09:00  20  wasn't high yielding.  It didn't allow you to support the

09:01  21  wider fractional bandwidths, and it was deposited on the

09:01  22  silicon carbide, a very expensive substrate.  We spent

09:01  23  probably another two years really advancing the single

09:01  24  crystal technology.  You know, we added a dope in switch

09:01  25  to allow you to extend the fractional bandwidth to our

reactor.  We also developed the process that we could

deposit on silicon, and, you know, very important is we've

been funded by DARPA, which is a defense agency of the

United States government, and millions of dollars of

contracts to advance our single crystal material.  They

see it as being a very important investment by the US

government, and part of that is where single crystals

really being critical is advancing up to higher

frequencies up to 20 gigahertz.  And this is an initiative

that Akoustis is one of the only companies that was

awarded that was a, you know, an acoustic company.  And

it's really for defense, you know, phase radars and other

similar applications.

**Q.**   Thank you.

Yesterday, we -- you know, you can't sit through

other people's testimony before you testify so you don't

necessarily know who has testified or when.  But

yesterday, we saw a video testimony from Rohan Houlden.

Do you know him?

**A.**   Yes, I do.

**Q.**   Who is he?

**A.**   Well, who he was, was a -- he worked at Akoustis,

and, I believe, he started late part of 2016, and he

initially was the VP of engineering when he started, and

then he was moved into chief product officer later.

09:02    1    **Q.**    Where was Mr. Houlden before he joined Akoustis?

09:02    2    **A.**    I don't know if he was anywhere when he joined

09:02    3    Akoustis, but prior to that, he was working at Qorvo.

09:03    4    **Q.**    Did you give any depositions in this case?

09:03    5    **A.**    Yes, I gave two depositions.

09:03    6    **Q.**    Okay.  Do you recall being shown documents in your

09:03    7    depositions by counsel for Qorvo?

09:03    8    **A.**    Yes.  I -- you know, through, obviously, yesterday

09:03    9    and discussions today, some of those documents and others

09:03    10    were shared with me during the depositions.

09:03    11    **Q.**    Do you recall any of those documents being sent to

09:03    12    you by Mr. Houlden?

09:03    13    **A.**    Not -- it's been six to nine months since we did

09:03    14    that.  Obviously, yesterday, you know, gave me a little

09:03    15    bit more of a refresh, but I don't recall specifics, but I

09:03    16    do remember receiving documents, you know, from -- and

09:03    17    e-mails, I should say from Rohan Houlden.

09:03    18    **Q.**    What policies, if any, does Akoustis have regarding

09:04    19    third party information?

09:04    20    **A.**    You know, we've got, I think, three policies; we've

09:04    21    got a confidentiality and intellectual proprietary

09:04    22    agreement that everybody signs when they onboard with the

09:04    23    company.  We've also got a code of ethics and conduct, and

09:04    24    then we also have a business conduct, you know, document

09:04    25    as well.  And all of those are documents that everybody

09:04  1    has to recognize and sign and acknowledge, and they all

09:04  2    state pretty much the same thing in different words,

09:04  3    basically, that any individual that joins Akoustis will

09:04  4    not bring in any third party intellectual property or

09:04  5    inventions.

09:04  6    **Q.**   What happens to an employee who violates those

09:04  7    policies?

09:04  8    **A.**   You know, obviously, it has to be raised, you know,

09:04  9    as a violation, you know.  And I believe if it's raised as

09:04  10   a violation, it should go to our HR director and then also

09:05  11   to general counsel.

09:05  12   **Q.**   Who decides the consequences, if any, if an employee

09:05  13   is found to have violated the policies you mentioned?

09:05  14   **A.**   My understanding is that, you know, that the HR

09:05  15   director and also general counsel would bring that before

09:05  16   our CEO, which is Dr. Shealy, and determinations would be

09:05  17   made at that point.

09:05  18   **Q.**   I think you testified yesterday about discussions

09:05  19   that you had with a couple of people who were based in

09:05  20   Asia.  Have you had occasions to discuss company policies

09:05  21   regarding third-party information with anybody else at

09:05  22   Akoustis?

09:05  23   **A.**   Yes.  I think I had discussions with Rohan at the

09:05  24   time, and then, obviously, my main interactions and focus

09:06  25   has been more with the sales team.  And, again, it's

09:06  1   really, you know -- and I've done this for many years,

09:06  2   collecting competitive information.  And, you know, with

09:06  3   the sales organization is that and/or others, you know, in

09:06  4   the, I guess, the outside that share information.  There

09:06  5   is competitive information, then there's truly

09:06  6   confidential information.  You've just got to be careful.

09:06  7        But competitive information is something everybody

09:06  8   does in the industry.  It's not exclusive to Akoustis.

09:06  9   You've just got to make sure that, you know, if it is

09:06  10  truly confidential, we don't need it, we don't want it.

09:06  11  It's not anything that we want to bring in.

09:06  12  **Q.**   Is it -- can it be hard to make that distinction?

09:06  13  **A.**   Yeah.  You know, documents can be marked confidential

09:06  14  that are basically in the public domain, you know, and a

09:06  15  lot of people have been tainted, or, I guess, numb to it,

09:06  16  they may ignore it.  I think it's clear certain documents,

09:06  17  you know, that were shared yesterday, they are truly

09:07  18  confidential, and we should not have had them.  The price

09:07  19  book -- I'll give an example too.  And that is something,

09:07  20  though, that was not used.  And but it is hard to make

09:07  21  distinctions, you know, with, you know, certain documents.

09:07  22  **Q.**   Did you ever speak with Mr. Houlden about sharing

09:07  23  documents that appeared to come from Qorvo?

09:07  24  **A.**   Yes.  I remember having conversations with him

09:07  25  regarding those documents, but not specifics that I can

*Aichele - Cross*

09:07  1    recall.

09:07  2    **Q.**   Did you take any action in connection with

09:07  3    Mr. Houlden sharing documents that appeared to come from

09:07  4    Qorvo apart from your discussions with him?

09:07  5    **A.**   No, I did not.

09:07  6    **Q.**   Well, given the company's policies that you discussed

09:07  7    a few minutes ago, why didn't you?

09:07  8    **A.**   I would highlight several reasons.  You know, first

09:07  9    is that we did have an NDA with Qorvo.  And Rohan was

09:07  10   having -- Mr. Houlden was having multiple discussions with

09:08  11   multiple people within Qorvo.  And so anything that he

09:08  12   would send me, I don't know exactly where he got it, you

09:08  13   know, if it was through, obviously, you know, right

09:08  14   channels or incorrect channels.  So I just didn't raise,

09:08  15   you know, any visibility to me on that as being a concern.

09:08  16       The second thing is, our technology is completely

09:08  17   different than Qorvo.  We have this cap back freestanding

09:08  18   type area on top and bottom.  And the XBAW process is

09:08  19   completely different to Qorvo's SMR.  And nothing I saw in

09:08  20   any of those documents tainted us with any kind of trade

09:08  21   secret, you know, that I thought would raise the level of

09:08  22   concern.

09:08  23       Third thing is -- I just touched on that earlier, but

09:08  24   just to reiterate.  You know, for many years I've been in

09:08  25   the industry, you know, I've made mistakes and, you know,

put in "Confidential" when I didn't need to put

"Confidential" in the tag.  I've used presentations that

were confidential in a public domain.  I am positive that,

you know, I did this at R&D, I'm positive Qorvo still does

that today.

And so when I see documents, you know, it maybe

didn't raise a level.  I didn't know exactly where it came

from.

The last part is just on the business intelligence.

We were leading the market.  We were ahead of it.  You

know, we showed the 1903.  I shared data sheets now today

that I'm sure that are, you know, marked "Confidential"

that get out into the public domain.  I don't look at the

trade data sheet as a trade secret.  I look at the data

sheet as a contract to the market to the customers.  It

doesn't tell you how to design.  It doesn't tell you how

to -- you know, how to fabricate the device.  It basically

shows you the kind of response.

So it's -- again, I don't really hold a lot

personally, you know, to data sheets.  I know they're

going to get leaked.  And this business is intelligent.

We were ahead on the market, so I didn't pay attention too

much.

Nevertheless, you know, Rohan was an officer of the

company.  He shared, you know, the documents, I believe,

*Aichele - Cross*

09:10   1   based on the discovery here that, you know, were

09:10   2   confidential.  And, you know, I should have raised that.

09:10   3   You know, it's a lesson learn.  It's something that I am

09:10   4   applying now more diligently than I did prior to, you

09:10   5   know, this lawsuit.  And it's something that I do regret.

09:10   6   **Q.**   We heard the context of Mr. Houlden's deposition,

09:10   7   indicated that he was no longer at Akoustis at that time.

09:10   8       Do you know the circumstances of Mr. Houlden's

09:10   9   departure from Akoustis?

09:10   10  **A.**   Yes, I do.

09:10   11  **Q.**   How is it that you know that?

09:10   12  **A.**   When -- of my two depositions.  One was an individual

09:10   13  deposition, and the other one I was a representative of

09:10   14  Akoustis, you know, for certain topics.  So I talked with

09:10   15  Dr. Shealy prior to my Akoustis deposition.

09:10   16  **Q.**   What did you learn about Mr. Houlden's separation

09:11   17  from the company?

09:11   18  **A.**   What I learned is that Mr. Houlden was terminated due

09:11   19  to, basically, not meeting personal goals and/or job

09:11   20  responsibilities.  And so it's a performance-based

09:11   21  termination.

09:11   22  **Q.**   When did that termination take place?

09:11   23  **A.**   I believe it was around the middle of 2022.

09:11   24  **Q.**   What role, if any, did this case play in

09:11   25  Mr. Houlden's termination?

09:11  1    **A.**   Absolutely nothing.

09:11  2    **Q.**   Why is that?

09:11  3    **A.**   You know, it -- I don't know exactly the time of, you

09:11  4    know, when a lot of this confidential information and the

09:11  5    discovery phase was made evident.  You know, originally,

09:11  6    when the lawsuit came in, it was more, I believe, on IP

09:11  7    infringement and so forth.

09:11  8         So that's just my viewpoint, is that -- the true

09:11  9    decision.  And, you know, we set out metrics and our

09:11  10   goals, you know, in the beginning of the 20 -- let's see,

09:11  11   if it was 2022, would have been middle of 2021.  So those

09:12  12   metrics are measured at the middle of 2022.  That's when

09:12  13   we do a review.  And I believe Jeff, maybe with guidance

09:12  14   from the board, they decided to do the termination based

09:12  15   on performance issues.

09:12  16   **Q.**   Thank you.

09:12  17        Okay.  We're going to switch gears.  I'm just going

09:12  18   to show you a series of four documents pretty quickly.

09:12  19   **A.**   Okay.

09:12  20   **Q.**   And just to be transparent, they're just to get them

09:12  21   into the record.  Other people will testify about them.

09:12  22        So the first one I'd like to show you is DTX-0558.

09:12  23             **MR. ELKINS:**  May I approach?

09:12  24             **THE COURT:**  You may.  I have a screen over

09:13  25   here.  Most of the time, I can see everything, so I'm

*Aichele - Cross*

09:13  1    going to let the courtroom deputy keep the exhibits.

09:13  2    **BY MR. ELKINS:**

09:13  3    **Q.**   Mr. Aichele, do you recognize what you have in your

09:13  4    hands that has been marked as DTX-0558?

09:13  5    **A.**   Yes, I do, in general.

09:13  6    **Q.**   What is it?

09:13  7    **A.**   It is an e-mail to me from Rohan, and it has in it an

09:13  8    e-mail communication between himself and Robert Aigner

09:13  9    from Qorvo.

09:13  10   **Q.**   Do you recognize the e-mail thread subject matter?

09:13  11   **A.**   Yes, I do.

09:13  12   **Q.**   What -- what is it, generally?

09:13  13   **A.**   You know, Rohan -- and, again, Rohan and

09:13  14   Robert Aigner were periodically meeting face to face and

09:13  15   through e-mail exchanges.  And Robert Aigner was also

09:13  16   engaged with other technical people within the company,

09:13  17   myself included.

09:13  18       And in this e-mail it looks like Rohan had posted

09:14  19   several questions to Robert Aigner, and Robert Aigner

09:14  20   responded back in this e-mail addressing the third

09:14  21   question, which was about power handling and really

09:14  22   providing some technical insight on power handling.

09:14  23       He also shared information as to FBAR, which is a

09:14  24   acoustic technology.  And their electrode structure, and

09:14  25   Qorvo's SMR structure, which is the SMR and using

*Aichele - Cross*

09:14　1　　aluminum-copper as electrode, and explaining the

09:14　2　　advantages and disadvantages of the material.

09:14　3　　**Q.**   Okay.  Thank you.

09:14　4　　　　　**MR. ELKINS:**  Your Honor, we have move PTX-0558

09:14　5　　into evidence.

09:14　6　　　　　**THE COURT:**  Received as 156.

09:14　7　　　　　(Trial Exhibit No. 156 was admitted into

09:14　8　　evidence.)

09:14　9　　**BY MR. ELKINS:**

09:14　10　　**Q.**   Mr. Aichele, I'm going to show you another document.

09:15　11　　　　　**MR. ELKINS:**  Permission to approach,

09:15　12　　Your Honor?

09:15　13　　　　　**THE COURT:**  You may.

09:15　14　　**BY MR. ELKINS:**

09:15　15　　**Q.**   Mr. Aichele, do you recognize what has been marked

09:15　16　　for identification as DTX-0580?

09:15　17　　**A.**   Yes, I do.

09:15　18　　**Q.**   What is it?

09:15　19　　**A.**   This is an internal Akoustis document that defines

09:15　20　　procedures for design development and maintenance of our

09:15　21　　process and our products.

09:15　22　　　　　**MR. ELKINS:**  Your Honor, move DTX-0580 into

09:15　23　　evidence.

09:15　24　　　　　**THE COURT:**  Marked and received as 157.

09:15　25　　　　　(Trial Exhibit No. 157 was admitted into

09:15  1  evidence.)

09:15  2  **BY MR. ELKINS:**

09:15  3  **Q.**    What is this document used for?

09:16  4  **A.**    This is really an administrative document that really

09:16  5  helps to provide some framework and guidance, you know, as

09:16  6  to, you know, how you bring a product concept, you know,

09:16  7  into development, and then, you know, what the different

09:16  8  steps that you go through.  And it gives you some flow

09:16  9  charts.

09:16  10       And that, first, under Instructions, you know, gives

09:16  11  you what we call the "gating phase" approach on bringing a

09:16  12  product process into production.

09:16  13  **Q.**    So is this a -- what is sometimes called a "phase

09:16  14  gate"?

09:16  15  **A.**    Correct.

09:16  16  **Q.**    Product development document?

09:16  17  **A.**    Correct.

09:16  18  **Q.**    Had you seen a document like this before joining

09:16  19  Akoustis?

09:16  20  **A.**    Yes.  I've had -- through many roles in different

09:16  21  companies, I've had responsibilities to do product

09:16  22  management.  So I worked with techno-electronics.  I've

09:16  23  worked with start-up companies called Digital Optics.  I

09:16  24  worked at RFD for nine years.  I worked with, you know, T1

09:17  25  Visions, and now at Akoustis.

09:17   1          And I've also seen documents like this in textbook.

09:17   2   So every company has, you know, similar, you know,

09:17   3   administrative documents like this that, you know, discuss

09:17   4   this phase-gate approach.  The specifics, you know, are

09:17   5   usually unique to a customer -- or to a company.

09:17   6   **Q.**    Is the information in this document proprietary?

09:17   7   **A.**    I would say it's -- you know, it's company centric.

09:17   8   And so in that respect, you know, it's unique.  But

09:17   9   there's nothing here, in my opinion, you know, that raises

09:17  10   to trade secrets or anything that's unique.  Everybody

09:17  11   typically follows the same process.

09:17  12   **Q.**    Thank you.

09:17  13          Two more documents to go.

09:18  14               **MR. ELKINS:**  May I approach?

09:18  15               **THE COURT:**  You may.

09:18  16               **MR. ELKINS:**  Thank you.

09:18  17   **BY MR. ELKINS:**

09:18  18   **Q.**    What I've handed to you is -- been marked as joint --

09:18  19   or JTX-0014.

09:18  20          Do you recognize it?

09:18  21   **A.**    Yes, I do.

09:18  22   **Q.**    What is it?

09:18  23   **A.**    This is a report that's generated by the company

09:18  24   called System Plus Consulting.  And it's a technical, and

09:19  25   I guess what they title in here "Reverse Costing

09:19  1    Structural Process and Cost Report."  And it's three

09:19  2    products.  These three products are Akoustis' products.

09:19  3    It's AKF-1256 and A10155 and A10165.  So the report is

09:19  4    around those specifics Akoustis' products.

09:19  5           **MR. ELKINS:**  Your Honor, we move what's been

09:19  6    marked as JTX-0014 into evidence.

09:19  7           **THE COURT:**  Marked and received as 158.

09:19  8           (Trial Exhibit No. 158 was admitted into

09:19  9    evidence.)

09:19  10   **BY MR. ELKINS:**

09:19  11   **Q.**   Do you know the source of this document?

09:19  12   **A.**   Yes.  It's coming from this company, System Plus

09:19  13   Consulting.

09:19  14   **Q.**   Who is System Plus Consulting?

09:19  15   **A.**   They are a well-known company in the -- they're -- I

09:19  16   think they're based -- I believe they're French, and, you

09:20  17   know, I believe, they have some test labs that are located

09:20  18   in North America as well.

09:20  19        But they do this type of analysis all the time.  And,

09:20  20   basically, it's -- this type of analysis is reverse

09:20  21   engineering, you know, where they will take publicly

09:20  22   available components and do the reverse engineering of

09:20  23   that to generate these reports.

09:20  24   **Q.**   Have you heard the term "teardown"?

09:20  25   **A.**   Yes, I have.

09:20  1    **Q.**   What does that mean?

09:20  2    **A.**   So you can -- actually, if you ever hear about Apple

09:20  3    iPhone teardowns, that's an example where someone will

09:20  4    take an Apple iPhone and actually deconstruct it and

09:20  5    really highlight all the different components that are on

09:20  6    that.  So that's done in the industry at a system level

09:20  7    all the time.  It's really to understand, you know, what's

09:20  8    the new chip sets and, you know, the new technology that's

09:20  9    going in.  And these iPhone teardowns are done once

09:21  10   they're publicly available.

09:21  11       Same thing with, you know, integrated passive devices

09:21  12   or active devices.  There's an interest in the industry,

09:21  13   you know, to do these type of teardowns where they can

09:21  14   actually, you know, really do analytical analysis of the

09:21  15   die.

09:21  16       These reports are very exhaustive as to looking at

09:21  17   cross-sections, you know, and material selection, material

09:21  18   analysis, et cetera.  And they also pull together what is

09:21  19   estimated manufacturing cost models as well.

09:21  20   **Q.**   Do you have an understanding about -- well, first of

09:21  21   all, did you obtain this report from System Plus

09:21  22   Consulting?  Did they just give it to you?

09:21  23   **A.**   No.  You have to buy these reports from System Plus.

09:21  24   **Q.**   Do you have an understanding about who can purchase

09:21  25   reports from System Plus?

*Aichele - Cross*

09:21　1　**A.**　Yeah.　You know, I think these reports -- you know,

09:21　2　so it's interesting to see a report on Akoustis, you know,

09:22　3　because at the time we were a small player.　So I believe

09:22　4　that System Plus, you know, unless there's a reason,

09:22　5　they're not going to go and generate a report.　I think

09:22　6　this one was generated because a competitor wanted a third

09:22　7　party to do the analysis on our technology.

09:22　8　　So I think this report was generated through that,

09:22　9　you know, that engagement, and then it was made publicly

09:22　10　available to purchase.

09:22　11　**Q.**　Understanding you're not a lawyer or trained in law,

09:22　12　Mr. Aichele, do you have a layperson's understanding about

09:22　13　the legality of reverse engineering somebody else's

09:22　14　product?

09:22　15　**A.**　Yeah.　I think it goes to, you know, my statement on

09:22　16　the iPhone, and it applies here as well.　These are

09:22　17　components that are in the public domain.　You can pick

09:22　18　them up anywhere.　So it's, in my opinion, layman-wise, is

09:22　19　that, you know, there is no IP infringement, you know,

09:22　20　when they're doing this type of analysis.

09:22　21　**Q.**　So just to help us get an understanding of the work

09:23　22　that a teardown report, or at least System Plus Consulting

09:23　23　teardown report can do, can I have you turn to -- it looks

09:23　24　like it's Slide 46.　It's also Page 46 of the exhibit.

09:23　25　And Mr. Brown has it.

09:23  1          Can you tell us what we're looking at there?

09:23  2   **A.**   So this is our A10155.  So this is a new part that

09:23  3   was really covering the full 5 gigahertz bandwidth.  And

09:23  4   what you're looking at is a top-down view of the die.  And

09:23  5   so when you see the S1, S2, S3, S4, S5, and S6, those are

09:23  6   series resonators.

09:23  7          And then the P1, P2, P3, P4, those are shunt

09:23  8   resonators.  So that is, you know, those resonators, as I

09:23  9   mentioned before.  So this is really the first time you

09:23  10  guys can see a filter design.  Those resonators are the

09:23  11  building block to allow you to you connect to, basically,

09:24  12  create this filter response.

09:24  13  **Q.**   How large are those individual resonators?

09:24  14  **A.**   Can't tell exactly on these, but the die size is

09:24  15  probably .9 by .8 milliliters.  And the resonators are

09:24  16  probably what they call 100 microns, 120 microns.  Very

09:24  17  small.

09:24  18  **Q.**   So this is -- is it your understanding that System

09:24  19  Plus Consulting was using some kind of microscope to take

09:24  20  this photo?

09:24  21  **A.**   Yes, absolutely.

09:24  22  **Q.**   Okay.  I'd like you to now just get another look, and

09:24  23  go to Page 72 of this document.

09:24  24          **MR. ELKINS:**  And if we could blow that up.

09:24  25  Thank you.

09:24  1  **BY MR. ELKINS:**

09:24  2  **Q.**    What are we looking at here?

09:24  3  **A.**    This is -- actually, I think I mentioned this.  This

09:24  4  is a cross-section.  So they've taken our die and they've

09:24  5  done a cross-section, which means they basically cut it in

09:25  6  half.  So now you can see the actual cross-section of the

09:25  7  BAW die.  And what they're highlighting, this is our

09:25  8  AKF-1256, which is 5.6 gigahertz part.

09:25  9      You can actually see the structures.  You can see the

09:25  10  silicon layer, which is a silicon wafer.  And then as you

09:25  11  go up, you can see the different material compositions

09:25  12  and, you know, basically, different thicknesses.  And you

09:25  13  can see, obviously, you know, how small, you know, these

09:25  14  different thicknesses are.

09:25  15  **Q.**    Okay.  Thank you.

09:25  16          **MR. ELKINS:**  We can take that down.  One more

09:25  17  document.

09:25  18          If may I approach, Your Honor?

09:25  19          **THE COURT:**  You may.

09:26  20  **BY MR. ELKINS:**

09:26  21  **Q.**    What I've handed you, Mr. Aichele, is marked for

09:26  22  identification as DTX-0623.  And, again, do you recognize

09:26  23  it?

09:26  24  **A.**    Yes, I do.

09:26  25  **Q.**    What is it?

09:26    1    **A.**    It's a report that System Plus Consulting generated

09:26    2    on a Qorvo high-band BAW filter, which I believe is

09:26    3    probably lower frequencies.  And Part Number TQF-6405.

09:26    4    **Q.**    Why did Akoustis -- well, let me ask you this:  Is

09:26    5    this a report that Akoustis acquired from System Plus

09:26    6    Consulting?

09:26    7    **A.**    I believe so, yes.

09:26    8    **Q.**    Why did Akoustis acquire this report from System Plus

09:26    9    Consulting?

09:26    10    **A.**    It's -- you know, we bought a similar report for

09:26    11    Broadcom's FBAR technology as well.  It is really

09:26    12    technical analysis that, you know, we can do, really, to,

09:27    13    you know, obviously understand, you know, what the

09:27    14    construction is of our competitors, you know, and really

09:27    15    understand, obviously, the market opportunities.

09:27    16    **Q.**    Okay.  Those are all my questions, Mr. Aichele, thank

09:27    17    you.

09:27    18        **MR. ELKINS:**  Pass the witness.

09:27    19        **THE COURT:**  This is both redirect and

09:27    20    cross-examination.

09:27    21        **MR. DeFOSSE:**  Thank you, Your Honor.

09:27    22        **MR. ELKINS:**  I'm sorry.  If I could, I

09:27    23    neglected to move the last one into evidence.

09:27    24        **THE COURT:**  Yes, sir.  That's correct.

09:27    25        **MR. ELKINS:**  That was --

*Aichele - Redirect*

09:27    1              **THE COURT:** -- 159.  Thank you.

09:27    2              **MR. ELKINS:** Apologies.  Thank you.

09:27    3              **THE COURT:** Marked and received as 159.

09:27    4              (Trial Exhibit No. 159 was admitted into

09:27    5     evidence.)

09:27    6                    REDIRECT EXAMINATION

09:27    7     **BY MR. DeFOSSE:**

09:27    8     **Q.**   Good morning, Mr. Aichele.

09:27    9     **A.**   Good morning.

09:27   10     **Q.**   I'd like to start with Exhibit 159, which is the last

09:27   11     one that Mr. Elkins showed you.

09:28   12              And I'd like you, if you could, to turn to Page 88 of

09:28   13     Exhibit 159, which is DTX-623.

09:28   14              And you see at the top of Page 88, there's a

09:28   15     statement there, it begins "Reverse costing analysis."

09:28   16              Do you see that?

09:28   17     **A.**   Yes, I do.

09:28   18     **Q.**   And the reverse costing analysis is what the System

09:28   19     Consulting Plus calls the report that they're putting

09:28   20     together here, right?

09:28   21     **A.**   Yes.  Appears so, yes.

09:28   22     **Q.**   And in the -- this highlighted phrase we have here,

09:28   23     Systems Consulting Plus has noted that this report is

09:28   24     based on publicly available data; is that right?

09:28   25     **A.**   Yes.

*Aichele - Redirect*

09:28  1    **Q.**    Okay.  Thank you.

09:28  2            You can put that one down.  Moving kind of in reverse

09:28  3    order here.  If I could ask you to take out DTX-580.

09:29  4            Thank you.

09:29  5            This is the procedure designed development

09:29  6    maintenance document that Mr. Elkins showed you?

09:29  7    **A.**    Yes.

09:29  8                **THE COURT:**  Also, Exhibit 157.

09:29  9                **MR. DeFOSSE:**  157.  Thank you, Your Honor.

09:29  10   **BY MR. DeFOSSE:**

09:29  11   **Q.**    On the last page of this document, Page 6 of 6,

09:29  12   there's a section that says "Revision History."

09:29  13           Do you see that?

09:29  14   **A.**    Yes, I do.

09:29  15   **Q.**    And revision history tracks how the document has gone

09:29  16   through the creation process; is that right?

09:29  17   **A.**    Correct.

09:29  18   **Q.**    What changes have been made over time?

09:29  19           I'd like you to look at Revision C --

09:29  20   **A.**    Uh-huh.

09:29  21   **Q.**    -- which was in 2016.

09:29  22           Do you see that?

09:29  23   **A.**    Yes, I do.

09:29  24   **Q.**    And you see that Revision C of this exhibit is

09:29  25   converted to Akoustis document.

*Aichele - Redirect*

09:29  1        Do you see that?

09:29  2    **A.**   Yes, I do.

09:29  3    **Q.**   Thank you.  Put that one down.

09:30  4        Okay.  If we could pull up PTX-718.

09:30  5        We are going to work on figuring out what the trial

09:30  6    exhibit number is.  I apologize on this one.

09:30  7        Mr. Aichele, I believe you testified in response to

09:30  8    Mr. Elkins, you mentioned that there was NDA between Qorvo

09:30  9    and Akoustis; is that correct?

09:30  10   **A.**   Correct.

09:30  11   **Q.**   And that's because at a point in time Qorvo was

09:30  12   considering purchasing a product from Akoustis, right?

09:30  13   **A.**   Considering -- we engaged with Akoustis to develop

09:30  14   products.

09:30  15   **Q.**   Okay.  And that would have required, if Qorvo were to

09:30  16   purchase a 5 gigahertz filter from Akoustis, the exchange

09:31  17   of information between the two parties, right?

09:31  18   **A.**   Correct.

09:31  19   **Q.**   So when Qorvo wanted to obtain information from

09:31  20   Akoustis, and share information with Akoustis, Qorvo

09:31  21   executed an NDA with you, correct?

09:31  22   **A.**   Correct.

09:31  23   **Q.**   It didn't go to third parties in the market to ask

09:31  24   for your confidential information, right?

09:31  25   **A.**   Correct.

09:31  1    **Q.**   And I don't think you meant to suggest that when

09:31  2    Mr. Houlden sent you Qorvo's confidential statement of

09:31  3    work from his personal e-mail address, that you thought he

09:31  4    was sharing that under an NDA, did you?

09:31  5    **A.**   No.  I don't imply that, no.

09:31  6    **Q.**   Okay.  Now, I'm going to backtrack to yesterday, if

09:31  7    we can remember there.  Mr. Elkins asked you a number of

09:31  8    questions about some of the documents that I showed you

09:31  9    during my examination.

09:31  10        Do you recall that?

09:31  11   **A.**   Yes.

09:31  12   **Q.**   And he ran through them and he asked you, Was any of

09:31  13   this information useful to Akoustis?

09:31  14        Do you remember that?

09:31  15   **A.**   Yes.

09:31  16   **Q.**   And I think your testimony yesterday was,

09:32  17   essentially, none of this information was useful to

09:32  18   Akoustis; is that right?

09:32  19   **A.**   Generally, yes.

09:32  20   **Q.**   Okay.  Could you pull up -- or I will hand to you

09:32  21   Exhibit 27, which is PTX-569.

09:32  22             **MR. DeFOSSE:**  May I approach, Your Honor?

09:32  23             **THE COURT:**  You may.

09:32  24   **BY MR. DeFOSSE:**

09:32  25   **Q.**   Okay.  You recall this was one of the documents we

09:32    1    looked at yesterday, right?

09:32    2    **A.**    Correct.

09:32    3    **Q.**    And this is a November 2020 Wi-Fi roadmap for Qorvo,

09:32    4    right?

09:32    5    **A.**    Correct.

09:32    6    **Q.**    And I believe Mr. Elkins asked you about this

09:32    7    yesterday, and you said this document, quote, Was not

09:32    8    particularly useful; is that right?

09:32    9    **A.**    I think I grouped it in, you know, all the documents

09:32    10    that we walked through.

09:33    11    **Q.**    Now, I'd like to look at what you actually said back

09:33    12    in 2020.

09:33    13                **MR. DeFOSSE:**    May I approach, Your Honor?

09:33    14                **THE COURT:**    You may.

09:33    15    **BY MR. DeFOSSE:**

09:33    16    **Q.**    Okay.  Mr. Aichele, I've handed you what's been

09:33    17    marked previously as Exhibit 134.  This is PTX-623.  And I

09:34    18    think you'll remember, this is one of the emails that we

09:34    19    looked at yesterday, right?

09:34    20    **A.**    Correct.

09:34    21    **Q.**    And this is the one where you had the orange

09:34    22    commentary in it, right?

09:34    23    **A.**    Correct.

09:34    24    **Q.**    Okay.  And contrary to your testimony yesterday, if

09:34    25    we look on Page 2, and we zoom in on the orange -- the

09:34  1    last orange entry below the "in meeting."

09:34  2        Back in 2020, when you were discussing the usefulness

09:34  3    of Qorvo's Wi-Fi roadmap, you actually said, "Thank you.

09:34  4    It will be very helpful if I can get Qorvo's Wi-Fi

09:34  5    information"; is that right?

09:34  6    **A.**   Yes.

09:34  7    **Q.**   Okay.  Now I'd like you to pull out what's been

09:34  8    marked for identification as PTX-0565.  This is an e-mail

09:35  9    from Steven Li to yourself and Colin Hunt; is that right?

09:35  10   **A.**   Correct.

09:35  11   **Q.**   Okay.  And the date of this -- we have not moved this

09:35  12   in yet.

09:35  13        **MR. DeFOSSE:**   Your Honor, we would offer --

09:35  14   plaintiffs would offer Exhibit 0565 into evidence.

09:35  15        **THE COURT:**   Marked and received as 160.

09:35  16        (Trial Exhibit No. 160 was admitted into evidence.)

09:35  17   **BY MR. DeFOSSE:**

09:35  18   **Q.**   Now, Mr. Aichele, Exhibit 160 is an e-mail from

09:35  19   Mr. Li to yourself and Mr. Hunt from 2021; is that right?

09:35  20   **A.**   Correct.

09:35  21   **Q.**   Okay.  And you see that there's an attachment to this

09:35  22   e-mail?

09:35  23   **A.**   Correct.

09:35  24   **Q.**   Okay.  And I've handed you that, which has been

09:35  25   marked for identification as PTX-0566, and that's

09:35   1    previously been entered into evidence as Exhibit 25 in

09:35   2    this case.

09:35   3        You would agree with me that this is a Qorvo data

09:35   4    sheet that's been watermarked as "Confidential, NDA

09:35   5    Required"?

09:35   6    **A.**   Yes, correct.

09:36   7    **Q.**   Now, I'd like you to return to Exhibit 160, which is

09:36   8    the cover e-mail.  And I'd like you to turn to Page 4.

09:36   9    And you see there's a Line D -- Letter D, thank you.  And

09:36   10   here -- this is in Mr. Li's e-mail to yourself -- he's

09:36   11   saying, "Please also find detailed BAW diplexer on Page 2

09:36   12   inside the Qorvo Wi-Fi presentation."

09:36   13       Do you see that?

09:36   14   **A.**   Yes, I do.

09:36   15   **Q.**   And then if you look at the next page, Page 3.

09:36   16   There's your response to Mr. Li's original e-mail to

09:36   17   yourself.

09:36   18       Do you see that?

09:37   19   **A.**   That's from Steven.

09:37   20   **Q.**   Yep.  We may have to go up to the e-mail above that.

09:37   21   Thank you.  And your response to him was, "Thank you for

09:37   22   the updated information.  Very helpful"; is that right?

09:37   23   **A.**   Yes.

09:37   24   **Q.**   Now, you remember Mr. Elkins also asked you whether

09:37   25   Qorvo's -- the confidential information you obtained about

09:37  1    Qorvo's automotive products was helpful to you.

09:37  2         Do you remember that?

09:37  3    **A.**   Yes.

09:37  4    **Q.**   And your response was that it was not helpful, right?

09:37  5    **A.**   I think my response was that we were not focused on

09:37  6    the automotive market.

09:37  7    **Q.**   And so that information wasn't useful to you?

09:37  8    **A.**   Yes, at the time.

09:38  9              **MR. DeFOSSE:**   Your Honor, may I approach?

09:38  10             **THE COURT:**   You may.

09:38  11   **BY MR. DeFOSSE:**

09:38  12   **Q.**   Mr. Aichele, I'd, again, like to look back at your

09:38  13   statements as to the usefulness of information at the time

09:38  14   it was sent.  We're going to start with what's been marked

09:38  15   previously as Exhibit 139, and that's on your copy,

09:38  16   PTX-1100.  This is the e-mail from Mr. Kim that was

09:39  17   sending you the confidential Qorvo presentation.

09:39  18        Do you recognize that?

09:39  19   **A.**   Yes, I do.

09:39  20   **Q.**   Okay.  Next we're going to go to PTX-1062.  This is

09:39  21   previously been marked as Exhibit 138.  And at the top you

09:39  22   see your response to Mr. Kim at the time:  "Thanks, SJ.

09:39  23   We are working on the CV2X filter, and this simulation

09:39  24   will be very helpful," right?

09:39  25   **A.**   Yes.

*Aichele - Redirect*

09:39  1   **Q.**   And then if we can go to what's been marked as

09:39  2   Exhibit 154.  Sorry.  That's for identification 154,

09:39  3   exhibit in this case 121.  It's PTX-154.  Thank you.

09:39  4        You see at the top if we can zoom in.  This is an

09:40  5   e-mail to yourself from yourself to Rama Vetury and Rohan

09:40  6   Houlden.

09:40  7        Do you see that?

09:40  8   **A.**   Yes, I do.

09:40  9   **Q.**   You see that you're attaching the confidential data

09:40  10  sheet Mr. Kim sent you, right?

09:40  11  **A.**   Yes, I do.

09:40  12  **Q.**   And you note in the first paragraph that attached is

09:40  13  an Qorvo competitive simulation for their CV2X design,

09:40  14  right?

09:40  15  **A.**   Correct.

09:40  16  **Q.**   And based on that, you updated the target spec table.

09:40  17       Do you see that?  It's the words we just highlighted.

09:40  18  **A.**   I updated the spec table, as I state there that

09:40  19  information from Audi, and then also comparing from Qorvo.

09:40  20  **Q.**   And the target spec table that you are talking about

09:40  21  was the target spec table for the Akoustis product that

09:40  22  was under development?

09:40  23  **A.**   It was a spec table to give to engineering.  To give

09:40  24  to them to -- it wasn't, as I mentioned, the product that

09:40  25  we were developing was more in the R&D phase.

09:40  1    **Q.**    Okay.  And this is why you told -- why you first

09:41  2    asked Mr. Kim to get the additional confidential

09:41  3    information for you, right?

09:41  4    **A.**    I didn't ask him to get confidential information.  I

09:41  5    asked him to share with me what he could on the part that

09:41  6    he could obtain.

09:41  7    **Q.**    Okay.  But I'm talking about the one where he sent

09:41  8    you, if you recall, the confidential Qorvo presentation,

09:41  9    and you said could you please get me additional pages of

09:41  10   that?  Do you remember that?

09:41  11   **A.**    Yes.

09:41  12   **Q.**    And so when you said to Mr. Kim when he followed your

09:41  13   instruction, "Thank you; this is very helpful," it was

09:41  14   very helpful because you were using it to update your

09:41  15   target spec table for the product that you had under

09:41  16   development?

09:41  17   **A.**    It was very helpful.  You know, obviously, comparing

09:41  18   a competitor that was, you know, leading in the market at

09:41  19   the time against, obviously, a technical exchange we had

09:41  20   with AUDI as you can see here, but, again, it was only

09:41  21   being used as an R&D phase.  We were not investing in the

09:41  22   automotive market.

09:42  23   **Q.**    Now, Mr. Aichele, when Mr. Elkins was examining you

09:42  24   earlier today, you had an explanation of all the work you

09:42  25   were out doing in the market in order to figure out what

*Aichele - Redirect*

09:42  1    products to develop for Akoustis.

09:42  2         Do you recall that?

09:42  3    **A.**    Yes.

09:42  4    **Q.**    Visiting customers and things like that.

09:42  5         Do you recall that you were also out in the market at

09:42  6    that time in 2016, seeking confidential information about

09:42  7    Qorvo?

09:42  8    **A.**    I was not seeking confidential information about

09:42  9    Qorvo.

09:42  10   **Q.**    Mr. Aichele, are you familiar with a company called

09:42  11   RFMW?

09:42  12   **A.**    Yes, I am.

09:42  13   **Q.**    And RFMW is a distributer; is that right?

09:42  14   **A.**    Correct.

09:42  15   **Q.**    And is a distributer, in particular, who works with,

09:42  16   among other companies, Qorvo?

09:42  17   **A.**    Correct.

09:42  18   **Q.**    And, therefore, has access to confidential Qorvo

09:42  19   information?

09:42  20   **A.**    I would assume so; you'd have to ask them.

09:43  21   **Q.**    Okay.

09:43  22         **MR. DeFOSSE:**    Sorry about the delay there.

09:43  23         Your Honor, may I approach?

09:43  24         **THE COURT:**    You may.

       25

09:44   1   **BY MR. DeFOSSE:**

09:44   2   **Q.**   Mr. Aichele, I've handed you what's been marked for

09:44   3   identification as PTX-0470 and 0471.  0470 is an e-mail

09:44   4   from a Steve Takaki to yourself; is that right?

09:44   5   **A.**   Correct.

09:44   6   **Q.**   And 0471 is the attachment to that e-mail?

09:44   7   **A.**   It appears so, yes.

09:44   8          **MR. DeFOSSE:**   Your Honor, plaintiffs would

09:44   9   offer into evidence PTX-0470 and 0471.

09:44   10          **THE COURT:**   Marked and received as 161 and 162.

09:44   11          (Trial Exhibit Nos. 161 and 162 were admitted

09:44   12   into evidence.)

09:44   13   **BY MR. DeFOSSE:**

09:44   14   **Q.**   All right.  First, I'd like to start with the date.

09:44   15   Mr. Aichele, do you see the top e-mail is from

09:44   16   September 2016; is that right?

09:45   17   **A.**   Correct.

09:45   18   **Q.**   And if we can actually, then, move, I'd like to look

09:45   19   at the e-mail that starts at bottom of the first page.

09:45   20   All the way at the bottom.  It's July 14, 2016, from

09:45   21   yourself to Mr. Takaki.

09:45   22          Do you see that?

09:45   23   **A.**   Yes, I do.

09:45   24   **Q.**   It carries over to the next page where you said two

09:45   25   items.  And Item Number 2 is, "You still planning to send

09:45  1    me the Qorvo BAW data spreadsheet that we reviewed?"

09:45  2         Do you see that?

09:45  3    **A.**    Correct.

09:45  4    **Q.**    And now if we zoom back out and go to the first page

09:45  5    of this document.  You see that he's attached an Excel

09:45  6    spreadsheet that's BAW.XLSX, right?

09:45  7    **A.**    Yes.

09:45  8    **Q.**    If you could look at Exhibit 471, this is a

09:45  9    spreadsheet that's listing Qorvo sales; is that right?

09:46  10   **A.**    Yes, it is.

09:46  11   **Q.**    And this is confidential information, right?

09:46  12   **A.**    I believe so, yes.

09:46  13   **Q.**    And you were requesting this information from

09:46  14   Mr. Takaki because you were trying to determine whether

09:46  15   there was a niche in the market that Akoustis could move

09:46  16   into, right?

09:46  17   **A.**    Yeah.  It was not this specific document that I was

09:46  18   pursuing.  It was in the discussions review that we had

09:46  19   with RFMW that they have a design registration process

09:46  20   that they follow, which I believe are RFMW documents that

09:46  21   basically highlighted opportunities that Qorvo was

09:46  22   struggling to service the existing customers that RFMW was

09:46  23   servicing, and so RFMW was bringing to us what I believed

09:46  24   were design opportunities that we could propose Akoustis

09:46  25   solutions for.

09:46   1          **MR. DeFOSSE:**  Okay.  If we could go back real

09:46   2   quick to Exhibit 4770.  And look at the top of Page 2.

09:46   3   **BY MR. DeFOSSE:**

09:47   4   **Q.**  So when you said, "You still planning on sending me

09:47   5   the Qorvo BAW spreadsheet that we reviewed?", you're not

09:47   6   suggesting that that was a different Qorvo BAW spreadsheet

09:47   7   than the one he actually sent you, are you?

09:47   8   **A.**  My recollection, yes, I am.

09:47   9          This spreadsheet he said adds no value to us, and it

09:47   10  gives nothing detail-wise as far as from a customer

09:47   11  standpoint.

09:48   12         **MR. DeFOSSE:**  Your Honor, may I approach?

09:48   13         **THE COURT:**  You may.

09:48   14  **BY MR. DeFOSSE:**

09:48   15  **Q.**  Mr. Aichele, I've handed you what's been marked for

09:48   16  identification as PTX-0 -- sorry, 1012.  Would you agree

09:48   17  with me that this is an e-mail from Mr. Li to yourself in

09:48   18  March of 2020?

09:48   19  **A.**  Correct.

09:48   20         **MR. DeFOSSE:**  Your Honor, plaintiffs would

09:48   21  offer into evidence PTX-1012.

09:48   22         **THE COURT:**  Marked and received as 163.

09:48   23         (Trial Exhibit No. 163 was admitted into

09:48   24  evidence.)

        25

*Aichele - Redirect*

09:48   1 | **BY MR. DeFOSSE:**

09:48   2 | **Q.**   Okay.  If we look at the top of Exhibit 163,

09:49   3 | Mr. Aichele, you have a message from Mr. Li to yourself,

09:49   4 | and he's attaching a Qorvo 1903 PDF.

09:49   5 |      Do you see that?

09:49   6 | **A.**   Yes, I do.

09:49   7 | **Q.**   And if you look at the attachment to Exhibit 163 --

09:49   8 | this is Page 3 -- that's the confidential Qorvo NDA

09:49   9 | required data sheet we talked about yesterday, right?

09:49   10 | **A.**   Correct.

09:49   11 | **Q.**   Now, if we go back to the first page of Exhibit 163,

09:49   12 | Mr. Li says to you in the last or the third line of his

09:49   13 | top e-mail, "I'm searching the spec of 1904 in my

09:49   14 | resource."

09:49   15 |      Do you see that?

09:49   16 | **A.**   Correct.

09:49   17 | **Q.**   And you understood that to mean that Mr. Li was also

09:49   18 | attempting to obtain for you the confidential data sheet

09:49   19 | for Qorvo's QPQ1904 product, right?

09:50   20 | **A.**   Not -- you know, again, I will reiterate that, not

09:50   21 | asking him to get the confidential, but that he is

09:50   22 | searching his resources to see if we can get a QPQ1904

09:50   23 | part, yes.

09:50   24 | **Q.**   You knew at this time that the data sheets for the

09:50   25 | QPQ1903 and QPQ1904 were confidential, right?

*Aichele - Redirect*

09:50  1    **A.**    They were marked confidential, yes.

09:50  2    **Q.**    And you affirmatively asked him to go out in the

09:50  3    market and see if he could find someone willing to share

09:50  4    confidential information with Akoustis?

09:50  5    **A.**    Again, when it's marked confidential doesn't mean

09:50  6    that it's, you know, not public, in the public domain.

09:50  7    So, you know, there are ways that they do find information

09:50  8    in Asia and China what is in the public domain.  So I

09:50  9    didn't ask him to go find confidential information.  I was

09:50  10   trying to get more information on certain competitive

09:50  11   parts.

09:50  12   **Q.**    Okay.  Now, you also asked SJ Kim to obtain that

09:50  13   confidential information for you too; is that right?

09:50  14   **A.**    Are you referring to something specific?

09:50  15   **Q.**    Well, you remember SJ Kim is the gentleman we

09:51  16   discussed yesterday who was using his expense account to

09:51  17   get things; do you recall him?

09:51  18   **A.**    He was using expense accounts to meet with, you know,

09:51  19   industry partners, yes.

09:51  20   **Q.**    Okay.  And you also asked him to obtain for you the

09:51  21   confidential data sheets for Qorvo's 5 gigahertz products,

09:51  22   right?

09:51  23   **A.**    I can't remember the specific e-mail you are

09:51  24   referencing or discussing, but, yes, I'm sure there was an

09:51  25   inquiry there.

*Aichele - Redirect*

09:51   1   **Q.**   Okay.  If you could look at what's been marked for

09:51   2   identification as PTX-0527.

09:51   3        This is an e-mail from Mr. Kim to yourself in April

09:51   4   of 2020; is that right?

09:51   5   **A.**   Yes, it is.

09:51   6   **Q.**   And then it has two attachments to that.  Do you see

09:51   7   that?

09:51   8   **A.**   Yes, I do.

09:51   9           **MR. DeFOSSE:**   Which have been marked for

09:51   10  identification as PTX-0528 and 0529.

09:51   11          **THE COURT:**   Marked and received as 164 and 165.

09:51   12          (Trial Exhibit Nos. 164 and 165 were admitted

09:51   13  into evidence.)

09:52   14          **MR. DeFOSSE:**   And, Your Honor, we would also

09:52   15  move for the admission of PTX-0527.

09:52   16          **THE COURT:**   166 marked and received.

09:52   17          (Trial Exhibit No. 166 was admitted into

09:52   18  evidence.)

09:52   19          **MR. DeFOSSE:**   Thank you, Your Honor.

09:52   20  **BY MR. DeFOSSE:**

09:52   21  **Q.**   And, Mr. Aichele, if we look at the bottom of the

09:52   22  first page of this e-mail, you can see there's a message

09:52   23  from yourself to Mr. Kim; is that right?

09:52   24  **A.**   Yes, I do see that.

09:52   25  **Q.**   And you say, "Any information and samples would be

*Aichele - Redirect*

09:52  1    appreciated."

09:52  2         Do you see that?

09:52  3    **A.**   Correct.

09:52  4    **Q.**   And you reference the two Qorvo 5 gigahertz BAW

09:52  5    filters?

09:52  6    **A.**   Yes, I do.

09:52  7    **Q.**   And by "samples," that meant you were also attempting

09:52  8    to obtain physical samples of those prototypes, right?

09:52  9    **A.**   Yes.  It appears so, yes.

09:52  10   **Q.**   And if we zoom back out and go to the top of this

09:52  11   e-mail, Mr. Kim has attached for you the two confidential

09:52  12   data sheets that were you asking for.  And he says, "I'm

09:53  13   still trying to have those samples"; is that right?

09:53  14   **A.**   Yes.  It appears so, yes.

09:53  15   **Q.**   Now, do you recall whether Akoustis was able to

09:53  16   obtain the samples of Qorvo's prototypes?

09:53  17   **A.**   I believe at some point we were able to receive the

09:53  18   samples, but I'm not sure with respect to this on timing.

09:53  19   **Q.**   Okay.  And you received those samples by borrowing

09:53  20   them from a customer?

09:53  21   **A.**   That could have been one means.  But it could have

09:53  22   been also through a, you know, through a distributer that

09:53  23   was managing Qorvo or that Qorvo was utilizing.

09:53  24            **MR. DeFOSSE:**  Your Honor, may I approach?

09:54  25            **THE COURT:**  You may.

*Aichele - Redirect*

BY MR. DeFOSSE:

09:54  1

09:54  2   **Q.**   Mr. Aichele, I've handed you what's been marked as

09:54  3   PTX-1042 for identification, as well as PTX- -- okay, as

09:54  4   well as two additional documents.  One at the top says,

09:54  5   "Qorvo QPF 7552," and the other one says, "QPF7551"; is

09:55  6   that right?

09:55  7              **THE WITNESS:**  Yes, it appears so.

09:55  8

09:55  9   BY MR. DeFOSSE:

09:55  10  **Q.**   PTX-1042 is an e-mail from yourself to the CEO Jeff

09:55  11  Shealy; is that right?

09:55  12  **A.**   Um --

09:55  13  **Q.**   Or, sorry, from Mr. Shealy to yourself.

09:55  14  **A.**   Appears so, yes.

09:55  15              **MR. DeFOSSE:**  Your Honor, we would offer into

09:55  16  evidence PTX-1042.

09:55  17              **THE COURT:**  Marked and received as 167.

09:55  18              (Trial Exhibit No. 167 was admitted into

09:55  19  evidence.)

09:55  20  BY MR. DeFOSSE:

09:55  21  **Q.**   And you see Mr. Shealy's message to you is, "Got it,"

09:56  22  but we need to look at the e-mail below that to see what

09:56  23  he's got, I think.  But you see that you've attached to

09:56  24  him two Qorvo data sheets?

09:56  25  **A.**   Yes, it appears so.

*Aichele - Redirect*

09:56  1    **Q.**   And then if you look at the two additional exhibits I

09:56  2    gave you, the QPF7552, and QPF7551, do those appear to the

09:56  3    data sheets that you sent to him?

09:56  4    **A.**   It appears so, yes.

09:56  5         **MR. DeFOSSE:**   Your Honor, plaintiffs would move

09:56  6    into evidence QPF7552 and QPF7551.

09:56  7         **THE COURT:**   Marked as received add 168 and 169.

09:56  8         (Trial Exhibit Nos. 168 and 169 were admitted

09:56  9    into evidence.)

09:56  10   **BY MR. DeFOSSE:**

09:56  11   **Q.**   Mr. Aichele, you would agree with me that the two

09:56  12   data sheets that were just entered into evidence as

09:56  13   Exhibit 168 and 169 are both marked as preliminary data

09:56  14   sheets in the top right-hand corner?

09:56  15   **A.**   Yes, it appears so.

09:56  16   **Q.**   Okay.   And both of these are also marked as private,

09:57  17   correct?

09:57  18   **A.**   Yes, it appears so.

09:57  19   **Q.**   Now, I just want to clear up -- I'm going to switch

09:57  20   gears now and talk about single crystal for a minute.

09:57  21        You testified earlier that Akoustis had invested and

09:57  22   was engaged in research and development with single

09:57  23   crystal products; is that right?

09:57  24   **A.**   Correct.

09:57  25   **Q.**   As of September of 2023, Akoustis had never reached

09:57  1    commercial production with any single crystal product,

09:57  2    right?

09:57  3    **A.**    Correct.

09:57  4    **Q.**    You also testified that Akoustis believed that its

09:57  5    single crystal products were beneficial because they could

09:57  6    achieve higher power handling; is that right?

09:57  7    **A.**    Correct.

09:57  8    **Q.**    Now, you are aware that test results showed that that

09:57  9    was not accurate, right?

09:57  10   **A.**    No.

09:58  11          **MR. DeFOSSE:**  Your Honor, may I approach?

09:58  12          **THE COURT:**  You may.

09:58  13   **BY MR. DeFOSSE:**

09:58  14   **Q.**    Mr. Aichele, I've handed you what's been marked for

09:58  15   identification as PTX-0605 and PTX-0606.  PTX-0605 is an

09:58  16   e-mail to yourself from a person named Takeshi Nakao; is

09:59  17   that right?

09:59  18   **A.**    Correct.

09:59  19   **Q.**    And PTX-0606 is an attachment to Mr. Nakao's e-mail

09:59  20   to yourself, right?

09:59  21   **A.**    Correct.

09:59  22          **MR. DeFOSSE:**  Your Honor, plaintiffs would

09:59  23   offer into evidence PTX-0605 and 0606.

09:59  24          **THE COURT:**  Marked and received as 170 and 171.

09:59  25          (Trial Exhibit Nos. 170 and 171 were admitted

*Aichele - Redirect*

09:59  1    into evidence.)

09:59  2    **BY MR. DeFOSSE:**

09:59  3    **Q.**    Mr. Aichele, Mr. Takeshi is an employee of a company

09:59  4    called Murata; is that right?

09:59  5    **A.**    Correct.

09:59  6    **Q.**    And Murata is a company that Akoustis was seeking to

09:59  7    engage in a business relationship with, right?

09:59  8    **A.**    Correct.

09:59  9    **Q.**    And as part of the efforts to engage Murata, Akoustis

09:59  10   sent that company samples of both its polycrystalline

09:59  11   filters and its single crystal filters, right?

09:59  12   **A.**    Correct.

09:59  13   **Q.**    And you understood that the purpose of sending those

10:00  14   to Murata was so that Murata could run a test comparing

10:00  15   the two, right?

10:00  16   **A.**    Correct.

10:00  17   **Q.**    If we look at the top email from Mr. Takeshi to

10:00  18   yourself, in the third paragraph, he's reporting on the

10:00  19   results of Murata's testing of the power handling of

10:00  20   Akoustis' filters, right?

10:00  21   **A.**    Correct.

10:00  22   **Q.**    And he says, "About the power handling, we could not

10:00  23   confirm the obviously difference between the previous

10:00  24   sample, (nonEpi), and this sample (Epi)."

10:00  25        Do you see that?

*Aichele - Redirect*

10:00    1    **A.**    Yes, that is his statement.

10:00    2    **Q.**    And when it says, "nonEpi" and "Epi," Epi is the

       3    single crystal version of the product; is that right?

10:00    4    **A.**    Correct.

10:00    5    **Q.**    And nonEpi is the poly crystal version of the

10:00    6    product, right?

10:00    7    **A.**    Correct.

10:00    8    **Q.**    Now, if we look at the attachment, which has been

10:00    9    marked as Exhibit 171.

10:00   10    This is the evaluation report that Mr. Takeshi sent

10:00   11    to you?

10:00   12    **A.**    Correct.

10:00   13    **Q.**    And if we could turn to the power handling section of

10:01   14    that report, which starts on Page 10.

10:01   15    See, this is where Murata is giving you the results

10:01   16    of the power handling tests. And if we go to Page 11,

10:01   17    Mr. Takeshi, again, says, "The Epi sample result is worse

10:01   18    than the nonEpi one," right?

10:01   19    **A.**    That is his statement, yes.

10:01   20    **Q.**    That's all I have. Thank you, Mr. Aichele.

10:01   21    **MR. ELKINS:** I have follow-up questions if I

10:01   22    may.

10:01   23    **THE COURT:** Under Rule 611, the examination

10:02   24    should be concluded. I will allow you a couple of

10:02   25    minutes, which is extra, but there may be a chance for

*Aichele - Redirect*

| | | |
|---|---|---|
| 10:02 | 1 | additional cross by Mr. DeFosse.  And only a couple of |
| 10:02 | 2 | minutes.  This is under Rule 611, we should be concluded. |
| 10:02 | 3 | **MR. ELKINS:**  I appreciate it. |
| 10:02 | 4 | **THE COURT:**  Sure. |
| 10:02 | 5 | **BY MR. ELKINS:** |
| 10:02 | 6 | **Q.**   Mr. Aichele -- |
| 10:02 | 7 | **MR. ELKINS:**  And if we could have Exhibit 157 |
| 10:02 | 8 | up, which was PTX-580.  I want to go back to -- or, excuse |
| 10:02 | 9 | me, DTX-580.  Go to the last page, please, Mr. Brown. |
| 10:02 | 10 | **BY MR. ELKINS:** |
| 10:02 | 11 | **Q.**   Mr. Aichele, who is Pat Lewis? |
| 10:02 | 12 | **A.**   Pat Lewis was one of the first employees at Akoustis, |
| 10:02 | 13 | and he had many responsibilities because we were smaller |
| 10:02 | 14 | at the time, but he was responsible for quality test |
| 10:02 | 15 | setups; QMS, which is document control; and so forth. |
| 10:03 | 16 | **Q.**   Was he former Qorvo employee? |
| 10:03 | 17 | **A.**   No, he was not. |
| 10:03 | 18 | **Q.**   Was he a former RFMW employee? |
| 10:03 | 19 | **A.**   No, he was not. |
| 10:03 | 20 | **Q.**   Is it your understanding in Row C that "converted to |
| 10:03 | 21 | Akoustis document" means it was converted from a Qorvo |
| 10:03 | 22 | document to an Akoustis document? |
| 10:03 | 23 | **A.**   No, that's not my understanding at all. |
| 10:03 | 24 | **Q.**   Mr. DeFosse was cross-examining you about your |
| 10:03 | 25 | comments to Mr. Li and Mr. Kim about things that are |

*Aichele - Redirect*

10:03    1    helpful.

10:03    2        Is there a difference in a document being helpful for

10:03    3    business intelligence gathering versus designing a

10:03    4    product?

10:03    5    **A.**    Yes, absolutely.  And I think that was -- my

10:03    6    statement there is that it was helpful in collecting

10:03    7    competitive analysis, but it did not, then, in any way

10:03    8    influence or change our strategies and our investments.

10:03    9    You know, it's really the summary I was trying arrive at

10:04   10    yesterday, I provided yesterday.

10:04   11            **MR. ELKINS:**  Okay.  No more questions.  Thank

10:04   12    you.

10:04   13            **MR. DeFOSSE:**  We don't have anything else.

10:04   14            **THE COURT:**  Thank you very much.  We will let

10:04   15    you step.

10:04   16            Do you know who will our next witness be?

10:04   17            I understand this will be by deposition.  Okay.

10:04   18            **MR. MASTERS:**  Good morning, Your Honor.  The

10:04   19    plaintiff will call next Colin Hunt, who is a president of

10:04   20    global sales for Akoustis.  This will be by video

10:04   21    deposition.

10:04   22            **THE COURT:**  Ladies and gentlemen, this is a

10:04   23    deposition.  It will be the only chance that you will have

10:04   24    to see this testimony.  It's just like the witness is here

10:04   25    with us in person.

*Hunt – Deposition Designation*

| | | |
|---|---|---|
| 10:04 | 1 | Please proceed. |
| 10:04 | 2 | (Deposition designation of Colin Hunt plays as |
| 10:04 | 3 | follows: |
| 10:04 | 4 | **BY MR. GILL:** |
| 10:04 | 5 | **Q.**   Can you please state your full name for the record? |
| 10:04 | 6 | **A.**   Yes.  It's Colin Leslie Hunt. |
| 10:04 | 7 | **Q.**   Who is your current employer? |
| 10:04 | 8 | **A.**   Akoustis. |
| 10:04 | 9 | **Q.**   When did you begin working with Akoustis. |
| 10:04 | 10 | **A.**   Three years ago, approximately. |
| 10:04 | 11 | **Q.**   What's your job title? |
| 10:04 | 12 | **A.**   I'm VP of global sales. |
| 10:05 | 13 | **Q.**   Has that been your title since you joined the |
| 10:05 | 14 | company? |
| 10:05 | 15 | **A.**   Correct. |
| 10:05 | 16 | **Q.**   And what is your goal in that title? |
| 10:05 | 17 | **A.**   I support customers.  I'm promoting products into |
| 10:05 | 18 | customers to gain as many sales as we can. |
| 10:05 | 19 | **Q.**   At some point did you work for RFMD? |
| 10:05 | 20 | **A.**   Yes, I did. |
| 10:05 | 21 | **Q.**   Do you remember what years that was? |
| 10:05 | 22 | **A.**   I don't remember the exact years.  I thought it was |
| 10:05 | 23 | for around about five or six years, I think. |
| 10:05 | 24 | **Q.**   Were you in sales at RFMD? |
| 10:05 | 25 | **A.**   Yes, I was looking out for European team. |

*Hunt – Deposition Designation*

10:05  1    **Q.**   How would you go about getting competitors' data

10:05  2    sheets?

10:05  3    **A.**   So they're either available on the web, or some

10:05  4    customers would provide that to you to support activities

10:05  5    such as application engineering.

10:05  6    **Q.**   Can you explain what you mean by that.

10:05  7    **A.**   Yes.  So in particular, relating to Qorvo and

10:05  8    Akoustis, so what happens is that the customer does a

10:06  9    build, and then they fine-tune that build.  To fine tune

10:06  10   that build, the product -- the PCB is then sent to either

10:06  11   Akoustis or to Qorvo or to both parties, and the data

10:06  12   sheets are used to make them all work together in

10:06  13   conjunction most efficiently.

10:06  14   **Q.**   To make what all work together?

10:06  15   **A.**   The RF, transmit receive chain.

10:06  16   **Q.**   So a customer's PCB might include parts from Akoustis

10:06  17   and parts from --

10:06  18   **A.**   Correct.

10:06  19   **Q.**   -- Qorvo to make those are parts work together the

10:06  20   PCB and data sheets are provided to each company?

10:06  21   **A.**   Correct.

10:06  22   **Q.**   Okay.  If a -- if the PCB includes only Qorvo parts

10:06  23   and not Akoustis parts, would the customer send the PCB to

10:06  24   Akoustis?

10:06  25   **A.**   No.  There's no need for it.  We don't offer a

10:07  1  service.

10:07  2  **Q.**  Would the customer send the data sheet to Akoustis in

10:07  3  that case?

10:07  4  **A.**  For tuning purposes, no, if it was all Qorvo parts.

10:07  5  **Q.**  Is there some other purpose why the customer would

10:07  6  send the data sheet to Akoustis, if you know?

10:07  7  **A.**  Yes, when they want a second source.

10:07  8  **Q.**  Meaning they want Akoustis to provide a part --

10:07  9  **A.**  Alternative product.

10:07  10  **Q.**  Okay.  Mr. Hunt, you've been handed three documents

10:07  11  marked Exhibits 613, 614, and 615.  Going to Exhibit 613,

10:07  12  this is an e-mail involving you and Dave Aichele, and then

10:07  13  further down the thread Steven Li, correct?

10:07  14  **A.**  Yes.

10:07  15  **Q.**  Who is Steven Li?

10:08  16  **A.**  Steven Li used to be the China sales manager.

10:08  17  **Q.**  And did he report to you --

10:08  18  **A.**  Yes.

10:08  19  **Q.**  And can you tell us who Dave Aichele?

10:08  20  **A.**  Dave Aichele is my boss who I report into.

10:08  21  **Q.**  Were the three of you working together in -- in sales

10:08  22  among other things?

10:08  23  **A.**  Sales and marketing, yes.

10:08  24  **Q.**  Do you recognize this e-mail thread?

10:08  25  **A.**  Having seen it, yes.

*Hunt — Deposition Designation*

10:08  1  **Q.**   -- Steven Li e-mailed you with some comments about

10:08  2  Akoustis' filters, correct?

10:08  3  **A.**   Yes, correct.

10:08  4  **Q.**   And one of things he said kind of halfway down his

10:08  5  e-mail is "When I promote our 1252 and 1256 to our

10:08  6  potential Wi-Fi customers, I often met the complaint from

10:08  7  our customer our rejection is marginal," correct?

10:08  8  **A.**   Correct.

10:08  9  **Q.**   What are 1252 and 1256?

10:08  10  **A.**   They are our first 5 low, 5 high Wi-Fi 6 filters.

10:09  11  **Q.**   I thought he was saying the rejection of the filter

10:09  12  was not very good?

10:09  13  **A.**   That's incorrect.  It was good enough for that time,

10:09  14  but the improvement is always there, and that's what we're

10:09  15  trying to do with the 10252 and 10256.

10:09  16  **Q.**   So then why was the customer complaining that the

17  rejection was very marginal?

10:09  18  **A.**   Rejection was marginal, so it's marginal.  So it's 40

10:09  19  to 50 plus 20 to 25 for the antenna, which is marginal.

10:09  20  Ideally, they want 75.  Ideally, they want infinity.  But

10:09  21  75 is the budget.

10:09  22  **Q.**   Okay.  And is he saying the customers didn't think

10:09  23  Akoustis' rejection was good enough?  Is that what he's

10:09  24  saying?

10:09  25  **A.**   Well, the incumbent is a dielectric resonator, which

10:09  1  is very high rejection, 55 to 60dB often is the case.  So

10:09  2  that's why he's probably saying it's marginal compared to

10:10  3  that.

10:10  4  **Q.**   And then down at the bottom of his e-mail, Mr. Li

10:10  5  says, "I also attached the data sheet of Qorvo part, and

10:10  6  you can see their rejection is more impressive."

10:10  7      Do you see that?

10:10  8  **A.**   Yes, I do.

10:10  9  **Q.**   Then going up, you forwarded this e-mail to

10:10  10  Mr. Aichele on June 10, 2020 --

10:10  11  **A.**   Yeah.

10:10  12  **Q.**   -- and attach two files, correct?

10:10  13  **A.**   The two files, yeah.

10:10  14  **Q.**   Were those two filters that Akoustis was competing

10:10  15  with for sales?

10:10  16  **A.**   I would say the other way around because we already

10:10  17  had 1252 and 1256.  So Qorvo were starting their

10:10  18  development of these two filters to compete with our

10:10  19  parts.

10:10  20  **Q.**   Okay.  Let's look at the attachments to your e-mail.

10:10  21  So Exhibit 614 is one of the attachments to your e-mail,

10:11  22  and it's a data sheet for the QPQ1903, correct?

10:11  23  **A.**   Yes.

10:11  24  **Q.**   How did you get this data sheet before you forwarded

10:11  25  it to Mr. Aichele?

*Hunt – Deposition Designation*

10:11  1    **A.**    The bottom of the 613 it says I also attached the

10:11  2    data sheets.

10:11  3    **Q.**    So you got from it from Mr. Li?

10:11  4    **A.**    Correct.

10:11  5    **Q.**    Do you know how he got it?

10:11  6    **A.**    I do not.

10:11  7    **Q.**    The data sheet up at the top right-hand corner is

10:11  8    marked preliminary, correct?

10:11  9    **A.**    Yes.

10:11  10   **Q.**    What's your understanding of what "preliminary" means

10:11  11   in this context?

10:11  12   **A.**    First offering.

10:11  13   **Q.**    First offering?  What do you mean by that?

10:11  14   **A.**    First idea of a specification to a customer.

10:11  15   **Q.**    So is it a product that's still under development in

10:11  16   your understanding?

10:11  17   **A.**    Reading this, yes, that's what I'm saying because it

10:12  18   also says, "subject to change" at the bottom.

10:12  19        There's no confidential markings on this and

10:12  20   customers send this sort of material to us.

10:12  21   **Q.**    But other than that, you didn't have any

10:12  22   authorization to share the document, correct?

10:12  23   **A.**    Correct.  From Qorvo.

10:12  24   **Q.**    Let's look at the next data sheet, Exhibit 615.

10:12  25        This is the data sheet for Qorvo's QPQ1904 Wi-Fi BAW

10:12   1   filter, correct?

10:12   2   **A.**   Correct.

10:12   3   **Q.**   And it's another preliminary data sheet?

10:12   4   **A.**   Yes.

10:12   5   **Q.**   On Page 2, production number ending 648, the data

10:12   6   sheet includes be electrical specifications, correct?

10:13   7   **A.**   Correct.

10:13   8   **Q.**   And the rejection at 5170 to 5330 megahertz is listed

10:13   9   as, typically, 63dB, correct?

10:13   10  **A.**   Correct.

10:13   11  **Q.**   Did Qorvo give you authorization to possess this

10:13   12  document?

10:13   13  **A.**   Same as before, no.

10:13   14  **Q.**   To share with others at Akoustis?

10:13   15  **A.**   I didn't get authorization from Qorvo, no.

10:13   16  **Q.**   Did you know how Mr. Li got this data sheet?

10:13   17  **A.**   I do not.

10:13   18  **Q.**   Why did you send these two data sheets to

10:13   19  Mr. Aichele?

10:13   20  **A.**   So that I could represent what my statement in my

10:13   21  e-mail, points Number 1 and Number 2 of Exhibit 613.

10:13   22  **Q.**   And that's where you were discussing the rejection of

10:14   23  the filters at certain frequencies?

10:14   24  **A.**   Correct.

10:14   25  **Q.**   And comparing them to the rejection of Akoustis' 1252

*Hunt – Deposition Designation*

| | | |
|---|---|---|
| 10:14 | 1 | and 1256 filters, correct? |
| 10:14 | 2 | **A.** That's correct. |
| 10:14 | 3 | **Q.** Mr. Hunt, you've been handed three documents marked |
| 10:14 | 4 | 616, 617, and 618, correct? |
| 10:14 | 5 | **A.** Correct. |
| 10:14 | 6 | **Q.** Looking at Exhibit 616, this is an e-mail thread |
| 10:14 | 7 | involving you and Mr. Aichele, and then further down, |
| 10:14 | 8 | Mr. Li, correct? |
| 10:14 | 9 | **A.** Yes. |
| 10:14 | 10 | **Q.** Do you recognize this e-mail thread? |
| 10:14 | 11 | **A.** I do. |
| 10:14 | 12 | **Q.** And then you forwarded his e-mail to Mr. Aichele, |
| 10:14 | 13 | correct? |
| 10:14 | 14 | **A.** Correct. |
| 10:14 | 15 | **Q.** And you attached two documents, correct? |
| 10:14 | 16 | **A.** Correct. |
| 10:14 | 17 | **Q.** You told Mr. Aichele, "Here is Steven's customers' |
| 10:14 | 18 | feedback on improvement, correct? |
| 10:14 | 19 | **A.** Yes. |
| 10:14 | 20 | **Q.** Why did you send this information to Mr. Aichele? |
| 10:15 | 21 | **A.** For market intelligence. |
| 10:15 | 22 | **Q.** And what did you expect Mr. Aichele would do with the |
| 10:15 | 23 | information? |
| 10:15 | 24 | **A.** To help drive improvement in our parts. |
| 10:15 | 25 | **Q.** Yeah, I -- I can -- the two files you sent to |

*Hunt – Deposition Designation*

10:15  1    Mr. Aichele, they relate to Qorvo's QPQ1903 and 1904

10:15  2    filters, correct?

10:15  3    **A.**    They do.  And they're the same files as previously

10:15  4    discussed.

10:15  5    **Q.**    Mr. Hunt, you've been handed what's marked as

10:15  6    Exhibit 619, and this is an e-mail thread starting with

10:15  7    Bate -- production Number AKTS_00151889.

10:15  8        Do you see that?

10:16  9    **A.**    Yes.

10:16  10   **Q.**    And if you look back at Exhibit 616, your if you look

10:16  11   back at Exhibit 616 your e-mail to Mr. Aichele was dated

10:16  12   July 22, 2020, at the last e-mail in that thread, correct?

10:16  13   **A.**    Yes.

10:16  14   **Q.**    Okay.  In Exhibit 619, the date of the last e-mail in

10:16  15   that thread is July 24, 2020, correct?

10:16  16   **A.**    Correct.

10:16  17   **Q.**    And if you look at both of those documents, this is a

10:16  18   continuation of the same thread, correct?

10:16  19   **A.**    Yes.

10:16  20   **Q.**    Do you recognize Exhibit 619?

10:16  21   **A.**    Yes.

10:16  22   **Q.**    And so on July 22nd, 2020 at 7:04 p.m., three e-mails

10:16  23   down, that's the e-mail we were just talking about with

10:17  24   Exhibit 616 where you forwarded Mr. Li's e-mail to

10:17  25   Mr. Aichele, correct?

*Hunt – Deposition Designation*

10:17    1    **A.**    Yes.

10:17    2    **Q.**    And in response to that, Mr. Aichele responded that,

10:17    3    "It would help to have samples to test and overlay with

10:17    4    measured and new sims," correct?

10:17    5    **A.**    Yes.

10:17    6    **Q.**    What did he mean by that?

10:17    7    **A.**    So taking the performance of the Qorvo parts, and

10:17    8    overlaying them with the new simulations for our third

10:17    9    version of the 1252, 1256.

10:17    10    **Q.**    Did the third version have a different number, or was

10:17    11    it still referred to as 1252 and 1256?

10:17    12    **A.**    Subsequently, it has changed, the part number, but I

10:17    13    don't know whether -- at this time, whether it referred to

10:17    14    as that new part number.  The new part number are 10252,

10:17    15    10256.

10:17    16    **Q.**    And down at the bottom of same e-mail from

10:17    17    Mr. Aichele, he asks you to work with Steven, Mr. Li, to

10:18    18    get QPQ1903 and QPQ1904 EVB samples, correct?

10:18    19    **A.**    Correct.

10:18    20    **Q.**    EVB refers to evaluation board?

10:18    21    **A.**    Yes.

10:18    22    **Q.**    What's an evaluation board?

10:18    23    **A.**    It's where a product is inserted onto a PCB and

10:18    24    connectorized.

10:18    25    **Q.**    Okay.  So he wanted you obtain to Qorvo evaluation

*Hunt – Deposition Designation*

10:18  1    boards for the two Qorvo filters, correct?

10:18  2    **A.**    Yes.

10:18  3    **Q.**    And that's so that you could generate measurement

10:18  4    data for those two filters?

10:18  5    **A.**    Correct.

10:18  6    **Q.**    How would you work with -- with Mr. Li to obtain

10:18  7    these evaluation boards?

10:18  8    **A.**    I would ask him if he could obtain them.

10:18  9    **Q.**    And how would you expect for him to obtain them?

10:18  10   **A.**    He would then look at his sales channels to see if he

10:19  11   could procure them.

10:19  12   **Q.**    What do you mean by sales channels?

10:19  13   **A.**    Distribution partners.

10:19  14   **Q.**    Are those partners that were distributing Akoustis

10:19  15   products?

10:19  16   **A.**    No.  They -- they would, because it's Qorvo product,

10:19  17   it would be Qorvo distribution partners.

10:19  18   **Q.**    You then forwarded Mr. Aichele's e-mail to Mr. Li and

10:19  19   asked him if he would able to obtain the evaluation

10:19  20   boards, correct?

10:19  21   **A.**    Yes.

10:19  22   **Q.**    You tell him, you have tried your usual channel

10:19  23   without success, correct?

10:19  24   **A.**    Yes.

10:19  25   **Q.**    What was your usual channel?

*Hunt – Deposition Designation*

10:19  1   **A.**   So it's catalog distributors -- it's catalog houses,

10:19  2   DigiKey or Mouser.

10:19  3   **Q.**   Why aren't you successful in getting these EVBs from

10:19  4   your -- from the distribution partners?

10:19  5   **A.**   They didn't exist on those sites.

10:19  6   **Q.**   The evaluation boards didn't exist on the partners'

10:20  7   websites?

10:20  8   **A.**   Correct.

10:20  9   **Q.**   How did you think Mr. Li would be successful getting

10:20  10  the evaluation boards when you weren't?

10:20  11  **A.**   Because there's different sales distributors out

10:20  12  there.

10:20  13  **Q.**   You've been handed three documents marked

10:20  14  Exhibit 620, 621, 622.

10:20  15       Exhibit 620 is an e-mail thread taking place on

10:20  16  July 29, 2020, correct?

10:20  17  **A.**   Yes.

10:20  18  **Q.**   So just a few days after the e-mail we were just

10:20  19  looking at in Exhibit 619, correct?

10:20  20  **A.**   Yes.

10:20  21  **Q.**   Exhibit 620 is a thread.  It involves you, Rohan

10:20  22  Houlden, that's R-O-H-A-N, H-O-U-L-D-E-N, Jeffrey Shealy,

10:20  23  S-H-E-A-L-Y, and Dave Aichele, and Robert Dry, correct?

10:21  24  **A.**   Yes.

10:21  25  **Q.**   Do you recognize this e-mail thread?

*Hunt – Deposition Designation*

10:21  1  **A.**  I do.

10:21  2  **Q.**  And under the third bullet point, Number 3,

10:21  3  Mr. Aichele provides a summary of the discussion between

10:21  4  someone Ty, T-Y, and Jay Kruse, K-R-U-S-E, correct?

10:21  5  **A.**  Correct.

10:21  6  **Q.**  Was Mr. Kruse with Eero?

10:21  7  **A.**  Yes.

10:21  8  **Q.**  Do you know what his role was with Eero?

10:21  9  **A.**  Yeah, I think he's chief -- I don't know his exact

10:21  10  title, but he's chief engineer for the Wi-Fi.

10:21  11  **Q.**  In that same bullet, little Number iii, Mr. Aichele

10:21  12  says, "Jay says Qorvo still claims 60dB of rejection on

10:21  13  both parts."

10:21  14  Correct?

10:21  15  **A.**  Yes.

10:21  16  **Q.**  He's referring to the rejection of QPQ1903 and

17  QPQ1904?

10:22  18  **A.**  I assume so.

10:22  19  **Q.**  And then if you go up, Mr. Aichele respond -- I'm

10:22  20  sorry -- Mr. Shealy responds to Mr. Aichele's e-mail,

10:22  21  correct?

10:22  22  **A.**  Yes.

10:22  23  **Q.**  And he says, "Looks like we better get to 60dB."

10:22  24  Do you see that?

10:22  25  **A.**  Yes.

10:22  1  **Q.**   In other words, he was saying that Akoustis needed to

10:22  2  improve the rejection of the 1252 and 1256 to compete with

10:22  3  Qorvo, correct?

10:22  4  **A.**   Yes.

10:22  5  **Q.**   And if you go back to the first page of Exhibit 620,

10:22  6  Mr. Houlden responds to Mr. Shealy's e-mail, correct?

10:22  7  **A.**   Yes.

10:22  8  **Q.**   And what he's saying is that Akoustis needs to

10:22  9  understand if the market prefers Akoustis' filters with

10:22  10  supposedly better insertion loss and worse rejection or

10:23  11  what he believes is the performance of Qorvo's filters

10:23  12  with worse insertion loss, but better rejection, correct?

10:23  13          **MR. STANTON:**   Objection.   Call for speculation.

10:23  14  Document speaks for itself?

10:23  15          **THE WITNESS:**   No, I don't think that's

10:23  16  accurate.   I think what Rohan is saying here is either do

10:23  17  we focus on insertion loss at 2dB, which gives us a

10:23  18  rejection of 55, which is Akoustis' focus on 2 and a half

10:23  19  and 3dB given rejection of 40DB.

10:23  20  **Q.**   So he wasn't referring to Qorvo's filters having 2.5

10:23  21  to 3dB of insertion loss and 60dB of rejection?

10:23  22  **A.**   I think it's focused on the -- from the customer

10:23  23  intelligence, finding out what the customer needs rather

10:23  24  than what the RF -- the Qorvo part is.

10:24  25  **Q.**   You respond to Mr. Houlden's e-mail, correct?

*Hunt – Deposition Designation*

10:24   1    **A.**   Yes.

10:24   2    **Q.**   And you have a number of bullet points in your

10:24   3    e-mail, correct?

10:24   4    **A.**   Yes.

10:24   5    **Q.**   They're -- they're difficult to see, but there are

10:24   6    some bullets that are little squares with no fill.

10:24   7         Can you see those?

10:24   8    **A.**   Yes.

10:24   9    **Q.**   In the second -- in the second one of those bullets,

10:24   10   you say, "Qorvo is promoting 1903/1904 C specs."  Correct?

10:24   11   **A.**   Correct.

10:24   12   **Q.**   You're referring to the QPQ 1903 and QPQ 1904 filters

10:24   13   that we've been discussing, correct?

10:24   14   **A.**   Yes.

10:24   15   **Q.**   And you attached to two files to your e-mail,

10:24   16   correct?

10:24   17   **A.**   Yes.

10:24   18   **Q.**   And looking at those same sub-bullets toward the top

10:24   19   of your e-mail when you're talking about Qorvo promoting

10:25   20   1903 and 1904 --

10:25   21   **A.**   Yeah.

10:25   22   **Q.**   -- you say, "I have my arms out -- out in China to

10:25   23   see if we can get a couple of samples for evaluation."

10:25   24   Correct?

10:25   25   **A.**   Correct.

*Hunt – Deposition Designation*

| | | |
|---|---|---|
| 10:25 | 1 | **Q.**   You're referring to samples of QPQ 1903 and QPQ 1904? |
| 10:25 | 2 | **A.**   Evaluation boards, yes. |
| 10:25 | 3 | **Q.**   Why were you reviewing out to China for those |
| 10:25 | 4 | samples? |
| 10:25 | 5 | **A.**   Because as per previous exhibit, I could not obtain |
| 10:25 | 6 | them from the sales channels here. |
| 10:25 | 7 | **Q.**   So you thought you might be able to get then in China |
| 10:25 | 8 | even though you couldn't get them in your sales channels? |
| 10:25 | 9 | **A.**   In the U.S. sales channels, correct. |
| 10:25 | 10 | **Q.**   And when you say you were reaching out in China, were |
| 10:25 | 11 | you referring to Mr. Li? |
| 10:25 | 12 | **A.**   Correct. |
| 10:25 | 13 | **Q.**   Exhibits 621 and 622, these are the same preliminary |
| 10:25 | 14 | data sheets that we looked at before, correct? |
| 10:25 | 15 | **A.**   Exactly the same, yeah. |
| 10:25 | 16 | **Q.**   You've been handed what's marked as Exhibit 623. |
| 10:25 | 17 | That's an e-mail exchange with production AKTS_00291717. |
| 10:26 | 18 | This is an e-mail exchange involving you, Dave Aichele, |
| 10:26 | 19 | and Steven Li, correct? |
| 10:26 | 20 | **A.**   Yes. |
| 10:26 | 21 | **Q.**   The e-mails in the exchange range from July 30th, |
| 10:26 | 22 | 2020, to July 31, 2020, correct? |
| 10:26 | 23 | **A.**   Yes. |
| 10:26 | 24 | **Q.**   And the e-mails concern a meeting that Akoustis had |
| 10:26 | 25 | with a customer or potential customer ███████, correct? |

10:26    1    **A.**    Yes.

10:26    2    **Q.**    Do you recognize this e-mail exchange?

10:26    3    **A.**    Yes.

10:26    4    **Q.**    Starting down at the first -- on the first page of

10:26    5    the thread of the document, Mr. Li sends you and

10:27    6    Mr. Aichele an e-mail summarizing his meeting with

10:27    7    ███████, correct?

10:27    8    **A.**    Yes.

10:27    9    **Q.**    And ███████ was an Akoustis customer?

10:27    10   **A.**    Potential customer.

10:27    11   **Q.**    Potential.

10:27    12          Do you know if ███████ was also a Qorvo customer?

10:27    13   **A.**    I believe so.

10:27    14   **Q.**    And both Akoustis and Qorvo were -- were trying to

10:27    15   sell -- or were selling BAW filters to ███████?

10:27    16   **A.**    Attempting, yeah.

10:27    17   **Q.**    Near the bottom of the second page of the document

10:27    18   with production number ending in 18, there are two

10:27    19   bullets.  One starts with "in the meeting."

10:27    20   **A.**    Right at the bottom here?

10:28    21   **Q.**    On the page ending 18.

10:28    22   **A.**    Yes.

10:28    23   **Q.**    He says "in the meeting, he" -- and you can review

10:28    24   this, but I think he's referring to Eric Li from

10:28    25   ███████ -- "he also told Qorvo's roadmap for Wi-Fi 6E."

10:28    1          Do you see that?

10:28    2    **A.**    Yes.

10:28    3    **Q.**    And is he referring to Mr. Li, Eric Li from █████

10:28    4    there?

10:28    5    **A.**    I think so, but it's difficult to say precisely.  I

10:28    6    would -- yes, because he's referenced Eric all the way

10:28    7    through.

10:28    8    **Q.**    Right.  Wi-Fi 6E was a technology space where Qorvo

10:28    9    and Akoustis were competing IN the BAW filter market,

10:28   10    correct?

10:28   11    **A.**    Yes.

10:28   12    **Q.**    To your knowledge, was Steven Li authorized to obtain

10:28   13    information regarding Qorvo's roadmap and filter

10:28   14    performance from █████?

10:29   15    **A.**    Customers often give us roadmap information for

10:29   16    market intelligence.  So if your question is, is he

10:29   17    authorized?  He's getting that market intelligence, yes.

10:29   18    **Q.**    Does Akoustis authorize its customers to provide that

10:29   19    type of information to competitors?

10:29   20    **A.**    Akoustis wouldn't authorize it to -- our roadmap to

10:29   21    competitors, no.

10:29   22    **Q.**    And do you know if Qorvo authorized █████ to share

10:29   23    Qorvo's roadmap with Mr. Li?

10:29   24    **A.**    I have no knowledge.

10:29   25    **Q.**    Why would -- why would Akoustis want Qorvo's roadmap?

10:29  1    **A.**   For market intelligence reasons.

10:29  2    **Q.**   Mr. Aichele responds to Mr. Li's bullet, and he says,

10:29  3    "Thank you.  It will be very helpful if you can get

10:29  4    Qorvo's Wi-Fi 6E information and samples of the QPQ1903

10:30  5    and QPQ1904."  Correct?

10:30  6    **A.**   Correct.

10:30  7    **Q.**   Why would Qorvo's roadmap -- strike that.

10:30  8         Why would Qorvo's Wi-Fi 6E information and samples of

10:30  9    those filters be very helpful to Akoustis?

10:30  10   **A.**   To understand the performance.

10:30  11   **Q.**   Mr. Hunt, you've been handed a document marked as

10:30  12   Exhibit 624.  It's an e-mail exchange bearing production

10:30  13   number AKTS_00152143, correct?

10:30  14   **A.**   Yes.

10:30  15   **Q.**   And this is another e-mail thread involving you, Dave

10:30  16   Aichele, and Steven Li, correct?

10:30  17   **A.**   Correct.

10:30  18   **Q.**   Do you recognize this e-mail?

10:30  19   **A.**   Yes.

10:30  20   **Q.**   This e-mail concerns evaluation boards for the

10:30  21   QPQ1903 and 1904 filters, correct?

10:31  22   **A.**   Yes.

10:31  23   **Q.**   The date of the last e-mail on the thread is

10:31  24   August 3rd, 2020?

10:31  25   **A.**   Yes.

10:31   1   **Q.**   And that's just a few days after the e-mails in

10:31   2   Exhibit 623 that we were just discussing, correct?

10:31   3   **A.**   Yes.

10:31   4   **Q.**   And that's where Mr. Aichele had said it would be

10:31   5   very helpful to get samples of those filters?

10:31   6   **A.**   Yes.

10:31   7   **Q.**   And looking back at 624, Mr. Li tells you that he

10:31   8   will get EVBs, or evaluation boards, of 1903 and 1904 from

10:31   9   his channels, correct?

10:31   10   **A.**   Correct.

10:31   11   **Q.**   In the second paragraph of Mr. Li's e-mail, he says,

10:31   12   "I will lend the EVBs from the customers side so I will

10:32   13   return them to the customer in two or three weeks,"

10:32   14   correct?

10:32   15   **A.**   Yes.

10:32   16   **Q.**   Is he saying that he will borrow an EVB from a

10:32   17   customer of Qorvo's?

10:32   18   **A.**   It looks that way, yes.

10:32   19   **Q.**   And then you responded to his e-mail the next day,

10:32   20   correct.

10:32   21   **A.**   Yes.

10:32   22   **Q.**   And then a bit later, at the top of the document, you

10:32   23   followed up, and you said, "Make sure your channels are

10:32   24   not breaking any NDA or agreement they have with Qorvo.  I

10:32   25   do not want us to undertake anything unethical," correct?

10:32  1    **A.**    Yes.

10:32  2    **Q.**    Why did you say that?

10:32  3    **A.**    I had joined in June 2020, so this was one of the

10:33  4    first instances, so I wanted to make sure the ground;

10:33  5    rules are set correctly.

10:33  6    **Q.**    Did you or Mr. Li ever obtain evaluation boards or

10:33  7    parts from a Qorvo customer without first confirming that

10:33  8    there was no NDA or confidentiality agreement in place

10:33  9    between Qorvo and the customer?

10:33  10          **MR. STANTON:**    Objection.  Calls for

10:33  11   speculation.  Compound.

10:33  12          **THE WITNESS:**    Not knowingly, as I sit here

10:33  13   today.  I don't recall it.

10:33  14   **Q.**    As part of your obtaining evaluation boards from your

10:33  15   channel or Mr. Li from his channel, was it typical for you

10:33  16   to ask the -- the distribution partner if they had a NDA

10:33  17   in place with Qorvo?

10:33  18   **A.**    They would have an NDA in place as part of the

10:33  19   contract.  That's typical.

10:33  20   **Q.**    Is -- is that something you would ask them about

10:34  21   before --

10:34  22   **A.**    No.

10:34  23          (Videotape paused.)

10:34  24          **THE COURT:**    We're going to stop there.  We will

10:34  25   come back and complete the deposition when we come back.

10:34  1    And same things apply, don't discuss the case among

10:34  2    yourselves.  Don't let anyone talk about the case.  If

10:34  3    anybody tries to talk to you, of course let me know about

10:34  4    that.  Don't speak to witnesses, lawyers, or parties in

10:34  5    the case.  No research, inquiry, at all times to avoid

10:34  6    media.  Continue to keep an open mind.

10:34  7            You will be excused.  It is 10:34.  I will make

10:34  8    that a 16-minutes break.  I will see you in 16 minutes.  I

10:34  9    will have to stay here.  Thanks very much.

10:34  10        (The jury exits the courtroom at 10:34 a.m.)   .

10:35  11            **THE COURT:**  You may be seated.  I think we have

10:35  12    at least, or approximately 10 or 11 -- 11 new exhibits, I

10:35  13    believe.  I'll leave it to the staff or anybody else to

10:35  14    confirm that.  If there's overlap -- I have 11 down

10:35  15    myself.

10:35  16            Is that the case?  I'm just checking.

10:35  17            **MR. ALPER:**  Good morning, Your Honor.  Zachary

10:35  18    Alper for plaintiff.

10:35  19            Your Honor, we have 16 exhibits that we would

10:35  20    like to move to enter.

10:35  21            **THE COURT:**  We've gotten 11?

10:35  22            **MR. ALPER:**  You've gotten 11.  You have 11 so

10:35  23    far.

10:35  24            **THE COURT:**  You have five more?

10:35  25            **MR. ALPER:**  Yes.

10:35  1      **THE COURT:**  Not a problem.  We will make the

10:35  2  count right.  That will give us a count.  So far we will

10:35  3  have a total of 16.  Not a problem.  I think we have 11 so

10:35  4  far.  That's helpful.

10:35  5      All right.  I think that's all that we have to

10:35  6  cover right now.  I know everybody would like a break at

10:36  7  this time.  Of course the jury has 16 minutes.  We will

10:36  8  end up with about 13 minutes.  See everybody in

10:36  9  13 minutes.  Thanks very much.

10:47  10      (Whereupon, a recess is taken.)

10:48  11      **THE COURT:**  All right.  We can bring the jury

10:48  12  in.

10:49  13      (The jury enters the courtroom at 10:49 a.m.)

10:49  14      **THE COURT:**  Everyone can be seated.  Of course

10:49  15  counsel may proceed with playing the deposition.

10:50  16      I think we can play the deposition.

10:50  17      (Playing of videotaped deposition of Colin

10:50  18  Leslie Hunt resumed as follows:)

10:50  19  **Q.**   So if there was an NDA in place between Qorvo and its

10:50  20  customer, your e-mail suggests that it would be unethical

10:50  21  to get that evaluation board, correct?

10:50  22  **A.**   Yes.

10:50  23  **Q.**   Mr. Hunt, you've been handed what's marked as

10:50  24  Exhibit 625.  It's an e-mail exchange bearing production

10:50  25  number AKTS_00152442, correct?

*Hunt – Deposition Designation*

10:51  1    **A.**   Yes.

10:51  2    **Q.**   And this is an e-mail between you and Mr. Aichele,

10:51  3    correct?

10:51  4    **A.**   Yes.

10:51  5    **Q.**   The subject of the e-mail is "Comparison data QPQ1903

10:51  6    QPQ1904, AKF1252, AKF1256," correct?

10:51  7    **A.**   Yes.

10:51  8    **Q.**   Those are the same Qorvo and Akoustis BAW filters

10:51  9    we've been discussing today, correct?

10:51  10   **A.**   Correct.

10:51  11   **Q.**   And if you look at the second page of this document

10:51  12   ending in production Number 43, there's an e-mail from

10:51  13   Marvin Ibro, correct?

10:51  14   **A.**   Yes.

10:51  15   **Q.**   Who is Marvin Ibro?

10:51  16   **A.**   He's applications engineering.

10:51  17   **Q.**   With Akoustis?

10:51  18   **A.**   Correct.

10:52  19   **Q.**   And Mr. Ibro sends --

10:52  20   **A.**   He is an applications engineering.

10:52  21   **Q.**   With Akoustis?

10:52  22   **A.**   Correct.

10:52  23   **Q.**   And Mr. Ibro sends Dave Aichele, Rohan Houlden and

10:52  24   some other folks at Akoustis what he calls comparison data

10:52  25   for QPQ1903 with AKF1252 and QPQ1904 with AKF1256,

10:52  1    correct?

10:52  2    **A.**    Correct.

10:52  3    **Q.**    And the date of Mr. Ibro's e-mail as August 10 of

10:52  4    2020, correct?

10:52  5    **A.**    Yes.

10:52  6    **Q.**    So this is just a week or two after you asked Mr. Li

10:52  7    to get evaluation boards for the QPQ1903 and 1904,

10:52  8    correct.

10:52  9    **A.**    Yes.

10:52  10        When you -- when you say I'm asking for EVBs, I

10:52  11   didn't ask for the EVBs.

10:53  12   **Q.**    Mr. Aichele asked?

10:53  13   **A.**    Yes.

10:53  14   **Q.**    Somebody instructed --

10:53  15   **A.**    Yes.

10:53  16   **Q.**    -- Mr. Li to go get evaluation boards --

10:53  17   **A.**    Correct.

10:53  18   **Q.**    And Mr. Ibro's e-mail with the comparison data

10:53  19   suggests that Mr. Li was able to get those evaluation

10:53  20   boards, correct?

10:53  21   **A.**    I can't recall where those EVBs came from, if he had

10:53  22   EVBs.

10:53  23   **Q.**    So you don't know -- you don't recall whether

10:53  24   Mr. Ibro used Qorvo evaluation boards to generate this

10:53  25   comparison data?

10:53  1   **A.**    I'm –– I'm not sure whether it was from the actual

10:53  2   graph or from the data sheet or whether it was from the

10:53  3   EVB comparison.

10:53  4   **Q.**    And after Mr. Ibro's e-mail, going back to the first

10:53  5   page, Mr. Aichele forwarded you the comparison data,

10:53  6   correct?

10:53  7   **A.**    Yes.

10:53  8   **Q.**    He says, "See comparison...," correct?

10:53  9   **A.**    Yes.

10:54  10  **Q.**    And you responded, above that, "Interesting.  The

10:54  11  Qorvo EVB looks much cleaner and neater.  Maybe plagiarism

10:54  12  on these EVBs may be a good solution," correct?

10:54  13  **A.**    Correct.

10:54  14  **Q.**    You were suggesting copying Qorvo's design, correct?

10:54  15  **A.**    Correct.  Copying the EVB design.  So, basically,

10:54  16  looking at a clean content to our existing EVBs.

10:54  17  **Q.**    And then Mr. Aichele, in response, says, "Yes, I

10:54  18  asked Marvin to highlight those and have closed with

10:54  19  Rohan."

10:54  20      You see that?

10:54  21  **A.**    Yes.

10:54  22  **Q.**    What did Mr. Aichele mean when he asked –– he says he

10:54  23  asked Marvin to highlight those?

10:54  24  **A.**    I believe he meant looking at the cleaner, neater

10:55  25  layout of the board.

10:55  1   **Q.**   Of Qorvo's board?

10:55  2   **A.**   Of Qorvo's board.

10:55  3   **Q.**   And do you know what he meant when he said "have

10:55  4   closed with Rohan"?

10:55  5   **A.**   He's discussed it with Rohan.

10:55  6   **Q.**   Mr. Aichele had discussed the evaluation boards with

10:55  7   Rohan, Mr. Houlden, correct?

10:55  8   **A.**   Yes.

10:55  9   **Q.**   Okay.  And then up at the top, you responded,

10:55  10  "Excellent.  Thanks, Dave.  And their part" -- there's a

10:55  11  typo there?

10:55  12  **A.**   Yeah.

10:55  13  **Q.**   But "parts look like they have a smoother response

10:55  14  than ours passband ripple."  Correct?

10:55  15  **A.**   Yes.

10:55  16  **Q.**   So you were telling Mr. Aichele that, based on the

10:55  17  comparison data, Qorvo's QPQ1903 and 1904 outperformed

10:55  18  Akoustis' 1252 and 1256 in terms of passband ripple,

10:56  19  correct?

10:56  20  **A.**   Yes.

10:56  21  **Q.**   What is passband ripple of a BAW filter?

10:56  22  **A.**   So if you're in the passband, you have a performance

10:56  23  and sometimes you have oscillations in that passband.

10:56  24  That's called the ripple.

10:56  25  **Q.**   So pretty much you want the passband to be flat,

10:56  1    correct?

10:56  2    **A.**    Correct.

10:56  3    **Q.**    You've been handed what's marked as Exhibit 626.

10:56  4    It's an e-mail bearing production number AKTS0_0518851,

10:56  5    correct?

10:56  6    **A.**    Correct.

10:56  7    **Q.**    This is an e-mail from Dave Aichele to you dated

10:56  8    October 20, 2021, correct?

10:56  9    **A.**    Yes.

10:56  10   **Q.**    And you received this e-mail at 14:29 or 2:49 p.m.,

10:56  11   correct?

10:56  12   **A.**    Yes.

10:56  13   **Q.**    Do you recognize this e-mail?

10:56  14   **A.**    It looks accurate.  I -- I don't recognize it off the

10:57  15   top of my head, no.

10:57  16   **Q.**    Okay.  Mr. Aichele asks you if you can lay your hands

10:57  17   on Qorvo C-V2X QPQ2200Q BAW filter data sheet, correct?

10:57  18   **A.**    Correct.

10:57  19   **Q.**    Was Akoustis developing a product to compete with the

10:57  20   2200Q?

10:57  21   **A.**    I believe so, yes.

10:57  22   **Q.**    Which product was that?

10:57  23   **A.**    The A10159.

10:57  24   **Q.**    That was also a BAW filter?

10:57  25   **A.**    Yes.

10:57   1   **Q.**   For the V2X market?

10:57   2   **A.**   Yes.

10:57   3   **Q.**   You've been handed what's mark as Exhibit 627.  It's

10:57   4   an e-mail bearing production number AKTS_00518852.

10:58   5       Do you see that?

10:58   6   **A.**   Yes.

10:58   7   **Q.**   This is an e-mail from you to Steve Takaki, correct?

10:58   8   **A.**   Yes.

10:58   9   **Q.**   E-mail was sent on October 20, 2021, correct?

10:58   10   **A.**   Correct.

10:58   11   **Q.**   At 4:56 p.m. correct?

10:58   12   **A.**   Correct.

10:58   13   **Q.**   And that's just a few hours after the e-mail in

10:58   14   Exhibit 626 was sent, correct?

10:58   15   **A.**   Yes.

10:58   16   **Q.**   Do you recognize this e-mail?

10:58   17   **A.**   Yes.

10:58   18   **Q.**   Who is Mr. Takaki?

10:58   19   **A.**   Steve Takaki is a person in RFMW, a distributer of

10:58   20   ours.

10:58   21   **Q.**   One of Akoustis' distribution partners?

10:58   22   **A.**   Correct.

10:58   23   **Q.**   Did RFMW also distribute Qorvo parts?

10:58   24   **A.**   Yes.

10:58   25   **Q.**   And you asked Mr. Takaki if there's a way you can get

*Hunt – Deposition Designation*

10:59  1   the data sheet for Qorvo part QPQ2200Q, correct?

10:59  2   **A.**   Yes.

10:59  3   **Q.**   Did you send this e-mail in response to Mr. Aichele's

10:59  4   e-mail, the one we were just looking at?

10:59  5   **A.**   Yes.

10:59  6   **Q.**   As Qorvo's distributer, RFMW and Mr. Takaki had

10:59  7   access to Qorvo data sheets, correct?

10:59  8   **A.**   Yes.

10:59  9   **Q.**   So you thought that because RFMW was distributing

10:59  10  Qorvo products, Mr. Takaki might have this data sheet,

10:59  11  correct?

10:59  12  **A.**   Correct.

10:59  13  **Q.**   Why would you ask RFMW for this data sheet rather

10:59  14  than asking somebody at Qorvo?

10:59  15  **A.**   There's two paths you could look at.

10:59  16  It was the easier path to ask RFMW.

10:59  17  **Q.**   Why was it easier?

11:00  18  **A.**   Because if I was in Qorvo's position, I wouldn't give

11:00  19  it to Akoustis.

11:00  20  **Q.**   Why not?

11:00  21  **A.**   Because it's information that I wouldn't want to get

11:00  22  to Akoustis.

11:00  23  **Q.**   Why's that?

11:00  24  **A.**   Because it gives the performance of the parts.

11:00  25  **Q.**   Did Mr. Takaki ultimately provide you with the

11:00    1    QFQ2200Q data sheet?

11:00    2    **A.**    I honestly don't know.  I can't recall.

11:00    3    **Q.**    You've been handed what's marked as Exhibit -- two

11:00    4    documents marked as Exhibit 630 and 631.  Exhibit 630

11:00    5    appears to be an e-mail bearing production number

11:00    6    AKTS_00362735, correct?

11:00    7    **A.**    Correct.

11:00    8    **Q.**    And Exhibit 631, I'll represent to you, is the

11:00    9    metadata that was produced to us with Exhibit 630.1.

11:00    10   Okay?

11:00    11   **A.**    Yeah.

11:00    12   **Q.**    And looking at Exhibit 631, about three-quarters of

11:01    13   the way down, it says the e-mail is from

11:01    14   chunt@Akoustis.com to daichele@akoustis.com.  That's your

11:01    15   e-mail and Mr. Aichele's e-mail, correct?

11:01    16   **A.**    Yes.

11:01    17   **Q.**    And do you recognize the e-mail in Exhibit 630?

11:01    18   **A.**    I recognize it, yes.

11:01    19   **Q.**    This e-mail from you to Mr. Aichele was received on

11:01    20   October 20, 2021 at 6:06 p.m., correct?

11:01    21   **A.**    Yes.

11:01    22   **Q.**    That's about an hour after Mr. Takaki's e-mail to

11:01    23   you, correct?

11:01    24   **A.**    Yes.

11:01    25   **Q.**    So was this a follow-up to the earlier e-mail that

| | | |
|---|---|---|
| 11:01 | 1 | Mr. Aichele sent to you asking for you to get the 2200Q |
| 11:02 | 2 | data sheet? |
| 11:02 | 3 | **A.**   Yes. |
| 11:02 | 4 | **Q.**   And you said, "I am getting somebody to ask Qorvo D/S |
| 11:02 | 5 | without leaving too much of a trail," correct? |
| 11:02 | 6 | **A.**   Correct. |
| 11:02 | 7 | **Q.**   What did you mean by that? |
| 11:02 | 8 | **A.**   Trying to get the Qorvo data sheet. |
| 11:02 | 9 | **Q.**   What did you mean by "without leaving too much of a |
| 11:02 | 10 | trail"? |
| 11:02 | 11 | **A.**   So that we could get as much information as we could |
| 11:02 | 12 | with minimum fuss. |
| 11:02 | 13 | **Q.**   Does that mean you didn't want Qorvo to find out? |
| 11:02 | 14 | **A.**   I think Qorvo will always find out. |
| 11:02 | 15 | **Q.**   So what do you mean by "too much fuss"? |
| 11:02 | 16 | **A.**   To try and get it from our sales partner. |
| 11:02 | 17 | **Q.**   Why was it important not to leave a trail? |
| 11:02 | 18 | **A.**   Because we'd like to get the information on new parts |
| 11:02 | 19 | as quickly as possible. |
| 11:03 | 20 | **Q.**   You go on to say, "Our sales partners don't have it |
| 11:03 | 21 | as no customer has asked for it," correct? |
| 11:03 | 22 | **A.**   Correct. |
| 11:03 | 23 | **Q.**   You are referring to Mr. Takaki, correct? |
| 11:03 | 24 | **A.**   Correct. |
| 11:03 | 25 | **Q.**   Mr. Hunt, you've been handed two documents marked |

*Hunt – Deposition Designation*

11:03  1   Exhibit 633 and Exhibit 634.  Exhibit 633 is a multipage

11:03  2   document with production number AKTS_00493746.

11:03  3        Do you see that?

11:03  4   **A.**   Yes.

11:03  5   **Q.**   Going back to Exhibit 633, do you recognize this

11:03  6   document?

11:03  7   **A.**   Yes.

11:03  8   **Q.**   Okay.  Exhibit 633, that's the -- that's a data sheet

11:03  9   for Qorvo's QPQ2200Q BAW filter, correct?

11:03  10  **A.**   Correct.

11:03  11  **Q.**   This is the data sheet that you and Mr. Aichele were

11:03  12  trying to get?

11:03  13  **A.**   Correct.

11:03  14  **Q.**   This is the one you tried to get from Mr. Takaki and

11:03  15  Mr. Bachem?

11:03  16  **A.**   Yes.

11:04  17  **Q.**   And up at the top, the data sheet is mark preliminary

11:04  18  is red.  Do you see that?

11:04  19  **A.**   Yes.

11:04  20  **Q.**   Were you authorized to possess this data sheet by

11:04  21  Qorvo?

11:04  22  **A.**   I don't know.  I wouldn't have got -- seeked

11:04  23  permission.

11:04  24  **Q.**   Do you recall how you got this data sheet?

11:04  25  **A.**   No.

11:04  1    **Q.**    You don't recall if it was from Mr. Takaki or

11:04  2    Mr. Bachem?

11:04  3    **A.**    I don't recall.

11:04  4    **Q.**    Mr. Hunt, you've been handed three documents marked

11:04  5    Exhibits 636, 637, and 638.  Exhibit 636 is an e-mail

11:04  6    bearing production number AKTS_00167236.  Exhibit 637 was

11:04  7    produced as an attachment to this e-mail.

11:04  8        Exhibit 636 is a multipage document that starts with

11:04  9    production number AKTS_00167237.  Exhibit 638 was also

11:05  10   produced as an attachment to Exhibit 636.  It's a

11:05  11   multipage document bearing production AKTS_00167245.

11:05  12       Do you see that?

11:05  13   **A.**    Yes.

11:05  14   **Q.**    Exhibit 636 is an e-mail from Steven Li to you,

11:05  15   copying Dave Aichele, correct?

11:05  16   **A.**    Yes.

11:05  17   **Q.**    And the e-mail is dated November 22, 2021, correct?

11:05  18   **A.**    Yes.

11:05  19   **Q.**    The subject is "Qorvo parts," correct?

11:05  20   **A.**    Yes.

11:05  21   **Q.**    And all Mr. Li says is, "Hi, Colin.  Please see --

11:05  22   please find the attached files.  Thanks a lot," correct?

11:05  23   **A.**    Yes.

11:05  24   **Q.**    And he attaches two files relating to Qorvo products,

11:05  25   correct?

11:05  1  **A.**   Correct.

11:05  2  **Q.**   Do you know why he was sending you these files?

11:05  3  **A.**   I would assume as these are front-end modules for

11:05  4  tuning of the customer board.

11:05  5  **Q.**   Exhibit 637 was one of the attachments to Mr. Li's

11:05  6  e-mail.  Do you recognize this document?

11:06  7  **A.**   I recognize it, yeah.

11:06  8      It's a specification for Qorvo's front-end module

11:06  9  supporting Wi-Fi6E.

11:06  10  **Q.**   That's QPF4656?

11:06  11  **A.**   Yes.

11:06  12  **Q.**   And up in the top right-hand corner, the data sheet's

11:06  13  classified as private, and it's also mark preliminary,

11:06  14  correct?

11:06  15  **A.**   Private.  Yes, it is.

11:06  16  **Q.**   To your knowledge, did Mr. Li have authorization from

11:06  17  Qorvo to have this private data sheet?

11:06  18  **A.**   Not to my knowledge.

11:06  19  **Q.**   Do you know how Mr. Li got the data sheet?

11:06  20  **A.**   No.

11:06  21  **Q.**   Why did Mr. Li want you to have this data sheet?

11:06  22  **A.**   As I said previously, I think it's to tune a customer

11:06  23  board.

11:06  24  **Q.**   Let's look at Exhibit 638.  This is the second

11:06  25  attachment to Mr. Li's e-mail.  This is the Qorvo data

| 11:06 | 1 | sheet for QPF7552, correct? |
| 11:07 | 2 | **A.**   Correct. |
| 11:07 | 3 | **Q.**   That's a Wi-Fi 6 front-end module? |
| 11:07 | 4 | **A.**   Yes. |
| 11:07 | 5 | **Q.**   And this data sheet's also classified as private, |
| 11:07 | 6 | correct? |
| 11:07 | 7 | **A.**   Yes. |
| 11:07 | 8 | **Q.**   You weren't authorized by Qorvo to have this data |
| 11:07 | 9 | sheet, were you? |
| 11:07 | 10 | **A.**   Not knowingly, no. |
| 11:07 | 11 | **Q.**   Will you please state your full name for the record? |
| 11:07 | 12 |         (Playing of video deposition concluded.) |
| 11:07 | 13 |             **THE COURT:**   All right.   That concludes the |
| 11:07 | 14 | deposition of Mr. Hunt. |
| 11:07 | 15 |             There will be 16 numbers added to our exhibit |
| 11:07 | 16 | list.   They will be 172 through 187.   And at the end, you |
| 11:07 | 17 | get a list, which will at least show a way to link |
| 11:07 | 18 | everything together as you look at the materials, and then |
| 11:07 | 19 | the exhibits that you have will have -- I'm sure both |
| 11:08 | 20 | numbers on them, but it will have our sequential numbers |
| 11:08 | 21 | in the case. |
| 11:08 | 22 |             Counsel, who will our next witness be? |
| 11:08 | 23 |             (Trial Exhibit Nos. 172, 173, 174, 175, 176, |
| 11:08 | 24 | 177, 178, 179, 180, 181, 182, 183, 184, 185, 186 and 187 |
| 11:08 | 25 | were admitted into evidence.) |

11:08  1          **MR. ALPER:**  Your Honor, permission to approach

11:08  2   with the binders for the exhibits?

11:08  3          **THE COURT:**  Sure.  No problem.  Understand I

11:08  4   believe it's Mr. Dry; is that right?

11:08  5          **MR. ALPER:**  Plaintiffs next witness is Akoustis

11:08  6   VP of assembly and test operations Mr. Robert Dry by

11:08  7   video.

11:08  8          (Deposition designation of Robert Dry plays as

11:08  9            follows:

11:08  10  **Q.**  Could you state your full name for the record.

11:08  11  **A.**  Yes, Robert Charles Dry.

11:08  12  **Q.**  Could you tell me what your current position is?

11:08  13  **A.**  I'm the VP of final operations at Akoustis

11:09  14  Technologies.

11:09  15  **Q.**  And for how long have you been working at Akoustis?

11:09  16  **A.**  Since October 2019.  I don't know the exact date the

11:09  17  date.  It was around about mid-October.

11:09  18  **Q.**  Where did you work prior to Akoustis?

11:09  19  **A.**  I worked at Qorvo in Texas, Richardson.  And RFMD in

11:09  20  Greensboro.  And prior to that, I had -- I worked in the

11:09  21  UK for a company called Filtronic.  And prior to that, a

11:09  22  company called Electronica.  And prior to that, a company

11:09  23  called Plessey.  There's a couple other companies as well

11:09  24  if you wish those.

11:09  25  **Q.**  What were your responsibilities as the vice president

*Dry - Deposition Designation*

| | | |
|---|---|---|
| 11:09 | 1 | of final operations at Akoustis? |
| 11:09 | 2 | **A.**   I was responsible for supporting what we call the |
| 11:10 | 3 | back end, so post fab.  So activities after wafers came |
| 11:10 | 4 | out of the fab became my responsibility. |
| 11:10 | 5 | **Q.**   So, Mr. Dry, I've actually handed you what's been |
| 11:10 | 6 | mark as Exhibits 200, 201, and 202. |
| 11:10 | 7 | Mr. Dry, do you recognize Exhibits 200 through 202? |
| 11:10 | 8 | **A.**   I do. |
| 11:10 | 9 | **Q.**   And what are they? |
| 11:10 | 10 | **A.**   200 is an e-mail.  I don't actually recall sending |
| 11:10 | 11 | the e-mail, but it's definitely come from myself, from my |
| 11:10 | 12 | AOL account, to Rohan Houlden.  And it shares two |
| 11:10 | 13 | documents.  Looking at the documents, one is some |
| 11:10 | 14 | information on pricing for a ceramic package.  And the |
| 11:10 | 15 | other one is images of -- cartoon images of different |
| 11:11 | 16 | package types. |
| 11:11 | 17 | **Q.**   Why did you send this to Mr. Houlden's personal |
| 11:11 | 18 | e-mail account? |
| 11:11 | 19 | **A.**   I have no recollection of why that would have been |
| 11:11 | 20 | the case.  He sent -- I was responding to the same e-mail |
| 11:11 | 21 | that he sent to me. |
| 11:11 | 22 | **Q.**   Okay.  In December of 2016, when you sent this e-mail |
| 11:11 | 23 | to Mr. Houlden, you were working at Qorvo? |
| 11:11 | 24 | **A.**   That's correct. |
| 11:11 | 25 | **Q.**   And you had a Qorvo e-mail account, right? |

*Dry – Deposition Designation*

11:11  1   **A.**   I did.

11:11  2   **Q.**   Why did you use your personal e-mail account to send

11:11  3   this information to Mr. Houlden?

11:11  4   **A.**   I do not recall.

11:11  5   **Q.**   Was there a concern that you didn't want Qorvo to see

11:11  6   that you were sending this information to Mr. Houlden?

11:11  7   **A.**   As I said, I don't recall.

11:11  8   **Q.**   Can you think of any other reason you would have used

11:11  9   your personal e-mail account to send the attachments to

11:11  10  Mr. Houlden?

11:12  11  **A.**   Only other than convenience.

11:12  12  **Q.**   Okay.  If we go to Exhibit 201.

11:12  13  **A.**   Okay.

11:12  14  **Q.**   This appears to be a spreadsheet listing prices for

11:12  15  packages; is that right?

11:12  16  **A.**   That's correct.

11:12  17  **Q.**   Is this information from Qorvo SAP system?

11:12  18  **A.**   I don't recall.

11:12  19  **Q.**   But this is -- the information in Exhibit 201 is

11:12  20  Qorvo's information, right?

11:12  21  **A.**   Looking through this, yes.

11:12  22  **Q.**   Is there a reason it would have been more convenient

11:12  23  for you to obtain Qorvo's information using -- and send

11:12  24  Qorvo's information using your personal e-mail account

11:12  25  rather than your Qorvo e-mail account?

*Dry – Deposition Designation*

11:12    1    **A.**    No.

11:12    2    **Q.**    And I mean, I would have thought that to the extent

11:12    3    you had Qorvo accounting information about packaging, that

11:12    4    would have been located on your Qorvo computer, right?

11:13    5    **A.**    I would assume so.

11:13    6    **Q.**    Okay.  The information that's reflected in

11:13    7    Exhibit 201 would have been confidential at Qorvo, right?

11:13    8    **A.**    Reflecting back, I would assume so, yes.

11:13    9    **Q.**    Meaning Qorvo would not typically send its

11:13    10    competitors cost information about its parts?

11:13    11    **A.**    It would not.

11:13    12    **Q.**    Do you recognize Exhibit 210?

11:13    13    **A.**    I do not.

11:13    14    **Q.**    All right.  Mr. Dry, I've handed you Exhibits 216 to

11:13    15    220.

11:13    16    **A.**    Yeah.

11:13    17    **Q.**    Let's move to Exhibit 220.

11:13    18        Do you recognize what this is?

11:13    19    **A.**    So again, reading through, it states it's an RFMD

11:13    20    package outline drawing.

11:13    21    **Q.**    What is a package outline drawing?

11:13    22    **A.**    Again, this is a drawing that would show anybody who

11:14    23    wants to use the part the -- the outline dimensions and

11:14    24    the pad dimensions of a product.

11:14    25    **Q.**    Who would a package outline drawing be provided to,

*Dry – Deposition Designation*

11:14  1  generally?

11:14  2  **A.**  It would be on data sheet, so -- which would be

11:14  3  available to for anybody looking to purchase the part or

11:14  4  who has purchased the part.

11:14  5  **Q.**  Okay.  So if you had downloaded the data sheet for --

11:14  6  **A.**  Yes.

11:14  7  **Q.**  -- RFFM4252, you would believe that you would have

11:14  8  seen a package drawing?

11:14  9  **A.**  I would have seen this information, yes.

11:14  10  **Q.**  Is there a reason that you sent Mr. Hosse this

11:14  11  package drawing instead of a data sheet for RFM --

11:14  12  RFFM4252?

11:14  13  **A.**  There's no reason I would know of.

11:15  14  **Q.**  This document, Exhibit 220, is a confidential

11:15  15  document?

11:15  16  **A.**  It states that, yes.

11:15  17  **Q.**  Okay.  And did you have authorization from Qorvo to

11:15  18  share Exhibit 220 with anyone at Akoustis?

11:15  19  **A.**  I did not, no.

11:15  20  I mean, looking at the documents now and reflecting

11:15  21  back, you know, clearly, I was in the wrong to share this

11:15  22  information, and I recognize that.  That was certainly an

11:15  23  error on my part.

11:15  24  **Q.**  Okay.  If you could take a moment and look at

11:15  25  Exhibits 221 through 223 and let me know whether you

*Dry – Deposition Designation*

11:15  1    recognize these documents.

11:15  2    **A.**    I do recognize them, yes.

11:15  3    **Q.**    Okay.  And what do you recognize these documents to

11:15  4    be?

11:15  5    **A.**    So one is the Qorvo General Branding Requirements and

11:15  6    Guidelines document, which is -- explains the branding

11:15  7    requirements applied to Qorvo parts.

11:15  8    **Q.**    And what exhibit are you referring to?

11:15  9    **A.**    That's Exhibit Number 222.

11:16  10        And Exhibit Number 223 is General Product Inspection

11:16  11   Procedure, which talks about inspection of parts,

11:16  12   specifically, I think, semiconductor active devices.

11:16  13   **Q.**    Do you recall sending this e-mail to Mr. Morgan?

11:16  14   **A.**    I don't recall sending the e-mail.

11:16  15   **Q.**    Okay.  Who was Mr. Morgan?

11:16  16   **A.**    Joel Morgan was the head of quality.

11:16  17   **Q.**    Okay.  And the subject of your e-mail is "Fab

11:16  18   Inspection"?

11:16  19   **A.**    Yes.

11:16  20   **Q.**    And you forwarded Mr. Morgan two attachments, right?

11:16  21   **A.**    Correct.

11:16  22   **Q.**    And the body of your e-mail was:

11:16  23        (Reading)

11:16  24        Joel, look what I have.

11:16  25   **A.**    Yeah.

| | | |
|---|---|---|
| 11:16 | 1 | **Q.**  Two question marks? |
| 11:16 | 2 | **A.**  Yes. |
| 11:16 | 3 | **Q.**  Why did you send Mr. Morgan Exhibits 222 and 223? |
| 11:16 | 4 | **A.**  I was looking for examples of the way that parts were |
| 11:16 | 5 | inspected and the way that parts were branded to |
| 11:16 | 6 | demonstrate the level of detail that needed to be applied, |
| 11:16 | 7 | I felt, to our products internally. |
| 11:17 | 8 | **Q.**  What -- one of these documents relates to inspection |
| 11:17 | 9 | procedure? |
| 11:17 | 10 | **A.**  Yes. |
| 11:17 | 11 | **Q.**  Exhibit 223? |
| 11:17 | 12 | **A.**  223, yeah. |
| 11:17 | 13 | **Q.**  What is -- what is the role of inspection procedures |
| 11:17 | 14 | in the production of parts? |
| 11:17 | 15 | **A.**  So when you manufacture anything, it has to be |
| 11:17 | 16 | manufactured to a standard.  The way you determine if |
| 11:17 | 17 | you've met the standard is you inspect it.  So it can be |
| 11:17 | 18 | done either visually or automatically, but you have to |
| 11:17 | 19 | recognize what is good and what is bad.  So by having a |
| 11:17 | 20 | document that provides details of what is an acceptable |
| 11:17 | 21 | standard for anything that you find and what is not |
| 11:17 | 22 | acceptable is what the document is there to provide. |
| 11:17 | 23 | **Q.**  Where did you get Exhibits 223 and 222? |
| 11:17 | 24 | **A.**  I have no recollection of where these came from. |
| 11:17 | 25 | **Q.**  You recognize Exhibit 222 and 223 are Qorvo |

*Dry – Deposition Designation*

11:18  1   documents?

11:18  2   **A.**   I do, yes.

11:18  3   **Q.**   Did you have authorization to share these Qorvo

11:18  4   documents with Akoustis?

11:18  5   **A.**   I did not.

11:18  6   **Q.**   And you would agree with me that Exhibit 222 and 223

11:18  7   are confidential documents?

11:18  8   **A.**   It states that on them, yes.

11:18  9   **Q.**   How were Exhibits 222 and 223 used by Akoustis?

11:18  10  **A.**   They were used as examples of a standard.  We didn't

11:18  11  actually use either document.  We created our own

11:18  12  documents completely.  The inspection document, our own

11:18  13  inspection document, is a very, very diluted, looks

11:18  14  nothing like this particular document at all.  I think

11:18  15  it's got two pages and eight pictures in it.  So my intent

11:18  16  was to get some level of detail applied to a document that

11:18  17  we would be using, and this was the example that I used to

11:19  18  drive that.  But in the end, we didn't do anything like

11:19  19  this.

11:19  20  **Q.**   If we look at the first page of Exhibit 222, at the

11:19  21  top, it's kind of near the top, there's a bolded, all

11:19  22  caps, it says "CONFIDENTIAL."

11:19  23       Do you see that?

11:19  24  **A.**   I do.

11:19  25  **Q.**   It says:  (Reading)

11:19  1          Property of Qorvo, Inc.  Do not reproduce, copy of

11:19  2     transfer to any third party without express permission

11:19  3     from Qorvo.

11:19  4          Do you see that?

11:19  5     **A.**   I do.

11:19  6     **Q.**   You didn't have express permission from Qorvo to

11:19  7     transfer this document to Mr. Hosse?

11:19  8     **A.**   I did not.

11:19  9     **Q.**   In retrospect, would you agree with me that it was

11:19  10    not proper to send this document to Mr. Hosse?

11:19  11    **A.**   I absolutely agree that in retrospect, I shouldn't

11:19  12    have sent these documents or certainly should have sought

11:19  13    permission before I did.  So yeah, it was an error on my

11:19  14    part.

11:19  15    **Q.**   If we can turn to Exhibit 223.

11:19  16    **A.**   Yeah.

11:19  17    **Q.**   It says at the top "General Products Inspection

11:20  18    Procedure."

11:20  19    **A.**   Yeah.

11:20  20    **Q.**   And it appears to me that this document may have been

11:20  21    modified in some way.  Would you agree with that?

11:20  22    **A.**   Yes.  It doesn't have the Qorvo emblems on it or

11:20  23    nomenclature, by the looks of it.

11:20  24    **Q.**   Do you recall having gone through and removed the

11:20  25    Qorvo nomenclature from this document before sending it to

11:20  1    Mr. Hosse?

11:20  2    **A.**   I believe I did.

11:20  3    **Q.**   And why did you do that?

11:20  4    **A.**   Because I wanted it to be used as an example rather

11:20  5    than specific, and it didn't make sense to me to have an

11:20  6    example with Qorvo written all over it.

11:20  7    **Q.**   Did you have a concern in January 2020 about sending

11:20  8    documents to other folks at Akoustis that had Qorvo's

11:20  9    confidentiality legends on them?

11:20  10   **A.**   I really didn't think about it.  I mean, reflecting

11:20  11   back, it was -- I should have thought more carefully about

11:20  12   it.  There was a huge amount going on at the time,

11:21  13   personally, as well as at work, I was trying to support

11:21  14   the business in ways that I've -- that I've seen done by

11:21  15   other people in the industry over many years.  But

11:21  16   certainly, when I sit here today and reflect on this, it

11:21  17   was some errors of judgment here on may part.

11:21  18   **Q.**   Mr. Dry, could I ask you to turn in Exhibit 223 --

11:21  19   **A.**   Yeah.

11:21  20   **Q.**   -- to what's on the top right-hand corner, it says

11:21  21   Page 7 of 19?

11:21  22   **A.**   Yeah.

11:21  23   **Q.**   And I'll identify for the record, the production

11:21  24   number on the bottom of that page is AKTS_00144097.

11:21  25        Are you there?

11:21  1    **A.**  I am, yes.

11:21  2    **Q.**  On this Page 7 of 19 and then continuing towards the

11:21  3    back of Exhibit 223 --

11:21  4    **A.**  Right.

11:21  5    **Q.**  -- there's a series of pictures --

11:21  6    **A.**  Correct, yeah.

11:21  7    **Q.**  -- that have been annotated.  Do you see that?

11:21  8    **A.**  Yes.

11:21  9    **Q.**  Is Akoustis -- or has Akoustis used any of these

11:22  10   pictures for the -- for its inspection guidelines?

11:22  11   **A.**  Absolutely not.

11:22  12   **Q.**  Okay.

11:22  13   **A.**  Just --

11:22  14   **Q.**  Are these pictures applicable or inapplicable to

11:22  15   products that Akoustis?

11:22  16   **A.**  Inapplicable.

11:22  17   **Q.**  Okay.  And is that because these are different kinds

11:22  18   of devices?

11:22  19   **A.**  Yes, these are -- appear to be all active devices.

11:22  20   And as I explained earlier, "active" means electrically

11:22  21   biased.  These don't -- these are not managed devices,

11:22  22   which is the focus of Akoustis' product portfolio.

11:22  23   **Q.**  Okay.  Mr. Dry, I've handed you what's been marked as

11:22  24   Exhibit 224, 225, and 226.

11:22  25       All right.  So I'd like to start with Exhibit 224.

*Dry – Deposition Designation*

11:22  1    **A.**    Yeah.

11:22  2    **Q.**    This is an e-mail from yourself to Ms. Wendy Wright;

11:22  3    is that right?

11:22  4    **A.**    At the top it was originally an e-mail to Mary

11:22  5    Winters.  It looks like Ken Fallon, Joel Morgan, and then

11:22  6    forwarded to Wendy.

11:22  7    **Q.**    Okay.  So yeah, you're referring to the bottom e-mail

11:23  8    in the chain --

11:23  9    **A.**    Yeah.

11:23  10   **Q.**    -- on Exhibit 224 was an e-mail from yourself to Mary

11:23  11   Winters and some other folks, right?

11:23  12   **A.**    Yes.

11:23  13   **Q.**    If we could turn to Exhibit 225.

11:23  14   **A.**    Okay.

11:23  15   **Q.**    I believe you identified this as a Qorvo document,

11:23  16   right?

11:23  17   **A.**    Yes.

11:23  18   **Q.**    And you understand that this is a confidential Qorvo

11:23  19   document?

11:23  20   **A.**    I do.

11:23  21   **Q.**    And did you not have authorization to share this

11:23  22   document Akoustis?

11:23  23   **A.**    I did not.

11:23  24   **Q.**    If you could compare Exhibit 225 with Exhibit 223.

11:23  25   Would you agree with me that these are different

*Dry – Deposition Designation*

11:23    1    documents?

11:23    2    **A.**    Yes.

11:23    3    **Q.**    So just so we have it clear on the record,

11:23    4    Exhibit 223 was a Qorvo document that you had sent to

11:23    5    Mr. Morgan on January 20th -- sorry, January 16th, 2020.

11:24    6    **A.**    Yeah.

11:24    7    **Q.**    And that Exhibit 223 was the General Products

11:24    8    Inspection Procedure, right?

11:24    9    **A.**    Correct.

11:24    10   **Q.**    And then Exhibit 225 is a Qorvo document that you

11:24    11   forwarded to Ms. Wright on January 1st, 2020.

11:24    12   **A.**    Yeah.

11:24    13   **Q.**    Which is First -- "Final Visual Quality Control

11:24    14   Inspection Document" from Qorvo, right?

11:24    15   **A.**    Right.

11:24    16   **Q.**    Do you know where you got the Final Visual Quality

11:24    17   Control Inspection document?

11:24    18   **A.**    No, I do not.

11:24    19   **Q.**    If we can turn to Exhibit 226.

11:24    20   **A.**    Yeah.

11:24    21   **Q.**    You identified this as the branding guidelines for

11:24    22   Akoustis?

11:24    23   **A.**    Yes.

11:24    24   **Q.**    Could I ask you to pull out Exhibit 222?

11:24    25   **A.**    Yes.

11:24  1    **Q.**  And Exhibit 222 was the Qorvo branding requirements

11:25  2    document that you sent to Mr. Morgan on July -- sorry,

11:25  3    January 16th, 2020, right?

11:25  4    **A.**  According to the e-mail, yes.

11:25  5    **Q.**  Okay.  And would you agree with me that the Akoustis

11:25  6    branding guidelines that have been marked as Exhibit 226

11:25  7    were derived from the Qorvo branding guidelines that have

11:25  8    been marked as 222?

11:25  9    **A.**  There are some similarities across the documents.

11:25  10   **Q.**  My question, I hope, is pretty straightforward.  So

11:25  11   on Exhibit 222 --

11:25  12   **A.**  Yeah.

11:25  13   **Q.**  -- there's a Qorvo label on the front left corner of

11:25  14   the document, right?

11:25  15   **A.**  Correct.

11:25  16   **Q.**  If you look at Exhibit 226, that Qorvo label has been

11:25  17   deleted?

11:25  18   **A.**  That's correct, yes.

11:26  19   **Q.**  On Exhibit 222 near the top of the page, there's a

11:26  20   Qorvo confidentiality legend, right?

11:26  21   **A.**  Yes.

11:26  22   **Q.**  If you look at Exhibit 226, that Qorvo

11:26  23   confidentiality legend has been deleted?

11:26  24   **A.**  It has, yes.

11:26  25   **Q.**  And you were the person that deleted those logo and

| | | |
|---|---|---|
| 11:26 | 1 | confidentiality legends before circulating Exhibit 226, |
| 11:26 | 2 | right? |
| 11:26 | 3 | **A.**   I do not recall doing that, but let me go back to the |
| 11:26 | 4 | e-mail which I don't remember. |
| 11:26 | 5 |      I can't confirm that I actually did that work. |
| 11:26 | 6 | **Q.**   You mean you can't confirm that you were the person |
| 11:26 | 7 | who deleted the information? |
| 11:26 | 8 | **A.**   No.  Correct. |
| 11:27 | 9 | **Q.**   Mr. Dry, I've handed you what's been marked as |
| 11:27 | 10 | Exhibit 227 and 228. |
| 11:27 | 11 | **A.**   Yeah. |
| 11:27 | 12 | **Q.**   Exhibit 227 is an Outlook calendar invite, it looks |
| 11:27 | 13 | to be. |
| 11:27 | 14 | **A.**   Yeah. |
| 11:27 | 15 | **Q.**   Is that right? |
| 11:27 | 16 | **A.**   Teams meeting, yeah. |
| 11:27 | 17 | **Q.**   And Exhibit 228 was produced to us as an attachment |
| 11:27 | 18 | to the calendar invite -- |
| 11:27 | 19 | **A.**   Yeah. |
| 11:27 | 20 | **Q.**   Okay.  Do you recognize Exhibits 227 and 228? |
| 11:27 | 21 | **A.**   228 is the same document as you shared as 225, it |
| 11:27 | 22 | would appear.  And 227, I recognize it as an invite, but I |
| 11:27 | 23 | don't personally recall setting up the meeting. |
| 11:27 | 24 | **Q.**   Okay.  So let's start with 227. |
| 11:27 | 25 | **A.**   Okay. |

*Dry — Deposition Designation*

| | | |
|---|---|---|
| 11:27 | 1 | **Q.**   You would agree that this calendar invite was issued |
| 11:27 | 2 | by you? |
| 11:27 | 3 | **A.**   Yes. |
| 11:27 | 4 | **Q.**   And you invited Mary Winters, Ken Fallon, |
| 11:27 | 5 | Joel Morgan, and Brook Hosse to a meeting? |
| 11:27 | 6 | **A.**   Correct. |
| 11:28 | 7 | **Q.**   Who is Ms. Winters? |
| 11:28 | 8 | **A.**   Mary Winters heads up the fab.  So she is the head of |
| 11:28 | 9 | front-end operations. |
| 11:28 | 10 | **Q.**   Okay.  And what are Ms. Winters' responsibilities as |
| 11:28 | 11 | head -- as the person who heads up the fab? |
| 11:28 | 12 | **A.**   She is totally responsible for all wafers that come |
| 11:28 | 13 | out of Akoustis. |
| 11:28 | 14 | **Q.**   And would that include the inspection of wafers? |
| 11:28 | 15 | **A.**   Yes. |
| 11:28 | 16 | **Q.**   The subject on the meeting was "Wafer Inspection |
| 11:28 | 17 | Document Review"? |
| 11:28 | 18 | **A.**   Correct. |
| 11:28 | 19 | **Q.**   And what was the purpose of this meeting? |
| 11:28 | 20 | **A.**   So I do remember the meeting.  I don't remember |
| 11:28 | 21 | sending the invite or this particular e-mail. |
| 11:28 | 22 | The purpose of the meeting was to show an example of |
| 11:28 | 23 | the level of inspection detailed in a document that I was |
| 11:28 | 24 | pushing to see if we could get applied to wafers coming |
| 11:28 | 25 | out of the fab.  So it's an opportunity to discuss |

11:28  1   inspection of wafers coming out.

11:29  2   **Q.**   Prior to the meeting, how was Akoustis inspecting

11:29  3   wafers out of the fab?

11:29  4   **A.**   So they were doing visual inspections.  They had

11:29  5   operators who would inspect wafers at each stage.  So

11:29  6   wafers were going through a recognized criteria for pass

11:29  7   and fail of different parts.  My concern was that there

11:29  8   wasn't enough detail, and I was pushing very hard as the

11:29  9   customer of the fab, is how it operates, to get a high

11:29  10  level of inspection applied.

11:29  11  **Q.**   Was there is any discussion at the meeting as to how

11:29  12  you had obtained the Qorvo inspection guidelines?

11:29  13  **A.**   I don't recall any discussion on that.

11:29  14  **Q.**   No one expressed any surprise that you had had this

11:29  15  document?

11:29  16  **A.**   I certainly don't recall that.

11:29  17  **Q.**   Mr. Dry, I've handed you what's been marked as

11:29  18  Exhibit 229 and Exhibit 230.

11:30  19       If we look at Exhibit 229, it's an e-mail from

11:30  20  yourself to Mary Winters, Ken Fallon, Joel Morgan,

11:30  21  Brook Hosse, and Thomas Mooney.

11:30  22       Do you see that?

11:30  23  **A.**   I do.

11:30  24  **Q.**   And you sent the e-mail on January 20th, 2020?

11:30  25  **A.**   Yeah.

*Dry – Deposition Designation*

| | | |
|---|---|---|
| 11:30 | 1 | **Q.**  And you attached to your e-mail the Qorvo Final |
| 11:30 | 2 | Visual Quality Inspection document? |
| 11:30 | 3 | **A.**  Correct. |
| 11:30 | 4 | **Q.**  In your message to the group that e-mailed, you said: |
| 11:30 | 5 | (Reading) |
| 11:30 | 6 | Attached is a doc that I have, and for good reasons |
| 11:30 | 7 | have edited out former references. |
| 11:30 | 8 | **A.**  Yeah. |
| 11:30 | 9 | **Q.**  What did you mean by "edited out former references"? |
| 11:30 | 10 | **A.**  I've edited out references to Qorvo because I didn't |
| 11:30 | 11 | want to be showing a document around that we would be |
| 11:30 | 12 | discussing as an example that had Qorvo written on it. |
| 11:31 | 13 | **Q.**  Mr. Dry, I've handed you what's been marked as |
| 11:31 | 14 | Exhibits 231 and 232.  As a result, you would agree that |
| 11:31 | 15 | Exhibit 232 is a Qorvo document? |
| 11:31 | 16 | **A.**  Yes. |
| 11:31 | 17 | **Q.**  And as with Exhibit 230 and 228, you didn't have |
| 11:31 | 18 | authorization to share this Qorvo document on |
| 11:31 | 19 | February 11th, 2020 with the folks who you had e-mailed it |
| 11:31 | 20 | to? |
| 11:31 | 21 | **A.**  Correct, I did not. |
| 11:31 | 22 | **Q.**  Okay.  I'd like to start with your e-mail, which has |
| 11:31 | 23 | been marked as Exhibit 231. |
| 11:31 | 24 | You e-mailed Jerry Gray, Brook Hosse, Joel Morgan, |
| 11:31 | 25 | Mary Winters, and Ken Fallon. |

| | | |
|---|---|---|
| 11:31 | 1 | Do you see that? |
| 11:31 | 2 | **A.** I do. |
| 11:31 | 3 | **Q.** If you look at the third paragraph -- well, first of |
| 11:31 | 4 | all, if you move down one line -- |
| 11:31 | 5 | **A.** Yeah. |
| 11:31 | 6 | **Q.** -- in your e-mail, it says:  (Reading) |
| 11:31 | 7 | Ahead of the call, I would like to share something |
| 11:32 | 8 | for discussion. |
| 11:32 | 9 | Do you see that? |
| 11:32 | 10 | **A.** Yeah. |
| 11:32 | 11 | **Q.** And then, I think, in the next to paragraphs you |
| 11:32 | 12 | outline some things you would like to discuss; is that |
| 11:32 | 13 | right? |
| 11:32 | 14 | You say:  (Reading) |
| 11:32 | 15 | My suggestion is, therefore, to use something like |
| 11:32 | 16 | the attached process, slash, form to highlight issues on a |
| 11:32 | 17 | wafer at a very macro inspection level prior to shipment |
| 11:32 | 18 | from the fab? |
| 11:32 | 19 | **A.** Correct. |
| 11:32 | 20 | **Q.** Okay.  And the attached process, slash, form that |
| 11:32 | 21 | you're referring to is the Qorvo Final Visual Quality |
| 11:32 | 22 | Control Inspection that's been marked as Exhibit 232? |
| 11:32 | 23 | **A.** Correct. |
| 11:32 | 24 | **Q.** And you were pressing the fab to adopt a procedure |
| 11:32 | 25 | like this so that they could use it to inspect wafers |

*Dry - Deposition Designation*

11:32  1   before they would be shipped to the assembly houses?

11:32  2   **A.**   Correct.  I would also, I mean, going back to

11:32  3   Document 229, which is the...yeah, which precede this,

11:32  4   which had previously been shared with the same group, I

11:33  5   had clearly stated:  (Reading)

11:33  6        There is far too much in this document than we will

11:33  7   need, but it does help provide a format and provide detail

11:33  8   of industry specs applied.  So although that's not

11:33  9   reiterated in this document, I think it's important to

11:33  10  recognize that this was an example of a very onerous

11:33  11  document covering a different portfolio of product, but it

11:33  12  was an example of an industry standard.

11:33  13  **Q.**   Mr. Dry, I've handed you what's been marked as

11:33  14  Exhibits 248 and 249.

11:33  15       Do you recognize these documents?

11:33  16  **A.**   No.

11:33  17  **Q.**   Okay.  If we can start with Exhibit 248, you would

11:33  18  agree with me that this is an e-mail exchange between

11:33  19  yourself and Jerry Gray?

11:33  20  **A.**   That's what it states here.

11:33  21  **Q.**   Who is Jerry Gray again?

11:33  22  **A.**   Head of project management team.

11:33  23  **Q.**   And if we look at the first e-mail chronologically in

11:34  24  the chain from Mr. Gray, at the bottom it says:  (Reading)

11:34  25       Rob, do you have a copy of the, quote, Q, end quote,

*Dry - Deposition Designation*

11:34   1   reflow policy, question mark.

11:34   2       Do you see that?

11:34   3   **A.**   I do.

11:34   4   **Q.**   When Mr. Gray referred to the "Q reflow policy," you

11:34   5   understood that that was referring to Qorvo's reflow

11:34   6   policy?

11:34   7   **A.**   I can't confirm that.

11:34   8   **Q.**   Okay.  Well, you responded to Mr. Gray the next day,

11:34   9   and you said, "Found it."

11:34   10  **A.**   Yes.

11:34   11  **Q.**   And you attached a document to your e-mail, right?

11:34   12  **A.**   Yes.

11:34   13  **Q.**   And if you look at Exhibit 249, this is a Qorvo --

11:34   14  **A.**   Okay.

11:34   15  **Q.**   -- reflow policy, right?

11:34   16  **A.**   Correct, it is.

11:34   17  **Q.**   So at least when Mr. Gray referred to a Q document,

11:34   18  you understood that that meant a Qorvo document?

11:34   19  **A.**   He was asking for a reflow document.  I found a

11:34   20  reflow document.

11:35   21  **Q.**   So a Q reflow document would refer to a Qorvo reflow

11:35   22  document, but a Q test plan would refer to a Qorvo test

11:35   23  plan?

11:35   24  **A.**   I don't know how you can assume that.  I don't -- I

11:35   25  mean, it's a reference to a Q.  It could mean anything.

11:35   1   **Q.**   Okay.

11:35   2   **A.**   The specifics of the e-mail was looking for a reflow

11:35   3   document.  It happened that what I found, and I have no

11:35   4   recollection of actually finding this or sending it to

11:35   5   him, but it is a Qorvo reflow document.

11:35   6   **Q.**   You said "found it" in your e-mail to him?

11:35   7   **A.**   Yes.

11:35   8   **Q.**   Where did you find it?

11:35   9   **A.**   I don't recall.

11:35   10  **Q.**   Did you have this on a home computer?

11:35   11  **A.**   I don't recall where I found it.

11:35   12  **Q.**   This is not the first time where you were able to

11:35   13  find confidential Qorvo policy somewhere and attach it to

11:35   14  an e-mail.  You don't have any recollection where you were

11:35   15  obtaining those policies?

11:35   16  **A.**   I do not.

11:35   17  **Q.**   Okay.  Mr. Dry, I've handed you what's been marked as

11:35   18  Exhibits 250 and 251.

11:36   19       Do you recognize Exhibits 250 and 251?

11:36   20  **A.**   I don't remember these.

11:36   21  **Q.**   Okay.  Exhibit 250 appears to be a follow-on to the

11:36   22  e-mail correspondence that we were just looking at in

11:36   23  Exhibits 248 and 249, correct?

11:36   24  **A.**   Correct.

11:36   25  **Q.**   So in other words, you had sent the Qorvo reflow

| | | |
|---|---|---|
| 11:36 | 1 | policy to Mr. Gray, and then he wrote back to you and |
| 11:36 | 2 | said -- he said:  (Reading) |
| 11:36 | 3 |     Thank you for the document. |
| 11:36 | 4 |     Right? |
| 11:36 | 5 | **A.**   Yes. |
| 11:36 | 6 | **Q.**   And he says:  (Reading) |
| 11:36 | 7 |     By chance, do you have POL-000021 customer |
| 11:36 | 8 | requirements for one-time reflow or 5TC preconditioning. |
| 11:36 | 9 |     Do you see that? |
| 11:36 | 10 | **A.**   I do. |
| 11:36 | 11 | **Q.**   So Mr. Gray was asking you for another Qorvo document |
| 11:36 | 12 | that had been referenced in the Qorvo reflow policy? |
| 11:36 | 13 | **A.**   Right. |
| 11:36 | 14 | **Q.**   Okay.  And you responded to Mr. Gray later that same |
| 11:36 | 15 | day and said, "Here you go." |
| 11:37 | 16 | **A.**   According to this, yes. |
| 11:37 | 17 | **Q.**   And you attached, again, another Qorvo document? |
| 11:37 | 18 | **A.**   Correct. |
| 11:37 | 19 | **Q.**   And that's Exhibit 251? |
| 11:37 | 20 | **A.**   Yes. |
| 11:37 | 21 | **Q.**   Okay.  Do you know where you got Exhibit 251 from? |
| 11:37 | 22 | **A.**   No, I do not recall. |
| 11:37 | 23 | **Q.**   Did you have authorization from Qorvo to share |
| 11:37 | 24 | Exhibit 251 with Akoustis? |
| 11:37 | 25 | **A.**   I did not. |

*Dry – Deposition Designation*

| | | |
|---|---|---|
| 11:37 | 1 | **Q.**   And I should have asked this before, but going back |
| 11:37 | 2 | to examine 249 -- |
| 11:37 | 3 | **A.**   Yes. |
| 11:37 | 4 | **Q.**   -- which is the reflow -- Qorvo reflow policy -- |
| 11:37 | 5 | **A.**   Right. |
| 11:37 | 6 | **Q.**   -- that you sent to Mr. Gray on May 20 of 2020. |
| 11:37 | 7 | Do you have that? |
| 11:37 | 8 | **A.**   Yes, I do. |
| 11:37 | 9 | **Q.**   Did you have authorization from Qorvo to share |
| 11:37 | 10 | Exhibit 249 with anyone at Akoustis? |
| 11:37 | 11 | **A.**   I did not. |
| 11:37 | 12 | **Q.**   I will hand you what's now been marked as |
| 11:37 | 13 | Exhibit 253. |
| 11:37 | 14 | Mr. Dry, do you recognize Exhibit 253? |
| 11:38 | 15 | **A.**   I recognize it from my time at Qorvo. |
| 11:38 | 16 | **Q.**   Do you understand that Exhibit 253 is a confidential |
| 11:38 | 17 | Qorvo document? |
| 11:38 | 18 | **A.**   I do. |
| 11:38 | 19 | **Q.**   Do you know how it came to be in your files at |
| 11:38 | 20 | Akoustis? |
| 11:38 | 21 | **A.**   I do not. |
| 11:38 | 22 | **Q.**   Did you have authorization to bring Exhibit 253 with |
| 11:38 | 23 | you to Akoustis? |
| 11:38 | 24 | **A.**   I did not. |
| 11:38 | 25 | (Playing of video deposition concluded.) |

| | | |
|---|---|---|
| 11:38 | 1 | **THE COURT:**  Okay.  That concludes that |
| 11:38 | 2 | deposition.  And I believe we have another 18 exhibits. |
| 11:38 | 3 | There be some overlap.  So what's the exact number? |
| 11:38 | 4 | **MR. ALPER:**  We have 12 new exhibits, |
| 11:38 | 5 | Your Honor. |
| 11:38 | 6 | **THE COURT:**  Twelve new ones.  Okay.  So we'll |
| 11:38 | 7 | add 12 to the existing numbers.  We were at 187, so we'll |
| 11:39 | 8 | be at 199.  Then we'll start 200 with the next set of |
| 11:39 | 9 | exhibits. |
| 11:39 | 10 | And, again, you'll receive that list, and, |
| 11:39 | 11 | hopefully, it will be helpful.  It won't have much |
| 11:39 | 12 | descriptive information. |
| 11:39 | 13 | Yes, Counselor? |
| 11:39 | 14 | (Trial Exhibit Nos. 188, 189, 190, 191, 192, |
| 11:39 | 15 | 193, 194, 195, 196, 197, 198, 199 were admitted into |
| 11:39 | 16 | evidence.) |
| 11:39 | 17 | **MR. ALPER:**  Permission to approach and hand up |
| 11:39 | 18 | the binders with the exhibits? |
| 11:39 | 19 | **THE COURT:**  That's fine. |
| 11:39 | 20 | And who's our next witness? |
| 11:39 | 21 | **MR. MASTERS:**  Plaintiffs call Dr. Jeff Shealy. |
| 11:39 | 22 | **THE COURT:**  Certainly. |
| 11:39 | 23 | Dr. Shealy, come forward. |
| 11:40 | 24 | Come forward.  The clerk will swear you in. |
| 11:40 | 25 | **THE CLERK:**  Please state and spell your name |

11:40   1    for the record.

11:40   2                    **THE WITNESS:**  Jeffrey B. Shealy.  So

11:40   3    J-E-F-F-R-E-Y, middle initial B., Shealy S-H-E-A-L-Y.

11:40   4                    **THE CLERK:**  Please remain standing and raise

11:40   5    your right hand.

11:40   6        JEFFREY B. SHEALY, having been called as a witness,

11:40   7    being first duly sworn under oath or affirmed, testified

11:40   8    as follows:

11:40   9                    **THE COURT:**  Thank you.  Please be seated.

11:40   10                   You may proceed -- counsel may proceed.

11:40   11                   **MR. MASTERS:**  Thank you, Your Honor.

11:40   12                         DIRECT EXAMINATION

11:40   13   **BY MR. MASTERS:**

11:40   14   **Q.**   Good morning, Dr. Shealy.

11:41   15   **A.**   Good morning.

11:41   16   **Q.**   My name is Robert Masters.  I represent the

11:41   17   plaintiff, and I'm going to ask you a few questions.

11:41   18        Dr. Shealy, you are the founder of Akoustis, correct?

11:41   19   **A.**   Yes, correct.

11:41   20   **Q.**   And you are the CEO of Akoustis?

11:41   21   **A.**   Yes, I am.

11:41   22   **Q.**   You've been the CEO of Akoustis since you found the

11:41   23   company?

11:41   24   **A.**   That is correct.

11:41   25   **Q.**   And what year was that?

11:41   1   **A.**   That would be 2014.

11:41   2   **Q.**   Okay.  And prior to 2014, you were employed by RFMD?

11:41   3   **A.**   That's correct.  RF Micro Devices, RFMD, yes.

11:41   4   **Q.**   And how long were you with RFMD?

11:41   5   **A.**   Approximately 13 years.

11:41   6   **Q.**   And at RFMD, did you ever work on BAW filters?

11:41   7   **A.**   No, I did not.

11:42   8   **Q.**   Now, BAW filters, you would agree with me, are fairly

11:42   9   complex devices?

11:42   10   **A.**   Yes.

11:42   11   **Q.**   Require high precision in the design of those

11:42   12   products?

11:42   13   **A.**   A lot of detail.  Yes, I would agree with that.

11:42   14   **Q.**   And that high precision of both the design and the

11:42   15   manufacturing of those products?

11:42   16   **A.**   Yes.  And those two things are coupled, so yes.

11:42   17   **Q.**   And require sophisticated technologies, like

11:42   18   trimming, for example?

11:42   19   **A.**   That would -- yes, that is correct.

11:42   20   **Q.**   And trimming is a technology that's been developed

11:42   21   over the years, right?

11:42   22   **A.**   The trade has been refined over the years, yes.

11:42   23   **Q.**   Has a lot of technology know-how and how to trim a

11:42   24   BAW filter, correct?

11:42   25   **A.**   There is a learning curve once you -- once you have

11:42    1    the tool to be able to trim the -- to be able to trim the

11:42    2    layer.

11:42    3    **Q.**    And when we talk about your products for the market,

11:43    4    would you agree with me that there are three phases?

11:43    5    There's the sampling phase, a preproduction phase, and

11:43    6    then a mass production phase?

11:43    7    **A.**    So if I look at a sales funnel, you could organize in

11:43    8    those.    That would be a reasonable organization of those

11:43    9    phases.

11:43    10    **Q.**    And sampling is -- well, why don't you explain to the

11:43    11    jury what sampling is.

11:43    12    **A.**    Sampling of a BAW device, or any semiconductor

11:43    13    device, would include an embodiment of the end product.

11:43    14    You would engineer that product against, presumably, a

11:43    15    data sheet.    And then once you're ready to present that to

11:43    16    a customer, you would call it "a sample," and you would

11:43    17    offer it to the customer for evaluation.

11:44    18    **Q.**    Okay.    And so in 2014, your first day at Akoustis

11:44    19    your idea is to develop a BAW filter with single crystal

11:44    20    technology?

11:44    21    **A.**    That is correct.

11:44    22             **MR. MASTERS:**    Your Honor, may I approach?

11:44    23             **THE COURT:**    You may.

11:44    24             **THE WITNESS:**    Thank you.

         25

1    **BY MR. MASTERS:**

2    **Q.**   Dr. Shealy, do you recognize what's been marked as

3    Plaintiff's Exhibit 767?

4    **A.**   Yes, I do.

5    **Q.**   And it's --

6    **A.**   There are multiple -- sir, there's multiple --

7    there's multiple documents here, but I do recognize the

8    document.  But I do see more than one document here, just

9    for clarification.

10   **Q.**   Okay.  Well, let's refer to the first two pages, if

11   you will.

12   **A.**   Okay.

13   **Q.**   This document's date is September 2014, correct?

14   **A.**   That is correct.

15   **Q.**   And it's titled "Akoustis, Inc. Single Crystal

16   Acoustic Resonator Filters," correct?

17   **A.**   That is correct.

18   **Q.**   And it has your name there, correct?

19   **A.**   Yes, sir, that's my name.

20           **MR. MASTERS:**  Your Honor, I would move the

21   admission of Plaintiff's Exhibit 767.

22           **MR. LEMIEUX:**  Your Honor, objection in the

23   sense that the witness has admitted that it's a multiple

24   document.

25           **THE COURT:**  I understand.  The objection is

*Shealy - Direct*

11:45   1   overruled.

11:45   2           If it turns out that it's an inappropriately

11:45   3   submitted document, we will take those out.

11:45   4           **MR. MASTERS:**  Your Honor, it's been admitted as

11:45   5   what number?

11:45   6           **THE COURT:**  It should be 200.

11:45   7           (Trial Exhibit No. 200 was admitted into

11:45   8   evidence.)

11:45   9           **MR. MASTERS:**  Thank you.

11:45   10          Can we project Plaintiff's 767.

11:45   11  **BY MR. MASTERS:**

11:45   12  **Q.**   So this is your document that you created, correct?

11:45   13  **A.**   Yes, sir.  I recognize the document.

11:45   14  **Q.**   What was the first day of Akoustis?

11:46   15  **A.**   May -- I'd have to look at the incorporation date,

11:46   16  but approximately mid-May of 2014.

11:46   17  **Q.**   Okay.

11:46   18          **MR. MASTERS:**  And can we go do Page 2, please.

11:46   19  **BY MR. MASTERS:**

11:46   20  **Q.**   This is an executive summary that you prepared,

11:46   21  correct?

11:46   22  **A.**   That is correct.

11:46   23  **Q.**   And in the middle, there's the "Value proposition,

11:46   24  single crystal devices offer better acoustic quality

11:46   25  versus today's BAW."

11:46  1        Do you see that?

11:46  2    **A.**   That's correct.

11:46  3    **Q.**   Okay.  And that was your understanding, the single

11:46  4    crystal technology would be better than conventional BAW

11:46  5    filters?

11:46  6    **A.**   That was our thesis going in.  Obviously, these are

11:46  7    the early stages of a company, which -- which, also, if

11:46  8    you're bringing a new nano material, you certainly look at

11:46  9    the physical properties, and then you can project those

11:47  10   physical properties to translate into better devices.

11:47  11   That would be the representation that you're highlighting,

11:47  12   sir.

11:47  13   **Q.**   And when we talk single crystal, we're talking about

11:47  14   the piezoelectric layer, correct?

11:47  15   **A.**   Yes, we are.

11:47  16   **Q.**   And that is the layer that sits between the two

11:47  17   electrodes, correct?

11:47  18   **A.**   Yes.  If you think of a capacitor, the piezoelectric

11:47  19   material would be the sandwich material in between the two

11:47  20   metals.

11:47  21   **Q.**   So you have the sandwich of a top electrode, the

11:47  22   bottom electrode, and a piezoelectric layer in between the

11:47  23   two, correct?

11:47  24   **A.**   That's a reasonable simple explanation of what it is,

11:47  25   yes.

11:47  1   **Q.**   Thank you.

11:47  2        And it was that middle layer that you were seeking to

11:47  3   make single crystal, correct?  That was the thesis of the

11:47  4   company?

11:47  5   **A.**   That was -- as we founded the company, yes.

11:47  6   **Q.**   And the conventional piezoelectric layer was what's

11:47  7   known as "polycrystalline"?

11:48  8   **A.**   Yes.  Or polycrystalline or thin film, which is, in

11:48  9   my view, equivalent.

11:48  10  **Q.**   Now, is what's been marked there in your hands as TX

11:48  11  Trial Exhibit 200, it was the starting point for a

11:48  12  marketing document for Akoustis?

11:48  13  **A.**   I'm sorry, sir.  Just guide me where we're going.

11:48  14  I'm sorry.

11:48  15  **Q.**   The same document --

11:48  16  **A.**   The same document.

11:48  17  **Q.**   This was the beginnings of a marketing document,

11:48  18  wasn't it?

11:48  19  **A.**   I think that would be reasonable, yes.  That would be

11:48  20  a reasonable conclusion.

11:48  21  **Q.**   Okay.

11:48  22          **MR. MASTERS:**  Your Honor, may I approach?

11:48  23          **THE COURT:**  You may.

11:48  24  **BY MR. MASTERS:**

11:49  25  **Q.**   Dr. Shealy, can you identify what's been marked as

| | | |
|---|---|---|
| 11:49 | 1 | Plaintiff's Exhibit 769? |
| 11:49 | 2 | **A.**    769 would represent a -- effectively, an update to a |
| 11:49 | 3 | marketing document, or a business plan document. |
| 11:49 | 4 | **Q.**    Okay.  And you recognize this document, correct? |
| 11:49 | 5 | **A.**    I'll probably flip through it and make sure it's not |
| 11:49 | 6 | mingled with anything else.  But, yes, I -- sir, I do |
| 11:49 | 7 | recognize the document, and -- |
| 11:49 | 8 | **MR. MASTERS:**  Your Honor, I would move for |
| 11:49 | 9 | admission Plaintiff's Exhibit 769. |
| 11:49 | 10 | **THE COURT:**  Marked and received as 201. |
| 11:49 | 11 | (Trial Exhibit No. 201 was admitted into |
| 11:49 | 12 | evidence.) |
| 11:49 | 13 | **MR. MASTERS:**  Can we project the cover? |
| 11:49 | 14 | **THE COURT:**  You may. |
| 11:49 | 15 | **BY MR. MASTERS:** |
| 11:49 | 16 | **Q.**    So Dr. Shealy, now we're in May of 2015, so about a |
| 11:49 | 17 | year after the company has been formed, correct? |
| 11:49 | 18 | **A.**    Approximately, yes. |
| 11:49 | 19 | **Q.**    And the title here is "Disruptive Single Crystal |
| 11:50 | 20 | Filter Solutions for 4G/LTE Smartphones and Beyond," |
| 11:50 | 21 | correct? |
| 11:50 | 22 | **A.**    That is correct. |
| 11:50 | 23 | **Q.**    So, again, you were -- you were still working on the |
| 11:50 | 24 | technology of single crystal for the piezoelectric layer, |
| 11:50 | 25 | correct? |

11:50  1    **A.**    That is correct.

11:50  2    **Q.**    And Trial Exhibit 201, at least, was identifying the

11:50  3    4G/LTE smartphone as the market for the BAW filters,

11:50  4    correct?

11:50  5    **A.**    4G/LTE is -- the smartphone market is the largest

11:50  6    market that's available.  So this type of document would

11:50  7    be used for marketing to investors.  And investors would

11:50  8    want to include a very broad -- they want to see a large

11:50  9    market opportunity.  So that's certainly consistent with

11:50  10   the marketing of the document.

11:50  11           **MR. MASTERS:**  Could we turn to Page 4, please.

11:50  12   **BY MR. MASTERS:**

11:50  13   **Q.**    Doctor, can you turn to Page 4?

11:50  14   **A.**    Yes, sir.

11:50  15   **Q.**    So this document illustrates a BAW filter up at the

11:51  16   top, correct?

11:51  17   **A.**    Yes.

11:51  18   **Q.**    And you have switches on one side, correct?

11:51  19   **A.**    That would represent our front end, so it would

11:51  20   include switches, yes, sir.

11:51  21   **Q.**    And on the left side, you have amps.  That would be

11:51  22   like a power amplifier, PA?

11:51  23   **A.**    That is correct.

11:51  24   **Q.**    Okay.  And this is somewhat of a typical layout for

11:51  25   the use of BAW filters in the wireless devices; is that

11:51   1   correct?

11:51   2   **A.**    This is very generic.  I would call it a generic

11:51   3   layout.  They could -- it could -- you could have

11:51   4   amplifiers and filters, amplifier switches.  But it's very

11:51   5   generic, as what's shown here.

11:51   6   **Q.**    Fair enough.

11:51   7       But generally speaking, or maybe even specifically,

11:51   8   BAW filters are designed to interface with switches, power

11:51   9   amplifiers; isn't that correct?

11:52   10  **A.**    They are designed to interface with other --

11:52   11  typically, in an RF chain, which is where you're

11:52   12  transmitting or receiving, it would be somewhere in the

11:52   13  line of -- it could be in the -- a head of an amplifier,

11:52   14  after the amplifier.  So the order wasn't really intended

11:52   15  to be specific here, other than if you took open a front

11:52   16  end, then -- or a fully integrated front end, you would

11:52   17  see a filter.  So...

11:52   18  **Q.**    But my question is:  Filters are designed to be

11:52   19  working with a power amplifier, for example?

11:52   20  **A.**    They are designed to work with a power amplifier or

11:52   21  other solid state devices in the transmit lineup or

11:52   22  receive lineup.

11:52   23  **Q.**    Other devices could be like a switch, RF switch,

11:52   24  correct?

11:52   25  **A.**    It would include switches, yes, sir.

11:52  1   **Q.**   Or LNAs, low noise amplifiers, correct?

11:52  2   **A.**   Yes, sir.  Anything in the transmit and receive

11:52  3   lineup.

11:52  4   **Q.**   Now, later in 2015, was Akoustis still working on

11:53  5   single crystal technology?

11:53  6   **A.**   Later in 2015?

11:53  7   **Q.**   Yes.

11:53  8   **A.**   The company, since its founding, has been working on

11:53  9   single crystal nano materials for BAW devices.  And so

11:53  10  that would include May of 2014 through current day.

11:53  11  **Q.**   Well, my question was in latter part of 2015, you

11:53  12  were still working on single crystal technology, correct?

11:53  13  **A.**   Yes, sir.

11:53  14  **Q.**   And were you still a technology company, or had you

11:53  15  transitioned to a product company yet?

11:53  16  **A.**   We had -- that transition would -- in order to

11:53  17  transition from an R&D company to a product company, you

11:53  18  would need a manufacturing capability.  And so we were, at

11:53  19  that time, working with an outside manufacturing

11:53  20  capability in the attempt to transition the materials we

11:54  21  were building into -- into samples and into products for

11:54  22  the market.

11:54  23  **Q.**   But it was true that in September 2015 and early

11:54  24  2016, the company needed to start generating revenue;

11:54  25  isn't that correct?

**A.**    My recollection is that the company started

generating revenue in early 2015.  The first revenue

generation would have been with -- in most high-tech

companies, the first customer in a new technology would be

the U.S. government.  So it would be, typically, the

defense market.

And we had won our first defense contract with

National Science Foundation.  I believe we got the letter

of that in December of 2014.

**Q.**    But in terms of selling single crystal BAW filters,

you never went into production of those in 2015, correct?

**A.**    I would have to -- I would have to check the records.

But what I would say is, we targeted the defense market,

and we -- if we had samples, we were sampling the market.

**Q.**    But did you ever go into production of BAW filters in

2015 that had single crystal technology?

**A.**    That would seem on the early end of sampling.  I

mean, we were just building samples at that time.

**Q.**    So sampling is first, production is the last stage;

isn't that correct?

**A.**    For a defense customer, that's building in small

quantities, samples would -- if they were putting them in

a system for ground -- if it's a ground-based radar, then

the samples could be used in the body of a defense system.

For example, if they only need ten to make a prototype

11:55  1    system, then ten devices would be enough.

11:55  2         And as I recall, the customer that we were using at

11:55  3    that time -- or we were engaging with at that time, was

11:55  4    actually inserting our devices for what I would consider

11:55  5    either mini systems or one-off systems.

11:55  6    **Q.**   So your testimony is that from within a year, year

11:55  7    and a half, you were already making BAW filters for the

11:56  8    government's use --

11:56  9    **A.**   Sir, my test- --

11:56  10   **Q.**   -- is that your testimony?

11:56  11   **A.**   Excuse me.  I'm sorry.

11:56  12   **Q.**   Is that your testimony?

11:56  13   **A.**   My testimony is that I would need to check the

11:56  14   records of when we sampled our first customer.  But our

11:56  15   first customer was National Science Foundation, which we

11:56  16   were sampling, and a defense radar customer, which would

11:56  17   require very low volumes.

11:56  18        So if we were building -- if the embodiments were

11:56  19   available, then we certainly could check the logs when we

11:56  20   ship things.  But that's what we were -- if we announced

11:56  21   something, then we had shipped it, that's for sure.

11:56  22   **Q.**   Now, we talked earlier about sampling, and

11:56  23   preproduction, and then production.

11:56  24        Do you recall that?

11:56  25   **A.**   Yes, sir.

11:56  1    **Q.**    Have you -- has Akoustis ever made single crystal BAW

11:56  2    filters in the production at the production levels, mass

11:56  3    production levels?

11:56  4    **A.**    Yes, we have.

11:56  5    **Q.**    And which product was that?

11:57  6    **A.**    A product which is a 10161 product.  Yes, sir.

11:57  7    **Q.**    And who was the client on that?

11:57  8    **A.**    It is in an HP Aruba Wi-Fi 7 router, which is in the

11:57  9    early stages of production as we currently speak.

11:57  10   **Q.**    Is that today?

11:57  11   **A.**    Yes, sir.  Wi-Fi 7s are the latest embodiment.  So

11:57  12   that would be Enterprise router by HP Aruba.

11:57  13   **Q.**    So in 2015, were you in mass production of single

11:57  14   crystal BAW filters?

11:57  15   **A.**    We were in -- in 2015, we were not in mass

11:57  16   production.  We were working on --

11:57  17   **Q.**    That's my question.

11:57  18   **A.**    Okay.

11:57  19   **Q.**    How about 2016, were you in mass production of single

11:57  20   crystal BAW filters?

11:57  21   **A.**    I think we -- so in 2016, we were still sampling in

11:57  22   small quantities, but those quantities were going to

11:58  23   defense customer.  And we could certainly provide the

11:58  24   details of what system that those samples were being

11:58  25   inserted or evaluated.

*Shealy - Direct*

11:58   1   **Q.**   Now, did there come a time when you transitioned to

11:58   2   making BAW filters using polycrystalline?

11:58   3   **A.**   Yes.  So --

11:58   4   **Q.**   When was that?  When was the first time you did that?

11:58   5   **A.**   The -- we acquired a -- our New York fab in 2017.

11:58   6   And so we were -- when we acquired the fab, it was in the

11:58   7   middle of 2017.  So up until that point, the expertise

11:58   8   within the company was all single crystal-based materials.

11:58   9   That's what we were building.  Prior to owning our own

11:59  10   fab, we were building this at a U.S. foundry out in

11:59  11   Torrance, California, called GCS.

11:59  12        And so all of the work that we were doing at the GCS

11:59  13   was with the single crystal materials, because that's what

11:59  14   we were procuring when -- just to finish the point.  In

11:59  15   2017, when we acquired the fab, the fab itself had an

11:59  16   internal capability of polycrystalline.

11:59  17   **Q.**   Okay.  And at that period of time in 2017, 2018 you

11:59  18   were really focused on making products using single --

11:59  19   using polycrystalline for production purposes, not

11:59  20   sampling, production; isn't that correct?

11:59  21   **A.**   When you acquire a new fab, the process -- you have

11:59  22   to transfer a technology into the fab so we were

11:59  23   transferring single crystal technology into the fab.  The

11:59  24   fab itself had an internal capability of polycrystalline,

12:00  25   and I believe in that time frame we had -- we originally

12:00  1    marked the technology as bulk 1, which was a single

12:00  2    crystal technology.  And when we finished the development

12:00  3    of the technology in the fab, given that it could use

12:00  4    either single crystal or polycrystalline, we rebranded the

12:00  5    technology XBAW, the X standing for transfer because it

12:00  6    was a transfer flow.

12:00  7            **MR. MASTERS:**  Your Honor, may I approach?

12:00  8            **THE COURT:**  You may.

12:00  9    **BY MR. MASTERS:**

12:00  10   **Q.**   Dr. Shealy, I've handed you what's been marked as

12:00  11   Plaintiff's Exhibit 791.  Do you recognize this document?

12:01  12   **A.**   Let me flip through since it's a pile of paper.

12:01  13        Yes, I do recognize the document, sir.

12:01  14   **Q.**   Okay.  And this is the transcript of a speech you

12:01  15   gave at the 21st annual Needham Growth Conference; is that

12:01  16   correct?

12:01  17   **A.**   Yes, sir, that is correct.

12:01  18   **Q.**   And that was January 2019, correct?

12:01  19   **A.**   Yes, sir, January 15.

12:01  20           **MR. MASTERS:**  Your Honor, I move the admission

12:01  21   of PTX-791.

12:01  22           **THE COURT:**  Marked and received as 202.

12:01  23           (Trial Exhibit No. 202 was admitted into

12:01  24   evidence.)

       25

12:01  1          **MR. MASTERS:**  Can we project that?  Fourth

12:01  2     paragraph.

12:01  3     **BY MR. MASTERS:**

12:01  4     **Q.**  Dr. Shealy, there you said --

12:01  5          **MR. MASTERS:**  Can we highlight "the company

12:01  6     today."

12:01  7     **BY MR. MASTERS:**

12:01  8     **Q.**  Here, during this speech, you represented that the

12:01  9     company today is a commercial stage company, correct?

12:02  10    **A.**  That is correct.

12:02  11    **Q.**  That Akoustis designs and manufactures patented

12:02  12    single crystal based BAW filters.

12:02  13    **A.**  Yes, sir.  Reading along with you, yes, sir.

12:02  14    **Q.**  But at the time, you were not in mass production of

12:02  15    any single crystal BAW filters, correct?

12:02  16    **A.**  We had -- if you look at the history of the company

12:02  17    in --

12:02  18    **Q.**  I'm sorry.  My question was, at that time, you were

12:02  19    not in mass production of single crystal technology; isn't

12:02  20    that correct?

12:02  21    **A.**  We were in a production platform in a defense market,

12:02  22    which is a small volume market.  So in the -- for mass

12:02  23    production, I would call mass production in the mobile

12:02  24    market or in the Wi-Fi market.

12:02  25    **Q.**  Okay.  And at the bottom, you were promoting -- at

| | | |
|---|---|---|
| 12:02 | 1 | the bottom, you were saying that the single crystal BAW |
| 12:02 | 2 | filters allows you to achieve product advantages including |
| 12:03 | 3 | power handling. |
| 12:03 | 4 | Do you see that? |
| 12:03 | 5 | **A.**   Yes, I do. |
| 12:03 | 6 | **Q.**   It allows higher bandwidth, smaller size, as well as |
| 12:03 | 7 | high speed operations, correct? |
| 12:03 | 8 | **A.**   That is correct.  Those would be the three -- those |
| 12:03 | 9 | three things are the trade-offs that we would design |
| 12:03 | 10 | around.  If you needed more one of one, these would be the |
| 12:03 | 11 | design trade-offs in the technology. |
| 12:03 | 12 | **Q.**   Now, you were not in the courtroom because you are |
| 12:03 | 13 | not allowed to hear when others are testifying, but |
| 12:03 | 14 | Mr. Aichele was testifying earlier today. |
| 12:03 | 15 | Do you know that? |
| 12:03 | 16 | **A.**   I was aware of that, yes, sir. |
| 12:03 | 17 | **Q.**   And Mr. Aichele's testimony was that Akoustis has |
| 12:03 | 18 | never gone to production with single crystal technology; |
| 12:03 | 19 | isn't that correct? |
| 12:03 | 20 | **A.**   I can't speak to what Mr. Aichele; I wasn't in the |
| 12:03 | 21 | courtroom. |
| 12:03 | 22 | **Q.**   Okay.  Fair enough. |
| 12:03 | 23 | **MR. MASTERS:**  Can we go to Page 2 of the same |
| 12:03 | 24 | exhibit.  And can we highlight the third paragraph |
| 12:04 | 25 | beginning with "Dave Aichele." |

**BY MR. MASTERS:**

**Q.**   This is in January of 2019 you're giving this
presentation, correct?

**A.**   Yes.

**Q.**   And you refer there to Mr. Aichele, first as the
executive and business development of the company.

**A.**   That is correct, sir.

**Q.**   And that he's responsible for customer acquisition,
as well as alignment with the market internally to the
company, right?

**A.**   I think that's a reasonable description of
Mr. Aichele's role.

**Q.**   Okay.  These are your words, right?

**A.**   Yes, sir.

**Q.**   Thank you.

     We really -- "we recently promoted Roman Houlden to
chief product officer"; is that true?

**A.**   Yes, we did.

**Q.**   "He's a former Qorvo general manager, and he is --
where he ran $150 million Wi-Fi business," right?

**A.**   That is correct.

**Q.**   And that was --

**A.**   That was --

**Q.**   Cornered the mark for you -- right -- at that time?

**A.**   We went into production in 2019 into Wi-Fi, so we

12:05   1   were in development prior to that point.

12:05   2   **Q.**    Okay.

12:05   3             **MR. MASTERS:**  Your Honor, may I approach?

12:05   4             **THE COURT:**  You may.

12:05   5   **BY MR. MASTERS:**

12:05   6   **Q.**   Dr. Shealy, I'm giving you what's been marked as

12:05   7   Plaintiff's Exhibit 790.

12:05   8        Do you recognize the top e-mail from you to Mary

12:05   9   Winters?

12:05  10   **A.**   Yes, I do.

12:06  11   **Q.**   And the bottom e-mail was also from you to

12:06  12   Mr. Houlden copying Dave Aichele?

12:06  13   **A.**    Yes.  I'm reading along with you, yes.

12:06  14             **MR. MASTERS:**  Your Honor, I move the admission

12:06  15   of Plaintiff's Exhibit 790.

12:06  16             **THE COURT:**  Marked and received as 203.

12:06  17             (Trial Exhibit No. 203 was admitted into

12:06  18   evidence.)

12:06  19             **MR. MASTERS:**  I'm sorry, Your Honor.  Was that

12:06  20   204?

12:06  21             **THE COURT:**  203.

12:06  22             **MR. MASTERS:**  Can we project?  Thank you.  Can

12:06  23   we highlight the -- top email, highlight the second

12:06  24   paragraph?

       25

12:07 1      **BY MR. MASTERS:**

12:07 2      **Q.**    You write to Mary Winters in August of 2018.  And

12:07 3      your comment is, "I would like to migrate quickly to a

12:07 4      dedicated lot, start meeting, which I sit to listen to

12:07 5      logic.  Poly" -- meaning polycrystalline, right?

12:07 6      **A.**    Yes, that is correct.

12:07 7      **Q.**    "Poly should be default until customer says no."

12:07 8          Do you see that?

12:07 9      **A.**    I do see that, yes, sir.

12:07 10     **Q.**    So you were telling Ms. Winters that you were going

12:07 11     to make polycrystalline the default products, BAW filters

12:07 12     that you were making, until customer would tell you no,

12:07 13     correct?

12:07 14     **A.**    Yes.

12:07 15     **Q.**    Thank you.

12:07 16         And whipsaw the fab is that you didn't want to try to

12:07 17     make single crystal or polycrystalline, you wanted to set

12:07 18     up lab manufacturing facility one way, correct?

12:07 19     **A.**    No, sir.  We wanted to focus the lots on poly.

12:07 20     There's a -- there's a engineering assumption that better

12:08 21     is the enemy of good enough; and if poly is good enough

12:08 22     for the product that we need, then don't use a more

12:08 23     complex material.  But, again, our process in the wafer

12:08 24     fab used either material.

12:08 25         There was a -- there was certainly sense between some

12:08  1    in management, we had an available material in the fab

12:08  2    that was polycrystalline that was more mature, and we were

12:08  3    still developing and engineering single crystal materials

12:08  4    and really had focused on the high power market.  This

12:08  5    happened to be for the Wi-Fi market, so it really is, what

12:08  6    is the best material for the job, that's what we were

12:08  7    emphasizing here.

12:08  8    **Q.**   But here, according to this e-mail in August of 2018,

12:08  9    polycrystalline was the default, correct?

12:08  10   **A.**   Better is the enemy of good enough would be my

12:08  11   testimony, sir.

12:08  12   **Q.**   At 2019 at the Needham conference, you're telling the

12:08  13   investors and customers that you are still single crystal,

12:09  14   selling single crystal as a commercial company, correct?

12:09  15   **A.**   We --

12:09  16   **Q.**   Yes or no.

12:09  17   **A.**   -- were doing development at ███████████, which

12:09  18   is high power single crystal-based devices.  This is

12:09  19   referring to the Wi-Fi market.

12:09  20   **Q.**   But you were sampling with ██████, correct?

12:09  21   **A.**   I would need -- I would defer to our marketing the

12:09  22   dates of that.  But, yes, we had development -- an ongoing

12:09  23   lengthy development contract with them, which was all

12:09  24   single crystal.

12:09  25   **Q.**   And you never went to full production with ██████,

12:09    1    correct?

12:09    2    **A.**    ████████    had moved the spec, the bandwidth spec, and

12:09    3    so we had to reset.

12:09    4    **Q.**    The answer is no?

12:09    5    **A.**    The answer is no.

12:09    6    **Q.**    Thank you.

12:09    7        **MR. MASTERS:**  Your Honor, may I approach?

12:09    8        **THE COURT:**  You may.

12:09    9    **BY MR. MASTERS:**

12:09    10   **Q.**    Dr. Shealy, I've handed you what's been marked

12:09    11   Plaintiff's Exhibit 760.  Do you see that?

12:09    12   **A.**    Yes, sir, I do.

12:09    13   **Q.**    Have -- and you recognize this document as Invention

12:10    14   Confidentiality and Nonsolicitation Agreement you signed?

12:10    15   **A.**    I'm just flipping through it, but it looks familiar.

12:10    16   Yes, sir.

12:10    17       **MR. MASTERS:**  Your Honor, I move for admission

12:10    18   of PTX-760?

12:10    19       **THE COURT:**  Marked and received as 204.

12:10    20       (Trial Exhibit No. 204 was admitted into

12:10    21   evidence.)

12:10    22       **MR. MASTERS:**  Could you project that.  Would

12:10    23   you start at the top, please.

12:10    24   **BY MR. MASTERS:**

12:10    25   **Q.**    Dr. Shealy, when you were with RF Micro Devices or

12:10   1    RFMD, you signed an inventions confidentiality and

12:10   2    nonsolicitation agreement; is that correct?

12:10   3    **A.**   Yes, sir, I did.

12:10   4    **Q.**   And it required you not to disclose any confidential

12:10   5    information of RFMD; is that correct?

12:10   6    **A.**   Yes, sir, it did.

12:10   7    **Q.**   Okay.

12:10   8        And you understood that your obligations to maintain

12:10   9    RFMD's information -- confidential information extended

12:11   10   beyond your employment with that company, correct?

12:11   11   **A.**   Yes, I did.

12:11   12   **Q.**   Okay.

12:11   13            **MR. MASTERS:**   Could we go to Page 7, please.

12:11   14   **BY MR. MASTERS:**

12:11   15   **Q.**   That's your signature, correct?

12:11   16   **A.**   Yes, sir, it is.

12:12   17            **MR. MASTERS:**   Your Honor, may I approach?

12:12   18            **THE COURT:**   You may.

12:12   19   **BY MR. MASTERS:**

12:12   20   **Q.**   Dr. Shealy, I've handed you what's marked been as

12:12   21   Plaintiff's Exhibit 785 and has already been entered into

12:12   22   evidence as Trial Exhibit 6.

12:12   23        Do you have that?

12:12   24   **A.**   Yes, sir.  I'm holding it.

12:12   25            **MR. MASTERS:**   Can we project the first page.

*Shealy - Direct*

BY MR. MASTERS:

**Q.**   Do you recognize it as an RFMD document?

**A.**   Yes, I do.

**Q.**   And it says "New Technology Development," correct?

**A.**   That's what the title states, yes, sir.

**Q.**   It was a document that was considered confidential to RFMD, correct?

**A.**   Yes, sir, it is.

**Q.**   And it states there "this is a confidential document," right?

**A.**   Yes, sir.

**Q.**   You understand that you had a copy of this document with you at Akoustis, correct?

**A.**   Yes, sir.

**Q.**   Did you have permission from RFMD to have this confidential document?

**A.**   I did not.

**Q.**   You used this document at Akoustis; isn't that, correct?

**A.**   My testimony is we did not use this document in the operations at Akoustis, no.

                **MR. MASTERS:**  Your Honor, may I approach?

                **THE COURT:**  You may.

BY MR. MASTERS:

**Q.**   Dr. Shealy, do you recognize Plaintiff's Exhibit 787?

12:13  1    **A.**    Yes, I do, sir.

12:13  2    **Q.**    Okay.  And this is a document that you prepared; is

12:13  3    that correct?

12:14  4    **A.**    From the material I've observed on what was on my

12:14  5    computer, this is a document that was opened for about 20

12:14  6    minutes on my computer, yes, sir.

12:14  7                  **MR. MASTERS:**  Your Honor, I move the admission

12:14  8    of Plaintiff's Exhibit 787?

12:14  9                  **THE COURT:**  Marked and received as 205.

12:14  10                (Trial Exhibit No. 205 was admitted into

12:14  11   evidence.)

12:14  12   **BY MR. MASTERS:**

12:14  13   **Q.**    So this is an Akoustis new technology development,

12:14  14   correct?

12:14  15   **A.**    This is not the Akoustis new technology development

12:14  16   document; this is a document that is -- was opened and a

12:14  17   label changed, but this is not a document that is used in

12:14  18   our company.

12:14  19   **Q.**    Okay.

12:14  20        Dr. Shealy, the title of this document is "Akoustis

12:14  21   new technology development," correct?

12:15  22   **A.**    I read what is on the paper.  That's what it says.

12:15  23   But --

12:15  24   **Q.**    That's all my question is, Doctor?

12:15  25   **A.**    My apologies.

12:15  1   **Q.**   This document is "Akoustis new technology

12:15  2   development," correct?  That's what it says?

12:15  3   **A.**   My testimony is this is not our new technology

12:15  4   development process, but I concur the title has been

12:15  5   changed in this document.

12:15  6   **Q.**   I didn't ask you if the title was changed.

12:15  7   **A.**   I just tried to clarify.

12:15  8   **Q.**   Okay.  Let's see if we can get this down.  The title

12:15  9   of this document in front of you, which is Trial

12:15  10  Exhibit 205, Plaintiff's Exhibit 787, is "Akoustis new

12:15  11  technology development," correct?

12:15  12  **A.**   I read what's highlighted in yellow, and that's what

12:15  13  it reads, yes, sir.

12:15  14  **Q.**   That's a yes.

12:15  15       Okay.  You are here identified as the author,

12:15  16  correct?

12:15  17  **A.**   My name is listed as the author.

12:15  18  **Q.**   Okay.  That's the Akoustis logo on the left-hand

12:15  19  side, correct?

12:15  20  **A.**   That is the Akoustis logo, sir.

12:16  21  **Q.**   And below that is -- and that -- you still use that

12:16  22  logo today, don't you?

12:16  23  **A.**   That is a corporate logo, yes, sir.

12:16  24  **Q.**   And that's your corporate headquarters there in

12:16  25  Huntersville, North Carolina?

12:16   1   **A.**   That is an accurate address, yes, sir.

12:16   2   **MR. MASTERS:**   Okay.  And, Mr. Faison, could you

12:16   3   please put Trial Exhibit 6 and 205 side by side.

12:16   4   **BY MR. MASTERS:**

12:16   5   **Q.**   Dr. Shealy, while he's putting those side by side,

12:16   6   you would admit that the document on the left looks quite

12:16   7   familiar to the document on the right, correct?

12:16   8   **A.**   The title of the document on the left was changed to

12:16   9   the highlighted regions that are highlighted, yes, sir.

12:16   10   **Q.**   Right.  So you replaced "RFMD" with "Akoustis,"

12:16   11   correct?

12:16   12   **A.**   That's what was done.  As I recall this document

12:16   13   was --

12:16   14   **Q.**   You added in the Akoustis logo in place of RFMD logo,

12:17   15   correct?

12:17   16   **A.**   That, as shown in the -- we are looking at the same

12:17   17   board, so, yes, sir.

12:17   18   **Q.**   And you created DTX-205 -- Trial Exhibit 205?

12:17   19   **A.**   I'm sorry?

12:17   20   **Q.**   That is the one with the Akoustis.  It's Plaintiff's

12:17   21   Exhibit 787 that we just marked as 205.

12:17   22   **A.**   I'm trying to follow, sir.

12:17   23   **THE COURT:**   I'm still not sure you got an

12:17   24   answer on that last one.

12:17   25   **THE WITNESS:**   If your question is the document

1  on the left, of that was saved on my machine at about 2:00

2  in the morning, yes.

3  **BY MR. MASTERS:**

4  **Q.**   And I would imagine you were pretty busy trying to

5  start a new company, correct?

6  **A.**   I would say mornings were early, and if I'm writing

7  something at 2:00 in the morning, evenings are late, yes,

8  sir.

9  **Q.**   So you had a lot of work to do trying to get the

10  business off the ground, right?

11  **A.**   We had -- at that time, we had just bought the fab,

12  and this type of document is -- is useful in an

13  administrative project management role, which was

14  potentially useful to the company.

15  **Q.**   Right.  Extremely useful because you're developing

16  new technology, right?

17  **A.**   In an early stage startup, you would not use a

18  formalized role like this.  This is more useful for a

19  quality audit, not to develop technology.  We were

20  iterating too fast to follow a phase gate document like

21  this as it turns out.

22  **Q.**   But then you took this document, which is Plaintiff's

23  Exhibit 787, and you sent it to Mr. Houlden and

24  Ms. Winters; isn't that correct?

25  **A.**   It was sent -- I don't have the time stamps, but I

1    will acknowledge that there was an e-mail sent to those

2    two parties.

3    **Q.**    And you sent it to them so they would never use it

4    within the company?

5    **A.**    We would need -- we were buying a fab, so we would

6    need to have appropriate quality documents, and whether

7    this one or had we already had one.  Because we just

8    bought a fab.  We hadn't closed on it.  So we wanted to

9    make sure we had appropriate -- if you call this

10    technology development process -- for program management,

11    we wanted to make sure that we had one, yes.

12    **Q.**    Okay.  And Trial Exhibit 205, sir, does that -- new

13    technology process document; isn't that correct?

14    **A.**    Sir, I -- could you please repeat the question, sir?

15    **Q.**    Trial Exhibit 205, the Akoustis new technology

16    document, that served as a process document for new

17    technology, right?

18    **A.**    No, sir.  It did not in our company.

19    **Q.**    But you did revise the document, you prepared it, you

20    put it in form ready for Akoustis, and you sent it to

21    Ms. Winters who is in charge of your fab in New York and

22    Mr. Houlden who is your chief product officer, correct?

23    **A.**    The document -- the title was modified, and the

24    document was e-mailed, yes.

25            **MR. MASTERS:**  Your Honor, may I approach?

*Shealy - Direct*

| | | |
|---|---|---|
| 12:20 | 1 | **THE COURT:**  You may. |
| 12:20 | 2 | **BY MR. MASTERS:** |
| 12:20 | 3 | **Q.**   Dr. Shealy, you have in front of you what's been |
| 12:20 | 4 | previously entered into evidence as Trial Exhibit 82, also |
| 12:20 | 5 | marked as Plaintiff's Exhibit 119. |
| 12:20 | 6 | Do you see it. |
| 12:20 | 7 | **A.**   Yes, sir, I'm holding the e-mail. |
| 12:21 | 8 | **MR. MASTERS:**  Could we project that, please? |
| 12:21 | 9 | **BY MR. MASTERS:** |
| 12:21 | 10 | **Q.**   At the bottom, the bottom e-mail, that's from you to |
| 12:21 | 11 | Mr. Houlden and Mr. Aichele, correct? |
| 12:21 | 12 | **A.**   I acknowledged the e-mail, yes, sir. |
| 12:21 | 13 | **Q.**   Again, early morning, 5:25 a.m.  You are busy, right? |
| 12:21 | 14 | **A.**   In this particular case, this wasn't related to the |
| 12:21 | 15 | company; this was related to a university professor that |
| 12:21 | 16 | was doing some research on a new power amplifier |
| 12:21 | 17 | technology asking for specs so -- |
| 12:21 | 18 | **Q.**   Okay.  So you asked -- |
| 12:21 | 19 | **A.**   I just want to be clear. |
| 12:21 | 20 | **Q.**   Sorry.  I will ask the questions. |
| 12:21 | 21 | You asked Mr. Houlden and Mr. Aichele if they could |
| 12:21 | 22 | send you a spec on Wi-Fi6E PA, right? |
| 12:21 | 23 | **A.**   Yeah, I -- |
| 12:21 | 24 | **Q.**   Either in standalone or FEM configuration, right? |
| 12:21 | 25 | **A.**   Any data sheet would do for the university, yes, sir. |

*Shealy - Direct*

12:21  1    **Q.**   "PA" is "power amplifier"?

12:21  2    **A.**   Yes, sir.

12:21  3    **Q.**   And Mr. Houlden, then, responded in the top e-mail,

12:21  4    right?

12:21  5    **A.**   Yes, sir.

12:21  6    **Q.**   And he sent you what was attached as a spreadsheet

12:22  7    with that title, 11ACFEMSPEC, correct?

12:22  8    **A.**   Yes, sir, that was the attachment.

12:22  9            **MR. MASTERS:**  Your Honor, may I approach?

12:22  10           **THE COURT:**  You may.

12:22  11   **BY MR. MASTERS:**

12:22  12   **Q.**   Dr. Shealy, what you have now is Plaintiff's

12:22  13   Exhibit 120.  That was previously marked as 83.

12:23  14        Do you have that?

12:23  15   **A.**   Yes, sir, I'm holding it.

12:23  16           **MR. MASTERS:**  Could we project the next

12:23  17   attachment.

12:23  18   **BY MR. MASTERS:**

12:23  19   **Q.**   And Trial Exhibit 83 is what Mr. Houlden sent to you,

12:23  20   correct?

12:23  21   **A.**   Yes, sir.

12:23  22   **Q.**   And it is a spec for a Wi-Fi6E power amplifier,

12:23  23   correct?

12:23  24   **A.**   Yes, sir, that is correct.

12:23  25   **Q.**   For a front end module, actually, correct?

| | | |
|---|---|---|
| 12:23 | 1 | **A.**   Yes, sir.  I'm reading along with the description |
| 12:23 | 2 | with you. |
| 12:23 | 3 | **Q.**   And it's rather detailed specification, isn't it?  It |
| 12:23 | 4 | has -- |
| 12:23 | 5 | **MR. MASTERS:**  Let's leaf through the pages up |
| 12:23 | 6 | through Page 8. |
| 12:23 | 7 | **BY MR. MASTERS:** |
| 12:23 | 8 | **Q.**   Okay.  Then next -- Page 8, you have some maximum |
| 12:24 | 9 | ratings, correct? |
| 12:24 | 10 | **A.**   Yes, sir. |
| 12:24 | 11 | **Q.**   And then a circuit diagram on Page 9? |
| 12:24 | 12 | **A.**   These would be elements of the data sheet, yes, sir. |
| 12:24 | 13 | **Q.**   Page 10, correct, you have now a layout, correct? |
| 12:24 | 14 | **A.**   I'm following along with you, yes, sir. |
| 12:24 | 15 | **Q.**   And it's a Qorvo specification, isn't it? |
| 12:24 | 16 | **A.**   As I learned later.  Yes, sir. |
| 12:24 | 17 | **Q.**   But you used it, nonetheless.  You send it onto the |
| 12:24 | 18 | professor for use? |
| 12:24 | 19 | **A.**   As I recall, I had cell phone.  I thought what was |
| 12:24 | 20 | going to be sent to me was a simple data sheet.  I popped |
| 12:24 | 21 | open the application.  I saw a table that looked like P in |
| 12:24 | 22 | P, which would be one of these tables, and I said that |
| 12:24 | 23 | would be good enough for the professor.  And it was sent |
| 12:24 | 24 | out -- on our company doesn't make PAs, so it would really |
| 12:25 | 25 | have no benefit or use to us. |

12:25    1              **MR. MASTERS:**  Okay.  Can you take that down.

12:25    2                   Your Honor, may I approach?

12:25    3              **THE COURT:**  You may.

12:25    4    **BY MR. MASTERS:**

12:25    5    **Q.**   Dr. Shealy, you have in front of you Plaintiff's

12:25    6    Exhibit 502 that's been entered into evidence as Trial

12:25    7    Exhibit 137.  Do you see that?

12:25    8    **A.**   Yes, sir.

12:25    9              **MR. MASTERS:**  Can we project that, please.

12:25    10   **BY MR. MASTERS:**

12:25    11   **Q.**   And you recognize this e-mail?

12:25    12   **A.**   Yes.  We've reviewed this e-mail previously.

12:25    13   **Q.**   Okay.  At the bottom, do you see the e-mail from

12:26    14   Mr. Kim who worked for Akoustis, right?

12:26    15   **A.**   Yes, he was a contractor at Akoustis.

12:26    16   **Q.**   And he said an e-mail to Mr. Aichele talking about

12:26    17   information they received concerning Qorvo's V2X filter,

12:26    18   correct?

12:26    19   **A.**   Yes, sir.

12:26    20   **Q.**   And then that e-mail, Mr. Aichele sent it on to you;

12:26    21   isn't that correct?

12:26    22   **A.**   As I follow up the chain, he did forward it to me,

12:26    23   yes, sir.

12:26    24   **Q.**   And your response was "interesting to note."

12:26    25              **MR. MASTERS:**  And can we highlight?

12:26  1    **BY MR. MASTERS:**

12:26  2    **Q.**   Yes.  "Interesting to note their slide says filter

12:26  3    and Wi-Fi module."  So their plan is to integrate in FEM,

12:26  4    front end module, right?

12:26  5    **A.**   Yes, sir, that's what it says.

12:27  6            **MR. MASTERS:**  And, Your Honor, may I approach?

12:27  7            **THE COURT:**  You may.

12:27  8    **BY MR. MASTERS:**

12:27  9    **Q.**   Dr. Shealy, Exhibit PTX-152 has been entered into

12:27  10   evidence already as Trial Exhibit 136, is what was

12:27  11   captured and sent to Mr. Aichele by Mr. Kim and then sent

12:27  12   to you; isn't that, correct?

12:27  13   **A.**   Yes, I believe so.

12:27  14   **Q.**   And it was a photograph of Qorvo's confidential

12:27  15   information concerning some BAW technology, correct?

12:27  16   **A.**   It was a picture of a slide, yes, sir, a PowerPoint

12:27  17   slide.

12:27  18   **Q.**   And it was for use in the automotive industry,

12:27  19   correct?

12:27  20   **A.**   Yes.  So it would be consistent with the e-mail, sir.

12:28  21   **Q.**   And Akoustis is working in the automotive industry

12:28  22   today, right?  That's an industry that you are going

12:28  23   after?

12:28  24   **A.**   That's an industry that we entered when we acquired a

12:28  25   division called RFMI, but we have development ongoing.

12:28  1    I'd have to look.  We also had filed a very early patent

12:28  2    that's issued.  I'd have to line up the timelines of that,

12:28  3    sir.

12:28  4    **Q.**    So Qorvo's information in the automotive industry

12:28  5    would be helpful to you here, correct?  Having

12:28  6    understanding of some competitors and what they're doing?

12:28  7    **A.**    I think my testimony would be, by 2019, this is a

12:28  8    Wi-Fi band architecture, and we had already entered mass

12:28  9    production in the Wi-Fi market at this time.  This was

12:28  10   2019.

12:28  11   **Q.**    Okay.

12:28  12   **A.**    So it was the year we penetrated the Wi-Fi market.

12:28  13   So the information, the band information, I believe you

12:29  14   could find on Google because those channels are -- those

12:29  15   aren't defined by Qorvo or Akoustis, they are defined by

12:29  16   the industry standard.

12:29  17   **Q.**    Okay.  Dr. Shealy, let's shift gears a little bit.

12:29  18   **A.**    Okay.

12:29  19   **Q.**    You are a board member, correct?

12:29  20   **A.**    Uhmm.  A director of the company yes, sir.

12:29  21   **Q.**    And you sit on the board of directors, right?

12:29  22   **A.**    Yes, sir, I do.

12:29  23   **Q.**    And Jerry Neal does as well?

12:29  24   **A.**    Yes, sir.

12:29  25   **Q.**    And he was formerly with RFMD, correct?

| | | |
|---|---|---|
| 12:29 | 1 | **A.**   Jerry Neal had retired prior to my departure from |
| 12:29 | 2 | RFMD, yes, sir, but he was -- |
| 12:29 | 3 | **Q.**   Susan -- |
| 12:29 | 4 | **A.**   -- one of the founders of RFMD, yes. |
| 12:29 | 5 | **Q.**   Suzanne Rudy is on the Akoustis board of directors, |
| 12:29 | 6 | correct? |
| 12:29 | 7 | **A.**   She is. |
| 12:29 | 8 | **Q.**   And Arthur Geiss, also on the board of directors? |
| 12:29 | 9 | **A.**   That is what these are, all current members of the |
| 12:29 | 10 | board. |
| 12:29 | 11 | **Q.**   Mr. Geiss came from RFMD, correct? |
| 12:30 | 12 | **A.**   Mr. Geiss retired from RFMD 20 years ago.  I don't |
| 12:30 | 13 | know the time frame, but he retired several years ago. |
| 12:30 | 14 | **Q.**   Suzanne Rudy came from Qorvo, correct? |
| 12:30 | 15 | **A.**   Suzanne Rudy was treasurer of Qorvo once Qorvo was |
| 12:30 | 16 | formed, and she was treasurer of the company, the |
| 12:30 | 17 | financial expert. |
| 12:30 | 18 | **MR. MASTERS:**  Your Honor, may I approach? |
| 12:30 | 19 | **THE COURT:**  You may. |
| 12:30 | 20 | **BY MR. MASTERS:** |
| 12:30 | 21 | **Q.**   Dr. Shealy, I've handed you what's been marked as |
| 12:30 | 22 | 793.  Do you recognize it? |
| 12:30 | 23 | **A.**   Yes, sir, I do recognize it. |
| 12:30 | 24 | **Q.**   It is a unanimous written consent from the board of |
| 12:30 | 25 | directors of the Akoustis technologies? |

12:31  1  **A.**  Yes, it is, sir.

12:31  2             **MR. MASTERS:**  I move for admission PTX-793.

12:31  3             **THE COURT:**  Marked and received as 206.

12:31  4             (Trial Exhibit No. 206 was admitted into

12:31  5  evidence.)

12:31  6             **MR. MASTERS:**  Mr. Faison, could you please

12:31  7  project.

12:31  8  **BY MR. MASTERS:**

12:31  9  **Q.**  So this is a written directive of the Akoustis board

12:31  10  of directors, correct?

12:31  11  **A.**  Yes, it is, sir.

12:31  12  **Q.**  It's called a "Unanimous Written Consent," right?

12:31  13  **A.**  It is the equivalent of an order by the board, yes.

12:31  14  **Q.**  All right.  And this order was issued on May 1 of

12:31  15  2023, correct?

12:31  16  **A.**  So verify the date, but May 1, 2023, yes, sir.

12:31  17             **MR. MASTERS:**  And if we can highlight the

12:31  18  first, whereas clause.

12:31  19  **BY MR. MASTERS:**

12:31  20  **Q.**  Okay.  See that, Dr. Shealy?  It says, "Whereas the

12:31  21  corporation."  Do you see that?

12:32  22  **A.**  Yes, sir.

12:32  23  **Q.**  The last clause.  So "the corporation is vigorously

12:32  24  defending itself in pending litigation with Qorvo, but

12:32  25  also recognizes that it will be some time before there is

12:32  1    a final determination regarding Qorvo's claims."

12:32  2        Did I read that right?

12:32  3    **A.**    Yes, sir, I'm following along.

12:32  4    **Q.**    "Including whether any of the documents that Qorvo

12:32  5    has identified in its allegations are, in fact,

12:32  6    confidential to Qorvo," right?

12:32  7    **A.**    Yes, sir, I'm following along.

12:32  8    **Q.**    They're referring to documents that Akoustis had,

12:32  9    correct?

12:32  10   **A.**    I believe they are referring to what this was, as I

12:32  11   understood it, was an order to go find documents and

12:32  12   remove them.

12:32  13   **Q.**    But the question here is that -- whether any of the

12:32  14   documents that Qorvo has identified in its allegations

12:32  15   are, in fact, confidential to Qorvo, right?  That was the

12:32  16   question as stated?

12:33  17   **A.**    I concur with the language in the UQC, sir.  Yes.

12:33  18        **MR. MASTERS:**    And can we highlight the "now

12:33  19   therefore" two paragraphs down.

12:33  20   **BY MR. MASTERS:**

12:33  21   **Q.**    "The board then authorized and directed the company

12:33  22   management to purge and permanently erase from the

12:33  23   company's record the disputed document, including

12:33  24   approximately 450 documents identify by Qorvo."

12:33  25        Do you see that?

*Shealy - Direct*

12:33  1   **A.**   Yes, sir, I'm following along with you.

12:33  2   **Q.**   They're referring to 450 of Qorvo's document that

12:33  3   were found in Akoustis' files, correct?

12:33  4   **A.**   I -- there's a protective order on this case, so I

12:33  5   don't know the number, but I followed along.  If counsel

12:33  6   is telling us there's 450 documents, I had no reason to

12:33  7   challenge them.

12:33  8   **Q.**   Is your testimony today you don't know?

12:33  9   **A.**   My testimony is, I don't know -- I don't know the

12:34  10  number of documents in dispute.  There's a protective

12:34  11  order on this case, and I've not been advised.

12:34  12  **Q.**   But, Dr. Shealy, you did sign this unanimous written

12:34  13  consent; isn't that correct?  As a member of the board of

12:34  14  directors, you signed this?

12:34  15  **A.**   I did, and the board was advised by Pillsbury, which

12:34  16  is also, you know, our formal counsel here had advised the

12:34  17  board given the knowledge they had about the case.

12:34  18  **Q.**   450 documents were identified as of May 1, 2023,

12:34  19  correct?

12:34  20  **A.**   I -- there's a protective order; I've not seen the

12:34  21  timeline of what documents are.  If Pillsbury tells us

12:34  22  there were 450 documents, I have no reason to dispute it.

12:34  23  They made this recommendation to our board.

12:34  24  **Q.**   And you signed this directive?

12:34  25  **A.**   Sir, my signature is on the final page there.  Yes,

*Shealy - Direct*

12:34  1    sir.

12:34  2    **Q.**   You have no reason -- I'll withdraw the question.

12:34  3             **MR. MASTERS:**   Can we go down and highlight the

12:35  4    second from the last "further resolved."

12:35  5    **BY MR. MASTERS:**

12:35  6    **Q.**   Another paragraph:  "The board authorizes and directs

12:35  7    the corporation's management to develop and implement

12:35  8    without reference to or use of the disputed documents,

12:35  9    replacement versions of any disputed documents for which

12:35  10   the corporation has an ongoing business need."

12:35  11        Do you see that?

12:35  12   **A.**   I'm following along.  Yes, I see it, sir.

12:35  13            **MR. MASTERS:**   And could we go to the next

12:35  14   "further resolved."  It spans the page.

12:35  15   **BY MR. MASTERS:**

12:35  16   **Q.**   Further resolved that the board authorizes and

12:35  17   directs the corporation's management to engage in a review

12:35  18   of the corporation's current compliance policies and

12:35  19   procedures related to the protection of intellectual

12:35  20   property rights and the handling of confidential

12:35  21   information."

12:35  22            **MR. MASTERS:**   Move on to the next page.

12:35  23   **BY MR. MASTERS:**

12:35  24   **Q.**   -- "and ensuring that all Akoustis employee

12:36  25   understand and comply with these mandatory obligations."

*Shealy - Direct*

12:36 1      Do you see that?

12:36 2  **A.**   Yes, sir, I see it.

12:36 3  **Q.**   Has the board taken any action against any employee

12:36 4  of Akoustis?

12:36 5  **A.**   As of this date, we still have protective order.  The

12:36 6  board does not --

12:36 7  **Q.**   The answer is "no"?

12:36 8  **A.**   The answer is "no," given we don't have the

12:36 9  information.

12:36 10 **Q.**   Has Akoustis -- has Akoustis taken any action against

12:36 11 any employees as of this date?

12:36 12 **A.**   Any employee?  I mean, we've had --

12:36 13 **Q.**   With respect to this case and the taking of Qorvo's

12:36 14 confidential information.

12:36 15 **A.**   No.  There's not -- the information is not available.

12:36 16 We don't make decisions without information in front of

12:36 17 us, and the extent of documents that are at issue in this

12:36 18 case have not been presented neither to the board nor to

12:36 19 me.  So I certainly couldn't vote on it in good faith,

12:36 20 because I don't know -- I would need information -- I need

12:37 21 more information, which I'm precluded from given the

12:37 22 protective order in the case.

12:37 23 **Q.**   Okay.  Are you precluded from looking at confidential

12:37 24 information in the files or looking at any files within

12:37 25 Akoustis' possession?

12:37  1   **A.**   Sir, could you please repeat the question?

12:37  2   **Q.**   Yes.  Are you precluded from looking at any files

12:37  3   within the possession at Akoustis?

12:37  4   **A.**   There's a protective order, and counsel has not made

12:37  5   available any -- and has pretty much told me I'm not

12:37  6   authorized to look at anything --

12:37  7   **Q.**   Okay.

12:37  8   **A.**   -- given I'm a material fact witness in the case.

12:37  9   **Q.**   You are a material fact witness in the case because

12:38  10  you have Qorvo's confidential information; is that your

12:38  11  understanding?

12:38  12  **A.**   I am a material fact witness because counsel has

12:38  13  designated me one, as a material fact witness.

12:38  14  **Q.**   Okay.

12:38  15          **MR. MASTERS:**  Your Honor, may I approach?

12:38  16          **THE COURT:**  You may.

12:38  17  BY MR. MASTERS:

12:38  18  **Q.**   Dr. Shealy, I'm handing you what's been marked as

12:38  19  PTX-0147, previously entered into evidence as Trial

12:38  20  Exhibit 104.  Do you see it?

12:38  21  **A.**   Yes, sir.  I'm just reviewing it.  But, yes, I do see

12:38  22  it.

12:38  23          **MR. MASTERS:**  And could we project that,

12:38  24  please?

       25

12:38  1    **BY MR. MASTERS:**

12:38  2    **Q.**  Do you recall this e-mail back in October 9, 2016,

12:39  3    right?

12:39  4    **A.**  It's been several years.  But we reviewed it during

12:39  5    deposition, sir.

12:39  6    **Q.**  Okay.  It was right after Akoustis hired Mr. Houlden,

12:39  7    correct?

12:39  8    **A.**  That is correct.

12:39  9    **Q.**  And Mr. Houlden -- you wanted to send out a press

12:39  10   release about hiring Mr. Houlden; isn't that correct?

12:39  11   **A.**  It would be consistent with the company's policy if

12:39  12   we hired an executive to issue a release to our investors.

12:39  13   **Q.**  And the response from Mr. Houlden to you, right in

12:39  14   the middle --

12:39  15   **A.**  Another late evening.

12:39  16   **Q.**  --  and he's talking about the cons of issuing a

12:39  17   press release, correct?

12:39  18   **A.**  I'm following along.  Yes, sir.

12:39  19   **Q.**  And he said, "Lori and I" -- Lori is Lori Shealy?

12:39  20   **A.**  Lori Shealy it is my ex-wife.

12:39  21   **Q.**  Okay.  She was in charge of HR at the time?

12:39  22   **A.**  At the time.

12:39  23   **Q.**  Okay.  "So Lori and I," so Mr. Houlden -- "have Mike

12:40  24   hitting Qorvo very hard right now."

12:40  25         Do you see that?

*Shealy - Direct*

12:40  1    **A.**    I'm following along, yes, sir.

12:40  2    **Q.**    Mike was a recruiter, technical recruiter, correct?

12:40  3    **A.**    Technical.   Yeah.   Yes, he's a technical recruiter

12:40  4    that was hired by the company.

12:40  5    **Q.**    Okay.   "And calling nearly every BAW DE -- design

12:40  6    engineer"?

12:40  7    **A.**    Design engineer would be DE.

12:40  8    **Q.**    Okay.   "Looking for the best two people willing to

12:40  9    move to CLT" -- Charlotte, correct?

12:40  10    **A.**    Yes, sir.   I'm following along.

12:40  11    **Q.**    "We're making a number of offers the next few weeks,"

12:40  12    right?

12:40  13    **A.**    Yes.   I'm following along.   Yes, sir.

12:40  14    **Q.**    Okay.   "Rather not rock the applecart right now.

12:40  15    Plus, prefer not to make it easy for Qorvo of how Mike

12:40  16    found the names of all these people," right?

12:40  17    **A.**    I'm following along yes, sir.

12:41  18    **Q.**    "Though I think I am clean, I want to delay as long

12:41  19    as I can any reason for Qorvo IT to look at my computer

12:41  20    and what I looked at on the Intranet," right?   Intranet is

12:41  21    within Qorvo?   Qorvo's Intranet?   Is that how you

12:41  22    understood that?

12:41  23    **A.**    I -- certainly that would be a reasonable conclusion

12:41  24    from my perspective.

12:41  25    **Q.**    Okay.   And then next paragraph, "Right now I have

12:41  1  access to two of Qorvo's four BAW MTS" -- members of

12:41  2  technical staff -- "to help us resolve QP."  See that?

12:41  3  **A.**   Yes, sir, I do.

12:41  4  **Q.**   "I have not leveraged this yet, but will begin once

12:41  5  we have Lot 19 results."  He goes on.

12:41  6        So did you, then, ever instruct Mr. Houlden not to

12:41  7  solicit design engineers from Qorvo or did you instruct

12:42  8  him to do it?

12:42  9  **A.**   So I -- my role in the company is not in the

12:42  10  recruiting phase.  If I'm asked to participate in

12:42  11  recruiting for an interview or such, I do make myself

12:42  12  available.  I did not ask Rohan to be focused on any one

12:42  13  company.  When we hire a recruiter, we don't specify a

12:42  14  company.  There are other companies outside Qorvo.  Qorvo

12:42  15  is certainly in the region.  And if we're looking for

12:42  16  people to move -- but recruiters call into companies all

12:42  17  the time with open positions.  They call into our company.

12:42  18  So...

12:42  19  **Q.**   Okay.  But you knew Mr. Houlden was hitting Qorvo

12:42  20  hard, right?

12:42  21  **A.**   At the top of the page here, it says, let's discuss

12:42  22  Monday.  Because this was very late in the evening.  I

12:42  23  don't recall the specific conversation with Mr. Houlden.

12:42  24  But I told him, "You're playing with fire."  As -- because

12:43  25  your former employee likely under a nonsolicitation and

12:43  1    that he better calm it down.  That's my recollection of

12:43  2    the conversation with him on Monday.

12:43  3    **Q.**   So you understood that Mr. Houlden had a

12:43  4    nonsolicitation agreement with Qorvo, right?

12:43  5    **A.**   I understood -- I had not received his

12:43  6    nonsolicitation, but I had -- I told him he better -- he

12:43  7    better be very careful and review his agreement and act

12:43  8    accordingly, because he's going to get himself in a lot of

12:43  9    trouble.  And I think that's personal trouble on his end.

12:43  10   I certainly wasn't under a nonsolicitation at that time,

12:43  11   but I believe with the recent -- his recent departure, he

12:43  12   was -- you know he was putting himself in jeopardy.

12:43  13   **Q.**   So instead of Mr. Houlden, then, soliciting employees

12:43  14   from Qorvo, you stepped in to assist him; isn't that

12:43  15   correct?

12:43  16   **A.**   HR -- HR manages --

12:44  17   **Q.**   My question is, you stepped in to get around

12:44  18   Mr. Houlden's nonsolicitation agreement; isn't that,

12:44  19   correct?

12:44  20       **MR. LEMIEUX:**  Objection, Your Honor, misstates

12:44  21   the witness's testimony.

12:44  22       **THE COURT:**  Objection is overruled.

12:44  23       **THE WITNESS:**  I interviewed -- my testimony is

12:44  24   I interviewed candidates when asked to interview, but I

12:44  25   was not the hiring manager, and I had further -- far other

12:44  1  activities in the company to tend to.  I never met Mike --

12:44  2  I believe this gentleman's name is Mike Ortiz.  I never

12:44  3  met, nor corresponded with Mike Ortiz on any recruiting,

12:44  4  is my testimony.

12:44  5  **BY MR. MASTERS:**

12:44  6  **Q.**   I'm talking about -- let's talk about Annia Shen.  Do

12:44  7  you recall her?

12:44  8  **A.**   I know Ms. Shen.

12:44  9       **THE COURT:**  Hold on.  One more minute, then we

12:44  10  will take our break.

12:44  11  **BY MR. MASTERS:**

12:44  12  **Q.**   You've -- you were involved with hiring Ms. Shen

12:44  13  because Mr. Houlden had a nonsolicitation agreement with

12:45  14  Qorvo; isn't that correct?

12:45  15  **A.**   I was called upon to meet with Ms. Shen because she

12:45  16  had questions over the direction of the company and wanted

12:45  17  to speak to the founder of the company.

12:45  18       So I was asked to get involved in the recruiting

12:45  19  process as a internal recruiter.  And as my testimony was

12:45  20  earlier, I participated in that activity, but I was not a

12:45  21  technical recruiter and not an inside recruiter for the

12:45  22  company.

12:45  23  **Q.**   But your --

12:45  24       **THE COURT:**  We should take our lunch break.  We

12:45  25  will come back and resume.

12:45  1            Ladies and gentlemen, it is 12:45.  We have

12:45  2    45 minutes for lunch.  I will stay here a little bit, but

12:45  3    we will stay on schedule.  We are working on the time very

12:45  4    hard.  Thank you for your patience.  Do not discuss the

12:45  5    case among yourselves.  Don't let anybody talk with you

12:45  6    about it.  We will see you -- I will actually see you at

12:46  7    1:30.  Thanks very much.

12:46  8        (The jury exits the courtroom at 12:46 p.m.)

12:46  9            **THE COURT:**  We will let you step down.  Nice

12:46  10   thing is, you can't talk about the testimony you've given.

12:46  11   But they can't critique if you don't ask them.  People

12:46  12   always want to say, How am I doing?  The answer is, don't

12:46  13   even ask that.  Just have a pleasant lunch, as anybody can

12:46  14   in a short time.

12:46  15           So we will see you about five minutes in

12:47  16   advance, so that will be about 1:25.  Thanks very much.

12:47  17           Everybody be seated just for a moment.  I need

12:47  18   to chat and see exactly where we are.

12:47  19           You can go out.  I'm not sure they set up

12:47  20   lunch.  They have it taken care of.  Hope they do.  I want

12:47  21   to check.  I think we are fine.  We will have a number of

12:47  22   exhibits that we are continuing to mark through this

12:47  23   process.  And I'm going to ask Mr. Master's -- sounds like

12:47  24   we're making progress and getting through your exam.  We

12:47  25   have a general projection.  We don't have to be right on

12:47  1    it, about how long to finish.

12:47  2              **MR. MASTERS:**  Five more minutes.

12:47  3              **THE COURT:**  Oh, wow.  Okay.  I'm going to write

12:47  4    that down.

12:47  5              **MR. MASTERS:**  Just don't hold me to it.  But I

12:47  6    only really have a few more questions.

12:47  7              **THE COURT:**  It will be relatively soon.  And

12:47  8    that's important for defense counsel to know.  They will

12:48  9    be cross-examining, and then they will be putting on

12:48  10   direct proof.  So I think we will probably be in a pretty

12:48  11   good situation.  And I need to be sure as to the rest of

12:48  12   the schedule for the day.  And I think that we're on time,

12:48  13   as far as I can tell.

12:48  14             **MR. MASTERS:**  Right.  So after Dr. Shealy, we

12:48  15   have a video deposition, our last one, of J.B. Kwon.  And

12:48  16   then Dr. Shanfield will be testifying next, and that will

12:48  17   be a long examination, Your Honor.  So I fully expect that

12:48  18   to go through today.  Not necessarily all on direct, it

12:48  19   could be --

12:48  20             **THE COURT:**  I understand.

12:48  21             **MR. MASTERS:**  -- that cross starts.

12:48  22             **THE COURT:**  Who will be after Dr. Shanfield?

12:48  23             **MR. MASTERS:**  Current plan is Michael Boyd, who

12:49  24   is a Qorvo employee, then Cuyler Robinson.  I can give you

12:49  25   the last three, Dr. Heinrich, Dr. Bravman, and Melissa

12:49    1    Bennis.  That will --

12:49    2              THE COURT:  That will wrap the case up?

12:49    3              MR. MASTERS:  That should wrap the case up.

12:49    4              THE COURT:  Okay.  I think we're okay then.  So

12:49    5    we're going to finish your case tomorrow; is that right?

12:49    6              MR. MASTERS:  I think it depends on the length

12:49    7    of the cross, but that would be great.

12:49    8              THE COURT:  Well, the reason to have that

12:49    9    discussion is so that defense can be entirely ready on

12:49    10    anything that they need to do at the close of your case.

12:49    11    So I think we're in good shape.

12:49    12              MR. MASTERS:  So their first witness will be

12:49    13    right after our last witness.

12:49    14              THE COURT:  Right.  Exactly.

12:49    15              Okay.  We need to let everybody have a break.

12:49    16    I'm sure everybody will appreciate that.  So we will see

12:49    17    you all at 1:25.

12:55    18        (Whereupon, a recess was taken.)

12:55    19              THE COURT:  Take a seat.

13:27    20              MR. MASTERS:  The video deposition.

13:27    21              THE COURT:  I'm talking about the expert

13:27    22    report.

13:27    23              MR. MASTERS:  Yes.  You want a copy of the

13:27    24    expert report?

13:27    25              THE COURT:  If I could have one up here -- it

| | | |
|---|---|---|
| 13:27 | 1 | would be much easier for you to provide one. |
| 13:27 | 2 | MR. MASTERS:  We will get you one. |
| 13:28 | 3 | MR. ELKINS:  Your Honor, should we -- I would |
| 13:28 | 4 | expect, and I think we talked about doing this before |
| 13:28 | 5 | trial, and we -- |
| 13:28 | 6 | THE COURT:  Sure. |
| 13:28 | 7 | MR. ELKINS:  -- forgot to do it.  But at least |
| 13:28 | 8 | in my experience, it's -- generally we should be handing |
| 13:28 | 9 | you a copy of the expert report whenever we are examining |
| 13:28 | 10 | and witness. |
| 13:28 | 11 | THE COURT:  Hundred percent.  Absolutely right |
| 13:28 | 12 | about that. |
| 13:28 | 13 | MR. ELKINS:  Okay. |
| 13:28 | 14 | MR. MASTERS:  We will get you one. |
| 13:28 | 15 | THE COURT:  We may have a juror with an issue. |
| 13:28 | 16 | That's what we're checking on. |
| 13:28 | 17 | I'm sorry.  Go ahead. |
| 13:28 | 18 | MR. MASTERS:  I was going to say, we will get |
| 13:28 | 19 | Dr. Shanfield's today and we'll bring the other three |
| 13:28 | 20 | expert reports to you tomorrow morning. |
| 13:28 | 21 | THE COURT:  That's fine.  That's not a problem. |
| 13:28 | 22 | If we do have a juror that needs to talk to |
| 13:28 | 23 | us -- I think there's somebody who might have a health |
| 13:28 | 24 | issue.  If we do, we will have them come to sidebar.  It's |
| 13:30 | 25 | 1:30.  We are ready to bring the panel in. |

| 13:30 | 1 |      **MR. MASTERS:**  This is the expert report. |

13:30 1       **MR. MASTERS:**  This is the expert report.

13:30 2       **THE COURT:**  That's fine.  We're going to bring

13:30 3 the jury in.  The health issue is being taken care of.  I

13:30 4 think the medication is going to take care of it.

13:31 5    (The jury enters the courtroom at 1:31 p.m.)

13:31 6       **THE COURT:**  Everyone be seated.  Counsel, you

13:31 7 may proceed.

13:32 8 **BY MR. MASTERS:**

13:32 9 **Q.**  Good afternoon, Dr. Shealy.  Just a few more

13:32 10 questions.  Before lunch break, we were talking about

13:32 11 hiring and recruiters.  Do you recall?

13:32 12 **A.**  Yes.

13:32 13 **Q.**  And isn't it true that at Akoustis, Dr. Shealy that

13:32 14 as you were building the company and scaling up, you were

13:32 15 doing targeting searches?

13:32 16 **A.**  When you say "targeting searches," could you

13:32 17 elaborate on that?  I mean, we were hiring key positions

13:32 18 in the company from day one.  You start with no employees.

13:32 19 So we're adding employees yes, sir.

13:32 20 **Q.**  So as you scaled up, there were new openings, new

13:32 21 roles, and you had to fill those with experienced

13:32 22 individuals, correct?

13:33 23 **A.**  Yes.

13:33 24 **Q.**  Okay.  And is it true that you targeted employment

13:33 25 candidates that had trade secrets so that they could bring

*Shealy - Direct*

13:33  1   them to Akoustis?

13:33  2   **A.**   No.

13:33  3   **Q.**   Okay.

13:33  4          **MR. MASTERS:**   Your Honor, may I approach?

13:33  5          **THE COURT:**   You may.

13:33  6   **BY MR. MASTERS:**

13:33  7   **Q.**   Dr. Shealy, do you recall a deposition in November of

13:33  8   2022?

13:33  9   **A.**   I recall the deposition, but that case had settled,

13:33  10  and I never received a copy of the transcript so I'm kind

13:33  11  of looking at this for the first time.

13:33  12  **Q.**   Can you turn to Page 40.

13:34  13  **A.**   Pages -- okay.  I'll find it.  I'm on Page 40.

13:34  14  **Q.**   Do you have it?

13:34  15  **A.**   Yes, sir.  I'm on page 49.

13:34  16  **Q.**   Okay.

13:34  17  **A.**   Sorry.  I'm looking at the bottom.  It says 40,

13:34  18  Pages 157 to 160.  Is that the correct page, sir?

13:34  19  **Q.**   No.  It should have Pages 40, 41 --

13:34  20  **A.**   Within the boxes?

13:34  21  **Q.**   Yes.

13:34  22  **A.**   Okay.  My apologies.

13:34  23  **Q.**   It has four pages on one page.

13:34  24  **A.**   I am on 40, sir.

13:34  25  **Q.**   Okay.  40, Line 6.

*Shealy - Direct*

**A.**    Yes.

**Q.**    You were talking about patents, correct?  And the
question to you was, "So, then, let's circle back to this
notion about patents, where you have a design engineer who
has a track record of, you know, being part of developing
patented technology, especially in this space, BAW
filters.  Are you really telling me that's not an
important consideration?"

Answer -- your answer.  "I'm telling you, it's not an
important consideration, and I'll tell you why."

And the examiner said:  "Okay."  And you went on.

Your answer was:  "Because I'm hiring a design
engineer.  So intellectual property can be viewed.  You've
touched on one piece of it, which is patents.
Intellectual property can also be trade secrets.  And so
there's a decision to make whether it's trade secret or
patent.  So your original question to me was how important
are patents?  I would far prefer an engineering candidate
coming to work for our company to have the trade secrets
to be able to come in and execute on design of circuits
using trade secrets that they developed at the company or
techniques that they've used previously and come in and
implement it and us achieve the -- achieve the end
product."

Did I read that correctly?

13:36  1   **A.**   I believe you read it correctly.  I have not read

13:36  2   this.

13:36  3   **Q.**   Did I read that correctly, Dr. Shealy?

13:36  4   **A.**   I believe you read it correctly.

13:36  5   **Q.**   That was your testimony under oath in November of

13:36  6   2022?

13:36  7   **A.**   This transcript has not been reviewed by me for

13:36  8   accuracy, and I think the context that you are asking me

13:36  9   about is skewed.  The -- if I could finish --

13:36  10   **Q.**   Did I read -- did I read the answer correctly?

13:36  11   **A.**   You may not --

13:36  12   **Q.**   Did I read the answer correctly, Dr. Shealy?

13:36  13   **A.**   You read what's in the transcript, sir.

13:36  14   **Q.**   Thank you.

13:36  15              **MR. MASTERS:**  No further questions, Your Honor.

13:36  16              **THE COURT:**  All right.  Cross-examination, and,

13:36  17   of course, there will be some direct.  Remember, you're

13:36  18   only going to have individuals up on one occasion, so your

13:36  19   cross exam and then direct examination will be much more

13:36  20   efficient.

13:36  21              Mr. Lemieux, ready to go?

13:36  22              **MR. LEMIEUX:**  Yes, I am, Your Honor.  Thank

13:36  23   you.

13:36  24                     CROSS EXAMINATION

13:36  25   **BY MR. LEMIEUX:**

13:36  1   **Q.**   Dr. Shealy, Mr. Masters was asking you a moment ago

13:36  2   about a question that was asked of you in a different

13:37  3   lawsuit with different issues; is that true?

13:37  4   **A.**   Yes.

13:37  5   **Q.**   And had you had an opportunity to review this

13:37  6   transcript for accuracy to be able to sign that it was

13:37  7   your truthful testimony?

13:37  8   **A.**   No, I did not.  And the reason being this case

13:37  9   ultimately settled.  This was a gender discrimination

13:37  10  case.  It was a deposition taken for gender

13:37  11  discrimination, and the case settled with the insurance

13:37  12  company; and, therefore, I had never seen this to be able

13:37  13  to review for accuracy or context.

13:37  14  **Q.**   Have you ever hired anyone for the purpose of them to

13:37  15  bring trade secrets from their prior employer to your

13:37  16  company?

13:37  17  **A.**   No, I have not.

13:37  18  **Q.**   Is there a policy at Akoustis regarding that issue?

13:37  19  **A.**   We have, on the onboarding, process the

13:37  20  confidentiality agreements which are signed and are --

13:38  21  contingent on them starting employment, they are -- they

13:38  22  sign a confidentiality agreement, which requests them not

13:38  23  to bring any former employer information.  What we're

13:38  24  interested in is experiences and their expertise.  If

13:38  25  you're hiring an electrical engineer, you -- if you have

*Shealy - Cross*

13:38  1    an engineering job, you want an electrical engineer.  If

13:38  2    it's -- so you want to hire the skill set that -- and the

13:38  3    experience and the expertise.  That's it.

13:38  4    **Q.**   Dr. Shealy, Mr. Masters asked you some questions

13:38  5    regarding Trial Exhibit 205?

13:38  6            **MR. LEMIEUX:**  Can we pull that up, please.

13:38  7    **BY MR. LEMIEUX:**

13:38  8    **Q.**   And Mr. Masters asked whether or not you had authored

13:39  9    any changes to this document, and I believe you said that

13:39  10   you were the author of any changes; is that right?

13:39  11   **A.**   Yes.

13:39  12   **Q.**   And this is a multipage document, isn't it?

13:39  13   **A.**   Yes, it is.

13:39  14   **Q.**   Dr. Shealy, did you make any changes to this document

13:39  15   beyond what is currently on the screen on Page 1?

13:39  16   **A.**   No, I did not.

13:39  17           **MR. LEMIEUX:**  If we could turn to Page 2 of

13:39  18   this document.

13:39  19   **BY MR. LEMIEUX:**

13:39  20   **Q.**   Does it indicate up at the top that it was RFMD

13:39  21   document?

13:39  22   **A.**   Yes, it does.

13:39  23   **Q.**   So beyond changing the logo on the first page and

13:39  24   putting your name to it, had you made any other changes to

13:39  25   this document whatsoever?

13:39  1    **A.**   No, I did not.

13:39  2    **Q.**   Was in document ever used at Akoustis?

13:39  3    **A.**   This document was never used at Akoustis.  We

13:39  4    acquired a wafer fab, this was -- the time stamp of this

13:40  5    e-mail was in the January of 2017, which is as we were

13:40  6    acquiring the chip fab, and the chip fab had its own

13:40  7    documents that came with it for this purpose.

13:40  8    **Q.**   So I just want to make sure I understand your

13:40  9    testimony, then, Dr. Shealy.  Are you saying that the fab

13:40  10   already had such a document of its own?

13:40  11   **A.**   Yes.  The expertise that we acquired with the fab

13:40  12   had -- at least the leadership had more than 20 years of

13:40  13   MEMs expertise in that facility.  So we bought an ongoing

13:40  14   running chip fab.  And that was a big accelerant to the

13:40  15   development of our technology because they were already --

13:40  16   they already knew how to run wafers processes and had

13:40  17   these sorts of documents in place.

13:41  18            **MR. LEMIEUX:**  If we could pull up Exhibit 82,

13:41  19   please.

13:41  20   **BY MR. LEMIEUX:**

13:41  21   **Q.**   I believe, Dr. Shealy, you testified that this was a

13:41  22   request that you sent out to Mr. Houlden and Mr. Aichele

13:41  23   looking for an example of a Wi-Fi spec; is that correct?

13:41  24   **A.**   That is correct.

13:41  25   **Q.**   And why were you asking them for a copy of a spec?

*Shealy - Cross*

13:41  1   **A.**    A professor at my former university, at University of

13:41  2   California Santa Barbara, was developing some power

13:41  3   amplifiers and was looking for data that they could go

13:41  4   benchmark again.  He said, do you have any data sheets on

13:41  5   a power amplifier in the Wi-Fi bands?  The intent when it

13:41  6   was asked was to solicit a public data sheet to give to a

13:42  7   university.  We do not make power amplifiers or FEMs or

13:42  8   front end modules, and so this was a university request to

13:42  9   me.

13:42  10       And as I said, when I forwarded this document, I was

13:42  11  on my phone, and I opened it enough to see two columns

13:42  12  that looked like P in, P out.  To my fault, I did not

13:42  13  review the entire document before sending it.  I was on

13:42  14  the road as I recall, and I sent it to the university

13:42  15  Professor.

13:42  16           **MR. LEMIEUX:**  For purposes of the redirect, I

13:42  17  guess, of Mr. Masters' examination, Your Honor, I don't

13:43  18  have any other questions.  And so I'd like to switch over

13:43  19  to the direct examination if that is permissible to the

13:43  20  Court?

13:43  21           **THE COURT:**  Absolutely, that's fine.  Thank

13:43  22  you.

13:43  23  **BY MR. LEMIEUX:**

13:43  24  **Q.**    Dr. Shealy, could you give us your educational

13:43  25  background, please.

*Shea - Cross*

13:43  1  **A.**    I started my education.  I was born in Western

13:43  2  North Carolina.  I did my undergrad at North Carolina

13:43  3  State University, achieved a bachelor's of science in

13:43  4  electrical engineering, magna cum laude.  I left NC State

13:43  5  and moved to California, where I studied at University of

13:43  6  California Santa Barbara, where I earned a master's degree

13:43  7  in electrical engineering, and then a PhD degree in

13:43  8  electrical engineering focusing on solid state physics.

13:43  9      Later on in my career, I earned an MBA from Wake

13:44  10  Forest University to kind of round out my business

13:44  11  education with my engineering.

13:44  12  **Q.**    Could you briefly describe for the Court and the jury

13:44  13  your work history from college moving forward?

13:44  14  **A.**    When I left undergrad at NC State, I moved to

13:44  15  California.  I went straight through and obtained my

13:44  16  doctorate.  I then left UCSB, which is Santa Barbara, and

13:44  17  I had earned a Howard Hughes Doctoral Fellowship while

13:44  18  studying at UCSB.  I had moved to Hughes Research Labs,

13:44  19  which is down in Malibu, California, where I studied power

13:44  20  amplifiers, processing, that sort of thing.

13:45  21      I stayed within the Hughes family and moved to Hughes

13:45  22  Networks Systems, which is Germantown, Maryland.  And I

13:45  23  was working in systems and satellite communications on top

13:45  24  of gas stations that allow transmitting your credit card

13:45  25  back and forth for credit checks.

*Shealy - Cross*

13:45  1    And then I left after designing hardware there, and

13:45  2    started a company called RF Nitro Communications.  It was

13:45  3    one of the first companies in gallium nitride.  We

13:45  4    licensed technology out of Cornell University, and we

13:45  5    built some high voltage prototypes that beat conventional

13:45  6    technology.  And that company was sold to RF Micro Devices

13:45  7    In 2001.

13:45  8    I stayed at RF Micro Devices for 13 years until I

13:45  9    left in February of 2014.  And then I founded Akoustis

13:46  10   Technologies in May, along with two other founders, one

13:46  11   Professor from University of California Santa Barbara who

13:46  12   is an expert in single crystal technology, as well as a

13:46  13   patent attorney, which, collectively, we launched the

13:46  14   company.

13:46  15  **Q.**   Dr. Shealy, why did you become an engineer?

13:46  16  **A.**   I -- you know, growing up, my father was in the

13:46  17   electrical trade, so he was wiring houses and owned a

13:46  18   electrical showroom, so selling light fixtures, wiring

13:46  19   houses.  And so it was -- I would frame it that I worked

13:46  20   on repairing lamps and moving appliances and hanging light

13:46  21   fixtures and working with, you know, skilled tradesmen.

13:46  22   So I got interested in electrical engineering there.

13:46  23   My brother was also a significantly older than I, he

13:47  24   was a professor of electrical engineering at Cornell

13:47  25   University.  And so I took inspiration from my father and

13:47  1    my brother.

13:47  2    **Q.**    And in your work experience, in your time at either

13:47  3    at RF nitro or at Hughes, did you gain experience working

13:47  4    with DARPA?

13:47  5    **A.**    So at Hughes Electronics, the first part of my career

13:47  6    there was at the research labs.  And that's predominantly,

13:47  7    they were doing government contracting.  So very early on,

13:47  8    very early concept phase of technology, we would take

13:47  9    concepts to the U.S. government through various agencies.

13:47  10   DARPA is one agency; Office of Naval Research is another

13:47  11   agency; the Air Force Research Labs is another agency.

13:47  12   And we would take and pitch new technology ideas, and

13:47  13   experts within the government would vet them, and then

13:48  14   ultimately fund them.

13:48  15       And beyond DARPA, also worked in another area before

13:48  16   my departure of Hughes called ARPAE, which is -- it's sort

13:48  17   of like DARPA, another government agency that was focused

13:48  18   on energy, clean energy.

13:48  19       So contracting with the government.  I also worked in

13:48  20   small business innovative research called SBIRs.  These

13:48  21   are government programs that, you know, will give you

13:48  22   $150,000 to help you launch a company.  In Akoustis, the

13:48  23   first contract I mentioned earlier was a contract with

13:48  24   National Science Foundation, so we wrote a proposal, had

13:48  25   the government vet it, and they awarded us the early

contract.

So throughout businesses, certainly, at Hughes and
then later on at RFMD, I ran our defense business.  We
moved up from there to doing things like congressional
appropriations for technology.  But a lot of that was
through Naval Research Labs and other government agencies.
But it's been something that I'm quite familiar with
throughout my career being in those environments.

**Q.**    When you were -- Dr. Shealy, when you were at the
University of California Santa Barbara, did you gain any
experience or have any experience working with single
crystal nano materials?

**A.**    Yes.  One of the reasons I went to that university, I
followed a professor at NC State who had set some of the
world records for these transistor speeds, so I was
inspired by him.  So the education that I got in grad
school at UCSB was what I would characterize as hands-on.
I was actually working in a chip fab.  We were -- the
wafers we were making, we were using innovative materials,
and then staying up very late hours converting those into
electronic devices.

I worked in various single crystal materials,
including indium phosphite, which is ultimately what I got
my doctorate in.  But gallium oxide at Hughes Electronics.
And then my first startup was in gallium nitride.  So

13:50  1    these are all single crystal electronic trade materials

13:50  2    that I've had a passion for throughout my career.

13:50  3    **Q.**    During your time at UCSB, were you also exposed at

13:50  4    that time to what we've heard previously testified to as

13:50  5    MEMS devices?

13:50  6    **A.**    Various MEMS technology, the answer to that is

13:51  7    actually no.  So the experience in MEMS technology I would

13:51  8    characterize the exposure I had at UCSB as more plainer

13:51  9    silicon-type processing.  MEMS technology implies --

13:51  10   oftentimes implies suspended structures or -- which the

13:51  11   way you make a suspended structure is you do a layer

13:51  12   transfer.

13:51  13        So you start on one substrate and you flip mount it,

13:51  14   and it's a -- those skilled in the art are geniuses in my

13:51  15   opinion, but I did not have experience in MEMS technology.

13:51  16   That's why we acquired the New York facility, because the

13:51  17   30 people that came -- that were running that facility

13:51  18   when we acquired it were experts, and had 20 years of

13:51  19   expertise in development of that -- or in producing

13:51  20   MEMS-based devices.

13:51  21   **Q.**    Now, I believe you testified earlier, Dr. Shealy,

13:51  22   that during the time were you at RFMD, one on the

13:51  23   precursor companies to Qorvo, that they did not make BAW

13:52  24   filters.

13:52  25        Had you done any filter work during the time that you

*Shea - Cross*

were at RFMD?

**A.**   I did not.  At the time I left RFMD, I was running

approximately five businesses.  But these would be a

defense business, a high frequence millimeter wave

amplifier business.  I was running a cable TV business,

and also a foundry business.  And I'm slipping on what the

other was.  But none of these were related to RF filters.

So the answer is, no.

**Q.**   Why did you form Akoustis?

**A.**   When I left RFMD, I reached out to my network.  And

that largely consists of professionals through kind of the

education channels.  So one of the first calls I made

after taking a short break was to Professor Steve Dunbar,

who is an expert in single crystal materials at UCSB.  He

is still currently on our board advising the company.

     And we had talked through a lot of intellectual

property ideas that were really unchartered in the types

of nitride materials, which is what we use.  They had done

a lot of patenting of technologies with LEDs, with lasers,

with RF power devices, with RF power switches for

automotive, batteries, that sort of thing.

     And we had a very broad discussion about technology,

and we came to the conclusion through a couple

conversations that they had never explored the acoustic

properties of some of these nitride materials.  Acoustic

13:54  1    properties would be -- these are acoustic wave filters.

13:54  2    BAW is an acoustic wave filter.

13:54  3        So we discussed some of the physics behind that.  We

13:54  4    discussed the lack of patents in that area that the

13:54  5    university had not explored.  And so I think from a novel

13:54  6    materials standpoint, single crystal aluminum nitride was

13:54  7    not very mature.  Aluminum scandium nitride from a single

13:54  8    crystal standpoint, had rarely been even demonstrated in a

13:54  9    single crystal form.

13:54  10        And then combine that with my history, I wanted to

13:54  11   move into an area where I had not worked before.  I'm an

13:54  12   entrepreneur; I am a builder.  And I wanted a challenge

13:55  13   that would -- that had potential payoff, which I thought

13:55  14   using advanced materials with better physical or better

13:55  15   physics, better physical properties, would allow us to

13:55  16   differentiate in the end product that we were selling to

13:55  17   the market.

13:55  18        That was the thesis behind the company, and it seemed

13:55  19   to stay clean from RFMD because, you know, I had not had

13:55  20   any involvement with any technology related to filters, so

13:55  21   it seemed clean there.  And innovation in nano science

13:55  22   seemed -- has been my experience to have a lot of

13:55  23   opportunities to make advanced technology and

13:55  24   better-functioning products.

13:55  25   **Q.**   Now, Dr. Shealy, why, when you formed and started

*Shea - Cross*

13:55  1    Akoustis, why you did you choose to focus on FBAR filter

13:55  2    instead of SMR filters?

13:55  3    **A.**   If you look at some of the earlier materials that we

13:55  4    were talking about -- RGLTE -- 4G was launched.  You

13:56  5    probably remember a lot of Verizon commercials, AT&T

13:56  6    commercials.  5G had been spun up as kind of the next big

13:56  7    thing.  5G was going to use a much higher frequency

13:56  8    spectrum.  And the government goes through a licensing

13:56  9    process to define that spectrum.  And so there was a lot

13:56  10   of buzz in the future about 5G.

13:56  11       Also, in Wi-Fi, a lot of emphasis, you know, early

13:56  12   routers that you had in your home would only have a single

13:56  13   band, very low frequency at 2.4.  All the new bands that

13:56  14   were opening up were all high frequency.

13:56  15       So the answer to your question is, an FBAR device has

13:56  16   lower parasitics, number one, than other conventional

13:56  17   technology such as SMR.  But it -- so it has lower

13:57  18   parasitics, and then the loading of the mirrors in the SMR

13:57  19   tends to have ripples in frequency, and so as you're

13:57  20   stacking these filters together, you can get ripple across

13:57  21   the bands.  So FBAR is a cleaner -- it's a cleaner filter

13:57  22   spectrum, Number 1; and, Number 2, we felt the market

13:57  23   leader is and was Avago.  They have really a position in

13:57  24   FBAR, and it is the choice of high frequency today.  And a

13:57  25   lot of the 4GLTE bands, they had really monopolized those

13:57  1    bands as well.

13:57  2        So it felt -- we wanted to start, our starting point

13:57  3    to go after with advanced nano science was going to be the

13:57  4    best configuration, which is, in our view, was an FBAR

13:57  5    like process.

13:58  6    **Q.**   Now, Dr. Shealy, you've described a little bit about

13:58  7    your experience during the early years of Akoustis.  Could

13:58  8    you briefly describe for the jury what your

13:58  9    responsibilities were during that time period?

13:58  10   **A.**   I can tell you the -- it evolves in a company like

13:58  11   ours.  I always seem to draw the short straw of having to

13:58  12   do all the fund-raising in the company.  As I said, I'm an

13:58  13   entrepreneur in technology and nano science.  But I think

13:58  14   I always ended up having to work fund-raising aspect of

13:58  15   it.  So early days when you have nobody there, you are

13:58  16   the -- you do everything that you -- you have to do

13:58  17   everything.

13:58  18       You know, some of the technical results that were in

13:58  19   the documents this morning, were -- I had a heavy hand in

13:58  20   producing those.  And then the goal once we went down a

13:59  21   path of what's called public venture financing, which is

13:59  22   what we did.  We are a public company.  We were able to

13:59  23   raise capital to finance the company through the public

13:59  24   markets.

13:59  25       Very quickly, the job went from me doing it myself to

13:59  1    hiring, you know, the best individuals.  And we use a

13:59  2    methodology, which I credit to a gentleman named Vinode

13:59  3    Vinod Khosla, Khosla Ventures.  We used an approach called

13:59  4    gene pool engineering when recruiting.  That is, you hire

13:59  5    expertise across a broad spectrum of industry, bring that

13:59  6    expertise, which has different backgrounds and

13:59  7    experiences, you bring them together and give them a very

13:59  8    difficult problem to solve, and that's how we did the

13:59  9    recruiting.

13:59  10        So we were recruiting, broadly speaking, and I

14:00  11    certainly was trying to fill key roles in the company to

14:00  12    delegate those aspects of the business.

14:00  13        So my role, to your question, going from early on

14:00  14    was, doing everything, to then, you know, getting the

14:00  15    company on a sustainable funding path where we could hire

14:00  16    and bring on new people.  We were bringing in government

14:00  17    contracts to fund those efforts.  And then as it moves on,

14:00  18    we get -- we're a public company, so I've taken more of a

14:00  19    front office job with investors with, you know, running

14:00  20    the public company.

14:00  21  **Q.**  Do you have a particular management style, Dr.

14:00  22    Shealy?

14:00  23  **A.**  I would summarize my management style is hire good

14:00  24    leaders, let them lead, get out of their way.  That is,

14:00  25    if -- what have I found in companies, small and big, is,

*Shealy - Cross*

14:00  1    if you micromanage, you're going to lose your best people.

14:00  2    You can -- you want to inspire them, get them -- let them

14:01  3    lead, get out of their way, and go solve another difficult

14:01  4    problem, because there's always problems to go solve in

14:01  5    these companies.

14:01  6    **Q.**   Now, Dr. Shealy, we've heard testimony in this case

14:01  7    that suggests that there are copies of a number of Qorvo

14:01  8    documents and presentations and templates, many of which

14:01  9    were labeled confidential and proprietary that were found

14:01  10   on various computers belonging to Akoustis employees.

14:01  11       Is that something that's allowed under the company's

14:01  12   policy?

14:01  13   **A.**   I will reiterate what I said earlier.  I don't have

14:01  14   the specifics of those numbers, given the protective

14:01  15   orders, but bringing documents into the company is not --

14:01  16   it is strictly prohibited in the confidentiality agreement

14:01  17   an employee signs on day one as a contingent of them

14:01  18   coming to work.

14:01  19       In addition, we have added additional measures,

14:01  20   business conduct guidelines, which the board has -- we

14:01  21   built those from the ground up, and the board has enacted

14:02  22   those.  So those would be policies the company has taken

14:02  23   steps to put into place.  The confidentiality has been

14:02  24   since day one.  BCG, or business conduct guidelines, is a

14:02  25   program we've enacted through our general counsel and

*Shealy - Cross*

14:02  1    outside counsel to make sure we insist upon the highest

14:02  2    standards.

14:02  3    **Q.**    Now, were you personally ever aware of Qorvo

14:02  4    materials being discussed at Akoustis by former Qorvo

14:02  5    employees?

14:02  6    **A.**    Repeat the question.  I'm sorry.

14:02  7    **Q.**    Yes.  Were you personally aware that the Qorvo

14:02  8    materials were being discussed at Akoustis by former Qorvo

14:02  9    employees?

14:02  10   **A.**    Materials would have been discussed.  We were under

14:02  11   nondisclosure with Qorvo.  And, actually, had development

14:02  12   activity.  So there certainly would be discussion of

14:02  13   materials related to specs that we had received, and those

14:02  14   sorts of materials, I certainly was aware of.  I was in

14:03  15   receipt of those sorts of materials from their

14:03  16   procurement, and also their chief technology officer who,

14:03  17   you know, was evaluating and testing our technology.

14:03  18   **Q.**    Were you ever aware, Dr. Shealy, of any Qorvo

14:03  19   confidential proprietary information being used in the

14:03  20   development of Akoustis technology?

14:03  21   **A.**    No.  No.  We didn't need it.  We were building a

14:03  22   different type of technology, and I would also state that

14:03  23   our transfer flow MEMS process, which is a flip -- is a

14:03  24   removal process, I don't think you could take process

14:03  25   recipes from another company, run it in our process, and

*Shealy - Cross*

1   it wouldn't work.  And I don't think you could take ours

2   and run it in their tool sets and it wouldn't work.  So

3   there's highly customized and engineered processes to

4   build our technology.  And that started from the MEMS

5   folks we acquired.

**Q.**  But, Dr. Shealy, we were shown through various

7   witnesses here that several former Qorvo employees did

8   copy their e-mail folders, and sometimes other materials

9   and presentations they had received at Qorvo, and

10  apparently transferred some of those, at least, to their

11  Akoustis laptops.

12      Was this conduct encouraged or approved by company

13  management?

**A.**  No.  Again, confidentiality documents were in place,

15  and still are in place today, business conduct guidelines

16  that prohibit that type of behavior.  The challenge for

17  the company as we were a small startup is we did not

18  have -- we didn't have the trust-but-verify IT systems to

19  see what was being plugged in.  In the early stages of a

20  startup, you're handing out computers, putting people to

21  work, trying to innovate on the technology.  If people are

22  plugging things into a laptop, don't have a direct way of

23  policing that.

24      Part of the BCG that I mentioned, part of what we've

25  been forced to do with the DARPA contracts that we are

*Shealy - Cross*

14:05  1  currently working on, they insisted on, and they've been

14:05  2  helping us pay for IT upgrades to our system in order to

14:05  3  be able to prevent outside intruders, be able to police

14:05  4  kind of inside documents.  That's a capability we did not

14:05  5  have, you know, prior to, you know -- these contracts have

14:05  6  been with us, you know, three or four years.

14:05  7          **MR. LEMIEUX:**  Your Honor, may I have permission

14:05  8  to approach the witness with an exhibit?

14:05  9            **THE COURT:**  You may.

14:05  10          **MR. LEMIEUX:**  I've handed the witness what's

14:06  11  been marked for identification purposes as Exhibit

14:06  12  DTX-0634.

13  **BY MR. LEMIEUX:**

14:06  14  **Q.**  Ask you to take a look at that, Dr. Shealy, and tell

14:06  15  us whether or not you've seen this document before.

14:06  16  **A.**  Yes, I've seen the document before.  I'm a coauthor

14:06  17  of this paper.

14:06  18  **Q.**  What is this exhibit?

14:06  19  **A.**  This exhibit is a IEEE, which IEEE is the Institute

14:06  20  of Electrical Electronics Engineers.  It is the gold

14:06  21  standard in electrical engineering.  This was a paper

14:06  22  submitted to a conference called the International

14:06  23  Ultrasonic Symposium, IUS.  And this paper, as I recall --

14:06  24  I don't see the date on it.  As I recall, this paper was

14:06  25  published in 2018 if my memory serves me correct.

*Shea40 - Cross*

BY MR. LEMIEUX:

**Q.** And what is this paper based on?

**A.** This paper was -- so the IUS is the, really the premier ultrasonics acoustic wave conference. This particular year, it was held in Kobe, Japan. It was -- so we solicited -- we began taking the -- with our new XBAW process, we wanted to demonstrate to the industry the potential of the single crystal XBAW technology we were producing.

So this paper outlines various things about the technology, figures of merit, power handling, that we measured. It had reliability of the single crystal material, much higher powers, and we demonstrated, in my view for the first time, approximately a 2X enhancement in the power handling of a single crystal BAW in our process compared to a polycrystalline BAW in our process.

So it really demonstrated the superior thermal conductivity of single crystal material, which can be leveraged for power applications. And that's what the paper demonstrates. Really, it's not a theory paper; this is all measured data, and it's data out of our lab, and --

**Q.** If I could ask you, what is this paper based on?

**A.** Oh, this is based upon our XBAW technology, which the experiment and the control in here are single crystal material and polycrystalline material, all built in our

14:08    1    fab in New York State.

14:08    2    **Q.**    Is this based on the research and development work

14:08    3    that is done at Akoustis?

14:08    4    **A.**    One hundred percent; and it is 100 percent internal

14:08    5    data.  We didn't outsource of any this.  This was our

14:08    6    data.  In addition, I'd have to look and see what

14:08    7    contracts we had running, but we were also sharing this

14:08    8    with the government agencies that we were talking to at

14:09    9    the time as -- if we had contracts at that time, these

14:09   10    would be some of the deliverables we would share with

14:09   11    them.

14:09   12              **MR. LEMIEUX:**    Your Honor, I'd like to move to

14:09   13    admit DTX-634 into evidence.

14:09   14              **THE COURT:**    Marked and received as 207.

14:09   15              (Trial Exhibit No. 207 was admitted into

14:09   16    evidence.)

14:09   17    **BY MR. LEMIEUX:**

14:09   18    **Q.**    Dr. Shealy, I believe Mr. Masters asked you this

14:09   19    question, but I just wanted to make sure I understand

14:09   20    properly.

14:09   21         Does Akoustis currently offer any BAW filters that

14:09   22    use a single crystal technology for the creation of the

14:09   23    resonator?

14:09   24    **A.**    Yes.  So we had an early -- the earliest project that

14:09   25    we had was a 1938 project.  That was for defense.  What we

*Shealy - Cross*

14:09  1   currently offer is a product, I believe, I called it

14:10  2   10161, or the 161 product.  The 161 product is a -- for

14:10  3   HPE Aruba.  In an enterprise router, they have multiple

14:10  4   bands within that router.  I think we have approximately

14:10  5   32 filters in their router box.  And, again, it's an

14:10  6   enterprise router that would be in a building like this

14:10  7   servicing all users.

14:10  8       So the 161 device is 6.1 gigahertz single crystal

14:10  9   piezoelectric that we were able to tune to get maximum Q,

14:10  10  and it had better power handling than the polycrystalline

14:10  11  material.  So, again, back to the philosophy of better is

14:10  12  the enemy of good enough.  Use polycrystalline when --

14:10  13  because it works in our process, we use that, but when we

14:10  14  need bump in performance, in this particular case of the

14:10  15  161, we used that, and were able to win the entire

14:11  16  platform of the HPE Aruba with all of our filters, both

14:11  17  narrow band, which are custom, as well as wide band.

14:11  18  **Q.**   Dr. Shealy, was there ever a time when Akoustis only

14:11  19  offered polycrystalline products?

14:11  20  **A.**   We were in development of single crystal from the

14:11  21  founding of the company until present time.  We were

14:11  22  engaged, we had different customers in defense in 5G

14:11  23  network infrastructure, in -- such as ██████████

14:11  24  that we had at least a two-year agreement that we were

14:11  25  working on.

14:11  1        We have had -- the first three years of the company,

14:11  2   we outsourced single crystal materials.  We brought that

14:11  3   capability, and if you toured our fab in New York, you

14:11  4   would see, you know, the tool set that is producing the

14:11  5   single crystal material.  It is -- we also have currently

14:11  6   won two phases of a new DARPA program where we're using a

14:12  7   blend of single crystal and polycrystalline materials to

14:12  8   actually do something called "overmoding the resonator,"

14:12  9   which allows you to multiply frequency of operations.

14:12  10       So, you know, this is sub-6 gigahertz technology.

14:12  11  We're now -- we've already delivered 18 gigahertz filter

14:12  12  samples using our P3F technology to the government.  And

14:12  13  we've got -- that's led us to multiple defense customers

14:12  14  working -- doing design work in our foundry.

14:12  15            **MR. LEMIEUX:**  No, further questions for this

14:12  16  witness, Your Honor.  I will pass.

14:12  17            **THE COURT:**  Cross-examination, and redirect.

14:12  18            **MR. MASTERS:**  Thank you, Your Honor.

14:12  19                    REDIRECT EXAMINATION

14:12  20  BY MR. MASTERS:

14:12  21  **Q.**   Dr. Shealy, you referred to Avago today as having a

14:13  22  monopoly position.

14:13  23       They're the big company in the field, right?  In the

14:13  24  market?

14:13  25  **A.**   They have the highest market share with their FBAR

14:13  1   technology, yes.  That would be Broadcom.

14:13  2   **Q.**   And the market is extremely lucrative for the BAW

14:13  3   filters, correct?

14:13  4   **A.**   I would characterize it, if you're okay, yes, it's

14:13  5   lucrative, and I would call it the premium market in the

14:13  6   industry.

14:13  7   **Q.**   Multibillion dollars annually?

14:13  8   **A.**   I believe the -- if you look at the -- I would steer

14:13  9   you to our website.  We put numbers that are published.

14:13  10  The mobile market alone is close to 10 billion.

14:13  11  **Q.**   $10 billion, around this time?

14:13  12  **A.**   Ten to 13 billion, something like that, sir.

14:13  13  **Q.**   And you would agree with me that to stay competitive

14:13  14  in this field, and to compete with people like Broadcom,

14:13  15  your intellectual property is one of your core assets of

14:13  16  your company, isn't it?

14:14  17  **A.**   I certainly would say our intellectual property is a

14:14  18  core asset to our company, yes, sir.

14:14  19  **Q.**   It's extremely important to stay competitive in this

14:14  20  market, right?

14:14  21  **A.**   Our IP is -- our IP is core to our success, yes.

14:14  22  **Q.**   And Qorvo's IP is important to Qorvo, right?

14:14  23  **A.**   And Qorvo's IP would be important to Qorvo.

14:14  24  **Q.**   And you would not share your IP and give it away to

14:14  25  any other competitor in this field, would you?

14:14  1   **A.**    Unless there was some agreement --

14:14  2   **Q.**    No agreement.  You would not give your IP --

14:14  3   **A.**    Oh, independent -- oh, I'm sorry, sir.

14:14  4   **Q.**    You would not give your IP to another company, or let

14:14  5   somebody take your IP out of the company to compete in

14:14  6   this market; isn't that correct?

14:14  7   **A.**    Unless we had an agreement with a -- nondisclosures

14:14  8   and we were working very closely together.

14:14  9   **Q.**    No agreements, you're not working closely --

14:14  10  **A.**    Okay.

14:14  11  **Q.**    -- another company, third party, they're coming into

14:14  12  the market, you're not going to give them your IP so they

14:14  13  can compete in this $13 billion market.

14:15  14        Isn't that a true statement?

14:15  15  **A.**    I believe that's a true statement, yeah.

14:15  16  **Q.**    Thank you.

14:15  17  **A.**    Thank you, sir.

14:15  18        **MR. MASTERS:**  Can we project, please, DTX-634

14:15  19  that I think counsel marked as Trial Exhibit 207.

14:15  20  **BY MR. MASTERS:**

14:15  21  **Q.**    Your article.  Your an author on this article?

14:15  22  **A.**    Yes, sir.  I'm the third author on this article.

14:15  23  **Q.**    Okay.  And 2018, you published, you believe?

14:15  24  **A.**    Mr. Vetury, or Dr. Vetury was the lead author and he

14:15  25  presented at the conference in Kobe, Japan.

14:15  1  **Q.**    Based on products in your lab?

14:15  2  **A.**    I don't -- I believe if you look at the paper, the

14:16  3  paper is a technology paper as well as the filters that we

14:16  4  show here, as well as the resonator data, the data and the

14:16  5  devices were built in our lab in Upstate New York.

14:16  6  **Q.**    Okay.  BAW filters are passive devices?

14:16  7  **A.**    It's a capacitor.  It is a highly sophisticated

14:16  8  capacitor, but it is a passive device.  Yes, sir.

14:16  9  **Q.**    Thank you.

14:16  10     And that means that you cannot get more energy out of

14:16  11  the filter than the amount of energy going in, correct?

14:16  12  **A.**    I would say, overall, in the physical world we live

14:16  13  in, you can't violate Mother Nature, physics of Mother

14:16  14  Nature.

14:16  15  **Q.**    So with a passive device, the energy coming out

14:16  16  cannot be greater than the energy going into this passive

14:16  17  device, right?

14:17  18  **A.**    I would point you to conservation of energy.

14:17  19  **Q.**    Would you say yes to my question?

14:17  20  **A.**    In any system, including a BAW device.

14:17  21         **MR. MASTERS:**  Can we go to Page 2, please.  Top

14:17  22  right.  Can we zoom in on the purple.  Can you zoom in on

14:17  23  the top.

14:17  24  **BY MR. MASTERS:**

14:17  25  **Q.**    So this is what's known as a Smith chart, right?

*Shealy - Redirect*

14:17  1    **A.**    The -- yes.  So it's a Bode plot on the left, and

14:17  2    that would be a Smith chart on the right.

14:17  3    **Q.**    Prepared for a conference?

14:17  4    **A.**    It was taken from our -- it was taken from our

14:17  5    engineering data at the company and formatted for the

14:17  6    conference.  Yes, sir.

14:17  7    **Q.**    Not peer-reviewed, correct?

14:17  8    **A.**    The paper had gone in and we were selected by the

14:17  9    committee.  In fairness to your question, if it was a IEEE

14:18 10    journal, those can be more what I would refer to as

14:18 11    peer-reviewed.  But a committee reviewed our paper and the

14:18 12    data and they accepted it for publication.

14:18 13    **Q.**    But not peer-reviewed, as in the classic sense of a

14:18 14    peer-reviewed technical article, correct?

14:18 15    **A.**    I would argue it's an IEEE conference.  The people

14:18 16    there are very -- and this is the premium in -- involved.

14:18 17    So for the committee to accept it, they wanted to see it

14:18 18    presented in the conference.

14:18 19    **Q.**    Okay.  And if we look at on the circle around --

14:18 20    from, say, 3:00 to 5:00, if you will, you have dots that

14:18 21    are plotted on the outside of that circle, correct?

14:18 22    **A.**    It would be useful to blow up that segment if you

14:18 23    wanted to evaluate that.

14:19 24    **Q.**    Well, with our technology --

14:19 25    **A.**    It looks like it's on the edge of the Smith chart,

14:19  1    sir.

14:19  2    **Q.**   And it's actually physically impossible, because

14:19  3    these are passive devices, to get more energy out of the

14:19  4    BAW filter.  And by having the dots on the outside of the

14:19  5    circle, is physically impossible.

14:19  6        Would you agree with me?

14:19  7    **A.**   What I -- my experience with these measurements is

14:19  8    that any error you would have in the calibration could

14:19  9    give you that.  But I don't see -- I see the red block

14:19  10   here, but that -- the line thickness that's chosen to show

14:19  11   the data is right on the edge of the Smith chart.

14:19  12   **Q.**   So it's either a calibration error or you subtracted

14:19  13   more losses than you should have for how this BAW filter

14:19  14   was being analyzed?

14:20  15   **A.**   I'm looking at the data, and I see it on the edge of

14:20  16   the Smith chart, which is -- that's a good calibration,

14:20  17   from what I see.

14:20  18   **Q.**   But on the outside, that's physically impossible

14:20  19   and --

14:20  20   **A.**   I would want to see a blowup of that chart.  Take the

14:20  21   data and blow it up, if we're going to have that

14:20  22   conversation.  It looks like it's on the edge of the Smith

14:20  23   chart, which isn't defying any physics whatsoever.

14:20  24   **Q.**   Okay.

14:20  25   **A.**   It's a very high --

14:20  1              MR. MASTERS:  Take that chart down.

14:20  2     BY MR. MASTERS:

14:20  3     Q.    Dr. Shealy, you talked about computer systems having

14:20  4     trust and verify software, correct?

14:20  5     A.    Not computer system.  Our IT system.

14:20  6     Q.    Fair enough.  Trust and verify IT systems, which

14:20  7     provides a way of policing what comes on to computers

14:20  8     within your organization, correct?

14:20  9     A.    That is correct.

14:20  10    Q.    Came later in time at Akoustis, correct?

14:20  11    A.    It did.

14:20  12    Q.    And in this instance, it took the board of directors

14:20  13    20 months after the complaint was filed to issue a

14:20  14    directive that you remove 450 documents from the computer

14:21  15    systems; isn't that correct?

14:21  16    A.    The -- my answer to that is, we were advised by our

14:21  17    counsel to do that.  We were in a -- we were in a hold --

14:21  18    we could not touch our servers --

14:21  19    Q.    Excuse me, Doctor.  I am not asking what counsel

14:21  20    advised you.

14:21  21    A.    Okay.

14:21  22    Q.    Your board of directors gave you an instruction to

14:21  23    remove the 450 Qorvo documents 20 months after this

14:21  24    complaint was filed; isn't that, correct.

14:21  25    A.    I'll stand with the dates that -- there.  I don't

1    have the time lines.

2    **Q.**    And that was May 1, 2023, the board of directors said

3    remove 450 documents.  And then the forensic inspection in

4    September 2023.  So, three, four, months later, showed

5    hundreds of thousands of documents, Qorvo documents, on

6    your computer systems; isn't that, correct?

7    **A.**    Sir, there's a protective order in this case, which I

8    have not seen the data you're mentioning.  And the only

9    other clarification I would give is we had a document

10   hold.  We could not destroy any documents once the

11   discovery process of this case started.  So there was no

12   removing documents off our servers.

13   **Q.**    So as a member of the board and CEO of this company,

14   you're going to hide behind a protective order; is that

15   your testimony?

16   **A.**    We have had a -- we had a Court issue us an order to

17   freeze and protect the integrity of the data, which means

18   you cannot go and delete computers, you cannot go delete

19   servers.  You can't touch it.  And the forensic people

20   that came, it was -- everything was in lockdown and

21   freeze.  It was only until our counsel in this case

22   basically advised the board, for reasons I don't know at

23   this point -- but they advised us to issue that and begin

24   a process.  And then that got frozen, so we con do that.

25   **Q.**    One more question.  The forensic inspector was only

| | | |
|---|---|---|
| 14:22 | 1 | able to inspect the computers that existed in September, |
| 14:23 | 2 | but not the computers and computer devices that were no |
| 14:23 | 3 | longer in place at Akoustis; isn't that true? |
| 14:23 | 4 | **A.**   Sir, I can't -- I can't comment on that. |
| 14:23 | 5 | **Q.**   No, further questions, Your Honor. |
| 14:23 | 6 | **A.**   I have no working knowledge on what was inspected or |
| 14:23 | 7 | not inspected. |
| 14:23 | 8 | **THE COURT:**  All right.  Thank you very much. |
| 14:23 | 9 | **MR. LEMIEUX:**  Your Honor, because he was my |
| 14:23 | 10 | direct, I think I can redirect. |
| 14:23 | 11 | **THE COURT:**  Sure. |
| 14:23 | 12 | **MR. LEMIEUX:**  It's only a single question, Your |
| 14:23 | 13 | Honor. |
| 14:23 | 14 | RECROSS EXAMINATION |
| 14:23 | 15 | **BY MR. LEMIEUX:** |
| 14:23 | 16 | **Q.**   Dr. Shealy, Mr. Masters there tried to make it appear |
| 14:23 | 17 | that there was a long period of time between the filing of |
| 14:23 | 18 | the lawsuit and the action that was taken by the board. |
| 14:23 | 19 | Are you aware of the fact that the trade secret |
| 14:23 | 20 | claims that were added to this case were only added in |
| 14:23 | 21 | February of 2023? |
| 14:23 | 22 | **A.**   Yes, I am aware of that. |
| 14:23 | 23 | **Q.**   And was the action taken by the board -- that was in |
| 14:24 | 24 | May of 2023, correct? |
| 14:24 | 25 | **A.**   That is correct. |

14:24  1  **Q.**   So just three months, not 40 months later, or

14:24  2  20 months later?

14:24  3  **A.**   That is correct.

14:24  4       **MR. LEMIEUX:**  No, further questions, Your

14:24  5  Honor.

14:24  6       **THE COURT:**  Thank you very much.  You may step

14:24  7  down.

14:24  8       **THE WITNESS:**  Thank you, Your Honor.

14:24  9       **THE COURT:**  Certainly.

14:24  10      And who will our next witness be?

14:24  11      **MR. MASTERS:**  Your Honor, the plaintiff calls

14:24  12  J.B. Kwon, who is a senior process engineer at Akoustis.

14:24  13  It will be by video deposition.

14:24  14      **THE COURT:**  And, once again, it's a deposition,

14:24  15  it is just as though the witness is before you here in

14:24  16  court, and this is your only opportunity to see the

14:24  17  deposition testimony.

14:24  18      You may proceed.

14:25  19      **MR. LEMIEUX:**  Is this video being played

14:25  20  without sound?

14:25  21      **THE COURT:**  No, it's not.  It's being played by

14:25  22  the IT person --

14:25  23      **MR. LEMIEUX:**  That's what I suspected, but I

14:25  24  just wanted to make sure.

14:25  25      (Deposition designation of J.B. KWON plays as

14:25  1    follows:

14:26  2    **Q.**   Could you state your name for the record?

14:26  3    **A.**   My name is Joonbum Kwon.

14:26  4    **Q.**   Have you ever been deposed before?

14:26  5    **A.**   No.  This is first time.

14:26  6    **Q.**   Who is your current employer?

14:26  7    **A.**   Northrop Grumman.

14:26  8    **Q.**   What does your current employer do?

14:26  9    **A.**   My position is process integration engineer.

14:26  10   **Q.**   Who was your first employer?

14:26  11   **A.**   TriQuint Semiconductor after I graduate my Ph.D.

14:26  12   **Q.**   Could you please tell me what positions you held

14:26  13   while you were at Qorvo?

14:26  14   **A.**   I work in the plasma process engineering team.  So

14:26  15   major role was to sustain or develop the plasma process

14:26  16   such as dry etch process and trim process.

14:27  17   **Q.**   And you mentioned the trimming.  What is trimming?

14:27  18   **A.**   Trim process is also -- it's kind of dry etch

14:27  19   process, but a little bit different.  But trim process is

14:27  20   using focused ion beams to etch the materials.  It could

14:27  21   be metal or nonmetal materials.

14:27  22   **Q.**   Is trimming used on both FBAR and SMR?

14:27  23   **A.**   Yes.

14:27  24   **Q.**   Is the process similar?

14:27  25   **A.**   Similar.  I'm not sure what your point is, process

*Kwon – Deposition Designation*

| | | |
|---|---|---|
| 14:27 | 1 | similar means. |
| 14:27 | 2 | **Q.**   We can go one at a time.  So can you use the same |
| 14:28 | 3 | trimming equipment for FBAR or SMR? |
| 14:28 | 4 | **A.**   It could be. |
| 14:28 | 5 | **Q.**   Do you remove material layer in an FBAR? |
| 14:28 | 6 | **A.**   Yeah. |
| 14:28 | 7 | **Q.**   Do you also remove a material on an SMR? |
| 14:28 | 8 | **A.**   Yes. |
| 14:28 | 9 | **Q.**   Do you remove a dielectric material on an FBAR? |
| 14:28 | 10 | **A.**   Yes. |
| 14:28 | 11 | **Q.**   Do you remove a dielectric material from an SMR? |
| 14:28 | 12 | **A.**   Yes. |
| 14:28 | 13 | **Q.**   Is -- is trimming necessary for BAW filter? |
| 14:28 | 14 | **A.**   Yes. |
| 14:28 | 15 | **Q.**   Why did you leave Qorvo? |
| 14:28 | 16 | **A.**   I work in Qorvo five years.  So I want to refresh my |
| 14:28 | 17 | life to experience new company.  That's the reason. |
| 14:29 | 18 | **Q.**   When did you leave Qorvo? |
| 14:29 | 19 | **A.**   2017.  I don't remember exact the month, date.  2017, |
| 14:29 | 20 | I left Qorvo, yeah. |
| 14:29 | 21 | **Q.**   Dr. Kwon, do you recognize the exhibit marked 647? |
| 14:29 | 22 | **A.**   No.  I don't remember. |
| 14:29 | 23 | **Q.**   What is the title of the document? |
| 14:29 | 24 | **A.**   Employee Confidentiality and Invention Assignment |
| 14:29 | 25 | Agreement. |

14:29  1    **Q.**    TriQuint is your former employer?

14:30  2    **A.**    Yes, this is my first employer.

14:30  3    **Q.**    And TriQuint is now Qorvo?

14:30  4    **A.**    Now, Qorvo, yeah.

14:30  5    **Q.**    Could you please look at page Qorvo_00842121 just at

14:30  6    the bottom.

14:30  7          This is your signature?

14:30  8    **A.**    Yes.

14:30  9    **Q.**    Where did you work after Qorvo?

14:30  10   **A.**    After Qorvo left, I joined Akoustis Technology.

14:30  11   **Q.**    During what period were you employed by Akoustis

14:30  12   Technology?

14:30  13   **A.**    I work in Akoustis 2017, around June to 2022, around

14:31  14   October.

14:31  15   **Q.**    How did you come to be employed by Akoustis?

14:31  16   **A.**    When I was in Qorvo, I'm trying to move to new

14:31  17   company.  So I apply some -- for some job link in the job

14:31  18   site, and then later one of the recruiters contact me and

14:31  19   introduce this, the Akoustis Technology company.

14:31  20   **Q.**    Who was this recruiter?

14:32  21   **A.**    Aaron, I don't remember last name.  First name is

14:32  22   Aaron.

14:32  23   **Q.**    Why did you decide to join Akoustis?

14:32  24   **A.**    Akoustis Technology company was a startup company,

14:32  25   and the company team introduced their company and their

14:32  1    business.  So after listen to them, I thought this company

14:32  2    has potential to be growing up in this market.  So that's

14:32  3    why I joined up.

14:32  4    **Q.**   Did -- did you get a raise by moving to Akoustis?

14:32  5    **A.**   Yes.

14:33  6    **Q.**   Did Akoustis offer better benefits?

14:33  7    **A.**   Yes.

14:33  8    **Q.**   Did Akoustis offer stock options?

14:33  9    **A.**   Yes.

14:33  10   **Q.**   Please tell me the positions you held while at

14:33  11   Akoustis.

14:33  12   **A.**   My position was senior process engineer, and they --

14:33  13   my position was to develop trim process.

14:33  14   **Q.**   Did any other process engineer have experience with

14:33  15   trim process?

14:33  16   **A.**   I don't remember.

14:33  17   **Q.**   What was state of Akoustis's trim process when you

14:33  18   were hired?

14:34  19   **A.**   I don't remember.

14:34  20   **Q.**   Did Akoustis have an established trim process when

14:34  21   you joined Akoustis?

14:34  22   **A.**   I don't remember.

14:34  23   **Q.**   When you joined Akoustis, who was working on the

14:34  24   design?

14:34  25   **A.**   I don't remember.

14:34   1   **Q.**   Manufacturing?

14:34   2   **A.**   I don't remember.

14:34   3   **Q.**   Testing?

14:34   4   **A.**   I don't remember.

14:34   5   **Q.**   Trimming?

14:34   6   **A.**   I don't remember.

14:34   7   **Q.**   Do you remember anything about Akoustis's business

14:34   8   when you were hired?

14:34   9   **A.**   No, I don't remember.

14:34   10   **Q.**   During your time at Akoustis, did Akoustis have a

14:34   11   single crystal design?

14:34   12   **A.**   I don't remember.

14:34   13   **Q.**   How does Akoustis trim its BAW filters?

14:34   14   **A.**   I don't remember.

14:34   15   **Q.**   Was there a process for trimming when you joined

14:34   16   Akoustis?

14:35   17   **A.**   I don't remember.

14:35   18   **Q.**   When you left Akoustis, did Akoustis have an

14:35   19   established trim process?

14:35   20   **A.**   I don't remember.

14:35   21   **Q.**   When you joined Akoustis, were you in charge of

14:35   22   trimming?

14:35   23   **A.**   Yes.

14:35   24   **Q.**   How many people did you supervise?

14:35   25   **A.**   I don't remember.

*Kwon – Deposition Designation*

14:35  1   **Q.**   Did anyone else at Akoustis work on trimming?

14:35  2   **A.**   I don't remember.

14:35  3   **Q.**   What were these parameters?

14:35  4   **A.**   I don't remember detail now.

14:35  5   **Q.**   How did you maintain trim process?

14:35  6   **A.**   As I said, we need to keep monitoring the process

14:35  7   parameters to see the parameters within the -- are in the

14:36  8   range, the healthy range.  So...

14:36  9   **Q.**   What is your understanding of why Akoustis hired you?

14:36  10  **A.**   I think they need the people with trim process

14:36  11  background.

14:36  12  **Q.**   Why did Akoustis need -- why do you think Akoustis

14:36  13  needed people with a trim process background?

14:36  14  **A.**   I think BAW filters need the trim process, yes.

14:37  15  **Q.**   Why did you leave Akoustis?

14:37  16  **A.**   Because my wife, she moved to new locations.

14:37  17  **Q.**   Dr. Kwon, I've just handed you two documents marked

14:37  18  as Exhibit Number, previously marked as Exhibit Number 452

14:37  19  and 453.

14:37  20  Please look at Exhibit Number 452.  Do you recognize

14:37  21  this document?

14:37  22  **A.**   No.  I don't remember that.

14:37  23  **Q.**   If you could flip to page 1 of Exhibit 452, it bears

14:37  24  the Bates stamp number AKTS_00118852.  If you look at the

14:38  25  top, is this an e-mail from you to Dr. Vetury, Dr. Kim,

14:38    1    and Mr. Lewis and Ms. Winters?  Is that correct?

14:38    2    **A.**    Yes.

14:38    3    **Q.**    It reads, "The enclosed is what I understand about

14:38    4    how Qorvo get trim sensitivity data."

14:38    5        That entire paragraph, do you see it?

14:38    6    **A.**    Yeah.

14:38    7    **Q.**    "Qorvo" means "Qorvo, Inc."?

14:38    8    **A.**    Yeah.

14:38    9    **Q.**    What is "trim sensitivity data"?

14:38    10    **A.**    Basically, this is how much frequence could be

14:38    11    shifted per material amount.

14:38    12    **Q.**    Below you said, "Hope this will be helpful for trim

14:38    13    plan."

14:39    14        Is this trim plan we have previously discussed about?

14:39    15    **A.**    Trim plan...as I say, I don't recall what is the trim

14:39    16    plan is.

14:39    17    **Q.**    Why did you say this will be helpful for trim plans?

14:39    18    **A.**    I don't remember that.  It's 2017.  So...

14:39    19    **Q.**    Okay.  If you could put the e-mail aside and move on

14:39    20    to the fourth exhibit number marked as 453.

14:39    21        Let's go he to Page 2 entitled "Trim Calculations

14:39    22    SiN – Trim Sensitivity Parameter."

14:39    23        Below there are colored boxes.  What are they?

14:39    24    **A.**    It looks like it is trim sensitivity calculations

14:39    25    method.

*Kwon – Deposition Designation*

14:40  1    **Q.**   Did you create these boxes?

14:40  2    **A.**   I don't remember.

14:40  3    **Q.**   Did you reference any documents bearing a Qorvo

14:40  4    confidential label to create these boxes?

14:40  5    **A.**   I don't remember.

14:40  6    **Q.**   Did you possess any Qorvo document when you left

14:40  7    Qorvo?

14:40  8    **A.**   No.

14:40  9    **Q.**   Did you access any document to create this -- these

14:40  10   boxes?

14:40  11   **A.**   No.

14:40  12   **Q.**   Did you access this presentation after you have

14:40  13   shared in the e-mail?

14:40  14   **A.**   No.

14:40  15   **Q.**   Did you have authorization from Qorvo to share this

14:40  16   information with any Akoustis employees?

14:41  17   **A.**   I don't remember that.

14:41  18   **Q.**   Did anyone say this should not be shared?

14:41  19   **A.**   I don't remember.

14:41  20   **Q.**   Did anyone say this should be deleted?

14:41  21   **A.**   I don't remember.

14:41  22   **Q.**   If you could look at the bottom of a Page 2 bearing

14:41  23   Bates number AKTS_00118856, there is a green box at the

14:41  24   bottom.  It then says, ███████████████████████

       25   ███████████████████████

*Kwon – Deposition Designation*

14:41  1          Do you see that?

14:41  2     **A.**    Yes.

14:41  3     **Q.**    Is this formula Qorvo confidential information?

14:41  4     **A.**    I don't know.  I don't remember.

14:41  5     **Q.**    Did Akoustis incorporate this formula in the trimming

14:41  6     operations?

14:41  7     **A.**    I don't remember.

14:41  8     **Q.**    Did you access any document to create this

14:41  9     presentation -- the boxes?

14:41  10    **A.**    I don't remember.

14:42  11    **Q.**    Dr. Kwon, I've just handed you a document marked as

14:42  12    652.

14:42  13          Do you recognize Exhibit Number 652?

14:42  14    **A.**    Yeah.

14:42  15    **Q.**    Is this an e-mail from Dr. Vetury to JB Kwon?  Is

14:42  16    that correct?

14:42  17    **A.**    Yeah.

14:42  18    **Q.**    And dated 2017, July 28th, Bates stamped -- time

14:42  19    stamped 2:00 and three minutes; is that correct?

14:42  20    **A.**    Yeah.

14:42  21    **Q.**    And this is Dr. Vetury's response to your prior

14:42  22    e-mail previously mark as Exhibit Number 452 attaching the

14:42  23    Exhibit Number 453?

14:42  24    **A.**    Okay.

14:42  25    **Q.**    On the e-mail it says, "Thanks, JB.  This is

14:42  1   helpful"; is that correct?

14:42  2   **A.**   Yeah.

14:43  3   **Q.**   Dr. Kwon, I've just handed you exhibits previously

14:43  4   marked as 420 and 421.

14:43  5        If you could flip to 420, Exhibit Number 420, please.

14:43  6   You can put that aside.

14:43  7        If you can refer to the e-mail at the top.  This is

14:43  8   an e-mail from you to Ms. Winters; is that correct?

14:43  9   **A.**   Yes.

14:43  10  **Q.**   And it is dated August 16, 2017, time stamped

14:43  11  4:56 p.m.; is that correct?

14:43  12  **A.**   Yeah.

14:43  13  **Q.**   Below in the content you say, "The enclosed shows";

14:43  14  is that correct?

14:43  15  **A.**   Yeah.

14:43  16  **Q.**   "Qorvo" means "Qorvo, Inc."?

14:43  17  **A.**   Yeah.

14:43  18  **Q.**   What does "SiN trimming" mean?

14:43  19  **A.**   Silicon nitride trim.  I -- I don't remember that.  I

14:43  20  already answered that.  I don't remember.

14:43  21  **Q.**   Did you have authorization from Qorvo to share

14:43  22  silicon -- Qorvo silicon nitride trimming methods?

14:43  23  **A.**   I don't remember.

14:43  24  **Q.**   Does Ms. Winters say this should not be shared?

14:44  25  **A.**   I don't remember.

*Kwon – Deposition Designation*

14:44  1    **Q.**   Does Ms. Winters say this should be deleted?

14:44  2    **A.**   I don't remember that.

14:44  3    **Q.**   This was within less than a month you were hired at

14:44  4    Akoustis; is that correct?

14:44  5    **A.**   One month?  Around one month, yeah, one month.

14:44  6    **Q.**   Did you learn how Qorvo used sensitivity data when

14:44  7    you worked at Qorvo?

14:44  8    **A.**   I don't remember that.

14:44  9    **Q.**   Did Akoustis incorporate Qorvo ███████████

14:44  10   ████████████████████████?

14:44  11   **A.**   I don't remember that.

14:44  12   **Q.**   How does Qorvo perform trimming on a BAW filter?

14:44  13   **A.**   I don't remember that.

14:44  14   **Q.**   Have you ever performed trimming on a Qorvo BAW

14:44  15   filter product when you worked at Qorvo?

14:44  16   **A.**   Yes.

14:45  17   **Q.**   Could you please explain, from the beginning to the

14:45  18   end, how you performed trimming on a Qorvo BAW filter

14:45  19   product?

14:45  20   **A.**   As I just said, I don't remember in detail.

14:45  21   **Q.**   Do you recall any Qorvo BAW filter product you

14:45  22   performed trimming on?

14:45  23   **A.**   No.

14:45  24   **Q.**   Dr. Kwon I've just handed you two documents premarked

14:45  25   as Exhibit Number 435 and 436.

14:45    1        If you could please turn to Exhibit Number 435.  Is

14:45    2    this an e-mail from you to Ms. Winters and Mr. Fallon?

14:45    3    **A.**    Yes.

14:45    4    **Q.**    The title of the e-mail is New Trim Tool Evaluation

14:45    5    Plan?

14:45    6    **A.**    Yes.

14:45    7    **Q.**    And it was sent on 2017, October 25th?

14:45    8    **A.**    Yes.

14:45    9    **Q.**    And below in the content of the document, it says,

14:45   10    "Hi, Mary, Ken.  The enclosed is new trim tool evaluation

14:46   11    PPT"?

14:46   12    **A.**    Yeah.

14:46   13    **Q.**    If you could flip to the first page of the document

14:46   14    of the exhibit number bearing Bates Numbers AKTS_00037312.

14:46   15    What is the title of the document?

14:46   16    **A.**    Trim System Evaluation Plan.

14:46   17    **Q.**    Could you please read what is below?

14:46   18    **A.**    "J.B. Kwon."

14:46   19    **Q.**    How many years of experience in trimming do you have?

14:46   20    **A.**    Around ten years.

14:46   21    **Q.**    In your current position at Northrop, do you work in

14:46   22    trimming?

14:46   23    **A.**    I cannot say anything about Northrop Grumman.

14:46   24    **Q.**    Understood.

14:46   25    **A.**    This is confidential.

*Kwon — Deposition Designation*

| | | |
|---|---|---|
| 14:46 | 1 | **Q.**   Could you please look at Exhibit Number 4 -- 437.  Is |
| 14:46 | 2 | this an e-mail to you to Ms. Winters and Mr. Fallon? |
| 14:47 | 3 | **A.**   Yes. |
| 14:47 | 4 | **Q.**   On Exhibit Number 438, if you could please flip to |
| 14:47 | 5 | Page 3 of the document.  Page 3 of the document, it bears |
| 14:47 | 6 | the Bates Number AKTS_00037341. |
| 14:47 | 7 | Could you please read the title of this presentation |
| 14:47 | 8 | for me? |
| 14:47 | 9 | **A.**   Qorvo Trim Process Flow. |
| 14:47 | 10 | **Q.**   Did you reference any document bearing a Qorvo label |
| 14:47 | 11 | to create this flow? |
| 14:47 | 12 | **A.**   I do not recall that.  I do not remember that. |
| 14:47 | 13 | **Q.**   Did you have an authorization from Qorvo to share |
| 14:47 | 14 | this information with Akoustis employees? |
| 14:47 | 15 | **A.**   I do not recall that. |
| 14:47 | 16 | **Q.**   Dr. Kwon, I've just handed you two documents |
| 14:47 | 17 | premarked as 661 and 662.  I'll identify -- could you |
| 14:47 | 18 | please look at Exhibit Number 661? |
| 14:48 | 19 | Is this an e-mail from Dr. Vetury to you? |
| 14:48 | 20 | **A.**   Yes. |
| 14:48 | 21 | **Q.**   Dated October 27, 2017? |
| 14:48 | 22 | **A.**   Yes. |
| 14:48 | 23 | **Q.**   Subject line says "Slides"; is that correct? |
| 14:48 | 24 | **A.**   Yes. |
| 14:48 | 25 | **Q.**   Below he says, "Hi JB, can you send the slides from |

*Kwon – Deposition Designation*

14:48  1  yesterday meeting"; is that correct?

14:48  2  **A.**   Yeah.

14:48  3  **Q.**   E-mail above, is this an e-mail from you to

14:48  4  Dr. Vetury?

14:48  5  **A.**   Yes.

14:48  6  **Q.**   Dated the same date 2017, October 27, sent five hours

14:48  7  thereafter, approximately?

14:48  8  **A.**   Yes.

14:48  9  **Q.**   This is a response to Dr. Vetury's e-mail?

14:48  10  **A.**   Yes.

14:48  11  **Q.**   And you write, "Hello, Rama, here we go."

14:48  12      Is that correct?

14:48  13  **A.**   Yes.

14:48  14  **Q.**   And you provide an attachment that was produced to us

14:48  15  as Exhibit Number 662.

14:48  16  **A.**   Okay.

14:49  17  **Q.**   Could you please return to the Exhibit Number 438,

14:49  18  slide Number 3, Page AKTS_00037341.

14:49  19  **A.**   Okay.

14:49  20  **Q.**   This slide reflects Qorvo's trim process flow?

14:49  21  **A.**   Qorvo trim process flow.  Yes.

14:49  22  **Q.**   Could you please turn to Exhibit Number 662.

14:49  23      Exhibit 662 is the trim work center attachment to

14:49  24  your e-mail to Dr. Vetury?

14:49  25  **A.**   Yes.

14:49  1    **Q.**  Could you put Exhibit 662 side by side with the

14:50  2    Exhibit 438?

14:50  3    **A.**  Yeah.

14:50  4    **Q.**  Please turn to Page 3 of Exhibit 438, Bates numbered

14:50  5    AKTS_00037341.

14:50  6        For the Exhibit 662, please turn to Page 3, with the

14:50  7    Bates stamp AKTS_00476749.

14:50  8        Exhibit 438, the top of the presentation reads "Qorvo

14:50  9    Trim Process Flow."  Is that correct?

14:50  10   **A.**  Yes.

14:50  11   **Q.**  On the Exhibit 662, it says, "Standard industrial

14:50  12   trim process flow."  Is that correct?

14:50  13   **A.**  Yes.

14:51  14   **Q.**  Why did you delete the reference to Qorvo?

14:51  15   **A.**  I don't remember that.

14:51  16   **Q.**  Why did you add the black boxes?

14:51  17   **A.**  I do not recall that.

14:51  18   **Q.**  Exhibit 438, the top of the presentation reads "Freq

14:51  19   Trim Comparison Qorvo v. Akoustis."  Is that correct?

14:51  20   **A.**  What is the exhibit number?

14:51  21   **Q.**  Exhibit Number 4 --

14:51  22   **A.**  438?

14:51  23   **Q.**  Yes.

14:51  24   **A.**  438.  Yes, right.

14:51  25   **Q.**  Okay.  Exhibit Number 662, on the top of it, it says

14:51  1    "Freq Trim Comparison Q vs. Akoustis"?

14:51  2    **A.**    Yes.

14:51  3    **Q.**    And you changed the wording from Qorvo to Q?

14:51  4    **A.**    I don't remember that.

14:51  5    **Q.**    Why did you replace Qorvo with Q?

14:51  6    **A.**    I have no idea.  I don't remember that.

14:51  7    **Q.**    Did you change Qorvo to Q to make it less obvious

14:51  8    that you were disclosing confidential Qorvo information?

14:52  9    **A.**    I do not remember that.

14:52  10        (Playing of video deposition concludes.)

14:52  11            **THE COURT:**  That concludes that deposition.

14:52  12    And who will the next witness be?  There are a couple of

14:52  13    exhibits that may have been added at that time.  Let me

14:52  14    get the number for sure.

14:52  15            **MR. MASTERS:**  I have ten exhibits, Your Honor,

14:52  16    to be marked.

14:52  17            **THE COURT:**  Right.  So that would give us

14:52  18    exhibits through 217.

14:52  19            (Trial Exhibit Nos. 207, 208, 209, 210, 211,

14:52  20    212, 213, 214, 215, 216 and 217 were admitted into

14:52  21    evidence.)

14:52  22            **MR. MASTERS:**  May I approach?

14:52  23            **THE COURT:**  Yes, you may.

14:53  24            **MR. MASTERS:**  Plaintiffs call Dr. Shanfield.

14:53  25            **THE COURT:**  Yes, sir.

*Shanfield - Direct*

14:53  1          THE CLERK:  Please state and spell your name

14:53  2    for the record.

14:53  3          THE WITNESS:  My name is Stanley Shanfield,

14:53  4    S-T-A-N-L-E-Y S-H-A-N-F-I-E-L-D.

14:53  5      STANLEY SHANFIELD, having been called as a witness,

14:53  6    being first duly sworn under oath or affirmed, testified

14:53  7    as follows:

14:53  8          THE CLERK:  Thank you.  Please be seated.

14:53  9

14:53  10                    DIRECT EXAMINATION

14:53  11   **BY MR. DeFOSSE:**

14:54  12   **Q.**   Dr. Shanfield, could you please introduce yourself to

14:54  13   the jury?

14:54  14   **A.**   Yes.  I'm Stan Shanfield, as you heard.

14:54  15   **Q.**   At high level, why are you here?

14:54  16   **A.**   I've been asked to provide some objective opinions on

14:54  17   the technical trade secrets that are being discussed in

14:54  18   this case.

14:54  19   **Q.**   Dr. Shanfield, before we discuss your opinions, I'd

14:54  20   like to talk about your background.

14:54  21   **A.**   Sure.

14:54  22          **MR. DeFOSSE:**  If we could pull up PDX-6.2,

14:54  23   please.

14:54  24   **BY MR. DeFOSSE:**

14:54  25   **Q.**   Is that's your picture?  Is that right?

14:54  1   **A.**   Yeah.

14:54  2   **Q.**   Looks like the picture of me on my website, actually.

14:54  3        Can you tell the jury where you went to school?

14:54  4   **A.**   Yeah.  I got my bachelor's degree at the University

14:54  5   of California Irvine in Physics.  And then I decided to go

14:55  6   to the East Coast and went to MIT, again in physics.  And

14:55  7   did my thesis there and got a PhD.

14:55  8   **Q.**   What was the focus of your thesis?

14:55  9   **A.**   It was solid state physics.  It was a high magnetic

14:55  10  field, a super conductor.

14:55  11  **Q.**   Does the subject matter you studied to receive your

14:55  12  PhD relate to the semiconductor industry?

14:55  13  **A.**   Yes, pretty directly.

14:55  14  **Q.**   Have you heard of the term "radio frequency" or RF?

14:55  15  **A.**   Yes.

14:55  16  **Q.**   What is RF technology?

14:55  17  **A.**   RF or radio frequency means the waves that are

14:55  18  carried in the air that you use when you are receiving

14:55  19  somebody's voice on your phone, for instance, or when you

14:55  20  are listening to a radio.

14:55  21  **Q.**   Do BAW filters use RF technology?

14:56  22  **A.**   Yes.

14:56  23  **Q.**   Have you taught any classes on RF technology,

14:56  24  including in RF filters?

14:56  25  **A.**   Yes.  Actually, probably made some money in grad

*Shanfield - Direct*

14:56  1    school.  I taught a course.  And then afterwards, I taught

14:56  2    courses in RF circuit design, and RF devices.

14:56  3    **Q.**    Have you written any papers related to RF technology?

14:56  4    **A.**    Yes.

14:56  5    **Q.**    Have you received any patents related to RF filter or

14:56  6    resonator technology?

14:56  7    **A.**    Yes, I have.

14:56  8    **Q.**    In addition to your educational and academic

14:56  9    background, do you have any industry experience related to

14:56  10   RF technology?

14:56  11   **A.**    Yes, quite a bit.

14:56  12   **Q.**    Could you tell us little bit about that?

14:56  13   **A.**    Yeah.  Well, when I left MIT, I started at Raytheon

14:56  14   Research Division in Massachusetts, and there I was able

14:56  15   to get some hands-on experience with building

14:56  16   semiconductor devices.  And I was interested in bulk

14:57  17   acoustic wave resonators, among other things.

14:57  18        I actually, over a period of several years, was able

14:57  19   to build bulk acoustic wave resonators, as the kind that

14:57  20   are being discussed here.  And Raytheon was interested in

14:57  21   using them for radar applications.

14:57  22        And then I eventually, at Raytheon, ended up going up

14:57  23   the management chain to the point where I was laboratory

14:57  24   manager.  Nevertheless, kept my hands in technical work

14:57  25   and characterizing the radio frequency devices that we

made in the laboratory.

And then I wanted to join the manufacturing group that was just getting started -- Raytheon was starting a commercial electronics facility in Andover, Massachusetts. So I switched over to manufacturing. It was not really a useful experience because the manufacturing plant was a semiconductor plant. It made all kinds of devices and -- like BAW filters. But, in particular, it ran 24/7 it was about 300 people who were employed there just running the fab.

Eventually I worked my way up to director of that facility. I got a very good taste of what it was like to sell components of the -- like BAW filters all over the world and how demanding it was to generate millions -- tens of millions of parts per month and do that in a way that is consistent, that you got the price for manufacturing them long enough. So that was really an eye-opener. But it was a tiring eye-opener.

So eventually I decided I wanted to start a company. I did it with some colleagues at -- from MIT. We started a company called Axsun. And we raised money. The company built -- was an optical components company. What that means, this thing was a little box that attached a fiber-optic cable, the kind that you use when you get cable TV. And this thing analyzed what was on the cable,

14:59   1   but it was small and cheap, and it used MEMS technology to

14:59   2   do the analysis.  So the thing you heard a little bit

14:59   3   about, micro electrical mechanical systems.  And I was the

14:59   4   inventor of the MEMS structure, along with a couple other

14:59   5   colleagues.  And I set up the fab for producing these,

14:59   6   that required a lot of the kinds of things you need to

15:00   7   produce BAW filters as well.

15:00   8        And we eventually sold the company.  I had concluded,

15:00   9   at that point, that I was more interested in technology

15:00   10  and science than business and running a business.  There's

15:00   11  a lot to that.  And I, through a colleague, joined Draper

15:00   12  Laboratories in Cambridge, Massachusetts.  It used to be

15:00   13  part of MIT.  And, of course, I knew some people there.

15:00   14  And at Draper, I was able to get back into putting my

15:00   15  hands on semiconductor devices, including BAW filters and

15:00   16  building systems out of BAW filters, and lots of little

15:00   17  micro miniature devices that go into spacecraft was a big

15:00   18  area for us, where you build these micro satellites, that

15:00   19  are kind of tiny little satellites that you launch them by

15:01   20  the hundreds from a rocket, and each one of them has to

15:01   21  have a transmit and receive capability and lots of filters

15:01   22  in them, among other things.

15:01   23       And all of that was fascinating and is fascinating to

15:01   24  me.  But it kept me with a hands-on approach to the

15:01   25  electronics that go into that, which is quite

15:01  1  sophisticated.

15:01  2      So I probably over-answered your question, but...

15:01  3  **Q.**  I let you go there.  So just backfilling a little

15:01  4  bit.  How many years were you at Raytheon?

15:01  5  **A.**  Eighteen years.

15:01  6  **Q.**  How long were you at Axsun until the company was

15:01  7  sold?

15:01  8  **A.**  That was about four years, I think.

15:01  9  **Q.**  And how long have you been at Draper Labs?

15:01  10  **A.**  Twenty-one years.

15:01  11  **Q.**  Okay.  And just -- I can't remember if you mentioned

15:01  12  your position at Draper Labs.

15:01  13  **A.**  Yeah.  I was division -- at one point I was a

15:01  14  division manager.  I have been a technical director.  In

15:01  15  fact, I am a technical director.  I'm a distinguished

15:01  16  member of technical staff, so I have some privileges of

15:02  17  being kind of a scientist at large.  So that's my role

15:02  18  right now.

15:02  19      **MR. DeFOSSE:**  Your Honor, we would like to

15:02  20  offer Dr. Shanfield as an expert in the semiconductor

15:02  21  industry and RF technology, including BAW filters.

15:02  22      **THE COURT:**  Any voir dire?

15:02  23      **MR. LEMIEUX:**  No objection, Your Honor.

15:02  24      **THE COURT:**  He is accepted as an expert in the

15:02  25  areas designated, including expert in semiconductor

15:02  1    industry and RF technology including filters.

15:02  2             **MR. DeFOSSE:**  Thank you, Your Honor.

15:02  3    **BY MR. DeFOSSE:**

15:02  4    **Q.**   Dr. Shanfield, can you explain for the jury how your

15:02  5    background and experience is relevant to the analysis that

15:02  6    you performed in this case?

15:02  7    **A.**   Sure.  Well, I found it was relevant in a couple of

15:02  8    ways.  The obvious one was that I was familiar with the

15:02  9    technology and it wasn't mysterious at all to me.  I've

15:02  10   built these devices before.  I knew what was involved.  I

15:02  11   know how fabs work and how RF measurements are made and so

15:02  12   on.

15:03  13            The other piece of it is because I helped start a

15:03  14   start-up company, I had a good picture of what it was like

15:03  15   to raise money and the pressures of a small group of

15:03  16   people trying to deliver a product.  So the story of

15:03  17   Akoustis was also familiar to me.

15:03  18   **Q.**   Dr. Shanfield, I'd just like to run through a few

15:03  19   areas of -- and find out if you have experience with

15:03  20   those.

15:03  21            I think you said you performed research and

15:03  22   development on BAW filters; is that right?

15:03  23   **A.**   Yes.

15:03  24   **Q.**   Do you have experience in market analysis?

15:03  25   **A.**   I do.  When I ran the semiconductor fab, we did that

*Shanfield - Direct*

15:03  1    all the time.  We are were always analyzing and changing

15:03  2    our analysis and adjusting it following a process for

15:03  3    doing that.

15:03  4    **Q.**  Do you have experience in developing business plans

15:03  5    in the semiconductor industry?

15:03  6    **A.**  Oh, yeah.  The business plan that we developed for

15:03  7    the start-up company, that was a real -- another slog to

15:04  8    get it right and to get it to -- get me a -- really point

15:04  9    the company in the right direction took a lot of work.

15:04  10   **Q.**  So we've heard a lot throughout this case about

15:04  11   trimming.  Do you have any experience with trimming?

15:04  12   **A.**  Yes, I do.  Both, ion beam trimming at the time.

15:04  13        (Court reporter clarification.)

15:04  14        **THE WITNESS:**  Ion beam trimming and plasma

15:04  15   trimming like Dr. Kwon was talking about.  So I've done

15:04  16   that and -- over several years.

15:04  17   **Q.**  What about testing, product testing?

15:04  18   **A.**  Yes.  That is another involved area which I've gotten

15:04  19   my hands into, maybe some electrical engineers didn't want

15:04  20   me to, but I wanted to make sure I knew how that worked as

15:04  21   well.  So I've done RF testing over many years and gotten

15:04  22   pretty good at it.

15:04  23   **Q.**  And what about customer engagement?

15:04  24   **A.**  Well, in running the semiconductor facility and

15:05  25   running a start-up company, that was a constant.  It's

15:05  1    something I didn't necessarily love that much, but I had

15:05  2    to do a lot of, and listen carefully and take in the

15:05  3    information that was given to me and us, and try and

15:05  4    convert that into a technology.

15:05  5    **Q.**    Now, you are being compensated for your time here

15:05  6    today, right?

15:05  7    **A.**    Yes.

15:05  8    **Q.**    And you've been compensated for the time you've spent

15:05  9    working on this case?

15:05  10   **A.**    Yeah, that's right.

15:05  11   **Q.**    What is your rate -- the rate at which you are being

15:05  12   compensated?

15:05  13   **A.**    About $385 an hour.

15:05  14   **Q.**    And has your rate remained constant during the time

15:05  15   of this case?

15:05  16   **A.**    Yes.

15:05  17   **Q.**    Are you being compensated in any way based on the

15:05  18   outcome of this case?

15:05  19   **A.**    No, not at all.

15:05  20   **Q.**    Now, I'd like to turn to PDX-6.3, please.

15:05  21        At a high level, what issues have you been asked to

15:06  22   address in this case, Dr. Shanfield?

15:06  23   **A.**    That's pretty easy to explain.  I was asked to

15:06  24   analyze trade secrets and look at them from a few

15:06  25   perspectives.

*Shanfield - Direct*

15:06   1          And, second, I was asked to look at the performance

15:06   2   aspects of a couple of patents and do computer simulations

15:06   3   on those.

15:06   4   **Q.**   So we're going to discuss the patent aspects of your

15:06   5   opinion kind of at the end of your testimony.  I want to

15:06   6   start with the trade secret aspects of your opinions.

15:06   7          If we could go to -- well, let me first ask you this,

15:06   8   how long have you been working on your trade secret

15:06   9   analysis in this case?

15:06  10   **A.**   It's a lot of work.  It's been more than a year, I'd

15:06  11   say.

15:06  12              **MR. DeFOSSE:**   Could we pull up PDX-6.5, please.

15:06  13   **BY MR. DeFOSSE:**

15:06  14   **Q.**   Can you provide an overview of the analysis that you

15:06  15   performed here with respect to the trade secrets?

15:06  16   **A.**   Sure.  Looks like this slide isn't quite correct.  It

15:06  17   really -- it turned out that there was more than 500,000

15:07  18   documents that were being discussed as being analyzed that

15:07  19   had been part of the discovery of Qorvo counsel had done

15:07  20   out of Akoustis.  That was an amount of documents that

15:07  21   would have overwhelmed me.  I have a full-time job.

15:07  22   Couldn't spend my time looking at those for the next three

15:07  23   years.

15:07  24          So we -- we cut down the number to -- it was around

15:07  25   10,000, I think, that we just picked out that were kind of

| | | |
|---|---|---|
| 15:07 | 1 | samples of the amount of documents that Akoustis had in |
| 15:07 | 2 | their possession. |
| 15:07 | 3 | And then there was also a lot of data, which I had to |
| 15:07 | 4 | look at. I didn't mention that. So the subset of about |
| 15:07 | 5 | 1400 were the ones that I identified as confidential. And |
| 15:07 | 6 | that took a lot of work. And what I had done more |
| 15:08 | 7 | recently is narrow this analysis to the point of making |
| 15:08 | 8 | eight groups, eight trade secret groups so that I can |
| 15:08 | 9 | explain things to other people in a way that's |
| 15:08 | 10 | comprehensible. So there was a lot of data, and I had to |
| 15:08 | 11 | kind of squeeze it into -- not categories, but groups to |
| 15:08 | 12 | try and talk about it easily. |
| 15:08 | 13 | **MR. DeFOSSE:** Could we go to PDX-6.6, please. |
| 15:08 | 14 | **BY MR. DeFOSSE:** |
| 15:08 | 15 | **Q.** Are these the eight trade secret groups that you |
| 15:08 | 16 | analyzed in this case? |
| 15:08 | 17 | **A.** Yes, these are them. |
| 15:08 | 18 | **MR. DeFOSSE:** And if we could go to PDX-6.7, |
| 15:08 | 19 | please. |
| 15:08 | 20 | **BY MR. DeFOSSE:** |
| 15:08 | 21 | **Q.** How many trade secrets are there in the eight groups? |
| 15:08 | 22 | **A.** There's a total of 46. And you can see how they are |
| 15:08 | 23 | divided up. So this is what it boiled down to. |
| 15:09 | 24 | **Q.** Okay. I would like to go through the trade secret |
| 15:09 | 25 | groups with you today, but, first, I'd kind of like to get |

15:09  1    a summary of your opinions.

15:09  2              **MR. DeFOSSE:**  So if we could go to PDX-6.8,

15:09  3    please.

15:09  4    **BY MR. DeFOSSE:**

15:09  5    **Q.**  Could you please provide the jury with a high-level

15:09  6    summary of the trade secret opinions you've formed in this

15:09  7    case?

15:09  8    **A.**  Yes.  And then I will later explain why I made these

15:09  9    conclusions.  But first of all, it was pretty obvious that

15:09  10   Akoustis had obtained this large amount of documents, but

15:09  11   confidential Qorvo documents.  They included specific

15:09  12   trade secrets that I could identify, and they were not

15:09  13   generally known.  And they were not readily ascertainable.

15:09  14   In other words, you couldn't publicly find out the

15:09  15   information that was in them.  They had significant

15:09  16   economic value.  I will give you some examples of that.

15:09  17   And they used the trade secrets in respect to both the

15:10  18   marketing analysis and the technical information and so

15:10  19   on.

15:10  20              And, finally, it became clear as I looked through the

15:10  21   documents, that they were aware that these were trade

15:10  22   secrets, and they should have been kept confidential.

15:10  23   **Q.**  Dr. Shanfield, now I would like to explore those

15:10  24   opinions in the context of each of the groups we've

15:10  25   identified.

*Shanfield - Direct*

15:10   1          **MR. DeFOSSE:**  Could we go to PDX-6.10, please.

15:10   2   **BY MR. DeFOSSE:**

15:10   3   **Q.**    Okay.  This is Trade Secret Group 1; is that right?

15:10   4   **A.**    Yes, that's right.

15:10   5   **Q.**    Just at a very high level, could you explain what

15:10   6   Trade Secret Group 1 is?

15:10   7   **A.**    This group, I think you've heard this before, this is

15:10   8   a group that relates to Qorvo's business plans for Wi-Fi

15:10   9   products.

15:10   10  **Q.**    And what role do business plans play in this

15:11   11  industry?

15:11   12  **A.**    They are really important.  I think, because of

15:11   13  technology and the market changes so fast, that you've

15:11   14  essentially got to be thinking ahead and marking out all

15:11   15  the parts of your business that you are looking to run,

15:11   16  and not just the technical, the, you know, how are you

15:11   17  going to convince customers, what your target customers

15:11   18  are going to be.  There's a huge amount of information in

15:11   19  a business plan.  It's really important.

15:11   20  **Q.**    Is there a particular business planning cycle that

15:11   21  applies to this industry?

15:11   22  **A.**    Yes.

15:11   23  **Q.**    And how would you characterize the duration of that

15:11   24  cycle?

15:11   25  **A.**    It's pretty fast.  I'd say that Qorvo was typical,

15:11  1    that you're turning it over like every quarter, changing

15:11  2    your plans as things around you change.

15:11  3    **Q.**   And does that require a lot of planning ahead?

15:11  4    **A.**   Oh, yeah.  You're always gathering data, rewriting

15:12  5    plans, and you'll see plans sometimes dramatically change.

15:12  6    **Q.**   Okay.

15:12  7              **MR. DeFOSSE:**  If we could look at PDX-6.11,

15:12  8    please.

15:12  9    **BY MR. DeFOSSE:**

15:12  10   **Q.**   How many Qorvo business plans did you analyze as part

15:12  11   of Trade Secret Group 1?

15:12  12   **A.**   So I picked out three, just to make it

15:12  13   comprehendible, and that -- these are the three.

15:12  14   **Q.**   And I'd like to go through each of those documents

15:12  15   and ask you to identify the specific trade secrets that

15:12  16   you found in those documents.  If we could start with

15:12  17   PDX-6.12.

15:12  18        Okay.  This is the IDP Market Segment Analysis Plan;

15:12  19   is that right?

15:12  20   **A.**   Yes, that's correct.

15:12  21   **Q.**   Okay.  What specific trade secrets did you identify

15:12  22   in this document?

15:12  23   **A.**   So IDP market, I learned, was the -- its

15:12  24   infrastructure and defense products, the market for Qorvo.

15:13  25   And the two items that I've highlighted -- or two trade

15:13  1   secrets that I put in red here are Qorvo's internal

15:13  2   assessment of the attractiveness of the Wi-Fi market, and

15:13  3   Qorvo's R&D priorities and investments.

15:13  4       And these were really elaborate plans, very

15:13  5   impressively done.  The market -- internal assessment of

15:13  6   the attractiveness of the market meant there were

15:13  7   salespeople that went out and evaluated what customers

15:13  8   wanted, whether the product that Qorvo offered or could

15:13  9   offer might fit their product; you know, if it's a Wi-Fi

15:13  10  router or it's a cell phone.

15:13  11      And that -- result of that was this kind of algorithm

15:13  12  that Qorvo had done -- developed over, you know, a couple

15:13  13  of decades of effort.  And that resulted in this chart you

15:13  14  see with the colors, where they rate red, yellow, green as

15:14  15  a -- you might think green is good.  Red is, there's a

15:14  16  problem there that might -- might need either correcting

15:14  17  or improvement.

15:14  18      The other slide is -- shows what they did in a

15:14  19  similar way with their research investment.  They didn't

15:14  20  just take money and say, you know, Guys, pick out what you

15:14  21  want to do your search on.  They figured out what pays off

15:14  22  the best.  And that was a lot of work as well because it

15:14  23  was a combination of deciding, Is this research really

15:14  24  going to fly to begin with?  And how much money should we

15:14  25  put into it?  What's the return on investment?

15:14  1    So it was very sophisticated and extensive analysis

15:14  2  in this particular business plan.

15:14  3  **Q.**   And I'll just note for the record that the business

15:14  4  plan shown here is Trial Exhibit 20; is that right?

15:14  5  **A.**   Yes, that's correct.

15:15  6    **MR. DeFOSSE:**  And, Your Honor, I should have

15:15  7  done this a few minutes ago.  But we are going to be, for

15:15  8  the rest of this examination until the patent part,

15:15  9  discussing the trade secrets.  So there's no one in the

15:15  10  gallery, right?

15:15  11    **THE COURT:**  If there's anyone present in the

15:15  12  courtroom who is not able to stay for this process, so not

15:15  13  involved in the actual litigation of the case, they need

15:15  14  to be excused at this time, as they have in the past.

15:15  15    **MR. DeFOSSE:**  Thank you, Your Honor.  If we

15:15  16  could go to PDX-6.3.

15:15  17    **THE COURT:**  This is, basically, under seal.

15:15  18  That's what's happened on each of these occasions.

15:15  19    **MR. DeFOSSE:**  Sure.  Yeah.  Yes, please,

15:15  20  Your Honor.  Thank you.

15:15  21    6.13, please.  There we go.

15:15  22  **BY MR. DeFOSSE:**

15:15  23  **Q.**   The next business plan that you analyzed was the CPE

15:15  24  Wi-Fi E Strategy Review; is that right?

15:15  25  **A.**   Yes, that's right.

*Shanfield - Direct*

15:15  1   **Q.**   And that's Trial Exhibit 21?

15:15  2   **A.**   Correct.

15:15  3   **Q.**   Okay.  What specific trade secrets did you identify

15:15  4   in this document?

15:15  5   **A.**   I'm showing these in red here.  1.3 is the target

15:15  6   customers and the projected serviceable market size.

15:16  7   Second, is the product roadmaps, and then, also, the gaps

15:16  8   in Qorvo's product offerings.

15:16  9           **MR. DeFOSSE:**  And if we could go to 6.14,

15:16  10  please.

15:16  11  **BY MR. DeFOSSE:**

15:16  12  **Q.**   This is the 5 gigahertz statement of work, that was

15:16  13  Trial Exhibit 22.

15:16  14       Is this the third business plan that you analyzed in

15:16  15  this trade secret group?

15:16  16  **A.**   Yes, it is.

15:16  17  **Q.**   And could you tell us what specific trade secrets you

15:16  18  identified in this plan?

15:16  19  **A.**   Yeah.  I wrote them here.  The projected cost and

15:16  20  revenue for the Qorvo's Wi-Fi BAW filters.  This is the

15:16  21  product area.  And, also, Qorvo's target product features,

15:16  22  like what kind of performance are they going to get, the

15:16  23  specifications they expect to get.

15:16  24  **Q.**   Now, the trade secrets that you identified in these,

15:16  25  has any fact witness addressed those at this trial?

*Shanfield - Direct*

15:16  1  **A.**   They have, yes.

15:16  2  **Q.**   And was that Mr. Testa?

15:16  3  **A.**   Yeah.  Mr. Testa had described these -- how this

15:17  4  analysis worked, and he given, I thought, a pretty good

15:17  5  description of how much work goes into these.  So I wanted

15:17  6  to remind you of that.

15:17  7        And it, then, also explained how the depth of these

15:17  8  investigations at Qorvo would do, maybe a quarterly rate,

15:17  9  or sometimes even monthly.  It was a lot of work and a lot

15:17  10  of investment in order to generate these documents.

15:17  11  **Q.**   Now, did you form any opinions as to whether the

15:17  12  trade secrets that you identified in Trade Secret Group 1

15:17  13  were generally known in the industry?

15:17  14  **A.**   Yes, I did.

15:17  15  **Q.**   Okay.  And what opinion did you form in that respect?

15:17  16  **A.**   It was clear to me that this was not known in the

15:17  17  industry, from my experience, in what's out there in the

15:17  18  journals and magazines versus what Qorvo had done.  There

15:17  19  was a clear difference.  So this was not something that

15:18  20  was known.

15:18  21  **Q.**   Was there anything on the face of the documents that

15:18  22  reinforced your opinion that these -- the information was

15:18  23  not generally --

15:18  24  **A.**   Absolutely.  There's -- you know, you've seen this

15:18  25  many times -- this logo that says "Confidential.  Qorvo

15:18  1    Internal Use Only," et cetera.  So they were clearly

15:18  2    marked.

15:18  3    **Q.**    Okay.  Did you also form an opinion as to the

15:18  4    economic value of the trade secrets in Group 1?

15:18  5    **A.**    Yes, I did.

15:18  6    **Q.**    And what value, in your opinion, do the trade secrets

15:18  7    in this group have?

15:18  8    **A.**    Well, it saves -- whoever gets ahold of this business

15:18  9    plan outside Qorvo, they save themselves a ton of work.

15:18  10   Because all the work that Qorvo did to produce this is now

15:18  11   being handed to them, and they didn't have to invest the

15:18  12   money or go traveling or all the other things you have to

15:18  13   do produce a plan like this.  So I'd say it's highly

15:18  14   useful and valuable.

15:19  15        **MR. DeFOSSE:**  Could we pull up PDX-6.15,

15:19  16   please.

15:19  17   **BY MR. DeFOSSE:**

15:19  18   **Q.**    Dr. Shanfield, could you explain to the jury what

15:19  19   this -- how this supports or what information you've

15:19  20   attempted to reflect here?

15:19  21   **A.**    Yeah.  I was summarizing the economic value of these

15:19  22   business plans.  You know -- if you know Qorvo's

15:19  23   confidential game plan, you know how to cut them off at

15:19  24   the pass.  If they're planning to go to a certain product,

15:19  25   or they think they have a gap in a certain product, that's

15:19  1    the place to look.  If they think there's an opportunity

15:19  2    that hasn't been addressed, they've done the work of

15:19  3    figuring out where that opportunity is.  You can go

15:19  4    address that before they do.

15:19  5        It also -- and so that's -- you're learning what

15:19  6    Qorvo, your competitor, is doing; and, second, you're

15:19  7    getting the benefit of their market analysis to figure out

15:20  8    where the payoff might be.  And both of those items are

15:20  9    high value.

15:20  10   **Q.**   Did you also form opinions in this case as to whether

15:20  11   Akoustis obtained and used the trade secrets in Group 1?

15:20  12   **A.**   Yes, I did.

15:20  13   **Q.**   Okay.  And what opinion did you reach?

15:20  14   **A.**   I had a way of approaching that question in each of

15:20  15   these groups you'll hear about, but in my -- my conclusion

15:20  16   was simple, that they had made use of it.  And there were

15:20  17   lots of evidence of that.

15:20  18   **Q.**   Okay.  And at a high level, how was it that Akoustis

15:20  19   used the trade secrets in Group 1?

15:20  20   **A.**   In that area, what I realized in looking through

15:20  21   their documents, was that Akoustis was going after, for

15:20  22   example, the 5 gigahertz market and Wi-Fi routers.  And

15:21  23   the -- I'm sorry, Qorvo was holding back on going after

15:21  24   the Wi-Fi market and 5 gigahertz.

15:21  25       And at the point where this information was received

15:21   1    by Akoustis, Qorvo was reconsidering that position and

15:21   2    deciding whether they wanted to take their resources and

15:21   3    point them at the 5 gigahertz Wi-Fi market.  They had lots

15:21   4    of other places they needed to invest as well.  And it's

15:21   5    the -- they had made the decision, Qorvo, that they were

15:21   6    going to start looking at 1five gigahertz again.  And they

15:21   7    had the capability of doing that fairly quickly once the

15:21   8    decision was made.

15:21   9        Well, Akoustis, in my opinion, took that information

15:21   10   and realized there was a real opportunity because Qorvo

15:21   11   had identified this gap.  And this is the perfect place

15:21   12   for Akoustis to go in there first.  And that's, indeed,

15:21   13   what they did.

15:22   14       So it was -- my view of it, in looking over the

15:22   15   timeline, I hope to make that point -- or show evidence of

15:22   16   that -- it was clear they had used that information, the

15:22   17   valuable business plan information in order to decide what

15:22   18   their business needed to do.

15:22   19   **Q.**   You mentioned the timeline, Dr. Shanfield.  Maybe we

15:22   20   can pull up 6.16.

15:22   21       Is this what you meant?

15:22   22   **A.**   Yes, exactly.

15:22   23   **Q.**   And at a high level, can you tell the jury what you

15:22   24   have done here?

15:22   25   **A.**   This is my methodology because I wanted to make sure

*Shanfield - Direct*

15:22  1    I could really prove there was, not only misappropriation,

15:22  2    but use.  And the best way, I think, of showing that, was

15:22  3    showing what happened with documents.  So this is a

15:22  4    timeline.  This is kind of the basis for my explanation.

15:22  5    **Q.**   Okay.  I'd like to walk through, at least quickly,

15:22  6    some of the dates on this.

15:22  7        And, first, I want to ask you:  Why does your

15:23  8    timeline start in August of 2016?

15:23  9    **A.**   Well, that that was the date that Rohan Houlden was

15:23  10   offered the position of VP of product engineering at

15:23  11   Akoustis.  He was a general manager at Qorvo.

15:23  12   **Q.**   Okay.

15:23  13          **MR. DeFOSSE:**  If we could go to PDX-6.17,

15:23  14   please.

15:23  15   **BY MR. DeFOSSE:**

15:23  16   **Q.**   Okay.  The next date on your timeline was

15:23  17   September 8th, 2016?

15:23  18   **A.**   Yes.

15:23  19   **Q.**   What's the relevance of that date, to your opinions?

15:23  20   **A.**   So this is before Houlden joined Akoustis.  So he's a

15:23  21   Qorvo employee.  And he sends Dave Aichele, who's the VP

15:23  22   of business development at Akoustis, this statement of

15:23  23   work, which was one of the business plans I just showed

15:23  24   you.

15:23  25        And he says, "This is the latest statement of work FL

*Shanfield - Direct*

15:23   1    is working on."  Florida.  And Florida is where the

15:23   2    development takes place.

15:23   3        So it came from Houlden's personal e-mail account,

15:23   4    not his business account.  And it went straight to the

15:24   5    Akoustis executive, Dave Aichele.

15:24   6    **Q.**    So this is Trial Exhibit 22, right?

15:24   7    **A.**    Yes, correct.

15:24   8    **Q.**    And to you, what's the significance?  Why does it

15:24   9    support your analysis that this plan came from

15:24   10   Mr. Houlden's personal account?

15:24   11   **A.**    Well, I know that colleagues of mine in the industry,

15:24   12   if you're working out in the open and transparent, you'd

15:24   13   use your company account to communicate.  If -- and the

15:24   14   fact that he wasn't using it meant there was something he

15:24   15   apparently didn't want to have exposed in using company

15:24   16   e-mail.  So he used his personal e-mail account.

15:24   17           **MR. DeFOSSE:**  If we could go to 6.18, please.

15:24   18   **BY MR. DeFOSSE:**

15:24   19   **Q.**    This was the next date on your timeline,

15:24   20   September 14th.  What happened on that day that was

15:24   21   relevant to you?

15:24   22   **A.**    Yeah.  I thought this was quite relevant.

15:25   23   Mr. Houlden, he was still an employee at Qorvo.  He gets a

15:25   24   thumb drive and fills it up with documents.  This is just

15:25   25   three of many more that he put on this thumb drive.

*Shanfield - Direct*

15:25  1   **Q.**   And are the three documents that you've listed on

15:25  2   PDX-6.18, the confidential business plans that you

15:25  3   included in Group 1?

15:25  4   **A.**   That's correct, yes.

15:25  5   **Q.**   Okay.  And in your experience in this industry, is it

15:25  6   routine practice for an employee to put such materials

15:25  7   onto a USB thumb drive?

15:25  8   **A.**   God, no.  You'd flag immediately if somebody saw you

15:25  9   do it.

15:25  10          **MR. DeFOSSE:**  If we go to 6.19, please.

15:25  11  **BY MR. DeFOSSE:**

15:25  12  **Q.**   The next date on your timeline is two days later, on

15:25  13  September 16.  Why is that date relevant to your analysis?

15:25  14  **A.**   Yeah.  This date was bothersome to me to see.

15:25  15  Mr. Houlden, this is his last day at Qorvo, signs a

15:26  16  severance agreement.  He makes ███████ in severance pay.

15:26  17  And his severance agreement is saying he's returning all

15:26  18  Qorvo's property to Qorvo.  Well, he just -- and two days

15:26  19  before, he had put the stuff on a thumb drive and was

15:26  20  intending to take it somewhere.  Well, you'll find out

15:26  21  where.

15:26  22  **Q.**   Is it common in this industry for employers to ask

15:26  23  employees to sign confidentiality obligations as they're

15:26  24  leaving the company?

15:26  25  **A.**   Yes.  Everybody in this business knows that everybody

*Shanfield - Direct*

15:26  1  involved is subject to one of these confidentiality

15:26  2  agreements, and that you can't take documents out of one

15:26  3  technology company and bring them to another.  That's --

15:26  4  without any signature at all, you would know you can't do

15:26  5  that.  This just highlights it.

15:26  6  **Q.**   And in your opinion, based on your more than 30 years

15:26  7  of experience in this industry, would the folks at

15:27  8  Akoustis have known that Mr. Houlden was not permitted to

15:27  9  bring Qorvo confidential information with him to the

15:27  10  company?

15:27  11  **A.**   They definitely would.  There was a number of former

15:27  12  Qorvo employees at Akoustis and they had signed such

15:27  13  agreements as well.

15:27  14  **Q.**   Okay.

15:27  15        **MR. DeFOSSE:**  If we could move to PDX-6.20.

15:27  16  **BY MR. DeFOSSE:**

15:27  17  **Q.**   This is September 21st, so a few days after

15:27  18  Mr. Houlden's last day of Qorvo; is that right?

15:27  19  **A.**   Yes.

15:27  20  **Q.**   What happened on this day that was relevant to your

15:27  21  analysis?

15:27  22  **A.**   So here is where Mr. Houlden now takes this thumb

15:27  23  drive full of data and documents, and transfers it into

15:27  24  Akoustis' system, computer system, and he puts it in a

15:27  25  folder that's called "Strategy."  So clearly, the business

15:27   1    plans, in his mind, were part of the strategy that he was

15:28   2    bringing to Akoustis.

15:28   3            **MR. DeFOSSE:**  If we could go to 6.21, please.

15:28   4    **BY MR. DeFOSSE:**

15:28   5    **Q.**    Okay.  You've included an October 9th, 2016 e-mail on

15:28   6    this slide, which was marked as Trial Exhibit 104.

15:28   7            What's the relevance of this e-mail to you?

15:28   8    **A.**    Yeah.  Well, here, now, Mr. Houlden is writing an

15:28   9    e-mail on Sunday that says he's realized there's going to

15:28   10   be a press release announcing that he's been hired.  And

15:28   11   he says, Well, hold on a minute, the press release looks

15:28   12   good, but I'm not sure of all the pros, but I've listed

15:28   13   some of the cons.

15:28   14       Well, the con is, he writes, "I think I'm clean, but

15:28   15   I want to delay as long as I can, any reason for Qorvo IT

15:28   16   to look at my computer and what I looked at on the

15:29   17   intranet."

15:29   18       "Intranet," meaning "Qorvo's intranet."

15:29   19   **Q.**    And Mr. Houlden references contracts in Outlook.

15:29   20       Do you see that?

15:29   21   **A.**    Yes.

15:29   22   **Q.**    Yeah.  And he sent this to Jeffrey Shealy, the CEO,

15:29   23   who we just saw testify a few moments ago, right?

15:29   24   **A.**    Yes.

15:29   25   **Q.**    What, based on your experience in this industry,

15:29    1    would this -- well, let me ask this:  Would it have been a

15:29    2    red flag to Jeff Shealy if this was sent to him?

15:29    3    **A.**    Absolutely.  That would be the point where the CEO,

15:29    4    Mr. Shealy, would be -- or Dr. Shealy, would be saying,

15:29    5    Wait a minute.  What are you talking about?  You can't do

15:29    6    that.

15:29    7    **Q.**    Okay.

15:29    8          **MR. DeFOSSE:**  If we could go to PDX-2.22.

15:29    9    **BY MR. DeFOSSE:**

15:29    10   **Q.**    What's relevant here?

15:29    11   **A.**    Well, this is the response from Dr. Shealy.  He says,

15:29    12   and he writes back to Rohan, "Got it."  In other words, he

15:30    13   gets what he's talking about.  "Let's discuss Monday."

15:30    14   And wants to discuss it in person.  Basically, he's fine

15:30    15   with it.

15:30    16   **Q.**    Okay.

15:30    17         **MR. DeFOSSE:**  PDX-6.23, please.

15:30    18   **BY MR. DeFOSSE:**

15:30    19   **Q.**    October 13th, 2016.  What's the relevance of that

15:30    20   date to your analysis?

15:30    21   **A.**    Yeah.  As I alluded to earlier, once this Qorvo

15:30    22   5 gigahertz statement of work was sent over to

15:30    23   David Aichele, the VP of business development at Akoustis,

15:30    24   he creates these slides and asks for a call to action with

15:30    25   a market priority of the 5 gigahertz Wi-Fi.  The very

*Shanfield - Direct*

15:30  1   thing that Qorvo had focused on in their business plan was

15:30  2   now appearing in Akoustis' business plan.

15:30  3          THE COURT:  We're going to take our 15-minute

15:31  4   break at this time.  Don't discuss the case among

15:31  5   yourselves.  Don't let anyone talk to you about it.  We'll

15:31  6   see you in 15 minutes.  Stay here just for a moment.

15:31  7          We will see you in 15 minutes.  Thanks very

15:31  8   much.

15:31  9      (The jury exits the courtroom at 3:31 p.m.).

15:31  10         THE COURT:  Let the witness step down.  Of

15:31  11  course, you can't talk about the testimony you've given.

15:31  12  What's coming up is a different thing, but best just to

15:31  13  avoid everybody.  It's always a good idea.  And we'll see

15:31  14  you in 13 minutes.

15:31  15             THE WITNESS:  Okay.  Thank you, Your Honor.

15:31  16             THE COURT:  Thank you.

15:31  17         The rest of you, be seated for just a moment.

15:32  18  I am just going to check on timing.  I really want defense

15:32  19  to be ready to go forward promptly.  So how much time do

15:32  20  we have?

15:32  21         MR. DeFOSSE:  I expect Dr. Shanfield will

15:32  22  likely take -- well, let's see.  We have two hours left in

15:32  23  our day today.  Are we going to 5:30 today, Your Honor?

15:32  24         THE COURT:  Right.  We'll go to 5:30.

15:32  25         So you think you will be wrapping up your

15:32    1    position of direct about what time?

15:32    2            **MR. DeFOSSE:**  It will be close, Your Honor, and

15:32    3    we have the patent issues that we have to do -- deal with

15:32    4    at the end.

15:32    5            And I also wanted to note, sorry, which is

15:32    6    while I have you -- we handed you up his trade secret

15:32    7    report.  He has a separate report for patent infringement

15:32    8    that I'll hand you up.

15:32    9            **THE COURT:**  Why don't you go ahead and do that.

15:32    10            We're fine.  I just wanted to know.  I was

15:32    11    really was trying to make sure that defense knows because

15:32    12    they need to know our schedule also so that everybody can

15:32    13    be very efficient.  That's the whole idea.

15:32    14            All right.  Let's give everybody a break, and

15:32    15    we'll see everybody in about 12 minutes now.  Thanks very

15:32    16    much.

15:43    17         (Whereupon, a recess was taken.)

15:45    18            **THE COURT:**  You may be seated.  Ready to bring

15:45    19    the panel in?

15:45    20            **MR. DeFOSSE:**  May I approach?

15:45    21            **THE COURT:**  Yes.

15:45    22       (The jury enters the courtroom at 3:45 p.m.)

15:46    23            **THE COURT:**  Counsel may proceed.  We're all

15:46    24    set.

25

*Shanfield - Direct*

15:46  1   **BY MR. DeFOSSE:**

15:46  2   **Q.**   Dr. Shanfield, before our break we were looking at

15:46  3   Trial Exhibit 124, which was the Akoustis 5 gigahertz

15:46  4   presentation that Mr. Aichele had drafted; is that right?

15:46  5   **A.**   Yes, that's right.

15:46  6          **MR. DeFOSSE:**   And if we could go to PDX-6.24,

15:46  7   please.

15:46  8   **BY MR. DeFOSSE:**

15:46  9   **Q.**   Dr. Shanfield, this is Trial Exhibit 22 and Trial

15:46  10  Exhibit 124.  Was there any way that you knew that

15:47  11  Mr. Aichele had used the information he received from

15:47  12  Mr. Houlden?

15:47  13  **A.**   Yes, there was.

15:47  14  **Q.**   And what was that?

15:47  15  **A.**   Yeah.  Well, when I looked closely at the Akoustis

15:47  16  5 gigahertz plan, I noticed that there was some familiar

15:47  17  comparisons and numbers in that plan that had come from

15:47  18  Qorvo's business plan about the statement of work.

15:47  19      What I'm showing in the slide -- first of all.  If

15:47  20  you look at the square in the center there, it's showing

15:47  21  Qorvo was comparing their performance to a dielectric

15:47  22  resonator.  And they had these set of numbers that they

15:47  23  expected to achieve.  This is all part of what they were

15:47  24  planning.

15:48  25      In Akoustis' plan, they also decided to make the

*Shanfield - Direct*

15:48  1  comparison to a dielectric resonator, sure enough.  And

15:48  2  the same one --

15:48  3          COURT REPORTER:  Excuse me.  Can we just take a

15:48  4  quick break.

15:48  5          THE COURT:  Sure.

15:48  6      (Whereupon, a recess was taken.)

15:48  7

15:51  8          MR. DeFOSSE:  If we could move to PDX-6.25.

15:51  9  BY MR. DeFOSSE:

15:51  10  Q.   I believe you said that one of the issues you

15:51  11  analyzed in this case and formed opinions on is whether

15:51  12  Akoustis new or should have known that the Qorvo

15:51  13  confidential documents in Group 1 were -- they had no

15:51  14  right to have those documents; is that right?

15:51  15  A.   Yes, that's right.

15:51  16  Q.   And does the information shown here on PDX-6.25 have

15:51  17  any relationship to that opinion?

15:51  18  A.   It does.  I mean, first of all, again, anybody in

15:51  19  this industry knows they're subject to confidentiality

15:51  20  agreement.  But here it is, and it makes the statement of

15:51  21  not supplying any information about Qorvo outside of

15:51  22  Qorvo, and Mr. Houlden signed that.

15:51  23          MR. DeFOSSE:  If we could go to 6.26, please.

15:52  24  BY MR. DeFOSSE:

15:52  25  Q.   In your opinion, did Dr. Shealy and Mr. Aichele know

15:52 1    that Mr. Houlden had confidentiality obligations that

15:52 2    prohibited him from sharing Qorvo confidential

15:52 3    information?

15:52 4    **A.**   Yes.  Again, even if I wasn't showing this, it would

15:52 5    be understood by somebody seasoned in the business, like

15:52 6    Dr. Shealy or Dave Aichele -- they would know this is not

15:52 7    allowed.  And, of course, these confidentiality agreements

15:52 8    have formalized that understanding.

15:52 9    **Q.**   And in this case, did Dr. Shealy and Mr. Aichele also

15:52 10   sign the same confidentiality obligations with RFMD that

15:52 11   Mr. Houlden did?

15:52 12   **A.**   Yes.  Exactly.  RFMD that became Qorvo.

15:52 13   **Q.**   I'm going to move to the next trade secret group in a

15:52 14   minute, but first I wanted to pause.  The jury has heard a

15:52 15   lot about FBAR versus SMR resonators?

15:53 16   **A.**   Yes.

15:53 17   **Q.**   Are the trade secrets in Trade Secret Group 1

15:53 18   relevant to all BAW filters?

15:53 19   **A.**   Yes, of course.  I mean, the marketing information

15:53 20   that was -- that Qorvo had produced and the analysis all

15:53 21   applied whether they were FBAR or a surface mount -- a

15:53 22   solidly mounted resonator SMR.  So it was -- it had the

15:53 23   same benefit.

15:53 24   **Q.**   I think we heard from Dr. Shealy that one of the main

15:53 25   players in this market is Avago Broadcom, right?

*Shanfield - Direct*

15:53  1    **A.**   Yes, right.

15:53  2    **Q.**   Who has FBAR filters?

15:53  3    **A.**   Yes, they do.

15:53  4    **Q.**   Does Qorvo compete with Broadcom and Avago in the

15:53  5    market?

15:53  6    **A.**   Yes, they do.

15:53  7            **MR. DeFOSSE:**   If we could go to Slide PDX-6.28,

15:53  8    please.

15:53  9    **BY MR. DeFOSSE:**

15:53  10   **Q.**   I'd like to talk about Trade Secret Group 2 now.

15:54  11           Can you remind the group how many trade secrets are

15:54  12   in this group?

15:54  13   **A.**   There's a total of 16 here.

15:54  14   **Q.**   And just at a high level, what is the nature of the

15:54  15   trade secrets in Group 2.

15:54  16   **A.**   Group 2 was what I would consider the treasure chest

15:54  17   of BAW filter and resonator designs by Qorvo.

15:54  18   **Q.**   What do you mean by "treasure chest"?

15:54  19   **A.**   In other words, it would -- it would give you a

15:54  20   blueprint for how to make a BAW resonator that's as good

15:54  21   as ones Qorvo makes.

15:54  22   **Q.**   Now, I'd like to discuss the trade secrets in this

15:54  23   group.  If we could turn to PDX-6.29.

15:54  24           How many documents did you include in your analysis

15:54  25   of the trade secrets in Group 2?

15:54  1  **A.**   I picked out three.  I didn't want to overwhelm

15:54  2  everybody with all the documents.

15:54  3  **Q.**   And are the three documents that you picked out

15:55  4  reflected on PDX-6.29?

15:55  5  **A.**   Yes, they are.

15:55  6  **Q.**   And those were marked as Trial Exhibits 8, 9, and 10?

15:55  7  **A.**   Correct.

15:55  8  **Q.**   And was there any witness in this trial who addressed

15:55  9  these three documents?

15:55  10  **A.**   Yes, there was.

15:55  11       This was addressed by Dr. Aigner.

15:55  12            **MR. DeFOSSE:**  If we could go to PDX-6.30.

15:55  13  **BY MR. DeFOSSE:**

15:55  14  **Q.**   What specific trade secrets did you identify in this

15:55  15  document?

15:55  16  **A.**   So this took a little bit of study.  As I said, this

15:55  17  is confidential information, and I had to understand it

15:55  18  myself.  And what this is, is subtle effect that actually

15:55  19  has a big impact on the filter performs.  That thing

15:55  20  that's ███████████████████████████████████████

15:55  21  ██████████████████████████████████████████

15:56  22  ████████████████████████████████████, but

15:56  23  you'd never guess or know where to look if you didn't have

15:56  24  this kind of information in front of you.

15:56  25  **Q.**   Okay.  Just so the record is clear, the slide we're

*Shanfield - Direct*

15:56    1    looking at has a reproduction of Trial Exhibit 8 on it?

15:56    2    **A.**    That's correct.

15:56    3    **Q.**    Which is the polygons versus resonators presentation?

15:56    4    **A.**    Yes.

15:56    5    **Q.**    Does the trade secret information contained in

15:56    6    Qorvo's research into resonator shape apply only to a

15:56    7    specific shape of resonator?

15:56    8    **A.**    No, it does not.

15:56    9    **Q.**    Why is that?

15:56    10    **A.**    That's because the physics in the resonator stays the

15:56    11    same.  No matter how you shape the top electrode, ██████

15:56    12    ████████████████████████████████████████████████████

15:56    13    ████████████████████████████████████ and it

15:56    14    wouldn't be obvious.  It wasn't obvious to me until I read

15:56    15    this where to look, and what --

15:56    16    **Q.**    What do you mean by "where to look"?

15:56    17    **A.**    ████████████████████████████████████████████

15:56    18    ████ -- well, I won't even make you try and look at that.

15:56    19    ████████████████████████████████████████████████

15:57    20    ████████████████████████████████████████████████

15:57    21    ████████████████████████████

15:57    22    **Q.**    Okay.  All right.

15:57    23            **MR. DeFOSSE:**    And if we could go to PDX-6.31.

15:57    24    **BY MR. DeFOSSE:**

15:57    25    **Q.**    This is the second document in Trade Secret Group 2;

*Shanfield - Direct*

15:57  1    is that right?

15:57  2    **A.**   That's correct, yep.

15:57  3    **Q.**   And that's Trial Exhibit 9.

15:57  4         Could you identify the specific trade secrets that

15:57  5    you believed were disclosed in this document?

15:57  6    **A.**   Yes.  I've listed them.  They are product

15:57  7    specifications, and that includes specs that Qorvo is

15:57  8    attempting to reach with a new product.

15:57  9         Expected circuit layouts.  They are telling you how

15:57  10   to build this thing on a wafer.  The schematics,

15:57  11   simulations that -- what Qorvo is shooting for.  Filter

15:58  12   trimming parameters and analysis, which is an absolute

15:58  13   essential if you're going to produce these parts in a way

15:58  14   that's economic.  So knowing how to do that and what

15:58  15   parameters to pick, that's really the gating item in

15:58  16   producing these things economically.

15:58  17        Tile information.  They are -- in this tile, there's

15:58  18   not only the filters which you're learning about from

15:58  19   this, you can see the bottom right -- bottom left, I mean.

15:58  20   But there's test structure that go in there.  And the

15:58  21   details of those are revealed in this document.

15:58  22        Electromagnetic modeling assumptions, and that's

15:58  23   nontrivial as to how you do the electromagnetic modeling,

15:58  24   how you get it correct.  And then, finally, the simulation

15:58  25   results ███████████████████, as they call them.  It's

*Shanfield - Direct*

15:58  1    just the details of the circuits.  There's a lot of stuff

15:58  2    you have to learn, that Qorvo learned over the years, and

15:58  3    it was all, essentially, being revealed in these

15:59  4    documents.

15:59  5    **Q.**    Do the trade secrets that you've identified in the

15:59  6    EG5877 technical presentation apply to both FBAR style

15:59  7    filters and SMR style filters?

15:59  8    **A.**    Absolutely.

15:59  9    **Q.**    Why is that?

15:59  10   **A.**    That's because everything in here, all the

15:59  11   information in here is kind of work -- whether it's an SMR

15:59  12   or FBAR filter, for example.  The trimming, it's done the

15:59  13   same way, whether it's FBAR or SMR.

15:59  14        The electromagnetic modeling, you do it the same way

15:59  15   in either case, you know, a slight geometry difference.

15:59  16   The information about the tile that controls the process

15:59  17   that you used to make these, it's the same thing in both

15:59  18   devices.  So all of this applies.

15:59  19   **Q.**    And I think the jury has heard this already, but is

15:59  20   it fair to say that the basic difference between an SMR

16:00  21   and FBAR filter is FBAR has an air cavity and SMR has a

16:00  22   Bragg reflector?

16:00  23   **A.**    That's correct.

16:00  24   **Q.**    Do the air cavity in an FBAR filter and a Bragg

16:00  25   reflector in an SMR filter serve the same practical

*Shanfield - Direct*

16:00  1    function?

16:00  2    **A.**    Yes.  Exact same function, which is they isolate the

16:00  3    thing where all the action is, the resonator from the rest

16:00  4    of the system.  And whether it's an air cavity or a Bragg

16:00  5    reflector, it does the same thing.

16:00  6    **Q.**    And I should have asked you this about the last

16:00  7    exhibit.  If we could go back to PDX-6.30.

16:00  8          This is where we have the Qorvo's research into

16:00  9    resonator shape?

16:00  10   **A.**    Yes.

16:00  11   **Q.**    Is the value of this research dependent on whether

16:00  12   you're developing and FBAR or SMR resonator?

16:00  13   **A.**    No.  That's the point.  You have the same problem and

16:00  14   the same subtly in where you look, and what you look for,

16:01  15   whether it's SMR or FBAR.

16:01  16         **MR. DeFOSSE:**  So I'd now like to go to

16:01  17   PDX-6.32.

16:01  18   **BY MR. DeFOSSE:**

16:01  19   **Q.**    Okay.  You're showing here Trial Exhibit 10, the

16:01  20   Acoustic Technology Update presentation that Dr. Aigner

16:01  21   addressed.

16:01  22         Did you identify specific trade secrets in this

16:01  23   document?

16:01  24   **A.**    I did.  I identified nine of them.

16:01  25   **Q.**    Maybe we can look at those directly.

16:01  1              MR. DeFOSSE:  If we could go to PDX-6.33.

16:01  2  **BY MR. DeFOSSE:**

16:01  3  **Q.**  Can you tell the jury what trade secret you're

16:01  4  identifying here?

16:01  5  **A.**  So this one, it's what Qorvo called their innovation

16:01  6  vectors.  It's all the things that Qorvo is planning to do

16:01  7  to make their filters better for the next few years.

16:01  8  Every vector points to the thing they are going to do, and

16:01  9  they list it here.  They give details on it.  They give a

16:02  10  schedule.  That's, of course, going to be a valuable thing

16:02  11  for a competitor to have.

16:02  12              MR. DeFOSSE:  If we could look at 6.34.

16:02  13  **BY MR. DeFOSSE:**

16:02  14  **Q.**  You've listed two additional trade secrets.  Can you

16:02  15  explain those?

16:02  16  **A.**  Sure.  This is -- the S parameter measurements are

16:02  17  basically the measurements on filters.  And the details of

16:02  18  these measurements and simulations is really important to

16:02  19  understanding what it is Qorvo was going after on this

16:02  20  5 gigahertz product.

16:02  21      The second item, the product design details, how it's

16:02  22  laid out.  You can see -- I'm looking at the right-hand

16:02  23  bottom slide.  That shows how it's laid out and kind of a

16:02  24  snake-like pattern.  And then, also, how -- they've been

16:02  25  doing a three-dimensional simulation of this device and

| | | |
|---|---|---|
| 16:02 | 1 | all the parameters that they're shooting for are on it. |
| 16:02 | 2 | So it's giving instructions on, hey, this is the |
| 16:03 | 3 | technology we're going for in 5 gigahertz, and here's how |
| 16:03 | 4 | we do it.  Obviously useful. |
| 16:03 | 5 | **Q.**   And the acoustic technology presentation that we are |
| 16:03 | 6 | looking at is Trial Exhibit 10; is that right? |
| 16:03 | 7 | **A.**   That's correct. |
| 16:03 | 8 | **MR. DeFOSSE:**  If we go to PDX-6.35. |
| 16:03 | 9 | **BY MR. DeFOSSE:** |
| 16:03 | 10 | **Q.**   You're talking here about scandium doping strategies. |
| 16:03 | 11 | Did you identify any trade secrets in this document |
| 16:03 | 12 | related to those strategies? |
| 16:03 | 13 | **A.**   I did.  I had read about scandium out in the open |
| 16:03 | 14 | literature, but what Qorvo discovered is ████████████ |
| 16:03 | 15 | ██████████████████████████████ -- that's a metal |
| 16:03 | 16 | that you add to the resonator.  And you can get some |
| 16:03 | 17 | better characteristics of the resonator. |
| 16:03 | 18 | ██████████████████████████████ |
| 16:03 | 19 | ████████████████   █████████████ |
| 16:03 | 20 | ████████ |
| 16:03 | 21 | So Qorvo's discoveries here are reflected in what |
| 16:04 | 22 | they've learned. |
| 16:04 | 23 | **Q.**   Can you remind the jury why scandium doping is |
| 16:04 | 24 | relevant in this industry? |
| 16:04 | 25 | **A.**   Yes.  It's going to work for FBAR or SMR, first of |

16:04 1   all, and it's relevant because that's going to give you a

16:04 2   better performing filter.  So the relevancy and value.

16:04 3   It's -- you'd like to use that, and you want to know how.

16:04 4   **Q.**   Okay.

16:04 5          **MR. DeFOSSE:**  If we can go to 6.36, please.

16:04 6   **BY MR. DeFOSSE:**

16:04 7   **Q.**   You've identified here some trade secrets under Size

16:04 8   and Cost Reduction Strategies.  Could you please explain

16:04 9   those to the jury?

16:04 10   **A.**   Sure.  One thing that I think, if you're not in the

16:04 11   industry is hard to appreciate, the cost it takes to

16:04 12   process a single wafer stays the same no matter what you

16:04 13   put on that wafer.

16:04 14      So if you can get 10,000 die on a wafer rather than

16:05 15   5,000 die, then the cost to make those die is half.

16:05 16   Because the cost of the wafer stays the same.  And

16:05 17   everybody in the semiconductor industry knows this.  And

16:05 18   what's being talked about here is size reduction means

16:05 19   cost reduction in a dramatic way.  You can't avoid the

16:05 20   reduced cost.

16:05 21      And so this is Qorvo's approach to getting size

16:05 22   reduced.  They're showing this thing called a micro BAW on

16:05 23   the left.  And they are also talking about a co-resonant

16:05 24   filter design which allows you to stack the resonators.

16:05 25   There's a thing called a micro BAW that Qorvo had

*Shanfield - Direct*

16:05  1   developed as well.

16:05  2        All of these are focused on making it smaller.  Not

16:05  3   only to make it cheaper, but a company like Apple that is

16:05  4   using filters, they want it small.  They want it

16:05  5   disappearing, really, but tiny as possible.  So it's a

16:06  6   double win.

16:06  7             **MR. DeFOSSE:**  If we could go to 6.36, please.

16:06  8             Maybe it's 6.37.

16:06  9   **BY MR. DeFOSSE:**

16:06  10  **Q.**   Have you also identified trade secrets related to

16:06  11  temperature control strategies?

16:06  12  **A.**   Yes.  Two of them here.

16:06  13  **Q.**   Okay.  And can you just briefly identify those trade

16:06  14  secrets?

16:06  15  **A.**   Yeah.  This is something Qorvo discovered.  I didn't

16:06  16  know until I read about this, the kind of detail they

16:06  17  offer here.  But the self-heating effect of -- these

16:06  18  little teeny things get hot in your phone.  And if they

16:06  19  get hot, they might drift or they won't be as reliable.

16:06  20  All of that is something Qorvo not only realized, but

16:06  21  modeled and figured out what to do about it.  So this

16:06  22  shows some of the things they've done about it.

16:06  23  **Q.**   And what did they figure out to do about it?

16:06  24  **A.**   One of the things they did was they ended up ███████

16:06  25  ███████████████ on the left, this ████████████████████

16:07   1    ███████████   I don't know, you can try and explain it

16:07   2    mean.  ████████████████████████████████████

16:07   3    ████████████████

16:07   4    **Q.**   Now, we've gone through the trade secrets and Trade

16:07   5    Secret Group 2 out of the three documents.

16:07   6         And I'd like to ask you, now, about whether the

16:07   7    information that you went through is generally known in

16:07   8    the industry?

16:07   9    **A.**   Yeah.  No, it wasn't.  I mean, I could tell because

16:07   10   I'm up on the literature in the industry, and this was not

16:07   11   generally known at the time.  And in some cases, still not

16:07   12   known.

16:07   13   **Q.**   Was there anything about the documents that you

16:07   14   reviewed that indicated to you that this is information

16:07   15   that's not available, generally?

16:07   16   **A.**   Well, first of all, the fact that it had a

16:07   17   "Confidential" label on it indicated to me that it was

16:07   18   being kept from the public domain.  It's not published in

16:08   19   any literature.  So that is also an indication to me that

16:08   20   there's no discussion of this kind of -- these kinds of

16:08   21   affects.

16:08   22   **Q.**   Okay.  And did you form opinions of the value of the

16:08   23   information in Trade Secret Group 2?

16:08   24   **A.**   I did.

16:08   25   **Q.**   Okay.  And what are those opinions?

**A.** Well, I think all of these techniques in these trade
secrets were extremely valuable in that you can't compete
without having these winning characteristics in there.
And by using these documents, then, tell you how to do
that and what to do, that's worth gold, really, because if
you're able to deliver something that has these
characteristics, people are going to buy it and they're
not going to buy the other guys' system.

**Q.** I think we've heard testimony that Akoustis wasn't
even able to develop a functioning resonator as of 2016.

Do you recall that?

**A.** That's correct.

**Q.** What value does the trade secrets in Group 2 have for
a company that can't even get a resonator to work?

**A.** Yeah. That is an important point because at the
point where, as you heard in some of the videos, Akoustis
wasn't even getting a resonator to resonate properly. It
was a loss. That's the point where they were acquiring
this kind of information from Qorvo.

And then ten months later, they end up with sampling
a filter, not just resonators. They got the resonators
working and they built a filter all in ten months.

My experience, and having set up a fab, and a
start-up company, and used it -- set it up to deliver
product, it takes years to do that. And Qorvo's

16:09  1    experience, once it decides -- it may take a while to make

16:09  2    a decision about going after a product, but once it

16:10  3    decides, it's probably faster than a startup than getting

16:10  4    it done.

16:10  5        And the fact that Akoustis managed to do this feat of

16:10  6    magic in ten months, is a sign to me there had to have

16:10  7    been some lift somewhere that was -- it's unexplained,

16:10  8    otherwise.

16:10  9    **Q.**    Did you, in fact, analyze whether Akoustis obtained

16:10  10   and used Qorvo's trade secrets in Group 2?

16:10  11   **A.**    Yes, I did.

16:10  12   **Q.**    Okay.

16:10  13        **MR. DeFOSSE:**    Could we go to PDX-6.38.

16:10  14   **BY MR. DeFOSSE:**

16:10  15   **Q.**    Okay.  It looks like we have another timeline here?

16:10  16   **A.**    Yeah.  Again, it's my method.  I know it's a

16:10  17   difficult to look at, but it's my method for producing

16:10  18   evidence that shows not only was misappropriation taking

16:10  19   place, but the information was used.

16:10  20   **Q.**    Okay.  Maybe we can knock a number of these out at

16:10  21   once.

16:10  22        **MR. DeFOSSE:**    If we go to 6.39.

16:10  23   **BY MR. DeFOSSE:**

16:10  24   **Q.**    It looks like you've grouped together the first six

16:11  25   dates on the Trade Secret Group 2 timeline.

16:11  1    Can you explain why you did that?

16:11  2  **A.**   Yes.   This is my idea on the slide.  So I didn't bore

16:11  3  the jury too much.

16:11  4    And this is, basically, from September 14th to

16:11  5  October 13th.  Mr. Houlden copies these 5 gigahertz design

16:11  6  presentations, including the ones I've shown you, the

16:11  7  polygon and this EG5877.  He transfers them to Akoustis,

16:11  8  and Akoustis, then, begins developing 5 gigahertz filters.

16:11  9  **Q.**   And I think in Trade Secret Group 1, you had made

16:11  10  reference to Mr. Houlden putting files on a USB drive

16:11  11  two days before leaving Qorvo, and then uploading them at

16:11  12  Akoustis a couple of days after arriving at the company?

16:11  13  **A.**   Yes.  And a file folder called "Strategy."

16:11  14  **Q.**   Okay.  And did he take these two documents, the

16:11  15  polygons versus resonators, and the EG5877 presentation at

16:11  16  the same time?

16:11  17  **A.**   Yes, he did, along with some other documents.

16:12  18  **Q.**   Okay.  If -- and I'd like to talk about these two

16:12  19  documents for a minute, and we'll get to the Acoustic

16:12  20  Technology presentation a little later.

16:12  21    **MR. DeFOSSE:**   Could we go to 6.40, please.

16:12  22  **BY MR. DeFOSSE:**

16:12  23  **Q.**   Okay.  Dr. Shanfield, what happened after Mr. Houlden

16:12  24  brought the Qorvo confidential design documents to

16:12  25  Akoustis?

*Shanfield - Direct*

**A.**   Well, this is another incident that I'm summarizing here, that supported my opinion, that they got this lift. And that's that, after Mr. Houlden obtained these design documents for 5 gigahertz product, he went to Dr. Hodge -- who was an Akoustis engineer, our engineer -- and he -- in this dialogue here, he says that Roland Houlden had provided these Qorvo documents to him, and he wanted them to review them.

And so this was clearly -- I mean, not clearly, but in my opinion, Dr. Houlden -- I mean, Mr. Houlden had the intent that this 5 gigahertz information handed to Dr. Hodge was going to help accelerate his work.

**Q.**   Was there any significance, in your opinion, of giving 5 gigahertz information particularly to Dr. Hodge at Akoustis?

**A.**   Yes, because Dr. Hodge was the RF engineer who was assigned to produce the 5 gigahertz product.  So it was clear intent.

**Q.**   Okay.

          **MR. DeFOSSE:**   If we go to PDX-4.1, please.

**BY MR. DeFOSSE:**

**Q.**   What are you attempting to address here?

**A.**   Yeah.  I actually found a little strange that Mr. Houlden carried around this kind of knapsack, computer knapsack, that was filled with documents.  And Dr. Hodge

*Shanfield - Direct*

16:14  1    mentions that he had this laptop bag, and he carried it in

16:14  2    and out of work.  And he would pull documents out of it

16:14  3    that were Qorvo documents and give them to Dr. Hodge.

16:14  4         And it was like, you know, Christmastime, or -- I

16:14  5    don't know how to describe it.  It just seemed like an odd

16:14  6    way to carry around technical information.

16:14  7    **Q.**   Okay.

16:14  8         **MR. DeFOSSE:**   If we could go to PDX-6.42,

16:14  9    please.

16:14  10   **BY MR. DeFOSSE:**

16:14  11   **Q.**   We're now at August of 2017.  Why have you included

16:14  12   this date on your timeline?

16:14  13   **A.**   Yeah.  This is now having to do with the point that

16:14  14   Akoustis now obtains all this information about

16:14  15   5 gigahertz.  Fall of 2016, they didn't even have a

16:15  16   working resonator, never mind a filter.  And there's all

16:15  17   kinds of steps you have to go through to get from -- even

16:15  18   when you have a resonator working, to a filter.

16:15  19        And then ten months later in a start-up company, with

16:15  20   few engineers -- and I point out, as you heard in some of

16:15  21   the videos, these engineers were not familiar with

16:15  22   building BAW filters.  I can see that just listening to

16:15  23   them.  But they also admitted it, that they hadn't even --

16:15  24   any experience at all in making them.  And then ten months

16:15  25   later, the company's delivering samples of their

*Shanfield - Direct*

16:15  1  5 gigahertz filter.

16:15  2       So they moved from designing this resonator to

16:15  3  designing and fabbing it.  And you can imagine the number

16:15  4  of cycles you have to go through to figure out how to make

16:15  5  a resonator correctly, and then the number of cycles you

16:15  6  have to go through to make a filter correctly.

16:16  7       They did all this in ten months, is it's clearly

16:16  8  something different was going on than anything I've ever

16:16  9  experienced in the industry.

16:16  10  **Q.**   Okay.

16:16  11           **MR. DeFOSSE:**  If we could go to 6.43.

16:16  12  **BY MR. DeFOSSE:**

16:16  13  **Q.**   Did you also analyze, with Trade Secret Group 2,

16:16  14  whether Akoustis knew or should have known that the

16:16  15  documents that Mr. Houlden was handing out were

16:16  16  confidential?

16:16  17  **A.**   Yes.  Like you've heard before, my opinion, and I

16:16  18  think it would be of any engineer I work with, is that

16:16  19  everybody knows you keep company confidential material

16:16  20  confidential.  You don't spread it around.  You don't take

16:16  21  it to your next job.

16:16  22       And here, this is talking -- this is when Dr. Hodge

16:16  23  was being deposed.  He said -- he was asked:  What's your

16:16  24  reaction when Mr. Houlden, in his little laptop bag, pulls

16:17  25  out some documents from Qorvo and hands them over?  He

16:17  1   feels repulsion, is what he says.  And I can understand

16:17  2   that because that's the people I know.  They wouldn't take

16:17  3   it.  And it's -- Dr. Hodge felt the same way; he didn't

16:17  4   want to take it.

16:17  5         **MR. DeFOSSE:**  If we could go to 6.44, please.

16:17  6   **BY MR. DeFOSSE:**

16:17  7   **Q.**   I now want to shift gears to talking about that

16:17  8   Akoustis technology update presentation, which was offered

16:17  9   later in time.

16:17  10        I think this is the first date on your timeline

16:17  11   that's relevant to that document?

16:17  12   **A.**   Yes.

16:17  13   **Q.**   So we're in 2020 now.  What's going on at Akoustis at

16:17  14   this point in time?

16:17  15   **A.**   So like I said, in ten months they were delivering

16:17  16   samples of filters.  The filters' performance had -- was

16:17  17   not great, but was the only filter out there at the time

16:18  18   in 5 gigahertz.  And then they get -- note information

16:18  19   that it looked like Qorvo was -- had decided previously to

16:18  20   build a 5 gigahertz filter.  So Qorvo is now realizing

16:18  21   there's going to be competition, and they started seeking

16:18  22   ways of finding information, confidential information

16:18  23   about Qorvo's product.

16:18  24        So here, it's showing how Mr. Steven Li, who's the

16:18  25   Chinese country manager, China country manager, sends

16:18  1    Dave Aichele this attached file.  It's a spec that's

16:18  2    confidential and from Qorvo on one of the 5 gigahertz

16:18  3    products, the 5.2 gigahertz product, and here it is.

16:18  4    **Q.**    You've looked at the confidential spec that Mr. Li

16:18  5    sent to Mr. Aichele?

16:19  6    **A.**    Yes.

16:19  7    **Q.**    Did you have any observations about how the

16:19  8    performance of the prototypes at Qorvo compared to the

16:19  9    performance of the Akoustis filters that were in the

16:19  10   market?

16:19  11   **A.**    Yes.  It was pretty striking.

16:19  12   **Q.**    And striking in what way?

16:19  13   **A.**    It was clearly better performance both, what they

16:19  14   call, rejection outside the van, how much it keeps the

16:19  15   noise away, and also how much you lose the signal in the

16:19  16   band you want, that insertion, as they call it, that was

16:19  17   better.  So the Qorvo product was better in those, at

16:19  18   least in those ways.

16:19  19   **Q.**    And do you believe that would have been a cause for

16:19  20   concern?

16:19  21   **A.**    I would think so.  And my, you know, sense of this,

16:19  22   and putting myself in their position as a start-up company

16:19  23   is, they'd be panicked about it.  And they were seeking

16:19  24   anything they could find out.

16:19  25   **Q.**    Okay.

16:19    1          **MR. DeFOSSE:**  If we could go to PDX-6.45.

16:20    2          Okay.  Your Honor, may I approach?

16:20    3          **THE COURT:**  You may.

16:20    4    **BY MR. DeFOSSE:**

16:20    5    **Q.**   Dr. Shanfield, I've handed you what's marked for

16:20    6    identification as PTX-1005.  I think it's the same

16:20    7    document that you have here.

16:20    8          Have you considered this document as part of your

16:20    9    analysis?

16:20    10   **A.**   Yes, I did.

16:20    11   **Q.**   And is this an internal Akoustis e-mail exchange?

16:20    12   **A.**   Yes, that's exactly what it is.

16:20    13         **MR. DeFOSSE:**  Your Honor, Plaintiff would move

         14   for admission of PTX-1005.

16:20    15         **THE COURT:**  All right.  That's going to be

16:20    16   marked and received as 218.

16:20    17         (Trial Exhibit No. 218 was admitted into

16:20    18   evidence.)

16:20    19   **BY MR. DeFOSSE:**

16:20    20   **Q.**   Dr. Shanfield, at this time, in February, March of

16:21    21   2020, when Akoustis found out that Qorvo is now

16:21    22   prototyping products that have superior performance, what

16:21    23   happened next?

16:21    24   **A.**   Well, Mr. Houlden was looking for ways to find

16:21    25   information about Qorvo's product.  And he found a guy who

16:21  1    was a senior RF test engineer at Qorvo who was interested

16:21  2    in coming to Akoustis, and he wanted to meet with him.

16:21  3    And it turned out it was at a Panera.  It was my idea to

16:21  4    put the sign up there because -- I call it the "Panera

16:21  5    meeting," because they then have a discussion there.

16:21  6    **Q.**    Okay.

16:21  7            **MR. DeFOSSE:**    And if we could go to the slide

16:22  8    PDX-6.46.

16:22  9    **BY MR. DeFOSSE:**

16:22  10   **Q.**    The Panera meeting, according to your timeline, is

16:22  11   February 27th, 2020; is that right?

16:22  12   **A.**    That's right.

16:22  13   **Q.**    Okay.  So about a week later, what happened?

16:22  14   **A.**    Yeah.  So a week later, this file is downloaded by

16:22  15   Mr. Schmid, the RF engineer, while he was at Qorvo.  This

16:22  16   has this information that's being shown there.

16:22  17   **Q.**    Okay.  And that's the meta data in the middle of this

16:22  18   slide?

16:22  19   **A.**    That's correct.  That shows that it was downloaded.

16:22  20   **Q.**    So in about a week after he met with Mr. Houlden,

16:22  21   Mr. Schmid went back to Qorvo and obtained a copy of this

16:22  22   Akoustis technology presentation?

16:22  23   **A.**    That's correct.

16:22  24           **MR. DeFOSSE:**    Your Honor, may I approach?

16:22  25           **THE COURT:**    You may.

16:22   1          **MR. DeFOSSE:**  Okay.  Could we go to PDX-6.47,

16:23   2   please.

16:23   3   **BY MR. DeFOSSE:**

16:23   4   **Q.**   Now, Dr. Shanfield, I've handed you what's been

16:23   5   marked as PTX-1077.

16:23   6        Is this a document that you analyzed as part of your

16:23   7   analysis of Trade Secret Group 2?

16:23   8   **A.**   Yes, it was.

16:23   9   **Q.**   And is this an e-mail from Brian Schmitt, the Qorvo

16:23  10   engineer who we were just discussing?

16:23  11   **A.**   Yes, it is.

16:23  12          **MR. DeFOSSE:**  Your Honor, Plaintiffs would move

16:23  13   for the admission of PTX-1077.

16:23  14          **THE COURT:**  Marked and received as 219.

16:23  15          (Trial Exhibit No. 219 was admitted into

16:23  16   evidence.)

16:23  17   **BY MR. DeFOSSE:**

16:23  18   **Q.**   Dr. Shanfield, could you explain to the jury why you

16:23  19   found this document to be significant in your analysis?

16:23  20   **A.**   Yes.  I found it significant and a little amusing,

16:23  21   too.  He's talking about -- Mr. Schmitt now has taken the

16:23  22   job at Akoustis.  It turned out, though, that he was still

16:23  23   employed by Qorvo while he was working at Akoustis.  There

16:24  24   was some overlap there.  And he's talking about how he has

16:24  25   to return his stuff this coming Wednesday.  So he's now at

16:24  1   Akoustis and he's got this document with him.

16:24  2   **Q.**   And Mr. Schmitt is the employee from Qorvo who took

16:24  3   this document to Akoustis after meeting with Mr. Houlden

16:24  4   at Panera?

16:24  5   **A.**   Right.  And it seemed to me like that discussion they

16:24  6   had must have been, Hey, we could use this information.

16:24  7   And Mr. Schmitt ends up having it with him.

16:24  8   **Q.**   Okay.  Before we shift to Trade Secret Group 3, I

16:24  9   think we talked about this a little bit with some of the

16:24  10  trade secrets already, but I want to make sure that you

16:24  11  agree for all.

16:24  12      Is there any distinction between FBAR resonators and

16:24  13  SMR resonators with respect to the trade secrets in trade

16:24  14  Secret Group 2?

16:25  15  **A.**   No.  They're not.  I mean, the information that's

16:25  16  being revealed here would apply in both cases, that

16:25  17  circuit information, the product specifications, the

16:25  18  layout, all of that is not specific to SMR and would

16:25  19  apply.  And if we had time we could walk through it, and I

16:25  20  could show in detail how that's true.

16:25  21  **Q.**   Okay.  Dr. Shanfield, I'd like to go to Trade Secret

16:25  22  Group 3 now.

16:25  23          **MR. DeFOSSE:**   And if we could pull up PDX-6.49.

16:25  24  **BY MR. DeFOSSE:**

16:25  25  **Q.**   How many trade secrets have you identified in this

*Shanfield - Direct*

16:25  1    group?

16:25  2    **A.**   There's three here.

16:25  3    **Q.**   Okay.  And the first one, so to save reading that

16:25  4    long, long description, relates to the sensitivity factor

16:25  5    calculations?

16:25  6    **A.**   That's right.

16:25  7    **Q.**   Okay.  And the second one is ███████████████████

16:25  8    ██████?

16:25  9    **A.**   Yes.

16:25  10   **Q.**   And the third is ██████████████████████████; is

16:25  11   that right?

16:25  12   **A.**   Yes, that's correct.

16:25  13   **Q.**   Okay.

16:25  14          **MR. DeFOSSE:**   So I'd like you to, please, go to

16:26  15   6.51, PDX-6.51.

16:26  16   **BY MR. DeFOSSE:**

16:26  17   **Q.**   And can you just explain -- the jury's heard some of

16:26  18   this already, but could you remind them what is Trade

16:26  19   Secret 3.1?

16:26  20   **A.**   Yeah.  You've probably seen this document too many

16:26  21   times at this point, but this is the sensitivity

16:26  22   calculation of the fundamental sensitivity algorithm that

16:26  23   Qorvo used, and it was their secret sauce that allowed

16:26  24   them to economical production of these parts, these

16:26  25   filters.

16:26    1          **MR. DeFOSSE:**  If we could go to PDX-6.52.

16:26    2    **BY MR. DeFOSSE:**

16:26    3    **Q.**   Is this Trade Secret 3.2?

16:26    4    **A.**   That's correct.  And here, it's another algorithm.

16:26    5    It's got some assumptions in it.  It tells you exactly

16:26    6    what to do in this diagram.  And this was another one of

16:26    7    the items that was in the documents that was taken.

16:27    8          **MR. DeFOSSE:**  And if we could go to PDX-6.53.

16:27    9    **BY MR. DeFOSSE:**

16:27   10    **Q.**   Is this the third trade secret?

16:27   11    **A.**   Yeah.  And this is, yet, another algorithm developed

16:27   12    by Qorvo with years of effort and testing and experiment

16:27   13    and evaluation.  This one is called ███████████████  I

16:27   14    won't try and explain in detail, but it was also included

16:27   15    in the documents that were taken.

16:27   16    **Q.**   Now, the three trade secrets that you've identified

16:27   17    in this group, do they all relate to how you remove that

16:27   18    layer of atoms?

16:27   19    **A.**   Yes.  The thing to have in mind about this algorithm,

16:27   20    it might not sound like much, but what you're doing to

16:27   21    tune these filters -- they're teeny little things -- and

16:27   22    you're removing layers of atoms, one layer of atom at a

16:27   23    time.  And you've got to do that in a way that you can't

16:27   24    go backwards and put them back.

16:27   25          So when you remove them, you're moving around

16:28    1    frequencies in the filter, and you've got to do it in a

16:28    2    certain way and in a certain order, and this algorithm

16:28    3    tells you how to do that.  It's definitely nontrivial, and

16:28    4    it took years for Qorvo to come up with it, and here it

16:28    5    is.

16:28    6    **Q.**    All right.  What would be the value of competitor of

16:28    7    having this trimming information?

16:28    8    **A.**    They would skip over all the work that Qorvo did to

16:28    9    figure this out, and all the investment Qorvo made in

16:28    10    running wafers and testing ideas and setting up computer

16:28    11    systems.  They would know straight what to do immediately.

16:28    12    **Q.**    What is the practical impact of having a really good

16:28    13    trimming procedure?

16:28    14    **A.**    It ends that you can make your product, your filters

16:28    15    more cheaply or cheaply.  You really can't be in business

16:28    16    without an algorithm like Qorvo's algorithm, and they had

16:28    17    it now readymade for them.

16:28    18    **Q.**    Did you consider as part of your analysis whether the

16:28    19    ███████ algorithms we looked at were generally available in

16:29    20    the industry?

16:29    21    **A.**    I did.

16:29    22    **Q.**    And were they?

16:29    23    **A.**    No.  I was familiar -- I'm familiar with trimming

16:29    24    procedures.  I did some myself.  I did once with High Beam

16:29    25    and with Plasma, and I've never been familiar -- I've

*Shanfield - Direct*

16:29  1    never seen this before, it was new, and it was innovative,

16:29  2    clearly, and it was not available in the public domain.

16:29  3    **Q.**   Do competitors in this industry share the type of

16:29  4    information that you saw in trade secret group 3?

16:29  5    **A.**   No.  They'd be crazy to share this; this is worth a

16:29  6    lot.

16:29  7    **Q.**   If we could go to -- well, let me.  Sorry.

16:29  8        Did you consider as part of your analysis of trade

16:29  9    secret group 3 whether Akoustis obtained and used those

16:29  10   trade secrets?

16:29  11   **A.**   I did.

16:29  12          **MR. DeFOSSE:**  Could we go to 6.54, please.

16:29  13   **BY MR. DeFOSSE:**

16:29  14   **Q.**   Now, I think you've put a couple images side by

16:29  15   side -- Trial Exhibit 11 and 12 here -- can you explain to

16:30  16   the jury why?

16:30  17   **A.**   Yes.  Well, if you recall, most of the folks at

16:30  18   Akoustis at the time that JB Kwon brought this information

16:30  19   in -- or he was one of the people that made use of this

16:30  20   information.  In my opinion, there was nobody who had

16:30  21   experience in either building resonators or filters, and

16:30  22   here's now this trimming sensitivity calculation and Qorvo

16:30  23   on the left -- from Qorvo on the left, and this is what

16:30  24   Akoustis on the right designates as their trim

16:30  25   calculation.  It's essentially borrowed -- you know, it's

16:30    1    almost exactly the same.  In the critical parts, it's

16:30    2    exactly the same thing as what Qorvo developed, and even

16:30    3    kept some of the coloring.  So the origin of this in my

16:31    4    opinion is from this Qorvo slide.

16:31    5    **Q.**    And the origin of this, you are referring to the

16:31    6    picture of the right-hand side that's from Trial

16:31    7    Exhibit 12?

16:31    8    **A.**    That's correct.

16:31    9    **Q.**    Which is the JB Kwon document?

16:31    10    **A.**    That's correct.

16:31    11    **Q.**    And did you perform a similar comparison for the

16:31    12    other algorithms?

16:31    13    **A.**    I did.

16:31    14         **MR. DeFOSSE:**  And if we could just look at them

16:31    15    quickly, 6.55.

16:31    16    **A.**    And I won't bore you with the details, but they look

16:31    17    exactly the same, the detail, they're going to function

16:31    18    the same way, so they are the same thing.

16:31    19         **MR. DeFOSSE:**  If we go to 6.56.

16:31    20    **BY MR. DeFOSSE:**

16:31    21    **Q.**    You have the Akoustis document on the right, the

16:31    22    Qorvo document on the left?

16:31    23    **A.**    Yes.  And you can see even the pictures are the same,

16:31    24    some of the wording is the same, and, certainly, the

16:31    25    algorithm is the same.

*Shanfield - Direct*

16:31  1          **MR. DeFOSSE:**  If we could go to 6.57, please.

16:31  2  **BY MR. DeFOSSE:**

16:31  3  **Q.**   You've put together a timeline for this trade secret?

16:31  4  **A.**   That's right; same idea.

16:31  5  **Q.**   Okay.  Let's go through this.  We are going to start

16:32  6  on -- well, all right, the first date on your timeline is

16:32  7  what?

16:32  8  **A.**   That's June 26, and that's when Akoustis hired JB

16:32  9  Kwon we just heard from to develop a trimming process.

16:32  10  **Q.**   And June 26 of what year?

16:32  11  **A.**   2017.

16:32  12          **MR. DeFOSSE:**  If we could go to 6.58, please.

16:32  13  **BY MR. DeFOSSE:**

16:32  14  **Q.**   Okay.  Next was July 28.  So month out, what

16:32  15  happened?

16:32  16  **A.**   Well, JB Kwon now sends an e-mail, and he says,

16:32  17  "Enclosed" -- which you can see is this PowerPoint set of

16:32  18  slides -- "Enclosed is what I understand about how Qorvo

16:32  19  gets trim sensitivity data.  Hope this will be helpful for

16:32  20  the trim plan."

16:32  21       So he's now distributing it to Mary Winters, who is

16:32  22  the executive VP of fab, and Rama Vetury you heard about,

16:32  23  and also Daeho Kim, who is the device -- director of

16:32  24  device engineering at Akoustis.

16:33  25  **Q.**   Was there any significance to you to the fact that

16:33  1    Mr. Kwon said expressly that he was sending out how Qorvo

16:33  2    gets trim sensitivity data when he circulated these

16:33  3    algorithms?

16:33  4    **A.**    Yes, of course, because he's explaining that he's

16:33  5    taking confidential information from Qorvo and identifying

16:33  6    it and putting it in an e-mail and sending it to employees

16:33  7    in Akoustis.

16:33  8            **MR. DeFOSSE:**  If we could go to 6.59, please.

16:33  9    **BY MR. DeFOSSE:**

16:33  10   **Q.**    Okay.  At the time Mr. Kwon sent the Qorvo trimming

16:33  11   procedures internally at Akoustis, did he have a

16:33  12   confidentiality obligation to Qorvo?

16:33  13   **A.**    Yeah, he certainly did.  And I think, like I said

16:33  14   before, people in the industry like Dr. Kwon knew this is

16:33  15   not the right thing to do, that you are bound by a

16:34  16   confidentiality agreement, and I hadn't seen the video,

16:34  17   but he clearly looked troubled about what he had done.

16:34  18           **MR. DeFOSSE:**  If we could go to PDX-6.59.

16:34  19   6.60?

16:34  20   **BY MR. DeFOSSE:**

16:34  21   **Q.**    How did Dr. Vetury respond when Mr. Kwon sent him the

16:34  22   Qorvo sensitivity plan?

16:34  23   **A.**    You can read it here.  He says, "Thanks JB, this is

16:34  24   helpful, and I'll send you the plan we promised you on

16:34  25   Monday."

16:34   1   **Q.**   Okay.  And based on your experience in this industry,

16:34   2   should Dr. Vetury -- did Dr. Vetury know or should he have

16:34   3   known that the Qorvo sensitivity data that Mr. Kwon had

16:34   4   sent to him was confidential?

16:34   5   **A.**   Absolutely.  Dr. Vetury is -- was experienced enough

16:34   6   to know, this is not the kind of thing you're allowed to

16:35   7   bring out of a company like Qorvo, and yet he's receiving

16:35   8   this.

16:35   9   **Q.**   In fact, Dr. Vetury also used to work at RFMD, right?

16:35   10  **A.**   That's correct, yes.  So he knew what the obligations

16:35   11  were for confidentiality.

16:35   12          **MR. DeFOSSE:**  If we could go to PDX-6.61.

16:35   13  **BY MR. DeFOSSE:**

16:35   14  **Q.**   August 16, 2017, just a couple of weeks later.  How

16:35   15  is this relevant to your analysis?

16:35   16  **A.**   Yeah.  This is actually interesting.  It is an e-mail

16:35   17  from Mary Winters, the VP of fabrication, to JB Kwon.  And

16:35   18  he's asking JB, can you come by and discuss this trimming

16:35   19  experiment that she's doing.  And here, you see to -- from

16:35   20  JB Kwon to Mary Winters, "Enclosed shows how Qorvo does

16:36   21  silicon nitrite trimming" -- trimming, in other words --

16:36   22  "on these filters."  And he has this set of documents in

16:36   23  PowerPoint.

16:36   24  **Q.**   And is this the second time that JB Kwon sent

16:36   25  trimming procedure to Ms. Winters?

16:36  1   **A.**   That's right, yes.

16:36  2   **Q.**   And in your opinion, did Ms. Winters know or should

16:36  3   have known that this was confidential Qorvo information?

16:36  4   **A.**   Absolutely.  I mean, as a senior executive level in

16:36  5   Akoustis, she would be aware this is not something you

16:36  6   should accept, particularly in a startup company where you

16:36  7   are -- you're going to be watched closely, and you have to

16:36  8   be absolutely scrupulous about it.

16:36  9   **Q.**   Have you seen any evidence in this case that

16:36  10  Ms. Winters objected on this occasion that Dr. Kwon sent

16:36  11  this?

16:36  12  **A.**   None.

16:36  13          **MR. DeFOSSE:**  Can we go to 67.62, please.

16:36  14  **BY MR. DeFOSSE:**

16:36  15  **Q.**   We are now at October 25, 2017?

16:37  16  **A.**   That's correct, yeah.

16:37  17  **Q.**   Did Dr. Kwon continue to circulate Qorvo's trimming

16:37  18  procedures internally at Akoustis?

16:37  19  **A.**   Yes, he did.  Here, he's enclosing the trim system

16:37  20  plan.  JB Kwon is sending it to Mary Winters again, along

16:37  21  with Ken Fallon who is the director of fab.  And there's

16:37  22  there is a note that says, "The new trim tool evaluation

16:37  23  PowerPoint."  Like this is the procedure that is

16:37  24  appropriate for this new tool we've got.

16:37  25  **Q.**   And at this point, Mr. Kwon is still not making any

16:37  1  effort to obscure the fact that he's spending Qorvo's trim

16:37  2  plan around?

16:37  3  **A.**   Yes, that's right.

16:37  4        **MR. DeFOSSE:**   If we can go to 6.63, please.

16:37  5  **BY MR. DeFOSSE:**

16:37  6  **Q.**   Now, this is the next day, October 26.

16:37  7  **A.**   Yes.

16:37  8  **Q.**   What's going on here, Dr. Shanfield?

16:37  9  **A.**   So JB Kwon sends Winters and Fallon a copy of the

16:38 10  presentation, like I said, with these Qorvo trade secrets

16:38 11  about trimming.  And then Kwon is asked to present what

16:38 12  he's calling the Akoustis trim work center at the meeting

16:38 13  of the technical committee of the Akoustis board of

16:38 14  directors.

16:38 15  **Q.**   So Dr. Kwon actually presented Qorvo's confidential

16:38 16  trimming algorithms to the board of directors at

16:38 17  Akoustis --

16:38 18  **A.**   That is --

16:38 19  **Q.**   Sorry.  To the technical committee?

16:38 20  **A.**   Yes.  Because that's what this e-mail is about.  This

16:38 21  is the trim work center update PowerPoint, and it's

16:38 22  Qorvo's procedures.

16:38 23        **MR. DeFOSSE:**   Okay.  If we could go to 6.64,

16:38 24  please.

      25

**BY MR. DeFOSSE:**

**Q.**   What happened after Dr. Kwon presented Qorvo's trade

secret concerning trimming to the board of directors

technical committee at Akoustis?

**A.**   Rama Vetury makes a request for JB, "Hey, can you

send over the slides you showed yesterday at the board of

directors committee?"  And what JB Kwon did, Dr. Kwon, was

attempt to obscure where the documents came from.  He

removed some of the Qorvo indications that it was Qorvo

documents.

          **MR. DeFOSSE:**  So if we can go to 6.65, please.

**BY MR. DeFOSSE:**

**Q.**   So sometime between presenting the procedures to the

technical committee and recirculating presentation to

Mr. Vetury, Mr. Kwon had made some changes?

**A.**   Yeah.  This is what I discovered.  And what was sent

is that the word "Qorvo" had been removed or changed to a

"Q," so he was starting to realize maybe we, you know,

shouldn't be having this confidential information reach

either the board of directors or anybody else in the

company.

          **MR. DeFOSSE:**  Your Honor, may I approach?

          **THE COURT:**  You may.

**BY MR. DeFOSSE:**

**Q.**   Dr. Shanfield, I've handed you what's been marked as

*Shanfield - Direct*

16:40  1  Exhibit PTX-0721 for identification.

16:40  2  **A.**   Yes, that's correct.

16:40  3  **Q.**   This is an e-mail from Mary Winters to Art Geiss?

16:40  4  **A.**   Yes, that's right.

16:40  5  **Q.**   Is this a document that you considered in analyzing

16:40  6  the trade secrets in group 3?

16:40  7  **A.**   Yes, I did.

16:40  8         **MR. DeFOSSE:**  Your Honor, plaintiff would move

16:40  9  for the admission of PTX-0721?

16:40  10        **THE COURT:**  Marked and received as 220.

16:40  11        (Trial Exhibit No. 220 was admitted into

16:40  12  evidence.)

16:40  13        **MR. DeFOSSE:**  Okay.  Could we go to 6.66,

16:40  14  please.

16:40  15  **BY MR. DeFOSSE:**

16:40  16  **Q.**   Can you explain what the relevance is of the --

16:41  17  **A.**   Sure.

16:41  18  **Q.**   -- exhibit I just handed you?

16:41  19  **A.**   Art Geiss is a board member of -- Akoustis board

16:41  20  member, and he's sent a note to Mary Winters saying, "Hey,

16:41  21  Mary, when time permits, please forward the files of the

16:41  22  presentation you gave," and had also a request for the

16:41  23  "presentation JB gave on the trim work stand."

16:41  24  **Q.**   And Mr. Geiss is a board member at Akoustis, right?

16:41  25  **A.**   That's correct.

*Shanfield - Direct*

16:41  1          **MR. DeFOSSE:**  Could we go to 6.67, please.

16:41  2      **BY MR. DeFOSSE:**

16:41  3      **Q.**   What's the relevance of the information shown on this

16:41  4      slide?

16:41  5      **A.**   Yeah.  This is now a comparison of the presentation

16:41  6      on October 26, and then the modified presentation that was

16:41  7      done on October 29.  Ms. Winters apparently changed

16:42  8      "Qorvo" to "industry standard" so that it was no longer

16:42  9      confidential information, and she does it in the title and

16:42  10     in the label of the process that's being taken.

16:42  11     **Q.**   Okay.  So Ms. Winters changed the headings on the

16:42  12     presentation before sending it to Art Geiss?

16:42  13     **A.**   Yes.

16:42  14     **Q.**   But she didn't remove the trade secret algorithm?

16:42  15     **A.**   No.  That was the one oddity.  So the algorithm is

16:42  16     still there; it's still exactly the same thing as what

16:42  17     Qorvo provided -- had been taken from Qorvo.

16:42  18     **Q.**   Okay.  I can't recall if I asked you this, but I want

16:42  19     to do it before I move to group 4.

16:42  20     **A.**   Sure.

16:42  21     **Q.**   Are the trade secrets in trimming group 3 dependent

16:42  22     on whether or not you are using an FBAR-style resonator or

16:42  23     and SMR resonator?

16:43  24     **A.**   No, they're not, as you can imagine, since what

16:43  25     you're doing is removing anodes from the top of the

16:43 1    resonators in the filter.  It doesn't matter how these

16:43 2    filters are supported.  What matters is how you remove

16:43 3    those layers and how you can do it carefully.  So it

16:43 4    applies in exactly the same way.

16:43 5    **Q.**    Thank you, Dr. Shanfield.

16:43 6            **MR. DeFOSSE:**  If we could move to Trade Secret

16:43 7    Group 4.  And go to PDX-6.69, please.

16:43 8    **BY MR. DeFOSSE:**

16:43 9    **Q.**    Could you remind us what is Trade Secret Group 4?

16:43 10   **A.**    It is Qorvo's evaluation board, design rules, and

16:43 11   schematics, and identified one trade secret, which is the

16:43 12   design of the RF connectors.

16:43 13           **MR. DeFOSSE:**  Okay.  If we could go PDX-6.70.

16:43 14   **BY MR. DeFOSSE:**

16:43 15   **Q.**    What's shown on this demonstrative, Dr. Shanfield?

16:43 16   **A.**    Here's -- you've seen this before.  This is Qorvo's

16:44 17   proprietary design that they worked out with ▮▮▮▮▮ of a

16:44 18   customized RF connector.  So this specialized customized

16:44 19   RF connector is -- and this was a document found at

16:44 20   Akoustis.

16:44 21   **Q.**    And did you assess the value of this particular

16:44 22   customized RF connector?

16:44 23   **A.**    Yes, I did.

16:44 24   **Q.**    And what is the value of the customized design here?

16:44 25   **A.**    Yeah.  It looks like a simple thing, an RF connector,

*Shanfield - Direct*

16:44  1    but what you learn when you're running things at high

16:44  2    frequency is you've got to have your connectors really

16:44  3    repeatable and reliable.  And Qorvo looked like it had

16:44  4    done a lot of work in figuring out to make a connector so

16:44  5    you could disconnect it and reconnect if the RF circuits

16:44  6    behave the same way on the demonstration board.  So this

16:44  7    is a really valuable item, because customers want

16:44  8    repeatability in testing -- using the test boards.  And

16:45  9    here, this is an RF connector that will do that.

16:45  10   **Q.**   What value would having the customized RF design have

16:45  11   to a competitor of Qorvo's in this industry?

16:45  12   **A.**   If a competitor were to get this design, then they

16:45  13   would have skipped all the work.  They probably went

16:45  14   through a number of prototypes of this before they settled

16:45  15   on a design.  And here, the competitor would have the

16:45  16   finished product without having to do the work, so they

16:45  17   would save time.  And money.

16:45  18   **Q.**   Is there any impact on the accuracy of the testing

16:45  19   you're performing if you have this connector?

16:45  20   **A.**   Yes.  You get to repeatability, and you get a better

16:45  21   measurement, and people who are doing RF measuring are

16:45  22   really sensitive to how accurate you are taking the

16:45  23   measurement.  They know how to check for that, and they

16:45  24   would see if the connector didn't work well.

16:45  25   **Q.**   Did you consider in this case whether Akoustis

16:45  1    obtained and used the customized Qorvo RF connector

16:46  2    design?

16:46  3    **A.**   Yes, I did.

16:46  4            **MR. DeFOSSE:**  Could we go to PDX-6.71.

16:46  5    **BY MR. DeFOSSE:**

16:46  6    **Q.**   We have another one of your timelines here?

16:46  7    **A.**   Yes.  It's the usual way I've used to show evidence

16:46  8    that the -- not only was there misappropriation, but that

16:46  9    the -- I'm sorry -- the trade secret were used, and I'm

16:46  10   showing it in this timeline.

16:46  11           **MR. DeFOSSE:**  Your Honor, may I approach?

16:46  12           **THE COURT:**  You may.

16:46  13   **BY MR. DeFOSSE:**

16:46  14   **Q.**   Dr. Shanfield, I've just handed you what's been

16:46  15   marked for identification as PTX-0729.  Do you recognize

16:47  16   this as a document that you considered in forming your

16:47  17   opinions concerning Trade Secret Group 4?

16:47  18   **A.**   Yes, it is.

16:47  19           **MR. DeFOSSE:**  Your Honor, plaintiffs would move

16:47  20   for the admission of PTX-0729.

16:47  21           **THE COURT:**  Marked and received, marked and

16:47  22   received as 221.

16:47  23           (Trial Exhibit No. 221 was admitted into

16:47  24   evidence.)

16:47  25           **MR. DeFOSSE:**  Could we go to PDX-6.72, please.

16:47   1    **BY MR. DeFOSSE:**

16:47   2    **Q.**    Okay.  The first date on your timeline is

16:47   3    November 22, 2016; is that right?

16:47   4    **A.**    Yes.

16:47   5    **Q.**    And on that date, you have had an e-mail that's now

16:47   6    been marked as Exhibit 2221 in this case?

16:47   7    **A.**    That's correct.

16:47   8    **Q.**    Can you explain how this relates to your opinions?

16:47   9    **A.**    Yeah.  This is where Mr. Houlden is requesting from a

16:47   10   Qorvo employee the drawing of this connector, this

16:47   11   specialized custom connector Qorvo had developed.  He's

16:48   12   writing that he's got "No IP concerns," intellectual

16:48   13   property concerns, but using personal e-mails will make

16:48   14   you feel more comfortable.

16:48   15   **Q.**    All right.  In your experience, are there concerns

16:48   16   related to RF connectors?

16:48   17   **A.**    Absolutely.  And this custom connector is clearly an

16:48   18   IP concern.

16:48   19           **MR. DeFOSSE:**  If we could go to PDX-6.73,

16:48   20   please.

16:48   21   **BY MR. DeFOSSE:**

16:48   22   **Q.**    What's the relevance of Dr. Hodge's testimony to your

16:48   23   opinions concerning the misappropriation of the trade

16:48   24   secret in Group 4?

16:48   25   **A.**    Yeah.  Dr. Hodge, he had supervised some technicians,

*Shanfield - Direct*

16:48  1    and one of the technicians was given a packet of documents

16:48  2    as he's explaining here, and that had details of the PCB

16:49  3    board and the connectors, as he explains, which is the

16:49  4    very connector that we just were looking at.

16:49  5    **Q.**   And that was fall 2016?

16:49  6    **A.**   That's correct, yes.

16:49  7            **MR. DeFOSSE:**   If we could go to PDX-6.74,

16:49  8    please.

16:49  9    **BY MR. DeFOSSE:**

16:49  10   **Q.**   And what did Mr. Houlden ask to be done with the

16:49  11   drawings of the connectors?

16:49  12   **A.**   Well, Dr. Hodge says, he asked David Dyer, the guy

16:49  13   who reported to him.  He said Mr. Houlden had asked him to

16:49  14   replicate the traces in this connector.  So, essentially,

16:49  15   replicate the board and the connector itself.

16:49  16           **MR. DeFOSSE:**   Your Honor, may I approach?

16:49  17           **THE COURT:**   You may.

16:50  18   **BY MR. DeFOSSE:**

16:50  19   **Q.**   I've handed you two documents.  The first was marked

16:50  20   for identification as PTX-0731, and the second is marked

16:50  21   for identification as PTX-0733.

16:50  22   **A.**   Yes.

16:50  23   **Q.**   Are these documents, documents that you considered in

16:50  24   forming your opinions concerning trade secret Group 4?

16:50  25   **A.**   Yes, they are.

16:50   1          MR. DeFOSSE:  Your Honor, plaintiff would move

16:50   2     for the admission of PTX-0731 and 0733.

16:50   3          THE COURT:  Marked and received as 222 and 223.

16:50   4          (Trial Exhibit Nos. 222 and 223 were admitted

16:50   5     into evidence.)

16:50   6          MR. DeFOSSE:  If we can go to PDX-6.75 please.

16:50   7     BY MR. DeFOSSE:

16:50   8     Q.   We're now in March of 2018 on your timeline.

16:50   9     A.   That's right.

16:50   10    Q.   And that's about two years, a little less, after

16:50   11    Mr. Houlden had handed over the drawings and asked for

16:51   12    them to be copied; is that right?

16:51   13    A.   That's correct.

16:51   14    Q.   Is there thing way that you know that Akoustis

16:51   15    actually went through with the copying of Qorvo's

16:51   16    drawings?

16:51   17    A.   Yeah.  I caught this in this e-mail where Mr. Houlden

16:51   18    is talking about an RF connector, and he indicates that

16:51   19    this part, Number ██████, is equivalent to an RFMD

16:51   20    custom connector.  So he knows that he copied it and that

16:51   21    this is what it is.  He's explaining that to Dave Hodge.

16:51   22          MR. DeFOSSE:  If we can go to 6.76, please.

16:51   23    BY MR. DeFOSSE:

16:51   24    Q.   And did Mr. Houlden ever describe why you would want

16:51   25    to go through copying the Qorvo connector as opposed to

*Shanfield - Direct*

16:51  1  just buying one on the market?

16:51  2  **A.**   Yeah.  He gets an e-mail from another employee at

16:52  3  Akoustis, and he's suggesting another connector, and he

16:52  4  responds, "RFMD had some unique work done to the ████

16:52  5  part," and so he want to stick with that part.  That's the

16:52  6  part that was the one that Akoustis copied from Qorvo.

16:52  7  **Q.**   And same question as with trade secret groups 1

16:52  8  through 3.  For Trade Secret Group 4, does the trade

16:52  9  secret depend on whether you are using an FBAR-style

16:52  10  resonator or an SMR-style resonator?

16:52  11  **A.**   No.  It doesn't depend on it at all.  I think that's

16:52  12  obvious.  The board has nothing to do with the resonator.

16:52  13  **Q.**   Okay.  It may not be obvious to me, though, so can

16:52  14  you just explain at a high level?

16:52  15  **A.**   Yeah.  This connector, you've got things you plug

16:52  16  into it, and the filter is sitting on a board has the

16:52  17  connectors on it.  So what -- the connector you use would

16:53  18  be the same whether you're going to use an SMR or an FBAR

16:53  19  filter.

16:53  20        **MR. DeFOSSE:**   Okay.  I'd like to move now to

16:53  21  Trade Secret Group 5.  And if we can go to PDX-6.78,

16:53  22  please.

16:53  23  **BY MR. DeFOSSE:**

16:53  24  **Q.**   How many trade secrets are there in Trade Secret

16:53  25  Group 5?

*Shanfield - Direct*

16:53  1    **A.**    I picked out five.

16:53  2              **MR. DeFOSSE:**    And if we could go to PDX-6.79,

16:53  3    please.

16:53  4    **BY MR. DeFOSSE:**

16:53  5    **Q.**    What types of documents did you consider in forming

16:53  6    your opinions with respect to trade secret Group 5?

16:53  7    **A.**    Yes.  I analyzed documents that were procedures that

16:53  8    Qorvo had created for development of product requirements

16:53  9    or for test plans.  And that's kind of portrayed here.

16:53  10   **Q.**    Okay.  And I should have clarified before.  What is

16:53  11   trade secret Group 5?

16:54  12   **A.**    Oh, yes.  It is -- has to do with the development or

16:54  13   product requirement procedures, and also the testing

16:54  14   procedures that Qorvo had developed over the years of

16:54  15   experience with their filters.

16:54  16             **MR. DeFOSSE:**    Can we go to PDX-6.80, please.

16:54  17   **BY MR. DeFOSSE:**

16:54  18   **Q.**    You are identifying in this slide two trade secrets;

16:54  19   is that right?

16:54  20   **A.**    That's right.

16:54  21   **Q.**    Could you explain those to the jury?

16:54  22   **A.**    Sure.  These are the technology and product

16:54  23   development processes and procedures, and also the phases

16:54  24   of the development process.  This includes gating and

16:54  25   information you consider.  And this all sounds like

16:54  1   something, you know, you could do in a couple of

16:54  2   afternoons or something.  It's not like that at all

16:54  3   because what you learn, and I learned in my startup

16:54  4   company is, the procedures are not obvious that make your

16:55  5   facility efficient and produce a new product that's really

16:55  6   going to sell.  There has to be some gating done.  It has

16:55  7   to be formalized.  That's reflected in these documents,

16:55  8   and that experience is baked into the information that was

16:55  9   in these documents.

16:55  10  **Q.**   So I think we heard, at least, questions suggesting a

16:55  11  lot of companies have phase gate procedures and product

16:55  12  development processes.

16:55  13  **A.**   Right.

16:55  14  **Q.**   Have you been present to hear those exchanges?

16:55  15  **A.**   Yes.

16:55  16  **Q.**   You don't disagree with that?

16:55  17  **A.**   No, I agree.

16:55  18  **Q.**   Okay.  But in your experience, more than 30 years in

16:55  19  the industry, do companies make their product development

16:55  20  processes available publicly?

16:55  21  **A.**   No, they don't.  You know, they're focused on a

16:55  22  particular set of products like Qorvo was, and the

16:55  23  procedures apply to that set of products.  And they are

16:55  24  usually the result of like the school of hard knocks in

16:56  25  figuring out what went wrong the first time you tried to

*Shanfield - Direct*

16:56  1    develop a product, what do you need to do differently, and

16:56  2    the procedures that are now in place to make that not

16:56  3    happen again.  So it's a very important document that way.

16:56  4    **Q.**    How would a competitor benefit from having access to

16:56  5    the product development processes of other competitors in

16:56  6    the same industry?

16:56  7    **A.**    The benefit would be that they are going realize all

16:56  8    the hard work Qorvo did in putting this thing together,

16:56  9    and they are going to know how to do the product

16:56  10   development and the steps in that development, how to

16:56  11   phase gate it in a way that's got the efficiency of years

16:56  12   of experience.  And they didn't have to have the

16:56  13   experience or go through the work of developing that

16:56  14   document.

16:56  15           **MR. DeFOSSE:**    Okay.  If we could go to

16:56  16   PDX-6.81, please.

16:56  17   **BY MR. DeFOSSE:**

16:56  18   **Q.**    Now, you also looked at product requirements

16:57  19   documents?

16:57  20   **A.**    Yes, I did.

16:57  21   **Q.**    Maybe first at a high level, what is the function of

16:57  22   these documents?

16:57  23   **A.**    Yeah.  You know, when you are making a new product,

16:57  24   you have to figure out what is the thing that you want

16:57  25   to -- what parameters do you want to assign to the

*Shanfield - Direct*

16:57  1    performance of the product.  And that might sound fairly

16:57  2    easy, there -- you might think there are a few parameters;

16:57  3    it doesn't look like that.

16:57  4        First of all, there's parameters underlying those

16:57  5    ones that you might show the customer, and you've got to

16:57  6    set up a system for being able to choose those beforehand

16:57  7    so that everybody in the engineering team, the design

16:57  8    team, fab team know what it is you are shooting for.  So

16:57  9    that's what a product requirement document is.

16:57  10   **Q.**   And have you identified specific trade secrets that

16:57  11   are found in Qorvo's product requirement documents?

16:57  12   **A.**   Yes, quite a few.

16:57  13   **Q.**   Okay.  And could you identify those trade secrets for

16:57  14   me?

16:58  15   **A.**   These are three that I listed:  Tracking and

16:58  16   documenting development process, what's going to

16:58  17   differentiate the new product, what's the cost target,

16:58  18   what's the specifications, and a particular part is what

16:58  19   are the testing procedures you're going to put in place.

16:58  20   For RF testing, that's really important because it's not

16:58  21   simple to do RF testing, and it's not obvious what tests

16:58  22   really matter.  That is all based on, and in these

16:58  23   documents, based on Qorvo's experience in that business.

16:58  24           **MR. DeFOSSE:**   If we could go to 6.82, please.

25

BY MR. DeFOSSE:

**Q.**   Have you also identified any trade secrets related to

Qorvo's test plans?

**A.**   Yeah.  I think as I was saying before, this shows one

example of an evaluation board test plan.  It goes -- as I

went through these, there's all these tabs, and there's

hundreds of parameters listed.  And there's results and

expectations for what these parameters should look like in

a product.  So it's an elaborate document, and it's really

going to be useful for somebody making a filter product.

**Q.**   Now, we've looked at five trade secrets in Group 5.

Did you form any opinions as to whether those trade

secrets were generally known in the industry?

**A.**   Yes, I did.

**Q.**   And what was your opinion?

**A.**   Like in the other cases, I concluded that this was

not known in the industry.  It was not obvious to me, and

I really had to go through it and look at what they had

figured out was important, and it was actually quite

interesting.  So this was clearly not available to anybody

but Qorvo employees.  It was confidential.

**Q.**   And did you also assess the value that the trade

secret in Group 5 would have?

**A.**   I did.

**Q.**   And what did you determine with respect to the value?

*Shanfield - Direct*

17:00  1  **A.**  Well, knowing what's important in RF measurement, not

17:00  2  only does it tell you how to evaluate your part in a way

17:00  3  that's going to be consistent and meaningful, it's also

17:00  4  customers are going to look at what you're doing and to

17:00  5  see if you know what you're doing, because they know some

17:00  6  of this stuff.  And if you've got that in hand already,

17:00  7  then you get the confidence the customer as well because

17:00  8  you've got these procedures in place.

17:00  9  **Q.**  Did you assess whether Akoustis obtained and used

17:00  10  Qorvo's test plans in this case?

17:00  11  **A.**  Yeah, I did.

17:00  12  **Q.**  And what did you conclude?

17:00  13  **A.**  That I have evidence that they did, and concluded

17:00  14  that they have.

17:00  15  **MR. DeFOSSE:**  If we could go to PDX-6.83

17:00  16  please.

17:00  17  **BY MR. DeFOSSE:**

17:00  18  **Q.**  What's shown in this slide?

17:01  19  **A.**  Here, again, is the usual timeline idea where I'm

17:01  20  showing evidence of how it's being misappropriated and the

17:01  21  fact it's being used and why I think that.

17:01  22  **MR. DeFOSSE:**  If we go to, next, PDX-6.84.

17:01  23  **BY MR. DeFOSSE:**

17:01  24  **Q.**  The first date on your timeline is January 30 of

17:01  25  2017; is that right?

17:01  1   **A.**   Yes.

17:01  2   **Q.**   What happened on that date?

17:01  3   **A.**   This is actually where Dr. Shealy has obtained RFMD

17:01  4   documents having to do with the new technology development

17:01  5   procedure, and he replaces the RFMD logo with Akoustis and

17:01  6   labels it Akoustis New Technology Development.

17:01  7   **Q.**   I think we heard testimony shortly before you took

17:01  8   the stand that Dr. Shealy said he never really used this

17:01  9   document.

17:01  10       Do you recall that?

17:01  11  **A.**   Yes, I do.

17:01  12  **Q.**   Is that consistent with your analysis?

17:01  13  **A.**   No, it is not.

17:01  14       **MR. DeFOSSE:**   If we could go to PDX-6.85.

17:02  15  **BY MR. DeFOSSE:**

17:02  16  **Q.**   So, first, what was your -- what was the significance

17:02  17  of how Dr. Shealy altered this document to you?

17:02  18  **A.**   Yes.  He also changed the confidentiality warning,

17:02  19  the original RFMD one is shown in the middle here.  And he

17:02  20  changed it.  And he wrote some of the terminology, but he

17:02  21  essentially created his own confidentiality warning.

17:02  22       **MR. BRAVERMAN:**   And then if we go to 6.86.

17:02  23  **BY MR. DeFOSSE:**

17:02  24  **Q.**   What did Dr. Shealy do after you converted the RFMD

17:02  25  procedure into the Akoustis technology development

*Shanfield - Direct*

17:02  1    procedure?

17:02  2    **A.**   Yeah.   Well, he also labeled himself the author.   And

17:02  3    then he e-mails it would Rohan Houlden, the executive

17:03  4    administrator of Dr. Shealy and Mary Winters who is

17:03  5    responsible for the fab.

17:03  6    **Q.**   And was there any significance to you in who Dr.

17:03  7    Shealy was sending this modified procedure to?

17:03  8    **A.**   Yeah, very much.   I mean, what he's doing is saying,

17:03  9    "Look, I've authored this document.   This is our document

17:03  10   now.   We can use this."   And his top management is getting

17:03  11   this document, so the implication that you're sending it

17:03  12   out from the CEO is this is something you are going to

17:03  13   use.

17:03  14   **Q.**   Okay.   And who are the users of a technology

17:03  15   development process at a company in this industry?

17:03  16   **A.**   It would be exactly the people he sent it to.   The VP

17:03  17   of product engineering would obviously be interested in

17:03  18   that.   And the fab person who is the VP of fab would also

17:04  19   be interested in how that's done and following that

17:04  20   procedure.

17:04  21         **MR. DeFOSSE:**   If we could go to 6.87, please.

17:04  22   **BY MR. DeFOSSE:**

17:04  23   **Q.**   Did you find other occasions in which Akoustis copied

17:04  24   Qorvo's trade secret from Group 5?

17:04  25   **A.**   Yes, I did.

17:04  1    **Q.**   What are you showing here for February 23, 2017?

17:04  2    **A.**   Yeah.  This was another instance I found where

17:04  3    Mr. Houlden used his personal e-mail account again, and

17:04  4    he's got these documents attached.  They are from Alan

17:04  5    Nicol, who's a Qorvo engineer, and to Mr. Houlden and it's

17:04  6    all in personal e-mail.  He knew Nicol -- Houlden knew

17:04  7    because he had signed this agreement, that Nicols --

17:04  8    subject to the confidentiality agreements.  And he was

17:04  9    asking now -- Alan was asking Mr. Houlden, "Have you

17:05  10   received the files" in this e-mail.

17:05  11          **MR. DeFOSSE:**  If we could go to 6.88.

17:05  12   **BY MR. DeFOSSE:**

17:05  13   **Q.**   What did Mr. Houlden do after he received the

17:05  14   confidential Qorvo test plans from Alan Nicol?

17:05  15   **A.**   Yes.  He then -- Rohan Houlden sends to Pat Lewis,

17:05  16   who is the director of business systems, a set of

17:05  17   documents that's Qorvo documents, but now they're called

17:05  18   AKF, and they're numbered according to this new numbering

17:05  19   scheme.

17:05  20       This is test plans, test plan qualifications, test

17:05  21   plan characterizations.  This is a whole set of documents

17:05  22   here that he's sending along.

17:05  23   **Q.**   And did this indicate to you that at the time

17:05  24   Mr. Houlden was requesting test plans from Qorvo, he was

17:05  25   working on drafting the Akoustis test plans?

*Shanfield - Direct*

17:06  1    **A.**   Yes, it does.

17:06  2              **MR. DeFOSSE:**   Your Honor, may I approach?

17:06  3              **THE COURT:**   You may.

17:06  4    **BY MR. DeFOSSE:**

17:06  5    **Q.**   Dr. Shanfield, I've handed you what's been marked for

17:06  6    identification as PTX-0749.  Do you recognize this as a

17:06  7    document that you considered in forming your opinions with

17:06  8    respect to Trade Secret Group 5?

17:06  9    **A.**   Yes, I do.

17:06  10             **MR. DeFOSSE:**   Your Honor, plaintiff would offer

17:06  11   for admission PTX-0749.

17:06  12             **THE COURT:**   Marked and received as 224.

17:06  13             (Trial Exhibit No. 224 was admitted into

17:06  14   evidence.)

17:06  15             **MR. DeFOSSE:**   If we could go to PDX-6.89,

17:06  16   please.

17:06  17   **BY MR. DeFOSSE:**

17:06  18   **Q.**   You've got two dates highlighted on this one, May 9,

17:06  19   2017 and May 12, 2017.  What are the significance of those

17:06  20   dates to you in your analysis, Dr. Shanfield?

17:07  21   **A.**   Yes.  The Qorvo evaluation board test plan, this is

17:07  22   what's on the left.  It says "RFMD confidential" at the

17:07  23   bottom.  On the right is the now converted to Akoustis

17:07  24   document number of the same evaluation board test plan,

17:07  25   with all the same items and even the same numbering

17:07  1   system.

17:07  2   **Q.**   Okay.  So is this another occasion where you found

17:07  3   that Akoustis almost directly copied a Qorvo document?

17:07  4   **A.**   Yes, exactly.

17:07  5   **Q.**   Was Akoustis' use of Qorvo's test plans limited to

17:07  6   only one period in time in its existence?

17:07  7   **A.**   No.  They did this repeatedly.  And they used Qorvo

17:07  8   documents in multiple cases.  I just didn't have time to

17:07  9   show you all the examples.

17:07  10  **Q.**   Okay.  If -- we're going to jump in your timeline to

17:08  11  2020 now, March 3.

17:08  12         **MR. DeFOSSE:**  If we can go to PDX-6.90, please.

17:08  13  **BY MR. DeFOSSE:**

17:08  14  **Q.**   First, I'd like you to explain, what does RVTM mean?

17:08  15  **A.**   Let's see if I remember that.

17:08  16  **Q.**   If you can't remember, what kind of document does it

17:08  17  relate to?  How about that?

17:08  18  **A.**   Yeah.  What you've got here is -- this is a template

17:08  19  for a part number and a part description with its features

17:08  20  and it's differentiators.  So it's a template for product

17:08  21  description.  And you can see in the bottom some of the

17:08  22  items that are in that description.

17:08  23       For example, the document number.  The cost target is

17:08  24  really -- is in there which is really important and

17:09  25  sensitive information.

*Shanfield - Direct*

17:09  1    **Q.**   Okay.  And at the top of PDX-690, it looks like

17:09  2    there's is a calendar invite; is that right?

17:09  3    **A.**   Yes, correct.

17:09  4    **Q.**   What was the relevance of this calendar invite to

17:09  5    you?

17:09  6    **A.**   This was from Roman Houlden.  And he was setting up a

17:09  7    meeting where he wanted to review these RVTM documents.

17:09  8    And the documents are attached, as you can see in this

17:09  9    e-mail.  It's an Excel spreadsheet.

17:09  10   **Q.**   Was there any significance to you of the people who

17:09  11   Mr. Houlden had invited to review the Qorvo RVTM

17:09  12   documents?

17:09  13   **A.**   Yes.  He says "required attendees" are himself,

17:09  14   Jerry Gray, Dave Hodge Pat Lewis, all Akoustis' employees,

17:09  15   all having to do with his area of product requirements

17:10  16   documents.

17:10  17   **Q.**   Okay.

17:10  18           **MR. DeFOSSE:**  If we could jump to January 12 of

17:10  19   2021.  Sorry.  And that would be PDX-6.91.

17:10  20   **BY MR. DeFOSSE:**

17:10  21   **Q.**   So this is the next date on your timeline.  Could you

17:10  22   explain to the jury what happened on this date?

17:10  23   **A.**   Yeah.  Here -- now, this is from an Akoustis

17:10  24   employee, Brad Bersin where he's setting up a conference

17:10  25   room with a follow-up discussion meeting.  And he's saying

*Shanfield - Direct*

17:10   1   it's for discussion the week of January 11.  "Any old

17:10   2   company -400 or -480 documents," those numbers are Qorvo

17:10   3   numbers.

17:10   4       And he gets a response from an Akoustis employee who

17:10   5   says, "I don't have any Qorvo contacts.  I can't get these

17:11   6   documents."

17:11   7       So he understood.  And I'm going to describe it as a

17:11   8   cry for help that this is not -- I don't want to do this,

17:11   9   and I have nothing to do with Qorvo either.

17:11  10   **Q.**   Okay.

17:11  11           **MR. DeFOSSE:**  If you can go to the PDX-6.92.

17:11  12   **BY MR. DeFOSSE:**

17:11  13   **Q.**   What happened after -- what happened next?

17:11  14   **A.**   So Rohan sends an e-mail, and he asks whether the

17:11  15   person -- says sent to Bradford Bersin, Jerry Gray as

17:11  16   well.  Did you, by chance, connect with Ahmad.  Ahmad is a

17:11  17   former Qorvo employee.  He is a source for Houlden.

17:12  18           **MR. DeFOSSE:**  Your Honor, may I approach?

17:12  19           **THE COURT:**  You may.

17:12  20   **BY MR. DeFOSSE:**

17:12  21   **Q.**   Dr. Shanfield, I've handed you what's been marked for

17:12  22   identification as PTX-0750.  Do you recognize this as one

17:12  23   of the documents that you've considered in forming your

17:12  24   opinions in this case?

17:12  25   **A.**   Yes, I do.

17:12  1         **MR. DeFOSSE:**  Your Honor, plaintiff would offer

17:12  2    into evidence PTX-05 -- sorry 0750?

17:12  3         **THE COURT:**  Marked and received as 225.

17:12  4         (Trial Exhibit No. 225 was admitted into

17:12  5    evidence.)

17:12  6         **MR. DeFOSSE:**  All right.  If we could go to

17:12  7    6.93, please.

17:12  8    **BY MR. DeFOSSE:**

17:12  9    **Q.**  So we're still on January 12, 2021, on your timeline.

17:13  10   And I see here that there's an e-mail from Ahmad at the

17:13  11   top.  Do you see that?

17:13  12   **A.**  Yes.

17:13  13   **Q.**  Who is Ahmad?

17:13  14   **A.**  Ahmad was a former Qorvo employee and was supplying

17:13  15   information to Mr. Houlden.

17:13  16   **Q.**  Okay.  And in this case, he sent the message to

17:13  17   Mr. Gray?

17:13  18   **A.**  That's correct.

17:13  19   **Q.**  And who's Mr. Gray?

17:13  20   **A.**  He was a program manager at Akoustis.

17:13  21   **Q.**  And so on this date, Mr. Abdelmajid --

17:13  22   **A.**  Yes.

17:13  23   **Q.**  -- is sending Mr. Gray, it looks like, quite a number

17:13  24   of Qorvo documents; is that right?

17:13  25   **A.**  Yes.  All sorts of Qorvo documents.

*Shanfield - Direct*

17:13  1              MR. DeFOSSE:  If we could go to PDX-6.94

17:13  2  please.

17:13  3  BY MR. DeFOSSE:

17:13  4  Q.    What's the significance of the information on this

17:13  5  slide, Dr. Shanfield?

17:13  6  A.    This is the part that caught my attention.  A month

17:13  7  later, after he's gotten all these documents, Houlden goes

17:13  8  back to Abdelmadjid and gets more requests and gets more

17:13  9  Qorvo documents.

17:14  10  Q.    Okay.

17:14  11              MR. DeFOSSE:  And if we can go to PDX-6.95.

17:14  12  BY MR. DeFOSSE:

17:14  13  Q.    What happened on September 14, 2021?

17:14  14  A.    Then once again, Mr. Houlden uses his personal e-mail

17:14  15  account -- or, I'm sorry -- Ahmad Abdelmadjid uses his

17:14  16  personal e-mail account to send documents that were Qorvo

17:14  17  documents to this address called Houlden House, and it's a

17:14  18  personal e-mail.

17:14  19  Q.    And did Mr. Houlden, then -- well, sorry.  Were those

17:14  20  documents then forwarded from that Houlden House account

17:14  21  to Mr. Houlden's Akoustis e-mail account?

17:14  22  A.    Yes.  So -- but what he did first is he eliminated

17:14  23  the mention of Abdelmadjid in this new e-mail that he sent

17:15  24  in to Akoustis.

17:15  25  Q.    And was there any significance to that --

17:15  1    **A.**   Sure people saw the name Abdelmadjid, they'd

17:15  2    understand this is a former Qorvo employee sending

17:15  3    documents that are confidential documents, and that's

17:15  4    where it came from --

17:15  5         **MR. DeFOSSE:**  Can we go to PDX-6.96, please.

17:15  6    **BY MR. DeFOSSE:**

17:15  7    **Q.**   What did you consider to be the significance of

17:15  8    Mr. Houlden's explanation of how those documents made it

17:15  9    from his personal account to his work account?

17:15  10   **A.**   Yeah.  This is something I caught during his

17:15  11   testimony that he said.  He's been told about the fact

17:15  12   that he forwarded this Mr. Abdelmadjid's e-mail with all

17:15  13   this Qorvo confidential information to his work address.

17:15  14   And he said, Well, somebody did and it might have been a

17:16  15   family member.

17:16  16       So he's realizing he really doesn't want to take

17:16  17   responsibility for that.  And, finally, he's asked, well,

17:16  18   who else in your house has access to this Houlden House

17:16  19   e-mail?

17:16  20       And he said, Oh, my wife and three kids.  I guess

17:16  21   they might have been the ones to forward it.

17:16  22   **Q.**   Whether it was Mr. Houlden himself or one of his

17:16  23   family members forwarding those documents to the Akoustis

17:16  24   account, do you have an opinion as to whether Mr. Houlden

17:16  25   either new or should have known that he didn't have

17:16   1   authorization to have those documents?

17:16   2   **A.**   I think, as I said before, Mr. Houlden's been in the

17:16   3   business a long time.  He knows this is confidential

17:16   4   information, that he shouldn't have it in his possession,

17:16   5   and he shouldn't be sending it to Akoustis.

17:16   6        So I think it's clear he was aware.

17:16   7   **Q.**   Okay.

17:16   8        **MR. DeFOSSE:**  If we go to PDX-6.97.

17:17   9   **BY MR. DeFOSSE:**

17:17   10   **Q.**   What did Mr. Houlden do after he received these Qorvo

17:17   11   documents at Akoustis?

17:17   12   **A.**   Then he took the documents and modified them.  He

17:17   13   eliminates the Qorvo logo again.  He gets the -- or

17:17   14   eliminates the confidentiality legend and from every

17:17   15   appearance is looking to use this document.

17:17   16        **MR. DeFOSSE:**  If we go to PDX-6.98, please.

17:17   17   **BY MR. DeFOSSE:**

17:17   18   **Q.**   What did Mr. Houlden do after modifying the product

17:17   19   requirements documents?

17:17   20   **A.**   This is where now Mr. Houlden sends the modified

17:17   21   document to Jeff Shealy, Dr. Shealy.  And you can see it's

17:17   22   attached.  And he says, "I would start with this."

17:17   23   Meaning let's use this document, this Qorvo document for

17:18   24   this -- a product requirements document that we've been

17:18   25   talking about.

*Shanfield - Direct*

17:18  1   **Q.**   So same question for Group 5 that I had for the first

17:18  2   four groups.  Are the trade secrets in Group 5 relevant

17:18  3   only if you are using an SMR-type filter?

17:18  4   **A.**   No.  A product requirements documents and these other

17:18  5   documents I've described, all of them are going to apply

17:18  6   whether it's an SMR or an FBAR filter.

17:18  7   **Q.**   All right.  Are the tests that are performed on

17:18  8   FBAR-type filters and SMR filters similar?

17:18  9   **A.**   They're almost identical.  In fact, they are

17:18 10   identical.  You're always looking for the same kind of

17:18 11   quality in the filter whether.  It's SMR or FBAR.  The

17:18 12   customers actually don't even care.  But they want to

17:18 13   measure those characteristics.  So the procedure is --

17:18 14   what parameters you measure, all of those are the same.

17:18 15   **Q.**   Would a company that's developing an FBAR-type filter

17:18 16   find value in the testing parameters and procedures and

17:19 17   specifications of a company that had developed an SMR-type

17:19 18   filter?

17:19 19   **A.**   Absolutely.  And it would be valuable because that

17:19 20   represents a lot of learning in the RF measurement

17:19 21   requirements.

17:19 22   **Q.**   Okay.  Let's move on to Trade Secret Group 6.

17:19 23         **MR. DeFOSSE:**  And if we would go to 6.99,

17:19 24   please.

      25

17:19   1   **BY MR. DeFOSSE:**

17:19   2   **Q.**   Dr. Shanfield, could you start, just at a high level,

17:19   3   of explaining what Trade Secret Group 6 is?

17:19   4   **A.**   Yeah.   Trade Secret Group 6 is having to do with

17:19   5   valuing reliability and meantime to failure for BAW filter

17:19   6   parts.

17:19   7   **Q.**   And just at a high level, what is reliability

17:19   8   testing?

17:19   9   **A.**   What that means is if you -- you get your Apple

17:19  10   phone, you don't want to have the filter fail after a few

17:19  11   years, and that's the reason you have to throw it away.

17:19  12        So these tests are designed to figure out how long

17:20  13   this particular design of filter is going to last, and you

17:20  14   can't wait two years or five years to see if it fails.

17:20  15   You have to accelerate it.   And the techniques for doing

17:20  16   that are very specific to the product, and they're closely

17:20  17   held and confidential because it takes time to figure out

17:20  18   how to do that.

17:20  19          **MR. DeFOSSE:**   If we could go to PDX-6.100.

17:20  20   **BY MR. DeFOSSE:**

17:20  21   **Q.**   How many trade secrets are there in Group 6?

17:20  22   **A.**   I listed six.

17:20  23          **MR. DeFOSSE:**   And if we go to PDX-6.10 -- 101.

17:20  24   I'm sorry.

       25

*Shanfield - Direct*

17:20  1    **BY MR. DeFOSSE:**

17:20  2    **Q.**   How many documents did you analyze?

17:20  3    **A.**   In this one, I analyzed one document.

17:20  4    **Q.**   Okay.

17:20  5            **MR. DeFOSSE:**  And if we go to PDX-6.102.

17:21  6    **BY MR. DeFOSSE:**

17:21  7    **Q.**   You identified your first trade secret on this slide.

17:21  8    Can you explain what that trade secret is?

17:21  9    **A.**   Yeah.  This is again, a treasure trove, as I would

17:21  10   call it as an engineer, of information about how you build

17:21  11   the testing system to ensure that you're testing it

17:21  12   properly.  It's got a schematic on the left.  And also on

17:21  13   the right, it's telling you how to power test filters.

17:21  14   That's a real art.  It sounds simply turn up the knob,

17:21  15   well, that won't work.

17:21  16        So power testing and what frequency and how you do it

17:21  17   and the root causes of the issues with that test that are

17:21  18   very subtle.  It's something Qorvo had learned over the

17:21  19   years, and it's reflected in these documents.

17:21  20           **MR. DeFOSSE:**  If we could go to PDX-1 -- sorry.

17:21  21   6.103.

17:21  22   **BY MR. DeFOSSE:**

17:21  23   **Q.**   Trade Secret 6.2, what's that?

17:21  24   **A.**   This is showing the configuration of test stations

17:22  25   and equipment that Qorvo used, and it might not seem like

17:22  1    there's that much information in the photograph, but there

17:22  2    actually is.

17:22  3        How you set up your reliability equipment, what it

17:22  4    looks like, how modular it is, what kind of connectors you

17:22  5    use.  All of that is revealed in these photographs.

17:22  6        And, again, like I said, the schematic is telling you

17:22  7    the configuration well.  So this is very useful

17:22  8    information.

17:22  9            **MR. DeFOSSE:**  PDX-6.104.

17:22  10   **BY MR. DeFOSSE:**

17:22  11   **Q.**    You identified three trade secrets on this slide.

17:22  12   Can you explain what those are?

17:22  13   **A.**    Yeah.  Self-heating, like I think I said earlier,

17:22  14   that was something Qorvo discovered was an important

17:22  15   effect that even at low power, the little teensy BAW

17:22  16   filters heat up and shifts around the frequencies.  The

17:22  17   are -- you know, supposed to filter.  And if you don't

17:22  18   compensate for that in the designed and in the materials,

17:23  19   you won't have a filter that you can sell.

17:23  20       Not only that, it won't last as long either.  So this

17:23  21   is really an important aspect of whether you can make a

17:23  22   reliable filter.

17:23  23           **MR. DeFOSSE:**  And if we could go to 6.105.

17:23  24   **BY MR. DeFOSSE:**

17:23  25   **Q.**    This is the last trade secret in this group.  What's

*Shanfield - Direct*

17:23  1    this trade secret?

17:23  2    **A.**    This is a method that Qorvo had discovered, and

17:23  3    really, through hard work, had figured out how to predict

17:23  4    how long your filters are going to last in your phone, and

17:23  5    just, you know, thinking you're going to accelerate the

17:23  6    failure rate by a certain amount -- you don't know what

17:23  7    that -- how much more you're going to make it fail if it's

17:23  8    10 degrees hotter unless you do these kinds of

17:23  9    measurements.

17:23  10        But how you do these is actually hard to do.  You've

17:23  11    got to have a statistical quantity, a number, possibly

17:23  12    don't want to overdo it.  You don't know what temperature

17:24  13    to set it at to do the acceleration.  And this shows now

17:24  14    Qorvo's results on accelerating the failure in the BAW

17:24  15    filters.  This would be immediate use.

17:24  16    **Q.**    Did you consider whether the trade secrets in Trade

17:24  17    Secret Group 6 were generally known in the industry?

17:24  18    **A.**    Yes, I did.

17:24  19    **Q.**    And what was your conclusion on that?

17:24  20    **A.**    No, they're not.  And it was apparent to me in what I

17:24  21    know and am familiar with about reliability testing.  It

17:24  22    was particular to BAW filters.  That was not made public.

17:24  23    It was the result of a lot of work, and a lot of money to

17:24  24    get this kind of data.

17:24  25    **Q.**    And what would be the economic value of the trade

*Shanfield - Direct*

17:24   1    secrets in Group 6?

17:24   2    **A.**   Well, if a competitor were to get ahold of this,

17:24   3    well, first of all they'd skip over all the work that goes

17:24   4    into evaluating how their filters run -- how their filter

17:24   5    should test, I should say, and they also have -- they can

17:25   6    indicate their knowledgeability by talking about the test

17:25   7    they are implementing to the customers, who will also know

17:25   8    something about this.

17:25   9        And if they see now this start-up company seems to

17:25   10   know what they're doing in reliability, that's another

17:25   11   valuable commodity to be able to present to customers.

17:25   12   **Q.**   I'm going to ask you the question I've asked for

17:25   13   every group so far.

17:25   14       Do the trade secrets in Trade Secret Group 6 depend

17:25   15   on whether you are using any particular type of resonator?

17:25   16   **A.**   No, they do not.  Not at all.

17:25   17   **Q.**   Okay.  And why is that?

17:25   18   **A.**   Because the way it's mounted, the way the resonators

17:25   19   are mounted, whether they're mounted over an air gap or in

17:25   20   a Bragg reflector, it doesn't affect how reliable they

17:25   21   are.  That's not where the failure occur.  They all occur

17:25   22   in where the power is flowing.  And that's in the bulk and

17:26   23   in the electrodes.  So it's going to have the exact same

17:26   24   behavior in either case.

17:26   25   **Q.**   Could you use the same reliability testing methods

17:26  1    and procedures to test a filter that's made with FBAR and

17:26  2    resonators and a filter that's made with SMR resonators?

17:26  3    **A.**   Yes, you would.  You would account for the internal

17:26  4    temperature that might be different in one or the other,

17:26  5    but that's also reflected in these documents is how to do

17:26  6    that.  So you would do it the same way.

17:26  7              **MR. DeFOSSE:**  Okay.  Your Honor, I'm going to

17:26  8    go into a timeline.

17:26  9              **THE COURT:**  It's actually almost 5:30, so we

17:26  10   will stop for today.

17:26  11             Now, the plan, we'll talk with counsel, is to

17:26  12   try to let us go home closer to 5:00 or 5:15 tomorrow

17:26  13   because it's your weekend.  In fact, a couple of people

17:26  14   who are staying overnight might still -- we've got at

17:27  15   least one.  I know I have Seat Number 1.  I thought I had

17:27  16   two.  I do have two.  I feel better about that.  And that

17:27  17   was to try to give you a little better weekend, a little

17:27  18   better travel.  Although, I must admit sometimes you might

17:27  19   as well leave later or traffic isn't very good.  But we're

17:27  20   going to try to do that.  It's not a promise, but we will

17:27  21   try to.

17:27  22             Okay.  Now, all of you know that you will come

17:27  23   in.  We will start here at 8:30.  I will start here at

17:27  24   8:15.  I'll be here very early, and so I'll -- we'll be

17:27  25   ready to go at 8:30.  We have a full day tomorrow.  We'll

17:27  1    look at the time really hard.  I've got a plan.  We have

17:27  2    to get the case concluded so that you get the case next

17:27  3    week.

17:27  4          I'm not exactly sure the ending points there.

17:27  5    I can't tell.  It's impossible.  So I just wanted to keep

17:28  6    you up-to-date because you are the ones who are having to

17:28  7    do your civic duty, and we appreciate it.

17:28  8          Now, don't discuss the case amongst yourselves.

17:28  9    Don't let anybody talk with you about it.  We've got a

17:28  10   substantial way to go, and you must continue to keep an

17:28  11   open mind.

17:28  12         So we will see all of you in here at 8:30.  I

17:28  13   know you've been coming in, some as early as -- one guy's

17:28  14   here early.  Anyway, some earlier than others.  But we

17:28  15   will start at 8:30, so everybody try to be here a little

17:28  16   early, probably 8:15 at the latest.  Thank you all very

17:28  17   much.  We will see you.  Thank you.

17:28  18       (The jury exits the courtroom at 5:28 p.m.)

17:28  19         **THE COURT:**  All right.  We are going to let our

17:29  20   witness step down.  And, of course, you know the benefit

17:29  21   of the rule, which is that you can't talk about the

17:29  22   testimony you've already given.  I know it's the plan that

17:29  23   they move on.  I understand that.

17:29  24         But if someone wants to go back about something

17:29  25   else, the answer is -- and they know that.  They are not

17:29  1    supposed to do that.  And don't talk with them about the

17:29  2    schedule about your testimony.  We'll get your testimony

17:29  3    wrapped up and get as far as we can.

17:29  4                THE WITNESS:  Okay.

17:29  5                THE COURT:  I'm sure we will see you by 8:15.

17:29  6                THE WITNESS:  Yes.

17:29  7                THE COURT:  We'll get started here absolutely

17:29  8    no later than 8:30, but if they are all here.  We will

17:29  9    start at 8:25.

17:29  10               THE WITNESS:  That's fine with me.

17:29  11               THE COURT:  Thank you.

17:29  12         (The witness exits the courtroom at 5:29 p.m.)

17:29  13               THE COURT:  Everybody be seated.  For the

17:29  14   moment.  We will redo your timeline.  Your timeline keeps

17:29  15   slipping a little bit.  I'm just noticing; I'm not -- it's

17:29  16   not a criticism.  Everybody knows that we've got

17:29  17   limitations.  We will do our calculation again this

17:30  18   evening.  And everybody is well aware of there is a lot to

17:30  19   do, and there's a precise period of time, and we all

17:30  20   understand that there won't be extensions on the time, so

17:30  21   everybody is well aware of that and have to plan

17:30  22   accordingly.

17:30  23               Is there anything else?  I don't think there's

17:30  24   anything else we need to take care of at this time.  Well,

17:30  25   from the defense, we do need -- from the defense, we do

17:30  1   need to know the sequence of depositions because there may

17:30  2   be one that's being dropped -- I think.  I'm not sure --

17:30  3   in the depositions from the defense.  And so I think; I'm

17:30  4   not sure.  I can't tell.

17:30  5           So what is the situation on the sequence of

17:30  6   depositions.  We will get those ready and enter the

17:30  7   determinations on any objections.  There's not that many,

17:30  8   at least on one.  On one, there are a lot more objections.

17:30  9       **MR. DeFOSSE:**  Your Honor, Mr. Masters just

17:31  10  whispered in my ear that it's possible that we're going to

17:31  11  finish our witnesses tomorrow.  And so the case will be to

17:31  12  the other side.

17:31  13      **THE COURT:**  That would be the ideal situation.

17:31  14  I will say this, let's say we finish at, well, it depends.

17:31  15  We almost never give up any significant period of time.

17:31  16  If we finished at 5:00, we would stop.  If we finished at

17:31  17  4:15, just so the defense will know, we will not stop.

17:31  18          I do understand that there is sometimes motion

17:31  19  practice in between, and I'm aware of that.  But it would

17:31  20  be -- defense -- what you're saying is defense may want to

17:31  21  have one witness ready to go, and I understand that.

17:31  22      **MR. DeFOSSE:**  Obviously.

17:31  23      **THE COURT:**  Much appreciated, and, of course,

17:31  24  we will see how that goes.

17:31  25      **MR. ELKINS:**  We have one deposition.

*Shanfield - Direct*

17:31  1               THE COURT:  Right.

17:31  2               Just one?

17:31  3               MR. ELKINS:  Just one.

17:31  4               THE COURT:  I want to make sure which one it

17:31  5       is.

17:31  6               MR. ELKINS:  Ms. Giovanni, Mia Giovanni.

17:32  7               THE COURT:  That's fine.  That's fine.  We

17:32  8       wanted to make sure because I thought something had been

17:32  9       dropped already.  I thought you had another one listed.

17:32  10      Maybe not.  That's what we wanted to know.  Okay.  Yes,

17:32  11      sir.

17:32  12              MR. ELKINS:  And that was all I came up to tell

17:32  13      you.

17:32  14              THE COURT:  That's all I need to know?

17:32  15              MR. ELKINS:  Yes, Your Honor.  I will confer

17:32  16      with Mr. DeFosse and Mr. Masters to get a timeline to see

17:32  17      if actually there case will finish tomorrow.

17:32  18              THE COURT:  I've got it sketched out too.  And

17:32  19      that would be a lot to cover, but I think what I'm hearing

17:32  20      from Mr. DeFosse is that he expects to finish this

17:32  21      witness's testimony within the first 60 minutes of

17:32  22      resuming.

17:32  23              MR. DeFOSSE:  Yes.

17:32  24              THE COURT:  And I think that's probably about

17:32  25      right.  May be a little generous; is that about right?

*Shanfield – Direct*

17:32  1          **MR. ELKINS:**  Yeah.  My concern is I think

17:32  2    you've got 90 slides left if you use them all.

17:33  3          **MR. DeFOSSE:**  There's going to have to be some

17:33  4    revision on my side, Your Honor, but based on where I'm at

17:33  5    now, I would expect to be done within 60 minutes, yes.

17:33  6          **THE COURT:**  Okay.  Right and everybody

17:33  7    understands what we're dealing with.  And that's all we

17:33  8    can do.  And, obviously, we look forward to seeing you at

17:33  9    8:15.  I was told it's all right by people who count.  And

17:33 10    we will take up anything we need to.  Hopefully -- well,

17:33 11    we'll just see what we can do.  Thanks very much, and have

17:33 12    a good evening.

      13          (The proceedings concluded at 5:33 p.m.)

      14

      15

      16              CERTIFICATE OF COURT REPORTER

      17

      18      I hereby certify that the foregoing is a true and

      19    accurate transcript from my stenographic notes in the

      20    proceeding.

      21

      22                    /s/ Bonnie R. Archer
                            Bonnie R. Archer, RPR, FCRR
      23                    Official Court Reporter
                            U.S. District Court

      24

      25

# EXHIBIT K

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3   QORVO, INC.,                    )
                                    )
4             Plaintiff,            )
                                    )  C.A. No. 21-1417-JPM
5    v.                             )  Volume 5
                                    )
6   AKOUSTIS TECHNOLOGIES, INC.     )
    AND AKOUSTIS, INC.,             )
7                                   )
              Defendants.           )
8                                   )

9

10

11                  Thursday, May 10, 2024
                         8:16 a.m.
12                       Jury Trial

13

14                    844 King Street
                  Wilmington, Delaware
15

16   BEFORE: THE HONORABLE JON PHIPPS MCCALLA
         United States District Court Judge
17

18

19   APPEARANCES:

20

21               MORRIS NICHOLS ARSHT & TUNNELL
                 BY:  JEREMY A. TIGAN, ESQ.

22               -and-

23

24

25   APPEARANCES CONTINUED:

```
 1              SHEPPARD, MULLIN, RICHTER & HAMPTON
 2              BY:  ROBERT M. MASTERS, ESQ.
                BY:  JONATHAN R. DEFOSSE, ESQ.
 3              BY:  ZACHARY ALPER, ESQ.

 4                     Counsel for the Plaintiff

 5

 6

 7

 8              BAYARD, P.A.
                BY:  STEPHEN B. BRAUERMAN, ESQ.
 9
                -and-
10
                SQUIRE PATTON BOGGS
11              BY:  DAVID S. ELKINS, ESQ.
                BY:  RONALD S. LEMIEUX, ESQ.
12              BY:  VICTORIA Q. SMITH, ESQ.
                       Counsel for the Defendants
13

14                _ _ _ _ _ _ _ _ _

15

16              P R O C E E D I N G S

17

18      (Proceedings commenced in the courtroom beginning at

19   8:16 a.m.)

20           THE COURT:  You may be seated.  Couple things

21   we ought to go over.  You should have your times, which

22   you already know.  You had those earlier.  Anticipate that

23   since we might conclude today, that any motion by the

24   defense may be better presented in writing, as you may

25   have a break.  I'm sure you prefer that rather than having
```

08:16:51  1    to wing it, which is never the most desirable way to do

08:16:55  2    it.

08:16:55  3              So if that does occur, if we're really close to

08:17:02  4    concluding plaintiff's case, I would think that's what we

08:17:05  5    would do.

08:17:06  6              Now, time on that -- since you're getting more

08:17:07  7    time, I don't want to invite more stuff, particularly.  We

08:17:11  8    would usually expect that -- if somebody is working on

08:17:17  9    that already, and that we would get the motion at 3:00 on

08:17:29 10    Saturday.

08:17:31 11              You've got to recognize that, otherwise, you

08:17:33 12    would be giving it at side bar, and that's just not

08:17:36 13    effective, perhaps.  And then we would get the reply, at

08:17:41 14    least initial reply from the plaintiff by 12 noon on

08:17:49 15    Sunday.  That's not a great -- we said 3:00, 3:00 on

08:17:53 16    Sunday.

08:17:54 17              And recognizing that those motions are often

08:18:00 18    oral and, therefore, this is somewhat of an advantage to

08:18:05 19    both parties to be able to reduce it to writing.  If you

08:18:08 20    say, I want to make oral and I don't want to do it in

08:18:13 21    writing, I would certainly let you do that.  I just don't

08:18:15 22    think it's the most efficient way to do it.  So that's

08:18:19 23    what we're thinking about.

08:18:20 24              I wanted to tell you now so that if someone on

08:18:22 25    the defense particularly is working on that, that they

08:18:27 1   know probably how we are going to proceed.  Any problem

08:18:31 2   with that?  Let me see if there's any problem at all.

08:18:36 3   Sounds like it's an advantage, actually.  I think it is.

08:18:41 4          **MR. LEMIEUX:**  I don't think it's an advantage,

08:18:43 5   but it's not a problem, Your Honor.  We can certainly

08:18:44 6   comply with that.

08:18:53 7          **THE COURT:**  All right.  And then you can get

08:18:53 8   citations a little more precise.

08:18:56 9          And from the plaintiff, any problem with that?

08:18:57 10  I know it's a little tough, but sometimes it's a more

08:18:59 11  efficient way to handle it.  And, actually, it doesn't

08:19:01 12  take away time from the parties.  At least one party may

08:19:06 13  be concerned about it.

08:19:09 14         **MR. DeFOSSE:**  Yeah, I appreciate that, Your

08:19:11 15  Honor.  No problem.

08:19:12 16         **THE COURT:**  I will mention one thing, and that

08:19:13 17  is if the plaintiff, at the conclusion of the day,

08:19:22 18  contemplates the dismissal of any claim in the case, I

08:19:27 19  think that Mr. Lemieux would like to know that, as would

08:19:31 20  everybody else.  And we've had that happen.  It's not

08:19:36 21  unusual.  I don't want anybody who is a layperson out

08:19:38 22  there to think that's odd; it's not.  I'm not saying it

08:19:43 23  has to happen.  I'm just saying I know that defense

08:19:47 24  counsel would appreciate it, the Court would appreciate

08:19:51 25  it, and probably everybody else would if something is

08:19:55  1    going to be taken off the table.  And I'm sure that you're

08:19:57  2    reviewing everything, that's normal, and seeing where you

08:19:59  3    are.  And Mr. Masters has got it all right there,

08:20:04  4    checking.

08:20:07  5                 **MR. MASTERS:**  Good morning, Your Honor.  Yes.

08:20:08  6    That's very clear.

08:20:09  7                 **THE COURT:**  Okay.  And I don't know about you,

08:20:10  8    I take it you're just figuring out where you're going at

08:20:13  9    the end of the case.  That's not unusual.

08:20:16 10                 **MR. MASTERS:**  Yep.

08:20:17 11                 **THE COURT:**  You may not be abandoning anything.

08:20:19 12    Sometimes people do.

08:20:20 13                 You have been in cases where they have done

08:20:22 14    that, right?

08:20:22 15                 **MR. MASTERS:**  Yes.  Absolutely.

08:20:24 16                 **THE COURT:**  Okay.  Those are two things that we

08:20:26 17    needed to cover.  I need to make sure -- the idea is also

08:21:13 18    that -- I think you all have transcript copies at this

08:21:18 19    point.  Am I correct or incorrect in that regard?

08:21:24 20                 Mr. DeFosse, is that right or wrong?

08:21:26 21                 **MR. DeFOSSE:**  I believe we do have at least

08:21:27 22    roughs from each day.

08:21:29 23                 **THE COURT:**  Okay.  Mr. Lemieux, you do, too.

08:21:31 24    Okay.

08:21:36 25                 **MR. MASTERS:**  Your Honor, I have the expert

08:21:37  1   reports for the remaining experts on the plaintiff's side.

08:21:40  2   May I approach?

08:21:42  3         **THE COURT:**  Yes, sir.  I have been following

08:21:43  4   the other report to a significant degree.  Thank you very

08:21:47  5   much.  All right.

08:21:50  6         I will execute those.  We did have one thing

08:21:54  7   come up, which was I think we had an undercount, perhaps,

08:21:58  8   on the exhibits.  Just confirming we didn't get any

08:22:05  9   pushback on this at all.

08:22:06  10        So on Houlden, we added an additional set,

08:22:13  11  which I think was 110, A, B, C, D, where there apparently

08:22:26  12  was a little bit of a miscount.  And therefore, we needed

08:22:31  13  to have those on the Houlden materials.

08:22:35  14        I want to make sure.  Everybody is clear on

08:22:37  15  this?  Not sure.

08:22:48  16        **MR. DeFOSSE:**  Your Honor, we do -- yes, we

08:22:49  17  agree with that, that there are additional ones for

08:22:53  18  Houlden.  I have the PTX numbers, if that assists the

08:22:56  19  Court.

08:22:57  20        **THE COURT:**  Right.  I think you're talking

08:22:57  21  about PTX-0122, PTX-0132, PTX-0124, and PTX-0125.  That's

08:23:12  22  what we had, and we made them 110 A, B, C, D, and

08:23:21  23  indicated that, administratively marked late.  Each is a

08:23:27  24  separate Houlden exhibit.

08:23:29  25        That's PTX-0123 would be B.  Okay.  Exactly.  I

08:23:47  1    think we've got that straightened out.  Just as long as

08:23:51  2    they appear sequentially and people know what they are.

08:23:54  3              MR. DeFOSSE:  Okay.  Your Honor, we also have

08:23:55  4    three additional ones on our list.

08:23:58  5              THE COURT:  Did you have PTX-0079, PTX-0093,

08:24:01  6    and PTX-0108.  They're already marked.  It was PTX-0079,

08:24:12  7    PTX-0093, and PTX-0108.  I believe those were previously

08:24:21  8    marked.  Okay.  We will recheck that.  If not, we can

08:24:25  9    add -- we can balance it out.  You can recheck, too.  We

08:24:31 10    rechecked once.  We will check again.

08:24:33 11              MR. DeFOSSE:  Okay.  Thank you, Your Honor.

08:24:35 12              THE COURT:  Everybody can check.  We've got

08:24:36 13    time over the weekend.

08:24:39 14              I think that's it.  I know the court reporter

08:24:41 15    wishes we had a mic that's a little different, but we're

08:24:45 16    okay.

08:24:45 17              All right.  Is everybody ready to proceed

08:24:48 18    today?

08:24:49 19              MR. DeFOSSE:  We are, Your Honor.

08:24:50 20              THE COURT:  You are still looking at

08:24:51 21    55 minutes?

08:24:54 22              MR. DeFOSSE:  I hope so.  But if Your Honor

08:24:56 23    won't hold me to that, I'd appreciate it.

08:25:00 24              THE COURT:  That's fine.  We're watching your

08:25:01 25    time, and we know you're watching your time.  I was

08:25:04  1    saying, I assume it's under an hour.

08:25:08  2            MR. DeFOSSE:  I worked on it last night.  I'm

08:25:11  3    hoping I got it down to an hour.

08:25:13  4            THE COURT:  We understand.  We are going to

08:25:14  5    have the witness come back around to the witness stand.

08:25:21  6    Make sure you have whatever you need with you at the

08:25:25  7    witness stand, including water; that's fine.

08:25:31  8            Okay.  We may start five minutes early.

08:25:39  9            Is the plaintiff ready to proceed?

08:25:41  10           MR. DeFOSSE:  We are, Your Honor.

08:25:43  11           THE COURT:  Defense already is.  We're good.

08:28:04  12           Everyone can be seated, and counsel may

08:28:06  13   proceed.

08:28:08  14           MR. DeFOSSE:  Thank you, Your Honor.

08:28:08  15           STANLEY SHANFIELD, after having been previously

08:28:08  16   duly sworn or affirmed, was questioned and testified as

08:28:08  17   follows:

08:28:08  18                    DIRECT EXAMINATION

08:28:08  19   BY MR. DeFOSSE:

08:28:09  20   Q.    Good morning Dr. Shanfield.

08:28:11  21   A.    Good morning.

08:28:12  22   Q.    I'd like to pick up today where we left off

08:28:15  23   yesterday.

08:28:15  24           MR. DeFOSSE:  If we could pull up PDX-6.100.

          25

BY MR. DeFOSSE:

Q.   I believe yesterday when we left off, we were talking about Trade Secret Group 6; is that right?

A.   That's correct, yeah.

         MR. DeFOSSE:  6.100, please.

BY MR. DeFOSSE:

Q.   Dr. Shanfield, could you just remind the jury what Group 6 is, please?

A.   Group 6 is the Qorvo systems for testing reliability in meantime to failure.

Q.   And how many trade secrets were there in this group?

A.   A total of six.

         MR. DeFOSSE:  If we could go to 6.101, please.

BY MR. DeFOSSE:

Q.   And is this the document that is at issue in Trade Secret Group 6?

A.   Yes, it is.

Q.   Okay.  So I think yesterday we already went through and identified the specific trade secrets in that document I'd like to move now to your opinions concerning whether Akoustis obtained and used those trade secrets.  Okay?

A.   Sure.

Q.   Did you have an opportunity to consider whether Akoustis did obtain and use the trade secrets in Group 6?

A.   Yes, I did.

*Shanfield - Direct*

08:29:32  1          MR. DeFOSSE:  If we could go to 6.106, please.

08:29:37  2     BY MR. DeFOSSE:

08:29:37  3     Q.    Is this another one of your timelines?

08:29:40  4     A.    Yes, that's right.

08:29:41  5     Q.    Okay.  I'd like to, as in the past, go through the

08:29:45  6     events in this timeline.

08:29:47  7          If we could start with August 15, 2018, at 2:34 p.m.

08:29:55  8          MR. DeFOSSE:  Could we go to PDX-6.107, please.

08:30:00  9     BY MR. DeFOSSE:

08:30:00 10     Q.    Can you explain to the jury the significance of this

08:30:04 11     date and time?

08:30:06 12     A.    Yeah.  This was the date that a former Akoustis -- a

08:30:11 13     former Qorvo employee, rather, an Akoustis employee, John

08:30:14 14     Myrick, sends this document over to Mr. Houlden at

08:30:24 15     Akoustis.

08:30:25 16          MR. DeFOSSE:  If we could go to 6.108, please.

08:30:29 17     BY MR. DeFOSSE:

08:30:30 18     Q.    We are now August 25, 2018, at 3:00 p.m.; is that

08:30:33 19     right?

08:30:34 20     A.    That's right, yes.

08:30:35 21     Q.    Approximately 26 minutes later, what happened?

08:30:40 22     A.    Mr. Houlden then sends the technical presentation to

08:30:44 23     the person at Akoustis who's responsible for reliability

08:30:48 24     testing.  That's Joel Morgan.

08:30:51 25          MR. DeFOSSE:  And then if we can go to

08:30:54 1    PDX-6.109, please.

08:31:00 2    **BY MR. DeFOSSE:**

08:31:00 3    **Q.**   We're now at 3:10 p.m. on that the same day.   What

08:31:01 4    happened, then?

08:31:02 5    **A.**   Mr. Houlden also sends the Qorvo confidential

08:31:06 6    document to the director of business systems, Pat Lewis,

08:31:11 7    and he writes that "Page 4 and 5 should look very

08:31:14 8    familiar."

08:31:15 9        So Mr. Lewis would be familiar with that; he's a

08:31:18 10   former Qorvo employee.

08:31:20 11            **MR. DeFOSSE:**   If we next at 6.110.

08:31:27 12   **BY MR. DeFOSSE:**

08:31:27 13   **Q.**   We're on August 16 now, the next day.   What happened?

08:31:32 14   **A.**   Here's where Mr. Houlden then sends that same

08:31:35 15   confidential document filled with lots of information

08:31:39 16   about reliability testing to Dave Aichele, the VP of

08:31:44 17   business development at Akoustis.

08:31:47 18            **MR. DeFOSSE:**   And if we could pull up 6.111,

08:31:51 19   please.

08:31:53 20   **BY MR. DeFOSSE:**

08:31:53 21   **Q.**   Dr. Shanfield, how do you know that Akoustis was

08:31:56 22   using the Qorvo trade secrets in Group 6?

08:32:02 23   **A.**   This is an important e-mail in that Joel Morgan, the

08:32:08 24   VP of quality, is telling Rohan Houlden that the primary

08:32:16 25   document he's been referencing regarding the methodology

*Shanfield - Direct*

08:32:20  1   for three temperature testing and meantime to failure is

08:32:24  2   the confidential Qorvo document explicitly saying this is

08:32:28  3   the primary document I've been referencing.

08:32:32  4       So he's using the confidential information in doing

08:32:36  5   his reliability evaluation.

08:32:38  6   **Q.**   Can you just, for the jury, at a high level, what is

08:32:41  7   three temperature testing?

08:32:43  8   **A.**   That's -- there's a technique for trying to predict

08:32:48  9   the life of a part and since you can't wait 20 years to

08:32:51 10   see if it fails, you to have speed it up by heating it up.

08:32:55 11   But what temperature you do that at, what the statistics

08:32:58 12   are, how many do you heat up at that temperature, and what

08:33:02 13   different temperatures do you use, all of that is

08:33:05 14   something that Qorvo had worked out by experience through

08:33:09 15   the years.  It's particular to BAW filters.  It doesn't

08:33:15 16   matter whether SMR or FBAR.  The effects work the same

08:33:20 17   way.  So they were making use of Qorvo's information about

08:33:24 18   how to do that evaluation.

08:33:26 19   **Q.**   And is three temperature testing and meantime to

08:33:29 20   failure testing what is disclosed in the confidential

08:33:33 21   Qorvo presentation that Akoustis was circulating?

08:33:35 22   **A.**   Yes, that's exactly what's in there.

08:33:39 23               **MR. DeFOSSE:**   Your Honor, may I approach?

08:33:41 24               **THE COURT:**   You may.

         25

*Shanfield - Direct*

BY MR. DeFOSSE:

Q.   Dr. Shanfield, I've handed you what's been marked for identification as PTX-1450.  Would you agree with me that this appears to be an e-mail from Joel Morgan, the VP of quality, at Akoustis to Paul Makowenskyj?

A.   Yes, that's what it is.

Q.   And is this one of the documents that you considered in forming your analysis concerning Trade Secret Group 6.

A.   Yes, it is.

        MR. DeFOSSE:   Could we please pull up PDX-6.112.

BY MR. DeFOSSE:

Q.   Did Akoustis continue to use Qorvo's confidential reliability testing after Mr. Morgan sent his e-mail that we just saw in April 2019?

A.   Yes, he did.

Q.   Okay.  And what is the significance of the information that you've depicted on Slide 112?

A.   This is another example where Mr. Morgan is sending the same packet of Qorvo confidential information to Paul Makowenskyj, and he's the quality engineering manager.  So the point that he's the quality engineering manager means he's -- clearly from the VP of quality is intending to have him make use of this document.

Q.   Just for the jury's perspective or information here,

08:35:20  1    the VP of quality and quality engineer, are those the

08:35:25  2    folks at a company that would be doing the three

08:35:27  3    temperature testing and meantime to failure testing?

08:35:30  4    **A.**   Yes.   Good point.   Exactly.   It would.

08:35:32  5         **MR. DeFOSSE:**   Your Honor, plaintiff would offer

08:35:34  6    into admission PTX-1450.

08:35:39  7         **THE COURT:**   Marked and received as 226.

08:35:43  8         (Trial Exhibit No. 226 was admitted into

08:35:43  9    evidence.)

08:35:44  10   **BY MR. DeFOSSE:**

08:35:48  11   **Q.**   Dr. Shanfield, if we take a step back -- I'm sorry.

08:35:50  12   I can't recall if I asked you this yesterday.

08:35:53  13        Are the trade secrets in Group 6 for reliability

08:35:57  14   testing applicable to both FBAR and SMR filters?

08:36:00  15   **A.**   Yes, they are.

08:36:02  16   **Q.**   And why is that?

08:36:04  17   **A.**   Because the place where these devices fail is up in

08:36:09  18   the -- where the electrode, the sandwich of the material

08:36:12  19   that vibrates exists.   It doesn't matter what's underneath

08:36:17  20   this vibrating resonator.   The failure actually occurs up

08:36:22  21   in the metal part and in the bulk of vibrating material.

08:36:25  22   So it wouldn't matter -- in other words, what applies to a

08:36:29  23   FBAR filter would apply to an SMR filter in the same way.

08:36:35  24   **Q.**   I'd like to move now to Trade Secret Group 7?

08:36:39  25        **MR. DeFOSSE:**   Could we pull up 6.113, please.

**BY MR. DeFOSSE:**

**Q.**    This trade secret group relates to Qorvo's manufacturing assembly and change procedures; is that right?

**A.**    That's correct, yeah.

**Q.**    Can you explain at a high level what role manufacturing, assembly, and change procedures play in this industry?

**A.**    Yes.  They're really important.  They look simple in a way, but what matters is when you're manufacturing millions of items, the consistency and the fact that it meets the customer's specification all the time has to be met.  And to do that, what people have learned, and Qorvo learned, is you have to implement certain rules in how you set up your manufacturing assembly and how you make any change in the process of manufacturing.  If you don't control that tightly, you'll end up with an inconsistent product or a failure and you'll have -- you'll lose customers.

So they're really important.  The detail of how you do that is actually pretty subtle; what you look at, how you spend your money, the spec, et cetera, is particular to the product, and it's going to make a big difference.

        **MR. DeFOSSE:**  Could we go to PDX-6.114, please.

*Shanfield - Direct*

**BY MR. DeFOSSE:**

**Q.**   How many trade secrets are there in Group 7,

Dr. Shanfield?

**A.**   There are four.

          **MR. DeFOSSE:**   And if we go to PDX-6.115,

please.

**BY MR. DeFOSSE:**

**Q.**   What documents did you analyze in connection with the

four trade secrets in Group 7?

**A.**   So these were the four.   They were packaging

qualification assembly specification reflow documents and

visual inspection.   I'll explain, to some extent, what

those are.

**Q.**   Okay.   And why don't we do that.

          **MR. DeFOSSE:**   If we go to 6.116.

**BY MR. DeFOSSE:**

**Q.**   Is Trade Secret 7.1 related to package qualification?

**A.**   Yes.   This is --

**Q.**   Okay.   Please explain that.

**A.**   Yes.   I blew up part of this form to show the kind of

detail you need.   You think mounting a chip in a package

should be simple, but there's materials, like solder, that

are used to attach the chip and then there's wire bonds

that you use to electrically connect the chip to the

outside world.   There's how you seal the package.

*Shanfield - Direct*

1      And all of this has to do with how is the package

2  going to be able to protect the chip and prevent it from

3  failing, you know, in a year or two.

4      So the details of that are described here, like

5  stencil material.  Why do you need a stencil?  Well,

6  you're stenciling solder, actually, before you run it

7  through the reflow furnace.  And those are the kinds of

8  details.  So it's actually page after page of this kind of

9  explanation particular to packaging the BAW filters that

10 Qorvo made, and that's what this represents.

Q.  If I could maybe take this up one level and just make

sure we're talking about -- what is "packaging" in this

context, how about that?

A.  Yeah.  Should have done that.

15     So you saw these tiny chips that are filters.  You've

16 got to put them in something that allows, let's say, the

17 phone manufacturer Apple to then insert it in their phone

18 and connect it up.  And it's got wires or little tabs

19 hanging out of it.  That's the package.

20     Sometimes it's going to be vacuated, pumped out so

21 there's no gas in it.  There's solder.  There's wire bonds

22 inside that tiny package.  And all of those details matter

23 a lot as to whether this thing -- if you solder it wrong

24 and leave it with stress, it will crack in a few months.

25 Those kinds of details is what's being described in the

1    document.

2    **Q.**    Okay.  And this document relates to the qualification

3    of packaging.  What does the qualification of packaging

4    mean?

5    **A.**    So what is done routinely, and Qorvo learned how to

6    do this and came up with the processes for doing this, is

7    you have to routinely check whether your package process

8    is producing chips plus packages that survive -- you know,

9    your cell phone gets left in the car, it's 150 degrees in

10   the car.  Is it going to crack?  Is it going to be a

11   failure of some kind?  If it's minus 30 degrees, you're

12   taking a ski trip.  Your phone is sitting there.  It has

13   to -- the package and its manufacture process has to be

14   tested.  That qualification procedure is also described in

15   this document.

16   **Q.**    Dr. Shanfield, if we could go to PDX-6.117, what is

17   Trade Secret 7.2?

18   **A.**    This is the assembly instructions, and, again, like

19   assembling -- if you are taking filter chips, and you

20   might put other chips in the package with the filter or

21   have them all on a substrate in the package, that's called

22   assembly.  And the instructions are, for example, how you

23   make little places for the wire bonds to land.  This

24   cross-section shows that they are pretty complicated

25   items.  They have gold, palladium, nickel in them.  And

*Shanfield – Direct*

1    it's a description of how you do that plating of those

2    little landing areas on a package.  There's lots of other

3    details like that.  This is a good example.

4         **MR. DeFOSSE:**  If we could go to 6.118.

5    **BY MR. DeFOSSE:**

6    **Q.**  The next trade secret relates to reflow processes.

7    Can you explain reflow processes to the jury?

8    **A.**  Sure.  I mentioned that stencil where you wipe what's

9    kind of a liquid mixed with solder and put solder dots in

10   the package, and then you run it through an oven and melt

11   that solder all at once.  It is a manufacturing process,

12   and it's called reflow.

13        But you have to condition the surfaces.  You can't

14   just stencil on this paste and solder and run it through

15   the oven.  There's all kinds of conditions; heating it,

16   evacuating.  And that's the description given here.  This

17   is what Qorvo's learned works gives them a reliable chip.

18   **Q.**  Again, Dr. Shanfield, maybe we can take this up a

19   level.  You mentioned "solder."  What is solder?

20   **A.**  Yeah.  That's a mixture of metals that melts at a

21   pretty low temperature, and so when you put it in an oven,

22   you don't have to heat it up so hot that you kill the

23   chip, but it does melt.  And they know when it freezes, it

24   hold wires and conducts electricity and it does that

25   reliably.  That's the solder material.

*Shanfield - Direct*

**Q.**   Okay.  And was using solder and reflow processes known in the industry?

**A.**   Oh, yes.

**Q.**   Okay.  And why do you think Qorvo had trade secrets related to the use of solder and reflow?

**A.**   Well, what's being described here is particular processes for particular alloys.  There's hundreds of alloys of solder; there's dozens of different preparation techniques for surfaces.  Qorvo had to figure out what works and gives us a reliable mount chip in a package.  So it's specific to what Qorvo's product was.

         **MR. DeFOSSE:**  If we could move to 6.119.

**BY MR. DeFOSSE:**

**Q.**   This is the last trade secret in Group 7.  Could you explain this one to the jury, please?

**A.**   Yeah.  Another point that matters a lot is what's called visual inspection.  And like it sounds, you put the part or the packaged part in a -- under a microscope, and you've got to know how to look for the various kinds of defects that might be on a chip that might be in the wiring.

         And these, if you can see in this right here, this photograph is kind of examples of the kind of defects you run into on chips or in wiring.  And you've got to identify which ones are going to cause a failure or which

*Shanfield - Direct*

08:45:24  1    ones are acceptable.  So this is all born of experience

08:45:30  2    and learning how to make, you know, sort between good and

08:45:34  3    bad.

08:45:36  4    **Q.**    Okay.  Now, Dr. Shanfield, the question I'm going to

08:45:38  5    ask you on every one of these group, do the trade secrets

08:45:41  6    in Group 7 relate to both SMR -- filters with SMR-type

08:45:47  7    resonators and filters with FBAR-type resonators?

08:45:51  8    **A.**    Yes, they do.  Defects, the soldering procedures, all

08:45:56  9    of the assembly procedures, they all are the same between

08:46:00 10    the two devices.

08:46:01 11    **Q.**    And when we're talking about assembly in Group 7, are

08:46:05 12    we talking about assembling the specific resonators that

08:46:09 13    are within the filters?

08:46:11 14    **A.**    No.  This is assembly with a chip.  So the filters

08:46:16 15    are done, and you're assembling now the wiring and the

08:46:19 16    package configurations, you know, after you've built the

08:46:24 17    resonators and the filters.

08:46:25 18    **Q.**    So the resonators are already inside the filters?

08:46:28 19    **A.**    Yes, correct.

08:46:30 20    **Q.**    Were the trade secrets in Group 7 generally known in

08:46:33 21    the industry?

08:46:34 22    **A.**    No.  I think it was everybody knew that you had

08:46:39 23    visual inspection criteria.  Any company is going to have

08:46:44 24    criteria.  But it's specific to the particular kind of

08:46:47 25    product that's being inspected, obviously.  And these

08:46:52  1    inspection procedures -- this goes with the other points

08:46:55  2    too -- is particular to the product, the Qorvo product.

08:47:00  3    **Q.**    And did you have a chance to assess the economic

08:47:03  4    value of the trade secrets in Group 7?

08:47:05  5    **A.**    Yes, I did.

08:47:06  6    **Q.**    And what did you conclude?

08:47:08  7    **A.**    I concluded that there was real economic value, the

08:47:12  8    reason being that there's experience built into what was

08:47:16  9    described in these documents, and you could see it page by

08:47:19 10    page.  This is things they've learned cause failures, so

08:47:23 11    they have failures identified.  Somebody makes use of

08:47:27 12    this, a competitor, for example, they won't have to go

08:47:30 13    through the hard work of figuring what gives good or bad

08:47:33 14    products; it's been work out for them, so they save time

08:47:37 15    and money.

08:47:38 16    **Q.**    Did you also have the opportunity to consider whether

08:47:41 17    Akoustis obtained and used the trade secrets in Group 7?

08:47:43 18    **A.**    Yes, I did.

08:47:45 19           **MR. DeFOSSE:**    All right.  If we could go to the

08:47:47 20    PDX-6.120, please.

08:47:49 21    **BY MR. DeFOSSE:**

08:47:52 22    **Q.**    Is this your timeline for Group 7, Dr. Shanfield?

08:47:55 23    **A.**    Yes.

08:47:55 24    **Q.**    Okay.  Before we jump in the timeline, I wonder if

08:47:58 25    you can just provide some context to the jury as to what

08:48:01 1    was going on at Akoustis in 2019 and 2020 that would make

08:48:05 2    these manufacturing assembly and change procedures

08:48:09 3    relevant to Akoustis?

08:48:10 4    **A.**    Yes.  It's -- I found it was a good idea to keep in

08:48:14 5    mind what was going on at Akoustis.  So at that point,

08:48:17 6    they had chips coming back from their fab, and they were

08:48:20 7    worrying about doing volume manufacturing.  They had been

08:48:24 8    offering samples, now they were being asked to manufacture

08:48:28 9    millions, tens of millions, hundreds of millions of these

08:48:33 10   devices.  And so the context here is that the attention

08:48:39 11   turned to, we need manufacturing procedures; where are we

08:48:43 12   going to get them?  And this, I think, you can see was, it

08:48:46 13   drove them to make use of the Qorvo confidential

08:48:51 14   documents.

08:48:51 15   **Q.**    Okay.  Your timeline starts on October 16, 2019.

08:48:56 16   What's the relevance of that date?

08:48:58 17   **A.**    There's a guy named Robert Dry, who starts working at

08:49:03 18   Akoustis.

08:49:03 19           **MR. DeFOSSE:**    And now if we could go to

08:49:06 20   PDX-1.21.

08:49:08 21   **BY MR. DeFOSSE:**

08:49:08 22   **Q.**    We're at January 16, 2020, so couple of months after

08:49:14 23   Mr. Dry joins.  What did you see that supported your

08:49:17 24   opinions as to Akoustis' use of Qorvo's trade secrets?

08:49:22 25   **A.**    So Mr. Dry was the vice president of what they call

*Shanfield - Direct*

08:49:26 1    final operations; that's like assembly and packaging.  He

08:49:30 2    sends an e-mail to the vice president of quality, and so

08:49:37 3    these are now executive level people in Akoustis, and he

08:49:42 4    has two confidential documents from Qorvo.  And he says,

08:49:45 5    "Look what I have."  And he's got this visual inspection

08:49:50 6    criteria.

08:49:51 7    **Q.**    Are these visual inspection criteria relevant to a

08:49:55 8    person in the position of Mr. Morgan as VP of quality?

08:49:59 9    **A.**    Yes.  The fact that Mr. Dry sent this to him, that's

08:50:04 10   exactly where you need visual inspection criteria, there

08:50:08 11   Mr. Dry.  I think the fact that he is sending it to the VP

08:50:13 12   of quality, he is saying, "let's use this."

08:50:16 13            **MR. DeFOSSE:**    Okay.  If we could go to

08:50:17 14   PDX-6.122, please.

08:50:20 15   **BY MR. DeFOSSE:**

08:50:20 16   **Q.**    Okay.  We're still on the same day, January 16, 2020.

08:50:24 17   What happened -- what else happened on that day?

08:50:28 18   **A.**    So Mr. Dry sets up a meeting, a Microsoft Teams

08:50:33 19   meeting, and he wants to review documents and requirements

08:50:37 20   for wafer inspection, but he attaches this document that's

08:50:43 21   the Qorvo Confidential Wafer Inspection Procedure.  So the

08:50:47 22   implication is he really wants to talk about this

08:50:51 23   document.  And, you know, the meeting is scheduled for the

08:50:58 24   following week.

08:50:58 25   **Q.**    And who was Mr. Dry scheduling this meeting to

*Shanfield - Direct*

1    discuss the Qorvo document with?

2    **A.**    Yeah.  It was all the people that would be involved

3    with doing being affected by visual inspection, including

4    Mary Winters, who is the fab VP; Ken Fallon, the director

5    of fab operations; the vice president of quality,

6    Mr. Morgan; and Brook Hosse, who is a product engineer.

7         **MR. DeFOSSE:**    If we could go to 6.123.

8    **BY MR. DeFOSSE:**

9    **Q.**    Four days later now.  What happened?

10    **A.**    So the document is sent, again, Mr. Dry sends it --

11    let's see if I can read this quickly.  Oh, yes, Mr. Dry

12    sends it to Mary Winters and Ken Fallon and also few other

13    Akoustis employees.

14         This wafer inspection document review.  It's still a

15    Qorvo confidential document, but he mentions that he has

16    edited out former references, and when I took a look at

17    what that document looked like, all he had done is taken

18    out all Qorvo's -- where it showed on each page "Qorvo"

19    and relayed it with, either left it empty or in some cases

20    replaced it with Akoustis.

21    **Q.**    Mr. Dry said that he had edited out for good reasons;

22    is that right?

23    **A.**    Yes.  Former references, meaning he's edited out the

24    "Qorvo."  So it's indicating he's well aware that using

25    Qorvo's confidential information is something he shouldn't

08:52:50  1    be doing.

08:52:52  2              **MR. DeFOSSE:**  If we go to PDX-1.25 now.

08:52:59  3    **BY MR. DeFOSSE:**

08:52:59  4    **Q.**  Were there other occasions on which Mr. Dry shared

08:53:03  5    Qorvo's manufacturing assembly and change procedures?

08:53:07  6    **A.**  Yes.  Here is a point where Mr. Gray asked Mr. Dry to

08:53:13  7    get a copy of another procedure, a Qorvo procedure.  He

08:53:17  8    says, "Do you have a copy of the Q reflow policy?"  Q

08:53:23  9    meaning Qorvo.  I guess he's trying to be secretive.

08:53:28 10        So they were passing around these procedures and

08:53:30 11    using them.  And it's my opinion, the fact there was a

08:53:32 12    clear understanding among the group that this is what was

08:53:37 13    available, and they were going to take advantage of it.

08:53:41 14    **Q.**  And this was May 19-2020?

08:53:44 15    **A.**  That's correct.

08:53:45 16              **MR. DeFOSSE:**  Okay.  If we could go to the next

08:53:46 17    day, May 20.

08:53:49 18    **BY MR. DeFOSSE:**

08:53:49 19    **Q.**  How did Mr. Dry respond to Mr. Gray's request?

08:53:55 20    **A.**  He produced -- Robert Dry has produced this

08:53:59 21    implementation requirements for reflow preconditioning.

08:54:02 22    It's a Qorvo document once again.  And he says, "Found

08:54:06 23    it," and he sends it along to Mr. Gray.

08:54:10 24        So there was documents, confidential Qorvo documents

08:54:14 25    being passed around to people in quality and inspection

08:54:20  1    and manufacturing.  And there seems to be a feeling that

08:54:24  2    these could be freely passed about and used however they

08:54:28  3    want.

08:54:28  4            **MR. DeFOSSE:**  And if we go to PDX-1.27, please.

08:54:33  5    **BY MR. DeFOSSE:**

08:54:33  6    **Q.**  What happened next?

08:54:36  7    **A.**  Here's another example where confidential reflow

08:54:42  8    documents, where you melt the solder, the procedure for

08:54:45  9    doing that.

08:54:46 10        Mr. Gray asked for more of these documents.  And he

08:54:50 11    says -- from Mr. Gray, he says, "Thanks.  This describes

08:54:56 12    the how" -- that means how you do the reflow.  "Do you

08:54:59 13    have, by chance," and then names another document that's a

08:55:02 14    Qorvo document.

08:55:04 15        So he's looking for more information.  Mr. Dry, the

08:55:07 16    vice president of final operations then produces that

08:55:11 17    document and says, "Here you go."

08:55:15 18        So as I said earlier, they're passing around these

08:55:17 19    confidential documents, and the people involved all know

08:55:22 20    this is not what they should be doing.

08:55:29 21    **Q.**  Okay.  I'd like to turn to Trade Secret Group 8 now,

08:55:32 22    Dr. Shanfield.

08:55:32 23            **MR. DeFOSSE:**  Could we pull up PDX-1.31.

08:55:40 24    **BY MR. DeFOSSE:**

08:55:40 25    **Q.**  First, can you remind the jury what Trade Secret

08:55:42  1    Group 8 is?

08:55:44  2    **A.**    Yes.  This is the last group.  This is Qorvo's

08:55:48  3    product roadmaps, and the actual product prototypes.

08:55:52  4    **Q.**    And how many trade secret are in Trade Secret

08:55:55  5    Group 8?

08:55:58  6    **A.**    I picked out five.

08:55:59  7              **MR. DeFOSSE:**  If we could go to PDX-6.123,

08:56:05  8    please.

08:56:07  9    **BY MR. DeFOSSE:**

08:56:07 10    **Q.**    What information did you consider in assessing the

08:56:10 11    five trade secrets in Group 8?

08:56:14 12    **A.**    I'm showing that, here, there was specification

08:56:16 13    sheets that were confidential, and there was a Wi-Fi

08:56:23 14    roadmap document that was full of useful information, and

08:56:26 15    also automotive prototype documents to discuss what Qorvo

08:56:31 16    was doing in the automotive filters.

08:56:33 17              **MR. DeFOSSE:**  If we could go to PDX-6.133,

08:56:37 18    please.

08:56:40 19    **BY MR. DeFOSSE:**

08:56:40 20    **Q.**    What are Trade Secrets 8.1 and 8.4?

08:56:45 21    **A.**    These are confidential documents.  They said

08:56:48 22    "Confidential NDA required."  They were timelines telling

08:56:52 23    whoever read them what Qorvo was planning to do in

08:56:57 24    delivering these new products, the 5.2 gigahertz and

08:57:01 25    5.6 gigahertz products, and the features of those new

1    products.

2        So they were filled with useful information to a

3    competitor.

**Q.** And data sheets are at some point in time published

5    publicly; is that right?

**A.** That's right.

**Q.** Okay. So why would you say that the anticipated

8    features and performance that are in the data sheets that

9    you are showing here are trade secrets?

**A.** The way the industry works is a company like Qorvo

11    creates a data sheet that is not intended to be

12    distributed publicly and only distributed to people that

13    are intending to buy the product, and that's why they say

14    "Confidential and nondisclosure agreement required,"

15    meaning they've come to the agreement between a potential

16    customer and Qorvo that they won't distribute this

17    document.

18        So at the point before the product is released to a

19    general consumption, this can go on for many months,

20    sometimes a year, before eventually a data gets released.

**Q.** And is the process of entering NDAs with customers

22    and sharing prototypes standard in the semiconductor

23    industry?

**A.** Yes. Completely. Everybody knows it and everybody

25    has done it, including these gentlemen.

*Shanfield - Direct*

**Q.**   Okay.

             **MR. DeFOSSE:**  If we could go to 6.32 please --

6.132.  All right.  Sorry.  Moving backwards.  We want to

go forwards.  Sorry 6.135.

**BY MR. DeFOSSE:**

**Q.**   What is Trade Secret 8.2.

**A.**   This is the actual prototypes that Qorvo had produced

and put on boards of their new product at 5.2 and 5.6

gigahertz.  So it's the hardware.

**Q.**   And what are the trade secrets that are related to

these prototypes?

**A.**   Well, there's a lot of them here.

       First of all, you can evaluate the board and see how

it works.  And testing is about it, that you can maybe

make it fail.  You can take it apart.  You can examine how

the board was designed.  You can examine a chip itself in

the cross section.  So you've learned now what Qorvo plans

to do, how -- to the extent you can, what they did looks

like.  So there's a lot of information in this.

             **MR. DeFOSSE:**  If we can go PDX-6.136.

**BY MR. DeFOSSE:**

**Q.**   What is Trade Secret 8.3?

**A.**   So this is some details now of Qorvo's analysis of

the Wi-Fi market now, the 6E Wi-Fi market.

**Q.**   Okay.

*Shanfield - Direct*

08:59:52  1          MR. DeFOSSE:  And if we could go to PDX-1.37.

08:59:56  2     BY MR. DeFOSSE:

08:59:56  3     Q.    What is Trade Secret 8.5?

08:59:59  4     A.    Qorvo was also looking into the automotive filter

09:00:04  5     market, and they had analysis of the market.  And they had

09:00:11  6     prototypes.  So this is the performance that was

09:00:18  7     associated with this analysis.  And it basically explained

09:00:24  8     what Qorvo's interest was, where the interest lies --

09:00:27  9     would lie, and, you know, other details that would be

09:00:31 10     really useful to a competitor.

09:00:34 11     Q.    Did you have a chance to assess whether the trade

09:00:38 12     secrets in Group 8 were generally known in the industry?

09:00:41 13     A.    Yes, I did.

09:00:42 14     Q.    And what did you conclude?

09:00:45 15     A.    No, this is information was not known.  It was clear.

09:00:49 16     Anybody in the industry would recognize that this -- that

09:00:52 17     this was not publicly released information.  This was

09:00:57 18     confidential.  It was specific to potential customers of

09:01:01 19     Qorvo and should not be in anybody else's hands.

09:01:05 20     Q.    And did you assess the economic value of the trade

09:01:07 21     secrets in Group 8?

09:01:09 22     A.    Yes, I did.

09:01:11 23     Q.    And what were your opinions on the economic value?

09:01:15 24     A.    So all of this information, prototypes, boards, the

09:01:20 25     market information, you can imagine how useful that is to

1    a competitor, also to the engineering staff, as they have

2    a look at what Qorvo's doing, how to compete, so you can

3    get the jump on Qorvo's work.

4        So, in a lot of aspects, there's real economic lift.

5    And I'd -- you know, I'd say it's very high economic

6    value.

7    **Q.**   And did you have the chance to assess whether

8    Akoustis obtained and used the trade secrets in Trade

9    Secret Group 8?

10   **A.**   Yes, I did.

11   **Q.**   And what did you conclude?

12   **A.**   That they had definitely done that.  There was

13   circulation of this information.  As you will see, the

14   boards -- or maybe we won't have time, but the boards were

15   used.  They were sent to be tested.  There was use of this

16   information in numerous ways.

17   **Q.**   Okay.

18           **MR. DeFOSSE:**  Could we please pull up

19   PDX-6.138.  And could we put next to that one 6.145.

20   **BY MR. DeFOSSE:**

21   **Q.**   In Trade Secret Group 8, Dr. Shanfield, you actually

22   have multiple timelines; is that right?

23   **A.**   Yes.

24   **Q.**   Okay.

25           **MR. DeFOSSE:**  And let's -- if we can also now

*Shanfield - Direct*

1  pull up -- I don't know if you can do it side by side --

2  PDX-1.54.

3  **BY MR. DeFOSSE:**

4  **Q.**  So why do you have so many timelines for Trade Secret

5  Group 8?

6  **A.**  Well, it's good to understand the context here in

7  that, for one thing, if you recall, Akoustis had delivered

8  a sample part of a 5 gigahertz filter and -- before Qorvo

9  had gotten any 5 gigahertz parts out for sampling.

10  And the performance was, you know, okay.  But the

11  point was, nobody else had any 5 gigahertz filters, so

12  they had an advantage in their position at the time.

13  Then there was word that Qorvo was coming out with

14  5 gigahertz parts, and there's a panic ensuing, as to how

15  I read it, looking at all this flurry of activity.

16  The performance seemed better and the threat was --

17  seemed to generate a panic in Akoustis.

18  **Q.**  Okay.  And as a result of that panic, what did you

19  see Akoustis out doing?

20  **A.**  They -- at the highest levels of the company,

21  including CEO, engaged in obtaining confidential

22  information about Qorvo's products any way they could

23  think of.  So there was reaching out in all directions is

24  what I saw.  I can show you some of the evidence of that.

25  **Q.**  Okay.

09:04:26  1          **MR. DeFOSSE:**  I'd like to start with PDX- --

09:04:28  2     and for this group, I think we're going to take things a

09:04:32  3     little bit out of timeline.  So I want to do PDX-146 --

09:04:36  4     6.146 first.

09:04:40  5     **BY MR. DeFOSSE:**

09:04:41  6     **Q.**    Okay.  Can you remind the jury who SJ Kim is?

09:04:45  7     **A.**    Mr. Kim is the country manager for Korea and sales

09:04:50  8     manager.

09:04:51  9     **Q.**    And I think we've obviously seen this before, but

09:04:53 10     just very briefly, what's the relevance of the information

09:04:57 11     that you have on PDX-1.46?

09:05:02 12     **A.**    This is the point that you've heard about where

09:05:04 13     Mr. Kim uses these expenses, entertainment expense as it

09:05:13 14     turned out, to get Qorvo information.  So he's using that

09:05:15 15     money to obtain information.

09:05:16 16     **Q.**    And that's what Mr. Kim referred to as the "key

09:05:20 17     confidential information"?

09:05:20 18     **A.**    That's correct.

09:05:21 19          **MR. DeFOSSE:**  And then if we could pull up

09:05:24 20     PDX-157.

09:05:30 21     **BY MR. DeFOSSE:**

09:05:30 22     **Q.**    Okay.  The e-mail that we just saw from Mr. Kim was

09:05:33 23     in August of 2019.  We're now August 7, 2020, so a year

09:05:39 24     later.  Did his activities, with his expense account,

09:05:43 25     continue?

**A.**   They did.   This e-mail shows one example where he's

sending a zip file filled with Qorvo confidential data,

and he's asking -- this is to Dave Aichele, who's a VP at

Akoustis, saying, "Don't ask me where I get from.

Frankly, I always use my expense for the right purpose."

So he's apparently -- you know, the way I read it,

he's still using money to get this confidential

information.

**Q.**   Okay.

        **MR. DeFOSSE:**   And then if we could go to

PDX-147.

**BY MR. DeFOSSE:**

**Q.**   I'd like to focus in specifically on the 5 gigahertz

information that Akoustis was seeking in the market about

Qorvo.

    What is the relevance of 6.147?

**A.**   So, here, Dave Aichele is getting an e-mail from

Steven Li.   And he sends attached in this e-mail a couple

documents.   One is a "Confidential NDA required" data

sheet that was explaining Qorvo's new product.   It was not

intended to be given to competitors.   And he also included

some data on this new device.

So there's now confidential information being sent to

Mr. Aichele.

        **MR. DeFOSSE:**   If we could go to PDX-6.148,

please.

BY MR. DeFOSSE:

Q.   What did Mr. Aichele do upon receiving the confidential data sheet from Mr. Li?

A.   Yeah.  Well, one striking thing I saw repeatedly is that really top management at Akoustis was dealing with this information because you can see Dave Aichele sends Houlden and Jeff Shealy, Dr. Shealy, the CEO at Akoustis, 5.2 gigahertz data sheets that are confidential.  And he explains that the word on the street is that they'll be putting out these products.

So the information was being passed around among these executives at Akoustis.

        MR. DeFOSSE:  And if we could go to PDX-6.150.

BY MR. DeFOSSE:

Q.   I want to jump forward to March of 2020.

Mr. Aichele also sent the data sheet to Dave Hodge; is that right?

A.   Yes.

Q.   What's the relevance of sending it to Mr. Hodge?

A.   Mr. Hodge was the engineer that was in charge of producing -- designing and producing the 5 gigahertz product.

So there was -- and he's noting some aspects of the data sheet, the out-of-band rejection, the harmonics.  So

09:08:35 1    it's clear that they're making use of this data in what

09:08:38 2    they do in developing their product.

09:08:41 3              **MR. DeFOSSE:**  If we go to 6.151.

09:08:45 4    **BY MR. DeFOSSE:**

09:08:45 5    **Q.**   I think you mentioned that Akoustis was also

09:08:48 6    attempting to obtain Qorvo's prototypes.  How does this

09:08:52 7    relate or support that opinion?

09:08:55 8    **A.**   Yeah.  In this panic period that I'm describing,

09:09:00 9    Mr. Aichele sends an e-mail requesting information.  He

09:09:06 10   says "Any information" and samples of the two new products

09:09:11 11   that Qorvo is making at 5 gigahertz, Mr. Aichele's

09:09:15 12   explicitly requesting.

09:09:17 13   **Q.**   And he's asking for those samples from Mr. Kim, the

09:09:21 14   gentleman he was aware was able to use his expenses to get

09:09:25 15   Qorvo confidential information?

09:09:27 16   **A.**   That's correct, yes.

09:09:27 17   **Q.**   Okay.

09:09:27 18             **MR. DeFOSSE:**  If we could go to PDX-6.155.

09:09:32 19   **BY MR. DeFOSSE:**

09:09:34 20   **Q.**   Was Akoustis attempting to obtain Qorvo's

09:09:37 21   confidential prototypes anywhere else?

09:09:40 22   **A.**   Yeah.  This is now Colin Hunt, who -- he's the

09:09:47 23   president of global sales, another executive-level person,

09:09:50 24   who says, "I have my arms out in China."

09:09:56 25        He wants to get a couple of samples.  These are

09:10:00  1    confidential samples of Qorvo's product.  And what again

09:10:06  2    strikes me as important is that Dr. Shealy, the CEO of

09:10:13  3    Akoustis, gets this e-mail.  He's not admonishing in any

09:10:20  4    of the e-mails that I saw.  He's apparently very

09:10:25  5    comfortable with this circulation of confidential

09:10:29  6    information.

09:10:29  7            **MR. DeFOSSE:**  If we go to 6.158.

09:10:33  8    **BY MR. DeFOSSE:**

09:10:33  9    **Q.**    Was Akoustis ultimately able to obtain confidential

09:10:35 10    prototypes of Qorvo's products?

09:10:38 11    **A.**    Yes.  After sorting through these e-mails and trying

09:10:43 12    to put them together, it became clear they had obtained an

09:10:47 13    evaluation board.

09:10:48 14            This is one e-mail.  It's from Colin Hunt, and it's

09:10:54 15    talking about this comparison of the Qorvo products to the

09:10:58 16    Akoustis products in 5 gigahertz.  And there's a comment

09:11:02 17    about it, "Hey, the Qorvo evaluation board looks a lot

09:11:06 18    cleaner and neater, why don't we copy it?" like maybe

09:11:09 19    plagiarism would be a good solution.

09:11:12 20            So that sort of conversation, to me, says these guys

09:11:16 21    are coupled with what normal engineers and executives

09:11:21 22    would not allow in their company.  Then he talks about

09:11:24 23    taking those boards and sending them up to their North

09:11:29 24    Carolina facility and testing them, working with Wi-Fi

09:11:33 25    experts once they get the boards.  So they are going to

09:11:37  1    examine them, every detail, to find out what information

09:11:41  2    they can get.

09:11:43  3                MR. DeFOSSE:  Your Honor, may I approach?

09:11:50  4                THE COURT:  You may.

09:11:59  5    BY MR. DeFOSSE:

09:12:00  6    Q.   Dr. Shanfield, I handed you what's been marked for

09:12:04  7    identification PTX-1013.  Is this a document that you

09:12:08  8    considered in forming your opinions concerning Trade

09:12:11  9    Secret Group 8?

09:12:12  10   A.   Yes, definitely.

09:12:13  11               MR. STANFORD:  Your Honor, plaintiff would

09:12:15  12   offer for admission PTX-1013.

09:12:19  13               THE COURT:  Marked and received as 227.

09:12:22  14               (Trial Exhibit No. 227 was admitted into

09:12:22  15   evidence.)

09:12:23  16               MR. DeFOSSE:  Okay.  Could we pull up

09:12:25  17   PDX-6.160, please.

          18   BY MR. DeFOSSE:

09:12:29  19   Q.   Did Akoustis ultimately test the confidential Qorvo

09:12:34  20   prototypes that it had obtained?

09:12:36  21   A.   Yes.  What you see here is an e-mail --

09:12:42  22   Q.   This is the wrong one.  Sorry.

09:12:44  23               MR. DeFOSSE:  6.160?  Okay, 6.159?  Bingo.

09:12:57  24   BY MR. DeFOSSE:

09:12:57  25   Q.   Okay.

**A.**    So here, now, you get -- this is an e-mail from Rama Vetury, who is the chief device scientist at Akoustis, and he says to Marvin Ibro, who is another Akoustis employee, "Please send me S2P of Qorvo part."  S2P is a detailed S parameter file.  That's the format that's always used with these files.  So he's saying, please send me the data you've taken on the confidential Qorvo test boards.

And sure enough, Mr. Vetury receives these attached -- he calls them "spar files."  So the information that they now extracted from confidential boards is being passed around, and Mr. Vetury apparently feels comfortable having a look at that.

**Q.**    If we could move to and switch gears -- well, sorry, let me ask first.  Same as I did for the first seven groups.

Do the trade secrets in Group 8 have -- are they relevant to companies that make either FBAR filters or SMR filters?

**A.**    Yes, of course, they are.

        **MR. DeFOSSE:**  Let's go switch gears now and go to 6.163.

**BY MR. DeFOSSE:**

**Q.**    Dr. Shanfield, as part of your analysis, did you assess who at Akoustis had Qorvo's confidential information in their file?

**A.**    Yes, I did.

**Q.**    And what did you conclude?

**A.**    Actually, it took me many hours of work, and this is the list of the people that had documents in their possession that were confidential from Qorvo.  It's 40 people.  And I know that the -- Kevin Faulkner, the guy who was allowed to look through the computers for limited time periods, and sometimes, essentially, excluded from other employees' computers could have probably found a lot more.

So what I am gleaning from this is that it was apparently acceptable within Akoustis to have confidential information of very high value passed around, discussed openly, used in whatever way they could use it to get an advantage over their competition.

**Q.**    Okay.  Dr. Shanfield, as part of the work you did on this case, were you asked to assess the benefit that Akoustis had received as a result of obtaining and using Qorvo's trade secrets?

**A.**    Yes, I was.

**Q.**    Did you measure that benefit?

**A.**    Yes, I did.

          **MR. DeFOSSE:**  Okay.  Could we go to 6.164, please.

**BY MR. DeFOSSE:**

**Q.**   Now, the head start analysis that you performed --
well, first of all what do you mean by "head start
analysis"?

**A.**   Well, took a while to think about how to account for
what was the advantage Akoustis obtained in each of the
trade secrets, and what in my experience you get from
confidential information like they were passing around is
you save time, and you save money too, but you save time
in getting to a point that, for example, Qorvo would be
in, let's say, delivering a product or in knowing what
customers to address.

And so I decided to try, and this slide explains it.
Correlate the trade secrets with tasks that the company
had accomplished, practical tasks like deliver 5.2
gigahertz product, and how much time did they save in that
activity.  The estimates that I put in this analysis,
you'll see, they were a result of both experience and my
sense of knowledge from having run a startup company,
having founded and run a startup company, and knowing how
fast a startup company can really get things done.

So I accounted for that based on that experience, and
also based on some background knowledge from what Qorvo
did and was able to do.

And finally Point 3, I made sure there was kind of a

1  fair assessment of how they got ahead, you know, if they

2  got an advantage of two months on one task or six months

3  on the next task, you can't say the total advantage is

4  eight months because they might be running in parallel.

5  So I counted for that by putting them in parallel where it

6  was reasonable, and as, you know, being the VP of

7  operations, I know what runs in parallel and what doesn't

8  in a startup company.  So I -- and it came out, I think,

9  with a reasonable estimate of what the advantage was.  And

10 that's what the analysis was here.

**Q.**   Did you perform the head start analysis for each of

the trade secret groups?

**A.**   Yes, I did.

          **MR. DeFOSSE:**  Your Honor, may I approach?

          **THE COURT:**  You may.

**BY MR. DeFOSSE:**

**Q.**   Dr. Shanfield, I've just handed you what's been

marked for identification as PTX-0993.  Do you recognize

this document?

**A.**   Yes, I do.

**Q.**   And is this Appendix 5 the visual of the head start

analysis that you performed?

**A.**   Yes, it is.

          **MR. DeFOSSE:**  Your Honor, plaintiff would offer

for admission PTX-0993.

09:19:28  1                    THE COURT:  Marked and received as 228.

09:19:31  2                    (Trial Exhibit No. 228 was admitted into

09:19:31  3       evidence.)

09:19:34  4                    MR. DeFOSSE:  I'd like to go to PDX-6.167.

09:19:39  5       BY MR. DeFOSSE:

09:19:39  6       Q.   And start by talking about the head start analysis

09:19:42  7       that you performed for Trade Secret Group 1.

09:19:47  8            Dr. Shanfield, how did you determine -- well, what

09:19:49  9       was the head start advantage that you associated with

09:19:54 10       Trade Secret Group 1?

09:19:56 11       A.   The cumulative head start, ignoring the parallels

09:19:59 12       between groups, was nine months.

09:20:03 13       Q.   And can you walk the jury through how you determined

09:20:07 14       that Akoustis saved nine months of time with respect to

09:20:12 15       group 1?

09:20:13 16       A.   Sure.  If you look at this chart, and I know it's

09:20:16 17       complicated looking, but each of those black lines on the

09:20:20 18       right under Year 1 represents a month of savings, so in

09:20:26 19       the first line "assessing Wi-Fi market including the size

09:20:32 20       of the available market and market segments," I'VE

09:20:35 21       determined that, well, in reality, and you've heard this

09:20:39 22       from other witnesses, it might take a year to do that kind

09:20:44 23       of analysis, and I estimated that they saved maybe three

09:20:49 24       months.  They got information they would have gathered on

09:20:51 25       their own too.  That's the three bars in that graph.

But you can see in the next line, "Assessing competition in market, including expected gaps," that two of the three months in that line are overlapping the earlier activity because that's something that would be done together, and that's the sort of the logic I used to create this chart.  It took hours of thinking about what was reasonable and fair.

**Q.**   Okay.  And so the cumulative head start advantage that you believe Akoustis received as a result of having the trade secrets in Group 1 was nine months?

**A.**   That's correct.

      **MR. DeFOSSE:**  Can we go to PDX-6.172.

**BY MR. DeFOSSE:**

**Q.**   Dr. Shanfield, can you explain to the jury what tasks correlate with Akoustis' misappropriation of Qorvo's BAW filter resonator design documents in Trade Secret Group 2.

**A.**   Yeah.  This is all in Group 2 of Qorvo's BAW filter and resonator design documents.

**Q.**   Okay.  And what trade secret information relating to the Group 2 did you consider here?

**A.**   Each -- like, once again, I converted the trade secret information that they collected in terms of tasks that had to accomplish in order to run a business, run Akoustis' business.

Pick an example here.  Let me find this.  Okay.  If

*Shanfield - Direct*

you look -- I don't have my pointer with me, but is there

a pointer?

**Q.**    Why don't we just do it without a pointer.

**A.**    Okay.  "Research concerning tile configuration and

rough layout," for example -- that's one, two, three,

four, five lines down.  And you can see that its -- thank

you -- that it's a total of five months advantage.  If you

remember, the tile configuration not only had the layouts

of the filters that were in the wafer that they had to

run, but it had dozens of test structures, structures that

would be useful to know about as things you would want to

carry on the wafer with the layout of the filters

themselves to monitor how your processes are working in

the filters.

Those kinds of things that are normally it takes a

long time to work out what those structures should look

like, and here they have them available.

So that five months, though, as you can see, there's

other activities that make -- that end up with a net zero

benefit as all of these are added up.  This 43-month head

start, if you took that advantage out because it's in

parallel, wouldn't change the number.  So that's how the

parallelism made a difference in how this analysis worked.

**Q.**    Okay.  And just so we're clear, the parallelism as

you referred to is to account for the fact that you

understood that, when Akoustis obtained Qorvo's trade

secrets and was using those trade secrets to perform

tasks, some of those tasks could have been performed at

the same time?

**A.**    That's right.  And given the context of the number of

engineers, the experience that I could glean from

listening to the engineers and what they knew, that helped

me calibrate.

**Q.**    Okay.  And for Trade Secret Group 2, what was the

cumulative head start that you calculated?

**A.**    The total came out to a 43-month head start.

        **MR. DeFOSSE:**  If we could go to Trade Secret

Group 3, PDX-6.175.

**BY MR. DeFOSSE:**

**Q.**    Can you explain to the jury why you estimated a

22-month head start with respect to the trimming trade

secrets in Group 3?

**A.**    Yes.  I think everybody in this industry recognizes

how important trimming is to be able to economically

manufacture filters.  If you don't get this right, you

can't do it.  You can manufacture a few samples, maybe,

but you're not going to be able to do tens of millions of

parts.

        So the trimming is removing layers that are one layer

of an atoms thick at a time on the filters in order to get

the frequencies that the filter works at correct.  And

you've got to trade-off parameters.  So, as you remember,

there was an -- actually, three algorithms that I showed

that Qorvo had worked out to get the filters tuned --

trimmed, actually.  And this really had tremendous value.

I mean, it -- although trimming's been around for a long

time, the value here gave a tremendous economic lift and

time savings.  They didn't have to do the work; they just

adopted what Qorvo did, maybe with a little variation.

So that's why it turned out to be this length of

time, 22 months.

**Q.**    Okay.

         **MR. DeFOSSE:**  If we could go to 6.177, please.

**BY MR. DeFOSSE:**

**Q.**    What was the head-start advantage that you associated

with -- or calculated for Group 4.

**A.**    Three months.

**Q.**    And this is the trade secret group that has the

customized RF connector?

**A.**    Yes.  And so if Akoustis' mechanical engineers had to

design RF connector -- well, they would have to

experiment.  As they would probably create variations.  It

would have to be machined, and produced by another

manufacturer.  They would have to test it.

So it actually would take a while to get a good RF

connector that was reliable, as it did Qorvo.  But it gave

it three-months advantage just because I think, you know,

they would have a starting point with what existing

connectors looked like.  So they would probably be able to

fairly quickly, in a few months, maybe six or eight

months, get a working connector.  They saved three months

by having Qorvo's design.

**MR. DeFOSSE:**  If we could go to Trade Secret

Group 5, and that's PDX-6.180.

**BY MR. DeFOSSE:**

**Q.**   What was the head-start advantage that you calculated

for Trade Secret Group 5?

**A.**   Yes.  The total cumulative head start was six months.

**Q.**   Okay.  Can you explain your head-start analysis for

this group, Dr. Shanfield?

**A.**   Yeah.  You've already heard me talk about the need to

have a technology development process, for example.  And

Qorvo's experience in having technology development go

smoothly and systematically, that's 15 years, 20 years of

experience.  They were able to use it as is.  And -- but I

conservatively estimated a couple of months' timesaving

for them because they probably would be able to lay out

technology, but without a process, it probably wouldn't

be -- certainly wouldn't be optimum if they didn't have

this confidential information.

*Shanfield - Direct*

So they got substantial -- probably more or less than I accounted for here.

MR. DeFOSSE:  If we could go to Trade Secret Group 6, 6.183.

BY MR. DeFOSSE:

Q.  Can you explain your head-start analysis for Trade Secret Group 6?

A.  Yeah.  This is associated with the systems processes procedures for testing reliability and coming up with meantime to failure.

This is hard to do, and usually takes years of experience in a company.  And the document that -- that I pointed to, the confidential document for Qorvo, had all that secret sauce in it, how you do the evaluation, how you extrapolate it, what works for a BAW filter.  And it applies to whether it's FBAR or SMR, these tests.

So the lift they got there, in technical terms, was significant.  They just had to simply do what Qorvo did.  This indication was that's exactly what happened.  So I gave it a year, 12 months advantage.

Q.  Okay.

MR. DeFOSSE:  And if we go to PDX-186, Group 7.

BY MR. DeFOSSE:

Q.  Can you explain your head-start calculation for the misappropriation of the trade secrets in Group 7?

*Shanfield - Direct*

**A.**    Yeah.   This was procedure you heard about this morning.   The inspection assembly instructions, the reflow conditioning, the qualification.   The net benefit was five months.   To try and really put those together could take nine or ten months, at least.   So the benefit in each case, except for the complexity of the visual inspection, I took to be three months, and the visual about five months.   They're all done in parallel, so they end up at five months, total.

**Q.**    Okay.

        **MR. DeFOSSE:**   And if we could go to Trade Secret Group 8.

**BY MR. DeFOSSE:**

**Q.**    Can you explain the head start that Akoustis received by obtaining and using Qorvo's product roadmaps and prototypes?

        **MR. DeFOSSE:**    Sorry.   We need PDX- it's 1.89, please -- 6.189.

        **THE WITNESS:**   Yes.   What you're seeing here I calculated a 15-month head start cumulative.   And there's -- first line, assessing performance of features of these 5 gigahertz parts, the 1903 and 1904, you get, looks like, a ten-month lift on that.

        And if you recall, I think I said it yesterday, Qorvo -- I'm sorry -- Akoustis had a situation where they

1    had a resonator that didn't work.  And they weren't able

2    to get, you know, the quality of resonance that they

3    needed to create a filter.  And ten months later they were

4    delivering 5 gigahertz sample parts of filters, not just

5    resonators.  And that was during the period where there

6    was this flurry of use of confidential information.

7         The confidential information that they took

8    allowed them this advantage, this ten-month advantage, in

9    my estimate, in getting to their 5 gigahertz part.  And

10   that's where that number comes from.

11        And I took estimates of the 6E products,

12   automotive products and 5G products as well.  I think they

13   are conservative, really, because in many cases -- I mean,

14   being able to go that fast, and the lift from that is

15   probably more than I actually estimated.

16   **BY MR. DeFOSSE:**

17   **Q.**   Dr. Shanfield, we walked through each of the groups.

18   I'd kind of like to try to put this all together because I

19   think your analysis needs to be looked at for all eight

20   groups together.

21   **A.**   Sure.

22        **MR. DeFOSSE:**  Could we pull up Appendix 5,

23   which is now trial Exhibit 228.  Okay.  Maybe we won't.

24   We'll pull up Appendix 5.

25        **THE COURT:**  You want to hold this up?

09:33:19  1          **MR. DeFOSSE:** Yeah.  I don't think anybody can

09:33:20  2    see that if you hold it up.

09:33:22  3          **THE WITNESS:** This is the whole -- you won't be

09:33:23  4    able to see it.

09:33:24  5    **BY MR. DeFOSSE:**

09:33:25  6    **Q.** Let's try to explain it verbally, then,

09:33:27  7    Dr. Shanfield.

09:33:28  8          Now, when you calculated each of the trade secrets in

09:33:31  9    the individual groups --

09:33:32 10    **A.** Yes.

09:33:32 11    **Q.** -- did you also run the head-start advantage that you

09:33:36 12    calculated for those groups in parallel or did you just

09:33:39 13    add them all up in line?

09:33:40 14    **A.** I put them in parallel, like you can kind of see this

09:33:43 15    in this diagram.  Each of these are the groups.  And I put

09:33:50 16    them in parallel in a way that kept the analysis as fair

09:33:54 17    as possible in the way a start-up like Akoustis -- ah.

09:33:59 18    Got it.

09:34:01 19          So, although you can't see them anymore, they're all

09:34:05 20    set in parallel.  I put a lot of thought into trying to

09:34:10 21    get this right.

09:34:11 22    **Q.** Okay.  And, again, by putting them in parallel, you

09:34:15 23    were accounting for the fact that if Akoustis obtained

09:34:18 24    Qorvo's trade secrets with respect to product prototypes

09:34:22 25    and confidential data sheets in Trade Secret Group 8, and

09:34:28  1    it also obtained Qorvo's information concerning

09:34:31  2    reliability testing, you may have some working on

09:34:34  3    reliability testing at the same time someone's out in the

09:34:38  4    market trying to figure out, you know, what products are

09:34:40  5    going to launch; is that right?

09:34:41  6    **A.**    That's right.  In fact, if you look here, you can see

09:34:43  7    there's whole groups of trade secrets that have no effect

09:34:47  8    on the total advantage because they're running in parallel

09:34:51  9    with other activities.

09:34:55 10    **Q.**    How does your opinion that Akoustis received a

09:34:57 11    55-month head start apply to what we see in the real world

09:35:03 12    or compared to what we see in the real world?

09:35:05 13    **A.**    Yeah.  That was another way I checked -- the sanity

09:35:09 14    check of the 55 months.  And if you remember, Dr. Aigner

09:35:19 15    said it takes typically five years from the point of

09:35:22 16    deciding you're going to make a product to the first

09:35:24 17    sample deliveries of this product at Qorvo.

09:35:28 18         Now, you could view Qorvo as not a start-up, but,

09:35:32 19    actually, has huge resources for getting things done.  So

09:35:37 20    once that decision is made, they're faster than how the

09:35:42 21    start-up would be in operating without confidential

09:35:47 22    information, in my opinion.  I have run a startup.  I know

09:35:50 23    how it works.

09:35:52 24         So the five years is 60 months.  That -- it seemed to

09:36:00 25    fit, rough amount, of -- there's other advantages that

09:36:05 1    Akoustis was realizing in marketing and so on.  So it's

09:36:09 2    not just delivering product, but it was definitely in the

09:36:14 3    right magnitude, approximately the right value.

09:36:19 4    **Q.**   Okay.  Dr. Shanfield if we could return to PDX-6.3,

09:36:24 5    from the beginning of our conversation.

09:36:36 6         You were asked to analyze two things in this case.

09:36:40 7    We just went through the trade-secret analysis.  Can you

09:36:42 8    remind the jury what the second thing you were asked to

09:36:45 9    look at was?

09:36:46 10   **A.**   Yes.  The second thing I was asked to do is analyze

09:36:48 11   the performance aspects of a couple of patents and do

09:36:53 12   computer simulations.  I promise it won't take as long as

09:36:57 13   the trade secret part.

09:36:58 14        **MR. DeFOSSE:**  Can we pull up PDX-6.191.

09:37:04 15   **BY MR. DeFOSSE:**

09:37:04 16   **Q.**   What were you asked -- what were you asked to do with

09:37:07 17   respect to computer simulations in this case?

09:37:10 18   **A.**   I was asked to simulate the benefits of these two

09:37:15 19   patents, '018 and '755 patent.

09:37:17 20   **Q.**   Okay.  And can you explain at a high level to the

09:37:20 21   jury what you did in connection with performing those

09:37:25 22   simulations?

09:37:26 23   **A.**   I've done many simulations with electroacoustic

09:37:31 24   devices, and I've modeled Akoustis devices and state of

09:37:37 25   the art -- or devices that were around at the same time

09:37:41  1    that would be representative of other BAW filter devices

09:37:47  2    with this Consol software, which is a finite element

09:37:54  3    analysis, is what it's called.  It's actually quite

09:37:58  4    complex.  It takes a lot of the work to get everything

09:38:02  5    working right, and you have to test it to make sure it's

09:38:06  6    giving you the answers that are physically meaningful.

09:38:09  7         So that's the approach I took to get simulations

09:38:14  8    done.

09:38:16  9                   MR. DeFOSSE:  Your Honor, may I approach?

09:38:18 10                   THE COURT:  You may.

09:38:41 11    BY MR. DeFOSSE:

09:38:42 12    Q.   Dr. Shanfield, I've handed you what's been marked for

09:38:44 13    identification as PTX-1715.

09:38:49 14         Do you recognize this document?

09:38:50 15    A.   Yes, I do.

09:38:52 16    Q.   And what is it?

09:38:53 17    A.   It's the patent I'm calling the '018 patent.

09:38:58 18                   MR. DeFOSSE:  Your Honor, plaintiff would offer

09:38:59 19    for admission PTX-1715.

09:39:02 20                   THE COURT:  Marked and received as 229.

09:39:06 21                   (Trial Exhibit No. 229 was admitted into

09:39:06 22    evidence.)

09:39:06 23    BY MR. DeFOSSE:

09:39:07 24    Q.   And I've also offered you what's previously been

09:39:11 25    marked in this case as Trial Exhibit 42, which is the

09:39:17   1    Fattinger patent; is that correct?

09:39:19   2    **A.**   That's correct.

09:39:20   3    **Q.**   Are these the two patents that you reviewed in

09:39:23   4    connection with performing your simulations?

09:39:25   5    **A.**   Yes.

09:39:28   6    **Q.**   Okay.  Let's start with the simulation you did for

09:39:31   7    the '018 patent.

09:39:32   8         **MR. DeFOSSE:**  Could we pull up 6.194, please.

09:39:38   9    **BY MR. DeFOSSE:**

09:39:38  10    **Q.**   Now, Dr. Shanfield, just for context for the jury,

09:39:41  11    they'll be hearing from Dr. Bravman and Dr. Heinrich later

09:39:46  12    today with respect to this claim.

09:39:48  13         You were asked to analyze only -- or perform the

09:39:51  14    simulations only with respect to one part of the claim; is

09:39:54  15    that right?

09:39:55  16    **A.**   That's right.

09:39:56  17    **Q.**   Could you identify for the jury which part of the

09:39:58  18    claim your simulations related to?

09:40:01  19    **A.**   Yeah.  You can see -- the part that I circled at the

09:40:04  20    bottom of Claim 1 is to increase a filter bandwidth of the

09:40:08  21    electro acoustic resonator.

09:40:12  22    **Q.**   And as a general matter, what does it mean to

09:40:15  23    increase the filter bandwidth?

09:40:17  24    **A.**   As you remember, that diagram that showed noise

09:40:21  25    coming into a filter and then a nice signal coming out.

09:40:24  1    If you increase the bandwidth, you may let some more

09:40:27  2    frequencies through, and what that ends up giving you, on

09:40:31  3    a cell phone using this filter, is a clear signal.  Like,

09:40:38  4    the voice sounds better or you can stream videos if the

09:40:42  5    bandwidth is larger, where you wouldn't be able to do it

09:40:45  6    with a narrow bandwidth.

09:40:52  7            **MR. LEMIEUX:**  Excuse me, Your Honor.  I just

09:40:53  8    wanted to clarify, this transcript is being sealed because

09:40:55  9    there is confidential information.

09:40:58  10           **THE COURT:**  I think all material has covered

09:41:01  11   confidential information.  All this information is

09:41:08  12   confidential, and there's no one in the room who was not

09:41:13  13   allowed to be in the room, I hope.  I didn't see anybody.

09:41:19  14           **MR. LEMIEUX:**  I didn't see anyone, Your Honor.

09:41:20  15   I just wanted to make sure the transcript is being

09:41:22  16   treated --

09:41:23  17           **THE COURT:**  Absolutely.  Thanks very much.

09:41:26  18   **BY MR. DeFOSSE:**

09:41:33  19   **Q.**   All right.

09:41:36  20           **MR. DeFOSSE:**  Can we go to PDX-6.196.

09:41:41  21       And Your Honor, may I approach?

09:41:44  22           **THE COURT:**  You may.

09:41:44  23   **BY MR. DeFOSSE:**

09:42:03  24   **Q.**   Dr. Shanfield, I've handed you also a hard copy of

09:42:06  25   the images that you see on the Slide 6.196 to assist you.

09:42:14  1      If we look at this graph, can you explain to the jury

09:42:17  2  what we see on the left-hand side?

09:42:20  3  **A.**   So what you see there is the structures I constructed

09:42:25  4  in the simulation.  The top structure is the structure

09:42:30  5  that uses the '018 patent, and the bottom structure is

09:42:37  6  what the prior art was of structures at the time of that

09:42:43  7  patent.  So there's thicknesses that are different in

09:42:48  8  each.

09:42:48  9  **Q.**   Okay.  And when you say that there's thicknesses that

09:42:52 10  are different in each, what do you mean?

09:42:54 11  **A.**   So if you remember, the resonators that make up

09:42:59 12  filters have these two metal electrodes, metal on top,

09:43:03 13  metal on the bottom.  And if you make the metal on the top

09:43:07 14  thinner than on the bottom, what the '018 patent says is

09:43:10 15  that you'll get better bandwidth.

09:43:13 16      So that's what I'm simulating here by doing thinner

09:43:19 17  on the top, thicker on the bottom, versus the same

09:43:22 18  thickness top and bottom.

09:43:23 19  **Q.**   Okay.  And just so we're clear, on the upper

09:43:27 20  right-hand side of the slide, in the blue box, that's the

09:43:32 21  Akoustis product that Qorvo is accusing of infringement;

09:43:35 22  is that right?

09:43:36 23  **A.**   Upper left-hand side.

09:43:37 24  **Q.**   Upper left-hand side.  In the blue box?

09:43:39 25  **A.**   Yes, that's correct.

**Q.**   And on the lower left-hand side of the green box, that is a prior art product where the thickness of electrodes is the same?

**A.**   That's correct.

**Q.**   So the difference between the lower box and the upper box is, in the lower box, the electrodes are the same thickness.  In the upper box, in the Akoustis product, the electrodes have different thicknesses?

**A.**   That's correct.

**Q.**   And where did you get the structures for the thicknesses of the electrodes, the information on that?

**A.**   From a combination of Dr. Heinrich and Dr. Bravman.

**Q.**   Who the jury will hear from --

**A.**   Yes.

**Q.**   -- later today?

Okay.  So you received the Akoustis structures and the prior art structures, and you ran a computer simulation; is that right?

**A.**   That's correct, yes.

**Q.**   And what was the result of the computer simulation?

**A.**   The result was that the '018 patent works.  It does increase the bandwidth, as taught in that patent.

**Q.**   Okay.  So did you see that the Akoustis product had an increased filter bandwidth?

**A.**   I did.

**Q.**   Can you explain to the jury how you can see that in

the computer simulation results on the right-hand side of

196?

**A.**   Yes.  If you look at what I've circled in red, what

you see is a green line, and it's -- what it's

representing is the energy leakage, the rate of energy

leakage of the prior art product.  And as -- and that's

been plotted as a function of frequency in the range of

the circle.  You see that green line goes zooming up.

That means that energy leakage is way up at the band edge.

And the blue line is the structure with the '018 details

included.  And, there, the blue line stays low.  So at the

band edge, the loss is low.  And that ends up making a

bigger bandwidth.  So that is how I got my result.

**Q.**   Okay.  So the blue line represents the Akoustis

product?

**A.**   Yes.

**Q.**   And by having the blue line below the green line in

the red circle, you can see that the bandwidth of the

Akoustis product has increased?

**A.**   That's correct.

**Q.**   I'd like to turn to the '755 patent now.

     **MR. DeFOSSE:**  And if we could pull up

PDX-6.199.

**BY MR. DeFOSSE:**

**Q.**  You were also asked to perform computer simulations
with respect to this patent, correct?

**A.**  Yes, that's right.

**Q.**  And, again, your simulations only related to one part
of the patent claim?

**A.**  That's right.

**Q.**  And the other parts are going to be addressed by
Dr. Bravman; is that right?

**A.**  Yes.

**Q.**  And for your simulations, which aspect of the claim
was relevant?

**A.**  Again, it was at the bottom of -- it's Claim 9.  And
what it's talking about is an arrangement in the structure
of the resonators such that there's less loss from the
resonator.

**Q.**  So you simulated whether the Akoustis product would
result in having less energy loss?

**A.**  Yes.  Energy leakage is the same thing.

**Q.**  Okay.

      **MR. DeFOSSE:**  If we go to PDX-6.200.

**BY MR. DeFOSSE:**

**Q.**  Does this slide show the computer simulation that you
ran?

**A.**  Yes, it does.

*Shanfield - Direct*

**Q.** And on the left-hand side, in the blue box, what is that?

**A.** So the blue box, again, is practicing what the details are of the '755 patent and represent the Akoustis device. And the structure below is representative of a device that does not practice '755 details.

**Q.** And what's in the green box?

**A.** That -- I'm sorry. That's the bottom one.

The green box is what the structure is that does not practice the '755 patent.

**Q.** Okay. So the blue box is the Akoustis product. The green box is the prior art?

**A.** Prior art, yes.

**Q.** Okay. And did you determine whether, with your simulation, the Akoustis product has less energy leakage?

**A.** Yes, I did.

**Q.** Okay. And is that shown in the graph on the right-hand side?

**A.** Yes, it is.

**Q.** How is that?

**A.** So now, here, you're interested in the passband, and I circled the passband of the filter. So that's the -- when I call it a "passband," I mean the frequency around 5.6 gigahertz in this graph. And what you see is the Akoustis structure with the blue line has less loss in

this passband than the green line, which is the prior art

structure.  The green line is above the blue line in that

frequency range.

**Q.**    Okay.  Dr. Shanfield.  Thank you.

          **MR. DeFOSSE:**  I will pass the witness.

          **THE COURT:**  Cross-examination.

                  CROSS EXAMINATION

**BY MR. LEMIEUX:**

**Q.**    Good morning, Dr. Shanfield.  You'll have to excuse

me as I grab my materials right here.  You covered a lot

of ground, so I have a lot of questions for you.

    In your analysis of the various groups of trade

secrets, you looked at numerous e-mails and other

materials that were presented to you from counsel for

plaintiff, right?

**A.**    What I did was take the material that had been

discovered on Akoustis' computers and narrowed down what I

wanted to look at and did it like a funnel arrangement

where I tried to narrow it down to the point where I

wouldn't have to spend three years looking at it.

**Q.**    And you said you wanted to do this to try to figure

out whether or not Akoustis received some type of

head-start benefit from its use or access or exposure to

this Qorvo information; is that right?

**A.**    Well, I was looking for, I think I had it in my

slide, these characteristics of whether it was known or

would be confidential information, whether there was an

awareness that the people handling that information was

confidential, whether there was economic value.  So I

don't mean to go through the whole list.  But that's the

characteristics I was looking for when I looked at the

group of -- this huge pile of data.

**Q.**   So your head-start calculation is based on what you

believe to be the time and expense that Akoustis avoided

by allegedly using Qorvo's information and materials has a

shortcut; is that right?

**A.**   I estimated the time savings; I didn't go into

expense.

**Q.**   And so, in fact, the GANTT chart that you showed up

here earlier is all just an estimate of time involved in

doing so; is that right?

**A.**   It's not a GANTT chart.

**Q.**   Sorry?

**A.**   It looks like a GANTT chart, but, actually, it's

just, when I say, "year 1, year 2," those are meant to be

arbitrary times.  It doesn't mean it started in year 1

that Akoustis was founded, for example.  It's -- year 1 is

the year that this -- my experience tells me a startup

company would save this amount of time in doing these

tasks first.  So it just put in order all the tasks so I

1    could make sure I accounted for how they were done in

2    parallel and not overestimate time savings.

3    **Q.**    So you divided them into year time periods on your

4    chart -- Year 1, Year 2, Year 3, Year 4, Year 5 -- that's

5    right?  I saw that accurately, didn't I?

6    **A.**    It's not divided.  I should have called it "Year A,

7    Year B, Year C, Year D."  They're not -- they are in order

8    in terms of how I would see a startup company executing

9    these tasks.

10    **Q.**    Okay.  And in terms of the order that you would see

11    them executing a task, I would assume that if something in

12    your chart was further over to the left, it's because you

13    believed that would have been a task they would have

14    attended to earlier in their formation, the items you

15    listed towards the right-hand side are items that you

16    would consider they would have gotten to later in their

17    attention; is that right?

18    **A.**    No.

19    **Q.**    So that the right to left -- or, excuse me, the left

20    to right head start you've calculated, that doesn't

21    actually mean that?

22    **A.**    What it means is I am plotting the benefit, the

23    savings in time the company realized, and I am putting

24    approximately where that savings might have been realized,

25    but it's somewhat arbitrary.  I just wanted to place it in

1    a way relative to the other tasks so that I could account

2    for the fact tasks are done in parallel in a real company,

3    and you can just add them all up.

4    **Q.**   Okay.  But when you are putting these in parallel,

5    you are putting a time component on them, right?  You're

6    saying that these activities, some overlap with each

7    other, but that each activity would take a certain amount

8    of time.  And you put them on a graph that's moving

9    chronologically in time from a start to finish, right?

10   **A.**   No.  What's plotted there is how much benefit in

11   terms of time savings Akoustis realized, my estimate of

12   that.  And in terms of the sequence, I wanted to make sure

13   I accounted for the fact these tasks, some of them would

14   be done in parallel in a real company.  So I aligned them

15   to the other tasks, but exactly where they happened in the

16   calendar is not representative there necessarily.  It's

17   their relation to the other tasks that I wanted to make

18   sure I accounted for.

19   **Q.**   Well, I'm a little confused, then, Dr. Shanfield,

20   because at the end of your chart, you match it up on a

21   line --

22          **MR. LEMIEUX:**  If we can pull up Appendix 5 to

23   Dr. Shanfield's report.

24   **BY MR. LEMIEUX:**

25   **Q.**   -- it measures up to the point where you got to your

1    55-month head-start estimation, right?

2    **A.**    Yeah, that's adding months; that's not calendar

3    years.

4    **Q.**    Right, but you didn't get to 55 months by simply

5    adding, as you said, all the different black boxes on your

6    chart.  You actually put them in some type of order that

7    you believed would be logical for a startup company to

8    follow?

9    **A.**    No.  Once again, what I did was made sure the

10   relationship in my mind was logical between tasks, like

11   for example, you're not going to start designing a

12   building a product, the 5 gigahertz, before you know

13   something about the market.  So probably you are not going

14   to do those two tasks in parallel.  And so that's what

15   this chart accounts for is that these two activities and

16   the benefit were not done in parallel, so you can add them

17   up.

18       On the other hand, getting documentation on how

19   you're going to your product development, your product

20   requirements documents, your qualification documents, I

21   expect that those would be done around the same time.  I

22   didn't say what time, but they are done around the same

23   time, and so I lined them up.  That way it accounts for

24   the fact that this work is done in parallel, and you don't

25   overcount the savings that Akoustis realized.

**Q.**   You will have to forgive me because I don't have the

degrees in physics that you have, Dr. Shanfield, but my

understanding of a head start means that that's time that

I was able to jump ahead where I on would have been

otherwise.  Is that an incorrect assumption on my part?

**A.**   No, that's right.

**Q.**   Okay.  So and that we measure a head start in terms

of time, like you have.  You measured it as 55 months.

But that 55 months has to start somewhere, right?  I mean,

my head start doesn't start out nowhere.  I start at a

place, and then 55 months later I'm finally at the place

where you say I should have been to begin with; is that

right?

**A.**   I guess.  I don't know what -- I guess I don't

understand your question.

**Q.**   Well, if you're talking about a head start, it's a

head start from someplace to someplace else, right?

**A.**   Yes.  I agree there's a duration of time over which

this happened, but --

**Q.**   Otherwise, a head start makes no sense, right?  I

mean, what you are saying it allows me to do is it allows

me to jump ahead 55 months to a point that I shouldn't

have been able to get there until I'd actually incurred

all of that other work, right?

**A.**   Let me give you an example.  I'll try and clarify

1    myself.  I know it is hard to understand.

2         But, for example, making the documents that spell out

3    how a company, how Akoustis does their product

4    development, their quality documents, their assembly

5    procedures, their inspection procedures, that could be

6    done early in the life of the company, that could be done

7    around the middle of the time of the company, that could

8    be done as soon as the company decides it's going into

9    manufacturing.  I didn't try and determine that, looking

10   in the minds of how Akoustis did it.

11        All I did was make sure that, whatever else was going

12   on in parallel in that activity, is also represented there

13   so that I didn't account -- I didn't count advantages in

14   places that were activity was going in parallel.

15        So I wasn't trying to predict the history of

16   Akoustis; all I was doing is taking what I knew about

17   running a startup company and my experience in the

18   industry and made sure I lined up what was being done in

19   parallel.

20   **Q.**  And so I assume, then, that when you say a 55-month

21   head start, you would be starting at where the company was

22   formed, and they got a 55-month head start at what point?

23   In the first years of their development?  In their

24   formation?  Their operation?

25   **A.**  Your assumption isn't right.  Forgive me.  It doesn't

09:59:48  1    have to be at when the moment this company was founded.

09:59:51  2    The advantage could have been realized somewhere else in

09:59:54  3    the history of the company.  I just wanted to make sure,

09:59:56  4    and I'm roughly accounting for how the sequence of

10:00:01  5    benefits took place, but I didn't try and predict the

10:00:05  6    history of the company itself.

10:00:06  7    **Q.**    Now, you've mentioned several times, Dr. Shanfield,

10:00:08  8    that you based these determinations in terms of number of

10:00:13  9    months when they would occur on your experience running a

10:00:16 10    startup company; is that right?

10:00:18 11    **A.**    That's partly what I did, yes.  I also accounted for

10:00:21 12    what I knew, for example, Qorvo would do, what I saw in my

10:00:29 13    experience in corporate life too.

10:00:31 14    **Q.**    Well, your last experience in running a startup

10:00:35 15    company was in 2003, wasn't it?

10:00:37 16    **A.**    Yes, that's right.

10:00:38 17    **Q.**    Okay.  So you haven't run one for over 20 years?

10:00:42 18    **A.**    Yes.

10:00:42 19    **Q.**    And in determining the months that you were looking

10:00:46 20    at for each period of each activity, is that estimation

10:00:49 21    based on some published journal somewhere, some study, or

10:00:53 22    is this just a number that you literally have generated

10:00:57 23    yourself out of thin air?

10:00:59 24    **A.**    In every case, I considered where I could find

10:01:04 25    information that would give me a reference point.  In some

*Shanfield - Cross*

cases, I thought about projects that I had done in
corporate life recently at Draper Labs maybe as few as two
years ago.  Other cases, I talked to somebody at Qorvo to
see how long this took.  In other cases, I looked back in
the records I had before we sold our company as to when
and what we did so that I remembered, and, you know, I had
some kind of sense of what made -- what would be fair and
what made sense in a startup company.

**Q.**    Now, you made reference a moment ago to Draper Labs.
Draper Labs is not a manufacturing company, is it?

**A.**    No.  And so that was more in the development aspects
and the procedure aspects, because we do provide low --
low-rate manufacturing in some cases.

**Q.**    So, for example, in terms of, you know, assembly,
packaging, and all that, that's not anything that Draper
Labs does, right?

**A.**    Yeah.  I think I used my experience in assembly and
packaging from -- I ran a 24/7 semiconductor company that
delivered hundreds of millions of parts a year.

**Q.**    When was that, Dr. Shanfield?

**A.**    That was in the '90s.

**Q.**    In the '90s.  And have there been any changes?

**A.**    And my experience with all the requirements you need
to be able to do that manufacturing.  So that's where I
looked when I thought about, well, what does it take to

1  set up this capability?

2  **Q.**   Have there been any changes or advances in the

3  packaging and assembly of semiconductor products over the

4  last 20 years?

5  **A.**   Depends on which industry.  I mean, there have been

6  changes, obviously.  What happened in the BAW industry is,

7  there's packaging that was developed in 1970s and '80s

8  that's being used today on BAW devices, because they're

9  not integrated circuits.  So there's differences relative

10  to your Intel microprocessor, which has stack chips and so

11  on.  None of that is being done in BAW.

12  **Q.**   And so in your experience or in your opinion, there

13  haven't been any changes in assembly, testing, or any of

14  that over the last 20 years?

15  **A.**   Absolutely not.  I'm not saying that at all.  I'm

16  just saying it's different for BAW.  That device, that

17  package, that was developed a long time ago, actually.

18  I'm actually very familiar with it; I know how it's done.

19  And I went to Korea and, you know, spent time watching

20  that type of packaging being done, so I had some relevant

21  experience.

22  **Q.**   And that was at what time period, Dr. Shanfield --

23  **A.**   In the '90s.

24  **Q.**   -- when you saw that?  In the '90s?

25  **A.**   It was microelectronics packaging.  So, again,

different demands on it, much more advanced in general,

much more expensive kind of technology.

**Q.**   So taking you back in to your determination of how

you assigned a certain amount of months for each of the

activities that you looked at here, is that assessment of

months for each task, like I said, is that based on any

other peer-reviewed or trade journal or any other

published material other than your own private estimation

that you did for this case?

**A.**   I think I did look in one case at a publication

that -- I'm trying to recall exactly what the subject

matter was.  I remember.  It was in setting up a

reliability facility.  I had a pile of publications, and I

glanced through them and looked at what, both what we had

done at Raytheon, and also what people who had published

information about -- evaluating filter reliability had

done so that I got a perspective, I saw the named

companies.  So I guess I did in that case look at actual

published information.

**Q.**   So you believe that in that particular instance, you

may have seen something.  If you had seen it, that would

have been included as a reference to your expert report,

correct, as something you relied on?

**A.**   I don't recall whether it was or not, but I do recall

I spent a lot of time making sure I was coming up with a

1    reasonable number based on the best information I could

2    find, whether it was published document.  A lot of times

3    this stuff isn't published because companies don't want to

4    share what it actually took for them to develop their

5    reliability setup.  So I had to kind of read in between

6    the lines in documents I read --

7    **Q.**    So, again, Dr. Shanfield, my question to you --

8    **A.**    -- (indiscernible).

9           (Reporter clarification.)

10   **BY MR. LEMIEUX:**

11   **Q.**    I'm sorry.  And I didn't mean to interrupt you.

12   That's actually my fault.

13          So, Dr. Shanfield, getting back to my question.  If

14   you had actually relied on something, it would be

15   reflected in your expert report, correct, because you have

16   an obligation to disclose every publication you relied on

17   in rendering your opinions in this case?

18   **A.**    I agree.

19   **Q.**    So if there isn't such a reference in your expert

20   report, because there wasn't one, correct?

21   **A.**    I don't recall.  There were so many documents.  I

22   just don't recall.

23   **Q.**    Now, again, getting to this time period of how you

24   get it, it sounds to me like if there is no published

25   guides for you to look at to determine this, then each of

*Shanfield - Cross*

10:07:02  1    these time periods is really just your guesstimate of what

10:07:06  2    you assigned to each of these tasks, both as to when they

10:07:09  3    would occur and how long it would take to make them

10:07:13  4    accomplished; isn't that correct?

10:07:15  5    **A.**    I'm not sure what you mean by "guesstimates."  Like I

10:07:18  6    said, dependent on the time period we're talking about,

10:07:23  7    and the activity, as to where I went.  I even asked

10:07:27  8    colleagues in one case.  So I looked for sources that made

10:07:33  9    me feel comfortable that I was estimating correctly in

10:07:37 10    every case.

10:07:38 11    **Q.**    Okay.  And the sources that you relied on were what

10:07:43 12    exactly?

10:07:45 13    **A.**    Dependent on the time period we're talking about.

10:07:48 14    Like I said, in the case of the reliability benefit, the

10:07:55 15    head start.  I actually talked to an old friend who had

10:08:00 16    set up a facility.  I looked at published papers on

10:08:05 17    reliability of filter devices, and in some cases, there

10:08:09 18    was -- at least, reading between the lines some hint of

10:08:14 19    what it would take.

10:08:15 20    **Q.**    But, again, Dr. Shanfield, if you had relied on a

10:08:19 21    conversation with an unnamed old friend, if that was the

10:08:22 22    basis for your opinion, you would have had to disclose

10:08:24 23    that in your expert report as something that you

10:08:27 24    considered in arriving at your opinion, right?

10:08:30 25    **A.**    That's right.

*Sharfield - Cross*

**Q.**   And so if there is nothing in your report identifying this unnamed old friend, then that was not something that you relied on in coming to your opinion in this case, was it?

**A.**   That's right.  I agree.

**Q.**   And you mentioned, you said you thought you talked to Qorvo.  On which of these items in any of these groups that you've identified did you talk to Qorvo to find out how long it took them to develop the alleged trade secret in this case?

**A.**   I talked with people at Qorvo about all of these items.  I didn't necessarily think they had the only word on it, but I reviewed them to make sure what they were saying.

**Q.**   And, again, if you had discussed any -- with any particular Qorvo individual, any of these particular trade secrets, that would have been listed in your report as well, correct, as sources that you relied on?

**A.**   Yes.

**Q.**   And as you sit here today, can you identify the names of any Qorvo individuals that you spoke to in arriving at these estimates?

**A.**   Sure.  Dr. Aigner, I probably got him tired out discussing this with him.

**Q.**   Which categories did you discuss with Dr. Aigner?

**A.**    I talked about all of them.  In some cases, he said
he didn't know.  So, but I wanted to go through all of
them.

**Q.**    And in situations where Dr. Aigner reported to you
that he didn't know, then how did you come up with your
estimate?

**A.**    It depended.  Maybe you want to pick a particular
time period and how I estimated it?  I've given you a
couple of examples; I don't want to keep...

**Q.**    Well, for example, one of the items you took was the
evaluation of 5.2 and 5.6 gigahertz products?

**A.**    Yes.

**Q.**    And those were products that Akoustis actually came
to market with before Qorvo, correct?

**A.**    Yes.

**Q.**    Because, in fact, Qorvo was actually looking at
Akoustis products to fill in gaps in its product line
because it had not devoted the R&D resources to come up
with products for the Wi-Fi space in those frequencies,
correct?

**A.**    That's correct, yes.

**Q.**    So you estimated quite a long time period there as to
the evaluation of something that Akoustis actually already
had products in and Qorvo was a latecomer to that area.
Why did you estimate the 22 months that you claim it would

1    have taken to evaluate that market?

2    **A.**    I, first of all, don't recall the 22 months you are

3    talking about.  Maybe you could be more specific and tell

4    me where in my chart you're looking at.

5    **Q.**    That's okay.  We will.  We're going to go through

6    each one of these.

7        As you saw, I was kind of taking notes as were you

8    talking, putting red tags every time you said something

9    that didn't seem quite right to me.

10       In determining and evaluating the 5.2 and

11   5.6 gigahertz frequencies, why would you estimate that

12   Akoustis had received any head start when they actually

13   had -- you know, head start from getting information from

14   Qorvo, when Akoustis actually already had products, and it

15   was Qorvo coming to them to evaluate Akoustis products,

16   not the other way around?

17   **A.**    As you recall, the products that Akoustis -- I'm

18   sorry -- that Qorvo evaluated weren't adequate for what

19   they wanted to do.  First -- and I'd like you to, if you

20   could, be specific about a particular time period and line

21   you are referring to so I can tell you exactly how I did

22   it.

23   **Q.**    We'll definitely do that.  Once again, I'm trying to

24   determine how you came up with what appear to be

25   completely arbitrary numbers.  And I'm sure you have a

10:12:17 1    basis.  We just didn't see it in your expert report, and

10:12:19 2    I'd like to give an opportunity for the jury to hear how

10:12:23 3    you actually came up with that number.

10:12:25 4    **A.**    Sure.

10:12:26 5    **Q.**    As opposed to some different number.

10:12:29 6        Now, in looking at the time periods, again, that you

10:12:36 7    assigned to each of the tasks for each of the eight groups

10:12:38 8    of trade secrets, how would you determine when that time

10:12:42 9    period would start and when that time period would end for

10:12:45 10   purposes of your overlap analysis?

10:12:49 11   **A.**    I was considering what I believed would be happening

10:12:51 12   in parallel in a start-up company environment for those

10:12:59 13   tasks.

10:13:01 14   **Q.**    But in this circumstance, Akoustis, while it was a

10:13:05 15   start-up as a technology company in its first three years,

10:13:08 16   after they acquired the New York fab facility, that was

10:13:12 17   not a start-up business, was it?

10:13:14 18   **A.**    And I accounted for that.

10:13:16 19   **Q.**    So in your calculations for things that take place in

10:13:21 20   the manufacturing environment, such as at the fab, you

10:13:25 21   took into account that the -- what was the head -- let's

10:13:29 22   take a step back, then.

10:13:31 23       Once they acquired the New York fab -- that facility

10:13:34 24   had been in operation for already about 14 years; is that

10:13:38 25   right?

*Sharfield - Cross*

**A.**    Yes.  I've been there.

**Q.**    And that facility was already making MEMS-type devices for numerous other companies, and we've heard the name of some of them, such as Xerox or Corning or Kodak.

**A.**    Yes.

**Q.**    And so given that that was an ongoing operation that already had 14 years of experience doing that, how does acquiring that facility and moving their production there give Akoustis a head start?  Don't they just simply take advantage of what that facility was already doing and what they already knew how to do?

**A.**    I don't think I have a task in there that says "acquire MEMS fab."

      What I accounted for was the fact they had a MEMS fab.  I was familiar with it; I've walked through it.  And it had a certain turnaround time and a certain capacity.  I kept that in mind in tasks that were affected by fab.

**Q.**    How did you account for it?

**A.**    I have a lot of experience in running fabs, having done my duty running a manufacturing fab for 24/7, so I've had that.

      I've also seen that fab and know -- we actually ran parts through it at Draper.  So the combination.

**Q.**    So you would agree that that fab brought with it its own wealth of experience and knowledge, having made MEMS

10:15:09  1    devices for many years?

10:15:10  2    **A.**   Sure.

10:15:12  3    **Q.**   And does using, then, such a facility, would that

10:15:21  4    involve, then, a head start somehow in terms of the issues

10:15:24  5    that have been presented in this case?

10:15:31  6    **A.**   I think what I -- the way I can answer your question,

10:15:34  7    if you'll allow me, is by explaining that I didn't have

10:15:40  8    tasks in there that were given head starts that involved,

10:15:43  9    say, turnaround time in the fab or getting a process up to

10:15:50 10    speed.  Because I felt those were in place after the fab

10:15:54 11    was acquired.

10:15:55 12        So it's the absence of that task that, I guess, I

10:16:00 13    could point to in accounting for the fact the experience

10:16:04 14    that was brought in already had that established.

10:16:09 15    **Q.**   One of the areas that you mentioned here was Group 6,

10:16:14 16    which was testing reliability --

10:16:16 17    **A.**   Yes.

10:16:16 18    **Q.**   -- processes.

10:16:19 19        And you also talked in terms of assembly.  I think it

10:16:26 20    was assembly testing evaluation.  That was all part of

10:16:30 21    Group 6, I believe.

10:16:32 22    **A.**   Yes, that was the procedures?

10:16:35 23    **Q.**   Yes.

10:16:35 24    **A.**   Yeah.

10:16:36 25    **Q.**   And you're aware that the assembly of the products

| | |
|---|---|
| 10:16:41 | 1 |

**1**  made by Akoustis is done by a third party, correct?

**2**  **A.**    Yes, I was aware of that.

**3**  **Q.**    Okay.  So you're aware whatever assembly procedures,

**4**  testing procedures that are done there are done by a third

**5**  party pursuant to that company's procedures, correct?

**6**  **A.**    That's correct.  Yes.

**7**  **Q.**    So if assembly and testing evaluation of the

**8**  packaging is done by a third party, how does getting that

**9**  similar information from Qorvo provide any type of head

**10**  start to Akoustis?

**11**  **A.**    It didn't.  If you look at my graph, it was running

**12**  in parallel.  It made no difference.

**13**  **Q.**    Okay.  So even though that's a group of trade secrets

**14**  and you claim that there's a head-start value attached to

**15**  that.

**16**  **A.**    Absolutely.

**17**  **Q.**    I believe you said that there was a 12-month head

**18**  start attached to it?

**19**  **A.**    I don't think so.  I would like you to show me that.

**20**           **MR. LEMIEUX:**  If we could pull up again -- it

**21**  would be PDX-6.183.

**22**           **THE WITNESS:**  I recall three months with the

**23**  document.

**24**  **BY MR. LEMIEUX:**

**25**  **Q.**    Here's your -- again, the systems process procedures

10:17:50  1    for testing reliability, meantime failure.  You said a

10:17:53  2    12-month head start.

10:17:56  3    **A.**    This has nothing to do with assembly.

10:17:59  4    **Q.**    Okay.  We're talking, though, about testing.  Was

10:18:01  5    that done, again, at a third-party site for Akoustis?

10:18:03  6    **A.**    This is testing for reliability.  It was not -- it

10:18:07  7    was done at Akoustis.

10:18:08  8    **Q.**    Right.  And isn't it true that Akoustis uses third

10:18:11  9    parties to do all of its assembly and test

10:18:16 10    post-manufacture, post-fab assembly and testing?

10:18:19 11    **A.**    Let me try and clarify for you.

10:18:21 12         This is a different activity than the assembly and

10:18:26 13    tests that you're talking about.  That's the manufacturing

10:18:29 14    assembly test.  This is establishing reliability of a new

10:18:36 15    product.

10:18:40 16              **MR. LEMIEUX:**  And could we pull up, please,

10:18:41 17    PDX-6.187 -- 187, I believe it is.  Here we go.

10:18:56 18    **BY MR. LEMIEUX:**

10:18:57 19    **Q.**    This is manufacturing assembly and change procedures

10:19:00 20    then?

10:19:00 21    **A.**    Correct.

10:19:01 22    **Q.**    And is this the type of activity that would take

10:19:03 23    place either at the fab or at a third-party assembly

10:19:08 24    company?

10:19:09 25    **A.**    Some of it.

**Q.**   Packaging assembly.

**A.**   Some of it.  So the inspection may or may not.  The procedures and processes for qualifying packaging, I don't think they would.  So it's a mixture.

**Q.**   Okay.  So you have drafting assembly instructions, developing processes, procedures for qualifying, packaging, a certain price.

     This is all done either at the fab or at a third party after the wafers have already been made, correct?

**A.**   No.  There's inspection all along.  So the qualification, for example, in deciding that your package is going to properly protect the chip, you typically would do that in the reliability facility that Akoustis had on site.  So the procedure and processes matter a lot.

**Q.**   Right.  Dr. Shanfield, isn't it true that in most -- much of semiconductor manufacturing, third-party companies that are called OSATs do the off-site assembly and testing of products, correct?

**A.**   I agree with you.  This is qualification I'm talking about there.

**Q.**   But that's not -- you have drafting, assembly instructions, developing processes and procedures for qualifying packaging.

     That's going to be done by the packaging company itself.

**A.**    Absolutely not.

**Q.**    It would not be done by the company?

**A.**    In my experience, you have to have a procedure for qualifying your package.  The customer's going to be looking for that.  You're not going to depend on the conditions that your third-party contractor decides qualify the package.  You have to define those.

          **MR. LEMIEUX:**  If we could look at -- I guess it was PDX-6.172.

**BY MR. LEMIEUX:**

**Q.**    Now, Akoustis developed its own 5.2 and 5.6 gigahertz products, and those products were developed prior to Qorvo's, correct?

**A.**    Yes.

**Q.**    And so creating research, and development schedules for 5 gigahertz BAW filter solutions, that's something that they did in order to come up with their 5.2 and 5.6 gigahertz products; isn't that right?

**A.**    No.  What this refers to is the fact -- if you'll recall, the performance of the 5 gigahertz parts that they made at first, it fell short of what Qorvo was able to do and what apparently the industry that was buying it wanted.  And they needed to improve what they had.  There was lots of detail about what you need to do to the BAW filter.

**Sharfield - Cross**

10:22:28  1         Secondly, it's an ongoing process.  Everybody is

10:22:34  2    looking to make their filters work more effectively,

10:22:40  3    handle higher power, have lower insertion loss.  The

10:22:44  4    rejection at the edges has got to be better.  And so

10:22:49  5    that's work that I'm referring to here in the schedule

10:22:53  6    that you create to figure out how to do that.

10:22:56  7    Q.    But when you say "creating research and development

10:23:00  8    schedules" for these products, if Akoustis was already

10:23:04  9    selling products -- I understand you to say that Qorvo

10:23:07 10    evaluated Akoustis' products and decided not to purchase

10:23:11 11    them.  That evaluation process took to two years for

10:23:16 12    Qorvo, didn't it?  From the time they started to the time

10:23:17 13    that Qorvo made a decision not to buy the products from

10:23:20 14    Akoustis, that ran over a two-year time period, didn't it?

10:23:24 15    A.    From when to when?  I'm sorry.

10:23:26 16    Q.    From the time that Qorvo started to evaluate

10:23:29 17    Akoustis' 5.2 and 5.6 gigahertz products to the time they

10:23:36 18    made a decision not to move forward with them, that was

10:23:38 19    two years, wasn't it?

10:23:41 20    A.    That sounds right, yes.

10:23:42 21    Q.    And in that time period, Akoustis was already selling

10:23:45 22    products in that area to other third parties, wasn't it?

10:23:50 23    A.    That's my understanding, yes.

10:23:51 24    Q.    Okay.  So, again, I'm trying to understand then that

10:23:55 25    in an area where they already had products and they were

*Shanfield – Cross*

10:23:59 1    selling them on the market to third parties, how getting

10:24:02 2    information three years after the fact from Qorvo gave

10:24:07 3    them a three-month head start for designing something they

10:24:11 4    already had.

10:24:14 5    **A.**    I'll try and explain in as much detail as you'll

10:24:18 6    allow me.

10:24:19 7         The performance of the filters that they were

10:24:22 8    sampling needed to be improved, and that's always the case

10:24:27 9    in this business.  And so there's always a view to what

10:24:32 10   you're going to do to make it better.  And that's the

10:24:36 11   research and development plan and schedule and budgeting

10:24:40 12   and so on.

10:24:40 13        So -- and that was clearly Akoustis' intent because

10:24:46 14   for the 2019, 2020, they had come out with what they were

10:24:54 15   referring to as the second generation.  They were looking

10:24:57 16   to improve what they had, which all companies that want to

10:25:00 17   stay in business have to do in BAW filters.

10:25:04 18        So that's what I'm talking about here.  Not -- it

10:25:07 19   doesn't suddenly, clunk, there's a product; they're done.

10:25:11 20   It's a constant race to keep up with what competitors are

10:25:16 21   doing and what customers want.

10:25:17 22   **Q.**    And we've heard testimony in this case,

10:25:19 23   Dr. Shanfield, that one of the reasons that Qorvo was

10:25:23 24   having to look to third-party sources for these products

10:25:27 25   is that they had decided to devote their R&D resources to

1    different products.

2        You've been sitting in the courtroom.  You've heard

3    that testimony?

4    **A.**    Sure.

5    **Q.**    And so isn't it also quite possible, then, that in

6    the two years that Qorvo was evaluating Akoustis'

7    products, as they had done with their own in that area,

8    they actually just used that time period to look at, under

9    the guise of nondisclosure agreements, how Akoustis'

10   products work so that they could build their own?

11   **A.**    I believe that there was a lot of restrictions in the

12   NDA they signed with Akoustis.  And the one thing I knew,

13   they couldn't do anything other than do testing.  I recall

14   that.  I saw the NDA.  And so I don't think there was any,

15   you know -- there's no evidence either that there was any

16   sign of reverse engineering or any other activity like

17   that.

18   **Q.**    But I believe, Dr. Shanfield, you've testified that

19   having testing results and the ability to have these

20   testing results of a competitor's product is something

21   that you've classified as a very valuable trade secret.

22   **A.**    That's correct.

23   **Q.**    Okay.  And so --

24   **A.**    But it is under --

25   **Q.**    -- during the time period, then, Qorvo was actually

10:26:46 1    getting information, pursuant to a nondisclosure

10:26:50 2    agreement, that you would consider to be very valuable

10:26:54 3    trade secret information?

10:26:54 4    **A.**    But the NDA restricts their use of that information.

10:26:57 5    So that's the formality that prevents people from making

10:27:03 6    use of confidential information, like test results.

10:27:07 7    **Q.**    And so, at the end of that two-year evaluation

10:27:12 8    period, Qorvo decides not to actually purchase from

10:27:15 9    Akoustis, but, instead, now has had time to develop their

10:27:19 10   own products in that area; isn't that right?

10:27:24 11   **A.**    Well, my view of it was that Qorvo could easily move

10:27:31 12   into the 5 gigahertz realm and that they were making

10:27:37 13   economic priority choices.  They had the capacity to

10:27:42 14   quickly come up with a good product.

10:27:47 15       And the question was, what was their decision about

10:27:50 16   it?  And so they didn't need those two years.  It was more

10:27:57 17   a matter of a decision.  And since -- I imagine part of

10:28:01 18   that, making that decision, was having to look at whether

10:28:05 19   anybody else could supply it for them because they wanted

10:28:09 20   to build a higher-level system that included the filter

10:28:13 21   that Akoustis made.  And when the filter proved

10:28:17 22   inadequate, then that effected their decision.

10:28:23 23           **MR. LEMIEUX:**  If we could pull up Slide

10:28:25 24   PDX-6.180, please.

25

**BY MR. LEMIEUX:**

**Q.**   Here, you've evaluated what you believe to be the
head-start advantages in various items in Group 5; is that
correct?

**A.**   Yes, that's correct.

**Q.**   And in your evaluation of the head start that was
allegedly provided here, did you review at all the library
of processes and development documents that were already
in place at the New York fab facility?

**A.**   I don't recall, frankly.  There's so many documents.
I have to go back in my report and check.

**Q.**   I can tell you, Dr. Shanfield, you did not.  At least
it was not listed in your report as items that you had
reviewed in arriving at your opinion.

**A.**   Okay.

**Q.**   So when you estimate the advantage of creating a
technology development process or product development
process, applicable testing procedures, parameters, you
had no idea of what was already actually in place at the
New York fab facility for these purposes, do you?

**A.**   Well, actually, I did because I had seen it.  But it
didn't matter.  I didn't use that.  What I'm aware of that
testing BAW filters is really specialized, and there's a
lot of detail to getting it right.  And that is not
something that the MEMS fab had the ability of doing, in

10:30:03  1    the information I had available.

10:30:04  2    **Q.**    So you believe a fab has years of experience in

10:30:07  3    making MEMS devices, has no procedures in place for

10:30:10  4    testing the devices its making?

10:30:12  5    **A.**    Remember, the testing that you have to do for MEMS

10:30:17  6    filter is RF testing at high frequency, much higher than

10:30:24  7    any MEMS normally runs.  There's no MEMS resonator at that

10:30:27  8    frequency that's any good.  No MEMS facility I've ever

10:30:31  9    seen has the kind of testing that -- you have to calibrate

10:30:37 10    that testing in a very elaborate way with S parameter

10:30:40 11    measurements.  All of that is really specialized, and

10:30:44 12    particular to BAW filters.

10:30:45 13        So that was, my view, something that was not

10:30:49 14    established at the fab.  And I took that into account.

10:30:53 15    **Q.**    But you've listed --

10:30:55 16        **THE COURT:**  It's 10:30, and, of course, we have

10:30:58 17    a ways to go.  This is our 15-minute morning break.  So,

10:31:02 18    remember, don't discuss the case among yourself.  Don't

10:31:06 19    let anybody talk to you about it.  Of course we will come

10:31:09 20    back and resume.  Keep an open mind.  Fifteen minutes.

10:31:13 21    Thanks very much.

10:31:16 22        (The jury exits the courtroom at 10:31 a.m.)

10:31:44 23        **THE COURT:**  Everyone can be seated.  The

10:31:46 24    witness will be able to step down for a 15-minute break.

10:31:49 25    Can't talk with anybody about answers given, so forth.

10:31:52  1    But this is our morning break.

10:31:56  2                Anything else before we take that break right

10:31:58  3    now?

10:32:00  4                **MR. LEMIEUX:**  No, I don't think so, Your Honor.

10:32:01  5                **THE COURT:**  Let's give everybody a chance to

10:32:03  6    have that break.  We will see everybody -- I will see you

10:32:07  7    in about 13 minutes.  Thank you very much.

10:32:59  8         (Whereupon, a recess was taken.)

10:46:49  9                **THE COURT:**  You may be seated.  We can have the

10:46:54 10    witness back on the stand, and the jury can come in.

10:47:30 11         (The jury enters the courtroom at 10:47 a.m.)

10:47:55 12                **THE COURT:**  Everybody can be seated, and

10:47:57 13    counsel may proceed.

10:47:58 14    **BY MR. LEMIEUX:**

10:48:00 15    **Q.**   Doctor, just before the break here, we were talking

10:48:04 16    about the operation of New York fab.  I wanted to make

10:48:07 17    sure I understood your testimony you've never actually

10:48:09 18    reviewed the fab's library of processes controls

10:48:13 19    procedures, have you?

10:48:18 20    **A.**   No, I don't think so.

10:48:21 21    **Q.**   So your opinion in this case is rendered without

10:48:23 22    actually looking at the actual procedures and processes

10:48:27 23    that are used in their fabrication in the manufacturing

10:48:31 24    facility in New York, correct?

10:48:32 25    **A.**   That's correct, but what that --

10:48:38  1    **Q.**   That's okay.  That's all I asked you.  Correct.

10:48:41  2    Thanks.

10:48:42  3        Now, one of the other documents that you mentioned as

10:48:46  4    part of this is this technology development document,

10:48:48  5    which I believe we've seen that had a front page that had

10:48:52  6    been modified by Dr. Shealy; is that right?

10:48:56  7    **A.**   Which one are you talking about?

10:48:58  8    **Q.**   The products developments document -- technology

10:49:00  9    development document.  Sorry.

10:49:02 10    **A.**   Oh, okay.  Yes.

10:49:04 11    **Q.**   Okay.  And you've used that as a basis for stating

10:49:08 12    that this was somehow used or otherwise misused by

10:49:12 13    Akoustis; is that right?

10:49:13 14    **A.**   That's correct.

10:49:14 15    **Q.**   And did you look beyond the first page of that

10:49:18 16    document, in terms of what else had been changed, if

10:49:20 17    anything, in that document other than the confidentiality

10:49:24 18    provision you noted on Page 1?

10:49:28 19    **A.**   I looked through the entire document.

10:49:30 20    **Q.**   And you would agree, then, that in that entire

10:49:32 21    document -- the rest of the document still says RFMD;

10:49:36 22    there was no changes in the rest of the document, correct?

10:49:39 23    **A.**   In the document we were able to recover, that's true.

10:49:44 24    **Q.**   And that's the only document that, in Mr. Faulkner's

10:49:49 25    analysis, was revealed to be shown on Dr. Shealy's

10:49:54  1    computer in that regard was that document, and there was

10:49:56  2    evidence that it was sent to Mr. Rohan -- or Rohan --

10:49:59  3    excuse me -- Houlden, and apparently there was also a copy

10:50:04  4    that was sent to Mary Winters that Mr. Faulkner said

10:50:08  5    wasn't opened by her.

10:50:10  6        Did you hear that testimony?

10:50:11  7  **A.**    What I heard Mr. Faulkner say is that he didn't have

10:50:14  8    access to the time periods where it most likely would have

10:50:19  9    been opened by her.

10:50:21 10  **Q.**    And if the intention was to change that document into

10:50:27 11    something that was going to be actually used by Akoustis,

10:50:30 12    don't you believe there would have been more changes than

10:50:33 13    simply the first face page?

10:50:39 14  **A.**    What I observed in looking through the many documents

10:50:41 15    is, in cases where Mr. Faulkner was able to recover or

10:50:47 16    find metadata of a document, there had been multiple

10:50:52 17    revisions, there was sometimes three or four revisions,

10:50:56 18    and not all of them were able to be -- were made available

10:51:02 19    to Mr. Faulkner.

10:51:04 20        In my view, given the blackout periods that he had to

10:51:10 21    deal with.  And I am of the -- I have the impression that

10:51:16 22    with documents where it was available, there was revision

10:51:21 23    after revision as different features were added, there

10:51:25 24    might have been changes.

10:51:27 25  **Q.**    And so, Dr. Shanfield, let me ask you, were you aware

1  of any evidence, whatsoever, that anything was changed to

2  that new technology development document other than the

3  logo on the first page and the confidentiality paragraph

4  on the first page?

5  **A.**   No.

6  **Q.**   Okay.  So the idea that somehow this might have been

7  changed in the future, that's speculation on your part,

8  correct?

9  **A.**   It's more than that.

10 **Q.**   Well, you've seen no evidence of any form of that

11 document that had been changed, other than the very

12 initial one that Dr. Shealy sent out; is that right?

13 **A.**   I considered two factors in that document, because

14 that its value is very high, and I -- my presumption was

15 there was -- and it wasn't just presumption.  There was so

16 much evidence of use of documents where those documents

17 were available in discovery, I was of the opinion, and I

18 have been of the opinion, that it was a culture of usage

19 of confidential information.

20      Given the value of that document, I thought, in

21 particular, that one was going to be likely used, whether

22 it was discovered by Mr. Faulkner or not.

23 **Q.**   And so I understand, Dr. Shanfield, you like to make

24 very broad generalizations as to what you believe the use

25 is.  But I'm asking you specifically as to this document,

*Shanfield - Cross*

1   which you've, again, testified to you believe is highly

2   valuable, whether any changes were made to that document,

3   other than the fact that the logo had been changed on the

4   first page, the author's name had been changed, and the

5   confidentiality, and the rest of that ten-page document

6   still said, "RFMD" had no changes made to it whatsoever?

7   **A.**   In the version that we got, that's correct.

8   **Q.**   Okay.  And you've not seen any other version of that

9   document indicating any other changes were made, have you?

10  **A.**   There were no other versions available to Dr.

11  Faulkner.

12  **Q.**   And you don't know whether or not the New York fab

13  facility actually had its own version of such a document

14  prior to its acquisition by Akoustis, do you?

15  **A.**   That is a non sequitur.  Maybe you could re-ask that

16  question.  Those two documents --

17  **Q.**   Well, isn't it true --

18  **A.**   -- technology.

19  **Q.**   I'm sorry.  I don't want to speak over you.

20       Isn't it true, Dr. Shanfield, that document is

21  actually a quality management system document that, even

22  though it's called a new technology development, it's

23  actually used for purposes of quality assessment purposes

24  for ISO certifications?

25  **A.**   I don't think so.  If you want to look at it.

*Shanfield - Cross*

Q.   Well, that's what I meant, because you seem to have
some experience, you say, in all of this.  So you don't
actually know what that document is really used for?

A.   I know exactly what it's used for.  I mean, I know
what it was used for at Qorvo I should say.

Q.   And you don't have any understanding as to whether or
not at the fab, they already had a new technology
development-type document?

A.   That document had information specific to resonators
and filters, BAW filters, and was particular to the
technology that Qorvo had and was developing.  There's a
lot of -- a treasure chest, I'd say, of information in
there about what to do, how to do it, what it looked like,
how to measure it.  That type of information.

Q.   So I want to make sure we're talking about the same
document, Dr. Shanfield.  You're saying that the document,
the new technology development document, that was shown to
Dr. Shealy yesterday that showed some changes on the first
page, but no other changes, you're saying that document
contained all sorts of specific information regarding BAW
filters?

A.   If you could help me recall exactly what's in that
document, since there were so many of them.  What I'm
saying is new technology documents that were circulated at
Akoustis had a lot of useful information about what to do

10:55:50  1    to improve the performance of BAW filters.

10:55:52  2    **Q.**    And again, I'm referring only to the document that

10:55:55  3    Dr. Shealy was shown yesterday and that was highlighted

10:55:58  4    here as something that you believe to be very important.

10:56:01  5        It's your testimony that that document contains

10:56:05  6    specific information regarding Qorvo's BAW filters?

10:56:09  7    **A.**    I wasn't referring to that specific document.  So

10:56:11  8    pardon me if that's how it came across.

10:56:14  9    **Q.**    Okay.  Well, that's part of the difficulty I have,

10:56:17 10    Dr. Shanfield, with much of your testimony is, I'm trying

10:56:20 11    to understand what's the difference between specific

10:56:22 12    documents you're talking about versus the broad

10:56:25 13    conclusions that you are otherwise expressing as your

10:56:28 14    opinions.

10:56:28 15        And so if we are looking at just that document, which

10:56:31 16    is the new technology document, why do you believe that

10:56:35 17    that was highly valuable to Akoustis?

10:56:39 18    **A.**    Could I ask you to bring it up so that I can see it?

10:56:50 19        **MR. LEMIEUX:**    Let's go ahead and bring up that

10:56:50 20    document, PTX-0787.  And first, actually, let's just bring

10:56:54 21    up -- here we go.  That's good.  Leave that one up.  It's

10:56:59 22    fine.

10:56:59 23    **BY MR. LEMIEUX:**

10:56:59 24    **Q.**    Okay.  So this is the document that was shown to

10:57:03 25    Dr. Shealy yesterday, and that he was -- he apparently had

*Sharfield - Cross*

1    changed to delete the logo up in the upper left-hand

2    corner, he put his name on there, and you highlighted the

3    confidential document paragraph had been slightly changed.

4    But other than that, were there any other changes made to

5    this multipage, appears to be a ten-page document.

6    **A.**    Well, first of all, if you'd allow me.  Now that I

7    see the document you were referring to, it's not the one I

8    was referring to.  I was talking about the packets of new

9    technology that were Qorvo development information.

10   **Q.**    You would agree with me that this document, if we

11   keep going.

12            **MR. LEMIEUX:**  Let's turn to Page 3, Page 4,

13   Page 5, Page 6, 7, 8, 9, 10 --

14   **BY MR. LEMIEUX:**

15   **Q.**    There's no information specific to BAW filters in

16   this document, is there?

17   **A.**    This document is of high value in new technology

18   development in BAW filters.  That's what it's for.  So

19   it's specific to BAW filter development.

20   **Q.**    You believe that this document was created by Qorvo

21   specific for BAW filters?

22   **A.**    For the products that Qorvo developed, which one of

23   the big ones and what this was used for was BAW filters.

24   So it applied in the technology development procedures.

25   These are really important documents, because its

experience the company has developed over years on how --

what to do and what not to do, how not to waste time, how

to avoid dead ends in technology development, which in my

experience happens all the time if you don't have these

procedures.

**Q.**   Can you point to me anywhere in this document where

it's specific to the development or use of the BAW filter

technology?

**A.**   I --

**Q.**   Or makes any reference to BAW filter technology

whatsoever?

**A.**   I don't know that that is necessarily in there or

not.  If you give me the time to look through it.

**Q.**   So even though it's not mentioned in there, you still

view it as very highly value document?

**A.**   Absolutely.

**Q.**   Okay.  And, again, there's no evidence that this was

ever used by Akoustis, other than as Mr. Faulkner pointed

out, apparently, that it was sent once to Mr. Houlden and

once to Ms. Winters?

**A.**   Isn't that evidence it was used?

**Q.**   That's --

**A.**   It was sent to the people who would be the most

interested in it.

**Q.**   Well, there's a difference, and I think that's part

*Sharfield – Cross*

of the distinction that's probably a question the jury may, and I know I have is, is there a difference between simply sending an e-mail to somebody with information in it, and someone actually using that information to change a procedure or manufacturing technique or something?  What you've pointed to and what you've analyzed is simply the e-mail traffic; isn't that right?

**A.**    I've analyzed a number of things.  E-mail traffic is one.

**Q.**    And, in fact, all of your timelines, which you think are particularly important, that's -- again, that's just analyzing the e-mail traffic of information that's being disseminated within the company, but being disseminated is not the same as use?

**A.**    That's absolutely not true.  I pointed to a document that actually had the information from a document that was taken from Qorvo and substituted.  So it's not just e-mail trails.

**Q.**    But, again, you've not seen anything, because you've not examined the actual documents used by Akoustis for making products -- you've admitted you've never looked at the library of techniques, procedures, or controls that are in place at their New York fab facility.

Have you looked at the control documents at all that they use for any of their outside testing and assembly

*Shanfield - Cross*

11:01:06 1    companies?

11:01:08 2    **A.**    No.

11:01:10 3    **Q.**    So again, you've looked at e-mails, and certainly we

11:01:14 4    would concede that there's e-mails that are going around

11:01:18 5    all over the place.  But you've not actually seen any

11:01:20 6    evidence that the information that you believe is so

11:01:22 7    valuable is actually being implemented in procedures used

11:01:27 8    by Akoustis, have you?

11:01:28 9    **A.**    I disagree.  There are several good examples.  The

11:01:31 10   reliability procedures, the person that was responsible

11:01:37 11   for doing that Akoustis acknowledged that this is how they

11:01:42 12   determined their meantime to failure of their devices.  It

11:01:46 13   was clearly being used.

11:01:48 14   **Q.**    Well, so, for example, you put up this morning there

11:01:52 15   was references to a visual inspection document that

11:01:56 16   Mr. Dry had introduced.  Do you recall that?

11:01:59 17   **A.**    Yes.

11:01:59 18   **Q.**    And do you recall also that when Mr. Dry was asked in

11:02:04 19   his deposition whether or not they actually implemented

11:02:08 20   and used that document, he said, No, they didn't, that

11:02:11 21   they have actually -- the document that they use at

11:02:14 22   Akoustis is something much simpler and easier because it

11:02:16 23   was already established at the fab facility.

11:02:19 24        Do you recall that testimony?

11:02:20 25   **A.**    Sure.

**Q.**    Okay.  And so, even though Mr. Dry had suggested

using this document as an example of one they could use,

it wasn't actually used or implemented, was it?

**A.**    The executives at Akoustis, including Dr. Shealy,

were up here denying the use of documents or even

possession of documents that the evidence showed they had

possession of, and they used.

So I'm not sure what to make of that, other than

apparently denial of the facts in front of them.

**Q.**    Well, actually, the denial is yours right now,

Dr. Shanfield.  Even though the testimony is that Mr. Dry

introduced this document, the testimony was that,

actually, they did not end up using it, that even though

it was something he was suggesting, that they didn't use

it.  Did you hear different testimony?

**A.**    What I was alluding to was the credibility of that

testimony.  The fact that I could see in my own eyes a

situation where there was clearly e-mails that indicated

use by Dr. Shealy, and yet he made the statement that he

never used them, they weren't of any use, et cetera.

**Q.**    So, again, Dr. Shanfield, you're presuming use based

on the fact that you've seen e-mails -- we've all seen

many of these e-mails that go back and forth -- that even

though there's no question that these e-mails occurred and

that these topics were being discussed, have you actually,

*Shanfield - Cross*

though, seen any evidence of them actually being employed in the manufacture of Akoustis products?

**A.**    In the manufacture of Akoustis products.  The usage that I showed evidence for was the two examples I gave you.  One was the marketing or the table of information on specifications for the Qorvo 5 gigahertz device that were taken, and the comparison that was being made, were taken directly into the Akoustis document discussing the same subject, and that becoming a strategy for Akoustis.

The other example is the statement from the VP of quality, or the person that reported to the VP of quality, that they used the Qorvo confidential information as the basis for their reliability evaluation of product.  There's, I think, a strong story there that, you know, it's being used.  Did I sit there watching them use it?  No.

**Q.**    And you didn't actually do the investigation of the documents actually used either, did you?  You simply analyzed the e-mail traffic that was provided to you?

**A.**    No.  I looked at the documents, too.

**Q.**    Well, you looked at documents that were attached to e-mails, correct?

**A.**    I looked at a number of documents, including documents attached to the e-mails.

**Q.**    But you didn't actually, like I said, ever look at

1    what's actually used in their fabrication facility to make

2    products, did you?

3    **A.**    If you're referring to the New York fab, that's

4    correct.

5    **Q.**    So you didn't look at what is being used to actually

6    manufacture the products in the fab.  You also didn't look

7    at any documentation that's used by their third-party

8    package and assembly companies to determine whether or not

9    Qorvo information is being used by those third parties,

10    have you?  You've not looked at that?

11    **A.**    That's correct.  What I did look at, however, was the

12    situations where there was available, evidence recovered

13    in discovery from Mr. Faulkner, and saw strong examples

14    that -- I just related a couple -- use.  So the examples

15    stand.

16    **Q.**    Now, the document that we were looking at a few

17    minutes ago that, again, you said was so valuable, the new

18    technology development, there's no reference to BAW

19    technology in there.  It appears just to be a general

20    template for kind of a phase gate type approval process,

21    wouldn't you agree?

22    **A.**    No.

23    **Q.**    You don't believe it's a generic template document?

24    **A.**    Not at all.

25            **MR. LEMIEUX:**  Can we pull that up again,

please.

                    THE WITNESS:  It's very specific.

                    MR. LEMIEUX:  The one we just had.  And if we
can look at Page 2 of this document.

BY MR. LEMIEUX:

Q.    Again, what is the purpose of this document?

A.    If you will allow me, I'll relay the story when I was
a young engineer and saw these documents -- type of
documents at Raytheon for the first time.  I initially
believed this is -- this is obvious.  This should be
something people can just figure out how to do.

       And it took experience in the industry of watching
what happens when you don't have the right kind of
procedures in position as to how development goes off
track and ends up developing something you can't use or
spending money in an inefficient way or the pace of the
development is just inadequate for the market.

       And I came to appreciate this kind of document
highly, as this is, to me, is a sign of a company who
spent years figuring out what works for developing BAW
resonators and filters.

       And so I think to the unpracticed eye, it looks --
apparently to you -- like it's just a generic template.
It's not.  This is really the specific kinds of activities
that are going to bring development and -- at a rate that

1    will meet the market, that will meet the price

2    requirements.  There's a lot of ways things can go wrong

3    in product development.

4    **Q.**   Well, I admit I am not as trained in all of this as

5    you are, Dr. Shanfield.  But I can read.  And if you look

6    at Paragraph 3 there, and it talks about the references

7    that are used, this looks a lot, to an uneducated person

8    like myself, as a phase gate array-type document.

9    **A.**   Well, it is.

10   **Q.**   Establishing different review processes to happen at

11   different times.  Which, in a very large company, I agree

12   with you it would be important that we have procedures in

13   place so that things are being done in an orderly fashion.

14   **A.**   No, that's not what I'm referring to.

15       What I am describing is not something you get off the

16   Internet.  It's specific to what works in the particular

17   kind of product you're developing, and a particular kind

18   of market you have to meet, whether it's driven by price,

19   being driven by performance.  All of those factors make

20   this document represent that difference, and that's

21   exactly what I see in this document.

22   **Q.**   Okay.  So you believe this document, which is an RFMD

23   document, is reflective of years of research in building

24   BAW-type filter products?

25   **A.**   No, I believe it is a --

**Q.**   You told me a moment ago.

**A.**   -- technology gating -- I'm sorry.  If you'll allow
me to finish.

It's a new technology development procedure RFMD
developed for RF devices, of which a BAW filter would be
one.  And they -- I'm well familiar with their work from
years ago.  They have clearly streamlined and figured out
how to generate product that's going to meet the market
requirements in one of fastest moving markets in the world
and the most price sensitive and technology sensitive
markets.  So it's really specific.

**Q.**   So I asked you earlier, Dr. Shanfield -- in response
to my question, you said that this document contained a
lot of very specific information for BAW.  When I asked
you, well, is BAW even mentioned anywhere in this
document.  You felt that didn't matter, but this was very
value to developing BAW filters; isn't that true?

**A.**   So whether there's mention of BAW or not is not the
place I'm referring to as far as the value.  It's what is
it -- what activity should the development team focus on,
what should it set as its gates for making decisions.

And you don't have to mention BAW or the -- you're
making a technology development procedure that's going to
apply to RF products, not just BAW.  And that's from
experience of the culture of the company.  And that's

*Shanfield - Cross*

11:11:43  1    what's reflected here.

11:11:45  2    **Q.**    And so maybe you would agree with me that this is a

11:11:49  3    template, product describing a process that should be

11:11:52  4    followed in the development of some new technology?

11:11:55  5    **A.**    I'm not sure what you mean by that.  Maybe you could

11:11:58  6    give me a little more detail.

11:12:00  7    **Q.**    You don't understand the word "template"?

11:12:02  8    **A.**    Well, to me, this is not a template, so I guess not.

11:12:07  9    **Q.**    Okay.  Now, in fact, this is an RFMD document.  You

11:12:12 10    would agree with me on that, correct?

11:12:14 11    **A.**    Yes.

11:12:14 12    **Q.**    And you are aware that RFMD never made BAW filters?

11:12:18 13    **A.**    Yes.

11:12:19 14    **Q.**    Okay.  So I think it's safe to say that this document

11:12:22 15    was not created to document the process of making BAW

11:12:26 16    filters, because they didn't make that product?

11:12:30 17    **A.**    Disagree.  This is RF products, and it would apply.

11:12:35 18    **Q.**    You believe this would apply?

11:12:37 19    **A.**    Yes.

11:12:37 20    **Q.**    And you believe it would apply even if there was a

11:12:39 21    different document that was actually used by Akoustis for

11:12:42 22    this purpose?

11:12:44 23    **A.**    I think what's indicated here is relevant to whatever

11:12:51 24    document Akoustis uses, and has used.  I think there's

11:12:57 25    experience contained here, and it will find its way into

what the value -- or whatever the final document is that

Akoustis decided to use.  I mean, this document apparently

was one that they were looking to incorporate in their

procedure.

**Q.**   Well, but you saw -- again, you saw no evidence that

it actually was incorporated, did you?

**A.**   I think I disagreed with you on that last time, and I

disagree again in that the culture at Akoustis was

something that I had to get used to because I have never

seen it before in any technology company, where documents

are being passed around, confidential documents, freely,

and that tells me that this document must likely ended up

like many documents that I can point to where there were

revisions, and those revisions were discovered, and

revisions of that revision, I don't have -- so --

**Q.**   So if there was an equivalent document at the fab

facility which you have not looked at, would there have

been a need for this document?

**A.**   This has very little to do with the fab facility.

Direct product new technology development is something you

don't do in a fab.  It's now something that uses a fab,

but the procedures for development of new technology in a

fab is focused on the process, how you do your plasma

etching or your wet etching, how you do your grinding.

There's -- that's not what this is applicable to.  This is

*Shanfield - Cross*

11:14:46 1  for RF devices like BAW filters.

11:14:50 2  **Q.**   This document simply describes a process to be used,

11:14:53 3  and, in fact, aren't these documents used for quality

11:14:56 4  management purposes, for customer audits and things of

11:15:01 5  that nature?

11:15:02 6  **A.**   When you say, "these documents," which one?

11:15:05 7  **Q.**   This one we're talking about here.  Even though it's

11:15:06 8  called new technology development, this is the type of

11:15:08 9  document that's actually used for doing customer audits

11:15:11 10  and seeking ISO certification and other matters that are

11:15:15 11  part of quality management systems?

11:15:18 12  **A.**   The use of this document is for guiding the

11:15:21 13  development teams established by RFMD, and later Qorvo.

11:15:29 14  Whether an ISO auditor wants to see what the procedure is,

11:15:34 15  is one thing.  They could ask for this document.

11:15:37 16  **Q.**   And that's, in fact, what these documents are usually

11:15:41 17  used for is to be able to show either customers or

11:15:45 18  certification organizations like ISO that procedures are

11:15:49 19  in place and this is what's being used?

11:15:51 20  **A.**   Absolutely not.  I thought that when I was a young

11:15:54 21  engineer, and I quickly learned otherwise.

11:15:57 22  **Q.**   Now, if we go back to the Group 1 -- we're kind of

11:16:05 23  going to just walk through the various groupings that you

11:16:08 24  made here of different alleged secrets.

11:16:11 25      Group 1 is business plans for Wi-Fi.  And I believe

11:16:16  1    your testimony was, was that these changed every quarter

11:16:20  2    or so; they moved very fast because this industry moves

11:16:23  3    very fast; isn't that right?

11:16:26  4    **A.**   There are updated probably every quarter.

11:16:29  5    **Q.**   Well, like I said, I believe your testimony was that

11:16:32  6    these move very quickly; these change every quarter or so

11:16:36  7    is what you said yesterday?

11:16:38  8    **A.**   Yeah, that's right.

11:16:39  9    **Q.**   And so these types of documents become stale after a

11:16:43 10    while, don't they, because the fact that the industry is

11:16:46 11    changes, if it's changing every quarter, something from a

11:16:49 12    couple of years ago isn't going to be of much use, is it?

11:16:52 13    **A.**   That depends on the document.

11:16:54 14    **Q.**   And Wi-Fi, the advent of 5G, that was something that

11:17:02 15    was widely publicized, even in the regular press and news

11:17:09 16    media, et cetera at the time, wasn't it?

11:17:11 17    **A.**   They are all versions of Wi-Fi, so I guess that's a

11:17:14 18    pretty broad statement.

11:17:16 19    **Q.**   Well, would you agree --

11:17:16 20    **A.**   Showed up in the public media.

11:17:19 21    **Q.**   So the identification that there is development going

11:17:23 22    on in Wi-Fi or that 5G is coming, et cetera, we all heard

11:17:27 23    the advertisements of those events.  That wasn't something

11:17:29 24    that was secret; that was something that was widely known

11:17:33 25    common knowledge, right?

**A.**     Yes.

**Q.**     Did you speak to anyone at Qorvo to find out how much
it took them to do their market analysis of the coming 5G
or Wi-Fi standards?

**A.**     Yes, I talked to Mr. Testa, and then I think the jury
heard Mr. Testa testify.

**Q.**     So you believe, other than that, that's the basis for
your belief as to the value of those items, or what
Mr. Testa has testified to?

**A.**     No, it's not the basis.  I've listened to him, and I
knew what he was going to say already, but I had
experience directly doing technical marking, and I
understood what it meant to make a plan, and how you do
that in a detailed way that actually works.  It's a lot of
work.

**Q.**     When was the last time you did any technical
marketing?

**A.**     Six months ago.

**Q.**     Okay.  So for your current company, which is an
R&D-type of enterprise, think tank?

**A.**     This is small, low-rate production, but, yes.

**Q.**     Okay.  Do you actually write technical marketing
documents for them?

**A.**     I was doing technical marketing of a particular
concept.  This is for SpaceX.  We make proposals and parts

11:19:00  1    for commercial companies, so that's what it was about.

11:19:06  2    **Q.**   One of the items that you identified that you thought

11:19:09  3    was rather suspicious was the use of personal e-mail

11:19:14  4    accounts instead of work e-mail accounts to transmit or

11:19:18  5    receive various e-mails; is that right?

11:19:21  6    **A.**   I didn't use the word "suspicious"; I thought it was

11:19:25  7    unusual.

11:19:27  8    **Q.**   And so that indicates that if you're using your work

11:19:30  9    e-mail, that there doesn't appear to be any effort to hide

11:19:33 10    what you are doing, it's just part of normal business,

11:19:36 11    right?

11:19:37 12    **A.**   Depends on the context.

11:19:40 13    **Q.**   Well, if -- you said that in your opinion, you use

11:19:43 14    personal e-mail accounts only if you're trying to hide

11:19:46 15    something.

11:19:49 16    **A.**   I don't remember the context of that statement.

11:19:53 17    **Q.**   So you've never had occasion to actually use your

11:19:56 18    personal e-mail account for nonpersonal reasons?

11:19:59 19    **A.**   Actually, I'm not allowed to use my personal account

11:20:05 20    for nonpersonal reasons at Draper.  That's not allowed.

11:20:10 21    **Q.**   Do they also have a rule at Draper you're not allowed

11:20:13 22    to use your professional e-mail account for personal

11:20:16 23    reasons?

11:20:17 24    **A.**   Yes.

11:20:17 25    **Q.**   You're fortunate.  My firm, we use our e-mails for

everything, to be able to do that.

**A.**   I think in tech companies, there's the awareness

of -- the importance of confidential information has come

up considerably.

**Q.**   You say it's come up considerably.  Is that, what --

in what time period?

**A.**   I think it's in general.  I can't really -- I haven't

given thought to exactly when, so I'd have to think about

it.

**Q.**   Now, you identified various documents that you

believed show the 5 gigahertz development plan that you

believe came from Qorvo statement -- 5 gigahertz statement

of work; is that right?

**A.**   That's correct.

**Q.**   And isn't it true that in terms of, you know, the

gigahertz spectrums, these are all pursuant to a standard,

correct?

**A.**   There's a standard involved in how customers use

them.

**Q.**   And so when we oftentimes are speaking of the spec --

the spec -- the standard sets out what the spec is,

doesn't it?

**A.**   No.

**Q.**   In what circumstances would the spec not generally

establish what the standard is going to be?

**A.**   I'm sorry.  The spec?

**Q.**   I'm sorry.  The standard wouldn't establish what the spec is supposed to be.

**A.**   I'd say in almost all circumstances.

**Q.**   Why is that?  What's the purpose of having a standard, then?

**A.**   Standard's a starting point.  Gives you a frequency range.  If there's particular product and it's using part of that frequency range, if it has designations like intermodulation distortion or, you know, third order of intercept.  All these various detail specs, that's not something that's standard, and that's something you've got to figure out.

**Q.**   Now, one of the other -- one of the other groups that you mentioned was BAW filter and resonator design.  That's Group 2, right?

**A.**   Yes.

**Q.**   And the document that you rely on that you claim was used by Akoustis is a discussion or a document that's polygons versus rectangles, and that's referring to resonator shapes, correct?

**A.**   That was the name of the document, yes.

**Q.**   And the type there, the shape of resonator that's used in the Akoustis products is neither a polygon or a rectangle, are they?

*Sharfield - Cross*

A.   The way masks are made to form those electrodes is

this protocol called GDS2.  It lays the mask out as

triangles.  And those triangles have straight sides.  So

the electrodes -- I think Dr. Aichele also referred to

this.  The electrodes are always polygons because that's

what you're printing on the wafer.

Q.   Well, I think we've heard testimony here that there's

different shape resonators, and one of the shapes of

resonators is an elliptical or oval shape.

     Do you disagree with that?

A.   No.

Q.   So there are such things as oval or elliptical

resonators?

A.   Yes, of course.

Q.   And are you familiar with the shape of the resonator

that's manufactured by Akoustis?

A.   Yes.

Q.   Okay.  And what shape is that?

A.   Depends.

Q.   Is it an oval or elliptical shape?

A.   Some of them, some of the resonators have that shape.

Q.   And does Qorvo use an oval or elliptical shape for

any of its resonators?

A.   The shape they use -- I don't know that I'd call it

oval or elliptical, but there's aspects of it that you

*Shanfield - Cross*

11:24:20  1  could call that.

11:24:22  2  **Q.**  Well --

11:24:22  3  **A.**  I'm not saying they're the same because the shape

11:24:25  4  isn't -- the specific name of the shape isn't so important

11:24:29  5  as how you know you picked the right shape.  There's lots

11:24:34  6  of shapes that probably work, and the actual shape, how

11:24:39  7  you name it isn't particularly important.

11:24:43  8  **Q.**  So you would agree that the document, though, that

11:24:46  9  you're relying on that contained what you said was very

11:24:50 10  value Qorvo information, is a discussion of rectangular

11:24:55 11  versus polygon shape resonators; isn't that right?

11:24:58 12  **A.**  No.  I would not agree with that.

11:25:01 13  **Q.**  Even though that's the title of the document?

11:25:02 14  **A.**  What that document describes is what the effect the

11:25:08 15  shape has on aspects that matter for a filter, and it

11:25:14 16  tells you not only what matters, but what to do about when

11:25:20 17  things go wrong in a shape.

11:25:22 18      So you pick a shape.  It might work.  You've got to

11:25:26 19  modify it in a way that you get rid of these modes that

11:25:30 20  develop in the resonator that will end up affecting your

11:25:35 21  filter when you build the filter out.  That is really

11:25:43 22  important information.  That's something I learned when I

11:25:45 23  read it.  It was not publicly available.  I found it

11:25:48 24  really interesting.

11:25:49 25  **Q.**  Now, the resonator shape that was being used by

*Shanfield - Cross*

11:25:51  1    Akoustis prior to its access to that document was an oval

11:25:57  2    or elliptical; would you agree?

11:26:00  3    **A.**    Can you repeat that question?  I'm sorry.

11:26:03  4    **Q.**    Sure.

11:26:03  5         You've seen diagrams of the resonator shapes employed

11:26:09  6    by Akoustis, right?

11:26:10  7    **A.**    Yes.

11:26:10  8    **Q.**    And you've seen diagrams of the resonator shapes

11:26:13  9    employed by Qorvo as well, haven't you?

11:26:15 10    **A.**    Yes.

11:26:16 11    **Q.**    And the resonator shapes employed by Akoustis are

11:26:23 12    oval or elliptical shaped; would you agree?

11:26:25 13    **A.**    Some of them.

11:26:26 14    **Q.**    And they were using those shapes prior to any

11:26:30 15    information received from Qorvo regarding the benefits or

11:26:36 16    negative aspects of using rectangles versus polygons,

11:26:41 17    correct?

11:26:42 18    **A.**    First of all, I don't agree with your

11:26:44 19    characterization.  What that document did, as I said, it

11:26:49 20    tells you what to look for in whatever shape you choose.

11:26:54 21    What to do about it if you end up with modes, which you

11:26:58 22    usually do --

11:26:59 23              **MR. LEMIEUX:**  Your Honor --

11:26:59 24              **THE WITNESS:**  -- at 5 gigahertz.

11:27:02 25              **MR. LEMIEUX:**  Sorry.

11:27:03  1          THE COURT:  Yes, sir.

11:27:03  2          MR. LEMIEUX:  We have persons not under the

11:27:05  3  protective order at this point.

11:27:07  4          THE COURT:  That person needs to be excused.

11:27:13  5          MR. LEMIEUX:  I don't know who the people are

11:27:15  6  in the back.

11:27:39  7          THE COURT:  Thank you.

11:27:43  8          THE WITNESS:  As I was explaining, that

11:27:45  9  document tells you -- it doesn't tell you exactly what

11:27:47 10  shape to pick, polygon, rectangle.  What it does tell you

11:27:52 11  is when you pick that shape, this is what you need to look

11:27:57 12  for, and you'll inevitably run into, this is what you need

11:28:00 13  to do about it.

11:28:01 14          So the particulars of the shape is not what's

11:28:04 15  the key there.

11:28:05 16  BY MR. LEMIEUX:

11:28:05 17  Q.   Well, the shape that was actually being used by

11:28:08 18  Akoustis didn't change after they received that document,

11:28:11 19  did it?

11:28:13 20  A.   I don't know.

11:28:14 21  Q.   It continued to use ovals and ellipticals?

11:28:17 22  A.   Well, the products I saw, they didn't -- they used

11:28:19 23  other shapes.

11:28:20 24  Q.   And so the fact that they were using ovals and

11:28:22 25  ellipticals before they received this information would

1    indicate that receipt of this information didn't change

2    the resonator shape that they were already using; isn't

3    that true?

4    **A.**    Like I said, in the new products, they weren't using

5    elliptical shapes for some of their resonators.  I saw it

6    in their layout.

7    **Q.**    They're using ovals or half ovals instead?

8    **A.**    I don't know how to describe them.  I have to show

9    you.

10           **MR. LEMIEUX:**  If we could pull up PDX-6.37.

11    Actually, before that, let's pull up 6.36.

12    **BY MR. LEMIEUX:**

13    **Q.**    And temperature, in terms of an issue, is something

14    that is common with any type of small electronic device,

15    correct?

16    **A.**    That's a pretty general statement.

17    **Q.**    Well, as we all know, our devices, whether they're

18    cell phones or other small electronic devices, generate a

19    certain amount of heat because of the energy they're

20    using; isn't that right?

21    **A.**    The active devices do, yes, sir.

22    **Q.**    And that trying to understand how to control those

23    temperatures and thermal qualities is something that's

24    common to all those types of devices, isn't it?

25    **A.**    No.  A resistor -- first of all, a BAW filter is a

11:30:25 1   passive device like a resistor.  And, typically, there's

11:30:30 2   not concern about the details of how a resistor might heat

11:30:35 3   up.

11:30:35 4   **Q.**   And isn't heat management techniques or thermal

11:30:39 5   controls known to others in the industry besides Qorvo?

11:30:42 6   **A.**   Of course.

11:30:44 7   **Q.**   Actually, it's a matter of oftentimes common

11:30:46 8   knowledge to those in material sciences, isn't it?

11:30:50 9   **A.**   Absolutely not.  The detail, what you do at the level

11:30:54 10   and the scale of microns and submicron dimensions is

11:31:00 11   not -- takes skill and knowing how to model it, what to do

11:31:05 12   about it that is consistent with the fabrication process.

11:31:09 13   **Q.**   Okay.  So someone, though, who has education and

11:31:12 14   training in that type of nano materials, et cetera,

11:31:15 15   they're going to understand the problem of heat transfer

11:31:18 16   and thermal management, aren't they?

11:31:22 17   **A.**   Yes, of course.

11:31:28 18   **Q.**   One of the other items that you believe that had been

11:31:34 19   transferred to Akoustis that you thought was very valuable

11:31:36 20   was size and reduction strategies; is that right?

11:31:42 21   **A.**   Yes, correct.

11:31:43 22   **Q.**   And how to make things smaller.  That's one of the

11:31:46 23   ongoing battles in almost all consumer electronics, isn't

11:31:52 24   it?

11:31:52 25   **A.**   Yes.  A lot of them, yes.

11:31:53 1    **Q.**    And so knowing that that's an issue that you have to

11:31:57 2    deal with, that's certainly not a trade secret, is it?

11:32:00 3    **A.**    No.

11:32:04 4    **Q.**    You also mentioned what you said was kind of this

11:32:06 5    suspicious bag that, I guess, Rohan Houlden used to carry

11:32:11 6    around with him.  People use computer laptop bags all the

11:32:16 7    time, don't they?

11:32:17 8    **A.**    I didn't call it suspicious, and I guess I found it

11:32:21 9    maybe a little bit humorous that he had his computer

11:32:27 10    laptop bag full of documents.

11:32:29 11    **Q.**    And so people use computer laptop bags to carry

11:32:33 12    things all the time.  There's nothing unusual about having

11:32:35 13    a laptop bag?

11:32:38 14    **A.**    No, not for an engineer.

11:32:39 15    **Q.**    Now, one of the things that you've criticized

11:32:46 16    Akoustis for is you believe that their development time to

11:32:50 17    being able to manufacture products was too short; is that

11:32:53 18    true?

11:32:54 19    **A.**    I wasn't criticizing it.  I observed that.

11:32:58 20    **Q.**    And when you were making that observation, did you

11:33:01 21    take into account the experience that the fab that they

11:33:05 22    acquired in 2017 already had in making these types of

11:33:09 23    devices?

11:33:10 24    **A.**    Yes, definitely.

11:33:11 25    **Q.**    Okay.  And so they were not starting from scratch,

| | |
|---|---|
| 11:33:13 | 1 |

were they?  When they -- after acquiring that fab, they

were acquiring actually up to 17 years' experience in

making MEM spec devices?

**A.**   MEMS are not BAW resonators.  They're very different

animals.  And I have experience making MEMS.  I have

inventions in MEMS.  There's a real difference in the

design of structures.  So, although the processes were in

place, and I definitely accounted for that, the experience

of making and measuring and trimming these devices wasn't

necessarily in place.

**Q.**   Trimming, that's something that you've, I think,

identified a number of different times as something that

you believe was a very valuable trade secret that was

otherwise moved from Qorvo to Akoustis; is that right?

**A.**   What was moved, and what I identified was what was in

the documents that were obtained by Akoustis.  There were

three algorithms that I pointed to, to explain that, and

that's -- that's what I testified about.

**Q.**   And have you examined the, what's called the XBAW

transfer process that's utilized in the New York fab for

actually etching the cavity for that -- for the Akoustis

device?

**A.**   Yes.  I'm quite familiar with it.

**Q.**   Okay.  And do you understand that basically, because

of the way that process works, it's impossible for them to

11:34:48 1    use the trimming method that you've described in those

11:34:53 2    Qorvo documents?

11:34:54 3    **A.**    I don't agree with that.

11:34:56 4    **Q.**    Okay.  So if it's shown to you later by one of our

11:35:00 5    other experts, you just would not believe them?

11:35:02 6    **A.**    What I would acknowledge is that there may be steps

11:35:08 7    in what Qorvo invented that aren't usable.

11:35:13 8        And the example I would give, and I acknowledge, is

11:35:16 9    the fact that there weren't openings cut in the silicon

11:35:20 10   nitride to be able to do █████████████████████████

11:35:24 11   ████████, and that is correct.  But that isn't a very

11:35:28 12   important step.

11:35:31 13       The algorithm that you use in order to get to the

11:35:35 14   ████████████████████████, that's really important.

11:35:40 15   **Q.**    Because it can't do a measurement of the cavity

11:35:44 16   before the cavity is created, correct?

11:35:47 17   **A.**    Measurement of what?

11:35:50 18   **Q.**    There's no trimming that can take place of the cavity

11:35:53 19   before the cavity exists.

11:35:54 20   **A.**    There's no trimming of the cavity at all.

11:35:56 21   **Q.**    That's right.  Exactly.

11:35:58 22   **A.**    Ever.  I'm not sure the relevance of that point.

11:36:04 23   **Q.**    So, once again, you didn't -- you haven't actually

11:36:05 24   observed the trimming process that takes place in New York

11:36:09 25   facility, have you?

*Sharifield - Cross*

**A.**    Not that I know of.  I've been there.

**Q.**    You've visited there.  But you've not observed the actual trimming process that's used in the creation of the Akoustis devices, have you?

**A.**    No.

**Q.**    One of the items that you also identified, and I believe shown, was a picture of some type of testing facility.  There was a gentleman operating with a number of pictures, looked like equipment behind him, that you identified that was also a Qorvo trade secret.

**A.**    Well, I think what you're referring to is the reliability facility, the schematic diagram, and the photographs that went with it?

**Q.**    Yes.  Photographs attached to that, yes.

**A.**    So the combination of having a schematic diagram, how you lay out your reliability system, it's not trivial. It's not simple engineering.

Also, the photograph showing things like -- I mean, I noticed right away as an engineer what the connectors were, the RF connectors.  Because that's really important, you know, to get the -- chosen so that they can withstand the temperature excursions.  So there was a lot of information to an engineer in that diagram.

**Q.**    We're going to try to -- I just asked them to pull up that picture.  They're going to try to pull that up.

11:37:52  1    **A.**    Sure.

11:38:28  2    **Q.**    And so we see these pictures of what looks like it's

11:38:31  3    labeled ██████████████████████████.

11:38:34  4    **A.**    Yes.

11:38:35  5    **Q.**    And you're saying that just by looking at these

11:38:38  6    pictures, you can tell what specific connectors in that

11:38:42  7    are being used?

11:38:44  8    **A.**    I take a lot of information from these photos.  If

11:38:48  9    you want, I can explain.

11:38:49 10    **Q.**    Well, so, for example, the RF connector.  Can you see

11:38:52 11    from these pictures what the specifications would be for

11:38:55 12    that RF connector?

11:38:57 13    **A.**    I recognized it right away.  If you look at what --

11:38:59 14    in the top picture that engineer is holding with the red

11:39:05 15    frame around it.  That's going into the temperature

11:39:08 16    chambers.  Those RF connectors have to tolerate -- and the

11:39:12 17    coax cables have to tolerate temperature set ups that are

11:39:17 18    running for months.

11:39:19 19         So choosing the right connector and the right cable,

11:39:23 20    a configuration where you made it modular, that's new to

11:39:28 21    me.  And I find it really interesting.  I'm sure that's of

11:39:33 22    value to someone who's setting this up.  Absolutely.

11:39:36 23    **Q.**    So what we can see from the picture is, for example,

11:39:38 24    there's an RF connector.  And an RF connector is something

11:39:43 25    that's oftentimes -- or used to be on the back of

1  television sets when we had cable, in the old days.  But

2  being able to look at that picture, that doesn't tell you

3  anything about the specification or the internal design of

4  the RF connector, does it?

5  **A.**  I know that connector already.  I can tell you what

6  it is.  And, also, if you look to the right, you see ███

7  ███ and also, those are systems that run at temperature

8  and we can see ████████████████████████████

9  ███████  ██████████████████  which -- that's

10  interesting.  Don't usually use that.  █████████████

11  But they clearly found that would work in the elevated

12  temperature environment.

13  **Q.**  So --

14  **A.**  I think that's interesting.  I mean, there's a lot of

15  information.

16  **Q.**  So I'm just curious.  So you can tell the

17  specifications of the RF connector just from looking at

18  the picture.  Is that because there's some sort of

19  industry standard RF connector?

20  **A.**  No.  I just happen to recognize it.  I've seen a lot

21  of RF connectors in my lifetime.

22  **Q.**  Is there some sort of marking on it that allows you

23  to identify it as an --

24  **A.**  No.  The shape, it was off to the side like that.  I

25  know.  I have to look it up, but I know where to look.

| | | |
|---|---|---|
| 11:40:56 | 1 | **Q.** You would know where to look from that? Okay. |
| 11:40:59 | 2 | **A.** Yeah. |
| 11:41:00 | 3 | **Q.** Your eyes are much better than mine. |
| 11:41:02 | 4 | **A.** Well, I have a screen that's right next to me here. |
| 11:41:05 | 5 | **Q.** So do I. I just -- I don't see any markings on |
| 11:41:07 | 6 | there. I don't see anything that would tell me who |
| 11:41:10 | 7 | manufacturers that connector, how the connector is |
| 11:41:13 | 8 | otherwise set up or set to a -- |
| 11:41:18 | 9 | **A.** Well -- |
| 11:41:18 | 10 | **Q.** -- the single processing for it, et cetera. I don't |
| 11:41:21 | 11 | see any of that from that picture. But you're able to |
| 11:41:23 | 12 | tell from the picture -- |
| 11:41:24 | 13 | **A.** An engineer looking at this, I'm sure, because |
| 11:41:28 | 14 | there's only a limited number of choices, and the decision |
| 11:41:32 | 15 | of what you use in the high-temperature oven, that's |
| 11:41:36 | 16 | difficult, and people often make mistakes. |
| 11:41:40 | 17 | Your -- the choice here is really interesting. If I |
| 11:41:44 | 18 | had this photo, I would adopt what Qorvo was doing; |
| 11:41:47 | 19 | they're experienced with in. |
| 11:41:49 | 20 | **Q.** You just mentioned a moment ago, there's only limited |
| 11:41:51 | 21 | choices available. So that means there's actually a |
| 11:41:54 | 22 | limited number of RF connectors that could perform this |
| 11:41:57 | 23 | type of testing? |
| 11:41:58 | 24 | **A.** What I meant by that is -- there's a wide variety of |
| 11:42:02 | 25 | RF connectors. There's only a limited number that |

actually work at high temperature and don't change their

characteristics or fail after a month.

**Q.**    Is that something that's generally known to engineers

in this industry?

**A.**    It would be to a reliability engineer, certainly.

**Q.**    I'm just curious, Dr. Shanfield, you've mentioned a

couple of times that you visited the New York fab

facility.  When was that?

**A.**    I'd have to check, but I remember being cold at the

time because it's Upstate New York.  But it's probably

three or four years ago.

**Q.**    You believe you've been there in the last three to

four years?

**A.**    Yes.

**Q.**    Okay.  And when you went there, were you there to

meet with somebody, or did you do an inspection of the

facility?  What was the purpose of your visit?

**A.**    We were looking at the possibility that they could do

MEMS work for us, MEMS research and development, and they

also provided a tour to me and a couple other people from

Draper of what they had in the way of equipment,

semiconductor equipment, test equipment, so on.

**Q.**    So you did a walk-through of the facility?

**A.**    Well, they gave some detailed discussion of the MEMS

process, and we went into detail.  And I am under NDA for

describing that, so I can't give you more.

**Q.** I can appreciate that. But that visit had nothing to do with this case, correct?

**A.** Yeah, it had nothing to do with this case.

**Q.** When you were mentioning earlier the evaluation board test plans, are those evaluation boards that are used in the fab, or where are those evaluation boards used?

**A.** They are provided to customers only so that they can, as the name implies, evaluate the product that they're mounted on. They are also used by a company like Akoustis or Qorvo to actually test their product. So you need a board to mount the filter on in order to do correct RF measurements.

**Q.** And are evaluation boards an item that's oftentimes listed for sale or purchase on a company's website?

**A.** Not for product that's in development.

**Q.** But for a product that's otherwise available, those evaluation boards is something that I could look up on a website and purchase --

**A.** Yes.

**Q.** -- if it's an existing product.

So if it's sold to the public, it's not trade secret once it's available on your website, right?

**A.** That's right.

**Q.** Now, you went through yesterday what you thought was

11:45:17  1    this -- or what you described, I guess, as a highly

11:45:21  2    elaborate attempt by Mr. Houlden to obscure or hide the

11:45:28  3    source of a Wi-Fi power amp spec that Mr. Houlden provided

11:45:34  4    to Dr. Shealy; isn't that true?

11:45:37  5    **A.**    Could you show me this?

11:45:40  6         **MR. LEMIEUX:**    Could we pull up DDX-6.97.

11:45:53  7    **BY MR. LEMIEUX:**

11:45:53  8    **Q.**    Does this help refresh your recollection as to what

11:45:55  9    document I am referring?

11:45:56 10    **A.**    Yeah.  It's a front-end module, not a power

11:46:02 11    amplifier.

11:46:03 12    **Q.**    And I believe that the evidence is that shown about

11:46:07 13    this document is that Mr. Houlden forwarded this to

11:46:10 14    Mr. Shealy, and Mr. Shealy sent this to a professor at the

11:46:15 15    University of California Santa Barbara; isn't that right?

11:46:20 16    **A.**    I don't recall the professor; I'll take your word for

11:46:23 17    it.

11:46:23 18    **Q.**    And so this document that Mr. Houlden was providing

11:46:27 19    to him was in response to a request from Dr. Shealy for an

11:46:31 20    example of a spec for a front-end assembly for Wi-Fi6?

11:46:38 21    **A.**    This isn't just a spec; this is a confidential

11:46:42 22    document revealing lots of details and measurement of this

11:46:47 23    front end module.

11:46:49 24    **Q.**    Right.  And I understand that, sir, but this document

11:46:52 25    was sent to Dr. Shealy in response to his request for a

11:46:57  1    spec for a front end module, wasn't it?  That's the e-mail

11:47:02  2    trail that you've shown?

11:47:07  3    **A.**   What I'm showing on the e-mail is that "I would start

11:47:10  4    with this," is what Mr. Houlden has written.  And so they

11:47:16  5    are starting with something.  As to what it was going to

11:47:22  6    be used for, this is confidential information.  These

11:47:27  7    spreadsheets, there's several tabs on the spreadsheet with

11:47:29  8    hundreds of lines of data in it, and all kinds of

11:47:34  9    settings, and the focus that Qorvo had on particular

11:47:39 10    characteristics of the module and the filters in the

11:47:43 11    module.  So it certainly --

11:47:46 12    **Q.**   Were you in the courtroom --

11:47:47 13    **A.**   -- more than a spec.

11:47:48 14    **Q.**   Were you in the courtroom, Dr. Shanfield, when

11:47:51 15    Dr. Shealy testified about this?

11:47:53 16    **A.**   Yes.

11:47:54 17    **Q.**   Okay.  And did you hear his testimony that he

11:47:56 18    requested this spec from Mr. Houlden, Mr. Houlden sent him

11:48:01 19    in document, Dr. Shealy saw that it was a rather lengthy

11:48:05 20    document, and just simply forwarded it onto the professor

11:48:08 21    who had made the request to him?

11:48:10 22          Did you hear that testimony?

11:48:14 23    **A.**   He apparently -- there was confidential markings on

11:48:17 24    it that had been removed, but -- and I'm showing those in

11:48:22 25    the red squares.  But the point is, this is a confidential

11:48:26  1    document that he should never have had possession of, and

11:48:29  2    certainly shouldn't forward it, no matter who he is

11:48:33  3    forwarding it to.

11:48:34  4    **Q.**    Would you agree with me, then, that, in this

11:48:35  5    circumstance, this isn't evidence that Akoustis actually

11:48:39  6    was using this document?

11:48:44  7    **A.**    Dr. Shealy is the CEO of Akoustis.  I really, if I

11:48:49  8    were in his role, which I have been in similar roles, you

11:48:53  9    set an example in how you handle documents like this by

11:48:57 10    what you do under circumstances like this.

11:49:00 11    **Q.**    But would you agree that, by the time that this

11:49:03 12    document was supplied by Mr. Houlden to Dr. Shealy,

11:49:06 13    Mr. Houlden removed all the confidentiality markings, as

11:49:11 14    you've pointed out here; isn't that true?

11:49:14 15    **A.**    I don't know who removed them.

11:49:17 16    **Q.**    Well, in your testimony yesterday, you said that

11:49:20 17    Mr. Houlden had removed these and then had sent it on to

11:49:24 18    Dr. Shealy.

11:49:24 19    **A.**    I never said that.

11:49:26 20    **Q.**    Okay.

11:49:27 21        So you don't know who did, but somebody had removed

11:49:29 22    them before this was forwarded from Mr. Houlden --

11:49:34 23    **A.**    Someone --

11:49:36 24        (Reporter clarification.)

11:49:36 25    **A.**    I'm sorry.  Could you repeat.

*Shanfield - Cross*

**BY MR. LEMIEUX:**

**Q.**  Someone had removed the confidentiality restrictions

before this document was sent to Dr. Shealy, right?

**A.**  Correct.

**Q.**  In fact, that spec is, as you've mentioned, is for a

front-end module, isn't it?

**A.**  That's right; that's what I said.

**Q.**  And Akoustis doesn't make front-end modules, does it?

**A.**  They make components of front-end modules.

Filters --

**Q.**  They make filters?

**A.**  There are many filters in a front-end module.

**Q.**  A front-end module contains many filters and contains

other constituent parts as well, right?  It's a more

complicated device than a simple filter?

**A.**  Most of time when filters get used, that's the case,

yes.

**Q.**  Right.  But, again, you agree, Akoustis doesn't make

front-end modules, does it?

**A.**  No.

**Q.**  We touched upon this a little bit earlier,

Dr. Shanfield, but you are aware that Akoustis doesn't do

its own packaging assembly, that it's done by actually a

third party company outside of Akoustis?

**A.**  That's my understanding, yes.

11:50:56  1    **Q.**    So, again, packaging and assembly information used by

11:51:00  2    Qorvo isn't going to be of much use to Akoustis if that

11:51:05  3    function is handled by a third party for Akoustis; isn't

11:51:08  4    that right?

11:51:09  5    **A.**    I disagree.

11:51:44  6    **Q.**    All right.  Dr. Shanfield, I'd like to just, then,

11:51:47  7    move on to your involvement in the assessment of potential

11:51:52  8    patent infringement in this case.

11:51:53  9    **A.**    Sure.

11:51:54 10    **Q.**    You were asked to conduct certain simulations for

11:52:00 11    purposes of other experts in this case to comment on; is

11:52:05 12    that right?

11:52:08 13    **A.**    Yes.  That's a good description, yes.

11:52:12 14    **Q.**    And you performed those simulations, and those

11:52:16 15    simulations produced certain graphs that you've referred

11:52:21 16    to in your testimony here today; is that right?

11:52:23 17    **A.**    Well, I performed dozens of simulations, but I am

11:52:28 18    showing the results from a few.

11:52:30 19    **Q.**    And the simulations you ran, they didn't consistent

11:52:33 20    of consist of actually physical testing of Akoustis

11:52:37 21    devices, did they?

11:52:38 22    **A.**    No.

11:52:38 23    **Q.**    It's just computer modeling in an attempt to project

11:52:42 24    what actual testing would show, right?

11:52:44 25    **A.**    Yes.  That was, I think --

*Sharifi106 - Cross*

Q.   And for the original --

A.   -- you heard from testimony and witnesses that, in fact, Dr. Aigner, the modeling is the way people design these devices now.  You can't build lots of different variations.  It just takes too long and it's too hard, and the modeling has gotten so good in the BAW resonators and filters that you end up very accurately predicting what the real world will do.  So modeling is the Number 1 approach, and the first approach you take in designing and deciding what you are going to build.

Q.   Okay.  So while modeling is a potentially useful device in designing figures, that's not the question I asked you.

    We were looking at, looking at actual finished devices and whether you did any physical testing of the actual finished device?

A.   I didn't do any.  It was cross-sections taken of actual physical devices.

Q.   So, again, what you did was you tried to create a computer model of what it would predict the actual device would do in operation, correct?

A.   No.  What I did was, I took the data that was supplied to me from scanning electron microscope images and measurements of the actual device, and I took those dimensions.  I put them in a model that I know gives

11:54:14 1    accurate results, have long experience with it, and I

11:54:19 2    tested that model.  I made dozens of simulations to make

11:54:24 3    sure the model behaved properly as expected.  And then I

11:54:29 4    did the simulations I was asked to do.

11:54:34 5    Q.    And simulations, as we heard from both Dr. Aigner and

11:54:37 6    Dr. Fattinger when they were on the witness stand, are

11:54:40 7    very complicated, aren't they?

11:54:42 8    A.    Yes.

11:54:42 9    Q.    And they consist of multiple variables that have to

11:54:45 10   be considered in order to produce a useful prediction;

11:54:49 11   isn't that right?

11:54:50 12   A.    That's correct.  Takes a lot of work to get it to

11:54:53 13   work, correct.

11:54:53 14   Q.    And --

11:54:53 15   A.    It's got to be checked a lot.

11:54:56 16   Q.    And if there is a mistake if one of those variables,

11:54:58 17   it's going to end up producing a result that's incorrect

11:55:01 18   or not useful, right?

11:55:03 19   A.    Yes.  A mistake is very unlikely, because I did the

11:55:06 20   same as all people who do modeling a lot do, and I tested

11:55:12 21   the model to make sure, in the range of parameters I was

11:55:15 22   looking at, that it behave the way I know the physical

11:55:19 23   world behaves.  So that you could check if there's

11:55:21 24   something wrong, you will see it in one of its

11:55:24 25   predictions.

**Q.** Now, you produced an expert report that contained --
well, let me step back for a second. So the results of
the computer modeling that you do, produced the graphs
that we saw up on the screen earlier this morning?

**A.** Yes.

**Q.** And in your original expert report, you produced
certain graphs that you believed depicted the actual
operation of the Akoustis devices, correct?

**A.** It predicted the performance of, in some cases,
Akoustis devices; in some cases what was the state of the
art at the time.

**Q.** And you reviewed your expert report, didn't you, to
make sure that it was accurate before it was provided to
counsel for Akoustis?

**A.** Yes.

**Q.** And, in fact, didn't it turn out that the graphs that
you provided in your original expert report were
incorrect?

**A.** I made a mistake of pasting the wrong graph into one
page, and the simulation itself that I pasted in was
correct, but it was not the one that I meant to refer to
in my writing. So I did, indeed.

**Q.** And even though that report was produced at towards
the end of November of 2023, you didn't notice that
mistake for several months; isn't that true?

**A.**    That's true.  I have a full-time job.  I have lots of
other things to worry about.

**Q.**    And, in fact, you didn't notice that mistake until it
was pointed out in the rebuttal reports submitted by
Akoustis' expert; isn't that true?

**A.**    No, that's not true.

**Q.**    And isn't it also true that you weren't aware of this
until Dr. Bravman, who we'll hear from later, pointed out
the mistake to you in your expert report?

**A.**    That's not true.

**Q.**    So if Dr. Bravman testifies that he had to point this
mistake out to you, he would be incorrect in that
testimony?

**A.**    Dr. Bravman pointed to that plot and found it wasn't
consistent with the language I was referring to, and I
looked at it and immediately knew what I had done, and I
pasted in the right plot.

**Q.**    And so you had to change your report, didn't you?
Had to supplement it to put in different graphs than what
you had included in your original report?

**A.**    I pasted in the wrong graph.  I took that out and put
the right one in.  The simulations were all correct.
There were no errors.

          **MR. LEMIEUX:**  No further questions for this
witness, Your Honor.

11:58:15   1          **THE COURT:**  Redirect.

11:58:16   2                    REDIRECT EXAMINATION

11:58:18   3   **BY MR. DeFOSSE:**

11:58:26   4   **Q.**   Dr. Shanfield, I'd like to start with where

11:58:28   5   Mr. Lemieux started.  I think he had a number of nitpicks

11:58:32   6   of your opinions, and I'd like to kind of take a step back

11:58:35   7   and talk about your head-start analysis.

11:58:38   8   **A.**   Sure.

11:58:39   9   **Q.**   That was based on your experience in project

11:58:41  10   management analysis; is that right?

11:58:43  11   **A.**   That's right.

11:58:44  12   **Q.**   Now, you've run companies?

11:58:46  13   **A.**   Yes, I have.

11:58:47  14   **Q.**   And you've managed fabrication facilities?

11:58:51  15   **A.**   I have, yes.

11:58:52  16   **Q.**   And you've worked on the design of RF products?

11:58:55  17   **A.**   Yes, I have.

11:58:55  18   **Q.**   And the marketing of RF products?

11:58:59  19   **A.**   Yes.

11:58:59  20   **Q.**   And you've been in this industry for more than

11:59:01  21   30 years, right?

11:59:02  22   **A.**   That's correct.

11:59:02  23   **Q.**   And you're currently working in the semiconductor

11:59:07  24   industry, right?

11:59:07  25   **A.**   That's right.

*Shanfield - Redirect*

11:59:08 1    **Q.**    In this case, you were asked to look at a lot of

11:59:11 2    information, right?

11:59:12 3    **A.**    That's correct, yes.

11:59:13 4    **Q.**    Including -- well, do you recall how many

11:59:16 5    confidential documents you identified were in the files of

11:59:20 6    Akoustis?

11:59:21 7    **A.**    We started with more than a half a million documents,

11:59:24 8    and I had to narrow that down to a number that I could

11:59:28 9    look at and sort through to identify trade secrets.  It

11:59:31 10    was in the order of 20,000 or so, ten to 20,000, and I

11:59:36 11    narrowed that down to 1500, so it was a huge number of

11:59:39 12    documents.

11:59:40 13    **Q.**    So you identified 1500 confidential document in

11:59:44 14    Akoustis' files?

11:59:45 15    **A.**    That's correct.

11:59:46 16    **Q.**    And out of those documents, you identified 46 trade

11:59:50 17    secrets that we talked about yesterday and today?

11:59:52 18    **A.**    Yes, that's right.

11:59:53 19    **Q.**    You put them into eight groups?

11:59:56 20    **A.**    Yes.

11:59:56 21    **Q.**    And you concluded that Akoustis had received a

12:00:00 22    head-start benefit; is that right?

12:00:02 23    **A.**    That's right.

12:00:02 24    **Q.**    And what do you believe that benefit was from those

12:00:05 25    trade secrets?

*Shanfield - Redirect*

**A.**    The benefit was the ability to get something done

sooner than they otherwise would have.  So the time saved.

**Q.**    Okay.  And in terms of the time saved, how many

months was it?

**A.**    Total of 55 months.

**Q.**    And is that consistent with your 30 years of

experience in this industry, that that's a reasonable of

time to have saved?

**A.**    It is.  I actually made sure it was a sane amount,

and wanted confirmation of that by checking with, for

example, with Qorvo development work, the pace that Qorvo

development worked at.

**Q.**    Mr. Lemieux also, I think, suggested at various

points in his examination that Akoustis had purchased this

fabrication facility in New York.

Do you recall that?

**A.**    Yes.

**Q.**    And that this facility had already had procedures in

place, and so Akoustis couldn't have stolen Qorvo's trade

secrets because of that.

**A.**    Yes, he said.

**Q.**    Was that facility in New York manufacturing RF

filters?

**A.**    No.

**Q.**    And did you see evidence in this case that, in fact,

12:01:18 1   the procedures that were -- that went to that facility

12:01:22 2   were supplied by Akoustis and not existing at that

12:01:25 3   facility?

12:01:26 4   **A.**   I did, yes.

12:01:27 5   **Q.**   Okay.  And maybe we can just look at a couple of the

12:01:33 6   PDXs.

12:01:34 7           **MR. DeFOSSE:**   Could I have 6.122?

12:01:37 8   **BY MR. DeFOSSE:**

12:01:45 9   **Q.**   Okay.  Do you recall this document from your direct

12:01:4910   examination?

12:01:4911   **A.**   Yes.

12:01:5112   **Q.**   And if we look in the upper left-hand corner, Mary

12:01:5613   Winters is referred to there?

12:01:5714   **A.**   Yes.

12:01:5715   **Q.**   Now, she was with the fab and came over to Akoustis

12:02:0216   with the acquisition, right?

12:02:0317   **A.**   That's my understanding, yes.

12:02:0518   **Q.**   But at this point, when -- the events you are talking

12:02:1019   about in this slide in 2020, she is at Akoustis and fab is

12:02:1420   at Akoustis, right?

12:02:1521   **A.**   That's correct, yes.

12:02:1622   **Q.**   And Mr. Dry is setting up a meeting with herself, the

12:02:1923   director of operations of the fab, and Akoustis' VP of

12:02:2424   quality, right?

12:02:2425   **A.**   Yes.

12:02:25 1    **Q.**    And he is attaching a confidential Qorvo document,

12:02:28 2    right?

12:02:28 3    **A.**    Yes, that's what's shown attached there.

12:02:31 4    **Q.**    To have a meeting to discuss that document?

12:02:33 5    **A.**    Correct.

12:02:34 6    **Q.**    The document relates to the visual inspection of

12:02:38 7    products; is that right?

12:02:39 8    **A.**    Yes, it does.

12:02:40 9    **Q.**    And I want to clear up one other thing I think

12:02:42 10   because I think there could be some confusion with the

12:02:44 11   jury.

12:02:45 12       The visual inspection document that's at issue here

12:02:48 13   relates to products that are coming out of Akoustis' fab

12:02:51 14   in New York, right?

12:02:52 15   **A.**    That's correct.

12:02:53 16   **Q.**    That's not the -- and can you explain the connection

12:02:56 17   between the fab in New York, what they're producing, and

12:03:00 18   these assembly houses we heard from Mr. Lemieux about?

12:03:03 19   **A.**    So the fab makes these wafers and dices them up, and

12:03:08 20   the inspection is done, it's done on the wafer level.

12:03:11 21   There's no packaging or assembly going on.  Then once the

12:03:17 22   chips are picked out, they are then sent to the assembly

12:03:22 23   house who mounts each die, each chip into a package.  And

12:03:28 24   maybe other parts too.  That's the assembly and the

12:03:31 25   inspection there, is in a separate place.

*Shanfield - Redirect*

**Q.**  One last thing.

         **MR. DeFOSSE:**  If we could go to 6.115.

**BY MR. DeFOSSE:**

**Q.**  These were the documents that you reviewed in connection with Trade Secret Group 7; is that right?

**A.**  Yes, that's right.

**Q.**  The manufacturing, assembly, and change procedures group?

**A.**  Yes.

**Q.**  And, again, my question relates to the correlation between these documents and the assembly houses that Mr. Lemieux brought up.

     Are these documents document that would be useful at Akoustis?

**A.**  In certain cases, yes.

**Q.**  Okay.  And, for example, the package qualification document?

**A.**  Yes.

**Q.**  Those are procedures that Akoustis puts in place with respect to the packaging that's done at the assembly house, right?

**A.**  That's correct.

**Q.**  Because it's Akoustis that's responsible to make those that those packages ultimately work?

**A.**  That right.  And that was the point I was trying to

12:04:36  1    make with Mr. Lemieux.

12:04:38  2    **Q.**    Thank you, Dr. Shanfield.

12:04:39  3            **THE COURT:**  All right.  Thanks very much.  You

12:04:42  4    may step down.

12:04:45  5            Who will our next witness be?

12:04:59  6            **MR. NAQVI:**  Good afternoon, Your Honor.

12:05:00  7    Plaintiff will call Michael Boyd to the stand.

12:05:20  8            **THE COURT:**  Mr. Boyd, come forward.  Come up to

12:05:23  9    the witness stand.  The clerk will swear you in.

12:05:31 10            **THE CLERK:**  Please remain standing.  Please

12:05:33 11    state and spell your name for the record.

12:05:35 12            **THE WITNESS:**  My name is Michael Boyd

12:05:36 13    M-I-C-H-A-E-L, B-O-Y-D.

12:05:40 14        MICHAEL BOYD, having been called as a witness, being

12:05:40 15    first duly sworn under oath or affirmed, testified as

12:05:40 16    follows:

12:05:40 17            **THE CLERK:**  Thank you.  Please be seated.

12:05:40 18            **THE COURT:**  Counsel, you may proceed.

12:05:40 19

12:05:41 20                    DIRECT EXAMINATION

12:06:07 21    **BY MR. NAQVI:**

12:06:12 22    **Q.**    Good afternoon.

12:06:13 23        Can you please introduce yourself to the jury.

12:06:15 24    **A.**    My name is Michael Boyd.  I am the chief information

12:06:18 25    security officer for Qorvo.

**Q.**   Mr. Boyd, do you have a family?

**A.**   I do.  Married 23 years to my wife, and we have two children, a son and a daughter.

**Q.**   Mr. Boyd, can you please describe to the jury, what is information security?

**A.**   So information security in a corporate environment is a broad practice that typically involves three key elements.  It's assuring both -- all three of these. Confidentiality of information in systems, so keeping them private.  Importantly, also, the availability of that information in those systems.  So it's not just confidentiality, it's the utility of the systems and the ability to access data.

And then third, and final, is integrity of the information, which is really just a fancier word for the accuracy and the usability of that information in those systems.

So it's balancing all three of those legalities.

**Q.**   Mr. Boyd, can you tell the jury a little more about how -- how you, in your role, balance confidentiality and availability of information?

**A.**   Sure.

I think it's probably easiest to use an example of that balancing act.  So we do a thing -- typically, in information security, everybody has a user name and a

password, at a minimum, to get to information and to get into systems.  Similar to an ATM machine, you might be familiar with.

So the act of logging into that system with my user name and password proves that that's me at that moment.  But every minute that passes after that, are we still really sure that it's me?

Well, if I'm continuously using the system, I'm relatively certain that it's still that individual there.  But if there's 15 minutes of inactive or an hour of inactive, did somebody else get onto that system?  So we do something called "locking" or "killing" sessions.  So if it hasn't been used for a specific amount of time, that user is kicked off.

The challenge is that doesn't work in some environments.  Because maybe it's totally appropriate for that system to not have activity and logging the person out means when they come back to it, it could stop a critical process, it could keep them from doing what their job is.  In some cases, it might even jeopardize safety or life if they can't, you know, hit a fire suppression system.  So, similar to the way an ATM works when you walk away, it knows that it's no longer you and the next person has to enter their card.

Q.    Mr. Boyd, what are your job responsibilities as chief

12:08:48  1    information security officer of Qorvo?

12:08:49  2    **A.**   So a broad range of responsibilities related to those

12:08:53  3    three topics, information security.  Kind of first and

12:08:56  4    foremost is establishing policies, procedures, and

12:08:59  5    standards around what measures we need to have in place to

12:09:03  6    protect our information in our systems.

12:09:06  7         Then training employees to make sure that they're

12:09:09  8    aware of those, advising senior leadership and information

12:09:13  9    technology in the business on what measures are

12:09:16 10    appropriate for protecting systems and information.

12:09:20 11         And then advising on selecting those technologies.

12:09:23 12    And then last, but certainly not least, I have a team of

12:09:27 13    security operations specialists who do continuous

12:09:30 14    monitoring and evaluation of systems and data to detect

12:09:34 15    problems and then they respond to them.

12:09:37 16    **Q.**   Mr. Boyd, can you please summarize your educational

12:09:39 17    background, beginning after high school?

12:09:41 18    **A.**   Sure.  After high school, I attended the United

12:09:46 19    States Naval Academy in Annapolis.  I received a bachelor

12:09:49 20    of science degree in computer science.  I was commissioned

12:09:52 21    as an officer in the Marine Corps, where I served for

12:09:55 22    six years.  A number of different professional trainings

12:09:59 23    and certifications while in the military.

12:10:01 24         After leaving the military to get back into IT and

12:10:05 25    security, I had a whole host of technical certifications

back when I was doing engineering and analyst work. The

one certification I currently maintain is called the

Certified Information Systems Security Professional, or

CISSP.

**Q.**    Mr. Boyd, when did you join Qorvo?

**A.**    I joined Qorvo as a CCO in April of 2021.

**Q.**    And do you report to anyone?

**A.**    I report to the chief information officer, the head

of IT, Mr. Todd Martin.

**Q.**    How many employees are on Qorvo's information

security team?

**A.**    We have seven direct members of the information

security team.

**Q.**    And outside of the dedicated information security

team, are there other employees at Qorvo who are involved

in information security?

**A.**    Absolutely. I think, fundamentally, most

importantly, every single Qorvo employee has very specific

and very well-publicized responsibilities for information

security. Appropriate use of systems, managing your

passwords effectively, acting in an ethical responsible

manner, as established in a number of policies.

More specifically to my role, I partner, and my team

partners with a whole host of other experts inside Qorvo

for things like compliance with laws and regulations. We

12:11:22   1    work with the legal team for employee matters.  We work

12:11:26   2    with human resources.  And then we work hand in hand with

12:11:29   3    dozens of folks in the IT department to make sure our

12:11:32   4    systems are secure.

12:11:34   5    Q.   How much does Qorvo spend on an annual basis on

12:11:37   6    information security?

12:11:38   7    A.   So directly in my budget, that rolls up to me, we

12:11:44   8    spend about seven and a half, a little shy of $7.5 million

12:11:47   9    a year on information security controls.

12:11:50  10        And then outside of my team, there are other security

12:11:53  11    features in a lot of other technology that don't fall

12:11:58  12    under my budget, but those are conservatively between $3-

12:12:02  13    and $4 million for those ones as well that I advise on.

12:12:07  14    Q.   Mr. Boyd, does Qorvo take information security

12:12:09  15    seriously?

12:12:11  16    A.   Absolutely.

12:12:11  17    Q.   Why do you say that?

12:12:13  18    A.   So as a technology company, our competitive edge is

12:12:17  19    really derived from high-value intellectual property.  I

12:12:21  20    call that the life blood of Qorvo, is our intellectual

12:12:23  21    property.

12:12:24  22        We spend significant money and significant time,

12:12:28  23    years and years, developing critical intellectual

12:12:31  24    property.  So we recognize, and our employees recognize,

12:12:35  25    that that's critically important.

1      Again, as I said, information security is not just

2  about keeping confidentiality of that.  We don't get value

3  from that information unless it's turned into products

4  that our customers are asking for.

5      So the availability and the integrity of that is also

6  very important.  Qorvo spends a lot of money, a lot of

7  time, and I have great engagement with our board of

8  directors and with our senior executives on the program as

9  well.

10  **Q.**   Mr. Boyd, does Qorvo maintain written policies

11  related to information security?

12  **A.**   We do.

13  **Q.**   And how do you know about policies related to

14  information security that predate when you joined Qorvo in

15  2021?

16  **A.**   So when I joined Qorvo, it was -- one of my primary

17  responsibilities is managing those policies, and they all

18  have a history to them.  So I can go back and look at

19  prior versions very easily, I can roll back and look at

20  what was there before and what changed.

21      So as part of my onboarding at Qorvo, I knew I needed

22  to go and review the policies that were currently in place

23  and what they had looked like prior.

24  **Q.**   Mr. Boyd, I'd now like to start walking through

25  various aspects of Qorvo's information security program.

12:13:48  1          Does Qorvo have physical security controls?

12:13:51  2    **A.**    We do.  We have what I would call the kind of

12:13:53  3    standard information security controls in a technology and

12:13:57  4    manufacturing environment, badges to our building.  So you

12:14:01  5    have to swipe your employer-issued badge to unlock an

12:14:03  6    electronic lock on the door.

12:14:04  7          We also have physical key locks in certain areas.  We

12:14:08  8    have cyber locks, which are little punch keys that you

12:14:11  9    have to enter numbers on for other areas.  We also have

12:14:15 10    video monitoring, on-site security guards in our major

12:14:18 11    facilities.  And all employees are issued a photographic

12:14:22 12    ID badge as well, that has to be displayed on premises at

12:14:25 13    all times.

12:14:26 14    **Q.**    Mr. Boyd, I'd now like to turn to employees

12:14:29 15    specifically.  When a new employee is hired by Qorvo, is

12:14:32 16    he or she required to sign a confidentiality agreement?

12:14:35 17    **A.**    Yes, they are.

12:14:36 18    **Q.**    And, to your understanding, was this same type of

12:14:39 19    requirement implemented by Qorvo's predecessor companies,

12:14:41 20    TriQuint and RF Micro Devices?

12:14:45 21    **A.**    Yes, it was.

12:14:46 22    **Q.**    How do you know that?

12:14:46 23    **A.**    I've come across a number of confidentiality

12:14:49 24    agreements signed by employees, on hire, that predated

12:14:54 25    Qorvo's merger, as far back as pre2000, actually.  So I've

12:14:57  1    seen, in my experience, that's been a standard practice.

12:15:01  2         **MR. NAQVI:**  Your Honor, may I approach the

12:15:02  3    witness?

12:15:05  4         **THE COURT:**  Yes.  You may approach.

12:15:44  5    **BY MR. NAQVI:**

12:15:50  6    **Q.**   Mr. Boyd, I've handed you three documents.  The first

12:15:52  7    that I'd like to ask you about is PTX-647, which has

12:15:56  8    already been admitted into evidence as Trial Exhibit 214.

12:16:03  9         **MR. NAQVI:**  And, Mr. Faison, if you can please

12:16:06 10    display Trial Exhibit 214.

12:16:10 11    **BY MR. NAQVI:**

12:16:10 12    **Q.**   Mr. Boyd, do you recognize this document?

12:16:11 13    **A.**   I do.

12:16:11 14    **Q.**   What is it?

12:16:12 15    **A.**   This is the employee confidentiality and invention

12:16:15 16    assignment agreement for TriQuint Semiconductor.

12:16:18 17    **Q.**   And can you tell who signed this agreement?

12:16:20 18    **A.**   This was signed on the second page by Joonbum Kwon on

12:16:24 19    May the 12th of 2012.

12:16:26 20    **Q.**   Will you seen signed TriQuint confidentiality

12:16:29 21    agreements before?

12:16:30 22    **A.**   Yes, I have.

12:16:31 23    **Q.**   Is that in connection with your job responsibilities

12:16:33 24    at Qorvo?

12:16:33 25    **A.**   Yes, it is.

12:16:34 1    **Q.**   Okay.  And looking at Section 1 of Trial Exhibit 214,

12:16:40 2    there's a section that describes confidentiality

12:16:43 3    obligations.

12:16:44 4         **MR. NAQVI:**  Mr. Faison, if we can please look

12:16:45 5    at Section 1 on Page 1.

12:16:48 6    **BY MR. NAQVI:**

12:16:48 7    **Q.**   And, Mr. Boyd, to your understanding, did the

12:16:51 8    confidentiality obligations on Page 1 end when the

12:16:56 9    employee left TriQuint?

12:16:58 10   **A.**   No, they did not.

12:16:59 11   **Q.**   Why do you say that?

12:17:01 12   **A.**   So in the last sentence of that section, it indicates

12:17:05 13   that those requirements endure during my employment by

12:17:08 14   TriQuint or hereafter.

12:17:12 15   **Q.**   Mr. Boyd, you can set that document aside.  Thank

12:17:14 16   you.

12:17:15 17        **MR. NAQVI:**  Next is PTX-760, which has already

12:17:18 18   been admitted into evidence as trial Exhibit 204.

12:17:22 19        Mr. Faison, if you could please display that

12:17:24 20   document.  Thank you.

12:17:26 21   **BY MR. NAQVI:**

12:17:26 22   **Q.**   Mr. Boyd, do you recognize this document?

12:17:28 23   **A.**   I do.

12:17:28 24   **Q.**   What is it?

12:17:29 25   **A.**   So similar to the previous one, this is the RFMD

1  Inventions, Confidentiality and Nonsolicitation Agreement

2  signed by employees.

3  **Q.**   And can you tell who signed this one?

4  **A.**   This was signed by Jeffrey B. Shealy on the 22nd of

5  October, 2001.

6  **Q.**   And have you seen signed RFMD confidentiality

7  agreements before?

8  **A.**   Yes, I have.

9  **Q.**   Is that in connection with your job responsibilities

10  at Qorvo?

11  **A.**   Yes, it is.

12  **Q.**   Looking at Section 1A, which starts on Page 1 and

13  moves to Page 2, this lists confidentiality obligations.

14  Are these -- did these confidentiality obligations end

15  when the employee left RFMD?

16  **A.**   They did not.

17  **Q.**   Why do you say that?

18  **A.**   Similar to the previous one, there's a sentence in

19  the middle of the paragraph, it says, "At all times, both

20  during the period of employment by employer and after

21  termination of that employment for any reason."

22  **Q.**   Thank you, Mr. Boyd.  You can set that one aside.

23         The third document that I handed you is

24  PTX-1218.

25         **MR. NAQVI:**  And, Mr. Faison, if we can

12:18:36  1    please -- actually, you can hold off on that.

12:18:38  2    BY MR. NAQVI:

12:18:38  3    **Q.**   Mr. Boyd, do you recognize this document?

12:18:40  4    **A.**   I do.

12:18:40  5    **Q.**   What is it?

12:18:41  6    **A.**   This is the Qorvo Inventions, Confidentiality, and

12:18:44  7    Nonsolicitation Agreement.

12:18:47  8    **Q.**   Can you tell who it was signed by?

12:18:49  9    **A.**   This was signed by Cheng Chen on October 22nd of

12:18:53 10    2022.

12:18:54 11    **Q.**   Have you seen this agreement before?

12:18:55 12    **A.**   Yes, I have.

12:18:56 13    **Q.**   Did you sign one of these personally when you joined

12:18:59 14    Qorvo?

12:18:59 15    **A.**   I signed one of these when I joined, yes.

12:19:02 16    **Q.**   And have you seen this type of document in connection

12:19:04 17    with your job responsibilities at Qorvo?

12:19:06 18    **A.**   Yes, I have.

12:19:07 19             **MR. NAQVI:**   Your Honor, I move into evidence

12:19:09 20    PTX-1218.

12:19:13 21             **THE COURT:**   Marked and received as 230.

12:19:17 22             (Trial Exhibit No. 230 was admitted into

12:19:17 23    evidence.)

12:19:20 24    BY MR. NAQVI:

12:19:22 25    **Q.**   And, Mr. Boyd, looking at Trial Exhibit 230, does

*Boyd - Direct*

12:19:25 1    this -- in Section 1A, does this have similar

12:19:29 2    confidentiality language as in the agreement we just

12:19:32 3    looked at for RFMD?

12:19:34 4    **A.**    Yes, it does.

12:19:35 5    **Q.**    And do the confidentiality obligations in this

12:19:37 6    section end when the employee leaves Qorvo?

12:19:41 7    **A.**    They do not.  Similar to the previous ones, the

12:19:44 8    second paragraph there states, "At all times, both during

12:19:47 9    my period of employment with Qorvo and after termination

12:19:50 10   of my employment for any reason."

12:19:53 11   **Q.**    Thank you, Mr. Boyd.  You can set that document

12:19:55 12   aside.

12:19:55 13   So does Qorvo remind employees of confidentiality

12:19:59 14   obligations during their employment at Qorvo?

12:20:02 15   **A.**    Absolutely.

12:20:03 16   **MR. NAQVI:**    Your Honor, may I approach the

12:20:04 17   witness?

12:20:05 18   **THE COURT:**    You may.

12:20:07 19   **BY MR. NAQVI:**

12:20:28 20   **Q.**    Mr. Boyd, I've handed you what's been marked as Joint

12:20:31 21   Exhibit 20.  Do you recognize this document?

12:20:33 22   **A.**    I do.

12:20:34 23   **Q.**    What is it?

12:20:35 24   **A.**    This is the Qorvo Code of Business Conduct and

12:20:38 25   Ethics, dated January 1st of 2015.

**Q.** Can you please describe to the jury what is Qorvo's
Code of Business Conduct and Ethics?

**A.** So the Code of Conduct -- Code of Business Conduct
and Ethics is a corporate policy and code delivered by the
CEO to all employees that covers a very broad range of
ethical practices. It covers things like anti-bribery,
gift-giving policies, those types of things. In addition
to that, it has a very significant section on
confidentiality, protection of intellectual property,
sharing of information with third parties, that kind of
thing.

**Q.** And are you familiar with Qorvo's Code of Business
Conduct and Ethics as part of your job responsibilities at
Qorvo?

**A.** I am.

**Q.** Are Qorvo employees required to review and
acknowledge its -- Qorvo's Code of Business Conduct and
Ethics?

**A.** Yes, they are.

**Q.** And how is that tracked or recorded?

**A.** So on initial hiring, you have to review this and
verify in what's called our learning management system.
It's an online application that delivers both training
content and policies to employees, in this case, the Code
of Business Conduct and Ethics. And you have to attest at

the end, basically an electronic signature, that you'll

follow this.

**Q.**   And has the requirement that an employee review and

acknowledge the Code of Business Conduct and Ethics on an

annual basis been a historical practice of Qorvo since

2015?

**A.**   Yes, it has.

        **MR. NAQVI:**   Your Honor, I move into evidence

Joint Exhibit 20?

        **THE COURT:**   Marked and received as 231.

        (Trial Exhibit No. 231 was admitted into

evidence.)

        **MR. NAQVI:**   Mr. Faison, if we can display Joint

Exhibit 20.  It's now been marked as Trial Exhibit 231.

**BY MR. NAQVI:**

**Q.**   Mr. Boyd, can you please turn to Page 8 of Trial

Exhibit 231.

        And on Pages 8 and 9 are the section titled

"Confidentiality."  Do you see that?

**A.**   I do.

**Q.**   And does this section have similar confidentiality

obligations and language as in the confidentiality

agreements that we just reviewed?

**A.**   It does.

**Q.**   And does this section on Page 9, at the top of

1    Page 9, address sharing confidential information with

2    third parties?

3    **A.**    It does.

4    **Q.**    And what does it say regarding sharing confidential

5    information with third parties?

6    **A.**    So it establishes for Qorvo employees that under all

7    circumstances, if you're going to share confidential

8    information with a third party, it's required to be done

9    under what's called a nondisclosure agreement.

10   **Q.**    Thank you, Mr. Boyd.  You set aside that document.

11        When an employee leaves Qorvo, are there any security

12   policies or procedures in place?

13   **A.**    There are.

14   **Q.**    Can you please briefly describe those to the jury?

15   **A.**    So when an employee is going to leave Qorvo, the

16   human resources department and the manager meet with them

17   and discuss the -- kind of circumstances of them leaving,

18   and there's an assessment of, is there a risk to Qorvo?

19   Is there not a risk to Qorvo?  And then, importantly, at

20   that time the employee is reminded of their enduring

21   confidentiality agreement with Qorvo as it relates to

22   intellectual property.

23        **MR. NAQVI:**  Your Honor, may I approach the

24   witness?

25        **THE COURT:**  You may.

**BY MR. NAQVI:**

**Q.**   Mr. Boyd, I've handed you what's been marked as PTX-1109.  Do you recognize this document?

**A.**   I do.

**Q.**   What is it?

**A.**   This is the -- "A Reminder of Your Continuing Obligations to Qorvo" document handed -- delivered to employees on departure.

**Q.**   And can you tell who signed this document?

**A.**   This document was signed by Robert Dry on October 15 of 2019.

**Q.**   Are you familiar with this document?

**A.**   I am.

**Q.**   Have you seen signed examples of this document in connection with your job responsibilities at Qorvo?

**A.**   Yes, I have.

**Q.**   And since 2015, has Qorvo required the signing of this agreement upon departure from the company?

**A.**   Yes, we have.

**Q.**   How do you know that?

**A.**   I've seen ones that go back to 2015, and even prior to 2015, the sort of similar documents.

         **MR. NAQVI:**  Your Honor, I move into evidence PTX-1109.

         **THE COURT:**  Marked and received as 232.

12:25:09  1              (Trial Exhibit No. 232 was admitted into

12:25:09  2       evidence.)

12:25:11  3              **MR. NAQVI:**  Mr. Faison, if you could please

12:25:16  4       display PTX-1109.

12:25:19  5       **BY MR. NAQVI:**

12:25:19  6       **Q.**   Mr. Boyd, does this Reminder to Employees upon

12:25:24  7       Departure contain similar confidentiality language as in

12:25:27  8       the prior documents that we've seen today?

12:25:29  9       **A.**   It does.

12:25:30 10       **Q.**   Can you please describe for the jury, generally, the

12:25:33 11       purpose of this document?

12:25:34 12       **A.**   So the purpose of this document is to remind

12:25:39 13       employees and memorialize that it was communicated to

12:25:42 14       those employees that ongoing obligation for the

12:25:44 15       confidentiality of information to Qorvo.

12:25:50 16              **MR. NAQVI:**  Your Honor, may I approach the

12:25:51 17       witness?

12:25:53 18              **THE COURT:**  You may.

12:26:07 19       **BY MR. NAQVI:**

12:26:13 20       **Q.**   Mr. Boyd, I've handed you what's been marked as

12:26:15 21       PTX-1770.  Do you recognize this document?

12:26:19 22       **A.**   I do.

12:26:20 23       **Q.**   What is it?

12:26:21 24       **A.**   This is Qorvo's Acceptable Use of Information Systems

12:26:24 25       Policy.

12:26:25  1    **Q.**   What is the date on this document?

12:26:28  2    **A.**   The date of this version is September 8 of 2020.

12:26:33  3    **Q.**   Can you please briefly describe to the jury the

12:26:35  4    purpose of this document?

12:26:36  5    **A.**   So this is a single policy that applies to all

12:26:40  6    employees at Qorvo around a broad range of uses of

12:26:44  7    information systems and data.  It's basically intended to

12:26:48  8    outline for all employees a whole host of things that are

12:26:52  9    their responsibility to, again, ensure those three areas

12:26:55 10    of information security around confidentiality,

12:26:58 11    availability, and integrity of systems and data.

12:27:01 12    **Q.**   And are you familiar with this policy?

12:27:04 13    **A.**   I am.

12:27:05 14    **Q.**   How?

12:27:05 15    **A.**   I'm responsible -- directly responsible for managing

12:27:08 16    this policy and distributing it.

12:27:10 17    **Q.**   Are Qorvo employees required to review this policy?

12:27:14 18    **A.**   Yes.  Upon hiring, like the Code of Business Conduct

12:27:17 19    and Ethics, all employees are required to read this and

12:27:20 20    attest that they understand and agree to follow it.

12:27:23 21          And then at least every year thereafter, they have to

12:27:25 22    do the same.  It might be more frequently if there are

12:27:29 23    changes made to it.

12:27:30 24          **MR. NAQVI:**  Your Honor, I move into evidence

12:27:31 25    PTX-1770.

12:27:34 1          **THE COURT:**  Marked and received as 233.

12:27:38 2          (Trial Exhibit No. 233 was admitted into

12:27:38 3     evidence.)

12:27:39 4          **MR. NAQVI:**  Mr. Faison, if we can please

12:27:43 5     briefly display that for the jury.

12:27:47 6     **BY MR. NAQVI:**

12:27:47 7     **Q.**   And, Mr. Boyd, does this policy describe acceptable

12:27:50 8     use of -- well, why don't you first describe for the jury,

12:27:53 9     what are information systems?

12:27:56 10    **A.**   So information systems is a broad category of

12:28:00 11    anything electronic that's involved with computers,

12:28:03 12    networks, file servers, firewalls, portable devices, a

12:28:08 13    smartphone, a laptop.  It's a broad term to capture

12:28:12 14    basically kind of all information technology.

12:28:14 15    **Q.**   And does this policy outline acceptable uses of

12:28:18 16    Qorvo's information systems?

12:28:19 17    **A.**   It does.

12:28:20 18    **Q.**   Thank you.

12:28:24 19         Mr. Boyd, I'd now like to discuss third parties.  Did

12:28:26 20    the code of conduct that we looked at earlier require the

12:28:29 21    use of nondisclosure agreements when sharing confidential

12:28:34 22    information with third parties?

12:28:35 23    **A.**   It did, yes.

12:28:37 24          **MR. NAQVI:**  Your Honor, may I approach the

12:28:38 25    witness?

12:28:38  1          THE COURT:  You may.

12:28:59  2     BY MR. NAQVI:

12:29:01  3     Q.   Mr. Boyd, I've handed you what's been marked as

12:29:03  4     PTX-1556.  What is this document?

12:29:07  5     A.   This is Qorvo's Mutual Nondisclosure Agreement.

12:29:10  6     Q.   And are you familiar with Qorvo's Mutual

12:29:13  7     Nondisclosure Agreement?

12:29:14  8     A.   Yes, I am.

12:29:15  9     Q.   Is PTX-1556 Qorvo's template NDA?

12:29:19 10     A.   Yes, it is.

12:29:19 11     Q.   And in connection with your job responsibilities at

12:29:22 12     Qorvo, do you review Qorvo's template NDA?

12:29:25 13     A.   Yes, I do.

12:29:26 14          MR. NAQVI:  Your Honor, I move into evidence

12:29:28 15     PTX-1556.

12:29:30 16          THE COURT:  Marked and received at 234.

12:29:34 17          (Trial Exhibit No. 234 was admitted into

12:29:34 18     evidence.)

12:29:35 19          MR. NAQVI:  Mr. Faison, if we can please

12:29:38 20     display for the jury.  Thank you.

12:29:40 21     BY MR. NAQVI:

12:29:40 22     Q.   Mr. Boyd, can you please briefly describe for the

12:29:41 23     jury what Qorvo's template NDA requires in terms of

12:29:45 24     disclosure or use of confidential information?

12:29:49 25     A.   Sure.

So, basically, what this document does is it establishes between Qorvo and a third party, which in a lot of instances is a customer, understanding that we're going to have to share back and forth very sensitive trade secret intellectual property around our customers' products and our products to make sure they work together.

So this establishes an agreement between both of us that we will treat our customer's confidential information as we would our own, and our customer will treat our confidential information as they would their own.

In addition to that, and very importantly, it establishes very specific ways in which our confidential information can be used by our customer. It doesn't give them the latitude to do whatever they want with it. It's very constrained by the scope of this agreement.

**Q.** Mr. Boyd, I'd now like to turn to labeling documents. So does Qorvo have any practices and procedures related to labeling confidential documents?

**A.** We do.

**Q.** Can you please describe those for the jury.

**A.** So the long-standing practice of labeling documents, sensitive documents at Qorvo, is to use a combination of terms, "Qorvo confidential" and/or "propriety information" on any sensitive documents.

**Q.** And where would those types of labels be found on

*Boyd - Direct*

1  documents?

2  **A.**   So it might vary by type of document, but typically

3  it would be either in the header at the very top of the

4  document, the footer at the bottom.  Might show up in a

5  legend, or it might be watermarked across the document,

6  sort of in shaded text.

7  **Q.**   And has this manner of labeling documents been

8  consistently used by Qorvo since 2015?

9  **A.**   Yes, it has.

10 **Q.**   How do you know that?

11 **A.**   Again, in the course of my job, I get involved in

12 investigations and incident response, some of those things

13 involve agreements and contracts and documents that

14 predate my arrival in 2021; some of them predate formation

15 of Qorvo in 2015 as well.  And the confidential and

16 propriety labeling has been universal on those documents

17 when they are sensitive.

18 **Q.**   Mr. Boyd, finally, I'd like to discuss information

19 systems security.  Does Qorvo have any policies or

20 practices related to passwords or encryption?

21 **A.**   Yes, we absolutely do.

22 **Q.**   Can you please describe those for the jury?

23 **A.**   So generally speaking, at a minimum, to get into

24 systems that access sensitive Qorvo information, employees

25 have to use a Qorvo account that includes a user name, and

*Boyd - Direct*

a password at a minimum to access those systems.

**Q.**   Does Qorvo have any policies and procedures related to use of mobile devices?

**A.**   We absolutely do.  Similarly, if, in using mobile devices, which could be anything from a laptop to a smartphone to a tablet, there are lots of types of mobile devices, to access Qorvo information systems, it has to be managed by Qorvo, again, has to use that account user name and password, and Qorvo has to have the ability to have positive control over that data as you access it.

**Q.**   Does Qorvo have any software that relates to information systems security?

**A.**   Again, in that budget, that seven and a half million dollar budget I discussed, there's a lot of software and systems that involve information security.

**Q.**   Can you please briefly describe those for the jury?

**A.**   Sure.  We have preventative controls to prevent bad things from happening, things like viruses, bad actors on the Internet to get into our network.  So we use fire walls, antivirus.  We use detection and monitoring systems to look at the network traffic that's occurring.  We monitor file accesses, and then we have things, as I mentioned, passwords so you get authenticated when you login to a system.

**Q.**   Mr. Boyd, does Qorvo have any systems or software --

12:33:34  1     I'm sorry.

12:33:35  2         Does Qorvo have any monitoring system controls?

12:33:38  3     **A.**   We do.  Extensive monitoring controls.  As it relates

12:33:42  4     to this matter, probably the most relevant is what's known

12:33:47  5     as a data loss prevention solution, which sits on a

12:33:50  6     computer and monitors how users are interacting with files

12:33:55  7     and data and what those files and data are.

12:33:57  8     **Q.**   What's the name of that data loss prevention tool

12:34:00  9     that you are describing?

12:34:01 10     **A.**   The one we're currently using is known as Digital

12:34:04 11     Guardian.

12:34:04 12     **Q.**   And when did that get implemented at Qorvo?

12:34:07 13     **A.**   That was implemented in the 2018 to 2019 time frame.

12:34:11 14     **Q.**   Can you give the jury an example of one mechanism or

12:34:14 15     way that Digital Guardian works?

12:34:16 16     **A.**   So one of the things that we have Digital Guardian

12:34:19 17     set to do is block certain types of file activity, in

12:34:24 18     particular, the use of external storage, USB devices,

12:34:27 19     thumb drives, and CDs, those types of things.  In the

12:34:32 20     current environment we operate in, we don't want to allow

12:34:35 21     data to flow to those kinds of media drives because it

12:34:39 22     could go anywhere and we would lose control over them, so

12:34:42 23     we restrict that.

12:34:44 24     **Q.**   And before Digital Guardian was implemented at Qorvo

12:34:46 25     in 2018 or 2019, was Qorvo using a different monitoring

*Boyd - Cross*

1   service?

2   **A.**   Qorvo was using a tool called Symantic Data Loss

3   Prevention.  It's a competitor to Digital Guardian, but

4   similar capabilities.

5   **Q.**   Thank you, Mr. Boyd?

6           **MR. NAQVI:**  No further questions.  Pass the

7   witness.

8           **THE COURT:**  Cross-examination.

9

10                  CROSS EXAMINATION

11  **BY MS. HARRIS:**

12  **Q.**   My name Rachael Harris, Mr. Boyd.  I am one of the

13  attorneys for the defendant, Akoustis.  It's nice to meet

14  you.

15       Just to start, you mentioned that prior to 2018,

16  Qorvo was using Symantic as a tool?

17  **A.**   Correct.

18  **Q.**   And Symantic didn't block the data transfers that you

19  just speaking about before 2018; is that correct?

20  **A.**   I'm sorry, it didn't?

21  **Q.**   You were speaking about blocking --

22  **A.**   Oh, yes.

23  **Q.**   -- data transfers, and I was asking if, before 2018

24  when you were using Symantic, it wasn't blocking those

25  transfers; that's correct?

*Boyd - Cross*

**A.**    Correct.  I don't believe Symantic was blocking those.

**Q.**    Okay.  And I think you mentioned early on in your testimony that all employees at Qorvo have the responsibility of information security; is that correct?

**A.**    That is correct.

**Q.**    And that's because humans have to implement policies; is that at least part of the reason?

**A.**    Correct.  Humans have to follow those policies.

**Q.**    They have to understand the policies in order to implement them correctly; is that fair to say?

**A.**    There are portions of those responsibilities, absolutely.

**Q.**    And are you familiar with the term "administrative vulnerability"?

**A.**    Yes, I am.

**Q.**    And is the -- is administrative vulnerability something similar to what you're talking about, it's the human side of how the systems are managed; is that correct?

**A.**    Human factors would be one type of administrative vulnerability, yes.

**Q.**    Sure.  Thank you.

    You joined Qorvo in April 2021; is that right?

**A.**    Correct.

**Q.**    And you testified, I believe, on direct testimony,
that you are familiar with Qorvo's current policies and
the prior versions of the current policies; is that
correct?

**A.**    That is correct.

**Q.**    But you don't have personal knowledge of historical
Qorvo policies, meaning -- and procedures, meaning
policies that may have been in existence at Qorvo in 2015,
2016, 2017, but were no longer in place when you arrived
at Qorvo; is that correct?

**A.**    So I've seen some, so I'm familiar with some of them,
but if they are not currently in effect, I haven't gone
back and looked at revisions of those.

**Q.**    You haven't done an investigation of old historical
policies that are no longer in place?

**A.**    No.

**Q.**    I believe we looked at a couple confidentiality
agreements.

        **MS. HARRIS:**  Can we see PTX-647, and that's
Trial Exhibit 214.

**BY MS. HARRIS:**

**Q.**    You testified --

        **MS. HARRIS:**  Can we look at the second page,
please.

BY MS. HARRIS:

Q.   You testified that this agreement was signed in 2012;
is that correct?

A.   Correct.

Q.   And this is the TriQuint agreement?

A.   Yes.

Q.   You didn't work at TriQuint in 2012?

A.   I did not work at TriQuint in 2012.

Q.   And this agreement, there is nowhere in this
agreement that references any of the specific security or
information security policies that you've talk about
today, is there?

A.   That's correct.

Q.   And you don't have any personal knowledge of any of
those information security policies that may have been
TriQuint to the extent they were no longer at Qorvo when
you arrived?

A.   Correct.

Q.   Thank you.

     Let's look at one other agreement.  PTX-6 -- I'm
sorry, 760.  It's Trial Exhibit 204.

BY MS. HARRIS:

Q.   This is an agreement from 2001 from RFMD; is that
correct?

A.   That's correct.

*Boyd - Cross*

| | |
|---|---|
| 12:39:11 | 1 |

**Q.**   And you didn't work at RFMD in 2001?

**A.**   That is correct; I did not.

**Q.**   Do you have the document in front of you, Mr. Boyd?

**A.**   I do.

**Q.**   Okay.  And, again, in Paragraphs 1 of this agreement, in the subparagraphs, there are no specific information security policies discussed; is that correct?

**A.**   In Paragraph 1?

**Q.**   Yes.

**A.**   That appears to be correct, no direct reference to a policy.

**Q.**   And you don't have any personal knowledge of information security policies that RFMD had historically to the extent they were not also in place at Qorvo when you arrived in 2021; is that also correct?

**A.**   Correct.

         **MS. HARRIS:**  You can take that down.

**BY MS. HARRIS:**

**Q.**   Mr. Boyd, I'd like to ask you some questions about the Acceptable Use Policy.

         **MS. HARRIS:**  That was PTX-1770.  And it's now Trial Exhibit 233.  Can we turn to the last page of this document.

**BY MS. HARRIS:**

**Q.**   Mr. Boyd, you testified that this version is from

12:40:34  1    September 8, 2020; is that correct?

12:40:37  2    **A.**    Correct.

12:40:38  3    **Q.**    And the initial release, the first release of this

12:40:41  4    policy was March 21, 2019; is that also correct?

12:40:47  5    **A.**    That is correct.

12:40:47  6    **Q.**    And you are not aware of an earlier version of this

12:40:50  7    formal written policy; is that also correct?

12:40:54  8    **A.**    Not this policy, not this Acceptable Use Policy, not

12:41:01  9    this specific named policy.

12:41:03 10          **MS. HARRIS:**    Let's go back to Page 1.

12:41:06 11    **BY MS. HARRIS:**

12:41:06 12    **Q.**    In the third bullet point down, do you see where

12:41:10 13    it's -- this is a policy statement that "Management must

12:41:14 14    ensure that," and the third bullet point down is "All

12:41:17 15    information system use complies with applicable Qorvo

12:41:20 16    policies."

12:41:24 17          Some of these other policies that this is

12:41:26 18    referencing, those would be, at least some of them,

12:41:28 19    information security policies?

12:41:30 20    **A.**    Yes.

12:41:32 21          **MS. HARRIS:**    Can we turn to Page 4, please.

12:41:34 22    **BY MS. HARRIS:**

12:41:37 23    **Q.**    Do you see in Paragraphs 5 and 6, where this is

12:41:42 24    discussing "protection of intellectual property labeling

12:41:45 25    of sensitive information"?

A.   Yes.

Q.   And Paragraph 6 requires users to label sensitive
information; is that right?

A.   Yes.

Q.   And that's because the sensitivity -- we label
documents -- Qorvo is labeling documents or has a
procedure for labeling documents because the sensitivity
of the data determines who should have physical or
electronic access to the system containing the data.

     And then do you see where it says, "See data
classification policy"?

A.   Yes, I do.

Q.   Are you familiar with Qorvo's data classification
policy?

A.   Yes, I am.

Q.   And what is that, generally?

A.   Generally, Qorvo's data classification policy guides
users to assess the sensitivity of data and the
criticality of data.  And if it is confidential and
proprietary information, to ensure that that label appears
on data as it's able to be affixed to that type of data
document, and then it further gives them instructions on
an internal level of sensitivity that we use at Qorvo to
give a little bit more context to why the information
might be confidential or proprietary.

Q.   And are you aware that that data classification

document was also first initially released in March 2019?

A.   Yes.  I mean, I'd have to look at the revision

schedule, but it shows when it was released.

Q.   Okay.  And in Qorvo's current data classification

policy that's referenced in this Acceptable Use Policy,

there's four classifications of documents, sensitive

documents, that can be critical, sensitive, private, or

unrestricted?  Those are the labels in the current policy?

A.   That is correct.

Q.   Is it also correct that select trade secrets would be

labeled "critical" under that current policy referenced

here?

A.   It -- sorry.  Can you repeat that.

Q.   Is it true that select trade secrets, so some trade

secrets would be labeled "critical" under this data

classification policy?

A.   Yes, that they -- yes, could be.

Q.   And part of the data classification policy, is there

a default label for documents and e-mails under that

policy?

A.   I don't believe the policy establishes a default.

But, in practice, a lot of systems do default to a label.

Q.   Fair to say it's a procedure or a standard practice

that there's a default?

**A.**    Yes.

**Q.**    And is the standard practice or procedure to have
that default label to be "private"?  Is that correct?

**A.**    Yes.  In some systems, "private" is the default.

**Q.**    And just so we're all clear, does default mean that
that's the label or classification that's put on the
document unless the user changes it otherwise?

**A.**    Generally, yes.  If a default is set, unless somebody
takes action or a system takes action, the default will
stay.

**Q.**    And so a default document may be an e-mail home -- or
a default private document may be an e-mail home that says
"I'm going to be late for dinner."  Is that possible?

**A.**    Well, it could be.  I mean, ideally, if I'm sending,
for example, an e-mail like that, that's not particularly
sensitive, we allow that kind of incidental personal use
of systems.  So I could remove the "private" and say it's
"unrestricted."  But we picked that default because, I
mean, information security officer, I will err on the side
of that.  There's no harm, no foul if it gets is marked as
"private" and it isn't.

        There's much more harm and foul if it is truly
confidential and proprietary and it doesn't get marked
that way.  So we'd err on that side for sure.

**Q.**    But the default isn't going to be there --

12:46:16  1          THE COURT:  We are at a time to take our lunch

12:46:18  2   break.  If you only have a couple more questions, maybe we

12:46:21  3   can conclude.

12:46:22  4          MS. HARRIS:  I probably have five more minutes,

12:46:24  5   Your Honor.

12:46:24  6          THE COURT:  Okay.  We're going to take our

12:46:26  7   lunch break at this time.  Don't discuss the case among

12:46:29  8   yourselves.  Don't let anybody talk with you.

12:46:31  9          This will be a 45-minute lunch break.  We will

12:46:34 10   see you at 1:30.  I will check on the status in terms of

12:46:38 11   progress.  We'll see you at 1:30.  Thank you very much.

12:46:45 12   Keep an open mind.

12:46:49 13       (The jury exits the courtroom at 12:46 p.m.)

12:47:07 14          THE COURT:  Everybody be seated.  Of course,

12:47:09 15   the witness step down.  You cannot discuss with anyone the

12:47:13 16   testimony you've already given.  If there's something that

12:47:17 17   will come up later, that is something you can discuss, but

12:47:19 18   try not to talk to anybody about it.

12:47:21 19          We will let you be excused at this time.  We

12:47:24 20   will see you at about 1:25.  Thanks very much.

12:47:28 21          THE WITNESS:  Thank you, Your Honor.

12:47:29 22          THE COURT:  Thank you.  Let's check and see how

12:47:32 23   we're doing.  I think we're -- Mr. Masters?

12:47:37 24          MR. MASTERS:  I think we're doing fairly well,

12:47:41 25   Your Honor.  This witness is just about completed, it

12:47:44  1    sounds like, and then we'll go to Mr. Robinson, Cuyler

12:47:48  2    Robinson, who is an expert on security measures as well.

12:47:53  3    And then Dr. Heinrich will be a fairly short examination

12:47:56  4    on our part.  Dr. Bravman, maybe 50 minutes.

12:48:02  5              **THE COURT:**  Okay.

12:48:04  6              **MR. MASTERS:**  And then Ms. Bennis is our last

12:48:06  7    witness.

12:48:11  8              **THE COURT:**  We will start Ms. Bennis, and we

12:48:12  9    may not finish that, but may.

12:48:16 10              **MR. MASTERS:**  May not finish that, but may not

12:48:18 11    finish cross either of Ms. Bennis.  But it would be great

12:48:21 12    if we could.

12:48:22 13              **THE COURT:**  That means we'll continue to try to

12:48:24 14    keep our schedule.  In terms of any motions from the

12:48:29 15    defense in that matter, I think it will be appropriate, it

12:48:32 16    will be a time-saver.  And it appears to be as much time

12:48:39 17    as the Court does to take a good look at materials that

12:48:41 18    may be submitted by the defense in motion practice at the

12:48:46 19    close of the plaintiff's proof.  So that will continue to

12:48:48 20    be our schedule in the case.

12:48:50 21              We will need to leave at somewhere between 5:00

12:48:53 22    and 5:05.  And I told the jury that, so I don't want to

12:48:57 23    say something contrary -- to do something contrary to what

12:49:00 24    we've indicated.  That is our situation.

12:49:03 25              Anything else from anyone else at this time?  I

*Boyd - Cross*

12:49:06 1    see nothing, then, we will see everybody, of course, with

12:49:09 2    at least five minutes to spare.

13:00:50 3            (Whereupon, a recess was taken.)

13:26:24 4               **THE COURT:**  You may be seated.  Have the

13:26:27 5    witness come back around.  If there's nothing else, we

13:26:41 6    will have the jury come in.

13:27:05 7                    Counsel, get set to go.

13:27:23 8            (The jury enters the courtroom at 1:27 p.m.)

13:27:55 9               **THE COURT:**  Go ahead and be seated.  We are

13:27:56 10   still on schedule for today's end of day that we planned

13:27:59 11   on, so that's good to know that.

13:27:59 12              Counsel, you may proceed.

13:28:00 13   **BY MS. HARRIS:**

13:28:01 14   **Q.**   Mr. Boyd, just a couple post-lunch questions for you.

13:28:03 15          Are you aware that Qorvo maintains a public website?

13:28:07 16   **A.**   Yes, I am.

13:28:08 17   **Q.**   And you're aware that Qorvo posts documents to that

13:28:12 18   public website, correct?

13:28:14 19   **A.**   Yes.

13:28:14 20   **Q.**   And those documents that are on the website, they are

13:28:17 21   available for the public to view?

13:28:19 22   **A.**   Yes, they are.

13:28:22 23   **Q.**   Mr. Boyd, are you aware that there have been

13:28:23 24   presentations labeled "Qorvo confidential and proprietary"

13:28:28 25   on Qorvo's public website?

**A.** Yes, I'm aware that there are.

**Q.** And are you also aware that there are data sheets labeled "preliminary" on Qorvo's public-facing website?

**A.** I'm not personally aware of any data sheets that are labeled as preliminary.

**Q.** And are you aware that there are data sheets labeled "private" on Qorvo's public website?

**A.** I'm not personally aware of that label on there either.

**Q.** It's not Qorvo's policy to post confidential information on its public website, is it?

**A.** No. It's Qorvo's policy on some occasions to post information that at some point was confidential or proprietary onto the website, so previously it may have been, but when it's posted to the website would not be.

**Q.** The documents that are on the website are not confidential?

**A.** They are not intended to be confidential -- they are not intended to be confidential posted to the public website, correct.

**Q.** And you are not aware of the process of how those documents are posted to Qorvo's website, that's not your team, is it?

**A.** I am aware of the process as you asked, yes, but it is not my team that does the posting of those documents.

**Q.**   And no one on your team is responsible for checking
the confidentiality designations on the public-facing
documents on that website?

**A.**   So as a routine course of business, no, my team isn't
the one that checks that.  But in the course of doing
security monitoring and testing, that might be part of
something we had a third party doing for us, looking at
things like.

**Q.**   Are you aware, Mr. Boyd, that Qorvo has undertaken
efforts over the past year to remove the labels of
"confidential" and "proprietary" on the presentations that
appear on Qorvo's website?

**A.**   I am not aware of that, no.

**Q.**   And you are aware that there are still documents
today on Qorvo's website labeled "confidential" and
"proprietary," are you aware of that?

**A.**   I am not aware of that, no.

**Q.**   So as the chief information security office, you are
not aware that on the public website there are documents
labeled "Qorvo confidential" and "proprietary"?

**A.**   I mean, I am aware that there have been.  I don't
know right now that there are.  But, again, some of those
documents would -- generally speaking, if it's on the
public website, and it was marked "confidential" and
"proprietary," and was not actually confidential and

13:31:07  1    proprietary, it was intended to be posted there, that

13:31:12  2    would be less of a concern than if the opposite were true,

13:31:15  3    that something that was truly confidential and proprietary

13:31:19  4    accidentally got posted to the website.  Much of that

13:31:22  5    information starts and continues its life cycle as

13:31:27  6    confidential and proprietary intended for internal use,

13:31:31  7    and then if marketing and communications who publishes

13:31:34  8    that accidentally doesn't remove that, I think that's

13:31:39  9    reasonable risk management.  I prefer that.

13:31:43 10    **Q.**    Thank you, Mr. Boyd.

13:31:43 11            **MS. HARRIS:**  No further questions, Your Honor.

13:31:48 12            **THE COURT:**  Redirect.

13:31:50 13            **MR. NAQVI:**  No further questions for this

13:31:51 14    witness, Your Honor.

13:31:52 15            **THE COURT:**  All right.  We will let you step

13:31:54 16    down.  Thanks very much.

13:31:55 17            And who will our next witness be?

13:31:59 18            **MR. NAQVI:**  Plaintiff call Mr. Cuyler Robinson

13:32:04 19    to the stand.

13:32:19 20            **THE CLERK:**  Please remain standing.  Please

13:32:20 21    spell your name for the record.

13:32:22 22            **THE WITNESS:**  My name is Richard Cuyler

13:32:25 23    Robinson, R-I-C-H-A-R-D, C-U-Y-L-E-R, R-O-B-I-N-S-O-N.

13:32:34 24      R. CUYLER ROBINSON, having been called as a witness,

13:32:34 25    being first duly sworn under oath or affirmed, testified

13:32:34  1    as follows:

13:32:34  2                    **THE CLERK:**  Thank you.  Please be seated.

13:32:51  3                    **THE COURT:**  You may be seated.

13:32:52  4             Counsel, you may proceed.

13:32:54  5                    DIRECT EXAMINATION

13:32:54  6

13:32:55  7    **BY MR. NAQVI:**

13:33:04  8    **Q.**   Good afternoon, Mr. Robinson.

13:33:05  9    **A.**   Good afternoon.

13:33:07 10    **Q.**   What were you asked to do this in case?

13:33:12 11    **A.**   I was asked to independently review Qorvo's

13:33:13 12    historical information security controls and determine,

13:33:17 13    under the circumstances, whether Qorvo took reasonable

13:33:21 14    efforts to protect their trade secret information.

13:33:22 15    **Q.**   And, Mr. Robinson, have you rendered any overall

13:33:26 16    opinions in this case?

13:33:27 17    **A.**   Yes, I have.

13:33:28 18    **Q.**   And what are they?

13:33:30 19    **A.**   It's my opinion that Qorvo took more than reasonable

13:33:33 20    efforts under the circumstances to maintain the

13:33:36 21    confidentiality of its trade secret information.

13:33:40 22    **Q.**   Mr. Robinson, can you please describe for the jury

13:33:42 23    where you currently work and your job title?

13:33:45 24    **A.**   Yes, I work at Charles River Associates, and I am a

13:33:48 25    vice president in the forensic services practice.

*Robinson - Direct*

Q.   What is Charles Rivers Associates?

A.   It is a management consulting firm.  There's over 900
different employees and experts.  We typically work in the
context of litigation.  We have different expertise, and
we help companies assess different things.  My expertise
is in information security.

Q.   And what types of work do you do related to trade
secret matters?

A.   On trade secret matters, I'm often retained to
investigate situations where employees have taken or
stolen trade secret information from computers or devices
or information systems.  I've worked on hundreds of those
matters, so I'm very well aware of the ways that
information gets taken from companies, the way it's
transferred, what happens.

     And then I also am frequently retained to look at
companies' information security programs, practices, and
compare those to well-known industry standards and
benchmarks.

Q.   Mr. Robinson, how many times have you testified or
provided an expert report in a case?

A.   Fifteen.

Q.   Outside of being retained or consulting with other
parties, do you have any job responsibilities within
Charles Rivers Associates?

**A.**    Yes, I do.

**Q.**    Can you please describe those for the jury?

**A.**    So within our forensic services practice, I serve as our chief information security officer.  So that means I lead our information security program.  I help decide what security controls we're going to use to protect our clients' information.  That includes undergoing different audits, and having us assessed each year by outside auditors.

**Q.**    Mr. Robinson, do you have any certifications related to information security?

**A.**    Yes.  Like Mr. Boyd before, I have the CISSP certification.  That's the Certified Information Systems Security Professional Certification, and that's the most well-known information security certification that someone can attain.

            **MR. NAQVI:**  Your Honor, at this time, based on his education, training, and experience, Qorvo tenders Mr. Cuyler Robinson in the field of information security.

            **THE COURT:**  Any voir dire?

            **MS. SMITH:**  No, Your Honor.

            **THE COURT:**  All right.  He's accepted as a person who can express an opinion, that he is an expert as to information security.

            Counsel may proceed.

13:36:15 1          **MR. NAQVI:**  Thank you, Your Honor.

13:36:16 2   **BY MR. NAQVI:**

13:36:17 3   **Q.**   Mr. Robinson, in connection with your work in this

13:36:20 4   case, did you review any documents?

13:36:22 5   **A.**   Yes, I did.

13:36:22 6   **Q.**   What types of documents did you review?

13:36:24 7   **A.**   I reviewed the Amended Complaint.  I reviewed

13:36:31 8   hundreds of different documents that were produced during

13:36:32 9   discovery in this matter.  I reviewed the declarations,

13:36:37 10  copies of deposition transcripts, and their exhibits.  It

13:36:43 11  included TriQuint information, RFMD information, and Qorvo

13:36:51 12  documents as well.

13:36:52 13  **Q.**   And did you speak to anyone at Qorvo to get an

13:36:54 14  understanding of Qorvo's security practices?

13:36:57 15  **A.**   Yes.  I interviewed three employees.  I interviewed

13:37:03 16  Todd Martin, who is Qorvo's current chief information

13:37:07 17  officer, and he previously work at TriQuint before moving

13:37:12 18  over to Qorvo when it formed.  I interviewed Mr. Michael

13:37:16 19  Boyd, who was here before me in his role as key chief

13:37:21 20  information security officer at Qorvo.  And I also

13:37:23 21  interviewed a gentleman by the name of Michael Lyssee.  He

13:37:27 22  is the director of IT and client services, and he worked

13:37:32 23  previously at RFMD, has been a long-tenured employee,

13:37:37 24  worked at RFMD, and then moved over to Qorvo when Qorvo

13:37:39 25  was formed.

**Q.**   Did you rely on any industry guides or frameworks in connection with your opinions in this case?

**A.**   Yes, I did.

**Q.**   Can you please describe those for the jury.

**A.**   So I used two well-known information security frameworks.  The first one that I used during my analysis is the CISSP Study Guide.  And that's a study guide for someone studying to earn the CISSP certification that I have.  And that's helpful because it provides uniform descriptions of information security controls, concepts, and it covers all aspects of information security.

And then the second framework that I used is the Carnegie Mellon University Common Sense Guide to Mitigating Insider Threats.  And what that is, is researchers at that university over the years have studied over 3,000 different instances where insiders, sometimes employees, have done something like taken company information or caused a problem that's impacted information security in some way.  And it lists out 22 best practices that companies can follow to help reduce that risk.

**Q.**   And, Mr. Robinson, did you review the trade secret statutes that are involved in this case?

**A.**   Yes, I did.

**Q.**   And what is your understanding of what those trade

secret statutes require in terms of reasonable security

measures?

**A.**    Specific to reasonable security measures, there's a

couple different criteria for trade secret information

under the legal definitions, but my analysis focused on

the requirement that the owner of the trade secret

information takes reasonable efforts under the

circumstances to protect that information or keep that

trade secret information secret.

**Q.**    What does "reasonable efforts under the

circumstances" mean?

**A.**    So the first word, "reasonable," that indicates a

standard; it doesn't mean all or perfect, it means

reasonable -- it's similar to adequate or appropriate

measures.

The word "measures" in the context of information

security, those are all the different things a company can

do to protect its information.  It could be security

controls.  It could be training.  It could be policies.

Those are the different types of measures.

**Q.**    Mr. Robinson, do the trade secret statutes that you

looked at require that all possible security measures be

taken?

**A.**    No, no.  It's -- again, it's that they are reasonable

measures taken, and it's also under the circumstances.  So

*Robinson - Direct*

1    each company is different, has different operations, it

2    has different types of information, and, you know, those

3    circumstances also come into play if you think about the

4    timing of when things occurred, because as you go back in

5    time, some things that are more typical and expected today

6    weren't standard practices seven, eight, nine, ten years

7    ago, so that all plays into what is reasonable under the

8    circumstances in the context of information security.

9    **Q.**    Based on your experience, if trade secrets are taken

10   from a company without authorization, does that, by

11   itself, mean that reasonable security measures were not in

12   place to begin with to safeguard those trade secrets?

13   **A.**    No.    Information security in and of itself, it's

14   designed to expect something bad will happen to

15   information.    And there's layers of control set up to

16   first try to prevent that.    And then, second, to try to

17   detect it if something's happened.    And then, finally, to

18   try and correct something that had happened.

19        So in the situation where employees may have taken

20   trade secret information, it happens frequently, despite

21   companies' best efforts to prevent that.    And I personally

22   have worked on hundreds of matters where employees have

23   taken information that was reasonably secured through

24   security measures.

25   **Q.**    Mr. Robinson, have you analyzed whether other

1  companies that are similar size to Qorvo have reasonable

2  security measures to safeguard trade secrets?

3  **A.**   Yes.   Yes.   On many occasions.   And it's -- again, it

4  depends on the circumstances, the different reasonable

5  measures.   And one other aspect of information security is

6  the company is -- it doesn't have infinite money to throw

7  at security.   It has to balance that with making sure that

8  business can be performed, information is valuable for

9  use, and the company has to decide what are the risks that

10  we have and what do we need to invest in to reduce or

11  mitigate those risks.

12  **Q.**   Mr. Robinson, are their certain criteria that you

13  look for when determining whether or not a company has

14  taken reasonable security measures to safeguard its trade

15  secrets?

16  **A.**   Yes.

17  **Q.**   And have you prepared a demonstrative slide to assist

18  the jury in understanding these criteria?

19  **A.**   Yes, I have.

20          **MR. NAQVI:**   Mr. Faison, if we can please

21  display that demonstrative for the jury.

22  **BY MR. NAQVI:**

23  **Q.**   Are these some of the criteria you looked at in this

24  case?

25  **A.**   Yes.   This here is a list of common criteria or a

13:42:53 1    checklist of different aspects of a reasonable information

13:42:57 2    security program.

13:42:58 3    **Q.**    All right.

13:42:59 4        Mr. Robinson, let's start walking through those

13:43:02 5    criteria.  So first is a formal information security

13:43:05 6    program.  Based on the materials you relied upon in this

13:43:08 7    case, does Qorvo invest resources into information

13:43:11 8    security?

13:43:12 9    **A.**    Yes, they do.  As you heard from Mr. Boyd beforehand,

13:43:16 10    when Qorvo was formed, they brought over the best aspects

13:43:20 11    of their two predecessor companies, and that was used to

13:43:23 12    form the initial information security program.  And what

13:43:27 13    that is, is the team, the department, the initial

13:43:31 14    policies, all the documents in that function at Qorvo.

13:43:35 15    And since its inception, when it was formed, protecting

13:43:38 16    intellectual property was one of its number one

13:43:40 17    priorities.

13:43:43 18    **Q.**    Mr. Robinson, in your opinion, based on your

13:43:45 19    experience, is the existence and size of Qorvo's

13:43:48 20    information security team a reasonable measure under the

13:43:50 21    circumstances to protect its trade secrets?

13:43:52 22    **A.**    Yes, it was.

13:43:55 23    **Q.**    Turning to the second criteria.

13:43:57 24        Mr. Robinson, does Qorvo maintain formal policies

13:44:00 25    related to information security?

*Robinson - Direct*

A.    Yes, they do.

Q.    And are these policies written?

A.    Yes, they are.

Q.    Why is it important that policies are written?

A.    A policy is -- its purpose is to provide clear instructions, typically to employees, on different topics. An information security policy gives instructions on information security topics. But it can also set standards as far as how systems should be configured or setup. When policies are established and followed, it ensures consistent and secure business operations.

Q.    And aside from formal written policies, does Qorvo also have historical practices that relate to information security?

A.    Yes, they do.

Q.    What is the difference between a formal policy and a historical practice when it comes to information security?

A.    So policies, those are formal documents. But in a business, it's not possible to write down each and every thing that must be done in order to operate securely, so companies also have practices that they follow. And this may just be through training or on-the-job behaviors that the company follows that help protect information.

Q.    And so, Mr. Robinson, in your opinion and based on your experience, are Qorvo's formal written policies and

13:45:22  1    practices related to information security reasonable

13:45:24  2    measures under the circumstances to safeguard Qorvo's

13:45:27  3    trade secrets?

13:45:28  4    **A.**    Yes, they were.

13:45:31  5    **Q.**    Did some of Qorvo's written policies related to

13:45:35  6    information security change over time?

13:45:36  7    **A.**    Yes, they did.

13:45:38  8    **Q.**    Why is that important?

13:45:39  9    **A.**    Well, that's expected.  As a business operates, there

13:45:43 10    may be changes in its environment.  It may be -- have, you

13:45:47 11    know, performing different types of businesses or the

13:45:51 12    threaten environment might change to where they need to

13:45:54 13    update their policies accordingly.  And by reviewing their

13:45:58 14    policies, there's revisions and historical versions going

13:46:02 15    back to 2015 and beyond.  So I was able to see that and

13:46:05 16    see how Qorvo improved its security over time by updating

13:46:08 17    its policies.

13:46:10 18    **Q.**    So, Mr. Robinson, in your opinion and based on your

13:46:12 19    experience, was Qorvo's modifications of its information

13:46:16 20    security policies a reasonable measure under the

13:46:18 21    circumstances to protect its trade secrets?

13:46:21 22    **A.**    Yes, it was.

13:46:23 23    **Q.**    I'd now like to turn to physical security.

13:46:25 24            So, Mr. Robinson, as part of your work in this case,

13:46:27 25    did you analyze whether Qorvo had physical security

13:46:30 1    controls?

13:46:31 2    **A.**   Yes, I did.

13:46:31 3    **Q.**   And what did you discover?

13:46:34 4    **A.**   So I examined the physical aspects of security, and

13:46:37 5    those are things that -- typically easier to picture, it's

13:46:42 6    the locks on the doors, the practices around making sure

13:46:46 7    their buildings are secure, employees must have badges in

13:46:50 8    order to access Qorvo environments, the use of security

13:46:54 9    cameras to monitor certain secure areas.  It was even

13:46:59 10   things like making sure they had waste bins in their

13:47:04 11   offices that would allow, when information needed to be

13:47:07 12   disposed, if it was confidential information, it could be

13:47:10 13   shredded and securely disposed of without being lost or

13:47:14 14   exposed.

13:47:16 15   **Q.**   So, Mr. Robinson, in your opinion, based on your

13:47:17 16   experience, were Qorvo's physical security controls

13:47:20 17   reasonable security measures under the circumstances to

13:47:22 18   safeguard its trade secrets?

13:47:25 19   **A.**   Yes, they were.

13:47:26 20   **Q.**   Now I'd like to turn to Item Number 5.

13:47:30 21        As part of your work on this case, did you analyze

13:47:32 22   whether Qorvo implemented risk management or audit

13:47:34 23   functions related to information security?

13:47:37 24   **A.**   Yes.  I looked at both of those.  And risk management

13:47:43 25   is an important function because information security, you

know, it's the process of protecting information by

mitigating risk.  And the way you understand what your

risks are is by going through and looking at what the

risks are to your business.  And Qorvo had a formal risk

management function.  Each year they would go through and

look at their business risk, their enterprise risk, their

cyber risks.  And they would catalog those and then record

those informal risk registers.

And what those do is that tracks what they've

identified, and then they can decide how they're going to

mitigate those risks.

And in addition to that, Qorvo -- it wasn't a

function that worked in a vacuum.  It reported those risks

to company management and the board of directors.  And

that's important because, then, based on risks, if Qorvo

needed to invest more money in security control, they

would have support from company management to get the

money they needed to make those improvement.

**Q.**  And what about audits?

**A.**  So audits is -- that is an important function.  Qorvo

had an internal audit team that each year would decide

what aspects of Qorvo should be tested or audited.  And

that helps information security because what that's doing

is testing the security controls that are in place to make

sure they're effective, to make sure they're working.  And

the results of audits can uncover situations where changes may need to be made.

And, in addition to Qorvo's internal teams, they also hired external auditors, such as Mandiant, a well-known security firm, and Black Hills Information Security to come into their environment, run tests, and provide reports of their findings.

**Q.**    So, Mr. Robinson, in your opinion, based on your experience, are Qorvo's risk management and audit functions related to information security reasonable measures under the circumstances to safeguard Qorvo's trade secrets?

**A.**    Yes, they were.

**Q.**    Let's turn to employees.

So in conducting your analysis in this case, did you look to see if Qorvo had any policies or procedures regarding employees?

**A.**    Yes, they did.

**Q.**    And why was that important to your analysis?

**A.**    Employees are a necessary part of any business.  Most businesses have them.  But employees are human, and it's -- you know, if an employee or human wants to take bad actions or sometimes they make accidental mistakes, that can impact information security.  So the documents and things surrounding employees is a very important

13:50:21 1    aspect of information security.

13:50:22 2    **Q.**    And does Qorvo require all its employees to sign a

13:50:26 3    confidentiality agreement upon hiring?

13:50:28 4    **A.**    Yes, they do.

13:50:28 5    **Q.**    And based on your review of the materials in this

13:50:30 6    case, was this same type of policy implemented by both

13:50:32 7    TriQuint and RF Micro Devices?

13:50:34 8    **A.**    Yes, it was.

13:50:35 9            **MR. NAQVI:**    Your Honor, may I approach the

13:50:37 10    witness?

13:50:37 11            **THE COURT:**    You may.

13:50:59 12    **BY MR. NAQVI:**

13:51:17 13    **Q.**    Mr. Robinson, I just handed you what's already been

13:51:19 14    admitted into evidence as Trial Exhibit 214, 204, and 230.

13:51:22 15    Those are respectively PTX-647, 760, and 1218.  They're

13:51:29 16    the same three confidentiality agreements that were just

13:51:31 17    shown to Mr. Boyd, one from TriQuint, one from RFMD, and

13:51:35 18    one from Qorvo.

13:51:36 19            Mr. Boyd, did you review these three documents as

13:51:38 20    part of your analysis in this case?

13:51:43 21    **A.**    Yes.  I reviewed these documents.

13:51:45 22    **Q.**    And in terms of confidentiality, do these agreements

13:51:46 23    generally have similar requirements?

13:51:48 24    **A.**    Yes, they do.

13:51:50 25    **Q.**    And in your opinion, is the requirement that every

1   employee sign a confidentiality agreement upon hiring a

2   reasonable security measure under the circumstances to

3   protect Qorvo trade secrets?

4   **A.**   Yes, it is.

5   **Q.**   Are Qorvo's employees informed of confidentiality

6   obligations only at the beginning of employment?

7   **A.**   No.

8   **Q.**   Why was that important to your analysis?

9   **A.**   Employees typically work at a company for many years,

10  and they also may change roles.  And it's important to

11  remind employees so that they are reminded of their

12  confidentiality obligations and don't have to refer back

13  to something they saw when they first were hired.

14          **MR. NAQVI:**   Your Honor, may I approach the

15  witness?

16          **THE COURT:**   You may.

17  **BY MR. NAQVI:**

18  **Q.**   Mr. Boyd, I've just handed you Joint Exhibit 20,

19  which was just admitted into evidence as Trial

20  Exhibit 231.

21      What is this document?

22  **A.**   This is Qorvo's Code of Business Conduct and Ethics,

23  and this is the 2015 version.

24  **Q.**   Did you consider this document in rendering your

25  opinions in this case?

*Robinson - Direct*

13:53:10  1    **A.**    Yes, I did.

13:53:10  2    **Q.**    And does this document have a section related to

13:53:13  3    confidentiality?

13:53:14  4    **A.**    Yes, it does.

13:53:16  5              **MR. NAQVI:**  And, Mr. Faison, if we can please

13:53:19  6    show Page 8 of Joint Exhibit 20 again.

13:53:23  7    **BY MR. NAQVI:**

13:53:23  8    **Q.**    And are the obligations in this confidentiality --

13:53:25  9    confidentiality obligations in this document similar to

13:53:28  10   the ones set forth in the confidentiality agreements that

13:53:32  11   an employee must sign upon hiring?

13:53:35  12   **A.**    Yes, they are.

13:53:36  13   **Q.**    And on Page 9 of this document, does it address

13:53:38  14   disclosure of confidential information to third parties?

13:53:41  15   **A.**    Yes, it does.

13:53:43  16   **Q.**    Based on your review of the materials in this case,

13:53:45  17   are employees required to review and acknowledge the Qorvo

13:53:49  18   code of conduct?

13:53:51  19   **A.**    Yes.  They're required to read this and acknowledge

13:53:54  20   that they've read this every year.

13:53:56  21   **Q.**    Has that been a historical practice of Qorvo since

13:53:59  22   2015?

13:54:00  23   **A.**    Yes, it has.

13:54:01  24   **Q.**    So, in your opinion, is Qorvo's policy related to its

13:54:04  25   Code of Business Conduct and Ethics a reasonable security

13:54:06  1    measure under the circumstances to protect Qorvo's trade

13:54:10  2    secrets?

13:54:10  3    **A.**   Yes, it is.

13:54:15  4            **MR. NAQVI:**   Your Honor, may I approach the

13:54:17  5    witness?

13:54:17  6            **THE COURT:**   You may.

13:54:36  7    **BY MR. NAQVI:**

13:54:41  8    **Q.**   Mr. Boyd, I just handed you PTX-1070, which was just

13:54:43  9    admitted into evidence as Trial Exhibit 233.

13:54:47 10       Can you just please remind the jury again what this

13:54:49 11    document is?

13:54:50 12    **A.**   This is Qorvo's Acceptable Use Policy.

13:54:55 13            **MR. NAQVI:**   And, Mr. Faison, if we could please

13:54:56 14    just display the first page of PTX-1770 for the jury.

13:55:01 15    **BY MR. NAQVI:**

13:55:01 16    **Q.**   And, Mr. Robinson, did you consider this document

13:55:03 17    when rendering your opinions?

13:55:05 18    **A.**   Yes, I did.

13:55:06 19    **Q.**   Are employees required to review this policy?

13:55:09 20    **A.**   Yes, they are.

13:55:10 21    **Q.**   And they are required to acknowledge it as well?

13:55:11 22    **A.**   Yes.  Similar to the Code of Business Conduct and

13:55:13 23    Ethics, this policy must be read and acknowledged by

13:55:16 24    employees every year.

13:55:18 25    **Q.**   And so is Qorvo's implementation of this Acceptable

*Robinson - Direct*

1  Use Policy a reasonable measure under the circumstances to

2  safeguard its trade secrets?

3  **A.**   Yes, it is.

4  **Q.**   Okay.  In your review of materials in this case, did

5  you look to see if Qorvo had any security policies or

6  procedures when an employee left the company?

7  **A.**   Yes, I did.

8  **Q.**   Why was that important to your analysis?

9  **A.**   This is an important point to remind employees of

10  their confidential obligations, that there's a best

11  practice in Insider Threat Guide that says to establish an

12  employee termination procedure and then use that as a

13  chance to remind them of their confidentiality agreements.

14          **MR. NAQVI:**  Your Honor, may I approach the

15  witness?

16          **THE COURT:**  You may.

17  **BY MR. NAQVI:**

18  **Q.**   Mr. Boyd, I've handed you PTX-1109, which has already

19  been admitted into evidence as Trial Exhibit 232?

20          **MR. NAQVI:**  Mr. Faison, if you could please

21  display that one more time for the jury.

22  **BY MR. NAQVI:**

23  **Q.**   Mr. Robinson, what is this document?

24  **A.**   This is a separation agreement, a Qorvo separation

25  agreement.

*Robinson - Direct*

Q.   And did you review this document when forming your opinions in this case?

A.   Yes, I did.

Q.   Is it your understanding that all employees are to sign this agreement upon departure?

A.   Yes, it is.

Q.   Has that been historical practice of Qorvo since 2015?

A.   Yes, it has.

Q.   So overall, Mr. Robinson, are Qorvo's policies related to confidentiality agreements in terms of hiring, during employment, and when an employee leaves Qorvo, reasonable measures under the circumstances to protect its trade secrets?

A.   Yes, it is.

Q.   Now I would like to turn to third parties briefly.

So as part of your analysis in this case, did you look to whether Qorvo had any information security policies or procedures regarding sharing confidential information with third parties?

A.   Yes.

Q.   Why was that important to your analysis?

A.   Well, typically, Qorvo's information or -- it's meant to be kept internally and used internally, but in the course of conducting business, there's going to be

13:57:38 1    instances where a customer or a supplier or a vendor may

13:57:41 2    need access to some type of limited confidential

13:57:44 3    information, so it's important to have some way to protect

13:57:47 4    that.

13:57:47 5    **Q.**    And does Qorvo require the use of nondisclosure

13:57:50 6    agreements before sharing confidential information with

13:57:53 7    third parties?

13:57:54 8    **A.**    Yes, they do.

13:57:54 9    **Q.**    Did you review any Qorvo NDAs in connection with your

13:57:58 10   work in this case?

13:57:59 11   **A.**    Yes.  I reviewed many of them.

13:58:00 12   **Q.**    And does the Code of Business Conduct that we just

13:58:03 13   looked at require the use of the NDAs?

13:58:05 14   **A.**    Yes, it does.

13:58:05 15   **Q.**    So, Mr. Robinson, in your opinion and based on your

13:58:09 16   experience, are Qorvo's policies and procedures related to

13:58:13 17   sharing confidential information with third parties

13:58:16 18   reasonable measures under the circumstances to safeguard

13:58:19 19   Qorvo's trade secrets?

13:58:21 20   **A.**    Yes, it is.

13:58:22 21   **Q.**    I'd like to turn to Number 8.  In assessing Qorvo's

13:58:26 22   information security policies and practices, did you look

13:58:28 23   at whether and how Qorvo labeled confidential documents?

13:58:32 24   **A.**    Yes, I did.

13:58:33 25   **Q.**    And why was that important to your analysis?

**A.**    Labeling confidential information, that's important

because that puts the reader or recipient of that

information, it information them of what that information

is. So if it says, "confidential" or "proprietary," then

they are made aware of that the fact through labels.

**Q.**    Mr. Robinson, can you please look back at PTX-1770,

which is Trial Exhibit 233, and turn to Section 5.

              **MR. NAQVI:** Mr. Faison, if you could please

display that for the jury.

**BY MR. NAQVI:**

**Q.**    So, Mr. Robinson, does Section 5 of the Acceptable

Use Policy address designating or labeling documents?

**A.**    Yes, it does.

**Q.**    And can you briefly describe what it says.

**A.**    So what it says here is that it provides the

different labels that Qorvo uses -- Qorvo restricted,

Qorvo confidential, Qorvo private -- and it also refers

back to the confidentiality section in the CBCE, which is

the Code of Business Conduct and Ethics.

**Q.**    Aside from this formal written policy, based on your

review of the materials in this case, does Qorvo have a

historical practice of labeling confidential documents?

**A.**    Yes, they do.

**Q.**    Can you please describe that for the jury.

**A.**    So Qorvo's practice is to use the labels

"confidential" and/or "proprietary" and place that on

documents that have confidential information, and that

may -- the location of those labels may change depending

on the document.  It may be at the footer, the top of the

page in a header, it may be on the -- if it's a

presentation, it may be on the first page or the

subsequent pages.  And it's in standard locations within

those documents, and that practice has been in place since

2015.

**Q.**   Did you review any of the Qorvo trade secret

documents at issue in this case?

**A.**   Yes, I did.

**Q.**   And the Qorvo documents that you reviewed, did they

have confidentiality labeling?

**A.**   Yes, they all had confidential labels on them.

**Q.**   So, Mr. Robinson, overall in your opinion and based

on your experience, is Qorvo's practice and policy

regarding labeling documents as confidential or

proprietary a reasonable measure under the circumstances

to safeguard Qorvo's trade secrets?

**A.**   Yes, it is.

          **MR. NAQVI:**  Can we please pull the slide again,

Mr. Faison?  Thank you.

**BY MR. NAQVI:**

**Q.**   Turning to Number 9.  Mr. Robinson, did you look to

*Robinson - Direct*

1  see if Qorvo had any security controls related to

2  information systems security?

3  **A.**  Yes, I did.

4  **Q.**  Why was that important to your analysis?

5  **A.**  Well, information systems, those are all the

6  computers, the networks, the files that Qorvo has, and

7  those can store a considerable amount of information, so

8  it's important that security controls protect those.

9  **Q.**  And can you briefly describe some of the security

10  controls related to information systems security that you

11  discovered being implemented at Qorvo?

12  **A.**  Yes.  So Qorvo has many, many, many types of these

13  controls.  Mr. Boyd described some.  But some examples of

14  the controls that I found Qorvo had include, they require

15  encryption on their computers, so that means if a user

16  isn't authorized to login to that computer, someone can't

17  access it; it's encrypted and the information secured.

18      They require if employees are trying to access the

19  Qorvo network remotely, they require that you not only

20  have a user name, a password, you also have to enter a

21  secondary code, which makes that a more secure way to

22  check to the network, and they've had that in place since

23  their inception in 2015.

24      They also have other types of security software that

25  monitors the systems and protects their environment from

1  antivirus -- or from viruses and malware and from other

2  malicious software.

3  **Q.**    So in your opinion and based on your experience, are

4  Qorvo's security controls related to its information

5  systems reasonable measures under the circumstances to

6  safeguard Qorvo's trade secrets?

7  **A.**    Yes, they are.

8  **Q.**    Finally, as part of your analysis, did you look to

9  see if Qorvo had any systems or controls in place related

10  to monitoring.

11  **A.**    Yes, I did.

12  **Q.**    Why was that something you looked for?

13  **A.**    So monitoring security controls, those are important

14  because they can detect something.  If something you tried

15  to prevent occurs, the monitoring controls can pick that

16  up, it can alert you to something bad that's happened, and

17  then it can be investigated.

18  **Q.**    And can you briefly describe the types of monitoring

19  controls that Qorvo implemented from 2015 to present?

20  **A.**    Yes.  So Qorvo stores the different logs and

21  informations -- information from its computers and network

22  as they're being used.  It stores those so that they can

23  go back and look and see, you know, what may have

24  happened, and investigate that.

25        There are a number of different systems that do that,

*Robinson - Direct*

14:03:45 1    some examples include their fire wall logs, their remote

14:03:51 2    access or VPN logs which shows who logged in and when.

14:03:55 3    And then they also use some specific software that

14:04:00 4    monitored employees' file activity around which types of

14:04:05 5    files they were accessing and if that information was

14:04:08 6    sensitive.

14:04:08 7    **Q.**    And so overall in your opinion and based on your

14:04:12 8    experience, Mr. Robinson, were Qorvo's monitoring security

14:04:15 9    controls reasonable measures under the circumstances to

14:04:17 10   safeguard Qorvo's trade secrets?

14:04:20 11   **A.**    Yes.

14:04:22 12   **Q.**    So, Mr. Robinson, to wrap up here, in assessing

14:04:25 13   Qorvo's information security, policies, practices, and

14:04:28 14   procedures as a whole, did you conclude that Qorvo took

14:04:31 15   reasonable measures under the circumstances to safeguard

14:04:34 16   its trade secrets?

14:04:36 17   **A.**    Yes.  As the checklist shows, across all these

14:04:40 18   different areas, you know, I examined Qorvo from its

14:04:43 19   inception all the way forward, identified the relevant

14:04:48 20   security controls, categorized them into these different

14:04:52 21   checklists, and it's my opinion that Qorvo took more than

14:04:56 22   reasonable efforts under the circumstances to protect

14:04:58 23   their trade secret information.

14:05:03 24   **Q.**    Thank you.

14:05:03 25           **MR. NAQVI:**  No further questions.  I pass the

14:05:04  1    witness.

14:05:05  2                    **THE COURT:**  Cross-examination.

14:05:06  3

14:05:06  4                         CROSS-EXAMINATION

14:05:14  5                    **MS. SMITH:**  Victoria Smith for Akoustis.

14:05:16  6                    Good afternoon, Your Honor.

14:05:17  7    **BY MS. SMITH:**

14:05:18  8    **Q.**    Good afternoon, Mr. Robinson.  How are you today?

14:05:21  9    **A.**    Good.  How are you?

14:05:22 10    **Q.**    I'm good.

14:05:23 11         Do you recognize me?  I took your depo in January.

14:05:26 12    Nice to see you again.

14:05:28 13    **A.**    Likewise.

14:05:32 14    **Q.**    Mr. Robinson, your assignment was to determine

14:05:36 15    whether Qorvo took reasonable efforts to keep its

14:05:39 16    confidential and alleged trade secret information at issue

14:05:42 17    in this lawsuit a secret, correct?

14:05:45 18    **A.**    Yes.

14:05:46 19    **Q.**    In November of last year, you submitted a report

14:05:51 20    containing all of your opinions on whether Qorvo has made

14:05:55 21    reasonable efforts to maintain confidentiality of its

14:05:59 22    alleged trade secrets, right?

14:06:00 23    **A.**    Yes.

14:06:03 24    **Q.**    Sitting here today, do you still stand by the

14:06:05 25    opinions in your report?

**A.** Yes, I do.

**Q.** Okay. Do you agree that, in the information security context, "confidential" and "trade secret" do not have identical meanings?

**A.** There could be overlap, but, yeah, there's two different meanings there.

**Q.** Information that is confidential may not necessarily be a trade secret, right?

**A.** It depends on the information. Like I said, there could be overlap, but it could be separate things.

**Q.** Right. Well, so let me repeat my question. Information that is confidential may not necessarily be a trade secret, right?

**A.** In order for something to be a trade secret, there's a number of legal definitions that have to be met, so it depends.

**Q.** Are all trade secrets confidential?

**A.** It depends. Because a trade secret is a legal definition, so it depends on what that information is, if it meets all those requirements. So it would depend on what types of information we're talking about.

**Q.** So sitting here today, you cannot say whether information that is confidential may not, may or may not, be a trade secret? Do you need more information than that?

**A.**    Yeah.  I'm not saying that that's not the case.  I'm

just saying, you know, hypothetically, it's appropriate

for a company to have confidential information, try to

protect that, use security controls to protect that, and

some of that information may be a trade secret.

**Q.**    Okay.  Earlier today, Mr. Boyd testified.  Were you

here for that testimony?

**A.**    Yes, I was.

**Q.**    He mentioned something called "administrative

vulnerabilities."  Let me repeat that "administrative

vulnerabilities."

       Did you hear his testimony on that?

**A.**    Yes.

**Q.**    When we talked back in January, I asked you about

that phrase and you were not familiar with it.

       Do you know what that means now?

**A.**    There's a couple of different interpretations.  I

mean, I heard how it was described by Mr. Boyd earlier.

**Q.**    Okay.  What is your understanding of what is human --

I'm sorry.

       What is "administrative vulnerabilities"?

**A.**    Well, the example that the discussion went to was

human employees and their behaviors.

**Q.**    Thank you.

       So in order to implement appropriate security

14:09:03 1    protocols, a company should know what assets they have,

14:09:06 2    where they are located, and what their importance is to

14:09:09 3    the organization, correct?

14:09:12 4    **A.**    That is a best practice, yes.

14:09:20 5    **Q.**    And which security policies and procedures may apply

14:09:24 6    in a given situation may depend on the level of

14:09:28 7    confidential information contained in the document, right?

14:09:32 8    **A.**    It may, yes.

14:09:35 9    **Q.**    Okay.  Is it fair to say that many of Qorvo's

14:09:42 10    information security policies depend on employees to be

14:09:47 11    implemented?

14:09:53 12    **A.**    It depends on the situation and the context, but,

14:09:56 13    yes, some -- some of those depend on employees to be

14:10:01 14    implemented.

14:10:02 15    **Q.**    So, for example, before a computer program that

14:10:06 16    tracks access to data can run on the company computer

14:10:09 17    systems, that program has to be installed by an employee,

14:10:13 18    right?

14:10:14 19    **A.**    In that example, yes.

14:10:18 20    **Q.**    And for information to be processed by that computer

14:10:28 21    program, an employee has to instruct the program to do so

14:10:32 22    in many circumstances, right?

14:10:35 23    **A.**    It depends on the circumstances, but generally that's

14:10:38 24    right.

14:10:39 25    **Q.**    Okay.  So an employee needs to first understand

14:10:43  1    whether a document contains confidential information

14:10:47  2    before the employee can choose the right security controls

14:10:50  3    for that document, right?

14:10:51  4    **A.**    No.   There's many security controls that Qorvo had

14:10:59  5    that it's not up to the employee to implement or do.   Some

14:11:04  6    involve the employee, but some don't.

14:11:07  7    **Q.**    Some do, though?

14:11:09  8    **A.**    Yes.   Some would, yes.

14:11:11  9    **Q.**    Okay.   And for those systems that rely on employees,

14:11:20 10    the employee would need to first know that a document

14:11:24 11    contains confidential information before the employee

14:11:27 12    would even naturally think to choose a security control,

14:11:31 13    right?

14:11:32 14    **A.**    No.   That's -- in the abstract, it's hard to say

14:11:39 15    because security controls could be many different things.

14:11:41 16    It can be software already running on the computer.

14:11:45 17    That's a security control that the employee doesn't know

14:11:50 18    is running on the computer, and it's protecting the

14:11:52 19    information.

14:11:52 20    **Q.**    Well, I'm talking about the ones that rely on the

14:11:55 21    employees.   Remember, we were only talking about those for

14:11:58 22    right now.

14:12:00 23    **A.**    Okay.

14:12:01 24    **Q.**    So an employee wouldn't use those security controls

14:12:05 25    if the employee didn't think that there was confidential

14:12:09 1    information in a document, right?

14:12:11 2    **A.**   You're going to have to give me examples of what

14:12:15 3    types of security controls you're referring to.

14:12:17 4    **Q.**   Well, let's talk about the labeling system.  Right?

14:12:21 5        You talked about a labeling system earlier whereby an

14:12:26 6    employee can label documents as containing confidential

14:12:30 7    information or sensitive information.

14:12:33 8        Do you remember that?

14:12:33 9    **A.**   Yes.

14:12:34 10   **Q.**   Okay.  So when a document -- when a document is

14:12:37 11   created by an employee, just a blank document, and the

14:12:41 12   employee puts some information into that document, writes

14:12:44 13   a few lines of words, the employee has to assess whether

14:12:49 14   those words are confidential before the employee would

14:12:53 15   apply the correct label; is that -- isn't that right?

14:12:57 16   **A.**   That's not how it works at Qorvo.  My analysis showed

14:13:01 17   that Qorvo had those standard labels already built into

14:13:05 18   their templates, their presentations, their documents.  So

14:13:08 19   when they started something new, those labels would

14:13:11 20   already be there.

14:13:12 21   **Q.**   Oh, that's right.  There was a default label, wasn't

14:13:15 22   there?  Was it "private"?

14:13:17 23   **A.**   No.  "Private" refers to the classification, internal

14:13:21 24   classification policy, which is separate and apart from

14:13:25 25   the labeling practice.

14:13:29  1    **Q.**    Okay.  What was the default label, then?

14:13:33  2    **A.**    Well, if a Qorvo employee took a -- wanted to create

14:13:37  3    a presentation, it would have "Confidential and

14:13:39  4    Proprietary" already in the footer, along with the logos

14:13:44  5    and the graphics.  It's part of Qorvo's branding.

14:13:47  6    **Q.**    I see.

14:13:49  7        So whenever an employee wants to create a

14:13:53  8    presentation in this instance, there would

14:13:56  9    automatically -- it would automatically be labeled

14:13:59 10    "confidential" from the get-go?

14:14:01 11    **A.**    That's how those types of documents and templates

14:14:05 12    would start.  And then it would be up to the employee to

14:14:08 13    decide if that should stay or if it's appropriate to

14:14:11 14    remove that label.

14:14:12 15    **Q.**    Okay.  When you submitted your expert report back in

14:14:22 16    November of 2023, you were not aware that documents that

14:14:28 17    had been labeled "Confidential" were posted to Qorvo's

14:14:32 18    public-facing website, right?

14:14:35 19    **A.**    Are you referring to the handful of documents that

14:14:38 20    were posted?

14:14:40 21    **Q.**    I'm referring to the documents that we discussed at

14:14:44 22    your deposition.

14:14:46 23    **A.**    Okay.

14:14:47 24    **Q.**    Yep.

14:14:48 25        Were you aware -- you were not aware of those when

14:14:50  1    you submitted your expert report, right?

14:14:54  2    A.    No, not when I submitted my report.

14:14:55  3    Q.    Okay.

14:15:04  4          Someone from Qorvo informed you of that when you were

14:15:08  5    preparing for your deposition, right?

14:15:09  6    A.    It was an attorney who informed me, from Sheppard &

14:15:17  7    Mullin.

14:15:24  8    Q.    Okay.  Prior to that, you had been on phone calls

14:15:29  9    during which Qorvo attorneys had been on the call; is that

14:15:33 10    right?

14:15:36 11    A.    Yes, that's right.

14:15:37 12    Q.    Okay.  And this issue did not come up at that time?

14:15:43 13    A.    I mean, I think we were discussing different topics.

14:15:46 14    I was interviewing Qorvo employees on their information

14:15:50 15    security controls at that time.

14:15:51 16          MS. SMITH:    Okay.  Your Honor, may I approach

14:16:04 17    the witness?

14:16:06 18          THE COURT:    You may.

14:16:44 19    BY MS. SMITH:

14:16:45 20    Q.    Mr. Robinson, I've just handed you what has been

14:16:49 21    marked as PTX-1239.  Do you recognize this document?

14:16:53 22    A.    Yes, I do.

14:16:54 23    Q.    What is it?

14:16:56 24    A.    This is the Common Sense Guide to Mitigating Insider

14:17:00 25    Threats, the seventh edition.

14:17:02  1           **MS. SMITH:**  Your Honor, I offer PTX-1239 into

14:17:05  2    evidence, please.

14:17:09  3           **THE COURT:**  Without objection, it is marked and

14:17:10  4    received as 235.

14:17:14  5           (Trial Exhibit No. 235 was admitted into

14:17:14  6    evidence.)

14:17:14  7           **MS. SMITH:**  Thank you.

14:17:16  8           May I have Page 2, please, Mr. Brown.

          9    **BY MS. SMITH:**

14:17:30 10    **Q.**   All right.  Is this the Common Sense Guide you had

14:17:33 11    referred to earlier in your testimony?

14:17:38 12    **A.**   Yes, it is.

14:17:40 13    **Q.**   And this is the document that you relied on in

14:17:42 14    forming your opinions of Qorvo's information security

14:17:45 15    policies and procedures, right?

14:17:48 16    **A.**   Yes, it is.

14:17:50 17    **Q.**   And this guide describes 22 best practices that

14:17:53 18    organizations should implement to prevent and detect

14:17:57 19    insider threats, right?

14:18:01 20    **A.**   Yes, it is.

14:18:04 21           **MS. SMITH:**  Mr. Brown, can we have Page 19.

14:18:07 22    **BY MS. SMITH:**

14:18:11 23    **Q.**   So shown here is "Best Practice 1:  Know and protect

14:18:16 24    your critical assets."

14:18:17 25           Do you see that?

*Robinson - Cross*

**A.**    Yes.

**Q.**    And Best Practice 1 is a best practice that you considered in your report, right?

**A.**    I refer to this best practice in my report, yes.

**Q.**    "Critical asset" is a term that is used in the Common Sense guide, right?

**A.**    Yes, it's listed here.

**Q.**    It includes intellectual property?

**A.**    It can include intellectual property, yes.

**Q.**    Trade secrets are a kind of intellectual property, right?

**A.**    Typically, yes.

        **MS. SMITH:**  Can we have Page 24, please.

**BY MS. SMITH:**

**Q.**    So we're still in the Best Practice 1 section that you relied on in your report.  Under the "Challenges to asset identification" section, would you please read for the record Item 2.

**A.**    So Number 2 says, "Determining appropriate metrics. The organization should determine what a critical asset is by identifying and using appropriate metrics.  Simply asking the organization's stakeholders to report on their critical assets will likely lead to overreporting."

**Q.**    Overreporting includes when an employee identifies something as confidential when it's not confidential,

14:19:56 1    right?

14:19:58 2    **A.**   Are you reading that from somewhere in this?

14:20:03 3    **Q.**   No.  I'm asking you that question.

14:20:07 4    **A.**   I mean, it depends.  If you're referring to what it's

14:20:12 5    discussing here, this is talking about metrics.

14:20:16 6    **Q.**   Right.  Metrics to assess overreporting.  Well,

14:20:23 7    overreporting includes when an employee identifies

14:20:28 8    something as confidential when it's not confidential,

14:20:31 9    right?

14:20:32 10   **A.**   I don't know if that's what this is referring to

14:20:36 11   here.

14:20:45 12   **Q.**   What is overreporting, then?

14:20:47 13   **A.**   Depends on the context.  The example you are giving

14:20:49 14   is if an employee labels confidential information as

14:20:55 15   confidential, but this is about collecting metrics to

14:21:01 16   track or identify their critical assets.

14:21:04 17   **Q.**   Well, critical assets includes IP.

14:21:07 18   **A.**   In the definition of this, yes, but it could also

14:21:12 19   include lots of other things as well.

14:21:14 20   **Q.**   Right.  So are you saying that overreporting is not a

14:21:18 21   term applied to intellectual property?

14:21:23 22   **A.**   I mean, you're taking one word out of this entire

14:21:28 23   best practice and trying to apply it.  So it's hard for me

14:21:33 24   to just say "yes" or "no" to that question.

14:21:38 25   **Q.**   Okay.  Earlier, you talked about some confidential

documents that Qorvo alleges includes trade secrets.

Do you remember that?

**A.**    Could you repeat the question?  I'm sorry.

**Q.**    Earlier, you talked about some confidential -- some
documents that were labeled confidential that Qorvo is
currently alleging contains trade secrets?

**A.**    Yes.

**Q.**    Okay.  There were confidential labels on those
documents, correct?

**A.**    Yes, there were.

**Q.**    You did not assess whether those documents actually
contained confidential information, though, right?

**A.**    I reviewed the documents to see that they had
confidential labels or proprietary labels.

**Q.**    But you did not assess whether those documents
actually contained confidential information, right?

**A.**    No.  I mean, I was told these are part of the --
Qorvo's trade secret information, so I just looked to
check and make sure that they had the right labels.

**Q.**    Okay.  So you were told that they contained trade
secrets; is that right?

**A.**    They were part of Qorvo's alleged trade secret
information that was at issue in this case.

**Q.**    Right.  And you are not saying that they actually
contained trade secrets, because that is not your

**Robinson - Cross**

1    expertise; is that right?

2    **A.**    Well, my expertise is information security, and you

3    have to take reasonable efforts to protect trade secret

4    information, so to that extent, it relates to trade

5    secrets, but all the other aspects, I'm not issuing any

6    opinions as to whether or not something is a trade secret.

7    **Q.**    You can't tell whether those documents actually

8    contains trade secrets, right?

9    **A.**    No.  I mean, that wasn't part of my assignment.

10    **Q.**    But that's also not part of your expertise, right?

11    **A.**    Well, strictly as it relates to efforts taken to

12    protect trade secrets, that ties back to my expertise in

13    information security.

14    **Q.**    Right.  So, Mr. Robinson, please listen to my

15    questions.  I'm asking you whether you know if those

16    documents contain trade secrets.  Do you know?

17    **A.**    I think that's the legal standard and that's the

18    process of going through and understanding what that

19    information is.  I was told by counsel these are the

20    alleged trade secret documents at issue in this case, so

21    that's why I analyzed them.

22    **Q.**    But you don't know whether they contain trade

23    secrets, right?  I just want to know what you know or you

24    don't know, that's all?

25    **A.**    No.  I mean, they may.  I don't know.

**Q.**    Okay.  And you just checked to see that they had a
confidential label on them?

**A.**    Yeah, I analyzed them and identified the appropriate
labels.

**Q.**    Okay.  Your analysis was only to check that they were
labeled "confidential," right?

**A.**    Well, I looked at a number of the different
documents, but that was one of the main purposes of my
analysis.

**Q.**    So you only checked to see that they had a
confidential label on them?

**A.**    For those documents, I looked to see where the labels
were and what the labels said.  In that case, they said
"confidential" and/or "proprietary."

**Q.**    So if the information in the documents were not
actually confidential, the label would be wrong.  Would
you agree with that?

**A.**    I mean, it depends.  I think we've talked about some
examples where, while information is being developed, it's
being created at Qorvo, it's going to be labeled as
"confidential," and then there may be a later point in
time where it's decided by Qorvo and the appropriate
stakeholders to remove that label so that it can be shared
with others appropriately.

**Q.**    Let's talk about that.

*Robinson - Cross*

14:25:47  1    So as information is being developed internally to

14:25:56  2  Qorvo, it's just defaulted to confidential; is that

14:26:01  3  correct?

14:26:02  4  **A.**    No, no.  I mean, it depends on the information.  They

14:26:05  5  have practices in place on standard documents that will

14:26:08  6  have the label by default at the start, but there's other

14:26:13  7  types of information that wouldn't have that type of

14:26:16  8  label.

14:26:16  9  **Q.**    But there are documents such as presentations that

14:26:20 10  have a template that defaults to confidential from the

14:26:24 11  get-go; isn't that right?

14:26:31 12  **A.**    Yes, that's a good security practice because

14:26:33 13  presentations are often presented to an audience.  To have

14:26:37 14  that label from the start is smart versus not having it

14:26:40 15  and hoping that the author or the presenter goes back and

14:26:43 16  adds it later.

14:26:46 17    And there are certain documents that are written with

14:26:53 18  the intention of being shown to non-Qorvo individuals, but

14:26:58 19  bear that label from the get-go because they are presented

14:27:01 20  in template form -- or in presentation form, right?

14:27:07 21  **A.**    Well, yes, but there's a number of --

14:27:09 22  **Q.**    Thank you.

14:27:10 23  **A.**    -- reasons for that.

14:27:12 24  **Q.**    Well, we can get to that in a bit; we'll get to that

14:27:15 25  in a bit.

1  So earlier, you testified about Qorvo's data

2  identification and handling policy.

3  Do you remember that?

4  **A.**  You mean today?

5  **Q.**  Yes.

6  **A.**  I referred to it, yes.

7  **Q.**  Okay.

8  **MS. SMITH:**  Mr. Brown, would you please pull up

9  PTX-1770, and that's been admitted as trial Exhibit 233.

10  Right.

11  **BY MS. SMITH:**

12  **Q.**  This is the document you were testifying about

13  earlier today, right?

14  **A.**  So this is the Acceptable Use Policy; I thought you

15  were referring to the Data Classification Policy.

16  **Q.**  The Acceptable Use Policy, that's right.

17  **MS. SMITH:**  Would you please forward to Page 4

18  of the PDF.

19  **BY MS. SMITH:**

20  **Q.**  I would like to ask you about Items 5 and 6 on this

21  page.

22  **MS. SMITH:**  There's one more line on Item 6.

23  Yes, thank you.

24  **BY MS. SMITH:**

25  **Q.**  So Item 6, "Sensitive information labeling."  At the

14:28:40 1    very end of that, it refers to a Data Classification

14:28:45 2    Policy.

14:28:45 3        Do you see that?

14:28:46 4    **A.**    Yes.

14:28:47 5    **Q.**    Did you review a Data Classification Policy when you

14:28:53 6    were preparing your report?

14:28:56 7    **A.**    Yes.

14:29:18 8            **MS. SMITH:**    Your Honor, may I approach the

14:29:19 9    witness, please?

14:29:20 10            **THE COURT:**    You may.

14:29:47 11    **BY MS. SMITH:**

14:29:48 12    **Q.**    Mr. Robinson, I've just handed you PTX-1214.  It's a

14:29:54 13    presentation entitled "Data Classification:  End user,"

14:29:59 14    and it's dated April 26, 2023.  Do you see that?

14:30:03 15    **A.**    Yes.

14:30:05 16    **Q.**    Do you recognize this document?

14:30:06 17    **A.**    Yes, I do.

14:30:11 18    **Q.**    You discussed this in your report, right?

14:30:14 19    **A.**    Yes, I did.

14:30:17 20            **MS. SMITH:**    Your Honor, I offer PTX-1214 into

14:30:20 21    evidence, please.

14:30:22 22            **THE COURT:**    Marked and received as 236.

14:30:24 23            (Trial Exhibit No. 236 was admitted into

14:30:24 24    evidence.)

25

BY MS. SMITH:

**Q.** So sitting here today, do you believe that the standard for data classification procedures is whether a company has a formal process, which Qorvo does; and, two, whether that process is used properly to classify information throughout the organization?

**A.** Could you repeat that question? I'm sorry.

**Q.** Sure. Sitting here today, is it your opinion that the standard for data classification procedures is; one, whether a company has a formal process, which Qorvo does; and, two, whether that process is used appropriately to classify information throughout the organization?

**A.** Yes. Generally yes.

**Q.** And data classification categories help employees internally categorize or identify information, right?

**A.** Yes.

        **MS. SMITH:** Mr. Brown, would you please scroll to Page 4. Can we zoom in on that? Great. Thank you.

BY MS. SMITH:

**Q.** At Qorvo, data can be classified internally as critical, sensitive, private, or unrestricted, right?

**A.** Yes.

**Q.** And a label on a document that contains critical data should say, "critical," right?

**A.** No, not exactly. You're -- labeling and

*Robinson - Cross*

1  classification, those are two different things.  A label

2  is those words like "confidential" and "proprietary" that

3  are in documents and you can see them.  It could be a

4  sticker on a hard drive or on a computer.  The

5  classifications in these examples of "critical,"

6  "sensitive," "private," "green," that's -- it could be a

7  separate classification.  It might not show up on the

8  information that you are looking at.  The internal system

9  classifies it and knows that this is critical or this is

10 private.  It might be displayed, but it depends on the

11 context.

12 **Q.**  So this might be an invisible classification; is that

13 what you're saying?

14 **A.**  Not invisible, no.  It's just there's a whole system

15 internally that Qorvo implemented to help classify all the

16 different information that gets created on a regular basis

17 as they're conducting business.

18 **Q.**  Trade secrets are considered critical; is that

19 correct?

20 **A.**  So this slide here has examples of the different

21 classifications, and it has trade secrets in the first box

22 that's red, but the other types of information in

23 "sensitive" and "private," may also rise to the legal

24 standard of a trade secret.  And at the bottom, just

25 before that black border, you'll see that it says,

*Robinson - Cross*

1    "Unauthorized disclosure of data classified as critical,

2    sensitive, or private, may cause irreparable harm to

3    Qorvo, and that type of information may rise to a trade

4    secret."

5    **Q.**    So trade secret can be in any of these

6    classifications?

7    **A.**    Potentially.  I mean, based on the information, if

8    it's kept secret, it has value, and the other legal

9    criteria information in these private, sensitive, and red

10   might rise to the level of a trade secret.

11   **Q.**    Okay.

12   **A.**    These are just examples to help employees, the end

13   users -- because this is a training document for the

14   employees, the end users -- to learn and understand how to

15   use Qorvo's internal data classification system.

16   **Q.**    Okay.

17            **MS. SMITH:**  Mr. Brown, may I have Page 2.

18            Can you please focus on the second-to-last pair

19   of bullets.

20   **BY MS. SMITH:**

21   **Q.**    At Qorvo, if an employee has questions regarding

22   which classification best applies to data, the employee is

23   supposed to contact his or her supervisor, manager, or

24   senior leader, right?

25   **A.**    That's what this says here, yes.

**Q.**   Prior to submitting your report, you did not speak to

any Qorvo employee who had had difficulty determining

whether information was confidential, correct?

**A.**   No.

**Q.**   Prior to submitting your report, you did not speak to

any Qorvo employee who had been approached by another

employee for help in determining whether information was

confidential, correct?

**A.**   Correct.

**Q.**   Okay.  To complete your assignment, you spoke to

individuals from Qorvo's information security team, right?

**A.**   Yes.  Well, information security and other teams.

**Q.**   Okay.  Because there are other employees involved in

information security?

**A.**   Well, all employees play a role, and certain

departments have certain functions they need to follow.

**Q.**   Okay.  So in addition to the information security

team, Qorvo's legal department is also involved in

information security, right?

**A.**   Yes.

**Q.**   And the legal department is responsible for

intellectual property protection and training, right?

**A.**   I don't know if they're solely responsible, but they

have responsibilities related to that.

**Q.**   This training includes training employees on how to

14:36:52  1    tell what is and what isn't confidential in order to

14:36:56  2    classify information correctly, right?

14:37:02  3    **A.**    Which training are you referring to?  A specific

14:37:05  4    training presentation or just in general?

14:37:08  5    **Q.**    Just in general, their responsibility includes

14:37:10  6    helping employees understand what is and what isn't

14:37:13  7    confidential?

14:37:15  8    **A.**    That's -- that would be something common -- that

14:37:21  9    would be common for legal to help an employee understand,

14:37:24 10    yes.

14:37:25 11    **Q.**    Okay.  Prior to submitting your report, you

14:37:28 12    participated on calls with Qorvo employees that included

14:37:32 13    Qorvo's legal department, right?

14:37:34 14    **A.**    Yes.

14:37:36 15    **Q.**    On those calls that were prior to submitting your

14:37:40 16    report, the employees from Qorvo's legal department only

14:37:45 17    introduced themselves and said their names and titles, but

14:37:47 18    they were just listening in on the calls, and you didn't

14:37:50 19    speak to them, correct?

14:37:51 20    **A.**    Yes.

14:37:53 21    **Q.**    You didn't ask the legal department any questions on

14:37:56 22    those calls?

14:37:59 23    **A.**    No.  Other than just introductions and names.

14:38:02 24    **Q.**    And you didn't gather information from the legal

14:38:04 25    department on those calls?

**A.**    No.

**Q.**    You never requested to speak with Qorvo's legal department about information security; is that right?

**A.**    That's correct.

**Q.**    So another team that is involved in information security is the human resources department, right?

**A.**    Yes.

**Q.**    And that department has responsibilities for hiring and terminating employees, right?

**A.**    Yes.  Generally, yes.

**Q.**    Termination's a kind of separation, right?

**A.**    Generally yes.

**Q.**    You didn't speak to anybody in Qorvo's human resources department for -- to prepare your opinions, right?

**A.**    Well, I relied upon documents that HR created and maintained rather than interviewing someone from HR.

**Q.**    You never requested to talk about anybody -- talk to anybody from HR?

**A.**    No.

**Q.**    Okay.  Earlier today during your testimony, you talked about USB drives, external drives.

Do you remember that?

**A.**    I don't know if I specifically said "USB drives," but I may have.

**Q.** Earlier today -- you were here when Mr. Boyd

testified?

**A.** Yes.

**Q.** And you heard when he talked about USB drives and how

Qorvo wanted to restrict flow of data to USB drives

because, his words were, "They could go anywhere."

Is that right?

**A.** Yes.

**Q.** And just for clarity, USB drives are those little

thumb drives that are very small and you just can connect

to your computer and store information; is that right?

**A.** They can be small or they can be larger. But, yeah,

they're external drives that connect to a computer.

**Q.** But the point is that they're very portable and

they're small so you can -- it's difficult to visually see

when people use them; they're easily removable?

**A.** I don't know if they're designed to be small so

they're hard to see. It might be more convenient that

they're more portable. But, yeah, their purpose is to

store data or transfer data.

**Q.** Now, Qorvo has a "no USB" policy currently, doesn't

it.

**A.** Yes. Currently, they don't allow USB drives, unless

there's a specific exception that someone's been granted

to use a USB drive.

*Robinson - Cross*

Q.   And that policy came into effect in 2019; is that right?

A.   Qorvo shifted to that in 2019.  Before that, there were many Qorvo employees who needed USB drives to move data from one Qorvo computer to the other, and that's -- that was approved, as long as they were doing it for approved Qorvo business reasons.

Q.   Well, let me step back a little bit.

     Prior -- in 2019, the Qorvo "no USB" policy instituted an actual -- a physical block on using USB drives, right?

A.   Prior to 2019, there was no actual physical thing that would prevent a USB drive from being corrected. That's how Qorvo was set up at the time.

Q.   But prior to 2019, there was a policy that employees should -- in general, should not use USB drives?

A.   I don't know if it was a formal policy or a practice, but Qorvo's chief information security officer explained that they allowed USB drives, and they were used for approved business reasons.

     They gave an example of if you had to move data from a computer to a separate test computer that wasn't on the network, that's where you would need a USB drive to get that data over to the computer because you couldn't just e-mail it.  And for those reasons, Qorvo employees were

14:42:57 1  allowed to use USB drives for approved business reasons,

14:43:00 2  which was pretty consistent with the rest of business

14:43:03 3  environments in 2015 to 2018 or '19.

14:43:09 4  **Q.**    So, in general, you're not supposed to use USB

14:43:14 5  drives, but there were specific reasons that if you

14:43:16 6  obtained approval for, you could use USB drives?

14:43:20 7  **A.**    Well, yeah, I mean, Qorvo's -- all of their existing

14:43:24 8  policies and confidentiality agreements say that you can

14:43:26 9  only use Qorvo business information for approved business

14:43:30 10  purposes, and that extends to if that information was on

14:43:33 11  USB drives.

14:43:34 12  **Q.**    Okay.  So back in 2005 to 2008 before the physical

14:43:40 13  block was instituted, USB drives were small at that time

14:43:46 14  also, right?

14:43:47 15  **A.**    I think I said 2005 earlier; I meant two thousand --

14:43:49 16  well, it depends.  2015 is when Qorvo --

14:43:54 17  **Q.**    I'm sorry, two thousand --

14:43:54 18  **A.**    -- not 2005.

14:43:54 19  **Q.**    Sorry.  2015.  You're right.

14:43:57 20  **A.**    Could you repeat the question?

14:43:58 21  **Q.**    Back in 2015 to 2018, the USB drives were small at

14:44:03 22  that time already, right?

14:44:05 23  **A.**    Some were.  I mean, it depends.  I mean, they're

14:44:09 24  about a finger in size; I guess some could be smaller.  It

14:44:12 25  just depends.

**Q.**   So Qorvo knew back in 2015 that USB drives could go anywhere, but didn't actually block the use of USB drives until 2019; is that right?

**A.**   So part of information security is mitigating risks, so Qorvo knew that there was a risk with USB drives, but they allowed it because there were proper business reasons for employees to use those in conducting their work.

**Q.**   But that's only with approval, right?

**A.**   Yes.

**Q.**   Before 2019, even without approval, employees were capable of using USB drives against the Qorvo policy at that time -- right? -- because there was no block?

**A.**   You might -- there's a distinction between you're approved to use USB drives as long as it's for business purposes, versus later where they said, "We're not allowing USB drives unless you have a specific exception, you've asked somebody, they say, 'Okay, fine, you can use this drive to transfer data.'"

So that happened in the 2018 time frame, but I don't know what your question relates to.

**Q.**   My question relates to the 2015 to the 2019 time frame before the block was instituted.

**A.**   Okay.

**Q.**   In that time frame, a Qorvo employee could, without permission, use a USB drive to transfer information out of

*Robinson - Cross*

1   Qorvo computer?

2   **A.**   Well, I mean, that's the challenge with employees --

3   **Q.**   Is that a "yes"?

4   **A.**   -- an employee can do anything --

5   **Q.**   They can use -- they were capable of doing that

6   because there was no block?

7   **A.**   Well, as I saying, I mean, that's the challenge of

8   employees.  Employees can do anything if they are going to

9   take bad intentions and not follow their agreements or

10  follow the policies, they could copy data to USBs even

11  though they're only supposed to do it for business

12  purposes.

13  **Q.**   But Qorvo knew that back in 2015 -- I mean, that's

14  not a new thing that Qorvo understood only in 2019, right?

15  Qorvo knew that in 2015, but they didn't institute the

16  block until 2019, right?

17  **A.**   So that's -- many companies were in the same

18  situation then and still today, where they allow employees

19  to use USB drives and don't block it.  They are accepting

20  the risk, but they are hoping and relying on their

21  security controls like employee confidentiality

22  agreements, monitoring, and other things, to still --

23  reduce that risk, but still allow the employees to use

24  those types of devices for work purposes.  It's just a

25  risk that they accepted during that time.  And it's

1  similar to how many, many other companies accepted that

2  same risk.

3  **Q.**   So earlier, you said that when RFMD and TriQuint came

4  together to form Qorvo, one of its top priorities was to

5  protect intellectual property and confidential

6  information.  That was back in 2015.  And despite that,

7  Qorvo was okay with the risk?

8  **A.**   They had -- that was a prior to their information

9  security program.  That was per Todd Martin, the current

10  CIO.  Mr. Boyd echoed that that's still one of their main

11  objectives today.  They -- it's a balance of, they need

12  access to the data, they need to perform their duties, but

13  then there's a trade-off of, you know, accepting some

14  risks and using other security controls to help protect

15  confidential information.

16  **Q.**   Who is Josh Adams?

17  **A.**   I don't know if I know who Josh Adams is.

18  **Q.**   One of the categories that you assessed on your list

19  of ten mentioned audits.  Does that refresh your memory as

20  to who is Josh Adams?

21  **A.**   No.

22  **Q.**   Okay.  Well, we can go on.

23       Audits and testing help determine the effectiveness

24  of existing security controls, right?

25  **A.**   Yes.

*Robinson - Cross*

**Q.**   And they help identify potential gaps in existing security controls that should be addressed, right?

**A.**   Should or could be addressed.

**Q.**   And reasonable security efforts require auditing information security policies every now and then, right?

**A.**   I wouldn't say it requires it.  If you conduct audits and testing, that's a sign of having reasonable security measures.  I don't know if it's absolutely required; it would depend on the circumstances.

**Q.**   So you are aware that there is an employee at Qorvo who is in charge of internal audits, right?

**A.**   Yes.

**Q.**   Okay.  So here's the spoiler.  Spoiler alert.  It's Josh Adams.

And Josh Adams, as the person in charge of internal audits, he comes up with an audit plan that includes aspects of Qorvo's business that will be tested each year for the yearly audit, right?

**A.**   Yes.

**Q.**   When you prepared your report, you didn't review any Qorvo audit plan, right?

**A.**   I reviewed reports to Qorvo's audit committee on their board of directors, so summaries or information about audits that had been conducted.

**Q.**   And you are not aware of any audit plan that included

14:50:22  1    analysis of Qorvo's procedures for handling the computers

14:50:25  2    used by terminated employees, right?

14:50:31  3    **A.**    I don't recall if that was listed in one of the

14:50:34  4    documents I reviewed.  I don't know.

14:50:37  5    **Q.**    So during the depo, do you remember you had described

14:50:39  6    that as a niche -- a "niche request," and that you had not

14:50:45  7    seen any audit plans or audit plan reports that analyzed

14:50:53  8    computers -- handling of computers used by terminated

14:50:56  9    employees?

14:50:59  10   **A.**    Yeah.  I think what I believe I was referring to

14:51:02  11   there is, like, those specific words, I don't know if

14:51:05  12   those would show up versus a more general description in

14:51:08  13   the types of documents that I reviewed.

14:51:14  14   **Q.**    So is it still your opinion that Qorvo took

14:51:19  15   reasonable efforts to keep its confidential and alleged

14:51:23  16   trade secret information confidential?

14:51:25  17   **A.**    Yes.

14:51:26  18   **Q.**    Okay.  Despite not speaking to anyone in legal about

14:51:30  19   classification and labeling?

14:51:36  20   **A.**    I mean, I reviewed the different policies and

14:51:38  21   documents and interviewed other Qorvo employees, so I

14:51:41  22   didn't feel it was necessary.

14:51:44  23   **Q.**    Sitting here today, do you know whether employees at

14:51:50  24   Qorvo understand those policies?

14:51:55  25   **A.**    Well, employees, that's -- again, the very dynamic,

*Robinson - Cross*

1    and it's a challenging aspect of business -- you can't

2    profile an employee to know which ones are going to act

3    with bad intentions.  You can issue clear policies, you

4    can train them, you can have them review their agreements

5    and remind them on their way out.

6        You can't -- as a business, you can't get inside

7    their head and know exactly what they think.  And you

8    can't monitor the heck out of them where you're invading

9    their privacy and recording their every move or keystroke.

10   It's that balance of accepting risk and putting in proper

11   security controls.

12   **Q.**   That's not my question, though.

13       In preparing your report, you did not try to assess

14   whether the policies were clear to employees, right?

15   **A.**   I read the policies and found them to be clear

16   myself.

17   **Q.**   Okay.  And you are an information security expert; is

18   that right?

19   **A.**   Yes.

20   **Q.**   And it was clear to you, as an expert?

21   **A.**   No.  It was clear to me as, is this clear, concise?

22   Is this something that's understandable, this policy or

23   this information?  It wasn't, is it clear to an

24   information security expert.

25   **Q.**   But you never actually talked to any employees to

14:53:16  1    determine whether they could understand the policies?

14:53:21  2    **A.**   No.   I had the policies themselves.   I could just

14:53:23  3    read the policies.

14:53:25  4    **Q.**   Okay.

14:53:27  5         Thank you.

14:53:27  6              **MS. SMITH:**   No further questions.

14:53:29  7              **THE COURT:**   Redirect.

14:53:33  8              **MR. NAQVI:**   Just two questions, Mr. Robinson.

14:53:34  9                        REDIRECT EXAMINATION

14:53:35 10    **BY MR. NAQVI:**

14:53:35 11    **Q.**   Can you give the jury a sense of the volume of

14:53:38 12    documents that are posted on Qorvo's website?

14:53:41 13    **A.**   So I reviewed their website, and they have thousands

14:53:44 14    of documents, product spec sheets, marketing materials,

14:53:48 15    other things that potential customers or website browser

14:53:52 16    would want to read.   So at least thousands.   I don't know

14:53:55 17    if it is quite up to tens of thousands.   It might cross

14:53:58 18    over to that.

14:53:59 19    **Q.**   To your understanding, were any of the Qorvo trade

14:54:01 20    secrets at issue in this case ever posted on Qorvo's

14:54:04 21    website or otherwise made publicly available?

14:54:06 22    **A.**   No.

14:54:07 23              **MR. NAQVI:**   No further questions.

14:54:10 24              **THE COURT:**   All right.   Well, thank you very

14:54:11 25    much.   We will let you step down.

14:54:13  1          And I will ask who our next witness is going to

14:54:16  2     be.  Who will our next witness be?

14:54:18  3          **MR. TIGAN:**  Your Honor, Qorvo calls

14:54:19  4     Dr. Heinrich as its next witness.

14:54:21  5          **THE COURT:**  All right.  Take a step up here to

14:54:31  6     the witness stand, and the clerk will swear you in.

14:54:36  7          **THE CLERK:**  Please state and spell your name

14:54:38  8     for the record.

14:54:38  9          **THE WITNESS:**  My name is Helge Heinrich,

14:54:39 10     H-E-L-G-E, H-E-I-N-R-I-C-H.

14:54:45 11          **THE CLERK:**  Please remain standing and raise

14:54:45 12     your right hand.

14:54:45 13        HELGE HEINRICH, having been called as a witness,

14:54:45 14     being first duly sworn under oath or affirmed, testified

14:54:45 15     as follows:

14:54:45 16

14:54:57 17          **THE COURT:**  Counsel may proceed.

14:55:06 18          Please have a seat.

14:55:06 19                    DIRECT EXAMINATION

14:55:07 20     **BY MR. TIGAN:**

14:55:08 21     **Q.**  Good afternoon, Dr. Heinrich.  Thank you for being

14:55:09 22     here.

14:55:10 23        Could you please introduce yourself to the jury.

14:55:13 24     **A.**  Good afternoon.  My name is Helge Heinrich, and I'm a

14:55:15 25     research scientist at the University of Virginia.

14:55:18 1   **Q.**   And what do you do as a research scientist at the

14:55:21 2   University of Virginia?

14:55:22 3   **A.**   My main research topics is dealing with materials

14:55:27 4   that need to be studied in electron microscopy.

14:55:32 5   **Q.**   And in simple terms, what is electron microscopy?

14:55:35 6   **A.**   I use a very fine electron beam that I scan over

14:55:40 7   materials and get the scattered signal back to figure out

14:55:44 8   what is in the materials or composition materials,

14:55:48 9   elements, or also looking at structures of materials.

14:55:53 10  **Q.**   And in preparation for your testimony today, did you

14:55:56 11  help prepare some slides?

14:55:58 12  **A.**   Yes, I did.

14:55:58 13         **MR. TIGAN:**   Could we put PDX-9.1 up on the

14:56:03 14  screen, please.

14:56:03 15  **BY MR. TIGAN:**

14:56:04 16  **Q.**   And, Dr. Heinrich, can you start telling us just a

14:56:06 17  little bit about your educational background?

14:56:08 18  **A.**   Yes.  I got an equivalent of a master's degree.  It's

14:56:11 19  called a "diploma" in Germany, in 1990 from the University

14:56:19 20  of Braunschweig, Technical University of Braunschweig.

14:56:19 21         And then, in 1994, I got a PhD in physics from Swiss

14:56:24 22  Federal Institute of Technology Zurich, in Switzerland.

14:56:29 23  **Q.**   And after you obtained your PhD, what did you do for

14:56:33 24  work?

14:56:33 25  **A.**   I stayed another nine years the Zurich for postdoc.

*Heinrich - Direct*

1    And then as lecturer and research scientist to study

2    materials, most electron microscopy.

3    **Q.**   What was your next position?

4    **A.**   My next position was a faculty position at University

5    of Central Florida.  I stayed there from 2003 to 2015

6    teaching courses in material science, physics, and

7    mechanical and aerospace engineering, including also

8    courses in electron microscopy.

9    **Q.**   And after Florida, what was your position?

10   **A.**   Next position is my current position as research

11   scientist at the Technical University of Virginia, where

12   I'm responsible for electron microscopy maintenance, for

13   training users in electron microscopes, and providing

14   services for customers.

15       I'm also teaching a course on electron microscopy.

16   My students have right now at this time their final.

17   **Q.**   Lucky them.

18       Are you the author of any publications in your field,

19   Doctor?

20   **A.**   Yes.  I have published -- sorry -- published 95

21   publications that are peer-reviewed, and have also

22   authored two book chapters on electron microscopy.

23   **Q.**   And were you retained by Qorvo as a technical expert

24   in this case?

25   **A.**   Yes, I was.

14:57:55 1    **Q.**    What was your assignment?

14:57:57 2    **A.**    I was assigned to prepare cross-sections of accused

14:58:01 3    products and study them in electron microscopy.

14:58:05 4    **Q.**    Okay.  You just used the term "cross-section."  The

14:58:07 5    jury may have an idea, but could you tell us what that

14:58:11 6    means in your field?

14:58:12 7    **A.**    Yes.  Imagine you have a piece of cake, nice round

14:58:14 8    piece.

14:58:15 9            **MR. TIGAN:**  And let's go to Slide 9.3.

14:58:16 10   **BY MR. TIGAN:**

14:58:16 11   **Q.**    I think you have an illustration.

14:58:18 12   **A.**    Nice round piece of cake, and you want to know they

14:58:20 13   are layer cakes or they're just homogeneous cake.  Right?

14:58:27 14   So cut it open, slide a piece away and look from the side.

14:58:30 15   And if you have a layer cake, you see something that you

14:58:34 16   can see over there.  You see layers of cakes.  I do that

14:58:38 17   in much smaller scale.  That's what I do in electron

14:58:42 18   microscopy, preparing cross-sections of samples.

14:58:44 19   **Q.**    And is this the type of work that you normally do in

14:58:47 20   your position at the University of Virginia?

14:58:50 21   **A.**    I do a lot of that.

14:58:51 22   **Q.**    Just ballpark, about how many times have you analyzed

14:58:53 23   the cross-section of a semiconductor?

14:58:56 24   **A.**    About a thousand times.

14:58:59 25           **MR. TIGAN:**  Your Honor, Qorvo offers

1    Dr. Heinrich as an expert in the area of electron

2    microscopy and the preparation of microscopic

3    cross-sections.

4            **THE COURT:**  Voir dire?  Any voir dire?

5            **MS. SMITH:**  No, Your Honor.

6            **THE COURT:**  He is accepted as a person who can

7    render an opinions, that is, he is an expert in the area

8    designated.

9            Counsel, you may proceed.

10           **MR. TIGAN:**  Thank you, Your Honor.

11    **BY MR. TIGAN:**

12    **Q.**    Doctor, were you provided with samples of the

13    Akoustis products at issue in this case?

14    **A.**    Yes, I was.

15    **Q.**    Just in general, how did you receive those samples?

16    **A.**    I got two shipments of samples in bags, individual

17    samples were important, shipments in a bag.  I got one

18    shipment from RFMW, that's a distributer, and I got a

19    second shipment from Akoustis directly.

20    **Q.**    Okay.

21            **MR. TIGAN:**  Let's put 9.4 on the screen,

22    please.

23    **BY MR. TIGAN:**

24    **Q.**    And is this a chart you prepared, Doctor?

25    **A.**    Yes, that is.  Yes.

**Q.**   And just at a high-level still, what does the chart
show us?

**A.**   It shows us which samples I received and which
samples I analyzed.  And all together, there are
19 accused samples.  And in the first column, you see the
name of the samples by Akoustis, then the sample number as
they came in the bags, in the third column.

And the fourth column says, "Samples" on top.  You
can see I received first -- in Row 1, I received ten
samples from Akoustis and ten samples from RFMW.

You go down the list there to see what it is.  And
then I prepared the cross-section, made a report, and you
can see what appendices each report is in.

**Q.**   Okay.  How many samples of each Akoustis product did
you analyze?

**A.**   Typically, one sample from each product.
Occasionally I did more.

**Q.**   Okay.  And is analyzing one sample of each product
sufficient to form conclusions?

**A.**   Yes.  Sample thickness, layer thicknesses of each
resonators and each device should be very, very similar
because of manufacturing tolerances.

**Q.**   And, essentially, your analysis was conducting these
cross-sections, right?

**A.**   Yes.

**Q.**   Okay.

**A.**   They were all cross-section.

**Q.**   And did you follow your normal process for taking

cross-section that you use as part of your research day to

day?

**A.**   Yes.

**Q.**   Okay.  We'll talk about those in just a moment, but

let me just confirm, did you record your results --

**A.**   Yes, I did.

**Q.**   -- as you took those?

        **MR. TIGAN:**  Your Honor, may I approach?

        **THE COURT:**  You may.

        **THE WITNESS:**  You have a lot of stuff here

that's not mine.

**BY MR. TIGAN:**

**Q.**   We will clear that out.  I apologize.

    Doctor, you have in front of you a document the

parties have marked as PTX-999.

    Do you recognize that document?

**A.**   Yes, I do.

**Q.**   And, generally speaking, what is it?

**A.**   This is the report I prepared about the different

devices.

        **MR. TIGAN:**  Your Honor, I move for the

admission of PTX-999 into evidence, please.

15:02:13 1         **THE COURT:**  Marked and received as 237.

15:02:16 2              (Trial Exhibit No. 237 was admitted into

15:02:16 3    evidence.)

15:02:16 4    **BY MR. TIGAN:**

15:02:17 5    **Q.**   Doctor, just so we have a clear record, I want to go

15:02:21 6    through this exhibit very briefly so we know what it

15:02:24 7    contains.

15:02:25 8         Can you turn to Appendix C, please?

15:02:27 9    **A.**   Yes, I can.

15:02:29 10   **Q.**   What is Appendix C?

15:02:31 11   **A.**   Appendix C is my report on are resonator, AKF-1252.

15:02:38 12   **Q.**   What about Appendix D?

15:02:39 13   **A.**   That is my report on resonator AKF-1938.

15:02:43 14   **Q.**   Appendix E?

15:02:45 15   **A.**   AKF-1256.

15:02:47 16   **Q.**   Appendix F?

15:02:51 17   **A.**   Which, sorry?

15:02:53 18   **Q.**   F as in Frank.

15:02:53 19   **A.**   Is the report on sample A10149.

15:03:00 20   **Q.**   Appendix G?

15:03:02 21   **A.**   My report on A10154.

15:03:06 22   **Q.**   Appendix H?

15:03:09 23   **A.**   My report on resonator A10155.

15:03:14 24   **Q.**   Appendix I?

15:03:19 25   **A.**   My report on A10156.

15:03:23  1    **Q.**   Appendix J?

15:03:25  2    **A.**   That is A10158.

15:03:29  3    **Q.**   Appendix L?

15:03:32  4    **A.**   That is my report on sample A10165.

15:03:37  5    **Q.**   Appendix M.

15:03:39  6    **A.**   My report on A10166.

15:03:42  7    **Q.**   Appendix N?

15:03:44  8    **A.**   My report on sample A10235.

15:03:48  9    **Q.**   Appendix O?

15:03:51 10    **A.**   A10252 report.

15:03:54 11    **Q.**   Appendix P -- we're almost there?

15:03:57 12    **A.**   That's my report on A10256.

15:04:01 13    **Q.**   Appendix Q?

15:04:03 14    **A.**   That's my resonator report on A10266.

15:04:07 15    **Q.**   Appendix R?

15:04:09 16    **A.**   That's my report on A10335.

15:04:13 17    **Q.**   Appendix S?

15:04:15 18    **A.**   That's my report on AKF-1252.

15:04:19 19    **Q.**   Appendix U?

15:04:20 20    **A.**   That's my report on AKF1336.

15:04:25 21    **Q.**   Appendix V?

15:04:28 22    **A.**   That's my report on the AKF-1938.

15:04:32 23    **Q.**   And what is Appendix W?

15:04:35 24    **A.**   These are additional slides that I prepared that are

15:04:39 25    not part of -- of the other.

15:04:45  1   **Q.**   Is that just a collection of the testing?

15:04:47  2   **A.**   Yes.  The whole collection of it.

15:04:50  3   **Q.**   Obviously, we are not going through all of these.

15:04:53  4   **A.**   Right.

15:04:53  5   **Q.**   But let's go through one example so the jury

15:04:55  6   understands what you did.

15:04:56  7   **A.**   Yes.

15:04:56  8   **Q.**   Can you turn to Appendix E.

15:04:59  9   **A.**   Okay.  I'm there.

15:05:00  10  **Q.**   And just to confirm, did you prepare the

15:05:02  11  cross-sectional images in Appendix E?

15:05:06  12  **A.**   Yes.  I did that, and among others too.

15:05:09  13           **MR. TIGAN:**  Let's put slide PDX-9.5.

15:05:11  14  **BY MR. TIGAN:**

15:05:11  15  **Q.**   And I'd like you to walk us through the steps you

15:05:13  16  took to test these samples.

15:05:15  17  **A.**   Yes.

15:05:16  18           **MR. TIGAN:**  Let's switch over to that real

15:05:18  19  quick.

15:05:19  20  **BY MR. TIGAN:**

15:05:22  21  **Q.**   While we're pulling that up, what was the first step

15:05:25  22  in analyzing a sample?  What did you do?

15:05:29  23  **A.**   When I received the samples, I took them out of the

15:05:31  24  bag, and I had to open up the housing or the packaging of

15:05:39  25  the device.  This whole device is about a 16th of an inch

in size.  You see the schematic on the left side there.

And I had to cut the packaging open to get the real device out, and I had a little micro saw that is a very small, very fine circular saw here that turns very slowly.  And in about 15, 20 minutes I can get the real device out of it.

MR. TIGAN:  Let's turn to the next slide, 9.6.

BY MR. TIGAN:

Q.  Here, you have Step Number 2.  What does that entail?

A.  So what you see on the right side is the system that I used for sample preparation prior to sample preparation imaging.  This is a scanning electron microscope with some students in front of it, not on the sample, obviously.  But on the left side, you see a scanning electromicrograph or image of -- top view of one of the resonators, and that was AKF1256 here.

MR. TIGAN:  Okay.  Let's go to the next slide.

BY MR. TIGAN:

Q.  And I would like to ask you what Step 3 is.

A.  Yes.  So this scanning electron microscope is also equipped with ion beam that I use to remove material from the surfaces.  What you see on these labeled micrograph on the left side is this resonator we named LR6.  You see this little oval that is magnified there, and you see this little slightly tilted line there.  This is micro section,

15:07:13  1    but I'm still viewing it from top.  And above these two

15:07:17  2    rectangles that you see there above and below, these are

15:07:20  3    the material that I removed from the sample during the

15:07:24  4    cross-section preparation.

15:07:26  5    **Q.**   Okay.

15:07:27  6            **MR. TIGAN:**  Let's go to the next slide, 9.8.

15:07:30  7    **BY MR. TIGAN:**

15:07:30  8    **Q.**   And I believe this is Step 4.  Can you walk us

15:07:33  9    through what you've put on here?

15:07:34 10   **A.**   Yes.  So there you are seeing me putting the sample

15:07:39 11   into my transmission electron microscope.  And I analyzed

15:07:44 12   the cross-sections of these materials.  You see -- on top

15:07:48 13   left, you see an image of whole cross-section that I

15:07:53 14   prepared.  It looks a little bit like a piece of bacon,

15:07:56 15   but you have to imagine this piece of bacon being about

15:08:00 16   5,000 times smaller in every direction, so in thickness,

15:08:04 17   length, and width, right?  And in the bottom view you see

15:08:08 18   a cross-section view of the same sample that is just at

15:08:12 19   higher magnification with some calibrated thickness

15:08:18 20   measurements that I did.

15:08:19 21           **MR. TIGAN:**  And if we can remove that blow-out.

15:08:22 22   **BY MR. TIGAN:**

15:08:22 23   **Q.**   I just want to confirm that, on the top left, is that

15:08:24 24   an entire resonator cross-section?

15:08:27 25   **A.**   That's a cross-section across the entire resonator,

1    yes.

2    **Q.**   And like I said, we won't go through all of these,

3    but just to confirm, did you perform these same steps for

4    all of the cross-sections that you go through in the

5    appendixes?

6    **A.**   Yes.

7    **Q.**   One last question for you.  We're going to wrap up

8    quickly.  Could you characterize the margin of error for

9    your measurements here?

10   **A.**   Yes.  My margin of error of the calibrations of the

11   microscope is about 1 to 2 percent.

12   **Q.**   Okay.  That's all the questions I have for now?

13               **MR. TIGAN:**   I pass the witness, Your Honor.

14               **THE COURT:**   Cross-examination.

15                       CROSS EXAMINATION

16   **BY MS. SMITH:**

17   **Q.**   Good afternoon, Dr. Heinrich.  How are you?

18   **A.**   Good afternoon.  Thank you.

19   **Q.**   You testified that you were provided with samples of

20   19 different Akoustis products, right?

21   **A.**   Correct, yes.

22   **Q.**   And you received multiple samples for each of the

23   products?

24   **A.**   Correct.

25   **Q.**   You tested only one sample of each product?

*Heinrich - Cross*

**A.**   I tested, occasionally, several samples of the same product.

**Q.**   When you say you tested multiple samples of the same product, were the -- when you said, "tested," do you mean you actually dismantled them, you sliced them open, and then you also measured the --

**A.**   Correct.  Yes.  "Testing" is not the right term, but I measured the thick -- cross-sectional thickness of the different layers.

**Q.**   Okay.  Did you provide the results of all of those multiple testings as part of your report?

**A.**   Yes.

**Q.**   Okay.  Of the same product?

**A.**   Yes.

**Q.**   Okay.  When you tested -- when you tested multiple samples for the same product, did you find that the measurements came out different in each of the samples?

**A.**   No.  Typically, when I tested the multiple samples, I actually looked at different resonator -- these oval things that you see in the SEM module, perhaps that I showed there before, I tested multiple resonators.  They may have different dimensions laterally, but the thicknesses are essentially the same.

**Q.**   They are not identical?

**A.**   Not all the resonators are identical, correct.  Some

15:10:48  1    of them are.

15:10:49  2    **Q.**   Some of them were identical?

15:10:51  3    **A.**   Yes.

15:10:52  4    **Q.**   But not all of them were?

15:10:53  5    **A.**   In dimensions they are; some of them are identical,

15:10:56  6    yes.

15:10:58  7    **Q.**   Oh, I'm referring to the measurements you took?

15:11:00  8    **A.**   Oh, the thicknesses?

15:11:01  9    **Q.**   The thickness.

15:11:02 10    **A.**   Yeah.  They're pretty much the same; within my error

15:11:05 11    bars, they are the same.

15:11:09 12    **Q.**   Okay.  Let's take a look at one of the samples you

15:11:12 13    took.

15:11:12 14          **MS. SMITH:**  May I have PTX-999, Page 133,

15:11:17 15    please.

15:11:24 16    **BY MS. SMITH:**

15:11:24 17    **Q.**   This is the results for the A10154.

15:11:30 18    **A.**   Uh-huh.

15:11:33 19          **MS. SMITH:**  Let's go to Page 137, please.

15:11:36 20    **BY MS. SMITH:**

15:11:37 21    **Q.**   This is one of the cross-section concluded in

15:11:40 22    appendix G, right?

15:11:41 23    **A.**   Yes.

15:11:43 24    **Q.**   Can you explain what these green lines represent?

15:11:46 25    **A.**   The green lines represent the lines that I drew after

1    imaging to measure the thicknesses of the different layers

2    in certain locations.

3    **Q.**    When you say, "I drew," what do you mean?

4    **A.**    I acquired the images, and then I can post-process

5    them by drawing lines from the bottom of a layer to the

6    top of a layer, and that indicates to me the thickness at

7    I use.

8    **Q.**    How did you draw those lines?

9    **A.**    With a computer cursor mouse.

10    **Q.**    With a mouse, so with your hand, basically?

11    **A.**    Yeah.  An automatic tool to do that.

12    **Q.**    So you manually picked -- for each of these

13    measurements, you manually picked the two points --

14    **A.**    Yeah.

15    **Q.**    -- and then the computer --

16    **A.**    Correct.

17    **Q.**    -- would generate a line connecting the two points --

18    **A.**    Correct.

19    **Q.**    -- and give you the distance, the thickness; is that

20    right?

21    **A.**    Correct.

22    **Q.**    Okay.  So someone else with the same expertise as you

23    might pick different points and get different results,

24    right?

25    **A.**    They may be slightly different; within probably

*Heinrich - Cross*

1 nanometer, they would be the same.

**Q.**    Okay.  So let's take a look at the measurement all

the way to the right, 53.35 nanometers.  That pair of

points that you chose, that you manually selected, they

resulted in a line that is not completely vertical; is

that right?

**A.**    Yes.

**Q.**    Okay.

**A.**    I had a bad drawing there.

**Q.**    Well, it's just connecting the two points that you

manually selected?

**A.**    Yes.

**Q.**    So if you picked a different pair of points and made

this actually vertical instead of angled like this, the

result would be different, right?

**A.**    It would be marginally different maybe on the last

digits, because it is only two or three pixels to the

side.  So at this magnification, I have typically a larger

magnification where I have more pixels to measure actual

length.  Each pixel here is probably half a nanometer

anyway.  So if I'm going at bigger, higher magnification,

I can get more pixels and get more accuracy.

**Q.**    But they would be different?

**A.**    Slightly different, but those measurements are within

my errors.

**Q.**    Okay.

                    **MS. SMITH:**  No further questions.

                    **THE COURT:**  Redirect.

                    **MR. TIGAN:**  Nothing on redirect, Your Honor.

                    **THE COURT:**  All right.  Well, thank you very

much.  You may step down.

                    Who will our next witness be?

                    **THE WITNESS:**  Should I bring everything with

me?

                    **THE COURT:**  You better leave it there.

                    **MR. TIGAN:**  Your Honor, may I come up and clear

some of that off?

                    **THE COURT:**  Sure.  That's fine.

                    **MR. MASTERS:**  Your Honor, plaintiffs call next

Dr. Bravman.

                    **THE COURT:**  All right.  You can come forward.

                    Walk to the witness stand, then, of course, you

will be sworn in by the clerk.

                    **THE CLERK:**  Please state and spell your name

for the record.

                    **THE WITNESS:**  John, J-O-H-N, Bravman, B like

boy, R-A-V, like Victor, M-A-N.

                    **THE CLERK:**  Please remain standing and raise

your right hand.

1      JOHN BRAVMAN, having been called as a witness, being

2    first duly sworn under oath or affirmed, testified as

3    follows:

4                    DIRECT EXAMINATION

5          **THE COURT:**  Counsel may proceed.

6          **MR. MASTERS:**  Thank you, Your Honor.

7    **BY MR. MASTERS:**

8    **Q.**   Good afternoon.  Would you briefly introduce yourself

9    to the jury?

10   **A.**   My name is John Bravman.  I am a career academic

11   scientist.  I grew up in New York City, spent 35 years at

12   Stanford University.  In 2010, moved to Pennsylvania,

13   where I joined Bucknell University as the 17th president

14   and professor of electrical engineering.

15         Where do you currently reside?

16   **A.**   Lewisburg, Pennsylvania.

17   **Q.**   And where is Lewisburg?

18   **A.**   It's 40 miles east of State College, Penn State, an

19   hour and ten minutes north of Harrisburg.

20   **Q.**   Okay.  Have you prepared a set of slides to assist

21   the jury in understanding your testimony?

22   **A.**   Yes, I have.

23         **MR. MASTERS:**  Mr. Faison, would you please

24   project PDX-10.1.

25

*Bravman - Direct*

BY MR. MASTERS:

Q.    So in addition to serving as the president of the
university, have you also taught classes?

A.    Yes.  As I indicated, I am a career academic.  I was
very fortunate to not only receive my education at
Stanford, but to stay there for 26 years on the faculty
where I taught classes in material science, electrical
engineering, and related fields.  I graduated 26 doctoral
students who worked for me at Stanford.  And I also did a
number of administrative jobs at the university, and I've
served my professional field through service in a number
of organizations.

Q.    Have you received any awards for teaching?

A.    Yes, I received eight teaching awards in my career.
I'm very proud of that.

Q.    And are you a member of any professional
associations?

A.    Yes.  Many of them are listed there.  In 1994, in
fact, I was the president of the Materials Research
Society, but all of these professional societies I remain
a member of to this day.

Q.    And can you explain to the jury some of the roles you
have had as a consultant?

A.    I've done technical consulting for about 30 years
now, and of late, that's been predominantly in these kind

1    of matters, patent infringement or intellectual property.

2    But I've also consulted for United States government at

3    Los Alamos National Laboratory and Sandia National

4    Laboratory with regard to their materials programs with

5    regard to national security.

6    **Q.**   And can we go back, and could you explain to the jury

7    your educational background?

8    **A.**   Yes.  I went to Stanford, as I said, in 1975.  I

9    received my bachelors, master of science, and, ultimately,

10   my PhD, all in material science and engineering at the

11   university.

12       The kind of work I did for my doctoral degree was

13   very similar to what you heard just a moment ago,

14   actually, developed techniques to do cross-section

15   electron microscopy before some of the sophisticated tools

16   that you just heard about were available.

17   **Q.**   And can you explain to the jury your work experience?

18   **A.**   I worked at Fairchild Semiconductor in their

19   materials analysis laboratory for the entire time I was

20   pursuing my doctoral degree from 1979 to 1984, and it was

21   a laboratory that, again, did the kind of work that you

22   just heard about with electron microscopes, optical

23   microscopes, Auger electron microscopy and other tools.

24   A-U-G-E-R.

25   **Q.**   And what was your next position?

**A.**   I then joined the faculty as Stanford as an assistant professor.  I earned tenure in six years later, six and a half years later, a process one never forgets, was then eventually promoted to full professor at Stanford and then later a chaired professor.

**Q.**   And then after Stanford University, where did you end up?

**A.**   In Lewisburg as president and professor at Bucknell University.

**Q.**   And that's where you sit today as president of Bucknell University?

**A.**   Yes.

**Q.**   Have you published?

**A.**   Yes.  My CV lists my publications.  I think it's on the order of 160 or so publications.

**Q.**   And have you served as an expert before in patent infringement cases?

**A.**   Yes, in many.  On the order of 70.

**Q.**   Okay.  And have you been qualified as an expert in patent infringement cases?

**A.**   In Federal Court and in ITC, yes, many times.

              **MR. MASTERS:**  Your Honor, based on the witness' education, training, and experience, Qorvo offers Dr. Bravman as an expert in the area of semiconductor materials and structures analysis and processing,

including microelectromechanical systems.

        **THE COURT:**  Any voir dire?

        **MR. LEMIEUX:**  No objection from the defendants, Your Honor.

        **THE COURT:**  He is received as a person who may express an opinion, that as an expert in the areas designated.

        Counsel may proceed.

**BY MR. MASTERS:**

**Q.**  Dr. Bravman, were you retained as a technical expert for Qorvo in this case?

**A.**  Yes.

**Q.**  Approximately when?

**A.**  I believe it was in the winter of 2022.

**Q.**  And can you explain to the jury what your assignment was?

**A.**  Yes.  If we can go to the next page, please, I have summarized that.

    I was asked to consider the asserted claims in two patents at issue in this matter.  So I reviewed those patents, and especially in light of the Court's claim construction order where the Court gives guidance or instruction to all the parties about what certain terms or phrases mean.

    I reviewed the structure of the certain 19 Akoustis

*Bravman - Direct*

1    BAW filter devices that you've heard about.  I've also

2    reviewed the work that you heard about just before me and

3    earlier today from Dr. Shanfield.

4         **MR. MASTERS:**  Your Honor, may I approach?

5         **THE COURT:**  You may.

6    **BY MR. MASTERS:**

7    **Q.**  Dr. Bravman, I've handed you what is both the '755

8    patent, which is has been mark as PTX-1716 and tendered as

9    Trial Exhibit 42, and '018 patent, which is PTX-715 and

10   has been entered as Trial Exhibit 229.

11        Starting with, first, the '018 patent, can you give

12   the jury just a high-level summary of the subject matter

13   of this patent?

14   **A.**  This has to do with a certain aspect of a type of BAW

15   filter called FBAR film bulk acoustic resonator.  And it

16   describes certain aspects of how it's constructed, most

17   particularly, with the relative thicknesses of the upper

18   and lower electrode.  And it specifies, most particularly,

19   that the upper electrode should be thinner than the lower

20   electrode to gain benefits in the performance of the

21   device that are also described in the patent.

22   **Q.**  And how about a high-level summary of the '755

23   patent?

24   **A.**  The '755 patent describes a different aspect of BAW

25   filters and specifically talks about both the film, the

*Bravman - Direct*

FBARs, and the solidly-mounted devices.  It talks about
the relative thicknesses -- not absolute values, but
relative thicknesses of a layer that's sort of near the
top of the structure called the passivation layer, and it
specifies that the thickness of that material above the
actual resonator structure that you've seen many times,
that is the structure that comprises the piezoelectric
film and upper and lower electrode, it compares and
specifies that the thickness of the material above that
upper electrode should be different than the thickness of
passivation layer or layers to the adjacent side of it
away from the actual membrane structure itself, or
piezoelectric structure itself.

          **MR. MASTERS:**  Mr. Faison, could we project
PDX-10.3.

**BY MR. MASTERS:**

**Q.**   So, Dr. Bravman, what is illustrated here on
PDX-10.3?

**A.**   Part of my assignment was to assess, based on the
information that was provided by Dr. Shanfield and
Dr. Heinrich, and my own analysis of interpreting the
patents in light of the Court's claim construction,
whether, in my opinion, these 19 devices that you've heard
about actually read on the claims at issue in this patent.

     And my assessment is that with regards to the '018,

*Bravman - Direct*

that 18 of those products do; and with regard to the '755

patent, that all 19 do.

**Q.**   Okay.

And, just generally, did you review technical

information with respect to each of the accused products?

**A.**   Yes.  Three types of technical information were

provided, at least to me, by attorneys from Akoustis.  And

also, as I said, I also reviewed the work of Dr. Heinrich

and Dr. Shanfield.

If you turn the page -- sorry.

**MR. MASTERS:**  May I approach?

**THE COURT:**  You may.

We will take a break in about four or five

minutes.

**MR. MASTERS:**  Great.

**BY MR. MASTERS:**

**Q.**   Dr. Bravman, I've handed you two documents.  The

first one is PTX-0404.

Can you identify this document?

**A.**   This is one of two manuals that I was provided,

labeled XB1 Design Manual, and it's a description, in

part, of how Akoustis designs and manufactures their BAW

filters.

**Q.**   Okay.  And did you rely on PTX-0404 in forming your

opinions?

**A.**   I did.

          **MR. MASTERS:**  Your Honor, I would move for the admission of PTX-0404.

          **THE COURT:**  Marked and received as 238.

          (Trial Exhibit No. 238 was admitted into evidence.)

**BY MR. MASTERS:**

**Q.**   And, Dr. Bravman, you have in front of you PTX-0854.

          Can you identify this exhibit?

**A.**   This is also a document entitled XB1 Design Rule Manual, and it also gives similar descriptions about the design, construction, dimensions, thicknesses, et cetera, of the Akoustis devices.

**Q.**   And did you rely on PTX-0854 in forming your opinions?

**A.**   Yes, I did.

          **MR. MASTERS:**  Your Honor, I move for admission PTX-0854.

          **THE COURT:**  Marked and received as 239.

          (Trial Exhibit No. 239 was admitted into evidence.)

          **MR. MASTERS:**  Mr. Faison, can we project PDX-10.4, please.

**BY MR. MASTERS:**

**Q.**   Mr. Bravman, this slide you have prepared refers to

1    both PTX-0404 that's been marked now as Trial Exhibit 238

2    and PTX-0854, Trial Exhibit 239.

3        Can you explain to the jury what you are illustrating

4    here?

5    **A.**    So, in smaller scale, there's four pages just

6    reproduced, but then one page that I blew out one of the

7    drawings.  And it's a graphic element.  It's a drawing of

8    certain aspects of an Akoustis BAW device, and the color

9    coding helps the reader identify different materials.

10        In this particular case, over roughly the central

11    line of that image, you can see a cavity, and that's why

12    this is a film BAW acoustic resonator.

13        The biggest structures you see are alternatively

14    brown and blue and brown.  The upper-lower brown sections,

15    those are the electrodes.  And the blue section in the

16    middle is the piezoelectric layer.  Here, it's blown up

17    further.  And on top of -- most pertinent for our further

18    discussions, on top of the upper electrode, you see a

19    layer of light blue that continues.  And we will see, and

20    we'll talk about how the thickness of that layer above the

21    upper electrode in the active portion of the device is, in

22    Akoustis' own drawing, clearly thinner than the

23    thicknesses somewhat off to the right, in that kind of

24    well that you'll see.

25        You see further that thicker blue region actually

comprises two layers, which the pertinent patent, when we

get to it, also describes.

**Q.**   And have you prepared a slide with annotations to

illustrate the relevant components of the BAW filter?

**A.**   Yes.  If you go to the next page.

        **MR. MASTERS:**  Rob, can you project PDX-10.5,

please.

        **THE COURT:**  We are going to take that short

break, and we'll come right back.

        Don't discuss the case among yourselves.  Don't

let anybody talk to you about it.  Of course, if anyone

tries to, report it promptly to me.  Keep an open mind.

See you in 15 minutes.

        Thank you very much.

    (The jury exits the courtroom at 3:30 p.m.)

        **THE COURT:**  Everyone take a seat.

        Let our witness -- should be able to step down.

This is our short restroom break.  And we'll be back in

about 12 minutes.  We will start right on time.

        Thank you.

        **THE WITNESS:**  Thank you.

        **THE COURT:**  All right.  I think we're set for

the break.  Anything else we need to know about at this

time?

        **MR. MASTERS:**  Nothing from the plaintiff, Your

1    Honor.

2              **THE COURT:**  All right.  Anything else from the

3    defense?

4              **MR. ELKINS:**  Nothing, Your Honor.

5              **THE COURT:**  All right.  Short break at this

6    time.  Be back certainly within the next 12 minutes.

7         (Whereupon, a recess is taken.)

8              **THE COURT:**  All right.  Everyone can be seated.

9    If the jury is ready, we will go ahead and start.

10        (The jury enters the courtroom at 3:43 p.m.)

11             **THE COURT:**  Everyone can be seated, and counsel

12   may proceed.

13             **MR. MASTERS:**  Thank you, Your Honor.

14   **BY MR. MASTERS:**

15   **Q.**  Dr. Bravman, before the break, we were on PDX-10.5,

16   and I think you were going to explain to the jury your

17   annotations.

18   **A.**  Yes.  So this is just a full-size blow-up of the

19   previous illustration where I've added some labels to some

20   of the important structures that I'm sure you've heard

21   about by now.

22        But in this region here, you can see the

23   piezoelectric layer surrounded by upper and lower

24   electrode and the passivation layer that I was talking

25   about in light blue.

*Bravman - Direct*

You can clearly see in this region here, in Akoustis'

own drawing, that, here, it's depicted on these as thicker

than it is over here.

These drawings are not to scale.  The vertical scale,

and the horizontal scales may be different.  And you saw a

moment ago from one of Dr. Heinrich's cross-sections, at

low magnification, that compared to the thickness of these

films, they're much, much wider than this would have you

believe.  But this is typical engineering illustration

that carries with it information about important aspects

of a device.

**Q.**   And is the information within the XB1 manual that you

considered relevant for all of the accused products?

**A.**   Yes.

          **MR. MASTERS:**  Your Honor, may I approach?

          **THE COURT:**  You may.

          **MR. MASTERS:**  Mr. Faison, can we project

PDX-10.6.

**BY MR. MASTERS:**

**Q.**   Dr. Bravman, I've handed you a collection of

documents.  Can you explain to the jury what -- what those

documents are?

**A.**   So there's a large number of documents here, stapled.

I mentioned that there were three types of information

that I was provided.  One was the design manual, the XB1.

The second type are these data sheets.  And there's one
illustration of a data sheet, pieces of a data sheet, or
sheets, on the screen in front of you.  And this clipped
document here represents all of the documents that are
represented on the far right-hand side of the screen.

So there's one data sheet, or sheets -- one set of
data sheets for each of the products that I was asked to
consider.

**Q.**   And did you rely on these data sheets in forming your
opinions?

**A.**   Yes.

**MR. MASTERS:**  And, for the record, I'd like to
read in the PTX-numbers and to move their admission.
There's 18 of them, Your Honor.

**THE COURT:**  All right.  It will be 18, so you
may read them in, which we will mark them 18 sequentially.

**MR. MASTERS:**  Thank you.

So, for the record, they're PTX-1241, PTX-1248,
PTX-1282, PTX-1256, PTX-1246, PTX-1247, PTX-1281, PTX-1252
PTX-1249, PTX-1263, PTX-1266, PTX-1264, PTX-1255,
PTX-1251, PTX-1250, PTX-1265, PTX-1254, and PTX-1253.

**THE COURT:**  That will take us to 257.

Marked sequentially.

(Trial Exhibit Nos. 240, 241, 242, 243, 244,
245, 246, 247, 248, 249, 250, 251, 252, 253, 254, 255,

256, 257 were admitted into evidence.)

       **MR. MASTERS:**  Thank you, Your Honor.

       **THE COURT:**  Thank you.

**BY MR. MASTERS:**

**Q.**  Did you consider each of these data sheets in forming your opinions?

**A.**  Yes.

       **MR. MASTERS:**  Mr. Faison, can we project PDX-10.7, please.

       And, Your Honor, may I approach?

       **THE COURT:**  You may.

**BY MR. MASTERS:**

**Q.**  Dr. Bravman, I've handed you another stack of documents.  Can you briefly -- or identify these documents for the record?

**A.**  This is a third group or type of information that I was provided to refer to as mask slides.  There's, again, 19 products, so there's 19 sets of pages, one for each of those 19 products.  And they describe other aspects of the accused Akoustis products, how they're laid out, the thicknesses, and elemental identifications of certain layers, et cetera.

    So this is another important document that a company typically would have to describe their product and how it's built.

15:49:04  1          MR. MASTERS:  And, Your Honor, similar to the

15:49:06  2    last collection of documents, I have 19 to move their

15:49:10  3    admission.

15:49:14  4          THE COURT:  Did you have 19, or did you have --

15:49:15  5    I'm sorry.

15:49:17  6          MR. MASTERS:  This time it's 19.

15:49:18  7          THE COURT:  This is an additional 19?

15:49:20  8          MR. MASTERS:  Yes.  I will read those numbers

15:49:22  9    into the record.

15:49:23 10          THE COURT:  Then we're going to mark them.  Go

15:49:24 11    ahead.

15:49:26 12          MR. MASTERS:  PTX-0855, PTX-1257, PTX-0856,

15:49:31 13    PTX-0857, PTX-1261, PTX-1260, PTX-0858, PTX-1262,

15:49:44 14    PTX-0859, PTX-1259, PTX-1258, PTX-0860, PTX-0861,

15:49:57 15    PTX-0405, PTX-0862, PTX-0864, PTX-0406, PTX-0865, and

15:50:08 16    PTX-0866.

15:50:13 17          THE COURT:  That should end on 276 and, of

15:50:18 18    course, we checked that, but that does appear to be the

15:50:21 19    correct number, which you will get a separate number

15:50:24 20    sequentially.

15:50:24 21          (Trial Exhibit Nos. 258, 259, 260, 261, 262,

15:50:24 22    263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 273,

15:50:24 23    274, 275, 275 were admitted into evidence.)

15:50:25 24          MR. MASTERS:  Thank you, Your Honor.

15:50:26 25          THE COURT:  Certainly.

*Bravman - Direct*

BY MR. MASTERS:

**Q.**    Dr. Bravman, with respect to what's illustrated here on PDX-10.7, can you explain to the jury what is shown down at the bottom left-hand corner?

**A.**    So, on the bottom left-hand corner is, effectively, a top-down view of an array of BAW resonator structures, a dozen or more, and you can see they are in a particular spatial relationship to one other.  This is why this might be called a layout pattern or a drawing.

This is at a fairly low magnification compared to some of the things you've been looking at, but you'll recall these are very small devices.  But this is a layout drawing with those resonators illustrated.

**Q.**    And before you discuss the middle one, why don't we go to PDX-10.8, and you can just explain to the jury what this table is showing.

**A.**    So this is just a blow-up of the table that was in the center of the previous page.  And this is part of the recipe, if you will, for how these structures are made.

Depending on the complexity of these types of devices, there may be a few hundred lines, there may be tens of thousands of lines, depending on the structure.

I have here circled a few key elements to highlight based on the matters important here.

We see that, for instance, the bottom electrode is

specified as being 930 angstroms thick.  We've also been

using the measurement term nanometers, a billionth of a

meter.  That is 93 nanometers.

     We see the piezoelectric layer is specified

3400 angstroms, et cetera.  So we see important

information here that are the targets for a manufacturer

to specify when it has designed and locked in a design to

then be implemented in a fabrication facility.

     It also illustrates, in the process step column --

that's the second column over from the left -- it may tell

you about what that material comprises.  It may tell you

what process step is involved.  You've heard about trim,

you've heard about aluminum nitride for the piezoelectric

layer.

     PECVD is plasma enhanced chemical vapor deposition.

That's a technique, for instance, for depositing SIO2

layers.  So this is the kind of information that these

recipes carry forward.

**Q.**    Do each of the accused Akoustis products have stacked

information as illustrated here?

**A.**    Yes.

**Q.**    Have you considered each of those stack information?

**A.**    Yes.

          **MR. MASTERS:**  Mr. Faison, can you project

PDX-10.9.

BY MR. MASTERS:

Q.   Very briefly, Dr. Bravman, did you also consider Dr. Heinrich's cross-section?

A.   Yes.  As I indicated, I also considered and used the information provided by Dr. Shanfield, and Dr. Heinrich. You just saw this.  This is just a summary slide.

Again, I did this kind of work personally starting as a graduate student, and so I'm very familiar with this and how these figures and information is produced.

Q.   Okay.

MR. MASTERS:  And, Mr. Faison, can we project PDX-10.10.

BY MR. MASTERS:

Q.   And did you also rely on Dr. Shanfield's simulations?

A.   Yes.  At the end of Dr. Shanfield's testimony here today, he described his work in doing finite element modeling.  This is a computer-based model involving, in this case, mechanical interactions between various places in a model structure.  And I'll touch on this a little bit more again, but you heard about this at somewhat length this morning from Dr. Shanfield.

This is a standard modeling procedure.  And so this is something that I personally do not do, but I've used throughout my career when done by others.

Q.   Dr. Bravman, let's turn to the '018 patent.

*Bravman - Direct*

MR. MASTERS:  Mr. Faison, can you project

10.11.

BY MR. MASTERS:

Q.   Can you now describe for the jury the '018 patent?

A.   Yes.  So this is the front page of the patent, and

the sort of -- very broadly illustrative cross-sectional

illustration of a FBAR BAW, a film bulk acoustic

resonator.  And you can see the films have numbered

numerals.  I think on the next page --

Do we have a colorized version of this?

MR. MASTERS:  Can we project 10.12.

THE WITNESS:  Yes.

So here's that same diagram where I've added

the key elements that we've been discussing.  The middle

piezoelectric layer, the upper and lower, or bottom and

top electrodes.  There's obviously other structures, too.

And, again, you can see that there's a void or a space

underneath the center region here.  That's what makes this

a film bulk acoustic resonator.

On the left is elements of Claim 1 of the '018

patent that I was asked to analyze.  And we'll see that

all but the very last part of the last claim have to do

with structural elements, structural features of these

devices.  I will touch on those first.

*Bravman - Direct*

BY MR. MASTERS:

**Q.**   So since we have Claim 1 illustrated here on the left-hand side, can you explain to the jury how you went about determining whether the accused Akoustis products are covered by Claim 1.

**A.**   Using all the information I had available, my own analysis of many documents, as well as the information provided by Dr. Shanfield and Dr. Heinrich, and my close read of the patents and other information, and in the other patents case, in light of the Court's clinical, I did the best I could to do a claim-by-claim element comparison to what my understanding is of the structures and how they read or not onto the claim elements, one at a time.

**Q.**   Okay.

          **MR. MASTERS:**  Let's -- Mr. Faison, please project PDX-10.13.

BY MR. MASTERS:

**Q.**   So, Dr. Bravman, can you please explain to the jury what you are illustrating here on PDX-10.13?

**A.**   Yes.  So Claim Element 1A says:  This electroacoustic resonator comprising -- in the upper right-hand corner, there is a data sheet that specifies the AKF1256 product that was entered into evidence a few minutes ago.

          It specifies that they're talking about a 5.6

*Bratman - Direct*

gigahertz Wi-Fi BAW filter, and that tells me that, in fact, the product designed does, in fact, comprise an electroacoustic resonator, as the patent specifies.

**Q.** How about Element 1B?

**A.** So for 1B, we can turn first to the drawing provided in Akoustis' XB1 design manual. And if we read through that, a membrane structure or FBAR -- described already it's clearly an FBAR from the drawing because of that void -- with a layered structure comprising piezoelectric layer, upper and lower electrodes. And then, importantly, it specifies that with a thickness of the two electrode layers being unequal.

So that's part of the issue patent that the upper and lower electrodes must be different thicknesses.

And then if we turn to the last claim element, the first half of it, it further goes on to specify that it's the top electrode which must be thinner than the bottom electrode.

So, cumulatively, you can see those features very clearly in the patent. The drawing here doesn't show the differential thicknesses of the electrode, and that's why we have to look at their own specifications for their target thicknesses, as well as rely on Dr. Heinrich's cross-section analyses to verify, in fact, that that upper half of Claim Element 1C is satisfied.

*Bravman - Direct*

1    **MR. MASTERS:** Mr. Faison, can you please

2    project PDX-10.14.

3    **BY MR. MASTERS:**

4    **Q.** And, Dr. Bravman, how do you go to about determining

5    whether the thickness of the electrodes in the accused

6    Akoustis products were different?

7    **A.** So here is that type of data sheet from that mask

8    slide set I described. And it describes that the target

9    is 930 angstroms for the bottom electrode and

10   830 angstroms for the top electrode. There's a little

11   more detail there. It shows that the initial thickness

12   was 1600 angstroms, but, then, in some etching operations,

13   that thickness was reduced by a specified amount, and so

14   you subtract the numbers there in red and you get

15   830 angstroms.

16   In this case, when Dr. Heinrich did his analysis, you

17   can see that in his calibrated microscope, the thicknesses

18   of the lower layer are pretty close it says

19   90.3 nanometers as opposed to 93 specified that's pretty

20   close. 920.3. The upper one is a bit off from the

21   specification. 730 angstroms as opposed to 830 specified.

22   And either way, the top electrode is clearly designed

23   to be, and, in fact, is thinner than the lower electrode

24   in this particular device. And then, sequentially --

25   which we're not going to run through all them today, but I

*Bravman - Direct*

16:00:21 1 reported them -- a similar analysis would yield the same

16:00:24 2 result in 18 of the 19 structures.

16:00:28 3       **MR. MASTERS:**  And for the record,

16:00:30 4 Dr. Heinrich's cross-sections are in PTX-0999, which has

16:00:37 5 been entered as Trial Exhibit 237.  Okay.

16:00:46 6       Mr. Faison, can you project PDX-10.15.

16:00:54 7       **THE WITNESS:**  So now we have the last half of

16:00:55 8 the last claim element, 1C, and this is not a structural

16:00:59 9 element; it's the effect that the patent specifies as the

16:01:02 10 outcome, the benefit of building the structure with this

16:01:06 11 thinner upper electrode relative to the bottom.  And this

16:01:09 12 is where I employed the work of Dr. Shanfield.

16:01:13 13       If we can go to the next slide, please.

16:01:15 14 **BY MR. MASTERS:**

16:01:20 15 **Q.**  So this is PDX-10.16.  So how did Dr. Shanfield's

16:01:25 16 analysis inform your decision as to whether the Akoustis

16:01:30 17 products infringed the last limitation of Claim 1?

16:01:34 18 **A.**  So this is one of the slides that he showed this

16:01:37 19 morning explaining how, in his analysis, the

16:01:40 20 implementation of the patented design here, which is the

16:01:46 21 blue box and the blue line on this right-hand or higher

16:01:51 22 frequency band edge, reduces the loss of a signal to the

16:01:57 23 lateral regions.  Compared to a structure which he modeled

16:02:02 24 using the same procedures where the upper and lower

16:02:06 25 electrodes are the same thickness, and that's the green

line.  And as he described, as you get higher and higher

frequencies, we see that the loss increases rapidly.

And so that's the kind of feature that would lead to

not an increase in bandwidth, but with the patented

design, thinner upper electrode, we see clear indications,

as Dr. Shanfield explained, that the bandwidth could in

fact, would in fact, be increased.

**Q.**   So have you formed an opinion as to whether the

difference in thickness of the electrodes in the accused

Akoustis products provide a filter, increases the filter

bandwidth of the resonator?

**A.**   Yes.  I believe they do, and based on the information

which I've just reviewed.

**Q.**   And does your opinion apply to all of the accused

products?

**A.**   It does.

**Q.**   Dr. Bravman, did you also consider Claim 12 of the

'018 patent?

**A.**   Yes.

**THE WITNESS:**   If you can advance the slide,

please.

**BY MR. MASTERS:**

**Q.**   And can you explain to the jury how you went about

informing -- or drawing an opinion as to whether Claim 12

was infringed or not?

*Bravman - Direct*

16:03:17 1    **A.**    So Claim 12 of this patent, basically, says, "Use of

16:03:21 2    a device designed according to Claim 1 in a radio

16:03:25 3    frequency filter."  That's what this claim is saying.  And

16:03:29 4    if we turn again to one of the Akoustis data sheets for

16:03:33 5    the 1256 device that I'm talking about, you see

16:03:37 6    highlighted in the top line that this is, in fact, for

16:03:39 7    a -- as it describes, "an ultra-wide bandwidth BAW RF

16:03:44 8    filter."  And so I think that reads directly on to

16:03:47 9    Claim 12 of the '018 patent.

16:03:50 10   **Q.**    And that data sheet is PTX-1265; is that correct?

16:03:54 11   **A.**    Yes.

16:03:55 12   **Q.**    But do all of the data sheets assist you in forming

16:03:59 13   your opinions as to whether Claim 12 has been infringed or

16:04:03 14   not?

16:04:03 15   **A.**    Yes.

16:04:06 16   **Q.**    Just in a final summary, what is your conclusion as

16:04:09 17   to whether or not the accused Akoustis products infringe

16:04:13 18   Claims 1 and 12 of the '018 patent?

16:04:19 19   **A.**    My conclusion is that 18 of the 19 products do.

16:04:23 20   **Q.**    Okay.

16:04:24 21        **MR. MASTERS:**  Can we, Mr. Faison, project

16:04:25 22   PDX-10.18, please.

16:04:30 23   **BY MR. MASTERS:**

16:04:30 24   **Q.**    So, Dr. Bravman, let's talk about the '755 patent.

16:04:33 25   Can you please explain this to the jury.

*Bravman - Direct*

**A.** So, again, this is a mainly structural modification of a BAW device with a different benefit asserted as a result of practicing the patent's claims. I think you heard about this earlier from one of the two inventors, Dr. Fattinger. I may have that name mispronounced.

I know from the transcript -- I was not here in Court that day -- they talked about the orange and the purple. And what this patent describes in words is that there is a benefit to having this region out here to the sides away from the active region of the device, having the layer or layers which comprise this region vertically be of a different thickness than the passivation layer that's here in orange directly above one of the electrodes.

The patent actually says the ratio of the two thicknesses must be different than one, which means it could actually be less than one. But what we looked at as I recall all the products, it's thicker out here, as is illustrated in the patent compared to this region over here.

**Q.** And according to the '755 patent, what is the benefit of having the thicker passivation layer as taught in Figure 2B?

**A.** The asserted benefit here is lower loss laterally to the sides of energy, and I think it's easy to image, anything you can do to not lose energy from a signal is

*Bravman - Direct*

always going to be a good thing.  There's no perfect

filter or device.  You always have some loss of signal

strength.  So engineers go to great lengths to minimize

that in every possible way in an actual device.

This can either be for signal strength, better

signal, battery life.  Whatever it is, you don't want to

waste energy, and this is one piece of that in this

patent.

Q.   And with respect to the '755 patent, what were you

asked to do?

A.   Same as before, to decide whether or not the 19

products read on the asserted claims of the '755 patent.

MR. MASTERS:  Mr. Faison, could we project

PDX-10.19.

BY MR. MASTERS:

Q.   Dr. Bravman, can you explain to the jury what you are

illustrating here.

A.   So here's the same drawing in the upper right-hand

corner.  Here, I mentioned already, in the lower right

side, the Court issued a ruling on what certain phrases in

the patent means -- "active region" and "outer region" --

and it gave its interpretation that we all, then, adopt.

And, also, said that a third phrase has it's plain and

ordinary meaning.

This Claim 9 has a longer set, as you can see, of

*Bravman - Direct*

1    claim elements.  But, again, we see that most of them are

2    structural in nature, they describe a structure in words.

3    But, then, at the bottom, again, at the last claim

4    element, it describes the asserted benefit of using this

5    patented invention.

6    **Q.**    Can you point out the structural limitations of

7    Claim 9?

8    **A.**    So Claim 9 -- 9A tells you what this is for.  It's a

9    BAW resonator.  But then 9B, 9C, D, E, and F, as well as

10   G, relate to the structure of this device.  And they tell

11   you about various aspects of it, which are then depicted

12   in the patent appropriately.

13   **Q.**    And then where is the performance aspects of Claim 9?

14   **A.**    So the performance aspects, again, is down here at

15   the bottom.  And it's telling us that, because of this --

16   thicker or thinner, but we focused on thicker -- thicker

17   outer region in purple, that less energy will be lost to

18   the sides.  And that's what the last claim element says.

19   It says, "They are acoustically matched in such a manner

20   that one or more wavelengths that cause energy leakage are

21   not excited, and, therefore, the energy is not lost."

22   **Q.**    And did you compare the structural features of the

23   accused Akoustis products to Claims 9A through G?

24   **A.**    Yes.

25            **MR. MASTERS:**  Mr. Faison, can you project

*Bravman - Direct*

16:09:18 1    PDX-10.20.

16:09:21 2    **BY MR. MASTERS:**

16:09:21 3    **Q.**    Dr. Bravman, can you explain to the jury what you

16:09:22 4    have illustrated here.

16:09:24 5    **A.**    So here, what I've done, the structural elements

16:09:28 6    referring to data sheets, referring to the design manual,

16:09:33 7    and also referring to some of Dr. Heinrich's work, one by

16:09:38 8    one, I determined that these were present.  So I think 9A,

16:09:44 9    B, C, and D, we've seen many times at least that layered

16:09:50 10   structure of a resonator.  Here in 9E, I already mentioned

16:09:56 11   this light blue region on the top that we're talking about

16:10:01 12   now for the first time, this passivation layer, and that's

16:10:04 13   what E is talking about.

16:10:07 14       And then F goes on in words to describe that certain

16:10:14 15   aspects of the thickness of that passivation layer or

16:10:18 16   layers is different in different regions of the device.

16:10:22 17   **Q.**    And you're referring to PTX-0404, which is the XB1

16:10:28 18   design manual --

16:10:29 19   **A.**    Yes.

16:10:29 20   **Q.**    -- as to inform your decision as to the structural

16:10:32 21   features of the accused products?

16:10:34 22   **A.**    That's what's on the screen.  That's right.

16:10:36 23               **THE WITNESS:**  And can I see the next slide?

16:10:38 24               **MR. MASTERS:**  Can we project PDX-10.21, then?

16:10:42 25               **THE WITNESS:**  So here's a little bit clearer

*Bravman - Direct*

16:10:43 1    drawing where I've taken the patented figure and colorized

16:10:48 2    it -- or others colorized it -- and compared it at nearly

16:10:53 3    equivalent magnifications to the structure in the XB1

16:10:59 4    design manual from Akoustis.  And so, again, it shows the

16:11:01 5    top and bottom electrodes in brown.  It shows the blue

16:11:05 6    piezoelectric layer, but now you can more clearly see the

16:11:08 7    passivation layer on top and how it continues around.

16:11:15 8            And, in fact, here, we can see that there's a

16:11:19 9    bilayer here, there's a double layer here.  And the patent

16:11:22 10   describes that in words, and this is a layer on the

16:11:26 11   silicon dioxide, which is deposited here before this upper

16:11:31 12   blue layer.  And so after the fact, the thickness here is

16:11:35 13   thicker or greater than the thickness here above the

16:11:40 14   actual membrane structure.  And so that's a very close --

16:11:43 15   these patent drugs are almost always idealized.  You never

16:11:48 16   have square edges in a real device.

16:11:51 17           But even the drawing here is on the right is

16:11:54 18   somewhat idealized, but it shows very much the target of

16:11:58 19   the manufacturer.

16:12:00 20   Q.   And how did you inform your opinion as to the exact

16:12:04 21   dimensions of these passivation layers?

16:12:06 22   A.   If we go to the next slide.

16:12:08 23           **MR. MASTERS:**  Mr. Faison, can we project

16:12:11 24   PDX-10.22.

          25

**BY MR. MASTERS:**

**Q.**   Dr. Bravman.

**A.**   So here we have, again, an extract from the relevant
set of mask slides, but we see here we actually don't have
numerical data on how thick these regions were, and I
asked if they were available, and I was simply told they
were not available.  So that heightened the importance of
Dr. Heinrich's work.  And here is a cross-section which he
produced.

And we see that, in this particular model, in this
device, the active region, the silicon nitride activation
thickness is 961-angstrom, about 96 nanometers.  But out
here in the bilateral stack of silicon nitride and silicon
dioxide sums to almost 1200 angstroms.  And so that
clearly is thicker than the 961 angstroms over the
membrane structure.  And so that comports with the
teaching of the patent.

**Q.**   Okay.  And for the record, you are referring to
Dr. Heinrich's Exhibit PTX-0999, which has now Trial
Exhibit 237, and the mask slide PTX-0404?

**A.**   Yes.

**Q.**   Or 0406.

                **MR. MASTERS:**  Mr. Faison, can we project
PDX-10.23.

**BY MR. MASTERS:**

**Q.**   And, Dr. Bravman, can you summarize your opinion,
then, with respect to the structural features of Claim 9?

**A.**   So looking at all the data available to me, produced
by both Akoustis and by independent analyses and my own
reading of the patent in light of the Court's claim
construction, I believe, it's my opinion that all the
structural elements of the patent are read upon by the
actual Akoustis devices.

**Q.**   And how did you go about to determine whether the
performance features of the Claim 9, that's Element 9H,
were satisfied?

**A.**   As before, this is where I turned to Dr. Shanfield's
analysis and created another finite element model.

      If we go to the next slide, please.

             **MR. MASTERS:**  Mr. Faison, please project
PDX-10.24.

**BY MR. MASTERS:**

**Q.**   In referring to Dr. Shanfield's simulations, can you
please explain your conclusions with respect to Claim 9H.

**A.**   So this is, again, a slide which you've seen this
morning.  And in this case, the -- Akoustis' design in
blue.  I've got a little blowup here to remind you, this
is with the thicker outer passivation region shows this
characteristic in the center region of the frequency band

1    and, as opposed to the model that Dr. Shanfield run --

2    ran, the outer and inner, I'll call it, regions of

3    passivation were the same thickness.

4        And we see, again, on a scale of lateral energy flux,

5    or loss, so that's out to the sides, the blue data shows

6    less loss than the green data, consistent with what the

7    patent teaches would be the benefit of adopting this kind

8    of structure.

9    **Q.**   Just so it's clear, in the comparative example when N

10   equals 1, that means the passivation layer is equal?

11   **A.**   Yes.

12   **Q.**   Okay.

13   **A.**   In this diagram here, that's the thickness in purple,

14   and the thickness in orange, the thickness outside and

15   inside the active region has the same thickness.  If you

16   recall, the time claim element here specifies that that

17   value -- it's not working -- 9G says that ratio is

18   something other than 1.  In this case, the ratio is

19   greater than 1 because it's thicker on the outside.

20   **Q.**   And based on your review of the design and structures

21   and performance of the Akoustis accused products,

22   Dr. Heinrich's testing in exhibits -- Trial Exhibit 237,

23   and Dr. Shanfield's analysis, have you reached a

24   conclusion as to whether all of the accused Akoustis

25   products infringe Claim 9?

*Bravman - Direct*

**A.** Yes. In this case, 19 of the 19 products, in my opinion, practice or read on all of the claims in Claim 9 of the '755 patent for the reasons that I reviewed with you briefly.

**Q.** Dr. Bravman, did you also consider Claim 10 of the '755 patent?

**A.** Yes.

THE WITNESS: If you go to the next slide please.

BY MR. MASTERS:

**Q.** So, please, Dr. Bravman what are you illustrating here? Can you refer to Claim 10?

**A.** So we see on the right-hand side, Claim Element 10, starting with A, says, "A method of fabrication." So there are method types of claims or patents, and there's so-called apparatus or structural descriptions. Claim 9 was the structure and the asserted benefit thereof. Claim 10 says -- or describes a method of fabricating such a structure, and if you go through B through H, 10B through 10H, you will see that it's a method of building -- it uses the word "providing" -- structures to create the structure. So it's more about providing or building a resonator, whereas, Claim 9, its description and benefit is evident in both.

MR. MASTERS: And, Mr. Faison, can you project

16:17:52  1    PDX-10.26.

16:17:55  2    **BY MR. MASTERS:**

16:17:55  3    **Q.**    And, Dr. Bravman, can you please explain how

16:17:58  4    PTX-0404, the XB1 design manual, informed your opinion as

16:18:02  5    to whether Claim 10 satisfied these steps?

16:18:06  6    **A.**    Yes.  If we look at the design manuals and we look at

16:18:09  7    data sheets and other things provided, we can step-by-step

16:18:14  8    walk through this and see, in fact, that the

16:18:17  9    description -- that Akoustis specifies construction of

16:18:23 10    devices that comport with or read upon Claim 10.  It's a

16:18:29 11    method of building it.

16:18:31 12         **MR. MASTERS:**  Can we go back to PDX-10.25,

16:18:34 13    please.

16:18:35 14    **BY MR. MASTERS:**

16:18:35 15    **Q.**    Dr. Bravman, do Claims 9 and 10 apply to both SMR and

16:18:40 16    FBAR filters?

16:18:42 17    **A.**    Yes.  A worker of skill would know that the patent

16:18:46 18    explicitly says that.

16:18:48 19         **MR. MASTERS:**  Can we jump to PDX-10.27, please.

16:18:51 20    **BY MR. MASTERS:**

16:18:51 21    **Q.**    And what do you illustrate here in PDX-10.27?

16:18:57 22    **A.**    Here, again, from the '755, I've called out two text

16:19:04 23    blocks, and I've laid, side by side -- Figure 2B is from

16:19:12 24    the patent.  It shows solid resonator.  It doesn't have

16:19:16 25    the cavity underneath.  And it shows a loss to the side as

*Bravman - Direct*

1    a result of the thicker purple regions on the periphery.

2         This little drawing just compares that what's

3    different is underneath in the FBAR as opposed to the

4    solid mounted resonator.  But the patent's talking about

5    loss peripherally to the side.  And so although these

6    structures have -- these types of resonators have

7    structural differences, this patent's talking about loss

8    to the sides laterally, and it does so explicitly in the

9    patent language.

10   **Q.**   And, for the record, the two blocks of text in

11   this -- from the '755 patent, which is Trial Exhibit 42,

12   is Column 2, Lines 14 to 26 and 15, Column 7, Lines 54 to

13   57.  It's not appearing there at the bottom.

14        **MR. MASTERS:**   Okay.  Mr. Faison, can we jump to

15   PDX-10.28, the next slide.

16   **BY MR. MASTERS:**

17   **Q.**   And then, Doctor, based on your review of all of the

18   information, can you summarize your overall opinion with

19   respect to infringement of the '018 and '755 patent?

20   **A.**   So this is an attempt to capture all the different

21   documents that I considered that were provided to me that

22   I described briefly this morning -- this afternoon, as

23   well as my conclusions 18 of the 19 patents -- products,

24   I'm sorry -- read upon the '018 patent and all 19 read on

25   the asserted claims of the '755 patent.

16:20:50  1          MR. MASTERS:  Your Honor, may I approach?

16:20:50  2          THE COURT:  You may.

16:21:56  3          MR. MASTERS:  You can take the slide down.

16:21:58  4   BY MR. MASTERS:

16:21:58  5   Q.   Dr. Bravman, I've handed you PTX-0710.

16:22:03  6        Do you have that in front of you?

16:22:08  7   A.   Yes.

16:22:08  8   Q.   And also --

16:22:12  9        What is PTX-0710?

16:22:15 10   A.   It's a license agreement between Akoustis

16:22:18 11   Technologies Incorporated and Cornell University for

16:22:22 12   patent 7,250,360.

16:22:27 13          MR. MASTERS:  Your Honor, I'd move for

16:22:28 14   admission PTX-710.

16:22:32 15          THE COURT:  Marked and received as 277.

16:22:35 16          (Trial Exhibit No. 277 was admitted into

16:22:35 17   evidence.)

16:22:37 18          MR. MASTERS:  And I move for admission the

16:22:41 19   Cornell patent, PTX-1307.

16:22:46 20          THE COURT:  Marked and received as 278.

16:22:48 21          (Trial Exhibit No. 278 was admitted into

16:22:48 22   evidence.)

16:22:49 23          MR. MASTERS:  Mr. Faison, can you just project

16:22:53 24   the cover of PTX-710.  Yes.

         25

*Bravman - Direct*

BY MR. MASTERS:

Q.   So, Dr. Bravman, I've handed you both the license and the patent.

Have you reviewed the patent that is the subject of this license agreement?

A.   Yes.

Q.   And can you just generally describe for the jury what the patent -- we call it the '360 patent, which is now Trial Exhibit 278 -- what does the '360 patent relate to?

A.   You may recall or be aware that solid materials may exist in the form of crystal and solids.  An engagement ring is a great example of a single crystal.  Most materials don't -- that are crystalline don't exist as single crystals.  You may know that the lower the number of defects in a diamond engagement ring, the more it costs because they're rare.  That's a single crystal.

Many materials, like almost all metals, copper, steel, aluminum, whatever it is, they're all crystalline most people don't know that, but it's almost certainly true that you've never seen a crystal of copper the size of a diamond engagement ring.

Those materials are usually what are called polycrystalline.  There's lots of small crystals aggregated together in a still solid material.

And one or the other, single crystal or polycrystal,

1    is not better or worse.  They have different qualities

2    about them.  In microelectronics, thin film devices of

3    many types -- I think you saw earlier in this trial

4    someone held up a silicon wafer.  That's a single crystal.

5    That never occurs in nature.  It is a marvel of

6    engineering, that we've learned to make crystals this big.

7    And, in fact, that's just a thin slice from a crystal

8    that, today, can be 12 inches in diameter and 5 feet long.

9    We've learned how to do that.

10        When you then, on a -- let's say, ideally, single

11   crystal surface, incredibly polished and cleaned and

12   prepared for the next step -- let's see you want to

13   deposit another material on top of that, or grow --

14   deposit or grow -- a thin film layer.

15        Normally what will happen is that layer of material

16   will not be single crystal.  It will be polycrystalline.

17   It's hard to do.  Very hard.  And there's a number of

18   reasons why that's the case.  But in certain combinations

19   of substrate and thin film --

20            **MR. LEMIEUX:**  I'm sorry, Your Honor.  Can I

21   have a sidebar on this.

22            **THE COURT:**  You may.

23            **MR. LEMIEUX:**  Thank you.  May I approach?

24            **THE COURT:**  You may.

25                                  -  -  -

1        (Whereupon, the following discussion is held at

2   sidebar:

3        **MR. LEMIEUX:**  The only part of this expert's

4   report -- the only part of this expert's report that

5   relates to the patent at issue --

6        **THE COURT:**  You can speak to both of us.  Speak

7   up.

8        **MR. LEMIEUX:**  -- is this one paragraph, 224 of

9   his report.  This entire scope of testimony that he's

10  providing now is far outside of what he's attuned to here,

11  which was just a valuation opinion.  There is nothing

12  about growth of single crystals and all the rest of it

13  that's in his report.

14       So everything that he's testifying to now is --

15  totally exceeds the scope of his report.

16       **THE COURT:**  He talks about a very specific

17  process of growing a particular layer.  It is narrow --

18  there's a specific reference, so let's talk about that.  I

19  think that might be simplification.  Let's talk about

20  that.

21       **MR. LEMIEUX:**  So this -- what he says about

22  this patent is that he's making a value judgment.  He says

23  this patent '360, relates to a very specific process for

24  growing an epitaxial layer.  And then the next -- the only

25  other sentence is, "It is narrower in import" meaning -- I

16:27:56  1    assume that's value -- "than the resonator performance

16:28:00  2    benefits identified in the '018 patent, and '755, which

16:28:04  3    are at issue in this case and that are applicable across

16:28:09  4    resonator types and are independent of fabrication

16:28:10  5    process."

16:28:11  6            So he doesn't give an opinion about the '360

16:28:14  7    other than to say that he believes it's of less import

16:28:18  8    than these two patents.  And that's not what he's

16:28:21  9    testifying to.

16:28:21 10            THE COURT:  Let's hear what --

16:28:22 11            MR. MASTERS:  So he gives a brief -- I concede

16:28:27 12    that --

16:28:28 13            THE COURT:  It is short.

16:28:29 14            MR. MASTERS:  -- about '360.

16:28:31 15            THE COURT:  Right.

16:28:31 16            MR. MASTERS:  I think for the purposes of

16:28:32 17    explaining this paragraph to the jury, he is going into

16:28:37 18    some detail, which is not necessary.  But he's an expert.

16:28:41 19    He's doing that.

16:28:42 20            If you like, I can give him a copy of his

16:28:45 21    report, and just say, can you please briefly describe

16:28:48 22    '360, trying to move along.

16:28:51 23            THE COURT:  I think that's appropriate because

16:28:52 24    I don't think we need -- one, we don't need a detailed

16:28:55 25    description.

16:28:56  1          MR. MASTERS:  I agree.  It's for purposes of

16:28:58  2  laying a foundation for the damages report.

16:28:59  3          THE COURT:  Sure.  I understand what he's

16:29:00  4  talking about, and that's not a problem.  He wants to show

16:29:02  5  this is better than the Cornell patent, right?

16:29:09  6          MR. MASTERS:  Well, no.  He's trying to --

16:29:10  7          MR. LEMIEUX:  He's --

16:29:10  8          THE REPORTER:  You have to talk one at a time.

16:29:10  9          MR. MASTERS:  The purpose of this is to show

16:29:12 10  the '360 is a very specific patent --

16:29:15 11          THE COURT:  Sure.

16:29:15 12          MR. MASTERS:  -- compared to the '755 and

16:29:19 13  '018 --

16:29:20 14          THE COURT:  Right.

16:29:20 15          MR. MASTERS:  -- that are broader in scope.

16:29:21 16          THE COURT:  All right.

16:29:21 17          MR. MASTERS:  And that's what the purpose of

16:29:21 18  his testimony is.

16:29:25 19          THE COURT:  Right.

16:29:25 20          MR. MASTERS:  And, as I said, he's just -- he's

16:29:27 21  a teacher.

16:29:27 22          THE COURT:  Sure.

16:29:27 23          MR. MASTERS:  And he's going into detail, which

16:29:30 24  honestly, he doesn't need, but --

16:29:32 25          THE COURT:  That's okay.  Maybe I'm missing

16:29:34  1    something here.  But I think he's saying that the licenses

16:29:38  2    are different significance.  Is that not right?

16:29:42  3              **MR. MASTERS:**  Yes.  With respect to the

16:29:43  4    patents.  By comparing the patents.  That's all he's

16:29:45  5    saying.

16:29:46  6              **THE COURT:**  Got it.  But I agree with the

16:29:49  7    defense counsel.  We don't need to go into --

16:29:52  8              **MR. MASTERS:**  No, I'd like to wrap up.

16:29:54  9              **THE COURT:**  Good.  Thank you very much.

16:29:55 10    Objection sustained.

16:29:57 11              We'll take care of it.

16:30:19 12         (Whereupon, the discussion at sidebar concludes.)

16:30:19 13                          -  -  -

16:30:20 14    **BY MR. MASTERS:**

16:30:21 15    **Q.**   Dr. Bravman, I would ask -- we were talking about the

16:30:23 16    Cornell patent.  And just very briefly, as you had

16:30:27 17    articulated within your --

16:30:29 18              **THE COURT:**  You indicate you may need to

16:30:30 19    approach, just for clarification; is that right?

16:30:34 20              **MR. MASTERS:**  May I approach?

16:30:35 21              **THE COURT:**  That's fine.  That's fine.

16:30:40 22    **BY MR. MASTERS:**

16:30:40 23    **Q.**   I want to hand you your expert report and refer to

16:30:44 24    Paragraph 224.

16:30:51 25         So, Dr. Bravman, having looked at the Cornell patent,

16:30:54 1    '360 patent, have you compared the subject matter of that

16:30:58 2    patent to the '018 and '755 patents and drawn any

16:31:03 3    conclusions as to the scope of the subject matter of the

16:31:06 4    Cornell patent relative to the two Qorvo patents?

16:31:10 5    **A.**    I did.  As I reported, that my opinion is that the

16:31:13 6    '360 patent is narrowly -- more narrow, more tailored and

16:31:19 7    focused description of a certain material's property,

16:31:22 8    about how to grow films on substrates with certain

16:31:27 9    orientation relationships.

16:31:28 10   **Q.**    And have you drawn any conclusions as to whether the

16:31:31 11   '755 and '018 patents, that subject matter is broader in

16:31:35 12   scope compared to the Cornell patent?

16:31:39 13   **A.**    Those two patents, as we've been looking at, describe

16:31:42 14   aspects that improve an actual device, and with a fairly

16:31:48 15   detailed description of how to do that structurally.

16:31:51 16   **Q.**    And when you say "device," you mean BAW filter?

16:31:54 17   **A.**    The resonators that go into BAW filters.

16:31:56 18   **Q.**    Very good.

16:31:57 19           **MR. MASTERS:**  No further questions, Your Honor.

16:31:58 20           **THE COURT:**  Cross-examination.

16:31:59 21                   CROSS-EXAMINATION

16:32:01 22   **BY MR. LEMIEUX:**

16:32:11 23   **Q.**    Dr. Bravman, nice to see you again.

16:32:14 24   **A.**    Thank you.

16:32:16 25   **Q.**    I know he's the president of one of the juror's

universities, but he's a colleague and alumni of mine, so
I respect him for that.

Dr. Bravman, would you agree that the structures for
SMRs and FBARs are different?

**A.**   They have different structural aspects of films, as
I've described.  FBAR, of course, has a cavity, has a
reflecting device for acoustic energy, whereas SMRs have a
stack of films, often called a Bragg reflector.

**Q.**   Would it also be correct to say that the
manufacturing process flows used to create and manufacture
SMRs are different than the ones used to make FBARs?

**A.**   Because you said "processing flows," yes.  The
details to build structures, you have to describe each and
every step.  So an SMR doesn't have a void underneath it
and an FBAR doesn't have a set of Bragg reflectors.  The
films, the types of materials used, the thicknesses, the
processing tools, the inspection techniques, those are in
common.

**Q.**   But the recipes to make them would be different,
right?

**A.**   In part, sure.

**Q.**   Now, earlier --

          **MR. LEMIEUX:**  If we could bring up -- I guess
it's Exhibit 238, PTX-0404.  And if we turn to Page 7,
please.

*Bravman - Cross*

BY MR. LEMIEUX:

Q.   Now, you were explaining a lot of what these different layers were in your testimony.  If I understood you correctly, the brown layer is representing the electrode layers.  There's an upper brown layer and lower brown layer?

A.   Yes.

Q.   Is that right?

     And if we just look at the bottom figure here -- it's just a little bit easier for me -- that white space in there in the middle, that's the air gap, the cavity that makes this an FBAR resonator?

A.   Right.

Q.   Okay.  And the active region for that, is that defined by basically the bottom part of that cavity?

A.   Where exactly the boundaries are for the active and so-called outer regions, the patent doesn't describe fully.  The Court offered a construction, which both parties had to apply as best they could.

     A worker of skill understands that the electric fields produced between the upper and lower electrode electromechanically activates the piezoelectric blue layer.  And you can see here, of course, that unlike the idealized drawings in the patent, the brown electrodes have more complicated structures.

*Bravman - Cross*

16:35:16 1    We also see them separated vertically from the

16:35:19 2    piezoelectric layers, in some places by films, and other

16:35:22 3    places not.  But this is the real structure.  And a worker

16:35:30 4    of skill would understand that the layers are what they

16:35:35 5    are, I don't think there's any dispute about.  But where

16:35:39 6    the various passivation layers are, I think they also

16:35:43 7    would not dispute.

16:35:44 8    **Q.**    So if I'm looking at this correctly, then, the light

16:35:47 9    green, what's labeled silicon oxide, the SIO2 there --

16:35:52 10   **A.**    Yes.

16:35:52 11   **Q.**    -- that's the substrate material, right?

16:35:54 12   **A.**    That a layer grown on the silicon substrate.

16:35:57 13   **Q.**    Okay.  And then the white area in the middle, that's

16:35:59 14   the air cavity?

16:36:01 15   **A.**    Yes.

16:36:01 16   **Q.**    Okay.  And the active area of that air cavity, that

16:36:05 17   goes from -- if I take just the bottom of it, it goes from

16:36:11 18   one side over to the other side, right?

16:36:12 19   **A.**    Of the cavity.  That's right.

16:36:16 20   **Q.**    Okay.

16:36:16 21   **A.**    The electric field strength is going to vary left to

16:36:19 22   right, I'd say across the page, between the two electrodes

16:36:22 23   penetrating through the piezoelectric layer.

16:36:24 24   **Q.**    But it's fair to say that entire space is the active

16:36:29 25   area?

**A.**    No.   I've not said -- I've not seen anything

described from Akoustis that delineates precisely the

inner and outer regions.   It is what the Court ordered

them to be.   And that does not include a precise

structural position, if you will.

**Q.**    I'm just -- you know, it's hard for me.   I guess I'm

a bit of a visual learner on these things, and so I'm just

trying to understand what one means by that.

**A.**    Well, I think if you look at the upper electrode in

particular, a worker of skill would understand on the

right side there's a thicker region.

On the left side there's a thicker region, which is

larger in a lateral extent left to right.   But those

regions are elevated above the piezoelectric film by an

intervening layer of dielectric material, that's SIO2, in

the light blue.   And so I think because of those, that

thickness, as guard ring structures, which I think workers

of skill would understand.

And because of the intervening thin layer of SIO2,

the real action's going to occur in the region where

there's no SIO2 between the upper electrode and the

piezoelectric.   So I think the active device region, as

the Court construed it, I would look at all the

information and, based on experience, posit that it was

that central region.

1    These are, in fact, very complex structures, as we

2    know, but I think that's a fair read that I would employ.

3    **Q.**   Okay.  So the active area covers, you know,

4    basically, the white area, the air cavity.

5    Now, if I'm looking at the top brown layer -- that's

6    the top electrode for purposes of your analysis?

7    **A.**   Yes.

8    **Q.**   Okay.  And then let's point out there.  Then the one

9    below that, that's considered to be the bottom electrode;

10   is that right?

11   **A.**   Yes.

12   **Q.**   Okay.  Now, over on the side here we can see part of

13   the top electrode actually on either side of that, as it

14   appears over the white active area, like the cavity, is

15   actually quite a bit thicker than the bottom electrode.

16   **A.**   That's right.  These are complicated structures.

17   **Q.**   Okay.  So if --

18   **A.**   The difference is that the blue SIO2 film intervenes

19   between the top electrode and the piezoelectric material.

20   That will affect the electric field as applied across the

21   piezoelectric material and thereby affect its operation.

22   **Q.**   I'm sorry.  I didn't mean to interrupt you.

23   The patent claim itself requires that the top layer

24   be thinner than the bottom layer, correct?

25   **A.**   Yes.

1          (Interruption in proceedings.)

2               **THE WITNESS:**   I think I indicated in my direct

3     testimony that this drawing wasn't to scale and that we

4     had to look at either data specified by Akoustis and/or

5     cross-sectional analyses provided by Dr. Heinrich to get

6     the actual ratios.

7     BY MR. LEMIEUX:

8     **Q.**   And I believe you also said, though, that this was an

9     actual depiction, which is why you used it as part of your

10    report, of the various layers of the Akoustis device.

11    **A.**   It's not an actual depiction, first of all, because

12    it's not to scale left to right and up and down.   I

13    said -- I'm quite sure I said you don't see sharp corners

14    in real devices.

15         But a worker of skill looking at a manual, such at

16    the XB1 manual and it's various descriptions, is aided in

17    his or her understanding by a drawing such as this.

18    **Q.**   Okay.  So just -- so you would agree with me in this

19    drawing that the upper electrode is thicker than the lower

20    electrode -- in this drawing at least?

21    **A.**   To my eyes it looks thicker in this nondispositive

22    drawing.

23    **Q.**   Okay.  Now, one of the differences -- or, I guess

24    excuse me -- one of similarities between FBARs and SMRs is

25    that they share certain common elements, as I believe

1    you've testified to --

2    **A.**    Yes.

3    **Q.**    -- and are those common elements well known, then, to

4    those who practice in the art of industry?

5    **A.**    The use of silicon, SIO2, silicon nitride, and those

6    kinds of materials is understood widely in the industry,

7    has been for 70 years.  It's how you make it work.  That's

8    where the magic is.

9    **Q.**    It's not a trade secret owned by any particular

10    company.  This is something well known to engineers like

11    yourself, university students, et cetera; is that right?

12    **A.**    The use of those materials, it is known broadly, are

13    common in microelectronic devices.

14    **Q.**    Now, if we're trying to measure the bandwidth of a

15    resonator, and I think we have -- in fact, if we could --

16    I wanted to confirm on one of your pictures here, make

17    sure that I was looking at the right thing.

18         **MR. LEMIEUX:**  If we could pull up PDX-10.7.

19    **BY MR. LEMIEUX:**

20    **Q.**    In the lower left-hand corner here, that's a

21    depiction of various resonators in this device?

22    **A.**    Yes.

23    **Q.**    Okay.  And those resonators are oval or elliptical,

24    correct?

25    **A.**    The ones that are elongated in the vertical

1  direction -- I'll say two, four, six, eight, ten -- those

2  are oval in shape.  The others -- the biggest one, the

3  upper left-hand and upper right-hand corner, maroon and

4  yellow, those are oval shape.  The other ones have more

5  complicated shapes.

6  **Q.**    Okay.  Is that because there's other devices that are

7  interacting with those resonators?

8  **A.**    Almost certainly.

9  **Q.**    So when we've been speaking in terms of an oval

10  versus a rectangular or polygon resonator, this is an

11  example of what an oval or elliptical resonator would look

12  like?

13  **A.**    This is what the shape on this drawing is.  These

14  are -- the ones I mentioned, 12 in number, are --

15  absolutely are oval.

16  **Q.**    Okay.  And this comes from documents that were

17  provided to you from Akoustis to show the design of its

18  actual devices, correct?

19  **A.**    Yes.

20         **MR. LEMIEUX:**  If we could turn to Page

21  PDX-10.8.

22  **BY MR. LEMIEUX:**

23  **Q.**    Now, in your stack information that you're looking at

24  here, you circled the bottom electrode at 930 angstroms.

25  And then for the top electrode, which you used the same

1    color, you have helper, a shunt in a series.

2        Is this all considered part of the top electrode?

3    **A.**    No.  Those are electrode structures in three

4    different resonators -- types, if you will, that are

5    present in an overall filter or structure.  So they have

6    different electrical purposes.

7    **Q.**    Okay.  So the series that you pointed out at

8    830 angstroms, what is that used for?

9    **A.**    So if you go to the previous drawing, I believe in

10   Dr. Heinrich's testimony he showed where he took the

11   cross-section, and it was through the series of what I

12   said were not normal ovals, left to right across the page.

13   That's where he took a section.  And those are the series

14   resonators -- resonator structures.  And that's why I

15   compared that number, 830 angstroms, to what he obtained

16   in his microscope.

17   **Q.**    What's a shunt, then, which you also have listed

18   under top electrode?

19   **A.**    Shunt and helper are other structures.  I'm not

20   offering an opinion about that.  I'm not a filter

21   designer.  But I know that what Dr. Heinrich

22   interrogated -- investigated was those series of resonator

23   structures.  And that's why, again, I compared his

24   microanalysis to the data sheet in front of us.

25   **Q.**    But you've grouped them together.  So I'm just trying

16:44:47  1    to understand why have you grouped the helper and the

16:44:50  2    shunt in the series all as part of the top electrode?  If

16:44:53  3    they're not part of it, why wouldn't you have listed them

16:44:56  4    elsewhere?

16:44:56  5    **A.**    Because they all have top and bottom electrodes.

16:44:59  6    **Q.**    Okay.  So, in this case, these helper and shunt

16:45:02  7    series, those are both showing larger sizes than the

16:45:05  8    bottom electrode layer?

16:45:07  9    **A.**    Correct.

16:45:08 10    **Q.**    Okay.

16:45:12 11            **MR. LEMIEUX:**    If we could go to Page PDX-10.10.

16:45:20 12    **BY MR. LEMIEUX:**

16:45:20 13    **Q.**    These are showing some of the diagrams or information

16:45:23 14    you received from Dr. Shanfield, right --

16:45:26 15    **A.**    Yes.

16:45:26 16    **Q.**    -- that assisted you in your analysis?

16:45:28 17    **A.**    Yes.

16:45:29 18    **Q.**    And on the graphs here, the larger graphs that are in

16:45:32 19    the middle, they say "lateral energy flux."

16:45:36 20            What's the unit of measurement that's along that

16:45:38 21    axis?

16:45:39 22    **A.**    I don't know what the unit is.  It's probably --

16:45:42 23    because this is a finite element model -- it was relative.

16:45:45 24    And so one would be a baseline.  But, again, I didn't

16:45:49 25    produce these.  And so Dr. Shanfield would have to answer

*Bravman - Cross*

1    that question.  I asked him, was this a linear scale or

2    log rhythmic scale.  He told me it was a linear scale and

3    relative values of energy loss or flux, laterally.

**Q.**    But we know -- we don't know what the .5, .11, .5 --

5    what that actually would measure to in a physical

6    measurement, we have no idea?

**A.**    Well, first of all, there's a times 10 to the minus

8    10 in the upper -- at the top there.  So these are very

9    small units, whatever they are.  If I read that, I don't

10   recall.  But because the patent speaks to relative

11   changes, it doesn't specify quantitative bars to be

12   surpassed.  It just says better, broader bandwidth, things

13   like that.

14       In this case, we're showing that type of -- only

15   semiquantitative effects.  This certainly suffices.  This

16   is Dr. Shanfield's work.

**Q.**    Because the bottom axis, we understand, that's

18   frequency.  That's measuring specific frequencies?

**A.**    Yes.

**Q.**    And so the vertical axis, though, is measuring

21   something we don't know relative to itself?

**A.**    Yeah.  The absolute value or the unit here, for the

23   purposes of showing that the alleged benefit of the patent

24   is obtained, that suffices.

**Q.**    If someone wanted -- or needed, I guess we should

*Bravman - Cross*

1  say -- needed to evaluate the bandwidth of a resonator,

2  would it be more acuate to physically test it and then

3  measure the device for its bandwidth or to create a

4  simulation to estimate its bandwidth?

5  **A.**    So I'm not offering an opinion about RF resonator

6  measurements.  That's not directly in my domain.  But I

7  can tell you that the use of testing and modeling, they're

8  both known -- but as you heard, I believe, Dr. Shanfield

9  testify, because of the complexity, time delay, and cost

10  of building all different -- perhaps, hundreds of

11  prototypes, this is why modeling was developed.  It's been

12  developed over the last 40-plus years.

13      Some of what we want to measure is extraordinarily

14  difficult or may, in fact, be impossible to actually

15  physically measure.  To go inside a nanometer-scaled

16  device and somehow measure the lateral energy flux, I

17  don't think that can be done.  That would have to be

18  intuited from other measurements.

19      So, whereas the performance, electrically, of a

20  multi-resonator filter, yes, that can be measured.

21  **Q.**    So you would agree with, Dr. Bravman, that physical

22  testing is going to be more accurate than running computer

23  simulations?

24  **A.**    No.  I would not agree with that.  It's so dependent

25  upon what you're trying to do.  And, again, this is why

this is so broadly accepted now in academia and in

industry, to use models for these very, very complicated

structures.

**Q.** Well, during your deposition, Dr. Bravman, you may

recall I asked you a question:

"Question: Are there any circumstances where running

a simulation would produce a more accurate result than

actual testing?"

And your response was: "So I hear the question. I

would say, by definition, no."

**A.** That presumes that you actually can make the

measurement.

**Q.** And you go on --

**A.** If you can't make --

**Q.** I'm sorry. I just want to provide your full answer.

**A.** Okay.

**Q.** And so you go on to say: "But I wasn't a moment ago

speaking about saving money by being able to do large

number of tests, although that might be a result. What I

was speaking of is you can conduct a large number of tests

that are simulations compared to what your ever

practically going to be able to do with real devices or

structures. But a given structure or device is a physical

object, is going to have a certain set of properties.

Whether or not you can measure them correctly is a

1  different story.  But I take that, that is reality and a

2  model is a model.  So I don't see how you could say it

3  could be more accurate.  Your assessments of the real

4  device may be done improperly.  The microscope may not be

5  calibrated right.  That is reality and the other thing's a

6  model."

7      So a simulation is just a prediction of what we think

8  actually is happening in the physical world, correct?

9  **A.**  By definition, that's what a model is.

10  **Q.**  Okay.  Thank you.

11  **A.**  There's no dispute about that.

12  **Q.**  Now, Dr. Shanfield testified earlier that he hadn't

13  conducted any actual physical tests of the accused

14  devices, that all he had done was run certain simulations

15  to produce what would appear to be these graphic results;

16  isn't that true?

17  **A.**  He did not do physical tests.  That's right.  He ran

18  finite element models with 3- and 400,000 calculational

19  data points.

20  **Q.**  And you've done no physical testing.  You've done no

21  testing of these devices, right?  You rely on

22  Dr. Shanfield and you rely on Dr. Heinrich for their --

23  for their tests?

24  **A.**  It's been the plan about that from the beginning.

25  That's right.

*Bravman - Cross*

**Q.**    Okay.  And so it's fair to say that your infringement opinion, then, is based upon the simulations run by Dr. Shanfield, in part, and in part by the testing done by Dr. Heinrich?

**A.**    Of course.

**Q.**    Now, earlier in this case, Dr. Shanfield -- and we talked about it a little bit in his testimony today -- produced an original expert report that had the kind of graphic information we saw here a moment ago.  But it wasn't these graphs, was it?

**A.**    I don't recall exactly what was in his report vis-a-vis these we have seen today.  But as you recounted, or someone recounted earlier today, I found that there was one that was erroneously included in his report.  It just didn't match his description.

**Q.**    Right.  And, in fact, you brought that, then, to Dr. Shanfield's attention.  And then he ran new testing or produced a new graph in a supplemental report; is that right?

**A.**    He didn't do new testing.  My understanding is he simply corrected his cut-and-paste error.

**Q.**    And so if your original opinion, however, on infringement was based upon the material that had been provided by Dr. Shanfield in his original report, wasn't it?

**A.** A study which yielded to me, as a worker of skill, that this must be an error, only one. And I reported that faithfully. And when it was corrected, it doesn't change my opinion at all.

**Q.** Well, it wasn't corrected for several months, isn't that true?

**A.** I'm not aware of the timing. I did my job and I reported it.

**Q.** You submitted your original expert report in this case in November of 2023; isn't that right?

**A.** Sounds about right.

**Q.** And Dr. Shanfield also produced his original report in November of 2023?

**A.** If you represent that, I'll take that at your word.

**Q.** Well, because, in fact, your infringement opinion relied upon analysis that he was doing. So that was the report that you were relying on at the time, correct?

**A.** It obviously could not have been after my report. That's correct.

**Q.** Okay. So we agree, then, that you were relying on the original report submitted by Dr. Shanfield in this case?

**A.** Yes.

**Q.** And so your infringement opinion, then, relied on something that ultimately turned out to be not correct,

*Bravman - Redirect*

16:53:21  1    which you noticed months later; is that right?

16:53:24  2    **A.**    It had one clearly cut-and-paste error in it.    That's

16:53:28  3    right.

16:53:40  4    **Q.**    I just want to check -- just bear with me for a

16:53:46  5    moment here.    I may be done.

16:54:03  6        Now, you spoke for a few minutes at the end of your

16:54:07  7    testimony, Dr. Bravman, about what was called the '360

16:54:11  8    patent.

16:54:13  9    **A.**    Yes.

16:54:13  10   **Q.**    And you're not a patent licensing expert, are you?

16:54:15  11   **A.**    No.

16:54:17  12   **Q.**    So any opinions you may have as to the value is

16:54:21  13   something that's outside the area of your expertise and

16:54:24  14   outside what you've been asked to do in this case,

16:54:26  15   correct?

16:54:27  16   **A.**    Monetary value, for sure outside my expertise.

16:54:31  17   **Q.**    Okay.

16:54:31  18             **MR. LEMIEUX:**    No further questions.

16:54:32  19             **THE COURT:**    Redirect?

16:54:33  20                      REDIRECT EXAMINATION

16:54:34  21   **BY MR. MASTERS:**

16:54:38  22   **Q.**    Dr. Bravman, counsel asked you about the

16:54:44  23   cut-and-paste error in Dr. Shanfield's report.

16:54:47  24   **A.**    Yes.

16:54:49  25   **Q.**    Is it your understanding that there was both a

16:54:52  1    written description and graphs in his report?

16:54:54  2    **A.**    Yes.

16:54:54  3    **Q.**    And how did you identify that the graph was in error?

16:55:00  4    **A.**    It could not comport with his own text.

16:55:03  5    **Q.**    And so you had an understanding of the results of his

16:55:07  6    simulations based upon the written description in

16:55:10  7    Dr. Shanfield's report?

16:55:11  8    **A.**    And it did not match what I saw in his graph, that

16:55:14  9    particular graph.

16:55:15 10    **Q.**    And do you understand that Dr. Shanfield's written

16:55:19 11    report is -- was accurate?

16:55:22 12    **A.**    That's my understanding, and I've seen nothing to the

16:55:25 13    contrary.

16:55:25 14            **MR. MASTERS:**  No further questions.  Thank you.

16:55:27 15            **THE COURT:**  All right.  Thank you very much.  I

16:55:30 16    will let you step down.

16:55:32 17            It is 4:55, and we have one witness for the

16:55:37 18    plaintiff to conclude, and that will take a little time.

16:55:43 19    So we will do that starting Monday.

16:55:50 20            I'm looking at counsel to make sure that's

16:55:52 21    still correct.

16:55:53 22            **MR. MASTERS:**  That's correct, Your Honor.

16:55:54 23            **THE COURT:**  Just want to make sure there hasn't

16:55:54 24    been any changes.

16:55:54 25            So that means that we will very likely -- I

16:55:58  1    can't tell you for sure -- conclude the plaintiff's case

16:56:03  2    probably before noon.  And there may also be at that time

16:56:09  3    a normal conference that occurs with counsel, which means

16:56:12  4    that we will very likely, and maybe earlier in the day,

16:56:16  5    get to -- if we do get to it, I think we will -- get to

16:56:21  6    any proof from the defense.  So we are on a good schedule.

16:56:28  7    And I will check with them about how long we anticipate

16:56:31  8    that proof will be.  But I think we are in shape to hit

16:56:36  9    the timeline that we sort of discussed at the very

16:56:39 10    beginning of the case.  I want to let you know that,

16:56:41 11    though, because you need to know how we're doing.

16:56:45 12            Now, you know that you're going to be -- some

16:56:47 13    of you are going home for the first time in a few days, at

16:56:52 14    least two of you.  And there is always a little extra

16:56:57 15    instruction at this time because the first time you're

16:57:01 16    going to have a week under away, and it's going to really

16:57:03 17    tempting -- maybe not really tempting at all, depending on

16:57:08 18    what kind of case it is -- might be tempting to tell

16:57:13 19    somebody about the case.  You're right, it's the kind of

16:57:16 20    case it's probably not so much that's not the case.

16:57:19 21            So main thing is, remember to just say it's a

16:57:23 22    civil case.  I'm on the jury, and it's anticipated -- I

16:57:29 23    think it's, really, just say for everybody, that the proof

16:57:32 24    will be completed mid-week, I think.  You want to check

16:57:37 25    about that.  And we will have the case.  And so the case

16:57:40  1    may be concluded.  Because you will have the case by

16:57:44  2    week's end.

16:57:46  3         And it is fair to tell somebody that's the

16:57:48  4    projected schedule because if you've got family, you've

16:57:51  5    got employers and so forth from work.  And that may be

16:57:55  6    helpful.  Not a promise as to when you'll conclude.  I

16:57:59  7    can't say that.  I can't say that.

16:58:01  8         So seven things.  Don't discuss the case

16:58:05  9    amongst yourselves, right?  Don't talk with anybody else

16:58:09  10    about the case, that includes family members, friends,

16:58:12  11    anybody else about the case, period.

16:58:16  12         Three is if somebody tries to talk to you about

16:58:20  13    the case -- that would be unusual.  It has happened very

16:58:24  14    rarely, but occasionally happens, that someone does try to

16:58:28  15    do that.  First thing, "I can't talk about the case."  But

16:58:32  16    the second thing, if someone persists in inquiring, then

16:58:35  17    you definitely need to let us know.  Probably let us know

16:58:38  18    anyway.  And we will make the appropriate inquiry.

16:58:42  19         The fourth thing is, unlikely that you will see

16:58:46  20    any of the lawyers or witnesses or parties during this

16:58:50  21    period of time, but you never know.  And so if you should,

16:58:53  22    just certainly avoid them.  They will avoid you.  Of

16:58:57  23    course when you come in on Monday, continue to avoid

16:59:01  24    anybody who has anything to do with the case.

16:59:03  25    Occasionally I see you, because we are in the same back

1   area.

2          The fifth thing is, don't do any research or

3   make any inquiry.  And that is the thing that actually

4   becomes a matter of curiosity.  And I understand that.  It

5   is absolutely forbidden for all reasons you know.  You

6   cannot use anything you find or found anyway.  That would

7   be inappropriate.  But you also might be influenced by

8   something and, therefore, you must avoid that.

9          If you inadvertently see something -- I can't

10  tell you that there won't be an article in "Popular

11  Mechanics" about something like this, and you're looking

12  at it.

13         Sometimes somebody inadvertently sees

14  something.  You just need to tell me about it.  It's

15  probably not a problem, but the parties are entitled, and

16  the Court, for that type of transparency.  So if you do

17  see something, just remember to let me know when you come

18  back on Monday.

19         Of course, avoid anything in the media about

20  this case or cases like it.  And it's more of a "like it"

21  cases that are always a possibility.  And so if you

22  should, again, see something in the media that, and

23  includes blogs or anything else, then, of course, let us

24  know.

25         And then the last thing is, continue to keep an

17:00:25 1      open mind until you've heard all the evidence in the case,

17:00:29 2      the final arguments of counsel, and the final instructions

17:00:31 3      on the law, and you've gone to the jury room and discussed

17:00:35 4      the case among yourselves.  And then only after all of

17:00:38 5      that, should you begin to make up your mind as to what you

17:00:42 6      think should be done.  And then the jury has the jury's

17:00:48 7      determination as to any verdict.

17:00:50 8              And really, when we take a long a break, I am

17:00:51 9      required to tell you that.  We do appreciate your

17:00:55 10     patience.  I really appreciate everybody being very

17:00:59 11     prompt.

17:00:59 12             It's been a very -- it's been a great group.

17:01:02 13     And I think it's contributed substantially to our being

17:01:06 14     able to move through the evidence.  So that's very

17:01:09 15     important.

17:01:09 16             On Monday, we should start in here at 8:30.

17:01:13 17     And that means you need to be here, obviously, no later

17:01:18 18     than 8:15, and we will -- we should hit the targets that

17:01:24 19     we've got right now in terms of the evidence in the

17:01:26 20     matter.

17:01:27 21             So all of you have a good Mother's Day, for

17:01:33 22     those who are going to celebrate the holiday.  Please do.

17:01:38 23     And come back and be rested and ready to go on Monday.

17:01:42 24             Thank you all so much, and we will let you be

17:01:43 25     excused through the jury room.  I have to stay here a

17:01:46  1    couple of minutes.

17:01:48  2         (The jury exits the courtroom at 5:01 p.m.)

17:02:12  3         **THE COURT:** Everybody can be seated just for a

17:02:14  4    minute.  I want to see what all of you think is the best

17:02:17  5    way to proceed.

17:02:19  6         We have received, I believe, all of the

17:02:21  7    evidence on questions of liability.

17:02:24  8         Is that what I am correct in understanding?  I

17:02:27  9    may not be quite right about that, but I know I've got to

17:02:31 10    be close.

17:02:31 11         **MR. MASTERS:** No, I think that's right.  The

17:02:32 12    next -- last witness is Ms. Bennis, who is on damages

17:02:36 13    issues.

17:02:37 14         **THE COURT:** Absolutely, and that's what I

17:02:38 15    understand.  And we talked about earlier that it would be

17:02:42 16    very useful and probably more efficient and probably of

17:02:45 17    greater comfort to both sides to have exchanged

17:02:51 18    information on any Rule 50 motion, unless the defendant is

17:02:54 19    not going to make one.

17:02:57 20         I'm looking over there just to be sure.  I've

17:02:59 21    got a smile on my face.

17:03:02 22         And the point there is, I do want to ask if the

17:03:06 23    defense thinks that's a good idea at least to submit

17:03:10 24    whatever Rule 50 position you have on liability, and maybe

17:03:14 25    damages too, but so that you've had a chance to fully

17:03:19  1    write that up and articulate it in that way.

17:03:23  2              Now, you may not want to.  I know it's always

17:03:27  3    tough to do things on the weekends, and I do understand

17:03:29  4    that.  But I think it might be a good idea, and it might

17:03:34  5    give you a higher level of confidence that you've covered

17:03:36  6    the points you want to.  I just want to ask what you

17:03:39  7    think.

17:03:40  8              MR. ELKINS:  Yeah.  Your Honor, we had

17:03:42  9    definitely planned to file a Rule 50 motion regarding

17:03:47 10    false advertising.

17:03:48 11              THE COURT:  Sure.

17:03:49 12              MR. ELKINS:  We were considering a couple other

17:03:51 13    issues.  But I'll let Mr. Masters speak to the false

17:03:58 14    advertising.

17:03:58 15              With respect to the other issues that -- to be

17:04:02 16    quite honest, you know, we like to be spare in our Rule 50

17:04:07 17    motions, and only move on things that are likely to move

17:04:12 18    the needle or for which we need to make a record.  And so

17:04:16 19    we're going to -- considering those.  But I will let Mr.

17:04:18 20    Masters speak with respect to the false advertising.

17:04:21 21              THE COURT:  Absolutely.  And we, you know,

17:04:23 22    sometimes have a little different timing.  We had a

17:04:28 23    conference to talk about it.  And, Mr. Masters, I think

17:04:30 24    you know the issues you've got to address, and maybe that

17:04:34 25    might be one of them.  I know you are thinking about that.

17:04:39  1          What are your thoughts right now?

17:04:39  2          **MR. MASTERS:**  Well, the plaintiffs intend to

17:04:41  3    dismiss their false advertising claim.

17:04:43  4          **THE COURT:**  Then that takes care of that.

17:04:45  5    There will be no false advertising claim in the case.  May

17:04:48  6    I take that as a motion?

17:04:50  7          **MR. MASTERS:**  You may.

17:04:51  8          **THE COURT:**  Okay.  So the motion -- well,

17:04:52  9    unless there's objection by the defense?

17:04:56 10          **MR. ELKINS:**  No opposition, Your Honor.

17:04:57 11          **THE COURT:**  It's the right thing to ask,

17:04:58 12    though.

17:04:59 13          **MR. ELKINS:**  Thank you.  I appreciate it.

17:05:01 14          **THE COURT:**  Technically, I can't do it unless

17:05:03 15    you agree.

17:05:04 16          **MR. ELKINS:**  Well, we join in the motion.

17:05:06 17          **THE COURT:**  Okay.  Absolutely.  So that will

17:05:07 18    also let us continue to clean up the instructions, which

17:05:12 19    is good, and, also, the verdict form, which we will

17:05:16 20    continue to do.  So that's very, very helpful.

17:05:18 21          And I always -- I told people the other day

17:05:22 22    that it's not unusual for that to occur, so I don't want

17:05:26 23    either of you to think that's odd.  That's good lawyering.

17:05:29 24    Typically, in terms of how things are handled by both

17:05:33 25    sides, and I appreciate it.

17:05:35  1              Okay.  Anything else?

17:05:36  2              MR. MASTERS:  I think you sent instructions,

17:05:38  3      final jury instructions maybe today and asked for a

17:05:43  4      response by Monday.  Should we just submit red lines?

17:05:47  5              THE COURT:  If you want us to clean that up

17:05:50  6      first.

17:05:51  7              MR. MASTERS:  If you wish, or we could do it

17:05:53  8      and submit something to the Court.

17:05:56  9              THE COURT:  I mean, I'm always glad to have you

17:05:58 10      do it.  I mean, at a certain point it kind of becomes our

17:06:02 11      material.  Well, it is our material.  But if you'd both

17:06:07 12      like to submit it, that's fine.  As long as you submit it

17:06:11 13      in a Word format, and we will take care of it, of course,

17:06:15 14      of it will remain in the same format that it is now.

17:06:18 15              Do you want to do that on the schedule that

17:06:20 16      we've got?

17:06:21 17              MR. MASTERS:  We can do that on the schedule

17:06:23 18      that you propose, but just in terms of dismissing this

17:06:26 19      claim, this does not get in front of the jury in any

17:06:29 20      respect?

17:06:30 21              THE COURT:  No, no.  We -- it just disappears.

17:06:31 22      It's as though it was never there.  And that's not a

17:06:37 23      problem.  If somebody inquires about it, we say that's

17:06:40 24      routinely how matters are handled.  It's not anything for

17:06:45 25      them to be concerned about, and they shouldn't consider it

17:06:48  1    at all as to reaching verdict as to the claims that are

17:06:51  2    before them.

17:06:52  3            If I need to say something, I will.  A lot of

17:06:55  4    times saying something is less helpful than not saying

17:06:59  5    anything.  You think about it.  If you want me to say

17:07:02  6    something, I will.

17:07:03  7            **MR. MASTERS:**  Okay.  And the defense cannot

17:07:05  8    raise that issue in any arguments.

17:07:08  9            **THE COURT:**  Of course not.  They're delighted

17:07:10 10    not to because they don't have to deal with it now, and

17:07:13 11    you all have a time limit.  Absolutely.  Okay, that's

17:07:17 12    good.  I think we have a schedule, then, for receiving

17:07:20 13    Rule 50 materials.

17:07:23 14            Is that going to work for defense?

17:07:25 15            **MR. ELKINS:**  Yes.  We will alert Mr. Masters

17:07:28 16    and his team as soon as we can, either tonight or early

17:07:32 17    tomorrow, whether we are going to file a Rule 50 motion at

17:07:35 18    all.

17:07:36 19            **THE COURT:**  Sure.

17:07:37 20            **MR. ELKINS:**  And if we are, then we will alert

17:07:39 21    them as to the issues, and we will get them -- I think

17:07:46 22    that we would get them a brief if we are going to file

17:07:49 23    anything, tomorrow.  And it will be -- I mean, I

17:07:53 24    anticipate Your Honor isn't, you know, it would be

17:07:58 25    probably better articulated than if we did it orally, but

17:08:01  1    it's not going to be what we would do after the verdict.

17:08:05  2         **THE COURT:**  Right.  We had identified the issue

17:08:06  3    that you might want to tell us about, so we are all ahead

17:08:11  4    on that.  Okay.  I think that's -- yes, sir.

17:08:14  5         **MR. ELKINS:**  So I have two questions.  The

17:08:15  6    first is -- and I have not had time to look at the draft

17:08:21  7    final jury instructions, if they're -- are they in Word?

17:08:25  8         **THE COURT:**  We usually send a PDF so you can't

17:08:28  9    mess it up.  I know that sounds kind of funny, but we send

17:08:33 10    a PDF because it's -- comments are more welcome than

17:08:39 11    rewrites.  Because you can do a red line.  That would have

17:08:42 12    been okay.  We could have sent it in Word, we just usually

17:08:45 13    don't.  Do you want us to try to send a Word?

17:08:48 14         **MR. ELKINS:**  It's easier to suggest red lines

17:08:51 15    in Word than in a PDF.  And given that the final

17:08:54 16    instructions are much lengthier than the special verdict

17:08:57 17    form or the preliminary instructions, that would be

17:09:00 18    easier.

17:09:00 19         **THE COURT:**  I think that's okay.  We do both.

17:09:05 20    We have to be -- this is not a problem in Delaware.

17:09:09 21    That's not a problem at all.  So we will send you one in

17:09:12 22    Word.  It may might -- I'm not exactly when you'll get it.

17:09:16 23    But you'll get it fairly soon.

17:09:18 24         **MR. ELKINS:**  The second issue is, I know Your

17:09:19 25    Honor is -- will probably ask if I didn't raise it, but I

17:09:23 1   thought I would raise it.  Would you like to know what we

17:09:25 2   are doing next week after --

17:09:27 3       THE COURT:  I did.  That was actually the thing

17:09:29 4   that I have to get to next.  I did want to know what you

17:09:34 5   are doing.  That's exactly right.  I know we started out

17:09:38 6   with Bennis, and, of course, I assume that -- and I hope I

17:09:42 7   was correct, that should conclude in the morning from both

17:09:47 8   of you?  Is that going to?  I know she's fairly long.

17:09:51 9       MR. MASTERS:  I would anticipate the direct

17:09:53 10   would be 40 minutes, maybe less.  So fairly quick.

17:09:58 11       THE COURT:  We had it assessed at not more than

17:10:00 12   an hour.  I don't know what it will be, but we guessed.

17:10:04 13       MR. ELKINS:  And I would expect that the cross

17:10:06 14   would be 30 to 40 minutes.

17:10:10 15       THE COURT:  Okay.  We are in great shape on

17:10:12 16   that on.

17:10:14 17       MR. ELKINS:  So --

17:10:14 18       THE COURT:  So we will take a brief conference

17:10:18 19   period, but we may not need to now that the issue that was

17:10:23 20   most before us is resolved.

17:10:27 21       MR. ELKINS:  Okay.

17:10:27 22       THE COURT:  Now let's hear from -- we're really

17:10:28 23   going to need the defense sequence.

17:10:33 24       MR. ELKINS:  I'm happy to share the full

17:10:35 25   sequence.  So we are going to start on Monday after

17:10:41  1    Ms. Bennis completes her testimony by opening our case

17:10:45  2    with Ms. Winters, who is our client representative and has

17:10:50  3    been sitting through the trial.

17:10:53  4          We anticipate next offering Mr. Daeho Kim, who

17:11:01  5    is the director of device engineering for Akoustis.  He

17:11:06  6    will be followed by the video deposition of Ms. Leah

17:11:10  7    Giovan, who is a former Qorvo employee.  Then we will have

17:11:21  8    Akoustis' director of human resources, Holly Johnson.  I

17:11:29  9    anticipate all of that can be completed on Monday.

17:11:35 10          THE COURT:  That seems very likely to me.

17:11:38 11          And than the rest of the schedule?

17:11:40 12          MR. ELKINS:  Yep.  Then -- and this is --

17:11:43 13    Mr. Lemieux and I did not get a chance to confirm this

17:11:51 14    together, so there might be slight adjustments, but

17:11:55 15    nevertheless, these are the remaining -- and then it's

17:11:57 16    experts, Your Honor.  We have four of them.  So we have

17:12:01 17    Dr. Clark Nguyen, Dr. Darveaux, Dr. Lebby, and our damages

17:12:12 18    expert is Carlyn Irwin.  And I think we can do all of

17:12:19 19    those in one day.

17:12:21 20          THE COURT:  All right.

17:12:22 21          MR. ELKINS:  And then we would rest.  So

17:12:23 22    there's -- I believe there's pretty good chance following

17:12:28 23    the schedule we've been going, if we go to 5:30 each day,

17:12:33 24    we may be able to rest the end of the day Tuesday.  And

17:12:37 25    then we could either close first thing Wednesday morning,

17:12:41  1   or if -- I think plaintiff would, obviously, need to

17:12:45  2   decide whether it wants to put on a rebuttal case,

17:12:49  3   depending on how much time it has left, but we could do

17:12:52  4   closing on Wednesday and instruct the jury.

17:12:55  5         **THE COURT:**  Right.  And at this time, I was

17:12:57  6   anticipating that if there was rebuttal, it would be in

17:13:00  7   the range of not more than a total of 15 minutes because

17:13:04  8   of your timing.

17:13:05  9         **MR. MASTERS:**  Right.

17:13:06 10         **THE COURT:**  Limitations.

17:13:07 11         **MR. MASTERS:**  That's right.

17:13:07 12         **THE COURT:**  And maybe no rebuttal.

17:13:09 13         **MR. MASTERS:**  That's also, right.

17:13:11 14         **THE COURT:**  And that's actually not uncommon

17:13:13 15   either, in case somebody is not aware of that.  All right.

17:13:16 16   And that means it is likely that we would -- and even if

17:13:19 17   we finish the defense case on Tuesday, at, let's say,

17:13:23 18   4:30, we're obviously not going to close then.  We're

17:13:27 19   going to close the next morning.  You will have evening,

17:13:31 20   and that's much better to let you be absolutely

17:13:36 21   comfortable and ready to go on that.

17:13:38 22         We talked about closing lengths at one point,

17:13:40 23   at least I had earlier talked about that, and I think the

17:13:46 24   thought was that they might need to be a little longer

17:13:50 25   than openings, but not a whole lot longer.

17:13:54  1              I'm going to ask Mr. Masters.

17:13:59  2              **MR. MASTERS:**  I think that's right; they will

17:14:00  3    be longer than the openings.

17:14:03  4              **THE COURT:**  Right.  And I'm thinking you're

17:14:04  5    probably thinking an hour and ten minutes is a long time.

17:14:08  6              **MR. MASTERS:**  An hour and ten minutes?

17:14:09  7              **THE COURT:**  Is that too long?

17:14:11  8              **MR. MASTERS:**  No.

17:14:13  9              **THE COURT:**  I'm not restricting you --

17:14:15 10              **MR. MASTERS:**  I think in that ballpark, hour

17:14:15 11    and ten, hour and 15.

17:14:16 12              **THE COURT:**  I'm looking for guidance; that's

17:14:18 13    all I'm looking for.

17:14:20 14              **MR. MASTERS:**  Hour and 15 minutes.

17:14:21 15              **THE COURT:**  That's not a problem.  I don't have

17:14:24 16    any problem with that.  I think we all want a little

17:14:26 17    guidance here.  An hour and 15.  And that's probably --

17:14:29 18    defense is probably saying that's more than enough time.

17:14:33 19              **MR. ELKINS:**  Yes, it is.

17:14:35 20              **THE COURT:**  Okay.  And then rebuttals always

17:14:36 21    are short.  I've said that -- I say it in every case.  And

17:14:40 22    that means short.  That means not long enough to

17:14:45 23    rearticulate things that have been said earlier, but to

17:14:48 24    only address new matters.

17:14:50 25              I think that covers everything.  We've got a

great schedule.  And, you know, I appreciate it.  I don't
know about anybody else, but I do appreciate the fact that
everybody has been working hard.  So maybe you will get a
little time off this weekend.  I'm not advising that.  I'm
just saying you might, hopefully.

       **MR. ELKINS:**  I will dream of that tonight, Your
Honor.

       **THE COURT:**  All right.  Well, it's good.  We
have a good schedule, and I think we are ready to shut
down for the day, then.  We'll have the hours again in a
few minutes, and I will try to look at those.  I have to
go to Baltimore.

       **MR. ELKINS:**  You have a phone call.

       **THE COURT:**  Thank you.  Very much.

       (The proceedings concluded at 5:15 p.m.)


<u>CERTIFICATE OF COURT REPORTER</u>


    I hereby certify that the foregoing is a true and
accurate transcript from my stenographic notes in the
proceeding.

                       /s/ Bonnie R. Archer
                       Bonnie R. Archer, RPR, FCRR
                       Official Court Reporter
                       U.S. District Court

# EXHIBIT L

13:12:40

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

QORVO, INC.,                    ) VOLUME 6
                               )
              Plaintiff,       )
                               ) C.A. No. 21-1417(JPM)
v.                             )
                               )
AKOUSTIS TECHNOLOGIES, INC.,)
and AKOUSTIS, INC.,            )
                               )
              Defendants.      )


                    Monday, May 13, 2024
                    8:30 a.m.
                    Jury Trial


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE JON P. McCALLA
         United States District Court Judge



APPEARANCES:


         MORRIS NICHOLS ARSHT & TUNNELL LLP
         BY:  JEREMY A. TIGAN, ESQ.
         BY:  ANTHONY D. RAUCCI, ESQ.

         -and-

         SHEPPARD MULLIN RICHTER & HAMPTON LLP
         BY:  ROBERT M. MASTERS, ESQ.
         BY:  JONATHAN R. DeFOSSE, ESQ.
         BY:  TIMOTHY P CREMEN, ESQ.
         BY:  KAZIM A. NAQVI, ESQ.
         BY:  JENNIFER KLEIN AYERS, ESQ.

                    Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2

3              BAYARD, P.A.
               BY:  STEPHEN B. BRAUERMAN, ESQ.
4              BY:  RONALD P. GOLDEN, III, ESQ.

5              -and-

6              SQUIRE PATTON BOGGS (US) LLP
               BY:  RONALD S. LEMIEUX, ESQ.
7              BY:  DAVID S. ELKINS, ESQ.
               BY:  VICTORIA Q. SMITH, ESQ.
8              BY:  XIAOMEI CAI, ESQ.
               BY:  RACHAEL A. HARRIS, ESQ.
9              BY:  MATTHEW A. STANFORD, ESQ.

10                         Counsel for the Defendants

11

12

13              _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

14

15

08:24:24 16    .

08:24:24 17              THE COURT:  We have one juror -- we have one

08:24:24 18    juror that we're waiting on.  And we have a couple of

08:24:24 19    materials, things to go over.  Since we have a little time,

08:24:27 20    we may want to talk about it, on the request for traditional

08:24:32 21    notice, it just seems problematic to add that many pages at

08:24:38 22    this point in time, and it seems confusing under 403.  And

08:24:43 23    really not particularly probative probably on the issue.

08:24:47 24              This is a 2011 set of material, as I understand

08:24:51 25    it, is that right?  Somebody knows what they're talking

08:24:58  1    about here.   There we go.

08:25:00  2              MR. DeFOSSE:  Good morning, Your Honor, I think

08:25:01  3    it was filed in 2012, Your Honor.

08:25:03  4              THE COURT:  It's an older case?

08:25:06  5              MR. DeFOSSE:  Actually 2011, you're correct.

08:25:08  6              THE COURT:  2011, most of the time we get it

08:25:14  7    right.   Go ahead and tell me, I have got the material, I

08:25:18  8    have looked at it, anything else from Akoustis on this

08:25:22  9    particular question, this rather large document?

08:25:27 10              MR. LEMIEUX:  Good morning, Your Honor.

08:25:29 11              THE COURT:  Good morning.

08:25:30 12              MR. LEMIEUX:  We believe this information is

08:25:32 13    directly relevant to their claim that this information is

08:25:36 14    trade secret, when in fact, it's been in the public domain

08:25:40 15    for, as you know, for over ten years as part of a public,

08:25:43 16    you know, declaration they filed at that time.

08:25:46 17              You asked us to try to illustrate the relevance

08:25:50 18    by showing which pieces of that declaration.

08:25:52 19              THE COURT:  Sure.

08:25:53 20              MR. LEMIEUX:  Applied to which claims that have

08:25:55 21    been made by the plaintiff in this case, and that's what the

08:25:58 22    exhibits attempt to do for you, is show where each part --

08:26:03 23    we haven't used all of the declaration that was filed, but

08:26:06 24    where the parts that were filed, we believe were directly

08:26:09 25    relevant to the various alleged trade secrets.

08:26:11  1          THE COURT:  Let me ask this question.  Were you

08:26:13  2   only going to use pages 104, 142, 145, and 171?

08:26:20  3          MR. LEMIEUX:  I believe those are the pages,

08:26:23  4   Your Honor, that we were using to -- that are directly

08:26:26  5   relevant to --

08:26:27  6          THE COURT:  That you were referenced --

08:26:29  7          MR. LEMIEUX:  Referenced in the reports.

08:26:32  8          THE COURT:  There are materials that are

08:26:35  9   referenced in the report, and usually be used.

08:26:38 10          Now, most of the time, or many times, the

08:26:42 11   materials that are referenced in the report might not

08:26:45 12   necessarily be received as exhibits.  So we'll talk about

08:26:49 13   that, but now you're talking about, so you really don't want

08:26:52 14   to use 196 pages.  I want to make sure I got that right.

08:26:57 15          MR. LEMIEUX:  I think that was an attempt by one

08:26:59 16   of my colleagues, Your Honor, to show where each of those

08:27:01 17   pages did relate specifically to a trade secret alleged in

08:27:04 18   this case, but most particularly what I'm interested in, is

08:27:08 19   making sure that the materials that were relied upon by my

08:27:11 20   expert as being established and being in the public domain,

08:27:14 21   are in fact able to be in evidence in front of the jury.

08:27:17 22          THE COURT:  That's really the support pages.

08:27:21 23   Okay.  That's more narrow.  Let's hear now, we've now

08:27:26 24   reduced it by 192 pages, so that's a good start.

08:27:30 25          MR. DeFOSSE:  No problem with those pages, Your

08:27:33  1    Honor.  We still don't think traditional notice is

08:27:36  2    necessary, we think that gives --

08:27:37  3            THE COURT:  We're not receiving, apparently no

08:27:41  4    real interest in receiving this 196 page document if it

08:27:47  5    would only be a possibility that they could show pages 104,

08:27:51  6    142, 145 and 171.

08:27:53  7            MR. DeFOSSE:  That's right, Your Honor, and I

08:27:55  8    guess on the judicial notice part, this document has already

08:27:59  9    been put in front of Dr. Aigner, he's --

08:28:05 10            THE COURT:  Looks like we're taken care of on

08:28:08 11    that.  That resolves that.  We don't have to talk about a

08:28:12 12    larger document.  The larger document would have been

08:28:15 13    confusing, it reminds me of a case I had a long time ago I

08:28:20 14    may have told you about, when the jury got the suitcase that

08:28:23 15    got on the airplane, did I mention that one?

08:28:25 16            MR. DeFOSSE:  I don't think so, Your Honor.

08:28:27 17            THE COURT:  So the jury comes back and they find

08:28:31 18    the defendant, it was a female who was transporting

08:28:35 19    controlled substances from California and turned out that

08:28:38 20    the jury went back and they unpacked the suitcase, which was

08:28:43 21    fine except nobody else had done it or talked about it

08:28:46 22    during the case; turns out when they unpacked the suitcase,

08:28:51 23    they said she must have known there was drugs in here

08:28:55 24    because of the contents that were placed in the suitcase,

08:28:58 25    anyway she was convicted, it was interesting because nobody

08:29:01 1    talked about it.  Nobody talked about it.

08:29:03 2              That's a risk when you have 196 page document is

08:29:06 3    you don't know what people are talking about so you want to

08:29:09 4    focus on the material that is relevant.

08:29:11 5              I think we covered that one.  That's done.

08:29:13 6              MR. LEMIEUX:  I just want to make it clear for

08:29:16 7    the record, Your Honor, we believe those other pages are

08:29:18 8    directly relevant to the trade secrets alleged here, but

08:29:21 9    understand Your Honor's ruling, the concerns the Court has.

08:29:26 10   I was just making it clear for our record potentially that

08:29:30 11   --

08:29:30 12             THE COURT:  Maybe I misunderstood, but I thought

08:29:33 13   we were saying the focus is these four pages, is that right?

08:29:38 14             MR. LEMIEUX:  That is the primary focus, Your

08:29:40 15   Honor, but we do believe those other materials are relevant

08:29:42 16   and show background for purposes of showing what was in the

08:29:45 17   public domain and what was not.

08:29:47 18             THE COURT:  It really does have a 403 aspect to

08:29:50 19   it, it -- if someone wants me to go through 192 additional

08:29:55 20   pages, we can do that, but since they have not been talked

08:30:00 21   about, had not been previously indicated would be marked and

08:30:05 22   received, we should not take judicial notice of that and

08:30:09 23   adopt the position of Qorvo.  So that takes care of that.

08:30:13 24             MR. LEMIEUX:  Thank you, Your Honor.

08:30:14 25             THE COURT:  Now, there was an issue, and this

08:30:16  1    might have been partly addressed but I don't think so yet,

08:30:19  2    this issue about the document that related to Ms. Johnson.

08:30:27  3    And I may not have the material that I'm able to make a

08:30:31  4    decision on that.  I read what you got, what you've

08:30:34  5    submitted, and I understand that this is part of -- it

08:30:40  6    refers to things that were being submitted as an exhibit,

08:30:43  7    but I wanted to be certain that it wasn't just a

08:30:46  8    demonstrative, but I think it's submitted as an exhibit but

08:30:49  9    I want to know for sure.

08:30:50 10                MR. DeFOSSE:  That's right, Your Honor.

08:30:51 11                THE COURT:  It has been submitted as an exhibit,

08:30:55 12    that's what I thought.

08:30:56 13                MR. DeFOSSE:  Yes, that's right.

08:30:58 14                So it's been marked for identification as

08:31:02 15    Exhibit 990, DTX-990.  We want to make clear, we only have

08:31:06 16    issue with one statement in here, which we think is a

08:31:09 17    hearsay statement.

08:31:10 18                THE COURT:  Some companies that participate

08:31:12 19    include, and it's got a list, includes Qorvo, but that was

08:31:16 20    not the issue, it was the list of all the companies.

08:31:20 21                MR. DeFOSSE:  Yes.  So what we think the purpose

08:31:23 22    of this document, Your Honor, is to suggest that Qorvo is

08:31:26 23    sharing publicly its compensation information.  I know my

08:31:30 24    friends on the other side have a different view.  We think

08:31:33 25    that under their view, the document would be irrelevant.

08:31:37 1          THE COURT:  We're going to have to retrieve my

08:31:40 2    pad because I don't have anything to read from, and this one

08:31:44 3    is not on.  Sorry about that.

08:32:00 4          (Discussion off the record.)

08:32:05 5          MR. DeFOSSE:  So, yes, Your Honor, the issue is

08:32:08 6    just that one statement which we believe is hearsay.  I know

08:32:11 7    my friends on the other side said they're not submitting it

08:32:14 8    for the truth of the matter, but we think that's a little

08:32:16 9    bit of a smoke screen here.  The reason that they want to

08:32:19 10   put it in front of the jury is to suggest that Qorvo is

08:32:21 11   sharing publicly its confidential compensation information.

08:32:26 12   And that -- if it's for that purpose, which we think it is,

08:32:31 13   it's a hearsay statement.

08:32:32 14          THE COURT:  Can you show me exactly what the

08:32:34 15   material looked like in the report, in the Radford report,

08:32:41 16   that might help.  Is that helpful to me making this

08:32:45 17   decision, maybe you can show that.

08:32:54 18          MR. DeFOSSE:  The Radford report, Your Honor, is

08:32:56 19   not being submitted into evidence, so I don't have that for

08:32:59 20   the Court, for the information, but I think --

08:33:04 21          THE COURT:  It's a market survey or something

08:33:06 22   that's done by a CPA firm or something like that, they do

08:33:09 23   compensation surveys all the time, but sometimes they

08:33:12 24   attribute the sources of two information, sometimes they do

08:33:16 25   not attribute the sources of the information.  I do not know

08:33:19  1    now what the survey looks like.

08:33:21  2              MR. DeFOSSE:  Yes, Your Honor.  And frankly, I

08:33:25  3    don't think we haven't either.  My understanding from

08:33:27  4    Ms. Johnson's testimony is at least, it's possibly an

08:33:31  5    anonymized, it's possibly aggregated, I can't recall

08:33:37  6    exactly.

08:33:37  7              THE COURT:  What I have seen in the past it

08:33:39  8    depends, it depends on what they say.  Usually it is

08:33:43  9    anonymous because they don't want to disclose exactly what

08:33:47 10    they're doing, but I do not know, I cannot tell.

08:33:50 11              MR. DeFOSSE:  Exactly our point, Your Honor,

08:33:52 12    with this statement, they're allowed to make an implication.

08:33:56 13    It would be one thing-- I see what Your Honor is saying if

08:33:59 14    they had the survey itself, and it was disclosing the

08:34:02 15    compensation information, we might have a different

08:34:06 16    discussion here, but all we have is a statement and a

08:34:08 17    PowerPoint saying Qorvo is participating in a survey and I

08:34:11 18    think they want to use that to suggest that well, we must

08:34:14 19    have been sharing our information.

08:34:16 20              THE COURT:  The fact that it was provided in the

08:34:19 21    process of a third party developing a report and we don't

08:34:24 22    know the conditions of that material being provided.  We

08:34:30 23    have a -- we've had different cases, I have not seen someone

08:34:35 24    try to say that somebody who may have participated in a

08:34:37 25    report or didn't participate in a report that that was

08:34:41  1    somehow giving up confidential information on an issue of

08:34:45  2    survey -- of compensation, I don't know.  Tell me more, let

08:34:50  3    the defense tell me more about this.

08:34:53  4                    MR. ELKINS:  Certainly.  Good morning, Your

08:34:54  5    Honor.

08:34:54  6                    THE COURT:  Good morning.  How are you this

08:34:56  7    morning?

08:34:56  8                    MR. ELKINS:  I'm doing well.

08:34:57  9                    THE COURT:  Did you have a good weekend?

08:34:58  10                   MR. ELKINS:  Well, you probably had a better

08:35:00  11   one, but it was good.

08:35:02  12                   THE COURT:  Well, good.

08:35:03  13                   MR. ELKINS:  I'm still standing.

08:35:04  14                   THE COURT:  I hope everybody got some rest.  I

08:35:07  15   think people look a little more rested.

08:35:10  16                   MR. ELKINS:  I think so.  Thank you.

08:35:11  17                   Do you have a copy of the proffered exhibit?

08:35:14  18                   THE COURT:  I have it right here.

08:35:16  19                   MR. ELKINS:  That's perfect.  I just want to

08:35:17  20   make sure.

08:35:18  21                   THE COURT:  That's all I got.  Without more,

08:35:20  22   it's kind of difficult.

08:35:21  23                   MR. ELKINS:  Let me give you some context, then,

08:35:24  24   Your Honor, as to why this document is being proffered.

08:35:27  25                   Ms. Johnson, who is the sponsoring witness --

08:35:31  1    THE COURT:  Realtime didn't come up.  It should

08:35:34  2  be there, the link right there.  Tomorrow we are going to be

08:35:42  3  a little concerned that we will have the Biden matter here,

08:35:47  4  not in this courtroom, but apparently next door.  So we will

08:35:53  5  time things so it shouldn't be a problem.  That hearing is

08:35:58  6  supposed to be at 11:00.  If we work it right, still not

08:36:01  7  going to be great, we will start our normal, right, and we

08:36:05  8  will take our break close, it's going to be a little

08:36:09  9  complicated, but close to 10:30, and that's the best we can

08:36:17 10  do.  You realize that's going to happen.

08:36:19 11    MR. ELKINS:  I didn't know, Your Honor, until

08:36:20 12  you just mentioned it.

08:36:21 13    THE COURT:  I just want to make sure, we got to

08:36:24 14  think through that a little bit more.  I think we should be

08:36:26 15  okay.  The jury will be here.  They'll be in the back.  It

08:36:30 16  should be generally okay.

08:36:31 17    MR. ELKINS:  I'm sorry, is the president going

08:36:33 18  to be next door?

08:36:34 19    THE COURT:  Not the president, no, his son.

08:36:36 20    MR. ELKINS:  It's going to be --

08:36:38 21    THE COURT:  Right next door.  Remember, he's got

08:36:40 22  a case here.

08:36:41 23    MR. ELKINS:  Okay.  Fair enough.

08:36:45 24    THE COURT:  I thought everybody knew this.

08:36:49 25    MR. ELKINS:  I might be the last person to know.

08:36:58  1    I'm not sure if you have got realtime back up.

08:37:01  2                THE COURT:  It's coming up now.  We're going to

08:37:04  3    set it up twice.  I know it seems odd.  We were going to

08:37:08  4    have two of them running.  Just a second.  Go ahead, I'm

08:37:11  5    just having a problem here --

08:37:13  6                MR. ELKINS:  Let me give you the context, Your

08:37:15  7    Honor.

08:37:15  8                THE COURT:  Yes.

08:37:15  9                MR. ELKINS:  So the -- during her deposition, so

08:37:20 10    Ms. Johnson was a 30(b)(6) witness for Akoustis regarding

08:37:24 11    human resources issues and as you know, the Plaintiff makes

08:37:28 12    a poaching allegation in this case.

08:37:30 13                THE COURT:  Right.

08:37:31 14                MR. ELKINS:  And so Ms. Johnson was proffered as

08:37:33 15    the corporate designee of Akoustis regarding this poaching

08:37:37 16    allegations, and so she was examined at her deposition about

08:37:43 17    a -- some documents that Mr. Houlden, Rohan Houlden had sent

08:37:51 18    to her by e-mail with a compensation spreadsheet that Qorvo

08:38:01 19    contends is a key to compensation for all levels of all

08:38:07 20    people across the entire company.

08:38:10 21                And in -- Mr. Houlden had provided it to

08:38:15 22    Ms. Johnson, and the allegation was that Akoustis had taken

08:38:19 23    that information and planned to make offers of compensation

08:38:24 24    benefits to employees using Qorvo information.  Ms. Johnson

08:38:28 25    testified in her deposition that's incorrect, that she

08:38:30 1 rejected Mr. Houlden's information, that the company did put

08:38:34 2 together a compensation structure, but because she didn't

08:38:37 3 trust the Qorvo information and she didn't think it was

08:38:41 4 appropriate to look at it, she had the company acquire a

08:38:45 5 compensation survey from Radford Aon, which as Your Honor

08:38:51 6 identified was one of these surveys.  That aggregates

08:38:55 7 information from different companies that participate in the

08:38:58 8 survey.

08:38:59 9          And one of the reasons that she did this --

08:39:04 10 well, not -- it wasn't a reason, but because essentially she

08:39:08 11 wanted to get Mr. Houlden off her back.  She understood that

08:39:15 12 the survey included aggregated information from among other

08:39:20 13 companies, Qorvo.  And that was one of the reasons why she

08:39:24 14 felt confident, vis-a-vis him in just going forward with

08:39:29 15 this, and rejecting his information.  That's the only

08:39:33 16 context that we're putting -- that we're -- it's to tell

08:39:37 17 that part of the story.  It's not to actually prove that

08:39:41 18 Qorvo participated.

08:39:42 19          There are a number of other companies in the

08:39:45 20 semiconductor industry that participated on an aggregated

08:39:50 21 basis and as indicated in the e-mail that we sent last

08:39:55 22 night, we think it's appropriate to come in.  If the Court

08:39:59 23 believes that a limiting instruction is necessary to guide

08:40:01 24 the jury's consideration of the document, of course we're

08:40:04 25 not going to object.

08:40:07  1                    Thank you.

08:40:08  2                    THE COURT:  Yes, sir.

08:40:09  3                    MR. DeFOSSE:  So, Your Honor, we have no

08:40:11  4     objection to the document coming in.  We have no objection

08:40:14  5     to Ms. Johnson referring to her desire to acquire a

08:40:19  6     third-party study.  What we have an objection to, is her

08:40:22  7     saying that she -- that this study including Qorvo's

08:40:25  8     information.  So it's a very limited objection that we have.

08:40:29  9     A limiting instruction we think is not helpful here because

08:40:32 10     it would only highlight for the jury the issue here.

08:40:36 11                    So with everything Mr. Elkins said, we're okay

08:40:41 12     with, up until the point that they want to elicit testimony

08:40:44 13     from Ms. Johnson that she acquired this because it had Qorvo

08:40:47 14     information in it.  We believe that's a hearsay statement

08:40:50 15     and is also a 403 problem.

08:40:54 16                    MR. ELKINS:  I have no objection to proceeding

08:40:57 17     the way that Mr. DeFosse just outlined, and I will be sure

08:41:01 18     to instruct the witness before she takes the stand that she

08:41:04 19     will not make that reference.

08:41:08 20                    THE COURT:  The question was whether or not the

08:41:12 21     particular compensation study information that was shown in

08:41:18 22     court would be shown to the jury.

08:41:20 23                    Let's go back to defense counsel briefly, but

08:41:26 24     yes, sir.

08:41:28 25                    MR. DeFOSSE:  So I don't believe, Your Honor,

08:41:29  1    that the compensation study itself is an exhibit that's

08:41:32  2    going to be shown to the witness, unless I'm incorrect.

08:41:35  3              THE COURT:  No, it's not going to be shown.

08:41:38  4              MR. ELKINS:  No, Your Honor, we deemed that that

08:41:40  5    would be too much detail that we didn't want to confuse the

08:41:44  6    jury by putting in that much paper.

08:41:47  7              THE COURT:  Sure.  The problem is, it is a 403

08:41:51  8    issue, whether or not it's going to create a problem for the

08:41:56  9    jury in terms of receiving information that would be less

08:42:02 10    probative and unfairly prejudicial.  I think that's the

08:42:06 11    issue.

08:42:07 12              And on this one, it does appear that this is

08:42:11 13    going to cause juror confusion, or will cause juror

08:42:15 14    confusion.  I don't think it affects the ability to give

08:42:18 15    testimony, all it does is remove from the panel something

08:42:22 16    that is more confusing -- confusing than probative in the

08:42:31 17    case.  So we're just going to strike that.  It's easy enough

08:42:35 18    to take that out of that particular document, everything

08:42:37 19    else is fine.  I think that covers that.

08:42:40 20              It's really a 403 issue.  I think that covers

08:42:44 21    that, yes, sir.

08:42:45 22              MR. ELKINS:  Just to make sure that we don't

08:42:47 23    display something we shouldn't, you know, you mean just take

08:42:50 24    that out, just take out the word Qorvo?

08:42:52 25              THE COURT:  No.  No.  I think because I can't

08:42:54  1    tell without saying -- and I'm not asking to see the survey

08:42:59  2    particularly, but without seeing the survey, I think the

08:43:03  3    worse problem is 403, I think that was already conceded in

08:43:07  4    the e-mail, because you said Akoustis is not relying on the

08:43:11  5    document to prove that Qorvo participated in the study.  Our

08:43:16  6    understanding was that that was -- one of the multiple

08:43:21  7    reasons where she caused Akoustis to purchase the survey.

08:43:25  8            We could take Qorvo out.  That might not be

08:43:28  9    quite correct.  We hate to do something that's not correct.

08:43:32 10    It seems like the easiest thing to do was to strike that

08:43:35 11    particular sentence.  And then she can say that it's not

08:43:42 12    uncommon, and it's routine actually in the accumulation of

08:43:45 13    this type of data that someone would put together such a

08:43:51 14    survey that would require numerous participants in the

08:43:58 15    industry and on a confidential basis would obtain their

08:44:01 16    information to compensation which I think is the way it's

08:44:04 17    usually done.  I'm not sure, does that sound about right.

08:44:07 18            MR. ELKINS:  I believe because the companies

08:44:09 19    participate in an aggregated way, they are not -- while

08:44:14 20    their information is being used and one could argue that

08:44:17 21    there is a waiver of confidentiality, nobody gets to see

08:44:21 22    Qorvo's individual information.

08:44:22 23            THE COURT:  Right.

08:44:23 24            MR. ELKINS:  On Semiconductor's individual

08:44:27 25    information, that way it's massed when it's published and

08:44:31  1    sold.

08:44:31  2              THE COURT:  Right, nobody actually sees Intel or

08:44:35  3    Samsung, but it's really an aggregation of information so

08:44:39  4    the inclusion of the language would tend to cause some

08:44:46  5    confusion, because of probative value, you got to explain

08:44:54  6    these surveys are prepared in such and such a way and

08:44:58  7    numerous companies would be inquired for this information,

08:45:02  8    it's beneficial to all of them to do that as you and I know,

08:45:06  9    they're trying to hire people, they want to know generally

08:45:10 10    what the industry is doing right, but they don't want

08:45:13 11    anybody to know what they're doing, is that about right?

08:45:15 12              MR. ELKINS:  That's correct.

08:45:16 13              THE COURT:  Absolutely.

08:45:17 14              MR. ELKINS:  I think I understand Your Honor, so

08:45:19 15    we should redact the entire bullet point.

08:45:22 16              THE COURT:  I would take that bullet point out.

08:45:24 17    That takes care of it.  But I'm not precluding that she can

08:45:27 18    -- and if the Plaintiff has a problem with that, we're not

08:45:31 19    precluding that there be some explanation of why these

08:45:34 20    surveys are useful.

08:45:35 21              MR. ELKINS:  Perfect.  Good.

08:45:36 22              THE COURT:  Thank you.  That covers that.

08:45:39 23    Hopefully we have got all our jurors now.  Absolutely.

08:45:43 24    We're running a little bit off of our regular schedule.

08:45:46 25              MR. DeFOSSE:  One small housekeeping matter,

08:45:48 1    Your Honor, we're obviously going to be resting today, and

08:45:51 2    the case is going to be passed to the other side and we

08:45:55 3    wanted some insight on how to handle confidentiality issues.

08:45:59 4    We're trying to be diligent right now.  We don't want to pop

08:46:04 5    up in the middle of their examination when they put up

08:46:06 6    Qorvo's information on the screen or something.  Our intent

08:46:09 7    was to continue to handle this as we have, we'll monitor the

08:46:13 8    courtroom and make sure there is no one else in here, and if

08:46:16 9    there is, then we would raise an issue.

08:46:18 10           THE COURT:  This is like some previous cases

08:46:20 11   that you have probably read about recently just courtroom

08:46:27 12   and get them to be excused, that will be done and we will

08:46:31 13   preserve the confidentiality of the information that is

08:46:33 14   going to be presented.  I think that will be easiest for

08:46:37 15   everybody.

08:46:37 16           MR. ELKINS:  And certainly we have disclosed all

08:46:39 17   our documents.  If Ms. Ayers or Mr. DeFosse or anybody on

08:46:43 18   the team believes that we would be taking measures before we

08:46:46 19   talk about particular documents, we can certainly do that.

08:46:49 20           THE COURT:  I think we're going to be just fine.

08:46:52 21   I think we're ready to go.

08:46:53 22           MR. ELKINS:  One unfortunately --

08:46:55 23           THE COURT:  I'm going to start this one also and

08:46:58 24   I'm not getting a connection here.

08:47:08 25           (Discussion off the record.)

08:47:16  1          THE COURT:  Okay.  Yes, sir.

08:47:17  2          MR. ELKINS:  So, Ms. Bennis will be testifying.

08:47:20  3  As Your Honor knows, we move to exclude her trade secrets

08:47:24  4  opinion under Daubert and Rule 702, for purposes of ensuring

08:47:32  5  that we have made a full, a full record for future purposes.

08:47:36  6          THE COURT:  Sure.

08:47:37  7          MR. ELKINS:  We just like to renew our motion,

08:47:39  8  Your Honor.  We believe it's well taken, and that under

08:47:42  9  amended Rule 702, the Court has an obligation to exercise

08:47:47 10  its gatekeeping obligations by excluding those opinions,

08:47:52 11  understanding you have already ruled, Your Honor.

08:47:55 12          THE COURT:  I'm just checking.  The nice thing I

08:47:59 13  have two screens that actually work today.

08:48:01 14          MR. ELKINS:  And that was the only thing that I

08:48:03 15  wanted to say before we began.  Thank you.

08:48:07 16          THE COURT:  Thank you.  I think we're all set.

08:48:10 17  I hope the witness is ready today.  Okay.  I see the witness

08:48:15 18  is.

08:49:00 19          I think we're trying to send you a revised

08:50:19 20  verdict form.  We'll get it to you fairly soon.

08:50:27 21          (Jury entering the courtroom at 8:50 a.m.)

08:50:56 22          THE COURT:  All right.  Everyone can be seated.

08:51:06 23  And that was some bad traffic I think coming in.  Is that

08:51:10 24  right?  I know somebody -- I thought someone reported that.

08:51:15 25  So I think we're all set.  We're starting a little late

Bennis - direct

08:51:18 1  today, sorry about that, but we've been here the whole time.

08:51:21 2  We're ready to have our next witness.  Who will our next

08:51:24 3  witness be?

08:51:25 4              MS. AYERS:  Your Honor, Qorvo calls Ms. Melissa

08:51:32 5  Bennis to the stand.

08:51:33 6              THE COURT:  All right.  If she'll come forward

08:51:38 7  to the witness stand, and then be sworn.

08:51:45 8              COURT CLERK:  Please remain standing and raise

08:51:50 9  your right hand.  Please state and spell your name for the

08:51:52 10 record.

08:51:53 11             THE WITNESS:  It's Melissa Bennis,

08:51:58 12 M-E-L-I-S-S-A, B-E-N-N-I-S.

08:52:01 13             MELISSA BENNIS, having been duly sworn, was

08:52:05 14 examined and testified as follows:

08:52:10 15             THE COURT:  You may be seated.

08:52:12 16             MS. AYERS:  May I proceed, Your Honor?

08:52:13 17             THE COURT:  You may.

08:52:14 18                  DIRECT EXAMINATION

08:52:14 19 BY MS. AYERS:

08:52:16 20 Q.     Good morning, Ms. Bennis.  Can you please introduce

08:52:18 21 yourself to the jury?

08:52:20 22 A.     Good morning.  My name is Melissa Bennis.  I work in

08:52:26 23 Chicago where I live with my family.  I have been married --

08:52:30 24 I have been married for twenty-three years and my husband

08:52:32 25 and I have three teenage daughters, the oldest of which just

Bennis - direct

08:52:36  1    wrapped up her freshman year in college.

08:52:39  2    Q.    Can you tell the jury what your role is here today?

08:52:42  3    A.    Yes.  I am here to testify on the topic of damages.

08:52:47  4    Q.    Have you calculated the damages that you believe to

08:52:50  5    be appropriate to award to Qorvo in this case?

08:52:53  6    A.    I have.

08:52:54  7    Q.    Are you providing an opinion on Akoustis's liability

08:52:58  8    for the claims that Qorvo is asserting?

08:53:00  9    A.    I am not.  So in my role as -- in calculating

08:53:06 10    damages, I assume liability since that is the instance in

08:53:10 11    which damages would be awarded.

08:53:14 12    Q.    Before we get into your opinions, I would like for

08:53:16 13    the jury to understand who you are and your area of

08:53:19 14    expertise.

08:53:20 15              MS. AYERS:  Your Honor, may I approach?

08:53:21 16              THE COURT:  You may.

08:53:34 17    BY MS. AYERS:

08:53:44 18    Q.    Ms. Bennis, do you recognize the document that I just

08:53:47 19    handed you?

08:53:48 20    A.    I do.

08:53:48 21    Q.    Can you tell the jury what it is?

08:53:50 22    A.    This is a copy of my curriculum vitae, otherwise

08:53:54 23    known as a professional resume.  This is the version that

08:53:57 24    looks like was attached to my report that I prepared and

08:54:02 25    issued last November per the Court's schedule, so this

Bennis - direct

08:54:07  1    contains all of my case work and work experience and such.

08:54:11  2    It was accurate as of November.  Since that time, I have had

08:54:14  3    other case work and other trials and things, but everything

08:54:17  4    within this document, yes, is accurate.

08:54:20  5              MS. AYERS:  Your Honor, I offer in to evidence

08:54:22  6    the document marked PTX-1004, Exhibit 1, which is

08:54:28  7    Ms. Bennis' curriculum vitae.

08:54:30  8              THE COURT:  Marked and received as 279.

08:54:33  9              (Trial Exhibit No. 279 was admitted into

08:54:35 10    evidence.)

08:54:35 11    By Ms. Ayers:

08:54:36 12    Q.    Can you please tell the jury where you went to school

08:54:38 13    and what training you received?

08:54:39 14    A.    Sure.  So I mentioned I live in Chicago.  That was

08:54:44 15    true also in high school.  So after high school, I attended

08:54:46 16    the University of Illinois where I earned a bachelor of

08:54:50 17    science in finance with an emphasis in accounting with

08:54:54 18    honors.

08:54:55 19    Q.    What did you do after college?

08:54:57 20    A.    Towards the end of my college career, I was recruited

08:55:01 21    to join the specialty consulting practice at Arthur Anderson

08:55:05 22    which at the time was one of the big five public accounting

08:55:09 23    firms.  And I joined them in their Chicago headquarters.

08:55:13 24    Q.    Do you have any other degrees?

08:55:16 25    A.    I do.  A few years into my career, I applied for and

Bennis - direct

08:55:23 1  was accepted into Northwestern University, which is also in

08:55:27 2  Chicago, a big time university, masters of administration

08:55:31 3  program, there I obtained a MBA with majors in accounting,

08:55:35 4  marketing and management strategy.

08:55:37 5  Q.    Do you have any other certifications?

08:55:39 6  A.    I do.  I am also a Certified Public Accountant or a

08:55:42 7  CPA, I'm licensed.

08:55:44 8  Q.    How long did you stay at Arthur Anderson?

08:55:47 9  A.    I stayed at Anderson for about three-and-a-half

08:55:51 10 years.  At that point I moved over to KPMG, which is another

08:55:55 11 one of the big public audit advisory firms, and I spent

08:56:00 12 about a year there at which point a group of us joined

08:56:03 13 together and formed a boutique consulting firm.  And I was

08:56:06 14 there for about nineteen years until about a little under

08:56:10 15 two years ago that firm was acquired by a firm called Stout,

08:56:14 16 which is where I work now as a managing director.

08:56:17 17 Q.    Can you explain to the jury what Stout is?

08:56:21 18 A.    Sure.  So Stout is another financial advisory firm,

08:56:26 19 provides services like business valuations, assistance with

08:56:32 20 mergers and acquisitions, we have a practice area that is

08:56:35 21 the disputes and investigations much like the work done

08:56:38 22 here, also is financially related advisory services.

08:56:43 23 Q.    So, in your career, what has your consulting work

08:56:46 24 focused on?

08:56:47 25 A.    My work has focused primarily in the assessment of

Bennis - direct

08:56:51  1    damages in the case of dispute, much like this one.  That

08:56:55  2    said, I have also performed other types of consulting type

08:56:59  3    arrangements for clients when asked things like royalty

08:57:02  4    audits, valuation of intellectual property, things like

08:57:06  5    patents before a merger.  I have consulted for clients that

08:57:12  6    are considering entering into patent license agreements

08:57:14  7    related to financial aspects, things of that nature.

08:57:18  8    Q.      Do you work for both plaintiffs and defendants in

08:57:21  9    your litigation service damages services?

08:57:25 10    A.      I do.

08:57:25 11    Q.      Can you describe the work that you have done on

08:57:28 12    litigations throughout your career?

08:57:30 13    A.      Sure.  So as I mentioned, I have been in this line of

08:57:34 14    work for about twenty-five years now.  The vast majority of

08:57:37 15    the case work has been in the realm of intellectual

08:57:41 16    property, so things like patent and trade secrets,

08:57:44 17    copyrights, trademarks, things of that nature.

08:57:46 18    Q.      Do you belong to any professional organizations?

08:57:49 19    A.      I do.  So as a CPA, I'm a member of the America

08:57:54 20    Institute of CPA's, the Illinois CPA Society, a group called

08:57:58 21    the Illinois CPA Licensing Society.  And although not a

08:58:03 22    lawyer, I am an association member of the American Bar

08:58:07 23    Association which is primarily for lawyers simply because my

08:58:09 24    work is embroiled in litigation and such, I like to keep up

08:58:14 25    on the read as it pertains to the damages issues.

Bennis - direct

08:58:17  1    Q.      Have you received any awards for the work that you

08:58:20  2    have done throughout your professional career?

08:58:22  3    A.      I have.   There is an industry group known as the IAM

08:58:27  4    1000, Intellectual Asset Management 1000 Group, and I have

08:58:31  5    been honored by them for the last six years running as a

08:58:35  6    recommended economics expert.   And I was also honored by the

08:58:39  7    Illinois CPA Society several years ago as a woman to watch

08:58:44  8    in the CPA industry.

08:58:47  9            MS. AYERS:   Your Honor, at this time we offer

08:58:50 10    Melissa Bennis as an expert in the field of damages.

08:58:52 11            MR. ELKINS:   No objection, Your Honor.

08:58:53 12            THE COURT:   She's received as a person who can

08:58:56 13    express an opinion in the area of damages.

08:58:58 14            You may proceed.

08:59:00 15    BY MS. AYERS:

08:59:00 16    Q.      Ms. Bennis, I would like to talk to you about your

08:59:03 17    approach to damages in this case.   Did you prepare any slide

08:59:06 18    to help the jury understand your testimony today?

08:59:08 19    A.      I did.

08:59:09 20    Q.      Mr. Faison, can you please display PDX-11.1?

08:59:17 21            Are these the slides that you assisted in the

08:59:20 22    preparation of?

08:59:21 23    A.      Yes.

08:59:21 24    Q.      Let's start with your damages conclusion.   Have you

08:59:24 25    made a determination of the damages in this case?

Bennis - direct

08:59:26  1    A.      Yes, I have.

08:59:27  2    Q.      What materials did you consider in coming to your

08:59:31  3    conclusion?

08:59:32  4    A.      So like with most cases, this case did not differ.  I

08:59:39  5    examined many, many, many files and documents from the files

08:59:41  6    of both Qorvo and Akoustis.  I read deposition transcripts,

08:59:47  7    so here in court last week we saw video versions of some of

08:59:51  8    those.  I reviewed the written transcripts of the

08:59:54  9    depositions, all the exhibits that are marked and shown in

08:59:57 10    those depositions.  I held conversations with Dr. Shanfield

09:00:01 11    and Dr. Bravman to get a better appreciation for the

09:00:05 12    technical details behind the trade secrets and patents.  I

09:00:09 13    also spoke to Dr. Fattinger at Qorvo for the same purpose,

09:00:15 14    as well as an HR representative at Qorvo.

09:00:19 15            MS. AYERS:  Mr. Faison, can you please display

09:00:22 16    PDX-11.2.

09:00:23 17            Ms. Bennis, can you summarize your opinions

09:00:27 18    regarding Qorvo's damages for the jury?

09:00:29 19    A.      Yes.  So the damages calculations I have grouped into

09:00:34 20    three categories, they follow the claims that have been

09:00:36 21    asserted by Qorvo against Akoustis.  But the first up is the

09:00:40 22    trade secret misappropriation damages.  This relates to

09:00:45 23    again, Qorvo's claims that Akoustis has misappropriated all

09:00:49 24    the different information that we've heard about.

09:00:51 25            We heard that that allowed Akoustis to achieve a

Bennis - direct

09:00:55  1    head-start into the market to get there earlier, so I have

09:01:00  2    evaluated the damages under those claims and under that

09:01:04  3    benefit as being $66,114,093.

09:01:11  4            Under the claims of unfair competition, there is

09:01:14  5    a claim, of course, that Akoustis had misappropriated

09:01:18  6    Qorvo's confidential information, so this is again a little

09:01:22  7    broader than just misappropriation of the trade secrets,

09:01:25  8    this includes other confidential information as well.  But

09:01:28  9    given that it's much the same actions, the benefit is the

09:01:32 10    same, it helps Akoustis get ahead.  I have measured the

09:01:39 11    benefit in the same way, so in essence, the 66.1 million

09:01:44 12    once again.

09:01:45 13            Separately under the unfair competition, I have

09:01:48 14    evaluated Qorvo's claim of employee poaching.  Of course we

09:01:53 15    have heard evidence that suggest that the poaching exercise

09:01:55 16    was intended to get at the trade secrets and confidential

09:02:00 17    information, however this category of damages is strictly

09:02:03 18    related to the business costs of losing the employees, of

09:02:08 19    having to replace them, but the real cost of business when

09:02:12 20    things like this happen.

09:02:13 21            And then the last category of damages relates to

09:02:16 22    the patent infringement.  So should Akoustis be found to

09:02:20 23    infringe one or both of the patents that have been asserted,

09:02:23 24    the damages associated with the use just through trial just

09:02:28 25    as today is $279,808.

Bennis - direct

09:02:32  1    Q.      I would like to break down each one of those category

09:02:35  2    of damages for the jury and talk about them a little bit

09:02:38  3    more with you today.  Did your -- and let's start with the

09:02:42  4    trade secrets claim, Ms. Bennis.

09:02:43  5              Did your damages analysis evaluate the benefit

09:02:46  6    that Akoustis received due to misappropriation of the trade

09:02:51  7    secrets contained in all eight groups of trade secret

09:02:53  8    identified during testimony in this trial?

09:02:55  9    A.      Yes.

09:02:56 10    Q.      How did you evaluate the technical benefit that the

09:03:00 11    misappropriation of these trade secrets provided to

09:03:03 12    Akoustis?

09:03:05 13    A.      So I mentioned, I'm not the technical expert, I left

09:03:08 14    that expertise to Dr. Shanfield and Dr. Bravman, so my

09:03:13 15    conversations were to educate me on the technical aspects,

09:03:17 16    and the benefits derived from the information.

09:03:20 17    Q.      And did Dr. Shanfield identify any benefits that

09:03:26 18    Akoustis received as a result of its misappropriation of

09:03:30 19    Qorvo's trade secrets?

09:03:31 20    A.      Yes.

09:03:31 21    Q.      Can you please display PDX-11.3.

09:03:35 22              Ms. Bennis, can you explain at a high level what

09:03:39 23    benefits Dr. Shanfield identified?

09:03:41 24    A.      Yes.  So these should not come as a surprise by this

09:03:45 25    point.  You heard about these last week.  The

Bennis - direct

09:03:48 1    misappropriation benefited Akoustis in that it allowed it to

09:03:54 2    identify a track area to target for its own product

09:03:58 3    development.  It identified gaps in Qorvo's product lines,

09:04:01 4    so it where to move.  And importantly, it allowed us to skip

09:04:07 5    unnecessary R & D, or research and development efforts

09:04:09 6    needed to produce a working resonator, we heard testimony

09:04:13 7    about that; to create a high quality evaluation board;

09:04:16 8    implement reliable testing processes; achieve high yield

09:04:21 9    manufacturing which is good for the bottom line or the

09:04:24 10   profitability using Qorvo's techniques.  And all of these

09:04:28 11   things helped in getting Akoustis to the market and doing

09:04:31 12   all of its business activities earlier than it otherwise

09:04:35 13   would have.

09:04:35 14   Q.    Can you explain to the jury how you calculated

09:04:38 15   Qorvo's trade secret damages based upon your understanding

09:04:41 16   of the possible categories of available damages for

09:04:44 17   misappropriation of trade secrets?

09:04:47 18   A.    Yes.  So there are various ways in which someone in

09:04:53 19   my shoes can calculate or evaluate the damages that's

09:04:58 20   dictated by the case law.  One of those categories is called

09:05:01 21   unjust enrichment.  So that is what I have focused on for

09:05:05 22   purposes of my analysis.  And what that really means is

09:05:10 23   enrichment, meaning benefits that Akoustis achieved by doing

09:05:13 24   something unjustly or unfairly.  So Akoustis's unjust

09:05:17 25   enrichment.

Bennis - direct

Q.      How did you calculate the unjust enrichment damages here?

A.      This analysis started, the starting point for it was Dr. Shanfield's analysis.  So again, last week we heard that all of the acquisition of confidential important information allowed Akoustis to move into the market and do all the business related things it was doing at least 55 months early.

        So it then turns to what benefit did that help Akoustis achieve: well, earning revenue.  It earned revenue earlier than it otherwise would have.  So the analysis then, the test for me, is how do you put a dollar figure on that?  How do you figure out the benefit of having that revenue sooner than you otherwise would have?

Q.      And how did you determine the monetary value of Akoustis obtaining a 55-month head-start to get into the market?

A.      My analysis measured the monetary value by evaluating the time value of having money earlier rather than later.

Q.      What do you mean by the time value of money?

A.      The time value of money is a very widely known studied economic concept.  To break it down more simply, the concept is that having a dollar today, is always better than having a dollar tomorrow.  And the reason being, if I have that dollar today, I can invest that dollar, I can earn

Bennis - direct

09:06:53 1    interest on that dollar.  If I'm a company, I can use that

09:06:56 2    dollar to buy things, to build things, to make more money.

09:07:00 3    So there is power in having money sooner rather than later,

09:07:04 4    is the general concept.

09:07:07 5    Q.    Did you prepare a slide that illustrates the time

09:07:10 6    value of the revenue Akoustis received 55 months early?

09:07:13 7    A.    I did.

09:07:14 8    Q.    Mr. Faison, can you please pull up PDX-11.4.

09:07:21 9    A.    What you will see here is a bar graph, and what this

09:07:24 10   does is take Akoustis's annual revenues as it reported in

09:07:29 11   its SEC filings, this is the filing with the Securities and

09:07:34 12   Exchange Commission, on an annual basis starting in 2016,

09:07:37 13   run it through present.  And it says if, in fact, these

09:07:43 14   revenues would have been delayed by 55 months, what would be

09:07:48 15   the differential in the time value of that money of having

09:07:53 16   it later, shifted out 55 months versus earlier.

09:08:00 17   Q.    So is your damages calculation the money itself that

09:08:03 18   Akoustis received?

09:08:05 19   A.    It's not.  And this is important.  It's not the

09:08:08 20   revenue.  Under this analysis, Akoustis keeps the revenue

09:08:13 21   that it's earned.  It's really only measuring the benefit --

09:08:16 22   the benefit by virtue of examining the time value, the

09:08:20 23   differential in having that revenue earlier.  And I have

09:08:24 24   measured that using an interest calculation.

09:08:27 25             And I guess another thing to note, what this

09:08:30 1  analysis also assumes is that Qorvo -- or rather Akoustis

09:08:35 2  could have gotten in the market, it could have actually

09:08:39 3  developed a saleable product, it could have made all the

09:08:42 4  same sales, it could have accomplished the exact same growth

09:08:46 5  rate despite the fact that the revenues would be shifting

09:08:49 6  into a point in time when the start of the revenue

09:08:52 7  generation would have been right in the middle of the Covid

09:08:56 8  pandemic, so there are some general assumptions, if you

09:09:01 9  will, about shifting the money forward as is.

09:09:03 10  Q.    Mr. Faison, can you please pull up PDX-11.5.

09:09:08 11        Ms. Bennis, does PDX-11.5 show the analysis that

09:09:12 12  you performed in this case?

09:09:13 13  A.    It does.  And I realize this looks very busy.  And

09:09:17 14  I'm not going to walk through all of the numbers.  But this

09:09:19 15  is the schedule that appeared within my report that really

09:09:22 16  kind of shows an interest calculation and how one works.

09:09:27 17        So I'll just point out a few important things

09:09:31 18  that will hopefully make a little bit more sense.

09:09:35 19        You'll see that these are again, these annual

09:09:40 20  revenue streams, row C, total Akoustis revenue.  In 2016,

09:09:46 21  Akoustis reported $254,844 in revenue.  Those revenue

09:09:51 22  streams as reported run all the way through present.  The

09:09:55 23  summation of all those equals 113.7 million in revenue that

09:10:00 24  Akoustis has reported.

09:10:03 25        Below that are all the different interest

Bennis - direct

09:10:07 1   calculations, and an interest rate you'll see of 14.8.  14.8

09:10:12 2   is important because that is the -- that was the active

09:10:16 3   interest rate that I employed as of present day in order to

09:10:20 4   bring all of those revenue streams up to the present value.

09:10:25 5   In order to evaluate as of a given point in time, what the

09:10:29 6   value of that revenue would be such that I can compare it to

09:10:32 7   what that revenue would be if the same revenue streams were

09:10:37 8   shifted forward 55 months.

09:10:39 9   Q.    Why did you choose to use 14.8 percent as your

09:10:43 10  interest rate?

09:10:44 11  A.    14.8 percent is the -- it's the weighted average cost

09:10:50 12  of capital, commonly abbreviated was a WACC, rate of

09:10:56 13  Akoustis, so it comes directly from Akoustis's financial

09:11:00 14  model, it reflects their debt and equity structure.  It's an

09:11:05 15  interest rate that companies use all the time because it

09:11:07 16  reflects their own unique financing abilities and position.

09:11:12 17  They use it to evaluate investment decisions and to

09:11:16 18  generally make money on how to finance their operation and

09:11:20 19  their decisions.

09:11:20 20  Q.    And did you use Akoustis' WACC in the economic

09:11:25 21  formulas that are shown on the slide to determine the

09:11:28 22  present value of the revenues that Akoustis received, and

09:11:30 23  the benefit of the 55-month head-start?

09:11:34 24  A.    I did.  So again, on this particular slide, you'll

09:11:38 25  see that once the interest rate of 14.8 percent as of

Bennis - direct

09:11:42  1    present day, as of the time of this analysis, is applied to

09:11:46  2    the 113 million in total Akoustis revenues, the present

09:11:51  3    value of having all of those revenue streams as early as

09:11:55  4    2016, means that that same 113 million today is worth 140

09:12:01  5    million.  And if you think about that, that makes sense

09:12:03  6    because they had the benefit of saying 2016 that $254,000

09:12:09  7    number, if you look down at the bottom, in today's dollars

09:12:13  8    over all those additional years, is actually worth 821,508.

09:12:20  9    Because they have the money, and they have been able to

09:12:22 10    invest it and do things with it, that's the concept in

09:12:25 11    economics about the value of a dollar.

09:12:27 12    Q.    Once you determine the present value of the revenue

09:12:30 13    that Akoustis actually received, what did you do next?

09:12:35 14    A.    So next, I performed the same exercise, and in fact I

09:12:40 15    think I have another exhibit from my report.  Yes.

09:12:45 16          So this took all of those annual revenue streams

09:12:49 17    and simply shifted them forward 55 months.  So you'll know

09:12:53 18    that because, say in the first column you'll see the date is

09:13:00 19    2022, it used to be 2016, we shifted those revenue streams

09:13:05 20    55 months into the future.  You know the revenue stream is

09:13:08 21    the same because we're still looking at the same

09:13:12 22    $113 million figure, but instead of that $254,834 number

09:13:18 23    that you see in the first column, being 800-some thousand

09:13:23 24    like we saw in the last slide, because it's now a lot closer

09:13:26 25    to present, that same revenue stream is only worth $436,000,

Bennis - direct

09:13:33 1  highlighted down at the bottom.  That's the difference of

09:13:35 2  having that money for a lesser period of time as we get

09:13:39 3  closer to present.

09:13:40 4          And then similarly, because we're measuring the

09:13:44 5  money as of present value, or as of now, because certain of

09:13:47 6  these revenue streams got pushed out into 2025, 2026, '27,

09:13:52 7  '28, we actually have to discount those back, because in the

09:13:56 8  real world, Akoustis wouldn't have had those yet.  So those

09:14:00 9  get -- those get reduced by the same interest calculation

09:14:04 10 and therefore the present value of those revenue streams

09:14:08 11 equals 74 million, 74.8 million as you'll see.  So that's

09:14:15 12 the time value of money concept.

09:14:16 13 Q.    So how did you use the present value of the revenue

09:14:20 14 that Akoustis actually received, and the present value of

09:14:23 15 the revenue that Akoustis would have received without

09:14:27 16 misappropriating Qorvo's trade secrets in order to calculate

09:14:31 17 Qorvo's damages in this case?

09:14:33 18 A.    So I think the next slide will show you, and it

09:14:36 19 really becomes quite simple.

09:14:38 20         You simply take the difference, look at the

09:14:41 21 differential between one revenue stream and the other, and

09:14:44 22 the difference represents again, not the revenue dollars

09:14:47 23 themselves, but just the benefit of having those at an

09:14:51 24 earlier point in time.  So the benefit is measured of the

09:14:54 25 head-start to be the $66,114,093 figure.

Bennis - direct

09:15:01  1    Q.      Ms. Bennis, the slide at PDX-11.7 says date of

09:15:06  2    original analysis, 11/23.  Can you tell the jury what that

09:15:09  3    means?

09:15:09  4    A.      Yeah.  So I mentioned that my report analysis was

09:15:12  5    finalized and issued back in November.  And so at that point

09:15:16  6    in time, we knew that the trial, the decision of the jury

09:15:23  7    would be happening now, so it made sense to run the analysis

09:15:26  8    through now.  But at that point in time in November, fiscal

09:15:30  9    year 2024, which we heard testimony last week runs from

09:15:36 10    July 1st through June 30th of a year, was not yet complete.

09:15:40 11    So in fact, if you go back a couple of slides, you'll see --

09:15:45 12    Q.      11.5.

09:15:47 13    A.      That last column 2024, EST, EST stands for estimated.

09:15:53 14    The estimate comes from Akoustis's own files, this is what

09:15:56 15    Akoustis projected that it was going to earn in it's fiscal

09:15:59 16    year 2024 on a whole.

09:16:06 17    Q.      Have you performed any updated calculations based

09:16:10 18    upon information presented to you during trial?

09:16:13 19    A.      Yes.  So last week when I was listening like you, I

09:16:18 20    heard the testimony of Mr. Aichele that suggested that their

09:16:22 21    --  that Akoustis's fiscal year 2024 results were going to

09:16:27 22    be 28 million in total, which was different than the

09:16:30 23    projections that they had made back that were available at

09:16:34 24    the time of my report.  So for the benefit of the jury to

09:16:37 25    see what that would look like, I ran that number through the

Bennis - direct

09:16:41  1    model.  When you run that projection, it's not complete, so

09:16:45  2    we don't know if that's ultimately how it will end up, but

09:16:48  3    if you run that figure through the model, performing the

09:16:53  4    same economic analysis, you get a total head-start damages

09:16:59  5    figure of $50.3 million.

09:17:03  6    Q.    Ms. Bennis, I want to make sure that your testimony

09:17:06  7    for the jury is clear.  The calculation that you provided to

09:17:08  8    PDX-11.7, which is the prior slide, Mr. Faison, was based

09:17:13  9    upon information that you received from Akoustis's own files

09:17:17 10    relating to what it thought it's revenue streams were going

09:17:21 11    to be for 2024; is that correct?

09:17:24 12    A.    That's correct.

09:17:24 13    Q.    And if we flip to the next slide, 11.8, you have

09:17:28 14    updated those calculations within your own model based upon

09:17:32 15    testimony that Mr. Aichele provided to the jury, is that

09:17:35 16    correct?

09:17:35 17    A.    That's correct.

09:17:38 18    Q.    When you calculated the unjust enrichment benefit to

09:17:43 19    Akoustis, did you consider how the trade secrets impacted

09:17:46 20    Akoustis's costs?

09:17:47 21    A.    Yes.  So recall when Dr. Shanfield talked about those

09:17:51 22    analysis, that he really only talked about the benefit of

09:17:54 23    the head-start in -- by virtue of the time saved.  But in

09:17:58 24    reality, companies incur real research and development hard

09:18:04 25    expenses.  So this analysis again, is only looking at the

Bennis - direct

09:18:08  1    head-start benefit as defined by a time period, it has not

09:18:12  2    included any types of hard research and development

09:18:16  3    personnel material type expenses that would typically be

09:18:20  4    incurred.

09:18:24  5              MS. AYERS:  Your Honor, may I approach?

09:18:26  6              THE COURT:  You may.

09:18:46  7    BY MS. AYERS:

09:18:51  8    Q.    Ms. Bennis, do you recognize the document that I just

09:18:54  9    handed you?

09:18:55 10    A.    I do.

09:18:55 11    Q.    Can you explain to the jury what it is?

09:18:57 12    A.    Yes.  So these are the three schedules that we

09:19:01 13    actually just looked at on the screen that show both the

09:19:07 14    time value calculation at present as well as that shifted

09:19:12 15    into the future, and then the differential that results in

09:19:15 16    the $66 million calculation.  So these were the exhibits

09:19:18 17    from my report.

09:19:19 18              MS. AYERS:  Your Honor, I move to enter

09:19:23 19    PTX-1004, Exhibit 3, Schedule 1; PTX-1004, Exhibit 3,

09:19:28 20    Schedule 2; and PTX-1004, Exhibit 3, Schedule 3, into

09:19:33 21    evidence.

09:19:33 22              THE COURT:  Marked and received as 280, 281 and

09:19:38 23    282.

09:19:39 24              (Trial Exhibit Nos. 280, 281 and 282 were

09:19:40 25    admitted into evidence.)

Bennis - direct

09:19:40  1  BY MS. AYERS:

09:19:45  2  Q.    Let's move on to your next category of damages,

09:19:48  3  Ms. Bennis, which is for those -- which are the damages for

09:19:51  4  Qorvo's claims of unfair competition.  You mentioned

09:19:54  5  previously that you calculated two categories of those

09:19:57  6  damages?

09:19:58  7  A.    I did.

09:20:00  8  Q.    Mr. Faison, can you please pull up PDX-11.9.

09:20:05  9        Let's start with the first amount listed under

09:20:10 10  unfair competition on this slide.  Can you explain to the

09:20:13 11  jury what this number relates to?

09:20:14 12  A.    Yes.  As I mentioned, the claim under unfair

09:20:19 13  competition that all of the different confidential

09:20:21 14  information was also misappropriated despite the fact I

09:20:26 15  understand that the broader amount of information, the

09:20:30 16  benefit, the idea of the benefit, the idea is that the

09:20:33 17  benefit is the same, it allowed a head-start, so therefore

09:20:36 18  the measurements and the mechanisms employed to get to a

09:20:41 19  computation of that benefit is the same.

09:20:44 20  Q.    And what is the second category of damages under

09:20:48 21  Qorvo's unfair competition claim?

09:20:51 22  A.    The second category is what I mentioned to be the

09:20:55 23  employee poaching damages, so again, poaching, taking

09:20:59 24  employees from one company to another.  And this is intended

09:21:03 25  to be separate again from the value of the information and

Bennis - direct

09:21:05  1    the benefits received by Akoustis, but rather the

09:21:09  2    computation of damages to a business of having losing

09:21:14  3    employees and having to replace and retrain, and all of

09:21:17  4    those real business expenses that are incurred as a result

09:21:20  5    of these actions.

09:21:21  6    Q.    Mr. Faison, can you please go to PDX-11.10.

09:21:25  7          Can you give the jury an example of some of the

09:21:28  8    cost that a company incurs when an employee leaves the

09:21:32  9    company?

09:21:32 10    A.    Sure.  So there is lots of articles and basically

09:21:40 11    industry knowledge and statistic and studies about these

09:21:43 12    real costs to business of losing employees.  So this is just

09:21:47 13    an example of an article that talked about all of the

09:21:51 14    different costs, hiding costs, real costs to companies and

09:21:55 15    it does include things like number four and number five of

09:21:59 16    time and money associated with hiring replacement and cost

09:22:02 17    of training new people.

09:22:04 18    Q.    How did you calculate the cost to Qorvo of losing

09:22:07 19    it's assembled workforce?

09:22:11 20    A.    So for purposes of this analysis, there was actually

09:22:15 21    a document within the files of Akoustis, and what that

09:22:19 22    document was, was a valuation performed by KPMG which you

09:22:25 23    know is a well-known audit advisory firm, and what happened

09:22:30 24    was I think it was in 2021, Akoustis acquired a business

09:22:35 25    called RFMI, and apart of that acquisition, which is not

09:22:39 1    uncommon, there were some valuations performed by a

09:22:43 2    third-party -- third-party groups to assess the value as it

09:22:48 3    got to the purchase price.

09:22:49 4            So one of the documents that existed as a result

09:22:52 5    of that acquisition was an asset valuation of an assembled

09:22:57 6    work force.  So for all those employees that were brought

09:23:00 7    into the walls of Akoustis that worked on filter products.

09:23:04 8    So it was spot on in terms of just assemble, looking at the

09:23:08 9    cost of the business to assemble a work force.

09:23:11 10           MS. AYERS:  Your Honor, may I approach the

09:23:13 11   witness?

09:23:14 12           THE COURT:  You may.

09:23:24 13   BY MS. AYERS:

09:23:31 14   Q.    Ms. Bennis, do you recognize the document that is

09:23:34 15   referenced PTX-1460?

09:23:36 16   A.    I do.

09:23:37 17   Q.    Can you tell the jury what it is?

09:23:39 18   A.    This is this document, the support from KPMG that I

09:23:45 19   read and reviewed.  And it says right on it, this was as of

09:23:48 20   2021, which is right in the heart of the time period when

09:23:51 21   all this was happening.  It was a valuation of intangible

09:23:56 22   subject assets in connection with the acquisition of RFMI

09:24:03 23   integrated device by Akoustis.

09:24:04 24   Q.    Ms. Bennis, did you rely on this document in

09:24:07 25   formulating your opinions of Qorvo's damages for losing the

Bennis - direct

09:24:11  1   assembled workforce?

09:24:12  2   A.      Yes.

09:24:13  3               MS. AYERS:  Your Honor I move PTX-1516 into

09:24:16  4   evidence.

09:24:17  5               THE COURT:  Marked and received as 283.

09:24:19  6               (Trial Exhibit No. 283 was admitted into

09:24:20  7   evidence.)

09:24:20  8   BY MS. AYERS:

09:24:21  9   Q.      Ms. Bennis, can you please explain what portion of

09:24:24  10  the KPMG analysis and valuation report that you relied on as

09:24:24  11  part of forming your opinion on the damages Qorvo suffered

09:24:35  12  in losing it's workforce?

09:24:35  13  A.      Yeah.  Within this evaluation report, was a page

09:24:39  14  that's displayed up here on the screen, and you'll see here

09:24:42  15  highlighted at the top is fair value of assembled workforce.

09:24:46  16  What it did, was it categorized those employees that

09:24:49  17  Akoustis got into its business by title, general manager,

09:24:53  18  senior projects engineer, et cetera.  And it totaled up what

09:24:58  19  are those kind of real costs that are experienced by

09:25:01  20  companies when they bring in employees, things like search

09:25:04  21  costs, interview costs, training costs, opportunity costs.

09:25:07  22  So I used this document in order to evaluate the costs to a

09:25:12  23  business within this industry, namely Akoustis, of

09:25:18  24  assembling a workforce and replacing employees.

09:25:21  25  Q.      Ms. Bennis, the jury has heard evidence that

Bennis - direct

09:25:24  1  forty-three former Qorvo employees have worked at one point

09:25:27  2  in time, at Akoustis.  Did you include every single one of

09:25:32  3  these former employees in your analysis of how much it would

09:25:35  4  have cost Qorvo to replace it's workforce?

09:25:38  5  A.     I didn't.  So you're right, the list of former

09:25:43  6  employees is much larger that were involved in various

09:25:48  7  allegations of misappropriation, however, for purposes of

09:25:52  8  this analysis, it was really meant to narrow in on those

09:25:55  9  employees that would have been poached and therefore

09:25:59  10  replaced.  So it wouldn't be examples of employees that were

09:26:03  11  job hunting on their own, or were replaced for one reason or

09:26:08  12  another.

09:26:08  13  Q.     How many former Qorvo employees did you include in

09:26:12  14  your analysis?

09:26:12  15  A.     I ended up including nineteen.

09:26:15  16  Q.     Mr. Faison, can you please display PDX-11.12.

09:26:20  17         Ms. Bennis, can you explain to the jury what is

09:26:23  18  going on in this slide?

09:26:25  19  A.     This is the summary that I put together that's

09:26:28  20  included in my report and all that does is take, again, the

09:26:31  21  information from the KPMG study by job title, by costs, by

09:26:37  22  category.  It then brought over those nineteen employees by

09:26:41  23  their speculative job titles and did the math.  So the math

09:26:45  24  results in a damages figure of $809,772.

09:26:56  25  Q.     Ms. Bennis, have you also calculated Qorvo's damages

Bennis - direct

09:26:59  1    for Akoustis's patent infringement?

09:27:01  2    A.      Yes.

09:27:04  3    Q.      How did you perform that calculation?

09:27:09  4    A.      So I understand that if, in fact, there is damages

09:27:13  5    associated with patent infringement, that the case law

09:27:16  6    suggest that the patent holder is due no less than a

09:27:20  7    reasonable royalty payment for use of those patents.

09:27:23  8    Q.      How did you calculate a reasonable royalty?

09:27:28  9    A.      So once again, the guidance provided to those in my

09:27:32 10    shoes is that we are asked, and in fact the jury is asked to

09:27:37 11    consider a hypothetical negotiation.  So had these parties

09:27:41 12    actually come together back at the point in time when the

09:27:44 13    patents were beginning to be used, what would they have

09:27:47 14    considered.  And what type of payment terms would they have

09:27:50 15    decided on to compensate for the use of those patents.

09:27:55 16    Q.      When would this hypothetical negotiation have taken

09:27:58 17    place?

09:28:00 18    A.      2016.

09:28:01 19    Q.      What parties would have participated in the

09:28:05 20    hypothetical negotiation?

09:28:07 21    A.      Qorvo and Akoustis.

09:28:08 22    Q.      And what did you ultimately determine a reasonable

09:28:11 23    royalty rate to be for the patents at issue in this case?

09:28:14 24    A.      A reasonable running royalty of one percent applied

09:28:20 25    to the sale price of the accused products.

Bennis - direct

Q.    I would like to walk the jury through your analysis, Ms. Bennis.  Mr. Faison, can you please pull up PDX-11.15.

Ms. Bennis, can you explain to the jury what is shown on this slide?

A.    Yes.  So as I mentioned, there is guidance provided to those in my shoes to help determine what a reasonable royalty would be.  And this list of fifteen factors is one piece of that guidance.  They're called the *Georgia-Pacific* factors because there was a court case many years ago that involved a company known as *Georgia-Pacific*, so these are all different things that the parties would have in their mind when they are negotiating what the proper royalty would be, so I have considered all these factors.

Q.    Were there any *Georgia-Pacific* factors that were important to your analysis?

A.    Yes.  As with any case, there is always certain factors that are more prevalent than others, just given the individual patents and circumstances of each negotiation.

Q.    Mr. Faison, can you please display PDX-11.16.

Ms. Bennis, can you explain to the jury which of the *Georgia-Pacific* factors were most prevalent for purposes of your analysis?

A.    Sure.  So the first couple *Georgia-Pacific* factors ask are there any existing licenses for patents, either the patent or patents like them that can help lend guidance as

Bennis - direct

09:29:53 1   to what market values are for patents of this type.

09:29:56 2           So in this case, there was a license that

09:30:00 3   Akoustis entered into for its own single crystal BAW filter

09:30:05 4   technology that was helpful.  I have also considered the

09:30:08 5   importance of the technology of the patents and the benefits

09:30:11 6   that are associated with their use, thanks to the help of

09:30:15 7   the technical experts.

09:30:17 8           I have considered the sales and profitability of

09:30:19 9   the products that practice these patents.  And I have also

09:30:23 10   considered the relationship between the parties, so between

09:30:27 11   Qorvo and Akoustis as competitors.

09:30:30 12           MS. AYERS:  Your Honor, may I approach the

09:30:31 13   witness?

09:30:32 14           THE COURT:  You may.

09:30:39 15   BY MS. AYERS:

09:30:54 16   Q.    Ms. Bennis, I have just handed you Trial Exhibit 277.

09:31:01 17   Can you please explain to the jury what this document is?

09:31:05 18   A.    This document is the license agreement that I

09:31:08 19   referenced.  This is between Akoustis and Cornell University

09:31:12 20   for one patent.  We heard this referenced last week.  I

09:31:16 21   believe by Mr. Shealy, and then again by Mr. Bravman.

09:31:21 22   Q.    Mr. Faison, can you please display PDX-11.17.

09:31:26 23           Ms. Bennis, can you please explain to the jury

09:31:30 24   the relevance of Trial Exhibit 277?

09:31:33 25   A.    So, after reviewing this particular license in

Bennis - direct

09:31:36 1    detail, the few highlights that are listed here.  It also

09:31:40 2    was effective in 2016, as would be our hypothetical

09:31:44 3    negotiation.  It was for one patent.  The compensation terms

09:31:48 4    were pertinent.  The compensation terms included annual

09:31:52 5    license and maintenance fees, plus a one percent royalty,

09:31:57 6    running royalty applied to the net sales, so that was of

09:32:01 7    interest.

09:32:01 8                And it was also of interest because of course it

09:32:05 9    related to Akoustis and its own BAW filter products, which

09:32:10 10   is what Akoustis would be looking to negotiate with Qorvo

09:32:13 11   here, the patent rights to be used in this BAW filter

09:32:17 12   products.

09:32:17 13   Q.    Did you speak with Mr. Shanfield and Mr. Bravman

09:32:20 14   about the relevance of this license?

09:32:22 15   A.    I did.  Like I mentioned, I relied on their expertise

09:32:26 16   to understand how the patent here related to, for instance,

09:32:31 17   the patents that are at issue with Qorvo.

09:32:34 18   Q.    And Mr. Faison, can you please return to PDX-11.16.

09:32:41 19                The next factor that you consider was the

09:32:44 20   benefits associated with the technology in the '018 patent,

09:32:47 21   and the '755 patent.  Is that correct Ms. Bennis?

09:32:50 22   A.    Yes.

09:32:51 23   Q.    Mr. Faison, can you please display PDX-11.19?

09:32:55 24                Can you explain to the jury what benefits the

09:32:58 25   asserted patents provided to the Akoustis resonators?

Bennis - direct

09:33:03  1    A.      We also heard testimony about this last week, in

09:33:06  2    general and in shorthand, the '018 patent, my general

09:33:10  3    understanding is that the -- it's really about that

09:33:14  4    electrode thicknesses lead to increased bandwidth and that's

09:33:19  5    a benefit.  The '755 patent again talked about the thickness

09:33:22  6    of those layers, if you can kind of remember the picture

09:33:25  7    that they were showing you and that led to less energy loss

09:33:29  8    or leaked energy out of the lateral sides, so that kind of

09:33:33  9    gets to laymen's description of the technical benefits of

09:33:37 10    those patents.

09:33:38 11            I did understand that it's fair to assume that

09:33:41 12    the role of those two patents are similar to each other

09:33:47 13    which is helpful to understand.

09:33:48 14    Q.      And Mr. Faison, can we please return back to

09:33:54 15    PDX-11.16.

09:33:55 16            The next point on your list was the sales and

09:33:58 17    profitability of the products incorporating the patented

09:34:02 18    technology.  Did you rely upon any data that Akoustis

09:34:04 19    provided as a part of your analysis of this factor?

09:34:07 20    A.      I did.

09:34:11 21    Q.      Mr. Faison, can you please display JTX-003A, which is

09:34:17 22    a native file Excel spreadsheet.  And Mr. Faison, can you

09:34:31 23    please click on the sheet that says Five-year Strat.

09:34:39 24            Ms. Bennis, do you recognize this document?

09:34:40 25    A.      I do.

09:34:41  1    Q.      And can you explain to the jury what this document

09:34:43  2    is?

09:34:45  3    A.      So this, again, was a financial forecast from

09:34:49  4    Akoustis's own files.  You'll see at the top there it says

09:34:53  5    five years strategic plan.

09:34:55  6    Q.      And Mr. Faison, if you'll scroll up in the sheet.

09:34:59  7            Where did you get this five-year forecast,

09:35:07  8    Ms. Bennis?

09:35:07  9    A.      So this was straight from the files at Akoustis.  It

09:35:11 10    was -- at the bottom it labeled the fact that these were

09:35:15 11    projections performed by Akoustis in June of 2022, and it

09:35:19 12    was their outlook for their next five years.

09:35:23 13            MS. AYERS:  Your Honor, I move to admit JTX-003A

09:35:27 14    into evidence.

09:35:28 15            THE COURT:  Marked and received as 284.

09:35:31 16            (Trial Exhibit No. 284 was admitted into

09:35:32 17    evidence.)

09:35:32 18    BY MS. AYERS:

09:35:33 19    Q.      Mr. Faison, can you please display PDX-11.31.

09:35:37 20            Ms. Bennis, can you please explain to the jury

09:35:42 21    what information in Akoustis's five-year strategic forecast

09:35:46 22    impacted your analysis of the sale and profitability of

09:35:49 23    products incorporating the patented technology for purposes

09:35:53 24    of the *Georgia-Pacific* factor?

09:35:54 25    A.      So these were kind of the salient points to pull out

1713

Bennis - direct

09:35:58 1   of that spreadsheet to highlight.  That Akoustis sold 61.6

09:36:06 2   million BAW filter units through 2023, those are actual

09:36:10 3   results.  But according to this five-year strategic plan,

09:36:14 4   Akoustis was projecting gross margins ███████████████████

09:36:18 5   ████████████████████████████████████████████████████████

09:36:23 6   ████████████████████████████████████████████████████████

09:36:28 7   ██████████████████████████████████████████████

09:36:34 8   ████████████████████████████████████████████████████████

09:36:40 9   █████████████████████████████████████████████████████

09:36:44 10  ████████████████████████████████████████████████████████

09:36:50 11  ████████████████████████████

09:36:51 12          And the reason this is pertinent, is because

09:36:56 13  there is a lot of upsize in this market.  We heard a lot of

09:37:01 14  testimony that this is a billion dollars market, billions of

09:37:06 15  BAW filters being sold, there is very healthy profit margins

09:37:09 16  to be made, and so sitting at that hypothetical negotiation,

09:37:13 17  Akoustis is going to say I need to make sure I get a patent

09:37:17 18  license so that I can practice these patents and sell these

09:37:20 19  products and achieve the upside, and get my piece of the

09:37:24 20  market that I'm after here.

09:37:26 21          So the sales and profitability are always on the

09:37:29 22  minds of parties when they think how much they have to gain

09:37:32 23  as a licensee, as the person taking the license.

09:37:36 24  Q.    Mr. Faison, can you please return back to PDX-11.16.

09:37:41 25          The last *Georgia-Pacific* factor that you

Bennis - direct

09:37:45  1  mentioned was the relationship between the parties.  Can you

09:37:48  2  please tell us what impact that would have had on the

09:37:51  3  hypothetical negotiation under *Georgia-Pacific*?

09:37:54  4  A.    The relationship of the parties is what is evaluated

09:37:59  5  under *Georgia-Pacific* factor number 5, and the reason why it

09:38:02  6  matters is because when you have a license like this one

09:38:05  7  that was between Cornell and Akoustis, Cornell is the

09:38:10  8  university, it's a research center, so it's not

09:38:13  9  manufacturing products and competing with Akoustis, Qorvo

09:38:16  10  is.  So it's typically -- it typically has the effect of

09:38:21  11  increasing the royalty rate, both demanded and paid when

09:38:25  12  there is a license between competitors as opposed a research

09:38:30  13  institution and a manufacturer.

09:38:31  14  Q.    After your consideration of those factors, as well as

09:38:34  15  all the other *Georgia-Pacific* factors, what is your opinion

09:38:37  16  regarding the royalty rate that Akoustis and Qorvo would

09:38:40  17  have agreed to for a license to the asserted patents?

09:38:43  18  A.    So it's my opinion that the parties would have agreed

09:38:46  19  on a royalty rate of -- as a result of a negotiation of at

09:38:51  20  least one percent.

09:38:52  21  Q.    And Mr. Faison, can you please pull up PDX-11.21.

09:38:57  22        Applying this analysis, if the jury finds that

09:39:01  23  Akoustis infringes Qorvo's patent, what are the damages that

09:39:06  24  Qorvo are entitled to?

09:39:08  25  A.    You'll see on this slide I have summarized the

Bennis - direct

09:39:12  1  accused product revenue that only starts as of October 2021,

09:39:15  2  since that's the date that this lawsuit was filed and

09:39:18  3  continues through present, begin the fiscal year 2024

09:39:22  4  results are estimated there.  So that amount of revenue is

09:39:26  5  then multiplied by the royalty rate to get the royalty

09:39:29  6  damages for the use of those patents.  That to date equals

09:39:33  7  $279,808.

09:39:36  8       It's important to note that if there is a

09:39:38  9  finding of infringement, that there is the ability for the

09:39:41 10  Court to suggest a license going forward.  So in a typical

09:39:46 11  licensing negotiation, just for context, the consideration

09:39:51 12  would be for a payment being paid until the expiration of

09:39:55 13  the patent.  So in this case, I think one of the patents

09:39:58 14  expired in 2035.  But this is what the damages date.

09:40:04 15  Q.    Can you explain to the jury why your damages for

09:40:07 16  patents infringement is so much lower than the damages that

09:40:10 17  you calculated for misappropriation of Qorvo's trade

09:40:13 18  secrets?

09:40:13 19  A.    Sure.  Again, the patent damages for two reasons,

09:40:17 20  really, they are -- they're is an important element of the

09:40:24 21  BAW filters for cells, but they're for a discrete

09:40:26 22  functionality.  This is also only reflective of the sale to

09:40:29 23  date, we saw those projections that expect the BAW filter

09:40:33 24  sales to grow very large numbers into the future.  But the

09:40:37 25  other difference is just overall scope, what we've heard is

Bennis - direct

09:40:40  1    that the trade secret misappropriation, of the confidential

09:40:44  2    information is really -- it's affected the business

09:40:49  3    strategies, the design of the filters, the testing, all of

09:40:53  4    the different elements that help actually build and test and

09:40:56  5    make a product successful.

09:40:58  6    Q.    Mr. Faison, could you please go back to PDX-11.2.

09:41:02  7              MS. AYERS:  Your Honor, may I approach?

09:41:05  8              THE COURT:  You may.

09:41:17  9    BY MS. AYERS:

09:41:25 10    Q.    Ms. Bennis, do you recognize the document that I just

09:41:27 11    handed you?

09:41:28 12    A.    I do.

09:41:28 13    Q.    Can you explain to the jury what it is?

09:41:31 14    A.    Yes.  So this is Appendix C, as it was included in my

09:41:36 15    report.  And what I did here was, with respect to the trade

09:41:40 16    secret misappropriation and unfair competition -- or

09:41:43 17    misappropriation of confidential information analysis, is

09:41:47 18    because Dr. Shanfield's analysis considered a period of

09:41:52 19    55 months, but he also included really the benefit in

09:41:57 20    monthly increments.  I have actually run these monthly

09:42:01 21    increments through the model such that there is an analysis

09:42:05 22    for damages under a head-start period of one month all the

09:42:09 23    way up to 54 months, in addition to the 55 months.  So this

09:42:13 24    is the appendix that simply runs the figures through the

09:42:18 25    model in monthly increments.

Bennis - cross

09:42:21  1                    MS. AYERS:  Your Honor, I move to admit Appendix

09:42:23  2    C.

09:42:24  3                    THE COURT:  Marked and received as 285.

09:42:27  4                    (Trial Exhibit No. 285 was admitted into

09:42:28  5    evidence.)

09:42:28  6    BY MS. AYERS:

09:42:29  7    Q.       Ms. Bennis, could you please explain to the jury, if

09:42:32  8    they determine, for example, Akoustis only received a

09:42:37  9    54-month head-start as opposed to a 55-month head-start in

09:42:42 10    the market, how could they use your Appendix C to determine

09:42:46 11    the amount that Akoustis was unjustly enriched?

09:42:50 12    A.       So there is a summary schedule at the top of all of

09:42:53 13    the individual different models that include the head-start

09:42:57 14    period by month.  So they would go to 54 months, and there

09:43:02 15    would be a total damages figure there of $65,230,701, for

09:43:10 16    example.

09:43:10 17                    MS. AYERS:  Thank you, Your Honor, I have no

09:43:12 18    further questions.

09:43:12 19                    THE COURT:  Cross-examination.

09:43:24 20                    MR. ELKINS:  Thank you, Your Honor

09:43:26 21                         CROSS-EXAMINATION

09:43:26 22    BY MR. ELKINS:

09:43:27 23    Q.       Good morning, Ms. Bennis.

09:43:28 24    A.       Good morning.

09:43:30 25    Q.       Before we get into the nitty-gritty, I would like to

Bennis - cross

09:43:38 1    just make sure that the jury understands the construct for

09:43:43 2    damages experts testifying in court.  And you would agree

09:43:49 3    with me that the construct in any lawsuit, let's say it's

09:43:54 4    intellectual property, products liability, employment, is

09:43:57 5    that there are no -- there is no damages without liability;

09:44:02 6    correct?

09:44:03 7    A.    Yes.

09:44:04 8    Q.    But because the jury typically has not heard all of

09:44:09 9    the evidence from both sides, especially when the Plaintiff

09:44:12 10   puts on its case, the damages experts are asked to assume

09:44:18 11   liability for purposes of their testimony so that if the

09:44:24 12   jury having heard all of the evidence finds liability, then

09:44:28 13   they have an understanding about how to assess damages, if

09:44:31 14   any; is that correct?

09:44:32 15   A.    Yes.

09:44:34 16   Q.    So both you and Ms. Irwin, Carolyn Irwin, Akoustis's

09:44:40 17   damages expert, come in assuming liability, but you're not

09:44:44 18   testifying as to liability, correct?

09:44:46 19   A.    Correct.  I did mention that at the beginning, yes.

09:44:48 20   Q.    So let me just recap.  In essence, you have three

09:44:55 21   different damages opinions.  You have one as to trade secret

09:44:58 22   misappropriation; correct?

09:45:00 23   A.    Yes.

09:45:00 24   Q.    And that is based on an unjust enrichment theory

09:45:06 25   using a head-start.  And that is for $66.1 million; correct?

Bennis - cross

09:45:11  1    A.      Yes.

09:45:13  2    Q.      And then you have an opinion regarding unfair

09:45:18  3    competition damages.  The first part of that is the benefit

09:45:22  4    of the head start to Akoustis, but that's from both trade

09:45:29  5    secrets and confidential information, correct?

09:45:34  6    A.      Yes.  Trade secrets as I understand it are subsumed

09:45:37  7    in confidential information, yes.

09:45:39  8    Q.      Okay.  So there is a bucket there of confidential

09:45:44  9    information, some of which are trade secrets and some of

09:45:47 10    which is just confidential information, but not trade

09:45:50 11    secrets?

09:45:50 12    A.      Yes, generally.

09:45:51 13    Q.      And that, your opinion for that also is based on an

09:45:56 14    unjust enrichment theory based on a head start, and it's

09:46:00 15    $66.1 million?

09:46:01 16    A.      That's right.

09:46:02 17    Q.      And there is also the second component of unfair

09:46:06 18    competition is the poaching damages, those are direct

09:46:10 19    damages to Qorvo; correct?

09:46:11 20    A.      Correct.

09:46:12 21    Q.      And that's 809,000?

09:46:14 22    A.      Yes.

09:46:15 23    Q.      And then number 3, you have the patent infringement

09:46:18 24    damages of $279,000?

09:46:20 25    A.      Correct.  Sounds right.

Bennis - cross

09:46:23  1   Q.    So I'm going to first -- first I'm going to do just

09:46:27  2   like Ms. Ayers did, we're going to talk about trade secret

09:46:31  3   misappropriation first, and then we'll talk about unfair

09:46:34  4   competition and then last, we'll talk about patent

09:46:37  5   infringement.

09:46:37  6         So first, to set the table regarding the types

09:46:41  7   of damages that are available to a Plaintiff that believes

09:46:46  8   it is -- it has been damaged by trade secret

09:46:51  9   misappropriation, there are basically under both federal

09:46:58 10   law, which Qorvo is suing under, and state law, which Qorvo

09:47:02 11   is also suing under, there is essentially three different

09:47:06 12   types of damages available; correct?

09:47:10 13   A.    Generally speaking, yes, there is three categories of

09:47:16 14   which various analysis can be evaluated.

09:47:18 15   Q.    Better said.  Thank you.

09:47:19 16         So the first type of damage, is damages for

09:47:25 17   actual loss suffered by the Plaintiff for trade secret

09:47:28 18   misappropriation; correct?

09:47:29 19   A.    Yes.

09:47:30 20   Q.    So those would be direct damages, actual damages

09:47:33 21   suffered by the Plaintiff in this case, Qorvo; right?

09:47:37 22   A.    Yes, those can be measured, that's right.

09:47:40 23   Q.    The second is essentially unjust enrichment that

09:47:45 24   basically as you have said, the benefit enjoyed or

09:47:49 25   accumulating to the Defendant from use of the plaintiff's

Bennis - cross

09:47:56  1    trade secrets; correct?

09:47:57  2    A.    I agree.

09:47:58  3    Q.    And finally, if neither Category 1 nor Category 2

09:48:05  4    really fits, then at a minimum, the Plaintiff can collect

09:48:10  5    what's known as a reasonable royalty for trade secret

09:48:14  6    misappropriation, I'm not saying it's the same, but

09:48:18  7    reasonable royalty in the same vain that you talked about

09:48:21  8    regarding patent infringement damages, right?

09:48:24  9    A.    I don't know that I would think of it as being

09:48:28 10    related to fit, I think it's more related to the idea of the

09:48:33 11    actual loss or unjust enrichment of difficult to calculate

09:48:38 12    for various reasons, which there can be various reasons,

09:48:42 13    that the trade secret holder is still due compensation as a

09:48:49 14    result of a bad act, so a reasonable royalty can be

09:48:52 15    evaluated to still make sure there is compensation for the

09:48:56 16    harm that's been imposed.

09:48:58 17    Q.    Correct.

09:48:58 18          Category 1, Category 2.  So we have actual

09:49:02 19    damages, Category 1.  Category 2 is unjust enrichment of the

09:49:08 20    Defendant.  Those are actually additive, aren't they?

09:49:11 21    A.    They are, to the extent they don't overlap.

09:49:14 22    Q.    So a Plaintiff can recover its actual damages, and it

09:49:19 23    can also recover for the Defendants' unjust enrichment

09:49:23 24    benefit, so long as elements of each do not overlap as you

09:49:29 25    just said; correct?

Bennis - cross

09:49:30  1  A.      That's my understanding.

09:49:32  2  Q.      Okay.  You have calculated no damages for Qorvo's

09:49:36  3  actual loss, correct?

09:49:36  4  A.      Correct, I evaluated only unjust enrichment, right.

09:49:40  5  Q.      You didn't attempt to calculate or to measure the

09:49:44  6  damages caused by misappropriation alleged against Akoustis

09:49:50  7  as measured by imposition of a reasonable royalty either,

09:49:55  8  correct?

09:49:55  9  A.      I did not reevaluate the reasonable royalty for the

09:49:59 10  claims of trade secret, that's correct.

09:50:00 11  Q.      And you don't really have a specific reason why you

09:50:02 12  did not express an opinion regarding the amount of Qorvo's

09:50:09 13  actual damages, correct?

09:50:11 14  A.      I think when we're phased with the task of evaluating

09:50:17 15  damages, sometimes there are choices to be made about what's

09:50:20 16  the most saleable, there is no question, there was no

09:50:27 17  question once the evidence kind of was laid out, the benefit

09:50:31 18  to Akoustis of obtaining this information.  And so because

09:50:36 19  there was such a clear head start benefit, it made sense to

09:50:40 20  evaluate the unjust enrichment accordingly.

09:50:43 21          There is no question that there are actual

09:50:46 22  losses to Qorvo.  The loss of the confidential nature of its

09:50:52 23  own information.  But for purposes of the damages analysis

09:50:55 24  that I performed, I focused on that second prong, and that

09:50:58 25  is unjust enrichment enjoyed by Akoustis.

Bennis - cross

09:51:01 1    Q.     But since they're additive, Qorvo could have claimed

09:51:05 2    more damages if it had actual damages to show, you just

09:51:09 3    didn't do that, correct?

09:51:10 4    A.     So, I made several conservatives in my analysis.

09:51:15 5    Like I mentioned, there were elements of unjust enrichment

09:51:19 6    that I also did not include.

09:51:20 7    Q.     And unjust enrichment measures the benefit realized

09:51:25 8    by the Defendant as a result of its use of the trade

09:51:28 9    secrets, correct?

09:51:29 10   A.     Yes.

09:51:29 11   Q.     There is no benefit without use, right?

09:51:33 12   A.     The unjust enrichment in this case follows the --

09:51:39 13   yes, the benefit from the use, yes, agree.

09:51:47 14   Q.     So let's focus now on unjust enrichment, which is

09:51:51 15   what you did calculate with respect to the trade secret

09:51:55 16   misappropriation element here.

09:51:56 17          And you would agree with me that court cases and

09:52:01 18   literature in the area recognizes three primary categories

09:52:07 19   of unjust enrichment in trade secret cases, correct?

09:52:13 20   Defendants' profits is one.  Head start benefit is another,

09:52:19 21   and avoided costs is the third.  Right?

09:52:27 22   A.     I certainly have done lots of reading and analysis

09:52:30 23   that evaluate unjust enrichment in a variety of ways.  Those

09:52:35 24   are certainly some of the ways that I have seen, yes, in

09:52:41 25   thinking about it.

Bennis - cross

09:52:42  1    Q.       You chose head start benefit.  Now, Akoustis never

09:52:47  2    made a profit, correct?

09:52:50  3    A.       My memory from the Akoustis financial results are

09:52:54  4    that it did not yet make a net profit, it has accomplished a

09:53:00  5    gross profit.

09:53:02  6    Q.       But a gross profit in the very low five or six

09:53:06  7    figures, correct, in 2015-2016, is that what you recall?

09:53:14  8    A.       I think that Akoustis had its fiscal year third

09:53:19  9    quarter investor presentation this morning in which it

09:53:22 10    announced a positive gross profit.

09:53:25 11    Q.       You're not going to testify about facts not before

09:53:27 12    the jury, are you?

09:53:28 13    A.       Sorry?

09:53:29 14    Q.       First of all, you're testifying about hearsay, so I'm

09:53:33 15    going to cut you off.  This is not something from your

09:53:36 16    report, correct?

09:53:37 17    A.       The results that were announced today would not have

09:53:41 18    been in my November report.

09:53:42 19    Q.       Correct.  And they're not in evidence, either, are

09:53:45 20    they?

09:53:47 21    A.       I was basing my statement on Akoustis's own

09:53:51 22    presentation of this investor financial performance this

09:53:55 23    morning.

09:53:55 24    Q.       Okay.  Well, your counsel can ask you about that if

09:53:59 25    she wants.  But I'm talking about when has Akoustis -- you

Bennis - cross

09:54:05  1    said in the past it has -- it has showed a small gross

09:54:11  2    profit; correct?

09:54:13  3    A.      I am aware that Akoustis has shown a small gross

09:54:17  4    profit.

09:54:18  5    Q.      We'll look at a table from your report so that we can

09:54:22  6    make that clear.

09:54:22  7            So you understand what avoided costs are?

09:54:28  8    A.      Yes.

09:54:28  9    Q.      And it's the costs -- they would be the development

09:54:34 10    costs that a Defendant avoids by using plaintiffs' trade

09:54:41 11    secrets; correct?

09:54:43 12    A.      Yes, generally speaking.

09:54:46 13    Q.      And I assume that you understand that avoided costs

09:54:52 14    is also a way to measure the benefit to a Defendant from a

09:54:57 15    head start?

09:54:59 16    A.      Yes, I think I mentioned that.

09:55:01 17    Q.      You did not attempt to calculate the benefit to

09:55:06 18    Akoustis from an-- on the basis of an avoided cost

09:55:11 19    methodology, correct?

09:55:12 20    A.      So like I mentioned earlier, my calculations

09:55:17 21    evaluated the time element of that benefit, it did not

09:55:21 22    evaluate any of the hard research development expenses that

09:55:25 23    are typically incurred by businesses.

09:55:27 24    Q.      So that would be yes, you did not calculate an

09:55:30 25    avoided cost calculation?

09:55:31  1    A.      I did not add into my damages overall calculations,

09:55:35  2    those types of expenses.

09:55:36  3    Q.      And we spoke at length in January during your

09:55:40  4    deposition, do you remember that?

09:55:41  5    A.      I do.

09:55:42  6    Q.      And you suggested the reason for not attempting to

09:55:46  7    calculate avoided costs was that you did not have the

09:55:49  8    information to calculate that, do you recall that?

09:55:52  9    A.      So in instances like this one, and in general,

09:55:58 10    Akoustis -- there are no such records in the files of

09:56:02 11    Akoustis because it didn't do it.  It didn't engage in the

09:56:04 12    research and development expenses that it instead

09:56:08 13    misappropriated.

09:56:09 14            So there are instances where one can use, for

09:56:13 15    instance, like in this case, Qorvo's research and

09:56:17 16    development expenses as a proxy or as an estimate for what

09:56:22 17    it would take for Akoustis or a company in its position to

09:56:26 18    do the same thing.  They're Qorvo's trade secrets, so I know

09:56:29 19    we heard testimony last week that Qorvo spent a billion

09:56:36 20    dollars in BAW filter research and development over the

09:56:40 21    course of twenty years.  Just to finish the analysis --

09:56:42 22    Q.      Well, you're not answering my question.  In fairness,

09:56:47 23    I asked you, didn't you say that, and you went off on a

09:56:50 24    tangent to put in front of the jury information that you

09:56:52 25    wanted it to hear.  So you know, your counsel can always

Bennis - cross

09:56:56  1   cover that with you if she wants.  But I am entitled to a

09:57:00  2   straight up answer, and the jury is entitled to a straight

09:57:02  3   up answer to an easy question, which was, you told me you

09:57:06  4   didn't have the information necessary to calculate an

09:57:11  5   avoided cost methodology at your deposition, true?

09:57:15  6   A.      I probably said that, which is true because Akoustis

09:57:20  7   doesn't have research and development expenses for endeavors

09:57:24  8   it didn't engage in, because it misappropriated those steps.

09:57:30  9   Q.      You understand the concept of cash flow, correct?

09:57:33 10   A.      Of course.

09:57:33 11   Q.      And cash flow, it refers to the movement of money in

09:57:39 12   and out of the business.  And is often expressed in the

09:57:44 13   difference between cash moving in and cash moving out;

09:57:48 14   right?

09:57:49 15   A.      Sure.

09:57:50 16   Q.      So cash received, is an inflow; right?

09:57:54 17   A.      Yes.

09:57:54 18   Q.      And so, for Akoustis, that would be money that it

09:57:58 19   receives for sales of its filters, or for nonrecurring

09:58:03 20   engineering work which they called NRE's, two examples,

09:58:07 21   right?

09:58:07 22   A.      I didn't hear the first part.

09:58:09 23   Q.      I'm sorry.  This mic kind of moves around a little

09:58:12 24   bit.

09:58:13 25   A.      And I'm straining to see, I don't mean to --

Bennis - cross

09:58:19  1   Q.      I'm not the tallest person in the world anyway.

09:58:22  2   A.      Me either.

09:58:23  3   Q.      So for Akoustis, cash inflow would be money that it

09:58:27  4   receives for the sale of the filters; right?

09:58:31  5   A.      And among other things.

09:58:33  6   Q.      Nonrecurring engineering expenses and so on?

09:58:37  7   A.      Yes.

09:58:37  8   Q.      And cash spent is an outflow; right?

09:58:40  9   A.      Yes.

09:58:41 10   Q.      So costs of creating revenue such as labor?

09:58:46 11   A.      That would be an example, yes.

09:58:48 12   Q.      And you -- in your report, you state that one way to

09:58:56 13   measure the economic benefit to Akoustis was to consider the

09:59:00 14   benefit that Akoustis received by prematurely having access

09:59:05 15   to cash flows.  Do you recall that statement?

09:59:08 16   A.      Yes.

09:59:08 17   Q.      But when you made your calculation of the supposed

09:59:18 18   head start benefit, you used revenue instead of cash flow;

09:59:23 19   right?

09:59:24 20   A.      Revenue is a cash flow.

09:59:27 21   Q.      It's an inflow, correct, revenue is a cash inflow,

09:59:32 22   correct?

09:59:32 23   A.      Revenue is a cash inflow, yes, I agree.

09:59:36 24   Q.      Okay.  But you used revenue, but you ignored the

09:59:39 25   costs that Akoustis incurred to make that revenue.  So in

Bennis - cross

09:59:44 1    other words, you only told half the story?

09:59:46 2    A.    No, I wouldn't characterize it like that.

09:59:49 3    Q.    If you had limited the -- if you had included the

10:00:00 4    costs of revenue so the cash outflows necessary to create

10:00:04 5    the revenue that you did count, it would have yielded a

10:00:09 6    vastly different result than the one you came up with;

10:00:12 7    correct?

10:00:13 8    A.    No, I don't think that's right.

10:00:16 9    Q.    Okay.  Can we show, Mr. Brown, Appendix A, Schedule A

10:00:25 10   from Ms. Bennis's report?

10:00:35 11           And just so you have a copy up close, I will

10:00:41 12   hand it to you.

10:00:43 13           MR. ELKINS:  Your Honor, may I approach?

10:00:44 14           THE COURT:  You may.

10:00:54 15   BY MR. ELKINS:

10:01:12 16   Q.    Okay.  So you'll recognize that on the screen we're

10:01:22 17   looking at Schedule A -- excuse me, Appendix A, Schedule 4

10:01:30 18   from your report.  And if we can focus -- we need Schedule

10:01:41 19   4, Mr. Brown.

10:01:43 20           And can we focus on the top, Mr. Brown, just

10:01:53 21   through gross margin?

10:01:57 22           So, what you're showing, or what you show in

10:02:11 23   your Appendix A, Schedule 4, is on a gross margin basis,

10:02:17 24   which approximates cash flow in this case, if you consider

10:02:21 25   the cash flow is the cost of creating the revenue, you

Bennis - cross

10:02:24 1  essentially see that except for 16, 17, 18 and 19, Akoustis

10:02:35 2  shows negative cash flow; correct?

10:02:41 3  A.     A couple of thoughts of what I think I heard you say.

10:02:46 4  You are focusing on the gross margin line item.

10:02:52 5  Q.     Yes, I am.

10:02:53 6  A.     That would be -- yeah, there are negative gross

10:02:56 7  margins in certain years, not all years.  I have not

10:03:01 8  highlighted the net profit margin on the bottom, but I agree

10:03:07 9  -- the question was, I am seeing negative gross margins,

10:03:11 10  right?

10:03:11 11  Q.     Yes.

10:03:12 12  A.     Yes, I am.

10:03:12 13  Q.     And that's essentially, if we were to look at cash

10:03:15 14  flow, and we limited the cash flow simply to the costs of

10:03:20 15  revenue, the cost of creating the revenue that is counted

10:03:23 16  and that's the only thing counted in your calculation of

10:03:27 17  benefit, then it shows in that loss, or a net negative of

10:03:36 18  ten-and-a-half million dollars for that time period,

10:03:38 19  correct?

10:03:39 20  A.     Yes, I agree.

10:03:41 21  Q.     And so essentially, because during that period all of

10:03:46 22  Akoustis's revenue, certainly from 2020 through 2023, was

10:03:53 23  eaten up by the costs of making its revenue, it didn't have

10:03:57 24  any cash inflows to enjoy for purposes of investing in

10:04:03 25  capital equipment; right?

Bennis - cross

10:04:07  1    A.      So it achieved a negative gross margin which would

10:04:12  2    have been true whether -- well, I should say it's

10:04:16  3    independent of the consideration of what was avoided by

10:04:21  4    virtue of misappropriation.  So it's not uncommon for a

10:04:25  5    company to start and stop an operation to sell at a negative

10:04:30  6    margin until things get to scale.  But that doesn't take

10:04:33  7    away from the fact that it's achieving the results it's

10:04:36  8    achieving 55 months earlier.

10:04:38  9    Q.      But your methodology relies on benefit to Akoustis,

10:04:45 10    and the issue is, does it have the benefit when it doesn't

10:04:50 11    see any positive cash flow, because the costs of creating

10:04:55 12    its revenue, are larger than the revenue it receives?

10:04:58 13    A.      Well, of course, because the analysis that you're

10:05:03 14    seeing right here would be protracted if not for the benefit

10:05:07 15    of being able to get into the market and earn all these

10:05:09 16    revenue streams at an earlier point in time.

10:05:12 17    Q.      So your focus is on revenue, and you have posited

10:05:19 18    that it's the time value of that revenue that Akoustis gets

10:05:22 19    to enjoy because it misappropriated trade secrets and got a

10:05:28 20    head start, but in fact, this shows that it didn't get to

10:05:31 21    enjoy any revenue because the revenue is not there sitting

10:05:36 22    in a bank, it's being consumed by the costs of revenue, the

10:05:41 23    cost of making that revenue is greater than the revenue

10:05:44 24    itself.  So there is nothing there to invest or earn

10:05:48 25    interest on.  There is nothing there to, you know, invest in

Bennis - cross

10:05:53  1  capital equipment.  It's being consumed by the costs of

10:05:57  2  revenue.  And that's really the problem with your theory is

10:06:00  3  you're trying to infer a benefit from revenue without taking

10:06:06  4  real world facts into account; right?

10:06:09  5  A.    No, I disagree completely.

10:06:12  6  Q.    Okay.

10:06:13  7  A.    And again --

10:06:14  8  Q.    Let's say you're aware that the courts rely on

10:06:25  9  publications that have considered expert witness

10:06:29 10  methodologies for estimating a head start benefit to a

10:06:33 11  Defendant having endorsed expert opinions using the amount

10:06:36 12  of the Defendant's incremental products, that's the

10:06:42 13  Defendant's profits, right?

10:06:43 14  A.    I believe so, yes.

10:06:45 15  Q.    And in a head start, they have also approved the use

10:06:50 16  of the increased value of the Defendant's company, company

10:06:56 17  value, as a result of a head start it obtained, you're aware

10:07:00 18  of that, right?

10:07:01 19  A.    Which is what all these types of things get to, yeah.

10:07:05 20  Q.    But you did not perform a valuation of Akoustis as a

10:07:11 21  company, correct?

10:07:12 22  A.    My analysis focuses just on the isolated benefit.

10:07:16 23  Q.    Right.  And you're aware, because I asked you at your

10:07:21 24  deposition, you're aware of the Sedona Conference, right?

10:07:25 25  A.    Yes.

Bennis - cross

10:07:26  1    Q.      And it's a well respected nonpartisan, nonprofit

10:07:31  2    research and educational institute, right?

10:07:34  3    A.      Yes.

10:07:34  4    Q.      And among other things, it's dedicated to the

10:07:38  5    advanced study of law and policy in the area of antitrust

10:07:42  6    law, complex litigation, intellectual property rights and

10:07:45  7    data security and practicing law, correct?

10:07:49  8    A.      I'll take your word for it.

10:07:51  9    Q.      And it publishes an autonomous journal that includes

10:07:56 10    articles, commentaries and other publications, right?

10:08:00 11    A.      Yes, I think groups like that often produce --

10:08:05 12    Q.      We discussed a particular publication by the Sedona

10:08:10 13    Conference, it published the Sedona Conference Commentary on

10:08:15 14    Monetary Remedies in Trade Secret Litigation, do you

10:08:19 15    remember that?

10:08:19 16    A.      I do.

10:09:21 17               MR. ELKINS:  May I approach, Your Honor?

10:09:23 18               THE COURT:  You may.

10:09:34 19    BY MR. ELKINS:

10:09:44 20    Q.      As I want to do, I sometimes forget to look at

10:09:47 21    things, so I'm looking at documents.  Before I have you do

10:09:50 22    that, Ms. Bennis, let me back up to the last document that I

10:09:53 23    showed you.  Mr. Brown, if you could put back on Appendix A,

10:09:58 24    Schedule 4.  There you go.

10:10:01 25               And could you focus on the lines right

Bennis - cross

10:10:04 1    underneath operating expenses.

10:10:08 2    A.    Okay.

10:10:09 3    Q.    And I just wanted to note, so you prepared this

10:10:17 4    spreadsheet for your own report; correct?

10:10:21 5    A.    I did.  I prepared this from an Akoustis material,

10:10:28 6    Form 10K filings, yes.

10:10:30 7    Q.    And you put --

10:10:31 8    A.    Amalgamated them.

10:10:33 9    Q.    Amalgamated into a useful fashion.  One thing I

10:10:36 10   wanted to confirm is, you have there a total of 152 point,

10:10:43 11   almost, $152.7 million in research and development from

10:10:48 12   fiscal year '16 through '23; correct?

10:10:52 13   A.    Yes.

10:10:53 14          MR. ELKINS:  Your Honor, we would offer Exhibit

10:10:56 15   A, Schedule 4 from Ms. Bennis's report into evidence.

10:11:00 16          THE COURT:  Marked and received as 286.

10:11:07 17          (Trial Exhibit No. 286 was admitted into

10:11:08 18   evidence.)

10:11:08 19          MR. ELKINS:  Thank you.

10:11:09 20   BY MR. ELKINS:

10:11:09 21   Q.    Okay.  Sorry for that detour.

10:11:13 22          Let's go back to the Sedona Conference paper.

10:11:20 23   And does this appear to be a true and correct copy of the

10:11:25 24   article that we discussed at your deposition?

10:11:28 25   A.    Yes, I believe so.

Bennis - cross

10:11:33   1            MR. ELKINS:  Your Honor, we would move the

10:11:35   2   Sedona Conference Journal Volume XIX, Number 2, into

10:11:39   3   evidence.

10:11:41   4            MS. AYERS:  Objection, Your Honor.

10:11:41   5            THE COURT:  Objection sustained.

10:11:45   6   BY MR. ELKINS:

10:11:45   7   Q.     Let's look --

10:11:46   8            THE COURT:  It's inconsistent with the portion

10:11:53   9   of the 803 series of rules.

10:11:57 10   BY MR. ELKINS:

10:11:58 11   Q.     Can you go to page 39, 39 of 81, which is not here,

10:12:04 12   but I think it's at page 684.  Well, let me do this without

10:12:36 13   the document.

10:12:38 14            When we spoke at your deposition in January, you

10:12:48 15   could not recall at that time having ever previously

10:12:51 16   performed a head start estimate of benefit in a trade secret

10:13:01 17   case before this one, is that accurate?

10:13:06 18   A.     A head start benefit?

10:13:11 19   Q.     Yes.

10:13:17 20   A.     I'm not sure that I have.

10:13:21 21   Q.     And while you're -- you're looking at the -- at least

10:13:28 22   in direct examination, you said that you're looking at the

10:13:31 23   time value of money received by Akoustis.  The money

10:13:39 24   received is revenue in this case; correct?

10:13:42 25   A.     Yes.

Bennis - cross

| | |
|---|---|
| 10:13:42 1 | Q.        And you could not at your deposition, identify a |
| 10:13:49 2 | single court case where a court approved using a Delta N |
| 10:13:56 3 | revenue as adjusted for the time value of money as a basis |
| 10:14:01 4 | for estimating a head start benefit, correct? |
| 10:14:05 5 | A.        That's right. |
| 10:14:06 6 | Q.        And you cannot identify a single informative |
| 10:14:11 7 | publication approving using revenue as the basis for |
| 10:14:16 8 | estimating a head start benefit in a trade secret case; |
| 10:14:21 9 | correct? |
| 10:14:24 10 | A.        I mean, I certainly can't cite to every publication |
| 10:14:28 11 | that's ever been authored.  I can't think of any examples. |
| 10:14:31 12 | I think every analysis that I see, both that I perform and |
| 10:14:35 13 | others in my shoes perform, are unique to the facts and |
| 10:14:38 14 | circumstances present in the analysis that we're asked to |
| 10:14:41 15 | perform.  So what I did in this particular case, was what I |
| 10:14:47 16 | felt fit best with the facts. |
| 10:14:51 17 | Q.        Even though there was no prior basis for doing it; |
| 10:14:55 18 | right? |
| 10:14:55 19 | A.        Well, like we have discussed, I mean, the measure of |
| 10:14:58 20 | a head start benefit is right in line with what's |
| 10:15:04 21 | appropriate to evaluate in the case of trade secret |
| 10:15:07 22 | misappropriation like we have here. |
| 10:15:10 23 | Q.        Now, in your but for world, in your but for world is |
| 10:15:18 24 | what damages experts call what should have happened but for |
| 10:15:24 25 | the facts that give rise to liability, in this case trade |

Bennis - cross

10:15:29  1    secret misappropriation, correct?

10:15:30  2    A.      Yes.

10:15:30  3    Q.      So the but for world is where you shift revenues

10:15:35  4    forward in time by 55 or however many months that the jury

10:15:39  5    might find the head start benefit was in effect; correct?

10:15:44  6    A.      Yes.

10:15:44  7    Q.      And in your but for world, you assume that Akoustis

10:15:51  8    fiscal year 2024 revenue would be $59.4 million, right?

10:15:59  9    A.      That's right.

10:15:59 10    Q.      So I just wanted to make sure.  You testified that

10:16:03 11    you adjusted that down to take into account the testimony

10:16:08 12    from Mr. Aichele testified that he anticipated that the full

10:16:16 13    fiscal year revenue for fiscal -- the fiscal year ending

10:16:23 14    June 30th, 2024, would be about $28 million?

10:16:25 15    A.      Yes.  To be clear, at the time of my report issuance

10:16:30 16    in November, I used Akoustis's projections, the most recent

10:16:35 17    projections that it had made at that point which included

10:16:40 18    fiscal year 2024 total revenue of 59 million.  Mr. Aichele

10:16:46 19    sat before us last week and said that number will be more

10:16:50 20    like 28 million, so I ran both figures through the model to

10:16:55 21    produce the result.

10:16:55 22    Q.      So if we use the most up-to-date reference at least

10:17:00 23    based on what Mr. Aichele said, that reduces the head start

10:17:03 24    benefit you calculated by about $16 million, correct?

10:17:06 25    A.      Yes.  I have not seen Mr. Aichele's projections in

Bennis - cross

10:17:10 1  writing anywhere, but again, for the benefit of the jury, I

10:17:13 2  ran that number through.

10:17:14 3  Q.    Right.  But you have seen the fiscal year, the Q1 and

10:17:20 4  Q2, quarter 1 and quarter 2 financial reports for Akoustis

10:17:27 5  for fiscal year 2024, correct?

10:17:30 6  A.    Yes.

10:17:30 7  Q.    Do you have any reason to disbelieve what Mr. Aichele

10:17:34 8  testified based on the revenue reported for quarters 1 and 2

10:17:39 9  of fiscal year 2024?

10:17:44 10  A.    I think I hear you asking two different things.  So

10:17:48 11  Mr. Aichele projected full year performance through quarter

10:17:51 12  4, but quarter 4 is not completed yet.  So that by

10:17:56 13  definition has to be a forecast.

10:17:59 14  Q.    Okay.  But you didn't see anything that looked --

10:18:02 15  based on your review of Q1 and Q2, leaped out at you as

10:18:09 16  being unrealistic of Mr. Aichele's forecast, correct?

10:18:12 17  A.    I mean, the same information I believe was available

10:18:16 18  at the time of the -- the projections that I reviewed back

10:18:21 19  in November, so just, both are projections, so I ran both

10:18:27 20  numbers.

10:18:28 21  Q.    So now, you also included all Akoustis's revenue in

10:18:34 22  your estimate of head start benefit, whether it's related to

10:18:41 23  alleged Qorvo trade secrets or not, correct?

10:18:44 24  A.    That's correct.

10:18:45 25  Q.    And I think that you stated that at the time of your

Bennis - cross

10:18:52 1   report, or in your report, you stated that the trade secrets

10:18:55 2   Akoustis is alleged to have misappropriated related to

10:18:59 3   virtually every aspect of its business and ability to get to

10:19:04 4   market in the time frame that it did, that includes its

10:19:08 5   ability to earn grant money, fabricate products, provide

10:19:12 6   engineering services and manufacturing products.  As such,

10:19:15 7   it is appropriate to consider Akoustis's total company

10:19:18 8   revenue in this analysis.  Is that right?

10:19:20 9   A.     Exactly right.

10:19:21 10   Q.     And you relied on an oral discussion with

10:19:26 11   Dr. Shanfield before you issued your report for that

10:19:31 12   conclusion; correct?

10:19:33 13   A.     Yes.

10:19:34 14   Q.     You never saw his written report before you -- in

10:19:39 15   fact, you never saw his written report until we had -- you

10:19:42 16   had your deposition in January of this year; right?

10:19:45 17   A.     So, the way the court schedules work in the cases,

10:19:49 18   his report and my report were due on the same day, so I

10:19:53 19   wouldn't have seen his report.  We talked with each other in

10:19:58 20   preparation with respect to reports, that's fine.

10:20:05 21   Q.     Do you know how many trade secrets -- well, at the

10:20:09 22   time of your deposition in January 2024, you didn't know how

10:20:13 23   many trade secrets Qorvo was asserting at the time?

10:20:16 24   A.     Yeah, I'm not sure individually now.  I know they

10:20:21 25   have been grouped into various groups that we've talked

Bennis - cross

10:20:24  1    about.

10:20:25  2    Q.    Well, you sat through all of the slides that show

10:20:28  3    them.  I'll represent to you that there are 46.

10:20:31  4    A.    Okay.

10:20:32  5    Q.    I'll also represent to you that at the time you

10:20:36  6    submitted your report and the time of your deposition, there

10:20:40  7    were 104.

10:20:42  8    A.    That's a lot.

10:20:43  9    Q.    That's a lot.  And now there are 46.  And at the time

10:20:47 10    of your report and deposition, there were ten categories of

10:20:53 11    alleged trade secrets, right?

10:20:54 12    A.    Yes.

10:20:54 13    Q.    Now there are eight.

10:20:56 14          So the number of trade secrets is 56 percent

10:21:02 15    less than it was before.  The number of categories is down

10:21:09 16    20 percent.  Yet your methodology still includes all

10:21:13 17    Akoustis's revenue regardless of source; right?

10:21:16 18    A.    So you may recall, I think we touched on it at my

10:21:20 19    deposition, you asked me about, there were two other

10:21:23 20    categories like 9 and 10, we've seen 8.  You asked about 9

10:21:29 21    and 10 and the inclusion in the analysis.  My memory was

10:21:33 22    there were other trade secrets originally asserted that had

10:21:37 23    to do with tax documents and processes, they weren't

10:21:39 24    technical in nature, but rather other business information.

10:21:43 25    So they did not necessarily impact the head start, they were

10:21:46  1   not reflected in the 55 month, they were additional.  So the

10:21:50  2   removal of those for purposes of just taking the jury

10:21:55  3   through a palatable amount of money, or evidence, rather,

10:22:00  4   doesn't affect the calculations that I presented.

10:22:02  5   Q.      Okay.  Now, you heard Mr. Aichele testify about the

10:22:07  6   breakdown of revenue between or among BAW filter revenue,

10:22:13  7   revenue from RFMi, the SAW filter company it acquired and

10:22:20  8   from GDSI, the back-end fabrication company, right?

10:22:25  9   A.      Yes.

10:22:25 10   Q.      And you heard that of the anticipated $28 million in

10:22:31 11   revenue that Akoustis will -- should receive in fiscal year

10:22:37 12   2024, about over $13 million of it comes from RFMi and from

10:22:44 13   GDSI, right?

10:22:45 14   A.      Yes.

10:22:46 15   Q.      So it's about 46, 47 percent of all revenue?

10:22:50 16   A.      At present, the jury may recall, we looked at the

10:22:53 17   spreadsheet that contained the annual projections moving

10:22:56 18   forward that in the future, the company is built around

10:23:00 19   filters, so that revenue is projected to be 90 plus percent

10:23:06 20   of total company revenue once they're up to speed.

10:23:10 21   Q.      But you're looking at -- that may be true, but for

10:23:16 22   current purposes, the years that you have used for revenue

10:23:20 23   are 2016 through 2024; correct?

10:23:24 24   A.      Yes.  Up to present.

10:23:25 25   Q.      And then you're just projecting those into the

Bennis - cross

10:23:28 1    future?

10:23:28 2    A.    Right.

10:23:29 3    Q.    So we're just talking about -- we're not talking

10:23:32 4    about what happens after that period.  And you were here for

10:23:38 5    Mr. Aichele's testimony, I saw you in the gallery; right?

10:23:41 6    And you know that RFMi and GDSi are subsidiaries of

10:23:47 7    Akoustis, right?

10:23:48 8    A.    I do.

10:23:48 9    Q.    And you undertook no analysis in your report to

10:23:52 10   determine whether Akoustis could have or would have acquired

10:23:56 11   them absent product revenue, right?

10:23:59 12   A.    Sorry, but --

10:24:01 13   Q.    Your report undertakes no analysis whether Akoustis

10:24:05 14   would have or could have acquired those two companies absent

10:24:11 15   any product revenue from filters?

10:24:14 16   A.    I didn't conduct specific analysis, again, I think

10:24:18 17   that's the point, though.  I mean, you can't acquire money

10:24:21 18   if you don't have money.  It gets to the time value of

10:24:25 19   power, remember when I was here talking about the power of

10:24:27 20   having a dollar today is more powerful than having a dollar

10:24:31 21   tomorrow because you can buy things, you can build things,

10:24:33 22   you can buy companies that bring in revenue stream to help

10:24:37 23   support your growth and your operation, that's the idea.

10:24:40 24   Q.    But Akoustis didn't have money from the get go, yet

10:24:43 25   it was able to fund $152 million in R & D, correct, it

Bennis - cross

10:24:48  1    didn't earn that from products?

10:24:49  2    A.      But again, they have the ability to do those things

10:24:53  3    because you were giving -- you're talking about cash flows,

10:24:56  4    you're having the benefit of those cash flows earlier rather

10:24:59  5    than later, and they didn't have to go then raise money from

10:25:02  6    investors, from banks in the same way that they would have

10:25:05  7    had they not had the benefit of those revenue streams.

10:25:08  8    Q.      Because they had already done that, though, they did

10:25:11  9    that in 2015, when they went public, right?

10:25:15 10    A.      I think I am misunderstanding your question.

10:25:19 11    Q.      You're aware that Akoustis is a public company?

10:25:22 12    A.      I am.

10:25:22 13    Q.      And when did it go public?  2015, right?

10:25:26 14    A.      I'm not recalling the exact date.  But again, the,

10:25:30 15    the idea is all of the activities they have taken, have been

10:25:34 16    by virtue of having the benefit of the information.  So it's

10:25:37 17    not to say that they couldn't have done those things, recall

10:25:40 18    I told you the analysis doesn't take away the revenue that

10:25:44 19    they've earned, it's intended to measure the benefit of

10:25:47 20    doing all these things earlier, that's all.

10:25:49 21    Q.      But -- we'll come back to that.

10:25:55 22            The revenue of GDSi and RFMi, those -- the

10:26:03 23    services and products they sell have nothing the do with

10:26:06 24    this case, correct, no technology of RFMI is at issue in

10:26:10 25    this case, correct?

Bennis - cross

10:26:11 1    A.        I would disagree that they have nothing to do with

10:26:13 2    this case.

10:26:14 3    Q.        Is any technology, is any Qorvo technology been

10:26:20 4    passed on to RFMI?

10:26:21 5    A.        The idea of the analysis is --

10:26:23 6    Q.        Can you answer my question yes or no?  It's a yes or

10:26:26 7    no question.

10:26:27 8    A.        I don't know.

10:26:28 9    Q.        You heard Mr. Aichele say it wasn't.  Are you aware

10:26:31 10   of any evidence that RFMI uses, or even has any information

10:26:36 11   that is a Qorvo trade secret?

10:26:39 12   A.        My memory of RFMI is that they are -- they make

10:26:44 13   filters as well, they were brought into the umbrella of

10:26:48 14   Akoustis by virtue of doing all the business activities that

10:26:51 15   Akoustis has done over the years, that's where the analysis

10:26:54 16   lies.

10:26:54 17   Q.        Okay.  Let me ask the question again.  Are you aware

10:26:57 18   of any Qorvo information that is in the possession of RFMI,

10:27:03 19   yes or no?

10:27:04 20   A.        I don't know that.

10:27:05 21   Q.        So the answer is no, you're not aware, correct?

10:27:08 22   A.        Possession, I can't speak to possession.

10:27:11 23   Q.        You have heard no evidence that RFMI has anything

10:27:17 24   relating to Qorvo, isn't that correct?

10:27:20 25   A.        That's correct, I don't know that.

Bennis - cross

10:27:22  1    Q.      Okay.  And the same with GDSi, you have heard no

10:27:26  2    evidence in this case that GDSi has any Qorvo information

10:27:30  3    whatsoever, correct?

10:27:31  4    A.      That's right, I don't know that.

10:27:32  5    Q.      In fact, GDSi's business isn't even related to what

10:27:37  6    Qorvo does, right?

10:27:37  7    A.      I think we heard testimony that it had to do with

10:27:40  8    slicing and dicing of filters, so it's BAW filter related as

10:27:46  9    I understand it, that's the nature of Akoustis's business.

10:27:50 10    Q.      Right.

10:27:51 11            So in general when estimating damages, an expert

10:27:56 12    is supposed to be conservative in her approach; correct?

10:28:02 13    A.      I would say that an expert is -- attempts to be

10:28:07 14    accurate, conservatives are part of those analyses at times.

10:28:15 15    Q.      By including revenue from completely independent

10:28:20 16    companies though, have you valuated that maximum?

10:28:23 17    A.      I disagree.

10:28:24 18    Q.      You already said, you did not undertake a specific

10:28:29 19    analysis whether or not Akoustis could have and would have

10:28:33 20    acquired RFMI or GDSi in the absence of trade secret

10:28:39 21    misappropriation that's alleged, correct?

10:28:42 22    A.      And I would repeat the same answer that I provided

10:28:45 23    earlier, which is I have not suggested that Akoustis

10:28:49 24    couldn't have gotten where it's gotten, I have simply

10:28:52 25    suggested the benefits incurred had they gotten there

Bennis - cross

10:28:57  1    earlier.

10:28:58  2    Q.    Let's move to unfair and deceptive trade practices,

10:29:07  3    that claim, which we have called unfair competition because

10:29:10  4    it's a lot easier.  It has two components as we already

10:29:16  5    discussed, the first one is confidential information

10:29:18  6    misappropriation, is what you called it in your slide deck.

10:29:22  7    And that reflects the benefit to Akoustis from the head

10:29:27  8    start; correct?

10:29:28  9    A.    Yes.

10:29:28 10    Q.    And essentially, you reused the methodology that you

10:29:37 11    put to use for the trade secret misappropriation benefit

10:29:43 12    analysis, and you're essentially reapplying it for the

10:29:47 13    purposes of unfair competition?

10:29:49 14    A.    It measures the benefits in the same way, yes.

10:29:53 15    Q.    Okay.  But this bucket as you -- as you said when we

10:29:59 16    first started talking is confidential information, so it

10:30:02 17    includes both the trade secrets that are the subject of your

10:30:08 18    prior benefit calculation, and then an unknown amount of

10:30:14 19    confidential information; correct?

10:30:16 20    A.    Yes.

10:30:17 21    Q.    But the addition of the confidential information to

10:30:22 22    your consideration does not move the needle so to speak,

10:30:27 23    with respect to the amount of the benefit, in other words,

10:30:31 24    it stays $66.1 million or $50 million, I guess, in light of

10:30:37 25    Mr. Aichele's testimony, whether that confidential

Bennis - cross

10:30:40 1   information is included or not; correct?

10:30:43 2   A.      That's right, I didn't increase the number so to

10:30:47 3   speak, I used the same consideration of that.

10:30:52 4   Q.      So the second component of unfair competition is

10:30:55 5   poaching.  And poaching damages are direct damages to Qorvo;

10:31:01 6   correct?

10:31:02 7   A.      It's an attempt to estimate an amount of money for

10:31:07 8   purposes of Akoustis's actions with respect to the poaching,

10:31:11 9   yes.

10:31:11 10  Q.      Right.

10:31:12 11          But as opposed to measuring the benefit to

10:31:15 12  Akoustis here, you're measuring the harm to Qorvo from

10:31:19 13  Akoustis's alleged poaching, correct?

10:31:21 14  A.      Yes.  The cost to a business like Qorvo to losing

10:31:28 15  employees in the manner that it did, yes.

10:31:30 16  Q.      Unwanted attrition has a cost, correct?

10:31:33 17  A.      Yes.

10:31:33 18  Q.      And businesses have various ways of accounting for

10:31:39 19  that in terms of the costs to the business of having to

10:31:42 20  replace an employee it wasn't looking to terminate?

10:31:48 21  A.      Yes.

10:31:49 22  Q.      Okay.  So, you took, essentially what you're looking

10:31:57 23  at are a -- on a per employee basis, the per employee

10:32:02 24  expenses that many people don't think about, HR time

10:32:08 25  invested in replacing an employee, lost productivity, et

Bennis - cross

10:32:13 1  cetera, and you're basically taking a number based on the

10:32:17 2  position of an employee and then multiplying it by the

10:32:21 3  number of employees that fit within that position who went

10:32:25 4  over to Akoustis?

10:32:26 5  A.      Correct.

10:32:31 6  Q.      So we've heard in this case, and you repeated that

10:32:36 7  forty-three former Qorvo or RFMD employees joined Akoustis;

10:32:46 8  correct?

10:32:47 9  A.      Founded Akoustis, yes.

10:32:51 10 Q.      Excuse me?

10:32:52 11 A.      Or founded Akoustis.

10:32:53 12 Q.      Or founded, Mr. Shealy who left RFMD because Qorvo

10:32:57 13 didn't exist yet, so he left RFMD, and founded Akoustis.

10:33:03 14         And you tried to determine who among that group

10:33:06 15 of forty-three was poached, right?

10:33:09 16 A.      Yes.

10:33:09 17 Q.      And you're not an expert in determining what poaching

10:33:12 18 is, right?

10:33:13 19 A.      No, I'm not.

10:33:14 20 Q.      And, or at least in determining what is poaching

10:33:19 21 versus hiring in the normal course of business, is what I

10:33:23 22 meant to say.  That's not within your realm of expertise,

10:33:26 23 right?

10:33:26 24 A.      That's right.

10:33:27 25 Q.      And so through Qorvo's counsel, you arranged to speak

Bennis - cross

10:33:32  1    with someone in Qorvo's human resources group, right?

10:33:36  2    A.      Right.

10:33:36  3    Q.      And that was Denise Stoddard?

10:33:40  4    A.      Leslie Stoddard.

10:33:42  5    Q.      Leslie Stoddard.  Ms. Stoddard is a Qorvo human

10:33:47  6    resources analysis?

10:33:48  7    A.      That sounds right.

10:33:49  8    Q.      And you asked her to walk you through the forty-three

10:33:52  9    people to determine whether or not there was some

10:33:56 10    circumstances that -- from which you could infer that a

10:34:01 11    person could not have been poached; right?

10:34:04 12    A.      My memory of the analysis is the starting point was

10:34:07 13    an Akoustis employee roster that was in the files of

10:34:11 14    Akoustis.  There were various employees on that list that I

10:34:15 15    knew just from my review of the deposition transcripts and

10:34:19 16    other evidence that were -- that were individuals that had

10:34:23 17    left Qorvo or that wouldn't belong in a poaching analysis.

10:34:27 18    So I was able to eliminate some of those people on my own.

10:34:32 19            And so by the time I got to my conversation with

10:34:36 20    Ms. Stoddard, it was really a function of tell me more about

10:34:39 21    the people that went directly, that were poached in order to

10:34:43 22    narrow it, just to be very conservative and try to limit it

10:34:48 23    to nineteen people.

10:34:50 24            THE COURT:  We're at 10:31.  We'll take a

10:34:53 25    fifteen-minute break.  Don't discuss the case amongst

Bennis - cross

10:34:56 1    yourselves or let anyone talk to you about it.  We'll see

10:34:58 2    you at 10:46.  And I'll stay here for just a minute.

10:35:05 3                   (Jury exiting the courtroom at 10:35 a.m.)

10:35:27 4                   THE COURT:  Be seated just for a moment.  We'll

10:35:34 5    have a short restroom break at this time this morning.  You

10:35:37 6    can't talk with anybody about your testimony you have given,

10:35:40 7    so simply don't have a conversation about that.  And we will

10:35:44 8    see you a little bit before 10:46, probably about three or

10:35:50 9    four minutes.  Thanks very much.

10:35:51 10                   Anything else from the parties at this time?

10:35:55 11   The objection, of course, was as to a specific instruction

10:36:00 12   under 803.18(b), which is the normal instruction which is

10:36:07 13   the documents that you were using cannot be received into

10:36:10 14   evidence but they can be referenced or portions can be read

10:36:14 15   of those.

10:36:15 16                   MR. ELKINS:  Okay.

10:36:15 17                   THE COURT:  That takes care of everything.  We

10:36:18 18   will let everybody be excused.  We'll see you back at least

10:36:22 19   three minutes in advance.

10:36:24 20                   (A brief recess was taken.)

10:55:21 21                   THE COURT:  You may be seated.

10:55:25 22                   We are ready to proceed.

10:55:42 23                   (Jury entering the courtroom at 10:55 a.m.)

10:56:03 24                   THE COURT:  Everyone can be seated.

10:56:10 25                   Counsel, you may proceed.

Bennis - cross

10:56:12  1          MR. ELKINS:  Thank you.

10:56:13  2   BY MR. ELKINS:

10:56:16  3   Q.     Ms. Bennis, before the break, we were talking about

10:56:20  4   Qorvo's employee poaching allegation, and the work you

10:56:25  5   conducted to determine the amount of direct damages to Qorvo

10:56:30  6   from the alleged poaching.  And we talked about how you

10:56:33  7   started with the forty-three, and you worked with Ms. Leslie

10:56:40  8   Stoddard, Qorvo's HR person, to try to whittle out of that

10:56:50  9   group of forty-three anybody who might be inappropriately

10:56:54 10   classified as having been poached; is that right?

10:56:56 11   A.     Yes, I think so.

10:57:00 12   Q.     Among the people that you did not include were people

10:57:04 13   that Qorvo had terminated as opposed to the employees

10:57:09 14   voluntarily leaving to come over to Akoustis; correct?

10:57:12 15   A.     That could be an example.  Other examples I can think

10:57:16 16   of would be there was one gentleman who was looking for

10:57:23 17   another job in another state, for instance, and then ended

10:57:26 18   up at Akoustis.  So there were examples like that that I

10:57:30 19   tried to not include.

10:57:32 20   Q.     Okay.  So -- but essentially, if anybody was the

10:57:36 21   subject of a reduction in force or was terminated for

10:57:39 22   another reason, you did not include them within the group of

10:57:44 23   nineteen people who you used for your poaching calculation,

10:57:50 24   correct?

10:57:50 25   A.     Reduction of force would be a good example of someone

Bennis - cross

10:57:55 1    that I wouldn't include as an employee, if there was not an

10:57:59 2    attempt to replace them.

10:58:02 3    Q.    Okay.  So you eliminated Mr. Houlden, for example,

10:58:06 4    because you understood from Ms. Stoddard that he was -- his

10:58:16 5    position was eliminated at Qorvo, right?

10:58:18 6    A.    That's right.

10:58:19 7    Q.    And you eliminated Mr. Shealy from the list because

10:58:22 8    he left Qorvo and then took a few months to found Akoustis;

10:58:28 9    right?

10:58:28 10   A.    That's right.

10:58:29 11   Q.    You included Mr. Kwon, though, J.B. Kwon, you saw him

10:58:38 12   testify in deposition, right?

10:58:40 13   A.    On video, yes.

10:58:42 14   Q.    Yes.  And you read his deposition as one of the

10:58:45 15   materials that you had before you issued your report; right?

10:58:49 16   A.    Yes.

10:58:49 17   Q.    And you heard him testify that he was the one who

10:58:53 18   decided to leave Qorvo, and applied through a recruiter.

10:58:59 19   A.    I did hear that.

10:59:00 20   Q.    So why did you include him?

10:59:02 21   A.    I think it was my understanding, again, based on

10:59:07 22   conversations, the belief was that it was a poaching

10:59:10 23   exercise, so he was included.

10:59:17 24   Q.    So if somebody said that, they were seeking to leave

10:59:21 25   voluntarily and approached Akoustis, you still counted that

Bennis - cross

10:59:25  1   as a poaching exercise?

10:59:27  2   A.    I can't think of any other examples like that.

10:59:31  3   Q.    Okay.  So would you agree with me that there are

10:59:39  4   three important issues in determining the harm to Qorvo from

10:59:43  5   poaching.  One, first, did Qorvo replace the departed

10:59:48  6   employee.  That would be one issue to look at; correct?

10:59:53  7   A.    It could be.

10:59:55  8   Q.    Number two, was the employee poached; right?

10:59:59  9   A.    Yes, that could be.

11:00:01 10   Q.    And third would be, what's the incremental amount of

11:00:04 11   money that Qorvo spent for, maybe through indirect means,

11:00:12 12   but the harm to Qorvo from having to replace that poached

11:00:19 13   employee, right?

11:00:20 14   A.    In general, these are costs incurred with having to

11:00:22 15   deal with these types of issues.

11:00:25 16   Q.    Let's take first, whether Qorvo replaced any or all

11:00:29 17   of the nineteen employees that are on your list.  At your

11:00:33 18   deposition in January 2024, you confirmed that that was a

11:00:38 19   question you didn't ask, correct?

11:00:40 20   A.    That's right.

11:00:41 21   Q.    So you spoke with Ms. Stoddard, but you didn't ask

11:00:44 22   her whether or not Qorvo replaced any of the nineteen

11:00:48 23   employees that are on your poached list?

11:00:51 24   A.    Yes, we spoke through again the various employees and

11:00:55 25   her understanding of their departures and such.  The

11:01:00  1    interesting part about this type of analysis is, these

11:01:04  2    training type costs and search costs and things of that

11:01:08  3    nature aren't necessarily something you see in black and

11:01:11  4    white on a company's financial statement, which is why you

11:01:14  5    have valuations like the one we saw for KPMG, or we have the

11:01:19  6    U.S. Laborer Statistic Bureau, which is a government entity

11:01:24  7    that puts out studies that I used in another analysis that

11:01:27  8    helps document what these costs are to other companies

11:01:30  9    because the costs are real.

11:01:31 10    Q.      No one is disputing that, Ms. Bennis.  I want to make

11:01:34 11    sure that I understand that -- so Qorvo possibly chose to

11:01:40 12    replace some, all or none of the nineteen people, but you

11:01:46 13    don't know that; correct?

11:01:47 14    A.      Right.  I understand that again, hiring some of these

11:01:52 15    positions is very iterative, and my discussion with Stoddard

11:01:56 16    did not prove that to be any different at Qorvo.

11:01:59 17    Q.      Let's consider the question now whether any of the

11:02:03 18    nineteen were actually poached.  So you understand that for

11:02:08 19    the employee poaching claim in this case, Qorvo does not

11:02:15 20    allege that Akoustis engaged in unfair business practices

11:02:19 21    simply by targeting and attempting to recruit Qorvo

11:02:24 22    employees generally, right?

11:02:26 23    A.      Can you ask that again?

11:02:29 24    Q.      Sure.  You understand that in the day-to-day world,

11:02:34 25    competitors will recruit employees from other competitors

Bennis - cross

11:02:39 1    all the time; correct?

11:02:42 2    A.        Generally speaking, yes.

11:02:45 3    Q.        And there is nothing wrong with that; correct?

11:02:48 4    A.        Right.

11:02:49 5    Q.        And what happens -- and in this case, what Qorvo

11:02:55 6    alleges is that its allegations concern Akoustis's alleged

11:03:03 7    practices of hiring certain Qorvo employees for the purpose

11:03:06 8    of having those employees misappropriate Qorvo's

11:03:10 9    confidential information and trade secrets for Akoustis's

11:03:17 10   use.  Would you agree with that characterization of claims?

11:03:21 11   A.        Yes, I share that understanding.

11:03:23 12   Q.        But you undertook no analysis, whether any evidence

11:03:27 13   suggest that Akoustis specifically targeted any of the

11:03:31 14   nineteen employees on your list for the express purpose of

11:03:35 15   having those employees misappropriate Qorvo's confidential

11:03:39 16   information and trade secrets for Akoustis's use; correct?

11:03:43 17   A.        Yes.  I assumed liability, so I assumed the poaching

11:03:46 18   exercises as charged by Qorvo.

11:03:50 19   Q.        But you also created a list of nineteen people?

11:03:53 20   A.        Yes.  Within the confines of the evidence and the

11:03:57 21   discussions with Ms. Stoddard, yes.

11:04:01 22   Q.        And did you not talk to Dr. Shanfield about who he

11:04:06 23   believed among the nineteen employees on your list actually

11:04:11 24   is for whom he had evidence that they accessed or brought

11:04:19 25   over Qorvo confidential information to Akoustis; correct?

Bennis - cross

| 11:04:22 | 1 | A.      No, I don't think he and I talked about that. |

11:04:22  1   A.      No, I don't think he and I talked about that.

11:04:33  2   Q.      So then comes the incremental expense to Qorvo for

11:04:39  3   replacing each employee, whom it replaced, and who was

11:04:44  4   poached, and you would agree with me -- I mean, you heard

11:04:49  5   from Mr. Creviston, who testified first, he's the client

11:04:55  6   representative of Qorvo, and he testified that Qorvo is a

11:04:59  7   three-and-a-half billion dollars enterprise with 8,000

11:05:03  8   employees or something like that, worldwide, do you remember

11:05:05  9   that?

11:05:06  10  A.      Something like that, yes.

11:05:08  11  Q.      Okay.  So wouldn't you expect an enterprise that

11:05:15  12  large to track the incremental costs of having to --

11:05:19  13  incremental costs to the company of unwanted employee

11:05:23  14  attrition?

11:05:23  15  A.      No, not necessarily.

11:05:25  16  Q.      I'm sorry.  I couldn't hear you.

11:05:26  17  A.      No, not necessarily.

11:05:28  18  Q.      Okay.  But you don't know whether it has or not

11:05:31  19  because you never asked Ms. Stoddard for that information,

11:05:36  20  correct?

11:05:37  21  A.      Again, our conversation revolved around the actual

11:05:41  22  employees, like I mentioned before in my experience, these

11:05:44  23  are not necessarily black and white expenses that are

11:05:46  24  recorded in financial statements, but they're well

11:05:50  25  understood to be costs to businesses, and employee

Bennis - cross

11:05:53  1    attrition.

11:05:54  2    Q.      Okay.  So you spoke with Ms. Stoddard about the

11:06:01  3    circumstances of the departures of the forty-three people to

11:06:04  4    get to the list of nineteen; right?

11:06:06  5    A.      Yes.

11:06:07  6    Q.      But you did not ask her whether or not any of the

11:06:09  7    nineteen had been replaced by Qorvo; right?

11:06:14  8    A.      Right.

11:06:14  9    Q.      And did you not ask her whether Qorvo tracks the

11:06:17 10    incremental cost of unwanted attrition on an employee basis,

11:06:21 11    correct?

11:06:21 12    A.      Right, for the reasons I explained.

11:06:25 13    Q.      So, while you rely on the KPMG analysis, and I heard

11:06:32 14    your testimony, I understood it, but you conducted no

11:06:36 15    analysis based on Qorvo's information to determine whether

11:06:41 16    or not the per employee costs in the KPMG analysis, was a

11:06:45 17    good proxy for what Qorvo's actual incremental cost from

11:06:53 18    unwanted employee attrition was; correct?

11:06:58 19    A.      When I came across the KPMG valuation, as accountants

11:07:03 20    go, I was excited because that is something that is -- it's

11:07:06 21    spot on to what I was looking for.  It talked about employee

11:07:10 22    costs versus employees in the BAW filter industry, not only

11:07:14 23    that, but in the walls of Akoustis.  These were the same job

11:07:18 24    titles, was a spot-on third-party analysis for the costs

11:07:21 25    that can be associated with assembling a workforce.

Bennis - redirect

11:07:28   1    Q.      So the third category of damages about which you

11:07:32   2    opined was patent infringement damages, correct?

11:07:35   3    A.      Yes.

11:07:35   4    Q.      And I imagine that it will come as some relief to you

11:07:40   5    and to the jury, and to the Court, for me to say that I

11:07:44   6    don't have any questions about that.  So thank you for your

11:07:46   7    time.

11:07:48   8              THE COURT:  Redirect.

11:07:53   9              MS. AYERS:  Yes, Your Honor, thank you.

11:07:55   10                    REDIRECT EXAMINATION

11:07:56   11   BY MS. AYERS:

11:07:57   12   Q.      Ms. Bennis, is a head start damage analysis one of

11:08:02   13   the acceptable ways to measure a Defendant's unjust

11:08:08   14   enrichment benefit as you understand the law?

11:08:13   15   A.      Yes.

11:08:16   16   Q.      And are you aware of court cases and conference

11:08:20   17   papers like Sedona Conference that entitle the Plaintiff to

11:08:25   18   recover the entire fair market value of a misappropriating

11:08:29   19   company?

11:08:29   20   A.      Yes.  In fact, I was perusing that particular

11:08:35   21   document on the break just now.

11:08:37   22   Q.      But you're not opining here today that Qorvo is

11:08:41   23   entitled to recover the entire fair market value of

11:08:45   24   Akoustis, correct?

11:08:45   25   A.      I am not.

Bennis - redirect

11:08:46  1    Q.      Can you remind the jury what unjust enrichment

11:08:52  2    benefit Akoustis did receive to which you are opining?

11:08:56  3    A.      The benefit I measured again, is just the value of

11:08:59  4    that head start.  It's meaningful to get into a market

11:09:03  5    earlier, the benefits as a result of being able to enter the

11:09:08  6    market earlier than otherwise one could accomplish, so that

11:09:12  7    isolated benefit is what I measured here.

11:09:15  8    Q.      Let's pull up PDX-4 again.

11:09:22  9            Ms. Bennis, in PDX-4, which identified the delay

11:09:28 10    in Akoustis's receipt of revenue under the head start model,

11:09:33 11    would Akoustis have occurred operating expenses from 2016 to

11:09:38 12    2020?

11:09:39 13    A.      Yes, it would have.

11:09:42 14    Q.      And let's pull up Schedule 4, Appendix A.

11:09:50 15            Ms. Bennis, would Akoustis have incurred R & D

11:10:09 16    expenses under the 55-month delay from 2016 to 2020?

11:10:16 17    A.      Yes, the idea here is even in the instance where

11:10:21 18    Akoustis would have had to go through its own research and

11:10:25 19    development expenses and do all the things that it would

11:10:27 20    have needed to do to get a product to market on its own.  It

11:10:31 21    still is a business, so it still incurs employee costs, they

11:10:36 22    have to pay people, it has to finance debt, it has to do all

11:10:39 23    the things that a business has to do just by virtue of

11:10:43 24    existing.

11:10:49 25    Q.      Mr. Elkins asked you questions regarding the totality

11:10:53 1    of the research and development expenses that Akoustis

11:10:56 2    incurred.  What was the majority of those research and

11:11:01 3    development expenses incurred?

11:11:04 4    A.    According to this particular schedule, you can see

11:11:07 5    that those, the majority that has been incurred in preceding

11:11:14 6    years.

11:11:15 7    Q.    For the benefit of the jury, can you point out what

11:11:18 8    Akoustis research and development expenses were in 2016?

11:11:22 9    A.    $1,758,701.

11:11:28 10   Q.    What are the research and development expenses that

11:11:30 11   Akoustis is incurring right now in 2023 and 2022?

11:11:33 12   A.    Fiscal year 2022, it recorded approximately

11:11:38 13   35.7 million.  Fiscal year 2023, it recorded approximately

11:11:44 14   33.2 million.

11:11:45 15   Q.    Mr. Elkins also asked you questions about the 104

11:11:50 16   trade secrets that Qorvo initially asserted against Akoustis

11:11:56 17   which have now for efficiency sake for the jury been dropped

11:12:01 18   down to somewhere in the range of the forties.  Was your

11:12:04 19   original head start analysis that you performed in November

11:12:08 20   based upon Groups 1 through 8 of Dr. Shanfield's report?

11:12:13 21   A.    That's correct.

11:12:14 22   Q.    And was your analysis based upon the 55-month head

11:12:18 23   start that Dr. Shanfield opined to during trial?

11:12:22 24   A.    Yes.

11:12:24 25           MS. AYERS:  I have no further questions for this

11:12:26  1  witness, Your Honor.

11:12:27  2              THE COURT:  All right.  You may step down.

11:12:28  3  Thanks very much.  And you are excused.  Thank you.

11:12:34  4              Who will our next witness be for the Plaintiff?

11:12:40  5              MR. MASTERS:  Your Honor, Ms. Bennis is the

11:12:46  6  Plaintiff's last witness and we rest our case.

11:12:48  7              THE COURT:  All right.  The Plaintiff has rested

11:12:51  8  its case.  There will be a short break as we've already

11:12:58  9  discussed a lot of material, but we need a few minutes to

11:13:02 10  discuss a few more things.  I would say ten minutes.  And we

11:13:06 11  will actually be here the whole time, so hopefully in ten

11:13:10 12  minutes we'll have you come back and then I'll ask the

11:13:13 13  defense if they wish to present any evidence in the case.

11:13:16 14  Of course evidence has already been presented from the

11:13:19 15  defense by individuals who were examined during the

11:13:23 16  case-in-chief, so I'll obviously know what the answer is.

11:13:27 17              I'll let you be excused for that ten-minute

11:13:30 18  period and have you come back and let you know where we're

11:13:32 19  going after that.  Don't discuss the case amongst

11:13:35 20  yourselves, or allow anyone to talk to you about it.  We'll

11:13:39 21  see you in ten minutes or so.

11:13:42 22              (Jury exiting the courtroom at 11:13 a.m.)

11:13:57 23              THE COURT:  Everybody can be seated.  We always

11:14:05 24  do take a break at this time.  I know that there has been

11:14:09 25  discussion earlier, and I think that the number of things

11:14:14  1    have been adjusted and some steps are being taken out of the

11:14:20  2    instructions right now.  So I'll start with lead counsel for

11:14:23  3    the defense.  Hopefully I have got the right lead counsel.

11:14:28  4              MR. ELKINS:  We will --

11:14:32  5              MR. LEMIEUX:  I'll defer to my colleague.

11:14:34  6              THE COURT:  I think that's what he told me, is

11:14:37  7    that right?  We're set to go.

11:14:38  8              MR. ELKINS:  Your Honor, we have two brief

11:14:44  9    Rule 50(a) motions to bring.  The first one we could not

11:14:47 10    bring until we heard testimony, and I will be extremely

11:14:53 11    brief.

11:14:53 12              The basis of this motion, Your Honor, is that

11:14:57 13    the head start duration estimated by Dr. Shanfield coupled

11:15:01 14    with the head start damages opinion from Ms. Bennis relying

11:15:06 15    on Dr. Shanfield's defective, in our view, estimate may not

11:15:13 16    be considered by the jury.  Together, they are the bases of

11:15:17 17    Qorvo's head start benefit theory.  And together, they do

11:15:20 18    not meet the standard for the admission of expert evidence.

11:15:25 19              I am not going to repeat the admissibility

11:15:32 20    tenants of Rule 702.  The Court is well aware of them.  But

11:15:38 21    I do believe that one, in this Court earlier this year, the

11:15:46 22    Court stated to satisfy the reliability requirement, the

11:15:49 23    expert testimony must be based on the methods and procedures

11:15:53 24    of science, not on subjective belief and unsupported

11:15:58 25    speculation.  And that is of extreme relevance in this case.

11:16:05  1          Ms. Bennis's calculation is entirely premised on

11:16:10  2   Dr. Shanfield's conclusion that a 55-month head start is

11:16:13  3   reasonable.  Dr. Shanfield admitted on cross-examination at

11:16:18  4   trial that he has no facts or publications to support his

11:16:24  5   55-month head start calculation, or the individual trade

11:16:27  6   secret by month calculations that comprise it.

11:16:31  7          While he considered where he could find

11:16:34  8   information that would give him a reference point for each

11:16:38  9   trade secret period, he admitted that he relied on his own

11:16:42 10   belief about things.  And I am citing to the trial record at

11:16:48 11   1381 through 1403.

11:16:52 12          Those beliefs are an improper basis for expert

11:16:57 13   opinion under Federal Rule of Evidence 702.

11:17:00 14          He relied on his own work at Draper Labs, which

11:17:06 15   he admitted was not a manufacturing company; his

11:17:09 16   conversations with unnamed people at Qorvo, although he did

11:17:12 17   identify Dr. Aigner, though he admitted Dr. Aigner did not

11:17:18 18   know for some categories.  He relied on his own corporate

11:17:22 19   experience which ended in 2003, more than twenty years ago.

11:17:26 20   He relied on an unnamed publication that was not in his

11:17:30 21   report.  And he relied on an old colleague with whom he

11:17:34 22   spoke, also not in his report.

11:17:37 23          Nothing about his testimony -- nothing about his

11:17:40 24   head start duration opinion as provided in his opinion is

11:17:44 25   reliable, and therefore it's inadmissible.

11:17:48  1              And for the reasons set forth in our prior

11:17:51  2      Daubert motion, Ms. Bennis's head start benefit opinion is

11:17:56  3      based on revenue rather than profit.  It does not meet the

11:18:00  4      standards for the admission of opinion testimony under 702,

11:18:03  5      but is rendered even more unreliable by her reliance on

11:18:08  6      Dr. Shanfield's head start duration estimate.

11:18:12  7              And that two expert witnesses are combining

11:18:16  8      unreliable opinions to spin a tale of head start fantasy

11:18:21  9      renders the Court's gatekeeping role even more imperative in

11:18:27 10      this case than it usually is.  The Court should instruct the

11:18:31 11      jury to disregard the two opinions, and without admissible

11:18:35 12      evidence regarding the value of Akoustis's purported head

11:18:38 13      start benefit, that issue should be removed from the jury's

11:18:42 14      purview.

11:18:43 15              That's all I have on that, Your Honor.

11:18:46 16      Mr. Lemieux has a related, but separate motion.

11:18:48 17              THE COURT:  Okay.  We will -- before we do that,

11:18:51 18      we'll hear a brief response on this head start question.

11:18:57 19              MS. AYERS:  Thank you, Your Honor.

11:18:58 20              As you know, Rule 703 allows an expert's

11:19:04 21      opinions to be based on fact and data that the expert has

11:19:07 22      personally observed in this case.  Dr. Shanfield testified

11:19:10 23      at length regarding the misappropriation.  He also testified

11:19:14 24      at length regarding how he calculated his head start

11:19:19 25      55-month analysis.  Through his testimony, he identified

11:19:22 1  numerous facts and factors that he relied upon for each

11:19:26 2  specific trade secret group with respect to the head start

11:19:29 3  analysis.  Those facts and factors are also specifically set

11:19:33 4  forth within the context of his expert report as well, which

11:19:36 5  we can provide to the Court in the event that he request it.

11:19:40 6  Those facts include information from fact witnesses who

11:19:43 7  testified in this case.

11:19:44 8          For example, Tony Testa testified that Qorvo

11:19:47 9  spent years including upwards of two years, for example, in

11:19:51 10 order to obtain the information that was found within the

11:19:53 11 context of its automotive marketing presentation that was

11:19:57 12 taken by Akoustis.

11:19:59 13         And the sum total of Dr. Shanfield's testimony

11:20:02 14 we believe actually does contain the facts upon which he

11:20:05 15 relies for purposes of calculating the specific 55-month

11:20:09 16 head start that Ms. Bennis then relies upon.

11:20:12 17         For the same reasons, Ms. Bennis' opinion is

11:20:15 18 reliable, she's permitted to rely upon Dr. Shanfield's

11:20:19 19 analysis of 55 months.  She also, as the Court noted in the

11:20:23 20 previous order, permitted to opine as to the unjust

11:20:29 21 enrichment head start benefits that Akoustis received.  I

11:20:33 22 think that her testimony here today made clear that she was

11:20:36 23 not attempting to disgorge in any way Akoustis's revenue,

11:20:40 24 and instead that she was merely valuing the time value of

11:20:43 25 that revenue to Akoustis, using generally accepted economic

11:20:47  1    formulas that accountants use every day in order to actually

11:20:51  2    analyze and measure the time value of revenue that a company

11:20:55  3    receives.

11:20:56  4            THE COURT:  All right.  This has been

11:21:01  5    established and addressed to some degree already, and so

11:21:07  6    time value analysis is very important in a case.  And the

11:21:15  7    unjust enrichment in light of the standard will be denied.

11:21:22  8    We're ready for the second matter.

11:21:27  9            I will say this, this is something we really

11:21:28 10    worked on.  I wish I had a case that told us exactly what to

11:21:37 11    do.  All of us have looked for that, and we have not been

11:21:40 12    able to do that, so it's an interesting and challenging

11:21:43 13    question.  It is a challenging question.  Counsel, you got

11:21:46 14    the second part.

11:21:47 15            MR. LEMIEUX:  It's a related 50(a) motion, Your

11:21:50 16    Honor.  That basically under the North Carolina Unfair

11:21:54 17    Competition Act that has been alleged in this case, it has

11:21:57 18    three requirements.  One, that there be an unfair deceptive

11:22:00 19    act or practice.  Two, that it will be in or affecting

11:22:04 20    commerce.  And three, that it proximally causes actual

11:22:08 21    injury to the claimant.  As we heard Ms. Bennis' testimony,

11:22:11 22    she did not provide any opinion whatsoever on actual injury

11:22:15 23    to the Plaintiff in this case.

11:22:18 24            They chose to follow an unjust enrichment which

11:22:21 25    is just simply the benefit allegedly received by the

11:22:26  1    Defendant for use of that information.  And they're entitled

11:22:29  2    to do that, and that's a legitimate remedy to be sought

11:22:33  3    under misappropriation of trade secrets.  But under the

11:22:36  4    difference of the unfair competition act, and one of the

11:22:39  5    ways in which the North Carolina Unfair Competition Act is

11:22:43  6    different from trade secrets is it has this third

11:22:46  7    requirement of actual injury to the claimant.  There has

11:22:48  8    been absolutely no evidence produced in this case of any

11:22:52  9    injury and Ms. Bennis repeated multiple times that she did

11:22:55 10    not provide any opinion as to any actual injury to the

11:22:59 11    claimant in this case.

11:23:00 12            Because of that, they don't meet the criteria to

11:23:05 13    state a claim except to the extent that they have alleged

11:23:09 14    this employee poaching claim.

11:23:10 15            So our motion, Your Honor, is that while they be

11:23:14 16    allowed to proceed with their unfair competition claim, that

11:23:17 17    the jury be instructed they may not consider the injury that

11:23:20 18    has been alleged under the misappropriation of trade

11:23:24 19    secrets, but be limited solely to the employee poaching

11:23:27 20    claims that they have made.

11:23:28 21            THE COURT:  Plaintiff's counsel?

11:23:40 22            MS. AYERS:  Your Honor, if you will bear with me

11:23:41 23    a moment, I'll pull up the draft jury instructions and I'm

11:23:48 24    waiting for my counsel to provide the draft jury

11:23:51 25    instructions to me so I can appropriately respond to this

11:23:58  1    allegation.

11:24:00  2                THE COURT:  Sure.

11:25:19  3                MS. AYERS:  Your Honor, in Qorvo's issues of law

11:25:35  4    to be litigated which was submitted on April 1st, 2024, the

11:25:39  5    legal authority for Qorvo assertion of unfair trade

11:25:43  6    practices under the North Carolina law, there are two North

11:25:48  7    Carolina cases that are cited in paragraph 120 of those

11:25:50  8    issues of law to be litigated, which state that the --

11:25:53  9                THE COURT:  Are either of those cases directly

11:25:57 10    on point?

11:25:58 11                MS. AYERS:  They are directly on point, Your

11:26:00 12    Honor, but the North Carolina Court of Appeals affirmed an

11:26:04 13    award of damages that under the UDTPA, a plaintiff is

11:26:08 14    awarded loss profits and the value of the benefits received

11:26:13 15    which are two types of benefits under UDTPA.  Our claim is

11:26:15 16    for the unjust enrichment benefit damages under the UDTPA.

11:26:19 17                We have shown actual harm as a result of the

11:26:22 18    unjust enrichment that our competitor actually received and

11:26:25 19    we think that the cases cited in paragraph 120 are our legal

11:26:29 20    authority for the recoverability of our unjust enrichment

11:26:33 21    damages is applicable to the Rule 50(a) motion.

11:26:44 22                THE COURT:  We're going to have to take that

11:26:46 23    under advisement and we can do that at this stage, so we

11:26:50 24    will provide on the case with that motion under advisement.

11:26:53 25                Counsel, anything else on that?

11:26:55  1            MR. LEMIEUX:  Just would like to add, Your

11:26:57  2     Honor, for the benefit of the Court, the case is Citibank

11:27:00  3     USA versus National Association versus RightSale.

11:27:04  4            THE COURT:  I think we're probably looking at

11:27:06  5     the same thing, yes, sir, tell me about it.

11:27:08  6            MR. LEMIEUX:  That's right.  In that case it

11:27:09  7     concluded that because there was no actual injury to the

11:27:14  8     plaintiff in that case or the claimant, as a matter of law,

11:27:17  9     it could not support a claim under the North Carolina Unfair

11:27:22 10     Competition Act.

11:27:22 11            THE COURT:  I appreciate that.  And I have it

11:27:24 12     right here.  And we're going to take that under advisement.

11:27:28 13            MR. LEMIEUX:  Thank you, Your Honor.

11:27:28 14            THE COURT:  Thank you.  All right.  We're going

11:27:30 15     to then turn -- I will in a moment turn to the defense.

11:28:04 16            I think we're still exactly where we were a

11:28:09 17     moment ago.

11:28:10 18            Counsel, I'll turn to you in just a moment and

11:28:13 19     say who will your next witness be.  I have the list here

11:28:16 20     that Mary Winters will be our next witness.  Is that still

11:28:19 21     correct?

11:28:20 22            MR. ELKINS:  That is correct, Your Honor, it

11:28:22 23     will be -- we have three fact witnesses today live.  It will

11:28:26 24     be Ms. Winters, Mr. Kim, and then Ms. Johnson.  And then if

11:28:30 25     we can get to it still, we'll have Leah Giovan by deposition

11:28:36  1    video.

11:28:36  2                THE COURT:  And we have gone through those,

11:28:38  3    there may be one or two, I don't think we have them out here

11:28:41  4    right now.  We may send you an e-mail message during lunch

11:28:45  5    there was one thing of which I wanted to see more documents.

11:28:49  6    Perhaps I'll look at it one more time, otherwise we'll be

11:28:53  7    able to get to that on schedule.

11:28:55  8                All right.  I think we're good.  Bring the jury

11:28:57  9    in.  And we'll see how far we can get today.

11:29:55 10                (Jury entering the courtroom at 11:25 a.m.)

11:29:55 11                THE COURT:  Everyone can be seated, and I'll now

11:29:58 12    go to the defense.  Does the defense wish to present any

11:30:02 13    evidence in this case?

11:30:03 14                MR. LEMIEUX:  Yes, we do, Your Honor.

11:30:04 15                THE COURT:  You may call your first witness.

11:30:06 16                MR. LEMIEUX:  Our first witness, Your Honor,

11:30:08 17    will be Mary Winters.

11:30:12 18                COURT CLERK:  Please raise your right hand.

11:30:17 19    Please state and spell your full name for the record.

11:30:21 20                THE WITNESS:  Mary Winters.  M-A-R-Y,

11:30:25 21    W-I-N-T-E-R-S.

11:30:28 22                MARY WINTERS, having been duly sworn, was

11:30:33 23    examined and testified as follows:

11:30:40 24                MR. LEMIEUX:  Your Honor, can I have permission

11:30:42 25    for Mr. Elkins to approach the witness and remove all the

Winters - direct

11:30:45  1    materials from the last examination?

11:30:46  2            THE COURT:  Certainly.

11:30:57  3                    DIRECT EXAMINATION

11:30:58  4    BY MR. LEMIEUX:

11:31:07  5    Q.    Good morning.  Excuse my voice, a little bit of a

11:31:10  6    cold over the weekend, so I'm going to apologize upfront.

11:31:14  7            Ms. Winters, can you please state your name for

11:31:16  8    the record?

11:31:16  9    A.    Yes, Mary Winters.

11:31:17 10    Q.    Who do you currently work for?

11:31:19 11    A.    Akoustis Technologies.

11:31:20 12    Q.    What is your position with Akoustis?

11:31:22 13    A.    I am the Executive Vice-President for Fab and

11:31:30 14    Corporate.

11:31:30 15    Q.    Just so the jury can get a little sense of who you

11:31:33 16    are, what is your educational background after high school?

11:31:35 17    A.    Sure.  I went to the University of Rochester where I

11:31:38 18    received a Bachelor of Science in Mechanical Engineering and

11:31:41 19    then I received a Masters of Engineering specializing in

11:31:46 20    MEMS, which is a Microelectrical Mechanical Systems.

11:31:49 21    Q.    Could you briefly describe for the jury your

11:31:52 22    employment history?

11:31:52 23    A.    Sure.  From right after high school?

11:31:55 24    Q.    From after you can start, yes.  Actually it's

11:31:58 25    relevant, start after high school.

Winters - direct

A.      Sure.  So during college, I had to help support being able to get my degree, so I had a number of different positions, but the most relevant to what I'm doing now is probably during my sophomore year in college I was able to work with a researcher mathematical center where I was first exposed to MEMS technology.  We were working on microfluidic devices to look at drug delivery systems.  They were doing research on hamsters, and this allowed you to do it in a mechanical form.

From there, I had the opportunity -- I was selected to be a part of the research, I remember it was called REU, but it was part of Cornell University, so at the University of Rochester we didn't have fabrication facilities, so I would go from Rochester to Ithica to do fabrication.  It's an hour-and-a-half drive.  I spent an entire summer at Cornell where I learned about all the fabrication processes, and that really got me excited about microelectronic systems and being able to use it more in the field.

From that, with my background when I was a junior in college, I had the opportunity to intern at Xerox. I worked thirty plus hours a week in addition to getting my degree.  There I was focusing on HF devices.

Q.      Have you always wanted to be an engineer, Ms. Winters?

Winters - direct

11:33:29 1    A.       I did not, I actually wanted to be a doctor, but I

11:33:32 2    quickly learned blood was not for me, but I really wanted to

11:33:36 3    stay in kind of the viral type, so that was with the MEMS

11:33:41 4    technology I was able to do that.

11:33:43 5    Q.       What are your duties and responsibilities as the

11:33:46 6    Executive Vice President in charge of the Fab and Corporate

11:33:49 7    Operations for Akoustis?

11:33:49 8    A.       Sure.  There are split responsibilities.  So for the

11:33:52 9    New York Fab, I'm completely responsible for the entire

11:33:56 10   manufacturing facility from start to finish.  That's where

11:33:59 11   the wafers are fabricated.  With corporate operations, I

11:34:04 12   took on additionally the product quality role back-end

11:34:08 13   operations, that's done by a third party overseas, and then

11:34:12 14   also logistics.

11:34:14 15   Q.       Is any part of your duties and responsibilities

11:34:17 16   pertain to the R & D process at Akoustis?

11:34:19 17   A.       It does.  I mean, everything we do with research and

11:34:23 18   development, so when you think of new processes, that's

11:34:27 19   where the research and development comes from.  So for the

11:34:31 20   wafer fabrication for our process, there is probably 200

11:34:35 21   plus different steps.  I know I have been able to sit

11:34:38 22   through the last week, and there is a lot of different steps

11:34:41 23   that were mentioned.  But that's probably only maybe five

11:34:45 24   percent of what's done.  So each of those steps require

11:34:49 25   process development.

Winters - direct

11:34:51  1    Q.      How many employees are you responsible for at

11:34:54  2    Akoustis?

11:34:54  3    A.      Right now it's about sixty.  At a time it was over

11:34:59  4    100 employees.

11:34:59  5    Q.      Are those primarily employees at the Fab facility in

11:35:05  6    New York?

11:35:05  7    A.      It is, the majority of the employees that report to

11:35:07  8    me are the New York facility.

11:35:09  9    Q.      Since Akoustis acquired the Fab in 2017, how many of

11:35:13 10    the Fab employees have ever been previously employed by

11:35:16 11    Qorvo?

11:35:17 12    A.      In the New York site?

11:35:18 13    Q.      In the New York facility.

11:35:20 14    A.      We only had one employee.

11:35:22 15    Q.      Who was that?

11:35:22 16    A.      J.B. Kwon.

11:35:24 17    Q.      Now, in your position as the EVP, are you familiar

11:35:28 18    with the design and manufacturing cycles for the products

11:35:31 19    made by Akoustis?

11:35:32 20    A.      Yes, I am.

11:35:33 21    Q.      Could you describe that process briefly for them, for

11:35:36 22    the jury?

11:35:37 23    A.      Sure.  It's a process.  I think we've heard it a

11:35:41 24    little bit here, if you have a new idea, a new concept,

11:35:44 25    you'll go through what is referred to as the gate phasing

Winters - direct

11:35:48 1  processes.  It's a similar process I studied as an engineer

11:35:52 2  while at Cornell.  There are similar things that you'll go

11:35:56 3  through.

11:35:57 4  Q.    We heard reference to this Fab facility in New York.

11:36:00 5  Where exactly in New York is it located?

11:36:02 6  A.    It's in Canandaigua, New York, if you're familiar

11:36:05 7  with the Finger Lakes, it's probably a half-hour outside of

11:36:10 8  Rochester, New York.

11:36:11 9  Q.    Now, what have your duties and responsibilities been

11:36:14 10 for the Fab since its acquisition by Akoustis?

11:36:16 11 A.    So it's changed over time.  So if it's okay, I will

11:36:20 12 go through kind of the history of how I first got introduced

11:36:24 13 at Akoustis.

11:36:24 14 Q.    Sure, that's fine.

11:36:25 15 A.    It may explain how my duties changed.  So late in

11:36:29 16 2016, Akoustis came to what the previous company was STC

11:36:34 17 MEMS, we were a MEMS foundry.  They were looking for another

11:36:37 18 foundry to be able to produce their raw filters, so they

11:36:41 19 came to us to look at it.  At the time, I would have been

11:36:44 20 the person to look at their process to determine whether or

11:36:48 21 not we could produce it.  Did we have the processes to do

11:36:51 22 it, did we have the equipment to do it.  So that was

11:36:54 23 assessed and we did based on what they were asking us to do.

11:36:57 24      So I spent time, I am the lead person looking at

11:37:02 25 their whole transferring it from their current foundry to

Winters - direct

11:37:05 1   us, looking at the process development of the individual

11:37:08 2   modules.  That would continue through as we transferred

11:37:12 3   their -- we use it a lot, their cavity flow is what it was

11:37:17 4   called.  We transferred that.  We were able to get that to

11:37:20 5   work.  It was low yielding.  So we ended up developing a

11:37:23 6   process that you probably heard here, either XBAW or XB1

11:37:29 7   that's a process that I helped develop.

11:37:31 8   Q.    So how long have you been in charge of the New York

11:37:34 9   Fab facility, Ms. Winters?

11:37:36 10  A.    Including my time before Akoustis, probably over ten

11:37:40 11  years.

11:37:41 12  Q.    Can you give us a brief history of the New York Fab

11:37:44 13  facility, how it started and got to the point where it is

11:37:48 14  now?

11:37:48 15  A.    Sure, it's quite, I'm not going to say an old

11:37:53 16  history, but it feels that way, they come and visit the

11:37:56 17  facility, they always ask me how long have you been there.

11:38:00 18  And I kind of go back to how old my oldest son is, and he's

11:38:04 19  going to be twenty-one in July.  So I actually came to be

11:38:07 20  part of that facility after my maternity leave with him,

11:38:11 21  it's very easy for me to remember that way.

11:38:13 22          So what occurred back in around 2001, there was

11:38:19 23  an idea for a center of excellence.  In 2003, what occurred

11:38:23 24  was there was a center of excellence formed between public

11:38:27 25  and private, so it was between New York State, the Federal

Winters - direct

11:38:31  1    Government, and then there were three member companies which

11:38:35  2    were Kodak, Xerox and Clinette, I was actually an in-kind

11:38:38  3    employee for Kodak to be able to bring up their process.

11:38:42  4            The thought behind this was to be able to help

11:38:44  5    with research and development, but also to help companies be

11:38:47  6    able to take an idea or a prototype and commercialize it.

11:38:51  7    Fabs are very expensive to run, and this was an opportunity

11:38:54  8    to do cost sharing at the time.

11:38:56  9            Depending on whether macros, Kodak when I

11:39:02 10    started, the size was 60,000 employees, now it's like 1,200

11:39:05 11    unfortunately, but it really -- so the three companies's

11:39:09 12    markets kind of changed, and then what occurred was

11:39:12 13    Infotronics became a MEMS foundry, and then in around, I

11:39:17 14    would say 2010, we merged with a larger center of excellence

11:39:21 15    which was out of Albany, which was called NTNS, National

11:39:30 16    Science and Technology, we merged with them and that's where

11:39:32 17    STC MEMS came from.

11:39:34 18    Q.    At the time that Akoustis acquired the fab

11:39:38 19    facilities, it was part of the Suny system, so University of

11:39:42 20    New York?

11:39:42 21    A.    Correct.  Yes.

11:39:43 22    Q.    And at that time, was the facility operating as a

11:39:48 23    MEMS foundry?

11:39:48 24    A.    It was.

11:39:49 25    Q.    Could you explain to the jury what it means to be a

Winters - direct

11:39:51  1  **MEMS foundry?**

11:39:52  2  **A.        Sure.  So when you look at, I think, in one of the**

11:39:57  3  **testimonies I saw, they show kind of a stack, it's kind of a**

11:40:00  4  **build up of the flows, so at a MEMS foundry, what we were**

11:40:04  5  **doing, we were working with very small start up companies**

11:40:07  6  **with maybe a couple of employees to very large multi-billion**

11:40:11  7  **dollar companies.  And with that, they each had different**

11:40:14  8  **MEMS devices that they were looking for us to produce.  So**

11:40:17  9  **they would bring, I like to call it, car pooling**

11:40:21 10  **engineering, so I think you guys probably saw those**

11:40:23 11  **cross-sections showing those kind of cartoons.  We would**

11:40:27 12  **then have specifications and we would work closely with them**

11:40:30 13  **to be able to build it.**

11:40:32 14          **So when you look at some of the devices we were**

11:40:34 15  **manufacturing there kind of day-to-day, some of the key ones**

11:40:38 16  **that I worked on personally that were built in the MEMS**

11:40:41 17  **foundry are like accelerometers, you'll find those in your**

11:40:44 18  **air bags, have accelerometers, if your kids or yourself are**

11:40:50 19  **really into computer games, your controllers have them,**

11:40:52 20  **also.**

11:40:52 21          **We spent a lot of time and years working on**

11:40:57 22  **basically the display for smart watches, that was probably**

11:41:01 23  **one of the coolest ones to look at because as you built it**

11:41:04 24  **up, you would start to see the image.  So we worked on**

11:41:08 25  **pilomotors, which are thermal imaging devices that you would**

Winters - direct

11:41:13  1    find in thermal guns, if you're looking for a cold or hot

11:41:16  2    spot in your wall.  Inject devices coming out of Kodak and

11:41:21  3    Xerox, that was big one just to name a few.

11:41:24  4    Q.    So what was your -- when you first started working at

11:41:27  5    the New York Fab, what was your position at that time?

11:41:30  6    A.    So when I first started working there as I mentioned,

11:41:33  7    I was an in-kind employee for Kodak, so I was a process

11:41:37  8    engineer for them.

11:41:38  9         I helped at that time, the facility that we're

11:41:42 10    at is probably 120,000 square feet facility, what they did

11:41:47 11    is, they actually gutted out an old clean room, and really

11:41:51 12    what we were responsible for was speccing out the process

11:41:55 13    flow, the equipment that was needed, so the first couple of

11:41:58 14    years was really building out the clean room and the fab.

11:42:01 15         We were working with equipment vendors, so most

11:42:04 16    of the equipment is, you can go have a third party produce

11:42:08 17    it for you.  So I was working at that time in the dry area,

11:42:13 18    so I was speccing out individual pieces of equipment for

11:42:16 19    them, we were bringing it in, we were installing it, we were

11:42:20 20    doing the process development, so typically the vendors will

11:42:23 21    have a standard recipe that's supported with the tool.  So

11:42:27 22    they go through, they bring up this equipment, they qualify

11:42:30 23    it, and then we'll do individual process development on

11:42:33 24    that.  Sometimes actually the vendors replicate, works

11:42:38 25    better than what I can develop.

Winters - direct

11:42:40  1   Q.      So when you started working at the Fab, over time did

11:42:44  2   it develop what's often times called a library of process

11:42:48  3   flows and steps and procedures for the operation of the

11:42:51  4   equipment and materials that were contained at the Fab?

11:42:53  5   A.      It did.  So when we -- we talked about the member

11:42:57  6   companies, each of those companies came over with certain

11:43:00  7   recipes, with certain process flows, but over, we mentioned

11:43:05  8   it started in 2003, we were acquired in 2017, so we have

11:43:09  9   fourteen years of experience with multiple customers, so at

11:43:14 10   any one time there could be forty different process flows

11:43:18 11   running, whether short loops or cold flows, so we had

11:43:22 12   thousands of recipes before we were acquired.

11:43:27 13               MR. LEMIEUX:  Permission to approach the

11:43:28 14   witness, Your Honor?

11:43:29 15               THE COURT:  You may.

11:43:45 16   BY MR. LEMIEUX:

11:43:48 17   Q.      Your Honor, I have handed the witness what's been

11:43:51 18   marked for identification as DTX-0579.  Ms. Winters, can you

11:43:59 19   please take a look at that and let me know if you know what

11:44:02 20   that document is and whether you're familiar with it?

11:44:04 21   A.      Yes.  This is one of the procedures from when we were

11:44:11 22   FTCM, it's our design and development procedure, you go to

11:44:14 23   page 2, it really talks about the different, you know, gates

11:44:19 24   or phases.

11:44:20 25   Q.      Before you get too far, is this a document, we have

Winters - direct

11:44:23  1    to have certain procedures we need to follow for the Court.

11:44:26  2    Is this a document that's maintained in the normal course

11:44:29  3    and scope of the organizations of the New York Fab?

11:44:30  4    A.    Yes, it is.

11:44:31  5              MR. LEMIEUX:  Your Honor, at this time, I would

11:44:33  6    like to move into evidence exhibit DTX-0579.

11:44:36  7              THE COURT:  Marked and received as 282.

11:44:41  8              (Trial Exhibit No. 282 was admitted into

11:44:42  9    evidence.)

11:44:42 10    BY MR. LEMIEUX:

11:44:45 11    Q.    All right.  Now you can go ahead and explain what

11:44:47 12    this document is.

11:44:48 13    A.    Sorry.

11:44:48 14    Q.    So the jury can actually see it.

11:44:50 15    A.    Okay.  So what you're seeing here, is a procedure

11:44:56 16    from when we were STC MEMS.  So that's the long name.  I

11:45:01 17    don't usually -- it's been a long time since I have seen the

11:45:05 18    full name.  But this was part of when we were doing design

11:45:09 19    development, whether it was internally, or for different

11:45:12 20    customers, this is a requirement actually that we were going

11:45:16 21    through ISO certification, something we had before we were

11:45:21 22    acquired by Akoustis.

11:45:23 23    Q.    If we could turn to page 2 of this exhibit.  What is

11:45:26 24    describe there, Ms. Winters?

11:45:27 25    A.    Yeah, on page 2, it's really just describing

Winters - direct

11:45:31  1   different design cycles, different phases, so I think the

11:45:37  2   phase gate has been brought up a couple of times.  This is

11:45:40  3   another example of it.  Really kind of a checklist and then

11:45:44  4   you have your nice flow chart document.

11:45:47  5   Q.    Okay.  And could you explain for the jury what's

11:45:49  6   contained on the following pages, 3, 4, 5 of this document?

11:45:53  7   A.    Sure.  In the next page, if you go to page 3, really

11:46:01  8   it is, if my memory serves me right, it's going and just

11:46:06  9   giving details if you were to go back to the flow chart,

11:46:09 10   it's telling you, giving you more description of what each

11:46:12 11   of those mean.  And then it will also reference if there are

11:46:15 12   different forms, if you -- hold on.  On three -- if you zoom

11:46:19 13   back up.  It will reference forms that are used.  So it

11:46:22 14   gives -- those that are using these documents, really it's

11:46:26 15   kind of your initial recipe of what to do, and then there is

11:46:30 16   forms associated with each of these.

11:46:32 17   Q.    And this was a document that was in use even prior to

11:46:35 18   the acquisition of the Fab by Akoustis?

11:46:38 19   A.    That's correct, yes.

11:46:38 20   Q.    And does this document continue to be part of the

11:46:41 21   library of process controls and other types of documentation

11:46:45 22   that's maintained by the Fab?

11:46:46 23   A.    It is.

11:46:58 24         MR. LEMIEUX:  If I can have permission to

11:47:00 25   approach the witness, Your Honor?

Winters - direct

11:47:02  1          THE COURT:  You may.

11:47:13  2  BY MR. LEMIEUX:

11:47:23  3  Q.      Ms. Winters, if you could please take a moment to

11:47:26  4  look at what's been marked for identification as DTX-0573.

11:47:32  5  And have you seen this document before?

11:47:34  6  A.      Yes, I have.

11:47:35  7  Q.      And is this also a document that is maintained in the

11:47:38  8  normal course and scope of business at the New York Fab?

11:47:40  9  A.      Yes, it is.

11:47:41 10          MR. LEMIEUX:  Your Honor, I would like to move

11:47:45 11  DTX-0573 into evidence.

11:47:47 12          THE COURT:  Marked and received as 287.

11:47:52 13          (Trial Exhibit No. 287 was admitted into

11:47:53 14  evidence.)

11:47:53 15  BY MR. LEMIEUX:

11:47:54 16  Q.      Ms. Winters, can you please describe what that

11:47:56 17  document is?

11:47:57 18  A.      This is one of the forms I mentioned from the

11:48:00 19  previous SOP, or Standard Operating Procedure.  So this

11:48:04 20  would be a form that's used in conjunction with that other

11:48:08 21  --

11:48:08 22  Q.      With the prior document we were just looking at?

11:48:10 23  A.      Correct.  Yes.

11:48:10 24  Q.      Now, I notice that these types of documents says they

11:48:15 25  are maintained by the Fab facility, seem to be shorter than

Winters - direct

11:48:20  1    some of the examples we've seen throughout the course of

11:48:22  2    this case that were identified as coming from Qorvo.  Do

11:48:29  3    these documents allow you to actually substantively do

11:48:32  4    anything at the Fab?

11:48:33  5    A.      Can you repeat that question?

11:48:35  6    Q.      Sure.  Do these documents as we've seen, do they

11:48:38  7    allow the actual substantive work to proceed at the Fab?

11:48:42  8    A.      Yes.

11:48:42  9    Q.      Why are these so much shorter than what we have seen

11:48:46  10   at Qorvo?

11:48:47  11   A.      We've learned over time you have to be very concise

11:48:51  12   especially from the Fab standpoint, people don't read very

11:48:54  13   long documents.  I think the one I saw was

11:48:56  14   forty-eight pages, or forty plus pages.

11:48:58  15   Q.      So these documents reflect then, the essential

11:49:01  16   information necessary for a particular process or procedure?

11:49:05  17   A.      Correct, yes.

11:49:08  18   Q.      And is this document currently something that's still

11:49:14  19   maintained in the library of process controls at the Fab?

11:49:18  20   A.      Yes.

11:49:18  21   Q.      Is this document still used?

11:49:19  22   A.      It is.

11:49:30  23            MR. LEMIEUX:  If I could have permission, Your

11:49:32  24   Honor, to approach the witness?

11:49:34  25            THE COURT:  You may.

Winters - direct

11:49:50  1          MR. LEMIEUX:  I have handed the witness, Your

11:49:55  2    Honor, what's been identified for purposes of just

11:49:57  3    identification, DTX-0574.

11:50:01  4    BY MR. LEMIEUX:

11:50:02  5    Q.      Ms. Winters, have you seen this document before?

11:50:04  6    A.      I have.

11:50:04  7    Q.      And is this a document that's maintained in the

11:50:07  8    normal course and scope of business at the New York Fab?

11:50:09  9    A.      It is.

11:50:10 10          MR. LEMIEUX:  Your Honor, I would like to move

11:50:12 11    into evidence exhibit DTX-0574.

11:50:16 12          THE COURT:  Marked and received as 288.

11:50:19 13          (Trial Exhibit No. 288 was admitted into

11:50:22 14    evidence.)

11:50:22 15    BY MR. LEMIEUX:

11:50:22 16    Q.      Ms. Winters, could you please explain for the jury

11:50:25 17    what this document is?

11:50:26 18    A.      Yes.  It's a procedure, if there is a control or

11:50:32 19    design change, being whether you're a Fab or manufacturing

11:50:36 20    facility, you can't just go and change something, there are

11:50:40 21    procedures associated with it.  You may hear the word to

11:50:43 22    like PCR, process change record or procedure.

11:50:47 23    Q.      And does page 2 of this document describe basically

11:50:51 24    the process flow for the use of this document?

11:50:55 25    A.      It does.

Winters - direct

11:50:56 1    Q.    And if you look at page 3 of this document, does it

11:50:59 2    make reference, then, to other records that are also created

11:51:03 3    in conjunction with this document?

11:51:06 4    A.    It does.  Again, the box number will reference you

11:51:11 5    back to the flow chart, and I see this is moving up, forms,

11:51:15 6    also that would be associated with it.

11:51:18 7    Q.    And was this document or this procedure in place

11:51:21 8    prior to the acquisition of the Fab by Akoustis?

11:51:24 9    A.    It was.  It was part of the STC MEMS document, it was

11:51:31 10   part of ISO, as you see in the revision history, this one

11:51:35 11   goes back to 2012.

11:51:37 12   Q.    Is this a document that continues to exist in the

11:51:39 13   library of process controls at the Fab today?

11:51:41 14   A.    It does, all of our historical STC MEMS still exist.

11:51:45 15   Q.    Is this type of document still used at the Fab today?

11:51:48 16   A.    Yes, this type of document is still used.

11:52:00 17   Q.    Now, at some point during your tenure with STC

11:52:04 18   Infotonics, Infotonics is the name of the company that took

11:52:08 19   over operation of the Fab, is that right?

11:52:09 20   A.    It went Infotonics, and then STC MEMS.

11:52:13 21   Q.    That's just the name of the company that's operating

11:52:15 22   the Fab or responsible for operating it?

11:52:17 23   A.    Yes.

11:52:18 24   Q.    And at some point in time, I think you have already

11:52:22 25   mentioned, that operation of the Fab they know was

Winters - direct

11:52:24  1    transferred to Suny Albany, is that right?

11:52:28  2    A.      Yes, we merged with Suny Albany, I think around 2010.

11:52:34  3    Q.      And what were your duties and responsibilities at the

11:52:37  4    Fab during the time it was operated by Suny Albany?

11:52:40  5    A.      So I have two primary responsibilities, one was

11:52:47  6    managing their operations, the other one was in business

11:52:50  7    development.  Really I was the interface to customers as I

11:52:53  8    mentioned before, looking at new processes, coming in,

11:52:56  9    really kind of being their point of contact, their kind of

11:53:00 10    program manager, if you want to think about it in that way

11:53:03 11    because of the technical experience that I had.

11:53:05 12    Q.      At some point in time during the operation of the Fab

11:53:09 13    by Suny New York, did your responsibilities change?

11:53:11 14    A.      When it was Suny?

11:53:14 15    Q.      Were you promoted, or did your overall

11:53:17 16    responsibilities change at all during that time?

11:53:18 17    A.      They didn't, it was what I had mentioned before.

11:53:21 18    Well, from when it started, I went from a process engineer

11:53:25 19    to Director of Ops and Director of Business Development over

11:53:29 20    that tenure.

11:53:30 21    Q.      At some point in time did you become the big boss at

11:53:34 22    the Fab in terms of you're responsible for its entire

11:53:37 23    operation?

11:53:37 24    A.      Yeah, in terms of operations, that's correct.

11:53:42 25    Q.      Now, in your current position as being responsible

Winters - direct

11:53:45  1    for the Fab's operations, are you the one, then, responsible

11:53:49  2    for deciding what goes into its library of process controls

11:53:54  3    and documentation?

11:53:55  4    A.    Yes, I am.

11:53:56  5    Q.    Now, if we want to look at what's currently going on

11:54:04  6    at the Fab since its acquisition by Akoustis, how would you

11:54:09  7    describe the current operations of the Fab facility?

11:54:12  8    A.    In terms of --

11:54:13  9    Q.    Types of products you're making, or what you're

11:54:16 10    working on, et cetera?

11:54:17 11    A.    Sure, in terms of types of products that we're

11:54:20 12    making, we're really focused on the BAW filter.

11:54:27 13    Q.    And initially prior to its acquisition by Akoustis, I

11:54:30 14    believe you said that the Fab operated as a foundry Fab?

11:54:34 15    A.    Correct.

11:54:35 16    Q.    Where the company made various MEMS devices.  Is any

11:54:41 17    of that type of operation currently happening at the Fab?

11:54:44 18    A.    We are starting it back up.  When we were acquired,

11:54:48 19    we still worked on some of our MEMS foundry customers, so we

11:54:52 20    were still running different types of MEMS products, but

11:54:55 21    there was a time when the decision was made to focus

11:54:58 22    completely on the BAW devices, so we are starting to bring

11:55:02 23    in other customers recently, that we could do MEMS foundry

11:55:06 24    work for.

11:55:06 25    Q.    Now, we've heard reference to this library of process

Winters - direct

11:55:10 1    controls, et cetera.  How is that type of document or

11:55:14 2    documents used at the Fab itself?

11:55:16 3    A.      So, I mean, the documents that are used, if we think

11:55:20 4    about how we came up with XBAW, we use the individual kind

11:55:26 5    of recipes.  So if you want to think about, I think somebody

11:55:29 6    mentioned, I remember that rainbow cake.  I'm going to talk

11:55:33 7    about cooking or baking a little bit.  But if you think

11:55:36 8    about it, we may be wanting to make two different types of

11:55:41 9    desserts.  Right?  So if somebody comes to you and they want

11:55:43 10   to make a chocolate cake, or an apple pie, or chocolate chip

11:55:49 11   cookies, right, there is a lot of equipment or tools that

11:55:52 12   you use the same thing to make those, but they don't all

11:55:56 13   have the same ingredients.  So if you think about it that

11:55:59 14   way, that I may not be able to make chocolate chips because

11:56:03 15   I don't have the chocolate chips right now.  I can make

11:56:06 16   everything else, but I don't have that one ingredient, if

11:56:09 17   you think about it that way.

11:56:11 18          When we look at it from a MEMS perspective, it's

11:56:14 19   the same thing, we're creating a recipe, so we give our

11:56:18 20   operators working on the floor without that, if I just gave

11:56:22 21   them a PowerPoint slide, they can't build anything.

11:56:26 22   Actually, we have over 200 steps and there is detail on

11:56:30 23   every single one of them just like if you were going to make

11:56:33 24   a cake.  So if you forgot to put an ingredient in, it's not

11:56:37 25   going to work.  An ingredient to make chocolate chip cookies

11:56:42 1    and to make an apple pie are different, but there are some

11:56:45 2    tools that I can use that are the same.

11:56:47 3    Q.    And so is it fair to say, then, that making different

11:56:51 4    MEMS devices would be like preparing different items of

11:56:55 5    food, they may use the same tools, many of the same tools,

11:56:58 6    but not necessarily all of them, is that right?

11:57:00 7    A.    That's correct.

11:57:01 8    Q.    And that the ingredients that are used or the recipes

11:57:04 9    used to actually make those devices would be different; is

11:57:07 10   that right?

11:57:07 11   A.    That's correct.

11:57:08 12   Q.    Now, you said that at the time the Fab was acquired

11:57:15 13   by Akoustis, it primarily focused on the filter products; is

11:57:22 14   that right?

11:57:22 15   A.    What, sorry, repeat that?

11:57:23 16   Q.    At the time that Akoustis acquired the Fab facility,

11:57:27 17   I believe you mentioned earlier that the work of the Fab

11:57:30 18   then tended to focus on the manufacture of Akoustis's filter

11:57:36 19   products, is that correct?

11:57:37 20   A.    Actually, at the time we were acquired, we were still

11:57:39 21   working on other MEMS products in addition to Akoustis.

11:57:43 22   Q.    And did that change at some point in time to focusing

11:57:46 23   primarily on the BAW products?

11:57:48 24   A.    It did, yes.

11:57:50 25   Q.    Okay.  Now, we've heard several people describe this,

Winters - direct

11:57:54  1   but briefly just from your perspective, what is a BAW

11:58:00  2   filter?

11:58:00  3   A.      So in terms of from Akoustis, how we manufacture it?

11:58:03  4   Q.      Just explain what the product is?

11:58:05  5   A.      Sure.  So bulk acoustic wafer filters, so it's

11:58:11  6   something you would find, I think you guys heard a number of

11:58:14  7   times now in your cell phones and in your Wi-Fi routers.

11:58:17  8   Q.      Are there different types of BAW filters?

11:58:19  9   A.      There are.

11:58:20 10   Q.      And what type of BAW filter is manufactured by

11:58:23 11   Akoustis?

11:58:24 12   A.      We do an FBAR.

11:58:26 13   Q.      And are you familiar with the term SMR BAW filter?

11:58:31 14   A.      I am.

11:58:31 15   Q.      What's the difference between an SMR BAW filter and

11:58:36 16   an FBAR BAW filter?

11:58:38 17   A.      The difference is, in my world, in terms of

11:58:41 18   foundation, we have this reflector that's the individual

11:58:45 19   layers that you guys have seen versus an air cavity.

11:58:49 20   Q.      Is the recipe then for making an FBAR BAW filter the

11:58:54 21   same for making an SMR BAW filter?

11:58:57 22   A.      Yes.

11:58:58 23   Q.      The recipe would be the same for making both of them?

11:59:00 24   A.      No, they are not the same, I'm sorry, no, they are

11:59:03 25   not.

Winters - direct

11:59:03  1    Q.      How are they different?

11:59:04  2    A.      So if you kind of -- if you had a cross-section, but

11:59:10  3    they're different in that you need different tools for them,

11:59:13  4    especially in being able to make that Bragg reflector.  So

11:59:17  5    for example, in our current facility we do not have the

11:59:21  6    capability to make those versus we do have the capability to

11:59:25  7    make the air cavity type of filter.

11:59:27  8    Q.      What additional material would you need if you were

11:59:29  9    going to make SMR type BAW filters?

11:59:32 10    A.      Yeah, so looking at it, I actually had the

11:59:35 11    opportunity I think as one of the patents came up where it

11:59:39 12    had alternating, I think it was tungsten oxide, we would

11:59:42 13    have to bring in the equipment, the fabrication equipment

11:59:45 14    for those in addition to the methodology that would be

11:59:50 15    required.

11:59:50 16    Q.      Has the New York Fab ever mentioned SMR BAW filters?

11:59:55 17    A.      We have not.

11:59:57 18    Q.      Now, when Akoustis first took over the Fab and they

12:00:01 19    asked you to start the manufacture of their FBAR filters,

12:00:07 20    were there any problems with the initial manufacture of

12:00:10 21    those devices?

12:00:11 22    A.      Yes, there were.

12:00:12 23    Q.      What problems were those?

12:00:13 24    A.      This was the first time we were doing FBAR filters,

12:00:17 25    so I think I mentioned when a new customer comes to us, we

Winters - direct

1 actually do a process assembly.  So we'll go through

2 everything, we'll look at the steps that are being provided

3 to us, a lot of times, that simple cartoon that you were

4 shown, we'll go through that, we'll look at it and see do we

5 have the equipment, do we already have processes that we can

6 use.

7         One of the nice things with being a MEMS foundry

8 and the way that the center of excellence was run is that

9 you could use individual processes or modules across

10 multiple customers, and that was an agreement across all

11 customers.  So it allowed you to do the process development

12 extremely quick.

13         With the process that was brought to us, what

14 they wanted to do, which we were very familiar with this in

15 terms of MEMS, is you would almost cut it's like a square

16 like this, I think you have seen it in some of the drawings.

17 The difference is in MEMS fabrication, it's all done in

18 silicone, so those recipes are well-known.

19         The difference what Akoustis was bringing us was

20 that they used a material called silicone carbide, and

21 that's unique.  We had to actually develop an etch process

22 for that and also a phototherapy process, so there are new

23 processes that we had the equipment for it, but we didn't

24 have the recipes to make it.  That was very unique to

25 Akoustis.

1794

Winters - direct

| | |
|---|---|
| 12:01:42 | 1 |

Q.      So when Akoustis first came and acquired the Fab

12:01:46  2  facility, did the Fab initially try to manufacture the FBAR

12:01:53  3  filters in the way that they had been manufactured by

12:01:56  4  Akoustis's prior foundry?

12:01:57  5  A.      We did, we transferred their cavity flow process from

12:02:01  6  a company called GCS.

12:02:04  7  Q.      Did that particular process have any problems or

12:02:07  8  issues?

12:02:07  9  A.      It did, it was very low yielding.  We had -- at this

12:02:12 10  time we actually brought most of the senior people back into

12:02:16 11  the Fab including even myself.  We were using technicians

12:02:20 12  and stuff that had thirty-plus years of experience.  It was

12:02:24 13  a very manual process where it wouldn't be able to be

12:02:28 14  produced in high volume.  We used to call at this time donut

12:02:31 15  process, because if you look at the wafer, the wafers were

12:02:34 16  transparent, so you could see through it, if you kind of

12:02:37 17  looked up, it was interesting, you would see good parts in

12:02:41 18  the center and in another ring, it was just not -- you would

12:02:45 19  not be able to mass produce it.

12:02:47 20  Q.      Did Akoustis take steps to address that yield

12:02:52 21  problem?

12:02:52 22  A.      We did, working with Daeho Kim from the device side

12:02:57 23  and our experience on the MEMS side, we worked together to

12:03:00 24  develop the MEMS process technology called XBAW or XB1,

12:03:07 25  you'll hear it both ways.

Winters - direct

12:03:08  1    Q.      Is the XBAW process different from the cavity process

12:03:12  2    that was used at their prior foundry?

12:03:14  3    A.      Yes, it's very different.

12:03:16  4    Q.      Is the XBAW process something that's used by Akoustis

12:03:20  5    just to make it FBAR BAW filters?

12:03:22  6    A.      Yes.

12:03:23  7    Q.      And do you believe the XBAW process is unique to

12:03:26  8    Akoustis?

12:03:26  9    A.      It is, we actually have a patent on it.

12:03:29 10    Q.      Now, are you one of the inventors for the XBAW

12:03:32 11    process?

12:03:33 12    A.      Yes, I am.

12:03:34 13    Q.      Now, I believe you told me this earlier, but I just

12:03:38 14    want to confirm.  Akoustis does not make any SMR BAW

12:03:42 15    filters, correct?

12:03:42 16    A.      No, they do not.

12:03:43 17    Q.      To your knowledge, has Akoustis ever made SMR BAW

12:03:48 18    filters?

12:03:52 19    A.      Not to my knowledge.

12:03:54 20    Q.      Are you familiar, Ms. Winters, with the resonators

12:03:57 21    that are manufactured and used by Akoustis in the

12:03:59 22    fabrication of its BAW filters?

12:04:01 23    A.      I am.

12:04:02 24    Q.      What is a resonator?

12:04:03 25    A.      It's really the building block for the filter device.

Winters - direct

| | | |
|---|---|---|
| 12:04:06 | 1 | Q.     Are you familiar with the shape of the resonators |
| 12:04:09 | 2 | that are used? |
| 12:04:10 | 3 | A.     I am. |
| 12:04:10 | 4 | Q.     Used by Akoustis? |
| 12:04:13 | 5 | A.     Yes. |
| 12:04:13 | 6 | Q.     What shape is that? |
| 12:04:14 | 7 | A.     I would say elliptical or oval, I think you have seen |
| 12:04:17 | 8 | some of the pictures of our filters. |
| 12:04:20 | 9 | Q.     Now, earlier in Qorvo's presentation of their case, |
| 12:04:24 | 10 | we heard of a process called trimming, and they displayed a |
| 12:04:28 | 11 | document that they described as describing Qorvo's trimming |
| 12:04:32 | 12 | process. Do you recall that testimony? |
| 12:04:33 | 13 | A.     I do, yes. |
| 12:04:34 | 14 | Q.     And is trimming used in the manufacture of Akoustis's |
| 12:04:46 | 15 | FBAR products? |
| 12:04:46 | 16 | A.     It is. |
| 12:04:47 | 17 | Q.     And does Akoustis use the trimming process that was |
| 12:04:51 | 18 | described in that Qorvo document? |
| 12:04:53 | 19 | A.     Not to my knowledge. |
| 12:04:55 | 20 | Q.     Could you, could Akoustis use that trimming procedure |
| 12:04:59 | 21 | as described in that document? |
| 12:05:01 | 22 | A.     No, based on the kind of, that first PowerPoint |
| 12:05:05 | 23 | slide, if you kind of like I mentioned, typically if I get |
| 12:05:09 | 24 | that one slide from any company, as you go through it, you |
| 12:05:14 | 25 | would kind of -- you would almost stop at Step 2 or 3 |

Winters - direct

12:05:18  1    because the way that we build our process, we talked about

12:05:21  2    that we have a cavity.

12:05:24  3              We use a sacrificial layer, if you think about

12:05:29  4    it, I'm going to use kind of an analogy, because we're done

12:05:33  5    cooking and baking, if you think about a jelly donut, in

12:05:37  6    order for it to be measured, we have to remove that jelly

12:05:40  7    out.  When we're talking about this measurement, we still

12:05:44  8    have jelly that's filled in it, we cannot get the data

12:05:47  9    leaking out of it, it wouldn't work, we wouldn't be able to

12:05:50 10    do it, just because the way we build our structure is so

12:05:54 11    different from the FBAR.

12:05:55 12    Q.    Who is the person responsible for the design of

12:05:58 13    Akoustis trimming procedures?

12:05:58 14    A.    It's a combination of people, but typically it's

12:06:01 15    coming from the device engineering team.

12:06:03 16    Q.    Is there a particular person at Akoustis who is

12:06:07 17    primarily responsible then for the trimming process that's

12:06:09 18    used?

12:06:09 19    A.    Yeah, so from the device standpoint, I think you'll

12:06:12 20    be hearing from Dr. Daeho Kim, he'll be working on that

12:06:16 21    piece of it, but there is also a process team, test team,

12:06:21 22    software team that needs to work on it.

12:06:23 23    Q.    Now, have you heard, or know the name Rohan Houlden?

12:06:28 24    A.    Yes.

12:06:29 25    Q.    And is he currently an employee of Akoustis?

Winters - direct

12:06:32  1    A.      No, he is not.

12:06:33  2    Q.      Did you ever report to Mr. Houlden?

12:06:36  3    A.      No, I did not.

12:06:37  4    Q.      Did Mr. Houlden ever report to you?

12:06:39  5    A.      No, he did not.

12:06:40  6    Q.      Was Mr. Houlden ever responsible for any part of the

12:06:44  7    operations of the New York Fab?

12:06:46  8    A.      No, I am the only executive that's actually in the

12:06:50  9    New York, located in the New York Fab.

12:06:53 10    Q.      Do you know a person by the name of Rob Dry, Robert

12:06:58 11    Dry?

12:06:58 12    A.      Yes, I did.

12:06:59 13    Q.      Is Mr. Dry still an Akoustis employee?

12:07:03 14    A.      No, he is not.

12:07:04 15    Q.      Did Mr. Dry report to you?

12:07:06 16    A.      He did for a short period of time after I took on the

12:07:09 17    role of corporate operations.

12:07:12 18    Q.      And what was Mr. Dry's duties and responsibilities

12:07:16 19    during the time he reported to you?

12:07:19 20    A.      His main role was around back-end operations, or as

12:07:21 21    we refer to it OSTAT.  He spent a lot of time overseas

12:07:26 22    working with the OSAT that we were bringing.

12:07:29 23    Q.      And OSAT is a third-party company.  What are they

12:07:32 24    used for?

12:07:33 25    A.      Correct.  It's a third-party company, it's used for

Winters - direct

12:07:36  1    our assembly and testing.  Wafers are made in New York, and

12:07:40  2    then they're shipped overseas for the back-end packaging.

12:07:52  3                MR. LEMIEUX:  May I have permission to approach

12:07:57  4    the witness?

12:08:02  5                THE COURT:  You may.

12:08:03  6    BY MR. LEMIEUX:

12:08:03  7    Q.    Ms. Winters, I'm going to hand you a couple of

12:08:07  8    documents that have been looked at in this case.

12:08:22  9                For the record, I would like to identify what's

12:08:38 10    been placed before the witness for identification purposes

12:08:41 11    as PTX-0227 and PTX-0228.

12:08:52 12    BY MR. LEMIEUX:

12:08:53 13    Q.    Ms. Winters, do you recognize exhibit PTX-0227?

12:08:58 14    A.    I do.

12:08:59 15    Q.    And what is that document?

12:09:04 16    A.    It is a Microsoft Teams meeting from Robert Dry.

12:09:09 17    Q.    Have you seen this document before?

12:09:10 18    A.    Yes, I have seen it in my deposition, and I've also

12:09:14 19    seen it here.

12:09:15 20                MR. LEMIEUX:  Your Honor, I would like to move

12:09:17 21    exhibit PTX-0227 into evidence.

12:09:19 22                THE COURT:  Marked and received as 289.

12:09:22 23                (Trial Exhibit No. 289 was admitted into

12:09:22 24    evidence.)

12:09:22 25    BY MR. LEMIEUX:

Winters - direct

12:09:27  1    Q.      If we could pull that up.  And again, what did you

12:09:30  2    say this document was, Ms. Winters?

12:09:32  3    A.      It was a meeting invite from Robert Dry, really just

12:09:37  4    reading through it.  Meeting to review document requirements

12:09:40  5    and generation for wafer inspection.

12:09:43  6    Q.      If you could take a look then at the document that I

12:09:46  7    have handed you, that's been marked PTX-0228.  Have you seen

12:09:54  8    this document before?

12:09:54  9    A.      I have.

12:09:55 10    Q.      Is this a document that has been referred to by

12:10:00 11    Mr. Dry in the e-mail that we see up on the screen?

12:10:03 12    A.      Yes, it appears to be so.

12:10:06 13            MR. LEMIEUX:  Your Honor, I would like to move

12:10:08 14    exhibit PTX-0228 into evidence.

12:10:11 15            THE COURT:  Marked and received as 290.

12:10:14 16            (Trial Exhibit No. 290 was admitted into

12:10:14 17    evidence.)

12:10:14 18    BY MR. LEMIEUX:

12:10:18 19    Q.      Ms. Winters, what is exhibit PTX, or I guess it's now

12:10:24 20    Exhibit 290?

12:10:24 21    A.      It appears to be a final visual quality control

12:10:29 22    inspection.

12:10:33 23    Q.      Do you recall seeing this document before?

12:10:35 24    A.      Do I recall seeing it --

12:10:38 25    Q.      Have you seen this document before?

Winters - direct

12:10:40  1   A.      I have, yes.

12:10:41  2   Q.      And was this a document that was referred to by

12:10:48  3   Mr. Dry in his e-mail that was something that was the

12:10:52  4   subject for your review?

12:10:53  5   A.      That's my understanding.

12:10:54  6   Q.      Has this document ever been used by Akoustis?

12:10:58  7   A.      No.

12:10:58  8   Q.      Why?

12:10:59  9   A.      It's 48 pages, and it doesn't reflect what we do.  So

12:11:06 10   it wouldn't be helpful or add any value to the operators on

12:11:10 11   the floor.

12:11:15 12   Q.      So is this the document, then, that Mr. Dry wanted

12:11:19 13   you to consider using?

12:11:20 14   A.      Correct.

12:11:20 15   Q.      And did you make a decision then, as to whether or

12:11:23 16   not to use it?

12:11:24 17   A.      Yes, we were not going to use this.

12:11:29 18   Q.      And just one last document, if I could have

12:11:32 19   permission to approach, Your Honor?

12:11:33 20           THE COURT:  You may.

12:11:46 21           MR. LEMIEUX:  For the record, what I have handed

12:11:49 22   the witness has been marked for identification as JTX-0003.

12:11:59 23   BY MR. LEMIEUX:

12:11:59 24   Q.      Ms. Winters, have you seen this document before?

12:12:01 25   A.      Yes, I have.

Winters - direct

12:12:02 1    Q.       And is this the document that is maintained in the

12:12:06 2    normal scope and course of the business operations of

12:12:09 3    Akoustis?

12:12:09 4    A.       Yes, it is.

12:12:11 5              MR. LEMIEUX:  Your Honor, I would like to move

12:12:12 6    exhibit JTX-0003 into evidence.

12:12:15 7              THE COURT:  Marked and received as 291.

12:12:17 8              (Trial Exhibit No. 291 was admitted into

12:12:18 9    evidence.)

12:12:18 10   BY MR. LEMIEUX:

12:12:20 11   Q.       Ms. Winters, what is this document?

12:12:23 12   A.       This is our wafer exclusion zone and die inspection

12:12:29 13   specification.

12:12:30 14   Q.       And is this a document or procedure that's in actual

12:12:34 15   use at Akoustis?

12:12:35 16   A.       Yes, it is.

12:12:36 17   Q.       And could you take us through briefly each page to

12:12:39 18   let us know what is being shown here in Exhibit 291?

12:12:43 19   A.       Sure.  So it's --

12:12:46 20   Q.       Hold on, just let her comment.

12:12:49 21   A.       Okay.  So as you will see, this is one of our SOP's,

12:12:53 22   Standard Operating Procedure.  We have hundreds of these.

12:12:57 23   It will go through what the purpose of it is, what the

12:13:01 24   scope, certain definitions, who is responsible for it.  Die

12:13:06 25   criteria, there will be different figures, talks about the

Winters - direct

12:13:10  1    wafer exclusion zone.  It gets easier if you go to page 3.

12:13:18  2    Maybe go to page 3.  This is an actual image of our BAW

12:13:22  3    wafer, so I mentioned how we wouldn't have used the other

12:13:25  4    document.  It doesn't -- you wouldn't have seen the wafer,

12:13:29  5    you wouldn't have seen what our filters look like.  If you

12:13:33  6    are building this, they would look completely different for

12:13:35  7    this.  This is just showing here, they'll talk about you

12:13:39  8    have typical clamping marks, some of our tools have

12:13:42  9    mechanical clamps that touch the wafer, so those would be

12:13:45 10    outside the exclusion zone.

12:13:47 11    Q.    And if we could turn to page 5 of this document.  It

12:13:53 12    appears to be describing wafer inspection failure criteria.

12:13:57 13    Could you tell the jury what that is a picture or

12:14:00 14    description of there, go back to the full page.  There we

12:14:04 15    go.

12:14:04 16    A.    Sure.  He this is bond discoloration, you heard a lot

12:14:11 17    about trade secrets.  One of our trade secrets is around our

12:14:14 18    bonding process.  And you kind -- you see that color

12:14:18 19    variation, that would be called a bond void.  So that's a

12:14:22 20    very quick visual to say that this particular die would be

12:14:27 21    inked out, it wouldn't go on to be assembled, that's a

12:14:30 22    critical one for us.

12:14:33 23    Q.    We see a number what appears to be egg-shaped

12:14:38 24    circles, can you describe for the jury what those are?

12:14:40 25    A.    These are individual resonators.

Winters - direct

12:14:41  1   Q.      Those are the individual resonator shapes used by

12:14:45  2   Akoustis for this device?

12:14:46  3   A.      Correct.  Yes.

12:14:47  4   Q.      And turn to page 9 of this document.  This is another

12:14:54  5   example.  What's being depicted here on page 9 of

12:14:59  6   Exhibit 291?

12:15:00  7   A.      So two different things you're seeing probe damage.

12:15:04  8   So when we're testing, some of our earlier test equipment it

12:15:08  9   kind of comes in with a probe, it's touching metal which is

12:15:12 10   soft, so it's actually coming in and we'll basically nick

12:15:17 11   the metal.  If it goes outside, when it goes to our OSAT to

12:15:22 12   do assembly, this would get flagged in their incoming

12:15:27 13   inspection.

12:15:27 14   Q.      To your knowledge, Ms. Winters, was this document

12:15:30 15   based on any Qorvo confidential information?

12:15:32 16   A.      It was not, it's specific to the XBAW process.

12:15:36 17   Q.      And does Akoustis currently use anything else for

12:15:39 18   visual inspection in addition to this document?

12:15:41 19   A.      We do.  So early on, we did everything as manual

12:15:45 20   inspections, so these types of pictures are very helpful.

12:15:49 21   But we want to do, what we call AOI, or automated, optical

12:15:55 22   inspection tool, we received a piece of equipment from a

12:15:58 23   company called LabTech.  Now what happens if you look at,

12:16:03 24   I'll use the one that's with contamination, basically you

12:16:08 25   would take a reference image, just like how that looks with

Winters - direct

12:16:11  1    this tool, it would be your golden unit, your best unit, you

12:16:16  2    would then train to say if you see those probe damage or

12:16:19  3    those bond voids, they would actually scan for that and it

12:16:22  4    would flag it that it's a bad die for that piece.

12:16:25  5            You would then take that map, that recipe, and

12:16:28  6    it gets courted over to our OSAT for that because they

12:16:32  7    continue on with these inspections.  They're giving them a

12:16:35  8    library of what our RD facts, it's matching exactly what

12:16:41  9    your filter looks like, and for every product, you create

12:16:45 10    that new reference slide, it's very specific to your

12:16:48 11    product, to your process.

12:16:49 12    Q.      To the best of your knowledge, Ms. Winters, has there

12:16:53 13    ever been any Qorvo confidential information that has been

12:16:57 14    utilized within the New York Fab facility?

12:16:59 15    A.      Not that I am aware of.

12:17:01 16    Q.      And if you became aware that somebody had brought

12:17:05 17    confidential information, not just Qorvo, but any third

12:17:08 18    party, attempted to bring that to modify a process or to use

12:17:13 19    something in the facility, what would be your response?

12:17:16 20    A.      That it's not allowed, it's not company policy, it's

12:17:19 21    not needed.

12:17:19 22    Q.      Why wouldn't you want to use something that you could

12:17:22 23    get from another company?

12:17:23 24    A.      Why wouldn't I?

12:17:25 25    Q.      Yeah.

Winters - direct

12:17:25 1   A.      Because it's their information, it's their trade

12:17:28 2   secret, we have spent a lot of time developing our own and

12:17:31 3   we do not require outside information like that.

12:17:34 4   Q.      Have you ever asked anybody within Akoustis to modify

12:17:39 5   or change any process of Akoustis and to use Qorvo

12:17:44 6   confidential information to do so?

12:17:46 7   A.      I have not.

12:17:47 8   Q.      Now, you have been in the courtroom, Ms. Winters, for

12:17:52 9   over a week, as have all of us, and you have heard a lot of

12:17:58 10  accusations of improper conduct by various Akoustis

12:18:01 11  employees and the alleged use of certain information.  How

12:18:04 12  does that make you feel?

12:18:06 13  A.      Because I haven't been part of this, it's very

12:18:10 14  upsetting over the last week to hear some of these things.

12:18:14 15  Q.      And how does it make you feel personally in terms of

12:18:17 16  the accusations that have been made against operations that

12:18:21 17  happen in the New York Fab?

12:18:22 18  A.      Yeah, like I said, upsetting.  I have worked in the

12:18:27 19  New York facility now for over twenty years.  A lot of the

12:18:31 20  people I work with I have known my entire career.  A lot of

12:18:35 21  us worked together at Kodak.  Over the last twenty years

12:18:38 22  we've developed the majority of these processes that are

12:18:42 23  used in the XBAW process, so to be falsely accused that

12:18:46 24  we're taking information from Qorvo to build XBAW, is just

12:18:50 25  disheartening, because we've spent hours upon hours, late

Winters - cross

12:18:55  1    weekends.  I have two boys at times that didn't see me

12:18:58  2    because they are in the middle of just developing this

12:19:01  3    process, so a lot of hours, hard work, innovation, from

12:19:05  4    thirty people in the beginning to at times over 100, so it's

12:19:11  5    heart breaking is all I can say.

12:19:15  6                MR. LEMIEUX:  No further questions at this time,

12:19:16  7    Your Honor.  I pass the witness.

12:19:18  8                THE COURT:  Cross-examination.

12:19:20  9                        CROSS-EXAMINATION

12:19:25  10   BY MS. AYERS:

12:19:33  11   Q.     Good morning, Ms. Winters.

12:19:34  12   A.     Good morning.

12:19:35  13   Q.     We have not met yet.  My name is Jennifer Ayers.

12:19:38  14   A.     Nice to meet you.

12:19:39  15   Q.     Nice to meet you, too.

12:19:40  16          Ms. Winters, you testified earlier that you

12:19:43  17   obtained a Masters Degree of Engineering from the University

12:19:47  18   of Illinois, correct?

12:19:49  19   A.     That's correct.

12:19:50  20   Q.     And while you were obtaining your masters degree, you

12:19:52  21   did not take any courses that were specifically related to

12:19:57  22   radio frequency or BAW filters; is that correct?

12:20:01  23   A.     That is correct.

12:20:02  24   Q.     And I think you testified that your first job was at

12:20:05  25   Kodak as a part of this conglomeration at the center of

12:20:10  1    excellence, is that correct?

12:20:11  2    A.    My first job was working as a process engineer before

12:20:15  3    I became in-kind employee.

12:20:19  4    Q.    And you were a process engineer specifically for

12:20:23  5    Kodak, is that correct?

12:20:24  6    A.    Yes.

12:20:24  7    Q.    While you were a process engineer for Kodak, you did

12:20:28  8    not work on any radio frequency filters or BAW filters; is

12:20:32  9    that correct?

12:20:32  10   A.    That is correct.

12:20:33  11   Q.    And then your next job I think you testified, is that

12:20:35  12   you were at Infotonics, is that correct?

12:20:38  13   A.    That's correct.

12:20:39  14   Q.    And you also didn't work on any radio frequency or

12:20:42  15   BAW filters at Infotonics, either?

12:20:44  16   A.    That is correct.

12:20:45  17   Q.    And while you were at Infotonics, you also did not

12:20:48  18   work on the design side of any of the devices that

12:20:52  19   Infotonics was creating, is that correct?

12:20:54  20   A.    That is correct.

12:20:55  21   Q.    Infotonics then become STC MEMS; is that right?

12:20:59  22   A.    That is correct.

12:21:00  23   Q.    And none of the work that you performed at STC MEMS

12:21:04  24   before Akoustis acquired STC MEMS involved radio frequency

12:21:10  25   or BAW filters; correct?

12:21:11  1    A.      That is correct.

12:21:11  2    Q.      And then STC MEMS was acquired by Akoustis in June of

12:21:16  3    2017; is that correct?

12:21:17  4    A.      That is correct.

12:21:18  5    Q.      And at the time that Akoustis acquired STC MEMS, the

12:21:23  6    facility in New York, the Fab facility that you have been

12:21:27  7    discussing, had never made a radio frequency filter;

12:21:30  8    correct?

12:21:30  9    A.      That is correct.

12:21:30 10    Q.      And that included BAW filters at the time that

12:21:33 11    Akoustis acquired STC MEMS, STC MEMS had actually never made

12:21:38 12    a BAW filter, is that correct?

12:21:40 13    A.      Yes.

12:21:40 14    Q.      You also never personally worked on the design of RF

12:21:45 15    filters for Akoustis, correct?

12:21:47 16    A.      The design, that's correct.

12:21:49 17    Q.      And because you have never done the design work at

12:21:52 18    Akoustis, you've also never done any of the work to design

12:21:55 19    the BAW filters that Akoustis sells, correct?

12:21:58 20    A.      When you refer to design, you're talking more on the

12:22:02 21    circuitry, correct?

12:22:04 22    Q.      I believe the question that you were asked in your

12:22:07 23    deposition, Ms. Winters, was, have you ever done any design

12:22:12 24    work of RF filters for Akoustis?

12:22:13 25    A.      Yes, that's fine, the answer is no.

Winters - cross

12:22:16  1    Q.      And you have not?

12:22:17  2    A.      That's correct.

12:22:19  3    Q.      You have also never had any input into the selection

12:22:22  4    of particular materials for the RF filters that Akoustis is

12:22:29  5    making, is that correct?

12:22:30  6    A.      That is correct.

12:22:34  7    Q.      After Akoustis acquired STC MEMS, Akoustis

12:22:39  8    transferred its processes for designing, fabricating,

12:22:44  9    testing and delivering BAW filter products from the facility

12:22:48 10    it had in North Carolina to STC MEMS, is that correct?

12:22:52 11    A.      That is not correct.  It didn't transfer it from

12:23:00 12    North Carolina, it transferred it from GTF.

12:23:03 13    Q.      I appreciate that clarification Ms. Winters, let me

12:23:07 14    rephrase my question.  After Akoustis acquired STC MEMS, it

12:23:11 15    transferred Akoustis's processes for designing, fabricating,

12:23:15 16    testing and delivering BAW filter products from the prior

12:23:18 17    facility it was using to STC MEMS, correct?

12:23:22 18    A.      That is not correct.

12:23:33 19    Q.      As a manager responsible for STC MEMS, are you aware

12:23:37 20    that Akoustis's Form 10K expressly states that it was

12:23:42 21    transferring BAW filter processes into the STC MEMS

12:23:47 22    facility?

12:23:47 23    A.      I'm not aware, I didn't read the 10K.

12:23:50 24    Q.      Have you ever read Akoustis's 10k's before?

12:23:55 25    A.      Not a full disclosure.

Winters - cross

12:24:01  1   Q.     Do you disagree with statements in Akoustis's 10K

12:24:05  2   that it has transferred our R & D resonator filter process

12:24:09  3   flow into the STC MEMS facility and we plan to utilize the

12:24:16  4   facility to optimize our XB1 technology to consolidate all

12:24:21  5   aspects of wafer manufacturing?

12:24:22  6   A.     It's the definition of process flow, so a process

12:24:25  7   flow could be the cartoon that's shown for the ellipsis,

12:24:28  8   that is not necessarily each of the individual recipes to be

12:24:32  9   able to make that.

12:24:33 10   Q.     Let's talk about the process flow.  You testified

12:24:38 11   that STC MEMS had a library of materials and documents that

12:24:44 12   was available to it for purposes of identifying and

12:24:49 13   establishing a process flow, is that correct?

12:24:51 14   A.     That is correct.

12:24:52 15   Q.     But the process flows that Akoustis was transferring

12:24:55 16   into STC MEMS was a process -- was the process flows for

12:25:00 17   resonators filter processes, correct?

12:25:03 18   A.     For their BAW resonator, correct.

12:25:07 19   Q.     You also walked through with Akoustis's counsel just

12:25:12 20   now a handful of trial exhibits that you identified as

12:25:16 21   coming from the STC MEMS library; is that correct?

12:25:21 22   A.     That is correct.

12:25:21 23   Q.     And I think that for the record was trial

12:25:25 24   Exhibits 286, 287, and 288.  If we could just pull up 286 as

12:25:31 25   an example?

Winters - cross

12:25:33 1   A.       The ST numbers?

12:25:36 2   Q.       As soon as I get it up on the screen I would tell you

12:25:40 3   what the DTX number is.  Let me see if I can also help out

12:25:48 4   my trial director.  It's going to be DTX-579.

12:25:55 5   A.       Okay.

12:25:55 6   Q.       I think you testified this is one of the documents

12:25:59 7   that STC MEMS had in its facility and in its library, is

12:26:04 8   that correct?

12:26:04 9   A.       That is correct.

12:26:05 10   Q.       And this document is dated August 17th, 2012;

12:26:12 11   correct?

12:26:12 12   A.       Correct.

12:26:13 13   Q.       And this document hasn't been updated since

12:26:17 14   August 17th, 2012; correct?

12:26:18 15   A.       Based on the document, correct.

12:26:20 16   Q.       And that is also true for Trial Exhibit 288, which is

12:26:25 17   DTX-0574, that also has a revision date of 8/13/2012,

12:26:36 18   correct?

12:26:37 19   A.       That's correct.

12:26:37 20   Q.       And this document also has not been updated since

12:26:42 21   2012; is that correct?

12:26:43 22   A.       Yes.

12:26:45 23   Q.       And if you go to DTX-0573, which is Trial

12:26:51 24   Exhibit 287, this one is a little bit harder to see, the rev

12:26:56 25   number is down on the left hand underneath the box.  This

12:27:00 1    document also has not been updated since August 13th, 2012;

12:27:08 2    correct?

12:27:09 3    A.    That's correct.

12:27:11 4    Q.    I think it's fair to say since these documents

12:27:14 5    haven't been updated since 2012, none of them actually

12:27:18 6    reflect the 200 steps, or the 200 processes that you have

12:27:22 7    testified Akoustis undertakes as a part of its BAW filter

12:27:26 8    process; correct?

12:27:26 9    A.    There would be separate documents for that.    It

12:27:29 10   wouldn't be reflected.    These are templates.    Those would be

12:27:37 11   covered under, what we would call a traveler that would have

12:27:40 12   all the work instructions in it that would cover those 200

12:27:44 13   plus steps.

12:27:45 14   Q.    You have not offered those travelers into evidence as

12:27:47 15   a part of your testimony correct?

12:27:49 16   A.    I have not been asked to, that's correct.

12:28:05 17   Q.    Let's pull up another one of the documents that you

12:28:11 18   discussed.    I just got to find it in my binder, if you'll

12:28:17 19   give me a moment.    Let's pull up PTX-227, which is Trial

12:28:36 20   Exhibit 289.

12:28:37 21          MS. AYERS:    And just for the record, Your Honor,

12:28:39 22   I think this may also be a Trial Exhibit that has been

12:28:42 23   double marked, but we can work with counsel in order to make

12:28:45 24   sure that we only have the document in there a single time.

12:28:48 25          THE COURT:    Thank you.

Winters - cross

BY MS. AYERS:

12:28:48  1

12:28:49  2    Q.      I'm looking at PTX-227, Trial Exhibit 289,

12:28:53  3    Ms. Winters.  This is a calendar invite that Mr. Dry sent to

12:28:57  4    you and others attaching a visual inspection document.

12:29:02  5    Correct?

12:29:02  6    A.      Correct.

12:29:03  7    Q.      Okay.  And if we turn to PTX-228 -- Ms. Winters first

12:29:09  8    of all sent this document to you on January 16th, 2020,

12:29:13  9    correct?

12:29:14 10    A.      I think you meant Mr. Dry.

12:29:16 11    Q.      I appreciate the clarification.

12:29:18 12    A.      No worries.

12:29:19 13    Q.      Thank you very much.

12:29:20 14            Mr. Dry sent this document, this calendar invite

12:29:24 15    to you on January 16th, 2020, correct?

12:29:27 16    A.      Correct.

12:29:28 17    Q.      And the meeting date was to occur on January 28,

12:29:31 18    2020; correct?

12:29:32 19    A.      Yes.  Based on the info, correct.

12:29:36 20    Q.      And attached to Mr. Dry's calendar invite is the

12:29:41 21    visual inspection document that we see at PTX-228, which has

12:29:45 22    been entered into evidence as Trial Exhibit 290; correct?

12:29:50 23    A.      Correct.

12:29:50 24    Q.      This is a Qorvo document; correct?

12:29:54 25    A.      Based on -- I'm looking through it.

Winters - cross

12:30:00  1    Q.      I may be able to help you out, Ms. Winters.  If you

12:30:04  2    go to page 5 of this document, and you go to

12:30:12  3    paragraph 7.1.2.

12:30:14  4    A.      Okay.

12:30:15  5    Q.      So -- there we go.  Thank you.

12:30:18  6    A.      Thank you.

12:30:19  7    Q.      The last sentence indicates that methods of test are

12:30:26  8    to be used for confirming that a reject condition does not

12:30:29  9    exist, they shall be approved by the customer and documented

12:30:32 10    by Qorvo Texas, do you see that?

12:30:34 11    A.      Yes, I do.

12:30:35 12    Q.      This is a Qorvo document that Mr. Dry circulated as a

12:30:38 13    part of the calendar invite that he sent to you in January

12:30:42 14    of 2020; correct?

12:30:43 15    A.      Yes, based on what you just showed me.

12:30:45 16    Q.      And this document indicates at the bottom of the page

12:30:48 17    that it's confidential and proprietary information, correct?

12:30:52 18    A.      That is correct.

12:30:57 19    Q.      When Mr. Dry sent this to you, he was the

12:31:03 20    Vice-President of Final Operations, correct?

12:31:06 21    A.      That's correct.

12:31:07 22    Q.      And he also copied, if we go back to the calendar

12:31:10 23    invite, Mr. Faison, he also sent it to Mr. Fallon,

12:31:16 24    Mr. Morgan, and Mr. Hosse, is that correct?

12:31:22 25    A.      Yes, based on the invite.

12:31:23  1    Q.      And Mr. Morgan was the Vice-President of Quality?

12:31:26  2    A.      Correct.

12:31:27  3    Q.      And Mr. Hosse was a senior product engineer?

12:31:30  4    A.      I don't think that was his exact title, I think he

12:31:34  5    was packaging manager, but I'm not sure at that time.

12:31:37  6    Q.      I appreciate that response, Ms. Winters.  And the

12:31:40  7    purpose of that meeting that Mr. Dry calendared, was to

12:31:43  8    review document requirements and generation for wafer

12:31:47  9    inspection specification, correct?

12:31:49 10    A.      That is correct.

12:31:49 11    Q.      Essentially, Akoustis needed to create and document

12:31:55 12    requirements for final wafer inspection; is that correct?

12:31:57 13    A.      That is not correct.

12:32:00 14    Q.      You're disagreeing with Mr. Dry, the meeting was to

12:32:03 15    review document requirements and generation for wafer

12:32:06 16    inspection specification?

12:32:07 17    A.      No, I'm not disagreeing with that.

12:32:10 18    Q.      Okay.  And this meeting was scheduled to occur

12:32:16 19    two-and-a-half years after Akoustis acquired STC MEMS;

12:32:20 20    correct?

12:32:21 21    A.      Two-and-a-half years.  Yes.

12:32:26 22    Q.      And I think you've already stated this, but the

12:32:29 23    document that we just looked at, this was what was attached

12:32:31 24    to this calendar invite; correct?

12:32:34 25    A.      Correct.

Winters - cross

12:32:39  1    Q.      Let's go to PTX-231 and 232, which needs to be put

12:32:52  2    into evidence.

12:34:16  3              THE COURT:  We are going to take our break right

12:34:42  4    now.  It may be more efficient.  We'll come back

12:34:47  5    fifteen minutes early so we'll come back at 1:15.  Don't

12:34:51  6    discuss the case amongst yourselves.  Don't talk to anyone

12:34:54  7    about it.  I'm going to sit here for a moment.  So we'll see

12:35:00  8    you all at 1:15.  Thank you very much.

12:35:03  9              (Jury exiting the courtroom at 12:35 p.m.)

12:35:21 10              THE COURT:  Everybody be seated for a moment.

12:35:26 11    We'll let your witness step down.  Don't discuss anything

12:35:31 12    that you testified about.  And we'll see you a little bit

12:35:36 13    before 1:15 and start then.

12:35:41 14              Thank you.  Anything else from the Plaintiff or

12:35:44 15    the Defendant?  Anything else from the defense at this time?

12:35:48 16              MR. LEMIEUX:  Nothing, Your Honor.

12:35:50 17              THE COURT:  Nothing else.  We're going to take

12:35:52 18    that break.  We'll see everybody a little bit before 1:15.

12:35:58 19    Thank you.

12:35:58 20              COURT CLERK:  All rise.

12:35:59 21              (A luncheon recess was taken.)

13:15:11 22              THE COURT:  All right.  You may be seated.  Make

13:15:21 23    sure everybody is ready.  We've got two or three minutes

13:15:29 24    maybe.  Anything else that needs to be submitted in

13:15:32 25    connection with the materials that have been submitted thus

13:15:35  1    far, particularly in connection with the North Carolina

13:15:38  2    statute?  Anything else?

13:15:44  3                    MR. MASTERS:  Good afternoon, Your Honor.

13:15:45  4                    The Plaintiffs would like to be able to submit a

13:15:49  5    memorandum shortly on the North Carolina issue.

13:15:53  6                    THE COURT:  That would probably be useful.

13:15:55  7    We're going to make a call on that fairly soon.

13:16:01  8                    MR. MASTERS:  That's what we're aiming for.

13:16:03  9                    THE COURT:  When do you think you'll have that

13:16:05 10    ready?

13:16:06 11                    MR. MASTERS:  Tonight.

13:16:06 12                    THE COURT:  Okay.  That's all right.  Tonight is

13:16:09 13    kind of a vague term.

13:16:11 14                    MR. MASTERS:  All running together, Your Honor,

13:16:13 15    but as soon as we can get it prepared this evening, we'll

13:16:16 16    get it over to you.

13:16:17 17                    THE COURT:  Okay.  Good deal.  That's fine.

13:16:19 18    That's okay.  All right.  I think we're ready.

13:17:07 19                    (Jury entering the courtroom at 1:17 p.m.)

13:17:31 20                    THE COURT:  Everybody can be seated.  And

13:17:39 21    counsel may proceed.

13:17:42 22                    MS. AYERS:  Thank you, Your Honor.

13:17:44 23    BY MS. AYERS:

13:17:44 24    Q.    Ms. Winters, before the lunch break, we were talking

13:17:46 25    about a January 2020 communication from Mr. Dry to you and

13:17:51  1    others.  Do you recall that?

13:17:53  2    A.    I do.

13:17:54  3              MS. AYERS:  Your Honor, may I approach?

13:17:57  4              THE COURT:  You may.

13:18:10  5    BY MS. AYERS:

13:18:41  6    Q.    Ms. Winters, I've just handed you a document that is

13:18:46  7    labeled PTX-231, which is Trial Exhibit 197, and PTX-0232.

13:18:53  8    PTX-0232 is the same visual inspection document that we were

13:18:59  9    looking at prior to the break.  Is that correct?

13:19:03 10    A.    Give me one second.  I just want to confirm.

13:19:09 11    Q.    Sure.  And if we pull up PTX-0232, and we go to

13:19:14 12    page 5.

13:19:15 13    A.    Sorry, I'm looking at 228 and 232?

13:19:18 14    Q.    Yes, ma'am.

13:19:19 15    A.    Thank you.  And sorry, go to page 5.

13:19:24 16    Q.    If you go to page 5 of 0232, you'll see the sentence

13:19:30 17    we looked at, when other methods of test are to be used to

13:19:34 18    confirm that a reject condition does not exist, they should

13:19:38 19    be approved by the customer and documented by Qorvo Texas?

13:19:41 20    A.    Yes, I see that in 7.1.2.

13:19:44 21    Q.    And PTX-0232, is the attachment to Trial Exhibit 197

13:19:49 22    which has a PTX number of 231; correct?

13:19:53 23    A.    Give me a second.  Yes, it appears that way.

13:20:00 24              MS. AYERS:  Your Honor, I move to admit PTX-0232

13:20:04 25    into evidence.

13:20:05  1          THE COURT:  Marked and received as 292.

13:20:11  2          (Trial Exhibit No. 292 was admitted into

13:20:12  3    evidence.)

13:20:12  4    BY MS. AYERS:

13:20:15  5    Q.    Mr. Dry's e-mail to you and to Mr. Gray and to

13:20:21  6    Mr. Morgan says, "My suggestion is therefore to use

13:20:25  7    something like the attached process."

13:20:31  8    A.    Give me a second.  Which paragraph are you on?

13:20:37  9    Q.    It is the second -- it's the last full paragraph,

13:20:42 10    Ms. Winters.

13:20:44 11    A.    Thank you.  Just give me one second to read it, if

13:20:47 12    that's okay.

13:20:49 13          (Witness reviewing document.)  Okay.

13:21:03 14    Q.    And the process that he is suggesting to use is the

13:21:08 15    visual inspection process that is attached to his

13:21:13 16    communication to you, correct?

13:21:14 17    A.    That's what it seems like from what's written.

13:21:17 18    Q.    If we go up a paragraph in that e-mail communication,

13:21:20 19    Ms. Winters, the last two sentences of that document says,

13:21:24 20    "The wafer inspection document that we discussed a couple of

13:21:26 21    weeks ago will only apply to production wafers and we should

13:21:30 22    include a caveat within the document to exclude development

13:21:34 23    wafers.  Do we have an assigned owner and target date yet

13:21:37 24    for this document?"

13:21:40 25          Do you see that?

Winters - cross

13:21:40 1    A.    I do.

13:21:41 2    Q.    And the wafer inspection document that was discussed

13:21:43 3    a few weeks earlier prior to February 11, 2020, was that

13:21:46 4    visual inspection document we looked at prior to the lunch

13:21:49 5    break; correct?

13:21:50 6    A.    Yes, based on the timeline.

13:21:52 7    Q.    And when he is saying that it should only apply to

13:21:58 8    production wafers, the reference there means it should only

13:22:00 9    apply to wafers that are actually going to be manufactured

13:22:03 10   and sold in mass quantities, correct?

13:22:06 11   A.    I'm sorry, can you repeat that?

13:22:08 12   Q.    Sure.  He says the wafer inspection document that we

13:22:11 13   discussed a couple of weeks ago, will only apply to

13:22:14 14   production wafers, that's a reference to wafers that

13:22:17 15   Akoustis plans to mass produce and sell in the market;

13:22:20 16   correct?

13:22:20 17   A.    That is correct.

13:22:20 18   Q.    And that's the difference between a development wafer

13:22:23 19   which Akoustis is performing testing on and things of that

13:22:26 20   nature; correct?

13:22:26 21   A.    A development wafer could also be used for sampling

13:22:30 22   to customers.

13:22:32 23   Q.    Okay.  You referenced JTX -- well, first of all, when

13:22:37 24   we were looking at this e-mail communication and we go back

13:22:41 25   to it, Mr. Faison, you didn't respond to Mr. Dry's e-mail

Winters - cross

13:22:50  1    and say that STC MEMS has an entire library of visual

13:22:57  2    inspection documents that can be referenced after you

13:22:59  3    received this e-mail, correct?

13:23:00  4    A.      I did not respond directly to this e-mail.

13:23:03  5    Q.      Let's look at JTX-3, which I believe is, you

13:23:07  6    testified is a document that Akoustis used?

13:23:15  7    A.      Can you give me one second to go through?  Yes, I

13:23:21  8    have it.

13:23:21  9    Q.      And I would like to go to the very last page.  The

13:23:27 10    last page indicates that Mr. Dry drafted this document in

13:23:33 11    June of 2020, correct?

13:23:34 12    A.      Based on this document, correct.

13:23:37 13    Q.      Approximately four months after the February e-mail

13:23:40 14    that we just looked at, correct?

13:23:43 15    A.      That's correct.

13:23:44 16    Q.      And five months prior to the January meeting that we

13:23:47 17    discussed prior to the lunch break, correct?

13:23:49 18    A.      Yes.

13:23:49 19    Q.      I would like to switch gears a little bit and talk

13:23:52 20    about trimming.  You can take that down, Mr. Faison.

13:23:56 21            Akoustis performs trimming of its BAW filters at

13:24:01 22    the New York Fab that used to be STC MEMS, correct?

13:24:05 23    A.      That is correct.

13:24:06 24    Q.      And you would agree with me that in general terms,

13:24:08 25    it's preferable to limit the amount of trimming steps;

Winters - cross

13:24:11  1    correct?

13:24:12  2    A.    That's correct.

13:24:12  3    Q.    And when you started working at Akoustis after the

13:24:16  4    acquisition in June of 2017, there was nobody working on

13:24:20  5    trimming at the New York facility, correct?

13:24:23  6    A.    That is correct.

13:24:23  7    Q.    And that's because STC MEMS did not perform trimming

13:24:27  8    prior to being acquired by Akoustis, correct?

13:24:30  9    A.    That's correct, trimming was done in North Carolina

13:24:33 10    at the time.

13:24:34 11    Q.    And would you agree with me that BAW filters are

13:24:36 12    somewhat unique in that they require very precise trimming?

13:24:41 13    A.    They do require precise trimming.

13:24:44 14    Q.    Akoustis hired J.B. Kwon, a former Qorvo employee

13:24:48 15    around the same time that it acquired STC MEMS to help with

13:24:52 16    trimming, is that correct?

13:24:53 17    A.    That's correct, it was part of his function.

13:24:55 18    Q.    And he provided specific input on the trimming

13:24:58 19    processes that Akoustis should use, correct?

13:25:00 20    A.    As a process engineer, correct.

13:25:02 21    Q.    And he was, in fact, responsible for setting up the

13:25:04 22    trimming operations for Akoustis's BAW filter products,

13:25:07 23    wasn't he?

13:25:08 24    A.    He was.

13:25:12 25          MS. AYERS:  Your Honor, may I approach?

13:25:13  1              THE COURT:  You may.

13:25:35  2      BY MS. AYERS:

13:25:54  3      Q.      Ms. Winters, for the record, and for the benefit of

13:25:58  4      Mr. Faison who put up these documents, I have handed you

13:26:04  5      documents which have been marked PTX-452 and 453, these have

13:26:08  6      been perviously admitted into evidence as Trial Exhibit 122,

13:26:12  7      which is the presentation you see on the right-hand side of

13:26:14  8      your screen, and Trial Exhibit 123, which is the e-mail that

13:26:19  9      appears on the left-hand side of your screen.

13:26:23 10              So I would like to go down to the second page of

13:26:29 11      the e-mail.

13:26:30 12      A.      Okay.

13:26:31 13      Q.      On the second page of the e-mail, there is a meeting

13:26:34 14      invite from you to a number of people including J.B. Kwon,

13:26:40 15      Daeho Kim, Rama Vetury, Rohan Houlden and others.  Do you

13:26:49 16      see that?

13:26:51 17      A.      I do.

13:26:52 18      Q.      And the subject of the calendar meeting is handle

13:26:55 19      letter wafer/trim weekly meeting.  Do you see that?

13:26:59 20      A.      I do.

13:27:00 21      Q.      This weekly meeting was held to determine how

13:27:02 22      Akoustis was going to trim the wafers that would ultimately

13:27:06 23      become BAW filters; is that correct?

13:27:07 24      A.      I would assume so, yes.

13:27:18 25      Q.      And if we go to the first page, Mr. Vetury follows up

13:27:25 1    the meeting and presents a list of action items that had to

13:27:31 2    be followed up on after the meeting.  And then at the top of

13:27:34 3    that e-mail communication, Mr. J.B. Kwon sends to Rama

13:27:42 4    Vetury and Daeho Kim, the trim calc SiN trims PowerPoint, do

13:27:52 5    you see that?

13:27:54 6    A.    Yes, I see it highlighted on the screen.

13:27:56 7    Q.    And Mr. Kim says the enclosed is what I understand

13:27:59 8    how Qorvo gets trim sensitivity data, ███████████████,

13:28:05 9    and trim removal amounts for SiN trims, do you see that?

13:28:08 10   A.    I do.

13:28:09 11   Q.    And the SiN is a reference to silicone nitride,

13:28:14 12   right?

13:28:14 13   A.    That's correct.

13:28:15 14   Q.    If we go to the attachment, Mr. Kim is attaching

13:28:18 15   information that relates to Qorvo's trim calculation and

13:28:24 16   Qorvo's trim algorithms, correct?

13:28:27 17   A.    Give me one second to review the document.

13:28:44 18         What's the question again?

13:28:46 19   Q.    This document contains Qorvo's trim calculations and

13:28:50 20   trim processes, correct?

13:28:52 21   A.    I'm just looking at it, I understand the e-mail says

13:28:55 22   Qorvo, but the document is not referencing Qorvo unless

13:28:58 23   there is something in the text.

13:28:59 24   Q.    So the e-mail specifically says the enclosed is what

13:29:02 25   I understand about how Qorvo gets trim sensitivity data,

13:29:07  1    correct?

13:29:08  2    A.      Yes.

13:29:08  3    Q.      And if we go to the second page of that document, or

13:29:13  4    actually let's go to the fourth page, and if we blow that

13:29:22  5    up, contained within it are steps for silicone nitride trims

13:29:28  6    relating to frequency trade-off of trim scheme, do you see

13:29:34  7    that?

13:29:34  8    A.      I do.

13:29:35  9    Q.      And there is a formulation included in the PowerPoint

13:29:37 10    presentation, correct?

13:29:42 11    A.      Give me a second.

13:29:44 12            I assume you mean in the box?

13:29:45 13    Q.      Yes.

13:29:45 14    A.      I do see it.  Thank you.

13:29:47 15    Q.      At the time you received this e-mail, you didn't tell

13:29:49 16    Mr. Kwon to stop sending you Qorvo trimming information,

13:29:53 17    correct?

13:29:53 18    A.      I did not.  There is no reference that it's

13:29:58 19    confidential.

13:30:00 20    Q.      There is a reference that indicates it came from

13:30:03 21    Qorvo; correct?

13:30:03 22    A.      That is correct.

13:30:04 23    Q.      And you knew that Mr. Kwon had immediately just left

13:30:08 24    Qorvo and gone to Akoustis, correct?

13:30:09 25    A.      That is correct.

Winters - cross

13:30:10  1    Q.      And Mr. Kwon was specifically hired by Akoustis to

13:30:15  2    perform trimming at the New York Fab, correct?

13:30:18  3    A.      He was hired for trim, and also other process

13:30:21  4    engineering skill sets that he previously had.

13:30:24  5    Q.      Let's go to PTX-420 and 421.  I'm going to hand them

13:30:29  6    to you.

13:30:30  7            MS. AYERS:  Your Honor, do I have permission to

13:30:32  8    approach?

13:30:32  9            THE COURT:  You do.

13:30:38  10           THE WITNESS:   Thank you.

13:30:44  11           MS. AYERS:  You're welcome.

13:30:45  12   BY MS. AYERS:

13:31:13  13   Q.      And for the record, PTX-420 has been entered into

13:31:17  14   evidence as Trial Exhibit 208, and PTX-421 has been entered

13:31:23  15   into evidence as Trial Exhibit 209.

13:31:26  16           Ms. Winters, on Wednesday, August 16th, 2017, so

13:31:30  17   about a month-and-a-half after the last document that we

13:31:33  18   just looked at, you asked J.B. if he could stop by to

13:31:37  19   discuss silicone nitride trimming experiment.  Do you see

13:31:40  20   that?

13:31:40  21   A.      I do.

13:31:41  22   Q.      And J.B. responded to your e-mail about forty minutes

13:31:45  23   later, and he reattached the trim presentation that we just

13:31:51  24   looked at in the prior e-mail, correct?

13:31:53  25   A.      Correct.

13:31:53  1    Q.      And he says in the communication he's sending to you,

13:31:58  2    "The enclosed shows how Qorvo does silicone nitride

13:32:03  3    trimming."

13:32:03  4            Correct?

13:32:03  5    A.      Correct.

13:32:04  6    Q.      At the time Mr. Kwon sent this document to you,

13:32:07  7    Akoustis was performing silicone nitride trimming

13:32:11  8    experiments, correct?

13:32:11  9    A.      We were if my memory serves me correctly, this was a

13:32:17 10    while ago, we were doing a couple of things.  We had an AMS

13:32:21 11    trim tool, so we were qualifying that, but we were also, I

13:32:26 12    think at the same time, evaluating new trim tools.

13:32:28 13    Q.      And Akoustis no longer uses a SiN trim tool, correct?

13:32:32 14    A.      That is correct.

13:32:33 15    Q.      It uses a tool that I believe is spelled SCIA?

13:32:37 16    A.      There were three tools we looked at, AMS, the tool

13:32:41 17    that was brought in from North Carolina was more of a manual

13:32:47 18    tool, more of a research tool, that's how we started a lot

13:32:51 19    of the XBAW, we looked at a SCIA tool, MB, a year before or

13:32:56 20    a second tool we looked at a company called Tele.  These are

13:33:00 21    common manufacturers for trim tools.

13:33:05 22    Q.      And the SCIA tool that Akoustis ultimately purchased

13:33:09 23    in order to perform its trimming, it's the same type of tool

13:33:13 24    that Qorvo uses, correct?

13:33:15 25    A.      Correct, it's the same type of tools other SAW or BAW

Winters - cross

13:33:20  1    manufacturers use.

13:33:21  2    Q.      When you received this presentation from J.B. Kwon

13:33:25  3    for a second time a few months after he started, Akoustis

13:33:28  4    was in the process of determining what trimming tools that

13:33:31  5    it should use and ultimately purchase, and it was performing

13:33:34  6    trimming experiments to see how it could trim silicone

13:33:37  7    nitride?

13:33:38  8    A.      That's correct.

13:33:44  9    Q.      And that's ultimately why Akoustis hired Mr. Kwon,

13:33:48 10    you wanted to have Mr. Kwon assist with trimming, is that

13:33:52 11    correct?

13:33:52 12    A.      Yes, as a process engineer.

13:33:58 13    Q.      You didn't respond to Mr. Kwon to tell him that you

13:34:01 14    didn't need or want Qorvo's trimming algorithms, correct?

13:34:04 15    A.      I did not.

13:34:06 16    Q.      And you also didn't respond to Mr. Kwon's e-mail to

13:34:10 17    tell him that the information he gave to you in response to

13:34:13 18    your e-mail wasn't what you were asking for, correct?

13:34:16 19    A.      I don't think so.

13:34:20 20    Q.      I would like to fast forward to October of 2017?

13:34:27 21            MS. AYERS:  Your Honor, may I approach?

13:34:29 22            THE COURT:  You may.

13:34:47 23            MS. AYERS:  And for the record, I have handed

13:34:56 24    Ms. Winters PTX-0271, which has already been entered into

13:35:02 25    evidence as Trial Exhibit 220.

Winters - cross

13:35:04  1    BY MS. AYERS:

13:35:05  2    Q.      This is an e-mail from you to Art Geiss, correct?

13:35:07  3    A.      Correct.

13:35:08  4    Q.      And Art Geiss is an Akoustis board member, correct?

13:35:11  5    A.      That's correct.

13:35:11  6    Q.      And Art Geiss used to work at RFMD before he left

13:35:16  7    that company, correct?

13:35:17  8    A.      Correct.

13:35:20  9    Q.      And Mr. Geiss is specifically asking you to please

13:35:24 10    forward the files of the presentation that you gave that

13:35:28 11    included micrograph of the XF2 release-etch test patterns

13:35:34 12    and the presentation that J.B. gave on the trim work center;

13:35:37 13    correct?

13:35:38 14    A.      That's correct.

13:35:38 15    Q.      And Mr. Geiss is referring to the presentation that

13:35:41 16    is attached to this e-mail, correct?

13:35:44 17    A.      Correct.

13:35:45 18    Q.      And you attended the board meeting that Akoustis had

13:35:50 19    with its board members where trim -- the trim work center

13:35:56 20    was discussed by Mr. Kwon; correct?

13:35:59 21    A.      Yes.  I'm not sure this was the board meeting or a

13:36:03 22    technical meeting, but yes.

13:36:04 23    Q.      So Akoustis routinely will meet with some of it's

13:36:08 24    board members to provide technical information to the board

13:36:11 25    members, correct?

Winters - cross

13:36:11  1    A.      Yes.

13:36:11  2    Q.      And during that board meeting, Mr. Kwon gave a

13:36:15  3    presentation on the trim work center that was actually in

13:36:17  4    place at the STC MEMS facility, correct?

13:36:21  5    A.      For the STC MEMS or --

13:36:23  6    Q.      The New York Fab.

13:36:24  7    A.      Sorry, I just want to make sure, just clarifying,

13:36:28  8    based on the e-mail, correct.

13:36:29  9    Q.      During that board meeting, did anybody ever tell you

13:36:31 10    that the trimming processes and algorithms contained within

13:36:35 11    J.B.'s presentations were Qorvo trade secret or secret

13:36:40 12    sauce?

13:36:40 13    A.      Not that I recall.

13:36:41 14    Q.      Let's take a look at Trial Exhibit 212 and Trial

13:36:46 15    Exhibit 213.

13:36:49 16            MS. AYERS:  Your Honor, do I have permission to

13:36:52 17    approach?

13:36:53 18            THE COURT:  You may.

13:37:07 19    BY MS. AYERS:

13:37:25 20    Q.      Ms. Winters, Trial Exhibit 212 and 213 is an e-mail

13:37:29 21    from J.B. Kwon to you on October 25th, 2016, which you

13:37:33 22    received just before the Akoustis board meeting; correct?

13:37:36 23    A.      Sorry.  You're saying Exhibit 437 and 438?

13:37:41 24    Q.      I'm talking about 437 and 438, yes.  I understand

13:37:45 25    sometimes the reference numbers are confusing.

Winters - cross

13:37:48 1   A.      I just want to make sure I'm looking at the correct

13:37:51 2   one.  Thank you.

13:37:51 3   Q.      So Trial Exhibit 437 and 438 is an e-mail

13:37:56 4   communication that J.B. Kwon sent to you on October 26th,

13:38:01 5   2017, correct?

13:38:01 6   A.      Correct.

13:38:02 7   Q.      And if we flip back to 721, you e-mailed Mr. Geiss on

13:38:09 8   October 29th, 2017, two days later; correct?

13:38:13 9   A.      I'm going through the timeline.  So I just want to

13:38:17 10  make sure I understand the timeline.  So the e-mail --

13:38:20 11              THE COURT:  I want to make sure, you said Trial

13:38:22 12  Exhibit, but we don't have a 437 and 438.

13:38:25 13              MS. AYERS:  It's Trial Exhibit 212 and 213, Your

13:38:29 14  Honor.

13:38:29 15              THE COURT:  Thank you.

13:38:30 16              THE WITNESS:  It's a deposition exhibit I guess

13:38:32 17  I'm looking at.  A lot of numbers.

13:38:34 18              So I just want to make sure I'm understanding

13:38:37 19  this.

13:38:38 20  BY MS. AYERS:

13:38:38 21  Q.      Sure.

13:38:38 22  A.      The e-mail from J.B. on 10/26 that you're

13:38:46 23  referencing?

13:38:46 24  Q.      Correct.

13:38:47 25  A.      And the e-mail that Art sends me is on Saturday,

Winters - cross

13:38:52  1   October 28th, and I responded to Art with the requested

13:38:54  2   presentations on Sunday the following morning.

13:38:57  3   Q.    Correct.

13:38:58  4   A.    Okay.

13:38:58  5   Q.    So Mr. Kwon sent you the trim work center

13:39:02  6   presentation that he was going to give to the board;

13:39:05  7   correct?

13:39:06  8   A.    Yeah.  And the question I guess I have is, do we know

13:39:09  9   what date the meeting was?  That's the piece I'm missing.

13:39:12 10   Q.    Well, presumably it happened sometime between

13:39:16 11   September 26th and September 29th, correct?

13:39:18 12   A.    I would assume that piece of it.

13:39:20 13   Q.    Okay.  And if we look at J.B.'s e-mail, he's saying,

13:39:26 14   "Hi Mary and Ken.  The enclosed is a trim work center

13:39:30 15   PowerPoint update."

13:39:31 16          Correct?

13:39:32 17   A.    That is correct.

13:39:32 18   Q.    And if we look at Trial Exhibit 213, which is

13:39:37 19   PTX-438, and we go to pages 11 and 12 of this document.

13:39:44 20   A.    Okay.

13:39:54 21   Q.    Please pull up page 11 as well.  This trim work

13:40:14 22   center update presentation that Mr. Kwon provided to you,

13:40:20 23   which was then given to Akoustis's board, contains the trim

13:40:23 24   sensitivity calculation and information from the Qorvo

13:40:27 25   presentation we were just looking at; correct?

13:40:32  1    A.      Yes.

13:40:33  2    Q.      And if we go to page 4 of this document, which is

13:40:43  3    PTX-438, which has been entered into evidence as Trial

13:40:49  4    Exhibit 213, there is also a comparison that shows Qorvo on

13:40:52  5    the left-hand side and Akoustis on the right-hand side,

13:40:55  6    correct?

13:40:55  7    A.      I see that.

13:40:56  8    Q.      And at the time this comparison was being made, you

13:41:00  9    indicated that Akoustis was using the AMS tool, correct?

13:41:03 10    A.      That's correct.

13:41:03 11    Q.      Akoustis eventually switched to the SCIA tool, is

13:41:07 12    that correct?

13:41:07 13    A.      That's correct.

13:41:07 14    Q.      That's the same tool that Qorvo uses, correct?

13:41:10 15    A.      That is my understanding.

13:41:12 16    Q.      Let's go back to PTX-721, which is Trial Exhibit 220.

13:41:25 17    A.      Okay.

13:41:27 18    Q.      And let's go to page 9 of the attachment.

13:41:49 19    A.      Okay.

13:41:50 20    Q.      The version of the trim work center presentation that

13:41:53 21    you gave to the board deleted Qorvo's name and put in

13:41:59 22    Industry Standard, correct?

13:42:00 23    A.      The thing is, I did not give the trim work center

13:42:04 24    presentations, I gave the other presentations to the board,

13:42:07 25    there is two presentations.

Winters - cross

13:42:10 1            You mean e-mails or presentations?

13:42:13 2    Q.      The trim work center presentation that you sent to

13:42:16 3    Akoustis's board members --

13:42:18 4    A.      Correct.

13:42:18 5    Q.      -- changed the language from Qorvo to Industry

13:42:21 6    Standard, correct?

13:42:22 7    A.      The two documents are different, that's correct.

13:42:26 8    Q.      And they're different because --

13:42:28 9            THE COURT:  Would you clarify that?

13:42:31 10           MS. AYERS:  I'm sorry.

13:42:32 11           THE COURT:  Please clarify the answer.

13:42:40 12   BY MS. AYERS:

13:42:40 13   Q.      Trial Exhibit 220 at page 9 contains the same

13:42:46 14   PowerPoint presentation that we just looked at, and Trial

13:42:55 15   Exhibit 213 at page 4.  Correct?

13:42:58 16   A.      You got to give me a second.

13:43:03 17   Q.      Mr. Faison, please pull up PTX-428, page 4, and put

13:43:10 18   it side-by-side with 721.

13:43:17 19   A.      Okay.

13:43:18 20   Q.      And the difference between these two documents is

13:43:21 21   that you changed the word "Qorvo", to "Industry Standard",

13:43:26 22   correct?

13:43:26 23   A.      I do not recall changing it.

13:43:28 24   Q.      Somebody at Akoustis changed it?

13:43:30 25   A.      I would assume so if it came from Akoustis.

13:43:33  1   Q.      Okay.  And if we go to page 11 of 721.

13:43:44  2   A.      Sorry, which -- the deposition exhibit or the PTX?

13:43:49  3   Q.      It's PTX-721, page 11.  The presentation that you

13:43:55  4   sent to Mr. Geiss included Qorvo's trim sensitivity

13:44:04  5   calculation; correct?

13:44:05  6   A.      Yes, based on the e-mail that was previously sent.

13:44:08  7   Q.      And if we flip to page 12, the next page of this

13:44:12  8   presentation, page 12 also includes information from the

13:44:20  9   Qorvo trim process document that we were looking at earlier,

13:44:24 10   correct?

13:44:24 11   A.      That's correct.

13:44:36 12   Q.      Is it fair to say that somebody at Akoustis changed

13:44:40 13   the word "Qorvo" to "Industry Standard" in an attempt to

13:44:45 14   obscure the original source of the trimming data provided in

13:44:48 15   the presentation?

13:44:49 16   A.      I don't know if it's fair to say if I don't know who

13:44:52 17   actually did it.

13:44:52 18   Q.      But it's your testimony you did not do it?

13:44:55 19   A.      I did not do it.

13:44:56 20   Q.      And you don't know who did?

13:44:57 21   A.      I do not.

13:45:15 22   Q.      I think you testified earlier that Akoustis did not

13:45:19 23   use Qorvo's trimming processes, procedures and algorithms,

13:45:24 24   correct?

13:45:24 25   A.      Correct, not to my knowledge.

13:45:26  1    Q.       Is Akoustis normally in the practice of sending to

13:45:29  2    its board members information that it doesn't use?

13:45:33  3    A.       In terms of?

13:45:36  4    Q.       When Akoustis meets with its board members, it wants

13:45:39  5    to provide information to the board that relates to what the

13:45:42  6    company is doing from a technological perspective, correct?

13:45:46  7    A.       That's correct.

13:45:46  8    Q.       And you indicated you weren't sure if this was a

13:45:49  9    board meeting, or this was some other kind of technological

13:45:52 10    presentation that Akoustis was giving to its board members,

13:45:55 11    correct?

13:45:55 12    A.       Correct.

13:45:56 13    Q.       When Akoustis meets with its board members, it's

13:46:00 14    trying to give its board members the most information it can

13:46:03 15    about the technological processes and procedures that

13:46:06 16    Akoustis is working on currently at that time, correct?

13:46:08 17    A.       That's correct.

13:46:10 18    Q.       I apologize, go ahead.  I did not intend to interrupt

13:46:15 19    you.

13:46:15 20             It's not Akoustis's practices to provide its

13:46:17 21    board members with information that Akoustis doesn't use or

13:46:20 22    is extraneous or is unnecessary, correct?

13:46:23 23    A.       That is correct.

13:46:24 24    Q.       Okay.  I have one last document for you, Ms. Winters,

13:46:30 25    you testified previously that you don't recall ever asking

Winters - cross

13:46:34  1    for Qorvo information; correct?

13:46:37  2    A.      That's correct.

13:46:40  3                MS. AYERS:  Your Honor, may I approach?

13:46:42  4                THE COURT:  You may.

13:46:49  5                THE WITNESS:  Thank you.

13:46:51  6                MS. AYERS:  You're welcome.

13:47:02  7    BY MS. AYERS:

13:47:03  8    Q.      Ms. Winters, I have handed you PTX-443.  And my first

13:47:08  9    question for you is, do you recognize this document?

13:47:10 10    A.      I do.

13:47:11 11    Q.      This is an e-mail from J.B. Kwon to you; correct?

13:47:15 12    A.      Correct.

13:47:16 13    Q.      And it starts, if you go back to the second page of

13:47:18 14    the document, it actually originates with an e-mail from you

13:47:22 15    to J.B. Kwon; correct?

13:47:24 16    A.      That's correct.

13:47:25 17                MS. AYERS:  Your Honor, I offer into evidence

13:47:27 18    PTX-443.

13:47:29 19                THE COURT:  Marked and received as 293.

13:47:34 20                (Trial Exhibit No. 293 was admitted into

13:47:34 21    evidence.)

13:47:34 22    BY MS. AYERS:

13:47:35 23    Q.      Let's go to the second page of this document,

13:47:41 24    Mr. Faison.

13:47:42 25                So the first e-mail in this document is from you

13:47:46  1    to Mr. Kwon on May 9th, 2018; correct?

13:47:50  2    A.      That's correct.

13:47:50  3    Q.      And that occurred a year after the events that we've

13:47:55  4    kind of been discussing relating to trimming, correct?

13:47:58  5    A.      Yes.

13:47:58  6    Q.      And you specifically asked J.B., does he know how

13:48:01  7    many testers Qorvo has, correct?

13:48:03  8    A.      That's correct.

13:48:04  9    Q.      Mr. Kwon responds on the first page of this document,

13:48:11 10    that he doesn't know the exact number. ███████████████

13:48:21 11    ████████████████████████████████████████████████████

13:48:24 12    ██████████████████, do you see that?

13:48:25 13    A.      I do.

13:48:26 14    Q.      And beneath that, he says the attachment is a

13:48:28 15    reference explaining about surface roughness and trim

13:48:31 16    process, correct?

13:48:32 17    A.      That's correct.

13:48:32 18    Q.      And in response to that question, you asked Mr. Kwon,

13:48:37 19    "Thanks J.B.  Any chance you know what type of test

13:48:41 20    equipment they use?"

13:48:42 21    A.      I see that.

13:48:43 22    Q.      And J.B. couldn't remember, correct?

13:48:45 23    A.      Correct.

13:48:47 24    Q.      At least at some point and time, you were asking

13:48:50 25    Mr. Kwon about information that he had from his employment

Winters - redirect

13:48:52  1    at Qorvo, correct?

13:48:54  2    A.      Correct.

13:48:55  3              MS. AYERS:  I have no further questions, Your

13:48:56  4    Honor.

13:48:56  5              THE COURT:  Redirect.

13:48:57  6                    REDIRECT EXAMINATION

13:48:59  7    BY MR. LEMIEUX:

13:49:07  8    Q.      I just have a couple of questions to kind of clear up

13:49:10  9    any misconceptions that may have been --

13:49:12 10              THE COURT:  Counsel, it's inappropriate on

13:49:15 11    questions, we do not do that anymore.

13:49:19 12              MR. LEMIEUX:  I apologize, Your Honor.

13:49:20 13    BY MR. LEMIEUX:

13:49:21 14    Q.      Now, you saw a number of documents that were handed

13:49:23 15    to you by Qorvo's counsel here that appear to be part of

13:49:28 16    some type of trimming PowerPoint?

13:49:30 17    A.      Yes.

13:49:32 18    Q.      And were you the person responsible for preparing any

13:49:36 19    of those trimming slides?

13:49:37 20    A.      I was not.

13:49:38 21    Q.      Do you know who was responsible for preparing those?

13:49:40 22    A.      J.B. Kwon.

13:49:41 23    Q.      And did you have any understanding as to whether or

13:49:47 24    not any of the information that was contained in the slides

13:49:50 25    prepared by Mr. Kwon contained confidential or proprietary

Winters - redirect

13:49:54  1    information belonging to Qorvo?

13:49:56  2    A.    No, I do not.

13:50:02  3    Q.    If we could pull up what was marked as Exhibit 220, I

13:50:07  4    believe, Trial Exhibit 220, which is PTX-0721.  If we go up

13:50:19  5    to the to and from, and attachment lines.

13:50:23  6          Ms. Winters, this appears to be your e-mail to

13:50:26  7    Art Geiss, and does it contain more than one presentation,

13:50:30  8    or more than one PowerPoint that's being sent to Mr. Geiss?

13:50:34  9    A.    Yes, it does.

13:50:35 10    Q.    And which of these presentations did you prepare?

13:50:37 11    A.    The transfer flow update.

13:50:40 12    Q.    Did you prepare the trim center work update 2017

13:50:44 13    document?

13:50:44 14    A.    No, I did not.

13:50:46 15    Q.    Who prepared that?

13:50:47 16    A.    J.B. Kwon.

13:50:49 17    Q.    And just again so that we're clear, are you aware of

13:50:56 18    any Qorvo -- was it ever identified to you that any of this

13:51:01 19    information was confidential and proprietary to Qorvo?

13:51:04 20    A.    No.

13:51:05 21          MR. LEMIEUX:  No further questions, Your Honor.

13:51:07 22          THE COURT:  All right.  Thank you very much.

13:51:09 23    You may step down.

13:51:10 24          THE WITNESS:  Thank you.

13:51:10 25          THE COURT:  Who will our next witness be?

Kim - direct

13:51:14  1          MR. ELKINS:  Your Honor, Akoustis calls

13:51:18  2  Dr. Daeho Kim as its next witness.

13:51:21  3          THE COURT:  Certainly.  The witness will step up

13:51:25  4  to the stand, come forward and step up here to the witness

13:51:32  5  stand and be sworn in.

13:51:42  6          COURT CLERK:  Please remain standing and raise

13:51:49  7  your right hand.  Please state and spell your name for the

13:51:54  8  record.

13:51:54  9          THE WITNESS:  Daeho Kim, D-A-E-H-O, K-I-M.

13:52:00 10          DAEHO KIM, having been duly sworn, was examined

13:52:05 11  and testified as follows:

13:52:09 12                      DIRECT EXAMINATION

13:52:12 13  BY MR. ELKINS:

13:52:20 14  Q.      Good afternoon, Dr. Kim.

13:52:22 15  A.      Good afternoon.

13:52:23 16  Q.      Can you please tell the jury a little bit about

13:52:26 17  yourself?

13:52:27 18  A.      I Daeho Kim again.  I'm from South Korea born and

13:52:34 19  educated there, and have -- and moved to U.S. about

13:52:43 20  twenty years ago.  I have a family, a wife, three daughters,

13:52:47 21  and two in high school.  And one finishing up elementary.

13:52:52 22  And my oldest one, she had a prom last Saturday, so I had to

13:53:01 23  make the schedule work to fly up here, so was trying to

13:53:07 24  drive her to the prom, but then she didn't like that so

13:53:12 25  there is some back and forth between my wife, me and Jen, so

Kim - direct

13:53:18  1   that's it.

13:53:19  2   Q.      Okay.  And where do you live?

13:53:22  3   A.      Right now, it's Cornelius, North Carolina.

13:53:29  4   Q.      Where do you work?

13:53:30  5   A.      It's Huntersville, North Carolina, right next to,

13:53:36  6   small town, Columbia and Huntersville right next to it.

13:53:40  7   Q.      And you work at Akoustis, right?

13:53:42  8   A.      That's correct, yes.

13:53:42  9   Q.      What's your title there?

13:53:44 10   A.      Director of Device Engineering.

13:53:49 11   Q.      And what are your primary responsibilities as

13:53:52 12   Director of Device Engineering?

13:53:54 13   A.      In short, it's a device R & D, so device means our

13:54:02 14   company is BAW resonators, that's part of the BAW filter

13:54:07 15   that we build.  And so I try to improve and maintain

13:54:14 16   performance of BAW resonators, try to make it work better

13:54:20 17   and better performance and with new structures and to

13:54:27 18   develop process to make those structures work with the

13:54:31 19   process we use.

13:54:34 20   Q.      Let's take a step back and see how you got into that

13:54:39 21   role.  Can you please give us an overview of your education?

13:54:44 22   A.      Yes.  I went to college in Seoul, Korea for the Seoul

13:54:51 23   National University.  I majored in physics education.  And

13:54:55 24   then I went to graduate school in physics department in

13:55:01 25   Seoul National University.  And I did a research and studied

Kim - direct

13:55:07 1    on connection master physics and it is about, my -- and got

13:55:14 2    a Ph.D. with that, and my Ph.D. was about ferroelectricity

13:55:23 3    and growing them and doing analysis to be target for

13:55:31 4    industry procedures, so that's my background.

13:55:35 5    Q.    And epitaxial thin films sometimes called single

13:55:40 6    crystal?

13:55:40 7    A.    That is correct.

13:55:41 8    Q.    What is condensed matter physics?

13:55:45 9    A.    Condensed matter physics is part of physics that, and

13:55:52 10   it studies and research on materials that condense or solid

13:56:00 11   material that is used in the semiconductor or other, used in

13:56:05 12   other industries.

13:56:06 13   Q.    Do you know what a bulk acoustic wave or BAW filter

13:56:13 14   is?

13:56:13 15   A.    Yes.

13:56:13 16   Q.    What is it?

13:56:14 17   A.    Bulk acoustic wave filter using bulk acoustic wafer

13:56:21 18   inside piezoelectric material and it forms a resonator that

13:56:27 19   utilizes electromagnetic -- no, sorry, electromechanical

13:56:34 20   coupling, and uses that to in lots of radio frequency

13:56:43 21   related occupations to filter out signals and just not --

13:56:49 22   outside the bandwidth that you want to pick up, but also

13:56:52 23   just pick up pass through, the let the signal pass through,

13:56:58 24   and it's a very widely used in communication devices, cell

13:57:03 25   phones and laptops and Wi-Fi routers and so on.

Kim - direct

13:57:08   1   Q.      How did you learn what a BAW filter is?

13:57:12   2   A.      So the basic concept is that are simple, so that is

13:57:23   3   cover in typical physics course in undergraduate and

13:57:28   4   electronics and -- sorry, electromagnetics and physics

13:57:36   5   course.  But for me since I started, continuing my research

13:57:40   6   in the graduate school on solid electrics, I knew and

13:57:46   7   understand as part of application, went one from

13:57:51   8   applications that uses piezoelectric material that is

13:57:56   9   ferroelectric, so I knew about principles and how it works.

13:58:01  10   Q.      Okay.  You said you received your Ph.D. from Seoul

13:58:06  11   National University.  When was that?

13:58:08  12   A.      That was 2003.

13:58:12  13   Q.      What did do you after receiving your Ph.D.?

13:58:15  14   A.      I stayed there for few months until I found a

13:58:21  15   position in Oakridge National Lab in Oakridge, Tennessee,

13:58:27  16   and moved to Oakridge National Lab as post-doctoral research

13:58:34  17   association.

13:58:34  18   Q.      What is Oakridge National Laboratory?

13:58:36  19   A.      It is one of several national laboratory in United

13:58:41  20   States.  And it is established as part of the Manhattan

13:58:50  21   project back in 1940's, and just a part of the whole -- part

13:58:57  22   of the laboratory is at Oakridge National Lab, and it's

13:59:04  23   mostly people doing research in physics and related fields

13:59:11  24   are doing research, and famous researchers all over the

13:59:16  25   world gather there and doing condensed matter research.

Kim - direct

13:59:27 1  Q.      What were your responsibilities as a post-doctoral

13:59:33 2  assistant at Oakridge National Lab?

13:59:37 3  A.      So there I did a research on ferroelectric insulins

13:59:47 4  and ferromagnetic insulins and especially for ferroelectric

13:59:51 5  insulins, that is piezoelectric, also I grew out

13:59:57 6  piezoelectric insulins and did analysis of many different

14:00:02 7  analysis, and find electrical property measured and analyzed

14:00:08 8  and then published papers and explained to other scientists

14:00:14 9  and, that was the job.

14:00:18 10  Q.      How long were you a post-doctoral research associate

14:00:22 11  at Oakridge?

14:00:23 12  A.      That is a little more than four years, four years and

14:00:30 13  seven months or something.

14:00:31 14  Q.      What did you do next?

14:00:33 15  A.      After that, I got an offer as an assistant professor

14:00:38 16  at Tulane University in New Orleans, Louisiana.

14:00:46 17  Q.      So that would have been 2008?

14:00:48 18  A.      Yes, that's about right.

14:00:51 19  Q.      And what department were you an assistant professor

14:00:56 20  at Tulane?

14:00:56 21  A.      In the Physics Department.

14:00:59 22  Q.      Did you teach any courses at Tulane?

14:01:01 23  A.      Yes, I teach several courses.  Called it '70's

14:01:08 24  Physics 101 to the undergraduate and electricity management

14:01:13 25  for a little upper class in the undergraduate and for

Kim - direct

14:01:17  1    graduate students, I taught condensed matter physics.

14:01:21  2    Q.      Did you perform research in addition to teaching?

14:01:24  3    A.      Yes, I did.  So I established a research laboratory

14:01:30  4    with three graduate students and two undergraduate students.

14:01:35  5    And I continued my research from Oakridge National Lab in

14:01:40  6    Tulane studying ferro, ferroelectric insulin, again, with

14:01:51  7    the associate piezoelectric group insulin and did a lot of

14:01:54  8    analysis and measured the chemical properties and published

14:02:00  9    papers on that.

14:02:01  10   Q.      How long did you teach in research at Tulane

14:02:05  11   University?

14:02:05  12   A.      That was four years.

14:02:07  13   Q.      So until 2012?

14:02:09  14   A.      Yes, that's correct.

14:02:11  15   Q.      What did you do next?

14:02:12  16   A.      After that I -- I mean, we as -- back then I had my

14:02:19  17   wife and I had two daughters.  We moved back to Korea and I

14:02:24  18   worked at Samsung Electromechanics, it's right below Seoul,

14:02:30  19   so I lived in Seoul and commuted to the company.

14:02:34  20   Q.      What were your primary responsibilities at Samsung

14:02:37  21   Electromechanics?

14:02:39  22   A.      In the beginning, there was a project on trying to

14:02:46  23   develop a piezoelectric sensors that are going to be in cell

14:02:52  24   phone.  But soon after, about a year or so, the company

14:02:59  25   decided to start developing BAW filters, and many people in

Kim - direct

14:03:07  1   the team was joined, like, everyone at work now this thing,

14:03:17  2   so BAW filters, so I continued developing BAW filters -- I

14:03:20  3   mean, I switched, switched to develop gone -- in developing

14:03:25  4   BAW filters.

14:03:26  5   Q.      Is Samsung Electromechanics sometimes referred to as

14:03:33  6   Semco for the initials of its name?

14:03:35  7   A.      Yes, that's what people use.

14:03:36  8   Q.      Okay, if I refer to it that way it's a little easier

14:03:40  9   to say.

14:03:40 10   A.      Yes.

14:03:40 11   Q.      What was your work in the BAW filter project at

14:03:47 12   Semco?

14:03:47 13   A.      So, I was also tasked to develop a device, I mean the

14:03:58 14   BAW resonators there, try to improve the coupling

14:04:06 15   coefficient, and quality factor.

14:04:12 16   Q.      What is a quality factor?

14:04:14 17   A.      A quality factor of resonator means how the resonator

14:04:22 18   continues to resonate without losing energy, so any device

14:04:28 19   that use resonators would require a high vector or accuracy

14:04:36 20   and low power sums and overall a high performance, so it's

14:04:45 21   important factor in BAW resonators.

14:04:48 22   Q.      And I have forgotten the precise term you used, the

14:04:53 23   coupling phrase you used?

14:04:55 24   A.      Coupling coefficient.

14:04:57 25   Q.      Yes.

Kim - direct

14:04:58  1    A.      That is in BAW resonators, it uses the coupling

14:05:05  2    between electrical energy and mechanical energy, and so it

14:05:09  3    provides -- so the system, the cell phone provides

14:05:15  4    electrical power to the BAW resonators and filters, and it

14:05:20  5    converts into mechanical energy, it makes it vibrate.  So --

14:05:28  6    and then if more energy goes into vibration, then more

14:05:32  7    energy come back from vibrating to electrical energy, then

14:05:36  8    it has a higher coupling coefficient.  That's very important

14:05:40  9    to have wide bandwidth in the BAW filters because that

14:05:46 10    translates into higher download speed for the product that

14:05:52 11    uses that BAW filter, so it's one of the key parameters to

14:05:57 12    improve on, in BAW resonators.

14:06:00 13    Q.      During the testimony that you haven't heard because

14:06:03 14    you haven't been present, but during trial we've heard about

14:06:10 15    BAW filters that are FBAR type and SMR type?

14:06:13 16    A.      Yes.

14:06:13 17    Q.      Was the BAW filter that you were helping develop at

14:06:18 18    Semco one of those two types?

14:06:20 19    A.      That is correct, it was FBAR type.

14:06:27 20    Q.      Was your Semco team successful in developing an FBAR

14:06:34 21    resonator with improved performance?

14:06:36 22    A.      Yes.  We were successful in developing good BAW

14:06:41 23    filter that works for cell phone device, that was used to

14:06:47 24    work for cell phone device.

14:06:49 25    Q.      How long did it take the Semco team to develop the

Kim - direct

14:06:54  1    FBAR resonator?

14:06:56  2    A.    It's, sorry, so about three years while I was there,

14:07:03  3    so we were able to make good filters, BAW filters.

14:07:11  4    Q.    Were you able to determine whether or not the FBAR

14:07:15  5    resonator that you were seeking to develop had improved

14:07:22  6    performance over what you were comparing it to?

14:07:27  7    A.    Comparing --

14:07:28  8    Q.    You mentioned that you were seeking to develop an

14:07:31  9    improved FBAR filter, or resonator with improved

14:07:35 10    performance?

14:07:36 11    A.    Yes.

14:07:36 12    Q.    How were you able to measure that?

14:07:38 13    A.    Oh, so it was the performance we had at the

14:07:46 14    beginning, and so after three years, the resonator

14:07:50 15    performance was much better than when we started.

14:07:59 16    Q.    At the time that you were -- when did you begin

14:08:03 17    working on the BAW filter project at Semco?

14:08:07 18    A.    That's around 2013.

14:08:11 19    Q.    Did you have any understanding whether any of

14:08:16 20    Samsung's or Semco's competitors were also looking into BAW

14:08:22 21    filter development at that time?

14:08:25 22    A.    Yes, there is -- yeah, I heard some development from

14:08:33 23    Skyworks going on around the same time.  And yes, that's --

14:08:40 24    and a few other companies were trying to develop BAW.

14:08:45 25    Q.    Do you know whether or not Skyworks was ever able to

Kim - direct

| | |
|---|---|
| 14:08:49 1 | develop a BAW filter for production? |
| 14:08:54 2 | A.    So, I heard that Skyworks started developing before I |
| 14:09:01 3 | leave Semco that was, sorry, 2017 I left Semco, but a year |
| 14:09:09 4 | before.  So from that, from then they started developing in |
| 14:09:14 5 | about three, four years I heard that they sell those in |
| 14:09:23 6 | smartphones. |
| 14:09:23 7 | Q.    When did you leave Samsung or excuse me, Semco? |
| 14:09:27 8 | A.    That was 2017. |
| 14:09:29 9 | Q.    Why did you leave Semco? |
| 14:09:32 10 | A.    I wanted to have more work life balance, and then at |
| 14:09:40 11 | that point -- more like we had three daughters, I mean, we |
| 14:09:45 12 | had one more, so I wanted to spend more time.  And so -- |
| 14:09:51 13 | which is hard in Korea, so was trying to move back to U.S., |
| 14:09:57 14 | and I found Akoustis, which that provided me that chance. |
| 14:10:04 15 | Q.    What was your title at Akoustis when you arrived -- |
| 14:10:08 16 | when did you arrive at Akoustis, do you recall? |
| 14:10:10 17 | A.    I arrived in February 2017. |
| 14:10:15 18 | Q.    And do you recall the title that you had when you |
| 14:10:18 19 | arrived? |
| 14:10:18 20 | A.    That was Senior Device Engineer. |
| 14:10:22 21 | Q.    Did you hold any other titles after you arrived? |
| 14:10:26 22 | A.    After that, I became Staff Device Engineer, and then |
| 14:10:31 23 | after a year or so, I became a manager as we hired more |
| 14:10:38 24 | device engineers, I became, or promoted to Manager of Device |
| 14:10:44 25 | Engineering.  Then after that, I promoted to Director of |

Kim - direct

14:10:50  1    Device Engineering.

14:10:50  2    Q.      And that's your current title, right?

14:10:52  3    A.      That is correct.

14:10:53  4    Q.      What were you assigned to do after starting work at

14:10:57  5    Akoustis?

14:10:58  6    A.      I was tasked to improve the performance of BAW

14:11:05  7    resonators.

14:11:05  8    Q.      To whom did you report?

14:11:12  9    A.      When I joined, I reported to Rama Vetury.

14:11:16 10    Q.      So you said that you were working on developing

14:11:23 11    resonators when you started.  Were you working on new

14:11:28 12    resonators, or ones that already existed?

14:11:31 13    A.      The ones that were already existing.  So when I

14:11:39 14    joined, we had a process we called cavity process, to

14:11:46 15    produce BAW resonators and BAW filters, so I was tasked to

14:11:53 16    improve the BAW resonator performance.  And to elevate yield

14:12:02 17    to -- using that process.

14:12:09 18    Q.      What did you understand needed to be improved

14:12:12 19    regarding the existing resonator design at Akoustis in 2017?

14:12:17 20    A.      So at that point, the coupling coefficient was good.

14:12:28 21    And quality factor was needed to improvement, but biggest

14:12:35 22    issue was yield that when you -- when we make these devices

14:12:43 23    or filters, on a six-inch wafer and there is like tens of

14:12:50 24    thousands of the devices and resonators, but only half of

14:12:57 25    them is working, and rest of it is not working because

Kim - direct

14:13:02 1  something is broken or not.  So I was tasked to improve

14:13:07 2  that, and that was the biggest issue.

14:13:11 3  Q.    So what did you do to address the improvement in

14:13:16 4  performance of the existing resonator design?

14:13:20 5  A.    So, I tried to understand the process in detail, and

14:13:30 6  looked into how that affect the resonator performance and

14:13:34 7  also about use yield issues and tried to fix using,

14:13:43 8  improving cavity process.  It was really hard to think of

14:13:49 9  solution in that way.

14:13:52 10        So I started to think about maybe we can do

14:13:57 11  something quite different, not -- start -- maybe I can come

14:14:05 12  up with a new idea or something quite different, new may

14:14:11 13  work better to take care of all the issues, so that what I

14:14:18 14  was doing.

14:14:18 15  Q.    What did you do along those lines?

14:14:20 16  A.    So I came up with a new process flow, so that's

14:14:28 17  called transfer process.  And it's to make a BAW resonator

14:14:35 18  and filters in a slightly different way.

14:14:39 19  Q.    How did you go about coming up with this new transfer

14:14:44 20  process?

14:14:46 21  A.    I'm sorry, you're asking --

14:14:50 22  Q.    Yeah, what were the tasks that you undertook to

14:14:53 23  develop this new transfer process?

14:14:56 24  A.    So, what I did is -- so, I came up with this idea,

14:15:02 25  and I -- so it was just an idea and then I started to put

Kim - direct

14:15:08  1    together the whole process in a way that I can explain to

14:15:14  2    other engineers, my colleagues there in Akoustis.  And I

14:15:22  3    explained the new process and explained that this will solve

14:15:27  4    these other issues.  And then it became more -- more details

14:15:34  5    were added, and it actually became quite complete and

14:15:42  6    comprehensive process.

14:15:45  7    Q.    Now, did you work on this process by yourself?

14:15:51  8    A.    Initially the idea and like the whole -- I mean, the

14:15:55  9    outline I worked myself.  But soon after I shared my idea,

14:16:03 10    different -- I mean, my colleagues started to add ideas to

14:16:10 11    develop this new process.

14:16:11 12    Q.    Were there any particular colleagues with whom you

14:16:15 13    worked particularly closely?

14:16:17 14    A.    Yes.  So conveniently, Rama Vetury, my manager back

14:16:23 15    then, and Mary Winters.  Then so, the head of the Fab, added

14:16:36 16    a lot of ideas, details and also Jeff Shealy, CEO, added --

14:16:45 17    helped out making it more comprehensive and detailed.  And a

14:16:49 18    lot of process engineers also helped out to provide the

14:16:57 19    detail and solutions to process, to this new process.

14:17:01 20    Q.    When you say new process, you mean part of the

14:17:07 21    manufacturing process?

14:17:08 22    A.    Yes.

14:17:11 23    Q.    Did Akoustis, this transfer process about which you

14:17:16 24    have been speaking for the last few minutes, did Akoustis

14:17:20 25    adopt this process for making its resonators and filters?

Kim - direct

14:17:23  1    A.    Yes.  Once -- so the process flow became very more

14:17:33  2    comprehensive, and then we started to actually do real

14:17:41  3    process, real wafers based on this new process.  And then we

14:17:45  4    started to get measured and then we measured a resonator,

14:17:52  5    BAW resonator performance and then filter performance and

14:17:58  6    yeah, it worked out well.

14:18:01  7    Q.    Let me introduce a new document before we go any

14:18:05  8    further.

14:18:26  9           MR. ELKINS:  May I approach?

14:18:27 10           THE COURT:  You may.

14:18:28 11           MR. ELKINS:  Thank you.

14:18:41 12    BY MR. ELKINS:

14:18:46 13    Q.    Dr. Kim, what I have handed to you was previously

14:18:53 14    marked as exhibit DTX-562, it appears to be a presentation

14:19:01 15    entitled ALN transfer process with sacrificial layer.  Do

14:19:09 16    you recognize this document?

14:19:10 17    A.    Yes, I do recognize this.

14:19:11 18    Q.    Can you describe what it is?

14:19:17 19    A.    Oh, yes.  This explains the transfer process step by

14:19:23 20    step from the beginning to make the resonator, BAW

14:19:30 21    resonators work.  And yes, it is like a later version with

14:19:41 22    some modification already added to it.

14:19:45 23    Q.    Okay.

14:19:45 24           MR. ELKINS:  Your Honor, we move what's been

14:19:47 25    marked as exhibit DTX-0562 into evidence.

14:19:52  1          THE COURT:  Marked without objection as 294.

14:19:59  2          (Trial Exhibit No. 294 was admitted into

14:20:00  3  evidence.)

14:20:00  4  BY MR. ELKINS:

14:20:01  5  Q.      Did you create this presentation, Dr. Kim?

14:20:04  6  A.      Yes, I did.

14:20:06  7  Q.      Okay.  And could you please turn to slide 2, which is

14:20:16  8  page 2, I believe.

14:20:17  9  A.      Yes.

14:20:17 10  Q.      If we could -- there we go.  What is shown here?

14:20:23 11  A.      So this slide shows the overall process flow on the

14:20:29 12  right.  And on the left side it shows the update that is

14:20:37 13  what's changed from the original slide that was created

14:20:44 14  before this one, that was in this new updated version.

14:20:52 15  Q.      There is a reference in the title to XB1, what does

14:20:56 16  that mean?

14:20:57 17  A.      XB1 is the name that we assigned to this process

14:21:01 18  flow.  It's -- so transfer process, so it's with the cross,

14:21:08 19  that's X came from and XB1 is B is a BAW, so one means the

14:21:16 20  first version of this process flow we've developed.  And

14:21:24 21  we're now working in XB2 and XB3 and so on.

14:21:30 22  Q.      So you said that X stands for transfer, B stands for

14:21:34 23  BAW.  We've heard testimony in this case about XBAW.  What

14:21:38 24  is the difference between XB1 and XBAW?

14:21:43 25  A.      Well XBAW also means transfer process, BAW resonator

Kim - direct

14:21:49  1    with a transfer process, but then XB1 is just the first

14:21:54  2    version of the XBAW process.

14:21:57  3    Q.    When did Akoustis make its first resonators using the

14:22:04  4    XB1 process?

14:22:06  5    A.    That was -- I don't remember exact date or even

14:22:13  6    month, but it was around early 2018 or late 2017.

14:22:22  7    Q.    Okay.  And when did you undertake the process, you

14:22:25  8    know, you were thinking about how to improve the resonators.

14:22:29  9    When did that start?

14:22:32 10    A.    So I mean, yeah, so I -- as soon as I joined the

14:22:38 11    company, I started working on that.  But then this idea

14:22:42 12    about you know, new process, transfer process came about

14:22:48 13    around summer of 2017.

14:22:52 14    Q.    So it took from summer of 2017 until the end of 2017

14:22:57 15    or beginning of 2018 to actually be able to produce

14:23:01 16    resonators using the XB1 process?

14:23:04 17    A.    That is correct.

14:23:05 18    Q.    Okay.  Does Akoustis currently use the XB1 process?

14:23:10 19    A.    Yes.

14:23:10 20    Q.    Are you aware of any other company that makes BAW

14:23:16 21    filters using the transfer process that you call XB1?

14:23:20 22    A.    No, I don't know any other companies doing that.

14:23:23 23    Q.    Okay.  We can take that document down.

14:23:27 24          I'm going to show you another document.

14:23:47 25          MR. ELKINS:  May I approach, Your Honor?

Kim - direct

14:23:49  1           THE COURT:  You may.

14:23:52  2  BY MR. ELKINS:

14:24:12  3  Q.      Dr. Kim, what I've handed you, and accidentally

14:24:17  4  handed to the Court, is a document that was marked as

14:24:21  5  PTX-0854, which I believe is already into evidence as Trial

14:24:29  6  Exhibit 239.

14:24:29  7           Do you recognize this document?

14:24:31  8  A.      Yes, I do recognize this.

14:24:34  9  Q.      Please tell us what it is?

14:24:36 10  A.      This is XB1 design rule manual, basically explains

14:24:43 11  how to draw, layout to make, to produce these XBAW

14:24:52 12  resonators and filters following on that -- using XB1

14:24:58 13  process.

14:24:59 14  Q.      The very top right of this document on the first

14:25:03 15  page, there is a box that says status and under it, it says

14:25:08 16  rev B, what does that mean?

14:25:09 17  A.      That means this is revision B, as in after revision

14:25:18 18  A, so there is update compared to revision A, so this is the

14:25:21 19  updated one and we -- so this documentation would be revised

14:25:29 20  to C and D and so on.

14:25:32 21  Q.      Is the XB1 transfer process based on any of Samsung's

14:25:38 22  processes?

14:25:39 23  A.      No, not at all.

14:25:41 24  Q.      Did you, in the work that you performed to create the

14:25:46 25  XB1 process, did you use any confidential information from

Kim - direct

14:25:51  1   any other company?

14:25:53  2   A.      No, not at all.

14:25:55  3   Q.      Now, you're aware that Qorvo alleges that Akoustis

14:25:59  4   had confidential information belonging to Qorvo?

14:26:02  5   A.      Yes, I am aware of it.

14:26:04  6   Q.      Did you personally see anything that you believed to

14:26:10  7   be confidential information from Qorvo when creating the XB1

14:26:17  8   process?

14:26:17  9   A.      No, I didn't see any.

14:26:19 10   Q.      At the time that you created the XB1 process, were

14:26:23 11   you aware of any Qorvo documents that Akoustis possessed?

14:26:28 12   A.      No, I wasn't aware of that.

14:26:33 13   Q.      At the time that you were creating the XB1 process,

14:26:39 14   did you see any documents at Akoustis that were labeled with

14:26:42 15   a Qorvo confidential and proprietary label?

14:26:45 16   A.      No, I didn't see any.

14:26:48 17   Q.      Have you ever been aware of any other employee at

14:26:51 18   Akoustis attempting to acquire confidential information

14:26:54 19   belonging to Qorvo?

14:26:55 20   A.      No, I didn't know that.

14:26:58 21   Q.      You can take that down.

14:27:21 22           MR. ELKINS:  May I approach, Your Honor?

14:27:23 23           THE COURT:  You may.

14:27:40 24   BY MR. ELKINS:

14:27:41 25   Q.      Dr. Kim, what I have handed you has been marked for

Kim - direct

14:27:45  1    identification as DTX-0988.  Do you recognize it?

14:27:52  2    A.    Yes, I do recognize it.

14:27:54  3    Q.    What is it?

14:27:56  4    A.    This is a granted patent for the XB1 process, or I

14:28:03  5    should say XBAW process.

14:28:06  6    Q.    And you're one of the inventors of that patent?

14:28:09  7    A.    Yes, I am.

14:28:10  8          MR. ELKINS:  Your Honor, we move to admit

14:28:12  9    exhibit DTX-0988 into evidence.

14:28:18 10          THE COURT:  All right.  It can be marked as

14:28:25 11    Exhibit 290.

14:28:26 12          (Trial Exhibit No. 290 was admitted into

14:28:29 13    evidence.)

14:28:29 14    BY MR. ELKINS:

14:28:29 15    Q.    To whom is this patent assigned, Dr. Kim?

14:28:33 16    A.    It is Akoustis, Incorporated.

14:28:36 17    Q.    And who are the other inventors identified in the

14:28:40 18    patent besides yourself?

14:28:42 19    A.    There is Mary Winters and Rama Vetury, and Jeff

14:28:52 20    Shealy.

14:28:53 21    Q.    And those were the people that you identified earlier

14:28:57 22    in terms of the ones who were of particular help in

14:29:03 23    developing the XB1 process with you?

14:29:05 24    A.    Yes, that is correct.

14:29:14 25    Q.    You can take that down.  Thank you.

Kim - direct

| | |
|---|---|
| 14:30:11 1 | MR. ELKINS:  May I approach, Your Honor? |
| 14:30:13 2 | THE COURT:  You may. |
| 14:30:28 3 | BY MR. ELKINS: |
| 14:30:35 4 | Q.    For efficiency sake, Dr. Kim, I have handed you three |
| 14:30:39 5 | documents that I'm going to question you about in quick |
| 14:30:42 6 | succession.  To save time, I've brought them all up. |
| 14:30:46 7 | Can you please turn your attention to the |
| 14:30:50 8 | document, the presentation that is marked as -- for |
| 14:30:55 9 | identification as DTX-0590, a presentation called activation |
| 14:31:02 10 | energy updates. |
| 14:31:04 11 | A.    Yes. |
| 14:31:06 12 | Q.    Do you recognize this document? |
| 14:31:07 13 | A.    Yes.  I do. |
| 14:31:12 14 | Q.    What is it? |
| 14:31:12 15 | A.    This is a slide and report showing the property of |
| 14:31:20 16 | reliability test of our BAW filters relating to how long it |
| 14:31:28 17 | will last to performing as with the performance. |
| 14:31:35 18 | Q.    Does the presentation also discuss a particular type |
| 14:31:39 19 | of software tool that you use? |
| 14:31:41 20 | A.    Yes. |
| 14:31:42 21 | Q.    What is that software tool? |
| 14:31:45 22 | A.    That is junk file, junk software. |
| 14:31:55 23 | Q.    Is that software that Akoustis developed on its own? |
| 14:31:59 24 | A.    No, we purchased it. |
| 14:32:01 25 | Q.    A third-party software? |

Kim - direct

14:32:04  1    A.      Yes.

14:32:05  2              MR. ELKINS:  Your Honor, we move to admit

14:32:07  3    exhibit DTX-0590 into evidence.

14:32:11  4              THE COURT:  Marked and received as 297.

14:32:16  5              (Trial Exhibit No. 297 was admitted into

14:32:16  6    evidence.)

14:32:16  7    BY MR. ELKINS:

14:32:17  8    Q.      Let's go the next document that I handed you,

14:32:20  9    Dr. Kim, it's an Akoustis corporate presentation dated

14:32:26 10    April 2017.  It is marked for identification as DTX-0591.

14:32:33 11    Do you recognize it?

14:32:33 12    A.      Yes.

14:32:33 13    Q.      What is it?

14:32:34 14    A.      It's a corporate presentation at that time and

14:32:41 15    showing the filter tool to create resonators in different

14:32:49 16    shapes.

14:32:51 17    Q.      And is this a software tool that's also a third-party

14:32:56 18    tool?

14:32:57 19    A.      No, this identified the software tool as yoga, and it

14:33:03 20    is developed by one of my -- one of our colleagues, you

14:33:09 21    know, by ourselves.

14:33:11 22              MR. ELKINS:  Your Honor, we move to admit what

14:33:13 23    was marked as DTX-0591 into evidence.

14:33:18 24              THE COURT:  Received as 297.

14:33:22 25              (Trial Exhibit No. 297 was admitted into

Kim - direct

14:33:23  1    evidence.)

14:33:23  2    BY MR. ELKINS:

14:33:24  3    Q.      And just for a brief second, Mr. Brown, if you have

14:33:29  4    that, do you have that?  This is DTX-0591.  And if we could

14:33:36  5    just go to page, the second slide, please.

14:33:42  6            And just focus in, Dr. Kim can you describe at a

14:33:47  7    very, very high level what we're seeing here?

14:33:52  8    A.      So this just shows the interface set up in the -- to

14:33:58  9    create the shapes identified on the right, labeled as

14:34:05 10    output, so you put some numbers and options on the tool and

14:34:11 11    you can see under resonator tool in the middle and click the

14:34:17 12    button, then it will create that shape.

14:34:21 13    Q.      Okay.  We can take that down.  Thank you.

14:34:24 14            And then the third document that I handed you is

14:34:28 15    marked JTX-0013 for identification.

14:34:34 16            Do you have that in front of you?

14:34:37 17    A.      Yes, I do.

14:34:38 18    Q.      What is it?

14:34:39 19    A.      This is what we call route and it's a detailed

14:34:47 20    process steps to create XBAW resonators and filters.

14:34:54 21    Q.      I'm sorry, the word that you used first, I had

14:34:58 22    trouble hearing you, did you say route?

14:35:00 23    A.      Yes.

14:35:00 24    Q.      R-O-U-T-E?

14:35:02 25    A.      That is correct.

Kim - direct

14:35:03  1    Q.      Okay.  And who uses this document that's marked

14:35:11  2    JTX-0013?

14:35:14  3    A.      Our process engineers.

14:35:18  4    Q.      And those are the process engineers at the New York

14:35:21  5    Fab?

14:35:22  6    A.      Yes, correct.

14:35:23  7            MR. ELKINS:  Your Honor, we move to admit

14:35:25  8    JTX-0013 into evidence.

14:35:28  9            THE COURT:  Marked and received as 298.

14:35:31 10            (Trial Exhibit No. 298 was admitted into

14:35:32 11    evidence.)

14:35:32 12    BY MR. ELKINS:

14:35:35 13    Q.      Okay.  I would like to take you back, Dr. Kim, to

14:35:44 14    what we were looking at a short time ago, which was Trial

14:35:53 15    Exhibit 239.  It's marked as PTX-0854, I believe you called

14:35:57 16    it the XB1 design rule manual?

14:36:01 17    A.      Yes.

14:36:02 18    Q.      And if we could go to page 3 of the PDF which is

14:36:11 19    entitled -- which is slide 2 of 2 -- 2 of 27.  Do you

14:36:18 20    recognize what is depicted here under the heading process

14:36:23 21    flow?

14:36:23 22    A.      Yes.

14:36:24 23    Q.      What does that show?

14:36:25 24    A.      It shows steps to -- steps of XB1 process, in the

14:36:36 25    cross-section drawing.

Kim - direct

14:36:38  1    Q.      Okay.  And if we could go to the next -- not the next

14:36:46  2    page, the page after that.  Page 4 of 27.  There you are.

14:36:50  3    If we could blow that up nice.

14:36:52  4             This appears to -- there is an 8.9 release and

14:36:58  5    final structure heading.  Can you explain what that means

14:37:02  6    and what the drawing is underneath of it?

14:37:04  7    A.      So this is a cross-section of a single BAW resonator

14:37:11  8    created with the XB1 process.  And in the middle part, you

14:37:18  9    can see like a white area, that's an air cavity, and then

14:37:24 10    right above it is the blue part is passivation and right

14:37:36 11    above it is brown colored layer is electrode, we call it

14:37:40 12    back side electrode, and then above it the blue layer is

14:37:46 13    piezoelectric layer, and then above it is another brown

14:37:52 14    layer that's another electrode we call front side electrode.

14:37:58 15    And then above it is front side passivation, that blue layer

14:38:05 16    right above that.  So those layers form BAW resonators, so

14:38:12 17    with the air cavity below, it resonates with the high

14:38:18 18    quality vector as the desired frequencies.

14:38:22 19    Q.      So just to ensure that we understand, the dark blue

14:38:27 20    band?

14:38:28 21    A.      Yes.

14:38:28 22    Q.      That's the piezoelectric layer?

14:38:30 23    A.      Yes.

14:38:32 24    Q.      And the light blue below it and above it, that's the

14:38:39 25    passivation layer?

Kim - direct

14:38:40  1    A.      That is correct.

14:38:43  2    Q.      So I am going to ask you to very brief -- I

14:38:49  3    understand that this is probably easy for you to understand,

14:38:53  4    but it's a little bit more difficult for history majors like

14:38:59  5    me and perhaps others who aren't -- don't have the same kind

14:39:03  6    of physics background that you do.  Could you at a very high

14:39:09  7    level simply explain what is the difference made by the XB1

14:39:17  8    transfer process?

14:39:19  9    A.      So, the XB1 process, a key is to allow the backside

14:39:29 10    structure, the bottom part of the lower part of the brown

14:39:36 11    layer, and the air cavity formation in the beginning of the

14:39:42 12    process, and then afterwards we transfer those core

14:39:51 13    structure to a carrier substrate, and this -- the green

14:39:56 14    layer at the bottom of this diagram is what the carrier

14:40:01 15    substrate that the structure is bonded to.  And then we move

14:40:11 16    -- we move the original substrate that we grow the

14:40:16 17    protectional layer over and then form the front side

14:40:19 18    structure on top.

14:40:21 19             So two things, the XB1 achieved critical -- is

14:40:31 20    that we achieved that piezoelectric layer straight flat and

14:40:40 21    continuous without any ups and downs that may degrade the

14:40:45 22    performance.

14:40:46 23             And then we also, this XB1 process allows very

14:40:52 24    precise control in the, forming the structures on the back

14:40:58 25    side depicted here, the backside electrode and the cavity,

Kim - direct

14:41:03 1    and also very precise control on the frontside electrode and

14:41:08 2    the frontside structures.  So that -- with that we achieved

14:41:12 3    high quality and good yield.

14:41:19 4    Q.    Mr. Brown, could we advance to page 25 of this

14:41:23 5    exhibit which is marked on the slide as page 24 of 27.  I

14:41:30 6    think it's the next page is where we want to go.  There we

14:41:39 7    go.

14:41:39 8              Dr. Kim, this page Trial Exhibit 239, PTX-0854,

14:41:52 9    the heading here says ten resonator shapes and under it is a

14:41:58 10   box with a bunch of shapes.

14:42:00 11   A.    Yes.

14:42:00 12   Q.    What is this page describing?

14:42:03 13   A.    These are the typical shapes of our BAW resonators

14:42:09 14   that some of it we use our BAW filters and some of it we use

14:42:14 15   just for R & D purposes.

14:42:16 16   Q.    What is a resonator shape?

14:42:17 17   A.    It's just how the resonator looks like when it's seen

14:42:23 18   right above it.  So different -- we try use different shapes

14:42:29 19   to optimize the performance of BAW resonators in a certain

14:42:35 20   way.

14:42:35 21   Q.    Did you design any of the resonator shapes shown

14:42:38 22   here?

14:42:38 23   A.    Yeah, I designed what's listed on the right column,

14:42:48 24   QA, QB, QC and QD.

14:42:52 25   Q.    Did other of your colleagues at Akoustis design the

Kim - direct

14:42:55  1  other resonator shapes that we're seeing on this particular

14:42:59  2  page?

14:42:59  3  A.    Yes.  The GCB shape on the top and GE shape on the

14:43:03  4  top and all the other GE with the numbers, those are

14:43:08  5  designed by my colleagues.  And the ones on the left are --

14:43:16  6  it's common shape that's either ellipse or rectangle or

14:43:25  7  round are simple shapes.

14:43:26  8  Q.    We can take that down.  Are you familiar with

14:43:31  9  something called scandium?

14:43:33  10  A.    Yes.

14:43:33  11  Q.    What is scandium?

14:43:35  12  A.    Scandium is one of the rare Earth elements, metal,

14:43:42  13  and it's used in an alloy with aluminum, because it has the

14:43:50  14  same ionic balance with aluminum metal.  So because of that

14:43:56  15  reason, scandium is added to other nitride to make BAW

14:44:02  16  filters perform better.

14:44:03  17  Q.    Does Akoustis use scandium?

14:44:06  18  A.    Yes, we use scandium.

14:44:08  19  Q.    In what way is it used?

14:44:10  20  A.    So, while we use -- we add -- sorry, we add scandium

14:44:18  21  in aluminum nitride so it becomes aluminum scandium nitride

14:44:25  22  and that's that dark blue layer in the center, in the middle

14:44:29  23  of the cross-section.  That, and that improves the

14:44:33  24  piezoelectric property of the material that is -- that leads

14:44:38  25  to bigger coupling coefficient and means wider bandwidth for

Kim - direct

14:44:45 1    the RF BAW filter.  And then again that means faster

14:44:49 2    download or upload speed for the product that it uses.  So

14:44:55 3    we use that, yes.

14:44:57 4    Q.    Is the use of scandium widely known in the industry?

14:45:02 5    A.    Yes, it is very widely known.

14:45:05 6    Q.    It's not something that Akoustis invented, correct?

14:45:11 7    A.    That is correct.  It was known by that time quite

14:45:17 8    widely.

14:45:18 9    Q.    Okay.  Now earlier you testified that the XB1 design

14:45:24 10   and process was intended to improve manufacturing yield?

14:45:28 11   A.    Yes.

14:45:29 12   Q.    And improve device performance.  What differences

14:45:33 13   have you seen as the Director of Device Engineering in yield

14:45:41 14   as between the XB1 products and the cavity products that

14:45:48 15   came before it?

14:45:49 16   A.    It's very big difference.  We had sometimes very low

14:45:55 17   yields with cavity process, below fifty percent.  But we are

14:46:01 18   getting consistently very high yields, above high

14:46:06 19   ninety percent yields with XB1 process.

14:46:09 20   Q.    Have you seen any improvements in the performance of

14:46:16 21   the device itself?

14:46:18 22   A.    Yes.  We do achieve a better -- I mean, the quantity

14:46:27 23   factor with the XB1 process because we can make the front

14:46:32 24   side and back side structures the way we want to, and very

14:46:36 25   accurately, so we achieve better performance in that way.

Kim - direct

14:46:40 1  Q.     Earlier I asked you -- earlier you testified that

14:46:46 2  epitaxial means single crystal.  And what is the difference

14:46:53 3  between epitaxial and polycrystalline?

14:46:58 4  A.     It's how the crystalline structure aligns in the same

14:47:03 5  filament.  Then I have to -- if I -- if I have to explain.

14:47:08 6  So you can think of aluminum nitride as a stack of eggs in

14:47:16 7  the big egg carton, so you can think of white eggs aluminum,

14:47:22 8  but then you, let's say you put the yellow eggs on top of

14:47:27 9  it, that's nitride.  So then aluminum nitride would be a

14:47:32 10  white yellow, white yellow, and you put a big stack like

14:47:36 11  that.  That's what we call grain of aluminum nitride, one

14:47:41 12  piece, very small crystal.  And if you imagine you can --

14:47:45 13  you have a whole floor of that stack, but then you can align

14:47:51 14  them, all those stacks perfectly aligned, like this

14:47:55 15  direction and that direction for the whole floor, that will

14:47:59 16  be aligned.  But in polycrystalline filling, what you have,

14:48:06 17  is you have the same stack of eggs, yellow and white the

14:48:11 18  same way and the whole floor, but each of the stack is

14:48:13 19  aligned, misaligned, so one stack is aligned like this way

14:48:17 20  and next to it, the one next to it is the skewed, and then

14:48:21 21  another one, like entitled so it kind of random, so that's

14:48:27 22  polycrystalline filling.

14:48:31 23  Q.     In connection with the use of an aluminum nitride or

14:48:36 24  aluminum scandium nitride thin film used for an epitaxial

14:48:42 25  layer, is there any difference between using single crystal

Kim - direct

14:48:46 1  or epitaxial versus using polycrystalline?

14:48:52 2  A.      Well, for the difference -- so before I go into the

14:48:57 3  difference.  So we're talking about same stack of eggs,

14:49:01 4  they're the same thing.  So piezoelectric property and the

14:49:06 5  poly factor is mostly the same or similar, very close, but

14:49:11 6  what we saw are the big difference is the how to achieve

14:49:20 7  propagates within the piezoelectric, that aluminum nitride

14:49:25 8  filling, so that leads to higher, a better high power

14:49:29 9  performance for -- especially from the more single

14:49:34 10 crystalline filling, because heat dissipates faster within a

14:49:41 11 filling, everything aligns, the heat goes out faster around.

14:49:45 12 So that's what we mainly see as a difference, I'm sorry.

14:49:52 13 Q.      Okay.  So I want to ask you, I want to change topics

14:49:57 14 right now, Dr. Kim, and ask you about trimming, about which

14:50:02 15 you haven't been around, but we've heard a lot about it in

14:50:06 16 this case.

14:50:06 17         As part of your work at Samsung and Akoustis,

14:50:10 18 have you gained any familiarity with trimming?

14:50:14 19 A.      Yes.  I am familiar with -- I was familiar with

14:50:23 20 trimming back in Semco.  There I was -- so device engineers

14:50:34 21 calculate each layer's thickness to make the product, so we

14:50:40 22 also provided how much to remove during the trim to get the

14:50:46 23 target frequencies.

14:50:49 24 Q.      Okay.  Can you explain -- I mean, what is the

14:50:53 25 relationship between the thickness of certain layers and

Kim - direct

14:51:00  1  frequencies of BAW filters?

14:51:02  2  A.    So like BAW filters is like layers, so you kind of

14:51:08  3  like -- you have different layers like stacked like this.

14:51:11  4  So then the thickness basically determines the frequency.

14:51:16  5  So you have more thickness, thicker stacks, the frequency

14:51:21  6  goes down, if the you have thin, frequency goes up.  So you

14:51:24  7  move like certain layers make it thinner, then the frequency

14:51:29  8  goes up, so that's the trim.

14:51:49  9  Q.    Did Akoustis develop a trimming process for use in

14:51:54 10  processing its XB1 filters or resonators?

14:52:05 11  A.    Yes, we developed a trim process, yes.

14:52:09 12  Q.    Okay.  And what, if anything, did you do in that

14:52:19 13  process?

14:52:22 14  A.    So first I explained about what -- how trim works and

14:52:30 15  why we need trim, and then put together the process steps

14:52:35 16  that we need to complete the trim.  So there is -- so trim

14:52:42 17  we do -- I mean, so we learn trim a few times, not just one

14:52:51 18  different, but few trim cycles to get exact target.

14:52:56 19        So it's like you start when you like make

14:53:02 20  something with wood or you know, carpentry to make some

14:53:06 21  furniture or something, you cut it a little bigger and then

14:53:10 22  sand it down to make exact fit, but you do it like few

14:53:14 23  different times and then check it and then do another time

14:53:18 24  and check it, so we also do few trims to get the exact

14:53:24 25  frequencies right.  So then that sequence, what to do

Kim - direct

14:53:28  1    exactly one after another is like, yeah, I worked together

14:53:32  2    with to develop that.

14:53:47  3                    MR. ELKINS:  May I approach the witness, Your

14:53:49  4    Honor?

14:53:49  5                    THE COURT:  You may.

14:54:05  6    BY MR. ELKINS:

14:54:13  7    Q.      Dr. Kim, I've handed you two exhibits.  Let's look at

14:54:17  8    the first one I've handed you, it's marked as PTX-0452.

14:54:22  9    It's been admitted into evidence in this case as Trial

14:54:26 10    Exhibit 123.

14:54:27 11                    Do you recognize this e-mail?

14:54:30 12    A.      Yes, I do.

14:54:33 13    Q.      What is it?

14:54:34 14    A.      So this is on top an e-mail from J.B., J.B. Kwon, but

14:54:45 15    we just called him J.B., saying -- so sharing his -- his

14:54:54 16    idea on the trim, that as he says, how Qorvo gets trim

14:55:01 17    sensitivity data.

14:55:03 18    Q.      And this e-mail appears to be dated in July, or the

14:55:09 19    end of July of 2017.  Where were you in developing the XB1

14:55:13 20    process at this point?

14:55:15 21    A.      So this is -- so after I came up with the XB1 idea

14:55:26 22    about how to make those resonators, BAW resonators.

14:55:35 23    Q.      Okay.  Did you know from the information in the

14:55:41 24    e-mail whether -- what Mr. Kwon, or Dr. Kwon was sending you

14:55:45 25    was confidential information?

Kim - direct

| | |
|---|---|
| 14:55:47 1 | A.      No, I didn't know it was confidential. |
| 14:55:50 2 | Q.      Let's take a look at the attachment to that e-mail, |
| 14:55:56 3 | which was marked as PTX-453, and is Trial Exhibit 12. |
| 14:56:11 4 |         Do you recognize this document as what was |
| 14:56:15 5 | attached to Dr. Kwon's e-mail? |
| 14:56:18 6 | A.      Yes. |
| 14:56:18 7 | Q.      And can you -- let's move to the next page, page 2. |
| 14:56:24 8 | Can you briefly describe what is shown on this page? |
| 14:56:27 9 | A.      This shows the steps to calculate sensitivity, trim |
| 14:56:35 10 | sensitivity for silicone nitride trims. |

14:56:43 11

14:56:52 12

14:57:00 13

14:57:08 14

14:57:13 15

| | |
|---|---|
| 14:57:19 16 | Q.      Okay.  When you saw this document that Dr. Kwon sent |
| 14:57:23 17 | you, did you -- were you aware of whether this was |
| 14:57:29 18 | confidential information belonging to Qorvo? |
| 14:57:31 19 | A.      I didn't -- I was not aware of that. |
| 14:57:35 20 | Q.      Okay.  Well, doesn't this document appear to |
| 14:57:41 21 | communicate information that would be unknown to other |
| 14:57:46 22 | people? |
| 14:57:47 23 | A.      No, I saw it, I think it was -- I should say, I |
| 14:57:54 24 | thought it was obvious |

14:58:04 25

Kim - direct

14:58:12  1  ███████████████████████████████████████

14:58:19  2  ████████████  so I didn't think it was a significant to work

14:58:27  3  out simple thing.

14:58:28  4  Q.      Okay.  What does it mean to probe a device?

14:58:32  5  A.      That means doing RF measurement or electrical

14:58:39  6  measurement.

14:58:40  7  Q.      And couldn't you have used this flow here that is

14:58:48  8  shown on page 2 of Trial Exhibit 12, and simply copied that

14:58:55  9  process to use for the XBAW process at Akoustis?

14:58:59 10  A.      No, I could not use this for XBAW process because

14:59:06 11  XBAW process is a FBAR process, which needs air cavity below

14:59:13 12  the resonator, the white, the white area in the diagram.  So

14:59:18 13  to get, to do electrical measurement for FBAR, you need that

14:59:24 14  area cleared out with the air, but we start the process with

14:59:29 15  some material filled in and we remove that material in that

14:59:37 16  cavity, in that area that's going to be air cavity as the

14:59:42 17  final step, then we do the trim.

14:59:45 18          So we can only do the one -- we can only probe

14:59:52 19  or do electrical measurement after silicone nitride

14:59:57 20  deposition which would be the -- which will be given to the

15:00:02 21  right one on the top right corner here.  So we don't have

15:00:06 22  that -- we cannot probe the first one, so this whole routine

15:00:15 23  idea doesn't work for FBAR or for sure our XB1 process.

15:00:20 24          And also, I skipped on the -- what is in the red

15:00:27 25  rectangle is the how to get very accurate silicone nitride

Kim - direct

15:00:35  1    thickness over the wafer, but we had -- we used optical tool

15:00:41  2    to measure silicone nitride thickness, and it was not

15:00:46  3    necessary to do anything like this for us, █████████

15:00:50  4    ██████████████████████████████ in the gray box here,

15:01:01  5    depicted in the gray box here, so we didn't have the proper

15:01:06  6    tool to do that.  So this thing wasn't for us.  We couldn't

15:01:14  7    -- not that we couldn't do it, this in principle or in

15:01:18  8    theory, this doesn't fit with FBAR process.

15:01:22  9    Q.      So would information about Qorvo's SMR trimming

15:01:27 10    process have been helpful to Akoustis in developing its FBAR

15:01:31 11    trimming process?

15:01:31 12    A.      Not at all.

15:01:33 13    Q.      I understand you prepared a demonstrative to help the

15:01:39 14    jury in your explanation of the differences between

15:01:42 15    Akoustis's trimming process and Qorvo's trimming process?

15:01:45 16    A.      I did, yes.

15:01:47 17    Q.      May we please have DDX-1.  Let's go to the next

15:01:58 18    slide.  This looks familiar.  You have just explained what's

15:02:01 19    going on here.  So let's move to DDX-2.

15:02:08 20            First, Dr. Kim, what are we looking at?

15:02:20 21    A.      This is the whole flow of our trim process, and it

15:02:25 22    start, the trim process start after release, so the XB1

15:02:31 23    process, and then the processing will finish after release

15:02:37 24    point and then we start trim process.  So then it shows

15:02:47 25    ████████████████████████████████████████████████████

Kim - direct

15:02:52  1  ███████████████████████████████████████████

15:02:57  2  ███████████████████████████████████████████

15:03:00  3  ████████████████████

15:03:02  4  **And then with that information,** ████████

15:03:04  5  ██████████████████████████████████████████

15:03:12  6  ██████████████████████████████████████████████

15:03:15  7  ██████████████████████████████████████████████

15:03:23  8  █████████████████████████████████████████████

15:03:27  9  ████████████████████████████████████████████

15:03:30 10  ███████████████████████████████████████ **.**

15:03:35 11  ██████████████████████████████████████

15:03:41 12  █████████████████████████████████████████████

15:03:44 13  █████████████████████████████████████████████

15:03:54 14  ████

15:03:55 15  Q.     **Okay.  And the reason you use** ████████████ **, is**

15:03:58 16  **that because the method of manufacturing an FBAR device does**

15:04:04 17  **not allow for probing the device before the silicone nitride**

15:04:11 18  **passivation layer is added?**

15:04:13 19  A.     **Yes, that is correct.**

15:04:16 20  Q.     **Does Akoustis's trimming process as depicted in**

15:04:21 21  **DDX-1.02 include information adopted from Qorvo's flow**

15:04:26 22  **diagram that we looked at?**

15:04:28 23  A.     **No, it is not.**

15:04:30 24  Q.     **Can we move to DDX-1.03?**

15:04:34 25          **So this is a side-by-side comparison of the last**

Kim - direct

15:04:39  1    two slides.  Can you -- can you tell us what's -- what the

15:04:46  2    similarities are, what the differences are between the two?

15:04:53  3    A.      Sorry, can you repeat the question?

15:04:55  4    Q.      Sure.  Sure.

15:04:57  5            So this is a side-by-side comparison of the

15:05:00  6    Akoustis trimming process on the right and the Qorvo process

15:05:05  7    on the left?

15:05:06  8    A.      Yes, that is correct.

15:05:08  9    Q.      Okay.  Can you give us a few examples of what's

15:05:13  10    different between them?

15:05:14  11    A.      So, the main difference is in Qorvo's flow, █████

15:05:21  12    ████████████████████████████████████████████████████████

15:05:26  13    ████████████████████████████████████████████████████████

15:05:29  14    █████████████

15:05:30  15            But in our process, we cannot do that, not that

15:05:36  16    we, you know, because of the difference between FBAR and

15:05:41  17    SMR, we only have one measurement, so then we -- so we ███

15:05:49  18    ████████████████████████████████████████████████████████

15:05:53  19    ████████████████████████████████, and then do the trim for

15:06:00  20    that wafer.  And then we can calculate sensitivity ████

15:06:06  21    █████████████████████████████████████████████

15:06:12  22            So then we feed █████████████████████████████████

15:06:18  23    ██████████████████████████████  So it's showing the

15:06:22  24    difference between these two trim steps and flow.

15:06:29  25    Q.      Okay.  Let's go to the next slide, please.

15:06:37  1        What are we looking at here in slide DDX-1.04?

15:06:45  2   A.     So this is the formula that calculate sensitivity

15:06:52  3   from the Qorvo, I believe this is copied from the previous

15:06:57  4   slide, so this formula just blown up.  And then the bottom,

15:07:04  5   the formula that we use at Akoustis to calculate the

15:07:11  6   sensitivity.

15:07:12  7   Q.     There was testimony earlier in this-- early in this

15:07:18  8   trial that Qorvo's trim sensitivity algorithm which is on

15:07:23  9   the top took a very long time to develop.  Does that seem

15:07:27 10   right to you?

15:07:30 11   A.     I mean, but it's quite simple flow, so not sure about

15:07:41 12   that.

15:07:42 13   Q.     Okay.  And how long did it take -- are you the one

15:07:46 14   who developed the Akoustis trim sensitivity formula on the

15:07:50 15   bottom?

15:07:51 16   A.     Yes, I worked out this formula ██████████████████████

15:07:55 17   ██████████████████████████████████████████████████████████

15:08:01 18   ██████████████████████████████████████████████████████████

15:08:08 19   ██████████████████████████████████████████████████

15:08:14 20   ███████████████████████████████████████████████████████

15:08:19 21   ████████████████████████████     So I need -- so if you would

15:08:23 22   notice ███████████████████████████████████████████

15:08:28 23   ████████████████████████████████████████████████

15:08:33 24   ████████████████████████████████████████████████.  And

15:08:39 25   this is easier to just to calculate on our part ███████████

Kim - cross

15:08:48  1      ████████████████████████████████████████  so

15:08:52  2   that's how it's decided.

15:08:55  3   Q.     Did you use any part of the presentation that

15:09:02  4   Dr. Kwon sent you?  And if we could maybe back up to the

15:09:11  5   slide, Mr. Brown, with the Qorvo presentation.  Maybe we can

15:09:16  6   use the next one.

15:09:19  7           Did you use any part of this including the

15:09:21  8   algorithm shown in the larger light green box on the bottom

15:09:25  9   in determining the sensitivity algorithm for Akoustis?

15:09:34 10   A.     No.  I didn't use information in here, but at that

15:09:39 11   time I was aware of how trim works, and how the sensitivity

15:09:44 12   can be calculated from same idea from Semco.

15:09:52 13   Q.     Okay.  And so in the end, is Qorvo's trimming

15:09:58 14   information applicable to Akoustis's XB1 process at all?

15:10:02 15   A.     No, it is not applicable.

15:10:06 16           MR. ELKINS:  Those are all the questions I have.

15:10:08 17   I pass the witness.

15:10:10 18           THE COURT:  Cross-examination.

15:10:20 19                CROSS-EXAMINATION

15:10:23 20   BY MR. MASTERS:

15:10:38 21   Q.     Good afternoon, Dr. Kim.

15:10:39 22   A.     Good afternoon.

15:10:41 23   Q.     I have a few questions for you.

15:10:46 24           So the first time you came across BAW filters

15:10:50 25   was when you were working for Semco?

Kim - cross

15:10:52  1    A.      That's correct.

15:10:54  2    Q.      And in Korea you were joined with a team to develop

15:10:59  3    BAW filters; correct?

15:10:59  4    A.      Yes, that is correct.

15:11:00  5    Q.      And it wasn't Samsung's first try to develop BAW

15:11:05  6    filters; correct?

15:11:06  7    A.      You mean Samsung -- so yes, there is a few different

15:11:11  8    companies in Samsung, so they were part of-- parts of

15:11:16  9    Samsung.

15:11:16 10    Q.      Samsung Electronics and Semco are closely related

15:11:21 11    companies, correct, they're under the Samsung umbrella,

15:11:25 12    correct?

15:11:25 13    A.      That is correct.

15:11:26 14    Q.      And in early 2000's, 2003, 2005, Samsung tried to

15:11:31 15    develop a BAW filter but they gave up on that research,

15:11:35 16    correct?

15:11:35 17    A.      That's what I heard.

15:11:36 18    Q.      Okay.  And then your team, or you were joined with

15:11:40 19    another team with Semco in 2013 to about 2017; is that

15:11:46 20    right?

15:11:46 21    A.      Yes, that's -- yes, from 2013.

15:11:50 22    Q.      Summer of 2013, right?

15:11:52 23    A.      Yes.

15:11:53 24    Q.      And you had other jobs at the time, too, you were

15:11:56 25    working on other projects until about the summer of 2014;

Kim - cross

15:12:00  1  right?

15:12:02  2  A.      I do not recall the exact dates, but something, yeah,

15:12:08  3  around that time.

15:12:09  4  Q.      So you and your -- but you and the team at Semco were

15:12:14  5  trying to develop a BAW filter in Korea?

15:12:18  6  A.      Yes.

15:12:18  7  Q.      And you were working on ways to improve the

15:12:26  8  performance of FBAR resonators, right?

15:12:29  9  A.      Yes.

15:12:31 10  Q.      And the resonator that you were working on never went

15:12:35 11  to commercial product; correct?

15:12:37 12  A.      That is correct.  But the performance was really

15:12:41 13  good.  It just that the measurements weren't to sell to the

15:12:49 14  Samsung Electronics, going in their flagship smartphone,

15:12:57 15  competing with the best resonator at that time, I mean, now

15:13:02 16  same in a way, that produced by Avago, now is Broadcom.  So

15:13:09 17  the resonators, the filters were quite good, enough to sell

15:13:14 18  in some other market but they weren't the fastest, so it was

15:13:20 19  not.

15:13:20 20  Q.      But Semco never ended up commercializing the BAW

15:13:25 21  filter you were working on, correct?

15:13:26 22  A.      That's correct.

15:13:28 23  Q.      Would Samsung make its technology development process

15:13:33 24  publicly available?

15:13:35 25  A.      I'm not sure what you mean.

Kim - cross

15:13:38  1    Q.    Well, would Semco publish technical designs of the

15:13:44  2    BAW filter that you were working on?

15:13:46  3    A.    So, we had some publications and some patent that

15:13:55  4    were published.

15:13:56  5    Q.    Did you have any trade secrets back in Semco on your

15:14:00  6    filter designs?

15:14:01  7    A.    Can you specify, specify which part of the design, or

15:14:05  8    which part.

15:14:06  9    Q.    Any part of the BAW filter that you were working on

15:14:10 10    at Semco?

15:14:11 11    A.    So the Sem -- the BAW filter in Semco had a trade

15:14:18 12    secret from other companies.

15:14:19 13    Q.    Not of other companies, of its own that you developed

15:14:22 14    while there?

15:14:22 15    A.    Yes, some of it is -- would be considered as trade

15:14:26 16    secret, I think.

15:14:27 17    Q.    And was Semco willing to publish those trade secrets

15:14:31 18    to others?

15:14:33 19    A.    No.

15:14:34 20    Q.    Okay.  Now, I believe you joined Akoustis in about

15:14:39 21    February of 2017; correct?

15:14:42 22    A.    February, yes, that would be correct.

15:14:46 23    Q.    And you had first reported to Rama Vetury?

15:14:50 24    A.    Yes, that is correct.

15:14:52 25    Q.    And then you later reported to Rohan Houlden, is that

Kim - cross

15:14:57  1    correct?

15:14:57  2    A.    Yes, that is correct.

15:14:59  3    Q.    And he was the Vice-President of Device Engineering?

15:15:04  4    A.    Rohan, you mean?

15:15:05  5    Q.    Yes.

15:15:06  6    A.    No, I think he was -- his title was different, it's

15:15:10  7    more like product.

15:15:11  8    Q.    Chief Product Officer?

15:15:12  9    A.    Chief Product Officer, yes.

15:15:14 10    Q.    I'm sorry, I missed you.

15:15:15 11    A.    Chief Product Officer.

15:15:17 12    Q.    Thank you.

15:15:17 13    A.    Something like that, I don't exactly remember the

15:15:21 14    whole title.

15:15:21 15    Q.    And when you joined Akoustis, they already had an

15:15:26 16    existing resonator design, isn't that correct?

15:15:29 17    A.    That is correct.

15:15:31 18    Q.    And they had what they referred to as a cavity

15:15:35 19    process?

15:15:38 20    A.    Yes.

15:15:39 21    Q.    And that was already in place when you joined,

15:15:41 22    correct?

15:15:42 23    A.    That's the process we did, yes.

15:15:47 24    Q.    And did you work with others in the I guess, device

15:15:52 25    engineering group, like Rama Vetury, Dave Hodge, Annia Shen?

Kim - cross

15:15:57  1    A.    Yes.

15:15:57  2    Q.    They all worked with you?

15:16:00  3    A.    Yes, they did work with me, yes.

15:16:04  4    Q.    When your counsel was asking you questions, they put

15:16:29  5    before you DTX-590 which is marked as Trial Exhibit 296.  Do

15:16:36  6    you have that?

15:16:39  7    A.    Yes, I have it.

15:16:41  8    Q.    Mr. Faison, could we project TX-296, please.

15:16:55  9          Do you have that document?

15:17:14 10    A.    Yes.

15:17:15 11    Q.    I believe you testified this was a document

15:17:23 12    protesting the reliability of products?

15:17:25 13    A.    Yes.

15:17:26 14    Q.    And at Akoustis, is it correct that Joel Morgan is

15:17:29 15    the Vice President of Quality?

15:17:32 16    A.    At that time.

15:17:34 17    Q.    And he was responsible for developing reliability

15:17:38 18    tests of the products, correct?

15:17:41 19    A.    Yes, he was.

15:17:43 20    Q.    And he developed the test to determine the amount of

15:17:46 21    time before a product would fail; correct?

15:17:50 22    A.    That's my understanding.

15:17:52 23    Q.    If we turn to page 2 of this document, it's dated

15:17:59 24    summary of June 13, 2018; is that correct?

15:18:03 25    A.    Yes, that is.

15:18:04 1    Q.    So your testimony is that as of June 13th, 2018,

15:18:11 2    Trial Exhibit 296 was the reliability testing document for

15:18:16 3    Akoustis?

15:18:20 4    A.    I don't understand the question.

15:18:22 5    Q.    Pardon me?

15:18:23 6    A.    I'm sorry, what was the question?

15:18:26 7    Q.    Yes.  That as of June -- June 13th, 2018, Trial

15:18:32 8    Exhibit 296 was Akoustis's reliability testing document for

15:18:38 9    BAW filters?

15:18:40 10   A.    Yes, that's what it seems like, but now I cannot

15:18:44 11   confirm that.  It's not my field.

15:18:48 12   Q.    Not your field.  Okay.

15:18:50 13              MR. MASTERS:  Your Honor, may I approach?

15:19:22 14              THE COURT:  You may.

15:19:23 15              MR. MASTERS:  Thank you.

15:19:33 16   BY MR. MASTERS:

15:19:41 17   Q.    Mr. Kim, I've given you a document, Akoustis document

15:19:51 18   entitled Tech Committee Meeting, August 23, 2018.  Do you

15:19:56 19   see that?

15:19:56 20   A.    Yes.

15:19:57 21   Q.    Were you involved in technical meetings at Akoustis

15:20:00 22   from time to time?

15:20:01 23   A.    Yes, for the device engineering, device development

15:20:07 24   topic.

15:20:08 25   Q.    And is testing part of device development?

Kim - cross

15:20:12  1    A.      No, it's on the reliability.

15:20:18  2    Q.      So reliability is part that you get involved in from

15:20:23  3    time to time in trying to come up with a better device

15:20:27  4    design?

15:20:27  5    A.      Yes, that is correct.

15:20:28  6            MR. MASTERS:  Your Honor, I would offer the

15:20:30  7    Akoustis Technology Committee Meeting document of August 23,

15:20:36  8    2018.

15:20:36  9            THE COURT:  Marked and received as 299.  299.

15:20:41 10            (Trial Exhibit No. 299 was admitted into

15:20:42 11    evidence.)

15:20:42 12    BY MR. MASTERS:

15:20:42 13    Q.      Mr. Faison, could we please project Exhibit 299,

15:20:47 14    please?

15:20:48 15            Dr. Kim, do you have this document?

15:21:14 16    A.      Yes.

15:21:15 17    Q.      And do you see just for the jury, it's dated

15:21:20 18    August 23, 2018?

15:21:21 19    A.      Yes.

15:21:22 20    Q.      All right.  And the last document we looked at which

15:21:25 21    was Trial Exhibit 296, that was dated June of 2018; correct?

15:21:34 22    A.      Yes.

15:21:35 23    Q.      So this is about two months later in time?

15:21:38 24    A.      Yes.

15:21:39 25    Q.      I'm sorry, Trial Exhibit 299 is dated about two

Kim - cross

15:21:43  1    months later than Trial Exhibit 296; correct?

15:21:48  2    A.    Yes.

15:21:49  3    Q.    Okay.  If we go to the next page.  Page 3.  There

15:22:00  4    we're talking about MTTF meantime to failure, correct?

15:22:06  5    A.    Yes, I believe so.

15:22:08  6    Q.    And it's talking about how to use temperature and RF

15:22:12  7    power acceleration for testing products; correct?

15:22:17  8    A.    That is what is said, but -- so this is not part of

15:22:22  9    my role, so -- yeah, what I'm saying.

15:22:29 10    Q.    Well, you presented Trial Exhibit 296 on testing and

15:22:33 11    reliability as Akoustis's witness.  So I understood you

15:22:38 12    understand how to test devices and what Akoustis does; is

15:22:44 13    that correct?

15:22:44 14    A.    Yes, but -- yes, to some level.

15:22:49 15    Q.    Okay.  Well, let's look at, then, the next page.

15:23:00 16    Keep going.  One more.

15:23:05 17          And here in Section 1.1.1, MTTF, path to

15:23:11 18    activation energy, EA, do you see that?

15:23:14 19    A.    Yes.

15:23:16 20    Q.    And this is within the Akoustis technology committee

15:23:22 21    meeting document, correct?

15:23:22 22    A.    That is correct.

15:23:23 23    Q.    And Mr. Faison, could we do a side-by-side comparison

15:23:28 24    then with TX-14, page 22?

15:23:38 25          So on the left you have TX-14, page 22 shows RF

Kim - cross

15:23:49  1    **power testing** ███████████████████████████████████

15:23:55  2    ████████████████████████████████ **correct?**

15:24:00  3    A.      **Yes.**

15:24:00  4    Q.      **And it's plotted on a graph with power at the bottom,**

15:24:06  5    **correct?**

15:24:06  6    A.      **Yes.**

15:24:07  7    Q.      **And the time to failure on the Y axis?**

15:24:11  8    A.      **Yes.**

15:24:12  9    Q.      **And then on the right-hand side of our screen that's**

15:24:16 10    **being projected is the Akoustis test plan; correct?**

15:24:20 11    A.      **Yes.**

15:24:20 12    Q.      **With also the same temperatures** █████████████

15:24:25 13    ████████████████████████████ **, correct?**

15:24:32 14    A.      **Yes.  But then that's common knowledge.  So it's, I**

15:24:45 15    **think it's common context.**

15:24:48 16    Q.      **Can we do a side-by-side with page 23 of Trial**

15:24:55 17    **Exhibit 14 and Trial Exhibit 299?**

15:24:59 18            **And now if we look at the top, we see the exact**

15:25:07 19    **same power levels** ██████████████████████████████ **;**

15:25:17 20    **correct?  And if we look back to the Trial Exhibit 299, we**

15:25:26 21    **have the same power levels and the same temperatures to**

15:25:30 22    **conduct the reliability test, isn't that correct?**

15:25:34 23    A.      **Yes, that is correct.**

15:25:36 24    Q.      **Thank you.**

15:25:37 25            **So in your direct testimony, your counsel showed**

Kim - cross

15:26:12  1    you a patent that you had; is that correct?

15:26:14  2    A.      Yes.

15:26:14  3    Q.      Could we project DX-988, which is Trial Exhibit 295,

15:26:26  4    please.  Could we go to the cover page first.  And right

15:26:36  5    here.

15:26:51  6            And then if we look here, Dr. Kim, in

15:27:01  7    Section 63, it refers to this application being filed on

15:27:04  8    March 11, 2016; correct?

15:27:07  9    A.      Yes, it is.

15:27:08  10   Q.      Yes.  That was nine months -- eleven months before

15:27:12  11   you have joined Akoustis; correct?

15:27:14  12   A.      Yes.

15:27:14  13   Q.      Okay.

15:27:16  14           MR. ELKINS:  Objection.  Misstates the document

15:27:18  15   on its face.

15:27:21  16           THE COURT:  Let's take a look at it.

15:27:24  17           THE WITNESS:  So --

15:27:26  18           THE COURT:  Excuse me, just bring it up.

15:33:44  19           (Side-bar discussion.)

15:33:44  20           THE COURT:  You're just looking for the date.

15:33:44  21           MR. MASTERS:  Right here, next --

15:33:44  22           THE COURT:  It's March 11, 2016.

15:33:44  23           MR. MASTERS:  That's what I said.

15:33:44  24           THE COURT:  You did.

15:33:44  25           MR. ELKINS:  But that's not the date it was

Kim - cross

15:33:44 1    filed.  The application was filed on October.

15:33:44 2            THE COURT:  It's a continuation in part.

15:33:45 3            MR. ELKINS:  That's not the same application.

15:33:45 4    This application was filed October 16, 2017.

15:33:45 5            THE COURT:  Let me take a look.

15:33:45 6            MR. ELKINS:  It's --

15:33:45 7            THE COURT:  Hold on.  Just a second.  Okay.  Go

15:33:45 8    ahead.

15:33:45 9            MR. ELKINS:  It's claiming priority to a --

15:33:45 10   partial priority to an earlier application.

15:33:45 11           THE COURT:  Sure, I understand.

15:33:45 12           MR. ELKINS:  But this particular application for

15:33:45 13   this patent was filed on October 16, 2016.

15:33:45 14           THE COURT:  I'm concerned that we're going to

15:33:45 15   have some confusion about the fact that you didn't introduce

15:33:45 16   the patent.  This has come up before.  What are you going to

15:33:45 17   use this for to argue?

15:33:45 18           MR. ELKINS:  The point I made.

15:33:45 19           THE COURT:  This patent is not relevant to

15:33:45 20   anything as it relates to the existing patent, right?

15:33:45 21           MR. ELKINS:  It's completely relevant.

15:33:45 22           THE COURT:  I agree.

15:33:45 23           MR. MASTERS:  What is relevant?

15:33:45 24           MR. ELKINS:  It's relevant to the fact that the

15:33:45 25   XBAW process was a significant event, it created new

Kim - cross

15:33:45  1    technology.

15:33:45  2                THE COURT:  That doesn't tell us that.

15:33:45  3                MR. ELKINS:  Excuse me?

15:33:45  4                THE COURT:  That doesn't tell us that.

15:33:45  5                MR. ELKINS:  The fact that they awarded a

15:33:45  6    patent.  The fact that they awarded a patent shows that

15:33:45  7    there was validity, correct?

15:33:45  8                THE COURT:  I think there may have been a

15:33:45  9    mishearing here.  I think that you're allowed to make an

15:33:45 10    inquiry, and that's fine, I understand what you're saying.

15:33:45 11    This is a different date and this is first filed October 16,

15:33:45 12    2017.  I think there are really different points here,

15:33:45 13    aren't there?  He's just trying to say this earlier patent

15:33:45 14    had been filed.

15:33:45 15                MR. ELKINS:  And that's fine, but asking the

15:33:45 16    witness who is the primary inventor of this particular

15:33:45 17    patent and was not on the prior one.

15:33:45 18                MR. MASTERS:  It's a continuation in part.

15:33:45 19                MR. ELKINS:  I understand that, but that's not a

15:33:45 20    concept that's going to be known to the jury and I think

15:33:45 21    it's confusing to say that it was -- that the application

15:33:45 22    date was something that it was not.  And I think it's also

15:33:45 23    confusing to the witness who is not a patent lawyer.

15:33:45 24                THE COURT:  I just want to make sure -- go

15:33:45 25    ahead.

Kim - cross

15:33:45  1          MR. MASTERS:  I want to make the point that it

15:33:45  2  was first filed March 2016 with the three other inventors,

15:33:45  3  and then it was later revised.  He filed -- his name is on

15:33:45  4  it February, or October.

15:33:45  5          THE COURT:  October.  Sure.  That's correct.

15:33:45  6          MR. MASTERS:  That's all I want to establish,

15:33:45  7  and I want to point to one other part in this patent and

15:33:45  8  then I'm moving on.

15:33:45  9          THE COURT:  Okay.  Go right ahead.  That's fine.

15:33:46 10  I am more concerned about the confusion.

15:33:46 11          MR. MASTERS:  So am I.  Should I get a special

15:33:46 12  instruction on that to the jury?

15:33:46 13          THE COURT:  Maybe at the end of the case.

15:33:46 14          MR. MASTERS:  Thank you.

15:33:46 15          (End of sidebar.)

15:33:46 16          THE COURT:  All right.  The objection is

15:33:46 17  overruled.  We're going to have a couple more questions and

15:33:46 18  then we're going to take our afternoon break.

15:33:46 19          MR. MASTERS:  Thank you, Your Honor.

15:33:46 20  BY MR. MASTERS:

15:33:46 21  Q.     Dr. Kim, this application was first filed March 11th,

15:33:46 22  2016, correct?

15:33:46 23  A.     That is correct.

15:33:46 24  Q.     And that was eleven months before you joined

15:33:46 25  Akoustis; correct?

Kim - cross

15:33:46  1    A.        That is correct.  And can I provide some detail on

15:33:46  2    that.  More like I would like to provide some detail.

15:33:46  3    Q.        Can I ask you the next question and maybe you'll be

15:33:46  4    able to answer and provide the detail?

15:33:46  5    A.        Sure.

15:33:46  6    Q.        If we go to the top we see another application was

15:33:46  7    filed October 16th, 2017 and then you were added as an

15:33:46  8    inventor on to this application, is that correct?

15:33:46  9    A.        Yes, that is correct.

15:33:46 10    Q.        So when it first filed, it was Ms. Winters,

15:33:46 11    Mr. Vetury and Mr. Shealy who were the inventors, not you?

15:33:46 12    A.        Yes, that's correct.

15:33:46 13    Q.        Can we turn to column 2, then, Mr. Faison.  From

15:33:46 14    lines 59 to 68.

15:33:46 15              Dr. Kim, do you see it on your screen?  This is

15:33:46 16    a description in the patent application that this patent

15:33:46 17    refers also to a Bragg type reflector which is used in an

15:33:46 18    SMR type BAW filter, is that correct?

15:33:46 19    A.        Yes.

15:33:46 20    Q.        Is the answer yes?  I can't hear.

15:33:46 21    A.        It is, yes.

15:33:46 22    Q.        So this paragraph refers to SMR BAW filters, correct?

15:33:46 23    A.        Yes.  And I added the similar type as an example,

15:33:46 24    also, because the transfer process can actually use to

15:33:46 25    produce SMR type resonators with SMR type reflector at

Kim - cross

15:33:46  1    reflector at the bottom.

15:33:46  2             MR. MASTERS:  Thank you.

15:33:46  3             THE COURT:  We do need to take our break now.

15:33:46  4    This is our fifteen-minute afternoon break.  I'll see you

15:33:46  5    all in fifteen minutes.  You can take a break, also, the

15:33:46  6    witness.  Don't discuss the case amongst yourselves, and

15:33:46  7    nobody can talk to you about it.

15:33:46  8             (Jury exiting the courtroom at 3:30 p.m.)

15:33:53  9             THE COURT:  Dr. Kim, this is your break, also,

15:33:56 10    so we'll see you in about twelve minutes or so.  Thank you

15:33:59 11    very much.  Just don't talk to anybody about your testimony.

15:34:02 12    Thank you.

15:34:03 13             THE WITNESS:  Yes.

15:34:03 14             THE COURT:  All right.  Everybody can be seated.

15:34:05 15             Very briefly, I don't really need to check with

15:34:09 16    anybody, but I want to check and see if anybody needs to do

15:34:13 17    something with me.  We're going to be receiving some

15:34:16 18    additional materials later on.  I think that covers it and

15:34:19 19    we'll see everybody in about twelve minutes.

15:34:22 20             Thank you.

15:34:22 21             (A brief recess was taken.)

15:49:49 22             THE COURT:  All right.  Everybody can be seated.

15:50:03 23             (Jury entering the courtroom at 3:50 p.m.)

15:50:27 24             THE COURT:  All right.  Everyone can be seated.

15:50:49 25    Counsel, you may proceed.

Kim - cross

| | | |
|---|---|---|
| 15:50:50 | 1 | MR. MASTERS:  Thank you, Your Honor. |
| 15:50:51 | 2 | BY MR. MASTERS: |
| 15:50:52 | 3 | Q.    Dr. Kim, I would like to turn our attention now to |
| 15:50:56 | 4 | trim, trim calculations.  So when you arrived in |
| 15:51:01 | 5 | February 2017 to Akoustis, there was -- Akoustis did not |
| 15:51:05 | 6 | have a trim plan; is that correct? |
| 15:51:08 | 7 | A.    That is correct. |
| 15:51:12 | 8 | Q.    I'm sorry? |
| 15:51:13 | 9 | A.    That is correct. |
| 15:51:15 | 10 | Q.    Okay.  And in like June or July of 2017, Akoustis |
| 15:51:20 | 11 | hired J.B. Kwon as a process engineer; correct? |
| 15:51:24 | 12 | A.    Yes. |
| 15:51:24 | 13 | Q.    And J.B. was charged with developing a trim plan for |
| 15:51:30 | 14 | Akoustis; is that correct? |
| 15:51:31 | 15 | A.    Yes. |
| 15:51:39 | 16 | MR. MASTERS:  Your Honor, may I approach? |
| 15:51:40 | 17 | THE COURT:  You may. |
| 15:51:52 | 18 | BY MR. MASTERS: |
| 15:51:59 | 19 | Q.    Dr. Kim, I gave you two documents.  The first one is |
| 15:52:03 | 20 | marked PTX-1068.  It has an Akoustis number.  And then █████ |
| 15:52:09 | 21 | ██████████    Do you see that? |
| 15:52:10 | 22 | A.    Yes. |
| 15:52:11 | 23 | Q.    And 10 -- PTX-1069 is also a █████████████████ that |
| 15:52:22 | 24 | Akoustis has within the company; is that correct? |
| 15:52:28 | 25 | A.    Yes, it looks like, but I'm not so familiar with this |

Kim - cross

15:52:35  1    part -- this document.

15:52:38  2    Q.      Okay.  Is that PTX-1069?

15:52:46  3    A.      Yes, that's --

15:52:49  4    Q.      PTX-1068, do you recognize?

15:52:52  5    A.      Yes, that is more familiar with, I'm more familiar

15:52:56  6    with this one.

15:52:57  7                MR. MASTERS:  Your Honor, I move for the

15:52:58  8    admission of PTX-1068.

15:53:00  9                THE COURT:  Marked and received as 300.

15:53:02 10                (Trial Exhibit No. 300 was admitted into

15:53:03 11    evidence.)

15:53:03 12    BY MR. MASTERS:

15:53:12 13    Q.      So if we go to page -- so Trial Exhibit 300 is a ██

15:53:18 14    ████████████, correct?

15:53:19 15    A.      Yes.

15:53:20 16    Q.      If we go to page 2, we have a couple of colorful

15:53:25 17    graphs.  Can we zoom in on those, Mr. Faison, please.

15:53:30 18                And on the right, it's Figure 3, it's referred

15:53:35 19    to as a ████████████  correct?

15:53:39 20    A.      Figure -- which one?

15:53:42 21    Q.      The one -- there we go, Figure 3.

15:53:45 22    A.      Yes, that is --

15:53:46 23    Q.      ████████████  that --

15:53:49 24    A.      Yeah, it says ████████████, yes.

15:53:51 25    Q.      And ████████████████████████████████████;

Kim - cross

15:53:54  1    correct?

15:53:55  2    A.      Yes.

15:53:55  3    Q.      Let's go to Figure 2, please.  And Figure 2 is a ███

15:54:06  4    ███████████ ; correct?

15:54:08  5    A.      That is correct.

15:54:09  6    Q.      And ███████████████████████████████████████

15:54:18  7    ██████████████? 

15:54:19  8    A.      That is correct.

15:54:20  9    Q.      Okay.  And then if we go to page 3, we show ████████

15:54:27 10    ████████████████████████████████████████████████████████

15:54:31 11    ████████████████████████████ ; is that correct?

15:54:35 12    A.      That is correct.

15:54:35 13    Q.      And ████████████████████████████████████████████ ;

15:54:42 14    correct?

15:54:43 15    A.      Yes.

15:54:43 16    Q.      Mr. Faison, could we drop that and project the

15:54:50 17    Defendant's demonstrative.  There we go.  Actually, can we

15:54:59 18    go to the next slide?  The other way.  Keep going.  There we

15:55:14 19    go.

15:55:14 20            So Dr. Kim, you have an understanding of Qorvo's

15:55:19 21    trim sensitivity algorithm on top, correct?

15:55:23 22    A.      Yes.

15:55:23 23    Q.      Did you learn that from J.B. Kwon?

15:55:28 24    A.      J.B. presented this to -- yeah.

15:55:32 25    Q.      Presented it to the group --

Kim - cross

15:55:33  1    A.      Yes.

15:55:34  2    Q.      -- of process engineers at Akoustis; correct?

15:55:38  3    A.      Yes.

15:55:40  4    Q.      And you had discussions about the Qorvo trim

15:55:43  5    sensitivity algorithms used?

15:55:47  6    A.      Yes, but I didn't -- so but it's common for trim in

15:55:54  7    general, for FBAR, for SMR filters.

15:56:01  8    Q.      And both ---and the bottom is the Akoustis trim

15:56:05  9    sensitivity, correct?

15:56:06 10    A.      That is correct.

15:56:07 11    Q.      And the Akoustis trim sensitivity, the variable T

15:56:13 12    refers to thickness, correct?

15:56:15 13    A.      That is correct, yes.

15:56:16 14    Q.      Thickness of the silicone nitride?

15:56:18 15    A.      Yes.

15:56:19 16    Q.      And FREQ refers to frequency, correct?

15:56:23 17    A.      That is correct.

15:56:25 18    Q.      And then if we look at the Qorvo trim sensitivity,

15:56:28 19    ██████████████████████████, correct?

15:56:32 20    A.      Yes.

15:56:33 21    Q.      ██████████████████?

15:56:35 22    A.      Yes, ████████████████████████, yes.

15:56:39 23    Q.      And the word thick means the thickness of the

15:56:44 24    silicone nitride, correct?

15:56:46 25    A.      In the formula, they measure, in Akoustis sensitivity

15:56:50  1  formula, ████████████████████████████████████████

15:56:54  2  ███████████████████████  so silicone nitride, a████████████

15:56:59  3  ████████████████████████████████████████

15:57:04  4  ████████████████████████████████████████

15:57:09  5  ████████████████████████████████████████████

15:57:13  6  ████████████████████████████████████

15:57:17  7  ████████████████████████████████████████

15:57:21  8  ███████████████████████████████████████

15:57:25  9  ████████████████████

15:57:27 10  Q.      And both the Qorvo trim sensitivity and the Akoustis

15:57:31 11  trim sensitivity are based on frequency; correct?

15:57:39 12  A.      I'm not sure what you mean by that.

15:57:41 13  Q.      Well, they're frequency dependent, you have a

15:57:44 14  frequency component in the equation for both as shown here

15:57:48 15  on your demonstrative?

15:57:50 16  A.      I'm a little confused what you mean by that.  But in

15:57:55 17  the equation, the frequency is used to calculate the

15:57:58 18  sensitivity if that's what you mean, yes.

15:58:00 19  Q.      Thank you.  Can we go back one slide.

15:58:03 20          Now, this is a demonstrative that you explained

15:58:06 21  to the jury during your direct examination, do you recall

15:58:11 22  that?

15:58:12 23  A.      Yes.

15:58:13 24  Q.      You've prepared this document yesterday; is that

15:58:17 25  correct?

Kim - redirect

15:58:17 1  A.      Actually it was -- the day before yesterday.

15:58:22 2  Q.      So Saturday?

15:58:23 3  A.      Saturday.

15:58:24 4  Q.      So you prepared what's marked on mine DDX-1.03 on

15:58:30 5  Saturday for the purposes of this case; is that correct?

15:58:32 6  A.      That is correct.

15:58:33 7          MR. MASTERS:  Thank you.  No further questions.

15:58:36 8          THE COURT:  Redirect.

15:58:37 9                   REDIRECT EXAMINATION

15:58:39 10 BY MR. ELKINS:

15:58:45 11 Q.      Dr. Kim, when Mr. Masters was examining you about

15:58:53 12 DTX-0988, the patent --

15:58:58 13 A.      Yes.

15:58:59 14 Q.      -- admitted as Trial Exhibit 295, you had something

15:59:04 15 to -- I thought you had something to explain.  What did you

15:59:08 16 want to explain?

15:59:09 17 A.      Oh, yes.  I just -- this is -- I was trying to

15:59:15 18 explain that this -- so this patent, so the original

15:59:20 19 application of this patent was applied in that date.  And

15:59:25 20 then I joined the company, and then made so -- so came up

15:59:32 21 with this XB1 process, and then the patent is updated as in

15:59:40 22 usual term, I'm not sure exact term for the patent term, I

15:59:44 23 mean, applications and all the legal issues, related to the

15:59:49 24 patent, but it was updated.  And so the original submission

15:59:57 25 date is -- remains the same, and even though it's before I

Kim - redirect

16:00:04  1    joined the company.

16:00:05  2    Q.      So there was a prior patent application before you

16:00:10  3    joined the company?

16:00:11  4    A.      Yes.

16:00:12  5    Q.      And your testimony is that when you developed the XB1

16:00:17  6    process or XBAW process, there were some new elements added

16:00:26  7    to the prior application?

16:00:28  8    A.      Yes.

16:00:30  9    Q.      And Akoustis applied for a new patent based on your

16:00:38 10    inventions added to the prior one on October 16th, 2017?

16:00:43 11    A.      Yes, that is correct.

16:00:45 12    Q.      Okay.  One more question.

16:00:51 13            Is all trimming a function of thickness and

16:00:54 14    frequency no matter who is doing it?

16:00:58 15    A.      Yes.  It basically removes a little bit of thickness,

16:01:05 16    typically in silicone nitride or in some other companies,

16:01:10 17    aluminum nitride, and get the right frequency to meet the

16:01:19 18    customer spec.

16:01:19 19    Q.      Okay.  And that was the -- you explained how

16:01:23 20    frequency moves up with the removal of layers, and frequency

16:01:32 21    goes down when you add more silicone nitride?

16:01:35 22    A.      Yes.

16:01:37 23    Q.      Okay.

16:01:37 24    A.      So the reason we -- there is the trim, as the

16:01:41 25    trimming like in itself is started way back from crystalline

16:01:48  1    layers, '60's or '50's even, so the concept was there.  And

16:01:53  2    what -- I mean, all the -- companies do basically the same,

16:01:58  3    remove some amount of material to get the right frequency.

16:02:03  4              And with the -- but then in BAW, what's

16:02:09  5    different in BAW resonators filters is that before BAW

16:02:16  6    resonators, the trim needed to be done in the single --

16:02:22  7    single product like, a resonator they trim each one by one,

16:02:29  8    but in SAW and BAW products came along in the industry, so

16:02:36  9    the -- the BAW resonator filters are on six-inch big wafer

16:02:42  10   and then the industry came up with -- developed the new tool

16:02:49  11   to trim layers ███████████████████████ that we just saw

16:02:57  12   earlier with the question from the Qorvo's attorney ██████

16:03:04  13   ████████████████████████████████ so that means that

16:03:09  14   amount of material is moved from the wafer and so that tool

16:03:16  15   enabled trim, doing trim in that way.

16:03:20  16             And it is common knowledge when we started -- I

16:03:29  17   mean, BAW filter developed back in Semco or even a few years

16:03:34  18   before that.  So there is nothing new about that from that

16:03:37  19   point on, except some just some details about tool companies

16:03:43  20   as to like at least trim off from the beginning, but they

16:03:50  21   improved their tools so they were okay from trimming, so, it

16:03:54  22   was very well-known before we start.

16:03:59  23   Q.    Are there a number of tool trim -- or trim tool

16:04:04  24   vendors who sell tools that enable a Fab like Akoustis to

16:04:13  25   trim?

Kim - redirect

16:04:14   1    A.      Yes.  So yeah, I mean, J.B. would know better, but

16:04:20   2    because he is doing the actual working with the tool.  But I

16:04:26   3    heard there is two or three different companies, and because

16:04:32   4    not many companies would need this tool, so there is just a

16:04:37   5    couple of companies selling these tools, so that's about it.

16:04:40   6    So you either buy from one of them and then yeah, you do the

16:04:47   7    trim in a similar way that the industry -- as the industry

16:04:53   8    developed.

16:04:54   9    Q.      Do the trim tool vendors provide training or teaching

16:04:59  10    regarding how to use their tools?

16:05:01  11    A.      Yes, they definitely provide -- they provide

16:05:06  12    training, definitely include how to -- how efficiently you

16:05:13  13    learn the tool, but in general how trim works in different

16:05:17  14    materials and that sort of process related issue that are

16:05:22  15    provided.

16:05:23  16           MR. ELKINS:  Thank you.  I have no more

16:05:25  17    questions.

16:05:25  18           THE COURT:  All right.  Thank you very much.

16:05:27  19    Thank you.  You may step down.

16:05:28  20           And who will our next witness be?

16:05:31  21           MR. ELKINS:  Akoustis calls Holly Johnson.

16:05:35  22           THE COURT:  All right.

16:05:51  23           If there are any exhibits that were on the

16:05:54  24    stand, we need to retrieve those.  All right.  So will the

16:05:59  25    witness come forward.  Yes, if you'll come this way, please,

Johnson - direct

16:06:17  1    the witness.  And step right over here.

16:06:24  2              COURT CLERK:  Please remain standing and raise

16:06:29  3    your right hand.  Please state and spell your name for the

16:06:32  4    record.

16:06:33  5              THE WITNESS:  Holly Johnson, H-O-L-L-Y,

16:06:35  6    J-O-H-N-S-O-N.

16:06:37  7              HOLLY JOHNSON, having been duly sworn, was

16:06:42  8    examined and testified as follows.

16:06:49  9                        DIRECT EXAMINATION

16:06:50 10    BY MR. ELKINS:

16:06:53 11    Q.      Good afternoon, Ms. Johnson.

16:06:55 12    A.      Good afternoon.

16:06:56 13    Q.      Can you tell the jury a little bit about yourself?

16:07:01 14    A.      Sure.  My name is Holly Johnson, I'm the Director of

16:07:05 15    Human Resources for Akoustis.  I joined Akoustis a little

16:07:08 16    over five years ago in January of 2019.  Prior to joining

16:07:12 17    Akoustis, I was -- worked with NRG Energy.  After they

16:07:18 18    acquired Zoom Energy, and after we finished the acquisition,

16:07:23 19    I left.  I was the Director of HR there.  I have been in

16:07:28 20    human resources management for twenty years.

16:07:31 21              I have my Bachelors Degree in Psychology.  I

16:07:36 22    have been married to my husband for twenty-three years.

16:07:39 23    He's a middle school math teacher.  We have two kids.  One

16:07:43 24    just finished college and one is in college.

16:07:45 25    Q.      Great.

Johnson - direct

16:07:46  1          To whom do you report directly at Akoustis?

16:07:52  2  A.      I report directly to Ken Boller, he is our CFO.  I

16:07:58  3  report indirectly also to members of the executive team.

16:08:02  4  Q.      Would you summarize for the jury the responsibilities

16:08:06  5  that you have as Director of Human Resources at Akoustis?

16:08:09  6  A.      Sure.  I'm responsible for everything in human

16:08:11  7  resources at Akoustis from I would say from hire to retire,

16:08:16  8  so that encompasses a lot of things.  And I'm responsible

16:08:20  9  for HR strategy and supporting the company and the

16:08:24 10  employees, you know, for the whole company so both in the

16:08:28 11  U.S. and outside the U.S.

16:08:29 12  Q.      Are you responsible for preparing employment offers

16:08:33 13  for new hires?

16:08:36 14  A.      I am responsible for reviewing and approving offers

16:08:41 15  before they go out.  Sometimes I prepare them myself as

16:08:45 16  well.

16:08:49 17  Q.      How does Akoustis decide whether to make a job offer

16:08:54 18  to a candidate?

16:08:57 19  A.      We have a process that we follow, and you know, we

16:09:02 20  have a job description and you know, what we're looking for

16:09:06 21  in a candidate.  And once we have gone through our interview

16:09:11 22  process, we will decide collectively looking at the

16:09:15 23  candidate, how they interviewed, what is their education,

16:09:19 24  experience, compared to what we're looking for.  And I'm

16:09:22 25  also, you know what kind of fit they are within our culture

Johnson - direct

16:09:27  1  which is really important to us, so there is a lot of

16:09:29  2  factors that go into making that decision.

16:09:32  3  Q.      Who makes the decision whether to make an offer to a

16:09:37  4  candidate?

16:09:37  5  A.      Well, we have an interview team.  It depends on what

16:09:40  6  their role is and who is on that team.  But that team will

16:09:45  7  give feedback to the hiring manager that he or she will

16:09:49  8  consider, but ultimately the hiring manager will make the

16:09:53  9  decision whether or not to make an offer.

16:09:55 10  Q.      So who is the hiring manager?

16:09:57 11  A.      Whoever is hiring for the role, whoever that position

16:10:00 12  will report to.

16:10:01 13  Q.      So is that in general, the more senior person in a

16:10:07 14  unique organization within the company?

16:10:09 15  A.      It would be anybody that's in a manager role that

16:10:17 16  has, you know, has a team reporting to them.  They'll always

16:10:22 17  have to get approval from their, you know, executives or VP

16:10:26 18  or whoever they report up to as well.  But anybody who is a

16:10:30 19  manager who may be hiring.

16:10:33 20  Q.      How does Akoustis determine the compensation to

16:10:36 21  include in a particular offer?

16:10:40 22  A.      I would say similar to what I mentioned earlier.  We

16:10:45 23  will have a job description and our position will have a

16:10:51 24  compensation range associated with it.  So we'll look at the

16:10:55 25  candidate that we want to make the offer to, compare his or

Johnson - direct

16:11:00 1    her, again, education, experience, you know, all that,

16:11:04 2    compared to the job.  And then also we'll look internally,

16:11:09 3    too, how does that candidate compare internally so that

16:11:13 4    we're considering what we call internal equity, so we can

16:11:18 5    make sure the compensation is fair and consistent within the

16:11:22 6    company, so there are a lot of factors we look at.

16:11:24 7    Q.      How does Akoustis communicate job offers?

16:11:28 8    A.      Initially, the hiring manager will contact, typically

16:11:32 9    the hiring manager will contact the candidate and make the

16:11:36 10   job offer, and then somebody on the HR team will follow-up

16:11:40 11   in writing with the offer letter and other documents that we

16:11:44 12   need to send to that candidate.

16:11:46 13   Q.      Okay.  I am going to hand you a couple of documents

16:11:49 14   that I would like to talk to you about.

16:11:52 15           MR. ELKINS:  Your Honor, may I approach the

16:11:54 16   witness?

16:11:55 17           THE COURT:  You may.

16:12:09 18   BY MR. ELKINS:

16:12:11 19   Q.      Ms. Johnson, I have handed you two documents.  The

16:12:13 20   first one I would like you to look at is marked for

16:12:16 21   identification as PTX-666, perhaps not the best number.

16:12:24 22   A.      Right.

16:12:25 23   Q.      But it's entitled employee confidentiality

16:12:28 24   proprietary information, and patent and invention assignment

16:12:33 25   agreement.  Do you have that in front of you?

Johnson - direct

16:12:35  1   A.      I do.

16:12:35  2   Q.      Do you recognize it?

16:12:37  3   A.      Yes.

16:12:37  4   Q.      What is it?

16:12:39  5   A.      It's got a very long name, we call it our

16:12:44  6   confidentiality and IP agreement.  It's really very lengthy.

16:12:48  7   It contains a lot of really important information.  To sum

16:12:52  8   it up, we're communicating with candidates and employees

16:12:57  9   what our expectations are in how they treat company's

16:13:02 10   confidential and proprietary information while they work at

16:13:06 11   Akoustis and when they leave, among other things, there is a

16:13:11 12   lot of really important information in there.

16:13:13 13                MR. ELKINS:  Your Honor, we move exhibit

16:13:15 14   PTX-0666 into evidence.

16:13:19 15                THE COURT:  Marked and received as 301.

16:13:22 16                (Trial Exhibit No. 301 was admitted into

16:13:22 17   evidence.)

16:13:22 18   BY MR. ELKINS:

16:13:30 19   Q.      Ms. Johnson, do you know when the confidentiality and

16:13:33 20   IP agreement was adopted?

16:13:35 21   A.      Yeah.  It was adopted shortly after 2014, after the

16:13:41 22   company formed.

16:13:42 23   Q.      How was it used at Akoustis?

16:13:45 24   A.      Initially, it's used during the offer, candidate

16:13:50 25   offer process we talked about earlier, either at the time of

Johnson - direct

16:13:53  1  the job offer or after a candidate has accepted, right then.

16:13:58  2  We will send this document to them and ask that they read

16:14:02  3  it, understand it, have time to review it because they'll be

16:14:06  4  expected to sign it on their first day at work.

16:14:10  5  Q.    Can we go to Section 8.2?

16:14:13  6        Can you -- well, maybe if you, it's two long

16:14:35  7  sentences, if you bear with me, maybe just read it to the

16:14:38  8  jury.

16:14:38  9  A.    Okay.  "Use of confidential information of other

16:14:41 10  persons.  I represent that I have not brought, and will not

16:14:46 11  bring with me to the company or use at the company any

16:14:49 12  materials or documents of an employer or a former employer

16:14:53 13  that are not generally available to the public, unless

16:14:56 14  express written authorization from such employer for their

16:15:00 15  possession and use has been obtained.  I also understand

16:15:12 16  that I am not to breach any obligation of confidentiality

16:15:17 17  that I have to any employer or former employer, and agree to

16:15:21 18  fulfill all such obligation during the period of my

16:15:25 19  affiliation with the company."

16:15:28 20  Q.    Why does Akoustis include that provision in its

16:15:32 21  confidentiality and IP agreement?

16:15:34 22  A.    Because we want to clearly communicate to candidates

16:15:39 23  and employees, that we do not want them to bring anything

16:15:42 24  proprietary from a company or competitor into our company.

16:15:46 25  Our company works really hard to create our own IP, and our

Johnson - direct

16:15:51 1  own products.  We don't want that to be tainted by some

16:15:54 2  other company's information.  We don't -- we want to

16:15:59 3  100 percent own our IP.  We've worked really hard and spent

16:16:03 4  a lot of time and money on that.

16:16:05 5  Q.    You can put that document away.

16:16:07 6        The other document I brought up to you is marked

16:16:11 7  PTX-0665 for identification.  It's entitled, code of ethics

16:16:18 8  and conduct.  Do you recognize that?

16:16:19 9  A.    Yes.

16:16:20 10 Q.    What is it?

16:16:21 11 A.    It's our code of ethics.  It's, again, you know,

16:16:27 12 fairly lengthy.  It's really important to us.  In a

16:16:30 13 nutshell, we use this to communicate to employees what our

16:16:35 14 expectations are for how they conduct themselves in all

16:16:40 15 aspects of their job, you know, at Akoustis, that we expect

16:16:45 16 them to perform their job with the highest level of

16:16:50 17 integrity and ethics in everything that they do.

16:16:53 18 Q.    To whom does the code apply?

16:16:55 19 A.    To all employees.

16:16:56 20      MR. ELKINS:  Your Honor, we move what's been

16:16:58 21 marked for identification as PTX-0665 into evidence.

16:17:02 22      THE COURT:  Marked and received as 302.

16:17:04 23      (Trial Exhibit No. 302 was admitted into

16:17:04 24 evidence.)

16:17:04 25 BY MR. ELKINS:

Johnson - direct

16:17:05  1   Q.      How does a new employee find out about the code of

16:17:08  2   ethics and conduct?

16:17:09  3   A.      On their first day of work, we have a new hire

16:17:13  4   orientation and we, we being a member of human resources

16:17:20  5   conduct this initial orientation and we share with them that

16:17:24  6   this is one of the documents, one of the policies that they

16:17:27  7   will need to read, and understand, so we kind of go over it

16:17:32  8   with them at a high level and then they are expected to read

16:17:36  9   it, and eventually like sign off on it during their employee

16:17:42 10   hire.

16:17:42 11   Q.      On this page is a section titled honest and ethical

16:17:46 12   conduct.  Would you please read it to the jury?

16:17:48 13   A.      "The company's policy is to promote high standards of

16:17:52 14   integrity by conducting its affairs honestly and ethically.

16:17:56 15   Each employee must act with integrity and observe the

16:18:00 16   highest ethical standards of business conduct in his or her

16:18:03 17   dealings with the company's customers, suppliers, partners,

16:18:07 18   service procedures, competitors, employees, and anyone else

16:18:10 19   with whom he or she has contact in the course of performing

16:18:15 20   his or her job."

16:18:18 21   Q.      So I'm going to ask you the same question I asked

16:18:20 22   about 8.2, the confidentiality and IP agreement.  Why does

16:18:24 23   Akoustis include this particular provision in the code of

16:18:28 24   ethics and conduct?

16:18:29 25   A.      Well, I mean, we're -- again, we're creating IP and

Johnson - direct

16:18:34  1  products.  We again are making sure employees understand and

16:18:40  2  are informed about what our expectations are and how they

16:18:45  3  conduct themselves within their job and with anybody that

16:18:48  4  they deal with while working at Akoustis which is again,

16:18:52  5  high ethics and integrity.

16:18:55  6  Q.    I'm going to show you two more documents, if you'll

16:19:03  7  bear with me.

16:19:17  8            MR. ELKINS:  Your Honor, permission to approach

16:19:19  9  again?

16:19:20 10            THE COURT:  You may.

16:19:38 11  BY MR. ELKINS:

16:19:45 12  Q.    The first document I handed you, or at least the one

16:19:49 13  on top is marked for identification as PTX-0315.  It's

16:19:54 14  entitled business conduct guidelines dated April 20, 2022.

16:20:00 15  Do you recognize it?

16:20:02 16  A.    Yes.

16:20:04 17  Q.    And again, can you please explain what it is?

16:20:05 18  A.    Yes.  We call it for short, our BCG.  It's -- it is

16:20:12 19  again, it's very lengthy, it goes through all kinds of areas

16:20:18 20  and communicates to employees what we expect and how they

16:20:24 21  conduct themselves, you know, again in the course of doing

16:20:27 22  their jobs.  So it contains, you know, our code of ethics,

16:20:31 23  non-retaliation, non-harassment, how managers should perform

16:20:36 24  their jobs, how we conduct ourselves through social media,

16:20:40 25  so a lot of ground is covered in this document.  It's really

Johnson - direct

16:20:44  1    critical to our company.

16:20:46  2              MR. ELKINS:  Your Honor, we move what's been

16:20:49  3    marked for identification as PTX-0315 into evidence.

16:20:52  4              THE COURT:  Marked and received as 303.

16:20:55  5              (Trial Exhibit No. 303 was admitted into

16:20:56  6    evidence.)

16:20:56  7    BY MR. ELKINS:

16:20:57  8    Q.      Ms. Johnson, this, as I mentioned in introducing this

16:21:01  9    document, it's dated April 2022, I can't even say it

16:21:08 10    anymore, 2022.  Is that when it was adopted?

16:21:11 11    A.      No, it was initially adopted in 2019.

16:21:15 12    Q.      And does, as you call it, the BCG play a part in the

16:21:20 13    onboarding process for new employees?

16:21:22 14    A.      Yes.  It's like the same thing I said earlier about

16:21:25 15    the code of conduct.  During the new hire orientation on day

16:21:29 16    one of employment, we go over this with them at a high level

16:21:33 17    with a new hire.  And we ask that they read it, make sure

16:21:39 18    they understand it.  And additionally, we have a video, a

16:21:44 19    BCG video that they watch to reinforce, because there is so

16:21:49 20    much in here that we don't want to leave it up to somebody

16:21:53 21    to read this whole thing, we need to reinforce it, so we

16:21:56 22    created the video for that as well.  Then they'll sign a

16:21:59 23    document saying that they did complete all of that, they

16:22:02 24    understood, and all that.

16:22:03 25    Q.      Is the BCG only for new hires?

Johnson - direct

16:22:07  1    A.      No, it's for new hires, it's for all employees.

16:22:13  2    Q.      And you mentioned with respect to the code of ethics

16:22:18  3    and conduct and the confidentiality and IP agreement that

16:22:22  4    new hires have to sign those documents.  Do new hires, and

16:22:28  5    indeed the existing employees need to sign the BCG?

16:22:31  6    A.      Yes, they do, they sign a document that includes the

16:22:35  7    BCG and again, that they've read it and understand it.

16:22:42  8    Q.      Can you please turn to page 9 of this -- of this

16:22:53  9    exhibit?  And you see the heading, respecting others

16:23:04 10    intellectual property rights?

16:23:06 11    A.      Yes.

16:23:06 12    Q.      Could can you please read to us just the first three

16:23:10 13    sentences of that section?

16:23:10 14    A.      Okay.  "We also respect intellectual property rights

16:23:13 15    of others.  This means we must never knowingly infringe on

16:23:18 16    the valid copyrights, trademarks, patents or trade secrets

16:23:22 17    of others, including your former employers.  You must not

16:23:27 18    share with Akoustis any confidential information or

16:23:30 19    intellectual property of your former employers, unless given

16:23:35 20    explicit permission to do so from your former employer and

16:23:39 21    the legal department."

16:23:42 22    Q.      How is that section different, if at all, from the

16:23:47 23    sections that you read from the confidentiality and IP

16:23:52 24    agreement and the code of ethics?

16:23:55 25    A.      It's not really different.  I mean, there may be

Johnson - direct

16:23:59  1    different words used, but again, we're reinforcing our

16:24:04  2    expectations not to share IP from another company or you

16:24:09  3    know, a competitor that you worked with, don't bring it into

16:24:14  4    the company, we don't want it.  And we're just restating

16:24:17  5    that here.

16:24:21  6    Q.     We can take that document down.  The other document I

16:24:26  7    handed to you is marked for identification as PTX-1476, it's

16:24:31  8    entitled annual compliance certification.  Do you recognize

16:24:35  9    it?

16:24:35 10    A.     Yes.

16:24:37 11    Q.     What is it?

16:24:38 12    A.     It's the document that we use for both new hires and

16:24:44 13    employees to certify, I talked earlier about how they are

16:24:49 14    expected to sign off that they did receive and did read and

16:24:52 15    understood, that's what this document is.  So it list the

16:24:55 16    BCG, code of ethics and some other compliance related

16:24:59 17    policies that we have to again certify that they're saying

16:25:04 18    yes, we read all that and we understand it.

16:25:06 19            MR. ELKINS:  Your Honor, we move into evidence

16:25:07 20    the document marked for identification as PTX-1476.

16:25:11 21            THE COURT:  Marked and received as 304.

16:25:17 22            (Trial Exhibit No. 304 was admitted into

16:25:18 23    evidence.)

16:25:18 24    BY MR. ELKINS:

16:25:18 25    Q.     Whom at the company is expected to -- well, first of

16:25:21  1   all, can we zoom in on Section 2.  And what is this section

16:25:33  2   for, Ms. Johnson?

16:25:34  3   A.       It is listing the policies that the employee is

16:25:41  4   attesting that they read.

16:25:44  5   Q.       And the attestation is at the very bottom?

16:25:47  6   A.       Correct.

16:25:49  7   Q.       And whom at the company is expected to sign the

16:25:53  8   compliance certification?

16:25:55  9   A.       All employees, new hires, employees will review on a

16:26:01 10   -- every now and then they'll review it as well.

16:26:14 11   Q.       So if you bear with me, I want to ask you some

16:26:17 12   questions about three exhibits that are related.  So if you

16:26:22 13   give me a moment, I will bring them all up to you at once.

16:26:59 14               MR. ELKINS:  May I approach, Your Honor?

16:27:01 15               THE COURT:  You may.

16:27:17 16   BY MR. ELKINS:

16:27:38 17   Q.       So, Ms. Johnson, I've handed you what has been marked

16:27:42 18   for identification as PTX-0669, 670, and 671.  And I have

16:27:54 19   given them to you because as I said, they are related.

16:27:58 20               Let's start with PTX-669, do you recognize it?

16:28:02 21   A.       Yes.

16:28:02 22   Q.       What is it?

16:28:04 23   A.       It's an e-mail from me to my boss, Ken Boller, in May

16:28:11 24   of 2020.  It's entitled Rohan's comp information so it was

16:28:16 25   sharing with my manager some compensation information that

16:28:19  1    Rohan Houlden had given me.  There are two attachments to

16:28:23  2    it.

16:28:23  3    Q.      We have heard, in fact, we have heard testimony from

16:28:27  4    Mr. Houlden in this case before you arrived, but just

16:28:29  5    generally, can you remind us who Mr. Houlden was as of

16:28:35  6    May 27th, 2020, the date of this e-mail?

16:28:37  7    A.      Yes, Rohan was our Chief Product Officer at the time.

16:28:41  8    Q.      And why were you sending an e-mail entitled Rohan's

16:28:50  9    comp info to Mr. Boller?

16:28:52 10    A.      A couple of reasons.  Primarily because Rohan had

16:28:56 11    shared it with me prior to this, and wanted it to be used

16:29:01 12    for our comp work.  I was sharing it with Ken who is my

16:29:09 13    boss, in passing basically sharing it with him to support

16:29:13 14    some conversations we were having.  We were getting ready to

16:29:16 15    start our own compensation project.

16:29:20 16    Q.      Okay.  Before you go any further, let me --

16:29:26 17                 MR. ELKINS:  Let me move, Your Honor, what has

16:29:28 18    been marked for identification as PTX-669 into evidence.

16:29:31 19                 THE COURT:  Marked and received as 305.

16:29:36 20                 (Trial Exhibit No. 305 was admitted into

16:29:36 21    evidence.)

16:29:36 22    BY MR. ELKINS:

16:29:39 23    Q.      And if you could blow it up so we just see,

16:29:42 24    Ms. Johnson's e-mail and the top part, so the part in blue

16:29:48 25    with the underlinings, are those attachments?

Johnson - direct

16:29:51 1    A.      Yes.

16:29:51 2    Q.      And you testified that you were embarking on a

16:29:59 3    project and you needed to discuss something with Mr. Boller.

16:30:03 4    Can you add a little more color to that?

16:30:06 5    A.      Yes.  So I was brought in to Akoustis to, you know,

16:30:14 6    lead obviously HR, but also to develop more structure and

16:30:18 7    process as the company was growing and maturing, we needed

16:30:22 8    to have that.  One of the areas that I identified we needed

16:30:26 9    was more structure around our compensation, we didn't have

16:30:30 10   -- really didn't -- we didn't have a good structure.  So I

16:30:38 11   was going to be starting a project, or seeking for approval

16:30:43 12   to have a project around that.

16:30:44 13           Further, Rohan had shared this data at some

16:30:49 14   point before this e-mail, a few months maybe before this.

16:30:55 15   He had wanted to use it, and you know, I didn't, but -- so

16:31:03 16   that, you know, is kind of I guess the color.

16:31:07 17   Q.      What did Mr. Houlden want to use the information he

16:31:12 18   sent you for, what was the purpose that he wanted you to use

16:31:16 19   it for?

16:31:17 20   A.      He wanted to use it for our own comp structure as

16:31:22 21   well as, you know, to -- in order to make job offers and

16:31:29 22   compensate employees, I mean, that's kind of all hand in

16:31:33 23   hand, so that's what he wanted to use it for.

16:31:35 24   Q.      Okay.  Let's -- let me ask you to look at what's been

16:31:41 25   marked for identification as PTX-0670.  And can you tell us

Johnson - direct

16:31:48  1   what that is?

16:31:50  2   A.       This is actually really lengthy, but there is a

16:31:58  3   chart, actually there is two charts on here, and they show a

16:32:02  4   bunch of information like RE codes, titles, and a lot of

16:32:10  5   like years experience, compensation ranges it looks like,

16:32:14  6   and there is two different ones on this initial page.

16:32:19  7   Q.       And is that the way you're looking at it is in the

16:32:23  8   nature of a spreadsheet?

16:32:24  9   A.       Yes, this was a spreadsheet.

16:32:27 10   Q.       And looking back at exhibit -- Trial Exhibit 305,

16:32:34 11   which is PTX-669, can you identify which of the attachments

16:32:39 12   it is?

16:32:40 13   A.       Yes.  This one is Rohan's guidance chart.

16:32:45 14   Q.       And the dot Excel SX?

16:32:49 15   A.       Yes.

16:32:50 16   Q.       And you recognize that as a Microsoft Excel file?

16:32:55 17   A.       That is correct, yes.

16:32:56 18   Q.       Okay.

16:32:57 19          MR. ELKINS:  Your Honor, we'll -- never mind.

16:33:01 20   By MR. ELKINS:

16:33:01 21   Q.       And then the next document is --

16:33:06 22          THE COURT:  I missed that, were you moving that?

16:33:07 23          MR. ELKINS:  Yeah, I'm contemplating that, Your

16:33:10 24   Honor.

16:33:10 25          THE COURT:  Okay, when you're ready.

Johnson - direct

16:33:11  1                    MR. ELKINS:  I had second thoughts.  Thank you.

16:33:13  2                    THE COURT:  Sure.

16:33:14  3    BY MR. ELKINS:

16:33:14  4    Q.    PTX-0671.  What is that?

16:33:18  5    A.    This is the other attachment Qorvo three years ago.

16:33:25  6    Q.    And that also came from Mr. Houlden?

16:33:28  7    A.    Yes.

16:33:30  8    Q.    And can you describe what that reports to show?

16:33:35  9    A.    Similar information as the other one that we just

16:33:38 10    talked about, has a chart, the top of it says engineering,

16:33:44 11    it has grades, a lot of the same information it looks like,

16:33:49 12    salary ranges.

16:33:51 13                    MR. ELKINS:  Actually let's go ahead and move

16:33:54 14    both into evidence, Your Honor.

16:33:55 15                    THE COURT:  Marked and received as 306 and 307.

16:34:00 16                    (Trial Exhibit Nos. 306 and 307 were admitted

16:34:01 17    into evidence.)

16:34:01 18    BY MR. ELKINS:

16:34:06 19    Q.    And again, what was your understanding as to why Mr.

16:34:10 20    Houlden sent you those two attachments?

16:34:13 21    A.    He had received them from someone at Qorvo and wanted

16:34:17 22    to use this, he felt this was good comp data to use at

16:34:23 23    Akoustis.  And so he was -- actually at one point he called

16:34:27 24    it Akoustis's pay scale, or called it something like that,

16:34:31 25    and I said no, that's not what that is.  He wanted to use it

Johnson - direct

16:34:35  1    for our internal, or at least as a part of creating our

16:34:40  2    internal guidelines.

16:34:41  3    Q.      Did you have any understanding about how Mr. Houlden

16:34:44  4    might have obtained that information from somebody at Qorvo?

16:34:47  5    A.      Yeah, my understanding is Rohan -- Rohan had worked

16:34:51  6    at Qorvo previously.  And he had maintained some good

16:34:56  7    relationships with people there.  And he had received this

16:35:00  8    from somebody in the HR department from Qorvo at some point

16:35:05  9    around the time he sent this over to me.

16:35:08 10    Q.      So at the time he was at Akoustis?

16:35:10 11    A.      Yes.

16:35:11 12    Q.      Do you know whether Mr. Houlden had Qorvo's

16:35:14 13    permission to use the information in the two attachments?

16:35:21 14    A.      Well, my assumption was that he did, given he

16:35:25 15    received it from somebody in the Human Resources Department.

16:35:29 16    Q.      Did you have any trouble believing that he received

16:35:31 17    it from somebody in the Human Resources Department at Qorvo?

16:35:35 18    A.      No, not at all.  Professionally, often times people

16:35:41 19    will share information with each other.  Compensation ranges

16:35:45 20    are always -- companies don't always consider that

16:35:49 21    confidential.  Some do, some don't.  But in this day and

16:35:53 22    age, compensation is often times required.  I know like in

16:35:58 23    states of New York and California, for example, you have to

16:36:02 24    share them.

16:36:04 25            So for me just professionally knowing that

Johnson - direct

16:36:08 1  sometimes professionals share things to help each other or

16:36:11 2  whatever, I didn't think that anything of it from that

16:36:16 3  perspective.

16:36:17 4  Q.      Okay.  So you previously testified that you were in

16:36:20 5  the process of creating a compensation structure as part of

16:36:25 6  one of your roles in terms of creating a more formal human

16:36:30 7  resources structure at the company?

16:36:32 8  A.      Yes.

16:36:33 9  Q.      And so -- and you testified that Mr. Houlden wanted

16:36:40 10 you to use these documents in connection with Akoustis's

16:36:44 11 compensation structure.  Did you use it?

16:36:46 12 A.      No.

16:36:48 13 Q.      Why not?

16:36:49 14 A.      Well, I mean, he handed me this.  I don't really

16:36:54 15 know, to me as a professional with over twenty years in HR

16:36:57 16 and compensation professional, I know there is a right way

16:37:02 17 to go about getting, you know, getting your structure

16:37:05 18 together and doing the research.  I didn't know -- to me

16:37:09 19 this wasn't valid.  I didn't know who put it together, how

16:37:12 20 they came up with the information.  I didn't really know how

16:37:16 21 old it was.

16:37:17 22          It was so -- you know, there was a lot of work

16:37:20 23 that goes into creating those ranges and just having

16:37:25 24 something like this handed to me was not -- I couldn't use

16:37:29 25 it, this wasn't valid to me.

Johnson - direct

16:37:31  1   Q.      So did you prepare a proposed new compensation

16:37:35  2   structure plan?

16:37:36  3   A.      I did, or we did.

16:37:38  4   Q.      Okay.  And did you use any information from outside

16:37:42  5   Akoustis to help prepare that plan?

16:37:44  6   A.      Yes.  We did some research and chose Aon Radford,

16:37:53  7   their compensation survey or database, as our data source

16:37:58  8   for our project.  Aon Radford is a well-known and well

16:38:04  9   respected company, they provide a lot of HR information,

16:38:07 10   support, around comp and benefits and you know, I was able

16:38:14 11   to get approval to use that as a really good source of data.

16:38:21 12   Q.      Did Aon Radford just give you the report?

16:38:25 13   A.      No.  We had to pay for it.  It was around $10,000.

16:38:29 14   Q.      And what's your understanding about the data used in

16:38:34 15   Aon Radford's compensation service?

16:38:38 16   A.      So in order to get that companies like HR departments

16:38:44 17   like myself from companies across the country or actually

16:38:48 18   around the world participate in their studies, so we are

16:38:51 19   providing them our comp data and they are using that and

16:38:55 20   aggregating it.

16:38:56 21           So when you are able -- when we use that, we are

16:39:00 22   able to basically slice and dice comp based on industry you

16:39:08 23   know, job title, you could do it by size of company or all

16:39:14 24   kinds of ways, geography.  So just a really good solid

16:39:18 25   source of compensation data for us.

Johnson - direct

16:39:21  1  Q.     Did you eventually complete the compensation

16:39:37  2  structure?

16:39:38  3  A.     Yes.

16:39:40  4  Q.     And in doing so, did you use any Qorvo information or

16:39:46  5  Qorvo confidential information?

16:39:47  6  A.     No.

16:39:47  7  Q.     Did you use any of the information in the two

16:39:52  8  attachments that Mr. Houlden sent to you?

16:39:56  9  A.     We did not use any of that to create our own ranges,

16:40:01 10  no.

16:40:03 11  Q.     Since you've started as -- you know, I understand

16:40:12 12  that you joined the company in 2019, but under your

16:40:16 13  leadership, what Qorvo information, if any, has Akoustis

16:40:21 14  used in establishing compensation ranges for Akoustis

16:40:25 15  employees?

16:40:26 16  A.     We haven't used any.

16:40:29 17  Q.     I'm going to ask you a similar question but with

16:40:32 18  respect to benefits.  What Qorvo confidential information,

16:40:35 19  if any, has Akoustis used in determining benefits for

16:40:39 20  Akoustis employees?

16:40:40 21  A.     None.

16:40:42 22  Q.     And since you became Director of Human Resources,

16:40:49 23  what Qorvo confidential information, if any, has Akoustis

16:40:53 24  used for any human resources purpose?

16:40:55 25  A.     We haven't used any.

Johnson - direct

16:40:57  1    Q.      Have you heard the phrase external recruiter?

16:41:02  2    A.      Yes.

16:41:02  3    Q.      What does it mean?

16:41:04  4    A.      It means it's a recruiter, a head hunter or a

16:41:08  5    recruiting firm that's outside of our company, so they don't

16:41:12  6    work internally, they're a company or a person you can hire

16:41:15  7    to recruit for the company.

16:41:17  8    Q.      In your human resources career, have you ever worked

16:41:20  9    with external recruiters?

16:41:23 10    A.      Yes.

16:41:23 11    Q.      What about at Akoustis?

16:41:25 12    A.      Yes, some.

16:41:27 13    Q.      Why did you do that?

16:41:29 14    A.      We'll only do it, at least since I have been here,

16:41:35 15    when we have to, if there is a role that is very hard to

16:41:38 16    fill, which is definitely the case in a company like ours,

16:41:43 17    there will be some engineering jobs and other roles that are

16:41:46 18    very hard to find.  So we may engage a recruiter to help us.

16:41:50 19    Q.      Have you personally worked with any external

16:41:53 20    recruiters at Akoustis?

16:41:55 21    A.      Yes.

16:41:55 22    Q.      How do you communicate to an external recruiter what

16:41:59 23    the company is looking for in a candidate?

16:42:01 24    A.      We have that job description I mentioned earlier, so

16:42:05 25    we'll share with them the job description and just in our

Johnson - direct

16:42:08  1    own words what are we looking for, besides what you see on

16:42:13  2    this piece of paper, what does the ideal candidate look

16:42:17  3    like.  And you know, what skills and those things, and we'll

16:42:23  4    also share our compensation range, benefits package, is

16:42:28  5    there going to be relocation offered, so we share all those

16:42:31  6    things with the recruiter.

16:42:33  7    Q.    Do you ever consider asking an external recruiter to

16:42:37  8    focus on sending, and I mean this -- let me rephrase the

16:42:42  9    question.

16:42:42 10            Under your leadership as Director of Human

16:42:47 11    Resources, have you ever considered asking an external

16:42:50 12    recruiter to focus on sending you candidates from Qorvo in

16:42:55 13    particular?

16:42:55 14    A.    No.

16:42:56 15    Q.    Why not?

16:42:57 16    A.    Well, I mean, we -- we wouldn't want to narrow our

16:43:03 17    search to one company.  Certainly we would consider -- we

16:43:07 18    want to consider candidates from all companies, and it

16:43:11 19    depends on what the job is, if -- you know, some jobs

16:43:14 20    require that they have semiconductor industry experience in

16:43:18 21    order to be able to do the job, so we may look at Qorvo

16:43:23 22    candidates, as well as Qualcomm or any other semiconductor

16:43:27 23    industry across the country.  So basically, we want to cast

16:43:30 24    a net and be able to identify the best candidate that's

16:43:34 25    available at the time.

Johnson - direct

16:43:38  1    Q.      Do you have -- do you do any internal recruiting at

16:43:42  2    Akoustis?

16:43:42  3    A.      Yes, that's our preferred method of recruiting.

16:43:45  4    Q.      Have you ever directed -- have you, as Director of

16:43:50  5    Human Resources, ever directed any of Akoustis's internal

16:43:54  6    recruiters to focus on candidates from Qorvo?

16:43:59  7    A.      No.

16:44:01  8    Q.      Same reason?

16:44:04  9    A.      Yeah, it's the same reason, we want to find the best

16:44:07 10    candidates that we can.

16:44:11 11    Q.      In your role as Director of Human Resources, have you

16:44:16 12    ever felt pressured to recruit specifically from Qorvo?

16:44:22 13    A.      No, not at all.

16:44:26 14    Q.      Do you know how many employees Akoustis has hired in

16:44:29 15    total since its founding in 2014?

16:44:33 16    A.      Yes.  We've hired a little over 400 employees since

16:44:37 17    then.

16:44:39 18    Q.      But that's not how many employees you have now, is

16:44:42 19    it?

16:44:42 20    A.      No.  No.

16:44:44 21    Q.      And how is it that you happen to know that number?

16:44:49 22    A.      I had -- I completed a deposition for this case last

16:44:57 23    year, and in preparing for that, we had to prepare a census

16:45:03 24    of all employees, anybody who has ever worked for Akoustis

16:45:07 25    in the history of Akoustis, so that's how I learned that it

Johnson - direct

16:45:11  1  was a little over 400.

16:45:14  2  Q.    And were you testifying as a company designee, or a

16:45:22  3  company witness in that deposition?

16:45:23  4  A.    Yes, I was.

16:45:27  5  Q.    Of the 400 plus total employees that Akoustis has

16:45:31  6  hired since 2014, do you know how many had previously worked

16:45:38  7  at Qorvo or the two entities that merged to create it, RFMD

16:45:43  8  and TriQuint?

16:45:45  9  A.    Yes.

16:45:45 10  Q.    How many?

16:45:47 11  A.    There are forty-three employees that have at some

16:45:51 12  time worked at one of those companies before working at

16:45:54 13  Akoustis.

16:45:55 14  Q.    Is that information you know from the work you had

16:45:57 15  to, or the research you had to perform to be the company's

16:46:01 16  deposition witness?

16:46:02 17  A.    Yes.  Qorvo had asked or as a part of this deposition

16:46:08 18  prep, we had to learn, identify those forty-three people.

16:46:13 19  Q.    Have you ever heard of Skyworks?

16:46:19 20  A.    Yes.

16:46:19 21  Q.    What is Skyworks?

16:46:20 22  A.    It's a large semiconductor company.

16:46:23 23  Q.    Are you aware of any products that Skyworks makes or

16:46:27 24  sells?

16:46:27 25  A.    I know that they are a competitor of ours.

Johnson - direct

16:46:31  1    Q.      Okay.  Are you aware whether Akoustis has hired

16:46:35  2    anybody that previously worked at Skyworks?

16:46:37  3    A.      We have.

16:46:38  4    Q.      How about, have you heard of Avago or Avago turned

16:46:48  5    into Broadcom, Broadcom?

16:46:49  6    A.      Yes.

16:46:50  7    Q.      Are you aware whether Akoustis has hired anybody who

16:46:53  8    previously worked at Avago or Broadcom?

16:46:56  9    A.      Yes, we have.

16:46:58 10    Q.      Have you ever heard of Qualcomm?

16:47:04 11    A.      Yes.

16:47:05 12    Q.      What is Qualcomm?

16:47:06 13    A.      A large semiconductor company, another competitor.

16:47:10 14    Q.      Are you aware of whether Akoustis has hired anybody

16:47:14 15    who previously worked at Qualcomm?

16:47:16 16    A.      Yes, we have.

16:47:18 17    Q.      Can you estimate for us approximately how many former

16:47:22 18    employees of Skyworks, Broadcom/Avago and Qualcomm that have

16:47:29 19    been hired over the last ten years at Akoustis?

16:47:34 20    A.      I would, I believe it's probably around fifteen

16:47:38 21    people.

16:47:39 22    Q.      Okay.  So you testified just a few minutes ago that

16:47:42 23    Akoustis has hired about forty-three people who formally

16:47:45 24    worked at Qorvo, RFMD or TriQuint, yet it's only hired

16:47:50 25    fifteen or so people from other competitors.  Do you have

Johnson - direct

16:47:54  1  any explanation for that discrepancy?

16:47:56  2  A.    Yeah.  A couple of things.  I would say, one is Qorvo

16:48:02  3  is the closest semiconductor company to Akoustis

16:48:05  4  geographically.  So it makes perfect sense that people would

16:48:13  5  move from Qorvo to Akoustis, some people don't want to

16:48:17  6  leave, don't want to relocate, they want to stay, but they

16:48:22  7  may want to still stay in the industry, so it's just like if

16:48:26  8  Charlotte is the banking hub, and Wells Fargo and Bank of

16:48:31  9  America compete for the same talent, people go from one bank

16:48:34 10  to the other, it's just common professionally.

16:48:38 11          Another reason is that we have members of the

16:48:41 12  executive team and other employees who worked for Akoustis

16:48:44 13  and it's known that people, you know, when you leave a job,

16:48:49 14  or when you're-- you know, somebody leaves your company, you

16:48:53 15  often times stay in touch with people and you network with

16:48:56 16  them, and you may reach out to them if you're unhappy where

16:49:00 17  you are or you're ready for a new opportunity, you're

16:49:04 18  probably going to reach out to your network and see what's

16:49:06 19  going on, and that definitely happened a lot at Akoustis, so

16:49:11 20  it's not a surprise to me to hear those numbers.

16:49:13 21  Q.    How many minutes does it take to drive from -- well,

16:49:18 22  Akoustis is based in Huntersville, North Carolina?

16:49:21 23  A.    Yes.

16:49:22 24  Q.    And where is Qorvo's headquarters?

16:49:25 25  A.    Greensboro, it's where people live, some people you

Johnson - direct

16:49:31  1    know may be an hour-and-a-half commute, some people might be

16:49:36  2    an hour, just depends on where they live.

16:49:38  3    Q.    How far is Greensboro -- I mean, we're in Delaware,

16:49:42  4    probably most people aren't familiar with how long it takes

16:49:45  5    to drive from Huntersville to Greensboro.  Assuming that

16:49:50  6    traffic isn't completely awful, how long would you expect it

16:49:53  7    to take?

16:49:54  8    A.    I believe about an hour-and-a-half.  I can't remember

16:49:57  9    the last time I drove to Greensboro, but I think it was

16:50:00 10    about an hour-and-a-half.

16:50:03 11    Q.    So in your mind, it's going from one company to the

16:50:09 12    other would be, it's at least plausible that somebody could

16:50:14 13    do it without having to relocate?

16:50:16 14    A.    Yes, that's correct.  I mean, some of our employees

16:50:18 15    that live in that area have relocated.  Others work remotely

16:50:24 16    a couple of days a week.  You know, and then drive back and

16:50:29 17    forth the other days.

16:50:30 18    Q.    By the way, are you aware of somebody named Pat

16:50:33 19    Lewis?

16:50:33 20    A.    Yes.

16:50:34 21    Q.    Who is he?

16:50:35 22    A.    He was our Director of Business Systems for a number

16:50:38 23    of years.

16:50:39 24    Q.    And so he was, you said, he no longer is?

16:50:47 25    A.    No, he's not.

16:50:49 1  Q.      Last week in trial, Dr. Shanfield who was a witness

16:50:59 2  for Qorvo mentioned in Court that Mr. Lewis of course

16:51:04 3  recognized the documents sent to him because he was a former

16:51:07 4  Qorvo employee.  Are you aware of whether Mr. Lewis ever

16:51:10 5  worked at Qorvo or one of Qorvo's predecessor companies?

16:51:15 6  A.      I'm familiar with Pat, Pat Lewis's employee file.

16:51:22 7  And no, he, according to what we have in his file, his

16:51:27 8  resume, his application, he never worked for Qorvo.

16:51:31 9              MR. ELKINS:  Thank you, Ms. Johnson.  Those are

16:51:34 10  all the questions that I have.  I pass the witness.

16:51:36 11              THE COURT:  Cross-examination.

16:51:43 12              MS. AYERS:  Understood.  Thank you, Your Honor

16:51:44 13                   CROSS-EXAMINATION

16:51:45 14  BY MS. AYERS:

16:51:45 15  Q.      Good afternoon, Ms. Johnson.

16:51:46 16  A.      Good afternoon.

16:51:47 17  Q.      I want to make sure that I understood the testimony

16:51:49 18  that you provided a few minutes ago.

16:51:53 19              You said that hiring managers are the people

16:51:56 20  responsible for conducting the interviews and putting

16:52:00 21  together the offers that are made.  Is that correct?

16:52:04 22  A.      No, that's not what I said.

16:52:10 23  Q.      Hiring managers are not the individuals that put

16:52:12 24  together the compensation offers that are initially then

16:52:15 25  sent to you for purposes of sending out to the individuals?

Johnson - cross

16:52:18  1    A.      No, that's not how our process works.

16:52:20  2    Q.      Okay.  Can you explain to me how your process worked

16:52:23  3    because that's not what I understood from the testimony you

16:52:25  4    just provided?

16:52:26  5    A.      Yeah, what I testified to is that hiring managers

16:52:29  6    make a decision after they have been recommended to them

16:52:32  7    after their boss has also approved.  But as far as putting

16:52:36  8    an offer together, the HR department puts an offer together,

16:52:40  9    so we, again, use all the data that I mentioned earlier to

16:52:46 10    create an offer, we do then talk with the hiring manager and

16:52:50 11    align on it.  And then we get approval, so that's how we do

16:52:56 12    that.

16:52:56 13    Q.      Okay.  Thank you for that clarification.

16:53:00 14    Ms. Johnson.  And when you mentioned hiring managers, the

16:53:02 15    concept is essentially that engineers hire engineers;

16:53:06 16    correct?

16:53:10 17    A.      You know, maybe in some -- I don't know that's true

16:53:17 18    in all cases.

16:53:18 19    Q.      The hiring managers responsible for determining

16:53:23 20    whether or not to interview and conduct an interview and

16:53:26 21    then ultimately make an offer to a candidate has expertise

16:53:31 22    in the area in which Akoustis is actually looking to employ

16:53:34 23    an individual, correct?

16:53:36 24    A.      Yes.

16:53:36 25    Q.      Okay.  So in that sense, you know, the people who are

Johnson - cross

16:53:40 1    responsible for managing the engineers, those are the

16:53:43 2    individuals that are interviewing the engineers as a hiring

16:53:46 3    manager, is that correct?

16:53:48 4    A.    Those are -- that's a part of the interview team,

16:53:51 5    yes.

16:53:52 6    Q.    Okay.  Fair enough, Ms. Johnson.

16:53:54 7          And you consult with the hiring managers when

16:54:00 8    the offer is put together to ensure that the hiring managers

16:54:04 9    are pleased with the package that is being offered to the

16:54:07 10   candidates that they want to hire; is that correct?

16:54:09 11   A.    That's our desire.  You know, that's not always the

16:54:13 12   case, but we do try to get to a point where we agree on it,

16:54:18 13   yes.

16:54:19 14   Q.    Okay.  And earlier in your testimony, you discussed

16:54:23 15   Trial Exhibit 305 and 306 with counsel for Akoustis, and

16:54:28 16   that is PTX-669 and 670.  I would like to get those up on

16:54:33 17   the screen for the jury.  And let's go ahead and put up 670

16:54:52 18   as well.  And go ahead and go to page 2 of 670.

16:54:57 19         And during your testimony with Akoustis's

16:55:04 20   counsel, you indicated that the information attached to

16:55:08 21   PTX-669, which is Trial Exhibit 305, came from Mr. Houlden;

16:55:15 22   correct?

16:55:15 23   A.    Correct.

16:55:16 24   Q.    And one of the things that Mr. Houlden sent to you

16:55:20 25   was the Excel spreadsheet chart which we're showing on the

16:55:25   1    right-hand side of the screen; correct?

16:55:26   2    A.      Yes.

16:55:27   3    Q.      And you were telling Mr. Boller, who was your boss,

16:55:30   4    the Chief Financial Officer, that the data you are sending

16:55:34   5    him in this e-mail is information that Rohan has gathered

16:55:38   6    from somebody at Qorvo; correct?

16:55:41   7    A.      Yes.

16:55:45   8    Q.      And you sent this communication to Mr. Boller on

16:55:51   9    May 27th, 2020; correct?

16:55:53  10    A.      Correct.

16:55:54  11    Q.      Okay.

16:55:56  12            MS. AYERS:  Your Honor, may I approach the

16:55:58  13    witness?

16:55:59  14            THE COURT:  You may.

16:56:18  15    BY MS. AYERS:

16:56:40  16    Q.      Ms. Johnson, PTX-673 is a May 26th e-mail from you --

16:56:49  17    from Mr. Houlden to you and Mr. Boller; correct?

16:56:54  18    A.      Yes.

16:56:55  19    Q.      And attached to PTX-673 is a spreadsheet called

16:57:02  20    Akoustis pay scale rev G, correct?

16:57:05  21    A.      Yes.

16:57:07  22            MS. AYERS:  Your Honor, I move into evidence the

16:57:09  23    document with the reference number PTX-673.

16:57:13  24            THE COURT:  Received as 308.  Marked and

16:57:19  25    received.

Johnson - cross

16:57:19  1                    (Trial Exhibit No. 308 was admitted into

16:57:21  2    evidence.)

16:57:21  3                    MS. AYERS:  And I also move into evidence the

16:57:22  4    document with reference number PTX-674.

16:57:26  5                    THE COURT:  Marked and received as 309.

16:57:29  6                    (Trial Exhibit No. 309 was admitted into

16:57:30  7    evidence.)

16:57:30  8    BY MS. AYERS:

16:57:32  9    Q.    Let's go ahead and get those up on the screen for the

16:57:38 10    jury.

16:57:47 11                    Okay, Ms. Johnson.  So up on the screen for the

16:57:50 12    jury is the communication from Mr. Houlden to you and to

16:57:54 13    Mr. Boller; correct?

16:57:56 14    A.    Yes.

16:57:57 15    Q.    And that was sent the day before the communication

16:58:00 16    that we were just looking at; correct?

16:58:04 17    A.    Yes.

16:58:05 18    Q.    Okay.  And the Akoustis pay scale revision G at

16:58:14 19    PTX-674, that looks pretty similar to the Rohan spreadsheet

16:58:19 20    that you sent to Mr. Boller the next day; correct?

16:58:24 21    A.    Yes, it does look similar.

16:58:26 22    Q.    Okay.  And for your benefit, and for the jury's

16:58:29 23    benefit, I would like to pull up PTX-670, which has been

16:58:34 24    entered into evidence as 306, and display that on the

16:58:38 25    left-hand side of the screen, that is the spreadsheet that

Johnson - cross

16:58:40 1  is entitled Rohan's guidance chart.  And I would like to

16:58:46 2  compare that to 674, which is a Trial Exhibit 309, which is

16:58:54 3  the Akoustis pay scale revision G.

16:59:02 4        Go ahead and blow that up for us so that she can

16:59:10 5  see the chart below as well.

16:59:12 6        And Ms. Johnson, if you need to look at the

16:59:18 7  physical exhibits in front of you, too, you are welcome to

16:59:21 8  do that as well.

16:59:22 9  A.      Okay.

16:59:23 10 Q.      The pay scale that is entitled Rohan's guidance chart

16:59:28 11 is identical to the pay scale that is entitled Akoustis pay

16:59:33 12 scale revision G; correct?

16:59:38 13 A.      I don't think it's exactly the same.  But it's very

16:59:48 14 close.

16:59:48 15 Q.      I think that's fair.  So what I am focusing on,

16:59:51 16 Ms. Johnson, is the salary schedule.

16:59:55 17 A.      Okay.

16:59:55 18 Q.      The salary schedules for both of these charts is the

17:00:00 19 same; correct?

17:00:01 20 A.      I believe so, yes.

17:00:02 21 Q.      And these are the salary schedules contained in

17:00:05 22 Akoustis's revision -- Akoustis's pay scale revision G;

17:00:10 23 correct?

17:00:10 24 A.      That's on the spreadsheet, that's not the correct

17:00:14 25 title, but yes, that's what's on the sheet.

Johnson - cross

17:00:16  1    Q.      So the spreadsheet is entitled Akoustis pay scale

17:00:20  2    revision G, correct?

17:00:21  3    A.      Yes, it is titled that.

17:00:22  4    Q.      And revision G implies that there were six other

17:00:29  5    revisions that occurred before revision G, correct?

17:00:31  6    A.      That would be my assumption.

17:00:35  7    Q.      But your testimony is that Akoustis's hiring

17:00:39  8    managers, including Mr. Houlden, did not use Qorvo

17:00:42  9    confidential information as a part of the compensation

17:00:45 10    determinations it was making for purposes of offering

17:00:48 11    salaries to interviewees, is that correct?

17:00:51 12    A.      My testimony is that we did not use this data as a

17:00:55 13    part of our comp project.  We did not -- this Akoustis pay

17:01:01 14    scale was a title Rohan gave this, not HR or Akoustis.  And

17:01:06 15    in this e-mail chain, I even said that, this is not that.

17:01:10 16    Q.      So he -- I apologize, I did not intend to interrupt

17:01:15 17    you, please finish.

17:01:16 18    A.      No, I'm good.

17:01:17 19    Q.      The comp pay study that you're referencing and

17:01:22 20    discussing, let's go back to PTX-669, which is Trial

17:01:32 21    Exhibit 305.  So in the second paragraph of this e-mail

17:01:41 22    communication to Mr. Boller, you say, "We could choose to

17:01:45 23    use it as a data point for our compensation project if we

17:01:48 24    want to."

17:01:49 25            Do you see that?

Johnson - cross

17:01:49  1   A.      I do.

17:01:49  2   Q.      So the compensation project that you have been

17:01:52  3   testifying about that you commissioned a third party to

17:01:54  4   assist with, that occurred after May of 2020; correct?

17:01:58  5   A.      Yes.

17:02:01  6   Q.      And in fact, I think that the Aon compensation study

17:02:06  7   was at least approved in July of 2020, is that correct?

17:02:09  8   A.      That sounds right.

17:02:18  9   Q.      Okay.  And I think your testimony to the jury was

17:02:20 10   that you did not use the Rohan guidance chart for the

17:02:25 11   Akoustis pay scale revision G in making compensation

17:02:29 12   decisions after you received that Aon compensation study,

17:02:34 13   correct?

17:02:36 14   A.      Correct.

17:02:37 15   Q.      But it would be fair to say that you did actually

17:02:40 16   reference the information that came from Qorvo as a part of

17:02:45 17   the compensation study, correct?

17:02:51 18   A.      I would say that is partially correct.  It was

17:02:55 19   referenced in order to appease Rohan, but not used in the

17:03:03 20   study.

17:03:26 21   Q.      You also testified regarding a number of policies

17:03:31 22   that Akoustis has in place that relates to the way Akoustis

17:03:38 23   employees should treat the intellectual property of Akoustis

17:03:41 24   and treat the intellectual property of third parties;

17:03:45 25   correct?

Johnson - cross

17:03:45  1    A.      Yes.

17:03:45  2    Q.      And I think one of them was a business conduct

17:03:48  3    guidelines; correct?

17:03:49  4    A.      Yes.

17:03:49  5    Q.      One of them was a code of ethics, is that correct?

17:03:52  6    A.      That's correct.

17:03:53  7    Q.      One of them was an employee confidentiality

17:03:55  8    agreement?

17:03:55  9    A.      Yes.

17:03:56 10    Q.      And you also required employees to sign an annual

17:04:02 11    compliance certification, correct?

17:04:04 12    A.      Yes.

17:04:04 13    Q.      I would like to pull up what is PDX-14.2.  And I

17:04:25 14    would like to approach the witness and provide her with an

17:04:29 15    exhibit, Your Honor.

17:04:31 16            THE COURT:  You may.

17:04:49 17    BY MS. AYERS:

17:04:53 18    Q.      And Ms. Johnson, the document that I just handed you

17:04:56 19    is the census that you created in order to identify whether

17:05:02 20    or not any individual at Akoustis previously worked for

17:05:08 21    Qorvo, RFMD or TriQuint; is that correct?

17:05:11 22    A.      That was a part of the reason this was created, yes.

17:05:14 23    Q.      Okay.  And you created that document for purposes of

17:05:18 24    identifying all the employees that have ever worked at

17:05:22 25    Akoustis, and then identifying whether or not they were

17:05:24 1    affiliated with or associated with Qorvo or one of its

17:05:28 2    predecessors, correct?

17:05:29 3    A.     It was created by a team of people, it wasn't just me

17:05:33 4    who created it with our attorneys.

17:05:35 5    Q.     So it was a team of individuals at Akoustis that

17:05:37 6    created this, correct?

17:05:38 7    A.     Our attorneys who are not at Akoustis, along with HR

17:05:43 8    created this.

17:05:45 9    Q.     Okay.  And the information contained within this

17:05:50 10   exhibit is actually from Akoustis's own business records;

17:05:55 11   correct?

17:05:56 12   A.     Yes, that's correct.

17:05:59 13           MS. AYERS:  Your Honor, I move to admit PTX-682.

17:06:02 14           THE COURT:  Marked and received as 310.

17:06:06 15           (Trial Exhibit No. 310 was admitted into

17:06:07 16   evidence.)

17:06:07 17   BY MS. AYERS:

17:06:08 18   Q.     Let's go ahead and put up 682 for the jury just for

17:06:13 19   one moment.

17:06:15 20           So if an individual wanted to determine whether

17:06:18 21   or not any individual employee at Akoustis worked previously

17:06:22 22   for Qorvo, or one of its predecessors, they could refer to

17:06:27 23   the information contained within this chart in order to do

17:06:31 24   that, is that correct?

17:06:32 25   A.     Yes.

Johnson - cross

17:06:35  1    Q.      Okay.  Let's go back to PDX-14.2.  And I'm not going

17:06:42  2    to walk through each one of these individuals, Ms. Johnson,

17:06:47  3    because frankly I don't think the jury would find that a

17:06:52  4    valuable use of their time, but if I wanted to, we could

17:06:55  5    look at the chart which I just gave you which is Trial

17:06:59  6    Exhibit 310 and PTX-682, and we can determine whether any

17:07:03  7    one of those individuals previously a Qorvo employee or not,

17:07:07  8    correct?

17:07:07  9    A.      Yes.

17:07:07 10    Q.      We know, for example, Mr. Daeho Kim is not a former

17:07:11 11    Qorvo employee because he just testified and stated he had

17:07:15 12    never worked previously at Qorvo.  But we could walk through

17:07:19 13    these and rid every individual at Akoustis who was

17:07:23 14    previously a Qorvo employee on this chart using your census

17:07:28 15    data, correct?

17:07:29 16    A.      Yes.

17:07:29 17    Q.      So my question for you is you testified that you're

17:07:32 18    responsible for, "everything in human resources."  Do you

17:07:36 19    remember that?

17:07:37 20    A.      Yes.

17:07:37 21    Q.      And everything in human resources includes

17:07:41 22    investigating employees for disciplinary actions, correct?

17:07:45 23    A.      In some cases, that would be correct.  In other cases

17:07:50 24    that would not be correct.

17:07:55 25    Q.      Have you, as the Director of Human Resources

17:07:58  1  disciplined any of the individuals listed on this slide for

17:08:03  2  violations of Akoustis's business conduct guidelines, code

17:08:08  3  of ethics or employee confidentiality agreements?

17:08:11  4  A.    No.

17:08:26  5          MS. AYERS:  I have no further questions, Your

17:08:27  6  Honor.

17:08:27  7          THE COURT:  Redirect?

17:08:30  8          MR. ELKINS:  Your Honor, we have no redirect.

17:08:34  9          THE COURT:  All right.

17:08:40 10          Ladies and gentlemen, we're going to stop today

17:08:42 11  because I need to discuss matters for the conclusion of the

17:08:45 12  case with counsel.

17:08:48 13          Thanks so much, ma'am, you may step down.

17:08:51 14          But we had several conferences, but we need to

17:08:58 15  have another conference as we work toward a final set of

17:09:03 16  instructions for all of you, so it makes a better use of our

17:09:06 17  time and your time.  We have one witness left, I understand,

17:09:10 18  is that right, for the defense, and that's by deposition.

17:09:13 19  Maybe I have miscounted.

17:09:14 20          MR. ELKINS:  Your Honor, we have one fact

17:09:16 21  witness left.

17:09:16 22          THE COURT:  One fact witness.

17:09:19 23          MR. ELKINS:  Yes.

17:09:19 24          THE COURT:  I'm sorry, one fact witness left,

17:09:21 25  and we'll play that first thing tomorrow.

17:09:23  1          MR. ELKINS:  Yes, we would play that first thing

17:09:26  2   tomorrow.

17:09:26  3          THE COURT:  Right.  And then we do have some

17:09:29  4   expert witnesses?

17:09:30  5          MR. ELKINS:  Then we have four expert witnesses

17:09:32  6   and we will be done.

17:09:33  7          THE COURT:  Not a problem.  I think you can hear

17:09:35  8   from everybody that we are in good shape on our schedule, I

17:09:39  9   think, hard to tell.  I think we are.  So that will give us

17:09:45 10   a chance to address a couple of things this afternoon, the

17:09:49 11   rest of the day and be better use of our time.

17:09:53 12          We will come in tomorrow, we will have a

17:09:55 13   deposition.  I didn't want to start the deposition and stop.

17:09:59 14   I'm going to ask you to come in as you have.  I understand

17:10:02 15   everybody got here right on time, somebody right on time.

17:10:06 16   So that's not a problem, and we will start in here as soon

17:10:10 17   as we can.

17:10:11 18          We are now in the process of discussing some

17:10:13 19   things as you can tell and I just mentioned to you, so it

17:10:16 20   may delay us just a little bit as we adjust some documents

17:10:21 21   for you and the close of the case.

17:10:23 22          Well, we got a ways to go.  Don't discuss the

17:10:27 23   case amongst yourselves.  Don't let anybody talk to you, if

17:10:30 24   somebody tries to.  Avoid things in the media, anything

17:10:34 25   about filters, it's probably easy to do, and of course keep

17:10:37  1    an open mind.  We'll see you all tomorrow to start at 8:30.

17:10:43  2    We'll come in a little earlier.  Thanks very much.

17:10:47  3                    (Jury exiting the courtroom at 5:10 p.m.)

17:11:14  4                    THE COURT:  Everyone can be seated for a moment.

17:11:23  5    This is kind of where we are.  We understand that -- and we

17:11:31  6    already mentioned this, we will need to eliminate the

17:11:36  7    instruction referencing the false advertising claim,

17:11:39  8    obviously, everybody agrees with that.  I'll go back to

17:11:43  9    Mr. Masters, he looks like he's in the seat in charge right

17:11:46 10    now, and that is correct, right?

17:11:48 11                    MR. MASTERS:  That is correct, Your Honor.

17:11:49 12                    THE COURT:  And then we need to possibly, and we

17:11:54 13    will make sure that there is an instruction, the principle,

17:11:59 14    we will look at that.  One has been proposed already that

17:12:01 15    you sent in, I'll recheck that.  We've got things on it, but

17:12:05 16    I may want to send one in tonight.

17:12:07 17                    MR. MASTERS:  Okay.

17:12:09 18                    THE COURT:  I'm sure we've got it.  It's not

17:12:12 19    something hard to find.

17:12:13 20                    We can do this, it's a little more awkward, we

17:12:23 21    have the delete the instruction concerning the Doctrine of

17:12:26 22    Equivalents, that's already been out for a while, so that's

17:12:29 23    gone.  We're going to -- are we going to renumber the

17:12:33 24    *Georgia-Pacific* factors, does it matter?  We can renumber

17:12:36 25    them.

17:12:37  1        However you want them re-numbered, we'll

17:12:39  2   renumber them that's not a problem.  You the limiting

17:12:43  3   instruction, attorney instruction, laptop commuters, I don't

17:12:46  4   think we have had any discussion about that and we're

17:12:49  5   probably better off the way we are.

17:12:51  6        MR. ELKINS:  I don't think we need it, Your

17:12:52  7   Honor.

17:12:52  8        THE COURT:  We don't need that, right?

17:12:54  9        MR. ELKINS:  Yes.

17:12:55 10        THE COURT:  We are going to strike it, we're

17:12:57 11   getting rid of that.  That takes care of that.  Delete the

17:13:00 12   reference to do bender and the conspiracy instruction, I

17:13:04 13   think we have to do that, too, so that -- anybody got

17:13:07 14   something contrary on that, looking to everybody to make

17:13:11 15   sure.  I'm pretty sure that's out, but -- at least one nod

17:13:17 16   from somebody in charge over there.  Okay.

17:13:19 17        We will look at that discussion regarding

17:13:26 18   replacing the instruction concerning duplicative damages

17:13:31 19   with the instructions the Court will ensure that there is no

17:13:36 20   dollar recovery, I can do that, I think I'm allowed to, it's

17:13:39 21   okay, I think that's all-think about that, I'm going to

17:13:44 22   think about it because I'm not completely resolved on that

17:13:47 23   frankly, and we do give that instruction with some

17:13:51 24   regularity, so I'm going to just put that down as maybe as

17:13:55 25   open still.  And then I think that's it.  Respond as

17:14:01 1    superior, I think we got that covered.

17:14:05 2             So now, right now and I'm not sure what's going

17:14:08 3    to happen, I'm not promising, but we have to continue to

17:14:11 4    revise documents.  It looks like under North Carolina law we

17:14:18 5    may put an nominal damages option there, that may be the way

17:14:22 6    that should be handled.  And we can talk about that some

17:14:25 7    more.  We're going to try to get through the process of

17:14:28 8    getting things on paper in a pretty close to final format.

17:14:35 9             That is a pretty good list of things that we're

17:14:38 10   taking care of.  Let me see what else we've got here.

17:14:42 11            Mr. DeFosse, I'm looking at memos that you

17:14:44 12   submitted, so if you want to tell me about them more, we

17:14:47 13   will talk about it.

17:14:50 14            MS. AYERS:  Your Honor, I don't think

17:14:52 15   Mr. DeFosse is in the courtroom.

17:14:54 16            THE COURT:  No, he's not.  He's gone.  Is he

17:14:59 17   coming back?  I'm sure he is.  I didn't see him, but that's

17:15:03 18   fine.  I've got the note and I understand how we're going to

17:15:06 19   try to take a look at things.

17:15:08 20            I just wanted to go over matters.  What else do

17:15:12 21   we have, we have maybe one more thing.  Civil conspiracy,

17:15:16 22   right now we got civil conspiracy in, right now I'm thinking

17:15:21 23   civil conspiracy remains in.  And civil conspiracy we can

17:15:24 24   look at that.  I know there was some discussion from the

17:15:28 25   defense side on civil conspiracy.  And I will think about it

17:15:33  1    a little bit more, but that's probably not going away, but

17:15:38  2    I'm not sure.

17:15:39  3             I think that covers -- and Mr. Masters, what

17:15:43  4    else do we need, or Ms. Ayers, what else do we need to put

17:15:47  5    on our list because we've got a pretty quick schedule, we're

17:15:51  6    going to complete that -- obviously defense is going to

17:15:55  7    complete that deposition testimony, it won't take that long,

17:15:57  8    well it takes a little while, you should have our list and

17:16:02  9    videographer has made our changes.

17:16:04 10             MR. ELKINS:  We've already made those changes

17:16:06 11    Your Honor, so we're ready to go.

17:16:08 12             THE COURT:  I don't remember how long that is.

17:16:10 13             MR. ELKINS:  Ninety minutes.

17:16:11 14             THE COURT:  Ninety minutes.  I knew it was a

17:16:13 15    little long but that's not a problem.  We'll start that

17:16:16 16    right at 9:30.

17:16:17 17             Mr. Masters, I know you're standing, but I got

17:16:20 18    to get that to counsel, Mr. Elkins, because they have got

17:16:24 19    the laboring for tomorrow.  I'm going to give you your

17:16:29 20    times, the time is getting eaten up pretty good, let me take

17:16:33 21    a look how bad they are.

17:16:35 22             We're doing them a little differently when you

17:16:45 23    were out.  We will recheck them, I think everybody has got

17:16:47 24    this down.  It looks like the Plaintiff has used 20 hours

17:16:51 25    and 53 minutes, so you're on--  and five seconds.  So that's

17:16:55  1    not a lot left there.  Defense has now used it looks like

17:17:02  2    15 hours, 32 minutes, and 0 seconds there.  There may be a

17:17:09  3    little bit on the side-bar, we'll adjust that and get that

17:17:13  4    taken care of.  So that will probably not change it very

17:17:16  5    much at all.

17:17:17  6              Mr. Masters, this is -- yes, sir.

17:17:19  7              MR. MASTERS:  I was going to ask another

17:17:23  8    question, so we can finish this topic.

17:17:25  9              THE COURT:  I just want you to know, everybody

17:17:27 10    knows we're going to be fight on Plaintiff's side, that's

17:17:30 11    not unusual, kind of how it works out.

17:17:32 12              MR. MASTERS:  We're hoping to land right under

17:17:34 13    the twenty-five, Your Honor.

17:17:35 14              THE COURT:  That's a good thing.

17:17:37 15              MR. MASTERS:  That's our goal.

17:17:38 16              I would like to say that I believe during Court

17:17:43 17    session today, we e-mailed to you our brief on the North

17:17:49 18    Carolina.

17:17:49 19              THE COURT:  Yes, I have got that, in fact I

17:17:51 20    started to look at it, and I already have a comment or two.

17:17:56 21              MR. MASTERS:  Would you like us to file it in

17:17:59 22    the court docket?

17:18:00 23              THE COURT:  Yes, it should be docketed.

17:18:01 24              MR. MASTERS:  We'll do that.

17:18:02 25              THE COURT:  And, of course, Mr. Elkins has a

17:18:06  1    copy, I don't know if he has.

17:18:07  2                MR. MASTERS:  We copied him.

17:18:08  3                MR. ELKINS:  I haven't checked e-mail since

17:18:10  4    yesterday.

17:18:11  5                THE COURT:  It's there.  I think we're good on

17:18:14  6    that.  Yes, sir.

17:18:15  7                MR. MASTERS:  Just I guess scheduling, if we --

17:18:17  8    I'm not sure we'll get through all the witnesses tomorrow,

17:18:20  9    but if we run into Wednesday with witnesses, would you

17:18:23 10    anticipate doing closing Wednesday afternoon?

17:18:26 11                THE COURT:  Yes.

17:18:26 12                MR. MASTERS:  Okay.

17:18:27 13                THE COURT:  Yes.

17:18:28 14                MR. MASTERS:  Or immediately after --

17:18:29 15                THE COURT:  Wednesday we're going to get to

17:18:32 16    closing, that seems very, time is going to run out, that's

17:18:36 17    extremely, extremely likely.  And that's a good -- that's

17:18:41 18    what I want the jury to know I think we're doing okay.

17:18:44 19                MR. MASTERS:  I only ask for planning purposes,

17:18:46 20    that's all on our side, that's all.

17:18:49 21                THE COURT:  I think we're in good shape.

17:18:50 22                MR. ELKINS:  I do, too, Your Honor.  Just for

17:18:55 23    your amusement, I guess.

17:18:57 24                THE COURT:  That looks terrible when you open a

17:18:59 25    book like that.

17:19:00  1          MR. ELKINS:  I know, but I had calculated that

17:19:02  2   tomorrow if we had started -- and again, we got kicked off a

17:19:06  3   little late today, but if we only had fifteen minutes with

17:19:10  4   Ms. Giovan tomorrow but we would only go seven-and-a-half

17:19:15  5   hours, we go 7:45 with the breaks.  So we'll be very close

17:19:19  6   to being done tomorrow, but I expect that things, you know,

17:19:24  7   things always take longer than one expects and if things

17:19:28  8   move faster, we will finish tomorrow, if they don't, then

17:19:32  9   Ms. Irwin will be the last expert to testify for us, it may

17:19:37 10   either fall on both Tuesday and Wednesday, or on Wednesday,

17:19:42 11   in which case you know, we can take a break and then close.

17:19:45 12          THE COURT:  Right.  Exactly.

17:19:46 13          MR. ELKINS:  Yeah.

17:19:47 14          THE COURT:  I think you're right.  Let's check

17:19:49 15   on one other thing, too, which is at this point I'm

17:19:52 16   anticipating that if there is any rebuttal, it will be super

17:19:58 17   short.  That's kind of what I'm thinking.  Is that what

17:20:00 18   you're thinking Mr. Masters?

17:20:03 19          MR. MASTERS:  It is.  And right now we don't

17:20:05 20   anticipate any rebuttal.

17:20:07 21          THE COURT:  We're going to get to close on

17:20:09 22   Wednesday for sure, and we got some things to work on in

17:20:14 23   terms of finishing up the instructions.  Do we get final red

17:20:19 24   lines from everybody, I haven't seen it.  They didn't print

17:20:28 25   it.  We're going to try to get that printed and we'll take

17:20:31  1   care of it.  I think we're in good shape to conclude matters

17:20:36  2   in this matter.  Is there anything else?

17:20:41  3                  MR. MASTERS:  Not today.

17:20:42  4                  THE COURT:  Mr. Elkins?

17:20:43  5                  MR. ELKINS:  I found out what the Biden thing is

17:20:45  6   tomorrow, so I'm gratified that I know that Hunter Biden

17:20:49  7   will be next door.

17:20:50  8                  THE COURT:  Apparently he's physically not

17:20:52  9   coming, just counsel, so there will be many disappointed

17:20:56 10   reporters.

17:20:57 11                  MR. ELKINS:  I'm sure they'll maybe be twenty,

17:21:01 12   you know, instead of having a thousand cameras only be like

17:21:04 13   eighty.

17:21:05 14                  THE COURT:  I do think it's good that you all

17:21:07 15   know about that so that you won't be -- one, you won't be

17:21:10 16   surprised and two, you can avoid the rush.

17:21:15 17                  Thank you all very much.  And we're going to

17:21:17 18   make some changes and we'll have this out to you very soon.

17:21:22 19   Thank you very much.

17:21:23 20                  COURT CLERK:  All rise.

17:21:24 21                  (Court adjourned at 5:21 p.m.)

        22                  I hereby certify the foregoing is a true and
             accurate transcript from my stenographic notes in the proceeding.
        23

        24                              /s/ Dale C. Hawkins
                                       Official Court Reporter
        25                               U.S. District Court

# EXHIBIT M

08:06:58

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3
     QORVO, INC.,                    ) VOLUME 7
4                                    )
                   Plaintiff,        )
5                                    ) C.A. No. 21-1417(JPM)
     v.                              )
6                                    )
     AKOUSTIS TECHNOLOGIES, INC.,    )
7    and AKOUSTIS, INC.,             )
                                     )
8                  Defendants.       )

9

10                      Tuesday, May 14, 2024
                        8:30 a.m.
11                      Jury Trial

12                      844 King Street
                        Wilmington, Delaware
13

14   BEFORE:  THE HONORABLE JON P. McCALLA
                 United States District Court Judge
15

16

17   APPEARANCES:

18
                        MORRIS NICHOLS ARSHT & TUNNELL LLP
19                      BY:  JEREMY A. TIGAN, ESQ.
                        BY:  ANTHONY D. RAUCCI, ESQ.
20
                        -and-
21
                        SHEPPARD MULLIN RICHTER & HAMPTON LLP
22                      BY:  ROBERT M. MASTERS, ESQ.
                        BY:  JONATHAN R. DeFOSSE, ESQ.
23                      BY:  KAZIM A. NAQVI, ESQ.
                        BY:  JENNIFER KLEIN AYERS, ESQ.
24

25                           Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2

3            BAYARD, P.A.
             BY:  STEPHEN B. BRAUERMAN, ESQ.
             BY:  RONALD P. GOLDEN, III, ESQ.

4            -and-

5

6            SQUIRE PATTON BOGGS (US)LLP
             BY:  RONALD S. LEMIEUX, ESQ.
             BY:  DAVID S. ELKINS, ESQ.

7            BY:  VICTORIA Q. SMITH, ESQ.
             BY:  XIAOMEI CAI, ESQ.

8            BY:  RACHAEL A. HARRIS, ESQ.
             BY:  MATTHEW A. STANFORD, ESQ.

9

10                        Counsel for the Defendants

11

12

13           _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

14

15

08:29:02 16           THE COURT:  You may be seated.  One of our jurors

08:29:08 17   has just arrived.  In connection with some of the material

08:29:18 18   that's been submitted, we need to keep in mind that there

08:29:23 19   are time limits in terms of the proposing or suggesting that

08:29:28 20   something does not state a claim.  And being late in that

08:29:31 21   regard is quite problematic.  So we will have to look

08:29:35 22   carefully at whether or not some of these objections are

08:29:40 23   simply late, which they may be.

08:29:45 24           We'll also have to have some discussion,

08:29:48 25   probably, on Dr. Lebby's testimony.  It's going to be quite

08:29:53  1    limited.  It was to be quite limited in terms of what was

08:29:57  2    submitted and what the Court has entered in order in that

08:30:01  3    regard.  He can certainly testify on certain things, like

08:30:04  4    general principles on the teardown and that sort of thing.

08:30:08  5            So we'll see and we'll be looking at this a bit

08:30:13  6    more during the day.

08:30:15  7            Let's see.  Where the parties do not agree on

08:30:23  8    the way to remedy an issue with regard to demonstratives,

08:30:27  9    generally we have not allowed demonstratives, remember to

08:30:31 10    keep that in mind, that's the way it's been handled all

08:30:33 11    along and we don't need to change that now.  This is the

08:30:37 12    very end of the trial and that's an issue.

08:30:41 13            Now, unreasonableness in terms of approving

08:30:49 14    demonstratives might lead to a slightly different

08:30:52 15    conclusion, we have to keep that in mind, there is a

08:30:55 16    reasonableness type of factor there.  We're still working on

08:30:58 17    material.  And that's where we are.  I'm looking around to

08:31:02 18    see who we have got.  Mr. DeFosse is back today.

08:31:06 19            MR. DeFOSSE:  I am today.

08:31:08 20            THE COURT:  I was looking around and I couldn't

08:31:09 21    find you.  I knew you had gone home, that's okay.  And

08:31:13 22    Mr. Lemieux is here, I think he's missing one of his buddies

08:31:17 23    over there.

08:31:18 24            MR. LEMIEUX:  One of my buddies will be a little

08:31:20 25    late this morning.

08:31:21  1          THE COURT:  That's perfectly fine.  People had

08:31:33  2    some problems getting parked because of what's going on.

08:31:37  3          So if you want to have a very brief, very brief

08:31:42  4    Lebby -- let me make sure I got the sequencing right.  The

08:31:48  5    sequence for today, we would have to look at Darveaux first.

08:32:00  6    Does the defense want to take its position, state it one

08:32:04  7    more time briefly, I'm just going to do it briefly because

08:32:07  8    we're going to -- we have to give him a chance to get a cup

08:32:12  9    of coffee, we're not going to take long on this.

08:32:15 10          MR. NAQVI:  Good morning, Your Honor.

08:32:18 11          THE COURT:  Go ahead.

08:32:19 12          MR. NAQVI:  I'll be very brief.  There are two

08:32:22 13    objections for the materials for Dr. Darveaux.  The first is

08:32:26 14    defense demonstrative 3.22, there is a limited statement in

08:32:29 15    that slide about a timeline of development and there is an

08:32:36 16    August 2015 date in a statement attached to it.  This was

08:32:38 17    never previously offered or opined on by Dr. Darveaux.

08:32:42 18    Akoustis claims that this information was set forth in PTX

08:32:46 19    682, but Dr. Darveaux never addressed that document in his

08:32:51 20    report or expressed any opinion on it, so we think that's

08:32:54 21    outside the scope of his opinions and should be excluded.

08:32:57 22          THE COURT:  Give me one second.  I've got to

08:32:59 23    make some adjustments up here.  I'll turn that one on.

08:33:17 24    Because we have a lot of papers, I am going to let you, if

08:33:20 25    you can, show us the precise document that you're concerned

| | |
|---|---|
| 08:33:25 1 | about, so just make it easier on us. |
| 08:33:28 2 | MR. NAQVI:  I have it here, Your Honor. |
| 08:33:30 3 | THE COURT:  If you pass it up.  Just come |
| 08:33:33 4 | forward. |
| 08:33:33 5 | MR. NAQVI:  Thank you. |
| 08:33:35 6 | THE COURT:  Just hand it -- I have got a whole |
| 08:33:38 7 | lot of material.  Okay.  All right.  Final response on that |
| 08:33:49 8 | one. |
| 08:33:50 9 | MS. SMITH:  Good morning, Your Honor.  So the |
| 08:33:54 10 | response on that is the document that Dr. Darveaux relies on |
| 08:34:00 11 | was part of his materials considered and it was basically a |
| 08:34:03 12 | spreadsheet of employees listed, and hiring dates.  And so |
| 08:34:10 13 | there was really nothing to opine on. |
| 08:34:16 14 | THE COURT:  Okay.  Well, I think we're talking |
| 08:34:19 15 | about this August 15th, began hiring ten staff, is that it? |
| 08:34:24 16 | MR. NAQVI:  Yes, Your Honor. |
| 08:34:25 17 | THE COURT:  What do we have that shows that that |
| 08:34:27 18 | was previously disclosed?  What do we have? |
| 08:34:31 19 | MS. SMITH:  It's the spreadsheet is listed as |
| 08:34:33 20 | part of Dr. Darveaux's materials considered attached to his |
| 08:34:40 21 | report -- |
| 08:34:40 22 | THE COURT:  That's not helping me at all.  Hand |
| 08:34:46 23 | me the spreadsheet.  I can't tell by someone telling me what |
| 08:34:49 24 | it says.  I don't know what it says. |
| 08:35:01 25 | MR. NAQVI:  Your Honor, may I approach? |

08:35:03  1               THE COURT:  Yes.  Take a look at it, see what it

08:35:06  2     says.  Everybody agrees this particular document was

08:35:10  3     disclosed, is that right?  Check with plaintiff's counsel,

08:35:14  4     you agree this document was disclosed.

08:35:16  5               MR. NAQVI:  Your Honor, I agree the document is

08:35:18  6     in his documents considered, but there are thousands of

08:35:21  7     documents in the materials considered and he didn't provide

08:35:23  8     an expressed opinion on this.  And I would also direct the

08:35:27  9     court to paragraph 58 of Dr. Darveaux's report, that's where

08:35:30 10     he provided the development timeline and the August 2015

08:35:34 11     date and note attached to it is not in there, so this was

08:35:37 12     just added just now.

08:35:39 13               THE COURT:  Okay.  Let me check.  I'm on

08:35:41 14     paragraph 58.

08:35:43 15               MR. NAQVI:  Paragraph 58, Your Honor, it's on

08:35:45 16     page 20.

08:35:45 17               THE COURT:  I got page 20, that's for sure.

08:35:49 18     Okay.  And your point about page 20 is exactly what, because

08:36:00 19     I got date, date, date, and then I got event, Akoustis,

08:36:05 20     Incorporated acquisition of STC MEMS at 2017.  So, yes, sir,

08:36:14 21     go ahead and tell me.

08:36:15 22               MR. NAQVI:  Correct.  The issue is here

08:36:18 23     Dr. Darveaux provides a development timeline and we haven't

08:36:22 24     objected to any of these dates that are reflected on his

08:36:25 25     demonstratives but the August --

08:36:26  1                  THE COURT:  I'm hearing what you're saying, he

08:36:28  2   didn't disclose the August date?

08:36:30  3                  MR. NAQVI:  That's correct, Your Honor.

08:36:31  4                  THE COURT:  He didn't disclose the August date.

08:36:33  5   What about that, counsel?

08:36:35  6                  MS. SMITH:  At the time it really wasn't much of

08:36:37  7   an issue because it was pretty much a corporate timeline --

08:36:43  8                  THE COURT:  That's not answering the question.

08:36:45  9   We agree he did not disclose the August 2015 date it

08:36:49 10   appears, is that right?

08:36:50 11                  MS. SMITH:  Well, it wasn't part of his timeline

08:36:52 12   in the expert report.

08:36:53 13                  THE COURT:  Show me where it is in the report.

08:36:55 14                  MS. SMITH:  It's not in the report.

08:36:57 15                  THE COURT:  That's all I need to know.

08:36:58 16                  MS. SMITH:  It's written in the materials --

08:37:00 17                  THE COURT:  I got you, it's not in the report.

08:37:03 18   He sets that timeline, it's very specific, now to assert a

08:37:07 19   new date and I understand these things happen, it's not like

08:37:11 20   it's anybody's fault, certainly not your fault, it's just

08:37:15 21   not there.  And because it is of significance in the case

08:37:19 22   and they have raised a proper objection, we're going to have

08:37:22 23   to sustain that one unless you can hear something really

08:37:25 24   quickly because everything else I got, I got very small time

08:37:30 25   here.  I don't seem to have anything -- is there something

08:37:35 1   else that would give me that date that would bail you out on

08:37:38 2   that, that's all I want to know.

08:37:41 3           MS. SMITH:  Well, everything is in the

08:37:43 4   spreadsheet you have and that's just listed in the materials

08:37:45 5   considered.  He did talk about in his deposition certain

08:37:52 6   employee hires, I believe, and would he be able to opine

08:37:57 7   about that just from the stand even if it's not on the

08:38:00 8   demonstrative?

08:38:01 9           THE COURT:  He does have employee hires, he's

08:38:04 10  got termination date, hire dates.  What I'm looking at has

08:38:08 11  this -- this portion has hires in 2021, some do go back to

08:38:14 12  2017.  Let me look quickly.  I have got one in 2016, Dyer.

08:38:28 13  Is that the earliest one.

08:38:31 14          MS. SMITH:  There is one in 2015.

08:38:34 15          THE COURT:  Can you tell me where?

08:38:39 16          MS. SMITH:  I don't know exactly where in the

08:38:41 17  spreadsheet, but if the names are in alphabetical order, it

08:38:45 18  should be the last name of Patel.

08:38:50 19          THE COURT:  All right.  Let me look just a

08:38:53 20  minute more.  I do have a 2015, April, and that's Michael

08:38:56 21  Patrick, director of business systems hired at that time.

08:39:03 22  How would that be relevant?

08:39:06 23          MS. SMITH:  I couldn't hear your --

08:39:08 24          THE COURT:  Director of business systems.

08:39:11 25          MS. SMITH:  Business systems.

08:39:12  1                THE COURT:  Right.  Michael Patrick.  That's the

08:39:15  2     one I found.  Maybe somebody else, Michael Patrick Lewis.

08:39:21  3                MS. SMITH:  I think you're getting there.  There

08:39:25  4     is also somebody in 2014 with the last name of Patel.

08:39:30  5                THE COURT:  Okay.  I'm sorry, I'm looking for

08:40:02  6     Patel.  I got -- if you can direct me a little more, I'm on

08:40:22  7     page 12 of the document handed up, it's got some material in

08:40:25  8     it.  And it's the table of hires.  You may have a different

08:40:31  9     page number on that, I'm not sure.  It should be right here.

08:40:45 10     Here it is, it was Patel and it was director of engineering,

08:40:50 11     R & D product engineering.  So forth.  He seems to have been

08:41:00 12     there and is still there, is that right?

08:41:04 13                MS. SMITH:  I believe so, yes, as of the date of

08:41:06 14     this spreadsheet.

08:41:07 15                THE COURT:  It looks like Patel is still there.

08:41:10 16     That's correct?  Okay.  Well, I see what you're saying.  The

08:41:15 17     issue is whether or not it's appropriate.  These are just

08:41:21 18     demonstratives just to go through all that, this is what

08:41:23 19     we're talking about.  Where the parties disagree on

08:41:27 20     something, we typically require either agreement or

08:41:31 21     deletion, and in this case when you look at the material on

08:41:34 22     page 20, it does seem to be setting a timeline.  It doesn't

08:41:40 23     include that date.  And if that was a significant date, it

08:41:44 24     should have been included and there is no way to -- it's not

08:41:53 25     a way to rationalize that by looking at the document.  I

08:41:59  1    don't think it would tell us that date.  It might tell us

08:42:04  2    some information that might have led to the date but it

08:42:07  3    would not tell the date.  You would not be able to tell.

08:42:11  4            I'm going to have to sustain the objection.

08:42:13  5    This is pretty, with all due respect, I know it's important,

08:42:16  6    but it's a demonstrative, and we're just taking it off the

08:42:20  7    screen because it is not previously disclosed as a key event

08:42:26  8    is what I understand, these are supposed to be key events,

08:42:30  9    is that right?

08:42:31 10            MS. SMITH:  It became a key event, just not as

08:42:35 11    the date of the --

08:42:36 12            THE COURT:  Right, and because it's a key event

08:42:38 13    but it's not disclosed on page 20, and clearly the timeline

08:42:42 14    there, it would be confusing, it would be 403 problem, and

08:42:48 15    also it just -- it's not adequately disclosed in the report.

08:42:54 16    I'm going to have to sustained that objection, I know we're

08:42:57 17    going to have to go to the next matter.  I'm going to hear

08:43:01 18    very briefly, tell the jury we're taking care of a

08:43:03 19    preliminary matter and we have another four or five minutes

08:43:07 20    maybe.

08:43:08 21            Let's go to the next issue.

08:43:12 22            MR. NAQVI:  Thank you, Your Honor, I appreciate

08:43:14 23    the time this morning.  The last objection for Dr. Darveaux

08:43:17 24    is to JTX 07.  This is an Akoustis trimming document.  And

08:43:22 25    the issue here is this document was not disclosed at any

08:43:26 1    point in Akoustis's initial disclosures, supplemental

08:43:31 2    disclosures, and more importantly we served an interrogatory

08:43:34 3    asking them to identify all documents that support any

08:43:37 4    contention that they independently developed any information

08:43:40 5    that overlapped with Qorvo's alleged trade secrets --

08:43:44 6         THE COURT:  Let me take a look at JTX 007,

08:43:47 7    because there are a lot of documents in this case, easier to

08:43:50 8    have you hand it up.

08:43:53 9         MR. NAQVI:  Would you like me to walk --

08:43:56 10        THE COURT:  Absolutely, yes, hand it up.  Let's

08:43:59 11   take a quick look at that, and --

08:44:04 12        MR. NAQVI:  Your Honor, if I may provide a

08:44:06 13   little more context here.  This wasn't disclosed during

08:44:10 14   discovery and it was first addressed in Dr. Shanfield's

08:44:13 15   report -- I'm sorry, in Dr. Darveaux's report and if the

08:44:17 16   Court may recall, we offered a supplemental report from

08:44:21 17   Dr. Shanfield that addressed this document and other similar

08:44:26 18   trimming arguments.  The Court did not allow those opinions

08:44:29 19   to come in.

08:44:30 20        This is sort of a goose and gander issue where

08:44:33 21   these opinions in this document was relied on for the first

08:44:36 22   time in the expert report of Dr. Darveaux, we tried to

08:44:39 23   supplement it and the Court did not permit those opinions to

08:44:42 24   come in, so we believe that JTX 007 should also not be used.

08:44:48 25        THE COURT:  Let me make sure.  Is there any

08:44:51 1    question about the authenticity or time of this particular

08:44:55 2    document?

08:44:56 3            MR. NAQVI:  I don't believe there is any dispute

08:44:58 4    as to authenticity, Your Honor.

08:45:03 5            THE COURT:  Ms. Smith, is that right?

08:45:05 6            MS. SMITH:  Yes.  Tell me about this one.  Sure.

08:45:09 7    Your Honor, we are not offering this exhibit as proof of

08:45:16 8    independent development of a trimming process that is

08:45:20 9    similar to Qorvo's, in fact we're doing this -- we're

08:45:26 10   presenting it for the opposite proposition, which is that we

08:45:30 11   have a different process.  And so that wouldn't have fallen

08:45:35 12   into the interrogatory response.  It would not have been

08:45:42 13   within the scope of that and Dr. Darveaux did opine on the

08:45:48 14   specific document in his expert report.

08:45:55 15           THE COURT:  Let me hear from counsel.  What's

08:45:58 16   the problem for this particular document?  I know the issue

08:46:00 17   is whether it was previously part -- is that correct,

08:46:05 18   previously part of the material?

08:46:08 19           MR. NAQVI:  Yes, Your Honor, I disagree with

08:46:10 20   counsel's argument, I do believe this goes to independent

08:46:13 21   development, our contention is they didn't have trimming,

08:46:16 22   they used Qorvo's information to develop their trimming,

08:46:19 23   whether it's a different process or not, I think that's a

08:46:21 24   factual issue.  But the more fundamental issue was that this

08:46:25 25   was disclosed for the first time in Dr. Darveaux's report,

08:46:28  1    we tried to have Dr. Shanfield respond to it, and we didn't

08:46:31  2    have that opportunity.

08:46:40  3              And when we asked Akoustis to identify documents

08:46:43  4    supporting any independent development this document was not

08:46:47  5    disclosed see we weren't able to address it in your

08:46:50  6    affirmative expert reports or during fact discovery.

08:46:53  7              THE COURT:  That was the note that I had was

08:46:55  8    failure to previously disclose being the problem, but maybe

08:47:00  9    not.

08:47:31 10              Does everybody agree that the document was not

08:47:34 11    disclosed in initial or subsequent disclosures under

08:47:37 12    Rule 26?

08:47:39 13              MS. SMITH:  That is true, however, it was, the

08:47:42 14    objections have been waived as far as the discovery is

08:47:44 15    concerned.

08:47:51 16              THE COURT:  Well, that doesn't solve that

08:47:55 17    problem.

08:47:56 18              MS. SMITH:  Your Honor, the issue here is Qorvo

08:47:58 19    thinks that the processes are the same, but they are not.

08:48:03 20    And that's why they were not disclosed.  It was not

08:48:07 21    responsive.

08:48:12 22              THE COURT:  I think you got a large person

08:48:15 23    standing behind you lurking.

08:48:18 24              MR. LEMIEUX:  I would also point out, Your

08:48:20 25    Honor, that you know, the initial disclosures, the plaintiff

08:48:23  1    in this case, as you know, has identified over a thousand

08:48:27  2    trade secrets allegedly at issue and until we got to trial

08:48:30  3    here --

08:48:30  4              THE COURT:  You're right, it's been an issue,

08:48:33  5    it's been a problem.  When did I first caution about too

08:48:37  6    many trade secrets?

08:48:38  7              MR. LEMIEUX:  Long before we were involved in

08:48:40  8    the case.

08:48:40  9              THE COURT:  A long time ago.  I wish they had

08:48:43 10    got this number a long time ago.  I am going to allow this

08:48:53 11    document.  I think it's appropriate to allow this document,

08:48:57 12    I don't have the same issues that we had before, I think

08:49:00 13    failure to disclose in a very complicated matter in which

08:49:04 14    disclosures were not the usual types of disclosures, I am

08:49:08 15    going to allow this document.

08:49:10 16              Trim process steps.  We've got that.  It doesn't

08:49:13 17    seem to me to be very unusual anyway with all due respect to

08:49:19 18    the document.  So we're going to allow that one.  I think

08:49:23 19    we've covered that.  Anything else on this particular

08:49:25 20    witness?

08:49:27 21              MR. NAQVI:  Not for Dr. Darveaux, Your Honor.

08:49:30 22              THE COURT:  I think it was important to get

08:49:31 23    through that.  We're going to bring the jury in.

08:49:34 24              MR. NAQVI:  Your Honor, would you like to hear

08:49:36 25    any argument about Dr. Lebby or Your Honor --

08:49:39  1          THE COURT:  I think we need to bring the jury

08:49:41  2   in.  And we're looking at the Lebby situation, we're also

08:49:44  3   looking at a couple of other things that have been raised in

08:49:47  4   terms of the election question and so forth.  And all of

08:49:52  5   this is -- got a lot to do.  But we need to let the jury

08:49:55  6   come in.

08:49:56  7          MR. NAQVI:  Understood, Your Honor.  Thank you.

08:49:58  8          THE COURT:  Sure.  No problem.

08:50:19  9          (Jury entering the courtroom at 8:50 a.m.)

08:50:28 10          THE COURT:  Everyone can be seated.  I hope

08:50:47 11   Mr. Romano got a chance to get a cup of coffee.  I think

08:50:50 12   parking wasn't so easy today, was it?

08:50:55 13          A JUROR:  No, it was not.

08:50:56 14          THE COURT:  As you can tell, as we move toward

08:50:58 15   the end of the process, we're going to have to have some

08:51:01 16   conferences that do delay you some, and for that I

08:51:05 17   apologize, but we have all been working since -- well, a

08:51:08 18   while already, quite a while, actually, and we made progress

08:51:11 19   in terms of our second witness, I believe, today, so that

08:51:15 20   will help us move that right along.

08:51:17 21          But the question right now is for the defense,

08:51:22 22   who is your next witness?

08:51:24 23          MR. LEMIEUX:  The next witness will be a

08:51:27 24   videotape testimony of Leah Giovan.

08:51:31 25          THE COURT:  Of course with all depositions, this

08:51:33  1    is the only opportunity you will get to see this testimony.

08:51:38  2    It is as though the witness were here in person in court, so

08:51:41  3    just keep that in mind.  We cannot, as you know, let you see

08:51:46  4    it again in the proceedings, there are several reasons for

08:51:48  5    that, but that would take it out of context and we could not

08:51:52  6    do that.

08:51:52  7            All right.  We're ready to proceed.  Thank you.

08:51:54  8            (Videotape deposition of Leah Giovan:)

08:53:09  9    Q.    Good morning, Ms. Giovan.

08:53:14 10    A.    Good morning, David.

08:53:16 11    Q.    Have you been deposed before?

08:53:18 12    A.    I have.

08:53:19 13    Q.    How about giving me sort of an overview of your

08:53:23 14    college education and then jobs up until the time you

08:53:27 15    joined, whether it was RFMD, TriQuint, Qorvo, kind of

08:53:31 16    whomever?

08:53:32 17    A.    I have a bachelor of science degree in marketing.

08:53:36 18    I'm old, so I won't bore you with all my jobs, but I started

08:53:40 19    at RFMD in 2007, which of course morphed into Qorvo, and

08:53:50 20    left there in May of 2022.

08:53:52 21    Q.    I'm old, too.  So just bore me with a little bit of

08:54:01 22    flavor of what you did before?

08:54:03 23    A.    All right.  Motorola Semiconductor.  CTC Engineering

08:54:07 24    after that.  Applied Materials for a short time.  And then

08:54:11 25    ASE, which is Advanced Semiconductor Engineering.  And then

08:54:18 1   RF Micro Devices and Qorvo.

08:54:25 2   Q.   And what did you generally do for all of those?  I'm

08:54:29 3   not going to ask you each one individually?

08:54:33 4   A.   Engineering, sales, and supply chain.

08:54:37 5   Q.   And when you started RFMD in 2007, what were you

08:54:42 6   hired to do?

08:54:42 7   A.   Supply chain.

08:54:44 8   Q.   And is that what you did throughout your career at --

08:54:50 9   A.   I did a --

08:54:54 10  Q.   -- RFMD?

08:54:55 11  A.   I did a short stint in sales with RFMD and then back

08:54:58 12  into the supply chain.

08:55:01 13  Q.   At the same level or different level?

08:55:04 14  A.   Different level.

08:55:06 15  Q.   So kind of give me the periods.

08:55:08 16  A.   2007 as supply chain.  2011, '12, and '13, in sales.

08:55:18 17  2014 back in supply chain.

08:55:23 18  Q.   So you were responsible for working with overseeing

08:55:27 19  manufacturing and test facilities that would make a product?

08:55:31 20  A.   Yes.

08:55:32 21  Q.   And that was then on behalf of what was RFMD?

08:55:35 22  A.   Yes.

08:55:35 23  Q.   What kind of devices?

08:55:36 24  A.   Various kind of -- all kinds of packages.  Plastic,

08:55:42 25  over molded, whatever kind of package we were --

08:55:49 1    Q.        Whatever package was needed for whatever the part

08:55:51 2    was?

08:55:52 3    A.        Correct, yes.

08:55:52 4    Q.        When you were director of supply chain, that was at

08:55:56 5    the beginning of RFMD; right?

08:55:58 6    A.        Yes.

08:55:58 7    Q.        And then at some point RFMD merged with TriQuint and

08:56:04 8    became Qorvo?

08:56:05 9    A.        Correct.  Yes.

08:56:06 10   Q.        And once then it was Qorvo, you still were the

08:56:10 11   director of supply chain?

08:56:11 12   A.        Then I was promoted to senior director.

08:56:15 13   Q.        At the time of around the merger?

08:56:18 14   A.        About the merger, yes.  A little after.

08:56:21 15   Q.        Okay.  When you were director of supply chain, you

08:56:29 16   just told me you had various responsibilities.  Could you

08:56:32 17   give me a sense of what those were?

08:56:34 18   A.        Various categories.  So --

08:56:36 19   Q.        Ah, I'm sorry.

08:56:38 20   A.        The categories we had were, again, contract

08:56:41 21   manufacturing, assembly, and test.  Front end, Fab

08:56:46 22   materials.  Chemicals.  Components such as MLCC's and

08:56:51 23   connectors.  So the entire -- sorry.  As director, I was

08:56:57 24   responsible for contract manufacturing, assembly, and test;

08:57:06 25   and then when I became senior director was when I had the

08:57:12  1    entire group.

08:57:13  2    Q.      When you were director of supply chain, to whom did

08:57:18  3    you report?

08:57:18  4    A.      To the Vice President of Operations.

08:57:21  5    Q.      And who was that?

08:57:23  6    A.      Initially it was James Stilson, until he retired, and

08:57:30  7    then it was Paul Fego, who was Jim's replacement.

08:57:37  8    Q.      And when you were senior director, to whom did you

08:57:41  9    report?

08:57:41 10    A.      Paul Fego.

08:57:44 11    Q.      So title changed but it didn't change in terms of to

08:57:51 12    whom you reported?

08:57:52 13    A.      Correct.

08:57:52 14    Q.      But as senior director, you had more people under

08:57:55 15    you?

08:57:55 16    A.      Yes.

08:57:56 17    Q.      About how many were on that team?

08:57:58 18    A.      Thirty-ish.

08:58:02 19    Q.      And were there certain classifications -- or were

08:58:05 20    those the ones that you listed for me before, that started

08:58:08 21    with contract manufacturing?

08:58:09 22    A.      Yes, that's correct.  And components -- filters were

08:58:13 23    part of components.

08:58:15 24    Q.      And as components, that would be purchasing

08:58:22 25    third-party components from outside vendors that then Qorvo

08:58:26  1    would use, correct?

08:58:28  2    A.      Correct.

08:58:29  3    Q.      And you then did that until 2022?

08:58:33  4    A.      I -- yes, until 2022.

08:58:36  5    Q.      And then you left Qorvo?

08:58:41  6    A.      Yes.

08:58:42  7    Q.      Why did you leave?

08:58:43  8    A.      I was fired.

08:58:44  9    Q.      Why were you fired?

08:58:46 10    A.      I had a disagreement with my manager.

08:58:49 11    Q.      Over?

08:58:52 12    A.      Over supply chain management.

08:58:56 13    Q.      Can you give me a bit more color?

08:59:07 14    A.      Well, there were several reasons, but we just

08:59:11 15    fundamentally disagreed on how to manage a supply chain.

08:59:17 16    Q.      All right.  Who was your manager at that time?

08:59:21 17    A.      Paul Fego.

08:59:25 18    Q.      Okay.  And he's still at the company?

08:59:26 19    A.      He is.

08:59:29 20    Q.      Okay.  Are you working anywhere now?

08:59:36 21    A.      Yes.

08:59:37 22    Q.      Where?

08:59:37 23    A.      Bose.

08:59:39 24    Q.      What do you do for Bose?

08:59:42 25    A.      Supply chain management.

08:59:44  1  Q.      So as the senior director of supply chain for Qorvo,

08:59:52  2  you were working for all of the different business units?

08:59:56  3  A.      Yes.

08:59:58  4  Q.      When do you recall first having become aware of

09:00:02  5  Akoustis as a company?

09:00:05  6  A.      I don't know the year.

09:00:09  7  Q.      Do you remember the circumstances?

09:00:11  8  A.      No.

09:00:16  9  Q.      What's the first recollection you have?

09:00:25 10          MR. NAQVI:  Objection, vague.

09:00:28 11  A.      Probably Jeff Shealy leaving Qorvo.

09:00:32 12  Q.      What do you remember about that?

09:00:33 13  A.      Only Jeff Shealy leaving Qorvo.

09:00:36 14  Q.      Do you remember any discussions with Jeff Shealy

09:00:46 15  after he left Qorvo?

09:00:49 16  A.      Yes.

09:00:49 17  Q.      What do you remember?

09:00:51 18  A.      I discussed -- I met with Jeff and had several

09:00:55 19  communications with Jeff.

09:00:57 20  Q.      Concerning what?

09:01:03 21  A.      Filters.

09:01:09 22  Q.      Were those communications concerning the Qorvo

09:01:12 23  purchase of filters from Akoustis?

09:01:16 24  A.      Yes.

09:01:20 25  Q.      What do you recall about those communications?

09:01:25 1    A.      There were several discussions, and we were

09:01:30 2    investigating the possibility of buying filters from

09:01:36 3    Akoustis.

09:01:43 4    Q.      While you worked at Qorvo, did Qorvo ever purchase

09:01:47 5    any filters from Akoustis?

09:01:49 6    A.      Not to my knowledge.

09:01:51 7    Q.      Were there people at Qorvo who were proponents of

09:01:54 8    Akoustis?

09:01:56 9            MR. NAQVI:   Objection, calls for speculation.

09:01:58 10           THE WITNESS:   I'm unsure what you mean by

09:02:01 11   "proponent."

09:02:04 12   Q.      Advocates for supporting.  But if you want to have a

09:02:09 13   different word to use, that's fine --

09:02:12 14   A.      Okay.

09:02:13 15   Q.      -- with me as well.

09:02:14 16   A.      Yes.  There were people at Qorvo that were interested

09:02:17 17   in evaluating Akoustis to support their business needs.

09:02:23 18   Q.      And who were those people?

09:02:25 19   A.      Those people were the general managers, primarily in

09:02:29 20   the IDP group.

09:02:31 21   Q.      And who were those general managers?

09:02:35 22   A.      That would be Cees Links in Wi-Con, Roger Hall in

09:02:43 23   HPS.  Tony Testa, who reported to Cees, those were the

09:02:51 24   primary functions that were looking for the possibility of

09:02:55 25   buying filters.

| | | |
|---|---|---|
| 09:03:01 | 1 | Q.    And were they looking for filters because they |
| 09:03:03 | 2 | weren't getting those filters from the internal -- |
| 09:03:06 | 3 | A.    Yes. |
| 09:03:08 | 4 | Q.    -- Qorvo? |
| 09:03:10 | 5 | A.    Yes. |
| 09:03:10 | 6 | Q.    So in your job on the supply chain, did you then work |
| 09:03:19 | 7 | directly with general managers like Cees Links and Roger |
| 09:03:25 | 8 | Hall? |
| 09:03:25 | 9 | A.    Yes. |
| 09:03:26 | 10 | Q.    And they would make requests to you:  "Giovan, please |
| 09:03:31 | 11 | look to get this kind of a part from somewhere outside of |
| 09:03:35 | 12 | Qorvo, because we may need it." |
| 09:03:39 | 13 | A.    Yes. |
| 09:03:40 | 14 | Q.    What kind of filters were Cees Links and Roger Hall |
| 09:03:46 | 15 | looking for you to get? |
| 09:03:48 | 16 |           MR. NAQVI:  Objection.  Vague. |
| 09:03:49 | 17 |           THE WITNESS:  BAW filters, in frequencies of |
| 09:03:54 | 18 | approximately 3.6 and then 5.5, approximately, frequencies. |
| 09:04:05 | 19 | BY MR. JAKOPIN: |
| 09:04:06 | 20 | Q.    Was Qorvo making filters in the 3.6 range of |
| 09:04:12 | 21 | frequencies? |
| 09:04:17 | 22 | A.    I don't know. |
| 09:04:19 | 23 | Q.    Was Qorvo making filters in the 5.5 range of filters |
| 09:04:23 | 24 | when they were asking you to then get them from some outside |
| 09:04:28 | 25 | source? |

09:04:28  1    A.      No.

09:04:29  2    Q.      Did they express to you why they were wanting you to

09:04:32  3    get BAW filters from an outside vendor at that frequency

09:04:38  4    range?

09:04:38  5    A.      Because we did not have what they needed internally.

09:04:41  6    Q.      Okay.  Are you familiar with the term "SMR"?

09:04:46  7    A.      I have heard the term, yes.

09:04:47  8    Q.      What's your understanding of it?

09:04:49  9    A.      It is a process for making filters.

09:04:51 10    Q.      Are you familiar with the term "FBAR"?

09:04:59 11    A.      Yes.

09:05:00 12    Q.      What's your understanding of that?

09:05:03 13    A.      It is a process for making filters.

09:05:05 14    Q.      Is it a process for making filters that's different

09:05:09 15    than the SMR process?

09:05:12 16    A.      Yes.

09:05:13 17    Q.      Do you have an understanding that Qorvo makes SMR

09:05:16 18    filters?

09:05:16 19    A.      Yes.

09:05:16 20    Q.      Do you have an understanding of other companies that

09:05:18 21    make FBAR filters?

09:05:21 22    A.      I understand that other companies make FBAR filters,

09:05:24 23    yes.

09:05:25 24    Q.      Do you have an understanding of any -- which ones of

09:05:27 25    those other companies make FBAR filters?

| | | |
|---|---|---|
| 09:05:31 | 1 | A. Yes. |
| 09:05:34 | 2 | Q. What companies are those? |
| 09:05:36 | 3 | A. RF360, which is now Qualcomm. |
| 09:05:42 | 4 | Q. Anyone else? |
| 09:05:44 | 5 | A. No. |
| 09:05:46 | 6 | Q. Do you know what kind of filters Broadcom makes? |
| 09:05:53 | 7 | A. FBAR. |
| 09:05:55 | 8 | Q. Do you know what kind of filters Akoustis makes? |
| 09:05:57 | 9 | A. No. |
| 09:05:59 | 10 | Q. Do you recognize that? |
| 09:06:03 | 11 | A. Yes. |
| 09:06:06 | 12 | Q. What do you recognize about it? |
| 09:06:10 | 13 | A. It is an e-mail that I sent to Tony. |
| 09:06:18 | 14 | Q. Relating to? |
| 09:06:20 | 15 | A. Relating to samples. Relating to Akoustis samples to |
| 09:06:32 | 16 | be evaluated. |
| 09:06:36 | 17 | Q. Who is Brian Balut? |
| 09:06:43 | 18 | A. Brian Balut was the engineering manager for IDP. |
| 09:06:50 | 19 | Q. And Bob Baeten? |
| 09:06:55 | 20 | A. Bob Baeten was an engineering manager in Cees Links' |
| 09:07:03 | 21 | group. |
| 09:07:03 | 22 | Q. And Alex Zajac? |
| 09:07:08 | 23 | A. Alex is an engineer in Apopka. I don't know his |
| 09:07:12 | 24 | position. |
| 09:07:13 | 25 | Q. And by "Apopka", you mean Apopka, Florida? |

09:07:18  1   A.      Yes.

09:07:19  2   Q.      What were the facilities in Apopka, Florida?

09:07:22  3   A.      It was a design center, filter design center.  And

09:07:27  4   they also did various manufacturing there.

09:07:31  5   Q.      What kind of manufacturing?

09:07:35  6   A.      There was a fab there.

09:07:41  7   Q.      Was it for BAW filters?

09:07:44  8   A.      I believe it was SAW filters.

09:07:47  9   Q.      Okay.  And by "SAW", surface acoustic wave?

09:07:57 10   A.      Yes.

09:07:57 11   Q.      In contrast to "BAW", which is bulk acoustic wave?

09:08:03 12   A.      Yes.

09:08:03 13   Q.      Okay.  So on the substance of the e-mail, it talks

09:08:07 14   about samples and test scores, do you see that?

09:08:10 15   A.      Yes.

09:08:10 16   Q.      Do you recall getting both of those?

09:08:12 17   A.      I recall asking for both of those.

09:08:14 18   Q.      Okay.  Do you recall whether both of those were

09:08:21 19   received?

09:08:22 20   A.      Yes.

09:08:26 21   Q.      And so the samples would -- were just the filters

09:08:29 22   themselves, individual die, correct?

09:08:33 23   A.      Yes.

09:08:34 24   Q.      And the test boards were certain individual die on a

09:08:39 25   test board with -- with some other components?

| | | |
|---|---|---|
| 09:08:41 | 1 | A.    Yes. |
| 09:08:42 | 2 | Q.    Do you recognize that? |
| 09:08:45 | 3 | A.    Yes. |
| 09:08:46 | 4 | Q.    What's this? |
| 09:08:48 | 5 | A.    I'm sorry.  Was there a question? |
| 09:08:51 | 6 | Q.    Yeah.  Do you -- what do you recognize about this |
| 09:08:54 | 7 | e-mail chain? |
| 09:08:57 | 8 | A.    That this is an e-mail communication between myself |
| 09:09:01 | 9 | and Dave Aichele. |
| 09:09:09 | 10 | Q.    And this is a follow-up relating to the samples we |
| 09:09:13 | 11 | just talked about in the previous exhibit? |
| 09:09:16 | 12 | A.    Yes. |
| 09:09:24 | 13 | Q.    And you write on October 4th, "The sample just |
| 09:09:29 | 14 | physically got handed to the engineer on Monday of this |
| 09:09:43 | 15 | week." |
| 09:09:47 | 16 | A.    Yes. |
| 09:10:13 | 17 | Q.    These were of the AKF-1252? |
| 09:10:25 | 18 | A.    If that's what it says. |
| 09:10:27 | 19 | Q.    Okay.  Do you remember receiving S bar plots? |
| 09:10:33 | 20 | A.    No. |
| 09:10:40 | 21 | Q.    Who is Dave Aichele? |
| 09:10:42 | 22 | A.    He is business development, VP, I think, for |
| 09:10:49 | 23 | Akoustis. |
| 09:10:49 | 24 | Q.    Did you know him from RFMD times? |
| 09:10:51 | 25 | A.    I did not. |

09:10:53  1    Q.      You write, "We seem to have a fear based denial of

09:10:58  2    Akoustis' ability to make a BAW filter."

09:11:00  3            What did you mean by that?

09:11:02  4    A.      That there was frustration about the press releases

09:11:14  5    that Akoustis was sending out with what we saw as false

09:11:24  6    claims.  And the fear part of that was internal that we were

09:11:40  7    -- that we were not diverting resources from mobile filters

09:11:49  8    to support IDP filters.

09:12:01  9    Q.      What was the difference between mobile filters and

09:12:05 10    IDP filters?

09:12:07 11    A.      The frequency and requirements were different.  The

09:12:14 12    biggest difference was the mobile would be very high

09:12:20 13    volumes, supporting commercial applications, IDP would be

09:12:24 14    very small volumes, supporting defense and infrastructure,

09:12:29 15    so the pay back on the investment would be substantially

09:12:36 16    different.

09:12:40 17    Q.      With the payback on the mobile filters being much

09:12:48 18    larger than the payback on the IDP filters?

09:12:51 19    A.      Yes.

09:13:03 20    Q.      I handed you a copy of what's been marked previously

09:13:07 21    as Exhibit 1023.  Do you recognize that?

09:13:12 22    A.      Yes.

09:13:13 23    Q.      What's this?

09:13:14 24    A.      This is an e-mail between me and Cees Links, and

09:13:21 25    discussing development of filters for internal versus buying

09:13:31 1    -- make versus buy, basically.

09:13:34 2    Q.      On the November 5th, 2018, 11:55 e-mail, you write,

09:13:42 3    "I've already engaged with Tony on this and understand that

09:13:47 4    Mp5 gigahertz is different than Wi-Con HPS."

09:13:52 5    A.      Yes.

09:13:52 6    Q.      What does that refer to?

09:13:53 7    A.      So Cees -- although they're both 5-gigahertz filters,

09:13:59 8    Cees -- the Wi-Con requirements for performance were

09:14:06 9    different than the performance requirements for HPS, for

09:14:13 10   Roger Hall's group.

09:14:16 11   Q.      So Wi-Con is?

09:14:17 12   A.      Wireless connectivity, that was Cees's group.

09:14:22 13   Q.      And HPS is?

09:14:23 14   A.      Is Roger Hall's group, high power.

09:14:29 15   Q.      And so while they're both 5-gigahertz, there is other

09:14:35 16   characteristics of the filters that make them different

09:14:37 17   between the two?

09:14:38 18   A.      Yes.

09:14:41 19   Q.      What's MP massive scale refer to in that e-mail?

09:14:46 20   A.      I don't know.

09:14:46 21   Q.      Do you know what the acronym "MP" is?

09:14:50 22   A.      No.

09:14:58 23           Oh, sorry, that's mobile products, sorry.  I was

09:15:01 24   trying to think of a process.

09:15:03 25   Q.      You remembering this from 2018 is remarkable, thank

09:15:08  1   you.  Okay.

09:15:08  2   A.      It's mobile products.

09:15:11  3   Q.      "You were going to have to be honest and open to

09:15:15  4   them, we'll focus on an internal solution for MP and

09:15:19  5   outsource solution for Wi-Con and HPS."

09:15:23  6           Were you saying that --

09:15:27  7           MR. LEMIEUX:  Your Honor?

09:15:28  8           THE COURT:  Yes, sir.

09:15:29  9           MR. LEMIEUX:  It appears that the video is

09:15:31 10   slightly out of sync with the written transcript that's

09:15:33 11   being shown on the screen here.

09:15:34 12           THE COURT:  That is correct.

09:15:35 13           MR. LEMIEUX:  I wonder if we can pause for a

09:15:37 14   second and have him re-sync it.

09:15:39 15           THE COURT:  Absolutely.

09:15:40 16           MR. LEMIEUX:  Thank you.

09:15:50 17           (Continuation of Leah Giovan's videotape

09:16:00 18   deposition:)

09:16:07 19   Q.      You write, "We seem to have a fear based denial of

09:16:11 20   Akoustis's ability to make a BAW filter."

09:16:13 21           What did you mean by that?

09:16:16 22   A.      That there was frustration about the press releases

09:16:28 23   that Akoustis was sending out with what we saw as false

09:16:37 24   claims.  And the fear part of that was internal that we were

09:16:53 25   -- that we were not diverting resources from mobile filters

09:17:02 1    to support IDP filters.

09:17:15 2    Q.     What was the difference between mobile filters and

09:17:18 3    IDP filters?

09:17:20 4    A.     The frequency and requirements were different.  The

09:17:28 5    biggest difference was the mobile would be very high

09:17:34 6    volumes, supporting commercial applications.  IDP would be

09:17:37 7    very small volumes, supporting defense and infrastructure,

09:17:42 8    so the payback on the investment would be substantially

09:17:50 9    different.

09:17:53 10   Q.     With the payback on the mobile filters being much

09:17:58 11   larger than the payback on the IDP filters?

09:18:05 12   A.     Yes.

09:18:06 13   Q.     Okay.  I gave you a copy of what's been marked

09:18:20 14   previously as Exhibit 1023.  Do you recognize that?

09:18:26 15   A.     Yes.

09:18:26 16   Q.     And what's this?

09:18:28 17   A.     This is an e-mail between me and Cees Links

09:18:35 18   discussing development of filters for internal versus

09:18:43 19   buying, make versus buy, basically.

09:18:48 20   Q.     On the November 5th, 2018, 11:55 e-mail, you write

09:18:56 21   "I've already engaged with Tony on this, and understand that

09:19:00 22   MP five-gigahertz is different than Wi-Con HPS?

09:19:06 23   A.     Yes.

09:19:06 24   Q.     What does that refer to?

09:19:08 25   A.     So Cees, although they're both five-gigahertz

09:19:14  1   filters, Cees, the Wi-Con requirements for performance were

09:19:19  2   different than the performance requirements for HPS, for

09:19:27  3   Roger Hall's group.

09:19:28  4   Q.      So Wi-Con is?

09:19:31  5   A.      Wireless connectivity, that was Cees' group.

09:19:35  6   Q.      And HPS is?

09:19:36  7   A.      Is Roger Hall's group, high power.

09:19:43  8   Q.      And so while they're both five-gigahertz, there is

09:19:47  9   other characteristics of the filters that make them

09:19:50 10   different between the two?

09:19:51 11   A.      Yes.

09:19:54 12   Q.      What's MP massive scale refer to in that e-mail?

09:20:00 13   A.      I don't know.

09:20:00 14   Q.      Do you know what the acronym MP is?

09:20:03 15   A.      No.

09:20:12 16           Oh, sorry, that's mobile products.  Sorry.  I

09:20:14 17   was trying to think of a process.

09:20:17 18   Q.      That you remember this from 2018 is remarkable.

09:20:21 19   Thank you.  Okay?

09:20:22 20   A.      It's mobile products.

09:20:25 21   Q.      You write, "We are going to have to be honest and

09:20:29 22   open with them, that we're focused on an internal solution

09:20:32 23   for MP and an outsourced solution for Wi-Con and HPS."

09:20:39 24           Were you saying that we'll have to be honest

09:20:41 25   with Akoustis is to whom you're referring to there, yes?

| | | |
|---|---|---|
| 09:20:45 | 1 | A.     Yes. |
| 09:20:45 | 2 | Q.     So Akoustis had just given a 5.2-gigahertz sample to |
| 09:20:51 | 3 | Qorvo to test, right? |
| 09:20:52 | 4 | A.     Yes. |
| 09:20:52 | 5 | Q.     Do you recognize that? |
| 09:20:57 | 6 | A.     Yes. |
| 09:20:59 | 7 | Q.     And what's this? |
| 09:21:01 | 8 | A.     This is the test results on the samples that I have |
| 09:21:08 | 9 | summarized to send to the team.  Internal. |
| 09:21:17 | 10 | Q.     Do you know where you received these test results |
| 09:21:20 | 11 | from? |
| 09:21:20 | 12 | A.     I do not. |
| 09:21:30 | 13 | Q.     And so this was sent to people that we've already |
| 09:21:35 | 14 | discussed before that were in the groups you talked about. |
| 09:21:39 | 15 | On the CC line, there is a Jim Stilson.  Who is that? |
| 09:21:45 | 16 | A.     That was my VP at the time. |
| 09:21:49 | 17 | Q.     He's the one that you reported to? |
| 09:21:53 | 18 | A.     Yes. |
| 09:21:53 | 19 | Q.     And Lee Hudgins? |
| 09:21:56 | 20 | A.     That was my direct boss. |
| 09:21:58 | 21 | Q.     And what was his role? |
| 09:21:59 | 22 | A.     He was the -- he was overall senior -- he was senior |
| 09:22:03 | 23 | director at the time of supply chain.  So -- |
| 09:22:07 | 24 | Q.     Which was the role you got later? |
| 09:22:09 | 25 | A.     Exactly, yes. |

09:22:11 1   Q.      So at this time, you were still the director of

09:22:16 2   supply chain?

09:22:17 3   A.      Correct.

09:22:18 4   Q.      Working with Akoustis to bring in the components?

09:22:23 5   A.      I bought filters, yes.

09:22:25 6   Q.      At that time were you working also doing the contract

09:22:32 7   manufacturing part?

09:22:34 8   A.      Yes.

09:22:36 9   Q.      And what else were you doing around that time as

09:22:39 10  well?

09:22:40 11  A.      Components and contract manufacturing, assembly and

09:22:44 12  test.

09:22:46 13  Q.      How did you get into having those two different

09:22:51 14  responsibilities?

09:22:51 15  A.      They're not really different.

09:22:53 16  Q.      How come?

09:22:55 17  A.      Because one goes into the other.  You buy components

09:23:01 18  or you source components, they go to the contract

09:23:04 19  manufacturer to build the product.

09:23:08 20  Q.      And from your perspective, you end up with something

09:23:13 21  that's a completed part?

09:23:15 22  A.      Correct.

09:23:16 23  Q.      I'm going to mark as Exhibit 1076 a document bearing

09:23:46 24  the Akoustis Bates range 120745 through 749.  It's an e-mail

09:23:55 25  with two Bates numbers that relate to a native file that was

09:24:01 1  attached at this, I have not printed out the native file,

09:24:07 2  but do you recognize that?

09:24:15 3  A.    Yes.

09:24:18 4  Q.    And what's this?

09:24:20 5  A.    This is a communication between myself and Dave

09:24:24 6  Aichele regarding whatever S par file is.

09:24:42 7  Q.    Do you have any reason to believe you didn't receive

09:24:45 8  an S par file?

09:24:47 9  A.    I don't know.

09:24:47 10 Q.    Do you know what an S par file is?

09:24:51 11 A.    No.

09:25:16 12 Q.    So at this time in December 2017, there is still

09:25:29 13 communications relating to the same samples and then some

09:25:33 14 further documents that are being sent on the Akoustis part?

09:25:37 15 A.    Yes.

09:25:38 16 Q.    Okay.  We'll mark for the record, it's been produced

09:25:45 17 as Akoustis 77474 through 77487, which is an e-mail.  Do you

09:25:57 18 recognize that?

09:26:07 19 A.    Yes.

09:26:08 20 Q.    And what's this?

09:26:09 21 A.    This is an e-mail communication between myself and

09:26:13 22 Dave Aichele.

09:26:19 23 Q.    And is this a follow-up of the previous ten that

09:26:23 24 we've seen before?

09:26:25 25 A.    Yes.

09:26:25 1   Q.     And this one there is an attachment that's entitled

09:26:31 2   AKF-1336 CBR Infrastructure BAW Filter?

09:26:37 3   A.     Yes.

09:26:37 4   Q.     And is that the BAW filter that Akoustis was

09:26:44 5   potentially going to be creating for Qorvo?

09:26:47 6   A.     I don't know.

09:26:49 7   Q.     Is it the filter that's discussed in the e-mail of

09:26:56 8   Dave Aichele to you that's at the top of the page?

09:26:59 9   A.     Yes.

09:27:00 10  Q.     Okay.  He says "We've completed the design spin and

09:27:11 11  release mass."

09:27:11 12          What's your understanding of that?

09:27:13 13  A.     That the part is designed and ready for production.

09:27:16 14  Q.     And this part was different than the 5.2-gigahertz

09:27:21 15  part that we were talking about before that had been

09:27:24 16  sampled, yes?

09:27:25 17  A.     From reading this, this says it's the 3.6-gigahertz

09:27:29 18  part.

09:27:29 19  Q.     So that would have been a different part?

09:27:31 20  A.     Yes.

09:27:31 21  Q.     Do you recognize that?

09:27:33 22          MR. NAQVI:  Do you want to put a sticker on that

09:27:37 23  one?

09:27:47 24          THE WITNESS:  Yes.

09:27:48 25  Q.     What do you recognize about it?

09:27:50 1   A.     Again, communication between myself and Dave Aichele

09:27:56 2   regarding sample evaluation.

09:28:03 3   Q.     And in your e-mail to him, you write, "Do you know

09:28:06 4   when you'll have measured data for AKF-1252 rev C new

09:28:13 5   design?"

09:28:13 6          Do you see that?

09:28:14 7   A.     Yes.

09:28:14 8   Q.     Was that a different 1252 further design than the

09:28:18 9   previous sample that Qorvo had received?

09:28:23 10  A.     Yes.

09:28:24 11  Q.     What is this?

09:28:25 12  A.     This is an e-mail from Dave Aichele to me regarding

09:28:34 13  getting an NDA in place.

09:28:36 14  Q.     There had been an NDA in place, which is the one

09:28:42 15  attached; correct?

09:28:43 16  A.     I don't know.  I mean, I don't know if it was in

09:28:45 17  place.

09:28:53 18  Q.     Understood.  Mr. Aichele says it looks like the NDA

09:28:59 19  is good until May 18th in his e-mail and he's attaching it

09:29:03 20  to you, and then he says to you, "Are you okay with this NDA

09:29:07 21  or would you like to get a new one in place?"

09:29:09 22          And he's asking you that to you, correct?

09:29:12 23  A.     Yes.

09:29:12 24  Q.     Do you know if you responded?

09:29:13 25  A.     I have seen communication where I said we were

09:29:18  1    working on a new e-mail, so, yes.

09:29:20  2    Q.      Do you recognize that?

09:29:25  3    A.      Yes.

09:29:28  4    Q.      What is that?

09:29:28  5    A.      This is communication between Dave Aichele and I

09:29:32  6    regarding the NDA.

09:29:40  7    Q.      You write the NDA is still under review by Qorvo

09:29:44  8    legal but will cover us for now.   Correct?

09:29:47  9    A.      Yes.

09:29:47 10    Q.      And in addition to that, Mr. Aichele then forwards to

09:29:53 11    you a spec and sample timeline for the Akoustis 5-gigahertz

09:29:59 12    Uni2 BAW filter that they were creating, yes?

09:30:02 13    A.      Yes.

09:30:04 14    Q.      And then the outline on the e-mail is some color on

09:30:10 15    the slides that are attached?

09:30:12 16    A.      Yes.

09:30:15 17    Q.      And then he asks, "Appreciate input on sample

09:30:19 18    expectations and we will try to accommodate."   He then

09:30:25 19    writes, "Primarily providing S-par data at room with each

09:30:29 20    sample right now."

09:30:30 21            Do you know what that means?

09:30:31 22    A.      Whatever s-par data is at room temperature.

09:30:34 23    Q.      Okay.   Is that S-parameter, maybe?

09:30:41 24    A.      Yes, that is exactly what it is.

09:30:44 25    Q.      Do you recognize that?

09:30:49  1   A.      Yes.

09:30:50  2   Q.      And what's this?

09:30:51  3   A.      More communication between Dave Aichele and myself

09:30:55  4   regarding the NDA.

09:30:58  5   Q.      As well as the 5-gigahertz BAW filter?

09:31:02  6   A.      As well as the attached 5-gigahertz BAW filter

09:31:08  7   information from Akoustis.

09:31:10  8   Q.      And on the attached information, there is on the

09:31:15  9   third page a slide entitled, Akoustis New York Wafer

09:31:24 10   Fabrication.  Do you see that?

09:31:25 11   A.      Yes.

09:31:25 12   Q.      Do you recall at that time if Akoustis had purchased

09:31:29 13   a Wafer facility?

09:31:32 14   A.      Yes.

09:31:32 15   Q.      Do you remember others talking to you about that?

09:31:34 16   A.      Yes.

09:31:35 17   Q.      Who was that, Rohan Houlden?

09:31:37 18   A.      Yes.

09:31:37 19   Q.      What did Mr. Houlden told you?

09:31:39 20   A.      That they had bought a wafer Fab facility and that we

09:31:45 21   actually talked about if he was going to be moving there to

09:31:49 22   support that.

09:31:50 23   Q.      Were you able to use the fact that Akoustis now had a

09:31:54 24   fabrication facility to help create further interest at

09:31:59 25   Qorvo to potentially buy Akoustis parts?

09:32:03  1                    MR. NAQVI:  Objection.  Vague.

09:32:05  2    A.        Not really.  Because what I was looking to Akoustis

09:32:10  3    for was very low volume, which I felt if we engaged, they

09:32:15  4    had that capability to support already in their North

09:32:21  5    Carolina facility, I thought.

09:32:23  6    Q.        Did you have an understanding that they had a North

09:32:27  7    Carolina facility that could create BAW filters?

09:32:30  8    A.        Yes.

09:32:31  9    Q.        Do you recognize that?

09:32:34 10    A.        Yes.

09:32:43 11    Q.        This is a continuation of the e-mails with you and

09:32:47 12    Mr. Aichele?

09:32:47 13    A.        Yes.

09:32:47 14    Q.        Do you recognize that?

09:32:53 15    A.        Yes.

09:32:54 16    Q.        And what's that?

09:32:56 17    A.        Communication between myself and Dave Aichele

09:33:00 18    regarding 3.6-gigahertz information.

09:33:07 19    Q.        So the date -- 3.6-gigahertz is in the e-mail at the

09:33:13 20    bottom of the page; right?

09:33:14 21    A.        Yes.

09:33:15 22    Q.        And then you ask him, this is the one that we've seen

09:33:20 23    before where you asked him about the AKF-1252 rev C new

09:33:27 24    design?

09:33:27 25    A.        Yes.

09:33:28  1  Q.      And the e-mail on top is the new report, which is his

09:33:31  2  response to you about that where he writes, "The modified

09:33:34  3  process addressed volume manufacturing requirements" at the

09:33:37  4  end of the first paragraph.  Do you see that?

09:33:39  5  A.      Yes.

09:33:40  6  Q.      Do you have any recollection whether that modified

09:33:42  7  process was a result of Akoustis now having a new

09:33:48  8  fabrication facility?

09:33:54  9  A.      Can you rephrase the question?  Let me just -- I knew

09:34:02 10  there was a modified process.  I knew that modified parts

09:34:06 11  were coming from New York, but I did not know it was -- that

09:34:13 12  they had to come from New York.  Okay?

09:34:21 13  Q.      In your position it didn't matter to you so much

09:34:24 14  where they came from as long as what they were met the

09:34:29 15  specifications that you were looking for in your role at

09:34:35 16  Qorvo?

09:34:35 17  A.      Yes.

09:34:36 18  Q.      But he then writes back to you in an e-mail back

09:34:39 19  there, "Yes, the personal NDA is off the table."

09:34:43 20          And then the reference above that is with

09:34:47 21  respect to NRE which you testified to earlier is what you

09:34:51 22  recollected being the proposal that had been in discussion

09:34:55 23  between the two companies, yes?

09:34:58 24  A.      Yes.

09:35:02 25  Q.      And then on the first page, the middle e-mail you

09:35:07 1    write, "Frankly, I feel like I'm getting a bit of a

09:35:12 2    runaround internally and I don't have time for it."

09:35:15 3              Do you see that?

09:35:15 4    A.    Yes.

09:35:15 5    Q.    Is that a runaround internally within Qorvo?

09:35:19 6    A.    Yes.

09:35:20 7    Q.    Why were you getting the runaround?

09:35:22 8    A.    Because I was not getting test results on the

09:35:28 9    samples.

09:35:30 10   Q.    Okay.  And then you say "We'll set up an internal

09:35:35 11   meeting next week with all the players to understand what we

09:35:39 12   need."

09:35:39 13             Who are all the players?

09:35:41 14   A.    That would have been primarily Todd Gillenwater and

09:35:45 15   whoever was doing the testing for Todd in the lab.

09:35:52 16   Q.    Do you know what this is testing what?

09:35:54 17   A.    Testing of the samples.

09:35:56 18   Q.    Do you recognize that?

09:36:07 19   A.    Yes.

09:36:08 20   Q.    And what do you recognize about it?

09:36:09 21   A.    This is an e-mail from me to Tony, from me to Jeff

09:36:18 22   regarding the NRA, I assume.

09:36:22 23   Q.    So you wrote to Jeff in that first paragraph, you had

09:36:31 24   an understanding that Qorvo had provided an investment, and

09:36:36 25   then you write, "It is not my understanding that in fact we

09:36:39  1    have not provided you a proposal, at least not a formal

09:36:43  2    written one."

09:36:44  3              Do you see that?

09:36:44  4    A.    Yes.

09:36:44  5    Q.    And so at this point then, there had been no formal

09:36:51  6    written proposal with respect to an investment agreement

09:36:56  7    between Qorvo and Akoustis?

09:37:00  8    A.    I don't know.

09:37:01  9    Q.    Okay.  And then in the next paragraph you tell him,

09:37:10 10    "We agree to test the parts and to not do a teardown of the

09:37:13 11    samples.  Simply trying to understand your process or

09:37:16 12    technology."  Correct?

09:37:17 13    A.    Correct.

09:37:18 14    Q.    Why was the -- doing a teardown an issue?

09:37:25 15    A.    Because we were doing a make versus buy decision with

09:37:34 16    a potential supplier that would have been sensitive to

09:37:42 17    Qorvo's capabilities to make that product.

09:37:46 18    Q.    And doing a tear down of that product would have

09:37:49 19    allowed Qorvo, then, to potentially more easily be able to

09:37:54 20    fabricate a similar product; right?

09:37:58 21    A.    I don't know.  This was the ask from Mr. Shealy when

09:38:03 22    we got the samples.

09:38:05 23    Q.    Did you have an understanding of why he made the ask?

09:38:08 24    A.    Generally, that would have been a standard response

09:38:12 25    from any supplier that was supplying a part that we were

09:38:16  1    capable of making.

09:38:17  2    Q.      Do you recognize this?

09:38:21  3    A.      Yes.

09:38:23  4    Q.      Now the e-mail on the back is the same one that we

09:38:27  5    just saw that was from you to Jeff; correct?

09:38:33  6    A.      Yes.

09:38:34  7    Q.      And on the front at the bottom is then Jeff's

09:38:38  8    response to you; correct?

09:38:40  9    A.      Yes.

09:38:41 10    Q.      And by Jeff, we're talking about Jeff Shealy, who was

09:38:46 11    the CEO at Akoustis; right?

09:38:48 12    A.      Yes.

09:38:48 13    Q.      And he writes, "I'm willing to loan sample parts plus

09:38:53 14    two loose pieces of our AKF-1252, 5.2-gigahertz WiFi con

09:39:02 15    filter along with data sheet with measured data."  Goes on

09:39:05 16    in this paragraph, correct?

09:39:06 17    A.      Yes.

09:39:07 18    Q.      And then he writes to you his reasoning for some

09:39:13 19    potential in terms of discussions going forward?

09:39:20 20            MR. NAQVI:  Objection to the extent counsel

09:39:22 21    mischaracterizes the document.  It speaks for itself.

09:39:29 22    Q.      You can still answer.

09:39:30 23    A.      Sorry.  Will you repeat the question?

09:39:32 24    Q.      Do you remember the difficult discussion of that

09:39:45 25    issue that he references in that e-mail?

09:39:50  1    A.      I remember Jeff wanting to discuss investment, Qorvo

09:39:57  2    investing in Akoustis.   I assume that's the difficult

09:40:03  3    discussion.

09:40:07  4    Q.      He writes, "Hence the risk we may do development work

09:40:12  5    and no guarantee of production."

09:40:14  6            Do you recall that being a concern that he

09:40:16  7    expressed?

09:40:17  8    A.      Not specifically, no.

09:40:19  9    Q.      Do you remember giving him an answer to that, then?

09:40:25 10    A.      Not specifically, no, I don't.

09:40:28 11    Q.      Okay.  You write to them, though, "Let's get through

09:40:31 12    the sample test and then jump through the next hurdle," in

09:40:35 13    your response to him, yes?

09:40:36 14    A.      Yes.

09:40:37 15    Q.      Thank you.  Mark as Exhibit 1087, a document bearing

09:40:45 16    the Qorvo Bates numbers 66564.  Do you recognize this?

09:40:56 17    A.      Yes.

09:41:00 18    Q.      And what do you recognize about it?

09:41:03 19    A.      This is a communication between me and Cees Links

09:41:07 20    regarding requesting samples for Wi-Con.

09:41:11 21    Q.      And Wi-Con --

09:41:13 22    A.      Sorry, sorry, requesting samples.  I don't know that

09:41:17 23    these samples were for Wi-Con.

09:41:25 24    Q.      Cees Links writes to you, "I do not trust the

09:41:29 25    progress of our internal development on 5-gigahertz BAW

09:41:35  1  filter..."  was that the same as the concern you expressed

09:41:38  2  before that he had about the Qorvo inability to produce that

09:41:44  3  part in a timely way for him?

09:41:47  4  A.    Not -- if I can rephrase your question.  Sorry.  It

09:41:54  5  wasn't a concern about ability, it was concern about

09:41:56  6  resources and timing.

09:41:58  7  Q.    And what was the concern about resources and timing?

09:42:01  8  A.    Those were resources and timing were being focused on

09:42:07  9  -- excuse me -- 5-gigahertz for mobile products, not for IDP

09:42:12 10  products.

09:42:19 11  Q.    Are you familiar with the Qorvo 1903?

09:42:24 12  A.    I don't know what that is, no.

09:42:26 13  Q.    The Qorvo 1903 BAW filter product?

09:42:29 14  A.    I don't know it by part number, no.

09:42:34 15  Q.    What was the 5-gigahertz mobile BAW filter that you

09:42:40 16  just referred to in your answer?

09:42:43 17  A.    I don't know.

09:42:44 18  Q.    But you just said that "there were resources from the

09:42:47 19  mobile group that were being dedicated, whereas those same

09:42:56 20  resources weren't being dedicated to the IDP group";

09:43:01 21  correct?

09:43:01 22  A.    At the time I don't know that we were actually

09:43:05 23  engaged in any development at this time in 2017 or 2018.  If

09:43:15 24  we were engaged in development for any IDP 3.5 or

09:43:23 25  5-gigahertz filters.  All of our BAW filter development,

09:43:30 1    including 5-gigahertz, and I don't know part numbers, I

09:43:33 2    don't know internal part numbers because I didn't deal with

09:43:36 3    those, was for the high volume Apple related mobile

09:43:42 4    business.

09:43:47 5    Q.    Thank you.

09:43:55 6          Same e-mail, though.  You write, "This is

09:44:02 7    political both within Qorvo, as well as with Akoustis so I

09:44:06 8    am treading lightly to achieve the goal."

09:44:10 9          Is that the same here is the investment they're

09:44:12 10   looking for and there are different people looking at it

09:44:15 11   different ways?

09:44:15 12   A.    Yes.

09:44:15 13   Q.    Mark as Exhibit 1088 a document bearing the Qorvo

09:44:20 14   Bates number 313877.  Do you recognize that?

09:44:33 15   A.    Yes.

09:44:34 16   Q.    Do you recall that?

09:44:36 17   A.    Yes.

09:44:37 18   Q.    What do you recall about it?

09:44:39 19   A.    Obviously more communication between myself and Dave

09:44:48 20   Aichele regarding samples.  5-gigahertz samples.

09:44:56 21   Q.    Do you recall him telling you that at this time the

09:45:01 22   AKF-1252 die design is locked?

09:45:08 23   A.    Yes.

09:45:09 24   Q.    What do you recall about those discussions?

09:45:12 25   A.    Just that he was saying they have a part ready to

09:45:16  1    sample.

09:45:17  2    Q.      Do you recall this?

09:45:20  3    A.      Yes.

09:45:21  4    Q.      What do you recall?

09:45:23  5    A.      This is an e-mail from me to Jeff Shealy following a

09:45:34  6    meeting that we had where we discussed Wi-Fi specs.

09:45:40  7    Q.      And you sent him some Wi-Fi specs?

09:45:47  8    A.      Evidently.

09:45:48  9    Q.      Are those the specs that are then attached at

09:45:53  10   AKTS-82513 through 515?

09:45:58  11   A.      I don't know.

09:46:01  12   Q.      Any reason to think that they're not?

09:46:09  13   A.      I -- I just don't know.  I don't know yes or I don't

09:46:14  14   know no.

09:46:16  15   Q.      One is for a 5-gigahertz Wi-Fi filter, target spec

09:46:24  16   two; correct?

09:46:26  17   A.      Yes.

09:46:26  18   Q.      And the other one is for another 5-gigahertz Wi-Fi

09:46:33  19   filter, target spec number one; right?

09:46:37  20   A.      Correct.

09:46:38  21   Q.      Do you recall whether these were Qorvo Wi-Fi specs?

09:46:43  22   A.      I don't recall.

09:46:49  23   Q.      So I'll have you take a look at Exhibit 1033.  It's

09:46:54  24   been marked before.  And I'll direct your attention to the

09:47:04  25   attachment.  The title is "QPQ1904 Micro BAW Eight-inch."

09:47:14  1    Do you see that?

09:47:14  2    A.      Yes.

09:47:14  3    Q.      And is this a specification for a five point

09:47:18  4    gigahertz Wi-Fi filter design of Qorvo?

09:47:21  5    A.      Yes.

09:47:23  6    Q.      Do you recall that?

09:47:41  7    A.      Yes.

09:47:41  8    Q.      What do you recall about it?

09:47:43  9    A.      This was the follow-up to the previous e-mail that we

09:47:47 10    looked at following a meeting with Jeff where he has

09:47:55 11    received the specs.

09:47:56 12    Q.      Do you remember the lunch that you had with him?

09:47:58 13    A.      Yes.

09:47:58 14    Q.      Was it in Greensboro or Charlotte?

09:48:02 15    A.      It was in Winston-Salem.

09:48:05 16    Q.      What do you recall about the lunch?

09:48:08 17    A.      That it was obvious to me walking out that Akoustis

09:48:15 18    was desperately seeking investment.

09:48:21 19    Q.      Was it just the two of you?

09:48:23 20    A.      No, it was Todd Gillenwater had joined.

09:48:26 21    Q.      Anything else that you recall about the lunch?

09:48:28 22    A.      That was it.

09:48:29 23    Q.      Okay.

09:48:45 24            Jeff writes to you to confirm, Akoustis is

09:48:47 25    currently working on both bands of interest.  Did you have

09:48:52  1    an understanding of what the bands of interest were?

09:48:59  2    A.     Yes.

09:49:00  3    Q.     What was that?

09:49:01  4    A.     Two different 5-gigahertz bands.

09:49:06  5    Q.     Was one the 5.2 and the other one the 5.6?

09:49:10  6    A.     Yes.

09:49:10  7    Q.     Are those the two bands that were the specifications

09:49:13  8    that were attached in Exhibit 1090 that we just looked at?

09:49:19  9    A.     I would have to look.  I don't know.

09:49:21 10    Q.     Go ahead.

09:49:25 11    A.     5.6, and -- are they separate or are they together?

09:49:36 12    I saw 5.6.  Sorry, do I have a 5.2?

09:49:47 13    Q.     I think it's this one that had the two pages, with

09:49:51 14    the target spec number one and the target spec number two

09:49:54 15    that was the attachment to Exhibit 1090.

09:49:57 16            Do you have an understanding that that's the

09:50:01 17    pass band?

09:50:01 18    A.     Yes.

09:50:01 19    Q.     And that the middle of that would be 5.2-gigahertz?

09:50:04 20    A.     Yes.

09:50:05 21    Q.     And so this is a reference to the 5.2-gigahertz band

09:50:10 22    of interest that was in Mr. Shealy's e-mail?

09:50:14 23    A.     Yes.

09:50:15 24    Q.     And then for target spec number one, the band of

09:50:18 25    interest is 5490 to 5850?

09:50:22  1    A.      So 5.6.

09:50:23  2    Q.      Which is the 5.6?

09:50:27  3    A.      Yes.

09:50:28  4    Q.      What do you recall about it?

09:50:31  5    A.      This is Jeff's -- Jeff Shealy's response back to me

09:50:35  6    on the specifications that I provided to him.

09:50:41  7    Q.      Now, this is an additional specification that you

09:50:44  8    provided to him on October 4, 2018, that has the item and

09:50:50  9    specification in block at the bottom of the page but then

09:50:54  10   flips to the next page; correct?

09:50:56  11   A.      Yes.

09:50:57  12   Q.      And so this was for a 4.9-gigahertz BAW filter?

09:51:08  13   A.      Yes.

09:51:14  14   Q.      And so the feedback is the feedback that is on the

09:51:18  15   first attachment, where it says feedback on Qorvo 4,800 to

09:51:23  16   5,000-megahertz 5G infrastructure spec, correct?

09:51:27  17   A.      Yes.

09:51:27  18   Q.      What they have done is they've taken the item in the

09:51:30  19   specification that was from your e-mail and then put in

09:51:35  20   Akoustis comments in blue on the right; correct?

09:51:39  21   A.      Yes.

09:51:42  22   Q.      And then the attachment was a foundry customer RF

09:51:46  23   filter design flow, next exhibit, that just shows what was

09:51:49  24   proposed in terms of a design flow for a foundry customer;

09:51:54  25   right?

09:51:54  1    A.       Yes.

09:51:57  2    Q.       Do you recall having discussions with Mr. Shealy

09:52:00  3    relating to Qorvo being a foundry customer?

09:52:04  4    A.       Yes.

09:52:04  5    Q.       What do you recall about those discussions?

09:52:07  6    A.       I recall his concern of would we engage with Akoustis

09:52:20  7    as a supplier.

09:52:25  8    Q.       Why would that be your concern, or why was that a

09:52:29  9    concern?

09:52:29 10    A.       Because we have the capability.  His concern was they

09:52:35 11    put in resources and then, you know, we have the capability

09:52:42 12    to make these, which is always a concern in a make versus

09:52:46 13    buy decision for a supplier.

09:52:50 14    Q.       Or the supplier is concerned that Qorvo may make it

09:52:55 15    rather than buy it?

09:52:56 16    A.       Correct.

09:52:57 17    Q.       Do you recall that?

09:53:10 18    A.       Yes.

09:53:11 19    Q.       What do you recall?

09:53:13 20    A.       This was Jeff just confirming that samples were

09:53:18 21    shipped.

09:53:22 22    Q.       And in the earlier part of the correspondence, I'm

09:53:35 23    looking at your e-mail of October 29, 2018, at 8:46 p.m. it

09:53:43 24    kind of spans the Bates 84478 to 79?

09:53:49 25             MR. NAQVI:  The second to last page?

2006

09:53:51  1    Q.      Second to last page, yes.  You write, "We agree to

09:53:54  2    test the parts and to not do a teardown of the samples."

09:53:58  3            So that ended up being what we had talked about

09:54:01  4    before in terms of these samples.  These are the different

09:54:05  5    samples than the ones at the first exhibit that we had in

09:54:08  6    this deposition, yes?

09:54:09  7    A.      I don't know.

09:54:10  8    Q.      From back in 2017?

09:54:13  9    A.      Yeah.  I don't know if these were different samples

09:54:18 10    or the same samples that we were talking about.

09:54:23 11    Q.      Okay.  Do you -- and then you write, "Do you still

09:54:27 12    agree to this first step to determine if there is a business

09:54:30 13    path between Akoustis and Qorvo?"

09:54:34 14            He wrote back to you, then, "I'm willing to loan

09:54:37 15    sample parts."

09:54:39 16            And that's at the top of 84477.  So do you

09:54:44 17    recall if that was what the agreement had been?

09:54:46 18    A.      Yes.

09:54:46 19    Q.      Who is John Fendrich?

09:54:51 20    A.      He works in a lab at Qorvo.  So he would have done

09:54:57 21    the actual testing of the samples.

09:55:02 22    Q.      Do you recall this?

09:55:11 23    A.      I do not.

09:55:13 24    Q.      Hans Schwarz is the Hans Schwarz we mentioned before,

09:55:18 25    who was in charge of MMA activities?

2007

09:55:22  1    A.      Correct.

09:55:22  2    Q.      And he's asking you, "Did we ever get the samples

09:55:26  3    from Akoustis to test?"

09:55:26  4    A.      He is.

09:55:27  5    Q.      And this is in December of 2018, yes?

09:55:30  6    A.      Yes.

09:55:31  7    Q.      Do you recall this?

09:55:46  8    A.      Yes.

09:55:46  9    Q.      What do you recall?

09:55:48  10   A.      This was my confirmation to Tony that we would convey

09:55:58  11   what we would agreed to with Jeff on the samples.

09:56:02  12   Q.      So these are the same samples from what was the

09:56:07  13   Exhibit 1094 that we talked about?

09:56:08  14   A.      I assume so.

09:56:10  15   Q.      IDP was the acronym for --

09:56:13  16   A.      Infrastructure and defense.

09:56:15  17   Q.      And mark as Exhibit 1099 a document bearing the

09:56:24  18   Akoustis Bates number 85830.  Do you recall this?

09:56:37  19   A.      I do.

09:56:38  20   Q.      What do you recall?

09:56:40  21   A.      Just Jeff confirming that he met with Tony and Todd

09:56:47  22   at MWC.

09:56:49  23   Q.      Jeff wrote, "AKTS capacity concerns were topic of

09:56:55  24   interest from Tony."  Is that Tony, Tony Testa?

09:56:58  25   A.      Yes.

09:56:58  1   Q.      And Tony Testa was concerned about Akoustis's

09:57:02  2   capacity?

09:57:02  3   A.      Yes.

09:57:02  4   Q.      At that time do you remember any other concerns that

09:57:07  5   were being expressed about Akoustis with respect to the

09:57:11  6   potential whether to buy Akoustis products?

09:57:14  7   A.      Yes.

09:57:15  8   Q.      What else?

09:57:15  9   A.      Performance to meet the data sheets that were

09:57:19 10   published.

09:57:21 11   Q.      And the data sheets that were published, what does

09:57:25 12   that refer to?

09:57:26 13   A.      Press releases, sorry, that could Akoustis actually

09:57:33 14   provide filters that met their data sheets.  There was

09:57:39 15   doubt.

09:57:39 16   Q.      By whom?

09:57:41 17   A.      By Qorvo engineering.

09:57:44 18   Q.      Anything else other than that in terms of concerns

09:57:47 19   that you recall?

09:57:49 20   A.      No.  Sorry, yes.  I had a concern about Akoustis'

09:58:03 21   viability, just financial viability.

09:58:07 22   Q.      Do you recall this?

09:58:09 23   A.      Yes.

09:58:10 24   Q.      What's this?

09:58:11 25   A.      This is me communicating with James Klein that just

09:58:20 1    generally about obtaining filters from -- from Akoustis for

09:58:25 2    IDP.

09:58:27 3    Q.    Now, this document has a one-page e-mail and then a

09:58:32 4    January 25th, 2019, attachment.  Do you see that?

09:58:37 5    A.    Yes.

09:58:37 6    Q.    What is this attachment?

09:58:41 7    A.    My assumption from reading this is this is the result

09:58:49 8    -- test results of these samples.

09:58:54 9    Q.    And Todd Gillenwater writes to Bob Bruggeworth on

09:59:01 10   March 20th, "We have taken all the data and provided it back

09:59:04 11   to Akoustis.  Overall I thought their data looked fine and

09:59:07 12   is probably the best part available for these frequency

09:59:10 13   bands."

09:59:11 14          Do you see that?

09:59:12 15   A.    Yes.

09:59:15 16   Q.    Did that go against what the thinking was at Qorvo

09:59:19 17   relative to the Akoustis ability to meet its specifications

09:59:24 18   that you just referred to?

09:59:26 19   A.    Seemingly so specific for this result, yes.

09:59:36 20   Q.    And you wrote to James Klein, Roger Hall, and Doug

09:59:43 21   Bostrum, "I guess my impression was incorrect according to

09:59:48 22   Todd's note below."

09:59:49 23          Yes?

09:59:49 24   A.    Yes.

09:59:51 25   Q.    You then wrote James, who -- James, James Klein?

09:59:55  1    A.      Yes.

09:59:56  2    Q.      "From our brief discussion last night with Akoustis

09:59:59  3    as a supplier, I'm not pushing them, just wanted to be sure

10:00:03  4    that IDP is the option to where the get 5-gigahertz filters

10:00:08  5    in hand from what is approximately two years late."

10:00:11  6              Do you see that?

10:00:12  7    A.      Yes.

10:00:12  8    Q.      Is the approximately two years late Qorvo being

10:00:16  9    approximately two years late, with respect to getting these

10:00:20 10    filters?

10:00:20 11    A.      Specifically to support IDP, yes.

10:00:28 12    Q.      So there may have been 5-gigahertz BAW filters to

10:00:33 13    support mobile, but there weren't 5-gigahertz BAW filters to

10:00:38 14    support IDP?

10:00:39 15    A.      Yes.

10:00:42 16    Q.      Did IDP ever get 5-gigahertz BAW filters to support

10:00:47 17    it while you were at Qorvo?

10:00:49 18    A.      From Akoustis?

10:00:50 19    Q.      No, from Qorvo?

10:00:52 20    A.      I don't know.

10:00:53 21    Q.      Do you recall that?

10:00:55 22    A.      Yes.

10:00:55 23    Q.      What do you recall?

10:00:57 24    A.      This is Jeff communicating to Todd that he would

10:01:05 25    provide him a PDK for the stated $85,000 and the terms of

10:01:12  1    that.

10:01:13  2    Q.      And as we show, Qorvo then obtained samples, and

10:01:19  3    Mr. Gillenwater said that "for these frequency bands, I

10:01:22  4    thought their data looked fine and is probably the best part

10:01:26  5    available for these frequency bands", correct?

10:01:28  6    A.      That is what he said, yes.

10:01:30  7    Q.      And the Qorvo people then still didn't believe that

10:01:35  8    Akoustis had that?

10:01:37  9    A.      Did not believe that Akoustis had the capabilities,

10:01:42 10    and also there is the other capability that was not

10:01:47 11    available from Akoustis was packaging.  So even if we could

10:01:52 12    get a filter, they didn't have WLP, wafer level packaging to

10:02:00 13    sell it to us.  A die has to be packaged to sell.

10:02:07 14    Q.      Uh-huh.

10:02:07 15    A.      And Akoustis did not have that capability either.

10:02:11 16    Q.      Isn't it common in the semiconductor industry to use

10:02:15 17    other companies to do wafer level packaging?

10:02:20 18    A.      To do packaging, yes, but -- yes, it is.

10:02:28 19    Q.      And wasn't that one of your responsibilities with

10:02:33 20    respect to external suppliers and managing as you said the

10:02:38 21    packaging of external houses when you were the director?

10:02:42 22    A.      There was -- I honestly don't remember having any

10:02:50 23    discussion about doing external WLP packaging for Akoustis.

10:02:58 24    But what I do remember is that Akoustis was not interested

10:03:01 25    in selling us die only.

| | | |
|---|---|---|
| 10:03:05 | 1 | Q.    They were interested in selling you wafers? |
| 10:03:08 | 2 | A.    They were interested in selling us packaged parts. |
| 10:03:13 | 3 | Q.    Okay.  So while Qorvo may have been interested in |
| 10:03:19 | 4 | buying die, Akoustis was interested in selling you packaged |
| 10:03:24 | 5 | parts? |
| 10:03:25 | 6 | A.    I don't know that we were interested in buying die. |
| 10:03:30 | 7 | Q.    Which is what Akoustis was interested in selling? |
| 10:03:32 | 8 | A.    That's all they had. |
| 10:03:36 | 9 | Q.    Akoustis was proposing that it would get its parts |
| 10:03:42 | 10 | packaged and sell them to Qorvo; correct? |
| 10:03:46 | 11 | A.    I don't recall that proposal being made. |
| 10:03:48 | 12 | Q.    Is there a way to use the parts without them being |
| 10:03:51 | 13 | packaged? |
| 10:03:52 | 14 | A.    No. |
| 10:04:02 | 15 | Q.    Was Akoustis proposing something that couldn't work? |
| 10:04:06 | 16 | A.    My understanding is that they were working on a WLP |
| 10:04:10 | 17 | solution so that they could sell a packaged part eventually. |
| 10:04:15 | 18 | Q.    Do you recall that? |
| 10:04:34 | 19 | A.    Yes. |
| 10:05:16 | 20 | Q.    I only have the one copy of that. |
| 10:05:19 | 21 | MR. NAQVI:  Okay. |
| 10:05:20 | 22 | Q.    I'm sorry about that. |
| 10:05:22 | 23 | MR. NAQVI:  I'm just going to take a peek at it. |
| 10:05:29 | 24 | Q.    Go ahead.  Do you recall anything in this e-mail |
| 10:06:31 | 25 | thread? |

| | | |
|---|---|---|
| 10:06:31 | 1 | A.      I recall Hans' comparison. |
| 10:06:38 | 2 | Q.      The comparison between Akoustis and Qorvo? |
| 10:06:41 | 3 | A.      Yes. |
| 10:06:41 | 4 | Q.      And we're now in November of 2019; correct? |
| 10:06:45 | 5 | A.      Correct. |
| 10:06:46 | 6 | Q.      And then you write to Dean on Monday, November 25th, |
| 10:06:54 | 7 | 2019, "Heads up, please do your own independent |
| 10:06:57 | 8 | investigation and not buy into rumored internal evaluation |
| 10:07:01 | 9 | of Akoustis capabilities.  It is quite emotional.  I keep |
| 10:07:06 | 10 | hearing how crappy their filters are, and keep seeing places |
| 10:07:10 | 11 | where they were winning." |
| 10:07:12 | 12 |      That's what you wrote, correct? |
| 10:07:13 | 13 | A.      Yes. |
| 10:07:13 | 14 | Q.      Where were the places that you won, that you kept |
| 10:07:19 | 15 | seeing? |
| 10:07:19 | 16 | A.      I'm sorry. |
| 10:07:20 | 17 | Q.      You wrote, "and keep seeing places that they are |
| 10:07:23 | 18 | winning", correct? |
| 10:07:24 | 19 | A.      Correct. |
| 10:07:24 | 20 | Q.      Those are accounts that they were winning and they |
| 10:07:26 | 21 | were selling parts into those, correct? |
| 10:07:28 | 22 | A.      Yes. |
| 10:07:28 | 23 | Q.      They were selling actual parts, right? |
| 10:07:31 | 24 | A.      I don't know what they were selling. |
| 10:07:34 | 25 |      MR. NAQVI:  Objection. |

| | | |
|---|---|---|
| 10:07:35 | 1 | Q.    You assume they were selling actual parts, yes? |
| 10:07:37 | 2 | A.    That was my assumption, yes. |
| 10:07:40 | 3 | Q.    Do you recall that.  And I'll note that you're on the |
| 10:07:43 | 4 | e-mail starting on page 2. |
| 10:08:02 | 5 | A.    (Witness reviewing document.)  Yes, I recall this. |
| 10:08:15 | 6 | Q.    And we're now in December of 2019.  This is the |
| 10:08:22 | 7 | e-mail on the earlier pages are from November, end of |
| 10:08:26 | 8 | November, 2019.  You're being asked to get further parts |
| 10:08:29 | 9 | from Akoustis; correct? |
| 10:08:31 | 10 | A.    Yes. |
| 10:08:38 | 11 | Q.    Roger writes to you, "Leah, is it possible to get |
| 10:08:42 | 12 | some samples of Akoustis filters for evaluation?" |
| 10:08:46 | 13 |         Yes? |
| 10:08:46 | 14 | A.    Where is that, please? |
| 10:08:47 | 15 | Q.    It's at the bottom of the Bates page 626272. |
| 10:08:54 | 16 | A.    Yes. |
| 10:08:56 | 17 | Q.    And you write back, "Will you please advise |
| 10:08:59 | 18 | specifically what you want, frequency, test board, quantity, |
| 10:09:03 | 19 | et cetera, from Akoustis and I will make the request." |
| 10:09:06 | 20 | A.    Yes. |
| 10:09:06 | 21 | Q.    Do you know why they're asking for further parts for |
| 10:09:09 | 22 | evaluation? |
| 10:09:14 | 23 | A.    This is for HPS.  I don't know if this was further |
| 10:09:22 | 24 | parts for Roger or if this was his first specific samples |
| 10:09:26 | 25 | for HPS. |

2015

| | | |
|---|---|---|
| 10:09:30 | 1 | Q.    And HPS is the high power? |
| 10:09:32 | 2 | A.    Yes. |
| 10:09:33 | 3 | Q.    Different from mobile? |
| 10:09:34 | 4 | A.    Yes. |
| 10:09:34 | 5 | Q.    Different from infrastructure? |
| 10:09:37 | 6 | A.    It is infrastructure. |
| 10:09:38 | 7 | Q.    It is infrastructure? |
| 10:09:40 | 8 | A.    Yes. |
| 10:09:40 | 9 | Q.    Okay. |
| 10:09:43 | 10 | A.    Different from Wi-Con. |
| 10:09:46 | 11 | Q.    Do you recall that? |
| 10:10:19 | 12 | A.    Yes. |
| 10:10:19 | 13 | Q.    What do you recall? |
| 10:10:21 | 14 | A.    I recall the Akoustis win or advertised win with |
| 10:10:36 | 15 | Euro. |
| 10:10:36 | 16 | Q.    So your April 24th, 2020, e-mail to Mr. Links said, |
| 10:10:44 | 17 | "I heard last night that Akoustis won a new slug of business |
| 10:10:48 | 18 | from Euro." |
| 10:10:49 | 19 |       From whom did you hear that from last night? |
| 10:10:52 | 20 | A.    I do not know. |
| 10:10:53 | 21 | Q.    But as a result of hearing that, you then found this |
| 10:10:56 | 22 | press release and forwarded it on? |
| 10:11:03 | 23 | A.    Evidently.  Did I do that?  Is it documented that I |
| 10:11:16 | 24 | forwarded this? |
| 10:11:17 | 25 | Q.    I don't know.  I'm just asking. |

10:11:19  1    A.      No -- I don't remember this press release or

10:11:23  2    forwarding it.

10:11:26  3    Q.      Okay.  The last e-mail at 12:28 has this as an

10:11:32  4    attachment on the e-mail from you, though, yes?

10:11:35  5    A.      The last e-mail?

10:11:38  6    Q.      I'm sorry, well -- well, the most recent.

10:11:43  7    A.      The first e-mail.

10:11:44  8    Q.      The first e-mail, I am sorry.

10:11:46  9    A.      Yes, there is an attachment, yes.

10:11:48 10    Q.      And there is this attachment; yes?

10:11:50 11    A.      Correct.  Correct.

10:11:51 12    Q.      And you were then forwarding this to Mr. Klein,

10:11:56 13    Mr. Links, Mr. Bostrum, and Mr. Testa with a CC to Mr. Fego?

10:12:02 14    A.      Correct.

10:12:02 15    Q.      And that's the Paul Fego, who is your boss?

10:12:07 16    A.      Yes.

10:12:19 17    Q.      On these e-mails, you'll see it says "classification

10:12:24 18    private".  What does that mean?

10:12:26 19    A.      It is just an automatic IT classification.  And at

10:12:39 20    this -- at this point in time in 2020, I think it just --

10:12:44 21    Qorvo's IT group just automatically classified unless you

10:12:50 22    over rode it with "highly sensitive" or something else.

10:12:57 23              (End of videotape deposition.)

10:13:08 24              MR. LEMIEUX:  Your Honor, I believe that ends

10:13:11 25    the video deposition excerpts of Ms. Giovan.  We have a

10:13:17  1    number of exhibits then to move into evidence.

10:13:19  2                THE COURT:  And they're going to be coming in.

10:13:22  3    We're going to start another witness, but I think it might

10:13:25  4    be easier for everybody, for particularly staff, if we can

10:13:28  5    mark the exhibits sequentially at this time and then we will

10:13:33  6    resume.

10:13:33  7                We're going to take an early, an early break.

10:13:38  8    And it's going to be at least twenty minutes because I'm not

10:13:43  9    sure we can accomplish all this in that twenty-minute

10:13:47 10    period.  It will give us a chance to do that.  When we come

10:13:49 11    back, I am going to ask who your next witness will be, I

10:13:53 12    think we know already.

10:13:54 13                MR. LEMIEUX:  The witness will be one of

10:13:56 14    defendant's experts, Dr. Darveaux.

10:13:59 15                THE COURT:  Exactly.  When we come back, we will

10:14:01 16    be hearing from Dr. Darveaux.  Don't discuss the case

10:14:05 17    amongst yourself, don't let anybody talk to you about the

10:14:07 18    case, keep an open mind.  We'll see you in twenty minutes,

10:14:11 19    it will be 10:30 at the time we come back.  I'll let you be

10:14:15 20    excused.

10:14:16 21                (Jury exiting the courtroom at 10:14 a.m.)

10:14:34 22                THE COURT:  Everybody be seated for a moment.

10:14:38 23    We're going to go back and look at this a little bit more.

10:14:41 24    There is some issues as to the materials that have been

10:14:46 25    submitted as to Lebby, and frankly, I'm going to go back and

10:14:54  1    recheck, but I already looked at the material and there is

10:14:58  2    certainly question about whether or not the materials have

10:15:00  3    been submitted will be able to be used.  I'll go back and

10:15:04  4    check on that.  We need to take that break.  They need to

10:15:08  5    mark everything.  It will take a few minutes.  Thanks very

10:15:11  6    much.

10:15:12  7                    COURT CLERK:  All rise.

10:15:13  8                    (A brief recess was taken.)

10:35:14  9                    THE COURT:  Everybody can be seated.

10:35:17  10                   Alex, our last exhibit number would be 340, is

10:35:35  11   that right?

10:35:37  12                   COURT CLERK:  340 will be our next one.  339.

10:35:41  13                   THE COURT:  339.  Got it.  Thank you.

10:35:44  14                   I think we're ready to bring our panel in.  We

10:35:50  15   have been working the Lebby matter.  Of course, he can say

10:35:54  16   certain things, we already indicated that.  There is a group

10:35:58  17   of unresolved issue on some of it, so I think we have

10:36:03  18   everything almost under control.  We're going to revise the

10:36:07  19   verdict form a little bit.

10:36:10  20                   North Carolina law is not so clear on a couple

10:36:13  21   of things.  There seems to be a basis for -- I think as I

10:36:18  22   understand the focus of the plaintiff is really the Defend

10:36:24  23   Trade Secrets Act in many respects, is that right?  At least

10:36:31  24   maybe now.

10:36:31  25                   MR. DeFOSSE:  I would say it's both, Your Honor.

10:36:34  1    The North Carolina law in some respects is broader --

10:36:38  2                  THE COURT:  You have the treble damage issue.

10:36:40  3                  MR. DeFOSSE:  Yes, we're talking about the issue

10:36:42  4    of the instruction to the jury on double recovery, that is

10:36:45  5    what we're concerned about?

10:36:49  6                  THE COURT:  Right.  We're going to redo that a

10:36:51  7    little bit.  I understand the preference, obviously of the

10:36:53  8    plaintiffs on that.  I will look at it a little bit more,

10:36:58  9    but I think the focus will probably need to be in the issue

10:37:04 10    before you make your own choices on Defend Trade Secrets

10:37:09 11    Act.

10:37:09 12                  MR. DeFOSSE:  Okay.

10:37:10 13                  THE COURT:  I don't know that you're going to be

10:37:12 14    able to pursue the treble damages issue later on.

10:37:16 15                  MR. DeFOSSE:  Okay.  I guess -- obviously we'll

10:37:19 16    wait for Your Honor's decision.

10:37:21 17                  THE COURT:  That's fine.

10:37:22 18                  MR. DeFOSSE:  If it helps, one thought we had,

10:37:24 19    our proposal was the Court could address the double recovery

10:37:28 20    issue, we're not seeking a double recovery.

10:37:32 21                  THE COURT:  I understand.

10:37:32 22                  MR. DeFOSSE:  The way we were thinking out one

10:37:36 23    suggestion for the verdict form would be in our unfair

10:37:38 24    competition claim, we really have two components of damages,

10:37:41 25    we have the damages that would be related to the

10:37:44  1  confidential information, which is somewhat overlapping but

10:37:46  2  I think broader than the trade secret issues.

10:37:49  3        Then we have the damages that are related to the

10:37:52  4  employee retraining.  And one way that would assist the

10:37:56  5  Court I think in preventing a double recovery is if we broke

10:38:00  6  out the quantification of those damages in the verdict form

10:38:04  7  because then we can see what the jury would award on both

10:38:08  8  components of the unfair competition, and it will be easier

10:38:11  9  to assess whether we're really talking about things that

10:38:16 10  could be covered by the Defend Trade Secrets Act or whether

10:38:18 11  we're talking about something else.  I think that would give

10:38:21 12  Your Honor the tools to help ensure there is no double

10:38:24 13  recovery.

10:38:25 14        THE COURT:  Sure.  I understand.  We'll consider

10:38:27 15  that.  Is there anything else you want to submit in that

10:38:29 16  regard in terms of modification of the form?

10:38:32 17        MR. DeFOSSE:  Thank you, Your Honor.

10:38:33 18        THE COURT:  Do you want to submit anything else?

10:38:35 19        MR. DeFOSSE:  Oh, yes.

10:38:36 20        THE COURT:  I don't mean a brief, I just mean

10:38:38 21  the form modification.

10:38:39 22        MR. DeFOSSE:  We would be happy to change the

10:38:41 23  form and break that out and show you what we are thinking

10:38:44 24  about.

10:38:45 25        THE COURT:  We want to receive that as soon as

Darveaux - direct

| | |
|---|---|
| 10:38:47 1 | we can. |
| 10:38:47 2 | MR. DeFOSSE:  This afternoon is fine? |
| 10:38:49 3 | THE COURT:  Sure. |
| 10:38:50 4 | MR. DeFOSSE:  Thank you, Your Honor. |
| 10:38:51 5 | THE COURT:  We're ready to bring the panel in |
| 10:38:53 6 | and we'll see where we are. |
| 10:38:59 7 | (Jury entering the courtroom at 10:39 a.m.) |
| 10:39:25 8 | THE COURT:  Everyone can be seated.  And who is |
| 10:39:47 9 | the defense's next witness? |
| 10:39:51 10 | Ms. Smith, yes? |
| 10:39:54 11 | MS. SMITH:  Yes.  We call Dr. Robert Darveaux. |
| 10:39:57 12 | THE COURT:  All right.  And will the Doctor come |
| 10:40:01 13 | forward and raise his right hand to be sworn in. |
| 10:40:08 14 | COURT CLERK:  Please remain standing.  Please |
| 10:40:13 15 | state and spell your full name for the record. |
| 10:40:20 16 | THE WITNESS:  Robert Darveaux.  R-O-B-E-R-T, |
| 10:40:25 17 | D-A-R-V-E-A-U-X. |
| 10:40:28 18 | ROBERT DARVEAUX, Ph.D., having be duly sworn, |
| 10:40:34 19 | was examined and testified as follows: |
| 10:40:37 20 | DIRECT EXAMINATION |
| 10:40:39 21 | BY MS. SMITH: |
| 10:41:00 22 | Q.    Dr. Darveaux, would you please state your full name, |
| 10:41:03 23 | age, and your current state of residence? |
| 10:41:05 24 | A.    Robert Francis Darveaux.  I'm sixty-two.  And I live |
| 10:41:08 25 | in Arizona. |

Darveaux - direct

| | |
|---|---|
| 10:41:10 1 | Q. Please tell the jury a little bit about yourself. |
| 10:41:13 2 | A. I grew up in Pikesville, Minnesota. I have got three |
| 10:41:18 3 | kids that are grown and four grandkids, and they're kind of |
| 10:41:22 4 | scattered around the country, not where I live. |
| 10:41:26 5 | Q. What are the specifics of your educational |
| 10:41:29 6 | background? |
| 10:41:30 7 | A. I have a bachelors of science in nuclear engineering |
| 10:41:35 8 | and I have a Ph.D. in material science and engineering. |
| 10:41:38 9 | Q. Are you the author of any publications? |
| 10:41:42 10 | A. Yeah, I have about ninety publications, I think, and |
| 10:41:47 11 | a combination of journal articles, conference articles, and |
| 10:41:53 12 | a couple of book chapters. |
| 10:41:55 13 | Q. What are the technical areas that you have written |
| 10:41:58 14 | in? |
| 10:41:58 15 | A. Pretty much my career has been in microelectronics, |
| 10:42:04 16 | and more on the packaging and assembly side, but many topics |
| 10:42:08 17 | like RF modules, flip chip devices, RF shielding, printed |
| 10:42:16 18 | circuit boards, reliability testing, thermal simulation, |
| 10:42:21 19 | mechanical simulation, you know, broad range of things |
| 10:42:27 20 | related to packaging. |
| 10:42:28 21 | Q. Are you the named inventor on any patents? |
| 10:42:32 22 | A. Yes. |
| 10:42:32 23 | Q. How many? |
| 10:42:33 24 | A. Somewhere north of seventy-five. I'm not sure of the |
| 10:42:40 25 | exact number. |

Darveaux - direct

10:42:41  1    Q.      And what fields of technology are your patents in?

10:42:46  2    A.      Similarly they're all in microelectronics, kind of

10:42:50  3    the same topics I just said, some are related to modules,

10:42:56  4    shielding, process, most of them are structure patents, so

10:43:00  5    structures in the package.  Flip chip, copper pillars, some

10:43:07  6    of the things that you have been seeing in this case.

10:43:10  7    Q.      You got a BS in nuclear engineering.  Why did you

10:43:14  8    switch course and go into electronics and materials

10:43:18  9    handling?

10:43:18 10    A.      Well, I worked for a year in the Savannah River plant

10:43:24 11    making nuclear weapons material, and then I decided to go

10:43:27 12    back to school and get my Ph.D. and I chose material

10:43:31 13    science.

10:43:32 14    Q.      Have you ever taught any courses in the field of

10:43:35 15    electronics?

10:43:35 16    A.      Yes.  So I did for about five years, I was a

10:43:39 17    part-time professor at Arizona State.  And I taught a

10:43:43 18    material science undergrad course, a grad course in

10:43:47 19    electronic packaging during that time.

10:43:51 20    Q.      Who do you work for currently?

10:43:53 21    A.      So right now I just have my own company.  I do some

10:43:57 22    consulting engineering work and then some expert witness

10:44:00 23    work.

10:44:00 24    Q.      How long have you had that company?

10:44:03 25    A.      So I retired from corporate life in 2019, so I have

Darveaux - direct

10:44:11  1    been doing it since then.

10:44:13  2    Q.      So what industry jobs did you have starting from your

10:44:17  3    first job out of college?

10:44:20  4    A.      So as I mentioned, I worked for DuPont, actually at

10:44:23  5    the Savannah River plant for a year.  Then I went back to

10:44:27  6    school.  I did my graduate research at a place called MCNC,

10:44:34  7    as you can see on the screen, North Carolina.  I lived in

10:44:37  8    North Carolina four years there.

10:44:40  9           When I graduated, I took a job with Motorola

10:44:43 10    down in Florida.  Down there we made two-way radios like

10:44:48 11    police and military have, or they might be mounted on a

10:44:52 12    trunk of a car, that was a product we made so I was involved

10:44:56 13    in the solder technology and process development for

10:44:59 14    packaging that Motorola used at that time.  In fact, some of

10:45:02 15    the packaging technology seen here, so some of this stuff is

10:45:06 16    quite old, as you have seen in this case.

10:45:09 17           Then I took a job with Amkor Technology.  You

10:45:13 18    heard them referred to as subcontractors or OSAT, that's

10:45:18 19    what Amkor does, they do the testing and operations for the

10:45:23 20    semiconductor companies, so pretty much all the largest

10:45:26 21    semiconductor companies in the world were our customers, we

10:45:29 22    were either number one or number two in the industry through

10:45:32 23    the seventeen years that I was there.

10:45:34 24           So my job there was technology development so

10:45:37 25    new platform development, new types of packaging, that's

10:45:43  1    what I did at Amkor.  In fact, you just saw Leah Giovan

10:45:47  2    testify, I met her in 1996, I think.  She was a supplier of

10:45:53  3    lead frames to me on one of the projects I had.  And back in

10:45:57  4    2001, 2002, actually RFMD was my customer, I had the RF

10:46:03  5    module product team.  And they were my biggest customer, so

10:46:07  6    I'm quite familiar with them.  We did production for them in

10:46:11  7    our Philippines P3 plant.  I had been in Greensboro meeting

10:46:15  8    with them at that time frame.

10:46:20  9    Q.      What about Skyworks?

10:46:21 10    A.      From there I went to Skyworks.  Skyworks was 2012 to

10:46:27 11    2019, so that's a time frame a lot of this activity in this

10:46:30 12    case was going on.  Skyworks was a competitor to Qorvo, and

10:46:35 13    eventually to Akoustis when they came on, so we produced

10:46:38 14    front-end modules, power amplifier modules, eventually we

10:46:43 15    produced filters themselves.

10:46:45 16            So Skyworks, when I first got there, did not

10:46:48 17    make any filters internally, we sourced filters, we bought

10:46:51 18    them from TileUni or Panasonic, or TDKF Coast, so it was

10:46:59 19    either SAW or BAW filters we bought, and then we integrated

10:47:04 20    those in our modules.  I had a team that was called

10:47:07 21    component engineering, among other teams, but that team was

10:47:10 22    responsible to qualify these filters so that we could use

10:47:13 23    them in our modules, so I was very familiar with the

10:47:17 24    development time that it took to develop new filters.

10:47:20 25            Eventually we bought that division of Panasonic,

Darveaux - direct

10:47:24  1    and so it became a Skyworks division to make SAW filters.

10:47:29  2    So there is a factory in Japan, a factory in Singapore, and

10:47:35  3    then I took over the team in Singapore that was doing the

10:47:39  4    packaging development, that was part of my responsibility in

10:47:42  5    addition to this other stuff.

10:47:44  6            Later Skyworks, we bought a small startup calls

10:47:49  7    MEMS Solution, that we had bought to bring BAW filters

10:47:52  8    internal to Skyworks, so I was in charge of that team to

10:47:54  9    integrate MEMS solution BAW filters into Skyworks.

10:47:58 10    Eventually that broke responsibility and I was only in

10:48:01 11    charge of the back end, but I initially had the entire the

10:48:04 12    team.

10:48:04 13            That was pretty much after that point.

10:48:11 14            MS. SMITH:  Your Honor, I tender Dr. Robert

10:48:14 15    Darveaux as an expert in the industry of RF filter

10:48:17 16    technology.

10:48:18 17            THE COURT:  Any voir dire?

10:48:19 18            MR. DeFOSSE:  No, Your Honor.

10:48:20 19            THE COURT:  He's received as a person who can

10:48:22 20    express an opinion that is an expert in the technology

10:48:26 21    specified.

10:48:28 22    BY MS. SMITH:

10:48:29 23    Q.     Dr. Darveaux, did you make some slides to help you in

10:48:34 24    your testimony today?

10:48:35 25    A.     I did.

Darveaux - direct

| | |
|---|---|
| 10:48:36 1 | Q.    Are these the ones? |
| 10:48:37 2 | A.    Yes. |
| 10:48:39 3 | Q.    Can we have DDX 3.3, please? |
| 10:48:44 4 | Are you providing an opinion -- I'm sorry, what |
| 10:48:49 5 | have you been asked to do today? |
| 10:48:51 6 | A.    So when I was brought into the case, I was asked to |
| 10:48:54 7 | provide opinions on things, so listed here in this slide. |
| 10:48:58 8 | So first one was whether the categories of information |
| 10:49:02 9 | described by Dr. Shanfield, who you saw last week, as trade |
| 10:49:07 10 | secrets were generally known or ascertainable through either |
| 10:49:12 11 | independent or reverse engineering, by people in the |
| 10:49:15 12 | industry.  That's one of the requirements to be called a |
| 10:49:20 13 | trade secret.  Whether or not Akoustis was able to compete |
| 10:49:23 14 | in the market for BAW filters more rapidly, this is the |
| 10:49:27 15 | head-start we have been talking about, did they get any |
| 10:49:29 16 | head-start advantage to get to the market faster. |
| 10:49:32 17 | And then if so, how much benefit did they get. |
| 10:49:36 18 | And then even further beyond that was what was any value of |
| 10:49:41 19 | these documents, really we're talking about a bunch of |
| 10:49:44 20 | documents here, what was the value to Akoustis.  Those are |
| 10:49:47 21 | the three things I was asked to give an opinion about. |
| 10:49:50 22 | Q.    Are you providing an opinion regarding all eight |
| 10:49:53 23 | groups of the alleged trade secrets that Dr. Shanfield |
| 10:49:57 24 | opined on earlier in the trial? |
| 10:49:59 25 | A.    No, I was asked to cover groups 2 through 7. |

Darveaux - direct

10:50:03  1    Q.      What did you consult to perform your work?

10:50:09  2    A.      Many things.  So we looked at -- I shouldn't say we,

10:50:14  3    I looked at the court documents, so there are many pleadings

10:50:18  4    I guess they're called, that go back and forth between the

10:50:22  5    teams that has information.  I looked at expert reports by

10:50:27  6    Shanfield, Bennis, and Faulkner, so I looked at those expert

10:50:32  7    reports.

10:50:33  8           I searched for lots of publicly available data,

10:50:37  9    so that would be coming from standards bodies or just

10:50:41 10    technical papers, you'll see some of that in my talk.  I

10:50:45 11    looked at the depositions that various people made on both

10:50:48 12    sides.  I did have some discussions with some of the

10:50:53 13    Akoustis employees, you know, like half hour kind of video

10:50:58 14    conferences.  I guess that was it.

10:51:03 15    Q.      Did you also research some documents on line?

10:51:09 16    A.      Yes.  Yeah.  So two ways, so one way is just

10:51:13 17    searching for stuff that's available now, and then a second

10:51:17 18    way is there this thing called a "Wayback Machine", which is

10:51:21 19    provided by an entity called internet archive, I believe

10:51:26 20    it's called, that you can actually go back in time and see

10:51:30 21    what was available on a company's website in 2016, for

10:51:35 22    example, so I did some of that as well.

10:51:38 23    Q.      All right.  Dr. Darveaux, let's talk about the

10:51:41 24    background technology.  Can I have DDX 3.5, please?

10:51:46 25           So this is document JTX 14.  Dr. Darveaux, are

Darveaux - direct

10:51:55  1    you familiar with this document?

10:51:57  2    A.    Yes.

10:51:58  3    Q.    What is it?

10:51:58  4    A.    So this is the front page of what we would call a

10:52:02  5    tear down report.  You can see this company here is System

10:52:07  6    Plus Consulting.  So as soon as any product becomes

10:52:10  7    commercially available, meaning you can go buy a phone or a

10:52:14  8    router or whatever and get it, there are companies that take

10:52:17  9    it, tear it apart and do very detailed analysis of the

10:52:21 10    components inside and the product itself.  So they'll

10:52:24 11    estimate the cost, they'll look at the technologies, all

10:52:27 12    sorts of things.  Then they produce a report and pretty much

10:52:30 13    anybody can buy that report.  So that's -- there are some

10:52:35 14    small time delay, but as soon as you put something on the

10:52:39 15    market, there could be a report about it out there.

10:52:42 16    Q.    Next page, please.

10:52:43 17          Would you please explain the general concept of

10:52:48 18    a BAW filter?

10:52:49 19    A.    Well, I think we've heard about that, but essentially

10:52:52 20    you got electrical frequencies coming into the device and it

10:52:58 21    passes some of those frequencies through the device and it

10:53:01 22    tries to reject other frequencies.  So you have like a

10:53:05 23    passband area.  And then these rejection areas on either

10:53:07 24    side of that.  That's a typical pass band, which is the most

10:53:12 25    common application.  It uses electrical and acoustic energy

Darveaux - direct

10:53:16  1    so there is PA's of electric materials that actually change

10:53:20  2    shape, you know, changes the dimension of the function of

10:53:24  3    the electric field, so that can create sound waves, that's

10:53:28  4    why they call them acoustic.  Then you see these different

10:53:31  5    resonators that are labeled in this picture, S1 through S6,

10:53:36  6    those are in series, P1, 2, 3, 4 for parallel or shunt

10:53:40  7    resonators, so when you design a filter you combine these

10:53:44  8    resonators to create the filtering effect.

10:53:47  9            In this case, this is an acoustic device that

10:53:52 10    was in that tear down report, you can see the shape of the

10:53:56 11    resonators in this particular design, they're either

10:54:00 12    elliptical or cut elliptical you would call that.  There is

10:54:03 13    wire bonds, you see the connections coming in, there are

10:54:06 14    five of them, these are gold wires that come down and

10:54:10 15    connect to the device.  That's how the electrical signals or

10:54:14 16    the grounding is applied to the device, that's part of what

10:54:18 17    we call the term packaging, you can look at, these are

10:54:21 18    fairly simple in terms of schematic wise compared to what an

10:54:27 19    integrated circuit would be, you can look at the device and

10:54:29 20    derive the circuit, which you'll see this in some of the

10:54:33 21    documents later.  So they didn't need to design the device,

10:54:37 22    they can just look at it and determine roughly basically

10:54:40 23    what the basic circuit diagram looks like.

10:54:43 24    Q.    Can we have DDX 3.7, please?

10:54:46 25            This is DTX 623.  Are you familiar with this

10:54:52  1    document, Dr. Darveaux?

10:54:53  2    A.      I am.

10:54:54  3    Q.      What is it?

10:54:55  4    A.      So this is another teardown report from further back

10:54:58  5    in time, I think this was 2016, of a Qorvo high band

10:55:04  6    front-end module, actually it was a TriQuint module, who

10:55:08  7    then became Qorvo.

10:55:10  8    Q.      Next page, please.

10:55:14  9    A.      So I just again, we have been talking about comparing

10:55:17 10    technologies, I just wanted to show them side-by-side for

10:55:20 11    you.  The one on the left is this particular Qorvo part, the

10:55:23 12    one on the right is the Akoustis part.  You can see the

10:55:26 13    shape of the resonators is different in this example.  The

10:55:30 14    other thing about the packaging is different like the one on

10:55:32 15    the left has all those round circles around the perimeter,

10:55:37 16    those are flip chip bumps we call those, because when the

10:55:40 17    die is mounted on the package it's flipped over and face

10:55:44 18    down, whereas the one on the right is facing up and the

10:55:47 19    wires coming in, that's why it's named flip chip by IBM in

10:55:51 20    the 1960s, been around a long time, it just keeps getting

10:55:55 21    better and better and smaller, rights?  So the one on the

10:55:57 22    right has the wire bonds going into it.

10:56:00 23    Q.      The next page, please.

10:56:02 24            What is shown on in slide?

10:56:03 25    A.      So again you have seen some cartoons about this.

Darveaux - direct

10:56:06  1   This is the actual parts, if you cut through them and zoom

10:56:09  2   in very close with an electron microscope like you heard

10:56:14  3   about last week, they have some similarities and they have

10:56:17  4   some differences, right?  Yes, they both have electrodes top

10:56:21  5   and bottom, that sandwich of piezoelectric layer, that's how

10:56:26  6   you create a BAW filter.

10:56:28  7        The differences are the one on the left, for

10:56:30  8   example, has a reflector region beneath it, so that stack is

10:56:34  9   all solidly mounted together, that's why they call it SMR,

10:56:37 10   the one on the right has an air cavity, so it's very thin

10:56:41 11   film.  In fact, the film is probably a hundred times more in

10:56:44 12   the direction of the right of this picture.

10:56:46 13        So it's a very thin film that's expanded -- it's

10:56:50 14   suspended and attached on certain perimeters, so

10:56:54 15   mechanically it's more fragile.  Thermally, it doesn't

10:56:58 16   conduct the heat away as well as the one on the right

10:57:00 17   because of the design.

10:57:01 18        And then, you know, the materials are actually

10:57:03 19   different in some cases, some are the same, many of the

10:57:06 20   materials are different.  The thicknesses can be different.

10:57:09 21   And that depends on each company's design rules and their

10:57:13 22   manufacturing flow because these things tie together, you

10:57:16 23   can't design something that does not fit your manufacturing

10:57:20 24   flow.  And so they have to be tied together.

10:57:24 25   Q.    Next slide, please.  What is shown on this slide?

Darveaux - direct

10:57:29 1  A.    So I just wanted to blow up an example of things that

10:57:32 2  are relevant in the design that we haven't really talked

10:57:35 3  about.  Every feature on here is designed down to the tenth

10:57:40 4  of a micron, roughly.  And some layers overlap other layers,

10:57:45 5  so there is design rules about how far it has to overlap,

10:57:48 6  some features have to be clearance from each other, there

10:57:52 7  are design rules to the clearance.

10:57:54 8          Every feature on here, to design this would

10:57:56 9  require many, many design rules.  You can't determine that

10:58:00 10 just by glancing at a photo or glancing at a PowerPoint

10:58:04 11 image, these are things that are developed in a factory, and

10:58:06 12 they do a bunch of experiments to determine these things and

10:58:09 13 then that feeds back to the design team, so they know what

10:58:13 14 rules to use when they're laying out resonators and laying

10:58:16 15 out the filter.

10:58:16 16 Q.    What's an etch hole?

10:58:18 17 A.    So, an etch hole, we talk about there is air cavity

10:58:22 18 underneath in P1 resonator, for example.  First it's filled

10:58:27 19 with the material during the manufacturing process and then

10:58:29 20 later they come in and etch it with a gas that attacks

10:58:32 21 through that hole and then it kind of burrows underneath,

10:58:35 22 and that's how you clear out what's underneath there.  So

10:58:38 23 it's an etchant, you can use liquid etchant for some kind of

10:58:44 24 process, in this case it would be a gas etchant, it is a

10:58:48 25 very small feature size.

Darveaux - direct

10:58:49  1    Q.      Next slide shown here is DTX 0562.  What is the --

10:58:58  2    what's this before and after sketch?

10:59:00  3    A.      Yeah.  So this is just again a cartoon or an

10:59:04  4    illustration of what, if you cut down through that picture I

10:59:08  5    just showed you and look from the side, you have -- before

10:59:11  6    etching, you've got this sacrificial material which is top

10:59:15  7    mid in this case and after it's etched, and it's removed

10:59:18  8    away, and that's how you create the air gap, depending which

10:59:22  9    direction you're looking for, it either looks like it's

10:59:24 10    suspended or it's connected on the edges, that's what an

10:59:28 11    FBAR filter has those specific features to it.  A resonator

10:59:32 12    I should say, FBAR resonator.

10:59:34 13    Q.      Does that sacrificial layer, what does it become, how

10:59:38 14    does it get out of there?

10:59:39 15    A.      It's vaporized essentially.  This process is done,

10:59:43 16    you know, in a vacuum, so it's essentially vaporized and it

10:59:47 17    gets pulled out of the system with a pump.

10:59:50 18    Q.      Next slide, please.

10:59:51 19            Shown here is DTX 034.  Dr. Darveaux, can you

10:59:59 20    explain the differences between FBAR and SMR?

11:00:02 21    A.      So, yeah, this is actually a slide from Dr. Fattinger

11:00:07 22    that he put together at TriQuint in 2008, so these things

11:00:10 23    have been around for some time.  I think it became public in

11:00:14 24    a court case around 2011.  But you know, in his words, you

11:00:19 25    know, certain advantages and advantages to either

Darveaux - direct

11:00:22 1   technology, so FBAR is on the left, it's easy to get high

11:00:26 2   Qs, so that's what -- that's a factor driving performance

11:00:30 3   but it's harder to manufacture and it's not as robust.

11:00:33 4   That's what I was talking about, you have this really thin

11:00:36 5   film that's attached to the edges, it's kind of fragile.

11:00:40 6   It's hard to do advanced topologies, means if you're trying

11:00:44 7   to stack resonators it's more difficult.

11:00:47 8           On the right, good power handling for SMR,

11:00:52 9   that's because it's solidly mounted so you can conduct the

11:00:55 10  heat directly down into the substrate, it doesn't have to

11:00:58 11  travel laterally through a thin film before being conducted

11:01:02 12  away.  It has a lower thermal resistance, and there is more

11:01:08 13  layers, when you do the manufacture, it has more layers, it

11:01:11 14  may take longer to run through your factory if they have to

11:01:14 15  do more layers, typically.

11:01:16 16  Q.    Next slide, please.

11:01:18 17          What are some other differences, for example, in

11:01:21 18  the packaging?

11:01:21 19  A.    Yeah.  So this is again, you heard the word

11:01:25 20  packaging, I was trying to give you some examples.  So the

11:01:27 21  one on the left is an example of the Qorvo package in that

11:01:30 22  teardown.  We would call this flip chip, so the die is

11:01:34 23  facing downward toward the thing that it's mounted, on which

11:01:37 24  would be a substrate.  And the features like you see

11:01:41 25  88 microns, that number on the left, that's the copper

Darveaux - direct

11:01:44 1   pilar, so that's the electrical interconnection between the

11:01:47 2   chip and the substrate below, and the resonator you can't

11:01:50 3   really see in this picture, they're so thin and tiny, but I

11:01:53 4   have put an arrow there so you can see it on the left where

11:01:56 5   the resonator would be.

11:01:57 6           On the right is the Akoustis package that was in

11:02:02 7   that tear down, it's a wire bonded package, you can see it's

11:02:05 8   much bigger and spread out, there is a lot of area that it

11:02:08 9   takes up.  The die is facing up and you have those gold

11:02:12 10  wires coming in to bring in the electrical signals and the

11:02:16 11  grounding.  But things like the packaging process, how you

11:02:19 12  manufacture those, is going to depend on each company's

11:02:23 13  flow.  It's going to be different in these two cases,

11:02:26 14  dramatically different, actually.

11:02:28 15          The material set, we heard of that, means what

11:02:30 16  are the materials they pick for each of those things you see

11:02:33 17  in the picture, that's different.  The design rules for

11:02:36 18  these packages for flip chip versus wire bond would be

11:02:40 19  different, and it's going to be a function of whoever

11:02:42 20  assembled those things for the company, if they did it

11:02:45 21  in-house, it would be their design rules, if they use a

11:02:48 22  subcontractor like Amkor that I used to work at it, it would

11:02:52 23  be Amkor's design rules that would be needed for them to

11:02:55 24  design the packaging.

11:02:56 25  Q.      Next slide, please.

Darveaux - direct

11:02:57  1        What is shown here?

11:03:00  2    A.      So this I wanted to show you again, you have heard a

11:03:03  3    little bit about mobile application or discrete filter

11:03:07  4    infrastructure like the last witness talked about.  So

11:03:10  5    mobile means small.  You have to crunch a lot of filters in

11:03:15  6    a very small space, so things like the size and the

11:03:18  7    thickness are very important, so your packaging choices are

11:03:22  8    going to drive that.

11:03:23  9        Where infrastructure, a lot more space to work

11:03:26 10    with.  You can see there is four filters on the right,

11:03:29 11    they're very spread out.  This is on the product board of

11:03:32 12    the customer, so the design rules of the board are

11:03:36 13    determined by the inter connection pitch, you know, on the

11:03:39 14    packages.  So it's a different application.  Volumes are

11:03:42 15    different.

11:03:43 16        The one on the left, your factory is going to be

11:03:46 17    putting out millions per day, the volumes are staggering on

11:03:50 18    this stuff.  The one on the right is maybe millions per year

11:03:53 19    or millions per month, it's a much different type of

11:03:57 20    business and different type of scale you need to compete.

11:03:59 21        Akoustis does not have a scale to compete with

11:04:03 22    the one on the left.  It may be their aspiration to do that,

11:04:06 23    but a tier one supplier is not going to be using them any

11:04:09 24    time soon.  But they can compete with the one on the right

11:04:13 25    because the volumes are lower and you don't need as much

2038

Darveaux - direct

11:04:16  1    capacity to manufacture it.  And different customer

11:04:19  2    specifications, I think you have heard that, too.  Even

11:04:21  3    though it could even be the same band, but the

11:04:24  4    specifications are slightly different and it comes from the

11:04:27  5    customer, so the customer on the left is different likely

11:04:29  6    than the one on the right, and each one will give the

11:04:32  7    specifications, that is determined by the rest of his

11:04:36  8    system, so he needs to know -- he knows what he's putting

11:04:39  9    with these filters, so he'll give you specs on I need

11:04:42 10    rejection here, I need a certain pass band, insertion loss,

11:04:46 11    the customer determines those specs.

11:04:48 12    Q.    Next slide, please.

11:04:50 13          Tell us about connectors and the evaluation

11:04:57 14    board?

11:04:57 15    A.    So this is an evaluation board.  You have heard that

11:04:59 16    term.  So that thing right in the center is the filter, it's

11:05:02 17    a tiny little thing, and the rest of it is just a mechanism

11:05:06 18    that you can test the filter and handle it.

11:05:09 19          And then these connectors, they're coax

11:05:13 20    connectors like you have on your cable box, you screw them

11:05:17 21    in, these are a little more probably higher spec range and

11:05:20 22    more expensive, but essentially it's the same thing, and

11:05:23 23    they're soldered to the board.  So the electrical signals

11:05:26 24    would come in through these solder connections, there is a

11:05:29 25    part of the connector that's like this and the pan of the

Darveaux - direct

11:05:34  1    board is like that, they're soldering metal to metal, that's

11:05:38  2    how the signal comes into the board and goes out again.

11:05:40  3    Q.    So what's the -- what is the interplay between the

11:05:46  4    evaluation board and the connector as far as how they --

11:05:52  5    hook together?

11:05:52  6    A.    Yes.  So the board has to be designed so it matches

11:05:56  7    the connector.  So you can see from the picture, you can't

11:05:58  8    have a pad here and the connector pin there, they have to

11:06:02  9    line up.  So later we're going to look at a connector

11:06:05 10    drawing and you can see a portion on that drawing where it

11:06:08 11    specs out.  Here is the PC board design you need to use for

11:06:13 12    our connector, that's why it matters, the question that she

11:06:16 13    asked.

11:06:17 14    Q.    Next slide, please.

11:06:18 15          What is an outsource model?

11:06:25 16    A.    So you heard the last witness talk about make versus

11:06:29 17    buy decision.  So what she's talking about is if you're

11:06:32 18    going to buy from outside, that's called outsourcing, you're

11:06:36 19    going to buy that service or that component from the

11:06:39 20    outside.  If you make it, that's internal manufacturing.  So

11:06:43 21    what happened in our industry in the '90s was many companies

11:06:47 22    went to an outsource model, so back in the '80's and 70's,

11:06:51 23    like IBM if they're going to make a computer, they would

11:06:55 24    make the printed circuit board, they would make all the

11:06:57 25    chips, they would do all the software, they would assemble

Darveaux - direct

11:07:00 1    it all internally, they own that whole thing, that's called

11:07:04 2    vertically integrated.

11:07:05 3            Motorola, when I joined Motorola was still like

11:07:09 4    that, but in the '90s all these companies broke apart.  They

11:07:12 5    broke into pieces, new companies formed that were pieces,

11:07:15 6    and what happened was you created this whole industry of

11:07:18 7    outsourcing, because now a lot of different companies were

11:07:22 8    using the same supplier for their assembly service or the

11:07:26 9    same wafer fab, you have heard of Invidia, they're like a

11:07:30 10   fabless company, they don't -- at that time, I don't think

11:07:34 11   still, they don't build anything, they just design and

11:07:36 12   market it and they have an outsource supplier, like TSMC, do

11:07:42 13   the wafer fab, and they have somebody like Amkor or ASC do

11:07:46 14   the assembly or test, and somebody like Broadcom or EMF Com

11:07:52 15   mount it on boards, if they have a product like that.  So

11:07:54 16   they just manage that whole thing, all those pieces are

11:07:56 17   outsourced.

11:07:56 18           So what happens in that model is you have

11:07:59 19   multiple suppliers, and companies always want multiple

11:08:03 20   suppliers, so I don't want to depend on only one supplier

11:08:06 21   for my component, I always have at least two, often three

11:08:09 22   because if one guy has a problem, I need to have a backup

11:08:13 23   very fast, right, so you always have two, plus for pricing

11:08:17 24   leverage you want two, right, you want to compare them and

11:08:20 25   work them against each other, so if he lowers his price, you

Darveaux - direct

11:08:24  1   give him more loading.  And then this guy lowers his price,

11:08:27  2   and he gets more loading back, so you always want multiple

11:08:32  3   suppliers.

11:08:32  4          In that environment what happens with this

11:08:35  5   outsourcing is auditing became very prevalent, when I say

11:08:40  6   auditing, what that means is a group of engineers in the

11:08:43  7   quality and technology people, maybe four or five will go to

11:08:46  8   the factory and audit all these documents, and you have been

11:08:49  9   seeing these documents like inspection documents, your

11:08:52 10   process documents, you know, it's auditing.

11:08:56 11          So the issue with auditing is even though yes,

11:08:59 12   you have an NDA with the customer, he's going to audit your

11:09:03 13   competitors and he doesn't necessarily hand your documents

11:09:07 14   to them, but the forms look the same and if there is

11:09:10 15   something that you have that the competitor does, he'll put

11:09:13 16   them on an action item, improve this thing.  Over time, over

11:09:17 17   decades now, all these forms look the same.

11:09:19 18          And then standards come up, too, so that the

11:09:23 19   forms are standardized, the inputs on these forms are

11:09:27 20   standardized, and these things are very similar.  So there

11:09:30 21   might be some little minor tweaks that are different to a

11:09:33 22   company, and I'll point those examples out as we go, but the

11:09:37 23   format of the forms and, you know, the requirement to have

11:09:40 24   the forms is very much been spread and common amongst the

11:09:45 25   industry due to outsourcing, due to auditing.  And then a

Darveaux - direct

11:09:50 1    large number of standards have all been -- I'll show some of

11:09:53 2    those in my talk today.

11:09:56 3    Q.    Next slide, please.

11:09:58 4            And you were talking about standards, what is

11:10:00 5    this?

11:10:00 6    A.    So this is a standard that's calling out standards.

11:10:03 7    So this is a JEDEC JDP70 and listed in here are 239

11:10:10 8    different standards that are free to anybody if they want to

11:10:14 9    know about electrical testing methods, qualification and

11:10:18 10   reliability monitoring, reliability testing, reliability

11:10:21 11   models, visual inspection, you know, all sorts of things are

11:10:26 12   standards that are free for everybody because the industry

11:10:29 13   has moved to this model where they want these type of things

11:10:32 14   to be the same and that allows you to have multiple

11:10:35 15   suppliers for the same part.  A lot of data out there.

11:10:39 16   Q.    All right.  Next slide, please.

11:10:41 17           Did you create this diagram?

11:10:46 18   A.    Go back.

11:10:48 19   Q.    Did you create this?

11:10:48 20   A.    I did, yeah.

11:10:49 21   Q.    What is it?

11:10:50 22   A.    So this is again, there were documents produced in

11:10:53 23   this case, so I was able to from those documents get the

11:10:57 24   suppliers that Akoustis uses for their supply chain flow.

11:11:01 25   You have heard Leah Giovan before she was a supply chain

Darveaux - direct

11:11:06  1    manager, this is a common thing in our industry, supply

11:11:10  2    chain.  This is a chain of companies and processes which you

11:11:12  3    use to supply your product, that's what supply chain means

11:11:16  4    essentially.

11:11:16  5         So it starts at the top, you need to design

11:11:19  6    something and develop something, Akoustis did that

11:11:22  7    themselves internally.  Wafer fab, originally they

11:11:26  8    outsourced that to GCS and once they bought the New York

11:11:30  9    Fab, they brought that internal.

11:11:31 10         That wafer probe and test and trim, that's

11:11:34 11    actually within the fab, so they did that themselves.

11:11:37 12    Initially they were doing it, you know, small volume in

11:11:40 13    North Carolina, but then it moved up to the fab was my

11:11:43 14    understanding.

11:11:44 15         Then packaging assembly and test.  Now I list a

11:11:48 16    lot of companies here because that was listed in the

11:11:50 17    documents of the court, but you know, some of these are ones

11:11:53 18    they use and don't use, but there are a few big ones in

11:11:57 19    there.  These are the companies that do this what I

11:12:00 20    mentioned, the outsource assembly and test, the packaging

11:12:03 21    part and the final test.  Here test means final test.

11:12:06 22         Once you have assembled that whole thing, you do

11:12:10 23    one more final test, confirm it's good, and then it can go

11:12:14 24    to a customer.  Sometimes it can right to the customer if

11:12:17 25    something is already in volume production, but initially

Darveaux - direct

11:12:21  1  you're going to go back for electrical characterization, you

11:12:24  2  heard that talk in this case where they're characterizing

11:12:27  3  these devices, you'll see some of the specs that talk about

11:12:30  4  characterization plans, that's in early stages of a given

11:12:33  5  product or a given filter.  And sometimes you go to

11:12:35  6  reliability testing.  Everything that goes to a customer

11:12:38  7  eventually has to be tested for reliability.

11:12:41  8       This is super standardized in our industry, it's

11:12:44  9  a requirement because you don't want products failing in the

11:12:47 10  field, it's very expensive for everybody.  And then if it's

11:12:50 11  a production flow, it goes straight to the customer.

11:12:52 12       Now what I'm also showing here is you have

11:12:56 13  equipment suppliers, substrate suppliers, material

11:12:59 14  suppliers, these are all your partners, so they have

11:13:01 15  resources and everybody's goal is to make you succeed,

11:13:06 16  that's how they get paid, right, they want you to succeed.

11:13:09 17  So all the suppliers are inputting their know-how and

11:13:13 18  engineering, so if you buy equipment, the equipment

11:13:16 19  supplier, they're selling you a trim tool, cost

11:13:19 20  one-and-a-half to $2 million, they don't just send you that

11:13:22 21  tool and say okay, it's yours, they station engineers in

11:13:25 22  your factory and train you, then they'll station the guy

11:13:29 23  there indefinitely, like in your Amkor factories, we had the

11:13:33 24  supplier engineers in our factory all the time because

11:13:36 25  they're constantly giving you support on their equipment,

Darveaux - direct

11:13:39  1    it's not like you're on your own, there is a lot of input

11:13:43  2    that comes from your partners.

11:13:44  3    Q.    Next slide, please.

11:13:46  4          Who are Akoustis's suppliers?

11:13:48  5    A.    So I figured you didn't know necessarily all these

11:13:52  6    companies that I had on the previous slide, so I just went

11:13:55  7    and looked, some of them are very old well-established

11:13:59  8    companies, even back into the early 1900s, so they're very

11:14:04  9    successful, they're battle hardened.  Some of them are as

11:14:09  10   recent as 2011 when they were established.  I wanted to give

11:14:12  11   you an example, these are mature resource companies that are

11:14:16  12   suppliers of Akoustis and partners.

11:14:17  13   Q.    Next slide, please.

11:14:19  14         What is after the determine time to market?

11:14:28  15   A.    The is the key element of this case, the alleged

11:14:32  16   trade secrets, allegedly gave Akoustis a 55-month head-start

11:14:36  17   in time to market.  So this is really important to

11:14:38  18   understand.  So what determines time to market?  So one

11:14:42  19   thing is it's kind of obvious, you have to meet the

11:14:46  20   customer's requirements and have a competitive price.

11:14:48  21   That's common to any business.  Right?  If you don't meet

11:14:51  22   his requirements, you're not going to sell him product and

11:14:54  23   if your price is too high, you're not going to sell him

11:14:58  24   product.  That's kind of obvious.

11:14:59  25         The next one is maybe not as obvious, your

11:15:03  1    choice of what you pick for materials, equipment and

11:15:06  2    fabrication suppliers.  If you pick something that's very

11:15:10  3    exotic, silicone carbide, we heard of wafers made out of

11:15:13  4    silicone carbide instead of silicone, that's going to take a

11:15:17  5    long time because it's not a well-established supply base.

11:15:21  6    Or if you have a new process that's early in the industry

11:15:24  7    like trimming, back in the early 2000s there wasn't a lot of

11:15:27  8    equipment suppliers at that time, it takes a long time.  You

11:15:30  9    heard Dr. Aigner talk about it took us a long time to get

11:15:34 10    our first mobile win.  They're throwing on numbers like ten

11:15:38 11    years, fifteen years.  The problem was some of the supply

11:15:41 12    base wasn't very mature.  It takes longer, absolutely that's

11:15:46 13    true.

11:15:46 14         Once it's in production, you have suppliers, the

11:15:49 15    follow-on competitors very legally so you can use the same

11:15:53 16    suppliers and they get theirs faster, that's just the nature

11:15:55 17    of our business.  That's the way it works.

11:15:57 18         And manufacturing cycle time, this once again

11:15:59 19    may not be obvious to you.  When you do the manufacturing

11:16:03 20    flow that I showed before, how fast you get through that is

11:16:07 21    very important.  So, for example, you know, we heard about

11:16:11 22    designing these filters and all that, yes, we use design

11:16:14 23    tools and we -- and we do simulations to predict what

11:16:18 24    they're going to do and that's all good, but it's not that

11:16:22 25    good.  We do a lot of testing.  We'll build, you know,

Darveaux - direct

11:16:25  1  multiple resonator shapes, run it through the factory, test

11:16:29  2  and characterize all those, and start to develop a library,

11:16:33  3  then they take those resonator libraries and start to put

11:16:36  4  those together as filters, run those through the factory

11:16:40  5  test, tweak the design, run it through again, tweak the

11:16:43  6  design, so you got to do multiple cycles. Early on in a

11:16:47  7  technology it might be like ten cycles through that to

11:16:50  8  finally get it right. And sometimes a customer changes the

11:16:53  9  specs a little bit because he found some interactions, and

11:16:56 10  now you got to do it again. This cycle time is very

11:17:00 11  important to get to market fast.

11:17:02 12  Q.    Dr. Darveaux, we have been hearing testimony about

11:17:04 13  front end and back end. What's the difference and what are

11:17:07 14  the -- what are the fab flows and the packaging and testing

11:17:12 15  flows for each of those?

11:17:14 16  A.    Yes. So front end -- people in our industry talk

11:17:16 17  about front end, you guys saw the example of that wafer,

11:17:20 18  that's the front end. So all the steps to make the wafer.

11:17:23 19  Then the back end is that is shipped to a different factory,

11:17:27 20  might be in Asia, where they dice that into pieces and do

11:17:31 21  all these packaging steps to make a component that looks

11:17:34 22  like a black spot. It's covered, it's connected, it has

11:17:39 23  connections that can be mounted on a thing. So that's what

11:17:42 24  we would call the back end in our industry.

11:17:45 25  Q.    And what's the difference in the number of steps

Darveaux - direct

11:17:49 1   between the front end and back end?

11:17:52 2   A.      Did we lose that slide?

11:17:54 3   Q.      I'm asking you.

11:17:56 4   A.      A lot.  So front end flow might be like a couple

11:18:01 5   hundred steps, literally 200 steps that you're doing all

11:18:04 6   these processes.  Then you got the wafer that you guys saw,

11:18:08 7   then that gets sent to the back end and that might be twenty

11:18:12 8   or thirty steps that they have to do.  All those steps have

11:18:14 9   piece of equipment and actual, you know, "process recipes"

11:18:20 10  so each equipment has its own recipe.  They have been

11:18:23 11  talking about recipes to make something.  There is literally

11:18:26 12  dozens of recipes for each device that you make, each

11:18:31 13  equipment has its own recipe.

11:18:32 14          So it's -- that's honestly, you know, barring

11:18:37 15  the legal definition, those things are really kind of the

11:18:40 16  trade secrets in our business, those things you don't share

11:18:43 17  in an audit, the recipes on the equipment itself that you're

11:18:46 18  using to make that stuff is not typically shared.  So -- but

11:18:50 19  there is a lot of steps.

11:18:53 20  Q.      Next slide, please.

11:19:45 21          MS. SMITH:  Your Honor, may I approach the

11:19:47 22  witness?

11:19:48 23          THE COURT:  You may.

11:19:57 24  BY MS. SMITH:

11:20:09 25  Q.      Next slide, please.

Darveaux - direct

11:20:12  1          Dr. Darveaux, I just handed you DTX 932 and DTX

11:20:23  2   134.  Did you review these two documents in preparing your

11:20:26  3   report?

11:20:52  4   A.     Yes, I did.

11:20:55  5          MS. SMITH:  Your Honor, I offer DTX 932 and DTX

11:21:00  6   134 into evidence.

11:21:03  7          THE COURT:  Without objection it's marked and

11:21:05  8   received and we'll be at 341.

11:21:11  9          COURT CLERK:  343.

11:21:13 10          THE COURT:  343.  Okay.  I have a question

11:21:16 11   there, 344.

11:21:29 12          I'll tell you what, it will be the next

11:21:31 13   sequentially numbered exhibits and I think they'll be 340

11:21:35 14   and 341.

11:21:37 15          (Trial Exhibit Nos. 340 and 341 were admitted

11:21:38 16   into evidence.)

11:21:38 17          MS. SMITH:  Just to be clear, Your Honor, DTX

11:21:42 18   932 is going to be 340 and DTX 134 is going to be Trial

11:21:48 19   Exhibit 341, is that right?

11:21:49 20          THE COURT:  Yes.  Marked and received.

11:21:56 21   BY MS. SMITH:

11:21:56 22   Q.     Can I have DTX 932, please?  Page 2, please.

11:22:06 23          Dr. Darveaux, what is this document?

11:22:08 24   A.     It's a press release.

11:22:12 25   Q.     What's the date on this?

Darveaux - direct

11:22:15   1    A.        Looks like August 16, 2017.

11:22:19   2    Q.        And what product is this article about?

11:22:21   3    A.        It's Akoustis, they shipped their first prototypes at

11:22:27   4    3.5-gigahertz, looks like to a customer, I guess.    Mobile

11:22:36   5    OEM customer.

11:22:40   6    Q.        And what kind of product was it?

11:22:42   7    A.        BAW filter.

11:22:44   8    Q.        All right.    Let's take a look at DDX 3.22.    Did you

11:23:03   9    make this slide?

11:23:04  10    A.        I did.

11:23:05  11    Q.        Okay.    What's this slide about?

11:23:07  12    A.        So this, again, a big part of this case is about time

11:23:11  13    to market.    So I tried to at least record what I understood

11:23:14  14    as Akoustis's time to market.    So they were incorporated in

11:23:19  15    May of 2014.    Basically within a few months they started

11:23:24  16    hiring engineering staff.    So they hired engineering staff

11:23:28  17    from 2014 on.    And then in June of 2017, they acquired the

11:23:36  18    MEMS, STC MEMS, the New York Fab you heard about.    That

11:23:40  19    happened in that time frame.

11:23:41  20              Then you have this press release we just saw

11:23:44  21    where they shipped the first prototype in August of 17.    And

11:23:48  22    then I looked at Ms. Bennis' expert report, and it showed

11:23:56  23    really the first product revenue was in fiscal '19, and then

11:24:03  24    from, you know, from the testimony, my understanding was it

11:24:07  25    was more like 2019, fiscal '19 runs mid -- June of '18

Darveaux - direct

11:24:13  1  through June of '19, so around 2019 they started to get some

11:24:17  2  product revenue.  This means they're shipping some kind of

11:24:20  3  low volume production to customers, that's when you start to

11:24:23  4  record product revenue.

11:24:25  5           So, you know, rough numbers it was about a

11:24:29  6  five-year time to market from incorporation, but it includes

11:24:33  7  these kind of things that happen along the way, adding

11:24:36  8  resources, doing work, typical project.

11:24:42  9  Q.    Can we go back to DTX 932, please, and I would like

11:24:47 10  to take a look at page 3.  In the second to last paragraph

11:24:53 11  there, can you focus in?

11:24:55 12           This says they quoted Mr. Shealy.  He's quoted

11:25:02 13  as saying, "The pass band frequency above 3.5-gigahertz is

11:25:07 14  also synergistic with our ongoing filter development for our

11:25:12 15  high growth markets including 5G mobile, 5-gigahertz Wi-Fi

11:25:16 16  router, and CBRS where BAW filters are expected to be

11:25:21 17  unrivaled in performance and size."

11:25:22 18           What does that tell you?

11:25:24 19  A.    So essentially, when you start to work on a new

11:25:27 20  technology, you have to put people in place, design tools,

11:25:31 21  start establishing design rules, you got to have that supply

11:25:34 22  chain flow that I showed you, you have to have your

11:25:39 23  developing processes and recipes for making things.  So you

11:25:43 24  know, ninety-nine percent of that probably applies from one

11:25:46 25  band to the next, there may be some changes, some tweaks

2052

Darveaux - direct

11:25:49  1    that you have to do to the next higher frequency band, but

11:25:53  2    you know, almost all of what you did applies.  So it's

11:25:57  3    synergistic, I guess that's the word he used, I think.  You

11:26:02  4    know, you're not like starting from scratch every time you

11:26:04  5    do a new band, you're using what you have and you modify

11:26:08  6    what you need to achieve the next milestone, the next

11:26:13  7    frequency band.

11:26:14  8    Q.    Can you pull up DTX 134, please.

11:26:18  9          Dr. Darveaux, do you recognize this document?

11:26:22 10    A.    I do.

11:26:23 11    Q.    Did you review it as part of your preparation for

11:26:26 12    your opinions?

11:26:27 13    A.    Yes.

11:26:29 14    Q.    Okay.  May I have page 46?  All right.

11:26:35 15          What is this, what's shown?

11:26:36 16    A.    So this was the Qorvo's internal road map.  And you

11:26:42 17    know, what you can see here is their own expectations, it

11:26:47 18    takes about two to three years to bring like the new

11:26:51 19    technology to market.

11:26:52 20          All right.  So they had 5-gigahertz BAW,

11:26:56 21    roughly, you know, two years to do the development and about

11:26:58 22    a year to roll out the production.  So, you know, three

11:27:03 23    years.  And they're doing multiple programs simultaneously,

11:27:07 24    which is often what you do, you're not just working on one

11:27:10 25    thing, you're staggering things and because there is delays

Darveaux - direct

11:27:13  1  -- like if you design something, you got to wait for it to

11:27:16  2  get fabricated and get test results, you're not sitting

11:27:20  3  around waiting, you're doing some other program at the same

11:27:23  4  time.  That's what it shows, their expectations was a

11:27:26  5  three-year time to market when they started a new projects.

11:27:29  6  Q.    So based on your experience, what is the typical time

11:27:32  7  to market in the electronics industry?

11:27:35  8  A.    So, again, depending on, you know, the magnitude of

11:27:39  9  the change, it's on the order of one to four years if you do

11:27:43 10  things right.  Right?  It can be a lot longer if you don't

11:27:46 11  make the right decisions, but typically if you're using

11:27:51 12  known suppliers, known materials, and providing your

11:27:56 13  innovation, but you're not going too far off the reservation

11:28:01 14  on what you pick, you can do it in, you know, one to

11:28:05 15  four years.

11:28:05 16  Q.    Do you agree with Dr. Shanfield that Akoustis gained

11:28:08 17  a head-start advantage of 55 months based on having access

11:28:13 18  to Qorvo's documents?

11:28:14 19  A.    No.

11:28:14 20  Q.    Why not?

11:28:16 21  A.    Well, I mean, in my report I did it two ways, I kind

11:28:20 22  of did a bottoms up look where I looked at each specific

11:28:24 23  thing, but even from a tops down gut feel, or sanity check,

11:28:29 24  if you add 55 months, which is four-and-a-half years on to

11:28:34 25  five years, that's like nine-and-a-half years, it's just not

11:28:38  1    even realistic that it would take somebody that long if

11:28:42  2    they're making reasonable choices and re-sourcing their

11:28:46  3    company.

11:28:48  4    Q.    All right.  So Dr. Darveaux, we went through the

11:28:51  5    background section, we talked about the industry, we talked

11:28:54  6    about supply chain and time to market.  And we're about to

11:29:00  7    dive in the actual documents that Dr. Shanfield had analyzed

11:29:04  8    as part of his opinions.

11:29:07  9          Before we do that, though, I just wanted to make

11:29:12  10   sure, so you reviewed -- you have been here since the

11:29:16  11   beginning of trial; is that right?

11:29:19  12   A.    Yes.

11:29:20  13   Q.    Did you watch Dr. Shanfield's testimony?

11:29:22  14   A.    I did.

11:29:23  15   Q.    Were you here, also, for Dr. Fattinger?

11:29:26  16   A.    Yes.

11:29:27  17   Q.    And how about Dr. Aigner?

11:29:28  18   A.    Yes.

11:29:29  19   Q.    And Mr. Testa?

11:29:30  20   A.    Yes.

11:29:31  21   Q.    Okay.  The documents that they all spoke of, you

11:29:36  22   reviewed them for your expert opinion?

11:29:41  23   A.    I think so.  I mean, we have to see which documents

11:29:44  24   you're talking about, but I believe so, yeah.

11:29:47  25   Q.    So before we actually get into the details, what is

Darveaux - direct

11:29:52 1    -- speaking from an industry expert, what is your impression

11:29:59 2    of the quality and type of documents that you have seen in

11:30:04 3    this case?

11:30:04 4    A.      Okay.  So there is -- all right, there is kind of two

11:30:10 5    general types of documents that we have seen.  We've seen

11:30:14 6    PowerPoint presentations, you know, they had technical

11:30:17 7    information on them, but basically it was a meeting, you

11:30:20 8    know, the PowerPoint presentation that you would show slides

11:30:23 9    at a meeting and the purpose of that is for discussion, it's

11:30:27 10   not -- it doesn't have nearly enough detail to actually

11:30:30 11   enable you to design or build something, it's just for the

11:30:34 12   people in the meeting to talk about, some of the documents

11:30:36 13   are kind of in that category.

11:30:38 14           And then some of the documents are more quality,

11:30:43 15   I would call quality or you heard the term administrative

11:30:46 16   documents, they'll describe the process used in a company,

11:30:49 17   it's documenting, you know, what they do.  And those are

11:30:54 18   pretty generic and as I mentioned about auditing, those are

11:30:59 19   pretty similar between companies.

11:31:00 20           Some of the details in there, like in an

11:31:03 21   inspection document, the actual pictures of the defects,

11:31:06 22   that would be specific to a factory where it's built.  But

11:31:10 23   the format and kind of the -- the basic stuff is pretty

11:31:15 24   common, very common, actually.  So those are kind of the two

11:31:20 25   main types of documents that I have seen that I have looked

Darveaux - direct

11:31:24  1   at and also been showing you during this trial.

11:31:28  2   Q.    So let's start talking about the documents

11:31:33  3   themselves.  I would like to ask you about group 3 first.

11:31:40  4   Can I have PDX 6.48?

11:31:50  5            Okay.  PDX 6.49.  Dr. Darveaux, here is

11:32:05  6   Dr. Shanfield's demonstrative in which he listed the trade

11:32:08  7   secrets that were for this group, Group 3.  Did you consider

11:32:11  8   each of the alleged trade secrets in Group 3?

11:32:14  9   A.    I did.

11:32:15 10   Q.    Next slide, please.

11:32:22 11            Dr. Shanfield also testified that pages 16

11:32:25 12   through 18 of PTX 1141 shown on this demonstrative contains

11:32:31 13   trade secrets.  Do you agree?

11:32:32 14   A.    No.

11:32:34 15   Q.    Let's move on to PDX 6.51.

11:32:41 16            THE COURT:  You need to use the document number,

11:32:45 17   exhibit number if we can.

11:32:47 18            MS. SMITH:  Okay.  I will.  Thank you, Your

11:32:49 19   Honor.

11:32:49 20   BY MS. SMITH:

11:32:50 21   Q.    So let's start talking about trade secret 3.1.  Shown

11:32:56 22   here is Trial Exhibit 11, PTX 1141, page 16.  Do you agree

11:33:05 23   with Dr. Shanfield that page 16 contains a trade secret?

11:33:09 24   A.    No.

11:33:10 25   Q.    Why not?

Darveaux - direct

11:33:11  1    A.      Okay.  So this document is again a PowerPoint slide

11:33:18  2    showing the concept, I think even, I believe it was Aigner

11:33:22  3    referred to it as a training document.  So it's showing the

11:33:25  4    concepts to people who don't know about the concepts yet.

11:33:29  5    But basically it shows the algorithm they want to do call it

11:33:32  6    of how to do the trimming operation.

11:33:34  7           So trimming is you're removing material, the

11:33:40  8    thickness of a layer in this case silicone nitride, to

11:33:44  9    change the frequency of the filter.  That's what trimming

11:33:48 10    is.  So that in itself is not a trade secret.  That's been

11:33:52 11    done by SAW filters and BAW filters for a couple of decades,

11:33:56 12    you know, before this whole thing was going on.  Certainly a

11:33:59 13    decade and a half.  Okay.  So that's not new.

11:34:02 14           What's shown in this device is their method of,

11:34:05 15    they probe the device before the deposition of this nitride

11:34:08 16    layer.  They probe the device after the deposition of the

11:34:12 17    silicon nitride layer.



Darveaux - direct

11:34:41  1  ████████████████████████████████████████

11:34:45  2  ██████████████████████████████████████

11:34:48  3  ████████████████████████████████████████

11:34:52  4  ████████████████████████████  When you remove

11:34:55  5  material, you're removing mass so that shifts the frequency

11:34:59  6  higher.

11:34:59  7        Then they calculate what they're calling a

11:35:01  8  sensitivity factor which is ██████████████████████

11:35:05  9  ████████████████████████████████████████

11:35:09 10  ████████████████████████████  that's not

11:35:11 11  a trade secret, that's actually what the process is meant to

11:35:14 12  do.

11:35:16 13  Q.      May I have DDX 3.41, please.

11:35:21 14        Did you create this slide?

11:35:23 15  A.      I did.

11:35:24 16  Q.      Regarding the document shown to the right of this

11:35:27 17  slide, which is DTX 034 at page 145, who is listed as the

11:35:36 18  author?

11:35:36 19  A.      So the right, that came from a document,

11:35:41 20  Dr. Fattinger, I think it was like an internal lunch and

11:35:44 21  learn presentation in 2008 at TriQuint, he prepared these

11:35:48 22  slides to educate his fellow workers on many things, one of

11:35:52 23  them was trimming.  And what you can see is the steps shown

11:35:58 24  there, and this became public in 2011 after there was a

11:36:02 25  court case at that time.

11:36:03  1          What you can see there just basically, it's

11:36:06  2   showing what's in the slide to the left and we put some

11:36:09  3   boxes around a couple of these items.  First is we probe the

11:36:14  4   device to get a frequency map before the deposition, so

11:36:17  5   that's like the box, exactly what the box is doing on the

11:36:20  6   upper left-hand corner, the red box that's around a yellow

11:36:24  7   box.

11:36:24  8          And then you probe again after silicone nitride

11:36:30  9   deposition, that's the box in the upper right corner of the

11:36:33 10   slide to the left.  And then you use that information

11:36:35 11   eventually and you're going to calculate ███████████████

11:36:40 12   which is the lower green, which is the sensitivity of each

11:36:45 13   site on the device and the desired thickness profile.  So

11:36:51 14   you're trying to calculate, you know, I know a thickness,

11:36:54 15   what's a thickness I'm trying to get to.  And it's a map

11:36:58 16   because it's not the same for the whole device, some areas

11:37:01 17   are thicker and thinner due to the manufacturing process.

11:37:04 18          Now in the case of Qorvo, ███████████████

11:37:07 19   ████████████████████████████████████████  In the

11:37:11 20   case of Akoustis, they don't, they just kind -- they █████

11:37:14 21   ██████████████████████████████████████  do their

11:37:17 22   process that way, but these guys, according to this slide,

11:37:21 23   anyway, ███████████████████████████████████████████

11:37:25 24   ████████████████████████.  Either way, it was known and

11:37:28 25   published as you can see.

11:37:31  1   Q.      So is measuring the sensitivity ███████

11:37:34  2   ████████████████████████ a trade secret?

11:37:39  3   A.      I don't believe its a trade secret given it was

11:37:42  4   published.

11:37:44  5   Q.      Can I have slide 3.43, please.

11:37:49  6           What is shown here?

11:37:54  7   A.      Okay.  So again, one of the questions in this case is

11:37:59  8   did Akoustis use any of this information, right, that's

11:38:02  9   important, you look at the documents, did they actually use

11:38:05 10   it, or could they have used it.  What we're showing here is

11:38:09 11   they really could not have used this method given their

11:38:12 12   process flow is different than what Qorvo does.

11:38:15 13           So this method that's shown in the slide on the

11:38:18 14   left requires you probe the device before silicone nitride

11:38:23 15   deposition, that means it has to be a functioning device,

11:38:26 16   you can't probe it if it's not functioning, that's the

11:38:29 17   point, you're getting these curves, right.  So then you

11:38:33 18   probe afterwards.

11:38:34 19           In the case of Akoustis, they cannot do that

11:38:37 20   because the nitride is already on the top surface, I have

11:38:40 21   shown an arrow, if you look at the figure on the right, we

11:38:44 22   got an arrow, SiN layer, there is like a thin blue layer,

11:38:49 23   that's the nitride layer, it's already on that surface and

11:38:52 24   it's not a functioning device yet because we still have that

11:38:55 25   sacrificial layer down below, so you cannot probe it at this

11:38:59  1    point.  So you can't probe it before nitride deposition in

11:39:04  2    their particular process flow, at least not in a practical

11:39:08  3    way, it would be -- it would add so many more steps, it's

11:39:12  4    not practical to do it that way, so they don't do it that

11:39:15  5    way.

11:39:16  6    Q.    Slide 3.44, please.

11:39:18  7          What is shown here?

11:39:21  8    A.    Okay.  So this is again, it's like a PowerPoint

11:39:26  9    summary of roughly their process.  They have many trim

11:39:30 10    steps, initial trim, bandwidth adjustment, et cetera, so

11:39:33 11    there are multiple times you go through this trim process to

11:39:37 12    get the frequency just right, the profile just right.  But

11:39:40 13    they don't use Qorvo's method ████████████████████████████

11:39:47 14    ██████████████████████████████████████████

11:39:49 15    ██████████████████████████████████████████████

11:39:52 16    ████████████████████████████████████████

11:39:55 17    ██████████████████████████████████████████████

11:39:59 18    ██████████████████████████.

11:40:01 19    Q.    All right.  Can I have PDX 6.51, please?

11:40:09 20          We talked about 3.1.  Let's see the next slide,

11:40:15 21    6.52.

11:40:17 22          Here is Dr. Shanfield's demonstrative regarding

11:40:22 23    trade secret 3.2.  Do you agree with Dr. Shanfield that

11:40:26 24    page 17 of PTX 1141, which is trial Exhibit 11 shown here,

11:40:32 25    contains a trade secret?

Darveaux - direct

11:40:33  1    A.      No.

11:40:34  2    Q.      Why not?

11:40:35  3    A.      Well, so what's shown in this slide is if you have a

11:40:41  4    target, you're trying to hit and you have a current measured

11:40:45  5    frequency, you want to trim enough to meet that target.

11:40:50  6    That is the purpose of trimming.  It's hard to imagine why

11:40:53  7    that would be a trade secret.  That's what you're doing,

11:40:56  8    that's the reason you're doing it.

11:40:58  9    Q.      All right.  May I have the next slide, please, PDX

11:41:03 10    6.53.

11:41:04 11            Here is Dr. Shanfield demonstrative regarding

11:41:11 12    trade secret 3.3.  Do you agree with Dr. Shanfield that

11:41:14 13    page 18 of PTX 1141, which is Trial Exhibit 11, shown here,

11:41:20 14    contains a trade secret?

11:41:22 15    A.      No.

11:41:23 16    Q.      Why not?

11:41:24 17    A.      Well, this is just -- this is another example.

11:41:27 18    ██████████████████████████████████████████████████████

11:41:30 19    ██████████████████████████████████████████████████

11:41:34 20    ███████████████████████████████████████████████████████

11:41:37 21    █████████████████████████████████████████████████████

11:41:41 22    ███████████████████████████████████████████████████████

11:41:44 23    █████████████████████████████████████████████████████

11:41:48 24    ██████████████████████████████████████████████████████

11:41:52 25    ██████████████████████████████████████████████████████

Darveaux - direct

```
11:41:54  1  ████████████████████████████████████████
11:41:58  2  ██████████████████████████████████████
11:42:02  3  ████████████████████████████████████████
11:42:06  4  █████████████████████████████████████████
11:42:09  5  █████████████████████████████ not a trade secret.
```

11:42:13   6    Q.     So there are a few pages shown here in

11:42:19   7    Dr. Shanfield's demonstrative, PTX 1141.  Did you review

11:42:26   8    that document in its entirety?

11:42:28   9    A.     Yes.

11:42:29  10    Q.     Okay.  Does the document contain any information that

11:42:31  11    is a trade secret?

11:42:32  12    A.     No.

11:42:36  13    Q.     So now we just went through all of the alleged trade

11:42:40  14    secrets in Group 3.  What is your opinion regarding where

11:42:42  15    entry of them are trade secrets?

11:42:44  16    A.     They are not.

11:42:46  17    Q.     How much time to market head-start did Akoustis

11:42:49  18    achieve by having these documents?

11:42:52  19    A.     They got no -- they got no head-start.

11:42:56  20    Q.     Okay.  So let's switch gears a little bit.  Assuming

11:43:01  21    that the information in these documents in Group 3 are trade

11:43:06  22    secrets, did you calculate avoided costs?

11:43:09  23    A.     Yes, I did.

11:43:11  24    Q.     Okay.  May I have DDX 3.48, please?

11:43:18  25           So is this one of the calculations that you did?

Darveaux - direct

11:43:21 1    A.      Yes.  So for each document that contained trade

11:43:27 2    secrets, this is the first one, we'll go through other ones,

11:43:30 3    but what I did was if you see the engineering task at the

11:43:34 4    bottom, I tried to explain what -- you know, assuming it was

11:43:39 5    a trade secret, you have to assume that for the purpose of

11:43:42 6    this calculation, you know, what was the task that was made

11:43:46 7    easier or reduced by, you know, for Akoustis because they

11:43:51 8    had access to these three PowerPoint slides, essentially.

11:43:54 9            So, you know, search, download, review technical

11:43:59 10   publications, and I found a few that I list here, make a

11:44:03 11   presentation slide for technical discussion, that's what

11:44:05 12   they did internally, right, they made slides, they talked

11:44:09 13   about them.  But in the end the final solutions were

11:44:12 14   different than Qorvo's because of what I just explained.  So

11:44:16 15   I did give them credit for let's say one -- I found an

11:44:20 16   Akoustis document that kind of reassembled those PowerPoint

11:44:24 17   slides, and one of the page seemed to resemble it, so I

11:44:29 18   tried to standardize for any given document.  I said in

11:44:33 19   engineering hours it takes about two hours to make that,

11:44:36 20   sometimes it's a lot less, but that's what I used, tried to

11:44:40 21   be consistent with my analysis.

11:44:42 22           And then to search and find something on line

11:44:44 23   and read it and understand it, again, that was roughly two

11:44:47 24   hours, that's kind of what it took me, sometimes it was

11:44:50 25   less, but that's what I used as a standard for my analysis,

Darveaux - direct

11:44:53  1    and if it was a document you had to pay for, sometimes you

11:44:57  2    have to pay for them, it was $33.00, that's what it cost me

11:45:01  3    to download the document.

11:45:02  4            I added all that up and if this was a trade

11:45:06  5    secret this is how much actual value these three PowerPoint

11:45:10  6    slides were to Akoustis, it turns out to be eight

11:45:15  7    engineering hours at $33.

11:45:22  8    Q.    So that completes the discussion on Group 3.  Let's

11:45:25  9    move to Group 2, one of the slides on trade secrets.  May I

11:45:31 10    have PDX 6.28, please?

11:45:36 11            So here is Dr. Shanfield's demonstrative listing

11:45:39 12    the alleged trade secret groups -- trade secrets in Group 2.

11:45:43 13    Did you consider each of the alleged trade secrets in this

11:45:47 14    group?

11:45:47 15    A.    I did.

11:45:48 16    Q.    Let's start with trade secret 2.1.  May I have PDX

11:45:57 17    6.29, please.

11:45:59 18            Let's go with 6.30.  Here is Dr. Shanfield's

11:46:09 19    demonstrative regarding trade secret 2.1.  Do you agree that

11:46:13 20    Dr. Shanfield -- with Dr. Shanfield that page 4 of PTX 78,

11:46:19 21    which is Trial Exhibit, shown here, contains a trade secret?

11:46:23 22    A.    No.

11:46:24 23    Q.    Why not?

11:46:25 24    A.    Well, this is tests that electrical results by Qorvo

11:46:32 25    that they used in a meeting, so this is a PowerPoint slide

11:46:35  1    of some results that they got.  The actual trade secret is

11:46:39  2    research into the relationship between resonator shape and

11:46:42  3    performance.  Obviously on this slide, you don't see any

11:46:46  4    resonator shapes.  If you go back one slide in the

11:46:49  5    presentation, you'll see the two shapes that they tested.

11:46:53  6    But you know, they're not -- the shapes are not trade

11:46:58  7    secret.

11:46:58  8            The methodology of testing is known to people

11:47:01  9    that are in this business, either SAW filters or BAW filters

11:47:06 10    or really any kind of RF component, potentially could know

11:47:11 11    elements of this testing, but certainly anybody in those two

11:47:14 12    businesses would know how to do this.  And it doesn't tell

11:47:18 13    you how to do that here anyway.  It talks about ████████

11:47:22 14    ████████████████████████████████████████████████████████

11:47:26 15    ███████████████████████████████████████████████

11:47:30 16    ██████████████████████████████████████████████████████

11:47:35 17    ████████████████████████████████████████████████████

11:47:38 18    ███████████████████████████████████████████████████████

11:47:41 19    ████████████████████████████████████

11:47:43 20    Q.    Can I have PTX 78, please.  This is the cover page

11:47:55 21    for PTX 78.  It's titled 5G 9 Polygons versus Rectangle.

11:48:01 22    Did you review this document in forming your opinion?

11:48:04 23    A.    I did.

11:48:07 24    Q.    May I see page 3, please.

11:48:11 25            So what is shown here?

Darveaux - direct

11:48:13  1    A.      So this is what I mentioned, the slide before the one

11:48:16  2    that their claimed trade secret was.  These are the two

11:48:20  3    shapes.  The one on the left, the gray, that's like a

11:48:24  4    ███████████████████████████████████████████████████████

11:48:28  5    ████████████████████████████████████████████

11:48:31  6    Those are the two shapes.  And then ████████████████████

11:48:37  7    ███████████████████████████████████████████████████████

11:48:41  8    ████████████████████████████████.  Again, there is no detail

11:48:44  9    in this document.  It's just for a discussion purpose in a

11:48:47 10    meeting.

11:48:48 11           I couldn't actually make that stuff.  ████████████

11:48:50 12    ███████████████████████████████████████████████████████

11:48:53 13    ██████████████████████████████████████████████ you

11:48:58 14    know what I mean?  This doesn't allow you to make anything,

11:49:01 15    it shows you basically this is what we did.  And the purpose

11:49:04 16    is they had a meeting and they discussed it and the next

11:49:06 17    page had the data that was from those two shapes.

11:49:10 18    Q.      Let's go to the next page, please.

11:49:12 19           So this is the data that you were talking about?

11:49:14 20    A.      Yeah.  Yep.

11:49:16 21    Q.      Okay.  All right.

11:49:37 22           MS. SMITH:  Your Honor, may I approach the

11:49:39 23    witness?

11:49:39 24           THE COURT:  You may.

11:49:57 25    BY MS. SMITH:

Darveaux - direct

11:50:06  1   Q.      Dr. Darveaux, I just handed to you JTX 9 and JTX 12.

11:50:15  2   Do you recognize these two documents?

11:50:17  3   A.      I do.

11:50:18  4   Q.      Did you consider them in forming your opinion?

11:50:22  5   A.      I did.

11:50:24  6           MS. SMITH:  Your Honor, I offer JTX 9 and JTX 12

11:50:29  7   into evidence.

11:50:31  8           THE COURT:  Marked and received as 342 and 343.

11:50:37  9           (Trial Exhibit Nos. 342 and 343 were admitted

11:50:39 10   into evidence.)

11:50:39 11   BY MS. SMITH:

11:50:40 12   Q.      May I have JTX 9.  Thank you.

11:50:42 13           Dr. Darveaux, what is this document?

11:50:45 14   A.      So this is a technical paper written by

11:50:51 15   Dr. Fattinger, BAW resonator design considerations and

11:50:54 16   overviews, so it's kind of like an overview paper, published

11:50:58 17   in 2008, so quite some time ago in IEEE, so obviously

11:51:04 18   whatever is in here is not trade secret, right, they publish

11:51:08 19   it.

11:51:08 20   Q.      All right.  Can you scroll to page 4 and 5, please.

11:51:14 21   I would like to see the paragraph that spans page 4 and 5.

11:51:23 22           Okay.  Dr. Darveaux, what does this language

11:51:29 23   mean from the article?

11:51:30 24   A.      Okay.  So the slides we just showed talk about

11:51:35 25   spurious noise and how you suppress that or at least

Darveaux - direct

11:51:38  1    mitigate it.   And this is talking about methods to do that

11:51:42  2    is one of the topics of this paper.   And it states change

11:51:46  3    the shape of the electrode, that's a method to mitigate

11:51:51  4    spurious noise.   And further it references another paper, I

11:51:55  5    don't see that here, but --

11:51:58  6    Q.     It's at the very end, it's reference number 11.   Can

11:52:02  7    we see that?

11:52:11  8    A.     Ten, it's ten?

11:52:18  9           So it references a paper by Link, back in 2006,

11:52:22 10    so again a couple of years area earlier, talking about the

11:52:26 11    same issue appropriate methods to suppress spurious FBAR

11:52:31 12    modes in volume production.

11:52:33 13    Q.     So can you take a look at JTX 12, which is what I

11:52:37 14    just handed to you, and that's Trial Exhibit 343.

11:52:50 15           Could we have JTX 12, please.   Thank you.

11:52:54 16           All right.   Dr. Darveaux, what is this document?

11:52:59 17    A.     This is a paper by Link that we just talked about,

11:53:03 18    appropriate methods to suppress spurious FBAR modes in

11:53:08 19    volume production, it was published 2006 in the IEEE

11:53:13 20    publication.

11:53:16 21    Q.     Could you please scroll down to page 3?   And focus in

11:53:23 22    on Figure 6, please.

11:53:26 23           What does this figure show, Dr. Darveaux?

11:53:29 24    A.     Yeah.   So in this publication, as we talked about,

11:53:33 25    they're interested in the shapes and you know they use this

Darveaux - direct

11:53:36  1    term apodization, so that's referring to the shape of the

11:53:40  2    resonator, they did three shapes, they did square, circle,

11:53:44  3    five sided polygon, and then they measured the response,

11:53:47  4    they built samples, they measured the response and looked

11:53:51  5    for the spurious noise.

11:53:56  6    Q.    Can I have PTX 0078, please and I would like to see

11:54:05  7    page 3.  What shape are Akoustis's resonators?

11:54:12  8    A.    Well, so what we've seen in the teardowns were

11:54:17  9    elliptical or cut elliptical shapes as you saw from Daeho

11:54:22 10    yesterday, they also have a library of other shapes, there

11:54:25 11    are different shapes they may use, but the ones we have seen

11:54:28 12    have been elliptical.

11:54:32 13    Q.    Are you aware of any information in PTX 78 that is a

11:54:40 14    trade secret?

11:54:41 15    A.    No.

11:54:45 16    Q.    Did Akoustis achieve any head-start by having this

11:54:48 17    information?

11:54:49 18    A.    No.

11:54:50 19    Q.    Are you aware of any evidence that Akoustis actually

11:54:53 20    used this information?

11:54:54 21    A.    No.

11:54:59 22    Q.    So may I see DDX 3.26, please.

11:55:09 23          So does that look correct to you in this flow

11:55:15 24    chart here?

11:55:16 25    A.    Yeah.  So for 2.1, it shows the name of that trade

11:55:21  1    secret, my opinion is no trade secret, no head-start.

11:55:27  2    Q.    So let's move on to trade secret 2.2 to 2.7.  May I

11:55:33  3    have PDX 6.30, please -- 6.31.  Here is Dr. Shanfield's

11:55:45  4    demonstrative regarding alleged trade secrets 2.2

11:55:49  5    through 2.7.  Do you agree with Dr. Shanfield that pages 11,

11:55:53  6    14, 19, of PTX 149, which is Trial Exhibit 9 shown here

11:56:02  7    contain trade secrets?

11:56:03  8    A.    No.  I don't agree.

11:56:06  9    Q.    Why not?

11:56:07 10    A.    Well, we can talk about each one individually.

11:56:12 11    Q.    We can talk about each one individually.

11:56:14 12    A.    The one on the left is a tile, so I think that's

11:56:19 13    referring -- I'm sorry, trade secret, which one it was, 2.5,

11:56:25 14    tile information.  Look at that one.  Okay.  So that's a

11:56:32 15    tile.

11:56:32 16          So what that means is when you do the wafer

11:56:34 17    fabrication, you have a tool that has artwork we call it or

11:56:41 18    mask, actually it's a bunch of multiple masks, so that's

11:56:45 19    repeated around the wafer.

11:56:46 20          So you saw that wafer, basically to fabricate

11:56:49 21    that you got a mask that's step and repeated, we call that a

11:56:53 22    stepper to make these images through photoresist that wafer.

11:56:57 23    There are actually multiple masks, there is not one, each

11:57:01 24    layer has a mask so there would be many, many masks in

11:57:04 25    making a wafer.  So this is an image of what's in that tile

Darveaux - direct

11:57:07 1    or that stepper or a portion of a stepper image.  And it's

11:57:12 2    got all those masks kind of collapsed into one.  You cannot

11:57:16 3    make anything from that image, you can just see it and talk

11:57:19 4    about it.  Right?

11:57:19 5            This is a PowerPoint slide for a meeting.  You

11:57:23 6    can see like along that left column of that tile, those are

11:57:26 7    filters and there might be variants in that, as I mentioned,

11:57:31 8    ████████████████████████████████████████████████████████

11:57:35 9    ████████████   Some of those other things that don't look like

11:57:38 10   filters, those are PCMs, process control monitors, those are

11:57:43 11   things that you probe to get information that relates back

11:57:46 12   to the process of which you made it.

11:57:48 13           Every fab in the world has process control

11:57:52 14   monitors embedded in their design so they can control their

11:57:55 15   process.  That's not a trade secret.  In fact, you can't

11:57:58 16   even make out what these are from this image, I challenge

11:58:01 17   anybody to explain to me what that is.

11:58:05 18   Q.    So slide 9, not a trade secret?

11:58:08 19   A.    Not a trade secret.

11:58:09 20   Q.    Did it give Akoustis any head-start?

11:58:13 21   A.    No.

11:58:15 22   Q.    Did Akoustis use this as far as you know?

11:58:18 23   A.    I saw no evidence of use.

11:58:20 24   Q.    Okay.  Let's go to the document itself.  Can I have

11:58:26 25   PTX 149, please?  And that's Trial Exhibit 9.  Slide 3.

Darveaux - direct

11:58:39  1          This is for trade secret 2.2.  Dr. Shanfield

11:58:43  2   testified that the information on slide three shown here

11:58:46  3   describes trade secret 2.2.  Do you agree?  I'm sorry, I

11:58:53  4   withdraw that.  Dr. Shanfield testified that the information

11:58:55  5   on slide three includes a trade secret.  Do you agree?

11:58:58  6   A.     No.

11:58:59  7   Q.     Why not?

11:59:00  8   A.     Well, okay, so this -- these are specs, so for a

11:59:07  9   device, you can see, you know like in that table up on the

11:59:10 10   upper right, center frequency, insertion loss, amplitude

11:59:15 11   ripple, that's related to the spurious stuff we're talking

11:59:19 12   about, input output impedance, these are specifications,

11:59:23 13   these are parameters and some conditions like the frequency

11:59:26 14   range of interest and then what are the might know, typical

11:59:29 15   max for those specs and then it has a box that says here is

11:59:34 16   what is critical.  Yeah, they're specs, they're for a

11:59:37 17   device, but it's not valuable for Akoustis to get that

11:59:40 18   information from their competitor.  In fact, it's not a good

11:59:44 19   idea to get that kind of information from your competitor.

11:59:47 20   You want to get specs from your customers.  The reason is

11:59:50 21   two, one is specs change.

11:59:53 22          So if I'm grabbing this slide, which I don't

11:59:56 23   know how old it is and I'm spending weeks to build parts and

12:00:01 24   test them to those specs and turns out the customer already

12:00:05 25   modified it, that's a waste of time.  I don't want to get

Darveaux - direct

| | |
|---|---|
| 12:00:08 1 | specs from my competitor, I want to get them from my |
| 12:00:11 2 | customer. |
| 12:00:11 3 | The second reason is you want to be in front of |
| 12:00:14 4 | your customer, you want to be constantly meeting with your |
| 12:00:17 5 | customer, getting information, exchanging, you build a |
| 12:00:20 6 | relationship with your customer.  You don't sneak around, |
| 12:00:22 7 | it's not useful to sneak around and find the specs from your |
| 12:00:25 8 | competitor, it's not a good idea and it's not useful.  Hence |
| 12:00:29 9 | it was not useful to Akoustis to have this in their |
| 12:00:33 10 | possession and it's not a trade secret. |
| 12:00:35 11 | Q.     May I have DTX 560, please.  And that's Trial |
| 12:00:42 12 | Exhibit 153. |
| 12:00:45 13 | Dr. Darveaux, do you recognize this document? |
| 12:00:47 14 | A.     I do. |
| 12:00:48 15 | Q.     Did you consider it as part of your opinion? |
| 12:00:50 16 | A.     Yes. |
| 12:00:51 17 | Q.     What is it? |
| 12:00:52 18 | A.     So this is an e-mail exchange between Akoustis and |
| 12:00:59 19 | their customer in this case, ███, and it shows where these |
| 12:01:03 20 | are the specifications and they were provided by ███, this |
| 12:01:07 21 | is just an example, you go to your customer, you get the |
| 12:01:09 22 | specs.  The top box is more electrical specifications, the |
| 12:01:13 23 | bottom one has to do with, you know, things like, you know, |
| 12:01:17 24 | case operating temperature, or you know, the voltage or the |
| 12:01:21 25 | input power level, those are things you would need to |

Darveaux - direct

12:01:25 1    understand reliability, this part has to run, also the

12:01:28 2    operating temperature you need to know because frequencies

12:01:31 3    shift when a device heats up or if you just put it in a

12:01:36 4    different ambience, you need to make your design capable of

12:01:40 5    being able to shift over those temperature ranges and still

12:01:44 6    be in spec, that's all provided by the customer and he

12:01:47 7    determines that from his application.

12:01:50 8    Q.    Can we go back to PTX 149, please, slide 3.

12:01:54 9          So no trade secret in this one?

12:02:01 10   A.    No.

12:02:02 11   Q.    All right.  So let's move on to trade secret 2.3

12:02:07 12   which is expected circuit layout, schematic and simulations.

12:02:15 13   Can we scroll down to page 14, 15 and 16.

12:02:21 14         So Dr. Shanfield testified that slides 14

12:02:25 15   through 16, but 14 through 15 shown here of PTX 149

12:02:32 16   described trade secrets.  Do you agree?

12:02:35 17   A.    No.

12:02:36 18   Q.    Let's focus on 14 first.  Why don't you believe that

12:02:43 19   slide 14 contains trade secrets?

12:02:46 20   A.    Well, again, this is a PowerPoint image of a design.

12:02:52 21   It's not the actual design file.  There are many, many, many

12:02:56 22   more details, so it just shows the image of a design.  It's

12:03:00 23   useful for discussion internally in the company, but it's

12:03:03 24   not useful to Akoustis.

12:03:08 25   Q.    How about slide 15, does this slide contain trade

Darveaux - direct

12:03:13  1    secrets?

12:03:13  2    A.    So, again, this is the schematic diagram, I think

12:03:17  3    it's for that design and they also have called out, you

12:03:20  4    know, the circle down on the bottom is EM, I believe that

12:03:24  5    means they're going to do simulation, okay, electromagnetic

12:03:31  6    simulation █████████████████████████████

12:03:35  7    █████████████████████████████████████████

12:03:39  8    █████████████████████████████████████

12:03:42  9    ████████████████████████████████

12:03:46 10    █████████████████████████████████

12:03:50 11    ██████████████████████████████████████

12:03:53 12    ████████████████████████████████  Not a trade

12:03:57 13    secret, commonly known.

12:04:00 14    Q.    Slide 16, please.

12:04:03 15          Does this slide contain trade secrets?

12:04:07 16    A.    So no.  This is, again, this is the results they did

12:04:13 17    of a simulation.  ████████████████████████

12:04:17 18    ████████████  I guess these go together.  It's specific to

12:04:21 19    whatever that design was, and all the different features

12:04:25 20    that aren't quantified, I would say, and they did some work,

12:04:32 21    it's good for their meeting discussion, not good for

12:04:36 22    Akoustis, no use to Akoustis.

12:04:38 23    Q.    Did Akoustis achieve a head-start by having this

12:04:41 24    information?

12:04:41 25    A.    No.

Darveaux - direct

12:04:42  1    Q.      Did Akoustis use it as far as you know?

12:04:44  2    A.      I saw no evidence of use.

12:04:46  3    Q.      So let's move on to trade secret 2.4, filter trimming

12:04:54  4    parameters and analysis.  Slide 17, please.

12:04:59  5            So Dr. Shanfield testified that slide 17

12:05:02  6    describes alleged trade secret 2.4, concerning filter

12:05:07  7    trimming parameters analysis.  Do you agree?

12:05:12  8    A.      No.

12:05:13  9    Q.      Why don't you agree?

12:05:14 10    A.      Okay.  Again, it's the PowerPoint slide that they use

12:05:18 11    for discussion, the table on the bottom appears to be -- you

12:05:22 12    can try to decipher it but there is a lot of kind of company

12:05:27 13    specific codes in there, looks like there are different trim

12:05:30 14    steps and what not.  Akoustis can't use that, they have

12:05:34 15    their own process and their own equipment.  But this was for

12:05:37 16    discussion at Qorvo.

12:05:40 17            Some of that other information you can't even

12:05:43 18    make out, and it shows some simulations.  It's specific to

12:05:47 19    Qorvo, it's good for them to talk about in a meeting.  It's

12:05:51 20    not useful to Akoustis.

12:05:52 21    Q.      So did Akoustis achieve any head-start by having this

12:05:57 22    document?

12:05:57 23    A.      No.

12:05:58 24    Q.      Did Akoustis use this document?

12:06:00 25    A.      I saw no evidence of use.

Darveaux - direct

12:06:02  1    Q.      Okay.  All right.  So we talked about alleged trade

12:06:07  2    secret 2.5 earlier, so I'm going to move on to alleged trade

12:06:11  3    secret 2.6, which is the electromagnetic modeling

12:06:20  4    assumptions.

12:06:22  5              May I have slide 24, please, 24 and 25.

12:06:26  6              Dr. Shanfield testified that slides 24 and 25 of

12:06:35  7    PTX 149 describe a trade secret.  Do you agree?

12:06:39  8    A.      No.

12:06:39  9    Q.      Why not?

12:06:40 10    A.      Well, okay, so again, these are slides for a meeting.

12:06:45 11    It showed -- the one on the left is an image of the chip,

12:06:49 12    and the table shows some of the features, if you can kind of

12:06:54 13    barely make out some material types, and maybe some

12:06:58 14    thicknesses, which is fine.  So that's their specific chip.

12:07:05 15    There is a lot of information missing like all the actual

12:07:08 16    pattern itself comes from a CAD file which is way, way, way

12:07:12 17    larger than this and more in depth and there is multiple

12:07:16 18    layers.  A lot of information missing.  It just shows they

12:07:19 19    did some work, they were able to talk about it in a meeting.

12:07:22 20              And the next slide is a package, so the chip

12:07:25 21    always goes on a package, so similarly you can do modeling

12:07:28 22    of the chip and the package together, you should, that's

12:07:31 23    good practice.  Everybody in this field knows that, and they

12:07:37 24    all do that type of work, and this again shows some partial

12:07:41 25    information, a lot of data left out.  It doesn't even show a

Darveaux - direct

12:07:44  1    result, it just shows that they did -- you know, they built

12:07:48  2    a model.

12:07:49  3    Q.      So no trade secret in these two?

12:07:51  4    A.      No.

12:07:52  5    Q.      Did Akoustis achieve a head-start by having this

12:07:55  6    information?

12:07:56  7    A.      No.

12:07:56  8    Q.      Did Akoustis use this information?

12:07:58  9    A.      I didn't see any evidence of use.

12:08:01 10    Q.      Okay.  Let's move on to number 2.7.  This is

12:08:08 11    simulation results ██████████████████████████████

12:08:12 12    ████████

12:08:14 13    A.      ████████

12:08:15 14    Q.      I'm sorry?

12:08:16 15    A.      I assume that's what that means.

12:08:18 16    Q.      We have a typo, sorry.  I was wondering about that.

12:08:24 17    ██████████████████████████

12:08:28 18    A.      ████████████████████████████

12:08:31 19    ████████████████████████████████████

12:08:37 20    ████████████████████████████████████████

12:08:39 21    ██████████████████████████████████

12:08:43 22    ████████████████████████████████████

12:08:46 23    ████████████████████████████████████████

12:08:49 24    ████████████████████████████████████████

12:08:53 25    ████████████████████████████████████████

Darveaux - direct

```
12:08:56   1   ████████████████████████
12:08:58   2          You have to simulate these things, ████████████
12:09:01   3   ██████████████████████████████████████
12:09:04   4   █████████████████████████████████████████
12:09:06   5   ████████████████████████████████████████████
12:09:08   6   ███████████████████████████████████
12:09:11   7   ████████████████████████████  it's a good thing to
12:09:15   8   simulate it, it's a good thing to measure it, it's not a
12:09:18   9   secret.
12:09:19  10   Q.     Can we see slide 11.
12:09:23  11          So Dr. Shanfield had testified that slide 11
12:09:26  12   contains trade secrets.  Do you agree with that?
12:09:29  13   A.     No.
12:09:30  14   Q.     All right.  Did Akoustis achieve a head-start by
12:09:32  15   having this information?
12:09:34  16   A.     No.
12:09:35  17   Q.     Did Akoustis use this information?
12:09:36  18   A.     I saw no evidence of use.
12:09:39  19   Q.     Okay.  So let's scroll back to the first page of this
12:09:44  20   exhibit.  So we got through trade secrets 2.2 and 2.7 just
12:09:53  21   now.  Did you review this exhibit in its entirety?
12:09:56  22   A.     I did.
12:09:56  23   Q.     Is any information in PTX 149 a trade secret?
12:10:01  24   A.     No.
12:10:01  25   Q.     Did Akoustis achieve a head-start by having any of
```

Darveaux - direct

| | | |
|---|---|---|
| 12:10:05 | 1 | this information? |
| 12:10:06 | 2 | A.    No. |
| 12:10:07 | 3 | Q.    And are you aware of any evidence showing that |
| 12:10:10 | 4 | Akoustis used this information? |
| 12:10:12 | 5 | A.    I saw no evidence of that. |
| 12:10:14 | 6 | Q.    Okay.  So may I have DDX 3.27, please. |
| 12:10:20 | 7 | So we've marked it on the chart accordingly. |
| 12:10:25 | 8 | A.    Agreed. |
| 12:10:26 | 9 | Q.    So onward to alleged trade secret 2.8.  May I have |
| 12:10:33 | 10 | PDX 6.33? |
| 12:10:38 | 11 | So this is Dr. Shanfield's demonstrative.  He |
| 12:10:47 | 12 | testified that slide 4 of PTX 720, which is Trial |
| 12:10:54 | 13 | Exhibit 10, contains alleged trade secrets.  Do you agree? |
| 12:10:58 | 14 | A.    No. |
| 12:11:00 | 15 | Q.    What is an innovation vector? |
| 12:11:02 | 16 | A.    So that's the direction you want to go for a given |
| 12:11:09 | 17 | innovation category, I guess.  I assume that's what they |
| 12:11:12 | 18 | mean by this.  Vector is pointing in a direction that has a |
| 12:11:17 | 19 | magnitude, that's a mathematical meaning of vector. |
| 12:11:22 | 20 | Q.    So the innovation vectors shown in this slide, were |
| 12:11:26 | 21 | those generally known in the industry? |
| 12:11:28 | 22 | A.    Yes. |
| 12:11:30 | 23 | Q.    Can you explain -- |
| 12:11:31 | 24 | A.    Do you want me to elaborate? |
| 12:11:33 | 25 | Q.    Yes. |

2082

Darveaux - direct

12:11:34  1    A.      So the vectors are, if you see the brownish arrows

12:11:39  2    and then the words below those.  So we want size to go down.

12:11:43  3    We want our Q value and coupling to go up.  So that's

12:11:47  4    performance, right?  We want temperature stability, so that

12:11:51  5    has to do with this frequency shift over temperature, you

12:11:55  6    want less shift so that you can do a wider temperature range

12:11:58  7    and still be in the spec.  And then you want operating

12:12:02  8    frequency up, that just means new bands that go higher and

12:12:05  9    higher gigahertz.  Those vectors have been the same vectors

12:12:10 10    for a few decades now, they are not trade secrets.

12:12:13 11    Q.      And does this slide have enough detail for an

12:12:17 12    engineering purposes?

12:12:18 13    A.      No.  So again, it's a meeting slide.  It shows some

12:12:22 14    words that if you're in the business you know -- you may

12:12:26 15    know what micro BAW is, if you're at Qorvo, you know what

12:12:30 16    wafer level fan out is kind of a type of industry term for a

12:12:34 17    kind of package, there are certain words in here, but it's

12:12:38 18    not an engineering document, it's not a recipe for making

12:12:41 19    any of that stuff, it's just a slide for a discussion in a

12:12:44 20    meeting at Qorvo.

12:12:45 21    Q.      Now, did you review PTX 720 which is Trial Exhibit 10

12:12:52 22    in its entirety?

12:12:53 23    A.      I did.

12:12:53 24    Q.      Does any part of this document contain trade secrets?

12:12:57 25    A.      No.

Darveaux - direct

| | |
|---|---|
| 12:12:58 1 | Q.      Did Akoustis achieve a head-start by having this |
| 12:13:01 2 | document? |
| 12:13:02 3 | A.      No.  I mean, another thing is it's a 2019 document, |
| 12:13:08 4 | and I think it maybe there was evidence that it got to |
| 12:13:12 5 | Akoustis in 2020 something, I didn't follow all the e-mail |
| 12:13:19 6 | trails that were shown, they were already in volume |
| 12:13:22 7 | production by then. |
| 12:13:23 8 |          So in terms of enabling their time to market, |
| 12:13:26 9 | it's kind of impossible that it could have improved their |
| 12:13:29 10 | time to market at that point in time.  They got into the |
| 12:13:32 11 | market already.  And it's not trade secret anyway. |
| 12:13:36 12 | Q.      Okay.  Let's look at DDX 3.28. |
| 12:13:41 13 |          So we've put the X's in the correct place? |
| 12:13:56 14 | A.      Uh-huh. |
| 12:13:57 15 | Q.      Can you confirm that? |
| 12:13:58 16 | A.      Yes. |
| 12:13:59 17 | Q.      All right.  So let's take a look at the next set, at |
| 12:14:03 18 | PDX 6.34. |
| 12:14:08 19 |          So these are alleged trade secrets 2.9 and 2.10. |
| 12:14:14 20 | Dr. Shanfield testified that slides 8 and 10 of PTX 720, |
| 12:14:20 21 | which is Trial Exhibit 10, contains Qorvo's trade secrets. |
| 12:14:26 22 | Do you agree? |
| 12:14:27 23 | A.      No. |
| 12:14:28 24 | Q.      So let's look -- let's look at slide eight, which is |
| 12:14:31 25 | in the lower left-hand corner of the demonstrative.  Do the |

Darveaux - direct

12:14:40  1    S parameter measures and simulations for Qorvo's 5-gigahertz

12:14:46  2    prototypes have any value outside of Qorvo?

12:14:48  3    A.      No.

12:14:49  4    Q.      Why not?

12:14:50  5    A.      Well, okay, so again, this is -- they're showing

12:14:55  6    simulation measurement for a demonstrator of this gigahertz,

12:15:00  7    5.6-gigahertz filter, which is fine for them.  It's meeting

12:15:05  8    discussion, it's not, there is nothing in here that's useful

12:15:08  9    for a competitor, I have to work on any own product based on

12:15:12 10    specs from my customer and get my filter to do whatever they

12:15:15 11    say.  This is useful for Qorvo to talk about, but it's not

12:15:20 12    useful for a competitor like Akoustis.

12:15:23 13    Q.      So let's focus on the other slide in this

12:15:27 14    demonstrative, which is page 10.

12:15:32 15            What's shown here, Dr. Darveaux?

12:15:33 16    A.      So, again, these are, you know, very high level

12:15:38 17    images, the one on the left looks like a design of a filter.

12:15:43 18    And you can see you know lots of resonators and other

12:15:46 19    features on there.  These are all the levels collapsed on to

12:15:51 20    one again, there are multiple layers in there that they just

12:15:55 21    smush together to talk about.  There is no design rules,

12:15:58 22    there is no -- it's not quantitative in any way, it wouldn't

12:16:03 23    allow to you make that.

12:16:04 24            The one on the right, it looks like again, some

12:16:07 25    sort of simulation result.  There is no input parameters on

Darveaux - direct

12:16:10  1    how they did it, you can't even tell what the result is

12:16:14  2    other than there is colors.  Okay?  Then they show some

12:16:18  3    quantitative numbers below, which is fine for them to

12:16:21  4    discuss in an internal meeting at Qorvo, but it's not useful

12:16:25  5    to Akoustis.

12:16:28  6    Q.    Can I have DDX 3.29, please?

12:16:33  7             So we've put X's in 2.9, but there should also

12:16:51  8    be one in 2.10.  But we're past the halfway point.  Let's

12:16:58  9    look at PDX 6.34.  6.35.

12:17:07  10            So here is alleged trade secret 2.11, regarding

12:17:17  11   measured data for a coupling and -- for coupling quality

12:17:22  12   factor versus percentage of scandium.  Dr. Shanfield

12:17:28  13   testified that slide 15 of PTX 720, which is Trial

12:17:33  14   Exhibit 10, contains Qorvo's trade secrets.  Do you agree?

12:17:36  15   A.    No.

12:17:37  16   Q.    Why not?

12:17:39  17   A.    Okay.  So this refers to the aluminum nitride as the

12:17:45  18   base electric layer and you can build with the scandium to

12:17:50  19   change the properties.  This was well-known in the industry

12:17:52  20   by that time.  And people, you know, were using it.  So this

12:17:56  21   shows some of the data where they evaluated it internally at

12:18:00  22   Qorvo.  It's not a trade secret, it's specific data that

12:18:03  23   they evaluated.

12:18:08  24   Q.    Is this publicly known information?

12:18:12  25   A.    Yes.  I'm saying the use of scandium and its effects

Darveaux - direct

12:18:18  1    are publicly known.  I don't know that that slide was shown

12:18:21  2    in public, I'm not sure about that slide, but the concept

12:18:24  3    shown here is absolutely publicly known.

12:18:38  4              MS. SMITH:  Your Honor, may I approach the

12:18:40  5    witness?

12:18:40  6              THE COURT:  You may.

12:19:05  7    BY MS. SMITH:

12:19:12  8    Q.    Dr. Darveaux, I just handed you DTX 668 and DTX 775.

12:19:20  9    Do you recognize those two documents?

12:19:21 10    A.    I do.

12:19:21 11    Q.    Did you use them in forming your opinions?

12:19:24 12    A.    I did.

12:19:26 13              MS. SMITH:  Your Honor, I move to enter DTX 668

12:19:30 14    and DTX 775 into evidence.

12:19:33 15              THE COURT:  Marked and received as 344.

12:19:40 16              (Trial Exhibit No. 344 was admitted into

12:19:41 17    evidence.)

12:19:41 18              MS. SMITH:  And 775, please.

12:19:48 19              THE COURT:  That would be 345.

12:19:50 20              (Trial Exhibit No. 345 was admitted into

12:19:51 21    evidence.)

12:19:51 22              MS. SMITH:  Thank you.

12:19:52 23    BY MS. SMITH:

12:19:57 24    Q.    Okay.  Dr. Darveaux, what is this document, DTX 775,

12:20:06 25    which is Trial Exhibit 345?

Darveaux - direct

12:20:09 1    A.      So this is a paper, **BAW filters for 5G bands** as you

12:20:17 2    can see the title as published by Dr. Aigner, who you saw

12:20:22 3    last week, and his colleagues, and Dr. Fattinger is on this

12:20:27 4    one.  It was published in 2018 in IEEE, at that point in

12:20:32 5    time obviously none of this is trade secret anymore, they

12:20:35 6    consider it trade secret otherwise they wouldn't have

12:20:38 7    published it.

12:20:38 8    Q.      Can we see Figure 2 on page 3, please?

12:20:42 9    A.      Yes.

12:20:43 10   Q.      Can you explain what is Figure 2 showing?

12:20:46 11   A.      Sure.  So, again, we talked about the piezo layer is

12:20:58 12   aluminium nitride, you build it with scandium to change the

12:21:00 13   properties, it results in a change in the resonator

12:21:02 14   performance.

12:21:02 15          The left access is Q, that's one of the

12:21:06 16   performance vectors related to the energy efficiency, that

12:21:10 17   dropped from 3,200 down to 1,900, as you put more scandium

12:21:15 18   the Q goes down, which is not what they usually want.

12:21:20 19          And the other vector is K squared, that's a

12:21:23 20   coupling coefficient, that starts down at 6.5 percent and

12:21:29 21   goes up to 9.2 percent, that's usually good, especially for

12:21:32 22   a wideband filter, you're going to pick a scandium amount

12:21:37 23   you want, some filters you use no scandium, other you might

12:21:41 24   use 6 or 9 and a half, whatever you want, it depends on the

12:21:41 25   spec you're trying to it, is it narrow filter, wide filter,

Darveaux - direct

12:21:48  1    it depends on the customer input to you.  Also depends on

12:21:50  2    what you get from your supplier, you can't just pick I want

12:21:54  3    6.9, 3, 1, you can't do that, the supplier only has a

12:21:57  4    limited amount he can sell you, this is a target that goes

12:22:02  5    in your sputtering energy machine, whatever equipment you're

12:22:04  6    using, it's a sputtering energy machine that deposits that

12:22:06  7    on the wafer, you have a certain number you can pick from

12:22:10  8    from the supply base, and you do your simulations and

12:22:14  9    testing to decide which ones you want to use for which type

12:22:17 10    of filter.  Each company has to do that for their own

12:22:20 11    process, the trends are going to be the same, but the

12:22:22 12    specifics for your filter depends on your process and your

12:22:25 13    design.

12:22:27 14    Q.      Are you aware of any evidence that Akoustis achieved

12:22:30 15    a head-start by having this information?

12:22:32 16    A.      No.

12:22:32 17    Q.      Are you aware of any evidence that Akoustis used this

12:22:35 18    information?

12:22:36 19    A.      So I believe that Akoustis does use scandium in some

12:22:40 20    of their products, but that was known in the industry and

12:22:45 21    they can just buy those targets from suppliers.

12:22:48 22    Q.      Okay.  Let's move on to trade secret 2.12 and 2.13.

12:22:55 23    May I have PDX 6.35, please.  Probably 6.36.

12:23:04 24                THE COURT:  Yes.  Marked and received.

12:23:08 25                MS. SMITH:  I didn't offer.

Darveaux - direct

| | | |
|---|---|---|
| 12:23:11 | 1 | THE COURT:  I think you missed one. |
| 12:23:12 | 2 | MS. SMITH:  No.  I wasn't offering any, I was |
| 12:23:16 | 3 | just asking for a -- |
| 12:23:17 | 4 | THE COURT:  I understand. |
| 12:23:18 | 5 | MS. SMITH:  Okay. |
| 12:23:20 | 6 | BY MS. SMITH: |
| 12:23:25 | 7 | Q.    So here is Dr. Shanfield's demonstratives on 2.12 to |
| 12:23:32 | 8 | 2.14.  And he testified that slides 23, 24, 29 of PTX 720, |
| 12:23:38 | 9 | which is Trial Exhibit 10, contains Qorvo's trade secrets. |
| 12:23:42 | 10 | Do you agree? |
| 12:23:43 | 11 | A.    No. |
| 12:23:43 | 12 | Q.    Can we see PTX 720, please.  Slides 23 and 24. |
| 12:23:54 | 13 | What is shown here? |
| 12:23:55 | 14 | A.    So this is something they're calling CRF, for coupled |
| 12:24:01 | 15 | resonator filter.  Basically they're stacking -- instead |
| 12:24:05 | 16 | normally resonator are side-by-side, they're stacking them |
| 12:24:07 | 17 | on top of each other, that way they can reduce the size, |
| 12:24:11 | 18 | which of course is what everybody likes for mobile phones |
| 12:24:14 | 19 | and that kind of market.  So yeah, that's what the concept |
| 12:24:18 | 20 | is. |
| 12:24:18 | 21 | They did some design studies, you know, the one |
| 12:24:21 | 22 | on the left they show how they combine those two filters and |
| 12:24:25 | 23 | stack them together to make this filter on the right for |
| 12:24:28 | 24 | this image, and then over here, you know, ███████████ |
| 12:24:33 | 25 | ████████████████████████████████████████████ |

Darveaux - direct

12:24:37  1  might be in a module at some point, it shows how they

12:24:40  2  reduced the area of that footprint we called that in the

12:24:43  3  front-end module.  And then they did some simulation work.

12:24:49  4  That's what's described here, was that your question?

12:24:52  5  Q.    Yes.

12:24:53  6  A.    Yes.

12:24:53  7        MS. SMITH:  Your Honor, may I approach the

12:24:55  8  witness?

12:24:55  9        THE COURT:  You may.

12:25:09 10  BY MS. SMITH:

12:25:12 11  Q.    Dr. Darveaux, I just handed you DTX 560.  Do you

12:25:16 12  recognize this document?

12:25:16 13  A.    I do.

12:25:17 14  Q.    What is this document?

12:25:18 15  A.    So this is a technical paper, single to balanced

12:25:23 16  filters for mobile phones using coupled resonator BAW

12:25:27 17  technology, so the same concept we're talking about here.

12:25:30 18  That was published by Dr. Fattinger, et al. in 2004,

12:25:35 19  actually, so this idea has been around for a long time.

12:25:39 20  Q.    Did you consider this when you were forming your

12:25:42 21  opinions?

12:25:42 22  A.    I did.

12:25:43 23        MS. SMITH:  Your Honor, I move to enter DTX 561

12:25:48 24  into evidence.

12:25:48 25        THE COURT:  Marked and received as 356 -- sorry,

Darveaux - direct

1    346.

2                    (Trial Exhibit No. 346 was admitted into

3    evidence.)

4                    MS. SMITH:   Thank you.

5    BY MS. SMITH:

6    Q.    Can you zoom in on Figure 1, please.   Is that a CRF?

7    A.    Yes, it's not labeled well, let me describe it to

8    you.  So those bluish layers, those are the piezoelectric

9    layers, you can see normally those are side-by-side in a

10   real product, now they're stacked on top of each other.  And

11   the yellow are silicone dioxide layers, and the gray of

12   metal layers, typically Tungsten, one example of what you

13   can use.

14                    So you got electrodes and you got this whole

15   stack and you can build that all in the same process inputs

16   in a fabrication facility, it's many, many, many more steps,

17   remember we're talking about for a normal filter it might be

18   200 or more steps, this would probably be, who knows, 300 or

19   more steps, it's a lot of steps to actually build something

20   like that.

21   Q.    So did Akoustis achieve a head-start by having this

22   information?

23   A.    No.  I mean, well first of all, it's not a trade

24   secret.  Secondly, I don't believe they have ever attempted

25   this.  It even states in the paper that this concept is more

Darveaux - direct

12:27:09  1    applicable to an SMR type filter than FBAR, because SMR you

12:27:14  2    can keep building layers on layers, FBAR you would have to

12:27:17  3    do a release process that's releasing multiple layers at the

12:27:21  4    same time which I don't believe -- I'm not sure I have ever

12:27:25  5    seen anybody attempt that.  But the paper itself indicates

12:27:30  6    this is probably more suitable for SMR.

12:27:32  7    Q.      Can we have PDX 6.36, please?  All right.  So we

12:27:46  8    talked about the two slides on, the left slide and the

12:27:51  9    middle slide.  Let's take a look at the slide on the right.

12:28:00 10    Dr. Shanfield testified that this slide reflects Qorvo's

12:28:04 11    alleged trade secret 2.14, micro BAW approach for reducing

12:28:11 12    die size.  Do you agree that's a trade secret?

12:28:14 13    A.      No.

12:28:15 14    Q.      Why not?

12:28:15 15    A.      Well, a couple of reasons.  First of all, you can't

12:28:20 16    really tell from this slide what micro BAW is.  So I had to

12:28:24 17    search if there was any publications that they had that

12:28:26 18    showed what micro BAW was, we'll get to that in a minute.

12:28:30 19    But basically it's taking the connections that are outside,

12:28:33 20    like normally you have a resonator and then you got these

12:28:37 21    bump areas outside.

12:28:39 22            So electrical connections are typically outside

12:28:41 23    the resonator regions, now they're trying to move them over

12:28:45 24    top.  What does that do?  Shrinks size, good idea, not a

12:28:50 25    trade secret.  For example, when I joined Skyworks in 2012,

Darveaux - direct

12:28:55  1    we were sourcing SAW filters from Panasonic, they had that

12:28:59  2    exact same concept in production, so you could have bought

12:29:02  3    any tear down product at that time and seen this type of

12:29:06  4    packaging approach to a SAW filter, which pretty much has

12:29:09  5    the identical packaging constraints as a BAW filter.

12:29:13  6    Q.    Can we have DTX 775, please, and focus on figures 4

12:29:18  7    and 5.

12:29:22  8            So is this an image of, as you like to say a

12:29:33  9    cartoon of a micro BAW?

12:29:34 10    A.    Yeah, this is an illustration, so the top image,

12:29:38 11    illustration is of the BAW case that I just described where

12:29:42 12    the resonators would be in that white box, so that's a

12:29:45 13    cavity, that's an air cavity, so the resonators are on that

12:29:50 14    surface facing downward on the BAW die surface, that's where

12:29:55 15    they would be in this illustration.  And the connection out

12:29:57 16    to the side of these copper pillars, that's the electrical

12:30:01 17    connection.  You can see the size of that conceptually.

12:30:04 18            Now, down below is what they are calling micro

12:30:07 19    BAW, that's just their word, where you move those

12:30:10 20    connections in board now, and you have to have via that go

12:30:14 21    through that yellow material, so that adds several process

12:30:18 22    steps.  It's a good idea for size reduction.  It does add

12:30:22 23    cost because you have to have more process for those vias to

12:30:26 24    get connections up in there.  As I pointed out, it's not a

12:30:30 25    trade secret for a couple of reasons, one is they didn't

Darveaux - direct

12:30:32  1  even think it was a trade secret, they published this paper

12:30:35  2  in 2018, and as I also pointed out, this has been in volume

12:30:41  3  production for sure by Panasonic and then Skyworks since at

12:30:46  4  least 2012.

12:30:48  5  Q.    So no head-start for Akoustis?

12:30:52  6  A.    No.

12:30:53  7  Q.    And you mentioned earlier that Akoustis would not be

12:30:56  8  using this information, right because --

12:30:59  9  A.    I'm sorry.

12:31:00 10  Q.    Did Akoustis use this information?

12:31:02 11  A.    Not to my knowledge.

12:31:03 12  Q.    Okay.  Can I have PDX 6.37, please.

12:31:12 13        So moving on to alleged trade secrets 2.15 and

12:31:20 14  2.16.  Dr. Shanfield testified that slide 36 and 37 of PTX

12:31:26 15  720, which is Trial Exhibit 10, contains Qorvo's alleged

12:31:30 16  trade secrets.  Do you agree?

12:31:32 17  A.    No.

12:31:34 18  Q.    So let's take a --

12:31:35 19  A.    I don't agree that they're trade secrets, if that was

12:31:38 20  your question.

12:31:39 21  Q.    All right.  Let's take a look at the slide on the

12:31:42 22  left which is slide 36.  What is shown here?

12:31:47 23  A.    Okay.  So this is again a schematic trying to -- you

12:31:51 24  know, a slide for a discussion in a meeting.  But what

12:31:55 25  they're trying to show is that there is heat generated the

Darveaux - direct

12:31:58  1    substrate.  For example, you got these resonators here and

12:32:01  2    there is some losses, they're not perfect, so that loss

12:32:05  3    turns into heat.  That heat █████████████████████████████

12:32:09  4    ████████████████████████████████████████████████████████

12:32:13  5    ████████████████  you don't see all that on this drawing,

12:32:17  6    the heat ██████████████████████████████████████████████

12:32:20  7    ███████████████████████████████  what they're

12:32:23  8    illustrating, ████████████████████████████████████████

12:32:26  9    ████████████████████████████████████████████████████

12:32:30  10   █████████████████████████████████████████████████████

12:32:34  11   ██████████████████████████  It's obvious what the properties

12:32:38  12   of that material are.

12:32:39  13          What they have done here is said okay, ████████

12:32:41  14   ████████████████████████████████████████████████████████

12:32:47  15   ███████████████████████████████  that's the concept, there is

12:32:50  16   no design rules, it's not an engineering drawing or an

12:32:53  17   engineering specification, it just shows the idea, not a

12:32:58  18   trade secret either, I think we're going to get to that.  Do

12:33:01  19   we have another slide on that one?

12:33:03  20   Q.     Yeah.  So PTX 961, please.  If we can scroll to

12:33:11  21   page 5.  Page 6.

12:33:18  22          So Dr. Darveaux, what is this document?

12:33:21  23   A.     Okay.  So this is a data sheet pulled off the Amkor

12:33:27  24   website using the Wayback Machine I mentioned.  So I worked

12:33:31  25   at Amkor at that time.  I actually was on the team that

12:33:37 1    developed this technology, we did it for TI, Texas

12:33:41 2    Instruments at that time.  And this is around 2010 time

12:33:43 3    frame.

12:33:44 4            And, you know, once you develop it in these

12:33:47 5    packaging companies then you put this on your website so any

12:33:51 6    customer can use it, basically that's the idea, that's how

12:33:55 7    you win business.

12:33:56 8            This shows copper pillars, which are the bumps.

12:33:59 9    We looked at different ways how to do the pilar over the

12:34:02 10   passivation, which is ███████████████    in the Qorvo

12:34:07 11   case, or pulled away the passivation, put it directly down

12:34:11 12   to IC pad that we would call, the image down there is just

12:34:16 13   an example of the parts we built, which it's right down to

12:34:18 14   IC pad, that's what the photograph is.  See all those little

12:34:22 15   snowcones sitting there and if you go down there is another

12:34:25 16   schematic cartoon, which looks pretty very much like the

12:34:29 17   Qorvo drawing.  If you zoom in, can you zoom in, Jesse,

12:34:33 18   that's it there.

12:34:35 19           So, you know, you got the aluminum pad, you got

12:34:40 20   the silicone substrate, the green is the passivation, so

12:34:43 21   that's ███████████████    in this particular example that

12:34:46 22   we're talking about.  ███████████████████████████

12:34:49 23   ██████████████████████████████████████████████████

12:34:53 24   ████████████████████    but there are other reasons that

12:34:55 25   you will do that as well, which we'll not talk about in this

Darveaux - direct

12:34:59  1    case.  It's been done, been a high volume production since

12:35:02  2    at least 2010 kind of time frame.  I think some of my

12:35:05  3    patents may even been on this kind of stuff.  I'm not sure.

12:35:09  4    I can't even remember.

12:35:13  5            MS. SMITH:  Your Honor, I move to enter DTX 961

12:35:17  6    into evidence.

12:35:18  7            THE COURT:  I'm sorry, I can't hear you.  You

12:35:20  8    got to speak up.

12:35:21  9            MS. SMITH:  Sure.  I move to enter DTX 961 into

12:35:25 10    evidence.

12:35:25 11            THE COURT:  Okay.  That's fine.  It's 347,

12:35:31 12    marked and received.

12:35:32 13            (Trial Exhibit No. 347 was admitted into

12:35:34 14    evidence.)

12:35:34 15    BY MS. SMITH:

12:35:35 16    Q.    All right.  May I have PDX 6.37, please?  So we just

12:35:47 17    talked about 2.15.  Let's talk about 2.16, and let's zoom in

12:35:54 18    on that image on the right, which is slide 37 of PTX 720,

12:36:00 19    Trial Exhibit 10.

12:36:01 20            Dr. Darveaux, what is shown here?

12:36:05 21    A.    Okay.  So this is measured data, so delta T on the

12:36:12 22    left is the temperature rise, they don't really say above

12:36:15 23    what, sometimes that's above the ambient, sometimes it's

12:36:19 24    above the case or the printed circuit board, they don't

12:36:21 25    really say.  This is not a technical paper, it's just an

Darveaux - direct

12:36:25  1    image that they used in a meeting, but it's data.  They show

12:36:30  2    Delta T, that's the temperature rise and they have different

12:36:32  3    cases where they varied the design, so you can see on the

12:36:35  4    right are some different filter designs, and if you start

12:36:39  5    with the -- you see those are the filter designs.  If you

12:36:44  6    look at the blue box in the upper left, and within the chart

12:36:48  7    area, that guy, that's like their baseline case.  Right?

12:36:54  8    The original, here is the original design.

12:36:56  9             So then they improved it ████████████████

12:37:00 10    ████████████████ and retested it and got some different

12:37:04 11    improvements depending on the design and where the bumps are

12:37:08 12    and things like that.  It's good data, they took some good

12:37:12 13    data, the specifics of the data depend on a lot of things,

12:37:15 14    how it was mounted in the substrate, how that package was

12:37:17 15    mounted on a motor board, whether or not it was cooled with

12:37:20 16    air or had a heat sync attached, so the actual specifics of

12:37:24 17    the data depend on several things.  But what you don't get

12:37:28 18    here, obviously it's not a technical paper.  But the concept

12:37:32 19    worked.  It's just -- it's not a trade secret, it's not new,

12:37:37 20    they tested it and confirmed that it worked at Qorvo.

12:37:41 21    Q.      Did Akoustis achieve a head-start by having this

12:37:44 22    document?

12:37:45 23    A.      No.

12:37:46 24    Q.      Did Akoustis use this document?

12:37:47 25    A.      Not to my knowledge.

Darveaux - direct

12:37:51  1    Q.      All right.  So we just finished talking about all of

12:37:53  2    the alleged trade secrets in Group 2.  So just to recap,

12:37:59  3    what is your opinion regarding whether any of them are trade

12:38:02  4    secrets?

12:38:02  5    A.      I saw no trade secrets.

12:38:05  6    Q.      Okay.  And how much time to market head-start did

12:38:07  7    Akoustis achieve by having these documents?

12:38:10  8    A.      My opinion is they got no head-start.

12:38:13  9    Q.      Okay.  So let's see DDX 3.37, please.

12:38:23  10              All right.  So we've marked those no trade

12:38:26  11   secret head-start.  Now switching gears, assuming that they

12:38:32  12   are trade secrets, just make that assumption.  Did you

12:38:35  13   calculate avoided costs for Akoustis?

12:38:37  14   A.      Yes, I did, on these three documents, these three

12:38:43  15   PowerPoint slide decks.

12:38:45  16   Q.      Okay.  So let's see DDX 3.38, please.  Are these your

12:38:51  17   calculations?

12:38:51  18   A.      Yeah.  So for each -- again, I went through this on

12:38:54  19   the last one, but for each document I looked for any pages

12:38:58  20   in the Qorvo document and if there was any Akoustis document

12:39:01  21   that I could find that was similar, I would call that out

12:39:04  22   and then for each page I credited avoided cost of two

12:39:12  23   engineering hours per page and then if I had to search

12:39:15  24   online or, you know, find some public references, I credit

12:39:19  25   two engineering hours for each document that I had to search

Darveaux - direct

12:39:22  1    for, if I had to buy a document, usually for $33, so that's

12:39:26  2    all summarized here for the three documents.

12:39:31  3    Q.    Can we see DDX 3.49, please.

12:39:38  4          So the document cost and engineering hours have

12:39:42  5    been added here.  And remember we did trade secret Group 3

12:39:48  6    earlier.  So I put this on there, too?

12:39:52  7    A.    Yeah, for this group, Group 2, it was $165 in

12:39:57  8    documents and twelve engineering hours, so previously Group

12:40:01  9    3 was $33.08 engineering hours, that's what's shown on the

12:40:05 10    chart here.

12:40:05 11    Q.    So Group 4 has only one trade secret in it?

12:40:09 12    A.    Uh-huh.

12:40:11 13    Q.    Let's go.

12:40:12 14    A.    Yeah.

12:40:14 15    Q.    PDX 6.68.  6.69.

12:40:23 16          Do you agree with Dr. Shanfield that Trial

12:40:28 17    Exhibit 13 -- next page, please?

12:40:30 18          So this is about connectors, right.  So do you

12:40:38 19    agree that Dr. Shanfield -- do you agree with Dr. Shanfield

12:40:43 20    that Trial Exhibit 13 shown here contains Qorvo trade

12:40:47 21    secrets?

12:40:47 22    A.    No.

12:40:48 23    Q.    Why not?

12:40:49 24    A.    Well, this is an ████████ drawing, we showed that in

12:40:55 25    the trial earlier, says right on the drawing it's a property

Darveaux - direct

12:40:59  1    of ███████, somebody noticed customer outline drawing and

12:41:05  2    misinterpreted that to say that this customer designed the

12:41:08  3    drawing, that's not what that means.

12:41:10  4            When I was at Amkor and Skyworks, I had design

12:41:13  5    teams reporting to me, it's common practice to put a

12:41:17  6    customer outline drawing out, that means it's for the

12:41:20  7    customer.  So you have your internal drawings and then what

12:41:24  8    you give the customer is the thing he needs to use the part.

12:41:26  9    In our industry that's what customer outline drawing means.

12:41:31 10            If you zoom in on this drawing, it even shows I

12:41:36 11    think down in the lower right-hand corner, right under the

12:41:40 12    words Customer Outline Drawing -- so you see under Customer

12:41:49 13    Outline Drawing it says all other sheets are for internal

12:41:52 14    use only.  That means there are actual sheets behind this

12:41:56 15    one that are ████████████ designed this.  Why are

12:42:00 16    there more sheets?  This is an assembly.  There are three

12:42:03 17    parts, there is a pin in the center, it's a coax, a

12:42:06 18    connector, there is a dielectric, Teflon material around

12:42:09 19    that, then there is this barrel assembly, a piece of metal

12:42:13 20    that's been machined, have threads, and there are some other

12:42:17 21    metal straps, that's welded together.  This thing needs to

12:42:20 22    be assembled, you need to design each of those, fabricate

12:42:24 23    it, assemble it, that's what ██████ does for a living and

12:42:27 24    then they sell it to anybody that wants to buy it.  It's

12:42:30 25    their property, anybody can buy it.

Darveaux - direct

12:42:32  1   Q.      Have you seen any evidence that Qorvo has the
12:42:35  2   internal sheets you're referring to?
12:42:36  3   A.      No, I saw no evidence of that.
12:42:38  4   Q.      What's the significance of not having the internal
12:42:41  5   sheets?
12:42:41  6   A.      It means they didn't design it.
12:42:45  7   Q.      And what's the date on this drawing?
12:42:51  8   A.      I believe it's down in that corner on the right.
12:43:00  9   May 6th of 2011.
12:43:02 10   Q.      Okay.  And have you ever worked with another company
12:43:12 11   to jointly develop something?
12:43:14 12   A.      Sure.
12:43:15 13   Q.      Okay.  So what kinds of agreements would you need in
12:43:19 14   order to protect your own interests?
12:43:23 15   A.      Okay.  So in our business, I'm sure many businesses,
12:43:28 16   you have nondisclosure agreements, you have heard about a
12:43:31 17   lot of those in this case.  So any supplier that you have,
12:43:35 18   you have a nondisclosure agreement with, or maybe multiple
12:43:39 19   nondisclosure if they're dependent on a topic.  So if you
12:43:43 20   got fifty suppliers, you got a minimum of fifty NDAs.  That
12:43:48 21   talks about how the information can be disclosed.  It
12:43:51 22   doesn't -- there is no ownership in there.
12:43:53 23           If you're going to do joint development, if
12:43:55 24   you're actually going to work with a supplier to develop a
12:43:59 25   technology that you jointly own, usually you would have a

Darveaux - direct

12:44:03  1    JDA, Joint Development Agreement, and that spells out

12:44:05  2    ownership, that says okay, who is going to own what portion

12:44:09  3    of this thing, what's the parameters around that.  That's --

12:44:12  4    if you're going to joint develop you need a JDA, that's

12:44:16  5    common in our industry.

12:44:18  6              MS. SMITH:  Your Honor, may I approach the

12:44:20  7    witness?

12:44:21  8              THE COURT:  You may.

12:44:28  9    BY MS. SMITH:

12:44:39 10    Q.      Dr. Darveaux, I just handed you DTX 961.  Do you

12:44:46 11    recognize this document?

12:44:48 12    A.      I think you handed me 0962.

12:44:51 13    Q.      I'm sorry, 0962.  DTX 962.  Do you recognize this

12:44:56 14    document?

12:44:56 15    A.      I do.

12:44:56 16    Q.      What is it?

12:44:57 17    A.      So this is an affidavit of Nathaniel Frank Wright who

12:45:03 18    is somebody who works at the Internet Archives.  I mentioned

12:45:08 19    earlier about this Wayback Machine could go back in time and

12:45:11 20    look at archived website's.  So this is an affidavit from

12:45:16 21    that entity that maintains that archive.

12:45:20 22    Q.      Okay.  And what did you download from this internet

12:45:25 23    archive?

12:45:26 24    A.      Well, so I downloaded, for example, data sheets on

12:45:37 25    BAW filters that were available at the time just to see what

Darveaux - direct

12:45:41  1    was being publicly shown to people.  I looked at Qorvo's

12:45:45  2    website in the 2016 time frame and I downloaded data sheets

12:45:50  3    for BAW filters just to see what did they disclose and what

12:45:53  4    was there that anybody could have downloaded at that time.

12:45:56  5    I think I also downloaded that Amkor document that we looked

12:46:00  6    at earlier.  I don't know if there is anything else, but

12:46:03  7    those two for sure.  Those two things.  I downloaded a lot

12:46:08  8    of data sheets and then that one Amkor document.

12:46:11  9              MS. SMITH:  Your Honor, I move to enter DTX 962

12:46:15 10    into evidence.

12:46:16 11              THE COURT:  Marked and received as 348.

12:46:19 12              (Trial Exhibit No. 348 was admitted into

12:46:20 13    evidence.)

12:46:20 14    BY MS. SMITH:

12:46:20 15    Q.    Can you please show DTX 962 at 53.

12:46:27 16              Dr. Darveaux, did you find any data sheets that

12:46:30 17    were labeled preliminary?

12:46:34 18    A.    I think a few of them were labeled preliminary.  I'm

12:46:38 19    not sure which ones.  Oh, yeah, this one is one.  If you

12:46:48 20    look down in the lower left-hand corner it says Preliminary

12:46:51 21    Data Sheet, Rev C, 1-20-16, so that's January of 2016.

12:46:58 22    Q.    So were you specifically searching for preliminary

12:47:03 23    labeled data sheets?

12:47:06 24    A.    No, what I was searching for was things like did they

12:47:10 25    show the schematics for the part on there.  Did they show

Darveaux - direct

12:47:13  1    the evaluation board, did they show the connectors.  Because

12:47:17  2    early in the case, all those things were claimed as trade

12:47:20  3    secrets and then later, you know, Qorvo dropped some of

12:47:23  4    those and just stuck with the connector was the last kind of

12:47:26  5    thing.

12:47:27  6            But originally there were a lot of things they

12:47:30  7    were claiming as trade secrets.  I was trying to understand

12:47:32  8    what was out there at the time, what were they putting on

12:47:35  9    their website.  Clearly if they were putting it on their

12:47:38 10    website it was not a trade secret, which was the idea.

12:47:41 11    Q.      May I have PDX 6.70 again.

12:47:52 12            Dr. Darveaux, PTX 1142 which is Trial

12:47:58 13    Exhibit 13, is it a trade secret?

12:47:59 14    A.      No.

12:48:01 15    Q.      Did Akoustis gain any head-start with this?

12:48:07 16    A.      So your question did Akoustis get any head-start by

12:48:10 17    having that document in their possession?

12:48:14 18    Q.      Correct?

12:48:14 19    A.      No.

12:48:15 20    Q.      So that is -- that ends the discussion for Group 4.

12:48:22 21            MS. SMITH:  Your Honor, is this a good time that

12:48:25 22    you want to break?

12:48:26 23            THE COURT:  12:45, it's about time for our

12:48:30 24    lunch.

12:48:30 25            Well, ladies and gentlemen, don't discuss the

Darveaux - direct

12:48:33  1    case amongst yourselves.  Don't let anybody talk to you

12:48:35  2    about it.  And we'll see you at 1:30.  Thanks very much.

12:48:40  3                (Jury exiting the courtroom at 12:48 p.m.)

12:49:00  4                THE COURT:  Everybody else be seated.  We'll let

12:49:02  5    the witness step down.  This is our lunch break and you

12:49:05  6    can't talk to anybody about the testimony you have given.

12:49:08  7    We'll see you about five before we start.  It will be about

12:49:13  8    1:25.  Thanks very much.

12:49:16  9                THE WITNESS:  Thank you, Your Honor.

12:49:16 10                THE COURT:  Anything else from anybody else at

12:49:18 11    this time?

12:49:19 12                We're going to take our lunch break at this

12:49:21 13    time.  Thank you very much.

12:49:22 14                COURT CLERK:  All rise.

12:49:24 15                (A lunch recess was taken.)

13:19:34 16                THE COURT:  Everybody can be seated.  I finally

13:35:26 17    gave up and decided to put a sweater on, guys, it's just

13:35:30 18    cold in here.

13:35:31 19                We will -- we've looked at this conspiracy issue

13:35:36 20    a lot and basically a civil conspiracy is a mode or method

13:35:43 21    by which a substitute law violation can be committed so you

13:35:48 22    can have a conspiracy and you can commit a trade secret

13:35:52 23    violation or you can misappropriation of trade secrets.

13:35:55 24                Now if you seek the substantive violation alone,

13:35:58 25    which is true here in this case, then the damages that you

Darveaux - direct

13:36:09  1    would receive in that -- well, if you're only seeking

13:36:14  2    conspiracy, there is no separate recovery under civil

13:36:16  3    conspiracy is the easy way to say that.  We're going to redo

13:36:22  4    the verdict form.  I don't see any reason other than a

13:36:26  5    problem in connection with inconsistent verdicts to keep it

13:36:29  6    in.  You see the problem with inconsistent verdicts.

13:36:33  7    Plaintiff, if you're the plaintiff or the defendant, but if

13:36:36  8    you're the defendant, the defendant might like inconsistent

13:36:42  9    verdicts, but if you're plaintiff and you obtain a

13:36:45 10    determination that there was a substantive violation of

13:36:48 11    trade secret, misappropriation, but then the jury decides

13:36:51 12    but there was no conspiracy to violate that, I don't think

13:36:55 13    you have helped yourself and I don't think it's helped

13:36:59 14    anybody and it's just confusing to the jury.

13:37:02 15              MR. DeFOSSE:  Yes, Your Honor, I see the concern

13:37:04 16    of the Court.  The only thing I would ask is I don't have it

13:37:08 17    at the tip of my fingers now, whether there are different

13:37:13 18    damages implications --

13:37:14 19              THE COURT:  That's the total issue, I agree with

13:37:16 20    you, that's the only remaining issue.  I agree with you

13:37:19 21    completely.  And but you don't -- nobody wants, hopefully, I

13:37:24 22    don't want inconsistent verdicts because I don't want to do

13:37:26 23    this again.  I don't think anybody wants to do this again.

13:37:29 24    We want finality in the case.  So you see the issue on that.

13:37:36 25    I think we're going to redo the verdict form, we're going to

Darveaux - direct

13:37:40  1   let everybody take a look at it.  And I hope that we're

13:37:43  2   getting a lot closer.  Of course we've had -- I think that's

13:37:47  3   what we need to do.

13:37:48  4                MR. DeFOSSE:  Thank you, Your Honor.

13:37:49  5                THE COURT:  I think we're -- I think that we

13:37:52  6   agree that we certainly don't want inconsistent verdicts.

13:37:56  7                MR. LEMIEUX:  Absolutely, Your Honor.

13:37:57  8                THE COURT:  Okay.  We'll take care of that.  Of

13:38:00  9   course we're already going to be dropping out anything

13:38:03 10   relating to Lanham Act.  The verdict form will be getting

13:38:08 11   shorter.  Good deal.  I think we're ready to bring the panel

13:38:11 12   in.

13:38:11 13                Ms. Smith, you all ready to go?

13:38:13 14                MS. SMITH:  I'm ready.

13:38:16 15                THE COURT:  I know sometimes you can't hear but

13:38:19 16   if you drop your voice I probably won't be able to hear you,

13:38:22 17   speak up just a little bit.

13:38:24 18                MS. SMITH:  I will Your Honor, I didn't realize

13:38:26 19   I was talking so softly.

13:38:28 20                THE COURT:  No problem, I didn't say anything

13:38:31 21   earlier, but it was kind of hard to hear.

13:38:34 22                MS. SMITH:  Okay.

13:38:38 23                THE COURT:  It's hard for me to hear.  Maybe

13:38:41 24   somebody else could.

13:38:57 25                (Jury entering the courtroom at 1:38 p.m.)

Darveaux - direct

13:39:04  1          THE COURT:  All right, everyone can be seated.

13:39:15  2    And counsel may proceed.

13:39:18  3    BY MS. SMITH:

13:39:21  4    Q.    So, Dr. Darveaux, when we last left off right before

13:39:24  5    lunch, we finished -- we finished trade secret Group 4.  Do

13:39:29  6    you remember that?

13:39:30  7    A.    Yes.

13:39:30  8    Q.    So we're going to now move on to trade secret Group

13:39:34  9    5.  May I have PDX 6.78, please?

13:39:40 10          All right.  Here is Dr. Shanfield's

13:39:47 11    demonstratives listing the documents he analyzed for Group

13:39:51 12    5.  Dr. Shanfield testified to these documents containing

13:39:55 13    alleged trade secrets.  Those documents are PTX 739, 785,

13:40:05 14    1089, and 114.  Did you review all four of these documents

13:40:11 15    in their entirety?

13:40:12 16    A.    I did.

13:40:13 17    Q.    May I have the next slide, please?

13:40:16 18          And for the record, those would be trial

13:40:26 19    Exhibits 32, 6, 7, and 34.

13:40:34 20          All right.  So let's move on to PDX 6.80.

13:40:47 21          Here is Dr. Shanfield's demonstrative regarding

13:40:53 22    alleged trade secrets 5.1 and 5.2.  Dr. Darveaux, have you

13:40:57 23    seen products and technology development procedures before?

13:41:00 24    A.    Yes.

13:41:01 25    Q.    Are they well-known?

Darveaux - direct

13:41:04  1   A.      Yes, they're well-known.

13:41:06  2   Q.      Have you ever heard of something called a stage gate

13:41:09  3   structure?

13:41:10  4   A.      Yes, I have.

13:41:11  5   Q.      Have you ever used one?

13:41:12  6   A.      Yes, I have.

13:41:14  7   Q.      Would it surprise you if two companies had similar

13:41:23  8   looking documents describing stage gate structures?

13:41:28  9   A.      Well, no.  I mean, so this concept or format has been

13:41:33  10  around for some time.  There was a review paper I found from

13:41:39  11  2000 which was reviewing people in the '90s.  And comparing

13:41:46  12  different ideas about it.  I, myself though was on a team at

13:41:50  13  Amkor that redrafted the procedures they already had in

13:41:53  14  place, so they had something in place and we kind of

13:41:57  15  redrafted it and undated it and that was around 1998,

13:42:00  16  roughly.

13:42:01  17          Motorola had something like this when I was

13:42:04  18  there, Skyworks had something when I was at Skyworks, so I

13:42:09  19  have direct knowledge of several cases and I found it in

13:42:23  20  this case.

13:42:29  21          MS. SMITH:  Your Honor, may I approach the

13:42:30  22  witness, please?

13:42:31  23          THE COURT:  You may.

13:42:39  24  BY MS. SMITH:

13:42:50  25  Q.      Dr. Darveaux, I just handed you DTX 592 and 593.  Do

Darveaux - direct

13:42:58  1   you recognize these two documents?

13:43:00  2   A.      I do.

13:43:01  3   Q.      Did you consider them in forming your opinions?

13:43:05  4   A.      I did.

13:43:09  5           MS. SMITH:  Your Honor, I move to have DTX 592

13:43:13  6   and DTX 593 admitted into evidence, please.

13:43:17  7           THE COURT:  Marked and received as the next

13:43:19  8   numbered exhibits, and I'll check on that.  349 and 350.

13:43:27  9           (Trial Exhibit Nos. 349 and 350 were admitted

13:43:30 10   into evidence.)

13:43:30 11   BY MS. SMITH:

13:43:36 12   Q.      Would you please pull up DTX 592 and 593, please.

13:43:50 13   Dr. Darveaux, what are these two documents?

13:43:52 14   A.      So the one on the left is the publication of the

13:43:58 15   documents, so it tells the author.  And the date it was

13:44:05 16   published in 2000, you can see the title "accelerating

13:44:09 17   product developments via phase gate processes", and it shows

13:44:13 18   where the paper was presented.  And the one on the right is

13:44:17 19   the actual paper itself.

13:44:18 20   Q.      Can you please turn to page 2 and take a look at the

13:44:22 21   figure on that page.  What does Figure 2 show?

13:44:27 22   A.      So, again, this is the basic idea, right?  You can

13:44:31 23   break a project into phases, and typical names would be

13:44:37 24   concept, development, production, et cetera.  But then in

13:44:41 25   between each phase if you want to get from one phase to the

Darveaux - direct

13:44:44  1    next phase, there is a gate, there is a meeting that has to

13:44:48  2    review all the data you gathered in this phase and say okay,

13:44:51  3    you're still on track, then move on to the next phase.  This

13:44:55  4    is the basic idea.  And many, most companies I would say

13:45:00  5    have something like this in their method of developing

13:45:04  6    products.

13:45:05  7    Q.    So is this particular design that we see on the

13:45:13  8    screen here, Exhibit 1 from -- on the page, is that

13:45:19  9    particular to a product or a set of products?

13:45:22 10    A.    So, no.  I mean, many industries, in fact, if you

13:45:28 11    look at the review paper, they call out lots of different

13:45:31 12    people that have published this.  But if you read the data

13:45:35 13    actually in the phase gate review, it can apply to many

13:45:39 14    things.

13:45:39 15          If you look at the documents we're going to look

13:45:42 16    at, you can't actually tell what they're developing, it's

13:45:45 17    just kind of a template to show here are the things you

13:45:48 18    should consider and in the real project there is going to be

13:45:51 19    data behind all those and files that you're capturing in the

13:45:55 20    actual project.

13:45:57 21    Q.    May I have PDX 6.80.

13:46:04 22          So here is Dr. Shanfield's demonstrative about

13:46:10 23    trade secrets 5.1 and 5.2 again, which you just testified

13:46:15 24    about, Dr. Darveaux.  Now, in Dr. Shanfield's demonstrative,

13:46:20 25    you can see that he called out something called stage

2113

Darveaux - direct

13:46:25  1  objectives, and you can see there it has little black

13:46:30  2  diamonds along in a horizontal line.  Is this a stage gate

13:46:42  3  process that Dan had discussed?

13:46:48  4  A.    This is an example of a stage gate process similar to

13:46:52  5  what was shown in that review article.

13:46:55  6  Q.    So, for example, under PD 7 ramp down stage on the

13:47:00  7  right, is notifying customers something that is generally

13:47:06  8  done by companies?

13:47:08  9  A.    Absolutely, so, for example, we call it end of life

13:47:14 10  builds and things like that.  If you're building and

13:47:16 11  manufacturing something for a customer, you're planning on

13:47:18 12  ramping it down, you have to notify them, you have to say

13:47:23 13  hey, this is your last chance by January of next year we're

13:47:27 14  going to stop the production, so they get to put in their

13:47:30 15  last order, that's the idea so they can decide how many they

13:47:33 16  want to build to have enough stock to go on or to get a

13:47:37 17  different supplier if that's the idea.  So customer

13:47:41 18  notification is important.

13:47:42 19  Q.    So let's go back to the demonstrative itself.  On the

13:47:47 20  demonstrative, you can see highlighted Qorvo, Inc. for Qorvo

13:47:53 21  internal use only, Qorvo confidential and proprietary

13:47:56 22  information, and then there is the legend on the bottom.

13:48:00 23  This is a confidential document.  Is there anything that is

13:48:05 24  trade secret in the documents you have seen?

13:48:09 25  A.    I did not see anything trade secret in these

Darveaux - direct

13:48:12 1    documents.

13:48:12 2    Q.      What about confidential, is this information

13:48:15 3    confidential?

13:48:17 4    A.      Well, the document is stamped confidential, but as

13:48:20 5    far as it being known and widely known, it's widely known.

13:48:26 6    I guess it depends on the definition of confidential in that

13:48:30 7    sense.  So things that are widely known, I guess they're not

13:48:34 8    capable of being confidential, I think that's a legal, I

13:48:37 9    guess, I think that's a legal definition related to that.

13:48:40 10   Q.      Did Akoustis achieve a head-start by having this

13:48:43 11   information?

13:48:44 12   A.      No.

13:48:44 13   Q.      Did Akoustis use this information?

13:48:48 14   A.      Not that I am aware of.  I didn't see any evidence of

13:48:51 15   use.

13:48:52 16   Q.      Okay.  Let's move on to PDX 6.81.

13:48:59 17           So here is Dr. Shanfield's demonstrative

13:49:05 18   regarding alleged trade secrets 5.3 through 5.5.

13:49:11 19   Dr. Darveaux, what is a product requirements document?

13:49:15 20   A.      So I don't know if that's a standard term in the

13:49:19 21   industry or not, but certainly that's the term that Qorvo

13:49:22 22   was using.  It's basically a spreadsheet that captures on

13:49:25 23   different sheets within the spreadsheet different aspects of

13:49:28 24   a project and what the requirements are.  And it's used to

13:49:31 25   communicate between groups in the company.  So most

Darveaux - direct

13:49:36  1    companies have that sort of thing, whether or not they call

13:49:38  2    it a PRD is not really relevant, I don't think.  But you

13:49:43  3    have to communicate between say the factory and the business

13:49:46  4    team or the sales and the business team or R & D and product

13:49:50  5    management, there is different communication that has to

13:49:54  6    happen.  So spreadsheets are a convenient way to do that.

13:49:59  7    Q.      Have you ever used, seen, or drafted one?

13:50:01  8    A.      Sure.

13:50:02  9    Q.      Is the use of a PRD to track and document product

13:50:06 10    development process trade secrets?

13:50:09 11    A.      No.  Using these type of things is a common method.

13:50:14 12    You can use an Excel spreadsheet or you can have third-party

13:50:18 13    software, there are things you can buy to do it, it's

13:50:21 14    commonly used.

13:50:22 15    Q.      May I have PTX 111, please, and that's Trial

13:50:28 16    Exhibit 33.

13:50:31 17            Do we have the native?  Can you click on the

13:50:52 18    overview tab and then scroll all the way to the top.  Okay.

13:50:59 19            What product is this particular PRD for,

13:51:04 20    Dr. Darveaux?

13:51:04 21    A.      So this is for QPF7250, so that's a Qorvo product,

13:51:10 22    and it's a front-end module.  A front-end module would have

13:51:15 23    a power amplifier, one or more, and switches and then maybe

13:51:19 24    some passive devices maybe like capacitors and maybe some

13:51:24 25    filters, depends on the design of the module, that's a

Darveaux - direct

13:51:28  1    front-end module that would go into a mobile product like a

13:51:32  2    cell phone.

13:51:32  3    Q.    Is this document something that's useful to Akoustis?

13:51:35  4    A.    No.

13:51:35  5    Q.    Why not?

13:51:36  6    A.    Well, so first of all, like I said, the format and

13:51:39  7    the idea of the document are commonly used.  The actual

13:51:43  8    specifications in the document are not for products they

13:51:47  9    make.  And even if there is a filter in that product shown

13:51:50 10    here, that is still not for Akoustis to get the data from

13:51:55 11    this document.  They want to get that specification data

13:51:58 12    from the customer so it's not useful to them in that sense.

13:52:02 13    Q.    May I have PTX 114 in native, please?  And can you

13:52:13 14    scroll all the way up?

13:52:14 15           So what kind of product is this PRD for,

13:52:19 16    Dr. Darveaux?

13:52:19 17    A.    So this is a QPF4551, it's also another front-end

13:52:27 18    module, pretty much.

13:52:27 19    Q.    Same issue?

13:52:28 20    A.    Everything I just said would apply to this one as

13:52:31 21    well.

13:52:34 22    Q.    Okay.  All right.

13:52:36 23    A.    One more point I just noticed like the cost target, I

13:52:40 24    think that was brought up earlier in the trial.  The cost

13:52:43 25    target for a front-end module is going to be much higher

Darveaux - direct

13:52:46  1    than just for a little filter that goes inside of it, so

13:52:50  2    that data is not useful to Akoustis.

13:52:52  3    Q.      May I have PDX 6.81 again, please?

13:52:58  4            All right.  So to sum up, do you agree with

13:53:03  5    Dr. Shanfield that these documents contain trade secrets?

13:53:06  6    A.      No.

13:53:07  7    Q.      Did Akoustis achieve a head-start by having this

13:53:10  8    information?

13:53:10  9    A.      They did not.

13:53:12 10    Q.      Did Akoustis use these documents?

13:53:14 11    A.      I saw no evidence of use.

13:53:18 12    Q.      All right.  May I have PDX 6.82, please?

13:53:28 13            So now we're on to characterization test plan

13:53:32 14    and here is Dr. Shanfield's demonstrative about alleged

13:53:37 15    trade secrets 5.5.  And he used three documents in his

13:53:43 16    analysis.  Let's zoom in on the one on the left.  And that

13:53:46 17    one is PTX 1089, Trial Exhibit 7.

13:53:51 18            What type of product is this test plan for,

13:53:55 19    Dr. Darveaux?

13:53:55 20    A.      It's some sort of integrated circuit.  I'm not

13:53:59 21    exactly sure what the function of it is, but you can see,

13:54:03 22    you know, it has voltage and current inputs and things that

13:54:09 23    -- I don't know what it does, it's some sort of integrated

13:54:12 24    circuit, it's not a BAW filter for sure.

13:54:14 25    Q.      Is this document useful to Akoustis?

Darveaux - direct

13:54:18  1    A.      No.

13:54:20  2    Q.      Because why?

13:54:21  3    A.      Well, again, you got the format of the document is

13:54:25  4    very common, standardized practically.  The data in the

13:54:30  5    document is for a product they don't make.

13:54:34  6    Q.      Okay.  So let's go back to the demonstrative

13:54:37  7    underneath and let's zoom in on the spreadsheets on the

13:54:41  8    right.  Those are PTX 88 and 89, which are Trial Exhibits 35

13:54:47  9    and 61.  Can you tell, Dr. Darveaux, what products these are

13:54:51 10    for?

13:54:52 11    A.      So the one furthest to the right is a spreadsheet for

13:54:58 12    RFSW, so that's a switch, which is again the product that

13:55:03 13    Akoustis does not make.  The one far to the left is SW8009.

13:55:11 14    Again, that's another switch type product.  And I don't know

13:55:14 15    if that center spreadsheet, it might be a second page of one

13:55:19 16    of them.  I can't tell from this.

13:55:22 17    Q.      So the fact that they are switches, does that tell

13:55:25 18    you whether these spreadsheets would be useful to Akoustis?

13:55:30 19    A.      Yeah, they're not useful.  It tells me that they're

13:55:34 20    not useful because it's not a product they make.  The format

13:55:37 21    is not unique, or it's well-known.  The data in there is not

13:55:43 22    useful.  If they wanted specifications on filters, they go

13:55:45 23    to their customers for that.

13:55:47 24    Q.      How much time to market head-start did Akoustis

13:55:50 25    achieve by having these documents?

Darveaux - direct

13:55:52  1    A.      No head-start.

13:55:55  2    Q.      All right.  So those are all of the Group 5 trade

13:56:02  3    secrets, alleged trade secrets and documents.  Switching

13:56:07  4    gears, did you do an avoided cost analysis for Group 5 where

13:56:16  5    you assumed that the documents did include trade secrets?

13:56:19  6    A.      I did.

13:56:20  7    Q.      Okay.  So may I have DDX 3.60, please.

13:56:26  8            Are these the charts that you used to do your

13:56:30  9    analysis?

13:56:35 10    A.      Yes.  There is five different charts because there

13:56:41 11    was five different documents or types of documents.  And I

13:56:45 12    did the same type of analysis I showed before where I

13:56:50 13    compared it if there was anything in Akoustis that even

13:56:53 14    reassembled it and anything you can find outside online or

13:56:58 15    through some other way, and I did the same type of analysis

13:57:01 16    to estimate the engineering hours saved potentially by

13:57:06 17    Akoustis by having access to the Qorvo documents and then

13:57:10 18    was there any document cost.

13:57:12 19    Q.      May I have DDX 3.61, please.

13:57:18 20            Okay.  So to confirm that the data entry on this

13:57:30 21    slide is correct, there are X's for trade secret and

13:57:35 22    head-start and the document cost and engineering costs are

13:57:39 23    entered here?

13:57:39 24    A.      So for Group 5, we're talking about here product

13:57:43 25    development process and testing procedures, I found no trade

Darveaux - direct

13:57:47  1    secrets.  I found no head-start was achieved.  There was no

13:57:53  2    document costs when I tried to search for that kind of

13:57:57  3    information, you know, as far as whatever I found, they were

13:58:01  4    pretty standard, the things, and I estimated sixty-four

13:58:05  5    engineering hours could have been saved if Akoustis had used

13:58:08  6    those documents.

13:58:09  7    Q.      Okay.  Now, in the row for Group 4, I notice that

13:58:15  8    there was a zero and a two, but we had not gone over your

13:58:19  9    analysis for Group 4 yet, so I would like to go back and do

13:58:23 10    that.

13:58:24 11    A.      Okay.

13:58:25 12    Q.      I think I was too excited to go to lunch, so sorry

13:58:29 13    about that.

13:58:29 14            Can we have DDX 3.53, please -- I'm sorry, 3.52.

13:58:38 15            Is this the analysis you did for Group 4's

13:58:42 16    avoided costs?

13:58:43 17    A.      Yeah.  This was again the connector as you guys

13:58:47 18    recall, and basically the engineering task is called the

13:58:52 19    supplier and ask for the equivalent design or that exact

13:58:56 20    design, two hours.

13:58:57 21    Q.      And when you did this analysis, did you assume that

13:59:00 22    there was trade secret?

13:59:03 23    A.      Yeah, all these analyses have to assume that, that's

13:59:07 24    the point of that type of analysis.

13:59:10 25    Q.      Let's go into Group 6.  May I have PDX 6.993 --

Darveaux - direct

13:59:18 1    **6.100.**

13:59:23 2           **All right.  So here is Dr. Shanfield's list of**

13:59:26 3    **alleged trade secrets in Group 6.  Did you consider each of**

13:59:29 4    **these alleged trade secrets?**

13:59:31 5    **A.     I did.**

13:59:32 6    **Q.     May I have PDX 6.101, please.**

13:59:39 7           **May I have six point -- oh, I'm sorry, no, this**

13:59:46 8    **is the one I want.**

13:59:47 9           **Here is Dr. Shanfield's demonstrative listing**

13:59:50 10    **the single document he analyzed for Group 6.  Dr. Shanfield**

13:59:54 11    **testified that particular pages in PTX 99, which is Trial**

14:00:00 12    **Exhibit 14, contained the alleged trade secrets in Group 6.**

14:00:03 13           **Did you review Trial Exhibit 14, Dr. Darveaux?**

14:00:07 14    **A.     I did.**

14:00:08 15    **Q.     In its entirety?**

14:00:09 16    **A.     In its entirety.**

14:00:11 17    **Q.     Okay.  Did you see any trade secrets in Trial**

14:00:15 18    **Exhibit 14?**

14:00:15 19    **A.     No.**

14:00:16 20    **Q.     So let's go to DDX 3.63.  All right.  Dr. Darveaux,**

14:00:27 21    **what's shown on this page?**

14:00:28 22    **A.     Okay.  So this set of alleged trade secrets coming**

14:00:34 23    **from this document are about reliability testing,**

14:00:37 24    **essentially.**

14:00:38 25           **And this is one of the most standardized areas**

Darveaux - direct

14:00:42  1    in our whole industry.  So I pulled several of the standards

14:00:46  2    here, these are free to anybody.  They have been in use a

14:00:50  3    long time.  But you can kind of see the list.  There are

14:00:53  4    standards on, you know, mathematical models, how to do

14:00:58  5    temperature cycling, how to do power cycling, how to do high

14:01:01  6    temperature operation life, which is kind of what this

14:01:05  7    specific test we're going to talk about is that's in that

14:01:08  8    category, it talks about power amplifier modules, how to

14:01:12  9    calculate failures in terms of fit, that's one of the terms

14:01:16 10    used in this document.  There are many, many standards that

14:01:19 11    are in place, and this is a common requirement for anybody

14:01:24 12    supplying in the industry to be able to do these types of

14:01:27 13    tests.

14:01:27 14         Depending on your product type, the equipment

14:01:30 15    that runs the device might be a little different, but

14:01:33 16    chambers and methodologies and failure models and

14:01:37 17    calculating energy activation, all of those things are very

14:01:41 18    standardized and well-known in the industry.

14:01:43 19         MS. SMITH:  Your Honor, may I approach the

14:01:46 20    witness?

14:01:47 21         THE COURT:  You may.

14:02:02 22    BY MS. SMITH:

14:02:09 23    Q.    Dr. Darveaux, I just handed you two documents, one of

14:02:13 24    which is DTX 961.  Do you have that in front of you?

14:02:18 25    A.    Yes.

Darveaux - direct

14:02:19  1    Q.      So earlier we talked about an Amkor copper buff web

14:02:27  2    page that you had found on the internet and downloaded

14:02:30  3    through Wayback Machine.  Do you remember that?

14:02:32  4    A.      Yes.

14:02:33  5    Q.      Is DTX 961 the document?

14:02:37  6    A.      Yeah, this is an affidavit again from the same guy,

14:02:42  7    that Nathaniel Frank Wright, of The Internet Archive, that's

14:02:47  8    what it is.

14:02:52  9            MS. SMITH:  Your Honor, I move to enter DTX 961

14:02:56 10    into evidence.

14:02:57 11            THE COURT:  Marked and received as 351.

14:03:00 12            (Trial Exhibit No. 351 was admitted into

14:03:01 13    evidence.)

14:03:01 14    BY MS. SMITH:

14:03:10 15    Q.      Dr. Darveaux, I also handed to you DTX 614.  Do you

14:03:15 16    have that in front of you?

14:03:16 17    A.      I do.

14:03:17 18    Q.      What is that document?

14:03:18 19    A.      So this is an example of one of the JEDEC standards,

14:03:23 20    this one talks about methods of calculating failure rates

14:03:26 21    and use of FIT.

14:03:27 22    Q.      Did you use this when you were forming your opinions?

14:03:33 23    A.      Yes.

14:03:36 24            MS. SMITH:  Your Honor, I move to enter DTX 614

14:03:40 25    into evidence.

Darveaux - direct

14:03:41  1          THE COURT:  Marked and received as 352.

14:03:47  2          (Trial Exhibit No. 352 was admitted into

14:03:49  3  evidence.)

14:03:49  4  BY MS. SMITH:

14:03:54  5  Q.      All right.  May I see DTX 614, please.

14:03:57  6          Dr. Darveaux, what is a failure rate?

14:04:05  7  A.      That's the rate of failure typically they're talking

14:04:09  8  about in the field, so if you ship a product into the field,

14:04:13  9  sometimes they fail, so this talks about the rate at which

14:04:16 10  they're failing, how many per day, or how many per hour,

14:04:20 11  things like that.

14:04:22 12  Q.      May I see PTX 0099, please, Trial Exhibit 14?

14:04:28 13          So Dr. Darveaux, this is the loan document that

14:04:35 14  Dr. Shanfield relies on for a trade secret Group 6.  Would

14:04:42 15  you please turn to page 3.

14:04:46 16          Have you seen this page before?

14:04:52 17  A.      I have.

14:04:53 18  Q.      What is the significance of this information being on

14:04:58 19  page 3 of the document?

14:04:59 20  A.      Well, so what they're saying is at that time, the

14:05:04 21  2015 time frame when this document was formed, TriQuint had

14:05:09 22  been using two different models to predict the life of

14:05:15 23  filters, either SAW or BAW devices, same methodology applies

14:05:20 24  to both.  The model one was based on a paper that was

14:05:23 25  published in 1998 by a man named Satoh, and others, and

Darveaux - direct

14:05:32  1    model 2 was more like a standard semiconductor model that

14:05:37  2    you'll find like for example in one of these standards that

14:05:40  3    I mentioned, I can show you that.  So model 2 depends on a

14:05:49  4    Arrhenius equation, that's a very common equation in

14:05:53  5    engineering.  It describes how things change with

14:05:56  6    temperature.  I don't know if you have heard that term, but

14:06:02  7    we use it a lot.

14:06:08  8    Q.    May I have PTX 101?  May I have PTX 102?

14:06:15  9           Here is Dr. Shanfield's slide regarding alleged

14:06:19 10    trade secret 6.1, and it looks like he analyzed pages 6 and

14:06:25 11    24 from the testing presentation we have been talking about,

14:06:30 12    PTX 0099.

14:06:34 13           Does this page contain information helpful to

14:06:36 14    know how to set up Qorvo's testing systems and processes?

14:06:42 15    A.    Well, the one on the left is a schematic of some test

14:06:50 16    lab in Qorvo, that was your question, is it related to

14:06:54 17    Qorvo?  Yes.

14:06:55 18    Q.    Well, is there enough detail to be helpful to an

14:06:59 19    engineer to set up such a testing system?

14:07:02 20    A.    If it's not in Qorvo?

14:07:05 21    Q.    Not in Qorvo?

14:07:06 22    A.    No, that's not what your question was.  If you're not

14:07:09 23    in Qorvo, it's just a schematic of something that exists in

14:07:13 24    Qorvo.  It's, again, very little detail, and none of this is

14:07:18 25    secret information in terms of the industry, it's

Darveaux - direct

14:07:21  1  well-known, how to create a schematic ███████████

14:07:26  2  ███████████████████████ that's kind of what this is

14:07:30  3  describing.

14:07:30  4  Q.    Can I have DDX 3.64, please?

14:07:37  5        Dr. Darveaux, did you create this slide?

14:07:45  6  A.    Yes.

14:07:46  7  Q.    Where did the information on the right come from?

14:07:51  8  A.    So the information on the right was pulled out of one

14:07:55  9  of the JEDEC specs, I don't recall which one it was off the

14:08:00 10  top of my head.  But this shows what's called the Eyring

14:08:04 11  model, so time to failure, TTF is a function of the

14:08:10 12  parameters on the right.

14:08:13 13        So you see that EXP, exponential of EAA, that's

14:08:20 14  the activation energy, EAA, one over KTE, K is volts

14:08:27 15  constant, T is absolute temperature, so that gives the

14:08:31 16  temperature effect.  So if you do a test at higher

14:08:34 17  temperature, usually things fail faster, that's basically

14:08:38 18  what this is.

14:08:39 19        If you know that constant EAA, that gives you an

14:08:43 20  equation that you can calculate how fast, how much quicker

14:08:47 21  they fail by testing at a higher temperature.

14:08:50 22        The front of this, a lot of times all you do is

14:08:53 23  vary temperature and all you need is that part of the

14:08:55 24  equation.  Sometimes you may vary things like the stress

14:09:00 25  either by in the case of, you know, the current density, or

14:09:08  1    power level, so that would be another factor that might also

14:09:12  2    affect the failure rate.  And a lot of times we use a power

14:09:16  3    off for that one.  So this is just a basic kind of equation

14:09:21  4    that's used in the industry.

14:09:24  5    Q.    So let's go back to the underlying slide.

14:09:28  6          Shown on the left there is page 24 in Qorvo's

14:09:35  7    document.

14:09:36  8          Are you telling me that the Arrhenius equation

14:09:41  9    is somehow in this slide?

14:09:42 10    A.    Yeah.  So if you look at the top, the inputs are

14:09:47 11    ██████████████████████████████████████████ that would be

14:09:51 12    like the test condition ███████████████████████

14:09:57 13    ████████████████████████████ that would be the field

14:10:01 14    condition you're trying to estimate.  If I get test results

14:10:04 15    ██████████████████████████████████████████████.

14:10:08 16          That ███████████████████████ that activation

14:10:11 17    energy, you have to measure experimentally on your product.

14:10:14 18    When you change your product, that number will change, you

14:10:17 19    have to re-get that constant each time.

14:10:19 20          So based on those things and the equation that's

14:10:23 21    shown under formula, that's basically that your Arrhenius

14:10:27 22    equation, █████████████████████████████████████████████

14:10:32 23    █████████████████████████████████████████████████

14:10:35 24    ████████████████████████████████    That's what that's

14:10:39 25    about.

Darveaux - direct

14:10:40  1    Q.      Okay.  So other than the well-known Arrhenius

14:10:45  2    equation, what other inputs go into this spreadsheet?

14:10:49  3    A.      Again, the next grouping is talking █████████████

14:10:52  4    ████████████████████████████████████████████████████████

14:10:56  5    ███████████████████    depends on what you're talking about.

14:10:59  6    But so if you run the test ██████████████████████████

14:11:03  7    ████████████████████████████████████████████████

14:11:06  8    ████████████████████████████████████████████████████████

14:11:11  9    ██████████████████████████████████████████████

14:11:14 10    ████████████

14:11:15 11            So in this case, ████████████████████████████████

14:11:19 12    ████ didn't get the units, but I'm pretty sure that's what

14:11:23 13    they mean, and ████████████████████████  so when they're using

14:11:28 14    the filter, you're running that much power through it, and

14:11:32 15    the power factor, ████████████████████████████████████

14:11:36 16    ████████████████████████████████████████████████████

14:11:42 17    ████████████████████████████████████████████████████

14:11:46 18    █████████████████████████████████████████

14:11:48 19    ████████████████████████████████████████████████

14:11:55 20    ████████████████████████████████████████████

14:12:00 21    ████████████████████████████████████████████████

14:12:04 22    ████████████████████████████████████████████████████

14:12:09 23    ████████████████████████

14:12:11 24    Q.      Where would all those other inputs come from?

14:12:14 25    A.      So the things like ██████████████████████  or the

Darveaux - direct

14:12:17  1  ███████████████████ the customer tells you that.  I'm

14:12:20  2  going to run your filter at certain power level through it,

14:12:23  3  here is the ambient in my system, so those inputs come from

14:12:26  4  the customer.

14:12:27  5           Some of the data, some of the inputs are

14:12:30  6  measured on your product, █████████████████████████████

14:12:33  7  ████████████ you have to do testing to get those inputs.

14:12:38  8  Q.      So is there any trade secret in this document?

14:12:41  9  A.      No, this is a spreadsheet calculator which has inputs

14:12:45 10  that are coming from different places.  It's a tool used by

14:12:49 11  engineers in this area to calculate life, essentially.

14:12:55 12  Q.      Can I go back to PDX 102, please.  6.102, I think it

14:13:02 13  is.

14:13:05 14           So we're back to Dr. Shanfield's demonstrative.

14:13:13 15  Did Akoustis achieve any head-start by having these

14:13:17 16  documents?

14:13:18 17  A.      No.

14:13:19 18  Q.      Did Akoustis use these documents?

14:13:22 19  A.      Not to my knowledge.

14:13:24 20  Q.      Okay.  So let's move on to PDX 6.103, please.  All

14:13:32 21  right.  So this is Dr. Shanfield's demonstrative for alleged

14:13:37 22  trade secret 6.2.  This is the same page 6 on the left that

14:13:42 23  we have been talking about.  But on the right, we have a

14:13:47 24  photo, which is page 7.  Does page 7 contain any trade

14:13:57 25  secrets?

Darveaux - direct

14:13:57  1    A.      No.  This is a picture of the laboratory that does

14:14:01  2    the reliability testing.  So in the industry, you would call

14:14:05  3    that a high temperature operation life, any semiconductor

14:14:10  4    company or filter company, any kind of company that's making

14:14:14  5    components for the industry has to do these types of tests.

14:14:18  6    So the specifics of how they set up, you know, the

14:14:21  7    equipment, how many units they want to test simultaneously,

14:14:27  8    which supplier they pick for the oven, which suppliers they

14:14:30  9    pick for the electronics, how they exercise the electronics,

14:14:34 10    that's up to the engineering choice and your budget

14:14:37 11    essentially of the guy setting up the lab, but everybody has

14:14:41 12    this type of lab.  This is just a picture of it.  There is

14:14:44 13    no detail here of that whole equipment list or anything like

14:14:47 14    that.  If I was going to set up my own lab, I can't use this

14:14:51 15    to get there.

14:14:52 16    Q.      So did having this information give Akoustis any

14:14:58 17    head-start?

14:14:58 18    A.      No.

14:15:00 19    Q.      Did Akoustis use this information?

14:15:01 20    A.      Not to my knowledge.

14:15:04 21    Q.      All right.  Let's move forward to PDX 6.104, please.

14:15:10 22            So here is Dr. Shanfield's demonstrative that

14:15:14 23    identifies slide 15 in PTX 99, which is Trial Exhibit 14, as

14:15:21 24    containing trade secrets.  Does this slide contain any trade

14:15:25 25    secrets?

Darveaux - direct

14:15:25  1    A.      No.

14:15:27  2    Q.      Why do you say that?

14:15:30  3    A.      Well, I mean, the three trade secrets that are

14:15:34  4    alleged are shown on the right, for example.  Models for

14:15:38  5    self heating, this is not a model for self heating.  It

14:15:42  6    mentions self heating in the words.  Self heating is when

14:15:47  7    you run power through the device or a device is powered it

14:15:51  8    heats up, that's what that means, it's heating up itself,

14:15:55  9    that's common to really any electronics.

14:15:57 10           So then the next two things are starting to talk

14:16:01 11    a little bit more about this figure and the picture.  A

14:16:05 12    process where they measured temperature and indirectly

14:16:08 13    determine the temperature by the shift in frequency of the

14:16:11 14    filter.  So this is a known characteristic of SAW filters

14:16:15 15    and BAW filters, it's often times specified.  And it's what

14:16:21 16    I talked about before, if the customer says I need it to

14:16:24 17    work between these two temperature ranges, you got to

14:16:28 18    understand that your filter is going to shift some from hot

14:16:31 19    to cold or cold to hot, you got to make sure you design it

14:16:34 20    so it stays in it, that's called a temperature coefficient

14:16:38 21    of frequency that's used.  That's a term to describe the

14:16:41 22    amount of shift.  That's a known thing.

14:16:44 23           You can use an oven to change temperature

14:16:46 24    without changing the power and you'll see a frequency shift

14:16:49 25    and you basically measured that thing, right, you know how

Darveaux - direct

14:16:52  1    much you changed the temperature in the oven and you have

14:16:55  2    seen how much the frequency shifts, that's a way someone

14:16:58  3    would measure.  This is a known thing.

14:16:59  4            In the specific test configuration shown here,

14:17:04  5    this, again, this is commonly known and it even matches

14:17:08  6    quite well to the document that was called out earlier in

14:17:11  7    this document, the Satoh paper.

14:17:15  8    Q.    I think we have that.

14:17:16  9    A.    But again, it's up to the engineer to settle that up.

14:17:19 10    Q.    Can I have DDX 3.68, please.

14:17:23 11            Is this the one you're talking about?

14:17:29 12    A.    Yeah.  So we compared that, we, I should say I,

14:17:34 13    compared that document, you see the figure here and the

14:17:39 14    Satoh figure, I believe it was nine on the left, and then

14:17:45 15    you know, we just highlighted what were the ones that were

14:17:48 16    common in this set up versus the one on the right.  It's

14:17:52 17    kind of configured different on the drawing, but essentially

14:17:56 18    those elements are there, and if they're not there, they're

14:18:00 19    close enough to be in there, that's the idea.  You can go on

14:18:03 20    the outside and get this done.

14:18:05 21            One thing I done, I took the Satoh paper, sent

14:18:08 22    it to an outside lab, can you perform this testing, do you

14:18:12 23    have that equipment, and immediately they said they could,

14:18:14 24    they wanted to get a quote going, I didn't want to do that,

14:18:18 25    I just wanted to know that you could get it done to the

Darveaux - direct

14:18:20  1    outside, which I knew.

14:18:21  2    Q.    Let's go back to PDX 6.103.

14:18:35  3          Dr. Darveaux, does this slide contain any

14:18:38  4    information that is a trade secret?

14:18:39  5    A.    No.

14:18:40  6    Q.    Did having this information give Akoustis any

14:18:44  7    head-start?

14:18:45  8    A.    It did not.

14:18:46  9    Q.    Did Akoustis use this information?

14:18:49 10    A.    I'm not aware of any evidence that they used it.  You

14:18:53 11    know, they had been doing this kind of testing already, you

14:18:56 12    know, there is e-mails that I think I referenced in my

14:19:01 13    report where they had done some -- already had done some

14:19:04 14    power testing, they were doing this, they had already been

14:19:08 15    entering types of data, when they got this document, they

14:19:11 16    were already on their way to doing this, it's all pretty

14:19:14 17    standard stuff in our industry as well.

14:19:17 18    Q.    All right.  Let's move on to the trade secrets -- the

14:19:22 19    last one, PDX 6.105.

14:19:28 20          Here is Dr. Shanfield's demonstrative that

14:19:31 21    identifies slide 23 of PTX 99, which is Trial Exhibit 14 as

14:19:38 22    containing trade secrets.  Does this slide contain any trade

14:19:41 23    secrets?

14:19:41 24    A.    No.  Further, the alleged trade secret doesn't

14:19:48 25    describe the slide or vice versa, they don't go together, I

Darveaux - direct

14:19:53  1    don't know if they mixed that up here.  But the trade secret

14:19:55  2    that's alleged here is the method of determining a filter

14:20:00  3    temperature by measuring the shift in frequency that we have

14:20:03  4    been talking about right.

14:20:04  5              What's shown on the left is the method of

14:20:05  6    determining the activation energy of your parts when they

14:20:08  7    fail, so you run three different temperature tests and you

14:20:12  8    record the failures and then you plot time to failure versus

14:20:17  9    the temperature, you do 1 over KT because that's the

14:20:23 10    Arrhenius equation I'm looking for.  You curve it through

14:20:26 11    that and get the activation energy, that's what's shown in

14:20:29 12    the chart, not what's described in the alleged trade secret.

14:20:33 13              Secondly, this kind of stuff was talked about

14:20:35 14    yesterday where I believe the opposing counsel called out 1

14:20:38 15    over T as the power.  That's not the power.  That's one

14:20:41 16    divided by the absolute temperature.

14:20:44 17              In this particular type of test, you do not vary

14:20:48 18    the power, you want to vary just temperature that's how you

14:20:52 19    can cleanly pull out the activation energy.

14:20:55 20    Q.    Does slide 15 contain any information that is a trade

14:20:59 21    secret?

14:20:59 22    A.    No.

14:20:59 23    Q.    And did having this information give Akoustis any

14:21:03 24    head-start?

14:21:04 25    A.    It did not.

Darveaux - direct

14:21:06 1    Q.      Are you aware of Akoustis making use of this

14:21:09 2    information?

14:21:09 3    A.      I am not aware of that.  They already had this

14:21:12 4    capability to -- as far as the slide goes, they already had

14:21:17 5    this capability and knowledge to calculate activation

14:21:20 6    energy.  As far as the text goes, they already were aware of

14:21:24 7    that, that is obvious to anybody that's in the filter

14:21:28 8    business.  And those two things don't go together obviously

14:21:33 9    as I said.

14:21:34 10   Q.      So you've talked about how Group 6, they're not trade

14:21:40 11   secrets and Akoustis did not achieve any head-start with

14:21:44 12   them.

14:21:45 13           Did you do an analysis where you assumed that

14:21:47 14   these were trade secrets and then figured out the avoided

14:21:51 15   costs?

14:21:51 16   A.      Yeah, so for the purpose of avoided costs, you have

14:21:55 17   to assume they are and then try to estimate what was the

14:21:58 18   value, what was the value of having that document.

14:22:00 19   Q.      So may I have DDX 3.71, please.

14:22:04 20           This looks like it's a little bit different, but

14:22:14 21   is this your chart?

14:22:15 22   A.      Yeah.

14:22:16 23   Q.      Okay.  What did your analysis determine?

14:22:19 24   A.      Okay.  So again the format is you got the Qorvo

14:22:24 25   document at the top, if I found any Akoustis documents that

Darveaux - direct

14:22:28 1  were similar, I called them out.  If there were any pages

14:22:31 2  similar, I gave two hours of engineering credit.  You know,

14:22:35 3  they saw that page, it saved them -- they had to generate

14:22:40 4  that page in your own document that was two hours.

14:22:42 5          Then I looked at all the relevant public

14:22:44 6  documents, that's the big list below.  I downloaded those,

14:22:48 7  it takes about two hours to search, download, read

14:22:52 8  something, understand what it says to make use of it.  So in

14:22:56 9  this case, I gave them credit for sixteen engineering hours

14:23:00 10 and $66.

14:23:03 11 Q.     May I have DDX 3.72, please.

14:23:08 12         All right.  So this scorecard table has a

14:23:16 13 counter for that.  Do you see that?

14:23:18 14 A.     Yeah.  So no trade secret, no head-start, the avoided

14:23:23 15 costs, or saved costs, as it says in this slide were $66 and

14:23:29 16 sixteen engineering hours.

14:23:31 17 Q.     May I have PDX 6.114, please.

14:23:37 18         So here is Dr. Shanfield's list of alleged trade

14:23:43 19 secrets in Group 7.  Did you consider each of these alleged

14:23:46 20 trade secrets?

14:23:47 21 A.     I did.

14:23:51 22 Q.     PDX 6.115, please.

14:23:58 23         So in this demonstrative, Dr. Shanfield listed

14:24:00 24 the documents that he analyzed for Group 7.  He testified

14:24:05 25 that particular pages in Trial Exhibits 36 to 41 contained

Darveaux - direct

14:24:10  1    the alleged trade secrets in Group 7.  And for the record,

14:24:14  2    those are -- the documents are PTX 253, 751, 249, 251, 223

14:24:24  3    and 225.

14:24:25  4              Did you review all six of these documents in

14:24:28  5    their entirety, Dr. Darveaux?

14:24:29  6    A.      I did.

14:24:30  7    Q.      Can you give a snappy description of these four types

14:24:38  8    of documents in Group 7?

14:24:40  9    A.      Sure.  So the first one, the packaging qualification

14:24:44 10    documents is if I recall, is just a list of different

14:24:48 11    parameters that -- if you want to pull that one up, I can

14:24:55 12    talk to it.  But I think that was the one that didn't have

14:24:58 13    any information in it in terms of data, it had a bunch of

14:25:02 14    things that they wanted their subcontractor to fill in when

14:25:05 15    they're building a qualification lot.

14:25:08 16    Q.      Let's pull up PTX 253.  Let's scroll through to the

14:25:16 17    second -- third page.  There we go.

14:25:20 18    A.      There you go.

14:25:23 19              So again, this is just a fill in the blank

14:25:26 20    things that the people like Amkor, ASC, whatever their

14:25:30 21    partner is doing packaging assembly, fill in for a

14:25:34 22    qualification lot.  And a qualification lot is what you're

14:25:38 23    using to qualify the products so you can finally sell it to

14:25:41 24    a customer, you're doing reliability testing on it, you are

14:25:45 25    doing a lot of data, you want to make sure you capture how

Darveaux - direct

14:25:49  1   it was built so if something fails later you can go back and

14:25:53  2   say okay, we used these parameters and you can capture it.

14:25:56  3   This is a big data capture.  Qorvo doesn't fill in the data,

14:26:01  4   their supplier fills in the data because their supplier is

14:26:03  5   doing all the work.  They're actually doing this work.

14:26:07  6   Q.    Let's scroll through to page 4.  Page 5.  Six.

14:26:16  7   Seven.  Eight.  Nine.  Okay.  So on this page --

14:26:25  8   A.    So you saw those are blank, right, it says here is

14:26:29  9   the thing, please fill in the information for us.

14:26:31  10  Q.    So this page talks about stencils.  I think

14:26:36  11  Dr. Fattinger had talked about that?

14:26:39  12  A.    Yeah, he's the one that discussed this.

14:26:42  13  Q.    All right.

14:26:44  14  A.    So stencils.  Stencil printing is a method of

14:26:48  15  applying solder paste, so whenever I mentioned like leads on

14:26:52  16  the pad are soldered, so soldering is a super well-known and

14:26:57  17  well-established technology.  So typically you would have a

14:27:01  18  stencil with a bunch of holes in it that match up to the

14:27:04  19  printed circuit board pads, you have the stencil, you put

14:27:08  20  solder paste, the machine squeegees across, which fills in

14:27:14  21  solder into all those little holes and then you pop the

14:27:18  22  stencil off and then you have deposited a bunch of little

14:27:20  23  bits of solder everywhere.

14:27:22  24       Next you put components down, this things talks

14:27:26  25  about the first part of that where you're just, all the

Darveaux - direct

14:27:29  1    parameters of the machine that you control to do that

14:27:31  2    process.

14:27:32  3              So this is like recipe information, we're

14:27:34  4    talking about recipes, you know, like, for example, the

14:27:37  5    thickness of the stencil, the material, again, you buy these

14:27:41  6    things from a supplier.  The aperture openings, it was a

14:27:46  7    flip chip you might have a special consideration there, but

14:27:49  8    then paste printing, this blade has an angle you can set, it

14:27:53  9    has a type of material, it has a force, how hard you're

14:27:56 10    pushing down and the speed at which it drags across.  Those

14:28:00 11    are examples of recipes of a manufacturing process.  And

14:28:03 12    there may be more than that, these are super common.  There

14:28:06 13    are literally thousands of factories in the world that do

14:28:10 14    this process.  And they all control these same things.

14:28:14 15    Q.    Does this particular document have an actual recipe

14:28:19 16    in it?

14:28:19 17    A.    No.  No.  That's what the Qorvo wants to learn from

14:28:24 18    their supplier.

14:28:25 19    Q.    Okay.

14:28:26 20    A.    Please fill in what you did, it's your recipe, fill

14:28:29 21    it in and tell us what you did so that later if something

14:28:33 22    happens I can track back to see if there was abnormal,

14:28:36 23    something abnormal about how we built those parts.

14:28:39 24    Q.    If it did have a recipe, then would this document be

14:28:44 25    considered trade secret?

Darveaux - direct

14:28:44  1    A.      So, I guess the point I was making is once you get to

14:28:49  2    the details of the actual recipes on equipment, those are

14:28:52  3    the things that the industry tends to guard more as a trade

14:28:56  4    secret, because they're not typically shown in an audit.

14:29:00  5            In this case, Qorvo is not regarding it as a

14:29:03  6    trade secret because they're telling their supplier please

14:29:06  7    give us all your information that you developed in your

14:29:09  8    factory.  But it's his product, so I get it, we comply as

14:29:13  9    Amkor would comply, we would tell them exactly how we built

14:29:18 10    this part, we develop it but we'll tell the customer here is

14:29:22 11    how we did it.

14:29:23 12    Q.      Have you seen any recipes in this case?

14:29:25 13    A.      No.

14:29:26 14    Q.      All right.  Did you find any equivalent form like

14:29:31 15    this one at Akoustis?

14:29:33 16    A.      I don't believe I found this one at all.  I would

14:29:36 17    have to check my table to say.  I don't believe I found that

14:29:40 18    one.  If I did, it would be recorded in those tables at the

14:29:44 19    end of each section.

14:29:45 20    Q.      Did Akoustis achieve any head-start by having this

14:29:49 21    document?

14:29:50 22    A.      No.  The manufacturer records all this anyway, so

14:29:55 23    they do this as a matter of practice for the same reason,

14:29:59 24    they want to know if something goes wrong how did we build

14:30:02 25    this part.

Darveaux - direct

Q.      So let's go to PDX 6.118.

          Here is Dr. Shanfield's demonstrative on alleged

trade secret -- oh, you know what, let's go back one slide

to 117.

          Here is Dr. Shanfield's demonstrative on what

alleged trade secret 7.2 and it identified Trial Exhibit 37

which is PTX 751 as containing a trade secret.  What are

assembly instructions, Dr. Darveaux?

A.      So we have been using the word assembly, that means

packaging, these are the details of each of those steps in

the packaging process and some of the things that are

captured with respect to the design rules and the process

capability.  So they call it assembly instructions.  That's

what it is.  And this happens to be for QFN type packages,

quad flat package, common package nowadays, it came out in

the late '90s, Amkor was one of the first ones to offer

that, for example.

Q.      Do you see the figure on the call out there, gold

pallidium, nickel, what is that?

A.      So this is just a piece of that document that was

discussed last week by I guess Shanfield, or somebody.  But

these are, this is called surface finishes, so this

soldering process, the surface of the thing you're soldering

to has to have certain metals that react well with the

solder, that the solder wets out to and bonds to, a common

Darveaux - direct

14:31:49  1    stack is nickel plated gold, it turns out my theories in the

14:31:54  2    late '80's I used nickel plated gold, this is not a new

14:31:58  3    stack up.  Every lead frame supplier in the world offers

14:32:02  4    this nowadays pretty much.  It's very standard.  You can

14:32:06  5    also get ███████████, that's the one above, so depending on

14:32:10  6    your need, you can specify what kind of finish you want on

14:32:14  7    your lead frame.

14:32:16  8    Q.    So for this particular document, or just assembly

14:32:21  9    know how in general, which direction does the information

14:32:25 10    flow, is it from the customer to the subcontractor or the

14:32:29 11    other way?

14:32:29 12    A.    So, depends on the customer.  So it's like some

14:32:35 13    customers that are fabless have no internal factory, and all

14:32:39 14    the information is flowing from the subcontractor to them.

14:32:42 15    And they create a document that they can use at different

14:32:45 16    subcontractors.  If the customer has internal factories,

14:32:48 17    then there may be more information flowing both ways, but

14:32:52 18    still, this is for a subcontractor, so it's got to reflect

14:32:55 19    what he can do.  There is not going to be anything in here

14:32:59 20    that he hasn't already agreed to do for you, otherwise there

14:33:02 21    is a problem.  Right?

14:33:03 22            If you try to design something that's beyond his

14:33:07 23    capability, you'll have loss and everybody loses money at

14:33:11 24    that point, they are not getting product out and he's not

14:33:14 25    getting paid for doing the assembly and you're not able to

14:33:17 1    sell to your customers.  So the information flows mostly

14:33:21 2    from the subcontractor, but all that has to be approved by

14:33:24 3    the subcontractor.  There is nothing in here that can be

14:33:28 4    shown that he can't do, that doesn't work.

14:33:29 5    Q.    Can you please pull up PTX 0751, that's Trial

14:33:35 6    Exhibit 37.  So here is the full document.

14:33:39 7    A.    Uh-huh.

14:33:40 8    Q.    Let's scroll all the way to the back to see the

14:33:43 9    revision history.  That's the end of it.  Let's go to

14:33:50 10   page 18, that's where it begins.

14:33:52 11            So do you see there at the top of the revision

14:33:56 12   history there is an initial release date?

14:33:58 13   A.    Yeah, around 2012, looks like.

14:34:01 14   Q.    What's significant about that?

14:34:04 15   A.    Well, I mean, again as I mentioned before, this is a

14:34:08 16   vision from RFMD, RFMD was Amkor's customer at that time

14:34:13 17   frame, and my responsibility was the RF module piece, this

14:34:16 18   is the MLF, which is a different product line within our

14:34:20 19   company.  But both products we were supporting RFMD, so

14:34:25 20   there used to be another document in this case that was more

14:34:28 21   about modules.  I think they removed that one, but this one

14:34:31 22   basically we're just trying to point out probably a good

14:34:34 23   deal at that initial release information came from Amkor.  I

14:34:38 24   don't have exact knowledge of that, but it's mostly because

14:34:41 25   I'm quite certain they did not have an internal factory at

Darveaux - direct

14:34:45  1    that time, I'm not sure if they ever did, internally, but if

14:34:50  2    they did, it was certainly not high volume at that time.

14:34:54  3    Q.    All right.  So did Akoustis achieve any head-start

14:35:04  4    from having this document?

14:35:06  5    A.    No.

14:35:07  6    Q.    Did Akoustis use this document?

14:35:10  7    A.    I'm not aware of the use.

14:35:14  8    Q.    All right.  Let's move on to PDX 6.119.  All right.

14:35:23  9          Here is Dr. Shanfield's demonstrative on alleged

14:35:27 10    trade secret 7.3.  And it identifies Trial Exhibits 38 and

14:35:33 11    39 which are PTX 249 and 241 as containing trade secrets.

14:35:39 12          What is reflow conditioning?

14:35:42 13    A.    Okay.  So this one, again, I think was a little bit

14:35:47 14    misrepresented earlier in the trial.  So when we talk about

14:35:50 15    pre conditioning, what we're talking about is, for example,

14:35:54 16    if I'm going to send some parts into reliability testing,

14:35:58 17    temperature cycling, or high temperature operation like,

14:36:02 18    first I pre-condition those parts, that means I expose them

14:36:05 19    to some sort of abuse that they're likely to seat if

14:36:11 20    customer, namely reflow, we know we're going to send our

14:36:14 21    parts to the customer, he's going to reflow them on to his

14:36:18 22    product board and then it will go off and have its life.

14:36:21 23          If I'm trying to simulate life, I want to abuse

14:36:25 24    that part a little bit first by recondition, I want to run

14:36:27 25    it through the profile to simulate what he's going to do,

Darveaux - direct

14:36:32  1    then I'll do my testing.  When your see preconditioning,

14:36:32  2    you're trying to stress the part similar to what it would

14:36:35  3    see at the customer and if there is any weak manufacturing

14:36:37  4    defects in there that maybe it's barely holding on, it will

14:36:41  5    break right away and you'll see that in your factory and not

14:36:44  6    the customer, that's the purpose of this document.

14:36:47  7    Q.    Is this well-known in the industry?

14:36:50  8    A.    Yes.

14:36:50  9    Q.    What is a reflow oven look like?

14:36:53 10    A.    I don't know if you have been to Blippy Subs, they

14:36:58 11    have this chain that goes along and you put the sub in, it

14:37:01 12    goes through, and it comes out and it's hot, it kind of

14:37:04 13    looks like that, it has a chain, either chains or conveyers

14:37:08 14    going through and as it goes through there are different

14:37:11 15    zones that you can heat the part, in our case, it's to melt

14:37:15 16    the solder, to solder the product to a the board, and as its

14:37:20 17    cools down, it comes out the other side.

14:37:40 18             MS. SMITH:  Your Honor, may I approach the

14:37:41 19    witness?

14:37:42 20             THE COURT:  You may.

14:37:56 21    BY MS. SMITH:

14:38:02 22    Q.    Dr. Darveaux, I just handed you DTX 617 and DTX 619.

14:38:09 23    Do you recognize those two documents?

14:38:10 24    A.    I do.

14:38:12 25    Q.    What are they?

Darveaux - direct

14:38:13  1  A.      Well, 617 is a moisture recoil sensitivity

14:38:20  2  classification for non-hermetic service mounting devices at

14:38:24  3  the joint JEDEC ICP publication.  This one is dated

14:38:31  4  December 2022, but the revs go back in time to 1990.  It's

14:38:37  5  been around a long time.

14:38:40  6          This other one is joint standard industry on

14:38:43  7  handling packing shipping on use of moisture and reflow

14:38:47  8  process sensitive devices, IPC JEDEC, this rev is April of

14:38:53  9  2018, last rev was 2014, I'm pretty sure this one goes back

14:38:57 10  in time farther than that as well.  Looks like 1990.

14:39:03 11          MS. SMITH:  Your Honor, I move for DTX 617 and

14:39:07 12  DTX 619 to be entered into the record.

14:39:11 13          THE COURT:  Marked and received as 353 and 354.

14:39:17 14          (Trial Exhibit Nos. 353 and 354 were admitted

14:39:18 15  into evidence.)

14:39:18 16  BY MS. SMITH:

14:39:20 17  Q.      Are standards used in reflow can conditioning,

14:39:24 18  Dr. Darveaux?

14:39:24 19  A.      Yes.  In fact, if you look at the Qorvo specs or

14:39:29 20  anybody's specs, they're always refer to these typically,

14:39:33 21  these standards, there may be one or two others, but these

14:39:37 22  are two of the common ones, company's spec often and almost

14:39:41 23  always that's available refers to an outside spec because

14:39:44 24  they want to show they're in compliance with what the rest

14:39:47 25  of the industry does, that's the purpose of referring to and

Darveaux - direct

14:39:50  1    using specs, standards, I'm sorry, standards.

14:39:54  2    Q.      May I have PTX 251, please.  Can we see the first

14:40:05  3    page?

14:40:05  4              All right.  Dr. Darveaux, do you recognize this

14:40:11  5    document?

14:40:12  6    A.      I do.

14:40:14  7    Q.      Did you review it in its entirety?

14:40:16  8    A.      I did.

14:40:17  9    Q.      Did you consider it as part of your opinions?

14:40:20  10   A.      I did.

14:40:22  11   Q.      Let's go to page 2 now and focus on the purpose and

14:40:27  12   scope.  What's the purpose of this reflow conditioning

14:40:33  13   document?

14:40:34  14   A.      Yeah.  This is what I meant by the word

14:40:38  15   preconditioning.  Qorvo has agreed ███████████████████

14:40:41  16   ████████████████████████████████████████████████████

14:40:45  17   ████████████████████████████████████████████████████

14:40:47  18   ████████████████████████████████████████████████████

14:40:51  19   ████████████████████████████████████████  Qorvo

14:40:54  20   captures that, rejects it, and never gets shipped to the

14:40:57  21   customer.  That's the purpose of this document.  You can

14:41:00  22   either use ███████████████████  same idea, you're

14:41:05  23   stressing the part, there are some weak ones, they fail, you

14:41:08  24   want to capture that, not ship it to your customer.

14:41:11  25   Q.      Let's go to page 4.  And focus in on -- oh, that's

Darveaux - direct

14:41:19  1    perfect.  What is the -- what is the significance of IDP

14:41:26  2    products none?

14:41:29  3    A.      Again, this is a Qorvo document, and their particular

14:41:33  4    case they have identified certain customers that want this

14:41:36  5    done, typically customers want that done after you had a

14:41:40  6    problem.  I don't know if that happened there, but that's

14:41:42  7    been my experience in the past, you had an issue and then

14:41:46  8    they make you implement this kind of screening procedure,

14:41:49  9    but at any rate, their mobile customers wanted it, plus

14:41:53 10    mobile is much higher volume.  There is much more of an

14:41:56 11    issue if things get out there to them because suddenly you

14:42:00 12    got millions of parts that are bad.  So mobile customers

14:42:02 13    tend to want this more, but IDP, that's their infrastructure

14:42:07 14    defense products, apparently in the case of Qorvo, they did

14:42:10 15    not require this screening be done, according to the

14:42:13 16    document.

14:42:14 17    Q.      Does this document cite to standards?

14:42:18 18    A.      I believe it does, up above, you probably went past

14:42:22 19    that part.

14:42:22 20    Q.      Let's go to page 2.

14:42:31 21    A.      Yeah.  So in the one X reflow, you see the IPC JEDEC

14:42:38 22    standard 020, which is this one is called out.  And the

14:42:43 23    other one is a temp cycle spec down below, A104, which is

14:42:49 24    not one you gave me, it's one I cited in my report.

14:42:53 25    Q.      All right.  So does Akoustis use preconditioning

Darveaux - direct

14:42:56  1    processes?

14:42:56  2    A.    I asked them that because it's possible they did, but

14:43:00  3    they told me they are not using that.   And also they serve

14:43:04  4    that same market that you saw Qorvo was not using either, so

14:43:08  5    maybe their customers don't require it, it sounds like.

14:43:10  6    Q.    Does this document contain any trade secrets?

14:43:14  7    A.    No.

14:43:15  8    Q.    Did Akoustis achieve a head-start by having PTX 249

14:43:20  9    and 251?

14:43:21 10    A.    No.

14:43:25 11    Q.    All right.   Let's go to PDX 6.119.   Here is

14:43:37 12    Dr. Shanfield's demonstrative on alleged trade secret 7.4.

14:43:40 13    It identifies Trial Exhibits 40 and 41, which are PTX 223

14:43:45 14    and 225, as containing trade secrets.   What is product

14:43:50 15    inspection?

14:43:51 16    A.    So inspection is again a common thing that's done in

14:43:57 17    probably a lot of industries, but to my knowledge,

14:44:00 18    electronics industry pretty much every factory does

14:44:03 19    inspection.   So what you're trying to do in inspection is

14:44:07 20    we're doing electrical tests to capture bad products but

14:44:11 21    sometimes there are defects that aren't captured in the

14:44:14 22    test.   They'll pass the test and then get to the customer

14:44:16 23    and fail.

14:44:17 24            So you do inspection visually or with a machine,

14:44:20 25    which is again visually to capture defects before they get

Darveaux - direct

14:44:24  1    to your customer.  That's the point of inspection.

14:44:27  2            Secondly, you want the feedback to your

14:44:29  3    manufacturing to fix things that come through as defects.

14:44:33  4    But the ultimate reason is you don't want defects to get to

14:44:37  5    your customer.

14:44:44  6    Q.    Is inspection in this industry highly standardized?

14:44:48  7    A.    Yes.  There are several specs on that which I

14:44:51  8    included in my report.  We may have a slide on that.

14:44:57  9    Q.    So defects to be detected specific to a product or

14:45:03 10    manufacturing process?

14:45:04 11    A.    Yes.

14:45:05 12    Q.    Why?

14:45:06 13    A.    So the purpose of the document is to layout -- see,

14:45:11 14    first you asked me why you do inspection.  Now the document,

14:45:14 15    you want to start talking about the document.  It has

14:45:16 16    different responsibilities, but at the end of the document

14:45:19 17    are examples.  The purpose of those examples, and you can

14:45:23 18    see some of them here for the Richardson facility of Qorvo

14:45:28 19    in Texas, is to train the inspectors what to look for.  So

14:45:32 20    if -- and that could be a machine inspector or a person

14:45:35 21    inspector.  So you want to train them.  This is a defect.

14:45:38 22    This is good.  You need images in this document that do

14:45:42 23    that.

14:45:42 24            So you're training the operators if it's manual

14:45:45 25    inspection, you're training a machine if it's automated

Darveaux - direct

14:45:48 1    inspection.  Same thing, machine captures images, it

14:45:51 2    compares the captured image of good and bad and they had an

14:45:55 3    algorithm to decide if it's within good or not.  If it's

14:45:58 4    not, it rejects it.

14:45:59 5            So the purpose of the pictures is to train your

14:46:02 6    inspectors.  And they're only valid for the factory that's

14:46:07 7    producing those defects, each factory has different things

14:46:11 8    that are defective.  Sometimes they may be similar factory

14:46:16 9    to factory, but that doesn't matter.  What you want to do is

14:46:19 10   train your operator what they look like on your product in

14:46:22 11   your factory so they can see it and recognize it.  It has to

14:46:25 12   be -- those images have to be from your factory to be of any

14:46:29 13   use.

14:46:29 14           MS. SMITH:  Your Honor, may I approach the

14:46:31 15   witness?

14:46:31 16           THE COURT:  You may.

14:46:45 17   BY MS. SMITH:

14:46:51 18   Q.    Dr. Darveaux, I just handed you PTX 114.  PTX 1114.

14:46:59 19   Do you recognize this document?

14:47:00 20   A.    I do.

14:47:01 21   Q.    What is it?

14:47:02 22   A.    So it's Qorvo visual quality control inspection.

14:47:07 23   This I believe was the original document before it was ever

14:47:12 24   modified by anybody.  So it has all the data in it.  In the

14:47:18 25   original form at least at that time.

Darveaux - direct

14:47:21  1   Q.      You had mentioned something about a Richardson

14:47:25  2   facility?

14:47:25  3   A.      Yeah.

14:47:25  4   Q.      So first of all --

14:47:31  5              MS. SMITH:  Your Honor, I move to have PTX 1114

14:47:35  6   entered into evidence.

14:47:36  7              THE COURT:  Marked and received as 355.

14:47:40  8              (Trial Exhibit No. 355 was admitted into

14:47:41  9   evidence.)

14:47:41 10   BY MS. SMITH:

14:47:41 11   Q.      Would you please pull up PTX 1114.  Focus in to the

14:47:48 12   purpose section.

14:47:50 13              So you were talking about a Richardson facility.

14:47:55 14   What's the significance of that?

14:47:58 15   A.      So, again, the defects that are shown in this

14:48:02 16   document, if you look at all the images, they're defects

14:48:05 17   that are generated by Qorvo's facility in Richardson, Texas,

14:48:10 18   and they're specific to these types of products, gallium

14:48:16 19   arsenide which a gallium, gallium nitride, same thing, field

14:48:20 20   effect transistors, bipolar transistors, monolithic

14:48:26 21   microwave integrated circuits.  Weirdly, you don't see any

14:48:30 22   filters in there, but the point is it's for their factory,

14:48:33 23   these kind of products generate these type of defects, so

14:48:37 24   it's useful for that purpose for them.

14:48:40 25   Q.      Okay.  So for 7.4, for trade secrets 7.4, did you

Darveaux - direct

14:48:51  1    review PTX 223 and 225 in their entirety?

14:48:59  2    A.      Sorry, which one?

14:49:01  3    Q.      Can we go back -- can we go back to -- yes, that one.

14:49:11  4    So these two documents here.

14:49:14  5    A.      Yes, so these are the modified versions of this

14:49:18  6    original document.  I believe that's what's shown here.

14:49:21  7    Correct?

14:49:22  8    Q.      Yes.

14:49:22  9    A.      Yes, I did review them.  I reviewed all of them.

14:49:25 10    Q.      Did you see any trade secrets in there?

14:49:27 11    A.      No.

14:49:28 12    Q.      Did Akoustis achieve any head-start by having these

14:49:32 13    documents?

14:49:32 14    A.      No.

14:49:33 15    Q.      Did Akoustis use these documents?

14:49:36 16    A.      Other than a template, no.

14:49:41 17    Q.      Okay.  Why couldn't they have used the photos at the

14:49:44 18    end?

14:49:44 19    A.      Because they're specific to Qorvo's Richardson Fab

14:49:48 20    and those type of products, the defects that are seen, and

14:49:52 21    the purpose of an inspection document is to train your

14:49:55 22    inspectors on what the defects are in your factory for your

14:49:58 23    process flow, your equipment.

14:50:01 24    Q.      Okay.  So for trade secret Group 7, did you perform

14:50:08 25    the avoided cost analysis where you assumed that there were

Darveaux - direct

14:50:12  1    trade secrets?

14:50:12  2    A.      I did.

14:50:13  3    Q.      Okay.  May I have DDX 3.73, please.  3.74, please.

14:50:47  4    3.72.

14:50:55  5    A.      There you go.

14:50:59  6    Q.      Okay.  It's 3.73.  Are these your analyses --

14:51:05  7    A.      Yes.

14:51:06  8    Q.      -- for Group 7?

14:51:08  9            Did you want to go into anything specific?

14:51:11 10    A.      No, again, there were four documents, so for each

14:51:14 11    document, same format, same idea, same methodology, if there

14:51:19 12    were any pages in an Akoustis document that were similar to

14:51:22 13    the Qorvo document.  I gave them credit for two hours per

14:51:26 14    page to write a page.  If I had to look up any documents,

14:51:30 15    same idea.  There might be document costs, typically not

14:51:33 16    here, these are standards.  And then added it all up at the

14:51:38 17    end.  I did that for each of the four documents that were

14:51:41 18    used for the alleged trade secrets.

14:51:46 19    Q.      Okay.  3.75, please.

14:51:51 20            So in sum, is it fair to say that you reviewed

14:51:57 21    all of the documents that were analyzed by Dr. Shanfield and

14:52:02 22    concluded that there were no trade secrets in Groups 2

14:52:07 23    through 7 and Akoustis had no head-start from having these

14:52:11 24    documents?

14:52:12 25    A.      Correct.

2155

Darveaux - direct

14:52:12  1    Q.      And the total saved costs when assuming that there

14:52:17  2    were trade secrets, the total saved costs or avoided costs

14:52:21  3    was $264 in document cost and 194 hours of engineering

14:52:29  4    hours; is that right?

14:52:30  5    A.      Yeah, that's correct.  Those numbers changed from my

14:52:35  6    report because my -- some of the documents that have been

14:52:38  7    thrown out of the case, I guess, so now these are the new --

14:52:41  8    these are the new numbers based on what was presented here

14:52:44  9    at trial.

14:52:46 10    Q.      Okay.  So to close, I wanted to talk to you about

14:52:54 11    your work at Amkor.  We started out this testimony talking

14:53:01 12    about time to market.  And I'd like for you to explain to

14:53:09 13    the jury why you have the experience and the know-how to

14:53:13 14    determine what is a fair time to market.  Can I have DDX

14:53:19 15    3.23, please.  Are all of these companies that you worked

14:53:27 16    for or that you had worked with?

14:53:31 17    A.      Yes.

14:53:32 18            So I can explain?

14:53:33 19    Q.      Go ahead.

14:53:34 20    A.      So I worked at Amkor for seventeen years, my job was

14:53:38 21    to develop products and release them to the market, so

14:53:41 22    concept phase to production.  Probably fifteen years into

14:53:46 23    that we did an analysis, we looked at all the ones we had

14:53:49 24    developed and we categorized how long from concept to

14:53:53 25    customer qualification, and then how long from customer

Darveaux - direct

14:53:57  1    qualification to a hundred million dollars revenue, so kind

14:54:00  2    of a ramp part, the development part of the ramp part.  We

14:54:04  3    found there were some common factors of the successful

14:54:07  4    programs that went faster.  And those were, you know, using

14:54:11  5    existing equipment, using existing materials, providing some

14:54:15  6    innovation within those boundaries, and then offering

14:54:18  7    something that met their needs at a good price, so a good

14:54:22  8    cost structure, not a very expensive thing.  So those

14:54:26  9    typically in that study were about two to four year time

14:54:29 10    frame, a wide range of packaging technology including RF

14:54:33 11    modules.

14:54:33 12            Then when I got to Skyworks.  We in-sourced our

14:54:40 13    filters from Panasonic, from TDK, Epso, Taiyo Yuden makes

14:54:48 14    FBAR and SAW.  TDK makes BAW and SAW filters.  And Panasonic

14:54:55 15    made SAW filters.  I was the component -- my team was the

14:54:58 16    component engineering, we qualified their new technologies,

14:55:01 17    we worked with them on their roadmap and development plans

14:55:04 18    so we could use their products.  Same thing, about one to

14:55:07 19    three years was common requirement, and was hit execution

14:55:11 20    wise by all those companies for developing new filters that

14:55:15 21    we've used in our modules.

14:55:16 22            Skyworks bought the Panasonic factory, so now it

14:55:20 23    was an internal factory where we hit those kind of time

14:55:24 24    lines.  And then Skyworks eventually brought in a BAW

14:55:28 25    technology.  Similarly we bought a small startup and ramped

Darveaux - cross

14:55:32 1  to very high volumes.  I think it was 150 million units

14:55:36 2  shipped within about three years.  That's where my basis for

14:55:40 3  my opinion comes from that a typical time to market is on

14:55:43 4  the order of one to four years depending on the magnitude of

14:55:46 5  your development, that's my basis.

14:55:49 6  Q.    So is Akoustis's time to market of about four years

14:55:54 7  reasonable in your opinion?

14:55:56 8  A.    Yeah.  So actually, they got from start to very low

14:56:05 9  volume production in about five years is what we showed

14:56:08 10  earlier, and then they still, they're still ramping, so I

14:56:11 11  think that's reasonable execution.  If you try to say that

14:56:16 12  it should have taken them nine years according to

14:56:20 13  Shanfield's or five more years or four more years, that's

14:56:24 14  completely not reasonable, not credible in my opinion.

14:56:28 15          MS. SMITH:  I pass the witness.

14:56:29 16          THE COURT:  Cross-examination.

14:56:32 17                  CROSS-EXAMINATION

14:56:32 18  BY MR. DeFOSSE:

14:56:41 19  Q.    Good afternoon, Dr. Darveaux.

14:56:44 20  A.    Good afternoon.

14:56:45 21  Q.    I would like to actually start with that last slide

14:56:47 22  we just had up, that's DDX 3.23.

14:56:55 23          Dr. Darveaux, none of the companies on this

14:56:57 24  slide are startup companies, right?

14:56:59 25  A.    That's correct.

Darveaux - cross

14:57:01  1   Q.      Okay.  And you mentioned that Skyworks eventually

14:57:05  2   entered the market for BAW filters, right?

14:57:08  3   A.      Yes.

14:57:09  4   Q.      What year was that?

14:57:10  5   A.      Well, we had BAW filters in our products, but I think

14:57:12  6   we shipped the first BAW filter, they shipped the first BAW

14:57:18  7   filters in production maybe the year after I left, or the

14:57:23  8   year I left, somewhere in that time frame.  We started the

14:57:26  9   program two or three years before that, that's what I was

14:57:29 10   involved with it.

14:57:30 11   Q.      What was the year you left, can you remind the jury?

14:57:32 12   A.      I left in March of 2019.

14:57:34 13   Q.      2019?

14:57:35 14   A.      Yeah.

14:57:35 15   Q.      Okay.  I think you mentioned that Skyworks entered

14:57:38 16   the market or produced its BAW filters after purchasing a

14:57:42 17   small start up?

14:57:43 18   A.      That's correct, it's called MEMS Solution.

14:57:45 19   Q.      That was called MEMS Solutions, is that right?

14:57:48 20   A.      I think it was MEMS Solution.

14:57:50 21   Q.      That was a Korean company?

14:57:52 22   A.      Yes.

14:57:53 23   Q.      And do you recall when MEMS Solution was founded?

14:57:58 24   A.      So this came up in the deposition as well.  I believe

14:58:02 25   they were founded 2001, 2002.  They had some low volume

Darveaux - cross

14:58:11 1    switch on the market a couple of years later and they had

14:58:14 2    some sort of a FBAR duplexer that they were offering to the

14:58:19 3    market in low volumes a couple of years after that.  So I

14:58:22 4    think it was about four or five years that they showed on

14:58:25 5    their website that they had some sort of FBAR duplexer

14:58:29 6    offering.  I don't know the volume level or anything like

14:58:32 7    that.  But we bought them in 2016, I believe it was.  They

14:58:36 8    had low volume production going, similar to Akoustis in

14:58:39 9    terms of the market segment.  Not mobile, they didn't have

14:58:44 10   the scale for mobile, but for the these other applications,

14:58:47 11   they had some low volume production, prototyping, I don't

14:58:52 12   remember the exactly the volume production.

14:58:55 13   Q.     Okay.  I would like to clarify.  I think you

14:58:58 14   mentioned this with Ms. Smith.  Your opinions in this case

14:59:01 15   are limited to trade secret Groups 2 through 7; is that

14:59:05 16   right?

14:59:05 17   A.     Yes.

14:59:05 18   Q.     You're not offering an opinion on Groups 1 or 8?

14:59:10 19   A.     No, I am not.

14:59:12 20   Q.     Okay.  I think you mentioned that you had reviewed

14:59:16 21   Dr. Faulkner's analysis as part of the work that you did in

14:59:19 22   this case?

14:59:20 23   A.     Yeah.  So we looked at Faulkner 's analysis to

14:59:23 24   understand, you know, of the documents that I analyzed to

14:59:28 25   look at -- as we showed through that whole presentation, if

Darveaux - cross

14:59:35 1  and when they were ever accessed at Akoustis, right, did

14:59:39 2  Akoustis even look at the documents.  Some of the documents

14:59:41 3  were never accessed, some of them were -- had an indication

14:59:44 4  of access, some of them, it's more like an e-mail trail, you

14:59:49 5  guys saw some of that.  So that was the purpose of looking

14:59:51 6  at his report was to look at -- to try to figure out these

14:59:58 7  access dates.

14:59:59 8  Q.      You understand that Mr. Faulkner identified 500,000

15:00:03 9  Qorvo e-mails on the Akoustis computer system?

15:00:05 10 A.      Yeah, I was here at the trial, I saw his report, yep.

15:00:09 11 Q.      And in addition to that, 9,000 other Qorvo documents

15:00:12 12 on Akoustis's computer system?

15:00:14 13 A.      Yes.  Yes, sir, I saw that.

15:00:16 14 Q.      Plus 279 gigabytes of data, in addition to those

15:00:22 15 documents, Mr. Faulkner found on Akoustis's computer system?

15:00:25 16 A.      If you say so.  I didn't memorize that number.

15:00:28 17 Q.      You understand from looking at his analysis that the

15:00:31 18 279 gigabytes of data that Mr. Faulkner found came from a

15:00:37 19 computer that Rama Vetury copied from Qorvo; right?

15:00:42 20 A.      That sounds right.  I heard that discussed last week.

15:00:46 21 Q.      And you understand that Dr. Vetury was the chief

15:00:51 22 device scientist at Akoustis; is that right?

15:00:53 23 A.      Yes.  In fact, we saw him, there was a video of his

15:00:57 24 testimony in this trial.

15:00:58 25 Q.      And from that, I think Dr. Shanfield said a large

2161

Darveaux - cross

15:01:03 1    volume of documents, he funneled it down and he identified

15:01:07 2    1,500 specific confidential Qorvo documents as part of his

15:01:11 3    analysis in this case, right?

15:01:12 4    A.    Yeah, I think those were the considered documents in

15:01:15 5    his report, I think that's what they were called.

15:01:18 6    Q.    And I think you have told me in the past, you have

15:01:21 7    considered all of those documents that Dr. Shanfield

15:01:23 8    identified in his report; right?

15:01:25 9    A.    Yes.  I either -- some of them were read in detail,

15:01:29 10   some of them were skimmed, I tried to do my best to look at

15:01:32 11   them all.  Obviously I focused more on the ones that were

15:01:36 12   actually in his report that he talked about, would be the

15:01:38 13   highest priority one to focus on.

15:01:41 14   Q.    Out of all of those documents, you didn't find a

15:01:44 15   single trade secret?

15:01:47 16   A.    I didn't find anything that was shown to me in

15:01:51 17   evidence that was a trade secret.  I'm sure there was

15:01:55 18   something in there that was useful to Qorvo, but if you have

15:02:01 19   something you want me to look at, I would be happy to look

15:02:04 20   at it if I haven't looked at it already.

15:02:07 21   Q.    I think you testified multiple times prior the lunch

15:02:10 22   break today that the documents that Dr. Shanfield identified

15:02:13 23   as containing trade secrets were simply presentations that

15:02:18 24   were discussed at meetings.  Do you recall offering that

15:02:21 25   testimony?

Darveaux - cross

15:02:22 1   A.      Well, what I said was what we reviewed in this case,

15:02:26 2   and the ones that have been discussed here and presented

15:02:29 3   into evidence here, were kind of two categories, one were

15:02:34 4   PowerPoint presentations that were discussed in meetings

15:02:37 5   obviously, and the other were these more administrative or

15:02:41 6   quality standard type documents.  I believe I grouped them

15:02:45 7   into those two categories just for discussion purposes.

15:02:49 8   Q.      You didn't mean to suggest that a trade secret can't

15:02:53 9   be a trade secret if it's discussed at a meeting, right?

15:02:55 10  A.      No, I didn't say that.

15:02:57 11  Q.      And you're also not opining in this case that you

15:03:00 12  can't have a trade secret if it's in a presentation, are

15:03:03 13  you?

15:03:03 14  A.      No.  No, sir.

15:03:04 15  Q.      You could have a trade secret embodied in a

15:03:07 16  presentation, right?

15:03:08 17  A.      I suppose so.

15:03:10 18  Q.      You worked at Skyworks prior to leaving that company;

15:03:16 19  correct?

15:03:16 20  A.      I worked there seven years.

15:03:18 21  Q.      And I assume that you attended meetings where design

15:03:22 22  presentations were provided?

15:03:24 23  A.      Absolutely.

15:03:25 24  Q.      Did Skyworks invite its competitors into those

15:03:30 25  meetings?

Darveaux - cross

15:03:30  1    A.      Not unless there was like some joint projects, no.

15:03:38  2    Q.      Now, I would like to start with trade secret Group 2.

15:03:43  3    And if we could pull up, Mr. Buchbinder, please, PTX 78 and

15:03:50  4    PTX 149.  Those are Trial Exhibits 8 and 9.

15:03:58  5              Now, Dr. Darveaux, I believe you discussed both

15:04:01  6    of these documents with Ms. Smith during your testimony

15:04:04  7    earlier today?

15:04:06  8    A.      Yes.

15:04:06  9    Q.      And you recognize these two documents as Qorvo design

15:04:11 10    presentations that were found in Akoustis's files; right?

15:04:17 11    A.      They're presentations.  I don't know if you want to

15:04:22 12    characterize them as design or whatever.  This one says

15:04:25 13    final circuit layout and tile.  So layout is one element of

15:04:31 14    design.  So I guess you could consider layout an element of

15:04:35 15    design.  The other one just talks about polygons versus

15:04:40 16    rectangle in the title, so I'm not sure --

15:04:44 17    Q.      And these were found in Akoustis's files?

15:04:46 18    A.      I'm sorry, sir?

15:04:47 19    Q.      These were found in Akoustis's files?

15:04:49 20    A.      Yes.

15:04:49 21    Q.      These are the two presentations, while -- you saw

15:04:56 22    Dr. Aigner discuss during his testimony?

15:04:57 23    A.      Yes, I saw.

15:04:58 24    Q.      Now, you're offering an opinion as I understand it

15:05:02 25    that neither of these presentations was valuable to

Darveaux - cross

15:05:04  1    Akoustis, did I understand that right?

15:05:05  2    A.    That's correct.

15:05:07  3    Q.    You said I think during your testimony because I

15:05:12  4    wrote it down, it's not useful to sneak around to try to get

15:05:17  5    the specs from your competitor.  Do you remember that?

15:05:20  6    A.    Yeah.

15:05:21  7    Q.    When you considered these two presentations, did you

15:05:26  8    consider how they came to be in Akoustis's possession?

15:05:29  9    A.    I read about it.

15:05:30 10    Q.    Okay.  So you are aware that Rohan Houlden copied

15:05:37 11    these two presentations two days before he left Qorvo,

15:05:41 12    right?

15:05:41 13    A.    I am aware of that.  I think these are the two.  I

15:05:44 14    know he did -- I can't keep track of which ones he did what,

15:05:48 15    but absolutely I know he did something like that.

15:05:50 16    Q.    You're aware that upon arriving at Akoustis within

15:05:54 17    two days, Mr. Houlden had uploaded these presentations to

15:05:58 18    the Akoustis computer system, right?

15:06:00 19    A.    I guess so, if that's -- I'll take your word for

15:06:03 20    that.

15:06:03 21    Q.    And then he printed out copies, right, put them in

15:06:06 22    his laptop bag, right?

15:06:08 23    A.    Yeah.

15:06:08 24    Q.    And then went to see Dr. Dave Hodge, right?

15:06:12 25    A.    Yeah, this was in the testimony and you and I even

Darveaux - cross

15:06:16  1   talked about this at my deposition, I remember.

15:06:19  2   Q.      And you know that Dr. Dave Hodge was the engineer

15:06:21  3   that Akoustis assigned to work on its development of

15:06:24  4   5-gigahertz filters, right?

15:06:26  5   A.      That's right.

15:06:28  6   Q.      In forming your opinion as to the value of these

15:06:34  7   documents, did you talk to Mr. Houlden?

15:06:37  8   A.      No, I have never met Mr. Houlden.

15:06:40  9   Q.      So you didn't ask him why he would have been handing

15:06:43 10   useless documents to Dr. Hodge?

15:06:46 11   A.      I can speculate on it, but I didn't ask him, I didn't

15:06:51 12   talk to him.

15:06:52 13   Q.      At the time Mr. Houlden handed these documents to

15:06:56 14   Dr. Hodge, he was aware that Akoustis's BAW filters were

15:07:02 15   FBAR style filters, right?

15:07:05 16   A.      I assume he was.  You would think he would be aware

15:07:07 17   of that.

15:07:08 18   Q.      But he still handed these two documents to Dr. Hodge?

15:07:11 19   A.      That's what's in the deposition, yes.

15:07:13 20   Q.      Okay.  And scheduled a meeting with Dr. Hodge to talk

15:07:16 21   about the documents?

15:07:17 22   A.      Yeah, I think they were having lunch meetings or

15:07:20 23   something it says in the deposition transcripts.

15:07:26 24   Q.      All right.  I would like to talk about trade secret

15:07:30 25   Group 3 for a minute.  Dr. Darveaux, you used to work at

Darveaux - cross

15:07:33  1    Skyworks, right?

15:07:33  2    A.      I did.

15:07:34  3    Q.      And we already talked about that, so I'm repeating

15:07:37  4    myself a little here.  And just to remind the jury, Skyworks

15:07:40  5    is a competitor of Qorvo and Akoustis in the BAW filter

15:07:44  6    market, right?

15:07:45  7    A.      Yes.  I mean, for example, yeah.

15:07:51  8    Q.      Okay.  And Skyworks engages in trimming like other

15:07:55  9    BAW filter companies, right?

15:07:56 10    A.      Yeah, so, for example, we do trimming on our SAW

15:08:00 11    filters and we do trimming on our BAW filters, yeah.

15:08:03 12    Q.      At Skyworks, you're talking about?

15:08:05 13    A.      Yeah.

15:08:05 14    Q.      If I were to start asking you details about Skyworks'

15:08:09 15    trimming process, that would make you nervous, wouldn't it?

15:08:13 16    A.      Go ahead and ask me one, I guess.

15:08:16 17    Q.      Okay.  So it won't make you nervous to describe

15:08:21 18    Skyworks trimming process here in court?

15:08:23 19    A.      Not if the elements I'm describing are well-known,

15:08:26 20    no.

15:08:36 21                MR. DeFOSSE:  Your Honor, may I approach?

15:08:38 22                THE COURT:  You may.

15:08:49 23    BY MR. DeFOSSE:

15:08:53 24    Q.      You recall you were deposed in this case?

15:08:55 25    A.      Yes.  I do.  I didn't meet you in person at that

Darveaux - cross

15:09:01  1    time, but I recognize your face.

15:09:02  2    Q.      That was in January of 2024, right?

15:09:05  3    A.      Yeah.

15:09:06  4    Q.      You recall that when we started that deposition, you

15:09:10  5    swore an oath to tell the truth, right?

15:09:12  6    A.      I did.

15:09:13  7    Q.      And could I ask you to turn, please, to page 171?

15:09:26  8    And look starting at line 25.  I'll give you just a minute

15:09:32  9    to look at that.

15:09:35 10    A.      Yeah.

15:09:38 11    Q.      So I asked you during the deposition:  "Okay.  Did

15:09:43 12    Skyworks embody its trimming process in any documents?"

15:09:47 13            Do you see that?

15:09:48 14    A.      I see that.

15:09:49 15    Q.      And your response to me was:  "Again, I'm not quite

15:09:54 16    sure what's relevant about Skyworks' trimming process to the

15:09:57 17    case here.  I didn't opine in my report about Skyworks'

15:10:00 18    trimming process, so I'm getting a little nervous about you

15:10:04 19    asking me details about Skyworks' trimming process."

15:10:08 20            Do you recall that?

15:10:08 21    A.      Totally.

15:10:09 22    Q.      And the reason you were nervous about that is because

15:10:12 23    Skyworks' trimming process was confidential, right?

15:10:15 24    A.      No.

15:10:15 25    Q.      Could I ask you to look at the next line.

Darveaux - cross

15:10:18  1    A.      The reason I said that is because --

15:10:20  2            THE COURT:  Excuse me.

15:10:21  3            THE WITNESS:  I'm sorry.

15:10:23  4            THE COURT:  Excuse me.  Please answer the

15:10:25  5    question.

15:10:25  6    A.      What was the question.

15:10:26  7    Q.      Could I ask you to look at the next line, please?

15:10:28  8    A.      Okay.

15:10:29  9    Q.      I said:  "Okay.  Is that because you're concerned

15:10:32 10    about revealing information that would be confidential to

15:10:34 11    Skyworks?

15:10:36 12            "ANSWER:  Yes, that's correct."

15:10:38 13            Did I read that correctly?

15:10:39 14    A.      Yeah.  Details.

15:10:46 15    Q.      All right.  Could we pull up Trial Exhibit 12 which

15:10:50 16    is PTX-453.

15:10:52 17            Dr. Darveaux, you recognize this document;

15:10:54 18    correct?

15:10:55 19    A.      Yes.

15:10:55 20    Q.      Maybe we can put side-by-side the first page and the

15:10:59 21    second page of this document.  Do you recognize this as the

15:11:05 22    document that J.B. Kwon authored after leaving Qorvo and

15:11:09 23    upon arriving at Akoustis; right?

15:11:13 24    A.      Yes.  So he named it trim calculations, SiN trims,

15:11:18 25    that's how you can tell it was the one he did.

15:11:20  1    Q.      And this is the document that reflects Qorvo's

15:11:23  2    trimming algorithms?

15:11:25  3    A.      This is --

15:11:26  4    Q.      We can scroll the pages?

15:11:29  5    A.      It's a PowerPoint slide that shows the main boxes

15:11:32  6    that we described earlier, if you want to call it an

15:11:35  7    algorithm, yeah.

15:11:36  8    Q.      If we could pull up Trial Exhibit 123, please, which

15:11:41  9    is PTX-452.

15:11:44 10            You understand that this is the e-mail that

15:11:47 11    Dr. Kwon attached those Qorvo trimming procedures to, right?

15:11:54 12    A.      Yeah, I see that.

15:11:56 13    Q.      Okay.  Sent in 2017, July?

15:12:01 14    A.      Yes.

15:12:02 15    Q.      And I believe you're opining in this case that those

15:12:06 16    trimming procedures were just not valuable or useful to

15:12:09 17    Akoustis, right?

15:12:10 18    A.      That's correct.

15:12:11 19    Q.      Okay.  You've never worked as a trim engineer before,

15:12:16 20    is that right?

15:12:16 21    A.      No, I haven't.

15:12:18 22    Q.      In forming your opinion about Trial Exhibit 12,

15:12:24 23    PTX-453, did you consider how it was distributed within

15:12:32 24    Akoustis?

15:12:32 25    A.      I saw from the e-mails, I saw the same e-mails you

Darveaux - cross

15:12:36  1   just showed, he sent files to people.  There were other

15:12:41  2   e-mails talking about meetings and things, so I saw that,

15:12:45  3   yeah.

15:12:45  4   Q.    So when you considered whether the algorithms in this

15:12:48  5   document were valuable to Akoustis, you considered what

15:12:51  6   people at Akoustis said at the time?

15:12:54  7   A.    Yeah.

15:12:55  8   Q.    Okay.  Did you talk to Dr. Kwon in preparing your

15:13:00  9   opinions in this case?

15:13:01 10   A.    I did not.

15:13:02 11   Q.    You understand that he sent this presentation to Mary

15:13:07 12   Winters and to Rama Vetury and to Daeho Kim?

15:13:12 13   A.    I remember Rama and Mary, I don't remember Daeho, but

15:13:17 14   I don't deny that.  I take your word for it.

15:13:21 15   Q.    Since you didn't talk to Dr. Kwon, you weren't able

15:13:23 16   to ask him why he would be sending useless information to

15:13:28 17   his colleagues at Akoustis?

15:13:29 18   A.    I didn't ask him why, no.

15:13:32 19   Q.    If we could pull up Trial Exhibit 215, which is PTX

15:13:37 20   652.

15:13:40 21         You understand what this is, right,

15:13:43 22   Dr. Darveaux?

15:13:45 23   A.    From Rama to J.B., said, "Thanks, very helpful."

15:13:50 24   Q.    So that's at the time, instead of sitting here today

15:13:54 25   where you're at, Rama Vetury said to Daeho Kim, "These

Darveaux - cross

15:13:58 1   trimming procedures are really helpful.  Thanks for sending

15:14:02 2   them."  Right?

15:14:03 3   A.      He sent an e-mail to J.B. and Daeho, I guess he's

15:14:08 4   talking to both of them, but they can't be J.B., so I assume

15:14:14 5   --

15:14:14 6   Q.      Did you ask Dr. Vetury why he would have told J.B.

15:14:18 7   Kwon that these trimming procedures were helpful if, in

15:14:22 8   fact, they had no value to Akoustis?

15:14:24 9   A.      I didn't talk to Rama.  Was that your question?  Did

15:14:29 10  I ask Rama?

15:14:30 11  Q.      Did you ask Rama Vetury why he would have said that

15:14:34 12  these trimming procedures were helpful if, in fact, they

15:14:37 13  were useless?

15:14:37 14  A.      No, I did not talk to Rama.

15:14:40 15  Q.      Okay.  Can we pull up Trial Exhibit 208, which is

15:14:47 16  PTX-420.  Maybe put that side-by-side with Trial Exhibit 9,

15:14:52 17  which is PTX-421.

15:14:54 18          On the right-hand side we have 421.  Do you

15:14:57 19  recognize that as being the same Qorvo trimming algorithms

15:15:01 20  that Mr. Kwon -- Dr. Kwon reproduced when he got to

15:15:05 21  Akoustis, right?

15:15:06 22  A.      It looks like the title page, I guess, yeah.

15:15:09 23  Q.      And on the left is an e-mail from August of 2017

15:15:13 24  where Dr. Kwon is resending these procedures to Mary Winters

15:15:18 25  for the second time; right?

15:15:23  1    A.      Yeah, I guess.  I don't remember the dates.  But I'll

15:15:26  2    take your word for it.

15:15:27  3    Q.      Okay.  You didn't ask Dr. Kwon why he would be

15:15:30  4    sending useless trimming procedures to Mary Winters again?

15:15:33  5    A.      I didn't talk to Dr. Kwon.

15:15:36  6    Q.      Okay.  Did you ask Mary Winters whether she said to

15:15:39  7    Dr. Kwon stop sending me this useless information, it has no

15:15:43  8    value to me?

15:15:43  9    A.      No, I never asked Mary that question.

15:15:46 10    Q.      You understand that after Dr. Kwon circulated the

15:15:51 11    Qorvo trimming algorithms for the second time, he sent them

15:15:54 12    again, right?

15:15:55 13    A.      You mean a third time?

15:15:57 14    Q.      Third time, right?

15:15:57 15    A.      If you say so.

15:15:59 16    Q.      You didn't consider that when you were determining

15:16:01 17    whether or not this information was useful to Akoustis?

15:16:04 18    A.      Look, I knew that they had been passed around.  I

15:16:09 19    read the e-mails, I didn't count how many times, but I

15:16:13 20    certainly considered that.  But I looked at the documents

15:16:16 21    and I judged based on what I saw in the documents versus my

15:16:20 22    knowledge of what Akoustis does.  That's how I came to my

15:16:25 23    opinion.

15:16:25 24    Q.      Trimming procedures were, in addition to being passed

15:16:28 25    around, they were actually presented to the technical

Darveaux - cross

15:16:33  1  committee, the board of directors at Akoustis, right?

15:16:35  2  A.    I saw that testimony -- I don't know if it was -- it

15:16:38  3  was at least to one member, it some guy on the board, I

15:16:41  4  saw that testimony.

15:16:42  5  Q.    In your experience, is it typical to present useless

15:16:45  6  information to the Board of Directors?

15:16:51  7  A.    It's typical to present updates to the Board of

15:16:54  8  Directors.  I don't think anyone attempts to present useless

15:16:57  9  information, that probably wouldn't be a good idea.

15:17:01  10  Q.    I would like to talk briefly about Group 4 now.  This

15:17:05  11  is the group that relates to the radio frequency connectors,

15:17:09  12  do you recall that?

15:17:09  13  A.    Uh-huh.

15:17:10  14  Q.    And it's your opinion that Qorvo's design for the

15:17:17  15  radio frequency connector wasn't useful to Akoustis?

15:17:22  16  A.    It was my opinion, there was no Qorvo design of the

15:17:27  17  connector, it was an ███████ design of the connector, that

15:17:31  18  was my opinion.

15:17:32  19  Q.    That's right actually, you said it was not useful to

15:17:35  20  Akoustis because anyone could just go to ████████ and buy

15:17:38  21  that part off the shelf, right?

15:17:40  22  A.    I said having the documents was not useful, it's not

15:17:43  23  -- I didn't say anything about who -- that it was Qorvo's

15:17:48  24  design.  I said having a document of a connector was not

15:17:51  25  useful.

Darveaux - cross

15:17:52  1    Q.      Yeah?

15:17:53  2    A.      It was not a trade secret, it's ███████ connector,

15:17:57  3    I think that's what I said.

15:17:57  4    Q.      And you said that that was because you didn't need

15:18:00  5    the drawing because anyone could just go to ██████ and buy

15:18:03  6    that connector, right, is that your testimony?

15:18:06  7    A.      If it was indeed an open tool connector, sure, yes.

15:18:10  8    Q.      But you know it wasn't an open tool connector, right?

15:18:13  9    A.      I don't know that at all.  They bought connectors

15:18:15 10    from ██████

15:18:16 11    Q.      Can we pull up --

15:18:18 12    A.      "They" being Akoustis, bought connectors from

15:18:21 13    ██████

15:18:21 14    Q.      Can we pull up Trial Exhibit 221, which is PTX 729.

15:18:27 15            Do you recall this e-mail?

15:18:30 16    A.      Absolutely.

15:18:31 17    Q.      Okay.  Just to remind the jury, this is an e-mail

15:18:35 18    from Rohan Houlden in November 22nd, 2016, from his personal

15:18:41 19    e-mail account, is that right?

15:18:43 20    A.      I guess so.

15:18:44 21    Q.      And he was e-mailing the personal e-mail account of a

15:18:49 22    Qorvo employee, do you recall that?

15:18:52 23    A.      Looks like somebody named Jamie Carter, maybe.

15:18:57 24    Q.      And Mr. Houlden says, "Wanted to use your yahoo and

15:19:02 25    my gmail account to make you feel more comfortable."

Darveaux - cross

15:19:10  1              Right?

15:19:10  2  A.       I see that.

15:19:11  3  Q.       And in this e-mail, Mr. Houlden was asking Mr. Carter

15:19:14  4  to send him the engineering drawings for the RF connector

15:19:20  5  that's manufactured at ███████ , right?

15:19:23  6  A.       Yeah.  It's an ███████ connector, there is a part

15:19:26  7  number, that's what I understand from the e-mail.

15:19:29  8  Q.       And zoom out, please.  If we look up above in -- hold

15:19:39  9  on.  If we look up above in the middle e-mail under on

15:19:44 10  Tuesday, there is a message from Mr. Carter, and he says

15:19:49 11  right there that the part wasn't available in the general

15:19:51 12  market, right, that's why Mr. Houlden couldn't find that

15:19:54 13  drawing.

15:19:56 14  A.       I see what he says, and he also says here is the one

15:19:59 15  that has the same contact pad area.  So if you look on that

15:20:05 16  drawing, they were trying to design, Akoustis was trying to

15:20:09 17  design an evaluation board that matched to the connector.

15:20:12 18  And what they wanted, what Houlden wanted, when I looked at

15:20:16 19  all this, this is what I determined, there is some pad

15:20:19 20  drawings on that connector that show this is the mating

15:20:23 21  thing if you're going to design a printed circuit board that

15:20:27 22  goes with this connector shown.  They were trying --

15:20:29 23  Akoustis wanted to design an evaluation board to go with

15:20:33 24  this off-the-shelf connector.

15:20:34 25              If you go up in the text it shows ███████

Darveaux - cross

15:20:37  1  ████████████████████████████████████████████

15:20:42  2  ████████████████████████████████████████████

15:20:46  3  █████████████████████████████  that's what I gather from the

15:20:49  4  text.

15:20:49  5  Q.    But that's not what ultimately happened here, you

15:20:53  6  know, right?

15:20:53  7  A.    Okay.  I'm not sure what you mean by that.

15:20:56  8  Q.    Were you here during the testimony of Dr. Dave Hodge?

15:20:59  9  A.    Yes.

15:21:00  10  Q.    Okay.  So then you know from Dr. Hodge's testimony

15:21:03  11  that what happened was Mr. Houlden obtained the engineering

15:21:09  12  drawing for the custom Qorvo RF connector, right, do you

15:21:14  13  recall that?

15:21:14  14  A.    Yeah, he had this drawing.

15:21:16  15  Q.    Okay.  And then Mr. Houlden handed that drawing to a

15:21:20  16  gentleman named David Dyer, right?

15:21:22  17  A.    Yes, correct.

15:21:23  18  Q.    He said to David Dyer, please go copy this drawing,

15:21:27  19  right?

15:21:28  20  A.    Wrong, that's not what he said.

15:21:29  21  Q.    That's what Dr. Hodge testified, right?

15:21:32  22  A.    No, I read the testimony, I read it word for word,

15:21:34  23  that's not what he said --

15:21:36  24  Q.    That testimony we can make available.

15:21:38  25  A.    Can I finish?

Darveaux - cross

15:21:38  1    Q.      I think you're actually done with that one?

15:21:41  2    A.      Okay.  All right.

15:21:45  3    Q.      Now, in performing your analysis as to whether this

15:21:49  4    RF connector was publicly available, did you go and try to

15:21:54  5    buy it?

15:21:56  6    A.      From ███████?

15:21:57  7    Q.      Yes.

15:21:58  8    A.      No.

15:21:58  9    Q.      Did you check ████████ website to see if it's

15:22:02  10   there?

15:22:02  11   A.      No, I didn't do that.

15:22:03  12   Q.      Ms. Smith showed you a bunch of data sheets that you

15:22:06  13   had gone and looked at from the Wayback Machine.  Do you

15:22:09  14   remember that?

15:22:09  15   A.      Yes.

15:22:09  16   Q.      And you said you were looking at those to check out

15:22:12  17   the evaluation boards and what drawings were available.  Do

15:22:15  18   you recall that?

15:22:15  19   A.      Yeah.

15:22:16  20   Q.      You didn't find that ███████ drawing in any of those

15:22:19  21   data sheets, did you?

15:22:20  22   A.      I was looking at the Qorvo website and pulling down

15:22:23  23   the data sheets to try to determine did Qorvo at the time or

15:22:27  24   TriQuint, consider the connector to be a trade secret, and

15:22:31  25   my conclusion was they did not because the connectors for

Darveaux - cross

15:22:35  1    these evaluation boards that they sell to their customers.

15:22:38  2    The part number is listed right on there.  That was why I

15:22:42  3    was looking at the data sheets.  I was trying to see if did

15:22:45  4    you guys -- before all the lawsuit happened, did you guys

15:22:48  5    really at that time frame consider connectors trade secrets,

15:22:51  6    it appeared to me that the answer is no, you did not.

15:22:54  7    Q.      In looking at those data sheets, did you ever find

15:22:57  8    this ███████ connector referenced even once?

15:23:00  9    A.      No, I didn't find that.

15:23:08 10    Q.      Can we go to Group 5, please, and pull up Trial

15:23:14 11    Exhibit 76, which is PTX-112.

15:23:18 12              Dr. Darveaux -- it would be great if we had the

15:23:23 13    native version of this one, actually, I think it's easier to

15:23:27 14    see.

15:23:27 15              Dr. Darveaux, you understand that this is the

15:23:36 16    Qorvo products requirement document, one of them that was

15:23:39 17    found in Akoustis's files in this case?

15:23:41 18    A.      This looks like one of the sheets.  I don't know

15:23:44 19    which one.  I can't see which part it was.

15:23:46 20    Q.      Maybe we can just start, the jury may be able to see,

15:23:50 21    on the bottom of this there is a large number of tabs in

15:23:53 22    this document.  We can start with the overview tab and maybe

15:23:56 23    scroll up.  This is the sheet for the QPF4551; right?

15:24:01 24    A.      Front-end module, that's correct.

15:24:03 25    Q.      Which is a front-end module.  You understand that

Darveaux - cross

15:24:07  1    this module includes 5-gigahertz BAW filters within it,

15:24:11  2    right?

15:24:11  3    A.      I believe so, I know one of them did, I guess we

15:24:14  4    would have to get to the details, but it could be -- I know

15:24:17  5    one of the documents did have a filter in the module.

15:24:22  6    Q.      And this is one of those documents that you said was

15:24:25  7    just not valuable or useful to Akoustis, right?

15:24:27  8    A.      So what I said was the format of the document, the

15:24:33  9    use of such documents is known.  The specific details like

15:24:37 10    you can see here the costs target obviously is not useful.

15:24:41 11    They don't make front-end modules, the filter is a small

15:24:44 12    part of that.

15:24:45 13            And if there is any specifications even

15:24:47 14    specifically on the BAW filters in Qorvo's front-end module

15:24:51 15    that's not useful to them because they need to get that and

15:24:54 16    they did get that type of information from their customers.

15:24:57 17    That was my testimony, I believe.

15:24:59 18    Q.      Okay.  When you concluded that this document had no

15:25:02 19    value to Akoustis --

15:25:03 20    A.      Yeah.

15:25:04 21    Q.      -- did you consider how Akoustis was using it at the

15:25:07 22    time that the document came into its possession?

15:25:10 23    A.      I didn't -- I didn't see how they used it at all.  It

15:25:16 24    may have been in an e-mail or something, but I didn't see

15:25:18 25    any evidence of use that showed up anywhere.

Darveaux - cross

15:25:22  1    Q.      Can we pull up Trial Exhibit 75, which is PTX-110.

15:25:31  2    Dr. Darveaux, this is a meeting invitation from Rohan

15:25:37  3    Houlden dated February 28th, 2020, right?

15:25:42  4    A.      Yes.

15:25:43  5    Q.      And Mr. Houlden had sent this invitation to Pat

15:25:47  6    Lewis, Jerry Gray, and Dave Hodge, is that right?

15:25:50  7    A.      That's correct.

15:25:51  8    Q.      And he's asking them to come to a meeting in

15:25:54  9    conference room 2 to review Qorvo RVTM, right?

15:25:59 10    A.      I'm not sure what RVTM means, but yes, I see that is

15:26:04 11    the subject.

15:26:04 12    Q.      Have you heard of a requirements verification and

15:26:08 13    traceability matrix?

15:26:09 14    A.      Okay.

15:26:09 15    Q.      Are you familiar with that term?

15:26:11 16    A.      I am now.  I mean, I didn't know if that was -- it's

15:26:14 17    not spelled out, so I don't know if that was specific to

15:26:18 18    Qorvo or not.  I wasn't sure if that was some acronym

15:26:23 19    specific to Akoustis.  I do know what you're talking about,

15:26:25 20    yes.

15:26:25 21    Q.      And you see that Mr. Houlden in requesting this

15:26:29 22    meeting attached the product requirement document for

15:26:34 23    QPF4551 that we were just looking at?

15:26:38 24    A.      Yes.  Looks like there is two documents attached,

15:26:41 25    yes.

Darveaux - cross

15:26:41  1    Q.       Did you attempt to determine in performing your

15:26:44  2    analysis why Mr. Houlden would have scheduled a meeting in

15:26:49  3    conference room 2 during working hours at Akoustis to

15:26:53  4    discuss a document that had no value to the company?

15:26:55  5    A.       I assume he was trying to help.  I wasn't at the

15:26:59  6    meeting, it doesn't have any meeting minutes, I can't tell

15:27:03  7    what happened at the meeting.

15:27:04  8    Q.       Okay.  You didn't talk to Mr. Houlden?

15:27:08  9    A.       No.

15:27:08 10    Q.       You didn't talk to Mr. Lewis or Mr. Gray either?

15:27:11 11    A.       No.

15:27:13 12    Q.       Okay.  Group 6.  Can we pull up Trial Exhibit 14,

15:27:18 13    which is PTX 99.

15:27:20 14             You recall testifying about this document,

15:27:22 15    right?

15:27:23 16    A.       Yes.

15:27:23 17    Q.       And like every other document you looked at in this

15:27:26 18    case, you said this one had no value to Akoustis; right?

15:27:30 19    A.       Right.

15:27:30 20    Q.       And you didn't see any evidence that Akoustis had

15:27:34 21    used this document at all?

15:27:35 22    A.       That's correct.

15:27:37 23    Q.       Okay.  Now you do know that this document was found

15:27:43 24    in Akoustis's files, right?

15:27:44 25    A.       Oh, yes.

2182

Darveaux - cross

15:27:44  1    Q.      And did you consider in determining that this

15:27:47  2    document had no value and was useless the circumstances

15:27:51  3    under which the document was circulated around Akoustis?

15:27:54  4    A.      Can you be specific?  You mean like an e-mail trail

15:28:00  5    or something?

15:28:01  6    Q.      Yeah, I can.  Let's go to PTX 98, which is Trial

15:28:07  7    Exhibit 66.  This is when the document first appears.  It

15:28:12  8    was sent from John Myrick to Rohan Houlden in August of

15:28:19  9    2018, do you see that?

15:28:22 10    A.      Yes.

15:28:24 11    Q.      And if we can also actually highlight the time, I

15:28:27 12    think the time is relevant to this.  It was sent at

15:28:30 13    2:34 p.m., do you see that?

15:28:32 14    A.      Okay.

15:28:33 15    Q.      Now, did you have a chance to speak with Mr. Myrick

15:28:36 16    as part of your analysis in this case?

15:28:37 17    A.      I did not.

15:28:38 18    Q.      So you don't know why Mr. Myrick would have been

15:28:41 19    sending Mr. Houlden a useless document with the subject you

15:28:45 20    may find this interesting?

15:28:46 21    A.      I assume he was trying to share with him.

15:28:50 22    Q.      Okay.  Why don't we go to Trial Exhibit 67, which is

15:28:55 23    PTX-100.  This was sent, same day, 3 o'clock, right?

15:29:07 24    A.      I guess so, yeah.

15:29:09 25    Q.      Okay.  August 18th, 2015, at 3:00 p.m.  So this is

15:29:13  1    twenty-four minutes after Mr. Houlden got the document from

15:29:16  2    Mr. Myrick.   Who did he send it to?

15:29:19  3    A.     Joel Morgan.

15:29:20  4    Q.     You understand that Mr. Morgan was the vice-president

15:29:22  5    of quality at Akoustis, right?

15:29:24  6    A.     That's correct.   I mean, I don't know his title, but

15:29:27  7    I know that was his function, yes.

15:29:28  8    Q.     And that's the function that's responsible for

15:29:31  9    reliability testing, right?

15:29:32 10    A.     That's correct.

15:29:32 11    Q.     Which is the subject of this presentation that's

15:29:36 12    being circulated?

15:29:37 13    A.     It is.

15:29:38 14    Q.     Did you talk to Mr. Morgan about this document?

15:29:40 15    A.     I did not.

15:29:41 16    Q.     So you didn't find out whether he thought this

15:29:44 17    document was useful, did you?

15:29:46 18    A.     No, I didn't talk to Mr. Morgan.

15:29:48 19    Q.     But you know from other things you have seen that he

15:29:51 20    did find this document useful, right?

15:29:53 21    A.     I'm not sure what you're referring to, what other

15:29:56 22    things?

15:29:57 23    Q.     Well, let's do first, the can we pull up Trial

15:30:02 24    Exhibit 69 and Trial Exhibit 71, side-by-side, that's

15:30:05 25    PTX-102 and PTX-104.

Darveaux - cross

15:30:08  1          This is Mr. Houlden's e-mails forwarding this

15:30:15  2  document to Pat Lewis on the left-hand side, and Dave

15:30:21  3  Aichele on the right-hand side.  Do you see that?

15:30:25  4  A.     Yeah, I see that.

15:30:26  5  Q.     So that's three folks at Akoustis who Mr. Houlden has

15:30:31  6  sent this document to within twenty-four hours of receiving

15:30:33  7  it; right?

15:30:35  8  A.     I see that, yeah.

15:30:36  9  Q.     Did you make any attempt to determine why Mr. Houlden

15:30:40 10  would have been forwarding irrelevant useless non-valuable

15:30:43 11  documents to these other folks at Akoustis?

15:30:45 12  A.     I assume he thought it was relevant.  I don't know

15:30:48 13  why else he would send it.

15:30:49 14  Q.     It wasn't just Mr. Houlden who thought it was

15:30:52 15  relevant right, it was also the vice-president of quality,

15:30:55 16  Joel Morgan who was responsible for reliability testing?

15:30:58 17  A.     I'm not sure where that came in.  Please show me

15:31:02 18  something that Joel Morgan thought it was relevant.

15:31:05 19  Q.     At your request.  Exhibit 72, PTX-106.  We have seen

15:31:17 20  this one before.  You recognize this document, right,

15:31:19 21  Dr. Darveaux?

15:31:19 22  A.     Yeah, I see the title, it's the same one we have been

15:31:23 23  talking about.  And you're saying do I recognize the e-mail,

15:31:26 24  yes, I do.

15:31:26 25  Q.     So this is now April of 2019, so roughly six months

15:31:32  1    after Mr. Houlden first started circulating the reliability

15:31:36  2    testing document; right?  August 2018 to April 2019?

15:31:41  3    A.    Oh, yeah, yeah, yeah, yep.

15:31:44  4    Q.    And Mr. Morgan resends the document back to

15:31:46  5    Mr. Houlden and to Mr. Aichele, right?

15:31:50  6    A.    Okay.

15:31:51  7    Q.    And then in his e-mail he says here is one more that

15:31:55  8    Rohan provided earlier.  This is the primary document I have

15:31:58  9    been referencing regarding methodology for three temp

15:32:01 10    testing and MTTF determination, do you see that?

15:32:10 11    A.    Yes.

15:32:10 12    Q.    You didn't speak to Mr. Morgan to find out why he

15:32:13 13    would have been using this document reference if was useless

15:32:20 14    and not valuable?

15:32:21 15    A.    I didn't speak to Mr. Morgan.

15:32:24 16    Q.    Let's go on to group 7, please.

15:32:27 17              THE COURT:  Counsel, we're at the break time.

15:32:30 18              MR. DeFOSSE:  Okay.

15:32:31 19              THE COURT:  We'll come back in fifteen minutes.

15:32:33 20    Don't discuss the case amongst yourselves.  Don't let anyone

15:32:36 21    talk to you about it.  We'll let the witness step down and

15:32:40 22    stretch.  Don't talk to anybody about your testimony.

15:32:43 23              See everybody in fifteen minutes.  Thanks very

15:32:46 24    much.

15:32:48 25              (Jury exiting the courtroom at 3:32 p.m.)

Darveaux - cross

15:32:55  1                    (A brief recess was taken.)

15:51:57  2                    THE COURT:  You may be seated.

15:52:03  3                    I have ruled on Defendant's Rule 50(a) motion

15:52:06  4    related to damages for unfair trade practice under North

15:52:14  5    Carolina law, so that will be docketed and appear within

15:52:18  6    fifteen minutes.  It's already been signed.  That takes care

15:52:21  7    of that, if your staff wants to look at it, because we got

15:52:24  8    some things to do.

15:52:25  9                    All set?

15:52:26 10                    MR. DeFOSSE:  We're all set, Your Honor.

15:52:27 11                    THE COURT:  Ready to bring the jury in.

15:52:36 12                    (Jury entering the courtroom at 3:52 p.m.)

15:52:55 13                    THE COURT:  All right.  Everyone can be seated

15:53:02 14    and counsel may proceed.

15:53:03 15                    MR. DeFOSSE:  Thank you, Your Honor.

15:53:07 16    BY MR. DeFOSSE:

15:53:08 17    Q.      Dr. Darveaux, as we left the break we were just about

15:53:12 18    to talk about trade secret Group 7.  You understand that

15:53:16 19    that group represents Qorvo's manufacturing assembly and

15:53:18 20    change procedures, is that right?

15:53:19 21    A.      Yeah, I remember the wording has changed but

15:53:23 22    basically the manufacturing.

15:53:23 23    Q.      And like the other groups, you have opined that the

15:53:26 24    documents in that group had no value or use to Akoustis,

15:53:29 25    right?

Darveaux - cross

15:53:30  1    A.      Yes.

15:53:30  2    Q.      Okay.  Can we pull up Trial Exhibit 195, which is PTX

15:53:37  3    0227?  Dr. Darveaux, you recognize this as one of the

15:53:42  4    documents you considered in forming your opinions in this

15:53:44  5    case?

15:53:44  6    A.      Yeah.  So this is a Robert Dry's team meetings,

15:53:54  7    invite that has an attachment to it.

15:53:55  8    Q.      And Mr. Dry is inviting Mary Winters, Ken Fallon,

15:54:01  9    Joel Morgan, and Brock Hosse to a meeting in January of

15:54:05  10   2020, is that right?

15:54:07  11   A.      Yes.

15:54:07  12   Q.      And he says the purpose of the meeting is to review

15:54:11  13   document requirements and generation for wafer inspection

15:54:14  14   specification.  Right?

15:54:17  15   A.      Yes.

15:54:18  16   Q.      And he attaches a document that he's entitled as

15:54:22  17   visual inspection, or visual INSP, do you see that?

15:54:26  18   A.      Yes, I see that.

15:54:28  19   Q.      And you understand that the document he's attached as

15:54:30  20   a Qorvo document that he had modified, right?

15:54:34  21   A.      I believe that's the one, I mean, I haven't seen it,

15:54:36  22   but that's what I recall.

15:54:37  23   Q.      If we could pull up Trial Exhibit 290, please, which

15:54:41  24   is PTX 228.  This is the attachment of the e-mail.  You do

15:54:46  25   recognize this as one of the Qorvo documents that Mr. Dry

Darveaux - cross

15:54:48  1    had modified, right?

15:54:50  2    A.      Yes.

15:54:50  3    Q.      And if we could actually put that down and pull up

15:54:53  4    the purpose paragraph.  Ms. Smith showed you a version of

15:54:59  5    this from Qorvo and pointed out that it related to the

15:55:02  6    Richardson facility in Texas, right, do you recall that?

15:55:06  7    A.      Well, she showed me the version and my testimony was

15:55:10  8    all the defects in that document that were shown in photos

15:55:14  9    related -- my testimony was that it related to the

15:55:17 10    Richardson Fab, because that's what it said it was for, the

15:55:21 11    Richardson Fab.

15:55:22 12    Q.      And you see in this version that Mr. Dry was

15:55:26 13    circulating around to Akoustis, he had been able to modify

15:55:29 14    this to reference the BAW devices produced by Akoustis,

15:55:32 15    right?

15:55:32 16    A.      Yeah, he changed the words in this paragraph.

15:55:35 17    Q.      Did you speak with Mr. Dry in connection with your

15:55:39 18    analysis of this case?

15:55:40 19    A.      I did.

15:55:40 20    Q.      You did?

15:55:41 21    A.      Yeah.

15:55:41 22    Q.      Did you ask him why he had modified this paragraph of

15:55:46 23    this document?

15:55:47 24    A.      Yes.

15:55:48 25    Q.      Okay.  Did you consider why Mr. Dry would be sending

Darveaux - redirect

15:55:54  1    a document to Ms. Winters, Mr. Fallon -- first of all, do

15:55:59  2    you know who Mr. Fallon is?

15:56:01  3    A.      Not -- I don't think I -- I am as familiar with

15:56:06  4    Fallon.

15:56:07  5    Q.      Is he the director of operations at the New York Fab?

15:56:10  6    A.      If you say so, I never met him.  I didn't talk to

15:56:13  7    him.  I'm not sure what his position was at the time.  If

15:56:16  8    you say so, I believe you, yes, I don't know.

15:56:19  9    Q.      Mr. Dry sent this document, which you found to be

15:56:23 10    unhelpful, to each of those individuals in January of 2020;

15:56:28 11    is that right?

15:56:28 12    A.      Yeah.  They had a meeting about it, apparently.

15:56:32 13    Q.      Okay.

15:56:33 14            MR. DeFOSSE:  No further questions.

15:56:34 15            THE COURT:  All right.  Redirect.

15:56:37 16                    REDIRECT EXAMINATION

15:56:39 17    BY MS. SMITH:

15:56:52 18    Q.      Could we focus in on the purpose section of 228, PTX

15:56:58 19    228.

15:57:01 20            Dr. Darveaux, what is MILSTD-883?

15:57:06 21    A.      That's military standard 883.  It's quite a big

15:57:10 22    document.  It's used in our industry.  Method 2010 has some

15:57:19 23    specifics about, I assume inspection, that's why they're

15:57:22 24    referencing it here.  I don't have all the numbers

15:57:24 25    memorized, but 883 is a very common number.

Darveaux - redirect

15:57:28  1    Q.      What does it mean when this document says that it is

15:57:31  2    based on criteria established in MIL-STD-883?

15:57:37  3    A.      So again, those specifications call out several

15:57:40  4    things like magnifications to use depending on the size of

15:57:43  5    the defect, and you know, methodologies.  Various things are

15:57:49  6    called out.  It seems like the magnification table is one

15:57:52  7    thing I remember seeing in the document.

15:57:54  8    Q.      And this standard is a well-known standard?

15:57:57  9    A.      Yes.

15:57:58  10   Q.      May I have PTX 227, please.

15:58:03  11           Mr. DeFosse just showed you this document, do

15:58:10  12   you remember?

15:58:10  13   A.      Yes.

15:58:10  14   Q.      And it says meeting to review document requirements

15:58:14  15   and generation for wafer inspection specification.  Does

15:58:22  16   this tell you whether the document is being considered as a

15:58:27  17   general template or not?

15:58:30  18   A.      I mean, I don't know that you can tell from that

15:58:35  19   sentence what they discussed, general requirements, review

15:58:41  20   the requirements, document requirements.  It doesn't say

15:58:46  21   template, sounds like a template, but it doesn't say

15:58:50  22   template.

15:58:51  23   Q.      Okay.

15:58:52  24   A.      I don't know exactly what he meant by that sentence.

15:58:55  25   Q.      Okay.  Let's take that down.

Darveaux - redirect

15:58:58  1          Can a document be interesting but not useful?

15:59:08  2  A.      Sure.

15:59:10  3  Q.      Can a document be helpful to understand a competitor

15:59:15  4  but does nothing to improve your own product or company?

15:59:18  5  A.      Yes.

15:59:21  6  Q.      Did you base your understanding of Akoustis's

15:59:24  7  trimming process on actual substantive conversations with

15:59:28  8  Daeho Kim or on short e-mails forwarding documents?

15:59:32  9  A.      I did speak with Daeho Kim, and read the documents

15:59:37 10  produced in the case.  Both things.

15:59:41 11  Q.      Are there ways of discussing trimming that do not

15:59:46 12  involve confidential information?

15:59:50 13  A.      Well, I mean, again, I'm not a lawyer, but my

15:59:55 14  understanding is if something is well-known, it technically

16:00:00 15  can't be considered confidential.  I guess that's -- I don't

16:00:03 16  know.  That's my working understanding of it anyway.

16:00:07 17  Well-known in the industry.

16:00:09 18  Q.      So you can be talking about something that is an

16:00:15 19  aspect of trimming that is well-known in the industry and

16:00:18 20  that would not be confidential information?

16:00:20 21  A.      That's my understanding, yes.

16:00:21 22  Q.      And there are ways of discussing trimming that would

16:00:26 23  involve confidential information, right?

16:00:28 24  A.      Sure.

16:00:28 25  Q.      Did you see anything in the Qorvo documents you

Darveaux - redirect

16:00:32  1   looked at where trimming was discussed in a confidential

16:00:36  2   way?

16:00:36  3   A.     No.

16:00:42  4   Q.     Earlier, Mr. DeFosse asked you whether you analyzed,

16:00:46  5   I think you said 500,000 documents that were found in this

16:00:49  6   case.  Do you remember that?

16:00:51  7   A.     Yes, I remember he mentioned the 500,000.  I don't

16:00:55  8   remember what his exact wording was in the question.

16:00:58  9   Q.     Did Dr. Shanfield provide any opinion on those

16:01:01 10   documents?

16:01:02 11   A.     It was not in his report that I understood.  I think

16:01:06 12   his report came down to about 1,500 documents and then in

16:01:10 13   the trial, the opinions he gave here were probably less than

16:01:17 14   thirty is my guess.  Yeah.

16:01:20 15   Q.     But Dr. Shanfield provided no opinion on those other

16:01:23 16   documents; right?

16:01:24 17   A.     I don't believe so, no.

16:01:35 18   Q.     May I have PTX 1142, please.

16:01:39 19          Earlier today, you promised the jury that you

16:01:46 20   would talk about the eval boards and the connectors and you

16:01:52 21   specifically mentioned a portion of this diagram.  Can we

16:01:56 22   blow up the recommended PCP dimensions at the top, please?

16:02:02 23          A few moments ago, you talked about how you had

16:02:12 24   reviewed all of the e-mail traffic between -- or the

16:02:19 25   deposition content about Hodge and Dyer, I believe is his

2193

Darveaux - redirect

16:02:25  1    name, related to this ██████████ connector?

16:02:29  2    A.      Yeah.

16:02:30  3    Q.      And that you believed that based upon your experience

16:02:34  4    in the industry, that something else was happening rather

16:02:41  5    than trying to duplicate this connector.  What was the basis

16:02:45  6    for you to say that?

16:02:46  7    A.      So I read the Hodge testimony, and it talks about

16:02:52  8    Dyer's position at the time, he was like a junior person

16:02:55  9    that did computer automated design, CAD, what you do with

16:03:01 10    CAD tools is layout the printed circuit board features,

16:03:04 11    that's what's shown here.  These are the features that the

16:03:07 12    supplier, ████████, recommends if you're going to use their

16:03:10 13    connector.  You design those on your print circuit board.

16:03:13 14            When I read Hodge's testimony, that's what I

16:03:17 15    concluded was they were trying to get this drawing so Dyer

16:03:21 16    could get that piece of it right there and design an

16:03:25 17    evaluation board that would match up to the connector.

16:03:26 18    That's what I understood the testimony to be when I read it.

16:03:31 19    Q.      Okay.  And that is not trade secret information?

16:03:36 20    A.      No.  This is what the supplier is giving their

16:03:40 21    customer so they can use the connector.  It's absolutely not

16:03:44 22    trade secret.

16:03:46 23    Q.      Does passing around well-known information turn it

16:03:49 24    into a trade secret?

16:03:51 25    A.      I don't believe so.

16:03:55  1           MS. SMITH:  No further questions.

16:03:57  2           THE COURT:  All right.  Thank you very much.

16:03:59  3  And you may step down.  Thanks very much.

16:04:02  4           Who will our next witness be?

16:04:08  5           MS. SMITH:  Dr. Lebby.

16:04:11  6           THE COURT:  All right.  If Dr. Lebby will come

16:04:14  7  forward and be sworn in.

16:04:29  8           COURT CLERK:  Please remain standing.  Please

16:04:34  9  state and spell your full name for the record.

16:04:40 10           THE WITNESS:  Michael Lebby, M-I-C-H-A-E-L,

16:04:46 11  L-E-B-B-Y.

16:04:47 12           MICHAEL LEBBY, having been duly sworn was

16:04:52 13  examined and testified as follows:

16:05:04 14           MR. CREMEN:  Your Honor, before we begin, can we

16:05:05 15  have a brief side-bar?

16:05:07 16           THE COURT:  Sure.

16:09:49 17           (Side-bar discussion:)

16:09:49 18           MR. NAQVI:  Before we commence with Dr. Lebby's

16:09:49 19  testimony, we asserted objections to an exhibit they want to

16:09:49 20  use with him.  I know the Court was considering that.

16:09:49 21           THE COURT:  We're going to allow his testimony

16:09:49 22  on the two subjects that we indicated earlier, and probably

16:09:49 23  on little else.  He can talk about the business plan,

16:09:49 24  general business plan, not general information in that

16:09:49 25  regard and the product roadmap which he can certainly talk

16:09:49  1    about.

16:09:49  2                    MR. NAQVI:  Okay.

16:09:49  3                    THE COURT:  And then he cannot go through market

16:09:49  4    reports, et cetera, and I don't believe that's going to be

16:09:49  5    appropriate with this witness.

16:09:49  6                    MR. NAQVI:  So that's a 222 report?

16:09:49  7                    THE COURT:  Right.  Anything else?

16:09:49  8                    MS. SMITH:  There are --

16:09:49  9                    THE COURT:  I'm sorry, I can't hear.

16:09:49 10                    MS. SMITH:  I understand.  So there are other

16:09:49 11    market reports in this case.  Is he allowed to go through

16:09:49 12    those or no market reports?  I mean, my -- I'm sorry, Your

16:09:49 13    Honor.

16:09:49 14                    THE COURT:  No, go right ahead.

16:09:49 15                    MS. SMITH:  My understanding was the Daubert

16:09:49 16    ruling was based upon the fact that for trade secrets he has

16:09:49 17    to know what's available publicly at a certain time, but all

16:09:49 18    he's going to talk about is his work, himself, in his

16:09:49 19    experience drafting roadmaps and business plans.

16:09:50 20                    THE COURT:  Sure.

16:09:50 21                    MS. SMITH:  And how he uses market reports and

16:09:50 22    teardown reports to inform him of how to create these plans.

16:09:50 23    So, I mean, I'll just tell you right now, what we were going

16:09:50 24    to do is just go through the report and say this is what is

16:09:50 25    available here and this is what that means, that's all we

16:09:50 1    were going to do.  We were not going to mention anything

16:09:50 2    about the other categories at all.

16:09:50 3                THE COURT:  Okay.  Well, that's probably -- go

16:09:50 4    ahead.

16:09:50 5                MR. NAQVI:  We don't object to Dr. Lebby

16:09:50 6    testifying generally about market reports.  He said he has

16:09:50 7    personal background with that, that's totally fine.

16:09:50 8                My concern, Your Honor, would be the motion to

16:09:50 9    exclude the ruling that you gave, I want to make sure there

16:09:50 10   isn't any testimony or confusion to the jury that

16:09:50 11   information in these reports is the same type of information

16:09:50 12   that is Qorvo trade secret because Your Honor prevented him,

16:09:50 13   excluded his opinion on Qorvo trade secret.

16:09:50 14               THE COURT:  I think we sit and listen carefully.

16:09:50 15   I know if he ventures off, you don't mind bringing him back

16:09:50 16   to the right spot.

16:09:50 17               MS. SMITH:  He's not going to be talking about

16:09:50 18   any of Qorvo's documents at all.

16:09:50 19               MR. NAQVI:  Or suggesting that anything in these

16:09:50 20   publicly available documents overlaps with Qorvo trade

16:09:50 21   secrets.

16:09:50 22               THE COURT:  I think his testimony will be

16:09:50 23   relatively short and it will focus on what we talked about

16:09:50 24   and we all know what we are not supposed to talk about.

16:09:50 25               MS. SMITH:  Right.

Lebby - direct

16:09:50  1          MR. NAQVI:  Just to clarify, is Ms. Smith

16:09:50  2  permitted to show him the 222 yield report?  I guess that's

16:09:50  3  the outstanding question.

16:09:50  4          THE COURT:  What about that?

16:09:50  5          MS. SMITH:  Well, I would like to because that's

16:09:50  6  basically his job, he makes roadmaps and business plans and

16:09:50  7  he uses reports, so he needs to also explain the paragraphs

16:09:50  8  that were not excluded that help -- it's the avoided cost

16:09:50  9  analysis, so he does say he would spend $10,000 on a market

16:09:50 10  report for the Category 1 document to -- basically

16:09:50 11  independently create a business report, a business plan.

16:09:50 12          THE COURT:  That's a practice in the industry, I

16:09:50 13  think he's allowed to testify in that regarded.  Okay.

16:09:50 14          MR. NAQVI:  We are okay with that.  Thank you,

16:09:50 15  Your Honor, for the clarification.  It was very helpful.

16:09:55 16          (End of sidebar.)

16:09:55 17          THE COURT:  Ms. Smith, you may proceed.

16:09:59 18              DIRECT EXAMINATION

16:09:59 19  BY MS. SMITH:

16:09:59 20  Q.     Good afternoon, Dr. Lebby.  How are you today?

16:10:02 21  A.     Good afternoon.  Very well.  Thank you.

16:10:04 22  Q.     Would you please state your full name, age, and your

16:10:07 23  current state of residence?

16:10:08 24  A.     My name is Michael Lebby.  I am sixty-three.  I live

16:10:11 25  in San Francisco, California.

Lebby - direct

16:10:14  1    Q.      And I have been having this problem myself today, so

16:10:19  2    I'm going to ask you to speak up so that everybody can hear

16:10:23  3    you.

16:10:23  4    A.      I will try.

16:10:24  5    Q.      Would you tell the jury a little bit about your

16:10:27  6    family background?

16:10:29  7    A.      Yes.  I am English by birth.  I'm a U.S. citizen.

16:10:34  8    Married.  I have two children.  My wife works as a middle

16:10:40  9    school teacher in Oakland, California.

16:10:42 10    Q.      What are the specifics of your educational

16:10:44 11    background?

16:10:45 12    A.      I was educated in England.  I have four degrees.  I

16:10:50 13    have a Bachelor of Electrical and Electronic Engineering in

16:10:55 14    '84.  I have an MBA in '85.  Ph.D. in '87.  And a second

16:11:01 15    doctorate, Doctor of Engineering in 2004.  These are at the

16:11:06 16    University of Bradford in the UK.

16:11:09 17    Q.      So what made you come to the U.S.?

16:11:13 18    A.      Actually -- usually you runaway from your parents,

16:11:19 19    but my parents ran away from me.  They left in 1980 to come

16:11:23 20    to California.  I had a scholarship, I finished university

16:11:29 21    and then I realized in the electronics field there are a lot

16:11:32 22    of job opportunities in the U.S., so I came in '85.

16:11:36 23    Q.      Who do you currently work for?

16:11:38 24    A.      I work for a public company, small public company

16:11:43 25    based in Denver, Colorado called Light Wave Logic.  It's a

Lebby - direct

16:11:48  1    company that develops chemistry or polymers, and the

16:11:51  2    application is for the internet.  And we turn these polymers

16:11:57  3    into little devices called modulators that actually speed up

16:12:01  4    the data that goes around the internet.

16:12:04  5           So, for example, if you're sitting in a home and

16:12:07  6    you have to turn your monitor off because you don't have the

16:12:10  7    bandwidth coming into your home, these type of devices send

16:12:15  8    a lot more information faster so they relieve that issue.

16:12:18  9    Q.    Do you have any professional certifications?

16:12:22 10    A.    Yes, I do.  I am a fellow of the IEEE, that's the

16:12:29 11    Institute of Electrical and Electronics Engineers.  I'm

16:12:32 12    fellow of OPTICA, which is another society, professional

16:12:35 13    society.  I'm also a fellow of the National Academy of

16:12:39 14    Inventors.

16:12:39 15    Q.    Are you the named inventor on any patents?

16:12:43 16    A.    Yes, I am.  I think to date it's more than 225 issued

16:12:49 17    USPTO patents.  And the fields include semiconductors,

16:12:55 18    electronics, platonics, which are also electronics,

16:13:01 19    packaging, materials and subjects like that.

16:13:05 20    Q.    Are you the author of any publications?

16:13:08 21    A.    Yes, I am.  I have roughly about sixty publications

16:13:12 22    to my name.

16:13:16 23    Q.    How about conference work and speaking engagements?

16:13:20 24    A.    So given my career over the last forty years, I have

16:13:24 25    somewhere close to 400 speaking engagements at conferences,

Lebby - direct

16:13:28 1  panels, invited talks, keynote talks, interviews, webinars,

16:13:33 2  things like that.

16:13:34 3  Q.     Which conferences have you chaired?

16:13:40 4  A.     So there is a couple of conferences I like to

16:13:43 5  participate in.  There is an international conference in

16:13:46 6  Europe on optical communications where I have chaired the

16:13:50 7  market focus committee in sessions for the last seven years

16:13:55 8  consecutively.

16:13:56 9          There is another conference in Europe where I

16:14:00 10 have chaired the actual conference and solicit papers and

16:14:04 11 speakers.  Speakers for the last nine years consecutively.

16:14:08 12 Q.     What other employment history do you have?

16:14:12 13 A.     I believe there is a demonstrative, if we're going to

16:14:15 14 use that.  So I started working in the UK for the British

16:14:22 15 government, then came to the United States in 1985 to Bell

16:14:25 16 Labs to do research in electronics.  I was there for four

16:14:29 17 years.

16:14:30 18         I then moved to Motorola in Phoenix, Arizona,

16:14:35 19 that's also to do with electronics.  I also started to do

16:14:41 20 other electronics there, too.  Motorola, we focused on the

16:14:45 21 corporate research area, and I was responsible in a number

16:14:48 22 of different positions and projects doing business plans and

16:14:52 23 technology road maps.

16:14:53 24         In 1998, nine years later, I went back across

16:14:58 25 the country to Pennsylvania to Tyco in Harrisburg.  And then

Lebby - direct

16:15:04  1    I had a more senior role in one of Tyco's divisions doing

16:15:10  2    technology business development, that's what BD means, and

16:15:15  3    that included work on business plans and technology road

16:15:19  4    maps.

16:15:19  5          In 1999, I went back across the country to

16:15:22  6    California to work for Intel.  Intel Capital is the venture

16:15:26  7    arm of Intelliware, they found lots of companies, so I did a

16:15:31  8    lot of work in advanced technology at Intel.

16:15:34  9          And after Intel, it was an interesting time for

16:15:36 10    me, because previous to that, I worked for large

16:15:40 11    corporations and then I started my own company with some

16:15:44 12    colleagues from HP, which was also in California.  So we

16:15:48 13    started a company and raised venture capital money and

16:15:51 14    developed our own business plans and technology and products

16:15:55 15    and took that to market.

16:15:58 16          In 2003, we were acquired by a large company in

16:16:01 17    England, and I was given a vice-president role of technology

16:16:07 18    and business development at that time reviewing most of the

16:16:14 19    company's technology roadmaps and plans and looking at some

16:16:17 20    of the product development.

16:16:18 21          2005, I went to Washington D.C., OIDA stands for

16:16:25 22    Optoelectronic Development Association, that's a nonprofit

16:16:28 23    trade association to represent the industry in Washington

16:16:33 24    DC.  So I learned lots about of how government worked from a

16:16:38 25    technical standpoint.  OIDA provided lots of services to its

Lebby - direct

16:16:43  1  members like workshops, conferences, they did roadmap

16:16:47  2  reports, they also did market analysis and market reports.

16:16:51  3  So I was responsible for that.

16:16:53  4         In 2010, I went back across the country to

16:16:58  5  California to Palo Alto, a startup company called

16:17:03  6  Translucent, where I focused on electronic RF and HF

16:17:08  7  materials.  In that company we did a lot of work on

16:17:11  8  electronics material and development, and took that to

16:17:15  9  product development.  I was the GM and the chief technical

16:17:21 10  officer there.  And then we come in 2015 to my present

16:17:25 11  company.

16:17:25 12  Q.    Do you do any consulting work?

16:17:28 13  A.    Yes, I do.  I consult for one entity, that's the

16:17:31 14  European commission, and in that capacity I help the

16:17:35 15  commission review electronic proposals and advice on

16:17:39 16  electronic strategy including optical electronics.

16:17:45 17         MS. SMITH:  Your Honor, I tender Dr. Michael

16:17:47 18  Lebby as an expert in the RF filter industry.

16:17:51 19         THE COURT:  Any voir dire?

16:17:53 20         MR. NAQVI:  No objection, Your Honor.

16:17:54 21         THE COURT:  He is accepted as an individual to

16:17:59 22  express opinions, he is an expert in the areas specified.

16:18:03 23  BY MS. SMITH:

16:18:04 24  Q.    So Dr. Lebby, would you please go a little bit in

16:18:08 25  more detail about your role at Motorola?

Lebby - direct

A.      Yes.  Motorola, I was there for nearly ten years and I started off in corporate research as a researcher and then ended up actually running lots of research groups.  And one of the things I learned coming from Bell Labs where it's a published or parish environment, you have to publish papers at Bell Labs to survive.  But in Motorola, they decided they didn't want us to publish papers, they wanted us to do patents and put business plans together for some of the research we were planning to do, some of the projects we were working on.  That was interesting because as a researcher that was quite new for me.  So in order to do that, what we started to do is to look at how best to put plans together so we could bridge the research going from new concepts of technology to develop that technology into products.

One of the things Motorola really watched very carefully was on your projects for new technology, they wanted to make sure there was a market for the new technology.  If you remember in the 1989 time frame, we had pagers, we had the little Motorola cell phones, so they were really interested in reducing the size of these cell phones and looking for new technology to put into those phones, like, for example, changing in displays and changing the performance, from digital to analog.  So we had to plot where the technology would be going a few years down the

2204
Lebby - direct

16:19:47  1    road, would it be a technology that would take off, would it

16:19:50  2    be a technology that would achieve a specification persons

16:19:54  3    would like to see.  And so it was a very -- for me an

16:19:58  4    interesting change from the classic research I did at Bell

16:20:02  5    Labs to more commercial research.  And that really focused

16:20:06  6    me on things that, some of the projects we worked on at

16:20:12  7    Motorola, including some of the original BAW filter designs,

16:20:16  8    SAW filters, projects you have heard about, so we looked at

16:20:20  9    some of those types of projects.

16:20:21 10    Q.     You talked about this bridge to connect technology

16:20:31 11    into a product.  Can that go beyond a single product getting

16:20:36 12    to market and can cover an evolution of that product?

16:20:39 13    A.     Yes.  I mean, from the very highest level, when I

16:20:44 14    talk about a bridge to take technology from its concept

16:20:49 15    stage all the way to product, we've heard something very

16:20:53 16    similar in trial in the last I guess eight or ten days,

16:20:57 17    people have been mentioning phase gates and stage gate

16:21:01 18    processes.  These are two techniques where you would qualify

16:21:07 19    a project as it advances from research to product

16:21:11 20    development.  And so these are like virtual gates.

16:21:15 21           What is a gate?  To answer your question, yes,

16:21:18 22    you can do this with many different products.  But what is a

16:21:21 23    gate?  To be reviewed by your peers and a review by higher

16:21:25 24    management to make sure the project is making really good

16:21:29 25    progress.  So you have got some new technology you're trying

Lebby - direct

16:21:32  1    to sort of develop into a product, management wants to know

16:21:36  2    when it gets to a product, is it going to make money, so you

16:21:41  3    got to show the cost of all the component parts or the bill

16:21:45  4    of materials is such that it's a low enough so it's

16:21:50  5    underneath the selling price so you can make money doing

16:21:53  6    that.  They also want to know is there a market for it, so

16:21:56  7    what is the application in the market.  They also want to

16:21:59  8    know what the specifications would be that the customers are

16:22:01  9    looking for.

16:22:02  10            Now, sometimes some of these technologies don't

16:22:05  11   make it through the gates, so you're either given more

16:22:09  12   funds, more budget, or more time or they just kill the

16:22:12  13   project.  I have been on a number of technology projects

16:22:15  14   which have basically been killed because they didn't make it

16:22:18  15   through the gates.

16:22:19  16            And so some people call it new product

16:22:23  17   introduction, some people call it stage gate, some people

16:22:27  18   call it phase gate, but they're generally a bridge to take

16:22:31  19   technology from its concept, from its new idea all the way

16:22:35  20   to products.

16:22:37  21   Q.    And what's the difference between a business plan and

16:22:41  22   a roadmap?

16:22:43  23   A.    So a business plan would give you, typically you

16:22:47  24   start off a business plan on a spreadsheet and you would see

16:22:51  25   if whatever you're designing, when it gets to product, will

Lebby - direct

16:22:55  1    it actually make any money.  You put it in the market and

16:22:59  2    can you ask a selling price that people, customers, will

16:23:02  3    actually pay and will you make a profit.

16:23:04  4         The business plan usually dictates if a product

16:23:08  5    can do that.

16:23:08  6         And so in order to do that, you really have to

16:23:12  7    understand the cost of all the component parts.  So I mean,

16:23:17  8    there is really an understanding if you have a wafer going

16:23:20  9    through the fab, you really have to understand the cost

16:23:23 10    reference.

16:23:24 11         In a roadmap, you're looking to see if the

16:23:26 12    technology you have chosen really actually can achieve the

16:23:29 13    specifications.  And maybe they can, maybe it looks like it

16:23:32 14    can when you begin and then the customer requirements change

16:23:37 15    as we just heard earlier today, and maybe the specifications

16:23:41 16    get a little more strict, more stringent, you want to make

16:23:45 17    sure that the technology has head room to improve in

16:23:48 18    performance, so a roadmap will give that you indication.

16:23:52 19 Q.    What sorts of tools would you use to create roadmaps

16:23:57 20    and business plans?

16:24:02 21 A.    Right.  So the types of tools I would look at would

16:24:05 22    be one of the things I learned when I was at Motorola, and I

16:24:08 23    didn't realize this existed at Bell Labs, was you can go out

16:24:11 24    and you can purchase market technology reports.  You can go

16:24:16 25    out and purchase technology reports.  Could go out and

Lebby - direct

16:24:20  1    purchase teardown reports.  We have seen examples of that

16:24:24  2    this last week.  These are things that you can buy from

16:24:28  3    third-party companies.

16:24:29  4            And I think I said in my deposition, you know,

16:24:31  5    the price ranges typically between $3,000 and $10,000.  And

16:24:36  6    so one of the things I was told to do when I first arrived

16:24:40  7    at Motorola was go buy a couple of market reports and figure

16:24:45  8    out the technology you're working on, where it's going to

16:24:48  9    go, what the application is, and what the market looks like.

16:24:52 10    I actually did that.

16:24:53 11            What that taught me and it sort of stayed with

16:24:56 12    me the rest of my career is there is a ton of information

16:24:59 13    out there that doesn't cost a lot of money that has lots and

16:25:02 14    lots of detail about what the raw materials would cost, how

16:25:07 15    much it would cost to run something through a fab, how much

16:25:10 16    it would cost to assemble something or package something,

16:25:13 17    and what the markets look like, who are the big players, who

16:25:16 18    are the competition, what the competition looks like, and

16:25:20 19    even to as we've seen from the two teardown reports today,

16:25:25 20    you can look at a competitor's product and you can see it

16:25:30 21    analyzed.

16:25:37 22    Q.    So you mentioned earlier that after you went to

16:25:40 23    Motorola, you then worked at Tyco and then you joined Intel,

16:25:44 24    but then you went to a startup called Ignis.  Why did that

16:25:52 25    happen?

Lebby - direct

16:25:53 1   A.      That was an opportunity, if you're in the field and

16:25:55 2   you're doing technology roadmaps, then at that time myself

16:25:59 3   and some colleagues saw an opportunity that wasn't being

16:26:02 4   covered by the larger corporations.  So my colleagues worked

16:26:06 5   at HP, I worked at Intel.  They weren't really interested in

16:26:10 6   an opportunity we saw in the marketplace, so we all decided

16:26:14 7   to leave the big companies, start our own company, raise

16:26:17 8   venture capital money, put our own plans together, put our

16:26:21 9   own roadmaps together, and really see if we could address a

16:26:25 10  gap in the marketplace.

16:26:27 11          What we discovered when we did this, we weren't

16:26:31 12  the only team on that, there were about twenty other start

16:26:34 13  up companies all start trying to do the same thing.  It was

16:26:38 14  very competitive, this was in the 2001 time frame.  But when

16:26:42 15  you start your own company, it's 24/7, you work seven days a

16:26:47 16  week, you work long hours.  We even had a couple of sofas in

16:26:51 17  the cafeteria area so people could sleep overnight.

16:26:56 18          But, you know, the exciting thing about that is

16:26:59 19  you took a brand-new technology and we turned it into

16:27:03 20  commercial products within two years, mostly because of

16:27:06 21  venture capitalists, we had to get the job done.  There is a

16:27:13 22  lot of pressure, but it's also a lot of fun, too.

16:27:16 23  Q.      After Ignis -- it was after Ignis was acquired by

16:27:23 24  Photon, you were at company come for a while and then you

16:27:26 25  went to OIDA?  What is OIDA?

Lebby - direct

16:27:29  1    A.      It's a trade association that represented a number of

16:27:31  2    companies in the U.S.  So there were companies such as

16:27:46  3    Intel, Motorola, companies like that that were members of

16:27:51  4    OIDA, it was a trade association.  And it was a nonprofit

16:27:55  5    trade association, and we put together workshops and

16:28:00  6    conferences for the members, and we wrote roadmap reports,

16:28:06  7    technology roadmap reports, we also did market analysis for

16:28:10  8    the members because they really wanted to understand what

16:28:13  9    the markets were like, it was a nonprofit trade association

16:28:18  10   that provided services to their members.

16:28:21  11   Q.      So then you were on the other side of the market

16:28:26  12   report; right, where you were creating them yourself?

16:28:30  13   A.      Absolutely.  It's before then I was actually

16:28:33  14   purchasing reports, but I went to RODA, part of the job was

16:28:38  15   to write market reports to what the members were looking

16:28:44  16   for.  And so, yes, I sat down and started to learn out to do

16:28:48  17   that process and we did that for like five consecutive years

16:28:54  18   in terms of market reports.

16:28:55  19           I believe there was probably ten or twelve

16:28:58  20   reports a year.

16:29:00  21   Q.      Okay.  May I see DDX 4.02, please.

16:29:08  22           Dr. Lebby, what have you been asked to do for

16:29:13  23   today?

16:29:14  24   A.      So I have been asked to calculate the avoided costs,

16:29:18  25   which is similar to what the Dr. Darveaux just talked about

Lebby - direct

16:29:23  1    when he did his calculation of avoided cost.  But the

16:29:26  2    categories I have been asked to look at are Categories 1 and

16:29:30  3    8 of Dr. Shanfield's report of the Qorvo's alleged trade

16:29:34  4    secrets.  So I have been looking at Categories 1 and 8, and

16:29:37  5    Dr. Darveaux looked at Categories 2 to 7.

16:29:41  6    Q.    What are Categories 1 and 8?

16:29:44  7    A.    Category number 1 is business plans for the Wi-Fi

16:29:48  8    market.  And Category 8 is roadmaps and prototypes.

16:30:08  9            MS. SMITH:  Your Honor, may I approach the

16:30:09 10    witness?

16:30:10 11            THE COURT:  You may.

16:30:16 12    BY MS. SMITH:

16:30:30 13    Q.    Dr. Lebby, I just handed you DTX 480.  Do you

16:30:37 14    recognize this document?

16:30:38 15    A.    Yes, I do.

16:30:40 16    Q.    What is this document?

16:30:42 17    A.    This is a BAW filter comparison document.  It's a

16:30:48 18    market report.  It is authored by the company, a French

16:30:53 19    company called Yole, Y-O-L-E, and the date of it is 2022.

16:31:01 20    Q.    Did you use this document when you were forming your

16:31:04 21    opinions?

16:31:05 22    A.    Yes, I did.

16:31:09 23            MS. SMITH:  Your Honor, I move for DTX 480 to be

16:31:13 24    entered into the evidence.

16:31:14 25            MR. NAQVI:  Objection, Your Honor.

Lebby - direct

16:31:15  1          THE COURT:  Objection sustained.  On the same

16:31:18  2  basis as the 803 objections previously raised in this area.

16:31:41  3          MS. SMITH:  May I show the report, Your Honor?

16:31:43  4          THE COURT:  Yes, I mean, can you show it to the

16:31:45  5  witness, sure.

16:31:46  6          MS. SMITH:  But I cannot display it?

16:31:48  7          THE COURT:  Take a look at Rule 803.17, that

16:31:53  8  will tell you what you can do.

16:31:55  9  BY MS. SMITH:

16:31:56 10  Q.    Dr. Lebby, would you turn to page 2 of the document.

16:32:13 11  A.    I am there.

16:32:15 12  Q.    All right.  What's on page 2?

16:32:18 13  A.    Page 2 is a table --

16:32:21 14          THE COURT:  It's 803 subpart 18.  Go ahead.

16:32:28 15  Q.    What's on page 2?

16:32:31 16  A.    Page 2 is a -- the first page of a table of contents.

16:32:38 17  It already shows it goes into over 126 pages.  It covers an

16:32:46 18  overview of the market, BAW filters, company profiles in

16:32:53 19  this market, the RF market, some of the competitors in the

16:32:58 20  market, it has a section on physical analysis, so what this

16:33:04 21  company is doing is taking -- looking at the physical

16:33:07 22  filters that are in these front end filter modules by a

16:33:13 23  number of different companies.  It does a comparison by

16:33:16 24  doing some analysis and then goes through some detailed

16:33:19 25  manufacturing process to make these filters.

Lebby - direct

16:33:23  1    Q.      So I would like to go through this report and ask you

16:33:36  2    what kind of information you would get from this report in

16:33:41  3    order to create business plans and roadmaps.

16:33:46  4            What's on page 145 of this report?

16:33:56  5    A.      Page 145 is entitled synthesis of the cost analysis.

16:34:02  6    And what it is a table with a number of competitive

16:34:07  7    companies like Skyworks, Broadcom, TileUni, Akoustis, Ross,

16:34:16  8    which is Chinese company, Qorvo, Texas Instruments, and it

16:34:22  9    compares different costs of the wafers, the die costs, and

16:34:25 10    the die costs per millimeter of all these different

16:34:29 11    companies.

16:34:29 12            For example, it lists which ones make SAW and

16:34:35 13    which ones makes SMR.  Broadcom has the lowest die cost per

16:34:41 14    millimeter squared for an FBAR, which is 4.2 cents per

16:34:46 15    millimeter, compared to Akoustis which is 5.9 cents per

16:34:51 16    millimeter.  SMR looks like Qorvo is 4.9 cents per

16:34:57 17    millimeter squared.  So it looks like the lowest cost filter

16:35:01 18    would be made by Broadcom compared to other companies.

16:35:07 19    Q.      How are the creators of this report able to determine

16:35:12 20    costs on such a granular level?

16:35:15 21    A.      So they do a lot of reverse breakdowns and reverse

16:35:20 22    costing analysis, and they're looking to detail how those

16:35:25 23    chips are fabricated.

16:35:27 24            For example, on this page it's got the wafer

16:35:29 25    cost, the wafer cost for Skyworks is $842, whereas for

Lebby - direct

16:35:34 1    Akoustis its $454.  And for Qorvo it's $612.  And so they

16:35:41 2    estimate the size of it, they got the size of the wafer

16:35:44 3    here, they got the process from doing the reverse breakdown

16:35:47 4    and they see how two chips are being fabricated.  This is a

16:35:52 5    typical thing.  And then they can work out exactly what the

16:35:55 6    chip costs are, what the yields are and they can put that

16:35:59 7    into a spreadsheet which is part of this 170 page report.

16:36:04 8           And so I would say they may not align exactly to

16:36:09 9    the numbers you'll find internally to companies, but it

16:36:13 10   gives you a pretty good idea of the relative costs each

16:36:17 11   company is achieving through their manufacturing processes.

16:36:21 12   Q.    Have you ever worked at a company whose product was

16:36:29 13   the subject of a teardown report?

16:36:35 14   A.    I believe at Motorola when I was there, some of the

16:36:40 15   products we had were subject to teardown.  But I haven't

16:36:43 16   seen the reports.  I believe that's the case.  I know when I

16:36:46 17   was there, I ordered quite a number of teardown reports of

16:36:50 18   different competitor's products.  In fact, in my deposition

16:36:54 19   in February, I told opposing counsel I purchased two reports

16:36:58 20   at Light Wave just in December this year for the team

16:37:02 21   because we really wanted to look into what the competitive

16:37:06 22   products actually were like, so we went out and purchased a

16:37:08 23   couple of reports.  I don't think they were $10,000, I think

16:37:11 24   they were about $7,000.

16:37:13 25           So in terms of the products I have developed, I

Lebby - direct

16:37:17 1  believe Motorola, somebody may have looked at those

16:37:20 2  products.  But for myself, I certainly purchase quite a few.

16:37:26 3  Q.    Okay.  Do these reports include forecasting of the

16:37:33 4  market?

16:37:33 5  A.    Yes, they do.  They give you a really interesting

16:37:37 6  market forecast.  They tell you what the market has been,

16:37:42 7  for example, in this report here, some of the forecast are

16:37:45 8  quite interesting.  It really looks at the RF industry from,

16:37:53 9  for you are phones, one of the teardowns is an iPhone 6 and

16:37:58 10 it shows you the market for 4G back in 2019 and it shows you

16:38:02 11 the big gray circle which decreases in size by 2026, they

16:38:08 12 don't actually recall the detail numbers.

16:38:11 13         And the interesting thing I remember about that

16:38:12 14 chart is that in 2019, there was a very small light green

16:38:16 15 circle for 5G, and I don't believe I had a 5G iPhone in

16:38:21 16 2019, but that circle is huge by 2026.  So it gives you a

16:38:25 17 really good feel for the market forecasts and market growth

16:38:30 18 for different types of technology and applications.

16:38:34 19 Q.    Do these reports also show where each of the

16:38:40 20 companies in the industry are positioned as far as the

16:38:45 21 variety of products they make?

16:38:47 22 A.    Yes.  And typically what you'll find in a technology

16:38:50 23 roadmap is you'll find different types of technologies

16:38:55 24 plotted and a figure of merit performance, so you can see

16:38:59 25 which technologies have the potential to go, for example, I

Lebby - direct

16:39:04  1    think there is one graph in here, high frequency, so we know

16:39:09  2    the originals of acoustic filter were SAW filters and we

16:39:14  3    know their performance goes up to about two, maybe

16:39:17  4    three-gigahertz.

16:39:18  5              And then we went to BAW filters and we know that

16:39:22  6    performance goes up to about five or six.  And then we have

16:39:26  7    received bar technology and that performance has been shown

16:39:30  8    to go above ten-gigahertz.  There is a graph here that

16:39:33  9    actually shows you the performance of different

16:39:36 10    technologies.

16:39:36 11              So when you're putting a business plan and a new

16:39:39 12    project together, you can have a feel and say well, maybe

16:39:43 13    that technology has merit.  Maybe it has the potential

16:39:46 14    performance to meet specs a few years down the road.  So

16:39:51 15    these reports give you a really good feel for the potential

16:39:55 16    to come up with a good technology platform.  I mean, I've

16:40:00 17    certainly used it to put business plans together, both for

16:40:04 18    startup companies as well as projects within the big

16:40:07 19    corporate environment.

16:40:10 20              MS. SMITH:  Your Honor, may I approach the

16:40:11 21    witness?

16:40:12 22              THE COURT:  You may.

16:40:26 23    BY MS. SMITH:

16:40:40 24    Q.    Dr. Lebby, I just handed to you JTX 0014, and DTX

16:40:56 25    0623.  Do you recognize these two documents?

Lebby - direct

16:40:58  1    A.      Yes, I do.

16:41:26  2    Q.      What are those documents?

16:41:28  3    A.      Well, the first document I'm looking at is JTX 0014.

16:41:34  4    This is a teardown report.  They actually call it a reverse

16:41:40  5    copying report.  The company who authored it is called

16:41:44  6    System Plus Consulting.  It is another French company.  It

16:41:48  7    is a report of it looks like about 170 pages, and what it is

16:41:56  8    entitled is Akoustis XBAW Technology for Connectivity.  So

16:42:02  9    it is a teardown of Akoustis parts, product parts.

16:42:06 10    Q.      And what is DTX 623?

16:42:09 11    A.      DTX 623 is another teardown report.  It's called a

16:42:16 12    reverse cost analysis, it's by System Boss, which is again a

16:42:23 13    French company.  The date is April 2016 and the title is

16:42:28 14    Qorvo TQF6045 High Band, FEM, SMR-BAW filter, and then

16:42:39 15    underneath it has iPhone 6S plus.  So it is a teardown

16:42:44 16    analysis of an iPhone 6 to do the reverse analysis on the

16:42:52 17    teardown of a TriQuint front-end module.

16:43:01 18    Q.      Can you please turn to page 113.

16:43:03 19    A.      Of DTX 0623?

16:43:06 20    Q.      No, of JTX 0014.

16:43:20 21    A.      I have page 113 in front of me.

16:43:26 22    Q.      What's on page 113?

16:43:28 23    A.      Sorry, it's got an echo in here.  On page 113, it is

16:43:35 24    entitled filter front-end process.  And what is depicted on

16:43:42 25    this slide or page is a very detailed list of the process

Lebby - direct

16:43:49  1    flow that you would see in a fab.  It has listed different

16:43:57  2    fab process steps, in quite detail to help put the structure

16:44:05  3    together.  So it is a cross-section of a filter, it looks

16:44:08  4    like it's a cross-section of a cavity Akoustis filter

16:44:15  5    because I can see where the cavity is, and I can see the

16:44:18  6    cross-section of the layers.

16:44:21  7                MS. SMITH:  Your Honor, these two exhibits have

16:44:23  8    already been admitted as Trial Exhibits 158 and 159.  Can

16:44:28  9    they be displayed?

16:44:33 10                THE COURT:  Let me see you briefly at side-bar.

16:49:53 11                (Side-bar discussion:)

16:49:53 12                THE COURT:  Okay.  Let's take a look.  Let's see

16:49:53 13    what we have got.  The document, that's what I was trying to

16:49:53 14    look at.

16:49:53 15                MR. NAQVI:  I have it here, Your Honor.

16:49:53 16                THE COURT:  That would be helpful.  That's my

16:49:53 17    outline.  This is the document.  Let's leave your outline.

16:49:53 18                MR. NAQVI:  Thank you.

16:49:53 19                THE COURT:  No problem.

16:49:53 20                MR. NAQVI:  That's JTX 14.

16:49:53 21                THE COURT:  Okay.  This is prepared by the

16:49:53 22    French consulting firm.

16:49:53 23                MR. NAQVI:  Correct.

16:49:53 24                MS. SMITH:  Right.

16:49:53 25                MR. NAQVI:  And I believe this is an analysis of

Lebby - direct

16:49:53  1   the Akoustis process.

16:49:53  2              THE COURT:  It is.  That's true.  I can't tell

16:49:53  3   exactly what it is, it's being presented as a market report

16:49:54  4   or commercial publication, but it looks -- is it a market

16:49:54  5   report or is it something else?  It looks like a technical

16:49:54  6   report.

16:49:54  7              MR. NAQVI:  It's reverse cost analysis, Your

16:49:54  8   Honor.

16:49:54  9              MS. SMITH:  This is what is made in the

16:49:54 10   industry, that's how --

16:49:54 11              THE COURT:  I believe that.  I'm just not sure

16:49:54 12   what it actually is.

16:49:54 13              MS. SMITH:  Okay.  I mean --

16:49:54 14              THE COURT:  Where does it say market report on

16:49:54 15   it?

16:49:54 16              MS. SMITH:  Well, take a look at, it has it down

16:49:54 17   right, but it also talks about the cost.

16:49:54 18              MR. STANFORD:  So it talks about the market at

16:49:54 19   the end, the cost of making these products, and --

16:49:54 20              THE COURT:  It does look like it may be a market

16:49:54 21   report that would qualify under the exception, market

16:49:54 22   reports -- he needs to -- I think he's adequately identified

16:49:54 23   it.  I'm asking, do we know anything else about this that I

16:49:54 24   need to know from either side?

16:49:54 25              MR. NAQVI:  I think, Your Honor, since it's

Lebby - direct

16:49:54  1    already in evidence.

16:49:54  2              THE COURT:  It's already marked.  It was marked

16:49:54  3    up here.

16:49:54  4              MR. NAQVI:  It doesn't have the trial stamp, but

16:49:54  5    it's already in evidence.

16:49:54  6              THE COURT:  No, that's not a problem, there is

16:49:54  7    no objection, so that's the issue.  We can receive it.  It's

16:49:54  8    the -- it has yet to be marked.  What's the number?

16:49:54  9              MR. NAQVI:  It's 159.

16:49:54 10              THE COURT:  Sure.  That's fine.  Go right ahead.

16:49:54 11    I wanted to make sure I knew what it looked like, because

16:49:54 12    it's big.  Huge.

16:49:54 13              MS. SMITH:  The other market report actually has

16:49:54 14    way more market stuff in it, and it's not just focus on

16:49:54 15    Akoustis and not just focused on Qorvo, that's why we

16:49:54 16    printed it at first because it's more about the market and

16:49:54 17    all the other players.

16:49:54 18              THE COURT:  Sure.

16:49:54 19              MS. SMITH:  Would we be able to get that into

16:49:54 20    evidence or display it?

16:49:54 21              MR. NAQVI:  We would object to that one, Your

16:49:54 22    Honor.  That's PTX 480 that we objected to on hearsay

16:49:54 23    grounds.

16:49:54 24              THE COURT:  That is right, you did.  It looks

16:49:54 25    like it might have some limited use which is probably fine,

Lebby - direct

16:49:54  1    but I don't think it can be received in the case.

16:49:54  2            MS. SMITH:  Okay.

16:49:54  3            THE COURT:  But this one is already in and

16:49:54  4    that's not a problem and it only relates to Akoustis, is

16:49:54  5    that right?

16:49:54  6            MR. NAQVI:  Correct.

16:49:54  7            MS. SMITH:  The other one relates to Qorvo.

16:49:54  8            MR. NAQVI:  One for Qorvo, one for Akoustis.

16:49:54  9            THE COURT:  That's perfectly fine.  This one is

16:49:54 10    in.  The other one, the whole report we would not receive.

16:49:54 11            MR. NAQVI:  Correct.

16:49:54 12            THE COURT:  I think we got it right.  Good deal.

16:49:54 13            MR. NAQVI:  Thank you, Your Honor.

16:49:54 14            MS. SMITH:  I can display it?

16:49:55 15            THE COURT:  This one you can display.

16:49:55 16            MS. SMITH:  And the Qorvo one, is that okay, or

16:49:55 17    no?

16:49:55 18            THE COURT:  That's where you run into the issue

16:49:55 19    -- I'm going to allow you to -- it's really just the

16:49:55 20    hearsay, the question is it sufficiently reliable.  It's

16:49:55 21    already been marked and received, no objection, it can be

16:49:55 22    received.  The Qorvo one hasn't been objected to.

16:49:55 23            MR. NAQVI:  It's this one, I think it's this

16:49:55 24    document.  She hasn't really asked questions about it yet.

16:49:55 25            MS. SMITH:  I just started questioning about it.

Lebby - direct

16:49:55  1                THE COURT:  We're going to allow them under

16:49:55  2    803.17.

16:49:55  3                MS. SMITH:  Okay.

16:49:55  4                THE COURT:  Thank you.

16:50:00  5                (End of side-bar.)

16:50:03  6                THE COURT:  Counsel, may proceed.

16:50:04  7                MS. SMITH:  All right.

16:50:05  8                THE COURT:  And you were seeking to have one is

16:50:08  9    already marked and then there is a second one that may be

16:50:10 10    admitted, is that right?

16:50:13 11                MS. SMITH:  Well, they're both admitted already.

16:50:16 12                THE COURT:  We're fine.  You can display those.

16:50:19 13    BY MS. SMITH:

16:50:19 14    Q.    May I have DTX 623, that's Trial Exhibit Number 159.

16:50:29 15    Actually let me try JTX 14, that's Trial Exhibit 158.

16:50:36 16                Dr. Lebby, is this the document that you have

16:50:40 17    been looking at?

16:50:40 18    A.    Yes, it is.

16:50:42 19    Q.    So let's start at the very beginning.  On page 2 --

16:51:03 20    all right, page 3.  That's the table of contents, right?

16:51:05 21    A.    That is correct.

16:51:06 22    Q.    Do you want to go through and just point out the

16:51:10 23    significant portions that you would normally look at for

16:51:14 24    creating business reports, business plans and roadmaps?

16:51:21 25    A.    So for the business plans and roadmaps, I certainly

Lebby - direct

16:51:24 1 would look at the company profile, which begins on page 8.

16:51:28 2 You can see in that section there is a lot of interesting

16:51:31 3 things to look at in terms of the applications and the

16:51:34 4 market analysis.  I would look at a little bit of the

16:51:39 5 physical analysis, which is the next chapter, which is where

16:51:43 6 the teardown starts.  You got the filter die, you got

16:51:48 7 different types of products.  So I would look at the type of

16:51:51 8 package that would be used, how the die layout would be

16:51:58 9 like.  But then I would really focus on the manufacturing

16:52:02 10 process, which begins on page 111 I believe it is.

16:52:06 11         And so now you're looking at the process flow.

16:52:09 12 This is how you would fabricate the filter in a Fab, in a

16:52:13 13 fabrication plant.  And so I would look at the test and

16:52:18 14 summary, that would give me a really good idea of how the

16:52:22 15 device is constructed, what the type of materials are, what

16:52:25 16 the layers are.

16:52:26 17         The next section you would need for the business

16:52:29 18 plan, that gives you a cost analysis and some of the yields,

16:52:32 19 that gives you a really good idea of the cost of it, how it

16:52:36 20 -- all the steps, I mean, there is probably 2 or 300 steps

16:52:40 21 in the fab, and so it would tell you which steps are the

16:52:43 22 most costly, the ones to watch out for, what's being used.

16:52:47 23 And that would allow you to put a bill of materials

16:52:50 24 together.

16:52:51 25         A bill of materials is basically you summarize

2223

Lebby - direct

16:52:57  1    all the raw costs.  So you need to know that figure to

16:53:00  2    figure out and compare that with this potential selling

16:53:03  3    price to find out if you're going to make some money.  So

16:53:06  4    that cost analysis and the cost comparison in the next

16:53:09  5    chapter is actually pretty important.

16:53:11  6              The next chapter, selling price, well, you want

16:53:15  7    to make sure that the consumers are paying reasonable money

16:53:18  8    for these things so you can make a profit.  So you need some

16:53:22  9    idea of what the selling price is.

16:53:24 10              And then the last bit is interesting, 164, these

16:53:30 11    companies don't just do teardown reports, they can do custom

16:53:34 12    reports, so you can call them up, if you want to pay three

16:53:37 13    or four times more money, they can do a custom report for a

16:53:42 14    particular product you want to analyze as opposed to a

16:53:44 15    product they believe should be analyzed.  So you could pay

16:53:48 16    more money for that.  So that's called custom services.  And

16:53:51 17    these companies can do things like that, too, and they can

16:53:54 18    really focus in on markets if you really ask them to do

16:53:58 19    that.

16:53:58 20    Q.     Let's take a look at page 9.  What information would

16:54:05 21    we use from this slide to do your work?

16:54:08 22    A.     This gives you financial highlights of Akoustis, it

16:54:13 23    shows you on the right-hand side that Akoustis is actually

16:54:16 24    losing money.  You can see there the net income is minus

16:54:21 25    $36 million.  I don't know the date when this was done.  It

Lebby - direct

16:54:25  1    says 2020.  So it gives you sales revenue of 1.8 million in

16:54:30  2    2020.  Gross margins of 30 percent.  So it gives you some

16:54:35  3    idea of the performance of one of the players in the field.

16:54:41  4    Q.      Can you go to page 12, please.  What does this tell

16:54:52  5    you?

16:54:52  6    A.      This tells you that this company has got some data

16:54:58  7    from the Akoustis parts, I don't know, looking at this slide

16:55:03  8    if this is data that is measured by this teardown company or

16:55:07  9    they have got the data from a data sheet.  My suspicion is

16:55:10 10    they probably got the data from a data sheet, but it does

16:55:14 11    give you the idea of a typical performance of what the

16:55:18 12    Akoustis part is.  And you can see in that top graph, I

16:55:21 13    don't know if you can see the numbers, but that square sort

16:55:25 14    of raised profile is between 5 and 6-gigahertz, so you know

16:55:30 15    this was operating in that sort of range.

16:55:35 16    Q.      Let's go to page 23.  What's shown on this slide?

16:55:39 17    A.      This is what I would call a Wi-Fi technology roadmap.

16:55:45 18    They come in different forms.  But you can see there what it

16:55:50 19    plots, and if you look at the bottom part of the graph, you

16:55:53 20    can see 1999 going out to 2025.  And right above that, you

16:55:59 21    see 4, 5, 6, 6E, and 7, this is 4G, 5G and 6G, which we

16:56:08 22    haven't seen yet, which is sort of I think is expected to

16:56:11 23    come, and these are branding names.  So I might be incorrect

16:56:16 24    in terms of the G here, but it certainly -- what you're

16:56:19 25    seeing here is a proceedings progression through the years

Lebby - direct

16:56:24  1    for increased performance and it tells you some of the

16:56:27  2    technology being used.  And on the top line it gives you

16:56:30  3    maximum speed, theoretical speed, as you look out to 2025,

16:56:36  4    so you can see that increasing.  So if you're designing into

16:56:40  5    the market you want to make sure your technology can achieve

16:56:43  6    these sort of performances, otherwise in 2025 you're not

16:56:46  7    going to be able to sell it.

16:56:48  8    Q.    So let's scroll over to page 29.  I think this is the

16:56:54  9    teardown section that you mentioned.  So I don't want to go

16:56:59 10    too deeply into this, but let's just scroll a few pages

16:57:03 11    forward to get a feel for what we're looking at here.

16:57:07 12              So next, next.  Keep going.

16:57:16 13              So is this what you were talking about when you

16:57:20 14    said this includes a teardown?

16:57:25 15    A.    What they have done here is taken the package out and

16:57:29 16    this is the chip, that's the cross-section of the chip in

16:57:31 17    the package, so you can see there is images from above and

16:57:35 18    there is images from a cross-section, so they have cut it in

16:57:39 19    two.  And typically the white on this graph is probably

16:57:45 20    metal.  I have not looked at it closely.  But you can see

16:57:49 21    the different types of materials there and you can analyze

16:57:52 22    those materials.

16:57:53 23              What's interesting here in the package is on the

16:57:56 24    blue striped box on the left, it's all got the different

16:58:01 25    layers and the layer thicknesses, so there is quite a lot of

Lebby - direct

16:58:05  1    detail here.

16:58:05  2    Q.    You mentioned that there is a third party company

16:58:08  3    that is doing this analysis.  Does this company make any

16:58:13  4    products?

16:58:15  5    A.    I don't believe these companies are in the business

16:58:18  6    to make products, they're in the business to sell reports,

16:58:22  7    so they sell reports on market business plans as well as

16:58:26  8    technology teardowns, technology roadmaps.  So I don't

16:58:31  9    believe -- I haven't come across a company making products,

16:58:35 10    but typically they write reports on analysis of the work

16:58:39 11    they do.

16:58:41 12    Q.    Okay.  Let's go to page 113.  So what's shown here?

16:58:48 13    A.    This was the slide I was trying to explain a little

16:58:51 14    earlier.  If you look at the green section on the lower

16:58:54 15    left, that's an FBAR type device, you can see the whites,

16:58:58 16    which is the cavity, which is the air space.

16:59:01 17            But what's really interesting to someone like

16:59:03 18    myself is not only that, but it's on the right-hand side.

16:59:07 19    Look at those detailed steps of an XBAW wafer as it goes

16:59:13 20    through the fab.  There is like fifty different steps.  So

16:59:16 21    if you just look -- actually it's really small font, so you

16:59:20 22    won't be able to read it, but they have got all the

16:59:22 23    different steps, the etching steps, the oven baking steps, I

16:59:30 24    mean, dryer steps, so it's really, really detailed here, so

16:59:34 25    it gives me a really good feel of the complexity of what

Lebby - direct

16:59:38  1  these things look like from a fab standpoint.

16:59:41  2  Q.      Let's go to page 132, please.  So what does this

16:59:52  3  slide tell you?

16:59:52  4  A.      This is part of the analysis of the filter front end

16:59:56  5  cost.  And you can see from that table on the top, if you

17:00:00  6  just read under fleet the front end is obviously a product

17:00:05  7  part, the raw wafer cost, the raw wafer, the support wafer,

17:00:10  8  the seed wafer, the XBAW process, and the yield loses, as

17:00:14  9  you run wafers through fabs, the cost changes, if the yield

17:00:18 10  is different.  So if you get a hundred percent yield, that

17:00:21 11  means everything on the wafer works.

17:00:23 12          So then if you divide the wafer into lots of

17:00:27 13  little chips, then that's going to be the lowest cost of the

17:00:32 14  chips because everything works, if only half the chips works

17:00:35 15  and the yield is really low, like fifty percent, the chips

17:00:38 16  would be double the cost.  You really have to think

17:00:40 17  carefully what the yields are as you run -- so that gives

17:00:44 18  you a cost breakdown.  And you can see from this slide it

17:00:48 19  tells me where the cost are going in terms of which part of

17:00:52 20  the process, vis-a-vis three different yields that are used

17:00:59 21  in this simulation here.

17:01:02 22  Q.      Let's take a look at pages 133 and 134.  What is

17:01:10 23  shown on 133?  So to the right-hand side, what is that table

17:01:20 24  telling you?

17:01:21 25  A.      On the right-hand side, well that's an interesting

Lebby - direct

17:01:24  1    table as you can see, it's actually called seed wafer step

17:01:28  2    cost.  And what's really interesting there is you look at

17:01:31  3    the step cost, which is the second column and you go -- you

17:01:35  4    work down there, and you see these little red boxes, and the

17:01:39  5    box that is the whitest is the aluminum nitride scandium

17:01:46  6    step cost, you can see in the bill of materials from this

17:01:50  7    chart, the most expensive process step is the aluminum

17:01:55  8    nitride scandium epitaxial growth.

17:01:59  9            The other steps, the I-beam trimming, we heard

17:02:01 10    about I-beam trimming earlier today, $18.57, that's the

17:02:06 11    second most expensive, so what this table tells me these are

17:02:11 12    things I really have to look out for if I'm going to put a

17:02:14 13    business plan together, these are the areas I got to focus

17:02:17 14    in on, that's where the big costs are, some of these big

17:02:23 15    costs, like passivation and oxidation cleaning and PC

17:02:29 16    cleaning, they are in the one to two cent range.  I've got

17:02:33 17    to look at the big ones and make sure those are under

17:02:36 18    control with high yield.

17:02:38 19    Q.    Let's take a look at page 149.

17:03:03 20            So what is being compared here between Broadcom

17:03:06 21    and Akoustis?

17:03:08 22    A.    So what's interesting about this report is they don't

17:03:13 23    only give you the breakdown of the one product, they also

17:03:16 24    compare it to some of the products competitors.  In this

17:03:19 25    case, they're comparing Akoustis product with the Broadcom

Lebby - direct

17:03:23  1    product.  And what's interesting here is there is slight

17:03:27  2    differences in the doughnut ring.  You can see the colors

17:03:31  3    are slightly different.  The colors are different because

17:03:33  4    some of the costs are different.  So if you just look at,

17:03:36  5    for example, the bottom line of this slide, the yield losses

17:03:41  6    represent thirteen percent in Broadcom, just as an example.

17:03:44  7    This is of the component costs.

17:03:46  8            But for Akoustis, the yield losses represent

17:03:49  9    twenty-five percent.  That's a huge difference.  So these --

17:03:53 10    this is data that's really important when you're putting

17:03:56 11    business plans together.

17:03:58 12    Q.    Let's turn to page 159.  All right.  What's shown

17:04:07 13    here?

17:04:07 14    A.    This is an interesting graph because it gives you an

17:04:18 15    estimate of Akoustis gross profit for this component, for

17:04:21 16    the product, the 10165, they estimate with the low yield,

17:04:26 17    you can see on the left, top left-hand corner of that table,

17:04:29 18    the component cost is 8.2 cents, they estimate it's got

17:04:34 19    about 4.4 cents gross profit, and they estimate the

17:04:39 20    component price should be about 12.7 cents.

17:04:43 21            So this tells me, okay, so these numbers may not

17:04:47 22    be exactly what Akoustis actually achieves internally but it

17:04:51 23    gives me a really good idea, you know, these components are

17:04:54 24    not $25, they're actually $0.12 or they could be $0.14, it

17:04:59 25    gives me a really good feel for imagining what profitability

Lebby - direct

17:05:04  1  you would see for these types of components.

17:05:08  2  Q.    Let's take a look at DTX 623, that's Trial

17:05:13  3  Exhibit 159.

17:05:14  4          What is this document, Dr. Lebby?

17:05:17  5  A.    This is a teardown analysis for a Qorvo part that was

17:05:21  6  in iPhone 6.

17:05:22  7  Q.    Let's look at page 10.  What does this tell you?

17:05:28  8  A.    This is a page that they have obviously sourced from

17:05:32  9  Qorvo, it's a financial page, it gives me some idea of what

17:05:35 10  the revenues are for Qorvo in 2015.  But in the table on the

17:05:41 11  right-hand side they probably copied that table from Qorvo

17:05:44 12  in a published report.  This gives you some idea of Qorvo's

17:05:49 13  performance as a company.  Clearly 7,000 employees where the

17:05:55 14  headquarters are, a little bit of history, just to get you

17:05:59 15  calibrated with who the company is.

17:06:01 16  Q.    Let's take a look at page 55 and 56.  What's shown

17:06:15 17  here?

17:06:15 18  A.    So these pages are of a MEMS wafer process flow on

17:06:21 19  the left-hand side on page 55.  It gives you some details

17:06:24 20  about the SMR BAW filters.  They're fabricated on

17:06:31 21  150-millimeter wafers, which is a six-inch wafer.  There is

17:06:35 22  a little bit of detail about how they're fabricated.  What's

17:06:38 23  on the metal layers are in terms of copper listed here, and

17:06:43 24  on the right-hand side where they're fabricated, they're

17:06:48 25  fabricated in Richardson, Texas.  The capacity of their fab

Lebby - direct

17:06:51  1   is 4,000 wafers per month.  How old the fab is.  What the

17:06:58  2   most advanced process is.  It gives you some idea of what is

17:07:01  3   happening in that company for these types of filters.

17:07:08  4   Q.    Dr. Lebby, are you aware of Dr. Shanfield's testimony

17:07:13  5   in this case?

17:07:14  6   A.    Yes, I wasn't here in court, but I did read the

17:07:18  7   transcript.

17:07:20  8   Q.    And Dr. Lebby, assuming that information identified

17:07:26  9   in Qorvo -- I'm sorry, in Qorvo's Category 1 trade secrets

17:07:33 10   are trade secret, how much engineering time and what

17:07:36 11   document costs would Akoustis have had to expend to

17:07:39 12   independently obtain the information described in

17:07:44 13   Category 1?

17:07:45 14         MR. NAQVI:  Your Honor, objection.  Can we have

17:07:47 15   a side-bar on this?

17:07:49 16         THE COURT:  You may.

17:10:59 17         (Side-bar discussion:)

17:10:59 18         MR. NAQVI:  So, Your Honor, that exact question

17:10:59 19   is our concern.  She's asking Dr. Lebby how much it would

17:10:59 20   cost independent of the information in Dr. Shanfield's group

17:10:59 21   one trade secret opinion.  The court excluded Dr. Lebby's

17:10:59 22   ability to testify to group 1, trade secrets in group 1.

17:10:59 23         MS. SMITH:  I think the exclusion was to testify

17:10:59 24   whether the trade secrets are published -- actually not

17:10:59 25   trade secret, but this analysis, requires him to say they

Lebby - direct

17:10:59 1    are trade secrets.

17:10:59 2              MR. NAQVI:  You're asking him to independently

17:10:59 3    develop, I take that to mean how could you sort of look at a

17:10:59 4    public report and glean this information from the public,

17:10:59 5    that was my concern.

17:10:59 6              THE COURT:  Give me just one second.  Trade

17:10:59 7    secret opinion is out.  I'm not sure it's particularly

17:10:59 8    covered by the limine order, that's the problem.  Do you

17:10:59 9    want to tell me about that?

17:10:59 10             MR. NAQVI:  Yeah.  So Your Honor, my

17:10:59 11   understanding of the Court's order is that the Court is

17:10:59 12   preventing Dr. Lebby from testifying as to trade secret

17:10:59 13   group one.

17:10:59 14             THE COURT:  Well, in this case we excluded --

17:10:59 15   what we specifically said was on the fifth question and he

17:10:59 16   was not able to discuss that, I don't know if this is an

17:10:59 17   issue of pricing.

17:10:59 18             MR. NAQVI:  Right.  I agree that Your Honor

17:10:59 19   didn't exclude his opinions on the avoid the cost analysis

17:10:59 20   he performed so that's one, we're okay with that.  My

17:10:59 21   concern is Ms. Smith is asking a question about

17:10:59 22   Dr. Shanfield --

17:10:59 23             THE COURT:  The witness is assuming that is a

17:10:59 24   valid trade secret?

17:11:00 25             MS. SMITH:  Correct.

Lebby - direct

17:11:00  1        THE COURT:  And now he's talking about the cost

17:11:00  2   and association with what they would have to do to produce

17:11:00  3   that product.

17:11:00  4        MS. SMITH:  That's right.

17:11:00  5        MR. NAQVI:  Okay.

17:11:00  6        THE COURT:  I believe as long as it's narrowly

17:11:00  7   posed, I don't see a problem.

17:11:00  8        MR. NAQVI:  I agree as long as she can

17:11:00  9   preference the question he's assuming that they are trade

17:11:00 10   secrets.

17:11:00 11        MS. SMITH:  I think I started my question that

17:11:00 12   way.  I apologize.

17:11:00 13        THE COURT:  That's okay.  Are we going to finish

17:11:00 14   the witness today?

17:11:00 15        MS. SMITH:  Yes.

17:11:00 16        THE COURT:  Direct?

17:11:00 17        MS. SMITH:  Yes.

17:11:05 18        (End of sidebar.)

17:11:05 19   BY MS. SMITH:

17:11:06 20   Q.    Dr. Lebby, assuming that information identified by

17:11:10 21   Qorvo in group 1 contains trade secrets, how much

17:11:14 22   engineering time and what document costs would Akoustis have

17:11:17 23   had to expend to independently obtain the information?

17:11:22 24   A.    Carry the one was the business plan, so I calculated

17:11:26 25   in my corrected expert report 480 hours, which translates to

Lebby - direct

17:11:31 1  three months, or twelve weeks if you use five days a week,

17:11:35 2  eight hours a day.  And I also included document cost of

17:11:41 3  $10,000.

17:11:44 4  Q.    And did you do the same analysis assuming that the

17:11:50 5  group 8, the group 8 information was actually trade secrets,

17:11:58 6  how much engineering time and what document costs would

17:12:01 7  Akoustis have had to expend to independently obtain that

17:12:04 8  information?

17:12:05 9  A.    Yes, I did.  And you can see this on the

17:12:08 10  demonstrative on the number 8.  So the product roadmaps and

17:12:13 11  prototypes, 480 engineering hours, that translates to

17:12:19 12  twelve weeks, or three months, with document costs of

17:12:23 13  $30,000.

17:12:24 14  Q.    How did you perform your calculations?

17:12:27 15  A.    So as you have seen through my experience over the

17:12:32 16  last thirty-five years since starting at Motorola in 1989, I

17:12:37 17  have been engaged in technology roadmapping and business

17:12:42 18  planning from an engineering standpoint for a long time.  In

17:12:46 19  fact, I have been doing that right now with my present

17:12:50 20  company.  In fact, I purchased a couple of market reports

17:12:52 21  just last week and set a couple of engineers doing a very

17:12:58 22  similar process, albeit in a different technology.  So I

17:13:01 23  have used my experience to think through what it would take

17:13:05 24  an engineer to create some business plans for Wi-Fi

17:13:09 25  products.

Lebby - cross

17:13:09   1          The $10,000 document costs would be one market

17:13:14   2   report.  Typically you can purchase these reports from three

17:13:18   3   to six or three to $7,000.  But I put in $10,000 because I

17:13:23   4   thought I would be conservative.  And for Category 8, the

17:13:28   5   $30,000 comes from three reports.  So that's a technology

17:13:32   6   market report, plus two teardown reports for two different

17:13:38   7   competitive products.

17:13:40   8          Now one could argue why should it be two instead

17:13:44   9   of one.  I think it's better to see two different

17:13:46  10   competitors teardowns because that gives you a little bit

17:13:50  11   more calibration.  As we can see, these reports give you a

17:13:53  12   lot of information, not only on the costs of the raw

17:13:56  13   materials and the wafers going through the fab, but they

17:14:00  14   give you a really good idea of the process flow and the

17:14:04  15   complexity, what the chips look like, what the packages look

17:14:08  16   like, what the assembly is like, so it gives a really good

17:14:13  17   feel to put a business plan together and quite honestly, the

17:14:17  18   startup companies I have generated, I have used these type

17:14:20  19   of market reports to help put the business plans together.

17:14:25  20          MS. SMITH:  I pass the witness.

17:14:26  21          THE COURT:  Cross-examination.

17:14:29  22              CROSS-EXAMINATION

17:14:30  23   BY MR. NAQVI:

17:14:42  24   Q.    Good afternoon, Dr. Lebby.  My name is Kazim Naqvi.

17:14:47  25   I don't believe we met before, so it's nice to meet you

Lebby - cross

17:14:49  1    today.

17:14:50  2    A.      Good to meet you.

17:14:51  3    Q.      Dr. Lebby, in connection with your professional

17:14:53  4    experience which you discussed today, you can't identify a

17:14:56  5    single BAW filter that you ever brought to market, isn't

17:15:00  6    that right?

17:15:01  7    A.      I believe that's the case, yes.

17:15:03  8    Q.      Okay.  And you testified about your experience in

17:15:06  9    creating market analysis reports; right?

17:15:09 10    A.      That is correct.

17:15:10 11    Q.      Okay.  But in your experience in creating markets

17:15:13 12    analysis reports, you never solicited confidential

17:15:17 13    information when you were creating those reports, right?

17:15:19 14    A.      That's correct.

17:15:20 15    Q.      And you purchased approximately 200 market analysis

17:15:24 16    reports during your career; is that right?

17:15:26 17    A.      That is correct.

17:15:27 18    Q.      Okay.  But in purchasing those reports, you did not

17:15:31 19    expect to see any confidential information from other

17:15:33 20    companies in those records, isn't that right?

17:15:35 21    A.      That is correct.

17:15:36 22    Q.      You also never received or reviewed a teardown report

17:15:40 23    for a product that you understood was confidential; isn't

17:15:42 24    that right?

17:15:43 25    A.      That is correct.  I expect these to be public

Lebby - cross

17:15:47 1    information.

17:15:48 2    Q.    And so in a scenario where a company has a

17:15:52 3    confidential prototype, meaning a prototype for which the

17:15:55 4    company doesn't want leaving its walls, you would not expect

17:15:59 5    to see a teardown of that prototype in a market report,

17:16:02 6    isn't that correct?

17:16:03 7    A.    That is correct.

17:16:03 8    Q.    Can we please put up on the screen DTX 623.

17:16:08 9          Dr. Lebby, you recall testifying about this

17:16:12 10   document during your direct examination?

17:16:13 11   A.    Yes, I do.

17:16:14 12   Q.    And you cited this document as an example of the type

17:16:18 13   of market analysis reports that are available for purchase;

17:16:21 14   is that correct?

17:16:23 15   A.    Well, this one is a teardown, but yes, this is an

17:16:27 16   example.

17:16:27 17   Q.    And this is of a Qorvo product; right?

17:16:29 18   A.    That is correct.

17:16:30 19   Q.    Okay.  And the Qorvo product that is subject of this

17:16:34 20   analysis was publicly available for purchase at the time

17:16:37 21   this report came out, you would agree?

17:16:39 22   A.    I would expect it to be so, yes.

17:16:41 23   Q.    Okay.  And so you also understand that the reverse

17:16:45 24   cost analysis in this report was based on publicly available

17:16:49 25   data, right?

Lebby - cross

17:16:52  1    A.      Yes, and I believe there is a disclaimer somewhere in

17:16:55  2    one of these reports that says they use public data, I'm

17:16:59  3    just looking at it on the front here, but maybe it's at the

17:17:03  4    back of the document.

17:17:04  5    Q.      We'll take a look at that shortly.  You would agree

17:17:07  6    that it's common in the industry for companies to buy parts

17:17:10  7    that are on the market and tear them down, right?

17:17:13  8    A.      If a company can purchase a part and tear that down,

17:17:17  9    then, yes, I have seen and heard that happen.

17:17:20 10    Q.      Okay.  Mr. Buchbinder, can we please turn to page 88

17:17:26 11    of this document.

17:17:27 12            So looking at the top portion here, it says

17:17:34 13    reverse costing analysis represents the best cost/price

17:17:38 14    evaluation given the publicly available data, and estimates

17:17:41 15    completed by industry experts.  Do you see that?

17:17:44 16    A.      I do see that.

17:17:45 17    Q.      So you would agree that this report is based on

17:17:47 18    publicly available data, right?

17:17:49 19    A.      Yes.

17:17:49 20    Q.      We also agree that the cost information that you were

17:17:52 21    talking about on direct, those are just estimates, right?

17:17:56 22    A.      Yes, these are estimates by this company that has

17:18:00 23    obviously quite a bit of experience.  I wouldn't expect them

17:18:04 24    to be exactly the same as what internal company numbers

17:18:07 25    would be, but yes, they would be estimates.

Lebby - cross

17:18:09  1    Q.      So you would agree that the cost information in this

17:18:12  2    document about a Qorvo product, that's not Qorvo's internal

17:18:16  3    cost information, right?

17:18:17  4    A.      I would expect the information in this product not to

17:18:21  5    be Qorvo's internal information.

17:18:23  6    Q.      Okay.  So you would agree that the report that we're

17:18:26  7    looking at did not contain any Qorvo confidential

17:18:28  8    information, correct?

17:18:29  9    A.      That's what I would expect, yes.

17:18:31 10    Q.      Can we please put up JTX 14?

17:18:35 11            This is the other report that we looked at on

17:18:40 12    your direct examination, correct?

17:18:42 13    A.      Correct.

17:18:42 14    Q.      And this market analysis report or reverse costing

17:18:47 15    report looks at an Akoustis product, right?

17:18:50 16    A.      Correct.

17:18:50 17    Q.      And this report is dated July 2021?

17:18:54 18    A.      That is correct.

17:18:55 19    Q.      And you would agree that the Akoustis products

17:18:58 20    addressed in this report were available for purchase at the

17:19:02 21    time this report came out, isn't that correct?

17:19:04 22    A.      That would be my expectation.

17:19:06 23    Q.      And you would also expect that this report would not

17:19:10 24    contain any confidential information, right?

17:19:12 25    A.      That would be correct.

Lebby - cross

17:19:13  1    Q.      Okay.  Can we please turn to page 170 of JTX 14.

17:19:32  2    170, please.

17:19:32  3            Dr. Lebby, you would agree that the disclaimer

17:19:40  4    here, is similar to the disclaimer we just looked at in the

17:19:45  5    prior report, correct?

17:19:46  6    A.      Yes, this is similar to a previous report.

17:19:48  7    Q.      And in the services section, you would agree that

17:19:50  8    there is similar language here confirming that this report

17:19:53  9    is based on publicly available data, correct?

17:19:55 10    A.      I agree, correct.

17:19:56 11    Q.      And you would also agree that the services section of

17:19:59 12    this document also confirms that the cost information,

17:20:03 13    they're just estimates, correct?

17:20:05 14    A.      That is correct.

17:20:06 15    Q.      Okay.  Early in your direct examination, Ms. Smith

17:20:12 16    was asking you about a teardown report.  Do you recall that?

17:20:17 17    A.      Not in great detail, can you help me?

17:20:21 18    Q.      The Yole report that you testified about?

17:20:23 19    A.      Yes.

17:20:23 20    Q.      And that's a report from 2022, is that correct?

17:20:25 21    A.      That's correct.

17:20:26 22    Q.      And you would agree that that report provides

17:20:30 23    teardowns of products that are available for purchase;

17:20:32 24    right?

17:20:33 25    A.      That's my understanding.

Lebby - cross

17:20:34 1    Q.      And so none of the products addressed in that report

17:20:37 2    to your understanding were unreleased prototypes, right?

17:20:40 3    A.      That is my understanding as well.

17:20:42 4    Q.      So you're not aware of any confidential information

17:20:44 5    set forth in that Yole report; is that right?

17:20:47 6    A.      That is correct.

17:20:47 7    Q.      Dr. Lebby, I would like to just close by talking

17:21:01 8    about your avoided cost analysis, do you recall that?

17:21:04 9    A.      I do recall that.

17:21:05 10   Q.      So for assuming group one trade secrets, you

17:21:08 11   estimated $10,000 and 480 engineering hours, is that right?

17:21:14 12   A.      That's correct.

17:21:14 13   Q.      And the $10,000 was based on purchase of one market

17:21:17 14   report?

17:21:18 15   A.      That is correct.

17:21:18 16   Q.      And the type -- and it would be similar to the type

17:21:21 17   of market report we just looked at, right?

17:21:25 18   A.      It would be -- I think out of the reports we have

17:21:29 19   here, it would be closest to the Yole report, I would expect

17:21:33 20   to have quite a bit of market data in it.

17:21:36 21   Q.      And that $10,000 estimate for a single report, you

17:21:40 22   agree that report would not contain any confidential

17:21:42 23   information in it, right?

17:21:43 24   A.      That is correct.

17:21:44 25   Q.      And the 380 hours that you estimated for an engineer

Lebby - cross

17:21:48 1    for the group 1 trade secrets, that amounts to about three

17:21:51 2    months of full-time work, right?

17:21:53 3    A.    Correct.

17:21:53 4    Q.    And then coming up with that estimate, you didn't

17:21:56 5    rely on any particular formula, correct?

17:21:59 6    A.    I relied on my experience of leading engineers to do

17:22:04 7    this function over the last thirty years.  But I didn't use

17:22:08 8    a formula per se.

17:22:09 9    Q.    Right.  So you relied on your experience even though

17:22:12 10    you can't identify a single BAW filter that you have ever

17:22:15 11    brought to market, right?

17:22:18 12    A.    I agreed I don't -- I am not aware of a BAW filter

17:22:23 13    that I have worked on that has been brought to market.

17:22:25 14    Q.    And then going to the second component, the group 8

17:22:29 15    trade secrets, you estimated $30,000 for two teardown

17:22:33 16    reports and one roadmap report; is that correct?

17:22:36 17    A.    That is correct.

17:22:36 18    Q.    And then another 480 hours for engineering time, is

17:22:40 19    that right?

17:22:40 20    A.    That is correct.

17:22:40 21    Q.    And for the two teardown reports and the additional

17:22:45 22    roadmap report as part of your $30,000 estimate, you would

17:22:49 23    agree that there would not be any confidential information

17:22:53 24    in those reports, right?

17:22:54 25    A.    That is correct.

Lebby - redirect

17:22:54 1    Q.      Okay.  And the three-month estimate that you came up

17:22:57 2    with, again, that was just based on your experience, right?

17:23:00 3    A.      Yes, it was.

17:23:02 4           MR. NAQVI:  No further questions.

17:23:03 5           THE COURT:  Redirect.

17:23:10 6                  REDIRECT EXAMINATION

17:23:11 7    BY MS. SMITH:

17:23:16 8    Q.      Dr. Lebby, how many years have you been using market

17:23:19 9    analysis reports?

17:23:20 10   A.      I first started using them in 1989 when I joined

17:23:25 11   Motorola, so what's that, thirty-five years.

17:23:29 12   Q.      How quickly would the industry know if any market

17:23:35 13   analysis report company were inaccurate in its reports?

17:23:44 14   A.      Well, I have seen many of these companies come and go

17:23:49 15   over the years, so the companies I used to work with back in

17:23:52 16   the '90s aren't here anymore.  I don't know the reason why.

17:23:59 17   But these companies come and go.  They tend to be small

17:24:04 18   companies that focus on things like teardowns.  But the one

17:24:08 19   company here like Yole, that seems to be around for the last

17:24:12 20   twenty years, it seems to be doing a good job.

17:24:15 21           I am not aware of any other effects that may

17:24:17 22   affect these companies, other than the fact that they do a

17:24:20 23   teardown and if they don't sell a lot of reports, they don't

17:24:23 24   make a lot of money, because they've got to sell a lot of

17:24:27 25   reports to pay for the salary of the person doing the

Lebby - redirect

17:24:29 1    teardown.  If you think about the salary, they're not

17:24:32 2    selling a ton of these reports, they're not going to be

17:24:34 3    making any money, so I would assume that some of these

17:24:37 4    companies choose products that are more successful than

17:24:40 5    others.  Some may learn the hard way, but I'm not clear on

17:24:45 6    that.

17:24:45 7    Q.    So can you explain the range of products you've

17:24:49 8    worked on for creating business reports and roadmaps as well

17:24:55 9    as reviewing business reports and roadmaps?

17:24:59 10   A.    So, for example, when I was at Translucent, we

17:25:04 11   developed a new technology for piezoelectric layers,

17:25:09 12   scandium aluminum nitride, we filed about six patents.  I

17:25:14 13   will agree with opposing counsel, I don't believe those

17:25:17 14   technologies made it to product.  They did make it to one of

17:25:20 15   these market reports.  But I had left the company, so I

17:25:24 16   don't know if they were produced or not.  But certainly to

17:25:27 17   do that project, we purchased market reports, technology

17:25:32 18   roadmaps reports and teardown reports for our folks so we

17:25:36 19   could really understand the market that we were trying to

17:25:39 20   aim for.

17:25:39 21   Q.    And is your opinion based on your experience

17:25:44 22   preparing market reports?

17:25:46 23   A.    So my experience is not only the purchase of market

17:25:50 24   reports, I've actually generated them myself when I was at

17:25:55 25   OIDA, it takes a lot of work.  The reports I wrote were

17:25:59  1   three to 500 pages long, which is a bit like an expert

17:26:03  2   report that you see in these litigations, it takes a lot of

17:26:06  3   work, a lot of analysis, a lot of getting on the telephone

17:26:10  4   and talking to people, going to world conferences, reading a

17:26:14  5   lot of technical work.  I really didn't want to do it as a

17:26:18  6   job afterward because it was such hard work, but I did it

17:26:22  7   for about five years and it was a really good experience.

17:26:25  8          MS. SMITH:  No further questions.

17:26:25  9          THE COURT:  All right.  Thank you very much.

17:26:28 10   We'll let you step down, and we'll probably wrap up for the

17:26:32 11   day.  But thank you.

17:26:33 12          THE WITNESS:  Thank you.

17:26:34 13          THE COURT:  Now, we have one witness left, but I

17:26:40 14   think we'll start that witness tomorrow.  It's 5:23.  Do you

17:26:45 15   want to start today?

17:26:46 16          MR. LEMIEUX:  No, I was just making sure, we

17:26:49 17   have two witnesses left, but we have Dr. Nguyen, who is on

17:26:53 18   patents and then we have our damages expert.

17:26:56 19          THE COURT:  All right.  No, that's correct, you

17:26:58 20   have -- but you're going -- we'll talk about the sequence.

17:27:05 21   All right.  That covers everything.  We are going to finish

17:27:08 22   our -- the whole case, I think, tomorrow.  I'm sure we'll

17:27:11 23   finish tomorrow, before noon, that's the plan.

17:27:16 24          And so I just have to talk to counsel.  Don't

17:27:21 25   discuss the case amongst yourselves.  Don't let anybody talk

17:27:25  1    to you about it.  Keep an open mind.  We've got a ways to

17:27:28  2    go.  You may be seated.  I got to stay here.  Thanks very

17:27:31  3    much.

17:27:32  4                    (Jury exiting courtroom at 5:27 p.m.)

17:27:53  5                    THE COURT:  Everybody can be seated.  We're just

17:27:59  6    going over -- if you got one printed up, we actually would

17:28:04  7    like to have that because we did not bring every piece of

17:28:08  8    paper available, we don't want to print every piece, all the

17:28:12  9    trees in the building.  So you got Irwin, I'm sure somebody

17:28:16 10    has got that.  Who has got the report on our expert, right?

17:28:22 11                    MR. LEMIEUX:  Yes, we'll be able to provide that

17:28:24 12    to you.

17:28:25 13                    THE COURT:  That's okay, it's helpful.

17:28:27 14                    MR. LEMIEUX:  We'll give you both reports.

17:28:29 15                    THE COURT:  That's exactly what I need.

17:28:31 16                    Now, Mr. Lemieux, how are we doing on time?

17:28:35 17                    MR. LEMIEUX:  We're doing great, Your Honor.

17:28:37 18                    THE COURT:  Okay.  Specifics?

17:28:40 19                    MR. LEMIEUX:  No, Dr. Nguyen will be on for,

17:28:45 20    depending on how long their cross is, I don't think actually

17:28:47 21    that long, we'll be able to finish early in the morning,

17:28:50 22    Your Honor.

17:28:50 23                    THE COURT:  With cross-exam?

17:28:52 24                    MR. LEMIEUX:  I believe so.

17:28:53 25                    THE COURT:  That's what I was thinking, too, but

2247

17:28:55  1    I want to feel comfortable that's where we are.  You want

17:28:58  2    your times right now?  Do you want to see how we're doing?

17:29:01  3                MR. LEMIEUX:  I would be interested, Your Honor,

17:29:03  4    if we have that available.

17:29:04  5                THE COURT:  I think we have it available.

17:29:06  6                COURT CLERK:  For Plaintiffs, I have you at

17:29:08  7    21 hours 34 minutes and 40 seconds, for Defendants, I have

17:29:11  8    you guys at 21 hours, 11 minutes and 3 seconds.

17:29:19  9                THE COURT:  So sort of amazing, we're getting

17:29:22 10    right down to the very end, I think -- everybody is very

17:29:27 11    mindful of their time and that's very good.

17:29:29 12                In connection with the clean copies of the jury

17:29:32 13    instructions, we're going to hopefully at least send them to

17:29:38 14    you, we will send it to you, bring it up-to-date with what

17:29:42 15    we have so far and there will be some deletions as obviously

17:29:46 16    everybody is expecting in terms of that.

17:29:49 17                There are still questions that will remain on

17:29:53 18    duplicate damages, which are now to page 39 and 40, but that

17:29:57 19    may change a little bit.  I have a feeling that we won't

17:30:01 20    need that instruction, but I'm not certain.  But Mr. Elkins,

17:30:06 21    it looks like we're drifting in that direction, I think

17:30:09 22    we're moving in that direction, I think we are probably are.

17:30:12 23                MR. ELKINS:  I think, Your Honor, if you stick

17:30:15 24    with what the Court sent out at 2 o'clock today, then I

17:30:20 25    don't see a need for the duplicative damages instruction.

2248

17:30:23  1        THE COURT:  You and I both are in agreement, I

17:30:26  2  think that we'll just -- I know I have to look at it,

17:30:30  3  Mr. Masters, I don't want to get too far ahead on that, but

17:30:33  4  that looks like that's probably not going to be necessary.

17:30:36  5        MR. MASTERS:  I haven't had a chance to look at

17:30:38  6  it since I have been here all day.

17:30:41  7        THE COURT:  I understand that, but that's the

17:30:44  8  consensus of everybody, and the detailed instruction on

17:30:47  9  page 29, we can look at that.  And that may get us very

17:30:50 10  close to exactly the final instructions.  You should already

17:30:53 11  have, I think, I know we have tried to do it, you should

17:30:57 12  already have a verdict form that's been revised.  I take it

17:31:02 13  that the defense does not have any objection to the verdict

17:31:05 14  form, but I'm not sure.

17:31:07 15        MR. ELKINS:  That's correct, Your Honor.  I

17:31:09 16  mean, apart from the ones that we made earlier, but we have

17:31:13 17  no changes to what you sent us.

17:31:15 18        THE COURT:  That's what I anticipated.  I'm not

17:31:17 19  sure on the Plaintiff's side, but if they may think it's

17:31:21 20  okay in light of the rulings so far.  Do you know where we

17:31:26 21  are?

17:31:27 22        MR. MASTERS:  I think that was sent this

17:31:29 23  afternoon as well, so I'm at a bit of at a disadvantage

17:31:33 24  here.

17:31:33 25        THE COURT:  You can figure with your colleagues

17:31:36  1    behind you, we will need to know that early.  And the reason

17:31:39  2    we have to know that early is I know that all of you need to

17:31:43  3    have, well you don't have to have it, but you probably would

17:31:46  4    want the verdict form as you -- at least available as you

17:31:52  5    give your closings and you'll want to perhaps, I'm not sure

17:31:57  6    about this, have a demonstrative, sometimes lawyers do that,

17:32:00  7    they don't always do that, but they do about

17:32:03  8    eighty-five percent of the time, most of the time, so that's

17:32:07  9    what we're trying to get done, we're trying to get you to

17:32:10  10   that place.  That's where we are for both sides.

17:32:13  11              MR. MASTERS:  That's where we are, we'll look at

17:32:15  12   it as soon as we get back and if Your Honor is okay with it,

17:32:19  13   we'll submit something in writing.

17:32:21  14              THE COURT:  If you will do that, because I think

17:32:23  15   that Mr. Elkins, I think that the defense -- we may want a

17:32:28  16   confirmation back from both of you, but I think the defense

17:32:32  17   has acknowledged it's probably okay with them.  We will need

17:32:36  18   that note if it's not, we'll need to know that right away

17:32:41  19   and exactly what we need to do.  Realize when you look at

17:32:44  20   it, you're probably going to say -- you're going to see that

17:32:48  21   use question, but -- and you're going to see that duplicate

17:32:53  22   damage questions, like I said on duplicate damages, I think

17:32:56  23   that needs to come out.  I think that's where we are.

17:32:58  24              Now, the last thing.  There was some discussion

17:33:01  25   at one point about whether or not we need to say something

17:33:06  1    to the panel about matters that they will not be ruling on

17:33:09  2    that they heard about earlier in the case.  And I suggested

17:33:14  3    that sometimes it's better to leave things alone because by

17:33:18  4    saying something, you actually highlight it versus not

17:33:21  5    highlighting, but I think it is the question, and we have

17:33:25  6    not -- we have not addressed that.

17:33:28  7              And I know Mr. Masters, you thought about it,

17:33:30  8    you raised it.  Have you thought about it anymore?

17:33:35  9              MR. MASTERS:  On the conspiracy claim?

17:33:38 10              THE COURT:  Well, the question is there are

17:33:43 11    several things that are out, yes, it would be on the

17:33:45 12    conspiracy claim.  But you also Lanham Act, it was so long

17:33:51 13    ago, nobody remembers the Lanham Act, you see what I'm

17:33:54 14    saying.

17:33:54 15              MR. MASTERS:  I did, but I thought that we

17:33:56 16    agreed that defense could not make a comment about the false

17:34:00 17    advertising claim.

17:34:01 18              THE COURT:  Right, they're not going to do that,

17:34:03 19    they agreed on that, they are not going to say well, they

17:34:07 20    brought this claim and now they're not bringing it, they're

17:34:10 21    not going there because we've already agreed that, and that

17:34:13 22    would require an instruction that the jury could not

17:34:17 23    consider the fact that a claim is no longer before them in

17:34:22 24    making their decision on the remaining claims, that would be

17:34:25 25    a simple instruction, but we were trying to avoid that.

2251

17:34:29  1          MR. MASTERS:  I don't think we need that

17:34:30  2   instruction, Your Honor.

17:34:31  3          THE COURT:  Right.  And there is more than one

17:34:33  4   thing that is being deleted so we probably don't need the

17:34:37  5   instruction on anything, right?

17:34:38  6          MR. MASTERS:  Right.

17:34:38  7          THE COURT:  That's where we want to get.  I

17:34:40  8   think you're going to be very close, then, to the final

17:34:43  9   instructions.  You are allowed -- we've had essentially a

17:34:47 10   rolling conference, is that a fair way to put that?  And the

17:34:51 11   reason is that the timing, it is a timed case, and I think

17:34:56 12   it's just -- I was trying to send you things in writing so

17:35:01 13   it didn't count against your time.  This is counting as a

17:35:04 14   conference now.

17:35:05 15          How much more conferencing are we going to need

17:35:08 16   then?  We'll start with Mr. Masters.

17:35:10 17          MR. MASTERS:  If I sit down, you don't count

17:35:13 18   against me, then.

17:35:14 19          THE COURT:  We're trying not to eat up your

17:35:17 20   time, we really aren't.

17:35:18 21          MR. MASTERS:  I think we're doing well on time,

17:35:20 22   Your Honor.  We have two crosses left and the closing and

17:35:23 23   with almost four hours, I think we're going on 3:20, we're

17:35:29 24   good on time.

17:35:29 25          THE COURT:  I think we're probably okay.  Let me

17:35:31 1  look at it one more time and be sure.  I want to check that

17:35:36 2  one thing.  I don't want anybody to be misled here.

17:35:40 3          That's a little questionable about whether you

17:35:43 4  call that four hours, more like I would call it three.

17:35:47 5          MR. MASTERS:  3 hours 20 minutes, 3 hours

17:35:50 6  19 minutes, but we're good on time with two crosses left and

17:35:53 7  the closing.

17:35:54 8          THE COURT:  I don't want anybody to be misled,

17:35:57 9  ever.

17:35:58 10          MR. MASTERS:  So to answer your question,

17:35:59 11  though, Your Honor, I need to look at the verdict form and

17:36:02 12  the, I think the last set of the jury instructions.

17:36:06 13          THE COURT:  And what we're doing is we're

17:36:08 14  counting these conferences as our conference as it relates

17:36:12 15  to the jury instructions.  So we'll get the finals tomorrow

17:36:18 16  morning hopefully from everyone, they're going to e-mail it

17:36:23 17  to us.  That will be good.

17:36:24 18          MR. MASTERS:  We'll do that.

17:36:25 19          THE COURT:  All right.  Thank you all.

17:36:27 20          MR. ELKINS:  Your Honor, I thought maybe we

17:36:29 21  could just better understand what you had in mind for

17:36:32 22  tomorrow since I take it we'll be closing after the close of

17:36:36 23  evidence.

17:36:36 24          THE COURT:  Yes.  Yes.  That's why I wanted to

17:36:38 25  get your position to do it.

2253

17:36:39  1              MR. ELKINS:  Yeah, so we, I anticipate that

17:36:43  2      we'll be done with Dr. Nguyen, who will start right at 8:30,

17:36:50  3      and shouldn't take too long, and then Ms. Irwin.  I think my

17:36:55  4      direct is going to be forty-five minutes, and then I would

17:36:59  5      expect a like amount of time from the Plaintiff.

17:37:01  6              We should be done around maybe I always -- I

17:37:06  7      never give us enough time, but I imagine by 11:00 we'll be

17:37:11  8      completely done.  And we'll have rested and I imagine that

17:37:15  9      Mr. Masters will not put on a rebuttal and --

17:37:21 10              THE COURT:  I was informed that you're not

17:37:22 11      planning on a rebuttal.

17:37:24 12              MR. MASTERS:  We're not planning on a rebuttal.

17:37:26 13              THE COURT:  That makes the timing a little

17:37:28 14      tricky.  Let me go over again the closing argument times.  I

17:37:34 15      would prefer that you get a decent break and I don't like to

17:37:37 16      break them in half, I don't like to have Plaintiffs and then

17:37:41 17      have lunch and then Defendants, it's a little complicated.

17:37:45 18      Any more thoughts on that?  I can check with staff, but what

17:37:50 19      we could do, Alex, see if we can have an early lunch.

17:37:55 20              COURT CLERK:  They usually get here at 11:00.

17:37:57 21              THE COURT:  They get here at 11:00.  So what we

17:38:00 22      might end up doing is getting to the very end at 11:00 and

17:38:03 23      taking our very early lunch break, pretty early lunch break,

17:38:09 24      and we'll tell the jury that, too, possibly, and then coming

17:38:13 25      back and do the closings and take a break for fifteen or

17:38:18  1    twenty minutes and then come back with final instructions.

17:38:21  2           Good question, though, I really appreciate that,

17:38:24  3    because Mr. Masters probably appreciates it, too, because it

17:38:29  4    sounds about right.

17:38:31  5           MR. MASTERS:  That sounds right and that's very

17:38:33  6    helpful.

17:38:34  7           THE COURT:  We would do close and hopefully at

17:38:36  8    either start at 11:45 or 12:00 depending a little bit on

17:38:42  9    margins there and both would run together.  I like to keep

17:38:45 10    them together if I can.  I don't like to have a break

17:38:47 11    between them if it's practical.

17:38:49 12           MR. MASTERS:  Would you do your normal

17:38:52 13    forty-five-minute lunch break a little early?

17:38:54 14           THE COURT:  That's going to be at 11:00, I can't

17:38:56 15    tell you, 11:10, or when it's going to be, but we will have

17:39:01 16    lunch before the 12 o'clock hour and that will be that

17:39:04 17    forty-five-minute period out and that gives everybody a

17:39:07 18    chance to be well rested for their close.  Let me check one

17:39:13 19    thing.  Who is doing close for the Plaintiff?

17:39:16 20           MR. MASTERS:  Mr. DeFosse will be presenting the

17:39:18 21    closing.

17:39:19 22           THE COURT:  Who is doing rebuttal if there is

17:39:21 23    one?

17:39:22 24           MR. MASTERS:  Mr. DeFosse.

17:39:24 25           THE COURT:  Okay.

17:39:27  1          MR. MASTERS:  He's working on it now, Your

17:39:30  2  Honor.

17:39:30  3          THE COURT:  He still disappeared.  Okay.  Does

17:39:32  4  he know he's doing it?

17:39:34  5          MR. MASTERS:  He will shortly.

17:39:35  6          THE COURT:  I understand.  No problem.  And of

17:39:38  7  course, I'm going to check, is Mr. Lemieux going to do it?

17:39:43  8          MR. ELKINS:  No.

17:39:43  9          MR. LEMIEUX:  Actually, my younger and better

17:39:46 10  looking colleague will be doing it, Your Honor.

17:39:48 11          THE COURT:  That's very helpful to know.  I was

17:39:50 12  not sure if you were going to split close because sometimes

17:39:54 13  one individual does rebuttal, but it's a difficult thing --

17:39:59 14  not difficult, but one where you have to be very mindful of

17:40:03 15  what's already been done and has to be quite short.  I think

17:40:06 16  we covered everything.

17:40:08 17          Are we all set?

17:40:09 18          MR. ELKINS:  Yes.  Mr. Masters and I along with

17:40:14 19  Mr. DeFosse have been discussing the disclosure of

17:40:18 20  demonstratives for closing.  And we're going to do that in

17:40:23 21  the morning.

17:40:24 22          THE COURT:  Okay.

17:40:25 23          MR. ELKINS:  Just given how --

17:40:27 24          THE COURT:  The thing I haven't talked about any

17:40:30 25  additional Rule 50, you know.

17:40:33  1          MR. ELKINS:  Right.  I think we make those

17:40:38  2     early, but it would be, you know, we already --

17:40:42  3          THE COURT:  We have gone through everything.

17:40:43  4          MR. ELKINS:  We have already gone through it.

17:40:45  5          THE COURT:  We have gone through it all and we

17:40:47  6     narrowed things quite a bit.  But there will need to be an

17:40:51  7     opportunity for that, we'll do that.  The jury will go out

17:40:54  8     for lunch, we'll have Rule 50, they may end up getting an

17:40:58  9     hour, I don't know if they need that.

17:41:02 10          MR. ELKINS:  We won't argue with an hour if

17:41:05 11     we're going to spend some of the time on Rule 50.

17:41:08 12          THE COURT:  We'll see how it works.  Anything

17:41:11 13     about tomorrow's demonstratives I have to look at again

17:41:13 14     tomorrow?  Hopefully you will agree.

17:41:15 15          MR. ELKINS:  Given that Your Honor already --

17:41:19 16     it's hard because the parties already agreed in a proposed

17:41:23 17     pretrial order.

17:41:25 18          What's fair game in terms of closing

17:41:28 19     demonstratives?  I don't -- there is not going to be much to

17:41:33 20     look at and given that it's closing argument and generally

17:41:37 21     it's there is more fair game in closing than there is in

17:41:43 22     witness examination, I think the parties will -- I would bet

17:41:48 23     Mr. Masters and I wouldn't have any disagreements, but if we

17:41:53 24     do, they'll be I'm sure very, very small in number.

17:41:57 25          THE COURT:  No problem.  I think we're all set.

17:41:59  1    We'll see everybody at 8:15 tomorrow, and maybe a little bit

17:42:05  2    after, depending on what you send us in the evening and

17:42:08  3    we're going to get it all to the jury tomorrow.  That's a

17:42:13  4    great schedule.

17:42:13  5                    Thank you all.

17:42:16  6                    COURT CLERK:  All rise.

17:42:16  7                    (Court adjourned at 5:42 p.m.)

          8

          9                I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the proceeding.

          10

          11                                  /s/ Dale C. Hawkins
                                          Official Court Reporter
          12                                U.S. District Court

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

# EXHIBIT N

1

2                    IN THE UNITED STATES DISTRICT COURT

3                       FOR THE DISTRICT OF DELAWARE

4    QORVO, INC.,                    )
                                     )
5              Plaintiff,            )
                                     )    C.A. No. 21-1417-JPM
6      v.                            )    Volume 8
                                     )
7    AKOUSTIS TECHNOLOGIES, INC.     )
     AND AKOUSTIS, INC.,             )
8                                    )
               Defendants.           )
9                                    )

10

11

12                        Wednesday, May 15, 2024
                              8:21 a.m.
13                            Jury Trial

14

15                          844 King Street
                          Wilmington, Delaware
16

17    BEFORE: THE HONORABLE JON PHIPPS MCCALLA
      United States District Court Judge
18

19

20    APPEARANCES:

21

                      MORRIS NICHOLS ARSHT & TUNNELL
22                    BY:  JEREMY A. TIGAN, ESQ.

23                    -and-

24

25

1    APPEARANCES CONTINUED:

2

3                    SHEPPARD, MULLIN, RICHTER & HAMPTON
                     BY:  ROBERT M. MASTERS, ESQ.
                     BY:  JONATHAN R. DEFOSSE, ESQ.
4                    BY:  ZACHARY ALPER, ESQ.

5                         Counsel for the Plaintiff

6

7

8

9                    BAYARD, P.A.
                     BY:  STEPHEN B. BRAUERMAN, ESQ.
10
                     -and-
11
                     SQUIRE PATTON BOGGS
12                   BY:  DAVID S. ELKINS, ESQ.
                     BY:  RONALD S. LEMIEUX, ESQ.
13                   BY:  VICTORIA Q. SMITH, ESQ.
                          Counsel for the Defendants

14

15                    _ _ _ _ _ _ _ _ _

16

17                    P R O C E E D I N G S

18

07:45:53 19        (Proceedings commenced in the courtroom beginning at

07:45:53 20    8:21 a.m.)

08:20:51 21

08:21:31 22            **THE COURT:**  You may be seated.  See if you all

08:21:34 23    got enough people from the defense side, but do we need to

08:21:37 24    wait on anybody?

08:22:04 25            We are trying to promote a nonlawyer to lawyer

08:22:07  1      status.

08:22:08  2                   **MR. ELKINS:**  Were you going to swear her in,

08:22:10  3      too?

08:22:10  4                   **THE COURT:**  We were waiting on you.

08:22:14  5                   **MR. ELKINS:**  Good morning, Your Honor.

08:22:15  6                   **THE COURT:**  Good morning.  Is there anything

08:22:16  7      else on the issue on use?  Because we agreed, at least in

08:22:22  8      part, with the defense position, but we think that there

08:22:25  9      are two sentences that can be allowed to be used because

08:22:29 10      they are more principles of law.

08:22:31 11                   And do you need to wait on somebody?

08:22:36 12                   **MR. ELKINS:**  Yeah, well, Ms. Harris is our

08:22:39 13      instructions expert.  She was just behind me in the line,

08:22:42 14      so she is present.

08:22:44 15                   **THE COURT:**  No problem.  We will wait on her.

08:22:46 16                   **MR. ELKINS:**  Thank you.

08:22:46 17                   **THE COURT:**  Absolutely.

08:22:47 18                   I will confirm one thing.  I think the verdict

08:22:49 19      form is done, right?  Everybody agrees?

08:22:53 20                   **MR. MASTERS:**  Good morning, Your Honor.

08:22:55 21                   **THE COURT:**  Good morning.

08:22:55 22                   **MR. MASTERS:**  I do think the verdict form is

08:22:57 23      done.  We've exchanged a list of the trade secrets for the

08:23:02 24      jurors, little back and forth, but I think we are now in

08:23:05 25      agreement on that.  It will have a list of trade secrets

08:23:09  1    opinion cites right underneath.

08:23:11  2          **THE COURT:**  Right.

08:23:11  3          **MR. MASTERS:**  As soon as Mr. Lemieux gets in,

08:23:13  4    we should be able to have that to the Court shortly.

08:23:18  5          **MR. ELKINS:**  Yeah.  He was further behind me.

08:23:21  6          **THE COURT:**  That will give us the verdict

08:23:22  7    forms, which is what the lawyers mostly should need to do

08:23:24  8    the close, and the instructions.  But we'll wait.  We've

08:23:30  9    got a couple minutes.  We will until Ms. Harris gets here.

08:23:36  10          **MR. ELKINS:**  Thank you.

08:23:37  11          Ah, there you are.

08:23:40  12          **THE COURT:**  Yes, absolutely.

08:23:43  13          **MR. ELKINS:**  So the question the Court poses is

08:23:45  14    that regarding the use instruction, and perhaps you could

08:23:50  15    state it better than I could, Your Honor.

08:23:52  16          **THE COURT:**  Right.  Well, Ms. Harris, what

08:23:55  17    we've done is, we tended -- I tend to agree with the

08:24:00  18    position that the sentence that begins:  "Examples of use

08:24:04  19    that fall within this definition include," I tended to

08:24:08  20    agree with you on that because it was a little too

08:24:10  21    specific and it was granular.  And that's uncomfortable

08:24:15  22    for the Court.  The jury gets to decide all questions of

08:24:17  23    fact, and that was a good point.

08:24:19  24          The principal can be articulated, though, is

08:24:24  25    that the unauthorized use need not extend to every aspect

08:24:29  1   or feature of a trade secret, use of any substantial

08:24:33  2   portion of a trade secret is sufficient to subject the

08:24:36  3   actor to liability.  That, I think, is in principle an

08:24:39  4   accurate statement law as far as I can tell.

08:24:43  5          I'm going to go through the rest, but that you

08:24:44  6   would prevail, though, on the issue of "Severely the actor

08:24:46  7   need not" --

08:24:46  8          (Reporter clarification.)

08:24:46  9              THE COURT:  No problem.

08:25:01 10          Then, we were going to promote that last two

08:25:04 11   sentences of the first paragraph that you were indicating.

08:25:08 12          So, basically, only one sentence, which -- and

08:25:10 13   so we're going to delete the last two sentences.  I know

08:25:18 14   you wanted to look at that, so take a look real quick.

08:25:22 15              MS. HARRIS:  Thank you, Your Honor.

08:25:23 16              THE COURT:  Yes, sir.

08:25:38 17              MR. MASTERS:  Your Honor, on the issue of use,

08:25:39 18   we did file a --

08:25:41 19              THE COURT:  You did.  We got it.

08:25:42 20              MR. MASTERS:  Make sure the Court has it.

08:25:44 21              THE COURT:  We read it.  We do.  We've done it,

08:25:46 22   and we're done.  I mean, we can talk about it, but I think

08:25:51 23   it's well said.

08:26:02 24          I don't want to mislead anybody.  We pretty

08:26:05 25   well decided this and so I was trying to get it to you so

08:26:08 1    that you would have it so that you would know what you

08:26:12 2    would be presenting in argument.  And some of these -- let

08:26:19 3    me give them a couple minutes.

08:28:37 4          All right.  I know we were giving you a moment

08:28:39 5    there.  Ms. Harris, it seems to me that what we would

08:28:43 6    include would be after the word "use" in that paragraph on

08:28:46 7    Page 29, we would then say, "The unauthorized use need not

08:28:50 8    extend to every aspect or future on a trade secret.  Use

08:28:54 9    of any substantial of a trade secret is sufficient to

08:28:57 10   subject the actor to liability."

08:28:58 11         I believe that to be an accurate statement, and

08:29:00 12   it may be an important principle clarification in the

08:29:04 13   case.

08:29:05 14         Now, I could look to Mr. Masters to confirm,

08:29:09 15   but it seems to me that that is the accurate statement on

08:29:12 16   that.  You may have a case that says, absolutely that, but

08:29:17 17   if you want to tell me about it.

08:29:19 18         **MR. MASTERS:**  Well, we have cited a case, Your

08:29:23 19   Honor, that does talk about the first two sentences of

08:29:27 20   that paragraph.

08:29:29 21         **THE COURT:**  I know that I could use that, but I

08:29:31 22   think that anytime it looks like it's directional or

08:29:35 23   suggesting something about the specific facts, we try to

08:29:38 24   avoid that and try to include the legal principle that's

08:29:42 25   involved.  I think the legal principle is still there, and

08:29:46  1    the rest is left the argument, but okay.

08:29:48  2          Yes, sir.

08:29:49  3          **MR. MASTERS:**  I guess the point is that this is

08:29:51  4    applicable to this case based on this facts and the

08:29:55  5    subject matter at issue in terms of an R&D in the

08:29:59  6    technology field such as the BAW filter.  So the use of

08:30:04  7    the trade secret, whether it's manufacturing, production

08:30:07  8    or accelerating R&D does seem to be quiet informative in

08:30:13  9    terms of instructing the jury on issues directly relevant

08:30:16 10    to what they need to decide.  And it does fine support in

08:30:18 11    the restatement of unfair competition.  And the *Universal*

08:30:27 12    *Systems* case is cited on Page 1 of our brief.

08:30:31 13          **THE COURT:**  Sometimes we receive a question

08:30:33 14    from the panel if they want further clarification on

08:30:36 15    principle, then we look back to what you just indicated,

08:30:39 16    and might use that in response to a question.

08:30:44 17          I don't disagree that it would not be -- I'm

08:30:49 18    used to the jury.  The question is, would it be something

08:30:53 19    that the Court would want to say other than the general

08:30:56 20    principles involved.  So we try to focus on the principle

08:30:58 21    of law and avoid things that sound like directional in

08:31:02 22    nature.

08:31:03 23          So I understand exactly what you're saying.  So

08:31:06 24    we've got that.

08:31:07 25          Now, on -- but that does mean it would include

08:31:10 1    the second sentence.  And, Ms. Harris, so it's sort of a

08:31:14 2    win.  I'm not splitting the baby.  I'm really trying to

08:31:17 3    focus on what's a principle versus what sounds

08:31:22 4    directional.

08:31:23 5            **MS. HARRIS:**  Your Honor, we're fine with that

08:31:24 6    approach.  Thank you.

08:31:25 7            **THE COURT:**  Okay.  That means that we would

08:31:30 8    also not include the language "but similarly, the actor

08:31:32 9    need not use the trade secrets in their original form, as

08:31:35 10   the actor is liable for using the trade secret with

08:31:38 11   independently created improvements."

08:31:40 12           I'm going to take that out, too, because that

08:31:42 13   sounds a little more directional.  The principles are

08:31:44 14   listed.  And, again, if the jury asks a question and we

08:31:48 15   may have to add something in response to the question.

08:31:52 16           Now, we were going to include the last

08:31:56 17   sentence, which is grayed out, because it would be correct

08:31:59 18   that, "but you may find that possession of the trade

08:32:02 19   secrets or the circumstances surrounding the possession of

08:32:06 20   the trade secrets are circumstantial evidence of use."

08:32:11 21           In this case, we understand that it's the

08:32:13 22   circumstances surrounding possession that is certainly

08:32:21 23   something that a jury could consider.  In this case,

08:32:23 24   there's a lot of evidence about that.  We wouldn't want to

08:32:27 25   exclude it because it might be confusing if we didn't

08:32:31  1    include it.  And that's where we are.

08:32:34  2         **MS. HARRIS:**  Your Honor, I think our point here

08:32:35  3    is that it's not necessary given the prior instructions on

08:32:37  4    circumstantial and direct evidence that proceed.  Thus, we

08:32:41  5    think it's essentially reiterating a principle that has

08:32:44  6    already been stated in the beginning of the instructions.

08:32:48  7         **THE COURT:**  I understand.  Because it talks

08:32:49  8    about circumstantial evidence, I think it probably is

08:32:53  9    helpful articulation in a slightly different way of a

08:32:59 10    principle that the jury can consider.

08:33:01 11         So we're going to redo the instructions.  The

08:33:03 12    first sentence is out on the gray area, the first gray

08:33:08 13    paragraph.  The second sentence is in.  The last two

08:33:13 14    sentences on the first grayed area are out.  And then the

08:33:16 15    grayed area at the bottom of Page 29 is out.  And we will

08:33:20 16    reprint the instruction.

08:33:22 17         Now, because there's going to be a slight

08:33:25 18    change because we're deleting on Page 39, that won't

08:33:31 19    affect it, but 40 will change the numbering slightly, just

08:33:35 20    so that the attorneys are aware of that.  So we'll print

08:33:37 21    you an extra copy so everybody can take a look at it and

08:33:41 22    use that.  I think we've got everybody.

08:33:47 23         Did our juror make it?  Good for her.  She

08:33:50 24    had -- she's tied up in traffic.  I think we're all set.

08:33:54 25         Is everybody ready?

08:33:56  1            **MR. MASTERS:**  We're ready, Your Honor.

08:33:57  2            **THE COURT:**  Okay.  You ready, Mr. Elkins?

08:33:59  3            **MR. ELKINS:**  Yes, we are, Your Honor.

08:34:01  4            **THE COURT:**  Okay.  Thank you.

08:34:02  5        (The jury enters the courtroom at 8:34 a.m.)

08:34:54  6            **THE COURT:**  Everyone can be seated.

08:35:00  7            Does the defense wish to call any additional

08:35:02  8   witnesses?

08:35:05  9            **MR. LEMIEUX:**  Yes, Your Honor.  We'd like to

08:35:07 10   call Dr. Clark Nguyen as a potential expert witness in

08:35:12 11   this case.

08:35:14 12            **THE COURT:**  All right.  If you come forward to

08:35:15 13   the podium.  And I know that you're handing up --

08:35:19 14            **MR. ELKINS:**  May I approach, Your Honor?

08:35:20 15            **THE COURT:**  Yes, if you don't mind.  Thank you.

08:35:31 16            **THE CLERK:**  Please remain standing and raise

08:35:31 17   your right hand.  Please state and spell your name for the

08:35:32 18   record.

08:35:35 19            **THE WITNESS:**  Clark Nguyen, C-L-A-R-K

08:35:38 20   N-G-U-Y-E-N.

08:35:38 21      CLARK NGUYEN, having been called as a witness, being

08:35:38 22   first duly sworn under oath or affirmed, testified as

08:35:38 23   follows:

08:35:38 24            **THE CLERK:**  Thank you.  Please be seated.

08:35:54 25            **MR. LEMIEUX:**  Your Honor, if I may I approach

*Nguyen - Direct*

08:35:55  1    just to hand you hard copies of the slides for the Court's

08:35:59  2    convenience?

08:36:01  3                **THE COURT:**  Certainly.

08:36:01  4                         DIRECT EXAMINATION

08:36:04  5    **BY MR. LEMIEUX:**

08:36:13  6    **Q.**   Good morning, Professor Nguyen.  If you could please

08:36:15  7    state your name for the record.

08:36:16  8    **A.**   Clark Nguyen.

08:36:18  9    **Q.**   And, Dr. Nguyen, could you please tell us a little

08:36:21 10    about yourself?

08:36:22 11    **A.**   Yeah, sure.

08:36:23 12         So I was born in Texas, I suppose.  We moved around

08:36:26 13    quite a bit.  I grew up sort of on the West Coast area.

08:36:31 14    I've actually lived throughout the United States.

08:36:32 15    Washington, D.C.; Ann Arbor, Michigan over my life.  Right

08:36:33 16    now, I currently reside in Berkley, California.  And I'm

08:36:39 17    happy to say that everywhere I've lived, I've loved.  So

08:36:43 18    that's, you know, a plus for our nation, I suppose, in

08:36:46 19    terms of good places to live.

08:36:48 20         One of my hobbies is playing electric guitar.  I like

08:36:53 21    playing and making guitars.  And maybe that's why I like

08:36:55 22    the type of research I do right now, just sort of these

08:36:58 23    vibrating types of devices.

08:37:00 24    **Q.**   Professor Nguyen, did you prepare any slides to help

08:37:04 25    aid and illustrate your testimony today?

08:37:06  1    **A.**    Yes, I did.

08:37:06  2    **Q.**    Okay.

08:37:06  3              **MR. LEMIEUX:**   If we could please pull up

08:37:09  4    Slide DTX-2.01.

08:37:14  5    **BY MR. LEMIEUX:**

08:37:14  6    **Q.**    Dr. Nguyen -- excuse me, I mean to call you Professor

08:37:17  7    Nguyen.  We've been calling everyone "doctors" here with

08:37:20  8    PhDs.

08:37:20  9          But could you please describe your educational

08:37:22  10   background?

08:37:22  11   **A.**    Yes.  So I got my bachelor's degree at the University

08:37:25  12   of California at Berkley in a major called "Electrical

08:37:31  13   Engineering and Computer Sciences."  It actually combines

08:37:33  14   these two majors into one major.

08:37:35  15         I guess I should say that before that, my first

08:37:37  16   two years of college were at the University of Washington.

08:37:39  17   And I transferred to Berkley to get my bachelor's degree

08:37:44  18   at the time.

08:37:45  19   **Q.**    And did you get any degrees after your bachelor's

08:37:47  20   degree?

08:37:49  21   **A.**    Yes, I did.  So I stayed at Berkley.  I got a

08:37:53  22   master's degree and a PhD in the same major, electrical

08:37:57  23   engineering and computer sciences.

08:37:58  24   **Q.**    What was your doctoral thesis about,

08:38:00  25   Professor Nguyen?

**A.**   Well, the title of my doctoral thesis was micromechanical signal processors.  It kind of predates a lot of stuff that's happened since then in MEMS.

I guess the claim to fame of my PhD thesis, it resulted in the first micromechanical resonator isolater that was stable enough for timing, and it was integrated with some micromechanical part together with transistors.

**Q.**   Are you currently employed?

**A.**   Yes.

**Q.**   By who?

**A.**   By the University of California.  And so I am now the chair of electrical engineering in the department of electrical engineering computer sciences.

So I graduated from this department, I left of it, I came back to become a professor here, and now I'm the chair of the electrical engineering division or department.

**Q.**   How large a department is that, Professor Nguyen?

**A.**   Quite large.  It's actually the largest department in terms of student count.  You can imagine this because computer science is something everyone wants to go into these days, so this department's got computer science in it.  It has about a hundred faculty, which is also one of the largest, if not the largest, on campus.

**Q.**   What courses have you taught during your teaching

*Nguyen - Direct*

1  career?

2  **A.**   So there's so many courses that I've done, and so my

3  expertise originally was in transistor design, so I design

4  analog circuits, digital circuits.  I also do

5  microelectromechanical systems, so manage as well.

6      So I taught courses in analog integrated circuits and

7  also in MEMS.

8  **Q.**   Have you taught any courses that cover the kind of RF

9  technology or filter technology that has been discussed in

10  this case?

11  **A.**   Yes, indeed, I have.

12  **Q.**   What courses have those been?

13  **A.**   So at the University of Michigan there was a course

14  called the AECS522, the title was analog Integrated

15  Circuits for Communications.  And so what we're talking

16  about is a technology for communications.

17      I've also taught MEMS courses that we'll talk about

18  all sorts of resonators, not just BAW-type resonators.

19  We're talking about now using aluminum nitride materials

20  and other materials as well.  And there's a whole host of

21  cool materials to use that people are investigating in

22  research.

23  **Q.**   You've mentioned, Professor Nguyen, you currently are

24  the chair at the University California Berkeley.  Have you

25  taught at any other universities?

08:40:20  1    **A.**    Yes, I have.  Before coming to Berkley, I went --

08:40:23  2    after graduating with my PhD in December 1994, in

08:40:29  3    January 1995, I immediately went to the University of

08:40:33  4    Michigan to teach.  I think Berkley has a rule that we

08:40:37  5    don't hire our own students coming out of college.  I

08:40:40  6    don't know why we have that rule.  We still actually have

08:40:41  7    it.

08:40:42  8    **Q.**    And have you won any awards for your teaching

08:40:46  9    abilities?

08:40:46 10    **A.**    Yes.  So let me just say that in the career of a

08:40:50 11    faculty person, a professor, you work really hard to teach

08:40:53 12    well in the beginning, then later on you have service and

08:40:55 13    research and stuff.  You still teach well.  But in the

08:40:58 14    beginning is when you win a lot of these awards.

08:41:01 15        And so I won a lot of awards at the University of

08:41:04 16    Michigan and some at Berkeley.  So at Michigan I won what

08:41:07 17    they call the 1938 E Award, it's a College of Engineering

08:41:10 18    award for the outstanding teacher for that particular

08:41:13 19    year.  I think I won that in 1998.

08:41:15 20        I also won what's called the Ruth and Joel Spira

08:41:16 21    Award for excellent teaching.  I won the -- I guess,

08:41:24 22    Department Excellent Teaching Awards at both University of

08:41:30 23    Michigan and UC Berkley.  And I suppose even beyond

08:41:32 24    teaching at a university, I've been a distinguished

08:41:35 25    lecturer for IEEE societies, in particular for the Solid

08:41:41  1    State Circuit Society.

08:41:42  2    **Q.**    In addition to your teaching responsibilities, have

08:41:45  3    you engaged in any research while you were at either the

08:41:48  4    University of Michigan or the University of California?

08:41:50  5    **A.**    Yes, absolutely.

08:41:51  6    **Q.**    And what kind of research have you conducted or

08:41:54  7    supervised?

08:41:55  8    **A.**    So the research has been largely into

08:41:57  9    microelectromechanical systems, but a lot of it pointed

08:42:00  10   towards the timing devices in microelectromechanical

08:42:03  11   systems.  And what that is similar resonators to what

08:42:06  12   we're talking about today, but what I would call much

08:42:10  13   better performance that you need in order to get timing.

08:42:12  14   And so timing is something we all have on us, in fact, all

08:42:15  15   our computers, all of our cell phones, you know, these

08:42:18  16   monitors, everything.  There's some clock in there that's

08:42:21  17   making sure that all of the circuits are synchronized

08:42:24  18   together.  And so the research has actually resulted in a

08:42:27  19   huge volume industry in MEMS.

08:42:31  20       The other research that I've done is integrating

08:42:34  21   integrated circuits together the MEMS.  It's kind of a

08:42:37  22   cool thing.  Right now what you see a lot in this trial is

08:42:39  23   having MEMS devices with circuits and they're bonded

08:42:43  24   together or they're clip-chipped onto each other.

08:42:46  25       Well, there's research going on to put the MEMS

directly above the circuits and maybe my group has had

some of the best success in doing something like that.

Once you're able to do that, there's technologies that may

allow you to actually put the whole cell phone onto a

single chip.  So that's what our goal is.

Think of your cell phone you hold in your hand as

maybe a ring on your finger or something.  Dick Tracy-

stuff is what we're looking at.

Q.   So what's the current focus of your research?  To the

extent that -- I obviously can't ask you anything that

might be classified that you might be doing for certain

governmental entities, but what is your current research

focus?

A.   The current research is to get better resonators, for

one thing.  I think you've heard about quality factor that

we've talked about here.  And for these BAW resonators,

the quality factor's on the order of 500 to 1,500, maybe

2,000 or so.

Our resonators we can make out of diamond, for

example.  That's kind of a cool material to try to use.

But those actually are 3 gigahertz have gotten Qs on the

order of 42,000, some approaching 80,000.  And, you know,

we've shown record performance in terms of what's called a

frequency Q product or so.

There are some issues with these.  The

08:43:59   1    electromechanical coupling is not as strong.  You've heard

08:44:05   2    that word here today.  And so they are relegated to other

08:44:07   3    types of applications, much more futuristic applications.

08:44:10   4    I would say maybe the most interesting type of research we

08:44:12   5    are doing right now is trying to eliminate transistors.

08:44:16   6        So I've kind of gone full circle.  In the beginning

08:44:17   7    of my career as a student, I wanted to combine transistors

08:44:21   8    with MEMS.  We call that integration.  Now I suppose what

08:44:24   9    I'm trying to do is disintegration.  We've realized that

08:44:27  10    transistors cost money.  So if you can do everything with

08:44:32  11    just the MEMS, then do it.

08:44:33  12        So what we've discovered is that you can actually do

08:44:35  13    all the amplification, the demodulation, the filtering,

08:44:39  14    all of these different things just using the mechanics.

08:44:43  15    So our dream is to be able to just have a chip that has

08:44:45  16    mechanics that does what your cell phone does but for

08:44:49  17    different applications, with the advantage of being --

08:44:51  18    it's all mechanical.  It consumes no power.

08:44:54  19        That means it can sit and listen for signals without

08:44:59  20    draining the battery.  Only when it actually receives a

08:45:02  21    real signal, when it has to process that, physics says it

08:45:05  22    has to consume energy.  But it consumes so little energy

08:45:08  23    that you might have, say, a cell phone on the ring on your

08:45:11  24    finger that doesn't need that big battery, that will last

08:45:14  25    longer than maybe the cell phones that you have today.

*Nguyen - Direct*

1    That's the dream for this type of research.

2    **Q.**    Here's one person who hopes that you get there

3    eventually so I don't have to carry around power cables

4    anymore.

5        Professor Nguyen, have you worked outside of

6    academia?

7    **A.**    Yes, I have.

8    **Q.**    And what kind of work or what type of activities have

9    you engaged in?

10   **A.**    I guess we can go all the way back to when I was a

11   student.  And so I actually did summers and even sometimes

12   during the academic year at Pacific Northwest Laboratory.

13   This is when I was at the University of Washington, and we

14   go back to Pacific Northwest Laboratory.  That's at

15   Battelle in Richland, Washington.  That's where they have

16   a lot of nuclear facilities and that sort of -- my father

17   was a nuclear engineer, actually.

18       And so at Battelle Northwest, what I did was first

19   working with laser Raman spectroscopy to study materials.

20   So that's a way to actually analyze and study materials.

21       After that, I really switched gears -- and maybe this

22   is my computer science coming in to me.  I started a

23   project where we were designing computer codes to try to

24   actually predict water table changes in the geography

25   around a certain area.  This was mainly because, again,

08:46:26 1   this was nuclear stuff.  We were trying to investigate

08:46:29 2   whether it made sense to put a nuclear waste repository

08:46:32 3   near Richland, Washington.  Why would anyone want that?

08:46:34 4   I'm not sure.

08:46:35 5       But we wrote the code for that, and we had to make

08:46:38 6   sure that the water table didn't move into the radioactive

08:46:41 7   material because you don't want that to happen.  That will

08:46:44 8   get into the ocean and everything else.  We had to make

08:46:45 9   sure that, in a thousand years, that that didn't happen.

08:46:48 10  And there are actually probabilistic codes that you can

08:46:51 11  write to try to predict that to a pretty good percentage.

08:46:56 12  **Q.**  Have you been involved in forming or creating any

08:47:00 13  companies?

08:47:01 14  **A.**  Yes.  And so while I was at the University of

08:47:03 15  Michigan in Ann Arbor, Michigan, I started and cofounded

08:47:06 16  together with Rick Snyder, who actually was the Governor

08:47:09 17  of Michigan after that time.  At that point, he was an

08:47:12 18  investor.  I cofounded a company called Discera.

08:47:15 19      This was the first company to commercialize some of

08:47:18 20  the technologies we pioneered in my research.  These are

08:47:21 21  the vibrating micromechanical devices used for timing.

08:47:24 22  And so this was the first company to commercialize timing.

08:47:27 23  It was funny because, when we tried to start this company,

08:47:30 24  all sorts of people were saying this would never happen.

08:47:33 25  And that's usually what happens when you are trying to

08:47:35 1    start a new company with new technology.  They'll come out

08:47:38 2    and say there's no way this is going to happen.  With

08:47:41 3    MEMS, it was because it was so small, there's no way it

08:47:44 4    could be as stable as quartz.

08:47:45 5        Now, fast-forward these 20 years now, MEMS is

08:47:48 6    actually more stable than quartz, mainly because of the

08:47:52 7    packaging that's it's put into.  And, actually, MEMS is

08:47:54 8    starting to develop into performances that quartz,

08:47:57 9    normally you don't see at this price point.

08:48:00 10       So, for example, there's something called Stratum E

08:48:03 11   stability.  Stratum E stability actually allows you to put

08:48:06 12   your timing device into a base station.  Where previously,

08:48:10 13   it's atomic clocks, which cost a lot more than these

08:48:15 14   devices in base stations.  And so some of the MEMS

08:48:17 15   technologies these days are quite amazing.

08:48:20 16       My company was bought in 2013, but there are

08:48:23 17   companies still working on this stuff, pushing the

08:48:25 18   technology to the point where, you know, it may just all

08:48:30 19   be MEMS in our economist vehicles, in our data centers,

08:48:32 20   all these things that we need to have modernized these

08:48:36 21   days to satisfy, I suppose, our voracious appetite for

08:48:41 22   data.

08:48:43 23   **Q.**  Professor Nguyen, I notice on your slide here you

08:48:44 24   have a reference to DARPA.  Could you please explain to

08:48:48 25   the jury what DARPA is?

**A.**    Yes.  So DARPA, I went to -- they borrowed me from the University of Michigan, I believe it was 2002 at that time.  And what DARPA is, is the Defense Advance Research Project Agency.  It's a government agency that funds research.  Every now and then, you hear the term pop up in movies and everything as sort of like, not the crazies, but the people that are way out there in terms of research.  And that's kind of DARPA what was.

That was a great time for me.  That was a time when I was right there at the spigot, you know, where all the money was flowing in Washington DC.  That's when I lived near Washington, D.C.

And, basically, I was able to raise money for members of my community; I was giving back to my community.  This money is not going to me, of course.  I'm a government employee at that time.  And so I'm raising money.  I raised, I think, a total $356 million to go out to people across the nation at different universities and different companies to do research in MEMS.  And there were so many different programs.  It's not just resonator programs that we're talking about today.

Indeed, FBARs and SMR and this sort of thing was funded under some of these programs.  But things like chip scale atomic clock.  This is getting an atomic clock, which usually is a refrigerator-size thing, into a tiny

08:50:07  1    size.  And all these have the same thing because that's

08:50:09  2    what MEMS is to me.  MEMS is basically shrinking things to

08:50:12  3    try to reap the performance benefits out of shrinking

08:50:15  4    things.  So when things get smaller, they just get faster.

08:50:19  5         And so that's an example of the type of stuff we were

08:50:22  6    trying to harness.  So other programs were things like

08:50:26  7    microcryogenic coolers, micro power sources, or power

08:50:30  8    sources that, instead of using lithium ion for batteries,

08:50:33  9    may use, say, some kind of chemistry, some hydrocarbon

08:50:38 10    chemistries or so to get much larger energy density.  And

08:50:38 11    even radio isotope nuclear batteries.  Just a whole host

08:50:44 12    of different programs, lots of funding that went out to

08:50:47 13    help people, to allow them to do research.  And, of

08:50:49 14    course, it then allows them to live the way they need to,

08:50:52 15    right, help their families, et cetera.

08:50:54 16    **Q.**   So, Professor Nguyen, do you have any patents?

08:50:58 17    **A.**   Yes.  I have quite a few patents.

08:51:01 18    **Q.**   Approximately, how many?

08:51:02 19    **A.**   More than 40.  I know that.

08:51:04 20    **Q.**   Are they in a particular area or field of study?

08:51:08 21    **A.**   Yeah.  They're in this very area that we're talking

08:51:11 22    about, but different types of -- different materials being

08:51:14 23    used.  A lot of different resonators, filter designs.

08:51:17 24    Even communication system designs that take advantage of

08:51:21 25    these resonators.

08:51:23 1          **MR. LEMIEUX:**  Your Honor, I'd like to move the

08:51:25 2   Court at this time to certify Dr. Nguyen as an expert in

08:51:28 3   the design and manufacture of MEMS devices in RF filters,

08:51:33 4   including bulk acoustic wave filters and resonators.

08:51:37 5          **THE COURT:**  Any voir dire?

08:51:38 6          **MR. MASTERS:**  No, Your Honor.  No objection.

08:51:40 7          **THE COURT:**  The witness is accepted as an

08:51:41 8   individual who can express an opinion, that is a witness

08:51:45 9   who is an expert in the designated areas.

08:51:50 10  **BY MR. LEMIEUX:**

08:51:51 11  **Q.**  Professor Nguyen, were you asked to provide an

08:51:52 12  opinion regarding the patent infringement claims in this

08:51:55 13  case?

08:51:55 14  **A.**  Yes.

08:51:57 15  **Q.**  And what were you asked to do?

08:51:59 16  **A.**  So I was asked to determine whether the accused

08:52:03 17  products infringed upon the patents at issue.

08:52:07 18  **Q.**  Either of the asserted patents?

08:52:08 19  **A.**  Yes.

08:52:10 20  **Q.**  So let's start with your opinion on whether or not

08:52:12 21  the accused products infringe patent number 7,522,018,

08:52:20 22  which I'm just going to refer to as the '018 patent for

08:52:22 23  matters of convenience.

08:52:23 24          **MR. LEMIEUX:**  If we can pull up the next slide,

08:52:25 25  please.

**BY MR. LEMIEUX:**

**Q.**   What did you review and analyze, Professor Nguyen, in order to provide your opinion regarding your opinion of the '018?

**A.**   So I, of course, reviewed this patent, which means I looked at the specification, reviewed the specification, reviewed the drawings of the patent, reviewed the claims. And on top of that, I reviewed the Court's claim construction order.

**Q.**   And do you have an opinion as to whether any of the accused Akoustis products infringe Claims 1 or 12 of the '018 patent?

**A.**   In my opinion, they do not infringe upon these patents.

**Q.**   And why do you believe that?

**A.**   This is because -- well, in some of the devices, the top electrode is actually not thinner than the bottom electrode, which is one of stipulations of this patent. And for all of the devices, Qorvo's experts did not actually do any physical measurements to confirm that the bandwidth of these devices increase, which is another stipulation of the last element of this patent.

Instead of doing actual measurements, they did simulations that actually for this patent don't really make any sense.  And really served as a proxy for

1    measurements they should have been able to make, because

2    these are not difficult measurements to make.

3           **MR. LEMIEUX:**  If we could pull up, I believe

4    what's been -- it's trial Exhibit 229.

5    **BY MR. LEMIEUX:**

6    **Q.**   Do you recognize this document, Professor Nguyen?

7    **A.**   Yes, this is the patent we're calling the '018

8    patent.

9    **Q.**   Could you briefly describe the subject matter of this

10   patent?

11   **A.**   Sure.  And so this patent stipulates that -- well,

12   requires that the top electrode in this figure -- and I

13   guess I will be describing this figure.  If we could blow

14   up -- but right now the top electrode of this figure needs

15   to be smaller than the bottom electrode of this figure.

16   And I actually have a laser pointer up here that I have

17   been cleared to use.  So...

18          **THE COURT:**  Sure.

19          **THE WITNESS:**  So I will use it.  So this is the

20   bottom electrode; this is the piezoelectric layer.

21   **BY MR. LEMIEUX:**

22   **Q.**   What's being referred to as T2 in the diagram?

23   **A.**   Yes.  T2 is the bottom electrode, this is the

24   piezoelectric layer, and this is the top electrode T1.

25   And you can see that this is actually a FBAR device, of

08:55:01  1    the two devices we've been talking about.  So it's

08:55:03  2    suspended in this membrane above an air gap underneath

08:55:08  3    this.

08:55:08  4         And so in this device, what the patent stipulates is

08:55:10  5    that the top electrode needs to be thinner than the bottom

08:55:13  6    electrode.  And at the same time, once you've achieved

08:55:17  7    that configuration, the bandwidth has to increase.

08:55:24  8    **Q.**  Now, the thickness differences that are discussed in

08:55:30  9    the '018 patent, are they in a particular relationship?  I

08:55:37 10    mean, does it matter which one is thicker or which one is

08:55:39 11    thinner?

08:55:40 12    **A.**  Yes.  The top electrode must be thicker than the

08:55:43 13    bottom electrode.

08:55:45 14    **Q.**  And what is --

08:55:46 15    **A.**  Sorry, sorry.  I got that backwards.  The top

08:55:48 16    electrode needs to be thinner than the bottom electrode.

08:55:51 17    **Q.**  And, again, what does that relationship -- what is it

08:55:55 18    required to provide?

08:56:00 19    **A.**  I don't quite understand the question, "what is it

08:56:02 20    require to provide."

08:56:03 21    **Q.**  Well, what's the purpose of having that difference in

08:56:06 22    thicknesses in that particular relationship?

08:56:08 23    **A.**  Yeah.  So the purpose of doing this is that when you

08:56:10 24    make the top electrode thinner than the bottom electrode,

08:56:13 25    the patent says that it actually creates a field

08:56:16 1    distribution, electric field distribution that better

08:56:20 2    matches the mode shape within the piezoelectric within the

08:56:23 3    electrodes, that then enhances the electromechanical

08:56:27 4    coupling coefficient of the device.

08:56:29 5              **MR. LEMIEUX:**  If we could please pull up

08:56:31 6    Exhibit 2.03.

08:56:32 7    **BY MR. LEMIEUX::**

08:56:32 8    **Q.**   And what is being represented here, Professor Nguyen?

08:56:37 9    **A.**   This is the claims of the '018 patent.

08:56:41 10   **Q.**   The elements of first claim?

08:56:43 11   **A.**   Oh, you mean the first claim?  Yes.

08:56:44 12        So for the first claim, this is looking for the

08:56:48 13   device to be an electroacoustic resonator.  This is the

08:56:53 14   case for the accused devices.  So there's a check mark in

08:56:56 15   there.

08:56:56 16   **Q.**   And then what is being -- what's required in the

08:56:59 17   second element, 1B?

08:57:00 18   **A.**   So as the second element is saying here, we're

08:57:03 19   looking for a membrane structure FBAR -- which we have --

08:57:06 20   with a layer structure comprising a piezoelectric layer --

08:57:10 21   which you saw was there -- and a top electrode and a

08:57:14 22   bottom electrode with the thickness of the two electrodes

08:57:16 23   being unequal, which is present in the accused devices.

08:57:20 24   **Q.**   Okay.  Could you please explain what is described in

08:57:23 25   Element 1C?

**A.**   So Element 1C is characterizing that the top electrode layer is thinner than the bottom electrode layer.  So that's the first thing that's necessary.  And the second thing that's necessary is that once you have this configuration, this must increase the bandwidth.

**Q.**   In your opinion, the accused devices for Akoustis do not satisfy the third element, 1C?

**A.**   Yes, that's what the "X" mark is for.

**Q.**   And why have you formed the opinion that the accused devices do not satisfy the requirements of 1C?

**A.**   So to say, again, in some of the devices, let's say nine out of the 19 devices, when we look at the cross-sections obtained by Dr. Heinrich, one of Qorvo's experts, there are top electrodes that are actually thicker than the bottom electrode.

          **MR. LEMIEUX:**  Can we pull up Demonstrative 2.04.

          **THE WITNESS:**  Yes.  Thank you.  This helps explain this quite well.

          And so if you look at this cross-section --
I'll just point out some of the things you've saw in that cartoon of his.  And so this is the aluminum nitride piezoelectric layer.  This is the bottom electrode underneath this.  This is the top electrode.  It's got a passivation above this.  It's got some support layers down

*Nguyen - Direct*

here like you saw on the drawing as well.

And, indeed, if you look at this portion of the top electrode, this is 73.34 nanometers. That is, indeed, thinner than the bottom electrode's 90.34 nanometers, and 91 and 90 there. And so I think in this portion of the top electrode, it is thinner than the bottom electrode; however, this is also the top electrode. Okay. This is a good 350 nanometers thick. This does not satisfy the requirement that the top electrode be thinner than the bottom electrode. And it's for this reason, this device does not infringe.

When you look at all the devices, all the accused devices, all 19 of them, nine of the devices have this feature. The other ten devices do not have this feature. So it looks at least in the data that Dr. Heinrich provided, that the top electrode is thinner than the bottom electrode. However, there is something we need to consider. And we need to consider how Dr. Heinrich actually did these measurements.

And so if you'll recall, in order to measure these devices, he had to pull them apart, access the devices. He had to cut them, he had to cleave them so that you actually can see the cross-section that you're seeing right there.

Now, a person of ordinary skill in the art will

*Nguyen - Direct*

understand that once you cleave this, you will reduce --

you will relieve some of the stress in the device.  So

when these devices are fabricated, they actually have some

amount of stress, especially when you're looking at these

membrane-type devices, like the FBAR.

So think of a rubber band.  So if you take a

rubber band and you stretch it, you know what happens.  It

gets thinner.  That means that when you're putting tensile

stress on that rubber band, you are changing the thickness

of that.

So think of it as this device actually being

stretched taut after fabrication in its pristine step

without having been cleaved, it is under that tension.

Once you cleave it, you take away some of those anchors

that are pulling on it.  And once you take away those

anchors, it's like letting go of the rubber band on this

side.  The rubber band comes back to its original shape,

which was thicker than before.

So after cleaving these devices, in actuality

with the stress relieved, the thicknesses you end up with

are not actually the same thickness as the thickness of

the uncleaved pristine device.  For that reason, this

measurement, I'm not sure is that reliable.

**BY MR. LEMIEUX::**

**Q.**   Has Dr. Heinrich, then, Professor Nguyen, introduced

a new variable that has to be accounted for during this

cleaving process?

**A.**   Yes.  I would say yes.

**Q.**   If we can now look back at exhibit --

Demonstrative 2.03.

Now, you've mentioned a second requirement for

Element 1C, Professor Nguyen.  It is also not infringed,

in your opinion, by the Akoustis devices.

Could you explain what you mean by that?

**A.**   Yes.  I think we have a demonstrative to help with

us.

        **MR. LEMIEUX:**  Can we have Demonstrative 2.05,

please.

        **THE WITNESS:**  Yes.  So this is the simulation

that was submitted to claim that this last part of that

Element 1C in the '018 patent was infringed.  However, if

you look at this data, there are some significant problems

with that data.

        So first of all, I can point out a couple of

things, right.  There's no units on this.  I think that's

been pointed out before.  That's a pretty big deal,

actually.  Let me say more about this later on when we

talk about the other patent.

        For now, if you look at this data, what they

did was they sort of looked at the right side of this, saw

09:02:20   1    that the green was larger than the blue.  And I think

09:02:23   2    there is an animation we can put in.

09:02:24   3            Yeah.  So they looked at that part, saying the

09:02:26   4    green was larger than the blue.  But you've got to look at

09:02:31   5    this part, too.  You can't just look at one event.  So if

09:02:33   6    we circle this part right here, the blue is higher than

09:02:36   7    the green.  So you can't even make much out of this in

09:02:38   8    terms of claiming that green is necessarily higher than

09:02:41   9    the blue.

09:02:41  10            But, you know, all of that is nonsense.  I

09:02:43  11    don't have to talk about any of this.  It would be a

09:02:45  12    complete waste of time, because look at the Y axis of

09:02:48  13    this.  It is lateral energy flux, plotting lateral energy

09:02:52  14    flux versus frequency.  Remember what the patent requires

09:02:55  15    is that the bandwidth increase.  This is not bandwidth.

09:02:59  16    They're not measuring bandwidth.  They needed to measure

09:03:04  17    bandwidth.  And so what do I mean by "bandwidth."  I have

09:03:08  18    a demonstrative that can help explain.

09:03:10  19            So this is a plot that I think you've seen

09:03:13  20    several times over this trial.  And so what this plot is,

09:03:15  21    is sort of the energy through the device as a function of

09:03:19  22    frequency.

09:03:21  23            And so if this is the filter -- so each device

09:03:24  24    is here.  And I think you've seen latter networks of the

09:03:28  25    filter.  If you put an input into the filter right here,

1  so you're putting input energy, input power, it has to go

2  through this and reach the output.  What you want in a

3  phone is for all the power that went into the input to get

4  to the output.

5       And so what happens, though, is that because of

6  what's called "loss" in the filter, so you lose some

7  energy because it leaks out in different places, not all

8  this energy actually gets to the output.  And so when

9  you're plotting this, which is sort of the energy or --

10 transmitted to the output, this is the filter spectrum you

11 get.

12      This is a bit busy because it's showing how the

13 filter is made of the different resonators.  The focus on

14 this part here, that's the filter spectrum you get.  This

15 is what's passing frequencies.  This is what's knocking

16 out the frequencies you don't want in your cell phone.

17      And if this line that I'm drawing across here

18 is perfectly transmitted through, say, just a wire from

19 here to here, if you get perfect transmission here, the

20 filter, because it loses some of it, goes below that line.

21 So this part here, I'm trying to go up and down there,

22 that's the loss that you see in this plot.  We're not

23 looking for loss for this patent.  We're looking for

24 bandwidth.  You can see right here, this is the filter

25 bandwidth.  The excursion of frequencies over which you're

passing signals through this.

And this is what you need to measure, not that
loss, but this.  Certainly not that chart that we looked
at, which is some kind of leakage or so.  It's more
related to loss.  You need to measure this bandwidth.
This bandwidth is not that difficult to measure.  You have
to see --

**BY MR. LEMIEUX:**

**Q.**    I mean -- so, Professor Nguyen, what could you use?
If they didn't measure bandwidth, how should they have
measured bandwidth?

**A.**    Yeah.  So they should have measured bandwidth by just
taking the device, putting it in the lab with the network
analyzer.  You may need to have some nice matching circuit
and that sort of thing.  But my students, for example, can
do all of this.  These companies we're talking about can
certainly do this.  This is their bread and butter.

You've seen data sheets already with exactly this
curve from both of these companies.  And you'll see them
from the all the companies in this space.  This is not a
difficult thing to measure.  It should have been measured.

**Q.**    So it's possible to actually measure bandwidth
whether it's increased or decreased?

**A.**    Oh, yeah.

**Q.**    And in this case, Dr. Shanfield stated that he did

09:05:50 1    not do any actual testing or measurements, and I believe

09:05:53 2    Dr. Bravman agreed with that.

09:05:55 3        Instead, what did they do?

09:05:57 4    **A.**    They, instead, did simulations like the one that you

09:06:01 5    showed there.  And that simulation doesn't even have much

09:06:03 6    to do with bandwidth.  It has more to do with loss, which

09:06:07 7    are different quantities of this plot here.  And it's even

09:06:09 8    difficult to determine how much loss you've got out of the

09:06:13 9    leakage of it.  You certainly cannot determine the

09:06:14 10   bandwidth off of that.

09:06:19 11   **Q.**    So instead of the proxy simulations that

09:06:24 12   Dr. Shanfield performed, he should have been able to

09:06:27 13   physically measure the bandwidth.

09:06:31 14       Could we go back to -- well, first, let me ask you,

09:06:35 15   Professor Nguyen:  Are you aware of any measurements that

09:06:38 16   were done by the plaintiff in this case related to the

09:06:41 17   bandwidth that were performed on the actual accused

09:06:45 18   devices?

09:06:45 19   **A.**    If they measured it, we were not supplied with the

09:06:50 20   measurements.

09:06:50 21   **Q.**    Now, are you aware of whether Qorvo or its experts

09:06:54 22   had samples of the accused devices on which they could

09:06:57 23   have performed actual physical bandwidth testing?

09:07:00 24   **A.**    Yes.  They obviously had samples of the accused

09:07:02 25   devices because Dr. Heinrich was able to split them apart

and get cross-sections of it.

It's also my understanding that the defendants sent additional samples based on what was called a "rosebud process," that included different variations of electrode thickness.  Not just the thinner top electrode and bottom electrode --

MR. MASTERS:  Objection, Your Honor.  May I have a sidebar?

THE COURT:  You may.

                        - - -

(Whereupon, the following discussion is held at sidebar:

THE COURT:  Yes, sir.

MR. MASTERS:  Your Honor's order on the summary judgment motion dealt specifically with the rosebud and alternative designs.  And --

THE COURT:  That's rosebud.

MR. MASTERS:  And Your Honor's ruling was that that is not to be in the case.  It was ruled out.  So this witness should not be testifying about rosebud or alternative designs.

THE COURT:  Yes, sir.

MR. LEMIEUX:  Summary judgment motion was asking for a finding based on the fact that they had and they failed to test them.  This is part of the discovery

09:08:44 1    in this case, Your Honor.  He's simply testifying to the

09:08:47 2    fact that they had these available.  They chose not to

09:08:50 3    test them.  That's part of their choice, just like they

09:08:52 4    chose to run the simulation test that they did.

09:08:55 5            I'm not, otherwise, getting into the rosebud.

09:08:56 6    I'm not asking the Court to make any findings regarding

09:08:59 7    those devices.  He's just simply mentioned that they were

09:09:03 8    there as part of what was given and provided to them for

09:09:05 9    testing purposes.

09:09:06 10           **THE COURT:**  They did say that they didn't test.

09:09:10 11           **MR. LEMIEUX:**  That's right.

09:09:11 12           **MR. MASTERS:**  But, Your Honor, that's

09:09:12 13   irrelevant to the issues in this case.  The issues deal

09:09:14 14   with the accused products, the 19 products --

09:09:16 15           **THE COURT:**  Right.

09:09:16 16           **MR. MASTERS:**  -- and that was your order.  Not

09:09:18 17   any alternative design.  So why are we talking about

09:09:21 18   alternative design other than to confuse the jury?

09:09:25 19           **THE COURT:**  There's no discussion about

09:09:26 20   alternative design.  Are we going there?

09:09:30 21           **MR. LEMIEUX:**  No.

09:09:30 22           **MR. MASTERS:**  But the -- I don't know where --

09:09:31 23   why rosebud is even being discussed.

09:09:34 24           **THE COURT:**  Well, I'm not sure he used it.  I

09:09:35 25   think it was just on one question which was, "Was there

09:09:39 1    separate testing of additional sampling?"  I think that's

09:09:42 2    all he's asking.

09:09:43 3              MR. MASTERS:  But why -- I don't understand the

09:09:45 4    relevance of that.

09:09:48 5              THE COURT:  Okay.  We're done.

09:09:48 6              MR. LEMIEUX:  Actually --

09:09:48 7              THE COURT:  If that's all we're asking, then --

09:09:53 8    it may be 403.

09:09:55 9              MR. LEMIEUX:  My question is simply --

09:09:55 10   actually, I wasn't anticipating he was going to mention

09:09:59 11   rosebud.

09:09:59 12             THE COURT:  Sure.

09:09:59 13             MR. LEMIEUX:  I was just simply asking him what

09:10:01 14   test they could have done on the devices they're talking

09:10:03 15   about.  I don't intend to go into rosebud at all.

09:10:07 16             MR. MASTERS:  Well, maybe you can ask him as to

09:10:08 17   the 19 accused products, if that -- if he knows what that

09:10:11 18   means.

09:10:12 19             THE COURT:  It certainly can't be anything

09:10:13 20   about alternative design if that's not part of the case.

09:10:18 21   I think the question posed is whether or not there was

09:10:22 22   initial testing on the accused devices.

09:10:24 23             MR. MASTERS:  If it's on the accused devices,

09:10:26 24   that's fair game.

09:10:28 25             THE COURT:  He's entitled to ask, entitled to

09:10:29  1    ask that.

09:10:30  2                    MR. LEMIEUX:  Sure.

09:10:30  3                    THE COURT:  I think that's what we're limited

09:10:31  4    to.

09:10:31  5                    MR. LEMIEUX:  Okay.  No problem.

09:10:31  6                    MR. MASTERS:  Just no testing as to the

09:10:34  7    rosebuds.

09:10:37  8         (Whereupon, the discussion at sidebar concludes.)

09:10:37  9                              -  -  -

09:11:10  10                   THE COURT:  We'll strike the question.  Strike

09:11:12  11   the response and start over as we discussed at sidebar.

09:11:16  12   BY MR. LEMIEUX:

09:11:17  13   Q.    So, Professor Nguyen, with regard to the 19 devices

09:11:20  14   that Dr. Heinrich examined and were the subject of this

09:11:24  15   case, is it your testimony, then, that they did not

09:11:29  16   actually test for bandwidth, which is one of the

09:11:31  17   requirements of the '018 patent?

09:11:34  18   A.    Yes.  Not to my knowledge.

09:11:36  19   Q.    And could they have tested for it had they chose to?

09:11:39  20   A.    Yes.

09:11:40  21   Q.    Is the equipment available in labs and university

09:11:44  22   labs or in commercial labs to do that type of testing?

09:11:48  23   A.    Yes.  There are many network analyzers at UC Berkley.

09:11:52  24   I'm sure there are a lot of MIT and Draper as well.

09:11:55  25   Q.    And in terms of the testing that they did do, did

09:11:58 1    that simulate bandwidth measurements?

09:12:02 2    **A.**    No.  It was simulated to some sort of leakage.

09:12:06 3    **Q.**    And what about Claim 12, the other claim for the '018

09:12:09 4    patent, does the accused devices in this case infringe

09:12:13 5    that claim?

09:12:15 6    **A.**    If Claim 12 depends on Claim 1, which it does, they

09:12:18 7    do not.

09:12:19 8    **Q.**    So because they don't infringe Claim 1, in your

09:12:22 9    opinion, they don't infringe Claim 12 either?

09:12:24 10    **A.**    Correct, yes.

09:12:30 11            **MR. LEMIEUX:**  If we could pull up, please,

09:12:31 12    PTX-716 of the '755 patent.

09:12:37 13    **BY MR. LEMIEUX:**

09:12:37 14    **Q.**    Professor Nguyen, do you recognize this document?

09:12:38 15    **A.**    Yes.  This is the patent that we're referring to as

09:12:41 16    the '755.

09:12:42 17    **Q.**    And this is the other asserted patent in the case?

09:12:45 18    **A.**    Yes.

09:12:46 19    **Q.**    Could you briefly describe the subject matter of the

09:12:47 20    '755 patent?

09:12:49 21    **A.**    So the '755 patent is -- in this case, I guess,

09:12:54 22    showing an SMR resonator -- but saying that if you

09:12:57 23    construct the outer region of this device -- this is a

09:13:02 24    small thing -- because an outer region for this device,

09:13:03 25    which I think we'll show in a second here -- if you

*Nguyen - Direct*

09:13:06  1    construct the layers of the outer region relative to the

09:13:11  2    layers above the actual electrode -- I guess this is a

09:13:14  3    bigger picture.  I can do it right here.

09:13:16  4         So looking at this, it's basically saying that if you

09:13:19  5    design this outer region here, the height of the layers of

09:13:22  6    this outer region to be a certain ratio over the

09:13:26  7    passivation layer, right here, over the top electrode,

09:13:28  8    then provided you get the right ratio, you can get a match

09:13:33  9    that will prevent wavelengths that you don't want to be

09:13:38 10    excited within the piezoelectric layer, which we assume,

09:13:40 11    then, might escape to the outer region and cause a loss or

09:13:44 12    leakage.

09:13:45 13         It's trying to prevent loss or leakage.

09:13:47 14    Q.   And so why is preventing that loss important?

09:13:50 15    A.   Preventing that loss is important because remember

09:13:53 16    the figure that I showed before with the input and output,

09:13:56 17    well, not all that input makes it to the output because

09:14:00 18    it's lost in these resonators.  And so that loss that

09:14:02 19    we're talking about here is part of how that energy

09:14:05 20    escapes and doesn't make it to the output.  We want all

09:14:09 21    the energy to make it to the output, if possible.

09:14:13 22    Q.   How is the resonator that is depicted here -- is this

09:14:17 23    an SMR resonator?

09:14:18 24    A.   Yeah.  Yes, it is.  So you can see the different

09:14:21 25    layers of this.  You can see the distinct between the FBAR

09:14:24 1   that you saw before.  This is quite different here in that

09:14:27 2   it's got these stacks of layers of silicon dioxide and

09:14:32 3   tungsten.  Each of these is sized appropriately in order

09:14:34 4   to make this look like a reflecter to any energy heading

09:14:39 5   in this direction.

09:14:39 6       So say this piezoelectric layer is actually

09:14:43 7   vibrating, it's acoustically moving, like I'm showing with

09:14:47 8   my hands here.  So it's doing this.  It's sort of like

09:14:49 9   breathing, I suppose, is how you can describe it.  It's

09:14:51 10  expanding and contracting around its thickness here, and

09:14:56 11  that's sending waves down in this direction.

09:14:58 12      And so in the FBAR, there was an air interface here.

09:15:00 13  Those are the waves -- those waves have nowhere to go but

09:15:04 14  to reflect back.  In this case, there's actually a solid.

09:15:07 15  And if not designed correctly, those waves can go straight

09:15:09 16  through and escape into the substrate, which means you've

09:15:13 17  lost that energy.  What this stack of materials does here,

09:15:15 18  when designed to just the right thickness -- so it's very

09:15:18 19  difficult to do because you have to get that thickness

09:15:20 20  very correct.

09:15:22 21      You have to get what's called a quarter wavelength

09:15:24 22  for each of these materials.  That's the same thing.  It's

09:15:27 23  got to be a certain thickness.  If they're the right

09:15:30 24  thickness, they will reflect the waves back in.  If

09:15:33 25  they're slightly not the right thickness, you may lose

09:15:36 1    more energy here.

09:15:37 2        So this is why the FBAR, actually, usually can get a

09:15:40 3    better loss performance than the SMR.  But like we saw

09:15:44 4    before, the SMR has other advantages, especially the power

09:15:47 5    handling, the heat dissipation, et cetera.

09:15:50 6    **Q.**    So even though, Professor Nguyen, this particular

09:15:52 7    figure in the '755 patent is showing an SMR resonator, the

09:15:57 8    patent applies to both FBARs and SMRs; isn't that right?

09:16:01 9    **A.**    Yes.  The patent claims to be for both SMR and FBAR.

09:16:05 10   **Q.**    So Claims 9 and 10 have been accused of infringe --

09:16:10 11   of, basically, the defendants' accused devices have been

09:16:15 12   accused of infringing.

09:16:16 13       Do you have an opinion on whether Claims 9 and 10 of

09:16:19 14   '755 patent are infringed by any of the accused Akoustis

09:16:22 15   devices?

09:16:22 16   **A.**    My opinion is no, they are not.

09:16:25 17   **Q.**    And why -- what's the basis for your opinion?

09:16:29 18   **A.**    Well, first of all, Claims 9 and 10 are similar.  You

09:16:32 19   can see Claim 9 here.  Claim 10 is more about a method of

09:16:36 20   constructing this device.  So most of these things just

09:16:38 21   have something like providing for in front of them.

09:16:42 22       But if you look at this, the reason why Claims 9 and

09:16:46 23   10 are not infringed by these devices is, again, because

09:16:50 24   the data that we were sent to prove infringement was not

09:16:55 25   sufficient.  It was very uncertain, very unreliable.

**Q.**    And in so if you were looking at the various elements
as Professor Bravman went through them, which of these
elements are satisfied by the Akoustis devices and which
elements are not?

**A.**    Yeah.  So I think in the interest of time, why don't
we just put all these checkmarks down this thing.  And all
these things up above on this patent, all the way down to
this last one are satisfied by the devices.

So the device is a BAW resonator.  It does have a
piezoelectric layer.  It does have a second electrode -- a
first electrode on a first surface.  It does have a second
electrode.  Sandwiched by electrodes.  It does have a
passivation layer on the surface of a second electrode
above the -- of active region.

It does have one or more material layers on the
surface of the area adjacent to the active region.  And it
does have a situation where the layers adjacent to the
active region and in the active region are different, such
that you have a value ratio between them.  A ratio of the
thickness of the outer region layer and the thickness over
the active region is not equal to one.  It does satisfy
all of those elements of this patent.

What it does not satisfy, though, I think we'll put
an X in that last one, is this last thing.  It does not
satisfy the requirement that N is such that the region of

the BAW resonator in the active region are acoustically

matched, such that one or more wavelengths that cause

energy leakage into the outer region are not excited in

the active region.  It does not have this match.  It

hasn't been proven to have this match, based on the data

that was sent to us.

**Q.**   So why do you believe, Professor Nguyen, that the

information that was provided by Dr. Shanfield and then

also discussed by Dr. Bravman, why do you believe that

they don't satisfy Element 9H?

**A.**   I believe we have a demonstrative to help with this.

          **MR. LEMIEUX:**  Can we have 2.08, please.

          **THE WITNESS:**  Okay.  So here are the

simulations that we were sent.  So far, in the few

weeks -- in the week that we've been here, this is what

you've seen as the data for this.  But, in reality, what

happened was for the initial data that was sent, this is

what was sent for this.

          So what are we looking at right here?  So let

me just analyze all of this.  Again, we're looking at this

lateral energy flux, the same thing that was simulated for

the '018 patent inappropriately.

          But this lateral energy flux, it does have to

do with loss.  So I can't say it's completely

inappropriate.  But let's take a look at what we're

looking at here.  So this is lateral energy flux versus
frequency.

These lines, vertical lines indicate the
passband for the resonator itself.  And the blue curve
corresponds to the offending device, the accused device,
which means the device for which N is not equal to 1.  The
green curve corresponds, I guess, a reference device where
N is equal to 1.  So this device in green would not
infringe the patent.

On the first set of data that was sent, notice
how the blue curve is much larger than the green curve?
What this means is the blue curve, the device that
actually satisfies and infringes the patent -- well, not
infringes the patent, but satisfies the element where N is
not equal to 1, actually is losing more energy than the
green one.

So in this actual curve, this is saying that
this device does not infringe the patent.  It's outright
saying that.  And I put that in my initial report.
Interestingly enough, a month later -- I'm not sure how
many weeks later after this, this data came in.  And you
heard that it was blamed on a clerical error of some sort.
Right?

And so in this data now, if you look at some
parts of this, oh, there's a part where the green is

greater than the blue.  This is the part that the Qorvo

experts pointed out as, you know, the reference device

being worse than the accused device because it has more

energy.  But, you know, you have to look at all of this

range.  You can't just look at this portion.  You've got

to look at this portion, you've got to look at that

portion.

          So if we can move the animation forward.

          What you really have to do is look at the

shaded regions here.  Which has more of the shaded

regions?  So on this one, obviously there's more of this

shaded region where the blue is higher than the green.

Obvious, here, this device does not infringe, according to

this simulation.

          If you go back to this here, I don't know.  Is

the blue more than the green?  Is the green more than the

blue?  I'm not sure I can tell.  And, you know, even if

you wanted to count all the boxes, you know, sum up the

boxes, say which one has more boxes than the other -- so

the little boxes, I'm talking about the grid there.

          You still couldn't conclude that here because

let's look at the rest of this plot.  There are no units

here.  That is a huge issue.  So think of yourself, say,

wanting to bake a cake or something and you're asking your

friend, how much sugar do I need.  And your friend says,

well, you need two.

The first thing that's going to come to your
mind is two what?  Two tablespoons?  Two teaspoons?  Two
cups?  How much sugar do I need?  And without that, you're
not really going to be able to bake the cake.  I guess you
could go forward.  It may not taste fantastic.

And so it's no different than science and
engineering.  You can't just put up a plot with no units
and say, all right, there it is.  We need units to know
exactly what we're looking at.  And, in fact, if you look
at units that you think it ought to be -- so the units it
ought to be for lateral energy flux is watts per square
meter.  That is the international standard unit that you
would use.

And if I plug in watts per square meter here,
and I actually calculate out the watts, which is what I
really need to compare the power through this device, the
amount of watts this corresponds to because the device is
so small, is on the order of 10 to the minus 19.  What
does 10 to the minus 19 mean?

You've already seen this 10 to the minus 10.
That's a very small number.  What that means when you say
10 to the minus 10 is you're going to put nine zeros in
front of the number.  Say if I'm looking at this peak
here, that looks like 3.  I'm going to put a decimal point

09:23:38  1    and nine zeros in front of that.

09:23:41  2         So in the power that I calculated, 10 to the

09:23:43  3    minus 19, that would be three times 10 to the minus 19.

09:23:46  4    Let me go ahead and count that out to you.  That's

09:23:50  5    0.000000000000000000.  That's a lot of zeros.  This is a

09:24:03  6    tiny signal that we're looking at.

09:24:06  7         And so this is being done by finite element

09:24:10  8    simulation.  Finite element simulation, I think you've

09:24:12  9    heard from the Qorvo experts, is not an easy thing to do.

09:24:15 10    This is something where you can try the simulation first,

09:24:17 11    but you can't just run one simulation.  Remember, you have

09:24:20 12    to run several of them in order to get it right.  That's

09:24:24 13    because just small differences in the inputs you put into

09:24:28 14    this -- in this case, it takes meshing.  A small

09:24:31 15    difference in the meshing, small difference maybe in --

09:24:33 16    anything you can put into this will change the result.

09:24:37 17         You've got to get it to the point that once you

09:24:39 18    start making differences, changes, the result doesn't

09:24:41 19    change much.

09:24:42 20         Well, the amount of excursion and signal here

09:24:46 21    is so small that one needs to suspect whether the

09:24:49 22    precision of the software is good enough to even delineate

09:24:53 23    this with this.  And when I look at these two curves,

09:24:57 24    because this is such a small scale right here, I wonder if

09:25:01 25    this really is a correct simulation, not really a clerical

*Nguyen - Direct*

error, but just has some change in the meshing of the

finite element that yields this.

So same device, same two plots there.  I wonder

about that because the precision of the software, I don't

think, is good enough to predict losses this small.

**BY MR. LEMIEUX:**

**Q.**   So, Professor Nguyen, in your opinion, then, is the

testing that was performed by Dr. Shanfield sufficient to

prove the final element of the Claim 9 of the '755 patent?

**A.**   It is not sufficient.

**Q.**   And could you briefly summarize why the testing that

was performed by -- or the simulations, excuse me --

performed by Dr. Shanfield insufficient to actually prove

the power loss that it is allegedly measuring?

**A.**   Okay.  So three different things.  One, no units on

these plots.  Second, just the analysis here of trying to

get all the areas in these shaded regions I don't think

was done correctly.  Finally, the total signal you're

looking at here is so small, I don't think the software

has the precision to predict this accurately.

**Q.**   Now, Dr. Bravman, when he testified, he admitted that

he didn't know what the units were either on this vertical

index, and yet still offered an opinion of infringement.

Do you believe that Dr. Bravman had the necessary

data to provide such an opinion, in view of the fact he

1    did not know what units were being depicted here?

2    **A.**    Yeah.  Obviously, in my opinion, no.  I don't see how

3    anyone could have made that decision based on this data

4    here.  In fact, I would say, again, this is something that

5    should have been measured because it is possible to

6    measure loss through exactly that same plot that we showed

7    before, except instead of looking at the bandwidth, which

8    is sideways, you look at how high the flat passband is

9    versus the zero transmission point.

10   **Q.**    Does your analysis comply equally, then, to Claim 10

11   of the '755 patent?

12   **A.**    It does, yes.

13   **Q.**    Which is just simply a method for building what is

14   otherwise described in Claim 9?

15   **A.**    Right.  That's something I said; it was a method for

16   building.

17                **MR. LEMIEUX:**  No further questions, Your Honor.

18                **THE COURT:**  Cross-examination.

19                          CROSS EXAMINATION

20   **BY MR. MASTERS:**

21   **Q.**    Good morning, Dr. Nguyen.

22   **A.**    Good morning.

23   **Q.**    How are you?

24   **A.**    I'm doing well.

25   **Q.**    I'd like to begin first with the '018 patent.

**A.**    Okay.

          **MR. MASTERS:**    And could we project, please, the

defendants' Demonstrative 2.01.    How about 02?    03, I'm

sorry.

**BY MR. MASTERS:**

**Q.**    So you've conceded that the accused devices meet

Element 1A?

**A.**    Yes.

**Q.**    And they satisfy Element 1B, correct?

**A.**    Yes, the accused devices.

**Q.**    And then on Element 1C, we have a structure component

that talks about the thicknesses -- the relative

thicknesses of the electrodes, correct?

**A.**    Yes.

**Q.**    And the increasing the filter bandwidth, correct?

**A.**    Yes.

**Q.**    Okay.    So let's focus first on the thickness of the

electrodes.    Your testimony applies to only nine of the 19

electrodes, accused products, correct?

**A.**    Correct.    In terms of what you can determine from

those -- that data, but, again, I think there's some

uncertainty in the data because of the stress effect that

I talked about.

**Q.**    We're going to talk about the stress effect, but

there's nine of these accused products that you say have a

*Nguyen - Cross*

09:29:16  1    thicker electrode, top electrode compared to the bottom

09:29:19  2    electrode, correct?

09:29:20  3    **A.**    Yes, in some places.

09:29:22  4    **Q.**    And then with respect to the other ten accused

09:29:26  5    products, you don't have that same position.  You'll

09:29:31  6    concede that they have a thinner top electrode compared to

09:29:35  7    the bottom electrode, correct?

09:29:36  8    **A.**    Yes, from the photographs we were shown.

09:29:40  9    **Q.**    Okay.

09:29:42 10             **MR. MASTERS:**  So can we have, let's see,

09:29:46 11    project PTX-406 that's been marked as Trial Exhibit 274

09:29:56 12    and we'll go to Page 4.

09:30:00 13    **BY MR. MASTERS:**

09:30:00 14    **Q.**    Doctor, in your analysis, did you review the stack

09:30:03 15    information that applies to each of the accused products?

09:30:07 16    **A.**    I did, yes.

09:30:08 17    **Q.**    And I think we saw this with Dr. Bravman and

09:30:13 18    Dr. Shanfield.

09:30:14 19             Were you here for their testimony?

09:30:16 20    **A.**    I was, yes.

09:30:17 21    **Q.**    Okay.  So you saw this stack information before,

09:30:20 22    right?

09:30:20 23    **A.**    Yes.

09:30:21 24    **Q.**    And this sets out the target for how thick the

09:30:25 25    electrodes should be -- the monitor kind of gets in our

09:30:28 1    way.

09:30:28 2    **A.**   That's because I'm too short.

09:30:32 3    **Q.**   So the stack information provides the targeted

09:30:36 4    thickness for the electrode, piezoelectric layer, the

09:30:40 5    bottom electrode, right?

09:30:42 6    **A.**   Yes, that's my understanding.

09:30:43 7    **Q.**   It also provides the thickness for what they call the

09:30:48 8    energy confinement frame, correct?

09:30:50 9    **A.**   The thickness for the energy confinement frame,

09:30:55 10   meaning the border ring you're saying?

09:30:58 11   **Q.**   Yes.

09:30:58 12   **A.**   Okay.

09:30:59 13   **Q.**   So the stack information calls out the border ring if

09:31:05 14   you will, correct?

09:31:07 15   **A.**   Yes.

09:31:09 16   **Q.**   And that's what's shown here if we could zoom in on

09:31:15 17   the middle of the page where you have ECF1.  So that is

09:31:21 18   the energy confinement frame, and that is showing a

09:31:26 19   desired thickness for that portion also called the border

09:31:29 20   ring, right?

09:31:33 21   **A.**   Yes.

09:31:35 22           **MR. MASTERS:**  Can we project Plaintiff's

09:31:37 23   Demonstrative 10.8.

09:31:37 24   **BY MR. MASTERS:**

09:31:41 25   **Q.**   And here, just to give a little more review of this,

*Nguyen - Cross*

09:31:45 1    we have here in green, the top electrode that has,

09:31:50 2    actually, thicknesses for three kinds of resonators,

09:31:53 3    right?  The electrodes for three different resonators:

09:31:55 4    The helper resonators, the shunt resonators, and the

09:32:02 5    series?

09:32:03 6    **A.**    Yes.

09:32:03 7    **Q.**    And the series, top electrode of the series resonator

09:32:06 8    shows 830-angstrom, correct, targeted thickness?

09:32:10 9    **A.**    Yes, yes.

09:32:10 10   **Q.**    And then that is unrelated to the ECF1 that's just

09:32:16 11   above the green there that shows 3,000 angstroms, right?

09:32:24 12   **A.**    Yes, I see it.  It's not circled.  I was looking for

09:32:27 13   circled things.  I see it, yes.

09:32:29 14   **Q.**    And so if we go back to, then, Defendants'

09:32:38 15   Demonstrative 2.04, this is your slide, right?

09:32:46 16   **A.**    Yes.

09:32:47 17   **Q.**    So where the thickness is 350.2 nanometers, which is

09:32:57 18   the thick white portion, right?  That's actually the

09:33:01 19   border ring, correct, that is called out by that stack

09:33:08 20   information?

09:33:08 21   **A.**    It is both the border ring and the electrode.

09:33:11 22   **Q.**    But the stack calls out specifically as ECF and it

09:33:16 23   specifies the thickness for that, correct?

09:33:19 24   **A.**    I would say it doesn't matter.  This is the

09:33:20 25   conductor.  It is part electrode.  It is actually

1    actuating the device under it, which is what the active

2    region electrode does.

3    **Q.**    But that functions as a border ring, correct?

4    **A.**    As both a border ring and a driving electrode.

5    **Q.**    But the other devices don't -- do not have the border

6    ring; they have a uniform thickness across, correct?

7    **A.**    I think so, yes, from memory, they do.

8    **Q.**    And when they increase the thickness on the

9    perimeter, the border if you will, that serves as the

10    confining energy, ECF energy confinement frame, correct?

11    **A.**    Yes.  So if you'll permit me, I can explain what is

12    happening with that.

13    **Q.**    No.  I'll ask you some questions to follow up

14    eventually.

15            **MR. MASTERS:**  And if we could then go to

16    Plaintiff's Demonstrative 10.16.  Can we take that down

17    for now.

18    **BY MR. MASTERS:**

19    **Q.**    Actually, on the thickness, you, yourself, did not

20    conduct any tear-downs of the accused products, did you?

21    **A.**    No.

22    **Q.**    You didn't have any of your students at Berkley to do

23    this analysis for you?

24    **A.**    No.  It's my understanding it's the plaintiffs --

25    it's the onus on the plaintiffs to do this.

*Nguyen - Cross*

Q.   Fair enough.

Did Akoustis give you any information or data about the thicknesses of the electrodes?

A.   No.

Q.   Did you ask them for that information?

A.   Well, other than what you showed, the stack thickness.

Q.   So you had received the documents showing the stack information?

A.   Yes.

Q.   How about data?  Did they give you any data from a tear-down of a product, of the accused products?

A.   Not that I looked at.

Q.   Did you ask them, ask Akoustis for that kind of information?

A.   No, no.

Q.   You could have conducted a tear-down, though, if you wanted to, right?

A.   Yeah, I trusted the data that was sent by your experts.

Q.   Okay.

And this idea about the rubber band and when you cut it, if it's going to have effect, it may have a little effect, but it's going to impact the layers, the top electrode and the bottom electrode in fairly the same way;

1    isn't that correct?

2    **A.**   Not necessarily.

3    **Q.**   But is it your testimony that it will impact the

4    differences so much that the top electrode now becomes

5    much larger than the bottom electrode?

6    **A.**   It's possible.  If you look at the thicknesses of the

7    top electrode and the bottom electrode, and this one we

8    looked at was 73 and 90, that's a very small number

9    between the two of them.  And some of the other ones we

10   looked at, the difference was even smaller.  It was

11   something like -- I don't see the numbers, but only

12   2-nanometers, 3-nanometers away.

13   **Q.**   It's possible, but that's just your theory.  You have

14   not tested that with actual data, correct?

15   **A.**   Yes.

16   **Q.**   And those dimensions of the electrodes correspond

17   fairly closely to the stack information that Akoustis

18   provides for those products?

19   **A.**   Not necessarily.

20   **Q.**   Well, within tolerance of manufacturing.  There are

21   errors or manufacturing because it's not precise, but they

22   are the targeted thickness?

23   **A.**   Well, would I say that if some of these things were

24   3-nanometers off, correct?  So I would say they missed

25   their target, as I recall, by as much as 3-nanometers off.

*Nguyen - Cross*

1    And so if this thickness change due to the tension release

2    does 3-nanometers of difference, that is significant

3    enough to make changes there.

4    **Q.**    So then is that a manufacturing error by Akoustis

5    when they make the products?

6    **A.**    I don't know if it is an error or not.  Probably it

7    is.  Just an opinion, though.

8              **MR. MASTERS:**  Can we go to Plaintiff's

9    Demonstrative 10.16, please.

10   **BY MR. MASTERS:**

11   **Q.**    So, Professor, you've now -- you have criticized the

12   simulations, if you will, correct?

13   **A.**    Yes.

14   **Q.**    You didn't conduct any simulations of your own,

15   right?

16   **A.**    No, I did not.

17   **Q.**    And you did testify, I believe, in your deposition,

18   even I think earlier today, that simulations are something

19   that even your students can do, correct?

20   **A.**    Yes.

21   **Q.**    And you criticized the simulations because you said

22   that we should have tested the bandwidth of the Akoustis

23   product itself, right?

24   **A.**    Yes.

25   **Q.**    But this is a comparative study, right?  It's of the

09:38:39  1    accused product where you have unequal thicknesses for the

09:38:44  2    electrodes compared to where the thicknesses equal each

09:38:49  3    other, right?

09:38:50  4    **A.**    Yes.

09:38:51  5    **Q.**    And there's no such product where the thicknesses are

09:38:54  6    equal, correct?

09:38:55  7    **A.**    There are devices that exist where the thickness is

09:38:59  8    equal.

09:39:00  9    **Q.**    But in terms of the Akoustis design as being a

09:39:02 10    comparative study to say that all things being equal

09:39:06 11    except for the thicknesses of the electrodes, it has

09:39:08 12    improved performance, right?

09:39:10 13    **A.**    So Akoustis did deliver, to my knowledge, devices

09:39:17 14    that had various electrode thicknesses to your experts.

09:39:22 15    **Q.**    I guess you maybe misunderstood my question.

09:39:25 16          So if we talk about, I think, the AKF1256, that

09:39:29 17    product.  That has the design of a -- the electrodes have

09:39:34 18    different thicknesses, right?  The comparative study is

09:39:38 19    that same design of the 1256 product, but the thicknesses

09:39:43 20    are now equal, correct?

09:39:46 21    **A.**    I mean, the -- what I'm saying -- no, actually.

09:39:49 22    Yeah.  So in that respect, if they have that thick part

09:39:53 23    they're never equal, right, because you have that thick

09:39:55 24    part that I consider the electrode that is thicker than

09:39:58 25    the bottom electrode.

**Q.**   You are talking the border ring?

**A.**   I am talking about the border ring and the electrode, they are the same thing.  My opinion, you cannot separate the two.  That is electrodes.

**Q.**   But Akoustis does separate them because they call out the energy confinement frame different from the actual electrode thickness itself?

**A.**   No, I --

**Q.**   That's in the stack information, correct?

**A.**   I disagree with that.  Stack information is just -- stack information is just identifying stack.  It's not identifying purpose necessarily.  It has little things that say sort of why that's there, but it's already understood that that thick portion is made of metal, it's part of the electrode.  It's right over the piezoelectric, which means it's driving the piezoelectric at that point.  That means it's part of the electrode; it's part of the active region.

     It serves two purposes at once.  It actually serves to drive it, and it serves as a border ring, which is a design technique known for decades now to confine energy under the active area.

**Q.**   Okay.  But Akoustis separates out the energy confinement frame and the electrodes in the stack information?

*Nguyen - Cross*

**A.**    I think they're just --

**Q.**    Correct?

**A.**    My opinion is that, if I were to create a document the like that, I would do the same thing.  Because I want people looking at it to understand what the different things are for.  And it would be automatically understood that that would be an electrode that would contribute to the current and output of the device, while at the same time being a border ring.

**Q.**    Okay.  So on the simulations, you would agree that, as illustrated here in Plaintiffs Demonstrative 10.16, there is -- the blue line corresponds to the Akoustis design, correct?

**A.**    Yes.

**Q.**    And the green line corresponds to the equal electrode thickness, correct?

**A.**    Yes.

**Q.**    And this simulation shows that for those two different products that have been modeled, produces different results; is that correct?

**A.**    This simulation claims that, but I would say the simulation is just burping out data because the precision it is not good enough to tell you this.

**Q.**    But it does produce different results; isn't that correct?

09:42:26  1    **A.**    It seems to produce different results when you mesh

09:42:29  2    it differently, because there were two pieces of data sent

09:42:34  3    to us.

09:42:35  4    **Q.**    Okay.

09:42:35  5    **A.**    It's reasonable to me that it could produce those

09:42:38  6    different results based on my own finite element analysis

09:42:42  7    that I've done in the past as well.

09:42:44  8    **Q.**    But you didn't do any of that analysis here to show

09:42:49  9    or disprove these simulations that were done by

09:42:50 10    Dr. Shanfield and also testified to by Dr. Bravman,

09:42:57 11    correct?

09:42:58 12    **A.**    Correct.  But I believe I have the experience to

09:42:59 13    know.

09:43:02 14    **Q.**    I'm sure you do.

09:43:03 15          So your experience, though, you disagree with

09:43:06 16    Dr. Shanfield and Dr. Bravman, correct?

09:43:08 17    **A.**    Yes.

09:43:26 18              **MR. MASTERS:**  Can we project Plaintiff's

09:43:28 19    Demonstrative 2.07, I believe.

09:43:32 20    **BY MR. MASTERS:**

09:43:32 21    **Q.**    Move to the '755, Doctor.

09:43:37 22          So for the '755 patent, you've conceded that all

09:43:44 23    accused products have every structure features of Claim 9,

09:43:48 24    from 9A through 9G, correct?

09:43:52 25    **A.**    Yes.  The accused products.

09:43:56 1    **Q.**    And the same would be for Claim 10, 10A through 10G,

09:44:01 2    correct?

09:44:02 3    **A.**    Yes.

09:44:02 4    **Q.**    So we're really just talking about the last element,

09:44:04 5    9H, where, again, you criticize the simulations conducted

09:44:10 6    by Dr. Shanfield and Dr. Bravman, correct?

09:44:13 7    **A.**    Yes.

09:44:14 8    **Q.**    And, again, you did not conduct any simulations here

09:44:19 9    with respect to the accused products, right?

09:44:22 10   **A.**    Correct.

09:44:22 11   **Q.**    You could have, right?

09:44:23 12   **A.**    Well, it's the onus on the plaintiff.

09:44:26 13   **Q.**    It's on -- you're right.

09:44:29 14   **A.**    Yes.

09:44:29 15   **Q.**    But you could have -- you had the information that

09:44:31 16   you could have plugged into your model, your simulation

09:44:34 17   tool.  Simulations are fairly common in this industry,

09:44:38 18   right?

09:44:38 19   **A.**    Yes.

09:44:40 20   **Q.**    Yes.  And they are fairly accurate these days?

09:44:42 21   **A.**    Wait, wait, wait.  They're common in the industry,

09:44:45 22   but this type of simulation, not so much.

09:44:49 23   **Q.**    Okay.  But they are common, and they are very

09:44:53 24   accurate in this industry for BAW filters?

09:44:56 25   **A.**    They are common if you are trying to simulate, let's

1   say, the bandwidth that we saw, right?  So at the very

2   least, for the '018 and even for this one, they should

3   have -- if they couldn't measure that curve that you

4   looked at there, they should have at the very least

5   simulated it.  Because what you're saying is correct; you

6   can simulate that stuff.

7       Now, for the leakage part that you're talking about,

8   the very curve you are looking at, that is very difficult

9   to do.  There is actually research going on now trying to

10  get that right.  Those energy differences are so small

11  that researchers don't get that right.

12      And the reason why I know that is because the devices

13  that I work on in research, they are much better than

14  these devices as far as loss is concerned.  So loss is

15  measured by quality factor.  Again, quality factor of

16  these devices are on the order of 500 to maybe 2,000.  The

17  quality factor of my research devices are on the order of

18  a hundred thousand.

19      And so the amount of loss between those is very

20  different.  These devices normally have a lot of loss.  My

21  devices have very little loss.  The loss you're looking at

22  in these curves that were simulated, they're smaller than

23  the losses in my device.  And we've tried to simulate the

24  losses in my devices.  Other people better than us at

25  simulations -- so UC Berkley is Number 1 in civil

engineering.  A lot of this type of loss is like

earthquake simulations.  They're also simulating energies

going out.  So some of our best earthquake designers have

actually come up with the best ways to simulate this kind

of loss, and they still can't get it right, even for our

devices, which have more loss than what you're looking at,

right there.

**Q.**   So just before we move to look at the actual

simulations, the structures of the accused Akoustis

products have every feature that's required by Claims 9

and 10 on the structure side?

**A.**   From what you can see from Dr. Heinrich's

cross-sections, that's what I would conclude, yes.

**Q.**   So you relied on Dr. Heinrich's cross-sections to

show that it had -- to get nine check marks on Claim 9,

correct?

**A.**   Yes.

**Q.**   Okay.

         **MR. MASTERS:**  Now, can we project Plaintiff's

Demonstrative 10.24.

**BY MR. MASTERS:**

**Q.**   So this was Dr. Shanfield's analysis, and it was with

respect to the AKF1256, correct?

**A.**   Yes.  This was the second one sent.

**Q.**   And this -- well, you make mistakes as well right,

09:47:31 1    Doctor?

09:47:32 2    **A.**   I do, but this is a big one.

09:47:34 3    **Q.**   Well, I mean, even your expert report is mislabeling

09:47:37 4    the resonators and the resonance for those different

09:47:42 5    resonators, right?  I don't even think you corrected it.

09:47:45 6    You still presented it wrong.

09:47:47 7    **A.**   Which one?  A resonance?

09:47:59 8           **MR. MASTERS:**  Can we project Defendants'

09:48:02 9    Demonstrative 2.06, parallel resonance and series

09:48:13 10   resonance.

09:48:14 11          **THE WITNESS:**  Oh yeah.

09:48:15 12   **BY MR. MASTERS:**

09:48:15 13   **Q.**   Yeah, that's the -- so you make a mistake every once

09:48:19 14   in a while, don't you?  Little cut and paste error.  Fine.

09:48:22 15   It's not an issue?

09:48:24 16          **MR. MASTERS:**  Let's go back to 10.24.

09:48:26 17   **BY MR. MASTERS:**

09:48:26 18   **Q.**   So the simulations, just to kind of get back on track

09:48:32 19   here, they -- the blue line -- and, again, we're trying to

09:48:39 20   model the -- the patent is about the amount of lateral

09:48:44 21   loss.  We're trying to prevent the loss from going to the

09:48:46 22   outer regions, keep it within the active region of the

09:48:49 23   device, correct?

09:48:50 24   **A.**   Well, actually, to be precise, the patent is about

09:48:54 25   preventing wavelengths from being generated in the active

*Nguyen - Cross*

09:48:59   1   region that could be lost to the outer region.

09:49:00   2   **Q.**   I accept your answer.

09:49:03   3   **A.**   Confining it would not -- I mean, that's something

09:49:05   4   people have been doing forever.

09:49:08   5   **Q.**   So the blue line refers to the Akoustis design,

09:49:11   6   correct?

09:49:11   7   **A.**   Yes.

09:49:11   8   **Q.**   And here, the green line refers to the comparative

09:49:15   9   product when N equals 1, correct?

09:49:19  10   **A.**   Yes.

09:49:19  11   **Q.**   And this simulation, again, shows different results

09:49:23  12   for the two different devices, correct?

09:49:26  13   **A.**   Yes.  But, again, if it's garbled stuff coming out,

09:49:30  14   you'll have different results.

09:49:33  15   **Q.**   But the simulations that were performed by

09:49:37  16   Dr. Shanfield and Dr. Bravman, that -- again, Dr. Bravman

09:49:43  17   didn't perform them; he opined on them -- do have

09:49:45  18   different results for the accused Akoustis designs

09:49:50  19   compared to this comparative product, correct?

09:49:52  20   **A.**   That's what's shown on this plot.

09:49:55  21   **Q.**   And you disagree with Dr. Shanfield and Dr. Bravman;

09:50:00  22   is that correct?

09:50:00  23   **A.**   Yes.

09:50:01  24   **Q.**   And, again, you didn't ask any of your students to

09:50:05  25   conduct a simulation just to test their simulations to see

*Nguyen - Redirect*

if you got something different or something similar, correct?

**A.**   Not for these devices.

**Q.**   Okay.  You could have, right?

**A.**   Depends on whether someone wants to pay me to do that.  But, yeah, I could have.  But the onus is not on the defendant to do this.  The onus is not on me to do this.

**Q.**   I'm not claiming it is.  I'm just asking you if you did it.  That's all that -- test your theory.

**A.**   I did not do it.

**Q.**   Okay.

Thank you, Dr. Nguyen.

**MR. MASTERS:**  No further questions.

**THE COURT:**  Redirect.

We will let the jury know, since we are actually moving at a good rate, so we will have to have early lunch today because it's going to work out that way in terms of concluding the proof in this case.

So I'm going to have a short break at the end of our witness, and then we will come back.  And then I assume we will have lunch.  It will be early.  It's going to be close to 11:00.  That will be very helpful in terms of staying on schedule.

**MR. LEMIEUX:**  If we could please pull up

1    defense demonstrative 2.04.

2                      REDIRECT EXAMINATION

3    **BY MR. LEMIEUX:**

4    **Q.**   Professor Nguyen, you were trying to explain what

5    constitutes the top electrode and weren't provided the

6    opportunity to finish your answer.  I wanted to give you

7    that opportunity.

8         What exactly is the top electrode that's depicted

9    here, which is actually a picture from Dr. Bravman's

10   analysis, I believe?

11   **A.**   Yes.

12        So you see the top electrode, again, is all of this

13   white material that you see.  That's all one material.

14   It's metal.  The bottom electrode you can see is all metal

15   as well.  On the active portion of this device, the way

16   that it works is you put the voltage between these metals.

17   That creates an electric field across this.

18        The piezoelectric device responds to this electric

19   field by moving.  So that's how you create motion in the

20   device.

21        If this is a metal material with a voltage on it,

22   that will create the electric field here.  And that means

23   this whole thing is serving as the top electrode.  It is

24   also simultaneously, as you've heard, because it's thicker

25   like this, serving as a geometric feature that actually

*Nguyen - Redirect*

1    confines energy.

2         So if you think of this thing as sort of the

3    breathing motion we were talking about, it's actually

4    moving, which is really cool.  It's moving a very small

5    amount at these very high frequencies.

6         It's breathing there but because you have this

7    feature, the amount of lateral energy -- so while it's

8    breathing, there's both vertical motions and there's some

9    lateral motions, too.

10        But because of this feature you have here, it

11   actually prevents the lateral motion from happening out

12   here.  And in that way, it contains the energy.  It

13   confines the energy there.  But it's not just serving as

14   an energy confinement, it is also serving as an electrode

15   driving this device.  It's serving two purposes at once.

16        And so, in my opinion, that means it is part of the

17   top electrode.  It is thicker than the bottom electrode

18   clearly, and so this device does not infringe the '018

19   patent.

20             **MR. LEMIEUX:**  If we pull up, please, Defense

21   Demonstrative 2.03.

22   **BY MR. LEMIEUX:**

23   **Q.**  Is it your understanding, Professor Nguyen, that in

24   order to establish infringement of Claim 1 of the '018

25   patent, you need to satisfy all three elements that are

09:53:54   1    depicted here?

09:53:56   2    **A.**   Yes.

09:53:57   3    **Q.**   And so if the accused device does not satisfy any of

09:54:03   4    the three elements, it does not infringe; is that your

09:54:06   5    understanding?

09:54:07   6    **A.**   Yes.

09:54:07   7    **Q.**   And is it your opinion that all of the devices, not

09:54:10   8    just nine out of the 19, but all of the -- for all of the

09:54:13   9    devices that have been accused of infringing Claim 1, that

09:54:18  10    1C has not been proven by the plaintiffs in this case; is

09:54:21  11    that right?

09:54:21  12    **A.**   Yes, because they have not established that the

09:54:24  13    bandwidth has increased.

09:54:25  14    **Q.**   Okay.  Because they didn't measure bandwidth, did

09:54:28  15    they?

09:54:28  16    **A.**   They didn't measure.

09:54:29  17         **MR. LEMIEUX:**   If we could pull up Defense

09:54:32  18    Demonstrative 2.07.

09:54:35  19    **BY MR. LEMIEUX:**

09:54:35  20    **Q.**   Again, in order to establish infringement of this

09:54:38  21    claim, they would need to satisfy all elements, 9A through

09:54:43  22    9H.  Is that your understanding?

09:54:45  23    **A.**   Yes.

09:54:45  24    **Q.**   And in your opinion, has the plaintiff proven that

09:54:49  25    9H, the last element, has been established with regard to

09:54:52  1    the accused devices?

09:54:53  2    **A.**   No, because we have not shown that -- well, the

09:54:58  3    simulations just are not trustable.

09:55:01  4         **MR. LEMIEUX:**  No further questions, Your Honor.

09:55:03  5         **THE COURT:**  Okay.  Thank you very much.  Step

09:55:05  6    down at this time.  Thank you.

09:55:08  7         We will take a short break.  Let's make it 15.

09:55:12  8    It's kind of hard to do.  We will make it 15 minutes.

09:55:17  9    This will be our last restroom break, then we'll come

09:55:20 10    back.  Then, we will conclude the last witness in the

09:55:26 11    case.  I believe it will be the last witness in the case.

09:55:29 12    And then we will have a lunch break.  Then we'll come back

09:55:32 13    for closing arguments.  We will try to stick to that

09:55:36 14    schedule.  That will be, I think, more efficient.

09:55:38 15         Don't discuss the case among yourselves.  Don't

09:55:40 16    let anyone talk to you about it.  I know we're changing a

09:55:43 17    little bit, but I think this will help us move through.

09:55:45 18         Everybody will be excused.  Remember, don't

09:55:47 19    discuss the case among yourselves.  Don't let anyone talk

09:55:51 20    with you about it, and keep an open mind.

09:55:54 21      (The jury exits the courtroom at 9:55 a.m.)

09:56:20 22         **THE COURT:**  Everybody can be seated.  I am

09:56:21 23    rechecking.  You should have the revised final set of jury

09:56:24 24    instructions.  Look at Page 29, do that now.  I will

09:56:28 25    recheck mine.  Recheck mine and make sure we have the

09:56:33 1    language in there correctly.  That is the way we have

09:56:52 2    determined this should be presented.  Yes, it is.

09:57:02 3         All right.  So you now have the final set of

09:57:04 4    instructions, and I think you've got them electronically.

09:57:06 5    We wanted to give those to you and make sure you had them,

09:57:13 6    give you a break on that, so that if you wish to refer to

09:57:16 7    the instructions in your closing argument, you may do so.

09:57:23 8    Hopefully you will get that message.

09:57:26 9         And so, of course, obviously -- now, if you do

09:57:33 10   that, I probably cautioned you once already, but you

09:57:36 11   probably need to say:  I believe the Court will give you

09:57:40 12   this instruction, of course, if the Court gives you a

09:57:42 13   different instruction, you should follow it.  I have had

09:57:45 14   things change on occasion.  And we want to be cautious so

09:57:48 15   we don't put you in a bad position.

09:57:50 16        I think we have everything we need now.  I want

09:57:53 17   to make sure I've got the list of trade secrets.  And

09:57:57 18   that's what I haven't seen.  Maybe it's been

09:57:58 19   electronically sent.  I'm not receiving those things right

09:58:04 20   this moment.  Do we have that?

09:58:06 21        **MR. MASTERS:**  We agree on the format, the

09:58:08 22   content, and I need -- I just learned that we agreed.  So

09:58:12 23   we're going to have it e-mailed to you within the hour.

09:58:15 24        **THE COURT:**  That's fine.

09:58:15 25        **MR. MASTERS:**  At this break, I will call back.

09:58:18 1          THE COURT:  Mr. Lemieux, I just make sure that

09:58:20 2     we've got it, because I want to be absolutely certain so

09:58:23 3     that we are finished.

09:58:29 4          MR. LEMIEUX:  We are in agreement.

09:58:31 5          THE COURT:  We are in agreement?  Okay.  Then

09:58:32 6     that will be attached to the verdict form so they can

09:58:35 7     follow the content of the verdict form.  I think we've

09:58:38 8     done everything.

09:58:39 9          Anything else that we have to complete before

09:58:42 10    we are ready for closing argument after the last witness?

09:58:45 11    Anything else?

09:58:46 12         I think the answer is no, but I want to make

09:58:48 13    sure.

09:58:49 14         MR. MASTERS:  Well, we may have a Rule 50

09:58:51 15    motion to present.

09:58:52 16         THE COURT:  Well, I understand.  I understand

09:58:53 17    there might be --

09:58:53 18         MR. MASTERS:  Other than that, nothing from

09:58:55 19    plaintiff.

09:58:56 20         THE COURT:  That's understood.

09:58:59 21         It looks like you are standing, so, yes, sir.

09:59:01 22         MR. ELKINS:  Yeah.  I agree.  We are set.

09:59:04 23         THE COURT:  Everybody has got the material they

09:59:05 24    need, and we will have it shortly, and we need to take

09:59:09 25    that break at this time.  We'll try to stay right on

09:59:13 1    schedule.  Thank you all very much.

10:10:04 2            (Whereupon, a recess was taken.)

10:14:33 3            **THE COURT:**  You may be seated.  I think we're

10:16:08 4    all set for our last witness.  I think we can bring the

10:16:12 5    panel in.

10:16:41 6            (The jury enters the courtroom at 10:16 a.m.)

10:17:02 7            **THE COURT:**  Everyone can be seated.

10:17:03 8            Mr. Elkins, who will our next witness be?

10:17:07 9            **MR. ELKINS:**  Thank you, Your Honor.  Our next

10:17:09 10   witness is Carlyn Irwin.

10:17:15 11           **THE COURT:**  Come forward and approach the

10:17:17 12   witness stand, and you'll be sworn in.

10:17:25 13           **THE CLERK:**  Raise your right hand.

10:17:28 14           **THE WITNESS:**  Carlyn Irwin, C-A-R-L-Y-N,

10:17:31 15   I-R-W-I-N.

10:17:32 16       CARLYN IRWIN, having been called as a witness, being

10:17:32 17   first duly sworn under oath or affirmed, testified as

10:17:32 18   follows:

10:17:33 19           **THE CLERK:**  Thank you.  Please be seated.

10:17:45 20           **MR. ELKINS:**  Your Honor, may I approach?

10:17:47 21           **THE COURT:**  You may.

10:17:33 22                      DIRECT EXAMINATION

10:17:59 23   **BY MR. ELKINS:**

10:18:00 24   **Q.**   Good morning, Ms. Irwin.

10:18:01 25   **A.**   Good morning, Mr. Elkins.

1  **Q.**   Can you please introduce yourself to the jury.

2  **A.**   Sure.  I'm Carlyn Irwin.  I'm a senior advisor with

3  the firm of Cornerstone Research in Los Angeles.  I live

4  in Orange County, California with my family.

5  **Q.**   Did you prepare materials to help describe the work

6  you performed in this case?

7  **A.**   I did.

8  **Q.**   Okay.  And what materials did you prepare?

9  **A.**   A brief set of slides.

10         **MR. ELKINS:**  Your Honor, these are marked

11  DDX-3.

12         **THE COURT:**  All right.

13         **MR. ELKINS:**  And I passed a set up, along with

14  the report for you.

15  **BY MR. ELKINS:**

16  **Q.**   Well, let's start with Slide 2, shall we?

17  **A.**   Sure.

18  **Q.**   Can you give us a high-level summary of your

19  experience?

20  **A.**   Yes.  So I have an undergraduate degree from the

21  University of California Santa Barbara, where I graduated

22  with a degree in organizational psychology with honors.

23  And then I attended the University of Southern California,

24  where I earned my master's in business administration,

25  focusing on accounting and finance.

10:19:06  1        Then I was -- my first job out of grad school was at

10:19:11  2    a local law firm called Mitchell Silverberg & Knupp where

10:19:16  3    I was under their assistant controller.  I had

10:19:16  4    responsibility for their general ledger, overseeing their

10:19:20  5    payroll, working with their auditors and the tax partners

10:19:23  6    on filing taxes for the firm.

10:19:25  7        I then was offered a position with Pricewaterhouse,

10:19:28  8    one of the, then, be big six firms, now known as

10:19:33  9    Pricewaterhouse Coopers.  And I was hired into their

10:19:36 10    financial advisory services group in their litigation

10:19:39 11    support services, where I worked with experts in providing

10:19:43 12    testimony in civil litigation.

10:19:45 13        And then in 2002, I was offered the opportunity to

10:19:49 14    open the Los Angeles office along with some very senior

10:19:53 15    colleagues of Cornerstone Research.  And I've been there

10:19:56 16    more than 22 years.

10:19:58 17  **Q.**   Can you give us a little color about Cornerstone

10:20:00 18    Research does?

10:20:02 19  **A.**   Yes.  We are an economic consulting firm, and we

10:20:05 20    provide expert witness support and services in complex

10:20:08 21    civil litigation like we are here talking about today.

10:20:11 22  **Q.**   Have you ever taught any courses?

10:20:13 23  **A.**   I have.  I've guest lectured several law schools in

10:20:19 24    Los Angeles area.  And then while I was at USC, I was a

10:20:22 25    teaching assistant for the undergraduate corporate finance

*Irwin - Direct*

10:20:26 1    group my second year.  I had a fellowship doing that.

10:20:29 2    **Q.**   What do you do at Cornerstone Research?

10:20:31 3    **A.**   As a senior advisor, I primarily serve now as an

10:20:34 4    expert witness in calculation of damages.  Frequently, in

10:20:38 5    the area of intellectual property, including trade secrets

10:20:41 6    and patents, which is what we are dealing with today.

10:20:43 7    **Q.**   Do you have any accreditations?

10:20:46 8    **A.**   I do.  I am a Certified Public Accountant, which is

10:20:50 9    administered by the American Institute of Certified Public

10:20:54 10   Accountants.  I also, through that institution, am

10:20:57 11   certified in financial forensics, accredited in business

10:21:02 12   valuation, certified in intangible valuations.  And then

10:21:06 13   I'm also a certified fraud examiner, which is offered by

10:21:10 14   the Association of Certified Fraud Examiners.

10:21:13 15   **Q.**   How have you applied your accreditations and

10:21:16 16   education in your role as a senior advisor at Cornerstone?

10:21:21 17   **A.**   Well, as a damages expert, I frequently am looking at

10:21:23 18   financial information, internal business records, you

10:21:28 19   know, case documents that explain the legal aspects of the

10:21:32 20   case, things of that nature.  So I rely heavily on my

10:21:35 21   education, my experience, as well as my 30 years of being

10:21:38 22   in the litigation services field.

10:21:41 23   **Q.**   So you're here today as a damages expert for the

10:21:47 24   defendants.  In your practice, do you have a tendency to

10:21:52 25   represent either plaintiffs or defendants?

*Irwin - Direct*

10:21:54  1    **A.**    It fluctuates over time, but I'm basically 50/50

10:21:58  2    plaintiffs and defendants.

10:22:00  3    **Q.**    Have you previously been qualified as an expert

10:22:03  4    witness in the field of economic damages?

10:22:05  5    **A.**    Yes.

10:22:05  6    **Q.**    And how about in intellectual property matters and

10:22:09  7    valuation issues?

10:22:11  8    **A.**    Yes.  Again, yes.

10:22:13  9    **Q.**    Have you previously been qualified as an expert

10:22:18 10    witness with respect to unfair competition issues?

10:22:22 11    **A.**    Yes, many times.

10:22:23 12    **Q.**    How many times have you been qualified as an expert

10:22:27 13    witness to testify regarding economic damages?

10:22:31 14    **A.**    At trial, I would say 15 times over the last 12-to-15

10:22:37 15    years, maybe more.

10:22:38 16    **Q.**    Are you compensated for your work on this case?

10:22:41 17    **A.**    Only through my salary from Cornerstone Research.

10:22:44 18    **Q.**    Is your compensation affected by the conclusions you

10:22:47 19    reach?

10:22:48 20    **A.**    No, not at all.

10:22:49 21            **MR. ELKINS:**  Your Honor, we tender Ms. Carlyn

10:22:53 22    Irwin as an expert witness in the area of economic

10:22:56 23    damages.

10:22:57 24            **THE COURT:**  Any voir dire?

10:22:59 25            **MS. AYERS:**  No, Your Honor.

THE COURT: She's accepted as a person who can express an opinion, sometimes referred as an expert witness, in the area of damages.

BY MR. ELKINS:

Q. Ms. Irwin, let's talk a little bit about your work in this case.

What were you asked to do?

A. Primarily, I was asked to review the expert report and deposition of Ms. Bennis, who you heard from on Monday, and respond to her conclusions and her methodologies.

Q. Did you review any other information for your work in this case?

A. Yes. I reviewed many of the -- if not all of the expert reports in this matter, reviewed multiple depositions, not just the experts, but the fact witnesses, their exhibits to their depositions. I also reviewed in many cases documents that were exchanged by the parties, as well as pleadings and other legal filings that kind of guide the context of my work.

Q. Did you have any discussions, apart from with me and my colleagues, or interviews with anybody in connection with your work in this case?

A. Yes. I spoke with both Doctors Darveaux and Lebby regarding the technical aspects of the trade secrets, and

*Irwin - Direct*

10:24:10 1    then I also spoke with Mr. David Aichele, who is the

10:24:14 2    executive vice president of business development for

10:24:18 3    Akoustis.

10:24:18 4    **Q.**   Why did you speak with Mr. Aichele?

10:24:20 5    **A.**   It was important for me to understand which products

10:24:23 6    that Akoustis sells that are basically the embodiment of

10:24:27 7    the alleged trade secrets and the alleged patent -- the

10:24:32 8    products that are subject to the patents at issue in this

10:24:35 9    case.  I also wanted to understand more about the cost

10:24:40 10   structure of Akoustis, and primarily the cost of goods

10:24:43 11   sold.

10:24:44 12   **Q.**   Did you form any opinions regarding the opinions and

10:24:49 13   analysis of Melissa Bennis who is the damages expert for

10:24:54 14   Qorvo?

10:24:54 15   **A.**   Yes.  And I believe if you go to the next slide,

10:24:57 16   there is a high level summary.

10:25:01 17   **Q.**   Okay.  Can -- you what's your first opinion?

10:25:04 18   **A.**   So generally, Ms. Bennis' calculation of Akoustis'

10:25:10 19   supposed head start benefit, it makes no sense and doesn't

10:25:13 20   fit the facts.  She used a head start approach.  That was

10:25:17 21   the methodology she selected.  And that is appropriate

10:25:21 22   when you have accelerated profits for a defendant, but not

10:25:24 23   when you have accelerating losses.  As you will see, it

10:25:28 24   makes no sense.

10:25:30 25   **Q.**   What is your second opinion?

*Irwin - Direct*

**A.**    That a different damages approach called the avoided

costs method, which I will explain, is a better fit for

calculating any benefit that Akoustis gained from

misappropriating and using the trade secrets.

**Q.**    Did you calculate Akoustis' avoided cost benefit?

**A.**    I did.  And, again, I think it was a better fit for

this case, and it ends up being around $305,000.

**Q.**    Do you have any opinions about Ms. Bennis' unfair

competition opinions in this case?

**A.**    I do.

**Q.**    What are they?

**A.**    So her calculation of the employee poaching is

fundamentally flawed.  First, she did no research on

whether or not Akoustis -- excuse me -- Qorvo actually

replaced the employees that were allegedly poached, yet

her calculation, at least she represented it to be the

cost that Qorvo incurred to replace those employees or

to -- the cost associated with losing them.

Second, she assumed that every one of the 19 people

she discussed with the HR director at Qorvo was poached.

Whereas, I understand that the plaintiff's argument here

is that employees were poached because they had access to

the alleged trade secrets.

And then third, the costs that she's using, or the

reference material, that doesn't have anything to do with

Qorvo's actual hiring costs. And it also ignores the fact that Qorvo didn't have to pay employees while the positions were being vacant. When someone's left, you no longer have to pay the salary, and that information is not being considered in her analysis.

**Q.** Now, in reaching your opinions, were you required to reach any or make any assumptions?

**A.** Yes. To calculate the issue of damages, to even think about approaching it, you first have to assume liability. As damages experts when we start out, we have no idea what information will be presented to you or what weight you will give to it. So what I typically do is I calculate damages assuming liability for all of the claims that the plaintiff has brought forward to give the jury, such as yourselves, the option to pick and choose the numbers that you see fit.

But in assuming liability, it's -- there are three components to the trade secrets. It's, first, assuming that are there trade secrets; second, assuming that they were misappropriated; and, third, that they were used. Because the benefit of trade secrets comes from their use, not just from them actually being trade secrets.

**Q.** So are you saying that you had to assume all three of those as fact in order for you to come up with your conclusions regarding damages in this case?

**A.**    Yes.  For example, if there are no trade secrets,
there are no damages.  If there's no misappropriation,
there's no damages.  If there's no use, there's no
damages.

     So I've assumed all three in order to model what I
believe to be the appropriate method to calculate damages
in the trade secrets claim.

**Q.**    Now, are you -- are you providing any opinions on the
trade -- the alleged trade secrets, themselves, in this
case?

**A.**    No.  I'm not that educated, compared to all of the
experts you've seen with all the patents and PhDs.  No, I
have relied on the technical experts for my understanding.

**Q.**    And are you opining at all on whether or not the
trade secrets were misappropriated or used?

**A.**    No.  Again, I assumed 100 percent that they've been
misappropriated and that they have been used.

**Q.**    And I think that's it.  That's all I had on that.

     Let me ask you about your opinions regarding
Ms. Bennis' calculation of the head-start benefit to
Akoustis from its alleged misappropriation and use of
trade secrets.

     So you testified at least -- you didn't testify, but
I understand that you will testify that there are multiple
ways of calculating trade secret --

**A.**    Yes, there's multiple ways --

**Q.**    -- damages?

**A.**    -- that are allowed.  And I think I have a slide that summarizes that.

So there are three that are -- I understand I'm not a lawyer, but I've done this long enough to understand this. There are generally three ways to calculate damages in a trade secret case.  The first is, is there damage to Qorvo caused by Akoustis' using the trade secrets?  And that's in the form of lost sales.

As we know, Ms. Bennis did not calculate that form of loss.  And I've seen know evidence or claim that Qorvo has lost any sales as a result of the alleged use of trade secrets.

Second is the benefit to Akoustis for the use of the trade secrets, what we call "unjust enrichment."

I will skip over the three bullets and circle back. The last is a reasonable royalty, which is what Qorvo and Akoustis would have negotiated for the use of the trade secrets at the time of the first misappropriation of use.

And Ms. Bennis uses that royalty methodology for her patent damages, but not for her trade secret damages.  But let me explain -- go back into a little more about the three types of unjust enrichment, which are based on the use.

10:31:19 1     So there's a time benefit which Ms. Bennis -- is the

10:31:21 2     methodology she used under head start theory.  Then

10:31:25 3     there's profits on defendants' sales.  But as you'll see,

10:31:29 4     there are no profits on the sales of any of Akoustis'

10:31:33 5     at-issue BAW filters, or for the company as a whole.

10:31:36 6     And then the third is the savings of R&D

10:31:38 7     expenditures.  And that is, in my opinion, the appropriate

10:31:44 8     approach here, but that was not the approach that

10:31:47 9     Ms. Bennis selected.

10:31:51 10    **Q.**   Ms. Irwin, do you have an understanding about whether

10:31:53 11    or not a plaintiff in a trade secret case in Qorvo's

10:31:57 12    position is able to recoup more than one of these measures

10:32:04 13    of damages if it prevails on establishing liability?

10:32:09 14    **A.**   Yes.  So if there is an actual loss to Qorvo, they

10:32:13 15    could claim those lost sales and unjust enrichment in one

10:32:18 16    of these three forms, as long as they're not duplicative.

10:32:21 17    Not the same sales.  So had there been actually Qorvo's

10:32:25 18    losses, it would not have been inappropriate for them to

10:32:28 19    claim those losses and a form of unjust enrichment.  You

10:32:31 20    just can't double dip.

10:32:33 21    **Q.**   And, again, your understanding is that -- is it that

10:32:39 22    Qorvo is or is not claiming damages for actual harm that

10:32:44 23    it allegedly suffered?

10:32:46 24    **A.**   No.  I've not seen any evidence, and nobody has

10:32:49 25    pointed me to any lost sales by Qorvo.

**Q.**   So did you see any issues with Ms. Bennis'
calculation of the head start benefit in this case?

**A.**   Yes.   There are three key issues -- I think if you go
to the next slide, they are summarized high level.

First, as we'll get into, she only focuses on
revenue.   And that's just fundamentally flawed.   She
doesn't include any costs related to the production of the
BAW filters.   And then setting aside the fact that she
completely ignores costs, she's overstated revenue in two
important ways.

First, she's including revenue that had nothing to do
with the BAW filters that embody the alleged trade
secrets.   And then, second, she, initially at least,
overstated the projected 2024 fiscal year revenue.

**Q.**   I understand you have a slide with respect to the
last two points?

**A.**   I do.   So just with respect to the overstating of
revenue, she presented two numbers in her testimony.   She
had a $66 million number and a $50 million number.   The
second and third point I make here represents 54 percent
of her $50 million calculation.

If you were to benchmark that off of her $66 million
calculation, this error -- these combined errors are
65 percent of her $66 million, which is -- just
demonstrates the sensitivity of these two errors.   Again,

10:34:18 1    setting aside the fact that she didn't look at costs at

10:34:21 2    all.

10:34:21 3    **Q.**    Now, can we go back to the first point, ignoring

10:34:30 4    costs relating to production of BAW filters.  Can you

10:34:32 5    explain what you mean by that in little bit more detail?

10:34:37 6    **A.**    Yes.  So it's important to understand that you can't

10:34:41 7    sell a product without making it.  And she doesn't account

10:34:46 8    for any costs associated with the revenue that she's

10:34:50 9    modeling.

10:34:51 10       She's tried to model the time value of that revenue,

10:34:54 11   but that revenue isn't available 100 percent to Akoustis

10:35:00 12   because they spent more money making and selling the

10:35:03 13   product than they actually earned in selling it to date.

10:35:10 14   **Q.**    By the way, I neglected to ask you, Ms. Irwin, in

10:35:14 15   your experience, have -- as a testifying expert, have you

10:35:19 16   ever analyzed the head start benefit in one or more cases

10:35:25 17   before?

10:35:25 18   **A.**    Yes.  Many.  Over the course of 30 years, it's

10:35:29 19   probably 20 to 25 times, and I've testified about the head

10:35:32 20   start period probably eight times in the last 12 years or

10:35:38 21   so.

10:35:39 22   **Q.**    Okay.  And I understand that you referred to, in your

10:35:46 23   analysis regarding the issue that you expressed regarding

10:35:55 24   Ms. Bennis failing to take into account costs with respect

10:35:57 25   to the production of BAW filters, in that process, you

10:36:01  1    referred to a couple different documents.

10:36:05  2          What are those documents?

10:36:07  3    **A.**    So there's two publications by an entity known as the

10:36:11  4    Sedona Conference.  And I relied and cited both of those

10:36:14  5    in my report and have done so on previous cases as well.

10:36:18  6    In other words, it's nothing new.  It's very standard in

10:36:22  7    this industry.

10:36:23  8          **MR. ELKINS:**  Your Honor, may I approach the

10:36:25  9    witness?

10:36:29 10          **THE COURT:**  You may.

10:36:47 11    **BY MR. ELKINS:**

10:36:53 12    **Q.**    Ms. Bennis [sic], I've handed you two documents for

10:36:56 13    your reference.  Can you describe what they are?

10:36:59 14    **A.**    I think you meant Ms. Irwin, but that's okay.

10:37:02 15    **Q.**    Sorry.  Ms. Irwin.  Ms. Bennis.  Ms. Irwin.

10:37:05 16    **A.**    Yes.  These are the two documents I referenced from

10:37:08 17    the Sedona Conference.  And these are the documents I

10:37:13 18    cited in my report.

10:37:15 19    **Q.**    Okay.  Have you relied on Sedona Conference

10:37:18 20    publications in past cases?

10:37:21 21    **A.**    I have many times.  And, in fact, the May 2022

10:37:28 22    publication, one of the contributors is a good, close

10:37:32 23    colleague of mine.  He's actually a senior vice president

10:37:34 24    at Cornerstone Research.  I talk with him about this stuff

10:37:37 25    all the time.

**Q.**    Okay.  And so one of them -- I think one of the

publications I handed you is entitled "Disputed Issues in

Awarding Unjust Enrichment Damages in Trade Secret Cases"?

**A.**    Yes.

**Q.**    And is there a particular passage in that -- I think

it was at Page 689 -- that you relied on in your report?

**A.**    Yes.

**Q.**    And I think there's a portion that you cited in your

expert report regarding the rationale for a head start

theory.  Could you just read that passage, please?

**A.**    Sure.  "A plaintiff seeking unjust enrichment damages

will have the burden of proving the defendants' net

profits gained from actions like those attributed to

accelerated time to market and avoided costs that are

proximately caused by the misappropriation of the

plaintiffs trade secrets."

**Q.**    And then there's the -- the other one is "Commentary

on Monetary Remedies in Trade Secret Litigation."

**A.**    Correct.

**Q.**    I think you had cited to Page 16 in that one.

**A.**    Yes.

    Would you like me to read it?

**Q.**    Yes, please.

**A.**    Okay.  I have to go slow for the court reporter.

    "Another category of unjust enrichment damages is the

1    benefit to the defendant of being able to develop a

2    competing business or product faster than it would have

3    been possible absent misappropriation.  The rationale for

4    this type of recovery is that the misappropriation has

5    given the defendant an unfair temporal advantage over its

6    competitors.  Specific examples include, first, plaintiff

7    awarded damages measured by defendants' incremental

8    profits on sales over a period of time, representative of

9    the research and development time, the misappropriation

10   allowed defendant to bypass.

11        "Second, defendant required to disgorge damages based

12   on the increased value of defendants' company due to

13   being, in this case two years, further along than

14   otherwise would have been in developing and

15   commercializing its products.

16        "Third, plaintiff awarded damages based on

17   defendants' profits on sales that began one year earlier

18   than would have been possible without the misappropriation

19   and without which the defendant could not have launched

20   its product at a key trade show."

21        Fourth and last.  "Defendant gained a three-year head

22   start on developing a competitive bid and business model

23   for" fixing -- "for fixed wing aircraft market entitling

24   plaintiff to recover damages measured by defendants'

25   profits during this period."

10:40:43 1    And just for reference, these are just citations of

10:40:46 2  multiple cases that the committee referenced.  So the

10:40:50 3  facts of those cases are different than here.  But the

10:40:53 4  principle is that everything for the head start period is

10:40:57 5  measured in profits.

10:40:58 6  **Q.**  And -- but there was one -- there was one that

10:41:00 7  mentioned an enhanced value of the defendant company.  Is

10:41:06 8  it your understanding -- do you have an understanding

10:41:10 9  whether or not Qorvo is contending damages under enhanced

10:41:13 10  value to the company theory?

10:41:15 11  **A.**  My understanding is that they're not.  At least

10:41:18 12  Ms. Bennis never analyzed that.

10:41:22 13  **Q.**  And -- but all of the other citations were to

10:41:26 14  defendants' profits?

10:41:28 15  **A.**  Correct.  And even -- even the valuation situation

10:41:32 16  would ultimately look at profits because you have to

10:41:34 17  consider both the inflows and the outflows of cash in

10:41:38 18  order to arrive at a value.  But, yes, they're all based

10:41:41 19  on profits.

10:41:41 20  **Q.**  Okay.  Not just revenue?

10:41:43 21  **A.**  No.

10:41:43 22  **Q.**  How does one typically calculate profit?  I think you

10:41:47 23  have a slide on that.

10:41:48 24  **A.**  I do.  So, first, let me say that this is the actual

10:41:51 25  reporting from Akoustis for fiscal year 2023.  And,

1    generally speaking, profits are sales minus costs.  And

2    there's various categories of profit that you can identify

3    on an income statement for a company.

4        The very top, you have revenue, which is a cash

5    inflow.  That's the value that Ms. Bennis uses.  For this

6    year, $27 million.  But then right after that is the cost

7    of revenue, which is an outflow, of $30 million.  And cost

8    of revenue are things like the materials that go into the

9    products, we've heard how expensive these products are to

10   make.  It includes the labor and -- related to the

11   manufacturing of these products.

12       And then you get to gross profit.  And it's a

13   partially corrected value in this case because the revenue

14   here, of course, as I mentioned, includes all revenue, not

15   just BAW filter revenue.

16       But then after you get to gross profit, there are

17   things like research and development.  That's related to

18   the entire company, general administrative expenses.  You

19   get to net profit.  And then there's other things like

20   interest and taxes, which can either increase profit or

21   decrease profit, depending on how many investments the

22   company has.  And ultimately you get to after tax income.

23   **Q.**  What measure of profit, gross profit or net profit or

24   income, I guess, is the most relevant here, in your

25   opinion, when analyzing a head start benefit?

**A.**    So to be conservative, I just adjusted Ms. Bennis'
analysis for gross profit, which is the, as you can see,
only negative $3 million versus negative 66 million, or
negative 63 million.

And there is debate in the Sedona conference
materials.  Courts are split on whether or not you should
use gross profit or maybe, at least incorporate a portion
of the R&D or a portion of sales and marketing.

But to be very conservative here, I've just looked at
the cost of sales, or cost of revenue.  Those are the same
things.

**Q.**    So is being conservative here erring on the side of
the plaintiff Qorvo here in terms of expressing the amount
of benefit?

**A.**    Yes.

**Q.**    So within the cost of revenue line that you mentioned
a moment ago, what type of costs did Akoustis incur in
creating its revenue?

**A.**    So consistent with generally accepted accounting
principles, and I confirmed my discussions with
Mr. Aichele, that, again, this line item, Cost of Revenue
or Cost of Sales, is only the cost of developing the
product that is sold.

So it could include some engineering time that's
specific to a customer or a batch of sales.  It's the very

expensive material that goes into the fabrication.  We've

heard about all the complicated compounds that are

involved.  And it includes labor.  I mean, you have to pay

people in order to make a product.

**Q.**   So earlier this week, we heard Dr. Daeho Kim testify

about the work that he undertook after he arrived at

Akoustis in 2017 to try to improve the resonators that he

found when he arrived at the company in February of 2017,

and the efforts that he and many colleagues made to

develop a new process and design to fix the yield issues,

but also enhance performance of the Akoustis filters.

Would that kind of work be included within the Cost

of Revenue line?

**A.**   Only to the extent that the cost of the material

increased.  So if -- as I seem to remember testimony that

a certain type of input could cost $200, and what Akoustis

actually incorporated cost around $2,000.  So only the

incremental cost of that material would be included in

cost of revenue.

To the extent that Dr. Kim or anyone else incurred

time in the research and development phase of the work,

that would be in the Research and Development line item,

which is another outflow of cash.

**Q.**   Okay.  So that's a below-the-line cost that is not

included in the gross profit?

**A.**    Yes.  That's a common way of putting it.  It's below

the line.

**Q.**    Okay.  Why is it necessary, in your opinion, to

include the cost of revenue in calculating the defendants'

benefit from a head-start theory?

**A.**    So as the slide says, you have to spend money to make

money.

Hypothetically, if I had a restaurant and someone was

to come into the restaurant and order a meal and a

beverage, I would have to buy groceries, I would have to

buy plates and silverware.  I would have to hire somebody

to cook and serve the food.  If the meal costs $20 and it

costs me $17 to make it, the only benefit I have that I

can reinvest in the business, or take as my own personal

compensation, is the remaining three dollars, or whatever

the deference is.

You have to spend money to make money.  You can't

just look at revenue.

**Q.**    Okay.  Does Ms. Bennis calculate profit of any kind

in arriving at her calculation?

**A.**    No.

**Q.**    Did she factor into her estimate of head-start

benefit any of the types of costs that you just mentioned?

**A.**    No.

**Q.**    So what did she do?

**A.**    She simply looks at revenue and measures the time.

What she calls the "time value of money."  The difference

between receiving the revenue and at the time that they

actually did, and then modeling it 55 months later, and

then taking the difference between those two present

values and calling that the benefit that Akoustis

received.

But as we'll see, they haven't made any money off the

gross profit level.  So there's been no benefit under this

model or methodology.

**Q.**    In your opinion, is relying on revenue alone to

calculate the head-start benefit consistent with the

principles governing your area of practice?

**A.**    No.  It's inconsistent with most basic financial

principles that I taught at USC, and I'm sure Ms. Bennis

studied as well.

**Q.**    And so is calculating the head-start benefit based on

revenue, even if it's discounted by the time value of

money, an accepted practice at all?

**A.**    No.  Now, let me back up a bit.  I don't disagree at

all with the concept of time value of money.  Again,

that's a very basic concept in finance.  It's the notion

that a dollar today is worth more than a dollar in a year

or 55 months.  But you have to understand what you have

available to actually invests and earn money on.

*Irwin - Direct*

1    So another example is, say I inherit $10,000 from my

2    grandmother.  Thank you, Grandma.  And if I just receive

3    that money, it's available for me to invest, to buy a

4    business, to help buy a house, whatever.  But let's say

5    the IRS gets involved and says, No, no, no, you don't get

6    to keep the entire 10,000, you have to pay some taxes on

7    that.

8         Say the taxes came out to be about 3,000 -- I'm from

9    California, so it would probably be higher -- but the

10   difference that I have is only $7,000 that's available to

11   invest.  The time value of money is only applicable to

12   what's available to invest.  Revenue is not available to

13   invest.

14        Only after you pay for some sort of costs -- and you

15   can debate which level here is relevant, but you have to

16   at least pay for the cost of revenue or the cost of sales

17   before you determine anything that's available to invest.

18   **Q.**   So hypothetically, let's assume that in the slide

19   that we have in front of us, Slide 8, that the cost of

20   revenue -- that the inflow and outflow were flipped, so

21   that would -- would that give you a gross profit of

22   $3.1 million?

23   **A.**   Yes.  So if the revenue was 30 million and the cost

24   of revenue was 27, you would have $3 million available to

25   invest.  The opposite is true here.  So it actually costs,

*Irwin - Direct*

10:50:38  1    at least in fiscal 2023 -- and that's been true for a lot

10:50:41  2    of years now -- the cost of revenue has exceeded the

10:50:45  3    actual revenue.

10:50:46  4    **Q.**    So in that case, could you, then, apply the time

10:50:49  5    value of money principle that Ms. Bennis tried to use in

10:50:56  6    her calculation?

10:50:58  7    **A.**    You could, but you would get a result that indicates

10:51:01  8    that this is not the right methodology.  In other words,

10:51:03  9    you could get a nonsensical result.

10:51:06  10   **Q.**    Okay.  We'll talk about that in a second.

10:51:07  11        Are you aware of any texts or scholarly articles,

10:51:12  12   like the Sedona Conference journal, approving Ms. Bennis'

10:51:17  13   methodology of using only revenue to measure the

10:51:21  14   head-start benefit?

10:51:22  15   **A.**    I am not.

10:51:25  16   **Q.**    Do any texts or articles, of which you are aware,

10:51:29  17   discuss Ms. Bennis' revenue methodology at all?

10:51:35  18   **A.**    Not as she's applied it here.

10:51:37  19   **Q.**    What effect does not including costs have on

10:51:41  20   Ms. Bennis' estimate of the head-start benefit?

10:51:44  21   **A.**    It makes it completely unreliable.

10:51:46  22   **Q.**    Okay.  And is that not offset by her use of the time

10:51:56  23   value of money?

10:51:57  24   **A.**    No.  Again, the only amount that's available to earn,

10:51:59  25   you know -- and can receive any time value of money to

*Irwin - Direct*

1  benefit from is the difference between the revenue you

2  bring in and the cost to make the -- to generate the

3  revenue.  You have to include costs.

4  **Q.**    Okay.  So could one fix Ms. Bennis' estimate of head

5  start benefit by accounting for Akoustis' costs?

6  **A.**    You could.  Again, it generates a nonsensical result,

7  and I can demonstrate how that's -- how it comes out.  But

8  the fundamental reason why you can't really fix it is the

9  head start methodology is intended for a defendant that

10  has accelerated profit.  All of the examples that I read

11  to you from the Sedona conference materials talked about

12  accelerated profits.  We could debate whether it's gross

13  profit or operating income, but they all talk about

14  profit.  And in this case, as you can see, Akoustis at the

15  gross profit level -- so that's just sales minus the cost

16  of sales -- had a very small profit for several years, and

17  then massive losses at the gross profit level through

18  2023.

19       And the cumulative gross profit losses for all of

20  that period of time is over $10 million.  So there's not

21  hundreds of millions or $60 million to invest; there's

22  negative $10 million to invest at the gross profit level.

23  **Q.**    Does a company benefit from a head start on losses?

24  **A.**    No, not under this methodology.  The math doesn't

25  work.

**Q.**   Okay.  So what impact would including costs have on Ms. Bennis' estimate?

**A.**   So if you go to the next slide, what you will see is, so I've laid out in Ms. Bennis' methodology that generated her $66 million, and the only thing I changed was, instead of revenue, I used the gross profit numbers that you saw on the previous slide and dropped them into her model.  As a result, in the actual world, Akoustis has lost $21 million in value.  And in the delayed, they've lost $11 million.  This means that they are worse off in the actual world where they allegedly misappropriated than in the world where they would have been delayed.

In other words, it wouldn't have benefited Akoustis to allegedly misappropriate.  And that's -- so I can't assume damages and then have a negative damages number.  That's just nonsense.  What that tells me as a practitioner is that this is not the right methodology, the head start method doesn't fit the facts in this case because there is no benefit to any acceleration in losses.

**Q.**   Okay.  So let me back up.  We originally started by you identifying three issues:  Ignoring costs related to the production of BAW filters.  The second one was including revenue unrelated to BAW filters.  And the third was overstating projected fiscal year 2024 revenue.

**A.**   Correct.

**Q.**   Let's go to the second one, which is including revenue unrelated to BAW filters.  Can you expand on the point that you were making with that?

**A.**   Yes.  So in her revenue numbers here, about 65 percent of the revenue that she includes here is generated from lines of businesses and sources other than the sale of BAW filters.  And, again, based on my understanding from speaking with experts, as well as Mr. Aichele, the BAW filters are the products that embed or reflect and are the bases of the alleged trade secrets. And so if you look at the next slide, you will see the difference here.

So we've got she includes revenue received from the National Science Foundation Grant.  Actually, that's not even revenue.  That's expected to be spent in R&D.  That's the purpose of a grant.

She also includes fabrication services, including GDSI, and she includes RMFI, which does not sell BAW filters.  And as I understand from her testimony on Monday, she didn't do any analysis on how any revenue that Akoustis earned enabled them to actually purchase those two companies that we've heard of.

And then if you look at the graph off to the side, what you will see is that the orange represents the nonBAW product revenue of about 42.8 million, and the BAW product

10:56:46 1    revenue of 39.4 million, which is the gray part.  And the

10:56:52 2    last bar is fiscal 2024.  It's adjusted here to 28 million

10:56:59 3    between the two, the orange and the gray because based on

10:57:02 4    Mr. Aichele's testimony about projected fiscal 2024

10:57:08 5    revenue, but the shaded part that goes all the way up to

10:57:12 6    almost $60 million, that's what Ms. Bennis includes in her

10:57:16 7    $66 million.

10:57:17 8        So she adjusted it here down to 50 to only include

10:57:22 9    the lower two sections, but her 66 million includes that

10:57:26 10   huge portion that she estimated for 2024 was actually

10:57:30 11   based on outdated estimates.  But what you can see is that

10:57:34 12   a huge portion, more than half of their overall revenue,

10:57:37 13   is from -- is not from BAW filters.  And, again, if you

10:57:41 14   adjust for this from her $66 million number, about

10:57:46 15   $65 million -- 65 percent is because of the -- she's

10:57:53 16   including the orange, and she's including the shaded part

10:57:56 17   on fiscal 2024.

10:57:58 18       So those errors -- those overstatements of revenue,

10:58:01 19   setting aside the fact that she didn't look at costs, just

10:58:05 20   looking at the revenue, that's the magnitude of that

10:58:08 21   error.

10:58:09 22   **Q.**   Okay.  Now, I want to look up here and just make sure

10:58:14 23   that everybody is on board with understanding what you

10:58:17 24   said.

10:58:17 25       Is this amount -- so Akoustis nonBAW product revenue,

10:58:23  1    $42.8 million and Akoustis BAW product revenue of

10:58:28  2    $39.4 million, is that cumulative over this entire period?

10:58:32  3    **A.**    Yes.  It's intended to be.  Of course, it's including

10:58:35  4    the estimates for 2024, which may be a little off, but it

10:58:39  5    would be minor compared to the estimate that Ms. Bennis

10:58:43  6    used for fiscal 2024.

10:58:45  7    **Q.**    Okay.  And so how does the cumulative amount of BAW

10:58:51  8    product revenue from when Akoustis first started making

10:58:56  9    money through 2024 compare to her head start benefit

10:59:04 10    calculation?

10:59:05 11    **A.**    Once you correct for this error, again, setting --

10:59:08 12    we're going to -- so I'm going to correct for both.  I'm

10:59:12 13    going to correct for the costs, inclusion of costs, and

10:59:15 14    I'm going to correct for the overstatement of revenue.

10:59:17 15    And if you go to the next slide, what you see is that you

10:59:21 16    end up with an even more illogical, nonsensical result.

10:59:25 17    The difference between the actual and the 55-month delay

10:59:30 18    is negative $22 million.

10:59:31 19         And, again, let me actually back up.  I'm just

10:59:35 20    accepting the 55-month delay.  I'm not -- I've just

10:59:39 21    accepted that.  I haven't analyzed that.  I've left that

10:59:43 22    up to the other experts.  But so relying on

10:59:46 23    Dr. Shanfield's estimate of 55-month delay, you get a

10:59:50 24    negative $22 million result, which, again, suggests that

10:59:54 25    Akoustis is worse off under the misappropriation

10:59:58  1    assumption than they would have been without the

11:00:01  2    misappropriation.  And that's inconsistent with the

11:00:03  3    assumption of liability when you're calculating damages.

11:00:09  4    **Q.**  So taking a step back, do you have any other thoughts

11:00:12  5    regarding Ms. Bennis' head-start calculation?

11:00:17  6    **A.**  Yes.  So as I mentioned at the very start of my

11:00:21  7    testimony, I think a better approach would be the avoided

11:00:24  8    cost.  We know that the head start, there's no

11:00:26  9    acceleration of profits.  There's no profits at all to

11:00:29  10   date.  And so the third option for unjust enrichment is to

11:00:35  11   look at any avoided costs that Akoustis benefited from

11:00:40  12   under the use of the alleged trade secrets.

11:00:42  13   **Q.**  So can you flesh out a little bit what you mean by

11:00:45  14   "avoided costs"?

11:00:46  15   **A.**  Sure.  Basically, by having the use of the trade

11:00:50  16   secrets or under the use of the trade secrets, the theory

11:00:53  17   is that Akoustis avoided having to do additional research

11:00:58  18   and development, and perhaps incurring other types of

11:01:03  19   expenses associated with getting to market.  So there is a

11:01:07  20   time aspect, which is the head start, but then there is a

11:01:09  21   cost aspect, which is the avoided cost.  This is the

11:01:12  22   methodology I have used multiple times.  I have been

11:01:14  23   involved in cases where Dr. Shanfield has used this

11:01:17  24   approach as well.  And, basically, you go back and look at

11:01:22  25   what, if any, costs did the defendant avoid in coming to

*Irwin - Direct*

1    market.

2    **Q.**    So did you undertake to compute the costs that

3    Akoustis may have avoided, assuming that it

4    misappropriated and used Qorvo's trade secret?

5    **A.**    Yes, I lead on Doctors Darveaux and Lebby as to

6    inform me as to how many unavoided engineering hours it

7    would have taken to recreate independently the information

8    that they found.  And then it also includes some purchase

9    of materials that are available publicly, but did cost

10    some money.  And I think that's summarized on the next

11    slide.

12        So the present value of the total avoided costs as of

13    the date of trial is about $293,000, but the way I get

14    there is I rely on Dr. Darveaux, who looked at categories

15    2 through 7, I believe, for groupings.  He identified a

16    number of documents, and based on his calculations and his

17    expertise, the avoided hours were about 194 hours, and

18    about $264 in costs.

19        Dr. Lebby identified 960 avoided hours based on --

20    for Groupings 1 and 8 for the trade secrets, and about

21    $40,000 for purchasing various studies that he thought was

22    relevant.

23        So we have a total avoided hours of roughly 100.  I

24    assumed an hourly rate of $110 per hour, and that's

25    basically the highest paid engineer at Akoustis.  I wanted

*Irwin - Direct*

11:03:13  1    to be conservative.  I added in some employee costs,

11:03:16  2    employer costs for tax and divided by 1800 hours and came

11:03:22  3    up with a cost of $110 per hour.

11:03:27  4        If you extrapolate that out, you get cost of

11:03:30  5    $167,000.  I assumed all of that was spent back in fiscal

11:03:36  6    2016, so even though you -- just to be super conservative,

11:03:39  7    and I didn't know exactly when that -- those -- when those

11:03:42  8    hours would have been spent.  I wanted to be -- just take

11:03:47  9    the beneficial view of it to Qorvo.  I assumed all of that

11:03:50 10    was spent back in fiscal 2016, and I brought it forward at

11:03:55 11    Ms. Bennis' weighted average cost of capital to the date

11:03:58 12    of trial.  So that's how you get from 167,000 to 293,000.

11:04:01 13  **Q.**  Okay.  So just, in that case, you are using the time

11:04:07 14    value of money on an investment that -- for purposes of

11:04:14 15    estimating the avoided cost benefit would have taken place

11:04:19 16    in 2016?

11:04:20 17  **A.**  That's exactly, right.  So in this methodology, I've

11:04:25 18    basically identified $167,000 that Akoustis didn't have to

11:04:32 19    spend that was available for investment in some fashion,

11:04:35 20    and they would have earned interest on that.  And so the

11:04:38 21    present value of 167,000 from fiscal year 2016 is 293,000.

11:04:45 22    But these are on costs, not on revenue.

11:04:48 23  **Q.**  So unlike revenue, money you save presumably is

11:04:52 24    available for you to invest or do something more

11:04:56 25    productive with?

*Irwin - Direct*

**A.** Absolutely.

**Q.** And by assuming that Akoustis would have had to undertake the work that it avoided in 2016, as opposed to spread over later years, you've maximized the amount of the time value of money here?

**A.** Correct. I've tried to be as generous in my calculations to Qorvo as possible.

**Q.** And just one -- just to clarify, too, if I can use -- I really like this little gizmo.

So here, you're talking about engineer cost per hour calculated using a pretty healthy salary of $186,000?

**A.** Correct.

**Q.** And then you're adding to that the contribution that Akoustis would have to make for SSI, Medicare, and then you divided that by an expected 1800 hours?

**A.** Correct. One thing I want to clarify. My present value calculation is -- incorporates Ms. Bennis' 14.8 weighted average cost of capital, but it also considers what Akoustis' weighted average cost of capital was over the entire period. It fluctuated quarter to quarter, so we did a calculation, and when you do a weighted calculation and divide it by the 1/T -- or not divide it. You take it to a 1/T power, you get 6.8 percent. Which, just to be very clear, it incorporates her 14.8 percent, but I relied on Akoustis' actual weighted average cost of

*Irwin - Direct*

1    capital as reported by Bloomberg over the entire period.

2    **Q.**    Okay.

3        So you mentioned in your explanation regarding this

4    slide, that you asked Darveaux and Lebby to estimate the

5    amounts of time that -- as well as the purchases that the

6    $40,264 up there -- that it would take to independently

7    have created the alleged trade secrets back in 2016.

8        Does your calculation include the cost to recreate

9    all of the alleged trade secrets that are discussed in

10   Dr. Shanfield's report on which Ms. Bennis relies in her

11   head start benefit calculations?

12   **A.**    Yes.  My understanding of Dr. Shanfield -- excuse

13   me -- Dr. Darveaux and Dr. Lebby's methodology was, when

14   they identified information in Akoustis' records that

15   reflected or was consistent with the alleged trade secrets

16   documents, they each assigned in their own expert opinion

17   a number of engineering hours it would take to

18   independently go out and recreate that exact information.

19       So in other words, you identify a problem, and you

20   say, okay, how am I going to solve this problem, not

21   knowing how to solve the problem.  And then you go out and

22   you independently research how do I solve this problem.

23   And then that's basically their methodology as I

24   understand it.

25   **Q.**    Okay.  Before we move onto the unfair competition

11:08:13 1    opinions, can you summarize the key points that you've

11:08:16 2    covered regarding the issue of unjust enrichment benefit

11:08:21 3    to Akoustis?

11:08:23 4    **A.**    Yes.  So, again, Ms. Bennis' head start methodology

11:08:27 5    is not appropriate in this case because we don't have

11:08:30 6    accelerated profits.  As the Sedona conference and other

11:08:34 7    materials contemplate, we have accelerated losses.  As we

11:08:37 8    know that Akoustis hasn't had any profits, so you can't

11:08:41 9    use that methodology either.

11:08:42 10       The third option is avoided costs, and based on the

11:08:46 11   information that I received from Doctors Darveaux and

11:08:50 12   Lebby, the overall avoided costs based on those

11:08:54 13   calculations is $293,000.

11:08:57 14   **Q.**    All right.  Let's talk about Ms. Bennis opinion

11:09:05 15   regarding unfair competition, in particular the employee

11:09:20 16   poaching issue.

11:09:25 17       And so you stated -- you summarized -- you briefly

11:09:30 18   summarized your opinion regarding Ms. Bennis' opinions

11:09:35 19   regarding the alleged employee poaching.

11:09:38 20       Can you just set the table here for the discussion in

11:09:41 21   more detail?

11:09:42 22   **A.**    Sure.  So my understanding is Ms. Bennis met with an

11:09:46 23   HR representative from Qorvo and identified 19 individuals

11:09:50 24   who moved from Qorvo to Akoustis without any other

11:09:53 25   intervening causes like a reduction in force or something

*Irwin - Direct*

11:09:56  1    like that.  And then she consulted a document related to

11:10:01  2    one of the acquisitions that Akoustis made with respect to

11:10:05  3    the value of an assembled workforce.  Which is, basically,

11:10:09  4    when you acquire a company, you have a team that knows

11:10:12  5    each other, that knows the business, that knows how the

11:10:16  6    company works; they have a value.  And she assumed that

11:10:20  7    those values represented Qorvo's costs to replace the 19

11:10:25  8    people.

11:10:25  9        The problem is that Number 1, she didn't ask whether

11:10:28 10    or not Qorvo replaced any of them.  Some of them maybe

11:10:33 11    didn't need to be replaced.  Some of them could have been

11:10:36 12    promoted from within.  That question was never answered.

11:10:39 13        I've had this methodology used even just last year in

11:10:44 14    a trial, and it's very important to identify, not just

11:10:48 15    that it was replaced, those people were replaced, but by

11:10:50 16    whom, and how much time was spent, you know, interviewing?

11:10:56 17    How much resumes were reviewed?  How many assessments were

11:10:59 18    done?  How many interviews were done?  With whom?  How

11:11:02 19    long the interviews were.

11:11:04 20        And then the other thing you want to consider is,

11:11:06 21    there is certainly a loss of productivity when that person

11:11:10 22    is -- when that position is vacant, and when the person is

11:11:14 23    hired, right?  You've got to come up to speed on your new

11:11:16 24    job; totally normal.

11:11:18 25        But you also want to consider, when that position is

vacant, you're not paying anyone a salary, so you have --

the literature suggests you have to take all of that into

account, and, instead, Ms. Bennis just looked at a report

from KPMG for a different set of employees and just

assumed that all of them -- that that was the exact cost

to rehire the 19 employees, even though we don't know if

the 19 employees were actually replaced.

**Q.**   Okay.  So in Ms. Bennis' calculation of employee

poaching harm -- and that's direct harm to Qorvo?

**A.**   Yes.  My understand is that what she was attempting

to measure, a direct harm to Qorvo.

**Q.**   As opposed to benefit to Akoustis like we were

talking about with respect to trade secrets?

**A.**   Exactly.

**Q.**   Okay.  She's -- was she asked to assume that the 19

individuals were poached?

**A.**   No.  I don't even think that she's asked to assume

that.  I think, typically, when I've used this

methodology, I have been asked to assume that the record

will show that those employees moved because of the

alleged wrongful conduct.  She just took the 19 and

calculated the value.

**Q.**   So just to put a finer point on it.  Did she

distinguish between the normal and accepted practice of

recruiting, sometimes from competitors, versus the

11:12:52 1    not-accepted practice of targeting employees in order to

11:12:56 2    exploit trade secrets from the former employer?

11:13:00 3    **A.**    No, she didn't.  So my understanding of Qorvo's

11:13:03 4    position on this is that it's normal for employees to move

11:13:07 5    and normal for people wanting to move from one competitor

11:13:10 6    to another.  And as we've heard, both of these companies

11:13:13 7    are located approximately -- very close together, so it

11:13:17 8    wouldn't be unusual.

11:13:19 9        So my understanding of their position is that the

11:13:23 10   employee movement or the poaching was driven by the access

11:13:27 11   to trade secrets, yet Ms. Bennis ignored Dr. Shanfield's

11:13:31 12   analysis showing that only eight -- excuse me -- yes, only

11:13:36 13   eight of her 19 employees actually accessed the alleged

11:13:41 14   trade secrets.

11:13:42 15       So if that's the -- if that's Qorvo's own position

11:13:47 16   about what constitutes poaching, then Ms. Bennis didn't

11:13:51 17   even incorporate Dr. Shanfield's opinions that reflected

11:13:56 18   that only eight of them actually accessed the alleged

11:14:00 19   trade secrets, which would -- my understanding of their

11:14:03 20   position would constitute poaching.

11:14:05 21   **Q.**    Okay.  So I think I did you a disservice because I

11:14:08 22   think you prepared slides to guide your discussion, and I

11:14:11 23   just complete ignored that.

11:14:13 24   **A.**    That's all right.

11:14:14 25   **Q.**    So let me go to the first one.  I think you covered

11:14:16 1    this, but perhaps you can just briefly touch on it.

11:14:20 2    **A.**    Yes, of course.

11:14:21 3         So, you know, number 1, were they replaced.  She

11:14:23 4    never asked.  We don't know.  There's nothing in the

11:14:25 5    record that reflects whether or not they were replaced at

11:14:28 6    all.

11:14:30 7         Second, she didn't look at or analyze, under her own

11:14:35 8    client's definition of poaching, then whether or not those

11:14:39 9    individuals had accessed the confidential information.

11:14:42 10        And then, third, she never asked Qorvo about the

11:14:45 11   actual costs associated with replacing employees.  She

11:14:50 12   just assumed that the value of an in-place workforce from

11:14:54 13   another company transitioned over to the value of

11:14:58 14   employees to Qorvo.

11:15:00 15   **Q.**    Okay.  And I think you've covered this, but just

11:15:02 16   wanted to give the opportunity to add any details that I

11:15:05 17   robbed you of by not showing you your own slide.

11:15:08 18   **A.**    That's okay.

11:15:09 19        So, yeah, I covered most of this, except for the

11:15:12 20   third of the second sub-bullet point, which is:  Of the

11:15:16 21   11, I mentioned that only eight, but if you reduce it to

11:15:19 22   just those eight people, the assumed cost to Qorvo, under

11:15:25 23   Ms. Bennis' methodology, is $356,000.

11:15:29 24   **Q.**    So when you say under her methodology, how are you

11:15:34 25   calculating that amount?

*Irwin - Direct*

11:15:35  1    **A.**    So I've looked at only the eight employees that
11:15:39  2    accessed the information, according to Dr. Shanfield,
11:15:41  3    while they were at Akoustis, which, of course, is the
11:15:45  4    definition of Qorvo's poaching efforts.  And then I just
11:15:50  5    relied on the KPMG assembled workforce valuation because I
11:15:55  6    don't have access to Qorvo's records on how many
11:15:58  7    interviews, how many applications, and all of that
11:16:00  8    information.
11:16:01  9        So I've just accepted her premise that the assembled
11:16:06 10    workforce valuation was appropriate and adopted it for
11:16:09 11    only those eight employees.  And total damages to Qorvo
11:16:12 12    would be $356,000.
11:16:14 13    **Q.**    So just to be clear, are you -- you had criticized
11:16:19 14    Ms. Bennis' reliance on the KPMG workforce replacement
11:16:25 15    report, in lieu of asking her own client what its costs
11:16:32 16    were.
11:16:33 17        Are you now saying that it's okay that she relied on
11:16:38 18    the RFMI report from KPMG?
11:16:42 19    **A.**    I think -- it's not okay without doing more due
11:16:45 20    diligence.  It may be relevant, it may not be.  She never
11:16:49 21    investigated whether or not any of those people had the
11:16:52 22    same skill set or whether they were, you know, were their
11:16:55 23    skills extremely unique.  So that investigation was never
11:17:00 24    done.  I'm just assuming her premise because I don't have
11:17:04 25    access to Qorvo's information to be able to do the

11:17:06 1    calculation that I think would be the right way.

11:17:09 2    **Q.**   Okay.  So, let's wrap up.  I understand you've

11:17:15 3    prepared a summary slide, so I'll put that up.

11:17:18 4    **A.**   Thank you.

11:17:18 5    **Q.**   In advance of asking the questions this time.

11:17:21 6         So, in total, what is your opinion regarding the

11:17:26 7    amount of unjust enrichment benefit, if any, that should

11:17:30 8    be awarded in the event that the jury finds both

11:17:36 9    misappropriation of Qorvo's trade secrets and their use?

11:17:39 10   **A.**   So under the avoided costs methodology we discussed,

11:17:42 11   $293,000.  And, then, under the employee poaching that we

11:17:47 12   just discussed, $356,000.  And then we haven't talked

11:17:52 13   about patent infringement, but I basically accepted

11:17:56 14   Ms. Bennis' analysis and conclusion that the reasonable

11:17:59 15   royalty for those two patents would be $279,000.

11:18:03 16   **Q.**   So you said "for those two patents," does that mean

11:18:07 17   for them in the aggregate or does that mean 279,000 per

11:18:13 18   patent?

11:18:14 19   **A.**   In the aggregate.

11:18:15 20   **Q.**   Okay.  And is it your understanding that Ms. Bennis'

11:18:18 21   opinion regarding 279,000 stem from her analysis of a

11:18:25 22   reasonable royalty that would have been agreed to by the

11:18:30 23   parties in the hypothetical negotiation about which she

11:18:33 24   testified?

11:18:34 25   **A.**   Yes.  Hypothetical negotiation is a very strange

concept, but I'm very familiar with it, and, yes, that's

my understanding of her opinion.

**Q.**   And her opinion was that the hypothetical negotiation

would have led to a license in which Akoustis would have

been able to use the two asserted Qorvo patents for a

total of $279,000, not $279,000 per patent?

**A.**   Correct.

        **MR. ELKINS:**  That concludes my questions.  I

pass the witness.

        **THE COURT:**  Cross-examination.

                        CROSS EXAMINATION

**BY MS. AYERS:**

**Q.**   Good morning, Ms. Irwin.  It's nice to see you again.

**A.**   Nice to see you.

**Q.**   I'd like to start by discussing your opinions

regarding Ms. Bennis' head start analysis.  But, first, I

want to make sure that the jury has an understanding of

unjust enrichment, and the unjust enrichment benefit in

the context of misappropriation of trade secrets.

        So you agree that the measurement of a defendants'

unjust enrichment is context-dependent, correct?

**A.**   Yes.  It has to fit the facts of the case, correct.

**Q.**   And you also agree that head start damages are a

recognized form of damages for misappropriation of trade

secrets, correct?

*Irwin - Cross*

**A.**    Yes.  As discussed at length in the Sedona Conference

materials and through my 30 years of practice, yes.

**Q.**    Okay.  And you agree that the head start damages

measure the unfair temporal advantage that the

misappropriation of trade secrets has given to a

defendant, correct?

**A.**    Only with respect to profits, but yes, I agree.

**Q.**    Okay.  But your report that you issued in this case

actually said that the head start damages measure the

unfair temporal advantage that the misappropriation of

trade secrets has given to a defendant, correct?

**A.**    Yes.

**Q.**    Okay.  And you agree that the rationale for awarding

head start damages is that the misappropriation of trade

secrets has allowed the defendant to be able to develop a

competing business or product faster than it would have

been possible absent misappropriation, correct?

**A.**    Correct.

**Q.**    So during your direct examination, you said that the

Akoustis' growing losses mean that there was no benefit to

the head start that it received, correct?

**A.**    Yes.  The application of that methodology results in

an illogical conclusion.

**Q.**    Okay.  And that's primarily because Akoustis had

negative gross profits, correct?

**A.**    Yes.

**Q.**    But you also agree that under the unjust enrichment

remedies a defendant -- that a plaintiff can recover from

a defendant for misappropriation of trade secrets, the

defendants' profits on product sales is actually a

completely separate category from head start damages,

right?

**A.**    Sorry.  Can you repeat that?  I think I lost the tail

end of it.

**Q.**    Sure.  That's okay.

So I think one of the slides that you showed the jury

identified three different types of head start -- or of

unjust enrichment benefits.  The first was the defendants'

profits on product sales.  The second was the head start

benefit, correct?  And the third was avoided costs,

correct?

**A.**    Correct.

**Q.**    So a defendants' profits on product sales is,

actually, its totally owned, separate category of unjust

enrichment benefits under the law, correct?

**A.**    Correct.

**Q.**    And I think you agreed with me at your deposition

earlier this year that a company with negative profits can

nevertheless have incredible value, correct?

**A.**    Yes.

**Q.**   And I think you used Amazon as an example in your

deposition.  So Amazon was a company that had negative

profits for years, but still had a great amount of value,

correct?

**A.**   Yes.

**Q.**   Do you also agree with the Sedona Conference which

states that in the case of a startup, a company's

valuation is closely tied to the value of the trade secret

technology?

**A.**   Yes, that can be true.

**Q.**   Okay.  And I just want to make sure, too, that the

record is clear.  The Sedona Conference isn't the law,

correct?  The judge is going to instruct the jury on what

the law is, correct?

**A.**   Of course.  And I should absolutely explain that.

The Sedona Conference is -- those publications are

issued.  They're a collaboration among attorneys, experts,

economists.  And there are -- I think there is some

judicial input.  It references case law.

But you're correct, it absolutely is up to the judge

to instruct you on what the appropriate form of damages

is.

**Q.**   And you testified that Akoustis did not make any

money and wasn't profitable, and therefore, it received no

head-start benefit.  That's kind of fundamentally your

11:23:43 1  opinion, correct?

11:23:44 2  **A.**    Correct.

11:23:49 3  **Q.**    In fact, I think you said that Akoustis was worse off

11:23:52 4  with a 55-month delay, correct?

11:23:55 5  **A.**    Under Ms. Bennis' analysis when you account for cost

11:23:58 6  of sales, yes, which is an illogical conclusion when you

11:24:03 7  assume liability.

11:24:05 8  **Q.**    Isn't it true that Akoustis' chief executive officer

11:24:09 9  received significant stock awards that he cashed out for

11:24:13 10 more than $14 million in this case?

11:24:15 11 **A.**    I'm not aware of that.  But if you represent it, I'll

11:24:18 12 accept it.

11:24:18 13 **Q.**    Okay.  So -- but you didn't consider the fact that

11:24:21 14 Dr. Shealy made more than $14 million selling Akoustis

11:24:24 15 stock when opining that Akoustis was unprofitable and had

11:24:27 16 no head-start benefit, correct?

11:24:28 17 **A.**    Correct.  But let me also put a caveat in there that

11:24:33 18 it depends on how that stock was accounted for on the

11:24:37 19 books and records of Akoustis, whether or not it was

11:24:40 20 included in an employee compensation in the cost of sales,

11:24:42 21 or whether or not it was below the line in sales -- like,

11:24:46 22 in general, like administrative.

11:24:48 23     I certainly wouldn't expect stock compensation to be

11:24:51 24 included in cost of sales.  That would be against

11:24:54 25 generally accepted accounting principles for a CEO.

*Irwin - Cross*

11:24:58  1    **Q.**   Okay.  And so when you're talking about below the

11:25:00  2    line, you're talking about operating expenses, correct?

11:25:02  3    **A.**   Correct.

11:25:03  4    **Q.**   Okay.  So you didn't account for Dr. Shealy receiving

11:25:08  5    more than $14 million when he cashed out Akoustis stock

11:25:11  6    because that would have been accounted for in the

11:25:14  7    below-the-line operating expenses of the company, correct?

11:25:17  8    **A.**   Correct.  In my analysis, I'm holding all of those

11:25:22  9    below-the-line expenses constant.

11:25:25 10    **Q.**   Okay.  We're going to talk about that in just a

11:25:27 11    minute, Ms. Irwin.

11:25:28 12         And I think it's fair to say you also didn't consider

11:25:32 13    the fact that Mr. Houlden made more than $1.7 million

11:25:36 14    selling Akoustis stock when opining that Akoustis was an

11:25:39 15    unprofitable business, and therefore, received no

11:25:42 16    head-start benefit, correct?

11:25:43 17    **A.**   Correct.  For the same reasons.

11:25:44 18    **Q.**   Because those would have been below-the-line expenses

11:25:46 19    that would have been accounted on Akoustis' books as

11:25:48 20    operating expenses, correct?

11:25:49 21    **A.**   Correct.  I would not expect them to be part --

11:25:51 22    accounted for part of cost of sales.

11:25:53 23    **Q.**   Okay.  And I think you told the jury that Ms. Bennis'

11:25:57 24    analysis was inappropriate because Akoustis has to spend

11:25:59 25    money to make money, right?

**A.**    Yes.

**Q.**    You can't make a product without -- you can't sell a product without making it.  You can't make a product without spending money, right?

**A.**    Right.

**Q.**    That's kind of a fundamental core of your opinions, correct?

**A.**    Yes.

**Q.**    So I just want to circle back to what gross profits are for the jury, to make sure that they completely understand what's captured in gross profits and what's captured in operating expenses, which is what's reflected in net profits.

So cost of goods sold directly relates to those expenses that are associated with making and selling of a product, correct?

**A.**    Yes.

**Q.**    And I think that you used Mr. Kim as an example in your explanation of how you were conservative by only looking at the gross profits that Akoustis made because Mr. Kim's research and development work would not have been captured in that Cost of Goods Sold line item; is that right?

**A.**    Unless he was spending time specifically on a specific sale, yes, that's consistent with generally

*Irwin - Cross*

1    accepted accounting principles.

2    **Q.**    Okay.  So cost of goods sold include things like the

3    silicon nitride and other chemicals that go into actually

4    making the wafers, correct?

5    **A.**    Yes.

6    **Q.**    But you would agree with me that cost of goods sold

7    don't include the costs to a business to generally just

8    keep its doors open?

9    **A.**    That's correct.

10    **Q.**    So it doesn't include like, for example, employee

11    payroll or benefits costs which are captured in operating

12    expenses below the line; is that correct?

13    **A.**    Yes.

14    **Q.**    And it doesn't include things like rent or utilities

15    or things like that, correct?

16    **A.**    In some instance, there can be allocation for that.

17    But that's generally correct.

18    **Q.**    Okay.  And the allocation that's usually made on a

19    cost of goods sold nature for rent and things like that,

20    is if you own a warehouse where you actually have to store

21    the product, right?

22    **A.**    Right.

23    **Q.**    Okay.  So it's not like the company's corporate

24    headquarters and the building where people go every day

25    just to kind of regularly conduct business and not

11:28:06 1    actually make the products itself, correct?

11:28:08 2    **A.**    Correct.

11:28:09 3    **Q.**    And using Mr. Kim as the example, it doesn't include

11:28:13 4    the cost of research and development, correct?

11:28:16 5    **A.**    Correct.

11:28:16 6    **Q.**    Okay.

11:28:17 7              **MS. AYERS:**  I'd like to pull up Trial

11:28:19 8    Exhibit 286, which is Ms. Bennis' Schedule 4A.  And if we

11:28:28 9    could focus in -- thank you so much.  I appreciate that.

11:28:32 10             **THE WITNESS:**  So do I.

11:28:33 11   **BY MS. AYERS:**

11:28:34 12   **Q.**    So Mr. Elkins questioned Ms. Bennis about this

11:28:37 13   document on Monday.  This is Akoustis' consolidated

11:28:40 14   statement of operations for fiscal years 2016 to 2023,

11:28:45 15   correct?

11:28:45 16   **A.**    Correct.

11:28:46 17   **Q.**    Okay.  Let's start with the very top line item just

11:28:49 18   to make sure that the jury understands the information

11:28:52 19   that appears on this slide.

11:28:53 20       The top line item has fiscal years 2016 through 2023.

11:28:58 21   And that's a reference to, essentially, how Akoustis

11:29:02 22   accounts for its yearly operations, correct?

11:29:05 23   **A.**    Yes.

11:29:06 24   **Q.**    They're on a schedule that I think has their year

11:29:09 25   beginning in July, and their year ending in June, as

*Irwin - Cross*

1    opposed to the calendar year, correct?

2    **A.**    Yes.

3    **Q.**    So that's what that "FY" means, correct?

4    **A.**    Correct.

5    **Q.**    And Total Revenue, if we look at the Total Revenue

6    line, is the line item that Ms. Bennis used in term

7    analysis, correct?

8    **A.**    Yes.

9    **Q.**    And you understand that for Ms. Bennis' analysis, she

10    essentially took this revenue beginning in fiscal year

11    2016, and she shifted it forward to February of 2020,

12    correct?

13    **A.**    Fifty-five months forward, correct.

14    **Q.**    Correct.

15         I think that's -- I think if we go back and look at

16    her schedules, we get to February of 2020 when we shift

17    this revenue 55 months forward, correct?

18    **A.**    That sounds about, right.

19    **Q.**    And your complaint about Ms. Bennis' methodology is

20    that she should have actually looked at this gross profit

21    line, correct?

22    **A.**    At a minimum, yes.

23    **Q.**    Okay.

24    **A.**    Well, she should have looked at gross profit for --

25    at least gross profit, but she also should not have

11:30:15 1    included non-BAW filter revenue.

11:30:18 2    **Q.**    Okay.  We're going to get to that, too.  And I

11:30:20 3    appreciate that clarification.  We're going to talk about

11:30:20 4    that.  I would just focus in on your critique that relates

11:30:23 5    to gross profits for right now.

11:30:25 6        And so what you did in your analysis, is that you

11:30:28 7    shifted the gross -- the cost of revenue, which is the

11:30:33 8    cost of goods sold, right?  And you shifted that cost of

11:30:37 9    revenue forward to February of 2020 as well, correct?

11:30:42 10   **A.**    Correct.  So in other words, I took the gross profit

11:30:45 11   line and shifted it forward.

11:30:46 12   **Q.**    Okay.  And I think you testified that this was the

11:30:49 13   conservative approach, to only look at gross profits and

11:30:52 14   not operating expenses and net profits because Akoustis

11:30:57 15   would have been worse off if we had looked at the net

11:31:01 16   profits line, correct?

11:31:02 17   **A.**    Well, any -- a better way to say it is, any

11:31:06 18   additional expenses I would have added to my analysis

11:31:10 19   would have made the number more negative.

11:31:13 20       So, in other words, had the head-start methodology

11:31:16 21   been the right method, the gross profit number should have

11:31:21 22   given Qorvo the highest amount of damages.

11:31:24 23       So that's a better of explaining what I mean by

11:31:26 24   "conservative."  And that's the way I tested the

11:31:30 25   head-start methodology.

*Irwin - Cross*

**Q.** Okay. But if we add these operating, Total Operating Expenses line item, if we add in the research and development costs, and we add in the SGNA, which is things like rent and utilities and the things that are necessary in order for a business just to keep its doors open, and we shift those forward to February of 2022, which is what you did with the Gross Profits line, there's a joint goose egg for operating expenses from 2016 to 2020, isn't there?

**A.** If I had done that, correct. But that's not what I did.

**Q.** Okay. Because it was more convenient to actually look at the gross profit line and not take into consideration the operating expense line, because if we shift our operating expenses forward to February 2022, what you've essentially assumed in your critique of Ms. Bennis' analysis is that Akoustis would have spent $0.00 -- zero -- on anything from February of 2016 to -- from 2016 to February of 2020, correct?

**A.** No. So my analysis, I am not including operating expenses. Let me just kind of use some numbers to be consistent.

So what I assumed is I shifted the gross profit forward, and I've left everything else exactly where it is. So had I put them in my model, I would have had $4.694 million in fiscal 2016, and I would have had that

*Irwin - Cross*

same number in the 55-month forward-looking period in
fiscal 2016.

I would have assumed -- basically, assumed all of
those operating expenses were incurred in the actual time
in both the actual world and the head start world.  And by
doing so, they perfectly offset.  You would have one at
present value from 2016 to the date of trial, and in the
other world, you'd have the same number in 2016 as of the
date of trial.  And those two would offset.  Because
you're taking the same number and moving them forward to
the date of trial and assuming that Akoustis would have
had in, the but-for world, $4.7 million in operating
expenses in fiscal year 2016.

**Q.**   Okay.  But now we just have a giant goose egg of
operating expenses in but-for world starting in
February 2020.  You have to have operating expenses held
constant for the totality of the period in the but-for
world in order for Akoustis to actually determine what
their benefit is because you have to have operating
expenses from 2016 to 2020, and you have to have operating
expenses in the but-for world all the way through 2016
past 2022, correct?

**A.**   Correct.  So what -- with respect to this year 2020
operating expenses, I've assumed -- my analysis inherently
assumes that Akoustis would have spent 31 million in the

*Irwin - Cross*

11:34:29  1    actual world in fiscal year 2020, and they would have

11:34:32  2    spent $31 million in but-for world.  It just would have

11:34:35  3    happened -- it would have happened in that same year

11:34:37  4    regardless of the shifting of gross profits.

11:34:41  5        Basically, what the result would have been is there

11:34:43  6    would have been more negative cash flow.  In shifting the

11:34:49  7    gross profits forward, you still would have had all of

11:34:53  8    these R&D expenses, and you're just shifting the benefit

11:34:57  9    after launching the benefit forward 55 months.

11:35:01 10    **Q.**   Do you agree with me having less debt is an actual

11:35:04 11    benefit that a company receives, correct?

11:35:06 12    **A.**   Yes.  In general, yes.

11:35:08 13    **Q.**   Okay.  So if we're double counting the operating

11:35:11 14    expenses in 2016 in the real world, and then we're

11:35:15 15    shifting it forward as well, which is what you're claiming

11:35:18 16    that you're actually doing --

11:35:20 17    **A.**   That's incorrect.  I am not shifting forward the

11:35:22 18    operating expenses.  I am assuming the operating expenses

11:35:24 19    that incurred in 2016 in the actual world would have

11:35:28 20    occurred in 2016 in the but-for world.

11:35:31 21    **Q.**   But --

11:35:31 22    **A.**   And if I model it out for you, you will see that

11:35:36 23    under that methodology, the two net out to zero.

11:35:39 24    **Q.**   But you don't have any operating expenses in the

11:35:41 25    but-for world for February 2020 going forward because you

1  haven't shifted any operating expenses as a part of your

2  analysis?

3  **A.**    In 2020, I have -- my analysis inherently assumes

4  that you have $31 million of operating expenses in 2020 in

5  the actual world, and those same expenses would have been

6  incurred exactly as they had in the actual world in the

7  but-for world 55 months advanced.

8       So I am holding the R&D exactly constant.  I am

9  not -- there's no goose egg from shifting the gross

10 profit.  I'm just shifting any earnings generated from

11 revenue or services forward 55 months.  That's all I'm

12 doing.

13 **Q.**    But the but-for world where Akoustis was delayed by

14 55 months receiving revenue, actually extends into -- and

15 let's just look at this and give the jury the number --

16 the but-for world extends into January of 2028, correct?

17 **A.**    Correct.

18       And under my methodology, whatever Akoustis will

19 spend in fiscal year 2028, they would have spent in both

20 the actual and the but-for world.  Whatever that number

21 is.  If it's a hundred million, it's a hundred million,

22 but it would have been spent in fiscal 2028 exactly in the

23 actual world as the but-for world.

24       Those expenses haven't been incurred yet.  We don't

25 know what they are.  So you could use X and Y and Z, and

*Irwin - Cross*

1   have them all -- but they would all offset.  Because I am

2   assuming that all of the R&D that occurred in the actual

3   world or will occur in the future actual world, occurs in

4   the but-for world exactly the same.  So they perfectly

5   offset.

6   **Q.**   So, essentially, what you are not accounting for in

7   your criticism of Ms. Bennis is the actual expenses that

8   Akoustis would have incurred as a part of its R&D in the

9   years in which the head start actually extends into for

10  2028, 2027, 2026, and 2025, because they haven't incurred

11  those expenses yet?

12  **A.**   I disagree with that.  They haven't incurred those

13  expenses yet, but I am assuming that they will be the same

14  in the actual and but-for world.  I am holding my

15  methodology consistent from 2016 all the way through 2028.

16  I am holding all of those numbers, they're all going to be

17  spent, whether historical or future, whatever the numbers

18  are, in the same year that they either have been spent or

19  will be spent, and, mathematically, those numbers offset.

20  **Q.**   But there are operating expenses that Akoustis

21  incurred from February of 2016 -- from 2016 to February of

22  2020 that are not actually being reflected in your

23  criticism of Ms. Bennis because you don't know what the

24  operating expenses will be in fiscal years 2025, 2026,

25  2027, 2028, et cetera, correct?

**A.**    Incorrect.

**Q.**    Let's talk about BAW filter revenue.  One criticism
that you had of Ms. Bennis is that she included revenue
not associated with the sale of Akoustis BAW filters,
correct?

**A.**    Yes.

**Q.**    And I think that your slide highlighted three things
that fall within that bucket:  National Science Foundation
Grants, fabrication services related to GDSI, and RFMI,
correct?

**A.**    Correct.

**Q.**    Your slide of nonBAW filter revenue actually included
a fourth category called NRE revenue, correct?

**A.**    Yes.  Nonrecurring engineering.

**Q.**    And nonrecurring engineering revenue is revenue that
is related to services performed in connection with BAW
filters, correct?

**A.**    Correct.

**Q.**    Okay.  And you excluded nonrecurring engineering
revenue even though it was associated with services
associated with the sale of BAW filters because that's
kind of what Mr. Aichele told you was the appropriate
result, correct?

**A.**    What he told me was that the nonrecurring engineering
services did not embody the trade secrets.  So that is

*Irwin - Cross*

11:40:47  1    what -- if it doesn't embody the trade secrets, then it's

11:40:50  2    not driven by the trade secrets.

11:40:53  3        So that's correct, I relied on Mr. Aichele for that.

11:40:55  4    But the logic is that they don't embody the trade secrets

11:40:59  5    themselves.

11:40:59  6    **Q.**    Okay.  But you're relying completely on Mr. Aichele

11:41:01  7    telling you that the nonrecurring engineering revenue

11:41:05  8    didn't relate to the trade secrets that Qorvo is alleging

11:41:09  9    Akoustis took from it, correct?

11:41:10 10    **A.**    I know I -- I mean, I spoke with him on it.  I

11:41:16 11    haven't seen anything else in the record that suggests

11:41:20 12    that it is related to the trade secrets; but, yes, I

11:41:22 13    relied on Mr. Aichele -- his description of those

11:41:25 14    services, as well as my general understanding of the

11:41:30 15    documents that were -- are at issue here and the testimony

11:41:32 16    of all of the experts.  At least the experts I spoke with.

11:41:37 17    **Q.**    Okay.  And you understand that the trade secrets

11:41:39 18    Qorvo is alleging Akoustis took from it relate to

11:41:43 19    literally everything, from business plans to trimming

11:41:47 20    methods and procedures, to evaluation boards to product

11:41:49 21    development processes and testing procedures, to

11:41:52 22    procedures for testing reliability and meantime to

11:41:55 23    failure, manufacturing assembly change procedures,

11:41:57 24    roadmaps, and product prototypes, correct?

11:42:01 25    **A.**    Yes.

**Q.** Okay. And you're relying completely on Mr. Aichele telling you that the NRE revenue has -- which you admit relates to services performed on BAW filters, has nothing to do with any of that, correct?

**A.** Correct.

**Q.** And you didn't perform any independent analysis in order to determine the correctness of that? And I'll say in fairness to you, Ms. Irwin, that's because you're not a BAW filter expert, correct?

**A.** That's correct. I'm certainly not.

**Q.** Akoustis purchased GDSI in January of 2023, correct?

**A.** Yes.

**Q.** So several years after Akoustis first began selling products, correct?

**A.** Yes.

**Q.** And generating revenue, correct?

**A.** And raising funds, correct.

**Q.** Okay. And Akoustis purchased RFMI in October of 2021, correct?

**A.** Yes.

**Q.** It's your opinion that Akoustis would have been able to purchase RFMI October 2021 even if it had experienced a 55-month delay in product sales, correct?

**A.** Those purchases, neither Ms. Bennis nor I, have done any analysis to establish that the investment -- the

*Irwin - Cross*

11:43:14 1    investment funds that were received by Akoustis, those are

11:43:16 2    the funds that actually went towards those acquisitions

11:43:21 3    because we know there wasn't enough gross profit to make

11:43:24 4    those acquisitions.  So the only source of those funds was

11:43:28 5    investment.  And neither myself nor Ms. Bennis have done

11:43:31 6    any analysis to tie those investments directly to the

11:43:35 7    ability to purchase.

11:43:36 8    **Q.**    Okay.  So as we saw in the prior slide, Akoustis had

11:43:41 9    a number of years where its operating income vastly --

11:43:46 10   operating expenses vastly exceeded the product sales,

11:43:50 11   correct?

11:43:50 12   **A.**    Correct.

11:43:51 13   **Q.**    And, presumably, it was getting money from somewhere,

11:43:54 14   either through stock issuance or through debt agreements

11:44:01 15   with banks and things of that nature, correct?

11:44:03 16   **A.**    Correct.

11:44:11 17   **Q.**    Were you in the courtroom when Dr. Shealy testified

11:44:14 18   last week?

11:44:16 19   **A.**    I wasn't.  I think that was one of the days I was

11:44:19 20   under the weather and I was trying not to contaminate my

11:44:21 21   team, but I reviewed the dailies.

11:44:24 22   **Q.**    You didn't -- one of complaints that you have about

11:44:27 23   RFMI is that Ms. Bennis included revenue associated with

11:44:34 24   RFMI, even though RFMI doesn't allegedly embody the trade

11:44:40 25   secrets, correct?

**A.**    Correct.

**Q.**    And, again, you're relying on upon Mr. Aichele and others to tell you that fact, correct?

**A.**    Correct.

**Q.**    You're not capable of actually determining whether or not RFMI's revenue is associated with the misappropriation of Qorvo's trade secrets, correct?

**A.**    That's correct.

**Q.**    And you didn't examine RFMI's books and records before opining that RFMI had nothing to do with Akoustis' misappropriation of trade secrets, correct?

**A.**    Correct.  I had to rely on others because that's not my area of expertise.

**Q.**    Okay.

       If it is actually shown that revenue associated with RFMI is related to the automotive industry, which is an industry that Akoustis entered when it acquired RFMI, would the theft of trade secrets related to automotive filters be relevant to your analysis of whether or not that revenue should be included?

**A.**    It could, but you'd still have to incorporate costs. And as my analysis showed you, end up with a larger negative number when you incorporate -- sorry.  You'd end up with negative $9 million when you include all of the revenue.

1    So it doesn't matter, really, what revenue you

2    include in the analysis.  As soon as you account for any

3    costs, that head start methodology makes no sense.

4    **Q.**    If the jury determines that Akoustis was only able to

5    purchase GDSI and RFMI because it misappropriated Qorvo's

6    trade secrets, then the distinction that you're making

7    between BAW revenue and revenue from GDSI and RFMI is kind

8    of irrelevant, correct?

9    **A.**    The revenue could be relevant, but -- so if the jury

10   finds that they were driven by the trade secrets, the

11   revenue and the costs would be relevant, and that results

12   in the negative $9 million number that I showed.

13   **Q.**    Let's talk about reasonable royalty.

14        You agree with me that a reasonable royalty for

15   patent infringement is supposed to measure the incremental

16   benefit specifically attributed to the claims of the

17   asserted patents, correct?

18   **A.**    Yes.

19   **Q.**    That's kind of the purpose of the hypothetical

20   negotiation, is actually to determine what incremental

21   benefit is associated with the new inventive concept that

22   is embodied in the patent itself, correct?

23   **A.**    Yes.

24   **Q.**    And you also understand that the patents in this case

25   relate specifically to an improvement to the resonator of

*Irwin - Cross*

11:47:13 1    a BAW filter, correct?

11:47:15 2    **A.**    That is my understanding yes.

11:47:17 3    **Q.**    Okay.  The asserted patents don't relate to Qorvo's

11:47:20 4    business plans, correct?

11:47:21 5    **A.**    Right.

11:47:21 6    **Q.**    And the asserted patents don't relate to Qorvo's

11:47:24 7    trimming methods and procedures, correct?

11:47:26 8    **A.**    I believe that's correct.

11:47:27 9    **Q.**    And the asserted patents don't relate to evaluation

11:47:31 10   board design rules and schematics, correct?

11:47:33 11   **A.**    Correct.

11:47:33 12   **Q.**    And the asserted patents don't relate to product

11:47:34 13   development processes or testing procedures, correct?

11:47:38 14   **A.**    Right.

11:47:38 15   **Q.**    And they also don't relate to Qorvo's systems for

11:47:41 16   processes procedures for testing reliability and meantime

11:47:44 17   to failure, correct?

11:47:45 18   **A.**    That's correct.

11:47:46 19   **Q.**    And they don't relate to Qorvo's manufacturing

11:47:48 20   assembly and change procedures, correct?

11:47:50 21   **A.**    I believe that's correct.

11:47:52 22   **Q.**    And they don't relate to Qorvo's product roadmaps and

11:47:55 23   product prototypes, correct?

11:47:57 24   **A.**    Right.

11:47:58 25   **Q.**    And these are all trade secrets that Qorvo has

11:48:00  1   alleged Akoustis stole, correct?

11:48:03  2   **A.**   Yes.

11:48:03  3   **Q.**   Which are unrelated to the asserted patents and the

11:48:06  4   hypothetical negotiation that the parties would have had

11:48:08  5   in order to determine a reasonable royalty rate, correct?

11:48:11  6   **A.**   Correct.

11:48:27  7   **Q.**   I'd like to switch gears and talk about your opinion

11:48:29  8   that Akoustis avoided spending only $293,000 because it

11:48:37  9   misappropriated Qorvo's trade secrets.

11:48:39 10        As we've discussed this morning at length, both with

11:48:42 11   Mr. Elkins and with me, avoided costs is just one type of

11:48:48 12   unjust enrichment damage, correct?

11:48:49 13   **A.**   Yes.

11:48:49 14   **Q.**   And I think you testified earlier that avoided costs

11:48:56 15   are supposed to measure the operational costs that

11:48:59 16   Akoustis avoided because it misappropriated Qorvo's trade

11:49:03 17   secrets, right?

11:49:04 18   **A.**   Yes.

11:49:04 19   **Q.**   And that includes things like research and

11:49:06 20   development, correct?

11:49:07 21   **A.**   Yes.

11:49:08 22   **Q.**   And it can include other types of operating costs

11:49:11 23   too, correct?

11:49:12 24   **A.**   It can.

11:49:13 25   **Q.**   So we saw that some of the trade secrets related to

*Irwin - Cross*

11:49:16  1    sales and marketing analysis of determining what type of

11:49:19  2    product to sell.

11:49:20  3        So those types of expenses would be avoided costs as

11:49:23  4    well, correct?

11:49:24  5    **A.**    Yes.  And to the extent that Dr. Darveaux and

11:49:27  6    Dr. Lebby identified those, I've included them in my

11:49:31  7    avoided costs.

11:49:32  8    **Q.**    Okay.  And because you don't have the technical

11:49:34  9    expertise to actually determine the correct number of

11:49:37 10    engineering hours, and that it would have taken for

11:49:40 11    Akoustis to perform tasks associated with the

11:49:44 12    misappropriation, you are relying totally on Dr. Darveaux

11:49:48 13    and Dr. Lebby for the hours estimates that you include in

11:49:52 14    your analysis, correct?

11:49:54 15    **A.**    Yes.  Absolutely.

11:49:55 16    **Q.**    Okay.  And I think we covered earlier that

11:49:57 17    Dr. Darveaux opined as to engineering hours associated

11:50:01 18    with Trade Secret Group 2 through 7, correct?

11:50:03 19    **A.**    Yes.

11:50:03 20    **Q.**    And Dr. Lebby opined as to the engineering hours that

11:50:08 21    Akoustis avoided under Groups 1 and 8, correct.

11:50:11 22    **A.**    Yes.

11:50:11 23    **Q.**    And the total number of hours that both Dr. Darveaux

11:50:15 24    and Lebby collectively opined that Akoustis avoided was

11:50:19 25    only 1154 hours, correct?

11:50:22 1    **A.**    Correct.

11:50:24 2    **Q.**    So to put that number in context for the jury,

11:50:28 3    Drs. Darveaux and Lebby opined that Akoustis avoided a

11:50:30 4    cost of a single person working for less than one year

11:50:34 5    when it took all of Qorvo's information, correct?

11:50:38 6    **A.**    I'm going to accept the characterization of "all of

11:50:41 7    Qorvo's information."  But, yes, that's correct.

11:50:43 8    **Q.**    Well, you have to assume misappropriation of trade

11:50:46 9    secrets as a part of your analysis, correct?

11:50:48 10    **A.**    Absolutely.  I just don't know that necessarily

11:50:51 11    qualifies as, quote, all of Qorvo's information.

11:50:54 12    **Q.**    Okay.

11:50:54 13    **A.**    So that's the only issue I had with that.

11:50:57 14    **Q.**    You first offered your opinions in this case related

11:51:00 15    to Akoustis' avoided costs in a report that you issued in

11:51:04 16    November, correct?

11:51:05 17    **A.**    December 20th.

11:51:08 18    **Q.**    Thank you for the clarification.

11:51:10 19         So in December of 2023, correct?

11:51:12 20    **A.**    Correct.  It was a very busy Thanksgiving and holiday

11:51:17 21    season for us.

11:51:19 22    **Q.**    And you didn't read Dr. Darveaux's and Lebby's

11:51:21 23    reports before you relied upon their hours estimates to

11:51:25 24    calculate Akoustis' avoided costs, correct?

11:51:27 25    **A.**    Correct.  They were issued at the same time as mine,

1    on December 20th.

2    **Q.**    And you also never spoke to either Dr. Darveaux or

3    Dr. Lebby before you relied upon their hours estimates to

4    determine Akoustis' avoided costs, correct?

5    **A.**    I did not, but my -- members of my team did.

6    **Q.**    Okay.  You didn't have a direct phone call with

7    Dr. Darveaux or Dr. Lebby in order to understand the hours

8    estimates that you were inputting into your damage model,

9    correct?

10   **A.**    Again, I did not, my team did.

11   **Q.**    Okay.

12   **A.**    I didn't speak with them until before my deposition.

13   **Q.**    So before you issued your report, you never asked

14   Dr. Darveaux to explain the hours estimates that he was

15   providing to you for purposes of your avoided costs

16   analysis, correct?

17   **A.**    I didn't speak with him personally, but my team

18   explained to me the substance of their conversations with

19   both Dr. Darveaux and Dr. Lebby.  And I should put into

20   context that my team collectively has 30 years of

21   experience, as do I.

22   **Q.**    But they don't have 30 years of experience in the BAW

23   filter industry, correct?

24   **A.**    No, but they do understand how to establish a

25   reasonable basis to accept information from other experts.

*Irwin - Cross*

**Q.**   But you don't know specifically what conversations your team actually had with Dr. Darveaux and Dr. Lebby in order to determine whether or not it was reasonable or appropriate to rely upon the hours estimates they provided to you, correct?

**A.**   I would say I had a reasonable basis to accept those numbers based on my discussions with my team, as well as my confidence in my team, and their skills and their experience and education.

**Q.**   You understand that Dr. Darveaux's opinion, which I think he expressed yesterday to the jury, is that none of the documents that Qorvo has entered into evidence contain trade secrets, correct?

**A.**   Correct.

**Q.**   And his hours estimates that he provided to you are based upon that opinion, correct?

**A.**   Incorrect.  Incorrect.

**Q.**   Okay.  Let's go look at what Dr. Darveaux said about his hours estimates.

                **MS. AYERS:**   Can you please pull up DDX-3.75.

**BY MS. AYERS:**

**Q.**   This is the hours estimate that Dr. Darveaux opined to yesterday in front of the jury, correct?

**A.**   Yes.

**Q.**   And it specifically states that none of the documents

*Irwin - Cross*

and information that Qorvo identified as containing trade

secret information was, in fact, an actual trade secret,

correct?

**A.**    Those -- that's what's reflected under the Trade

Secret and Head Start.  But if you look at the Saved Cost,

there's an asterisk.  And down below, it says -- the

asterisk indicates that these estimates are assuming the

category contains trade secrets.

**Q.**    Let's talk about his estimates.

So Dr. Darveaux's estimate is that Akoustis saved

eight hours, a single engineering workday, when it

misappropriated all of the information associated with

Qorvo's trimming methods and procedures, correct?

**A.**    Yes.  Based on his many years of expertise, that's

correct.

**Q.**    And, for example, Dr. Darveaux opined that Akoustis

saved only 16 hours, so two engineering workdays, when it

misappropriated Qorvo's systems and processes and

procedures for testing reliability and meantime to failure

of parts, correct?

**A.**    Yes.  Again, based on his experience, he came up with

those estimates.

**Q.**    Okay.  And those estimates were in part based upon

the availability of public information that Dr. Darveaux

claims covers Qorvo's trade secrets, correct?

*Irwin - Cross*

**A.**    Yes.  I'm not going to recite all of his testimony.
But, yes, I sat through his testimony, and that's my
understanding, correct.

**Q.**    So the total number of hours that Dr. Darveaux opined
Akoustis saved for Groups 2 through 7 is just 194, right?

**A.**    That's correct.

**Q.**    The vast majority of all of the hours that are
included in your avoided costs analysis come from Groups 1
and 8 from Dr. Lebby, correct?

**A.**    Correct.

**Q.**    Okay.  And the 194 engineering hours is basically
six weeks of work for a single human being, correct?

**A.**    I can do the math, but I will accept that, yes.

**Q.**    If the jury disagrees with Dr. Darveaux and concludes
that the information in Qorvo's documents were trade
secrets that would have taken Akoustis much longer than
eight hours in order to replicate in some form or fashion
or independently develop, then you haven't really
calculated the harm to Qorvo and the unjust enrichment
benefit that Akoustis received from its misappropriation,
correct?

**A.**    That's correct.  I mean, I assume and I believe the
jury, based on whatever instruction is given, can take my
analysis and adjust it however they see fit.  So that's
why I give all the detail I give, so that that information

*Irwin - Cross*

can be used.

**Q.**    So if the jury determines that Akoustis saved more than eight hours when it misappropriated Qorvo's trimming methods and procedures, your analysis and your calculation of the avoided costs that Akoustis was able to have is incorrect, correct?

**A.**    Yes.  It would be too low, and it would need to increase based on whatever information and conclusions the jury comes to.

**Q.**    And the same concept applies to Dr. Lebby as well. If the jury rejects Dr. Lebby's opinions about the total number of hours it would have taken to replicate all of work that went into creating the trade secret information that was part of Groups 1 and 8, you haven't provided mathematical calculation for what Akoustis saved in avoided costs, correct?

**A.**    Correct.  If you change the inputs, my output would change.  That's just the way the calculation works.

**Q.**    Okay.  And so even though Tony Testa testified that just for one trade secret group, Group 8, that Qorvo spent two years developing the information that related to, for example, the QPQ2200, you're relying completely on Dr. Lebby's analysis that that entire group is only worth 400 hours as a part of your damages calculation, correct?

**A.**    Correct.  I'll also add that Ms. Bennis didn't

11:58:05 1    conduct an avoided cost analysis, which, based on those

11:58:07 2    kind of records, could have been done, but she didn't

11:58:10 3    choose that methodology.

11:58:11 4    **Q.**    Okay.  And I think kind of in sum, you haven't

11:58:14 5    calculated the harm to Qorvo in the unjust enrichment

11:58:17 6    benefit that Akoustis received if the jury fundamentally

11:58:21 7    disagrees with Dr. Darveaux and Dr. Lebby's hours

11:58:24 8    estimates, correct?

11:58:25 9    **A.**    Correct.  That would be -- I mean, obviously, my

11:58:28 10   opinion is that the head-start methodology is incorrect

11:58:31 11   until you at least account for costs.  And there are no

11:58:35 12   profits.  And if they disagreed with the avoided costs

11:58:39 13   methodology or the inputs, then, yes, that's correct.

11:58:42 14   **Q.**    Okay.

11:58:43 15            **MS. AYERS:**  I have no further questions,

11:58:44 16   Your Honor.

11:58:45 17            **THE COURT:**  Redirect.

11:58:46 18                    REDIRECT EXAMINATION

11:58:48 19   **BY MR. ELKINS:**

11:58:53 20   **Q.**    Ms. Irwin, I will be brief, although I'm sure you've

11:58:55 21   heard that from lawyers in the past.

11:58:59 22   **A.**    Unfortunately, yes.

11:59:00 23   **Q.**    Well, hopefully, I will prove that correct.

11:59:06 24            Ms. Ayers asked you, or she proposed that -- what's

11:59:10 25   the difference between the defendants' profits measure of

*Irwin - Redirect*

unjust enrichment, if you're simply going to insist that
the head start benefit also be measured by loss -- by the
defendants accelerated profits?

        Can you -- is there a difference, and if so, can you
explain it?

**A.**    Sorry.  I want to make sure I understand.  Is there a
difference between defendants' profits and accelerated
profits?

**Q.**    Correct.  As an unjust enrichment measure.

**A.**    So just comparing those two methodologies, there's
slightly different but-for world assumption in defendants'
profits.  That assumption is the defendant never would
have been able to enter the market, in which case you
would look at all of the expenses in that.  Which, again,
is negative.  It's even more negative; it's like hundreds
of millions of dollars.

        But those are both appropriate measures, but in
both -- under both of those scenarios, damages would be
negative in this case based on the facts, and that's a
nonsensical conclusion, indicating to me that those aren't
the right methodologies to consider.

**Q.**    But the difference between them is that in -- when
you're calculating the defendants' unjust enrichment
benefit by looking at his lost profits, you are including
an additional layer of costs versus because of the

assumption that the defendant would never have entered the market, versus the head start unjust enrichment benefit theory, which doesn't carry that assumption?

**A.**   That's correct.  Yeah.  There's a slightly different assumption between those two unjust enrichment measures. The defendants' profits only would be a scenario where you have somebody who has taken unjust -- taken trade secrets and misappropriated them who never would have been able to get into this business ever, never, ever, ever.

And so they would look at, basically, the net income of the entire company, and take that and treat that as the benefit of the defendants' caused -- based on the use of the trade secrets.

**Q.**   Okay.  And you testified that you've sat through all of the testimony and evidence in court, or when you were ill, you read the daily transcripts that we provided to you?

**A.**   Correct.

**Q.**   Are you aware of any record evidence at all from this trial, from which one could reasonably conclude that Akoustis' acquisitions of RFMI and GDSI were driven by trade secret misappropriation from Qorvo?

**A.**   No, that information is not available.  I have seen nothing that indicates that that could be the reason for those acquisitions, or enable those acquisitions.

*Irwin - Redirect*

**Q.**   Okay.  And they know when we talk about unjust

enrichment as a theory of recovery versus actual harm to

the plaintiff, which Qorvo does not allege, but when we

talk about unjust enrichment, are we talking about harm to

Qorvo or benefit to Akoustis?

**A.**   It's benefit to Akoustis that, based on use of the

assumed trade secret status, misappropriation and use of

the trade secrets.

**Q.**   So when Ms. Ayers was referring to avoided costs

being a measure of the harm to Qorvo, is that actually the

benefit to Akoustis from being able to save money that it

otherwise would have spent on creating the technology that

it didn't have to create because of the alleged trade

secret misappropriation and use?

**A.**   Yes.  If she -- she said was that it was harm to

Qorvo, I missed that in her question.  The avoided costs

is only looking at any benefit to Akoustis from the trade

secret status misappropriation and use of the trade

secrets.

**Q.**   Thank you.

         **MR. ELKINS:**  Those are all the questions I

have.

         **THE COURT:**  All right.  Well, thank you very

much.  And we'll have you may step down.

         I will turn to the defense, will there be any

12:03:28  1    additional evidence from the defense?

12:03:31  2              MR. ELKINS:  No, Your Honor.  We rest.

12:03:32  3              THE COURT:  All right.

12:03:33  4              Will there be any additional evidence from the

12:03:35  5    plaintiff?

12:03:37  6              MR. MASTERS:  No, Your Honor.

12:03:38  7              THE COURT:  All right.  Ladies and gentlemen,

12:03:40  8    the parties have rested their case.  We'll have the final

12:03:46  9    arguments of counsel and the final instructions on the

12:03:48 10    law.

12:03:49 11              Time has slipped a little bit, but that's okay.

12:03:51 12    It is 12:03, so we are going to take our lunch break at

12:04:01 13    this time.  We will plan on coming back at 12:50, giving

12:04:06 14    people two extra minutes.  And at that time, we will have

12:04:09 15    closing arguments in the case.

12:04:11 16              We will take a break after that, and we'll have

12:04:12 17    final instructions after closing arguments.

12:04:16 18              You all may be excused, but, of course, do not

12:04:19 19    discuss the case amongst yourself.  Don't let anyone talk

12:04:22 20    to you about it so you can keep an open mind.  You still

12:04:25 21    have a ways to go.  I will let you be excused to the jury

12:04:28 22    room.  Thank you.

12:04:29 23         (The jury exits the courtroom at 12:04 p.m.)

12:04:59 24              THE COURT:  Everybody can be seated.  We are

12:05:00 25    going to get the time count, just so everybody is clear on

12:05:02 1    how much time each of you has remaining.  And we will have

12:05:04 2    that in just a moment I think.

12:05:12 3        Plaintiff has how much time remaining if we can

12:05:14 4    tell?  It may take a second.  If we need to delay on that,

12:05:22 5    I can let everybody do that after I'm off the bench.  Will

12:05:26 6    that be easier?  We'll do that.

12:05:28 7        So you will each get your time count, and when

12:05:31 8    we come back, I assume there will be some desire by the

12:05:36 9    plaintiff to reserve some portion of their time -- well,

12:05:40 10   let's wait and see what you've got left -- for rebuttal.

12:05:44 11   I think that's everything we need to do right now.

12:05:46 12   Anything else?  You should all have, again, a full set of

12:05:49 13   instructions.  You should have the Word -- or you should

12:05:52 14   have a copy of that, probably in PDF form.  Of course, you

12:05:55 15   can use those.  You have -- I want to make sure I've got

12:05:59 16   the final exhibit.  I just haven't seen it yet.  We don't

12:06:04 17   have trade secret exhibit yet?  Oh, I don't like that.

12:06:07 18   That's not good.

12:06:09 19       **MR. MASTERS:**  Your Honor, if I may just let

12:06:13 20   defendants address the Court on that point.  We've sent

12:06:16 21   the list.  It's over waiting for their confirmation.

12:06:19 22       **THE COURT:**  I think I heard there was an

12:06:21 23   agreement already on that.

12:06:23 24       Mr. Lemieux, looks like you are on first base

12:06:25 25   or whatever it is.

12:06:27  1          MR. LEMIEUX:  There is agreement on the form,

12:06:28  2    Your Honor.  We were just checking to make sure that the

12:06:31  3    exhibits that are referenced in this document were proper.

12:06:34  4    And before the examination of Ms. Irwin, I was told on my

12:06:38  5    team they just had two of the eight sections left to

12:06:40  6    check, and hopefully by now, that's been finished.

12:06:44  7          THE COURT:  Looks like I saw a nod that looks

12:06:46  8    affirmative on that -- I got two nods of affirmative.

12:06:56  9          MR. LEMIEUX:  We've got to talk a little bit.

12:06:57 10    I think we are very close and we should have it

12:06:59 11    momentarily.  It sounds like they've identified a couple

12:07:02 12    of items I need to discuss with Mr. Masters.

12:07:03 13          THE COURT:  Well, we can do close.  Actually, I

12:07:05 14    will have to stay here and make sure this is ironed out.

12:07:08 15    I can't not do that.  It would be probably unfair to the

12:07:12 16    parties.  So why don't you all confer real quickly, and

12:07:15 17    we'll do some more calculations on the time.

12:07:19 18          MR. ELKINS:  One other issue, Your Honor, which

12:07:20 19    is the formality of the Rule 50 motions at the close of

12:07:25 20    evidence.  Just wanted to see what your preference is for

12:07:29 21    handling that.

12:07:32 22          THE COURT:  Well, it has to be in conformance

12:07:37 23    with Third Circuit requirements for Rule 50 motion.  I

12:07:40 24    know that that varies a little bit, not a whole lot,

12:07:44 25    circuit to circuit.

12:07:50  1        I think it's pretty plain or pretty clear that

12:07:54  2   we have, along the way -- I have considerable relief in

12:08:01  3   terms of what could have been Rule 50s, but they've been

12:08:06  4   narrowed down.  We've actually gotten rid of almost

12:08:09  5   everything that Rule 50 would normally relate to.  And on

12:08:11  6   the other matters that remain, which are limited, it does

12:08:16  7   not appear that there is a basis to grant Rule 50 relief.

12:08:20  8   But do you have a suggestion as to how you want to handle

12:08:25  9   your presentation?

12:08:26 10        **MR. ELKINS:**  Well, my presentation would be

12:08:28 11   incredibly short, which would simply be for purposes of

12:08:33 12   making -- ensuring that we've made the record vis-a-vis

12:08:37 13   the first Rule 50 motion we previously made in connection

12:08:42 14   with the combination of Ms. Bennis' opinion with

12:08:47 15   Dr. Shanfield's head start opinion.

12:08:49 16        I don't have anything to say that I didn't say

12:08:51 17   before, Your Honor, but I'm compelled to simply reurge it

12:08:55 18   for purposes of the record.  And I thought I heard

12:08:57 19   Mr. Masters saying something about a Rule 50 motion that

12:09:02 20   the plaintiff might have, but obviously he can speak to

12:09:05 21   that himself.

12:09:06 22        **THE COURT:**  Okay.  Well, I understand what the

12:09:10 23   record is on the defense Rule 50 motion.

12:09:14 24        Yes, sir, Mr. Masters.

12:09:15 25        **MR. MASTERS:**  So on the plaintiff's side, Your

12:09:16  1    Honor, we make a Rule 50 motion with respect to the trade

12:09:21  2    secret issues in two respects.

12:09:24  3          The first is that plaintiff put forward and

12:09:29  4    established the existence -- existence of Trade Secret

12:09:33  5    Groups 1 and 8 and the misappropriation of those groups,

12:09:36  6    and that went in through Mr. Testa and Dr. Shanfield, and

12:09:41  7    it was unrebutted in the defense case.

12:09:45  8          And the second issue relates to Qorvo having

12:09:48  9    established reasonable measures to secure its trade

12:09:51 10    secrets.  That went in, in Qorvo's case in chief through

12:09:56 11    Qorvo's chief information security officer, Michael Boyd,

12:10:00 12    and Qorvo's expert, Mr. Robinson.  That reasonable

12:10:07 13    security measures was also unrebutted in the defendants'

12:10:10 14    case.

12:10:11 15          I have a motion here, Your Honor, if I may

12:10:13 16    approach and hand the Court a copy.

12:10:17 17          **THE COURT:**  Yes, that's fine.

12:10:32 18          The motion has been handed to the Court, and it

12:10:33 19    will be docketed in the record.  And we need to allow the

12:10:39 20    defense to respond to that in like format.  So I'm going

12:10:47 21    to have to take this under advisement until I get the

12:10:51 22    response, which I'm not expecting today.  I understand we

12:10:55 23    have a few things to finish, but I will need it promptly.

12:11:00 24          In this case, and I'm not ruling on this at

12:11:03 25    this time, but in this case, on the question of the trade

secret, the existence of trade secrets and refers to the reasonable steps. These are questions that would normally be presented to the jury.

Now, I'm going to read -- I haven't had a chance to review the memo, and it may convince me to the contrary, but at this point, I'm going to take it under advisement, with that piece of advice, which is that these look like issues that would go to the jury. I just have to wait. I just have to wait on this. And I will look at it, but I'm not going to try to resolve, ultimately, until after the defense has had a chance to respond in writing. And they won't have a chance to do that until sometime reasonably soon, and we'll talk about that later, after they've had a chance to think about it. We'll handle it that way.

Thank you very much. And I'm going to hand this to Ms. Currier and she will actually docket -- not now, but it will be a little later.

Anything else?

**MR. MASTERS:** Just one quick issue with respect to the trial exhibits. We would ask Your Honor to have the clerk seal those exhibits, which I understand --

**THE COURT:** Yes, that is correct. Most of this -- much of this material has been classified as trade secret and/or at least confidential. And we understand

12:12:26 1    the problems created by not doing that, so we're

12:12:29 2    definitely going to do that in this case.  We will take

12:12:31 3    care of that.

12:12:33 4                MR. MASTERS:  Thank you.

12:12:33 5                THE COURT:  I know that everyone will be

12:12:38 6    working on getting that set of materials together in the

12:12:41 7    next couple hours.

12:12:43 8                Now let's go back and get a time count, if we

12:12:45 9    have one.  We are adding the time.

12:12:49 10                THE CLERK:  Plaintiffs still have 2 hours,

12:12:50 11    16 minutes, and 52 seconds left.  Defendants have 1 hour,

12:12:55 12    52 minutes, and 42 seconds left.

12:13:00 13                THE COURT:  Okay.  That means that we obviously

12:13:01 14    have plenty of time for both sides.  Hopefully, you won't

12:13:05 15    take all of the time.  But you have plenty of time.  I

12:13:07 16    just wanted to make sure that you were aware of the time

12:13:10 17    count.

12:13:11 18                Okay.  We do need to let everybody take that

12:13:13 19    break.  And so it will be shorter than anticipated.  And I

12:13:16 20    take it that that Mr. DeFosse will, perhaps, join us for

12:13:24 21    the next portion of the case.

12:13:25 22                MR. MASTERS:  Well, we're hoping.  We've got to

12:13:25 23    make sure he's up.

12:13:26 24                THE COURT:  Well, Ms. Ayers is all ready.

12:13:28 25    She's all set.

12:13:29  1          So, Mr. Masters, that will be fine, I'm sure.

12:13:35  2          **MS. AYERS:**  I might have a bone to pick with

12:13:38  3    Mr. DeFosse if he doesn't show up, Your Honor.

12:13:40  4          **THE COURT:**  I understand.  Thank you all very

12:13:40  5    much.  And we will go directly, then -- I think I

12:13:40  6    understand that, Mr. Elkins, you will handle the entire

12:13:45  7    portion, obviously, of the defendants close.

12:13:48  8          **MR. ELKINS:**  I will.

12:13:48  9          **THE COURT:**  And so I'll -- you know, I'm just

12:13:49 10    going to turn to you and say, "Does the defense wish to

12:13:51 11    make a closing argument," and I understand the answer will

12:13:54 12    be "Yes."

12:13:55 13          **MR. ELKINS:**  Yes.

12:13:55 14          **THE COURT:**  Good deal.  Thank you all very

12:13:57 15    much.

12:13:57 16       (Whereupon, a recess is taken.)

12:48:55 17          **THE COURT:**  What we will do, the stipulated

12:48:57 18    facts, they begin on Page 6 to 10.  We're just going to go

12:48:59 19    ahead and cut and paste those into a document, which will

12:49:02 20    say, "Stipulated Facts."  And then I'm going to put a

12:49:06 21    signature line for both sides.

12:49:07 22          Now, we stipulated to them a long time ago, so

12:49:10 23    it's not anything new.  And it will be exactly what's in

12:49:13 24    the pretrial order.  But they're long.  They're fairly

12:49:16 25    long.  And I will decide if I'm going to read the full set

12:49:20  1    of stipulated facts to the panel.  And I usually do, and I

12:49:24  2    probably will.  But they are rather long.  So that will be

          3    a change.

12:49:32  4         We will have a change a little bit there to get

12:49:35  5    that in correctly.  But you can use the stipulated facts

12:49:39  6    in argument, certainly.

12:49:40  7         **MR. MASTERS:**  Your Honor, the uncontested facts

12:49:41  8    include references to prior art and invalidity.

12:49:46  9         **THE COURT:**  They do.  I know it's a problem.

12:49:49 10    We can take those out.  I just, I understood that we would

12:49:52 11    be getting them.  Not your fault.  We'll just get it

12:49:55 12    straightened out.  Sometimes those things happen.  This is

12:49:57 13    like a -- what we do all the time.

12:50:01 14         All right.  But I do need the materials back

12:50:03 15    from everybody very promptly, and then we're going to have

12:50:06 16    to mark them very quickly.  So I may need you to check

12:50:13 17    around, but I do need those papers back.

12:50:16 18         If you'll look, you can take a look at them.

12:50:17 19    Mr. Masters, since you're all through for the today, I

12:50:20 20    will let you -- if you don't mind being in charge of that.

12:50:27 21    You and Mr. Lemieux are now on coasting, so let's make

12:50:29 22    sure we get those from you.

12:50:31 23         Okay.  I think we're very close.

12:50:36 24         Mr. DeFosse, are you ready to proceed?

12:50:39 25         **MR. DeFOSSE:**  Yes, Your Honor.

12:50:39  1                THE COURT:  Okay.  Are you going to reserve any

12:50:41  2    time, or are you going to take any time of rebuttal?

12:50:44  3                MR. DeFOSSE:  Yes.  I would like to reserve

12:50:45  4    some time.

12:50:46  5                THE COURT:  Okay.  And that's fine.  That's not

12:50:47  6    a problem.

12:50:48  7                And since you have plenty of time left for

12:50:51  8    rebuttal.  So as you know, don't usually proceed -- at the

12:50:53  9    most, about ten, maybe 12 minutes.  That's pretty long for

12:50:57 10    rebuttal.  Usually, it's quite short.

12:50:59 11                MR. DeFOSSE:  Okay, Your Honor.  I was thinking

12:51:02 12    15, but I'll take Your Honor's advice on that.

12:51:04 13                THE COURT:  Well, it needs to be proportionate.

12:51:05 14    And that's what I'm worried about.  If it's a repeat of

12:51:10 15    things that have already been said, that becomes an issue.

12:51:14 16    So just be mindful.

12:51:16 17                MR. DeFOSSE:  Okay.  I will, Your Honor.  Thank

12:51:17 18    you.

12:51:18 19                THE COURT:  Okay.

12:51:18 20                All right.  And let's make sure that,

12:51:20 21    Mr. Elkins, you're set to go, too.

12:51:24 22                MR. ELKINS:  Yes, I am, Your Honor.

12:51:25 23                THE COURT:  All right.  Well, I think we are

12:51:27 24    more than ready.  They were supposed to be here one minute

12:51:31 25    ago.  So we will bring the jury in.  We will work on the

```
12:51:33  1    issue that remains.  And, of course, then, we will get the

12:51:39  2    stipulated fact question taken care of.

12:52:12  3         (The jury enters the courtroom at 12:52 p.m.)

12:52:31  4              THE COURT:  Everyone can be seated.

12:52:35  5              Mr. DeFosse, do you wish to make a closing

12:52:37  6    argument on behalf of Qorvo?

12:52:41  7              MR. DeFOSSE:  We do, Your Honor.

12:52:42  8              THE COURT:  You may proceed.

12:52:44  9              MR. DeFOSSE:  Thank you, Your Honor.

12:52:56 10              Good afternoon, ladies and gentlemen.  So we

12:52:58 11    made it to the closing arguments, and the first thing I

12:53:00 12    would like to do is really thank you very sincerely for

12:53:04 13    your time in this case.  We appreciate, the attorneys, and

12:53:06 14    our client especially appreciates all the dedication

12:53:09 15    you've brought to this matter the attention and the focus.

12:53:12 16              As you can probably tell, this is a very

12:53:14 17    important matter to us.  Qorvo, as you heard in the

12:53:18 18    opening statement, is not in the business of suing its

12:53:20 19    competitors.  We're not often in these kinds of lawsuits,

12:53:23 20    and we are here today because we face the situation of a

12:53:29 21    competitor that was competing with us unfairly.  And that

12:53:33 22    jeopardizes our company, and that jeopardizes our

12:53:35 23    employees who do things the right way, and who understand

12:53:38 24    that innovation is about hard work.  And that's why we

12:53:42 25    have to be here, and we appreciate your focus on this
```

case.

So ten days ago, Mr. Masters laid out for you
what we expected the evidence in this case to show.  And I
hope at this point you would agree with me that we've met
those things that he said we would put in front of you
with the witnesses and the documents.  This case really
starts in some ways in 2014.  That's when Jeff Shealy left
RFMD and formed Akoustis.  And what he told the investors
at that time was that he wanted to have a company that
would invest in the research and development of
single-crystal BAW filter technology.

If you fast forward two years from that time to
2016, what we have is a situation where Akoustis was not
prepared to enter the mark.  Its technology wasn't
working.  And that really -- it shouldn't have been a
surprise to anyone at that point, because this is a really
difficult market with difficult technology.

You heard Mr. Aigner explain that it took Qorvo
20 years of research and development to have the first
commercial product introduced.  And on top of, that
Akoustis didn't have the type of engineers who had
experience in this.

You heard testimony from Dr. Shealy and
Dr. Vetury, they hadn't worked with BAW filters before.
So it shouldn't have been a surprise in 2016 that they

weren't really close to entering the mark.  But that wasn't acceptable to Akoustis, I think, as you've seen here.  They didn't want to wait.  They didn't want to make the investment that it takes to get into the market.

They wanted to transition to generating revenues by selling products.  And the way -- and because they wanted to generate revenues and returns for their investors, including, importantly, the executives at the company, and to do that, the strategy that they adopted was to siphon off large amounts of confidential information from Qorvo.  And I think we've put that evidence in front of you, and I hope you will agree with that.

Now, what I would like to do over the next several minutes is summarize for you the evidence that we think is key that we presented.  I'm not going to go through everything again because you've been very patient with me in the past, and I know at some point you must be like, "Oh, my gosh, are we really on Trade Secret Group 6. We have two more to go."

I am going to go through the groups, so I'm not promising you I won't do that, but I'm going to try to go quickly.  And what I am trying to do here today is to give you some context about what you've seen and kind of put it together, because, you know, we have witnesses who do

12:56:12  1    Trade Secret Group 1 and 4 and 8, and, you know, with

12:56:15  2    Dr. Shanfield, we tried to do timelines and show you where

12:56:18  3    this all came from and how it works.  But I will try to do

12:56:21  4    that a little more briefly today and give you some overall

12:56:24  5    context.

12:56:25  6           So I'd like to start with Group 1.  And put

12:56:30  7    the -- the context I'd like for this group is kind of what

12:56:32  8    I said already.  We're at a point in time in 2016,

12:56:35  9    April -- August of 2016, when Akoustis is trying to figure

12:56:40 10    out what products it's going to develop.  It wants to

12:56:43 11    transition to making products.  It needs to figure out,

12:56:46 12    the first step in doing that is what product are we going

12:56:50 13    to pursue?

12:56:50 14           The first step in this was August 2016, they

12:56:55 15    hire Rohan Houlden whom you saw Mr. Houlden's deposition

12:56:59 16    testimony.  He was the general manager at Qorvo at this

12:57:02 17    time.  He was responsible for wireless connectivity

12:57:06 18    devices.  And so he is going to go and work at Akoustis.

12:57:07 19    Fine.  That's not a problem.  Having an employee move from

12:57:11 20    one company to another, we don't content that that in and

12:57:13 21    of itself is a problem.

12:57:15 22           But what Mr. Houlden did here is a problem, and

12:57:17 23    I think you've seen the evidence.  This is September 8,

12:57:20 24    2016.  So Mr. Houlden left the company on September 16,

12:57:25 25    2016.  This is eight days before he left.  He's already

12:57:29  1    sending Mr. Aichele Qorvo's confidential documents.  This

12:57:32  2    is the statement of work for Qorvo's 5 gigahertz BAW

12:57:36  3    filters that was sent to Mr. Aichele in September.

12:57:40  4            Now, we fast-forward to September 14, 2016.

12:57:43  5    This is the day Mr. Houlden, still working at Qorvo,

12:57:47  6    downloads documents to an external drive, including the

12:57:52  7    three business plans that are at issue in Trade Secret

12:57:55  8    Group 1.

12:57:57  9            September 16, two days later.  Mr. Houlden, as

12:58:01 10    all employees do when they are leaving and get severance,

12:58:04 11    signs an agreement and says, "I've returned all my

12:58:07 12    documents to you.  I don't have documents left.  I

12:58:09 13    returned them to you."  In consideration for that, he

12:58:13 14    received a substantial severance pay of ████████

12:58:19 15            Five days later, he goes to Akoustis.  The

12:58:22 16    documents he promised that he returned are uploaded to

12:58:24 17    Akoustis' system, and in particular, they are uploaded to

12:58:27 18    the folder that he created called "Strategy."  And I don't

12:58:30 19    think there's any question in this case what the evidence

12:58:33 20    shows on that.  It shows that Akoustis did, in fact, use

12:58:36 21    Qorvo's business plans for its strategy.

12:58:40 22            Now, why do I say that?  First of all, the

12:58:42 23    documents had everything Akoustis needed in trying to

12:58:44 24    decide what product they are going to develop.  This is

12:58:48 25    one of the documents.  This is a very detailed strategy

12:58:52 1    presentation that goes market segment by market segment,

12:58:55 2    identifies the attractiveness of markets, so it helps you

12:58:58 3    decide which areas of the market you may want to pursue

12:59:01 4    with the product.

12:59:03 5                Next presentation.  This is a Wi-Fi marketing

12:59:07 6    strategy.  So we've now gone down a level of detail, and

12:59:09 7    we're focusing on Wi-Fi products.  And what's really

12:59:12 8    critical about this presentation -- I will see if I can

12:59:15 9    get this to work -- if you see down in the -- maybe I

12:59:20 10   can't --

12:59:20 11               You see down in the lower right-hand corner, it

12:59:21 12   says, "Gap" in red.  So what was happening in this

12:59:25 13   presentation was Qorvo was deciding how it's going to

12:59:28 14   invest its resources, and it was saying, this is where

12:59:31 15   when we are making our internal decisions.  And we're

12:59:32 16   saying mobile is a big market; we want to focus there.  We

12:59:36 17   could do 5 gigahertz, but we are going to have a gap in

12:59:39 18   that while we put our resources in mobile.

12:59:42 19               So this tells a company, for example, Akoustis,

12:59:45 20   if you want to compete with Qorvo, here is the place to

12:59:49 21   go.  You want to go to 5 gigahertz Wi-Fi because Qorvo is

12:59:51 22   going to be behind.

12:59:53 23               And then this is the one I mentioned already.

12:59:55 24   This is the statement of work that Mr. Houlden had already

12:59:57 25   sent to Mr. Aichele in September.  On the right-hand side

12:59:59  1    of this, you see blue boxes.  That's Qorvo's target

13:00:02  2    specifications for its 5 gigahertz filter.

13:00:06  3            Now, you've heard sometimes there are

13:00:08  4    specifications available in the public, and you could get

13:00:10  5    those from datasheets or things like that.  The critical

13:00:13  6    thing to know here, the context that you have to have to

13:00:16  7    understand this is, there were no 5 gigahertz products on

13:00:18  8    the market in 2016.  That is years away.  We're looking

13:00:23  9    four, five years away at this point, and this is a company

13:00:27  10   that is a leader in the mark saying this is the

13:00:29  11   performance I think I can achieve; these are the

13:00:32  12   parameters I think I'm going to be able to hit.

13:00:34  13           That is incredibly valuable information to a

13:00:36  14   competitor because now they know what they need to do to

13:00:39  15   compete with Qorvo, not day, but four years from now.  I

13:00:43  16   mean, this is super valuable.

13:00:44  17           And the other thing I would note about this is,

13:00:46  18   even the analysis that Qorvo performed here on whether

13:00:50  19   Qorvo should enter into the 5 gigahertz market was

13:00:53  20   comparing its product to the existing dielectric filters

13:00:57  21   that were servicing this market.  That's exactly what

13:01:00  22   Akoustis did once it got these presentations.

13:01:01  23           So it not only took the exact specifications

13:01:04  24   from our plans, and not only decided to focus its

13:01:08  25   attention on the exact market where we said we have a gap,

13:01:11  1    it used the same exact analysis that you see in these

13:01:15  2    documents.

13:01:16  3            So you heard from Mr. Aichele, and I think his

13:01:19  4    testimony -- I can't quote it word for word, but it was,

13:01:22  5    essentially, oh, we had decided long before this to go

13:01:25  6    into the 5 gigahertz market.  I was traveling all over.  I

13:01:29  7    visited Singapore or whatever, you know, I talked to

13:01:31  8    companies.  We were already doing this.

13:01:34  9            As with a lot of the testimony in this case, I

13:01:36 10    think you have to ask yourself, is what -- is what's being

13:01:39 11    said here, the same as what they were saying at the time?

13:01:42 12    I think that's a theme that you should see throughout the

13:01:45 13    testimony.  Now, when they show up and tell you what

13:01:47 14    they're doing:  We all -- we independently developed this.

13:01:50 15    We didn't use it.  I had already decided to do

13:01:52 16    5 gigahertz.

13:01:53 17            But look at the document that I have in front

13:01:55 18    of you.  This is their 5 gigahertz business plan.  It's

13:02:00 19    September, it's dated and titled September 16, so the

13:02:03 20    month that Houlden comes.  It's sent to Jeff Shealy

13:02:07 21    October 2013.  What does it say?  I don't think it's a

13:02:10 22    surprise.  Mr. Aichele suddenly thinks that the top market

13:02:13 23    for them to pursue is the one Qorvo has a gap in,

13:02:16 24    5 gigahertz.  And he issued a call to action at the end of

13:02:20 25    this:  Let's kick off development of this.

13:02:23  1          So this decision had not been made, as he was

13:02:26  2   saying, months or years before.  This is a decision that

13:02:28  3   was made after Houlden came to the company and brought

13:02:32  4   Qorvo's confidential documents with him.

13:02:34  5          And when I say they used the documents, it's

13:02:38  6   not just, you know, my speculation on this.  The documents

13:02:41  7   themselves show this.  This is on the left-hand side, the

13:02:46  8   Qorvo statement of work that was sent to them; on the

13:02:48  9   right-hand side is the Akoustis business plan.  They

13:02:51 10   copied it word for word.  And they rearranged the boxes a

13:02:55 11   little as those lines show you.  But this is out the Qorvo

13:02:59 12   confidential presentation.  So they were using this

13:03:01 13   material to make strategic decisions.

13:03:03 14          So that's Group 1.  The Group 1 is the Wi-Fi

13:03:07 15   business plans.  There's three business plans in that

13:03:11 16   group, and the ones that I just went through.

13:03:15 17          So next I want to talk about Group 2.  And the

13:03:19 18   context for this is, it's not enough if you just decide,

13:03:22 19   okay, I want to enter a market, and this is the product

13:03:25 20   I'm going to develop.  You have to be able to make it,

13:03:28 21   right?  And I think you've heard enough testimony here

13:03:30 22   that you're probably becoming as much of a BAW filter as I

13:03:34 23   am.  You have a BAW filter, and then you have resonators

13:03:36 24   that are the kind of component parts that make the filter

13:03:40 25   work.  You have to develop a resonator.  You have to be

able to make a resonator work before you make a filter
work.

     At this time in 2016, Akoustis couldn't even
make a resonator work.  So they didn't have like the most
basic fundamental level of technology.  They decided to
enter the 5 gigahertz market.  They don't know what to do.
Houlden has, again, another solution for them on this.

     And this is Mr. Houlden's testimony confirming
they didn't have a working resonator.  What did he do?
This is the same date that he copied the business plans,
he copied the design presentations onto his drive.

     He shows up at Akoustis, uploads those same
presentations to his computer.  And then I think you've
also seen the testimony.  That's not where he stops.  And
we have under-oath testimony from the engineer at Akoustis
who was assigned to develop these 5 gigahertz products.
Houlden walks up to him, pulls the documents out of his
laptop bag, and hands them to him.

     That's not a coincidence these documents that
show you -- I mean, Dr. Aigner said -- got it.  Sorry.
Technology failed.

     Dr. Aigner said that the bottom document on
this list, that's the cookbook that a company needs to
make a 5-gigahertz filter.  It has everything you need to
know about the process, the simulations you're running,

13:05:01  1    the types of layouts you should check.  Remember the

13:05:03  2    tiles?  Like, what you should be testing when you're doing

13:05:06  3    your test to figure out how is this going to work.  That's

13:05:08  4    the cookbook here.  Ends up in the hands of the engineer

13:05:12  5    at Akoustis who's supposed to do this.

13:05:16  6           And then this is Dr. Shanfield.  How do we know

13:05:20  7    that they're using this document?  It's not possible that

13:05:23  8    they did.  This is a company that can't make a resonator

13:05:26  9    work, but a year later, they're selling filters on the

13:05:28 10    market.

13:05:31 11           So that's Trade Secret Group 2.  It relates to

13:05:33 12    their design presentations.  The ones I just showed you

13:05:36 13    are the first two design presentations in that group.

13:05:39 14    Now, we also have another design presentation that we've

13:05:42 15    shown you that's in this group that came later.

13:05:44 16           And if you recall, this is the presentation

13:05:46 17    that was the subject or came after the Panara meeting on

13:05:51 18    Route 68, where Mr. Houlden and Mr. Dry met with a Qorvo

13:05:56 19    employee at the Panara to talk about job opportunities.  A

13:06:00 20    week later, he goes back to Qorvo and suddenly decides

13:06:03 21    that he needs to download this presentation.  He, then,

13:06:06 22    goes to Akoustis, starts to work a week before he leaves

13:06:09 23    Qorvo.  And brags about it in an e-mail to his friends;

13:06:11 24    "I'm already here working at Akoustis.  I haven't even

13:06:15 25    turned my stuff in at Qorvo."  And this document is on his

13:06:18  1    computer at Akoustis.

13:06:20  2         Okay.  And this is the one that Dr. Aigner

13:06:21  3    explained to you, has a number of the trade secrets, nine

13:06:24  4    of the trade secrets in Group 2.  And it's really, if you

13:06:27  5    want to kind of characterize what's going on in this

13:06:30  6    document, this is a looking-forward document.

13:06:32  7         So the two documents we looked at before, those

13:06:34  8    are things you need to know in order to build a

13:06:37  9    5-gigahertz BAW filter.

13:06:38 10         This is a document that's telling a company,

13:06:40 11    Here's where we're going next.  We need to make these

13:06:44 12    things smaller.  Here's how we're going to make these

13:06:47 13    smaller.  We're going to develop special technologies to

13:06:50 14    put filters on top of each other to achieve better

13:06:54 15    performance and better footprints.  So these are the

         16    things Qorvo was looking at and saying, This is where I'm

         17    going.

13:06:59 18         And the value of this document to a company

13:07:02 19    like Akoustis, is that they can now get a head start on

13:07:05 20    where they're going.  Because once -- even once they get

13:07:07 21    into the market, you don't just stop.  You don't stand

13:07:09 22    still with your 5-gigahertz product.  You have to, then,

13:07:12 23    look at, where's the product part -- the market going

13:07:15 24    next, because your competitors are doing the same.  And so

13:07:18 25    Akoustis skips that work because it has Qorvo to give it

13:07:21  1    the head start.  So look at these things.

13:07:23  2         So, again, nine trade secrets in this document.

13:07:28  3         I want to go out of order now and do Group 4,

13:07:30  4    because I kind of want to keep -- I'm trying to go roughly

13:07:33  5    chronologically in what's going on and how it's useful to

13:07:35  6    Akoustis.

13:07:36  7         Trade Secret Group 4, you may remember, is the

13:07:40  8    RF connector.  The context for this is, when you are

13:07:45  9    developing a filter, you need to have a way to test it.

13:07:48 10    And you can't -- as I think you heard testimony, you can't

13:07:50 11    just directly test the filter.  You have to be able to

13:07:53 12    mount it on a board to test it.

13:07:54 13         And so Mr. Houlden knows we're moving, we're

13:07:57 14    going to start developing these things.  I'm going to have

13:07:59 15    to also get my evaluation board together.  And part of

13:08:03 16    that is these RF connectors.

13:08:05 17         The RF connector is sending a signal back and

13:08:07 18    forth across the board to test equipment.  It doesn't

13:08:10 19    sound very sexy.  You know, I think someone referred to it

13:08:13 20    as like a cable or something like that.  But the point is

13:08:17 21    that these are critical.  You get critical performance

13:08:19 22    because these filters are operating at such a fine level.

13:08:23 23    If you have any interference, if you have any degradation

13:08:26 24    in the connector itself, it gives you false results on

13:08:30 25    your testing.

13:08:31 1      So you don't know, is there something wrong

13:08:33 2  with my filter, or is there something wrong with the test,

13:08:35 3  or what's going on?  So it's really critical to actually

13:08:37 4  have these filters.  And that's why RFMD went to the

13:08:42 5  trouble of designing a custom filter and having █████████

13:08:45 6  make it.

13:08:46 7      So this, we have November 2016, right at the

13:08:50 8  same time where they decided to move into the 5 gigahertz

13:08:53 9  market.  Mr. Houlden writes, "Using personal account" --

13:08:57 10  to Qorvo employee, saying, "I am using personal accounts

13:09:00 11  to make you more comfortable.  Can you send me this

13:09:03 12  drawing for this connector?"

13:09:05 13      And this is what the drawing looks like.  And I

13:09:07 14  think we've had some discussion about, "Well, it says

13:09:10 15  ███████████ on it."  Of course it says ███████████  Qorvo

13:09:13 16  doesn't build the parts itself, but it enters into -- when

13:09:15 17  it wants a custom part, it enters into an NDA with a

13:09:18 18  manufacturer who will make it for us.

13:09:21 19      Talked with Dr. Darveaux about this yesterday,

13:09:24 20  and I think you may remember, he said he had something

13:09:27 21  like a different interpretation of what Dr. Hodge said

13:09:30 22  when he said that Houlden handed this drawing over and

13:09:33 23  said, "Copy it."

13:09:34 24      Well, I went back, pulled up Dr. Hodge's

13:09:37 25  testimony, wanted to make sure I was not crazy, what my

13:09:40  1    interpretation was.  And I think you can see exactly what

13:09:41  2    it says.  Dr. Darveaux was saying -- he wasn't really

13:09:44  3    talking about copying the RF connector with something

13:09:48  4    else.  No, Dr. Hodge said that Houlden was talking about

13:09:51  5    copying the RF connector.  He says that -- he asked -- he

13:09:54  6    handed the document that had the details on the connectors

13:09:59  7    used for building filters, and he asked for you to draw

13:10:02  8    the traces, including the dimensions of the connector, and

13:10:05  9    then you see in the bottom, replicate the traces for this

13:10:09  10   connector.

13:10:09  11           And it wasn't just that.  Dr. Hodge also

13:10:11  12   explained exactly why Mr. Houlden wanted to do this.

13:10:15  13   Because Akoustis couldn't go to ███████ and say, Sell me

13:10:20  14   this connector.  It was a Qorvo part.  ███████ wouldn't

13:10:23  15   do it.  But if Akoustis copied the drawing and showed up

13:10:27  16   at ███████ and handed them a drawing and said, Could you

13:10:29  17   please build this for me, well, then they could buy the

13:10:33  18   part.

13:10:33  19           Okay.  If there's any doubt about what was

13:10:38  20   actually happening here, it should be alleviated in 2018.

13:10:40  21   This is an e-mail from Mr. Houlden to Dave Hodge, and he

13:10:45  22   expressly notes -- he references the custom RFMD

13:10:49  23   connector, he gives the part number, ███████, and then he

13:10:51  24   gives the Akoustis number.  So that's Trade Secret

13:11:00  25   Group 4.  One trade secret in that group about the

13:11:03  1    connector.

13:11:05  2           Trade Secret Group 5.  Product development

13:11:07  3    processes and testing procedures.  You've heard, I think,

13:11:10  4    more about this than some of the other trade secret groups

13:11:12  5    here.

13:11:13  6           The key context to understand is, when you are

13:11:16  7    a company that's building products, you have to have

13:11:20  8    procedures in place to control the investment you're

13:11:23  9    making, control the steps that you're taking to make sure

13:11:26 10    that you're going in the right direction, otherwise, you

13:11:28 11    can be going down blind alleys.  You can be going off in

13:11:32 12    directions that you can't go.

13:11:34 13           So any serious engineering company needs to

13:11:36 14    have a set of engineering documents that it's going to

13:11:39 15    follow.  So that's Trade Secret Group 5.

13:11:42 16           What do we have here.  January of 2017,

13:11:43 17    Akoustis is now on the road to trying to build its first

13:11:48 18    5 gigahertz products.

13:11:50 19           Jeffrey Shealy, the CEO, grabs the RFMD, the

13:11:55 20    new technology development process document, and he

13:11:58 21    changes it.  You've heard this.  Puts the Akoustis label

13:12:01 22    on it, names himself as the author.

13:12:03 23           One thing I wanted to be clear on, though, I

13:12:05 24    think we've had some suggestions in this case that the

13:12:09 25    only he changed was the label on the first page and his

13:12:12  1  name, and all the rest of the pages were exactly the same,

13:12:14  2  in general.  That's not the case.

13:12:16  3      This was the testimony from Mr. Faulker when he

13:12:20  4  testified.  There are three versions of this document:

13:12:22  5  Zero, 1, and 1.1.  So the version that you've been able to

13:12:27  6  see in this case, you can put your hands on it and will be

13:12:29  7  able to put your hands on it is one, Version 1.  That's

13:12:32  8  the one where he changed the label on the first page and

13:12:34  9  named himself the author.

13:12:36 10      He then went on to create Version 1.1, not

13:12:41 11  produced in this case.  So why is that?  It's because when

13:12:43 12  you produce documents in a case like this, you do word

13:12:46 13  searches.  "RFMD" is a word that we searched for.  So it

13:12:50 14  hit on Version 1 because "RFMD" was on Page 2.

13:12:54 15      When Mr. Shealy went through and created 1.1,

13:12:56 16  he scrubbed out the other references to "RFMD," presumably

13:13:00 17  changed those to "Akoustis," but we don't know because we

13:13:03 18  don't have that document.  But the reasons it's not

13:13:04 19  produced is it doesn't hit the word search.

13:13:07 20      So the suggestion that, Oh, all Dr. Shealy did

13:13:09 21  was he changed one word or one logo, that's not consistent

13:13:13 22  with the testimony of Dr. Faulker.

13:13:14 23      And it's not just that Dr. Shealy changed the

13:13:19 24  document, he, then, e-mails this to the very people who

13:13:22 25  would find this document useful:  Rohan Houlden, the vice

13:13:26 1    president of product engineering; Mary Winters, the head

13:13:29 2    of the fab.  He's sending this technology development

13:13:32 3    document that he's modified to them.

13:13:35 4            That's not the only time where Akoustis has

13:13:38 5    taken an RFMD document or a Qorvo document and just

13:13:40 6    stripped it off and repurposed it as an Akoustis document.

13:13:43 7            This is an evaluation board test plan from May

13:13:48 8    of 2017.  Left-hand side RFMD version, right-hand side,

13:13:52 9    Akoustis version.

13:13:53 10            I think you heard Dr. Darveaux suggest

13:13:56 11    yesterday, Oh, well, this is about, I don't know what kind

13:13:57 12    of product.  It's not useful to Akoustis.

13:14:00 13            And that was kind of a common theme of

13:14:03 14    Dr. Darveaux's testimony.

13:14:04 15            If it wasn't useful, why were they going

13:14:07 16    through the trouble of copying it and changing it to an

13:14:09 17    Akoustis document?  I mean, all way down to the

13:14:10 18    confidentiality legend: Akoustis confidential.

13:14:13 19            Here's another example from this group,

13:14:15 20    Group 5.  This is the Qorvo product requirements document

13:14:20 21    that you've seen.  I think you've seen before.  This is a

13:14:23 22    very impressive spreadsheet, lots of tabs, a ton of

13:14:27 23    information, what you need to know when you're developing

13:14:29 24    a product.

13:14:31 25            Mr. Houlden scheduled a meeting, conference

13:14:35  1    room 2 in March 2020, attaches two of these documents, to

13:14:39  2    the engineers who are developing products, including Dave

13:14:42  3    Hodge, who at this point is working on the second

13:14:43  4    generation, 5 gigahertz product, says "let's have a

13:14:46  5    meeting to talk about this."

13:14:49  6           So that's Group 5.  There's five trade secrets

13:14:52  7    in that group.  They all relate to product development

13:14:55  8    processes and testing plans.

13:14:58  9           Now, I was out of order because I wanted to go

13:15:00 10    kind of chronologically, so we'll go back to trimming.

13:15:03 11    I'm sure you heard more about trimming than you thought

13:15:07 12    you would ever hear in your whole lives.  I'm not go

13:15:10 13    through all of it again.  But I think the point, the

13:15:12 14    context for this one is this is important stuff.  You

13:15:15 15    cannot manufacture BAW filters unless you can trim them

13:15:18 16    because you can't get the yields you need.

13:15:20 17           If you can't trim the filters that you're

13:15:23 18    putting on your wafer -- remember Dr. Aigner showed you a

13:15:26 19    wafer -- the number of filters that work off that wafer is

13:15:30 20    too low.  So you have to trim to adjust the frequency to

13:15:32 21    deal with manufacturing processes.

13:15:35 22           So, again, common theme here, Akoustis doesn't

13:15:39 23    know how to do this.  They've not manufactured products

13:15:42 24    before.  They're now in July of 2017.  They're approaching

13:15:46 25    the time where they're anticipating we're going to start

13:15:49  1    manufacturing these things.  And they're like, we don't

13:15:51  2    know how to trim, what are we going to do?

13:15:54  3           Solution again?  Go hire an employee from

13:15:57  4    Qorvo, JB Kwon.  Bring him in.  And what does Mr. Kwon do?

13:16:00  5    Within a month of being hired at Akoustis, he circulates

13:16:04  6    Qorvo's trimming algorithms.  And it's not just that he

13:16:07  7    circulating to anyone; he's sending them to Mary Winters,

13:16:11  8    the head of fab, to Rama Vetury, the chief device

13:16:15  9    scientist, to Daeho Kim, who you saw in here who at that

13:16:17 10    time was director of device engineering.  These are

13:16:20 11    significant people that he's sending this to.

13:16:24 12           And it's not just that he's sending them.  It's

13:16:24 13    he's telling them in the e-mail, this is how Qorvo trims

13:16:28 14    sensitivity data.  So he's not even hiding that he's

13:16:31 15    sending them this Qorvo information.  And they know that

13:16:34 16    this information is confidential.

13:16:36 17           I mean, they are in this industry.  They know

13:16:38 18    they don't know how to do trimming.  And you better

13:16:40 19    believe, if you could get this information publicly, from

13:16:43 20    some public source, they would do it.  They would have got

13:16:46 21    it there.  They wouldn't go and get Qorvo's confidential

13:16:49 22    trimming algorithms, right?

13:16:50 23           And so what was the response to JB Kwon when he

13:16:54 24    sent this stuff?  Was it, please don't send us these

13:16:56 25    trimming algorithm?  Or was it:  This is totally not

13:16:59  1    useful.  This is about SMR resonators and we have FR

13:17:03  2    resonators?  No.  His response, "This is helpful."  This

13:17:10  3    is helpful stuff to them.

13:17:12  4         Okay.  And it's not just we're looking

13:17:16  5    myopically at one e-mail here where it says it's helpful

13:17:21  6    August 2017, Dr. Kwon sends procedures again to Mary

13:17:25  7    Winters in the context of discussing the trimming process,

13:17:29  8    the trimming experiment that's going on at Akoustis.

13:17:33  9         A month later, sending these again.  October of

13:17:36 10    2017, Dr. Kwon incorporates the Qorvo trimming algorithms

13:17:41 11    into the Akoustis trim work center update.  He sends it

13:17:45 12    again to Mary Winters and Ken Fallon, who is also director

13:17:49 13    at the fab in New York for them.

13:17:52 14         It's not just that he sends it to them.  This

13:17:54 15    is in advance of a meeting with the board of directors,

13:17:57 16    the technical committee of the board of directors.  He

13:18:00 17    goes on and presence this trimming plan with Qorvo's

13:18:03 18    algorithms to the Akoustis board of directors.

13:18:07 19         One of the board members attends the meeting

13:18:09 20    and says, Hey, can you send me that presentation that JB

13:18:13 21    Kwon gave.  Mary Winters says, sure, I will attach it for

13:18:17 22    you.  What does she do?  At this point I think someone is

13:18:20 23    get a little nervous about what's going on here.  We have

13:18:22 24    these Qorvo trimming algorithm passing around, we've got

13:18:26 25    presentation says "Qorvo."  Right?

13:18:28 1          So what happens?  They don't delete the Qorvo

13:18:30 2     trimming algorithms.  They change the titles in the

13:18:33 3     presentation.  So now it was Qorvo, Qorvo versus Akoustis,

13:18:39 4     Qorvo.  Let's change those.  Let's not delete the

13:18:42 5     algorithms.  Let's change title so no one knows where this

13:18:45 6     information is coming from.  Let's call it "Industry

13:18:47 7     Standard."

13:18:48 8          You better believe it, if there were an

13:18:50 9     industry standard trimming algorithm that was this, you

13:18:53 10    would have seen it in this case.  They wouldn't have

13:18:55 11    stopped at anything to find that algorithm to put in front

13:18:57 12    of you.  You don't have it.

13:19:00 13         Okay.  I will take a minute to talk about this.

13:19:04 14    Daeho Kim came here and testified to you, and he said

13:19:07 15    along the lines of, we done use that.  Here is the

13:19:10 16    trimming procedure we use.  This is different, right?

13:19:12 17         And this is a red flag I want to raise with a

13:19:15 18    lot of testimony.  I kind of mentioned it already.  You

13:19:17 19    can't just look at what somebody sitting here says today.

13:19:20 20    You need to look at the historical documents.  It's easy

13:19:23 21    for someone to come in here and say, "Oh, well, this is

13:19:25 22    the procedure we're using today."

13:19:27 23         This procedure that is on this slide was

13:19:30 24    created two days before Mr. Kim testified.  He put this

13:19:33 25    together two days before.  This isn't a historical

13:19:38  1    document saying this is what we were doing.  This is

13:19:38  2    something that was created for the purpose of this

13:19:40  3    litigation.

13:19:41  4            We have shown you the e-mails, the evidence at

13:19:44  5    the time of this stuff being presented to the people who

13:19:47  6    matter, the people who are working on trimming, the board

13:19:49  7    of directors.  So this is trimming, Group 3.  There's

13:19:54  8    three trade secrets in this group.

13:19:59  9            Group 6 reliability testing.  Maybe in a

13:20:02 10    perverse way, this is one of my favorite ones to go

13:20:06 11    through.  The reliability testing is essential when you

13:20:11 12    are going to put a product on the market.  And I think, as

13:20:13 13    you heard some witnesses testify, your customers need to

13:20:17 14    know, is it going to fail.  And so you have to put it

13:20:19 15    through its kind of rigorous testing, raise the

13:20:21 16    temperatures and stuff.

13:20:22 17            And to be clear, and I think this relates to

13:20:25 18    Dr. Darveaux's testimony.  We're not saying in this case

13:20:28 19    that reliability testing, point blank, the concept of it

13:20:32 20    is Qorvo's trade secret.  I hope we've been pretty clear

13:20:35 21    about that.  The trade secrets here are the testing

13:20:37 22    procedures, and setups, and the list of trade secrets that

13:20:41 23    are in this particular document.

13:20:43 24            So, you know, a lot of Dr. Darveaux's testimony

13:20:46 25    was, let's abstract something to a higher level, like, oh,

13:20:49 1    well, this is about reliability testing.  And then they

13:20:51 2    would pop a document in front of you and say, "This

13:20:54 3    document says, 'reliability testing. that can't be a

13:20:55 4    corporate trade secret."

13:20:57 5         That's not what we're saying our trade secret

13:20:59 6    is.  Our trade secret are the specific things that

13:21:01 7    Dr. Aigner walked through in this document and showed you,

13:21:04 8    the things that set Qorvo's reliability testing apart from

13:21:07 9    the other companies in this industry that's really

13:21:10 10   valuable.

13:21:11 11        So this document comes into Akoustis August of

13:21:15 12   2018.  Again, Mr. Houlden is involved.  He seems to be an

13:21:19 13   essential figure in a lot of this stuff.  He gets this

13:21:22 14   from John Myrick, used to be in engineering at Qorvo, and

13:21:25 15   has since moved to Akoustis.  He sends him this document

13:21:27 16   August at 2:34 in the p.m.

13:21:31 17        So Mr. Houlden, during his testimony:  "You

13:21:35 18   understand that this was a confidential document?"  Yes.

13:21:37 19   He understands that this is a confidential Qorvo document.

13:21:42 20   Well, what are you doing with this?  I didn't forward it.

13:21:43 21   That's the first thing he says, "I didn't forward this

13:21:46 22   document."

13:21:48 23        Okay.  We said, okay, but wait.  Here's an

13:21:52 24   e-mail 26 minutes later of you forwarding this document,

13:21:56 25   not just to anyone, you're sending it Joel Morgan, who is

13:22:00  1      the person at Akoustis who is responsible for reliability

13:22:04  2      testing.

13:22:05  3           Okay.  What's his excuse then?  Okay, maybe I

13:22:07  4      forwarded it, but there's a really good chance I didn't

13:22:11  5      open it; I didn't look at it closely.

13:22:13  6           Well, then we showed him the next e-mail in the

13:22:16  7      chain, ten minutes later.  He's forwarding it to someone

13:22:19  8      else, to Pat Lewis.  And now he's referencing pages in the

13:22:22  9      document that he's reviewed, the document he didn't really

13:22:25 10      look at closely, but he certainly looked at Pages 4 to 5,

13:22:28 11      right?

13:22:29 12           So what does he say now?  Okay.  Our test setup is

13:22:33 13      completely different.  I forwarded it.  I may have looked

13:22:36 14      at some pages, but our test set up is completely

13:22:39 15      different.  Mr. Morgan is doing something completely

13:22:41 16      different than what's in this.

13:22:44 17           And then, yeah, here's Mr. Morgan's e-mail six months

13:22:48 18      later, sending the same document back that Mr. Houlden got

13:22:51 19      him.  And what did he say?  "This is the primary document

13:22:53 20      I've been referencing."

13:22:58 21           It didn't stop there.  This is two years later,

13:23:03 22      March 2021.  Mr. Morgan, the VP who is in charge of

13:23:10 23      reliability testing, is sending this same confidential

13:23:13 24      Qorvo document again to Paul Makowenskyj, quality

13:23:17 25      engineer.  This is the person who is responsible, right?

You have the VP of quality, and then you have the
engineer?  This is the person directly involved in
reliability testing.  Two years later, they are still
circulating this document.  And they want you to believe,
well, this is useless; this has no value to Akoustis.

So that's Group 6.  We have -- all of these trade
secrets in Group 6 are about that one document, the pages
that Dr. Aigner went through with.

Group 7, manufacturing assembly procedures.  So,
again, context on this.  And we're kind of -- remember,
Mr. Masters said in opening we had that roadmap.  He said
each step along the way there were trade secrets?  So
we're getting towards the right-hand side of that.

We are now at the point where Akoustis has gotten all
these trade secrets to help them develop a product get
into the market.  They have to manufacture it, and they've
got to do it in an efficient way.  And, again, they're not
a product development company.  They weren't manufacturing
products, so they had to do all of this again.  And
instead of building from scratch, instead of investigating
in that, what do they do?

They hire Robert Dry, Qorvo employee, to come in and
be their vice president of operations.  Mr. Dry, he was
hired October 2019.  He brings a repository of Qorvo
documents with him.

13:24:31  1    Okay.  January 2020, a couple months after he was

13:24:34  2    there, he starts circulating these documents around.  Look

13:24:37  3    what I have -- to Joel Morgan.  I've got this Qorvo

13:24:41  4    document.  And you notice something interesting about the

13:24:43  5    way Mr. Dry does it as opposed to some of the other folks.

13:24:46  6    He actually goes in and strips out the Qorvo logos on

13:24:51  7    these things.

13:24:52  8    And we have the e-mail where he's even acknowledging

13:24:56  9    that:  "For good reasons, I edited out former references."

13:25:00 10    And his good reasons are, he doesn't want to make it

13:25:04 11    obvious he is sending around Qorvo documents.

13:25:10 12    And it's not just that he's sending them around once.

13:25:14 13    It's repeatedly over and over again.  It's let's look at

13:25:18 14    this document.  Let's schedule a meeting to talk about

13:25:21 15    this document.  Review this before we meet.  We need to

13:25:26 16    have documents like this one.

13:25:32 17    Also, here's another good example.  This is

13:25:37 18    Jerry Gray about the reflow preconditioning.  May 2020,

13:25:40 19    Jerry Gray writes to Robert Dry, "Do you have the Q reflow

13:25:45 20    policy?"  Again, because they don't want to use the word

13:25:48 21    Qorvo in their emails.  "Do you have the Q reflow policy?"

13:25:51 22    Robert Dry says, "Found it.  See attached."  So he

13:25:54 23    went to his repository, found it.

13:25:55 24    Jerry Gray writes back to him and says, "Wait, wait,

13:25:58 25    wait.  It's not the one I was looking for.  There's

13:26:01  1    another document.  Another Qorvo document that's

13:26:03  2    referenced in this one.  Do you have that one?"

13:26:05  3        Mr. Dry writes back a few minutes later, "Here you

13:26:07  4    go."  Got that one too.  He's, like, just pulling them out

13:26:11  5    of the repository, passing them around.  Anybody wants a

13:26:15  6    Qorvo document, come talk to me.

13:26:17  7        And this was one I found really interesting.  So we

13:26:20  8    obviously deposed Mr. Dry in this case.  And after showing

13:26:24  9    him document after document, where he had Qorvo

13:26:29 10    confidential information he was circulating around, that's

13:26:32 11    when he said -- decided, "I absolutely agree.  In

13:26:34 12    retrospect, I shouldn't have sent these documents, or

13:26:38 13    certainly should have sought permission before I did."

13:26:41 14        Even there, I think, there was no world in which

13:26:44 15    Mr. Dry was going to get permission to circulate Qorvo

13:26:48 16    documents, so he still kind of excuses himself.  But it's

13:26:49 17    only when he's caught and he's faced with all of these

13:26:50 18    documents that he says, "Okay.  Yeah, I guess, that was my

13:26:53 19    bad on that one."

13:26:55 20        So this is Group 7, manufacturing, assembly, change

13:26:59 21    procedures.  There's four trade secrets in this group.

13:27:01 22    They all relate to those manufacturing and assembly

13:27:04 23    documents that Dr. Fattinger talked about.

13:27:10 24        And then we have Group 8.  And the context for this

13:27:11 25    group is we're now all the way at the far end of the

13:27:12  1    roadmap.  And Akoustis has a product that's in the market.

13:27:16  2    Its selling its 5-gigahertz filters.  But, again, it can't

13:27:19  3    stay stale.  And this market is typified by, first of all,

13:27:23  4    long lead times.  So you have to be able to estimate

13:27:25  5    what's happening years in advance, and rapid changes in

13:27:29  6    technology.

13:27:29  7        So it's not just you have to have to assume what's

13:27:30  8    happening years in advance, but you really have to see

13:27:34  9    where people are moving.  And there are right ways to deal

13:27:37 10    with that and there are wrong ways to deal with that.

13:27:39 11        I think you've heard from Dr. Lebby, you know, some

13:27:41 12    companies will wait until a product is out in the market,

13:27:43 13    they get a teardown report, they look at it and they say,

13:27:45 14    Okay, what should we do?  Qorvo doesn't have a problem

13:27:47 15    with that.  We agree, that's a standard industry practice.

13:27:51 16    That's not what Akoustis was doing here.

13:27:54 17        So I started with this one.  This is the e-mail

13:27:58 18    exchange, you may remember, with SJ Kim about the

13:28:01 19    automotive filters.  This was, just to bring you back,

13:28:04 20    SJ Kim is the country manager in Korea, took a picture of

13:28:07 21    a computer screen that had a Qorvo confidential

13:28:10 22    presentation on it.  And it said, "Qorvo Confidential" on

13:28:14 23    it, and he sent it to Mr. Aichele.

13:28:15 24        Now, you heard Mr. Aichele testify about he has

13:28:17 25    conversations with these people.  He's talked multiple

13:28:19  1    times that you shouldn't use or solicit confidential

13:28:21  2    information from Qorvo or from any other competitors.

13:28:25  3    But, again, compare what he's saying here to you, sitting

13:28:29  4    there, to what he said at the time.

13:28:31  5         He didn't say, SJ, don't send me this presentation.

13:28:35  6    He forwarded it to the CEO.  And then he said to the CEO,

13:28:39  7    I asked SJ if he got more confidential information.  And

13:28:44  8    the CEO didn't say, Hey, Dave, you really shouldn't be

13:28:48  9    doing this.  This is confidential stuff.  He looked at it

13:28:51 10    and said, Oh, this is interesting, and he commented on it.

13:28:54 11         Okay.  And what ultimately happens with this one,

13:28:58 12    SJ Kim complies.  He finds the rest of the presentation

13:29:02 13    material that Dave Aichele was looking for, the

13:29:05 14    confidential Qorvo material, he sends it to Dave Aichele,

13:29:06 15    Dave Aichele passes it along to Rama Vetury, and they use

13:29:10 16    this information to modify the specifications that

13:29:13 17    Akoustis has for the product that it has under

13:29:15 18    development.

13:29:17 19         It's not the only example.  I think there's lot of

13:29:20 20    e-mails, a lot of traffic in this case about the

13:29:22 21    5 gigahertz products because this was Akoustis' claim to

13:29:26 22    fame.  This was their thing.  Like, we were the first to

13:29:29 23    market with 5 gigahertz products.

13:29:32 24         And what happened was they got to the market and then

13:29:34 25    they started hearing rumblings.  Qorvo was starting to

13:29:39  1    sign NDAs with customers.  They're starting to promote

13:29:40  2    their products.  And I think, frankly, they panicked.

13:29:43  3    They're like, Qorvo is now coming into this market, what

13:29:46  4    are we going to do?

13:29:47  5        So again, instead of doing it the right way, the way

13:29:49  6    you would -- you know, doing teardown, waiting for the

13:29:51  7    product to come out and do teardowns, they start canvasing

13:29:55  8    for Qorvo confidential information; going out and looking

13:29:57  9    for data sheets; going out and trying to get prototypes so

13:30:00 10    they can get -- just so they can test the product.

13:30:03 11        So this is one -- Dave Aichele from Steven Li in

13:30:06 12    China, in March of 2016, sending the Qorvo confidential

13:30:11 13    data sheet.  This is long before this product was

13:30:13 14    available.  You can't get this data sheet on a website.

13:30:19 15        Okay.  And then, so the question of use keeps coming.

13:30:21 16    Like, Well, was this really useful to them?  Well, they

13:30:24 17    were certainly using it.  The e-mail traffic at the time

13:30:27 18    shows that they're looking at the specifications and

13:30:30 19    they're adjusting their product under development.

13:30:35 20        So I think that's just common sense, right?  Like,

13:30:37 21    they wouldn't have been out canvasing the world for

13:30:41 22    confidential Qorvo information because it was useless.  Of

13:30:43 23    course, they wanted to use it.  I mean, that's -- it's

13:30:45 24    just common sense.  And the e-mails show that.

13:30:50 25        And they weren't satisfied just with those data

13:30:52 1   sheets.  And this is from Colin Hunt, the president of

13:30:57 2   global sales.  They're looking for samples.  These are --

13:31:00 3   again, these -- the context is, these are confidential

13:31:03 4   samples.  These are only shared with customers under NDA.

13:31:06 5   And what do they have?

13:31:08 6       They have their arms out to China.  Let me see if we

13:31:12 7   can pick up some of these samples so we can test them.

13:31:14 8   And, unfortunately, they did.  They got -- they borrowed

13:31:17 9   one from a customer.  They sent it to the United States to

13:31:19 10  test.  And they got the customer to violate the NDA.

13:31:22 11      And their response when they got it, they received it

13:31:25 12  in the United States, what was their first response?

13:31:26 13  Maybe plagiarism on these EVBs may be a good solution.

13:31:32 14  Right?  And then they pass it to the test engineers and

13:31:33 15  they test it up months before they could have gotten this

13:31:36 16  product and torn it down, because they're getting a head

13:31:39 17  start on this stuff.

13:31:40 18      Okay.  And last one I'm going to -- as an example in

13:31:43 19  this group.  This is the next generation of Wi-Fi.  The

13:31:47 20  Wi-Fi 6E.  We have roadmaps and they're very clearly

13:31:50 21  marked as "Confidential."  They have these, like, big red

13:31:53 22  boxes, "Development, Preview Only, Confidential," right?

13:31:56 23      And this is the document, you may remember,

13:31:59 24  Mr. Aichele said, Oh, it was really -- it had no value to

13:32:02 25  me.  It was useless.

13:32:03  1    And I pulled out the e-mail that showed that he was

13:32:06  2    asking for this document, and said, That would be very

13:32:08  3    helpful if you could get it.  Well, they got it, passed it

13:32:10  4    around, discussed it.

13:32:12  5    So that's Group 8.  Five trade secrets in Group 8.

13:32:16  6    And those relate to the product development, the product

13:32:20  7    roadmaps and the prototypes.

13:32:25  8    So, you know, details matter in this case.  And, you

13:32:28  9    know, I just went through and I hit you with a lot of

13:32:31 10    details.  But it's also important to take a step back and

13:32:36 11    think about context more generally and, you know, what

13:32:40 12    we're -- why we're here and what we're looking at because

13:32:42 13    this is not a one-off, like they took one confidential

13:32:47 14    data sheet or they took one test plan.

13:32:49 15    What we're talking about here is a profound sustained

13:32:54 16    widespread efforts to take everything you need in order to

13:32:59 17    create yourself as a competitor in this market.  And I

13:33:00 18    think that's what the eight trade secret groups show.

13:33:03 19    And it's also important to note, there's been some, I

13:33:06 20    mean, suggestions like you can somehow distinguish

13:33:09 21    Akoustis from what these folks are doing.  These folks are

13:33:13 22    Akoustis, right?  If you're an employee who is acting in

13:33:15 23    your official role at a company, you are the company.

13:33:19 24    Right?

13:33:19 25    So I think this is a document you've seen before, and

one that I find just stunning in this case.  These are the people at Akoustis who we know of, who had confidential information in their files.  That's 40 people on this list.  Just think about it.  This is not one-off.  This is not a case where someone leaves their company and they may have some information on a USB drive and they forgot to turn it in, or they may have some information on their home computer, and there's some debate, like, Did they really mean to take it, or didn't they?

This is a case where we have systematic widespread profound misappropriation trade secrets reaching to 40 different employees that we know of.

What we did on this slide, is we highlighted the ones in red, who came from Qorvo, and we kept the ones in black who didn't come from Qorvo.

And why we think this is important is, it just shows how the confidential information is spreading at Akoustis.  This isn't someone taking a USB drive and sitting in their office with the USB drive.  The information gets in and it spreads like wildfire.

And this is not just -- I mean, maybe you can try to make an excuse for someone.  I'm just out of college.  I don't know how this industry works.  You know, I had a lapse in judgment or something.

These are senior people.  The misappropriation in

13:34:39 1    this case starts at the very top, from the CEO, whose

13:34:43 2    copying new development technology process documents from

13:34:48 3    RFMD, and sending them around to his executives.  Okay.

13:34:50 4        And look at the executives on this.  I mean, we have

13:34:52 5    the chief product officer.  We have the executive vice

13:34:54 6    president of business development.  We have the vice

13:34:56 7    president of quality.  These are senior folks.  They've

13:34:59 8    been in this industry, and they know this is wrong.  They

13:35:01 9    know you can't do this.

13:35:06 10       This one we've seen.  I don't want to beat this one

13:35:09 11   to death.  But, I mean, I think it's very -- typifies the

13:35:12 12   culture at Akoustis.  Dave Aichele, who claims that he's

13:35:17 13   out telling people you shouldn't get confidential

13:35:20 14   information, gets an e-mail from his country manager in

13:35:22 15   Korea, who says, I'm using my expense report to get key

13:35:26 16   confidential information about our competitors, including

13:35:29 17   Qorvo.

13:35:30 18       How does Mr. Aichele respond?  Does he say, SJ, don't

13:35:34 19   do that, I've told you before, you can't get this

13:35:37 20   information?  No.  That's not what he does.

13:35:39 21       I mean, look at what we have in the upper right-hand

13:35:41 22   corner of this.  This is an e-mail from Mr. Aichele in

13:35:44 23   April 2020.  So this is six months after Mr. Kim tells

13:35:47 24   him, I'm using my expense account to get confidential

13:35:50 25   information.  What does SJ -- what does Mr. Aichele do

13:35:53 1    six months later?  He's out there asking Mr. Kim, along

13:35:56 2    with other folks, please try to find this confidential

13:35:59 3    Qorvo information for me.

13:36:00 4        Again, these are the 5 gigahertz products at Qorvo

13:36:03 5    that are not on the market, and he is out there saying,

13:36:06 6    Please try to go get these.  I mean, I don't think it

13:36:09 7    takes a huge leap of imagination to say, that's because

13:36:12 8    Dave Aichele knew that SJ Kim had a way to get

13:36:15 9    confidential information.

13:36:18 10        This is another one, too.  And we've heard a lot, in

13:36:21 11    this case a lot.  We've heard in this case that Akoustis

13:36:24 12    has a code of ethics and a code of business conduct,

13:36:26 13    right?  And I think that that's being presented to you to

13:36:31 14    suggest that Akoustis is really an ethical company.  I

13:36:34 15    would suggest to you it shows the opposite.

13:36:36 16        The first thing it shows you is that Akoustis knows

13:36:40 17    that you shouldn't get confidential information from third

13:36:43 18    parties because that's what the policy says, right?  So it

13:36:46 19    says, Employees should not obtain and use third-party

13:36:49 20    confidential information.  So the company knows that's

13:36:51 21    wrong.

13:36:51 22        But then what are they doing in practice?  Are they

13:36:53 23    implementing this policy?  No.  From the top down, they're

13:36:57 24    going out and getting confidential information and using

13:37:00 25    it.  So that shows not only do they know that this is

13:37:04  1    wrong, it shows that they are violating their own

13:37:08  2    policies.

13:37:10  3        We had Ms. Johnson testify here, not a single person

13:37:13  4    has been disciplined under this policy.  Not a single one.

13:37:16  5    And you've seen the evidence in this case.  I think that's

13:37:19  6    crazy.  I mean, we have six years of Qorvo's confidential

13:37:23  7    information being passed around there.  Not a single

13:37:25  8    person.  SJ Kim, who's bribing people for confidential

13:37:28  9    information, he's not disciplined under this policy.

13:37:31 10    Certainly, the CEO is not disciplined, even know he's

13:37:33 11    copying our documents.

13:37:35 12        I mean, that's -- we're talking about, I think what

13:37:37 13    Dr. Shanfield said was a culture of corruption.  I mean,

13:37:39 14    this is really, I mean, stunning stuff.

13:37:44 15        The other scary question to ask in this case is, what

13:37:47 16    don't we know?  So you saw Mr. Faulker's analysis here,

13:37:53 17    all the stuff he found with the limited number of devices

13:37:56 18    he got.  Also, look at all the devices he didn't get.

13:38:00 19        Dave Aichele, we didn't get his computers from 2015

13:38:04 20    to 2021.  What was on those?

13:38:07 21        Rohan Houlden, 37 removable drives that he's using to

13:38:11 22    move information around between his computers, including,

13:38:12 23    by the way, the drive he used to take the stuff from

13:38:16 24    Qorvo.  Didn't get that.

13:38:17 25        So just imagine what we would have found if we had

13:38:20  1    all of these devices.  I mean, I think it's a scary

13:38:23  2    prospect.

13:38:25  3        So we've also heard in this case -- and I want to

13:38:27  4    take a few minutes to talk about the arguments on the

13:38:30  5    other side, their excuses for what's going on here.

13:38:33  6        First one is trade secrets that Qorvo's pointing to

13:38:39  7    had no value.  And I think that one you almost have to

13:38:42  8    take a step back before you even start to dig in, say,

13:38:45  9    Does that make any sense?  Like, it's a

13:38:48  10   litigation-inspired position, first.  That's not what they

13:38:52  11   were saying at the time.  If you look at what they were

13:38:54  12   saying at the time, This is helpful.  Look at this.  This

13:38:56  13   is the primary document I'm using.

13:38:58  14       But, you know, they get caught and they stall, and

13:38:59  15   they say, Well, none of this stuff was really useful.  I

13:39:01  16   don't think that.  I would suggest to you that that

13:39:04  17   doesn't make sense.  They wouldn't be passing it around if

13:39:06  18   it wasn't useful.

13:39:08  19       The other thing is -- and I think the Court will

13:39:13  20   instruct you later on what "use" means.  And I'm not -- I

13:39:17  21   do not give you the law in this case.  So I have an

13:39:20  22   expectation of what that may be, but you need to follow

13:39:23  23   whatever the Court instructs you on what use is.

13:39:24  24       But I expect the Court will tell you "use," in this

13:39:27  25   context, is a broad concept, right.  It covers things

1    like, I get your engineering information and I consider

2    that in engineering my products.  That is use.

3        And the other side seems to have this concept that

4    use is only something you can touch.  I don't even know

5    what their concept is.  But this is use here.  And I think

6    you will see that.

7        And, you know, I don't want to -- I think it's kind

8    of common sense, so I don't want to belabor this too much.

9    But, I mean, we have so many levels of what they were

10   doing with the information here; from just, like, straight

11   out copying it.

12       I mean, how many instances do we have where they just

13   straight out copied the information?  You had the trimming

14   algorithms.  You have the RF connector design.  You have

15   the new development technology procedure.  You have the

16   reliability testing.  You have the inspection procedure.

17   I mean, it's just one after another.  They're, like,

18   directly copying the documents.  So, but that's not use, I

19   guess.

20       Then, I think, it's also critical context.  These are

21   technology companies, right.  So when you get a

22   competitor's innovations, their research, their research

23   showing you -- for example, we've heard a lot about shape

24   of resonators, right.

25       Dr. Aigner testified, that's not about, Well, you

13:40:38 1    have to choose a polygon or you have to choose a

13:40:40 2    rectangle.  It's about the process, not the product.  It's

13:40:44 3    about the process of figuring out which shape you should

13:40:47 4    choose, and what test are you running, and most

13:40:49 5    importantly, where are you looking.  That is super value

13:40:54 6    information.  And it goes to a competitor, and they're

13:40:55 7    saying, Well, that was not useful to me, that has no

13:40:58 8    value?  I don't think it stands up to the smell test.

13:41:05 9         Kind of covered a lot of these, so I'm just going to

13:41:06 10   skip, and, hopefully, we'll get done a little sooner.

13:41:12 11        FBAR.  That was the original -- I mean, we go back

13:41:16 12   when we do these things and we look at what was said in

13:41:19 13   the opening, right, like what did they promise to show

13:41:20 14   you?  What did we say we would show you?  I think one of

13:41:23 15   the big promises from their opening is, you're going to

13:41:24 16   find out that this is just totally different technology.

13:41:28 17        I hope that you've seen that that's not the case at

13:41:31 18   this point.  There is a difference between FBAR and SMR

13:41:35 19   resonators.  No one is denying that.  The difference is

13:41:37 20   what's shown here.  An FBAR resonator has an air cavity.

13:41:42 21   And SMR resonator has reflecters.  Okay?

13:41:46 22        The critical thing is not that that's a difference,

13:41:48 23   it's why does that matter to the documents that we're

13:41:51 24   talking about here?  We are not asserting trade secrets

13:41:53 25   about how to form the reflecters that sit underneath our

13:41:57 1    resonators or how to form the air cavity, okay?  And

13:42:00 2    everything else about these -- these technologies is the

13:42:04 3    same.  Even the function of the air cavity and the

13:42:07 4    reflector is the same.

13:42:08 5        And so on this one, you kind of have to ask yourself

13:42:10 6    again, well, go through the trade secret groups, business

13:42:13 7    plans.  Does the structure of the resonator have anything

13:42:17 8    to do with the business plans?

13:42:19 9        The technology, the Group 2, the development

13:42:21 10   procedures, that's probably the one that's most relevant

13:42:25 11   to this, but we had Dr. Aigner and Dr. Fattinger and

13:42:28 12   Dr. Shanfield go through those, every single one, and the

13:42:31 13   answer was the same on every single one:  This is

13:42:34 14   valuable.  It doesn't matter what kind of resonator you

13:42:36 15   have, okay?

13:42:38 16       And like let's look at this.  This is Dr. Aigner.

13:42:41 17   He's -- I mean, he is a serious guy, right?  They use the

13:42:46 18   same principle, FBAR and SMR.  And what that is, is the

13:42:50 19   air cavity is meant to reflect the waves back up.  That's

13:42:55 20   what the reflector does.  Dr. Fattinger:  Fundamentally,

13:43:01 21   the resonator structure is the same.  Dr. Shanfield --

13:43:05 22   remember, I'm sure he hated me at the time.  I went

13:43:09 23   through every single group with him:  Is there a

13:43:11 24   difference, FBAR and SMR, for this trade secret?  Every

13:43:14 25   single one, no.

13:43:19  1          Daeho Kim, their employee.  And we've seen this too.

13:43:26  2     It's not just Mr. Kim's patent that applies to both FBAR

13:43:30  3     and SMR.  Dr. Fattinger's patent too.  I mean, this is --

13:43:33  4     it's known in the industry now.  That's not to say you

13:43:36  5     couldn't have a trade secret that was related to some

13:43:39  6     aspect of one of these that's different.  Like, you could

13:43:42  7     have a trade secret on something to do with the reflectors

13:43:45  8     or the air cavity.

13:43:46  9          But that's not what the trade secrets at issue here

13:43:48 10     are.  We've not asserted anything like that.  So this is,

13:43:51 11     again, kind of doesn't pass the smell test.  If all of

13:43:54 12     this was irrelevant, why were they passing around the

13:43:58 13     information?  Why didn't someone say, stop sending me this

13:44:00 14     SMR stuff; this isn't useful to me?  You didn't see any of

13:44:04 15     that.  That's something they invented for this litigation.

13:44:07 16     They invented to tell you that.  No one has ever mentioned

13:44:11 17     that before.

13:44:12 18          Okay.  Here's the other one.  The theme.  Akoustis

13:44:15 19     was ahead of Qorvo in its 5 gigahertz development.  And

13:44:19 20     this one is kind of like the most dangerous type of

13:44:22 21     assertion that's made in the context like this.  Because

13:44:25 22     there is kind of glimmer of truth to it, right?  Akoustis

13:44:29 23     reached the market for 5 gigahertz filters before Qorvo

13:44:32 24     did.  There's not a dispute over that.  But that doesn't

13:44:36 25     mean Akoustis was ahead of Qorvo.

13:44:39  1    I think you heard Dr. Aigner's testimony about all of

13:44:42  2    our R&D.  Twenty years to launch these filters.  Our

13:44:47  3    predecessor company has been around since the 1980s.  Our

13:44:50  4    predecessor company started working on BAW filter

13:44:54  5    technology in the 1990s.  It took 20 years to get to

13:44:57  6    commercial production.  But by the time it did, we were

13:45:00  7    able to launch a number of products, and by the time

13:45:02  8    Akoustis was formed, we had billions of products on the

13:45:05  9    market, billions.  They didn't know how to make a

13:45:08  10   resonator.

13:45:08  11   We had billions of products on the market; they

13:45:10  12   didn't know how to make a resonator.  And they want you to

13:45:13  13   believe, well, they were ahead, and we had to buy our

13:45:15  14   technology from them because they are ahead.  The only

13:45:18  15   reason they are ahead was because we made a strategic

13:45:21  16   decision on how to allocate our resources.  Businesses do

13:45:24  17   this, right?

13:45:26  18   We looked at where we could get the best return, and

13:45:28  19   we focused on the mobile products.  That wasn't because we

13:45:31  20   didn't have the ability to do 5 gigahertz; that's because

13:45:34  21   we made a decision.  And by the way, we made the decision

13:45:38  22   partially because companies like Akoustis shouldn't have

13:45:40  23   been able to get out on the market because they didn't

13:45:42  24   have our technological background.  And the only reason

13:45:45  25   Akoustis was able to jump us and get in the market was

13:45:48 1    because they took our trade secrets.

13:45:53 2        Okay.  On this last excuse here, all this stuff was

13:45:56 3    publicly available.  What I would be asking myself or

13:45:59 4    suggest here is that what have they shown you that's

13:46:03 5    publicly available?  I mean, you'll have the documents

13:46:05 6    when you go back to the jury room, so you can look and

13:46:06 7    verify, right?  Like, this is the Qorvo trade secret.

13:46:09 8    What's the thing?  If it's publicly available, this should

13:46:13 9    be pretty simple, right?  Put up the publicly available

13:46:16 10   thing that shows the trimming algorithms.  Put up the

13:46:17 11   publicly available thing that shows the specific trade

13:46:20 12   secrets.  That's not what they've done here.

13:46:21 13       Again, what they've done is they've abstracted this

13:46:22 14   to a higher level and said, oh, well this trade secret

13:46:25 15   relates to coupled resonator frequency in a BAW device.

13:46:31 16   Okay.  But that wasn't what the trade secret was.  The

13:46:33 17   trade secret was something very specific that Dr. Aigner

13:46:35 18   pointed to in the presentation, but instead of showing

13:46:37 19   that specific thing, they go out to a presentation that

13:46:41 20   has the same general topic and say, Oh, this is all

13:46:43 21   publicly available.

13:46:44 22       But that's not the analysis.  The analysis is whether

13:46:47 23   the trade secret were publicly available; not the concept.

13:46:55 24       Okay.  So at the end of the day, you will be asked to

13:47:00 25   go back and deliberate.  And, again, I'm not -- I don't

13:47:05 1    instruct you on the law.  Your only instructions on the

13:47:09 2    law will come from the Judge in this case.  I expect that

13:47:10 3    he's going to tell you about the burden of proof, and that

13:47:15 4    you're going to be asked to answer a series of questions

13:47:18 5    based on the preponderance of the evidence.  What does the

13:47:21 6    preponderance of the evidence show?

13:47:22 7        And, again, I think you may recall previously, and I

13:47:25 8    expect it will be instructed again, that preponderance of

13:47:27 9    the evidence means if you put the evidence on a scale.  If

13:47:31 10   it tilts even slightly towards Qorvo, we've carried our

13:47:35 11   burden.  So 50.1 percent, we've established a

13:47:40 12   preponderance of the evidence.  This is not a reasonable

13:47:42 13   doubt case like a murder case where you have to prove

13:47:44 14   beyond any doubt that something has happened.

13:47:47 15       You are going to be asked to answer some questions on

13:47:49 16   your verdict form.  The first questions are going to be:

13:47:54 17   Has Qorvo established by the greater weight of the

13:47:58 18   preponderance of the evidence that this alleged trade

13:47:59 19   secret qualifies as a trade secret and that Akoustis is

13:48:03 20   liable for this trade secret misappropriation?

13:48:10 21       So just so you have in mind, I'm not going to go

13:48:15 22   through all this again for a second time.  And you're

13:48:16 23   going to be asked to go through by

13:48:19 24   trade-secret-by-trade-secret, group-by-group to answer

13:48:21 25   these questions.

13:48:22 1    The evidence we presented:  Tony Testa came here and

13:48:24 2    talked about Groups 1 and 8.  And he explained the value

13:48:29 3    of these trade secrets to a business, how essential these

13:48:33 4    business plans are, and why you don't want a competitor to

13:48:36 5    have your business plan, why that's really valuable to

13:48:40 6    your competitors as well.

13:48:42 7    Dr. Aigner.  He carried a heavy load here.  He talked

13:48:44 8    about four on the trade secret groups.  He did the BAW

13:48:47 9    filter and resonator designs, the trimming methods and

13:48:49 10   procedures, the valuation boards, and the mean time to

13:48:54 11   failure and reliability testing trade secret.  And, again,

13:48:56 12   we walked through each specific trade secret with him, and

13:48:59 13   for each one we asked him, what's the value of this?  Why

13:49:02 14   would you -- are you keeping it secret?  What are you

13:49:04 15   doing to keep these secret?  Would a competitor find this

13:49:08 16   valuable?

13:49:09 17   And Dr. Fattinger.  He did Groups 5 and 7, and he

13:49:13 18   talked about the product development process and testing

13:49:16 19   procedures and the assembly procedures.  Same thing.

13:49:19 20   Walked through these.

13:49:21 21   And then we have Mr. Creviston, who has been with us

13:49:25 22   this whole time, kicked us off with his testimony

13:49:28 23   explaining the real significance of these development

13:49:31 24   processes as well.

13:49:35 25   And, finally, you had several hours with

13:49:40  1    Dr. Shanfield going through every single group with you

13:49:42  2    and explaining, again, why these are trade secret, are

13:49:44  3    they generally known?  Is this stuff that's valued in the

13:49:47  4    industry?

13:49:49  5         And reasonable security measures is another issue

13:49:52  6    that's kind of baked into the trade secret question.  Were

13:49:54  7    we trying to protect our trade secrets?  On this, I think

13:49:56  8    the evidence is fairly unrebutted.  We had our chief

13:50:00  9    information security officer come in, and, also,

13:50:03  10   Mr. Robinson who is one on the foremost experts in this

13:50:06  11   area, talk to you about all the things Qorvo does to

13:50:08  12   protect its security, from contractual protections to

13:50:13  13   technology protections to physical protections.

13:50:16  14        Okay.  And you will also be asked:  Did Akoustis

13:50:22  15   misappropriate trade secret in this case?  And I've gone

13:50:24  16   through a lot of that evidence here today, and I think the

13:50:26  17   answer on that one is they clearly acquired these trade

13:50:30  18   secrets.  They knew that the acquisition of those trade

13:50:32  19   secrets was contrary to confidentiality obligations that

13:50:36  20   are standard in the industry.

13:50:38  21        So if you agree with us in this case, as I hope you

13:50:41  22   do, and you answer these questions, the answer in the

13:50:44  23   first column will be yes.

13:50:47  24        Then the second column is about unjust enrichment.

13:50:51  25   That's the next thing you will be asked:  Did they get a

13:50:53  1    benefit, did Akoustis receive a benefit from taking these

13:50:56  2    trade secrets?

13:50:57  3        And on that, we've put in Dr. Shanfield's analysis,

13:51:00  4    and you're going to recall that he went through and he

13:51:03  5    took every trade secret and he associated it with a task

13:51:07  6    that Akoustis would need to perform.  And he made an

13:51:09  7    estimate of, well, how much time on that task did Akoustis

13:51:12  8    save because they had the trade secrets.

13:51:14  9        So you didn't have to go out and build your own

13:51:16 10    business plan, but you had the benefit of looking at

13:51:19 11    Qorvo's business plan, how much time would you save?  And

13:51:22 12    so he looked at that said, you know, for some of these

13:51:24 13    things you'd save three months, like, for business plan,

13:51:27 14    business planning purposes.  For other things like product

13:51:29 15    development and technology or reliability testing, he

13:51:32 16    thought they saved a longer amount of time.

13:51:34 17        And then what Dr. Shanfield was testifying about is

13:51:38 18    that, as a conservatism, he didn't just go through and add

13:51:42 19    up all of the time that was saved.  And if he did that,

13:51:46 20    I've done that exercise at one point here.  It's like more

13:51:49 21    than 20 years if you just add it up.

13:51:52 22        But he said, you know, that's not fair, because a

13:51:54 23    company in Akoustis' position, although they are small and

13:51:57 24    a startup, can do more than one thing at the same time.

13:52:00 25    And so you really need to think about these things as

13:52:03  1    staggered tasks.  And so if we're looking at what the real

13:52:05  2    head start they got is, it's not 20 years; it's 55 months

13:52:09  3    is what he said.

13:52:10  4        And I think we've had testimony from the experts on

13:52:13  5    the other side that -- from Dr. Darveaux, oh, 55 months is

13:52:16  6    crazy.  That's saying that it would have taken them nine

13:52:19  7    years to enter this market.

13:52:21  8        I would push back on that fairly strongly.  It took

13:52:24  9    Qorvo 20 years, and you heard another example with

13:52:26 10    Dr. Darveaux, Skyworks, a major company in this industry,

13:52:29 11    when it wanted to move forward with BAW filter

13:52:32 12    development, it bought a company that had been already

13:52:35 13    working on BAW filters for more than a decade, and it

13:52:38 14    still took another four years to get into the market.

13:52:40 15        So these kind of timelines, nine and a half years is

13:52:43 16    not a crazy timeline in this kind of setting.  This is

13:52:47 17    really, really complicated technology.  This is not the

13:52:50 18    kind of stuff that you do in a garage, unfortunately.

13:52:59 19        Dr. Shanfield's analysis is going to be available to

13:53:01 20    you in the jury room.  You'll have his chart, which was

13:53:04 21    put in as an exhibit.

13:53:10 22        So I'm not going to walk through every one of these

13:53:12 23    with you.  I'll just give you the exhibit number, if I can

13:53:15 24    find it.  It's 228.  So if you want to have your hands on

13:53:20 25    Dr. Shanfield's analysis and how he stacked these up, its

Exhibit 228.

And look at all the time we are going to save here.
All right.

So if you agree with us again, as we hope you do,
that there was a benefit to Akoustis from obtaining the
trade secrets, then you would put a "yes" in that second
column on the chart.  We're only showing Group 1 here, but
you'll have the same chart for all the groups.

Damages.  So you heard from Melissa Bennis yesterday.
The way we've done damages here is we kind of took a step
back and we said, okay, if you have a 55-month head start,
what's the real benefit of that to you?

And what Ms. Bennis concluded is the real benefit to
a person, which I think makes total common sense is, if
you get a dollar today, it's worth more than a dollar
tomorrow.  So it's just the time value of money.  She's
not attempted to take away any of Akoustis' revenue,
saying you would have made less money or anything like
that.

All she's saying is if Dr. Shanfield's correct, which
she assumes he is, that his 55-month head start, then the
revenue she got today would have been later in time.  And
she's calculated time value of money, which is one of the
most basic principles that we learn.

Here's the animation showing, it's pushing the

13:54:43 1   revenues out.  I think there was some suggestion earlier

13:54:46 2   today that the real impact of this would have been that

13:54:51 3   Akoustis was worse off because they got Qorvo's trade

13:54:53 4   secrets or something like that.  If you're not a

13:54:55 5   profitable company, you can't get a head start in going to

13:54:59 6   the market.

13:55:00 7       And that's just -- I mean, again, that kind of defies

13:55:03 8   common sense, doesn't it?  If Akoustis got a head start,

13:55:06 9   it got a head start.  It didn't -- whether Akoustis got a

13:55:09 10  head start doesn't matter whether they're profitable or

13:55:11 11  not.  It looks at the time they're saving.  And, you know,

13:55:15 12  part of the problem with that analysis is, look at what

13:55:18 13  they're using the money for.  That's part of why you get a

13:55:21 14  head start.  You get the revenues in the door.  You're

13:55:23 15  able to invest in things.  So they got revenues 55 months

13:55:27 16  early here so they can go buy a New York fab or they can

13:55:30 17  hire more engineers or go and do more marketing trips.

13:55:33 18  That's all a real time value factor.  Because if they

13:55:38 19  don't have that revenue stream, the money has to come from

13:55:42 20  somewhere else.  They've got to raise it.  And that's what

13:55:43 21  the time value of money is.

13:55:45 22      Okay.  So on damages, the number we've put in that

13:55:48 23  we're asking to be awarded is 50.3 million.  $50,334,371.

13:55:55 24  This is, just to be clear, adjusted from Ms. Bennis'

13:56:01 25  original analysis.  When we had testimony from Dr.

13:56:04 1   Aichele, he said our revenues were not -- we were off on

13:56:08 2   our projections.  Revenues were down.  So we adjusted that

13:56:11 3   number down on the bases of that testimony.

13:56:15 4       You're also going to be asked questions on exemplary

13:56:20 5   damages.  I want to just talk about that because we

13:56:26 6   haven't said a whole lot about that in this case.

13:56:30 7       So if there's ever been a case where exemplary

13:56:36 8   damages are appropriate, we would submit to you this is

13:56:38 9   the one.  It's -- you've seen the pervasive long-standing

13:56:44 10   efforts to get our trade secrets here.  It's not a one-off

13:56:47 11   instance.

13:56:48 12       Also, I think you may have seen it come through with

13:56:51 13   the witnesses.  There's a total lack of remorse and

13:56:54 14   accountability with these witnesses.  I mean, it goes

13:56:58 15   down -- I mean, all the way down to the expert witness.

13:57:00 16   None of this is useful.  We didn't need any of this stuff.

13:57:04 17       You know, Dr. Shealy, one of my favorite ones, he's a

13:57:08 18   hands-off leader.  Don't blame me for this.  I'm a

13:57:10 19   hands-off -- I let me people go and they're just going to

13:57:12 20   do what they're -- what they're going to do.

13:57:15 21       Also think about, when you think about the exemplary

13:57:19 22   damages aspect of this, the efforts to evade, right?  The

13:57:23 23   deception that's involved here, switching to your personal

13:57:27 24   accounts.  Telling people, I'll do this to make you feel

13:57:31 25   more comfortable.  Bribing people.  Using your expense

13:57:34  1    account to bribe people.

13:57:35  2         This is stuff -- this is not normal stuff.  This is

13:57:37  3    really very atypical, serious behavior.  And a company

13:57:43  4    that engages in this kind of behavior from the top down,

13:57:46  5    that's the -- that's why we have exemplary damages.  This

13:57:50  6    is exactly the kind of case where they should -- where

13:57:52  7    they should be awarded.

13:57:55  8         Okay.  So I'm going to spend just a minute on patent

13:58:02  9    infringement.  The stepsister, I guess, in this case in

13:58:07 10    some ways.

13:58:09 11         We've done an analysis and we've asserted

13:58:13 12    infringement of two patents in this case.  We've analyzed

13:58:16 13    19 Akoustis products and we've determined that 19 of those

13:58:22 14    products infringe for the '755 patent and 18 infringe for

13:58:26 15    the '018 patent.

13:58:29 16         So I want to start with the '018 patent.  I believe

13:58:32 17    you will hear from the judge later today with his

13:58:35 18    instructions but, again, you have to take his

13:58:37 19    instructions, not mine, that you look at a patent claim on

13:58:40 20    a limitation-by-limitation basis.  You have to look at

13:58:44 21    each one of the limitations that we have here.

13:58:46 22         The good news is I don't think there's any dispute on

13:58:50 23    limitation 1A or 1B for this patent, the '018 patent.  So

13:58:56 24    there's really only, I believe, two issues that are before

13:58:57 25    you.

13:58:58  1    The first issue on this patent is whether or not the

13:59:01  2    top electrode is thinner than the bottom electrode.  So,

13:59:05  3    remember, there's a sandwich.  You have a bottom

13:59:08  4    electrode, piezoelectric layer, and top electrode.  So

13:59:10  5    there's a dispute as to whether the top electrode in the

13:59:13  6    Akoustis products is thinner than the bottom electrode.

13:59:16  7    The second one is the point of the '018 patent is

13:59:18  8    you're changing the structure of the resonator in order to

13:59:23  9    increase the bandwidth of the filter.  So the last element

13:59:26 10    of this claim is, we need to show you that they're using

13:59:29 11    the structure and the patent, the thinner top layer,

13:59:32 12    thicker bottom layer, is going to actually increase the

13:59:35 13    bandwidth.

13:59:37 14    So on the first issue, on whether it's thinner or

13:59:41 15    thicker at the top, we've submitted to you a couple of

13:59:44 16    pieces of evidence here.  The first on the left-hand side

13:59:47 17    is from Akoustis' own internal documents, where they list

13:59:52 18    what the thickness is of these resonator -- these

13:59:55 19    electrodes.  And you can see the bottom electrode here

13:59:59 20    which needs to be thicker is listed as having 930A, that's

14:00:05 21    angstroms, so that's the thickness measurement, and the

14:00:08 22    top is listed as having 830A, angstroms.  So Akoustis' own

14:00:13 23    documents indicate the top electrode is thinner than the

14:00:16 24    bottom electrode.

14:00:17 25    But we didn't just stop there.  We had Dr. Heinrich,

14:00:19  1    who you may remember he was the -- with the bacon

14:00:22  2    references.  He did the -- he used an electron microscope

14:00:27  3    to measure the layer of thicknesses.  And that's what you

14:00:31  4    see on the right-hand side of this slide.  The top

14:00:33  5    Number 73.34, that's the top electrode.  The bottom

14:00:37  6    Number, 90.34, that's is the bottom electrode.

14:00:41  7        So Dr. Heinrich's analysis also confirms that in the

14:00:44  8    Akoustis products, the top electrode is thinner than the

14:00:47  9    bottom electrode.

14:00:49 10        Now, this goes to -- I think what you've heard from

14:00:52 11    the opposing expert on this -- what they're going to argue

14:00:55 12    that the top electrode was thicker, is instead of looking

14:00:58 13    at the electrode, they're looking at this thing on the

14:01:01 14    side that's called a border ring.  It's like a bump on the

14:01:03 15    side, kind of holds stuff in.  Think about it that way.

14:01:08 16    And that bump is thicker than the bottom electrode.  But

14:01:12 17    that's not the top electrode, and so that's what's going

14:01:15 18    on here.

14:01:16 19        And if you look at this slide in front of you,

14:01:18 20    Dr. Heinrich actually indicated or shown where the

14:01:22 21    electrode is.  And so -- and what they're pointing to is

14:01:25 22    they want to ignore that whole electrode and look at only

14:01:28 23    the thing that's on the right-hand side, circled in red,

14:01:31 24    which is the border ring and not the top electrode.  So

14:01:33 25    that's what's going on there.

14:01:36  1        And then the other issue with this argument about the

14:01:39  2    border rings is that only certain Akoustis products

14:01:42  3    actually have the border ring.  So even if the border ring

14:01:44  4    were the top electrode, which it's not, that's not found

14:01:48  5    in a number of Akoustis products, and that's what we're

14:01:51  6    showing here.  Only eight of the Akoustis accused products

14:01:55  7    have that border ring structure.

14:01:59  8        And then on the simulations -- this one is a little

14:02:01  9    bit a strange one.  So we did simulations to look at what

14:02:04 10    the bandwidth effect was.  That's Dr. Shanfield's analysis

14:02:07 11    and that's what you see on the left-hand side of this

14:02:10 12    slide where the -- what it's showing is on the blue line

14:02:14 13    is dropping, so loss is going down on the blue line on the

14:02:19 14    right-hand side here.  On the left-hand side of the slide

14:02:22 15    but on the right-hand side of the image, the blue is going

14:02:24 16    down, which means that the border of the passband -- your

14:02:28 17    loss is going down.  And that's what increases the

14:02:31 18    bandwidth of the filter.

14:02:32 19        And so Dr. Shanfield's simulation shows that this

14:02:36 20    is -- that this effect of increasing the bandwidth is

14:02:39 21    done.

14:02:40 22        Dr. Nguyen didn't do a simulation of his own.  He

14:02:43 23    could have done a simulation and said, Dr. Shanfield, your

14:02:46 24    simulation is wrong.  The loss goes up so the bandwidth

14:02:48 25    goes down.  He didn't do that.  So really what you have is

14:02:52 1    Dr. Shanfield's analysis.  You know, so there's that.

14:02:58 2         And then this is the second patent.  You may remember

14:03:00 3    Dr. Fattinger talking about this.  This is the '755

14:03:04 4    patent.  There's only, again, good news for the

14:03:07 5    limitations that we're going through.  There's only one

14:03:09 6    that I believe is in dispute here, and that's the last

14:03:11 7    one, 19H.  And the question on this one is just a

14:03:15 8    simulation question.  It's whether the -- using the

14:03:18 9    structure of this patent will result in less energy

14:03:23 10   leakage.

14:03:24 11        And so you may remember what Dr. Fattinger explained.

14:03:28 12   He had purple and the orange, right?  And what this patent

14:03:32 13   is basically covering is the purple part on the right-hand

14:03:34 14   side of the slide.  The purple part needs to be a

14:03:36 15   different thickness than the orange part in the middle.

14:03:39 16   And there's no dispute in this case, the purple part is

14:03:42 17   the outer region and the orange part is inside the active

14:03:46 18   region.

14:03:47 19        There's no dispute in this case that the Akoustis

14:03:50 20   products have this exact structure.  That's why there's

14:03:53 21   green checkmarks on all the other limitations.  The only

14:03:55 22   dispute is whether having that structure results in less

14:03:58 23   energy leakage.  So that's a matter of the simulations.

14:04:02 24        And what we can see here, again, is Dr. Shanfield,

14:04:05 25   he's done the simulation.  Again, the Akoustis product is

14:04:10  1    the blue line.  And this is energy loss that's being

14:04:14  2    shown.  And you can see at the 5.6 gigahertz range, which

14:04:17  3    is the center frequency -- that's the frequency we care

14:04:20  4    about -- that loss has gone down because of the structure.

14:04:23  5    It's below the green line.

14:04:25  6         So, again, Dr. Shanfield's simulation shows that the

14:04:30  7    energy leakage is less using the structure of this patent.

14:04:33  8    And there's really -- I think the argument on the other

14:04:35  9    side of this is Dr. Shanfield made a mistake because when

14:04:38 10    he originally did his report, he had a bunch of

14:04:41 11    screenshots and he put in the wrong screenshot into his

14:04:45 12    report.  But, you know, there's no, I think, attack on the

14:04:48 13    validity of his simulation.  Simulation shows reduced

14:04:53 14    energy loss.

14:04:55 15         All right.  That's what I have.  I appreciate your

14:04:59 16    attention, and I thank you again for everything that

14:05:02 17    you've done over the last ten days.  It's been really --

14:05:04 18    we are really grateful for it.

14:05:14 19              THE COURT:  Mr. Elkins, do you wish to make a

14:05:15 20    closing argument on behalf of Akoustis?

14:05:20 21              MR. ELKINS:  I do, Your Honor.

14:05:21 22              THE COURT:  You may proceed.

14:05:22 23              MR. ELKINS:  Thank you.

14:05:29 24         So I'm going to parrot Mr. DeFosse to start

14:05:33 25    off, and that is to thank you for your service.  Being a

14:05:38  1  juror is not easy, especially when you're doing it for two

14:05:41  2  weeks, probably listening to stuff you never thought or

14:05:43  3  perhaps ever wanted to hear about, especially in the kind

14:05:46  4  of detail you have.

14:05:48  5        So, you know, jury service is -- in civil

14:05:53  6  trials is unique to the United States.  It's some kind of

14:05:57  7  strange torture we put our citizens through.  I can raise

14:06:00  8  my hand to say that I have, too, been tortured over two

14:06:04  9  weeks in a case involving abandonment of hazardous waste.

14:06:11 10  And I will tell you, my caffeine intake went up a lot.

14:06:15 11        But, in all seriousness, thank you very much.

14:06:19 12  Both sides appreciate the fact that you've been very

14:06:22 13  attentive, notwithstanding the less-than-exciting subject

14:06:25 14  matter at times, and we really appreciate it.

14:06:32 15        What -- you can see that I've taken up my

14:06:36 16  colleague, Mr. Lemieux's, parable about Paul Harvey, who I

14:06:42 17  did not grow up with, but I remember my grandfather

14:06:45 18  singing his praises when I was listening to a completely

14:06:48 19  different station in my car.  And we appreciate that you,

14:06:54 20  you know, remained steadfast through the first week of

14:06:58 21  hearing nothing but evidence from Qorvo, notwithstanding

14:07:04 22  Mr. Aichele and Mr. Shealy, who testified in their direct

14:07:10 23  examinations, and waited for us to tell the other side, or

14:07:15 24  the rest of the story, which paints a slightly different

14:07:18 25  picture than what was foretold in Mr. Masters' opening.

14:07:25  1          Hear the witnesses that you heard from at trial
14:07:30  2     Mr. Aichele, Dr. Shealy, Daeho Kim, Dr. Kim, Holly
14:07:35  3     Johnson, Mary Winters, our client rep who was here the
14:07:39  4     entire time, and Drs. Darveaux and Lebby, on the bottom
14:07:44  5     row, and Professor Nguyen and Ms. Irwin, who I will not
14:07:51  6     call Ms. Bennis again.
14:07:53  7          But I really wanted to start my discussion with
14:07:57  8     the elephant in the room, at least the elephant in the
14:08:00  9     room as regards Akoustis.  Because I think that
14:08:06 10     Mr. DeFosse framed a good question for us.  We have all of
14:08:12 11     these documents.  You know, the business conduct
14:08:17 12     guidelines, the code of ethics and conduct.  The employee
14:08:21 13     confidentiality agreement.  What the heck was Akoustis
14:08:27 14     doing with a bunch of documents that didn't belong to it
14:08:32 15     in its possession.  And if I were you, I'd be asking
14:08:36 16     myself the same question, or rhetorical questions, that
14:08:40 17     Mr. DeFosse was asking.
14:08:42 18          And -- but first, you know, Ms. Johnson
14:08:46 19     testified about these.  And the purpose was perhaps not as
14:08:52 20     Mr. DeFosse suggested.  It wasn't to say that, you know,
14:08:56 21     to try to paint a pollyannish picture.  The purpose was to
14:09:02 22     tell you that the company was set up to follow these
14:09:06 23     guidelines.  And along the way it stumbled.  And it -- it
14:09:15 24     did not adhere to them in the way that it should have or,
14:09:18 25     perhaps, the way that the company really wanted to.

14:09:24 1          And I'm going to pick on a little bit

14:09:29 2    Mr. Aichele and Mr. Shealy.  They are both executive

14:09:32 3    officers of the company.  Mr. Shealy, obviously, the CEO

14:09:36 4    and cofounder; Mr. Aichele is an executive vice president

14:09:39 5    and -- of business development.

14:09:44 6          And they, you know, they have this honest and

14:09:51 7    ethical conduct that they make every employee sign the

14:09:56 8    agreement with this in it.  And then the other agreements

14:10:00 9    I just showed you parrot the same, maybe not word for

14:10:03 10   word, but, certainly, it's the same idea, which is not

14:10:07 11   only are we going to protect our own confidential

14:10:10 12   information, but we're going to behave ethically.

14:10:14 13          And that includes -- I think I have a little

14:10:19 14   pointer here I can use on this.

14:10:21 15          So it's not just service providers and

14:10:24 16   suppliers, but also competitors.  And in a lot of ways

14:10:28 17   they don't do that.  And, you know, you've heard, you've

14:10:31 18   seen, again, a litany of documents from Qorvo, which

14:10:36 19   suggest that they didn't live this credo.

14:10:43 20          Mr. Aichele, you know, testified about this

14:10:48 21   kind of a difficult line to walk between getting

14:10:52 22   legitimate business intelligence and not using

14:10:57 23   confidential information that he was able to get through

14:11:00 24   people like Mr. Li or Mr. Kim in Korea.

14:11:09 25          He should have led by example, and he didn't.

14:11:11 1   And that's on him.  Mr. Shealy, I think was -- and I think

14:11:17 2   his testimony supports this.  You know, here's a scientist

14:11:24 3   who is trying to lead a startup company in a competitive

14:11:29 4   area, and, you know, he hires a lot of friends from RFMD

14:11:36 5   or acquaintances he knew from there, and, you know, he --

14:11:42 6   but he didn't pay attention to what they were doing.

14:11:46 7           And so, you know, the -- as I think Harry

14:11:51 8   Truman, who I'm glad to say was little bit before my time,

14:11:57 9   but, you know, he had this famous little block on his desk

14:12:01 10  that said, "The buck stops here."  And, you know

14:12:06 11  Mr. Shealy, as the CEO and founder, and Mr. Aichele as the

14:12:10 12  executive vice president, need to accept some

14:12:13 13  responsibility for the company, certainly, and we'll get

14:12:19 14  to the trade secrets, but, certainly, on the ethical side

14:12:22 15  they could have done a lot better.

14:12:24 16          I will say that the evidence shows that, over

14:12:26 17  time, you know, you really see these documents stop.  The

14:12:32 18  date of these documents from Qorvo appear to stop around

14:12:35 19  2020, and I think, as I will refer to later, you can see a

14:12:40 20  big change coming around in 2017 when the company acquires

14:12:45 21  the STC MEMS facility in New York, which provides the

14:12:51 22  manufacturing know-how based on its 20 years of

14:12:57 23  experience.  And Dr. Kim arrives from Samsung

14:13:03 24  Electromechanical and resets the company's technology to

14:13:09 25  the XBAW process for which we have heard nothing from

14:13:15  1    Qorvo about the XBAW process somehow incorporating Qorvo

14:13:20  2    technology or being based on any Qorvo processes.

14:13:33  3         These three names figure prominently in

14:13:37  4    Qorvo's -- in Mr. DeFosse's presentation, and no wonder.

14:13:44  5    Mr. Houlden, who, you know, when he -- I think Mr. DeFosse

14:13:53  6    said what Mr. Houlden did here was a problem.  I wrote

14:13:56  7    that down.  I wrote it down to repeat it because I agree.

14:13:59  8    What he did was a problem.  That is not the way to exit

14:14:06  9    one company and come to a competitor.  It's, at a minimum

14:14:11 10    it's extreme laziness to just, you know, open your laptop

14:14:16 11    bag and pull out a document and give it to Mr. Hodge, as

14:14:22 12    Mr. Hodge testified he did.

14:14:24 13         Mr. Dry, I think Mr. DeFosse -- I, again, wrote

14:14:26 14    this down -- brought a repository of documents regarding

14:14:30 15    operations and manufacturing with him when he arrived in

14:14:35 16    2019.

14:14:37 17         Rama Vetury is notable, and, really, we didn't

14:14:41 18    really hear any information.  We didn't hear anything

14:14:43 19    about him sharing information.  The reason that he's among

14:14:48 20    this trio is that he's the one who, for whatever reason,

14:14:52 21    decided that he was going to not give back to Qorvo the

14:14:58 22    backup of his laptop and his e-mail account at Qorvo.

14:15:05 23         So you've heard multiple times in this trial

14:15:08 24    about the 500,000 e-mails and the 279 gigabytes of

14:15:14 25    information.  That all came mostly came from Mr. Vetury.

But there's really very little, if any, evidence that he actually accessed it and used it.  Certainly, he received some information.  We can -- and we will debate whether or not that was trade secret.  For example, the e-mail regarding the Qorvo trim process from Dr. Kwon.

But he's here because it was just stupid to bring along all that information when you don't need it.  And, you know, you heard Ms. Johnson testify that the reason those policies were put in place was because Akoustis wants to build something on its own that it owns, where it owns its own IP.  And the reason you have those policies is so you're not a potential slave to some other company that says, "Hey, you took my stuff, and now you've got to pay."

So it's -- you know, it's coming to roost in this case, and there's, you know, there's a lot of information here to process.

I want to look at it a little more closely because I think it bears on the remedies here.  But if you thought I was going to get up here and try to sweep it under the rug, you're wrong.  It was wrong to do.  And the company accepts that.  Mr. Aichele -- I wouldn't say he was fully contrite, but he accepted responsibility at his deposition; he accepted responsibility on the stand.

And Mr. Shealy did have a good point.  That the

businesspeople in this case have been screened off from the very documents that Akoustis is accused of taking from Qorvo, that Qorvo has claimed as trade secrets, we're not allowed to show them to the businesspeople at Akoustis unless they are on the document themselves or if Qorvo decided to show it to the witness in deposition.

So jumping ahead in Mr. DeFosse's presentation, he remarks on how Ms. Johnson says no one has been disciplined. Well, you know, there was no testimony on this, and I'm not going to represent anything that's not in the record, but I would be shocked if there was not a reconning coming after this case is over when the record is, you know, can be more fully shared with the board of directors.

I do want to talk about here, because taking responsibility also means weighing whether or not the information taken was merely confidential information, or whether it was trade secret information. And you will remember that, when Ms. Bennis testified in her testimony -- excuse me. I think it was -- can't even remember the days anymore, but I think it was this week actually. But, originally, her -- she -- we -- I cross-examined her on a -- well, let me back up. Because I think I -- I can't remember when I cross-examined her about or not because the days blur together.

14:18:56  1          But there are a lot of documents in this case

14:19:00  2     that have been provided to you that are simply

14:19:03  3     confidential information that are not tied to trade

14:19:06  4     secrets.  And the issue is whether or not the information

14:19:12  5     that Qorvo has put before you is really trade secret, and

14:19:19  6     if it is a trade secret, whether it's been used.  And so I

14:19:23  7     want to explore that in a little bit more detail.

14:19:27  8          But first, I also want to talk about what I'll

14:19:34  9     call the -- what I will call kind of the second elephant

14:19:44 10     in the room.  And that is, you've seen tons and tons of

14:19:53 11     presentations marked "Qorvo internal use only," "Qorvo

14:20:00 12     confidential and proprietary information."  Every

14:20:04 13     presentation you've seen has been marked in that way.

14:20:06 14          You've heard from Ms. Giovan in her videotape

14:20:10 15     deposition:  Every e-mail outgoing is marked private now

14:20:14 16     since 2019 or 2020.  Qorvo has a culture of marking

14:20:20 17     everything as confidential.

14:20:21 18          And the question -- okay, my children are now

14:20:28 19     of the age, you know they're 30 and 26, but they were

14:20:34 20     young enough to watch the Incredibles.  If you haven't

14:20:37 21     seen it, it's good.  I recommend it.  But there's a scene

14:20:40 22     there where this guy uses technology to become incredible

14:20:50 23     like the Incredibles themselves, his whole plan is to make

14:20:54 24     everybody incredible, because when everybody is

14:20:58 25     incredible, nobody is.

14:20:59  1        And I was reminded of that here because when

14:21:03  2  everything is confidential, nothing is.  When you mark

14:21:06  3  everything in the company as confidential, then, how are

14:21:10  4  employees supposed to understand what's really supposed to

14:21:14  5  be protected and what's not, when every e-mail is marked

14:21:19  6  private as a default?  So you've got to, you know,

14:21:22  7  manually change it every time you send an e-mail.  I don't

14:21:25  8  know about you, but I send a lot of e-mails every day, I

14:21:30  9  get a lot of e-mails every day.  And it's not the first

14:21:34 10  thing on everybody's mind.

14:21:37 11        And I don't know if you have experience in

14:21:37 12  PowerPoint, but changing one of those template footers is

14:21:41 13  not easy, as I've tried to do it on my own law firm's

14:21:46 14  template, and I've not been able to figure it out.  So

14:21:51 15  they've -- my point here is that Qorvo has paraded dozens,

14:21:56 16  if not hundreds of documents marked confidential, and

14:22:00 17  every time they examine a witness, Oh, this is a

14:22:02 18  confidential document.  Well, it's marked confidential.

14:22:05 19        So the question is, is it really confidential?

14:22:08 20  Is it really not being shared?  And you can't just rely on

14:22:13 21  a tag when everything is tagged confidential, because as

14:22:19 22  the slide says, when everything is confidential, nothing

14:22:21 23  is.

14:22:24 24        This was a big group of confidential documents

14:22:27 25  supposedly taken by Akoustis.  It's not part of the trade

14:22:31  1    secret claim.  And, you know, the question is, why has it
14:22:35  2    been paraded in front of jury ad nauseam?  And we also
14:22:42  3    have the unknown number of confidential documents that
14:22:46  4    the -- about half a million e-mails and the 279 gigabytes
14:22:51  5    of data recovered.  And they talked about it, but it's
14:22:57  6    never been analyzed.  Nobody knows what's in it.

14:23:02  7        The reason that Qorvo spent hours and hours
14:23:06  8    talking about this was to pile on to the trade secrets
14:23:10  9    that they're accusing Akoustis of misappropriating.  And
14:23:18 10    the question is why they do that.  And I think there are
14:23:23 11    two reasons.

14:23:24 12        The first reason is, when -- I think you saw
14:23:29 13    earlier in this case a timeline.  And Qorvo presented the
14:23:36 14    timeline, and it -- this case commenced in October of
14:23:42 15    2021.  And it was sometime in 2022 when the discovery
14:23:50 16    process began in earnest.  That's when the parties
14:23:54 17    exchange documents.  They request documents from each
14:23:58 18    other; we have to produce them.

14:24:00 19        And when Akoustis started producing documents,
14:24:03 20    both to the surprise of Qorvo's lawyers and Akoustis'
14:24:09 21    lawyers, there are a lot of Qorvo documents in there.  And
14:24:17 22    I believe that when Mr. DeFosse and Mr. Masters expressed
14:24:25 23    indignation regarding the fact that Akoustis has a lot of
14:24:29 24    Qorvo information, that's reflecting the indignation of
14:24:34 25    their executives, Mr. Creviston, the other Qorvo

14:24:40  1    businesspeople who are in the gallery, and deservedly so.

14:24:48  2         Not a very good thing to take discovery from,

14:24:52  3    you know, an emerging growth competitor to find out that

14:24:56  4    that emerging growth competitor has a bunch of your

14:25:00  5    documents.  So I think that, like anybody who feels

14:25:02  6    wronged, feels better about talking about it.  I think

14:25:07  7    that that's part of why you heard a lot evidence

14:25:12  8    regarding, frankly, for legal purposes, an extraneous

14:25:18  9    purpose, because it's not really going to any of the

14:25:21 10    claims.

14:25:22 11         But I believe there's also a second reason, and

14:25:25 12    it's a little bit darker.  And it is, you know, Akoustis

14:25:31 13    is an emerging startup company.  It's, notwithstanding the

14:25:39 14    testimony from some of Qorvo's witnesses -- Dr. Aigner,

14:25:45 15    being among them, you know, kind of more or less

14:25:51 16    poo-pooing the technology and whether or not Akoustis has

14:25:55 17    had success.

14:25:56 18         You've seen e-mails that were shown to

14:26:01 19    Mr. Creviston and Mr. Testa about Akoustis having some

14:26:04 20    success with customers.  And it's in the 5 gigahertz and

14:26:08 21    up ranges in areas that Qorvo acknowledges it decided not

14:26:15 22    to invest in, at least not at the time.  And so Akoustis

14:26:19 23    was able to get to market first in the 5 gigahertz area.

14:26:22 24    But it's, you know, you could see from some of the e-mails

14:26:30 25    that we discussed with Mr. Testa in particular, the

14:26:37 1    reaction of some of the Qorvo people who, notwithstanding

14:26:40 2    the fact that this was an area that they decided, not to

14:26:43 3    invest in, they did not seem particularly happy that

14:26:47 4    Akoustis was having success head to head against Qorvo

14:26:52 5    vis-a-vis so many customers.

14:26:56 6         Also, frankly, Dr. Aigner who is a brilliant,

14:27:02 7    brilliant man.  He's also a proud man.  The way he

14:27:08 8    testified, I think he was indignant that this company was

14:27:12 9    able to get off the ground and compete with Qorvo in the

14:27:16 10   time that it did.

14:27:18 11        So I think that there's some, you know, there's

14:27:21 12   some concern on the part of Qorvo that Akoustis is a more

14:27:27 13   nimble competitor.  You saw one of the Qorvo e-mails where

14:27:31 14   the executives with whom Mr. Testa was corresponding were

14:27:41 15   grousing about Qorvo being slow and Akoustis being more

14:27:44 16   nimble because it didn't have to produce millions of

14:27:48 17   products.

14:27:48 18        So I think it's also, the second reason for

14:27:50 19   showing you all this extraneous information is to

14:27:54 20   demonstrate that, you know -- let me back that up.

14:28:04 21        The second reason, this kind of more darker

14:28:05 22   reason that is fueling all this extraneous confidential

14:28:09 23   information, is really kind of to stir you up in the hope

14:28:16 24   that you will punish Akoustis beyond the extent to which

14:28:21 25   it should be punished in the event you find liability.

14:28:24   1          And Qorvo knows what Akoustis' financial status

14:28:29   2    is.  It's a public company.  It has to publish its

14:28:34   3    financial results.  You heard Ms. Bennis almost talk about

14:28:37   4    it on Monday when she was testifying about it, because

14:28:42   5    Akoustis had released its third quarter 10Q report.  And

14:28:49   6    so, you know, to the extent possible, if Qorvo can tip the

14:28:56   7    scales with the tawdry tails of Mr. Houlden and Mr. Dry

14:29:02   8    and talk about a bunch of confidential information that's

14:29:05   9    really not an issue in any of the legal claims before you,

14:29:10  10    and at the time same time have Ms. Bennis invent a

14:29:16  11    methodology that did not exist until this case of using

14:29:22  12    bare revenue to try to demonstrate benefit for unjust

14:29:27  13    enrichment, that all adds up to, you know, if they knock

14:29:33  14    Akoustis off its porch or even knock it out of business,

14:29:35  15    that wouldn't be such a bad thing.

14:29:42  16          So on the one hand, I want to make clear that

14:29:46  17    there's an acceptance of responsibility for things that

14:29:49  18    Akoustis shouldn't have done.  On the other hand, we hope

14:29:56  19    that you will -- whatever verdict you render will be based

14:30:00  20    on the facts based on your weighing of credibility and the

14:30:05  21    evidence, and based on the legal instructions that are

14:30:08  22    provided to you by Judge McKellen.

14:30:17  23          So let's talk a little bit about how, if at

14:30:21  24    all, was Qorvo harmed.

14:30:28  25          I examined this -- Ms. Bennis about this during

14:30:32 1   cross-examination, and Ms. Irwin also testified about it

14:30:39 2   this morning.  But there is a two-prong approach to

14:30:43 3   damages for trade secret misappropriation, and it's on the

14:30:47 4   screen in front of you.

14:30:50 5          Plaintiff in Qorvo's shoes can recover two

14:30:53 6   types of remedies.  The first is damages for actual loss.

14:30:59 7   So the actual loss caused by the misappropriation, and it

14:31:02 8   also gets to recover the defendants' unjust enrichment.

14:31:06 9   The reason to get both is because the plaintiff should be

14:31:13 10  compensated for its direct loss, but you shouldn't leave

14:31:17 11  the defendant with any profit that's -- it has unjustly

14:31:23 12  enriched itself with, any benefit, really.  I'll use the

14:31:27 13  word benefit.  So that's what the law provides.

14:31:30 14         And then, if you can't get either or if there

14:31:33 15  are problems with proof, you can rely on reasonable

14:31:36 16  royalty and provide that information to provide a full

14:31:40 17  picture, but neither side is -- but, certainly, Qorvo is

14:31:43 18  not seeking a reasonable royalty in this case.

14:31:49 19         But they are also not seeking actual loss or

14:31:52 20  damages for actual loss.  Ms. Bennis confirmed that, that

14:31:56 21  she's only evaluated unjust enrichment.  And that is a

14:32:04 22  tacit admission that Qorvo was not harmed itself.  It has

14:32:12 23  not put forth any evidence that it's lost any sales

14:32:16 24  because of trade secret misappropriation at all.  You

14:32:20 25  didn't hear that.

14:32:22  1    And notwithstanding the very large number that

14:32:27  2   Ms. Bennis has put forward as her damages amount, Qorvo

14:32:33  3   does not have any evidence to try to puff it up even

14:32:37  4   further with actual harm.  So Qorvo wasn't harmed, then.

14:32:43  5   The only question left is how, if at all, did Akoustis

14:32:47  6   benefit.

14:32:49  7    So I want to get back to use.  Mr. DeFosse

14:32:54  8   touched on use in his presentation.  And, by the way, I'll

14:33:01  9   go off on a slight tangent just to let you know because I

14:33:05 10   don't think it was explained to you that, because Qorvo

14:33:09 11   has the burden of proof as the plaintiff, it got to go

14:33:13 12   first in opening statement, and it got to go first in

14:33:18 13   closing argument, but it also gets to go last.  So Mr. --

14:33:21 14   I get to respond in part to what Mr. DeFosse says, so

14:33:27 15   he'll be following up afterward, so you'll probably hear

14:33:32 16   from him again.

14:33:34 17    But getting back to the point, there can be no

14:33:40 18   trade secret misappropriation without use.  Ms. Bennis

14:33:43 19   admitted that.  So simply having a trade secret is not

14:33:46 20   enough.  If I -- let's say Mr. DeFosse is an excellent

14:33:52 21   baker, and I steal his recipe for, you know, the best

14:33:58 22   German chocolate bundt cake in the world, but I put in a

14:34:03 23   lockbox and lose the key, I haven't memorized it.  I'm not

14:34:07 24   really going to benefit from taking his trade secret

14:34:12 25   German chocolate bundt cake recipe.

So there has to be some use.  And so you heard
Mr. Darveaux in his going through all of the trade secrets
yesterday one by one, not only identifying whether or not
the trade secret had some value, but also paying attention
to whether it was used.

So what about use?  I'm not going to focus on a
lot of documents, but I did want to take on some of the
documents on which Qorvo has spent the most time.  And we
heard a lot about this trim calculation silicon nitride
trim document created by JB Kwon that he circulated to,
you know, several people, but more than once I might add.
There's also no evidence that he used anything other than
his own memory, but nevertheless, you haven't heard
anything on our side say, "That's not what Qorvo does."

The question is, was it used?  And Mr. DeFosse
discussed it at length.  And what he did not discuss,
though, was that, once Mr. Kim was involved, had the idea
to create the XBAW process to help fix the problems that
Akoustis was having with yield and with some performance
issues.  There was no discussion after 2018 or, certainly,
March of 2018, once Akoustis had the XBAW process
operating at its New York fab regarding Qorvo's trim
calculations.

And the reason is because it can't be used.
The reason it can't be used is because of the

14:36:16  1    difference -- and here's one difference -- between SMR and

14:36:19  2    FBAR.  As Mr. Kim testified, the way that you make an SMR

14:36:25  3    is that you can measure the metal layer before and after

14:36:31  4    passivation.  The reason is because the Bragg reflector

14:36:35  5    that is built into the structure, it will resinate.  On

14:36:40  6    the other hand, the FBAR process, the one with the cavity

14:36:44  7    in it, that cavity is evacuated.  In other words, it's

14:36:49  8    filled with a substance, and during the passivation step,

14:36:53  9    I think there's an acid bath, and whatever is in that

14:36:57 10    cavity is taken out.  So it will not resinate before it's

14:37:02 11    passivated.  So they have to basically put the entire

14:37:07 12    passivation layer on it.  And the trimming is really about

14:37:11 13    taking off the passivation layer to get to the right

14:37:14 14    frequency.

14:37:15 15         Dr. Kim also testified that the trimming,

14:37:18 16    frankly, although everybody needs to do it, is not very

14:37:23 17    complicated, that he didn't find anything in Qorvo's

14:37:29 18    process remarkable.  But more to the point, it was

14:37:32 19    irrelevant.  Akoustis had to fashion its own trim process

14:37:40 20    fresh, not using Qorvo information.  It didn't use the

14:37:44 21    algorithm.  And nothing in that SMR trimming process was

14:37:48 22    helpful to Akoustis in developing its FBAR trimming

14:37:52 23    process for XBAR, and there's nothing in the record to say

14:37:55 24    otherwise.

14:37:58 25         I forgot to give you that.

14:38:01  1          I also wanted to talk about Dr. Shealy's

14:38:09  2   attempt to create a new product or a new technology

14:38:16  3   development document.  Obviously, ham-handed and not

14:38:23  4   terribly wise to take something that belonged to a former

14:38:27  5   employee, whether a trade secret or not.  Ethically -- and

14:38:32  6   ethics are a big part of the business conduct guidelines

14:38:37  7   and the code of ethics and conduct at Akoustis --

14:38:41  8   shouldn't have done it.  He did it anyway.  He changed a

14:38:45  9   few things.  He left in a whole bunch of references to

14:38:49 10   RFMD in the document, and then he sent it to several

14:38:54 11   colleagues, right after the fab -- well, anticipating that

14:39:00 12   the fab purchase was going to close.

14:39:04 13          The question is, was it used?  And the answer

14:39:08 14   is no.  You heard that from Dr. Shealy himself.  I mean,

14:39:12 15   this -- it was a terrible idea, but it went nowhere.  We

14:39:16 16   never saw -- you never saw from Qorvo a completed document

14:39:21 17   that was tailored to Akoustis and its processes, and the

14:39:27 18   reason is because, as Ms. Winters testified, is that the

14:39:32 19   fab already had its own suite, its own library of

14:39:37 20   processes and procedures on which it could rely.  This

14:39:40 21   document was unnecessary.  There is no proof of its use

14:39:43 22   anywhere.

14:39:49 23          Third one that you've heard a lot about is

14:39:53 24   Mr. Dry's attempt to kickstart the process of doing a

14:39:59 25   final visual quality control inspection.  And he, again,

14:40:08  1    took the lazy way and took a Qorvo or RFMD document and

14:40:16  2    made some changes to it so that it could pass as a

14:40:22  3    nonQorvo document, or at least a draft of something and

14:40:26  4    passed it around.

14:40:29  5            But, again, the testimony is unequivocal that

14:40:32  6    it was not used.  It's 48 pages.  As Ms. Winters

14:40:38  7    testified, it doesn't reflect what the fab does.  And so

14:40:42  8    it wasn't helpful or it didn't add any value.  So did

14:40:50  9    Akoustis benefit from that document?  Did it benefit from

14:40:53 10    the document that Dr. Kwon put together based on a pretty

14:40:59 11    good memory of what Qorvo does in trimming?  Does it, you

14:41:04 12    know, is that a real use of the RFMD new technology

14:41:11 13    development document?  In a way that benefited Akoustis,

14:41:15 14    we submit no.

14:41:20 15            What did Dr. Shanfield say about use?  I mean,

14:41:23 16    basically, Dr. Shanfield equated e-mailing something as

14:41:27 17    use.  And that's simply not true.  There's, you know, you

14:41:30 18    could look at what Mr. Aichele testified to regarding some

14:41:34 19    of the documents he got.  And he testified that, you know,

14:41:37 20    it was interesting, it was business intelligence.  Reading

14:41:40 21    something and, you know, having interest sated is not

14:41:46 22    equivalent to use.

14:41:51 23            So, but Dr. Shanfield really didn't have much

14:41:53 24    to say.  He wasn't able to draw the lines between Qorvo

14:41:59 25    documents and any resulting processes or products.  Look

at what -- if you look on the patent side of this case,
and, frankly, a trade secret is not dissimilar from a
patent.  A patent is for an invention, but the way you get
your rights to that is that you to disclose it to the
public.  And nobody can use it during the term of the
patent, but after that term is over to dedicate it to the
public, anybody can use an expired patent.  Trade secrets
rely on confidentiality to maintain their protection.

So we saw from Dr. Bravman and Dr. Shanfield, a
lot of documents that, essentially, tried to take each
element of each asserted claim of the patents, and there's
a dotted line to where you can find it in Akoustis'
products.  You didn't see that at all with respect to the
alleged trade secrets.  Most of the -- almost all of the
evidence regarding the use of trade secrets is what we
call in the law business -- there's a lot of Latin
expressions in the law business.  One is ipse dixit, which
means, basically, you know, because I say so.

And these -- why are these quotes here from
Dr. Shanfield?  He is speculating.  For example, this
response from Dr. Shealy writing back to Mr. Houlden, "Got
it."  In other words, he gets what he's talking about.
Okay.  Well, I would agree with that.  That's what "got
it" means.  "Let's discuss Monday."  And wants to discuss
it in person.  And he says, basically, he's fine with it.

14:43:51  1    That's not a logical conclusion from that.  It could mean

14:43:57  2    anything.  It could be "got it.  I want to talk to you

14:44:00  3    because that's not what we're doing" is as plausible as

14:44:04  4    saying, "Oh, yeah, I agree with you."  If he was fine with

14:44:07  5    it, why would he need to talk to him about it?

14:44:10  6            Also, you know, relying on the fact that

14:44:13  7    Akoustis managed to pull off a feat of magic in ten

14:44:18  8    months, that's a sign that, oh, they must have had

14:44:19  9    something to do that lift for them.  Otherwise, it's

14:44:22 10    unexplained.  That is speculation.  And that permeates

14:44:27 11    much of what Dr. Shanfield testified to.

14:44:31 12            We have some other examples from Dr. Shanfield.

14:44:38 13    I like this one with Mr. Schmid:  It seemed to me like

14:44:42 14    that discussion they had must have been, "Hey, we would

14:44:45 15    could use this information," and Mr. Schmid ends up having

14:44:48 16    it with him.  He admitted that he rendered his opinion

14:44:52 17    without actually looking at the actual procedures and

14:44:55 18    processes that are used in fabrication in the

14:44:59 19    manufacturing facility in New York.  So Dr. Shanfield's

14:45:04 20    testimony regarding use is, let's just say it's not very

14:45:10 21    convincing.

14:45:15 22            On the other hand, you had Ms. Winters testify.

14:45:18 23    You could judge her credibility because she's sitting in

14:45:21 24    front of you in the jury box.  She came to Akoustis from

14:45:28 25    STC MEMS where she had been for a long time.  She

14:45:32  1    testified about all the processes and procedures that they

14:45:37  2    had.

14:45:38  3              I will get a drink of water.

14:45:45  4              That confirmed Mr. Kim's testimony that the

14:45:51  5    trimming process described in the Qorvo document was not

14:45:55  6    used, that Akoustis couldn't even use it if it wanted to.

14:46:06  7              Ms. Winters is unaware, testified she was

14:46:10  8    completely unaware of any Qorvo information that had

14:46:14  9    actually been used in the New York fab.  Dr. Kim, again,

14:46:17 10    testified in a separate part of his examination that

14:46:22 11    Qorvo's trimming information is not relevant at all to the

14:46:26 12    XB1 process.

14:46:31 13        Dr. Shealy testified that confidential and

14:46:34 14    proprietary information was not used in the development of

14:46:38 15    Akoustis' technology.  Mr. Aichele testified about that

14:46:49 16    they did not use the information.  Certainly, they used it

14:46:53 17    as a business intelligence source, but it did not affect

14:46:56 18    the plans or the specs for products.

14:47:01 19        And I want to also talk a little bit more in detail,

14:47:04 20    because the Rohan Houlden e-mails that were sent to

14:47:11 21    Mr. Aichele in September were -- I thought I had a

14:47:19 22    reference to it.  I do.

14:47:22 23        and I don't know, Mr. Brown, if you could put up some

14:47:26 24    slides from PTX-for Mr. DeFosse's presentation.  So 19.9

14:47:37 25    and 19.10.  Thank you

14:47:47  1    so On 19.9, this is Trial Exhibit 21, Mr. DeFosse

14:47:52  2    said, "Oh, well, from this, they knew that there was going

14:47:53  3    to be a gap in Qorvo's product roadmap." but in 19.10,

14:48:01  4    Dr. Shanfield testified, "Oh, this is how Mr. Aichele knew

14:48:10  5    to do a business plan because he got from this, 'Oh, it's

14:48:13  6    really good idea to get into 5 gigahertz."

14:48:16  7        So, you know, those are contention with each other.

14:48:21  8        What Mr. Aichele testified to is that there was a

14:48:24  9    thing called Wi-Fi 6, which was not a surprise to anybody.

14:48:28 10    It was a new relatively new spec.  There was a customer,

14:48:32 11    Eero, maker of pretty good Wi-Fi mesh systems.  I have

14:48:40 12    one.  I endorse it.  But it's a -- came out in 2016.

14:48:44 13    Those parts were needed then.  It was not a surprise to

14:48:47 14    anybody that 5 gigahertz bandwidth was in need of somebody

14:48:54 15    making parts other than the dielectric resonator makers in

14:48:58 16    China who made the larger footprint ones.

14:49:02 17        And it also was not a bad idea to go after a market

14:49:07 18    that Qorvo wasn't paying attention to.  And Qorvo, at the

14:49:13 19    time, was not -- this was not a surprise to anybody that,

14:49:19 20    you know, Qorvo was paying attention to its mobile unit.

14:49:24 21        And Mr. Aichele -- actually, I will take that back,

14:49:31 22    because Mr. Aichele was expecting Qorvo to do something

14:49:34 23    because he put the QPQ19XX as a potential competitor in

14:49:40 24    his sheet.  But, you know, the specifications were

14:49:45 25    provided from the dielectric resonators who were already

14:49:49  1    making parts in the 5 gigahertz range.  So there really is

14:49:52  2    no evidence there of any change in plans or any change in

14:49:57  3    strategy.

14:50:02  4         And, you know, Mr. Aichele did some things wrong.  He

14:50:07  5    obviously should have shut off Mr. Li.  I take issue with

14:50:14  6    Mr. DeFosse's insistence that Mr. Li was bribing people,

14:50:18  7    or Mr. Kim, I can't remember which one it was.  But,

14:50:22  8    obviously, there were entertainment expenses and people

14:50:28  9    were going out to lunch, and apparently they were all

14:50:31 10    sharing information.

14:50:32 11         And Mr. Aichele mentioned that he was worried that

14:50:34 12    Mr. Kim was sharing information about Akoustis too.  So

14:50:37 13    there's a little bit of a different culture there in Asia.

14:50:40 14         But there is no evidence at all that any of that

14:50:45 15    information changed any plans at Akoustis or persuaded it

14:50:50 16    to change its strategies.  So we submit that there really

14:51:16 17    is no evidence of any benefit to Akoustis.

14:51:23 18         I want to talk about damage methodologies.  I took

14:51:28 19    this slide from Ms. Irwin's presentation this morning.

14:51:33 20    There are three ways to value -- to assess remedies in a

14:51:42 21    trade secret case.  I talked about this a few minutes ago.

14:51:46 22    No damage to Qorvo, so Number 1 is out.

14:51:49 23         Number 3, they're not relying on a royalty

14:51:53 24    methodology for trade secrets, so that is out.

14:51:56 25         So really, we're only talking about unjust enrichment

14:51:59  1    here.

14:51:59  2        And there are three, at least three methods for

14:52:03  3    assessing the value of an unjust enrichment benefit to the

14:52:08  4    defendant.  Time benefit of trade secrets or head start.

14:52:12  5    That's what Ms. Bennis -- that's her approach.  Profits on

14:52:17  6    sales, which depends on profits.  Akoustis has no profits.

14:52:22  7    That is out.

14:52:22  8        And then there's the research and development cost

14:52:25  9    savings, avoided costs.  And that is something about which

14:52:27 10    Ms. Irwin testified at length today.

14:52:33 11        So Dr. Shanfield, by the way, seemed to suggest that

14:52:38 12    an avoiding costs theory might have been best when he

14:52:45 13    stated that he estimated the time savings didn't go into

14:52:50 14    expense, that that would have been time and expense that

14:52:51 15    Akoustis avoided by using Qorvo's information as a

14:52:55 16    shortcut.

14:53:03 17        Mr. DeFosse says a dollar today is, you know, worth

14:53:06 18    more than a dollar next week, or next year, or ten years

14:53:09 19    from now.  As Ms. Irwin made clear, that assumes you have

14:53:14 20    that dollar to do something with.  If all of your dollars

14:53:17 21    are consumed with the cost of creating the product from

14:53:22 22    which you are deriving the revenue, you don't have a

14:53:25 23    benefit.

14:53:26 24        You may have a benefit measured in a different way,

14:53:28 25    and I'll talk about that in a second, but you don't have a

14:53:33  1    benefit from which you can measure head start where the

14:53:38  2    real calculation must be based on profits, not on revenue,

14:53:42  3    because revenue does not measure benefit.  It only -- it's

14:53:46  4    a concept, but nobody relies on revenue.  It's not an

14:53:52  5    accepted principle in this area, as Ms. Irwin testified

14:53:55  6    to.

14:53:58  7        Ms. Bennis didn't, you know -- did her best to

14:54:00  8    support it, but she admitted that she was not aware of any

14:54:03  9    court case that has approved her methodology, nor is she

14:54:06 10    aware of any secondary authority, any treaties or articles

14:54:12 11    that says, Yeah, you can just use revenue instead.

14:54:17 12        We have this thing called lost -- the "defendants'

14:54:20 13    lost profits."  And, you know, if we could just substitute

14:54:22 14    in revenue, every plaintiff would love that because then

14:54:26 15    they can just -- you know, the numbers would be a lot

14:54:29 16    higher and they could get more damages, but that's not the

14:54:31 17    case, because unjust enrichment measures the benefit to

14:54:35 18    the defendant.  And that's why Ms. Bennis' methodology is

14:54:39 19    simply wrong.

14:54:41 20        If we correct her methodology to use gross profit or,

14:54:45 21    basically, simply only taking off -- it's the first line,

14:54:49 22    so it's only taking off the amount that is necessary to

14:54:53 23    create the products from which the revenue comes, then

14:55:00 24    we're at a negative number.  And the time value of

14:55:05 25    negative $9 million is still a negative number.  It's not

1    any better.  And as Ms. Irwin showed, it just gets worse

2    over time.

3        I want to talk about employee poaching briefly.

4        So 43, 19, eight.  43, the total number of Qorvo

5    employees who jumped ship to Akoustis.  You heard one of

6    the -- and Ms. Johnson testify, Why are there so many

7    former Qorvo people at Akoustis as compared to Skyworks or

8    Broadcom?  And the reason is because they're in the same

9    metropolitan area.  I mean, It's not a short drive, but at

10   least Greensboro and Charlotte are pretty close together.

11       On top of that, you've got a number -- you know,

12   you've got RFMD former employee who founded Akoustis, and

13   so, you know, people will tend to work with people they

14   know.

15       Nineteen is the number that Ms. Bennis chose as the

16   number who were poached because everybody -- all the other

17   43, there are reasons, terminations, rifts, other things.

18   There was some other issue that prevented them from being

19   poached.  But she never established that they were

20   poached.

21       Poaching means, in this case -- and you've heard the

22   testimony -- that, you know, just simply, you know, if I

23   recruited Mr. Masters to my law firm after this trial were

24   over, or he recruited me to his law firm, that kind of

25   stuff happens all the time.  People go out and they hire

employees from competitors.

What makes it poaching is that when you do it in a wrongful manner, you poach that employee, you take that employee, you target that employee because of what she has and is going to give to you.  It's that confidential or trade secret information.

Ms. Bennis made absolutely no effort to determine whether that happened with any of the 19.  Ms. Irwin did, as she testified.  She found eight of the 19 people on a list that Dr. Shanfield had included in his report.  Those were people who received, according to him, confidential Qorvo information.  And so they dwindled it down.  But that doesn't make the poaching claim okay for eight.  Because what Ms. Bennis never did was find out whether or not Qorvo had even replaced any of these folks.

And, remember, poaching damages is reimbursement or compensation for the amount of money that Qorvo lost because it had to replace people.  There's what we call "soft costs" in replacing anybody we lose to unwanted attrition.  She never did that.  So she has failed to meet the burden of proof on that.  She failed to meet the burden of actual poaching, and as a result, there's no -- Qorvo has failed to meet its burden of proving any poaching whatsoever in this case.

Regarding the patent claims, I'm not going stand here

14:58:27 1    and repeat everything Dr. Nguyen said to you this morning.

14:58:31 2    You heard what he said.  The testimony, you can weigh it

14:58:37 3    for yourself while it's fresh in your minds.

14:58:40 4        We submit that, you know, Qorvo has failed to bear

14:58:46 5    its burden of proving that the top electrode layer is

14:58:50 6    thinner than the bottom with at least a number of

14:58:53 7    products, and they have failed to call together admissible

14:58:59 8    evidence regarding the increase in filtered bandwidth.  As

14:59:04 9    Dr. Nguyen testified, that's not what they did.

14:59:08 10        And regarding the '755 claims, again, I'm not

14:59:12 11    going -- it's fresh in your minds.  I don't think it would

14:59:15 12    be worthwhile to go into a lot of detail.  But suffice it

14:59:18 13    to say, we disagree with Mr. DeFosse's conclusion.

14:59:26 14        I want to talk about the damages that Akoustis has

14:59:32 15    put forward in the event that you find liability.  This

14:59:35 16    trade secret misappropriation is -- Ms. Irwin testified to

14:59:41 17    that.  And now I'm going to come back to what I was going

14:59:43 18    to say about unjust enrichment.

14:59:46 19        Qorvo could have chosen a different methodology.  It

14:59:49 20    could have tried to value -- and Mr. DeFosse was indignant

14:59:55 21    in saying, Hey, they can't say that this stuff that they

14:59:59 22    passed around has no value whatsoever.  And, you know,

15:00:02 23    Dr. Darveaux disagrees.  But there's a lot of information

15:00:09 24    out there.  It's not impossible that you would disagree

15:00:12 25    with Dr. Darveaux on one or more trade secrets.

The question is, though, in the event that you do find liability, what is compensation due to Qorvo?  Again, it could have chosen a methodology that worked.  It could have chosen to say, Hey, Akoustis would have had X value had it not done this, as a going entity.  It chose not to do that.  It chose to grab for the brass ring uses a methodology that has never before been used.

I'm not talking about the time value of money because that notion would have been applied to any gross profit had Akoustis had any.  I'm talking about using this revenue number that is the only way they can get a positive number generated.  They could have used avoiding costs.  They chose not to do that.  It is a choice that Ms. Bennis made, I expect, in conjunction with her client, to go for that particular remedy.  And that she chose a trade secret misappropriation remedy that is not appropriate and does not fit the facts of this case, is on her.

Employee poaching, at most, should be 356,000 in the event you even find poaching.  And patent infringement should be a total of $279,000.  You will see a line on the special verdict form an amount for each patent.  And I just want to remind you that Qorvo -- Ms. Bennis said that the amount of damages, based on reasonable royalty, is 279,000 for both patents.  So just want to caution you

1    about double counting in that.

2        I've taken a lot of your time.  I did want to respond

3    very quickly, rapid fire, to a few of the things that

4    Mr. DeFosse said.

5        He says, you know, they're saying that these trade

6    secrets have no value.  How can that be?  They passed it

7    around ad nauseam.  They wouldn't be passing around

8    information if it was not useful.  That's not the way to

9    value a trade secret.

10       The way to value a trade secret is whether or not you

11   can use it in some form, other than being of interest if

12   somebody reads it.  E-mailing is not using.  And you

13   cannot simply conclude with any kind of reasonable

14   certainty, and certainly without, you know, on the basis

15   of a preponderance of the evidence that simply because

16   somebody e-mails a document that might contain a trade

17   secret, that, in fact, it was using.

18       Missing devices was another issue that was mentioned.

19   And Mr. DeFosse said, Imagine if we had all those devices.

20   I just wanted to explain that this litigation commenced in

21   October of 2021.  Parties, both parties have an obligation

22   once litigation is commenced, or you're aware of that

23   litigation may be commenced, to preserve evidence.

24       So until Akoustis was sued on October 4, 2021, there

25   was no notice that Qorvo had these claims.  All of those

15:03:37  1    laptops were just simply recycled in the normal course of

15:03:41  2    business, as I'm sure those of you who get business-issued

15:03:45  3    laptops or court devices, you know, probably glad when you

15:03:48  4    get a new one because the old ones tend to lag pretty

15:03:52  5    badly.  That's what happened here.

15:03:53  6         There's been no allegation that Akoustis destroyed

15:03:57  7    anything in -- you know, any of those devices that Mr.

15:04:05  8    DeFosse put up on the slide, there's been no allegation

15:04:07  9    that Akoustis acted willfully there.

15:04:12  10        I also wanted to remind you about the timeline.  And

15:04:14  11   this is important because it's in 2017 when Daeho Kim and

15:04:22  12   Mary Winters come.  And there was a reason why we put them

15:04:25  13   first in our lineup.  And it's because they represent a

15:04:30  14   big change at Akoustis.  And you can say what you will

15:04:34  15   about Rohan Houlden or Mr. Vetury or Rob Dry, who comes

15:04:41  16   and goes later.  But I think their testimony was clear,

15:04:45  17   that what they did was original, not rely on anything that

15:04:50  18   Qorvo provided.  And what they created are the products

15:04:54  19   that Akoustis is selling now.

15:04:59  20        Finally, I want to respond to Mr. DeFosse's ask for

15:05:09  21   an exemplary damages amount that, you know, if this case

15:05:15  22   doesn't merit exemplary damages, then no case does, I

15:05:19  23   think, is what he said.

15:05:21  24        Mr. Brown, can you -- I think I have the -- I won't

15:05:28  25   ask you for it, because I don't have the page with me.

15:05:32  1    But I don't want to belabor the point.

15:05:35  2        But we trust that in the event that you find

15:05:40  3    liability, damages that you find will fit the facts and

15:05:48  4    fit the theory that makes sense to you; common sense.  If

15:05:54  5    you find that exemplary damages, sometimes called

15:06:01  6    "punitive damages," are something that you want to award,

15:06:05  7    then my only suggestion is that they are in proportion to

15:06:15  8    whatever compensatory damages that you find.

15:06:19  9        Again, I will say that it's not easy to come up here

15:06:24 10    and talk to you and tell you that my client, our client,

15:06:31 11    did things that are, frankly, unethical.  But that doesn't

15:06:36 12    mean that they misappropriated and used trade secrets.  It

15:06:42 13    doesn't mean that they owe Qorvo $50 million, let alone

15:06:47 14    the $66.1 million that was first put up by Ms. Bennis.

15:06:52 15        The damages testimony you heard from Ms. Irwin, I

15:06:57 16    think, provides some very good perspective that I'm sure

15:07:01 17    you will consider carefully.

15:07:05 18        Good luck with your deliberations today.  Again,

15:07:08 19    thank you for your time.  Thanks for listening to me for a

15:07:12 20    an hour.  And we wish you well in your deliberations.  So

15:07:20 21    thank you.

15:07:24 22            THE COURT:  Mr. DeFosse, do you wish to make a

15:07:26 23    brief rebuttal argument?

15:07:29 24            MR. DeFOSSE:  Very brief, Your Honor.

15:07:31 25            I'm sure you were excited when you heard you

15:07:35  1    were going to hear from me again.  It is going to be very

15:07:38  2    brief.  I promise.

15:07:40  3            First thing I want to say is, you know,

15:07:43  4    Mr. Elkins, I think, did a great job of coming up here and

15:07:45  5    expressing contrition, but I would like you to put that in

15:07:50  6    context of what we're talking about.  He's trying to

15:07:53  7    suggest to you that they're contrite to avoid an award of

15:07:58  8    damages here, is what's going on.

15:07:59  9            And what I would ask you to remember is, what

15:08:01 10    was the opening statement in this case?  Was there any

15:08:03 11    contrition expressed during the opening statement?  I

15:08:07 12    didn't hear any.

15:08:08 13            This is a new -- you know, we've caught --

15:08:10 14    we've got caught over the last ten days, seen all this

15:08:15 15    evidence, it's really bad, so now we're contrite.  At the

15:08:19 16    time, no contrition.  When we filed this case, no

15:08:22 17    contrition.  Up until this very moment, this very moment,

15:08:25 18    no contrition.  It's to influence your deliberations, is

15:08:31 19    what it is.

15:08:35 20            Mr. Elkins put up on the screen the

15:08:38 21    confidential Qorvo documents.  All the documents are

15:08:40 22    listed as "Confidential."  And that one strikes me as a

15:08:42 23    little strange.  We're in a case where we're accusing them

15:08:46 24    of misappropriating our trade secret.  Of course, the

15:08:49 25    documents are mark as "Confidential."  I think it would

15:08:50    1    probably be a problem if it was the opposite.  That

15:08:53    2    doesn't mean that Qorvo marks all of its documents

15:08:55    3    "Confidential."

15:08:57    4        And as you heard from Mr. Robinson, we have a

15:09:00    5    confidentiality legend that's on the presentations that

15:09:03    6    our employees are trained to take that off.  And it's

15:09:06    7    smart, right.  That is smart to protect your information

15:09:10    8    with that.

15:09:11    9        And just think about it, these are not kind of

15:09:13   10    marketing presentations.  We're talking about design

15:09:16   11    presentations from the BAW filter research and development

15:09:21   12    group.  Okay.  So these are things that you would expect

15:09:22   13    to be confidential.  And, of course, everything here is

15:09:25   14    marked "Confidential."

15:09:29   15        Okay.  Can we put up PTX-453, please.  And go

15:09:36   16    to the second page.

15:09:39   17        Now, this one just caught me.  And, again, we

15:09:41   18    have this kind of, like, weird contrast here where we're

15:09:44   19    really contrite, we're sorry, we did unethical things, but

15:09:47   20    we didn't use any of it, we didn't copy any of it.  And

15:09:50   21    all J.B. Kwon did, was he reproduced something from his

15:09:56   22    memory.  I had two reactions right away to that.

15:09:59   23        I mean, maybe someone could reproduce this from

15:10:03   24    their memory.  But I think you also heard J.B. Kwon's

15:10:06   25    testimony in this case, right?  I have to say, that

15:10:09  1    gentleman remembered almost nothing.  So I don't think

15:10:13  2    this was coming from his memory.

15:10:18  3            You know, the other thing Mr. Elkins went

15:10:20  4    through is a lot of testimony from witnesses in this

15:10:23  5    trial.  Again, that's created here at this trial.  What do

15:10:28  6    the documents show you?

15:10:32  7            Mr. Elkins suggested that Dr. Shanfield was

15:10:34  8    just speculating when he said, for example, that there was

15:10:38  9    a meeting at the Panera, and Mr. Schmid got the document.

15:10:42  10   I would suggest to you that that's not speculation, that's

15:10:45  11   what we call, in this world, circumstantial evidence.

15:10:48  12           You know, if you have a meeting, seven days

15:10:52  13   later, the person you had the meeting with downloads the

15:10:56  14   document; and a month after that, they bring the document

15:10:58  15   and upload it to the computer systems at Akoustis?  I

15:11:00  16   mean, you've heard the instruction about, if someone walks

15:11:03  17   in and they have water on their umbrella, you can infer

15:11:07  18   that it's raining outside.  I mean, how wet is Akoustis

15:11:11  19   here?  I mean, they're like dripping wet.  The water is

15:11:14  20   pooling around their feet with this evidence.  It's not

15:11:18  21   speculation.

15:11:19  22           On damages, you have to, I think, take a step

15:11:24  23   back again on Ms. Irwin's testimony here.  If you take her

15:11:28  24   at face value, Qorvo should be paying Akoustis almost

15:11:32  25   $10 million for the benefit of having stolen our trade

15:11:36  1    secrets.  Akoustis is worse off because it took our trade

15:11:40  2    secrets.  Does that make sense?  I mean, it makes no sense

15:11:43  3    to me.

15:11:44  4         And the concept that only a profitable company

15:11:48  5    could have a head start, that also doesn't make sense.

15:11:51  6    You can have a head start if you're not profitable.  And

15:11:53  7    just think about some of the companies, the -- like the --

15:11:56  8    the most successful companies in the world may have

15:11:58  9    started as nonprofitable companies.  You have Teslas, your

15:12:01 10    Amazons.  I mean, you have a lot of companies who are

15:12:04 11    very -- who have losses, but can still benefit from

15:12:07 12    getting trade secrets from someone else.  And that's what

15:12:09 13    happened here.

15:12:11 14         The company may have had a loss, but they still

15:12:14 15    got an acceleration.  They got the revenues accelerated,

15:12:17 16    and they could use those to pay expenses.  These aren't

15:12:20 17    expenses that are related to the trade secrets.  It's not

15:12:22 18    like they took the trade secret and their expense went up.

15:12:25 19    These are expenses they had anyway.

15:12:26 20         And so they're getting the benefit of those

15:12:28 21    revenues to pay their expenses.  That's the damage here;

15:12:30 22    having that now, instead of having to go out to the market

15:12:33 23    raise capital, or go to a bank and borrow money.  That's

15:12:37 24    time value of money.  It's a substantial benefit.

15:12:41 25         Could we pull up -- Mr. Brown, are you able to

15:12:43  1    do 19.138.  That's from the slide presentation today.  Our

15:12:59  2    slide presentation.  And could we go one more slide in the

15:13:07  3    future.  There we go.

15:13:09  4            So Mr. Elkins put up their calculation of the

15:13:11  5    poaching damages, and I just wanted to put ours up in

15:13:14  6    front of you.  Our calculation is 809,000.  And I think

15:13:15  7    this is a pretty simple calculation that Ms. Bennis based

15:13:21  8    on the 19 employees who were taken directly from Qorvo.

15:13:24  9    The reason it's 19 and not 43 is Ms. Bennis, again, out of

15:13:29 10    conservatism, didn't want to estimate a damage to Qorvo

15:13:33 11    for folks who had left previously or left for other

15:13:37 12    reasons and weren't taken.  So that's why it's 19.  It's

15:13:39 13    not to suggest that the other 43, or the other however

15:13:43 14    many, 19 minus 43, weren't taken to obtain confidential

15:13:47 15    information.

15:13:49 16            So that's what I would leave you with.  I

15:13:52 17    appreciate, and we appreciate your time and diligence and

15:13:54 18    effort in this case, and your attention.  Thank you.

15:14:01 19            **THE COURT:**  Ladies and gentlemen, that

15:14:02 20    concludes the closing argument in the case.  We are going

15:14:06 21    to take like a 16-minute, come back at 3:30 for the

15:14:11 22    instructions on the law.

15:14:14 23            You will have to wait here just a moment, and

15:14:16 24    you will be excused at this time.  Don't decide the case.

15:14:19 25    Keep an open mind, and, of course, don't discuss the case

15:14:23  1    amongst yourself.  We have a ways to go.  Thanks very

15:14:27  2    much.

15:14:28  3         (The jury exits the courtroom at 3:14 p.m.)

15:15:01  4         **THE COURT:**  You have the redraft of the

15:15:03  5    stipulation.  I think that everything is okay in there.  I

15:15:05  6    know that there's one time where the word "prior art"

15:15:07  7    appears, but I don't think it's confusing.  I think it's

15:15:10  8    in a context that's allowed, and we're not having a

15:15:14  9    discussion about that anyway, but it was stipulated as a

15:15:20 10    fact.

15:15:21 11         And I will probably not have -- I will probably

15:15:24 12    reference it.  I will reference the stipulations.  I may

15:15:27 13    even briefly sort of say what they are about, but I'm not

15:15:31 14    going to read them to them probably.  I'm also not going

15:15:34 15    to reread the trade secret.  I think they've heard this

15:15:39 16    many times, and they will have that information attached,

15:15:42 17    but I will tell them that it is attached.

15:15:44 18         In connection with the witness list and exhibit

15:15:48 19    list, you should have those.  We do have to have those

15:15:51 20    approved before we send them back.  I think they are

15:15:55 21    right.  If you don't like them, you can complain to the

15:15:58 22    two people in front of me.  But I think they are, correct.

15:16:01 23         So those are those three things.  I will need

15:16:05 24    you to take a look at that stipulation.  If you think

15:16:07 25    something ought to be changed on it, you've already

15:16:09 1    stipulated to it.  It was agreed to.  It's in the pretrial

15:16:13 2    order, so it's a little awkward to be saying you didn't

15:16:15 3    agree to the fact, but you tell me if you need to.  Okay.

15:16:21 4            I'm going to go through the instructions.  I

15:16:24 5    may take a stretch break when I get to patents because

15:16:27 6    it's kind of long, always seems to be somewhat long, and

15:16:31 7    that's what we will probably end up doing.

15:16:35 8            Anything else from the plaintiff?  Any problem

15:16:39 9    with the stipulation?  I mean, you have agreed to this in

15:16:42 10    the past, so do you still agree to it?

15:16:45 11            **MR. MASTERS:**  I've read it.  It looks fine to

15:16:47 12    us, Your Honor.  Nothing beyond this.

15:16:50 13            **THE COURT:**  All right.  And maybe check with --

15:16:51 14    yes, sir, our expert over here.

15:16:55 15            **MR. ELKINS:**  My more-seasoned colleague says

15:16:57 16    it's fine, Your Honor.

15:16:58 17            **THE COURT:**  All right.  I do need your

15:16:59 18    signatures on it because we will file it with the case,

15:17:01 19    and they need to see that it's, in fact, it's been -- they

15:17:05 20    know it's been stipulated to, but they need to see that it

15:17:08 21    has been stipulated to.  That's how people want things

15:17:11 22    done nowadays.  I don't blame them.

15:17:15 23            I think that means that we get a short break at

15:17:16 24    this time, and we will everyone in about ten minutes.

15:17:25 25    Thanks very much.

15:17:26  1           (Whereupon, a recess is taken.)

15:17:26  2           **THE CLERK:**  All rise.

15:17:26  3           **THE COURT:**  All right.  You can be seated.  I

15:27:03  4  see everybody is a little relaxed, so that's okay.

15:29:18  5           We are waiting on the signed stipulation, and

15:29:20  6  I'm going to add that to the folder.

15:29:24  7           **MR. MASTERS:**  One question.  The exhibit and

15:29:24  8  witness list that was mailed?

15:29:26  9           **THE COURT:**  Yes.

15:29:26 10           **MR. MASTERS:**  The exhibit list looks fine.  Is

15:29:29 11  there a separate witness list, or is it --

15:29:31 12           **THE COURT:**  The witnesses are listed on there.

15:29:33 13           **MR. MASTERS:**  Yes.

15:29:33 14           **THE COURT:**  So there is not a separate one.

15:29:35 15           **MR. MASTERS:**  Okay.  So Dr. Nguyen and Ms.

15:29:37 16  Irwin who testified today, there were no exhibits.

15:29:40 17           **THE COURT:**  There were no exhibits.

15:29:41 18           You're right.  They need to be added.  There

15:29:43 19  were two that did not have exhibits.

15:29:47 20           **MR. MASTERS:**  Otherwise, we're fine with that.

15:29:49 21           **THE COURT:**  Absolutely.  Absolutely.  Thank

15:29:59 22  you.

15:31:05 23           I think we are ready to bring the jury in.

15:31:48 24           All right.  The jury should be coming in

15:31:53 25  momentarily.

15:32:28  1        (The jury enters the courtroom at 3:32 p.m.)

15:32:40  2            **THE COURT:**  Everyone can be seated.

15:32:45  3            In a moment, I will begin the jury

15:32:47  4    instructions, and I will tell you at the beginning and

15:32:51  5    then later on that you will also receive a verdict folder,

15:32:54  6    which will contain certain stipulated facts by the

15:32:58  7    parties, and it also will contain the special verdict

15:33:01  8    form.  And it will also contain a list of alleged trade

15:33:06  9    secrets, which match up with the special verdict form.

15:33:09 10    And it will also contain a list of witnesses and a list of

15:33:14 11    exhibits.

15:33:15 12            So you will receive those at the end as you go

15:33:19 13    back to deliberate on your verdict.

15:33:22 14            Ladies and gentlemen, obviously, we have now

15:33:24 15    come to that point in the case when it is my duty to

15:33:30 16    instruct you on the rules of law that you must follow and

15:33:33 17    apply in deciding this case.  As jurors, it will be and is

15:33:40 18    your exclusive duty to decide all questions of fact

15:33:44 19    submitted to you, and for that purpose to determine the

15:33:47 20    effect and the value of the evidence.

15:33:52 21            You must not be influenced by sympathy, bias,

15:33:56 22    or prejudice, or compassion.  You must follow the law as I

15:34:01 23    explain it to you whether you agree with that law or not.

15:34:04 24    You are not to single out any particular part of the

15:34:08 25    instructions and ignore the rest.  But you are to consider

15:34:12 1   all of the instructions as a whole and regard each in the

15:34:17 2   light of the others.  Of course, you will have a full set

15:34:21 3   of the instructions, written instructions with you in the

15:34:24 4   jury room.

15:34:26 5        I will start by explaining the general rules

15:34:30 6   that apply in every civil case, then I will explain some

15:34:34 7   rules that you must use in evaluating the testimony and

15:34:38 8   evidence.  Next, I will explain the law you will apply in

15:34:44 9   this case.  And after that, at the very end, I will

15:34:48 10  explain the rules that you must follow during your

15:34:51 11  deliberations in the jury room and the possible verdicts

15:34:55 12  that you may return.

15:34:58 13       Please pay careful attention to everything I

15:35:01 14  say.  You will, of course, receive a written copy of these

15:35:05 15  instructions and will have them with you in the jury room

15:35:09 16  for your reference during your deliberations.  You will

15:35:13 17  also have a verdict form, which will list the verdict

15:35:17 18  questions that you must answer in deciding this case.

15:35:32 19       As you know, in this case, the parties are

15:35:37 20  corporations.  Under the law, a corporation is considered

15:35:39 21  to be a person.  It can only act through its employees,

15:35:45 22  agents, or officers.  Therefore, a corporation is

15:35:49 23  responsible for the acts of its employees, agents,

15:35:52 24  directors, and officers performed within the scope of

15:35:56 25  their authority.

1    In this case, the plaintiff and defendant are

2  business organizations, and, of course, the fact that the

3  parties in this case are organizations must be influence

4  you in your deliberations or in your verdict.

5    You may not discriminate between businesses and

6  natural persons.  Each is a person in the eyes of the law

7  and each is entitled to the same fair and impartial

8  consideration and justice by the same legal standard.

9    This case should be considered by you as you

10  decide it as an action between persons of equal standing

11  in the community, of equal worth, and holding the same or

12  similar stations in life.  An organization is entitled to

13  the same fair trial at your hands as a private individual.

14  All persons, including corporations, governments and

15  government entities stand equal before the law and are to

16  be dealt with as equals in a court of justice.

17    It will be your duty to decide this case with

18  the same impartially you would use in deciding a case

19  between individuals.

20    While Qorvo and Akoustis -- and I'm going to

21  use -- I know that we have two defendants, but we agreed

22  we would use one word to describe both of them.

23    While Qorvo and Akoustis are parties in this

24  case, that does not mean that only the actions of each

25  business organization as one body are to be considered by

15:37:42  1    you in determining its claims or defenses.  The

15:37:46  2    corporation or business organization acts not only through

15:37:49  3    the policies and decisions it makes, but also through its

15:37:53  4    designated supervisory employees, such as its managers,

15:37:58  5    officers, and others designated by the corporation to act

15:38:02  6    on its behalf.

15:38:05  7         Pay close attention to the remainder of these

15:38:07  8    instructions.  As you apply subsequent portions of these

15:38:10  9    instructions, you will have to determine whether or not

15:38:12 10    employees, managers, or agents were authorized to act on

15:38:17 11    behalf of the party that you are considering.

15:38:23 12         You must make your decision based only on the

15:38:25 13    evidence that you saw and heard in the court.  Do not let

15:38:30 14    rumors, suspicions, or anything else that you may have

15:38:34 15    seen or heard outside the court influence your decision in

15:38:38 16    any way.  The evidence in this case includes only what the

15:38:42 17    witnesses said while they were testifying under oath,

15:38:46 18    including deposition transcript testimony, which was

15:38:51 19    played by video or read to you, the exhibits that are

15:38:56 20    allowed into evidence, and the stipulations to which the

15:38:59 21    parties agreed.

15:39:00 22         Now, you will note that I referenced

15:39:01 23    stipulations when we first began our discussion, and there

15:39:05 24    is a separate document, which lists those.  Go over them

15:39:10 25    briefly at an appropriate point in time.

Nothing else is evidence.  The lawyers' statements are offered solely to aid you and to help you in your determination of the facts.  As indicated, the lawyers' statements and arguments are not evidence.  Their questions objections are not evidence.  And my legal rulings are not evidence.

You should not be influenced by a lawyer's objection or by my ruling on that objection.  None of my comments or questions are evidence.

During the trial, I may not have let you hear the answer to some of the questions that the lawyers asked.  There were only a few situations where we -- where we sustained the objection.  I also may have ruled that you could not see some of the exhibit that lawyers wanted you to see, and sometimes I may have ordered that you disregard something that you saw or heard -- that happened, I think, once, but it did happen -- whether I struck from the record something that was said.  And that did happen once or twice.  You must ignore all of these things.

Do not speculate as to what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decisions based only on the evidence

15:40:47 1    as I've defined it here, and as we've discussed earlier,

15:40:51 2    and on nothing else.

15:40:57 3          During the preliminary instructions, I told you

15:41:00 4    about direct evidence and circumstantial evidence.  Now,

15:41:05 5    again, I will remind you what that means.  Direct evidence

15:41:10 6    is simply evidence like the testimony of an eyewitness,

15:41:13 7    which, if you believe it, directly proves a fact.  If a

15:41:20 8    witness testified that he or she saw it raining outside

15:41:24 9    and you believed him or her, that would be direct evidence

15:41:27 10   that it was raining because they said it was raining.

15:41:31 11         Circumstantial evidence is simply a chain of

15:41:34 12   circumstances that indirectly prove a fact.  If someone,

15:41:38 13   as we talked about at the beginning, walked into the

15:41:41 14   courtroom wearing a raincoat, covered with drops of water,

15:41:44 15   and carrying a wet umbrella -- seems like it's rained a

15:41:48 16   lot ever since we started this case -- that would be

15:41:51 17   circumstantial evidence from which you could consider or

15:41:55 18   conclude that it was raining.

15:41:57 19         It is your job to decide how much weight to

15:42:00 20   give the direct and circumstantial evidence.  The law

15:42:04 21   makes no distinction between the weight you should give to

15:42:08 22   either one, nor does it say that one is any better

15:42:13 23   evidence than the other.  You should consider all the

15:42:16 24   evidence, both direct and circumstantial, and give it

15:42:21 25   whatever weight you believe that it deserves.

1    You should use your common sense in weighing

2    the evidence.  Consider it in light of your everyday

3    experience with people and events, and give it whatever

4    weight you believe it deserves.  If your experience tells

5    you that certain evidence reasonably leads to a

6    conclusion, you are free to reach that conclusion.

7    Nothing that I've said or done during this

8    trial was meant to influence your decision in any way.

9    You must decide the case yourself based on the evidence

10   presented.  The Court has no opinion on the outcome of the

11   case.  If I have read any of these instructions

12   inconsistently with the written text -- and there will be

13   some things that I'm not going to read that you are going

14   to look at -- or if they are inconsistent with other

15   instructions you receive during the case, you are to rely

16   on the written instructions in your deliberations.

17   I hope I don't misread anything, but if I do,

18   it's written down.  Or if you misheard me, that's --

19   they're for that purpose too, so can you check exactly

20   what the instruction is.

21   A further word about statements of counsel and

22   arguments of counsel.  I always have to remind every jury

23   that the attorneys' statements and arguments are not

24   evidence.  Instead, their statements and arguments are

25   intended to help you review the evidence presented.  If

you remember the evidence differently from the way it was

described by the attorney or attorneys, you should rely

upon your own recollection of the evidence.

You, the jurors, are the sole judges of the

credibility or believability of the witnesses you have

seen during the trial and the weight of their testimony.

You should carefully scrutinize all the

testimony that each witness has given and every matter of

evidence that tends to show whether he or she is worthy of

belief.  You should consider the reasonableness or

unreasonableness of the testimony of the witness; the

opportunity or lack of opportunity of the witness to know

the facts about which he or she testified; the

intelligence or lack of intelligence of the witness; the

interest of the interest in the result of the lawsuit; the

relationship of the witness to any of the parties in the

lawsuit, if any; and whether the witness testified

inconsistently while on the witness stand; and if the

witness said or did something or failed to say or do

something at any other time that is inconsistent with what

the witness said while testifying.

Discrepancies in testimony of different

witnesses may or may not cause you to discredit such

testimony.  Two or more persons witnessing an incident or

transaction may see or hear it differently.  Likewise, in

15:45:56  1    determining the weight to give the testimony of the

15:45:58  2    witness, you should ask yourself whether there was

15:46:03  3    evidence tending to prove that the witness testified

15:46:06  4    falsely about some other, or some important fact, and

15:46:13  5    whether there was evidence that at some other time the

15:46:17  6    witness said or did something or failed to say or do

15:46:21  7    something that was different from or inconsistent with the

15:46:25  8    testimony that he or she gave before you during this

15:46:29  9    trial.

15:46:32 10         It is within the providence of the jury to

15:46:36 11    determine whether a false statement or prior inconsistent

15:46:40 12    statement discredits the witness' testimony.  You should

15:46:46 13    remember that a simple misstatement by a witness does not

15:46:50 14    mean that the witness was not telling the truth.  People

15:46:54 15    may tend to forget some things or remember other things

15:46:58 16    inaccurately.  If a witness has made a misstatement, you

15:47:02 17    must consider whether it was simply an innocent lapse of

15:47:06 18    memory, or an intentional falsehood.  And that may depend

15:47:11 19    upon whether it concerns an important factor or only an

15:47:15 20    unimportant detail.

15:47:18 21         The witness may be discredited or impeached by

15:47:22 22    contradictory evidence or by evidence that at some other

15:47:25 23    time a witness has said or done something or failed to say

15:47:28 24    or do something that is inconsistent with the witness'

15:47:31 25    present testimony.  If you believe that any witness has

1   been impeached, and, thus, discredited, you may give the

2   testimony of that witness such credibility, if any, you

3   think it deserves.  If the witness is shown knowing to

4   have testified falsely about any material matter, you have

5   a right to distrust such witness' other testimony, and you

6   may reject all the testimony of that witness, or give it

7   such credibility as you think it deserves.  You may, of

8   course, accept any part you decide is true.  That is all

9   for you, the jury, to decide.

10          An act or omission is done knowingly if

11  committed voluntarily and intentionally and not because of

12  mistake or accident or some other innocent reason.

13          One additional point about witnesses.

14  Sometimes jurors wonder if the number of witnesses who

15  testify makes any difference, and that is the number of

16  witnesses testifying on a particular point.  Do not make

17  any decisions based only on the number of witnesses who

18  testified.  What is more important is how believable the

19  witnesses were and how much weight you, the jury, think

20  their testimony deserves.  Concentrate on that, of course,

21  and not the number of witnesses.

22      During the trial, you heard testimony from expert

23  witnesses, sometimes referred to as opinion witnesses

24  because the word "expert" sometimes suggests to us that we

25  must accept their testimony.  But that's not the case;

that's just the way we refer to this group of witnesses.

When knowledge or special skill from a technical or business subject matter might be helpful to the jury, a person who has special training or experience in that technical or business field, usually called an expert witness, is permitted to state his or her opinion on those technical or business matters; however, you are not required to accept that opinion.  As with any other witness, it is up to you to judge the credibility and credentials of the expert witness and decide whether to rely on each witness' testimony.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors that I previously mentioned for weighing testimony of any other witness.

You should consider each expert opinion received in evidence in this case and give it such weight as you think that it deserves.  If you decide that the opinion of an expert witness is not based upon sufficient education, experience, or if you conclude that the reasons given in support of the opinion are not sound, or if you feel that the opinion is outweighed by other evidence, you may disregard the opinion in whole or in part.

15:51:27 1      During the trial, certain testimony was presented to

15:51:30 2  you through excerpts from depositions.  The deposition

15:51:34 3  testimony may have been edited or cut to exclude

15:51:40 4  irrelevant testimony as the parties have only a limited

15:51:43 5  amount of time to present you with evidence.  You should

15:51:46 6  not attribute any significance to the fact that the

15:51:50 7  depositions may appear to have been edited.  I remember a

15:51:53 8  couple of times when we could see that there was a switch

15:51:56 9  in terms of witness looked one way and suddenly they

15:52:00 10  looked a slightly different way.

15:52:03 11      Deposition testimony is out-of-court testimony given

15:52:08 12  under oath, and is entitled to the same consideration you

15:52:12 13  would give it had the witness personally appeared here in

15:52:15 14  the Court.

15:52:18 15      You may have taken notes during the trial to assist

15:52:21 16  your memory.  As I instructed you at the beginning of the

15:52:25 17  case, you should use caution in consulting your notes.

15:52:30 18  There may be a tendency to attach undue importance to

15:52:35 19  matters that one has written down.  Some testimony that is

15:52:42 20  considered unimportant at the time presented, and thus not

15:52:46 21  written down, takes on greater importance later in the

15:52:50 22  trial in light of all the other evidence presented.

15:52:52 23  Therefore, your notes are only a tool to aid your own

15:52:58 24  individual memory.  You should not compare notes with

15:53:03 25  other jurors in determining the content of any testimony

or in evaluating the importance of any evidence.

You recall we said at the very beginning in this case, that your notes are not evidence and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, your memory should be your greatest asset when it comes to deliberation and rendering a decision in this case. And, of course, on matters that you do not recall, or do not recall clearly, you may rely on the collective recollection of all of you.

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." Here, the burden of proof is called "preponderance of the evidence."

As you know, the plaintiff in this case is Qorvo, Inc., which I will refer to in this instructions as the "Plaintiff" or "Qorvo." The defendants are Akoustis Technologies, Inc. and Akoustis, Inc., which I will refer to as "Defendants" or collectively as "Akoustis."

Qorvo asserts claims against Akoustis for patent infringement, misappropriation of trade secrets, unfair and deceptive trade practices. Of course, Akoustis has denied these assertions. Of course, you have the benefit of having heard counsel in this case.

Qorvo has the burden of proving its case by a preponderance of the evidence. This means Qorvo has to

15:54:59 1    produce evidence which, when considered in light of all

15:55:02 2    the facts, leads you to believe that Qorvo's claims are

15:55:07 3    more likely true than not.  Of course, each claim is

15:55:11 4    considered individually, so each claim is either more

15:55:14 5    likely true than not.  To put it differently, if you were

15:55:18 6    to put Akoustis' evidence on the opposite side of the

15:55:21 7    scale, the evidence supporting Qorvo would have to tip the

15:55:27 8    scale to its side.  That is, the balance in favor of

15:55:31 9    Qorvo.  But if the scale reflects that the two sides are

15:55:34 10   equally balanced or tips in favor of Akoustis, you must

15:55:38 11   find in favor of Akoustis.

15:55:40 12       Some of you have heard -- I know all of you have

15:55:46 13   heard of "proof beyond a reasonable doubt," and that

15:55:48 14   burden does apply in criminal cases.  That requirement is

15:55:52 15   the highest burden of proof in our judicial system.  But

15:55:57 16   it does not apply in civil cases, like this one, and,

15:56:02 17   therefore, you should put that out of your mind.  It is

15:56:05 18   not the applicable standard.

15:56:11 19       Turning now to the legal theories in the case.  I'll

15:56:16 20   address each one separately.

15:56:24 21       Qorvo alleges that Akoustis misappropriated its trade

15:56:29 22   secrets in violation of the federal Defend Trade Secret

15:56:34 23   Act and the North Carolina Trade Secrets Protection Act.

15:56:38 24       Under both claims, for each trade secret that Qorvo

15:56:42 25   identifies, Qorvo has to prove by a preponderance of the

evidence the following elements:  (1) the existence of a

trade secret; and (2) misappropriation of that trade

secret.

Under federal Defend Trade Secret Act, Qorvo has to

also prove by a preponderance of the evidence that each

trade secret at issue is related to a product or service

used in, or intended for use in, interstate or foreign

commerce.

I will note that in commercial cases, interstate or

foreign commerce is fairly routinely established by

showing shipments from state to state, or country to

country.

In deciding the misappropriation of trade secrets

issue, you must first decide whether Qorvo owned an

identifiable trade secret or trade secrets.  The term

"trade secret" means all forms and types of financial,

business, scientific, technical, economic, or engineering

information, including patterns, plans, compilations,

program devices, formulas, designs, prototypes, methods,

techniques, processes, procedures, programs, or codes,

whether tangible or intangible, and whether or how stored,

compiled, or memorized -- memorialized physically,

electronically, graphically, photographically, or in

writing if:

(1) the information is secret;

15:58:31  1    (2) the owner of the information has taken reasonable

15:58:36  2    measures to keep such information secret; and.

15:58:39  3    (3) the information derives independent economic

15:58:42  4    value, actual or potential, from not being generally known

15:58:49  5    to, and not being readily ascertainable through proper

15:58:53  6    means by, another person who can obtain economic value

15:58:58  7    from the disclosure or use of the information.

15:59:03  8    In articulating a trade secret, it is not enough for

15:59:06  9    Qorvo to point to a broad general class.  Rather, Qorvo

15:59:10  10   has the burden of identifying concrete information that it

15:59:15  11   contends constitutes it's trade secrets.  By its

15:59:20  12   definition, a "trade secret" concerns information.  By

15:59:27  13   contrast, an employee's general knowledge, skills,

15:59:30  14   experience, talents, or abilities cannot be trade secrets.

15:59:35  15   To determine whether a trade secret exists, you must

15:59:38  16   decide whether the information was, indeed, secret when

15:59:42  17   Akoustis allegedly wrongfully obtain it.  That is, when

15:59:49  18   Akoustis' allegedly wrongful conduct occurred.  Matters

15:59:55  19   that are generally known to the public at large or to

15:59:59  20   people in the trade business, are not trade secrets.  Nor

16:00:04  21   can information be considered a trade secret if it would

16:00:07  22   be ascertainable with reasonable ease of publicly

16:00:12  23   available information.  In addition, a trade secret must

16:00:17  24   possess enough originality so that it can be distinguished

16:00:21  25   from everyday knowledge.

16:00:24  1    Absolute secrecy is not necessary for information to
16:00:29  2    qualify as a trade secret.  There is no requirement that
16:00:32  3    no one else in the world possess the information.  Rather,
16:00:35  4    Qorvo must demonstrate that the information was known only
16:00:39  5    to it or to a few others who have also treated the
16:00:45  6    information as a trade secret.
16:00:49  7    To qualify as a trade secret, the information must
16:00:51  8    derive independent economic value from the fact that it is
16:00:55  9    not generally known or not readily ascertainable by proper
16:01:00 10    means.  To derive independent economic value from not
16:01:05 11    being generally known means that the information gives a
16:01:10 12    business a competitive advantage over other businesses
16:01:13 13    that do not know the information.  Information that is
16:01:18 14    generally known or understood within an industry, even if
16:01:22 15    not known to the public at large, does not qualify as a
16:01:26 16    trade secret.  But information that requires considerable
16:01:29 17    time, effort, and expense to duplicate, even if it is
16:01:34 18    derived from public sources, can still qualify as a trade
16:01:39 19    secret.  Absolute secrecy, in the sense that no one else
16:01:46 20    in the world possesses the information, is not required.
16:01:54 21    Qorvo must prove by a preponderance of the evidence
16:01:56 22    that it took reasonable measures to protect the secrecy of
16:02:01 23    its trade secrets.  There is no precise definition of what
16:02:06 24    "reasonable measures" are; what is reasonable depends on
16:02:10 25    the situation.  Factors you may wish to consider in

16:02:16  1    evaluating whether "reasonable measures" were taken could

16:02:20  2    include the following:

16:02:22  3        1.  Whether Qorvo made it a practice to inform its

16:02:27  4    employees or others involved within its business that the

16:02:31  5    information was a trade secret and/or was to be kept

16:02:35  6    confidential;

16:02:37  7        2.  Whether Qorvo required employees or others

16:02:41  8    involved with its business to sign confidentiality

16:02:46  9    agreements regarding the information or agreements not to

16:02:50 10    compete in areas that could use the information;

16:02:54 11        3.  Whether Qorvo restricted access to the

16:02:58 12    information on a "need to know" basis; or.

16:03:03 13        4.  Whether Qorvo generally maintained reasonable

16:03:08 14    security to protect the alleged trade secret, and did not

16:03:14 15    voluntarily disclose it to others, except in confidence.

16:03:20 16        If you find that Qorvo has proven by a preponderance

16:03:23 17    of the evidence that a trade secret existed, then you must

16:03:29 18    decide whether that trade secret information was

16:03:33 19    misappropriated by Akoustis.

16:03:37 20        To approve misappropriation occurred, Qorvo must

16:03:40 21    prove by a preponderance of the evidence that:

16:03:42 22        (1)  Akoustis acquired Qorvo's trade secret knowing

16:03:47 23    or having reason to know that the trade secret was

16:03:51 24    acquired by improper means; or.

16:03:55 25        (2)  Akoustis disclosed or used Qorvo's trade secret

16:04:01 1  without Qorvo's express or implied consent, and Akoustis:

16:04:06 2      (a)  Used improper means to acquire knowledge of the

16:04:09 3  trade secret; or.

16:04:11 4      (b)  At the time of the disclosure or use of the

16:04:15 5  trade secret, knew or had reason to know that knowledge of

16:04:19 6  the trade secret was:

16:04:21 7      (i)  Derived from or through a person who used

16:04:25 8  improper means to acquire it; or.

16:04:28 9      (ii)  Acquired under circumstances giving rise to a

16:04:33 10  duty to maintain its secrecy or limit its use; or.

16:04:39 11      (iii)  Derived from or through a person who owed a

16:04:43 12  duty to Qorvo to maintain its secrecy or limit its use.

16:04:50 13      "Improper means" in acquiring a trade secret can

16:04:55 14  arise in three types of circumstances:

16:04:59 15      (a) where Qorvo [sic] itself obtained the trade

16:05:02 16  secret by its own improper conduct.

16:05:05 17      (b) where Qorvo [sic] obtained the trade secret from

16:05:09 18  a third party who Akoustis -- let me read that one again.

16:05:16 19  I may have read it inappropriately.  Let me go back and

16:05:20 20  read one, two, three.

16:05:22 21      Three types of circumstances would be improper means

16:05:28 22  for acquiring the trade secret:

16:05:30 23      (a) whether Akoustis itself obtained the trade secret

16:05:32 24  by its own improper conduct.

16:05:35 25      (b) where Akoustis obtained the trade secret from a

16:05:40 1    third party who Akoustis knew had reason to know acquired

16:05:47 2    the trade secret by improper means, and.

16:05:52 3        (3), or (c) where Akoustis induced another to obtain

16:05:57 4    the trade secret by improper means.

16:06:02 5        It would be improper for Akoustis to acquire trade

16:06:05 6    secret information by theft, bribery, trespass,

16:06:09 7    misrepresentation, or corporate espionage, such as

16:06:16 8    wiretapping.  It would also be improper for Akoustis to

16:06:19 9    acquire the information from a third party who Akoustis

16:06:22 10   knew or had reason to know either used improper means to

16:06:27 11   acquire the information or breached a duty of

16:06:30 12   confidentiality in disclosing the information.  Where

16:06:35 13   Akoustis acquired the information from a third party in

16:06:38 14   one of the circumstances, Akoustis' conduct is only

16:06:43 15   improper if Akoustis knew or should have known that it was

16:06:47 16   acquiring a trade secret belonging another.

16:06:52 17       Last, it would be improper for Akoustis to induce

16:06:55 18   another to either use improper means to acquire the

16:06:59 19   information or to breach a duty of confidentiality that

16:07:04 20   person owed to Qorvo.

16:07:08 21       Because improper means can cover a wide variety of

16:07:13 22   circumstances, it may be helpful to identify situations

16:07:17 23   that the law would not consider "improper means."  It is

16:07:22 24   not improper to acquire information through independent

16:07:28 25   development, research of public resources (such as, for

example, trade directories, patent filings, or even will telephone book), or purchase of a product that contains trade secrets and then disassembling it to analyze those secrets (a process called "reverse engineering"). Similarly, a party who obtains information by mistake, or without knowledge or reason to know that the information is a trade secret, has not acquired the trade secret through improper means.

A defendant who is acquired trade secret information by improper means has no right to use or disclose the information in any way whatsoever. Thus, any use or disclosure by a defendant who has acquired a trade secret by improper means is wrongful.

To prove "use" of a trade secret, Qorvo must prove by a preponderance of the evidence that Akoustis used the alleged trade secrets without Qorvo's consent. That is, Akoustis must -- I'm going to say that one again.

To prove "use" by a trade secret -- use of a trade secret, Qorvo must prove by a preponderance of the evidence that Akoustis used the trade secrets without Qorvo's consent.

"Use" has a broad definition in trade secret law. As a general matter, any exploitation of a trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use." The unauthorized

16:09:32  1    use need not extend to every aspect or feature of the

16:09:37  2    trade secret; use of any substantial portion of the secret

16:09:42  3    is sufficient to subject the actor to liability.  Use

16:09:50  4    requires the productive use of the trade secret.  Merely

16:09:55  5    possessing a trade secret without utilizing a trade secret

16:09:59  6    is note "use."  But you may find that possession of a

16:10:05  7    trade secret, or the circumstances surrounding the

16:10:09  8    possession of trade secrets, are circumstantial evidence

16:10:14  9    of "use."

16:10:19 10        I will now instruct you on the law that you must

16:10:22 11    follow in determining compensatory damages in the context

16:10:25 12    of trade secret.  The purpose of compensatory damages is

16:10:32 13    to award, as far as possible, just and fair compensation

16:10:37 14    for the loss, if any, which resulted from the defendants'

16:10:42 15    violation of a plaintiff's rights.  Compensatory damages

16:10:45 16    are not intended to punish the defendant.

16:10:50 17        You must not take these instructions as implying my

16:10:54 18    view about which party is entitled to your verdict in this

16:10:58 19    case.  Instructions regarding the measure of damages are

16:11:01 20    given for your guidance in the event that you find in

16:11:05 21    favor of Qorvo from a preponderance of the evidence in the

16:11:10 22    case in accordance with the other instructions.

16:11:14 23        If you find that Qorvo proved that Akoustis

16:11:19 24    misappropriated Qorvo's trade secrets, you must decide

16:11:23 25    whether Qorvo is entitled to damages on its claim for

misappropriation of trade secrets.

Qorvo has the burden of proving whether Akoustis
caused the damage that Qorvo is claiming by a
preponderance of the evidence.  Qorvo must prove the
amount of damages with reasonable certainty, but need not
prove the amount of damages with mathematical precision.
However, Qorvo is not entitled to damages that are remote
or speculative.

If you determine that Qorvo is entitled to damages,
you may award Qorvo an amount that represents the benefit
actually received by Akoustis.  This is called "unjust
enrichment."  Regardless of whether you find that Qorvo
itself suffered losses, if you find that Akoustis
benefited from using a trade secret belonging Qorvo, then
you may award the monetary value that you attribute to
those benefits and that Qorvo has proven by a
preponderance of the evidence.

There can be multiple forms of unjust enrichment.

One form of unjust enrichment can be measured by a
"head start" theory.  The head start theory measures the
value of the temporal advantage a defendant obtains from
its use of the trade secrets.  The "head start" period is
the time it would have taken Akoustis to develop its
products and compete in the market absent any
misappropriation.  That is, not using the alleged trade

1     secrets until they were generally known or legitimately

2     acquired elsewhere.

3       The second point of unjust enrichment is called

4     "avoided costs." Avoided costs are the amount that

5     Akoustis would have incurred to achieve the same result

6     without the use of the appropriated trade secrets.

7       If you find for Qorvo, on its trade secret claims,

8     you may, but are not required to, assess exemplary damages

9     against Akoustis. The purpose of exemplary damages are to

10    punish a defendant for its conduct and to deter it and

11    others from engaging in similar conduct in the future.

12      For Qorvo to recover exemplary damages, you must

13    first find that Qorvo has proven by a preponderance of the

14    evidence that Akoustis' acts were willful and malicious.

15    "Willful and malicious" means that such intentional acts

16    or gross negligence of duty as to exhibit a reckless

17    indifference of the rights of others on the part of the

18    wrongdoer, and an entire want of care so as to raise the

19    presumption that the entity at fault is conscious of the

20    consequences of its carelessness.

21      Qorvo contends that Akoustis engaged in unfair and

22    deceptive trade practices in violation of North Carolina

23    law. So I'm switching slightly. I want you to note that.

24      Qorvo alleges that Akoustis engaged in one or more of

25    the following unfair or deceptive acts:

1.  Akoustis misappropriated Qorvo's trade secrets.

That may sound redundant because we just finished the discussion under a different theory, but, of course, now we're going to the North Carolina law.

So Qorvo alleges that Akoustis engaged in one or more of the following unfair or deceptive acts:

1.  Akoustis misappropriated Qorvo's trade secrets;

2.  Akoustis hired former Qorvo employees as part of a scheme to acquire Qorvo's confidential information;

3.  Akoustis obtained or used Qorvo's confidential information unfairly or deceptively.

So you can see this is a different claim.  And we'll talk about that in terms of how it may also be referred to in some other occasions in the instructions.

To succeed on its claim for unfair and deceptive trade practices, Qorvo must prove each of the following by a preponderance of the evidence:

(1)  Akoustis committed an unfair or deceptive act or practice;

(2) -- I think our numbers are wrong here.  I will fix them -- Akoustis' conduct was in or affecting commerce; and.

(3)  Akoustis' conduct caused Qorvo injury.

A practice is unfair when it offends established public policy or when the act or practice is "immoral,

1    unethical, oppressive, unscrupulous, or substantially

2    injurious to consumers."  A party commits an unfair act or

3    practice when it engages in conduct that amounts to an

4    inequitable assertion of its power or position.  For an

5    act or practice to be deceptive, it must have "the

6    capacity or tendency to deceive" or proof of actual

7    deception -- but proof of actual deception is not

8    required.

9        A violation of a statute or other law is not

10   automatically an unfair or deceptive practice or act.

11   Qorvo must prove that conduct was unfair or deceptive.

12   Deliberate acts or deceit or bad faith do not have to be

13   shown, rather Qorvo must demonstrate that the act or

14   practice possesses the tendency and capacity to mislead or

15   create the likelihood of deception.

16       As a general matter, Akoustis has the freedom to

17   compete, including to divert business not only from

18   competitors generally, but also from Qorvo.  You may only

19   find Akoustis liable for unfair and deceptive trade

20   practices if you determine that the harm to Qorvo resulted

21   from particular methods of competition determined to be

22   unlawful.

23       To succeed on the second element, plaintiff must

24   prove that the defendants' conduct was either "in

25   commerce," or that it "affected commerce."

1    Conduct is "in commerce" when it involves a business

2    activity.  Conduct "affects commerce" whenever a business

3    activity is adversely or substantially affected.  A

4    business activity is the way a business conducts its

5    regular day-to-day activities or affairs, such as the

6    purchase or sale or goods or whatever other activities the

7    business regularly engages in and for which it is

8    organized.

9    The third element requires that Qorvo prove by a

10   preponderance of the evidence that Akoustis' conduct

11   proximately caused injury to Qorvo.  To prove this, Qorvo

12   must prove:

13       (a) that Qorvo has suffered an injury; and

14       (b) that Akoustis' conduct was the proximate cause of

15   any injury to Qorvo.

16   Proximate cause is a cause that in a natural and

17   continuous sequence produces the injury, and is a cause

18   that a reasonable and prudent person could have foreseen

19   with produces such injury or other similar injurious

20   result.

21   In connection with its Unfair and Deceptive Trade

22   Practices claim, Qorvo seeks the recovery of compensatory

23   damages.  Qorvo seeks recovery of damages for actual loss.

24   In determining compensatory damages based on actual

25   loss, you may consider whether Qorvo suffered any

16:21:05  1    measurable loss as a result of Akoustis' conduct.  In this

16:21:10  2    case, Qorvo claims that its business was affected, and

16:21:15  3    that it suffered monetary loss due to the loss -- due to

16:21:19  4    the cost to recruit, hire, and train additional employees

16:21:25  5    based on Akoustis' unlawful hiring of Qorvo employees.

16:21:34  6         Qorvo's damages, if any, are to be reasonably

16:21:38  7    determined from the evidence presented in the case.  Qorvo

16:21:41  8    is not required to prove with mathematical certainty the

16:21:45  9    extent of its injury in order to recover damages.  You may

16:21:50 10    not award, however, any damages based upon your

16:21:54 11    speculation or conjecture.

16:22:01 12         Now, and the verdict form will help us as we go

16:22:05 13    through that, because it's broken down in a way, I think,

16:22:08 14    to assist you as you put all of this together.

16:22:11 15         I'm going to turn to patent infringement theory in

16:22:14 16    this case.

16:22:19 17         Qorvo has alleged that Akoustis has directly

16:22:24 18    infringed Claims 1 and 12 of the '018 patent and Claims 9

16:22:29 19    and 10 of the '755 patent.  I will refer to those as "the

16:22:37 20    asserted claims."  Infringement is assessed on a

16:22:42 21    claim-by-claim basis.  To prove infringement, Qorvo must

16:22:47 22    prove that the requirements for direct infringement are

16:22:51 23    met by a preponderance of the evidence, that is, that it

16:22:56 24    is more likely than not that all requirements of direct

16:23:01 25    infringement have been proven.

16:23:04  1    Akoustis denies that it has infringed the asserted

16:23:08  2    claims.  Your job in this portion, certainly, is to decide

16:23:13  3    whether Akoustis has infringed the asserted claims in the

16:23:16  4    patents.

16:23:19  5    The specific questions that you must answer relate to

16:23:27  6    patent infringement.  And the specific questions that you

16:23:33  7    must answer relate to patent infringement, and are listed

16:23:37  8    on the verdict form that I will give to you as we conclude

16:23:45  9    the instruction on the substantive theories of the

16:23:50 10    parties.

16:23:51 11    Here are the issues that you must decide in this

16:23:53 12    context, in the patent context:

16:23:55 13    Whether Qorvo has proven by a preponderance of the

16:24:00 14    evidence that Akoustis infringes Claim 1 and/or 12 of the

16:24:07 15    '018 patent.

16:24:10 16    If you decide Akoustis has proven -- excuse me -- if

16:24:14 17    you decide that Qorvo has proven that Akoustis infringes

16:24:18 18    Claims 1 and/or 12 of the '018 patent, whether Qorvo has

16:24:25 19    proven by a preponderance of the evidence that Akoustis

16:24:28 20    willfully infringes.

16:24:33 21    If you decide that Qorvo has proven that Akoustis

16:24:37 22    infringes Claims 1 and/or 12 of the '018 patent, what

16:24:41 23    amount of monetary damages Qorvo has proven by a

16:24:47 24    preponderance of the evidence.

16:24:48 25    And whether Akoustis has proven by a preponderance of

the evidence -- it's difficult because they sound alike to

be confusing, so I will say that one again correctly.

Whether Qorvo has proven by a preponderance of the

evidence that Akoustis infringes Claims 9 and/or 10 of the

'755 patent.

If you decide that Akoustis has proven -- excuse me.

If you decide that Qorvo -- I'm going to get Ms. Duvall to

come up here and read this.  She said, no.

If you decide that Qorvo has proven that Akoustis

infringes Claims 9 and/or 10 of the '755 patent, whether

Qorvo has proven by a preponderance of the evidence that

Akoustis willfully infringes.  And if you decide that

Qorvo has proven that Akoustis infringes Claims 9 and/or

10 of the '755 patent, what amount of monetary damages

Qorvo has proven by a preponderance of the evidence?

I will now give you some further instructions

regarding patent infringement.  I have a few changes.

Before you decide many of the issues in this patent

portion of the case, you will need to understand the role

of patent claims.

Now, I told you earlier, I'm going to go through

several pages of this, but then I'm going to tell you that

there is a glossary, and that can be of assistance if you

reach a question about what does a particular term mean.

And I'll mention what the terms are defined in the

glossary, but recognizing that I agree, it's pretty

difficult to remember all of this.  I will leave those for

to you further scrutinize as you determine that you need

to.

Before you decide many of issues in this patent

portion of the case, you will need to understand the role

of patent claims.  Now, you have some idea because we saw

the film earlier.  But I will go over it again.

Patent claims are the numbered sentences at the end

of the patent.  The claims are important because the words

of a claim define the scope of the patent right.  The

figures and text in the rest of the patent provide a

description and/or examples of the invention and provide a

context for the claims, but the claims define the extent

of the patent's coverage.  Therefore, what a patent covers

depends, in turn, on what each of its claims covers.

To know what a claim covers, a claim sets forth in

words a set of requirements.  Each claim sets forth its

requirements in a single sentence.  The requirements of

the claim are often referred to as "claim elements" or

"claim limitations."  The coverage of a patent is assessed

claim by claim.

When a thing (such as a product or a process) meets

all of the requirements of a claim, the claim is said to

"cover" that thing.  And that thing is said to fall within

16:28:44  1    the scope of that claim.  In other words, a claim covers a

16:28:49  2    product or process where each of the claim elements or

16:28:53  3    limitations is present in that product or process.

16:29:00  4        To decide whether or not a claim is infringed, we

16:29:04  5    will first need to understand what the claims of the '018

16:29:07  6    and the '755 patents cover.  To do so, you will need to

16:29:15  7    understand the meaning of the words used in the claims.

16:29:19  8        The law says that it is my role, when necessary, to

16:29:23  9    define the terms of the claims, and it is your role to

16:29:27 10    apply my definitions to those terms -- of those terms to

16:29:31 11    the issues that you are asked to decide in this case.  As

16:29:37 12    I explained to you at the start of the case, and, really,

16:29:40 13    in the preliminary instructions a little bit, I have

16:29:43 14    determined that the following claim terms have the

16:29:46 15    following definitions.  It's been referenced before that

16:29:49 16    we've construed certain claims.

16:29:52 17        As to the '018 patent, the term that has been defined

16:29:57 18    is "reference numerals."  And the term is construed to

16:30:06 19    mean, "The reference numerals in the asserted claims of

16:30:10 20    the '018 patent are not limiting and are solely for

16:30:16 21    exemplary purposes."

16:30:22 22        Patent Number '755, the term "active region."  "The

16:30:29 23    region of the resonator that is electrically driven, plus

16:30:38 24    any portions of the resonator that are located above or

16:30:42 25    below the electrically driven regions."

16:30:53 1        Patent '755, "outer region."  "The region of a

16:31:00 2    resonator that is outside of the active region."

16:31:06 3        And a term in Patent '755, "are not excited in the

16:31:12 4    active region," and that's term that that will have its

16:31:17 5    plain and ordinary meaning.

16:31:19 6        You must accept my definitions of those terms as

16:31:22 7    being correct.  It is your job to take these definitions

16:31:28 8    and apply them to the issues that you are deciding,

16:31:31 9    including the issues of infringement.

16:31:37 10        If I have not provided a specific definition for a

16:31:42 11    term in the claims of the '018 and '755 patents, you are

16:31:49 12    to use the plain and ordinary meaning to a person of

16:31:54 13    ordinary skill in the art of that term.

16:31:58 14        You should not take my definition of language of the

16:32:02 15    patent claim as indication that I have a view regarding

16:32:07 16    how you should decide the issues that you are being asked

16:32:11 17    to decide.  The issues in this case are yours to decide.

16:32:18 18        And that's really the issues in this patent portion

16:32:21 19    of the case, certainly, and all the issues in this case

16:32:24 20    are for you to decide.

16:32:29 21        There are two types of patent claims.  There are

16:32:32 22    independent claims and there are dependent claims.

16:32:36 23    Claim 1 of the '018 patent and Claims 9 and 10 of the '755

16:32:44 24    patent are independent claims.

16:32:47 25        An independent claim sets forth all the requirements

that must be met in order to be covered by that claim.
Thus, it is not necessary to look at any other claim to
determine what an independent claim covers.

Claim 12 of the '018 patent is a "dependent claim."
A "dependent claim" does itself recite all the
requirements of the claim, but refers to another claim for
some of its requirements.  In this way, the claim
"depends" on the other claim.  A dependent claim
incorporates all of the requirements of the claims to
which it refers.  The dependent claim then adds its own
additional requirement.

To determine what a dependent claim covers, it is
necessary to look at both the dependent claim and the
other claim, both claims, to which it refers.  A product
or a process that meets all the requirements of both the
dependent claim and the claims to which it refers, is
covered by that dependent claim.  Obviously, it would be
meet all the requirements of the claim to which it refers,
and the additional requirements that are set out in the
dependent claim itself.

I'll now instruct you as to the rules you must follow
in deciding whether Qorvo has proven that Akoustis has
infringed the asserted claims.

The United States Patent law gives the owner of a
patent the right to exclude others from importing, making,

16:34:51 1    using, selling or offering to sell, patented products and

16:34:56 2    services or performing a patented method within the United

16:35:02 3    States during the term of the patent.  Any person or

16:35:10 4    company that has engaged in any of these acts without the

16:35:14 5    patent owner's permission infringes the claim.

16:35:22 6        Infringement is assessed on a claim-by-claim basis

16:35:26 7    therefore, there may be infringement as to one claim, but

16:35:29 8    no infringement as to another claim.

16:35:33 9        In this case, Qorvo has alleged that Akoustis has

16:35:37 10   directly infringed Claims 1 and 12 of the '018 patent and

16:35:43 11   Claims 9 and 10 of the '755 patent.  As I will explain to

16:35:50 12   you, this case addresses liberal -- excuse me, "literal

16:35:55 13   infringement."  I'm going to make sure you understand

16:35:59 14   that's literal infringement.

16:36:02 15       To prove infringement, Qorvo must prove that the

16:36:05 16   requirements for direct infringement are met by a

16:36:08 17   preponderance of the evidence.

16:36:13 18       Akoustis may infringe a patent unknowingly, that is

16:36:18 19   without knowledge that what -- that what it is doing or

16:36:26 20   its product infringes the patent.

16:36:29 21       In other words, it's not a knowledge requirement.

16:36:32 22   You don't have to know you are infringing.  Now, that's

16:36:35 23   important in some circumstances, but it's not necessary.

16:36:41 24       Akoustis may also infringe while believing in good

16:36:44 25   faith that a particular action does not infringe a patent.

16:36:56  1        I will now explain some more about infringement.

16:37:06  2        Claims 1 and 12 of the '018 patent and Claim 9 of the

16:37:12  3    '755 patent are apparatus claims.  In other words, these

16:37:17  4    claims cover a physical product.  To prove literal

16:37:23  5    infringement of these apparatus claims, Qorvo must prove

16:37:28  6    by a preponderance of the evidence that it is more likely

16:37:31  7    than not that Akoustis made, used, sold or offered for

16:37:34  8    sale within the United States or imported into the United

16:37:38  9    States, a product that meets all of the requirements of

16:37:41 10    the claim and did so without the permission of Qorvo

16:37:46 11    during the time the patents were enforced.

16:37:51 12        To determine literal infringement on these apparatus

16:37:55 13    claims, you must compare the features of the accused

16:37:59 14    products identified by Qorvo with each asserted claim to

16:38:06 15    determine whether each and every one of the requirements

16:38:09 16    of that claim are satisfied or whether each one of those

16:38:14 17    is satisfied.  It can be read because it's as to each

16:38:20 18    claim, is that element met.

16:38:29 19        If any of the accused products do not contain one or

16:38:32 20    more elements recited in the claim, there is no literal

16:38:37 21    infringement with respect to that claim.  Each claim

16:38:40 22    should be considered, of course, individually, as all of

16:38:44 23    you know.

16:38:46 24        Claim 10 of the '755 patent is a method claim.  In

16:38:52 25    other words, this claim covers a way to do something.  To

prove literal infringement of this method claim, Qorvo

must prove by a preponderance of the evidence that

Akoustis used, in the United States, a method that meets

all the requirements of the asserted claim and did so

without the permission of Qorvo during the time the

patents were in force.

To determine literal infringement of this method

claim, you must compare the methods of using the accused

products identified by Qorvo with the claim steps to

determine whether each and every one of the requirements

of the claim is satisfied.

If any of the methods of making the accused products

does not meet one or more of the elements recited in the

claim, there is no literal infringement with respect to

the claim.

Qorvo need not always have direct evidence of

infringement.  Infringement may be established by

circumstantial evidence.

In this case, Qorvo argues that Akoustis willfully

infringed asserted claims.  If you have decided that Qorvo

has infringed the asserted claims, you must go on and

address the additional issue of whether or not this

infringement was willful.

To show that Akoustis' infringement was willful,

Qorvo must prove by a preponderance of the evidence that

16:40:41 1    Akoustis knew of Qorvo's patents, and intentionally

16:40:45 2    infringed the asserted claims after October 4 of 2021.

16:40:53 3        You may not determine that infringement with willful

16:40:57 4    just because Akoustis was aware of the asserted patents

16:40:59 5    and infringed them.  Instead, you must also find that

16:41:03 6    Akoustis deliberately infringed the asserted claims.

16:41:08 7        To determine whether Akoustis acted willfully, you

16:41:11 8    should consider all the facts and assess Akoustis'

16:41:16 9    knowledge at the time of the challenged conduct.  Facts

16:41:22 10   that may be considered include, but are not limited to --

16:41:26 11   and I'm going to tell you there are going to be, I think,

16:41:29 12   15 of these.  This is a little shorter list.  Only five.

16:41:40 13   Okay.  Still there, folks?

16:41:45 14       Okay.  I think Ms. Rodriguez, you okay over there?  I

16:41:52 15   got you.  Honest.

16:41:56 16       Facts that may be considered include, but not limited

16:41:59 17   to:

16:41:59 18       (1) Whether or not Akoustis acted consistently with

16:42:03 19   the standards of behavior for its industry;

16:42:06 20       (2) Whether or not Akoustis intentionally copied a

16:42:09 21   product of Qorvo that is covered by the asserted patent;

16:42:16 22       (3) Whether or not Akoustis reasonably believed it

16:42:18 23   did not infringe on the asserted claims or that the

16:42:26 24   asserted claims were invalid;

16:42:30 25       (4) Whether or not Akoustis made a good faith effort

to avoid infringing the asserted patents, for example, whether Akoustis attempted to design around the asserted patents; and

(5) whether or not Akoustis tried to cover up its infringement.

If you do decide that there was willful infringement, that decision should not affect any damages award that you give in this case.

I want to say at again because I want you to —I know you'll get to it and look at it, but this is the rule.  If you do decide that there was willful infringement, that decision should not affect any damages award you give in this case, which we're talking about patent-related damages in that circumstance, if you reach that question.

If you find that Akoustis infringed Claim 1 or 12 of the '018 patent, and/or that Akoustis infringed Claims 9 and/or 10 of the '755 patent, you must then consider what amount of damages to award to Qorvo.

I'll now instruct you about the measure of patent infringement damages.  By instructing you on damages, just as I said earlier, I am not suggesting which party should win this portion of the case on any issue.

If you find that Akoustis has not infringed any claims of the '018 patent, or any claims of the '755 patent, then Qorvo is not entitled to any damages for

patent infringement.

I will now instruct you about how to measure damages
for patent infringement.  If you find that Akoustis has
infringed any claims of the '018 patent, or any claims of
the '755 patent, then the claim -- the damages you award
must be adequate to compensate Qorvo for the infringement.
They are not meant to punish the infringer.  Your damage
award or damages award, if you reach this issue, should
put Qorvo in approximately the same financial position
that it would have been in had the infringement not
occurred.

Qorvo has the burden to establish the amount of its
damages by a preponderance of the evidence.  In other
words, you should award only those damages that Qorvo
establishes that it more likely than not suffered.  While
Qorvo is not required to prove the amount of its damages
with mathematical precision, it must prove them with
reasonable certainty.  You may not award damages that are
speculative, damages that are only possible, or damages
that are based on guesswork.

In determining infringement damages, you must not
consider Qorvo's allegations of willfulness, or consider
any evidence relating to those allegations.  The
consideration of willfulness, if any, is entirely separate
from the question of any infringement damages that you are

asked to determine.  Nor should you include any amount in your infringement damages award for interest, attorneys' fees or other expenses.

There are different types of compensatory damages that Qorvo may be entitled to recover in connection with this patent infringement claims.  In this case, Qorvo seeks a reasonable royalty as a result of Akoustis' infringement in the patent infringement suit -- of the patents in suit.

Now, that's an interesting way, because we hadn't said that much before.  "Patents-in-suit" means the patents that are a part of this case, the two patents that we're talking about.

In connection with its patent infringement claims, Qorvo seeks to recover a reasonable royalty.  A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.

A reasonable royalty is the amount of royalty payment that Qorvo and Akoustis would have agreed to in a hypothetical negotiation taking place before the infringement first began.  The reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.

When the infringement methods have been patented and have -- both patented and unpatented features, measuring

16:47:44 1    this value requires a determination of the value added by

16:47:48 2    the patented features.  The royalty rate must reflect the

16:47:54 3    value attributable to the infringing features of the

16:47:59 4    method and no more.

16:48:02 5        In considering this hypothetical negotiation, you

16:48:06 6    should focus on what the expectations of the Qorvo and

16:48:09 7    Akoustis would have been had they entered into an

16:48:14 8    agreement at that time and had they acted reasonably in

16:48:18 9    their negotiations.  In determining this, you must assume

16:48:22 10   that the parties to the hypothetical negotiation believed

16:48:26 11   Qorvo's Asserted Patents were valid and infringed, and

16:48:30 12   that the parties were willing to enter into an agreement

16:48:35 13   just before the infringement began.

16:48:37 14       The reasonable royalty that you determine must be a

16:48:41 15   royalty that would have resulted from this hypothetical

16:48:45 16   negotiation and not simply a royalty either party would

16:48:51 17   have preferred.

16:48:54 18       Evidence of things that happened after the

16:48:58 19   infringement first began can be considered in evaluating

16:49:02 20   the reasonable royalty only to the extent that the

16:49:05 21   evidence aids in assessing what royalty would have

16:49:10 22   resulted from a hypothetical negotiation just prior to the

16:49:15 23   first infringement.

16:49:18 24       In determining the amount of reasonable royalty --

16:49:20 25   this is the long list I was getting to.

16:49:24  1          In determining the amount of a reasonable royalty,

16:49:27  2  you may consider evidence of any of the following factors

16:49:31  3  in addition to any other evidence presented by the parties

16:49:35  4  on the economic value of the patent:

16:49:38  5          (1)  Any established policy by Qorvo to maintain its

16:49:44  6  patent exclusivity and right to exclude others from using

16:49:51  7  the patented inventions by not licensing other to use the

16:49:56  8  inventions or by granting licenses under special

16:49:59  9  conditions designed to preserve that exclusivity;

16:50:04 10          (2)  The commercial relationship between Qorvo and

16:50:10 11  Akoustis, such as whether or not they are competitors in

16:50:14 12  the same territory in the same line of business;

16:50:18 13          (3)  The effect of selling the patented products in

16:50:23 14  promoting sales of other Akoustis products and services,

16:50:27 15  the existing value of the inventions to Qorvo as a

16:50:34 16  generator of sales of its non-patented items, and the

16:50:39 17  extent of such collateral sales;

16:50:43 18          (4)  The duration of Qorvo's asserted patents and

16:50:49 19  term of the hypothetical license;

16:50:51 20          (5)  The established profitability, commercial

16:50:55 21  success, and popularity of the products made under Qorvo's

16:51:00 22  asserted patents;

16:51:02 23          (6)  The utility and advantages of the patented

16:51:06 24  inventions over old modes or devices -- that's old modes

16:51:13 25  or devices -- if any, that had been used for working out

similar results;

(7)   The nature of the patented inventions, the character of their commercial embodiments as owned and produced by Qorvo, and the benefits to those who have used the inventions;

(8)   The extent to which Akoustis has made use of the inventions and any evidence probative of the value of that use;

(9)   The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the inventions or analogous inventions;

(10)   The portion of realized profit that should be credited to the patented inventions themselves as opposed to unpatented features, business risks, or significant features or improvements added by Akoustis;

(11)   The opinion testimony of qualified experts;

(12)   The amount that Qorvo and Akoustis would have agreed upon (at the time the infringement began) if the parties had been reasonable and voluntarily trying to reach the reach an agreement; that is, the amount which a prudent licensee -- who desired as a business proposition to obtain a license to manufacture and sell particular articles embodying the patented inventions -- would have been willing to pay as a royalty and yet be able to make a

reasonable profit and which amount would have been

acceptable by a patent holder who was willing to grant a

license;

(13)  The royalties received by Akoustis for

licensing of the patent-in-suit -- of course, in this case

it's patents-in-suit, depending on how you determine these

facts -- proving or tending to prove an established

royalty;

(14)  The rates paid by Akoustis for the use of other

patents comparable to the patents-in-suit -- or

patents-in-suit; and

(15)  Any other economic factor that a normally

prudent businessperson would, under similar circumstances,

take into consideration in negotiating the hypothetical

license.

I know you are glad to hear, no one factor is

dispositive.

And there was some discussion of factors along the

way.  So you may recall that.

You should consider the evidence that has been

presented to you in this case on each of these factors.

You may also consider any other factors that, in your

mind, would have increased or decreased the royalty

Akoustis would have been willing to pay and Qorvo would

have been willing to accept, acting as normally prudent

1    businesspeople.

2        If you award a reasonable royalty, for any damages

3    you award, the amount you find as damages must be based on

4    the value attributable to the patented technology, as

5    distinct from other, unpatentable features of the accused

6    product or method, or other factors such as marketing or

7    advertising, or Akoustis' size or market position.  When

8    damages must be apportioned, the amount that you find as

9    damages must be based on the value attributable to the

10   patented invention, as distinct from unpatented features

11   of the accused product or other factors such as marketing

12   advertising, or Akoustis [sic] size or marketing position.

13       When apportionment is required, a royalty

14   compensating the patent holder for damages must reflect

15   the value attributable to the infringing features of the

16   product or method, and no more.  The process separating

17   the value of allegedly infringing features from the value

18   of all other features is called "apportionment."

19       When the accused infringing products or methods have

20   both patented and unpatented features or steps, your award

21   must be apportioned so that it is based only on the value

22   of the patented features, and no more.

23       Now, we come to glossary, so I'm going to do this.

24       Some of the terms in this glossary will be reflected

25   in more detail in materials that you will be looking at.

16:56:26 1    And some that we've already received, really.  And,

16:56:29 2  also, some of the things that we discussed earlier in the

16:56:33 3  film, which we are only referring back to just to help you

16:56:37 4  recall.

16:56:38 5    The definitions in the instructions must follow --

16:56:40 6  must be followed and must control your deliberations.

16:56:44 7    I'm not going to read each one of them.  But they

16:56:46 8  have abstract, which is a brief summary.  It's going to

16:56:48 9  tell you more about that if you need to.

16:56:51 10    Amendment.  It will tell you about amendments.

16:56:53 11    It will talk about assignment.  I know that there was

16:56:56 12  some evidence about assignment here.  If you want to read

16:56:59 13  more about that, it will be there.

16:57:01 14    Claim.  We've talked about claims.  You've got a

16:57:05 15  pretty good idea of what claims are, but there's more

16:57:07 16  there in the glossary, which will be available for you in

16:57:10 17  the jury room.

16:57:11 18    Drawings.  Obviously, there are always some drawings

16:57:14 19  in connection with patents.  And you've seen some of them.

16:57:19 20    Elements.  We've talked about elements.

16:57:22 21    Embodiment.  That's a product or method that contains

16:57:25 22  the claimed invention.  And I think that's understood.

16:57:29 23    Examination.  That's really a matter that we didn't

16:57:34 24  go into much because that's before the PTO, the Patent

16:57:37 25  Trademark Office, typically.

16:57:39  1        Filing Date.  You know that there's some dates on the

16:57:42  2   front sheet that you saw a long time ago in that regard.

16:57:46  3        Infringement.  Of course, we've talked about that.

16:57:48  4        And the definitions apply limitations.  We talked

16:57:51  5   about limitations within the patent, within the claims.

16:57:57  6        Office action.  You really have to talk about that.

16:57:59  7   That's really not going to have an application here, but

16:58:01  8   it's in there if you really want to read about it.

16:58:05  9        It's got patent.  We know this earlier because we

16:58:07 10   told you earlier.  It's an exclusive right granted by the

16:58:11 11   United States Patent and Trademark Office by the inventor

16:58:13 12   to prevent others from making, using, or selling an

16:58:17 13   invention for a term of 20 years.  Tremendous history

16:58:20 14   about that.  We're not going to talk about that either, a

16:58:23 15   patent and whether it's important in this country.  It

16:58:26 16   goes all the way back to the founding of the republic.

16:58:30 17        Patent and Trademark Office.  That's the PTO.  An

16:58:34 18   administrative branch of the Department of Commerce.  And

16:58:38 19   we've got prosecution history.  There wasn't really a

16:58:41 20   discussion of that, but it's here if you're interested in

16:58:43 21   that.

16:58:44 22        Read on.  We talked about that, something reads on a

16:58:46 23   claim.  And then requirement, a required part or step of

16:58:50 24   the invention set forth in the patent claim.

16:58:53 25        And the term, the word "requirement" is often used

16:58:56  1    interchangeably with the word "limitation."  We talked

16:58:59  2    about that.

16:59:00  3         Royalty, we just finished the discussion on that.

16:59:03  4    And then specification, those do not apply; because

16:59:04  5    they're -- they are the text that precedes the claims.

16:59:11  6    Put it that way.  That wasn't really discussed much here.

16:59:15  7    But that will tell you what that is.

16:59:18  8         I don't think we need to go over those in more detail

16:59:22  9    because the relevant pieces were really discussed in my

16:59:25  10   previous instruction.  But they're there if someone is

16:59:28  11   interested.  It's certainly something you can consider, if

16:59:31  12   you would like to.

16:59:32  13        Now, you've heard -- we've really completed much of

16:59:37  14   our discussion, and I need to tell you this.  You have

16:59:40  15   heard evidence that forensic analysis of certain Akoustis

16:59:45  16   devices or systems and/or personal devices of Akoustis'

16:59:51  17   employees contained a large number of documents and

16:59:56  18   additional data allegedly created by Qorvo.

17:00:00  19        The quantity of documents and data referred to by

17:00:06  20   Qorvo does not establish that those documents contained

17:00:08  21   confidential information or trade secrets, or that those

17:00:13  22   documents were used by Akoustis or its employees.

17:00:16  23        I'm not making any comment, other than saying having

17:00:19  24   a lot of documents doesn't tell us anything except there

17:00:21  25   were a lot of documents.  It doesn't tell us the other

17:00:25 1    answers.  Those are matters that we talked about earlier

17:00:28 2    and resolve those.  But you can go back and say, oh, there

17:00:32 3    were a whole bunch of documents, and therefore.  That

17:00:34 4    would not be correct.  That's a cautionary and limiting

17:00:38 5    instruction.

17:00:41 6        Well, we have finally come to that point where we're

17:00:46 7    going to discuss the form of your verdict.  I'm going to

17:00:49 8    tell you some other things too, but I've come to the point

17:00:50 9    where your verdict and the process of your deliberations.

17:00:54 10   And you will be taking with you to the jury room a verdict

17:00:58 11   form, which will reflect your findings and the verdict

17:01:03 12   form reads as follows.

17:01:04 13       And usually I have an ELMO in here, but I don't right

17:01:08 14   now, so I can't do that.

17:01:11 15       But form of the verdict, it's kind of thin.  It's got

17:01:17 16   two pieces to it.  And so I'm going to read it so that you

17:01:20 17   will be able to follow it.  It's important that everybody

17:01:23 18   understand what's on the verdict form.

17:01:25 19       It says "Special Verdict Form."  And it has an

17:01:30 20   attached -- well, I told you earlier, which is list of

17:01:36 21   alleged trade secrets.  And it's got 1.1, 1.2.  Remember

17:01:41 22   those?  It's got 2.1, 2.2.  It goes all the way over to

17:01:47 23   7.1, 7.2, and it ends up with 8.4.  So it's got all those

17:01:54 24   listed.  So that's going to be a relevant part of this

17:01:58 25   verdict form.

17:01:58 1        Now, the verdict form starts out and reads as

17:02:02 2    follows -- and they're not looking at me to make sure --

17:02:02 3    no, we've still have lots of time.

17:02:17 4        When answering the following questions and completing

17:02:20 5    this Verdict Form, please follow directions provided on

17:02:23 6    each page that follows and the Jury Instructions that you

17:02:26 7    have been given.  So if they relate to the trial,

17:02:29 8    obviously.

17:02:31 9        Your answer to each question must be unanimous.  So

17:02:33 10   when you answer a question, all ten of you have to agree.

17:02:38 11       Some of the questions contain legal terms that are

17:02:41 12   defined and explained in the Jury Instructions.  And

17:02:43 13   that's why you have the instructions.  Please refer to the

17:02:46 14   Jury Instructions if you are unsure about the meaning or

17:02:49 15   usage of any legal term that appears in the questions that

17:02:53 16   are listed below.

17:02:54 17       As used in this Verdict Form:

17:02:57 18       1.  "Plaintiff" and "Qorvo" both refer to Plaintiff

17:02:59 19   Qorvo, Inc.

17:03:01 20       2.  "Defendants" and "Akoustis" both collectively

17:03:04 21   refer to Defendants Akoustis technologies, Inc. and

17:03:07 22   Akoustis, Inc.

17:03:08 23       3.  "Asserted Patents" refers collectively to U.S.

17:03:13 24   Patent -- and I'm going to use the shortcut -- '018 patent

17:03:17 25   and the '755 patent.  You have the full numbers there.

4. The "'018 Patent" refers to U.S. Patent 7,522,018, and.

5. "'755 Patent" refers to U.S. Patent 9,735,755.

You will note that the Verdict Form uses the eight alleged or asserted trade secret groups that the Plaintiff proposed in the presentation of some of the Plaintiff's proof. The Court is not making any factual determinations as to the alleged trade secrets, their organization, whether they are properly grouped together, or whether or not each is a trade secret. The Verdict Form's organization is only for your convenience. All questions of fact are for you, the jury, to decide.

But we recognize we have to give you some system to look at things, and so that's all we're doing.

Okay. Questions and answers. That looks kind of exciting, right. We've tried to make it as straightforward and simple as possible. So while it may look a little complicated, this is what it says:

We, the jury, unanimously find as follows:

Trade Secret Misappropriation Under the Defend Trade Secrets Act and the North Carolina Trade Secret Act.

For each of the Alleged Trade Secrets that Plaintiff Qorvo presented at trial, please answer the following questions as instructed in this section.

Question 1(a). And that is the charge here.

17:05:02 1    It will say:  Please write "Yes" or "No" in each column of

17:05:07 2    the table below.

17:05:09 3          It's going to say "Alleged Trade Secret."  You

17:05:11 4    are going to have this.  So you use that as a way that's

17:05:14 5    useful to you.  And you will say 1.1 -- and it's going to

17:05:20 6    have Group 1, Group 2, Group 3, all the way down.

17:05:24 7          Okay.  The question in this column is:  Has

17:05:28 8    Qorvo established by the greater weight or preponderance

17:05:31 9    of the evidence that (a) this alleged trade secret

17:05:35 10   qualifies as a trade secret and (b) Akoustis is liable for

17:05:41 11   trade secret misappropriation for this trade secret?

17:05:45 12         And the answer is "Yes" or "No."  Look at each

17:05:48 13   one.  Look at all the information that you'll have, which

17:05:50 14   some of -- a significant part I know you haven't seen

17:05:54 15   before.  And then whatever your answer is.

17:05:57 16         Then the second question is:  Has Qorvo

17:06:01 17   established by a greater weight or preponderance of the

17:06:03 18   evidence that Akoustis was unjustly enriched by

17:06:08 19   misappropriating this trade secret?

17:06:10 20         Now, just looking at 1.1, if you have a "Yes,"

17:06:13 21   then "yes."  That's important.  If you have a "No" in

17:06:16 22   there, that's obviously important there, too.  But you

17:06:18 23   make a decision as to each asserted trade secret.  So,

17:06:21 24   obviously, these work together.

17:06:23 25         Now, you go all the way through.  And I'm not

17:06:27  1    deciding that Group A is a Group A.  I'm just saying

17:06:30  2    that's the way it's organized if you look at it.

17:06:33  3         Then it gets over to the next page.  Well,

17:06:35  4    you've got all these columns.  Hopefully you'll get those

17:06:39  5    filled out.

17:06:39  6         And then it will say:  If you answered "Yes" in

17:06:43  7    both columns for any alleged trade secret in

17:06:48  8    Question 1(a), then answer Question 1(b) and 1(c) below.

17:06:54  9    If you did not answer "Yes" in both columns for any

17:07:00 10    alleged trade secret in Question 1(a), you write "N/A" in

17:07:06 11    Question 1(b) and 1(c), and move on to Question 2.

17:07:11 12         Now, that -- I don't think that's confusing,

17:07:12 13    but I;m going to say it again.

17:07:15 14         If you did not answer "Yes" in both columns for

17:07:19 15    any -- the word is "any" -- alleged trade secrets in

17:07:23 16    Question 1(a), and write "N/A" to Question 1(b) and (c),

17:07:30 17    and move on.

17:07:31 18         So I'm not saying how you ought to come out on

17:07:34 19    this.  I have nothing to do with this.  It's just to help

17:07:35 20    you get through it.  If you have all "Nos" everywhere, and

17:07:40 21    no "Yeses," then you won't get to 1(b).  But if you've got

17:07:49 22    a "Yes, yes," you know, then you're going to go to 1(b).

17:07:57 23         Well, 1(b) is:  State the amount Akoustis was

17:08:00 24    unjustly enriched -- because you've got to have two

17:08:02 25    "yeses."  Right.  So I'm not saying there are any.  I'm

17:08:06 1    not saying that comes out at all.  I'd say that 50 times.

17:08:09 2    I'm sorry, folks.  But if you're at 7.1, and you say "Yes"

17:08:14 3    and "Yes," you're going to get to that question.

17:08:17 4            Okay.  State the amount Akoustis was unjustly

17:08:20 5    enriched by misappropriating Qorvo's trade secrets as to

17:08:24 6    which you answered "Yes" and "Yes" in Question 1(a) above.

17:08:28 7            And that's Step 1.  And it's got a dollar sign

17:08:28 8    in 1.  And we went through that damages discussion

17:08:35 9    earlier.  And if you've reached that question, then you'll

17:08:37 10   be able to answer that question.

17:08:41 11           Then Question 1(c).  Well, was Qorvo's

17:08:46 12   misappropriation as to Qorvo's trade secrets as to which

17:08:51 13   you answered "Yes" and "Yes" in Question 1(a) above

17:08:57 14   willful and malicious?  Please, write "Yes" or "No," or

17:09:01 15   "N/A" on the line below.

17:09:03 16           If you have all "Nos," it's going to be "N/A."

17:09:06 17   But "Yes" or "No."  And you decide that.  You've got a

17:09:10 18   pretty extensive discretion about what would be willful

17:09:14 19   and malicious.

17:09:16 20           Then, if you answered "Yes" to Question 1(c),

17:09:23 21   answer Question 1(d) below.  If you answered "No" or "N/A"

17:09:30 22   to Question 1(c), write "N/A" on the Question 1(d), and

17:09:34 23   move on to Question 2.

17:09:36 24           Now, remember, we talked about exemplary

17:09:38 25   damages?  I'm not saying you are going to get there.  I

17:09:40 1  can't say any of that.  But the question is:  What amount

17:09:43 2  of exemplary damages, if any, do you award to Qorvo

17:09:48 3  against Akoustis?

17:09:49 4          And that's a different line.  It's got a dollar

17:09:52 5  sign.  And that's how that works.  That's how the form

17:09:55 6  works.  So we tried to make it as simple as possible while

17:09:59 7  covering all the necessary things.  And I realize you have

17:10:04 8  a lot of things to fill out there.

17:10:06 9          Now, the next page, Page 5, Unfair and

17:10:12 10 Deceptive Trade Practices under North Carolina Law.

17:10:18 11         Question 2:  Has Qorvo proven by a

17:10:23 12 preponderance of the evidence its Unfair Deceptive Trade

17:10:27 13 Practices claim against Akoustis as to its confidential

17:10:31 14 information and trade secret claim?

17:10:32 15         And, again, it is a "Yes" or "no."  And you'll

17:10:35 16 remember there's a description of that in the

17:10:39 17 instructions.

17:10:39 18         And Question 2(b):  Has Qorvo proven by a

17:10:44 19 preponderance of the evidence its Unfair and Deceptive

17:10:47 20 Trade Practices claim against Akoustis as to its poaching

17:10:52 21 claim?

17:10:53 22         Now, remember, the poaching claim relates to

17:10:56 23 employee.  And so that's obviously what's being talked

17:11:01 24 about here.  I don't know your answer, but that's -- you

17:11:03 25 make it, you'll get to that question.

17:11:06  1        And then answer Question 2(c) only if you

17:11:09  2    answered "Yes" to Question 2(b).  Otherwise, do not answer

17:11:14  3    and move on to Question 3.

17:11:16  4        So if you said "Yes" on 2(b), you'll answer the

17:11:19  5    next question.  If you said "No," you won't.

17:11:23  6        Question 2(c):  Did Qorvo prove by a

17:11:27  7    preponderance of the evidence damages caused by Akoustis'

17:11:30  8    actions for the alleged unfair and deceptive trade

17:11:36  9    practice related to poaching?

17:11:39 10        And you'll put a "Yes" or "No" if you reach

17:11:41 11    that question.

17:11:41 12        Now, answer Question 2(d) only if you answered

17:11:44 13    "Yes" to Question 2(c).  Otherwise, do not answer and move

17:11:48 14    on to Question 3.

17:11:51 15        Question Number 2(d):  What damages, if any,

17:11:55 16    did Qorvo prove by a preponderance of the evidence that

17:11:58 17    its entitled to for Akoustis' unfair and deceptive trade

17:12:03 18    practices related to employee poaching?

17:12:06 19        And, again, there's a dollar sign.  I'm not

17:12:09 20    saying you'll get there, but you have to have a form in

17:12:11 21    case you do.  It has a dollar sign and you'll insert your

17:12:15 22    finding.

17:12:16 23        Now, Patent Infringement.

17:12:21 24        Question 3(a):  Do you find that Qorvo has

17:12:26 25    proven by a preponderance of the evidence that the claims

17:12:29  1    of the '018 or the '755 Patents have been infringed?

17:12:36  2    Please write "Yes" or "No" in each box below.

17:12:39  3            You have your verdict.  You've got Claim 1 and

17:12:41  4    Claim 12 under '018.  And you've got Claim 9 and 10 of the

17:12:47  5    '755 patent.  And you've got a "Yes" or "No" in each

17:12:52  6    blank.

17:12:53  7            Only answer the following Question 3(b) and

17:12:56  8    3(c) if you answered "Yes" to any part of Question 3(a).

17:13:01  9    Otherwise, do not answer Question 3(b) or 3(c) and move

17:13:05 10    directly to the unanimous verdict page, which is a

17:13:09 11    signature page.

17:13:11 12            Question 3(b) (damages):  What do you find is

17:13:14 13    the amount of damages, if any, that should be paid to

17:13:17 14    Qorvo for the alleged infringement, or for the

17:13:21 15    infringement of each alleged patent -- or Asserted

17:13:24 16    Patent -- sorry, Asserted Patent -- to compensate for the

17:13:26 17    damages caused by Akoustis' infringement?

17:13:30 18            And then you've got '018 Patent.  Of course, if

17:13:32 19    you said "No" to both of those, you're not going to have a

17:13:35 20    number there.  And if you said "Yes" as to a number, a

17:13:38 21    single claim, then, of course, you would.  And -- or

17:13:41 22    depending on how you analyze the damages, ^ figure

17:13:46 23    determination.

17:13:47 24            And then the '755 patent, the dollar sign.

17:13:50 25            Okay.  Now, Question 3(c):  Did Qorvo prove by

17:13:55 1    a preponderance of the evidence that Akoustis infringed

17:13:58 2    the '018 or the '755 patent, the infringement was willful?

17:14:05 3            And, again, you answer "Yes" or "no."  And

17:14:07 4    that's all you say.  That's all you say on there.

17:14:09 5            Remember, when we went through it, I said

17:14:11 6    that's all you're going to be doing.  You won't write

17:14:12 7    anything else.  Of course, you know that -- if you want to

17:14:17 8    look back, if you get to that question, if you get to

17:14:20 9    those questions, be sure to look back at the damages and

17:14:22 10   see what you cannot do in connection with some of these

17:14:25 11   responses.

17:14:26 12           Okay.  Unanimous Verdict.  Well, that's where

17:14:29 13   it's got, the very end of the verdict form, it says:  Upon

17:14:32 14   reaching a unanimous verdict on each question above, the

17:14:37 15   presiding juror must sign and each juror must sign below.

17:14:41 16   We, the jury, unanimously agree to the answer of the

17:14:44 17   following questions and return them under the instruction

17:14:48 18   of this Court as our verdict in this case.

17:14:51 19           And you would date it.  You would sign it

17:14:53 20   Presiding Juror.  And then each juror will sign below.

17:14:57 21           Now, I did tell you a couple other things.  I'm

17:15:01 22   going to go through those quickly and then we're going to

17:15:03 23   get back to the final information on the form of the

17:15:06 24   verdict.

17:15:07 25           These are the stipulated facts in the case.

1   These stipulated facts are just some background

2   information as to Qorvo.  they're not disputed.  It's when

3   Qorvo was incorporated and so forth and so on.  When

4   different portions like RF micro devices were formed in

5   1991, those facts are not in dispute.  There are different

6   ones in here.

7           And it's also Akoustis Technologies, a Delaware

8   corporation with the principle place of business in

9   Huntersville, North Carolina.  And Qorvo is a Delaware

10  corporation with principle place of business in

11  Greensboro, North Carolina.  Gives the address.

12          Okay.  It's got a little more information about

13  each one.  And then it's got the names of the patent

14  holders and so forth.  And most of that is something that

15  will not be critical.  It's just information on which they

16  agreed.  And I'm not saying it's not important.  I'm just

17  saying in this case it's not the focus of the case.

18          And then it's got information like the '755

19  patent includes one through 18 claims.  So that type of

20  information.

21          And then it also has Qorvo's ^certificates --

22  it's accused product infringes Claim 9 of the '755.  So

23  these are all agreed upon facts.  I don't think that

24  you've heard anything at all to the contrary.  I'm sure

25  you haven't heard anything to the contrary.  But if you

17:16:40 1    want to look and check to make sure that all this is

17:16:44 2    accurate, that's fine.

17:16:46 3              Now, the last thing on this page, it's been

17:16:48 4    signed by counsel for both parties.  That's how that

17:16:51 5    works.  It reads as follows.  I'm going to read it in.

17:16:53 6              It says:  31, the 31st stipulation.  In other

17:16:57 7    words, stipulations, again, are used to save us time, and

17:17:01 8    they do.  We didn't have to hear all this particular

17:17:04 9    separate things.

17:17:05 10             It says:  As of November 16, 2023, these 43

17:17:12 11   employees that at one time worked for Qorvo and/or its

17:17:16 12   predecessor, 19 accepted an offer of employment with

17:17:21 13   Akoustis; while employees of Qorvo remained, 24 accepted

17:17:23 14   an offer of employment from Akoustis after leaving Qorvo

17:17:27 15   or its predecessor or company.

17:17:31 16             So there was reference to that earlier and it's

17:17:34 17   part of the stipulations.

17:17:36 18             All right.  You've got the special verdict

17:17:38 19   form.  You've got the list that goes with the special

17:17:41 20   verdict form.  I'm going to put a clip on there, if I can

17:17:44 21   find one.

17:17:49 22             I've got stipulated facts here.

17:17:50 23             And the last thing I've got.  And then I

17:17:56 24   promise you all that you would have, for your convenience,

17:18:01 25   a witness list and exhibit list.  And that has the -- the

17:18:07 1    purpose of it is to provide the -- each trial exhibit and

17:18:13 2    then a reference to its previous description such as

17:18:18 3    PTX-1107 and so forth.  So as you go through them, you

17:18:21 4    will say, this is Trial Exhibit 1.  Easier to deal with.

17:18:25 5            At the very end, you're going to see that as to

17:18:27 6    the last three individuals who testified, that there were

17:18:32 7    no exhibits, so we put "N/A" after them.  And it shows

17:18:35 8    that we had a total of -- I bet you all remember -- 355

17:18:40 9    exhibits.  I think it maybe, and it's traditional to

17:18:45 10   provide you with this information.  All right.

17:18:59 11           You will note that the Verdict Form uses the

17:19:03 12   eight allege trade secret groups that the Plaintiff

17:19:06 13   proposed and the presentation of some of the Plaintiff's

17:19:09 14   proof.

17:19:09 15           And I -- again, I'm required and will say --

17:19:10 16   the Court is not making any factual determinations as to

17:19:14 17   the alleged trade secrets, their organization, whether

17:19:17 18   they are properly grouped together, or whether or not each

17:19:20 19   is a trade secret.  The Verdict Form's organization is

17:19:23 20   only for your convenience.  All questions of fact are for

17:19:26 21   you, the jury, to decide.

17:19:28 22           When you go to the jury room, which will be

17:19:31 23   very shortly -- and I know you will going home pretty

17:19:33 24   soon.  But when you go to the jury room, you will be

17:19:35 25   selecting -- and I suggest you try to do this today, if

17:19:38  1    you can -- selecting a foreperson.  That person will

17:19:43  2    preside over your deliberations and be your spokesperson

17:19:46  3    here in the courtroom.  When you have completed your

17:19:50  4    deliberations, your foreperson will fill in the verdict

17:19:53  5    form, and all of you will sign, the verdict form.

17:19:58  6           Each of you should deliberate and vote on each

17:20:01  7    issue to be decided.

17:20:04  8           Before you return your verdict, however, each

17:20:06  9    of you must agree to the answer to each question so that

17:20:10  10   you will be able to truthfully state that the verdict is

17:20:13  11   yours.

17:20:14  12          The verdict you return to the court must

17:20:17  13   represent the reasoned judgment of each juror.  In order

17:20:21  14   to return a verdict, it is necessary that each juror agree

17:20:25  15   to each answer.  Your verdict must be unanimous.

17:20:28  16          It is your duty to consult with one another and

17:20:30  17   to reach agreement if you can do so without violence to

17:20:33  18   your individual judgments.  Each of you must decide the

17:20:37  19   case for yourself, but do so only after impartial

17:20:40  20   consideration of the evidence if your fellow jurors.  In

17:20:44  21   the case of your deliberations, do not hesitate to

17:20:48  22   re-examine your own views and to change your mind if you

17:20:52  23   are convinced that you were wrong, but do not surrender

17:20:58  24   your honest conviction as to the weight and effect of the

17:21:01  25   evidence solely because of the opinion of your fellow

17:21:04 1    jurors, or for the mere purpose of running a verdict.

17:21:08 2        We will be sending to you -- and I'm trying

17:21:09 3    to -- we may not actually send them back right now, but we

17:21:12 4    can.

17:21:14 5        We will be sending to you in the jury room all

17:21:18 6    the exhibits that have been marked and received in the

17:21:20 7    case.  There may have been a couple that there not, and I

17:21:24 8    don't -- so they will not go back there.

17:21:28 9        You have not received, in fact, you may not

17:21:30 10   have received all of the documents.  I'm quite certain you

17:21:33 11   have not seen every page.  And they are there for your

17:21:38 12   review and consideration.  You may, of course, take a

17:21:41 13   break before you begin deliberating.

17:21:43 14       What we're going to try to do, is I'm going to

17:21:45 15   check with counsel.  I will let you be excused, the jury

17:21:47 16   in a minute.  I can't do that until I check with counsel.

17:21:50 17       But do not begin your deliberations or have any

17:21:57 18   discussions ^about the case unless all of you are present

17:21:59 19   together in the jury room.

17:22:01 20       Now, some of you have taken notes.  And we had

17:22:05 21   a discussion about that already in the instructions.

17:22:09 22       Remember, they are for your individual use, and

17:22:14 23   are to be used only by you to refresh your recollection

17:22:19 24   about the case.  They are not to be shown to others on the

17:22:24 25   jury or otherwise used as a basis for your discussions

about the case.

If a question does arise during your
deliberations and you need further instructions, please
write down your question on a sheet of paper, knock on the
door in the jury room, and then give the question to
either the court security officer or the courtroom deputy
clerk.

**THE CLERK:**  It will be the court security
officer.

**THE COURT:**  All right.  And we have one right
back there.

There's a note sheet, too.  So I am not
encouraging you to send me notes, but if you want to,
please write them down.

And, also, have them signed, because every now
and then, I get a note that's not signed.  I wonder, who
wrote the note?  And one time I found out it wasn't
actually from the foreperson, and the rest of the jury
didn't want to send the note.  So make sure everybody is
okay with sending the note.

I will review your question, and after
consulting with counsel in the case, will either respond
to your question in writing or by having you return to the
courtroom for further oral instruction.  Normally, we
respond in writing.  Please understand that I may only

answer your questions on the law.  And I cannot answer

questions about the evidence.  I caution you, however,

with regard to any question or message that you might send

me, you should not tell me your numerical division at any

time.

You can never tell me, Oh, such and such and

such.  I can never know that.  I can know that the jury

has reached a verdict or the jury has not reached a

verdict, but I cannot know numerical division at any time.

I remind you that you are here to decide this

case based only on the evidence that you've heard in court

and the law that I have given to you.  You know that you

are prohibited from considering any other information.

And you are not to consult with any outside sources for

information.

Now, I told you at the very beginning where I

had the jury in Virginia decided to go and look up terms

in the dictionary, and it didn't go well for anybody in

the sense that the case had to be retried.  So even that

is -- I want to make it really clear that you just can

look up anything.  If you need to know something, send us

a note.  And if we can tell you, we will.

You are not to communicate with or provide any

information, photographs, or video to anyone by any means

about this case or about your deliberations.  You may not

17:25:16  1    use any electronic device or media, such as a telephone,

17:25:20  2    cell phone, smart phone, or computer; the Internet, any

17:25:24  3    text or instant messaging service; or chat room, blog,

17:25:29  4    website or social media platform such as Facebook,

17:25:33  5    Instagram, LinkedIn, YouTube, Twitter/X, or TikTok, or

17:25:40  6    anything like that, to communicate with anyone or to

17:25:43  7    conduct any research about the case.

17:25:46  8            I need to see counsel briefly at the sidebar,

17:25:49  9    and hopefully we will have a short break, and then

17:25:52 10    we'll -- I also want to consult about what you want to do

17:25:55 11    as to your schedule for tomorrow.  So I'm going to check

17:25:58 12    with them so -- before I can let you go back to the jury

17:26:01 13    room.

17:26:02 14            Let me see counsel briefly.

17:26:34 15                           -  -  -

17:26:34 16        (Whereupon, the following discussion is held at

17:26:34 17    sidebar:

17:26:35 18        **THE COURT**:  It's a lot easier to give

17:26:37 19    instructions in a patent case, mostly because it's so

17:26:41 20    straightforward.

17:26:42 21            I had to break it up a little bit before I lost

17:26:45 22    all my jurors.  Both of you, you've got to be careful with

17:26:48 23    that too when you were doing your closing.

17:26:51 24            Any objections to the instructions as given?

17:26:52 25    Every now and then, I switched a word and I tried to

17:26:56  1    switch it back.

17:26:58  2         **MR. LEMIEUX:**  There was, just in the written

17:26:59  3    instructions, Your Honor, there was two places where you

17:27:03  4    didn't say it, but there was a reference to a conspiracy

17:27:07  5    claim and --

17:27:11  6         **THE COURT:**  I'm sure I struck through it.

17:27:13  7         **MR. LEMIEUX:**  Yeah.  You did not say it, but I

17:27:15  8    wanted to make sure in the written copy that goes back --

17:27:18  9         **THE COURT:**  Pull them out and make sure we've

17:27:19 10    got both of them.  I'm sure we did.  Thank you.  I have

17:27:24 11    been on the lookout for it.

17:27:26 12         **MR. LEMIEUX:**  There's one other one too, but I

17:27:28 13    can check.  Again, I was just making sure.  It wasn't

17:27:30 14    anything you said.

17:27:31 15         **THE COURT:**  No.

17:27:31 16         **MR. LEMIEUX:**  I just wanted to make sure that

17:27:32 17    the written --

17:27:33 18         **THE COURT:**  We did mark through it.  I marked

17:27:34 19    through it to not say it.  Absolutely.  Always a good

17:27:37 20    comment.

17:27:37 21         **MR. ELKINS:**  You flagged those, right?

17:27:40 22         **MR. LEMIEUX:**  Yes.

17:27:40 23         **THE COURT:**  One of them was very early like

17:27:41 24    Page 2, and then I don't remember where the other ones

17:27:44 25    was.

17:27:45  1          **MR. LEMIEUX:**  I will bring it up.  I apologize.

17:27:48  2          **THE COURT:**  We will search again, but we'll

17:27:51  3  make absolutely sure.  They're not going to be here long

17:27:55  4  today.  We will make sure it is good.

17:27:57  5          Okay.  Anything else from the defense?

17:28:01  6          **MR. ELKINS:**  I just, are you going to have them

17:28:05  7  go back and select a foreperson?

17:28:07  8          **THE COURT:**  I would like them to select a

17:28:08  9  foreperson and tell me what their schedule will be.  I

17:28:12 10  will suggest they come in on the current schedule, but

17:28:14 11  tell them on any day that they can stay as late, and as

17:28:19 12  you know, basically, five of seven if they wish to.  If

17:28:25 13  they tell me today they want to stay late, I would have

17:28:28 14  them stay late.  I want to let it be their decision until

17:28:31 15  we decide they need to stay later.  Okay.  Absolutely.

17:28:36 16  Thank you you all very much.

17:28:39 17          **MR. DeFOSSE:**  It's not jury instructions, Your

17:28:41 18  Honor, but on one of the exhibits from Dr. Aigner's

17:28:44 19  deposition, we had excerpts that are going to go back, and

17:28:48 20  I want to make sure that exhibit is fixed.

17:28:51 21          **MR. LEMIEUX:**  You mean the declaration?

17:28:53 22          **MR. DeFOSSE:**  The declaration, yes, that Your

17:28:54 23  Honor ruled on previously.

17:28:56 24          **MR. LEMIEUX:**  It's --

17:28:58 25          **THE COURT:**  We are not going to send the

17:29:00 1    exhibits back right now unless they ask for them.

17:29:05 2            **MR. MASTERS:**  Do you happen to remember the

17:29:05 3    trial --

17:29:07 4            **MR. DeFOSSE:**  I can't remember the trial

17:29:09 5    exhibit number, but we can work this out.  I think we just

17:29:13 6    need to resubmit that exhibit, and we'll find that number

17:29:16 7    as soon as we can.

17:29:17 8            **THE COURT:**  Okay.

17:29:23 9            **MR. LEMIEUX:**  No.  It's a question for judicial

17:29:25 10   notice.

17:29:27 11           **THE COURT:**  Anything else?

17:29:28 12           **MR. MASTERS:**  Just I understand there might be

17:29:30 13   some pieces of evidence that are in native form that would

17:29:33 14   be viewed on the computer.  Has that been arranged?

17:29:36 15           **THE CLERK:**  Yes.

17:29:36 16           **MR. MASTERS:**  It has been.

17:29:37 17           **THE COURT:**  I think that's all taken care of.

17:29:40 18           **MR. MASTERS:**  Then nothing else from us.

17:29:42 19           **THE COURT:**  Very good point.  We will allow our

17:29:44 20   jury to go back.

17:29:44 21       (Whereupon, the discussion at sidebar concludes.)

17:29:44 22                            -  -  -

17:29:44 23           **THE COURT:**  Okay.  Let me tell you a couple of

17:30:07 24   things quickly.  I'm going to hand you -- have my

17:30:10 25   courtroom deputy clerk, Ms. Currier, whichever one wants

```
17:30:16  1    it -- a verdict form, and it will have -- and the folder.
17:30:19  2    It's got the special verdict form, which has two pieces to
17:30:22  3    it.  It's got the stipulated facts, and it has the exhibit
17:30:25  4    list.
17:30:25  5            You will also be receiving, which we will print
17:30:28  6    out, a full set of the instructions, but I'm not going to
17:30:31  7    put it in there right now.  And you also have the ability
17:30:34  8    to ask for, and if you want them this evening, you can
17:30:37  9    stay as late as 7:00.  I see a "no" here.
17:30:41 10            But the point is that, if you ask for them, we
17:30:44 11    would do what you wanted to do.  What I will do here,
17:30:47 12    then, is I will hand it to -- I think I will hand it to
17:30:51 13    Ms. Currier or our CSO if he wants to.  In just a moment,
17:30:59 14    I will have you go back to the jury room.  If you can do
17:31:02 15    one thing, two things; one, we would like for you to stay
17:31:05 16    on the current schedule, which is coming in, certainly,
17:31:09 17    8:15, approximately, or very close to 8:15.  Everybody has
17:31:14 18    been really great about that, and then proceed to
17:31:17 19    deliberate.  But you can only do that when you have the
17:31:20 20    folder, so I'm going to hand the folder in a moment to you
17:31:24 21    as a group.  If you can agree on a presiding juror right
17:31:30 22    away, that's fine.  If there's going to be a campaign on
17:31:31 23    who it's going to be, then -- I don't think.
17:31:34 24            So my point is if you cannot quickly decide,
17:31:37 25    that's okay.  But if you do decide, that's fine, that's
```

17:31:39  1    probably the right kind of progress.  And that way, I will

17:31:42  2    ask you what you want to do in terms of schedule.  I

17:31:46  3    think -- I am looking to all of you -- the current

17:31:49  4    schedule is okay; is that right?

17:31:51  5            Okay.  So we're going to stay with that

17:31:52  6    schedule.  But if you decide, for example, tomorrow, if

17:31:55  7    you wanted to stay until 6:30, that would be fine.  But

17:32:00  8    you would need to tell us because the building starts to

17:32:03  9    close about seven?

17:32:08  10           **COURT SECURITY OFFICER:**  Five to the public.

17:32:11  11           **THE COURT:**  Oh, 5:00?  You're right.

17:32:12  12           But you're judges of the facts, so I think we

17:32:13  13   can make the other courtroom available to you.  So you can

17:32:17  14   tell me what your schedule is.  You also tell us about

17:32:20  15   your lunch schedule and so forth, this is what you want to

17:32:22  16   do.

17:32:23  17           So any time that you are -- when you go home,

17:32:25  18   for example, today, knock on the door, you return the

17:32:31  19   folder with the materials in it, and that will indicate to

17:32:33  20   us that you are not deliberating.  When you return

17:32:36  21   tomorrow, you will knock on the door and retrieve the

17:32:40  22   folder with the materials in it.  We will have all the

17:32:42  23   materials ready for you.

17:32:45  24           And then anytime you take a break, in the

17:32:48  25   morning, or lunch break, in which you are not going to be

17:32:52  1    deliberating.  Morning break and afternoon break are

17:32:56  2    usually non-deliberating breaks, but sometimes a jury

17:33:01  3    decides -- it will be up to you -- do you want to

17:33:03  4    deliberate during lunch, and you can have your lunch if

17:33:06  5    you want to, have it together.  But always remember that

17:33:10  6    you must all ten be together in the jury room able to hear

17:33:15  7    what's being said in order to deliberate.  So if somebody

17:33:20  8    takes a restroom break, just stop right there and restart

17:33:24  9    when everybody is available.

17:33:26 10            Ladies and gentlemen, we are going excuse you

17:33:28 11    at this time to the jury room to begin your deliberations,

17:33:31 12    and, of course, you can, then, when you are ready to go,

17:33:34 13    knock on the door, and I will let you come back in just

17:33:37 14    very briefly for dismissal for the day.

17:33:42 15            So I will let you all be excused.  It is up to

17:33:45 16    you to take off, and we will see you all shortly.

17:33:51 17        (The jury exits the courtroom at 5:33 p.m.)

17:34:45 18            **THE COURT:**  All right.  Be seated just for a

17:34:47 19    moment.  I want to go over your schedule.

17:34:55 20            Oh, let me check on the second page where you

17:34:58 21    found "conspiracy."

17:34:58 22            **MR. LEMIEUX:**  There was only one page for

17:35:00 23    "conspiracy."  That was Page 19.  And the other was a

17:35:05 24    numbering issue on Page 35.  Both of us said those are the

17:35:09 25    only things.

17:35:09  1          **THE COURT:**  I think we've got them.  We're

17:35:12  2   going to check that.

17:35:12  3          Now, your schedule is this.  You don't have to

17:35:14  4   be here tomorrow -- isn't that nice?  You can sleep in.

17:35:18  5   You don't have to be here tomorrow at 8:30 or nine.  You

17:35:26  6   know, there's no rush to your be here.

17:35:28  7          What you have to do is, and I'll leave with

17:35:34  8   staff, either Ms. Currier or our courtroom deputy, your

17:35:40  9   cell phone numbers.  And we absolutely have to have the

17:35:43 10   cell phone numbers for at least lead counsel, both -- you

17:35:47 11   know, the three lead counsel on both sides.  She may be

17:35:56 12   gone.  What I'm saying, if we can get the cell phone

17:35:59 13   numbers from three of you, I'm not going to worry about.

17:36:03 14          **MR. GOLDEN:**  No problem, Your Honor.  We will

17:36:04 15   certainly take care of it.

17:36:05 16          **THE COURT:**  Okay.  So we've got at least three

17:36:07 17   numbers because we want to be absolutely certain that we

17:36:09 18   can reach you, both of your respective teams.  And then we

17:36:14 19   expect you to be within, usually 15 minutes of the

17:36:18 20   courthouse.  You should be; I think you are now.

17:36:23 21          So that's -- and so we will call you as soon as

17:36:26 22   we get something from the panel.  And if we get an

17:36:31 23   administrative issue, you know, can we have more pizza

17:36:36 24   from wherever it is, we obviously don't call you.  But if

17:36:40 25   we get anything, we will call you and then we will have

17:36:43 1    you, at least part of your team here right away, so we can

17:36:46 2    answer a question the panel has.

17:36:48 3        You are not expected to have everybody around.

17:36:52 4    You know, you are expected to go. I know you've got other

17:36:55 5    things to work on, so that will be fine.

17:36:59 6        Now, if I don't hear from the panel by -- this

17:37:02 7    is the standard practice; you can make the time different

17:37:06 8    if you want, but if I don't hear from the panel by 4:45

17:37:11 9    tomorrow -- and I'm not saying I'm going to, and it's

17:37:13 10   probably better that I didn't -- then I need you to show

17:37:16 11   up at 4:45. I will know more about what the jury is

17:37:21 12   saying in terms of how long they want to stay.

17:37:24 13       If they want to go home at 5:30, I do want you

17:37:27 14   to check back in with me. Because there's always a chance

17:37:30 15   that everything failed, and we need to get in touch with

17:37:34 16   you, and somehow -- and so that's just a super backstop to

17:37:38 17   make sure that we can see, not your whole team, but

17:37:41 18   representatives as appropriate. I will send a couple, the

17:37:46 19   three lead counsel probably on both sides, and they want

17:37:48 20   to be here. I don't have to have everybody except lead

17:37:53 21   counsel, to figure out who they were in the sense. I want

17:37:57 22   you to feel comfortable. That's it.

17:38:00 23       So you actually have the day where you do not

17:38:02 24   have to show up at all until 4:45 unless we get a

17:38:07 25   question. I would not be surprised if we got a question.

17:38:15  1    That's pretty routine.  And then we've had -- well, we

17:38:20  2    will start with the process for that.  So I think that's

17:38:23  3    it.  I think everybody knows what we're doing.

17:38:30  4              Anything else?

17:38:32  5              MR. DeFOSSE:  So, Your Honor, the trial exhibit

17:38:34  6    I was referencing previously that will need to be

17:38:38  7    excerpted as Trial Exhibit 18, we'll work with counsel for

17:38:43  8    Akoustis to submit -- resubmit that.

17:38:47  9              THE COURT:  Okay.  You need to make sure that

17:38:49 10    that is taken care of.  They will get all those exhibits

17:38:52 11    tomorrow morning.

17:38:54 12              MR. DeFOSSE:  Okay.  Yes.  So we would ask,

17:38:55 13    obviously, that that exhibit be removed, and we will

17:38:58 14    submit a substitute.

17:39:00 15              THE COURT:  Removed and substituted.  I'm just

17:39:02 16    confirming that --

17:39:05 17              Mr. Lemieux, is that what you want to do on

17:39:07 18    that one?  Are you in charge of this?

17:39:10 19              MR. LEMIEUX:  I believe so, Your Honor.  We'll

17:39:12 20    work it out with counsel.  Again, it refers to the

17:39:15 21    judicial notice request, and so we'll work it out with

17:39:18 22    counsel as to what are the appropriate pages to be able to

17:39:21 23    send back.

17:39:23 24              THE COURT:  Okay, I understand that.  I think

17:39:25 25    that takes care of that.  Can you get that to me by what

17:39:29 1    time?

17:39:30 2         **MR. DeFOSSE:**  First thing tomorrow morning or

17:39:32 3    this evening, whatever the Court would prefer.

17:39:34 4         **THE COURT:**  Well, first thing tomorrow morning.

17:39:41 5    They are not coming in until 8:15 or so.  So if you get it

17:39:47 6    to us by 8:15.  I tell's you what; I need it by 8:00 just

17:39:55 7    in case.

17:39:55 8         If you are not resolved on it -- I think you

17:39:59 9    will be, but if you are not resolved, I want the team here

17:40:02 10   to -- whoever you want to discuss it.

17:40:04 11        **MR. DeFOSSE:**  Yes.  I think Your Honor has

17:40:05 12   already identified the pages that will come in, so we'll

17:40:08 13   submit those.  Would you prefer hard copy, I assume?

17:40:14 14        **THE COURT:**  Yes.

17:40:15 15        **MR. LEMIEUX:**  And, Your Honor, if we could just

17:40:15 16   confirm when you would like response back to the

17:40:19 17   Plaintiff's Rule 50A motions.

17:40:21 18        **THE COURT:**  Well, I thought about that, and I

17:40:24 19   know people have gotten pretty tired.  I was thinking that

17:40:28 20   we would get it by noon on Friday.  That's a long time.

17:40:35 21   And if you want to get it back earlier, that's fine.

17:40:39 22        **MR. ELKINS:**  I think we've -- I imagine.

17:40:41 23        **THE COURT:**  Is that reasonable?

17:40:42 24        **MR. ELKINS:**  It is absolutely reasonable.  It's

17:40:43 25   more than reasonable.  I anticipate we will probably file

17:40:45  1    by tomorrow, but having until noon Friday would be great.

17:40:49  2        **THE COURT:**  Well, I just think everybody's

17:40:51  3    worked hard and find that you're a little tireder than you

17:40:54  4    thought you were; maybe not, though.  Maybe everybody's

17:40:58  5    pretty rested.  Okay.  We'll get that by Friday at noon.

17:41:02  6    If there's a dispute on Exhibit 18, which I don't expect

17:41:07  7    there to be, then we will get everything -- you will need

17:41:11  8    to be here at 8:15.  I will need to know that by 8:00.

17:41:16  9    You can send me an e-mail at 7:30; doesn't matter.

17:41:20  10       If we do have to go, we'll meet at 8:15 to get

17:41:25  11   that resolved.

17:41:26  12       Is that it?  Anything else?  Seeing nothing

17:41:29  13   else.  In connection with the materials that you have in

17:41:31  14   the courtroom, the normal practice is that, of course, you

17:41:35  15   can remove everything that you need to, and your IT

17:41:41  16   personnel, I take it, are heading for the hills?

17:41:47  17       No, no.  I don't know.  That's why I'm asking.

17:41:48  18   I don't know what your plan is.

17:41:53  19       **THE CLERK:**  They are right outside the

17:41:54  20   courtroom.

17:41:55  21       **THE COURT:**  So I understand.  Thank you for

17:41:57  22   everything that you've been doing in that regard.  He

17:41:59  23   certainly makes cases a lot better, so I won't see you

17:42:04  24   again.  Appreciate that.

17:42:05  25       I think that covers everything.  I will be here

17:42:08 1    early, but you know what to do on the 18.  I will need to

17:42:12 2    have a hard copy in hand preferably at 8:00.  If it's all

17:42:19 3    prepared, you don't need to show up, obviously.  If there

17:42:21 4    is a dispute, though, be here at 815.  Otherwise, what

17:42:25 5    time do you have to be here in this matter, Mr. Masters if

17:42:30 6    nothing happens?

17:42:31 7             **MR. MASTERS:**  4:45.  I'll be here about five

17:42:33 8    minutes before that, actually, at 4:40.

17:42:36 9             **THE COURT:**  4:45.  I appreciate that.  That's

17:42:37 10   just a super backstop in case we have an issue to get

17:42:40 11   ahold of somebody.  I think that covers everything except

17:42:43 12   I have to wait for a minute and see what our panel is

17:42:45 13   going to do.  There are two ways I can handle this.  You

17:42:48 14   can all stay here until they advise us how they want to

17:42:52 15   proceed, or I can then let them myself, but if I do that,

17:42:58 16   everybody else will probably want to -- you probably want

17:43:02 17   two people here.  How do you want to handle it?  I'll let

17:43:06 18   them go home, but I do have to remind them when they come

17:43:09 19   back in, this is the first time they have been

17:43:12 20   deliberating.  They cannot now discuss with anybody at

17:43:16 21   home, so I just have to state that.  I think they want to

17:43:20 22   stay.  I'm watching.

17:43:41 23             They seem so young; nice to be that young.

17:43:59 24             Be at ease.  I'll just hang out up here.  I'm

17:44:04 25   not saying you can run around.  I'm just saying don't just

17:44:07  1    sit there.  Pack up whatever you need to do.

17:45:23  2        (Whereupon, a recess was taken.)

17:45:23  3        **THE COURT:**  We will be back in session.  The

17:45:24  4    jury is going to come in.  They are going come back on

17:45:28  5    regular schedule tomorrow.

17:45:58  6        (The jury enters the courtroom at 5:46 p.m.)

17:46:21  7        **THE COURT:**  All right.  Everybody can be

17:46:22  8    seated.

17:46:22  9        I understand we do have a residing juror, and

17:46:25 10    that's in seat Number 5, is that right?  Who is the

17:46:29 11    presiding juror?  Number 6.  I was misled.

17:46:38 12        Oh, Mr. Snader.

17:46:38 13        **PRESIDING JUROR:**  Yes.

17:46:38 14        **THE COURT:**  Okay, well.

17:46:40 15        What we are going to do is -- I need to remind

17:46:43 16    everybody, anytime the jury goes home after they start the

17:46:45 17    deliberating process, we do one more reminder of the seven

17:46:50 18    things that we've got to do.  And then after tomorrow, we

17:46:53 19    will start with tomorrow, you can tell us when you want to

17:46:56 20    leave at the end of the day; although, I do encourage you

17:47:01 21    to stay a little extra just to see how far you can get.

17:47:06 22        Okay.  Well, when you come in tomorrow, then,

17:47:08 23    we will have the exhibits all ready for you.  They will be

17:47:12 24    in the back.  We will have the folder all ready with the

17:47:15 25    extra set of instructions in the back or with the Court

17:47:18  1    security officer.  And you know how to go through that

17:47:21  2    process and so forth.

17:47:23  3        I have to remind you, anytime you are going

17:47:27  4    home a different change of circumstances, that you cannot

17:47:29  5    speak with anybody at home about the case.  I don't think

17:47:33  6    anybody in this case would want to, honestly.  I don't

17:47:37  7    think there's much reason to, but the point there is that

17:47:41  8    we have changed what you're doing; and, therefore, we are

17:47:45  9    bestowing the seven factors.

17:47:46 10        The first thing is, when you are not together

17:47:49 11    in the jury room, you cannot discuss the case.  And that

17:47:51 12    sometimes gets confused.  And so, you know, if somebody is

17:47:55 13    eating lunch with somebody else, you cannot discuss the

17:47:58 14    case unless all ten of you are part of that conversation.

17:48:02 15        So, one, don't discuss the case among

17:48:04 16    yourselves unless all ten of you are together and are

17:48:08 17    there to discuss the case.  You can discuss the case

17:48:11 18    during lunch if you want to, and jurors often do that.  It

17:48:16 19    is entirely up to you.  You may want to have a break.  But

17:48:19 20    you, obviously, during restroom breaks so forth, there's

17:48:23 21    no discussion.

17:48:24 22        You remember to lock the door when you return,

17:48:26 23    and that's our signal to know that you are deliberating,

17:48:28 24    you're not deliberating, we need to know that.

17:48:31 25        The second thing is that not only can you not

17:48:33  1    discuss the case amongst yourselves when you're not all

17:48:36  2    ten together discussing the case, but you can't talk with

17:48:39  3    anybody else about it, including individuals at home, and

17:48:43  4    that's the main reason for this gathering so you remember

17:48:44  5    you cannot do that.

17:48:46  6            The third thing is that you can't speak to

17:48:48  7    witnesses, lawyers, or parties.  And I need to let you

17:48:51  8    know that this will now change, and they will not all be

17:48:56  9    here.  And that is perfectly routine, and that is normal.

17:49:00 10    It doesn't mean that somebody is not interested at all.

17:49:03 11    It just means that we all have things to do.  And,

17:49:05 12    actually, we have a communication system where they may be

17:49:09 13    working off-site, and will be here very promptly if they

17:49:13 14    need to return.  So that does not mean anything at all

17:49:16 15    done.  But, obviously, you know you can't speak to them,

17:49:19 16    they can't sneak to you and so forth.

17:49:22 17            The fourth thing is, if anybody tries to speak

17:49:24 18    to you about the case, it would be extraordinarily

17:49:27 19    unusual, and you do need to tell the court security

17:49:30 20    officer or tell my staff or me and we will take the

17:49:32 21    appropriate steps.

17:49:35 22            The fifth thing is, don't do any research or

17:49:36 23    make any inquiry.  We've gone over that in great detail,

17:49:40 24    absolutely prohibited; you all know not to do that.

17:49:43 25            The sixth thing is to avoid things in the media

17:49:45  1    that might be about this case or cases like it.  Also want

17:49:48  2    to caution you, you need to avoid things that might be

17:49:50  3    about any parties in the case.  Obviously, that's

17:49:53  4    something you don't need to do, and even if an entity is a

17:49:56  5    public entity, you cannot look up any information about

17:49:58  6    it.  Just be mindful of that.  And if somehow that has

17:50:01  7    inadvertently occurred at some point, you need to tell me

17:50:05  8    about it.  Probably is not a problem, but certainly not a

17:50:07  9    problem, but you have to let me know.

17:50:10 10         And then the last thing is that you have to

17:50:12 11    continue to keep an open mind, because the deliberating

17:50:14 12    process contemplates that you are all discussing the case

17:50:16 13    among yourselves before you make up your mind on each

17:50:21 14    factor as you go forward.  There are a number of questions

17:50:24 15    to be asked, so continue to keep an open mind.  And go

17:50:27 16    through that deliberating process, that discussion.

17:50:32 17         All right well, I understand we will see you

17:50:34 18    here -- I want to make sure we've got this right now.

17:50:37 19         So, Mr. Clayton, I want to make sure, what

17:50:41 20    times are you guys coming in tomorrow?

17:50:47 21         **THE JUROR:**  8:30.

17:50:48 22         **THE COURT:**  8:30?  You have a casual day.

17:50:49 23    That's okay.  And I will be here, obviously, but I do not

17:50:53 24    require the parties to be here.  They are close by, and so

17:50:56 25    you will probably see no one, draw no inference at all

17:51:00 1    from that.

17:51:01 2          And then I think that covers everything we need

17:51:05 3    to cover.  You know all you have to do tomorrow is when

17:51:07 4    you come in, all ten of you together, knock on the door,

17:51:10 5    retrieve the folders.  Alex will be here and will provide

17:51:13 6    you with the exhibits, and you will have everything that

17:51:16 7    you will be entitled to have.  You will be ready to go.

17:51:21 8          Thank you all very much.  Okay, tomorrow

17:51:23 9    evening -- I said it once already; I will say it one more

17:51:26 10    time, it will not be -- you will tell me what you want

17:51:29 11    your schedule to be.  I will need to know that, if that's

17:51:33 12    okay.

17:51:34 13          All right.  Thank you all very much, and we

17:51:35 14    will see you -- at what time are we going to see

17:51:39 15    everybody, again, Mr. Rodman, tomorrow?

17:51:43 16          **THE JUROR:**  8:30.

17:51:44 17          **THE COURT:**  You guys will be together at 8:30.

17:51:46 18    No problem.  Everybody was -- you didn't have too much

17:51:53 19    trouble getting in this morning.  You had an accident on

17:51:55 20    the interstate, on the highway.  I think Ms. Rodriguez

17:52:01 21    did.  She did.  Thank you for calling in.  I do appreciate

17:52:07 22    that.  So that's exactly what she did.

17:52:10 23          Let you all be excused; I will stay here just

17:52:12 24    for a moment.

17:52:14 25       (The jury exits the courtroom at 5:52 p.m.)

**THE COURT:** Everybody can be seated. I think we have concluded everything that we need to do today. So clear your places and adjourn for today.

(The proceedings concluded at 5:52 p.m.)

CERTIFICATE OF COURT REPORTER

I hereby certify that the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Bonnie R. Archer
Bonnie R. Archer, RPR, FCRR
Official Court Reporter
U.S. District Court